# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-_____ |
| Debtors. | Joint Administration Requested |

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING, BUT NOT REQUIRING, THE DEBTORS TO HONOR CERTAIN PREPETITION OBLIGATIONS TO CUSTOMERS AND TO OTHERWISE CONTINUE PREPETITION CUSTOMER PROGRAMS AND PRACTICES IN THE ORDINARY COURSE OF BUSINESS

The above-captioned debtors and debtors in possession (each a "Debtor" and

collectively, the "Debtors") hereby move this Court (the "Motion") pursuant to sections 105(a),

363, 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code") for entry of

an order authorizing, but not requiring, the Debtors to honor certain prepetition obligations to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (6232); Tribune Entertainment Company (6231); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

customers and to otherwise continue their prepetition customer programs and practices in the ordinary course of business. The facts and circumstances supporting this Motion are set forth in the concurrently filed Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company, in Support of First Day Motions (the "Bigelow Affidavit"). In further support of the Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1.    On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including an order to have these cases jointly administered.

2.    The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    No request has been made for the appointment of a trustee or examiner and no official committee has yet been established in these cases.

4.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a), 363, 1107(a) and 1108 of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

5.    Debtor Tribune Company ("Tribune") is America's largest employee-owned media company and is the ultimate parent company of each of the Debtors. The Debtors operate

businesses in publishing, interactive, and broadcasting. These operations are conducted through two business segments: (i) publishing and (ii) broadcasting and entertainment.

6.    The Debtors' publishing segment currently operates eight (8) market leading daily newspapers and related businesses, distributes entertainment and syndicated content, and manages a 24-hour cable news channel. The Debtors are the nation's third largest newspaper publisher in terms of revenue and circulation. Daily newspapers published by the Debtors include the Los Angeles Times and the Chicago Tribune. The Debtors' publishing segment also manages the websites of their daily newspapers, television stations, and other branded sites targeting specific communities of interest. As of the Petition Date, the Debtors' publishing segment employed approximately 12,000 full-time equivalent employees.

7.    The Debtors' broadcasting and entertainment segment includes 23 television stations, WGN America, WGN-AM, and the Chicago Cubs baseball team.[2] Through their television stations and WGN America, the Debtors' broadcasting and entertainment segment reaches more than 80% of television households in the United States. Thirteen (13) of the Debtors' stations are affiliates of The CW Television Network, America's "fifth" major broadcast network. Seven (7) are affiliates of Fox Broadcasting Network. As of the Petition Date, the Debtors' broadcasting and entertainment segment employed approximately 2,600 full-time equivalent employees.

8.    The Debtors are based in the United States, with headquarters located in Chicago, Illinois. In fiscal year 2007, the Debtors and their non-debtor subsidiaries (collectively, the "Tribune Entities") recorded revenues of approximately $5.1 billion, resulting in net income

---

[2] The broadcasting and entertainment segment also includes the subsidiaries that own the Chicago Cubs baseball operations and an equity interest in regional sports network Comcast SportsNet Chicago, LLC, which are not Debtors in these cases.

of approximately $87.0 million.  During this time, the publishing segment contributed

approximately 72% of the Tribune Entities' revenue and the broadcasting and entertainment

segment contributed approximately 28% of the Tribune Entities' revenue.  Advertising revenue

is the primary source of revenue for both the publishing and broadcasting and entertainment

segments.  For the quarterly period ended September 28, 2008, the consolidated financial

statements of the Tribune Entities reported approximately $7.6 billion in total assets and

approximately $13.9 billion in total liabilities.

## RELIEF REQUESTED

9.    Prior to the Petition Date, and in the ordinary course of their business

operations, the Debtors engaged in certain practices to develop and sustain a positive reputation

for their publications, syndicated content offerings, broadcast stations, cable networks and

interactive websites with subscribers and advertisers and in the marketplace generally

(collectively, the "Customer Programs").  The Customer Programs, many of which are

customary in the Debtors' industries, include, among others, rebates, prepayments, refunds,

adjustments, customer service programs and delivery programs, each of which is described in

greater detail below.  The goals of the Customer Programs are to meet competitive pressures,

ensure customer and advertiser satisfaction and generate goodwill for the Debtors, thereby

retaining current customers and advertisers, attracting new ones and ultimately enhancing

revenue and profitability.

10.  By this Motion, the Debtors seek entry of an order, pursuant to sections

105(a), 363, 1107(a) and 1108 of the Bankruptcy Code, authorizing the Debtors, in their

discretion, to perform the Debtors' prepetition obligations related to the Customer Programs as

they determine advisable.  Accordingly, the Debtors desire to continue during the postpetition

period those Customer Programs that they believe are beneficial to the Debtors' businesses.  The

4

Debtors believe that such relief is necessary to preserve the Debtors' critical customer and

advertiser relationships. The total operational and administrative costs to the Debtors to continue

the Customer Programs is relatively insignificant when compared to the revenue that the Debtors

generate from their subscribers and advertisers. For the reasons set forth herein, the Debtors

assert that it is in the best interests of the Debtors and their estates to continue, in the ordinary

course of business, the Customer Programs.

   11. In addition, in light of the fact that some of the Customer Programs, as they

relate to prepetition agreements regarding the Debtors' publishing and broadcast and

entertainment businesses, may represent unperformed prepetition obligations, the Debtors seek

this Court's authorization to perform the Debtors' obligations related to the Customer Programs.[3]

Because the Debtors' industries are highly competitive, some of their subscribers may cease to

purchase the Debtors' publications and turn to other sources if the Debtors fail to timely perform

their obligations under the Customer Programs. Similarly, parties who advertise in or subscribe

to the Debtors' products may cease to conduct business with the Debtors due to the Debtors'

failure to honor their obligations under the Customer Programs. For these reasons, and those

discussed above, maintaining the Customer Programs is necessary in order for the Debtors to

stay competitive and maintain their customer base during the course of these chapter 11 cases.

## CUSTOMER PROGRAMS

---

[3] Nothing contained herein shall constitute, nor shall it be construed as, a request to assume or adopt any executory contract with respect to any customer. The Debtors expressly reserve all rights with respect to the continuation or cessation of any contract with any customer and the assumption, adoption, modification or rejection of any executory contract with any customer. Furthermore, the Debtors reserve the right to contest the amounts claimed to be due, if any, by any customer in the ordinary course of business.

12.   The Debtors seek to continue the Debtors' Customer Programs because they have produced positive results in the past and are responsible for generating valuable goodwill, repeat business and increased revenue.  The Debtors believe that continuing these Customer Programs in the ordinary course of business during these chapter 11 cases is essential to maximizing the value of their estates for the benefit of all creditors.  Furthermore, all of the Debtors' Customer Programs are standard in the Debtors' industries and are therefore necessary in order to keep pace with the Debtors' competitors.  The following are general descriptions of the prepetition obligations relating to the Debtors' Customer Programs.

## I.    Advertising Programs

13.   The vast majority of the Debtors' revenue comes from advertising, with the remainder coming mostly from subscriptions.  Advertising revenue accounts for approximately 73% of the Debtors' total publishing revenue, and approximately 95% of the Debtors' total broadcasting revenue.[4]  There are several types of Customer Programs related to the Debtors' advertising services (the "Advertising Programs").  The Debtors' Advertising Programs, each of which is described more fully below, include (i) advertising rebates and related discounts or price adjustments (the "Rebate Program"); (ii) broadcasting audience delivery guarantees (the "Make-Good Program"); (iii) online audience guarantees (the "Online Advertisement Program"); and (iv) correction of improperly run ads (the "Error Credit Program").

### a.   The Rebate Program

14.   The Debtors offer rebates, allowances, discounts and other price adjustments (the "Rebates") to certain advertisers to incentivize such advertisers to purchase large volumes of print advertising from the Debtors.  These Rebates, which are limited to those advertisers purchasing the largest volume of print advertising, are custom-negotiated by the Debtors and the

---

[4] This estimate excludes advertising revenue generated by a certain non-debtor affiliate.

advertisers to fit the specific demands of the advertisers.  The Rebate program is consistent with customary industry practice and has been employed by the Debtors for several years.

15.    Typically, the Debtors will accrue Rebates monthly, with such amounts paid in cash or otherwise credited to the advertiser monthly, quarterly, or annually, depending on the specific terms of the applicable Rebate agreement.  As of the Petition Date, the Debtors believe that there is approximately $5,000,000 of potential liability outstanding in connection with the Rebates.  However, in light of the fact that many of these Rebates are granted in the form of a credit applied to a particular advertiser's account, the Debtors believe that their actual cash liability to their advertisers with respect to Rebates will be considerably lower.  By this Motion, the Debtors request the authority, but not direction, to continue the Rebate Program and to honor any prepetition amounts outstanding in connection therewith.

b.    The Make-Good Program

16.    The Debtors' also provide television and radio advertising services to their advertisers.  If, in connection with these services, an advertisement does not reach a requisite audience base or demographic, the Debtors will, in accordance with their Make-Good Program, rerun the advertisement to make up for the audience underdelivery (the "Audience Underdelivery") at no additional charge to the Debtors' advertiser.[5]

17.    In order to estimate the value of advertising spots that may be owed on account of a failure to deliver a requisite audience base, the Debtors utilize a standardized valuation methodology which measures the estimated audience for an advertisement.  An estimate is generated from this valuation, and, at any point during a specified year, this figure represents a reasonable estimate against which the Debtors calculate Audience Underdelivery

---

[5] In very limited circumstances the Debtors may issue a credit to the advertiser's account to be credited towards future advisements.  However, the Debtors believe that no such liability currently exists.

liability. The Debtors estimate that, as of the Petition Date, up to approximately $4,600,000 of

potential liability is outstanding in connection with the Make-Good Program. However, the

Debtors anticipate that little, if any, cash payments will actually be made to advertisers on

account of this liability. Instead, the Debtors anticipate that this liability will be satisfied by

providing additional advertising services to their advertisers.

18. The Make-Good Program is intended to ensure the satisfaction of the

Debtors' advertisers and to retain their long term business. The Debtors failure to honor the

Make-Good Program could severely undermine advertiser satisfaction and may potentially result

in the loss of advertisers to competitors providing similar programs. Accordingly, the Make-

Good Program is essential to preserving the goodwill of the Debtors' advertisers and ensuring

that they do not seek alternatives for their advertising needs. By this Motion, the Debtors request

the authority, but not direction, to continue the Debtors' Make-Good Program and to honor all

prepetition obligations owed in connection therewith.

c. Online Advertisement Program

19. As mentioned above, the Debtors' business operations include several

interactive websites related to their daily newspapers, television stations, and other branded sites

targeting specific communities of interest. Among other things, the Debtors' websites provide

online advertisements on behalf of various businesses. Parties utilizing the Debtors' online

advertisement services are generally billed by the number of times an online advertisement is

viewed ("Impressions"). The Debtors often guarantee their advertisers a certain number of

Impressions for each advertisement. If the requisite number of Impressions is not achieved,

under the Online Advertisement Program, an advertiser may generally elect to either pay only for

those Impressions that were delivered or to have the Debtors continue the advertisement for an additional period of time at no added cost.

20.    The Debtors generally do not issue cash refunds to their advertisers in connection with the Online Advertising Program.  As a result, the Debtors' do not believe that there is any cash liability owing to advertisers as of the Petition Date on account of the Online Advertisement Program.  Instead, the Debtors' obligations related to this program are primarily to provide additional advertisement slots to advertisers or to issue credits to such advertisers for future advertising services.  The Debtors believe that this program is an essential component to maintaining the satisfaction of their advertisers utilizing online advertisement services. Therefore, by this Motion, the Debtors request the authority to continue the Online Advertisement Program and to honor all prepetition obligations related thereto.

d.  Error Credit Program

21.    The Debtors regularly print advertisements in their various publications for advertisers.  Despite the Debtors' best efforts, given the enormous size of the Debtors' print advertising businesses, from time to time advertisements are run with errors or are otherwise not to the advertiser's satisfaction.  To the extent such issues occur, under the Error Credit Program, the Debtors will rerun the advertisement at no additional charge.  In certain limited circumstances, if an advertising error cannot be corrected by rerunning the advertisement, the Debtors will issue a credit to the advertiser's invoice.

22.    As of the Petition Date, the Debtors estimate that there may be as much as $1,500,000 of potential liability outstanding with respect to the Error Credit Program.  However, because the Debtors' primary obligations associated with the Error Credit Program are to rerun advertisements or, where necessary, to issue a credit to the advertiser's invoice, the Debtors do

not believe that there are any cash payments outstanding to their advertisers as of the Petition

Date on account of the Error Credit Program.

23.  The Debtors believe that their ability to continue providing the services

rendered in connection with the Error Credit Program is an essential element of their print

advertising business.  Accordingly, by this Motion, the Debtors request the authority, but not

direction, to continue the Error Credit Program and to honor all prepetition obligations related

thereto.

## II.   Delivery Service Program

24.  The Debtors provide delivery services for certain non-affiliated newspaper

companies (the "Newspaper Companies") in defined geographical areas (the "Delivery Service

Program ").  These delivery services, which vary among each Newspaper Company, include

"home delivery" and "single copy" delivery services.  For home delivery service, the Debtors

deliver newspapers directly to the Newspaper Companies' subscribers.  For single copy delivery

services, the Debtors deliver the Newspaper Companies' newspapers to newsstands, stores, or

other retail locations.  As a part of their services to the Newspaper Companies, the Debtors

collect the proceeds owed to the Newspaper Companies from these retail locations.  In some

instances, the Debtors also agree to buy newspapers from the Newspaper Companies at a

wholesale price which the Debtors then resell to retailers.  The Debtors collect the proceeds from

such retail sales.

25.  As compensation for the delivery services, the Debtors are generally paid a

set price per copy delivered.[6]  In certain instances, the Debtors remit the proceeds collected on

behalf of the Newspaper Companies to such companies who in turn separately forward payment

to the Debtors for the Debtors' services.  However, in most instances, the Debtors deduct the fees

---

[6] In rare instances, the Debtors are paid a set price per copy delivered and an additional flat fee.

they are owed in connection with the Delivery Service Program from the proceeds collected from the retailers. To the extent the proceeds exceed the amounts due to the Debtors under the Delivery Service Program, the Debtors remit such excess to the appropriate Newspaper Company.

26.    As of the Petition Date, the Debtors estimate that due to the deduction of fees owed to the Debtors, the Debtors do not have any cash payment obligations to the Newspaper Companies. However, the Debtors request the authority, but not direction, to honor all prepetition obligations to the Newspaper Companies, including the exercise of any setoff rights with respect to amounts owed to the Newspaper Companies, and to otherwise honor the Delivery Service Program.

**III.    Direct Mail Program**

27.    The Debtors also provide certain direct marketing services to customers seeking to distribute advertisements and similar materials directly to the homes and offices of a geographically defined market base. These services typically involve mailing a customers' print media directly to a specified mailing list on or before a certain date (the "Direct Mail Program"). Under the Direct Mail Program, the Debtors' customers are responsible for paying postage costs associated with the delivery of their direct mailing products. The USPS is the primary method the Debtors use to ship such direct mailing products. The Debtors typically provide their customers with an estimate of the postage charges (the "Postage Estimate") approximately seven (7) to ten (10) days before the direct mailing products are scheduled to be shipped. Customers may either (i) remit the amount due under the Postage Estimate directly to the Debtors, (ii) write checks made payable to the USPS to be delivered to the USPS by the Debtors, or (iii) pay USPS directly. If the customer chooses to pay the Debtors rather than the USPS, their payment is

deposited in a centralized Direct Mail Program account (the "Postage Account"). The Debtors

then pay the USPS out of the Postage Account. To the extent a customer provides the Debtors

with postage-related funds in excess of the actual postage charges, such excess funds are

returned to the customer.

28.    As of the Petition Date, the Debtors estimate that they have in their

possession approximately $2,600,000 in respect of postage funds advanced by customers under

the Direct Mail Program. The Direct Mail Program provides an enormous benefit to the

Debtors' direct marketing customers not only through access to a certain marketing

demographic, but also by relieving the customers from the burden of mailing the print media

themselves. To the extent that the Debtors' fail to honor their obligations under the Direct Mail

Program, the Debtors' customers will likely seek other providers for such services and cease

doing business with the Debtors. Accordingly, by this Motion, the Debtors request the authority,

but not direction, to honor any prepetition obligations outstanding in connection with the Direct

Mail Program.

**IV.    Billing Adjustments**

29.    Despite the Debtors best efforts, from time to time in the Debtors' publishing

and broadcast and entertainment businesses, subscribers and advertisers are invoiced in error for

amounts that they did not actually incur. Such errors include improper invoicing (when the

invoice created does not properly reflect the items ordered by a customer), duplicate payment

(when a customer makes two payments on account of the same order), mis-pricing (when a

customer is charged or pays an incorrect price – either too high or too low – for the Debtors

products), mis-run advertisements (where the wrong version of a radio or television

advertisement is aired or the advertisement is aired at the incorrect time), and various other

billing and payment errors (collectively, the "Invoicing Errors").  Where a customer pays for

such amounts invoiced in error, the Debtors correct the Invoicing Errors through billing

adjustments (the "Billing Adjustments").

30.    Because there is some delay from the time the invoice is first issued to the

time the Invoicing Error is first realized, it is difficult to predict with certainty the amount

outstanding on account of such errors.  However, as of the Petition Date, the Debtors estimate

that approximately $4,500,000 is outstanding in connection with Billing Adjustments.  It is

essential that the Debtors be able to continue to refund amounts due under such Invoicing Errors

to their customers in order to maintain the customers' business and preserve the long-term

goodwill of the Debtors businesses.  By this Motion, the Debtors request authority, but not

direction, to continue issuing Billing Adjustments and to honor the prepetition amounts owed in

connection therewith.

## IV.    Customer Service Program

31.    In order to best serve their customers, the Debtors have engaged the services

of certain third-party customer service representatives to address inquiries and issues related to

the Debtors' advertising services and publications, including, but not limited to, newspaper

subscription issues, delivery issues, billing questions, advertising customer accounting, online

technical issues, and debt collection services (the "Customer Service Providers").  The Customer

Service Providers provide these services primarily through outsourced customer call centers.

32.    The Customer Service Providers function as a critical intermediary between

the Debtors and their customers.  Due to the direct level of contact between the Customer

Service Providers and the Debtors' customers, many customers perceive the Customer Service

Providers as direct employees of the Debtors.  As a result, the failure of the Customer Service

Providers to adequately perform their services could severely undermine customer loyalty. Furthermore, the services provided by the Customer Service Providers are based on countless hours of planning, organization and training by both the Debtors and the Customer Service Providers. The cost to the Debtors' estates to formulate an alternative program with new providers and to train new customer service representatives would greatly outweigh the cost of paying the Customer Service Providers for their prepetition services.

33.   Customer Service Providers generally invoice the Debtors for services rendered in the previous month in an amount based on the volume of calls received. [7] Because the Customer Service Providers generally bill in arrears, the Debtors estimate that, as of the Petition Date, approximately $825,000 is due and owing to Customer Service Providers. As set forth above, it is imperative that the Debtors be authorized to pay any prepetition amounts owing to the Customer Service Providers and continue to honor their obligations to the Customer Service Providers. By this Motion, the Debtors request the authority, but not direction, to pay all prepetition amounts outstanding on account of the services provided by the Customer Service Providers and to continue utilizing the Customer Service Providers, in the ordinary course of business.

## VI.    Prepayments

34.   There are certain instances when the Debtors receive payments from their customers in advance of providing goods and services (the "Prepayments"). For instance, in the Debtor's publishing businesses, nearly all subscribers prepay for newspaper subscriptions in advance of being provided the newspapers (the "Prepaid Subscriptions"). The Debtors' also

---

[7] Customer Service Providers providing debt collection services on the Debtors' behalf (the "Collection Agents") are paid on a contingency fee basis. Specifically, the Collection Agents are paid a set percentage of overdue debt that is successfully collected on the Debtors' behalf. The Collection Agents net out the set percentage due to them from the amounts collected from the Debtors' customers before remitting the collected amounts to the Debtor.

receive payments from certain advertisers in advance of providing broadcasting or publication advertising slots for such advertisers (the "Prepaid Advertisements").  Additionally, certain customers prepay the Debtors to place customer inserts, such as weekly magazines and other media inserts, into the Debtors' newspapers (the "Prepaid Inserts").  The Debtors generally do not incur actual cash liability on account of the Prepaid Subscriptions, Prepaid Advertisements, and Prepaid Inserts, but instead incur the obligation to deliver the prepaid subscriptions, advertisements, and inserting services.  However, in the event a Prepaid Subscription, Prepaid Advertisement, or Prepaid Insert is cancelled by a customer, in certain instances, the Debtors are obligated to return unused prepaid amounts (the "Refunds").  Generally, the Debtors issue Refunds totaling approximately $13,000,000- $14,000,000 per year.

35.  Continuing the Debtors' practices with respect to Prepayments and Refunds is essential to the maintenance of the Debtors' ongoing business operations.  For example, newspaper subscriptions represent approximately 13% of the Debtors' publishing revenue.  If the Debtors were to cease to be able to issue Refunds to subscribers who cancel Prepaid Subscriptions, or otherwise be unable to perform their obligations to their prepaid subscribers, the Debtors' goodwill could be severely undermined, and, consequently, the Debtors could lose subscribers.  It is therefore crucial that the Debtors be able to issue such Refunds and generally perform their obligations to deliver Prepaid Subscriptions to their subscribers.

36.  Similarly, as mentioned above, advertising provides the largest source of the Debtors' revenue.  Accordingly, the revenue generated by the Debtors from their advertisers represents a significant portion of the Debtors' total revenue.  The Refunds issued to advertisers are comparatively minute in contrast to the amount of revenue generated by the advertisers.  Any suspension in the Debtors' performance of their obligations on account of Prepaid

Advertisements may result in the loss of advertisers and could have devastating effects on the Debtors' ability to generate revenue going forward. Similarly, with respect to Prepaid Inserts, any failure of the Debtors to issue Refunds to customers for unused Prepayments could jeopardize the Debtors' ability to continue doing business with such customers in the future. It is therefore crucial that the Debtors be able to issue Refunds to their advertisers and generally perform their obligations to run advertisements and distribute inserts that have been prepaid.

37.    As of the Petition Date, the Debtors believe that they are holding approximately $62,700,000 on account of Prepayments, and that there is approximately $500,000 outstanding in connection with Refunds. By this Motion, the Debtors request the authority, but not direction, to honor their prepetition obligations with respect to Prepaid Subscriptions, Prepaid Advertisements, Prepaid Inserts, and other prepaid customers, and to issue Refunds for any amounts owed to customers in connection therewith, whether by check directly to the customer or through the customers' applicable credit card company.

38.    The motion further seeks authorization for the applicable banks asked to process, honor and pay any and all checks on account of claims with respect to Customer Programs to rely on the representations of the Debtors as to which checks are issued and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

## BASIS FOR RELIEF

39.    Sections 1107(a) and 1108 of the Bankruptcy Code authorize a debtor in possession to operate its business. Further, section 363(c) of the Bankruptcy Code authorizes a debtor in possession operating its business pursuant to section 1108 of the Bankruptcy Code to use property of the estate in the ordinary course of business without notice or a hearing.

40.   The Court may also authorize continuation of the Customer Programs under section 363(b) of the Bankruptcy Code.  That section provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1) (2004).  Under this section, a court may authorize a debtor to pay certain prepetition claims.  See Ionosphere Clubs, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing payment of prepetition claims where the debtors articulate "some business justification, other than the mere appeasement of major creditors"); see also In re James A. Phillips, Inc., 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing, pursuant to section 363, a contractor to pay prepetition claims of some suppliers who were potential lien claimants, because the payments were necessary for the general contractors to release funds owed to the debtors).  As discussed more fully herein and in the Bigelow Affidavit, the importance of the Debtors' advertisers and subscribers to their business operations cannot be overstated.  As a result, the relief requested herein is necessary to maintain the value of the Debtors' estates for the benefit of all creditors, and therefore should be granted.

41.   Additionally, section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  Under section 105(a), the Court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor."  In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); see also In re Just for Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999) ("to invoke the necessity of payment doctrine, a debtor must show that

payment of the prepetition claims is critical to the debtor's reorganization"). The Debtors submit that maintenance of the Customer Programs is critical to their reorganization efforts and should therefore be approved under section 105(a) of the Bankruptcy Code.

42.    Retaining loyalty and patronage of customers is critical to successful chapter 11 cases, and courts in this District have thus routinely granted relief similar to that requested here. See, e.g., In re Hilex Poly Co. LLC, et. al., Case No. 08-10890 (Bankr. D. Del. May 7, 2008) (KJC); In re Linens Holdings Co., et. al., Case No. 08-10832 (CSS) (Bankr. D. Del. May 2, 2008); In re Buffets Holding, Inc., Case No. 08-10141 (Bankr. D. Del. Jan. 23, 2008) (MFW) (entered by BLS); In re Remy Worldwide Holdings, Inc., et al., Case No. 07-11481 (Bankr. D. Del. Oct. 10, 2007) (KJC); In re Holliston Mills, Inc., Case No. 07-10687 (Bankr. D. Del. May 23, 2007) (MFW); In re Pliant Corp., et al., Case No. 06-10001 (Bankr. D. Del. Jan. 4, 2006) (MFW); In re Meridian Automotive Systems-Composites Operations, Inc., Case No. 05-11168 (Bankr. D. Del. April 27, 2005) (MFW); In re Ultimate Electronics, Inc., et al., Case No. 05-10104 (Bankr. D. Del. Jan. 12, 2005) (PJW); In re KB Toys, Inc., Case No. 04-10120 (Bankr. D. Del. Jan. 16, 2004) (PJW). The Debtors respectfully submit that similar relief is warranted in these chapter 11 cases.

43.    Finally, as described by one court, prepetition customer claims clearly meet the requirements for postpetition payment because without satisfaction of prepetition customer claims, a debtor's goodwill and its going concern value will be destroyed. In re CoServ, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Maintaining the Debtors' ability to generate revenue will be absolutely crucial to the Debtors' ability to confirm a plan of reorganization that will provide a basis for the long-term success and profitability of the Debtors, to the benefit of all of the Debtors' constituencies. In addition, as described above, the damage to the Debtors'

18

prospects for rehabilitation if the Debtors were put in a position where their Customer Programs could no longer be honored is clearly disproportionate to the relatively small cost of maintaining the Customer Programs.

44.    Accordingly, the success, viability and revitalization of the Debtors' business is dependent upon the development and maintenance of customer loyalty, especially through the Debtors' subscribers and advertisers.  The commencement of these chapter 11 cases will no doubt create apprehension on the part of subscribers, advertisers and other customers of the Debtor or potential subscribers, advertisers and customers regarding their willingness to continue or commence doing business with the Debtors.  The Debtors believe that without the requested relief, the stability of the Debtors' businesses will be significantly undermined and otherwise loyal subscribers and advertisers may explore alternative sources for the Debtors' products and services.  As described above, the damage that would result if the Debtors fail to honor their prepetition obligations with respect to the Customer Programs significantly outweighs any arguable harm to the Debtors' estate.  To preserve the value of the Debtors' business, the Debtors must be permitted, in their sole discretion, to continue honoring or paying all Customer Programs without interruption or modification.  In addition, to provide necessary assurances to subscribers, advertisers and other customers on a going-forward basis, the Debtors request authority to continue honoring or paying all obligations to subscribers, advertisers and other customers that arise in the ordinary course of the Debtors' business from and after the Petition Date.

45.    Additionally, pursuant to the recently revised Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 20 days after the Petition Date if such relief is necessary to avoid immediate and irreparable harm.  As described above, the Customer Programs are vital to the Debtors' operations and are necessary to

maintain the amiable relations and goodwill of the Debtors' subscribers and advertisers. Failure to satisfy the Customer Programs in the ordinary course of business during the first 20 days of the chapter 11 cases would cause irreparable damage to the Debtors' relationships with their subscribers and advertisers, and by extension, the Debtors' reorganization efforts.

46.    Accordingly, the Debtors have satisfied the requirements of Bankruptcy Rule 6003, and authorizing but not directing the Debtors, in their discretion, to honor prepetition obligations to customers and continue the Customer Programs is in the best interests of the Debtors, their estates and their creditors.

## NOTICE

47.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) the administrative agents for the Debtors' prepetition loan facilities; and (vii) the indenture trustee for the Debtors' prepetition notes. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

48.    The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as Exhibit A, (i) authorizing, but not directing, the Debtors to honor their prepetition obligations to their customers and to continue the Customer Programs in the ordinary course of business, and (ii) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
      December 8, 2008

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Jessica C.K. Boelter
Kerriann S. Mills
Bridget J. Hauserman
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

     -and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
1000 N. West Street, Suite 1200
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

PROPOSED ATTORNEYS FOR
DEBTORS AND DEBTORS IN
POSSESSION