# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-_____ |
| Debtors. | Joint Administration Requested |

## MOTION FOR AN ORDER (I) AUTHORIZING: (A) PAYMENT OF PREPETITION EMPLOYEE WAGES, SALARIES, AND OTHER COMPENSATION; (B) PAYMENT OF PREPETITION COMPENSATION OWED TO INDEPENDENT CONTRACTORS AND TEMPORARY WORKERS; (C) REIMBURSEMENT OF PREPETITION EMPLOYEE BUSINESS EXPENSES; (D) PAYMENTS FOR WHICH PREPETITION PAYROLL AND TAX DEDUCTIONS WERE MADE; (E) CONTRIBUTIONS TO PREPETITION EMPLOYEE BENEFIT PROGRAMS AND CONTINUATION OF SUCH PROGRAMS IN THE ORDINARY COURSE; (F) PAYMENT OF WORKERS' COMPENSATION OBLIGATIONS; AND (G) PAYMENT TO THIRD PARTIES OF ALL COSTS AND EXPENSES INCIDENT TO THE FOREGOING PAYMENTS AND CONTRIBUTIONS; AND (II) AUTHORIZING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PAY ALL CHECKS AND TRANSFERS DRAWN ON THE DEBTORS' PAYROLL ACCOUNTS TO MAKE THE FOREGOING PAYMENTS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (5)); KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Tribune Company and most of its wholly-owned subsidiaries, each of which is a debtor and debtor-in-possession herein (each a "Debtor" and collectively, the "Debtors") hereby move this Court (the "Motion") for entry of an order pursuant to sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of title 11 of the United States Code (the "Bankruptcy Code"), (i) authorizing, but not directing, the Debtors, in accordance with their stated policies, to: (a) pay all prepetition wages, salaries, and other compensation owed to the Debtors' Employees, subject to specified caps; (b) pay all prepetition compensation owed to individuals who work regularly as the Debtors' Independent Contractors and Temporary Workers (as such terms are defined below), subject to specified caps; (c) reimburse all prepetition business expenses to Employees, subject to a specified cap; (d) make all payments for which prepetition payroll and tax deductions were made, subject to specified caps; (e) honor prepetition obligations under certain employee benefit programs, subject to specified caps, and continue such programs in the ordinary course; (f) honor workers' compensation obligations; (g) make all payments to third parties relating to the foregoing payments and contributions; and (ii) authorizing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' payroll accounts to make the foregoing payments. The facts and circumstances supporting this Motion are set forth in the concurrently filed Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company, in support of First Day Motions (the "Bigelow Affidavit"). In further support of this Motion, the Debtors respectfully represent as follows:

## STATUS OF THE CASE AND JURISDICTION

1.  On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the

Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including an order to have these cases jointly administered.

2.     The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     No request has been made for the appointment of a trustee or examiner and no official committee has yet been established in these cases.

4.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

5.     Debtor Tribune Company ("Tribune") is America's largest employee-owned media company and is the ultimate parent company of each of the Debtors.  The Debtors operate businesses in publishing, interactive, and broadcasting.  These operations are conducted through two business segments: (i) publishing and (ii) broadcasting and entertainment.

6.     The Debtors' publishing segment currently operates eight (8) market leading daily newspapers and related businesses, distributes entertainment and syndicated content, and manages a 24-hour cable news channel.  The Debtors are the nation's third largest newspaper publisher in terms of revenue and circulation.  Daily newspapers published by the Debtors include the Los Angeles Times and the Chicago Tribune.  The Debtors' publishing segment also manages the websites of their daily newspapers, television stations, and other branded sites targeting specific communities of interest.  As of the Petition Date, the Debtors' publishing segment employed approximately 12,000 full-time equivalent employees.

7.      The Debtors' broadcasting and entertainment segment includes 23 television stations, WGN America, WGN-AM, and the Chicago Cubs baseball team.[2]  Through their television stations and WGN America, the Debtors' broadcasting and entertainment segment reaches more than 80 percent of television households in the United States.  Thirteen (13) of the Debtors' stations are affiliates of The CW Television Network, America's "fifth" major broadcast network.  Seven (7) are affiliates of Fox Broadcasting Network.  As of the Petition Date, the Debtors' broadcasting and entertainment segment employed approximately 2,600 full-time equivalent employees.

8.      The Debtors are based in the United States, with headquarters located in Chicago, Illinois.  In fiscal year 2007, the Debtors and their non-debtor subsidiaries (collectively, the "Tribune Entities") recorded revenues of approximately $5.1 billion, resulting in net income of approximately $87.0 million.  During this time, the publishing segment contributed approximately 72% of the Tribune Entities' revenue and the broadcasting and entertainment segment contributed approximately 28% of the Tribune Entities' revenue.  Advertising revenue is the primary source of revenue for both the publishing and broadcasting and entertainment segments.  For the quarterly period ended September 28, 2008, the consolidated financial statements of the Tribune Entities reported approximately $7.6 billion in total assets and approximately $13.9 billion in total liabilities.

## RELIEF REQUESTED

9.      The Debtors currently employ approximately 13,940 full-time and 2,450 part-time employees (the "Employees").  In addition, the Debtors normally utilize the services of approximately 12,000 independent contractors (as more fully defined in paragraph 12 below, the

---

[2] The broadcasting and entertainment segment also includes the subsidiaries that own the Chicago Cubs baseball operations and an equity interest in regional sports network Comcast SportsNet Chicago, LLC, which are not Debtors in these cases.

"Independent Contractors") and approximately 770 full-time equivalent hourly temporary workers (the "Temporary Workers"). Bigelow Aff. ¶ 167.

10.    Approximately sixteen percent (16%) of the Employees of the Tribune Entities' publishing segment and approximately twenty-four percent (24%) of the Employees of the Tribune Entities' broadcasting and entertainment segment are represented by unions (the "Union Employees") and covered under various collective bargaining agreements (the "CBAs").[3] Bigelow Aff. ¶ 168.

11.    The Employees' skills, knowledge, and understanding of the Debtors' businesses are the Debtors' most valuable asset. Without the continued services of the Employees, an effective reorganization of the Debtors will not be possible. Bigelow Aff. ¶ 169.

12.    For purposes of this Motion, the Independent Contractors are those individuals whose skill sets and services are directly involved in the actual operations of the Debtors' businesses, excluding the brokers who are involved in the sales of advertising and subscriptions. The Independent Contractors involved in the publishing segment of the Debtors' business are individuals who work in the physical printing, assembly, and distribution of the Debtors' newspapers, the majority of whom are newspaper carriers and truck drivers. The Independent Contractors involved in the broadcasting and entertainment segment include the talent involved in the on-air television and radio broadcasts and various camera crews that are relied upon for the coverage of news stories and sporting events. The Independent Contractors involved in the direct mail business are individuals who work in the production, labeling, packaging and delivery of the mail brochures that the Debtors prepare and assemble for their

---

[3] For purposes of this Motion only, the Employees other than the Union Employees shall be collectively referred to as the "Non-Union Employees". As a result of the different CBAs entered into by the Debtors, the contractual terms of Union Employees' hours worked, overtime, vacation, and other benefits vary slightly depending upon the particular CBA.

customers. The services these Independent Contractors provide are critical to the smooth

functioning of both the Debtors' (i) publishing and (ii) broadcasting and entertainment

businesses. Bigelow Aff. ¶ 170.

14. The Temporary Workers are hourly workers who perform various tasks,

including packaging, mailing, assisting with advertising inserts, printing processes, technology,

and administrative tasks. The same individual Temporary Workers are regularly used by the

Debtors and thus have developed expertise and experience that are necessary to the smooth

functioning of the Debtors' operations. Bigelow Aff. ¶ 171.

14. To minimize the personal hardship that the Employees, Independent

Contractors, and Temporary Workers will suffer if prepetition employee-related obligations are

not paid when due or as expected, as well as to maintain morale and an essential workforce

during this critical time, the Debtors, by this Motion, seek authority, in accordance with their

stated policies, to: (a) pay all prepetition wages, salaries, and other compensation owed to the

Debtors' Employees, subject to specified caps; (b) pay all prepetition compensation owed to

individuals who work regularly as the Debtors' Independent Contractors and Temporary

Workers, subject to specified caps; (c) reimburse all prepetition business expenses to Employees,

subject to a specified cap; (d) make all payments for which prepetition payroll and tax

deductions were made, subject to specified caps; (e) honor prepetition obligations under certain

employee benefit programs, subject to specified caps, and continue such programs in the

ordinary course; (f) honor workers' compensation obligations; (g) make all payments to third

parties relating to the foregoing payments and contributions; and (ii) authorizing and directing

applicable banks and other financial institutions to honor and pay all checks and transfers drawn

on the Debtors' payroll accounts to make the foregoing payments (collectively, and as more fully

described below, the "Employee Wages and Benefits"). In effectuating the relief sought by this Motion, the Debtors shall not pay more than 25% in excess of each of the estimated amounts of the following outstanding prepetition obligations that are defined or described below in this Motion: Unpaid Wages for Employees and unpaid compensation for the services of Independent Contractors and Temporary Workers, Reimbursable Expenses, Payroll Taxes, Deductions, and certain Specified Employee Benefits (hereinafter, the "Cap").

## I.    PREPETITION EMPLOYEE OBLIGATIONS

### a.    *Wages, Salaries, and other Compensation*

15.    The Debtors' average gross monthly compensation for their Employees' wages is approximately $79.7 million ("Wages"). More than 90% of payroll payments are made by direct deposit through electronic transfer of funds directly to the Employees, and the remaining Employees are paid via check. Most Employees are paid one week in arrears on a staggered, bi-weekly basis (each a "Pay Day"). Wages are generally handled on a centralized basis and without a third party payroll processor.[4] Bigelow Aff. ¶ 173.

16.    Because most of the Debtors' Employees are paid in arrears, as of the Petition Date, some of the Debtors' Employees have not been paid all of their prepetition wages. Additionally, compensation may be due and owing as of the Petition Date because some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date. Bigelow Aff. ¶ 174.

17.    As of the Petition Date, the aggregate amount of accrued wages (excluding the Payroll Taxes and Deductions) earned prior to the Petition Date that remains unpaid to the Debtors' Employees is approximately $18.0 million (the "Unpaid Wages"). By this Motion, the

---

[4]Debtor InsertCo, Inc.'s payroll processing is handled through Automated Data Processing, Inc. ("ADP").

Debtors request the authority to pay all such Unpaid Wages to their Employees in the ordinary course of business, subject to the Cap. The Debtors have made careful inquiries and have taken diligent steps to ensure that their Employees are not owed more than $10,950 for Unpaid Wages as of the Petition Date. Accordingly, if this Motion is granted, the Debtors are confident that no Employee should be paid more than $10,950 for such Unpaid Wages. Bigelow Aff. ¶ 175.

18.     The number of Independent Contractors engaged by the Debtors varies from month to month. The Debtors typically spend an average of $25.6 million per month on Independent Contractors. Depending on the type of service rendered, Independent Contractors are paid on a weekly or monthly basis or on a per assignment basis. As of the Petition Date, the Debtors estimate that they owe approximately $9 million for the unpaid and accrued services of the Independent Contractors. Given the relatively low amount paid to the Debtors' Independent Contractors, most of whom are newspaper carriers, the Debtors are confident that no Independent Contractor is owed more than $10,950 as of the Petition Date. By this Motion, the Debtors request authority to pay all prepetition amounts owing for the services of their Independent Contractors, subject to the Cap. Bigelow Aff. ¶ 176.

19.     The number of Temporary Workers engaged by the Debtors varies from month to month, and the number of Temporary Workers can increase by as much as 30% around the end of the calendar year. Payment for the services of the Temporary Workers is generally made on a weekly basis. As of the Petition Date, the Debtors estimate that they owe approximately $1.1 million for the unpaid and accrued services of Temporary Workers. Given that the hourly wages of the Temporary Workers range from $9 - $15 per hour, the Debtors are confident that no Temporary Worker is owed anywhere near $10,950 as of the Petition Date. By

this Motion, the Debtors request authority to pay all prepetition amounts owing for the services

of their Temporary Workers, subject to the Cap.    Bigelow Aff. ¶ 177.

      ***b.***    ***Reimbursement of Prepetition Employee Business Expenses***

      20.    Prior to the Petition Date, and in the ordinary course of their businesses,

the Debtors directly or indirectly reimbursed Employees for certain expenses incurred on behalf

of the Debtors in the scope of their employment (the "Reimbursable Expenses").    The

Reimbursable Expenses are expenses for air travel, lodging, ground transportation, meals, and

other business-related expenses.[5]    Bigelow Aff. ¶ 178.

      21.    The Debtors have existing arrangements with American Express Travel

Related Services Company ("American Express") that provide approximately 3,500 Employees

who incur the greatest amount of Reimbursable Expenses with corporate credit cards that are to

be used solely for incurring Reimbursable Expenses on behalf of the Debtors.    The Debtors remit

payment for these Reimbursable Expenses directly to American Express on a weekly basis after

the Employees have submitted the appropriate receipts and expense reports.    Bigelow Aff. ¶ 179.

      22.    While most of the Reimbursable Expenses are paid through the use of the

American Express cards, a portion of the Reimbursable Expenses are incurred by Employees on

behalf of the Debtors through use of personal funds or credit cards.    After submission and

approval of expense reports, such Employees are reimbursed through the regular bi-weekly

payroll process.    Bigelow Aff. ¶ 180.

      23.    The Debtors spend an average of approximately $3.1 million per month on

Reimbursable Expenses incurred by Employees either through the use of the American Express

corporate cards or through the use of personal funds or credit cards.    Bigelow Aff. ¶ 181.

---

[5] The total for Reimbursable Expenses includes amounts paid to members of the Board of Directors in connection
with attendance at board meetings.

24.     Because Employees do not submit expense reports with perfect regularity, it is difficult to determine with precision the aggregate amount of outstanding Reimbursable Expenses.  However, the Debtors estimate that as of the Petition Date, approximately $3 million in Reimbursable Expenses have been incurred but remain unpaid.  Bigelow Aff. ¶ 182.

25.     The Reimbursable Expenses were all incurred on the Debtors' behalf and with the understanding that they would be reimbursed.  To avoid harming the individual Employees who incurred the Reimbursable Expenses, the Debtors request authority to reimburse Employees for Reimbursable Expenses that were incurred prepetition, including, as applicable, (a) making all payments to American Express and (b) paying all unpaid Reimbursable Expenses that accrued prepetition or relate to the prepetition period, subject to the Cap.  Bigelow Aff. ¶ 183.

c.     *Prepetition Withholdings and Deductions*

26.     The Debtors are required by law to withhold from an Employee's wages amounts related to, among other things, federal, state and local income taxes, and social security and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state or local taxing authorities.  The Debtors must then match from their own funds for social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes").  The Debtors' current monthly Payroll Taxes total approximately $32.4 million.  The Debtors' Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authorities at the same time Employee payroll checks are administered.[6]  As of the Petition Date, the Debtors estimate

---

[6] On each Pay Day, the Debtors wire to ADP the total amount necessary to satisfy their obligations in connection with the Payroll Taxes.  ADP then processes and remits the Payroll Taxes to the appropriate federal, state or local

that the amount of accrued and outstanding prepetition obligations with respect to the Payroll Taxes to be approximately $9.0 million.  Bigelow Aff. ¶ 184.  The Debtors seek authority to honor and process the prepetition obligations with respect to the Payroll Taxes, including forwarding the Withheld Amounts to ADP, subject to the Cap.

27.    During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) union dues and union fund contributions, (b) garnishments, child support, and similar deductions, (c) deductions for voluntary charitable contributions, and (d) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits or insurance premiums) (collectively, the "Deductions") and forward those amounts (with the exception of any amounts owing on account of self-insured programs) to various third party recipients.  On average, the Debtors have historically deducted approximately $12 million in Deductions from the Employees' paychecks per month.  As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding Deductions was approximately $12 million.  Bigelow Aff. ¶ 185.  Accordingly, the Debtors seek authority to forward these prepetition Deductions to the applicable third party recipients, subject to the Cap.

## II.    PREPETITION EMPLOYEE BENEFITS

28.    The Debtors provide their Employees, directly or indirectly, and in the ordinary course of business, with a number of employee benefits, including, but not limited to (a) a broad range of medical and health care programs, (b) vacation, sick, holiday and leave benefits, (c) savings plans, and (d) certain other specific employee benefits, described in greater detail below (collectively, the "Specified Employee Benefits").  Bigelow Aff. ¶ 186.  The Debtors also provide various other benefits to their Employees such as pension plans and severance payments,

---

taxing authorities.

which are not the subject of this Motion for first-day relief and thus not included in the Specified Employee Benefits.

### a.    *Health Care Programs*

29.    The Debtors offer several programs to eligible full-time and part-time Employees[7] for health, prescription drug, dental, and vision care coverage (the "Health Care Programs"). A majority of the Debtors' Health Care Programs are provided through self-insured programs currently administered by Blue Cross Blue Shield of Illinois ("Blue Cross Blue Shield") and CIGNA, Inc., but which will be subsequently administered by United Healthcare beginning January 1, 2009 (the "Self-Insured Health Programs").[8] The Debtors also maintain insured medical, dental, prescription drug and vision care policies for approximately twenty percent (20%) of their Employees with a variety of other health care insurers (the "Insured Health Programs"). The Health Care Programs are funded through contributions by the Debtors and participating Employees. The Debtors contribute a majority of the costs for both the Self-Insured Health Programs and the Insured Health Programs, and the percentage contributed by the Employee varies depending on whether the Employee's family members or partners and any dependent is covered. Employee contributions are deducted from Employees' paychecks. Bigelow Aff. ¶ 187.

30.    On average, the Debtors pay approximately $10.85 million per month for both the Self-Insured Health Programs and the Insured Health Programs. In addition, the Debtors' average monthly administrative fees currently paid for Self-Insured Health Programs total approximately $494,000. As of the Petition Date, the Debtors estimate that the amount of

---

[7] Generally, active, regular, full-time Employees are eligible to participate in the Health Care Programs. However, eligibility of part-time Employees to participate in the Health Care Programs is determined by individual business units. Temporary Workers and Independent Contractors are not eligible to participate in the Health Care Programs.
[8] The Debtors provide prescription drug coverage to full-time Employees participating in the Blue Cross Blue Shield and CIGNA plans through Caremark and self-insured vision care coverage to all full-time Employees through Vision Service Plan.

accrued and outstanding prepetition obligations with respect to the Health Care Programs to be

approximately $14.48 million.  Bigelow Aff. ¶ 188.

31.    By this Motion, the Debtors seek authority to (a) continue to provide the

Health Care Programs for their Employees in the ordinary course of business, (b) continue to

honor obligations under such benefit programs, including any premiums and administrative fees,

and (c) pay all such amounts owed under the Health Care Programs to the extent that they remain

unpaid on the Petition Date.

### b.    *Vacation, Sick, Holiday, and Leave Benefits*

32.    The Debtors provide vacation time to their Employees as a paid time-off

benefit (the "Vacation Time").  The duration of vacation benefits varies based on the Employee's

location, position, amount of time employed by the Debtors, and may be governed by CBAs

(where applicable).  When used, Employees are generally paid for Vacation Time at their regular

hourly or salaried rates.  Other than where mandated by state law or CBA, accrued but unused

Vacation Time does not carry over to the following calendar year.  Bigelow Aff. ¶ 189.

33.    In the ordinary course of business, the Debtors provide sick leave ("Sick

Leave") to certain of their Employees.  Although sick leave for Union Employees may vary

depending on the applicable CBA, generally eligible Employees receive five (5) paid sick days

per year.  Accrued but unused Sick Leave does not carry over to the following calendar year.

Bigelow Aff. ¶ 190.

34.    The Debtors also provide paid holidays for all Employees ("Holiday

Pay").  While local practices on Holiday Pay may vary, Non-Union Employees are generally

entitled to ten (10) paid holidays per calendar year.  With respect to Union Employees, the

number of paid holidays and the provisions governing Holiday Pay are typically governed by the

applicable CBA, and may vary based on, among other things, length of service and shift worked. Bigelow Aff. ¶ 191.

35.    In addition to the primary leave policies discussed above, the Debtors offer additional leave policies to certain subsets of their Employees (the "Additional Leave Policies"; and together with the Vacation Time, Sick Leave, and Holiday Pay, the "Leave Pay"). For example, Non-Union Employees are entitled to take paid time off on account of (i) jury duty service and (ii) bereavement or funeral leave.  Moreover, because the benefit programs for Union and Non-Union Employees sometimes differ, and because the benefit provisions in the CBAs are not always the same, the Debtors may offer other leave programs, some of which are only applicable to small subsets of the Debtors' Employees.  Bigelow Aff. ¶ 192.

36.    Costs of Leave Pay that accrued prepetition will be honored through the payroll process by the continuation of pay during the Employees applicable leave.  Thus, with the exception of accrued but unused Vacation Time, the costs of Leave Pay are included in the "Unpaid Wages" total set forth above in paragraph 17.  In most states, the Debtors' policy is that all unused Vacation Time must be utilized before the end of the calendar year.  Consequently, the estimated amount of unused Vacation Time is relatively small – approximately $8.6 million as of the Petition Date.  Bigelow Aff. ¶ 193.  By this Motion, the Debtors request authority to continue to honor their Leave Pay policies in the ordinary course of business and to honor all prepetition obligations related thereto, subject to the Cap.

    *c.*    ***Employee Savings Plans***

37.    Prior to the Petition Date, and in the ordinary course of business, the Debtors maintained three savings plans for the benefit of their Employees: the Tribune Company 401(k) Savings Plan, the Tribune Company Defined Contribution Plan, and the Times Mirror Savings Plus Plan (collectively, the "Employee Savings Plans").  The Employee Savings Plans

generally provide for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating Employee's paycheck. Approximately 12,800 Employees currently participate in the Tribune Company 401(k) Savings Plan, and they have contributed approximately $47.40 million of their own funds into this plan during the first ten months of 2008. Approximately 1,300 Employees currently participate in the Tribune Company Defined Contribution Plan, and they have contributed approximately $5.66 million of their own funds into this plan during the first ten months of 2008. Approximately 190 Employees currently participate in the Times Mirror Savings Plus Plan, and they have contributed approximately $203,000 of their own funds into this plan during the first ten months of 2008. The Debtors also make varying contributions, which are indexed to Employee contributions, to the Employee Savings Plans for certain participating Employees. During the first ten (10) months of 2008, the Debtors have paid their contributions to these Employee Savings Plans in the amount of approximately $1.37 million with respect to the Tribune Company 401(k) Savings Plan, $1.39 million with respect to the Tribune Company Defined Contribution Plan, and $52,000 with respect to the Times Mirror Savings Plus Plan. Bigelow Aff. ¶ 194. By this Motion, the Debtors seek authority to pay all amounts owed under the Employee Savings Plans, subject to the Cap, and continue to perform their obligations under the Employee Savings Plans.

### d. *Additional Employee Benefits*

#### (i) *Disability*

38. The Debtors provide full-time Employees with self-funded short-term disability benefits (the "Short-Term Disability Benefits"). Short-Term Disability Benefits are self-funded, and eligible Non-Union Employees are entitled to, among other things, certain continuations of salary in the event of a short-term medical disability due to a non-work related

illness or injury.  Short-Term Disability Benefits begin after a Non-Union Employee is absent

from work for eight (8) consecutive days and may be continued for a maximum of twenty-six

(26) weeks.  Depending on the Employee's location, the amount of Short-Term Disability

Benefits that an Employee is eligible to receive may be based on the number of years of service

or may be based on a fixed schedule.  For example, to the extent an Employee's eligibility to

receive Short-Term Disability Benefits is based on the number of years of service, an Employee

who has completed between six (6) months and four (4) years of service is eligible to receive

100% of the Employee's base salary for the first six weeks of disability but only 60% for weeks

seven (7) through twelve (12) while on disability.[9]  For Union Employees, Short-Term Disability

Benefits, if any, are typically governed by the CBA at issue and accordingly, the terms and

conditions of such policies may vary.  The Debtors currently pay approximately $430,000 per

month with respect to Short-Term Disability Benefits.  Amounts owed on account of Short-Term

Disability Benefits that accrued prepetition will be honored through the payroll process by the

continuation of pay to Employees receiving Short-Term Disability Benefits.  Thus, outstanding

amounts owed on account of Short-Term Disability Benefits are included in the "Unpaid Wages"

total set forth above in paragraph 17.  The Debtors request authority to pay all prepetition

amounts owed on account of Short-Term Disability Benefits and to otherwise continue this

program in the ordinary course of business.  Bigelow Aff. ¶ 195.

   39. The Debtors currently provide full-time Employees with long-term

disability benefits (the "Long-Term Disability Benefits") through an insured program with

Metropolitan Life Insurance Company ("MetLife").  Generally, full-time Employees may receive

Long-Term Disability Benefits after six (6) months of employment with the Debtors and, in most

---

[9] Unless governed by a CBA, beginning January 1, 2009, each Employee will be eligible to receive Short-Term Disability Benefits in the amount of 40% of the Employee's base salary for up to twenty-six (26) weeks while receiving Short-Term Disability Benefits regardless of the Employee's location.

instances, become eligible for Long-Term Disability Benefits after the Employee's Short-Term Disability Benefits end. The Long-Term Disability Benefits are generally paid at a rate of 50% of a participating Employee's base salary, with a maximum monthly benefit of $15,000.[10] Bigelow Aff. ¶ 196.

40.      In prior years, the Debtors maintained self-insured long-term disability programs for their full-time Employees for income and medical benefits. Beginning in January of 2005, the Debtors instituted a fully-insured long-term disability program to cover long-term disability income benefits, while continuing to provide limited healthcare benefits to Employees receiving Long-Term Disability Benefits. Bigelow Aff. ¶ 197.

41.      The monthly premium for the current insured Long-Term Disability Benefits is approximately $279,000, and it has been paid through the end of this calendar year. The Debtors currently pay approximately $110,000 per month with respect to the self-insured portion of their Long-Term Disability Benefits. The Debtors maintain a credit balance with MetLife, which administers the self-funded portion of the Long-Term Disability Benefits. Accordingly, there are no outstanding amounts owed on account of the Long-Term Disability Benefits as of the Petition Date. Bigelow Aff. ¶ 198.

42.      The Debtors request authority to pay all prepetition amounts owed on account of Long-Term Disability Benefits and to continue to provide Long-Term Disability Benefits in the ordinary course of their businesses post-petition.

    (ii)    *Life Insurance*

43.      The Debtors provide company-paid basic life insurance coverage ("Life Insurance") for eligible Employees through MetLife, which coverage entitles the Employee's

---

[10] Unless governed by a CBA, beginning January 1, 2009, the Debtors' long-term disability program will become entirely voluntary.

beneficiary to receive an amount equal to the Employee's annual base salary up to a maximum of $2,000,000. Virtually all of the Debtors' Employees participate in the Life Insurance program, which costs the Debtors $121,000 per month. As of the Petition Date, the Debtors believe that approximately $121,000 is owed to MetLife in connection with the Life Insurance program. Bigelow Aff. ¶ 199. By this Motion, the Debtors request authority to pay all prepetition amounts owed account of the Life Insurance program, subject to the Cap, and to continue to provide Life Insurance in the ordinary course of their businesses post-petition

(iii)    *Voluntary Insurance Programs*

44.    In addition, eligible Employees may enroll for and purchase supplemental long-term disability, supplemental life insurance, and accidental death and dismemberment coverage (the "Voluntary Insurance Programs"). As participating Employees pay all premiums in connection with the Voluntary Insurance Programs, the Debtors anticipate that all amounts outstanding with respect to the Voluntary Insurance Programs will be handled through payroll deductions. Bigelow Aff. ¶ 200.

(iv)    *Flexible Spending*

45.    The Debtors offer their Employees the ability to contribute a portion of their compensation, which amounts are generally deducted automatically from each participating Employee's paycheck, into flexible spending accounts for health and dependent care through Wage Works, Inc., which operates as a third party administrator to the plans (the "Flexible Spending Program"). Approximately 3,800 Employees participate in the Flexible Spending Program, which costs the Debtors approximately $26,000 per month. Bigelow Aff. ¶ 201. As of the Petition Date, the Debtors estimate that approximately $30,000 is outstanding in connection

with the Flexible Spending Program.  By this Motion, the Debtors seek authority to continue

their prepetition practices with respect to the Flexible Spending Program, subject to the Cap.

> (v)     *Employee Relocation Program*

46.     The Debtors also pay relocation expenses incurred by certain of its

Employees in connection with their employment (the "Employee Relocation Program").  During

the first ten months of 2008, the Debtors have expended approximately $2.68 million on account

of such services.  As of the Petition Date, there are no amounts owed in connection with the

Employee Relocation Program.  Bigelow Aff. ¶ 202.  By this Motion, the Debtors seek authority,

but not direction, to continue to maintain the Employee Relocation Program in the ordinary

course of business.

> (vi)    *Retiree Medical Programs*

47.     The Debtors maintain approximately 60 plans that provide different levels

of medical, dental, life insurance, and prescription drug programs to approximately 2,500 retired

Non-Union Employees and to retired Union Employees pursuant to various CBAs (collectively,

the "Retiree Medical Benefits").  The Debtors spend an average of $1.4 million on Retiree

Medical Benefits per month.  Bigelow Aff. ¶ 203.  By this Motion, the Debtors seek authority to

pay all Retiree Medical Benefits that accrued as of the Petition Date, and to continue honoring

their commitment to pay Retiree Medical Benefits in accordance with 11 U.S.C. § 1114.[11]

48.     In recent months and weeks prior to the Petition Date and in the ordinary

course of business, the Debtors terminated the employment of certain employees for reasons

other than cause, of which approximately 950 of them continue were continuing to receive

---

[11] The Debtors modified their self-insured and insured healthcare programs for Employees and retirees prior to the Petition Date by making arrangements for all healthcare to be provided by one administrator and carrier, United Healthcare.  Employees and retirees were notified of these changes a number of months prior to the Petition Date, and the overall changes were orchestrated prepetition.  These changes to the Debtors' healthcare programs will be fully operational as of January 1, 2009.  Bigelow Aff. ¶ 203, n. 30.

various severance benefits immediately prior to the Petition Date (the "Severed Employees"). As part of these severance arrangements, the Debtors had agreed to provide these Severed Employees with continued pay at their regular base rate and continue healthcare benefits for varying periods of time as well as certain outplacement services. As of the Petition Date, the Debtors have discontinued the remaining unpaid severance pay to these Severed Employees. However, by this Motion, the Debtors request authority to pay prepetition and postpetition healthcare benefits ("Continued Healthcare Benefits") to all such Severed Employees for three (3) months (the "Notice Period"). The Notice Period will provide the Debtors with sufficient time to identify Severed Employees who have retired and will prevent any needless interruption of healthcare benefits to retired Employees that might have given rise to any of the protections of 11 U.S.C. § 1114. The Notice Period will also provide non-retiree Severed Employees the opportunity to obtain alternate healthcare coverage. Bigelow Aff. ¶ 204.

49.     During the Notice Period, the Debtors will notify all Severed Employees of the Debtors' intent to discontinue Continued Healthcare Benefits to non-retired Severed Employees upon expiration of the Notice Period. To the extent a Severed Employee is under 55 years old, the Debtors will notify such Employee that Continued Healthcare Benefits will terminate upon expiration of the Notice Period, unless the Employee provides evidence of retirement prior to such date. On the other hand, in the event a Severed Employee is 55 years old or older, the Debtors will assume the Employee is likely to have retired and will automatically continue the Employee's Continued Healthcare Benefits during the duration of the promised severance benefits to the Severed Employees. As of the Petition Date, there are approximately 460 Severed Employees who are 55 years old or older. The Debtors estimate that providing Continued Healthcare Benefits to all Severed Employees during the Notice Period and for the

Severed Employees who are 55 years old or older for the balance of the duration of the promised

severance benefits will cost the Debtors approximately $717,000.  By this Motion, the Debtors

seek authority, but not direction, to (i) provide Continued Healthcare Benefits to all Severed

Employees during the Notice Period, and (ii) to provide Continued Healthcare Benefits to

Severed Employees who are 55 years old or older or have provided evidence of their retirement

for the balance of the duration of the promised severance benefits, subject to the Cap.

### III.    WORKERS' COMPENSATION PROGRAM

50.    Under the laws of the various states in which they operate, the Debtors are

required to maintain workers' compensation policies and programs to provide its Employees

with compensation for injuries arising from or related to their employment with the Debtors.

The Debtors maintain workers' compensation insurance policies with a variety of providers (the

"Workers' Compensation Program") for all Employees in all states in which they operate.

51.    The current Workers' Compensation Program provides coverage in excess

of a $1 million deductible up to applicable statutory limits.  Most of the Debtors' workers'

compensation claims are under the deductible amount and are thus self-funded.  The Debtors

estimate that their annual payments to claimants for all prior and current Workers' Compensation

Programs are approximately $14 million, and an additional $2 million is paid annually for

premiums and claims administration.  The premiums under the current Workers' Compensation

Program are paid monthly from March to December 1st, and therefore, as of the Petition Date,

there is no outstanding premium amount on account of the Workers' Compensation Program.  In

prior years, the Debtors' workers' compensation policies provided for varying ranges of

deductibles.  The premiums on these policies have been fully paid.  Bigelow Aff. ¶ 207.

52.    As of the Petition Date, there are approximately 750 workers'

compensation claims (the "Workers' Compensation Claims") pending against the Debtors arising

out of alleged injuries incurred by Employees during the course of their employment.[12]   Bigelow

Aff. ¶ 208.

53.     Because the Workers' Compensation Program is essential to the continued

operation of the Debtors' businesses under the laws of the various states in which they operate,

the Debtors request authority to pay any and all deductibles that may become due with respect to

the Workers' Compensation Program.  The Debtors further seek authority to maintain and

continue their prepetition practices with respect to the Workers' Compensation Program,

including, among other things, maintaining insurance coverage and allowing workers'

compensation claimants, to the extent they hold valid claims, to proceed with their claims under

the Workers' Compensation Program.

### AUTHORITY TO MAKE ALL PAYMENTS TO THIRD PARTIES INCIDENT TO THE PAYMENTS AND CONTRIBUTIONS

54.     The Debtors request authority to pay all costs incident to, among other

items, the Employee Wages and Benefits, Unpaid Wages, Reimbursable Expenses, and the

Payroll Taxes and Deductions, including other processing costs or administration costs

("Prepetition Processing Costs").  The Debtors estimate that the aggregate amount of Prepetition

Processing Costs accrued but unpaid as of the Petition Date constitutes a *de minimis* amount.

Payment of the Prepetition Processing Costs is justified because the failure to pay any such

amounts might disrupt services of third party providers with respect to the Employee Wages and

Benefits, Unpaid Wages, and the Payroll Taxes and Deductions.

### AUTHORITY FOR BANKS TO HONOR AND/OR REISSUE CHECKS

55.     The Debtors request that all applicable banks and other financial

institutions be authorized to receive, process, honor and pay any and all checks and transfers

---

[12] In addition, the Debtors maintain letters of credit totaling approximately $66 million to support certain obligations under the Workers' Compensation Program.

drawn on the Debtors' dedicated payroll and medical expense accounts, whether such checks

were presented before, or are presented after, the Petition Date.

56.    Accordingly, by this Motion, the Debtors seek (i) authorization for, and/or

ratification of, their banks' honoring of prepetition payroll and employee benefit checks and

transfers on or after the Petition Date, (ii) authorization for their banks to process and honor all

other checks issued for payments approved by this Motion, and (iii) authorization to reissue

checks for payments approved by this Motion where the applicable check is dishonored

postpetition.  The Debtors further seek comfort that the banks and other financial institutions

shall rely on the representations of the Debtors as to which checks are honored, processed and

reissued in accordance with this Motion without any duty of further inquiry and without liability

for following the Debtors' Instructions.

## JUSTIFICATIONS FOR GRANTING REQUESTED RELIEF

57.    The Debtors seek the relief requested herein because any delay in paying

any of the Employee-related wages, deductions, reimbursements and benefits described herein,

(including, without limitation, the compensation owed to Independent Contractors and

Temporary Workers) could severely disrupt the Debtors' relationship with their Employees and

dedicated non-Employee personnel and irreparably impair the Employees' morale at the very

time that their dedication, confidence, and cooperation are most critical.  The Debtors face the

risk that their operations may be severely impaired if the Debtors are not immediately granted

authority to pay the Employee Wages and Benefits.  At this critical stage, the Debtors simply

cannot risk the substantial disruption of their business operations that would attend any decline in

workforce morale attributable to the Debtors' failure to pay the Employee Wages and Benefits in

the ordinary course of their businesses.  Bigelow Aff. ¶ 209.

58.     If the relief requested herein is not granted, the Employees would suffer hardship and, in many instances, financial difficulties, since these monies are needed to enable them to meet their personal obligations.  In addition, without the requested relief, the Debtors' stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.

## BASIS FOR RELIEF

59.     Pursuant to section 507(a)(4) of the Bankruptcy Code, each Employee, Independent Contractors, and Temporary Workers may be granted a priority claim for:

> allowed unsecured claims, but only to the extent of $10,950 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for –
>
> (A)     wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; or
>
> (B)     sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services, for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation earned by acting as an independent contractor in the sale of goods or services was earned from the debtor...

11 U.S.C. § 507(a)(4).

60.     Likewise, under section 507(a)(5) of the Bankruptcy Code, Employees may ultimately be granted a priority claim for:

> allowed unsecured claims for contributions to an employee benefit plan –
>
> (A)     arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
>
> (B)     for each such plan, to the extent of –

> > (i)     the number of employees covered by each such plan multiplied by
> >         $10,950; less
>
> > (ii)    the aggregate amount paid to such employees under paragraph (3)
> >         of this subsection, plus the aggregate amount paid by the estate on
> >         behalf of such employees to any other employee benefit plan.

11 U.S.C. § 507(a)(5).

61.     The Debtors believe that the Employee-related obligations that they seek
to pay with respect to the Unpaid Wages and Reimbursable Expenses are entitled to priority
status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code and do not exceed
$10,950.00 per Employee, Independent Contractors, and Temporary Workers. The Debtors
would therefore be required to pay these claims in full in order to confirm a plan of
reorganization. See 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured
claims for wages, salaries, and commissions, and certain allowed unsecured claims for
contributions to an employee benefit plan). Thus, granting the relief requested herein would only
affect the timing, and not the amount, of the payment of such amounts to the extent that they
constitute priority claims.

62.     Furthermore, the vast majority of the Debtors' Employees rely exclusively
on their full compensation or reimbursement of their expenses in order to continue to pay their
daily living expenses, and these Employees will be exposed to significant financial difficulties if
the Debtors are not permitted to pay the unpaid Employee Wages and Benefits. Moreover, the
Debtors believe that if the Debtors are unable to honor such obligations, Employee morale and
loyalty will be jeopardized at a time when such support is critical. Courts in this district have
approved the payment of prepetition claims of employees for wages, salaries, expenses, and
benefits on the grounds that the payment of such claims was necessary to effectuate a successful
reorganization. See, e.g., In re Hilex Poly Co. LLC, Case No. 08-10890 (Bankr. D. Del. May 7,

2008) (KJC); In re Sharper Image Corp., Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008)

(KG); In re Lillian Vernon Corp., Case No. 08-10323 (Bankr. D. Del. Feb. 21, 2008) (BLS); In

re Buffets Holdings, Inc., Case No. 08-10141 (Bankr. D. Del. Jan 23, 2008) (MFW); American

Home Mortgage Holdings, Inc., Case No. 07-11047 (Bankr. D. Del. Aug. 7, 2007) (CSS); In re

Pharmaceutical Formulations, Inc., Case No. 05-11910 (Bankr. D. Del. July 12, 2005) (MFW);

In re Meridian Automotive Systems – Composites Operations, Inc., Case No. 05-11168 (Bankr.

D. Del. May 27, 2005) (MFW); In re Maxide Acquisitions, Inc., Case No. 05-10429 (Bankr. D.

Del. Feb. 15, 2005) (MFW); In re Ultimate Electronics, Inc., Case No. 05-10104 (Bankr. D. Del.

Jan. 13, 2005) (PJW); In re ETeam USA and ETeam of Philadelphia, Case No. 04-11302 (Bankr.

D. Del. May 6, 2004) (PJW).

   63. Indeed, the Payroll Taxes and the Deductions principally represent

Employee earnings that governments (in the case of taxes), Employees (in the case of voluntarily

withheld amounts), and judicial authorities (in the case of involuntarily withheld amounts) have

designated for deduction from Employees' paychecks. The failure to pay these benefits could

result in hardship to certain Employees and an administrative burden for the Debtors. Indeed,

the Debtors expect inquiries from garnishors regarding the Debtors' failure to submit, among

other things, child support and alimony payments that are not the Debtors' property, but, rather,

have been withheld from Employees' paychecks on such parties' behalf. Moreover, if the

Debtors cannot remit these amounts, the Employees may face legal action due to the Debtors'

failure to submit such payments.

   64. The Employees, Independent Contractors, and Temporary Workers are

essential to the orderly and successful reorganization of the Debtors. They have an intimate

knowledge of the operation of the Debtors' businesses, and any deterioration in Employee

morale and welfare at this critical time undoubtedly would adversely impact the Debtors, the value of their assets and business, and ultimately their ability to reorganize.

65.    Moreover, maintaining the Workers' Compensation Program is indisputably justified because applicable state law mandates this coverage.  Furthermore, with respect to the Workers' Compensation Claims, the risk that eligible claimants will not receive timely payments with respect to employment-related injuries could have a severe effect on the financial well-being and morale of the Debtors' Employees and their willingness to remain in the Debtors' employ.  A significant deterioration in employee morale undoubtedly will have a substantially adverse impact on the Debtors, the value of their assets and business, and their ability to reorganize.  Substantial losses in the Debtors' workforce at this critical time may result in a disruption of the Debtors' businesses to the detriment of all parties in interest.  It is therefore critical that the Debtors continue to maintain their Workers' Compensation program on an uninterrupted basis and be permitted to pay any prepetition obligations thereunder in the ordinary course of business, consistent with prepetition practices.

66.    The "fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs." NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984).  Payment of the amounts requested in this Motion is in the interest of all parties because such payment will facilitate the continued operation of the Debtors' businesses and will help avoid liquidation of the estates.  See Lehigh and New England Ry. Co., 657 F.2d at 581. Accordingly, the relief sought by this Motion will allow the Debtors to continue to operate with minimal disruption and enable the Debtors to stabilize their businesses.

67.    In addition, the Debtors request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay all checks

presented for payment and to honor all fund transfer requests made by the Debtors related to the

Employee Wages and Benefits and the Reimbursable Expenses, whether such checks were

presented or fund transfer requests were submitted prior to or after the Petition Date. The

Debtors represent that these checks are drawn on identifiable bank accounts. Accordingly,

checks other than those for the Employee Wages and Benefits and the Reimbursable Expenses

will not be honored inadvertently. Moreover, the Debtors represent that they have sufficient cash

reserves to promptly pay all of the Employee Wages and Benefits and the Reimbursable

Expenses, to the extent described herein, on an ongoing basis and in the ordinary course of their

businesses.

68.     For the foregoing reasons, the Debtors believe that granting the relief

requested herein is appropriate and in the best interests of their estates and creditors.

69.     The Debtors further submit that because the relief requested in this Motion

is necessary to avoid immediate and irreparable harm to the Debtors, for the reasons set forth

herein, Bankruptcy Rule 6003 has been satisfied.

## NOTICE

70.     Notice of this Motion has been provided to: (i) the Office of the United

States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the

of the United States Attorney General for the District of Delaware; (iv) the Internal Revenue

Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) the

administrative agents for the Debtors' prepetition loan facilities; and (vii) the indenture trustee

for the Debtors' prepetition notes. Notice of this Motion and any order entered hereon will be

served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested

herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

71.     The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtors respectfully seek entry of an order, in substantially the form of the order attached hereto as Exhibit A, (i) authorizing, but not directing, the Debtors, in accordance with their stated policies, to: (a) pay all prepetition wages, salaries, and other compensation owed to the Debtors' Employees, subject to the Caps; (b) pay all prepetition compensation owed to individuals who work regularly as the Debtors' Independent Contractors and Temporary Workers, subject to the Caps; (c) reimburse all prepetition business expenses to Employees, subject to the Cap; (d) make all payments for which prepetition payroll and tax deductions were made, subject to the Caps; (e) honor prepetition obligations under the Specified Employee Benefits, subject to the Caps, where applicable, and continue such programs in the ordinary course; (f) honor workers' compensation obligations; (g) make all payments to third parties relating to the foregoing payments and contributions; and (ii) authorizing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' payroll accounts to make the foregoing payments.

Dated: Wilmington, Delaware
December 8, 2008

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
D'Lisia E. Bergeron
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

Cole, Schotz, Meisel,
Forman & Leonard, P.A.

_____

Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION