# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-_____ |
| Debtors. | Joint Administration Requested |

## MOTION OF THE DEBTORS
## FOR AN ORDER (I) APPROVING CASH
## MANAGEMENT SYSTEMS, (II) AUTHORIZING USE OF
## PREPETITION BANK ACCOUNTS AND BUSINESS FORMS,
## (III) WAIVING THE REQUIREMENTS OF 11 U.S.C. § 345(b) ON AN
## INTERIM BASIS, AND (IV) GRANTING ADMINISTRATIVE EXPENSE STATUS TO
## POSTPETITION INTERCOMPANY TRANSACTIONS

The above-captioned debtors and debtors in possession (each a "Debtor" and

collectively, the "Debtors") hereby move this Court (the "Motion") for entry of an order (i)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

authorizing and approving the Debtors' continued use of their existing cash management system, (ii) authorizing the Debtors to continue using their prepetition bank accounts and business forms, (iii) waiving the requirements of 11 U.S.C. § 345(b) on an interim basis with respect to the Debtors' deposit practices, and (iv) granting administrative expense status to postpetition intercompany claims between and among the Debtors and between and among the Debtors and their non-Debtor affiliates.  The facts and circumstances supporting this Motion are set forth in the concurrently filed affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company, in Support of First Day Motions (the "Bigelow Affidavit").  In further support of the Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1.       On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code"). On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including an order to have these cases jointly administered.

2.       The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.       No request has been made for the appointment of a trustee or examiner and no official committee has yet been established in these cases.

4.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105(a) and 345 of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

5.       Debtor Tribune Company ("Tribune") is America's largest employee-owned media company and is the ultimate parent company of each of the Debtors.  The Debtors operate businesses in publishing, interactive, and broadcasting.  These operations are conducted through two business segments: (i) publishing and (ii) broadcasting and entertainment.

6.       The Debtors' publishing segment currently operates eight (8) market leading daily newspapers and related businesses, distributes entertainment and syndicated content, and manages a 24-hour cable news channel.  The Debtors are the nation's third largest newspaper publisher in terms of revenue and circulation.  Daily newspapers published by the Debtors include the Los Angeles Times and the Chicago Tribune.  The Debtors' publishing segment also manages the websites of their daily newspapers, television stations, and other branded sites targeting specific communities of interest.  As of the Petition Date, the Debtors' publishing segment employed approximately 12,000 full-time equivalent employees.

7.       The Debtors' broadcasting and entertainment segment includes 23 television stations, WGN America, WGN-AM, and the Chicago Cubs baseball team.[2]  Through their television stations and WGN America, the Debtors' broadcasting and entertainment segment reaches more than 80% of television households in the United States.  Thirteen (13) of the Debtors' stations are affiliates of The CW Television Network, America's "fifth" major broadcast network.  Seven (7) are affiliates of Fox Broadcasting Network.  As of the Petition

---

[2] The broadcasting and entertainment segment also includes the subsidiaries that own the Chicago Cubs baseball operations and an equity interest in regional sports network Comcast SportsNet Chicago, LLC, which are not Debtors in these cases.

Date, the Debtors' broadcasting and entertainment segment employed approximately 2,600 full-time equivalent employees.

8.     The Debtors are based in the United States, with headquarters located in Chicago, Illinois.  In fiscal year 2007, the Debtors and their non-debtor subsidiaries (collectively, the "Tribune Entities") recorded revenues of approximately $5.1 billion, resulting in net income of approximately $87.0 million.  During this time, the publishing segment contributed approximately 72% of the Tribune Entities' revenue and the broadcasting and entertainment segment contributed approximately 28% of the Tribune Entities' revenue.  Advertising revenue is the primary source of revenue for both the publishing and broadcasting and entertainment segments.  For the quarterly period ended September 28, 2008, the consolidated financial statements of the Tribune Entities reported approximately $7.6 billion in total assets and approximately $13.9 billion in total liabilities.

## RELIEF REQUESTED

9.     By this Motion, the Debtors seek entry of an order (a) authorizing the continued use of their existing cash management system, (b) authorizing the continued use of their existing bank accounts and business forms, (c) authorizing their deposit practices and waiving the requirements of section 345(b) in connection therewith on an interim basis, and (d) granting administrative priority status to postpetition intercompany claims between and among the Debtors and between and among the Debtors and their non-Debtor affiliates.  In connection with this relief, the Debtors respectfully request a waiver of certain of the operating guidelines established by the Office of the U.S. Trustee for the District of Delaware that require the Debtors

to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and provide new business forms and stationery.

I.     **Request for Authority to Continue Using Existing Cash Management System and to Provide Protection to Cash Management Banks**

### A. Description of Centralized Cash Management System

10.     In the ordinary course of their businesses, the Debtors and certain of their non-Debtor affiliates utilize a centralized cash management system to collect funds from their operations and to pay operating and administrative expenses in connection therewith (the "Centralized Cash Management System").[3] The Centralized Cash Management System is similar to those utilized by other large, diversified companies to collect, concentrate, and disburse funds generated by numerous operating entities in a cost-effective and efficient manner.

11.     The Centralized Cash Management System is carefully managed through oversight procedures and controls implemented by the treasury department at the Debtors' headquarters in Chicago, Illinois.  The treasury department's control over the administration of the various bank accounts utilized by the Debtors to effect the collection, disbursement, and movement of cash facilitates accurate cash forecasting and reporting and enables the Debtors to monitor capably the collection and disbursement of funds.

12.     A diagram outlining the general movement of funds within the Centralized Cash Management System is attached hereto as Exhibit A.  In addition, a more detailed schematic illustrating the movement of funds among the Debtors and certain of their non-Debtor affiliates through various bank accounts is attached hereto as Exhibit B.  Finally, a list of

---

[3] As discussed in greater detail in sub-Section I(A)(4) and Part IV below, both the Debtors and certain of their non-Debtor affiliates utilize the Centralized Cash Management System.

substantially all of the Debtors' bank accounts utilized in the Centralized Cash Management System is attached hereto as <u>Exhibit C</u>.[4]

13.    As illustrated in the Exhibits attached hereto and as discussed in greater detail below, the Centralized Cash Management System operates primarily through bank accounts maintained at three financial institutions—Bank of America ("<u>BOA</u>"), JPMorgan Chase Bank ("<u>JPMC</u>"), and Northern Trust Bank ("<u>NT</u>").  In general, all revenue received by the Debtors and certain of their non-Debtor affiliates is concentrated in two concentration accounts with JPMC (the "<u>JPMC Primary Concentration Accounts</u>").  Revenues reach the JPMC Primary Concentration Accounts through three concentration accounts: the BOA Receivables Concentration Account, the JPMC Receivables Concentration Account, and the BOA Concentration Account (each as defined below).[5]  These concentration accounts receive funds through three primary paths: (1) accounts held at BOA and JPMC that are utilized in connection with a receivables purchase lending facility provided by Barclays (the "<u>Receivables Facility Accounts</u>"), (2) circulation and business unit accounts, and (3) miscellaneous other accounts.

14.    For example, prior to reaching the JPMC Primary Concentration Accounts, the Receivables Facility Accounts sweep into the BOA or JPMC receivables facility concentration accounts (the "<u>Receivables Concentration Accounts</u>").  The accounts that are not subject to the Receivables Facility (as defined below), which include certain circulation, business unit and miscellaneous other accounts, are concentrated either directly into the JPMC Primary Concentration Accounts or in a Tribune Company concentration account held at BOA (the

---

[4] The Centralized Cash Management System operates entirely between affiliates.  Indeed, each of the Debtors is a direct or indirect wholly-owned subsidiary of Debtor Tribune Company.  Thus, the Debtors are "affiliates" as such term is defined in section 101(2) of the Bankruptcy Code.

[5] In addition, as described in greater below, a few circulation accounts held at JPMC fund directly into the JPMC Primary Concentration Accounts, without passing through an intermediate concentration account.

"BOA Concentration Account"), which then funds into the JPMC Primary Concentration Accounts. Funds are then disbursed from the JPMC Primary Concentration Accounts through various disbursement accounts. As discussed in Part III below, cash balances in excess of the amount needed to fund the Debtors' daily operations are currently invested in low-risk, highly-rated U.S. treasury obligations. A more detailed description of the primary bank accounts utilized in the Centralized Cash Management System follows.

### (1)   Receivables Facility Accounts

15.   During the summer of 2008, Debtor Tribune Company[6] established an accounts receivables purchase facility (the "Receivables Facility"). Pursuant to that certain Receivables Purchase Agreement dated as of July 1, 2008, certain Debtors sell their accounts receivables to their parent, Debtor Tribune Company, which then sells the accounts receivables to a special purpose vehicle buyer, Tribune Receivables, LLC, which is not a Debtor in these proceedings. Tribune Receivables, LLC purchases accounts receivables from Debtor Tribune Company through loans provided by certain lenders under the Receivables Loan Agreement. Pursuant to a Security Agreement, dated as of July 1, 2008, between Tribune Receivables, LLC and Barclays Bank PLC ("Barclays"), Tribune Receivables, LLC grants Barclays a first-priority perfected security interest in, among other things, the Receivables Facility Accounts, the Tribune Receivables, LLC Receivables Concentration Accounts, and permitted investments held in a

---

[6] Debtor Tribune Company is the servicer and buyer of the accounts receivables purchased from certain Debtor subsidiaries participating as sub-originators under the Receivables Purchase Agreement dated as of July 1, 2008. The sub-originators are: Chicagoland Television News, Inc., Tribune Broadcast Holdings, Inc., Tribune Interactive, Inc., Tribune Television Holdings, Inc., WGN Continental Broadcasting Company, WPIX, Inc., Tribune Television New Orleans, Inc., KSWB Inc., KTLA Inc., KIAH Inc., Tower Distribution Company, Tribune Television Northwest, Inc., Tribune Television Company, Channel 40, Inc., Channel 39, Inc., Los Angeles Times Communications, LLC, WDCW Broadcasting, Inc., Orlando Sentinel Communications Company, Sun-Sentinel Company, Gold Coast Publications, Inc., Forum Publishing Group, Inc., The Daily Press, Inc., Chicago Tribune Company, The Baltimore Sun Company, The Hartford Courant Company, and The Morning Call, Inc. KWGN Inc. and KPLR, Inc. are no longer sub-originators as of September 2008. The entities associated with the Cubs are not sub-originators.

controlled money market fund account at BOA (the "Cash Reserve Account"). The Receivables Facility Accounts, the Receivables Concentration Accounts, and Cash Reserve Account are all subject to control agreements with Barclays.

16.    The Receivables Facility Accounts currently include 37 controlled accounts held at two banks: 31 controlled accounts are held at BOA and 6 controlled accounts are held at JPMC. These accounts primarily collect lockbox and credit card receipts. The majority of the funds deposited into the Receivables Facility Accounts are advertising revenue generated by the Debtors' broadcasting and publishing entities. The Receivables Facility Accounts receive approximately 80% of the incoming cash receipts from the Debtors' operations.

17.    All Receivables Facility Accounts are zero balance controlled accounts and sweep into two Receivables Concentration Accounts: one held at BOA for the BOA Receivables Facility Accounts and the other held at JPMC for the JPMC Receivables Facility Accounts. Funds in the BOA Receivables Concentration Account are swept into the BOA Concentration Account, which is then manually transferred to the JPMC Primary Concentration Accounts. The JPMC Receivables Concentration Account is a zero balance account that transfers directly into the JPMC Primary Concentration Accounts. Thus, the JPMC Primary Concentration Accounts contain receivables from both the BOA and JPMC Receivables Facility Accounts.

**(2)    Other Receivables Accounts**

18.    The Debtors maintain other receivables accounts for the collection of circulation revenues and revenues from other operations. The Debtors collect circulation revenue related to their publishing operations primarily through 12 BOA accounts and 10 JPMC

accounts (the "Circulation Accounts"). In addition to the Circulation Accounts, the Debtors and

certain of their non-Debtor affiliates[7] maintain 25 accounts at BOA (the "BOA Business Unit

Accounts") for various other operations. These accounts are used by the Debtors and their non-

Debtor affiliates in a broad range of broadcasting, publishing, interactive, and sports and

entertainment businesses.[8] The Circulation and BOA Business Unit Accounts are not subject to

the Receivables Facility or any control agreements with the Debtors' prepetition lenders.

19.    The Circulation Accounts and the BOA Business Unit Accounts are zero

balance accounts. The BOA Circulation Accounts and the BOA Business Unit Accounts are

swept into the BOA Concentration Account. The BOA Concentration Account and the JPMC

Circulation Accounts are swept into the JPMC Primary Concentration Accounts. As a result of

these activities, substantially all of the Debtors' incoming receivables are concentrated in the

JPMC Primary Concentration Accounts.[9]

20.    Finally, in addition to the receivables accounts discussed above, the

Debtors maintain other accounts at various financial institutions on behalf of certain local

operations, commercial accounts, and newly-acquired businesses. These other receivables

accounts include primarily publishing-related accounts, but also encompass accounts used by

non-Debtor affiliate TMS Entertainment Guides Canada Corp., which funds Debtor Tribune

Media Services, Inc., and Debtor InsertCo, Inc., a newly acquired subsidiary, which operates, in

---

[7] The Chicago National League Ball Club, LLC, Wrigley Field Ticket Services, LLC, and Tribune Interactive, Inc. each have a receivables account at BOA.

[8] The Debtors and their non-Debtor affiliates also process direct debits against certain of these accounts for routine business purposes such as certain payroll services, utilities, postal meter services, insurance, and other services in the ordinary course of their businesses.

[9] In addition, certain of these receivables accounts also have direct debits initiated by vendors and merchant card vendors. Such activity is noted in Exhibit B attached hereto.

part, on a standalone basis from the Centralized Cash Management System. Funds from these accounts are transferred by wire transfer to the JPMC Primary Concentration Accounts.

### (3)    Disbursements and Payroll Accounts

21.    The Debtors and their non-Debtor affiliates process and disburse substantially all of their accounts payable and payroll obligations through Tribune Company accounts. The overwhelming majority of accounts payable is disbursed from accounts maintained at NT. The Debtors also fund voluntary employee benefits and retiree trust accounts at NT. Most payroll for the Debtors and their non-Debtor affiliates, however, is processed through a master payroll account held at JPMC. Accounts payable and payroll disbursements are generally made by ACH debit, check, and wire transfer from the Debtors' accounts at JPMC and NT.[10]

22.    NT Accounts Payable Accounts. The Debtors' primary disbursement accounts are maintained at NT. Debtor Tribune Finance Service Center ("Tribune FSC") is an in-house servicer for the Debtors and their non-Debtor affiliates' accounts payable. Tribune FSC is managed centrally at the Debtors' headquarters in Chicago. Most accounts payable for the Debtors and their non-Debtor affiliates are processed through the Tribune FSC controlled disbursement account ("CDA") held at NT.[11] The JPMC Primary Concentration Accounts fund the primary disbursement account at NT (the "Primary Disbursement Account"). The NT Primary Disbursement Account then funds the zero balance Tribune FSC CDA to disburse most accounts payable obligations.

---

[10] The Debtors also maintain direct debit accounts at BOA and JPMC to process routine postage, tax, and credit card-related payments.

[11] This account is protected for fraud with "positive pay" protection, which prevents altered or fraudulently-created checks from clearing by matching the sequence number, payee name, and payable amount of the presented check with a file sent by the Debtors to NT at the time the checks are mailed.

23.     Tribune FSC transmits ACH debit instructions and a "positive pay" check file to NT daily that covers the vast majority of the accounts payable for the Debtors and certain of their non-Debtor affiliates.  Checks are printed and mailed from Debtor Tribune Company's headquarters.  Based on the instructions transmitted to NT, NT initiates ACH credits and clears checks received that have been verified against the "positive pay" check file.  The NT disbursement accounts clear checks presented by mid-morning and checks presented for payment after that time clear the following day.  By enforcing a cutoff time and prohibiting debits against the CDAs after that time, the Debtors are able to monitor their cash position on a daily basis.[12]

24.     <u>Master Payroll and Benefits Account</u>.  The Debtors and certain of their non-Debtor affiliates primarily use one master payroll account maintained at JPMC (the "<u>JPMC Payroll Account</u>").  For each bi-weekly, staggered payroll cycle, total budgeted payroll for the Debtors and certain of their non-Debtor affiliates is $15 to $20 million.[13]  Each payroll period, the Debtors generate a cash position report two business days before the scheduled pay date and transmit ACH debit instructions and a "positive pay" check file to the JPMC Payroll Account.  The Debtors fund the JPMC Payroll Account from the JPMC Primary Concentration Accounts for the amount of payroll paid via direct deposit to employees before JPMC processes the ACH file.  For employees that are instead paid by check, debits are made against the JPMC Payroll Account when checks are presented and verified with the "positive pay" file.

25.     The Debtors also fund four types of employee benefits trust accounts at NT with transfers from the JPMC Primary Concentration Accounts.  These accounts are for

---

[12] The Debtors maintain one manual checking CDA account at NT for emergency situations that is sparingly used. Access to the emergency account is highly restricted.  Checks require centralized approvals and two signatures for check requests exceeding $5,000 and checks are limited to $30,000 without additional approvals.  These checks are manually entered into the "positive pay" file and will not clear without going through the central approval process.

[13] Debtors also use an American Express travel and entertainment card program for employee business-related travel and entertainment expenses and a pay card program to pay certain employees with VISA-branded debit cards.

voluntary employee benefits contributions, retiree benefits, long-term disability, and 401(k) programs.

26.    <u>Direct Debit Postage and Tax Accounts</u>.  The Debtors maintain 7 direct debit accounts at BOA and JPMC of which 6 are for postage and one is for tax payments.  These accounts are debited by the U.S. Postal Service or tax authorities in the ordinary course of business and are paid from the JPMC Primary Concentration Accounts or the BOA Concentration Account tied to such account in an amount equal to the debited amount.

### (4) Non-Debtor Affiliate Accounts

27.    As previously discussed, the Debtors and their non-Debtor affiliates operate in a highly integrated manner through the Centralized Cash Management System. Certain non-Debtor affiliates derive great benefits from operating a centralized cash management system; however, a by-product of the efficiencies created by this system is that certain non-Debtor affiliates do not have their own cash management capabilities and fully rely on the parent Debtor Tribune Company for all of their cash management needs.  These non-Debtor affiliates must continue to use the Centralized Cash Management System to successfully meet their business needs.  The primary non-Debtor affiliates that participate in the Centralized Cash Management System are the Chicago National League Ball Club, LLC and related non-Debtor entities (the "<u>Chicago Cubs</u>"), Tribune Interactive, Inc., and certain foreign office affiliates.

28.    For example, the Chicago Cubs operate in a manner that is fully integrated with the Debtors' Centralized Cash Management System.  The BOA Business Unit Accounts for the Chicago National League Ball Club, LLC lockbox account and the Wrigley Field Premium Ticket Services, LLC account are swept automatically into the BOA Concentration Account, like all other BOA Business Unit Accounts, and are processed as receivables to Debtor Tribune

Company.  Likewise, certain other non-Debtor affiliates, such as Tribune Interactive, Inc., are

fully integrated with the Debtors' Centralized Cash Management System.  Certain foreign non-

Debtor affiliates, such as Tribune Hong Kong Ltd., also interact with the Debtors' Centralized

Cash Management System.  Receipts for this integrated non-Debtor affiliate are received by

Debtor Tribune Company and disbursements are made by Debtor Tribune Company on the

behalf of such affiliate in the ordinary course of its business through one Centralized Cash

Management System.

       29.     As described more fully in Part IV below, the Debtors are requesting the

authority to continue providing cash management services and disbursing funds to such

affiliates.

  **B.**     **Continuing Use of the Debtors' Centralized Cash Management System Is in
the Best Interests of the Debtors' Estates and Creditors**

       30.     The Debtors seek authority to continue utilizing their Centralized Cash

Management System, as described above, on a post-petition basis.  It is critical that the Debtors

remain able to manage cash and centrally coordinate transfers of funds in order to efficiently and

effectively operate their large and complex business operations.  Substantially disrupting their

current cash management procedures would impair the Debtors' ability to preserve and enhance

their respective going concern value and to successfully reorganize during these chapter 11

cases.

       31.     The Centralized Cash Management System utilizes the Debtors' bank

accounts to effectively and efficiently collect, concentrate, and disburse funds as needed in the

Debtors' business operations.  The Centralized Cash Management System provides significant

benefits to the Debtors, including the ability to: (a) closely track, and thus control, all corporate

funds through the provision of regular status reports on the location and amount of all funds, (b)

ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. Indeed, a disruption in the Centralized Cash Management System would likely cause delays in the collection and disbursement of funds, thus impeding the Debtors' ability to carry out their normal business operations to the detriment of employees, customers, suppliers and advertisers.

32.    With its accounting controls, the Centralized Cash Management System also enables the Debtors to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  The Debtors will continue to maintain detailed records reflecting all transfers of funds.

33.    Further, the Debtors manage the Centralized Cash Management System in an automated environment using treasury management software and bank account structures to guard against fraud and to protect the integrity of the overall system.  Over many years, the Debtors developed their treasury systems to automate reporting and calculate their cash position and they continue to invest in the system.  Fraud protection remains a high priority through use of "positive pay" programs, debit blocks, and limited use of direct check issuance and wire transfers by the Debtors' subsidiaries and affiliates.  Any changes to the Debtors' bank accounts or their systems that report on account activity and generate wire transfers would be extremely disruptive to the Debtors' businesses and could unwind the Debtors' efforts to create a safe and effective system.

34.    Therefore, it is both essential and in the best interests of the Debtors' respective estates and creditors that the Centralized Cash Management System be maintained. Further, the Debtors' reorganization efforts will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would inevitably be associated with a

substantial disruption in the Centralized Cash Management System. Accordingly, the Debtors respectfully request that the Court authorize their continued use of the Centralized Cash Management System.

35.     This Court has the authority to grant the requested relief pursuant to its equitable powers under section 105(a) of the Bankruptcy Code. Section 105(a) provides, in relevant part, that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The relief requested herein is both necessary and appropriate to allow the Debtors to successfully reorganize and to maximize the value of their estates.

36.     Bankruptcy courts routinely grant chapter 11 debtors authority to continue utilizing existing cash management systems and treat requests for such authority as a relatively "simple matter." In re Baldwin-United Corp., 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). This is particularly true where, as here, the chapter 11 cases involve affiliated Debtors with complex financial affairs. See, e.g., In re The Charter Co., 778 F.2d 617 (11th Cir. 1985). In large chapter 11 cases such as these, courts in this circuit have recognized that allowing a debtor to maintain existing cash management systems is appropriate. See, e.g., In re Genesis Health Ventures, Inc., 402 F.3d 416, 424 (3d Cir. 2005); In re Kindred Healthcare, Inc., 2003 WL 22327933, at *1 (Bankr. D. Del. Oct. 9, 2003).

37.     Allowing debtors to utilize their prepetition cash management systems is entirely consistent with applicable provisions of the Bankruptcy Code. Delaware bankruptcy courts have recognized that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." In re Columbia Gas Sys., Inc., 136 B.R. 930, 934

(Bankr. D. Del. 1992), aff'd in part and rev'd in part, 997 F.2d 1039 (3d. Cir. 1993), cert. denied

sub nom Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp., 510 U.S.

1110 (1994); see also In re Hilex Poly Co., LLC, Case No. 08-10890 (Bankr. D. Del. May 7,

2008) (KJC); In re Pliant Corp., Case No. 06-10001 (Bankr. D. Del. Jan. 4, 2006) (MFW); In re

Maxide Acquisitions, Inc., Case No. 05-10429 (Bankr. D. Del. Feb. 15, 2005) (MFW); In re

Ultimate Electronics, Inc., et al., Case No. 05-10104 (Bankr. D. Del. Jan. 13, 2005) (PJW).  The

Third Circuit has agreed, emphasizing the "huge administrative burden" and economic

inefficiency of requiring the debtors to maintain all accounts separately.  Columbia Gas, 997

F.2d at 1061.  See also, In re Southmark Corp., 49 F.3d 1111, 1114 (5th Cir. 1995) (maintaining

existing cash management system allows debtor "to administer more efficiently and effectively

its financial operations and assets").

     38.    The Debtors also request that no bank participating in the Cash

Management Systems (the "Cash Management Banks") that honors a prepetition check issued

prior to the Petition Date or other item drawn on any of the Debtors' accounts that are the subject

of this Motion (a) at the direction of the Debtors, (b) in a good faith belief that the Court has

authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake

made despite implementation of reasonable item handling procedures, be deemed to be liable to

the Debtors or to their estates on account of such prepetition check or other item being honored

postpetition.  The Debtors believe that such flexibility accorded the Cash Management Banks is

necessary in order to induce the Cash Management Banks to continue providing cash

management services without additional credit exposure.

## II.    Request for Authority to Maintain Existing Bank Accounts and Continue to Use Existing Check and Business Forms

39.     The U.S. Trustee for Region 3, who administers bankruptcy cases filed in the District of Delaware, has issued certain chapter 11 operating guidelines pursuant to 28 U.S.C. § 586. These guidelines require that chapter 11 debtors, among other things: (a) close all existing bank accounts upon filing of their petitions and open new "debtor-in-possession" accounts in certain financial institutions designated as authorized depositories by the U.S. Trustee; (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes; and (c) maintain a separate debtor-in-possession account for cash collateral.

A.    **Request for Authority to Maintain Existing Bank Accounts**

40.     The Debtors seek a waiver of the U.S. Trustee requirement that their bank accounts be closed and that new postpetition bank accounts be opened. If enforced in these cases, such requirements would cause enormous disruption in the Debtors' businesses and would impair the Debtors' efforts to successfully reorganize. As described in detail above, the Debtors' bank accounts comprise an established Centralized Cash Management System that the Debtors need to maintain in order to ensure smooth collections and disbursements in the ordinary course of their businesses. Therefore, to avoid delays in paying obligations incurred postpetition, and to ensure as smooth a transition into chapter 11 as possible, the Debtors should be permitted to continue to maintain their existing bank accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations. Otherwise, transferring the Debtors' bank accounts will be disruptive, time consuming and expensive.

41.     Accordingly, the Debtors request that this Court waive the strict enforcement of the requirement that the Debtors open new bank accounts. The Debtors further request that their bank accounts be deemed debtor-in-possession accounts and that the Debtors be authorized to maintain and continue using these accounts in the same manner and with the

same account numbers, styles and document forms as those employed during the prepetition period.

42.    In other large cases, this Court has waived the strict enforcement of bank account closing requirements and replaced them with an alternative procedure that provides the same protection. See, e.g., In re Hilex Poly Co., LLC, Case No. 08-10890 (Bankr. D. Del. May 7, 2008) (KJC); In re Sharper Image Corp., Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008) (KG); In re Lillian Vernon Corp., Case No. 08-10323 (Bankr. D. Del. Feb. 21, 2008) (BLS); In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. January 23, 2008) (MFW); In re Delta Fin. Corp., Case No. 07-11880 (Bankr. D. Del. December 19, 2007) (CSS); Am. Home Mortgage Holdings, Inc., Case No. 07-11047 (Bankr. D. Del. Aug. 7, 2007) (CSS); In re Pliant Corp., Case No. 06-10001 (Bankr. D. Del. Jan. 4, 2006) (MFW); In re Maxide Acquisitions, Inc., Case No. 05-10429 (Bankr. D. Del. Feb. 15, 2005) (MFW); In re Ultimate Electronics, Inc., Case No. 05-10104 (Bankr. D. Del. Jan. 13, 2005) (PJW).

43.    The Debtors represent that if the relief requested herein is granted, they will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court. For example, concurrently with the filing of this Motion, the debtors are filing motions requesting authority to pay certain prepetition obligations to employees, taxing authorities, customers and other key constituencies in the ordinary course of business. To prevent the possible inadvertent payment of prepetition claims such as payroll checks issued prepetition, except those otherwise authorized by the Court, the Debtors will immediately advise the Cash Management Banks not to honor checks issued prior to the Petition Date. The Debtors will work closely with the Cash

Management Banks to ensure appropriate procedures are in place to prevent checks issued

prepetition from being honored absent this Court's approval.

**B.     Request for Authority to Continue to Use Existing Check and Business Forms**

44.    Local Rule 2015-2(a) provides that the Debtors may, with Court approval,

continue to use their existing check and business forms without imprinting "DIP" or "Debtor-in-

Possession" thereon until such forms are depleted.[14]    In accordance with Local Rule 2015-2(a),

the Debtors request that they be authorized to continue to use all correspondence, check and

business forms (including, but not limited to, letterhead, purchase orders, and invoices) existing

immediately before the Petition Date without reference to the Debtors' status as debtors-in-

possession.    Parties doing business with the Debtors undoubtedly will be aware of the Debtors'

status as debtors-in-possession as a result of the size and publicity surrounding the cases.    If the

Debtors were required to change their correspondence, check and business forms, they may be

forced to choose standard forms rather than the current forms with which the Debtors'

employees, customers and vendors are familiar.    Such a change in operations would create a

sense of disruption and potential confusion within the Debtors' organization and confusion for

the Debtors' customers and vendors.    The Debtors believe that it would be costly and disruptive

to cease using all existing forms and to purchase and begin using new stationery, check and

business forms.    The Debtors respectfully submit that to do so would be unnecessary and that

appropriate care can be taken to assure the proper use of the existing forms.

---

[14] Local Rule 2015-2(a) states as follows:

> Bank Accounts and Checks.    Where the debtor uses pre-printed checks, upon motion of the debtor, the Court may, without notice and hearing, permit the debtor to use its existing checks without the designation "Debtor-In-Possession" and use its existing bank accounts.    However, once the debtor's existing checks have been used, the debtor shall, when reordering checks, require the designation "Debtor-in-Possession" and the corresponding bankruptcy number on all such checks.

45.    In other large cases, this Court has allowed debtors to use their prepetition check and business forms without the "debtor-in-possession" label until the debtors depleted their existing supply of check and business forms.  See, e.g., In re Hilex Poly Co., LLC, Case No. 08-10890 (Bankr. D. Del. May 7, 2008) (KJC); In re Holley Performance Prods. Inc., Case No. 08-10256 (Bankr. D. Del. Feb. 12, 2008) (PJW); In re Sharper Image Corp., Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008) (KG); In re Lillian Vernon Corp., Case No. 08-10323 (Bankr. D. Del. Feb. 21, 2008) (BLS); In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. January 23, 2008) (MFW); In re Delta Fin. Corp., Case No. 07-11880 (Bankr. D. Del. December 19, 2007) (CSS); Am. Home Mortgage Holdings, Inc., Case No. 07-11047 (Bankr. D. Del. Aug. 7, 2007) (CSS); In re Pliant Corp., Case No. 06-10001 (Bankr. D. Del. Jan. 4, 2006) (MFW); In re Maxide Acquisitions, Inc., Case No. 05-10429 (Bankr. D. Del. Feb. 15, 2005) (MFW); In re Ultimate Electronics, Inc., Case No. 05-10104 (Bankr. D. Del. Jan. 13, 2005) (PJW).

46.    The Debtors should therefore be authorized to use their existing check and business forms.  The Debtors use a significant number of checks and a wide variety of business forms in the ordinary course of their business operations.  To require the Debtors to revise all of their existing check and business forms would be unduly burdensome and costly, particularly when appropriate care can be taken to assure the proper usage of the existing forms.

### III.    Request that the Court Waive the Deposit Requirements of 11 U.S.C. § 345(b) on an Interim Basis

47.    The Debtors engage in relatively simple investment activities through manual transfer of funds from their concentration accounts into investment accounts at Fidelity

(the "Fidelity Accounts").[15]  Deposits in the Fidelity Accounts are invested predominantly in

U.S. Treasury obligation-based money market funds, including Fidelity's "Treasury Only

Portfolio" fund and "Treasury Portfolio" fund.  The Treasury Only Portfolio and Treasury

Portfolio funds invest at least 80% of their assets in U.S. Treasury securities.  The Debtors'

investments are executed by authorized persons, recorded, and subject to internal control

procedures.

   48. The Debtors are requesting that the Court waive the requirements of

section 345(b) on an interim basis and permit them to maintain their deposits in their investment

accounts in accordance with their existing deposit practices until such time as the Debtors obtain

this Court's approval to deviate from the guidelines imposed under section 345(b) of the

Bankruptcy Code on a final basis.

   49. Section 345(a) of the Bankruptcy Code authorizes deposits or investments

of money of a bankruptcy estate, such as cash, in a manner that will "yield the maximum

reasonable net return on such money, taking into account the safety of such deposit or

investment."  11 U.S.C. § 345(a).  For deposits or investments that are not "insured or

guaranteed by the United States or by a department agent or instrumentality of the United States

or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy

Code provides that the estate must require from the entity with which the money is deposited or

invested a bond in favor of the United States secured by the undertaking of an adequate corporate

surety.  11 U.S.C. § 345(b).

   50. A court may, however, relieve a debtor-in-possession of the restrictions

imposed by section 345(b) for "cause."  11 U.S.C. § 345(b).  Consistent with section 345(b),

---

[15] The Debtors maintain other money market accounts at BOA and JPMC with no current balances, including the Cash Reserve Account held at BOA which was described in Part I above.

Local Rule 2015-2(b) provides that no waiver of "section 345 shall be granted by the Court, without notice and an opportunity for hearing, in accordance with these Local Rules." Nevertheless, Local Rule 2015-2(b) further provides that "if a motion for such waiver is filed on the first day of a chapter 11 case in which there are more than 200 creditors, the Court may grant an interim waiver until a hearing on the Debtors' motion can be held." As this Motion is being filed on the first day of the Debtors' chapter 11 cases and the Debtors collectively have in excess of 200 creditors, the Debtors request that the Court enter an order waiving, on an interim basis, the requirements of Section 345(b) for forty-five (45) days, without prejudice to the Debtors' ability to seek a further interim or final waiver.

51.     Given the complexity of the Debtors' existing Centralized Cash Management System and the relative security of the Centralized Cash Management System, the Debtors submit that cause exists to grant an interim forty-five (45) day waiver of the requirements of section 345(b) of the Bankruptcy Code. This Court previously has granted similar relief on numerous occasions. See, e.g., In re Sharper Image Corp., Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008) (KG); In re Lillian Vernon Corp., Case No. 08-10323 (Bankr. D. Del. Feb. 21, 2008) (BLS); In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. January 23, 2008) (MFW); In re Delta Fin. Corp., Case No. 07-11880 (Bankr. D. Del. December 19, 2007) (CSS); Am. Home Mortgage Holdings, Inc., Case No. 07-11047 (Bankr. D. Del. Aug. 7, 2007) (CSS); In re Pliant Corp., Case No. 06-10001 (Bankr. D. Del. Jan. 4, 2006) (MFW); In re Maxide Acquisitions, Inc., Case No. 05-10429 (Bankr. D. Del. Feb. 15, 2005) (MFW); In re Ultimate Electronics, Inc., Case No. 05-10104 (Bankr. D. Del. Jan. 13, 2005) (PJW).

IV.    **Request that the Court Allow Administrative Expense Status for Postpetition Intercompany Transactions**

52.    In the normal course of their businesses, the Debtors and their non-Debtor affiliates engage in various intercompany transactions due to their centralized cash administration system.  As of any given date, there are numerous intercompany claims (the "Intercompany Claims") that reflect intercompany receivables and payables made in the ordinary course between and among the Debtors and between and among the Debtors and their non-Debtor affiliates (the "Intercompany Transactions").  These Intercompany Transactions include, but are not limited to:

a)    Accounts Receivables, Accounts Payables and Payroll.  In the ordinary course of business, the Debtors and certain of their non-Debtor affiliates contribute cash and process disbursements through one Centralized Cash Management System maintained by the parent, Debtor Tribune Company.  The system is so integrated that substantially all receipts are concentrated into and substantially all disbursements are paid from parent-level concentration accounts.  Also, in the ordinary course of business, the Debtors and certain of their non-Debtor affiliates may collect cash and disburse funds on behalf of other Debtors and certain other non-Debtor affiliates.  The Debtors account for this intercompany movement of cash in their intercompany books and records.

b)    Centrally Billed Expenses.  In the ordinary course of business, the Debtors and their non-Debtor affiliates incur centrally billed expenses, such as employee medical costs, insurance premiums, certain taxes (including real estate, franchise, sales, etc.) and leased equipment.  These charges are allocated among the Debtors and their non-Debtor affiliates and are reflected on the Debtors' intercompany accounts.

c)    Corporate Expense Allocation.  Charges for certain corporate expenses provided to the Debtors and their non-Debtor affiliates are allocated among the Debtors and certain of their non-Debtor affiliates based upon the cost of service provided, directly identifiable costs and other allocation methods in addition to a services fee.

d)    Capital Calls.  In the ordinary course of business, the Debtors are obligated to make capital contributions pursuant to joint venture agreements with certain non-Debtor affiliates.

53.     The Debtors maintain records of all Intercompany Transactions and can ascertain, trace and account for all Intercompany Transactions between and among the Debtors and between and among the Debtors and their non-Debtor affiliates.  Certain non-Debtor affiliates, which do not have independent cash management systems, operate within the Centralized Cash Management System.  Therefore, continuation of the existing cash management system among the Debtors and their non-Debtor affiliates is critical to preserving the nature of their businesses and avoiding highly disruptive operational distractions.

54.     To ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims against a Debtor by another Debtor or non-Debtor affiliate arising after the Petition Date as a result of Intercompany Transaction be accorded administrative priority expense status.  If all postpetition Intercompany Claims are accorded administrative priority expense status, each entity will continue to bear ultimate repayment responsibility for such ordinary course transactions. Administrative expense treatment for postpetition intercompany transactions, as requested herein, has been granted in other comparable chapter 11 cases in this District.  See, e.g., In re Tropicana Entm't, LLC, Case No. 08-10856 (Bankr. D. Del. May 6, 2008) (KJC); In re Pope & Talbot, Inc., Case No. 07-1 1738 (Bankr. D. Del. Nov. 21, 2007) (CSS); In re Dura Automotive Sys., Case No. 06-11202 (Bankr. D. Del. Oct. 31, 2006) (KJC); In re J.L. French Automotive Castings, Inc., Case No. 06-10119 (Bankr. D. Del. Mar. 9, 2006) (MFW); In re Pliant Corp., Case No. 06-10001 (Bankr. D. Del. Jan. 4, 2006) (MFW); In re FLYi, Inc., Case No. 05-20011 (Bankr. D. Del. Nov. 8, 2005); In re Federal-Mogul Global, Inc., Case No. 01-10578 (Bankr. D.

Del. Oct. 4, 2001); In re NationsRent, Inc., Case No. 01-11628 (Bankr. D. Del. Dec. 18, 2001);

In re FFC Holding, Inc., Case No. 01-2399 (Bankr. D. Del. July 18, 2001).

## V.    **Other Relief**

55.    Finally, JPMC and BOA are creditors of most of the Debtors.  It is

possible that JPMC and BOA may assert rights of setoff or banker's liens against monies of the

Debtors held at the Petition Date in these institutions.  The Debtors do not seek to prejudice such

rights by this Motion and the relief sought herein.  Consequently, the Debtors request that any

order granting this Motion further provide that "to the extent a bank has a valid and enforceable

right of setoff or lien in cash present in a Debtor's account at such bank at the moment of the

filing of the petition commencing the chapter 11 case of such Debtor (the "Petition Date Cash"),

and to the extent such cash is thereafter used by such Debtor, such bank is hereby granted (i) a

replacement lien in the Debtors' cash, and such replacement lien shall be of the same extent and

priority as such bank's interest, as of the filing of the petition commencing the chapter 11 case of

such Debtor, in the Petition Date Cash subsequently used by the Debtors and (ii) an

administrative expense claim to the extent of any diminution of Petition Date Cash after the

petition commencing the case is filed."  The Debtors believe that a relatively small or even de

minimis amount of funds is subject to this relief.

### NO PRIOR REQUEST

56.    The Debtors have not previously sought the relief requested herein from

this or any other Court.

### NOTICE

57.    Notice of this Motion has been provided to: (i) the Office of the United

States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the

United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) the administrative agents for the Debtors' prepetition loan facilities; (vii) the indenture trustee for the Debtors' prepetition notes; and (viii) the Debtors' Cash Management Banks.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as <u>Exhibit D</u>, (i) authorizing and approving the Debtors' continued use of their existing cash management system, (ii) authorizing the Debtors to continue using prepetition bank accounts and business forms, (iii) waiving the requirements of section 345(b) on an interim basis, (iv) granting administrative expense status to postpetition intercompany claims by and between the Debtors and their non-Debtor affiliates, and (v) granting such other and further relief as the Court may deem just and proper.

Dated:  Wilmington, Delaware
       December 8, 2008

Respectfully submitted,

SIDLEY AUSTIN LLP
Bryan Krakauer
James F. Conlan
Paul S. Caruso
Jessica C.K. Boelter
Candice L. Kline
One South Dearborn Street
Chicago, Illinois  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
1000 N. West Street, Suite 1200
Wilmington, Delaware  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

PROPOSED ATTORNEYS FOR
DEBTORS AND DEBTORS IN
POSSESSION