**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-_____ |
| Debtors. | Joint Administration Requested |

**MOTION OF THE DEBTORS FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 363(b) AND 363(c)(1) AUTHORIZING, BUT NOT REQUIRING, THE DEBTORS TO CONTINUE TO OPERATE IN THE ORDINARY COURSE, INCLUDING PAYMENT OF PREPETITION DATE CLAIMS, WITH RESPECT TO BROKERS**

The above-captioned debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors") hereby move this Court (the "Motion") pursuant to sections 363(b), 363(c)(1) and 105(a) of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order authorizing, but not requiring, the Debtors to continue to operate in the ordinary course of business and maintain their business relationships with respect to the Debtors' brokers,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

including payment of certain prepetition amounts owed to the brokers. The facts and circumstances supporting this Motion are set forth in the concurrently filed Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company, in support of First Day Motions (the "Bigelow Affidavit"). In further support of the Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1. On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including an order to have these cases jointly administered.

2. The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. No request has been made for the appointment of a trustee or examiner and no official committee has yet been established in these cases.

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105 and 363 of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

5. Debtor Tribune Company ("Tribune") is America's largest employee-owned media company and is the ultimate parent company of each of the Debtors. The Debtors operate businesses in publishing, interactive, and broadcasting. These operations are conducted through two business segments: (i) publishing and (ii) broadcasting and entertainment.

6. The Debtors' publishing segment currently operates eight (8) market leading daily newspapers and related businesses, distributes entertainment and syndicated content, and manages a 24-hour cable news channel. The Debtors are the nation's third largest newspaper publisher in terms of revenue and circulation. Daily newspapers published by the Debtors include the <u>Los Angeles</u> Times and the <u>Chicago Tribune</u>. The Debtors' publishing segment also manages the websites of their daily newspapers, television stations, and other branded sites targeting specific communities of interest. As of the Petition Date, the Debtors' publishing segment employed approximately 12,000 full-time equivalent employees.

7. The Debtors' broadcasting and entertainment segment includes 23 television stations, WGN America, WGN-AM, and the Chicago Cubs baseball team.[2] Through their television stations and WGN America, the Debtors' broadcasting and entertainment segment reaches more than 80% of television households in the United States. Thirteen (13) of the Debtors' stations are affiliates of The CW Television Network, America's "fifth" major broadcast network. Seven (7) are affiliates of Fox Broadcasting Network. As of the Petition Date, the Debtors' broadcasting and entertainment segment employed approximately 2,600 full-time equivalent employees.

8. The Debtors are based in the United States, with headquarters located in Chicago, Illinois. In fiscal year 2007, the Debtors and their non-debtor subsidiaries (collectively, the "<u>Tribune Entities</u>") recorded revenues of approximately $5.1 billion, resulting in net income of approximately $87.0 million. During this time, the publishing segment contributed approximately 72% of the Tribune Entities' revenue and the broadcasting and entertainment segment contributed approximately 28% of the Tribune Entities' revenue. Advertising revenue

---

[2] The broadcasting and entertainment segment also includes the subsidiaries that own the Chicago Cubs baseball operations and an equity interest in regional sports network Comcast SportsNet Chicago, LLC, which are not Debtors in these cases.

is the primary source of revenue for both the publishing and broadcasting and entertainment segments. For the quarterly period ended September 28, 2008, the consolidated financial statements of the Tribune Entities reported approximately $7.6 billion in total assets and approximately $13.9 billion in total liabilities.

### DESCRIPTION OF THE BROKERS

9.  As mentioned above, the Debtors currently operate one radio station and several television stations and cable networks. The Debtors also publish several newspaper publications and other niche publications. Every day, millions of people rely on the Debtors' radio station, television stations, cable networks and publications to help them understand the world and navigate their daily lives.

10. The Debtors' operations generate revenue from two primary sources: (i) advertising purchased by customers and (ii) subscriptions purchased by customers. The Debtors obtain new customers and maintain long-term customer relationships with certain of their advertising customers (the "Advertisers") and subscription customers (the "Subscribers") through various channels of sale and distribution. The Debtors' sales efforts are conducted through a combination of individuals employed by the Debtors (the "Employees") and relationships that have been formed with various third-party sales providers. Specifically, the Debtors utilize the services of (i) third-party telemarketing firms (the "Telemarketing Firms"); (ii) third-party marketing firms (the "Marketing Firms"); (iii) third-party advertising firms (the "Advertising Firms"); and (iv) Employee and third-party sales representatives (collectively, the "Sales Representatives" and, together with the Telemarketing Firms, Marketing Firms, Advertising Firms, and other similar sales force relationships, the "Brokers").[3]

---

[3] This Motion seeks relief with respect to Employees that are Sales Representatives (the "Employee Sales Representatives") solely in connection with the commissions that are owed on account of prepetition services provided by such Employee Sales Representatives. Relief with respect to other obligations that may be outstanding

4

11. In general, the Brokers are responsible for the promotion, sale, solicitation and confirmation of orders from Advertisers and Subscribers for the Debtors' advertising services and publications. In addition, the Brokers are responsible for directly communicating with Advertisers and Subscribers in connection with the sale and marketing of the advertising services and publications. Among other things, the Brokers generally provide the Debtors with information regarding any complaints or other problems with these items. Some of the Brokers are party to contracts with the Debtors, while others are not. A description of the specific services provided by certain Brokers follows.

    a. <u>Telemarketing Firms</u>

12. The Debtors utilize the services of approximately fourteen (14) third-party Telemarketing Firms. These firms, which are located in different geographic regions, provide a variety of marketing and subscription sales services for the Debtors' various publications. For example, certain Telemarketing Firms promote and sell, by telephone, publication subscriptions to first-time customers of the Debtors. Other Telemarketing Firms target the Debtors' prior customers, focusing instead on continuing or restarting previous customer relationships. In either scenario, the sales efforts of the Telemarketing Firms are generally focused on a particular publication and a particular geographic region.

13. The Telemarketing Firms are generally paid either or a combination of (i) commissions calculated based on the amount of subscriptions sold by the Telemarketing Firms to Subscribers located in a specific geographic region and/or (ii) a flat hourly fee for trained

---

to the Employee Sales Representatives is requested in the Debtors' Motion for an Order (I) Authorizing: (A) Payment of Prepetition Employee Wages, Salaries, Bonuses, and Other Compensation; (B) Payment of Prepetition Compensation Owed to Independent Contractors and Temporary Workers; (C) Reimbursement of Prepetition Employee Business Expenses; (D) Payments for which Prepetition Payroll and Tax Deductions Were Made; (E) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (F) Payment of Workers' Compensation Obligations; and (G) Payment To Third Parties of All Costs And Expenses Incident to The Foregoing Payments and Contributions; and (II) Authorizing and Directing Applicable Banks and Other Financial Institutions to Honor and Pay All Checks and Transfers Drawn on the Debtors' Payroll Accounts to Make the Foregoing Payments, filed contemporaneously herewith.

associates. In most cases, the Telemarketing Firms are paid one week in arrears. As a result, as of the Petition Date, there are amounts outstanding to some or all of the Telemarketing Firms.

      b. <u>Marketing Firms</u>

14. The Debtors conduct a substantial amount of publication subscription sales through the use of approximately fifty-seven (57) Marketing Firms. The Marketing Firms, each of which covers a specified geographic region, generate subscription sales for the Debtors' publications through various direct-marketing methods. For example, certain Marketing Firms solicit subscription sales at kiosks, tables, and booths set up in various retail locations or at planned special events, such as sporting events. Other Marketing Firms solicit sales through door crews that directly knock on home doors in search of new customers.

15. While the payment terms may differ among various Marketing Firms, the Debtors generally issue, on a weekly basis, commission payments to each Marketing Firm for subscriptions solicited by that Marketing Firm.[4] To the extent a Marketing Firm does not solicit any such subscriptions, the Debtors generally are not required to issue any payments to the Marketing Firm. Because the Marketing Firms are paid only after a subscription is solicited, as of the Petition Date, there are amounts due and outstanding to certain Marketing Firms on account of prepetition services.

      c. <u>Advertising Firms</u>

16. The Debtors have contracted with approximately fifteen (15) independent Advertising Firms to procure advertisement agreements and contracts for their various publications, radio station, television stations, and cable networks. In addition to placing advertisements in the Debtors' publications, the Advertising Firms serve as sales representatives

---

[4] In certain cases, a subscription must be maintained by a Subscriber for a specified period of time before any commission payments are issued.

for radio and television's time, programs, program packages, and facilities for advertising purposes.

17. Agreements with the Advertising Firms generating advertisements for the Debtors' publications are generally entered on a non-exclusive basis. However, with respect to television advertisements, the Debtors have entered an exclusive contract with one of its Advertising Firms for solicitation of certain national spot advertisements.[5] Similarly, with respect to radio advertisements, the Debtors have entered an exclusive contract with one of its Advertising Firms for solicitation of certain national broadcast advertisements.

18. The Advertising Firms are generally paid a set commission for their services. With respect to certain Advertising Firms, amounts that are owed by Advertisers on account of advertisements generated by the Advertising Firms are collected from the Advertisers by the Advertising Firms. The Advertising Firms then net out the set commission percentage due to them before remitting the remaining collected amounts to the Debtor. With respect to other Advertising Firms, the Debtors bill and collect amounts due from their Advertisers for advertisements generated by the Advertising Firms. The Debtors then remit a set commission to the Advertising Firms for the advertisements generated during the previous monthly period. Because the Advertising Firms are paid in arrears, as of the Petition Date, amounts are outstanding to certain Advertising Firms on account of prepetition services.

d. Sales Representatives

19. The Debtors also utilize approximately 1,657 Sales Representatives to solicit new advertising agreements and contracts for their various publications and related websites.[6] The Sales Representatives have developed relationships that consistently generate a

---

[5] Subject to certain exceptions, national spot or broadcast advertising generally refers to broadcast advertising time that is procured outside a station's home market.
[6] Approximately six (6) of the Sales Representatives are third-parties and approximately 1,651 of the Sales

7

certain volume of advertising for the Debtors. With respect to certain Advertisers, the Debtors' advertising revenue generation is entirely dependent upon the existing relationships that the Sales Representatives maintain. In many situations, these Advertisers work exclusively through the Sales Representatives.

20. The Sales Representatives are compensated primarily on a commission basis,[7] and are generally paid only after payment for a generated advertisement is received by the Debtors. Because the Sales Representatives are paid in arrears, as of the Petition Date, the Debtors owed amounts to certain Sales Representatives on account of prepetition services.

## RELIEF REQUESTED

21. As of the Petition Date, the Debtors' estimate the aggregate amount of accrued and outstanding prepetition obligations with respect to their Brokers to be approximately $9,300,000. By this Motion, the Debtors request the entry of an order granting the Debtors authority, in their discretion, to operate in the ordinary course of business and to maintain their business relationships with the Brokers, including the performance or payment of certain prepetition obligations the Debtors owe to their Brokers up to the amount specified as an estimate in this paragraph plus additional amounts, if necessary, up to 25% beyond the foregoing estimate. Although the Debtors believe that their estimate of their Broker liabilities set forth in this Motion have been accurately and completely prepared, permitting total payments to the Brokers of up to 125% of their estimated amount will permit the Debtors to pay most or all additional Broker liabilities that may be identified while limiting or eliminating the need to secure further Court approvals for payment of such amounts.

---

Representatives are Employee Sales Representatives.
[7] Certain Sales Representatives receive different compensation structures which may include, among other things, a fixed salary component or bonuses.

8

22.     The Debtors believe the relief requested herein is necessary to their reorganization, because the Brokers are essential to the Debtors' overall business operations. The strength of the Debtors' businesses is based upon the Debtors' continued and substantial presence in several markets, including the publishing and broadcasting industries. The Debtors rely heavily on their Brokers to sell their many publications and to place advertisements in their publications and on their broadcast radio and television stations and cable networks. Approximately 45% of the Debtors' circulation subscription sales are derived through publication subscription sales generated by Brokers, and approximately 35% of the Debtors' advertising sales are derived through television, radio, and print advertisement sales generated by Brokers. The Debtors' Broker compensation is designed to ensure that the Brokers maximize their efforts in enlisting new Advertisers and Subscribers and maintaining existing relationships with Advertisers and Subscribers.

23.     The Debtors further believe that a failure to pay the prepetition amounts owing to the Brokers would have a material, adverse effect on the Debtors' relationships with its Brokers. First, for the majority of the Brokers, the sole source of revenue from the sale of the Debtors' advertising services and publication subscriptions is from the commissions earned on account of such sales. In addition, while certain Brokers may have performance goals or quotas placed upon the Brokers obligating them to sell a pre-defined amount of advertisements or subscriptions, the Brokers' motivation to aggressively solicit new Advertisers and Subscribers to meet this quota is based primarily on the Brokers' desire to obtain the related commissions. In other words, the Brokers' incentive to expend the effort to sell the Debtors' advertisements and subscriptions is tied directly to the Brokers' commission package. Accordingly, the Debtors believe that if the Brokers are not paid on account of their prepetition obligations, the Brokers can and will substantially reduce their sales efforts on behalf of the Debtors (as their only

9

incentive to sell the Debtors' products is the payment of commissions) or completely cease their brokerage activities on behalf of the Debtors.

24. Moreover, the uninterrupted payment of the Brokers is critical to maintaining the Brokers' allegiance to the Debtors.[8] One factor contributing to the Brokers' loyalty to the Debtors during the prepetition period was the Debtors' making of timely payments to the Brokers. In the event the Brokers go unpaid, the Debtors believe that the Brokers may not put forth the same effort previously expended in connection with the sale of the Debtors' advertising services and publication subscriptions or may cease to represent the Debtors at all. As these Brokers are essentially representatives of the Debtors with respect to certain of the Advertisers and Subscribers, the Brokers' happiness and willingness to successfully market the Debtors' advertising services and publications to Advertisers and Subscribers is of utmost import to their businesses and the Debtors reorganization.

25. If certain Brokers' quality of performance were to deteriorate or certain Brokers ceased operations, the Debtors' ability to service its Advertisers and Subscribers would be damaged. The Debtors' goodwill, presence, and recognition with its Advertisers and Subscribers, which are enhanced by, and in certain cases hinge upon, the efforts of these Brokers, would be substantially harmed by a deterioration or complete cessation of effort by the Brokers. Furthermore, it is likely that the resulting erosion of the Debtors' customer base and revenue streams would severely limit the likelihood of a successful reorganization in these cases.

26. As explained above, the Debtors compensate their Brokers in arrears by commissions that are calculated based on the amount of the Debtors' advertisements and

---

[8] Furthermore, because of the small size of certain of the Brokers, any disruption in the payments to such Brokers could have an adverse effect on their operations. Many of the Brokers are small, independently run operations that are dependent on receiving timely payment from the Debtors for their livelihood and may suffer hardship if not paid. If these locations are forced to close their doors, the Debtors may not have as much or any presence in the geographic regions serviced by such Brokers.

subscriptions sold to Advertisers and Subscribers. If the Debtors are unable to make these payments, the resulting deterioration in its relationship with its Brokers is likely to have an immediate and irreparable harm on the Debtors' operations, and consequent deleterious effect on the Debtors' prospects for a successful reorganization. Further, although not all of the Brokers are subject to contract, where there are agreements in place, with respect to some of these agreements, the Debtors believe it is possible that they will assume such Broker agreements during the course of the reorganization, and therefore, any prepetition amounts owed to such Brokers would likely be considered cure obligations at the time of assumption.[9] Accordingly, for the reasons set forth herein, this Court should authorize, but not require, the Debtors to satisfy the prepetition amounts owed to the Brokers.

27. The Motion further seeks authorization for the applicable banks asked to process, honor and pay any and all checks on account of claims with respect to Brokers to rely on the representations of the Debtors as to which checks are issued and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

## APPLICABLE LAW

28. This Court has the authority to permit the Debtors to pay prepetition amounts owing to the Brokers pursuant to sections 363(b) and 105(a) of the Bankruptcy Code. The fundamental purpose of a chapter 11 reorganization is to rehabilitate the Debtors' businesses to preserve jobs and maximize value for creditors and shareholders. To help accomplish these goals, section 363(b) of the Bankruptcy Code provides "[t]he trustee after notice and a hearing,

---

[9] Nothing contained herein shall constitute, nor shall it be construed as, a request to assume or adopt any executory contract with respect to any Broker. The Debtors expressly reserve all rights with respect to the continuation or cessation of any contract with any Broker and the assumption, adoption, or rejection of any executory contract with any Broker. Furthermore, the Debtors reserve the right to contest the amount claimed to be due by any of the Brokers in the ordinary course of business.

11

may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts have properly relied on section 363(b)'s broad authority to allow debtors in possession to pay prepetition claims in circumstances where, as here, the estate will obtain more value for all creditors or avoid more harm by making the prepetition payment. See In re Synteen Tech., Inc., No. 00-02203-W, 2000 WL 33709667, at *2 (Bankr. D.S.C. 2000); In re Ionosphere Clubs, Inc., 98 B.R. 174, 176-77 (Bankr. S.D.N.Y. 1989).

29.     Furthermore, under section 105(a) of the Bankruptcy Code, the court is given broad discretion to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). It is essential to the Debtors' operations and, thus, to the success of their reorganization efforts, that the relief requested herein be granted. The Debtors' payment of their Brokers will help ensure that the Debtors' operations continue seamlessly. Accordingly, in light of the foregoing, the Debtors believe that the relief requested herein is in their best interests and the best interests of their estates and creditors, and should be approved.

30.     Numerous courts have used their section 105(a) equitable powers under the necessity of payment doctrine[10] to authorize payment of a debtor's prepetition obligations where, as here, such payment is necessary to effectuate the "paramount purpose" of chapter 11 reorganization, which is to prevent the debtor from going into liquidation and preserve the debtor's potential for rehabilitation. See In re Lehigh & New England Ry., 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the. . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); In re Ionosphere Clubs, Inc., 98 B.R. 174, 176-

---

[10] This doctrine, first articulated by the United States Supreme Court in Miltenberger v. Logansport, C. & S.W.R. Co., 106 U.S. 286, 311-12 (1882), recognizes the existence of judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor.

77 (Bankr. S.D.N.Y. 1989) (doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor"); see also In re Just for Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999) ("to invoke the necessity of payment doctrine, a debtor must show that payment of the prepetition claims is critical to the debtor's reorganization"); In re James A. Phillips, Inc., 29 B.R. 391, 394-95 (S.D.N.Y. 1983) (upholding the bankruptcy court's order authorizing the debtor to make postpetition payment of prepetition claims in the ordinary course without notice and a hearing). Ultimately, the "'necessity of payment'" doctrine is intended to facilitate the paramount goal of chapter 11; namely, "facilitating the continued operation and rehabilitation of the debtor…" Ionosphere Clubs, 98 B.R. at 176.

31. As is set forth in the Bigelow Affidavit, authorizing, but not requiring, the Debtors to perform their prepetition obligations owed to the Brokers in order to maintain the Debtors' business relationships with the Brokers will enable the Debtors to maintain their current Advertisers and Subscribers and to continue to enlist new Advertisers and Subscribers. If the Brokers are not timely paid, it is likely that they will no longer be willing to provide the same quality of service to the Debtors. Moreover, any burden to the estate to pay such obligations is significantly outweighed by the resulting loss of business that would be caused by a failure to pay such obligations and the deleterious effects on the Brokers and Advertisers and Subscribers. Because of the importance of the Brokers to the Debtors' overall industry presence and operations, the Debtors believe that paying such prepetition claims to the Brokers is integral to the Debtors' business going forward and their ability to maintain their enterprise value and to serve their Advertisers and Subscribers. As a result, the Debtors submit that authorization to continue to operate in the ordinary course regarding the payment of prepetition amounts owed to Brokers is appropriate and justified under sections 363(b) and 105(a) of the Bankruptcy Code.

32. In addition, the claims against the Debtors resulting from non-payment of the prepetition amounts due under the written Broker agreements would most likely constitute "cure" obligations under section 365(b)(1)(A) of the Bankruptcy Code to the extent the Debtors' contractual relationships with the Brokers are executory contracts that the Debtors decide to assume in the exercise of their business judgment. At this early stage of these bankruptcy cases, the Debtors have not determined which Broker contracts will be assumed. Rather than take such an action at this time, the Debtors propose to continue the status quo by paying the prepetition amounts due under the Broker agreements as set forth herein. Then, after the Debtors have had the opportunity to review their executory contracts and develop a plan of reorganization, the Debtors can determine which of the Broker contracts they wish to assume.

33. Finally, the Debtors submit that their ability to continue to operate in the ordinary course with respect to the Brokers is warranted under section 363(c)(1) of the Bankruptcy Code. Section 363(c)(1) provides that a debtor in possession "may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Section 363(c)(1) is intended to give a debtor in possession "the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving an opportunity to be heard when transactions are not ordinary." In re Roth American, Inc., 975 F.2d 949, 952 (3rd Cir. 1992) (explaining that section 363(c)(1) strikes a balance between the debtors ability to carry on with its daily operations without excessive oversight and the need to protect secured creditors from the dissipation of assets); In re Crystal Apparel, Inc., 207 B.R. 406, 409 (S.D.N.Y. 1997); In re Sieling Assocs. Ltd. P'ship, 128 B.R. 721, 724 n.3 (Bankr. E.D. Va. 1991) (explaining that section 363(c)(1) allows a debtor in possession to 'exercise reasonable

judgment in carrying out its everyday affairs and . . . avoid excessive judicial involvement in it reorganization.') (citing <u>In re D'Lites of America, Inc.</u>, 108 B.R. 352, 355 (Bankr. N.D. Ga. 1989)).

34. Additionally, pursuant to the recently revised Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 20 days after the Petition Date if such relief is necessary to avoid immediate and irreparable harm.

35. As set forth above, payment of the prepetition amounts owed to the Brokers is necessary and in the best interests of the Debtors, their estates, creditors, and other parties-in-interest. In addition, the Debtors' ability to reorganize is likely to be immediately and irreparably damaged unless the Debtors continue to maintain their existing relationships with the Brokers. The maintenance of these relationships depends on the payment of Broker claims as set forth herein. Payment of the Debtors' prepetition obligations to the Brokers is thus necessary to the survival of the Debtors and appropriate in these cases.

## NOTICE

36. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) the administrative agents for the Debtors' prepetition loan facilities; and (vii) the indenture trustee for the Debtors' prepetition notes. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

Case 08-13141-BLS   Doc 12   Filed 12/08/08   Page 16 of 17

## **NO PRIOR REQUEST**

37. No previous application for the relief requested herein has been made by the Debtors to this or any other court.

16

WHEREFORE, the Debtors respectfully request that the Court enter an order (i) granting the relief requested herein and (ii) granting such other and further relief as is just and proper.

Dated: Wilmington, Delaware
December 8, 2008

Respectfully submitted,

SIDLEY AUSTIN LLP
Bryan Krakauer
James F. Conlan
Jessica C.K. Boelter
Kerriann S. Mills
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
1000 N. West Street, Suite 1200
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

PROPOSED ATTORNEYS FOR
DEBTORS AND DEBTORS IN
POSSESSION