# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-_____ |
| | Joint Administration Requested |
| Debtors. | |

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE PAYMENT OF PREPETITION CLAIMS OF SHIPPERS AND LIEN CLAIMANTS

The above-captioned debtors and debtors in possession (each a "Debtor" and

collectively, the "Debtors") hereby move this Court (the "Motion") for entry of an order pursuant

to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code")

authorizing the Debtors, in their discretion, to pay certain prepetition claims of shipping vendors

and lien claimants in the ordinary course of business. The facts and circumstances supporting

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

this Motion are set forth in the concurrently filed Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company, in support of First Day Motions (the "Bigelow Affidavit"). In further support of the Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1.      On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including an order to have these cases jointly administered.

2.      The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner and no official committee has yet been established in these cases.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a) and 363 of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

5.      Debtor Tribune Company ("Tribune") is America's largest employee-owned media company and is the ultimate parent company of each of the Debtors. The Debtors operate businesses in publishing, interactive, and broadcasting. These operations are conducted through two business segments: (i) publishing and (ii) broadcasting and entertainment.

6.      The Debtors' publishing segment currently operates eight (8) market leading daily newspapers and related businesses, distributes entertainment and syndicated

content, and manages a 24-hour cable news channel. The Debtors are the nation's third largest newspaper publisher in terms of revenue and circulation. Daily newspapers published by the Debtors include the Los Angeles Times and the Chicago Tribune. The Debtors' publishing segment also manages the websites of their daily newspapers, television stations, and other branded sites targeting specific communities of interest. As of the Petition Date, the Debtors' publishing segment employed approximately 12,000 full-time equivalent employees.

7.       The Debtors' broadcasting and entertainment segment includes 23 television stations, WGN America, WGN-AM, and the Chicago Cubs baseball team.[2] Through their television stations and WGN America, the Debtors' broadcasting and entertainment segment reaches more than 80% of television households in the United States. Thirteen (13) of the Debtors' stations are affiliates of The CW Television Network, America's "fifth" major broadcast network. Seven (7) are affiliates of Fox Broadcasting Network. As of the Petition Date, the Debtors' broadcasting and entertainment segment employed approximately 2,600 full-time equivalent employees.

8.       The Debtors are based in the United States, with headquarters located in Chicago, Illinois. In fiscal year 2007, the Debtors and their non-debtor subsidiaries (collectively, the "Tribune Entities") recorded revenues of approximately $5.1 billion, resulting in net income of approximately $87.0 million. During this time, the publishing segment contributed approximately 72% of the Tribune Entities' revenue and the broadcasting and entertainment segment contributed approximately 28% of the Tribune Entities' revenue. Advertising revenue is the primary source of revenue for both the publishing and broadcasting and entertainment segments. For the quarterly period ended September 28, 2008, the consolidated financial

---

[2] The broadcasting and entertainment segment also includes the subsidiaries that own the Chicago Cubs baseball operations and an equity interest in regional sports network Comcast SportsNet Chicago, LLC, which are not Debtors in these cases.

statements of the Tribune Entities reported approximately $7.6 billion in total assets and approximately $13.9 billion in total liabilities.

## DESCRIPTION OF SHIPPERS AND THEIR CLAIMS

9.    As mentioned above, the Debtors' business operations involve both the publication of multiple newspapers and the placement of advertisements in these publications and otherwise.  The advertisement placement services provided by the Debtors include certain direct mailing services, whereby the Debtors print and deliver advertisements or other materials directly to their advertisers' customers (the "Direct Mail Advertisements").  The Debtors frequently utilize reputable third-party common carriers and truckers (collectively, the "Shippers") to directly and indirectly transport completed publications from the Debtors' printing facilities to the Debtors' distribution centers.[3]  The Debtors also utilize the services of Shippers to transport Direct Mail Advertisements from the Debtors' printing facilities[4] to the appropriate third-party distributor, which is typically the United States Postal Service (the "USPS").  The Debtors employ approximately thirty-eight (38) Shippers to ensure that their delivery network runs smoothly.  The Debtors anticipate that, as of the Petition Date, certain of the Shippers will have outstanding invoices for the transportation services provided to the Debtors prior to the Petition Date (the "Shipping Claims").

10.    The Shippers provide services to the Debtors on a daily basis and, as a result, in the ordinary course of business, Shippers regularly have possession of the Debtors' publications and Direct Mail Advertisements.  Specifically, each day, the Debtors rely on the

---

[3] In certain instances, the Shippers transport completed publications directly to the Debtors' various distribution centers.  In other instances, the Shippers transfer completed publications from the Debtors' printing facilities to other Shippers, who then transport the completed publications to the Debtors' distribution centers.

[4] On certain occasions, the Debtors outsource the printing of Direct Mail Advertisements.  In these situations, the Shippers transport the Direct Mail Advertisements from an outsourced printing facility to the USPS or other appropriate distribution facility.

Shippers to transport several hundred thousand copies of their publications from their printing facilities to their distribution centers, following which the Debtors arrange to have the publications delivered from the distribution centers to their subscribers. Because the publications must arrive at the Debtors' distribution centers before they can be delivered to the Debtors' subscribers, if a Shipper's deliveries are delayed by even one day, the Debtors would be unable to deliver their publications to several hundred thousand subscribers. Any such delay would not only jeopardize the Debtors' ability to satisfy their obligations to their subscribers, but could, in turn, endanger the Debtors' ability to meet the audience base expectations of various advertisers who advertise in the Debtors' publications. Similarly, each day, the Debtors also rely on the Shippers to transport their Direct Mail Advertisements, which generate a substantial amount of advertising revenue for the Debtors, from their printing facilities to the USPS. Because the Direct Mail Advertisements are often time sensitive materials, it is imperative that they be delivered with no interruption or delay. Accordingly, with respect to transportation of both completed publications and Direct Mail Advertisements, the Debtors believe that the potential injury to the Debtors if they are not permitted to pay their Shippers is likely greatly to exceed the amount of Shipping Claims held by such parties.[5]

---

[5] In addition, under most state laws, a Shipper may have a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods. Pursuant to section 363(e) of the Bankruptcy Code, the Shippers as bailee[s], may be entitled to adequate protection in the form of a possessory lien. For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." See U.C.C. § 7-307(1) (2003). As a result, certain Shippers may refuse to deliver or release the publications in their possession or control, as applicable, before their Shipping Claims have been satisfied. As explained above, should the Shippers refuse to deliver even a single day's publications or Direct Mail Advertisements, the Debtors' business operations could be negatively impacted.

## DESCRIPTION OF LIEN CLAIMANTS

11.     The Debtors operate approximately 300 printing plants, business and editorial offices, and warehouse spaces. The Debtors routinely transact business with a number of third-parties (collectively, the "Lien Claimants") who, under applicable state law, have the potential to assert liens against the Debtors and their property or other assets if the Debtors fail to pay for goods or services rendered prior to the Petition Date ("Statutory Liens"). The Lien Claimants perform various services for the Debtors, including repairing, upgrading, and servicing equipment, as well as assisting with maintenance and construction activities conducted at the Debtors' printing plants, business and editorial offices, and warehouse spaces.

12.     While many of the services performed by the Lien Claimants are routine repair and maintenance services, the Debtors also utilize a significant number of Lien Claimants in connection with certain large, ongoing construction and equipment upgrade projects. As of the Petition Date, the Debtors' largest ongoing projects include a (i) Los Angeles Reinforcement Project and (ii) Web-Width Reduction Projects, each defined and discussed in further detail below.[6]

### a.     The Los Angeles Reinforcement Project

13.     The primary office building for one of the daily newspapers published by the Debtors, the Los Angeles Times, is located in downtown Los Angeles, California. A multi-year project is in process to make certain reinforcements to the building needed to satisfy

---

[6] In addition to these projects, in order to maintain a leading market position in the broadcasting industry, the Debtors are continually expanding the scope of their high definition television services (the "HD Transition"). This expansion involves, among other things, the upgrade of video cameras, lighting equipment, and other broadcasting equipment to support high definition transmissions. In addition, on February 17, 2009, all full-power broadcast television stations in the United States must stop broadcasting on analog airwaves and begin broadcasting only in digital format. In order to ensure that their broadcast television stations are able to meet this deadline, the Debtors' have significant equipment alterations and upgrades in process (the "DT Transition", and together with the HD Transition, the "Television Broadcasting Transition Project"). Due to the various pieces of equipment and related components requiring upgrades in connection with the Television Broadcasting Transition Project, there may potentially be Lien Claimants associated with this project.

recently implemented building code requirements (the "Los Angeles Reinforcement Project").

These reinforcements primarily involve seismic structural enhancements designed to protect the

building structure from the effects of earthquake activity. In addition to satisfying applicable

building code requirements, these enhancements will ultimately provide additional safety to the

Debtors' employees working in the building, as well as added protection for the Debtors'

equipment and inventory located inside the building.

14.    Due to the magnitude of concurrent tasks required to complete the Los

Angeles Reinforcement Project, the Debtors have engaged the services of a general contractor

who, in turn, hires a significant number of subcontractors to complete various projects, each of

which may potentially be Lien Claimants.

b.  The Web-Width Reduction Projects

15.    The Debtors have several ongoing Web-Width Reduction Projects (the

"Web-Width Reduction Projects"). The Web-Width Reduction Projects seek to reduce the

printing press widths in several of the Debtors newspaper markets. The reduction in printing

press widths is anticipated to provide the Debtors with a substantial reduction in overall printing

costs.

16.    The Web-Width Reduction Projects involve the replacement of several

key components of the Debtors' printing presses. Because the Debtors are currently

implementing web-width reductions in several markets, at any given time, there may be Lien

Claimants working on or in possession of various pieces of the Debtors' printing presses.

7

## RELIEF REQUESTED

### I.    Shippers

17.    By this Motion, the Debtors seek authority to pay certain prepetition claims held by Shippers in amounts the Debtors determine necessary or appropriate to (i) maintain a reliable, efficient and smooth transportation system, (ii) induce critical Shippers to continue timely transporting the Debtors' publications, and (iii) obtain releases of their publications that may be subject to liens. The Debtors propose to pay such claims when, in the Debtors' discretion and business judgment, a failure to pay would unduly disrupt the Debtors' business operations. Accordingly, the Debtors hereby seek immediate authority to pay and discharge, on a case-by-case basis and in their discretion, the Shipping Claims, as of the Petition Date, in an amount not to exceed $5,000,000.[7]

18.    The Debtors submit that they will only pay the Shipping Claims that they believe, in their business judgment, are necessary or appropriate. In determining whether such payments are necessary or appropriate the Debtors submit that they will consider whether (i) the benefits to the Debtors' estates and creditors from making such payments would exceed the costs attributable to the failure to render payment and (ii) whether the additional expenses the Debtors would incur (in the form of premium transportation costs) to replace the Shippers would exceed the amount of unpaid prepetition claims.

19.    The Debtors further submit that they will, in their discretion, attempt to condition any payment on account of a Shipping Claim on the written acknowledgement from the applicable Shipper that it will continue to provide their services to the Debtors on trade terms that, at a minimum, such Shipper provided to the Debtors six months prior to the Petition Date,

---

[7] While this estimate reflects the amounts the Debtors believe to be outstanding on account of Shipping Claims as of the Petition Date, the Debtors are still conducting diligence efforts with respect to such amounts. As a result, the Debtors reserve the right to adjust this estimate at or prior to the hearing considering this Motion.

8

or such other trade practices and programs that are at least as favorable to the Debtors as those in effect prior to the Petition Date. Furthermore, the Debtors reserve the right to negotiate more favorable trade terms with any Shipper as a condition to payment of any such prepetition claim.

20.     The Debtors believe that the total amount to be paid to the Shippers on account of their prepetition claims is minimal compared to the importance and necessity of the Shippers to the Debtors' business operations and the direct and indirect losses that the Debtors would suffer as a consequence of a Shipper's refusal to deliver the Debtors' publications or Direct Mail Advertisements to the appropriate distribution centers.[8] Moreover, the Debtors do not believe that there are viable and timely alternatives to the Shippers that the Debtors have used prior to the Petition Date.

21.     The Debtors' strong industry presence revolves around reliable and dependable delivery to their subscribers and on behalf of their advertisers. This presence is maintained, in part, by the timely delivery of the Debtors' publications and Direct Mail Advertisements to the appropriate distribution centers, which ultimately provides for the timely delivery of both publications to the Debtors' subscribers and advertisements for the Debtors advertisers. If the Debtors' subscribers are unable to receive deliveries on a timely and uninterrupted basis, the Debtors will likely suffer, at a minimum, a significant loss of credibility, subscriber goodwill, and revenue, thereby causing substantial and potentially irreparable harm to the Debtors' businesses and reorganization efforts. The Debtors may further suffer an erosion of their advertiser base, as certain advertisers may cease advertising in the Debtors' publications if the publications are not timely delivered to the subscribers targeted by the advertisers. Similarly, if the Debtors are unable to deliver the Direct Mail Advertisements in the timeframe specified by

---

[8] As noted above, publications are generally delivered to the Debtors' distribution centers and Direct Mail Advertisements are generally delivered to the USPS. However, in certain rare instances, the appropriate distribution center may be another location.

9

their advertisers, certain, and perhaps all, of the direct-mail advertisers may choose to utilize

another provider for these services. Therefore, it is essential to the Debtors' business operations

and reorganization efforts that they maintain a reliable and efficient transportation system.

## II.    Lien Claimants

22.    In order to avoid undue delay and to facilitate the continued operation of

the Debtors' businesses, the maintenance of their properties, and the completion of the repairs

and upgrades in process for their property, equipment, or other assets, the Debtors seek, by this

Motion, immediate authority to pay and discharge, on a case-by-case basis and in their

discretion, the claims of all Lien Claimants that have given or could give rise to a Statutory Lien

against the Debtors' property, equipment, or other assets, regardless of whether such Lien

Claimants have already perfected their interests (the "Lien Claimant Claims") in an amount not

to exceed $10,000,000[9]; provided, however, that with respect to each Lien Claimant Claim, the

Debtors will not be authorized to pay a Lien Claimant Claim unless the Lien Claimant has

perfected or, in the Debtors' judgment, is capable of perfecting or may be capable of perfecting

in the future, one or more Statutory Liens in respect of such claim. Nor shall such payment be

deemed to be a waiver of any rights regarding the extent, validity, perfection or possible

avoidance of such liens.

23.    Because the Debtors will only pay Lien Claimants that have perfected

secured claims or are capable of perfecting secured claims, such payment will not affect the

amount of the distribution to such creditors, but only the timing thereof. As a result, the relief

requested herein will not prejudice other creditors of the Debtors' estates. The Debtors further

propose to condition the payment of Lien Claimant Claims, in their discretion, on the written

---

[9] While this estimate reflects the amounts the Debtors believe to be outstanding on account of Lien Claimant Claims as of the Petition Date, the Debtors are still conducting diligence efforts with respect to such amounts. As a result, the Debtors reserve the right to adjust this estimate at or prior to the hearing considering this Motion.

acknowledgment of individual Lien Claimants to continue supplying goods and services to the

Debtors on the trade terms that, at a minimum, such Lien Claimant provided to the Debtors on a

historical basis prior to the Petition Date, or such other trade practices and programs that are at

least as favorable to the Debtors as those in effect prior to the Petition Date. The Debtors also

reserve the right to negotiate new trade terms with any Lien Claimant as a condition to payment

of any Lien Claimant Claim.

       24.    As mentioned above, at any given time, third-party Lien Claimants may be

providing services for the Debtors' properties, equipment, or other assets, and may therefore

have the right to perfect state law liens related to these services. Any such liens would have to

be settled by the Debtors or their various customers, at potentially great cost to the Debtors,

including costs resulting from the likely strain on customer relations. Additionally, the existence

and perfection of the Mechanics' Liens could possibly place the Debtors out of compliance under

certain of their leases.

       25.    Further, in certain instances, such as the Web-Width Reduction Project

and Television Broadcasting Transition Project, the Debtors must meet specified target

completion dates in order to maintain industry viability. Any delay in the delivery of services or

equipment related to these projects could severely disrupt customer expectations and additionally

strain customer relations. Similarly, the Debtors are required by certain local or state laws and

regulations to complete the building enhancements associated with the Los Angeles

Reinforcement Project. A delay in the completion of this project could potentially subject the

Debtors to various fines and an interruption in office space.

26.    In order to avoid undue delay and to facilitate the continued operation of the Debtors' businesses, the Debtors believe that it is necessary, in their discretion, to pay the Lien Claimant Claims.

27.    The Motion further seeks authorization for the applicable banks asked to process, honor and pay any and all checks on account of claims with respect to Shippers and Lien Claimants to rely on the representations of the Debtors as to which checks are issued and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

## BASIS FOR RELIEF

28.    The Court may authorize the Debtors to pay the Shipping and Lien Claimants Claims under section 363(b) of the Bankruptcy Code.  That section provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under this section, a court may authorize a debtor to pay certain prepetition claims.  See Ionosphere Clubs, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing payment of prepetition claims where the debtors articulate "some business justification, other than the mere appeasement of major creditors"); see also In re James A. Phillips, Inc., 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing, pursuant to section 363, a contractor to pay prepetition claims of some suppliers who were potential lien claimants, because the payments were necessary for the general contractors to release funds owed to the debtors).

29.    As discussed above, the Debtors' request to pay the prepetition claims of the Shippers and Lien Claimants easily meets this standard because the failure to satisfy the Shipping Claims and Lien Claimant Claims could have a material adverse effect on the Debtors'

day-to-day business operations and relationships with their subscribers, as well as their
reorganization efforts.

30.     In addition, section 105(a) empowers the Court to "issue any order,
process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11
U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers to "authorize the payment of
prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a
novel concept." In re Ionosphere Clubs, Inc., 98 B.R. at 175.  Under section 105(a), the Court
"can permit pre-plan payment of a prepetition obligation when essential to the continued
operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); see also In
re Just for Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999).

31.     Finally, the "Necessity of Payment" doctrine further supports the relief
requested in this Motion.  The "necessity of payment" doctrine "recognizes the existence of the
judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such
payment is essential to the continued operation of the debtor." Ionosphere Clubs, 98 B.R. at 176;
In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987).  This rule is consistent with the
paramount goal of chapter 11, i.e., "facilitating the continued operation and rehabilitation of the
debtor ....". Ionosphere Clubs, 98 B.R. at 176; see also In re Just for Feet, Inc., 242 B.R. at 826
("To invoke the necessity of payment doctrine, a debtor must show that payment of the
prepetition claims is critical to the debtor's reorganization").

32.     Under the doctrine of necessity, a bankruptcy court may exercise its
equitable power to authorize a debtor to pay the prepetition claims of creditors whose services
are essential to the debtor's reorganization efforts. See In re Columbia Gas Sys., Inc., 136 B.R.

13

930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a prepetition claim 'is

essential to the continued operation of [the debtor], payment may be authorized'").

33.      The Debtors strongly believe that (i) continuation of their positive

relationships with the Shippers and Lien Claimants is imperative to their continued business

operations and reorganization efforts and (ii) the payment of the Shipping Claims and Lien

Claimant Claims is essential to preserve the value of the Debtors' estates.  Therefore, the Court

should exercise its equitable powers under section 105(a) to grant the relief requested in this

Motion.

34.      Indeed, it is not uncommon for courts in this District to authorize the

payment of prepetition claims of shippers and lien claimants. See e.g., In re Buffets Holdings,

Inc., Case No. 08-10141 (Bankr. D. Del. Feb. 13, 2008) (MFW); In re Holliston Mills, Inc., Case

No. 07-10687 (Bankr. D. Del. May 23, 2007) (MFW); In re Adva-Lite, Inc., Case No. 07-10264

(Bankr. D. Del. March 2, 2007) (KJC); In re Meridian Automotive Systems – Composites

Operations, Inc., et al., Case No. 05-11168 (Bankr. D. Del. Apr. 27, 2005) (MFW); In re

Ultimate Electronics, Inc., et al., Case No. 05-10104 (Bankr. D. Del. Jan. 13, 2005) (PJW); In re

KB Toys, Inc., Case No. 04-10120 (Bankr. D. Del. Jan. 16, 2004) (PJW).  The Debtors

respectfully submit that similar relief is warranted in these chapter 11 cases.

35.      Moreover, pursuant to the recent revisions to Bankruptcy Rule 6003, the

Court may authorize payment of a prepetition claim within 20 days after the Petition Date if such

relief is necessary to avoid immediate and irreparable harm.

36.      As described above, it is vital to the Debtors' reorganization efforts that

they be authorized to pay the Shipping Claims and Lien Claimant Claims in order to maintain the

Debtors' operations and the confidence and goodwill of their subscribers, advertisers, and other

customers. Failure to satisfy such claims in the first 20 days of these cases could lead to the disruption of the Debtors' operations and would also likely cause an interruption in the delivery of the Debtors' publications and Direct Mail Advertisements, or a failure to maintain industry standards with respect to broadcasting transmissions. Put very simply, maintaining timely delivery of the Debtors' publications and Direct Mail Advertisements, as well as the quality of the Debtors' broadcasting transmissions, is necessary in order for the Debtors' businesses to survive in the preliminary stages of these cases. For the foregoing reasons, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 and should be authorized, at their discretion, to immediately pay certain prepetition Shipping Claims and Lien Claimant Claims.

37.     For all the reasons discussed herein, the Debtors submit that paying the Shipping Claims and Lien Claimant Claims is critical to the Debtors' reorganization efforts and in the best interests of their estates, and therefore should be granted.

## NOTICE

38.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) the administrative agents for the Debtors' prepetition loan facilities; and (vii) the indenture trustee for the Debtors' prepetition notes. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

39.      The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as Exhibit A, (i) authorizing the Debtors to pay, in their discretion and in the ordinary course of business, the Shipping Claims and Lien Claimant Claims, and (ii) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
       December 8, 2008

Respectfully submitted,

SIDLEY AUSTIN LLP
Bryan Krakauer
James F. Conlan
Jessica C.K. Boelter
Kerriann S. Mills
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
1000 N. West Street, Suite 1200
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

PROPOSED ATTORNEYS FOR
DEBTORS AND DEBTORS IN
POSSESSION