# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-_____<br><br>Joint Administration Requested |

## MOTION OF THE DEBTORS FOR
## (I) AN ORDER AUTHORIZING, ON AN EMERGENCY
## BASIS, PAYMENT OF CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS
## AND (II) AN ORDER AUTHORIZING, BUT NOT DIRECTING, AFTER NOTICE AND
## A HEARING, THE DEBTORS TO PAY CERTAIN OBLIGATIONS ARISING IN
## CONNECTION WITH GOODS RECEIVED BY THE DEBTORS WITHIN
## THE TWENTY DAY PERIOD BEFORE THE PETITION DATE

The above-captioned debtors and debtors in possession (each a "Debtor" and

collectively, the "Debtors") hereby move this Court (the "Motion") pursuant to sections 105(a),

363, 364, 503(b), 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code")

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

for entry of (i) an order authorizing, on an emergency basis, the Debtors to pay, in their

discretion, certain prepetition claims of critical vendors and (ii) an order authorizing, but not

directing, after notice and a hearing, the Debtors, in their discretion, to pay certain obligations

arising under section 503(b)(9) of the Bankruptcy Code in connection with goods supplied by

vendors that were received by the Debtors in the ordinary course of their businesses within the

twenty day period before the Petition Date (as defined herein).  The facts and circumstances

supporting this Motion are set forth in the concurrently filed Affidavit of Chandler Bigelow III,

Senior Vice President and Chief Financial Officer of Tribune Company, in support of First Day

Motions (the "<u>Bigelow Affidavit</u>").  In further support of this Motion, the Debtors respectfully

state as follows:

**<u>STATUS OF THE CASE AND JURISDICTION</u>**

1.      On December 8, 2008 (the "<u>Petition Date</u>"), the Debtors each filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On the Petition Date, the

Debtors also jointly filed motions or applications seeking certain typical "first day" relief,

including an order to have these cases jointly administered.

2.      The Debtors have continued in possession of their respective properties

and have continued to operate and maintain their businesses as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner

and no official committee has yet been established in these cases.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this

2

Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief

sought herein are sections 105(a), 363, 364, 503(b), 1107 and 1108 of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

5.     Debtor Tribune Company ("Tribune") is America's largest employee-

owned media company and is the ultimate parent company of each of the Debtors. The Debtors

operate businesses in publishing, interactive, and broadcasting. These operations are conducted

through two business segments: (i) publishing and (ii) broadcasting and entertainment.

6.     The Debtors' publishing segment currently operates eight (8) market

leading daily newspapers and related businesses, distributes entertainment and syndicated

content, and manages a 24-hour cable news channel. The Debtors are the nation's third largest

newspaper publisher in terms of revenue and circulation. Daily newspapers published by the

Debtors include the Los Angeles Times and the Chicago Tribune. The Debtors' publishing

segment also manages the websites of their daily newspapers, television stations, and other

branded sites targeting specific communities of interest. As of the Petition Date, the Debtors'

publishing segment employed approximately 12,000 full-time equivalent employees.

7.     The Debtors' broadcasting and entertainment segment includes 23

television stations, WGN America, WGN-AM, and the Chicago Cubs baseball team.[2] Through

their television stations and WGN America, the Debtors' broadcasting and entertainment

segment reaches more than 80% of television households in the United States. Thirteen (13) of

the Debtors' stations are affiliates of The CW Television Network, America's "fifth" major

broadcast network. Seven (7) are affiliates of Fox Broadcasting Network. As of the Petition

---

[2] The broadcasting and entertainment segment also includes the subsidiaries that own the Chicago Cubs baseball operations and an equity interest in regional sports network Comcast SportsNet Chicago, LLC, which are not Debtors in these cases.

Date, the Debtors' broadcasting and entertainment segment employed approximately 2,600 full-time equivalent employees.

8.    The Debtors are based in the United States, with headquarters located in Chicago, Illinois.  In fiscal year 2007, the Debtors and their non-debtor subsidiaries (collectively, the "Tribune Entities") recorded revenues of approximately $5.1 billion, resulting in net income of approximately $87.0 million.  During this time, the publishing segment contributed approximately 72% of the Tribune Entities' revenue and the broadcasting and entertainment segment contributed approximately 28% of the Tribune Entities' revenue.  Advertising revenue is the primary source of revenue for both the publishing and broadcasting and entertainment segments.  For the quarterly period ended September 28, 2008, the consolidated financial statements of the Tribune Entities reported approximately $7.6 billion in total assets and approximately $13.9 billion in total liabilities.

## RELIEF REQUESTED

9.    By this Motion, the Debtors seek entry of an order pursuant to sections 105(a), 363, 364, 1107 and 1108 of the Bankruptcy Code and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the Debtors, (i) on an emergency basis, in their discretion, to pay the prepetition claims of critical vendors that delivered goods or provided services to the Debtors before the Petition Date and (ii) authorizing, after notice and a hearing, the Debtors to pay, in their discretion, certain administrative expense priority claims for obligations arising in connection with goods supplied by certain vendors that were received by the Debtors in the ordinary course of business within the twenty day period before the Petition Date (the "Twenty Day Period").[3]

---

[3] The Debtors also seek the authority, where applicable and consistent with the relief sought in this Motion, to "pay"

10.    The Motion further seeks authorization for all applicable banks and other financial institutions asked to process, honor and pay any and all checks and transfer requests with respect to Critical Vendor Claims and Twenty Day Claims (each as defined below) to rely on the representations of the Debtors as to which checks are issued or authorized to be paid in accordance with this Motion without any further duty of inquiry and without liability for following the Debtors' instructions.

**BASIS FOR RELIEF**

## I.    CRITICAL VENDOR PAYMENTS

11.    Certain vendors (the "Critical Vendors") have claims for providing (i) essential goods to the Debtors that were received by the Debtors before the Petition Date and/or (ii) essential services that were rendered to, or on behalf of, the Debtors before the Petition Date (collectively, the "Critical Vendor Claims").  By this Motion, the Debtors seek entry of an order authorizing the Debtors, in their discretion, to pay the prepetition claims of such Critical Vendors in an aggregate amount not to exceed $20,350,000 (the "Critical Vendor Cap").

12.    The Debtors believe that payment of the Critical Vendor Claims is vital to the Debtors' reorganization efforts because the Critical Vendors are the only source from which the Debtors can procure certain goods and services within a timeframe and at a price that will permit the Debtors to continue their businesses.  A failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendors refusing to provide goods and services to the Debtors postpetition, and may force the Debtors to obtain such goods and services elsewhere at a higher price or not of the quantity or quality required by the Debtors.[4]

---

certain of the Critical Vendor Claims and Twenty Day Claims (each as defined below) by cancelling out certain postpetition amounts that may be owed to the Debtors (a "Cancellation").  Such Cancellations would merely serve to avoid the administrative burden of keeping track of payments flowing both to and from the Debtors.

[4]    Nothing in this Motion should be construed as a waiver of the Debtors' right to compel performance of any non-

13.     The Debtors have examined whether the payment of Critical Vendor Claims is necessary and will ensure that the Debtors have access to adequate amounts of trade credit on a postpetition basis.  Specifically, the Debtors have reviewed their accounts payable and undertaken a process to identify those vendors who are essential to the Debtors' operations. The Debtors have further developed certain procedures (for which they seek this Court's approval) that, when implemented, will ensure that vendors receiving payment of Critical Vendor Claims will continue to supply trade credit necessary to the Debtors' operations on a postpetition basis.

14.     The Debtors consulted with appropriate members of their management team to identify those vendors that are most likely essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole-source" provider, (b) whether certain customizations prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe, (c) if a vendor is not a sole provider, whether the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is secured, and (d) whether a vendor meeting the standards of (a) or (b) is likely to refuse to continue providing goods or services to the Debtors postpetition if its prepetition balances are not paid.

15.     After carefully assessing the universe of vendors against the foregoing criteria, the Debtors estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtors in calculating the Critical Vendor Cap.

16.     The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of the individual Critical Vendor to continue supplying goods and services to

debtor under any agreement.

the Debtors on terms that are as or more favorable to the Debtors as the most favorable trade

terms, practices, and programs in effect between the Critical Vendor and the Debtor in the six

months prior to the Petition Date (the "Customary Trade Terms"), or such other trade terms as

are agreed to by the Debtors and the Critical Vendor.  The Debtors reserve the right to negotiate

new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor

Claim.

        17.    The Debtors further propose to take appropriate efforts, in their discretion,

to cause each Critical Vendor to enter into an agreement (the "Trade Agreement") that includes,

without limitation, the following terms:

    (a)    The amount of such Critical Vendor's estimated prepetition claim, after
accounting for any setoffs, other credits and discounts thereto, shall be as
mutually determined in good faith by the Critical Vendor and the Debtors
(but such amount shall be used only for purposes of the Order and shall
not be deemed a claim allowed by the Court, and the rights of all parties in
interest to object to such claim shall be fully preserved until further order
of the Court);

    (b)    The amount and timing of any payment agreed to be paid in satisfaction of
such estimated prepetition claim by the Debtors, subject to the terms and
conditions as set forth in this Court's Order;

    (c)    The Critical Vendor's agreement to provide goods and/or services to the
Debtors based upon the Customary Trade Terms (including, but not
limited to, credit limits, pricing, cash discounts, timing of payments,
allowances, rebates, coupon reconciliation, normal product mix and
availability and other applicable terms and programs), or such other
favorable trade terms as mutually agreed to by the Debtors and such
Critical Vendor, and the Debtors' agreement to pay the Critical Vendor in
accordance with such terms;

    (d)    The Critical Vendor's agreement not to file or otherwise assert against the
Debtors, their estates or any of their assets or property (real or personal)
any lien (a "Lien") (regardless of the statute or other legal authority upon
which such Lien is asserted) related in any way to any remaining
prepetition amounts allegedly owed to the Critical Vendor by the Debtors
arising from goods provided to the Debtors prior to the Petition Date, and
that, to the extent that the Critical Vendor has previously obtained such a

Lien, the Critical Vendor shall immediately take all necessary actions to release such Lien;

(e)     The Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the Order and consents to be bound thereby;

(f)     The Critical Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

(g)     If a Critical Vendor who has received payment of a prepetition claim subsequently refuses to supply goods to the Debtors on Customary Trade Terms or other favorable trade terms, any payments received by the Critical Vendor on account of its Critical Vendor Claim will be deemed to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor, and that such Critical Vendor shall immediately repay to the Debtors any payments received on account of its Critical Vendor Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of setoff or reclamation.

18.     Such Trade Agreements may be in addition to any other agreements between the parties.

19.     For those Critical Vendors who have agreed to provide goods or services to the Debtors on terms different from their Customary Trade Terms, the Debtors reserve the right to seek written acknowledgment of such terms on a case-by-case basis. Nothing in this Motion or any order of this Court approving this Motion should be construed as a waiver by any of the Debtors of their rights to contest any invoice of a Critical Vendor under applicable non-bankruptcy law.

20.     If a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following payment of any portion of its Critical Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors hereby seek authority to, in their discretion and without further order of the Court, (i) terminate any Trade Agreement between the Debtors and such Critical Vendor (if applicable), and (ii) deem any payments made to such Critical Vendor on account of its Critical Vendor Claim, whether

8

pursuant to a Trade Agreement or otherwise, to have been in payment of then-outstanding postpetition claims of such Critical Vendor (the "Terminated Critical Vendor") without further order of the Court. If, however, the Debtors choose not to terminate a Trade Agreement immediately upon a refusal by the participating Critical Vendor party to provide goods and/or services in accordance with such Trade Agreement, they shall not be deemed to have waived the ability to terminate such Trade Agreement.

21.     In the event the Debtors exercise either of the rights set forth in the preceding paragraph, the Debtors request that the Terminated Critical Vendor be required to immediately return any payments made on account of its Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owed to such Terminated Critical Vendor, without giving effect to any rights of setoff or reclamation. In the event that a Terminated Critical Vendor refuses to acknowledge such recharacterization and to issue the repayment, the Debtors propose that they be authorized to compel such recharacterization and repayment by a motion (on such notice as is required by this Court or by the Local Rules for the United States Bankruptcy Court for the District of Delaware).

A.     **PAYMENT OF THE CRITICAL VENDOR CLAIMS IS CRITICAL TO THE DEBTORS' REORGANIZATION EFFORTS**

22.     The Debtors believe that authority to pay the Critical Vendor Claims is vital to their reorganization efforts. If this Motion is not granted, the Debtors believe that many of the Critical Vendors will stop providing goods and services to the Debtors altogether, thereby causing immediate and irreparable damage to the Debtors and their estates.

23.     The Critical Vendors generally provide the following categories of goods and services: (i) newsprint and other printing related raw materials, (ii) commercial printing, and

(iii) broadcasting, transmissions and related services, each of which is described in further detail below.

### a. Newsprint and Other Printing Related Raw Materials

24.     Newsprint constitutes the principal raw material used by the Debtors to complete the printing of their various publications.  The price of newsprint has historically been volatile and the consolidation of North American newsprint mills over the years has reduced the number of newsprint suppliers which, over the last year, has created increases in newsprint prices.  The Debtors believe that a failure to pay the prepetition amounts owing to their newsprint suppliers on a timely basis could negatively impact their existing relationships with newsprint suppliers and, therefore, could adversely impact newsprint prices in the future.  The Debtors further believe that, due to recent market downturns in the newsprint industry, any failure to promptly pay newsprint suppliers may severely impact the financial condition of the newsprint suppliers.  Moreover, should the newsprint suppliers fail to supply newsprint continuously and promptly to the Debtors, the Debtors' business operations would be significantly disrupted.

25.     In addition to newsprint, the Debtors' ability to complete the printing of their various publications is dependent on several other raw materials.  For example, the Debtors' printing process is heavily reliant on a continuous ink supply.  As another example, the Debtors must have a sufficient inventory of custom-fit newspaper plates to ensure that ink images can successfully be transferred to newsprint.  The Debtors must also maintain an adequate inventory of polybags and shrink-wrap to guarantee that their newspapers are appropriately assembled for and adequately protected during the newspaper delivery process.  Each of these raw materials is essential to the production of the Debtors' publications.  Further, several of the raw materials are

customized to fit the Debtors' needs and, as a result, are purchased by the Debtors from a single or limited number of suppliers. Due to the critical nature of the continuous supply of these materials to the production of the Debtors' publications, it is essential to the Debtors' reorganization efforts that the delivery of these raw materials continues without any delay.

### b. Commercial Printers

26.     While the Debtors handle a significant amount of their printing and inserting requirements, the Debtors outsource certain of these obligations to third-party commercial printers (the "Commercial Printers"). Specifically, the Debtors utilize Commercial Printers to prepare inserts and print certain items that, due to specific formatting requirements and printing specifications, are either inefficiently handled or incapable of being handled by the Debtors' printing presses. For example, several of the Debtors' advertisers request the Debtors to provide direct mailing services, whereby the Debtors print and deliver advertisements or other materials directly to the advertisers' customers. These advertisements often require unique printing configurations that are not available on the Debtors' printing presses. In order to meet these printing requirements, the Debtors utilize Commercial Printers with appropriately configured printing presses. The Debtors also utilize Commercial Printers to print certain sections of their publications, such as the comics section, that require specially configured printing presses otherwise unavailable to the Debtors.

27.     The delivery of materials printed by the Commercial Printers in accordance with a specified time line is critical to the Debtors' ability to meet the demands of their advertisers, subscribers and other customers. Due to the time sensitive and customized nature of the products provided by the Commercial Printers, it is essential to the Debtors'

reorganization efforts that the Commercial Printers continue to provide customized printing
without any delay.

### c. Broadcasting, Transmissions and Related Services

28.     Certain Critical Vendors supply services that are essential to the Debtors'
maintenance of a competitive position in the broadcasting and related advertising industry.
Specifically, the Debtors' broadcast television and radio stations compete for audiences and
advertising opportunities with other broadcast television and radio stations, cable television, and
other media serving the same markets.  Competition for audience and advertising is based upon
various interrelated factors, including programming content.  The Debtors have negotiated the
right with certain third-parties to provide programming currently in high demand by their
audiences and also utilize a third-party service to monitor, track, and bill advertisers for all ads
run during their broadcast programs (the "Broadcast Trafficking").  Any interruption of the
Debtors' programming or Broadcast Trafficking services would significantly impede the
Debtors' ability to run, track and bill millions of dollars of advertising.

29.     The Debtors' broadcasting businesses are also dependent on various
transmission service providers to ensure reliable transmission of their broadcast programming
(the "Transmission Services").  For example, the Debtors' broadcast transmissions are entirely
dependent on certain custom configured satellite Transmission Services.  As another example,
during certain programming, the Debtors rely on live or real-time transmissions captured by
highly customized retro-fit helicopters.  Any interruptions in the Debtors' broadcast
programming — due to a Transmissions Service interruption or otherwise — would significantly
impede the Debtors' ability to schedule, track and bill for millions of dollars of advertisements
run during their broadcast programs.

**B.**   **CASE LAW AND STATUTORY SUPPORT FOR AUTHORIZATION TO PAY CRITICAL VENDOR CLAIMS**

      **i.**   **This Court May Authorize Payment of the Critical Vendor Claims Pursuant to Sections 363 and 364 of the Bankruptcy Code**

      30.   The Court may grant the relief requested herein pursuant to sections 363 and 364 of the Bankruptcy Code. See, e.g., In re UAL Corporation, et al., Case No. 02-48191 (ERW) (Bankr. N.D. Ill. December 11, 2002) (an essential trade motion generated by section 363 is "completely consistent with the Bankruptcy Code" and such payments have further support where the Debtor seeks "the extension of credit under section 364 on different than usual terms, terms that might include payment of a prepetition obligation"); In re James A. Phillips, Inc. Inc., 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing, pursuant to section 363, a contractor to pay prepetition claims of some suppliers who were potential lien claimants, because the payments were necessary for the general contractors to release funds owed to the debtors).

      31.   The relief requested in this Motion contemplates the payment of Critical Vendor Claims of those Critical Vendors who agree to provide postpetition goods to the Debtors on Customary Trade Terms or other terms acceptable to the Debtors.  As a result, the payment of such Critical Vendor Claims is consistent with and appropriate under sections 363 and 364 of the Bankruptcy Code.

      32.   As detailed above, maintaining the goods and services provided by the Critical Vendors is vital to the Debtors' continuing business operations and the success of these chapter 11 cases.  In addition, and as also detailed above, the Debtors have conducted an extensive analysis and review of the Debtors immediate trade needs and supplier base and have concluded that there is a significant risk that the Critical Vendors will cease doing business with the Debtors unless their Critical Vendor Claims are paid.  Should any Critical Vendor stop

supplying goods or services to the Debtors, or choose to significantly downgrade the Debtors'

trade terms, their businesses would be adversely affected as a result of, among other things, an

adverse impact on the Debtors' ability to timely produce publications and maintain a competitive

broadcasting and online presence.  This, in turn, could result in lost advertising and circulation

revenue, as well as overall subscriber and advertiser dissatisfaction.  As such, the Debtors submit

that the amount of the Critical Vendor Cap pales in comparison to the likely damage to the

Debtors' businesses and estates should the relief requested herein not be granted.  In light of the

foregoing, the Debtors submit that payment of the Critical Vendor Claims is plainly in the best

interests of their estates and creditors.

      ii.      **The Court May Also Grant the Motion Pursuant to Its General Equitable Powers under Section 105(a) of the Bankruptcy Code and the Necessity of Payment Doctrine**

      33.      The Court's general equitable powers are codified in section 105(a) of the

Bankruptcy Code.  Section 105(a) empowers the Court to "issue any order, process, or judgment

that is necessary to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  A

bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt

when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."

In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  Under section 105(a),

the Court "can permit pre-plan payment of a prepetition obligation when essential to the

continued operation of the debtor."  In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992);

see also In re Just for Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999) ("to invoke the necessity of

payment doctrine, a debtor must show that payment of the prepetition claims is critical to the

debtor's reorganization").

34.    Numerous courts have used their section 105(a) equitable powers under the necessity of payment doctrine[5] to authorize payment of a debtor's prepetition obligations where, as here, such payment is necessary to effectuate the "paramount purpose" of chapter 11 reorganization, which is to prevent the debtor from going into liquidation and preserve the debtor's potential for rehabilitation.  See In re Lehigh Co. & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); In re Ionosphere Clubs, Inc., 98 B.R. 174,176-77 (Bankr. S.D.N.Y. 1989) (doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor"); see also In re James A. Phillips, Inc., 29 B.R. 391, 394-95 (S.D.N.Y. 1983) (upholding the bankruptcy court's order authorizing the debtor to make postpetition payment of prepetition claims in the ordinary course without notice and a hearing).  The "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor."  Ionosphere Clubs, 98 B.R. at 176; In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987).  This rule is consistent with the paramount goal of chapter 11, i.e., "facilitating the continued operation and rehabilitation of the debtor . . . ." Ionosphere Clubs, 98 B.R. at 176.

35.    Under the doctrine of necessity, a bankruptcy court may exercise its equitable power to authorize a debtor to pay the prepetition claims of certain critical vendors.

---

[5] This doctrine, first articulated by the United States Supreme Court in Miltenberger v. Logansport, C. & S.W.R. Co., 106 U.S. 286, 311-12 (1882), recognizes the existence of judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor.

See In re Columbia Gas Sys., Inc., 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a prepetition claim 'is essential to the continued operation of [the debtor], payment may be authorized'"). Indeed, it is not uncommon for courts in this District to authorize the payment of critical trade claims where the payment of such claims is essential to the debtor's continued operations. See, e.g., In re Buffets Holding, Inc., Case No. 08-10141 (Bankr. D. Del. Jan. 24, 2008) (MFW) (entered by BLS); In re American Home Mortgage Holdings, Inc., Case No. 07-11047 (Bankr. D. Del. Aug. 7, 2007) (CSS); In re Tweeter Home Entertainment Group, Inc., Case No. 07-10787 (Bankr D. Del. June 12, 2007) (PJW); In re Holliston Mills, Inc., Case No. 07-10687 (Bankr. D. Del. May 23, 2007) (MFW); In re Meridian Automotive Systems-Composite Operations, et al., Case No. 05-11168 (Bankr. D. Del. May 27, 2005) (MFW); In re Glass Group, Inc., Case No. 05-10532 (Bankr. D. Del. Mar. 2, 2005) (PJW). This Court has also upheld the relief requested by the Debtors concerning their remedies for breach of a Trade Agreement. See In re Maxxim Medical Group, Inc., Case No. 03-10438 (Bankr. D. Del. Feb. 19, 2003) (Walsh, J.). The Debtors respectfully submit that similar relief is warranted in these chapter 11 cases.

> **iii.    The Court May Also Authorize the Relief Requested as a Valid Exercise of the Debtors' Fiduciary Duties**

36.    The Debtors, operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business for the benefit of . . . [their] creditors and (if the value justifies) equity owners." In re CoServ, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including operating business's going-concern value." Id.

37.     It has been noted that there are instances in which a debtor-in-possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id.  The CoServ court specifically noted that pre-plan of reorganization satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate" and also when the payment was to "sole suppliers of a given product." Id. at 497-98.  The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498.

38.     Payment of the Critical Vendor Claims meets the test set forth in CoServ. As described above, the Debtors have narrowly tailored the Critical Vendor Cap to encompass only those Critical Vendors which are essential to the business and operation of each of the Debtors' businesses.  Any interruption of the Debtors' operations could cost the Debtors' estates millions of dollars in lost revenues and furthermore, could cause the Debtors' to lose a significant amount of customers.  Accordingly, the harm that would stem from the failure to pay of any of the Critical Vendors is disproportionate to the amount of the prepetition claims that the Debtors are seeking to pay hereunder.  Moreover, with respect to each Critical Vendor, the Debtors have examined other options short of payment of such Critical Vendor Claims and have determined that to avoid significant disruption of the Debtors' business operations, there exists

17

no practical or legal alternative to payment of the Critical Vendor Claims. Therefore, the

Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and

1108 of the Bankruptcy Code by payment of the Critical Vendor Claims. Accordingly, the Court

should grant the relief requested herein.

> **iv.    The Court Should Authorize the Debtors to Satisfy the Critical
> Vendor Claims Within Twenty Days After the Petition Date as
> Requested**

39.    Pursuant to the recent revisions to Bankruptcy Rule 6003, the Court may

authorize payment of a prepetition claim within 20 days after the Petition Date if such relief is

necessary to avoid immediate and irreparable harm. As explained above, satisfying the Critical

Vendor Claims is essential to the continued, uninterrupted operation of the Debtors' businesses.

Without satisfaction of these claims, the Debtors believe that the Critical Vendors will

significantly downgrade trade terms and may stop supplying them with critical goods and

services necessary in their operations, thereby hampering the Debtors' ability to successfully

reorganize.

40.    For the foregoing reasons, the Debtors submit that they have satisfied the

requirements of Bankruptcy Rule 6003 and accordingly, the Court should grant the relief

requested herein.

## II.    PAYMENTS TO VENDORS RELATED TO SECTION 503(b)(9) ADMINISTRATIVE EXPENSE PRIORITY CLAIMS

41.    In the ordinary course of their businesses, the Debtors receive goods on a

daily basis that are used in their operations. As such, the Debtors have received goods (the

"Twenty Day Goods") from various vendors, including certain Critical Vendors, (the "Twenty

Day Vendors"), in the ordinary course of their businesses within the Twenty Day Period for

which payment has not yet been made. In order to maintain and ensure timely delivery of

postpetition goods from the Twenty Day Vendors, and to help ensure that the Debtors have access to postpetition trade credit from the Twenty Day Vendors, the Debtors also seek entry of an order, after notice and a hearing, authorizing payment in the ordinary course of certain prepetition claims of Twenty Day Vendors entitled to administrative priority under Bankruptcy Code sections 503(b)(9) and 507(a)(2) for those undisputed obligations arising from Twenty Day Goods received by the Debtors (the "Twenty Day Claims"). The Debtors estimate that they have received approximately $30,000,000 of Twenty Day Goods, which have not yet been paid for.

42.    Section 503(b)(9) of the Bankruptcy Code provides that "there shall be allowed administrative expenses . . . including . . . the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). Moreover, pursuant to section 507(a)(2) of the Bankruptcy Code, administrative expenses allowed under section 503(b) are granted priority status. Accordingly, Twenty-Day Vendors with Twenty-Day Claims should be allowed administrative expense priority claims for those undisputed obligations. 11 U.S.C. § 503(b)(9).

43.    Although Twenty Day Claims are not <u>required</u> to be paid prior to the general payment of administrative claims in connection with confirmation of a chapter 11 plan, nothing in the Bankruptcy Code prohibits the Debtors from paying such claims sooner if they choose to do so, and courts in this district have held that timing of such payments is within the discretion of the Court. <u>See</u> <u>e.g.</u>, <u>In re Global Home Products, LLC</u>, 2006 Bankr. LEXIS 3608 (Bankr. D. Del. December 21, 2006) (timing of payment of section 503(b)(9) claim is within discretion of court). Additionally, since the enactment of 503(b)(9), courts in this jurisdiction have exercised their discretion in favor of granting relief similar to the relief requested herein.

See e.g., In re Dura Automotive Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31,

2006); In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. June 13,

2006).  In fact, one judge in this district, in granting similar relief, noted that "arguably the

debtor could pay its 503(b)(9) claimants without court approval."  In re Dura Automotive Sys.,

Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) (approving payment of 503(b)(9)

claims as first day relief).

   44. As described above with respect to the Critical Vendor Claims, the

Debtors submit that they will, in their discretion, attempt to condition any payment on account of

a Twenty Day Claim on the written acknowledgement from the applicable Twenty Day Vendor

that they will continue to provide their goods to the Debtors on trade terms that, at a minimum,

such Twenty Day Vendor provided to the Debtors six (6) months prior to the Petition Date, or

such other trade practices and programs that are at least as favorable to the Debtors as those in

effect prior to the Petition Date.[6]  Furthermore, the Debtors reserve the right to negotiate more

favorable trade terms with any Twenty Day Vendor as a condition to payment of any such

Twenty Day Claim.  Moreover, the Debtors are not seeking authority to alter the priority scheme

created by the Bankruptcy Code in a manner which prejudices the rights of their general

unsecured creditors, but rather the Debtors are merely seeking authority to alter the timing of

payments of administrative expense claims that the Twenty Day Vendors are entitled to be paid

under the Bankruptcy Code.

   45. Accordingly, the Debtors should be authorized, in their discretion, after

notice and hearing, to pay the Twenty Day Claims pursuant to section 503(b)(9) of the

---

[6] Any payment made by the Debtors on account of section 503(b)(9) of the Bankruptcy Code will be conditioned upon the Vendor's agreement to refrain from asserting, or to withdraw, any reclamation claim with respect to the Priority goods.

20

Bankruptcy Code.[7]  A hearing with respect to the relief requested in connection with the Twenty

Day Claims shall be held on the date and at the time specified in the Order attached hereto as

Exhibit A, and parties shall be given an opportunity to object as set forth in the Order.  A

proposed order with respect to the relief requested herein in connection with the Twenty Day

Claims is attached hereto as Exhibit B.

## NOTICE

46.     Notice of this Motion has been provided to: (i) the Office of the United

States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the

United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the

Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) the administrative

agents for the Debtors' prepetition loan facilities; and (vii) the indenture trustee for the Debtors'

prepetition notes.  Notice of this Motion and any order entered hereon will be served in

accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the

Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

47.     The Debtors have not previously sought the relief requested herein from

this or any other Court.

---

[7] To the best of their knowledge, any Twenty Day Claims that the Debtors seek to satisfy under this Motion, pursuant to section 503(b)(9), do not exceed the value of the underlying goods, as required by section 503(b)(9) of the Bankruptcy Code.

WHEREFORE, the Debtors respectfully request that the Court enter orders, in substantially the forms attached hereto as Exhibit A and Exhibit B (i) authorizing, on an emergency basis, the Debtors to satisfy, in their discretion, the Critical Vendor Claims; (ii) authorizing, after notice and a hearing, the Debtors to satisfy, in their discretion, the Twenty Day Claims as they come due; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware  
       December 8, 2008

Respectfully submitted,

SIDLEY AUSTIN LLP  
James F. Conlan  
Bryan Krakauer  
Jessica C.K. Boelter  
Kerriann S. Mills  
One South Dearborn Street  
Chicago, IL  60603  
Telephone:  (312) 853-7000  
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,  
FORMAN & LEONARD, P.A.

By: _____  
Norman L. Pernick (No. 2290)  
J. Kate Stickles (No. 2917)  
Patrick J. Reilley (No. 4451)  
1000 N. West Street, Suite 1200  
Wilmington, DE  19801  
Telephone:  (302) 652-3131  
Facsimile:  (302) 652-3117

PROPOSED ATTORNEYS FOR  
DEBTORS AND DEBTORS IN  
POSSESSION