# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141-KJC |
| Debtors. | Joint Administration Requested |

**MOTION OF THE DEBTORS FOR AN ORDER (I) AUTHORIZING THE DEBTORS TO GUARANTEE AN AMENDED SECURITIZATION FACILITY AND FOR CERTAIN DEBTORS TO CONTINUE SELLING RECEIVABLES AND RELATED RIGHTS PURSUANT THERETO, (II) AUTHORIZING THE DEBTORS TO ENTER INTO A LETTER OF CREDIT FACILITY, (III) MODIFYING THE AUTOMATIC STAY AND (IV) GRANTING OTHER RELATED RELIEF PURSUANT TO SECTIONS 105, 362(d), 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) AND 365 OF THE BANKRUPTCY CODE**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

The above-captioned debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors") hereby move this Court (the "Motion") for entry of an order (i) authorizing Tribune Company and the other Originators[2] to enter into an omnibus amendment (as amended, supplemented or otherwise modified from time to time, the "Omnibus Amendment") to (a) that certain Receivables Loan Agreement, dated as of July 1, 2008 (as heretofore amended, the "RLA") among Tribune Company, Tribune Receivables, LLC ("Tribune Receivables" or the "Buyer") and Barclays Bank PLC, in its capacities as Lender, Funding Agent and Administrative Agent (in all such capacities, and together with its successors in such capacities, the "RLA Agent"), (b) that certain Receivables Purchase Agreement, dated as of July 1, 2008 (as heretofore amended, the "RPA") among Tribune Receivables, Tribune Company and the other Originators and (c) that certain Servicing Agreement, dated as of July 1, 2008 (as heretofore amended, the "Servicing Agreement") among Tribune Receivables, Tribune Company and the other Originators, which Omnibus Amendment shall, among other things, increase the aggregate principal amount of Loans (as defined in the RLA, as amended by the Omnibus Amendment) available to Tribune Receivables under the RLA, as amended by the Omnibus Amendment, to $300,000,000; (ii) authorizing Tribune Company and the other Debtors to guarantee certain of the obligations of Tribune Receivables under the RLA, RPA and Servicing Agreement, in each case, as amended by the Omnibus Amendment (collectively, the

---

[2] "Originators" means, collectively, the following Debtors: Tribune Company, Chicagoland Television News, Inc., Tribune Broadcast Holdings, Inc., Tribune Interactive, Inc., Tribune Television Holdings, Inc., WGN Continental Broadcasting Company, WPIX, Inc., Tribune Television New Orleans, Inc., KSWB Inc., KTLA Inc., KIAH Inc., Tower Distribution Company, Tribune Television Northwest, Inc., Tribune Television Company, Channel 40, Inc., Channel 39, Inc., Los Angeles Times Communications LLC, WDCW Broadcasting, Inc., Orlando Sentinel Communications Company, Sun-Sentinel Company, Gold Coast Publications, Inc., Forum Publishing Group, Inc., The Daily Press, Inc., Chicago Tribune Company, The Baltimore Sun Company, The Hartford Courant Company and The Morning Call, Inc.

"Amended Agreements") and other Transaction Documents (as defined in the Amended

Agreements), and execute a guarantee in favor of the RLA Agent in connection therewith (as

amended, supplemented or otherwise modified from time to time, the "Guaranty") and secure

their obligations under the Guaranty, the Amended Agreements and the Transaction Documents

pursuant to a security agreement (as amended, supplemented or otherwise modified from time to

time, the "Guaranty Security Agreement"); (iii) authorizing Tribune Company and the other

Debtors to enter into, perform its reimbursement and other obligations under, and provide the

required cash collateral under, a new, postpetition letter of credit facility in the amount of up to

$50,000,000 (as amended, supplemented or otherwise modified from time to time, the "Letter of

Credit Agreement") to be provided by Barclays Bank PLC, as administrative agent (in such

capacity, the "LC Agent") and issuing bank (in such capacity, the "Issuing Bank") and a

syndicate of other financial institutions (including Barclays Bank PLC, the "Lenders"); (iv)

granting the RLA Agent, the LC Agent, the Issuing Bank and the Lenders priority in payment

with respect to the obligations of Tribune Company and the other Debtors under the Amended

Agreements, the Guaranty, the Guaranty Security Agreement and the Letter of Credit Agreement

over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b)

and 507(b), other than in respect of the Carve-Out (as defined below); (v) scheduling a

preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of an interim

order pursuant to Bankruptcy Rule 4001 (this "Order"); and (vi) requesting that a final hearing

(the "Final Hearing") be scheduled, and that notice procedures in respect of the Final Hearing be

established, by this Court to consider entry of a final order (the "Final Order") authorizing on a

final basis, among other things, the Omnibus Amendment, the Guaranty, the Guaranty Security

Agreement and the Letter of Credit Agreement, and granting other related relief.  The facts and

circumstances supporting this Motion are set forth in the concurrently filed affidavit of Chandler

Bigelow III, Senior Vice President & Chief Financial Officer of Tribune Company, in Support of

First Day Motions (the "Bigelow Affidavit").  In further support of the Motion, the Debtors

respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1.      On December 8, 2008 (the "Petition Date"), the Debtors each filed a

voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code").

On the Petition Date, the Debtors also jointly filed motions or applications seeking certain

typical "first day" relief, including an order to have these cases jointly administered.

2.      The Debtors have continued in possession of their respective properties

and have continued to operate and maintain their businesses as debtors-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner

and no official committee has yet been established in these cases.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief

sought herein are sections 105, 361, 362(d), 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2),

364(c)(3), 364(d)(1), 364(e) and 365 of title 11 of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

5.      Based in Chicago, Illinois, Tribune Company ("Tribune") is America's

largest employee-owned media and entertainment company and is the ultimate parent company

of each of the Debtors.  Tribune is a media industry leader, reaching more than 80% of U.S.

households through its newspapers and other publications, its television and radio broadcast stations and cable channels, and its other entertainment offerings. Tribune's operations are conducted through two primary business segments: (i) publishing and (ii) broadcasting and entertainment.

### Publishing

6.    The Debtors' publishing segment currently operates eight (8) major-market daily newspapers, distributes entertainment listings and syndicated content through its Tribune Media Services business unit, and manages the Chicago area's first and only 24-hour cable news channel, CLTV. The Debtors publish daily newspapers in two of the three largest metropolitan markets and are the nation's third largest newspaper publisher in terms of revenue and circulation. The daily newspapers published by the Debtors, which have collectively garnered 83 Pulitzer prizes, include market leading papers such as the Chicago Tribune, the Los Angeles Times, The Sun, the South Florida Sun-Sentinel, the Orlando Sentinel, the Hartford Courant, The Morning Call, and the Daily Press. The Debtors' newspapers collectively have paid circulation of 2.2 million copies daily and 3.3 million copies on Sundays. In addition, the Debtors publish over 100 "niche" publications that target various geographic, ethnographic and demographic audiences and include the upscale Chicago Magazine, the Spanish language newspaper "Hoy," which is published in Chicago and Los Angeles, and Chicago's Redeye, which targets a younger demographic. The Debtors' publishing segment also manages the websites of the Debtors' daily newspapers, television stations, and other branded sites targeting specific communities of interest. Every day, millions of people rely on the Debtors' newspapers, niche publications and websites to help them understand the world and navigate their daily lives.

As of the Petition Date, the Debtors' publishing segment employed approximately 12,000 full-time equivalent employees.

### Broadcasting and Entertainment

7.    The Debtors' broadcasting and entertainment segment includes 23 television stations in 19 markets, including seven stations in the top 10 U.S. markets. The Debtors also own and operate the cable "Superstation" WGN America, which is seen in approximately 71 million homes, and Chicago radio station WGN-AM, which first went on the air in 1924 and whose call letters reflect the Chicago Tribune's longtime slogan, "the World's Greatest Newspaper." Long a broadcast innovator -- it was first to broadcast the World Series, the Indianapolis 500 and the Kentucky Derby and broke new ground by introducing microphones in the courtroom during the famous 1925 Scopes "monkey trial" -- WGN is perennially the number one radio station in the Chicagoland market. Through its television stations and WGN America, the Debtors' broadcasting and entertainment segment reaches more than 80 percent of television households in the United States. Thirteen (13) of the Debtors' stations are affiliates of The CW Television Network, America's "fifth" major broadcast network, with affiliate stations located in New York, Los Angeles, Chicago, Dallas, Washington D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, Hartford and New Orleans. The Debtors' broadcasting operations also include seven (7) Fox Broadcasting Network affiliates, located in Seattle, Sacramento, Indianapolis, San Diego, Hartford, Grand Rapids and Harrisburg, and one ABC television affiliate in New Orleans.[3] As of the Petition Date, the Debtors' broadcasting and entertainment segment employed approximately 2,600 full-time equivalent employees.

---

[3] The broadcasting and entertainment segment also includes the subsidiaries that own the Chicago Cubs baseball operations and an equity interest in regional sports network Comcast Sportsnet Chicago, LLC, which are not Debtors in these cases.

### Recent Operations

8.      In fiscal year 2007, the Debtors and their non-debtor subsidiaries[4]

(collectively, the "Tribune Entities") recorded revenues of approximately $5.1 billion, resulting

in net income of approximately $87 million.  During this time, the publishing segment

contributed approximately 72% of the Tribune Entities' revenue and the

broadcasting/entertainment segment contributed approximately 28% of the Tribune Entities'

revenue.  Advertising is the primary source of revenue for both the publishing and

broadcasting/entertainment segments.  Daily newspaper revenues are derived principally from

advertising and circulation sales, which accounted for 78% and 14%, respectively, of the

publishing segment's total revenues in 2007.  Publishing revenues decreased 9%, or $354

million, in 2007, primarily due to a decrease in advertising revenue, which declined 10%, or

$334 million, in 2007, while circulation revenues were down 7%.  Broadcasting and

entertainment revenues decreased in 2007 by 2%, or $27 million, due to decreased television

revenues which, in turn, resulted primarily from a decline in advertising revenues.

9.      While the Debtors' performance is comparable, and in some areas

superior, to that of their peers, operations have been adversely affected by the general

deterioration in the publishing and broadcasting industries, particularly through the continuing

severe decline in advertising revenue in this recession.  As a result, the Debtors face increasing

---

[4] The non-debtor subsidiaries are:  Chicago National League Ball Club, LLC; Chicago Cubs Dominican Baseball Operations, LLC; Diana-Quentin, LLC; Fairfax Media, Inc.; Multimedia Insurance Company; Professional Education Publishers International (Africa) Pty Ltd.; TMS Entertainment Guides Canada Corp.; Tribune (FN) Cable Ventures Inc.; Tribune Hong Kong, Ltd.; Tribune Interactive, Inc.; Tribune Media Services, B.V.; Tribune National Marketing Company; Tribune ND, Inc.; Tribune Receivables LLC; Tribune Sports Network Holdings, LLC, and Wrigley Field Premium Tickets and Services, LLC.  For the most part, these entities are either (i) associated with business operations that are co-owned with third parties, (ii) foreign corporations, (iii) businesses subject to disposition, such as the Chicago Cubs baseball operations, or (v) entities for which a bankruptcy filing is not suitable, such as Tribune Receivables, LLC, the special purpose subsidiary which is party to the Debtors receivables financing facility, and MultiMedia Insurance Company.  Entities in which the Debtors own less than 100% of the equity are also not included in the bankruptcy filing.

constraints on their liquidity, including their ability to service the approximately $13 billion in

indebtedness owed to their lenders and noteholders.  These Chapter 11 Cases were commenced

to restructure and strengthen the Debtors' balance sheet, preserve the enterprise for the Debtors'

stakeholders, including the employee owners, and improve the Debtors' liquidity going forward.

## SUMMARY OF PREPETITION INDEBTEDNESS

10.     In connection with the Merger and in order to fund ongoing general

corporate and working capital needs, Tribune entered into financing facilities in May, 2007 and

December, 2007, as described below.  Tribune is also the obligor on a series of outstanding bond

issuances that predated the Merger, as further described below.  Accordingly, as of the Petition

Date, Tribune owed approximately $13 billion in total funded debt.  Additionally, Tribune (in its

capacity as servicer) and Tribune Receivables LLC, a wholly owned special purpose subsidiary

which is not a Debtor, are parties to a $300 million trade receivables securitization facility for

which Barclays Bank PLC is the administrative agent and Tribune Receivables LLC is the

borrower.  The outstanding balance under the trade receivables securitization facility is

approximately $225 million.

11.     The following is a brief overview of Tribune's debt facilities and

outstanding note issuances.  All of the indebtedness described below -- the Credit Agreement

indebtedness, the Bridge Facility indebtedness, the Notes and the PHONES -- are obligations of

the parent company, Tribune.  This indebtedness is pari passu in payment priority at Tribune,

except for the PHONES which are contractually subordinated to all other funded indebtedness at

Tribune.  The Credit Agreement indebtedness and the Notes are secured at Tribune, equally and

ratably, by a stock pledge of the equity in two subsidiaries.  Neither the Bridge Facility nor the

PHONES is secured.  Additionally, the indebtedness under the Credit Agreement and the

indebtedness under the Bridge Facility constitute unsecured obligations at those Tribune

subsidiaries (the "Guarantor Subsidiaries"),[5] which have guaranteed (i) the Credit Agreement

indebtedness on a senior priority basis, and (ii) the Bridge Facility indebtedness on a subordinate

basis to the Credit Agreement indebtedness.  Neither the Notes nor the PHONES are guaranteed

by, or constitute obligations of, any of the subsidiaries; they are liabilities solely of Tribune.

Additionally, Tribune is obligated on a $225 million subordinated promissory note to EGI-TRB

LLC and certain permitted assignees of EGI-TRB LLC, which note is subordinate to the

indebtedness under the Credit Agreement, the Bridge Facility and the Notes.

### (1)    The Senior Credit Facility

12.    On May 17, 2007 Tribune entered into a $8.028 billion Credit Agreement

(as amended, the "Credit Agreement") with JPMorgan Chase Bank, N.A. as Administrative

Agent, Merrill Lynch Capital Corporation as Syndication Agent, Citicorp North America, Inc.,

Bank of America, N.A. and Barclays Bank PLC as Co-Documentation Agents, and the Initial

Lenders named therein.  The Credit Agreement consists of the following facilities: (a) a $1.5

billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion

---

[5] The Guarantor Subsidiaries are those subsidiaries deemed material under the Credit Agreement, and are comprised of the following:  Tribune Broadcasting Holdco, LLC; Tribune Broadcasting Company; ChicagoLand TV News, Inc.; KWGN, Inc.; KTLA, Inc.; WPIX, Inc.; KPLR, Inc.; Tribune Television Northwest, Inc.; WGN Continental Broadcasting; Tribune Broadcast Holdings, Inc.; Tower Distribution Co.; Tribune Television Holdings, Inc.; Tribune Television Company; KSWB, Inc.; KIAH, Inc.; TV FN Cable Ventures, Inc.; Tribune Television New Orleans, Inc.; Tribune Entertainment Co.; Channel 40, Inc. (KTXL); Channel 39, Inc. (WBZL); WTXX, Inc.; WBCW Broadcasting, Inc.; 5800 Sunset Production, LLC; Eagle New Media Investments, LLC; Tribune NM, Inc.; Star Community Publishing, LLC; Stemweb, Inc.; Internet Foreclosure Service, Inc.; Homeowners Realty, Inc.; Forsalebyowner.com Corp.; Hoy Publications, LLC; Chicago Tribune Company; Tribune Interactive; Chicagoland Publishing Company; Tribune Direct Marketing, Inc.; Eagle Publishing Investments, LLC; Forum Publishing Group, Inc.; Tribune California Properties, Inc.; Sun Sentinel Co.; Gold Coast Publications, Inc.; Tribune Los Angeles, Inc.; LA Times Communications, LLC; Tribune Manhattan Newspaper Holdings, Inc.; Tribune New York Newspaper Holdings, LLC; Tribune National Mktg. Co.; Tribune Media Net, Inc.; Orlando Sentinel Communications Co.; Tribune Media Services, Inc.; TMS Entertainment Guides, Inc.; The Daily Press, Inc.; Virginia Gazette Companies, LLC; Baltimore Sun Co.; Homestead Publishing Co.; Patuxent Publishing Co.; Tribune Finance, LLC; Morning Call, Inc.; So. Conn. Newspaper, Inc.; TMLSI, Inc.; Chicago National League Ball Club, LLC; Tribune N.D., Inc.; DSA, Inc. Star Community Publishing, LLC; Hartford Courant Co.; Courant Specialty Products; New Mass Media, Inc.; CA Community News Corp.; and TMLH2, Inc.

Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed

Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750

million Revolving Credit Facility (the "Revolving Credit Facility"), which includes a letter of

credit subfacility in an amount up to $250 million and a swing line facility in an amount up to

$100 million.  The Credit Agreement also provided a commitment for an additional $2.105

billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility").

Accordingly, the aggregate amount of the facilities under the Credit Agreement total $10.133

billion.  As of the Petition Date, the approximate outstanding balances on the Tranche X Facility,

Tranche B Facility and the Revolving Credit Facility are $512 million, $7.5 billion and $237

million, respectively.  This indebtedness is secured by a pledge of the equity interests of Debtors

Tribune Finance, LLC and Tribune Broadcasting Holdco, LLC ("Stock Pledge"), and is

guaranteed, on a senior priority basis, by the Guarantor Subsidiaries.

> **(2)**     **The "Bridge" Credit Facility**

13.     On December 20, 2007, Tribune entered into (i) a $1.6 billion Senior

Unsecured Interim Loan Agreement (the "Interim Credit Agreement") with Merrill Lynch

Capital Corporation as Administrative Agent, JPMorgan Chase Bank, N.A. as Syndication

Agent, Citicorp North America, Inc. and Bank of America, N.A. as Co-Documentation Agents,

and the Initial Lenders named therein, and (ii) a number of increase joinders pursuant to which

the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement.

Pursuant to the Interim Credit Agreement, Tribune borrowed $1.6 billion under a twelve (12)

month bridge facility (the "Bridge Facility").  The total proceeds of $3.705 billion from the

Bridge Facility and the Incremental Facility were used by Tribune, among other ways, in

connection with the consummation of the Merger and for general corporate purposes.  The

Bridge Facility indebtedness is unsecured but is guaranteed, on a senior subordinate basis,[6] by the Guarantor Subsidiaries.  As of the Petition Date, the approximate outstanding balance of the Bridge Facility is $1.6 billion.

**(3)    The Notes and the PHONES**

14.    Pursuant to Indentures entered into between 1992 and 1997, Tribune is obligated on various issues of outstanding bonds ("Notes") in the aggregate approximate amount of $1.26 billion.  Each outstanding series and the approximate principal amounts owing are as follows:

| Indenture | Interest Rate | Maturity Date | Outstanding Amount |
|---|---|---|---|
| 1992 | 6.25% | November 10, 2026 | $120,000.00 |
| 1995 | 7.25% | March 1, 2013 | $ 82,083,000.00 |
| 1995 | 7.5% | July 1, 2023 | $ 98,750,000.00 |
| 1996 | 6.61% | September 15, 2027 | $ 84,960,000.00 |
| 1996 | 7.25% | November 15, 2096 | $148,000,000.00 |
| 1997 | 4.875% | August 15, 2010 | $450,000,000.00 |
| 1997 | 5.25% | August 15, 2015 | $330,000,000.00 |
| 1997 | 5.67% | December 8, 2008 | $ 69,550,000.00 |

15.    The Notes are not guaranteed, but as a result of "equal and ratable" provisions in the various indentures, the Notes (other than the PHONES, described below) are secured by the Stock Pledge on a pari passu basis with the indebtedness under the Credit Agreement.

16.    In April, 1999, Tribune issued 8 million Exchangeable Subordinated Debentures due 2029 (the "PHONES") for an aggregate principal amount of approximately $1.3 billion.  At the time of issuance, the value of one PHONES was related to the value of one

---

[6] The guaranty by the Guarantor Subsidiaries of the Bridge Facility indebtedness is subordinate to the guaranty of the Credit Agreement indebtedness.

"reference share" of AOL common stock, which was trading at $157 per share at the time. On November 22, 1999, AOL split (2:1), changing the reference to two shares of AOL for each PHONES. On January 11, 2001, America Online and Time Warner merged to form AOL Time Warner Inc. with the merged entity continuing to trade under the ticker AOL. On October 16, 2003, AOL Time Warner Inc. changed its name to Time Warner Inc. and began trading as TWX. As a result of the split and subsequent merger, two shares of TWX common now represent the "reference shares" for each PHONES share. Tribune may redeem the PHONES at any time for the higher of the principal value of the PHONES or the then current market value of two shares of Time Warner common stock, subject to certain adjustments. Holders of PHONES are contractually entitled to exchange a PHONES for an amount of cash equal to 95% (or 100% under certain circumstances) of the then current market value of two shares of Time Warner stock. As of the Petition Date, the approximate amount of PHONES outstanding was $900,000,000. The PHONES are contractually subordinated in right of payment to the indebtedness owing under the Bridge Facility, the Credit Agreement and the Notes.

### RELIEF REQUESTED

17.    By this Motion, the Debtors request:

        a.   Authority for the Debtor Tribune Company and the other Debtors to enter into an Omnibus Amendment to (a) that certain RLA, dated as of July 1, 2008 among Tribune Company, Tribune Receivables and Barclays Bank PLC, the RLA Agent, (b) that certain RPA, dated as of July 1, 2008 among Tribune Receivables, Tribune Company and the other Originators and (c) that certain Servicing Agreement, dated as of July 1, 2008 among Tribune Receivables, Tribune Company and the other Originators, which Omnibus Amendment shall, among other things, increase the aggregate principal amount of Loans (as defined in the RLA, as amended by the Omnibus Amendment) available to Tribune Receivables under the RLA, as amended by the Omnibus Amendment, to $300,000,000;

b.  Authorize Debtor Tribune Company and the other Debtors to guarantee certain of the obligations of Tribune Receivables under the Amended Agreements and other Transaction Documents (as defined in the Amended Agreements), and execute a Guaranty in favor of the RLA Agent in connection therewith and secure their obligations under the Guaranty, the Amended Agreements and the Transaction Documents pursuant to a Guaranty Security Agreement;

c.  Authorize Debtor Tribune Company and the other Debtors to enter into, perform its reimbursement and other obligations under, and provide the required cash collateral under, the Letter of Credit Agreement, a new, postpetition letter of credit facility in the amount of up to $50,000,000 to be provided by Barclays Bank PLC, as the LC Agent and the Issuing Bank and a syndicate of other Lenders;

d.  Authorize Debtor Tribune Company and the other Debtors to grant to the RLA Agent, the LC Agent, the Issuing Bank and the Lenders priority in payment with respect to the obligations of Tribune Company and the other Debtors under the Amended Agreements, the Guaranty, the Guaranty Security Agreement and the Letter of Credit Agreement over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than in respect of the Carve-Out (as defined below);

e.  For the avoidance of doubt, the Guaranteed Obligations, the Indemnification Obligations and the Receivables Obligations do not include any amounts owing to Barclays Bank PLC or its affiliates under or in connection with (i) any swap claims, or (ii) any credit agreement in existence prior to the Petition Date not related to the Financing Agreement and other Transaction Documents ((i) and (ii) together, "Other Indebtedness") and the property hereafter conveyed to Tribune Receivables and/or the RLA Agent pursuant to the RLA, the RPA and the Servicing Agreement. shall not secure such Other Indebtedness;

f.  The other relief described in the proposed Order.

## I.  Request for Authority to Assume a Modified Securitization Facility and to Continue Selling Receivables and Related Rights Pursuant Thereto

### A.  Description of the Prepetition Receivables Facility[7]

---

[7] Additional defined terms not set forth in this Motion are provided in the prepetition Receivables Facility Agreements attached in the Exhibits hereto.

18.     During the summer of 2008, Debtor Tribune Company[8] established an accounts receivables purchase facility (the "Receivables Facility").  Pursuant to that certain RPA dated as of July 1, 2008, certain Debtors sell their accounts receivables (the "Receivables") to their parent, Debtor Tribune Company (the "Parent" or "Servicer"), which then sells the accounts receivables to a special purpose vehicle buyer, Tribune Receivables, LLC (the "Buyer" or "Borrower"), which is not a Debtor in these proceedings.  Tribune Receivables, LLC purchases accounts receivables from Debtor Tribune Company through loans provided by certain lenders, currently Barclays (the "Lender"), under the RLA.  Pursuant to a Security Agreement, dated as of July 1, 2008, between Tribune Receivables, LLC and Barclays, Tribune Receivables, LLC grants Barclays a first-priority perfected security interest in, among other things, the Receivables purchased by it, all accounts to which collections on the Receivables are remitted (the "Receivables Facility Accounts"), the related concentration accounts, and permitted investments held in a controlled money market fund account at BOA.  These accounts are all subject to control agreements in favor of Barclays.  By this Motion, the Debtors request relief to enter into the Omnibus Amendment (collectively, the Amended Agreements, as defined above) to this Receivables Facility (as amended, the "Amended Receivables Facility") to ensure sufficient liquidity and continuity of operations during the pendency of these chapter 11 cases.

---

[8] Debtor Tribune Company is the servicer and buyer of the accounts receivables purchased from certain Debtor subsidiaries participating as sub-originators under the Receivables Purchase Agreement dated as of July 1, 2008. The sub-originators are: Chicagoland Television News, Inc., Tribune Broadcast Holdings, Inc., non-Debtor affiliate Tribune Interactive, Inc., Tribune Television Holdings, Inc., WGN Continental Broadcasting Company, WPIX, Inc., Tribune Television New Orleans, Inc., KSWB Inc., KTLA Inc., KIAH Inc., Tower Distribution Company, Tribune Television Northwest, Inc., Tribune Television Company, Channel 40, Inc., Channel 39, Inc., Los Angeles Times Communications, LLC, WDCW Broadcasting, Inc., Orlando Sentinel Communications Company, Sun-Sentinel Company, Gold Coast Publications, Inc., Forum Publishing Group, Inc., The Daily Press, Inc., Chicago Tribune Company, The Baltimore Sun Company, The Hartford Courant Company, and The Morning Call, Inc.  KWGN Inc. and KPLR, Inc. are no longer sub-originators as of September 2008.

19.      The purpose of the Receivables Facility is to provide liquidity to the

Debtor Tribune Company and certain of its Debtor subsidiaries by enabling them to realize the

cash equivalent value of certain of their accounts receivables prior to the usual collection period.

The Receivables Facility Accounts primarily receive collections on the Receivables, including

credit card receipts. The majority of the funds deposited into the Receivables Facility Accounts

are advertising revenue generated by the Debtors' broadcasting and publishing entities. The

Receivables Facility Accounts receive approximately 80% of the incoming cash receipts from

the Debtors' operations.

20.      The proposed Order and the agreements that comprise the Receivables

Facility and the proposed Omnibus Amendment to the Receivables Facility are provided with

this Motion. The proposed Order granting the relief set forth in this Motion is attached hereto as

Exhibit A. The Omnibus Amendment to the Receivables Facility as agreed among the Borrower,

Servicer, and Barclays in its capacity as Lender, Funding Agent and Administrative Agent is

attached hereto as Exhibit B. For additional background, the agreements that comprise the

Receivables Facility -- specifically the RPA, the RLA, the Security Agreement, and the

Servicing Agreement -- are also being filed with the Court and available for inspection in the

court docket.

### (1)      Receivables Purchase Agreement

21.      The RPA is an agreement between Debtor Tribune Company as Parent

and as Servicer, certain of its subsidiaries as Sub-Originators, (together, with the Parent, the

"Originators"), and the non-Debtor affiliate Tribune Receivables, LLC as Buyer. The purpose of

this agreement is to govern a two-step receivables purchase program. First, the RPA provides

for the sale on a daily basis by the Sub-Originators of their Receivables and Receivables

Property to the Parent, Debtor Tribune Company. Second, the RPA provides for the sale on a daily basis by the Parent to the Buyer, of all of its right, title and interest in the Receivables and Receivables Property.

22.    These transactions are contemplated to be true sales of the Receivables and the Receivables Property. None of the Sub-Originators, Parent, and Buyer intends these transactions to be, or for any purpose to be characterized as, loans from the Buyer to the Originators of the Receivables. The Buyer funds its purchase of the Receivables and the Receivables Property by requesting Loans from the Lenders on the terms and conditions set forth in the RLA.

23.    The Sub-Originators sell to the Parent all of the Sub-Originator's right, title and interest in and to all Receivables and Receivables Property for the Purchase Price with respect to each Sub-Originator. In the transaction, the Parent acquires the Sub-Originator's right, title, and interest in and to all Receivables and Receivables Property. The Purchase Price is due and payable on the date the Receivable comes into existence. In addition, each Sub-Originator also transfers to the Parent its interest in, and control of, the Receivables Facility Accounts. The Parent then sells its title and interest in the Receivables and Receivables Property for the Purchase Price to the Buyer. Further, the Parent transfers to the Buyer its interest in, and control of, the Receivables Facility Accounts. In the ordinary course of business, the Buyer funds its purchase of the Receivables and Receivables Property by using (i) the proceeds from the Loans provided by the Lenders under the RLA, (ii) collections on Receivables previously purchased by the Buyer (to the extent not needed to pay interest, fees and other amounts owing under the RLA) and (iii) if necessary, intercompany loans from the Parent.[9]

---

[9] A Purchase Price Loan agreement between the Parent and the Buyer is also provided for in the RPA.

24.    In the event that an Originator Termination Event occurs, including bankruptcy of an Originator, as in this case, the Receivables Facility is terminated and the transfers of Receivables and Receivables Property cease upon termination, unless the parties agree to a waiver in accordance with the RLA.

**(2)    Receivables Loan Agreement**

25.    Pursuant to the RLA, Tribune Receivables, LLC pledges as security all of its right, title and interest in such Receivables and Receivables Property, its accounts, and any other collateral to the RLA Agent, Barclays.  The terms of the pledge arrangement are set forth in the Security Agreement discussed below.  To fund its acquisitions under the RPA the Borrower requests Loans from the Lenders on the terms and conditions of the RLA.  The RLA contemplates that there may be multiple Lenders, some of which may be Committed Lenders and some of which may be Conduit Lenders.  There is currently only one Lender, Barclays, which acts as the Committed Lender.

26.    The Lender has commitment to make Loans in an aggregate principal amount not to exceed $300 million.[10]  The Receivables Facility is subject to a borrowing base test, so that the maximum amount of Loans that can be outstanding at any one time will vary depending on the outstanding balance of the Eligible Receivables, the size of the Total Reserves and other factors.  Subject to the terms of the Agreement, the Borrower may borrow, prepay and reborrow the Loans up to four times in any calendar month.  A portion of the Loan may be allocated by the Borrower to its Cash Reserve Account.  On each settlement date for a tranche of Loans, the Borrower pays to the relevant Funding Agent all accrued and unpaid interest with respect to such tranche.  The outstanding principal amount of each Loan is due and payable in

---

[10] The RLA also provides for the addition of a Class B Lender Group subject to the terms set forth therein, but no Class B Lender Group has ever been added.

full on the Maturity Date. Interest for any Tranche and Tranche Period is the sum of (a) for each day during such Tranche Period the Interest Rate for such Tranche for such day multiplied by the Principal Balance of such Tranche on such day, which is then multiple by an appropriate days basis depending on whether the Base Rate, the CP Rate or the Eurodollar Rate is used for the Tranche and (b) the Liquidation Fee, if any (all terms defined in the RLA). The Interest Rate for the Tranche for any day is the CP Rate if such Tranche is funded through the issuance of Commercial Paper or an Alternate Rate (which may be either the Base Rate or the Eurodollar Rate if it is not funded through the issuance of Commercial Paper).

27.    The Borrower is permitted to use the Loan proceeds to pay the Purchase Price of the Receivables and Receivables Property pursuant to the RPA, pay transaction fees, costs and expenses, pay the Parent monies owed in respect of an intercompany note, and make deposits to its Cash Reserve Account.

28.    The Servicer, Debtor Tribune Company, is entitled to a Servicing Fee from the Borrower for its services. The Borrower pays the Administrative Agent and the Class A Funding Agent fees set forth among the parties in a fee agreement.

**(3)    Security Agreement**

29.    Pursuant to a Security Agreement dated as of July 1, 2008, the Borrower, Tribune Receivables, LLC grants a security interest to Barclays, the Administrative Agent, in all property of the Borrower (the "Collateral") as a condition precedent to entering into the Receivables Facility. The Collateral pledged under the Agreement includes (a) all Pool Receivables and Related Security; (b) all of the Borrower's rights, remedies, powers and privileges in respect of the Servicing Agreement, the Receivables Purchase Agreement, and all other Transaction Documents (excluding the Receivables Loan Agreement, this Security

Agreement and the Fee Letters); (c) the Receivables Facility Accounts and any other account into which collections of pertinent Receivables may be deposited or Permitted Investments credited; and all funds on deposit in the Receivables Facility Accounts, and other related interests; (d) all chattel paper, accounts, instruments, general intangibles, and other personal property of the Borrower; and (e) all Collections and all other products and proceeds of the foregoing.

30.     The Security Agreement creates a continuing security interest in the Collateral and remains in full force until such Collateral is released by the Administrative Agent and is binding upon the Borrower, its successors, transferees and assigns.  Upon a facility termination event, the Administrative Agent may realize upon the Collateral to satisfy outstanding Loan obligations of the Borrower.

**(4)     Servicing Agreement**

31.     Pursuant to a Servicing Agreement dated as of July 1, 2008, the Parent has agreed to service the Receivables purchased by the Buyer and the Sub-Originators have agreed to act as sub-servicers of the Receivables.

32.     The Parent is entitled to receive a Servicing Fee for its services equal to 2.0% per annum on the weighted average Outstanding Balance of the Receivables, payable monthly in arrears.

**B.     Description of Omnibus Amendments to the Receivables Facility**

33.     The Debtors seek access to the financing proposed to be provided by the Amended Agreements and the Letter of Credit Agreement in order to assure sufficient available sources of working capital and financing to carry on the operation of their businesses. Specifically, the Amended Agreements will permit the Originators to continue transferring the

Receivables, the Related Security and the Collections (each as defined in the RLA and hereinafter, collectively, the "RPA Assets") to Tribune Receivables, allowing them to continue their prepetition practice of converting Receivables to cash as soon as possible to provide cash flow necessary for various business purposes. The Letter of Credit Agreement will permit Tribune Company to obtain stand-by letters of credit necessary in the ordinary course of its, and certain of its subsidiaries', businesses. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, to purchase and supply new inventory and otherwise finance their operations, is essential to the Debtors' continued viability. In addition, the Debtors' need for financing is immediate. In the absence of the proposed financing, serious and irreparable harm to the Debtors and their estates could occur which may include third parties declining to conduct business dealings with the Debtors. The preservation, maintenance and enhancement of the going concern value of the Debtors are of the utmost significance and importance to a successful reorganization of the Debtors under Chapter 11 of the Bankruptcy Code.

34.    The Debtors have a vital business purpose for continuing the Amended Receivables Facility. It is essential that the Debtors immediately instill their employees, vendors, service providers, and customers with confidence in the Debtors' ability to transition their businesses smoothly through the chapter 11 process, operate normally in that environment, and implement their reorganization plan in an expeditious manner. The Amended Agreements, together with the Guaranty Security Agreement and the Letter of Credit Agreement are necessary to do all such things, including, most importantly, to effectuate the Debtors' reorganization efforts, which require liquidity on short notice.

**(1)    Amendment Terms**

35.    The Omnibus Amendment, the effectiveness of which is conditioned upon the receipt of a satisfactory Interim Financing Order, amends the Amended Agreements in the following respects:

a)  The Facility Limit under the RLA is reduced to $225,000,000 (the current amount outstanding under the facility), until such time as the Pre-Petition Loan Balance has been reduced to zero.

b)  The Facility Termination Date for the loans under the RLA is changed to April 10, 2009.

c)  The various representations, covenants, defaults and amortization triggers in the RLA, RPA and Servicing Agreement are revised to provide that the filing of the Motion does not, in and of itself, trigger a termination of the facility or the amortization of the loans outstanding hereunder.

d)  Additional Facility Termination Events relating to the proceedings in this case are incorporated into the RLA.

e)  Additional covenants governing sales, purchases, investments, dividend distributions, incurrence of debt and other actions of Tribune Company are incorporated into the RPA.

## (2)    Guaranty

36.    The material terms of the Guaranty are as follows:

a)  Tribune Company and the Debtors guarantee, jointly and severally, payment of all Loans outstanding under the RLA as of any date.  For purposes of the Guaranty, the aggregate Principal Balance of the Loans is deemed to be, as of such day, an amount equal to the excess of (x) the aggregate Principal Balance of the Loans on such day over (y) the Pre-Petition Loan Balance on such day. "Pre-Petition Loan Balance" means, as of any date of determination, an amount equal to (a) the aggregate Principal Balance of the Loans as of the opening of business on the Filing Date minus (b) all amounts applied by the Company after the Filing Date to the repayment of the principal amount of the Loans in accordance with the terms of the RLA.

b)  Tribune Company and the Debtors also guarantee the Secured Obligations, i.e., other obligations of Tribune Receivables under the RLA and the other Transaction Documents, whether for principal, interest, costs, fees, expenses, indemnities or otherwise.

c)  If a Trigger Event or Facility Termination Event occurs under the RLA at such a time when any of the Loans or Secured Obligations are not yet due and payable, Tribune Company and the Debtors agree to pay the full amount that would be due and payable under the Guaranty if such Loans and Secured Obligations were due and payable.

d)  The obligations of Tribune Company and the Debtors under the Guaranty are secured pursuant to the Guaranty Security Agreement (discussed below).

**(3)     Guaranty Security Agreement**

37.     The material terms of the Guaranty Security Agreement are as follows:

a)  Each of Tribune Company and the Debtors grants to the Administrative Agent, for the benefit of the Secured Parties (as defined in the Guaranty Security Agreement), a first priority, perfected security interest in all of its personal assets and property of any kind or description.

b)  The Collateral pledged under the Guaranty Security Agreement secures the obligations of Tribune Company and the Debtors under the RPA, the Guaranty, the Servicing Agreement and any other document or instrument executed in connection therewith.

c)  The security interest granted under the Guaranty Security Agreement is a first priority, perfected security interest in all Collateral that is not otherwise encumbered by a perfected security interest as of the Filing Date.  It is a junior, perfected security interest in all Collateral that is subject to a Permitted Lien.

d)  If a Facility Termination Event occurs, the Administrative Agent may, upon three Business Days' notice Tribune Company and the Debtors, enforce its security interest and exercise any and all remedies available under the Guaranty Security Agreement, the Transaction Documents, or the Financing Order, including foreclosing on the Collateral.

**(4)     Letter of Credit Agreement**

38.     The significant elements of the Post-Petition Letter of Credit Agreement

are as follows:

a)  <u>Type of Facility</u>:  A postpetition letter of credit facility in the amount of up to $50,000,000

b)  <u>Administrative Agent</u>:  Barclays Bank PLC

c) <u>Lenders</u>: Barclays Bank PLC and the other lenders party from time to time to the Letter of Credit Agreement

d) <u>Account Parties</u>: Tribune Company and its debtor subsidiaries signatory to the Letter of Credit Agreement

e) <u>Guarantors</u>: The debtor subsidiaries signatory to the Letter of Credit Agreement

f) <u>Commitment Amount</u>: $50,000,000

g) <u>Letter of Credit Commissions</u>: 3% per annum of the daily average indrawn face amount of the applicable Letter of Credit

h) <u>Interest Rate</u>: The Administrative Agent's base rate plus a margin of 5% per annum

i) <u>Collateral</u>: The "LC Cash Collateral" (as that term is defined in the Interim Financing Order), means the amounts deposited into the Collateral Account from time to time pursuant to Section 8.2.4 of the Letter of Credit Agreement. The applicable Account Party is obligated to cash collateralize each outstanding obligation in an amount at least equal to 105% of such obligation.

j) <u>Termination Date</u>: The earliest to occur of the following: (i) the date that is 120 days after the Filing Date, (ii) January 15, 2009, in the event that the Final Financing Order has not been approved by the Bankruptcy Court on or prior to that date, (iii) the effective date of a plan of reorganization under the Chapter 11 Cases or (iv) such other date on which the Commitments terminate pursuant to Section 9 of the Letter of Credit Agreement.

k) <u>Tenor of Letters of Credit</u>: Up to one year after date of issue

l) <u>Security</u>: The facility will be secured by a first administrative priority status and a first priority security interest and Lien on the LC Cash Collateral by the Bankruptcy Court pursuant to Section 364(d) of the Bankruptcy Code, with priority and superpriority over (i) any and all other Liens and claims against the property of the Company or of the Debtor Subsidiaries or the Collateral existing on the Filing Date, and (ii) priority claims (including administrative expenses) alleging priority pursuant to Section 503, Section 506(c) or Section 507 of the Bankruptcy Code, heretofore or hereafter arising or incurred in the Chapter 11 Cases or in any superseding case or cases under any chapter of the Bankruptcy Code.

m) <u>Fronting Fee</u>: 0.125% per annum of the daily average indrawn face amount of the applicable Letter of Credit

n)  Commitment Fee:  0.5% per annum on the daily average unused amount of the applicable Lender's commitment

o)  Administrative Fee: $10,000 per month

p)  Representations and Warranties:  Usual and customary for a facility of this type.

q)  Covenants:  Usual and customary for a facility of this type, including but not limited to: (i) the timely furnishing of annual and quarterly financial reports, SEC reports, notices of default, Chapter 11 filings to the Administrative Agent and (ii) a covenant not to permit to exist any claims entitled to a superpriority under Section 364(c)(1) of the Bankruptcy Code, other than those of the Post-Petition Agent and the Lenders.

r)  Events of Default:  Usual and customary for a facility of this type, including but not limited to: (i) non-payment of reimbursement obligations under the Letter of Credit Agreement, (ii) non- compliance with the provisions of the Letter of Credit Agreement, (iii) dismissal or conversion of the Chapter 11 case, (iv) the modification or failure to enter into effect of the Financing Orders, or the Debtors' failure to comply with the Financing Orders, (v) the contest or disallowance of any Lender's claim related to the Receivables or LC facilities and (vi) other bankruptcy-related events as discussed in Section 9.1 of the Letter of Credit Agreement.

**(5)   Principal Order Terms**

39.   The principal terms set forth in the Interim Order are as follows:

a)  Authorize Debtor Tribune Company and the other Debtors to enter into an Omnibus Amendment to the existing Receivables Facility with Barclays;

b)  Authorize Debtor Tribune Company and the other Debtors to transfer, free and clear of all liens, encumbrances and other interests;

c)  Authorize Debtor Tribune Company to service, administer and collect the RPA Assets on behalf of Tribune Receivables pursuant to the Amended Agreements;

d)  Authorize the Debtors and Tribune Receivables to perform all acts required in connection with the Amended Agreements and the transactions contemplated thereby;

e)  A grant of a superpriority administrative expense claim as adequate protection under section 364(c)(1) to the extent of the Debtors' obligations under the Amended Agreements;

f)  A grant of a security interest in the Receivables and Receivables Property (collectively, the RLA Collateral) under section 364(c)(2) in case these transactions were recharacterized as financings;

g)  Authorize Debtor Tribune Company and the other Debtors to guarantee certain of the obligations of Tribune Receivables under the RLA, RPA and Servicing Agreement, in each case, as amended by the Omnibus Amendment (collectively, the Amended Agreements) and other Transaction Documents (as defined in the Amended Agreements), and execute a Guaranty in favor of Barclays, the RLA Agent and secure their obligations under the Guaranty Security Agreement;

h)  Authorize the Debtors to execute the Letter of Credit Agreement and all related documents and instruments to be executed and delivered in connection therewith, and to comply with and perform all terms and conditions of the Letter of Credit Documents, including perform its reimbursement and other obligations under, and provide the required cash collateral under the Letter of Credit Agreement;

i)  A grant of a security interest in the LC Collateral under section 364(c)(2), which includes, among other things, the Debtors' right, title and interest in cash in an amount equal to 105% of the Letter of Credit Obligations at any time outstanding;

j)  Authorize Debtor Tribune and the other Debtors to use extensions of credit and proceeds of the Loans in the ordinary course of the Debtors' businesses;

k)  Grant the RLA Agent, LC Agent, the Issuing Bank and the Lenders priority in payment with respect to the obligations of Tribune Company and the other Originators under these Agreements over any and all administrative expenses of the kinds specified in §§ 503(b) and 507(b), other than in respect of the Carve-Out;

l)  Schedule a Preliminary Hearing on the Motion to consider entry of an Interim Order pursuant to Bankruptcy Rule 4001;

m)  Request a Final Hearing and entry of a Final Order.

40.    The Debtors and Barclays intend to explore the extension of the Amended

Receivables Facility beyond the initial terms set forth in the Omnibus Amendment. The

provisions of the post-petition financing facilities requested by this Motion provide the Debtors

with a critical source of continued liquidity and send an important message to the numerous

vendors and literally millions of customers that deal with the Debtors that the Debtors have

sufficient liquidity to continue to conduct their business.  Moreover, this 120 day facility

provides the Debtors a reasonable period to evaluate the impact of these chapter 11 proceedings

on its business, determine the Debtors' longer term financing needs, and fully explore with

Barclays and others the best alternatives for such financing.  This is all extremely beneficial to

the Debtors and their estates.

   41. Finally, Barclays, the Administrative Agent, Funding Agent and Lender,

has determined that the relief requested in this Motion is acceptable to it.

## II. Request to Modify the Automatic Stay

   42. Pursuant to the Amended Agreements, Tribune Receivables may deduct

from the purchase price of RPA Assets amounts which are payable by the Originators to Tribune

Receivables in respect of violations of certain representations and warranties and dilution items

(all of such amounts, collectively, the "Repayment Amounts"), and the automatic stay provisions

of Section 362 of the Bankruptcy Code should be modified to the extent necessary so as to

permit the deduction of such amounts by Tribune Receivables.  The payment by Tribune

Receivables of the purchase price for Receivables which are subsequently reduced by such

Repayment Amounts constitutes an extension of credit to the applicable Originators accordingly,

to the extent that such deduction is not available, Tribune Receivables should be granted,

pursuant to Section 364(c)(1) of the Bankruptcy Code an allowed administrative claim against

the applicable Originators, with priority over all other administrative claims.

43.     The performance by the Originators and Tribune Receivables of their respective obligations under the Financing Agreements, and the consummation of the transactions contemplated by the Financing Agreements, and the conduct by the Originators and Tribune Receivables of their respective businesses should not provide a basis for a substantive consolidation of the assets and liabilities of the Originators, or any of them, with the assets and liabilities of Tribune Receivables or a finding that the separate corporate identities of the Originators and Tribune Receivables may be ignored.  Further, the RLA Agent, the LC Agent, the Issuing Bank and the Lenders have agreed to enter into the Financing Agreements and the other Transaction Documents in express reliance on Tribune Receivables being a separate and distinct legal entity, with assets and liabilities separate and distinct, from that and those of any of the Debtors.

44.     As is customary in commercial transactions of this nature, the Originators and Tribune Receivables, respectively, are required (without the necessity of any further application being made to or Order being obtained from this Court) to pay or reimburse Tribune Receivables, the RLA Agent, the LC Agent, the Issuing Bank and the Lenders and their respective affiliates and agents, respectively, for the payment of certain fees and expenses pursuant to the Financing Agreements and the other Transaction Documents (the "Fees").  In addition, pursuant to the fee letters dated December 8, 2008 (the "Fee Letters"), Tribune Company has agreed (without the necessity of any further application being made to, or Order being obtained from, this Court) to pay the fees referred to in the Fee Letters in consideration of the RLA Agent's and the LC Agent's respective services in structuring and negotiating the Omnibus Amendment and the Letter of Credit Agreement.

45.    Therefore, the automatic stay provisions of Section 362 of the Bankruptcy Code should be vacated and modified to the extent necessary to permit the RLA Agent and the LC Agent to exercise, upon the occurrence of any Facility Termination Event or Event of Default (as defined in the RLA, as amended by the Omnibus Amendment, or the Letter of Credit Agreement, respectively), all rights and remedies provided for in the Financing Agreements and the other Transaction Documents, and to take any or all of the following actions without further order of or application to this Court: (a) cease to make any extensions of credit or loans or advances to the Debtors or Tribune Receivables; (b) declare all obligations to be immediately due and payable; (c) set off and apply immediately any and all amounts in accounts maintained by the Debtors with the RLA Agent or the LC Agent against the obligations, and otherwise enforce rights against the RLA Collateral and Cash Collateral in the possession of the RLA Agent or the LC Agent for application towards the obligations; and (e) take any other actions or exercise any other rights or remedies permitted under the proposed Order, the Financing Agreements, the other Transaction Documents or applicable law to effect the repayment and satisfaction of the Obligations; provided, that the RLA Agent shall provide five (5) business days written notice (by facsimile, telecopy, electronic mail or otherwise) to the United States Trustee, counsel to the Debtors and counsel to any statutory committee appointed in the Chapter 11 Cases prior to exercising any enforcement rights or remedies in respect of the RLA Collateral (other than the rights described above (to the extent they might be deemed remedies in respect of the RLA Collateral) and other than with respect to freezing any deposit accounts or securities accounts); provided further, that the Debtors shall have the right to seek continuation of the automatic stay during such five (5) day period solely on the basis that no Facility Termination Event or Event of Default has occurred.  Notwithstanding anything herein to the contrary, no

extensions of credit, RLA Collateral, LC Cash Collateral, or any portion of the Carve-Out may

be used to object to, or contest, in any manner, or raise any defenses to, the validity, perfection,

priority, extent or enforceability of the Letter of Credit Obligations, Receivables Obligations,

Indemnification Obligations, Guaranteed Obligations, or the obligations of the Originators under

or in connection with Financing Agreements or other Transaction Documents, or to assert any

claims or causes of action against the RLA Agent, the Released Parties, the LC Agent, the

Issuing Bank, the Lenders, or any agent of any of the foregoing.

## DISCLOSURE UNDER LOCAL RULE 4001-2

46.    The Debtors believe that the following provisions of the Order and the

Financing Agreements are required to be identified in accordance with Rule 4001-2 of the Local

Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules")

and that such provisions are necessary and justified in the context of and circumstances of these

cases:

a)    Rule 4001-2(A) Cross Collateralization.  Certain prepetition Indemnification Obligations and Receivables Obligations are cross-collateralized under the RLA Amendment.  Order, ¶13.

b)    Rule 4001-2(B) Binding the Estate to Validity, Perfection, or Amount of Secured Debt.  The Order includes certain stipulations by the Debtors related to the validity, perfection, or amount of RLA Agent's prepetition liens.  Order, ¶3.  The Order reserves for 30 days after the Filing Date the right of any party to challenge such liens with respect to validity, perfection, or amount.  Order, ¶26.

c)    Rule 4001-2(C) Waiver of 506(c) Surcharge.  The proposed waiver of the estates' rights will only be effective after entry of the Final Order granting such relief.  Order, ¶17.

d)    Rule 4001-2(D) Liens on Avoidance Actions.  The Order provides for the granting of liens on avoidance actions.  Order, ¶13.

e)    Rule 4001-2(E) Provisions That Deem Prepetition Debt to be Postpetition Debt.  Although not a roll-up of prepetition debt *per se*,

certain prepetition Indemnification Obligations and Receivables Obligations are deemed postpetition obligations of certain Debtors. Order, ¶ 12.

47.    In addition, though not required under Local Rule 4001-2, the Debtors wish to highlight the following additional provisions, which the Debtors believe are necessary and justified in the context of and circumstances of these cases:

a) <u>True Sale.</u> The Order provides that transfers of RPA Assets by the Originators pursuant to the RPA, whether occurring prepetition or postpetition, constitute true sales or true contributions. Order, ¶4.

b) <u>Non-Consolidation</u>. The Order provides for the performance by the Originators and Tribune Receivables of their respective obligations under the Financing Agreements (as defined in the Order), and the consummation of the transactions contemplated by the Financing Agreements, and the conduct by the Originators and Tribune Receivables of their respective businesses, do not, and shall not, provide a basis for a substantive consolidation of the assets and liabilities of the Originators, or any of them, with the assets and liabilities of Tribune Receivables or a finding that the separate corporate identities of the Originators and Tribune Receivables may be ignored. Order, ¶20.

48.    The provisions of the Order and Financing Agreements as to which disclosure is required under Local Rule 4001-2 and the other provisions referenced above are all justified under the circumstances of these cases to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing. Barclays would not agree to modify and extend the Receivables Facility or provide the letter of credit facility without the inclusion of such terms, each of which was heavily negotiated between the parties. In addition, the Debtors determined in the exercise of their sound business judgment that agreeing to such provisions was appropriate under the circumstances of the case in light of the unavailability of other adequate financing alternatives.

## APPLICABLE AUTHORITIES

49.    The continuation of the Receivables Facility is vital to the success of the

Debtors' reorganization efforts and is the only available means for the Debtors to access

sufficient postpetition financing for their operations.  The preservation of the Debtors' business

and the Debtors' ability to reorganize successfully depend heavily on the expeditious approval of

this Motion.  Absent the Court's approval of the interim relief sought herein, the Debtors face a

substantial risk of severe disruption to their business operations and irreparable damage to their

relationships with their vendors, customers, and advertisers.

50.    The Court should approve the relief sought in this Motion because: (1) the

Debtors are unable to obtain financing on an unsecured, or junior secured, basis; (2) the

prepetition Conduit Lenders have consented to the continuation of the Receivables Facility as

amended; and (3) approval of the continuation of the Receivables Facility is in the best interests

of the Debtors' estates.

### A.    Debtors' Seek Authority to Sell Receivables Pursuant to Amended Receivables Facility

51.    The Debtors must continue the Amended Receivables Facility to ensure

adequate liquidity and continuity in financing of their ongoing operations.  Continuation of this

well-established facility would instill confidence in the Debtors' employees, vendors,

advertisers, service providers, and customers.  The unique opportunity to extend the existing

facility promotes stability during the chapter 11 process and facilitates the Debtors' ability to

operate normally and without undue disruption.  Further, the Amended Receivables Facility is

the most favorable  only financing option available to the Debtors to meet their needs for short-

term liquidity during the pendency of these chapter 11 cases.

52.     The Debtors therefore seek authority to continue the Amended

Receivables Facility and to pay Amendment Fees required by the Amendments pursuant to

section 363(b) of the Bankruptcy Code, which permits the Debtors to use, sell or lease property

of the estate outside the ordinary course of business, after notice and a hearing.  11 U.S.C. §

363(b)(1).  Courts typically approve sales of Debtors' assets, including the receivables sales as

described herein, where there is a sound business purpose, adequate notice, good faith

negotiations, and a fair and reasonable purchase price.  See, e.g., Comm. of Equity Sec. Holders

v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983) (sale of assets pursuant to

section 363(b) is evaluated under the business judgment standard); In re Crowthers McCall

Pattern, Inc., 114 B.R. 877, 881-82 (Bankr. S.D.N.Y. 1990); In re New Era Resorts, LLC, 238

B.R. 381, 387 (Bankr. E.D. Tenn. 1999); In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 149-50

(3d Cir. 1986).

## B.     Authorizing a Lien Under § 364(c)(2) of the Bankruptcy Code and Protecting Good Faith Purchasers Under § 364(e)

53.     The Bankruptcy Code permits postpetition credit under section 364(c)[11] of

the Bankruptcy Code if the court makes a finding, made after notice and a hearing, that the

debtors-in-possession are "unable to obtain unsecured credit allowable under section 503(b)(1)

of [the Bankruptcy Code] as an administrative expense."  See In re Garland Corp., 6 B.R. 456,

461 n.11 (1st Cir. B.A.P. 1980) (secured credit under section 364(c)(2) is authorized, after notice

---

[11] Section 364(c) of the Bankruptcy Code provides that:

   (c) If the trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

      (1) with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;
      (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
      (3) secured by a junior lien on property of the estate that is subject to a lien.

and a hearing, upon showing that unsecured credit cannot be obtained); <u>In re Crouse Group, Inc.,</u> 71 B.R. 544, 549 (Bankr. E.D. Pa.), <u>modified</u> <u>on</u> <u>other</u> <u>grounds,</u> 75 B.R. 553 (1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to 364(b) of the Bankruptcy Code); <u>In re Ames Dept.</u> <u>Stores, Inc.,</u> 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code). The Debtors describe the difficult credit market conditions and their inability to secure unsecured credit in the Bigelow Affidavit. For these reasons, the Debtors are unable to acquire additional financing to support their operations.

54.    To show that the credit required is not obtainable on an unsecured basis, the debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by sections 364(c) or 364(d) of the Bankruptcy Code. <u>Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.),</u> 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." <u>Id.</u> at 1088; see also <u>In re Ames Dept. Stores,</u> <u>Inc.,</u> 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders); <u>In re Reading Tube</u> <u>Indus.,</u> 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders."). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." <u>In re Sky Valley, Inc.,</u> 100 B.R.

107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99

B.R. 117, 120 n.4 (N.D. Ga. 1989).

55.     The Debtors, together with their investment bankers and financial

advisors, sought indications of interest in a subordinate DIP facility, but the financial institutions

that were approached were unwilling to provide the Debtors with additional liquidity on an

unsecured basis. The Debtors therefore believe that they have satisfied the requisite showing

that credit was not available on an unsecured or subordinate basis and that the proposed

continuation of the amended Receivables Facility is the best available financing under the

circumstances. The efforts by the Debtors constitute a good faith effort and satisfy section

363(m) of the Bankruptcy Code. 11 U.S.C. § 363(m).

56.     The Debtors are entitled to financing under section 364(c) because the

Debtors are unable to obtain unsecured credit under section 364(b), the financing is necessary to

preserve the assets of the Debtors' estates, and the terms of the transaction are fair, reasonable,

and adequate given the circumstances. In re Ames Dept. Stores, Inc., 115 B.R. at 37-39. The

terms of the Amended Receivables Facility are fair, reasonable, and in the best interests of the

Debtors and their estates. Likewise, the fees and charges required under the Amended

Receivables Facility are reasonable and appropriate under the circumstances and the result of

good faith, arm's length negotiations. The Debtors should be allowed to continue the Amended

Receivables Facility as the best available financing solution available. For these reasons, the

Debtors' should be authorized to continue the amended Receivables Facility.

**C.      The Receivables Sales Contemplated by the Receivables Facility Agreements Constitute True Sales**

57.    The Debtors and the Administrative Agent for the Amended Receivables Facility intend the sales of Receivables to be true sales, free and clear of all liens, claims or other interests within the meaning of section 363(f) of the Bankruptcy Code. Further, section 1129(b)(2)(A) of the Bankruptcy Code specifically allows a debtor to sell property subject to a lien free and clear of such a lien if that lien attaches to the net proceeds of the same, subject to any claims and defenses the debtor may possess with respect thereto. Based upon the foregoing, the sale of receivables free and clear of liens, claims or other interests should be approved under section 363(f) of the Bankruptcy Code.

58.    In addition, the Receivables Purchase Agreement expressly contemplates that each receivables sale is a "true sale" and sets forth, "The Originators and the Buyer intend the transactions contemplated hereby to be (a) true sales of the Receivables from each Sub-Originator to the Parent, providing the Parent with the full benefits of ownership of the Receivables, and none of the Sub-Originators and the Parent intends these transactions to be, or for any purpose to be characterized as, loans from the Parent to any Sub-Originator; and (b) true sales of the Receivables from the Parent to the Buyer, providing the Buyer with the full benefits of ownership of the Receivables, and neither the Parent nor the Buyer intends these transactions to be, or for any purpose to be characterized as, loans from the Buyer to the Parent."

59.    Courts will not recharacterize a sale of receivables as a secured loan where the parties' intent is clear. Kassuba v. Realty Income Trust (In re Kassuba), 562 F.2d 511, 514 (7th Cir. 1977). Further, once the parties to a transaction establish that a true sale was intended, any party challenging that transaction must prove, by clear and convincing evidence, that the transaction is in fact a disguised loan. Chicoine v. OMNE Partners (In re Chicoine), 67 B.R. 793 (Bankr. D.N.H. 1986). Further, Tribune Receivables, LLC has no credit recourse under the

Amended Receivables Facility. See Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc., 602 F.2d 538, 544 (3d Cir. 1979) (noting that credit recourse is a sign of a secured loan instead of a true sale). Therefore, the Debtors respectfully request the Court to hold that the sale of Receivables pursuant to the Amended Receivables Facility constitutes a true sale, and not a disguised loan.

60.    The Debtors, the Buyer, the Administrative Agent and the Lenders intend the transfers of Receivables under the Receivables Purchase Agreement to the Buyer to be true sales. If notwithstanding such intention, the transfers of the Receivables are deemed not to be sales, the Buyer would have a security interest in the Receivables and Related Property as defined in the Omnibus Amendment. Therefore, the Debtors request the Court to authorize the grant of a security interest, as provided for in the Receivables Purchase Agreement, with respect to any Receivables transferred postpetition pursuant to section 364(c)(2) of the Bankruptcy Code.

### D.    Buyers are Entitled to a Protection of Their Pre-Petition Claims and Interest Related to the Receivables Facility and Other Related Relief

61.    The Debtors and Barclays as Administrative Agent have agreed to the following adequate protection provisions in order to induce the Lenders to enter into the Omnibus Amendments and to protect the Lenders' Commitments: (a) that the Debtors acknowledge: (i) the transfer of the Receivables from the Originators to the Buyers are true sales, (ii) the Receivables, Collections and the proceeds of the foregoing are not property of the estate and are free and clear of all interests other than the Administrative Agent's, and (iii) that the Debtors, Tribune Receivables, the Administrative Agent and the Lenders have negotiated the terms and conditions of the Omnibus Amendment and the Order in good faith and at arms length,

(b) the Debtors will not: (i) seek to substantively consolidate Tribune Receivables with the Debtors, or (ii) file a bankruptcy petition for Tribune Receivables, and (c) the Lenders are entitled, pursuant to Bankruptcy Code section 364(c)(1), to receive a superpriority administrative expense claim (the "Superpriority Claim") subordinate only to the postpetition lenders' superpriority administrative expense claims, equal to the amounts advanced to the Debtors postpetition under the Program to protect against diminution of the resources available to satisfy the Lenders' claims against Tribune Receivables.  In addition, the Superpriority Claims is due immediately if: (a) the Order is entered and then modified in any respect without the Agent's consent; (b) the stipulations, admissions, releases and other provisions set forth in the Order fail to become final and binding on all parties in interest in these chapter 11 cases within thirty (30) days after the Petition Date; or (c) the effective date of any confirmed plan of reorganization in these cases.  Finally, as part of the adequate protection, the stipulations and admissions described in subparagraph (a) above become binding on all parties in interest if they are not challenged within the time period set by the Court in the Interim Order.

   62. By this Motion, Debtors request authorization to continue the amended Receivables Facility to serve the best interests of their creditors and protect the value of the Debtors' estates.

## IV. Approval of the Amended Receivables Facility Is in the Best Interests of the Debtors' Estates

   63. A denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their estates.  Absent access to the financing available by the Amended Receivables Facility, the Debtors would experience difficulties in continuing their operations while also meeting their ongoing obligations to suppliers, vendors, employees, and other creditors.  If the Debtors are unable to pay their ongoing obligations, they will face

operational constraints that would jeopardize their successful reorganizations and value of their estates. In contrast, the Debtors' access to the Amended Receivables Facility will ensure that the "going concern" value of the assets are preserved and substantially greater than the value of the assets if such funding were denied.

64.     Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment ... [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); cf. Group of Inst. Investors v. Chicago, Mil., St. P. & Pac. Ry., 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); In re Simasko Prods. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court."). In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). Consistent with this authority, the Debtors respectively submit that the Court should approve the Debtors' decision to accept and enter into the Amended Receivables Facility.

65.     Given the widespread usage of such receivables purchase financing programs and the essential role of such programs in improving liquidity, courts frequently permit debtors-in-possession to continue operating receivables purchase facilities and have granted

relief similar to that requested in this Motion.  See, e.g., In re DJK Residential LLC, Case No. 08-10375 (Bankr. S.D.N.Y. Feb. 5, 2008); In re J.L. French Automotive Castings, Inc., Case No. 06-10119 (Bankr. D. Del. Mar. 3, 2006); In re Blue Bonnet Logistics Corp., Case No. 03-12413 (Bankr. W.D. Tex. June 2, 2003); In re Checkmate Staffing, Inc., Case No. 03-19318 (Bankr. C.D. Cal. Dec. 30, 2003); In re Access Med. Staffing and Servs., Case No. 02-46731 (Bankr. N.D. Cal. Dec. 31, 2002).

66.     The Debtors submit for all these reasons that ample justification exists for the relief requested herein.

## REQUEST FOR INTERIM RELIEF

67.     Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for authority to obtain financing during the 15-day period following the filing of a motion "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2).  In examining such requests under Bankruptcy Rule 4001, courts apply the same business judgment standard as is applicable to other business decisions.  See, e.g., In re Ames Dept. Stores, Inc., 115 B.R. at 38.  Further, pursuant to Bankruptcy Rule 6004, use of estate property outside the ordinary course of business within twenty (20) business days of the Petition Date is allowed to prevent "immediate and irreparable harm."  Authorization to continue the Debtors' Amended Receivables Facility is necessary to avoid deeply harmful results.  The Debtors submit that, for the reasons set forth herein, authority to obtain postpetition financing on an interim basis as requested in this Motion is necessary to avert immediate and irreparable harm to the Debtors' businesses.

## REQUEST FOR FINAL HEARING

68.     Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), the Debtors respectfully request that the Court set a date for the Final Hearing that is no later than thirty (30) days following the Petition Date.

## NO PRIOR REQUEST

69.     The Debtors have not previously sought the relief requested herein from this or any other Court.

## NOTICE

70.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) the administrative agents for the Debtors' prepetition loan facilities; (vii) the indenture trustee for the Debtors' prepetition notes; (viii) the administrative agent for the Debtors' Receivables Facility; and (ix) the Debtors' primary cash management banks.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as Exhibit A, (i) authorizing the Debtor Tribune Company and the other Debtors to enter into an Omnibus Amendment to (a) that certain RLA, dated as of July 1, 2008 among Tribune Company, Tribune Receivables and Barclays Bank PLC, the RLA Agent, (b) that certain RPA, dated as of July 1, 2008 among Tribune Receivables, Tribune Company and the other Originators and (c) that certain Servicing Agreement, dated as of July 1, 2008 among Tribune Receivables, Tribune Company and the other Originators, which Omnibus Amendment shall, among other things, increase the aggregate principal amount of Loans (as defined in the RLA, as amended by the Omnibus Amendment) available to Tribune Receivables under the RLA, as amended by the Omnibus Amendment, to $300,000,000; (ii) authorizing the Debtor Tribune Company and the other Debtors to guarantee certain of the obligations of Tribune Receivables under the Amended Agreements and other Transaction Documents (as defined in the Amended Agreements), and execute a Guaranty in favor of the RLA Agent in connection therewith and secure their obligations under the Guaranty, the Amended Agreements and the Transaction Documents pursuant to a Guaranty Security Agreement; (iii) authorizing Debtor Tribune Company and the other Debtors to enter into, perform its reimbursement and other obligations under, and provide the required cash collateral under, the Letter of Credit Agreement, a new, postpetition letter of credit facility in the amount of up to $50,000,000 to be provided by Barclays Bank PLC, as the LC Agent and the Issuing Bank and a syndicate of other Lenders; (iv) authorizing Debtor Tribune Company and the other Debtors to grant to the RLA Agent, the LC Agent, the Issuing Bank and the Lenders priority in payment with respect to the obligations of Tribune Company and the other Debtors under the Amended Agreements, the Guaranty, the Guaranty Security Agreement and the Letter of Credit Agreement over any and all

administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other

than in respect of the Carve-Out; and (v) granting such other relief described in the proposed

Order and further relief the Court may deem just and proper.

Dated: Wilmington, Delaware          Respectfully submitted,
       December 9, 2008

SIDLEY AUSTIN LLP
Bryan Krakauer
James F. Conlan
Janet E. Henderson
Candice L. Kline
One South Dearborn Street
Chicago, Illinois  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: *Norman L. Pernick*
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
1000 N. West Street, Suite 1200
Wilmington, Delaware  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

PROPOSED ATTORNEYS FOR
DEBTORS AND DEBTORS IN
POSSESSION