**<u>EXHIBIT E</u>**

**POST-PETITION LETTER OF CREDIT AGREEMENT**

**dated as of December __, 2008**

**among**

**TRIBUNE COMPANY,**

**VARIOUS FINANCIAL INSTITUTIONS,**

**BARCLAYS CAPITAL,**
**as Sole Lead Arranger,**

**BARCLAYS BANK PLC,**
**as Issuing Bank**

**and**

**BARCLAYS BANK PLC,**
**as Post-Petition Agent**

# TABLE OF CONTENTS

**Page**

SECTION 1.        DEFINITIONS................................................................................ 1

    1.1    Definitions .......................................................................................... 1

    1.2    Other Interpretive Provisions.............................................................. 5

SECTION 2.        COMMITMENTS OF THE LENDERS; ISSUANCE PROCEDURES............. 6

    2.1    Commitments....................................................................................... 6

    2.2    Certain Conditions ............................................................................ 10

    2.3    Security Interests; Collateral............................................................. 10

    2.4    Application of Collateral Account ..................................................... 10

    2.5    Guaranty............................................................................................ 10

    2.6    Discharge .......................................................................................... 10

SECTION 3.        INTEREST ................................................................................... 11

    3.1    Interest Rate ...................................................................................... 11

SECTION 4.        FEES .......................................................................................... 11

    4.1    Commitment Fee................................................................................ 11

    4.2    Fee Letter .......................................................................................... 11

SECTION 5.        MAKING AND PRORATION OF PAYMENTS; SETOFF; TAXES ............. 11

    5.1    Making of Payments ......................................................................... 11

    5.2    Setoff................................................................................................. 11

    5.3    Proration of Payments ...................................................................... 12

    5.4    Taxes................................................................................................. 12

SECTION 6.        REPRESENTATIONS AND WARRANTIES ................................................ 13

    6.1    Organization...................................................................................... 13

    6.2    Authorization; No Conflict ............................................................... 13

    6.3    Validity and Binding Nature ............................................................. 14

    6.4    Investment Company Act .................................................................. 14

    6.5    Regulation U ..................................................................................... 14

    6.6    No Default.......................................................................................... 14

SECTION 7.        COVENANTS ............................................................................... 14

    7.1    Reports, Certificates and Other Information...................................... 14

        7.1.1    Annual Report ..................................................................... 14

## TABLE OF CONTENTS
(continued)

Page

|  |  | 7.1.2 | Interim Reports | 15 |
|  |  | 7.1.3 | Reports to the SEC | 15 |
|  |  | 7.1.4 | Notice of Default | 15 |
|  |  | 7.1.5 | Chapter 11 Cases | 15 |
|  |  | 7.1.6 | Other Information | 15 |
|  | 7.2 | Further Assurances | | 16 |
|  | 7.3 | No Surcharge | | 16 |
|  | 7.4 | No Superpriority Claims | | 16 |
|  | 7.5 | Maintenance of Collateral | | 16 |
| SECTION 8. | | EFFECTIVENESS; CONDITIONS OF ISSUANCE, ETC | | 16 |
|  | 8.1 | Initial Credit Extension | | 16 |
|  |  | 8.1.1 | Incumbency and Signature Certificates | 17 |
|  |  | 8.1.2 | Payment of Fees | 17 |
|  |  | 8.1.3 | Closing Certificate | 17 |
|  | 8.2 | Conditions | | 17 |
|  |  | 8.2.1 | Compliance with Warranties, No Default, etc | 17 |
|  |  | 8.2.2 | Orders | 17 |
|  |  | 8.2.3 | Issuance Certificate | 18 |
|  |  | 8.2.4 | Cash Collateral | 18 |
|  |  | 8.2.5 | KYC Diligence | 18 |
| SECTION 9. | | EVENTS OF DEFAULT AND THEIR EFFECT | | 18 |
|  | 9.1 | Events of Default | | 18 |
|  |  | 9.1.1 | Non-Payment of Reimbursement Obligations, etc | 18 |
|  |  | 9.1.2 | Non-Compliance with Agreement | 18 |
|  |  | 9.1.3 | Representations and Warranties | 19 |
|  |  | 9.1.4 | Dismissal or Conversion of Chapter 11 Cases | 19 |
|  |  | 9.1.5 | Modification of Financing Orders | 19 |
|  |  | 9.1.6 | Contest of Claims | 19 |
|  |  | 9.1.7 | Disallowance of Claims | 19 |
|  |  | 9.1.8 | Interim Financing Order | 19 |

-ii-

# TABLE OF CONTENTS
### (continued)

Page

|  |  |  |  |
|---|---|---|---|
| | 9.1.9 | Final Financing Order | 20 |
| | 9.1.10 | Failure to Comply with Financing Orders | 20 |
| | 9.1.11 | Invalidity of Agreement, etc | 20 |
| | 9.1.12 | Superpriority | 20 |
| | 9.1.13 | Surcharge | 20 |
| | 9.1.14 | Automatic Stay | 20 |
| | 9.1.15 | Impairment | 20 |
| | 9.1.16 | Plan of Reorganization | 20 |
| | 9.1.17 | RLA Default | 20 |
| 9.2 | | Effect of Event of Default | 20 |
| SECTION 10. | | THE POST-PETITION AGENT | 21 |
| 10.1 | | Appointment and Authorization | 21 |
| 10.2 | | Delegation of Duties | 21 |
| 10.3 | | Liability of Post-Petition Agent | 22 |
| 10.4 | | Reliance by Post-Petition Agent | 22 |
| 10.5 | | Notice of Default | 22 |
| 10.6 | | Credit Decision | 22 |
| 10.7 | | Indemnification | 23 |
| 10.8 | | Post-Petition Agent in Individual Capacity | 23 |
| 10.9 | | Successor Post-Petition Agent | 24 |
| 10.10 | | Collateral Matters | 24 |
| SECTION 11. | | GENERAL | 24 |
| 11.1 | | Waiver; Amendments | 24 |
| 11.2 | | Notices | 25 |
| 11.3 | | Costs, Expenses and Taxes | 25 |
| 11.4 | | Subsidiary References | 25 |
| 11.5 | | Captions | 26 |
| 11.6 | | Assignments; Participations | 26 |
| | 11.6.1 | Assignments | 26 |
| | 11.6.2 | Participations | 26 |

# TABLE OF CONTENTS
(continued)

**Page**

11.7  Governing Law ................................................................................................ 27

11.8  Counterparts.................................................................................................... 27

11.9  Successors and Assigns .................................................................................. 27

11.10 Indemnification by the Company .................................................................. 27

11.11 Nonliability of Lenders .................................................................................. 28

11.12 Forum Selection and Consent to Jurisdiction ........................................... 28

11.13 Waiver of Jury Trial........................................................................................ 29

SCHEDULES

SCHEDULE 2.1        Lenders and Pro Rata Shares
SCHEDULE 11.3       Addresses for Notices

EXHIBITS

EXHIBIT A           Form of Issuance Certificate

POST-PETITION CREDIT AGREEMENT

THIS POST-PETITION CREDIT AGREEMENT dated as of December __, 2008 (this "Agreement") is entered into among TRIBUNE COMPANY, a Delaware corporation (the "Company"), the Subsidiaries of the Company signatory hereto (the "Debtor Subsidiaries"), the financial institutions that are or may from time to time become parties hereto (together with their respective successors and assigns, the "Lenders"), and BARCLAYS BANK PLC (in its individual capacity, "Barclays"), as issuing bank and as administrative agent for the Lenders.

W I T N E S S E T H:

WHEREAS, on December 8, 2008 (the "Filing Date"), the Company filed, with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and

WHEREAS, the Lenders have agreed to make available to the Company a letter of credit facility upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

SECTION 1.  DEFINITIONS.

1.1    Definitions.  When used herein the following terms shall have the following meanings:

Affiliate of any Person means (i) any other Person that, directly or indirectly, controls or is controlled by or is under common control with such Person and (ii) any officer or director of such Person.  A Person shall be deemed to be "controlled by" any other Person if such Person possesses, directly or indirectly, power to vote 5% or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managers or power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

Agreement – see the Preamble.

Assignment Agreement – see Section 11.6.1.

Attorney Costs means, with respect to any Person, all reasonable fees and charges of any counsel to such Person, the reasonable allocable cost of internal legal services of such Person, all reasonable disbursements of such internal counsel and all court costs and similar legal expenses.

Bankruptcy Code – see the recitals.

Bankruptcy Court means the United States Bankruptcy Court for the District of Delaware or such other court as shall have jurisdiction over the Chapter 11 Cases.

Barclays – see the Preamble.

Budget means a 13 week projection as to sources and uses of funds delivered to the Post-Petition Agent and the Lenders, and which shall be in form and detail acceptable to the Post-Petition Agent.

Business Day means any day of the year (other than any Saturday or Sunday) which is not a day on which commercial banks are authorized or required by law to close in Chicago, Illinois or New York, New York.

Chapter 11 Cases means the chapter 11 cases of the Company and the Debtor Subsidiaries jointly administered under case no. 08-13141 in the Bankruptcy Court.

Closing Date – see Section 8.1.

Code means the Internal Revenue Code of 1986.

Collateral means the "LC Cash Collateral" (as that term is defined in the Interim Financing Order), including, without limitation, all amounts deposited into the Collateral Account from time to time pursuant to Section 8.2.4.

Collateral Account means a segregated cash collateral account maintained with Barclays and under the sole dominion and control of the Post-Petition Agent.

Commitment means, as to any Lender, such Lender's commitment to participate in Letters of Credit.  The initial amount of each Lender's Pro Rata Share of the Commitment Amount is set forth on Schedule 2.1.  The Commitments shall be reduced to zero on the Termination Date.

Commitment Amount means $50,000,000.

Company – see the Preamble.

Debtor Subsidiary – see the Preamble.

Dollar and the sign "$" mean lawful money of the United States of America.

Event of Default means any of the events described in Section 9.1.

Filing Date – see the recitals.

Final Financing Order means an order of the Bankruptcy Court which contains substantially the same provisions as the Interim Financing Order, in form and substance reasonably satisfactory to the Post-Petition Agent.

Financing Orders mean, collectively, the Interim Financing Order and the Final Financing Order.

Fiscal Quarter means a fiscal quarter of a Fiscal Year.

Fiscal Year means the fiscal year of the Company and its Subsidiaries, which period shall be the 12-month period ending on December 31 of each year. References to a Fiscal Year with a number corresponding to any calendar year (e.g., "Fiscal Year 2008") refer to the Fiscal Year ending on December 31 of such calendar year.

FRB means the Board of Governors of the Federal Reserve System or any successor thereto.

GAAP means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

Guaranteed Obligations – see Section 2.5.

Indemnified Liabilities – see Section 11.10.

Interest Rate means, for each day, a rate per annum equal to the sum of (a) the Base Rate for such day, plus (b) a margin of five percent (5.00%) per annum. For purposes of this definition,

"Base Rate" means, for any day, a rate per annum equal to the greater of (x) the Prime Rate in effect on such day, and (y) the Federal Funds Rate in effect on such day plus 0.50%;

"Federal Funds Rate" means the fluctuating interest rate per annum equal for each day to the weighted average of the rates of interest on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York; and

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Barclays as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by Barclays in connection with extensions of credit).

Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Rate shall be effective as of the opening of business on the effective date of such change in the Prime Rate or the Federal Funds Rate, respectively.

Interim Financing Order means an order of the Bankruptcy Court entered on an emergency and/or interim basis, in form and substance reasonably satisfactory to the Post-Petition Agent, and after notice given and a hearing conducted in accordance with Bankruptcy Rule 4001(c) no later than two days after the Filing Date, authorizing and approving the transactions contemplated in this Agreement and finding, among other things, that the Lenders are extending credit to the Company in good faith within the meaning of Bankruptcy Code § 364(e), which order shall, on an interim basis, (i) approve the payment by the Company of the fees set forth in Section 5 and the professional fees of the Post-Petition Agent, (ii) grant and approve the superpriority liens and security interests and administrative expense claims contemplated herein, (iii) approve the entering into this Agreement by each of the Debtor Subsidiaries, (iv) otherwise be in form and substance reasonably satisfactory to the Post-Petition Agent and (v) prior to the entry of the Final Financing Order, be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified without the prior written consent of the Required Lenders (subject to the proviso to Section 8.2.2).

Issuing Bank means Barclays or any other bank appointed for such purpose by Barclays with the consent of the Company.

Lender – see the Preamble.

Letter of Credit Liabilities means, without duplication, at any time and in respect of any Letter of Credit, the sum of (a) the undrawn face amount of such Letter of Credit, and (b) the aggregate unpaid principal amount of all Reimbursement Obligations with respect to such Letter of Credit at such time.

Letters of Credit means letters of credit issued pursuant to Section 2.1.

Lien means, with respect to any Person, any interest granted by such Person in any real or personal property, asset or other right owned or being purchased or acquired by such Person which secures payment or performance of any obligation and shall include any mortgage, lien, encumbrance, charge or other security interest of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise.

Margin Stock means any "margin stock" as defined in Regulation U.

Person means any natural person, corporation, partnership, trust, limited liability company, association, governmental authority or unit, or any other entity, whether acting in an individual, fiduciary or other capacity.

Post-Petition Agent means Barclays in its capacity as administrative agent for the Lenders hereunder and any successor thereto in such capacity.

Pro Rata Share means, with respect to any Lender, the percentage which (a) the Commitment of such Lender is of (b) the sum of the Commitments of all Lenders. The initial Pro Rata Share of each Lender is set forth across from such Lender's name on Schedule 2.1.

Regulation U means Regulation U of the FRB.

Reimbursement Obligations means, at any time, the obligations of the Company then outstanding in respect of all Letters of Credit to reimburse amounts paid by the Issuing Bank in respect of drawings under a Letter of Credit.

Required Lenders means Lenders having Pro Rata Shares of more than 50% in the aggregate, provided that that at any time there are fewer than three Lenders, "Required Lenders" means all Lenders.

RLA means that certain Receivables Loan Agreement, dated as of July 1, 2008, among Tribune Receivables, LLC, the Company, certain Subsidiaries of the Company and Barclays Bank PLC, as Administrative Agent.

SEC means the Securities and Exchange Commission or any other governmental authority succeeding to any of the principal functions thereof.

Subsidiary means, with respect to any Person, a corporation, partnership, limited liability company or other entity of which such Person and/or its other Subsidiaries own, directly or indirectly, outstanding shares or other ownership interests as have more than 50% of the ordinary voting power for the election of directors or other managers of such corporation, partnership, limited liability company or other entity.  Unless the context otherwise requires, each reference to Subsidiaries herein shall be a reference to Subsidiaries of the Company.

Termination Date means the earliest to occur of the following:  (a) the date that is 120 days after the Filing Date, (b) January 15, 2009, in the event that the Final Financing Order has not been approved by the Bankruptcy Court on or prior to that date, (c) the effective date of a plan of reorganization under the Chapter 11 Cases or (d) such other date on which the Commitments terminate pursuant to Section 9.

Unmatured Event of Default means any event that, if it continues uncured, will, with lapse of time or the giving of notice or both, constitute an Event of Default.

100% Issue – see Section 11.1.

1.2     Other Interpretive Provisions.  (a)  The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(a)     Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(b)     The term "including" is not limiting and means "including without limitation."

(c)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including."

(d)     Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include

all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

(e)     This Agreement may use several different limitations, tests or measurements to regulate the same or similar matters. All such limitations, tests and measurements are cumulative and each shall be performed in accordance with its terms.

(f)     This Agreement is the result of negotiations among and has been reviewed by counsel to the Post-Petition Agent, the Company, the Lenders and the other parties thereto and are the products of all parties. Accordingly, this Agreement shall not be construed against the Post-Petition Agent or the Lenders merely because of the Post-Petition Agent's or Lenders' involvement in its preparation.


SECTION 2.  COMMITMENTS OF THE LENDERS; ISSUANCE PROCEDURES.

2.1     <u>Commitments</u>. Subject to the terms and conditions of this Agreement, the Commitments may be used, upon the request of the Company, by the issuance by the Issuing Bank of standby letters of credit for account of the Company or any of its Debtor Subsidiaries (as specified by the Company), <u>provided</u> that:

(i)     in no event shall any Letter of Credit be issued after the Termination Date,

(ii)     in no event shall the aggregate amount of all Letter of Credit Liabilities exceed the aggregate amount of the Commitments, or

(iii)     each such Letter of Credit shall provide that it shall expire on the earlier of the following:

(A)     either (x) ten days after notice from the Issuing Bank to the beneficiary of such Letter of Credit of the termination of such Letter of Credit, or (y) the date of consummation of a plan of reorganization of the Company, and

(B)     a date no later than the first anniversary of the date of issuance of such Letter of Credit.

The Issuing Bank agrees not to give the notice referred to in the foregoing clause (iii)(A)(x) until either (A) the confirmation of a plan of reorganization of the Company, (B) any Event of Default shall be then continuing, or (C) the Company shall have entered into a financing after the date hereof that provides for the refinancing of any advances made under the RLA at any time after the Filing Date.

The following additional provisions shall apply to Letters of Credit:

(a)     The Company shall give the Post-Petition Agent at least five Business Days' irrevocable prior notice(effective upon receipt), or such shorter period as the Issuing Bank may agree, specifying the Business Day (which shall be no later than the

Termination Date) each Letter of Credit is to be issued, the account party or parties therefor and the proposed form of such Letter of Credit. Upon receipt of any such notice, the Post-Petition Agent shall advise the Issuing Bank of the contents thereof.

(b)     On each day during the period commencing with the issuance by the Issuing Bank of any Letter of Credit and until such Letter of Credit shall have expired or been terminated, the Commitment of each Lender shall be deemed to be utilized for all purposes of this Agreement in an amount equal to such Lender's Pro Rata Share of the then undrawn face amount of such Letter of Credit. Each Lender (other than the Issuing Bank) agrees that, upon the issuance of any Letter of Credit hereunder, it shall automatically acquire a participation in the Issuing Bank's liability under such Letter of Credit in an amount equal to such Lender's Pro Rata Share of such liability, and each Lender (other than the Issuing Bank) thereby shall absolutely, unconditionally and irrevocably assume, as primary obligor and not as surety, and shall be unconditionally obligated to the Issuing Bank to pay and discharge when due, its Pro Rata Share of the Issuing Bank's liability under such Letter of Credit.

(c)     Upon receipt from the beneficiary of any Letter of Credit of any demand for payment under such Letter of Credit, the Issuing Bank shall promptly notify the Company (through the Post-Petition Agent) of the amount to be paid by the Issuing Bank as a result of such demand and the date on which payment is to be made by the Issuing Bank to such beneficiary in respect of such demand. The Post-Petition Agent shall, promptly after receipt of any such notice, withdraw from the Collateral Account an amount equal to the amount to be so paid by the Issuing Bank, and remit such amount to the Issuing Bank to be applied by the Issuing Bank to pay the amount of such demand.

(d)     If, for any reason, funds in the Collateral Account are insufficient to pay the amount of any demand under any Letter of Credit or funds in the Collateral Account are not available to be withdrawn by the Post-Petition Agent for such purpose, and notwithstanding the identity of the account party of any Letter of Credit, the Company hereby unconditionally agrees to pay and reimburse the Post-Petition Agent for account of the Issuing Bank for the amount of each such demand for payment under such Letter of Credit at or prior to the date on which payment is to be made by the Issuing Bank to the beneficiary thereunder, without presentment, demand, protest or other formalities of any kind.

(e)     If, for any reason, any payment by the Issuing Bank is not reimbursed pursuant to Section 2.1(d), each Lender (other than the Issuing Bank) shall pay to the Post-Petition Agent for account of the Issuing Bank at the principal office of the Post-Petition Agent in New York City in Dollars and in immediately available funds, the amount of such Lender's Pro Rata Share of any payment under a Letter of Credit upon notice by the Issuing Bank (through the Post-Petition Agent) to such Lender requesting such payment and specifying such amount. Each such Lender's obligation to make such payment to the Post-Petition Agent for account of the Issuing Bank under this clause (e), and the Issuing Bank's right to receive the same, shall be absolute and unconditional and shall not be affected by any circumstance whatsoever, including, without limitation, the failure of any other Lender to make its payment under this clause (e), the financial

condition of the Company (or any other account party), the existence of any Event of Default or Unmatured Event of Default or the termination of the Commitments. Each such payment to the Issuing Bank shall be made without any offset, abatement, withholding or reduction whatsoever. If any Lender shall default in its obligation to make any such payment to the Post-Petition Agent for account of the Issuing Bank, for so long as such default shall continue the Post-Petition Agent may at the request of the Issuing Bank withhold from any payments received by the Post-Petition Agent under this Agreement for account of such Lender the amount so in default and, to the extent so withheld, pay the same to the Issuing Bank in satisfaction of such defaulted obligation.

(f)    Upon the making of each payment by a Lender to the Issuing Bank pursuant to clause (e) above in respect of any Letter of Credit, such Lender shall, automatically and without any further action on the part of the Post-Petition Agent, the Issuing Bank or such Lender, acquire (i) a participation in an amount equal to such payment in the Reimbursement Obligation owing to the Issuing Bank by the Company hereunder and under the Letter of Credit Documents relating to such Letter of Credit and (ii) a participation in a percentage equal to such Lender's Pro Rata Share in any interest or other amounts payable by the Company hereunder and under such Letter of Credit Documents in respect of such Reimbursement Obligation (other than the commissions, charges, costs and expenses payable to the Issuing Bank pursuant to clause (g) of this Section 2.1). Upon receipt by the Issuing Bank from or for account of the Company of any payment in respect of any Reimbursement Obligation or any such interest or other amount (including by way of setoff or application of proceeds of any collateral security) the Issuing Bank shall promptly pay to the Post-Petition Agent for account of each Lender entitled thereto, such Lender's Pro Rata Share of such payment, each such payment by the Issuing Bank to be made in the same money and funds in which received by the Issuing Bank. In the event any payment received by the Issuing Bank and so paid to the Lenders hereunder is rescinded or must otherwise be returned by the Issuing Bank, each Lender shall, upon the request of the Issuing Bank (through the Post-Petition Agent), repay to the Issuing Bank (through the Post-Petition Agent) the amount of such payment paid to such Lender, with interest at the Interest Rate.

(g)    The Company shall pay to the Post-Petition Agent for account of each Lender (ratably in accordance with their respective Pro Rata Shares) a letter of credit fee in respect of each Letter of Credit in an amount equal to three percent (3.00%) per annum of the daily average undrawn face amount of such Letter of Credit for the period from and including the date of issuance of such Letter of Credit (i) in the case of a Letter of Credit that expires in accordance with its terms, to and including such expiration date and (ii) in the case of a Letter of Credit that is drawn in full or is otherwise terminated other than on the stated expiration date of such Letter of Credit, to but excluding the date such Letter of Credit is drawn in full or is terminated (such fee to be non-refundable, to be paid in arrears on the last Business Day of each month and on the date of such drawing in full or termination and to be calculated for any day after giving effect to any payments made under such Letter of Credit on such day). In addition, the Company shall pay to the Agent for account of the Issuing Bank a fronting fee in respect of each Letter of Credit in an amount equal to one-eighth percent (0.125)% per annum of the daily average undrawn face amount of such Letter of Credit for the period from and including the date of

issuance of such Letter of Credit (i) in the case of a Letter of Credit that expires in accordance with its terms, to and including such expiration date and (ii) in the case of a Letter of Credit that is drawn in full or is otherwise terminated other than on the stated expiration date of such Letter of Credit, to but excluding the date such Letter of Credit is drawn in full or is terminated (such fee to be non-refundable, to be paid in arrears on the last Business Day of each month and on the date of such drawing in full or termination and to be calculated for any day after giving effect to any payments made under such Letter of Credit on such day) plus all commissions, charges, costs and expenses in the amounts customarily charged by the Issuing Bank from time to time in like circumstances with respect to the issuance of each Letter of Credit and drawings and other transactions relating thereto.  Letter of credit fees and fronting fees shall be computed for the actual number of days elapsed on the basis of a year of 360 days.

(h)    The issuance by the Issuing Bank of each Letter of Credit shall, in addition to the conditions precedent set forth in Section 2.2, be subject to the conditions precedent that (i) such Letter of Credit shall have a face amount at least equal to $1,000,000 (or such smaller amount as the Issuing Bank may agree) or an integral multiple of $250,000 (or such smaller amount as the Issuing Bank may agree) in excess thereof, (ii) such Letter of Credit shall be in such form, contain such terms and support such transactions as shall be reasonably satisfactory to the Issuing Bank consistent with its then current practices and procedures with respect to letters of credit of the same type (and in any event shall be governed by the International Standby Practices 1998 (ISP98) published by the International Chamber of Commerce), and (iii) the Company shall have executed and delivered such applications, agreements and other instruments relating to such Letter of Credit as the Issuing Bank shall have reasonably requested consistent with its then current practices and procedures with respect to letters of credit of the same type, provided that in the event of any conflict between any such application, agreement or other instrument and the provisions of this Agreement, the provisions of this Agreement shall control.

(i)    To the extent that any Lender shall fail to pay any amount required to be paid pursuant to clause (e) or (f) of this Section 2.1 on the due date therefor, such Lender shall pay interest to the Issuing Bank (through the Post-Petition Agent), on demand, on such amount from and including such due date to but excluding the date such payment is made, at a rate per annum equal to the Interest Rate.

(j)    The issuance by the Issuing Bank of any modification or supplement to any Letter of Credit hereunder shall be subject to the same conditions applicable under this Section 2.1 to the issuance of new Letters of Credit, and no such modification or supplement shall be issued hereunder unless either (i) the respective Letter of Credit affected thereby would have complied with such conditions had it originally been issued hereunder in such modified or supplemented form or (ii) each Lender shall have consented thereto.

The Company hereby indemnifies and holds harmless each Lender and the Post-Petition Agent from and against any and all claims and damages, losses, liabilities, costs or expenses that such Lender or the Post-Petition Agent may incur (or that may be claimed against such Lender or the

Post-Petition Agent by any Person whatsoever) by reason of or in connection with the execution and delivery or transfer of or payment or refusal to pay by the Issuing Bank under any Letter of Credit; provided that the Company shall not be required to indemnify any Lender or the Post-Petition Agent for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, caused by (x) the willful misconduct or gross negligence of the Issuing Bank in determining whether a request presented under any Letter of Credit complied with the terms of such Letter of Credit or (y) in the case of the Issuing Bank, the Issuing Bank's failure to pay under any Letter of Credit after the presentation to it of a request strictly complying with the terms and conditions of such Letter of Credit.  Nothing in this Section 2.1 is intended to limit the other obligations of the Company, any Bank or the Agent under this Agreement.

2.2    Certain Conditions.  Notwithstanding any other provision of this Agreement, the Issuing Bank shall have no obligation to issue any Letter of Credit if an Event of Default or Unmatured Event of Default exists.

2.3    Security Interests; Collateral.  Pursuant to the Financing Orders, as security for the full and timely payment and performance of all obligations of the Company hereunder, now existing or hereafter arising, the Company has granted to the Post-Petition Agent a valid, binding, enforceable, duly perfected security interest in the Collateral.  Without limiting the generality of the foregoing, the repayment of the Reimbursement Obligations and all other obligations of the Company and the Debtor Subsidiaries arising under this Agreement shall be granted a first administrative priority status and a first priority security interest and Lien on the Collateral by the Bankruptcy Court pursuant to Section 364(d) of the Bankruptcy Code, with priority and superpriority over (i) any and all other Liens and claims against the property of the Company or of the Debtor Subsidiaries or the Collateral existing on the Filing Date, and (ii) priority claims (including administrative expenses) alleging priority pursuant to Section 503, Section 506(c) or Section 507 of the Bankruptcy Code, heretofore or hereafter arising or incurred in the Chapter 11 Cases or in any superseding case or cases under any chapter of the Bankruptcy Code.

2.4    Application of Collateral Account.  The Post-Petition Agent may, at any time any Reimbursement Obligation or other amount is payable by the Company under this Agreement, withdraw funds from the Collateral Account in an amount sufficient to pay the same, and apply such withdrawn funds to the payment of such Reimbursement Obligation or other amount.

2.5    Guaranty.  The Debtor Subsidiaries hereby jointly and severally guarantee to the Lenders and their respective successors and assigns the prompt payment in full when due of the Letter of Credit Liabilities, all interest and fees in respect thereof and all other amounts from time to time owing by the Company under this Agreement.  The Debtor Subsidiaries hereby further jointly and severally agree that if the Company shall fail to pay in full when due any of the Guaranteed Obligations, the Debtor Subsidiaries will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due in accordance with the terms of such extension or renewal.

2.6    Discharge.  The Company agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization under the Chapter 11

Cases (and the Company, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) any superpriority claim granted to the Post-Petition Agent and the Lenders pursuant to the Financing Orders and the Liens granted to the Post-Petition Agent pursuant to the Financing Orders and this Agreement, in each case with respect to the Letter of Credit Liabilities, shall not be affected in any manner by the entry of an order confirming a plan of reorganization under the Chapter 11 Cases.

## SECTION 3.  INTEREST.

3.1    Interest Rate.  The Company promises to pay interest on the unpaid principal amount of all Reimbursement Obligations at the Interest Rate.  Interest on the Reimbursement Obligations is payable on demand.  Interest shall be computed for the actual number of days elapsed on the basis of a year of 365 days.

## SECTION 4.  FEES.

4.1    Commitment Fee.  The Company agrees to pay to the Post-Petition Agent for account of each Lender a commitment fee on the daily average unused amount of such Lender's Commitment (for which purpose the aggregate amount of any Letter of Credit Liabilities shall be a pro rata use of each Lender's Commitment), for the period from and including the date of this Agreement to but not including the Termination Date, at a rate per annum equal to one-half percent (0.50%).  Accrued commitment fees shall be payable monthly in arrears on the last Business Day of each month and on the Termination Date.  Commitment fees shall be computed for the actual number of days elapsed on the basis of a year of 360 days.

4.2    Fee Letter.  The Company agrees to pay to Barclays for its own account the fees described in the fee letter, dated December 8, 2008, from Barclays to the Company and Tribune Receivables, LLC, on the dates, in the amounts and otherwise as set forth in said fee letter.

## SECTION 5.  MAKING AND PRORATION OF PAYMENTS; SETOFF; TAXES.

5.1    Making of Payments.  All payments of principal of or interest on the Reimbursement Obligations, and of all fees and other amounts payable by the Company hereunder, shall be made by the Company to the Post-Petition Agent in immediately available funds at the office specified by the Post-Petition Agent not later than 10:00 a.m., New York time, on the date due; and funds received after that hour shall be deemed to have been received by the Post-Petition Agent on the following Business Day.  The Post-Petition Agent shall promptly remit to the Issuing Bank and each Lender its share of all such payments received in collected funds by the Post-Petition Agent for the account of the Issuing Bank or such Lender.

5.2    Setoff.  The Company agrees that the Post-Petition Agent and each Lender have all rights of set-off and bankers' lien provided by applicable law, and in addition thereto, the Company agrees that at any time any Event of Default exists, the Post-Petition Agent and each Lender may, without further order of or application to the Bankruptcy Court, apply to the payment of any obligations of the Company hereunder, whether or not then due, any and all

balances, credits, deposits, accounts or moneys of the Company then or thereafter with the Post-Petition Agent or such Lender, irrespective of whether the Lenders have demanded payment.

5.3    Proration of Payments.  If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of offset or payment of a secured claim under Section 506 of the Bankruptcy Code or otherwise, but excluding any payment pursuant to Section 11.6) on account of principal of or interest on any Reimbursement Obligation in excess of its pro rata share of payments and other recoveries obtained by all Lenders on account of principal of and interest on the Reimbursement Obligations then held by them, such Lender shall purchase from the other Lenders such participations in the Commitments held by them as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; provided that if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery.

5.4    Taxes.  All payments of principal of, and interest on, the Reimbursement Obligations and all other amounts payable hereunder shall be made free and clear of and without deduction for any present or future income, excise, stamp or franchise taxes and other taxes, fees, duties, withholdings or other charges of any nature whatsoever imposed by any taxing authority, excluding franchise taxes and taxes imposed on or measured by the Post-Petition Agent's or any Lender's net income or receipts (all non-excluded items being called "Taxes").  If any withholding or deduction from any payment to be made by the Company hereunder is required in respect of any Taxes pursuant to any applicable law, rule or regulation, then the Company will:

(a)    pay directly to the relevant authority the full amount required to be so withheld or deducted;

(b)    promptly forward to the Post-Petition Agent an official receipt or other documentation reasonably satisfactory to the Post-Petition Agent evidencing such payment to such authority; and

(c)    pay to the Post-Petition Agent for the account of the Lenders such additional amount as is necessary to ensure that the net amount actually received by each Lender will equal the full amount such Lender would have received had no such withholding or deduction been required.

Moreover, if any Taxes are directly asserted against the Post-Petition Agent or any Lender with respect to any payment received by the Post-Petition Agent or such Lender hereunder, the Post-Petition Agent or such Lender may pay such Taxes and the Company will promptly pay such additional amounts (including any penalty, interest or expense) as is necessary in order that the net amount received by such Person after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount such Person would have received had such Taxes not been asserted.

If the Company fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to the Post-Petition Agent, for the account of the respective Lenders, the required receipts or other required documentary evidence, the Company shall indemnify the Lenders for

any incremental Taxes, interest or penalties that may become payable by any Lender as a result of any such failure. For purposes of this <u>Section 5.4</u>, a distribution or payment hereunder by the Post-Petition Agent or any Lender to or for the account of any Lender or the Post-Petition Agent shall be deemed a payment by the Company.

Each Lender that (a) is organized under the laws of a jurisdiction other than the United States of America or a state thereof and (b)(i) is a party hereto on the Closing Date or (ii) becomes an assignee of an interest under this Agreement under <u>Section 13.9.1</u> after the Closing Date (unless such Lender was already a Lender hereunder immediately prior to such assignment) shall, on or prior to the Closing Date (or, if later, the first relevant date for withholding in the case of any such assignee) execute and deliver to each of the Company and the Post-Petition Agent (x) two or more (as the Company or the Post-Petition Agent may reasonably request) United States Internal Revenue Service Forms W-9, W-8ECI or W-8BEN, or any successor form to any of the foregoing forms, in each case establishing that such Lender is exempt from withholding or deduction of Taxes, or (y) if such Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and intends to claim exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," a Form W-8BEN or any successor thereto (and, if such Lender delivers a Form W-8BEN, a certificate representing that such Lender is not a "bank" for purposes of Section 881(c) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Company and is not a controlled foreign corporation related to the Company (within the meaning of Section 864(d)(4) of the Code)), or such other forms or documents, appropriately completed, in each case establishing that such Lender is exempt from withholding or deduction of Taxes. The Post-Petition Agent and any successor Post-Petition Agent under <u>Section 10.9</u> shall, prior to the Closing Date (or the first relevant date for withholding, in the case of such successor), execute and deliver to the Company two or more (as the Company may reasonably request) of either Internal Revenue Service Form W-8IMY (with respect to each Lender) or Internal Revenue Service Form W-9, or any successor to any of the foregoing forms. The Company shall not be required to pay additional amounts to any Lender pursuant to this <u>Section 5.4</u> to the extent that the obligation to pay such additional amounts would not have arisen but for the failure of such Lender to comply with this paragraph.

SECTION 6.    REPRESENTATIONS AND WARRANTIES.

To induce the Post-Petition Agent and the Lenders to enter into this Agreement and to induce the Issuing Bank and the Lenders to incur obligations in respect of Letters of Credit hereunder, the Company represents and warrants to the Post-Petition Agent and the Lenders that:

6.1    <u>Organization</u>. The Company is a corporation validly existing and in good standing under the laws of the State of Delaware. Each Debtor Subsidiary is validly existing and in good standing under the laws of its jurisdiction of organization.

6.2    <u>Authorization; No Conflict</u>. Upon entry of the Interim Financing Order (or the Final Financing Order, as applicable) by the Bankruptcy Court, the Company and each Debtor Subsidiary is duly authorized to execute and deliver this Agreement, each of the Company and each Debtor Subsidiary is duly authorized to have Letters of Credit issue for its account

hereunder and the Company is duly authorized to grant Liens to the Post-Petition Agent for the benefit of the Lenders and to perform its obligations under this Agreement.  Upon entry of the Interim Financing Order (or the Final Financing Order, as applicable) by the Bankruptcy Court, the execution, delivery and performance by the Company and each Debtor Subsidiary of this Agreement and issuance of Letters of Credit for the account of the Company and each Debtor Subsidiary hereunder, do not and will not (a) require any consent or approval of any governmental agency or authority (other than the Financing Orders), (b) conflict with (i) any provision of law, (ii) the charter, by-laws or other organizational documents of the Company or any Debtor Subsidiary or (iii) any agreement, indenture, instrument or other document, or any judgment, order or decree, which is binding upon the Company or any Debtor Subsidiary or any of their respective properties and which was entered into after the Filing Date or (c) except as provided in the Financing Orders and except for Liens in favor of the Post-Petition Agent for the benefit of the Lenders, require, or result in, the creation or imposition of any Lien on any asset of the Company or any Debtor Subsidiary.

6.3     Validity and Binding Nature.  Upon entry of the Interim Financing Order (or the Final Financing Order, as applicable) by the Bankruptcy Court, this Agreement has been duly executed and delivered by the Company and each Debtor Subsidiary and is the legal, valid and binding obligation of the Company and each Debtor Subsidiary, enforceable against the Company and each Debtor Subsidiary in accordance with its terms.

6.4     Investment Company Act.  Neither the Company nor any Debtor Subsidiary is an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940.

6.5     Regulation U.  The Company is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

6.6     No Default.  No Event of Default or Unmatured Event of Default exists or would result from the issuance of any Letter of Credit hereunder.


SECTION 7.  COVENANTS.

Until the expiration or termination of the Commitments and thereafter until all obligations of the Company hereunder are paid in full, the Company agrees that, unless at any time the Required Lenders shall otherwise expressly consent in writing, it will:

7.1     Reports, Certificates and Other Information.  Furnish to the Post-Petition Agent (and the Post-Petition Agent shall promptly provide to each Lender):

7.1.1     Annual Report.  Promptly when available, and in any event within 90 days after the close of each Fiscal Year, a copy of the annual audit report of the Company and its Subsidiaries for such Fiscal Year, including therein consolidated balance sheets and consolidated statements of earnings and cash flows of the Company and its Subsidiaries as at the end of such Fiscal Year, certified by independent auditors of recognized national standing selected by the Company.

7.1.2   Interim Reports.  The following:

(a)     Promptly when available and in any event within 45 days after the end of each Fiscal Quarter (other than the last Fiscal Quarter of any Fiscal Year), an unaudited consolidated balance sheet of the Company and its Subsidiaries as of the end of such Fiscal Quarter, together with unaudited consolidated statements of earnings and cash flows for such Fiscal Quarter and for the period beginning with the first day of such Fiscal Year and ending on the last day of such Fiscal Quarter, together with a comparison with the corresponding period of the previous Fiscal Year, certified by the chief financial officer or the treasurer of the Company; and

(b)     Promptly when available and in any event within 30 days after the end of each month, an unaudited consolidated balance sheet of the Company and its Subsidiaries as of the end of such month, together with unaudited consolidated statements of earnings and cash flows for such month and for the period beginning with the first day of such Fiscal Year and ending on the last day of such month, together with a comparison with the corresponding period of the previous Fiscal Year, certified by the chief financial officer or the treasurer of the Company.

7.1.3   Reports to the SEC.  Promptly upon the filing or sending thereof, copies of all regular, periodic or special reports of the Company or any Debtor Subsidiary filed with the SEC; and copies of all registration statements of the Company or any Debtor Subsidiary filed with the SEC (other than on Form S-8).

7.1.4   Notice of Default.  Promptly upon becoming aware of the occurrence of any Event of Default or any Unmatured Event of Default, written notice describing the same and the steps being taken by the Company or the Debtor Subsidiary affected thereby with respect thereto.

7.1.5   Chapter 11 Cases.  Promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information, Budgets and any revisions thereof and with respect thereto and other documents filed by or on behalf of the Company or any Debtor Subsidiary with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of the Company or any Debtor Subsidiary to any official committee appointed in the Chapter 11 Cases or any lenders or agents with respect to any indebtedness outstanding on the Filing Date.

7.1.6   Other Information.  Promptly from time to time, such other information concerning the Company and its Subsidiaries as any Lender or the Post-Petition Agent may reasonably request.

Reports, certificates and information required to be delivered pursuant to Sections 7.1.1, 7.1.2 and 7.1.3 shall be deemed to have been delivered on the date on which the Company posts reports containing such financial statements on its website on the Internet at www.sec.gov or at such other website identified by the Company in a notice to the Post-Petition Agent and that is accessible by the Lenders without charge; provided that the Company shall deliver paper copies of such information to any Lender promptly upon request of such Lender through the Post-Petition Agent and provided further that the Lenders shall be deemed to have received the

information specified in Sections 7.1.1 through 7.1.4 on the date (x) the information regarding the website where such financial information can be found is posted at the website of the Post-Petition Agent identified from time to time by the Post-Petition Agent to the Lenders and the Company and (y) such posting is promptly notified to the Lenders (it being understood that the Company shall have satisfied the timing obligations imposed by those clauses as of the date such information is delivered to the Post-Petition Agent).

7.2    Further Assurances.  Take, execute and deliver any and all such further acts, deeds, conveyances, security agreement, mortgages, assignments, estoppel certificates, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments the Post-Petition Agent or the Required Lenders, as the case may be, may reasonably request from time to time in order to perfect and maintain the validity, effectiveness and priority of the Liens on the Collateral intended to be created under the Financing Orders. The Company and each Debtor Subsidiary agrees that, upon entry of the Interim Financing Order (and, if entered, the Final Financing Order), no further actions or filings are required to create or perfect the Liens on the Collateral of the Post-Petition Agent for the benefit of the Lenders.

7.3    No Surcharge.  Not assert any charges under Section 506(c) of the Bankruptcy Code against any Collateral securing the Letter of Credit Liabilities.

7.4    No Superpriority Claims.  Not permit to exist any claims in respect of the Collateral entitled to a superpriority under Section 364(c)(1) of the Bankruptcy Code, other than those of the Post-Petition Agent and the Lenders.

7.5    Maintenance of Collateral.  If at any time the aggregate credit balance of the Collateral Account is an amount that is less than 105% of the aggregate amount of Letter of Credit Liabilities with respect to all outstanding Letters of Credit, the Company shall, no later than two Business Days thereafter, deposit additional amounts in the Collateral Account so that, after giving effect thereto, the aggregate credit balance of the Collateral Account is at least equal to 105% of the aggregate amount of Letter of Credit Liabilities with respect to all outstanding Letters of Credit.

SECTION 8.  EFFECTIVENESS; CONDITIONS OF ISSUANCE, ETC.

The obligation of the Issuing Bank to issue any Letter of Credit is subject to the following conditions precedent:

8.1    Initial Credit Extension.  The obligation of the Issuing Bank to issue the first Letter of Credit hereunder is, in addition to the conditions precedent specified in Section 8.2, subject to the conditions precedent that (a) all of the "first day orders" entered by the Bankruptcy Court in the Chapter 11 Cases shall be reasonably satisfactory in form and substance to the Post-Petition Agent, (b) the Post-Petition Agent shall have received a copy certified by the Secretary of the Company of the Interim Financing Order entered by the Bankruptcy Court within 2 days of the Filing Date and the Interim Financing Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended, (c) the Required Lenders shall be satisfied that the Post-Petition Agent and the Lenders shall have the protection of Section 364(e)

of the Bankruptcy Code and (d) the Post-Petition Agent shall have received all of the following, each duly executed and dated the Closing Date (or such other date as shall be satisfactory to the Post-Petition Agent), in form and substance reasonably satisfactory to the Post-Petition Agent (and the date on which all such conditions precedent have been satisfied or waived in writing by the Post-Petition Agent and the Required Lenders is called the "Closing Date"):

8.1.1    Incumbency and Signature Certificates. A certificate of the Secretary or an Assistant Secretary (or other appropriate representative) of the Company certifying the names of the officer or officers of the Company authorized to sign this Agreement, together with a sample of the true signature of each such officer (it being understood that the Post-Petition Agent and each Lender may conclusively rely on each such certificate until formally advised by a like certificate of any changes therein).

8.1.2    Payment of Fees. Evidence of payment by the Company simultaneously with the issuance of the first Letter of Credit hereunder of all accrued and unpaid fees, costs and expenses to the extent then due and payable on the Closing Date, together with all Attorney Costs of the Post-Petition Agent to the extent invoiced prior to the Closing Date.

8.1.3    Closing Certificate. A certificate signed by a vice president of the Company dated as of the Closing Date, affirming the matters set forth in Section 8.2.1 as of the Closing Date.

8.2    Conditions. The obligation of the Issuing Bank to issue each Letter of Credit is subject to the following further conditions precedent that:

8.2.1    Compliance with Warranties, No Default, etc. Both before and after giving effect to the issuing of any Letter of Credit, the following statements shall be true and correct:

(a)    the representations and warranties of the Company set forth in this Agreement shall be true and correct in all material respects with the same effect as if then made (except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date); and

(b)    no Event of Default or Unmatured Event of Default shall have then occurred and be continuing.

8.2.2    Orders. The Interim Financing Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended or, if the date of the requested extension of credit is after January 15, 2009, then (x) the Post-Petition Agent shall have received, with a copy for each Lender, a date stamped copy of the Final Financing Order entered by the Bankruptcy Court, in form and substance reasonably satisfactory to the Post-Petition Agent with such changes thereto as may be approved by the Post-Petition Agent and its counsel and (y) the Final Financing Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended; provided that the Required Lenders may approve any amendment or modification to the Financing Orders (except that any amendment or modification to any Financing Order that would have the effect of revising provisions contained herein that require the consent of all of the Lenders pursuant to Section 11.1 hereof will require the consent of all of the Lenders) .

8.2.3    Issuance Certificate. The Post-Petition Agent shall have received (in sufficient counterparts to provide one to each Lender) a certificate, substantially in the form of Exhibit A hereto, dated the date of such requested Letter of Credit and signed by a duly authorized representative of the Company (i) as to the matters set out in Section 8.2.1 (it being understood that each request by the Company for the issuance of a Letter of Credit shall be deemed to constitute a warranty by the Company that the conditions precedent set forth in Section 8.2.1 will be satisfied at the time of the issuance of such Letter of Credit), (ii) to the effect that the proposed Letter of Credit and its intended use are consistent with the terms of this Agreement and is necessary in order to satisfy the Company's obligations in the ordinary course of business or as otherwise permitted under this Agreement, (iii) to the effect that the Company has observed or performed all of its covenants and other agreements in, and has satisfied in all material respects every condition contained in, the Interim Financing Order or the Final Financing Order (as applicable) to be observed, performed or satisfied by the Company and (iv) to the effect that the requirements of Section 8.2.4 will be satisfied with respect to such Letter of Credit, together with such other documents as the Post-Petition Agent or any Lender may reasonably request in support thereof.

8.2.4    Cash Collateral. The Company shall have deposited into the Collateral Account an amount in Dollars in immediately available funds such that, immediately after the issuance of such Letter of Credit, the aggregate credit balance of the Collateral Account shall not be less than an amount equal to 105% of the aggregate amount of Letter of Credit Liabilities at such time in respect of all outstanding Letters of Credit.

8.2.5    KYC Diligence. If the account party of such Letter of Credit is a Debtor Subsidiary, the Issuing Bank shall have received such documentation and evidence as it may reasonably request in order for it to carry out all "know your customer" or other checks in relation to the identity of such Debtor Subsidiary that it is required to carry out in relation to the transactions contemplated by this Agreement and such Letter of Credit, and the Issuing Bank shall be satisfied with the result of all such "know your customer" or other checks.

SECTION 9.  EVENTS OF DEFAULT AND THEIR EFFECT.

9.1    Events of Default. Each of the following shall constitute an Event of Default under this Agreement:

9.1.1    Non-Payment of Reimbursement Obligations, etc. Default (i) in the payment when due of the principal of any Reimbursement Obligation or (ii) in the payment of any interest, fee or other amount payable by the Company hereunder within two days after the same becomes due and payable.

9.1.2    Non-Compliance with Agreement. Any of the following:

(a)    failure by the Company to comply with or to perform any covenant set forth in Section 7 (other than Sections 7.1.1, 7.1.2, 7.1.3, 7.1.5, 7.1.6 and 7.2); or

(b)    failure by the Company to comply with any other provision of this Agreement, which failure shall continue for ten Business Days after notice thereof to the Company from the Post-Petition Agent or any Lender.

9.1.3    <u>Representations and Warranties</u>. Any representation or warranty made by the Company or any Debtor Subsidiary herein is breached or is false or misleading in any material respect, or any schedule, certificate, financial statement, report, notice or other writing furnished by the Company or any Debtor Subsidiary to the Post-Petition Agent or any Lender at any time in connection herewith is false or misleading in any material respect on the date as of which the facts therein set forth are stated or certified.

9.1.4    <u>Dismissal or Conversion of Chapter 11 Cases</u>. The Bankruptcy Court shall enter an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case or cases under Chapter 7 of the Bankruptcy Code, or appointing a trustee in any of the Chapter 11 Cases or appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Company's or any of the Debtor Subsidiaries' business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b).

9.1.5    <u>Modification of Financing Orders</u>. An order of the Bankruptcy Court shall be entered in any of the Chapter 11 Cases amending, supplementing, staying, vacating or otherwise modifying any of the Financing Orders, or the Company or any of the Debtor Subsidiaries shall apply for authority to do so; <u>provided</u> that no Event of Default shall occur under this <u>Section 9.1.5</u> to the extent that any such amendment, supplement or other modification is made in compliance with this Agreement and is not adverse in any material respect, in the reasonable judgment of the Post-Petition Agent, to the rights and interests of the Lenders under this Agreement.

9.1.6    <u>Contest of Claims</u>. The Company or any of the Debtor Subsidiaries shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Company or any of the Debtor Subsidiaries) any other Person's opposition of, any motion made in the Bankruptcy Court by any Lender seeking confirmation of the amount of such Lender's claim or the validity and enforceability of the Liens in favor of such Lender.

9.1.7    <u>Disallowance of Claims</u>. The Company or any of the Debtor Subsidiaries shall seek to, or shall support (in any such case by way of motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Company or any of the Debtor Subsidiaries) any other Person's motion to, disallow in whole or in part any Lender's claim in respect of the obligations hereunder or to challenge the validity and enforceability of the Liens in favor of the Post-Petition Agent or any Lender.

9.1.8    <u>Interim Financing Order</u>. From and after the date of entry thereof, the Interim Financing Order shall cease to be in full force and effect (or shall have been vacated, stayed, reversed, modified or amended), in each case without the consent of the Required Lenders, and the Final Financing Order shall not have been entered prior to such cessation (or vacatur, stay, reversal, modification or amendment).

9.1.9    <u>Final Financing Order</u>. The Final Financing Order shall not have been entered by the Bankruptcy Court on or before January 15, 2009; or from and after the date of entry thereof, the Final Financing Order shall cease to be in full force and effect (or shall have been vacated, stayed, reversed, modified or amended), in each case without the consent of the Required Lenders.

9.1.10    <u>Failure to Comply with Financing Orders</u>. The Company or any of the Debtor Subsidiaries shall fail to comply with the terms of the Financing Orders.

9.1.11    <u>Invalidity of Agreement, etc</u>. This Agreement shall cease to be in full force and effect; or the Company (or any Person by, through or on behalf of the Company or any of the Debtor Subsidiaries) shall contest in any manner the validity, binding nature or enforceability of this Agreement.

9.1.12    <u>Superpriority</u>. The entry of an order (other than the Financing Orders) granting any other claim superpriority status or a Lien equal or superior to that granted to the Post-Petition Agent for the benefit of the Post-Petition Agent and the Lenders in respect of the Collateral.

9.1.13    <u>Surcharge</u>. The entry of an order authorizing recovery by any Person from the Collateral for any costs of preservation or disposition thereof under Section 506(c) of the Bankruptcy Code or (except as provided in the Final Financing Order) authorizing the use of cash collateral without consent in writing by the Post-Petition Agent.

9.1.14    <u>Automatic Stay</u>. The entry of an order granting relief from the automatic stay so as to allow a third party to proceed in any interest in any asset or assets of the Company or of any of the Debtor Subsidiaries having a value greater than $25,000,000 in the aggregate.

9.1.15    <u>Impairment</u>. The filing by the Company or any of the Debtor Subsidiaries of any motion or proceeding which could reasonably be expected to result in material impairment of the Lenders' rights under this Agreement; or a final determination by the Bankruptcy Court (or any other court of competent jurisdiction) with respect to any motion or proceeding brought by any other party which results in any material impairment of the Lenders' rights under this Agreement.

9.1.16    <u>Plan of Reorganization</u>. The filing of a plan of reorganization by the Company or the entry of an order confirming such a plan which fails to provide for the payment in full of cash of the Reimbursement Obligations and other obligations hereunder and the cancellation of all outstanding Letters of Credit (or the provision of other arrangements satisfactory to the Issuing Bank to replace all such Letters of Credit or provide credit support therefor).

9.1.17    <u>RLA Default</u>. Any "Facility Event" or "Facility Termination Event" under the RLA.

9.2    <u>Effect of Event of Default</u>. If any Event of Default shall occur and be continuing: (i) upon one day's written notice to the Company the automatic stay under Section 362 of the Bankruptcy Code shall be deemed lifted, without further order of or application to the Bankruptcy Court, to permit the Post-Petition Agent (upon the direction of the Required Lenders) to do one or more of the following (A) reduce the amount of the Commitments (if they

have not theretofore terminated), (B) terminate this Agreement and/or (C) declare the Commitments (if they have not theretofore terminated) to be terminated, whereupon the Commitments (if they have not theretofore terminated) shall immediately terminate and/or all obligations hereunder shall become immediately due and payable, all without presentment, demand, protest or other notice of any kind (all of which are hereby waived by the Company); and (ii) upon three Business Days' notice to the Company (as well as counsel of record for any statutory committee appointed in the Chapter 11 Cases (and the Office of the United States Trustee for the District in which the Chapter 11 Cases is pending), the automatic stay under Section 362 of the Bankruptcy Code shall be deemed lifted, without further order of or application to the Bankruptcy Court, to permit the Post-Petition Agent (upon the direction of the Required Lenders) to (A) enforce the Liens securing the obligations hereunder, (B) exercise any and all remedies under this Agreement, the Financing Orders and applicable law available to the Post-Petition Agent or the Lenders, including but not limited to, all rights and remedies as a secured creditor under the Uniform Commercial Code or in equity in respect of the Collateral, (C) take immediate possession of the Collateral and/or (D) solely to the extent the aggregate balance of the Collateral Account is less than the aggregate amount of Letter of Credit Liabilities with respect to all Letters of Credit outstanding at any time, set-off or otherwise seize amounts in any account maintained with the Post-Petition Agent or any Lender or under their control and apply such amounts to the such deficiency. The foregoing shall not be construed to limit the Post-Petition Agent's or any Lender's discretion (to the extent provided in this Agreement) to take the actions described above at any other time. In connection with the exercise by the Post-Petition Agent or the Lenders of any remedy provided to them hereunder or under the Financing Orders, the Company agrees not the object to or otherwise challenge the Post-Petition Agent's security interest under the Financing Orders. Notwithstanding the foregoing, the effect as an Event of Default of any event described in Section 9.1.1 may be waived by the written concurrence of all of the Lenders, and the effect as an Event of Default of any other event described in this Section 9 may be waived by the written concurrence of the Required Lenders.

SECTION 10. THE POST-PETITION AGENT.

10.1    Appointment and Authorization.  Each Lender hereby irrevocably (subject to Section 10.9) appoints, designates and authorizes the Post-Petition Agent to take such action on its behalf under the provisions of this Agreement and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere in this Agreement, the Post-Petition Agent shall not have any duty or responsibility except those expressly set forth herein, nor shall the Post-Petition Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist against the Post-Petition Agent.

10.2    Delegation of Duties.  The Post-Petition Agent may execute any of its duties under this Agreement by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Post-Petition Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects with reasonable care.

10.3    <u>Liability of Post-Petition Agent</u>.  None of the Post-Petition Agent nor any of its directors, officers, employees or agents shall (i) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or in connection with the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (ii) be responsible in any manner to any of the Lenders for any recital, statement, representation or warranty made by the Company or any Debtor Subsidiary or Affiliate of the Company, or any officer thereof, contained in this Agreement, or in any certificate, report, statement or other document referred to or provided for in, or received by the Post-Petition Agent under or in connection with, this Agreement, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, or for any failure of the Company to perform its obligations hereunder.  The Post-Petition Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement, or to inspect the properties, books or records of the Company or any of the Company's Subsidiaries or Affiliates.

10.4    <u>Reliance by Post-Petition Agent</u>.  The Post-Petition Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to the Company), independent accountants and other experts selected by the Post-Petition Agent. The Post-Petition Agent shall be fully justified in failing or refusing to take any action under this Agreement unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, confirmation from the Lenders of their obligation to indemnify the Post-Petition Agent against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Post-Petition Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

10.5    <u>Notice of Default</u>.  The Post-Petition Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default or Unmatured Event of Default except with respect to defaults in the payment of principal, interest and fees required to be paid to the Post-Petition Agent for the account of the Lenders, unless the Post-Petition Agent shall have received written notice from a Lender or the Company referring to this Agreement, describing such Event of Default or Unmatured Event of Default and stating that such notice is a "notice of default".  The Post-Petition Agent will notify the Lenders of its receipt of any such notice.  The Post-Petition Agent shall take such action with respect to such Event of Default or Unmatured Event of Default as may be requested by the Required Lenders in accordance with <u>Section 9</u>; <u>provided</u> that unless and until the Post-Petition Agent has received any such request, the Post-Petition Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default or Unmatured Event of Default as it shall deem advisable or in the best interest of the Lenders.

10.6    <u>Credit Decision</u>.  Each Lender acknowledges that the Post-Petition Agent has not made any representation or warranty to it, and that no act by the Post-Petition Agent hereafter taken, including any review of the affairs of the Company and its Subsidiaries, shall be deemed

to constitute any representation or warranty by the Post-Petition Agent to any Lender. Each Lender represents to the Post-Petition Agent that it has, independently and without reliance upon the Post-Petition Agent and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Company and its Subsidiaries, and made its own decision to enter into this Agreement and to extend credit to the Company hereunder. Each Lender also represents that it will, independently and without reliance upon the Post-Petition Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Company. Except for notices, reports and other documents expressly herein required to be furnished to the Lenders by the Post-Petition Agent, the Post-Petition Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial or other condition or creditworthiness of the Company which may come into the possession of the Post-Petition Agent.

10.7    <u>Indemnification</u>. Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Post-Petition Agent and its directors, officers, employees and agents (to the extent not reimbursed by or on behalf of the Company and without limiting the obligation of the Company to do so), from and against any and all Indemnified Liabilities in accordance with its Pro Rata Share; <u>provided</u> that no Lender shall be liable for any payment to any such Person of any portion of the Indemnified Liabilities resulting from such Person's gross negligence or willful misconduct. Without limitation of the foregoing, each Lender shall reimburse the Post-Petition Agent upon demand for such Lender's Pro Rata Share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Post-Petition Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, or any document contemplated by or referred to herein, to the extent that the Post-Petition Agent is not reimbursed for such expenses by or on behalf of the Company. The undertaking in this Section shall survive termination or expiration of the Letters of Credit, any foreclosure under, or modification, release or discharge of, any or all of the Collateral Documents, termination of this Agreement and the resignation or replacement of the Post-Petition Agent.

10.8    <u>Post-Petition Agent in Individual Capacity</u>. Barclays and its Affiliates may make loans to, issue letters of credit for the account of, acquire equity interests in and generally engage in any kind of business with the Company and its Subsidiaries and Affiliates as though Barclays were not the Post-Petition Agent and without notice to or consent of the Lenders. The Lenders acknowledge that, pursuant to such activities, Barclays or its Affiliates may receive information regarding the Company or its Affiliates (including information that may be subject to confidentiality obligations in favor of the Company or such Affiliate) and acknowledge that the Post-Petition Agent shall be under no obligation to provide such information to them. Barclays and its Affiliates shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though Barclays were not the Post-Petition Agent, and the

terms "Lender" and "Lenders" include Barclays and its Affiliates, to the extent applicable, in their individual capacities.

10.9    Successor Post-Petition Agent. The Post-Petition Agent may resign as Post-Petition Agent upon 30 days' notice to the Lenders. If the Post-Petition Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders. If no successor agent is appointed prior to the effective date of the resignation of the Post-Petition Agent, the Post-Petition Agent may appoint, after consulting with the Lenders and the Company, a successor agent from among the Lenders. Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers and duties of the retiring Post-Petition Agent and the term "Post-Petition Agent" shall mean such successor agent, and the retiring Post-Petition Agent's appointment, powers and duties as Post-Petition Agent shall be terminated. After any retiring Post-Petition Agent's resignation hereunder as Post-Petition Agent, the provisions of this Section 10 and Sections 11.3 and 11.10 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Post-Petition Agent under this Agreement. If no successor agent has accepted appointment as Post-Petition Agent by the date which is 30 days following a retiring Post-Petition Agent's notice of resignation, the retiring Post-Petition Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Post-Petition Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.

10.10    Collateral Matters. The Lenders irrevocably authorize the Post-Petition Agent, at its option and in its discretion, to release any Lien granted to or held by the Post-Petition Agent hereunder or under any Financing Order upon termination of the Commitments and payment in full of all Reimbursement Obligations and all other obligations of the Company hereunder. Upon request by the Post-Petition Agent at any time, the Lenders will confirm in writing the Post-Petition Agent's authority to release, or subordinate its interest in, particular types or items of collateral pursuant to this Section 10.10.

SECTION 11. GENERAL.

11.1    Waiver; Amendments. No delay on the part of the Post-Petition Agent or any Lender in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by any of them of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy. No right or remedy herein conferred upon the Lenders or the Post-Petition Agent is intended to be exclusive of any other right or remedy contained herein, and every such right or remedy shall be cumulative and shall be in addition to every other such right or remedy contained herein or therein or now or hereafter existing at law or in equity or by statute or otherwise. No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed and delivered by Lenders having an aggregate Pro Rata Share of not less than the aggregate Pro Rata Share expressly designated herein with respect thereto or, in the absence of such designation as to any provision of this Agreement, by the Required Lenders, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which

given. No amendment, modification, waiver or consent shall change the Pro Rata Share of any Lender without the consent of such Lender. No amendment, modification, waiver or consent shall (i) increase the Commitment Amount, (ii) extend the date for payment of any principal of or interest on any Reimbursement Obligations or any fees payable hereunder, (iii) reduce the principal amount of any Reimbursement Obligation, the rate of interest thereon or any fees payable hereunder, (iv) release any guarantor or all or any part of the Collateral, (v) reduce the aggregate Pro Rata Share required to effect an amendment, modification, waiver or consent or (vi) modify Section 8.2.4 (each, a "100% Issue") without, in each case, the consent of all Lenders. No provision of Section 10 or other provision of this Agreement affecting the Post-Petition Agent in its capacity as such shall be amended, modified or waived without the consent of the Post-Petition Agent. No provision of Section 2 or other provision of this Agreement in its capacity as such shall be amended, modified or waived affecting the rights of the Issuing Bank without the consent of the Issuing Bank.

11.2    Notices. Except as otherwise provided in Section 2.1, all notices hereunder shall be in writing (including facsimile transmission) and shall be sent to the applicable party at its address shown on Schedule 11.2 or at such other address as such party may, by written notice received by the other parties, have designated as its address for such purpose. Notices sent by facsimile transmission shall be deemed to have been given when sent; notices sent by mail shall be deemed to have been given three Business Days after the date when sent by registered or certified mail, postage prepaid; and notices sent by hand delivery or overnight courier service shall be deemed to have been given when received. For purposes of Section 2.1, the Post-Petition Agent shall be entitled to rely on telephonic instructions from any person that the Post-Petition Agent in good faith believes is an authorized officer or employee of the Company, and the Company shall hold the Post-Petition Agent and each other Lender harmless from any loss, cost or expense resulting from any such reliance.

11.3    Costs, Expenses and Taxes. The Company agrees to pay on demand, without further order of or application to the Bankruptcy Court, all reasonable out-of-pocket costs and expenses of the Post-Petition Agent and the Lenders (including Attorney Costs) in connection with the preparation, execution, syndication, delivery and administration of this Agreement and all other documents provided for herein or delivered or to be delivered hereunder or in connection herewith (including any amendment, supplement or waiver to this Agreement), and all out-of-pocket costs and expenses (including Attorney Costs and the reasonable fees and expenses of financial advisors to the Post-Petition Agent) incurred by the Post-Petition Agent and each Lender if an Event of Default exists in connection with the enforcement of this Agreement or any such other documents, including, without limitation, the reasonable fees and expenses of Mayer Brown LLP. In addition, the Company agrees to pay, and to save the Post-Petition Agent and the Lenders harmless from all liability for, any stamp or other similar taxes (excluding income taxes and franchise taxes based on net income or receipts) which may be payable in connection with the execution and delivery of this Agreement, the borrowings hereunder, or any other document provided for herein or delivered or to be delivered hereunder or in connection herewith. All obligations provided for in this Section 11.3 shall survive the termination of expiration of the Letters of Credit and termination of this Agreement.

11.4    Subsidiary References. The provisions of this Agreement relating to Subsidiaries shall apply only during such times as the Company has one or more Subsidiaries.

11.5    Captions.  Section captions used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

11.6    Assignments; Participations.

11.6.1  Assignments.  Any Lender may, with the prior written consent of the Post-Petition Agent and the Issuing Bank (which consent shall not be unreasonably delayed or withheld and, in any event, shall not be required for an assignment by a Lender to one of its Affiliates), at any time assign and delegate to one or more Persons (any Person to whom such an assignment and delegation is to be made being herein called an "Assignee") all or any fraction of such Lender's interest in Letter of Credit Liabilities and its Commitment (which assignment and delegation shall be of a constant, and not a varying, percentage of all the assigning Lender's interest in Letter of Credit Liabilities and Commitment) in a minimum aggregate amount equal to the lesser of (i) the amount of the assigning Lender's Pro Rata Share of the Commitment Amount and (ii) $1,000,000; provided that the Company and the Post-Petition Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned and delegated to an Assignee until the date when all of the following conditions shall have been met:

(i)    five Business Days (or such lesser period of time as the Post-Petition Agent and the assigning Lender shall agree) shall have passed after written notice of such assignment and delegation, together with payment instructions, addresses and related information with respect to such Assignee, shall have been given to the Company and the Post-Petition Agent by such assigning Lender and the Assignee,

(ii)   the assigning Lender and the Assignee shall have executed and delivered to the Company and the Post-Petition Agent an assignment agreement reasonably satisfactory to the Post-Petition Agent (an "Assignment Agreement"), together with any documents required to be delivered thereunder, which Assignment Agreement shall have been accepted by the Post-Petition Agent, and

(iii)  except in the case of an assignment by a Lender to one of its Affiliates, the assigning Lender or the Assignee shall have paid the Post-Petition Agent a processing fee of $3,500.

From and after the date on which the conditions described above have been met, (x) such Assignee shall be deemed automatically to have become a party hereto and, to the extent that rights and obligations hereunder have been assigned and delegated to such Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder and (y) the assigning Lender, to the extent that rights and obligations hereunder have been assigned and delegated by it pursuant to such Assignment Agreement, shall be released from its obligations hereunder.  Any attempted assignment and delegation not made in accordance with this Section 11.6.1 shall be null and void.

11.6.2  Participations.  Any Lender may at any time sell to one or more commercial banks or other Persons participating interests in any Letter of Credit Liabilities owing to such Lender, the Commitment of such Lender or any other interest of such Lender hereunder (any

Person purchasing any such participating interest being herein called a "Participant"). In the event of a sale by a Lender of a participating interest to a Participant, (x) such Lender shall remain the holder of its interest in Letter of Credit Liabilities and shall remain responsible for all its obligations as a Lender hereunder for all purposes of this Agreement, (y) the Company and the Post-Petition Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder and (z) all amounts payable by the Company shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender. No Participant shall have any direct or indirect voting rights hereunder except with respect to any 100% Issue. Each Lender agrees to incorporate the requirements of the preceding sentence into each participation agreement which such Lender enters into with any Participant. The Company agrees that if amounts outstanding under this Agreement are due and payable, each Participant shall be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; provided that such right of setoff shall be subject to the obligation of each Participant to share with the Lenders, and the Lenders agree to share with each Participant, as provided in Section 5.3.

11.7    Governing Law. This Agreement shall be a contract made under and governed by the laws of the State of New York applicable to contracts made and to be performed entirely within such State, except to the extent governed by the Bankruptcy Code. Whenever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. All obligations of the Company and rights of the Post-Petition Agent and the Lenders expressed herein shall be in addition to and not in limitation of those provided by applicable law.

11.8    Counterparts. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement.

11.9    Successors and Assigns. This Agreement shall be binding upon the Company, the Lenders and the Post-Petition Agent and their respective successors and assigns, and shall inure to the benefit of the Company, the Lenders and the Post-Petition Agent and the successors and assigns of the Lenders and the Post-Petition Agent.

11.10    Indemnification by the Company. In consideration of the execution and delivery of this Agreement by the Post-Petition Agent and the Lenders and the agreement to extend the Commitments provided hereunder, the Company hereby agrees to indemnify, exonerate and hold the Post-Petition Agent, each Lender and each of the officers, directors, employees, Affiliates and agents of the Post-Petition Agent and each Lender (each a "Lender Party") free and harmless from and against any and all actions, causes of action, suits, losses, liabilities, damages and expenses, including Attorney Costs (collectively, the "Indemnified Liabilities"), incurred by the Lender Parties or any of them as a result of, or arising out of, or relating to (i) any transaction financed or proposed to be financed in whole or in part, directly or indirectly, with any of the

Letters of Credit, (ii) the use, handling, release, emission, discharge, transportation, storage, treatment or disposal of any Hazardous Substance at any property owned or leased by the Company or any Debtor Subsidiary, (iii) any violation of any Environmental Law with respect to conditions at any property owned or leased by the Company or any Debtor Subsidiary or the operations conducted thereon, (iv) the investigation, cleanup or remediation of offsite locations at which the Company or any Debtor Subsidiary or their respective predecessors are alleged to have directly or indirectly disposed of hazardous substances or (v) the execution, delivery, performance or enforcement of this Agreement by any of the Lender Parties, except that the Company shall not be obligated to indemnify any Lender Party to the extent such Indemnified Liabilities are finally judicially determined to have directly and primarily resulted from such Lender Party's gross negligence or willful misconduct or breach of its express obligations under this Agreement. If and to the extent that the foregoing undertaking may be unenforceable for any reason, the Company hereby agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. All obligations provided for in this <u>Section 11.10</u> shall survive expiration or termination of the Letters of Credit, any foreclosure under, or any modification, release or discharge of, any or all of the Collateral Documents and termination of this Agreement.

11.11  <u>Nonliability of Lenders</u>. The relationship between the Company on the one hand and the Lenders and the Post-Petition Agent on the other hand shall be solely that of debtor and creditor. Neither the Post-Petition Agent nor any Lender shall have any fiduciary responsibility to the Company. Neither the Post-Petition Agent nor any Lender undertakes any responsibility to the Company to review or inform the Company of any matter in connection with any phase of the Company's business or operations. The Company agrees that neither the Post-Petition Agent nor any Lender shall have liability to the Company (whether sounding in tort, contract or otherwise) for losses suffered by the Company in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by this Agreement, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought. Neither the Post-Petition Agent nor any Lender shall have any liability with respect to, and the Company hereby waives, releases and agrees not to sue for, any special, indirect or consequential damages suffered by the Company in connection with, arising out of, or in any way related to this Agreement or the transactions contemplated thereby.

11.12  <u>Forum Selection and Consent to Jurisdiction</u>. ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE POST-PETITION AGENT, THE LENDERS OR THE COMPANY SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, ANY STATE OR FEDERAL COURT IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK. THE COMPANY HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE AFORESAID COURTS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION.

THE COMPANY FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF
PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE
WITHIN OR OUTSIDE OF THE STATE OF NEW YORK.  THE COMPANY HEREBY
EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED
BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO
THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH
COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS
BEEN BROUGHT IN AN INCONVENIENT FORUM.

        11.13   Waiver of Jury Trial.  THE POST-PETITION AGENT, THE LENDERS AND
THE COMPANY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY
WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY
LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION
WITH, THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING,
STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE POST-
PETITION AGENT, THE LENDERS OR THE COMPANY.  THE COMPANY
ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT
CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH
OTHER LOAN DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION
IS A MATERIAL INDUCEMENT FOR THE POST-PETITION AGENT AND THE
LENDERS ENTERING INTO THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

**TRIBUNE COMPANY**

By:_____

Name:  Chandler Bigelow III

Title:    Senior Vice President/Chief Financial Officer

**BARCLAYS BANK PLC**, as Post-Petition Agent, as Issuing Bank and as a Lender

By:_____

Name:

Title:

**TRIBUNE PUBLISHING COMPANY**
**INSERTCO, INC.**
as Debtor Subsidiaries


By:_____
Name:  Chandler Bigelow III
Title:    Treasurer


**TMLS I, INC.**
**SOUTHERN CONNECTICUT NEWSPAPERS, INC.**
as Debtor Subsidiaries


By:_____
Name:  Chandler Bigelow III
Title:    President and Assistant Treasurer


**TIMES MIRROR LAND AND TIMBER COMPANY**
as Debtor Subsidiary


By:_____
Name:  Chandler Bigelow III
Title:

**SHEPARD'S INC.**
**TIMES MIRROR SERVICES COMPANY, INC.**
**CANDLE HOLDINGS CORPORATION**
**DISTRIBUTION SYSTEMS OF AMERICA, INC.**
**EAGLE NEW MEDIA INVESTMENTS, LLC**
**EAGLE PUBLISHING INVESTMENTS, LLC**
**FORTIFY HOLDINGS CORPORATION**
**GREENCO, INC.**
**JULIUSAIR COMPANY, LLC**
**JULIUSAIR COMPANY II, LLC**
**STAR COMMUNITY PUBLISHING GROUP, LLC**
**NBBF, LLC**
**TIMES MIRROR PAYROLL PROCESSING**
    **COMPANY, INC.**
**TRIBUNE FINANCE, LLC**
**TRIBUNE FINANCE SERVICE CENTER, INC.**
**TRIBUNE LICENSE, INC.**
**TRIBUNE LOS ANGELES, INC.**
**TRIBUNE MANHATTAN NEWSPAPER**
    **HOLDINGS, INC.**
**TRIBUNE NEW YORK NEWSPAPER HOLDINGS,**
    **LLC**
**TRIBUNE NM, INC.**
**PUBLISHERS FOREST PRODUCTS CO. OF**
    **WASHINGTON**
**NEW RIVER CENTER MAINTENANCE**
    **ASSOCIATION, INC.**
**SIGNS OF DISTINCTION, INC.**
**TRIBUNE BROADCASTING HOLDCO, LLC**
as Debtor Subsidiaries


By:_____
Name:  Chandler Bigelow III
Title:    President and Treasurer

FORSALEBYOWNER.COM REFERRAL
    SERVICES, LLC
INTERNET FORECLOSURE SERVICE, INC.
CHICAGOLAND TELEVISION NEWS, INC.
TRIBUNE BROADCAST HOLDINGS, INC.
TRIBUNE TELEVISION HOLDINGS, INC.
WGN CONTINENTAL BROADCASTING
    COMPANY
WPIX, INC.
TRIBUNE TELEVISION NEW ORLEANS, INC.
KSWB INC.
KTLA INC.
TOWER DISTRIBUTION COMPANY
TRIBUNE TELEVISION NORTHWEST, INC.
TRIBUNE TELEVISION COMPANY
CHANNEL 40, INC.
CHANNEL 39, INC.
LOS ANGELES TIMES COMMUNICATIONS LLC
WDCW BROADCASTING, INC.
ORLANDO SENTINEL COMMUNICATIONS
    COMPANY
SUN-SENTINEL COMPANY
GOLD COAST PUBLICATIONS, INC.
FORUM PUBLISHING GROUP, INC.
THE DAILY PRESS, INC.
CHICAGO TRIBUNE COMPANY
THE BALTIMORE SUN COMPANY
THE HARTFORD COURANT COMPANY
THE MORNING CALL, INC.
435 PRODUCTION COMPANY
5800 SUNSET PRODUCTIONS INC.
BALTIMORE NEWSPAPER NETWORKS, INC.
CALIFORNIA COMMUNITY NEWS
    CORPORATION
CHANNEL 20, INC.
CHICAGO AVENUE CONSTRUCTION COMPANY
CHICAGO RIVER PRODUCTION COMPANY
as Debtor Subsidiaries


By:_____
Name:  Chandler Bigelow III
Title:    Assistant Treasurer

**CHICAGO TRIBUNE NEWSPAPERS, INC.**
**CHICAGO TRIBUNE PRESS SERVICE, INC.**
**CHICAGOLAND MICROWAVE LICENSEE, INC.**
**CHICAGOLAND PUBLISHING COMPANY**
**COURANT SPECIALTY PRODUCTS, INC.**
**DIRECT MAIL ASSOCIATES, INC.**
**FORSALEBYOWNER.COM CORP.**
**HEART & CROWN ADVERTISING, INC.**
**HOMEOWNERS REALTY, INC.**
**HOMESTEAD PUBLISHING CO.**
**HOY, LLC**
**HOY PUBLICATIONS, LLC**
**KIAH INC.**
**KPLR, INC.**
**KWGN INC.**
**LOS ANGELES TIMES INTERNATIONAL, LTD.**
**LOS ANGELES TIMES NEWSPAPERS, INC.**
**MAGIC T MUSIC PUBLISHING COMPANY**
**NEOCOMM, INC.**
**NEW MASS. MEDIA, INC.**
**NEWSCOM SERVICES, INC.**
**NEWSPAPER READERS AGENCY, INC.**
**NORTH MICHIGAN PRODUCTION COMPANY**
**NORTH ORANGE AVENUE PROPERTIES, INC.**
**OAK BROOK PRODUCTIONS, INC.**
**PATUXENT PUBLISHING COMPANY**
**SENTINEL COMMUNICATIONS NEWS**
       **VENTURES, INC.**
**STEMWEB, INC.**
**THE OTHER COMPANY LLC**
**TMLH 2, INC.**
**TMS ENTERTAINMENT GUIDES, INC.**
**TOWERING T MUSIC PUBLISHING COMPANY**
**TRIBUNE BROADCASTING COMPANY**
**TRIBUNE BROADCASTING NEWS NETWORK,**
       **INC.**
**TRIBUNE CALIFORNIA PROPERTIES, INC.**
**TRIBUNE DIRECT MARKETING, INC.**
**TRIBUNE ENTERTAINMENT COMPANY**
as Debtor Subsidiaries


By:_____
Name:  Chandler Bigelow III
Title:   Assistant Treasurer

**TRIBUNE ENTERTAINMENT PRODUCTION**
    **COMPANY**
**TRIBUNE MEDIA NET, INC.**
**TRIBUNE MEDIA SERVICES, INC.**
**TRIBUNE NETWORK HOLDINGS COMPANY**
**VALUMAIL, INC.**
**VIRGINIA COMMUNITY SHOPPERS, LLC**
**VIRGINIA GAZETTE COMPANIES, LLC**
**WATL, LLC**
**WCWN LLC**
**WLVI INC**
**WTXX INC.**
as Debtor Subsidiaries


By:_____
Name:  Chandler Bigelow III
Title:    Assistant Treasurer

## SCHEDULE 2.1

### LENDERS AND PRO RATA SHARES

| Lender | Pro Rata Share of Commitment Amount | Pro Rata Share |
|---|---|---|
| Barclays Bank PLC | $50,000,000 | 100% |
| TOTAL | $50,000,000 | 100% |

SCHEDULE 11.2

ADDRESSES FOR NOTICES

<u>TRIBUNE COMPANY</u>

435 North Michigan Avenue, 6th Floor, Chicago, Illinois 60611
Attention:  General Counsel
Telephone: (312) 222-9100
Facsimile: (312) 222-4206

*with a copy to:*
Art Hickock
Sidley Austin LLP
787 Seventh Avenue, New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

<u>BARCLAYS</u>, as Post-Petition Agent, Issuing Bank and a Lender

Dawn Townsend
Letter of Credit Manager
200 Park Avenue, New York, New York 10166
Telephone: (212) 526-1203
Facsimile: (212) 412-5011
Email: dawn.townsend@barclayscapital.com

*with a copy to:*
David E. Barton
Director
Barclays Capital
745 Seventh Avenue, New York, New York 10019
Telephone: (212) 526-9870
Facsimilie: (212) 412-7600
Email: davidebarton@barcap.com

*and with a copy to:*
Anna Ashurov
Barclays Capital
745 Seventh Avenue, New York, New York 10019
Telephone: (212) 526-1374
Facsimilie: (212) 526-5115
Email: ann.ashurov@barcap.com