or served in or on the appropriate filing office, Official Body or other Person in each jurisdiction necessary for such purpose and (iii) all fees and Taxes, if any, payable in connection with such actions and filings shall have been paid in full when or before due.

(x)    Performance and Compliance with Contracts and Credit and Collection Policies

The Borrower will, at its expense, timely and fully comply with the Credit and Collection Policies except where failure to comply would not be reasonably expected to have a Material Adverse Effect.

## 5.2    Inspections; Agreed Upon Procedures Audit

Until the Final Payout Date, the Borrower will, and will cause each Servicer Party to, at its respective expense (but subject to the last sentence of this Clause), during regular business hours as requested by the Administrative Agent and/or any Funding Agent upon (absent a Facility Event) reasonable prior notice, permit the Administrative Agent, any Funding Agent, or their respective agents or representatives (including independent accountants or consultants) (a) to conduct periodic audits of, or to perform agreed upon procedures with respect to, the Receivables, the Related Security, the other Collateral and the related books and records, including the Contracts, and collections systems of the Borrower, or the applicable Servicer Party, as the case may be, (b) to examine and make copies of and abstracts from all documents, purchase orders, invoices, agreements, books, records and other information (including computer programs, tapes, discs, cards, data processing software, storage media and related property and rights) in the possession or under the control of the Borrower or the applicable Servicer Party, as the case may be, relating to Receivables, the Related Security and the other Collateral, including the Contracts (c) to visit the offices and properties of the Borrower or the applicable Servicer Party, as the case may be, for the purpose of examining such materials described in Clauses 5.2(a) and (b), and to discuss matters relating to Receivables, the Related Security and the other Collateral or the Borrower's, or the applicable Servicer Parties' performance under the Transaction Documents or under the Contracts with any of the officers or employees of the Borrower, or the applicable Servicer Party, as the case may be, having knowledge of such matters. Unless a Facility Event has occurred, the Borrower shall not be liable for the expense of more than two audits or agreed upon procedures reports during any fiscal year of the Servicer, and any additional audits or agreed upon procedures reports shall be at the expense of the Lenders.

## 6.    ADMINISTRATION AND COLLECTION OF RECEIVABLES

## 6.1    Designation of Servicer

The servicing, administration and collection of the Pool Receivables shall be conducted by the Servicer so designated under the Servicing Agreement from time to time.

6.2    **Certain Rights of the Administrative Agent**

(a)    The Administrative Agent may (and if so directed by the Required Funding Agents, shall), at any time have each Borrower Account and the Cash Reserve Account transferred into the name of the Administrative Agent for the benefit of the Secured Parties. The Administrative Agent may (and, if so directed by the Required Funding Agents, shall) assume exclusive control of the Borrower Accounts. The Administrative Agent may take such actions to effect such transfer or assumption as it may determine to be necessary or appropriate (including delivering the notices attached to the applicable Security Documents). The Administrative Agent and the Funding Agents agree that the Administrative Agent will not effect such transfer or assumption with respect to any Facility Account other than the Cash Reserve Account unless a Facility Event has occurred. The Administrative Agent shall have exclusive control with respect to the Cash Reserve Account at all times.

(b)    Following the occurrence and during the continuation of a Trigger Event, at the Administrative Agent's request (acting either on its own initiative or at the request of the Required Funding Agents) and at the Borrower's expense, the Borrower shall, or shall cause each Servicer Party to (and if any Servicer Party shall fail to do so within two Business Days, the Administrative Agent may) take any or all of the following actions:

(i)     The Borrower or such Servicer Party shall execute any power of attorney or other similar instrument and/or take any other action necessary to give effect to the notice and directions described in this Clause, including any action required (x) to convey or perfect the Borrower's title or the Administrative Agent's security interest in the Pool Receivables and Related Security, or (y) to be taken so that the obligations or other indebtedness of such Obligors in respect of any Pool Receivables and any Related Security with respect thereto may no longer be legally satisfied by payment to the applicable Originator or any of its Affiliates.

(ii)    The Borrower or such Servicer Party shall (A) assemble all of the Contracts, documents, instruments and other records (including computer tapes and disks) that evidence or relate to the Collateral, or that are otherwise necessary to collect the Collateral, and shall make the same available to the Administrative Agent at a place selected by the Administrative Agent or its designee, and (B) segregate all cash, checks and other instruments received by it from time to time constituting Collections of Collateral in a manner acceptable to the Administrative Agent and, promptly upon receipt, remit all such cash, checks and instruments, duly endorsed or with duly executed instruments of transfer, to the Administrative Agent or its designee.

(iii)   The Borrower or such Servicer Party shall (and without limiting any rights of the Administrative Agent granted elsewhere under the Transaction

Documents) (A) notify each Obligor of Pool Receivables of the transfer, sale, trust, assignation and assignment of the Pool Receivables and the Related Security with respect thereto pursuant to the Transaction Documents and of the Borrower's ownership of, and the Administrative Agent's security interest in, the Pool Receivables and the Related Security with respect thereto, and (B) direct such Obligors that payments under any Pool Receivable or any Related Security with respect thereto be made directly to the Administrative Agent or its designee.

(c)     Following the occurrence and during the continuation of a Trigger Event, the Borrower authorizes the Administrative Agent to take any and all steps in the Borrower's name and on behalf of the Borrower that are necessary in the determination of the Administrative Agent, to collect amounts due under the Collateral, including (i) endorsing the Borrower's or any other Transaction Party's name on checks and other instruments representing Collections, and (ii) enforcing the Receivables and the Related Security and the Security Agreements and other Transaction Documents, including to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with therewith and to file any claims or take any action or institute any proceedings that the Administrative Agent (or such designee) may deem to be necessary for the collection thereof or to enforce compliance with the terms and conditions of, or to perform any obligations or enforce any rights of the Borrower or any other Transaction Party in respect of, the Receivables and the Related Security and the other Transaction Documents.

6.3     **Performance of Obligations**

(a)     If the Servicer or the Borrower fails to perform any of its obligations under this Agreement or any other Transaction Document, taking into account any applicable grace periods and/or right to remedy breaches, the Administrative Agent may (but shall not be required to) itself perform, or cause performance of, such obligation; and the Administrative Agent's costs and expenses incurred in connection therewith shall be payable by the Servicer or the Borrower, as applicable.

(b)     The Borrower shall, and shall cause the Servicer to, perform their respective obligations, and exercise their respective rights, under the Contracts and the Transaction Documents to the same extent as if a security interest therein had not been granted to the Administrative Agent. The exercise by the Administrative Agent on behalf of the Secured Parties of their rights under this Agreement shall not release the Servicer or the Borrower from any of their duties or obligations with respect to any Contracts or Transaction Documents. None of the Administrative Agent, the Lenders or the Funding Agents shall have any obligation or liability with respect to any Transaction Documents or Contracts, nor shall any of them be obligated to perform the obligations of any Transaction Party under any Transaction Document or Contract.

      (c)     The Administrative Agent's rights and powers under this Clause 6 and under the Servicing Agreement shall not subject the Administrative Agent to any liability if any action taken by it proves to be inadequate or invalid nor shall such powers confer any obligation whatsoever upon the Administrative Agent.

6.4    **Backup Servicing Agreement**

Each of the Borrower and the Servicer agrees that within sixty (60) days of the Closing Date, the Borrower and Servicer will enter into a Backup Servicing Agreement, in form and substance satisfactory to the Administrative Agent, with Hewlett-Packard or such other backup servicer as may be acceptable to the Administrative Agent, in which such backup servicer agrees to assume responsibility for servicing the Pool Receivables as a replacement Servicer (following such replacement, the "**Replacement Servicer**"); provided that (i) the scope of the services to be provided by the Replacement Servicer with respect to all Pool Receivables shall include (A) all of the services currently performed by Hewlett Packard-Costa Rica with respect to a portion of the Pool Receivables and (B) such other reporting and other services as the Administrative Agent reasonably deems necessary to realize the value of such Receivables for the benefit of the Secured Parties and to protect the rights and interests of the Secured Parties with respect to the Collateral, (ii) the pricing for such services shall be set forth in such agreement and reasonably acceptable to the Administrative Agent, and (iii) the Transaction Parties shall have agreed to such actions as are reasonably necessary to enable the Replacement Servicer to perform its obligations thereunder at the request of the Administrative Agent following a Servicer Default, subject to such exceptions as the Administrative Agent shall agree.  It is understood and agreed that such backup servicer shall not be required to replicate the Servicer's Chicago-based systems.  The Servicer shall provide current data to the backup servicer in a format compatible with the backup servicer's systems.

7.      **TRIGGER EVENTS AND TERMINATION EVENTS**

7.1    **Trigger Events**

If any of the following events (each, a "**Trigger Event**") shall occur and be continuing:

      (a)     Any of the following shall occur:

           (i)     any Transaction Party shall fail to make any payment of Interest or Fees required to be made by it hereunder or under any other Transaction Document when due hereunder or thereunder, or shall fail to deposit Collections (other than Deemed Collections) when such Collections are required to be deposited by it under a Transaction Document and such failure shall continue for two (2) Business Days after the earlier of written notice to such Transaction Party or actual knowledge of a Responsible Officer of a Transaction Party;

(ii)    any Transaction Party shall fail to make any deposit of Deemed Collections required to be made by it hereunder or under any Transaction Document to which it is a party when due hereunder or thereunder, and such failure shall continue for two (2) Business Days after the earlier of written notice to such Transaction Party or a Responsible Officer of a Transaction Party having actual knowledge of such failure;

(iii)    the Borrower shall fail to make any payment of principal on any Loan when due;

(iv)    any Transaction Party shall fail to make any other payment or deposit required to be made by it hereunder or under any other Transaction Document to which it is party when due hereunder or thereunder, and such failure shall continue for ten (10) calendar days after the earlier of written notice to such Transaction Party or a Responsible Officer of a Transaction Party having actual knowledge of such failure;

(v)    any Monthly Report or Supplemental Report shall not have been delivered within two (2) Business Days of the date when due; provided that if the failure to deliver such report results from a Force Majeure Event, the grace period in this clause shall be three (3) Business Days instead of two (2) Business Days;

(vi)    any Interim Report shall not have been delivered within one (1) Business Day of the date when due; provided that, if the failure to deliver such report results from a Force Majeure Event, the grace period in this clause shall be two (2) Business Days instead of one (1) Business Day; or

(vii)    during any calendar month more than two Interim Reports shall not have been delivered when due other than by reason of a Force Majeure Event not to exceed two weeks in duration;

(b)    other than as addressed in Clauses 7.1(a) and 7.2(a), any Transaction Party shall fail to perform or observe any term, covenant or agreement contained in this Agreement or any other Transaction Document to which such Transaction Party is a party and, if such failure relates to a Specified Provision and is capable of being remedied, such Transaction Party shall have failed to remedy such failure within fifteen (15) Business Days after the earlier of such Transaction Party receiving written notice of such failure or a Responsible Officer of a Transaction Party having actual knowledge of such failure;

(c)    an "Event of Default" shall occur under, and as defined in, the Senior Credit Agreement;

(d)    the Administrative Agent, on behalf of the Secured Parties, shall, for any reason, fail or cease to have a valid and perfected first priority charge, security interest or pledge in the Collateral prior to all other interests, or there shall exist any Adverse Claims on such Collateral (except as arising under the Transaction Documents);

(e)     a Servicer Default or Facility Termination Event shall occur;

(f)     other than as permitted by Clause 11.14 (*Limitations on Addition and Termination of Originators*), any Change of Control shall occur with respect to Tribune or the Parent shall cease to own (i) directly 100% of the Equity Interests of the Borrower or (ii) directly or indirectly 100% of the Equity Interest of each Sub-Originator;

(g)     the Percentage Factor exceeds the Maximum Percentage Factor on any Business Day, and such circumstance remains unremedied on the related Interim Settlement Date;

(h)     as at the end of any Calculation Period, (i) the Three-Month Rolling Average Dilution Ratio-Broadcasting exceeds 3.0%, or (ii) the Three-Month Rolling Average Dilution Ratio – Publishing exceeds 7.0%;

(i)     as at the end of any Calculation Period, the Three-Month Rolling Average Default Ratio exceeds 7%;

(j)     as at the end of any Calculation Period, the Three-Month Rolling Average Delinquency Ratio exceeds 6.75%;

(k)     at the end of any Calculation Period, (i) the Three-Month Rolling Average DSO-Broadcasting is greater than 120, or (ii) the Three-Month Rolling Average DSO – Publishing is greater than 75;

(l)     any Transaction Party receives notice or becomes aware that a notice of lien has been filed against any Transaction Party under Section 430(k) of the IRC or Section 303(k) of ERISA for a failure to make a required installment or other payment to a plan to which Section 430(k) of the IRC or Section 303(k) of ERISA applies;

(m)     for any Test Period:

       (i)     the Interest Coverage Ratio is less than the Minimum Interest Coverage Ratio;

       (ii)     the "Total Guaranteed Leverage Ratio" is more than the Maximum Total Guaranteed Leverage Ratio; or

       (iii)     the aggregate amount of Capital Expenditures is greater than the Maximum Capital Expenditures;

The terms "Interest Coverage Ratio," "Total Guaranteed Leverage Ratio," "Minimum Interest Coverage Ratios," "Maximum Total Guaranteed Leverage Ratio" and "Test Period" shall have the meanings assigned to such terms in the Senior Credit Agreement and Schedule 7 (*Certain defined terms*) to this Agreement as in effect on the date hereof, subject to Approved Amendments;

(n)     judgments or orders for the payment of money in excess of $75,000,000 in the aggregate shall be rendered against one or more Transaction Parties and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 60 consecutive days during which payment for such judgment or order shall remain unsatisfied or a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; provided, however, that any such amount shall be calculated after deducting from the sum so payable any amount of such judgment or order that is covered by a valid and binding policy of insurance in favor of such Transaction Parties;

(o)     the failure by the Borrower to pay one or more final judgments requiring the Borrower to pay a sum or sums of money (whether or not such judgment may be stayed or further appealed), which judgments are not discharged or effectively waived or stayed (including by appeal provided that Borrower is not required to make any payment in respect of such judgment pending such appeal) for a period of fifteen (15) days, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of the Borrower to enforce any such judgment; or

(p)     or any provision of a Transaction Document shall cease, for any reason, to be in full force and effect or to be the legally valid, binding and enforceable obligation of any Transaction Party thereto (including without limitation as a result of an Originator Termination Event but excluding a termination of an Originator's obligations permitted by Clause 11.14 (*Limitations on Addition and Termination of Originators*)), or any Transaction Party shall so assert in writing or any Transaction Party shall (except as expressly permitted by any Transaction Document) otherwise seek to terminate or disaffirm its material obligations under any such Transaction Document;

then, and in any such event, the Administrative Agent may, in its discretion, and shall, at the direction of the Required Funding Agents, declare the Facility Termination Date to have occurred upon notice to the Borrower (in which case the Facility Termination Date shall be deemed to have occurred).

## 7.2    Facility Termination Events

If any of the following events (each, a "**Facility Termination Event**") shall occur and be continuing:

(a)     any representation, warranty, certification or statement made by any Transaction Party in this Agreement or any other Transaction Document to which such Transaction Party is a party shall prove to have been incorrect in any material respect when made or deemed made; provided that if such breach relates to a Specified Provision and is capable of being cured, such breach shall not constitute a Facility Termination Event unless it continues unremedied for five (5) Business Days after the earlier of a Transaction Party receiving written notice of such

breach or a Responsible Officer of a Transaction Party having actual knowledge of such breach;

(b)    an Event of Bankruptcy shall occur with respect to any Transaction Party; or

(c)    (i) any Material Indebtedness of any Transaction Party is not paid when due or is declared or otherwise becomes due prior to its scheduled maturity as a result of any termination event, event of default or other similar event (however described), or (ii) any pledge, charge or security interest securing the Material Indebtedness of any Transaction Party is enforced in whole or in part as a result of any termination event, event of default or other similar event (however described);

then, and in any such event, the Administrative Agent may, in its discretion, and shall, at the direction of the Required Funding Agents, declare the Facility Termination Date to have occurred upon notice to the Borrower (in which case the Facility Termination Date shall be deemed to have occurred); provided that automatically upon the occurrence of any event (without any requirement for the giving of notice) described in Clause 7.2(b), the Facility Termination Date shall occur.  Upon any such declaration or upon such automatic termination, the Lenders, the Funding Agents and the Administrative Agent shall have, in addition to the rights and remedies which they may have under this Agreement, all other rights and remedies provided after default under applicable Law (including the UCC), which rights and remedies shall be cumulative.

7.3    **Acceleration of Maturity**

If a Facility Termination Event shall have occurred and be continuing, then and in every such case the Administrative Agent may, and if so directed by the Required Funding Agents shall, declare all of the Loans to be immediately due and payable by a notice in writing to the Borrower, and upon any such declaration the unpaid principal amount of the Loans, together with accrued and unpaid interest thereon, shall become immediately due and payable; provided that in the case of any event described in Clause 7.2(b), the Loans shall become immediately and automatically due and payable, without notice of any kind being given to the Borrower.

8.    **THE ADMINISTRATIVE AGENT**

8.1    **Authorization and Action**

Each Lender and each Funding Agent hereby irrevocably appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Transaction Documents as are delegated to the Administrative Agent by the terms hereof and the other Transaction Documents, together with such powers as are incidental thereto. Without limiting the foregoing, the Administrative Agent is empowered and authorized, on behalf of the Secured Parties, to hold and administer the Collateral for the benefit of the Secured Parties under the Security Documents. The Administrative Agent shall not have any duties other than those expressly set forth in the Transaction Documents, and no implied obligations or

liabilities shall be read into any Transaction Document, or otherwise exist, against the Administrative Agent. The Administrative Agent does not assume, nor shall it be deemed to have assumed, any duty of care or obligation to, or relationship of trust or agency with, any Transaction Party, the Conduit Lenders, the Committed Lenders, the Funding Agents or any other Secured Party, except as expressly set out in the Transaction Documents. Notwithstanding any provision of this Agreement or any other Transaction Document, in no event shall the Administrative Agent ever be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to any provision of any Transaction Document or applicable Law. Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Agreement with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

8.2    **Liability of Agent**

Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them as Administrative Agent under or in connection with the Transaction Documents (including the Administrative Agent's servicing, administering or collecting Receivables as Servicer pursuant to Clause 6 (*Administration and Collection of Receivables*)), in the absence of its or their own gross negligence or willful misconduct. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    may consult with legal counsel (including counsel for the Borrower or any Servicer Party), independent certified public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts;

(b)    makes no warranty or representation to any Funding Agent, Conduit Lender, Committed Lender or other Secured Party (whether written or oral) and shall not be responsible to any Funding Agent, Conduit Lender, Committed Lender or other Secured Party for any statements, warranties or representations (whether written or oral) made in or in connection with this Agreement or any other Transaction Document;

(c)    shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or any other Transaction Document on the part of any Transaction Party or to inspect the property (including the books and records) of any Transaction Party;

(d)    shall not be responsible to any Funding Agent, Conduit Lender, Committed Lender or other Secured Party for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Transaction Document; and

(e)     shall incur no liability under or in respect of this Agreement or any other Transaction Document by acting upon any notice (including notice by telephone), consent, certificate or other instrument or writing (which may be by facsimile) believed by it in good faith to be genuine and signed or sent by the proper party or parties.

8.3     **Barclays and Affiliates**

The obligation of Barclays to fund Loans under this Agreement may be satisfied by Barclays or any of its Affiliates.  With respect to any Loan or interest therein owned by it, Barclays shall have the same rights and powers under this Agreement as any Committed Lender and may exercise the same as though it were not the Administrative Agent. Barclays and any of its Affiliates may generally engage in any kind of business with the Transaction Parties or any Obligor, any of their respective Affiliates and any Person who may do business with or own securities of the Transaction Parties or any Obligor or any of their respective Affiliates, all as if Barclays were not the Administrative Agent and without any duty to account therefor to the Funding Agents, the Conduit Lenders, the Committed Lenders or other Secured Parties.

8.4     **Indemnification of Administrative Agent**

Whether or not the transactions contemplated hereby are consummated, each Committed Lender severally agrees to indemnify the Administrative Agent (to the extent not reimbursed by the Transaction Parties), ratably based on the Commitment of such Committed Lender (or, if the Commitments have terminated, ratably according to the respective Commitment of such Committed Lender immediately prior to such termination), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Administrative Agent, in any way relating to or arising out of this Agreement or any other Transaction Document or any action taken or omitted by the Administrative Agent, under this Agreement or any other Transaction Document, provided that no Committed Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence or willful misconduct; provided, however, that no action taken in accordance with the direction of the Required Funding Agents shall be deemed to constitute gross negligence or willful misconduct for purposes of this Clause 8.4.  Without limitation of the foregoing, each Committed Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorney's fees) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Transaction Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower.  The undertaking in this Clause 8.4 shall survive payment on the Final Payout Date and the resignation or replacement of the Administrative Agent.

8.5     **Delegation of Duties**

The Administrative Agent may execute any of its duties through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

8.6     **Action or Inaction by Administrative Agent**

The Administrative Agent shall in all cases be fully justified in failing or refusing to take action under any Transaction Document unless it shall first receive such advice or concurrence of the Funding Agents, the Committed Lenders or the Required Funding Agents, as the case may be, and assurance of its indemnification by the Committed Lenders, as it deems appropriate.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Transaction Document in accordance with a request or at the direction of the Required Funding Agents, Funding Agents or Committed Lenders, as the case may be, and such request or direction and any action taken or failure to act pursuant thereto shall be binding upon all Conduit Lenders, Committed Lenders and the Funding Agents.  Unless any action to be taken by the Administrative Agent under a Transaction Document (a) specifically requires the advice or concurrence of all the Funding Agents or Committed Lenders or (b) specifically provides that it be taken by the Administrative Agent alone or without any advice or concurrence of any Funding Agent, then the Administrative Agent may (and shall, to the extent required hereunder) take action based upon the advice or concurrence of the Required Funding Agents.

8.7     **Notice of Facility Events; Action by Administrative Agent**

The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Facility Event or any other default or termination event under the Transaction Documents, as the case may be, unless the Administrative Agent has received notice from any Funding Agent, Lender, any Servicer Party or the Borrower stating that a Facility Event has occurred hereunder or thereunder and describing such event or default.  If the Administrative Agent receives such a notice, it shall promptly give notice thereof to each Funding Agent whereupon each Funding Agent shall promptly give notice thereof to its respective Conduit Lender(s) and Committed Lenders.  The Administrative Agent shall take such action concerning a Facility Event or any other matter hereunder as may be directed by the Required Funding Agents (subject to the other provisions of this Clause 8), but until the Administrative Agent receives such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, as the Administrative Agent deems advisable and in the best interests of the Lenders.

8.8    **Non-Reliance on Administrative Agent and Other Parties**

Each Funding Agent and Lender expressly acknowledges that neither the Administrative Agent nor any of its directors, officers, agents or employees has made any representations or warranties to it and that no act by the Administrative Agent hereafter taken, including any review of the affairs of the Transaction Parties, shall be deemed to constitute any representation or warranty by the Administrative Agent. Each Lender represents and warrants to the Administrative Agent that, independently and without reliance upon the Administrative Agent, any Funding Agent or any other Lender and based on such documents and information as it has deemed appropriate, it has made and will continue to make its own appraisal of and investigation into the business, operations, property, prospects, financial and other conditions and creditworthiness of each Transaction Party and the Receivables and its own decision to enter into this Agreement and to take, or omit, action under any Transaction Document. Except for items expressly required to be delivered under any Transaction Document by the Administrative Agent to any Funding Agent or Lender, the Administrative Agent shall not have any duty or responsibility to provide any Funding Agent or Lender with any information concerning the Transaction Parties or any of their Affiliates that comes into the possession of the Administrative Agent or any of its directors, officers, agents, employees, attorneys-in-fact or Affiliates.

8.9    **Successor Administrative Agent**

The Administrative Agent may resign as Administrative Agent. Except as provided below, such resignation shall not become effective until a successor Administrative Agent is appointed by the Required Funding Agents (with the consent of the Servicer, such consent not to be unreasonably withheld or delayed) and has accepted such appointment. If no successor Administrative Agent shall have been appointed within 30 days after the departing Administrative Agent's giving of notice of resignation, the departing Administrative Agent may appoint a successor Administrative Agent, which successor Administrative Agent shall have short-term debt ratings of at least A-1 from S&P and P-1 from Moody's and shall be either a commercial bank having a combined capital and surplus of at least $250,000,000 or a Subsidiary of such an institution and shall be acceptable to the Servicer (such acceptance not to be unreasonably withheld or delayed). If no successor Administrative Agent shall have been appointed within 60 days after the departing Administrative Agent's giving of notice of resignation, the departing Administrative Agent may petition a court of competent jurisdiction to appoint a successor Administrative Agent, which successor Administrative Agent shall have short-term debt ratings of at least A-1 from S&P and P-1 from Moody's, and shall be either a commercial bank having a combined capital and surplus of at least $250,000,000 or a Subsidiary of such an institution. Upon such acceptance of its appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall succeed to and become vested with all the rights and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from any further duties and obligations under the Transaction Documents. After any retiring Administrative Agent's resignation hereunder, the provisions of Clause 2.6 (*Indemnities by Servicer*) of the Servicing Agreement and Clause 10 (*Indemnities by*

*the Borrower*) and this Clause 8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent.

8.10    **Consent to Agreed Upon Procedures**

Each Lender and Funding Agent, by becoming a party to this Agreement, authorizes the Administrative Agent to execute on its behalf a letter agreement with respect to the limited engagement of, and consenting to the agreed upon procedures to be performed by, a firm of nationally recognized independent accountants or consultants acceptable to the Administrative Agent in connection with the transactions contemplated by the Transaction Documents.

9.    **THE FUNDING AGENTS**

9.1    **Authorization and Action**

Each Conduit Lender and each Committed Lender which belongs to the same Lender Group hereby appoints and authorizes the Funding Agent for such Lender Group to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Transaction Documents as are delegated to such Funding Agent by the terms hereof and the other Transaction Documents, together with such powers as are incidental thereto. No Funding Agent shall have any duties other than those expressly set forth in the Transaction Documents, and no implied obligations or liabilities shall be read into any Transaction Document, or otherwise exist, against any Funding Agent. No Funding Agent assumes, nor shall it be deemed to have assumed, any obligation to, or relationship of trust or agency with any Transaction Party, Conduit Lender or Committed Lender except as otherwise expressly agreed by such Funding Agent. Notwithstanding any provision of this Agreement or any other Transaction Document, in no event shall any Funding Agent ever be required to take any action which exposes such Funding Agent to personal liability or which is contrary to any provision of any Transaction Document or applicable Law.

9.2    **Funding Agent's Reliance, Etc.**

No Funding Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them as a Funding Agent under or in connection with this Agreement or the other Transaction Documents in the absence of its or their own gross negligence or willful misconduct. Without limiting the generality of the foregoing, a Funding Agent: (a) may consult with legal counsel (including counsel for the Administrative Agent, the Borrower, any Servicer Party), independent accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Conduit Lender or Committed Lender (whether written or oral) and shall not be responsible to any Conduit Lender or Committed Lender for any statements, warranties or representations (whether written or oral) made in or in connection with this Agreement or any other Transaction Document; (c) shall not have any duty to ascertain or to inquire as to the performance or observance

of any of the terms, covenants or conditions of this Agreement or any other Transaction Document on the part of any Transaction Party or any other Person or to inspect the property (including the books and records) of any Transaction Party; (d) shall not be responsible to any Conduit Lender or any Committed Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Transaction Documents or any other instrument or document furnished pursuant hereto; and (e) shall incur no liability under or in respect of this Agreement or any other Transaction Document by acting upon any notice (including notice by telephone), consent, certificate or other instrument or writing (which may be by facsimile) believed by it to be genuine and signed or sent by the proper party or parties.

9.3     **Funding Agent and Affiliates**

With respect to any Loan or interests therein owned by it, each Funding Agent shall have the same rights and powers under this Agreement as any Committed Lender and may exercise the same as though it were not a Funding Agent. A Funding Agent and any of its Affiliates may generally engage in any kind of business with any Transaction Party or any Obligor, any of their respective Affiliates and any Person who may do business with or own securities of any Transaction Party or any Obligor or any of their respective Affiliates, all as if such Funding Agent were not a Funding Agent and without any duty to account therefor to any Conduit Lenders or Committed Lenders.

9.4     **Indemnification of Funding Agents**

Each Committed Lender in any Lender Group severally agrees to indemnify the Funding Agent for such Lender Group (to the extent not reimbursed by the Transaction Parties), ratably according to its Pro Rata Share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Funding Agent in any way relating to or arising out of this Agreement or any other Transaction Document or any action taken or omitted by such Funding Agent under this Agreement or any other Transaction Document, provided that no Committed Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Funding Agent's gross negligence or willful misconduct.

9.5     **Delegation of Duties**

Each Funding Agent may execute any of its duties through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. No Funding Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact.

9.6     **Action or Inaction by Funding Agent**

Each Funding Agent shall in all cases be fully justified in failing or refusing to take action under any Transaction Document unless it shall first receive such advice or concurrence of the Conduit Lenders and Committed Lenders in its Lender Group and

assurance of its indemnification by the Committed Lenders in its Lender Group, as it deems appropriate. Each Funding Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Transaction Document in accordance with a request or at the direction of the Committed Lenders in its Lender Group representing a majority of the Commitments in such Lender Group, and such request or direction and any action taken or failure to act pursuant thereto shall be binding upon all Conduit Lenders and Committed Lenders in its Lender Group.

9.7     **Notice of Events of Termination**

No Funding Agent shall be deemed to have knowledge or notice of the occurrence of any Facility Event or and other default or termination event under the Transaction Documents unless such Funding Agent has received notice from the Administrative Agent, any other Funding Agent, any Conduit Lender or Committed Lender, any Servicer Party or the Borrower stating that a Facility Event or default or termination event under the Transaction Documents, as the case may be, has occurred hereunder or thereunder and describing such event or default. If a Funding Agent receives such a notice, it shall promptly give notice thereof to the Conduit Lenders and Committed Lenders in its Lender Group and to the Administrative Agent. The Funding Agent may take such action concerning a Facility Event as may be directed by Committed Lenders in its Lender Group representing a majority of the Commitments in such Lender Group (subject to the other provisions of this Clause 9), but until such Funding Agent receives such directions, such Funding Agent may (but shall not be obligated to) take such action, or refrain from taking such action, as such Funding Agent deems advisable and in the best interests of the Conduit Lenders and Committed Lenders in its Lender Group.

9.8     **Non-Reliance on Funding Agent and Other Parties**

Except to the extent otherwise agreed to in writing between a Conduit Lender and its Funding Agent, each Conduit Lender and Committed Lender in the same Lender Group expressly acknowledges that neither the Funding Agent for its Lender Group nor any of such Funding Agent's directors, officers, agents or employees has made any representations or warranties to it and that no act by such Funding Agent hereafter taken, including any review of the affairs of the Transaction Parties, shall be deemed to constitute any representation or warranty by such Funding Agent. Each Conduit Lender and Committed Lender in the same Lender Group represents and warrants to the Funding Agent for such Lender Group that, independently and without reliance upon such Funding Agent, any other Funding Agent, the Administrative Agent or any other Conduit Lender or Committed Lender and based on such documents and information as it has deemed appropriate, it has made and will continue to make its own appraisal of and investigation into the business, operations, property, prospects, financial and other conditions and creditworthiness of the Transaction Parties and the Receivables and its own decision to enter into this Agreement and to take, or omit, action under any Transaction Document. Except for items expressly required to be delivered under any Transaction Document by a Funding Agent to any Conduit Lender or Committed Lender in its Lender Group, no Funding Agent shall have any duty or responsibility to provide any Conduit Lender or Committed Lender in its Lender Group with any information

concerning the Transaction Parties or any of their Affiliates that comes into the possession of such Funding Agent or any of its directors, officers, agents, employees, attorneys-in-fact or Affiliates.

9.9 **Successor Funding Agent**

Any Funding Agent may, upon written notice to the Administrative Agent, the Borrower, the Servicer and the Conduit Lenders and Committed Lenders in its Lender Group, resign as Funding Agent for its Lender Group. Except as provided below, such resignation shall not become effective until a successor Funding Agent has been appointed in the manner prescribed by the relevant Program Support Agreements or, in the absence of any provisions in such Program Support Agreements providing for the appointment of a successor Funding Agent, until a successor Funding Agent is appointed by the Conduit Lender(s) in such Lender Group (with the consent of Committed Lenders representing a majority of the Commitments in such Lender Group and has accepted such appointment. If no successor Funding Agent shall have been so appointed within 30 days after the departing Funding Agent's giving of notice of resignation, then the departing Funding Agent may appoint a successor Funding Agent for such Lender Group, which successor Funding Agent shall have short-term debt ratings of at least A-1 from S&P and P-1 from Moody's and shall be either a commercial bank having a combined capital and surplus of at least $250,000,000 or an Affiliate of such an institution. Upon such acceptance of its appointment as Funding Agent for such Lender Group hereunder by a successor Funding Agent, such successor Funding Agent shall succeed to and become vested with all the rights and duties of the retiring Funding Agent, and the retiring Funding Agent shall be discharged from any further duties and obligations under the Transaction Documents. After any retiring Funding Agent's resignation hereunder, the provisions of Clause 2.6 (*Indemnities by Servicer*) of the Servicing Agreement and Clause 10 (*Indemnities by the Borrower*) and this Clause 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was a Funding Agent.

9.10 **Reliance on Funding Agent**

Unless otherwise advised in writing by a Funding Agent or by any Conduit Lender or Committed Lender in such Funding Agent's Lender Group, each party to this Agreement may assume that (a) such Funding Agent is acting for the benefit and on behalf of each of the Conduit Lenders and Committed Lenders in its Lender Group, as well as for the benefit of each assignee or other transferee from any such Person and (b) each action taken by such Funding Agent has been duly authorized and approved by all necessary action on the part of the Conduit Lenders and Committed Lenders in its Lender Group.

10. **INDEMNITIES**

Without limiting any other rights that the Administrative Agent, the Funding Agents, the Conduit Lenders, the Committed Lenders, the Program Support Providers, any Program Manager or any of their respective officers, directors, agents, attorneys, advisors, representatives, employees, controlling Persons or Affiliates of any of the foregoing (each, an **"Indemnified Party"**) may have hereunder, under any other Transaction

Document or under applicable Law, the Borrower hereby agrees to indemnify and hold harmless each Indemnified Party from and against any and all damages, losses, claims, liabilities, deficiencies, costs, disbursements and expenses, joint or several, including interest, penalties, amounts paid in settlement and attorneys' fees and expenses (all of the foregoing being collectively referred to as "**Indemnified Amounts**") awarded against or incurred by any Indemnified Party (including in connection with or relating to any investigation by an Official Body, litigation or lawsuit (actual or threatened) or order, consent decree, judgment, claim or other action of whatever sort (including the preparation of any defense with respect thereto regardless of whether such Indemnified Person is a party thereto)), in each case, arising out of or in connection with this Agreement or any other Transaction Document or any transaction contemplated hereby or thereby, excluding, however (a) Indemnified Amounts to the extent that such Indemnified Amounts are finally judicially determined to have resulted from the bad faith, gross negligence, or willful misconduct of such Indemnified Party, (b) Taxes and (c) recourse (except as otherwise specifically provided in this Agreement or any other Transaction Document) for Pool Receivables that are not collected or not collectable on account of the insolvency, bankruptcy or financial inability to pay of the Obligors in respect of such Pool Receivables.

Without limiting the generality of the foregoing indemnification, but subject to the exclusions set forth in clauses (a) and (b) above, the Borrower shall indemnify each Indemnified Party for Indemnified Amounts relating to or resulting from:

(i)     reliance on any representation or warranty made by any Transaction Party (or any officers of any such Person) under or in connection with this Agreement, any other Transaction Document or any other information or report delivered by any such Person pursuant hereto or thereto, which shall have been false or incorrect when made or deemed made;

(ii)    the failure by any Transaction Party to comply with any term, provision or covenant contained in a Transaction Document or any agreement executed in connection with a Transaction Document or with any applicable law, rule or regulation with respect to any Receivable or Contract related thereto, or the nonconformity of any Receivable or Contract included therein with any such applicable law, rule or regulation;

(iii)   any failure of a Transaction Party to perform its duties, covenants or other obligations in accordance with the provisions of this Agreement or any other Transaction Document;

(iv)    any libel, personal injury or damage suit, or other similar claim arising out of or in connection with any Contract or any Receivable;

(v)     any dispute, claim, offset or defense (other than discharge in bankruptcy of the Obligor) of the Obligor to the payment of any Receivable including, without limitation, (x) a defense based on such Receivable or the related Contract not being a legal, valid and binding obligation of such Obligor

enforceable against it in accordance with its terms, (y) any defense or dispute relating to whether, as between an Advertising Agency and the related Advertising Agency Clients, which Person or Persons are obligated to make payment on a Receivable (whether before or after an Advertising Agency Client remits payment to the related Advertising Agency), and (z) or any other claim resulting from the sale of the services related to such Receivable or the furnishing or failure to furnish such services;

(vi)    the commingling of Collections of Receivables at any time with other funds;

(vii)    any investigation, litigation or proceeding related to or arising from this Agreement or any other Transaction Document, the transactions contemplated hereby, the use of the proceeds of a Loan, the ownership of the Loans or any other investigation, litigation or proceeding relating to a Transaction Party in which any Indemnified Party becomes involved as a result of any of the transactions contemplated hereby;

(viii)    any inability to litigate any claim against any Obligor in respect of any Receivable as a result of such Obligor being immune from civil and commercial law and suit on the grounds of sovereignty or otherwise from any legal action, suit or proceeding;

(ix)    any Facility Termination Event described in Clause 7.2(b) (*Facility Termination Events*);

(x)    any failure of the Borrower to acquire and maintain legal and equitable title to, and ownership of any Pool Receivable and the Related Security and Collections with respect thereto from the applicable Originator, free and clear of any Adverse Claim (other than as created hereunder); or any failure of the Borrower or of Parent to give reasonably equivalent value to the applicable Originator under the Receivables Purchase Agreement in consideration of the transfer by Parent or such other Originator of any Receivable, or any attempt by any Person to void such transfer under statutory provisions or common law or equitable action;

(xi)    any failure to vest and maintain vested in the Administrative Agent, for the benefit of the Secured Parties, or to transfer to the Administrative Agent, for the benefit of the Secured Parties, a first priority perfected security interest in the Receivables, the Related Security, the Collections, the Facility Accounts and the other Collateral, free and clear of any Adverse Claim (except as created by the Transaction Documents);

(xii)    the failure to have filed, or any delay in filing, financing statements or other similar instruments or documents under the UCC of any applicable jurisdiction or other applicable laws with respect to any Receivable, the Related Security and Collections with respect thereto, and any proceeds

101

thereof, whether at the time of any Incremental Borrowing or Repeat Advances or at any subsequent time;

(xiii)    the failure by a Transaction Party to be duly qualified to do business, to be in good standing or to have filed appropriate fictitious or assumed name registration documents in any jurisdiction where its ownership of property or the conduct of business requires such qualification;

(xiv)    the failure of a Transaction Party to pay when due any Taxes or charges imposed on such party.

(xv)    any action or omission by a Transaction Party which reduces or impairs the rights of the Administrative Agent, Agents or the Lenders with respect to any Receivable or the value of any such Receivable;

(xvi)    any attempt by any Person to void any Loan or any other transaction contemplated by the Transaction Documents under statutory provisions or common law or equitable action; and

(xvii)    the failure of any Receivable included in the calculation of the Net Receivables Balance at any time as an Eligible Receivable to be an Eligible Receivable at the time so included.

11.    **MISCELLANEOUS**

11.1    **Amendments, Etc.**

No failure on the part of the Funding Agents, the Conduit Lenders, the Committed Lenders or the Administrative Agent to exercise, and no delay in exercising, any power, right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any power, right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other power, right or remedy. The rights and remedies herein provided shall be cumulative and non-exclusive of any rights and remedies provided by Law. No amendment or waiver of any provision of this Agreement or consent to any departure by any Transaction Party therefrom shall be effective unless in writing signed by the Administrative Agent, with the prior written consent of the Required Funding Agents (and, in the case of any amendment, also signed by the Borrower and the Servicer), and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that no amendment, waiver or consent shall, unless in writing and signed by each Lender (or, in the case of subclause 11.1(b) or (c), each Lender having its Fees reduced or delayed or its Commitment or Conduit Lending Limit increased or extended) in addition to the Administrative Agent:

(a)    reduce the Principal Balance of, or Interest that is payable on, account of any Loan or Tranche or delay any scheduled date for payment thereof;

(b)    reduce Fees payable by the Borrower to the Funding Agents, the Conduit Lenders or the Committed Lenders or delay the dates on which such Fees are payable, or increase the Commitment or Conduit Lending Limit of any Lender;

(c)    extend the Scheduled Commitment Facility Termination Dates or the Maturity Date;

(d)    except as provided in Clause 11.14 *(Limitation on the Addition and Termination of Sub-Originators)*, release more than five percent (5%) of the Collateral, or release any portion of the Collateral if a Facility Event has occurred and is continuing or would result therefrom;

(e)    change any of the provisions of this Clause or the definition of "Required Funding Agents,"

(f)    amend any Trigger Event set forth in Clause 7.1(a), (d), (h), (i), (j), (k), and (l) *(Trigger Events)*;

(g)    amend any Facility Termination Event set forth in Clause 7.2(b) *(Facility Termination Events)*,

(h)    amend the definition of "CP Rate," "Total Reserves," "Percentage Factor," "Loss and Dilution Reserve," "Yield and Servicing Fee Reserve," "Default Ratio," "Defaulted Receivable," "Delinquent Receivable," "Net Eligible Receivables Balance," "Stress Factor," "Eligible Receivables," or "Commingling Reserve" or increase the Maximum Percentage Factor or any Concentration Limit; or

(i)    release the Borrower, the Servicer or Parent from all of its obligations under the Transaction Documents.

and provided, further, that (i) no amendment, waiver or consent shall increase the Commitment of any Committed Lender or the Conduit Lending Limit of any Conduit Lender unless in writing and signed by such Committed Lender or such Conduit Lender, as the case may be, and the relevant Funding Agent and (ii) no amendment, waiver or consent shall alter the duties of the Administrative Agent or any Funding Agent without the consent of the Administrative Agent or such Funding Agent, as applicable.

11.2    **Notices, Etc.**

All communications and notices provided for hereunder shall be provided in the manner described in Schedule 2 *(Address and Notice Information)*.

11.3    **Assignability**

(a)    General

This Agreement and each Lender's rights and obligations hereunder shall be assignable by such Lender and its successors and permitted assigns to any Eligible

Assignee subject to Clauses 11.3(b) and (c). Each assignor of a Loan or any interest therein shall notify the Administrative Agent and the Borrower of any such assignment. Each assignor of a Loan or any interest therein may, in connection with the assignment or participation, disclose to the assignee or participant any information relating to the Transaction Parties, including the Collateral, furnished to such assignor by or on behalf of any Transaction Party or by the Administrative Agent; provided that, prior to any such disclosure, the assignee or participant agrees to preserve the confidentiality of any confidential information relating to the Transaction Parties received by it from any of the foregoing entities in a manner consistent with Clause 11.6(b) (*Confidentiality*). Notwithstanding anything herein or in any other Transaction Document to the contrary, neither the Borrower nor any other Transaction Party shall be responsible for any costs or other expenses incurred in connection with any assignment or sale of a participation described in Clauses 11.3(b), (c) and (f).

(b)    Assignments by Conduit Lenders

Each Conduit Lender may pledge or otherwise grant security interests in all of any portion of the Loans to a security trustee in connection with its commercial paper program without prior notice to or consent from any other party or any other condition or restriction of any kind. Each Conduit Lender may assign or otherwise transfer all or any portion of the Loans to any Eligible Assignee or Program Support Provider with respect to such Conduit Lender without prior notice to or consent from any other party or any other condition or restriction of any kind; provided, that any such transfer must be approved in writing by the Borrower (such approval not to be unreasonably withheld or delayed) unless (i) the transferee is (i) a Lender, an Affiliate thereof or a Conduit Assignee or (ii) a Facility Event is continuing. Without limiting the generality of the foregoing, each Conduit Lender may, from time to time with prior or concurrent notice to the Borrower and each Funding Agent, assign all or any portion of its interest in the Loans and its rights and obligations under this Agreement and any other Transaction Documents to which it is a party to a Conduit Assignee. Upon such assignment by a Conduit Lender to a Conduit Assignee, (i) unless a new Lender Group is being established pursuant to Clause 11.3(i), the Funding Agent for such Conduit Lender will act as the Funding Agent for such Conduit Assignee hereunder, (ii) such Conduit Assignee (and any related commercial paper issuer, if such Conduit Assignee does not itself issue commercial paper) and its liquidity support provider(s) and credit support provider(s) and other related parties (including all of its Program Support Providers) shall have the benefit of all the rights and protections provided to such Conduit Lender and its related Committed Lenders herein and in the other Transaction Documents (including any limitation on recourse against such Conduit Assignee), (iii) such Conduit Assignee shall assume all of such Conduit Lender's obligations hereunder or under any other Transaction Document (whenever created, whether before or after such assignment) with respect to the assigned portion of the Loans held by such Conduit Lender and such Conduit Lender shall be released from all such obligations, (iv) such Conduit Assignee shall not be entitled to indemnification

pursuant to Clause 2.15(a) (*Indemnity for Taxes*) unless it complies with the requirements of Clause 2.15(d), (v) all distributions to such Conduit Lender hereunder with respect to the assigned portion of the Loans shall be made to such Conduit Assignee, (vi) the definition of the term "CP Rate" shall be determined on the basis of the interest rate or discount applicable to Commercial Paper issued by such Conduit Assignee (and any related commercial paper issuer, if such Conduit Assignee does not itself issue commercial paper) rather than such assigning Conduit Lender, (vii) the defined terms and other terms and provisions of this Agreement and the other Transaction Documents shall be interpreted in accordance with the foregoing and (viii) if requested by the Administrative Agent or Funding Agent with respect to the Conduit Assignee, the parties will execute and deliver such further agreements and documents (including amendments to this Agreement) and take such other actions as the Administrative Agent or such Funding Agent may request to evidence and give effect to the foregoing.

(c)    Assignment by Committed Lenders

Each Committed Lender may assign to any Eligible Assignee all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and any Loans or interests therein owned by it); provided, however that:

(i)    each such assignment shall be of a constant, and not a varying, percentage of all rights and obligations under this Agreement;

(ii)    the amount being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than the lesser of (A) $10,000,000 and (B) all of the assigning Committed Lender's Commitment;

(iii)    the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register (as defined below), an Assignment and Acceptance, together with a processing and recordation fee of $3,000. The Borrower shall have no responsibility for such fee; and

(iv)    any such transfer must be approved in writing by the Borrower (such approval not to  be unreasonably withheld or delayed) unless (A) the transferee is a Lender, an Affiliate thereof or a Conduit Assignee or (B) a Facility Event has occurred and is continuing.

Upon such execution, delivery, acceptance and recording from and after the effective date specified in such Assignment and Acceptance, (x) the assignee thereunder shall be a party to this Agreement and, to the extent that rights and obligations under this Agreement have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Committed Lender thereunder, (y) such assignee shall not be entitled to indemnification

pursuant to Clause 2.15(a) (*Indemnity for Taxes*) unless it complies with the requirements of Clause 2.15(d) and (z) the assigning Committed Lender shall, to the extent that rights and obligations have been assigned by it pursuant to such Assignment and Acceptance, relinquish such rights and be released from such obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Committed Lender's rights and obligations under this Agreement, such Committed Lender shall cease to be a party hereto). In addition, any Committed Lender or any of its Affiliates may assign any of its rights (including rights to payment of Principal Balance and Interest under this Agreement to any Federal Reserve Bank without notice to or consent of any Transaction Party, any other Committed Lender or Conduit Lender, any Funding Agent or the Administrative Agent; provided that such assignment shall not relieve such Committed Lender of its obligations hereunder.

(d)    Register

At all times during which any Loan is outstanding, the Administrative Agent shall maintain at its address referred to in Clause 11.2 (*Notices, etc.*) (or such other address of the Administrative Agent notified by the Administrative Agent to the other parties hereto) a register as provided herein (the "**Register**"). All Loans and any interest therein, and any Assignments and Acceptances of any Loans and any interest therein delivered to and accepted by the Administrative Agent, shall be registered in the Register, and the Register shall serve as a record of ownership that identifies the owner of each Loan and any interest therein. Notwithstanding any other provision of this Agreement, no transfer of any Loan or any interest therein shall be effective unless and until such transfer has been recorded in the Register. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Servicer, the Administrative Agent, the Funding Agents, the Conduit Lenders and the Committed Lenders may treat each Person whose name is recorded in the Register as a Committed Lender or Conduit Lender, as the case may be, under this Agreement for all purposes of this Agreement. This Clause 11.3(d) shall be construed so that each Loan and any interest therein is maintained at all times in "registered form" within the meaning of clauses 163(f), 871(h) and 881(c) of the IRC, solely for the purposes of this Clause 11.3, the Administrative Agent will act as an agent of the Borrower. The Register shall be available for inspection by the Borrower, any Funding Agent, any Conduit Lender or any Committed Lender at any time and from time to time upon prior notice.

(e)    Procedure

Upon its receipt of an Assignment and Acceptance executed by an assigning Committed Lender and an Eligible Assignee, the Administrative Agent shall, if such Assignment and Acceptance has been duly completed, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower.

(f)    Participations

Each Lender may sell participations to one or more banks or other entities that are Eligible Assignees on the date of such sale (each a "**Participant**") in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of its interests in the Loans owned by it and, in the case of a Committed Lender, its Commitment); provided, however, that:

(i)    such Lender's obligations under this Agreement shall remain unchanged;

(ii)    such Lender shall remain solely responsible to the other parties to this Agreement for the performance of such obligations; and

(iii)    the Administrative Agent, the Funding Agents, the other Lenders, the Borrower and the Servicer shall have the right to continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that the Participant shall not have any right to direct the enforcement of this Agreement or other Transaction Documents or to approve any amendment, modification or waiver of any provision of this Agreement or the other Transaction Documents; provided that such agreement or instrument may provide that such Committed Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver of a type that would require the consent of each Lender affected thereby pursuant to Clause 11.1 (*Amendments, etc.*). No Participant shall be entitled to indemnification pursuant to Clause 2.15(a) (*Indemnity for Taxes*) unless it complies with the requirements of Clause 2.15(d).

(g)    Issuer and Servicer Assignment

Neither the Borrower nor the Servicer may assign any of its rights or obligations hereunder or any interest herein without the prior written consent of the Administrative Agent and the Committed Lenders.

(h)    Cooperation

The Borrower and the Servicer agree to assist each Committed Lender, upon its reasonable request, in syndicating their respective Commitments hereunder, including making management and representatives of the Servicer and the Borrower reasonably available to participate in informational meetings with potential assignees.

(i)    New Lender Groups

In connection with any assignment by a Conduit Lender of all or any portion of its Conduit Lending Limit to a Conduit Assignee, such Conduit Assignee may elect

to establish a new Lender Group hereunder by the execution and delivery of a Joinder Agreement by such Conduit Assignee, the Committed Lenders which are to be in its Lender Group and the Person which is to be the Funding Agent for such Lender Group, in each case without the consent of any other party.  Upon the effective date of such Joinder Agreement, (i) the Person specified therein as a "Funding Agent" shall become a party hereto as a Funding Agent, entitled to the rights and subject to the obligations of a Funding Agent hereunder and (ii) Schedule 1 (*Lender Groups*) shall be deemed to have been amended as appropriate to incorporate the information set forth in such Joinder Agreement.

(j)    Notwithstanding anything herein to the contrary, no Loan or interest therein may be assigned to any Person (other than a Federal Reserve Bank) that is not a Qualified Purchaser.  Each Lender represents and warrants as of the date hereof (or, if later, as of the date it becomes a party to this Agreement) that it is a Qualified Purchaser.

## 11.4    Costs and Expenses

In addition to the rights of indemnification granted under Clause 10 (*Indemnities by the Borrower*) and its other obligations herein, the Borrower agrees to pay on demand all costs and expenses incurred by any Indemnified Party in connection with the preparation, execution, delivery and administration of this Agreement, any Asset Purchase Agreement, the other Transaction Documents, including (a) the reasonable out-of-pocket fees and expenses of one counsel acting jointly for the Administrative Agent, the Conduit Lenders, the Funding Agents, the Committed Lenders and their respective Affiliates with respect thereto and with respect to advising the Administrative Agent, the Funding Agents, the Conduit Lenders, the Committed Lenders and their respective Affiliates as to their rights and remedies under this Agreement, (b) all rating agency fees, (c) all reasonable out-of-pocket fees and expenses associated with any audits and other due diligence prior to or after the Closing Date, and (d) any amendments, waivers or consents under the Transaction Documents.  In addition, the Borrower agrees to pay on demand all costs and expenses (including reasonable out-of-pocket counsel fees and expenses), of each of the Administrative Agent, the Funding Agents, the Conduit Lenders, the Committed Lenders, the Program Support Providers and their respective Affiliates, incurred in connection with the enforcement of, or any dispute, work-out, litigation or preparation for litigation involving, this Agreement or any other Transaction Document.

## 11.5    No Proceedings; No Recourse

Each of the parties hereto, each assignee of a Loan or any interest therein and each Person which enters into a commitment to purchase Loans or interests therein hereby agrees that it will not institute against any Conduit Lender any proceeding of the type referred to in the definition of Event of Bankruptcy so long as any Commercial Paper or other senior indebtedness issued by such Conduit Lender (or its related commercial paper issuer) shall be outstanding or there shall not have elapsed one year plus one day since the last day on which any such Commercial Paper or other senior indebtedness shall have been outstanding.  Notwithstanding anything to the contrary contained in this Agreement

or any other Transaction Document, the obligations of the Conduit Lenders under this Agreement and all other Transaction Documents are solely the corporate obligations of the Conduit Lender and shall be payable solely to the extent of funds received from the Borrower in accordance herewith or from any party to any Transaction Document in accordance with the terms thereof in excess of funds necessary to pay matured and maturing Commercial Paper.

11.6    **Confidentiality**

(a)    Subject to Clause 11.6(c), the Fee Letter (including any prior drafts thereof) and any other pricing information relating to the facility contemplated by the Transaction Documents (including such information set forth in any engagement letter, term sheet or proposal prior to the Closing Date) (collectively, "**Product Information**") are confidential. Each of the Borrower and the Servicer agrees:

(i)    to keep all Product Information confidential and to disclose Product Information only to those of its Affiliates and its and their respective officers, employees, agents, accountants, legal counsel and other representatives (collectively "**Representatives**") who have a need to know such Product Information for the purpose of assisting in the negotiation, completion and administration of the facility contemplated hereby (the "**Facility**");

(ii)    to use the Product Information only in connection with the Facility and not for any other purpose; and

(iii)    to cause its Representatives to comply with these provisions and to be responsible for any failure of any Representative to so comply.

The provisions of this Clause 11.6(a) shall not apply to Product Information that is or hereafter becomes (through a source other than the Borrower, the Servicer or any of their respective Affiliates or other Representatives) a matter of general public knowledge. The provisions of this Clause 11.6(a) shall not prohibit the Borrower or the Servicer from filing with any governmental or regulatory agency any information or other documents with respect to the Facility as may be required by applicable Law. Product Information may be disclosed (I) to the extent requested or required by any state, Federal or foreign authority or examiner regulating any Transaction Party, (II) to the extent required by applicable law, rule or regulation or by any subpoena or similar legal process, or in connection with the enforcement of the Transaction Documents, (III) in connection with any litigation or legal proceeding relating to or in connection with the Transaction Documents or the enforcement of rights hereunder or thereunder or to which the Borrower or the Servicer or any of its Affiliates may be a party, (IV) with the consent of the Funding Agents, or (V) to any Rating Agency when required by such Rating Agency,

(b)     Each Lender, each Funding Agent, and the Administrative Agent (each, a "**Lender Party**") agrees to maintain the confidentiality of the Company Information (as defined below), except that Company Information may be disclosed (i) to a Lender Party's affiliates, partners, directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Company Information and agree to keep such Company Information confidential), (ii) to the extent requested or required by any state, Federal or foreign authority or examiner regulating a Lender Party, (iii) to the extent required by applicable law, rule or regulation or by any subpoena or similar legal process, or in connection with the enforcement of the Transaction Documents, (iv) in connection with any litigation or legal proceeding relating to or in connection with the Transaction Documents or the enforcement of rights hereunder or thereunder or to which a Lender Party or any of its affiliates may be a party, (v) with the consent of the Borrower or Servicer, (vi) to any Rating Agency when required by such Rating Agency, (vii) to persons acting as or proposing to act as Program Support Providers or commercial paper dealers for any Conduit Lender and its Affiliates, partners, directors, officers, employees and agents (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Company Information and agree to keep such Company Information confidential in accordance with this Section), (viii) to any assignee or prospective assignee of a Lender Party (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Company Information and agree to keep such Company Information confidential in accordance with this Section), or (ix) to the extent such Company Information (1) becomes publicly available other than as a result of a breach of this Clause, (2) has been available to the Lender Parties for three years or more after the Facility Termination Date, or (3) becomes available to a Lender Party on a nonconfidential basis from a source other than the Servicer or any of the Servicer's subsidiaries, officers, directors, employees or advisors. For the purposes of this paragraph, "**Company Information**" means any information received by such Lender Party from the Servicer or any of the Servicer's subsidiaries, officers, directors, employees or advisors relating to the Transaction Parties or their businesses, other than any such information that is or becomes available to a Lender Party on a nonconfidential basis other than through disclosure by a Transaction Party. Any person required to maintain the confidentiality of Company Information as provided in this paragraph shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Company Information as such person would accord to its own confidential information.

(c)     The provisions of Clause 11.6(b) shall not apply to information that is or hereafter becomes (through a source other than the applicable Lender, Funding Agent or the Administrative Agent or any Lender Representative associated with such party) a matter of general public knowledge. The provisions of this Clause 11.6(c) shall not prohibit any Lender, Funding Agent or the Administrative Agent

from filing with or making available to any governmental or regulatory agency any information or other documents with respect to the Facility as may be required by applicable Law or requested by such governmental or regulatory agency.

**11.7    Further Assurances**

From time to time as may be necessary, each of the Borrower and the Servicer shall (i) cooperate with each Rating Agency in connection with any review of the Transaction Documents which may be undertaken by such Rating Agency and (ii) provide each Rating Agency with such information or access to such information as they may reasonably request in connection with any future review of the ratings referred to above.

**11.8    Execution in Counterparts**

This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by electronic file in a format that is accessible by the recipient shall be effective as delivery of a manually executed counterpart of this Agreement.

**11.9    Integration; Binding Effect; Survival of Termination; Severability**

This Agreement and the other Transaction Documents executed by the parties hereto on the date hereof contain the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof superseding all prior oral or written understandings. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns (including any trustee in bankruptcy). Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. This Agreement shall create and constitute the continuing obligations of the parties hereto in accordance with its terms and shall remain in full force and effect until the Final Payout Date; provided, however, that the provisions of Clauses 2.11 (*Breakage Costs*), 2.14 (*Indemnity for Reserves and Expenses*), 2.15 (*Indemnity for Taxes*), 10 (*Indemnities by the Borrower*), 11.4 (*Costs and Expenses*), 11.5 (*No proceedings; no recourse*), 11.6 (*Confidentiality*), 11.11 (*Right of setoff*), 11.13 (*Limitation of liability*), 11.15 (*Waiver of jury trial*), 11.16 (*USA PATRIOT Act*) and 11.17 (*No proceeding; limited recourse*) shall survive any termination of this Agreement. If any one or more of the provisions of this Agreement shall for any reason whatsoever be held invalid, then such provisions shall be deemed severable from the remaining provisions of this Agreement and shall in no way affect the validity or enforceability of such other provisions.

11.10 **GOVERNING LAW; SUBMISSION TO JURISDICTION; APPOINTMENT OF PROCESS AGENT**

(a)    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.

(b)    EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT SITTING IN NEW YORK CITY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE TRANSACTION DOCUMENTS, AND EACH PARTY HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.

(c)    THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THEY MAY EFFECTIVELY DO SO, THE DEFENSE OF INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING. THE PARTIES HERETO AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(d)    EACH OF THE PARTIES HERETO CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO IT AT ITS ADDRESS SPECIFIED HEREIN.  NOTHING IN THIS CLAUSE 11.10(D) SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY MANNER PERMITTED BY LAW.

(e)    THE SUBMISSION TO THE JURISDICTION OF THE COURTS REFERRED TO IN CLAUSE 11.10(B) SHALL NOT (AND SHALL NOT BE CONSTRUED SO AS TO) LIMIT THE RIGHT OF ANY PARTY TO TAKE PROCEEDINGS AGAINST ANY OTHER PARTY OR ANY OF ITS RESPECTIVE PROPERTY IN ANY OTHER COURT OF COMPETENT JURISDICTION NOR SHALL THE TAKING OF PROCEEDINGS IN ANY OTHER JURISDICTION PRECLUDE THE TAKING OF PROCEEDINGS IN ANY OTHER JURISDICTION, WHETHER CONCURRENTLY OR NOT.

11.11  **Right of Setoff**

Following the occurrence and during the continuation of a Facility Termination Event, each Indemnified Party is hereby authorized (in addition to any other rights it may have) at any time to setoff, appropriate and apply (without presentment, demand, protest or

other notice which are hereby expressly waived) any amounts and any other indebtedness held or owing by such Indemnified Party to, or for the account of any Transaction Party against the amount of the Transaction Party Obligations owing by such Transaction Party to such Indemnified Party directly or as assignee of the Borrower.

11.12 **Ratable Payments**

If any Committed Lender, whether by setoff or otherwise, has payment made to it with respect to any Transaction Party Obligation in a greater proportion than that received by any other Committed Lender entitled to receive a ratable share of such Transaction Party Obligation, such Committed Lender agrees, promptly upon demand, to purchase for cash without recourse or warranty a portion of such Transaction Party Obligation held by the other Committed Lenders so that after such purchase each Committed Lender will hold its ratable proportion of such Transaction Party Obligation; provided that if all or any portion of such excess amount is thereafter recovered from such Committed Lender, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

11.13 **Limitation of Liability**

(a)    No claim may be made by any Lender Party or its respective Affiliates, directors, officers, employees, attorneys or agents (each a "**Default Party**") for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any other Transaction Document, or any act, omission or event occurring in connection herewith or therewith; and each party hereto hereby waives, releases, and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(b)    Notwithstanding anything to the contrary contained herein or any other Transaction Document, the obligations of the respective Conduit Lenders under this Agreement and all other Transaction Documents are solely the corporate obligations of each such Conduit Lender and shall be payable only at such time as funds are actually received by, or are available to, such Conduit Lender in excess of funds necessary to pay in full all outstanding Commercial Paper issued by such Conduit Lender and shall be non-recourse other than with respect to such excess funds, if ever, and until such time as such Conduit Lender has sufficient funds to pay such obligation shall not constitute a claim against such Conduit Lender. Each party hereto agrees that the payment of any claim of any such party shall be subordinated to the payment in full of all Commercial Paper.

(c)    No recourse under any obligation, covenant or agreement of any Conduit Lender contained in this Agreement or any other Transaction Document shall be had against any incorporator, stockholder, officer, director, member, manager, employee or agent of such Conduit Lender, the Funding Agent with respect to such Conduit Lender or any of their Affiliates (solely by virtue of such capacity)

by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute or otherwise; it being expressly agreed and understood that this Agreement and the other Transaction Documents are solely a corporate obligation of such Conduit Lender, and that no personal liability whatever shall attach to or be incurred by any incorporator, stockholder, officer, director, member, manager, employee or agent of any Conduit Lender, any Funding Agent or any of their Affiliates (solely by virtue of such capacity) or any of them under or by reason of any of the obligations, covenants or agreements of such Conduit Lender contained in this Agreement or any other Transaction Document, or implied therefrom, and that any and all personal liability for breaches by any Conduit Lender of any of such obligations, covenants or agreements, either at common law or at equity, or by statute, rule or regulation, of every such incorporator, stockholder, officer, director, member, manager, employee or agent is hereby expressly waived as a condition of and in consideration for the execution of this Agreement or any other Transaction Document; provided that the foregoing shall not relieve any such Person from any liability it might otherwise have as a result of grossly negligent or fraudulent actions taken or grossly negligent or fraudulent omissions made by them.

(d)     Each of the parties hereto hereby agrees that (i) it will not institute against any Conduit Lender any proceeding of the type referred to in the definition of Event of Bankruptcy so long as any Commercial Paper or other indebtedness issued by such Conduit Lender is outstanding or there shall not have elapsed two years plus one day since the last date on which any such Commercial Paper or other indebtedness shall have been outstanding and (ii) notwithstanding anything contained herein or in any other Transaction Document to the contrary, the obligations of any Conduit Lender, if any, under the Transaction Documents are solely the corporate obligations of such Conduit Lender and shall be payable solely to the extent of funds which are received by such Conduit Lender pursuant to the Transaction Documents and available for such payment in accordance with the terms of the Transaction Documents and shall be non-recourse other than with respect to such available funds and if ever and until such time as such Conduit Lender has sufficient funds to pay such obligation shall not constitute a claim against such Conduit Lender.

## 11.14   Limitation on the Addition and Termination of Sub-Originators

The Borrower shall not consent to any request made to add a new Originator to the Receivables Purchase Agreement or to terminate the right or obligation of any Originator to continue selling or contributing its Receivables to the Parent or to the Borrower (as applicable) thereunder, nor will any Sub-Originator which is the subject of such request be terminated under the Receivables Purchase Agreement, in each case unless:

(a)     each of the Administrative Agent and the Funding Agents will have received (i) fifteen (15) Business Days prior written notice of any such addition, which fifteen Business Day period shall commence only after the Administrative Agent and the Funding Agents shall have substantially received such information as any of them

may request with respect to such addition, or (ii) ten (10) Business Days prior written notice of any such termination,

(b)    concurrently with the notice described in subclause (a) above, the Servicer provides the Administrative Agent, each Funding Agent and each Committed Lender with a certificate (signed by a Responsible Officer of the Servicer) which attaches a Monthly Report and Interim Report giving pro forma effect to any increase or reduction in the Net Eligible Receivables Balance resulting from the addition or termination of such Sub-Originator, as applicable, and any change in the Total Reserves as set forth in the next sentence, and which certifies that, after giving pro forma effect to such addition or termination and any prepayments of Loans on or prior to the date of such addition or termination, the Percentage Factor does not exceed the Maximum Percentage Factor,

(c)    no Facility Event (other than with respect to a Sub-Originator so terminated, if applicable) has occurred and is continuing (both before and after giving effect to such addition or termination),

(d)    with respect to the removal of an Originator, the aggregate amount of Pool Receivables originated by all Sub-Originators released pursuant to this Clause 11.14 in any Benchmark Year does not exceed 15% of the aggregate outstanding balance of all Pool Receivables held by the Borrower as of the start of such Benchmark Year (determined for each Sub-Originator as of the date of its removal),

(e)    with respect to the addition of an Originator, the aggregate amount of Pool Receivables originated by all Sub-Originators added pursuant to this Clause 11.14 in any Benchmark Year does not exceed 15% of the aggregate outstanding balance of all Pool Receivables held by the Borrower as of the start of such Benchmark Year (determined for each Sub-Originator as of the date of its addition).

(f)    in the case of an addition of an Originator, the applicable Sub-Originator shall have delivered such lien releases, UCC filings, certifications, opinions and other closing documents comparable to those delivered at closing with respect to the original Sub-Originators,

(g)    in the case of a removal of an Originator, such Sub-Originator (or substantially all of its assets) will be transferred to a Person that is not a Tribune Affiliate and either (i) all Pool Receivables originated by such Sub-Originator shall be purchased by Tribune or its Affiliate concurrently with such release, or (ii) such Pool Receivables will be treated as ineligible for funding hereunder;

(h)    with respect to a removal, Section 1.09 of the Receivables Purchase Agreement (*Termination of Status as an Originator*) shall have been satisfied; and

(i)    with respect to an addition, Section 1.10 of the Receivables Purchase Agreement (*Addition of Sub-Originator*) shall have been satisfied.

11.15  **WAIVER OF JURY TRIAL**

EACH PARTY HERETO HEREBY WAIVES, TO THE MAXIMUM EXTENT
PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY JUDICIAL
PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER
(WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY
ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT
OR ANY OTHER TRANSACTION DOCUMENT.

11.16  **USA Patriot Act**

Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA
Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) and any
similar Law in any relevant jurisdiction (the "**Acts**"), it is required to obtain, verify and
record information that identifies the Transaction Parties, which information includes the
name and address of each Transaction Party and other information that will allow such
Lender to identify such Transaction Party in accordance with the Acts.

11.17  **No Proceeding; Limited Recourse**

(a)     Each of the parties hereto hereby agrees that (i) it will not institute against the
Borrower any proceeding of the type referred to in the definition of Event of
Bankruptcy until there shall have elapsed one year plus one day since the Final
Payout Date and (ii) notwithstanding anything contained herein or in any other
Transaction Document to the contrary, the obligations of the Borrower under the
Transaction Documents are solely the obligations of the Borrower and shall be
payable solely to the extent of funds which are received by the Borrower pursuant
to the Transaction Documents and available for such payment in accordance with
the terms of the Transaction Documents and shall be non-recourse other than with
respect to such available funds and, without limiting Clause 11.18 (*Tax
Treatment*), if ever and until such time as the Borrower has sufficient funds to pay
such obligation shall not constitute a claim against the Borrower.

(b)     No recourse under any obligation, covenant or agreement of the Borrower
contained in this Agreement or any other Transaction Document shall be had
against any incorporator, stockholder, officer, director, member, manager,
employee or agent of the Borrower by the enforcement of any assessment or by
any legal or equitable proceeding, by virtue of any statute or otherwise; it being
expressly agreed and understood that this Agreement and the other Transaction
Documents are solely an obligation of the Borrower, and that no personal liability
whatever shall attach to or be incurred by any incorporator, stockholder, officer,
director, member, manager, employee or agent of the Borrower or any of them
under or by reason of any of the obligations, covenants or agreements of the
Borrower contained in this Agreement or any other Transaction Document, or
implied therefrom, and that any and all personal liability for breaches by the
Borrower of any of such obligations, covenants or agreements, either at common
law or at equity, or by statute, rule or regulation, of every such incorporator,

stockholder, officer, director, member, manager, employee or agent is hereby expressly waived as a condition of and in consideration for the execution of this Agreement; provided that the foregoing shall not relieve any such Person from any liability it might otherwise have as a result of fraudulent actions taken or fraudulent omissions made by them.

## 11.18  Tax Treatment

Notwithstanding anything to the contrary in this Agreement or any other Transaction Document, for U.S. federal and applicable State and local income and franchise tax purposes, the parties hereto agree that (i) they intend that the transactions contemplated hereby evidence a loan secured by the Receivables, Related Security and Collections, and (ii) unless and until they are required by applicable Law or regulations to treat the transactions contemplated hereby inconsistent with such intention, they shall report the transactions contemplated hereby on all tax returns and otherwise for all U.S. federal and applicable State and local income tax purposes consistent with such intention.

## 11.19  Barclays Roles

Each of the Lenders acknowledges that Barclays acts, or may in the future act, (i) as administrative agent for any Transaction Party or Lender, (ii) as issuing and paying agent for the Commercial Paper, (iii) to provide credit or liquidity enhancement for the timely payment for the Commercial Paper and (iv) to provide other services from time to time for any Transaction Party or Lender (collectively, the "**Barclays Roles**"). Without limiting the generality of this Clause, each Lender hereby acknowledges and consents to any and all Barclays Roles and agrees that in connection with any Barclays Role, Barclays may take, or refrain from taking, any action that it, in its discretion, deems appropriate, including, without limitation, in its role as administrative agent for any Conduit Lender.

## 11.20  Replacement of Lenders

(a)   If (A) Borrower is required to pay any additional amount to any Lender or any Official Body for the account of any Lender pursuant to Clause 2.15 (*Indemnity for Taxes*), (B) any Lender gives notice pursuant to Clause 2.12 (*Illegality*) with respect to an occurrence or state of affairs not applicable to all Lenders, (C) any Committed Lender shall fail to extend any Loan which it is required to make under the terms of this Agreement, (D) any Committed Lender is a Non-Renewing Committed Lender under Clause 2.16 (*Extension of Scheduled Commitment Facility Termination Date*) or (E) any Lender becomes insolvent and its assets become subject to a receiver, liquidator, trustee, custodian or other Person having similar powers, then Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender, together with the other members of its Lender Group, to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Clause 11.3 (*Assignability*)), all of their interests, rights and obligations under this Agreement and their Loans, if any, to an Eligible

Assignee or Eligible Assignees that shall assume such obligations (which assignees may be other Lenders, if such Lenders accept such assignment); provided that:

(i)     Borrower shall have paid to the Administrative Agent the assignment fee specified in Clause 11.3 (*Assignability*) or the Administrative Agent shall have waived receipt of such fee in writing;

(ii)    such replaced Lender shall have received payment of an amount equal to the outstanding principal of its Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under its Note (including any amounts under Clauses 2.5(b)(*Payment and Prepayment of Loans*), 2.11(*Breakage Costs*) and 2.15 (*Indemnity for Taxes*)) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrower (in the case of all other amounts);

(iii)   in the case of any such assignment resulting from a claim for compensation under payments required to be made pursuant to Clause 2.15 (*Indemnity for Taxes*), such assignment will result in a reduction in such compensation or payments thereafter;

(iv)    the assignee shall be an Eligible Assignee and shall agree to accept such assignment and to assume all obligations of such Lender hereunder in accordance with Clause 11.3 (*Assignability*);

(v)     any such replacement shall not be deemed to be a waiver of any rights that any party shall have against any other party;

(vi)    in the case of any such assignment of a Non-Renewing Committed Lender under Clause 2.16 (*Extension of Scheduled Commitment Facility Termination Date*), the assignee's Scheduled Commitment Facility Termination Date shall be the same as the remaining Committed Lenders;

(vii)   the consent of any Non-Renewing Committed Lender to any such assignment shall not be required; and

(viii)  such assignment does not conflict with applicable law.

Upon compliance with the provisions of this Clause 11.20, (I) the replacement Lender or Lenders shall each become a Lender hereunder and shall appoint a Funding Agent or Funding Agents for their respective Lender Groups and (II) the Lender so replaced shall cease to constitute a Lender hereunder, the Funding Agent for the replaced Lender's Lender Group shall cease to be a Funding Agent hereunder, and the other Lenders in the replaced Lender's Lender Group shall cease to be Lenders hereunder. A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

TRIBUNE RECEIVABLES, LLC,
as Borrower

By: _____

Name:  Brian F. Litman
Title:    Assistant Treasurer


TRIBUNE COMPANY,
as Servicer

By: _____

Name: Chandler Bigelow III
Title:   Senior Vice President/Chief Financial Officer

*Receivables Loan Agreement*

**BARCLAYS BANK PLC,**
as Administrative Agent

By: _____
Name:        Pierre Duleyrie
Title:           Director

**BARCLAYS BANK PLC,**
as a Funding Agent for the Class A Loans

By: _____
Name:        Pierre Duleyrie
Title:           Director

**SHEFFIELD RECEIVABLES CORPORATION,**
as a Committed Lender and a Conduit Lender for the Class
A Loans

By: _____
Name:
Title:        Fouad S. Onbargi
                    Director

## SCHEDULE 1
## LENDER GROUPS

### CLASS A LOANS

| Lender Group | Funding Agent | Committed Lender(s) | Conduit Lender(s) | Program Manager(s) | Funding Agent's Account | Class A Commitment |
|---|---|---|---|---|---|---|
| Barclays Class A Lender Group | Barclays Bank PLC | Sheffield Receivables Corporation | Sheffield Receivables Corporation | | | $300,000,000 |
| | | | | | | |

Schedule 1-1

5209577 08059699

**SCHEDULE 2**
**ADDRESS AND NOTICE INFORMATION**

If to the Borrower:

> Tribune Receivables, LLC
> 435 N. Michigan Avenue, 6th Floor
> Chicago, IL 60611
> Attention:  General Counsel
> Telecopy:  (312) 222-4206

If to the Servicer:

> Tribune Company
> 435 N. Michigan Avenue, 6th Floor
> Chicago, IL 60611
> Attention:  General Counsel
> Telecopy:  (312) 222-4206

If to the Administrative Agent:

> Barclays Bank PLC
> 200 Park Avenue – 5th Floor
> New York, NY  10166
> Attention:  Hong Zhao
> Telecopy:  (212) 412-6846

## SCHEDULE 3
## CREDIT AND COLLECTION POLICIES

TRIBUNE COMPANY
FINANCE SERVICE CENTER
CREDIT AND COLLECTIONS POLICY

### OBJECTIVE AND MISSION

This objective of the credit and collections policy of the Finance Service Center of Tribune Company is to carry an investments in accounts receivable and bad debt expense at a lower level than industry peers while exhibiting flexibility in risk management to allow for the maximization of advertising sales. This must be accomplished in an environment, which recognizes that market conditions and business unit cultures vary from location to location.

### CREDIT GRANTING

The granting of credit is the first step in an effective Credit and Collections policy. It is the goal of the credit department to grant credit to as many advertisers as possible and find ways to enable the customer to pay within the terms of the individual business unit. The credit department strives to complete credit decisions on a timely basis and reach a decision within an average of 3 business days. Credit granting for commercial accounts should be based on a customer's liquidity, how they pay their obligations in general and most importantly, how they pay other media.

All accounts are cash-with-order until credit is, approved. In order to establish credit accounts must submit credit information before running ads on a credit basis. The preferable form for credit information is a credit application from the business unit at which the advertiser wishes to run. If an account wishes to run on credit without a credit application, as is often the case with public or well-known companies, information must still be supplied to the credit department of the Finance. Service Center. This information can take the form of an information packet provided by the advertiser, an annual report to stockholders or, in the case of an ad agency, an insertion order form delineating the liability relationship between the paper, the client and an agency. Agencies and advertisers granted credit at one business unit and meeting obligations in a timely fashion, should be accorded credit terms at all other business units handled by the Finance Service Center.

Good credit decisions are based on the judgment of the credit analyst, the commercial credit rating of the liable party (D&B rating etc.) and the market conditions affecting the advertiser and their market. At the Finance Service Center, a decision tree (attached) is used to facilitate the making of credit decisions. This concept looks at specific attributes of the advertiser and once the applicant has passed certain tests, credit is granted without further work being performed. This approach saves time and expenses in the credit granting process while still producing sound credit decisions. Accounts not qualifying under the tree should not be dismissed as bad risks and

should still be considered for credit based on other factors. Special care should be exercised when considering accounts under a year old and accounts in certain high risk categories such as restaurants, bars etc. These are generally cash-with copy until a reasonable track record of over one year in business is established. Information from sales representatives handling an account should be given weight in cases of new accounts and personal and corporate guarantees are tools to be considered when risk needs to be mitigated.

Once a credit decision has been reached, the customer and the associated sales representative handling the advertising, are notified of the outcome. This should be done in the form of a letter sent to the advertiser and a report sent to the sales staff. This action should be performed the day the credit decision is reached. On deadline situations the sales representative may wish or need to be notified of the decision immediately. In these cases a telephone call or e-mail should be used in addition to the letter sent to the advertiser.

CREDIT CONTROLS

When a new advertiser is acquired by a business unit an Account Master Record is input by the Ad Order Entry Department and a Credit Master is established when the first Insertion Order is input into the system. All new Credit Masters are automatically established by the system with a Status = New, a Credit Limit $1.00 and an Operator ID Blank. These- conditions insure that the Credit Master of the account will be sent, on-line/real time, to a Credit Queue monitored by the appropriate Credit Analyst when the first ad is ordered. It is the responsibility of the sales person to secure cash with copy for the ad or establish credit for the account prior to the first ad running.

Once an account is opened on a credit basis, it is assigned a credit limit in ADMARC. Additionally, the Status of the account is changed to Blank and an Operator ID is assigned to the appropriate collector to manage the account going forward. If the account is denied credit the Credit Limit remains at $1.00, the Status is changed to CASH, and the Operator ID is changed to that of the appropriate Cash with Copy Collector.

CREDIT LIMITS

Credit Limits are a part of the ADMARC system and a numerical value is required in the Credit Limit field in ADMARC to make the system function. As a matter of policy and practice, Credit Limits should be used only as a general guideline, based on the advertising expenditure the customer projects he/she will spend with the business unit. Credit Limits should not be rigid and inflexible, as is often the case in banking or consumer finance. If a customer that has been granted credit exceeds their credit limit on a regular basis and is a customer who pays their obligations promptly, the collector assigned to the account should raise the limit to accommodate approximately 2 times the highest monthly expenditure the customer has made within the past year. This will prevent Credit Masters for over limit accounts from overloading the Hold Queues used by collectors to manage credit review and ad release for past due accounts. This philosophy is based on the, idea that incremental charges for advertising which are over limit but current risk only incremental newsprint and ink. While there is opportunity risk here, it is not the same as banking or postage for direct mail where the incremental investment is real money in the amount of the balance over the credit limit.

## AGENCY/CLIENT LIABILITY AND BILLING

The question of Sole/Sequential/Dual liability is one the credit department must evaluate regularly. It is the general practice for the credit department to ask an advertising agency for sole liability, that is, the agency is held solely liable for payment regardless of whether the advertiser has paid the agency or not. This is usually true with the local agencies handling Automotive, Recruitment, or Real Estate accounts, but more agencies including the members of the Four A's (AAAA) are moving to sequential liability.

Some agencies wish to use Sequential Liability, which encompasses wording on the insertion order stating that the agency is "solely liable for payment to the extent that the advertiser has paid the agency". In this type of arrangement the agency pays for the ads if and when they have been paid. The FSC, and in many cases the sales force, have no relationship with the client and the ultimate credit and collection of the account is surrendered to the agency. This is generally not acceptable to the Credit Department and is only accommodated in some instances. The risk associated with agency default has been less than our overall bad debt of .05% of revenue.

The third type of liability arrangement is usually seen in Florida and is called care-of billing. In this case the bills are sent to the agency for review but the check is cut by the client, (as opposed to sequential liability where the check is cut by the agency). This type of billing is confusing because it requires a different account for the advertiser for each billing entity and when an advertiser changes agencies the receivables can become co-mingled. Still, the collection department can initiate collection activity with the client since the credit is in the client's name.

## COMMERCIAL COLLECTIONS

### TERMS OF SALE

While one objective of the Credit Department is to grant credit to as many advertisers as possible, it is imperative that payments for ads running on a credit basis be kept within the terms of sale of each individual business unit. These terms of sale and the associated practices to enforce them have grown up over time in each local market, however they all have one thing in common, all are based on an attempt by the individual papers to be paid within 30 days or less after billing.

The published terms of sale for commercial advertising for the various newspaper-publishing units of Tribune Company are as follows:

| | |
|---|---|
| Chicago Tribune | Due 15 Days After Bill Date. |
| Orlando Sentinel | Due 25 Days After Bill Date |
| Sun Sentinel | Due 25 Days After Bill Date |
| Daily Press | Due 25 Days After Bill Date. |
| Hoy | Due 15 Days After Bill Date |
| Chicago Magazine | Net 30 |
| Chicagoland Pub. | 2% 10 Days Net 30 |

At each of the newspaper business units the terms of sale are enforced and all customers are asked to pay within 30 days or risk having further advertising refused. No individual advertiser or advertising agency is allowed to enjoy terms of sale not enjoyed by others.

The one exception to newspaper standard terms of sale is when Advertising Networks are involved. National Newspaper Network (NNN), Florida Newspaper Advertising Network (FNAN) in which the papers have an investment, and certain state or regional press associations in which the papers are members, are allowed to pay the paper once they have been paid by the customer. This same practice also can be accorded to other private networks such as the American Newspaper Network (ANN) if it is in the best interest of the paper to do so.

COLLECTION PROCEDURES

Collections at the Finance Service Center are primarily telephone collections.

The commercial collection staff is divided into groups or teams organized around business units or types of customers. There is a team of collectors dedicated to all ad agencies since one contact can handle all FSC newspapers. There is a team of 2 collectors dedicated to cash-with-order accounts at all FSC papers since this one type of business can be segregated by practices. There are 4 teams dedicated to direct, credit business at the papers as follows: Chicago 3, Orlando 3, Ft Lauderdale 3, Forum Publishing 2, Newport News 2. These teams also handle the collection of Hoy, Chicago Magazine, and Chicagoland Publishing accounts.

While the timing of collection actions may vary from business unit to business unit depending on p practices and stated terms, the general tool of collections is the telephone call. Calls are made td accounts 30 days old or older at the first two weeks of the month in an attempt to secure payment o resolve discrepancies for outstanding items. Between the 15th and 25th of the month the collectors switch their efforts to current balances and make courtesy calls to make sure current balances are se for payment and due to arrive before the end of the month. This proactive calling helps prevent accounts from becoming past due in the first place and helps prevent the need to defend preference payments in the event of a late payment on an account which has filed for protection under the bankruptcy act. If an account promises payment the appropriate Credit Master is dated out for review using the Review Queue in ADMARC. This is an automatic Up File, which reminds the collectors o what is due to be done each day. If a customer breaks promises to pay he establishes a track record which the collector should use to determine if ads could be run for a customer once a promise of payment is extricated.

HOLD QUEUES AND CLASSIFIED FRONT END SYSTEMS

The second collection tool available to the Commercial Collectors is the availability of the Hold Queue in ADMARC and Credit Queues/Baskets in the classified systems. All credit authorizations are done on an exception processing system at the FSC. If an account has a balance 30 days old or older it's Credit Master is flagged and put into a queue to be worked by the collector prior to deadline. This practice requires the collector to call the customer and set up a payment or promise of payment before the new ad can be released to run. This is a very effective method of collections because the customer is very receptive to making payment when

another ad is desired. All queues at the FSC are not fatal, that is, they require positive action to prevent an ad from running.

This way ads are not held up as a result of someone not acting on a queue.

OUTSIDE PLACEMENTS FOR COLLECTIONS

Regardless of how persistently a collector pursues an account, some advertisers can or will not pay for ads placed on credit. When this becomes apparent, usually between 45 and 75 days, an account should be referred to a third party for outside collection activity before it is too old to promise any recovery. Accounts placed for collection are generally placed with a commercial collection agency, which will infer that if the balance is not paid legal action, will be taken. The intervention by a third party often has the effect of bringing about collection of the account because the advertiser realizes the Credit Department is serious about collecting the obligation. In some instances, the account will be forwarded directly to an attorney for litigation if that is the appropriate thing to do. In the case of a bankruptcy, the claim form should be filled out by the Collection Coordinator and filed with the appropriate Bankruptcy Court. At this point, the account should be written of to the reserve for bad debts. All other accounts placed for collection are written off at time of placement.

TRANSIENT

Transient advertising makes up 10 to 11% of newspaper advertising at Tribune Company newspapers yet it accounts for the majority or the bad debts experienced by those newspapers. This is true of the newspaper industry in general. That is why most Private Party Classified advertising has moved to prepayment. All other Transient advertising is based on the principle that we limit exposure to bad debts through large numbers of customers, frequent billing, and assertive collections and through a finite credit limit.

The Credit Limit for Transient advertising at all newspapers is $500.00 except for Help Wanted/Recruitment, which is $1,500 at Daily Press, $2,500 in Ft Lauderdale and Orlando and $3.500 at Chicago Tribune. Customers may place ads, up to this amount, provided they have a phone number for billing purposes and have not balance over 30 days old.

Terms of payment for Transient advertising are "Due Upon Receipt Of. Invoice" and ads are billed once a week, on Sunday, for all ads run from the previous

Monday through the bill date. All bills are mailed each Monday. Accounts with a balance 30 days old or older are considered delinquent.

Delinquent accounts are aged in ADMARC and the phone number of the

advertiser is passed to the classified system at the newspaper and entered in the "Bad Phone File" in the system. All ads are passed against this file when taken and if the billing phone number of the ad is found in the bad phone file, the ad is placed in a credit queue for review by a collector. Accounts over the established credit limit are also queued in the same manner.

Credit review of accounts is accomplished by calling up the ads from the credit queue and reviewing the ad to see the copy. The customer's account from ADMARC should also be called up to see how long the account has been delinquent, the amount the account is over the credit limit, and how the account has paid in the past.

Once the above steps have been taken the account should be called by the collector and the account asked to pay. The offer of taking payment over the phone by a credit card should be made or the customer should take payment to the newspaper prior to deadline to get the ad into publication. Accounts running some time and having an established track record of payment may be allowed to run on the promise of a payment but these should be followed up by the collector using the review queue function in ADMARC. If in doubt, the collector should hold the ad from publication until the account is settled.

Accounts not paying within 90 to 120 days are charged of to bad debts and placed with a collection agency for attention. These remain in the bad phone file of the classified system at the newspaper to flag any future ads to prevent further losses.

## DECISION TREE

1.    Extend a line of credit based o the current D&B rating.

| D&B Rating | Credit Limit |
| --- | --- |
| 5A1-5A2 | 200,000 |
| 4A1-4A2 | 150,000 |
| 3A1-3A2 | 100,000 |
| 2A1-2A2 | 75,000 |
| 1A1-1A2 | 50,000 |
| BA1-BA2 | 30,000 |
| BB1-BB2 | 20,000 |
| CB1-CB2 | 10,000 |

In the absence of the above ratings the guidelines will be as follows:

2.    A line of credit up to $150,000 may be extended on a full D&B report.

3.    In the absence of a D&B report, a credit limit may be extended based on two satisfactory media references

4.    In the absence of a D&B rating, D&B report or trade references, a line of credit (based on requirements) may be extended on a bank reference, personal credit report, and guaranty.

5.    Customer has a line of credit with another Tribune property.

6.    Opened at credit manager's discretion.

7.    A line of credit based on requirements may be extended to transient accounts with a satisfactory six month payment history.

8.  A line of credit (based on requirements) may be extended based on a corporate guaranty for a company that has established credit.

9.  Credit may be extended based on an irrevocable letter of credit when there is unsatisfactory or a lack of credit information.

10. In the absence of a D&B report and media references, a line of credit as required may be extended based on two satisfactory references (reporting prompt payment histories).

11. Customer signed an agreement to abide by our terms.

12. In the absence of a D&B rating, a business that has been in existence for at least one year and can provide one credit reference showing a prompt pay history for one year or longer may be extended a credit limit up to $1,000, provided no additional references can be obtained.

13. A line of credit may be extended to a cash-with-order accounts based on a satisfactory six-month prepayment history.

Courtesy Lines On Commercial Accounts:

A courtesy line of $3,500 may be extended to an account in order to run Redeye recruitment ads.

A courtesy line of $5,000 may be extended to Chicago Magazine account provided that billed exposure does not exceed that amount.

One Time Passes - Additional Ads Revert To Cash With Order

A one-time pass can be given in any publication to a customer whose schedule is valued at less than $500, such as Dinner Banner ads.

A. one-time pass can be given to new advertisers for town sections and other special sections provided the value of the ad is less than $1,500.

A one-time pass up to the Transient Recruitment limits for each newspaper for Display and Classified ads.

Passes may be given when needed for job fair packages up to $1,000.

**SCHEDULE 4**
**CONDITION PRECEDENT DOCUMENTS**

PART I:      Principal Closing Documents

     1.      Executed copies of the Receivables Purchase Agreement, duly executed by the parties thereto.

     2.      Executed copies of the Agreement, duly executed by the parties thereto.

     3.      Executed copies of the Servicing Agreement, duly executed by the parties thereto.

     4.      Executed copies of the Account Control Agreements with Bank of America and JPMorgan Chase Bank, N.A., duly executed by the parties thereto.

     5.      Executed copies of the Lockbox Agreement(s), duly executed by the parties thereto.

     6.      Executed copies of the Security Agreement, duly executed by the parties thereto.

     7.      Fee Letter

PART II:      Corporate Documents

     8.      Copy of the Resolutions of the Board of Directors of each Originator certified by its Secretary, authorizing execution, delivery and performance of the Receivables Purchase Agreement and other documents to be delivered thereunder, and, in the case of Tribune, stating that Borrower is not a "Restricted Subsidiary" for purposes of any existing indenture (and making any other designation required for execution of the Receivables Purchase Agreement under any existing indenture).

     9.      Articles or Certificate of Incorporation or formation of each Originator certified by the Secretary of State of the jurisdiction of incorporation or organization on or within thirty (30) days prior to the initial Loan.

     10.      Current Bylaws or Limited Liability Company Agreement for each Originator.

     11.      Good Standing Certificate for each Originator issued by the Secretaries of State of its state of incorporation or organization on or within thirty (30) days prior to the initial Loan (as defined in the Receivables Purchase Agreement) as listed on Exhibit II (*Places of Business; Jurisdiction of Organization; Organizational Numbers; Other Names*) to the Receivables Purchase Agreement.

     12.      Officer's Certificate of each Originator certifying its charter documents and the names and signatures of the officers authorized on its behalf to execute the Receivables Purchase Agreement and other documents.

13.    Copy of the Resolutions of the Board or Directors of the Borrower certified by its Secretary authorizing such person's execution, delivery and performance of the Receivables Loan Agreement and the other documents to be delivered thereunder.

14.    Certificate of Formation of the Borrower certified by the Secretary of State of its jurisdiction of organization on or within 30 days prior to the initial Loan.

15.    Limited Liability Company Agreement of Borrower.

16.    Good Standing Certificate for the Borrower issued by the Secretaries of State of its jurisdiction of organization and where it has material operations on or within 30 days prior to the initial Purchase.

17.    Officer's Certificate of the Borrower certifying its charter documents, the names and signatures of the officers authorized on its behalf to execute the Receivables Loan Agreement and any other documents to be delivered by it hereunder.

18.    Officer's certificate of the Borrower certifying that (i) the conditions precedent to the initial Loans have been satisfied and (ii) no Facility Event has occurred and is continuing.

PART III:    Legal Opinions

19.    A favorable opinion of legal counsel for each Transaction Party acceptable to Administrative Agent (or its assigns) which addresses the following matters and such other matters as Administrative Agent (or its assigns) may request:

--    Each Transaction Party is a limited liability company or corporation, as applicable, duly organized or incorporated, validly existing, and in good standing under the laws of its state of organization or incorporation.

--    Each Transaction Party has all requisite authority to conduct its business in each jurisdiction where failure to be so qualified would have a material adverse effect on each Transaction Party's business.

--    The Borrower is not required to be registered as an "investment company" as defined in the Investment Company Act of 1940.

--    The execution and delivery by each Transaction Party of the Receivables Purchase Agreement and each other Transaction Document to which it is a party and its performance of its obligations thereunder have been duly authorized by all necessary organizational or corporate action and proceedings on the part of each Transaction Party and will not:

(a)    require any action by or in respect of, or filing with, any governmental body, agency or official (other than the filing of UCC financing statements);

(b)    contravene, or constitute a default under, any provision of applicable law or regulation or of its articles or certificate of incorporation or bylaws or of any agreement,

judgment, injunction, order, decree or other instrument binding upon any Transaction Party; or

(c)      result in the creation or imposition of any Adverse Claim on assets of any Originator or any of its Subsidiaries (except as contemplated by the Receivables Purchase Agreement).

--      The Receivables Purchase Agreement and each other Transaction Document to which it is a party has been duly executed and delivered by each Transaction Party and constitutes the legal, valid, and binding obligation of each Transaction Party enforceable in accordance with its terms, except to the extent the enforcement thereof may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject also to the availability of equitable remedies if equitable remedies are sought.

--      The provisions of the Receivables Purchase Agreement are effective to create a valid security interest in favor of Borrower in all Receivables and upon the filing of financing statements, Borrower shall acquire a first priority, perfected security interest in such Receivables and the provisions of this Agreement are effective to create a valid security interest in favor of the Administrative Agent, and upon the filing of financing statements, the Administrative Agent shall acquire a first priority, perfected security interest in such Receivables.

--      To the best of the opinion giver's knowledge, there is no action, suit or other proceeding against each Transaction Party or any Affiliate of each Transaction Party, which could materially adversely affect the business or financial condition of each Originator and its Affiliates taken as a whole or which would adversely affect the ability of any Transaction Party to perform its obligations under the Receivables Purchase Agreement.

20.      A "true sale" opinion and "substantive consolidation" opinion of counsel for each Transaction Party with respect to the transactions contemplated by the Receivables Purchase Agreement.

21.      [Reserved].

PART IV: UCC MATTERS

22.      Pre-filing state and federal tax lien, judgment lien and UCC lien searches against Borrower and each Originator in their respective jurisdictions of organization and such other jurisdictions as may be necessary in the opinion of the Administrative Agent.

23.      Time stamped receipt copies of proper UCC termination statements, if any, necessary to release all security interests and other rights of any Person in the Receivables, Contracts or Related Security previously granted by Borrower or any Originator.

24.      Copies of proper financing statements, in a form suitable for filing under the UCC on or before the date of the initial Purchase (as defined in the Receivables Purchase Agreement)

in all jurisdictions as may be necessary or, in the opinion of Administrative Agent (or its assigns), desirable, under the UCC of all appropriate jurisdictions or any comparable law in order to perfect the security interests contemplated by the Receivables Loan Agreement.

25.     Copies of proper financing statements, in a form suitable for filing under the UCC on or before the date of the initial Purchase (as defined in the Receivables Purchase Agreement) in all jurisdictions as may be necessary or, in the opinion of Administrative Agent (or its assigns), desirable, under the UCC of all appropriate jurisdictions or any comparable law in order to perfect the ownership interests contemplated by the Receivables Purchase Agreement.

26.     Post-filing UCC lien searches against the Borrower and each Originator.

PART V:     Miscellaneous Closing Documents

27.     Executed copies of (i) all consents from and authorizations by any Persons and (ii) all waivers and amendments to existing credit facilities, that are necessary in connection with the Transaction Documents.

28.     Executed copies of the Intercompany Note by Borrower in favor of Parent.

29.     A Compliance Certificate with initial Monthly Report and Interim Report.

30.     Withholding Tax Forms such as W-9 or W8 BEN.

31.     Copies of S Corporation or qualified subchapter S subsidiary, as applicable, election(s) of Originators, filed with the Internal Revenue Service.

## SCHEDULE 5
## FACILITY ACCOUNTS AND ACCOUNT BANKS

| Bank | Account Name | Legal Name | Account Number | Lockbox Number and Address |
|------|-------------|-----------|----------------|---------------------------|
| Bank of America | WGN Continental Broadcasting Company | WGN Continental Broadcasting Company | 8188303406 | No Lockbox |
| Bank of America | Los Angeles Times Communications LLC, as sub-servicer for Tribune Receivables, LLC | Los Angeles Times Communications LLC | 8188508912 | File 51163 Los Angeles, CA 90074<br><br>File 54221 Los Angeles, CA 90074 |
| Bank of America | Los Angeles Times Communications LLC, as sub-servicer for Tribune Receivables, LLC | Los Angeles Times Communications LLC | 8188508917 | No Lockbox |
| Bank of America | Chicago Tribune Company, as sub-servicer for Tribune Receivables, LLC | Chicago Tribune Company | 8188300559 | 14889 Collections Center Dr. Chicago, IL 60693<br><br>14839 Collections Center Dr. Chicago, IL 60693 |

| | | | | |
|---|---|---|---|---|
| Bank of America | Sun Sentinel Company, as sub-servicer for Tribune Receivables, LLC | Sun Sentinel Company | 8188602665 | P.O. Box 100621 Atlanta, GA 30384 |
| | | | | P.O. Box 100606 Atlanta, GA 30384 |
| Bank of America | Forum Publishing Group, Inc., as sub-servicer for Tribune Receivables, LLC | Forum Publishing Group, Inc. | 8188911286 | P.O. Box 100773 Atlanta, GA 30384 |
| | | | | P.O. Box 100641 Atlanta, GA 30384 |
| Bank of America | Forum Publishing Group, Inc., as sub-servicer for Tribune Receivables, LLC | Forum Publishing Group, Inc. | 8188911285 | No Lockbox |
| Bank of America | Orlando Sentinel Communications Company, as sub-servicer for Tribune Receivables, LLC | Orlando Sentinel Communications Company | 8188702556 | P.O. Box 100630 Atlanta, GA 30384 |
| | | | | P.O. Box 100608 Atlanta, GA 30384 |
| | | | | P.O. Box 100606 Atlanta, GA 30384 |
| Bank of America | Orlando Sentinel Communications Company, as sub-servicer for Tribune Receivables, LLC | Orlando Sentinel Communications Company | 8188502557 | No Lockbox |

| | | | | |
|---|---|---|---|---|
| Bank of America | The Hartford Courant Company, as sub-servicer for Tribune Receivables, LLC | The Hartford Courant Company | 8188316178 | P.O. Box 40215 Hartford, CT 06150 |
| Bank of America | The Daily Press, Inc., as sub-servicer for Tribune Receivables, LLC | The Daily Press, Inc. | 8188108438 | P.O. Box 100634 Atlanta, GA 30384 |
| | | | | P.O. Box 100611 Atlanta, GA 30384 |
| | | | | P.O. Box 100790 Atlanta, GA 30384 |
| Bank of America | The Daily Press, Inc., as sub-servicer for Tribune Receivables, LLC | The Daily Press, Inc. | 8188202785 | No Lockbox |
| Bank of America | The Morning Call, Inc., as sub-servicer for Tribune Receivables, LLC | The Morning Call, Inc. | 8188507187 | P.O. Box 3226 Boston, MA 02241-3226 |
| Bank of America | The Morning Call, Inc., as sub-servicer for Tribune Receivables, LLC | The Morning Call, Inc. | 8188413099 | No Lockbox |
| Bank of America | The Baltimore Sun Company, as sub-servicer for Tribune Receivables, LLC | The Baltimore Sun Company | 8188507229 | P.O. Box 3132 Boston, MA 02241 |
| | | | | P.O. Box 415215 Boston, MA 02241 |

| | | | | |
|---|---|---|---|---|
| Bank of America | Tribune Interactive, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Interactive, Inc. | 8188611051 | 14891 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | KTLA Inc., as sub-servicer for Tribune Receivables, LLC | KTLA Inc. | 1233254161 | File 11155 Los Angeles, CA 90074 |
| Bank of America | WGN Continental Broadcasting Company, as sub-servicer for Tribune Receivables, LLC | WGN Continental Broadcasting Company | 8188503165 | 98473 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | WGN Continental Broadcasting Company, as sub-servicer for Tribune Receivables, LLC | WGN Continental Broadcasting Company | 8188303166 | 98519 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | KHCW Inc., as sub-servicer for Tribune Receivables, LLC | KHCW Inc. | 1233071096 | P.O. Box 843744 Dallas, TX 75284 |
| Bank of America | WDCW Broadcasting, Inc., as sub-servicer for Tribune Receivables, LLC | WDCW Broadcasting, Inc. | 3751844428 | 22264 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | Tribune Television Northwest, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Television Northwest, Inc. | 1233930374 | File 30697 P.O. Box 60000 San Francisco, CA 94160 |
| Bank of America | KPLR, Inc., as sub-servicer for Tribune Receivables, LLC | KPLR, Inc. | 8188015453 | 12848 Collections Center Dr. Chicago, IL 60693 |

| Bank of America | WTIC-TV, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company | 8188912658 | 3562 Collections Center Dr. Chicago, IL 60693 |
|---|---|---|---|---|
| Bank of America | Tower Distribution Company, as sub-servicer for Tribune Receivables, LLC | Tower Distribution Company | 8188313245 | 5980 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | KSWB Inc., as sub-servicer for Tribune Receivables, LLC | KSWB Inc. | 1233322094 | File 749011 Los Angeles, CA 90074 |
| Bank of America | Tribune Broadcast Holdings, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Broadcast Holdings, Inc. | 8188015458 | File 30691 P.O. Box 60000 San Francisco, CA 94160 |
| Bank of America | KWGN Inc., as sub-servicer for Tribune Receivables, LLC | KWGN Inc. | 8188507243 | 15188 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | Tribune Television Company, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company | 8188507200 | 15190 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | Channel 39, Inc., as sub-servicer for Tribune Receivables, LLC | Channel 39, Inc. | 8188507224 | P.O. Box 277122 Atlanta, GA 30384 |
| Bank of America | Channel 40, Inc., as sub-servicer for Tribune Receivables, LLC | Channel 40, Inc. | 8188507182 | File 51150 Los Angeles, CA 90074 |

Schedule 5-5

| | | | | |
|---|---|---|---|---|
| Bank of America | Tribune Television Company, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company | 8188507205 | 15247 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | Tribune Television Holdings, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Television Holdings, Inc. | 8188509020 | 15252 Collections Center Dr. Chicago, IL 60693 |
| JPMorgan Chase Bank | WPIX, Inc., as sub-servicer for Tribune Receivables, LLC | WPIX, Inc. | 9102470128 | No Lockbox |
| JPMorgan Chase Bank | WPIX, Inc., as sub-servicer for Tribune Receivables, LLC | WPIX, Inc. | 5261740 | 13831 Brooklyn, NY |
| JPMorgan Chase Bank | WGN Continental Broadcasting Company, as sub-servicer for Tribune Receivables, LLC | WGN Continental Broadcasting Company | 323383009 | 26918 Brooklyn, NY |
| JPMorgan Chase Bank | Tribune Television Company, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company (KDAF) | 1887512059 | 970585 Dallas, Tx |
| JPMorgan Chase Bank | Tribune Television Company, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company (WXIN) | 193078128 | 663698 Indianapolis, IN |
| JPMorgan Chase Bank | Tribune Television New Orleans, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Television New Orleans, Inc. | 110293568 | 62019 New Orleans, LA |
| JPMorgan Chase Bank | Chicagoland Television News, Inc., as sub-servicer for Tribune Receivables, LLC | Chicagoland Television News, Inc. | 5257085 | 93094 Chicago, IL |

| | | | | |
|---|---|---|---|---|
| Wachovia Bank | The Morning Call, Inc. Advertising | The Morning Call, Inc. | 20000303723529 | No Lockbox |
| M&T Bank | Baltimore Sun Advertising | The Baltimore Sun Company | 17795065 | No Lockbox |
| Wachovia Bank | Forum Publishing Group Inc. Credit Card | Forum Publishing Group, Inc. | 2090002084485 | No Lockbox |
| Suntrust Bank | Sun-Sentinel Advertising | Sun Sentinel Company | 401000390550 | No Lockbox |
| Mellon Bank | The Hardford Courant Credit Card | The Hartford Courant Company | 178-2649 | No Lockbox |
| Union Bank | KTXL-TV | Channel 40, Inc. | 750410022 | No Lockbox |
| National City Bank | WPHL-TV | Tribune Television Company | 0935-025 | No Lockbox |
| Suntrust Bank | WSFL-TV | Channel 39, Inc. | 418006046781 | No Lockbox |
| **Borrower Concentration Accounts** | | | | |
| Bank of America | Tribune Receivables LLC | Tribune Receivables, LLC | 8188509303 | No Lockbox |
| JPMorgan Chase Bank | Tribune Receivables, LLC | Tribune Receivables, LLC | 754223311 | No Lockbox |

Schedule 5-7

**SCHEDULE 6**
**[RESERVED]**

Schedule 6-1

## SCHEDULE 7
## CERTAIN DEFINED TERMS

Unless otherwise defined in this Agreement, each term used in this Schedule 7 that is defined in the Senior Credit Agreement shall have the meaning given in the Senior Credit Agreement as in effect on the date hereof, as modified by the Approved Amendments.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Lease Obligations) by Tribune and its Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on a consolidated statement of cash flows of Tribune and its Subsidiaries; provided that the term "Capital Expenditures" shall not include (i) with respect to any purchase or acquisition of all of the Equity Interests of a Person or all or substantially all of the property or assets of a Person or business line of a Person, (x) the purchase price thereof and (y) any Capital Expenditures expended by the seller or entity to be acquired in connection with such purchase or acquisition prior to the date thereof, (ii) expenditures constituting part of a Permitted Disposition Transaction, (iii) the purchase of the TMCT Real Property, (iv) expenditures of insurance proceeds to rebuild or replace any asset, (v) leasehold improvement expenditures for which Tribune or a Subsidiary is reimbursed by the lessor, sublessor or sublessee and (vi) expenditures of proceeds (including Net Cash Proceeds) of any asset sale permitted under Section 5.02(e) of the Senior Credit Agreement

"**Interest Coverage Ratio**" means, for any Test Period, a ratio of Consolidated EBITDA of Tribune and its Subsidiaries for such period to Cash Interest Expense of Tribune and its Subsidiaries during such period.

"**Maximum Capital Expenditures**" means the amount set forth opposite such period below plus the Retained Amount:

**Period Amount (in millions)**

| Period | Amount (in millions) |
| --- | --- |
| December 26, 2007 –December 28, 2008 | $210.0 |
| December 29, 2008 – December 27, 2009 | $145.0 |
| December 28, 2009 – December 26, 2010 | $145.0 |
| December 27, 2010 and thereafter | $145.0 |

; provided, however, that if the aggregate amount of Capital Expenditures made in any fiscal year shall be less than the maximum amount of Capital Expenditures permitted hereunder for such fiscal year, then an amount of such shortfall may be added to the amount of Capital Expenditures permitted hereunder for the succeeding fiscal years.

"**Maximum Total Guaranteed Leverage Ratio**" means, as of the last day of any Test Period in effect during any period in the table below, the ratio set forth opposite such period in the table below:

| Test Period | | | Total Guaranteed Leverage Ratio |
|---|---|---|---|
| Closing Date | - | December 28, 2008 | 9.00 to 1.0 |
| December 29, 2008 | - | December 27, 2009 | 8.75 to 1.0 |
| December 28, 2009 | - | December 26, 2010 | 8.50 to 1.0 |
| December 27, 2010 and thereafter | | | 8.25 to 1.0 |

"**Minimum Interest Coverage Ratio**" means for any Test Period in effect during any period in the table below, the ratio set forth opposite such period in the table below:

| Test Period | | | Interest Coverage Ratio |
|---|---|---|---|
| Closing Date | - | December 28, 2008 | 1.15 to 1.0 |
| December 29, 2008 | - | December 27, 2009 | 1.20 to 1.0 |
| December 28, 2009 and thereafter | | | 1.25 to 1.0 |

"**Test Period**" means, for any determination hereunder, the four consecutive fiscal quarters most recently then last ended.

"**Total Guaranteed Leverage Ratio**" means, at any date, the ratio of (x) the aggregate principal amount of Debt for Borrowed Money of Tribune that is Guaranteed by any of the Senior Credit Agreement Guarantors and the aggregate principal amount of Debt for Borrowed Money of the Senior Credit Agreement Guarantors (on a consolidated basis) to (y) EBITDA for the period of four fiscal quarters most recently then ended.

Schedule 7-2

## SCHEDULE 8
## FISCAL MONTHS

| | M | T | W | TH | F | SA | SU |
|---|---|---|---|---|---|---|---|
| **Fiscal 2008** | | | | | | | |
| | 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| **1** | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27* |
| | 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| **2** | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 18 | 19 | 20 | 21 | 22 | 23 | 24* |
| | 25 | 26 | 27 | 28 | 29 | 1 | 2 |
| | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| **3** | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| | 24 | 25 | 26 | 27 | 28 | 29 | 30* |
| | 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| **4** | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27* |
| | 28 | 29 | 30 | 1 | 2 | 3 | 4 |
| **5** | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25* |
| | 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| **6** | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| | 23 | 24 | 25 | 26 | 27 | 28 | 29* |
| | 30 | 1 | 2 | 3 | 4 | 5 | 6 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| **7** | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27* |
| | 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| **8** | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| | 25 | 26 | 27 | 28 | 29 | 30 | 31* |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| **9** | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28* |
| | 29 | 30 | 1 | 2 | 3 | 4 | 5 |
| **10** | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 20 | 21 | 22 | 23 | 24 | 25 | 26* |
| | 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| **11** | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| | 24 | 25 | 26 | 27 | 28 | 29 | 30* |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| **12** | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28* |

* Broadcast month end

Schedule 8-1

| Fiscal 2009 | | | | | | |
|---|---|---|---|---|---|---|
| | M | T | W | TH | F | SA | SU |

| | M | T | W | TH | F | SA | SU |
|---|---|---|---|---|---|---|---|
| 1 | 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25* |
| | 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| 2 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22* |
| | 23 | 24 | 25 | 26 | 27 | 28 | 1 |
| 3 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| | 23 | 24 | 25 | 26 | 27 | 28 | 29* |
| 4 | 30 | 31 | 1 | 2 | 3 | 4 | 5 |
| | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 20 | 21 | 22 | 23 | 24 | 25 | 26* |
| 5 | 27 | 28 | 29 | 30 | 1 | 2 | 3 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 6 | 25 | 26 | 27 | 28 | 29 | 30 | 31* |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28* |
| 7 | 29 | 30 | 1 | 2 | 3 | 4 | 5 |
| | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 20 | 21 | 22 | 23 | 24 | 25 | 26* |
| | 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| 8 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| | 24 | 25 | 26 | 27 | 28 | 29 | 30* |
| 9 | 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27* |
| 10 | 28 | 29 | 30 | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25* |
| 11 | 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 12 | 23 | 24 | 25 | 26 | 27 | 28 | 29* |
| | 30 | 1 | 2 | 3 | 4 | 5 | 6 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27* |

* Broadcast month end

Schedule 8-2

| Fiscal 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **M** | **T** | **W** | **TH** | **F** | **SA** | **SU** |
| **1** | 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| | 25 | 26 | 27 | 28 | 29 | 30 | 31* |
| **2** | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28* |
| **3** | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28* |
| **4** | 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25* |
| **5** | 26 | 27 | 28 | 29 | 30 | 1 | 2 |
| | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| **6** | 24 | 25 | 26 | 27 | 28 | 29 | 30* |
| | 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27* |
| **7** | 28 | 29 | 30 | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25* |
| | 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| **8** | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| | 23 | 24 | 25 | 26 | 27 | 28 | 29* |
| **9** | 30 | 31 | 1 | 2 | 3 | 4 | 5 |
| | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 20 | 21 | 22 | 23 | 24 | 25 | 26* |
| **10** | 27 | 28 | 29 | 30 | 1 | 2 | 3 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| **11** | 25 | 26 | 27 | 28 | 29 | 30 | 31* |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| **12** | 22 | 23 | 24 | 25 | 26 | 27 | 28* |
| | 29 | 30 | 1 | 2 | 3 | 4 | 5 |
| | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 20 | 21 | 22 | 23 | 24 | 25 | 26* |

* Estimated broadcast month end

**SCHEDULE 9**
**TRANSITION EXCEPTIONS**

**Sub-Originator Facility Accounts held at a bank other than JPMorgan ("JPMorgan")**
**or Bank of America, N.A. ("BofA")**

*With respect to each account specified below, (i) only Receivables owed to the entity set forth opposite such account may be paid to such account, (ii) such account will be closed no later than the date specified opposite such account under the column "Close Date", and (iii) prior to the Closing Date, all Obligors making payment to such account shall have been instructed to make all payments to a Facility Account at JPMorgan or BofA.*

| Name of Entity | Financial Institution at which account is currently held | Account Number | Close Date |
|---|---|---|---|
| WGN Continental Broadcasting Company | Bank of America | 8188303406 | July 15, 2008 |
| The Morning Call, Inc. | Wachovia Bank | 20000303723529 | September 30, 2008 |
| The Baltimore Sun Company | M&T Bank | 17795065 | September 30, 2008 |
| Forum Publishing Group, Inc. | Wachovia Bank | 2090002084485 | September 30, 2008 |
| Sun Sentinel Company | Suntrust Bank | 401000390550 | September 30, 2008 |
| The Hartford Courant Company | Mellon Bank | 178-2649 | September 30, 2008 |
| KTXL-TV | Union Bank | 750410022 | September 30, 2008 |
| WPHL-TV | National City Bank | 0935-025 | September 30, 2008 |
| WSFL-TV | Suntrust Bank | 418006046781 | September 30, 2008 |

## SCHEDULE 10
## BROADCASTING ORIGINATORS

ChicagoLand Television News, Inc.

Tribune Broadcast Holdings, Inc.

KWGN Inc.

Tribune Television Holdings, Inc.

WGN Continental Broadcasting Company

WPIX, Inc.

Tribune Television New Orleans, Inc.

KSWB Inc.

KTLA Inc.

KHCW Inc.

Tower Distribution Company

Tribune Television Northwest, Inc.

KPLR, Inc.

Tribune Television Company

Channel 40, Inc.

Channel 39, Inc.

WDCW Broadcasting, Inc.

## SCHEDULE 11
## PUBLISHING ORIGINATORS

Tribune Interactive, Inc.

Los Angeles Times  Communications LLC

Orlando Sentinel Communications Company

Sun-Sentinel Company

Gold Coast Publications, Inc.

Forum Publishing Group, Inc.

The Daily Press, Inc.

Chicago Tribune Company

The Baltimore Sun Company

The Hartford Courant Company

The Morning Call, Inc.

EXHIBIT A

ASSIGNMENT AND ACCEPTANCE

THIS ASSIGNMENT AND ACCEPTANCE (this "**Assignment and Acceptance**") is entered into as of the ___ day of _____, ____, by and between _____ ("**Assignor**") and _____ ("**Assignee**").

PRELIMINARY STATEMENTS

A.    This Assignment and Acceptance is being executed and delivered in accordance with Clause 11.3 (*Assignability*) of that certain Receivables Loan Agreement dated as of July 1, 2008 by and among Tribune Receivables, LLC, Tribune Company, as Servicer, [Conduit], Barclays Bank PLC, as Administrative Agent, and the Lenders and Funding Agents party thereto (as amended, modified or restated from time to time, the "**Receivables Loan Agreement**") [and Section 5.5(c) of that certain Revolving Asset Purchase Agreement dated as of July 1, 2008 by and among [Conduit], the Administrative Agent and the Lenders (as amended, modified or restated from time to time, the "**RAPA**").] Capitalized terms used and not otherwise defined herein are used with the meanings set forth or incorporated by reference in the Receivables Loan Agreement [or the RAPA, as applicable].

B.    Assignor is a Lender party to the Receivables Loan Agreement [and an Assignee party to the RAPA], and Assignee wishes to become a Lender [and Assignee] under the Receivables Loan Agreement [and the RAPA], respectively; and

C.    Assignor is selling and assigning to Assignee an undivided _____% (the "**Transferred Percentage**") interest in all of Assignor's rights and obligations under the Receivables Loan Agreement, [the RAPA] and the Transaction Documents, including, without limitation, Assignor's Commitment and (if applicable) the Principal Balance of Assignor's Loans as set forth herein.

AGREEMENT

The parties hereto hereby agree as follows:

1.    The sale, transfer and assignment effected by this Assignment and Acceptance shall become effective (the "**Effective Date**") two (2) Business Days (or such other date selected by the Administrative Agent in its sole discretion) following the date on which a notice substantially in the form of Schedule II to this Assignment and Acceptance ("**Effective Notice**") is delivered by the Administrative Agent to Borrower, Assignor and Assignee. From and after the Effective Date, Assignee shall be a [Class A] [Class B] Lender party to the Receivables Loan Agreement and an APA Bank party to the APA for all purposes thereof as if Assignee were an original party thereto and Assignee agrees to be bound by all of the terms and provisions contained therein.

2.    If Assignor has no outstanding Principal Balance under the Receivables Loan Agreement, on the Effective Date, Assignor shall be deemed to have hereby transferred and assigned to Assignee, without recourse, representation or warranty (except as provided in

paragraph 6 below), and the Assignee shall be deemed to have hereby irrevocably taken, received and assumed from Assignor, the Transferred Percentage of Assignor's Commitment and all rights and obligations associated therewith under the terms of the Receivables Loan Agreement [and the RAPA], including, without limitation, the Transferred Percentage of Assignor's future funding obligations under Section 2.1 of the Receivables Loan Agreement [and Section [____] of the RAPA.]

3.      If Assignor has any outstanding Principal Balance under the Receivables Loan Agreement, at or before 12:00 noon, local time of Assignor, on the Effective Date Assignee shall pay to Assignor, in immediately available funds, an amount equal to the sum of (i) the Transferred Percentage of the outstanding Principal Balance of Assignor's Loans (such amount, being hereinafter referred to as the "**Assignee's Principal Balance**"); (ii) all accrued but unpaid (whether or not then due) Yield attributable to Assignee's Principal Balance; and (iii) accruing but unpaid fees and other costs and expenses payable in respect of Assignee's Principal Balance for the period commencing upon each date such unpaid amounts commence accruing, to and including the Effective Date (the "**Assignee's Acquisition Cost**"); whereupon, Assignor shall be deemed to have sold, transferred and assigned to Assignee, without recourse, representation or warranty (except as provided in paragraph 6 below), and Assignee shall be deemed to have hereby irrevocably taken, received and assumed from Assignor, the Transferred Percentage of Assignor's Commitment and the Principal Balance of Assignor's Loans (if applicable) and all related rights and obligations under the Receivables Loan Agreement and the Transaction Documents, including, without limitation, the Transferred Percentage of Assignor's future funding obligations under Clause 2.1 (*The Loans*) of the Receivables Loan Agreement [and Section [____] of the RAPA.]

4.      Concurrently with the execution and delivery hereof, Assignor will provide to Assignee copies of all documents requested by Assignee which were delivered to Assignor pursuant to the Receivables Loan Agreement.

5.      Each of the parties to this Assignment and Acceptance agrees that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Assignment and Acceptance.

6.      By executing and delivering this Assignment and Acceptance, Assignor and Assignee confirm to and agree with each other, the Administrative Agent and the Lenders as follows: (a) other than the representation and warranty that it has not created any Adverse Claim upon any interest being transferred hereunder, Assignor makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made by any other Person in or in connection with the Receivables Loan Agreement or the Transaction Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of Assignee, the Receivables Loan Agreement or any other instrument or document furnished pursuant thereto or the perfection, priority, condition, value or sufficiency of any collateral; (b) Assignor makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower, any Obligor, any Transaction Party or the performance or observance by the Borrower, any Obligor, any Transaction Party of any of their respective obligations under the Transaction Documents or any other instrument or document furnished

pursuant thereto or in connection therewith; (c) Assignee confirms that it has received a copy of the Receivables Loan Agreement and copies of such other Transaction Documents, and other documents and information as it has requested and deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (d) Assignee will, independently and without reliance upon the Administrative Agent, the Borrower or any other Committed Lender or Conduit Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Receivables Loan Agreement and the Transaction Documents; (e) Assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Transaction Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto; and (f) Assignee agrees that it will perform in accordance with their terms all of the obligations which, by the terms of the Receivables Loan Agreement and the other Transaction Documents, are required to be performed by it as a Committed Lender or, when applicable, as a Conduit Lender.

7.      Each party hereto represents and warrants to and agrees with the Administrative Agent that it is aware of and will comply with the provisions of the Receivables Loan Agreement, including, without limitation, Clauses 2.10 *(Tranches)* and 11.5 *(No Proceedings; No Recourse)* thereof.

8.      Schedule I hereto sets forth the revised Commitment of Assignor and the Commitment of Assignee, as well as administrative information with respect to Assignee.

9.      THIS ASSIGNMENT AND ACCEPTANCE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS.

10.      Assignee hereby covenants and agrees that, prior to the date which is one year and one day after the payment in full of all senior indebtedness for borrowed money of Borrower, it will not institute against, or join any other Person in instituting against, Borrower any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or other similar proceeding under the laws of the United States or any state of the United States.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective duly authorized officers of the date hereof.

[ASSIGNOR]


By:_____
Title:

[ASSIGNEE]

By:_____
Title:

Exhibit A-3

SCHEDULE I TO ASSIGNMENT AND ACCEPTANCE

LIST OF LENDING OFFICES, ADDRESSES
FOR NOTICES AND COMMITMENT AMOUNTS

Date: _____, _____

Transferred Percentage:        _____%

**Assignor:**

|  | A-1 | A-2 | B-1 | B-2 |
|---|---|---|---|---|
|  | Commitment (prior to giving effect to the Assignment and Acceptance) | Commitment (after giving effect to the Assignment and Acceptance) | Outstanding Principal Balance (if any) | Ratable Share of Outstanding Principal Balance |
| Class A |  |  |  |  |
| Class B |  |  |  |  |
| Total |  |  |  |  |

**Assignee:**

|  |  | A-2 | B-1 | B-2 |
|---|---|---|---|---|
|  | Commitment (prior to giving effect to the Assignment and Acceptance) | Commitment (after giving effect to the Assignment and Acceptance) | Outstanding Principal Balance (if any) | Ratable Share of Outstanding Principal Balance |
| Class A |  |  |  |  |
| Class B |  |  |  |  |
| Total |  |  |  |  |

**Address for Notices**

Attention:
Phone:
Fax:

5209577 08059699                    Exhibit A-4

SCHEDULE II TO ASSIGNMENT AND ACCEPTANCE

EFFECTIVE NOTICE

TO:    _____, Assignor

      _____

      _____

      _____


TO:    _____, Assignee

      _____

      _____

      _____


      The undersigned, as Administrative Agent under the Receivables Loan Agreement dated as of July 1, 2008 by and among Tribune Receivables, LLC as Borrower, Tribune Company, as Servicer, [Conduit], Barclays Bank PLC, as Administrative Agent, and the Lenders and Funding Agents party thereto, hereby acknowledges receipt of executed counterparts of a completed Assignment and Acceptance dated as of _____, _____ between _____, as Assignor, and _____, as Assignee.  Terms defined in such Assignment and Acceptance are used herein as therein defined.

      1.     Pursuant to such Assignment and Acceptance, you are advised that the Effective Date will be _____, _____.

Exhibit A-5

[2.    Pursuant to such Assignment and Acceptance, the Assignee is required to pay $_____ to Assignor at or before 12:00 noon (local time of Assignor) on the Effective Date in immediately available funds.]

Very truly yours,

BARCLAYS BANK PLC,
individually and as Administrative Agent


By:_____
Title:_____

[CONDUIT]


By:_____
Title:   Authorized Signer

Exhibit A-6

**EXHIBIT B**

**FORM OF INCREMENTAL BORROWING REQUEST**

[Date]


Barclays Bank PLC, as
Administrative Agent
[Address]

[Name and address of each Funding Agent]

Re:   INCREMENTAL BORROWING REQUEST


Ladies and Gentlemen:

Reference is hereby made to the Receivables Loan Agreement, dated as of July 1, 2008, by and among Tribune Receivables, LLC (the "Borrower"), Tribune Company, as Servicer, the Lenders and Funding Agents party thereto, and Barclays Bank PLC, as Administrative Agent (the "Receivables Loan Agreement"). Capitalized terms used herein shall have the meanings assigned to such terms in the Receivables Loan Agreement.

The Borrower hereby requests the following Incremental Borrowing:

| | | |
|---|---|---|
| 1. | Amount of Incremental Borrowing: | $_____ |
| 2. | Cash Reserve Account Amount: | $_____ |
| 3. | Wire Transfer Amount to Borrower (Line 1 minus Line 2) | $_____ |
| 4. | Amount of Class A Loans in this Incremental Borrowing: | $_____ |
| 5. | Amount of Class B Loans in this Incremental Borrowing: | $_____ |
| 6. | Desired Incremental Borrowing Date: | _____ |

Please credit the Cash Reserve Account Amount in immediately available funds to the Cash Reserve Account [and then wire-transfer the balance of the Incremental Borrowing in immediately available funds on the above-specified Incremental Borrowing Date to:

[Account Name]
[Account No.]
[Bank Name & Address]
[ABA #]

Reference:
Telephone advice to: [Name] @ tel. No. ( )

     Please advise [Name] at telephone no ( ) _____ if the Lenders will not be making this Incremental Borrowing.

     In connection with the Incremental Borrowing to be made on the above listed Incremental Borrowing Date, the Borrower hereby certifies that the following statements are true on the date hereof, and will be true on the Incremental Borrowing Date (before and after giving effect to the proposed Incremental Borrowing):

          (i)     the representations and warranties of the Borrower set forth in Section 4.1 of the Receivables Loan Agreement are true and correct on and as of the Incremental Borrowing Date as though made on and as of such date;

          (ii)     no event has occurred and is continuing, or would result from the proposed Incremental Borrowing, that will constitute a Trigger Event, Potential Trigger Event, Facility Termination Event or a Potential Facility Termination Event;

          (iii)     the Facility Termination Date has not occurred;

          (iv)     the Percentage Factor does not exceed the Maximum Percentage Factor and the Aggregate Principal Balance does not exceed the Facility Limit; and

          (iv)     the amount of the Aggregate Principal Balance is $_____ after giving effect to the Incremental Borrowing to be made on the Incremental Borrowing Date.

                     Very truly yours,


                     TRIBUNE RECEIVABLES, LLC

                     By:_____
                     Name:
                     Title:

             Exhibit B-2

**EXHIBIT C**

**FORM OF JOINDER AGREEMENT**

[Date]

Reference is made to the Receivables Loan Agreement, dated as of July 1, 2008 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), by and among Tribune Receivables, LLC (the "Borrower"), Tribune Company (the "Servicer"), the persons from time to time party thereto as Conduit Lenders and Committed Lenders, Barclays Bank PLC and the persons from time to time parties thereto as funding agents (the "Funding Agents") and Barclays Bank PLC, (the "Administrative Agent"). Terms defined in the Loan Agreement and not otherwise defined herein are used herein as defined in the Loan Agreement.

_____ (the "New Funding Agent"), _____ (the "New Conduit Lender[s]"), _____ (the "New Committed Lender[s]"; and together with the New Funding Agent and New Conduit Lender[s], the "New Lender Group"), the [Name of Conduit Lender] agrees as follows:

1.    Pursuant to Section 11.3(i) of the Loan Agreement, [Name of Conduit Lender] hereby assigns [all] or [portion] of its Conduit Lending Limit to the New Conduit Lender[s] and the New Conduit Lender[s] hereby establish[es] the New Lender Group.

2.    The effective date (the "Effective Date") of this New Lender Group Joinder Agreement (the "Joinder Agreement") shall be the later of (i) the date on which a fully executed copy of this Joinder Agreement is delivered to the Administrative Agent and (ii) the date of this Joinder Agreement.

3.    By executing and delivering this Joinder Agreement, each of the New Funding Agent, the New Conduit Lender and the New Committed Lender[s] confirms to and agrees with each other party to the Loan Agreement that (i) it has received a copy of the Loan Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Joinder Agreement; (ii) it will, independently and without reliance upon the Administrative Agent, the other Funding Agents, the other Lenders or any of their respective Affiliates, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Agreement or any Transaction Document; (iii) it appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Loan Agreement, the Transaction Documents and any other instrument or document pursuant thereto as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto and to enforce its respective rights and interests in and

under the Loan Agreement, the Transaction Documents, the Receivables, the Related Security and the Collections; (iv) it will perform all of the obligations which by the terms of the Loan Agreement and the Transaction Documents are required to be performed by it as a Funding Agent, a Conduit Lender and a Committed Lender, respectively; (v) its address for notices shall be the office set forth beneath its name on the signature pages of this Joinder Agreement; and (vi) it is duly authorized to enter into this Joinder Agreement.

4.   On the Effective Date of this Joinder Agreement, each of the New Funding Agent, the New Conduit Lender and the New Committed Lender[s] shall join in and be a party to the Loan Agreement and, to the extent provided in this Joinder Agreement, shall have the rights and obligations of a Funding Agent, a Conduit Lender and a Committed Lender, respectively, under the Loan Agreement.

5.   The Commitment with respect to the [Name of Conduit Lender] is:

[Name of Conduit Lender]               $[_____]

6.   The "Commitment[s]" with respect to the New Conduit Lender[s] [is] [are]:

[New Conduit Lender]               $[_____]

7.   This Joinder Agreement may be executed by one or more of the parties on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

8.   This Joinder Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Joinder Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

Very truly yours,


CONDUIT LENDER:                      [CONDUIT LENDER]

                                     By:_____
                                     Name:

                                     Title:

                                     Address for notices:
                                     [Address]

NEW CONDUIT LENDER:                  [NEW CONDUIT LENDER]

                                     By:_____
                                     Name:

                                     Title:

                                     Address for notices:
                                     [Address]

NEW COMMITTED LENDER[S]:             [NEW COMMITTED LENDER[S]]

                                     By:_____
                                     Name:
                                     Title:

                                     Address for notices:
                                     [Address]

NEW FUNDING AGENT:                   [NEW FUNDING AGENT]

                                     By:_____
                                     Name:
                                     Title:

                                     Address for notices:
                                     [Address]

BORROWER:                        TRIBUNE RECEIVABLES, LLC

                                 By:_____
                                 Name:

                                 Title:


SERVICER:                        TRIBUNE COMPANY

                                 By:_____
                                 Name:
                                 Title:


ADMINISTRATIVE AGENT:            BARCLAYS BANK PLC

                                 By:_____
                                 Name:
                                 Title:

**EXHIBIT D**

**FORM OF PREPAYMENT NOTICE**

Barclays Bank PLC, as
Administrative Agent
[Address]

[Name and address of each Funding Agent]

Re:  PREPAYMENT NOTICE

Ladies and Gentlemen:

    Reference is hereby made to the Receivables Loan Agreement, dated as of July 1, 2008, by and among Tribune Receivables, LLC (the "Borrower"), Tribune Company, as Servicer, the Lenders and Funding Agents party thereto, and Barclays Bank PLC, as Administrative Agent (the "Receivables Loan Agreement").  Capitalized terms used herein shall have the meanings assigned to such terms in the Receivables Loan Agreement.

    The Borrower hereby notifies the Funding Agents that it wishes to make the following prepayment in accordance with Clause 2.5(b)(*Payment and Prepayment of Loans*) of the Receivables Loan Agreement:

| | |
|---|---|
| Calculation of Prepayment Amount: | |
| Principal: | $_____ |
| Interest: | $_____ |
| Breakage Costs: | $_____ |
| Amount of Class A Loans to be prepaid: | $_____ |
| Amount of Class B Loans to be prepaid: | $_____ |
| Total Prepayment Amount: | $_____ |
| Desired Date of Prepayment: | _____ |

Exhibit D-1

| Tranches to which such prepayment is to be applied (note that prepayments must be allocated in accordance with Section 2.5(b).) | _____ |
| --- | --- |

Please contact [Name] at telephone no ( ) _____ if you have any questions about this request.

Very truly yours,

TRIBUNE RECEIVABLES, LLC

By:_____
Name:
Title:

**EXHIBIT E**

**FORM OF EXTENSION REQUEST**

[Date]

[Name and Address of Funding Agent]

Re:  EXTENSION REQUEST

Ladies and Gentlemen:

Pursuant to Clause 2.16 (*Extension of Scheduled Facility Commitment Termination Date*), the Borrower hereby requests an extension of the Scheduled Facility Commitment Termination Date for your Lender Group from [Date] to [Date].  Please provide written notice to the Borrower of your decision with regard to this request no later than [**30** days prior to current Scheduled Facility Commitment Termination Date.]

Please contact [Name] at telephone no ( ) _____ if you have any questions about this request.

Very truly yours,

TRIBUNE RECEIVABLES, LLC

By:_____
Name:
Title:

**EXHIBIT F**

**FORM OF NOTE**

**[CLASS A][CLASS B] NOTE**

$[          ]                                        [          ], 20[___]

FOR VALUE RECEIVED, the undersigned, TRIBUNE RECEIVABLES, LLC, a Delaware limited liability company (the "Borrower"), promises to pay to the order of [_____] (the "Lender") on July 1, 2010 (or such earlier date as may be specified in the Receivables Loan Agreement referenced below) the principal sum of [_____] DOLLARS ($[_____]) or, if less, the aggregate unpaid principal amount of all [Class A][Class B] Loans shown on the schedule attached hereto (and any continuation thereof), or in the records of the Lender, made by the Lender pursuant to that certain Receivables Loan Agreement, dated as of July 1, 2008 (together with all amendments and other modifications, if any, from time to time thereafter made thereto, the "Receivables Loan Agreement"), among the Borrower, Tribune Company, as Servicer, Barclays Bank PLC, as Administrative Agent, and the various Lenders (including the Lender) as are, or may from time to time become, parties thereto as Lenders or as Funding Agents.

The Borrower also promises to pay Interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until the Facility Termination Date (whether by acceleration or otherwise) and, after the Facility Termination Date, until the Final Payout Date, at the rates per annum and on the dates specified in the Receivables Loan Agreement.

Payments of both principal and interest are to be made in lawful money of the United States of America in same day or immediately available funds to the account designated by the Administrative Agent pursuant to the Receivables Loan Agreement.

This Note is one of the Notes referred to in, and evidences Indebtedness incurred under, the Receivables Loan Agreement, to which reference is made for a description of the security for this Note and for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments of principal of the Indebtedness evidenced by this Note and on which such Indebtedness may be declared to be immediately due and payable. Unless otherwise defined, capitalized terms used herein have the meanings provided in the Receivables Loan Agreement.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

**THIS NOTE HAS BEEN DELIVERED IN NEW YORK CITY, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK.**

5209577 08059699                    Exhibit F-1

TRIBUNE RECEIVABLES, LLC

By:_____
       Name:
       Title: