# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13141<br>Jointly Administered<br>**Objection Deadline: January 8, 2009 at 4:00 p.m.**<br>**Hearing Date: January 15, 2009 at 1:30 p.m.** |

## MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 503(c)(3) AUTHORIZING THE IMPLEMENTATION OF AN EMPLOYEE RETENTION PLAN

Tribune Company and most of its wholly-owned subsidiaries, each of which is a debtor and debtor-in-possession herein, hereby move this Court (the "Motion") for entry of an order pursuant to sections 105(a), 363(b), and 503(c)(3) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing debtors KWGN, Inc. ("KWGN") and KPLR, Inc. ("KPLR") (each a "Debtor" and collectively, the "Debtors") to implement a retention plan in order to retain thirty-three (33) key, non-insider and non-management employees who are necessary for an

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, LLC (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

46429/0001-5230147v1

effective and orderly transition of operations under a local marketing agreement entered into by KWGN in Denver and a shared services agreement entered into by KPLR in St. Louis, as more fully described below.[2] The Debtors submit that the total cost of the proposed retention plan is $384,317.98. The facts and circumstances supporting this Motion are set forth in the accompanying Declaration of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company (the "Bigelow Declaration") filed with this Court on December 24, 2008. In further support of this Motion, the Debtors respectfully represent as follows:

## STATUS OF THE CASE AND JURISDICTION

1. On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including an order to have these cases jointly administered. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

2. The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner.

3. On December 18, 2008, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Committee").

---

[2] The term "retention" in connection with the proposed payments described herein applies to both non-union "Transitional Employees," as defined herein, and union "Transitional Employees." However, as noted in footnote four, the payments to be made to the union "Transitional Employees" are contractually dictated severance payments under their collective bargaining agreement (the "CBA") and will satisfy such contractual obligations. See CBA, § 8.05. This is so notwithstanding the use of the terms "retention payment" and "proposed payments" throughout this Motion in reference to the payments to both union and non-union "Transitional Employees." In both cases, the payments serve the objectives set forth in this Motion.

2

46429/0001-5230147v1

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b), and 503(c)(3) of the Bankruptcy Code.

## BACKGROUND TO THE MOTION

5.      Tribune Company ("Tribune"), a debtor in the above-captioned case, is America's largest employee-owned media company and is the ultimate parent company of each of the Debtors. Tribune operates businesses in publishing, interactive media, and broadcasting. These operations are conducted through two business segments: (i) publishing and (ii) broadcasting and entertainment.

6.      Tribune's broadcasting and entertainment segment includes 23 television stations, WGN America, WGN-AM, and the Chicago Cubs baseball team.[3] Through their television stations and WGN America, Tribune's broadcasting and entertainment segment reaches more than 80% of television households in the United States. Thirteen (13) of Tribune's stations are affiliates of The CW Television Network ("CW"), America's "fifth" major broadcast network. Seven (7) are affiliates of Fox Broadcasting Network ("Fox"). Debtor KWGN is Tribune's CW affiliate in Denver and Debtor KPLR is a CW affiliate in St. Louis.

7.      On October 3, 2008, KWGN, on the one hand, and Community Television of Colorado, LLC, and Community Television of Colorado License, LLC, (collectively, "Community Colorado"), on the other, entered into a local marketing agreement (the "LMA") which, inter alia, integrated certain operations of KDVR, Community Colorado's Fox affiliate in Denver, and KWGN. Under the LMA, both KDVR and KWGN will operate out of Community

---

[3] The broadcasting and entertainment segment also includes the subsidiaries that own the Chicago Cubs baseball operations and an equity interest in regional sports network Comcast SportsNet Chicago, LLC, which are not Debtors in these cases.

3

Colorado's KDVR's studios with Community Colorado, as an independent contractor, providing operating and programming related services.

8. Also on October 3, 2008, KPLR, on the one hand, and Community Television of Missouri, LLC, and Community Television of Missouri License, LLC, (collectively, "Community Missouri"), on the other, entered into a shared services agreement (the "SSA"), which, inter alia, integrated certain operations of KTVI, Community Missouri's Fox affiliate in St. Louis, and KPLR. Under the SSA, KPLR and KTVI will operate out of KPLR's studios with Community Missouri, acting as an independent contractor, providing operating and programming related services. (Community Colorado and Community Missouri may sometimes collectively be referred to herein as "Community").

9. The LMA and SSA (together, the "Agreements") enable the relevant stations in Denver and St. Louis to integrate operating facilities, production of local news, and certain programming functions. This integration of facilities, use of combined news operations, and realization of certain programming efficiencies is intended, among other things, to significantly reduce the Debtors' costs, streamline its operations, and enable the Debtors to deliver a better and higher-quality product to their customers and viewers.

10. Although the Debtors have already seen some benefit from the integration, they are still in the process of transitioning and consolidating certain of their operations with those of Community. This transition requires the short-term retention and continued employment by the Debtors of certain key non-insider and non-management employees (the "Transitional Employees") whose positions will be eliminated as a result of consolidation of operations under the LMA and SSA, but who are necessary to effectuate a smooth and orderly integration of the relevant Denver and St. Louis broadcast stations under the Agreements. The

Transitional Employees provide a wide range of required services to the Denver and St. Louis television stations, including advertising sales and traffic support, engineering, and production assistance for the local news. These services will continue to be required as the Debtors and Community complete their integration under the Agreements.

11. Accordingly, the Debtors have asked the Transitional Employees to remain in their current employment for a short period of time as the Agreements are fully implemented. In return for the Transitional Employees' agreement to remain until a date certain (the "Termination Dates"), the Debtors seek authorization to pay the Transitional Employees certain retention compensation. The Termination Dates for the Transitional Employees are staggered between December 31, 2008, and March 2009. The proposed compensation for the Transitional Employees are more fully explained on the attached Exhibit A.

## RELIEF REQUESTED

12. The Debtors currently employ twenty (20) full-time, non-union Transitional Employees at KWGN and five (5) non-union and eight (8) union Transitional Employees at KPLR. As noted, without the continued services of the Transitional Employees for a brief period, implementation of the Agreements will be hampered. Because the Transitional Employees' continued service is necessary to the integration of the stations under the Agreements and because the Transitional Employees continue to perform needed services for the Debtors, the Debtors believe that it is appropriate and in the best interests of their estates that the Debtors pay the proposed compensation to the Transitional Employees.[4] Finally, as the

---

[4] The amount of the proposed payments for both the union and non-union Transitional Employees was calculated by reference to the employees' length of service and, in the case of the union employees, by reference to the applicable CBA provisions. With respect to the eight (8) union Transitional Employees, these payments will be made in compliance with section 8.05 of the CBA which governs the payment of severance and, thus, constitutes the contractually required severance payments thereunder. Nevertheless, these payments also serve to induce the union Transitional Employees to remain at their jobs through the integration of the television stations. The payments made to the union Transitional Employees are not additional to the severance payments set forth in their collective

5
46429/0001-5230147v1

aggregate amount of the proposed retention compensation is relatively small – approximately $384,317.98, net to the Debtors – the cost to the Debtors and their estates from making the proposed payments will not be economically material to the Debtors' estates while the payments will provide significant benefit to the estates.

13. The Debtors estimate that the retention payments for all Transitional Employees would equal $684,364.22, with the Transitional Employees at KWGN receiving $420,432.07 and the Transitional Employees at KPLR receiving $263,932.15. Importantly, however, the Debtors would ultimately only be liable for $384,317.98 of this cost, or approximately fifty-six percent (56%) of the total amount, as Community has agreed to reimburse the Debtors $300,046.24, or forty-four percent (44%) of the total payment.

14. In addition, the Debtors also request that this Court allow the immediate payment of retention compensation from the total amount requested to any Transitional Employee whose Termination Date has passed as of the date of this Motion.

### JUSTIFICATION FOR REQUESTED RELIEF

15. The Debtors seek the relief requested herein because any delay or disruption in paying any of the Transitional Employees under the retention plan could disrupt the Debtors' relationship with their Transitional Employees and their relationship with Community under the Agreements. Further, the Debtors fear that not allowing the payments under the proposed retention plan to the Debtors' Transitional Employees could impair the Transitional Employees' morale at the very time that their dedication, confidence, and cooperation are most critical. In addition, The Debtors face the risk that their business operations, their Agreements with Community, and their ability to successfully deliver local area news and programming to

---

bargaining agreements. With respect to the non-Union Transitional Employees, they will be required to sign a customary company form agreement upon separation providing, among other things, that they waive and release any claims against the Debtors.

the residents of the Denver and St. Louis metropolitan areas could be adversely impacted if the Debtors are not granted the relief requested.

16. KWGN and KPLR, as FCC licensees, are also required to fulfill certain federal regulations under the Communications Act of 1934, the rules, regulations, and policies of the FCC, and other applicable state, local, and federal law. These requirements generally dictate ongoing broadcasting operations at the licensee stations and also require the Debtors to perform matters as basic as the upkeep of the broadcasting towers to issues far more pressing such as warning local residents in the case of an emergency. Payment of the proposed compensation to the Transitional Employees will help to ensure that operations continue without disruption.

17. At this critical stage in the integration of the television stations, the Debtors cannot risk any disruption of their business operations. The failure to fund the retention plan could lead to Transitional Employees leaving their jobs in order to immediately find employment elsewhere. The Transitional Employees understand that their jobs with the Debtors are not permanent. A primary incentive of the Transitional Employees to remain at their jobs through the successful integration of the Debtors' and Community's stations is the promise of the retention payment that they will receive at the completion of their employment. This is especially so as the Transitional Employees will be let go on a rolling basis through March of 2009. If the Transitional Employees leaving the Debtors' employment earlier in the transition period are not paid the retention payment, the remaining Transitional Employees will understand that they too are ineligible. This could lead to the remaining Transitional Employees opting to leave before their Termination Dates, which would, in turn, limit the ability of the Debtors to fully realize the value of the Agreements. Finally, if the relief requested herein is not granted,

46429/0001-5230147v1

the Transitional Employees themselves would suffer hardship and, in many instances, financial difficulties, particularly since they cannot expect continued employment with the Debtors.

## BASIS FOR RELIEF

18. The retention plan should be approved by the Court pursuant to sections 363(b)(1), 503(c), and 105(a) of the Bankruptcy Code. The retention plan is in the "ordinary course of business" under section 363(b)(1); required by the "facts and circumstances" under section 501(c)(3); and "necessary and appropriate" under section 105(a).

19. Under section 363(b)(1), the decision to use property of the estate outside of the ordinary course of business is entrusted to the sound business judgment of the debtor. See *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbots Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Railway, Co.*, 124 B.R. 169, 176 (D. Del. 1991). Thus, when a valid business justification exists, there is a strong presumption that the debtor made the decision in good faith and in the best interests of the company. *Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D. N.Y. 1992) (holding that the Delaware business judgment rule applies "by analogy" in chapter 11 where the debtor is a Delaware corporation). Courts have also historically limited objections to a debtor's business judgment to situations in which the objections allege "bad faith, self-interest, or gross negligence." *Id.* See also *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D. N.Y. 1986).

20. Furthermore, section 503(c) of the Bankruptcy Code, which restricts a debtor's ability to fund severance or retention payments to "insiders" of the debtors and certain types of payments "outside of the ordinary course of business," does not prohibit the plan at issue. 11 U.S.C. § 503(c), *et seq*. Section 503(c)(1) prohibits payments which the debtor intends

to induce "insiders" to remain with the business unless certain criteria are met under section 503(c)(1)(A), 503(c)(1)(B), and 503(c)(1)(C). 11 U.S.C. § 503(c)(1). In the same manner, section 503(c)(2) allows severance payments to "insiders" only if they are part of a program generally applicable to all employees and "not greater than 10 times the amount of the mean severance pay given to nonmanagement employees." 11 U.S.C. § 503(c)(2). These sections are limited, however, by their plain language to "insiders." Insider is a defined term under the Bankruptcy Code, and, to be an insider, one must be a director, officer, general partner, or person in control of the debtor or a relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B). The Transitional Employees are not insiders and do not satisfy the definition set forth in the Bankruptcy Code. They are simply employees tasked with the day-to-day functioning of the Debtors' television stations without any managerial control or oversight.

21.     Section 503(c)(3), however, is not limited to insiders of the debtor and prohibits "transfer or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). In determining the applicability of this section, the courts have generally used a form of the "business judgment" standard to determine whether the "facts and circumstances" standard of section 503(c)(3) has been satisfied. See, e.g., *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC), Hr'g Tr. 40:17-41:2 (Bankr. D. Del. April 25, 2007) (Section 503(c)(3) is "something above the business judgment standard but maybe not much farther above it"). See also *In re Werner Holding Co. (DE), Inc.*, Case No. 06-10578 (KJC) (Bankr. D. Del. July 20, 2006, Aug. 22, 2006, and Dec. 20, 2006); *In re Nobex Corporation*, No. 05-20050 (CSS) (Bankr. D. Del. May 15, 2006 and Dec. 21, 2005) ("I find it quite frankly nothing more than a reiteration of the standard

9

under 363 . . . the business judgment of the debtor. . . "); *In re Riverstone Networks, Inc.*, No. 06-10110 (CSS) (Bankr. D. Del. Mar. 28, 2006); *In re Pliant Corporation*, No. 06-10001 (MFW) (Bankr. D. Del. Mar. 14, 2006).

22. Furthermore, the Bankruptcy Court of the Southern District of New York in *In re Dana Corp.* held that to satisfy section 503(c)(3) "[a]n expense must be an actual, necessary cost or expense of preserving the estate" and that it must satisfy the "sound business judgment" test. *In re Dana Corp.* 358 B.R. 567, 576 (Bankr. S.D. N.Y. 2006). The Court then weighed the following factors in determining whether the debtor had satisfied section 503(c)(3): (i) whether a reasonable relationship existed between the proposed plan and the desired results; (ii) whether the cost of the plan was reasonable in light of the overall facts of the case; (iii) whether the scope of the plan was fair and reasonable; (iv) whether the plan was consistent with industry standards; (v) whether the debtor had put forth sufficient due diligence efforts in formulating the plan; and (vi) whether the debtor received sufficient independent counsel in performing any due diligence and formulating the plan. *Id.*, at 576-77.

23. Because the Transitional Employees at KWGN and KPLR are not insiders under section 101(31)(B), the question before the court is whether the retention plan falls within the ordinary course of the Debtors' business under section 363(b)(1) or is justified by the "facts and circumstances" under section 503(c)(3). The Debtors submit that ample justification exists for the implementation of their retention plan under both sections of the Bankruptcy Code.

24. First, various Tribune debtors have made similar retention payments in conjunction with the sale and consolidation of television stations in order to ease the transition from the sale announcement through the FCC approval process to the close of the transaction. In

addition, the Tribune debtors have made retention payments during the shut-down of other business units in order to effectuate an orderly and efficient wind-down of operations.

25. In addition, retention payments such as these are not unusual in circumstances where necessary employees are being asked to work themselves out of the job. In fact, bankruptcy courts in this District have approved plans similar in structure to the one proposed in this Motion for amounts far greater than the $384,317.98 requested by the Debtors. See, *In re Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2008); (allowing the payment of approximately $2,508,470.00 in retention and incentive bonuses and accrued vacation); *In re Linens Holdings Co.*, No. 08-10832 (CSS) (Bankr. D. Del. Oct. 21, 2008) (approving both a retention and incentive plan in the aggregate amount of approximately $3,800,000.00); *In re Semcrude, LP*, No. 08-11528 (BLS) (Bankr. D. Del. Sept. 17, 2008) (allowing incentive payments for 261 employees and executives). See also *In re IdleAire Technologies Corp.*, No. 08-10960 (KG) (Bankr. D. Del. June 27, 2008); *In re Global Home Prod. LLC*, No 06-10340 (KG) (Bankr. D. Del. May 30, 2006); *In re Advanced Marketing Services, Inc.*, No. 06-11480 (CSS) (Bankr. D. Del. March 13, 2007). While it is true that these cases concerned, for the most part, the liquidation of a company and a going-concern sale, the theory behind these cases is the same as the case at bar. The companies sought to retain necessary employees to aid them in an efficient and beneficial sale and winding down of their operations. The companies offered their employees incentives in order to have them remain at the companies and effectively "work [themselves] out of the job." See, e.g., *In re Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. Oct. 22, 2008); *In re Linens Holdings Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. Oct. 8, 2008). That situation, while regrettable, is

ultimately the same as the one in this case, as the Debtors require skilled employees to successfully integrate the affected television stations.

26.    Second, given the facts of this case, the Debtors' Transitional Employees may understandably seek long-term employment elsewhere if they do not receive the payments which they were promised. The retention plan proposed by the Debtors is intended to retain the Transitional Employees by providing them with the means of supporting themselves while they seek other employment after their employment with the Debtors ends. If these payments are not allowed, the Debtors believe that the Transitional Employees may leave *en masse* and that the Debtors' ability to integrate the television stations at issue will be impaired.

27.    If there is an exodus of the Debtors' necessary Transitional Employees, the Debtors will have to hire and train new employees to perform technical and complicated tasks in a very short amount of time. Assuming that the Debtors are able to find replacement employees in the Denver and St. Louis markets with the necessary skills and training, finding and training the new employees will require time and money and limit the Debtors' ability to provide a quality product to its customers and viewers. Moreover, the inability of the Debtors to efficiently transition to the new stations may lead to tensions with Community. This could jeopardize the success of the Agreements and limit the Debtors' ability to streamline operations and decrease costs.

28.    The facts and circumstances in which the Debtors find themselves, therefore, justify the payment of retention compensation to the Debtors' Transitional Employees.

## NOTICE

29.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service;

46429/0001-5230147v1

(v) proposed counsel for the Official Committee of Unsecured Creditors; (vi) the administrative agents for the Debtors' prepetition loan facilities; (vii) the administrative agent for debtors' postpetition loan facility; (viii) the indenture trustees for the Debtors' prepetition notes; and (ix) all parties having requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **NO PRIOR REQUEST**

30.     The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtors respectfully seek entry of an order, in substantially the form of the order attached hereto as Exhibit B, authorizing the Debtors, in accordance with their stated policies, to implement an retention plan in order to retain the Transitional Employees.

Dated: Wilmington, Delaware
       December 24, 2008

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Gregory V. Demo
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

       -and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: */s/ Norman L. Pernick*
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
1000 N. West Street, Suite 1200
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION

46429/0001-5230147v1