|  |  |
|---|---|
| _____ ) |  |
| In re: ) | Chapter 11 |
| ) |  |
| **TRIBUNE COMPANY**, *et al.*, ) | Case No. 08-13141 (KJC) |
| ) |  |
| Debtors. ) | (Jointly Administered) |
| ) |  |
| ) | Re: Docket Nos. 11, 61 |
| ) | Objection Deadline: 12/29/08, 4:00 p.m. |
| ) | Hearing Date: 1/5/09 at 1:30 p.m. |
| ) |  |
| _____ ) |  |

## OBJECTION OF CERTAIN UTILITY COMPANIES
### TO THE MOTION FOR AN INTERIM ORDER AND A FINAL ORDER PURSUANT TO SECTIONS 105(a) AND 366 OF THE BANKRUPTCY CODE (I) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING UTILITY SERVICES, (II) DEEMING UTILITY PROVIDERS ADEQUATELY ASSURED OF FUTURE PERFORMANCE, AND (III) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT

The Connecticut Light and Power Company ("CL&P"), Yankee Gas

Services Company ("Yankee"), PECO Energy Company ("PECO"),

Commonwealth Edison Company ("ComEd"), Duke Energy Indiana, Inc.

("DEI"), Southern California Edison Company ("SCE"), Virginia

Electric and Power Company d/b/a Dominion Virginia Power ("DVP"),

Niagara Mohawk Power Corporation d/b/a National Grid

("NIMO"),Consolidated Edison Company of New York, Inc. ("ConEd"),

Metropolitan Edison Company ("MetEd"), Pennsylvania Electric

Company ("Penelec"), CenterPoint Energy Services, Inc.

("CenterPoint"), Connecticut Natural Gas Corporation ("CNG") and

Baltimore Gas And Electric Company ("BGE")(collectively, the

"Utilities"), by counsel, hereby object to the *Motion For An Interim and Order and a Final Order Pursuant To Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures For Determining Adequate Assurance of Payment* (the "Utility Motion"), and set forth the following:

## Introduction

Section 366(c)(2), as amended, requires a Chapter 11 debtor to provide utilities with adequate assurance of payment that is satisfactory to the utility within 30 days of the Petition Date. If a debtor believes the **amount** of the utility's request pursuant to Section 366(c)(2) needs to be modified, the debtor can file a Motion pursuant to Section 366(c)(3) seeking to modify the **amount** of the utility's request (a "Modification Motion"). Moreover, if the debtor acts promptly, it can file and schedule the Modification Motion to be heard before the 30 day period expires.

Instead of waiting to receive deposit requests from their utility providers and follow the express requirements and procedures set forth in Section 366, the Debtors subverted the requirements of Section 366 by filing their Utility Motion at the very outset of this case seeking to establish their own form of adequate assurance of payment, which is to establish an account

2

containing an amount supposedly equal to fifty percent (50%) of the Debtors' estimated average monthly cost of utility service (the "Escrow Account"). Neither this Court nor the Debtors have the authority to establish the **form** of adequate assurance of payment. At best, the Debtors, after notice and a hearing, can seek to modify the Utilities' adequate assurance of payment requests pursuant to Section 366(c)(3). In this case, the Utilities are requesting adequate assurance of payment in the **form** of cash deposits paid directly to the Utilities. Therefore, this Court should deny the Utility Motion as not being properly before the Court because the Utility Motion: (1) does not address the Utilities' deposit requests; (2) was not heard after notice and a hearing; and (3) does not seek to modify the amount of the Utilities' deposit requests.

Furthermore, as more fully explained herein, the Debtors' proposed Escrow Account is not in compliance with Section 366(c) and is an otherwise unreliable form of adequate assurance of future payment. Accordingly, the Utilities request that the Court deny the Utility Motion as to the Utilities.

## Facts

### Procedural Facts

1. On December 8, 2008 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are now pending with

SL1 892820v1/000000.00000

this Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.     The Debtors' cases are being jointly administered.

## The Utility Motion

3.     On the Petition Date, the Debtors filed the Utility Motion.

4.     No notice of the Utility Motion was given to the Debtors' utilities prior to the December 10, 2008 hearing on the Utility Motion.

5.     Thus, because the Utilities were never served with the Utility Motion, they had no opportunity to respond to the Utility Motion or otherwise be heard at the *ex parte* hearing that took place on December 10, 2008, despite the fact that Section 366(c)(3) (presuming this was the statutory basis for the relief sought by the Debtors) requires that there be "notice and a hearing" and the Utilities were known entities that provided continuous prepetition utility goods and services to the Debtors.

6.     Through the Utility Motion, the Debtors seek to avoid the procedural and substantive requirements of Section 366. Instead of responding to adequate assurance demands of their utility companies, the Debtors elected to file the Utility Motion and seek burdensome procedures and Court approval for the establishment of an account containing an amount supposedly equal

4

to fifty percent (50%) of the Debtors' estimated average monthly
cost of utility service (the "Escrow Account"). Utility Motion
at ¶ 9. The Debtors further propose to "adjust" the amount in
the Escrow Account to reflect (i) termination of utility services
by the Debtors, (ii) agreements with utility providers, and (iii)
to remove from the monthly spending figure any amount spent on
utility services from utility providers that already hold
deposits or other security from the Debtors. Accordingly, the
Debtors are essentially proposing nothing as adequate assurance
for any utilities that hold prepetition deposits or other
security from the Debtors. Utility Motion at ¶ 14.

7. The Debtors' contend, without providing any supporting
documentation, that they spend approximately $5.51 million a
month for utility services. Utility Motion at ¶ 11.

8. In the Utility Motion, the Debtors also seek various
burdensome procedures that are either not authorized by Section
366 or are contrary to its specific provisions.

9. On December 10, 2008, the Court held an *ex parte*
hearing on the Utility Motion and thereafter, on an *ex parte*
basis, granted the Utility Motion and entered the *Interim Order
Pursuant To Sections 105(a) and 366 of the Bankruptcy Code (I)
Prohibiting Utility Providers From Altering, Refusing, or
Discontinuing Utility Services, (II) Deeming Utility Providers
Adequately Assured of Future Performance, and (III) Establishing*

5

*Procedures For Determining Adequate Assurance of Payment* (the "Interim Utility Order"). The Interim Utility Order in part approved the two-week Escrow Account.

## Facts Regarding the Debtors

10. Debtor Tribune Company ("Tribune") is a media and entertainment company, and is the ultimate parent company of each of the Debtors. Tribune's operations are conducted through two primary business segments: (i) publishing, and (ii) broadcasting and entertainment. *Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company In Support of First Day Motion* at ¶ 8 (hereinafter "Bigelow Aff. at ¶ __").

11. For the quarterly period ended September 28, 2008, the consolidated financial statements of the Debtors and their non-debtor subsidiaries (the "Tribune Entities") reported approximately $7.6 billion in total assets and approximately $13.9 billion in total liabilities.

12. The Debtors' operations have been adversely affected by the general deterioration in the publishing and broadcasting industries, particularly through the continuing severe decline in advertising revenue. As a result, the Debtors admit that they face increasing constraints on their liquidity, including their ability to service approximately $13 billion in indebtedness owed to their lenders and noteholders. Bigelow Aff. at ¶ 12.

SL1 892820v1/000000.00000

13.  Tribune (in its capacity as servicer) and Tribune Receivables LLC, a wholly owned special purpose subsidiary which is not a Debtor, are parties to a $300 million trade receivables securitization facility.  The outstanding balance under the trade receivables securitization facility is approximately $225 million.  Bigelow Aff. at ¶ 17.

14.  The Debtors' admit that the newspaper publishing industry is in the midst of an unprecedented decline which has been exacerbated by the current recession.  Newspaper advertising revenue is in significant decline, down industry-wide nearly $2 billion, or 18%, in the third quarter of 2008 alone.  The Debtors' broadcasting revenue is lower than their 2007 performance, largely as a result of declining advertising revenue.  Through November 2008, Tribune's consolidated revenue was down 10% versus in 2007, with publishing advertising revenues down 18% and broadcasting and entertainment revenues down 3%.  On a consolidated basis, Tribune's operating cash flow (excluding equity compensation, one-time items and discontinued operations) was down 33%.  Bigelow Aff. at ¶ 24.

15.  The Debtors' claim that despite their aggressive efforts to enhance revenues, reduce expenses and monetize various assets, the impact of the economic downturn has left the Debtors with weak operating results and significant liquidity issues.  In December 2008 alone, the Debtors face debt service and related

7

payments of approximately $200 million, with another $1.3 billion due in 2009, including $512 million in Tranche X debt maturing in June 2009.

## Post-Petition Financing

16.   On December 9, 2008, the Debtors filed their *Motion of the Debtors For An Order (I) Authorizing the Debtors To Guarantee An Amended Securitization Facility and For Certain Debtors To Continue Selling Receivables and Related Rights Pursuant Thereto, (II) Authorizing the Debtors To Enter Into a Letter of Credit Facility, (III) Modifying the Automatic Stay and (IV) Granting Other Related Relief Pursuant To Sections 105, 362(d), 363(b)(1), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 365 of the Bankruptcy Code* (the "Financing Motion").

17.   Through the Financing Motion, the Debtors are seeking authority in part to (i) increase the aggregate principal amount of loans available to Tribune Receivables under the Receivables Loan Agreement to $300 million, and (ii) a new post-petition letter of credit facility in the amount of up to $50 million.

18.   On December 11, 2008, the Court entered the Interim Financing Order which in part authorized the Debtors to (i) enter into agreements to increase the aggregate principal amount of loans available to Tribune Receivables under the Receivables Loan Agreement to $300 million, and (ii) enter into a new post-petition letter of credit facility in the amount of up to $50

8

million.

19.    The Interim Financing Order also approved an
administrative expense carve-out (the "Carve Out") in the amount
of $5 million for attorneys' fees and costs incurred by Debtors'
counsel and any committee counsel.    Interim Utility Order at ¶
16.

### Facts Concerning the Utilities

20.    Each of the Utilities provided the Debtors with
prepetition utility goods and/or services and has continued to
provide the Debtors with utility goods and/or services since the
Petition Date.

21.    Under the Utilities' billing cycles, the Debtors
receive approximately one month of utility goods and/or services
before the Utility issues a bill for such charges.    Once a bill
is issued, the Debtors have approximately 15 to 30 days to pay
the applicable bill.    If the Debtors fail to timely pay the bill,
a past due notice is issued and a late fee is subsequently
imposed on the account.    If the Debtors fail to pay the bill
after the issuance of the past due notice, the Utilities issue a
notice that informs the Debtors that they must cure the arrearage
within a certain period of time or their service will be
disconnected.    Accordingly, under the Utilities' billing cycles,
the Debtors could receive at least 2 months of unpaid charges
before the utility could cease the supply of goods and/or

SL1 892820v1/000000.00000

services for the post-petition payment default.

22. In order to avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated billing cycles, the Utilities request this Court, pursuant to Rule 201 of the Federal Rules of Evidence, to take judicial notice of the Utilities' billing cycles. Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities are providing the following web site links to the tariffs and/or state laws, regulations and/or ordinances, and/or cooperative service rules:

CL&P –
http://www.cl-p.com/esuppliers/rates.aspx

Yankee –
http://www.yankeegas.com/AboutYG/rates_riders.asp

PECO –
Tariffs –
http://www.exeloncorp.com/ourcompanies/peco/pecores/energy_rates/our_rates_and_prices.htm

Regulations -
http://www.pacode.com/secure/data/052/chapter55/chap55toc.html

ComEd –
http://www.exeloncorp.com/ourcompanies/comed/comedbiz/energy_rates/our_rates_and_prices.htm

DEI –
http://www.duke-energy.com/rates/indiana/tariff.asp

SCE –
http://www.sce.com/AboutSCE/Regulatory/tariffbooks/rules.htm

SL1 892820v1/000000.00000

DVP –

   http://www.dom.com/customer/vabus_rates.jsp

NIMO –

   Electric –
   http://www.nationalgridus.com/niagaramohawk/non_html/rates_psc207.pdf

   Gas –
   http://www.nationalgridus.com/niagaramohawk/non_html/rates_psc219.pdf

ConEd –

   Electric – http://www.coned.com/rates/elec-sched1.asp
   Gas – http://www.coned.com/rates/gas_main.asp

MetEd –

   Tariffs –
   http://www.firstenergycorp.com/Residential_and_Business/Customer_Choice/files/Tariff_-_PA/Met-Ed_Complete_Tariff_No._50_w-Supp_6_bookmarked.pdf

   Regulations –
   http://www.pacode.com/secure/data/052/chapter55/chap55toc.html

Penelec –

   Tariffs –
   http://www.firstenergycorp.com/Residential_and_Business/Customer_Choice/files/Tariff_-_PA/Penelec_Complete_Tariff_No._79_with_Supp_5_bookmarked.pdf

   Regulations –
   http://www.pacode.com/secure/data/052/chapter55/chap55toc.html

CenterPoint – The adequate assurance requirements of CenterPoint are not governed by a rate tariff or utility commission regulation. CenterPoint's deposit requirements consist of an amount equal to the sum of the two highest bills rendered to the Debtor during the previous twelve month period.

   CNG –
   http://www.cngcorp.com/Tariffs/Tariff%20Complete.pdf

11

BGE – i. Tariffs –
http://www.bge.com/portal/site/bge/menuitem.5e7b43cdabceb7c33c88ff10016176a0/

ii. Code of Maryland Regulations  http://www.dsd.state.md.us/comar/20/20.30.01.04.htm

23.   Subject to a reservation of the Utilities' rights to supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified, the Utilities' estimated prepetition debt owed by the Debtors to the Utilities, and post-petition deposit requests are currently as follows:

| Utility | No. of Accts. | Est. Pre-Pet. Debt | Dep. Request |
|---|---|---|---|
| CL&P | 21 | n/a | $139,230 (3-month) |
| Yankee | 5 | n/a | $19,505 (3-month) |
| PECO | 2 | $31,000 | $49,600 (2-month) |
| ComEd | 67[1] | $120,090 | $656,280 (4-month) |
| DEI | 2 | n/a | $12,925 (2-month) |
| SCE | 55 | $445,000.00 | $1,041,321 (2-month) |
| DVP | 5 | $39,038.92 | $92,851 (2-month) |
| NIMO | 3 | $n/a | $50,812 (2-month) |
| ConEd | 3 | $15,419.92 | $108,225 (2-month) |
| MetEd | 4 | $22,701.12 | $33,390 (2-month) |
| Penelec | 2 | $25,423.19 | $39,690 (2-month) |
| CNG | 3 | $45,309.79 | $117,661 (3-month) |

---

[1]   ComEd has been able to identify 67 accounts, but believes there are more that it has been unable to identify.

SL1 892820v1/000000.00000

| | | | |
|---|---|---|---|
| BGE | 25 | $55,743 | $142,559 (2-month) |
| CenterPoint | 4 | $n/a | $290,000 (2-month) |

24.  NIMO maintained prepetition deposits totaling $5,310 on the Debtors' prepetition accounts that will be applied to the Debtors' prepetition debt.

25.  SCE held a prepetition letter of credit in the amount of $650,000(the "SCE LOC"). A claim will be made upon the SCE LOC for payment of the estimated prepetition balance of $445,000, which will leave a balance on the SCE LOC.

26.  ComEd held a $17,463.34 prepetition cash deposit that it will recoup against its prepetition debt pursuant to Section 366(c)(4). ComEd's deposit request is based on the assumption that Constellation Energy will continue to provide eclectic commodity to the Debtors. In the event Constellation Energy ceases supplying the Debtors with electric commodity, ComEd's deposit request would increase to $2,625,120.

## Discussion

### A.   THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.

Sections 366(b) and (c) of the Bankruptcy Code, in pertinent part, provide:

(b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the Debtors, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.
(c)(1)(A) For purposes of this subsection, the term

13

"assurance of payment" means
        (i) a cash deposit;
        (ii) a letter of credit;
        (iii) a certificate of deposit;
        (iv) a surety bond;
        (v) a prepayment of utility consumption; or
        (vi) another form of security that is mutually agreed upon between the utility and the Debtors or the trustee.

    (B) For purposes of this subsection an administrative expense priority shall not constitute an assurance of payment,

    (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the Debtors or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

    (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

    (B) In making a determination under this paragraph whether an assurance of payment is adequate, the court may not consider
        (i) the absence of security before the date of the filing of the petition;
        (ii) the payment by the Debtors of charges for utility service in a timely manner before the date of the filing of the petition; or
        (iii) the availability of an administrative expense priority.

    (4) Notwithstanding any other provision of law, with respect to a case subject to this subsection, a utility may recover or set off against a security deposit provided to the utility by the Debtors before the date of the filing of the petition without notice or order of the court.

11 U.S.C. §366.

SL1 892820v1/000000.00000

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997)("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner.").

A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request.

In this case, the Debtors completely ignore the Utilities' adequate assurance requests. Instead, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c) from modifying the amount of the Utilities' adequate assurance request to establishing the **form** and the

SL1 892820v1/000000.00000

amount of adequate assurance of payment acceptable to the

Debtors. Accordingly, this Court should not reward the Debtors

for their failure to comply with the requirements of Section

366(c) and deny the Utility Motion as to the Utilities. *See In re*

*Viking Offshore (USA), Inc.*, 2008 WL 782449 at *3 (Bankr.

S.D.Tex. Mar. 20, 2008) ("The relief requested by Debtors would

reverse the burden, by making an advance determination that the

proposed assurance was adequate. . . . the court lacks the power

to reverse the statutory framework for provision of adequate

assurance of payment.")

>    **1.    The Debtors' Proposed Escrow Account Does Not
>           Provide the Utilities With Adequate Assurance of
>           Payment.**

The Escrow Account is an improper and otherwise unreliable

form of adequate assurance of future payment for the following

reasons:

(i)     (i) This Court only has authority under Section
        366(c)(3) to modify the <u>amount</u> of the Utilities'
        deposit requests. Neither the Debtors nor this
        Court have the authority to establish the <u>form</u> of
        adequate assurance of payment, i.e., the creation of
        an escrow account as opposed to adequate assurance
        in the form of cash deposits that the Utilities are
        requesting from the Debtors.

(ii)    The Debtors have failed to propose any procedures as
        to when and how the Utilities can obtain funds from
        the Escrow Account. Presumably, the Utilities would
        have to incur legal fees and costs to file and
        litigate an application for payment of post-petition
        administrative expenses, which would be for at least
        one month's service because the Utilities bill the
        Debtors on a monthly basis.

(iii)    The Escrow Account may not continue to be funded if the Debtors default on the use of post-petition financing.

(iv)    The Debtors propose to "adjust" the amount in the Escrow Account to reflect (i) termination of utility services by the Debtors, (ii) agreements with utility providers, and (iii) to remove from the monthly spending figure any amount spent on utility services from utility providers that already hold deposits or other security from the Debtors. Accordingly, the Debtors are essentially proposing nothing as adequate assurance for any utilities that hold prepetition deposits or other security from the Debtors.

(v)    The Utilities bill monthly in arrears so any request upon the Escrow Account will be, at a minimum, for monthly bills. Accordingly, the Escrow Account that would merely contain the estimated cost of 50% of the Debtors' monthly utility charges would be undercapitalized from the outset. Furthermore, it is not clear if the Debtors correctly estimated their monthly post-petition utility expenses.

(vi)    There is no limit on what a utility can demand from the Escrow Account, so it could be depleted by the requests of several large utilities if the Debtors do not have sufficient cash collateral to replenish the Escrow Account to its original balance.

(vii)    The Escrow Account would favor utilities with early monthly billing cycles or earlier due dates that can make demand before other utilities with later billing cycles and/or due dates.

(viii)    The Debtors include waste management companies in the Utility Motion even though they are probably not utility companies entitled to the protections of Section 366. Accordingly, there are numerous entities that would have access to the Escrow Account that are not entitled to post-petition security pursuant to Section 366.

Accordingly, the Court should not approve the Escrow Account as

adequate assurance to the Debtors' utility providers on a final basis because the Escrow Account is not the **form** of adequate assurance requested by the Utilities herein and because it is an otherwise unreliable form of adequate assurance.

> 2. **The Utility Motion Should Be Denied As To the Utilities Because the Debtors Have Not Set Forth Any Basis For Modifying the Utilities' Requested Deposits.**

In the Utility Motion, Debtors fail to address why this Court should modify the Utilities' requests for adequate assurance of payment deposits set forth above. Under Section 366(c)(3), the Debtors have the burden of proof as to whether the Utilities' adequate assurance of payment requests should be modified. *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D.Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof). The Debtors, however, offer the Court no evidence nor factually supported documentation to explain how or why the amount of the Utilities' adequate assurance requests should be modified. Indeed, the Debtors never even address the matter in the Utility Motion because Debtors failed to: (1) contact the Utilities concerning their adequate assurance requests; and (2) make any attempt to determine whether the Utilities' requests for adequate assurance needed to be modified. Accordingly, the Court should deny the relief requested by Debtors in the Utility Motion

18

and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities. *See In re Lucre, Inc.*, 333 B.R. 151, 154 (Bankr. W.D. Mich. 2005) (holding that the right of a debtor or trustee to seek modification of a utility's deposit request "arises only after the adequate assurance payment has been agreed upon by the parties.").

**B.    THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.    Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

A determination of adequate assurance is within the court's discretion, and is made on a case-by-case basis, subject to the new requirements of Section 366(c). *See In re Utica Floor Maintenance, Inc.*, 25 B.R. 1010, 1016 (Bankr. N.D.N.Y. 1982); *In re Cunha*, 1 B.R. 330, 332-33 (Bankr. E.D. Va. 1979).    Section 366

SL1 892820v1/000000.00000

of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990). The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985). Based on the Debtors' anticipated utility consumption, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of bills is approximately two (2) months. Accordingly, the deposits requested by the Utilities are reasonable. *See In re Stagecoach*, 1 B.R. at 735-36 (holding that a two month deposit is appropriate where the debtor could receive sixty (60) days of service before termination of services because of the utilities' billing cycle.); *see also In the Matter of Robmac, Inc.*, 8 B.R. 1, 3-4 (Bankr. N.D. Ga. 1979).

As set forth above, the Utilities' adequate assurance requests are based on: (1) the Utilities' billing exposure

created by their respective state law tariffs and/or regulations (the "Tariffs"); and, (2) amounts that applicable public service commissions, which are neutral third-party entities, permit the Utilities to request from their customers. Although the Utilities recognize that this Court is not bound by the Tariffs, the Tariffs are extremely relevant information of a determination made by an independent entity on the appropriate amount of adequate assurance that should be paid to the Utilities.

In contrast, the Debtors do not provide an objective, much less an evidentiary, basis for their proposed adequate assurance in the form of an Escrow Account containing the equivalent of the Debtors' estimation of 50% of monthly utility charges. Moreover, it appears that Debtors' counsel believes the only way to secure the payment of their fees, along with other professionals, is to seek and obtain a Carve Out from post-petition funding. If people with first-hand knowledge of the Debtors' current and future financial condition believe they need to obtain a carve-out to have their bills paid, it would appear that post-petition vendors, such as the Utilities, should be included in the Carve Out.

Additionally, the monthly exposure of many of the Utilities is significant and would result in a material loss if the Debtors failed to pay their monthly utility invoices. The Debtors proposed two-week Escrow Account does not cover the Utilities' monthly invoices and is woefully inadequate to cover exposure if the Debtors fail to timely

pay for one month's service and receive another month's service before the applicable Utility could terminate service for the post-petition payment default. The bottom line is that if the Debtors want to continue to receive the Utilities' generous trade terms established by the Tariffs (i.e. bills issued monthly in arrears with due dates 15 to 30 days thereafter), they need to provide the Utilities with more security than a two-week deposit escrow. The Debtors are not asking their counsel to provide unsecured post-petition service and likely are on C.O.D. with most of their other post-petition vendors (other than those whose prepetition claims they are paying at the beginning of these cases because they are purportedly more critical than the Utilities) so they should not be allowed to treat the Utilities so differently.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1. Denying the Utility Motion as to the Utilities;

2. Awarding the Utilities post-petition adequate assurance of payment pursuant to Section 366 in the amounts satisfactory to the Utilities; and

3. Providing such other and further relief as the Court deems just and appropriate.

Dated:  December 24, 2008        STEVENS & LEE, P.C.

/s/ John D. Demmy_____
John D. Demmy (DE Bar No. 2802)
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Phone:    (302) 425-3308
Fax:      (610) 371-8515
E-mail:   jdd@stevenslee.com

-and-

Russell R. Johnson III
John M. Craig
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
Facsimile: (804) 749-8862

*Counsel For Connecticut Light and Power Company, Yankee Gas Services Company, PECO Energy Company, Commonwealth Edison Company, Duke Energy Indiana, Inc., Southern California Edison Company, Virginia Electric and Power Company d/b/a Dominion Virginia Power, Niagara Mohawk Power Corporation d/b/a National Grid, Consolidated Edison Company of New York, Inc., Metropolitan Edison Company, Pennsylvania Electric Company, CenterPoint Energy Services, Inc., Connecticut Natural Gas Corporation and Baltimore Gas And Electric Co.*

SL1 892820v1/000000.00000