```
                IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE DISTRICT OF DELAWARE

                              - - -

IN RE:                       : Chapter 11
                             :
TRIBUNE COMPANY, et al,      : Case No. 08-13141 (KJC)
                             :
                             : Wilmington, Delaware
                             : December 10, 2008
          Debtors            : 10:43 o'clock a.m.
. . . . . . . . . . . . . . . :

                          HEARING
               BEFORE THE HONORABLE KEVIN J. CAREY
               UNITED STATES BANKRUPTCY COURT JUDGE

                              - - -

APPEARANCES:

For the Debtor:      JAMES F. CONLAN, ESQUIRE
                     BRYAN KRAKAUER, ESQUIRE
                     KEVIN LANTRY, ESQUIRE
                     JESSICA BOELTER, ESQUIRE
                     Sidley Austin LLP
                     One South Dearborn Street
                     Chicago, IL  60603

                          - and -

                     NORMAN L. PERNICK, ESQUIRE
                     WARREN A. USATINE, ESQUIRE
                     Cole, Schotz, Meisel, Forman
                     & Leonard, P.A.
                     1000 N. West Street
                     Suite 1200
                     Wilmington, DE  19801

                          - and -

                     DAVID ELDERSVELD, ESQUIRE
                     Tribune Company

For the Trustee:     JOSEPH McMAHON, ESQUIRE
                     U.S. Department of Justice
                     Office of the United States Trustee
                     J. Caleb Boggs Federal Building
                     844 King Street, Suite 2207
                     Wilmington, DE  19801

                              - - -
```

2

APPEARANCES:  (continued)

```
For Merrill Lynch:      LAURIE SELBER SILVERSTEIN, ESQUIRE
                        Potter, Anderson & Corroon LP
                        1313 N. Market Street
                        Wilmington, DE  19801

                                  - and-

                        MADLYN PRIMOFF, ESQUIRE
                        Kaye Scholer, LLP
                        425 Park Avenue
                        New York, NY  10022

For Washington         JAMES L. LINSEY, ESQUIRE
Baltimore Newspaper    Cohen Weiss & Simon, LLP
Guild:                 330 West 42nd Street
                        New York, NY  10036

For Barclays:           WILLIAM E. CHIPMAN, JR., ESQUIRE
                        Edwards Angell Palmer & Dodge
                        919 North Market Street
                        15th Floor
                        Wilmington, DE  19801

                        BRIAN TRUST, ESQUIRE
                        ANNA PRIHAN, ESQUIRE
                        Mayer Brown LLP
                        1675 Broadway
                        New York, NY  10019-5820

For JP Morgan Chase: MARK COLLINS, ESQUIRE
                        Richards, Layton & Finger P.A.
                        One Rodney Square
                        920 North King Street
                        Wilmington, DE  19801

                                  - - -

Audio Operator:        Al Lugano

Transcribed by:        Paula L. Curran, CET
```

        (Proceedings recorded by The Record Player digital
sound recording; transcript provided by AAERT-certified
transcriber.)

1          (The following occurred in open court at 10:42

2    o'clock a.m.)

3          THE CLERK:  All rise.

4          THE COURT:  Good morning, everyone.

5          MR. PERNICK:  Good morning, your Honor.  Norman

6    Pernick from Cole, Schotz, Meisel, Forman & Leonard, on

7    behalf of the debtors.  We are co-counsel with the Sidley &

8    Austin firm in the Tribune Family cases.  We thank your

9    Honor, off the bat, for making the time for us this morning

10   on your schedule.

11         And your Honor, I have three parties who are going

12   to speak today from Sidley, three of my co-counsel, Mr. James

13   Conlan, Mr. Bryan Krakauer and Mr. Kevin Lantry are here.  We

14   have already filed pro hac motions for them.  And I'm not

15   sure what your Honor's pleasure is.  Would you like other

16   parties to do introductions, at this point or as they speak?

17         THE COURT:  Why don't we do that now.

18         MR. PERNICK:  Okay, thank you.

19         MR. CHIPMAN:  Good morning, your Honor, William

20   Chipman, Edwards, Angell, Palmer & Dodge on behalf of

21   Barclays.  Your Honor, in the courtroom with me today is Mr.

22   Brian Trust from Mayer, Brown and Anna Prihan (ph) from Mayer

23   Brown.  Your Honor, we filed their pro hac papers yesterday

24   and I believe your Honor has already entered an order.

25         THE COURT:  All right, thank you.

1              MR. CHIPMAN:  Thank you.

2              MS. SILVERSTEIN:  Good morning, your Honor, Laurie

3    Silverstein, Potter, Anderson & Corroon.  With me today is

4    Madlyn Primoff from Kaye Scholer.  We represent the agent on

5    the bridge facility, Merrill Lynch and I would move for

6    admission orally pro hac, so, she can address the Court today

7    and I will follow it up with a written submission.

8              THE COURT:  All right, thank you, that's fine.

9              MS. SILVERSTEIN:  Thank you.

10             MR. COLLINS:  Good morning, your Honor, for the

11   record, Mark Collins of Richards Layton & Finger on behalf of

12   JP Morgan Chase.  Your Honor, I'd like to introduce Damian

13   Schaible and James Florack of the Davis Polk and Wardwell

14   firm.  We will be filing notices of appearance on behalf of

15   JP Morgan later today.

16             THE COURT:  All right, thank you.

17             MR. COLLINS:  Thank you.

18             MR. LINSEY:  Good morning, your Honor.  My name is

19   James Linsey of the law firm Cohen Weiss and Simon in New

20   York.  Your Honor, due to the time constraints, I have not

21   yet had an opportunity to engage local counsel.  But with

22   your Honor's permission, I would like to be heard today on

23   behalf of the Newspaper Guild of New York and the Washington

24   Baltimore Newspaper Guild.  They represent employees at WPIX

25   in New York and the Baltimore Sun respectively.

1          THE COURT:  Are you a member in good standing of

2    another bar?

3          MR. LINSEY:  Yes,  your Honor.

4          THE COURT:  Welcome, sir.

5          MR. LINSEY:  Thank you.

6          MR. PERNICK:  Your Honor, we have good news.  We've

7    actually resolved many of the objections and questions and

8    concerns from the U.S. Trustee and other parties that we had

9    before the hearing.  So, I'm going to turn the podium over to

10   Mr. Conlan, at this point and he's going to go through those

11   with you and suggest an order, mostly within the order on the

12   agenda.  I think we're going to suggest that we move a couple

13   of the ones that we still have issues on towards the end.

14         THE COURT:  Very well.

15         MR. PERNICK:  Thank you.

16         MR. CONLAN:  Good morning, your Honor.  I am Jim

17   Conlan from Sidley Austin on behalf of the debtors.  Your

18   Honor, first, just by way of a relatively brief introduction

19   and to give you some background, I'll give you a brief walk

20   through of these charts that we've put on either side of your

21   courtroom.

22         But by way of a brief background, we have in the

23   courtroom with us -- let me rephrase that.  Let's start with

24   introductions.  Mr. Chandler Bigelow is sitting behind me.

25   Mr. Bigelow is the Senior Vice President and Chief Financial

1    Officer of the Tribune Companies, the entity at the very top

2    of that chart.

3            Also, next to Mr. Bigelow, to his right, is Mr.

4    David Eldersveld.  He is a Vice President and he is the

5    Deputy General Counsel of the Tribune Companies, again, the

6    entity at the very top.

7            Now, some brief background.  Your Honor, as you may

8    know, the Tribune Companies, the debtors, are the largest

9    employee-owned media and entertainment company in the United

10   States.  The business breaks down into two very broad

11   categories.  The first category is publishing, for example,

12   the newspaper business.  And the other is broadcasting and

13   entertainment, like the TV business, radio business, for

14   example.  It's a big company, to state the obvious.  The '07

15   revenues of the companies and that's debtors and non-debtors,

16   was $5.1 billion.  Going back to those two broad business

17   segments again, publishing represented 72 percent of those

18   revenues and broadcasting and entertainment represented the

19   other 28 percent.

20           In terms of the reason we're here, we are here

21   because our business is both the publishing side and the

22   broadcasting and entertainment side depend most on

23   advertising.  We make some money selling newspapers and the

24   like, but mostly, it's from advertising.  And there has been,

25   to say the least, a precipitous decline in the advertising

1    business generally, because of the broad trends in the

2    economy, that is, difficulty in the economy and because of

3    changes in the way advertising works.  I won't say more about

4    it in terms of why we're here than that, at this juncture.

5              In terms of the entities that are in bankruptcy, I

6    want to just walk you, again, briefly through this chart to

7    your right, your Honor, my left.  This chart and I'll try to

8    stay near the microphone.  This chart represents all of the

9    affiliates of the Tribune Company.

10              THE COURT:  Well, we have the hand-held mike if

11   you'd like to walk toward the chart.  It's up to you.

12              MR. CONLAN:  Okay.

13              (Pause.)

14              MR. CONLAN:  We also, I believe, have some extra

15   copies, if anybody in the courtroom would like a miniature

16   version of what's up there on the left.

17              (Pause.)

18              MR. CONLAN:  Pardon me, your Honor, while those are

19   handed out.

20              THE COURT:  That's fine.

21              (Pause.)

22              MR. CONLAN:  Okay, very well.  There are 128

23   entities up there on that chart.  111 of them are the subject

24   of this bankruptcy case or these bankruptcy cases.  The

25   balance of the entities are not in bankruptcy and the one

1  entity I want to describe and entities around it, that is not

2  in bankruptcy is the Cubs organization.  The Cubs are not in

3  bankruptcy.

4         In terms of this chart, the way we've attempted to

5  designate the debtors versus the non-debtors is the debtors

6  are the entities where the line around the name is solid.

7  And the non-debtors are the entities where the line is not

8  solid or rather, dashed.  One more thing I want to say about

9  this chart and then I will go from the left, my left, over to

10  my right.

11         The chart on the right, which is a bit more

12  simplistic, is that with the exception of the two stock

13  pledges that are at the very top of the chart, where you will

14  see the red X's, one on your left, just above Tribune

15  Broadcasting, HoldCo, LLC and the other, just above Tribune

16  Finance, LLC, on your right.  With the exception of those

17  stock pledges and I'll come back to who enjoys those stock

18  pledges or which of the creditor groups enjoy them.  With the

19  exception of those stock pledges, none of the debt at the

20  debtor operating company guarantors, is secured in any

21  respect.  That is and I'm going to start, I'm going to go

22  over here to this chart, as I explain it.  And if people

23  can't hear me, I'll come back to the microphone, but I'm

24  going to try to cast my voice.

25         THE COURT:  Well, we have the lapel mike for you to

1    use.

2            MR. CONLAN:  Pardon me?

3            THE COURT:  We have the lapel mike that you can use,

4    if you'd like to walk from the podium.

5            MR. CONLAN:  That would be great, yes, if you have

6    it handy.

7            (Pause.)

8            MR. CONLAN:  This chart, your Honor, shows the

9    Tribune Company funded debt structure.  We haven't attempted

10   to show trade credit.  It isn't an enormous amount to begin

11   with, but we haven't attempted to show it here.  Here, where

12   we say holding company, Tribune Company, this yellow box at

13   the top, corresponds to the box at the very top over there,

14   Tribune Company.  We call it the parent.

15           The parent funded debt obligations are what we call

16   the credit facility, which includes and you'll become

17   intimately familiar with these debt phrases, the X, the B and

18   the revolver, the total amount approximately of the X, the B

19   and the revolver is $8.449 billion U.S.

20           The holding company, again, on the left, is also

21   obligated on what we call the bridge facility.  It is $1.6

22   billion.  The holding company is also obligated on eight

23   series of public notes, that in the aggregate comprise $1.26

24   billion.  Those obligations, those three categories of

25   obligations that I just walked through, are all, with respect

1  to their claims against the holding company, pari passu, they

2  are at the same level with one another.

3       The other funded debt obligations of the holding

4  company are subordinate to those three sets of obligations

5  that I just went through.  They are a $225 million dollar

6  note to EGI and $900 million in obligations to what we refer

7  to as the Phones (ph).  Again, these are substantially all of

8  the funded debt obligations of the parent company, Tribune

9  Company.

10       The box on the bottom right here, corresponds to

11  what we put into three categories.  These are debtors, the

12  publishing companies and the broadcast and entertainment

13  companies.  And then on the right, what again, we call the

14  non-debtor companies, for example, the Cubs and others, the

15  ones that have the dashed lines around them.  There is, to

16  say the least, enormous value at the level of these operating

17  companies.  There's also very significant value at Tribune,

18  itself, in terms of the assets it owns, but there is enormous

19  value at the operating companies.  The obligations of the

20  operating companies, debtors and non-debtors, are again, the

21  credit facility obligation, the X, the B and the revolver,

22  which comprise $8.449 billion.

23       And now -- and you'll notice I didn't list, pardon

24  me.  I did list, well, let me back up and walk through it

25  this way.  The obligations of the operating companies are the

1    credit facilities, the X, the B and the revolver and it also

2    has obligations that are contractually subordinate to the

3    credit facility, but those obligations are only the bridge

4    facility of $1.6 billion.  Stated differently or by negative

5    implication, the operating companies are not obligated on the

6    notes.  They are not obligated on the EGI promissory note and

7    they are not obligated on the $900 million of Phones.  And

8    you will hear that many times throughout these cases.  Again,

9    the subordination of the $1.6 billion bridge facility to the

10   X, B and revolver, is contractual subordination found in the

11   guarantee of the bridge facilities by the operating

12   companies.

13           Coming back, your Honor, to the broad theme that I

14   started with before I started to go through the charts, what

15   makes this group of companies so remarkable and what should

16   give us the opportunity to restructure these businesses in

17   the most intelligent, deliberate way for the benefit of the

18   collective stakeholders of these companies, is that the

19   operating companies don't have any secured debt.  The claims

20   against them on those guarantees, credit facility, meaning

21   the X, the B, the revolver, the $8.449 billion and the

22   contractually subordinated bridge facility, are -- those

23   guarantee claims are unsecured, your Honor.

24           Up at the holding company, with the exception of

25   those stock pledges that I mentioned over here, those

1   obligations are otherwise unsecured.  That puts this company,

2   again, in a strikingly good position to reorganize

3   intelligently with this Court's help.  The cash that the

4   company has, as well, is for the most part, other than small

5   amounts that are what we called caught in a system, are not

6   subject to any right of offset.  The cash sits in banks,

7   financial institutions that are not among our creditors, so,

8   they have no -- our creditors have no right of offset with

9   respect to the cash that we had on the day when we initiated

10  these bankruptcy proceedings.

11         With that little bit of background, I'd like to move

12  in, if your Honor would let me, into the first day motions.

13         THE COURT:  Very well.

14         MR. CONLAN:  Your Honor, as Mr. Pernick suggested,

15  at the opening, the good news is the substantial number of

16  the motions that we have filed are unopposed.  There are some

17  modifications to the orders, to arrive at that place and we

18  will walk through those.  And I'll do that and what I will do

19  as part of that, your Honor, is tender to the Court both

20  clean and blackline versions of the orders that will show you

21  the modifications.  I'm also going to go through them in sort

22  of a headline way.  And if you want me to show you where the

23  changes are in the order, I can do that or we can just do it

24  in a headline fashion.

25         THE COURT:  All right, well, I'll have the

1  blacklines in front of me.

2          MR. CONLAN:  May I approach?

3          THE COURT:  You may.  Thank you.

4          MR. CONLAN:  Your Honor, the first item on the

5  agenda is not a motion.  It's the affidavit of Mr. Chandler

6  Bigelow, the gentleman I introduced to you at the beginning,

7  who is, again, present in the courtroom right behind me.  And

8  if it pleases the Court, I'll move on to the uncontested

9  motions and when we're finished with those, I'll either

10  proffer the affidavit with respect to those uncontested

11  motions or we will wait and deal with that until after we go

12  through the contested motions.

13          THE COURT:  All right, I have read it.

14          MR. CONLAN:  Okay.

15          THE COURT:  You may proceed.

16          MR. CONLAN:  First up, your Honor, Item Number 2 on

17  the agenda, which is simply the joint administration motion.

18  It is not surprisingly, unopposed.

19          THE COURT:  Anyone else care to be heard in

20  connection with this motion?  I hear no response.

21          MR. CONLAN:  Item Number 3, your Honor, the

22  application for an order authorizing the debtors and the

23  debtor in possession to retain and employ Epiq Bankruptcy

24  Solutions, LLC as claims noticing and balloting agent.  It is

25  unopposed, we believe.  We've worked out the U.S. Trustee's

1    issues, the modification that was required was a change to

2    the engagement letter.  The revised engagement letter should

3    be attached to the blackline order and it is referenced in

4    the order.

5                THE COURT:  All right.  I've reviewed the blackline.

6    Let me ask if anyone else cares to heard in connection with

7    this motion.

8                MR. McMAHON:  Your Honor, good morning, Joseph

9    McMahon for the acting United States Trustee, to complete the

10   record on this point.  In addition to two changes to the

11   engagement letter, we also inserted the standard provision

12   regarding fee review invoices in the order.  Thank you.

13               THE COURT:  All right.  I don't have any questions.

14   That order has been signed.

15               MR. CONLAN:  Very well, thank you.  And your Honor,

16   we will be as organized, as we can, but we appreciate the

17   help of the U.S. Trustee's Office, particularly, Mr. McMahon,

18   who's been working very late with us on these changes, so

19   there may be items like the one where Mr. McMahon quite

20   correctly pointed out where our notes aren't perfectly in

21   sync, but we're in agreement.

22               THE COURT:  All right.

23               MR. CONLAN:  The next item, Item Number 4, the

24   so-called tax motion.  The motion of the debtors for an order

25   authorizing, but not directing, the payment of certain

1   pre-petition sales use of franchise and property taxes,

2   licensing fees and similar obligations.  Your Honor, that is

3   also unopposed.  We have some modifications.  The

4   modifications are, first, a hard cap of $18,260,000 rather

5   than any kind of cap plus a percentage flexibility above

6   that.  What the U.S. Trustee wanted and we agree, is a fixed

7   number and that number is $18,260,000.

8        THE COURT:  All right.  This is the first item for

9   which I think it's necessary to have some evidentiary

10  support.  So, I think we have to address that issue, at this

11  time, by having you proffer the first day affidavit or to

12  address that in some other way.

13       MR. CONLAN:  Okay.  Your Honor, help me with respect

14  to how you'd like to proceed.  I can --

15       THE COURT:  I would be content simply to have you

16  offer it into evidence.

17       MR. CONLAN:  Very well.

18       THE COURT:  Subject to objection and subject to

19  someone in connection with this motion or another, wishing to

20  cross-examine.

21       MR. CONLAN:  Very well, your Honor.  We proffer the

22  affidavit of Mr. Chandler Bigelow into evidence and if anyone

23  wishes to cross-examine him with respect to the matters in

24  his affidavit now or as a grouping, at the end, depending on

25  how you care to proceed with respect to this tax motion, we

1    are happy to make him available.

2              THE COURT:  All right.  Let me first ask whether

3    anyone has any objection to the admission of affidavit of Mr.

4    Bigelow?  I hear no response.  It's admitted without

5    objection.  Does anyone wish to examine Mr. Bigelow in

6    connection with this motion or to otherwise be heard in

7    connection with this motion?  All right.

8              I see one of the revisions to the form of order

9    involves addition of a hard cap, as opposed to the variance,

10   which was initially proposed.  I think that was a good

11   change.  I have read the affidavit in support of this relief.

12   I'll also mention that with respect to this and other

13   motions, which call for payments which would otherwise be

14   governed by the standard under Rule 6003.  While the orders

15   specifically do not have language which indicates that that

16   standard has been met, based upon the support offered in the

17   first day affidavit and made part of the record and in the

18   absence of objection, I will conclude orally from the bench,

19   that that standard has been met.  So, I'm prepared to grant

20   the relief that's been requested.

21              MR. CONLAN:  Thank you, your Honor.  One additional

22   point, at JP Morgan's request.  It's a good request, we're

23   happy with it.  This order also provides and you'll see this

24   in some of the other orders when I come on to them, is that

25   it now provides that the debtors shall provide to the

1   statutory committee of unsecured creditors and to the Office

2   of the United States Trustee, reasonable and timely access to

3   information sufficient to enable such parties to monitor

4   payments made, obligations satisfied and other actions taken

5   pursuant to this order and we are happy with that.  There is

6   also a standard provision added that says, to the extent the

7   debtors have good funds standing in their credit with such

8   banks or other financial institutions, that's just an add-on

9   to the order to the banks that they receive, process and

10  honor checks.  It basically says, to the extent we have money

11  available.   And certainly, that's fair and they wish that

12  clarification.

13          Rather than repeating those last to items, the if we

14  have money in the bank point, as well as the reasonable

15  access point, when that comes up in subsequent motions, I

16  will simply refer to it as the -- if your Honor is okay with

17  this -- as the JPM addition?

18          THE COURT:  I'm fine with that.

19          MR. CONLAN:  Next, your Honor, the insurance motion.

20  Item Number 5 on the agenda.  The motion of the debtors for

21  an order authorizing the debtors to pay installments on a

22  pre-petition insurance premium finance arrangement, continue

23  pre-petition insurance programs and pay all pre-petition

24  obligations in respect thereof.  Your Honor, this is

25  unopposed.  The JPM language will be inserted.

```
 1                THE COURT:  All right, does anyone else care to be
 2    heard in connection with this motion?  All right, I'll simply
 3    note that the submissions indicate that there is presently no
 4    amount past due under this arrangement and the order
 5    authorizes going forward with the payment of the installments
 6    when due.
 7                MR. CONLAN:  Thank you, your Honor.  Also, to
 8    correct what I just said, the JPM language is in.  I said it
 9    will come in, it's in, in the orders that you have.
10                THE COURT:  That order has been signed.
11                MR. CONLAN:  Item Number 6, the customer
12    accommodation motion.  The motion of the debtors for an order
13    authorizing, but not requiring the debtors to honor certain
14    pre-petition obligations to customers and to otherwise
15    continue pre-petition customer programs and practices in the
16    ordinary course of business.  Your Honor, this motion is
17    unopposed and the JPM language has been inserted.
18                THE COURT:  All right.  Let me ask if anyone else
19    cares to be heard in connection with this motion?  I hear no
20    response.  I note that there is no cap inserted in this
21    order, but given the nature of the adjustments that are made
22    under some of the programs, I can understand why that would
23    not be appropriate in this case.  I have no questions and I'm
24    prepared to grant the relief that's been requested based upon
25    the record made.
```

1            MR. CONLAN:  Thank you, your Honor.

2            THE COURT:  That order has been signed.

3            MR. CONLAN:  That brings us to Item Number 7, so

4    often referred to as the wage motion.  Unless the Court

5    requires, I will not go through the title of this motion.

6            THE COURT:  I'd prefer you wouldn't, actually.

7            MR. CONLAN:  Thank you, your Honor.  This motion is,

8    we believe, unopposed.  We have the agreement of the U.S.

9    Trustee with significant modifications, all of which we agree

10   to.  A couple of facts, your Honor, which are rather just to

11   remind people in the courtroom, all of which is in the

12   affidavit.  We have 14,600 employees, 12,000 independent

13   contractors and 770 temporary workers.  This wage motion has

14   a number and we'll go through what this number means later,

15   of $74 million.  If people in the courtroom are curious as to

16   what the debtors monthly typically would be, it's 107, it's a

17   big company.

18           With respect to changes to the order, your Honor,

19   that we've agreed to with the U.S. Trustee, we have inserted

20   an aggregate cap of $74,037.000.  Excluded from that cap,

21   however, are items that are not estimable.  Number one,

22   healthcare, two, long-term disability, three, workers

23   compensation and four, retiree medical care.  Those amounts

24   which are difficult, if not impossible, to estimate, go above

25   the $74,037,000.

1        With respect to individuals, your Honor and I'm

2   moving on now from the aggregate concepts to the individuals.

3   We have, of course, agreed to the $10,950 cap per individual.

4   After excluding the following categories, again, for which

5   estimates of the amount of pre-petition claims cannot be

6   individually determined, healthcare, long-term disability,

7   workers comp and retiree medical care.  Also excluded from

8   that $10,950 cap is vacation time that is actually taken by

9   an employee by receiving continual payroll during vacation

10  leave, rather than through any lump sum.  Or vacation that is

11  required to be cashed out under applicable State Law.  I

12  understand, California, for example, requires that.  It is

13  important for your Honor to hear from us, in our view, that

14  our policy is to not cash people out with respect to their

15  vacation.  That's our policy, we only would cash them out if

16  State Law required it.  So, if they don't use it, you know,

17  either they lose it, depending on the policy or they'll have

18  it in another place, but not cash.

19        The last item that is excluded from the $10,950 cap

20  by agreement with the U.S. Trustee is the category of

21  reimbursable expenses that are paid directly to employees, to

22  reimburse them for amounts expended, provided that the

23  aggregate -- now I'm switching back from individual to

24  aggregate -- provided that the aggregate amount that the

25  debtors can expend on account of reimbursable expenses, is

1    $3,450,000, it can't be more than that.

2              The order also provides the JPM language that we

3    will provide to the United States Trustee and the official

4    unsecured creditors committee reasonable access to monitor

5    payments made here, as well.

6              Further and if I misstate this, I certainly hope Mr.

7    McMahon will join me and help me.  The U.S. Trustee and the

8    pre-petition lenders, JPM, both wanted us to represent and

9    we're happy to do it, that the wage motion does not involve

10   any payments for the following.  Bonuses, payments to or

11   funding of the ESOP, the Employee Stock Ownership Plan.  Does

12   not involve contributions to the debtor's pension plans,

13   other than the partial matching for employee's 401K

14   contributions.  It does not involve payments under

15   non-qualified pension plans.  And it does not involve

16   severance payments other than the brief continuation of

17   healthcare during a 90-day notice period.  With all of those

18   items, your Honor, we have, I believe, an agreed and

19   unopposed wage order, at least, with the U.S. Trustee and

20   JPM.

21              THE COURT:  All right, let me ask if anyone else

22   cares to be heard in connection with this motion.

23              MR. McMAHON:  Your Honor, good morning.  Joseph

24   McMahon, again, for the acting U.S. Trustee.  One additional

25   representation, which I believe is accurate, is that the

1   motion is not seeking going forward authority to implement a

2   bonus or severance plan in ordinary course or otherwise, in

3   addition to payment of the pre-petition fees.

4           MR. CONLAN:  That's correct, it does not seek that.

5           MR. LINSEY:  Good morning, your Honor, James Linsey

6   on behalf of the Washington Baltimore Newspaper Guild, on

7   this particular motion.  Your Honor, in reading the motion,

8   particularly, at paragraphs 47 and 48, I believe or I'm

9   sorry, 48 and 49, the debtor does not seek authority to pay

10  severance pay, but does seek authority to pay up to three

11  months continued healthcare benefits.  And I believe that

12  their concern there was so as not to run into concerns with

13  11 USC, Section 114, protecting those benefits until --

14  unless and until they've been rejected.

15          Your Honor, but we would point out that Section 1113

16  of the Code is also implicated in this motion, since

17  approximately 16 employees are due for severance payments

18  under a collective bargaining agreement between the

19  Washington Baltimore Newspaper Guild.  These are employees at

20  the Baltimore Sun and a slightly greater number have

21  continued healthcare benefits beyond this motion's proposed

22  three-month cap.  We don't believe that the debtor has, by

23  this motion, formulated an 1113 motion and we would just

24  preserve all of our rights with this respect.  Hopefully, the

25  debtor and we can have a dialogue and we can quickly move the

1    Court to preserve and protect these collectively bargained

2    items without significant, we don't believe significant,

3    expense to the debtor.

4              THE COURT:  Thank you.

5              MR. LINSEY:  Thank you, your Honor.

6              THE COURT:  Does anyone else care to be heard in

7    connection with this motion?  I hear no further response.

8    All right, I'm assuming that the debtor's in agreement with

9    that statement.  I did read the motion that way, myself.

10             MR. CONLAN:  We are in agreement with that

11   statement, your Honor.

12             THE COURT:  I don't have any questions and based on

13   the record made, I'm prepared to grant the relief that's been

14   requested.

15             MR. CONLAN:  Thank you, your Honor.

16             THE COURT:  The amount is a significant one, but as

17   counsel has pointed out on several occasions, this is a large

18   enterprise and the submissions indicate in detail the various

19   programs and justify the need for the continuance of the

20   benefits.  And therefore, I think the relief is warranted.

21             MR. CONLAN:  Thank you, your Honor.  With respect to

22   Number 8, the motion for an order approving the cash

23   management system, we'd like to pass that to the end and

24   we'll couple it up with the financing motion.

25             THE COURT:  Okay.

1         MR. CONLAN:  Moving on to Number 9.  We have

2    agreement with the U.S. Trustee on Item Number 9.  A couple

3    of points, a couple of clarifications.  We do not seek, at

4    this time, to net out any deposits that utilities might have,

5    in calculating the two weeks of deposit that the motion asked

6    for approval of and Mr. McMahon raised that and we agree with

7    that.

8         He also asked us and we were happy to do it, to

9    tighten our language, so that it more accurately tracked 366.

10    And this is, as your Honor knows, an interim order and the

11    parties have the ability to come back at the second day

12    hearing, we'll call it, which we'll be asking for at the end

13    of these hearings today.

14         THE COURT:  Does anyone else care to be heard in

15    connection with this motion?  I hear no response.  This is a

16    fairly standard relief requested here and I'm prepared to

17    grant it.  I will, however, set the order aside, for the

18    moment.  This involves choosing, as you point out, a hearing

19    date and there are, at least, a couple others that will

20    require the same, so, let's address them, at least in terms

21    of the date, altogether, at the end.

22         MR. CONLAN:  Thank you, your Honor.  That brings us

23    to Item Number 10.  What we call the broker motion, the

24    motion of the debtors for an order pursuant to 363(b) and

25    (C)1 authorizing, but not requiring, the debtors to continue

1    to operate in the ordinary course, including payment of

2    pre-petition date claims with respect to brokers.  We have a

3    large number of brokers who are employees, typically, sales

4    people.  And we have agreed with the U.S. Trustee to cap

5    that, that is, cap the amount paid to each of those

6    individuals at $10,950, excluding the very same items that

7    were excluded back under the wage motion, your Honor.  Which

8    I could, I'll just refer to them, unless you want me to walk

9    through them?

10             THE COURT:  Not necessary.

11             MR. CONLAN:  Thank you.  The second point is we have

12   also agreed and we do intend to come back in the future, if

13   any of our broker employees would exceed that, to ask the

14   Court, perhaps, to approve amounts that are above that.  But

15   we're not asking for that relief today.

16             THE COURT:  All right.  And again, I see there's a

17   bland for a hearing date.  Let me ask if anyone else cares to

18   be heard in connection with this motion?  I hear no response

19   and based on the record, I'm prepared to grant that relief,

20   but we'll put that aside and fill in the date later.

21             MR. CONLAN:  Very well.  The JPM language is in that

22   order, as well, your Honor.

23             That brings us to Number 11, the shippers and lien

24   claimants motion.  This, too, is unopposed with

25   modifications.  The shippers, the U.S. Trustee had no issue

1    there.   The amount, with respect to the amount, the amount is

2    $5,500,000 for the shippers.  For the lien claimants, the

3    U.S. Trustee did have some issues with respect to the size of

4    that, that is the amount that was being requested and we have

5    agreed to reduce it to $2,591,920.  And the JPM language is

6    included.

7            THE COURT:  All right, does anyone else care to be

8    heard in connection with this motion?  I hear no response.

9    Based upon the record that's been made, I'm prepared to grant

10   the relief that's been requested.  That order has been

11   signed.

12           MR. CONLAN:  Thank you, your Honor.  Next, Item

13   Number 12, is simply a motion for an order granting

14   additional time to file schedules of assets and liabilities

15   and our statements of financial affairs.  Your Honor, this is

16   unopposed by agreement with the U.S. Trustee, but we want to

17   be clear with the Court that while we have 45 days under the

18   order that we have provided you, 15 plus the 30, by virtue of

19   the fact that we have more than 200 creditors, we don't think

20   we can get it done in 45 days, but we will try.  And we want

21   to let you know that we will be asking you for a hearing date

22   in the future.  Once we have a better sense of how much more

23   time we will need and that's without prejudice to the U.S.

24   Trustee's rights, of course, to say that we shouldn't have

25   more time.  But, we wanted to be open and in front with you

1    about our lack of optimism with respect to our ability to get

2    it done in 45 days.

3            THE COURT:  All right, it's an anticipated debt, you

4    would come back in the batch of the second day hearings or

5    you'd like a date further out for this one?

6            MR. CONLAN:  Your Honor, the tension, frankly, in my

7    own mind there, is that if you give us a second day hearing

8    that is at the very beginning of January and therefore, we've

9    only worked on the schedules and so is, albeit, very hard for

10   25 days, the U.S. Trustee may wonder if we've really tried

11   hard to make it within 45.  So, perhaps, we could tell you

12   where we are at the second day hearing, but keep in your mind

13   that we may need a hearing after that, that is closer to 45

14   days, but not too close.

15           THE COURT:  All right, we can pick a different date

16   for that.

17           MR. CONLAN:  All right, thank you, your Honor.

18           THE COURT:  Does anyone else care to be heard in

19   connection with this motion?  I have no questions, the

20   request is a modest one.

21           MR. CONLAN:  Next, your Honor, the critical vendor

22   motion.  Your Honor, I believe we have agreement here.  It is

23   unopposed in terms of modifications, the bridge lenders, the

24   $1.6 billion over there on the chart, represented by Kaye

25   Scholer, asked for and it was a good change, a conforming

1  change in the order, to make clear that as a condition to

2  anybody receiving critical vendor dollars, that they will

3  give us customary terms or whatever else we are able to

4  negotiate with them, as a condition of that.  And we should

5  have caught that ourselves and that we made that change.  And

6  of course, the JPM language is in.

7          As your Honor knows, the number for critical vendor

8  is $20,350,000.

9          THE COURT:  Yes.  And not an insignificant number,

10  but reasonable in relation to the magnitude of the debtor's

11  business -- businesses, I should say.  But, let me ask if

12  anyone else cares to be heard in connection with this motion?

13  I hear no response.  Based upon the record made, I'm prepared

14  to grant this relief.  Again, it calls for a hearing date,

15  so, let me put that aside for a date.  And just let me ask,

16  is that something that you would think fall into second days

17  or should we push that back, say, with the --

18          MR. CONLAN:  Your Honor, actually, and I'll ask you

19  to help me here, we thought this would be a final order for

20  the -- our ability to spend up to $20,350,000 that we

21  wouldn't have to bring this back on the second day.

22          THE COURT:  Well, the form of order provides, unless

23  I'm looking at the wrong one --

24          MR. CONLAN:  Oh, I apologize, your Honor.

25          THE COURT:  Yes.

1    MR. CONLAN:  What we do need a second day hearing on

2    is with respect to the item that we didn't ask for any relief

3    on today.  I apologize.

4    THE COURT:  Yes, the 503(b)9.

5    MR. CONLAN:  The 503(b)9 number of $30 million.  I

6    apologize, yes, we do need that on the second day hearing.

7    THE COURT:  All right.  I will set that aside, as

8    well.

9    MR. CONLAN:  Your Honor, that concludes the items

10   that we are confident are unopposed.  We now are going to

11   take up -- my partner, Bryan Krakauer will take up the Number

12   8, the motion for an order approving cash management systems

13   and he will also take up the motion for a document to be

14   filed under seal and that will also relate to the financing

15   motion.

16   THE COURT:  All right.  I'm going to take just a

17   five-minute break before we begin that, so, don't go far.

18   MR. CONLAN:  Very good.

19   THE COURT:  We stand in recess.

20   MR. CONLAN:  Thank you, your Honor.

21   (Court in recess 11:32 to 11:50 o'clock a.m.)

22   THE CLERK:  All rise.

23   MR. KRAKAUER:  Your Honor, Bryan Krakauer, Sidley &

24   Austin, representing the debtors.  Give me just one minute to

25   figure out how to hook on this mike.

1          THE COURT:  All right.

2          (Pause.)

3          MR. KRAKAUER:  Your Honor, I'm going to first

4    address our cash management motion that requests authority to

5    continue in place our current cash management system.  The

6    cash management system that the debtors have is very

7    extensive, it's very complicated and it's also very

8    centralized.  And I think it's probably most helpful if I

9    start by walking you through, essentially, how it works.  And

10   we have this chart that I have over here, which has also been

11   attached as an exhibit to our motion, so, most of the people

12   in the audience should have a copy of the chart.

13          THE COURT:  All right.

14          MR. KRAKAUER:  Okay.  The cash management system

15   first consists of collection accounts and broadly, there's

16   two kinds of collection accounts.  There's collection

17   accounts for accounts that have been conveyed over for the

18   Barclays facility and basically, the way that works is

19   accounts receivable are sold to the parent and then the

20   parent turns around and sells them to an entity called

21   Tribune Receivables, LLC.  Tribune Receivables, LLC is not a

22   debtor in these proceedings, a special purpose entity.

23   Barclays then lends to that entity against those accounts and

24   the proceeds from that lending, in the normal course, are

25   used to fund the purchase of the receivables.  Okay.

1          These accounts over here are at Bank of America for

2    the Barclays receivables just solely.  These accounts, at the

3    very bottom, are at Chase Bank, JP Morgan Chase, also with

4    respect to the Barclays facility.  So, basically, it's the

5    top group of boxes and the bottom group of boxes.  And for

6    the most part, that consists of advertising revenues and

7    there are accounts that have conformed very, very well.

8    They're from payors who have excellent credit ratings and

9    from a lender's standpoint, they're the best accounts to

10   have.

11         There also are other collection accounts that are

12   not in the Barclays facilities.  The ones that are at Bank of

13   America are listed here in the second box to the left.  And

14   they are general business accounts, which is the first group.

15   And then, at the bottom, it's circulation accounts.

16   Circulation accounts would be for instance, if you buy your

17   newspaper and you, for instance, would pay for your

18   newspaper, you would send your check, typically, into a

19   circulation account.

20         Then there are other receivables at various other

21   bank accounts around the country, not as Bank of America, not

22   as JP Morgan and they are local to some of the business

23   units.  Most of these are debtors, but some of them are not

24   debtors.  And basically, all the entities, in one form or

25   another, both debtors and non-debtors, are in this system

1    where they come into one form or another of these collection

2    accounts.

3              For the most part, these accounts are all known as

4    zero balance accounts, meaning they get swept at the end of

5    every day.  So, whatever is in these accounts gets swept out

6    and they get swept out to what are known as concentration

7    accounts.  Concentration accounts, you will see with these

8    arrows, are at Bank of America and also at JP Morgan Chase.

9    And there's a separation in terms of the concentration

10   accounts between those that are in the Barclays facility and

11   those that are not, for obvious reasons.

12             When the petition was filed for these cases, one of

13   the things that happened is Barclays and we agree with this,

14   exercised their rights to basically freeze the amounts in the

15   Barclays accounts that were from the non-debtor entities.

16   So, they would cease falling to the estate.  So, since the

17   petition's been filed, there have not been further amounts,

18   at least to my knowledge, that have come out of those

19   accounts and are moving into the debtor's system.  So, right

20   now, the Barclays money is essentially frozen in their

21   account.

22             These concentration accounts, in the normal course,

23   is the appeal for B of A and JPM then move into a primary

24   concentration account.  So, after they're released from the

25   Barclays facility, after a receivable is essentially paid

1    for, they come out of the Barclays facility.  Otherwise,

2    they're not sent into Barclays, the move into this general

3    account.  And we have a primary concentration account at JP

4    Morgan Chase.  So, at the end of the day, money moves into a

5    single account and we deal with it from a centralized system

6    at JP Morgan Chase.

7          Then you get to disbursements.  On the disbursements

8    side, there are accounts at Northern Trust and there are

9    accounts at JP Morgan Chase.  And for instance, you'll see

10   the payroll account is at JP Morgan Chase.  A lot of the

11   vendor accounts are at Northern Trust.  And then there are

12   various draft, smaller accounts that are used by some of the

13   entities.  And you'll see, you know, little stuff that might,

14   in the normal course, seem a little bit strange, but it's out

15   there.  For instance, we have reporters in Baghdad and

16   there's an account with the Baghdad bank to fund the expenses

17   of that reporter.  And you have things like that that have

18   small amounts of money.  But for the most part, moneys come

19   out of either Northern Trust and JP Morgan Chase and that's

20   how the disbursements are handled.

21          And then separate from all this is referred to as

22   the company's excess money.  Moneys that it doesn't need to

23   keep in the system on a daily basis.  Right now, those moneys

24   are sitting in investment accounts at Fidelity in treasury,

25   treasury mutual funds, basically.  They only invest in or

1   primarily invest in treasury bills that are very short term

2   duration, basically the safest investments that Fidelity has.

3   So, right now, they're sitting in those accounts, the excess

4   money.

5           The system is set up in a way where it provides for

6   a centralized control over accounts.  So, even with respect

7   to a non-debtor, let me give you an example, the Cubs.  Any

8   money that comes into the Cubs on a daily basis, gets swept

9   into the system and winds up in the JP Morgan concentration

10  account.  Any payroll of the Cubs, any expense of the Cubs,

11  are funded out of the disbursement accounts that you see

12  there at Northern Trust or at JP Morgan Chase.  So, the Cubs,

13  themselves, don't handle disbursements.  They're not set up

14  for it, they don't have a system for doing that.  And that is

15  also true of most all of the entities that -- virtually, all

16  of the entities of the Tribune organization, both debtors and

17  non-debtors.

18          So, we have a very centralized system that handles

19  all of the functions associated with cash management in the

20  way I've just described.  It works well from a management

21  point of view.  It allows the company to keep very good track

22  of cash coming in, cash coming out and it's very cost

23  efficient.  It would be extraordinarily costly and would take

24  a very extended amount of time to try and set up individual

25  systems or individual entities to handle cash management.

1   And you know, even to suggest to the company would be very,

2   very burdensome and very, very costly.  And at the end of the

3   day, you also would have the very bad affect that the company

4   then loses control over managing its cash, because you don't

5   have, again, a centralized place where you keep track of it.

6           So, this type of system for a company this size is

7   probably, I would imagine, very common.  Companies that don't

8   have this are not handling their cash management very well.

9           What we're asking for in terms of relief is the

10  ability to keep this cash management system in place and to

11  continue to operate it and to continue to function as we have

12  before.  We spent a good amount of time with the U.S. Trustee

13  talking through all of this.  And Mr. McMahon has been very

14  helpful.  I think he's been very cooperative in doing a lot

15  of this.  One issue that we've spent probably the most time

16  in is dealing with the non-debtors in the system.  And I

17  don't want to speak for Mr. McMahon, but I think his concern

18  is a natural one of are funding non-debtors and are you

19  putting cash outside the system that's going to harm the

20  estate and harm creditors of the debtors.  And we've been

21  trying to come up with ways of dealing with that.

22          On an aggregate basis, the non-debtors are extremely

23  valuable assets of the debtor organizations.  Take the Cubs,

24  for example, without, you know, my expressing a view of what

25  they're worth, you know, newspaper articles have talked about

1   the Cubs being worth around a billion dollars, give or take.

2   That's a lot of value for the creditors in this case, for

3   their constituencies in this case.  And it's vitally

4   important that we keep that value in place and fund that

5   entity.

6            One of the issues you have, even though it's a very

7   valuable entity, is first, it's seasonal and I think the

8   Court could take judicial notice of the fact that baseball is

9   only played at certain times of the year.  That revenues

10  coming in at certain times of the year when there's games.

11  And you have other times of the year where you have some

12  costs and not a lot of revenues.  So, you will have cash

13  negative months for the Cubs and but they are going to be

14  balanced over the course of the year, by very significant

15  cash positive months.  And net, there's going to be cash

16  positive in the Cubs organization generally.

17           And that's true with respect to what I refer to as

18  the business units of the non-debtors.  And by business

19  units, I mean the group of companies that, one we call the

20  Cubs or there's a group of companies we refer to as Tribune

21  Media Services, has the same dynamic.

22           It is not necessarily true of particular corporate

23  entities and I'll give you an example.  In the Cubs

24  organization, one of the things the Cubs does is it recruits,

25  looks for players in the Dominican Republic.  Unfortunately,

1    I'm not enough of a baseball fan.  I used to be when I was a

2    kid, but I don't quite follow it as much, to tell you who the

3    Cubs have gotten from the Dominican Republic.  But they keep

4    scouts down there in order for player development.  We've set

5    up an entity called the Chicago Cubs Dominican Baseball

6    Operations, LLC.  That consists of basically, some scouts,

7    who go down there from time to time and scout players.  Well,

8    that organization is valuable to the Cubs, but it's not a

9    revenue-generating organization to have those scouts down in

10   the Dominican Republic.  So, if you looked and asked, does it

11   make sense to fund that entity, if you looked at it on a pure

12   cash flow basis for that particular entity, you'd say, well,

13   it's a cost center, it doesn't generate revenues.  But,

14   you've got to look at it in the fact that it's integrated

15   with the Cubs organization, generally and the Cubs

16   organization, generally, depends upon it to perform valuable

17   services.

18          Similarly, with respect to some of our other

19   entities, for instance, there's a group of entities that we

20   refer to as TMS or Tribune Media Services, that provide and

21   distribute and create news information and entertainment

22   content that is used in print, online or over the internet

23   and on screen on your TV screen.  That group of companies is

24   also very profitable as a group.  It consists, though, of

25   some entities that operate overseas, that are relatively

1    small and are in a stage of their business development, where

2    they are building, so, their revenues haven't yet got to the

3    point where they are fully cash flow positive.  In that

4    particular case, we're not dealing with great amounts of

5    negative money, but the companies are building.  So, you

6    look, we develop a product that works for the company that's

7    very profitable and we have started operating in some

8    countries where we're a little bit more in the development

9    phase and less in the fully realized phase.  We think that

10   with respect to those kind of entities, it also makes sense

11   to keep going.  It did not make sense, from a legal and

12   practical point of view, to file those entities in foreign

13   countries.  We have one in Hong Kong.  We have one in Canada.

14   And we have one in the Netherlands.  And so, we did not file

15   those entities.  But yet, we have some funding needs

16   associated with those.  It's another example.

17          So, I've basically outlined the problem and as I

18   said, Mr. McMahon has been very solicitous just trying to

19   work on this with us.  But I don't think there is a -- there

20   is not a way to fully budget it, because of its complexity

21   and trying to deal with it on an individual entity by entity

22   basis and trying to figure out a budget or projection, that

23   is frankly not really doable.  What we can say is these

24   entities, the non-debtor entities, as a group, are absolutely

25   expected to be very, very cash positive for the debtor

1    entities over the course of a year.  They generate very

2    significant revenue and they a very valuable asset.

3         What we've agreed to do is, first, to track the

4    transfers back and forth between the debtor entities and

5    non-debtor entities.  So, we will know exactly what goes in

6    and what comes out.  And we will keep that information as

7    current as we possibly can.  We will do it, at least, monthly

8    and we will see if we can do it any more frequently than

9    that.

10        Second, we are providing information and agreed to

11   provide information to our major constituencies to allow them

12   to review these transcripts.  We will certainly give it to

13   the U.S. Trustee and Mr. McMahon.  We would certainly give it

14   to any creditors committee that's formed and we've also,

15   although, it's not in the order that's presented to you, we

16   certainly have no problem giving it to the agent for the

17   senior debt and the agent for the bridge funds.  So, they can

18   see exactly how the money is falling back and forth and

19   understand what's happening and monitor it.

20        And third, we have also proposed in the order that

21   the relief we're seeking today to allow us to continue the

22   system in place, be without prejudice to third parties coming

23   back to this Court if they see a problem.  If somebody thinks

24   that we shouldn't be funding some particular non-debtor, that

25   it's not injurious to the estate and they look at the numbers

1    and say, to them it just doesn't make sense.  We preserve the

2    right for that person to come back in to this Court, raise it

3    before the Court.  So, we're not asking you to make any

4    findings that we can do this forever.  We're leaving that

5    issue open.  And we think that as people look at the numbers,

6    look at the projections and look at the actual movements of

7    cash and we showed our major constituencies, people are going

8    to get very comfortable with it.

9            THE COURT:  And within what period of time would you

10   expect that information to become available?

11           MR. KRAKAUER:  We think we could report this, right

12   now, on a monthly basis.  So, I don't know, I could ask how,

13   at the end of each month, how many days will it take us to

14   give that information, if you want.  I'll ask, the CFO is

15   right here.

16           THE COURT:  Certainly.

17           (Pause.)

18           MR. KRAKAUER:  Your answer is that we believe we can

19   have that information available within ten days after the

20   close of each month.

21           THE COURT:  Okay.

22           MR. KRAKAUER:  So, I think that's really the major

23   issue we've been trying to come to grips with and I think

24   we've come up with a solution that I hope this Court would

25   approve.  But maybe the thing for me to do, is to sit down

1   for a second and let other people be heard.

2            THE COURT:  All right, thank you.  Let me hear first

3   from the U.S. Trustee.

4            MR. McMAHON:  Your Honor, good afternoon.  Joseph

5   McMahon for the acting United States Trustee.  Your Honor, I

6   would agree with Mr. Krakauer's characterization of our give

7   and take on this motion.  It was amicable and designed to

8   address this issue.  And I think, basically, our office and

9   the debtors has come at it from a different view.  We

10  appreciate the fact that the debtors are trying to provide us

11  with reporting.  We think that's an essential element of any

12  type of, I'd say, resolution that would address our concerns

13  with this matter.  At the same time, it's our view that a lot

14  can occur at any given month and at this point, we are being

15  told that we have a series of non-debtors who, on an annual

16  basis, I would assume that Mr. Bigelow can testify to this,

17  have been cash positive, historically, for the debtors.

18            But again, we requested and I think we need from

19  this Court, something more with respect to the procedure on

20  this.  And what it is that we propose and it was an exchange

21  of information designed to get a sense of what the peaks and

22  valleys were along the way for these debtors, insofar as, you

23  know, cash-in, cash-out.

24            THE COURT:  So, the U.S. Trustee isn't objecting, as

25  a matter of concept, to the funding of non-debtors by debtor

1    entities.  But that what you need is to have the universe

2    defined?

3              MR. McMAHON:  That's correct, your Honor.  And that

4    that's essentially our concern.  I could, you know, I could

5    address some specific points that Mr. Krakauer made, but I

6    think that's -- it doesn't get any more simple than that.

7    That's basically our point.

8              THE COURT:  All right, thank you.  Does anyone else

9    care to be heard in connection with this motion?

10             MS. PRIMOFF:  Good afternoon, your Honor, Madlyn

11   Primoff of Kaye Scholer for Merrill Lynch, as agent for the

12   bridge lenders.  We do have concerns about cash leaking out

13   from the debtors to fund the operations of non-debtors.  And

14   it may be that overall, it's a net positive to the debtor and

15   that's terrific, but we think there's an insufficient record

16   to establish that here today on the first day of the case.

17   So, at a minimum, we would ask that any relief that your

18   Honor approves should be on an interim basis and perhaps, put

19   this on for hearing at your second day hearings.  And in the

20   meantime, perhaps, the debtors could share with all the

21   constituencies information about transfers back and forth.

22   And we'd also like the opportunity to talk with them about

23   additional solutions.  So, perhaps, the non-debtor entities

24   could grant security interests in their assets to the debtor

25   entities that are providing the funding for them.

1          THE COURT:  Thank you.

2          MS. PRIMOFF:  Thank you, your Honor.

3          THE COURT:  Anyone else care to be heard in

4    connection with this motion?  All right.  I think the

5    suggestion of granting relief on an interim basis is a good

6    one.  I am inclined to grant relief because, first of all, in

7    concept, this is not an unusual -- it's not unusual for a

8    debtor to be funding non-debtor subsidiaries.  However,

9    without knowing exactly what the numbers are, the parties and

10   the Court are without some recent basis to determine if there

11   is a problem and if so, how to fix it.  So, you know, I don't

12   know.  Let me ask, I mean, is the debtor able to put any

13   further definition on what flows out to non-debtor entities

14   or what would, for example, between today and the second day

15   hearings?  Any notion of that, I mean, that goes beyond just

16   speculation?

17          MR. KRAKAUER:  Yes, our notion is that on a net

18   basis between now and the next hearing, that the amount will

19   not be negative.  In other words, if you look at all the

20   money that's coming in from the non-debtors and compare it to

21   the moneys going out from the non-debtors, we think that, you

22   know, over the next 30 to 60 days, it's going to wind up

23   being cash positive.  So, there won't be an aggregate amount

24   going out.

25          THE COURT:  All right, well, I'm prepared to give

1    interim approval of the cash management system with the

2    changes that you talked about to the form of order that

3    haven't already been added.  And with the caveat that we'll

4    set it for further hearing on whatever date we pick for the

5    second days.  And hopefully, that will give the parties more

6    time to talk about how to protect the estates and I do so

7    based upon the understanding that there's no -- that it's a

8    net positive between now and then.  Mr. McMahon?

9              MR. McMAHON:  Your Honor, I only rise to emphasize,

10   from our office's standpoint, that the critical aspect is

11   that we analyze this on an entity by entity basis.  It's

12   fine, the debtor's counsel can represent on an aggregate

13   basis, but if the Cubs positive cash flow is masking issues

14   with respect to other entities, then we've got an issue

15   still.

16             THE COURT:  No, I think that you're right, that the

17   parties will have to drill down on an entity by entity basis

18   and I'm sure the committee, once formed, will want to do the

19   same thing, as likely will its financial advisor.  So,

20   there'll be, I'm certain that given a relatively brief amount

21   of time, there will be plenty of attention and oversight

22   given to this issue.  And that's why I'm willing to make that

23   approval on an interim basis.  So, for those reasons, I will

24   grant the relief only on an interim basis and ask that a

25   revised form of order be submitted under certification.

1          MR. KRAKAUER:  We will do that, your Honor, thank

2     you.

3          THE COURT:  All right.

4          (Pause.)

5          MR. KRAKAUER:  Your Honor, one request on that

6     interim relief?

7          THE COURT:  Yes.

8          MR. KRAKAUER:  We need this order entered, so that

9     we can make payroll this afternoon.  So, if we could hand

10    interlineate the making -- I think there are only two

11    changes.  One making an interim pending the next hearing and

12    second, just adding the two agents to those people who are

13    entitled to the information.  If we can do that and hand it

14    up to you over the next few minutes, that would help us make

15    sure that we could --

16         THE COURT:  Yes, I'll take that at the conclusion of

17    the hearing.  We'll also need to add the date, the hearing

18    date.

19         MR. KRAKAUER:  Yes, correct, sir.

20         THE COURT:  All right.  As long as it's legible,

21    that's fine with me.

22         (Discussion off the record.)

23         MR. KRAKAUER:  Your Honor, I think our final motion

24    today is authorizing the debtors to proceed with what I'll

25    refer to as our debtor in possession financing.

```
1              THE COURT:  Well, with the accompanying motion to

2      seal.

3              MR. KRAKAUER:  Correct.  And the -- I don't know

4      which order between -- maybe it makes sense to take up the

5      motion to seal first.

6              THE COURT:  I think it does.

7              MR. KRAKAUER:  Okay.  And on that, we have joined

8      with Barclays in requesting that the seal, I would say it has

9      been a common practice to seal the orders and Barclays has

10     requested it, but I think probably the better person to argue

11     this, since it's information that Barclays feels very

12     strongly about with regard to why it should be kept

13     confidential is Mr. Trust, on behalf of Barclays.

14             THE COURT:  All right.

15             MR. KRAKAUER:  So, if you'll let me defer to him.

16             THE COURT:  Very well.

17             MR. TRUST:  I checked my clock, good afternoon, your

18     Honor, Brian Trust of Mayer Brown on behalf of Barclays.

19     Your Honor, I think it's important just to, as we talk about

20     Barclays motion in which we joined with the debtors seeking

21     to seal the fee letters, I think it's important that we just

22     take a brief step back and focus on a couple of very salient

23     facts pertaining to the requested financing on the part of

24     the debtors.

25             First, it's a very complex financing structure.
```

1    It's a financing structure that effectively harmonizes and I

2    use that word intentionally, it harmonizes what I would

3    describe as a relatively standard letter of credit facility

4    to be opened at the parent company, Tribune Company, with an

5    amended and modified, very complex securitization.  A

6    securitization transaction, which pertains to the flow and

7    purchase of specific assets, accounts receivable, through the

8    Tribune entities, which are purchased by an entity outside of

9    the bankruptcy.  We call it the SPV and the correct name, I

10   think, as Mr. Krakauer pointed out earlier, is Tribune

11   Receivables, LLC.

12            THE COURT:  I grant you that the financing scheme is

13   outside of what I would ordinarily see here, but it didn't

14   strike me as being something unusual, based upon things I'd

15   seen outside of this in the past.

16            MR. TRUST:  I concur with that outside, yes.

17            THE COURT:  Okay.

18            MR. TRUST:  Yeah, thank you.  I think that's a

19   clarification that I would concur with.  It's a standard

20   financing vehicle and what I think is interesting and you

21   know, complex here is the way it's been melded with and into

22   the more traditional letter of credit facility.

23            The use of this financing structure is, in our view

24   and I think the estate would agree, results in a very

25   significant economic benefit to the estate.  It creates

1    enhanced liquidity.  It effectively unlocks the value, that

2    is, it monetizes the receivable on a very expedited basis.

3    Generally, generally, there's a view in the marketplace that

4    this type of a structure does raise somewhat lower costs of

5    funding significantly, unlike a very standard revolving

6    credit facility with a lender as an agent for a bank

7    syndicate.  While it does have covenants, it does have

8    negative covenants, these are not quite as limiting, nor

9    would they be, but not the type of limiting type of

10   covenants.  It creates significant benefit to the estate and

11   that's simply because the loan arrangement, the

12   borrower/lender relationship is outside of the estate as

13   between Barclays and the SPV.

14           It's probably also worth noting that the transaction

15   was negotiated and documented, I would say, over slightly

16   less than one week on a virtual 24/7 basis, with the debtors

17   and of course, their lawyers and advisors.  The fee letters

18   are, in Barclays view, constitute commercial information

19   which is protected under Bankruptcy Code Section 107(b).  It

20   is proprietary to Barclays and we look at it from two

21   perspectives.

22           One, because the substantial portion of the fee, in

23   the letters that we want to seal, is actually paid by a non-

24   debtor and it's being paid effectively as the proceeds of

25   assets which are certainly pre-petition, as they have been

1    purchased.  The estate has and would have no right, title and

2    interest in those assets or the proceeds.  These

3    transactions, on a pre-petition basis, are effectively

4    limited on an almost non-recourse, if you will, to Tribune

5    Company by virtue of the structure of the securitization.

6    That is, that it's being done outside of the bankruptcy.  We

7    get it though and we understand transparency and we get where

8    we are today and Barclays understands that.  So, I want to

9    just make sure that there's no misunderstanding on what we

10   are saying.  But we are saying that the economics have

11   occurred previously and the fee is paid by a non-debtor

12   affiliate.

13          The confidential information relates to the

14   allocation of credit risk, collateral, as it exists outside

15   of the estate, the accounts receivable monitoring evaluation,

16   the very highly sophisticated financial analysis, not just of

17   Tribune, but more importantly, of it's many, many underlying

18   account debtors and all of the particular issues, offsets,

19   criteria issues that arise with respect thereto.  Barclays

20   had and has a competitive advantage in this financing because

21   of that confidential commercial information as is

22   contemplated under Section 107(b).

23          Barclays believes that it would suffer material harm

24   if this specialized knowledge that ultimately resulted in

25   it's ability to price arrangement, underwriting of related

1    fees for this transaction were made public.  Barclays also

2    has the ability under the structure of each of the

3    transactions, both the letter of credit facility and the

4    securitization, has the ability to syndicate those

5    transactions if it chooses to reduce its exposures to this

6    estate.  It is generally well understood in the lending

7    community that the -- that revealing the nature of these fees

8    and certainly the methodologies that go into understanding

9    and calculating them would put the syndicator at a

10   competitive disadvantage.

11          I also note in our consideration of seeking the

12   specific relief today, your Honor, that in jurisdictions,

13   including in Delaware, many financial institutions, including

14   Barclays and other brand names such as JP Morgan Chase, DE

15   Shore, Goldman Sachs, Citi and others.  Frankly, many of them

16   represented by many of the same firms here today have

17   successfully, based on those arguments including the very

18   clear focus on Section 107(b), have in fact, obtained seal

19   orders and some of the names in Delaware, of course, include

20   Kaiser, Federal Mogul, Flomix and U.S.G.  I would also note

21   that, certainly, in the Southern District and other

22   jurisdictions, this is very, very prevalent.

23          Lastly, given the current freeze, which I think we

24   all are keenly aware of in the credit markets and Barclays

25   view that it would suffer material harm if it was to reveal

1    to the public, you know, the confidential information that

2    becomes part of and roles up into their fee.  It believes

3    that it would have an effective chill on the DIP lending

4    business which we think today is not quite what it was

5    before.

6                 THE COURT:  I was going to say what business?

7                 MR. TRUST:  That's correct, your Honor, thank you.

8    Anyway, based on the motion and I certainly did not, I tried

9    not to repeat any of the arguments.  I know you read the

10   motion, there's a bunch of arguments there, we're not

11   repeating them.  Based on the motion and the argument that I

12   made, at this time, we would ask respectfully, that the Court

13   agree to seal the fee letters, given the benefits that inure

14   for the benefit of this estate.  And certainly, I'll defer

15   discussion as to the financing when the debtors present that

16   motion.  But we think, obviously, it's beneficial and the

17   linkage is certainly that we respectfully ask you to seal the

18   fee letters.

19                 THE COURT:  All right.

20                 MR. TRUST:  Thank you, sir.

21                 THE COURT:  Thank you.  Are there any objections to

22   the relief that's been requested here?

23                 MR. McMAHON:  Your Honor, good afternoon, Joseph

24   McMahon for the acting United States Trustee and we rise to

25   voice our office's objection to the instant motion.  And

1    before I begin, I think I should frame the argument, Section

2    107(b) of the Bankruptcy Code displaces the old common law

3    balancing test, insofar as weighing the various equities of a

4    particular matter and reduces it to, essentially, a strict

5    legal question.  Which is whether or not the material sought

6    to be sealed falls into one of the categories or buckets

7    enumerated in that sub-section of the statute.  And the

8    question which Barclays has brought before this Court today

9    is whether the letter constitutes confidential commercial

10   information.

11          We have no evidentiary record supporting the

12   request.  As of now, I believe, we have the argument of

13   counsel.  But I do want to respond to certain points that

14   counsel has made with respect to the analysis of the statute

15   and how it applies to this particular situation.

16          First, it's not any competitive disadvantage which

17   warrants protection under the statute.  I think that Judge

18   Walrath's opinion in _Altera_ (ph), fairly recently written, a

19   very thorough analysis of the subject --

20          THE COURT:  Yes, arising, of course, in a completely

21   different context.

22          MR. McMAHON:  Your Honor, I agree.  I just cite it

23   for the legal analysis that it has to be unfair competitive

24   disadvantage and a couple of things about that.  First, your

25   Honor, this Court is undoubtedly familiar with the host of

1    instances where DIP lending fees and I don't know if your

2    Honor has a copy of the letter for review right now, but

3    where fees of the -- I would represent to the Court -- fees

4    of the type disclosed in the letter are disclosed publicly in

5    DIP financing motions.  And that's really where, I think, the

6    essential question is, which is Barclays, when it's talking

7    about competition, I get the sense that it's almost talking

8    about the competition between it and it's potential syndicate

9    partners over potentially how to share or allocate the

10   amount.  And I would submit to the Court that that's not the

11   type of competition that 107(b) was ever designed to deal

12   with or protect.

13        The issue is, in the market for providing financing

14   of this sort, this is the type of information that's

15   typically found under seal.  And you know, your Honor, we

16   have a full courtroom and I'm well aware of the posture that

17   I find myself in.  I could get into more detail about why I

18   believe that certain elements of the fee letter are actually

19   routinely publicly disclosed.  With that being said, I have

20   my -- the limitations of a full courtroom right now.

21        THE COURT:  Well, Mr. McMahon, it seems to me that

22   there are a couple of things that are changing.  While I

23   don't disagree that fees are often disclosed in connection

24   with financing, whether it's DIP financing or exit financing,

25   I will tell you it's my experience that lately, given the --

1    I'll call it turmoil -- in the credit markets, I have

2    received increasingly frequent requests to seal such

3    information.  And until very recently, I haven't received

4    objections from the U.S. Trustee in connection with such

5    matters.  So, let me ask what's changed with respect to the

6    U.S. Trustee's view in connection with these matters or am I

7    just wrong about whether there's been a change in the U.S.

8    Trustee's position or is there something special about this

9    particular situation which draws your objection?

10           MR. McMAHON:  Your Honor, I wouldn't consider this

11   particular case to be special, insofar as the U.S. Trustee's

12   attention or position in approaching it.  And with respect to

13   the Court's observation that we have been appearing on this

14   issue recently, I only have -- I have a particular experience

15   in my office.  I'm certainly aware of certain instances

16   recently in which this Court has shot down requests to put

17   this type of information under seal.  I'm well aware --

18           THE COURT:  Well --

19           MR. McMAHON:  -- of Judge Walrath's --

20           THE COURT:  -- I've declined such requests.  I don't

21   know I've been shooting at anybody, Mr. McMahon, in

22   particular.

23           MR. McMAHON:  So, I don't know if I could be artful

24   in explaining to the Court where it is we, you know, the

25   history behind our approach to this particular issue.  But I

1    would say that generally, we have been routinely reviewing

2    requests to seal information.  And that this particular

3    subject, which involves ultimately and I appreciate the fact

4    that Barclays counsel has its own view of it.  But it seems

5    to me that there's a disconnect between availing the -- well,

6    the bank or the debtor's availing itself of this Court's

7    jurisdiction for the purpose of obtaining protections under

8    364 and the like.  And then making the argument that, oh,

9    it's just this little non-debtor over here, it's being paid

10   with non-debtor money.  We can just, you know, put this to

11   one side or characterize it differently.

12            THE COURT:  Well, I think counsel pretty much

13   defused that notion when he acknowledged that, well, in my

14   words, not his.  This particular relief has a critical impact

15   on the administration of the estates and regardless of the

16   structure, it was Barclays expectation that it would have to

17   justify the request to seal.  Notwithstanding, the

18   involvement of a non-debtor entity here.  Save me the trouble

19   of having to say that and I appreciate that counsel was up

20   front about that.

21            MR. McMAHON:  So, your Honor, where we come back to

22   is, I appreciate the Court's observation regarding the state

23   of the credit markets.  It's all over the literature these

24   days.  I think the point is --

25            THE COURT:  Well, it's here, too, I mean, in this

1    courtroom.

2              MR. McMAHON:  I agree, your Honor.

3              THE COURT:  And it started, at least, in my

4    experience, when Dora (ph) was ready to come out of 11, but

5    couldn't, at the time, find exit financing.  It fortunately

6    did, several months later.  But, I mean, that's been -- I've

7    had that issue now for more than a year.

8              MR. McMAHON:  And your Honor, it's, well, it's

9    interesting that your Honor mentions the Dora case, because

10   in our efforts to ascertain what Barclays' position has been

11   on this issue, we noted that the, I believe, that the motion

12   to file the exit financing letter in connection with that

13   case, under seal, was withdrawn and Barclays was a party to

14   that facility.  So, again, where we're at is, I appreciate

15   the debtor's need for the financing and our concerns with

16   respect to the underlying motion will be addressed in short

17   order, I'm sure.  But we just simply don't have a record

18   supporting the request for relief today before the Court.

19   And from the standpoint of confidential commercial

20   information, while there has been a change in the choppiness

21   of the water, I think that the statutory language is fairly

22   clear as to what Barclays has to show in order to get what

23   it's seeking here today.

24             THE COURT:  Well, actually, in a certain sense, I

25   agree with you. It's either commercial information or it

1    isn't.  What may have changed, though, because of the

2    circumstances of the market, is the lenders desire, because

3    of present circumstances, to keep the information

4    confidential.  Whereas, before, when things are more static

5    or actually, they were robust for an extended period of time,

6    the concern wasn't as great, because it didn't matter, they

7    were getting so beat up over fees, anyway, I guess.  Now, the

8    situation has changed a little bit and there's a, you know,

9    there's a change in the nature of the competition.

10           Well, you are right about one thing and that is,

11   there is no evidentiary record.  But I don't, I don't know

12   that there has to be with respect to the question of whether

13   it's commercial information or not.  I think it fairly can be

14   considered within that category.  But, I guess I don't know

15   what else the U.S. Trustee would like to hear or expect to

16   hear or insist upon having, by way of evidence, that would

17   support this request for relief, if you assume that I would

18   determine its commercial information.

19           MR. McMAHON:  Well, I appreciate the fact that -- I

20   think that, well, let's put it this way.  The bottom line is

21   that with respect to this type of information, it is our

22   consistent position and I think it's borne out by the record

23   in may cases before this Court, that the pricing terms of a

24   loan, a DIP loan or otherwise, are presented to the parties

25   in interest in such a way, whereby, they can understand

58

1    what's going on.  And our concern with respect to the sealing

2    of the fee letter is and remains that part of that

3    information remains out of court view.

4           Now, in terms of the evidentiary record, I think

5    that instead of counsel asserting that, you know, Barclays

6    will suffer some significant or unfair competitive

7    disadvantage with respect to if this information were made

8    part of the public record, that we have an assertion right

9    now.  And they would have to bring in a competent witness to

10   testify regarding the state of the market in that regard.

11          THE COURT:  All right.  Let me ask if anyone else

12   cares to be heard in connection with this matter?

13          MR. TRUST:  Thank you, your Honor.  I just have a

14   couple of very, very brief points.  I do believe clearly that

15   under Section 107(b), Barclays satisfies the statutory

16   requirement that being a party interest requesting this

17   relief with respect to, you know, commercial information.

18          Two, I do note that the fee letters have, in fact,

19   been provided in full to the Court, your Honor's chambers and

20   of course, the United States Trustee's Office.

21          Three, if your Honor is prepared to rule at this

22   time and doesn't require anything in addition, that's fine.

23   I'm happy to sit down.  Obviously, this is an issue,

24   particularly given the financial dislocation today in the

25   markets of the utmost critical importance to this lender

1    prepared to engage in this financing transaction with this

2    estate.  If, however, if the Court requires a proffer, that

3    is certainly something that we can and will do.  However, if

4    you're prepared to rule without that, that's fine, based on

5    the definition under 107(b) of commercial information.

6            THE COURT:  Well, are you prepared to make a proffer

7    today?

8            MR. TRUST:  Yes, sir.

9            THE COURT:  Then I would ask that you do so.

10           MR. TRUST:  Certainly.  Your Honor, in the courtroom

11   is a gentleman by the name of Mark Shapiro.  Mr. Shapiro, if

12   he testified on direct, would testify that he is currently

13   the head of the global restructuring group of Barclays Bank,

14   PLC.  From 2002 to 2008, Mr. Shapiro was a managing director

15   and the head of the restructuring group at Lehman Brothers,

16   Inc.  Prior thereto, Mr. Shapiro was a partner in the

17   bankruptcy and restructuring group at the New York based law

18   firm of Sherman & Sterling.  Previously, as a practicing

19   attorney and currently, as a banker, Mr. Shapiro has had

20   extensive experience in arranging and overseeing many complex

21   debtor in possession financings, for multiple numbers of

22   debtors in many different jurisdictions.

23           Mr. Shapiro would testify that the proposed

24   financing is a highly complex transaction which harmonizes

25   for the benefit of the debtors, a letter of credit facility

1    at the parent level and an amended, modified assumed

2    securitization facility at the SPV level, which includes a

3    Barclays loan to a non-debtor affiliate which finances by

4    virtue of secured loans, the purchase of the accounts

5    receivable from the Tribune originators for the benefit of

6    the debtors' estates.

7            Mr. Shapiro would further testify that the fees, as

8    allocated to the securitization financing would be paid out

9    of the securitization's assets, assets that the estate has

10   neither right, title, nor interest in.

11           Mr. Shapiro would testify that the financing was

12   negotiated, arranged and documented in less than one week

13   with bankers and lawyers working around the clock with the

14   debtors and their legal and financial advisors.  Barclays'

15   specialized knowledge of the unique structure,

16   securitization, cash flows, accounts, eligibility

17   requirements and related matters pertaining to the financing,

18   constitutes confidential, commercial information value on a

19   proprietary basis to Barclays.

20           The commercial information also includes Barclays

21   disciplinary team's knowledge of underwriting, credit,

22   financial issues, economics, marketing and legal issues and

23   the combination thereof, that developed a proprietary way to

24   make this financing available to this debtor, particularly,

25   particularly in a market of critical financial dislocation

1    with a virtual near-freeze on the extensions of credit

2    through banks.

3            Mr. Shapiro would testify that a broad publication

4    of the fee letters and therefore, a broad publication of the

5    confidential commercial information referred to earlier,

6    including a way to calculate the debtor in possession

7    financing fees on this transaction, would materially harm

8    Barclays businesses.  The public information of such

9    information Mr. Shapiro would say would cause, in his view,

10   an unfair advantage to competitors.

11           Mr. Shapiro would also testify that as part of the

12   consideration in constructing these financing facilities,

13   Barclays reserved and has the right to syndicate such

14   facilities, if it chooses to do so.  To the extent that these

15   fees become public information, broadcast publicly and put

16   into the marketplace, Mr. Shapiro would testify that it was

17   impair Barclays ability to effectively syndicate the

18   facilities, make it less likely that Barclays would do this

19   transaction and therefore, the estate would lose the benefit

20   of this financing and liquidity provided there from.

21           Mr. Shapiro would also testify that if Barclays were

22   put in an untenable position of having to disclose its fee

23   letters, it may force Barclays to pass on this lending

24   transaction and possibly consider exiting this marketplace.

25   These concerns expressed Barclays today are commonplace for

62

1    the reasons discussed earlier in the debtor in possession

2    financing marketplace.

3              Accordingly, Mr. Shapiro would testify for all of

4    the foregoing reasons that the publication of Barclays fee

5    letters would cause Barclays to be competitively harmed.

6    That would be the extent, sir, of Mr. Shapiro's proffer.

7              THE COURT:  Thank you.  Does anyone wish to examine

8    Mr. Shapiro?

9              MR. McMAHON:  Your Honor, very briefly.

10             THE COURT:  All right, before you do, Mr. McMahon,

11   something is in the back of my head that said that the debtor

12   needs its cash management order signed, so we can meet a

13   deadline for payroll.  If that's ready, I'll address that

14   now.

15             MR. CONLAN:  Your Honor, two things.  Jim Conlan on

16   behalf of the debtors.  We need the wage motion docketed and

17   we need this interim cash management order signed and

18   docketed, so that the banks on whom our payroll accounts --

19             THE COURT:  Well, the wage motion, I signed, I

20   think, already and it might already be docketed.

21             MR. CONLAN:  Very good, your Honor.

22             MR. McMAHON:  And your Honor, I think, as you

23   pointed out, the blanks to be filled in on this are the date

24   for the final hearing.

25             THE COURT:  All right, so, I guess we have to --

```
 1              MR. McMAHON:  And we should probably set an

 2    objection date.

 3              THE COURT:  -- I guess we have to address that now.

 4    For second days, Counsel, what are you requesting?

 5              MR. CONLAN:  Your Honor, what do you have available?

 6    I will tell you that we're in a special --

 7              THE COURT:  Are you going to answer my question

 8    first?

 9              MR. CONLAN:  -- yeah, very early January.  We are in

10    discussions already with the U.S. Trustee about a formation

11    meeting, perhaps as early as December 18th.  We want to get a

12    committee in place, let them hire counsel and as far in

13    advance as possible of those second day hearings, as a matter

14    of fairness.  And so, sometime at the very beginning of

15    January would be helpful.  How does January 3rd look?

16              THE COURT:  It looks like a Saturday.

17              MR. CONLAN:  Oh, sorry.  How about January 2nd?  How

18    about January 5th?

19              THE COURT:  Okay, now you're getting warmer.

20    Actually, I was -- how much time do you need, do you think,

21    for the next round.  Should I reserve a couple of hours,

22    probably?

23              MR. CONLAN:  I think a little longer than that,

24    perhaps four hours.

25              THE COURT:  All right.  I think we'll do 1:30 on
```

64

1    January 5th.

2              MR. CONLAN:  I will also note for your Honor, as

3    well as my colleague, Ms. Boelter, that our utility order

4    says 25 days after the petition.  Out of an abundance of

5    caution for the final hearing and I think 25 would take you

6    to Saturday, January 3rd.  So, that's why I was thinking the

7    2nd.  So, we'll need to mark that up, as well, in the order

8    when we put the 5th in.

9              THE COURT:  Okay.

10             MR. CONLAN:  Okay?

11             THE COURT:  Yes.  And is there an objection?  Say

12   the 29th of December.

13             MR. CONLAN:  That's fine.  I would also ask, your

14   Honor, that you think about and I'll rise after we finish

15   with the financing motion, about the possibility of having

16   set hearing dates a couple of days -- a couple of times a

17   month in the first three or four months of this case.

18             THE COURT:  I've done that before and I'm willing to

19   consider that here.  And I do it for two reasons.  One to

20   make sure that we do all the business we need to do on a

21   timely basis.  And to minimize the request for expedited

22   considerations and with a number of dates available, I hope

23   to keep those to a minimum.

24             MR. CONLAN:  We can come back to that after we

25   finish with the financing motion.

```
 1              THE COURT:  Okay.

 2              MR. CONLAN:  Okay.

 3              THE COURT:  I have signed the cash management order.

 4    Let me just take a very quick break.  We'll get that in

 5    process and then we'll come back and hear testimony.

 6              MR. CONLAN:  Thank you, your Honor.

 7              THE COURT:  All right, court will stand in recess.

 8              (Court in recess 12:50 to 12:58 o'clock p.m.)

 9              THE CLERK:  All rise.

10              MARK SHAPIRO, Witness, Sworn.

11              THE CLERK:  Please state your full name for the

12    record and spell it.

13              THE WITNESS:  Mark J. Shapiro, S-H-A-P-I-R-O.

14                         CROSS-EXAMINATION

15    BY MR. McMAHON:

16    Q   Mr. Shapiro, good afternoon.

17    A   Good afternoon.

18    Q   How long have you been employed by Barclays?

19    A   Since Barclays acquired Lehman, which I think happened

20    around September 22nd.

21    Q   And what are the sources of your personal knowledge

22    regarding Barclays participation in the market for financing

23    debtor in possession financing in bankruptcy cases,

24    generally?

25    A   Since I was the head of restructuring and finance at
```

1    Lehman Brothers, where I was the managing director from 2002

2    through 2008, prior to the Chapter 11 filing by Lehman

3    Brothers.  I was the architect of the Lehman Brothers sale to

4    Barclays and since then, I have been the head of

5    restructuring and finance at Barclays.

6            My responsibilities include DIP financing, exit

7    financing and rescue financing for distressed companies.  So,

8    in terms of my knowledge, my responsibility is to originate

9    and structure transactions like the one we're here today to

10   discuss.

11   Q   And since becoming employed by Barclays, have you done

12   any specific research into cases where Barclays has provided

13   debtor in possession financing in bankruptcy cases?

14   A   Have I do the research?  I wouldn't say I've done

15   research, I'm familiar with situations where both Lehman and

16   Barclays and me, personally, have been involved in these

17   situations.  But I don't have -- if you're asking me the

18   question, am I aware of every financing provided by Barclays

19   in the past, the answer is no.

20   Q   You also have experience as a bankruptcy attorney with a

21   major New York firm, correct?

22   A   I did, prior to 2002.

23   Q   In your experience, have you been familiar with

24   situations where the fee portion of financing arrangements or

25   particularly, debtor in possession arrangements, have been

1    placed, in whole or part, in the public domain in connection

2    with obtaining financing?

3    A    My experience is that most of the time and again, I'm not

4    going to get into, I guess, specific examples, because I

5    really haven't analyzed all the data that might be out there.

6    But most of the time, things are maintained confidentially

7    and the principal reason that agent or arrangers of these

8    types of loans want confidentiality is because when we go

9    into making a loan, they're obviously going into making a

10   loan to make money.  And typically, part of the strategy of

11   making a loan is not to necessarily hold the entire loan, but

12   to syndicate that loan.  And obviously, that market's become

13   a more challenging market.  But certainly, no lender in

14   today's world goes into a loan with the expectation of

15   holding it forever.

16          The expectation is that you're going to sell it

17   down.  And the challenge of selling down a loan, if you've

18   disclosed all the fees to the market is that the entire

19   market knows what you've been paid for it and there's no

20   ability to effectively make money on that, because people

21   will come to you and say, well, we know what you got paid for

22   that, we want that same amount of money.  So, what disclosing

23   confidential fees does is it dis-incentivizes arrangers from

24   underwriting loans that they then expect or may decide to

25   syndicate into the market, because once you've put that

1  | information into the market and everyone understands it, then
2  | it's a completely transparent transaction and you've
3  | dis-incentivized the underwriter, who is taking the initial
4  | risk for naturally making that loan.
5  |         And so, I guess to answer your question, from my
6  | perspective on behalf of Barclays, the reason that, actually,
7  | the most important reason that and it's not just for
8  | Barclays, but for virtually everybody who is in this market,
9  | particularly today, where it is so difficult to get credit
10 | approval, number one and so difficult to then syndicate,
11 | number two.  If a fee, like the one we have earned, which, by
12 | the way, is a market-based fee and I have no, you know,
13 | there's nothing to be -- there's no -- we're not hiding the
14 | amount of the fee.  The courts see the fee.  You've seen the
15 | fee.  The fee is well within the bounds of the norm in these
16 | kinds of transactions.  So, really what we're talking about
17 | is opening the fee up to the world and in particular, the
18 | world that would potentially be interested in buying these
19 | loans, at some point, if we decided to syndicate them down
20 | the road.  Such that, it would be putting us at a
21 | disadvantage and frankly, you know, if you had asked me, you
22 | know, would we have made the loan, in first place?  Would we
23 | have extended this credit, in the first place, if we knew
24 | that our fee was going to be exposed to the world.  We would
25 | have serious doubts as to whether we would make that loan.

1   Q    Let me go back to my question.  There are certain fees

2   that you've been involved in, in bankruptcy cases where

3   lender fees have been put into the public domain, correct?

4   A    I believe that's the case.  I don't remember honestly,

5   specifically, which ones.  But I think, generally, there have

6   been some cases where they've been in the public domain,

7   correct.

8   Q    So, my question is, what is it that's unique about fees

9   that are contained in a fee letter such that they become --

10  have a special status or are distinct from those that are put

11  in the public domain?

12  A    Well, I think I just explained that, but I'll try again.

13  An arranger fee, like the one that's in the letter that

14  you're disclosing, talking about, is a fee that we would

15  receive and then if we chose to go out and syndicate that, we

16  would have to pay to people who would buy the loans from us,

17  some amount of money to get to incentivize them to buy the

18  loan from Barclays.  If they know exactly what we've been

19  paid, they will demand the full amount of that fee.  And so,

20  in order for us to incentivize -- to be incentivized in order

21  to make the loan, we can't be disclosing that fee up front.

22  I think it's a reasonably simple and straightforward

23  proposition.  And frankly, you know, if fees, I think to your

24  Honor's point earlier, if fees like this were commonly

25  disclosed, I think you will create an additional dis-

1    incentive and there's no need to create additional dis-

2    incentives right now, you know, for banks and other financial

3    institutions not to be making loans, because obviously, the

4    market is extremely tight.  The last thing I would think we

5    would want to be doing is dis-incentivizing the flow of

6    capital right now.  And so, from my general vantage point, I

7    think that it's important to preserve confidentiality so that

8    you can incentivize firms like Barclays and others to

9    underwrite deals that they can then sell into the

10   marketplace.

11   Q    Are you familiar with any -- have you attempted to

12   determine prior to testifying today, whether or not there

13   have been any circumstances in which Barclays has disclosed

14   the contents of a fee letter?

15   A    I have not asked that question or sought research on that

16   answer.

17   Q    And your -- so therefore, you can't, you don't know

18   whether or not Barclays has ever, you know, filed a motion

19   and/or subsequently disclosed the contents of a fee letter?

20   A    I don't know that, no.

21   Q    Your observation with respect to harm, is that the

22   situation with each and every fee letter that's ever filed?

23   A    Well, we're only talking about the one that's on record

24   today, so, I'm only speaking to the one today.  As for today,

25   there is harm, the harm that I just described.

1    Q    And to the extent that Barclays has made a decision in

2    the past to release the terms of a fee letter, in a given

3    situation, there wouldn't be, you know, it would be a case

4    specific analysis to there may or may not be harm?

5    A    Well, I'm only here talking about the letter that's at

6    issue today, so I don't know the answer to your question

7    about anything that Barclays had done prior to today.  And as

8    I told you, I was only employed by Barclays starting in

9    September and I'm not aware of any prior practices that

10   Barclays had in connection with these types of letters.

11          MR. McMAHON:  Your Honor, I don't have any further

12   questions.

13          THE COURT:  All right, thank you.  Any redirect?

14                    REDIRECT EXAMINATION

15   BY MR. TRUST:

16   Q    Good afternoon again, Mr. Shapiro.

17   A    Good afternoon.

18   Q    Your concern is expressed with respect to the harm that

19   would arise, particularly, as you focus on the syndication

20   for it.  Is it fair to say that it's commonplace for every

21   financial institution who looks to engage in that syndication

22   transaction?

23   A    Yeah, as I indicated, if you're an underwriter, I mean

24   and underwriter means you are taking the initial risk of

25   buying the loan and then you want to then sell that loan and

1    the market requires you to pay people to buy that loan, then

2    disclosing the fee up front is a dis-incentive for doing the

3    underwriting.

4    Q    Am I correct in understanding that the commercial

5    information in the fee letters relative to this financing, if

6    disclosed, would cause harm to Barclays?

7    A    In connection with the issues I've described earlier,

8    correct.

9    Q    Thank you.

10            MR. TRUST:  Thank you, no further questions, your

11   Honor.

12            THE COURT:  Any recross?

13            MR. McMAHON:  No, your Honor.

14            THE COURT:  Thank you, sir, you may step down.

15            THE WITNESS:  Thank you, your Honor.

16            THE COURT:  All right, anything further in support

17   of the motion?

18            MR. TRUST:  I thank you, your Honor, nothing further

19   from Barclays.

20            THE COURT:  All right, Mr. McMahon, anything

21   further?

22            MR. McMAHON:  Nothing further.

23            THE COURT:  All right, I'm prepared to make my

24   ruling.  This record amply demonstrates the entitlement to

25   the relief that's been requested here.  Under the present

1    circumstances, I am satisfied that the 107(b)1 standard has

2    been met and will grant the relief requested.  Now, of

3    course, it's understood that this does not insulate the

4    information from a later motion by an interested party to

5    unseal the record.  But, at least, as far as where we stand

6    today, I will grant this relief.  Is there a form of order?

7             MR. TRUST:  Your Honor, may I approach?

8             THE COURT:  You may.  Thank you.  That order has

9    been signed.

10            MR. KRAKAUER:  Your Honor, I think we're to the last

11   motion now, which is the motion to continue, basically, our

12   securitization vehicle.  I described before I went to the

13   cash management motion, how the Barclays securitization works

14   in our cash management system and the sale of receivables.  A

15   continuation of this securitization allow the company to

16   maintain a large component of its working capital going

17   forward.  The proposal, it's a $300 million facility pending

18   the final hearing.  Or excuse me, not pending the final

19   hearing, pending a three or four week period while

20   post-petition receivables are purchased.  The amount that

21   would be advanced under it is $225 million and then, that

22   would then flow up to $300 million.  It's based on

23   availability of formulas based on the receivables actually

24   purchased, approximate availability, give or take a little

25   bit, is in the neighborhood right now at $250, $260 million.

1          Allowing this facility to go forward does allow that

2   to maintain -- us to maintain that component of our working

3   capital.  It's an important component as set forth in the

4   affidavit.  It's also important in terms of the numerous

5   parties in which the company deals, both it's vendors, it's

6   customers.  And this is one company that has customers in the

7   millions, obviously.  And if you look at -- you define it as

8   being people who watch TV, it probably includes about 80

9   percent of the country is covered in one form or another by

10  the TV stations.  And as well as business partners, people

11  who do deals or transact business with the company, knowing

12  that it has liquidity facility is an important message to

13  send, particularly, given its present circumstance in Chapter

14  11.

15          The particular facility we're dealing with does have

16  only a 120 day term.  So, a natural question is why 120 days?

17  Well, and what good does that do to the company?  And first,

18  120 days was what we were able to negotiate, at this time,

19  with respect to Barclays.  Barclays has verbally conveyed to

20  us that they aren't interested in doing a longer term

21  facility.  And we would expect that negotiations would

22  continue after this facility as to longer term.

23          We were also in discussions with a group led by JP

24  Morgan Chase who is also interested in considering longer-

25  term debtor in possession financing with the company, and we

1  absolutely intend to also continue those discussions with JP

2  Morgan Chase.  We're benefitted now by having two groups that

3  are interested, and we hope to turn that into the best

4  facility for this company going forward over the long term,

5  and we would certainly hope that JP Morgan Chase continues to

6  express an interest in providing a DIP facility to this

7  company going forward, because if they do we absolutely will

8  continue to talk to them also to see if something could be

9  worked out.  So we view it as extremely beneficial to have

10  something in place for a period of time while we work on a

11  longer-term facility with two different parties and see which

12  one offers the better alternative.

13          Second there is a possibility that during the 120-

14  day period that we may pursue further some potential sales.

15  We would have a much better view of that during this 120-day

16  period and know whether or not there is a sale transaction

17  that is likely to be consummated soon.  Possibly that may

18  affect our liquidity also, maybe another source of cash.

19          I do want to stay and have discussions with various

20  parties here.  Be clear, we're not in this facility and in

21  today, we're not asking this Court to make any findings

22  whatsoever with respect to what the appropriate disposition

23  of the sale of non-debtor assets should be, if there are sale

24  proceeds from that, for instance, from the Chicago Cubs.

25  That's an issue for another day, and we're not asking or

1    suggesting that this Court determine that.

2              One of the provisions also in the Barclays facility

3    is some requirements of mandatory paydowns.  Also want to

4    make clear that pending the final hearing, all parties are

5    reserving their rights with respect to the propriety of those

6    provisions, whether the Barclays facility should have a

7    mandatory paydown in the event of a sale of nondebtor assets.

8    So that is something which if we can't resolve to everybody's

9    satisfaction, you may hear about at the final hearing.

10             THE COURT:  Well, I'll follow on with the comment

11   that I normally do make on the first day with respect to

12   financing motions, and that is an interim order is an interim

13   order, and that's what I consider it to be.

14             MR. KRAKAUER:  So in sum the 120-day period I think

15   does provide the company a great value in terms of having an

16   ability to function, having liquidity and preparing for a

17   longer period.  And I think the third factor is just looking

18   at how this Chapter 11 filing and also the general turmoil in

19   the economy over the last couple of months may -- we may have

20   a better window as to how those affect this company in the

21   advertising world over the next 120 days, too, and also have

22   a better sense of our business operations and the top line

23   revenue over that period.  And I think that would be also

24   helpful trying to allow the company to estimate its cash

25   gains going forward.

1          So in sum we have a lot of reasons why a 120-day

2   bridge facility is very valuable to the company.

3          In terms of what this facility structure is, it's a

4   continuation of the securitization that we've had before.  We

5   haven't changed the advance rates on it.  It's basically as

6   they were before.  We have put in place a guarantee structure

7   that was not in place prepetition, and basically the

8   guarantee is a guarantee by all the debtors of repayment of

9   their facility.  And the guarantee is secured by the assets

10  of the debtors.  It's subject to any preexisting liens that

11  are out there in priority.  There isn't a great amount of

12  that; there's very little of that.  But there are some liens,

13  including liens and some stock for a holding company, and

14  it's subordinate to that.

15          And that basically in today's market allowed us to

16  get this facility and allowed us to continue with it going

17  forward.  The structure of this is that if the facility does

18  term we can then pay it out.  In a lot of circumstances it

19  would term out over 45 days and receivables collection

20  himself would pay it.  And before coming back to -- before

21  they could realize on the guarantee, there is a five day

22  notice period, so that if anybody thinks there's an issue

23  about whether or not we're in default, it would come back

24  before this Court.

25          One thing a couple people have also asked me to

1   clarify is a provision with regard to setoff rights that

2   would occur during a five-day default period.  Those setoff

3   rights are limited, and one way to look at this is there are

4   three buckets of cash, if you will.  There is the cash that

5   the company has in its various accounts that it used for

6   operation purposes.  There is moneys that sit in the

7   securitization vehicle itself, basically the collections on

8   receivables that are collected off of the receivables that

9   are sold to the securitization facility.  And third, one

10  aspect of what we're also getting is an LC facility where we

11  would cash collateralize any LCs we choose to issue.

12          And the setoff right that we're talking about in

13  connection with enforcement here would not include during

14  that five business day period the company's general cash.  It

15  would only include the LC facility which has already been

16  given to the lender.  We have no access to that money once

17  it's securing a newly-issued LC, and it would include moneys

18  that are sitting in the nondebtor special purpose entity,

19  which we would not have access in the normal course to unless

20  they were using it for purchasing more receivables.  I just

21  wanted to get that on the record since a couple parties asked

22  me to.

23          Your Honor, in terms of the facility itself, it's

24  clear there is no ability for this company to borrow these

25  amounts of moneys on an unsecured basis.  I mean it's

1    uncontested.  And we think that it is, for the reasons

2    indicated in Mr. Bigelow's affidavit and (indiscernible)

3    articulate to the Court very much in the interest of these

4    estates.  And we would ask it be granted.

5            There are some provisions in the loan agreement --

6    one particular provision -- or excuse me, in the facility

7    agreement, that I want to announce that we have a small

8    change on, and there's some provisions in the order which we

9    worked out with Mr. McMahon that I also would like to go

10   through with this Court also, if I may, your Honor.

11           THE COURT:  Yes.

12           MR. KRAKAUER:  With regard to the agreement itself,

13   in the omnibus agreement which is one of the exhibits

14   attached -- if you give me a second I'll have the page.

15           On the omnibus agreement which is attached as an

16   exhibit to what we filed on page eight, there's Section J

17   dealing with the ability of the debtor to make payments

18   basically on account of prepetition debt.  And what was filed

19   indicate an aggregate limit of 80 million.  What that will be

20   changed to is an indication that will allow for us to make

21   payments on whatever this Court authorizes in connection with

22   our first day motions.  So whatever you authorize today, and

23   there's certain amounts that, for instance, in the broker

24   amount if we would seek this Court's authority to use it, in

25   the first day motions, if this Court ultimately were to allow

1    those, that would be included, too.

2           So basically what we've sought in our first day

3    motions would be permitted as long as this Court approves it.

4    And I would make the representations since Barclays has asked

5    me to is those amounts are consistent with the cash flows

6    that we provided Barclay over the next 120 days, that they

7    anticipated all those amounts would remain.

8           And second, in terms of other amounts to be 503(b)

9    amounts, there's an amount of 25 million in J and the actual

10   amount we're seeking is 30 million, so it would be changed to

11   that.  And I think that's it for the agreement itself.

12          Now I'll walk through some changes in the order.

13          THE COURT:  Mr. Krakauer, let me just ask --

14          MR. KRAKAUER:  Right.

15          THE COURT:  -- is the form of order that came with

16   the binder the same as that which was handed up to me earlier

17   this morning?

18          MR. KRAKAUER:  I believe so, your Honor, yes.  There

19   have not -- these would be changes to that.

20          On page 12 of the order, dealing with avoidance

21   actions, taking a lien on avoidance actions, if you go about

22   two-thirds of the way down on the page, there is a

23   parenthetical which begins "Which includes."  Rather than but

24   subject to, this language would be changed to the word

25   "upon."  And that provision just deals with the fact that

1   we're not asking you today to rule on whether or not a lien

2   on avoidance actions is appropriate.  That will be a matter

3   which comes up with the file here.

4          On page 15, and this is a general point, we're going

5   to get to language a little later in the day, but the U.S.

6   Trustee's Office has asked it to be made clear that the

7   carveout includes the ability of creditor's committee to

8   examine any possible claims, causes of action, defenses, et

9   cetera, and that nothing -- whatever fee carveout is there

10  include that concept, as well as the amount of the claim that

11  Barclays has.

12          THE COURT:  Well, tell me specifically what the

13  language is going to say, if you know now.

14          MR. KRAKAUER:  The reason I didn't have language is

15  it goes in about three places in this order, and that's --

16  and we haven't drafted it all.  Mr. Trust and I met with Mr.

17  McMahon this morning.  I think in concept we're agreed to it,

18  but the concept is that there will be money available in the

19  carveout to review the claims of Barclays and any defenses to

20  those claims.

21          THE COURT:  Okay.  But will there be a prohibition

22  against use of the carveout to actually bring the claim?

23          MR. KRAKAUER:  Yeah, that will remain.  This is just

24  investigation.

25          THE COURT:  I expected that.  I just wanted to know.

1           MR. KRAKAUER:  I apologize if it wasn't clear.  And

2    that comes -- I won't go through the other pages where that

3    same play comes up, but it comes up on a couple other places.

4    Okay.

5           On page 21, paragraph 26, this is the provision

6    regarding the fact that this is an interim order, that there

7    is a later date for other parties to review and object to

8    claims of Barclays.  This is now going to be changed to

9    conform to the local rule.  And instead of a 30-day period it

10   will be 60 days after the -- well, it will be the later of 60

11   days after the committee is formed or 75 days after the

12   filing date is I believe what the local rule says.  And there

13   won't be a provision that the hearing has to be five days

14   thereafter.

15          There was one provision that the U.S. Trustee -- I

16   think I've gotten everything.  But there's one -- (pause.)

17          Mr. Trust points out that in terms of the notice

18   provision it will also now include counsel to the bridge

19   lenders, the agent for the bridge lenders, which is Kaye

20   Scholer.

21          Mr. McMahon, I think we made certainly a lot of

22   progress with Mr. McMahon.  And I think there's one small

23   exception.  We're agreed -- if we have an agreement on this--

24   oh, okay.  Then I think we're done.  Mr. Trust resolved while

25   we were out in the hall.

1           That's what I think we have.  Obviously we'll see if

2    anybody --

3           MR. TRUST:  I have one other point of clarification.

4           MR. KRAKAUER:  Sure.

5           MR. TRUST:  Your Honor, sorry, just there was one

6    other point of clarification that I just want to make sure

7    again if it's okay with the Court, because our conversation

8    with Mr. McMahon ended just before the hearing commenced.  We

9    will just, you know, put the changes in and then submit to

10   you with Mr. McMahon's consent the revised order.  But there

11   was one further clarification.

12          With respect to the lift of the automatic stay, the

13   vacation and modification of the automatic stay, as it

14   pertains only to the letter of credit facility which, as Mr.

15   Krakauer explained, is prior to opening letters of credit is

16   cash collateralized by the debtor depositing cash in the

17   Barclays account, because of the way the letter of credit

18   facility works, the setoff that is going to not require the

19   five-day notice and be excluded from the automatic stay would

20   be limited only to the cash sitting in the Barclays account.

21   It's not a broader right of setoff where the five-day rule of

22   notice would apply.  So to the extent that a beneficiary

23   under a letter of credit were to draw and the mechanic in the

24   loan agreement reflects and requires this, then Barclays

25   would take the cash on deposit in the account which was

1   effectively prepaid by the debtor for the benefit of having

2   that letter of credit, and they would use that cash to pay

3   the beneficiary under the letter of credit.  It would make no

4   sense for the estate to incur an interest expense associated

5   with delay given that it was again effectively prepaid.  So

6   that clarification as to the lack of a five-day notice on

7   setoff as to the letter of credit facility will also, in

8   addition to the changes Mr. Krakauer identified, will be

9   reflected as well.

10           THE COURT:  All right, thank you.

11           Does anyone else care to be heard in connection with

12   the financing motion?  I hear no response.

13           Does the debtor have anything further in support of

14   the motion?

15           MR. KRAKAUER:  Your Honor, we would do, I think,

16   between the affidavit and where I proffered, I think we're

17   there.

18           THE COURT:  All right.  Based upon the record made,

19   including the Bigelow affidavit and the resolution of

20   whatever informal objections have been made, especially those

21   requested by the U.S. Trustee, I'm satisfied that the debtor

22   has met its burden demonstrating entitlement to this relief.

23   I'll therefore approve the proposed financing and will review

24   upon receipt a revised order under certification.  I'm

25   assuming it will be accompanied by black line.

1          MR. KRAKAUER:  It will, your Honor.

2          THE COURT:  All right.  Let's fill in the blanks on

3   the orders I had set aside earlier.

4          MR. CONLAN:  Your Honor, if I may approach, we have

5   actually filled the blanks in for you on those three orders.

6          THE COURT:  How considerate of you.  Yes.  Thank

7   you.

8          MR. CONLAN:  Your Honor, James Conlon on behalf of

9   the debtor again.  We can either wait until we're before you

10  on January 5 to talk about dates a couple of times a month in

11  January, February, March, or we could talk about dates now,

12  whichever you like.

13         THE COURT:  My suggestion is for dates going

14  forward, just be in touch with my courtroom deputy and we'll

15  work them out that way.  But there is I think one date maybe

16  we should in fact pick today, and that is the one concerning

17  debtor's request for another hearing on extension of time to

18  file schedules.  So if you give me a general time frame ...

19         MR. CONLAN:  I'm going to look at Mr. Lantry.

20         THE COURT:  Okay.

21         MR. CONLAN:  Just working forward from the petition

22  date, we think a date that is between 35 and 40 days from the

23  petition date is about the right time.

24         THE COURT:  Well, that puts us in the week of the

25  12th or the week of the 19th, I guess, somewhere in that

1    ballpark.

2          MR. CONLAN:  Yeah.  Anytime the week of the 12th

3    would be very good.

4          If your calendar is open, Thursday afternoons are

5    nice.

6          THE COURT:  Well, that happens to be my monthly

7    trial date.  Now while I don't wish to jinx myself, I haven't

8    had to use one of them in a while.

9          I can't see any current information on what's

10   scheduled.  Oh, are those the ones on which dispositive

11   motions are outstanding?

12         Okay, how's 1:30 on the 15th?  1:30 on January 15th?

13         MR. CONLAN:  That's fine.  And there's one -- pardon

14   me.  In addition to that date, your Honor, for the hearing

15   for further extension on the Sulfas (ph) and the schedules,

16   we also wanted to know for the January 5th hearing that

17   that's a good day for the final hearing on the financing as

18   well.

19         THE COURT:  Yes.  Actually given how the cases have

20   gone lately, that's a pretty decent interval between

21   committee organization and second day hearings.

22         Is there anything further for today?

23         MR. CONLAN:  There is not, your Honor, other than to

24   thank you for taking the time today and providing us the

25   relief you have provided.  We feel fortunate to be before you

1   in Delaware.  All of the relief you have provided today will

2   help us maintain the value of these businesses.  Our vendors,

3   our customers and our employees really are the value creators

4   for our creditors here, and this relief mattered a lot, and

5   we thank you.

6          THE COURT:  All right.  I thank you all.  That

7   concludes this hearing.  The Court will stand in recess.

8          MR. CONLAN:  Thank you.

9          (Proceedings concluded at 1:35 o'clock p.m.)

88

1                          I N D E X

2    WITNESS                    D       C       RD      RC

3    Mark Shapiro

4     By Mr. McMahon                    65

5    By Mr. Trust                               71

6                                   -  -  -

```
                            CERTIFICATION


          I hereby certify that the foregoing is a correct

transcript from the electronic sound recording of the

proceedings in the above-entitled matter.



Geraldine C. Laws, CET          Dated 1/4/09
Laws Transcription Service
```