# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13141 (KJC)<br><br>Jointly Administered<br>**Objection Deadline: January 27, 2009 at 4:00 p.m.**<br>**Hearing Date: February 3, 2009 at 10:00 a.m.** |

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING, BUT NOT REQUIRING, THE DEBTORS TO PAY PREPETITION AMOUNTS UNDER NON-INSIDER INCENTIVE PROGRAMS

The above-captioned debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors") hereby move this Court (the "Motion") pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order authorizing, but not requiring, the Debtors to pay prepetition amounts owed to employees under the Debtors' non-insider incentive programs in an amount not to exceed $8.8 million. The facts

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

46429/0001-5275280v1

and circumstances supporting this Motion are set forth in the concurrently filed Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company, in Support of the Motion (the "Bigelow Affidavit"). In further support of the Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1.  On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On December 10, 2008, the Bankruptcy Court entered an order consolidating the Debtors' chapter 11 cases for procedural purposes only.

2.  The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner.

3.  On December 18, 2008, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee") in these cases.

4.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a) and 363(b) of the Bankruptcy Code and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

## RELIEF REQUESTED

5.  The Debtors currently employ approximately 13,940 full-time and 2,450 part-time employees. In addition to wage and commission-based compensation, consistent with

their historical practices, the Debtors offer a substantial percentage of their employees the opportunity to earn additional compensation through various incentive bonus programs that are designed and administered through the local business units and individual administrative departments. These incentive bonus programs are designed to reward employees for outstanding achievements based upon specific metrics that are relevant to the respective employees' local or departmental line of work. Through this Motion, the Debtors are seeking authority, but not direction, to honor their pre-petition obligations to non-insider employee participants (the "Participating Employees") under the Debtors' local and departmental incentive bonus programs (the "Incentive Programs").[2]

6. Insiders of the Debtors are not among the Participating Employees that the Debtors are seeking to pay through this Motion.[3] In addition, the Participating Employees that are subject to the relief requested in this Motion are not participants in the Debtors' current management incentive plan, which will be the subject of a later motion. Instead, the Participating Employees include employees at the local business units that are immediately responsible for revenue generation through direct sales and the Debtors' operational performance. The average total Incentive Program bonus compensation the Debtors are seeking pay herein is approximately $2,551 per Participating Employee.

7. The Incentive Programs, which are described in more detail below, are generally divisible into three categories based upon operating segment—publishing, broadcast and entertainment, and administration. Within each operating segment, the Incentive Programs

---

[2] Nothing contained herein shall constitute, nor shall it be construed as, a request to assume or adopt any executory contract. The Debtors expressly reserve all rights with respect to the continuation or cessation of any Incentive Program and the assumption, adoption, modification or rejection of any executory contracts.

[3] Although approximately 24 insiders of the Debtors participate in the Incentive Programs, the Debtors have excluded from the relief sought herein any relief with respect to such individuals. Instead, the Debtors anticipate that they will seek authority, in a subsequent motion, to pay amounts due to these insiders and that subsequent request will likely be filed in conjunction with a motion seeking Court approval of the 2008 management incentive plan payments.

3

are constructed by and specific to each local business unit or department. In the aggregate, there are sixty-three business units participating in the Incentive Programs, which generally correspond to the Debtors' eight newspapers, twenty-four television and radio broadcast stations, and various administrative departments. Each local business unit and administrative department customizes the Incentive Programs applicable to its Participating Employees to reflect specific targets that are relevant to the particular location or department. These Incentive Programs provide incentive bonuses to approximately 3,000 Participating Employees at the local business units and administrative departments.

8. Although, as noted above, the Incentive Programs are largely localized, the vast majority of the Incentive Programs across all business units are designed to reward superior sales performance (both circulation and advertising sales), which is the cornerstone of the Debtors' ability to generate revenue. In addition to sales-based incentive programs, other Incentive Programs reward operational and productivity achievements, such as reducing newsprint waste, rewarding high ratings or collecting overdue payments, each of which also ultimately contributes to the Debtors' bottom-line.

9. Incentive bonuses are generally paid based upon annual, quarterly or monthly performance, with the exception of a few programs based upon specific ratings periods and weekly sales performance. The Incentive Programs are generally paid after the conclusion of the applicable measurement period and after management of the applicable business unit is able to assess the Participating Employees' performance vis-à-vis established targets or other goals. Due to the fact that the Petition Date fell (a) near the end of the 2008 annual bonus period, (b) over two-thirds into the fourth quarter of 2008, (c) at the end of the November 2008 ratings

period, and (d) one week into the month of December, the Debtors have accrued prepetition obligations to nearly all of the Participating Employees.

10. In order to continue to incentivize the Participating Employees, the Debtors believe that it is essential that they be permitted to honor the prepetition amounts due to the Participating Employees under the Incentive Programs. As of the Petition Date, the Debtors currently estimate that approximately $7.6 million in unpaid incentive bonuses was accrued and owing under the Incentive Programs. Through this Motion, the Debtors are seeking authority to pay prepetition amounts in excess of that amount—up to $8.8 million—due to the fact that the payouts under most of the Incentive Programs are based upon year-end, quarter-end or month-end performance. The Debtors are in the process of finalizing their review of results relating to these periods and have requested the increased amount to avoid the need to request further relief at a later date. For the 2007 Incentive Programs, the Debtors paid an aggregate of approximately $24.8 million, and estimate that the total amount owed under the 2008 Incentive Programs will be approximately $22.2 million. The annual amount spent on the Incentive Programs is approximately 2% of the total amount spent by the Debtors on compensation annually. Pursuant to confidentiality arrangements with the Official Committee of Unsecured Creditors and the steering committee of prepetition lenders, the Debtors have provided to such constituencies additional, back-up data concerning the relief sought in this Motion and will continue to make themselves and their professionals available to such constituents to respond to any further inquiries.

11. The Incentive Programs have historically been the principal mechanism by which the Debtors incentivize Employees to increase sales and revenue and achieve other operational goals. Moreover, these programs provide the added benefit of bolstering

Participating Employee morale and productivity. Many Participating Employees work hard to meet the targets of the Incentive Programs and rely on the bonuses paid under the Incentive Programs as a significant component of their total compensation. For example, in the broadcast and entertainment segment, payments made under the Incentive Programs on average comprise approximately 6.9% of the Employee Participants' total compensation up to a maximum of 50.2% for certain Employee Participants. To prevent the personal hardship that the Participating Employees will suffer if the Incentive Program obligations are not paid when due or as expected, as well as to maintain morale and an essential workforce during this critical time, the Debtors, by this Motion, seek authority to pay prepetition amounts outstanding under the Incentive Programs and to continue the Incentive Programs postpetition.

12. A brief description of the general categories of Incentive Programs follows:

### A. PUBLISHING SEGMENT INCENTIVE PROGRAMS.

13. As described below, there are four general categories of publishing segment Incentive Programs: (a) advertising sales Incentive Programs, (b) circulation sales Incentive Programs, (c) operations department Incentive Programs, and (d) other miscellaneous Incentive Programs. Approximately 2,684 Participating Employees receive incentive compensation from the publishing segment Incentive Programs.

14. **Advertising Sales Incentive Programs.** Participants in the advertising sales Incentive Programs include non-insider management Participating Employees in the advertising departments at the Debtors' publishing business units. The incentive bonuses are typically based upon achieving certain revenue goals for a month, a quarter or for the full year. Actual payouts are usually made monthly, quarterly or after the conclusion of a calendar year and are generally based on the Participating Employee's performance against specified targets. These revenue

targets are typically established prior to the start of the applicable measurement period and are designed to be a motivational driver of advertising revenue for the Debtors' publishing businesses. Although the Participating Employees receiving these incentives also receive a salary, as sales managers they do not receive a sales commission with each sale (unlike the sales personnel that they supervise). As a result, these bonuses and incentives are a significant portion of these Participating Employees' overall compensation. For example, at one of the Debtors' newspapers, thirty-two advertising sales managers may have the opportunity to participate in a quarterly incentive program which typically contributes about 30% of their total cash compensation. These participating managers typically earn about $12,000/quarter if they achieve pre-set advertising revenue goals for their department. They must achieve at least 91% of their pre-set target revenue goal to be eligible for an incentive payout and then the incentive increases with their revenue achievement.

15. **Circulation Sales Incentive Programs.** The circulation-related sales Incentive Programs cover both management Participating Employees and certain "line" Participating Employees in the circulation departments at the Debtors' newspapers. These bonuses and incentives are typically based on achieving certain targets in any of the following areas: (a) customer service metrics such as low subscriber complaint ratios and call handling times, (b) acquisition of new subscribers, (c) retention ratios for subscribers, (d) circulation revenue and expense goals, and (e) department or company financial goals. The targets for these programs are generally established prior to the applicable measurement period and incentivize employees to provide quality customer service to the Debtors' subscribers and to gain and retain subscribers. The managers and other Participating Employees receiving these bonuses and incentives also receive a salary; however, the incentive bonuses comprise an important

7

component of such Participating Employees' total compensation package. For example, at one of the Debtors' newspapers, sixteen division managers in the circulation department may have the opportunity to participate in a circulation incentive program with both quarterly and annual payouts. The incentive payouts are based on achieving pre-set target goals discussed above covering customer service metrics such as targets for subscriber complaint ratios, delivery costs per copy and overall company financial performance. If all target goals are achieved, the manager could earn an incentive of $7,200 of which 70% is paid quarterly and 30% is paid based on annual company financial performance. If targeted goals are exceeded, the manager can earn up to 110% of that target (e.g., 110% of $7,200).

16. **Operations Department Incentive Programs.** Participants in the operations department Incentive Programs include "line" Participating Employees and junior managers. These incentives are typically based on achieving certain productivity measures, including (a) efforts to reduce and minimize newsprint waste and increase the speed and reliability of inserting customer-provided inserts into the Debtors' publications and (b) achievements of safety goals and other efficiency or financial metrics related to the Debtors' operations departments. These targets are established prior to the applicable measurement period and encourage Participating Employees to achieve these key production metrics and reduce the Debtors' operational expenses. Payouts under the operations department Incentive Programs are monthly, quarterly or annually. At one of the Debtors' newspapers, approximately 300 employees in the newspapers' inserting department have the opportunity to participate in a quarterly incentive plan, which pays out based on achieving pre-set goals related to how many pieces of customer-provided inserts are inserted per hour, the accuracy of the inserting operation,

minimization of inserting machine downtime and various safety measures. If all goals are achieved, the employee could earn an incentive of up $250 per quarter or $1,000 per year.

17. **Other Miscellaneous Incentive Programs.** In addition to the Incentive Programs described above, the publishing segment employs a wide variety of other programs to motivate and incentivize Participating Employees. Many of these other Incentive Programs serve to reward lower level managers or other Participating Employees for great work on a specified project or achieving preset goals that are important to the financial performance of the Debtors. For example, at one of the Debtors' newspapers, about 200 employees participate in an annual non-manager bonus plan. This plan is designed to reward participants for outstanding performance and/or participation on key projects such as re-designing the newspaper. On average, participants in this plan receive an annual award of about $1,000 with a maximum award of $5,000 for outstanding performance. These awards are usually made on an annual basis. Although these awards are often more subjective in nature and specific to individual accomplishments, like the other Incentive Programs they serve to motivate and reward Participating Employees to achieve key company goals such as systems implementations or management of departmental expenses.

**B.    BROADCASTING AND ENTERTAINMENT SEGMENT INCENTIVE PROGRAMS.**

18. As described below, there are three general categories of broadcasting and entertainment segment Incentive Programs: (a) advertising sales Incentive Programs, (b) ratings-related Incentive Programs, and (c) operational and other Incentive Programs. Approximately 179 Participating Employees receive incentive compensation from the broadcasting and entertainment segment Incentive Programs.

19. **Advertising Sales Incentive Programs.** Participants in the advertising sales Incentive Programs include Participating Employees that are members of the sales management team at the respective broadcasting business unit. In addition, at a small number of business units, more junior account executives participate for bonuses in the Incentive Programs. The incentive bonuses paid to members of the sales management team are based upon achieving certain metrics, including achieving a pre-set revenue target, a pre-set market-share of revenues target, and/or meeting certain objectives based on individual performance. In addition, the revenue targets established at various business units may have sub-components that identify particular programs that the business unit's management has identified as areas requiring special attention. The advertising sales Incentive Programs are primarily based upon quarterly or annual performance and are paid after the conclusion of the applicable measurement period. For example, for some television stations, three participating sales managers may have the opportunity to earn up to a maximum of between approximately $1,000 to $1,250 if pre-set market share and revenue targets are met for the quarter and the station meets billing targets for specified programming (such as sporting events or news programming). This incentive bonus may be in addition to a maximum annual bonus of between $5,000 and $10,000 for such individuals that would be awarded based upon achieving annual revenue and market share goals.

20. **Ratings-Related Incentive Programs.** Ratings-related Incentive Programs provide incentive bonuses, in limited circumstances, to broadcast "talent" (such as television anchors or other television and radio "personalities") and to certain members of station management. The Incentive Programs for the television and radio stations are based upon ratings achieved during ratings periods. These programs incentivize Participating Employees to achieve higher ratings, which in turn relate to higher revenues from the advertisements aired

46429/0001-5275280v1

during those programs. These Incentive Programs provide, in advance, detailed benchmarks, which if achieved or exceeded, translate to a bonus payment for the applicable Participating Employee. These bonuses are paid after the conclusion of the applicable ratings period.

21. **Operational and Other Incentive Programs.** There are several, smaller Incentive Programs falling into this category. For example, various business units may offer (a) incentive bonuses for credit and collection managers that hit specific targets (e.g., $1,500 maximum quarterly payment for meeting bad debt reduction goals and reducing outstanding payables), (b) monthly and weekly new business sales generation (e.g., a maximum award of $2,500 for three sales personnel each month based upon new business), and (c) employee of the month and employee of the quarter awards (e.g., monthly or quarterly awards of up to a maximum of a few hundred dollars). In addition, on a more limited basis, certain of the business units provide annual, subjective bonuses to award excellent performance overall or with respect to specified goals, such as renewing national agreements or strengthening affiliate relationships. All of these subjective bonuses, however, must be proposed by the general manager of the applicable station and approved as part of the business unit's incentive program.

C.   **ADMINISTRATION INCENTIVE PROGRAMS.**

22. As described below, there are a number of administration segment Incentive Programs, which correspond to each Participating Employee's department within the Debtors' organization. Approximately 119 Participating Employees receive incentive compensation from the administration segment Incentive Programs.

23. **Corporate Relations.** A few non-management employees in the Debtors' centralized corporate relations department are eligible for annual incentive bonuses that range typically between $2,500 and $7,500. These bonuses are paid out after the conclusion of the

11

calendar year and recognize contributions by non-management employees beyond the employees' stated job description. Such bonuses will recognize extraordinary efforts related to, among other things, development of material for the Debtors' external and internal websites, managing budgeting and invoicing, assisting with employee enrollment for certain benefit plans and creating press releases and other materials for various transactions that the Debtors are involved in.

24. **Finance Service Center.** The Debtors' Finance Service Center manages virtually all of the Debtors' receivables and payables processing. High performing employees that are not included in the Debtors' management incentive program are eligible to receive annual bonuses, which are paid after the conclusion of the year, which have traditionally ranged between $1,000 to $7,500. Approximately twenty-five individuals participate in this program. Incentive bonuses are awarded based on strong performance that is summarized in annual performance appraisals. Examples of exceptional performance that may result in a bonus payment include, but are not limited to, significant participation in successful system implementations and cost savings initiatives and the assumption of additional day-to-day work as a result of staff reductions, new processes and outsourcing.

25. **Human Resources.** Non-management employees in the Debtors' human resources department are generally eligible to receive annual bonuses based on extraordinarily high performance during the year. These bonuses generally range from $1,000 to $10,000 and reward employees that have managed or been key contributors on significant human resources initiatives or if they have assumed a great deal of additional work as a result of staff reductions. In addition to the annual bonus program, the human resources department has established a one-time incentive bonus program in the aggregate amount of $45,000 to be paid to ten members of

the human resources staff. This one time incentive bonus has been established to reward the employees' efforts related to a rapid transition of all health and welfare benefits for the Debtors' employees to United Health Care effective January 1, 2009.

26. **Technology.** As with the other administrative departments, the Debtors' Information Technology group pays an annual bonus to certain non-management employees who make significant contributions to the organization through participation in special initiatives or going above and beyond what is expected of the particular employee. These bonuses range between $500 and $3,000 and are paid out of an aggregate department pool of $50,000.

27. **Tax and Audit.** The Debtors' tax and audit departments also have limited annual bonuses to award extraordinary contributions. In the tax department, the Debtors anticipate that a handful of individuals are eligible to receive an annual bonus based on contributions during the 2008 calendar year to recognize significant overtime work and assistance with special projects. These bonuses range between $1,000 to $3,000, and will be paid from a total department pool of $7,000. In addition, there are a few individuals in the audit department that provided assistance on special departmental projects during 2008. These individuals are eligible to receive a bonus between $1,000 and $2,000.

28. **Other Departments.** In addition to the departmental Incentive Programs described above, various other administrative departments have limited Incentive Programs to incentivize Participating Employees' performance. For example, certain employees in the properties and securities departments are eligible to receive incentive bonus payments ranging between $1,000 to $10,000 for outstanding performance and/or perfect attendance. Similarly, the strategy and financial reporting departments also offer limited incentive bonuses based on outstanding performance and work on special projects.

46429/0001-5275280v1

## BASIS FOR RELIEF

29. The Court may authorize the payment of prepetition claims under the Incentive Programs under section 363(b) of the Bankruptcy Code. That section provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1) (2004). Under this section, some courts have authorized a debtor to pay certain prepetition claims. See Ionosphere Clubs, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing payment of prepetition claims where the debtors articulate "some business justification, other than the mere appeasement of major creditors"); see also In re James A. Phillips, Inc., 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing, pursuant to section 363, a contractor to pay prepetition claims of some suppliers who were potential lien claimants, because the payments were necessary for the general contractors to release funds owed to the debtors). As discussed, the importance of the Participating Employees to the Debtors' continued operations cannot be understated. As a result, the relief requested herein is necessary to maintain the value of the Debtors' estates for the benefit of all creditors, and therefore should be granted.

30. Additionally, section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). Under section 105(a), the Court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); see also In re Just for Feet, Inc., 242 B.R. 821,

825 (D. Del. 1999) ("to invoke the necessity of payment doctrine, a debtor must show that payment of the prepetition claims is critical to the debtor's reorganization"). The Debtors submit that payment of prepetition amounts owed to the Participating Employees and maintenance of the Incentive Programs is critical to their reorganization efforts. The Incentive Programs are directly linked to revenue and performance targets. Maintaining a strong market share and incoming revenues is in the best interests of all parties in interest in these cases and should therefore be approved under section 105(a) of the Bankruptcy Code.

31. Furthermore, many of the Participating Employees count on the amounts paid under the Incentive Programs as an integral part of their income upon which they rely to pay their daily living expenses, and these Participating Employees will be exposed to financial difficulties if the Debtors are not permitted to honor their prepetition Incentive Program obligations. Accordingly, the Debtors believe that if the Debtors are unable to honor such obligations, employee morale and loyalty will be jeopardized at a time when such support is critical. Courts in this district have often approved the payment of employee incentive programs where such payments are essential to the debtors reorganization. See, e.g., In re Hines Horticulture, Inc., Case No. 08-11922 (Bankr. D. Del. Aug 22, 2008) (KJC); In re Quebecor World (USA) Inc., Case No. 08-10152 (JMP) (Bankr. D. Del. Mar 20, 2008); In re Global Home Products, Inc., Case No. 06-10340 (Bankr. D. Del. May 4, 2006) (KG); In re Pliant Corporation., Case No. 06-10001 (Bankr. D. Del. Jan 4, 2006) (MFW). The Debtors respectfully submit that similar relief is warranted in these chapter 11 cases.

32. The success, viability and revitalization of the Debtors' business is dependent upon the Debtors' employees and their continued morale and welfare at this critical time. It is therefore essential to preserve the value of the Debtors' business, that Debtors must be permitted,

in their sole discretion, to pay prepetition amounts owed to Participating Employees under the Incentive Programs and continue honoring their obligations under the Incentive Programs without interruption or modification and any other obligations in connection with the Incentive Programs that may arise in the ordinary course of the Debtors' business from and after the Petition Date. Moreover, the relief requested herein does not fall within the restrictions set forth in section 503(c) of the Bankruptcy Code because no insiders of the Debtors will be paid though the Incentive Programs, the Debtors are not seeking to pay retention bonuses through the Incentive Programs and the Debtors' obligations under Incentive Programs occur in the ordinary course of the Debtors' business.

33. The Debtors also seek a waiver of the ten-day stay pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure to permit immediate payment of amounts due under the Incentive Programs for the reasons set forth in this Motion.

## NOTICE

34. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel for the steering committee for the Debtors' prepetition loan facilities; (vi) proposed counsel to the Creditors' Committee; (vii) counsel for the agent for the Debtors' post-petition financing facility; and (viii) any party who has requested to receive notices in these chapter 11 cases pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

46429/0001-5275280v1

## NO PRIOR REQUEST

35. The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as Exhibit A, (i) authorizing, but not directing, the Debtors to honor their prepetition obligations to Participating Employees under the Incentive Programs and to continue the Incentive Programs in the ordinary course of business, (ii) authorizing the waiver of the ten day stay period, and (iii) granting such other and further relief as the Court deems just and proper.

Dated: January 13, 2009

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Jessica C.K. Boelter
Bridget J. Hauserman
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
1000 N. West Street, Suite 1200
Wilmington, DE  19801
Telephone:  (302) 652-3131

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION