# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## AFFIDAVIT OF CHANDLER BIGELOW III, SENIOR VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF TRIBUNE COMPANY, IN SUPPORT OF MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING, BUT NOT REQUIRING, THE DEBTORS TO PAY PREPETITION AMOUNTS UNDER NON-INSIDER INCENTIVE PROGRAMS

STATE OF ILLINOIS )
) ss:
COUNTY OF COOK )

CHANDLER BIGELOW III, being duly sworn, deposes and states:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9056); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

1.    I am a Senior Vice President and the Chief Financial Officer of Tribune Company, a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").[2] Tribune Company is the direct or indirect parent company of the other Debtors herein. I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records.

2.    I submit this affidavit (the "Affidavit") in support of the Debtors' Motion for an Order Authorizing, But Not Requiring, the Debtors to Pay Prepetition Amounts Under Non-Insider Incentive Programs (the "Motion"). I am familiar with the contents of the Motion, and supporting data. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, on information supplied to me by other members of the Debtors' management teams and/or professionals retained by the Debtors, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and present liquidity needs. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Affidavit on behalf of the Debtors.

## BACKGROUND TO THE MOTION

3.    The Debtors currently employ approximately 13,940 full-time and 2,450 part-time employees. In addition to wage and commission-based compensation, consistent with their historical practices, the Debtors offer a substantial percentage of their employees the opportunity to earn additional compensation through various incentive bonus programs that are designed and administered through the local business units and individual administrative departments. These incentive bonus programs are designed to reward employees for outstanding

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion (as defined above).

achievements based upon specific metrics that are relevant to the respective employees' local or departmental line of work.

4.    Insiders of the Debtors are not among the Participating Employees that the Debtors are seeking to pay through the Motion.[3] In addition, the Participating Employees that are subject to the relief requested in the Motion are not participants in the Debtors' current management incentive plan, which will be the subject of a later motion. Instead, the Participating Employees include employees at the local business units that are immediately responsible for revenue generation through direct sales and the Debtors' operational performance. The average total Incentive Program bonus compensation that the Debtors are seeking to pay in the Motion is approximately $2,551 per Participating Employee.

5.    The Incentive Programs, which are described in more detail below, are generally divisible into three categories based upon operating segment—publishing, broadcast and entertainment, and administration. Within each operating segment, the Incentive Programs are constructed by and specific to each local business unit or department. In the aggregate, there are sixty-three business units participating in the Incentive Programs, which generally correspond to the Debtors' eight newspapers, twenty-four television and radio broadcast stations, and various administrative departments. Each local business unit and administrative department customizes the Incentive Programs applicable to its Participating Employees to reflect specific targets that are relevant to the particular location or department. These Incentive Programs provide incentive bonuses to approximately 3,000 Participating Employees at the local business units and administrative departments.

---

[3] Although approximately 24 insiders of the Debtors participate in the Incentive Programs, the Debtors have excluded from the relief sought in the Motion any relief with respect to such individuals. Instead, the Debtors anticipate that they will seek authority, in a subsequent motion, to pay amounts due to these insiders and that subsequent request will likely be filed in conjunction with a motion seeking Court approval of the 2008 management incentive plan payments.

6.    Although, as noted above, the Incentive Programs are largely localized, the vast majority of the Incentive Programs across all business units are designed to reward superior sales performance (both circulation and advertising sales), which is the cornerstone of the Debtors' ability to generate revenue.  In addition to sales-based incentive programs, other Incentive Programs reward operational and productivity achievements, such as reducing newsprint waste, rewarding high ratings or collecting overdue payments, each of which also ultimately contributes to the Debtors' bottom-line.

7.    Incentive bonuses are generally paid based upon annual, quarterly or monthly performance, with the exception of a few programs based upon specific ratings periods and weekly sales performance.  The Incentive Programs are generally paid after the conclusion of the applicable measurement period and after management of the applicable business unit is able to assess the Participating Employees' performance vis-à-vis established targets or other goals. Due to the fact that the Petition Date fell (a) near the end of the 2008 annual bonus period, (b) over two-thirds into the fourth quarter of 2008, (c) at the end of the November 2008 ratings period, and (d) one week into the month of December, the Debtors have accrued prepetition obligations to nearly all of the Participating Employees.

8.    In order to continue to incentivize the Participating Employees, the Debtors believe that it is essential that they be permitted to honor the prepetition amounts due to the Participating Employees under the Incentive Programs.  As of the Petition Date, the Debtors currently estimate that approximately $7.6 million in unpaid incentive bonuses was accrued and owing under the Incentive Programs.  Through the Motion, the Debtors are seeking authority to pay prepetition amounts in excess of that amount—up to $8.8 million—due to the fact that the payouts under most of the Incentive Programs are based upon year-end, quarter-end or month-

4

end performance. The Debtors are in the process of finalizing their review of results relating to these periods and have requested the increased amount to avoid the need to request further relief at a later date. For the 2007 Incentive Programs, the Debtors paid an aggregate of approximately $24.8 million, and estimate that the total amount owed under the 2008 Incentive Programs will be approximately $22.2 million. The annual amount spent on the Incentive Programs is approximately 2% of the total amount spent by the Debtors on compensation annually.

9.    The Incentive Programs have historically been the principal mechanism by which the Debtors incentivize Employees to increase sales and revenue and achieve other operational goals. Moreover, these programs provide the added benefit of bolstering Participating Employee morale and productivity. Many Participating Employees work hard to meet the targets of the Incentive Programs and rely on the bonuses paid under the Incentive Programs as a significant component of their total compensation. For example, in the broadcast and entertainment segment, payments made under the Incentive Programs on average comprise approximately 6.9% fo the Employee Participants' total compensation up to a maximum of 50.2% for certain Employee Participants. To prevent the personal hardship that the Participating Employees will suffer if the Incentive Program obligations are not paid when due or as expected, as well as to maintain morale and an essential workforce during this critical time, the Debtors, by the Motion, seek authority to pay prepetition amounts outstanding under the Incentive Programs and to continue the Incentive Programs postpetition.

10. A brief description of the general categories of Incentive Programs follows:

A.    **PUBLISHING SEGMENT INCENTIVE PROGRAMS.**

11. As described below, there are four general categories of publishing segment Incentive Programs: (a) advertising sales Incentive Programs, (b) circulation sales Incentive

Programs, (c) operations department Incentive Programs, and (d) other miscellaneous Incentive Programs. Approximately 2,684 Participating Employees receive incentive compensation from the publishing segment Incentive Programs.

12. **Advertising Sales Incentive Programs.** Participants in the advertising sales Incentive Programs include non-insider management Participating Employees in the advertising departments at the Debtors' publishing business units. The incentive bonuses are typically based upon achieving certain revenue goals for a month, a quarter or for the full year. Actual payouts are usually made monthly, quarterly or after the conclusion of a calendar year and are generally based on the Participating Employee's performance against specified targets. These revenue targets are typically established prior to the start of the applicable measurement period and are designed to be a motivational driver of advertising revenue for the Debtors' publishing businesses. Although the Participating Employees receiving these incentives also receive a salary, as sales managers they do not receive a sales commission with each sale (unlike the sales personnel that they supervise). As a result, these bonuses and incentives are a significant portion of these Participating Employees' overall compensation. For example, at one of the Debtors' newspapers, thirty-two advertising sales managers may have the opportunity to participate in a quarterly incentive program which typically contributes about 30% of their total cash compensation. These participating managers typically earn about $12,000/quarter if they achieve pre-set advertising revenue goals for their department. They must achieve at least 91% of their pre-set target revenue goal to be eligible for an incentive payout and then the incentive increases with their revenue achievement.

13. **Circulation Sales Incentive Programs.** The circulation-related sales Incentive Programs cover both management Participating Employees and certain "line"

Participating Employees in the circulation departments at the Debtors' newspapers. These bonuses and incentives are typically based on achieving certain targets in any of the following areas: (a) customer service metrics such as low subscriber complaint ratios and call handling times, (b) acquisition of new subscribers, (c) retention ratios for subscribers, (d) circulation revenue and expense goals, and (e) department or company financial goals. The targets for these programs are generally established prior to the applicable measurement period and incentivize employees to provide quality customer service to the Debtors' subscribers and to gain and retain subscribers. The managers and other Participating Employees receiving these bonuses and incentives also receive a salary; however, the incentive bonuses comprise an important component of such Participating Employees' total compensation package. For example, at one of the Debtors' newspapers, sixteen division managers in the circulation department may have the opportunity to participate in a circulation incentive program with both quarterly and annual payouts. The incentive payouts are based on achieving pre-set target goals discussed above covering customer service metrics such as targets for subscriber complaint ratios, delivery costs per copy and overall company financial performance. If all target goals are achieved, the manager could earn an incentive of $7,200 of which 70% is paid quarterly and 30% is paid based on annual company financial performance. If targeted goals are exceeded, the manager can earn up to 110% of that target (e.g., 110% of $7,200).

14. **Operations Department Incentive Programs.** Participants in the operations department Incentive Programs include "line" Participating Employees and junior managers. These incentives are typically based on achieving certain productivity measures, including (a) efforts to reduce and minimize newsprint waste and increase the speed and reliability of inserting customer-provided inserts into the Debtors' publications and (b)

7

achievements of safety goals and other efficiency or financial metrics related to the Debtors'
operations departments.  These targets are established prior to the applicable measurement period
and encourage Participating Employees to achieve these key production metrics and reduce the
Debtors' operational expenses.  Payouts under the operations department Incentive Programs are
monthly, quarterly or annually.  At one of the Debtors' newspapers, approximately 300
employees in the newspapers' inserting department have the opportunity to participate in a
quarterly incentive plan, which pays out based on achieving pre-set goals related to how many
pieces of customer-provided inserts are inserted per hour, the accuracy of the inserting operation,
minimization of inserting machine downtime and various safety measures.  If all goals are
achieved, the employee could earn an incentive of up $250 per quarter or $1,000 per year.

15.  **Other Miscellaneous Incentive Programs.**  In addition to the Incentive
Programs described above, the publishing segment employs a wide variety of other programs to
motivate and incentivize Participating Employees.   Many of these other Incentive Programs
serve to reward  lower level managers or other Participating Employees for great work on a
specified project or achieving  preset goals that are important to the financial performance of the
Debtors.  For example, at one of the Debtors' newspapers, about 200 employees participate in an
annual non-manager bonus plan.  This plan is designed to reward participants for outstanding
performance and/or participation on key projects such as re-designing the newspaper.  On
average, participants in this plan receive an annual award of about $1,000 with a maximum
award of $5,000 for outstanding performance.   These awards are usually made on an annual
basis.  Although these awards are often more subjective in nature and specific to individual
accomplishments, like the other Incentive Programs they serve to motivate and reward

8

Participating Employees to achieve key company goals such as systems implementations or management of departmental expenses.

**B.      BROADCASTING AND ENTERTAINMENT SEGMENT INCENTIVE PROGRAMS.**

16.   As described below, there are three general categories of broadcasting and entertainment segment Incentive Programs: (a) advertising sales Incentive Programs, (b) ratings-related Incentive Programs, and (c) operational and other Incentive Programs.  Approximately 179 Participating Employees receive incentive compensation from the broadcasting and entertainment segment Incentive Programs.

17.   **Advertising Sales Incentive Programs.**  Participants in the advertising sales Incentive Programs include Participating Employees that are members of the sales management team at the respective broadcasting business unit.  In addition, at a small number of business units, more junior account executives participate for bonuses in the Incentive Programs.  The incentive bonuses paid to members of the sales management team are based upon achieving certain metrics, including achieving a pre-set revenue target, a pre-set market-share of revenues target, and/or meeting certain objectives based on individual performance.  In addition, the revenue targets established at various business units may have sub-components that identify particular programs that the business unit's management has identified as areas requiring special attention. The advertising sales Incentive Programs are primarily based upon quarterly or annual performance and are paid after the conclusion of the applicable measurement period.  For example, for some television stations, three participating sales managers may have the opportunity to earn up to a maximum of between approximately $1,000 to $1,250 if pre-set market share and revenue targets are met for the quarter and the station meets billing targets for specified programming (such as sporting events or news programming).  This incentive bonus

may be in addition to a maximum annual bonus of between $5,000 and $10,000 for such

individuals that would be awarded based upon achieving annual revenue and market share goals.

18. **Ratings-Related Incentive Programs.** Ratings-related Incentive Programs

provide incentive bonuses, in limited circumstances, to broadcast "talent" (such as television

anchors or other television and radio "personalities") and to certain members of station

management. The Incentive Programs for the television and radio stations are based upon

ratings achieved during ratings periods. These programs incentivize Participating Employees to

achieve higher ratings, which in turn relate to higher revenues from the advertisements aired

during those programs. These Incentive Programs provide, in advance, detailed benchmarks,

which if achieved or exceeded, translate to a bonus payment for the applicable Participating

Employee. These bonuses are paid after the conclusion of the applicable ratings period.

19. **Operational and Other Incentive Programs.** There are several, smaller

Incentive Programs falling into this category. For example, various business units may offer (a)

incentive bonuses for credit and collection managers that hit specific targets (e.g., $1,500

maximum quarterly payment for meeting bad debt reduction goals and reducing outstanding

payables), (b) monthly and weekly new business sales generation (e.g., a maximum award of

$2,500 for three sales personnel each month based upon new business), and (c) employee of the

month and employee of the quarter awards (e.g., monthly or quarterly awards of up to a

maximum of a few hundred dollars). In addition, on a more limited basis, certain of the business

units provide annual, subjective bonuses to award excellent performance overall or with respect

to specified goals, such as renewing national agreements or strengthening affiliate relationships.

All of these subjective bonuses, however, must be proposed by the general manager of the

applicable station and approved as part of the business unit's incentive program.

C.     ADMINISTRATION INCENTIVE PROGRAMS

20.   As described below, there are a number of administration segment Incentive

Programs, which correspond to each Participating Employee's department within the Debtors'

organization.  Approximately 119 Participating Employees receive incentive compensation from

the administration segment Incentive Programs.

21.  **Corporate Relations.**  A few non-management employees in the Debtors'

centralized corporate relations department are eligible for annual incentive bonuses that range

typically between $2,500 and $7,500.  These bonuses are paid out after the conclusion of the

calendar year and recognize contributions by non-management employees beyond the

employees' stated job description.  Such bonuses will recognize extraordinary efforts related to,

among other things, development of material for the Debtors' external and internal websites,

managing budgeting and invoicing, assisting with employee enrollment for certain benefit plans

and creating press releases and other materials for various transactions that the Debtors are

involved in.

22.  **Finance Service Center.**  The Debtors' Finance Service Center manages

virtually all of the Debtors' receivables and payables processing.  High performing employees

that are not included in the Debtors' management incentive program are eligible to receive

annual bonuses, which are paid after the conclusion of the year, which have traditionally ranged

between $1,000 to $7,500.  Approximately twenty-five individuals participate in this program.

Incentive bonuses are awarded based on strong performance that is summarized in annual

performance appraisals.  Examples of exceptional performance that may result in a bonus

payment include, but are not limited to, significant participation in successful system

implementations and cost savings initiatives and the assumption of additional day-to-day work as a result of staff reductions, new processes and outsourcing.

23. **Human Resources.** Non-management employees in the Debtors' human resources department are generally eligible to receive annual bonuses based on extraordinarily high performance during the year. These bonuses generally range from $1,000 to $10,000 and reward employees that have managed or been key contributors on significant human resources initiatives or if they have assumed a great deal of additional work as a result of staff reductions. In addition to the annual bonus program, the human resources department has established a one-time incentive bonus program in the aggregate amount of $45,000 to be paid to ten members of the human resources staff. This one time incentive bonus has been established to reward the employees' efforts related to a rapid transition of all health and welfare benefits for the Debtors' employees to United Health Care effective January 1, 2009.

24. **Technology.** As with the other administrative departments, the Debtors' Information Technology group pays an annual bonus to certain non-management employees who make significant contributions to the organization through participation in special initiatives or going above and beyond what is expected of the particular employee. These bonuses range between $500 and $3,000 and are paid out of an aggregate department pool of $50,000.

25. **Tax and Audit.** The Debtors' tax and audit departments also have limited annual bonuses to award extraordinary contributions. In the tax department, the Debtors anticipate that a handful of individuals are eligible to receive an annual bonus based on contributions during the 2008 calendar year to recognize significant overtime work and assistance with special projects. These bonuses range between $1,000 to $3,000, and will be paid from a total department pool of $7,000. In addition, there are a few individuals in the audit

department that provided assistance on special departmental projects during 2008. These individuals are eligible to receive a bonus between $1,000 and $2,000.

26. **Other Departments.** In addition to the departmental Incentive Programs described above, various other administrative departments have limited Incentive Programs to incentivize Participating Employees' performance. For example, certain employees in the properties and securities departments are eligible to receive incentive bonus payments ranging between $1,000 to $10,000 for outstanding performance and/or perfect attendance. Similarly, the strategy and financial reporting departments also offer limited incentive bonuses based on outstanding performance and work on special projects.

## IMPORTANCE OF THE INCENTIVE PROGRAMS
## TO THE DEBTORS' REORGANIZATION EFFORTS

27. The payment of prepetition amounts owed to the Participating Employees and maintenance of the Incentive Programs is critical to the Debtors' reorganization efforts. The Incentive Programs are directly linked to revenue and performance targets. Maintaining a strong market share and incoming revenues is in the best interests of all parties in interest in these cases.

28. Furthermore, many of the Participating Employees count on the amounts paid under the Incentive Programs as an integral part of their income upon which they rely to pay their daily living expenses, and these Participating Employees will be exposed to financial difficulties if the Debtors are not permitted to honor their prepetition Incentive Program obligations. Accordingly, the Debtors believe that if the Debtors are unable to honor such obligations, employee morale and loyalty will be jeopardized at a time when such support is critical.

29. The success, viability and revitalization of the Debtors' business is dependent upon the Debtors' employees and their continued morale and welfare at this critical time. It is

13

therefore essential to preserve the value of the Debtors' business, that Debtors must be permitted, in their sole discretion, to pay prepetition amounts owed to Participating Employees under the Incentive Programs and continue honoring their obligations under the Incentive Programs without interruption or modification and any other obligations in connection with the Incentive Programs that may arise in the ordinary course of the Debtors' business from and after the Petition Date.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.

Dated: _January 13, 2009_          _Chandler Bigelow_
                                   Chandler Bigelow III
                                   Senior Vice President & Chief Financial Officer
                                   Tribune Company

Sworn to and subscribed before me this
_13th_ day of January, 2009.

_Margaret M. Weimer_
Notary Public

"OFFICIAL SEAL"
Margaret M. Weimer
Notary Public, State of Illinois
My Commission Expires Feb. 1, 2009