# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

**Requested Hearing Date:**
**February 3, 2009 at 10:00 a.m. (ET)**
**Requested Objection Deadline:**
**January 27, 2009 at 4:00 p.m. (ET)**

## MOTION OF DEBTOR KPLR, INC.
## FOR AN ORDER AUTHORIZING ENTRY INTO A POSTPETITION
## LOCAL MARKETING AGREEMENT
## WITH COMMUNITY TELEVISION OF MISSOURI

KPLR, Inc., one of the above-captioned debtors and debtors in possession

("KPLR" or the "Debtor" and collectively, the "Debtors"), by and through its undersigned

proposed counsel, hereby moves this Court (the "Motion") for entry of an order pursuant to

sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code")

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

authorizing it to enter into that certain Local Marketing Agreement (the "LMA")[2] with

Community Television of Missouri, LLC and Community Television of Missouri License, LLC

(collectively, "Community Missouri"). (A copy of the LMA is attached as Exhibit A).[3]  In

support of this Motion, KPLR respectfully states as follows:

## STATUS OF THE CASE AND JURISDICTION

1.      On December 8, 2008 (the "Petition Date"), the Debtors each filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      The Debtors have continued in possession of their respective properties

and have continued to operate and maintain their businesses as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

4.      On December 18, 2008, the United States Trustee for the District of

Delaware appointed an official committee of unsecured creditors (the "Creditors' Committee").

No request has been made for the appointment of a trustee or examiner.

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief

sought herein are sections 105(a) and 363 of the Bankruptcy Code.

---

[2]  Nothing contained in this Motion is intended to alter any provision of the agreements attached as exhibits hereto. In the event of a discrepancy between the description of such agreements in this Motion and their actual terms as reflected in the exhibits, the terms of such agreements shall control.

[3]  Exhibits A, B and C have all been redacted to protect confidential, commercial or competitively sensitive information.  A motion to file these documents under seal is being filed concurrently with this Motion.

## **BACKGROUND TO THE MOTION**

6.      Tribune Company ("Tribune"), a debtor in the above-captioned cases, is America's largest employee-owned media company and is the ultimate parent company of each of the Debtors.  Tribune operates businesses in publishing, interactive media, and broadcasting. These operations are conducted through two business segments: (i) publishing and (ii) broadcasting and entertainment.

7.      Tribune's broadcasting and entertainment segment includes 23 television stations, WGN America, WGN-AM, and the Chicago Cubs baseball team.[4]  Through its television stations and WGN America, Tribune's broadcasting and entertainment segment reaches more than 80% of television households in the United States.  Thirteen (13) of Tribune's stations are affiliates of The CW Television Network ("CW"), America's "fifth" major broadcast network.  Seven (7) are affiliates of Fox Broadcasting Network ("Fox").  Debtor KPLR is a CW affiliate in St. Louis.

8.      On October 3, 2008, KPLR and Community Missouri entered into a shared services agreement (the "SSA"), which, *inter alia*, integrated certain operations of KPLR and KTVI, Community Missouri's Fox affiliate in St. Louis.  Under the SSA, KPLR and KTVI agreed to operate out of KPLR's studios, with Community Missouri acting as an independent contractor and providing certain operating and programming-related services.  A copy of the SSA is attached hereto as Exhibit B.

9.      The SSA enables KPLR and KTVI to integrate their operating facilities, production of local news, and certain programming functions.  This integration of facilities, use of combined news operations, and realization of certain programming efficiencies is intended,

---

[4] The broadcasting and entertainment segment also includes the subsidiaries that own the Chicago Cubs baseball operations and an equity interest in regional sports network Comcast SportsNet Chicago, LLC, which are not Debtors in these cases.

among other things, to significantly reduce the KPLR's costs, streamline its operations, and

enable KPLR to deliver a better and higher-quality product to its customers and viewers.

10.    KPLR believes that it is in its best interests to convert the terms of the

SSA into a local marketing agreement.  The LMA would permit Community Missouri to share a

significantly larger portion of its programming with KPLR.  Under the SSA, Community

Missouri can only provide 15 percent of KPLR's programming.  (SSA, § 1.1).  Under the LMA,

however, Community Missouri would provide virtually all of it.  (LMA, § 1.1).  The LMA

would also permit Community Missouri to handle all of KPLR's advertising sales, (LMA § 1.1),

which would allow greater efficiencies and cost savings than the 50% limit set forth in the SSA.

(SSA § 2.2(b)).  Finally, the LMA provides greater regulatory certainty.  While the Video

Division of the Federal Communications Commission (the "FCC") has reviewed and approved

on a case-by-case basis shared services agreements entered into by broadcasters, the FCC has not

to date addressed shared services agreements in its rules.  With the FCC rules applying to LMAs

established, entering into the LMA here affords enhanced stability and predictability to the

parties.

11.    When KPLR and Community Missouri entered into the SSA in October

2008, they were unable to enter into a local marketing agreement under rules promulgated by the

FCC.  47 C.F.R. § 73.3555(b) and Note 2(j)(2).[5]  Two stations in the same market cannot enter

into a local marketing agreement if, among other things, they are both ranked in the top four

stations in the market by audience share of viewers.  *Id.*  Based on the all day (9:00 a.m. to

midnight) audience share, as measured by Nielsen Media Research, available in October 2008,

both KPLR and KTVI were ranked among the top four stations in the St. Louis Designated

Market Area ("DMA").

---

[5] The FCC generally defines a local marketing agreement (also known as "time brokerage") as an agreement under which a local broadcaster supplies the programming and sells the commercial spot announcements for more than 15 percent of another station's broadcast week. *See* Note 2(j) to 47 C.F.R. § 73.3555(b).

12.     Based on the most recently-released Nielsen Media Research audience share rankings (for November 2008 sweep period), KPLR was not among the top four stations in the St. Louis DMA.  Consequently, KPLR and KTVI now have the opportunity to enter into the LMA.[6]

13.     The LMA is not only substantially similar to the existing SSA, but also, promotes greater integration between the stations.  Among its other terms, for example, the LMA provides for:

A.     Shared Programming.  Community Missouri can broadcast on television station KPLR-TV up to 166 hours per week of programming under the LMA.  However, under the SSA, consistent with FCC rules, Community Missouri was limited to only a fraction of that amount.  (LMA, § 1.1, Exh. A; *Cf.* SSA § 1.1, Exh. B).

B.     Integrated Advertising Sales.  Community Missouri would provide advertising sales for both KPLR and KTVI under the LMA, but unlike the SSA, would not be restricted to 50% of KPLR's advertising time.[7]  (LMA § 1.1; *Cf.* SSA § 2.2(b)).

C.     Accounting and Financial Reporting.  Community Missouri collects revenue, prepares annual budgets and operating plans, and pays bills for KPLR.  (LMA § 3; *Cf.* SSA § 3).

D.     Rights to Purchase Stations.  Subject to various timing and other provisions, the LMA and SSA both (i) grant similar rights for KPLR and Community Missouri to purchase the station of the other party or request that the other party purchase its station, (ii) impose a "right of first offer" on either party's sale of its station to a third party, and (iii) impose

---

[6] Concurrently with execution of the LMA, the parties will execute that certain Letter Agreement that governs how Community Missouri and KPLR will physically integrate their studios and upgrade the resulting combined studio at KPLR.  A copy of the Letter Agreement is attached as Exhibit C.  In addition, they will execute that certain Termination Agreement to cancel the SSA.  A copy of the Termination Agreement is attached as Exhibit D.

[7] It is KPLR's understanding that the 50% advertising limit in the SSA was necessitated by an existing agreement to which Community Missouri is a party, but such agreement does not impose a similar limit for LMAs to which Community Missouri is a party.

upon any third-party purchaser of a station the obligation to assume the selling party's

obligations under the SSA or LMA. Such provisions are important in these types of agreements

because they foster vigorous investment of capital and effort in the operation of the stations

during the term and provide comfort that each party will receive the benefit of its bargain. (*Id.*,

§ 10; *Cf.* SSA § 10).

14.    KPLR would like to execute the LMA at this juncture because, while the

parties currently qualify to enter into the LMA, they may not continue to qualify if their rankings

were to change in the future (for example, the results of the next ratings period will be released

in early February 2009). Therefore, time is of the essence to ensure that the parties to the LMA

can capitalize on this business opportunity.

**RELIEF REQUESTED**

15.    KPLR, in the exercise of its business judgment, has determined that it is in

its best interests, its estate and creditors to enter into the LMA. Accordingly, KPLR requests that

the Court permit it to enter into the LMA.

**BASIS FOR RELIEF**

16.    Section 363 of the Bankruptcy Code provides that a debtor, "after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code further provides that

"[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of this title." 11 U.S.C. § 105.

17.    In this Circuit, courts have repeatedly approved the use of a debtor's assets

outside of the ordinary course of business if the debtor can propose a sound business

justification. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting

that under normal circumstances, courts defer to a trustee's judgment concerning use of property

under section 363(b) when there is a legitimate business justification); In re Lionel Corp., 722

F.2d 1063, 1070 (2d Cir. 1983) (same); In re Delaware and Hudson Ry. Co., 124 B.R. 169, 176

(D. Del. 1991) (noting that the Third Circuit has adopted the "sound business judgment" test for

use of property under section 363).

18.    A debtor has the burden of establishing that a valid business purpose exists

for the use of estate property in a manner outside the ordinary course of business. See Lionel

Corp., 722 F.2d at 1071. Once the debtor articulates a valid business justification for the

proposed action, it is presumed that the decision was made "on an informed basis, in good faith

and in the honest belief that the action was in the best interests of the company." In re Integrated

Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d

858, 872 (Del. 1985)). In other words, the business judgment rule essentially shields the debtor's

management from judicial second-guessing and mandates that a court approve a debtor's

business decision unless the decision is a product of bad faith or gross abuse of discretion. See

In re Global Crossing, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); see also In re Johns-Manville

Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct").

19.    There are substantial business justifications for granting the relief

requested herein. The LMA is the product of arms-length, good-faith negotiations between the

parties. After extensively evaluating the terms of the LMA, KPLR believes that its terms are fair

and reasonable, consistent with industry practice, and economically favorable to KPLR. In

particular, the LMA greatly expands the ability of Community Missouri to provide programming

to KPLR while at the same time continuing the efficient integration of operations begun under

the SSA. Moreover, the LMA provides enhanced regulatory certainty and predictability, in light

of the recognized status of local marketing agreements with the FCC. Accordingly, KPLR

believes that it is in the best interests of its estate and creditors to enter into the LMA.

## NOTICE

20.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) proposed counsel for the Creditors' Committee; (iii) counsel to the administrative agents for the Debtors' prepetition loan facilities; (iv) the indenture trustee for the Debtors' prepetition notes; (v) the United States Securities and Exchange Commission; (vi) the Office of the United States Attorney for the District of Delaware; (vii) the Internal Revenue Service; (viii) counsel for Community Missouri; and (ix) all parties that have requested notice pursuant to Federal Rule of Bankruptcy Procedure 2002.  In light of the nature of the relief requested herein, KPLR submits no other or further notice is necessary.

## NO PRIOR REQUEST

21.    KPLR has not previously sought the relief requested herein from this or any other Court.

[REMAINDER INTENTIONALLY BLANK]

WHEREFORE, KPLR respectfully requests that the Court enter an order, in substantially the form attached hereto as Exhibit E, (i) authorizing KPLR to enter into the LMA and (ii) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
      January 16, 2009

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Theodore R. Scarborough
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
1000 N. West Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

PROPOSED ATTORNEYS FOR
DEBTORS AND DEBTORS IN
POSSESSION