# EXHIBIT B

*Shared Services Agreement*

*REDACTED*

## SHARED SERVICES AGREEMENT

**THIS SHARED SERVICES AGREEMENT** (this "**Agreement**") is entered into as of the 3rd day of October, 2008, by and among COMMUNITY TELEVISION OF MISSOURI, LLC, a Delaware limited liability company, COMMUNITY TELEVISION OF MISSOURI LICENSE, LLC, a Delaware limited liability company, and KPLR, INC., a Missouri corporation.

### RECITALS:

WHEREAS, KPLR, Inc. ("**Licensee**") is the owner and operator of television station KPLR-TV, St. Louis, Missouri, Facility ID No. 35417 (the "**Station**") pursuant to authorization(s) issued by the Federal Communications Commission (the "**FCC**");

WHEREAS, Community Television of Missouri, LLC and Community Television of Missouri License, LLC, are the owners and operators of television station KTVI(TV), St. Louis, Missouri, Facility ID No. 35693 ("**Community's Station**") pursuant to authorization(s) issued by the FCC (Community Television of Missouri, LLC, together with Community Television of Missouri License, LLC, "**Community**"); and

WHEREAS, Licensee and Community desire for Community, acting as an independent contractor, to provide certain operational services with respect to the Station while Licensee maintains ultimate control over Licensee's finances, personnel matters, and programming.

NOW, THEREFORE, in consideration of the above recitals, and mutual promises and covenants contained herein, the parties intending to be legally bound, agree as follows:

## SECTION 1    USE OF STATION AIR TIME.

1.1    Scope.    During the Term (as defined in Section 1.2), Licensee shall make available to Community broadcast time on the Station (including the Station's applicable digital spectrum for digital television service) for not more than fifteen percent (15%), by duration, per analog and per digital channel, of the operational time of the Station during any broadcast week, at mutually agreeable times and subject to Licensee's Pre-Existing Programming Contracts (as defined in Section 6.1). Community shall deliver such programming, at its expense, to the Station's transmitters or other authorized remote control points designated by Licensee. Community shall provide such programming of Community's selection complete with commercial matter, news, public service announcements, and other suitable programming to the Station. Except as otherwise provided in this Agreement, Licensee agrees to broadcast such programming in its entirety, including commercials at the times specified, on the facilities of the Station without interruption, deletion, or addition of any kind. Subject to the limitations in Section 2.2 (b) below, Licensee agrees that Community may sell, or engage a third party to sell, commercial time during the programming provided by Community to the Station.

1.2    Term.    Subject to the provisions for early termination contained herein, the initial term of this Agreement (the "**Initial Term**") shall commence on 12:01 a.m. local

*REDACTED*

Station time on October 6, 2008 (the "**Commencement Date**") and shall expire upon the earlier to occur of (a) the closing of the transactions contemplated under Section 10.1; (b) the closing of the transactions under Section 10.5 if either party hereto exercises its right of first offer identified therein and consummates the acquisition of the other party's station; or (c) the eighth (8th) anniversary of the Commencement Date, provided that upon mutual consent of the parties in writing the Initial Term may be extended for a second 8-year term (the Initial Term, together with the renewal term, if any, shall be referred to herein as the "**Term**").

## SECTION 2    SHARED SERVICES.

      2.1    Licensee Control Over Station Operations.  Licensee shall retain full authority, power, and control over the management and operations of the Station during the Term, including specifically, control over the personnel, programming, and finances of the Station.

      2.2    Community's Services.

      (a)    Subject to Licensee's full authority, power, and control over the management and operations of the Station, Community agrees to provide the following services to the Station:

      (i)    supervising all development, construction, and community relations, marketing, advertising, promotion, and publicity relating to the Station;

      (ii)    providing such assistance to Licensee as Licensee may reasonably request in connection with the preparation of applications, requests and presentations to obtain or maintain in effect, and operate the Station in substantial compliance with permits, licenses, franchise, authorizations, approvals, consents, and variance, whether regulatory, governmental, quasi-governmental or otherwise, as may be necessary or appropriate for the maintenance and operation of the Station;

      (iii)    arranging for those maintenance and other services that Community shall deem advisable in connection with the operation of the Station and approved by Licensee, which approval shall not be unreasonably withheld, conditioned, or delayed;

      (iv)    coordinating and supervising all maintenance, alterations, improvements, and replacements of and to the Station, subject to the supervision of Licensee's designated chief operator;

      (v)    interviewing, selecting, and supervising such engineers, contractors, consultants, and similar professionals as may be necessary or appropriate for the performance of Community's

2

*REDACTED*

obligations hereunder and for the maintenance and operation of the Station; and

(vi)     preparation of overall marketing strategy for sale of commercial time on the Station.

(b)     Licensee hereby appoints Community as Licensee's advertising representative, effective as of the Commencement Date, for the sale of commercial announcements to be broadcast on the Station (the "**Advertising Inventory**") for up to fifty (50) percent of the weekly advertising time available for broadcast on the Station, and shall, without restriction as to how Community may package or otherwise market the Advertising Inventory with any other advertising inventory, permit Community to sell such Advertising Inventory to third parties provided, however, that the rates to be charged by Community for the sale of the Advertising Inventory shall be subject to the ultimate control of Licensee.

(c)     Licensee and Community agree that the individual named on Schedule 2.2(c)(b)(i) shall serve as the initial station manager of Community's Station during the Term (the "**Community Market Manager**") until his death, resignation or his removal by Community. Community shall determine who shall serve as any successor Community Market Manager(s) (and any successors thereto), subject to Licensee's approval, which approval shall not be unreasonably withheld, conditioned, or delayed. Licensee and Community agree that the individual named on Schedule 2.2(c)(ii) shall serve as the initial station manager of the Station during the Term (the "**Station Manager**") until his death, resignation or his removal by Licensee. Licensee shall determine who shall serve as any successor Station Manager (and any successors thereto), subject to Community's approval, which approval shall not be unreasonably withheld, conditioned, or delayed. Subject to the respective licensee's full authority, power, and control over the management and operations of the respective station, the Station Manager and the Community Market Manager shall manage the Station and Community's Station, respectively, during the Term.

**SECTION 3   FINANCIAL TERMS.**

3.1     Collected Revenue. Community shall collect all revenues earned and received by Community's Station and the Station (collectively, the "**Stations**") during the Term ("**Collected Revenue**") in a newly-established lock box (the "**Lock Box**"), which Collected Revenue shall include, without limitation: (a) all revenues from and in connection with sales of advertising to be placed in all programming broadcast on the Stations whether placed by Licensee or Community; (b) all revenues from and in connection with any programming fees for any programming broadcast on the Stations whether such programming is delivered or arranged for by Licensee or Community; (c) all revenues from and in connection with the Stations' web sites; (d) all revenues from and in connection with the Stations' applicable digital spectrum for digital television service; and (e) any and all other revenues of the Stations, other than the Excluded Revenue (as defined below).

3

*REDACTED*

     3.2    <u>Excluded Revenue</u>. The following shall constitute revenue that is to be excluded from Collected Revenue and retained by Licensee or Community, as the case may be (collectively, the "**Excluded Revenue**"):

     (a)    all retransmission consent revenues associated with Licensee's or Community's respective station(s) (*i.e.*, the retransmission consent revenues of the Station with respect to Licensee and the retransmission consent revenues of Community's Station with respect to Community), as the case may be (in each case, "**Retransmission Revenues**"); and

     (b)    all revenue from advertising broadcast by Licensee or Community's respective station(s), as the case may be, prior to the Commencement Date; provided, that Community shall assist with the collection of all such revenue for Licensee on Licensee's behalf in accordance with <u>Section 3.6</u>.

     3.3    <u>Reimbursement of Expenses</u>. Community shall reimburse Licensee during the Term for all verifiable, reasonable, customary, and usual costs and expenses associated with the ownership and operation of the Station paid by Licensee for expenses as set forth on <u>Schedule 3.3</u> hereto (collectively, the "**Expenses**"). Community shall reimburse Licensee for Expenses within thirty (30) days after Community's receipt of an invoice paid by Licensee for such Expense or other documentation evidencing such Expense, or under such other system of payment upon which the parties agree.

     3.4    <u>Shared Services Fee</u>. As consideration for agreements and covenants under this Agreement, Community shall pay Licensee the monthly fee set forth on <u>Schedule 3.4</u> (the "**SSA Fee**") in arrears within eighty (80) days after the end of each calendar month (or a prorated portion for any partial calendar month), during the Term from and after the month during which the Term commences; <u>provided, however,</u> that for the first three (3) months during the Term, the SSA Fee shall be paid in arrears within ninety (90) days after the end of each such calendar month.

     3.5    <u>Financial Statements and Other Information</u>.

     (a)    Licensee will maintain true books and records of accounts in which full and correct entries will be made of all of the transactions contemplated by this Agreement with respect to the Station pursuant to a system of accounting established and administered in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), and will set aside on its books all such proper accruals and reserves as shall be required under GAAP. Licensee will provide Community timely access to such books and records of the Station as Community may reasonably request. Community will provide to Licensee timely access to such accounting systems of Community as Licensee may reasonably request in order to fulfill its record keeping obligations hereunder.

     (b)    Community will maintain true books and records of accounts in which full and correct entries will be made of all the transactions with respect to Community's Station pursuant to a system of accounting established and administered in accordance with GAAP, and

4

*REDACTED*

will set aside on its books all such proper accruals and reserves as shall be required under GAAP.

(c)     During the Term, Community shall deliver to Licensee financial reports as set forth in Schedule 3.5.

3.6     Accounts Receivable.

(a)     Licensee shall create and deliver to Community within ten (10) business days after the Commencement Date a complete and detailed statement of all of the Station's accounts receivable as of the Commencement Date (the "**Accounts Receivable**"), showing the name, amount, and age of each Accounts Receivable as of the Commencement Date (the "**Receivables List**"). Community shall, in the ordinary course of business, prepare invoices for each person or entity obligated with respect to any of the Accounts Receivable (individually, "**Account Debtor**" and collectively, "**Account Debtors**"), which shall include the Accounts Receivable, and shall deliver such invoices to the applicable Account Debtors in the ordinary course of business.

(b)     From the date of delivery of the Receivables List to Community throughout the remainder of the Term (the "**Collection Period**"), Community will collect the Accounts Receivable in the same manner and with the same diligence that Community uses to collect its own accounts receivable; provided, however, (i) that Community shall not be obligated to use any extraordinary efforts (including, without limitation, demand letters, the institution of litigation or any other extraordinary means of collection), or to take such other action other than those it would customarily undertake in the ordinary course of business, to collect any of the Accounts Receivable, or to refer any of such Accounts Receivable to a collection agency or to an attorney for collection and (ii), at any time during the Term, upon Licensee's written notice, Community shall cease collecting the Accounts Receivable and shall transition the collection thereof to Licensee and Licensee shall thereafter be solely responsible for the collection thereof. Community shall not have the right to compromise, settle, or adjust the amounts of any of the Accounts Receivable without Licensee's prior written consent. Subject to the foregoing, Community shall incur no liability to Licensee for any uncollected amount. Neither Licensee nor its agents or successors or assigns shall make any direct solicitation of the Account Debtors for collection purposes nor other direct attempts to collect from Account Debtors during such Collection Period except as may be agreed to by Community. Licensee shall be entitled to inspect and/or audit the records maintained by Community pursuant to this Section 3.6 from time to time, upon reasonable advance notice.

(c)     During the Collection Period, any payments received by Community from any Account Debtor shall be applied on a "first in, first out" basis, except to the extent (i) any Account Debtor may have specified otherwise, in which case, such Account Debtor's instructions shall govern; or (ii) an Account Debtor has contested in writing the validity of its obligation with respect to any Accounts Receivable, in which case Community may return that Accounts Receivable to Licensee after which Licensee shall be solely responsible for the collection thereof. Community shall give Licensee written notice of any such dispute with respect to which Community has received notice from an Account Debtor. Except for the

5

*REDACTED*

payment of all salesperson's, agency, and representative commissions due and not paid prior to the Commencement Date with respect to the Accounts Receivable, Community shall not incur or cause to be incurred any collateral or outside fees, costs, or charges in connection with its efforts at collection of the Accounts Receivable without first having obtained the authorization in writing of Licensee. Community shall remit to Licensee all amounts collected on Licensee's behalf pursuant to this Section 3.6.

      3.7     Accounts Payable.

      (a)     Licensee shall be responsible for all accounts payable (the "**Accounts Payable**") of the Station arising out of or related to the ownership or operation of the Station by Licensee prior to the Commencement Date, and Community shall be responsible for all Accounts Payable of the Station, except for Licensee's income tax obligations, from and after the Commencement Date until the end of the Term, except as otherwise set forth herein and such payables that are Community's responsibility shall be included as an expense in the calculation of the SSA Fee as provided in Schedule 3.4.

      (b)     In the case of any Accounts Payable of the Station that are payable with respect to a period that begins before the Commencement Date and ends after the Commencement Date (a "**Straddle Period**"), the portion of any such Accounts Payable that is allocable to the portion of the period ending on the Commencement Date shall be deemed the responsibility of Licensee and the portion of any such Accounts Payable that is allocable to the portion of the period ending from and after the Commencement Date shall be deemed the responsibility of Community and included as an expense in the calculation of the SSA Fee as provided in Schedule 3.4.

      (c)     During the Term, Community shall pay any Accounts Payable arising out of or related to Community's obligations hereunder during a Straddle Period. If during the Term, Community is required to pay any Accounts Payable of the Station that arise during a Straddle Period, Community shall (i) pay the entire amount of such liability in the ordinary course of business and (ii) provide Licensee with written evidence of the amount of such liability and the payment of such liability and a written statement setting forth Licensee's pro-rata share of such liability based on the allocation in Section 3.7(a). Community shall be entitled to deduct from the SSA Fee an amount equal to Licensee's pro-rata share of any such liability or request the payment of Licensee's pro rata share of any such liability from Licensee, which payment shall be made by Licensee within twenty (20) days of request thereof.

      (d)     Community shall be responsible for all accounts payable of Community's Station (the "**Community Accounts Payable**") arising out of or related to the ownership or operation of Community's Station by Community prior to the Commencement Date. Community shall be responsible for all Community Accounts Payable arising from and after the Commencement Date until the end of the Term and same shall be included as an expense in the calculation of the LMA Fee as provided in Schedule 3.4.

      (e)     In the case of any Community Accounts Payable that are payable with respect to the Straddle Period, the portion of any such Accounts Payable that is allocable to the

*REDACTED*

portion of the period ending on the Commencement Date shall be deemed the responsibility of Community and the portion of any such Accounts Payable that is allocable to the portion of the period ending from and after the Commencement Date shall be deemed the responsibility of Community and included as an expense in the calculation of the SSA Fee as provided for in Schedule 3.4.

      3.8     Prepaid Expenses. Prepaid expenses shall be handled as set forth in Schedule 3.8.

## SECTION 4   STATION PUBLIC INTEREST OBLIGATIONS.

      4.1     Licensee Authority. Licensee shall be responsible for the Station's compliance with all applicable provisions of the Communications Act of 1934, as amended (the "**Communications Act**"), the rules, regulations, and policies of the FCC (the "**FCC Rules**," and collectively with the Communications Act, the "**Communications Laws**"), and all other applicable laws. Community shall cooperate with Licensee, at Community's expense, in taking such actions as Licensee may reasonably request to assist Licensee in maintaining the Station's compliance with the Communications Laws, and all other applicable laws. Notwithstanding any other provision of this Agreement, Community recognizes that Licensee has certain obligations to operate the Station in the public interest and to broadcast programming to meet the needs and interests of the Station's communities of license and service areas. From time to time Licensee shall air, or if Licensee requests, Community shall include within programming that it supplies to Licensee, programming on issues of importance to the local community. Nothing in this Agreement shall abrogate or limit the unrestricted authority of Licensee to discharge Licensee's obligations to the public and to comply with the Communications Laws, and Licensee shall have no liability or obligation to Community, for taking any action that Licensee deems necessary or appropriate to discharge such obligations or comply with the Communications Laws.

      4.2     Additional Licensee Obligations. Although both Licensee and Community shall cooperate in the broadcast of emergency information over the Station, Licensee shall retain the right, without any liability or obligation to Community, to interrupt Community's programming in case of an emergency or for programming which, in the good faith judgment of Licensee, is of greater local or national public importance. In all such cases, Licensee shall use Licensee's commercially reasonable efforts to provide Community notice of Licensee's intention to interrupt Community's programming. Licensee shall coordinate with Community the Station's hourly station identification and any other announcements required to be aired by the Communications Laws. Licensee shall (a) continue to maintain and staff a main studio in compliance with the Communications Laws; (b) maintain the Station's local public inspection file within the Station's community of license or at the Station's main studio; and (c) prepare and place in such inspection file in a timely manner all material required by Section 73.3526 of the FCC Rules, including without limitation the Station's quarterly issues and program lists and FCC Form 398. Community shall, upon request by Licensee, promptly provide Licensee with such information concerning Community's programs and advertising as is necessary to assist Licensee in the preparation of such information or to enable Licensee to verify independently the Station's compliance with any other laws, rules, regulations or policies applicable to the Station's

7

*REDACTED*

operation. Licensee shall also maintain the station logs, receive and respond to telephone inquiries, and control and oversee any remote control point for the Station.

## SECTION 5    STATION PROGRAMMING & OPERATIONAL POLICIES.

5.1    Broadcast Station Programming Policy Statement. Licensee has adopted a Broadcast Station Programming Policy Statement (the "**Policy Statement**"), a copy of which appears as Schedule 5.1 hereto and which may be amended by Licensee from time to time upon written notice to Community in order to comply with the Communications Laws. Community agrees and covenants to comply with the Policy Statement, the Communications Laws, and with all changes subsequently made by Licensee or the FCC. Community shall furnish or cause to be furnished the artistic personnel and material for the programs supplied by Community as provided by this Agreement and all programs shall be prepared and presented in conformity with the Communications Laws and with the Policy Statement. All advertising spots and promotional material or announcements shall comply with all applicable federal, state, and local regulations and policies and the Policy Statement, and shall be produced in accordance with quality standards established by Community. If Licensee determines that a program, commercial announcement, or promotional material supplied by Community is for any reason, in Licensee's reasonable discretion, unsatisfactory or unsuitable or contrary to the public interest or does not comply with the Policy Statement, Licensee may, upon written notice to Community (to the extent time permits such notice), and without any liability or obligation to Community, suspend or cancel such program, commercial announcement, or promotional material and substitute its own programming or, if Licensee requests, Community shall provide promptly suitable programming, commercial announcement or other announcement, or promotional material.

5.2    Licensee Control of Station Programming. Notwithstanding any contrary provision contained in this Agreement, and consistent with Licensee's obligations pursuant to the Communications Laws, Licensee shall have the right, without any liability or obligation to Community, to delete any material contained in any programming or commercial matter furnished by Community for broadcast over the Station that Licensee determines in good faith is unsuitable for broadcast or the broadcast of which Licensee believes in good faith would be contrary to the public interest. Licensee shall have the right, without any liability or obligation to Community, to broadcast Licensee's own programming in place of such deleted material.

5.3    Political Advertising. Licensee shall oversee and shall take ultimate responsibility for the Station's compliance with the political broadcasting rules of the FCC and Sections 312 and 315 of the Communications Act, including, but not limited to, the provision of equal opportunities, compliance with lowest unit charge requirements, and the provision of reasonable access to federal political candidates. Community shall cooperate with Licensee, at Community's expense, to assist Licensee in complying with the political broadcasting rules of the FCC. Community shall supply such information promptly to Licensee as may be necessary to comply with the lowest unit charge and other applicable political broadcast requirements of federal law. To the extent that Licensee deems necessary or appropriate, Community shall release advertising availabilities to Licensee to permit Licensee to comply with the political broadcasting rules of the FCC and Sections 312 and 315 of the Communications Act.

8

*REDACTED*

Community shall be entitled to all revenues received by Licensee for such advertising.  All such revenues shall be forwarded to the Lock Box and shall constitute Collected Revenue.

5.4     Children's Programming.  Licensee shall oversee and shall take ultimate responsibility for the Station's compliance with the Children's Television Act of 1990 and the rules and published policies of the FCC promulgated thereunder, including ensuring that the Station complies with the commercial limits established therein and serves the educational and informational needs of children, as it applies to the Station.  Community, while conducting its activities with regard to the Station pursuant to this Agreement, will comply with such rules and policies by presenting a reasonable amount of children's programming, including educational/informational programming, and by strictly observing the limitations on advertising content and amount as it applies to the Station.  Community shall supply such information promptly to Licensee as may be necessary for Licensee to prepare all necessary reports to the FCC.  Licensee will be responsible for drafting all necessary reports and certifications regarding children's programming and shall be responsible for placement of the same in the Station's public inspection file and submitting such reports to the FCC as set forth in Section 4.2.

5.5     Payola/Plugola.  In order to enable Licensee to fulfill Licensee's obligations under Section 317 of the Communications Act, Community, in compliance with Section 507 of the Communications Act, will, in advance of any scheduled broadcast by the Station, disclose to Licensee any information of which Community has knowledge or which has been disclosed to Community as to any money, service, or other valuable consideration that any person has paid or accepted, or has agreed to pay or to accept, for the inclusion of any matter as a part of the programming or commercial matter to be supplied to Licensee pursuant to this Agreement.  Community will cooperate with Licensee, at Community's expense, as necessary to ensure compliance with this provision.  Commercial matter with obvious sponsorship identifications shall not require disclosure in addition to that contained in the commercial copy.

5.6     Community Compliance with Copyright Act.  Community represents and warrants that (a) Community will have full authority to broadcast its programming on the Station; (b) Community shall not broadcast any material in violation of the Copyright Act; and (c) the performing rights to all music contained in broadcast material supplied hereunder by Community are (i) licensed by BMI, ASCAP, or SESAC; (ii) are in the public domain; (iii) are controlled by Community; or (iv) are cleared at the source by Community.

5.7     Licensee Compliance with Copyright Act.  Licensee represents and warrants that (a) Licensee will have full authority to broadcast its programming on the Station; (b) Licensee shall not broadcast any material in violation of the Copyright Act; and (c) the performing rights to all music contained in broadcast material supplied hereunder by Licensee are (i) licensed by BMI, ASCAP, or SESAC; (ii) are in the public domain; (iii) are controlled by Licensee; or (iv) are cleared at the source by Licensee.

5.8     Licensee's Responsibility for Compliance with FCC Technical Rules.  Licensee will be responsible for compliance by the Station with the technical operating and reporting requirements established by the FCC.  Community will provide such assistance to

9

*REDACTED*

Licensee as Licensee may reasonably request with such technical operating and reporting requirements.

## SECTION 6    ADDITIONAL RIGHTS AND OBLGIATIONS; CERTIFICATIONS.

    6.1    Pre-Existing Contracts.

    (a)    Licensee (or its Parent or its Affiliates (as defined herein)) has pre-existing agreements with third parties for programming for the Station as set forth on Schedule 6.1(a)(i) ("**Pre-Existing Programming Contracts**") and has pre-existing agreements for other products and/or services for the Station as set forth on Schedule 9.1(f), as not required to be listed on Schedule 9.1(f) pursuant to the first sentence of Section 9.1(f) and as reflected in Licensee's historical financial statements made available to Community ("**Pre-Existing Other Contracts**" and, together with the Pre-Existing Programming Contracts, the "**Station Contracts**"). The parties acknowledge and agree that this Agreement shall not constitute an assignment of the Pre-Existing Programming Contracts or the Pre-Existing Other Contracts, but, to the extent permitted by law and the applicable contract, other than for the Pre-Existing Other Contracts set forth on Schedule 6.1(a)(ii) and the Pre-Existing Programming Contracts, shall constitute an equitable assignment by Licensee and assumption by Community of Licensee's rights and obligations under the Pre-Existing Other Contracts with respect to the Station, with Licensee making available to Community the benefits thereof and Community performing the obligations thereunder on Licensee's behalf. Community shall reimburse Licensee for any costs or expenses arising out of the Station Contracts to the extent such costs or expenses are allocable to the Station pursuant to Section 3.3. For purposes of this Agreement, except for Section 10.2, "Affiliate" means, as applied to any person or entity, any other person or entity directly or indirectly controlling, controlled by or under common control with, that person or entity and for the purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by", and "under common control with") as applied to any entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that entity, whether through ownership of voting securities, by contract or otherwise.

    (b)    Notwithstanding Section 6.1(a), at any time during the Term, at Licensee's request and subject to Community's consent, which consent shall not be unreasonably withheld, conditioned or delayed, the parties shall cooperate in good faith to assign to Community the rights and obligations under any Pre-Existing Other Contract(s) specified by Licensee.

    6.2    Affiliation Change. Neither party shall change the network affiliation of the Station or Community's Station without the prior written consent of the other party, such consent not to be unreasonably withheld, conditioned, or delayed.

    6.3    Digital Television.

    (a)    Subject to Section 6.3(b), (i) Community shall use its commercially reasonable efforts, subject to Licensee's ultimate control and supervision, to meet the FCC's requirements for the digital transition of the Station, including implementation of any

10

*REDACTED*

maximization authorizations, in a timely manner and (ii) Community shall use its commercially reasonable efforts to meet the FCC's requirements for the digital transition of Community's Station, including implementation of any maximization authorizations, in a timely manner.

(b)     Licensee shall be responsible for and pay all costs and expenses to transition the Station to its maximum DTV facilities and to implement redundant DTV facilities for the Station as implemented or planned and all such anticipated costs and expenses are listed on Schedule 6.3(b).

(c)     Community shall be responsible for and pay all costs and expenses to transition Community's Station to its maximum DTV facilities and to implement redundant DTV facilities for Community's Station as implemented or planned and all such anticipated costs and expenses are listed on Schedule 6.3(c).

6.4     Web Site Operations.  As of the Commencement Date, during the Term, Community shall (a) operate the Station's web site and related Internet and online activities in the manner Community chooses in its discretion, but in all respects in compliance with applicable laws; and (b) assume, in accordance with the terms of this Agreement, all obligations relating thereto to the extent arising on or after the Commencement Date.

6.5     Mandatory Carriage/Retransmission Consent.  Licensee shall consult with Community prior to making any election of mandatory carriage rights or retransmission consent pursuant to Section 76.64 of the FCC Rules and regulations and the provisions of the Cable Television Consumer Protection and Competition Act of 1992 and Community shall commit on Licensee's behalf with respect to such mandatory carriage rights or retransmission consent regarding either the analog or Digital Spectrum of the Station if and only if specifically requested by Licensee; provided, however, that neither party shall have the right to determine to "go dark" for any of the Stations on any cable television systems, direct broadcast satellite, and other multichannel video programming distributors (collectively, "**MVPDs**") in the St. Louis DMA (as defined by Nielsen Media Research (the "St. Louis Market")) without the other party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

6.6     Trademarks.  Licensee hereby grants Community a limited, royalty-free license to use solely in connection with providing certain programming on the Station any and all trademarks, service marks, trade names, jingles, slogans and logotypes owned and used or held for use by Licensee in conjunction with the Station, including the Station's call sign, subject to Licensee's quality control standards ("**Licensee Marks**").  Licensee agrees to execute such additional documentation as may be necessary or desirable to effectuate the license granted in this Section 6.6.  Community acknowledges that (a) the limited license provided in this Section 6.6 does not transfer any ownership interest in the Licensee Marks to Community; (b) Licensee is the sole and exclusive owner of the Licensee Marks; and (c) all use of the Licensee Marks pursuant to this Agreement shall inure solely to the benefit of Licensee.

6.7     Music Licensing; Rating Information.  Community shall pay from Collected Revenue, and any such payment by Community shall be included as operating expenses applicable to the operations of the Stations for the purpose of calculating the SSA Fee

11

*REDACTED*

pursuant to Section 3.4 and Schedule 3.4, any and all fees charged by ASCAP, BMI, SESAC, or similar performing rights societies relating to the Stations, and Community shall indemnify, defend and hold harmless Licensee against any and all claims by any performing rights societies arising out of the same, unless such claims are the result of Licensee's actions or inactions in which case Community shall have no duty to indemnify the Licensee. Community shall not disseminate or authorize dissemination by other parties of information concerning the ratings of the Station issued by Nielsen Media Research, the Arbitron Company, or any other entity, other than as permitted under Community's or Licensee's valid license with such parties. Licensee shall not be required to purchase a license to receive ratings information, but will cooperate with Community in Community obtaining such license, provided that any consideration is paid by Community.

6.8     Station Employees and Severance.

(a)     Licensee shall employ such management and staff-level employees to direct the day-to-day operations of the Station as necessary to comply with the Communications Laws regarding main studio staffing and as necessary to enable Licensee to perform its obligations under this Agreement (the "**Station Personnel**"). The Station Personnel, as of the date of this Agreement, are listed on Schedule 6.8(a). The Station Personnel will report to and be accountable solely to Licensee.

(b)     Licensee and Community will consult regarding the employment by Community of Station employees who are employed by Licensee as of the date of this Agreement (other than the Station Personnel) (the "**Covered Employees**"), provided that Community shall be under no obligation to hire any of the Covered Employees. Payment of severance and related employer payroll taxes paid by either Licensee or Community for employees of the Stations who are employed as of the date of this Agreement shall be as set forth on Schedule 6.8(b). The Licensee and Community, respectively, shall each be responsible for complying with its respective notification requirements, if any, under the Worker Adjustment and Retraining Notification Act or any similar state or local requirement, if applicable, both prior to and following the Commencement Date.

(c)     Licensee hereby assigns to Community all of Licensee's right, title and interest in the employment agreements and personal services agreements set forth on Schedule 6.8(c) effective as of the Commencement Date and Community hereby assumes, effective as of the Commencement Date, all liabilities and obligations under such employment agreements and personal services agreements from and after the Commencement Date to the extent such obligations are attributable to the period on or after the Commencement Date. Licensee shall retain all liabilities and obligations under such assigned agreements arising prior to the Commencement Date and will pay, perform and discharge such liabilities in accordance with their respective terms.

6.9     Community's Compliance with Law. Community agrees that, throughout the Term, Community will comply with all laws, rules, regulations, and policies applicable to the functions performed by it in connection with the Stations, including meeting equal employment opportunity requirements with respect to Community's employees performing duties in

12

*REDACTED*

connection with the Stations. Community knows of no fact or circumstance that would, under the federal antitrust laws, the Communications Laws, or otherwise, disqualify or preclude Community from entering into this Agreement.

   6.10 <u>Maintenance of FCC Licenses</u>. Licensee will maintain the validity of the licenses issued to it for the operation of the Station, except for such FCC licenses no longer needed for the operation of the Station. Without limiting its obligations under <u>Section 6.9</u>, Community will maintain the validity of the licenses issued to it for the operation of Community's Station, except for such FCC licenses no longer needed for the operation of Community's Station.

   6.11 <u>Ownership Restrictions</u>. Without limiting its obligations under <u>Section 6.9</u>, Community is responsible for ensuring that the execution and performance of this Agreement complies with the FCC's restrictions on ownership set out in 47 C.F.R. Section 73.3555.

   6.12 <u>Insurance</u>.

   (a) With respect to its activities and properties, each of Licensee and Community will maintain broadcasters' liability insurance policies covering libel, slander, invasion of privacy and any other claims arising out of or related to each party's material broadcast on any of the Stations, general liability, crime, property damage, business interruption, automobile liability, and workers' compensation insurance in forms and amounts that are subject to the approval of Licensee and Community, respectively, such approval which shall not be unreasonably withheld, conditioned or delayed if such forms and amounts are customary in the television broadcast industry. Such insurance policies held by Community in effect on the Commencement Date are listed on <u>Schedule 6.12(a)(i)</u> and such insurance policies held by Licensee in effect on the Commencement Date are listed on <u>Schedule 6.12(a)(ii)</u>. Licensee and Community will name the other party an additional insured on all applicable insurance policies, including but not limited to the broadcasters' liability, general liability and automobile liability policies, and will provide notice to the other party prior to cancellation thereof. For such worker's compensation, property damage, and business interruption policies, Licensee and Community will secure such policies commensurate with each party's relevant exposures, but in such amounts that are subject to the approval of each party, which approval shall not be unreasonably withheld, conditioned or delayed. Licensee and Community shall provide certificates of insurance to the other party, evidencing procurement of all said insurance policies and demonstrating type of insurance, coverage amounts and additional insured status. Licensee and Community shall renew each such expiring policy prior to its expiration date, <u>provided, however,</u> that each party notifies the other party no less than fifteen (15) days prior to the expiration of any such insurance policy. Licensee and Community shall provide certificates of insurance to the other party evidencing renewal of such policies. Licensee and Community also reserve the right to maintain other insurance policies not mentioned in this section on behalf of the other party which mirrors like policies maintained by such party. To the extent that any insurance policies procured by Licensee and Community hereunder provide for claims-made

13

*REDACTED*

coverage, then the other party is responsible to secure coverage at its expense for any prior acts of that party.

(b)    Waiver of Subrogation. Each of Community and Licensee hereby agree, and shall cause its Affiliates to agree to, waive all claims which it may have, as well as its right of subrogation, with respect to any worker's compensation claim, property loss, business interruption loss, or economic loss to its property with respect to its respective owned station(s) arising out of the transactions contemplated by this Agreement against the other party hereto to the extent such waiving party actually receives insurance proceeds for any such claim from a third party insurance provider; provided, however, the waiver of claims as provided for above shall not be applicable to the portion of any damage which is not reimbursable by the damaged party's insurer because of any deductible permitted in the damaged party's insurance coverage; provided, further, however, that such waiver shall be effective only if such waiver does not diminish or negate any such insurance coverage.

6.13    Liens.

(a)    After the Commencement Date, Licensee may grant Liens to third party lenders with respect to assets of the Station that are wholly owned by Licensee if such Liens, at the time of grant and thereafter, (i) would not reasonably be expected to impair Licensee's ability to perform under this Agreement, or (ii) do not cause or result in a material adverse effect on the financial condition, assets or results of operations of the Stations. "**Liens**" means all charges, conditions, community property interests, options, hypothecations, attachments, conditional sales, title retentions, rights of first refusal, debts, security interests, mortgages, trusts, claims, pledges or other liens, liabilities, encumbrances or rights of third parties whatsoever.

(b)    After the Commencement Date, Community may grant Liens to third party lenders with respect to assets of the Station or Community's Station that are wholly owned by Community if such Liens, at the time of grant and thereafter, (i) would not reasonably be expected to impair Community's ability to perform under this Agreement, or (ii) do not cause or result in a material adverse effect on the financial condition, assets or results of operations of the Stations.

## SECTION 7    TERMINATION.

7.1    Right to Terminate. This Agreement may be terminated (a) at any time upon the mutual agreement of the parties or (b) by the non-defaulting party upon the occurrence of an Event of Default (as defined below) after the expiration of any applicable cure periods, if any, as set forth in Section 7.2.

7.2    Events of Default.

(a)    The occurrence of any of the following (after the expiration of any applicable cure periods) will be deemed an "**Event of Default**" by Community under this Agreement: (i) Community fails to timely pay the SSA Fee or make any other payment required

*REDACTED*

under this Agreement when due and such failure remains uncured for a period of (A) fifteen (15) business days with respect to the payment of the SSA Fee or (B) thirty (30) days after Licensee has provided Community with written notice thereof with respect to any other payment required under this Agreement, provided, however, if Community fails to timely pay the SSA Fee when due two (2) or more times during the Initial Term then there shall be no such cure period for failure to pay the SSA Fee; (ii) Community fails to observe or perform any other obligation contained in this Agreement and such failure results in a material adverse effect on the financial condition, assets or results of operations of the Station; or (iii) Community breaches any representation or warranty made by it under this Agreement and such breach results in a material adverse effect on the financial condition, assets or results of operations of the Station.

(b)     The occurrence of the following (after the expiration of any applicable cure periods) will be deemed an "**Event of Default**" by Licensee under this Agreement: (i) Licensee fails to observe or perform any obligation contained in this Agreement and such failure results in a material adverse effect on the financial condition, assets or results of operations of Community's Station taken as a whole; or (ii) Licensee breaches any representation or warranty made by it under this Agreement and such breach results in a material adverse effect on the financial condition, assets or results of operations of Community's Station.

(c)     Notwithstanding the foregoing, any non-monetary Event of Default will not be deemed to have occurred until forty-five (45) days after the non-defaulting party has provided the defaulting party with written notice specifying the Event of Default and such Event of Default remains uncured; provided, however, such cure period shall be extended up to sixty (60) days (or such longer extension period as mutually agreed to by the parties) if the defaulting party is diligently pursuing a cure but is unable to cure the Event of Default within the initial forty-five (45) day cure period.

(d)     Upon the occurrence of an Event of Default, and in the absence of a timely cure pursuant to this Section 7.2, (i) the non-defaulting party may terminate this Agreement, effective immediately upon written notice to the defaulting party or (ii), in the event the non-defaulting party is the Licensee, Licensee shall have the right, in lieu of terminating this Agreement, to step into Community's rights under this Agreement to serve as the service provider of the Stations subject to the terms and conditions set forth herein, and, in the event Licensee decides in its sole discretion to exercise such right, the parties hereto shall negotiate in good faith to amend this Agreement accordingly.

7.3     Effect of Termination; Survival.

(a)     If the Term of this Agreement expires, or if this Agreement is terminated for any reason other than a purchase by one party of the station(s) of the other party (*i.e.,* a purchase of the Station by Community or a purchase of Community's Station by Licensee), (i) the parties agree to cooperate with one another and to take all actions necessary to rescind this Agreement and return the parties to the status *quo ante* and (ii) all costs incurred by Community with respect to relocating the operations of the main studio of Community's Station shall be paid by Community, provided, however, that if this Agreement is terminated as a result of an Event of Default by Licensee, Licensee shall be responsible for paying such costs and expenses of

15

*REDACTED*

Community. The termination of this Agreement shall be without prejudice to any rights that shall have accrued to the benefit of any party prior to such termination.

(b)     Upon termination or expiration of this Agreement, (i) the SSA Fee shall be prorated to the date of termination and shall be due within sixty (60) days of termination or expiration of this Agreement; (ii) Community shall be responsible as set forth in this Agreement for all liabilities, debts, and obligations incurred by Community during the Term in connection with the performance of its obligations hereunder and its use of the Station's transmission facilities; and (iii) Community shall be required to promptly reimburse Licensee for any Expenses incurred by Licensee prior to the end of the Term as set forth in this Agreement. Section 8.1, Section 8.2 and Section 11.2 shall survive the termination or expiration of this Agreement for any reason.

7.4     Renegotiation Upon FCC Action.

(a)     Should a change in the Communications Laws make it necessary to obtain FCC consent for the implementation, continuation, or further effectuation of any element of this Agreement, the parties hereto shall use their commercially reasonable efforts diligently to prepare, file, and prosecute before the FCC all petitions, waivers, construction applications, amendments, rulemaking comments, and other related documents necessary to secure and/or retain FCC approval of all aspects of this Agreement. Licensee and Community shall each bear half the cost of preparation of such documents and prosecution of such actions. Notwithstanding anything in this Agreement to the contrary, it is understood that no filing shall be made with the FCC with respect to this Agreement unless each party hereto has had an opportunity to review such filing and to provide comments thereon. Each party shall use its commercially reasonable efforts to incorporate the comments (whether in whole or in part) of the other parties to any filing to be made with the FCC with respect to this Agreement.

(b)     If the FCC determines that this Agreement is inconsistent with Licensee's licensee obligations or is otherwise contrary to the Communications Laws, or if regulatory or legislative action subsequent to the date of this Agreement alters the permissibility of this Agreement under the Communications Laws (an "**FCC Permissibility Determination**"), the parties shall renegotiate this Agreement in good faith and recast this Agreement in terms that are likely to cure the defects perceived by the FCC while maintaining the benefit of the bargain to the parties hereunder and to return a balance of benefits to both parties comparable to the balance of benefits provided by the Agreement in its current terms. If, after such good faith negotiations, either party determines that recasting this Agreement to cure the defects on which the FCC Permissibility Determination was based is impossible, either party may terminate this Agreement without further liability upon forty-five (45) days' prior written notice, subject to Section 7.3. If this Agreement is terminated in accordance with this Section 7.4(b), such termination shall extinguish and cancel this Agreement.

## SECTION 8   INDEMNIFICATION.

8.1     Indemnification by Licensee. Licensee will indemnify, defend, and hold harmless Community, its Affiliates and all officers, directors, employees, stockholders, partners,

16

*REDACTED*

members, and agents of Community and its Affiliates (individually, a "**Community Indemnitee**") from and against any and all claims, demands, costs, damages, losses, liabilities, joint and several, expenses of any nature (including reasonable attorneys', accountants' and experts' fees, and disbursements), judgments, fines, settlements, and other amounts (collectively, "**Damages**") arising out of or resulting from acts or omissions of Licensee involving: (a) libel or slander; (b) illegal competition or trade practices; (c) infringement of trademarks, trade names, service marks, copyrights, or any other proprietary rights of a third party; (d) violations of law, rules, regulations, or orders (including the Communications Laws and laws related to the employment and/or separation from employment by Licensee of the Covered Employees); (e) invasion of rights of privacy; (f) breaches of this Agreement; (g) the broadcast of programming furnished by Licensee; (h) Licensee's sale of advertising and the operation by Licensee of Licensee's business relating to the Station; and (i) Licensee's gross negligence or willful misconduct in the performance of its obligations under this Agreement.

8.2     Indemnification by Community.  Community will indemnify, defend, and hold harmless Licensee, its Affiliates and all officers, directors, employees, stockholders, partners, members, and agents of Licensee and its Affiliates (individually, a "**Licensee Indemnitee**") from and against any and all Damages arising out of or resulting from acts or omissions of Community involving: (a) libel or slander; (b) illegal competition or trade practices; (c) infringement of trademarks, trade names, service marks, copyrights, or any other proprietary rights of a third party; (d) violations of law, rules, regulations, or orders (including the Communications Laws); (e) invasion of rights of privacy; (f) breaches of this Agreement; (g) the broadcast of programming furnished by Community; (h) Community's sale of advertising, the operation of Community's business relating to the Station or Community's Station and the operation of the Stations' websites; and (i) Community's gross negligence or willful misconduct in the performance of its obligations under this Agreement.

8.3     Responsibility; No Set-off.

(a)     For the avoidance of doubt, Licensee's obligation to indemnify under Section 8.1 and Community's obligation to indemnify under Section 8.2 are the full responsibility of the applicable indemnifying party (*i.e.,* Licensee with respect to Section 8.1 and Community with respect to Section 8.2) and are not subject to the reimbursement procedures in Section 3.3 and any Damages for which any party hereto is required to indemnify the other party hereto pursuant to SECTION 8 shall not be included in the calculation of the SSA Fee pursuant to Schedule 3.4.

(b)     Community shall not be entitled to set-off any amount of the SSA Fee by the amount of any Damages for which Community seeks indemnification pursuant to Section 8.1.

## SECTION 9  REPRESENTATIONS, WARRANTIES, AND COVENANTS; CERTIFICATIONS.

9.1     Representations, Warranties, and Covenants of Licensee.  Licensee represents, warrants, and covenants that:

17

*REDACTED*

(a)       Licensee is duly organized, validly existing, and in good standing under the laws of the state of its incorporation.  Licensee has the requisite power and authority to execute and deliver this Agreement and all of the other agreements and instruments to be executed and delivered by Licensee pursuant hereto to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions, and provisions hereof and thereof.

(b)       The execution, delivery, and performance of this Agreement has been duly authorized and approved by all necessary action of Licensee and does not require any further authorization or consent of Licensee.  This Agreement is a legal, valid, and binding agreement of Licensee enforceable in accordance with its respective terms, except in each case as such enforceability may be limited by bankruptcy, moratorium, insolvency, reorganization, or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity.

(c)       Neither the execution and delivery by Licensee of this Agreement nor the consummation by Licensee of any of the transactions contemplated hereby or thereby nor compliance by Licensee with or fulfillment by Licensee of the terms, conditions, and provisions hereof or thereof will (i) conflict with the certificate of incorporation or bylaws of Licensee or any applicable laws to which Licensee is subject; (ii) require the approval, consent, authorization or act of, or the making by Licensee of any declaration, filing, or registration with, any third party or any governmental authority; (iii) violate, conflict with, result in any breach of, or constitute a default (or an event which, with notice or lapse of time, or both, would become a default) under,  give any person (including Licensee) any right of termination or cancellation, any right to assert any remedy with respect to, or the right to cause the acceleration of the maturity of, any contract or agreement to which Licensee is a party or by which its property is bound; or (iv) cause the loss of any rights, advantages, or privileges under or relating to such property or assets.

(d)       There is no action, suit, proceeding, or investigation pending or, to the knowledge of Licensee, threatened against Licensee which questions the validity of this Agreement or the right of Licensee to enter into it or to consummate the transactions contemplated hereby.

(e)       Licensee currently is the holder in good standing of the authorization(s) necessary to operate the Station.

(f)       Schedule 6.1(a)(i) contains a list, as of August 31, 2008, of all Pre-Existing Programming Contracts and Schedule 9.1(f)(i) contains a list, as of the date of this Agreement, of all Pre-Existing Other Contracts pursuant to which the Station's annual expense is in excess of Twenty Thousand Dollars ($20,000), other than advertising trade agreements (collectively, the "**Material Pre-Existing Other Contracts**" and together with the Pre-Existing Programming Contracts, the "**Material Station Contracts**").  Except as set forth on Schedule 9.1(f)(ii), since August 31, 2008, Licensee has not entered into any programming agreements with third parties applicable to the Station which are in effect as of the date of this Agreement that would have been required to have been listed on Schedule 6.1(a)(i) if such schedule

18

*REDACTED*

reflected programming agreements as of the date of this Agreement. Licensee will not enter into any agreement after the date of this Agreement which would have constituted a Pre-Existing Other Contract if entered into on or prior to the date of this Agreement without Community's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Licensee has made available to Community or will make available to Community prior to the Commencement Date true and complete copies of all written Material Pre-Existing Other Contracts, and true and complete memoranda of all oral Material Pre-Existing Other Contracts, and any and all amendments and other modifications thereto. Each of the Material Pre-Existing Other Contracts is in effect and is binding upon Licensee or its Affiliates and, to Licensee's knowledge, the other parties thereto (in each case, subject to bankruptcy, insolvency, reorganization or other similar laws relating to or affecting the enforcement of creditors' rights generally). Licensee and/or its Affiliates have performed their obligations under each of the Material Pre-Existing Other Contracts in all material respects, and are not in default thereunder, and to Licensee's and/or its Affiliates' knowledge, no other party to any of the Material Pre-Existing Other Contracts is in default thereunder in any respect. The Material Pre-Existing Other Contracts are consistent in nature and scope with Licensee's historical financial statements made available to Community.

(g)     Cable, Satellite Matters and Digital Television.

(i)     Cable and Satellite Matters. Schedule 9.1(g)(i) sets forth as of the date of this Agreement a list of all MVPDs in the St. Louis Market that have provided current and pending written notices to Licensee or the Station of an intention to delete the Station's signal(s) from carriage or to change the channel position of the Station's signal(s).

(ii)     Digital Television Matters. The Station has been assigned a channel (channel 26) by the FCC for the provision of digital television service ("**DTV**"). Except as set forth in Schedule 9.1(g)(ii), (A) the Station has constructed its DTV facility and has filed for a DTV license; (B) the Station is operating on assigned digital channel 26 pursuant to program test authority; (C) the Station is in compliance with the FCC's rules, policies and deadlines concerning construction of its DTV facilities; and (D) the Station's election of a channel on which to provide DTV service following the end of the DTV transition has been approved by the FCC. Neither Licensee nor any Affiliate thereof has leased, licensed, assigned, conveyed or otherwise encumbered the Station's digital television spectrum or any portion thereof for the provision of any "ancillary or supplementary services" (as the term is defined pursuant to the Communications Laws).

(h)     The terms of Licensee's severance policy are set forth on Schedule 9.1(h).

9.2     Representations, Warranties, and Covenants of Community. Community represents, warrants, and covenants that:

(a)     Community is duly organized, validly existing, and in good standing under the laws of the state of its formation. Community has the requisite power and authority to execute and deliver this Agreement and all of the other agreements and instruments to be

19

*REDACTED*

executed and delivered by Community pursuant hereto, to consummate the transactions contemplated hereby and thereby and to comply with the terms hereof and thereof.

(b)     The execution, delivery and performance of this Agreement has been duly authorized and approved by all necessary action of Community and does not require any further authorization or consent of Community.  This Agreement is a legal, valid and binding agreement of Community enforceable in accordance with its respective terms, except in each case as such enforceability may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity.

(c)     Neither the execution and delivery by Community of this Agreement nor the consummation by Community of any of the transactions contemplated hereby or thereby nor compliance by Community with or fulfillment by Community of the terms, conditions and provisions hereof or thereof will (i) conflict with the certificate of formation or limited liability company operating agreement of Community or any applicable laws to which Community is subject; (ii) require the approval, consent, authorization or act of, or the making by Community of any declaration, filing, or registration with, any third party or any governmental authority; (iii) violate, conflict with, result in any breach of, or constitute a default (or an event which, with notice or lapse of time, or both, would become a default) under, give any person (including Community) any right of termination or cancellation, any right to assert any remedy with respect to, or the right to cause the acceleration of the maturity of, any contract or agreement to which Community is a party or by which its property is bound; or (iv) cause the loss of any rights, advantages, or privileges under or relating to such property or assets.

(d)     There is no action, suit, proceeding or investigation pending or, to the knowledge of Community, threatened against Community which questions the validity of this Agreement or the right of Community to enter into it or to consummate the transactions contemplated hereby.

(e)     Community currently is the holder in good standing of the authorization(s) necessary to operate Community's Station.

(f)     Schedule 9.2(f) contains a list, as of the date of this Agreement, of all contracts pursuant to which the Community is a party relating to Community's Station, other than advertising trade agreements ("**Community's Station Contracts**").  Community has made available to Licensee or will make available to Licensee prior to the Commencement Date true and complete copies of all written Community's Station Contracts, and true and complete memoranda of all oral Community's Station Contracts, and any and all amendments and other modifications thereto.  Each of Community's Station Contracts is in effect and is binding upon Community or its Affiliates and, to Community's knowledge, the other parties thereto (in each case, subject to bankruptcy, insolvency, reorganization or other similar laws relating to or affecting the enforcement of creditors' rights generally).  Community and/or its Affiliates have performed their obligations under each of Community's Station Contracts in all material respects, and are not in default thereunder, and to Community's and/or its Affiliates' knowledge, no other party to any of Community's Station Contracts is in default thereunder in any respect.

20

*REDACTED*

Community's Station Contracts are consistent in nature and scope with Community's historical financial statements made available to Licensee.

       (g)     Cable, Satellite Matters and Digital Television.

          (i)     Cable and Satellite Matters.  Schedule 9.2(g)(i) sets forth as of the date of this Agreement a list of all MVPDs in the St. Louis Market that have notified Community or Community's Station in writing of an intention to delete Community's Station's signal(s) from carriage or to change the channel position of Community's Station's signal(s) and which notices are current and pending;

          (ii)     Digital Television Matters.  Community's Station has been assigned channel 43 by the FCC for the provision of DTV.  Except as set forth in Schedule 9.2(g)(ii), (A) Community has constructed its DTV facility and has filed for a DTV license; (B) Community's Station is operating on assigned digital channel 43 pursuant to program test authority; (C) Community's Station is in compliance with the FCC's rules, policies and deadlines concerning construction of its DTV facilities; and (D) Community's Station's election of a channel on which to provide DTV service following the end of the DTV transition has been approved by the FCC.  Neither Community nor any Affiliate thereof has leased, licensed, assigned, conveyed or otherwise encumbered Community's Station's digital television spectrum or any portion thereof for the provision of any "ancillary or supplementary services" (as the term is defined pursuant to the Communications Laws).

       (h)     The terms of Community's severance policy are set forth on Schedule 9.2(h).

       9.3     Certifications.

       (a)     Licensee hereby verifies that for the Term of this Agreement it shall maintain ultimate control over the Station's facilities, including specifically control over the Station's finances, personnel, and programming, and nothing herein shall be interpreted as depriving Licensee of the power or right of such ultimate control.

       (b)     Community hereby verifies that the execution and performance of this Agreement complies with the FCC's restrictions on ownership set out in 47 C.F. R. Section 73.3555.

## SECTION 10 PUT/CALL RIGHT; COVENANT NOT TO SELL OR ENCUMBER; MARKET ACQUISITIONS; SALE OF ENTIRE COMPANY; RIGHT OF FIRST OFFER.

       10.1     Put/Call Right.

       (a)     Subject to the provisions of this Section 10 and Schedule 10.1(a), at any time following January 31, 2013 until the end of the Term (the "**Put/Call Right Period**"), (i) Community shall have the right to request that Licensee purchase Community's Station, and (ii)

*REDACTED*

Licensee shall have the right to request that Community purchase the Station or that Community purchase from Tribune Broadcasting Company ("**TBC**") one hundred percent (100%) of the outstanding stock of Licensee (the "**Stock**"), in each case in accordance with the procedures set forth on Schedule 10.1(a) (the "**Put Right**").

(b)    Subject to the provisions of this Section 10 and Schedule 10.1(b), at any time during the Put/Call Right Period, (i) Community shall have the right to offer to purchase the Station (or at Licensee's request following receipt of such an offer from Community, the Stock) and (ii) Licensee shall have the right to offer to purchase Community's Station, in each case in accordance with the procedures set forth in Schedule 10.1(b) (the "**Call Right**").

10.2    Covenant Not to Sell.

(a)    During the Term, Community shall not sell or enter into any agreement to sell Community's Station (the "**Community Sale Agreement**"), other than to an Affiliate of Community, without the prior written consent of Licensee; provided, however, that such consent shall not be unreasonably withheld, conditioned, or delayed if (i) the third party purchaser of Community's Station (A) assumes in writing all rights and obligations of Community under this Agreement, including, but not limited to, Section 10, pursuant to an assumption agreement reasonably acceptable to Licensee; (B) is financially capable of performing Community's obligations in this Agreement; and (C) is acceptable to the FCC.   Community shall give Licensee written notice twenty (20) days prior to the initiation of any discussions with any third party regarding the sale of Community's Station or of Community's intent to sell or transfer Community's Station to an Affiliate, and thereafter, Licensee may not exercise its rights under Section 10.1 for a period commencing on the date of execution and delivery by Community and the other parties thereto of a Community Sale Agreement until the earlier of (A) three hundred and sixty-five (365) days after the date of the Community Sale Agreement (the "**Community Upset Date**"), (B) the date that the Community Sale Agreement has been terminated in accordance with its terms or (C) the date the transactions contemplated by the Community Sale Agreement are consummated.  Community agrees that any Community Sale Agreement will contain a provision entitling Community to terminate such agreement on or after the Community Upset Date if a closing has not occurred thereunder.  If, following the Community Upset Date, Licensee exercises its rights under Section 10.1, Community agrees to immediately terminate the Community Sale Agreement.  Notwithstanding Section 10.2(d), Community may transfer Community's Station to an entity controlled by a successor investment entity or entities to Oak Hill Capital Partners II, L.P. or Oak Hill Capital Partners III, L.P. (collectively, the "**Oak Hill Funds**") provided that a majority of the individuals who control the Oak Hill Funds control such successor entity(ies).  The transferee in any transfer to an Affiliate of Community or as set forth in the immediately preceding sentence must assume in writing all rights and obligations of Community under this Agreement, including, but not limited to, Section 10, pursuant to an assumption agreement reasonably acceptable to Licensee.  To the extent that any sale or transfer by Community of Community's Station to a third party is first subject to Section 10.5, then this Section 10.2(a) shall not apply.

22

*REDACTED*

(b)    During the Term, Licensee shall not sell or enter into any agreement to sell the Station (the "**Licensee Sale Agreement**"), other than to an Affiliate of Licensee, without the prior written consent of Community; provided, however, that such consent shall not be unreasonably withheld, conditioned, or delayed if (i) the third-party purchaser of the Station (A) assumes in writing all rights and obligations of Licensee under this Agreement, including, but not limited to,  Section 10, pursuant to an assumption agreement reasonably acceptable to Community; (B) is financially capable of performing Licensee's obligations in this Agreement; and (C) is acceptable to the FCC.  Licensee shall give Community written notice twenty (20) days prior to the initiation of any discussions with any third party regarding the sale of the Station or of Licensee's intent to sell or transfer the Station to an Affiliate, and thereafter, Community may not exercise its rights under Section 10.1 for a period commencing on the date of execution and delivery by Licensee and the other parties thereto of a Licensee Sale Agreement until the earlier of (A) three hundred and sixty-five (365) days after the date of the Licensee Sale Agreement (the "**Licensee Upset Date**"), (B) the date that the Licensee Sale Agreement has been terminated in accordance with its terms or (C) the date the transactions contemplated by the Licensee Sale Agreement are consummated.  Licensee agrees that any Licensee Sale Agreement will contain a provision entitling Licensee to terminate such agreement on or after the Licensee Upset Date if a closing has not occurred thereunder.  If, following the Licensee Upset Date, Community exercises its rights under Section 10.1, Licensee agrees to immediately terminate the Licensee Sale Agreement.  The transferee in any transfer to an Affiliate of Licensee must assume in writing all rights and obligations of Licensee under this Agreement, including, but not limited to, Section 10, pursuant to an assumption agreement reasonably acceptable to Community.  To the extent that any sale or transfer by Licensee of  the Station to a third party is first subject to Section 10.5, then this Section 10.2(b) shall not apply.

(c)    Notwithstanding anything in this Agreement to the contrary, if, at any time during the Term, either party (or their successors) is required for regulatory purposes (as determined by the respective party in its sole discretion) to divest a station in the St. Louis Market in connection with a transaction by either party or their respective Affiliates, either party shall have the right to sell the Station or Community's Station, as applicable,  to a third-party purchaser, without needing the consent of the other party, provided that (i) such third party purchaser (A) assumes in writing all rights and obligations of the selling party under this Agreement, including, but not limited to, Section 10.1, pursuant to an assumption agreement reasonably acceptable to the other party; (B) is financially capable of performing Licensee's or Community's obligations in this Agreement; and (C) is acceptable to the FCC and (ii) such selling party shall provide the other party hereto with prior written notice of such divestiture.

(d)    For purposes of this Section 10.2, "**Affiliate**" means, as applied to any person or entity, any other person or entity directly or indirectly controlling, controlled by or under common control with, that person or entity and for the purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by", and "under common control with") as applied to any entity, means the ownership, directly or indirectly, of more than 50 percent of the equity interests, the holders of which are ordinarily, in

*REDACTED*

the absence of contingencies, entitled to elect the corporate directors (or persons performing a similar function) , or of more than 50 percent of the economic interests in such person or entity..

10.3   Market Acquisitions.   During the Term, neither party shall, and each party shall cause its Affiliates not to, purchase or program, or enter into an agreement to purchase or program, another television station in the St. Louis Market, or enter into any other similar arrangement with respect to any such station (including, but not limited to, a joint sales agreement, a joint operating agreement, or a local marketing agreement or time brokerage agreement), without first obtaining the prior written consent of the other party, such consent not to be unreasonably withheld, conditioned, or delayed; provided, however, that either party or any of its Affiliates may purchase another television station in the St. Louis Market without the other party's prior written consent, provided that such acquisition is in connection with a multi-station acquisition by such party or its Affiliates and such acquisition would not cause such party to be in violation of the Communications Laws.

10.4   Sale of Entire Company.   Notwithstanding anything in this Agreement to the contrary, if at any time during the Term, the direct or indirect parent company of a party hereto (or their successors) shall have the right to engage in a transaction (or series of transactions) without prior advance notice to the other party hereto and without the prior written consent of the other party hereto if such transaction (or series of transactions) results in the sale of the entire parent company and its subsidiaries, including the respective party hereto, whether by merger, consolidation, reorganization or similar corporate transaction of the parent company with or into a third party, by a sale or other disposition of substantially all the assets of or substantially all the outstanding voting equity securities of the parent company, or upon a complete liquidation or dissolution of the parent company; provided, that such party shall provide the other party hereto written notice of such transaction (or series of transactions) after the execution of a definitive agreement with respect to such transaction (or series of transactions) and if such transaction (or series of transactions) would result in the assignment of this Agreement, this Agreement shall be assumed by the acquiring entity.

10.5   Right of First Offer.

(a)   For the period of time commencing on the Commencement Date and continuing until the fourteen (14) month anniversary of the Commencement Date, in the event that either party (the "**Selling Party**") desires to sell its respective station (*i.e.,* the Station or the Stock with respect to Licensee or TBC, respectively, as the Selling Party and Community's Station with respect to Community as the Selling Party) (in each case, the "**Subject Station**"), other than to an Affiliate, whether pursuant to a sale of all or substantially all of the assets of such station or a sale of all or substantially all of the outstanding stock or other equity of Licensee or Community, then the Selling Party shall first comply with the procedures in this Section 10.5.  For the purposes of this Section 10.5 "Affiliate" shall have the meaning as provided for in Section 10.2(d) above; provided, however, notwithstanding Section 10.2(d), Community may transfer Community's Station to an entity controlled by a successor investment entity or entities to Oak Hill Funds provided that a majority of the individuals who control the Oak Hill Funds control such successor entity(ies).  The transferee in any transfer to an Affiliate

24

*REDACTED*

(which shall include with respect to Community any entity described in the immediately preceding sentence) must assume in writing all rights and obligations of Community or Licensee, respectively, under this Agreement, including, but not limited to, Section 10, pursuant to an assumption agreement reasonably acceptable to the other party.

(b)     The Selling Party shall deliver to the other party hereto (the "**Recipient Party**") a written notice of its intent to sell the Subject Station (the **"Notice of Sale"**). For a period of thirty (30) days following the date of Recipient Party's receipt of the Notice of Sale (the "**Exercise Period**"), the Recipient Party shall be entitled to conduct due diligence on the Subject Station and deliver a written notice (a "**Responding Notice**") to the Selling Party of either Recipient Party's binding election to acquire the Subject Station, or the election of a third-party purchaser satisfactory to the Recipient Party (a "**Designated Buyer**") to acquire the Subject Station, at a specified price (which shall be payable solely in cash) and upon the other terms and conditions of such acquisition as outlined in the Responding Notice, which Responding Notice shall include material terms and conditions. If the Recipient Party fails to send a Responding Notice within the Exercise Period it shall be deemed to have elected not to purchase the Subject Station. If the Recipient Party sends a Responding Notice in accordance with this Section 10.5(b), the Recipient Party or the Designated Buyer, as the case may be, and the Selling Party shall have another thirty (30) days (such additional thirty (30) day period to be referred to herein as the "**ROFO Negotiating Period**") within which to negotiate and execute a mutually acceptable acquisition agreement for the Subject Station.

(c)     If the Recipient Party fails to respond or exercise its right, or the right of a Designated Buyer, as the case may be, to purchase the Subject Station during the Exercise Period, or if the Recipient Party, or a Designated Buyer, as the case may be, exercises its right to purchase but, through no fault of the Selling Party, subsequently fails to enter into an acquisition agreement for the Subject Station during the ROFO Negotiating Period, or if the Recipient Party, or a Designated Buyer, as the case may be, enters into an acquisition agreement for the Subject Station during the ROFO Negotiating Period but, through no fault of the Selling Party, the closing of the transactions contemplated by such acquisition agreement does not occur, then the Selling Party shall have the right, for one hundred eighty (180) days thereafter, to enter into a binding acquisition agreement with a third party for the sale of the Subject Station, provided that (i) such third party purchaser (A) assumes in writing all rights and obligations of Selling Party under this Agreement; (B) is financially capable of performing Selling Party's obligations in this Agreement; and (C) is acceptable to the FCC; (ii) the terms and conditions of the sale to such third-party purchaser are no less favorable in the aggregate to the Selling Party than the terms in the Responding Notice, provided, that, in the event that the Station is the Subject Station, the purchase price paid by such third party purchaser may be ▮▮▮▮▮▮ less than the purchase price in the Responding Notice and in the event that Community's Station is the Subject Station, the purchase price paid by such third party purchaser may be ▮▮▮▮▮▮ less than the purchase price in the Responding Notice; and (iii) such transaction is consummated within two hundred seventy (270) days following the execution of the acquisition agreement which contemplates such sale.

(d)     If the Selling Party has not succeeded in (i) obtaining a binding contract with a third party with respect to the Subject Station within a period of one hundred eighty (180)

*REDACTED*

days following (A) the expiration of the Exercise Period, if Recipient Party failed to respond to the Notice of Sale during the Exercise Period, or (B) the expiration of the ROFO Negotiating Period, if the Recipient Party delivered a Responding Notice, as applicable, or (ii) consummating the sale of the Subject Station to a third party within a period of two hundred seventy (270) days following the date of the acquisition agreement entered into with such third party for the sale of the Subject Station, then Selling Party will again be obligated to comply with all of the provisions of this Section 10.5 prior to any sale of the Subject Station.

        10.6    Sale/Change of Control. For all purposes of this Section 10, any reference to a sale of any station shall be deemed to include a sale of all or substantially all of the assets of any such station, a sale of all or substantially all of the outstanding stock or other equity of either Licensee or Community, or a merger, consolidation, reorganization or similar corporate transaction of either Licensee or Community with or into a third party.

## SECTION 11 MISCELLANEOUS.

        11.1    Force Majeure. Notwithstanding anything contained in this Agreement to the contrary, no party shall be liable to the other party for failure to perform any obligation under this Agreement to the extent prevented from doing so by reason of fires, acts of terrorism, strikes, labor unrest, embargoes, civil commotion, rationing or other orders or requirements, acts of civil or military authorities, acts of God or other contingencies, including equipment failures, beyond the reasonable control of the parties, and all requirements as to notice and other performance required hereunder within a specified period shall be automatically extended to accommodate the period of pendency of such contingency which shall interfere with such performance.

        11.2    Confidentiality and Press Releases.

        (a)    Each party acknowledges that in the course of performing its services or satisfying its obligations hereunder, it may be exposed to or acquire information that is identified as "confidential" or "proprietary" by the other party or which a reasonable person would conclude is of a confidential nature based on the manner and means of disclosure or the type of information disclosed (the "**Confidential Information**"). Accordingly, when a party (the "**Receiving Party**") receives Confidential Information from another party (the "**Owning Party**") the Receiving Party shall, and shall obligate its employees and agents to: (i) maintain the Confidential Information received from the Owning Party in strict confidence; (ii) not disclose the Confidential Information received from the Owning Party to a third party without the Owning Party's prior written approval (except as required by law); and (iii) not, directly or indirectly, use the Confidential Information received from the Owning Party for any purpose other than for the purposes permitted by this Agreement. Upon the expiration or termination of this Agreement, each party shall promptly return all information, documents, and other materials belonging to the Owning Party to such party.

        (b)    No press release or public disclosure, either written or oral, of the existence or terms of this Agreement or the transactions contemplated hereby shall be made by either party to this Agreement without the consent of the other, and each party shall furnish to

*REDACTED*

the other advance copies of any release which it proposes to make public concerning this Agreement or the transactions contemplated hereby and the date upon which such party proposes to make public such press release.

(c)     Notwithstanding anything contained herein to the contrary, no party shall be prohibited from (i) making any disclosures to any governmental authority that it is required to make by law, including the filing of this Agreement with the FCC and placing a copy of this Agreement in each station's public inspection files (*i.e.,* the public inspection file of the Station with respect to Licensee and the public inspection file of Community's Station with respect to Community); (ii) disclosing this Agreement or its terms to its attorneys, accountants, agents or advisors; or (iii) filing this Agreement with, or disclosing the terms of this Agreement to, any institutional lender to such party and as to any other third party as required by either party's credit agreement(s) and similar financing agreements and arrangements.

11.3    Notices.  All notices and other communication hereunder shall be in writing and shall be deemed given (a) if delivered personally, when received; (b) if by facsimile transmission, upon the generation by the transmitting facsimile machine of a confirmation that the entire document has been successfully transmitted; (c) if mailed by registered or certified mail (postage prepaid, return receipt requested), on the third business day following the date of deposit in the United States mail; or (d) if sent by a nationally recognized courier service, on the business day following the date of deposit with such courier service.  All such notices shall be addressed to a party at the following address (or at such other address for a party as shall be specified by like notice):

If to Community:

Community Television of Missouri, LLC
Community Television of Missouri License, LLC
c/o Local TV, LLC
Lookout Corporate Center
1717 Dixie Highway, Suite 650
Fort Wright, Kentucky  41011
Attention: Mr. Robert Lawrence
Facsimile:  (859) 331-6014
Confirmation:  (859) 331-9100
with copies (which shall not constitute notice) to:

Keystone Group, L.P.
201 Main Street, Suite 3100
Fort Worth, Texas  76102
Attention:  Kevin G. Levy, Esq.
Facsimile:  (817) 820-1623
Confirmation:  (817) 390-8503


with a copy (which shall not constitute notice) to:

27

*REDACTED*

Graydon Head & Ritchey LLP
1900 Fifth Third Center
Cincinnati, OH 45202
Attention:  John J. Kropp, Esq.
Facsimile: (513) 651-3836
Confirmation:  (513) 629-2820


If to Licensee:

KPLR, Inc.
c/o Tribune Company
435 North Michigan Avenue
6th Floor
Chicago, IL  60611
Attention:  Chief Operating Officer
Facsimile: (312) 222-3203
Confirmation:  (312) 222-4122

and

Tribune Company
435 North Michigan Avenue
6th Floor
Chicago, IL  60611
Attention:  General Counsel
Facsimile: (312) 222-4206
Confirmation:  (312) 222- 3651


with a copy (which shall not constitute notice) to:

Hogan & Hartson LLP
555 Thirteenth Street, NW
Washington, DC 20004-1109
Attention:  Marissa G. Repp, Esq.

Facsimile:  (202) 637-5910
Confirmation:  (202) 637-5600

or to such other address as either party shall have designated by notice in the foregoing manner
to the other parties.

11.4    Severability.  If any covenant or provision hereof is determined to be void
or unenforceable in whole or in part, it shall not be deemed to affect or impair the validity of any

28

*REDACTED*

other covenant or provision, each of which is hereby declared to be separate and distinct. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable. If any provision of this Agreement is declared invalid or unenforceable for any reason other than overbreadth, the offending provision will be modified so as to maintain the essential benefits of the bargain among the parties hereto to the maximum extent possible, consistent with law and public policy.

11.5    Payment of Expenses. Except as otherwise provided herein, Licensee and Community shall pay their own expenses incident to the preparation and carrying out of this Agreement, including all fees and expenses of their respective counsel.

11.6    Further Assurances. The parties shall take any actions and execute any other documents that may be necessary or desirable to the implementation and consummation of this Agreement or that may be reasonably requested by any party hereto. Each party will cooperate with the other party and provide any assistance reasonably requested by the other party to effectuate the terms of this Agreement.

11.7    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. Each party hereto will receive by delivery or facsimile transmission a duplicate original of the Agreement executed by each party, and each party agrees that the delivery of the Agreement by facsimile transmission will be deemed to be an original of the Agreement so transmitted.

11.8    Headings. The headings in this Agreement are for the sole purpose of convenience of reference and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Agreement.

11.9    Relationship, Dealings with Third Parties, No Partnership and No Joint Venture. Each party hereto is an independent contractor, and no party is, or shall be considered to be, the agent of another party for any purpose whatsoever. No party has any authorization to enter into any contracts or assume any obligations for another party nor make any warranties or representations on behalf of the other party, other than as expressly authorized herein. Nothing in this Agreement shall be construed as establishing an agency, partnership, fiduciary relationship or joint venture relationship between the parties hereto. No party is or shall hold itself out to be vested with any power or right to bind contractually or act on behalf of the other party as the other party's contracting broker, agent or otherwise for committing, selling, conveying or transferring any of another party's assets or property, contracting for or in the name of the other party or making any representations contractually binding the other party.

11.10   Waiver. The waiver by Community or Licensee of any breach of any term, covenant, or condition contained in this Agreement shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant, or condition contained herein. No covenant, term, or condition of this Agreement shall be deemed to have been waived by Community or Licensee, unless such waiver is in writing and is signed by the party against whom such waiver is asserted.

29

*REDACTED*

11.11    <u>Assignability</u>.  No party hereto may assign this Agreement without the prior written consent of the other parties, except as provided in <u>Section 10.1</u>, <u>Section 10.2</u>, <u>Section 10.4</u>, and <u>Section 10.5</u>.

11.12    <u>Governing Law</u>.  This Agreement shall be construed under and in accordance with the laws of the State of Delaware without giving effect to the principles of conflict of laws, but applying the Communications Act in the event of a conflict between the laws of the State of Delaware and the Communications Act.

11.13    <u>Specific Performance</u>.  Each party hereto hereby acknowledges and agrees that money damages would not be a sufficient remedy for any breach of this Agreement by such party, that the other party would suffer irreparable harm as a result of any such breach, and that, to the extent permitted by law, including the Communications Laws, in addition to all other remedies available under this Agreement or at law or in equity, the other party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach, without posting any bond, security or other undertaking.  In the event of any action by a party to enforce this Agreement, the other party hereby waives the defense that there is an adequate remedy at law.

11.14    <u>Entire Agreement</u>.  This Agreement (together with the Schedules attached hereto) and that certain letter agreement of even date herewith entered into by the parties hereto and certain of their respective Affiliates (the "**Letter Agreement**") represents the entire understanding and agreement between Community and Licensee with respect to the specific subject matter hereof.  This Agreement cannot be amended or modified except by an agreement in writing which makes specific reference to this Agreement and which is signed by the parties hereto.

*[Remainder of Page Intentionally Left Blank]*

WDC - 033181/000002 - 2798950 v5

*REDACTED*

IN WITNESS WHEREOF, the parties hereto have executed this Shared Services Agreement as of the date first above written.

COMMUNITY TELEVISION OF MISSOURI, LLC

By: /s/ Kevin G. Levy
Name: Kevin G. Levy
Title: Vice President

COMMUNITY TELEVISION OF MISSOURI LICENSE, LLC

By: /s/ Kevin G. Levy
Name: Kevin G. Levy
Title: Vice President

KPLR, INC.

By: /s/ Gina M. Mazzaferri
Name: Gina M. Mazzaferri
Title: Vice President

Solely for purposes of Section 10.1, Section 10.2, Section 10.5, Schedule 10.1(a) and Schedule 10.1(b):

TRIBUNE BROADCASTING COMPANY

By: /s/ Gina M. Mazzaferri
Name: Gina M. Mazzaferri
Title: Vice President

31

*REDACTED*

[Schedules Are Redacted]