# **EXHIBIT C**

*Letter Agreement*

*REDACTED*

KPLR, INC.
c/o Tribune Company
435 North Michigan Avenue
6th Floor
Chicago, IL 60611

February __, 2009

Community Television of Missouri, LLC
Community Television of Missouri License, LLC
KPLR
c/o Local TV, LLC
1717 Dixie Highway, Suite 650
Fort Wright, Kentucky 41011

Ladies and Gentlemen:

      Reference is made to that certain Local Marketing Agreement (the "**LMA**") dated as of the date hereof by and among Community Television of Missouri, LLC, a Delaware limited liability company, and Community Television of Missouri License, LLC, a Delaware limited liability company (collectively, "**Programmer**"), and KPLR, Inc., a Missouri corporation ("**Licensee**"). Capitalized terms not otherwise defined in this letter agreement (the "**Letter Agreement**") shall have the meaning set forth in the LMA.

1.    Relocation.

     (a)    As soon as reasonably practicable following the date hereof and to the extent not already completed, Programmer shall relocate the main studio of Programmer's Station to the studio facility (the "**Studio Facility**") used by Licensee for the Station for the term of the LMA (the "**Relocation**"). During and after the completion of the Relocation, Licensee shall provide to Programmer's employees and agents, at no additional cost, the right to access and use sufficient facility space as Programmer reasonably requires for the conduct of the business of Programmer's Station and as necessary to perform its obligations under the LMA, including furnishings and office equipment for Programmer's Station's main studio operations and equipment for the remote control of Programmer's Station and studio transmitter links for Programmer's Station, and sufficient space to permit Programmer to maintain and make available to the public Programmer's Station's public inspection file and otherwise satisfy the applicable "main studio" requirements of the Communications Laws at such locations in or near the Studio Facility, in each case as may be mutually acceptable to Licensee and Programmer and in accordance with the applicable requirements of the FCC, so long as the provision of such space and the use of such equipment do not unreasonably interfere with the conduct of Licensee's business or operations and are consistent with the terms and conditions of the Lease (as defined below).

*REDACTED*

(b)     From and after the completion of the Relocation until the earlier of the termination or expiration of the Term, Licensee shall give Programmer and its agents a nonexclusive and unrestricted right of access to the Studio Facility at all times, subject only to Licensee's reasonable security procedures applicable to its own employees, as Programmer reasonably requires for the conduct of the business of Programmer's Station, for the purpose of providing services to Licensee in accordance with the LMA and to fulfill Programmer's obligations as an FCC licensee. The right granted under this Section 1 shall include the incidental benefit and reasonable right of use of utilities (heat, water, electricity) provided for purposes of Licensee's own operations. In addition, Licensee shall provide separate, lockable office facilities for use by Programmer's managerial employee(s) and shall permit Programmer to install appropriate signs on the inside and outside of the Studio Facility (consistent with applicable local requirements governing such signage, if any, and the Lease and with the overall appearance of the Studio Facility) identifying Programmer as the owner and licensee of Programmer's Station.

(c)     If, at the time of termination of the LMA in accordance with its terms, neither Programmer nor Licensee has exercised the Put Right or Call Right and closed the transactions contemplated under Section 10.1 of the LMA or exercised its right of first offer and subsequently closed a transaction pursuant to Section 10.5 of the LMA, Programmer shall be given a transition period of not less than [REDACTED] following such termination in which to relocate the operations of the main studio of Programmer's Station. All costs incurred by Programmer with respect to relocating the operations of the main studio of Programmer's Station shall be paid by Programmer; provided, however, that if the LMA is terminated by Programmer in accordance with its terms as a result of an Event of Default by Licensee, Licensee shall be responsible for paying such costs and expenses of Programmer. During such transition period, Programmer shall have access to the Studio Facility in the same manner as during the term of this Letter Agreement. Such transition period may be lengthened upon such terms and conditions as may be mutually agreeable to the parties.

(d)     For the avoidance of doubt, all access and use rights granted by Licensee in this Section 1 are subject to the terms and conditions of the Lease Agreement dated as of [REDACTED], as amended, or to such lease(s) as Licensee may subsequently enter into for the operation of its main studio, whether with a different landlord and/or at a different location than its current main studio location (the "**Lease**").

2.     Upgrade Expenditures; Fixed Asset Expenditures; Operating Funds; Payments.

(a)     As soon as reasonably practicable after the date hereof, Programmer shall upgrade the Studio Facility, on Licensee's behalf, in accordance with the Communications Laws, subject to Licensee's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed to accommodate Programmer's relocation of Programmer's Station to the Studio Facility pursuant to Section 1 and any such upgrade shall be in compliance with the terms and conditions of the Lease. All

costs and expenses related to (i) the relocation of Programmer's Station to the Studio Facility by either Programmer or Licensee and (ii) the upgrade of the Studio Facility by Programmer in accordance with this Section 2(a) (collectively, the costs and expenses specified in clauses (i) and (ii) of this Section 2(a) are hereafter referred to as the "**Upgrade Expenditures**") will be split between Programmer and Licensee, respectively, in accordance with their BCF Percentage Share. For purposes of this Letter Agreement, "BCF Percentage Share" shall mean for Programmer, ▬▬▬▬▬▬▬▬, and for Licensee, ▬▬▬▬▬▬▬▬, as such percentages may be adjusted from time to time pursuant to Section 2(e) of this Letter Agreement.

(b)   Programmer shall be entitled to make all reasonable future additional expenditures for fixed assets that are necessary to operate the Stations, subject to Licensee's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed, and subject to the terms and conditions of the Lease. Any additional expenditures made by Programmer related to the Stations in accordance with this Section 2(b) (collectively, the "**Fixed Asset Expenditures**"), shall be paid by each of Programmer and Licensee, respectively, in accordance with their respective BCF Percentage Share.

(c)   If Programmer determines that additional working funds (other than for fixed assets) are required to operate the Stations (any such amount referred to herein as, "**Operating Funds**"), Programmer and Licensee shall discuss in good faith, and mutually agree on, the amount of Operating Funds to be paid by Programmer and Licensee in accordance with their respective BCF Percentage Share.

(d)   Upon receipt of a written notice from Programmer of the need to fund any Upgrade Expenditures, Fixed Asset Expenditures or Operating Funds, and the subsequent consent by Licensee with respect to such Upgrade Expenditures, Fixed Asset Expenditures or Operating Funds, as the case may be, Licensee shall either directly or through Tribune Broadcasting Company (or any successor, assignee or Affiliate thereof) ("**Licensee Parent**") pay Programmer its share of such amount in cash and Local TV Holdings, LLC (or any successor, assignee or Affiliate thereof) ("**Programmer Parent**") shall pay Programmer its share of such amount in cash in each case within thirty (30) days of receipt of such notice. Licensee Parent hereby agrees to pay or cause the payment of Licensee's share of any Upgrade Expenditures, Fixed Asset Expenditures or Operating Funds in accordance with this Section 2(d). Programmer Parent hereby agrees to pay or cause the payment of Programmer's share of any Upgrade Expenditures, Fixed Asset Expenditures or Operating Funds in accordance with this Section 2(d).

(e)   In the event any party (including for purposes of this Section 2(e) the Programmer Parent and Licensee Parent, as may be applicable) fails to timely pay the amount necessary to fund such party's portion of Upgrade Expenditures, Fixed Asset Expenditures and/or Operating Funds in accordance with Section 2(d), then the other party shall be permitted (but not required) to make such payment on behalf of the delinquent party. If the other party makes such payment, then the party making such payment may either: (a) elect to receive all payments of Adjusted BCF otherwise

payable to the delinquent party until such time as those payments equal the full amount paid by the paying party pursuant to this Section 2(e) plus interest on such amount at the rate of ███████ per annum or the maximum rate allowed by law, whichever is less; or (b) elect to permanently adjust the BCF Percentage Share of the delinquent party by the full amount paid by the paying party pursuant to this Section 2(e) so that the delinquent party's reduced BCF Percentage Share would equal the Adjusted BCF for the most recently completed fiscal year multiplied by the delinquent party's existing BCF Percentage Share minus the full amount paid by the paying party on behalf of the delinquent party, which difference is then divided by the Adjusted BCF for the most recently completed fiscal year. Upon so reducing the delinquent party's BCF Percentage Share, the BCF Percentage Share of the paying party shall be increased to a percentage equal to 1.00 minus the revised BCF Percentage Share of the delinquent party. For example, if Adjusted BCF for the most recently completed fiscal year was ███████, the delinquent party's BCF Percentage Share was ██ and the amount paid by the paying party was ███████, then the delinquent party's revised BCF Percentage Share would be ███████████████████████████ and the paying party's revised BCF Percentage Share would be ███████████.

(f)     All proceeds ("**Sale Proceeds**") of the sale of fixed assets purchased or acquired as a result of Upgrade Expenditures and/or Fixed Asset Expenditures (collectively "**Acquired Shared Assets**") shall be split between Programmer and Licensee, respectively, in accordance with their respective BCF Percentage Share; provided however, that in the event Programmer determines to use the Sale Proceeds for the Stations, the Sale Proceeds shall be used as determined by Programmer, subject to Licensee's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed. Upon termination of the LMA in accordance with its terms, if at the time of such termination, neither Programmer nor Licensee has exercised the Put Right or Call Right and closed the transactions contemplated by Section 10.1 of the LMA, and neither Programmer nor Licensee has exercised its right of first offer and closed the transactions contemplated by Section 10.5 of the LMA, (i) Programmer and Licensee shall mutually agree, acting reasonably, on the distribution of the Acquired Shared Assets that have not been sold and (ii) Programmer shall pay to Licensee an amount equal to the unexpended Upgrade Expenditures and/or Fixed Asset Expenditures, if any, multiplied by Licensee's BCF Percentage Share; provided, however, that the amounts payable to Licensee pursuant to the foregoing clauses (i) and (ii) of this Section 2(f) shall be reduced by any amounts payable to Programmer pursuant to Section 2(e), if any.

3.     Lease and Tower Leases. Licensee hereby agrees to use its commercially reasonable efforts to maintain in effect, and not take any action that would cause the termination of, the following agreements during the Term: (a) the Lease, (b) the Lease Agreement by and between ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, and (c) the

Agreement by and between ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (collectively, the "**Licensee Critical Contracts**"). In the event that any such Licensee Critical Contract is terminated and Programmer is not able to perform in all material respects its obligations under the LMA, then Programmer shall have the right upon sixty (60) days prior written notice to Licensee, to terminate the LMA in accordance with its terms and Section 7.3 of the LMA will govern the effect of termination thereof; provided, however, that Programmer shall not have the right to terminate the LMA pursuant to this Section 3 if any of the Licensee Critical Contracts is terminated primarily as a result of, directly or indirectly, Programmer's actions or omissions with respect to any of the Licensee Critical Contracts.

4.  Term.

This Letter Agreement shall be void and of no force and effect and all rights and obligations of the parties hereunder shall terminate without any further liability on the part of any party hereto in respect thereof upon the termination of the LMA in accordance with its terms; provided, however, that nothing herein will relieve any party from liability for any breach hereof or fraud, and each party will be entitled to any remedies at law or in equity to recover Damages arising from such breach; provided, further, that Sections 1(c), 2(d), 2(e) and 2(f) shall survive the termination of this Letter Agreement.

5.  Governing Law.

This Letter Agreement shall be construed under and in accordance with the laws of the State of Delaware without giving effect to the principles of conflict of laws, but applying the Communications Act in the event of a conflict between the laws of the State of Delaware and the Communications Act.

6.  Miscellaneous.

All notices and other written communications shall be provided in accordance with Section 11.3 of the LMA. This Letter Agreement may be executed in one or more counterparts for the convenience of the parties hereto, each of which shall be deemed an original and all of which together will constitute one and the same instrument. Facsimile signatures shall be treated as original signatures for all purposes hereunder. In the event that any one or more of the provisions or parts of a provision contained in this Letter Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or part of a provision of this Letter Agreement or any other jurisdiction, but this Letter Agreement shall be reformed and construed in any such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part shall be reformed so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction, provided that any such reform or construction does not affect the economic or legal substance of the transactions contemplated herein or in the LMA in a manner adverse to any party. This Letter Agreement may not be modified or amended except in

*REDACTED*

writing signed by the parties hereto. The terms of this Letter Agreement may be waived only by a written instrument signed by the party or parties waiving compliance. No waiver of any provision of this Letter Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise provided. No delay on the part of any party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. The rights and remedies herein provided shall be the exclusive rights and remedies available to the parties hereto at law or in equity. This Letter Agreement and the LMA contain the entire understanding of the parties relating to the subject matter hereof and supersede all prior written or oral and all contemporaneous oral agreements and understandings relating to the subject matter hereof.

Each party hereto is an independent contractor, and no party is, or shall be considered to be, the agent of another party for any purpose whatsoever. No party has any authorization to enter into any contracts or assume any obligations for another party or make any warranties or representations on behalf of the other party, other than as expressly authorized herein. Nothing in this Letter Agreement shall be construed as establishing, nor do the parties intend to establish hereby, an agency, partnership, fiduciary relationship or joint venture relationship between the parties hereto. No party is or shall hold itself out to be vested with any power or right to bind contractually or act on behalf of the other party as the other party's contracting broker, agent or otherwise for committing, selling, conveying or transferring any of another party's assets or property, contracting for or in the name of the other party or making any representations contractually binding the other party.

**[*Remainder of Page Intentionally Left Blank*]**

*REDACTED*

If the above reflects your understanding of the parties' agreement, please acknowledge your acceptance of the foregoing by executing the countersignature below.

KPLR, INC.

By: _____
Name: _____
Title: _____

ACKNOWLEDGED, ACCEPTED AND AGREED TO
AS OF THE DATE FIRST WRITTEN ABOVE:

COMMUNITY TELEVISION OF MISSOURI, LLC

By: _____
Name: _____
Title: _____

COMMUNITY TELEVISION OF MISSOURI LICENSE, LLC

By: _____
Name: _____
Title: _____

FOR PURPOSES OF SECTION 2(d) AND SECTION 2(e) ONLY:

LOCAL TV HOLDINGS, LLC

By: _____
Name: _____
Title: _____

TRIBUNE BROADCASTING COMPANY

By: _____
Name: _____
Title: _____