# EXHIBIT B

<u>FULL-TIME TRANSPONDER CAPACITY AGREEMENT (PRE-LAUNCH)</u>

This Agreement (the "Agreement") is entered into this 30th day of July , 2006 (the "Execution Date"), by and between Tribune Broadcasting Company, a Delaware corporation ("Customer") and PANAMSAT CORPORATION, a Delaware corporation] (the "Contracting Provider"), on behalf of itself and JSAT INTERNATIONAL INC., a _____ (collectively, "Provider," and individually, each a "Provider Company").

WHEREAS, the Provider operates, and has the right to provide Transponder capacity from the Ku-band payload of that certain satellite referred to by Provider as Horizons 2 at its assigned orbital location (the "Satellite" or "Horizons 2"), which is currently under construction.

WHEREAS, Provider desires to provide to Customer, and Customer desires to accept from Provider, the "Customer's Transponder Capacity" (as defined below).

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises set forth below, Provider and Customer mutually agree as follows:

ARTICLE 1. <u>THE CUSTOMER'S TRANSPONDER CAPACITY.</u>

1.1     <u>Description of Capacity</u>. Provider agrees to provide to Customer and Customer agrees to accept from Provider, on a full time basis (24 hours a day, seven days a week), in outerspace, for the Capacity Term (as defined herein), the Customer's Transponder Capacity (defined below) meeting the "Performance Specifications" set forth in the "Technical Appendix" attached hereto as Appendix B. For purposes of this Agreement, the "Customer's Transponder Capacity" shall consist of one (1) 36 MHz, Ku-Band transponder in the beam(s) that are identified in Appendix A to this Agreement from the Satellite. The transponders on the Satellite and the beams in which these transponders are grouped are referred to as "Transponder(s)" and the "Beam(s)," respectively. If the Customer's Transponder Capacity is provided from a partial Transponder, the Customer's Transponder Capacity shall be power and bandwidth limited, consisting of a Transponder segment, equivalent to the amount of bandwidth (stated in Appendix A) and associated power on the Transponder (a "Transponder Segment"). Provider shall not preempt or

-2-

interrupt the provision of the Customer's Transponder Capacity to Customer, except as specifically permitted under this Agreement.

1.2     Beam and Transponder Designation.     The Beams, and subject to Section 5.1 and Appendix B, the particular Transponder that shall make up the Customer's Transponder Capacity shall be identified in accordance with Appendices A and B.  The initial Transponder assignment(s) shall be specified by Provider after consultation with Customer prior to the launch of the Satellite. Provider may, in accordance with the Technical Appendix, reassign the Transponder on which Customer's Transponder Capacity is located during the Capacity Term (as defined below) or change the frequency assignments of Customer's Transponder Capacity upon advance notice to Customer as soon as reasonably practicable under circumstances.

1.3     Permitted Use.     Except as otherwise expressly provided in Section 10.4 of the Agreement, the Customer's Transponder Capacity may be used by Customer solely for transmission of its own digital telecommunications services (whether for data or video services), which, for purposes of this Agreement include the provision of value-added telecommunications services, wherein the Customer's provision of digital telecommunications services to its customers includes, without limitation, substantially more communications facilities than bare space segment capacity and Customer is responsible for all facilities communicating with, and for coordinating the use with PanAmSat of, the Customer's Transponder Capacity.

1.4     Transmission Plan and Test Period.

(A)     Customer and Provider agree to the pre-approved transmission plan attached hereto as Appendix E (the "Transmission Plan").  Customer shall also be permitted, subject to Provider's prior written approval, to modify the Transmission Plan from time to time.  Provider makes no representation, warranty, or covenant regarding the efficacy of the use of any number of carriers or other alternative uses of Customer's Transponder Capacity.

(B)     For the first thirty (30) days after the Commencement Date as defined in Section 2.1, below (the "Test Period"), Provider will provide, and Customer will be permitted to use, an additional Transponder with the same polarity as the Transponder on which Customer's Transponder Capacity is located, at no additional charge to Customer, to test the throughput parameters (expressed in information rate Kbps) set forth in Appendix E (the "Throughput Parameters").  Both Provider and Customer will jointly develop all test plans and procedures, and each of the parties will have the right to review and confirm the test results at its own facilities and at its own expense.  If, following the completion

-3-

of the Test Period, both parties determine that the Throughput Parameters are not met, Customer and Provider will consult each other and jointly work together diligently and in good faith to modify the Transmission Plan, and the terms of Section 7.6(B) will apply.

(C)    During the first year after the Commencement Date, provided that Provider has not provided additional capacity as referred to in Section 7.6(B), if the Throughput Parameters are not met as confirmed by both Provider and Customer, then Provider will provide additional capacity of up to ten (10) MHz on the Satellite, at no additional charge.

(D)    From the first year anniversary of the Commencement Date and through the remainder of the Capacity Term, provided that Provider has not provided additional capacity as referred to in Section 7.6(B) or Section 1.4(C), as the case may be, if the Throughput Parameters are not met as confirmed by both Provider and Customer, then Provider, subject to availability as determined by Provider in its sole discretion, will provide additional capacity of up to ten (10) MHz on the Satellite, at no additional charge.

ARTICLE 2. <u>CAPACITY TERM</u>.

2.1    <u>Capacity Term</u>.  This Agreement shall be effective as of the Execution Date.  The "Capacity Term" shall commence on the date that Provider certifies to Customer that the Satellite has been placed into commercial operation in its assigned orbital location, with the Customer's Transponder Capacity meeting the Performance Specifications and available for Customer's use (the "Commencement Date").  If one or more, but not all of the Transponder(s) or Transponder Segment(s) that constitute the Customer's Transponder Capacity meet the Performance Specifications, Provider shall so state in its certification, and the Capacity Term shall commence with respect to such Transponder(s) or Transponder Segment(s), and, if applicable, with respect to any "Substitute Capacity" that Provider may provide for any of the initially assigned Transponders or Transponder Segments that constitute Customer's Transponder Capacity.  The Capacity Term shall continue until 23:59 Greenwich Mean Time on the date that is one day earlier than the seventh (7th) year anniversary of the Commencement Date.

ARTICLE 3. <u>CUSTOMER PAYMENTS</u>.

3.1    <u>Monthly Fee and Deposit</u>.  From and after the Commencement Date, Customer agrees to pay the "Monthly Fee" shown in Appendix A hereto (prorated for partial months).  Customer's deposit of $57,200 from that certain Full-Time Transponder Capacity Agreement dated the 20th day of December 2002, as amended, will be applied towards the deposit under this Agreement (the "Deposit"), which shall be held by Provider and applied towards the Monthly Fee due for the last month of the Capacity Term.  If,

-4-

during the Capacity Term, Customer's Monthly Fees are late (meaning that PanAmSat has the right to charge a delinquency charge as set forth in Section 3.3) for two (2) consecutive months, then PanAmSat shall have the right to require Customer to pay to PanAmSat the Monthly Fee for two (2) additional months (the "Deposit"), which shall be held by PanAmSat and applied towards the Monthly Fee due for the last two (2) months of the Capacity Term, and if PanAmSat so requires, Customer shall pay the Deposit.

3.2    <u>Manner of Payment</u>. Except as otherwise set forth in Section 3.1, Customer shall make all payments of the Monthly Fee, in advance, no later than the first business day of each month of the Capacity Term. All payments to be made hereunder to the Provider shall be made to Contracting Provider on the Provider's behalf. Customer shall make all payments (i) in U.S. dollars without offset, deduction or withholding (except to the extent permitted in accordance with Provider's credit invoice issued in connection with Outage Credits as set forth in Section 5.2) and (ii) by bank wire transfer to such bank account as Provider may designate by notice to Customer under Appendix F or by cashier's or certified check, from a U.S. bank, delivered to Provider at such address as Provider may designate by notice to Customer. In addition, Customer shall be responsible for any and all transfer, exchange, or other similar charges. All payments shall be deemed to be made only upon the confirmation by Contracting Provider's bank receipt of Customer's wire transfer.

3.3    <u>Late Payment</u>. Any payments due from Customer and not received by Provider within five (5) days of the due date shall be subject to a delinquency charge (liquidated damages) at the rate of one and a half percent (1-1/2%) per month, or the highest rate permitted by law, if less, on such overdue amount from the due date until it is actually received by Provider. Customer acknowledges that such delinquency charge is reasonable under all the circumstances existing as of the Execution Date.

3.4    <u>Taxes</u>. Customer shall pay, and shall indemnify Provider for, any taxes, charges (including universal service fund contribution charges, if any), levies, duties, withholding, usage or other fees which may be asserted against Provider, any member of the "Provider Group" (as defined in Section 9.3), or the Customer by any local, state or national governmental entity with respect to or arising out of this Agreement, the Customer's Transponder Capacity or the use thereof, or the Monthly Fees (collectively, "Taxes"), with the exception of any U.S. or Japanese net income taxes on Provider or any member of the Provider Group. If Provider receives a notice of any Taxes, then Provider shall provide a notice to Customer within ten (10) business days after Provider's receipt of notice of assertion of any such Taxes. If Customer desires to contest the assessment of any such Taxes, then it may do so at its sole expense. Upon the request of Customer, Provider shall reasonably cooperate with Customer in contesting the assessment of any such tax, provided that Customer shall reimburse Provider for all

-5-

reasonable out-of-pocket expenses incurred in connection with such cooperation. If any Taxes are so asserted, Customer agrees to pay Provider that amount, if any, which ensures that Provider and the Provider Group receive the same amount it would have received had such Taxes not been asserted. In addition, if any Taxes are asserted with respect to the Satellite itself, the point of space that it occupies or the frequencies employed, and such Taxes are not specifically attributable to the Customer's Transponder Capacity, then Customer shall be responsible for its pro rata allocation of such Taxes as determined by Provider in its sole discretion exercised in good faith.

ARTICLE 4.    CUSTOMER'S OBLIGATIONS.

4.1    Non-interference and Use Restrictions.    Customer's transmissions to and from the Satellite and its use of the Customer's Transponder Capacity shall comply with all applicable governmental laws, rules and regulations. Customer will follow established practices and procedures for frequency coordination and will not use the Customer's Transponder Capacity, or any portion thereof, in a manner which would or could be expected to, under standard engineering practice, harm the Customer's Transponder Capacity or interfere with the use of or harm any portion of the Transponder from which the Customer's Transponder Capacity is provided that is not assigned to Customer, any other Transponder, the Satellite, or any other in-orbit satellite or transponder on such satellite. Customer shall also comply with the "Operational Requirements" set forth in Appendix C, as the same may be modified from time to time by Provider, in its reasonable discretion and on prior notice to Customer.

4.2    Terrestrial Facilities.    Customer shall be responsible for the provision, installation, operation, maintenance of, and for securing all necessary licenses and/or authorizations for all earth station facilities and equipment ("Customer-Provided Facilities"), for transmitting signals to, or receiving signals from, the Satellite in accordance with the requirements set forth in this Agreement. Any provision by Provider to Customer of earth station or other terrestrial facilities or services shall be the subject of a separate agreement. Without in any way limiting the generality of the foregoing, the parties acknowledge that Customer's Washington Media Center has a terminal (or will have a comparable connection) through which Customer can access Provider's satellite capacity scheduling system.

4.3    Customer's Transmitting Stations.    Customer will configure, equip and operate its transmit facilities so that the interface of these facilities, in outerspace, with the Satellite shall conform to the characteristics and technical parameters of the Satellite. Customer will follow Provider's procedures for initiating, or terminating any transmission to the Satellite. Customer will operate all transmit facilities in a manner that allows for cessation of, and will cease, transmission immediately upon receiving notice from Provider under Section 14.5(a) ("Telephone Notices"). Customer will furnish such information

-6-

regarding the technical parameters of its transmissions as may be required by Provider prior to commencing, during, and upon the conclusion of any transmission to the Satellite. Customer may reconfigure power and bandwidth as necessary for fixed uplink from Customer's Central Distribution Center, without contacting Provider in advance, provided that Customer's activities pursuant thereto conform with Appendix E, as such may be modified pursuant to Section 1.4 (A), Appendix B, Appendix C, and Section 4.1 of the Agreement.

Provider shall have the right, but not the obligation, to inspect any Customer-Provided Facilities together with associated facilities and equipment used by Customer, or by a third party under the authority of Customer, to transmit to any of the Customer's Transponder Capacity. Provider will use all reasonable efforts to schedule inspections to minimize the disruption of the operation of the facilities, and Customer shall make the facilities available for inspection at all reasonable times. Customer shall, upon Provider's request, provide measured proof that any transmit facility meets or exceeds the sidelobe envelope described in Appendix C.

4.4    Customer Uplink Providers.  Customer shall be permitted to contract with other parties to transmit its signals to, or receive its signals from the Satellite; provided, that Customer requires its contractors to comply with all of the requirements of this Agreement regarding transmissions to, or reception from, the Satellite. If Customer retains third parties as permitted by the previous sentence, these third parties' facilities shall be deemed to be Customer-Provided Facilities and the acts and omissions of these third parties in connection with the transmission or reception of Customer's signals shall be deemed to be the acts and omissions of such third parties and of Customer.

4.5    Third Party Use.  Without implying any right of Customer to permit any third party use of the Customer's Transponder Capacity (except as otherwise set forth in Section 10.4, below), Customer shall be responsible to Provider for any third party use or transmissions that is/are permitted by Customer to the same extent as it would be for Customer's own use or transmissions and references in this Agreement with respect to Customer's responsibilities to Provider regarding Customer's use or transmissions shall be interpreted accordingly.

ARTICLE 5. OUTAGES.

5.1    Failure of Capacity.  If, after the Commencement Date, the Customer's Transponder Capacity fails to meet the Performance Specifications for:  (a) a cumulative period of ten (10) hours during any consecutive 30-day period, or (b) any period of time following a catastrophic event under circumstances that make it clearly ascertainable that a failure described in clause (a) will occur, the

-7-

Customer's Transponder Capacity shall be deemed to have suffered a "Confirmed Failure," unless such failure is the result of circumstances specified in Sections 6.1 or 8.1, in which event the consequences of such a failure shall be governed under said Sections. Provider must confirm any such failure. If confirmed, any failure (both for purposes of this Section 5.1 and Section 5.2 below) shall be measured as commencing from the later to occur of (i) Customer's cessation of use of the affected Customer's Transponder Capacity and (ii) notice from Customer to Provider of such failure. Any such failure shall be deemed to have ended upon the earlier to occur of (x) Customer's resumption of use of the Customer's Transponder Capacity and (y) notice by Provider to Customer that the affected Customer's Transponder Capacity meets the Performance Specifications.

In the event of a Confirmed Failure of the Customer's Transponder Capacity, Provider shall, as soon as possible and to the extent technically feasible, employ certain redundant equipment units on the Satellite ("Spare Equipment") on a first-needed, first-served basis as among Customer and other Transponder owners, customers, and users, including without limitation, those who may take service via Satellite capacity provided by Provider, but who may have no direct right to access the capacity themselves, such as compressed digital channel customers ("Protected Parties"), as a substitute for an equipment unit which has failed; provided, that Provider may elect to use "Substitute Capacity" (as provided below), if available, in lieu of using Spare Equipment.

Customer acknowledges and agrees that the Spare Equipment redundancy plan of the Satellite may require Provider to reassign certain SSPAs or TWTAs, as applicable, among Transponders to make use of Spare Equipment. In circumstances in which a spare SSPA or TWTA is required to be employed for any Protected Party and to do so requires a change in the SSPA or TWTA assigned to Customer, Customer shall, on notice from Provider, immediately cease transmitting to the Satellite to allow the SSPA or TWTA that is assigned to its Transponder to be reassigned and a different unit (that meets the Performance Specifications) to be put in its place.

If: (a) the Customer's Transponder Capacity suffers a Confirmed Failure, and (b) the Spare Equipment associated with such Customer's Transponder Capacity is not available or the use of such Spare Equipment would not correct the failure, and (c) equivalent capacity on another Transponder meeting the Performance Specifications in the same Beam(s) of the Satellite as such Customer's Transponder Capacity and designated by Provider for Television Service use (the "Substitute Capacity"), is available and its use by Customer in accordance with Provider's Operational Requirements is not predicted to interfere with the use or rights of others using the Satellite, in each case as determined by Provider in its sole discretion, acting in good faith, then Provider shall, as soon as possible and to the extent technically feasible, employ such Substitute Capacity for the Customer's Transponder Capacity to

-8-

satisfy Provider's obligations under this Agreement. In the event that Provider employs such Substitute Capacity for the failed Customer's Transponder Capacity, such Substitute Capacity shall be deemed to be Customer's Transponder Capacity for all purposes under this Agreement. Any Transponder or equipment unit that is replaced by Provider under this Agreement shall cease being Customer's Transponder Capacity at the time of such replacement.

In the event that two or more Transponders on the Satellite simultaneously fail to meet their respective service or performance specifications and Spare Equipment or Substitute Capacity is available for some, but not all of the affected capacity, then the allocation of such Spare Equipment or Substitute Capacity shall be determined by Provider based upon the date on which the affected party executed a transponder purchase, capacity, lease, use or service agreement with Provider. As used in this Section 5.1, the term "simultaneously" shall be deemed to mean occurring within a 24 hour period. All determinations as to when failures requiring protection shall have occurred, for purposes of determining whether the failures are "simultaneous," shall be made by Provider in its sole discretion acting in good faith.

5.2    Outage Credits.    If for any particular month during the Capacity Term there is a Confirmed Failure of the Customer's Transponder Capacity, Provider shall credit to Customer's next payment an "Outage Credit" that shall be determined, on a Transponder by Transponder basis, (or, if applicable, by Transponder Segment) by the following formula:

Outage Credit equals:

$$\frac{N}{M} \text{ multiplied by S;}$$

Where,

N =    the number of hours (or portion thereof) during a month that there has been a Confirmed Failure of a particular Transponder (or Transponder Segment) that is part of the Customer's Transponder Capacity

M =    the number of hours in the month, and

S =    Customer's Monthly Fee, applicable to the affected Transponder (or Transponder Segment, if applicable), for said month

5.3    Performance at Particular Locations.    The city tables that are provided in the Performance Specifications of the Technical Appendix show minimum anticipated power at particular locations. In the event of a bona fide dispute regarding whether the Performance Specifications are being met, Provider will take measurements from one of its U.S. teleports or at other convenient locations

-9-

and extrapolate data for the particular city table locale. If Customer disagrees with Provider's extrapolation of data and believes that measurements need to be taken in the city referenced in the city table, if it is at all practical to do so and can be done at what the parties reasonably agree are reasonable costs, PanAmSat will (itself or through a qualified contractor) take the measurements at the referenced city locale; provided that if the measurements confirm that the Performance Specifications at issue are being met at the location, Customer shall reimburse Provider, within thirty (30) days of invoice, for all of Provider's reasonable out of pocket expenses (including third party contractor charges, if any) incurred by Provider to take such measurements. For the avoidance of doubt, the city table references are given for engineering purposes only and do not constitute a representation or warranty by Provider with respect to the existence (or lack thereof) of legal restrictions that may prevent or limit the use of the Customer's Transponder Capacity at particular locations.

5.4    <u>Customer Cooperation</u>.  If the Customer's Transponder Capacity fails to meet the Performance Specifications, Customer shall use all reasonable efforts to cooperate and aid Provider in curing such failure by modifying the terrestrial facilities so that there is no net loss in performance, in which event the Performance Specifications shall be deemed still to be met; provided, that all reasonable efforts can be made at no expense to Customer, unless reimbursed by Provider. These obligations of Customer shall include, but shall not be limited to, the following:

(a)    At the request of Provider, if there is a problem that can be compensated for by increasing the power of Customer's transmission to the Satellite, without affecting Customer's use of the Customer's Transponder Capacity, Customer shall increase the power of the transmission to the extent it can with existing equipment; and

(b)    Permitting Provider, at Provider's option, and at Provider's cost and expense, to upgrade the Customer-Provided Facilities.

5.5    <u>Application to Individual Transponders</u>.  All determinations as to Confirmed Failures, Outage Credits, and protection rights to be made under this Article 5 shall be made on an individual Transponder by Transponder (or Transponder Segment, if applicable) basis.

5.6    <u>Replacement of Satellite and/or Communications Payload</u>.  During the Capacity Term, Provider may replace the Satellite or its Ku-band communications payloads with another satellite (a "Replacement Satellite") at the same orbital location or at such other orbital location to which such Replacement Satellite may be authorized by the FCC to be located.  In such circumstances, provided there is available substantially comparable substitute capacity on the Replacement Satellite, Provider

-10-

shall provide such capacity to Customer (the "Replacement Capacity") and this Agreement shall continue with such Replacement Capacity in lieu of the capacity originally provided for the remainder of its scheduled Capacity Term. The Replacement Capacity shall be deemed substantially comparable if the performance specifications for the Replacement Capacity (the "Replacement Performance Specifications") have materially the same or better coverage and performance than the Performance Specifications. Provider shall provide an applicable Replacement Technical Appendix with Replacement Performance Specifications to Customer prior to the transfer to the Replacement Satellite. Provider shall use all reasonable efforts to minimize any disruption of operations while the Customer's Transponder Capacity is being transferred from one satellite to the other and Customer shall be entitled to Outage Credits during any period that the Customer's Transponder Capacity may be unavailable from both satellites. In the event of a replacement of Customer's Transponder Capacity under this Section, all references in this Agreement to the Satellite, Customer's Transponder Capacity, the Technical Appendix and the Performance Specifications, shall thereafter be deemed to refer to the Replacement Satellite, the Replacement Capacity, the Replacement Technical Appendix and the Replacement Performance Specifications, respectively.

-11-

## ARTICLE 6. PREEMPTIVE RIGHTS.

6.1    Preemptive Rights.  Customer recognizes that it may be necessary, if the Satellite or any component thereof, loses power, or in other unusual or abnormal technical situations, or other unforeseen conditions, for Provider deliberately to preempt or interrupt Customer's use of the Customer's Transponder Capacity, solely in order to protect the overall health and performance of the Satellite, or as otherwise necessitated by any reduction in available power.  Provider shall make such decisions in its sole discretion exercised in good faith.  To the extent technically feasible, Provider shall give Customer at least 24 hours notice of such preemption or interruption and will use all reasonable efforts to schedule and conduct its activities during periods of such preemption or interruption so as to minimize the disruption to users of the Satellite.  Customer shall immediately cease transmissions to the affected Transponder(s) at such time as Customer's Transponder Capacity is preempted or interrupted pursuant to this Section.  To the extent that such preemption results in a loss to Customer of the use of the Customer's Transponder Capacity that otherwise would be sufficient to constitute a Confirmed Failure, Customer shall have all of the rights and remedies regarding Outage Credits and termination that are set forth in Articles 5 and 7.

6.2    Testing in the Event of Customer's Transponder Capacity Failure.  If a Transponder that is part of Customer's Transponder Capacity is not meeting Performance Specifications, but Customer elects to continue to use such Customer's Transponder Capacity, as degraded, Provider may interrupt Customer's use as necessary to perform testing or take any other action that may be appropriate to attempt to restore the affected Transponder to its Performance Specifications.  In such event, Provider shall coordinate activities with affected users of the Satellite and shall use all reasonable efforts to minimize the overall disruption.  To the extent that any period of interruption results in a loss to Customer of the use of the Customer's Transponder Capacity that is sufficient to constitute a Confirmed Failure, Customer shall have all of the rights and remedies regarding Outage Credits and termination that are set forth in Articles 5 and 7.

## ARTICLE 7. TERMINATION RIGHTS.

7.1    Termination for Late Delivery.  "Late Delivery" shall mean a failure to place the Satellite in its assigned orbital location with sufficient capacity to meet Customer's requirements (Customer's Transponder Capacity) and meeting the requisite Performance Specifications prior to the date on which the satellite scheduled to be replaced is taken out of normal station-keeping mode of operation.  In the event of Late Delivery, Customer may terminate this Agreement on thirty (30) days' prior written notice to Provider (the "Notice Period"), unless within such thirty (30) days, Replacement Capacity is provided in

-12-

accordance with Section 5.6. In the event of a Late Delivery, PanAmSat shall also be permitted to terminate this Agreement on notice to Customer, if PanAmSat determines because of force majeure conditions not to proceed with the construction and launch of the Satellite.

7.2    Termination for Confirmed Failure.  If there is a Confirmed Failure of any of the Transponders (or Transponder Segments) that constitute the Customer's Transponder Capacity or, if on the Commencement Date, any of such Transponders or Transponder Segments do not meet their Performance Specifications, this Agreement shall automatically terminate as to such failed Transponder(s) or Transponder Segment(s) unless, within the Cure Period (defined below), Provider restores such capacity to the Performance Specifications including through the use of Spare Equipment or Substitute Capacity. In the event this Agreement is terminated under this Section 7.2 for all of Customer's Transponder Capacity (i.e., all such Capacity has suffered Confirmed Failure(s), without restoration as provided above), this Agreement shall terminate in its entirety. As used in this Section 7.2, the "Cure Period" means within: (i) thirty (30) days of a failure whether or not such failure was caused by a Force Majeure event that does not involve equipment failure on board an in-orbit Satellite; or (ii) any such shorter period as it may become clearly ascertainable that the restoration within the time frame permitted under clause (i) is not possible.

7.3    Taking the Satellite Out Of Commercial Operation.  This Agreement shall terminate on the date that the Satellite is taken out of commercial operation, unless Provider provides Replacement Capacity to Customer pursuant to Section 5.6. In the event that Provider plans to take the Satellite out of commercial operation, it shall give Customer not less than ninety (90) days' prior written notice thereof to the extent practicable under circumstances.

7.4    Termination by Provider for Cause.

(A)    Provider may immediately terminate this Agreement:

(I) if Customer fails to make payment of any amount due and such amount remains unpaid within thirty (30) days after receiving from Provider a notice of such nonpayment, or

(II) if Customer fails to cease any activity in violation of Sections 4.1, 6.1 or 7.5 upon receiving notice from Provider in accordance with Section 14.5(a), or

-13-

(III) if Customer fails to cease any other activity in material violation of Customer's material obligations under this Agreement within thirty (30) days after receiving from Provider a notice of such violation.

(B)    In the event that Provider terminates this Agreement for any of the reasons set forth in subsection (A) above, in addition to all of Provider's other remedies at law or in equity, Provider may declare immediately due and payable the Monthly Fees for each month that would have remained in the Capacity Term under Section 2.1 on or after the date of such termination. In the event that Customer has paid Provider the Monthly Fees for the remaining Capacity Term of this Agreement, then Provider shall use reasonable efforts to re-market Customer's Transponder Capacity to third parties, including, without limitation, one (1) end user to be referred to by Customer, and, in the event Provider subsequently reaches an agreement to provide service to a third party via the Customer's Transponder Capacity during the period Customer's Transponder Capacity otherwise would have been provided to Customer via such Transponder, PanAmSat shall remit to Customer any fees it receives from such third party with respect to such Transponder, applicable to such period, up to the Monthly Fees paid by Customer for such period for which Customer did not receive Customer's Transponder Capacity, less (i) any amounts owed by Customer to Provider under this Agreement; (ii) any costs (including reasonable attorneys' fees) incurred by Provider in attempting to collect such amounts from Customer or otherwise enforce its rights under this Agreement; (iii) any other damages incurred by Provider as a result of Customer's breach of its obligations hereunder; (iv) any costs (including reasonable attorneys' fees) incurred by Provider in marketing such Transponder to, or negotiating a capacity agreement with, third parties; and (v) any costs incurred by Provider in providing related services and equipment (not provided to Customer) that may be associated with the provision of such capacity. Nothing herein shall be deemed to require Provider to enter into such a capacity agreement if the nature of the party, the party's proposed use of the capacity or demand for terms and conditions for capacity, or other reasonable and appropriate factors, lead Provider to determine not to enter such a capacity agreement; nor shall Provider be obligated to use the capacity formerly used to provide Customer's Transponder Capacity to Customer ahead of any other capacity that PanAmSat may also have available. Customer will have the right to provide Provider with the name of one (1) end user who is interested in leasing the Customer's Transponder Capacity for the remaining Capacity Term within thirty (30) days after the date of notice of non-payment issued by PanAmSat as referred to in Section 7.4(A)(I).

In such circumstances, Provider shall be entitled to use the Customer's Transponder Capacity for whatever purpose Provider sees fit and Customer shall not be entitled to any equitable relief with respect to such use or any refund of amounts paid to Provider. Customer acknowledges that Provider's rights set

-14-

forth in this subsection (B): (i) are reasonable under all of the circumstances existing as of this date; (ii) constitute liquidated damages for the loss of a bargain; and (iii) do not constitute a penalty.

-15-

7.5     Right to Deny Access.

(A)     Provider may deny Customer's access to the Customer's Transponder Capacity in any circumstance in which Provider would have the right to terminate this Agreement for cause under Section 7.4 above; provided, that any notice that would be required for termination under Section 7.4 is also given for any such denial of access.

(B)     Customer shall cease transmissions to the Satellite upon notice of denial of access by Provider under this Section 7.5.  Provider may continue to deny Customer access under this Section 7.5 until any breach of the Agreement by Customer is cured.

(C)     If Provider prevented Customer from accessing any or all of Customer's Transponder Capacity at a time when Provider did not have the right to do so under this Section 7.5, then Customer shall be entitled to Outage Credits for the period during which access was denied, which shall be calculated in accordance with Section 5.2.  Except as provided in the preceding sentence, a denial of access made by Provider under this Section 7.5 shall not result in any Outage Credit to Customer for Monthly Fee payments, which shall continue to be due and payable.

7.6     Customer's Special Termination Right.

(A)     Customer may terminate this Agreement if Provider fails to cease any activity in material violation of Provider's material obligations under this Agreement within thirty (30) days after receiving from Customer a notice of such violation.

(B)     If, at the end of the Test Period as referred to in Section 1.4, above, both parties determine that the Throughput Parameters are not met and the parties have not agreed upon the modified Transmission Plan (as set forth in Section 1.4, above) within ten (10) days after the end of the Test Period, then Provider will provide additional capacity of up to ten (10) MHz on a Transponder with the same polarization as the Transponder on which Customer's Transponder Capacity is located on the Satellite, at no additional charge.  If, however, the Throughput Parameters are not still met with the increased capacity provided by Provider, then Customer shall have a one-time right to terminate the lease of Customer's Transponder Capacity by giving Provider a written notice to do so within thirty (30) days after the first day of the provision of the increased capacity.

7.7     Rights and Obligations upon Termination.  Upon termination of this Agreement in accordance with any of Sections 7.2, 7.3 or 7.6 above, or Section 8.1 below, Provider shall promptly

-16-

refund to Customer any portion of the Monthly Fee previously paid (including any applicable portion of the Deposit) applicable to any period after the date of such termination plus any unapplied Outage Credits to which Customer was entitled prior to termination. The termination of this Agreement for any reason shall extinguish all of Provider's obligations to provide, and Customer's obligations to accept, the Customer's Transponder Capacity, but shall not relieve either party of any obligation that may have arisen prior to such termination, including (without limitation), under Section 7.4 above, nor shall termination affect the parties' obligations under Article 9 (Limitation of Liability and Indemnification), Article 11 (Confidentiality), Article 14.1 (Applicable Law and Jurisdiction) and 14.1A (ITAR) that shall survive the termination of this Agreement.

ARTICLE 8. <u>FORCE MAJEURE</u>.

8.1    <u>Excused Conduct</u>. Other than an obligation to make payment, any failure or delay in the performance by either party shall not be a breach of this Agreement, if such failure or delay results from any Act of God, governmental action (whether in its sovereign or contractual capacity), or any other circumstance reasonably beyond the control of such party, including, but not limited to, receive earth station sun outage, meteorological or astronomical disturbances, earthquake, hurricane, snowstorm, fire, flood, strikes, labor disputes, war, civil disorder, epidemics, quarantines, embargoes, each a "Force Majeure Event." The foregoing notwithstanding, Provider shall provide Customer with Outage Credits in circumstances in which Provider is unable to perform because of force majeure conditions, with the exception of force majeure conditions that are attributable to sun outages, meteorological or astronomical disturbances. Nothing herein shall be deemed to permit Customer to transmit to the Satellite in a manner that does not comply with Customer's obligations hereunder, i.e., if a Force Majeure Event prevents compliant transmission, no transmission should be made.

ARTICLE 9. <u>LIMITATION OF LIABILITY AND INDEMNIFICATION</u>.

9.1    <u>Limitation of Provider's Liability</u>.    <u>ANY AND ALL EXPRESS AND IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PURPOSE OR USE, ARE EXPRESSLY EXCLUDED AND DISCLAIMED, EXCEPT THAT THE CERTIFICATION, IF GIVEN, BY PROVIDER UNDER SECTION 2.1, SHALL BE TRUE AS OF THE TIME THAT IT IS GIVEN. IT IS EXPRESSLY AGREED THAT PROVIDER AND EACH PROVIDER COMPANY'S SOLE OBLIGATION AND CUSTOMER'S EXCLUSIVE REMEDIES FOR ANY CAUSE WHATSOEVER ARISING OUT OF OR RELATING TO THIS AGREEMENT UNDER ANY THEORY OF LAW OR EQUITY ARE LIMITED TO THOSE SET FORTH IN SECTION 5.2, ARTICLE 7 AND SECTION 9.5 BELOW AND ALL OTHER REMEDIES, INCLUDING (WITHOUT LIMITATION) ANY</u>

-17-

THAT MIGHT OTHERWISE APPLY UNDER ANY UNIFORM COMMERCIAL CODE OF ANY KIND ARE EXPRESSLY EXCLUDED. In no event shall Horizons Satellite LLC (the "LLC"), Provider or any Provider Company be liable for any incidental or consequential damages or loss of revenues, whether foreseeable or not, occasioned by any defect in the Satellite, the Transponders or the provision of Customer's Transponder Capacity to Customer, any delay in the provision of Customer's Transponder Capacity to Customer, any failure of any of them to provide Customer's Transponder Capacity, any provision or failure to provide any engineering or tracking, telemetry and control service, or any other cause whatsoever.

9.2    Limitation of Liability of Others. Without limiting the generality of the foregoing, Customer acknowledges and agrees that it shall have no right of recovery for the satisfaction of any cause whatsoever, arising out of or relating to this Agreement, against (a) the LLC or any parent company of a Provider Company, (b) any supplier of services or equipment to Provider in connection with the construction, launch, operation, maintenance, tracking, telemetry and control of the Satellite or the Customer's Transponder Capacity, or the provision of Customer's Transponder Capacity to Customer, or (c) any officer, director, employee, agent, partner or shareholder of Provider or any Provider Company.

9.3    Indemnification. Customer shall indemnify and save harmless the "Provider Group" (defined herein to mean Provider, all Provider Companies, the LLC, and all officers, employees, agents, partners, members and shareholders of Provider, the Provider Companies and/or the LLC) from any claims, liabilities, losses, costs, or damages, including attorneys' fees and costs, arising out of (a) Customer's use of the Customer's Transponder Capacity, including any actual or alleged libel, slander, obscenity, indecency, infringement of copyright, breach in the privacy or security of transmissions; or (b) Customer's breach of its obligations under Section 4.1, 6.1, or 7.5; or (c) disputes between or among Customer and its transmission recipients or its programs or other transmission content suppliers; or (d) any warranty, representation, or statement Customer may make to a third party in connection with transmissions over the Satellite.

9.4    Limitation of Customer's Liability. In no event shall Customer be liable for any incidental or consequential damages or loss of revenues (other than for the Monthly Fees and/or Termination Fee due hereunder), whether foreseeable or not occasioned by any cause whatsoever; provided that this limitation shall not apply to Customer's obligations under Section 9.3.

9.5    Injunctive Relief. Nothing herein shall be deemed to preclude either party from seeking injunctive relief, if necessary, in order to prevent the other from willfully or intentionally breaching its

-18-

material obligations under this Agreement or to compel the other to perform its material obligations under this Agreement in the event of a willful or intentional failure to comply with this Agreement.

ARTICLE 10. SUBORDINATION AND ASSIGNMENT.

10.1    No Property Interest Created. This Agreement does not grant, and Customer shall not assert, any right, interest, or lien upon the property or assets of Provider, including in the Customer's Transponder Capacity or in any satellite or related equipment which it may own.

10.2    Subordination. Customer acknowledges and agrees that Provider may grant security interests in the Transponders and/or the Satellite to other parties, subject to the secured party's agreement to grant quiet enjoyment in accordance with provisions that are substantially similar to those set forth in Appendix D.

10.3    Provider's Right to Assign. Customer agrees that Provider may assign its rights and interests under this Agreement and to the Satellite and any or all sums due or to become due under this Agreement to an assignee for any reason. Customer agrees that upon receipt of notice from Provider of such assignment, Customer shall perform all of its obligations directly for the benefit of the assignee and shall pay all sums due or to become due directly to the assignee, if so directed. Upon receipt of notice of such assignment, Customer agrees to execute and deliver to Provider such documentation as assignee may reasonably require from Provider. As used in this Section 10.3, assign shall mean to grant, sell, assign, encumber or otherwise convey directly or indirectly, in whole or in part.

10.4    Customer Assignment.

10.4A    Customer Assignment. Customer may assign its rights and interests under this Agreement, only in whole, and only after securing Provider's express prior written consent, which consent shall not be unreasonably withheld or conditioned. The foregoing notwithstanding, Customer may on notice to Provider assign its rights and interests under this Agreement, in whole, to (a) to an entity "controlling", "controlled" by, or under "common control" with Tribune Broadcasting Company or (b) to an entity that is acquiring all or substantially all of Tribune Broadcasting Company's assets, by merger or otherwise, in either case subject also to the following conditions:  (i) the proposed assignee in writing assumes all of Customer's obligations with respect to this Agreement and agrees to be treated as Customer for all purposes under this Agreement; and (ii) such written undertaking is delivered to Provider prior to or contemporaneously with the assignment. Upon receipt of notice of such assignment, Provider agrees to execute and deliver to Customer such documentation as assignee may reasonably require from

-19-

Customer. As used in this Section 10.4A and elsewhere in this Agreement, "control" shall mean with respect to any entity, the ownership, directly or indirectly, of twenty-five percent (25%) or more of the equity interests of such entity.

10.4B.  Sublease Rights.

Subject to the conditions stated herein, Customer shall be permitted to sublease Customer's Transponder Capacity on a full-time basis (i.e., 24 hours per day, seven days a week) for all or any part of the balance of the Capacity Term as follows:

(i)    Sublease Rights.  Customer may sublease all or any portion of its Customer Transponder Capacity, to an entity "controlling", "controlled" by, or under "common control" with Customer (any such entity, a "Customer Affiliate") or any other entity on a one-time, part-time or occasional basis: except to resellers of satellite services and other satellite operators, provided that the proposed sublessee consents to all of the terms of this Agreement.

(ii)    General Rights and Obligations.  Customer shall be responsible to Provider for any third party or affiliate use or transmission that is permitted by Customer to the same extent as it would be for Customer's own use or transmissions and references in this Agreement with respect to Customer's responsibilities to Provider regarding Customer's use or transmissions shall be interpreted accordingly. Customer shall require sublessees to comply with all restrictions of this Agreement regarding use of the capacity and shall make Provider an express third party beneficiary entitled to enforce such restrictions. In no event shall any sublease diminish Provider's rights or expand Provider's obligations hereunder.  No sublessee shall be deemed to be a third party beneficiary of this Agreement nor shall any sublessee have any right of action whatsoever against Provider in any way related to its sublease or this Agreement, and shall so acknowledge in its agreement with Customer to which Provider shall be a third party beneficiary. Without in any respect limiting Provider's rights and remedies against Customer, Provider shall also, jointly and severally, have all rights and remedies available to it against such a sublessee as Provider has against Customer to enforce Provider's rights under Article 4 hereto.  Customer will pay to Provider all reasonable out-of-pocket expenses (including reasonable attorney's fees) incurred in connection with Provider's enforcement against any sublessee and/or Customer arising out of any sublessee's use of a portion of Customer's Transponder Capacity under a sublease.

10.5    Successors.  Subject to all the provisions concerning assignments, above, this Agreement shall be binding on and shall inure to the benefit of any successors and assigns of the parties; provided, that no assignment of this Agreement shall relieve either party of its obligations to the other

-20-

party. Any purported assignment by either party not in compliance with the provisions of this Agreement shall be null and void and of no force and effect.

10.6    No Resale. The Customer's Transponder Capacity is provided for Customer's own use and in no event shall Customer be permitted to resell in any manner the Customer's Transponder Capacity, in whole or in part, to any other person or entity, except as expressly provided under Sections 1.3 and 10.4 of this Agreement.

ARTICLE 11. CONFIDENTIALITY.

11.1    Non-disclosure. Provider and Customer shall hold in confidence the information contained in or exchanged in connection with this Agreement. Notwithstanding the foregoing, disclosure, on a confidential basis, by either party is permitted: (a) (a) to its principals, auditors, attorneys, investors, lenders, insurance agents, and proposed and actual assignees and successors in interest, (b) to the Provider Companies and its and their principals, auditors, attorneys, investors, lenders, insurance agents, and proposed and actual successors in interest and (b) to comply with law and enforce its rights and perform its obligations under this Agreement.

ARTICLE 12. REPRESENTATIONS, WARRANTIES AND COVENANTS.

Subject to the understanding that certain applications may be pending or subsequently filed by Provider, the Provider Companies, or the LLC with the FCC, Provider and Customer each represents and warrants to, and agrees with, the other that:

12.1    Authority. It has the right, power and authority to enter into and perform its obligations under this Agreement.

12.2    Partnership and Corporate Approvals. It has taken all requisite partnership or corporate action, as applicable, to approve execution, delivery and performance of this Agreement, and this Agreement constitutes a legal, valid and binding obligation upon itself.

12.3    Consents. The fulfillment of its obligations and conduct hereunder will not constitute a material violation of any existing applicable law, rule, regulation or order of any governmental authority, or contract to which it is subject. All public or private consents, permissions, agreements, licenses or authorizations necessary for the performance of its obligations under this Agreement to which it is subject have been obtained, or it will itself and/or it shall cause the LLC to use all reasonable efforts to obtain, in

-21-

a timely manner. Provider shall itself and/or it shall cause the LLC to use all reasonable efforts to obtain and maintain all necessary U.S. governmental authorizations or permissions to operate the Satellite within plus or minus one degree of the assigned orbital location and to comply in all material respects with all FCC, and other U.S. (and, to the extent that it may be required under its U.S. authorizations, other) governmental regulations regarding the operation of the Satellite.

12.4     No Broker.   It does not know of any broker, finder or intermediary involved in connection with the negotiations and discussions incident to the execution of this Agreement, or of any broker, finder or intermediary who might be entitled to a fee or commission upon the consummation of the transactions contemplated by this Agreement.

12.5     Relationship of Provider and the LLC.   Provider's agreement with the LLC gives Provider all of the rights and authority to the Customer's Transponder Capacity and the other elements of the Satellite necessary for their operation that are required for Provider to perform its obligations to Customer under this Agreement.

ARTICLE 13. REPRESENTATION AND WARRANTY OF CONTRACTING PROVIDER.

13.1     Signing Authority.   Contracting Provider represents and warrants to Customer that Contracting Provider has the power to enter into this Agreement on behalf of the Provider.

ARTICLE 14. MISCELLANEOUS.

14.1     Applicable Law, Entire Agreement and Effectiveness.   This Agreement shall be interpreted according to the laws of the State of New York, U.S.A. and, where applicable, subject to compliance with the laws, rules and regulations of the United States and Japan, including, without limitation, those of the FCC and those governing communications, exports and re-exports, and any action or proceeding arising out of this Agreement shall be brought and maintained in New York, without regard to any conflict of law provisions. Customer consents to the jurisdiction of courts located in New York and agrees that service of process in any action or proceeding shall be deemed sufficient if mailed, first class, postage prepaid, to Customer at the address set forth in Section 14.5(b), as the same may be changed in accordance with that Section. This Agreement constitutes the entire agreement between the parties and supersedes any and all prior or contemporaneous statements, understandings, writings, commitments, or representations concerning its subject matter. This Agreement may not be amended or modified in any way, and none of its provisions may be waived, except by a prior writing signed by an authorized officer

-22-

of each party. This Agreement shall not be binding or effective on any party until fully executed by both parties hereto.

14.1A    U.S. International Traffic in Arms Regulations ("ITAR")- U.S. Export Control Restrictions. Notwithstanding anything in the Agreement to the contrary: (a) the parties acknowledge and agree that if (i) Customer is a "Foreign Person or Entity" (as defined below), (ii) this Agreement is assigned by Customer to a "Foreign Person or Entity" (as defined below) or (iii) Customer otherwise requests that Provider provide information to a Foreign Person or Entity (as Customer shall disclose in its request, to the best of its knowledge), Provider's disclosure of information under the Agreement shall be subject to compliance with the laws, rules and regulations of the United States regarding export restrictions ("U.S. Export Laws"), and that such U.S. Export Laws may prohibit, limit or delay Provider's ability to disclose information as otherwise required under this Agreement; and (b) to the extent that any information disclosed by Provider to Customer under the Agreement is subject to U.S. Export Laws (including, without limitation, the International Traffic in Arms Regulations, 22 CFR §§ 120-130 ("ITAR")), Customer shall handle such information in compliance with the applicable U.S. Export Laws and shall not disclose, transfer or otherwise export (as defined in ITAR § 120.17) such information to any foreign individual (including employees of Customer), foreign corporation (including subsidiaries or affiliates of Customer), foreign government or other foreign person (as defined in ITAR § 120.16), collectively herein, a "Foreign Person or Entity," except as authorized by the applicable U.S. Export Control Law or by written authorization of the U.S. government. This Section shall survive the termination of the Agreement for any reason.

14.2    Severability. Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law. If any provision of this Agreement shall be invalid or unenforceable, the provisions of this Agreement so affected shall be curtailed and limited only to the extent necessary to permit compliance with the minimum legal requirements.

14.3    No Third Party Beneficiary. The provisions of this Agreement are for the benefit only of Customer and Provider, and, except as may be provided under Appendix D and Section 10.2, no third party may seek to enforce or benefit from these provisions, except that both parties acknowledge and agree that the non-interference requirements of Section 4.1 are intended for the benefit of both Provider and all other Protected Parties, and that the provisions of Article 9 are intended for the benefit of the Provider Group and that such intended beneficiaries may separately, or in addition to the parties hereto, seek to enforce such provisions.

-23-

14.4    <u>Non-Waiver of Breach</u>.    Either party may specifically waive any breach of this Agreement by the other party; provided, that no such waiver shall be binding or effective unless in writing and signed by an officer of the party to be bound and no such waiver shall constitute a continuing waiver of similar or other breaches.    A waiving party may at any time, upon notice given in writing to the breaching party, direct future compliance with the waived term or terms of this Agreement, in which event the breaching party shall comply as directed from such time forward.

14.5    <u>Notices</u>.

(a)    <u>Telephone Notices</u>.    For the purpose of receiving notices from Provider regarding preemption, interference or other technical problems, including with respect to Transponder failure and restoration, Customer shall maintain at each earth station transmitting signals to the Satellite a telephone that is continuously staffed at all times during which Customer is transmitting signals to the Satellite and an automatic facsimile machine in operation and capable of receiving messages from Provider at all times. <u>THOSE PERSONS STAFFING THE EARTH STATION, FOR THE PURPOSES OF RECEIVING SUCH MESSAGES FROM PROVIDER, MUST HAVE THE TECHNICAL CAPABILITY AND ABSOLUTE AUTHORITY IMMEDIATELY TO TERMINATE OR MODIFY THE TRANSMISSION IF NOTIFIED BY PROVIDER.</u> Provider shall also maintain a telephone that is continuously staffed for the purposes of receiving notices regarding the matters identified above.  All such notices shall be made in English and shall be effective upon the placement of a telephone call from one party to the other.  Each party shall promptly confirm all telephone notices that may be given under this Agreement in writing in accordance with Section 14.5(b) below.

(b)    <u>General Notices</u>.  All notices and other communications from either party to the other, except as otherwise stated in this Agreement, shall be in English writing and shall be deemed received upon actual delivery or completed facsimile addressed to the other party as follows:

<u>To Provider:</u>

|  |  |  |
|---|---|---|
| If by mail or by personal delivery to its principal place of business: | c/o PanAmSat Corporation 20 Westport Road Wilton, Connecticut 06897 USA | |
| | Attention: | General Counsel |
| If by facsimile: | Facsimile: | 203-210-8683 |
| | Telephone: | 203-210-8000 |
| | Attention: | General Counsel |

<u>With a copy to:</u>

-24-

|  | c/o JSAT Corporation<br>Toranomon 17 Mori<br>Building 6F |
|---|---|
| If by mail or by personal delivery to its principal place of business: | 1-26-5 Toranomon, Minato-ku<br>Tokyo 105-0001<br>JAPAN |

| | |
|---|---|
| | Attention: Mr. Toru Mizoguchi, General Manager, International Business Development |

| If by facsimile: | Facsimile:  011-81-3-5512-7888 |
|---|---|
| | Telephone: 011-81-3-5511-7634 |
| | Attention: Mr. Toru Mizoguchi, General Manager, International Business Development |

**To Customer:**

| If by mail or by personal delivery to its principal place of business: | 5800 Sunset Blvd<br>Los Angeles, CA 90028<br>Attention:   Ira Goldstone |
|---|---|

| If by facsimile: | Facsimile:  312-527-8535 |
|---|---|
| | Telephone: 323-460-3987 |
| | Attention:  Ira Goldstone |

**With a copy to:**

| If by mail or by personal delivery to its principal place of business: | Tribune Company<br>Law Department<br>435 North Michigan Avenue,<br>Suite 600<br>Chicago, Illinois 60611<br>Attention:   General Counsel |
|---|---|

| If by facsimile: | Facsimile:  312-222-4206 |
|---|---|
| | Telephone: 312-222-4565 |
| | Attention:  General Counsel |

| If by mail or by personal delivery to its principal place of business: | Tribune Broadcasting Company<br>1325 G. Street NW,<br>Suite 200<br>Washington, DC 20005<br>Attention:   Cissy Baker, Bureau Chief |
|---|---|

| If by facsimile: | Facsimile:  202-824-8333 |
|---|---|
| | Telephone: 202-824-8251 |
| | Attention:  Cissy Baker, Bureau Chief |

-25-

Each party will advise the other of any change in the address, designated representative or telephone or facsimile number.

14.6    Headings.  The descriptive headings of the Articles and Sections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

14.7    Documents.  Each party agrees to provide information and to execute, and, if necessary, to file with the appropriate governmental entities and international organizations, such documents as the other party shall reasonably request in order to carry out the purposes of this Agreement.

14.8    Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute but one and the same instrument.

ARTICLE 15.    Additional Transponder Capacity.  During the Capacity Term and subject to availability as determined by Provider in its sole discretion, Customer shall have the right to request to lease from Provider additional transponder capacity of six (6) MHz Ku-band transponder segment on the Satellite.  If Provider determines that such additional capacity is available, then the use of such additional transponder shall be at the monthly rate of $16,667 per month.  The use of such Ku-Band capacity shall be made available to Customer via a separate amendment to this Agreement.  Customer agrees and acknowledges that such additional transponder capacity, if provided by Provider, may be located on a Transponder different than the Transponder on which the Customer's Transponder is located.

ARTICLE 16.    CONDITION PRECEDENT.  The parties agree that the effectiveness of this Agreement shall be subject to a condition precedent that Customer and PanAmSat shall have executed that certain Third Amendment to the Full-Time Transponder Capacity Agreement for SBS-6 dated December 20, 2002 covering the extension of the capacity term and the provision of certain Ku-band backup protection from Galaxy XR.

-26-

Each of the parties has duly executed and delivered this Agreement as of the Execution Date.

TRIBUNE BROADCASTING COMPANY

By: _____

Name: _Ira Goldstone_____

Title: _CTO Tribune Broadcasting Company_

PANAMSAT CORPORATION

By: _____

Name: _MICHAEL ANTONOVICH_

Title: _EVP, GLOBAL SALES & MARKETING_

and    June 30, 2006

By: _____

Name: _MIKE INGLESE_____

Title: _EVP CFO_____

June 30, 2006

On behalf of PANAMSAT CORPORATION AND JSAT
INTERNATIONAL INC. AS THE PROVIDERS OF THE
KU-BAND PAYLOAD OF THE SATELLITE

LB#189923 – FINAL-Tribune H2 TCA                    DAS/ACK – 6/29/06

## LIST OF APPENDICES

A.  Customer's Transponder Capacity and Payment Schedule

B.  Technical Appendix

C.  Operational Requirements

D.  Sample Subordination Provision

E.  Transmission Plan

F.  Plan Wire Transfer Instructions

APPENDIX A

CUSTOMER'S TRANSPONDER CAPACITY AND PAYMENT SCHEDULE FOR

TRIBUNE BROADCASTING COMPANY

| Satellite | Band | MHz | Downlink Beam | Monthly Fee Per Transponder (or Transponder Segment) |
|-----------|------|-----|---------------|------------------------------------------------------|
| Horizons 2 | Ku | 36 | CONUS | US$100,000 |

APPENDIX D

SAMPLE SUBORDINATION PROVISION

## SUBORDINATION TO [SECURED PARTY]

Subordination. Customer hereby acknowledges that this Agreement and all rights granted to Customer hereunder are subject and subordinate to a security interest and lien in favor of **[Secured Party]**, as same may be assigned, (the "Interest") in and to **[the Customer's Transponder Capacity and /or the Satellite]** (and/or the proceeds from the sale or other disposition of all or any portion thereof, or any insurance that may be received by Provider as a result of any loss or destruction of, or damage to, **[the Customer's Transponder Capacity and/or the Satellite]**) and to all renewals, modifications, consolidations, replacements and extensions of any security agreement, mortgage or other document reflecting any such Interest arising under that certain **[Security Agreement]** by and between Provider and **[Secured Party]**; provided, that the holder of such Interest agrees that, so long as (i) Customer is not in default under the terms and conditions of this Agreement, as to which any applicable cure period stated in this Agreement has expired, (ii) Customer shall not pay any of its obligations under this Agreement (other than a deposit) more than thirty (30) days prior their scheduled payment date under this Agreement, (iii) after receipt of notice from the holder of the Interest of a default by Provider under the agreement providing for the Interest, this **[Agreement]** shall not be supplemented, amended or extended (except by its terms with respect to specified extension periods) or otherwise modified in any manner and (iv) after receipt of notice from the holder of the Interest of a default by Provider under the agreement providing for the Interest, Customer agrees to make and makes all payments thereafter as instructed by the holder of the Interest; and (v) this subordination provision is not amended; Customer shall continue to have the benefits of this Agreement notwithstanding any default on the part of Provider under the agreement providing for such Interest. This clause shall be self-operative and no further instruction of subordination shall be required by any security agreement, mortgage or other document reflecting such Interest to make this subordination effective. In confirmation of such acknowledged subordination, Customer shall execute promptly any instrument or certificate which Provider or the holder of such an Interest may reasonably request.

### TRANSMISSION PLAN

Table XX.1 5 MHz 8PSK DVB-S2 carrier
REFERENCE TRANSMISSION PARAMETERS for 5 MHz Multi-carrier 8PSK DVB-S2 loading

| Parameter | Carrier Type** | |
|---|---|---|
| | 8PSK (1 carrier) | QPSK (1 of 6 carriers) |
| Information Rate, kbps | 10584 | 4024 |
| Forward Error Correction | R8/9, DVB-S2 | R3/4, DVB-S1 |
| Symbol Rate, msps | 4.0 | 3.7 |
| Filter Rolloff | 1.25 | 1.35 |
| Allocated Bandwidth, MHz | 5.0 | 5.0 |
| EIRP per carrier toward Beam Center, dBW | 40.9* | 36.8* |
| Rx Earth Station Saturated EIRP Contour, dBW | 50.6 | 48.9 |
| Rx Earth Station min Antenna Diameter, M | 3.7 | 3.7 |
| Rx Earth Station min G/T, dB/K | 30 | 30 |
| Rx Earth Station threshold C/N, dB | 10.5 | 5.86 |
| Tx Earth Station G/T contour, dB/K | 4.9 | 5.2 |
| Tx Earth Station min Antenna diameter, M | 4.6 | 1.8 |
| | | |

*for 30/70 pwr split (30%pwr for single 8PSK carrier,
70% pwr for total of six QPSK carriers) Composite OBO = 4.8 dB
OBO may vary based on actual transponder performance in order to achieve desired C/N

** Carrier loading is multi-carrier, 7 total carriers (one 8PSK carrier at low freq
end of transponder, 6 identical QPSK carriers in remaining transponder Bandwidth)

-2-

Table XX.2 10 MHz 8PSK DVB-S2 carrier
REFERENCE TRANSMISSION PARAMETERS for 10 MHz Multi-carrier 8PSK DVB-S2 loading

| Parameter | Carrier Type** | |
|---|---|---|
| | 8PSK (1 carrier) | QPSK (1 of 5 carriers) |
| Information Rate, kbps | 21168 | 4024 |
| Forward Error Correction | R8/9, DVB-S2 | R3/4, DVB-S1 |
| Symbol Rate, msps | 8.0 | 3.7 |
| Filter Rolloff | 1.25 | 1.35 |
| Allocated Bandwidth, MHz | 10.0 | 5.0 |
| EIRP per carrier toward Beam Center, dBW | 43.8* | 35.3* |
| Rx Earth Station Saturated EIRP Contour, dBW | 50.6 | 48.9 |
| Rx Earth Station min Antenna Diameter, M | 3.7 | 3.7 |
| Rx Earth Station min G/T, dB/K | 30 | 30 |
| Rx Earth Station threshold C/N, dB | 10.5 | 5.86 |
| Tx Earth Station G/T contour, dB/K | 4.9 | 5.2 |
| Tx Earth Station min Antenna diameter, M | 4.6 | 1.8 |
| | | |

*for 59/41 pwr split (59%pwr for single 8PSK carrier,
41% pwr for total of five QPSK carriers) Composite OBO = 4.8 dB
OBO may vary based on actual transponder performance in order to achieve desired C/N

** Carrier loading is multi-carrier, 6 total carriers (one 8PSK carrier at low freq
end of transponder, 5 identical QPSK carriers in remaining transponder Bandwidth)

-3-

Table XX.3 15 MHz 8PSK DVB-S2 carrier
REFERENCE TRANSMISSION PARAMETERS for 15 MHz Multi-carrier 8PSK DVB-S2 loading

| Parameter | Carrier Type** | |
|---|---|---|
| | 8PSK (1 carrier) | QPSK (1 of 4 carriers) |
| Information Rate, kbps | 31752 | 4024 |
| Forward Error Correction | R8/9, DVB-S2 | R3/4, DVB-S1 |
| Symbol Rate, msps | 12.0 | 3.7 |
| Filter Rolloff | 1.25 | 1.35 |
| Allocated Bandwidth, MHz | 15.0 | 5.0 |
| EIRP per carrier toward Beam Center, dBW | 44.8* | 34.1* |
| Rx Earth Station Saturated EIRP Contour, dBW | 50.6 | 48.9 |
| Rx Earth Station min Antenna Diameter, M | 3.7 | 3.7 |
| Rx Earth Station min G/T, dB/K | 30 | 30 |
| Rx Earth Station threshold C/N, dB | 10.5 | 5.86 |
| Tx Earth Station G/T contour, dB/K | 4.9 | 5.2 |
| Tx Earth Station min Antenna diameter, M | 4.6 | 1.8 |
| | | |

*for 75/25 pwr split (75%pwr for single 8PSK carrier,
25% pwr for total of four QPSK carriers) Composite OBO = 4.8 dB
OBO may vary based on actual transponder performance in order to achieve desired C/N

** Carrier loading is multi-carrier, 5 total carriers (one 8PSK carrier at low freq
end of transponder, 4 identical QPSK carriers in remaining transponder Bandwidth)

-4-

Table XX.4 20 MHz 8PSK DVB-S2 carrier
REFERENCE TRANSMISSION PARAMETERS for 20 MHz Multi-carrier 8PSK DVB-S2 loading

| Parameter | Carrier Type** | |
|---|---|---|
| | 8PSK (1 carrier) | QPSK (1 of 3 carriers) |
| Information Rate, kbps | 42336 | 4024 |
| Forward Error Correction | R8/9, DVB-S2 | R3/4, DVB-S1 |
| Symbol Rate, msps | 16.0 | 3.7 |
| Filter Rolloff | 1.25 | 1.35 |
| Allocated Bandwidth, MHz | 20.0 | 5.0 |
| EIRP per carrier toward Beam Center, dBW | 44.7* | 35.6* |
| Rx Earth Station Saturated EIRP Contour, dBW | 50.6 | 48.9 |
| Rx Earth Station min Antenna Diameter, M | 3.7 | 3.7 |
| Rx Earth Station min G/T, dB/K | 30 | 30 |
| Rx Earth Station threshold C/N, dB | 10.5 | 5.86 |
| Tx Earth Station G/T contour, dB/K | 4.9 | 5.2 |
| Tx Earth Station min Antenna diameter, M | 4.6 | 1.8 |
| | | |

*for 73/27 pwr split (73%pwr for single 8PSK carrier,
27% pwr for total of three QPSK carriers) Composite OBO = 4.8 dB
OBO may vary based on actual transponder performance in order to achieve desired C/N

** Carrier loading is multi-carrier, 4 total carriers (one 8PSK carrier at low freq
end of transponder, 3 identical QPSK carriers in remaining transponder Bandwidth)

-5-

Table XX.5 25 MHz 8PSK DVB-S2 carrier
REFERENCE TRANSMISSION PARAMETERS for 25 MHz Multi-carrier 8PSK DVB-S2 loading

| Parameter | Carrier Type** | |
|---|---|---|
| | 8PSK (1 carrier) | QPSK (1 of 2 carriers) |
| Information Rate, kbps | 52920 | 4024 |
| Forward Error Correction | R8/9, DVB-S2 | R3/4, DVB-S1 |
| Symbol Rate, msps | 20.0 | 3.7 |
| Filter Rolloff | 1.25 | 1.35 |
| Allocated Bandwidth, MHz | 25.0 | 5.0 |
| EIRP per carrier toward Beam Center, dBW | 45.3* | 35.4* |
| Rx Earth Station Saturated EIRP Contour, dBW | 50.6 | 48.9 |
| Rx Earth Station min Antenna Diameter, M | 3.7 | 3.7 |
| Rx Earth Station min G/T, dB/K | 30 | 30 |
| Rx Earth Station threshold C/N, dB | 10.5 | 5.86 |
| Tx Earth Station G/T contour, dB/K | 4.9 | 5.2 |
| Tx Earth Station min Antenna diameter, M | 4.6 | 1.8 |
| | | |

*for 83/17 pwr split (83%pwr for single 8PSK carrier,
17% pwr for total of two QPSK carriers) Composite OBO = 4.8 dB
OBO may vary based on actual transponder performance in order to achieve desired C/N

** Carrier loading is multi-carrier, 3 total carriers (one 8PSK carrier at low freq
end of transponder, 2 identical QPSK carriers in remaining transponder Bandwidth)

-6-

Table XX.6 30 MHz 8PSK DVB-S2 carrier
REFERENCE TRANSMISSION PARAMETERS for 30 MHz Multi-carrier 8PSK DVB-S2 loading

| Parameter | Carrier Type** | |
|---|---|---|
| | 8PSK (1 carrier) | QPSK (1 of 1 carriers) |
| Information Rate, kbps | 63504 | 4024 |
| Forward Error Correction | R8/9, DVB-S2 | R3/4, DVB-S1 |
| Symbol Rate, msps | 24.0 | 3.7 |
| Filter Rolloff | 1.25 | 1.35 |
| Allocated Bandwidth, MHz | 30.0 | 5.0 |
| EIRP per carrier toward Beam Center, dBW | 45.7* | 35.3* |
| Rx Earth Station Saturated EIRP Contour, dBW | 50.6 | 48.9 |
| Rx Earth Station min Antenna Diameter, M | 3.7 | 3.7 |
| Rx Earth Station min G/T, dB/K | 30 | 30 |
| Rx Earth Station threshold C/N, dB | 10.5 | 5.86 |
| Tx Earth Station G/T contour, dB/K | 4.9 | 5.2 |
| Tx Earth Station min Antenna diameter, M | 4.6 | 1.8 |
| | | |

*for 92/8 pwr split (92%pwr for single 8PSK carrier,
8% pwr for one QPSK carrier) Composite OBO = 4.8 dB
OBO may vary based on actual transponder performance in order to achieve desired C/N

** Carrier loading is multi-carrier, 2 total carriers (one 8PSK carrier at low freq
end of transponder, one QPSK carrier in remaining transponder Bandwidth)

-7-

Table XX.7 36 MHz 8PSK DVB-S2 carrier
REFERENCE TRANSMISSION PARAMETERS for 36 MHz Single carrier 8PSK DVB-S2 loading

| Parameter | Carrier Type**<br>8PSK (1 carrier) |
|---|---|
| Information Rate, kbps | 76204 |
| Forward Error Correction | R8/9, DVB-S2 |
| Symbol Rate, msps | 28.8 |
| Filter Rolloff | 1.25 |
| Allocated Bandwidth, MHz | 36.0 |
| EIRP per carrier toward Beam Center, dBW | 50.4 |
| Rx Earth Station Saturated EIRP Contour, dBW | 50.6 |
| Rx Earth Station min Antenna Diameter, M | 3.7 |
| Rx Earth Station min G/T, dB/K | 30 |
| Rx Earth Station threshold C/N, dB | 12.4 |
| Tx Earth Station G/T contour, dB/K | 4.9 |
| Tx Earth Station min Antenna diameter, M | 4.6 |
| | |

OBO may vary based on actual transponder performance in order to achieve desired C/N

** Carrier loading is single carrier at 0.5 dB OBO
(one 36 MHz 8PSK)

-8-

APPENDIX F
<u>WIRE TRANSFER INSTRUCTIONS</u>

| | |
|---|---|
| Bank: | Citibank, N.A. |
| Address: | 111 Wall Street |
| | New York, NY |
| ABA#: | 021000089 |
| FBO: | PanAmSat Corporation |
| Account #: | 40778407 |