1

UNITED STATES BANKRUPTCY COURT

DELAWARE DISTRICT OF DELAWARE

Case No. 08-13141

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


TRIBUNE COMPANY, ET AL.,


       Debtors.


- - - - - - - - - - - - - - - - - - - -x


         U.S. Bankruptcy Court

         824 Market Street

         Wilmington, Delaware


         February 3, 2009

         10:07 AM


B E F O R E:

HON. KEVIN J. CAREY

U.S. BANKRUPTCY JUDGE

2

1

2   Hearing re:  Application for an Order Authorizing the Debtors

3   and Debtors in Possession to Employ and Retain Paul, Hastings,

4   Janofsky & Walker LLP as Special Counsel for General Real

5   Estate and Related Matters

6

7   Hearing re: Application for an Order Authorizing Debtors and

8   Debtors in Possession to Employ and Retain Reed Smith LLP as

9   Special Counsel for Certain Litigation Matters Pursuant

10

11  Hearing re:  Application for an Order Authorizing the

12  Employment and Retention of Cole, Schotz, Meisel, Forman &

13  Leonard, P.A. as Co-Counsel to the

14

15  Hearing re:  Debtors' Motion for an Order Authorizing the

16  Debtors to (I) Implement a Severance Policy for Non-Union

17  Employees and (II) Continue Severance Arrangements in

18  Accordance with Collective Bargaining Agreements

19

20  Hearing re:  Motion of the Debtors for an Order Authorizing,

21  but not Requiring, the Debtors to Pay Prepetition Amounts Under

22  Non-Insider Incentive Programs

23

24

25

3

1

2   Hearing re:  The Official Committee of Unsecured Creditors'

3   Motion to Limit Creditor Access to Confidential and Privileged

4   Information Nunc Pro Tunc to the Formation Date and to

5   Establish Related Procedures.

6

7   Hearing re:  Motion of Debtor KPLR, Inc. for an Order

8   Authorizing Entry into a Postpetition Local Marketing Agreement

9   with Community Television of Missouri

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Hana Copperman

25

4

1

2    A P P E A R A N C E S :

3    NORMAN PERNICK, ESQ.

4    COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, PA

5    REPRESENTING:  Debtors

6

7    KEVIN LANTRY, ESQ.

8    BRYAN KRAKAUER, ESQ. (BY TELEPHONE)

9    SIDLEY AUSTIN LLP

10   REPRESENTING:  Debtors

11

12   DON LIEBENTRITT, ESQ. (BY TELEPHONE)

13   DAVE ELDERSVELD, ESQ. (BY TELEPHONE)

14   NILS LARSEN (BY TELEPHONE)

15   CHANDLER BIGELOW (BY TELEPHONE)

16   TRIBUNE COMPANY

17   REPRESENTING:  Debtors

18

19   DAVID LEMAY, ESQ.

20   CHADBOURNE & PARKE LLP

21   REPRESENTING:  Creditors' Committee

22

23   ADAM LANDIS, ESQ.

24   LANDIS RATH & COBB LLP

25   REPRESENTING:  Creditors' Committee

5

1
2   JOSEPH MCMAHON, ESQ.
3   OFFICE OF THE UNITED STATES TRUSTEE
4   UNITED STATES TRUSTEE
5
6   ADAM HILLER, ESQ.
7   DRAPER & GOLDBERG, PLLC
8   REPRESENTING:  Retiree Claimants
9
10   JAY TEITELBAUM, ESQ.
11   TEITELBAUM & BASKIN, LLP
12   REPRESENTING:  Retiree Claimants
13
14   DONALD L. GOUGE, ESQ.
15   HEIMAN, GOUGE & KAUFMAN, LLP
16   REPRESENTING:  International Brotherhood of Electrical Workers
17   AFL-CIO Local 4, St. Louis
18
19   LAURA J. EISELE, ESQ. (BY TELEPHONE)
20   ALIXPARTNERS, LLC
21   REPRESENTING:  AlixPartners, LLC
22
23   ANNA KALENCHITS (BY TELEPHONE)
24   ANNA KALENCHITS
25   REPRESENTING:  ANNA KALENCHITS

6

```
 1
 2    DOUGLAS H. MANNAL, ESQ. (BY TELEPHONE)
 3    JENNIFER SHARRET, ESQ. (BY TELEPHONE)
 4    KRAMER LEVIN NAFTALIS & FRANKEL, LLP
 5    REPRESENTING:  Kramer Levin Naftalis & Frankel, LLP
 6
 7    JUSTIN GORDON, (BY TELEPHONE)
 8    CERBERUS CALIFORNIA
 9    REPRESENTING:  Cerberus California
10
11    PATRICIA SMOOTS, ESQ. (BY TELEPHONE)
12    MCGUIREWOODS LLP
13    REPRESENTING:  Nielsen Co.
14
15    PEG BRICKLEY (BY TELEPHONE)
16    DOW JONES NEWS WIRES
17    REPRESENTING:  Dow Jones News Wires
18
19    ZACHARY LEWIS (BY TELEPHONE)
20    ZACHARY LEWIS IN PROPRIA PERSONA
21    REPRESENTING:  Zachary Lewis in Propria Persona
22
23
24
25
```

7

          P R O C E E D I N G S

1       THE CLERK:  All rise.  Be seated, please.

2       THE COURT:  Good morning, all.

3       ALL:  Good morning, Your Honor.

4       MR. PERNICK:  Your Honor, Norm Pernick on behalf of

5  the debtors, Tribune companies.  And I thought what I might do

6  is just run through the agenda real quick.  There have been a

7  couple of changes to the good, just to make sure that we clear

8  out what's going forward today, what's continued and some other

9  things that have been resolved.  I have as continued to

10 February 20th number 1, which is cash management, number 2,

11 which is the Sidley retention, number 3, which is the McDermott

12 Will retention, number 4, which is the Lazard retention, number

13 5, the extension of time to file the Rule 2015.3 information,

14 and new addition number 9, which is the Jenner & Block

15 retention, number 18, which is the Landis Rath & Cobb

16 retention, 19, which is Chadbourne & Parke's retention, and 21,

17 which is the AlixPartners retention.

18      I have as resolved number 6, which is the Cruz motion

19 to modify employment status that was actually a motion that was

20 withdrawn.  Number 11, Paul, Hastings retention, we're going to

21 submit an order at this hearing and we'll come back to it at

22 the end.  Number 15, which is the non-union severance motion,

23 again, we're going to make a quick presentation.  Mr. Lantry

24 wants to discuss that with the Court, but that is resolved and

8

1   we'll submit an order to the Court.  And, actually, number 12,

2   which is Reed Smith's retention, there was an inquiry by the

3   U.S. Trustee.  That's been resolved, as I understand it, and

4   unless Your Honor has questions we can come back to it or the

5   order that's in front of you that was submitted with the

6   application is actually fine to be considered.

7          THE COURT:  The only question I had was, I guess,

8   maybe, most properly directed to the U.S. Trustee.  I've never

9   seen so many retention applications the subject of discussion,

10  and I'm curious about that.  Mr. McMahon?

11         MR. PERNICK:  We may want to give you our viewpoint

12  too, Your Honor.

13         THE COURT:  And you would be free to do so.  I'm not

14  saying it's a bad thing.  I'm just curious.

15         MR. MCMAHON:  Your Honor, good morning.  I'm Joseph

16  McMahon for the Acting U.S. Trustee, and, initially, Your

17  Honor, I want to thank the Court for its courtesy in allowing

18  us to file papers on matters going forward through and

19  including noon yesterday.  Your Honor, with respect to the

20  debtor and the committee items I'll talk about separately.

21  With respect to the debtor items, we went out with an initial

22  set of comments around mid-January to certain professionals,

23  and there's a follow-up set of comments with respect to items

24  that were filed later.  As Your Honor may recall some of these

25  items were on the agenda for the 13th or 14th of mid-January

9

1    and were continued.  Your Honor, there's a gamut of issues that

2    are, at least, have been raised by us, and I don't know how

3    much detail Your Honor would like to hear about the specific

4    inquiries, but in terms of the speed and reason why we're not

5    going forward today a lot of them are premised upon information

6    exchanges.  For example, and without limitation, some of the

7    employment applications for 327(a) professionals did not

8    include a preference run or a complete preference run such that

9    we could work through that information.  And some of the

10   professionals have long-standing relationships with the debtor,

11   such that the preference run for a year tends to be rather

12   extensive.  That's just an example.  I can go into further

13   detail.

14            THE COURT:  No, I mean, I like to be specific.  I'd

15   like to know if I'm seeing something new, whether it's in an

16   effort by the U.S. Trustee to focus on things that she might

17   not have focused on before or whether the professionals are

18   asking for terms of engagement and compensation that maybe are

19   giving the U.S. Trustee pause.  But if what you just said is

20   illustrative of the type of thing it doesn't sound like

21   anything new to me.  It just sounds like maybe there's more of

22   it here.

23            MR. MCMAHON:  Well, Your Honor, I want to be clear

24   about something just so I'm not creating an expectation that

25   I'm going to run afoul of in the court, and it's with the

1    following.  There are, with respect to certain professionals,

2    from time to time, certain, I guess, conflicts of interest and

3    nondisclosure issues that we may raise in terms of informal

4    discussion as part of that dialogue.  They're not what I call

5    run-of-the-mill retention issues.

6         THE COURT:  But the nature of the inquiry is not new.

7         MR. MCMAHON:  Exactly.

8         THE COURT:  Okay.

9         MR. MCMAHON:  Also, sometimes with respect to billing

10    rates is another issue that can be specific as to one

11    professional.  We may ask a few.  But, again, they involve the

12    types of information exchanges such that they don't lend

13    themselves to a two week time frame to resolve.  But, again, I

14    can be more specific as to particular professionals.

15         THE COURT:  No.  I think that that's probably left to

16    see whether they can be resolved, and if they can't be the

17    Court will, I suppose, but thank you, Mr. McMahon.  But if

18    anyone else would like to comment, since I've asked the

19    question, you're free to do so.

20         MR. PERNICK:  Your Honor, I just want to say all

21    kidding aside from the debtors' perspective we've actually

22    found the process to be pretty normal.  There have been a lot

23    of inquiries, but working with Mr. McMahon and the trustee's

24    office has been a very reasonable process.  The questions, we

25    think, have been fair.  There's been information requested.  We

1    have to get it back to them.  I'm not sure if from our

2    perspective we see new issues.  There might be emphasis on some

3    different issues, but I think we think the process has been a

4    good one, and in that vein, actually, there are a few retention

5    applications that are not going to be heard today.  We're

6    hoping to resolve them shortly after today, but there have been

7    continuing discussions.  We're hopeful we're going to resolve

8    them.  If we can't, I guess, the worst case is we'll continue

9    them to the 20th.  So from a technical matter, I think, for

10    today's hearing they are continued, but we're hoping to submit

11    orders to the Court, and that would be number 8, which is

12    Alvarez & Marsal, number 10, which is PWC, 13, which is Edelman

13    and 17, which is Jones Day.  That's 8, 10, 13 and 17.

14              THE COURT:  Okay.  Anyone else?

15              MR. LEMAY:  Your Honor, good morning.  David LeMay

16    from Chadbourne & Parke on behalf of the Creditors' Committee.

17    I just wanted to say that with respect to the retention

18    applications on our side of the table, I think in their nature

19    committee professional retentions are just inherently probably

20    more straightforward than debtors' side retentions, because you

21    don't have issues about retainers or preexisting relationships.

22    We did get some inquiries a few days ago from the Office of the

23    United States Trustee, and, of course, we want to work with

24    them to try to resolve those.  From our point of view the

25    retention applications seem relatively straightforward on our

1   side.  We are meeting with Mr. McMahon, actually, at 1 o'clock

2   this afternoon, and we'll certainly continue to work with him

3   and try and sort everything out as best we can.

4           THE COURT:  All right.  Thank you.

5           MR. PERNICK:  A couple of other matters just for

6   status.  With respect to certifications and no objection or

7   certifications of counsel, number 7, you were kind enough to

8   enter an order.  Already that's a local marketing agreement

9   seal motion.  Number 14 was the Cole, Schotz retention, and we

10  did submit a certification of counsel.  There were two issues

11  that Mr. McMahon raised on those, and they're reflected, I

12  think, in paragraph 4 of the revised form of order.  One was we

13  had a security retainer in the original retention agreement.

14  Under the facts and circumstances of this case we've agreed to

15  apply that security retainer and not hold it to the end of the

16  case.  And we have a provision in paragraph 4 that makes that

17  clear that it is under the facts and circumstances of this

18  case, and that we are certainly free to at least apply to the

19  Court in other cases, under appropriate circumstances, for a

20  security retainer arrangement.  And then number --

21          THE COURT:  I did receive that this morning, and I

22  have just now signed that order.

23          MR. PERNICK:  Thank you, Your Honor.  Number 22 is

24  the local marketing agreement motion on the merits, and that,

25  actually, was not objected to, but we're going to give the

1    Court a quick presentation on that and Mr. Lantry is going to

2    handle that.  That leaves us with two items that I haven't

3    covered yet, number 16, which is the motion with respect to

4    prepetition amounts to non-insider incentive programs, and

5    number 20, which is the committee's confidentiality motion.

6    Those are both going forward.

7         So just to complete the list of what we're going to

8    come back to now, it's number 11, which is Paul, Hastings to

9    submit an order, number 12, Reed Smith's retention to submit an

10   order, 15, the non-union severance agreement motion, 22, the

11   local marketing agreement, 16 the non-inside incentive programs

12   and 20, which is committee's confidentiality.  And unless the

13   Court has a preference we'll just do those in the order that

14   they're on the agenda.

15             THE COURT:  That's fine.

16             MR. PERNICK:  Thank you, Your Honor.  Mr. Lantry is

17   going to handle that.

18             THE COURT:  All right.  Thank you.

19             MR. LANTRY:  Good morning, Your Honor.  Kevin Lantry

20   of Sidley Austin on behalf of the debtors.  Your Honor, I think

21   Norm had identified number 11 as being something that was still

22   on to submit an order, so I don't believe that it -- is that

23   changed?

24             MR. LANTRY:  Your Honor, if I may approach?

25             THE COURT:  You may.  Thank you. All right.  I've

14

1    reviewed the blackline.  Don't have any questions. Does anyone

2    else care to be heard in connection with this matter?  I hear

3    no response.  That order has been signed.

4         MR. LANTRY:  That brings us to number 15, Your Honor.

5    This is the debtors' motion to implement a new severance

6    program for non-union employees and to continue the severance

7    arrangements under collective bargaining agreements with the

8    union employees.  Your Honor, I think it's useful to back up

9    for a second and describe how the information is being shared

10   with the committee and with the steering committee for the

11   lenders, just to kind of give you a sense of how we're working

12   together.  It applies to a number of the business motions here.

13   We have been meeting at least once a week, almost for full day

14   sessions, with financial advisors for the committee and for the

15   steering committee for the lenders, and we try to be efficient

16   and be together.  This is the debtors just giving a whole lot

17   of financial information to them, some that they create agendas

18   for and some that we want to brief them on.  And that sharing

19   arrangement has been going quite well.  In addition, obviously,

20   the lawyers talk almost every day in terms of more specific

21   items, but that information flow is going nicely.  And so, for

22   example, with regard to the severance arrangements we provide a

23   lot of data to the committee and to the steering committee for

24   the lenders in terms of the savings that would occur over in

25   the future annual period under the new severance program.  We

1    provided copies of all the collective bargaining agreements in

2    terms of their terms of severance.  We gave a lot of the

3    background in terms of the history of the company's prior

4    arrangements with employees and that type of thing.  This is

5    done under what we now have with confidentiality agreements,

6    and so it does permit us to be much more candid and forthcoming

7    about the details.

8              With regard to the two items that were raised, first,

9    working with the U.S. Trustee's office we have made one change

10   to the order, and if I might approach that could be useful in

11   terms of me showing a blackline in that.

12             THE COURT:  You may.  Thank you.

13             MR. LANTRY:  The U.S. Trustee's Office was anxious to

14   make sure that the order indicated that we would comply with

15   Section 503(c)(2) in terms of any payments under the severance

16   plan for insiders, so we've added the language of the statute

17   to make sure that we do comply with that.  In addition the U.S.

18   Trustee wanted us to acknowledge on the record that if the U.S.

19   Trustee's office did want additional information about actual

20   payments that are made under this new severance program during

21   the proceedings, that we would make that information available

22   to them.  And we will.  In addition, because the 503(c)(2) does

23   make reference to the term insiders, which is a complex term in

24   terms of the case law, the U.S. Trustee wanted to make sure

25   there was a reservation of rights about how to interpret that

16

1    as we apply 503(c)(2), and we agreed to that.

2            THE COURT:  Well, how, mechanically, is that supposed

3    to work?  You've agreed to comply with the statute.  How does

4    anybody know when that happens?

5            MR. LANTRY:  Your Honor, this is a statute that has

6    caused any number of anxieties for us.  What we imagine will

7    occur is we will have a given number of layoffs during this

8    calendar year, and the statistics of those will then permit us

9    to deal with whether any insider is getting ten times the mean

10   of what nonmanagement personnel do.  If we were to have a

11   termination of an insider at the very beginning that would be

12   very complex to administer.  If it happens to be farther on,

13   after we've got a good set of data, it will probably solve

14   itself.  The only thing that we've contemplated that might work

15   is if, indeed, the ten times the mean test was not allowing us

16   to perform the terms of the new severance plan we would have to

17   give the lesser amount on the initial termination date of an

18   insider, and then, at the end of the year, we could go back,

19   add up the total for the year, and maybe make a subsequent

20   distribution, again, in compliance with, so long as it's not

21   more than ten times the mean.  That was the mechanics that we

22   talked about with Joe, and I think that's probably as good as

23   we can do in fully complying with the statute.

24           THE COURT:  What's the information flow on that

25   process?  Does the U.S. Trustee and the committee and the

1    steering committee, do they get prior notice of such payments?

2    Do they get notice after it's happened and with what backup

3    information?

4         MR. LANTRY:  We would anticipate that the committees

5    would be given information after the notice goes out in terms

6    of termination.  And the evidence supporting how we complied

7    with the payment stream, obviously we're fine if they or the

8    U.S. Trustee's Office wants to knock on our door and say that's

9    fine, but if it's an insider give us prior warning.  We're fine

10   with working with them, but I, again, didn't want to spell

11   things out too specifically in the form of order because we've

12   been working cooperatively with each other and often it's

13   easier to see how things work.  And, again, I hate to, in a

14   public forum, articulate anticipated layoffs.

15         THE COURT:  Well, as I look at the form of order my

16   concern is that there's no evidence based upon which the Court

17   could conclude that the debtor is in compliance with the

18   statutory confines.  And, oftentimes, the reason I asked the

19   question previously the way I did is oftentimes there is a

20   notice procedure among various parties before payment is

21   actually made.  My concern would be here, specifically, that if

22   a payment is made but then later contested by another party in

23   the case that it wasn't in compliance with the statutory

24   section how do we get it back, and why do we let the horse out

25   of the barn first?  That's my concern.

1          MR. LANTRY:  Your Honor, if you would like we can

2     easily commit to notice.  The committee, and if the U.S.

3     Trustee's Office would like with any prior notice before any

4     payment to an insider occurs.

5          THE COURT:  Yes.  It seems to me these things have to

6     work one of two ways.  Either you come to me and say okay, here

7     are the people we're terminating and here are the severance

8     payments that are proposed.  Here's what they do.  And everyone

9     gets the chance to say are they insiders or are they not

10     insiders or are there other issues in it.  Hearing what you've

11     just told me I can understand why you're not in a position to

12     do that today.  So what you're asking for is a prospective

13     blanket approval of such payments with a trust me, I'll do what

14     the Bankruptcy Code tells me to do.  And it's not that I don't

15     trust you.  But in bankruptcy, typically, we tell everybody

16     what we're doing and give everyone a chance to add their two

17     cents if they sense that something is not going as it should.

18     And it seems to me that if you want the prospective relief

19     which I'm content to give, it seems to me it's got to be

20     conditioned on some process which lets others know what the

21     debtor is doing in such a way that nobody's rights are lost in

22     the process.  Now, if there's an issue with that tell me what

23     it is and we'll talk about it.

24          MR. LANTRY:  That should be fine, Your Honor.  So

25     what I think may be the best is for us to again submit an

1   additional modification that would add in the ordered paragraph

2   involving insiders that we added, provided additionally that

3   before any payment is made to an insider notice will be given

4   to the committee and the U.S. Trustee's Office.  Would that be

5   acceptable?

6           THE COURT:  That is along the lines of what I was

7   thinking.  If anyone else has a comment I'll hear it now.

8           MR. LANTRY:  Your Honor, I have one more

9   clarification that I promised the U.S. Trustee's Office I would

10  make and then a description of the other issue that was raised

11  by Mr. Teitelbaum.

12          THE COURT:  Okay.

13          MR. LANTRY:  There is under a number of our

14  collective bargaining agreements silence on the issue of

15  severance.  And under compliance with the National Labor

16  Relations Act the procedure is to negotiate what that might be.

17  And so we were silent on the issue of we will comply with the

18  collective bargaining agreements and the NLRA requirements, but

19  Mr. McMahon wanted us to clarify that we -- obviously, both him

20  and us will have to make determinations in terms of whether any

21  payments under these collective bargaining agreements

22  negotiations that might occur are within the ordinary course.

23  And we suspect they will be, just because we don't intend to

24  give them more than what the market bears at this time.  But we

25  will be, obviously, keeping, again, the U.S. Trustee's Office

20

1   and the committee advised of those types of negotiations.  But,

2   again, this is not a blanket -- the order is not a blanket

3   blessing to anything we do under those NLRA negotiations as

4   blessed by Your Honor.  We may need to come back if we deem it

5   to be outside the ordinary course.

6         THE COURT:  Okay.  Let me ask if anyone else would

7   like to be heard on this matter?

8         MR. LANDIS:  Very briefly, Your Honor, for the record

9   Adam Landis from Landis Rath & Cobb on behalf of the creditors'

10  committee.  I can tell the Court that the committee did a

11  fairly extensive analysis of these issues in considering the

12  motion, and I'm pleased to report that we got good information

13  from the debtors, a lot of cooperation in going back-and-forth,

14  but we do see the value in a prior notice provision that sort

15  of is baked into the order.  I think that for good hygiene's

16  sake we do continue to get good information, but having it in

17  the order is probably good and on a prior basis.  So we'll work

18  with debtors' counsel to get that language set up, and

19  hopefully they'll be able to spit something on certification

20  that we all agree to.

21        THE COURT:  All right.  Thank you.  Does anyone else

22  care to be heard?

23        MR. LANTRY:  Your Honor, there was an objection

24  filed, and it has been resolved, but I wanted to describe that

25  and then give a chance for Mr. Teitelbaum to describe the

21

1     situation a little further.

2          THE COURT:  Okay.

3          MR. LANTRY:  What was happening before we signed our

4     confidentiality agreement with the committee -- it took a

5     little while to get that all ironed out -- is that we had a

6     sort of understanding that a lot of the information we were

7     providing was more on a professional eyes only basis, and a

8     distilled version of that would be provided to the committee as

9     needs be.  It would during that interim that we had briefed the

10    committee on the severance arrangement.  Mr. Teitelbaum

11    represents one of the committee members who didn't feel that he

12    and the sort of retired executives that are in a similar

13    situation as him had been adequately briefed on the issue, and

14    so they filed an objection, basically looking for more

15    information and feeling like we had not made a sufficient

16    showing of our business judgment.  After the confidentiality

17    agreement was signed up we then met with Mr. Teitelbaum, gave

18    him the same data dump that we had given the committee before,

19    and, essentially, he was satisfied with this motion.  Having

20    said that, he did want to just articulate where and whence he

21    was coming from, and I'd like to turn the lectern over to him.

22         THE COURT:  Very well.

23         MR. HILLER:  Good morning, Your Honor, Adam Hiller on

24    behalf of about eighty retiree claimants in this case.  I'd

25    like to introduce to the Court my cocounsel, Jay Teitelbaum.

22

We have moved for his admission pro hac vice.  The order hasn't

been entered yet, but I've asked that the Court hear his

argument today.

                THE COURT:  All right.  Thank you.

                MR. HILLER:  Thank you.

                THE COURT:  Welcome.

                MR. TEITELBAUM:  Thank you, Your Honor.  Good

morning.  Hopefully it's not argument, it's just a statement,

and I appreciate the Court taking a few moments to hear us out,

because one of the things that I wanted to sort of bring to the

fore today is that this is more than a financial restructuring

involving big banks and funds and bondholders and a lot of

professionals.  It's a bankruptcy that involves probably close

to 200 retirees, current retirees of Times Mirror, that retired

at about 2000 when the Times Mirror/Tribune merger occurred,

and we represent approximately eighty of those folks right now.

And we're estimating the claims are close to 80 to 100 million

dollars.  It could be more or less, depending on actuarial

figures.  And I wanted to bring this to the attention of the

Court because that's really why we filed our pleading that we

did, which was at about the time of the bankruptcy my clients

received a notification that benefits that they had been

receiving under nonqualified plans were ceasing.  And just to

throw some numbers, thirty percent of my clients were over

seventy years of age.  Of my clients fifty percent are over

23

1    sixty-five.  Virtually all of them have seen a reduction in

2    their retirement income that they've been receiving and

3    counting on for years between twenty-five and fifty percent.

4    Some more.  And they're very typical people.  Fortunately we

5    actually represent four of the very senior executives of former

6    Times Mirror.  These are wealthy individuals, and that's a

7    great thing and not a great thing.  It's not a great thing

8    because some of the perception is ah, these guys are rich, who

9    cares?  But the great thing is they are very paternalistic, and

10   they're involved in this, and they're help footing the bill for

11   a lot of people like Ms. Horn, who's fifty years old and had

12   300,000 dollars in deferred comp for her kids' college

13   education, and they're ready to go to school.  And she's not

14   getting any checks.  And we've got three widows.  And we've got

15   real people out there.  So, Your Honor, I just wanted to come

16   up and present that and convey to the Court that we've actually

17   had conversations with counsel for the debtor, counsel for the

18   committee, and I'm not wearing my hat as counsel for Mr. Niese,

19   who sits on the committee, to try to appreciate the breadth of

20   the impact on these real people.  And hopefully we're going to

21   be able to come up with a creative way to address that in the

22   context of a plan that realizes that these people need income,

23   they need cash, they don't necessarily need equity in a

24   reorganized entity.  So that is really why I wanted to come up

25   and say a few things.  And the last thing I'd like to just

24

1    raise, if it's not too burdensome, that we be included in the

2    notices.  We do represent eighty retirees, we did take an

3    interest in the severance program, and that we get a similar

4    notice that would be provided to the U.S.T. and the committee

5    about insider payments, if that's not too burdensome.  It

6    wouldn't have to go to all eighty, just to my firm as counsel.

7    Thank you, Your Honor.

8              THE COURT:  Thank you.

9              MR. LANTRY:  Your Honor, I would propose regarding

10   the request for notice about any severance to insiders that we

11   provide that to Mr. Niese in his capacity as a committee member

12   and with Mr. Teitelbaum, and to the extent the committee wants

13   to make arrangements with the rest of Mr. Teitelbaum's

14   constituency there is a provision in their bylaws that permits

15   an additional confidentiality provision to be executed between

16   the two of them.  We can leave that to how that can get out,

17   but at least Mr. Teitelbaum, through Mr. Niese, can pass down

18   the committee, would get that notice.

19             THE COURT:  Mr. Teitelbaum, will that suffice?

20             MR. TEITELBAUM:  It sort of puts me in a box that I'm

21   not sure how I get out of in that I'm not sure why this

22   information should be limited to the committee.  I'm not saying

23   that it has to go to the world, but what happens if Mr. Niese's

24   capacity outside the committee or my other clients decide that

25   a certain payment is not appropriate.  I'm not sure how we get

25

1    to use the information that's been provided, and unless,

2    frankly, there's a showing as to why it shouldn't be shared

3    with us under, essentially, I'll be happy to discuss

4    confidentialities.  We're not looking to blab this with the

5    world, and I think Mr. Lantry knows that I've been doing this

6    long enough that I appreciate the sensitivity of these issues,

7    but I don't think that it's appropriate to put us in that box.

8    I'm not here in my capacity as counsel for Mr. Niese and the

9    committee.  I'm here in my capacity as counsel for eighty

10   creditors of the case that's filed a pleading.

11            THE COURT:  Well, I'm not suggesting this is the only

12   way, but one way those matters are often handled is that if

13   parties are in receipt of confidential information which

14   serves, in part, as the basis for a pleading that's filed, the

15   request is usually made that it be kept under seal or some

16   redacted form of it be put in.  And I'm not saying I will or

17   won't approve such a request.  There may be other ways to

18   address it as well.  But there are ways to let you out of your

19   box, assuming that it's warranted.

20            MR. TEITELBAUM:  Your Honor, I appreciate that, and

21   what I'm suggesting is I'm prepared to deal with that, but I

22   don't necessarily think it should be provided solely in the

23   capacity as on the committee.  What I'm suggesting is the

24   confidentiality can be negotiated in the capacity as

25   representing eighty creditors in the case, and then we can deal

26

1    with the issue of 107, whether it's sealed.

2            THE COURT:  Oh, I mean, I suppose it could be

3    presented directly to you on an attorney's eyes only basis, but

4    it would put you in the same box --

5            MR. TEITELBAUM:  Yes, I know.

6            THE COURT:  -- so I don't know what difference it

7    makes in the end.

8            MR. TEITELBAUM:  Your Honor, why don't we see how we

9    can work through it, and if it presents itself as a problem or

10   an issue we know where you are and we know where the Court is.

11           THE COURT:  All right.

12           MR. TEITELBAUM:  Thank you.

13           THE COURT:  All right.  Then the parties will

14   consider that in connection with submitting a revised order

15   under certification.

16           MR. LANTRY:  Thank you, Your Honor.

17           THE COURT:  Anything further on this matter?

18           MR. LANTRY:  Your Honor, that brings us to number 16.

19   This is the debtors' motion to pay various amounts under a non-

20   insider incentive program, or I should say programs.  There's

21   over ninety of them.  We have, again, been working with the

22   committee and the steering committee, the lenders as well as

23   the U.S. Trustee's Office in providing a lot of detail.  And

24   there is a lot of details about this.  Again, as the motion

25   indicates, these programs are often monthly, quarterly, yearly

1  in terms of their performance requirements and measuring

2  metrics.  In addition, because they are done by individual

3  business units and there is over sixty of those throughout the

4  Tribune companies, it tends to be very detailed in terms of how

5  each of these are working.  There's over 3,000 participants.

6  In light of that we've provided, as I say, a lot of the backed

7  up detail.  The committees have looked through and asked for

8  additional backup that, obviously, isn't publicly filed.  The

9  U.S. Trustee's Office actually asked for the details for each

10  3,000, the estimated amount, their identities, and we provided

11  that.  The outcome is we have made one proposed change to the

12  form of the order which satisfies the U.S. Trustee's Office,

13  and with that I think there are no objections or issues.

14  Again, if I could approach and show you that redline.

15            THE COURT:  You may.  Thank you.

16            MR. LANTRY:  The U.S. Trustee's Office was anxious to

17  make sure that there was no reconsidering after the fact of the

18  various metrics and objectives and criteria for the payment.

19  In other words, if something were to be revised on a

20  discretionary basis to permit people to be paid that was not

21  consistent with the terms of each of these various incentive

22  programs, and so we have added the paragraph that reads "The

23  debtors will verify that the incentive program payees have

24  satisfied the objective and discretionary payment conditions

25  set at or prior to the inception of the relevant measuring

28

1    periods before making such payments".  And that satisfies the

2    U.S. Trustee's Office.

3            THE COURT:  And what will the form of such

4    verification take?

5            MR. LANTRY:  We spent a long time yesterday on the

6    phone with the U.S. Trustee's Office talking about that.  We

7    had the CFO involved, two, actually, three vice presidents, and

8    we walked him through, probably half an hour or more, the

9    details of how this works.  Again, the company's approach is if

10   someone were to be getting paid in a way that wasn't compliance

11   with the criteria, the company considers that to be fraudulent,

12   and the company has any number of mechanisms through the

13   business unit heads and through the people who report up to the

14   business unit heads to verify and determine how this is paid.

15   In addition, what's happening right now is because the

16   estimates that were prepared in the motion are now being

17   corroborated by the actual performance that comes in at year-

18   end or month end or quarter end, all that data is now coming

19   into headquarters in Chicago, and that team is, again,

20   verifying the metrics of the numbers before the checks would go

21   out.  So there's two or three different layers that we walked

22   the U.S. Trustee's Office through in terms of how that

23   verification process works.  And after we walked them through

24   that he was satisfied that that was going to be satisfactory.

25           THE COURT:  All right.  So that, in short, it is

1    memorialized in some way, either on paper or electronically, so

2    that if it needed to be reviewed at a later time the basis for

3    these payments would be apparent.

4         MR. LANTRY:  That's correct, Your Honor.

5         THE COURT:  All right.  Does anyone else care to be

6    heard in connection with this matter?

7         MR. LEMAY:  Your Honor, David LeMay from Chadbourne

8    and & Parke, again, for the committee.  A general observation

9    about the business.  As the Court is aware the newspaper and

10   media businesses generally are not in good shape these days.

11   It's very, very tough times for these businesses.  That said,

12   the debtors are paying attention to cost cutting issues and

13   ways in which to shrink the cost side, but no business can

14   shrink itself into prosperity.  And the top line is extremely

15   important in any business, and especially now for this

16   business.

17        THE COURT:  And, in fact, I wonder whether the

18   business has to change itself in order to remain viable.

19        MR. LEMAY:  And I think Mr. Lantry's clients would

20   say the answer to that is yes.  That's what I keep hearing from

21   them, but I'll let the debtor speak to that.

22        THE COURT:  Yes, I didn't mean to sidetrack us,

23   but --

24        MR. LEMAY:  Right.  I was only going to say --

25        THE COURT:  In the moments, you know, in the middle

1    of the night when I wake up and think great thoughts, that was

2    one of them.

3              MR. LEMAY:  I think a lot of people feel that this

4    industry is in the middle of a fundamental change, but what I

5    was rising to make the point, or the point I was rising to

6    make, is simply that because they cannot shrink themselves to

7    prosperity the top line is very important.  The incentive

8    compensation that's being talked about in this motion, not for

9    every employee is affected, but for many of them, relates to

10   those people who bring money in the door.  And although

11   creditors' committees must keep, and do keep, an eagle eye on

12   payments that are made, bringing money into the door is very,

13   very important to this company right now.  The plan that Your

14   Honor has in front of you is not directed exclusively to

15   revenue generators.  There are some people on the staff side.

16   But the committee, after doing a pretty deep dive, was

17   satisfied that this creates the right incentives to the right

18   people to pay attention to making sure that the top line does

19   as well as can possibly be done in this very difficult

20   environment.

21             THE COURT:  All right.  Thank you.  Does anyone else

22   care to be heard in connection with this motion?  The U.S.

23   Trustee's objection indicated that she wished to put the debtor

24   to its proofs.  Is the U.S. Trustee still pressing for proffer

25   or some other evidence to be put forth by the debtors in

31

1    support of the relief that's been requested?

2         MR. MCMAHON:  Your Honor, good morning.  Joseph

3    McMahon for the Acting U.S. Trustee.  After our communication

4    yesterday, Your Honor, and after further reviewing the

5    affidavit of Mr. Bigelow that was appended to the motion, we're

6    satisfied with the record as it stands.

7         THE COURT:  All right.  Anything further in support

8    of the motion?

9         MR. LEMAY:  No, Your Honor.

10        THE COURT:  I do think that the record here,

11   especially in light of the accommodation made with the U.S.

12   Trustee and, frankly, the minimal amount per employee that this

13   plan involves and, again, compared to the overall size of the

14   debtors' business, the overall cap is a figure which I would

15   view as modest under the circumstances.  I'm prepared to grant

16   the relief that's been requested.

17        MR. LEMAY:  Thank you, Your Honor.

18        THE COURT:  Do you have an order?  Oh, I'm sorry.

19   You do have an order.  All right.  That order has been signed.

20        MR. LEMAY:  Your Honor, I think that brings us to

21   number 20, and I would turn the lectern over to the committee,

22   who's the movant.

23        THE COURT:  Very well.

24        MR. LANDIS:  Good morning, Your Honor.  Again, Adam

25   Landis, for the record, on behalf of the Official Committee of

32

1    Unsecured Creditors.  Item number 20 on the agenda is the

2    Committee's motion caption to limit creditor access to

3    confidential and privileged information nunc pro tunc to the

4    formation date of the committee and to establish procedures

5    pursuant to Sections 105(a), 1102(b)(3) and 1103(c) of the

6    Bankruptcy Code.  I'm certain Your Honor is familiar with this

7    type of motion.  It's become relatively standard practice, I

8    think, in some of the larger cases, and the necessity of the

9    motion --

10            THE COURT:  Even in some of the smaller ones, too.

11            MR. LANDIS:  Well, in any case, I think where there's

12    a creditors' committee that is concerned about complying with

13    1102(b)(3).  We're not breaking new ground here, Your Honor,

14    but, really, just continuing on a path that has been required

15    to be walked based on the changes in the Bankruptcy Code that

16    requires a creditors' committee to provide access to the

17    information to any constituent member and any group that has an

18    unsecured claim.  The codes also requires that a committee

19    solicit and receive comments from its constituent members, and

20    in order to really bridge some of the gaps that are in the code

21    creditors' committees, and this creditors' committee, filed a

22    motion seeking to make sure that we're not required to give

23    confidential information except under limited circumstances

24    where that information can be protected.  The committee

25    believes that protection of confidential information is in the

33

1    interests not only of the committee but of the debtor as a

2    larger enterprise.

3            Your Honor, I'm pleased to report that after filing

4    the motion we did have conversations with debtors' counsel and

5    with the Office of the United States Trustee, who provided

6    comments of a rather limited in clarifying nature.  I have a

7    blackline forms of the order, and the form of nondisclosure and

8    confidentiality agreement that I'd like to hand up to Your

9    Honor.

10           THE COURT:  Very well.  Thank you.

11           MR. LANDIS:  Your Honor, I would like to walk through

12   the changes, which, again, as I stated, are relatively minor.

13   What the order does, it provides, in essence, that a creditors'

14   committee, in order to satisfy its obligation to solicit and

15   receive comments, will create a creditor committee website.

16   That website will be run by a creditors' committee information

17   agent.  That information agent will be paid by the debtors upon

18   submission of invoices.  We've agreed with the Office of the

19   United States Trustee that the Court will retain jurisdiction

20   over those payments and that noticed parties will be provided

21   with invoices prior to any payments being made.  And that

22   change, Your Honor, can be found in the blacklined portion.  In

23   paragraph 12 there's new language in the carryover of page 9 to

24   page 10.

25           Other changes, Your Honor, that were made really have

34

1    to do with notice that will be provided other than certain nits

2    and nats and typographical errors that the U.S. Trustee was

3    able to point out.  That in paragraph 10 of the order, Your

4    Honor, if we are having a dispute with a creditor regarding the

5    provision of information we have agreed with the debtors that

6    the debtors would request that the Court schedule a hearing no

7    later than thirty days after the service of the debtors'

8    objection the creditors' committee information demand.  In

9    essence, that gives everybody time to try to work things out,

10   to make sure that we can't work things out, and if we can't

11   we'll be in front of Your Honor to try to narrow the issue or

12   have the Court resolve it.

13            Also in paragraph 10, subparagraph B, Your Honor,

14   we've really made kind of a minor clarifying change with

15   respect to third-party confidential information.  If the

16   confidential information is held by another entity other than

17   the debtor, but that other entity would include the debtors'

18   agents or professionals, the committee still can make a written

19   request that that information be given to a constituent member

20   of the committee.

21            Your Honor, those, in essence, are the changes that

22   we've made to the order.  With respect to the form of

23   confidentiality and nondisclosure agreement that's attached to

24   the order, we've added, really, two paragraphs, new paragraph 4

25   and 5, which essentially provide that if a creditor -- well,

1    let me back up.  As a precondition to receiving confidential

2    information a creditor would be required to sign up to a form

3    of confidentiality agreement, nondisclosure agreement, and we

4    thought it best to have that form approved so we don't have a

5    lot of back-and-forth on whether our form is appropriate or

6    their form is appropriate.  This is a form that we have used in

7    a number of other cases and we found has worked quite well for

8    the situation.  But debtors' counsel has requested that we add

9    specifically if the recipient of confidential information is

10   served with any kind of process pursuant to which it would be

11   required to disclose the information, that it gives notice to

12   the committee and the debtors so that we could, should we feel

13   necessary, come to this Court and seek to have that information

14   not disclosed pursuant to that process.  That's paragraph 4.

15           In new paragraph 5 the debtor has requested, and we

16   have ceded to the request, that if the creditor receives

17   confidential information and would like to use it in a court

18   proceeding, that they first seek to have that information

19   submitted under seal.  To the extent that the Court denies that

20   request that would not constitute a violation of the order or

21   the nondisclosure agreement, but the obligation would be on the

22   creditor with confidential information to come to court and

23   seek to have it sealed.

24           Those, essentially, are the highlights of the changes

25   that we've made, and with that, unless Your Honor has

36

1    questions, we'd ask that Your Honor approve the order.

2         THE COURT:  You've requested that the effective date

3    be December 18 of last year.  My question is are there any

4    outstanding requests for information that have been made

5    between that date and today?

6         MR. LANDIS:  Well, Your Honor, I anticipated the

7    question, and I'm glad you asked it.  To my knowledge, as

8    counsel to the debtors, I have not received any requests for

9    information.  We have a relatively large creditors' committee,

10   and a number of people who may have been or their agents or

11   employees may have been requested with information, we have not

12   surveyed everybody on the committee, or those who represent

13   them, to see if they have been served with such a request, but

14   we thought it prudent to receipt nunc pro tunc relief to the

15   extent there's a request out there and someone might pop up and

16   suggest that creditors' committee was in violation of

17   1102(b)(3).

18        THE COURT:  All right.  Let me ask if anyone else

19   cares to be heard in connection with this motion?  I hear no

20   response.  That was my only question.  I'm prepared to grant

21   the relief that's been requested.

22        MR. LANDIS:  And I have a clean form of order for

23   Your Honor.

24        THE COURT:  Very well.  Thank you.  That order has

25   been signed.

37

1      MR. LEMAY:  Your Honor, I think that brings us to

2   number 22, the last on the agenda, and that's the debtors'

3   motion to enter into a local marketing agreement with respect

4   to KPLR, a broadcasting entity of the debtors in the Missouri

5   area.  Again, this is a fairly simple matter where the prior

6   shared services agreement is now being molded into a more

7   facile local marketing agreement.  We have this opportunity

8   because under various regulatory arrangements if you're not one

9   of the top four in your designated geographic area you can't

10  enter into the local marketing agreement.  And we'd like to

11  seize on that opportunity since KPLR is now not one of those

12  top four.  This allows a lot more of savings and efficiency in

13  terms of how this would be operated with a sister station there

14  in St. Louis area.  And so we wanted to move for this

15  advantageous arrangement.

16      We ran into a number of issues that we resolved with

17  parties.  The FCC wanted to make sure that we had included some

18  language that made them comfortable, both in the agreement and

19  in the form of order, so we have added a lengthy paragraph that

20  satisfies those desires.  If I may approach and show you that?

21  Do you have a blackline of the order?

22      THE COURT:  You may.  Thank you.

23      MR. LEMAY:  And, again, the added paragraph, as well

24  as a few changes to the underlying agreement, and, by the way,

25  the underlying agreement changes with both the clean and the

38

1    blackline were submitted on January 29.  But that solves the

2    FCC's concerns.

3            In addition, Nielsen raised a number of issues, and

4    we have made changes, principally in section 6.1 of the

5    underlying agreement that was, again, submitted on January 29,

6    which satisfies their concerns.  They basically wanted to make

7    sure that their rights were not impaired.

8            And, also, we have addressed a number of factual

9    inquiries, both the committee and the U.S. Trustee's, but with

10   those changes, both to the agreement as submitted and to the

11   form of order we had no objection.

12           THE COURT:  All right.  Let me ask if anyone else

13   cares to be heard in connection with this matter?  I hear no

14   response.  I don't have any questions.

15           MR. LEMAY:  Thank you, Your Honor.

16           THE COURT:  That order has been signed.

17           MR. PERNICK:  Your Honor, that last item is actually

18   a follow-up item from the last hearing with respect to your

19   request.  You tasked up with submitting two to three names with

20   respect to a fee auditor, and we actually did search a number

21   of the larger cases in the district and elsewhere.  We had

22   discussions with the committee about some potential names, and

23   we actually just, sort of as a failsafe, ran a Google search

24   just to see if there were any other websites of people who did

25   this kind of work, and, I guess, the most interesting thing is

39

1    there don't seem to be a lot of people that make a market out

2    of this and do it.  The two that come to mind that we are

3    totally comfortable recommending to the Court are Warren Smith

4    and Stewart Maue, and I believe the Court is familiar with both

5    of those.  If you would like us to submit information on either

6    of those we'd be happy to do that.

7            THE COURT:  No, I've used them both.  And, in fact,

8    they're the only two I have used, and I'm always on the hunt

9    for others, and I am a little bit surprised there aren't more

10   in the game.

11           MR. PERNICK:  Yes, we were a little surprised, too,

12   on that.  And I'm not saying we canvassed the entire universe,

13   but we did check with a lot of different professionals on both

14   sides and we just couldn't find anybody else, and we thought in

15   a case this large, with this many retentions and applications,

16   that it was important that we hire somebody who had the

17   infrastructure to handle the fee applications on a timely

18   basis.  There is one other name which we can submit to the

19   Court, although he is a smaller operation, well, the Court may

20   be aware of Robert Treasio (ph.).  He has also acted as a fee

21   auditor in some of the cases.  We put him in third position

22   only because he does have, we believe, some connections with

23   some of the attorneys in these cases.  He acts as a trustee in

24   other matters before the Court, and sometimes he hires

25   different counsel in Delaware to be his counsel, and I think

40

1    there's one or two in this case, actually, who he has hired,

2    so -- I'm not sure that the debtors have a problem with that

3    disclosure.  If the Court wished Mr. Treasio I think we'd be

4    fine with it.  We think he'd be fair.  I've actually worked

5    with him before.  I don't have a problem with it.  I'm not sure

6    that he's got a staff of paralegals to handle this volume, and

7    that was, frankly, the debtors' concern.  But with him I have

8    no concern on a personal level.

9            THE COURT:  Okay.  Does anyone else care to comment

10   on that?  I hear no further response.  Mr. Pernick, let me just

11   page through my agenda one more time to make sure we've covered

12   everything.

13           MR. PERNICK:  Okay.

14           THE COURT:  With respect to Alvarez & Marsal, are you

15   submitting an order today or will you submit one later?

16           MR. PERNICK:  We do not have an agreement yet.

17   That's in the category of the ones that we hope to reach one

18   shortly and submit an order after the hearing.

19           THE COURT:  All right.

20           MR. PERNICK:  If not, it'll be continued to the 20th.

21           THE COURT:  Same with Jenner & Block?

22           MR. PERNICK:  Jenner is actually continued to the

23   20th.

24           THE COURT:  Oh, to the 20th.  I'm sorry.  The agenda

25   indicates that.

1      MR. PERNICK:  Number 12 is the only one that you

2   might have on there, which was Reed Smith.  That order is

3   actually okay for Your Honor to consider.

4      THE COURT:  PWC?

5      MR. PERNICK:  PWC is in the category of ones we hope

6   to resolve, and if not it'll be on for the 20th.

7      THE COURT:  Okay.  12?

8      MR. PERNICK:  12 is Reed Smith, right?

9      THE COURT:  Well, let me get that right now.  That

10  order has been signed.

11     MR. PERNICK:  Thank you, Your Honor.

12     THE COURT:  All right.  13 to come later?

13     MR. PERNICK:  Correct.

14     THE COURT:  14 we talked about.  17 to come later?

15     MR. PERNICK:  17 to come later, Your Honor.

16     THE COURT:  All right.  That exhausts my list.

17  Anything further for today?

18     MR. LANDIS:  Your Honor, it wasn't explicitly stated.

19  Adam Landis for the record, and an optimistic Adam Landis here

20  to suggest that with respect to items 18 and 19, the

21  applications to retain my firm and Chadbourne & Parke as

22  counsel to the committee, should we resolve issues that have

23  been raised by the United States Trustee on a consensual basis

24  I don't know if it would be appropriate to submit orders under

25  certification or if you'd like us to come back on the 20th to

42

1    discuss whatever resolution there is.

2              THE COURT:  Well, Mr. Landis, I'm always in favor of

3    taking an optimistic approach.  So if resolution is reached

4    submit them under certification.  If I have questions I'll

5    arrange a time that we can speak.

6              MR. LANDIS:  Thank you, Your Honor.

7              THE COURT:  All right.  Anything further for today?

8              MR. PERNICK:  Nothing further from the debtor, Your

9    Honor.

10             THE COURT:  Thank you all very much.  That concludes

11   this hearing.  Court will stand in recess.

12             MR. PERNICK:  Thank you, Your Honor.

13        (Proceedings concluded at 11:03 AM)

14

15

16

17

18

19

20

21

22

23

24

25

43

I N D E X

RULINGS

                              Page      Line

Granting of Application    12       23
Authorizing Retention and
Employment of Cole, Schotz,
Meisel, Forman & Leonard,
P.A. as Co-Counsel to the
Debtors


Granting of Application    14       3
Authorizing Employment
and Retention of Paul,
Hastings, Janofsky
& Walker LLP


Granting of Motion for     31        15
an Order Authorizing,
but not Requiring, the
Debtors to Pay Prepetition
Amounts Under Non-Insider
Incentive Programs

44

1

2   Granting of Motion to      36       20

3   Limit Creditor Access to

4   Confidential and

5   Privileged Information

6

7   Granting of Motion of      38       16

8   KPLR for an Order

9   Authorizing Entry into a

10  Postpetition Local

11  Marketing Agreement with

12  Community Television of

13  Missouri

14

15  Granting of Application    41       10

16  for an Order Authorizing

17  Debtors and Debtors in

18  Possession to Employ and

19  Retain Reed Smith LLP as

20  Special Counsel for

21  Certain Litigation

22  Matters

23

24

25

45

1

2                            C E R T I F I C A T I O N

3

4       I, Hana Copperman, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       HANA COPPERMAN

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  February 11, 2009

16

17

18

19

20

21

22

23

24

25