# EXHIBIT C

## AFFIDAVIT OF ELLEN BARKER, MSN, APN

1. I am over the age of eighteen and understand the obligation of an oath.

2. I am an advanced practice nurse with prescription authority who has maintained a concentrated practice working with neurologically impaired patients over the last twenty five years. I am certified and have frequently acted as case manager, life care planner, and hospital consultant for such patients, including stroke and traumatic brain injury patients.

3. I hold a Masters Degree in nursing and I have served on the faculties of the University of Delaware, Hahnemann University and the University of Pennsylvania.

4. I have authored over 50 articles in medical publications.

5. I am the editor/author of "Neuroscience Nursing", an award winning textbook which focuses on the care of neurologically impaired patients.

6. I am a frequent lecturer at medical conferences in which I present to physicians, nurses, and other health care professionals recent developments in the care of neurologically impaired patients.

7. I was retained by the family of Andrew Faggio, a Connecticut police officer, who suffered a severe traumatic brain injury on January 31, 2003. I was requested to develop a care plan which would maximize his comfort, recovery, general health, and longevity.

8. Over the last few years I have closely followed Mr. Faggio's medical course, and his treatment history at various facilities. I have met with his physicians and caregivers at the Hospital for Special Care where he is presently a long term patient. I have personally observed Mr. Faggio during his care and interactions with family members.

9. As a result of his traumatic brain injury, Mr. Faggio is a tetraplegic and totally dependent on others for his care. He is unable to stand, walk, use his hands, or speak. He

cannot communicate with others except by facial gestures and eye movements. His responsiveness varies: on occasions he has been able to follow verbal commands; at other times only his eye movements track the activity around him.

10. Mr. Faggio has been determined by several different medical examiners to be in a minimally conscious state. Based on my own observations and those of his caregivers, Mr. Faggio experiences physical pain and has an awareness of his surroundings.

11. Since December 2007, Mr. Faggio has been a long term patient at the Hospital for Special Care. Although at prior facilities, and during a prior admission to The Hospital for Special Care, Mr. Faggio received aggressive rehabilitative treatment-- including daily physical therapy, occupational therapy, and hands on nursing efforts to maintain his level of consciousness and minimize his physical discomfort—at the time of his readmission Mr. Faggio was reassigned by his managers at the Hospital for Special Care to a different program of treatment which could be characterized as "maintenance" or "custodial" care.

13. At that time, his managers at the hospital determined that Andrew had reached a recovery plateau—or "maximum medical recovery." As a result of this determination, various services were discontinued, including aggressive daily physical therapy, aggressive occupational therapy, and patient-dedicated hands on care.

14. Mr. Faggio has now developed increased hypertonicity and spasticity in his limbs, which includes progressive contractures of his upper and lower extremities. Without assistance from others, his arms and legs are in curled, inwardly contracted positions. These contractures, neurologic in origin and secondary to his TBI, are painful for Mr. Faggio, despite receiving medication treatment and pain management. In my opinion, the most effective treatment for these conditions is daily aggressive physical therapy, to stretch out his extremities and relieve their spasm.

15. In addition, Mr. Faggio has developed a disruption of his normal awake/sleep cycle because he is alone in his room in bed with only the television for distraction for long periods each day. He sleeps by day and wakes at night. As a result, during the day he is often very difficult to arouse during family visits and treatment, and has greater difficulty engaging with people and his environment.

16. Finally, in my opinion the withdrawal of more aggressive, hands-on treatment has had a negative impact on his general health. For a TBI patient like Mr. Faggio, physical stimulation and activity must be generated by caregivers. The more stimulation the patient receives, the more body and mind are called into use and response, with resulting benefit to his immune systems and other organs. While it is true that Mr. Faggio will never recover to his pre-accident condition, he remains a sentient human being who is conscious of his existence and who experiences pain. He deserves that level of care which will maximize his overall health and comfort.

17. I strongly recommend the resumption of aggressive rehabilitative treatments so as to reduce his spasticity, decrease the pain associated with the spasticity, re-orient him to a normal sleep/awake cycle, increase his alertness and responsiveness to family visitors and caregivers, and generally improve his health and his prospects for a longer life.

18. In my opinion the treatment goals for Mr. Faggio should not be simply to keep him stable with so-called "custodial" care. My life care plan incorporates modalities of therapy and treatment which will improve his quality of life, decrease his pain, increase his level of awareness and consciousness, and improve his general health. The current plan of care at the Hospital for Special Care does not provide for these additional services.

19. In my opinion, without the resumption of these more aggressive treatments Mr. Faggio's comfort, health, and responsiveness will continue to decline unnecessarily, with potentially life-threatening results. Moreover, further delay will make these additional treatments less effective once they are resumed.

20. My life care plan sets out the cost of these additional services, which would add an additional cost in excess of $150,000.00 per year to the current charges for Mr. Faggio's "maintenance" care at Hospital for Special Care (approximately $580,000. per year)

21. Because the services recommended in my life care plan are beyond the current plan of care at the Hospital for Special Care, it is my understanding that the health coverage Mr. Faggio currently has in place will not pay for these additional services and they must consequently be paid out of pocket by the patient's family.

*(signature)* MSN, APN
Ellen Barker

Subscribed and sworn to this 29th day of January 2009 in New Castle County.

*(signature)*
Notary Public

ROBIN G. BROOKS
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Aug. 11, 2009

4



# EXHIBIT D

## **AFFIDAVIT OF JENNIFER FAGGIO**

1. I am over the age of eighteen and understand the obligation of an oath.

2. I am the wife of Andrew Faggio and the mother of his two young sons. I am also a registered nurse. My husband was a police detective with the City of New Haven.

3. Following my husband's traumatic brain injury in a 2003 work-related car accident, he was admitted to several different hospitals and rehabilitation facilities where he received aggressive daily physical therapy and other forms of care to help him recover function.

4. Sometime in 2007, upon admission as a long term care patient to Hospital for Special Care, my husband's care givers determined that my husband had reached maximum medical recovery, that further rehab services would likely not yield any further recovery of function, and he was reassigned to a treatment protocol which has been described to me as "maintenance".

5. Since the time of his reclassification, my husband has not received the aggressive therapies previously rendered to him at the Hospital for Special Care and at other facilities. Although my husband's minimum medical needs are certainly being met, he is basically left alone all day in the room he shares with one other TBI patient. Other than when I am present or a caregiver checks in, my husband is alone all day and night in bed, with the television left on six inches from his face as his only company and stimulation.

6. My husband received his injuries during his work as a police officer. For this reason, the cost of his care is paid by his employer, the City of New Haven. The City of New Haven has negotiated with the Hospital for Special Care to pay for his "maintenance" care, once he achieved maximum improvement. In short, they won't pay for anything over and above this baseline care.

7. Since the time my husband's care was scaled back to "maintenance care," I have observed a deterioration in his condition. My husband's responsiveness to me and our sons when we visit has decreased. His spasticity and contractures have become more pronounced, in spite of receiving strong medications. He is in pain every time I visit. His sleep cycle is now upset and he often lies awake at night and is consequently difficult to arouse when my sons and I visit by day.

8. I am aware of the recommendations of Ellen Barker that the aggressive therapies which my husband earlier received be resumed. I have also been advised that the cost of providing these services would be in excess of $150,000.00 a year, all of which would have to be paid from my own funds.

9. I do not have the resources to pay for these services myself. One of my main goals in bringing the lawsuit has been to recover sufficient monies to provide my husband with the best possible care for as long as he lives. As a nurse, I understand that he will never recover his full faculties. But I am certain that more can be done to keep him alert and responsive, to minimize his pain, to improve his overall health.

10. My husband was a highly decorated police officer who was selected to become one of the youngest detectives ever with the City of New Haven. He was a person who dedicated his professional life to helping other people. He was a hero to his friends and family. He was the sweetest, most compassionate man I've ever known.

11. Although my husband can't speak to me anymore, he is aware of my presence and he understands his circumstance. At the present time, because the lawsuit has been "put on hold" due to the bankruptcy filing, I feel as powerless as my husband must feel. It was my hope and understanding that the case would be over by the fall of 2009, and money would be then available to pay for his additional care.

12. In light of what my husband sacrificed for our community here in Connecticut, it seems wrong that the end of my husband's lawsuit is being delayed for technical reasons.

Everyone agrees that there is more than enough liability insurance to cover my husband's claim. No one thinks that the additional care I want for my husband will hurt him. Ellen Barker thinks it will make him more comfortable, healthy, and engaged in the remaining years of his life. I don't think it's right for him to have to wait any longer than he already has for the case to be over and for the money to become available to pay for what he deserves, the best possible medical care.

*Jennifer Faggio*
Jennifer Faggio

CTDL 154527492 3/12/201

Subscribed and sworn to this 27th day of January 2009 in Madison, CT Connecticut.

_____
Notary Public

Exp 4/30/09

3