# EXHIBIT C

**(Proxy (Excerpted Pages))**

DEFM14A 1 a2178705zdefm14a.htm DEFM14A
QuickLinks -- Click here to rapidly navigate through this document

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

# SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of**
**The Securities Exchange Act of 1934**

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material Pursuant to §240.14a-12

---

**Tribune Company**

---

(Name of Registrant as Specified In Its Charter)

---

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☐   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)    Title of each class of securities to which transaction applies:

        Common stock of Tribune Company, par value $0.01 per share

    (2)    Aggregate number of securities to which transaction applies:
        118,282,175 shares of common stock
        5,586,083 options to purchase shares common stock
        Restricted stock units with respect to 2,901,245 shares of common stock
        Share equivalents with respect to 382,523 shares of common stock

    (3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined): The maximum aggregate value was determined based upon the sum of (A) 118,282,175 shares of common stock multiplied by $34.00 per share; (B) options to purchase 5,586,083 shares of common stock with exercise prices less than $34.00 multiplied by $7.79 (which is the difference between $34.00 and the weighted average exercise price of such options of $26.21 per share); (C) restricted stock units with respect to 2,901,245 shares of common stock multiplied by $34.00 per share; and (D) share equivalents with respect to 382,523 shares of common stock multiplied by $34.00. In accordance with Section 14(g) of the Securities Exchange Act of 1934, as amended, the filing fee was determined by multiplying 0.00003070 by the sum calculated in the preceding sentence.

    (4)    Proposed maximum aggregate value of transaction:
        $4,176,757,677

    (5)    Total fee paid:
        $128,227

☒   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the

offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)    Amount Previously Paid:

_____

(2)    Form, Schedule or Registration Statement No.:

_____

(3)    Filing Party:

_____

(4)    Date Filed:

_____

# TRIBUNE

July 13, 2007

Dear Shareholder:

We cordially invite you to attend a special meeting of shareholders of Tribune Company, which we will hold on August 21, 2007, at 9:00 a.m., Central Time, at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois. At the special meeting, we will ask you to consider and vote on a proposal to adopt the Agreement and Plan of Merger (the "Merger Agreement"), dated as of April 1, 2007, by and among Tribune Company (the "Company"), GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee (the "Trustee") of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub") and, for limited purposes, EGI-TRB, L.L.C. (the "Zell Entity"), a Delaware limited liability company wholly owned by a trust established for the benefit of Samuel Zell ("Zell" or "Mr. Zell") and his family.

The Merger Agreement contemplates the merger of Merger Sub into the Company (the "Merger"), with the Company surviving and becoming wholly owned by the ESOP. The Merger is part of a series of transactions under which the ESOP and the Zell Entity have invested and will invest in the Company. If we complete the Merger, the Company will become a privately held company wholly owned by the ESOP, with the Zell Entity as an investor in the Company through a subordinated promissory note and a warrant to acquire common stock. In the Merger, all shares of the Company's common stock ("Company Common Stock"), other than shares held by the ESOP and shares held by shareholders who validly exercise appraisal rights, will be converted into the right to receive $34.00 per share in cash. If the Merger does not close by January 1, 2008, this amount will be increased at an annualized rate of 8% from January 1, 2008 to the closing. Adoption of the Merger Agreement and approval of the Merger requires the affirmative vote of holders representing a majority of the shares of Company Common Stock outstanding and entitled to vote at the special meeting. **Your board of directors recommends that you vote FOR adoption of the Merger Agreement and approval of the Merger.**

The accompanying notice of special meeting and proxy statement provide you with a summary of the Merger Agreement and the Merger, conditions and other factors relating to the Merger, and additional important information. **Please read these materials carefully.**

The board has fixed the close of business on July 12, 2007, as the record date for the purpose of determining shareholders entitled to receive notice of and to vote at the special meeting or any adjournment, postponement or continuation of the meeting. The board knows of no other matters that will be presented for consideration at the special meeting. If any other matters properly come before the special meeting, the persons named in the enclosed form of proxy or their substitutes will vote in accordance with their best judgment on such matters.

**YOUR VOTE IS VERY IMPORTANT. Whether or not you plan to attend the special meeting in person, please sign and return the enclosed proxy in the envelope provided.** You may also submit your proxy by either visiting the website or calling the toll-free number shown on your proxy card. If you attend the special meeting and desire to vote in person, you may do so even though you have previously sent a proxy. Because adoption of the Merger Agreement and approval of the Merger requires approval by the holders of a majority of the outstanding shares of Company Common Stock, your failure to vote will have the same effect as a vote against the Merger. If you hold your shares through a broker, your broker will be unable to vote your shares without your instructions. You should instruct your broker how to vote your shares, following the procedures provided by your broker.

We thank you for your support.

Sincerely,

Dennis J. FitzSimons
*Chairman, President and Chief Executive Officer*

Neither the Securities and Exchange Commission nor any state securities regulatory agency has approved or disapproved the Merger, passed upon the merits or fairness of the Merger or passed upon the adequacy or accuracy of the disclosure in this document. Any representation to the contrary is a criminal offense.

This proxy statement is dated July 13, 2007, and is first being mailed to shareholders on or about July 17, 2007.

# TRIBUNE

## NOTICE OF SPECIAL MEETING OF SHAREHOLDERS
## TO BE HELD ON AUGUST 21, 2007

We will hold a special meeting of shareholders of Tribune Company ("Tribune" or the "Company") on August 21, 2007, at 9:00 a.m., Central Time, at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois, for the following purposes:

1.   to consider and vote on a proposal to adopt the Merger Agreement and approve the Merger;

2.   to approve the adjournment of the meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes at the time of the meeting to adopt the Merger Agreement and approve the Merger; and

3.   to act on any other business that may properly come before the meeting.

Only holders of record of Company Common Stock at the close of business on July 12, 2007, the record date for the special meeting, are entitled to notice of and to vote at the meeting. We cordially invite all shareholders of record to attend the special meeting in person. We will ask you to confirm your identity and stock ownership prior to entering the meeting. If you hold your shares through a broker, please bring a copy of a brokerage statement reflecting your stock ownership as of July 12, 2007. For at least ten days prior to the meeting, the Company will maintain, at its principal executive offices, a list of the names and addresses of shareholders eligible to vote at the meeting.

Your vote is important, regardless of the number of shares of Company Common Stock you own. The adoption of the Merger Agreement and approval of the Merger requires the affirmative vote of holders representing a majority of the outstanding shares of Company Common Stock entitled to vote thereon. The proposal to adjourn the meeting, if necessary or appropriate, to solicit additional proxies requires the affirmative vote of a majority of the votes cast on the matter by the holders of shares of Company Common Stock present and entitled to vote. Even if you plan to attend the special meeting in person, we encourage you to complete, sign, date and return the enclosed proxy card to ensure that your shares will be represented at the special meeting.

You may also vote your shares by proxy using a toll-free telephone number or the Internet. We have provided instructions on the proxy card for using these convenient services. If you sign, date and return your proxy card without indicating how you wish to vote, we will vote your proxy in favor of the adoption of the Merger Agreement and the proposal to adjourn the special meeting, if necessary or appropriate, to solicit additional proxies. If you fail to return your proxy card and do not vote at the meeting, we will not be able to count your shares for purposes of determining whether a quorum is present at the special meeting and your failure to vote will have the same effect as a vote against adoption of the Merger Agreement.

If you are a shareholder of record, voting in person at the special meeting will revoke any proxy that you previously submitted. If you hold your shares through a bank, broker or other custodian, you must obtain a legal proxy from such custodian in order to vote in person at the special meeting.

If you do not vote in favor of adoption of the Merger Agreement, you will have the right to seek appraisal of the fair value of your shares if we complete the Merger, but only if you submit a written demand for appraisal to the Company before the vote is taken on the Merger Agreement and otherwise strictly comply with all requirements of Delaware law, which we summarize in the accompanying proxy statement.

By order of the board of directors,

Crane H. Kenney
*Senior Vice President,*
*General Counsel and Secretary*

Dated: July 13, 2007

**IMPORTANT**

**PLEASE VOTE.**   YOU MAY VOTE BY:

- SIGNING AND RETURNING THE ACCOMPANYING PROXY CARD

  OR

- SUBMITTING YOUR PROXY BY TELEPHONE OR BY INTERNET  (see the proxy card for instructions)

  OR

- VOTING IN PERSON AT THE MEETING (if you are a shareholder of record or hold a legal proxy from the shareholder of record)

## TABLE OF CONTENTS

| | Page |
|---|---|
| SUMMARY TERM SHEET | 1 |
| QUESTIONS AND ANSWERS ABOUT THE MERGER AND THE SPECIAL MEETING | 8 |
| INTRODUCTION | 16 |
| SPECIAL FACTORS | 16 |
| Background of the Merger | 16 |
| Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board | 28 |
| Reports of the Special Committee's Financial Advisor | 32 |
| Reports of the Company's Financial Advisors | 32 |
| Opinion of the Special Committee's Financial Advisor | 34 |
| Opinion of the Company's Financial Advisor | 43 |
| Opinion of Valuation Research Corporation | 47 |
| Purposes and Reasons of the ESOP and Merger Sub | 50 |
| Purposes and Reasons of the Zell Investors | 50 |
| Position of the ESOP and Merger Sub as to Fairness | 51 |
| Position of the Zell Investors as to Fairness | 52 |
| Certain Effects of the Merger | 54 |
| Plans for the Company after the Merger and the Other Leveraged ESOP Transactions | 56 |
| Conduct of the Company's Business if the Merger is Not Completed | 57 |
| Financing | 57 |
| Interest of Directors and Executive Officers | 60 |
| Fees and Expenses | 66 |
| Appraisal Rights | 67 |
| United States Federal Income Tax Consequences | 67 |
| Litigation | 69 |
| Regulatory Approvals | 71 |
| Accounting Treatment of the Merger | 72 |
| IDENTITY AND BACKGROUND OF FILING PERSONS | 73 |
| The Company | 73 |
| The ESOP and Merger Sub | 75 |
| The Zell Investors | 76 |
| THE SPECIAL MEETING | 79 |
| Time, Place and Purpose of the Special Meeting | 79 |
| Record Date and Quorum | 79 |
| Required Vote | 79 |
| Proxies; Revocation | 80 |
| Adjournments and Postponements | 81 |
| Solicitation of Proxies | 81 |
| THE MERGER AGREEMENT | 82 |
| Effective Time; Structure | 82 |
| Treatment of Company Common Stock | 82 |
| Treatment of ESOP and Merger Sub-Owned Shares | 82 |
| Treatment of Preferred Stock | 82 |

i

| | |
|---|---|
| Treatment of Merger Sub Common Stock | 83 |
| Representations and Warranties | 83 |
| Conduct of Business Pending the Merger | 85 |
| No Solicitation of Transactions | 87 |
| Shareholders Meeting | 89 |
| Stock Options and Other Stock-Based Awards; Employee Benefits | 90 |
| Indemnification and Insurance | 90 |

| | |
|---|---|
| Agreement to Take Further Action and to Use All Reasonable Best Efforts | 91 |
| Financing Commitments; Company Cooperation | 91 |
| The Tender Offer | 92 |
| Eagle Exchange | 92 |
| Other Covenants and Agreements | 92 |
| Conditions to the Merger | 92 |
| Termination | 93 |
| Amendment and Waiver | 94 |
| OTHER TRANSACTION AGREEMENTS | 95 |
| Zell Entity Purchase Agreement | 95 |
| ESOP Purchase Agreement | 97 |
| Investor Rights Agreement | 98 |
| Voting Agreement | 98 |
| Zell Entity/ESOP Registration Rights Agreement | 99 |
| Chandler Trusts Registration Rights Agreement | 99 |
| ESOP Plan Documents | 100 |
| Amendment of Shareholder Rights Plan | 101 |
| APPRAISAL RIGHTS | 101 |
| INFORMATION ABOUT THE COMPANY | 104 |
| About Tribune Company | 104 |
| Selected Financial Data | 106 |
| Market Price of Company Common Stock | 119 |
| Security Ownership of Certain Beneficial Owners and Management | 119 |
| FINANCIAL PROJECTIONS | 124 |
| MULTIPLE SHAREHOLDERS SHARING ONE ADDRESS | 129 |
| SUBMISSION OF SHAREHOLDER PROPOSALS | 129 |
| OTHER MATTERS | 129 |
| PROVISIONS FOR UNAFFILIATED SHAREHOLDERS | 130 |
| CAUTIONARY NOTE ON FORWARD-LOOKING STATEMENTS | 130 |
| WHERE YOU CAN FIND MORE INFORMATION | 132 |
| ANNEXES | |
| Annex A  Agreement and Plan of Merger | A-1 |
| Annex B  Opinion of Morgan Stanley & Co. Incorporated | B-1 |
| Annex C  Opinion of Merrill Lynch, Pierce, Fenner & Smith Incorporated | C-1 |
| Annex D  Section 262 of the Delaware General Corporation Law | D-1 |

ii

# SUMMARY TERM SHEET

We are providing this summary term sheet for your convenience. We refer to the Company at times as "we," "our" or "us." This summary term sheet highlights the material information in this proxy statement, but you should realize that it does not describe all of the details of the Merger and related transactions to the same extent described in this proxy statement. We recommend that you read the entire proxy statement because it contains details of the Merger and other important information. We have included references to the pages of this proxy statement where you will find a more complete discussion where helpful.

## The Parties to the Merger

*Tribune Company.* The Company is a media and entertainment company, operating primarily in the United States, that conducts its operations through two business segments: publishing and broadcasting and entertainment. In publishing, the Company's leading daily newspapers include the *Los Angeles Times, Chicago Tribune, Newsday* (Long Island, NY), *The Sun* (Baltimore), *South Florida Sun-Sentinel, Orlando Sentinel* and *Hartford Courant*. The Company's broadcasting group operates 23 television stations, Superstation WGN on national cable, Chicago's WGN-AM and the Chicago Cubs baseball team. Popular news and information websites complement the Company's print and broadcast properties and extend its nationwide audience. These segments reflect the manner in which the Company sells its products to the marketplace, manages its operations and makes business decisions. The Company's media operations are principally in major metropolitan areas of the United States and compete against all types of media on both a local and national basis. The Company was founded in 1847 and incorporated in Illinois in 1861. As a result of a corporate restructuring in 1968, the Company became a holding company incorporated in Delaware. The principal executive offices of the Company are located at 435 North Michigan Avenue, Chicago, Illinois 60611 and its telephone number is (312) 222-9100. The Company is publicly traded on the New York Stock Exchange (the "NYSE") under the symbol "TRB."

*Tribune Employee Stock Ownership Plan.* The ESOP was newly formed by the Company on April 1, 2007, with an effective date of January 1, 2007, to enable eligible employees to acquire stock ownership interests in the Company by investing primarily in the Company's common stock. The ESOP is intended to be a qualified employee benefit plan under section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and an employee stock ownership plan within the meaning of section 4975(e)(7) of the Code. The ESOP is intended to invest primarily in the common stock of the Company, and is specifically permitted to invest up to 100% of its assets in the common stock of the Company. As of the record date, July 12, 2007, the ESOP owns 8,928,571 shares of Company Common Stock. The address of the Tribune Employee Stock Ownership Plan is c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523; telephone (630) 572-5130.

The trustee of the ESOP is GreatBanc Trust Company, a Delaware corporation with its principal executive offices at 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523, and its telephone number is (630) 572-5130. Incorporated in 1989, GreatBanc Trust Company provides trust, investment and wealth management services to individuals as well as a range of institutional services to corporations, foundations, endowments and not-for-profit organizations. GreatBanc Trust Company is an independent ERISA trustee with a specialization in employee stock ownership plans. Together with its two affiliates, Salem Trust Company and Pennant Management, Inc., GreatBanc Trust Company supervises client assets from its headquarters in Oak Brook, Illinois and offices in New York, Chicago, Milwaukee and several locations in Florida.

*Tesop Corporation.* Tesop Corporation is a Delaware corporation wholly owned by the ESOP with its principal executive offices at c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak

1

Brook, Illinois 60523. Merger Sub's telephone number is (630) 572-5130. Merger Sub was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions. Merger Sub has not conducted any activities to date other than activities incidental to its formation and in connection with the Leveraged ESOP Transactions.

*EGI-TRB, L.L.C.*    EGI-TRB, L.L.C. (the "Zell Entity") is a Delaware limited liability company wholly owned by Sam Investment Trust, a trust established for the benefit of Zell and his family. Its address is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606; telephone number (312) 454-0100. The Zell Entity was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions. As of the record date, July 12, 2007, the Zell Entity owns 1,470,588 shares of Company Common Stock. The Zell Entity has not conducted any activities to date other than activities incidental to its formation and in connection with the Leveraged ESOP Transactions. See "Identity and Background of Filing Persons" beginning on page 73.

### The Proposal

We are asking you to consider and vote on a proposal to adopt the Merger Agreement and thereby approve the Merger. We have attached a copy of the Merger Agreement to this proxy statement as Annex A. The Merger is part of a series of transactions, which we refer to as the Leveraged ESOP Transactions, under which the ESOP and the Zell Entity have invested and will invest in the Company. In the Merger, all shares of Company Common Stock, other than shares held by the ESOP and shares held by shareholders who validly exercise appraisal rights, will be converted into the right to receive $34.00 per share in cash. If the Merger does not close by January 1, 2008, this amount will be increased at an annualized rate of 8% from January 1, 2008 to the closing. We refer to the per share amount paid in the Merger as the "Merger Consideration." See "The Special Meeting" beginning on page 79.

### Date, Time and Location of the Special Meeting

We will hold the special meeting at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois, on August 21, 2007, starting at 9:00 a.m., Central Time. See "Time, Place and Purpose of the Special Meeting" beginning on page 79.

### Record Date

Each holder of record of shares of Company Common Stock entitled to vote will have the right to one vote for each such share held. Only holders of record at the close of business on July 12, 2007, the record date for the special meeting, are entitled to notice of and to vote at the special meeting. See "Record Date and Quorum" beginning on page 79.

### Required Vote

In order for us to complete the Merger, shareholders representing at least a majority of shares of Company Common Stock outstanding and entitled to vote thereon at the close of business on the record date must vote "**FOR**" adoption of the Merger Agreement and approval of the Merger. A failure to vote your shares of Company Common Stock, an abstention or a broker non-vote will have the same effect as a vote against the proposal to adopt the Merger Agreement and approve the Merger. In addition, the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies requires the affirmative vote of a majority of the votes cast by our shareholders on the proposal. For the purpose of such adjournment proposal, if a holder of shares of Company Common Stock fails to cast a vote, in person or by authorizing a proxy, such failure will not

2

have any effect on the outcome of the proposal. Abstentions and broker non-votes are not considered votes cast and therefore will have no effect on the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies. See "Required Vote" beginning on page 79.

**When the Merger Will be Completed**

We anticipate completing the Merger by the end of 2007, subject to adoption of the Merger Agreement by the Company's shareholders and satisfaction of the other closing conditions set forth in the Merger Agreement. See "The Merger Agreement—Effective Time; Structure" beginning on page 82.

**Effects of the Merger**

If the Company's shareholders adopt the Merger Agreement and we satisfy the other conditions to closing, Merger Sub will merge into the Company, with the Company being the surviving corporation in the Merger (the "Surviving Corporation") and becoming wholly owned by the ESOP. Following completion of the Merger, the Company Common Stock will no longer be publicly traded and shareholders other than the ESOP will cease to have any ownership interest in the Company and will not participate in any future earnings and growth of the Company. Immediately following the consummation of the Merger, the Zell Entity will purchase from the Company a subordinated promissory note and a warrant to acquire common stock. Immediately upon completion of the Leveraged ESOP Transactions, the ESOP will own approximately 52% of the fully diluted equity of the Company, and the Zell Entity will own a warrant to purchase approximately 40% of the fully diluted equity of the Company, in each case after giving effect to the grant of share equivalent awards expected to be made to certain members of management and other key employees. See "Certain Effects of the Merger" beginning on page 54.

**Recommendation of the Company's Board of Directors**

The Company's board of directors (the "Board") recommends that you vote **FOR** adoption of the Merger Agreement and approval of the Merger. See "Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board" beginning on page 28.

On September 21, 2006, the Board formed a special committee (the "Special Committee"), consisting of all of the members of the Board other than the Chief Executive Officer and the three directors nominated by Chandler Trust No. 1 and Chandler Trust No. 2 (the "Chandler Trusts"), to oversee a formal process of exploring strategic alternatives. The Special Committee was created to ensure oversight of the process free of any potential conflicts of interest.

On April 1, 2007, the Board, based on the recommendation of the Special Committee, determined that the Merger Agreement is advisable, fair to and in the best interests of the Company and its unaffiliated shareholders, and approved the Merger Agreement and the transactions contemplated thereby. Representatives of the Chandler Trusts on the Board abstained from voting as directors, and Mr. Zell was not a member of the Board at the time the Board made these determinations, recommendations and approvals.

For the factors considered by the Board in reaching its decision to approve the Merger Agreement and approve the Merger, see "Special Factors—Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board." See also "Special Factors—Interest of Directors and Executive Officers" beginning on page 60.

3

**Opinion of the Special Committee's Financial Advisor**

In connection with the Merger, the Special Committee received a written opinion, dated April 1, 2007, from Morgan Stanley & Co. Incorporated ("Morgan Stanley"), the Special Committee's financial advisor, as to the fairness, from a financial point of view and as of the date of the opinion, of the Merger Consideration to be received by the unaffiliated holders of Company Common Stock. Morgan Stanley also provided this opinion to the Board. We have attached the full text of Morgan Stanley's written opinion to this proxy statement as Annex B. We encourage you to read this opinion carefully in its entirety for a description of the assumptions made, procedures followed, matters considered and limitations on the review undertaken. Morgan Stanley addressed its opinion to the Special Committee and the Board in connection with their evaluation of the Merger Consideration from a financial point of view, and its opinion does not address any other aspects or implications of the Merger, and does not constitute a recommendation to any shareholder as to how such shareholder should vote or act on any matters relating to the Merger. See "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 34 and Annex B.

**Opinion of the Company's Financial Advisor**

In connection with the Merger, the Board received a written opinion, dated April 1, 2007, from Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), the Company's financial advisor, as to the fairness, from a financial point of view and as of the date of the opinion, of the Merger Consideration to be received by unaffiliated holders of Company Common Stock. We have attached the full text of Merrill Lynch's written opinion to this proxy statement as Annex C. We encourage you to read this opinion carefully in its entirety for a description of the assumptions made, procedures followed, matters considered and limitations on the review undertaken. Merrill Lynch addressed its opinion to the Board in connection with its evaluation of the Merger Consideration from a financial point of view, and its opinion does not address any other aspects or implications of the Merger, and does not constitute a recommendation to any shareholder as to how such shareholder should vote or act on any matters relating to the Merger. See "Special Factors—Opinion of the Company's Financial Advisor" beginning on page 43 and Annex C.

**Opinion of Valuation Research Corporation**

In connection with the Tender Offer, the Board received written opinions, dated May 9, 2007 and May 24, 2007, from Valuation Research Corporation ("VRC") as to the solvency and capital adequacy of the Company after giving effect to the Step One Transactions, as of those dates. VRC's opinion is directed to the Board, addresses only the matters set forth therein, and does not constitute a recommendation to any shareholder of the Company as to how such shareholder should vote or act on any matters relating to the Merger. The Company also expects that VRC will provide a solvency opinion in connection with the Merger. The Company's receipt of a satisfactory solvency opinion giving effect to the Merger and related transactions is a condition to consummation of the Merger. See "Special Factors—Opinion of Valuation Research Corporation" beginning on page 47.

**Financing**

The Company has entered into a commitment letter with certain lenders with respect to a $2.105 billion incremental term loan facility and a $2.1 billion senior unsecured bridge facility. The Company may issue $2.1 billion senior notes or senior subordinated notes in lieu of drawing under the senior bridge facility or to refinance the senior bridge facility at a later date. The proceeds from these borrowings or issuances will in all cases be used by the Company, among other ways, in connection

4

with the payment of the Merger Consideration pursuant to the terms of the Merger Agreement. See "Special Factors—Financing" beginning on page 57.

**No-Solicitation Provision of the Merger Agreement**

The Company has agreed not to take certain actions that would encourage an alternative proposal to the Merger. However, the parties to the Merger Agreement have agreed that, under certain circumstances, the Company may respond to an unsolicited alternative proposal. The Company has also agreed not to withdraw or modify the approval by the Special Committee or the Board of the Merger or the Merger Agreement, or propose publicly to do so, or to approve or propose publicly to approve any alternative proposal, except, under certain circumstances, if the Board determines that failure to take the foregoing actions would be inconsistent with the exercise of its fiduciary duties. See "The Merger Agreement—No Solicitation of Transactions" beginning on page 87.

**Conditions to the Merger**

The obligations of the parties to complete the Merger are subject to the satisfaction or waiver of certain conditions, including shareholder and regulatory approval, receipt of financing and receipt of a satisfactory solvency opinion. See "The Merger Agreement—Conditions to the Merger" beginning on page 92.

**Termination of the Merger Agreement**

The Merger Agreement may be terminated by mutual agreement of the Company and the ESOP (but only with the prior written consent of the Zell Entity). In addition, the Merger Agreement may be terminated, under certain circumstances, if the Merger has not occurred by May 31, 2008, if any final and non-appealable injunction or order permanently prohibits the consummation of the Merger, or if shareholder approval has not been obtained at the shareholders meeting.

In addition, the Merger Agreement may be terminated by the Company, under certain circumstances: (1) if the ESOP breaches or fails to perform its representations, warranties, covenants or other agreements contained in the Merger Agreement, which breach or failure to perform would result in a failure of a mutual condition or a condition to the Company's obligation to consummate the Merger to be satisfied and cannot be cured by May 31, 2008; (2) in order to accept a Superior Proposal; or (3) if the Zell Entity Purchase Agreement is terminated in accordance with its terms prior to the consummation of the Merger.

The Merger Agreement may be terminated by the ESOP, under certain circumstances: (1) if the Company breaches or fails to perform its representations, warranties, covenants or other agreements contained in the Merger Agreement, which breach or failure to perform would result in a failure of a mutual condition or a condition to the ESOP's obligation to consummate the Merger to be satisfied and cannot be cured by May 31, 2008; or (2) with the prior written consent of the Zell Entity, if prior to approval of the Company's shareholders the Board has failed to make the required recommendation in the proxy statement or has effected a change of recommendation in a manner adverse to the ESOP. See "The Merger Agreement—Termination" beginning on page 93.

If the Merger Agreement is terminated under certain specified circumstances, the Company may be required to pay the Zell Entity a fee of $25 million, including in the event of termination due to (1) certain breaches by the Company, (2) a change in recommendation by the Board or the Special Committee, (3) a determination by the Board or the Special Committee to accept a Superior Proposal or (4) shareholder disapproval under certain circumstances if the Company then enters into an alternative transaction meeting certain criteria within a year after termination. In addition, under

5

certain specified circumstances the Zell Entity may be required to pay the Company a fee of $25 million, including in the event of termination due to (1) certain breaches by the Zell Entity or (2) failure to obtain the financing for the transactions unless the failure is due to a breach by the Company or the ESOP. See "Other Transaction Agreements—Zell Entity Purchase Agreement" beginning on page 95.

## Treatment of Stock Options

The Merger Agreement provides that all holders of the Company's stock options will receive an amount in cash equal to the excess of the Merger Consideration over the applicable per share exercise price for each stock option (whether vested or unvested) held, less applicable withholding tax. See "The Merger Agreement—Stock Options and Other Stock-Based Awards; Employee Benefits" beginning on page 90.

## Treatment of Restricted Stock Shares and Stock-Based Awards

The Merger Agreement provides that all holders of the Company's restricted stock shares and stock-based awards will receive the Merger Consideration in cash for each share (whether vested or unvested) held, less applicable withholding tax. See "The Merger Agreement—Stock Options and Other Stock-Based Awards; Employee Benefits" beginning on page 90.

## Interests of the Company's Directors and Executive Officers in the Merger

In considering the recommendation of the Board, you should be aware that our directors and executive officers may have interests in the Merger that are different from, or in addition to, your interests as a shareholder, and that may present actual or potential conflicts of interest. See "Special Factors—Interest of Directors and Executive Officers" beginning on page 60.

## Material United States Federal Income Tax Consequences

If you are a U.S. holder (as defined below) of shares of Company Common Stock, the Merger will be a taxable transaction to you. For U.S. federal income tax purposes, your receipt of cash in exchange for your shares of Company Common Stock generally will cause you to recognize a gain or loss measured by the difference, if any, between the cash you receive in the Merger and your adjusted tax basis in your shares of Company Common Stock. **You should consult your own tax advisor for a full understanding of how the Merger will affect your taxes.** See "Special Factors—United States Federal Income Tax Consequences" beginning on page 67.

## Regulatory Approvals

The parties have filed applications with the Federal Communications Commission ("FCC") for consent to the transfer of control of the Company from its public shareholders to the ESOP, the Zell Entity and Zell. The parties have also requested that the FCC waive its rule prohibiting the common ownership of daily English language newspapers and broadcast stations in the five markets where the Company owns such combinations. The parties have also requested a "failing station waiver" to permit the continued common ownership of the Company's two television stations in Hartford, Connecticut, as well as a "satellite waiver" to permit the continued common ownership and operation of WTTK, Kokomo, Indiana, as a satellite station of WTTV, Indianapolis, Indiana. See "Special Factors—Regulatory Approvals" beginning on page 71.

6

**Rights of Appraisal**

Delaware law provides you with appraisal rights in the Merger. This means that, if you fully comply with the procedures for perfecting appraisal rights, Delaware law entitles you to have the fair value of your shares of common stock determined by the Delaware Court of Chancery and to receive payment based on that valuation in lieu of the Merger Consideration. The ultimate amount you receive in an appraisal proceeding may be more or less than, or the same as, the amount you would have received under the Merger Agreement. To exercise your appraisal rights, you must deliver a written demand for appraisal to the Company before the vote on the Merger Agreement at the special meeting and you must not vote in favor of the adoption of the Merger Agreement. Your failure to follow strictly the procedures specified under Delaware law will result in the loss of your appraisal rights. We have attached a copy of Section 262 of the General Corporation Law of the State of Delaware ("DGCL"), which sets forth the requirement for exercising appraisal rights, to this proxy statement as Annex D. We encourage you to consult your legal advisor if you intend to seek appraisal rights. See "Special Factors—Appraisal Rights" beginning on page 67 and Annex D).

7

## QUESTIONS AND ANSWERS ABOUT THE MERGER AND THE SPECIAL MEETING

The following questions and answers address briefly some questions you may have regarding the Merger and the special meeting. These questions and answers may not address all questions that may be important to you as a shareholder of the Company. Please refer to the more detailed information contained elsewhere in this proxy statement, the annexes to this proxy statement and the documents that we refer to or incorporate by reference in this proxy statement.

**What am I being asked to vote on?**

We are asking you to vote on adoption of the Merger Agreement entered into by and among the Company, the ESOP, Merger Sub and, for limited purposes, the Zell Entity, and thereby to approve the Merger.

**What is the purpose of the Merger?**

The purpose of the Merger is to make the Company a private company, wholly owned by the ESOP, with the Zell Entity as an investor in the Company through a subordinated note and a warrant to acquire common stock. The Merger is one step in the Leveraged ESOP Transactions. In the Merger, all shares of Company Common Stock, other than shares held by the ESOP and shares held by shareholders who validly exercise appraisal rights, will be converted into the right to receive $34.00 per share in cash. If the Merger does not close by January 1, 2008, this amount will be increased at an annualized rate of 8% from January 1, 2008 to the closing.

**What are the Leveraged ESOP Transactions?**

What we refer to as the "Leveraged ESOP Transactions" consist of a series of transactions that include the Merger, as well as the following:

- The ESOP has purchased 8,928,571 shares of Company Common Stock from the Company at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP or distributions paid on the shares of Company Common Stock held by the ESOP. See "Other Transaction Agreements—ESOP Purchase Agreement."

- The Zell Entity has made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of the Company Common Stock at a price of $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million, which the Company must repay immediately prior to the Merger. The promissory note is exchangeable at the Company's option, or automatically upon termination of the Merger Agreement, into an aggregate of 5,882,353 shares of Company Common Stock, subject to antidilution adjustments. The shares of Company Common Stock, the exchangeable promissory note and any underlying shares acquired upon exchange that are held by the Zell Entity are subject to certain transfer restrictions until April 23, 2010. In connection with the Zell Entity's investment, on May 9, 2007, Mr. Zell was appointed as a member of the Board. See "Other Transaction Agreements—Zell Entity Purchase Agreement."

- The Company commenced, on April 25, 2007, a tender offer to purchase up to 126,000,000 shares of Company Common Stock at a price of $34.00 per share in cash (the "Tender Offer"). Approximately 218,132,000 shares were tendered in the Tender Offer, which expired at 5:00 p.m. New York City time, on May 24, 2007. Because more than 126,000,000 shares were tendered in the Tender Offer, proration of tendered shares, except for "odd lots" (lots held by owners of less than 100 shares), was required.

8

- The Company, the ESOP, Merger Sub and, for limited purposes, the Zell Entity entered into the Merger Agreement providing for the Merger, on the terms and subject to the conditions set forth in the Merger Agreement. See "The Merger Agreement."

- In the Merger, the Zell Entity will receive cash for the shares of Company Common Stock it owns and, immediately prior to the Merger, the Company will repay the exchangeable promissory note held by the Zell Entity. Following consummation of the Merger, the Zell Entity will purchase from the Company, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant (the "Warrant"). The Warrant will entitle the Zell Entity to purchase 43,478,261 shares of Company Common Stock (subject to adjustment), which will represent approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to share equivalents under a management equity incentive plan). The Warrant will have an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). See "Other Transaction Agreements—Zell Entity Purchase Agreement."

- The Company has agreed to grant the Zell Entity and the ESOP registration rights, in the event the Merger does not close, with respect to the shares of Company Common Stock that the Zell Entity and the ESOP purchased from the Company in their initial investments. However, the Zell Entity will not be able to exercise its registration rights prior to April 23, 2010 and, in the event the Merger does not close, will be prohibited from selling or assigning its Company Common Stock, exchangeable promissory note or underlying shares acquired upon exchange until April 23, 2010, other than to certain permitted transferees. In addition, the ESOP will not be able to exercise its registration rights prior to April 1, 2008. The Company has also agreed to grant the Chandler Trusts registration rights. See "Other Transaction Agreements—Zell Entity/ESOP Registration Rights Agreement" and "Other Transaction Agreements—Chandler Trusts Registration Rights Agreement."

- The Company has secured financing commitments from and executed a Credit Agreement with certain lenders to provide the Company with the ability to borrow the amounts required for purposes of financing the Leveraged ESOP Transactions, to refinance certain indebtedness of the Company, including indebtedness under its existing credit facilities, and for working capital and general corporate purposes of the Company. See "Special Factors—Financing."

- The Chandler Trusts tendered into the Tender Offer all shares held by them as of the expiration of the Tender Offer.

- Effective no later than January 1st following the date the Merger is consummated, the Company intends to elect to be treated as an S corporation under Subchapter S of the Code and to elect for each of its domestic eligible subsidiaries (other than (a) immaterial subsidiaries and (b) any other subsidiaries for which the Company reasonably determines the failure to be treated as a qualified subchapter S subsidiary for U.S. federal income tax purposes would not result in material adverse tax consequences to the Company) to be treated as qualified subchapter S subsidiaries for U.S. federal income tax purposes. Subject to certain limitations (such as the built-in gains tax applicable for ten years to gains accrued prior to the election), once the Company so elects, it will not be subject to federal income tax. Instead, the Company's income will be required to be reported by its shareholders. The ESOP will generally not be taxed on the share of income that is passed through to it.

In addition, after the 2007 baseball season, the Company intends to dispose of an interest in the Chicago Cubs and the Company's 25 percent stake in Comcast SportsNet Chicago. The Company currently expects to use proceeds from such disposition to pay down Company debt.

9

## Who will own the Company following the Merger?

Immediately upon completion of the Merger, the Company will be wholly owned by the ESOP. The Zell Entity will be an investor in the Company through a subordinated promissory note and a warrant to acquire common stock, which will entitle the Zell Entity to purchase, at a future date, approximately 40% of the economic equity interest in the Company.

## Why is the Company engaging in the Merger and the other Leveraged ESOP Transactions?

After a rigorous and thorough strategic review process during which the Special Committee considered a number of strategic alternatives, the Special Committee and the Board determined that the Merger and the other Leveraged ESOP Transactions were in the best interests of the Company and its shareholders. The Special Committee and the Board considered a number of factors in determining to recommend the Merger and the other Leveraged ESOP Transactions. These included:

- the fact that the value offered in the Leveraged ESOP Transactions was as high as any proposal received from any third party, and the consideration offered in the Merger of $34.00 per share reflects a premium of approximately 5.9% to the closing price of Company Common Stock on March 30, 2007, the last trading day before the proposal was made public, and approximately 12.5% to the average closing price of Company Common Stock for the 30 calendar day period ending on March 30, 2007;

- the business, operations, properties and assets, financial condition, business strategy and prospects of the Company (as well as the risks involved in achieving those prospects);

- the fact that the Company had explored a variety of strategic alternatives over an extended period of time and the Special Committee's view that the Leveraged ESOP Transactions, including the Merger, were in the best interests of the Company and its unaffiliated shareholders compared to the alternatives considered;

- the fact that the transactions were structured to permit the Tender Offer as a means of purchasing a significant portion of the Company Common Stock on an accelerated timetable, and the increased consideration to be paid in the Merger, in the form of the 8% annualized "ticking fee," in the event the Merger does not close by January 1, 2008;

- the other terms of the Merger Agreement, including the fact that the Merger Agreement does not preclude unsolicited offers from other parties, subject to specified conditions, and permits the Company to terminate the Merger Agreement prior to shareholder approval to accept a superior proposal, subject to payment by the Company of a $25 million termination fee;

- the availability of financing commitments for the Merger and other steps in the Leveraged ESOP Transactions;

- the analysis and written opinion of Morgan Stanley to the effect that, as of April 1, 2007, and based upon the factors and subject to the assumptions set forth in its written opinion, the Merger Consideration to be received by the holders of Company Common Stock (other than certain affiliated entities) was fair from a financial point of view to such shareholders; and

- the analysis and written opinion of Merrill Lynch to the effect that, as of April 1, 2007, and based upon the factors and subject to the assumptions set forth in its written opinion, the Merger Consideration to be received by the holders of Company Common Stock (other than certain affiliated entities) was fair from a financial point of view to such shareholders.

For additional factors and more details with respect to the factors considered by the Special Committee and the Board, see "Special Factors—Background of the Merger" and "Special Factors—Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board."

10

**Is this part of a going-private transaction?**

Yes. In the Merger, all the remaining shares of Company Common Stock, other than shares held by the ESOP and shares held by shareholders who validly exercise appraisal rights, will be converted into the right to receive cash. As a result, following the Merger, the Company will cease to be a public company.

**What does it mean to cease to be a public company?**

Immediately upon completion of the Merger, the Company will be wholly owned by the ESOP, which will result in the Company being delisted from the NYSE and will permit the Company to deregister the shares under the Securities Exchange Act of 1934 (the "Exchange Act"). However, the Company has debt securities that are registered under the Securities Act of 1933, certain of which are listed on the NYSE and, so long as those debt securities remain outstanding, the Company will continue to have reporting obligations under the Exchange Act.

**Has the Company or the Board adopted a position on the Merger?**

Yes. The Board, based on the recommendation of the Special Committee, has determined that the Merger Agreement, including the Merger, is advisable, fair to and in the best interests of the Company and the Company's unaffiliated shareholders, and recommends that shareholders vote their shares in favor of the Merger Agreement and the Merger. Representatives of the Chandler Trusts abstained from voting as directors, and Mr. Zell was not a member of the Board at the time the Board made these determinations, recommendations and approvals. See "Special Factors—Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board."

**How will the Company pay the Merger Consideration?**

We anticipate that we will pay for the Merger Consideration from borrowings under the Second Step Credit Facilities (as defined below). At this time, the Company does not have any alternative financing arrangements or plans in the event these sources do not provide the funds necessary to pay the Merger Consideration. See "Special Factors—Financing."

**When and where is the special meeting?**

We will hold the special meeting of shareholders of the Company on August 21, 2007, at 9:00 a.m., Central Time, at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois. See "The Special Meeting."

**May I attend the special meeting?**

All Company shareholders of record as of the close of business on July 12, 2007, the record date for the special meeting, or their duly appointed proxies, may attend the special meeting. In order to be admitted to the special meeting, we will require a form of personal identification, as well as proof of ownership of Company Common Stock.

If you hold your shares of Company Common Stock in the name of a bank, broker or other holder of record, and you plan to attend the special meeting, you must present proof of your ownership of Company Common Stock, such as a bank or brokerage account statement or other proof of ownership, in order to be admitted to the special meeting.

Please note that if you hold your shares of Company Common Stock in the name of a bank, broker or other holder of record, and plan to vote at the special meeting, you must also present at the special meeting a proxy issued to you by the holder of record of your shares.

11

No cameras, recording equipment, electronic devices, large bags, briefcases or packages will be permitted in the special meeting.

### Who can vote at the special meeting?

You can vote at the special meeting if you owned shares of Company Common Stock at the close of business on July 12, 2007, the record date for shareholders entitled to vote at the special meeting. As of the close of business on that day, 127,330,754 shares of Company Common Stock were outstanding (excluding shares held by our subsidiaries). See "The Special Meeting."

### What constitutes a quorum?

The special meeting will only be held if a quorum is present. The presence, in person or by proxy, of shareholders having a majority of the votes entitled to be cast at the meeting will constitute a quorum to conduct business. Abstentions and broker non-votes are counted as present for establishing a quorum. A broker non-vote occurs when a broker cannot vote on a matter because the broker has not received instructions from the beneficial owner and lacks discretionary voting authority with respect to that matter, in circumstances where the broker votes a client's shares on some but not all of the proposals presented at the meeting.

### How do I vote?

Shareholders of record can vote in person, or by proxy on the Internet, by telephone or by mail. To submit a proxy by mail, complete, sign and date the enclosed proxy card and return it in the enclosed postage-paid envelope. To submit a proxy by telephone or on the Internet, follow the instructions on the proxy card. We will vote your shares as you indicate. Unless you give other instructions on your proxy card, the persons named as proxy holders on the proxy card will vote your shares in accordance with the Board's recommendations.

You have the right to revoke your proxy at any time before the meeting by:

- delivering a written notice of revocation to Tribune's corporate secretary;

- voting in person by ballot at the meeting;

- returning a later-dated proxy card; or

- submitting a new proxy by telephone or on the Internet.

If you hold shares through a broker, your broker will instruct you as to how your shares may be voted by proxy, including whether telephonic or Internet voting options are available, and as to how your proxy may be revoked. If you would like to vote in person at the meeting, you must obtain a proxy from your broker and bring it to the meeting.

### How do I vote my shares in Tribune's employee benefit plans?

If you are a participant in the Tribune Company 401(k) Savings and Profit Sharing Plan, the Tribune Company Defined Contribution Retirement Plan, or the Times Mirror Savings Plus Plan (collectively, the "Retirement Plans") or in the Tribune Company Employee Stock Purchase Plan (the "Stock Purchase Plan"), you are entitled to instruct the appropriate plan trustee or nominee how to vote the shares held in an account for you under these plans. Plan participants may give instructions to the appropriate plan trustee or nominee by mail, by telephone or on the Internet by following the procedures described on the proxy card.

Any participant may revoke or modify such instructions prior to 5:00 p.m., Central Time, on August 17, 2007 by delivering written notice to the trustee or nominee. The trustee or nominee will vote shares under Tribune's employee benefit plans in accordance with instructions that it receives by

12

the close of business on August 17, 2007. Shares held in any of the Retirement Plans for which no instructions are received by the close of business on August 17, 2007 will be voted in the same proportion as the shares in each plan for which instructions are received. Shares held in the Employee Stock Purchase Plan for which no instructions are received by the close of business on August 17, 2007 will not be voted.

**How many shares are held by Tribune's employee benefit plans?**

Computershare Trust Company, Inc. is the nominee of the Tribune Company Employee Stock Purchase Plan. The Northern Trust Company is the trustee of each of the Retirement Plans. As of the record date, July 12, 2007, the following shares are held in these plans:

| | |
|---|---|
| Tribune Company Employee Stock Purchase Plan | 2,078,829 shares |
| Tribune Company 401(k) Savings and Profit Sharing Plan | 8,513,927 shares |
| Times Mirror Savings Plus Plan | 256,218 shares |
| All other Tribune defined contribution plans | 1,125,282 shares |

**How are votes counted?**

The inspector of election appointed for the special meeting will count the votes, and will separately count "For" and "Against" votes, abstentions and broker non-votes. A "broker non-vote" occurs when a nominee holding shares for a beneficial owner does not receive instructions from the beneficial owner with regard to the proposed Merger, in circumstances where the broker is authorized to vote the client's shares on some but not all of the proposals presented at the meeting and lacks discretionary voting authority with respect to that matter. Because adoption of the Merger Agreement and approval of the Merger requires the affirmative vote of holders representing a majority of the shares of Company Common Stock outstanding and entitled to vote thereon, the failure to vote, broker non-votes and abstentions will have the same effect as voting "Against" adoption of the Merger Agreement.

**How many votes are required to approve the Merger Agreement?**

Adoption of the Merger Agreement and approval of the Merger requires the affirmative vote of holders representing a majority of outstanding shares of Company Common Stock entitled to vote thereon as of the close of business on July 12, 2007, the record date for shareholders entitled to vote at the special meeting. As of the close of business on the record date, there are 127,330,754 shares of Company Common Stock outstanding and entitled to vote on the Merger Agreement and the Merger.

**How many votes are required to approve an adjournment of the special meeting?**

Approval of any adjournments of the special meeting to solicit additional proxies requires the affirmative vote of a majority of the votes cast by our shareholders, in person or by proxy, on the proposal. For the purpose of this proposal, if you fail to cast a vote on this proposal, in person or by proxy, such failure will not have any effect on the outcome of this proposal. Abstentions and broker non-votes are not considered votes cast and therefore will have no effect on the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies.

**How do the Company's directors and executive officers intend to vote?**

To the best of our knowledge, all of our directors and executive officers intend to vote their shares of Company Common Stock in favor of the adoption of the Merger Agreement and approval of the Merger, although such persons have not entered into agreements obligating them to do so. The Zell Entity, which is owned by a trust established for the benefit of Zell (who became a director of the Company effective May 9, 2007) and his family, has entered into an agreement to vote all of the shares

13

of Company Common Stock that it beneficially owns in favor of the adoption of the Merger Agreement and approval of the Merger. As of the record date, the directors and executive officers of the Company (in the aggregate) hold and are entitled to vote Company Common Stock representing approximately 0.6% of the outstanding shares (which amount does not include the approximately 1.2% of the outstanding shares held by the Zell Entity). See "Other Transaction Agreements—Zell Entity Purchase Agreement."

**How does the ESOP intend to vote?**

The ESOP currently holds and is entitled to vote 8,928,571 shares of Company Common Stock, representing approximately 7% of the outstanding shares. The ESOP intends to vote all its shares of Company Common Stock in favor of the adoption of the Merger Agreement and approval of the Merger.

**How many votes do I have?**

You have one vote for each share of Company Common Stock you own as of the record date. If you are a participant in one of the Retirement Plans or in the Stock Purchase Plan, you can direct one vote for each share allocated to your account under these plans.

**If my shares are held in "street name" by my broker, will my broker vote my shares for me?**

Your broker will vote your shares only if you provide instructions to your broker on how to vote. You should instruct your broker to vote your shares by following the directions provided to you by your broker. See "The Special Meeting."

**What if I fail to instruct my broker?**

Without instructions, your broker will not vote any of your shares held in "street name." Broker non-votes, if any, will be counted for the purpose of determining the presence or absence of a quorum, but will not be deemed votes cast and will have the same effect as a vote "Against" the Merger proposal.

**Will my shares held in "street name" or another form of record ownership be combined for voting purposes with shares I hold of record?**

No. Because any shares you may hold in "street name" will be deemed to be held by a different shareholder than any shares you hold of record, any shares so held will not be combined for voting purposes with shares you hold of record. Similarly, if you own shares in various registered forms, such as jointly with your spouse, as trustee of a trust or as custodian for a minor, you will receive, and will need to sign and return, a separate proxy card for those shares because they are held in a different form of record ownership. Shares held by a corporation or business entity must be voted by an authorized officer of the entity.

**When should I send in my stock certificates?**

After the completion of the Merger, you will receive a letter of transmittal to complete and return to Computershare Trust Company, N.A., the paying agent. In order to receive the Merger Consideration as soon as reasonably practicable following the completion of the Merger, you must send the paying agent your validly completed letter of transmittal together with your Company stock certificates as instructed in the separate mailing. **You should not send your stock certificates now.**

**I do not know where my stock certificate is—how will I get my cash?**

The materials we will send you after completion of the Merger will include the procedures that you must follow if you cannot locate your stock certificate. This will include an affidavit that you will

14

need to sign attesting to the loss of your certificate. We may also require that you provide a bond to the Company in order to cover any potential loss.

**What should I do now?**

Mail your completed proxy card in the enclosed return envelope. You may also submit your proxy by visiting the website or by calling the toll-free number shown on your proxy card.

**What happens if I sell my shares before the special meeting?**

If you transfer your shares of Company Common Stock after the record date but before the special meeting, you will, unless special arrangements are made, retain your right to vote at the special meeting but will transfer the right to receive the Merger Consideration to the person to whom you transfer your shares.

**Can I change my vote after I have mailed in my proxy card?**

Yes. You can change your vote at any time before we vote your proxy at the special meeting. You can do so in any of the following ways: first, you can send a written notice stating that you would like to revoke your proxy to the Corporate Secretary of the Company at the address given below; second, you can request a new proxy card, complete it and send it to the Corporate Secretary of the Company at: 435 North Michigan Avenue, Chicago, Illinois 60611 or complete a new proxy by visiting the website or by calling the toll-free number shown on your proxy card; and third, you can attend the special meeting and vote in person. You should send any written notice or request for a new proxy card to the attention of Corporate Secretary, Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611. Submitting your proxy via the Internet, by telephone or by mailing in your proxy card will not prevent you from voting in person at the special meeting. See "The Special Meeting."

**What if I have further questions?**

If you have additional questions about the Merger or if you would like additional copies of this proxy statement or a new proxy card, you may call our proxy solicitor, Innisfree M&A Incorporated, toll-free at (877) 825-8621 or contact our Corporate Secretary, Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611.

15

## INTRODUCTION

We are providing you with this proxy statement and the accompanying form of proxy in connection with the solicitation of proxies by our Board for use at a special meeting of our shareholders to be held on August 21, 2007, at 9:00 a.m., Central Time, at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois.

At the special meeting, we will ask you to vote on adoption of the Merger Agreement and thereby approve the Merger. The Merger is part of a series of transactions, which we refer to as the Leveraged ESOP Transactions, under which the ESOP and the Zell Entity have invested and will invest in the Company. If we complete the Merger, the Company will become a privately held company wholly owned by the ESOP, and our shareholders will have the right to receive the Merger Consideration for each share of Company Common Stock.

**Our Board, based on the recommendation of the Special Committee, has determined that the Merger Agreement and the Merger are advisable, fair to and in the best interests of the Company and the Company's unaffiliated shareholders and recommends that shareholders vote "FOR" adoption of the Merger Agreement and approval of the Merger. Representatives of the Chandler Trusts abstained from voting as directors, and Mr. Zell was not a member of the Board at the time the Board made these determinations, recommendations and approvals. See "Special Factors— Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board."**

## SPECIAL FACTORS

### Background of the Merger

The Company periodically conducts strategic reviews of its businesses internally and with the Board as a means of evaluating the Company's strategic direction and alternatives.

As early as February 2005, the Company and Merrill Lynch, the Company's outside financial advisor, reviewed with the Board certain factors affecting the Company's Broadcasting & Entertainment Group (the "B&E Group") and discussed on a preliminary basis the range of financial and strategic options available with respect to that business. While the Company had preliminary discussions with certain third parties with respect to the B&E Group, the Company determined not to proceed further with any such discussions pending an upcoming strategic review with the Board.

In October 2005, the Company held a two-day strategic review with the Board and Merrill Lynch. These sessions included a full review of the media business environment, strategic opportunities and capital planning. Among the strategic alternatives reviewed, the Board dedicated substantial time to exploring the possible sale or other separation of the B&E Group and the impact that such a transaction might have on shareholder value. The Board asked the Company's management and Merrill Lynch to continue their evaluation of such a transaction and other strategic alternatives.

At a Board meeting in December 2005, the Board explored further the possibility of a separation of the B&E Group, as well as other strategic alternatives, with management and Merrill Lynch. Potential value creation alternatives that were reviewed included a variety of structures for separating the B&E Group, a possible strategic combination with another media company and the acquisition of the Company by financial buyers through a leveraged buy-out. The Board also considered an increase in the Company's stock repurchase authority.

With respect to the separation of the B&E Group, the Board focused on a tax-free spin-off as having substantial tax and other advantages compared to a taxable sale of the B&E Group. The Board also considered the need to restructure two limited liability companies, TMCT, LLC and TMCT II, LLC (the "TMCT LLCs"), co-owned by the Company and the Chandler Trusts, in connection with a spin-off of the B&E Group or certain other transactions. The restructuring of the TMCT LLCs required the mutual consent of the Company and the Chandler Trusts. The Board

16

directed management to prepare for a possible spin-off of the B&E Group and to pursue the necessary restructuring of the first TMCT LLC, as well as to continue to explore the possible sale of the B&E Group. The Board also increased the Company's stock repurchase authority.

In mid-December 2005 and early 2006, representatives of the Company met with representatives of a private equity firm, at the firm's request, to understand outside views of the potential value to shareholders of possible private equity transactions. The Company's management and Merrill Lynch also continued to evaluate the possible spin-off of the B&E Group. In January 2006, representatives of the Company met with representatives of the Chandler Trusts to discuss the Company's strategic alternatives and the impact of those alternatives on the TMCT LLCs. The Chandler Trusts representatives expressed their desire to combine any strategic alternative pursued by the Company with the restructuring of the TMCT LLCs. The Chandler Trusts representatives suggested that such a restructuring could occur in the third quarter of 2006.

In early February 2006, prior to a February 2006 Board meeting, the Chandler Trusts sent a letter to the Board reiterating their desire to restructure the TMCT LLCs and proposing that the TMCT LLCs be restructured prior to a spin-off of the B&E Group. The letter suggested that the restructuring of the first TMCT LLC should be completed by the end of May and the second in September, with a spin-off of the B&E Group promptly thereafter. The letter also stated that in the absence of satisfactory progress on these suggestions, the Chandler Trusts would begin exploring with other shareholders and possible acquirors the possibility of a "fundamental transaction" involving the Company.

At the February 2006 Board meeting, the Company's management and Merrill Lynch reviewed the Company's progress toward a spin-off of the B&E Group. Management and the Board, including the directors nominated by the Chandler Trusts, discussed the impediments posed by the TMCT LLCs to a spin-off transaction and the Chandler Trusts' proposed resolution through a restructuring of the TMCT LLCs. Management also reviewed its discussions with third parties with respect to a possible sale, spin-off or merger of the B&E Group. In addition, management reviewed its meetings with the private equity firm and its assessment of the range of private equity opportunities that might be available to the Company, and sought the Board's permission to have further discussions to explore a private equity transaction. After reviewing these alternatives, the Board determined that the potential spin-off of the B&E Group was more promising than the other alternatives reviewed. Accordingly, the Board directed management and Merrill Lynch to continue preparing for a possible spin-off of the B&E Group and to continue working toward a resolution of the TMCT LLCs. In light of the focus on a possible spin-off and resolution of the TMCT LLCs, the Board directed management not to have further discussions with the private equity firm.

At a special meeting of the Board in late March 2006, management reviewed the Chandler Trusts' proposal for restructuring the first TMCT LLC through a distribution to the Company of the Company's interest, the Company's evaluation of that proposal as well as tax and accounting issues, and the work being performed by consultants to appraise certain assets held by that TMCT LLC. Management also reviewed the continued work on the separation of the B&E Group and the potential spin-off, and noted that it would be necessary to restructure not only the first TMCT LLC but also TMCT II, LLC in connection with a spin-off. In late April 2006, the Chandler Trusts sent a letter to the Board stating that they remained committed to a May 31 deadline for restructuring the first TMCT LLC, and urging that the Company announce a plan to spin off the B&E Group at the same time, with a target for completion of the spin-off in September following a restructuring of the second TMCT LLC. The letter also stated that the Chandler Trusts had received "feelers" from a variety of parties and that the Company was considered vulnerable to a transaction initiated by outside parties.

In early May 2006, the Board reviewed with management and Merrill Lynch the status of the negotiations with respect to the first TMCT LLC, and progress toward a spin-off of the B&E Group. Citi was also invited to this Board meeting to make a presentation regarding a recapitalization and

17

other alternatives. Management and the financial advisors reviewed with the Board various recapitalization alternatives available to the Company, either alone or in combination with a spin-off or other separation of the B&E Group, as a means of returning capital to shareholders in the near term. Merrill Lynch and Citigroup Global Markets Inc. ("Citi") reviewed the impact of a leveraged recapitalization and other considerations that would accompany such a transaction. Management discussed potential cost-savings measures and divestitures that could be used to reduce debt following a leveraged recapitalization. The directors nominated by the Chandler Trusts expressed a lack of support for a leveraged recapitalization, but the rest of the Board determined that further work should be done on the leveraged recapitalization alternatives and should be presented to the Board at the end of the month. The Board also directed management to continue working toward a resolution of the TMCT LLCs and the possible spin-off of the B&E Group.

At a meeting on May 26, 2006, the Board reviewed with the Company's management, Merrill Lynch and Citi a potential leveraged recapitalization transaction that would involve the repurchase of up to 75 million shares of Company Common Stock. Merrill Lynch and Citi reviewed the benefits of the transaction and the impact on the Company of such a repurchase. Following these reviews, the Board authorized the leveraged recapitalization transaction in the form of a repurchase of up to 75 million shares of Company Common Stock at prices not to exceed $32.50 per share. The three directors nominated by the Chandler Trusts voted against the transaction. On May 30, 2006, the Company announced the leveraged recapitalization transaction using a modified "dutch auction" tender offer. The Company also identified a performance improvement plan with targets of $200 million in annual cost savings and $500 million in asset sale proceeds.

On June 13, 2006, the Chandler Trusts sent a letter to the Board, and filed the letter publicly, stating that the Chandler Trusts did not intend to tender any shares into the tender offer. The letter said that the Chandler Trusts believed that the process that led to the offer was "hasty and ill-informed" and that the offer failed to address the business issues facing the Company. The letter urged the Company to restructure the TMCT LLCs and to spin off the B&E Group, and suggested the possibility of a financial sponsor for the spin-off. The letter expressed the view that the Company should also promptly explore other strategic alternatives, including a possible leveraged buyout. In addition, the letter called on the Board to appoint a committee of independent directors, with independent financial advisors and legal counsel, to oversee a review of the issues facing the Company and to take action to enhance shareholder value. The letter concluded that, if timely action were not taken, the Chandler Trusts intended to engage with other shareholders and parties to pursue changes in the Company's management and other transactions to enhance value.

On June 27, 2006, the Company announced that it had repurchased 55 million shares for a price of $32.50 through the tender offer and a separate purchase agreement with the McCormick Tribune Foundation and the Cantigny Foundation (the "Foundations"), two of the Company's major shareholders, at the same price. As a result of these repurchases and the Chandler Trusts' decision not to tender any shares, the Chandler Trusts became the Company's largest shareholders, increasing their percentage ownership in the Company to approximately 15% of the Company's outstanding shares.

On July 19, 2006, management and the Board reviewed the results of the recapitalization plan with Merrill Lynch and Citi and the Board continued its discussion of other strategic alternatives. The Board requested that each of Merrill Lynch and Citi separately analyze the strategic alternatives available to the Company given the existing operating conditions and to provide their recommendations to the Board at a special meeting scheduled for September 21, 2006. The Board also directed management to renew its efforts to resolve the TMCT LLC issues with the Chandler Trusts.

Between July 19 and September 21, 2006, representatives of the Company re-engaged with representatives of the Chandler Trusts with respect to the restructuring of the first TMCT LLC and, in September, also engaged in discussions with respect to TMCT II, LLC, including negotiating valuations with respect to the assets of the TMCT LLCs and the timing and terms of a redemption of the

18

Company's interests in the TMCT LLCs. Representatives of the Chandler Trusts reiterated their view that the Company should undertake a public process to review the Company's strategic alternatives. During this same period, Merrill Lynch and Citi each conducted a review of strategic alternatives available with respect to the Company's businesses and the Company as a whole.

At its meeting on September 21, 2006, the Board reviewed with management and Merrill Lynch the progress of negotiations on the restructuring of the TMCT LLCs, and reviewed with Merrill Lynch and Citi their analyses of strategic alternatives. The Board reviewed with management and Merrill Lynch the proposed terms of a distribution to the Company of the Company's interests in the TMCT LLCs, including the valuations that had been negotiated with respect to the assets held by the TMCT LLCs, and the proposed distribution to the Company of all of the Company's preferred stock and 80% of the Company Common Stock held by the TMCT LLCs. The Board approved the redemption on the terms presented.

The range of strategic alternatives reviewed with the Board at the September 21, 2006 meeting included continuing to operate without further restructurings, continuing to pursue a separation of the B&E Group, alternatives with respect to the publishing business, and seeking proposals from third parties for the acquisition of the entire Company. Following this review, the Board created the Special Committee, consisting of all of the members of the Board other than the Chief Executive Officer and the three directors nominated by the Chandler Trusts, to oversee a formal process of exploring strategic alternatives. The Special Committee was created to ensure oversight of the process free of any potential conflicts of interest. As part of this process, the Board authorized the Company to seek third-party proposals for the acquisition of the Company.

Following the September 21, 2006 meeting, the Company publicly announced the creation of the Special Committee to oversee the process of evaluating strategic alternatives for the Company. The Company stated that it expected the process to conclude by the end of 2006. The Company also publicly announced the restructuring of the TMCT LLCs. As a result of the restructuring, the Chandler Trusts' percentage ownership in the Company increased further. The Special Committee subsequently engaged Morgan Stanley as its financial advisor, as well as separate legal counsel. In addition, the Company formally engaged Citi to act as co-advisor with Merrill Lynch for purposes of the process. Thereafter, the Special Committee directed Merrill Lynch and Citi to begin contacting a wide range of private equity firms and potential strategic buyers to invite them to indicate their interest in an acquisition of the Company, and the Company entered into confidentiality agreements and began sharing information about the Company with interested parties. Over the next several weeks, these parties began receiving information and conducting due diligence with respect to the Company for purposes of determining whether to submit a preliminary bid for the acquisition of the Company. Merrill Lynch and Citi requested preliminary bids from interested parties by October 27, 2006.

On October 18, 2006, the Special Committee reviewed with the Company's advisors and management and with the Special Committee's financial and legal advisors the status of the strategic review process and considerations relating to the financing that Merrill Lynch and Citi proposed to make available to interested parties. The Special Committee also reviewed with its financial advisor considerations relating to the benefits and risks of exploring the possible sale of parts of the Company concurrently with the possible sale of the whole Company.

On October 31, 2006, the Special Committee reviewed the process to date with the Company's financial advisors and management, and with the Special Committee's financial and legal advisors. As of October 31, 2006, a total of 17 confidentiality agreements were signed with private equity firms and potential strategic bidders (by the end of the process, 31 confidentiality agreements were signed with potential bidders). Five parties or groups had submitted preliminary indications of interest, with indications of price ranging from $30 to $34 per share. One other group stated that it expected to submit an indication of interest shortly and another group requested an extension. The Special Committee also reviewed with the Company's management and advisors the possibility of asset sales as

19

an enhancement to the process, as well as the possibility of a further leveraged recapitalization of the Company. The Special Committee directed management and the Company's financial advisors to continue the process of seeking a buyer for the entire Company and to explore the sale of all of the B&E Group, the sale of the major market assets of the B&E Group and the sale of the Company's largest newspaper. Thereafter, six parties or groups continued in the process and conducted further due diligence, including data room access and management presentations.

On November 8, 2006, Zell's Equity Group Investments, L.L.C. ("EGI") signed a confidentiality agreement with the Company.

On November 17, 2006, the Special Committee reviewed with the Company's financial advisors the status of the process and the parties who remained interested in a potential acquisition of the Company. The financial advisors also reported on parties that had expressed interest in discrete assets of the Company, as well as parties that had initially expressed some interest but had dropped out, including Zell. In addition, the Company's financial advisors reported that the Chandler Trusts desired to enter the bidding process with a possible transaction involving the spin-off of the B&E Group and the Chandler Trusts' acquisition of the remaining Company following the spin-off. The Company's financial advisors also reported on the buyout of Clear Channel Communications that had just been announced, and the implications of that transaction for the Company's process, including the timing of when the Company should request final bids and potential regulatory issues that the buyers in the Clear Channel transaction would have with respect to a subsequent acquisition of the Company. The Special Committee requested further consideration and analysis of these issues.

On November 27, 2006, the Special Committee received an update from the financial advisors and the Company's management. The advisors reported that one party had dropped out of the process due, in part, to the party's involvement in the Clear Channel transaction, and that the status of another party was uncertain. In light of these uncertainties and a strong desire expressed by the remaining participants in the process for adequate time to prepare and submit a definitive proposal, the Company's financial advisors recommended that final bids not be requested until January 12, 2007. The Special Committee approved this timetable and, the next day, the Company issued a press release stating that the process was being extended and the Company expected a final recommendation in the first quarter of 2007.

On December 12, 2006, the Special Committee received a further update on the process from the Company's financial advisors and the Company's management. Five parties or groups continued to show interest in making a bid for the Company. In addition, other parties had shown interest in parts of the Company, including the Chandler Trusts, who were continuing to conduct due diligence and to work on their proposal for a spin-off of the B&E Group followed by an acquisition of the remaining Company. The Special Committee also reviewed with the advisors possible alternative approaches in the event that there was not a satisfactory bid for the whole Company. These included selling the Company in two or more pieces, a spin-off of the B&E Group or other restructuring, and a further leveraged recapitalization. The Special Committee directed the Company's financial advisors to request final bids from the remaining interested parties by January 12, 2007.

Following the December 12 Special Committee meeting, Merrill Lynch and Citi sent letters to the remaining interested parties to request final bids by January 12, 2007, and sent a form of merger agreement to these parties with a request that the parties provide markups of a form of merger agreement by January 3, 2007. Merrill Lynch and Citi also invited the Chandler Trusts to formalize their proposal, and the Company's counsel subsequently sent counsel for the Chandler Trusts a form of spin-off agreement with respect to the spin-off of the B&E Group as well as the form of merger agreement. In early January 2007, counsel for the Chandler Trusts sent counsel for the Company a markup of the form of merger agreement and spin-off agreement. One other potential bidder sent an issues list reflecting issues with the form of merger agreement. Another potential bidder determined

20

that it was interested only in acquiring the B&E Group, and the Company's counsel sent that bidder a form of stock purchase agreement with respect to that potential transaction.

On January 12, 2007, the Special Committee reviewed with the Company's financial advisors and the Company's management the status of the bidding process. Several parties had determined that they would not be submitting final proposals, while two bidders were still pursuing bids for the whole Company. In addition, one bidder was pursuing a bid for the B&E Group, and the Chandler Trusts were continuing to pursue their proposal for a spin-off of the B&E Group followed by an acquisition by the Chandler Trusts of the remaining Company. The Special Committee also reviewed with the Company's financial advisors and separately with Morgan Stanley the various strategic alternatives available to the Company, including a sale of the whole Company, a leveraged recapitalization of the Company, the sale of the B&E Group, a spin-off of the B&E Group and a split-off of the Company's publishing business.

On January 20, 2007, the Special Committee met to review the proposals that had been submitted to the Company pursuant to its process. One of the bidders that was still pursuing a bid as of January 12, 2007 had dropped out of the process. The remaining proposals consisted of: (1) a proposal from a third-party group for a transaction pursuant to which the Company would pay a $27 per share dividend to its shareholders, the third-party group would invest $500 million in new equity and warrants, and shareholders would retain an equity interest in the Company that the third-party group asserted, based on its assumptions of the discounted present value of the future expected trading values of the recapitalized equity, would be valued at $7 per share or more; (2) a third-party proposal to acquire the B&E Group, including the Cubs, for cash in a taxable transaction for a purchase price of approximately $4.8 billion; and (3) the Chandler Trusts' proposal to spin off the B&E Group and acquire the remaining Company, with shareholders receiving $19.30 per share in cash and equity in the B&E Group, in a transaction that the Chandler Trusts asserted, based on their valuation of the B&E Group equity, to be worth $31.70 per share. In addition, the Special Committee reviewed a letter submitted by the Foundations, expressing the Foundations' preference that the Company continue as a public company with its current structure unless a transaction for the whole Company at a substantial premium with minimal closing risk could be obtained.

The Special Committee reviewed with the Company's advisors the terms of each of the proposals submitted, including the financial advisors' valuations of such proposals. In the case of the first and third proposals, the financial advisors' valuations were lower than the valuations asserted by the third- party group and the Chandler Trusts, respectively. In addition, the advisors reviewed the conditionality and tax consequences to the Company and to shareholders of the proposals. Representatives of the third-party group making the first proposal and representatives of the Chandler Trusts both made presentations at the meeting with respect to their proposals. The Special Committee also met separately with its financial and legal advisors to review the proposals. Following these reviews, the Special Committee determined that none of the proposals was satisfactory, and directed the Company's financial advisors to seek improvements in the proposals. The Special Committee also directed the Company's financial advisors to analyze alternatives that the Company could implement on its own. In addition, the Special Committee directed the Company to permit discussions between the Chandler Trusts and the Foundations to determine whether the Foundations could assist in developing an improved proposal. Following the Special Committee meeting, the Company issued a press release saying that its strategic review was continuing and that a decision was expected by the end of the first quarter.

The Special Committee received an update on the process on January 27, 2007. The Company's financial advisors again reviewed the three proposals that had been submitted, including minor revisions to the proposals designed to make them more attractive. In the case of the first proposal, the third-party group agreed to reduce the amount of warrants that it would acquire, limiting its ownership in the Company following the $27 dividend to 40%. In the case of the bid to acquire the B&E Group, the third party slightly increased the price it was willing to offer. In the case of the Chandler Trusts'

21

proposal, the Chandler Trusts suggested the possibility of additional leverage at the B&E Group to permit an increased cash payment of $24.55 per share, reducing the equity value of the B&E Group to be spun off to shareholders under their proposal.

The Special Committee reviewed with the Company's advisors their valuations of these proposals, which again were lower than the valuations asserted by the third parties in the case of the first and third proposals, as well as their assessment of conditionality and execution risk. Management and the Company's advisors also reviewed a possible leveraged recapitalization of the Company and spin-off of the B&E Group, under which the Company would pay a special dividend of $20 per share in cash prior to the spin-off. The Special Committee reviewed the valuations of the leveraged recapitalization and spin-off plan compared to the third-party proposals with the Company's financial advisors and then separately with the Special Committee's financial advisor. The Special Committee directed the Company's management and financial advisors to continue to seek improvements in the proposals while developing further details with respect to the leveraged recapitalization and spin-off plan.

On February 2, 2007, the Special Committee received a letter from the Foundations expressing their preference for the recapitalization and spin-off plan compared to the other alternatives available to the Company. The Foundations also stated that, in connection with a recapitalization and spin-off plan, the Foundations would be willing to consider increasing their ownership in the Company, including by purchasing shares of Company Common Stock from the Chandler Trusts.

The Special Committee received an update on February 3, 2007. Morgan Stanley compared the two remaining third-party proposals to a leveraged recapitalization of the Company that contemplated a cash dividend of $20 per share. In addition, Morgan Stanley noted that EGI had submitted a proposal the previous day for a transaction in which EGI and a Company ESOP would acquire the Company at a price of $30 per share. Following these reviews, the Special Committee directed management and the Company's financial advisors to present a full comparison of the possible alternatives and recommendations to the Special Committee and the Board at their meetings scheduled for February 12 and 13, 2007.

The Special Committee met on February 12, 2007 to review presentations and recommendations with respect to the alternatives available to the Company. The review included presentations by the Company's management and by the advisors with respect to a proposed recapitalization and spin-off plan, contemplating a dividend of $20 per share and a subsequent spin-off of the B&E Group. Management and the Company's advisors also reported that the Chandler Trusts and the Foundations had been negotiating with respect to the purchase of shares of Company Common Stock by the Foundations from the Chandler Trusts in the context of the recapitalization and spin-off plan. The Company's management recommended proceeding with this plan. Management also reviewed certain revisions to the Company's financial outlook based on preliminary operating results in January 2007. In particular, management revised downward the outlook for the Company's publishing business, and this revised outlook was shared with the parties that had submitted proposals.

The Special Committee also reviewed the status of the other proposals that had been submitted. The third-party proposal that had originally contemplated a cash dividend of $27 per share had been verbally revised to reduce the cash dividend to $23 per share, but to add a contingent value right tied to any recovery from the Company's appeal of certain tax litigation. That third party stated that if the Company were interested in the revised proposal, the third party would submit the proposal in writing if so requested by the Board. The Chandler Trusts' proposal contemplated a cash payment of $18 per share upon completion of audited financial statements for the B&E Group, with an additional cash payment of $6 per share upon the spin-off of the B&E Group. The EGI proposal was revised to provide for an acquisition by EGI and a Company ESOP of the entire Company at $33 per share.

Following these reviews and presentations, the Special Committee determined to recommend to the Board that the Company proceed with the recapitalization and spin-off plan and that the Company not continue to pursue the Chandler Trusts' proposal or the other third-party proposals. The Special

22

Committee did, however, direct management and the Company's advisors to continue to develop the EGI proposal to determine its feasibility. The Special Committee, following consultation with its financial advisors and the Company's financial advisors, did not believe that the Chandler Trusts' proposal or the other third-party proposals offered as much value as the recapitalization and spin-off plan or the EGI proposal. The following day, the Board authorized the Company to move forward towards completion of the recapitalization and spin-off plan. Following the Board meeting, the Company issued a press release stating once again that the Special Committee's process was continuing and that the Board expected to make a decision before the end of the first quarter.

Following these meetings, the Company's management and advisors worked to complete the required documentation with respect to the recapitalization and spin-off plan, including the negotiation of registration rights agreements with the Chandler Trusts and the Foundations. In addition, the Chandler Trusts and the Foundations negotiated with respect to the terms and pricing of a purchase of shares of Company Common Stock by the Foundations from the Chandler Trusts in connection with the recapitalization and spin-off plan.

At the same time, the Company's management and financial advisors sought to develop further details with respect to the potential ESOP transaction proposed by Zell and EGI. The Company engaged counsel to advise it on ESOP matters, and engaged GreatBanc Trust Company as the Trustee in connection with the possible ESOP transaction. The Trustee engaged Duff & Phelps as its financial advisor and engaged K&L Gates as its legal counsel. Duff & Phelps had previously conducted due diligence with respect to the Company in connection with a possible engagement to provide a solvency opinion to the Company, but this possible engagement was rescinded after Duff & Phelps was engaged by the Trustee.

On February 19, 2007, EGI submitted a term sheet to the Company with respect to proposed terms for the ESOP transaction. The term sheet contemplated a merger in which the Company's shareholders would receive $33 per share in cash, with a new LLC formed by EGI investing $225 million, a newly formed ESOP investing $825 million and the Company incurring debt for the remaining cash payments to shareholders. Following the merger, the Company would elect to become an S-corporation for federal income tax purposes, with the result that the Company would not pay corporate level federal income taxes. The EGI LLC would initially hold approximately 21.4% of the Company Common Stock following the merger and would acquire 20-year warrants to purchase an additional 20%. The term sheet also contemplated a management incentive plan with respect to the economic equivalent of 5% of the Company Common Stock. After preliminary conversations with the Company's management and financial advisors, EGI submitted a revised term sheet on February 22, 2007, which included a description of the terms of proposed financing for the transaction.

On February 24, 2007, the Special Committee reviewed with the Company's management and advisors the status of the proposed recapitalization and spin-off plan, as well as an update with respect to EGI's proposed ESOP transaction. For a description of the financial advisors' presentations at this meeting and subsequent meetings, see "Special Factors—Reports of the Special Committee's Financial Advisor" and "Special Factors—Reports of the Company's Financial Advisors" below, as well as the financial advisors' presentation materials, which are attached as exhibits to the Schedule 13E-3 filed with the Securities and Exchange Commission (the "SEC") in connection with this proxy statement (the "Schedule 13E-3").

The advisors also described the steps involved in the proposed ESOP transaction and the anticipated timetable. They noted that EGI's proposal contemplated voting agreements from the Chandler Trusts and the Foundations. Following these reviews, the Special Committee also consulted separately with its financial and legal advisors. The Special Committee then directed the Company's management and financial advisors to solicit the views of the Chandler Trusts and the Foundations with respect to the EGI proposal, and to continue to pursue the proposal with a view to improving the economic terms and certainty. On February 25, 2007, the Company's advisors had separate discussions

23

with representatives of the Chandler Trusts and representatives of the Foundations with respect to the EGI proposal.

Over the course of the next week, the Company's management and advisors had discussions with representatives of EGI and the ESOP with respect to the proposed ESOP transaction. On March 1, 2007, EGI's counsel provided the Company's counsel with a markup of the form of merger agreement. On March 2, EGI's counsel and the Company's counsel discussed the markup, particularly with respect to conditions to the merger and termination fees in the event the merger did not close. Also on March 1, the Foundations sent a letter to the Special Committee expressing concerns about the timing and execution risk of the proposed ESOP transaction, and suggesting that the Company pursue the recapitalization and spin-off plan. On March 2, the Chandler Trusts sent a letter to the Special Committee also indicating concern about the timing and execution risk of the proposed ESOP transaction, and indicating a willingness to continue to work with the Company to complete the recapitalization and spin-off plan. On March 3, the Company's counsel provided a revised draft of the merger agreement, and counsel for the parties had further discussions with respect to the draft on March 4.

Also on March 4, 2007, EGI provided the Company with a revised term sheet, reflecting improvements to the proposed economic terms of the transaction. In particular, the revised term sheet contemplated that the Company would effect a first step tender offer at $33 per share in cash, as a means of providing a portion of the cash consideration to the Company's shareholders more quickly and with greater certainty. The revised term sheet also contemplated that shareholders would receive an 8% "ticking fee" on the merger consideration running from six months following execution of the merger agreement until closing of the merger, and that the Company would be permitted to pay regular quarterly cash dividends until the merger closed.

During the week of March 5, 2007, representatives of the Company continued to have discussions with representatives of EGI and the ESOP with respect to the potential transaction. In the course of these discussions, EGI indicated that it would be willing to make an investment of $250 million in the Company as soon as possible following execution of the merger agreement and before the closing of the merger, in order to create more certainty with respect to the transaction. The parties also discussed a similar investment by the ESOP concurrently with executing the merger agreement. On March 6, EGI provided a revised term sheet reflecting this change of structure and other improved economic terms. The revised term sheet contemplated that EGI would purchase $250 million of Company Common Stock at $33 per share as soon as practicable following execution of the merger agreement, and that the ESOP would purchase $250 million of Company Common Stock at market prices concurrently with executing the merger agreement. The revised term sheet also contemplated that shareholders would receive a 5% "ticking fee" on the merger consideration running from the date of execution of the merger agreement until closing, but that the Company would not pay dividends on the Company Common Stock between signing and closing. The revised term sheet also contemplated that EGI's initial investment would be cashed out in the merger, but that EGI would then immediately purchase a $185 million subordinated note and pay an additional $40 million to acquire a 20-year warrant to acquire 38% of the Company Common Stock for an aggregate exercise price of $351 million.

On March 7, 2007, EGI's counsel provided the Company with a revised draft of a merger agreement reflecting the revised structure of the proposed transaction. The revised merger agreement contemplated that the Company would merge with an entity owned by the ESOP, with the ESOP initially owning 100% of the Company Common Stock following the merger. EGI's counsel also provided the Company with drafts of a warrant agreement setting forth the terms of EGI's proposed warrant, and a voting agreement under which the Chandler Trusts and the Foundations would vote for the ESOP transaction. On March 8, the Company's ESOP counsel circulated drafts of an ESOP purchase agreement, loan agreement, pledge agreement and note. During March 8 and 9, counsel for the parties exchanged comments on various agreements, including comments from the ESOP's counsel on the draft merger agreement, and EGI's counsel provided drafts of the Zell Entity securities

24

purchase agreement, the subordinated note, the warrant, the investor rights agreement and the registration rights agreement and the charter and by-laws for the Company following the merger.

On March 10, 2007, the Company informed EGI that the Company was reconsidering its level of comfort with the proposed ESOP transaction, including the levels of leverage contemplated by that transaction, and was also reconsidering the possible recapitalization and spin-off plan at reduced levels of leverage. Over the course of the following week, representatives of the Company discussed with representatives of the Chandler Trusts and the Foundations the possibility of pursuing the recapitalization and spin-off plan with a dividend of $15 per share rather than $20 per share. The Foundations and the Chandler Trusts engaged in discussions with respect to restructuring their agreement on the purchase of shares by the Foundations from the Chandler Trusts in the context of a reduced dividend. The Company's advisors and the Special Committee's financial and legal advisors also had discussions with respect to the advisability of pursuing a revised recapitalization and spin-off plan versus re-engaging on the proposed ESOP transaction. As a result of these discussions, the Special Committee scheduled a meeting for March 21, 2007 to consider the status of the two potential transactions.

At the March 21, 2007 Special Committee meeting, the Company's management and advisors provided a full review of the proposed terms of the potential ESOP transaction with a first-step cash payment to shareholders equivalent to $17.50 per share, and compared it to a recapitalization and spin-off transaction with a $17.50 per share cash dividend. The Company's advisors stated that the ESOP transaction involved substantially more debt, but as a result of the tax advantages of the S-corporation structure, as well as the elimination of the Company's 401(k) cash contributions after creation of the ESOP and other cost savings, the cash flow available for debt repayment would be approximately equivalent in the two alternatives. The Company's advisors noted, however, that they expected that the credit rating agencies would rate the Company's debt in the proposed recapitalization transaction one level higher than they would rate the Company's debt in the proposed ESOP transaction. The Company's financial advisors also provided a comparative valuation of the two alternatives.

The Special Committee also heard presentations from the Trustee and its financial advisor about their qualifications and the process they were following with respect to determining the fairness of the transaction to the ESOP. Management reported on the Company's financial performance to date in 2007, and the Company's legal advisors reported on the legal terms of the alternative transactions. The Company's advisors also reviewed the financing arrangements contemplated by each transaction. The Special Committee consulted separately with its financial and legal advisors with respect to the two potential transactions. Following these reviews, the Special Committee directed the Company's management and advisors to present two fully developed alternatives to the Special Committee at a meeting on March 30, 2007 for a final determination.

Between March 21 and March 30, 2007, representatives of the Company, EGI and the ESOP, including the Special Committee's financial and legal advisors, negotiated the terms of the various agreements relating to the potential ESOP transaction. In addition, representatives of the Company and EGI negotiated with representatives of the Chandler Trusts with respect to the proposed voting agreement and registration rights agreement. The Foundations declined to negotiate with respect to a voting agreement. The Company sought to increase the certainty with respect to the transaction, to limit any breakup fees the Company would have to pay, and to require a breakup fee from EGI in the event financing was not obtained for any reason other than a breach by the Company or the ESOP. The Company also required that its obligation to complete the merger would be conditioned on the receipt of a satisfactory solvency opinion, among other conditions.

As a result of negotiations with the Company and the ESOP, the initial investment by the Zell Entity was restructured so that the Zell Entity would purchase $50 million in Company Common Stock and $200 million in a subordinated exchangeable note that would be exchangeable into Company

25

Common Stock at the Company's election, or automatically if the Merger Agreement was terminated. The parties also negotiated the terms of proposed financing, with the goal of increasing the certainty that the financing would be available, and agreed that receipt of financing would be a condition to the merger.

The Company continued to seek improvements in the economic terms of the transaction, including an increase in the price to be paid to the Company's shareholders and an increase in the investment to be made by EGI. The Company and the Trustee also negotiated the terms of the ESOP's investment, including with respect to the price to be paid by the ESOP for the shares of Company Common Stock to be purchased by the ESOP. In addition, the Board received two letters from one of the third-party groups that had previously made a revised proposal with respect to a transaction with the Company. In the first letter, the third-party group sought access to further information and, thereafter, additional information was provided to them. In the second letter, the third-party group expressed its interest in participating with a $500 million equity investment in an ESOP transaction in which the Company's shareholders would receive $34 per share. This second letter was not accompanied by any further documents or financing commitments. Thereafter, the Company's financial advisors had further discussions with the financial advisors to the third-party group in order to obtain further details about the proposal.

Prior to the meeting of the Special Committee on March 30, EGI slightly revised its proposal to increase the stated per share consideration in the merger to $33.50, but with the "ticking fee" start date moved to January 1, 2008.

On March 30, the Special Committee and the Board met for a full review of the alternative transactions. The Special Committee received presentations and reviewed in detail the terms of the proposed ESOP transaction and the terms of the proposed recapitalization and spin-off, including the terms of the draft agreements with respect to each alternative, the terms of proposed financing for each alternative, the transaction steps and timing of each alternative, regulatory approvals and tax treatment for each alternative, and the process undertaken by the Trustee and its advisors in connection with the proposed ESOP transaction. The Company's financial advisors also reviewed the relative valuations of the two alternatives. The Board and Special Committee also reviewed the letters received as described above and the discussions between the third-party group submitting such letters and the financial and legal advisors of the Company and the Special Committee.

Following these reviews, the Special Committee met separately with its advisors to review the alternatives. Based on its review, and after consultation with its advisors, the Special Committee determined that the proposed ESOP transaction was a more attractive transaction than the proposed recapitalization and spin-off. In particular, the Special Committee noted that the proposed price for the ESOP transaction was at the high end of the valuation ranges presented for the recapitalization and spin-off transaction. See "Special Factors—Reports of the Special Committee's Financial Advisor" and "Special Factors—Reports of the Company's Financial Advisors." In addition, the Special Committee believed that the execution risk of the recapitalization and spin-off transaction was higher, given that the valuation ranges presented depended on the ability of the Company to meet the projections that the advisors had used in developing these valuation ranges. The Special Committee directed the Company and its advisors to continue to seek improvement of the economic terms of the proposed ESOP transaction. The Special Committee noted that the proposal from the third-party group required additional work and documentation and directed the Company and its advisors to continue discussions with the third-party group. Based on these recommendations, the Board directed the Company's management and financial advisors, and the Special Committee's financial and legal advisors, to seek to complete negotiation of the proposed ESOP transaction and present the completed proposal to the Board at a meeting on Sunday morning, April 1, and concurrently to continue discussions with the third-party group.

26

The representatives of the Company, the ESOP, EGI and the Chandler Trusts then continued negotiation of the agreements with respect to the ESOP transaction. In the course of these negotiations, EGI agreed to increase the price to be paid to the Company's shareholders from $33.50 to $34 per share, with an 8% "ticking fee" running from January 1, 2008 to the closing of the merger if the merger did not close by January 1, 2008. EGI agreed that its initial $250 million investment in the Company would be based on a $34 per share price, and that its investment would increase to $315 million in connection with the merger, consisting of a $225 million subordinated note and a $90 million purchase price for the warrant. EGI also agreed to a breakup fee of $25 million to be paid by the Company if it accepted a superior proposal and agreed to pay a $25 million breakup fee if financing was not obtained for any reason other than breach by the Company or the ESOP. The Company and the ESOP agreed to a $28 per share purchase price for the ESOP's purchase of shares of Company Common Stock. The Chandler Trusts agreed to the voting agreement and, in connection with the registration rights agreement, agreed to tender their shares of Company Common Stock in the Offer, and to cause the directors nominated by the Chandler Trusts to resign upon the closing of the Offer (or under certain other circumstances).

On Sunday morning, April 1, the Special Committee received a report on the status of the proposed ESOP transaction and additional discussions over the last few days with the third-party group that submitted the letters described above. The Company's management and advisors reported that all major open issues with respect to the proposed ESOP transaction had been resolved, with the exception of the exercise price of the warrant. Given the increase in price under the proposed ESOP transaction to $34 per share, the same price proposed in the third-party group's letter, and the fact that the third-party group's proposal was subject to additional work and documentation, the Special Committee believed that the proposed ESOP transaction should continue to be pursued subject to resolution of the remaining open issue. The Special Committee agreed to reconvene that evening to permit the parties to resolve this open issue.

During the course of the day, the Company, the ESOP and EGI reached agreement that the exercise price of the warrant would increase by $10 million per year for the first 10 years of the warrant, to a maximum of $600 million, and that the term of the warrant would be reduced from 20 years to 15 years. The Special Committee and the Board reconvened on Sunday evening, April 1, and the Company's management and advisors reported on the resolution of all open issues. The Company's legal counsel reviewed all the agreements and actions to be approved in connection with the proposed ESOP transactions. In a separate meeting of the Special Committee, Morgan Stanley rendered its oral opinion to the Special Committee, subsequently confirmed in writing as of the same date, to the effect that, as of April 1, 2007, and based upon the factors and subject to the assumptions set forth in its written opinion, the Merger Consideration to be received by the holders of Company Common Stock (other than certain affiliated entities) was fair from a financial point of view to such shareholders. See "Special Factors—Opinion of the Special Committee's Financial Advisor." The Trustee provided information to the Special Committee regarding the Trustee's role in the negotiation of the transactions. The Special Committee recommended that the Board approve the Leveraged ESOP Transactions. At the full meeting of the Board, Merrill Lynch gave its oral opinion, subsequently confirmed in writing as of the same date, as to the fairness of the Merger Consideration from a financial point of view (see "Special Factors—Opinion of the Company's Financial Advisor" below), and Morgan Stanley delivered to the full Board the opinion it had previously given to the Special Committee. The Board then approved the Leveraged ESOP Transactions and the related documents. Representatives of the Chandler Trusts on the Board abstained from voting as directors; Dudley Taft was not present at the meeting and did not vote. Following the Board meeting, the approved agreements were executed and the transaction was publicly announced on April 2, 2007.

On Wednesday, April 25, 2007, the Company commenced the Tender Offer. On May 9, 2007, the Company received an opinion from VRC as to the solvency of the Company after giving effect to the Step One Transactions. See "Special Factors—Opinion of Valuation Research Corporation."

27

On May 17, 2007, the Company entered into a credit agreement, as borrower, with several lenders, with respect to an $8.028 billion senior secured credit facility, the proceeds of which are intended to be used by the Company, among other ways, to make payments in connection with the Tender Offer and to refinance certain existing indebtedness.

The Tender Offer expired at 5:00 p.m. New York City time, on May 24, 2007. On May 31, 2007, the Company announced that approximately 218,132,000 shares were tendered in the Tender Offer. The shares tendered in the Tender Offer represented approximately 90% of shares outstanding, and, after proration, the shares that the Company repurchased represented approximately 52% of shares outstanding.

On June 4, 2007, Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. resigned as members of the Board. Messrs. Chandler, Goodan and Stinehart served on the Board as representatives of the Chandler Trusts, which agreed to cause the resignations of Messrs. Chandler, Goodan and Stinehart effective upon the consummation of the Tender Offer.

On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman, Sachs & Co. ("Goldman Sachs") and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of Company Common Stock, the remainder of the shares owned by them following the Tender Offer, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to a shelf registration statement that the Company filed with the Securities and Exchange Commission and that became effective on April 25, 2007. Following the closing of this transaction on June 7, 2007, the Chandler Trusts no longer own any shares of Company Common Stock.

**Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board**

The Board, based in part on the recommendation of the Special Committee, has (1) determined that the Merger Agreement, including the Merger and the other transactions contemplated by the Merger Agreement, is fair to, advisable and in the best interests of the Company and its unaffiliated shareholders, (2) approved the Merger Agreement and the Merger, and (3) determined to recommend that the Company's shareholders vote in favor of adoption of the Merger Agreement. Representatives of the Chandler Trusts on the Board abstained from voting as directors, and Mr. Zell was not a member of the Board at the time the Board made these determinations, recommendations and approvals. **Accordingly, the Board recommends that you vote "FOR" adoption of the Merger Agreement and approval of the Merger.**

*The Special Committee.*   In reaching its determination to recommend the Leveraged ESOP Transactions, including the Merger Agreement, the Merger and the other transactions contemplated by the Merger Agreement, the Special Committee, in consultation with its legal and financial advisors, and the Company's management and legal and financial advisors, considered the following material factors and benefits of the Leveraged ESOP Transactions, each of which the Special Committee believed supported its recommendation:

- recent and historical market prices for the shares of Company Common Stock and the fact that the value offered in the Leveraged ESOP Transactions was as high as any proposal received from any third party, and the consideration offered in the Merger of $34.00 per share represented a premium of approximately 5.9% to the closing price of Company Common Stock on March 30, 2007, the last trading day before the proposal was made public, approximately 12.5% to the average closing price of Company Common Stock for the 30 calendar day period ending on March 30, 2007 and approximately 9.5% to the average closing price for the 52 weeks ended March 30, 2007;

- the business, operations, properties and assets, financial condition (as described under "Information About the Company—Selected Financial Data"), business strategy and prospects

28

## THE MERGER AGREEMENT

The following is a summary of certain material provisions of the Merger Agreement, a copy of which is attached as Annex A to this proxy statement and which we incorporate by reference herein. This summary does not purport to be complete and may not contain all of the information about the Merger Agreement that is important to you. We encourage you to read carefully the Merger Agreement in its entirety, as the rights and obligations of the parties are governed by the express terms of the Merger Agreement and not by this summary or any other information contained in this proxy statement.

The description of the Merger Agreement in this proxy statement has been included to provide you with information regarding its terms. The Merger Agreement contains representations and warranties made by and to the Company, the ESOP and Merger Sub as of specific dates. The statements embodied in those representations and warranties were made for purposes of that contract among the parties and are subject to qualifications and limitations agreed by the parties in connection with negotiating the terms of that contract.

*Effective Time; Structure.*   At the "Effective Time" of the Merger, Merger Sub will merge with and into the Company with the Company surviving the Merger (the "Surviving Corporation") and becoming a wholly owned subsidiary of the ESOP. The Effective Time will occur at the time that the Company files a certificate of merger with the Secretary of State of the State of Delaware on the closing date of the Merger (or such later time as Merger Sub and the Company may agree and as provided in the certificate of merger). The closing date will occur no later than the third business day after satisfaction or waiver of the conditions to the Merger (other than those conditions that are to be satisfied at the closing) set forth in the Merger Agreement (or such other date as the ESOP and the Company may agree), as described below under "The Merger Agreement—Conditions to the Merger."

*Treatment of Company Common Stock.*   In the Merger, each share of Company Common Stock, other than shares owned by the ESOP or Merger Sub immediately prior to the Effective Time or for which appraisal rights have been properly exercised, will be converted into and represent the right to receive $34.00 in cash, plus, if the Merger does not close by January 1, 2008, the Additional Share Consideration (as defined below), if any (the "Merger Consideration"). The "Additional Share Consideration" means the amount per share, if any, equal to (1) $34.00, multiplied by (2) 8%, multiplied by (3) the quotient obtained by dividing the number of days elapsed from January 1, 2008 to and including the Closing Date by 365. All shares of Company Common Stock that have been converted into the right to receive the Merger Consideration will be automatically cancelled and cease to exist, and the holders of certificates which, immediately prior to the Effective Time, represented such shares, will cease to have any rights with respect to such shares other than the right to receive the Merger Consideration.

*Treatment of ESOP and Merger Sub-Owned Shares.*   In the Merger, each share of Company Common Stock owned, directly or indirectly, by the ESOP or Merger Sub immediately prior to the Effective Time or held by the Company immediately prior to the Effective Time will be cancelled and retired and no consideration will be delivered in exchange for such cancellation and retirement.

*Treatment of Preferred Stock.*   As of May 31, 2007, there were approximately 60,671,319 shares of Company Common Stock and approximately 137,643 shares of Series D-1 Preferred Stock of the Company held by the Eagle Entities (as defined below). All of the common equity interests in the Eagle Entities are held by the Company. The Merger Agreement contemplates that, immediately prior to the Merger, the shares of Series D-1 Preferred Stock and the shares of Company Common Stock held by the Eagle Entities will be exchanged for a new Series E Preferred Stock of the Company, as described below under "The Merger Agreement—Eagle Exchange." Each share of Series E Preferred

82

Stock outstanding at the time of the Merger will remain outstanding following the Merger and will be entitled to appraisal rights.

   *Treatment of Merger Sub Common Stock.*    All the issued and outstanding shares of common stock of Merger Sub will be converted into, in the aggregate, 56,521,739 shares of common stock of the Surviving Corporation.

   *Representations and Warranties.*    The Merger Agreement contains representations and warranties made by the Company to the ESOP and Merger Sub, and representations and warranties made by the ESOP and Merger Sub to the Company. These representations and warranties are subject to important limitations and qualifications agreed to by the parties in connection with negotiating the terms of the Merger Agreement. In particular, the representations that the Company made are qualified by filings that the Company made with the SEC after December 25, 2005 and prior to the date of the Merger Agreement (other than risk factor and similar cautionary disclosure contained in such filings), as well as by a confidential disclosure schedule that the Company delivered to the ESOP and Merger Sub concurrently with the signing of the Merger Agreement. In addition, certain representations and warranties were made as of a specified date, may be subject to contractual standards of materiality different from those generally applicable to public disclosures to shareholders, or may have been used for the purpose of allocating risk among the parties rather than establishing matters of fact. For the foregoing reasons, you should not rely on the representations and warranties contained in the Merger Agreement as statements of factual information. The Company's material representations and warranties relate to:

   - the Company's, its subsidiaries' and certain joint ventures' proper organization, good standing and qualification to do business;

   - the Company's capitalization, including the number of outstanding shares of Company Common Stock and preferred stock, stock options and other equity-based interests;

   - the Company's corporate power and authority to enter into the Merger Agreement and to consummate the transactions contemplated by the Merger Agreement;

   - the absence of violations of or conflicts with the Company's and its subsidiaries' and certain joint ventures' governing documents, applicable law or certain agreements as a result of entering into the Merger Agreement and consummating the Merger and the other transactions contemplated by the Merger Agreement;

   - the timeliness and compliance with SEC requirements of the Company's SEC filings since December 25, 2005, including the accuracy and compliance with GAAP and SEC requirements of the financial statements contained therein;

   - the adequacy of the Company's disclosure controls and procedures and internal controls over financial reporting;

   - the absence of undisclosed liabilities;

   - permits and compliance with applicable legal requirements, including licenses issued by the FCC;

   - environmental matters;

   - matters relating to employee benefit plans;

   - the absence of certain changes since December 31, 2006 and the absence of certain changes since the date of the Merger Agreement;

   - legal proceedings and investigations;

83

- accuracy and compliance with applicable securities law of filings made by the Company with the SEC in connection with the Merger Agreement;

- amendment of the Rights Agreement;

- tax matters;

- employment and labor matters affecting the Company or its subsidiaries;

- intellectual property and real property;

- the receipt by the Board of an opinion from Morgan Stanley and Merrill Lynch as to the fairness, from a financial point of view, of the Merger Consideration to be received by the holders of shares of Company Common Stock (other than certain affiliated entities);

- the required vote of the Company's shareholders in connection with the required adoption of the Merger Agreement and approval of the Merger;

- material contracts and performance of obligations thereunder;

- absence of undisclosed brokers' fees;

- insurance;

- absence of affiliate transactions;

- indebtedness; and

- cable and satellite matters.

Many of the Company's representations and warranties are qualified by a "Company Material Adverse Effect" standard. For the purposes of the Merger Agreement, "Company Material Adverse Effect" means any facts, circumstances, events or changes that are materially adverse to the business, assets, financial condition, results of operations on an ongoing basis or continuing operations of the Company and its subsidiaries, taken as a whole, or that have a material adverse effect on the ability of the Company to perform its obligations under the Merger Agreement, or to consummate the Merger and the other transactions to be consummated by the Company.

However, a Company Material Adverse Effect will not include facts, circumstances, events or changes resulting from:

- changes in general economic or political conditions or the securities, credit or financial markets in general;

- general changes or developments in the industries in which the Company and its subsidiaries operate, including general changes in law or regulation across such industries;

- the announcement of the Merger Agreement or the pendency or consummation of the Merger;

- compliance with the terms of, or the taking of any action required by, the Merger Agreement or consented to by the Zell Entity and the ESOP;

- any acts of terrorism or war;

- the identity of the Zell Entity or the ESOP or any of their affiliates as participants in the transactions contemplated by the Merger Agreement or other agreements described in the Merger Agreement; or

- changes in United States generally accepted accounting principles ("GAAP") or the interpretation of GAAP by the Financial Accounting Standards Board, the Accounting Principles Board, the American Institute of Certified Public Accountants and similar organizations.

84

The exceptions described in the first two bullet points above will apply except to the extent such facts, circumstances, events, changes or developments have a disproportionate impact on the Company and its subsidiaries, taken as a whole, relative to other companies in the industries or in the geographic markets in which the Company conducts its businesses after taking into account the size of the Company relative to such other companies.

The parties also have agreed that any decline in the stock price of the Company Common Stock or any failure to meet internal or published projections, forecasts or revenue or earning predictions for any period will not, in and of itself, constitute a Company Material Adverse Effect, but the underlying causes of such decline or failure will be considered to the extent applicable in determining whether there is a Company Material Adverse Effect.

The Merger Agreement also contains various representations and warranties made by the ESOP and Merger Sub that are subject, in some cases, to specified exceptions and qualifications. The material representations and warranties relate to:

- organization, valid existence and good standing;

- corporate or other power and authority to enter into the Merger Agreement and to consummate the transactions contemplated by the Merger Agreement;

- enforceability of the Merger Agreement as against the ESOP and Merger Sub;

- required consents and approvals of governmental entities in connection with the consummation of the Merger and the other transactions contemplated by the Merger Agreement;

- the absence of any violation of or conflict with their governing documents, applicable law or certain agreements as a result of entering into the Merger Agreement and consummating the Merger and the other transactions contemplated by the Merger Agreement;

- governmental investigations and litigation;

- accuracy and compliance with applicable securities law of the information supplied by the ESOP and Merger Sub for inclusion in the filings made with the SEC in connection with the Tender Offer, the Merger and the other transactions contemplated by the Merger Agreement;

- capitalization of Merger Sub;

- lack of ownership of Company Common Stock; and

- absence of undisclosed broker's fees.

Many of the ESOP and Merger Sub's representations and warranties are qualified by an "ESOP Material Adverse Effect" standard. For the purposes of the Merger Agreement, "ESOP Material Adverse Effect" means an effect that prevents or materially delays or materially impairs the ability of the ESOP or Merger Sub to consummate the Merger and the transactions contemplated by the Merger Agreement.

The representations and warranties of each of the parties to the Merger Agreement will expire upon the Effective Time.

*Conduct of Business Pending the Merger.*    Under the Merger Agreement, the Company has agreed that, subject to certain exceptions, from and after the date of the Merger Agreement and prior to the Effective Time or the date, if any, on which the Merger Agreement is earlier terminated:

- the Company and its subsidiaries will conduct their business in the ordinary course of business in a manner consistent with past practice; and

85

- the Company and its subsidiaries will use their reasonable best efforts to preserve substantially intact the Company's business and to keep available the services of the key present officers, employees and consultants.

The Company has also agreed that during the same time period, subject to certain exceptions contained in the Merger Agreement and except as otherwise contemplated by the Merger Agreement, the Company will not (unless the ESOP gives its prior written consent):

- authorize or pay any dividend or distribution on any shares of capital stock or other equity securities (other than dividends and distributions made on a pro rata basis by subsidiaries and except that the Company may continue to pay dividends on its preferred stock);

- split, combine or reclassify its capital stock or other equity securities, or issue or authorize or propose to issue any other securities in respect of its capital stock or other equity securities, except for any such transaction by a wholly owned subsidiary that remains a wholly owned subsidiary after consummation of such transaction and except as contemplated by the Eagle Exchange;

- increase the compensation or other benefits provided to the Company's employees, directors, consultants, contractors or service providers except in the ordinary course of business consistent with past practice; pay any pension, service or retirement benefits not required by any existing plan or agreement; enter into or amend any compensation or benefit plan, collective bargaining agreement or welfare benefit plan, other than employment, severance or retention agreements entered into in the ordinary course of business consistent with past practice between the Company (or one of its subsidiaries) and any consultant, independent contractor, service provider or employee who is not an executive officer; or accelerate the vesting of, or the lapsing of restrictions with respect to, any stock-based compensation, or otherwise accelerate any rights or benefits or make determinations that would result in a material increase in liabilities under any Company benefit plan;

- change financial accounting policies or procedures or any of its methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP or applicable law;

- amend any provision of its certificate of incorporation or by-laws or similar applicable charter documents;

- issue, sell, pledge, dispose of or encumber, or authorize any of the foregoing in respect of shares of capital stock or other ownership interests in the Company or any Subsidiaries, other than certain permitted issuances of shares;

- except among the Company and its wholly owned subsidiaries or among the Company's wholly owned subsidiaries, purchase, redeem or otherwise acquire any shares of capital stock or other equity securities or any rights, warrants or options to acquire any such equity securities;

- incur, assume, guarantee, prepay or otherwise become liable for any indebtedness for borrowed money except for (1) indebtedness incurred to replace any existing indebtedness on certain terms; (2) guarantees by the Company of indebtedness of subsidiaries; (3) indebtedness necessary to effect the exercise of the purchase option for the properties owned by TMCT, LLC and leased to the Company and its subsidiaries; (4) indebtedness in an amount not to exceed $100 million in aggregate principal amount outstanding at one time incurred under the existing credit agreements or as an advance under the revolving credit facility included in the new credit agreements; (5) indebtedness for borrowed money among the Company and its wholly owned subsidiaries or among the Company's wholly owned subsidiaries; (6) indebtedness as required to

86

consummate the Tender Offer; and (7) unsecured indebtedness not to exceed $100 million in aggregate principal amount outstanding at any time;

- sell, lease, license, transfer, exchange or swap, mortgage or otherwise encumber or otherwise dispose of any material portion of its properties or assets, except sales of inventory in the ordinary course and pursuant to existing agreements;

- modify, amend, terminate or waive any rights under certain material contracts in any material respect in a manner that is adverse to the Company;

- enter into certain material contracts;

- make, change or revoke any material tax election; file any amended tax return or settle or compromise any liability for taxes;

- acquire, including by merger, consolidation or acquisition, any corporation or business organization or any division, or any material amount of assets with a purchase price of $120 million in the aggregate, provided that without the consent of the ESOP, the Company will not acquire or make any investment in any entity that holds any license, authorization or approval issued by the FCC;

- adopt a plan of restructuring, recapitalization or other reorganization;

- settle any claim, action or proceeding, except those involving only the payment of monetary damages not in excess of $20 million individually and $75 million in the aggregate;

- make capital expenditures other than in accordance with the Company's budget consistent with past practice and other expenditures necessary in response to emergencies such as natural disasters or acts of terrorism;

- enter into any agreement, arrangement or understanding between the Company (or any subsidiary) and any affiliate that would be required to be disclosed under Item 404 of Regulation S-K;

- take any action reasonably likely to prevent or cause a material delay in the satisfaction of certain conditions contained in the Merger Agreement or the consummation of the Merger; or

- agree, or permit any of its subsidiaries, to take any of the foregoing actions.

In addition, the Company has agreed that between the date of the Merger Agreement and the Effective Time, it shall not, and shall not permit any of its subsidiaries or affiliates to, enter into or consummate any agreements or arrangements for an acquisition of any ownership interest attributable to the ESOP or any of its affiliates under the FCC rules in any radio or television broadcast licensee, or the publisher of any English language daily newspaper of general circulation, if ownership of such interest would reasonably be expected to result in any delay in obtaining, or the failure to obtain, an FCC order granting the consents or approvals required under the Communications Act of 1934 (the "FCC Order") or require the FCC to issue additional waivers prior to granting the FCC Order.

*No Solicitation of Transactions.*    During the period beginning on the date of the Merger Agreement and continuing until the Effective Time or the earlier termination of the Merger Agreement, the Company has agreed not to, and to cause its representatives not to:

- solicit, initiate, knowingly encourage or facilitate any inquiries with respect to, or the making, submission or announcement of, any Alternative Proposal (as defined below);

- participate in any negotiations regarding an Alternative Proposal, or furnish any non-public information regarding an Alternative Proposal or access to its properties, books, records or

87

personnel in connection with the Alternative Proposal, to any person that has made or is considering making an Alternative Proposal;

- engage in discussions regarding an Alternative Proposal with any person that has made or is considering making an Alternative Proposal;

- approve, endorse or recommend any Alternative Proposal;

- enter into any letter of intent, agreement in principle or any agreement providing for any Alternative Proposal;

- cooperate with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any person with respect to, or that would reasonably be expected to result in, an Alternative Proposal; or

- exempt any person from state takeover restrictions or similar laws, or otherwise cause such restrictions not to apply.

In addition, the Company has agreed to, and to cause each of its subsidiaries to, and to direct each of its and its subsidiaries' representatives to, immediately cease any discussions or negotiations with any parties that may be ongoing with respect to any Alternative Proposal. However, the Company, the Zell Entity and the ESOP have agreed that the provisions of any standstill agreement entered into between the Company and any third party will not be deemed to prohibit the third party from submitting competing proposals to the Special Committee or the Board.

"Alternative Proposal" means any bona fide proposal or offer from any person or group of persons, prior to the receipt of Company shareholder adoption of the Merger Agreement and approval of the Merger (other than a proposal or offer by the ESOP, Merger Sub or the Zell Entity and other than the Tender Offer), for:

- a merger, reorganization, share exchange, consolidation, business combination, recapitalization, dissolution, liquidation or similar transaction involving the Company;

- the direct or indirect acquisition by any person of assets representing 20% or more of the assets, revenues or earnings of the Company and its subsidiaries;

- the direct or indirect acquisition by any person of 20% or more of the outstanding shares; or

- any tender offer or exchange offer that if consummated would result in any person beneficially owning 20% or more of the shares.

The parties have agreed, however, that the Company may take the following actions, at any time from the date of the Merger Agreement and continuing until the earlier of the receipt of Company shareholder adoption of the Merger Agreement and the termination of the Merger Agreement, in response to a bona fide written and unsolicited Alternative Proposal that constitutes a Superior Proposal (as defined below) or that the Special Committee or the Board determines in good faith could reasonably be expected to result in a Superior Proposal, if the Special Committee or the Board determines in good faith, after consultation with outside legal counsel, that the failure to take such actions would be inconsistent with the directors' exercise of their fiduciary duties:

- furnish non-public information to the third party making the Alternative Proposal (if the Company receives an executed confidentiality agreement having confidentiality provisions substantially similar to the provisions of the confidentiality agreement between the Company and EGI);

- engage in discussions with the third party with respect to the Alternative Proposal; and

88

- approve, recommend and enter into an agreement with respect to the Alternative Proposal in connection with the termination of the Merger Agreement in accordance with its terms.

The ESOP will be entitled to receive an executed copy of the confidentiality agreement referred to above and the Company will substantially simultaneously provide or make available to the ESOP any written material non-public information that is provided to the third party making the Alternative Proposal that was not previously provided to the ESOP.

The Company has also agreed that neither the Board nor any committee thereof will:

- withdraw or modify, or propose publicly to withdraw or modify in a manner adverse to the ESOP, the approval or recommendation by the Special Committee or the Board of the Merger or the Merger Agreement or other transactions contemplated by the Merger Agreement, including the Tender Offer (the "Recommendation");

- approve, adopt or recommend, or propose publicly to approve, adopt or recommend, any Alternative Proposal;

- recommend that shareholders tender their shares in any tender offer or exchange offer (other than the Tender Offer); or

- exempt any person from state takeover or similar restrictions.

Any of the foregoing actions constitute a "Change of Recommendation" under the Merger Agreement. However, if the Board or the Special Committee determines in good faith, after consultation with outside legal counsel and financial advisors, that failure to effect a Change of Recommendation would be inconsistent with the Board's or the Special Committee's exercise of its fiduciary duties, the Board or the Special Committee may make a Change of Recommendation.

The Company is required to promptly (within 48 hours) advise the ESOP of any Alternative Proposal or any inquiry that would reasonably be expected to lead to any Alternative Proposal, any request of non-public information relating to the Company or its subsidiaries or any inquiry for discussion or negotiation regarding an Alternative Proposal, including the identity of the person making any Alternative Proposal and the material terms of any such Alternative Proposal or inquiry. The Company must keep the ESOP reasonably informed on a current basis of the status of any Alternative Proposal or inquiry, and must promptly (within 48 hours) notify the ESOP if it determines to begin providing information or engaging in discussions concerning an Alternative Proposal.

"Superior Proposal" means any Alternative Proposal on terms that the Board or the Special Committee determines in good faith, after consultation with the Company's or the Special Committee's outside legal counsel and financial advisors, and considering such factors as the Board or the Special Committee considers to be appropriate, is more favorable to the Company and its shareholders than the transactions contemplated by the Merger Agreement. For purposes of the definition of "Superior Proposal," the references to "20%" in the definition of Alternative Proposal are deemed to be references to "50%."

*Shareholders Meeting.*    The Company must, as promptly as reasonably practicable following the mailing of the proxy statement, call and hold a meeting of the Company's shareholders for the purpose of obtaining the shareholders' adoption of the Merger Agreement and approval of the Merger. The Company is required to use all reasonable best efforts to solicit shareholder proxies in favor of the approval of the Merger Agreement and the transactions contemplated by the Merger Agreement, subject to the other terms of the Merger Agreement. Unless the Merger Agreement has been terminated prior to the Company's meeting of shareholders, the Company is required to submit the Merger Agreement to a vote of shareholders even if the Board or the Special Committee has approved, endorsed or recommended an Alternative Proposal or has made a Change of Recommendation.

89

*Stock Options and Other Stock-Based Awards; Employee Benefits.*    Under the terms of the Merger Agreement, at the Effective Time, each outstanding Company stock option that remains outstanding immediately prior to the Effective Time, whether vested or unvested, will become fully vested and the holder of the stock option will receive a cash payment equal to the product of (1) the number of shares subject to the option as of the Effective Time, multiplied by (2) the excess, if any, of the Merger Consideration over the exercise price per share of Company Common Stock subject to such option, less applicable tax withholding.

Under the terms of the Merger Agreement, at the Effective Time, each right of any kind to receive shares of Company Common Stock or benefits measured in whole or in part by the value of shares of Company Common Stock granted under Company stock or benefit plans, other than restricted shares, whether vested or unvested, that is outstanding immediately prior to the Effective Time will become fully vested and cease to represent a right or award with respect to shares of Company Common Stock and the holder of such right will receive a cash payment, less applicable withholding taxes, of the Merger Consideration for each share underlying such stock-based award. In addition, under the terms of the Merger Agreement, immediately prior to the Effective Time, each share of restricted Company Common Stock shall vest in full and be converted into the right to receive the Merger Consideration, less any applicable withholding taxes.

The parties have agreed that the Surviving Corporation will honor all Company benefit plans and compensation arrangements in accordance with their terms. The Surviving Corporation will provide each current and former employee, other than employees covered by collective bargaining agreements whose employment terminates during the one-year period following the Effective Time with severance benefits at levels in accordance with the terms of the Company's severance plans and policies in effect immediately prior to the Effective Time. The Surviving Corporation will fulfill the Company's obligations under the Company's Transitional Compensation Plan, without any amendment that is adverse to any beneficiary of such plan.

For all purposes under any new employee benefit plans of the Surviving Corporation providing benefits to employees of the Company after the Effective Time, each employee will be credited with his or her years of service with the Company under the employee benefit plans of the Surviving Corporation to the same extent that he or she was entitled to credit for service under the Company's similar benefit plans prior to the Effective Time. Each employee will be immediately eligible to participate in the Surviving Corporation's new employee benefit plans that replace a similar or comparable old benefit plan under which the employee participated. In addition, for new plans of the Surviving Corporation, preexisting condition exclusions and similar requirements will be waived to the extent they were waived under the Company's old plans, and eligible expenses incurred by an employee during the portion of the year prior to consummation of the Merger will be credited for deductible, coinsurance and maximum out-of-pocket expenses for that year under the Surviving Corporation's benefit plans.

*Indemnification and Insurance.*    For a period of six years from the Effective Time, the Surviving Corporation will maintain in effect director, officer and employee exculpation, indemnification and advancement of expenses provisions no less favorable than those of the Company's and any of its subsidiaries' certificates of incorporation and by-laws as in effect immediately prior to the Effective Time or in any indemnification agreements of the Company or its subsidiaries with any of their respective directors, officers or employees as in effect immediately prior to the Effective Time, and will not amend, repeal or otherwise modify any such provisions in any manner that would adversely affect the rights thereunder of any individuals who at the Effective Time were current or former directors, officers or employees of the Company or any of its subsidiaries.

The parties have also agreed that the Surviving Corporation will, to the fullest extent permitted under applicable law, indemnify and hold harmless each current and former director, officer or

90

employee of the Company or any of its subsidiaries and each person who served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise at the request of the Company (each, an "Indemnified Party") against any costs or expenses, judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened action, arising out of, relating to or in connection with any action or omission occurring or alleged to have occurred whether before or after the Effective Time (including acts or omissions in connection with such persons serving as an officer, director or other fiduciary in any entity if such service was at the request or for the benefit of the Company).

The parties have further agreed that for a period of six years from the Effective Time, the Surviving Corporation will maintain in effect the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and its subsidiaries with respect to matters arising on or before the Effective Time, subject to a maximum annual insurance premium of 200% of the last annual premium paid by the Company prior to the date of the Merger Agreement in respect of such coverage (the "Maximum Premium"). At the Company's option, after consultation with the ESOP, the Company may purchase, prior to the Effective Time, a six-year prepaid "tail" policy (at an aggregate cost not exceeding the Maximum Premium times six) on terms and conditions providing substantially equivalent benefits as the current policies of directors' and officers' liability insurance and fiduciary liability insurance. If the Company obtains such a prepaid tail policy, the Surviving Corporation will maintain the policy in full force and effect for its full term.

The Surviving Corporation will also pay all reasonable expenses, including reasonable attorneys' fees that may be incurred by any Indemnified Party in enforcing the foregoing obligations.

*Agreement to Take Further Action and to Use All Reasonable Best Efforts.* Each of the Company, the ESOP and Merger Sub has agreed to use its reasonable best efforts to do all things necessary, proper or advisable under applicable laws to consummate and make effective the Merger and the other transactions contemplated by the Merger Agreement, including to obtain necessary consents or waivers from third parties, to defend any lawsuit challenging the Merger Agreement or the consummation of the Merger or the other transactions contemplated by the Merger Agreement, and to execute and deliver any additional documents necessary to complete the Merger and the other transactions contemplated by the Merger Agreement. However, in no event are the ESOP, Merger Sub or the Company or any of its subsidiaries required to pay prior to the Effective Time any fee or other consideration to any third party for any consent or approval required for the consummation of the transactions contemplated by the Merger Agreement under any contract or agreement.

The Company and the ESOP have agreed to use reasonable best efforts to cooperate with each other in making any required filings with any governmental entity, and have agreed to take such further action as reasonably may be necessary to resolve objections, if any, as the FCC, the Federal Trade Commission, the Antitrust Division of the United States Department of Justice, state antitrust authorities or competition authorities of another nation, or any other person may assert under regulatory law so as to enable the closing of the Merger to occur as soon as reasonably possible.

*Financing Commitments; Company Cooperation.* The Company has agreed to use its reasonable best efforts to arrange the debt financing in connection with the Merger, the Tender Offer and the other transactions contemplated by the Merger Agreement on the terms described in the debt commitment letters delivered in connection with the signing of the Merger Agreement. If any of this debt financing becomes unlikely to occur in the manner or from the sources described in the debt commitment letters, the Company will promptly notify the ESOP and use its reasonable best efforts to obtain alternative debt financing.

91

The ESOP has agreed to cooperate with the Company in obtaining the financing, including:

- participating in a reasonable number of meetings on reasonable advance notice;

- providing information reasonably required to be included in the preparation of offering memoranda, private placement memoranda, prospectuses and similar documents; and

- cooperating and assisting in the preparation, negotiation, execution and closing of any underwriting or placement agreements, indentures, credit agreements, pledge and security documents or other definitive financing documents.

*The Tender Offer.*    The Company agreed in the Merger Agreement to commence the Tender Offer. The Tender Offer was commenced on April 25, 2007, and expired on May 24, 2007. Approximately 218,132,000 shares were tendered in the Tender Offer. Because more than 126,000,000 shares were tendered in the Tender Offer, proration of tendered shares, except for "odd lots" (lots held by owners of less than 100 shares), was required.

*Eagle Exchange.*    The Merger Agreement also provides that, if any shares of Company Common Stock or shares of Series D-1 Preferred Stock are owned or held by Eagle New Media Investments, LLC or Eagle Publishing Investments, LLC (the "Eagle Entities") less than 20 business days prior to the closing of the Merger, the Company will, and will cause the Eagle Entities to, (1) enter into an exchange agreement providing for the Eagle Entities to exchange all shares of Company Common Stock and Series D-1 Preferred Stock held by the Eagle Entities for shares of newly designated and issued Series E Preferred Stock of the Company (the "Exchange") and (2) consummate the Exchange prior to the closing of the Merger.

*Other Covenants and Agreements.*    The Merger Agreement contains additional agreements among the Company, the ESOP and Merger Sub relating to:

- specified divestitures by the Company, and the process by which such divestitures are conducted;

- compliance with requirements of the FCC and notification of any inquiry by the FCC relating to each radio broadcast and television station owned and operated by the Company or its subsidiaries;

- providing the ESOP reasonable access during normal business hours to the Company's officers, employees, properties, contracts, commitments, books and records;

- taking actions necessary to exempt the transactions contemplated by the Merger Agreement from the effect of any takeover statutes; and

- the issuance of press releases or other public statements relating to the Merger Agreement or the transactions contemplated by the Merger Agreement.

*Conditions to the Merger.*    The obligations of the parties to complete the Merger are subject to the satisfaction or waiver of the following mutual conditions:

- the Company shareholder approval must be obtained;

- no restraining order, injunction or other order by any court that prohibits consummation of the Merger shall have been entered and shall continue to be in effect;

- any applicable waiting period under the HSR Act shall have expired or been earlier terminated and the FCC Order shall have been obtained;

- certain specified consents and approvals shall have been received;

- the Exchange shall have been consummated, if applicable;

92

- the conditions precedent to the consummation of the purchase of the Subordinated Note and the Warrant (as described below under "Other Transaction Agreements—Zell Entity Purchase Agreement") shall have been satisfied or waived;

- the Company has obtained the debt financing on the terms set forth in the debt commitment letters, or alternative financing on substantially similar terms;

- the representations and warranties of the other party are true and correct both when made and as of the closing date (except to the extent made as of an earlier date, in which case as of such date), except where the failure of such representations and warranties to be so true and correct would not have, individually or in the aggregate, an ESOP Material Adverse Effect or a Company Material Adverse Effect, as the case may be; and

- the other party has in all material respects performed all obligations and complied with all covenants required by the Merger Agreement prior to the Effective Time.

In addition, the Company's obligation to effect the Merger is further subject to the fulfillment of the following conditions:

- the FCC Order does not impose any condition on the ESOP, the Company or any subsidiary that, individually or in combination with one or more conditions, would reasonably be expected to have a material adverse effect on the business, assets, financial condition, results of operations on an ongoing basis or continuing operations of the broadcasting business of the Company and its subsidiaries, taken as a whole;

- the ESOP has delivered to the Company a certificate, dated the Effective Time, certifying to the effect that the conditions related to the representations and warranties and performance in all material respects by the ESOP and Merger Sub of their obligations and covenants required by the Merger Agreement have been satisfied; and

- the Company has obtained an opinion from Valuation Research Corporation or another nationally recognized firm, in form and substance reasonably satisfactory to the Company, as to the solvency of the Company, after giving effect to the transactions contemplated by the Merger Agreement.

In addition, the ESOP's and Merger Sub's obligation to effect the Merger is further subject to the fulfillment of the condition that the Company has delivered to the ESOP a certificate, dated the Effective Time, certifying to the effect that the conditions related to the representations and warranties and performance in all material respects by the Company of its obligations and covenants required by the Merger Agreement have been satisfied.

*Termination.*   The Merger Agreement may be terminated by either the ESOP or the Company, if:

- the Company and the ESOP agree to do so;

- the Effective Time shall not have occurred by May 31, 2008, except that this right will not be available to a party if the failure to fulfill any of such party's obligations under the Merger Agreement is the proximate cause of the failure to complete the Merger on or prior to such date;

- any final and non-appealable injunction or order permanently restrains, enjoins or prohibits the consummation of the Merger, except that the party seeking to terminate the Merger Agreement must have used its reasonable best efforts to remove such injunction or order; or

- the Company shareholders meeting shall have concluded and the Company shareholder approval was not obtained.

93

The Merger Agreement may be terminated by the Company:

- if the Company is not in material breach of any of its representations, warranties or covenants and if the ESOP breaches or fails to perform in any material respect any of its representations, warranties, covenants or other agreements contained in the Merger Agreement, which breach or failure to perform (1) would result in a failure of a mutual condition or a condition to the Company's obligation to consummate the Merger to be satisfied and (2) cannot be cured by May 31, 2008; and the Company has provided the ESOP 30 days' written notice of its intention to terminate;

- in order to accept a Superior Proposal if, prior to the Company shareholder approval, (1) the Company has provided written notice to the ESOP advising that it has received a Superior Proposal; (2) at least three business days following receipt of such notice, the Board or the Special Committee has determined that, taking into account any revised proposal made by the ESOP, the Superior Proposal remains a Superior Proposal; (3) the Company has not breached its no-solicitation obligations; (4) the Board concurrently approves and the Company concurrently enters into a definitive agreement for such Superior Proposal; and (5) the Company has given the ESOP 48 hours' written notice of its intention to terminate the Merger Agreement; or

- if the consummation of the purchase of shares of Company Common Stock and the Exchangeable Note pursuant to the Zell Entity Purchase Agreement (as described below under "Other Transaction Agreements—Zell Entity Purchase Agreement") has not occurred on or before August 17, 2007, or if the Zell Entity Purchase Agreement is terminated in accordance with its terms prior to the Effective Time. The purchase of shares and the Exchangeable Note was consummated on April 23, 2007.

The Merger Agreement may be terminated by the ESOP:

- if the ESOP is not in material breach of any of its representations, warranties or covenants and if the Company breaches or fails to perform in any material respect any of its representations, warranties, covenants or other agreements contained in the Merger Agreement, which breach or failure to perform (1) would result in a failure of a mutual condition or a condition to the ESOP's obligation to consummate the Merger to be satisfied and (2) cannot be cured by May 31, 2008; and the ESOP has provided the Company 30 days' written notice of its intention to terminate; or

- if prior to the Company shareholder approval, the Board has failed to make the Recommendation in the proxy statement or has effected a Change of Recommendation in a manner adverse to the ESOP.

If the Merger Agreement is terminated, the Merger will not occur. See "Special Factors—Conduct of the Company's Business if the Merger is Not Completed."

*Amendment and Waiver.* The Merger Agreement may be amended by a written agreement signed by the Company, the ESOP and Merger Sub at any time prior to the Effective Time. However, neither the ESOP nor Merger Sub may, without the prior written consent of the Zell Entity, either (1) waive or amend any provision of the Merger Agreement (including, without limitation, any closing condition), including by the exercise of any consent rights, or (2) agree to, or exercise any right to, terminate the Merger Agreement as described under the first bullet point or the last bullet point under the subheading "The Merger Agreement—Termination" above. In addition, no amendment that requires further approval of the Company's shareholders will be made without obtaining that approval.

94

Annex B

April 1, 2007

# Morgan Stanley

1585 Broadway
New York, NY 10026

Special Committee of the Board of Directors
Board of Directors
Tribune Company
435 North Michigan Avenue
Chicago, IL 60611

Members of the Special Committee of the Board and the Board of Directors:

We understand that Tribune Company (the "Company"), GreatBanc Trust Company ("GreatBanc"), not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "Buyer"), Tesop Corporation, a wholly owned subsidiary of the Buyer (the "Merger Sub"), and EGI-TRB, L.L.C. (solely for the limited purposes of Section 8.12 thereof) (the "Investor") propose to enter into an Agreement and Plan of Merger, substantially in the form of the draft dated April 1, 2007 (the "Merger Agreement"), which provides, among other things, for the merger (the "Merger") of the Merger Sub with and into the Company. Pursuant to the Merger, the Company will become a wholly owned subsidiary of the Buyer and each outstanding share of common stock, par value $0.01 per share, of the Company (the "Common Stock"), other than shares of Common Stock held by the Company as treasury stock, shares of Common Stock owned by the Buyer or the Merger Sub immediately prior to the effective time of the Merger or shares of Common Stock as to which dissenters' rights have been perfected, will be converted into the right to receive $34.00 in cash plus the Additional Per Share Consideration (as defined in the Merger Agreement). The terms and conditions of the Merger are more fully set forth in the Merger Agreement. We further understand that the Investor will invest in debt and equity securities of the Company prior to the Merger and debt and equity securities of the surviving corporation following the Merger pursuant to a Securities Purchase Agreement, substantially in the form of the draft dated April 1, 2007 and related agreements, each entered into in connection with the Merger (together, the "Investor Agreements"). In addition, we understand that the Buyer will invest in equity securities of the Company prior to the Merger pursuant to an ESOP Purchase Agreement, substantially in the form of the draft dated April 1, 2007 and related agreements, each entered into in connection with the Merger (together, the "ESOP Purchase Agreements"). Furthermore, we understand that in the event that Eagle New Media Investments, LLC or Eagle Publishing Investments, LLC (together, the "Eagle Entities") own or hold any shares of Common Stock or Series D-1 preferred stock of the Company (the "Preferred Stock") shortly before the consummation of the Merger, the Company and the Eagle Entities will enter into a Stock Exchange Agreement, substantially in the form of the draft dated April 1, 2007 (the "Stock Exchange Agreement"), pursuant to which the Eagle Entities will exchange the shares of Common Stock and Preferred Stock owned or held by them for shares of Series E preferred stock, without par value, of the Company prior to the consummation of the Merger.

You have asked for our opinion as to whether the consideration to be received by the holders of shares of Common Stock (other than the Investor, the Eagle Entities, the Buyer and the Merger Sub) pursuant to the Merger Agreement is fair from a financial point of view to such holders.

For purposes of the opinion set forth herein, we have:

(i)  reviewed certain publicly available financial statements and other information of the Company;

B-1

# Morgan Stanley

(ii) reviewed certain internal financial statements and other financial and operating data concerning the Company prepared by the management of the Company;

(iii) analyzed certain financial projections prepared by the management of the Company;

(iv) discussed the past and current operations and financial condition and the prospects of the Company with senior executives of the Company;

(v) reviewed the reported prices and trading activity for shares of the Common Stock;

(vi) compared the financial performance of the Company and the prices and trading activity of shares of the Common Stock with that of certain other comparable publicly-traded companies and their securities;

(vii) reviewed the financial terms, to the extent publicly available, of certain comparable acquisition transactions;

(viii) participated in discussions and negotiations among representatives of the Special Committee, the Company, the Buyer, the Investor and their financial and legal advisors;

(ix) reviewed the Merger Agreement; drafts of the debt financing commitments provided to the Company by certain lending institutions dated April 1, 2007 (the "Commitment Letters"); drafts of the Investor Agreements dated April 1, 2007; the Stock Exchange Agreement; drafts of the ESOP Purchase Agreements dated April 1, 2007; a draft of the Voting Agreement, dated April 1, 2007, by and between the Company and each of Chandler Trust No. 1 and Chandler Trust No. 2 and certain other related documents; and

(x) performed such other analyses and considered such other factors as we have deemed appropriate.

We have assumed and relied upon, without independent verification, the accuracy and completeness of the information reviewed by us for purposes of this opinion. With respect to the financial projections, we have assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the future financial performance of the Company. We have also assumed that the Merger will be consummated in accordance with the terms set forth in the Merger Agreement without any waiver, amendment or delay of any terms or conditions including, among other things, that the transactions contemplated by the Investor Agreements, the ESOP Purchase Agreements and the Stock Exchange Agreement (if entered into pursuant to the terms of the Merger Agreement) will be consummated in accordance with their terms. We are not legal, tax or regulatory advisors. We are financial advisors only and have relied upon, without independent verification, the assessment of the Company and its legal, tax or regulatory advisors with respect to such matters.

This opinion does not address the fairness of any consideration to be received by the Buyer, the Investor or the Eagle Entities pursuant to the Merger Agreement, the ESOP Purchase Agreements, the Investor Agreements or the Stock Exchange Agreement (if entered into pursuant to the terms of the Merger Agreement), the relative fairness of any portion of the consideration to holders of any series of common or preferred stock of the Company, the relative merits of the Merger as compared to alternative transactions or strategies that might be available to the Company, or the underlying business decision of the Company to enter into the Merger Agreement. We have not made any independent valuation or appraisal of the assets or liabilities of the Company nor have we been furnished with any such valuations or appraisals. Our opinion is necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to us as of, the date hereof. Events occurring after the date hereof may affect this opinion and the assumptions used in preparing it, and we do not assume any obligation to update, revise or reaffirm this opinion.

B-2

# Morgan Stanley

We acted as financial advisor to the Special Committee of the Board of Directors of the Company in connection with this transaction and will receive a fee for our services, a substantial portion of which became payable at the time we advised the Special Committee of the Board of Directors that we were prepared to deliver this opinion. In the past, Morgan Stanley & Co. Incorporated and its affiliates have provided financial advisory and financing services for the Company and affiliates of the Investor and have received fees for the rendering of these services. In addition, we and our affiliates, directors or officers, including individuals working with the Company in connection with this transaction, may have committed and may commit in the future to invest in investment funds managed by affiliates of the Investor. In the ordinary course of our trading, brokerage, investment management and financing activities, we and our affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for our own account or the accounts of our customers, in debt or equity securities or senior loans of the Company or any other company or any currency or commodity that may be involved in this transaction.

It is understood that this letter is for the information of the Special Committee of the Board of Directors of the Company and the Board of Directors of the Company and may not be used for any other purpose without our prior written consent, except that a copy of this opinion may be included in its entirety in any filing the Company is required to make with the Securities and Exchange Commission in connection with this transaction if such inclusion is required by applicable law. In addition, we express no opinion or recommendation as to how the shareholders of the Company should vote at the shareholders' meeting to be held in connection with the Merger.

Based on the foregoing, we are of the opinion on the date hereof that the consideration to be received by the holders of shares of the Common Stock (other than the Investor, the Eagle Entities, the Buyer and the Merger Sub) pursuant to the Merger Agreement is fair from a financial point of view to such holders.

Very truly yours,

MORGAN STANLEY & CO. INCORPORATED

By:    /s/ THOMAS F. WHAYNE
       _____
       Thomas F. Whayne
       Managing Director

B-3

Annex C

**Global Markets & Investment
Banking Group**

4 World Financial Center
North Tower 30th Floor
New York, New York 10080
212 449 1000



April 1, 2007

Board of Directors
Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611

Members of the Board of Directors:

Tribune Company ("Company"), the Tribune Employee Stock Ownership Trust ("Acquiror"), which forms a part of the Tribune Employee Stock Ownership Plan, and Tesop Corporation, a Delaware corporation all of the common stock of which is owned by the Acquiror ("Acquisition Sub"), propose to enter into an Agreement and Plan of Merger dated as of April 1, 2007 ("Merger Agreement"), pursuant to which Acquisition Sub would be merged with and into the Company ("Merger"), with the Company surviving the merger and becoming wholly owned by the Acquiror. In the Merger, each share of Company common stock, par value $0.01 per share ("Company Shares", which term shall also apply to the common stock of the surviving corporation following the Merger), other than any shares held by the Acquiror and other than shares with respect to which dissenters rights are perfected, would be converted into the right to receive $34.00 per share in cash, such amount to be adjusted upward at an 8% annualized rate from January 1, 2008 to and including the closing date if the Merger does not close by January 1, 2008 (the "Consideration"). As part of the transaction, the Company and EGI-TRB, L.L.C., a Delaware limited liability company ("EGI-TRB") and Samuel Zell as guarantor of EGI-TRB ("Guarantor"), have entered into a Securities Purchase Agreement dated April 1, 2007 ("Securities Purchase Agreement") by which EGI-TRB has agreed to purchase 1,470,588 newly issued Company Shares at $34.00 per Company Share and an unsecured subordinated exchangeable note in the principal amount of $200.0 million which shall be exchangeable at the option of the Company, or automatically in certain circumstances, into 5,882,353 Company Shares (the "Subordinated Exchangeable Note") prior to consummation of the Merger. In addition, GreatBanc Trust Company ("ESOP Trustee"), not in its individual or corporate capacity, but solely as trustee of Acquiror, has entered into an ESOP Purchase Agreement with the Company dated April 1, 2007, by which the Acquiror has agreed to purchase 8,928,571 Company Shares at $28.00 per share immediately following execution of the Merger Agreement. As soon as practicable following the execution of the Merger Agreement, the Company will commence a self-tender share repurchase ("Self-Tender") of up to approximately 126 million Company Shares at $34.00 per share. Immediately prior to the Merger, the Company will repay the Subordinated Exchangeable Note, and immediately following consummation of the Merger, EGI-TRB will purchase from the Company an unsecured subordinated promissory note in the principal amount of $225.0 million (the "Subordinated Note") and purchase a 15-year warrant (the "Warrant") to purchase 43,478,261 Company Shares (subject to adjustment). The purchase price of the Warrant will be $90 million, and the initial aggregate exercise price of the Warrant will be $500 million, increasing by $10 million per year for the first 10 years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment).

C-1

We understand that the Company has entered into a Voting Agreement (the "Voting Agreement") with Chandler Trust No. 1 and Chandler Trust No. 2, pursuant to which Chandler Trust No. 1 and Chandler Trust No. 2 have agreed, among other things, to vote in favor of the Merger Agreement and the Merger. We further understand that the Company has entered into separate Registration Rights Agreements (the "Registration Rights Agreements") with (a) Chandler Trust No. 1 and Chandler Trust No. 2 (the "Chandler Registration Rights Agreement") and (b) a Registration Rights Agreement with EGI-TRB and the Acquiror (the "EGI-TRB/Acquiror Registration Rights Agreement").

You have asked us whether, in our opinion, the Consideration to be received by the holders of the Company Shares pursuant to the Merger is fair from a financial point of view to such holders, other than the Acquiror and its affiliates and the Guarantor and his affiliates.

In arriving at the opinion set forth below, we have, among other things:

(1)     Reviewed certain publicly available business and financial information relating to the Company that we deemed to be relevant;

(2)     Reviewed certain information, including financial forecasts, relating to the business, earnings, cash flow, assets, liabilities and prospects of the Company furnished to us by the Company;

(3)     Conducted discussions with members of senior management and representatives of the Company concerning the matters described in clauses 1 and 2 above;

(4)     Reviewed the market prices and valuation multiples for the Company Shares prior to the Merger and compared them with those of certain publicly traded companies that we deemed to be relevant;

(5)     Reviewed the results of operations of the Company and compared them with those of certain publicly traded companies that we deemed to be relevant;

(6)     Compared the proposed financial terms of the Merger with the financial terms of certain other transactions that we deemed to be relevant;

(7)     Participated in certain discussions and negotiations among representatives of the Company and the Acquiror and the Guarantor and their financial and legal advisors;

(8)     Reviewed a draft dated as of April 1, 2007 of the Merger Agreement (it being understood that such draft was, in all material respects, in the form to be executed); and

(9)     Reviewed such other financial studies and analyses and took into account such other matters as we deemed necessary, including our assessment of general economic, market and monetary conditions.

In preparing our opinion, we have assumed and relied on the accuracy and completeness of all information supplied or otherwise made available to us, discussed with or reviewed by or for us, or publicly available, and we have not assumed any responsibility for independently verifying such information or undertaken an independent evaluation or appraisal of any of the assets or liabilities of the Company or been furnished with any such evaluation or appraisal, nor have we evaluated the solvency or fair value of the Company under any state or federal laws relating to bankruptcy, insolvency or similar matters. In addition, we have not assumed any obligation to conduct any physical inspection of the properties or facilities of the Company. With respect to the financial forecast information furnished to or discussed with us by the Company, we have assumed that they have been reasonably prepared and reflect the best currently available estimates and judgment of the Company's management as to the expected future financial performance of the Company. We have also assumed that the final form of the Agreement will be substantially similar to the last draft reviewed by us.

C-2

Our opinion is necessarily based upon market, economic and other conditions as they exist and can be evaluated on, and on the information made available to us as of, the date hereof. We have reviewed drafts dated as of April 1, 2007 (it being understood that such drafts were, in all material respects, in the form to be executed) of the Securities Purchase Agreement, the Subordinated Exchangeable Note, the ESOP Purchase Agreement, the Subordinated Note, the Warrant, the Voting Agreement, the Chandler Registration Rights Agreement and the EGI-TRB/Acquiror Registration Rights Agreement, however we express no opinion on any aspect of such agreements, or on any other document referred to in the Merger Agreement to be entered into in connection with the transaction.

We are acting as financial advisor to the Company in connection with the Merger, and will assist the Company in arranging a portion of the financing for the Merger, and will receive fees from the Company for our services, significant portions of which are contingent upon the consummation of the Merger and such financing. In addition, the Company has agreed to indemnify us for certain liabilities arising out of our engagement. We are a participant in the Company's credit facilities which will be refinanced in connection with the transaction and anticipate that we will be a participant in such refinancing. We have, in the past, provided financial advisory and financing services to the Company and/or its affiliates and the Guarantor and/or his affiliates and may continue to do so and have received, and may receive, fees for the rendering of such services. In addition, in the ordinary course of our business, we may actively trade the Company Shares and other securities of the Company for our own account and for the accounts of customers and, accordingly, may at any time hold a long or short position in such securities.

This opinion is for the use and benefit of the Board of Directors of the Company. Our opinion does not address the merits of the underlying decision by the Company to engage in the Merger and transactions related thereto and does not constitute a recommendation to any shareholder as to whether such shareholder should tender any Company Shares pursuant to the Self-Tender and how such shareholder should vote on the proposed Merger or any matter related thereto. In addition, you have not asked us to address, and this opinion does not address, the fairness to, or any other consideration of, the holders of any class of securities, creditors or other constituencies of the Company, other than the holders of the Company Shares (excluding the Acquiror and its affiliates and the Guarantor and his affiliates).

On the basis of and subject to the foregoing, we are of the opinion that, as of the date hereof, the Consideration to be received by the holders of the Company Shares pursuant to the Merger is fair from a financial point of view to the holders of such shares, other than the Acquiror and its affiliates and the Guarantor and his affiliates.

Very truly yours,

MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED

C-3