# EXHIBIT H

**(Second Amended Complaint)**

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| DAN NEIL, CORIE BROWN, HENRY WEINSTEIN, WALTER ROCHE, JR., MYRON LEVIN and JULIE MAKINEN, individuals, on behalf of themselves and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 08-cv-06833 |
| vs. | ) ) ) ) | Hon. Rebecca R. Pallmeyer |
| SAMUEL ZELL; GREATBANC TRUST COMPANY, a Delaware corporation; EGI-TRB, L.L.C., a Delaware corporation; et al. | ) ) ) ) ) ) ) | CLASS ACTION SECOND AMENDED COMPLAINT |
| Defendants. | ) | |

Plaintiffs Dan Neil, Corie Brown, Henry Weinstein, Walter Roche, Jr., Myron Levin, Jack Nelson, and Julie Makinen, by and through their attorneys, individually and on behalf of all others similarly situated, complain and allege as follows:

## I.    INTRODUCTION

*The only security of all is in a free press. The force of public opinion cannot be resisted when permitted to be freely expressed. It is necessary, to keep the waters pure.*

Thomas Jefferson to Lafayette, 1823.

*Grave dancing is an art that has many potential benefits. But one must be careful while prancing around not to fall into the open pit and join the cadaver.*

Sam Zell, 1976[1]/

---

[1]    Zell, Sam. *The Grave Dancer: A Guide to the Risky Art of Resurrecting Dead Properties.* Real Estate Review (1976).

1.    This case is about a corporate take-over done through a series of carefully manipulated complex financial transactions involving an Employee Stock Ownership Plan.

2.    In 2006, Samuel Zell developed a plan to take over the Tribune Company by risking other people's money in the hope that he would receive the reward. His plan was described in his own words:

> **Dear Partners,**
>
> **When we closed the going-private transaction in December [2007], our total debt increased to nearly $13 billion. I put $315 million behind that debt . . . . The employees - you - then acquired 100 percent of the company. I acquired an option to buy 40 percent of the company for $500 to $600 million within the next 15 years.**
>
> **●●●**
>
> **In the end, you and I together will own a collection of assets worth billions of dollars.**
>
> Sam Zell, 2008.[2/]  (See **Exhibit A**, attached hereto and incorporated herein).

3.    To accomplish his plan, Zell enticed members of the Board of Directors of the Tribune Company and aided and abetted Dennis J. FitzSimons, among others, in breaching their fiduciary duties by paying them millions of dollars. Indeed, the Tribune Company's SEC filing of December 28, 2007 indicated that Zell and the Company created a $25 million pool for a management equity *incentive plan* to provide money for Tribune executives to complete the going-private transaction and retain them over a transition period. FitzSimons received about $3 million from this pool and a total of approximately $17.7 million in severance and other payouts.

4.    Now, Zell and his accessories threaten to destroy the Tribune Company and its assets, which include some of the nation's oldest and best daily newspapers, including the Los Angeles *Times*, the Chicago *Tribune*, and the Baltimore *Sun*, along with several other great daily

---

[2]    February 2008 edition of Tribune News Special ESOP Edition.

newspapers. They are doing so illegally and without consideration for the employee-owners or respect for the institution.

5.      As part of his takeover of the Tribune Company in <u>December, 2007</u>, Sam Zell's illegal and irresponsible actions and public statements have damaged the reputation and business of the company he purports to want to preserve. Through the structure of his takeover, Zell and his accessories have diminished the value of the employee-owned company to benefit himself and his fellow board members, while bankrupting the Company. Through their self-dealing at the expense of employees, Zell and his co-fiduciaries have repeatedly breached their ERISA fiduciary duties, as fully set forth below.

6.      In <u>April 2007</u>, the Tribune Company announced that it had accepted Zell's bid to acquire the Company in a complicated deal that used the Employee Stock Ownership Plan (the "Tribune ESOP") as a springboard. The deal included borrowing billions against the Company's assets - Tribune Company's debt surged from less than **$4 billion** to approximately **$13 billion**. Further, approximately $10.6 billion of new debt were at variable rates of interest. If interest rates were to increase, the Tribune ESOP debt service obligations would increase, even though the amount borrowed remained the same. The Company was also converted from a C-corporation to an S-corporation, a tax strategy that allows Zell to avoid paying most corporate taxes. Using a structure allegedly designed to benefit employees (the Tribune ESOP), Zell took over a highly valuable company, imposed on it the most encumbered balance sheet in the newspaper industry, and avoided any real personal risk or responsibility, all while enjoying the benefits of a tremendously valuable tax structure and letting employee "owners" bear the damaging consequences going forward.

7.      Despite the legal mandate to administer the Tribune ESOP (the Tribune Company's only shareholder) solely in the interests of the employee-owners, Zell and his accessories orchestrated what was clearly an imprudent purchase by the Tribune ESOP. It was a deal designed to benefit corporate insiders at the employees' expense.

8.    Not only was the imprudence of this transaction clear, but its consequences were easily foreseeable. After engineering the transaction - which essentially let someone buy an $8 billion house with a variable interest-rate mortgage and with no down payment - Zell redirected the Company's operations from running newspapers to *servicing the new debt*. The Company's cash flow was not sufficient to service its newly-imposed crushing debt burden and so the Company filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on December 8, 2008.

9.    As was widely reported by industry analysts, the price paid for Tribune stock during the acquisition was a significant over-valuation given the debt burden imposed by Zell. On November 2, 2007 - over one month before the deal closed - a Lehman Brothers' Newspaper Valuation and Stock Scorecard clearly presented the impact of Zell's debt on the fair market value of the Tribune Company's stock: "Should the Tribune privatization deal break and not occur, we believe that fair value on the stock, if it were to remain an ongoing public entity, would be significantly less than the current stock price. *Given the added $7 billion in debt to repurchase 126 million shares in the tender offer, we think fair value on the stock would be $7-$8* per share based on our detailed sum-of-the-parts analysis..." (emphasis added). (See **Exhibit B**, attached hereto and incorporated herein by this reference.)

10.    After the transaction closed, Goldman Sachs provided another clear indication of the deal's imprudence: "Tribune's $34 go-private price represents... [a] very rich valuation in the context of the cyclical and secular challenges facing the industry." That report also predicted the measures Zell would take to service the imposed debt: "the transaction leaves very little room for error, particularly given the extremely challenging industry backdrop. The company could potentially face a liquidity crunch fairly quickly... [w]e wouldn't be surprised to see *additional asset sales* beyond the announcements to date..." (emphasis added). (See **Exhibit C**, attached hereto and incorporated herein by this reference.)

4

11.    In <u>March, 2008</u>, Standard & Poor's cut the Company's credit rating to "B-,"
stating that the cut "reflects the concern that Tribune might violate [loan agreements] in the near
term... as early as December." The Tribune Company's credit rating was reduced since the
ESOP acqusition and, soon thereafter, some of its bonds traded at $0.35 on the dollar. A report
from Fitch Ratings in late <u>August 2008</u> indicated that the Company's credit rating was further
lowered to junk level "CCC," indicating a "real possibility" the issuer could default and that the
Company's ability to meet financial commitments "is vulnerable to deterioration in business and
economic conditions." This report stated that there is reason to be "concerned about the
company's ability to generate cash to meet its interest payments, principal amortization and
maturities under its debt obligations."

12.    No prudent consumer, much less a prudent fiduciary, would have paid a grossly-
inflated price to buy a company valued at $8 billion, adding $8.4 billion in new debt to its
balance sheet, particularly when industry analysts reported that fair market value on the stock
was at least $20 per share *less **than the price paid***, and when those analysts predicted the
significant challenges that would continue to face the industry. By orchestrating what was
clearly an imprudent transaction, Zell, his accessories, and the Tribune ESOP trustee, GreatBanc,
breached their fiduciary duties to the employee-owners.

13.    As a result, employees now depend for their livelihoods on a company that is both
disastrously over-leveraged and managed in a way that flies in the face of the purpose of ESOP-
owned companies: to benefit and encourage the participation of employees in their company.
Zell and his accessories maintain complete control over the Company, even though employees of
the Tribune Company technically own the Company through the Tribune ESOP. Without having
any power over the Company's daily operations, employees of the Tribune Company suffer the
direct consequences of Zell's efforts to drive the Tribune Company's most valuable assets -
newspapers - into the ground.

14.      In connection with the acquisition, Zell made numerous assurances that employee benefits would remain secure and that the Company needed to focus on revenue because expenses had been cut enough. At the December 2007 closing, Zell stated: "I believe this company has spent a significant amount of time in the last five years cutting costs and maybe not enough time on increasing revenue. So I think our focus and our gut is that we can significantly increase the revenue of this company and dramatically increase its profitability going forward." This statement is contrary to all the later actions taken by Zell and his cohorts.

15.      The Tribune Company has cut more than **1,300** employees since the ESOP Acquisition.

16.      Plaintiffs bring this class action on behalf of themselves and a class consisting of those individuals who are participants in and beneficiaries of the Tribune ESOP, whose rights were and are being violated by Defendants.

17.      Defendants include the Plan Committee and the ESOP Trustee, who all engaged in numerous, repeated, and continuing breaches of fiduciary duties by, among other things, engaging in conflicts of interest, prohibited transactions and failures to disclose material information. As a result, the Tribune ESOP borrowed billions to become the sole shareholder of a company that is essentially controlled by one man: Sam Zell. As stated in the Company's 10-K filed with the SEC on December 30, 2007:

We have significant debt and other financial obligations as a result of Leveraged ESOP Transactions.... Our significantly increased debt level and related debt service obligations:

- Require us to dedicate a substantial portion of our cash flows to the payment of principal and interest on our debt which will reduce the funds we have available for other purposes;

- Limit our liquidity and operational flexibility and our ability to respond to the challenging general and industry-specific economic and business conditions that currently exist or that we may face in the future;

- May require us in the future to defer planned capital expenditures, further reduce the size of our work force, reduce discretionary spending, dispose of assets or

6

forego acquisitions or other strategic opportunities, any of which decisions may affect our revenues and place us at a competitive disadvantage compared to our competitors with less debt or with comparable debt at more favorable interest rates and who, as a result, may be better positioned to withstand economic downturns or pursue key acquisitions or other strategic opportunities;

- Impose on us additional financial and operational restrictions;

- Expose us to increased interest rate risk because a substantial portion of our debt obligations are at variable interest rates; and

- Subject us to market and industry speculation as to our financial condition and the effect of our debt level and debt service obligations on our operations, which speculation could be disruptive to our relationships with customers, suppliers, employees, creditors, and other third parties.

As a result, Zell and his accessories, through the ESOP acquisition, placed the Company in a position where it would not be able to generate sufficient cash to service or make required repayments of its indebtedness and it would be forced to take other actions to satisfy its obligations under its indebtedness, which had a high probability of not being successful.

19. In this action, Plaintiffs and the class seek to recover all the losses to the Tribune ESOP and the Company caused by Defendants' breaches of fiduciary duties in the form of restitution or damages as applicable. In addition, Plaintiffs seek disgorgement of any of Defendants' ill-gotten profits for such breaches and an accounting. Finally, Plaintiffs seek the removal of Defendants, and each of them, from their fiduciary positions.

19. The claims of Plaintiffs and the class arise under the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA"). Plaintiffs and the class seek compensatory damages and/or equitable relief as applicable, including injunctive relief.

## II.    **JURISDICTION AND VENUE**

20. The claims of Plaintiffs and the proposed class arise under the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq. ("ERISA"), and state law governing corporate fiduciary duties. Plaintiffs seek to enjoin acts and practices which

7

violate the provisions of Title I of ERISA, to make good to the Plan losses resulting from fiduciary violations, restore to the Plan any profits which have been made by the breaching fiduciaries through the use of Plan assets, to obtain other appropriate equitable and legal remedies in order to redress violations and enforce the provisions of Title I of ERISA.

21.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

22.     Venue is properly laid in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the employee benefit plan at issue was administered in this District during the relevant time, some or all of the events or omissions giving rise to the claims occurred in this District, and one or more of the Defendants may be found in this District.

## III.    **PARTIES**

23.     Plaintiff **DAN NEIL** has been employed by the Tribune Company in the County of Los Angeles, California, as a journalist at the Los Angeles *Times* since 2003.  In 2004, Neil was awarded the Pulitzer Prize for criticism.  He is a citizen of the State of California and resides in the County of Los Angeles. At all relevant times, Plaintiff NEIL has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Tribune Employee Stock Ownership Plan (the "Tribune ESOP").

24.     Plaintiff **CORIE BROWN** was employed by the Tribune Company in the County of Los Angeles, California as a journalist at the Los Angeles *Times* from 2000 until September 2008.  Formerly Newsweek Magazine's West Coast Entertainment Correspondent, Brown won the 2006 award for "Best Reporting" by the Association of Food Journalists, and was the 2008 winner of the prestigious Penney-Missouri Lifestyle Journalism award.  At all relevant times, Plaintiff BROWN has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Tribune ESOP.

25.     Plaintiff **HENRY WEINSTEIN** worked as a journalist for the Los Angeles *Times* from 1978 until 2008.  Weinstein was employed by the Tribune Company in the County

8

of Los Angeles, California, from the time of its acquisition of the Times Mirror Company in

2000 until 2008. One of the paper's most respected reporters, Weinstein was the 2006 recipient

of the prestigious John Chancellor Award for Excellence. Weinstein is a citizen of the State of

California and resides in the County of Los Angeles. At all relevant times, Plaintiff

WEINSTEIN has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the

Tribune ESOP.

      26.    Plaintiff **WALTER ROCHE, JR.** worked as a journalist for the Baltimore *Sun*

from 1996 until 2004, and later for the Los Angeles *Times* from 2004 until 2008. Roche was

employed by the Tribune Company from the time of its acquisition of the Times Mirror

Company in 2000 until 2008. Roche resides in Lafayette Hill, Pennsylvania. At all relevant

times, Plaintiff ROCHE has been a participant, as defined in ERISA § 3(7), 29 U.S.C. §

1002(7), in the Tribune ESOP.

      27.    Plaintiff **MYRON LEVIN** worked as a journalist for the Los Angeles *Times* from

1984 until 2008. Mr. Levin was employed by the Tribune Company in the County of Los

Angeles, California, from the time of its acquisition of the Times Mirror Company in 2000 until

2008. Levin has won a number of journalism honors and awards, including a prestigious Alicia

Patterson Foundation fellowship and the National Press Club's 2008 consumer journalism award.

Levin is a citizen of the State of California and resides in the County of Los Angeles. At all

relevant times, Plaintiff LEVIN has been a participant, as defined in ERISA § 3(7), 29 U.S.C.

§ 1002(7), in the Tribune ESOP.

      28.    Plaintiff **JULIE MAKINEN** currently works as a Deputy Business Editor of the

Los Angeles Times. She joined the Los Angeles Times in 2001 as a foreign correspondent before

becoming an assistant foreign editor. Prior to 2001, MAKINEN worked at the Washington Post,

where she worked as a copy editor, reporter and editor in the metro and foreign sections. In 2004,

she took a leave from the paper to train Afghan journalists through the Institute of War and

9

Peace Reporting. At all relevant times, Plaintiff MAKINEN has been a participant, as defined in

ERISA § 3(7), 29 U.S.C. § 1002(7), in the Tribune ESOP.

29.    The Tribune Company (the "Tribune Company" or "Company") is the Sponsor of

the TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN ("Tribune ESOP"), within the

meaning of ERISA § 3(16)(B). The Tribune Company established the Tribune ESOP on April 1,

2007, with an effective date of January 1, 2007. The Tribune Employee Stock Ownership Trust

("ESOT") for the Tribune ESOP was established pursuant to an agreement between the Tribune

Company and Defendant GreatBanc Trust Company on April 1, 2007. The Tribune Company at

all relevant times was a fiduciary of the Tribune ESOP under ERISA § 3(21)(A), 29 U.S.C.

§ 1002(21)(A), in that it exercised discretionary authority or discretionary control respecting

management of the Tribune ESOP and/or exercised authority or control respecting management

or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary

responsibility in the administration of the Tribune ESOP. Under the terms of the Tribune ESOP,

the Tribune Company is responsible for appointing Defendant Tribune Company Employee

Benefits Committee. The Tribune Company is also a party in interest under ERISA § 3(14), 29

U.S.C. § 1002(14). On December 8, 2008, after Plaintiffs filed their original Complaint, the

Tribune Company filed a voluntary petition under chapter 11 of title 11 of the United States

Code in the United States Bankruptcy Court for the District of Delaware, Case No. 08-13141.

Pursuant to Section 362 of the Bankruptcy Code, there is an automatic stay as to the Tribune

Company. Therefore, Plaintiffs acknowledge that this action is stayed as to the Tribune

Company only.

30.    Defendant **TRIBUNE COMPANY EMPLOYEE BENEFITS COMMITTEE**

("Committee") is the administrator of the Tribune ESOP, within the meaning of ERISA

§ 3(16)(A), 29 U.S.C. § 1002(16)(A), and therefore a fiduciary of the Tribune ESOP. At all

relevant times, Defendant Committee was also a fiduciary of the Tribune ESOP, within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary

authority or control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the ESOP. Defendant Committee at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

31.    At some relevant times, Defendant **GERALD AGEMA** was a member of the Committee.  Upon information and belief, Defendant AGEMA was Vice President/Administration and Chief Financial Officer for the Tribune Company and currently resides in Palos Park, Illinois.  Defendant AGEMA was a fiduciary of the Tribune ESOP at some relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP.  Defendant AGEMA at some relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

32.    At all relevant times, Defendant **HARRY AMSDEN** has been a member of the Committee.  Upon information and belief, Defendant AMSDEN is Senior Vice President of Financial Operations for the Tribune Company and resides in Clarendon Hills, Illinois. Defendant AMSDEN was a fiduciary of the Tribune ESOP at all relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP.  Defendant AMSDEN at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

33.    At all relevant times, Defendant **CHANDLER BIGELOW** has been a member of the Committee. Defendant BIGELOW is Chief Financial Officer for the Tribune Company and resides in Northfield, Illinois. Defendant BIGELOW was a fiduciary of the Tribune ESOP at all relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP. Defendant BIGELOW at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

34.    At some relevant times, Defendant **MICHAEL BOURGON** was a member of the Committee. Defendant BOURGON is Vice President, Human Resources at the Tribune Company and resides in Palatine, Illinois. Defendant BOURGON was a fiduciary of the Tribune ESOP at some relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP. Defendant BOURGON at some relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

35.    At some relevant times, Defendant **DONALD GRENESKO** was a member of the Committee. Defendant GRENESKO was Senior Vice President of Finance And Administration at the Tribune Company and resides in Winnetka, Illinois. Defendant GRENESKO was a fiduciary of the Tribune ESOP at some relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or

discretionary responsibility in the administration of the Tribune ESOP. Defendant GRENESKO at some relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

36.    At some relevant times, Defendant **JAMES KING** was a member of the Committee. Defendant KING resides in Arlington Heights, Illinois. Defendant KING was a fiduciary of the Tribune ESOP at some relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP. Defendant KING at some relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

37.    At some relevant times, Defendant **LUIS E. LEWIN** was a member of the Committee. Defendant LEWIN was Senior Vice President of Human Resources at the Tribune Company and resides in Chicago, Illinois. Defendant LEWIN was a fiduciary of the Tribune ESOP at some relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP. Defendant LEWIN at some relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

38.    At some relevant times, Defendant **RUTHELLYN MUSIL** was a member of the Committee. Defendant MUSIL was Senior Vice President of Corporate Relations at the Tribune Company and resides in Chicago, Illinois. Defendant MUSIL was a fiduciary of the Tribune ESOP at some relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary

responsibility in the administration of the Tribune ESOP. Defendant MUSIL at some relevant

times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

39.    At some relevant times, Defendant **SUSAN O'CONNOR** was a member of the

Committee. Defendant O'CONNOR was Director of Compensation and Benefits at the Tribune

Company and resides in Chicago, Illinois. Defendant MUSIL was a fiduciary of the Tribune

ESOP at some relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A), because she exercised discretionary authority or discretionary control respecting

management of the Tribune ESOP and/or exercised authority or control respecting management

or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary

responsibility in the administration of the Tribune ESOP. Defendant O'CONNOR at some

relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

40.    At all relevant times, Defendant **JOHN POELKING** has been a member of the

Committee. Defendant POELKING is Chief Financial Officer at Tribune Broadcasting and

resides in Arlington Heights, Illinois. Defendant POELKING was a fiduciary of the Tribune

ESOP at all relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A),

because he exercised discretionary authority or discretionary control respecting management of

the Tribune ESOP and/or exercised authority or control respecting management or distribution of

the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in

the administration of the Tribune ESOP. Defendant POELKING at all relevant times was also a

party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

41.    At all relevant times, Defendant **NAOMI SACHS** has been a member of the

Committee. Defendant SACHS is Director of Investments at the Tribune Company and resides

in Chicago, Illinois. Defendant SACHS was a fiduciary of the Tribune ESOP at all relevant

times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised

discretionary authority or discretionary control respecting management of the Tribune ESOP

and/or exercised authority or control respecting management or distribution of the Tribune

14

ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP. Defendant SACHS at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

42.    At some relevant times, Defendant **IRENE SEWELL** was a member of the Committee. Defendant SEWELL was VP/Compensation and Benefits at the Tribune Company and resides in Glenview, Illinois. Defendant SEWELL was a fiduciary of the Tribune ESOP at some relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP. Defendant SEWELL at some relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

43.    At some relevant times, Defendant **GARY WEITMAN** was a member of the Committee. Defendant WEITMAN was Senior Vice President, Corporate Relations at the Tribune Company and resides in Wilmette, Illinois. Defendant WEITMAN was a fiduciary of the Tribune ESOP at some relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP. Defendant WEITMAN at some relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

44.    At all relevant times, Defendant **GREATBANC TRUST COMPANY** ("GreatBanc" or "Trustee") has been the trustee of the Tribune ESOP. Pursuant to the ESOT, GreatBanc accepted appointment as the Trustee of the Tribune ESOP effective on or about mid-February, 2007. According a GreatBanc press release, the bank's role in the ESOP Acquisition was to act as a "watchdog" for the participants in the Tribune ESOP, and its sole purpose as

ESOP Trustee is to serve the best interests of participants in the Tribune ESOP. Defendant

GreatBanc at all relevant times was a "fiduciary" within the meaning of ERISA § 3(21)(A), 29

U.S.C. § 1002(21)(A), because it exercised discretionary authority or discretionary control

respecting management of the Tribune ESOP and/or exercised authority or control respecting

management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or

discretionary responsibility in the administration of the Tribune ESOP. Defendant GreatBanc at

all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

Defendant GreatBanc is a Delaware corporation headquartered in Illinois.

  45. Upon information and belief, Defendant **EGI-TRB, L.L.C.** ("EGI-TRB" or "Zell

Entity") was formed for the purpose of entering into and consummating the leveraged ESOP

transactions discussed herein. Defendant Zell is the founder of the Zell Entity. On information

and belief, the Zell Entity is wholly-owned by Sam Investment Trust, an Illinois trust established

for the benefit of Zell and his family. Upon information and belief, at all relevant times, the Zell

Entity was a "party in interest" as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). The Zell

Entity is a Delaware limited liability company located in Illinois.

  46. Defendant **SAMUEL ZELL** was elected to the Board of Directors of the Tribune

Company in or about May 2007 and remains a member of the Board. In December 2007, Zell

became Chairman of the Board of Directors of the Tribune Company, as well as President and

CEO. Zell was a fiduciary of the Tribune ESOP at all relevant times, within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or

discretionary control respecting management of the Tribune ESOP and/or exercised authority or

control respecting management or distribution of the Tribune ESOP's assets, and/or had

discretionary authority or discretionary responsibility in the administration of the Tribune ESOP.

Zell at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

  47. At all relevant times, Defendant **JEFFREY S. BERG** has been a Director on the

Board of Directors of the Tribune Company. On information and belief, Defendant Berg resides

in Pacific Palisades, California. Defendant BERG at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).

48.    At all relevant times, Defendant **BRIAN L. GREENSPUN** has been a Director on the Board of Directors of the Tribune Company. Defendant GREENSPUN at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14). On information and belief, Defendant Greenspun resides in Henderson, Nevada and is the owner of the Las Vegas *Sun*.

49.    At all relevant times, Defendant **BETSY D. HOLDEN** has been a Director on the Board of Directors of the Tribune Company. Defendant HOLDEN at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14). On information and belief, Defendant Holden resides in Winnekta, Illinois.

50.    At all relevant times, Defendant **WILLIAM A. OSBORN** has been a Director on the Board of Directors of the Tribune Company. Defendant OSBORN at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14). On information and belief, Defendant Osborn resides in Winnekta, Illinois. Defendant Osborn is also chairman and a director of Northern Trust Corporation and its principal subsidiary, The Northern Trust Company (collectively, "Northern Trust"). Northern Trust was retained by the Company as trustee of each of the Company's 401(k) savings plans, receiving millions of dollars in fees.

51.    At all relevant times, Defendant **WILLIAM PATE** has been a Director on the Board of Directors of the Tribune Company. Defendant PATE at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14). On information and belief, Defendant Pate resides in Chicago, Illinois.

52.    At all relevant times, Defendant **MARY AGNES WILDEROTTER** has been a Director on the Board of Directors of the Tribune Company. Defendant WILDEROTTER at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14). On information and belief, Defendant Wilderotter resides in Stamford, Connecticut.

53.    At all relevant times, Defendant **MARK SHAPIRO** is a Director of the Tribune Company.  Defendant SHAPIRO at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).  On information and belief, Defendant SHAPIRO resides in Westport, Connecticut.

54.    At all relevant times, Defendant **FRANK WOOD** has been a Director of the Tribune Company.  Defendant WOOD at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).  On information and belief, Defendant Wood resides in Cincinnati, Ohio.

55.    Defendants ZELL, BERG, GREENSPUN, HOLDEN, OSBORN, PATE, WILDEROTTER, SHAPIRO, and WOOD are referred to collectively as the "New Tribune Board."

56.    Defendant **DENNIS J. FITZSIMONS** was at the Tribune Company from 1982 to 2007: serving as President (since 2001), CEO (since 2003), and Chairman of the Board (since 2004).  Defendant FitzSimons retired from the Tribune Company on or about December 20, 2007 and, at or about the same time, received approximately $17.7 million in severance and other payments. Defendant FitzSimons was a fiduciary of the Tribune ESOP at some time during the relevant time period, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP.  Defendant FitzSimons at some relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).  On information and belief, Defendant FitzSimons resides in Winnekta, Illinois.

IV.    **PLAINTIFFS ASSERT ERISA'S WHISTLEBLOWER PROTECTION**

57.    Plaintiffs Neil and Makinen are current employees of the Tribune Company and are fearful that their jobs and employment benefits are in jeopardy because they have filed this

action. On information and belief, Plaintiffs and the putative class have been exposed to implicit and explicit threats and innuendo that their jobs could be at stake or they could be subject to retaliation for filing this lawsuit to challenge Defendants' actions.

58.    As a result, Plaintiffs Neil and Makinen hereby invoke the protections of the ERISA anti-retaliation statute.

59.    Specifically, ERISA § 510, 29 U.S.C. § 1140, protects participants in and beneficiaries of the Tribune ESOP from retaliation for exercising their rights. Section 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary" in an employee benefits plan covered by ERISA for the purpose of "interfering with the attainment of any right to which such participant may become entitled under" the plan or ERISA. Section 510 specifically prohibits retaliation for providing information or testimony, or being about to give testimony, in any "inquiry or proceeding" relating to ERISA. Any attempt by Defendants, or any of them, to retaliate against Plaintiffs and other potential class members, or any of them, for participating in this lawsuit will result in an additional Section 510 claim in which Plaintiffs and/or the putative class will seek all remedies afforded by law and/or equity, including, but not necessarily limited to, reinstatement, attorneys' fees and costs.

## V.    **FACTUAL BACKGROUND**

### A.    **Company History**

60.    On <u>June 10, 1847</u>, the Tribune Company published its first edition of the Chicago *Tribune* in Chicago. In <u>1983</u>, the Tribune Company became a public company with an initial offering of 7.7 million shares valued at $206 million. At the time, it was one of the largest IPOs ever made. On <u>June 12, 2000</u>, the Tribune Company and the (Los Angeles) Times Mirror Company merged. This merger added seven daily newspapers to the Tribune Company's fold, including the Los Angeles *Times* and *Newsday* in New York.

61.    Prior to the ESOP acquisition at issue, the Company's assets included the Los Angeles *Times*, the Chicago *Tribune*, the Baltimore *Sun*, *Newsday*, and six other daily newspapers. In addition, the Company owned over 50 web sites; 25 television stations; a 31% stake of the Food Network; the Chicago Cubs baseball team, and significant holdings in real estate across the country.

**B.    The Strategic Alternatives Review Process**

62.    On May 30, 2006, the then-Board of Directors of the Tribune Company announced a plan to repurchase up to 75 million shares of Company Common Stock, as well as a performance improvement plan aimed at additional cost savings and asset sales, in an attempt to address the Company's financial challenges. On June 27, 2006, the Company announced that it had repurchased 55 million shares for $32.50 per share through this offer and a separate purchase agreement with two of the Company's major shareholders, the McCormick Tribune Foundation and the Cantigny Foundation (collectively, "the Foundations").

63.    In approximately September 2006, the Tribune Company announced the creation of a "Special Committee" to oversee the process of evaluating strategic alternatives for the Company. Shortly thereafter, the Special Committee (through co-advisors Merrill Lynch and CitiGroup Global Markets, Inc. ("Citi")) began inviting interest in an acquisition of the Company. Merrill Lynch and Citi requested preliminary bids by October 27, 2006. On November 8, 2006, Defendant EGI-TRB signed a confidentiality agreement with the Company, indicating its interest in pursuing a bid to acquire the Company.

64.    Merrill Lynch and Citi received approximately $35.8 million and $37 million, respectively, for their roles as advisors to the Special Committee. These companies received other financial benefits from the deal: after advising the Special Committee to select Zell's bid to take the Tribune Company private, both Merrill Lynch and Citi were among the companies that lent Zell the money to complete the transaction. For their role on that side of the deal, Merrill Lynch and Citi shared $47 million in fees with other banks involved in financing Zell's deal.

20

65.     By <u>December 12, 2006</u>, five parties maintained interest in purchasing the Company.  Additional groups showed interest in purchasing parts of the Company.  One such group, shareholder Chandler Trusts, proposed a spinoff of the Tribune Company's Broadcasting and Entertainment Group followed by an acquisition of the rest of the Company.

66.     After <u>December 12, 2006</u>, Merrill Lynch and Citi contacted the remaining interested parties to request final bids by <u>January 12, 2007</u>.  Merrill Lynch and Citi also invited Chandler Trusts to formalize their proposal.

67.     On <u>January 20, 2007</u>, the Special Committee met to review the proposals that had been submitted to the Company.  The Special Committee reviewed three proposals (including the proposal from Chandler Trusts) and a letter submitted by two major shareholders requesting that the Company continue as a public company, unless a transaction for the whole Company at a substantial premium with minimal closing risk could be obtained. The Special Committee determined that none of the proposals were satisfactory and directed the Company's financial advisors to seek improvements in the proposals, and also to analyze alternatives that the Company could implement on its own.

68.     On <u>January 27, 2007</u>, the Special Committee received an update on the process. Each of the three groups submitted improved proposals.  Management and the Company's advisors also reviewed a possible leveraged recapitalization of the Company and spin-off of the Broadcasting and Entertainment Group, under which the Company would pay a special dividend of $20 per share in cash prior to the spin-off.  On <u>February 2, 2007</u>, the Special Committee received a letter from the Foundations expressing their preference for the recapitalization and spin-off plan and stating that they would consider increasing their ownership in the Company under that plan.

69.     On <u>February 2, 2007</u>, Defendant EGI-TRB submitted a proposal for a transaction in which it and a Company ESOP would acquire the Company at a price of $30 per share.

21

70.    On February 12, 2007, the Special Committee met and reviewed the alternatives available to the Company. The Tribune Company management recommended proceeding with the recapitalization and spin-off plan. At this meeting, Company management also reviewed revisions to the Company's financial outlook and shared this revised outlook with the parties that had submitted acquisition proposals. In particular, management revised the outlook for the Company's publishing business *downward*.

71.    Following the February 12, 2007 meeting, the Special Committee determined to recommend to the Board that the Company proceed with the recapitalization and spin-off plan, and that the Company not continue to pursue any other proposals, with the exception of the EGI-TRB proposal. On February 13, 2007, the Board authorized the Company to move forward with the recapitalization and spin-off plan.

72.    During this period, the Company's management and financial advisors continued to develop the potential ESOP transaction proposed by Defendants Zell and EGI-TRB. The Company retained counsel to advise it on ESOP matters and hired Defendant GreatBanc as the Trustee for the possible ESOP transaction.

73.    Through the end of February 2007, the Special Committee reviewed proposed terms of the ESOP transaction, as well as the proposed recapitalization and spin-off plan. The Special Committee sought the views of major shareholders the Chandler Trusts and the Foundations with respect to the EGI-TRB proposal. The Chandler Trusts and the Foundations each expressed concerns about the timing and execution risk of the proposed ESOP transaction, and encouraged the Company to pursue the recapitalization and spin-off plan.

74.    In early March 2007, Company representatives continued to discuss the terms and structure of the proposed transaction with representatives of Defendant EGI-TRB. On March 10, 2007, the Company informed Defendant EGI-TRB that it was reconsidering its comfort with the proposed ESOP transaction, including the level of leverage contemplated by the ESOP

transaction. The Company began reconsidering the recapitalization and spin-off plan, due to its lower levels of leverage.

75.    At a meeting on March 21, 2007, the Company's advisors informed the Special Committee that the ESOP transaction involved substantially more debt that the recapitalization and spin-off transaction, although the two plans would be comparable with regard to cash flow available for debt repayment. The Company's advisors also informed the Special Committee that they expected that the credit rating agencies would rate the Company's debt in the proposed recapitalization and spin-off plan one level higher than they would rate the Company's debt in the proposed ESOP transaction.

76.    Following the March 21, 2007 meeting, the Special Committee and the Board of Directors, EGI-TRB, and the Tribune ESOP continued negotiating the terms of the Tribune ESOP transaction.

77.    On March 30, 2007, the Special Committee and the Board of Directors met to review the two potential transactions. The Special Committee determined that the proposed Tribune ESOP transaction was more attractive, in particular due to the fact that the proposed price for the Tribune ESOP transaction was at the high end of the valuation ranges presented for the recapitalization and spin-off plan. The Special Committee also saw higher execution risk in the recapitalization and spin-off plan, due to the fact that the proposal would require the Company to meet the projections that advisors had used in developing relevant valuation ranges.

78.    In addition, in agreeing to and consummating the Zell bid, the Special Committee and the Board of Directors failed to consider in good faith one of the competing offers made jointly by billionaire investors Eli Broad and Ronald Burkle for the Company. The Special Committee and the Board of Directors rejected these two bidders twice: first, on July 31, 2006, when they unequivocally rebuffed offers from Broad, Burkle and entertainment mogul David Geffen to purchase the Los Angeles *Times* from the Company at a substantial premium; and again in March 2007, when they ignored Broad and Burkle's $34 per share offer purportedly

23

because it was not structured as an ESOP. Despite being shut out of the bidding process, Broad

and Burkle submitted a revised proposal that included an ESOP structure, but the Special

Committee and the Board of Directors cut short the bidding process.

79.     On April 1, 2007, after further negotiations between the Special Committee and

the Board of Directors and Defendant EGI-TRB, the Board of Directors of the Tribune Company

approved a proposed acquisition for $34 per share offered by Defendants Zell and EGI-TRB.

The Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with

GreatBanc Trust Company, Tesop Corporation (a Delaware corporation wholly owned by the

Tribune ESOP), and a Zell entity providing for the Tesop Corporation to be merged with and

into the Tribune Company. Following the merger, the Tribune Company would continue as the

surviving corporation wholly owned by the Tribune ESOP.

80.     The Company's April 2, 2007 press release announcing the merger had the

headline "Tribune to Go Private for $34 Per Share; Employee Stock Ownership Plan (ESOP)

Created; Sam Zell to Invest, Join Board; Chicago Cubs and Comcast SportsNet Interest to be

Sold," and stated, in relevant part as follows:

> "With the completion of its strategic review process, the Company today
> announced a transaction which will result in the company going private and
> Tribune shareholders receiving $34 per share.  Sam Zell is supporting the
> transaction with a $315 million investment.  Shareholders will receive their
> consideration in a two-stage transaction.
> "Upon completion of the transaction, the company will be privately held, with an
> Employee Stock Ownership Plan ('ESOP') holding all of Tribune's then-
> outstanding common stock and Zell holding a subordinated note and a warrant
> entitling him to acquire 40 percent of Tribune's common stock.  Zell will join the
> Tribune board upon completion of his initial investment and will become
> chairman when the merger closes.
> "The first stage of the transaction was a cash tender offer for approximately 126
> million shares at $34 per share.  The tender offer will be funded by incremental
> borrowings and a $250 million investment from Sam Zell... The second stage is a
> merger expected to close in the fourth quarter of 2007 in which the remaining
> publicly-held shares will receive $34 per share.  Zell will make an additional
> investment of $65 million in connection with the merger, bringing his investment
> in Tribune to $315 million.

"The board of directors of Tribune, on the recommendation of a special committee comprised entirely of independent directors, has approved the agreements and will recommend Tribune shareholder approval."

81.    Upon information and belief, valuation reports and other financial reports prepared in the course of the negotiations described above projected that the Tribune Company's financial results would continue to deteriorate.

82.    On April 4, 2007, David Hiller, the Los Angeles *Times* CEO and publisher, represented that: "It is very important that people understand that the existing pension plans and current 401(k)'s are fully protected.  The new plans will start in 2008."

83.    In an SEC filing on April 5, 2007, the Company disclosed that Zell would effectively have power to veto major transactions, even though he was only a minority shareholder.  Under the terms, transactions with a value of more than $250 million, among others, would required the approval of the Tribune Board, which will include two directors of Zell's choice.  These transactions, along with any changes to the by-laws of the Company, would require approval of a majority of the Tribune Board's independent directors as well as that of one of Zell's appointees.

84.    On April 13, 2007, according to several sources, a letter was sent from Tribune CEO Dennis FitzSimons to the Wall Street Journal, indicating that the ESOP Trustee obtained a fairness opinion on both the price of the shares purchased by the Tribune ESOP and the relative price Zell "will have to pay to obtain his 40% stake in the company."

85.    On December 20, 2007, using only $315 million of his own money, Zell closed the $8.2 billion deal taking the Company private through an S corporation.  An S Corporation is a "pass-through tax entity" taxed under Chapter 1, Subchapter S of the Internal Revenue Code. Profits of an S corporation are passed through to individual tax returns, and the profits are therefore reported and taxed by their shareholders.  This structure thereby allowed the Company to avoid most corporate taxes, freeing up cash flow to pay down debt (which surged by billions as a result of the ESOP Acquisition).  The Company thus became the largest 100% ESOP-owned S corporation, and the fifth largest majority employee-owned company in the United States.

25

86.    In connection with the closing of the ESOP Acquisition, Zell held a press conference at which he referred to the transaction as the "deal from Hell."

87.    The ESOP Acquisition was characterized by Goldman Sachs as follows: "With an estimated annual interest expense (before adjustments for asset sales) of $1 billion and 2008 EBITDA of $1.147 billion, the transaction leaves little room for error, particularly given the extremely challenging industry backdrop."

88.    In commenting on the valuation paid by the Tribune ESOP, Goldman Sachs stated: "Based on our 2008 estimate of EBITDA, and assuming the company's other assets (Chicago Cubs, Food Network interest, CareerBuilder stake, etc.) are worth approximately $2.2 billion, Tribune's $34 go-private price represents a multiple of about 9.0x EBITDA. We view this as a very rich valuation in the context of the cyclical and secular changes facing the industry."

89.    Based on industry analyst reports, it is clear that the Tribune ESOP vastly overpaid in its acquisition of the Tribune Company. As stated by Lehman Brothers in its November 2, 2007 report on the publishing industry: "Should the Tribune privatization deal break and not occur, we believe that fair value on the stock, if it were to remain an ongoing public entity, would be significantly less than the current stock price [$34 per share]. Given the added $7 billion in debt to repurchase 126 million shares in the tender offer, we think fair value on the stock would be $7-$8 per share on our detailed sum-of-the-parts analysis...." Among the issues cited by Lehman Brothers in its November 2007 Publishing report are: "declining readership and circulation, declining advertising market share, a weak newspaper advertising revenue outlook (estimated down 8.0% in 2007 and down 5% in 2008), a total decoupling of newspaper advertising growth from nominal GDP growth, very tight cost containment already over the past seven years, and margins that are currently at pre-1990's levels on average due to secular issues."

90.    Upon information and belief, the deterioration of the Company's financial performance accelerated between the Stage One Purchase Transaction and the Stage Two Purchase Transaction, as more fully described hereafter. Similarly, the "challenging industry backdrop" cited in the December, 2007 Goldman Sachs reports deteriorated further.

91.    On December 28, 2007, the Company's SEC filing indicated that Zell, the Special Committee, and the Board of Directors created a $25 million pool for a management equity incentive plan to provide incentives for Tribune executives to complete the going-private transaction and retain them over a transition period. Notably, then-Tribune CEO Dennis FitzSimons received about $3 million from this pool and a total of approximately $17.7 million in severance and other payouts.

### C.    The 2007 Transactions

92.    Defendant EGI-TRB's acquisition of the Tribune Company took place in a two-part transaction.

#### 1.    Step One Purchase Transaction: April 2007 Purchase Agreement

93.    On April 1, 2007, the Tribune ESOP purchased 8,928,571 shares of the Tribune Company's common stock from the Tribune Company at a price of $28 per share. The Tribune ESOP paid for this purchase with a promissory note in the principal amount of $250 million, to be repaid by the Tribune ESOP over the 30-year life of the loan through its use of annual contributions from the Tribune Company to the Tribune ESOP and/or distributions paid on the shares of the Company's common stock held by the Tribune ESOP. Upon consummation of the Merger (as described below), the 8,928,571 shares of the Company's common stock held by the Tribune ESOP were converted into 56,521,739 shares of common stock and represented the only outstanding shares of capital stock of the Company after the Merger.

94.    On April 23, 2007, pursuant to the purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), Defendant EGI-TRB made an initial investment of $250 million in the Company in exchange for: (a) 1,470,588 shares of the Company's common stock at

a price of $34 per share; and (b) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million, which the Company repaid immediately prior to the Merger (as described below).

95.    On April 25, 2007, the Tribune Company commenced a tender offer to repurchase up to 126 million shares of the Company's common stock that were then outstanding at a price of $34 per share in cash (the "Share Repurchase"). The tender offer expired on May 24, 2007, and 126 million shares of the Company's common stock were repurchased and subsequently retired on June 4, 2007, returning approximately $4.3 billion of capital to shareholders and utilizing proceeds from the Credit Agreement. The tender offer was subject to the completion of financing arrangements, receipt of a solvency opinion and other customary conditions

96.    On May 9, 2007, Zell was appointed as a member of the Tribune Board, pursuant to the Zell Entity Purchase Agreement.

97.    At the time the Tribune ESOP acquired approximately 9 million Tribune shares as part of the Step One Purchase Transaction, cash flow was down 12% through Q3, 2007, and management had decided to eliminate the profit sharing plan contribution. The Company borrowed $7 billion (refinancing approximately $3 billion in existing debt and taking on approximately $4 billion in new debt) to redeem shares at $34 per share. The Company also sold some assets while still a C corporation.

## 2.    Step Two Purchase Transaction: December 2007 Merger

98.    On December 20, 2007, the Tribune Company completed the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of the Company, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by the Company, the Tribune ESOP, or the Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34, without interest and less any applicable withholding taxes, and the Company

28

became wholly owned by the Tribune ESOP. The merger was subject to Tribune shareholder approval, FCC and other regulatory approvals, receipt of financing and a solvency opinion, and other conditions reflected in the definitive agreements.

99.    In the Merger, Defendant EGI-TRB received cash for the shares of the Company's common stock it had acquired pursuant to the Zell Entity Purchase Agreement and the Company repaid the exchangeable promissory note held by Defendant EGI-TRB, including approximately $6 million of accrued interest. In addition, the Company paid to Defendant EGI-TRB a total of $5 million in legal fee reimbursements, of which $2.5 million was previously paid following the Share Repurchase described above.

100.    In this second stage of the purchase transaction, the Company was converted from a C corporation to an S corporation. The Company then borrowed an additional $3 billion, and it acquired all outstanding shares not held by the Tribune ESOP, leaving the Company as a 100% privately owned S corporation. The Company also redeemed Zell's initial $250 million investment.

101.    The Step Two Purchase Transaction had the effect of making the Tribune ESOP the ultimate purchaser of the Company's remaining shares at the price of $34 per share and, because the ESOP was the Company's sole remaining shareholder, left the ESOP with the risk created by the massive additional debt taken on to finance the highly-leveraged transactions.

### D.    Zell's Synthetic Equity

102.    Through Defendant EGI-TRB, Zell made a $315 million investment in the form of a $225 million subordinated note with an 11- year maturity and the purchase of a warrant for $90 million upon completion of the Merger. The warrant can be exercised anytime within 15 years of issuance and gives Zell, through Defendant EGI-TRB, the right to acquire 40% of the Company (approximately 43,478,261 shares of common stock) from the Tribune ESOP. The exercise price of the warrant starts at $500 million and increases by $10 million a year until it reaches $600 million, where it remains until it expires. Thereafter, Defendant EGI-TRB

29

assigned minority interests in the subordinated promissory note and the warrant to certain of Zell's accessories.

103.    The exercise price of the warrant provides a much lower value to the Company than reflected in the share prices paid by the Tribune ESOP as part of the 2007 purchase transactions.

### E.    Credit Agreements

104.    Prior to the Tribune ESOP Acquisition, the Company had approximately $3.6 billion in debt. After the Tribune ESOP Acquisition, the Company was approximately $13 billion in debt.

105.    On May 17, 2007, the Company entered into a **$8.028 billion** senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consisted of the following facilities: (a) a $1.5 billion Senior Tranche X Term Loan Facility (the Tranche X Facility"); (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"); (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility"); and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement equaled **$10.133 billion in new debt**. On June 4, 2007, proceeds from the Tranche X facility and the Tranche B Facility were used by the Company to consummate the Share Repurchase and to refinance the Company's former five-year credit agreement and former bridge credit agreement.

106.    On June 29, 2007, the Company repaid $100 million of the $1.5 billion of borrowings under the Tranche X Facility. The remaining principal balance of the Tranche X Facility was required to be repaid in an aggregate amount of $650 million on December 4, 2008,

and the remaining outstanding amount of the Tranche X Facility, if any, was required to be repaid on June 4, 2009.

107.    On December 20, 2007, the Company entered into an agreement to obtain an additional $3.705 billion in debt which was used by the Company to consummate the Merger.

F.    Probable Risk Factors Resulting from the ESOP Acquisition

108.    The Tribune Company eliminated employer matching contributions to the Tribune Company 401(k) Plan as a result of the ESOP transaction. Zell informed ESOP participants that "What would have been discretionary company contributions to 401(k) accounts going forward are what's financing the ESOP."

109.    As a result of the ESOP Acquisition, Zell and his accessories had placed the Company in an unnecessarily insecure position, where probable risk factors could materially and adversely affect the Company's business, operating results, or financial condition.

110.    Among the material risks related to the Company's capital structure were significantly increased debt level and related debt service obligations. As a result, it was anticipated that the Company probably would not be able to generate sufficient cash to service or make required repayments of its indebtedness and it probably would be forced to take other actions to satisfy its obligations under its indebtedness which other actions may not be successful.

111.    In 2007, publishing represented 72% of the Company's consolidated revenues; advertising accounted for about 78% of those revenues. Also in 2007, publishing operating revenues decreased 9% primarily due to a decrease in advertising revenue. Planning for 2008, the Company anticipated that it would experience accelerating decline in publishing operating revenues. The Company's increased leverage and the anticipated decline in publishing operating revenues materially exposed the Tribune ESOP to increased risk, particularly during periods of downturns in the Company's business or in the economy generally. Because the Company's cash flows would likely decrease in 2008, material risk to the Tribune ESOP was heightened as

31

its required principal repayments in respect of indebtedness were not anticipated to change, and
its interest expense obligations were anticipated to increase due to increases in interest rates.

### G.    The Company's Operations Continued to Deteriorate Following the Merger

112.    On <u>February 12, 2008</u>, Zell announced to employees that the Company would
eliminate all profit-sharing contributions to the pension plan.

113.    Upon information and belief, since the ESOP acquisition, the Tribune Company
and the New Tribune Board terminated numerous long-term employees who were Tribune ESOP
participants or took action to force their early resignations or retirement.

114.    Since the ESOP Acquisition, the Tribune Company eliminated approximately
2,000 jobs in several staff cuts at its newspapers, particularly the Los Angeles *Times*.

115.    On <u>February 13, 2008</u>, Zell suggested in a memo that the moves reflected the
reality of the Tribune Company's significant debt levels.  Zell announced that the Tribune
Company would cut its staff by 2%, including approximately 150 jobs from the Los Angeles
*Times*.  In <u>May 2008</u>, the Company announced its quarterly earnings for the First Quarter of
2008.  Newspaper sales declined 11%.  All print advertising categories showed some
acceleration of their decline in the first quarter compared to the fourth quarter of 2007.
Newspaper EBITDA fell 37%.

116.    On <u>April 4, 2008</u>, *Reuters* reported that the Tribune Company faced serious risk
of defaulting on its debt as early as <u>October, 2009</u>.  The report cited the nearly $4 billion in debt
and interest payments due by the end of 2009, and the Company's credit rating, which was
lowered by Standard and Poor's on <u>March 17, 2008</u> from "B" to "B-" with a negative outlook.

117.    In <u>June 2008</u>, the Company announced that the Los Angeles *Times* building and
the Chicago Tribune Tower were up for sale. The Company also announced that it would reduce
by 500 the number of pages dedicated to news each week across all of its newspapers.

118.    On July 1, 2008, the Company and one of its subsidiaries borrowed $225 million under a trade receivables securitization facility.  On July 3, 2008, the Company used the net proceeds of that facility to repay borrowings under its Tranche X Facility.

119.    On July 2, 2008, the Tribune Company announced another round of mass layoffs, including 250 from the Los Angeles *Times*.  On July 13, 2008, David Hiller resigned as publisher of the Los Angeles *Times* and Ann Marie Lipinski resigned as editor of the Chicago *Tribune*.

120.    On July 14, 2008, the Associated Press reported that the Los Angeles *Times* planned to cut 250 positions.  It also stated that: "Last December, Tribune bought out its public shareholders in an $8.2 billion deal orchestrated by real estate mogul Sam Zell.  Now, he and the company are struggling to service that debt."

121.    On August 13, 2008, the Company reported its Second Quarter results. Company revenues decreased 6%, with publishing operating revenues down $83 million, or 11%, from its 2007 level.

122.    On August 16, 2008, the Chicago *Tribune* reported that 80 editorial positions would be eliminated.

123.    In or around October, 2008, on information and belief, the Tribune Company began consolidating the Washington, D.C. bureaus of its flagship newspapers, the Los Angeles *Times* and the Chicago *Tribune,* by taking steps toward dismantling each newspaper's Washington, D.C. bureau to create a single Tribune Company Washington Bureau that produces shared content for all Tribune Company newspapers.  On information and belief, the consolidation included significant newsroom staff reductions.

124.    On October 27, 2008, the Los Angeles *Times* fired an additional 75 members of the editorial staff as part of a 200 employee reduction that began the week of October 20, 2008. The reduction represents 10% of the paper's editorial staff, and brought its total newsroom staff to approximately 660, according to a *Times* report.

125.    On <u>November 7, 2008</u>, the Wall Street Journal and other publications reported that the Tribune Company announced that it was willing to sell a smaller share of the Chicago Cubs than it had previously planned. As early as <u>April 2007</u>, Zell had discussed his plan to sell a 95% stake in the Chicago Cubs and Wrigley Field in order to help finance the debt acquired in the go-private transaction. The <u>November 7, 2008</u> reports noted that, given the credit crisis, the Company would potentially be willing to sell a 50% stake in the Cubs franchise.

126.    On <u>November 11, 2008</u>, Standard & Poor's lowered the Tribune Company's credit rating two levels - eight levels from its initial investment grade - from "B-" to "CCC," or highly speculative, with a negative outlook. Citing the difficulty of further asset sales and the Tribune Company needs to repay debt, Standard & Poor's noted the likelihood that the Tribune Company could violate a debt covenant in the current quarter by stating: "Leverage levels are high enough, and expected EBITDA declines large enough, that Tribune is unlikely to continue to service its current capital structure over the intermediate term, even with significant asset sales."

127.    On <u>December 8, 2008</u>, the Tribune Company filed a voluntary petition under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, Case No. 08-13141, because the Company was unable to service the crushing debt burden created by the ESOP transactions.

### H.    Zell Controls the Zell Entity, the Tribune ESOP and the Tribune Board

128.    At all relevant times, Zell was and is the President of the Zell Entity and its controlling executive officer.

129.    There exists, and at all times herein mentioned, there existed, a unity of interest between Zell and the Zell Entity (EGI-TRB), such that any individuality and separateness between Zell and the Zell Entity has ceased, and the Zell Entity is the alter ego of Zell. Indeed, the Zell Entity has no board of directors. However, Zell is the President and one of only three executive officers. The other two executive officers work for Zell at EGI. Furthermore, the

34

Tribune Company's SEC filings expressly stated that for Zell and the Zell Entity, the purpose of the leveraged Tribune ESOP transactions was to allow the Zell Entity to benefit. On information and belief, Zell controls the Zell Entity.

130.    Adherence to the fiction of the separate existence of the Zell Entity as an entity distinct from Zell would permit an abuse of corporate privilege and would promote injustice. Indeed, the Zell Entity is, and at all times mentioned herein was, a mere shell, instrumentality, and conduit through which Zell carried on his business in the corporate name, while exercising complete control and dominance of such business to such extent that any individuality or separateness of the Zell Entity and Zell does not, and at all times herein mentioned did not, exist.

131.    Furthermore, Zell controls the Tribune Board. Indeed, Zell effectively has veto power over major transactions because such transactions require approval of a majority of the Tribune Board's independent directors and Zell's appointed Zell Entity director. Specifically, the Company cannot engage in any of the following actions without Zell's approval:

(a)    amend, alter or repeal any provision of the Certificate of Incorporation or By-laws of the Company;

(b)    create, or authorize the creation of, or issue or obligate itself to issue shares of, any additional class or series of capital stock other than shares issued and sold to the Tribune ESOP at fair market value solely for purposes of maintaining its 51% equity ownership of the Company, on a fully diluted basis;

(c)    liquidate, dissolve or wind-up the business and affairs of the Company, or consent to any of the foregoing;

(d)    purchase or redeem (or permit any subsidiary of the company to purchase or redeem) or pay or declare any dividend or make any distribution on, any shares of capital stock of the Company other than (i) repurchases of stock from former employees, officers, directors, consultants or other

35

persons who performed services for the Company or any subsidiary in connection with the cessation of such employment or service, (ii) dividends or distributions necessary to enable the Tribune ESOP to make all payments due under the terms of the ESOP Loan Agreement as they come due, and (iii) repurchases of stock from the Tribune ESOP as required by the terms of the Tribune ESOP plan document;

(e)     engage in transactions with affiliates other than in their capacity as a stockholder, director, officer or employee of the Company, including any transaction, contract, agreement or arrangement between the Tribune ESOP and the Company, or any amendment or waiver thereof, other than the Investor Rights Agreement, the Merger Agreement, the ESOP Purchase Agreement, the ESOP Loan Agreement and the ESOP Pledge Agreement, and the transactions contemplated thereby;

(f)     make, or permit any subsidiary to make, any loan or advance to any subsidiary or other corporation, partnership or other entity unless it is wholly owned by the Company;

(g)     make, or permit any subsidiary to make, any loan or advance to any person, including, without limitation, any employee or director of the Company or any subsidiary of the Company except: (i) advances and similar expenditures in the ordinary course of business or under the terms of an employee stock option plan approved by the Tribune Board, (ii) notes that may be issued by the Company to participants of the Tribune ESOP under the terms of the Tribune ESOP, and (iii) financing provided to the Tribune ESOP;

(h)     guarantee, directly or indirectly, or permit any subsidiary of the Company to guarantee, directly or indirectly, any indebtedness except for trade

36

accounts of the Company or any subsidiary of the Company arising in the ordinary course of business;

(i)     incur any aggregate indebtedness in excess of $250 million that is not already included in the Company's annual budget approved by the Tribune Board, other than trade credit incurred in the ordinary course of business;

(j)     acquire any assets or securities of any person in a transaction resulting in payments by the Company in an aggregate amount in excess of $250 million;

(k)     sell, assign, license, pledge or encumber any assets of the Company for an amount in excess of $250 million;

(l)     enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $250 million;

(m)     change the fiscal year of the Company; or

(n)     elect not to qualify, or continue to qualify as an S corporation.

132.    Moreover, as described in further detail below, Zell, through the New Tribune Board in its fiduciary capacity, controls the Tribune ESOP, which is the sole shareholder of the Tribune Company.  Among other things, Zell has the power to appoint and remove other Tribune ESOP fiduciaries such as the ESOP Trustee and ESOP Plan Administrator.

133.    By reason of his management positions, membership or representations on the Zell Entity and Tribune's Board of Directors, or stock ownership options, Zell controls the Zell Entity, the New Tribune Board, the Tribune Company and the Tribune ESOP.  Since the ESOP Acquisition closed in <u>December 2007</u>, Zell had power, influence and control, and exercised it.  A result has been the violations of law complained of herein.

VI.    <u>CLASS ACTION ALLEGATIONS</u>

134.    Plaintiffs seek certification, under Fed. R. Civ. P. 23 (a) and (b), of a class as identified below.

135.    Plaintiffs bring this action on behalf of themselves and a putative class consisting of:

> **All individuals who are or, at any time on or after the 2007 Transactions, were participants in or beneficiaries of the Tribune ESOP. Excluded from the class are Defendants and their affiliates; the officers and directors of any Defendant or of any entity in which a Defendant has a controlling interest; and legal representatives, successors, and assigns of any such excluded persons.**

136.    The members of the proposed class are so numerous that joinder of all members is impracticable. While the exact numbers of members in the proposed class are unknown to Plaintiffs at this time, such information can be ascertained from records maintained by Defendants and their agents. The Tribune Company currently has over 19,000 employees. Plaintiffs estimate that the putative class encompasses over 15,000 of the Tribune Company's current and former employees.

137.    Common questions of law and fact exist as to all members of the putative class, including, *inter alia*:

  a.    whether Defendants breached their duty of prudence under ERISA;

  b.    whether Defendants breached their duties of loyalty and disclosure under ERISA;

  c.    whether Defendants breached their duty to monitor under ERISA;

  d.    whether Defendants breached their duty to avoid conflicts of interest under ERISA;

  e.    whether Defendants are subject to co-fiduciary liability under ERISA;

  f.    whether Defendants engaged in prohibited transactions in violation of ERISA;

g.    whether the Tribune ESOP paid more than adequate consideration for the Tribune stock purchased in the 2007 Transactions; and

h.    The appropriate measure of injunctive relief, restitution and/or damages.

138.    There are no substantial individual questions among the class claims on the merits of this action, and Plaintiffs are not aware of any conflicts between themselves and the putative class members.

139.    Plaintiffs' claims are typical of the claims of the members of the putative class, as Plaintiffs and all other members of the putative class were harmed by Defendants' wrongful conduct.  Plaintiffs are aggrieved by the breaches of fiduciary duties they and all other class members have suffered at Defendants' hands, and are intent on seeing such wrongs remedied. Plaintiffs therefore are committed to fairly, adequately, and vigorously representing and protecting the interests of the members of the class, and have retained counsel competent and experienced in class action litigation of this nature for this purpose.  Neither Plaintiffs nor their counsel have any interests that might cause them to refrain from vigorously pursuing the claims in this class action.  Thus, Plaintiffs are adequate representatives of the class.

140.    Class certification of Plaintiffs' Claims for Relief is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

141.    Class certification of Plaintiffs' Claims for Relief also is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to

39

Plaintiffs and the Class as a whole. The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' fiduciary violations.

142.    On information and belief, the names and addresses of the class members are available from Defendants, and adequate notice can be provided to members of the class to the extent required by Fed. R. Civ. P. 23.

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**[Breach of Fiduciary Duty Under ERISA §§ 502(a)(2) and (a)(3),**

**29 U.S.C. §§ 1132(a)(2) and (a)(3), Against All Defendant Fiduciaries]**

143.    Plaintiffs incorporate Paragraphs 1-141 as though set forth herein.

144.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia,* that a plan fiduciary discharge his, her, or its duties with respect to a plan solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

145.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia,* that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

146.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring an action for relief under ERISA § 409.

147.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring an action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

148.    Defendant Fiduciaries, and each of them, have breached their duties of loyalty and prudence under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). These breaches include but are not limited to the following: favoring the Zell offer over competing offers; using the Tribune ESOP as a takeover vehicle; causing the Tribune ESOP to pay more than fair market value for Tribune stock in each of the 2007 Transactions; failing to conduct a thorough and independent review and adequately consider whether each of the 2007 Transactions were in the best interests of the ESOP participants; failing to make certain that reliance on any and all valuation experts' advice was reasonably justified under the circumstances of each of the 2007 Transactions; failing to make certain that reliance on any and all other experts' advice was reasonably justified under the circumstances of each of the 2007 Transactions; failing to adequately consider how the massive debt taken on to finance the Step One Purchase Transaction and/or Step Two Purchase Transaction affected the value of the Tribune stock acquired by the Tribune ESOP; failing to adequately consider the risk posed by the massive debt taken on to finance the Step One Purchase Transaction and/or Step Two Purchase Transaction and how this risk affected the prudence of the proposed transaction; failing to adequately consider whether the Tribune Company would be able to continue or expand its business operations and also service the enormous debt created by the highly-leveraged Step One Purchase Transaction and/or Step Two Purchase Transaction; failing to adequately consider the Tribune Company's ability to service the enormous debt created by the highly-leveraged Step One Purchase Transaction and/or Step Two Purchase Transaction given that financial projections available at the time of the 2007 Transactions predicted that the Company's income and other financial measures would continue to deteriorate; failing to adequately consider whether the Step One Purchase Transaction and/or Step Two Purchase Transaction were prudent in light of the deterioration of the general

41

economy, the newspaper and media industries, and/or the Tribune Company's operations; failing

to adequately consider whether the Tribune ESOP should proceed with the Step Two Purchase

Transaction in light of the accelerating deterioration of the general economy, the newspaper and

media industries, and/or the Tribune Company's operations between the date of the Step One

Purchase Transaction and the Step Two Purchase Transaction; failing to adequately consider the

prudence of the Step One Purchase Transaction and the Step Two Purchase Transaction in light

of the difficulties in placing the debt for these transactions; and failing to make an honest,

objective effort to read the valuation reports and/or solvency opinions, understand them, and

question the methods and assumptions that did not make sense.

149.    Each Defendant Fiduciary is also liable as a co-fiduciary with respect to each

fiduciary violation by each other fiduciary of the Plan under ERISA § 405, 29 U.S.C. § 1105, to

the extent that:  (a) such fiduciary has participated knowingly in, or has knowingly undertaken to

conceal, an act or omission of any other fiduciary, knowing such action is a breach; (b) by his,

her, or its failure to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), he, she, or it has

enabled such other fiduciary to commit a breach; or (c) if he, she, or it has had knowledge of a

breach by any other fiduciary, unless he, she, or it has made reasonable efforts under the

circumstances to remedy the breach.

150.    The actions of Defendant Fiduciaries, and each of them, caused millions of dollars

of losses to the Plan in an amount to be proven more specifically at trial.

## SECOND CLAIM FOR RELIEF
**[Engaging in Prohibited Transaction Forbidden by ERISA §§ 406(a)-(b),
29 U.S.C. §§ 1106(a)-(b), Against All Defendant Fiduciaries and Parties in Interest]**

151.    Plaintiffs incorporate Paragraphs 1-149 as though set forth herein.

152.    ERISA § 406(a), 29 U.S.C. § 1106(a), requires that a plan fiduciary "shall not

cause the plan to engage in a transaction, if he knows or should know that such transaction

constitutes a direct or indirect sale or exchange, or leasing of any property between the plan and

a party in interest," or a "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

153.   ERISA § 406(b), 29 U.S.C. § 1106(b), mandates that a plan fiduciary shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants," or "deal with the assets of the plan in his own interest or for his own account," or "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

154.   ERISA § 408(e), 29 U.S.C. § 1108(e), provides a conditional exemption from the prohibited transaction rules for sale of employer securities to or from a plan if a sale is made for adequate consideration.  ERISA § 3(18)(B) defines adequate consideration as "the fair market of the asset as determined in good faith by the trustee or named fiduciary."  ERISA's legislative history and existing case law make clear that ERISA § 3(18)(B) requires that the price paid must reflect the fair market value of the asset, and the fiduciary must conduct a prudent investigation to determine the fair market value of the asset.

155.   Fiduciary Defendants, and each of them, engaged in a prohibited transaction in violation of ERISA §§ 406(a)-(b), 29 U.S.C. §§ 1106(a)-(b), by failing to ensure that the Tribune ESOP paid no more than fair market value for Tribune stock in the 2007 Transactions.

156.   ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia,* that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

157.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief under ERISA § 409.

158.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring a suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

159.    Certain Defendants, including members of the Old Tribune Board, profited in an amount to be proven at trial from the prohibited transaction by receiving more than fair market value for Tribune stock sold to the Tribune ESOP in the 2007 Transactions.

160.    Defendant Fiduciaries, and each of them, have caused millions of dollars of losses to the Tribune ESOP by the prohibited transactions in an amount to be proven more specifically at trial.

161.    Each Defendant Fiduciary is also liable as a co-fiduciary with respect to each fiduciary violation by each other fiduciary of the ESOP under ERISA § 405, 29 U.S.C. § 1105, to the extent that:  (a) any fiduciary has participated knowingly in, or has knowingly undertaken to conceal, an act or omission of any other fiduciary, knowing such action is a breach; (b) by his, her, or its failure to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), he, she, or it has enabled such other fiduciary to commit a breach; or (c) if he, she, or it has had knowledge of a breach by any other fiduciary, unless he, she, or it has made reasonable efforts under the circumstances to remedy the breach.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants, and each of them, on each Claim for Relief and for the following relief:

### As to the First Claim for Relief:

A.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23;

B.    Declare that Defendant Fiduciaries, and each of them, have breached their fiduciary duties to the Plaintiff Class;

C.    Enjoin Defendant Fiduciaries, and each of them, from further violations of their fiduciary responsibilities, obligations and duties;

D.    Issue a preliminary and permanent injunction removing Defendant Fiduciaries, and each of them, as members of the Plan Committee or Trustees of the Tribune ESOP and/or barring Defendant Fiduciaries, and each of them, from serving as members of the Plan Committee or Trustees of the Tribune ESOP in the future, and appointing independent fiduciaries as Trustees and members of the Plan Committee;

E.    Order that Defendant Fiduciaries and each of them, make good to the Tribune ESOP and/or to any successor trust(s) the losses resulting from their breaches and restoring any profits they have made through use of assets of the Tribune ESOP;

F.    Order that Defendant Fiduciaries provide other appropriate equitable relief to the Tribune ESOP, including but not limited to, by forfeiting their Plan accounts, providing an accounting for profits, imposing a constructive trust and/or equitable lien on any funds wrongfully held by any of the Defendant Fiduciaries;

G.    Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

H.    Order Defendant Fiduciaries to pay prejudgment interest; and

I.    Award such other and further relief as the Court deems equitable and just.

**As to the Second Claim for Relief:**

A.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23;

B.    Declare that Defendants, and each of them, have breached their fiduciary responsibilities and/or duties as parties in interest to the Plaintiff Class;

C.    Enjoin Defendants, and each of them, from further prohibited transactions and violations of their fiduciary responsibilities, obligations and duties;

45

D.      Issue a preliminary and permanent injunction removing Defendant Fiduciaries, and each of them, as members of the Plan Committee and/or Trustees of the Tribune ESOP and/or barring Defendant Fiduciaries, and each of them, from serving as members of the Plan Committee or Trustees of the Tribune ESOP in the future, and appointing independent fiduciaries as Trustees and members of the Plan Committee;

E.      Declare that Defendants and each of them engaged in prohibited transactions in violation of ERISA §§ 406(a)-(b), 29 U.S.C. §§ 1106(a)-(b), by causing the Plan to purchase Tribune stock for more than adequate consideration;

F.      Order Defendants, and each of them, make good to the Tribune ESOP and/or to any successor trust(s) the losses resulting from their breaches and restoring any profits they have made through use of assets of the Tribune ESOP;

G.      Order that Defendant Fiduciaries provide other appropriate equitable relief to the Tribune ESOP, including but not limited to, by forfeiting their Plan accounts, providing an accounting for profits, imposing a constructive trust and/or equitable lien on any funds wrongfully held by any of the Defendants, and/or tracing the Tribune ESOP's assets received by parties-in-interest;

H.      Order Defendants to pay prejudgment interest.

I.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund; and

J.      Award such other and further relief as the Court deems equitable and just.

Dated: February 27, 2009                    Respectfully submitted,


                                            By:     /s/ _Michael M. Mulder_
                                                    Michael M. Mulder
                                                    Attorney for Plaintiffs and the Class

46

THOMAS R. MEITES
Trmeites@mmmglaw.com
MICHAEL M. MULDER
Mmmulder@mmmglaw.com
PAUL W. MOLLICA
Pwmollica@mmmglaw.com
HINA SODHA
Hsodha@mmmglaw.com
MEITES, MULDER, MOLLICA &
GLINK
20 S. Clark Street, Suite 1500
Chicago, IL 60603
Telephone: (312) 263-0272
Facsimile: (312) 263-2942

DANIEL FEINBERG, Pro Hac Vice
dfeinberg@lewisfeinberg.com
TODD JACKSON, Pro Hac Vice
tjackson@lewisfeinberg.com
ANGELICA JONGCO
ajongco@lewisfeinberg.com
NINA WASOW, Pro Hac Vice
nwasow@lewisfeinberg.com
LEWIS, FEINBERG, LEE, RENAKER &
JACKSON, P.C.
1330 Broadway, Suite 1800
Oakland, California 94612
Telephone: (510) 839-6824
Facsimile: (510) 839-7839

JOSEPH W. COTCHETT
jcotchett@cpmlegal.com
PHILIP L. GREGORY, Pro Hac Vice
pgregory@cpmlegal.com
LAURA E. SCHLICHTMANN,
lschlichtmann@cpmlegal.com
GERALD S. OHN (#217382)
gohn@cpmlegal.com
COTCHETT, PITRE & McCARTHY
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577