**ATTACHMENT 1**

**AMENDED AND RESTATED RECEIVABLES LOAN AGREEMENT**

Dated April 10, 2009

(1)    **TRIBUNE RECEIVABLES, LLC**,
       as Borrower

(2)    **TRIBUNE COMPANY**,
       as Servicer

(3)    The persons from time to time party hereto as
       Lenders

(4)    **BARCLAYS BANK PLC**,
       as Administrative Agent

(5)    **WELLS FARGO FOOTHILL, LLC**,
       as Documentation Agent

(6)    **THE CIT GROUP/BUSINESS CREDIT, INC.**,
       as Syndication Agent

---

AMENDED AND RESTATED
RECEIVABLES LOAN AGREEMENT

---

9206336.20 08141696

# TABLE OF CONTENTS

**Page**

1. DEFINITIONS ................................................................................................ 2
    1.1    Certain Defined Terms ........................................................................ 2
    1.2    Other Terms ...................................................................................... 41
    1.3    Computation of Time Periods .......................................................... 42

2. AMOUNTS AND TERMS OF THE LOANS ............................................... 43
    2.1    The Loans ......................................................................................... 43
    2.2    Loan Procedures .............................................................................. 44
    2.3    Payments Generally ......................................................................... 47
    2.4    Interest and Fees .............................................................................. 48
    2.5    Payment and Prepayment of Loans .................................................. 48
    2.6    Application of Collections Prior to Facility Termination Date ........... 50
    2.7    Application of Collections after Facility Termination Date ................ 52
    2.8    Deemed Collections; Application of Payments ................................. 54
    2.9    Payments and Computations, Etc .................................................... 55
    2.10   Tranches .......................................................................................... 56
    2.11   Breakage Costs ................................................................................ 56
    2.12   Illegality ........................................................................................... 56
    2.13   Inability to Determine Eurodollar Rate ............................................. 57
    2.14   Indemnity for Reserves and Expenses ............................................. 57
    2.15   Indemnity for Taxes ......................................................................... 59
    2.16   No Liability of Lenders to other Persons ........................................... 61
    2.17   Cash Reserve Account ..................................................................... 61
    2.18   Defaulting Lender ............................................................................ 62

3. CONDITIONS OF TERM BORROWING, INCREMENTAL BORROWINGS
   AND REPEAT ADVANCES ......................................................................... 64
    3.1    Conditions Precedent to Borrowings on the Closing Date ................ 64
    3.2    Conditions Precedent to All Borrowings .......................................... 64

4. REPRESENTATIONS AND WARRANTIES ............................................... 66
    4.1    Representations and Warranties of the Borrower ............................. 66

5. COVENANTS ............................................................................................. 71
    5.1    Covenants of the Borrower .............................................................. 71
    5.2    Inspections; Agreed Upon Procedures Audit ................................... 80

6. ADMINISTRATION AND COLLECTION OF RECEIVABLES .................. 81
    6.1    Designation of Servicer .................................................................... 81
    6.2    Certain Rights of the Administrative Agent ...................................... 81

9206336.20 08141696

# TABLE OF CONTENTS
(continued)

Page

|   | 6.3 | Performance of Obligations | 83 |
|   | 6.4 | Backup Servicing Agreement | 83 |
| 7. | | TRIGGER EVENTS AND TERMINATION EVENTS | 83 |
|   | 7.1 | Trigger Events | 83 |
|   | 7.2 | Facility Termination Events | 86 |
|   | 7.3 | Acceleration of Maturity | 89 |
| 8. | | THE ADMINISTRATIVE AGENT | 89 |
|   | 8.1 | Authorization and Action | 89 |
|   | 8.2 | Liability of Agent | 90 |
|   | 8.3 | Barclays and Affiliates | 91 |
|   | 8.4 | Indemnification of Administrative Agent | 91 |
|   | 8.5 | Delegation of Duties | 92 |
|   | 8.6 | Action or Inaction by Administrative Agent | 92 |
|   | 8.7 | Notice of Facility Events; Action by Administrative Agent | 92 |
|   | 8.8 | Non-Reliance on Administrative Agent and Other Parties | 92 |
|   | 8.9 | Successor Administrative Agent | 93 |
|   | 8.10 | Consent to Agreed Upon Procedures | 94 |
| 9. | | INDEMNITIES | 94 |
| 10. | | MISCELLANEOUS | 96 |
|   | 10.1 | Amendments, Etc | 96 |
|   | 10.2 | Notices, Etc | 98 |
|   | 10.3 | Assignability | 98 |
|   | 10.4 | Costs and Expenses | 101 |
|   | 10.5 | Confidentiality | 101 |
|   | 10.6 | Further Assurances | 103 |
|   | 10.7 | Execution in Counterparts | 103 |
|   | 10.8 | Integration; Binding Effect; Survival of Termination; Severability | 103 |
|   | 10.9 | GOVERNING LAW; SUBMISSION TO JURISDICTION; APPOINTMENT OF PROCESS AGENT | 104 |
|   | 10.10 | Right of Setoff | 105 |
|   | 10.11 | Ratable Payments | 105 |
|   | 10.12 | Limitation of Liability | 105 |
|   | 10.13 | Limitation on the Addition and Termination of Sub-Originators | 105 |
|   | 10.14 | WAIVER OF JURY TRIAL | 107 |
|   | 10.15 | USA Patriot Act | 107 |
|   | 10.16 | No Proceeding; Limited Recourse | 107 |
|   | 10.17 | Tax Treatment | 108 |

# TABLE OF CONTENTS
(continued)

Page

10.18   Barclays Roles ........................................................................... 108
10.19   Replacement of Lenders ............................................................ 108
10.20   Original Agreement ................................................................... 110
10.21   Syndication Agent; Documentation Agent ...................................... 110

## Schedules

1-A     Restructuring of Class A Loans
1-B     Lenders, Commitments and Percentages
2       Address and Notice Information
3       Credit and Collection Policies
4       Condition Precedent Documents
5       Facility Accounts and Account Banks
6       Fiscal Months
7       Broadcasting Originators
8       Publishing Originators
9       Filing Sub-Originators
10      Lenders' Accounts


EXHIBIT A         Form of Assignment and Acceptance
EXHIBIT B         Form of Incremental Borrowing Request
EXHIBIT C         Form of Prepayment Notice
EXHIBIT D-1       Form of Term Note
EXHIBIT D-2       Form of Revolving Note

-iii-

**THIS AGREEMENT** (this "**Agreement**") is dated April 10, 2009 and made among:

(1)     **TRIBUNE RECEIVABLES, LLC**, a limited liability company organized under the laws of Delaware, as Borrower;

(2)     **TRIBUNE COMPANY**, a corporation incorporated under the laws of Delaware, as Servicer;

(3)     the Lenders from time to time parties hereto;

(4)     **BARCLAYS BANK PLC**, as Administrative Agent;

(5)     **WELLS FARGO FOOTHILL, LLC**, as Documentation Agent; and

(6)     **THE CIT GROUP/BUSINESS CREDIT, INC.**, as Syndication Agent.

**BACKGROUND:**

(A)     The Borrower, the Servicer, Barclays, as a Lender, the Administrative Agent and Barclays, as Funding Agent, entered into a Receivables Loan Agreement, dated July 1, 2008 (as amended prior to the date hereof, the "**Original Agreement**").

(B)     The other financial institutions party hereto wish to become Lenders.

(C)     The Borrower, the Servicer, the Lenders and the Administrative Agent desire to enter into this Agreement in order to amend and restate the Original Agreement in its entirety.

(D)     The Borrower shall from time to time acquire Receivables and any Related Security with respect thereto from the Originators pursuant to the Receivables Purchase Agreement, provided that, in the case of Receivables and Related Security originated by Sub-Originators, such Receivables and Related Security shall first be sold by the Sub-Originators to Tribune and then sold or contributed by Tribune to the Borrower.

(E)     The Borrower shall pledge as security all of its right, title and interest in such Receivables and Related Security, the Borrower Accounts and any other Collateral to the Administrative Agent pursuant to the Security Documents.

(F)     To fund its acquisitions under the Receivables Purchase Agreement, the Borrower (i) shall receive a Term Loan from the Term Lenders on the date hereof and (ii) may from time to time request Revolving Loans from the Revolving Lenders, each on the terms and conditions of this Agreement.

**IT IS AGREED that:**

1.   **DEFINITIONS**

1.1   **Certain Defined Terms**

As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**Account Control Agreement**" means a control agreement in favor of the Administrative Agent with respect to a Facility Account, which agreement is in form and substance reasonably satisfactory to the Administrative Agent.

"**Acts**" has the meaning specified in Clause 10.15 (*USA Patriot Act*).

"**Administrative Agent**" means Barclays Bank PLC, in its capacity as Administrative Agent for the Lenders, and any successor thereto in such capacity appointed pursuant to Clause 8 (*The Administrative Agent*).

"**Adverse Claim**" means a lien, security interest, mortgage, hypothecation, charge, floating charge or any promise or irrevocable mandate or other encumbrance (including any lien by attachment, retention of title and any form of extended retention of title), or other right or claim under the laws of any jurisdiction in, of or on any asset or property of a Person in favor of another Person (including any UCC financing statement or any similar instrument of any jurisdiction filed against such Person, its assets or properties).

"**Advertising Agency**" means a Person that is in the business of procuring or preparing advertising materials, services or rights, including media space and time, for other Persons that are not affiliated with it.

"**Advertising Agency Client**" means a Person that contracts with an Advertising Agency to procure or prepare advertising materials, services or rights, including media space and time.

"**Affiliate**" means any Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, another Person or any subsidiary of such other Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of the controlled Person, whether through ownership of share capital, by contract or otherwise.

"**Aggregate Commitment**" means, at any time, the sum of the Commitments then in effect. The initial Aggregate Commitment as of the Closing Date shall be equal to $225,000,000.

"**Aggregate Principal Balance**" means the aggregate outstanding Principal Balance of the Loans (and all Tranches thereof) hereunder.

"**Aggregate Revolving Loan Commitment**" means, at any time, the sum of the Revolving Loan Commitments then in effect. The initial Aggregate Revolving Loan Commitment as of the Closing Date shall be equal to $75,000,000.

"**Aggregate Term Commitment**" means the sum of the Term Commitments then in effect. The initial Aggregate Term Commitment as of the Closing Date shall be equal to $150,000,000.

"**Agreement**" has the meaning specified in the preamble hereto.

"**Applicable Margin**" means (i) for any Loan accruing interest based on the Eurodollar Rate, 6.0%, and (ii) for any Loan accruing interest based on the Base Rate, 5.0%.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Term Lender, (b) an Affiliate of a Term Lender or (c) an entity or an Affiliate of an entity that administers or manages a Term Lender.

"**Assignment and Acceptance**" means an assignment and acceptance agreement entered into by a Lender and an Eligible Assignee, pursuant to which such Eligible Assignee may become a party to this Agreement in substantially the form of Exhibit A (*Form of Assignment and Acceptance*).

"**Attributable Debt**" shall mean, when used with respect to any Sale and Lease-Back Transaction, as at the time of determination, the present value (discounted at a rate equivalent to Tribune's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Lease-Back Transaction.

"**Backup Servicing Agreement**" means the Backup Servicing Agreement, dated August 29, 2008, among the Servicer, the Borrower, Hewlett-Packard Company and Barclays, as Administrative Agent.

"**Bankruptcy Code**" means the United States Bankruptcy Code of 1978, as amended from time to time.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or such other court as shall have jurisdiction over the Chapter 11 Cases.

"**Barclays**" means Barclays Bank PLC, in its individual capacity.

"**Base Rate**" means, on any day of determination, a rate per annum equal to the highest, of (i) the prime rate of interest announced by the Administrative Agent from time to time, changing when and as said prime rate changes (such rate not necessarily being the lowest or best rate charged by the Administrative Agent) and (ii) the sum of (a) 0.50% plus (b) the rate equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding

Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three (3) Federal funds brokers of recognized standing selected by it, and (iii) one month LIBOR determined on such date in good faith by the Administrative Agent in the manner contemplated by the definition of Eurodollar Rate; <u>provided</u> that in no event shall the Base Rate be less than 4.0% per annum.

"**Base Rate Tranche**" has the meaning specified in Clause 2.12 (*Illegality*).

"**Benchmark Year**" means (i) the period from the Closing Date to the first anniversary of the Closing Date, and (ii) each subsequent one-year period, provided that the outstanding balance of Pool Receivables and the Dilution Ratio-Broadcasting, Dilution Ratio-Publishing, Default Ratio, Delinquency Ratio, DSO-Broadcasting and DSO-Publishing as of the start of any Benchmark Year shall be deemed to be such balance or ratio as shown in the Monthly Report delivered immediately prior to the beginning of such Benchmark Year.

"**Borrower**" means Tribune Receivables, LLC, a limited liability company organized under the laws of the State of Delaware.

"**Borrower Account**" means any Borrower Concentration Account or any other bank or securities account maintained by the Borrower (other than the Cash Reserve Account).

"**Borrower Account Bank**" means any bank or other financial institution set forth on Schedule 5 (*Facility Accounts and Account Banks*) under the heading "Borrower Account Bank," as such Schedule may be amended from time to time in accordance herewith.

"**Borrower Concentration Account**" means any account set forth on Schedule 5 (*Facility Accounts and Account Banks*) under the heading "Borrower Concentration Account," as such Schedule may be amended from time to time in accordance herewith.

"**Borrowing**" means an Incremental Borrowing or a Term Borrowing.

"**Borrowing Date**" means, with respect to an Incremental Borrowing under a Revolving Loan, the Incremental Borrowing Date therefore and, with respect to the Term Loans, the Closing Date.

"**Broadcast AR**" means Receivables owed to the Originators listed on Schedule 7 (*Broadcasting Originators*) and any other Originator identified as an Originator of Broadcast AR in connection with its addition to the Receivables Purchase Agreement pursuant to Clause 10.13 (*Limitation on the Addition and Termination of Originators*).

"**Broadcast Rights Arrangement**" means any arrangement under any Contract for the Obligor to provide the applicable Originator or Originators with programming for broadcast in exchange for payment by an Originator.

"**Budget**" means a 13 week projection as to sources and uses of funds delivered to the Administrative Agent, and which shall be consistent in form and detail with the cash flow projections furnished to the Administrative Agent prior to the Closing Date.

"**Business Day**" means any day on which banks are not authorized or required to close in New York, New York or Chicago, Illinois and The Depository Trust Company of New York is open for business, and, if the applicable Business Day relates to any computation or payment to be made with respect to the Eurodollar Rate, any day on which dealings in dollar deposits are carried on in the London interbank market.

"**Calculation Period**" means each period from and including the first day of a Fiscal Month of Tribune to and including the last day of such Fiscal Month (whether such month occurs before or after the Closing Date).

"**Capitalized Lease Obligation**", means, of any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"**Carve-out**" has the meaning set forth in the Financing Orders.

"**Cash Reserve Account**" means the account established by the Borrower pursuant to Clause 2.17 (*Cash Reserve Account)* and subject to an Account Control Agreement received by the Administrative Agent.

"**Cash Reserve Account Amount**" has the meaning given in Clause 2.1(a) hereof (*The Loans*).

"**Change in Law**" means (a) the adoption of any Law (including any applicable law, rule or regulation regarding capital adequacy), (b) any change in any of the foregoing or in the interpretation or application thereof by any Official Body, or (c) compliance by any Indemnified Party or by any lending office of such Indemnified Party or by such Indemnified Party's holding company, if any, with any request, guideline or directive (whether or not having the force of law) of any Official Body.

"**Change of Control**" means (i) any Person or group of Persons (within the meaning of Sections 13(d) and 14(d) under the Exchange Act), other than EGI-TRB, L.L.C., the ESOP, the ESOP Trust or Zell or any Permitted Transferee, shall become the ultimate "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of Voting Stock representing 40% or more of the Voting Stock of Tribune (or other securities convertible or exercisable into such Voting Stock) on a fully diluted basis (including common stock equivalents issued pursuant to the Tribune Management Equity Incentive Plan) or shall obtain the power (whether or not exercised) to elect a majority of Tribune's directors or (ii) during any period of 24 consecutive months, individuals who at the beginning of such period constituted the Board of Directors of Tribune (together with any new directors whose election to such board or

whose nomination for election by the stockholders of Tribune was approved by a vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of Tribune then in office.

"**Chapter 11 Cases**" means the Chapter 11 cases of the Parent and certain of its Subsidiaries jointly administered under case no. 08-13141 in the Bankruptcy Court.

"**Charged-Off Receivable**" means a Receivable: (i) as to which an Event of Bankruptcy has occurred in respect of the Obligor thereof; (ii) as to which the Obligor thereof, if a natural person, is deceased, (iii) which, consistent with the Credit and Collection Policy, would be written off Borrower's books as uncollectible or (iv) which has been identified by the Servicer as uncollectible.

"**Closing Date**" means April 10, 2009.

"**Collateral**" means (a) the "Collateral" under and as defined in the Security Agreement, and (b) any other assets, property, rights, interests, claims or benefits in respect of which an Adverse Claim has been created under or pursuant to the Security Documents.

"**Collection Account Bank**" means any bank or other financial institution set forth on Schedule 5 (*Facility Accounts and Account Banks*) under the heading "Collection Account Banks," as such Schedule may be amended from time to time in accordance herewith.

"**Collection Accounts**" means any account set forth on Schedule 5 (*Facility Accounts and Account Banks*) under the heading "Collection Accounts," as such Schedule may be amended from time to time in accordance herewith.

"**Collection Amount**" means the aggregate Collections received from Obligors during a Calculation Period.

"**Collections**" means, collectively (without duplication) (a) all cash collections (including, if applicable, any sales taxes) and other cash proceeds of the Pool Receivables, including all Finance Charges, cash proceeds of Related Security with respect to any such Receivable, any Deemed Collections of such Receivables and any payments made by any Originator or the Servicer with respect to such Receivables (including any payments made with respect to a Diluted Receivable or other Deemed Collections pursuant to the terms of the Receivables Purchase Agreement or the Servicing Agreement) and (b) all other cash collections and other cash proceeds of the Collateral.

"**Commitment**" of any Lender means the sum of its Revolving Commitment and Term Commitment.

"**Compliance Certificate**" has the meaning given in the Servicing Agreement.

"**Concentration Factor**" means, with respect to any Obligor Group as of any date of determination, a percentage equal to the following:

(a)     if such Obligor Group has (i) an Obligor Group Rating of at least A+ by S&P and (ii) an Obligor Group Rating of at least A1 by Moody's, 16.25%;

(b)     if such Obligor Group is not qualified under clause (a) above, but has (i) an Obligor Group Rating of at least A- by S&P and (ii) an Obligor Group Rating of at least A3 by Moody's, 8.125%;

(c)     if such Obligor Group is not qualified under clauses (a) or (b) above, but has (i) an Obligor Group Rating of at least BBB- by S&P and (ii) an Obligor Group Rating of at least Baa3 by Moody's, 5.42%; or

(d)     if such Obligor Group (i) has (A) an Obligor Group Rating of lower than BBB- by S&P and (B) an Obligor Group Rating of lower than Baa3 by Moody's, or (ii) does not have an Obligor Group Rating from S&P or Moody's, 3.25%;

provided that the Concentration Factor for the Zell Obligors, as a group, shall not be greater than 3.25% at any time; provided, further, that the Concentration Factor for Official Bodies, taken as a group (but excluding the U.S. federal government) shall not be greater than 2.0% at any time; and, provided further, that special Concentration Factors for specific Obligors may be agreed upon from time to time in writing between the Borrower and the Required Lenders, subject to conditions to be mutually agreed between the Borrower and the Required Lenders.  In the event the ratings of any Obligor Group from S&P and Moody's fall within different ratings levels, the Concentration Factor for such Obligor Group shall be determined based upon the lower of the two ratings.

"**Concentration Limit**" means, with respect to any Obligor Group at any time, the product of the Concentration Factor for such Obligor Group, multiplied by the aggregate Outstanding Balance of the Pool Receivables at such time.

"**Contact Details Report**" has the meaning specified in the Servicing Agreement.

"**Contra Balance**" means, with respect to an Obligor Group and at any time, the aggregate amount of funds or services that are owed by an Originator to an Obligor in such group at such time, in respect of services, Make Good Arrangements, or other viewership guarantees, damages for breach of any agreement with such Obligor, or Broadcast Rights Arrangements, amounts accrued for the benefit of such Obligor in respect of volume rebate or other incentive programs, and any other arrangement that has given rise to a rebate, administrative fee, discount, credit memo, refund, non-cash payment, chargeback, billing adjustment or other adjustment (except any such change made in settlement of such Receivable in accordance with the Credit and Collection Policy resulting from the financial inability of the Obligor to pay such Receivable).

"**Contract**" means, with respect to any Receivable, any and all contracts, instruments, agreements, invoices or other writings pursuant to which such Receivable arises or which evidences such Receivable.

"**Credit and Collection Policies**" means, with respect to an Originator, the credit and collection policies and practices of such Originator in effect on the date of this Agreement, as modified in compliance with this Agreement, the Receivables Purchase Agreement and the Servicing Agreement; provided that, to the extent such policies and practices are summarized in a written form for internal management purposes of any Originator, such policies and practices are described in Schedule 3 (*Credit and Collection Policies*).

"**Days Sales Outstanding**" means an amount, expressed in terms of days, equal to:

(a)     (i) the Outstanding Balance of Pool Receivables minus any Unapplied Cash and the Diluted Receivables as of the last day of the most recent Calculation Period, divided by (ii) the aggregate sales during the most recent Calculation Period, multiplied by

(b)     the actual number of days in the most recent Calculation Period.

"**Debt Rating**" for any Person at any time means the then-current rating by S&P or Moody's of such Person's long-term public senior unsecured debt.

"**Deemed Collections**" means any amounts paid or payable, as the context requires, by the Borrower under Clause 2.8 (*Deemed Collections; Application of Payment*) of this Agreement or by the Servicer or any Originator under Section 1.03 (*Deemed Collections*) of the Receivables Purchase Agreement.

"**Default Excess**" means, with respect to any Funds Defaulting Lender, the sum for Revolving Loans and for Term Loans of the excess, if any, of such Defaulting Lender's pro rata share of the aggregate Principal Balance of Revolving Loans of all Revolving Lenders or the aggregate Principal Balance of Term Loans of all Term Lenders (calculated in each case  as if all Funds Defaulting Lenders (including such Funds Defaulting Lender) had funded all of their respective Defaulted Loans), as applicable, over the aggregate Principal Balance of all Revolving Loans or Term Loans, as applicable, of such Funds Defaulting Lender.

"**Default Horizon**" means, as of any Monthly Reporting Date, the number of days equal to the number of days in the three most recent Calculation Periods ending prior to the Calculation Period related to such Monthly Reporting Date.

"**Default Period**" means, (x) with respect to any Funds Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates:  (i) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable, (ii) the date on which (a) the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms of Clauses 2.5 and 2.18 or by a combination thereof) and (b) such Defaulting Lender shall have delivered to the Borrower and the Administrative Agent a written reaffirmation of its intention to

honor its obligations hereunder with respect to its Commitments, and (iii) the date on which the Borrower, the Administrative Agent and Required Lenders waive all Funding Defaults of such Defaulting Lender in writing; and (y) with respect to any Insolvency Defaulting Lender, the period commencing on the date of the applicable Lender Insolvency Default and ending on the earliest of the following dates: (i) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable and (ii) the date that such Defaulting Lender ceases to hold any portion of the Loans or Commitments.

"**Default Rate**" means a rate per annum equal to the otherwise applicable Interest Rate plus 2.00%.

"**Default Ratio**" means the ratio (expressed as a percentage) computed as of each Monthly Reporting Date for the immediately preceding Calculation Period by dividing (a) the sum (without duplication) of the aggregate Outstanding Balance of all Receivables which were 121-150 days past their invoice date as at the end of such Calculation Period plus the aggregate Outstanding Balance of all Receivables which became Defaulted Receivables during such Calculation Period by (b) the aggregate amount of sales giving rise to Receivables that were generated during the Calculation Period immediately preceding the commencement of the Default Horizon.

"**Defaulted Loan**" has the meaning specified in Clause 2.18 (*Defaulting Lender*).

"**Defaulted Receivable**" means, without duplication, a Receivable (a) as to which any payment, or part thereof, remains unpaid for 121 or more days from the invoice date for such Receivable, (b) as to which an Event of Bankruptcy has occurred and is continuing with respect to the Obligor thereof, (c) which has been identified by the relevant Originator as uncollectible in accordance with the applicable Credit and Collection Policy, or (d) which, in accordance with the applicable Credit and Collection Policy, has been or should be written off as uncollectible.

"**Defaulting Lender**" has the meaning specified in Clause 2.18 (*Defaulting Lender*).

"**Delinquency Ratio**" means the ratio (expressed as a percentage) computed as of each Monthly Reporting Date for the immediately preceding Calculation Period by dividing:

(a)    the aggregate Outstanding Balance of all Delinquent Receivables as of the end of such Calculation Period by

(b)    the difference of (i) the aggregate Outstanding Balance of billed Receivables as of the last day of such Calculation Period, plus (ii) the lesser of (A) the aggregate Outstanding Balance of Unbilled Receivables or (B) 50% of the aggregate Net Eligible Receivables Balance at such time, minus (iii) Unapplied Cash as of the last day of such Calculation Period.

"**Delinquent Receivable**" means a Receivable (a) as to which any payment, or part thereof, remains unpaid for more than 91 days from the invoice date for such Receivable and (b) which is not a Defaulted Receivable.

"**Deposit Adjustment Date**" means the last Business Day of each week.

"**Diluted Receivable**" means any Receivable or part thereof which is either (a) reduced, cancelled or adjusted as a result of (i) any defective services or any failure by the relevant Originator to provide any services or otherwise to perform under any related Contract, (ii) any change in the terms of, or cancellation of, a Receivable or any rebate, administrative fee, discount, credit memo, refund, non-cash payment (other than payments by check), chargeback, allowance or any billing or other adjustment by the relevant Originator (except any such change made in settlement of such Receivable in accordance with the Credit and Collection Policies resulting from the financial inability of the Obligor to pay such Receivable), or (iii) any setoff or offset in respect of a claim by the relevant Obligor against the relevant Originator or with respect to the actions of the relevant Originator (in the case of a Diluted Receivable with respect to such Originator) or against the Borrower (in the case of a Diluted Receivable with respect to the Borrower) (whether such claim arises out of the same or a related transaction or an unrelated transaction), or (b) subject to any specific counterclaim or defense whatsoever against the relevant Originator or with respect to the actions of the relevant Originator or against the Borrower (except the discharge in a proceeding under applicable Insolvency Law of the Obligor thereof).  For the avoidance of doubt, Diluted Receivable will include any reduction, cancellation, adjustment, change, setoff or offset in respect of an Unbilled Receivable, whether or not reflected or to be reflected in the related invoice sent or to be sent to the related Obligor.

"**Dilution Horizon – Broadcasting**" means, as of any Monthly Reporting Date, the three immediately preceding Calculation Periods.

"**Dilution Horizon – Publishing**" means, as of any Monthly Reporting Date, the immediately preceding Calculation Period.

"**Dilution Horizon Ratio – Broadcasting**" means, with respect to the Broadcasting Receivables, as of any Monthly Reporting Date and continuing until (but not including) the next Monthly Reporting Date, a number equal to a fraction, the numerator of which is the aggregate amount of all sales which gave rise to Receivables (including Unbilled Receivables) that were generated during the Calculation Periods included in the Dilution Horizon-- Broadcasting, and the denominator of which is the Outstanding Balance of Pool Receivables (including Unbilled Receivables but excluding Defaulted Receivables and Diluted Receivables) minus Unapplied Cash as of the last day of the most recent Calculation Period.

"**Dilution Horizon Ratio – Publishing**" means, with respect to the Publishing Receivables, as of any Monthly Reporting Date and continuing until (but not including) the next Monthly Reporting Date, a number equal to a fraction, the numerator of which is the aggregate amount of all sales which gave rise to Receivables (including Unbilled Receivables) that were generated during the Calculation Period included in the Dilution Horizon-- Publishing, and the denominator of which is the Outstanding Balance of Pool Receivables (including Unbilled Receivables but excluding Defaulted Receivables and Diluted Receivables) minus Unapplied Cash as of the last day of the most recent Calculation Period.

"**Dilution Ratio – Broadcasting**" means the ratio (expressed as a percentage) computed as of each Monthly Reporting Date for the immediately preceding Calculation Period by dividing (a) the aggregate amount of Receivables which became Diluted Receivables during that Calculation Period, by (b) the aggregate amount of all sales which gave rise to Receivables that were generated during the Calculation Period immediately preceding the commencement of the Dilution Horizon – Broadcasting.

"**Dilution Ratio – Publishing**" means the ratio (expressed as a percentage) computed as of each Monthly Reporting Date for the immediately preceding Calculation Period by dividing (a) the aggregate amount of Receivables which became Diluted Receivables during that Calculation Period, by (b) the aggregate amount of all sales which gave rise to Receivables that were generated during the Calculation Period immediately preceding the commencement of the Dilution Horizon – Publishing.

"**Dilution Reserve Ratio**" means the sum of:

(a)     the Dilution Reserve Ratio – Broadcasting times the Segment Percentage for the Broadcast AR, plus

(b)     the Dilution Reserve Ratio – Publishing times the Segment Percentage for the Publishing AR.

"**Dilution Reserve Ratio – Broadcasting**" means, as of any Monthly Reporting Date, and continuing until (but not including) the next Monthly Reporting Date, the greater of (i) 5% and (ii) an amount (expressed as a percentage) that is calculated as follows:

$$DRRB = [(SF \times ADRB) + [(HDRB-ADRB) \times (HDRB/ADRB)]] \times DHRB$$

where:

DRRB =      Dilution Reserve Ratio – Broadcasting;

SF     =      the Stress Factor;

ADRB =      the "Average Dilution Ratio – Broadcasting," defined as the twelve-month rolling average of the Dilution Ratios-- Broadcasting that occurred during the period of twelve consecutive Calculation Periods ending immediately prior to such earlier Monthly Reporting Date;

HDRB =      the "Highest Dilution Ratio – Broadcasting," defined as the highest Three Month Rolling Average of the Dilution Ratios – Broadcasting that occurred during the period of twelve consecutive Calculation Periods ending immediately prior to such earlier Monthly Reporting Date; and

DHRB=      the Dilution Horizon Ratio – Broadcasting.

"**Dilution Reserve Ratio – Publishing**" means, as of any Monthly Reporting Date, and continuing until (but not including) the next Monthly Reporting Date, the greater of (i) 5% and (ii) an amount (expressed as a percentage) that is calculated as follows:

$$DRRP = [(SF \times ADRP) + [(HDRP-ADRP) \times (HDRP/ADRP)]] \times DHRP$$

where:

| | | |
|---|---|---|
| DRRP = | Dilution Reserve Ratio – Publishing; |
| SF = | the Stress Factor; |
| ADRP = | the "Average Dilution Ratio – Publishing," defined as the twelve-month rolling average of the Dilution Ratios – Publishing that occurred during the period of twelve consecutive Calculation Periods ending immediately prior to such earlier Monthly Reporting Date; |
| HDRP = | the "Highest Dilution Ratio – Publishing," defined as the highest Three Month Rolling Average of the Dilution Ratios – Publishing that occurred during the period of twelve consecutive Calculation Periods ending immediately prior to such earlier Monthly Reporting Date; and |
| DHRP = | the Dilution Horizon Ratio – Publishing. |

"**DIP Documents**" means the Guaranty, the Guaranty Security Agreement, the Letter of Credit Agreement and the Fee Letters.

"**Disputed Receivable**" means any Receivable the Obligor of which has failed or refused to pay by reason of a dispute between the Originator or any Affiliate thereof and the Obligor thereon relating to the services the sale of which shall have given rise to such Receivable, or relating to the performance by the Originator or any Affiliate thereof of any of its obligations to the Obligor under the Contract relating to such Receivable.

"**Doubtful Receivable**" means any Receivable the Obligor of which has failed or refused to pay and which the Servicer believes will not be collected.

"**DSO – Broadcasting**" means an amount, expressed in terms of days, equal to:

(a)      (i)      the Outstanding Balance of Broadcast AR minus any Unapplied Cash and the Diluted Receivables included in Broadcast AR as of the last day of the most recent Calculation Period, divided by (ii) the aggregate sales giving rise to Broadcast AR during the most recent Calculation Period, multiplied by

(b)      the actual number of days in the most recent Calculation Period.

"**DSO – Publishing**" means an amount, expressed in terms of days, equal to:

(a)    (i)    the Outstanding Balance of Publishing AR minus any Unapplied Cash and the Diluted Receivables included in Publishing AR as of the last day of the most recent Calculation Period, divided by (ii) the aggregate sales giving rise to Publishing AR during the most recent Calculation Period, multiplied by

(b)    the actual number of days in the most recent Calculation Period.

"**Eligible Account Bank**" means a depositary institution or trust company (which may include the Administrative Agent and its Affiliates) organized under the laws of the U.S. or any one of the States thereof or the District of Columbia; provided, however, that at all times (i) such depositary institution or trust company is a member of the Federal Deposit Insurance Corporation, (ii) unless the Administrative Agent consents in writing otherwise, the unsecured and uncollateralized debt obligations of such depositary institution or trust company are rated at least A-1 by S&P and P-1 by Moody's and (iii) such depositary institution or trust company has a combined capital and surplus of at least $125,000,000.

"**Eligible Assignee**" means, with respect to any (A) Revolving Lender, any Qualified Purchaser (i) that is a Lender, or any Affiliate of such Person that has a short-term debt rating of at least A-1 by S&P and P-1 by Moody's, (ii) that is managed or sponsored by a Person described in clause (i) above and that has a short-term debt rating of at least A-1 by S&P and P-1 by Moody's or (iii) any other Person that has been approved by the Administrative Agent and the Borrower; and (B) Term Lender, any Qualified Purchaser (i) that is an Approved Fund, (ii) that is a Lender or an Affiliate of such Person or (iii) any other Person that has been approved by the Administrative Agent and the Borrower, provided, that in each case, such approval of any Eligible Assignee may not be unreasonably withheld or delayed; provided further that the Administrative Agent's approval of any Eligible Assignee shall not be required if such Eligible Assignee is Barclays and, provided further that Borrower's approval of any Eligible Assignee shall not be required if (a) a Facility Event has occurred and is continuing, or (b) the Facility Termination Date has occurred.

"**Eligible Contract**" means, at any time, a Contract that satisfies all of the conditions set forth below:

(i)    The Contract (i) complies with all requirements of the applicable Credit and Collection Policy, (ii) does not allow the Obligor to defer or extend payment of the invoiced amount beyond the original term set forth in the invoice, and (iii) does not provide for the forgiveness or reduction of the amount required to be paid by the Obligor (other than with respect to amounts for which the Transaction Parties maintain adequate reserves in accordance with GAAP and which amounts are included in the Contra Balance for such Obligor).

(ii)    The Contract (a) is in full force and effect and (b) represents the legal, valid and binding obligation of such Obligor, enforceable against such Obligor in accordance with its terms, except as such enforceability may be limited by

applicable bankruptcy, reorganization, insolvency, moratorium or other laws affecting creditors' rights generally, and except as such enforceability may be limited by general principles of equity (whether considered in a suit at law or in equity).

"**Eligible Deposit**" means, as of any date of determination, the amount of available funds on deposit in the Cash Reserve Account as of the close of business as of the immediately preceding Business Day; provided that all of the following conditions are satisfied: (i) the Cash Reserve Account is subject to an Account Control Agreement in form and substance satisfactory to the Administrative Agent, (ii) the Administrative Agent and the Lenders shall have received an opinion of Sidley Austin LLP, in form and substance reasonably satisfactory to the Administrative Agent, as to the enforceability of such agreement and the perfection of the Administrative Agent's security interest in the security entitlements credited to such account, (iii) the Administrative Agent has password protected on-line access to current information as to activity in the Cash Reserve Account (including deposits, withdrawals and balances therein) directly from the relevant Facility Account Bank, and (iv) the portion of the Eligible Deposit that may be included in the calculation of the Percentage Factor may not exceed $30,000,000.

"**Eligible Receivable**" means, at any time, a Receivable:

(i)     the Obligor of which (A) is not an Affiliate of any Originator, the Borrower or the Servicer (or any of their respective Affiliates) unless such Obligor is a member of the Zell Obligor Group and (B) is not the U.S. federal government and (C) unless such Receivable arises from the placement of a classified ad in a print medium, is a corporation or other business organization, is organized under the laws of the United States or any political subdivision thereof and has its chief executive office in the United States;

(ii)    as to which, all right, title and interest to and in which has been validly transferred by the applicable Originator directly to Parent, if applicable, and to Borrower under and in accordance with the Receivables Purchase Agreement, the Borrower has good and marketable title thereto free and clear from Adverse Claims except as created under the Transaction Documents, and which has been the subject of either a valid transfer and assignment from the Borrower to the Administrative Agent (for the benefit of the Lenders) of an undivided interest in all the Borrower's right, title and interest therein (and in the proceeds thereof), or the grant of a first priority perfected "security interest" (within the meaning of the applicable UCC therein) (and in the proceeds thereof);

(iii)   the Obligor of which is not the Obligor of any Charged-Off Receivable, and if the Obligor is the Obligor of any Defaulted Receivables, the aggregate Outstanding Balance of such Defaulted Receivables does not exceed an amount equal to 35.0% of the Outstanding Balance of all Receivables of such Obligor at such time;

(iv)    which is not a Charged-Off Receivable, a Disputed Receivable, a Doubtful Receivable, a Delinquent Receivable, or a Defaulted Receivable;

(v)    which by its terms is due and payable within 30 days of the original invoice date therefor and has not had its payment terms extended, except in accordance with the Credit and Collection Policy; provided, that no such extension shall cause a Receivable that, but for such extension, would have been a Defaulted Receivable to be an Eligible Receivable;

(vi)    as to which the applicable Originator has timely and fully performed all obligations required to be performed by it under the related Contract and which has been billed to the related Obligor (provided, however, that any otherwise Eligible Receivable, that has accrued and is the legal valid and binding obligation of the related Obligor but which is an Unbilled Receivable may constitute an Eligible Receivable so long as the aggregate Outstanding Balance of Receivables which constitute "Eligible Receivables" by reason of this proviso, does not, at any time, exceed an amount equal to 50% of the aggregate Net Eligible Receivables Balance at such time) and provided that no more than 30 days have elapsed since the completion of the services giving rise to such Unbilled Receivable; and which in all cases, together with such Receivable and any applicable related Contract, is in full force and effect and constitutes the legal, valid and binding obligation of the related Obligor enforceable against such Obligor in accordance with its terms subject to no offset, counterclaim or other defense that has been asserted by or on behalf of such Obligor; provided that, whether or not any offset, counterclaim or other defense has been asserted, the portion of the Outstanding Balance of the Receivables owed by an Obligor Group and subject to offset at any time shall be reduced (for purposes of all calculations under the Transaction Documents) by the Contra Balance for such Obligor;

(vii)    (A) which is assignable in the manner contemplated hereby and by the other Transaction Documents under the laws of all applicable jurisdictions, and (B) the applicable Originator is authorized and/or otherwise entitled under the terms of the related Contract (if any) and applicable law, to disclose to the Administrative Agent and the Lenders all information relating to such Receivable as contemplated hereby or by any other Transaction Document, or that is otherwise necessary for the Administrative Agent or any Lender to exercise its rights hereunder or thereunder;

(viii)    which, together with the Contract related thereto, does not contravene any law, rule or regulation applicable thereto (including, without limitation, any law, rule or regulation relating to advertising, media providers and privacy) and with respect to which no part of the Contract related thereto is in violation of any such law, rule or regulation;

(ix)    that is an "account" or "payment intangible" (within the meaning of Section 9-102 of the applicable UCC);

(x)     that is denominated and payable only in United States dollars in the United States of America;

(xi)    that satisfies in all material respects all applicable requirements of the Credit and Collection Policy and with respect to which the representations and warranties in Clause 3.1(g) (*Representations and Warranties of the Servicer*) of the Servicing Agreement are true and correct;

(xii)   which was generated in the ordinary course of the applicable Originator's business, consistent in all material respects with such Originator's business as conducted as of the Closing Date, and prior to the transfer contemplated by the Transaction Documents, was the sole property of such Originators free and clear of Adverse Claims;

(xiii)  the Obligor of which has been directed to make all payments to a Collection Account with respect to which a valid and enforceable Account Control Agreement is in effect;

(xiv)   (i) the Receivables Purchase Agreement under which such Receivable was sold to Tribune (if applicable) and to the Borrower is in full force and effect, (ii) the Originator of such Receivable has not been terminated as an "Originator" under the Receivables Purchase Agreement, and (iii) the Originator Termination Date has not occurred with respect to that Originator;

(xv)    with respect to which all consents, licenses, approvals or authorizations of, or registrations or declarations with, any governmental authority required to be obtained, effected or given in connection with the creation of such Receivable have been duly obtained, effected or given and are in full force and effect;

(xvi)   that is not subject to any waiver or modification except for a Receivable which is subject to a waiver or modification as permitted in accordance with the Credit and Collection Policy and which waiver or modification is reflected in the Servicer's records and computer files relating thereto;

(xvii)  that is not subject to any enforceable provision prohibiting the transfer or assignment of such payment obligation;

(xviii) that arises under an Eligible Contract;

(xix)   as to which the applicable Originator has satisfied and fully performed all material obligations on its part with respect to such Receivable required to be fulfilled by it, and no further material action is required to be performed by any Person with respect thereto other than payment thereon by the applicable Obligor.

"**Equity Interests**" of any Person means any and all shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, and the regulations promulgated thereunder, in each case as amended.

"**ERISA Affiliate**" means any Person that is a member of any Transaction Party's controlled group, or under common control with any Transaction Party, within the meaning of Section 414 of the IRC.

"**ERISA Event**" means (a) (i) the occurrence of a Reportable Event, or (ii) the requirements of subclause (1) of Section 4043(b) of ERISA (without regard to subclause (2) of such Section) are met with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of a Transaction Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by a Transaction Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for the imposition of a lien under Section 302 or Section 303 of ERISA shall have been met with respect to any Plan; (g) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 206(g) of ERISA; (h) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan; or (i) the receipt by a Transaction Party or an ERISA Affiliate of any notice concerning the imposition of liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part 1 of Subtitle E of Title IV of ERISA, or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"**ESOP**" means the Tribune Company Employee Stock Ownership Plan.

"**ESOP Purchase Agreement**" means the ESOP Purchase Agreement made April 1, 2007, between Tribune and GreatBanc Trust Company, as trustee of the ESOP Trust, a separate trust created under the ESOP, as the same may be amended, restated or otherwise modified from time to time.

"**ESOP Trust**" means the Tribune Employee Stock Ownership Trust, dated April 1, 2007.

"**Eurodollar Rate**" means, for any Tranche Period for each Eurodollar Tranche, an interest rate per annum equal to the rate per annum obtained by dividing (a) the rate per annum appearing on Reuters LIBOR 01 (or any successor page) as the London interbank offered rate for deposits in U.S. dollars at approximately 11:00 A.M. (London time) two

Business Days prior to the first day of such Tranche Period for a term comparable to such Tranche Period or, if for any reason such rate is not available, the average of the rate per annum at which deposits in U.S. dollars are offered by the principal office of Barclays in London, England to prime banks in the London interbank market at 11:00 A.M. (London time) two Business Days before the first day of such Tranche Period in an amount substantially equal to Barclays' Eurodollar Tranches comprising part of such Eurodollar Tranche to be outstanding during such Tranche Period (or, if Barclays does not have any Eurodollar Tranches then outstanding, the Eurodollar Tranche of the relevant Lender) and for a period equal to such Tranche Period by (b) a percentage equal to 100% minus the Eurodollar Rate Reserve Percentage at the start of such Tranche Period; provided that in no event shall the Eurodollar Rate be less than 3.0% per annum.

"**Eurodollar Rate Reserve Percentage**" means the maximum aggregate reserve requirement (including all basic, supplemental, marginal or other reserves) which is imposed against the Administrative Agent in respect of Eurodollar liabilities, as defined in Regulation D of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Eurodollar Tranche**" means a Tranche for which interest is calculated by reference to the Eurodollar Rate.

"**Event of Bankruptcy**" means, with respect to any Person, the occurrence of any of the following:

    (a)    such Person shall commence any case, proceeding or other action, or present a petition or make an application under any Insolvency Law:

        (i)    relating to bankruptcy, insolvency, court protection, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, examination, liquidation, administration, administrative receivership, dissolution, court protection, composition, declaration or other similar relief with respect to it or any of its debts; or

        (ii)    seeking the appointment of a liquidator, receiver, administrative receiver, examiner, security trustee, custodian, compulsory manager, administrator or other similar official for it or for all or any substantial part of its assets; or

    (b)    there shall be commenced, presented or made against such Person any case, proceeding or other action referred to in (a) above unless: (i) solely in the case of any such case, proceeding or action as to which, within three Business Days after its commencement, such Person has delivered to the Administrative Agent a certificate of a Responsible Officer substantially to the effect that, in the reasonable judgment of such Responsible Officer

after due inquiry, such case, proceeding or action will be discharged or dismissed by the relevant court, tribunal or authority, and (ii) such case, proceeding or action is in fact discharged or dismissed by such relevant court, tribunal or authority within 45 days (or such longer period as the Administrative Agent may agree) after its commencement.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any Transaction Party Obligation, (i) income and franchise taxes imposed with respect to the Administrative Agent or any Lender by the Official Body under the laws of which the Administrative Agent or such Lender, as applicable, is organized or in which it has its principal office or maintains its applicable lending office, (ii) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which Borrower is located and (iii) any Tax resulting from the failure of the Administrative Agent, such Lender or such recipient to deliver federal tax forms required by Clause 2.15(e).

"**Existing Facility**" means the Original Agreement, and all related documentation.

"**Facility Account**" means, as the context requires, all or any one of the Collection Accounts, the Cash Reserve Account or the Borrower Accounts.

"**Facility Account Bank**" means, as the context requires, a Borrower Account Bank or a Collection Account Bank.

"**Facility Event**" means a Potential Trigger Event, Trigger Event, Facility Termination Event or Potential Facility Termination Event.

"**Facility Termination Date**" means the earliest of (a) April 10, 2010, (b) the date that the Facility Termination Date is declared or automatically occurs pursuant to Clause 7.1(*Trigger Events*) or Clause 7.2 (*Facility Termination Events*), (c) any Monthly Settlement Date specified by the Servicer or the Parent on not less than 30 days (or such shorter period as the Administrative Agent and the Required Lenders may agree, acting reasonably) prior written notice to the Administrative Agent and (d) if Borrower's Net Worth is less than the Required Capital Amount, any Business Day specified by Parent on not less than three (3) Business Days prior written notice that Borrower may no longer borrow under the Intercompany Note.

"**Facility Termination Event**" has the meaning specified in Clause 7.2 (*Facility Termination Events*).

"**Fee Letters**" means, collectively, (i) the second amended and restated fee letter, dated as of the Closing Date, between Parent and the Administrative Agent with respect to, among other things, the Applicable Margin, and (ii) the fee letter, dated as of the Closing Date, between the Parent and Barclays Bank, PLC, in its individual capacity.

"**Fee Calculation Period**" means (i) the period commencing on (and including) the Closing Date and ending on (and including) the first Monthly Settlement Date thereafter, (ii) each subsequent period commencing on (but excluding) a Monthly Settlement Date and ending on (and including) the next Monthly Settlement Date.

"**Fees**" means the fees payable pursuant to any Fee Letter.

"**Filing Date**" means December 8, 2008.

"**Filing Debtor**" means Parent, a Filing Sub-Originator or any other Subsidiary of Parent that is a debtor in any of the Chapter 11 Cases.

"**Filing Sub-Originator**" means each of the Sub-Originators listed on Schedule 9 hereto (*Filing Sub-originators*).

"**Final Financing Order**" means the order of the Bankruptcy Court approving the Existing Facility entered by the Bankruptcy Court on January 15, 2009.

"**Final Payout Date**" means the date after the Facility Termination Date on which all the Transaction Party Obligations have been irrevocably reduced to zero by payment in full in cash.

"**Finance Charges**" means, with respect to a Receivable, any finance, interest, late payment or similar charges owing by an Obligor in respect of such Receivable pursuant to the related Contract.

"**Financing Orders**" mean, collectively, the Interim Financing Order, the Final Financing Order and any Subsequent Financing Orders.

"**Fiscal Month**" means the applicable fiscal month listed on Schedule 6 hereto (*Fiscal Months*).

"**Fitch**" means Fitch, Inc.

"**Force Majeure Event**" means, with respect to a Person, riots, acts of God or the public enemy, strikes, communication line failures, computer viruses, acts of war, acts of terrorists, epidemics, fire, equipment or power failures, flood, embargoes, weather, earthquakes or other events beyond the control of such Person.

"**Foreign Lender**" shall mean any Lender that is organized under the laws of a jurisdiction other than the United States of America, or any state or governmental unit therein.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**Funding Default**" has the meaning specified in Clause 2.18 (*Defaulting Lender*).

"**Funds Defaulting Lender**" has the meaning specified in Clause 2.18 (*Defaulting Lender*).

"**GAAP**" means, with respect to any Person, generally accepted accounting principles applicable to such Person (including generally accepted accounting principles applicable to such Person by Law) or the consolidated group of which such Person is a member.

"**Guarantor**" means Parent and each Subsidiary that was a Filing Debtor on the Filing Date.

"**Guarantor Collateral**" means the assets of the Guarantors subjected to liens in favor of the Administrative Agent under the Guaranty Security Agreement and the Financing Orders.

"**Guaranty**" means the Amended and Restated Guaranty, dated as of the Closing Date, of the Guarantors in favor of the Administrative Agent, as the same may be amended, restated or otherwise modified from time to time.

"**Guaranty Security Agreement**" means the Amended and Restated Security Agreement, dated as of the Closing Date, among the Parent, the Filing Debtors and the Administrative Agent, as the same may be amended, restated or otherwise modified from time to time.

"**Hedge Agreements**" means interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other similar agreements.

"**Incremental Borrowing**" has the meaning specified in Clause 2.1(a) (*The Loans*).

"**Incremental Borrowing Date**" has the meaning specified in Clause 2.2(a)(i) (*Incremental Borrowing Request*).

"**Incremental Borrowing Request**" has the meaning specified in Clause 2.2(a)(i) (*Incremental Borrowing Request*).

"**Indebtedness**" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all payment obligations of such Person for the deferred purchase price of property or services (other than trade payables not overdue by more than 120 days incurred in the ordinary course of such Person's business), (c) all payment obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Purchase Money Obligations, Capitalized Lease Obligations, Attributable Debt and under synthetic, off-balance sheet or tax retention leases (excluding, however, operating leases), (e) all payment obligations, contingent or otherwise, of such Person in respect of acceptances, standby letters of credit or similar extensions of credit, (f) all net payment obligations of such Person in respect of Hedge Agreements, (g) all payment obligations outstanding to Persons that are not Affiliates of Borrower in connection with a Receivables Facility, (h) all Indebtedness of others referred to in clauses (a) through (g) above or clause (i) below (collectively,

"**Guaranteed Debt**") guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person, through an agreement (1) to pay or purchase such Guaranteed Debt or to advance or supply funds for the payment or purchase of such Guaranteed Debt, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Guaranteed Debt or to assure the holder of such Guaranteed Debt against loss in respect of such Guaranteed Debt, (3) to supply funds to or in any other manner invest funds in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss in respect of such Guaranteed Debt and (i) all Indebtedness referred to in clauses (a) through (h) above (including Guaranteed Debt) secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Adverse Claim on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness; provided that, if such Person has not assumed or otherwise become liable in respect of such Indebtedness, such obligations shall be deemed to be in an amount equal to the lesser of (i) the amount of such Indebtedness and (ii) fair market value of such property at the time of determination (in the Borrower's good faith estimate). The amount of any Guaranteed Debt shall be deemed to be an amount equal to the lesser of (a) the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made and (b) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Debt, unless such primary obligation and the maximum amount for which such guaranteeing Person may be liable are not stated or determinable, in which case the amount of the Guaranteed Debt shall be such guaranteeing Person's reasonably anticipated liability in respect thereof as determined by Tribune in good faith. Notwithstanding anything to the contrary, Tribune's obligation to pay Dividends to the ESOP pursuant to Section 6.3(a)(3) of the ESOP Purchase Agreement shall not constitute Indebtedness.

"**Indemnified Amounts**" has the meaning specified in Clause 9 (*Indemnities*).

"**Indemnified Party**" has the meaning specified in Clause 9 (*Indemnities*).

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

"**Independent Director**" shall mean a member of the board of directors of Borrower who is not at such time, and has not been at any time during the preceding five (5) years, (A) a director, officer, employee or affiliate of Borrower, any Originator, or any of their respective Subsidiaries or Affiliates, or (B) the beneficial owner (at the time of such individual's appointment as an Independent Director or at any time thereafter while serving as an Independent Director) of any of the outstanding Equity Interests of Borrower, any Originator, or any of their respective Subsidiaries or Affiliates.

"**Insolvency Defaulting Lender**" has the meaning specified in Clause 2.18 (*Defaulting Lender*).

"**Insolvency Law**" means any Law relating to bankruptcy, insolvency, administration, receivership, examination, administrative receivership, reorganization, winding up or composition, moratorium or adjustment of debts or the rights of creditors generally (whether by way of voluntary arrangement or otherwise).

"**Intercompany Note**" has the meaning specified in the Receivables Purchase Agreement.

"**Interest**" means, for any Tranche and any Tranche Period, the sum of:

(a) for each day during such Tranche Period of the following:

$$\frac{IR \; x \; PB}{Y}$$

plus

(b) the Liquidation Fee, if any, for such Tranche for such Tranche Period

where:

IR    =    the Interest Rate for such Tranche for such day;

PB    =    the Principal Balance of such Tranche on such day; and

Y    =    (a) in the case of any Tranche for which the Interest Rate is based on the Base Rate (other than the Default Rate), 365 or 366, as applicable, and (b) in the case of any other Tranche, including any tranche for which the Interest Rate is based on the Default Rate, 360;

provided, that no provision of this Agreement shall require the payment or permit the collection of Interest in excess of the maximum permitted by applicable Law; and provided further that Interest for any Tranche shall not be considered paid by any distribution to the extent that at any time all or a portion of such distribution is rescinded or must otherwise be returned for any reason.

"**Interest Rate**" means for any Tranche during any Tranche Period, an interest rate per annum equal to the sum of the Applicable Margin plus the Eurodollar Rate or the Base Rate, as selected by the Borrower, for such Tranche Period; provided, however, that in case of:

(a)    any Tranche Period with respect to which the Eurodollar Rate is not available pursuant to Clause 2.12 (*Illegality*) or 2.13 (*Inability to Determine Eurodollar Rate*); or

(b)    any Tranche Period as to which the Administrative Agent does not receive notice by 2:00 p.m. (New York time) on the third Business Day preceding the first day of such Tranche Period,

the Interest Rate for such Tranche Period shall be an interest rate per annum equal to the sum of the Applicable Margin plus the Base Rate in effect from time to time during such Tranche Period; provided further that the Interest Rate shall be the Default Rate after the occurrence and during the continuance of a Trigger Event or Facility Termination Event.

"**Interim Financing Order**" means an order of the Bankruptcy Court entered on December 10, 2008 authorizing and approving the Existing Facility.

"**Interim Period**" shall mean a period beginning on and including one Business Day (commencing with the Closing Date) and ending on and excluding the next Business Day.

"**Interim Report**" means a report furnished by the Servicer pursuant to Clause 2.3 (*Reporting requirements*) of the Servicing Agreement substantially in the form attached as Exhibit A-2 (*Form of Interim Report*) to the Servicing Agreement.

"**Interim Settlement Date**" means the second Business Day immediately following the end of each Interim Period.

"**IRC**" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"**Law**" means any law (including common law), constitution, statute, treaty, regulation, rule, ordinance, order, injunction, writ, decree or award of any Official Body.

"**Lender's Account**" means, with respect to any Lender, the account of such Lender identified on Schedule 10 (*Lenders' Accounts*), or such other account as such Lender may designate in writing to the Borrower, the Servicer and the Administrative Agent.

"**Lender Insolvency Default**" has the meaning specified in Clause 2.18 (*Defaulting Lender*).

"**Lender Party**" has the meaning specified in Clause 10.6(b) (*Confidentiality*).

"**Lenders**" means, collectively, the Revolving Lenders and the Term Lenders.

"**Letter of Credit Agreement**" means the Letter of Credit Agreement, dated as of December 8, 2008, between Barclays, as letter of credit provider, the Parent and certain Subsidiaries of the Parent party thereto, as amended by Amendment No. 1 to the Letter of Credit Agreement, dated as of March 6, 2009, and Amendment No. 2 to Letter of Credit Agreement, dated as of the Closing Date, between Barclays, as letter of credit provider, the Parent and certain Subsidiaries of the Parent party thereto, and as further amended, restated or otherwise modified from time to time.

"**Liquidation Fee**" means for any Tranche Period for which Interest is computed by reference to the Eurodollar Rate and a reduction of the Principal Balance of the relevant Tranche is made for any reason on any day other than the last day of such Tranche

Period, the amount, if any, by which (A) the additional Interest (calculated without taking into account any Liquidation Fee or any shortened duration of such Tranche Period pursuant to clause (b) of the definition thereof) which would have accrued during such Tranche Period on the reductions of Principal Balance of the Tranche relating to such Tranche Period had such reductions not occurred, exceeds (B) the income, if any, received by the Lender which holds such Tranche from the investment of the proceeds of such reductions of Principal Balance. A certificate as to the amount of any Liquidation Fee (including the computation of such amount) shall be submitted by the affected Lender to the Borrower and shall be conclusive and binding for all purposes, absent manifest error.

"**Loan**" means a loan made to the Borrower pursuant to Clause 2 (*Amounts and Terms of the Loans*).

"**Lock-Box**" means each locked postal box with respect to which a Collection Account Bank has executed an Account Control Agreement and has been granted exclusive access for the purpose of retrieving and processing payments made on the Receivables.

"**Loss and Dilution Reserve**" means, on any date, an amount equal to:

$$LDRR \times NERB$$

where:

LDRR    =    the Loss and Dilution Reserve Ratio on such date; and

NERB    =    the Net Eligible Receivables Balance at the close of business of the Servicer on such date.

"**Loss and Dilution Reserve Ratio**" means, on any day, the sum of the Loss Reserve Ratio plus the Dilution Reserve Ratio.

"**Loss Horizon**" means, as of any Monthly Reporting Date, the current Calculation Period and the two immediately preceding Calculation Periods.

"**Loss Horizon Ratio**" means, as of any Monthly Reporting Date and continuing until (but not including) the next Monthly Reporting Date, the amount equal to (a) the aggregate amount of all sales which gave rise to Receivables (including Unbilled Receivables) that were generated during the Calculation Periods included in the Loss Horizon divided by (b) the Outstanding Balance of Pool Receivables (including Unbilled Receivables but excluding Defaulted Receivables and Diluted Receivables) minus Unapplied Cash as of the end of the Calculation Period immediately preceding such earlier Monthly Reporting Date.

"**Loss Reserve Ratio**" means, as of any Monthly Reporting Date and continuing until (but not including) the next Monthly Reporting Date, the greater of (i) 16.25% and (ii) amount (expressed as a percentage) that is calculated as follows:

$$LRR = SF \times AD \times LHR$$

where:

| | | |
|---|---|---|
| LRR | = | Loss Reserve Ratio; |
| SF | = | the Stress Factor; |
| AD | = | the "Average Default," defined as the highest Three-Month Rolling Average of the Default Ratio that occurred during the period of 12 consecutive Calculation Periods immediately preceding such earlier Monthly Reporting Date; and |
| LHR | = | the Loss Horizon Ratio. |

"**Make Good Arrangement**" means any obligation under any Contract to provide any Obligor with additional air time for such Obligor's advertisements due to previous viewership of such Obligor's advertisements failing to reach an agreed upon threshold.

"**Material Adverse Effect**" means, with respect to any event or circumstance, a material adverse effect, individually or in the aggregate with other events or circumstances, on: (a) the status, existence, perfection or priority of the interest of the Administrative Agent in the Guarantor Collateral, taken as a whole; (b) the value or collectibility of the Guarantor Collateral, taken as a whole; (c) the ability of the Borrower to perform its obligations under the Transaction Documents, (d) the ability of the Transaction Parties, taken as a whole, to perform their obligations under the Transaction Documents; (e) the status, existence, perfection or priority of the rights, title and interest of the Borrower or the Administrative Agent, on behalf of the Secured Parties, in and to the Pool Receivables, Collections or Related Security related thereto or any Facility Account; or (f) the value, validity, enforceability or collectibility (if applicable) of all or any material portion of the Pool Receivables, Collections or Related Security related thereto.

"**Material Indebtedness**" means Indebtedness (other than the Loans or other Indebtedness arising pursuant to and contemplated by the Transaction Documents) (i) of any one or more of the Transaction Parties, other than the Borrower, in an aggregate principal amount exceeding $75,000,000, and (ii) with respect to the Borrower, in an aggregate principal amount exceeding $50,000 (or the equivalent thereof in any other currency).

"**Maturity Date**" means the earliest of (i) the forty-fifth day after the then-scheduled Facility Termination Date under clause (a) of the definition thereof, (ii) the effective date of a Chapter 11 plan of reorganization for the Parent, (iii) the date on which a sale of all or substantially all of the assets of the Guarantors is consummated under Section 363 of the Bankruptcy Code and (iv) the date on which maturity of the Loans is accelerated

pursuant to Clause 7.3 (*Acceleration of Maturity*) as a result of a Facility Termination Event.

"**Maximum Percentage Factor**" means 100%.

"**Measurement Period**" means the period between the end of an Interim Period and the delivery of the related Interim Report to the Administrative Agent.

"**Monthly Report**" means a report substantially in the form of, and containing the information described in, Exhibit A-1 (*Form of Monthly Report*) to the Servicing Agreement duly completed and furnished by the Servicer pursuant to Clause 2.3 (*Reporting requirements*) of the Servicing Agreement and containing the certification of the Servicer.

"**Monthly Reporting Date**" means the Business Day immediately preceding each Monthly Settlement Date.

"**Monthly Settlement Date**" means the fifteenth (15th) Business Day immediately succeeding each Calculation Period, or if that day is not a Business Day, the next following Business Day.

"**Moody's**" means Moody's Investors Service, Inc.

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Transaction Party or any ERISA Affiliate is making or had an obligation to make contributions, has within any of the preceding five plan years made or has an obligation to make contributions or with respect to which any Transaction Party or any ERISA Affiliate could have liability.

"**Multiple Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of a Transaction Party or any ERISA Affiliate and at least one Person other than the Transaction Party and the ERISA Affiliates or (b) was so maintained and in respect of which a Transaction Party or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"**Net Eligible Receivables Balance**" means at any time an amount equal to (a) the aggregate Outstanding Balance of Pool Receivables that qualify as Eligible Receivables at such time minus (b) the aggregate amount for all Obligor Groups by which the Outstanding Balance of all Eligible Receivables of each Obligor Group exceeds the Concentration Limit for such Obligor Group at such time, minus (c) Unapplied Cash at such time.

"**Net Worth**" has the meaning specified in the Receivables Purchase Agreement.

"**Non-Consenting Lender**" has the meaning specified in Clause 10.19 (*Replacement of Lenders*).

"**Note**" has the meaning given in Clause 2.2(e) (*Notes*).

"**Obligor**" means, with respect to any Receivable, each Person obligated to make payments in respect of such Receivable pursuant to a Contract.

"**Obligor Group**" means any Obligor and all of its Affiliates.

"**Obligor Group Rating**" means, with respect to an Obligor Group, the Debt Rating of the parent company for such Obligor Group (which parent company may or may not be an Obligor).

"**Official Body**" means any government or political subdivision or any agency, authority, bureau, central bank, commission, department or instrumentality of any such government or political subdivision, or any court, tribunal, grand jury or arbitrator, or any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, or any accounting board or authority (whether or not a part of government) which is responsible for the establishment or interpretation of national or international accounting principles.

"**Organic Documents**" of any Person means its memorandum and articles of association, articles or certificate of incorporation and by laws, limited liability agreement, partnership agreement or other comparable charter or organizational documents as amended from time to time.

"**Original Agreement**" has the meaning specified in the recitals hereto.

"**Originator Event**" means an Originator Termination Event or an event that but for notice or lapse of time or both would constitute an Originator Termination Event;

"**Originator Payout Date**" means an "Originator Payout Date" under, and as defined in, the Receivables Purchase Agreement.

"**Originator Termination Date**" means the "Termination Date" under, and as defined in, the Receivables Purchase Agreement.

"**Originator Termination Event**" means an "Originator Termination Event" under, and as defined in, the Receivables Purchase Agreement.

"**Originators**" means Parent and the Subsidiaries of Parent identified as sellers of Receivables to Parent under the Receivables Purchase Agreement.

"**Other Taxes**" means any and all present or future stamp or documentary taxes or any other excise, sales, good and services or transfer taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, any Transaction Document, in each case, other than Excluded Taxes.

"**Outstanding Balance**" means, with respect to any Receivable at any time, the then outstanding principal amount thereof, excluding any Finance Charges related thereto.

"**Outstanding Investment**" of Barclays, determined as of the Closing Date, shall mean the Class A Outstandings (as defined in the Existing Facility) reduced by any amounts repaid by Borrower and attributable to the amount funded by Barclays pursuant to the Existing Facility prior to giving effect to the transactions contemplated by Clause 2.1(a).

"**Outstanding Receivables Report**" has the meaning specified in the Servicing Agreement.

"**Parent**" has the meaning specified in the Receivables Purchase Agreement.

"**Participant**" has the meaning specified in Clause 11.3(e) (*Participations*).

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**PDT Entity**" has the meaning specified in the Senior Credit Agreement.

"**Percentage Factor**" means, as of any date of determination, the fraction (expressed as a percentage) computed as follows:

$$\frac{APB + TR}{NERB + ED}$$

where:

APB    =    the aggregate outstanding principal balance of Loans on the date of such computation;

TR    =    Total Reserves on the date of such computation;

NERB =    the Net Eligible Receivables Balance on the date of such computation; and

ED    =    the Eligible Deposit as of the end of the most recent Deposit Adjustment Date (after giving effect to any deposit or withdrawal on such date).

"**Permitted Adverse Claim**" means an Adverse Claim that is permitted to exist under the covenants contained in Section 4.27 of the Receivables Purchase Agreement.

"**Permitted Disposition**" shall be as agreed between the Parent and the Administrative Agent.

"**Permitted Investments**" means, with respect to any Borrower Account, any of the following investments denominated and payable solely in U.S. Dollars:  (a) readily marketable debt securities issued by, or the full and timely payment of which is guaranteed by the full faith and credit of, the United States of America, (b) insured

demand deposits, time deposits and certificates of deposit of any Eligible Account Bank that is organized under the laws of the United States of America, (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with a bank meeting the qualifications described in clause (b) above, (d) money market funds rated in the highest ratings category by each of Moody's and S&P (which rating, in the case of S&P, shall be AAA and shall not have the "r" symbol attached to such rating and, in the case of Moody's "P-1" or "Aaa" and "MR1+"), (e) commercial paper of any corporation incorporated under the laws of the United States of America or any political subdivision thereof, provided that such commercial paper is rated at least A-1 (and without any "r" symbol attached to any such rating) by S&P and at least Prime-1 by Moody's, (f) cash, and (g) such other investments as are approved by the Administrative Agent.

"**Permitted Transferee**" means (i) any direct or indirect Affiliate of EGI-TRB, L.L.C., Equity Group Investments, L.L.C. or Zell, (ii) any direct or indirect member of EGI-TRB, L.L.C. and any direct or indirect Affiliate thereof, (iii) Zell or his spouse, lineal ancestors and descendants (whether natural or adopted), or (iv) any trust or retirement account primarily for the benefit of Zell and/or his spouse, lineal ancestors and descendants, any entity formed and wholly owned by any such trust or retirement account and any private foundation formed by Zell and/or any one or more of his descendants.

"**Person**" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture, Official Body or any other entity.

"**Plan**" means a Single Employer Plan or a Multiple Employer Plan.

"**Pool Receivable**" means any Receivable (other than a Receivable that has been repurchased or retransferred to an Originator pursuant to, and in accordance with, the Transaction Documents) which has been sold, contributed or otherwise assigned (or purported to be sold, contributed or otherwise assigned) by an Originator to the Parent (if applicable) and to the Borrower pursuant to the Receivables Purchase Agreement.

"**Portfolio Report**" means any Monthly Report or Interim Report.

"**Post-Petition PDT Debt**" means any Indebtedness incurred in connection with a Permitted Disposition after the filing of the Chapter 11 Cases.

"**Potential Facility Termination Event**" means an event that but for notice or lapse of time or both would constitute a Facility Termination Event.

"**Potential Trigger Event**" means an event that but for notice or lapse of time or both would constitute a Trigger Event.

"**Potential Servicer Default**" means an event that but for notice or lapse of time or both would constitute a Servicer Default.

"**Principal Balance**" means, with respect to any Tranche, the original principal amount of any Loan made hereunder that has been allocated to such Tranche pursuant to Clause 2.10 (*Tranches*), as such amount may be divided or combined in accordance with such Clause, in each case as reduced from time to time by Collections or other payments received by the applicable Lender(s) holding such Tranche, on account of the Principal Balance of such Tranche; provided that if such Principal Balance shall have been reduced by any distribution and thereafter all or a portion of such distribution is rescinded or must otherwise be returned for any reason, such Principal Balance shall be increased by the amount of such rescinded or returned distribution, as though it had not been received by such Lender(s).

"**Publishing AR**" means Receivables owed to the Originators listed on Schedule 8 (*Publishing Originators*) and any other Originator identified as an Originator of Publishing AR in connection with its addition to the Receivables Purchase Agreement pursuant to Clause 10.13 (*Limitation on Addition and Termination of Originators*).

"**Purchase Money Obligation**" shall mean, for any Person, the obligations of such Person in respect of Indebtedness (including Capitalized Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any property (including Equity Interests of any Person) or the cost of installation, construction or improvement of any property and any refinancing thereof; provided, however, that (i) such Indebtedness is incurred within one year after such acquisition, installation, construction or improvement of such property by such Person and (ii) the amount of such Indebtedness does not exceed 100% of the unamortized cost of such acquisition, installation, construction or improvement, as the case may be.

"**Qualified Purchaser**" means a "qualified purchaser" as defined in Section 2(a)(51) the Investment Company Act of 1940, as amended.

"**Rate Type**" means the Eurodollar Rate or the Base Rate.

"**Rating Agency**" shall mean Moody's or S&P.

"**Receivable**" means any indebtedness and other obligations owed to any Originator or any right of any Originator to payment from or on behalf of an Obligor, or any right to reimbursement for funds paid or advanced by any Originator on behalf of an Obligor (whether or not yet billed to such Obligor) constituting an account, chattel paper, payment intangible, instrument or general intangible, however arising (whether or not earned by performance), and includes, without limitation, the obligation to pay any Finance Charges, fees and other charges with respect thereto. Indebtedness and other rights and obligations arising from any one transaction, including, without limitation, indebtedness and other obligations represented (or, in the case of Unbilled Receivables, to be represented) by an individual invoice or ledger entry, shall constitute a Receivable separate from a Receivable consisting of the indebtedness and other rights and obligations arising from any other transaction; provided, that any indebtedness, rights or obligations referred to in the immediately preceding sentence shall be a Receivable

regardless of whether the account debtor or Borrower treats such indebtedness, rights or obligations as a separate payment obligation.

"**Receivables Facility**" one or more receivables financing facilities, in each case, as amended, supplemented, modified, extended, renewed, restated, refunded, replaced or refinanced from time to time, the Indebtedness of which is non-recourse (except for Standard Receivables Facility Undertakings) to Tribune and its Subsidiaries, other than any Receivables Subsidiary, pursuant to which Tribune or any of its Subsidiaries sells its accounts, payment intangibles and related assets to either (a) a Person that is not a Senior Credit Agreement Guarantor or (b) a Receivables Subsidiary.

"**Receivables Facility Repurchase Obligation**" means any obligation of Tribune or a Subsidiary that is a seller of assets in a Receivables Facility to repurchase the assets it sold thereunder as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"**Receivables Purchase Agreement**" means the Amended and Restated Receivables Purchase Agreement, dated the Closing Date, among the Originators, the Servicer and the Borrower.

"**Receivables Subsidiary**" means any Subsidiary formed solely for the purpose of engaging, and that engages only, in one or more Receivables Facilities.

"**Register**" has the meaning specified in Clause 10.3(c) (*Register*).

"**Related Security**" means, with respect to any Receivable, all of the Originators', or Borrower's, as applicable, right, title and interest in, to and under:

(a)     all security interests, reservations of ownership, liens or other Adverse Claims and property subject thereto from time to time purporting to secure payment of such Receivable, whether pursuant to the Contract related to such Receivable or otherwise, together with all financing statements, registrations, hypothecs, charges or other similar filings or instruments against an Obligor and all security agreements describing any collateral securing such Receivable;

(b)     all guarantees, default swaps, insurance and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Receivable whether pursuant to the Contract related to such Receivable or otherwise; provided, that it is understood and agreed that any amounts received by any Transaction Party in respect of, or otherwise in connection with, such guarantee or other agreement or arrangement or credit or other insurance shall constitute "Related Security" for all purposes of the Transaction Documents, including any obligation of any Transaction Party under the Transaction Documents to promptly deposit amounts received in respect of Collections to a Facility Account;

(c)     all other documents, purchase orders, invoices, agreements, books, records and other information (but excluding computer programs, tapes, discs, punch cards, data processing software, storage media and any license related thereto) to the extent relating to such Receivable, the applicable Contract and the related Obligor;

(d)     all Contracts or other agreements or documents to the extent that they evidence or secure such Receivable;

(e)     all of the Borrower's right, title and interest in, to and under the Transaction Documents with respect to the obligations of, and claims against, other Transaction Parties; and

(f)     all Collections and other proceeds of the foregoing.

"**Repeat Advance**" means a remittance of Collections to the Borrower pursuant to Clause 2.6(b)(v) (*Application of Collections prior to Facility Termination Date*).

"**Repeat Advance Date**" has the meaning specified in Clause 2.3(b) (*Payments Generally*).

"**Reportable Event**" means with respect to a Plan an event described in Section 4043 of ERISA or the regulations issued thereunder (other than an event for which the 30-day notice period is waived).

"**Reporting Date**" means any date on which a Portfolio Report is delivered or required to be delivered by the Servicer pursuant to Clause 2.3 (*Reporting Requirements*) of the Servicing Agreement.

"**Required Capital Amount**" has the meaning set forth in the Receivables Purchase Agreement.

"**Required Lenders**" means Lenders having aggregate Total Percentages of more than 50%; provided that during any period in which there are only two Lenders, "Required Lenders" shall mean all Lenders.

"**Required Reduction**" has the meaning specified in Clause 2.5(a) *(Payment and Prepayment of Loans)*.

"**Responsible Officer**" means, with respect to any Transaction Party, the manager, the president, any vice president, a director, any duly authorized officer, the chief financial officer, the treasurer, the controller, the general counsel or in-house counsel having responsibility for administering the Transaction Documents, or, to the extent any of the foregoing are not recognized in a jurisdiction, the equivalent thereof in such jurisdiction, of such Transaction Party or any senior individual nominated by such Transaction Party as a Responsible Officer and promptly notified to the Administrative Agent in writing.

"**Restricted Payments**" has the meaning specified in Clause 5.1(m) (*Distributions, etc.*).

"**Revolving Commitment**" means, of any Lender, the amount set forth on Schedule 1-B (*Lenders, Commitments and Percentages*) as its Revolving Commitment opposite such Lender's name or, in the case of a Lender that became a party to this Agreement pursuant to an Assignment and Acceptance, the amount set forth therein as such Lender's Revolving Commitment, in each case as such amount may be (a) reduced or increased by any Assignment and Acceptance entered into by such Lender in accordance with the terms of this Agreement and (b) reduced pursuant to Clause 2.1(b) (*The Loans*).

"**Revolving Lender**" means each Lender having an outstanding Revolving Commitment or Revolving Loan.

"**Revolving Loan**" has the meaning specified in Clause 2.1(a) (*Restructuring of Class A Loans under Original Agreement*).

"**Revolving Outstandings**" means all Revolving Loans and all amounts payable under the Transaction Documents to the Revolving Lenders.

"**Revolving Percentage**" means, for any Lender, the percentage equivalent of a fraction (expressed out to five decimal places), the numerator of which is the Revolving Commitment of such Revolving Lender and the denominator of which is the Aggregate Revolving Loan Commitment.

"**S&P**" means Standard & Poor's Rating Services, a division of McGraw-Hill Companies, Inc.

"**Sale and Lease-Back Transaction**" means any arrangement with any Person providing for the leasing by Tribune or any Subsidiary of any real or tangible personal property, which property has been or is to be sold or transferred by Tribune or such Subsidiary to such Person in contemplation of such leasing.

"**Secured Obligations**" means all Transaction Party Obligations of the Borrower and all other obligations described as Secured Obligations under the Security Agreement.

"**Secured Parties**" means, collectively, the Lenders, the Administrative Agent and each other Indemnified Party.

"**Security Agreement**" means the Security Agreement, dated as of July 1, 2008, between the Borrower and the Administrative Agent, as amended by Amendment No. 1 to Security Agreement, dated as of the Closing Date, between the Borrower and the Administrative Agent, and as further amended, restated or otherwise modified from time to time.

"**Security Documents**" means the Security Agreement, the Guaranty Security Agreement, each Account Control Agreement, and each other security agreement, assignment or other analogous agreement executed or delivered from time to time by the Borrower or any Transaction Party pursuant to, or in connection with, the transaction contemplated by the Transaction Documents.

"**Segment Percentage**" means, as of any Monthly Reporting Date, (a) with respect to the Broadcast AR, a fraction, the numerator of which is the Outstanding Balance of the Broadcast AR and the denominator of which is the Outstanding Balance of all Pool Receivables, in each case determined as of the last day of the immediately prior Calculation Period, and (b) in the case of the Publishing AR, a fraction, the numerator of which is the Outstanding Balance of the Publishing AR and the denominator of which is the Outstanding Balance of all Pool Receivables, in each case as of the last day of the prior Calculation Period.

"**Senior Credit Agreement**" means that certain Credit Agreement, dated as of May 17, 2007, among Tribune, each lender from time to time party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, Merrill Lynch Capital Corporation, as Syndication Agent, Citicorp North America, Inc., and Bank of America, N.A., as Co-Documentation Agents, and J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC as Joint Lead Arrangers and Joint Bookrunners, as amended by that certain Amendment No. 1 dated June 4, 2007, as in effect immediately prior to the Filing Date.

"**Senior Credit Agreement Guarantor**" means each entity that is named as a "Guarantor" under the terms of the Senior Credit Agreement.

"**Senior Credit Agreement Rate**" means, at any time, the highest default rate at which interest is calculated in accordance with the Senior Credit Agreement, which rate as of the Filing Date is set forth in Section 2.07(b) of the Senior Credit Agreement.

"**Servicer**" means at any time the Person then authorized pursuant to Clause 2.1 (*Designation of Servicer; Power of Attorney*) of the Servicing Agreement to administer and collect the Receivables.

"**Servicer Default**" has the meaning specified in Clause 2.9 (*Servicer Default*) of the Servicing Agreement.

"**Servicer Parties**" means, collectively, the Servicer and the Sub-Servicers.

"**Servicing Agreement**" means the Amended and Restated Servicing Agreement, dated the Closing Date among the Servicer, the Borrower, the Sub-Servicers and the Administrative Agent.

"**Servicing Fee**" has the meaning specified in Clause 2.4(b) (*Interest and Fees*).

"**Servicing Fee Payment Date**" means each Monthly Settlement Date.

"**Servicing Fee Percentage**" means 2.0% per annum or, following a Servicer Default and the appointment of a successor Servicer pursuant to Clause 6 (*Administration and Collection of Receivables*), such other rate per annum as may be agreed in good faith by such successor Servicer and the Administrative Agent (with the prior written consent of the Required Lenders).

"**Servicing Fee Reserve**" means, on any date, an amount equal to

$$RB \times SRR$$

where:

| | | |
|---|---|---|
| RB | = | the Outstanding Balance of Pool Receivables at the close of business of the Servicer on such date; and |
| SRR | = | the Servicing Reserve Ratio on such date. |

"**Servicing Reserve**" means the ratio equal to the greater of (x) 0.50% and (y) the quotient of (1) the product of (i) the Servicing Fee Percentage, (ii) the highest Three Month Rolling Average of the Days Sales Outstanding over the prior twelve Calculation Periods times (iii) the Stress Factor, divided by (2) 360.

"**Servicing Reserve Ratio**" means, on any Monthly Reporting Date and continuing until (but not including) the next Monthly Reporting Date, and amount, expressed as a percentage, equal to the Servicing Reserve.

"**Settlement Date**" for any Tranche means (a) the last day of each Tranche Period for such Tranche and (b) on and after the occurrence of the Facility Termination Date, each Business Day.

"**Single Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of a Transaction Party or any ERISA Affiliate and no Person other than the Transaction Party and the ERISA Affiliates or (b) was so maintained and in respect of which any Transaction Party or any ERISA Affiliate could have liability, including, under Section 4069 of ERISA, in the event such plan has been or were to be terminated.

"**Specified Provision**" means any of the following:

(i)     Clause 4.1(a), (e), (h), (i), (j) or (q) (*Representations and Warranties of the Borrower*) or Clause 5.1(a), (b), (d), (i), (j)(ii), (o), (r), (v) or (x) (*Covenants of the Borrower*) of this Agreement;

(ii)    Clause 3.1(a), (e), (f), (g), (h) or (i) (*Representations and Warranties of the Servicer*) or Clause 4.1(a), (b), (e), (g), (j), (m), and (n)(i) (*Covenants of the Servicer*) of the Servicing Agreement; or

(iii)   Section 3.01(a)(*Corporate Existence and Power*), (e)(*Actions, Suit*s), (h) (*Accuracy of Information*), (i)(i)(*Jurisdiction of Organization, Places of Business and Locations of Records*), or (p) (*Eligible Receivables)* or Section 3.02(a)(*Representations and Warranties of Buyer*) or Section 4.01 (*Compliance with Laws, Etc.*), Section 4.02 (*Records and Procedures*), 4.05 (*Extension or Amendment of Receivables and Contracts*), 4.09 (*Separateness*), 4.10(*Change in Business, Credit and Collection Policies*), Section 4.18 (*Licenses, Etc.*) of the

Receivables Purchase Agreement or Section 4.20 (*Performance and Compliance with Contracts and Credit and Collection Policies*).

"**Standard Receivables Facility Undertakings**" means representations, warranties, covenants and indemnities entered into by Tribune or any Subsidiary that Tribune has determined in good faith to be customary in financings similar to a Receivables Facility, including, without limitation, those relating to the servicing of the assets of a Receivables Subsidiary, it being understood that any Receivables Facility Repurchase Obligation shall be deemed to be a Standard Receivables Facility Undertaking.

"**Stress Factor**" means 2.5.

"**Sub-Originator**" has the meaning specified in the Receivables Purchase Agreement.

"**Subsequent Financing Order**" means an order of the Bankruptcy Court relating to the Transaction Documents which contains substantially the same protections as the Final Order, in form and substance satisfactory to the Administrative Agent.

"**Sub-Servicer**" has the meaning specified in Clause 2.5 (*Sub-Servicers*) of the Servicing Agreement.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, trust or estate or other business entity of which (or in which) more than 50% of (a) the issued and outstanding equity having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time equity of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such limited liability company, partnership or joint venture or (c) the beneficial interest in such trust or estate or other business entity is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries, in each case, with respect to Tribune.  Unless expressly stated otherwise or the context otherwise requires, any reference to "Subsidiary" shall mean a Subsidiary of Tribune.

"**Supermajority Lenders**" means Lenders having aggregate Total Percentages that equal or exceed 66 2/3%.

"**Supplemental Report**" means any Contact Details Report or Outstanding Receivables Report.

"**Taxes**" means any and all present or future taxes, levies, imposts, duties (including stamp duties), deductions, charges or withholdings imposed by any Official Body.

"**Term Borrowing**" has the meaning specified in Clause 2.1(b) (*The Term Loan*).

"**Term Commitment**" means, of any Lender, the amount set forth on Schedule 1-B (*Lenders, Commitments and Percentages*) as its Term Commitment opposite such Lender's name.

"**Term Lender**" means each Lender that holds a Term Commitment or Term Loan.

"**Term Loan**" has the meaning specified in Clause 2.1(a) (*Restructuring of Class A Loans under Original Agreement*).

"**Term Outstandings**" means all Term Loans and all amounts payable under the Transaction Documents to the Term Lenders.

"**Three Month Rolling Average**" means, at any time and with respect to any ratio or other amount, the result obtained by (a) adding such ratio or amount from each of the three most recently ended Calculation Periods, and (b) dividing such sum by three.

"**Total Percentage**" means, as to any Lender, the ratio (expressed as a percentage) that (a) the Revolving Commitment of such Lender (or, after termination of the Revolving Commitments, the sum of the outstanding principal balance of the Revolving Loans of such Lender) plus the outstanding principal amount of the Term Loan of such Lender is over (b) the sum of (i) the Aggregate Revolving Loan Commitment (or, after the termination of the Revolving Commitments, the sum of the outstanding principal balance of the Revolving Loans) plus (ii) the outstanding principal amount of all Term Loans.

"**Total Reserves**" means, at any time, an amount equal to the sum of (a) the Loss and Dilution Reserve plus (b) the Yield and Servicing Fee Reserve.

"**Tranche**" has the meaning specified in Clause 2.10 (*Tranches*).

"**Tranche Period**" means, with respect to any Tranche (a) initially the period commencing on (and including) the applicable Borrowing Date and ending on (and including) (i) with respect to any Base Rate Loan, the next Monthly Settlement Date, and (ii) with respect to any Eurodollar Rate Loan, one or three months thereafter, as selected by the Borrower and (b) thereafter, each successive period commencing on (but excluding) the last day of the immediately preceding Tranche Period for such Tranche and ending on (and including) (i) with respect to any Base Rate Loan, the next Monthly Settlement Date, and (ii) with respect to any Eurodollar Rate Loan, the date one or three months thereafter, as selected by the Borrower; provided, however, that:

(i)       any Tranche Period (other than a Tranche Period of one day) with respect to any Tranche which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day (provided, however, that if Interest in respect of such Tranche Period is computed by reference to the Eurodollar Rate, and such Tranche Period would otherwise end on a day which is not a Business Day, and there is no subsequent Business Day in the same calendar month as such day, such Tranche Period shall end on the next preceding Business Day);

(ii)      in the case of any Tranche Period of one day (A) if such Tranche Period is the initial Tranche Period for a Tranche, such Tranche Period shall be the applicable Borrowing Date, (B) any subsequently occurring Tranche Period which is one day shall, if the immediately preceding Tranche Period is more than one day, be the

last day of such immediately preceding Tranche Period and, if the immediately preceding Tranche Period is one day, be the day next following such immediately preceding Tranche Period and (C) if such Tranche Period occurs on a day immediately preceding a day which is not a Business Day, such Tranche Period shall be extended to the next succeeding Business Day;

(iii)   in the case of any Tranche Period for any Tranche which commences before the Facility Termination Date and would otherwise end on a date occurring after the Facility Termination Date, such Tranche Period shall end on the Facility Termination Date and the duration of each Tranche Period which commences on or after the Facility Termination Date shall be as selected by the Administrative Agent;

(iv)   at any time when the Base Rate shall have been in effect for a period of 3 consecutive Business Days, and the conditions set forth in clauses (a) and (c) of the definition of Interest Rate do not exist, the Administrative Agent shall, upon one Business Day's notice to the Borrower and the Servicer, select as the next succeeding Tranche Period for such Tranche (and any subsequent Tranche Periods designated by the Administrative Agent) a period of one month during which Interest shall be computed by reference to the Eurodollar Rate; provided, however, that prior to such selection the Servicer may notify the Administrative Agent that, in view of anticipated Collections and repayments, Interest should continue to be computed by reference to the Base Rate; and

[(v)   there shall be no more than [_____] Tranche Periods at any one time.]

"**Transaction Documents**" means this Agreement, the Receivables Purchase Agreement, the Servicing Agreement, the Backup Servicing Agreement, the Security Documents, the Fee Letters, the DIP Documents and all other instruments, documents and agreements executed and/or delivered pursuant to or in connection therewith.

"**Transaction Parties**" means, collectively, the Borrower, Parent, each other Originator, the Servicer (so long as it is an Originator or an Affiliate thereof) and each Sub-Servicer (so long as it is an Originator or an Affiliate thereof).

"**Transaction Party Obligations**" means all present and future indebtedness and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due) of the Borrower or any other Transaction Party to the Secured Parties arising under or in connection with this Agreement or any other Transaction Document other than the Letter of Credit Agreement or the transactions contemplated hereby or thereby, and shall include the aggregate Principal Balance of the Loans, Interest accrued and to accrue to maturity with respect to all Tranche Periods at such time, Fees, and all other amounts owed and payable (whether or not due and payable) by the Borrower or any other Transaction Party under or in connection with this Agreement or any other Transaction Document other than the Letter of Credit Agreement (whether in respect of fees, expenses, indemnifications, breakage costs, increased costs or otherwise), including interest, fees and other obligations that

accrue after the commencement of any bankruptcy, insolvency or similar proceeding with respect to any Transaction Party (in each case whether or not allowed as a claim in such proceeding).

"**Tribune**" means Tribune Company, a corporation organized under the laws of the State of Delaware.

"**Trigger Event**" has the meaning specified in Clause 7.1 (*Trigger Events*).

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the applicable jurisdiction or jurisdictions.

"**Unapplied Cash**" means, at any time, Collections that have been received by or on behalf of the Borrower or the Servicer but have not yet been applied to the reduction of the Outstanding Balance of a Receivable.

"**Unbilled Receivable**" means a Receivable that has not yet been billed to the related Obligor.

"**Unpaid Balance**" means, with respect to any Receivable at any time, the unpaid amount of such Receivable at such time, excluding any Finance Charges.

"**Unused Fee**" has the meaning specified in Clause 2.4(c) (*Interest and Fees*).

"**Unused Fee Percentage**" means [    ]% per annum.

"**U.S.**" means the United States of America.

"**U.S. Dollars**" and "**$**" each mean the lawful currency of the United States of America.

"**Voting Stock**" means capital stock issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or Persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"**Yield Fee Reserve**" means, on any date, an amount equal to

$$AC \times YRR$$

where:

AC    =    the Aggregate Commitment at the close of business of the Servicer on such date; and

YRR    =    the Yield Reserve Ratio on such date.

"**Yield Reserve Ratio**" means, on any Monthly Reporting Date and continuing until (but not including) the next Monthly Reporting Date, an amount, expressed as a percentage, equal to the sum of the Yield Reserve.

"**Yield Reserve**" means the ratio equal to the greater of (x) 1.00% and (y) an amount equal to:

$$YR = \frac{(1.5xER) + AM \times HDSO \times SF}{360}$$

Where:

| | | |
|---|---|---|
| YR | = | Yield Reserve; |
| ER | = | the Eurodollar Rate in effect on the most recent Monthly Reporting Date; |
| AM | = | the Applicable Margin for Loans accruing interest at the Eurodollar Rate |
| HDSO | = | the highest Three Month Rolling Average of Days Sales Outstanding during the prior twelve Calculation Periods; and |
| SF | = | the Stress Factor. |

"**Yield and Servicing Fee Reserve**" means, on any date, the sum of the Yield Fee Reserve and the Servicing Fee Reserve on such date.

"**Zell**" means Samuel Zell, a natural person.

"**Zell Obligor Group**" means that Obligor Group consisting of all Obligors that are Affiliates of Zell, and all of their respective Affiliates, but excluding (i) Tribune or its direct and indirect subsidiaries and (ii) any joint venture to which Tribune or any of its direct or indirect subsidiaries is a party.

1.2    **Other Terms**

All terms defined directly or by incorporation herein shall have the defined meanings when used in any certificate or other document delivered pursuant hereto unless otherwise defined therein. For purposes of this Agreement and all such certificates and other documents, unless the context otherwise requires: (a) accounting terms not otherwise defined herein, and accounting terms partly defined herein to the extent not defined, shall have the respective meanings given to them under, and shall be construed in accordance with, GAAP; (b) references to any amount as on deposit or outstanding on any particular date means such amount at the close of business on such day; (c) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement (or the certificate or other document in which they are used) as a whole and not to any particular provision of this Agreement (or such certificate or document); (d) references to any Clause, Schedule or Exhibit are references to Clauses, Schedules and Exhibits in or to this Agreement (or the certificate or other document in which the reference is made)

and references to any paragraph, subsection, clause or other subdivision within any Clause or definition refer to such paragraph, subsection, clause or other subdivision of such Clause or definition; (e) the term "including" means "including without limitation"; (f) references to any Law refer to that Law as amended or re-enacted from time to time and include any successor Law; (g) references to any agreement refer to that agreement as from time to time amended, supplemented or novated or as the terms of such agreement are waived or modified in accordance with its terms; (h) references to any Person include that Person's successors and permitted assigns; (i) references to "setoff" shall include analogous rights under applicable Law, (j) headings are for purposes of reference only and shall not otherwise affect the meaning or interpretation of any provision hereof; (k) references to the term "continuing," in respect of a Trigger Event, Potential Trigger Event, Facility Termination Event, Potential Facility Termination Event, Servicer Default or Potential Servicer Default shall be construed as a reference to the relevant event which has not been remedied or waived in accordance with the relevant Transaction Document; (l) where in any Transaction Document there is an obligation to "perfect" a transfer, assignment, charge or other transaction, that shall be construed as an obligation to take all steps necessary in the relevant jurisdiction to perfect the transaction and any reference to "perfected" shall be construed accordingly (provided that nothing in this sub-clause (l) shall limit the obligation of any Transaction Party to give any such notice to an Obligor where and in the circumstances expressly required by the provisions of the Transaction Documents); (m) without prejudice to any provision in this Agreement or in any other Transaction Document which requires the consent, approval, authorization, assent or confirmation from the Administrative Agent (whether on its own behalf or on behalf of the Required Lenders or any other Person), in the event that any Transaction Party receives instructions from a Secured Party which, in the determination of such Transaction Party, conflict with or otherwise contradict instructions received by such Transaction Party from another Secured Party (which instructions shall be in respect of the same matter or thing), such Transaction Party shall promptly (and in any event within one Business Day) request further instructions with respect to such matter or thing from the Administrative Agent and shall treat the Administrative Agent's instructions as conclusive and determinative with respect to such matter or thing and (n) after the Originator Payout Date with respect to any Originator, that Originator will no longer be treated as an Originator for purposes of this Agreement or the other Transaction Documents, except for purposes of any provisions of the Transaction Documents which by their terms survive any termination of such Transaction Documents.

## 1.3    Computation of Time Periods

Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each means "to but excluding," and the word "within" means "from and excluding a specified date and to and including a later specified date."