**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**TRIBUNE RECEIVABLES, LLC**,
as Borrower


By:_____
Name:
Title:


**TRIBUNE COMPANY**,
as Servicer


By:_____
Name:
Title:

**BARCLAYS BANK PLC**,
as Administrative Agent


By:_____
Name:
Title:


**WELLS FARGO FOOTHILL, LLC**,
as Documentation Agent


By:_____
Name:
Title:


**THE CIT GROUP/BUSINESS CREDIT, INC.,**
as Syndication Agent


By:_____
Name:
Title:


**BARCLAYS BANK PLC**,
as a Lender for the Term Loans and as a Lender for
the Revolving Loans


By:_____
Name:
Title:


**WELLS FARGO FOOTHILL, LLC**,
as a Lender for the Term Loans and as a Lender for
the Revolving Loans


By:_____
Name:
Title:

**CIT BANK**,
as a Lender for the Term Loans and as a Lender for
the Revolving Loans


By:_____
Name:
Title:




[Signature Blocks for other Lenders to be added]

CONSENTED AND AGREED:

**BARCLAYS BANK PLC**,
as a Funding Agent for the Class A Loans
under the Original Agreement


By:_____
Name:
Title:

**BARCLAYS BANK PLC**,
as a Committed Lender for the Class A Loans
under the Original Agreement


By:_____
Name:
Title:

## SCHEDULE 1-A

## RESTRUCTURING OF CLASS A LOANS

| Lender | Term Commitment | Principal Balance of Term Loans on Closing Date | Revolving Commitment | Principal Balance of Revolving Loans on Closing Date | Aggregate Commitment |
|---|---|---|---|---|---|
| Barclays Bank PLC | $150,000,000 | | $75,000,000 | | $225,000,000 |

## SCHEDULE 1-B
## LENDERS, COMMITMENTS AND PERCENTAGES

| Lender | Term Commitment | Principal Balance of Term Loans on Closing Date | Revolving Commitment | Principal Balance of Revolving Loans on Closing Date | Revolving Percentage | Aggregate Commitment |
|---|---|---|---|---|---|---|
| Barclays Bank PLC | | | | | | |
| | | | | | | |

**SCHEDULE 2**
**ADDRESS AND NOTICE INFORMATION**

If to the Borrower:

> Tribune Receivables, LLC
> 435 N. Michigan Avenue, 6th Floor
> Chicago, IL 60611
> Attention: General Counsel
> Telecopy: (312) 222-4206

If to the Servicer:

> Tribune Company
> 435 N. Michigan Avenue, 6th Floor
> Chicago, IL 60611
> Attention: General Counsel
> Telecopy: (312) 222-4206

If to the Administrative Agent:

> Barclays Bank PLC
> 200 Park Avenue – 5th Floor
> New York, NY 10166
> Attention: Charlie Siew
> Telecopy: (212) 412-6846
>             and
> Attention: Kristin Terranova
> Telecopy: (212) 412-6846

**SCHEDULE 3**
**CREDIT AND COLLECTION POLICIES**

TRIBUNE COMPANY
FINANCE SERVICE CENTER
CREDIT AND COLLECTIONS POLICY

OBJECTIVE AND MISSION

This objective of the credit and collections policy of the Finance Service Center of Tribune Company is to carry an investments in accounts receivable and bad debt expense at a lower level than industry peers while exhibiting flexibility in risk management to allow for the maximization of advertising sales. This must be accomplished in an environment, which recognizes that market conditions and business unit cultures vary from location to location.

CREDIT GRANTING

The granting of credit is the first step in an effective Credit and Collections policy. It is the goal of the credit department to grant credit to as many advertisers as possible and find ways to enable the customer to pay within the terms of the individual business unit. The credit department strives to complete credit decisions on a timely basis and reach a decision within an average of 3 business days. Credit granting for commercial accounts should be based on a customer's liquidity, how they pay their obligations in general and most importantly, how they pay other media.

All accounts are cash-with-order until credit is, approved. In order to establish credit accounts must submit credit information before running ads on a credit basis. The preferable form for credit information is a credit application from the business unit at which the advertiser wishes to run. If an account wishes to run on credit without a credit application, as is often the case with public or well-known companies, information must still be supplied to the credit department of the Finance. Service Center. This information can take the form of an information packet provided by the advertiser, an annual report to stockholders or, in the case of an ad agency, an insertion order form delineating the liability relationship between the paper, the client and an agency. Agencies and advertisers granted credit at one business unit and meeting obligations in a timely fashion, should be accorded credit terms at all other business units handled by the Finance Service Center.

Good credit decisions are based on the judgment of the credit analyst, the commercial credit rating of the liable party (D&B rating etc.) and the market conditions affecting the advertiser and their market. At the Finance Service Center, a decision tree (attached) is used to facilitate the making of credit decisions. This concept looks at specific attributes of the advertiser and once the applicant has passed certain tests, credit is granted without further work being performed. This approach saves time and expenses in the credit granting process while still producing sound credit decisions. Accounts not qualifying under the tree should not be dismissed as bad risks and

should still be considered for credit based on other factors. Special care should be exercised when considering accounts under a year old and accounts in certain high risk categories such as restaurants, bars etc. These are generally cash-with copy until a reasonable track record of over one year in business is established. Information from sales representatives handling an account should be given weight in cases of new accounts and personal and corporate guarantees are tools to be considered when risk needs to be mitigated.

Once a credit decision has been reached, the customer and the associated sales representative handling the advertising, are notified of the outcome. This should be done in the form of a letter sent to the advertiser and a report sent to the sales staff. This action should be performed the day the credit decision is reached. On deadline situations the sales representative may wish or need to be notified of the decision immediately. In these cases a telephone call or e-mail should be used in addition to the letter sent to the advertiser.

CREDIT CONTROLS

When a new advertiser is acquired by a business unit an Account Master Record is input by the Ad Order Entry Department and a Credit Master is established when the first Insertion Order is input into the system. All new Credit Masters are automatically established by the system with a Status = New, a Credit Limit $1.00 and an Operator ID Blank. These- conditions insure that the Credit Master of the account will be sent, on-line/real time, to a Credit Queue monitored by the appropriate Credit Analyst when the first ad is ordered. It is the responsibility of the sales person to secure cash with copy for the ad or establish credit for the account prior to the first ad running.

Once an account is opened on a credit basis, it is assigned a credit limit in ADMARC. Additionally, the Status of the account is changed to Blank and an Operator ID is assigned to the appropriate collector to manage the account going forward. If the account is denied credit the Credit Limit remains at $1.00, the Status is changed to CASH, and the Operator ID is changed to that of the appropriate Cash with Copy Collector.

CREDIT LIMITS

Credit Limits are a part of the ADMARC system and a numerical value is required in the Credit Limit field in ADMARC to make the system function. As a matter of policy and practice, Credit Limits should be used only as a general guideline, based on the advertising expenditure the customer projects he/she will spend with the business unit. Credit Limits should not be rigid and inflexible, as is often the case in the traditional sense in banking or consumer finance. If a customer that has been granted credit exceeds their credit limit on a regular basis and is a customer who pays their obligations promptly, the collector assigned to the account should raise the limit to accommodate approximately 2 times the highest monthly expenditure the customer has made within the past year. This will prevent Credit Masters for over limit accounts from overloading the Hold Queues used by collectors to manage credit review and ad release for past due accounts. This philosophy is based on the, idea that incremental charges for advertising which are over limit but current risk only incremental newsprint and ink. While there is opportunity risk here, it is not the same as banking or postage for direct mail where the incremental investment is real money in the amount of the balance over the credit limit.

AGENCY/CLIENT LIABILITY AND BILLING

The question of Sole/Sequential/Dual liability is one the credit department must evaluate regularly. It is the general practice for the credit department to ask an advertising agency for sole liability, that is, the agency is held solely liable for payment regardless of whether the advertiser has paid the agency or not. This is usually true with the local agencies handling Automotive, Recruitment, or Real Estate accounts, but more agencies including the members of the Four A's (AAAA) are moving to sequential liability.

Some agencies wish to use Sequential Liability, which encompasses wording on the insertion order stating that the agency is "solely liable for payment to the extent that the advertiser has paid the agency". In this type of arrangement the agency pays for the ads if and when they have been paid. The FSC, and in many cases the sales force, have no relationship with the client and the ultimate credit and collection of the account is surrendered to the agency. This is generally not acceptable to the Credit Department and is only accommodated in some instances. The risk associated with agency default has been less than our overall bad debt of .05% of revenue.

The third type of liability arrangement is usually seen in Florida and is called care-of billing. In this case the bills are sent to the agency for review but the check is cut by the client, (as opposed to sequential liability where the check is cut by the agency). This type of billing is confusing because it requires a different account for the advertiser for each billing entity and when an advertiser changes agencies the receivables can become co-mingled. Still, the collection department can initiate collection activity with the client since the credit is in the client's name.


COMMERCIAL COLLECTIONS

TERMS OF SALE

While one objective of the Credit Department is to grant credit to as many advertisers as possible, it is imperative that payments for ads running on a credit basis be kept within the terms of sale of each individual business unit. These terms of sale and the associated practices to enforce them have grown up over time in each local market, however they all have one thing in common, all are based on an attempt by the individual papers to be paid within 30 days or less after billing.

The published terms of sale for commercial advertising for the various newspaper-publishing units of Tribune Company are as follows:

| | |
|---|---|
| Chicago Tribune | Due 15 Days After Bill Date. |
| Orlando Sentinel | Due 25 Days After Bill Date. |
| Sun Sentinel | Due 25 Days After Bill Date |
| Daily Press | Due 25 Days After Bill Date. |
| Hoy | Due 15 Days After Bill Date |
| Chicago Magazine | Net 30 |
| Chicagoland Pub. | 2% 10 Days Net 30 |

Schedule 3-3

At each of the newspaper business units the terms of sale are enforced and all customers are asked to pay within 30 days or risk having further advertising refused. No individual advertiser or advertising agency is allowed to enjoy terms of sale not enjoyed by others.

The one exception to newspaper standard terms of sale is when Advertising Networks are involved. National Newspaper Network (NNN), Florida Newspaper Advertising Network (FNAN) in which the papers have an investment, and certain state or regional press associations in which the papers are members, are allowed to pay the paper once they have been paid by the customer. This. same practice also can be accorded to other private networks such as the American Newspaper Network (ANN) if it is in the best interest of the paper to do so.

COLLECTION PROCEDURES

Collections at the Finance Service Center are primarily telephone collections.

The commercial collection staff is divided into groups or teams organized around business units or types of customers. There is a team of collectors dedicated to all ad agencies since one contact can handle all FSC newspapers. There is a team of 2 collectors dedicated to cash-with-order accounts at all FSC papers since this one type of business can be segregated by practices. There are 4 teams dedicated to direct, credit business at the papers as follows: Chicago 3, Orlando 3, Ft Lauderdale 3, Forum Publishing 2, Newport News 2. These teams also handle the collection of Hoy, Chicago Magazine, and Chicagoland Publishing accounts.

While the timing of collection actions may vary from business unit to business unit depending on p practices and stated terms, the general tool of collections is the telephone call. Calls are made td accounts 30 days old or older at the first two weeks of the month in an attempt to secure payment o resolve discrepancies for outstanding items. Between the 15th and 25th of the month the collectors switch their efforts to current balances and make courtesy calls to make sure current balances are se for payment and due to arrive before the end of the month. This proactive calling helps prevent accounts from becoming past due in the first place and helps prevent the need to defend preference payments in the event of a late payment on an account which has filed for protection under the bankruptcy act. If an account promises payment the appropriate Credit Master is dated out for review using the Review Queue in ADMARC. This is an automatic Up File, which reminds the collectors o what is due to be done each day. If a customer breaks promises to pay he establishes a track record which the collector should use to determine if ads could be run for a customer once a promise of payment is extricated.

HOLD QUEUES AND CLASSIFIED FRONT END SYSTEMS

The second collection tool available to the Commercial Collectors is the availability of the Hold Queue in ADMARC and Credit Queues/Baskets in the classified systems. All credit authorizations are done on an exception processing system at the FSC. If an account has a balance 30 days old or older it's Credit Master is flagged and put into a queue to be worked by the collector prior to deadline. This practice requires the collector to call the customer and set up a payment or promise of payment before the new ad can be released to run. This is a very effective method of collections because the customer is very receptive to making payment when

another ad is desired. All queues at the FSC are not fatal, that is, they require positive action to prevent an ad from running.

This way ads are not held up as a result of someone not acting on a queue.

OUTSIDE PLACEMENTS FOR COLLECTIONS

Regardless of how persistently a collector pursues an account, some advertisers can or will not pay for ads placed on credit. When this becomes apparent, usually between 45 and 75 days, an account should be referred to a third party for outside collection activity before it is too old to promise any recovery. Accounts placed for collection are generally placed with a commercial collection agency, which will infer that if the balance is not paid legal action, will be taken. The intervention by a third party often has the effect of bringing about collection of the account because the advertiser realizes the Credit Department is serious about collecting the obligation. In some instances, the account will be forwarded directly to an attorney for litigation if that is the appropriate thing to do. In the case of a bankruptcy, the claim form should be filled out by the Collection Coordinator and filed with the appropriate Bankruptcy Court. At this point, the account should be written of to the reserve for bad debts. All other accounts placed for collection are written off at time of placement.

TRANSIENT

Transient advertising makes up 10 to 11% of newspaper advertising at Tribune Company newspapers yet it accounts for the majority or the bad debts experienced by those newspapers. This is true of the newspaper industry in general. That is why most Private Party Classified advertising has moved to prepayment. All other Transient advertising is based on the principle that we limit exposure to bad debts through large numbers of customers, frequent billing, and assertive collections and through a finite credit limit.

The Credit Limit for Transient advertising at all newspapers is $500.00 except for Help Wanted/Recruitment, which is $1,500 at Daily Press, $2,500 in Ft Lauderdale and Orlando and $3,500 at Chicago Tribune. Customers may place ads, up to this amount, provided they have a phone number for billing purposes and have not balance over 30 days old.

Terms of payment for Transient advertising are "Due Upon Receipt Of. Invoice" and ads are billed once a week, on Sunday, for all ads run from the previous

Monday through the bill date. All bills are mailed each Monday. Accounts with a balance 30 days old or older are considered delinquent.

Delinquent accounts are aged in ADMARC and the phone number of the

advertiser is passed to the classified system at the newspaper and entered in the "Bad Phone File" in the system. All ads are passed against this file when taken and if the billing phone number of the ad is found in the bad phone file, the ad is placed in a credit queue for review by a collector. Accounts over the established credit limit are also queued in the same manner.

Credit review of accounts is accomplished by calling up the ads from the credit queue and reviewing the ad to see the copy. The customer's account from ADMARC should also be called up to see how long the account has been delinquent, the amount the account is over the credit limit, and how the account has paid in the past.

Once the above steps have been taken the account should be called by the collector and the account asked to pay. The offer of taking payment over the phone by a credit card should be made or the customer should take payment to the newspaper prior to deadline to get the ad into publication. Accounts running some time and having an established track record of payment may be allowed to run on the promise of a payment but these should be followed up by the collector using the review queue function in ADMARC. If in doubt, the collector should hold the ad from publication until the account is settled.

Accounts not paying within 90 to 120 days are charged of to bad debts and placed with a collection agency for attention. These remain in the bad phone file of the classified system at the newspaper to flag any future ads to prevent further losses.

DECISION TREE

1.    Extend a line of credit based o the current D&B rating.

| D&B Rating | Credit Limit |
| --- | --- |
| 5A1-5A2 | 200,000 |
| 4A1-4A2 | 150,000 |
| 3A1-3A2 | 100,000 |
| 2A1-2A2 | 75,000 |
| 1A1-1A2 | 50,000 |
| BA1-BA2 | 30,000 |
| BB1-BB2 | 20,000 |
| CB1-CB2 | 10,000 |

In the absence of the above ratings the guidelines will be as follows:

2.    A line of credit up to $150,000 may be extended on a full D&B report.

3.    In the absence of a D&B report, a credit limit may be extended based on two satisfactory media references

4.    In the absence of a D&B rating, D&B report or trade references, a line of credit (based on requirements) may be extended on a bank reference, personal credit report, and guaranty.

5.    Customer has a line of credit with another Tribune property.

6.    Opened at credit manager's discretion.

7.    A line of credit based on requirements may be extended to transient accounts with a satisfactory six month payment history.

8.   A line of credit (based on requirements) may be extended based on a corporate guaranty for a company that has established credit.

9.   Credit may be extended based on an irrevocable letter of credit when there is unsatisfactory or a lack of credit information.

10.  In the absence of a D&B report and media references, a line of credit as required may be extended based on two satisfactory references (reporting prompt payment histories).

11.  Customer signed an agreement to abide by our terms.

12.  In the absence of a D&B rating, a business that has been in existence for at least one year and can provide one credit reference showing a prompt pay history for one year or longer may be extended a credit limit up to $1,000, provided no additional references can be obtained.

13.  A line of credit may be extended to a cash-with-order accounts based on a satisfactory six-month prepayment history.

Courtesy Lines On Commercial Accounts:

A courtesy line of $3,500 may be extended to an account in order to run Redeye recruitment ads.

A courtesy line of $5,000 may be extended to Chicago Magazine account provided that billed exposure does not exceed that amount.

One Time Passes - Additional Ads Revert To Cash With Order

A one-time pass can be given in any publication to a customer whose schedule is valued at less than $500, such as Dinner Banner ads.

A. one-time pass can be given to new advertisers for town sections and other special sections provided the value of the ad is less than $1,500.

A one-time pass up to the Transient Recruitment limits for each newspaper for Display and Classified ads.

Passes may be given when needed for job fair packages up to $1,000.

## SCHEDULE 4
## CONDITION PRECEDENT DOCUMENTS

PART I:    Principal Closing Documents

1.    Executed copies of the Receivables Purchase Agreement, duly executed by the parties thereto.

2.    Executed copies of this Agreement, duly executed by the parties thereto.

3.    Executed copies of the Servicing Agreement, duly executed by the parties thereto.

4.    Copy of the Backup Servicing Agreement, duly executed by the parties thereto and certified by the Servicer.

5.    Copy of the Account Control Agreements with Bank of America and JPMorgan Chase Bank, N.A., duly executed by the parties thereto and certified by the Servicer.

6.    Copy of the Security Agreement, duly executed by the parties thereto and certified by the Servicer.

7.    Executed copies of Amendment No. 1 to Security Agreement, duly executed by the parties thereto.

8.    Executed copies of the Guaranty Security Agreement, duly executed by the parties thereto.

9.    Copy of the Senior Credit Agreement, duly executed by the parties thereto and certified by the Servicer.

10.    Fee Letters duly executed by the parties thereto.

11.    Executed copies of Subsequent Financing Order.

PART II:    Corporate Documents

8.    Copy of the Resolutions of the Board of Directors of each Originator and each Guarantor certified by its Secretary, authorizing execution, delivery and performance of the Receivables Purchase Agreement and/or other documents to be delivered by it thereunder, and, in the case of Tribune, stating that Borrower is not a "Restricted Subsidiary" for purposes of any existing indenture (and making any other designation required for execution of the Receivables Purchase Agreement under any existing indenture).

9.    Articles or Certificate of Incorporation or formation of each Originator and each Guarantor certified by its Secretary.

10.    Current Bylaws or Limited Liability Company Agreement for each Originator and each Guarantor.

11.    Good Standing Certificate for each Originator and each Guarantor issued by the Secretaries of State of its state of incorporation or organization on or within thirty (30) days prior to the initial Loan (as defined in the Receivables Purchase Agreement) as listed on Exhibit II (*Places of Business; Jurisdiction of Organization; Organizational Numbers; Other Names*) to the Receivables Purchase Agreement.

12.    Officer's Certificate of each Originator and each Guarantor certifying its charter documents and the names and signatures of the officers authorized on its behalf to execute the Receivables Purchase Agreement and/or other documents.

13.    Copy of the Resolutions of the Board or Directors of the Borrower certified by its Secretary authorizing such person's execution, delivery and performance of the Receivables Loan Agreement and the other documents to be delivered thereunder.

14.    Certificate of Formation of the Borrower certified by the Secretary of State of its jurisdiction of organization on or within 30 days prior to the initial Loan.

15.    Limited Liability Company Agreement of Borrower.

16.    Good Standing Certificate for the Borrower issued by the Secretaries of State of its jurisdiction of organization and where it has material operations on or within 30 days prior to the initial Purchase.

17.    Officer's Certificate of the Borrower certifying its charter documents, the names and signatures of the officers authorized on its behalf to execute the Receivables Loan Agreement and any other documents to be delivered by it hereunder.

18.    Officer's certificate of the Borrower certifying that (i) the conditions precedent to the initial Loans have been satisfied and (ii) no Facility Event has occurred and is continuing.

PART III:    Legal Opinions

19.    Opinions of legal counsel for each Transaction Party and each Guarantor (other than ForSaleByOwner.com Referral Services, LLC, North Orange Avenue Properties, Inc., New River Center Maintenance Association, Inc., New Mass Media, Inc., Times Mirror Land and Timber Company, Homeowners Realty, Inc., and Publishers Forest Products of Washington) acceptable to Administrative Agent (or its assigns) reasonably acceptable in form and in substance to the Administrative Agent.

PART V:    Miscellaneous Closing Documents

21.    Executed copies of (i) all consents from and authorizations by any Persons and (ii) all waivers and amendments to existing credit facilities, that are necessary in connection with the Transaction Documents.

22.    Executed copies of the Intercompany Note by Borrower in favor of Parent.

23.    A Compliance Certificate with initial Monthly Report and Interim Report.

24.    Withholding Tax Forms such as W-9 or W8 BEN.

[25.    Written confirmation from (i) Moody's that the Revolving Loans and the Term Loans contemplated by the Transaction Documents have each received a [___] rating and (ii) S&P that the Revolving Loans and the Term Loans contemplated by the Transaction Documents have each received a [___] rating.]

26.    Preliminary unaudited financial statement for Parent and its Subsidiaries for Parent's 2008 fiscal year, which shall not be required to include footnotes.

Schedule 4-3

## SCHEDULE 5
## FACILITY ACCOUNTS AND ACCOUNT BANKS

| Bank | Account Name | Legal Name | Account Number | Lockbox Number and Address |
|---|---|---|---|---|
| Bank of America | WGN Continental Broadcasting Company | WGN Continental Broadcasting Company | 8188303406 | No Lockbox |
| Bank of America | Los Angeles Times Communications LLC, as sub-servicer for Tribune Receivables, LLC | Los Angeles Times Communications LLC | 8188508912 | File 51163 Los Angeles, CA 90074<br><br>File 54221 Los Angeles, CA 90074 |
| Bank of America | Los Angeles Times Communications LLC, as sub-servicer for Tribune Receivables, LLC | Los Angeles Times Communications LLC | 8188508917 | No Lockbox |
| Bank of America | Chicago Tribune Company, as sub-servicer for Tribune Receivables, LLC | Chicago Tribune Company | 8188300559 | 14889 Collections Center Dr. Chicago, IL 60693<br><br>14839 Collections Center Dr. Chicago, IL 60693 |

| Bank of America | Sun Sentinel Company, as sub-servicer for Tribune Receivables, LLC | Sun Sentinel Company | 8188602665 | P.O. Box 100621 Atlanta, GA 30384 |
| --- | --- | --- | --- | --- |
| | | | | P.O. Box 100606 Atlanta, GA 30384 |
| Bank of America | Forum Publishing Group, Inc., as sub-servicer for Tribune Receivables, LLC | Forum Publishing Group, Inc. | 8188911286 | P.O. Box 100773 Atlanta, GA 30384 |
| | | | | P.O. Box 100641 Atlanta, GA 30384 |
| Bank of America | Forum Publishing Group, Inc., as sub-servicer for Tribune Receivables, LLC | Forum Publishing Group, Inc. | 8188911285 | No Lockbox |
| Bank of America | Orlando Sentinel Communications Company, as sub-servicer for Tribune Receivables, LLC | Orlando Sentinel Communications Company | 8188702556 | P.O. Box 100630 Atlanta, GA 30384 |
| | | | | P.O. Box 100608 Atlanta, GA 30384 |
| | | | | P.O. Box 100606 Atlanta, GA 30384 |
| Bank of America | Orlando Sentinel Communications Company, as sub-servicer for Tribune Receivables, LLC | Orlando Sentinel Communications Company | 8188502557 | No Lockbox |

| | | | | |
|---|---|---|---|---|
| Bank of America | The Hartford Courant Company, as sub-servicer for Tribune Receivables, LLC | The Hartford Courant Company | 8188316178 | P.O. Box 40215 Hartford, CT 06150 |
| Bank of America | The Daily Press, Inc., as sub-servicer for Tribune Receivables, LLC | The Daily Press, Inc. | 8188108438 | P.O. Box 100634 Atlanta, GA 30384 |
| | | | | P.O. Box 100611 Atlanta, GA 30384 |
| | | | | P.O. Box 100790 Atlanta, GA 30384 |
| Bank of America | The Daily Press, Inc., as sub-servicer for Tribune Receivables, LLC | The Daily Press, Inc. | 8188202785 | No Lockbox |
| Bank of America | The Morning Call, Inc., as sub-servicer for Tribune Receivables, LLC | The Morning Call, Inc. | 8188507187 | P.O. Box 3226 Boston, MA 02241-3226 |
| Bank of America | The Morning Call, Inc., as sub-servicer for Tribune Receivables, LLC | The Morning Call, Inc. | 8188413099 | No Lockbox |
| Bank of America | The Baltimore Sun Company, as sub-servicer for Tribune Receivables, LLC | The Baltimore Sun Company | 8188507229 | P.O. Box 3132 Boston, MA 02241 |
| | | | | P.O. Box 415215 Boston, MA 02241 |

Schedule 5-3

| | | | | |
|---|---|---|---|---|
| Bank of America | Tribune Interactive, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Interactive, Inc. | 8188611051 | 14891 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | KTLA Inc., as sub-servicer for Tribune Receivables, LLC | KTLA Inc. | 1233254161 | File 11155 Los Angeles, CA 90074 |
| Bank of America | WGN Continental Broadcasting Company, as sub-servicer for Tribune Receivables, LLC | WGN Continental Broadcasting Company | 8188503165 | 98473 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | WGN Continental Broadcasting Company, as sub-servicer for Tribune Receivables, LLC | WGN Continental Broadcasting Company | 8188303166 | 98519 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | KHCW Inc., as sub-servicer for Tribune Receivables, LLC | KHCW Inc. (now KIAH Inc.) | 1233071096 | P.O. Box 843744 Dallas, TX 75284 |
| Bank of America | WDCW Broadcasting, Inc., as sub-servicer for Tribune Receivables, LLC | WDCW Broadcasting, Inc. | 3751844428 | 22264 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | Tribune Television Northwest, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Television Northwest, Inc. | 1233930374 | File 30697 P.O. Box 60000 San Francisco, CA 94160 |
| Bank of America | WTIC-TV, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company | 8188912658 | 3562 Collections Center Dr. Chicago, IL 60693 |

| | | | | |
|---|---|---|---|---|
| Bank of America | Tower Distribution Company, as sub-servicer for Tribune Receivables, LLC | Tower Distribution Company | 8188313245 | 5980 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | KSWB Inc., as sub-servicer for Tribune Receivables, LLC | KSWB Inc. | 1233322094 | File 749011 Los Angeles, CA 90074 |
| Bank of America | Tribune Broadcast Holdings, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Broadcast Holdings, Inc. | 8188015458 | File 30691 P.O. Box 60000 San Francisco, CA 94160 |
| Bank of America | Tribune Television Company, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company | 8188507200 | 15190 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | Channel 39, Inc., as sub-servicer for Tribune Receivables, LLC | Channel 39, Inc. | 8188507224 | P.O. Box 277122 Atlanta, GA 30384 |
| Bank of America | Channel 40, Inc., as sub-servicer for Tribune Receivables, LLC | Channel 40, Inc. | 8188507182 | File 51150 Los Angeles, CA 90074 |
| Bank of America | Tribune Television Company, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company | 8188507205 | 15247 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | Tribune Television Holdings, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Television Holdings, Inc. | 8188509020 | 15252 Collections Center Dr. Chicago, IL 60693 |
| JPMorgan Chase Bank | WPIX, Inc., as sub-servicer for Tribune Receivables, LLC | WPIX, Inc. | 9102470128 | No Lockbox |

9206336.20 08141696                                    Schedule 5-5

| | | | | |
|---|---|---|---|---|
| JPMorgan Chase Bank | WPIX, Inc., as sub-servicer for Tribune Receivables, LLC | WPIX, Inc. | 5261740 | 13831 Brooklyn, NY |
| JPMorgan Chase Bank | WGN Continental Broadcasting Company, as sub-servicer for Tribune Receivables, LLC | WGN Continental Broadcasting Company | 323383009 | 26918 Brooklyn, NY |
| JPMorgan Chase Bank | Tribune Television Company, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company (KDAF) | 1887512059 | 970585 Dallas, Tx |
| JPMorgan Chase Bank | Tribune Television Company, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company (WXIN) | 193078128 | 663698 Indianapolis, IN |
| JPMorgan Chase Bank | Tribune Television New Orleans, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Television New Orleans, Inc. | 110293568 | 62019 New Orleans, LA |
| JPMorgan Chase Bank | Chicagoland Television News, Inc., as sub-servicer for Tribune Receivables, LLC | Chicagoland Television News, Inc. | 5257085 | 93094 Chicago, IL |
| Wachovia Bank | The Morning Call, Inc. Advertising | The Morning Call, Inc. | 20000303723529 | No Lockbox |
| [M&T Bank | Baltimore Sun Advertising | The Baltimore Sun Company | 17795065 | No Lockbox |
| Wachovia Bank | Forum Publishing Group Inc. Credit Card | Forum Publishing Group, Inc. | 2090002084485 | No Lockbox |
| Suntrust Bank | Sun-Sentinel Advertising | Sun Sentinel Company | 401000390550 | No Lockbox |
| Mellon Bank | The Hartford Courant Credit Card | The Hartford Courant Company | 178-2649 | No Lockbox |
| Union Bank | KTXL-TV | Channel 40, Inc. | 750410022 | No Lockbox |
| National City Bank | WPHL-TV | Tribune Television Company | 0935-025 | No Lockbox |
| Suntrust Bank | WSFL-TV | Channel 39, Inc. | 418006046781 | No Lockbox] |

**Borrower
Concentration
Accounts**

| | | | | |
|---|---|---|---|---|
| Bank of America | Tribune Receivables LLC | Tribune Receivables, LLC | 8188509303 | No Lockbox |
| JPMorgan Chase Bank | Tribune Receivables, LLC | Tribune Receivables, LLC | 754223311 | No Lockbox] |

[Confirm that payments that were being made to these Accounts have been redirected to Facility Accounts at BofA or JPM.]

## SCHEDULE 6
## FISCAL MONTHS

| Fiscal 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **M** | **T** | **W** | **TH** | **F** | **SA** | **SU** |
| **1** | 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25* |
| | 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| **2** | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22* |
| | 23 | 24 | 25 | 26 | 27 | 28 | 1 |
| **3** | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| | 23 | 24 | 25 | 26 | 27 | 28 | 29* |
| **4** | 30 | 31 | 1 | 2 | 3 | 4 | 5 |
| | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 20 | 21 | 22 | 23 | 24 | 25 | 26* |
| **5** | 27 | 28 | 29 | 30 | 1 | 2 | 3 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| **6** | 25 | 26 | 27 | 28 | 29 | 30 | 31* |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28* |
| **7** | 29 | 30 | 1 | 2 | 3 | 4 | 5 |
| | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 20 | 21 | 22 | 23 | 24 | 25 | 26* |
| | 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| **8** | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| | 24 | 25 | 26 | 27 | 28 | 29 | 30* |
| **9** | 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27* |
| **10** | 28 | 29 | 30 | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25* |
| **11** | 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| **12** | 23 | 24 | 25 | 26 | 27 | 28 | 29* |
| | 30 | 1 | 2 | 3 | 4 | 5 | 6 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27* |

\* Broadcast month end

| Fiscal 2010 | | | | | | |
|---|---|---|---|---|---|---|
| **M** | **T** | **W** | **TH** | **F** | **SA** | **SU** |

| | M | T | W | TH | F | SA | SU |
|---|---|---|---|---|---|---|---|
| **1** | 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| | 25 | 26 | 27 | 28 | 29 | 30 | 31* |
| **2** | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28* |
| **3** | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28* |
| **4** | 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25* |
| **5** | 26 | 27 | 28 | 29 | 30 | 1 | 2 |
| | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| **6** | 24 | 25 | 26 | 27 | 28 | 29 | 30* |
| | 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27* |
| **7** | 28 | 29 | 30 | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 | 24 | 25* |
| | 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| **8** | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| | 23 | 24 | 25 | 26 | 27 | 28 | 29* |
| **9** | 30 | 31 | 1 | 2 | 3 | 4 | 5 |
| | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 20 | 21 | 22 | 23 | 24 | 25 | 26* |
| **10** | 27 | 28 | 29 | 30 | 1 | 2 | 3 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| **11** | 25 | 26 | 27 | 28 | 29 | 30 | 31* |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| **12** | 22 | 23 | 24 | 25 | 26 | 27 | 28* |
| | 29 | 30 | 1 | 2 | 3 | 4 | 5 |
| | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 20 | 21 | 22 | 23 | 24 | 25 | 26* |

* Estimated broadcast month end

**SCHEDULE 7**
**BROADCASTING ORIGINATORS**

ChicagoLand Television News, Inc.

Tribune Broadcast Holdings, Inc.

Tribune Television Holdings, Inc.

WGN Continental Broadcasting Company

WPIX, Inc.

Tribune Television New Orleans, Inc.

KSWB Inc.

KTLA Inc.

KIAH Inc.

Tower Distribution Company

Tribune Television Northwest, Inc.

Tribune Television Company

Channel 40, Inc.

Channel 39, Inc.

WDCW Broadcasting, Inc.

**SCHEDULE 8**
**PUBLISHING ORIGINATORS**

Tribune Interactive, Inc.

Los Angeles Times  Communications LLC

Orlando Sentinel Communications Company

Sun-Sentinel Company

Gold Coast Publications, Inc.

Forum Publishing Group, Inc.

The Daily Press, Inc.

Chicago Tribune Company

The Baltimore Sun Company

The Hartford Courant Company

The Morning Call, Inc.

[Tribune Media Services, Inc.]

**SCHEDULE 9**
**FILING SUB-ORIGINATORS**

Chicagoland Television News, Inc.,

Tribune Broadcast Holdings, Inc.,

Tribune Television Holdings, Inc.,

WGN Continental Broadcasting Company,

WPIX, Inc.,

Tribune Television New Orleans, Inc.,

KSWB, Inc.,

KTLA, Inc.,

KIAH, Inc.,

Tower Distribution Company,

Tribune Television Northwest, Inc.,

Tribune Television Company,

Channel 40, Inc.,

Channel 39, Inc.,

Los Angeles Times Communications LLC,

WDCW Broadcasting, Inc.,

Orlando Sentinel Communications Company,

Sun-Sentinel Company,

Gold Coast Publications, Inc.,

Forum Publishing Group, Inc.,

The Daily Press, Inc.,

Chicago Tribune Company,

The Baltimore Sun Company,

The Hartford Courant Company,

The Morning Call, Inc.

[Tribune Media Services, Inc.]

**SCHEDULE 10**

**LENDERS' ACCOUNTS**

**[Insert Applicable Account Information]**

## EXHIBIT A

## ASSIGNMENT AND ACCEPTANCE

THIS ASSIGNMENT AND ACCEPTANCE (this "**Assignment and Acceptance**") is entered into as of the ____ day of _____, ____, by and between _____ ("**Assignor**") and _____ ("**Assignee**").

## PRELIMINARY STATEMENTS

A.    This Assignment and Acceptance is being executed and delivered in accordance with Clause 10.3 (*Assignability*) of that certain Amended and Restated Receivables Loan Agreement dated as of April 10, 2009 by and among Tribune Receivables, LLC, Tribune Company, as Servicer, Barclays Bank PLC, as Administrative Agent, and the Lenders party thereto (as amended, modified or restated from time to time, the "**Receivables Loan Agreement**"). Capitalized terms used and not otherwise defined herein are used with the meanings set forth or incorporated by reference in the Receivables Loan Agreement [or the RAPA, as applicable].

B.    Assignor is a Lender party to the Receivables Loan Agreement [and an Assignee party to the RAPA], and Assignee wishes to become a Lender [and Assignee] under the Receivables Loan Agreement; and

C.    Assignor is selling and assigning to Assignee an undivided _____% (the "**Transferred Percentage**") interest in all of Assignor's rights and obligations under the Receivables Loan Agreement and the Transaction Documents, including, without limitation, Assignor's Commitment and (if applicable) the Principal Balance of Assignor's Loans as set forth herein.

## AGREEMENT

The parties hereto hereby agree as follows:

1.    The sale, transfer and assignment effected by this Assignment and Acceptance shall become effective (the "**Effective Date**") two (2) Business Days (or such other date selected by the Administrative Agent in its sole discretion) following the date on which a notice substantially in the form of Schedule II to this Assignment and Acceptance ("**Effective Notice**") is delivered by the Administrative Agent to Borrower, Assignor and Assignee. From and after the Effective Date, Assignee shall be a [Term] [Revolving] Lender party to the Receivables Loan Agreement and an APA Bank party to the APA for all purposes thereof as if Assignee were an original party thereto and Assignee agrees to be bound by all of the terms and provisions contained therein.

2.    If Assignor has no outstanding Principal Balance under the Receivables Loan Agreement, on the Effective Date, Assignor shall be deemed to have hereby transferred and assigned to Assignee, without recourse, representation or warranty (except as provided in paragraph 6 below), and the Assignee shall be deemed to have hereby irrevocably taken, received and assumed from Assignor, the Transferred Percentage of Assignor's Commitment and

all rights and obligations associated therewith under the terms of the Receivables Loan Agreement, including, without limitation, the Transferred Percentage of Assignor's future funding obligations under Section 2.1 of the Receivables Loan Agreement.

3.      If Assignor has any outstanding Principal Balance under the Receivables Loan Agreement, at or before 12:00 noon, local time of Assignor, on the Effective Date Assignee shall pay to Assignor, in immediately available funds, an amount equal to the sum of (i) the Transferred Percentage of the outstanding Principal Balance of Assignor's Loans (such amount, being hereinafter referred to as the "**Assignee's Principal Balance**"); (ii) all accrued but unpaid (whether or not then due) Yield attributable to Assignee's Principal Balance; and (iii) accruing but unpaid fees and other costs and expenses payable in respect of Assignee's Principal Balance for the period commencing upon each date such unpaid amounts commence accruing, to and including the Effective Date (the "**Assignee's Acquisition Cost**"); whereupon, Assignor shall be deemed to have sold, transferred and assigned to Assignee, without recourse, representation or warranty (except as provided in paragraph 6 below), and Assignee shall be deemed to have hereby irrevocably taken, received and assumed from Assignor, the Transferred Percentage of Assignor's Commitment and the Principal Balance of Assignor's Loans (if applicable) and all related rights and obligations under the Receivables Loan Agreement and the Transaction Documents, including, without limitation, the Transferred Percentage of Assignor's future funding obligations under Clause 2.1 (*The Loans*) of the Receivables Loan Agreement.

4.      Concurrently with the execution and delivery hereof, Assignor will provide to Assignee copies of all documents requested by Assignee which were delivered to Assignor pursuant to the Receivables Loan Agreement.

5.      Each of the parties to this Assignment and Acceptance agrees that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Assignment and Acceptance.

6.      By executing and delivering this Assignment and Acceptance, Assignor and Assignee confirm to and agree with each other, the Administrative Agent and the Lenders as follows: (a) other than the representation and warranty that it has not created any Adverse Claim upon any interest being transferred hereunder, Assignor makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made by any other Person in or in connection with the Receivables Loan Agreement or the Transaction Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of Assignee, the Receivables Loan Agreement or any other instrument or document furnished pursuant thereto or the perfection, priority, condition, value or sufficiency of any collateral; (b) Assignor makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower, any Obligor, any Transaction Party or the performance or observance by the Borrower, any Obligor, any Transaction Party of any of their respective obligations under the Transaction Documents or any other instrument or document furnished pursuant thereto or in connection therewith; (c) Assignee confirms that it has received a copy of the Receivables Loan Agreement and copies of such other Transaction Documents, and other documents and information as it has requested and deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (d) Assignee will,

Exhibit A-2

independently and without reliance upon the Administrative Agent, the Borrower or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Receivables Loan Agreement and the Transaction Documents; (e) Assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Transaction Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto; and (f) Assignee agrees that it will perform in accordance with their terms all of the obligations which, by the terms of the Receivables Loan Agreement and the other Transaction Documents, are required to be performed by it as a Lender.

7.      Each party hereto represents and warrants to and agrees with the Administrative Agent that it is aware of and will comply with the provisions of the Receivables Loan Agreement, including, without limitation, Clause 2.10 *(Tranches)* thereof.

8.      Schedule I hereto sets forth the revised Commitment of Assignor and the Commitment of Assignee, as well as administrative information with respect to Assignee.

9.      THIS ASSIGNMENT AND ACCEPTANCE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS.

10.      Assignee hereby covenants and agrees that, prior to the date which is one year and one day after the payment in full of all senior indebtedness for borrowed money of Borrower, it will not institute against, or join any other Person in instituting against, Borrower any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or other similar proceeding under the laws of the United States or any state of the United States.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective duly authorized officers of the date hereof.

[ASSIGNOR]


By:_____
Title:

[ASSIGNEE]

By:_____
Title:

SCHEDULE I TO ASSIGNMENT AND ACCEPTANCE

LIST OF LENDING OFFICES, ADDRESSES
FOR NOTICES AND COMMITMENT AMOUNTS

Date: _____, _____

Transferred Percentage:    _____%

**Assignor:**

|  | Commitment (prior to giving effect to the Assignment and Acceptance) | Commitment (after giving effect to the Assignment and Acceptance) | Outstanding Principal Balance (if any) | Ratable Share of Outstanding Principal Balance |
|---|---|---|---|---|
| **Revolving Loan** |  |  |  |  |
| **Term Loan** |  |  |  |  |
| **Total** |  |  |  |  |

**Assignee:**

|  | Commitment (prior to giving effect to the Assignment and Acceptance) | Commitment (after giving effect to the Assignment and Acceptance) | Outstanding Principal Balance (if any) | Ratable Share of Outstanding Principal Balance |
|---|---|---|---|---|
| **Revolving Loan** |  |  |  |  |
| **Term Loan** |  |  |  |  |
| **Total** |  |  |  |  |

**<u>Address for Notices</u>**

Attention:
Phone:
Fax:

9206336.20 08141696                          Exhibit A-4

SCHEDULE II TO ASSIGNMENT AND ACCEPTANCE

EFFECTIVE NOTICE

TO: _____, Assignor

_____

_____

_____

TO: _____, Assignee

_____

_____

_____

The undersigned, as Administrative Agent under the Amended and Restated Receivables Loan Agreement dated as of April 10, 2009 by and among Tribune Receivables, LLC as Borrower, Tribune Company, as Servicer, Barclays Bank PLC, as Administrative Agent, and the Lenders party thereto, hereby acknowledges receipt of executed counterparts of a completed Assignment and Acceptance dated as of _____, \_\_\_\_ between _____, as Assignor, and _____, as Assignee.  Terms defined in such Assignment and Acceptance are used herein as therein defined.

1.    Pursuant to such Assignment and Acceptance, you are advised that the Effective Date will be _____, \_\_\_\_.

[2.      Pursuant to such Assignment and Acceptance, the Assignee is required to pay
$_____ to Assignor at or before 12:00 noon (local time of Assignor) on the Effective
Date in immediately available funds.]

Very truly yours,

BARCLAYS BANK PLC,
individually and as Administrative Agent

By:_____
Title:_____

[ASSIGNEE]

By:_____
Title:   Authorized Signer

## EXHIBIT B

## FORM OF INCREMENTAL BORROWING REQUEST

[Date]


Barclays Bank PLC, as
Administrative Agent
[Address]


Re:   INCREMENTAL BORROWING REQUEST


Ladies and Gentlemen:

Reference is hereby made to the Amended and Restated Receivables Loan Agreement, dated as of April 10, 2009, by and among Tribune Receivables, LLC (the "Borrower"), Tribune Company, as Servicer, the Lenders party thereto, and Barclays Bank PLC, as Administrative Agent (the "Receivables Loan Agreement"). Capitalized terms used herein shall have the meanings assigned to such terms in the Receivables Loan Agreement.

The Borrower hereby requests the following Incremental Borrowing:

| 1. | Amount of Incremental Borrowing: | $_____ |
|----|----------------------------------|--------|
| 2. | Cash Reserve Account Amount: | $_____ |
| 3. | Wire Transfer Amount to Borrower (Line 1 minus Line 2) | $_____ |
| 4. | Desired Incremental Borrowing Date: | _____ |
| 5. | Rate Type: | _____ |
| 6. | Tranche Period | _____ |

Please credit the Cash Reserve Account Amount in immediately available funds to the Cash Reserve Account [and then wire-transfer the balance of the Incremental Borrowing in immediately available funds on the above-specified Incremental Borrowing Date to:

[Account Name]
[Account No.]
[Bank Name & Address]
[ABA #]
Reference:
Telephone advice to: [Name] @ tel. No. ( )

Please advise [Name] at telephone no ( ) _____ if the Lenders will not be making this Incremental Borrowing.

In connection with the Incremental Borrowing to be made on the above listed Incremental Borrowing Date, the Borrower hereby certifies that the following statements are true on the date hereof, and will be true on the Incremental Borrowing Date (before and after giving effect to the proposed Incremental Borrowing):

(i)    the representations and warranties of the Borrower set forth in Section 4.1 of the Receivables Loan Agreement are true and correct on and as of the Incremental Borrowing Date as though made on and as of such date;

(ii)    no event has occurred and is continuing, or would result from the proposed Incremental Borrowing, that will constitute a Trigger Event, Potential Trigger Event, Facility Termination Event or a Potential Facility Termination Event;

(iii)    the Facility Termination Date has not occurred;

(iv)    the Percentage Factor does not exceed the Maximum Percentage Factor and the Aggregate Principal Balance does not exceed the Aggregate Commitment; and

(iv)    the amount of the Aggregate Principal Balance is $_____ after giving effect to the Incremental Borrowing to be made on the Incremental Borrowing Date.

Very truly yours,


TRIBUNE RECEIVABLES, LLC

By:_____
Name:
Title:

## EXHIBIT C

## FORM OF PREPAYMENT NOTICE

Barclays Bank PLC, as
Administrative Agent
[Address]

Re:  PREPAYMENT NOTICE

Ladies and Gentlemen:

Reference is hereby made to the Amended and Restated Receivables Loan Agreement, dated as of April 10, 2009, by and among Tribune Receivables, LLC (the "Borrower"), Tribune Company, as Servicer, the Lenders party thereto, and Barclays Bank PLC, as Administrative Agent (the "Receivables Loan Agreement").  Capitalized terms used herein shall have the meanings assigned to such terms in the Receivables Loan Agreement.

The Borrower hereby notifies the Administrative Agent that it wishes to make the following prepayment in accordance with Clause 2.5(b)(*Payment and Prepayment of Loans*) of the Receivables Loan Agreement:

| | |
|---|---|
| Calculation of Prepayment Amount: | |
| Principal: | $_____ |
| Interest: | $_____ |
| Breakage Costs: | $_____ |
| Amount of Revolving Loans to be prepaid: | $_____ |
| Amount of Term Loans to be prepaid: | $_____ |
| Total Prepayment Amount: | $_____ |
| Desired Date of Prepayment: | _____ |

| Tranches to which such prepayment is to be applied (note that prepayments must be allocated in accordance with Section 2.5(b).) | _____ |
|---|---|

Please contact [Name] at telephone no ( ) _____ if you have any questions about this request.

Very truly yours,

TRIBUNE RECEIVABLES, LLC

By:_____

Name:

**EXHIBIT D-1**

**FORM OF TERM NOTE**

$[        ]                                                    [        ], 20[__]

FOR VALUE RECEIVED, the undersigned, TRIBUNE RECEIVABLES, LLC, a Delaware limited liability company (the "Borrower"), promises to pay to the order of [_____] (the "Lender") on April 10, 2010 (or such earlier date as may be specified in the Receivables Loan Agreement referenced below) the principal sum of [_____] DOLLARS ($[_____]) or, if less, the aggregate unpaid principal amount of the Term Loan made by Lender, as shown in the records of the Lender, pursuant to that certain Amended and Restated Receivables Loan Agreement, dated as of April 10, 2009 (together with all amendments and other modifications, if any, from time to time thereafter made thereto, the "Receivables Loan Agreement"), among the Borrower, Tribune Company, as Servicer, Barclays Bank PLC, as Administrative Agent, and the various Lenders (including the Lender) as are, or may from time to time become, parties thereto as Lenders.

The Borrower also promises to pay Interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until the Facility Termination Date (whether by acceleration or otherwise) and, after the Facility Termination Date, until the Final Payout Date, at the rates per annum and on the dates specified in the Receivables Loan Agreement.

Payments of both principal and interest are to be made in lawful money of the United States of America in same day or immediately available funds to the account designated by the Administrative Agent pursuant to the Receivables Loan Agreement.

This Term Note is one of the Term Notes referred to in, and evidences Indebtedness incurred under, the Receivables Loan Agreement, to which reference is made for a description of the security for this Note and for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments of principal of the Indebtedness evidenced by this Note and on which such Indebtedness may be declared to be immediately due and payable. Unless otherwise defined, capitalized terms used herein have the meanings provided in the Receivables Loan Agreement.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

**THIS TERM NOTE HAS BEEN DELIVERED IN NEW YORK CITY, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK.**

This Term Note is issued in partial replacement of the Note dated July 1, 2008 issued by the Borrower to Barclays Bank PLC (the "Original Note"). This Term Note evidences the debt

evidenced by the Original Note and is not intended to be, nor shall it be deemed to be, a prepayment or novation of such debt or a release of the liens evidenced by such Original Note.

TRIBUNE RECEIVABLES, LLC


By:_____
          Name:
          Title:

EXHIBIT D-2

FORM OF REVOLVING NOTE

$[        ]                                                              [        ], 20[__]

FOR VALUE RECEIVED, the undersigned, TRIBUNE RECEIVABLES, LLC, a Delaware limited liability company (the "Borrower"), promises to pay to the order of [_____] (the "Lender") on April 10, 2010 (or such earlier date as may be specified in the Receivables Loan Agreement referenced below) the principal sum of [_____] DOLLARS ($[_____]) or, if less, the aggregate unpaid principal amount of all Revolving Loans shown on the schedule attached hereto (and any continuation thereof), or in the records of the Lender, made by the Lender pursuant to that certain Amended and Restated Receivables Loan Agreement, dated as of April 10, 2009 (together with all amendments and other modifications, if any, from time to time thereafter made thereto, the "Receivables Loan Agreement"), among the Borrower, Tribune Company, as Servicer, Barclays Bank PLC, as Administrative Agent, and the various Lenders (including the Lender) as are, or may from time to time become, parties thereto as Lenders.

The Borrower also promises to pay Interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until the Facility Termination Date (whether by acceleration or otherwise) and, after the Facility Termination Date, until the Final Payout Date, at the rates per annum and on the dates specified in the Receivables Loan Agreement.

Payments of both principal and interest are to be made in lawful money of the United States of America in same day or immediately available funds to the account designated by the Administrative Agent pursuant to the Receivables Loan Agreement.

This Revolving Note is one of the Revolving Notes referred to in, and evidences Indebtedness incurred under, the Receivables Loan Agreement, to which reference is made for a description of the security for this Note and for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments of principal of the Indebtedness evidenced by this Note and on which such Indebtedness may be declared to be immediately due and payable. Unless otherwise defined, capitalized terms used herein have the meanings provided in the Receivables Loan Agreement.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

**THIS REVOLVING NOTE HAS BEEN DELIVERED IN NEW YORK CITY, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK.**

This Revolving Note is issued in partial replacement of the Note dated July 1, 2008 issued by the Borrower to Barclays Bank PLC (the "Original Note"). This Revolving Note

evidences the debt evidenced by the Original Note and is not intended to be, nor shall it be deemed to be, a prepayment or novation of such debt or a release of the liens evidenced by such Original Note.

TRIBUNE RECEIVABLES, LLC


By:_____
        Name:
        Title: