ARTICLE VI
INDEMNIFICATION

SECTION 6.01. <u>Indemnities by Originators</u>. Without limiting any other rights that the Buyer and its respective officers, directors, agents, employees, assigns (including the Administrative Agent and each Secured Party), controlling Persons or Affiliates of any of the foregoing (each, an "<u>Indemnified Party</u>") may have hereunder, under any other Transaction Document or under applicable Law, the Originators, jointly and severally, agree to indemnify and keep indemnified each Indemnified Party from and against any and all damages, losses, claims, liabilities, deficiencies, costs, disbursements and expenses, including interest, penalties, amounts paid in settlement and lawyers' fees and expenses (all of the foregoing being collectively referred to as "<u>Indemnified Amounts</u>") awarded against or incurred by any Indemnified Party (including in connection with or relating to any investigation by an Official Body, litigation or lawsuit (actual or threatened) or order, consent, decree, judgment, claim or other action of whatever sort (including the preparation of any defense with respect thereto regardless of whether such Indemnified Party is a party thereto)), in each case, arising out of or resulting from this Agreement or any transaction contemplated hereby, excluding, however (a) Indemnified Amounts to the extent that such Indemnified Amounts are finally judicially determined to have resulted from the bad faith, gross negligence, or willful misconduct on the part of such Indemnified Party, (b) recourse (except as otherwise specifically provided in this Agreement or any other Transaction Document) for Acquired Receivables that are not collected or not collectable on account of the insolvency, bankruptcy or financial inability to pay off the Obligors in respect of such Acquired Receivables, (c) Taxes, excluding those Taxes owed to the Borrower and (d) without prejudice to <u>Section 8.03,</u> costs and expenses incurred by an Indemnified Party in connection with the (i) preparation, execution, delivery and administration of the Transaction Documents, amendments or modifications thereto or consents thereunder, (ii) any rating of the Loans not requested by the Administrative Agent with the consent of the Borrower, or (iii) absent a Trigger Event, any audit or inspection.

Without limiting the generality of the foregoing indemnification, but subject to the exclusions set forth in <u>clauses (a)</u> and <u>(b)</u>, above, the Originators jointly and severally shall indemnify each Indemnified Party for Indemnified Amounts relating to or resulting from:

(i)     reliance on any representation or warranty made by any Originator (or any officers of any such Person) under or in connection with this Agreement, any other Transaction Document or any other information or report delivered by any such Person pursuant hereto or thereto, which shall have been false or incorrect when made or deemed made;

(ii)     the failure by any Originator to comply with any term, provision or covenant contained in a Transaction Document or any agreement executed in connection with a Transaction Document or with any applicable law, rule or regulation with respect to any Receivable or Contract related thereto, or the nonconformity of any Receivable or Contract included therein with any such applicable law, rule or regulation;

(iii)    any failure of an Originator to perform its duties, covenants or other obligations in accordance with the provisions of this Agreement or any other Transaction Document;

(iv)    any libel, personal injury or damage suit, or other similar claim arising out of or in connection with any Contract or any Receivable;

(v)    any dispute, claim, offset or defense (other than discharge in bankruptcy of the Obligor) of the Obligor to the payment of any Receivable (including, without limitation, (x) a defense based on such Receivable or the related Contract not being a legal, valid and binding obligation of such Obligor enforceable against it in accordance with its terms), (y) any defense or dispute relating to whether, as between an Advertising Agency and the related Advertising Agency Clients, which Person or Persons are obligated to make payment on a Receivable (whether before or after an Advertising Agency Client remits payment to the related Advertising Agency), and (z) any other claim resulting from the sale of the merchandise or service related to such Receivable or the furnishing or failure to furnish such merchandise or services;

(vi)    the commingling of Collections of Receivables at any time with other funds;

(vii)    any investigation, litigation or proceeding related to or arising from this Agreement or any other Transaction Document, the transactions contemplated hereby, or any other investigation, litigation or proceeding relating to an Originator in which any Indemnified Party becomes involved as a result of any of the transactions contemplated hereby;

(viii)    any inability to litigate any claim against any Obligor in respect of any Receivable as a result of such Obligor being immune from civil and commercial law and suit on the grounds of sovereignty or otherwise from any legal action, suit or proceeding;

(ix)    any Originator Termination Event described in <u>Section 7.01</u> (*Originator Termination Events*);

(x)    any failure of any Transferee or its assigns to acquire and maintain legal and equitable title to, and ownership of any Receivable and the Related Security and Collections with respect thereto from the applicable Originator, free and clear of any Adverse Claim (other than as created hereunder); or any failure of the Borrower to give reasonably equivalent value to the applicable Originator under the Receivables Purchase Agreement in consideration of the transfer by such Originator of any Receivable, or any attempt by any Person to void such transfer under statutory provisions or common law or equitable action;

(xi)    any failure to vest and maintain vested in the Buyer legal and equitable title to, and ownership of, and a first priority perfected ownership interest or any failure to vest and maintain vested in the Administrative Agent a first priority perfected security interest in the Receivables, the Related Security, the Collections and

the Collection Accounts, in each case free and clear of any Adverse Claim (except as created by the Transaction Documents);

(xii)    the failure to have filed, or any delay in filing, financing statements or other similar instruments or documents under the UCC of any applicable jurisdiction or other applicable laws with respect to any Receivable, the Related Security and Collections with respect thereto, and the proceeds of any thereof, whether at the time of any Purchase or at any subsequent time;

(xiii)    the failure by an Originator to be duly qualified to do business, to be in good standing or to have filed appropriate fictitious or assumed name registration documents in any jurisdiction where its ownership of property or the conduct of business requires such qualification;

(xiv)    the failure of an Originator to pay when due any Taxes or charges imposed on such party;

(xv)    any action or omission by an Originator which reduces or impairs the rights of the Parent, the Buyer, the Administrative Agent or the Lenders with respect to any Receivable or the value of any such Receivable;

(xvi)    any attempt by any Person to void any Purchase, Contribution of Receivables to the Parent or the Buyer or any Loan or any other transaction contemplated by the Transaction Documents under statutory provisions or common law or equitable action; and

(xvii)    the failure of any Receivable included in the calculation of the Net Receivables Balance by an Originator in its capacity as a Servicer Party or otherwise as an Eligible Receivable to be an Eligible Receivable at the time so included.

## ARTICLE VII
## ORIGINATOR TERMINATION EVENTS; EFFECT OF TERMINATION DATE

SECTION 7.01.  Originator Termination Events.  If any of the following events (each an "Originator Termination Event") shall occur and be continuing:

(a)    an Originator shall fail to make any payment or deposit of Collections or Deemed Collections required to be made by it hereunder or under any other Transaction Document to which it is a party when due hereunder or thereunder, and such failure shall continue for two (2) Business Days after the earlier of written notice to such Originator or a Responsible Officer of an Originator having actual knowledge of such failure; or any Originator shall fail to make any other payment or deposit required to be made by it hereunder or under any Transaction Document to which it is a party when due hereunder or thereunder and such failure shall continue for ten (10) days after the earlier of written notice to such Originator or a Responsible Officer of an Originator having actual knowledge of such failure; or

(b)    any representation, warranty, certification or statement made by an Originator in this Agreement or any other Transaction Document to which such Person is a party

shall prove to have been incorrect in any material respect when made or deemed made; provided that if such breach relates to a Specified Provision and is capable of being cured, such breach shall not constitute an Originator Termination Event unless it continues unremedied for five (5) Business Days after the earlier of such Transaction Party receiving written notice of such breach or a Responsible Officer of a Transaction Party having actual knowledge of such breach; or

(c)    other than as addressed in Sections 7.01(a) and (b), an Originator shall fail to perform or observe any term, covenant, undertaking or agreement contained in this Agreement or any other Transaction Document to which such Person is a party and, if such failure relates to a Specified Provision and is capable of being remedied, such Person shall have failed to remedy such failure within 15 Business Days after the earlier of an Originator receiving written notice of such failure or an Originator having actual knowledge of such failure; or

(d)    any Transaction Party receives notice or becomes aware that a notice of lien has been filed against any Transaction Party under Section 430(k) of the IRC or Section 303(k) of ERISA for a failure to make a required installment or other payment to a plan to which Section 430 of the IRC or Section 303 of ERISA applies;

(e)    other than as permitted by Clause 10.13 of the Receivables Loan Agreement (*Limitations on Addition and Termination of Originators*), any Change of Control shall occur with respect to an Originator; or

(f)    this Agreement, any Account Agreement or any other Transaction Document to which an Originator is a party or any provision hereof or thereof shall cease, for any reason, to be in full force and effect with respect to an Originator (other than as a result of a termination of an Originator's obligations in compliance with Section 1.09 (*Termination of Status as Originator*), or an Originator shall (except as expressly permitted by any Transaction Document) so assert in writing or shall otherwise seek to terminate or disaffirm its obligations hereunder or under any other Transaction Document to which it is a party; or

(g)    a Facility Termination Event shall occur under the Receivables Loan Agreement;

then the Buyer (or the Administrative Agent acting on behalf of the Buyer) may, (and if so directed by the Required Lenders shall), declare the Termination Date to have occurred with respect to either each Originator with respect to which an Originator Termination Event has occurred or as to all Originators, the Termination Date shall occur automatically with respect to all Originators. Upon any such declaration or upon such automatic termination, the Buyer and the Administrative Agent shall have, in addition to the rights and remedies which they may have with respect to the applicable Originator or Originators under this Agreement, all other rights and remedies provided after default under applicable Law, which rights and remedies shall be cumulative.

SECTION 7.02.  Effect of Termination Date.  Following the occurrence of the Termination Date in respect of any Originator or Originators, the applicable Originator or Originators shall not sell or contribute, and the Buyer shall not purchase or receive as a capital contribution from such Originator or Originators, any Receivables or Receivables Property.  It is

understood and agreed that the termination of an Originator pursuant to Section 1.09 (*Termination of Status as an Originator*) shall constitute a Facility Termination Event and the resulting Originator Termination Event shall apply to all Originators, unless such Facility Termination Event shall have been waived in accordance with the terms of the Receivables Loan Agreement.

No termination or rejection or failure to assume the executory obligations of this Agreement in any Event of Bankruptcy with respect to any Originator or the Buyer (or the Buyer's assignees) shall be deemed to impair or affect the obligations pertaining to any executed sales, executed contributions or other executed obligations or undertakings, including pre-termination breaches of representations and warranties by the Originators or the Buyer.

Notwithstanding anything herein or any other Transaction Document to the contrary (a) the occurrence of the Termination Date in respect of any Originator or Originators shall not discharge any Person from any obligations incurred prior to the Termination Date, including any obligations to make any payments with respect to the interest of the applicable Transferee or its assigns in any Receivable or other Receivables Property sold, assigned, transferred and otherwise conveyed by the applicable Originator to the applicable Transferee or its assigns prior to the Termination Date; and (b) the rights and remedies with respect to any breach of any representation and warranty made by any Originator pursuant to Article III (*Representations and Warranties*), it being understood and agreed that any such rights and remedies shall be no greater than the rights and remedies that existed prior to the Termination Date, and the provisions of Section 1.03 (*Deemed Collections*), 8.03 (*Costs, Expenses and Taxes*), 8.05 (*No Proceedings*) and 8.09 (*Choice of Law*) shall survive the occurrence of the Termination Date.

ARTICLE VIII
MISCELLANEOUS

SECTION 8.01.  Waivers and Amendments.  (a) No failure or delay on the part of the Parent, the Buyer or the Administrative Agent in exercising any power or other right or remedy under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such power or other right or remedy preclude any further exercise thereof or the exercise of any other power or other right or remedy.  The rights and remedies herein provided shall be cumulative and non-exclusive of any rights and remedies provided by Law.

(b)    Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Buyer and the Parent and consented to by the Required Lenders, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 8.02.  Notices.  (a) All communications and notices provided for hereunder shall be provided in the manner described in Schedule 2 (*Address and Notice Information*) to the Receivables Loan Agreement.

(b)    Each Sub-Originator hereby appoints the Parent as its agent and irrevocably authorizes the Parent to execute and deliver all notices required hereunder on its behalf.  Any notice required to be delivered to any Sub-Originator hereunder shall be deemed

delivered to such Sub-Originator if delivered to the Parent in accordance with the terms hereof. The Parent accepts such appointment as agent of each Sub-Originator and agrees to act thereas until the date on which this Agreement has terminated in accordance with its terms. Each Sub-Originator agrees not to revoke, modify or withdraw such appointment until terminated pursuant to the preceding sentence.

SECTION 8.03.  Costs. Expenses and Taxes.  In addition to the rights and indemnification granted under Section 6.01 (*Indemnities by Originators*) and their other obligations herein, the Originators jointly and severally agree to pay all costs and expenses incurred by the Administrative Agent in connection with the preparation, execution, delivery and administration of this Agreement and the other documents and agreements to be delivered hereunder or in connection herewith, including (i) the fees and expenses of counsel for the Administrative Agent with respect thereto and with respect to advising it as to its rights and remedies under this Agreement; (ii) all fees and expenses of the Administrative Agent associated with any audits and other due diligence conducted prior to or after the Closing Date and (iii) any amendments, waivers or consents under the Transaction Documents.  In addition, the Originators jointly and severally agree to pay all costs and expenses of the Indemnified Parties, if any (including counsel fees and expenses), incurred in connection with the enforcement of, or any dispute, work-out, litigation or preparation for litigation involving, this Agreement and the other Transaction Documents.

SECTION 8.04.  Confidentiality.  The Fee Letters (including any prior drafts thereof) and any other pricing information relating to the facility contemplated by the Transaction Documents (including such information set forth in any engagement letter, term sheet or proposal prior to the Closing Date) (collectively, "Product Information") are confidential.  Each of the Originators agrees:

(a)     to keep all Product Information confidential and to disclose Product Information only to those of its Affiliates and its and their respective officers, employees, agents, accountants, legal counsel and other representatives (collectively "Representatives") who have a need to know such Product Information for the purpose of assisting in the negotiation, completion and administration of the facility contemplated hereby (the "Facility");

(b)     to use the Product Information only in connection with the Facility and not for any other purpose; and

(c)     to cause its Representatives to comply with these provisions and to be responsible for any failure of any Representative to so comply.

The provisions of this Section 8.04 shall not apply to Product Information that is or hereafter becomes (through a source other than the Originators or any of their respective Affiliates or other Representatives) a matter of general public knowledge.  The provisions of this Section 8.04 shall not prohibit any Originator from filing with any governmental or regulatory agency any information or other documents with respect to the Facility as may be required by applicable Law.  Product Information may be disclosed (I) to the extent requested or required by any state, Federal or foreign authority or examiner regulating any Originator, (II) to the extent required by applicable law, rule or regulation or by any subpoena or similar legal process, or in connection

with the enforcement of the Transaction Documents, (III) in connection with any litigation or legal proceeding relating to or in connection with the Transaction Documents or the enforcement of rights hereunder or thereunder or to which the Originators or any of their respective Affiliates may be a party or to the Bankruptcy Court or as the Bankruptcy Court otherwise directs, (IV) with the consent of the Administrative Agent, or (V) to any Rating Agency when required by such Rating Agency.

SECTION 8.05.  No Proceedings.  Each of the parties hereto hereby agrees that:

(a)      it will not institute against, or join any other Person in instituting against, the Buyer any proceeding of the type referred to in the definition of Event of Bankruptcy so long as there shall not have elapsed one year plus one day since the Final Payout Date; and

(b)      notwithstanding anything contained herein or in any other Transaction Document to the contrary, the obligations of the Buyer to the Originators under the Transaction Documents are solely the corporate obligations of the Buyer and shall be payable solely to the extent of funds which are received by the Buyer pursuant to the Transaction Documents and available for such payment in accordance with the terms of the Transaction Documents and shall be non-recourse other than with respect to such available funds and, without limiting Section 8.05(a), if ever and until such time as the Buyer has sufficient funds to pay such obligation shall not constitute a claim against the Buyer.

SECTION 8.06.  Third Party Beneficiary.  (a) Each of the parties hereto hereby acknowledges that the Buyer may assign all or any portion of its rights under and pursuant to this Agreement and that such assignees may further assign, or grant security interests in, their rights under this Agreement, and each Originator hereby consents to any such assignment or grant.  All such assignees and secured parties, and all other Indemnified Parties, shall be third party beneficiaries of, and in the case of assignees shall to the extent provided in the relevant assignment agreement be entitled to enforce the applicable Transferee's rights and remedies under and pursuant to, this Agreement to the same extent as if they were parties hereto.  Without limiting the generality of the foregoing, each Originator hereby acknowledges that the Buyer has granted and will grant a security interest in all of its powers and other rights and remedies under and pursuant to this Agreement to the Administrative Agent pursuant to the Security Documents.  The Originator agrees that the Administrative Agent (for the benefit of the Secured Parties) shall, subject to the terms of the Receivables Loan Agreement, have the right to enforce this Agreement and to exercise directly each applicable Transferee rights and remedies under this Agreement (including the right to give or withhold any consents or approvals of the Buyer to be given or withheld hereunder) and each Originator agrees to cooperate fully with the Administrative Agent in the exercise of such rights and remedies.  Each Originator further agrees to give to the Administrative Agent copies of all notices and reports it is required to give each applicable Transferee hereunder.

(b)      Notwithstanding anything herein to the contrary, (i) no declaration of the Termination Date in respect of an Originator (other than a declaration pursuant to Section 1.09), and no other amendment, waiver, consent, request or other modification made or granted by any applicable Transferee hereunder, shall in any case be effective unless the same shall have been made or granted by, or approved in writing by, the Required Lenders, and (ii) no declaration of

the Termination Date in respect of an Originator by such Originator shall in any case be effective unless notice of such declaration shall have been received by the Administrative Agent.

SECTION 8.07.  Restriction on Payments: Setoff.

(a)     The obligations of each Originator to make deposits and other payments contemplated by this Agreement is absolute and unconditional and all payments to be made by such Originator under or in connection with this Agreement or the Servicing Agreement, including in their capacities as Servicer Parties under the Servicing Agreement, shall be made free and clear of, and each Originator hereby irrevocably and unconditionally waives all rights of, any counterclaim, setoff, deduction or other analogous rights or defenses, which such Originator may have against the Parent, the Buyer, the Administrative Agent, the Secured Parties or otherwise (including any obligation of the Buyer under the Intercompany Note or in respect of the payment of the Purchase Price for any Receivable sold hereunder), whether under this Agreement, the Transaction Documents, applicable Law, in equity or otherwise.

(b)     Notwithstanding anything in this Agreement or elsewhere to the contrary, each Originator acknowledges and agrees to the restrictions on payments set forth in, and the other terms of, the Intercompany Note and agrees to be bound thereby.

(c)     Each Indemnified Party is hereby authorized (in addition to any other rights it may have) at any time to setoff, appropriate and apply (without presentment, demand, protest or other notice which are hereby expressly waived) any amounts and any other indebtedness held or owing by such Indemnified Party to, or for the account of, an Originator against the amount of the Transaction Party Obligations owing by such Originator to such Person.

SECTION 8.08.  Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by electronic file in a format that is accessible by the recipient shall be effective as delivery of a manually executed counterpart of this Agreement

SECTION 8.09.  CHOICE OF LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK.

SECTION 8.10.  CONSENT TO JURISDICTION.  (a) EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT SITTING IN NEW YORK CITY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE TRANSACTION DOCUMENTS, AND EACH PARTY HERETO HERBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THEY MAY EFFECTIVELY DO

SO, THE DEFENSE OF INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING. THE PARTIES HERETO AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)     EACH OF THE ORIGINATORS AND THE BUYER CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO IT AT ITS ADDRESS SPECIFIED HEREIN. NOTHING IN THIS <u>SECTION 8.10</u> SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY MANNER PERMITTED BY LAW.

SECTION 8.11. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT.

SECTION 8.12. <u>USA PATRIOT Act.</u> Buyer hereby notifies each Originator that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) and any similar Law in any relevant jurisdiction (the "<u>Acts</u>"), each Lender is required to obtain, verify and record information that identifies the Transaction Parties, which information includes the name and address of each Transaction Party and other information that will allow such Lender to identify such Transaction Party in accordance with the Acts.

SECTION 8.13. <u>Binding Effect; Assignability</u>. (a) This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and shall also inure to the benefit of the parties to the Receivables Loan Agreement and the other Transaction Documents and their respective successors and assigns. No Originator may assign or transfer its rights and obligations hereunder or any interest therein without the prior written consent of the Buyer and the Administrative Agent. Each Originator acknowledges that the applicable Transferee's rights under this Agreement and under each Account Control Agreement may be assigned to the Buyer, if applicable, and to the Administrative Agent, on behalf of the Secured Parties, under the Security Documents and consents to such assignments and to the exercise of those rights directly by the applicable Transferee and/or the Administrative Agent to the extent permitted under the Security Documents.

(b)     This Agreement shall create and constitute the continuing obligations of the parties hereto in accordance with its terms, and shall remain in full force and effect until, with respect to any Originator,  the Originator Payout Date with respect to such Originator; provided, however, that the rights and remedies with respect to any breach of any representation and warranty made by any Originator pursuant to <u>Article III</u> (*Representations and Warranties*) it being understood and agreed that any such rights and remedies shall be no greater than the rights and remedies that existed prior to termination of this Agreement, and the provisions of <u>Sections</u>

1.03 (*Deemed Collections*), 8.03 (*Costs, Expenses and Taxes*) and 8.09 (*Choice of Law*) shall be continuing and shall survive any termination of this Agreement.

SECTION 8.14.  Integration; Survival of Termination; Severability.  This Agreement and the other Transaction Documents executed by the parties hereto contain the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof superseding all prior oral or written understandings.  Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. If any one or more of the provisions of this Agreement shall for any reason whatsoever be held invalid, then such provisions shall be deemed severable from the remaining provisions of this Agreement and shall in no way affect the validity or enforceability of such other provisions.

SECTION 8.15.  Original Receivables Purchase Agreement.  The Parent, the Servicer, the Sub-Originators and the Borrower entered into the Original Receivables Purchase Agreement.  The parties hereto desire to enter into this Agreement in order to amend and restate the Original Receivables Purchase Agreement in its entirety.  Nothing herein shall relieve the Parent, the Servicer or any Sub-Originator from any liability it may have accrued under the Original Receivables Purchase Agreement, which liability shall be evidenced by this Agreement. All references to the Original Purchase Agreement in any other agreement or document shall be deemed to be references to this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date hereof.

TRIBUNE COMPANY, as Parent and as Servicer

By:_____
    Name:
    Title:

**CHICAGOLAND TELEVISION NEWS, INC.,
TRIBUNE BROADCAST HOLDINGS, INC.,
TRIBUNE INTERACTIVE, INC.,
TRIBUNE TELEVISION HOLDINGS, INC.,
WGN CONTINENTAL BROADCASTING
COMPANY,
WPIX, INC.,
TRIBUNE TELEVISION NEW ORLEANS, INC.,
KSWB INC.,
KTLA INC.,
KIAH INC.,
TOWER DISTRIBUTION COMPANY,
TRIBUNE TELEVISION NORTHWEST, INC.,
TRIBUNE TELEVISION COMPANY,
CHANNEL 40, INC.,
CHANNEL 39, INC.,
LOS ANGELES TIMES COMMUNICATIONS LLC,
WDCW BROADCASTING, INC.,
ORLANDO SENTINEL COMMUNICATIONS
COMPANY,
SUN-SENTINEL COMPANY,
GOLD COAST PUBLICATIONS, INC.,
FORUM PUBLISHING GROUP, INC.,
THE DAILY PRESS, INC.,
CHICAGO TRIBUNE COMPANY,
THE BALTIMORE SUN COMPANY,
THE HARTFORD COURANT COMPANY,
THE MORNING CALL, INC.,**
and **TRIBUNE MEDIA SERVICES, INC.** as
Sub-Originators

By: _____
    Name:
    Title:
    Authorized Signer

TRIBUNE RECEIVABLES, LLC, as Buyer

By: _____
     Name:
     Title:


CONSENTED AND AGREED:

BARCLAYS BANK PLC, as a
Funding Agent for the Class A Loans
under the Original Agreement


By: _____
     Name:
     Title:

BARCLAYS BANK PLC, as
Administrative Agent


By: _____
     Name:
     Title:

## EXHIBIT I

Definitions

This is Exhibit I to the Agreement (as hereinafter defined).  As used in the Agreement and the Exhibits, Schedules and Annexes thereto, capitalized terms have the meanings set forth in this Exhibit I (such meanings to be equally applicable to the singular and plural forms thereof).  If a capitalized term is used in the Agreement, or any Exhibit, Schedule or Annex thereto, and not otherwise defined therein or in this Exhibit I, such term shall have the meaning assigned thereto in Clause 1.1 (*Certain Defined Terms*) of the Receivables Loan Agreement, which definitions are incorporated herein.  In the case of any inconsistency between such terms and the terms defined in this Agreement, the terms defined in this Exhibit I shall prevail for all purposes of this Agreement.  The principles of interpretation set forth in Clauses 1.2 (*Other Terms*) and 1.3 (*Computation of Time Periods*) of the Receivables Loan Agreement shall apply to this Agreement as if fully set forth herein.

All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles.  All terms used in Article 9 of the Uniform Commercial Code in the State of New York, and not specifically defined herein, are used herein as defined in such Article 9.

"Account Control Agreement" means an account control agreement substantially in one of the forms attached as Exhibit IV (*Account Control Agreement Form*) hereto or such other form as shall have been approved by the Administrative Agent.

"Acquired Receivable" means any Receivable which is purchased (or purported to be purchased) by the Buyer or contributed (or purported to be contributed) as capital from Tribune to the Buyer, in each case, pursuant to Article I (*Amounts and Terms*).

"Additional Originator" means any Qualifying Subsidiary of Tribune which becomes a party hereto in accordance with Section 1.10 (*Addition of Sub-Originator*).

"Agreement" means the Amended and Restated Receivables Purchase Agreement, dated as of April 10, 2009, among the Originators and the Buyer, as the same may be amended, restated or otherwise modified.

"Authorized Officer" means, with respect to each Originator, its president, corporate controller, treasurer or chief financial officer.

"Buyer" has the meaning set forth in the preamble to the Agreement.

"Capped Expenditures" means the aggregate (without duplication) of the following expenditures by the Companies during the Measurement Period:

(i)      all Capital Expenditures by the Companies (other than Capital Expenditures described in the proviso to Section 4.26(i)); plus

(ii)    the purchase price paid by the Companies for all acquisitions made in reliance on Section 4.26(f)(v); plus

(iii)    all Investments made by the Companies in reliance on Section 4.26(h)(vii).

"Capped Expenditure Limit" means $200,000,000.

"Discount" means, in respect of each Purchase, the Discount Percentage multiplied by the Unpaid Balance of the Receivables that are the subject of such Purchase.

"Discount Percentage" means, with respect to the Purchase of any Receivable, 2.15%; provided that the Buyer and Parent may agree in writing to increase or decrease the Discount Percentage for future Purchases if the Buyer and Parent, in their good faith judgment, determine that the adjusted Discount Percentage would more accurately reflect the fair market value of the Receivables being sold hereunder.

"Effective Date" means, with respect to (a) each Originator that is a party hereto on the date hereof, the Closing Date and (b) each Additional Originator, the Originator Addition Date with respect to such Additional Originator.

"Indemnified Amounts" has the meaning specified in Section 6.01 (Indemnities by Originators).

"Indemnified Party" has the meaning specified in Section 6.01 (Indemnities by Originators).

"Intercompany Note" means a promissory note in substantially the form of Exhibit V hereto as more fully described in Section 1.02 (Payment for Purchase) of the Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Joinder Agreement" means an instrument in the form attached hereto as Exhibit VI.

"Measurement Period" means the period from and including April 10, 2009 to but excluding the Final Payout Date.

"Net Worth" means as of the last Business Day of each Calculation Period preceding any date of determination, the excess, if any, of (a) the sum of (i) any cash or cash equivalents then held by the Buyer, plus (ii) the aggregate Outstanding Balance of the Receivables at such time, minus (b) the sum of (i) the Aggregate Principal Balance outstanding at such time, plus (ii) the aggregate outstanding principal balance of the Purchase Price Loans (including any Purchase Price Loan proposed to be made on the date of determination).

"Originator" has the meaning set forth in the preamble to the Agreement.

EXHIBIT I - 2

"Originator Addition Date" has the meaning specified in Section 1.10 (*Addition of Sub-Originator*).

"Originator Event" means an Originator Termination Event or Potential Originator Termination Event.

"Originator Payout Date" means, with respect to any Originator, the earlier of (a) the Final Payout Date and (b) the latest of (i) the date described in Section 1.09 (*Termination of Status as an Originator*) on which such Originator elects to cease to transfer Receivables to the applicable Transferee hereunder, (ii) the date on which each Acquired Receivable originated by such Originator has been paid in full or such Acquired Receivable has become a Defaulted Receivable and the applicable Transferee has received all amounts it expects to receive in respect of such Receivable and its Related Security (including the proceeds of any claim under a credit insurance policy), and (iii) the date on which that Originator has made all payments and deposits required, as at the later of the dates referred to in (i) and (ii) above, to be made by it under this Agreement and the other Transaction Documents to which it is a party.

"Originator Termination Event" has the meaning specified in Section 7.01 (*Originator Termination Events*).

"Parent" has the meaning set forth in the preamble to the Agreement.

"Potential Originator Termination Event" means an event which, with the passage of time or the giving of notice, or both, would constitute an Originator Termination Event.

"Purchase" means the purchase under the Agreement by a Transferee from the applicable Originator of the Receivables, the Related Security and the Collections related thereto, together with all proceeds and related rights in connection therewith.

"Purchase Price" means, with respect to any Purchase on any date, the aggregate price to be paid by the applicable Transferee to the applicable selling Originator for such Purchase in accordance with Section 1.02 (*Payment for Purchase*) of the Agreement for the Receivables, Collections and Related Security being sold to such Transferee on such date, which price shall equal to (a) the Unpaid Balance of the Receivables that are the subject of such Purchase, minus (b) the Discount for such Purchase. The Purchase Price shall not include any amounts with respect to Receivables contributed from time to time to the capital of the Buyer, the consideration for which being an increased membership interest in the Buyer.

"Purchase Price Loan" has the meaning set forth in Section 1.02(a) (*Payment for Purchase*) of the Agreement.

"Receivables Loan Agreement" means the Amended and Restated Receivables Loan Agreement, dated as of the Closing Date, between (1) the Buyer, (2) the Parent, (3) the Persons from time to time party thereto as Lenders, (4) Barclays Bank PLC, as the Administrative Agent, (5) Wells Fargo Foothill, LLC, as Documentation Agent, and (6) The CIT Group/Business Credit, Inc., as Syndication Agent as the same may at any time be amended, amended and restated or otherwise modified.

"Receivables Property" has the meaning specified in Section 1.02 (*Payment for Purchase*).

"Required Capital Amount" means, the greater of (x) $15,000,000 or (y) 9.75% of the aggregate outstanding principal balance of the Acquired Receivables.

"Sub-Originator" has the meaning set forth in the preamble to the Agreement.

"Termination Date" means, with respect to any Originator, the earliest of (a) the Facility Termination Date, (b) the date on which the Termination Date is declared or automatically occurs with respect to such Originator pursuant to Section 7.01 (*Originator Termination Events*) and (c) the date described in Section 1.09 (*Termination of Status as an Originator*) on which such Originator elects to cease to transfer Receivables to the Buyer hereunder.

"Transferee" means, (i) with respect to a Purchase from any Sub-Originator, the Parent; and (ii) with respect to a Purchase from the Parent, the Buyer.

EXHIBIT I - 4

## EXHIBIT II

PLACES OF BUSINESS; JURISDICTION OF ORGANIZATION;
ORGANIZATIONAL NUMBERS; OTHER NAMES

| Entity | Jurisdiction | Organizational Number | Principal Places of business | Additional Places of Business | Prior Names |
|---|---|---|---|---|---|
| Tribune Receivables, LLC | Delaware | 4501307 | Chicago, IL | N/A | N/A |
| Tribune Company | Delaware | 0674607 | Chicago, IL | N/A | N/A |
| Chicagoland Television News, Inc. | Delaware | 2270399 | Chicago, IL | Oak Brook, IL | Tribune Regional Programming, Inc. |
| Tribune Broadcast Holdings, Inc. | Delaware | 0844589 | Chicago, IL | Beaverton, OR<br><br>Indianapolis, IN | WGN of California, Inc. Tribune Sacramento Radio, Inc. Tribune Denver Radio, Inc. |
| Tribune Interactive, Inc. | Delaware | 2634608 | Chicago, IL | N/A | Tribune Digital, Inc. |
| Tribune Television Holdings, Inc. | Delaware | 2095934 | Chicago, IL | N/A | Danville Cable Company Tribune New York Radio, Inc. |
| WGN Continental Broadcasting Company | Delaware | 0608827 | Chicago, IL | N/A | WGN, Inc. |

| | | | | | |
|---|---|---|---|---|---|
| WPIX, Inc. | Delaware | 0896279 | Chicago, IL | New York, NY | Tribune Company Communications Tribune Company Communications, Inc. News Building Inc. Tribune New York Properties, Inc. |
| Tribune Television New Orleans, Inc. | Delaware | 0937051 | Chicago, IL | Metairie, LA | Tribune Productions Incorporated Shelf Business Corporation WGNO Inc. |
| KSWB Inc. | Delaware | 0845225 | Chicago, IL | San Diego, CA | Tribune Peninsula, Inc. Peninsula Newspapers Incorporated Tribune Newspapers West, Inc. Peninsula Newspapers, Inc. KYYT Inc. |
| KTLA Inc. | California | C0268059 | Chicago, IL | Los Angeles, CA | KMPC, Inc. KMPC, The Station of the Stars Golden West Broadcasters Golden West Television, Inc. |
| KHCW Inc. (now KIAH Inc.) | Delaware | 2544438 | Chicago, IL | Houston, TX | KHTV Inc. KHWB Inc. |

| Tower Distribution Company | Delaware | 2878374 | Chicago, IL | New York, NY | UVTV, Inc. |
|---|---|---|---|---|---|
| Tribune Television Northwest, Inc. | Delaware | 2015097 | Chicago, IL | Seattle, WA | Tribune Broadcasting of Atlanta, Inc. WGNX Inc. KCPQ Inc. |
| Tribune Television Company | Delaware | 2105947 | Chicago, IL | N/A | Renaissance Communications Corp. |
| Channel 40, Inc. | Delaware | 2183388 | Chicago, IL | Sacramento, CA | N/A |
| Channel 39, Inc. | Delaware | 2173736 | Chicago, IL | Hollywood, FL | N/A |
| Los Angeles Times Communications LLC | Delaware | 3237782 | Chicago, IL | Los Angeles, CA | N/A |
| WDCW Broadcasting, Inc. | Delaware | 3076967 | 435 N. Michigan Avenue, 6th Floor Chicago, IL 60611 | Washington, D.C. | General DC Acquisition Corp. WBDC Broadcasting, Inc. |
| Orlando Sentinel Communications Company | Delaware | 0611915 | Chicago, IL | Orlando, FL | Sentinel Star Company Sentinel Communications Company |
| Sun-Sentinel Company | Delaware | 0598511 | Chicago, IL | Fort Lauderdale, FL | Gore Newspapers Company News and Sun-Sentinel Company |

| | | | | | |
|---|---|---|---|---|---|
| Forum Publishing Group, Inc. | Delaware | 2542544 | Chicago, IL | Deerfield Beach | South Florida Newspaper Network, Inc. Sun-Sentinel Community News Group, Inc. |
| The Daily Press, Inc. | Delaware | 2095936 | Chicago, IL | Newport News, VA | N/A |
| Chicago Tribune Company | Illinois | 48278540 | Chicago, IL | N/A | N/A |
| The Baltimore Sun Company | Maryland | D02142065 | Chicago, IL | Baltimore, MD | TM Publishing Company |
| The Hartford Courant Company | Connecticut | 0121412 | Chicago, IL | Hartford, CT | N/A |
| The Morning Call, Inc. | Pennsylvania | 92851 | Chicago, IL | Allentown, PA | Democrat Publishing Company Allentown Herald Publishing Company Allentown Call Publishing Company Call-Chronicle Newspapers, Inc. |
| Gold Coast Publications, Inc. | Delaware | 0929050 | Chicago, IL | Fort Lauderdale, FL | |

## EXHIBIT III

### NAMES OF COLLECTION BANKS; COLLECTION ACCOUNTS

| Bank | Account Name | Legal Name | Account Number | Lockbox Number and Address |
|---|---|---|---|---|
| Bank of America | Los Angeles Times Communications LLC, as sub-servicer for Tribune Receivables, LLC | Los Angeles Times Communications LLC | 8188508912 | File 51163 Los Angeles, CA 90074<br><br>File 54221 Los Angeles, CA 90074 |
| Bank of America | Los Angeles Times Communications LLC, as sub-servicer for Tribune Receivables, LLC | Los Angeles Times Communications LLC | 8188508917 | No Lockbox |
| Bank of America | Chicago Tribune Company, as sub-servicer for Tribune Receivables, LLC | Chicago Tribune Company | 8188300559 | 14889 Collections Center Dr. Chicago, IL 60693<br><br>14839 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | Sun Sentinel Company, as sub-servicer for Tribune Receivables, LLC | Sun Sentinel Company | 8188602665 | P.O. Box 100621 Atlanta, GA 30384 P.O. Box 100606 Atlanta, GA 30384 |

| Bank of America | Forum Publishing Group, Inc., as sub-servicer for Tribune Receivables, LLC | Forum Publishing Group, Inc. | 8188911286 | P.O. Box 100773 Atlanta, GA 30384  P.O. Box 100641 Atlanta, GA 30384 |
|---|---|---|---|---|
| Bank of America | Forum Publishing Group, Inc., as sub-servicer for Tribune Receivables, LLC | Forum Publishing Group, Inc. | 8188911285 | No Lockbox |
| Bank of America | Orlando Sentinel Communications Company, as sub-servicer for Tribune Receivables, LLC | Orlando Sentinel Communications Company | 8188702556 | P.O. Box 100630 Atlanta, GA 30384  P.O. Box 100608 Atlanta, GA 30384  P.O. Box 100606 Atlanta, GA 30384 |
| Bank of America | Orlando Sentinel Communications Company, as sub-servicer for Tribune Receivables, LLC | Orlando Sentinel Communications Company | 8188502557 | No Lockbox |
| Bank of America | The Hartford Courant Company, as sub-servicer for Tribune Receivables, LLC | The Hartford Courant Company | 8188316178 | P.O. Box 40215 Hartford, CT 06150 |

| | | | | |
|---|---|---|---|---|
| Bank of America | The Daily Press, Inc., as sub-servicer for Tribune Receivables, LLC | The Daily Press, Inc. | 8188108438 | P.O. Box 100634 Atlanta, GA 30384  P.O. Box 100611 Atlanta, GA 30384  P.O. Box 100790 Atlanta, GA 30384 |
| Bank of America | The Daily Press, Inc., as sub-servicer for Tribune Receivables, LLC | The Daily Press, Inc. | 8188202785 | No Lockbox |
| Bank of America | The Morning Call, Inc., as sub-servicer for Tribune Receivables, LLC | The Morning Call, Inc. | 8188507187 | P.O. Box 3226 Boston, MA 02241-3226 |
| Bank of America | The Morning Call, Inc., as sub-servicer for Tribune Receivables, LLC | The Morning Call, Inc. | 8188413099 | No Lockbox |
| Bank of America | The Baltimore Sun Company, as sub-servicer for Tribune Receivables, LLC | The Baltimore Sun Company | 8188507229 | P.O. Box 3132 Boston, MA 02241 P.O. Box 415215 Boston, MA 02241 |
| Bank of America | Tribune Interactive, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Interactive, Inc. | 8188611051 | 14891 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | KTLA Inc., as sub-servicer for Tribune Receivables, LLC | KTLA Inc. | 1233254161 | File 11155 Los Angeles, CA 90074 |

EXHIBIT III - 3

| | | | | |
|---|---|---|---|---|
| Bank of America | WGN Continental Broadcasting Company, as sub-servicer for Tribune Receivables, LLC | WGN Continental Broadcasting Company | 8188503165 | 98473 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | WGN Continental Broadcasting Company, as sub-servicer for Tribune Receivables, LLC | WGN Continental Broadcasting Company | 8188303166 | 98519 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | WGN Radio, Chicago-Credit Card-Dep, as sub-servicer for Tribune Receivables, LLC | WGN Continental Broadcasting Company | 8188303406 | No Lockbox |
| Bank of America | KHCW Inc., as sub-servicer for Tribune Receivables, LLC | KHCW Inc. (now KIAH Inc.) | 1233071096 | P.O. Box 843744 Dallas, TX 75284 |
| Bank of America | WDCW Broadcasting, Inc., as sub-servicer for Tribune Receivables, LLC | WDCW Broadcasting, Inc. | 3751844428 | 22264 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | Tribune Television Northwest, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Television Northwest, Inc. | 1233930374 | File 30697 P.O. Box 60000 San Francisco, CA 94160 |
| Bank of America | WTIC-TV, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company | 8188912658 | 3562 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | Tower Distribution Company, as sub-servicer for Tribune Receivables, LLC | Tower Distribution Company | 8188313245 | 5980 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | KSWB Inc., as sub-servicer for Tribune Receivables, LLC | KSWB Inc. | 1233322094 | File 749011 Los Angeles, CA 90074 |
| Bank of America | Tribune Broadcast Holdings, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Broadcast Holdings, Inc. | 8188015458 | File 30691 P.O. Box 60000 San Francisco, CA 94160 |

| Bank of America | Tribune Television Company, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company | 8188507200 | 15190 Collections Center Dr. Chicago, IL 60693 |
|---|---|---|---|---|
| Bank of America | Channel 39, Inc., as sub-servicer for Tribune Receivables, LLC | Channel 39, Inc. | 8188507224 | P.O. Box 277122 Atlanta, GA 30384 |
| Bank of America | Channel 40, Inc., as sub-servicer for Tribune Receivables, LLC | Channel 40, Inc. | 8188507182 | File 51150 Los Angeles, CA 90074 |
| Bank of America | Tribune Television Company, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company | 8188507205 | 15247 Collections Center Dr. Chicago, IL 60693 |
| Bank of America | Tribune Television Holdings, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Television Holdings, Inc. | 8188509020 | 15252 Collections Center Dr. Chicago, IL 60693 |
| JPMorgan Chase Bank | WPIX, Inc., as sub-servicer for Tribune Receivables, LLC | WPIX, Inc. | 9102470128 | No Lockbox |
| JPMorgan Chase Bank | WPIX, Inc., as sub-servicer for Tribune Receivables, LLC | WPIX, Inc. | 5261740 | 13831 Brooklyn, NY |
| JPMorgan Chase Bank | WGN Continental Broadcasting Company, as sub-servicer for Tribune Receivables, LLC | WGN Continental Broadcasting Company | 323383009 | 26918 Brooklyn, NY |
| JPMorgan Chase Bank | Tribune Television Company, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company (KDAF) | 1887512059 | 970585 Dallas, TX |
| JPMorgan Chase Bank | Tribune Television Company, as sub-servicer for Tribune Receivables, LLC | Tribune Television Company (WXIN) | 193078128 | 663698 Indianapolis, IN |
| JPMorgan Chase Bank | Tribune Television New Orleans, Inc., as sub-servicer for Tribune Receivables, LLC | Tribune Television New Orleans, Inc. | 110293568 | 62019 New Orleans, LA |

9207170.17 08141696

EXHIBIT III - 5

| JPMorgan Chase Bank | Chicagoland Television News, Inc., as sub-servicer for Tribune Receivables, LLC | Chicagoland Television News, Inc. | 5257085 | 93094 Chicago, IL |
|---|---|---|---|---|
| [Wachovia Bank | The Morning Call, Inc. Advertising | The Morning Call, Inc. | 20000303723529 | No Lockbox |
| M&T Bank | Baltimore Sun Advertising | The Baltimore Sun Company | 17795065 | No Lockbox |
| Wachovia Bank | Forum Publishing Group Inc. Credit Card | Forum Publishing Group, Inc. | 2090002084485 | No Lockbox |
| SunTrust Bank | Sun-Sentinel Advertising | Sun Sentinel Company | 401000390550 | No Lockbox |
| Mellon Bank | The Hardford Courant Credit Card | The Hartford Courant Company | 178-2649 | No Lockbox |
| Union Bank | KTXL-TV | Channel 40, Inc. | 750410022 | No Lockbox |
| National City Bank | WPHL-TV | Tribune Television Company | 0935-025 | No Lockbox |
| SunTrust Bank | WSFL-TV | Channel 39, Inc. | 418006046781 | No Lockbox] |
| **Borrower Concentration Accounts** | | | | |
| Bank of America | Tribune Receivables, LLC | Tribune Receivables, LLC | 8188509303 | No Lockbox |
| JPMorgan Chase Bank | Tribune Receivables, LLC | Tribune Receivables, LLC | 754223311 | No Lockbox |

[Account Information to be updated]

# **EXHIBIT IV**

## ACCOUNT CONTROL AGREEMENT FORM

**EXHIBIT V**

Form of Intercompany Note

INTERCOMPANY NOTE

April 10, 2009

1.    Note. FOR VALUE RECEIVED, the undersigned, Tribune Receivables, LLC, a Delaware limited liability company ("SPV"), hereby unconditionally promises to pay to the order of Tribune Company, a Delaware corporation ("Parent"), in lawful money of the United States of America and in immediately available funds, on or before the third anniversary of the Facility Termination Date (the "Collection Date"), the aggregate unpaid principal sum outstanding of all "Purchase Price Loans" made from time to time by Parent to SPV pursuant to and in accordance with the terms of that certain Amended and Restated Receivables Purchase Agreement dated as of April 10, 2009 among Parent, as itself and as Servicer, certain Subsidiaries of the Parent and SPV (as amended, restated, supplemented or otherwise modified from time to time, the "Receivables Purchase Agreement"). Reference to Section 1.02 (*Payment for the Purchase*) of the Receivables Purchase Agreement is hereby made for a statement of the terms and conditions under which the loans evidenced hereby have been and will be made. All terms which are capitalized and used herein and which are not otherwise specifically defined herein shall have the meanings ascribed to such terms in the Receivables Purchase Agreement.

2.    Interest. SPV further promises to pay interest on the outstanding unpaid principal amount hereof from the date hereof until payment in full hereof at a rate equal to [__]% per annum; provided, however, that if SPV shall default in the payment of any principal hereof, SPV promises to pay, on demand, additional interest at the rate of 1% per annum on any such unpaid amounts, from the date such payment is due to the date of actual payment. Interest shall be payable on each Monthly Settlement Date in arrears; provided, however, that SPV may elect on the date any interest payment is due hereunder to defer such payment and upon such election the amount of interest due but unpaid on such date shall constitute principal under this Intercompany Note. The outstanding principal of any loan made under this Intercompany Note shall be due and payable on the Collection Date and may be repaid or prepaid at any time without premium or penalty.

3.    Principal Payments. Parent is authorized and directed by SPV to enter on the grid attached hereto, or, at its option, in its books and records, the date and amount of each loan made by it which is evidenced by this Intercompany Note and the amount of each payment of principal made by SPV, and absent manifest error, such entries shall constitute prima facie evidence of the accuracy of the information so entered; provided that neither the failure of Parent to make any such entry or any error therein shall expand, limit or affect the obligations of SPV hereunder.

4.    Restrictions on Payment. Notwithstanding anything in this Intercompany Note or elsewhere to the contrary, the Parent, by its acceptance hereof, hereby acknowledges and agrees that all payments of principal of, and interest on, this Intercompany Note (a) shall be subordinated to, and made solely out of funds available to the SPV which are not otherwise required to be applied or set-aside for the payment of, any obligations of the SPV under the

Receivables Loan Agreement and any other Transaction Documents (collectively, the "SPV Obligations"), and shall be non recourse other than with respect to such funds and until such time as the SPV has sufficient funds to make such payment shall not constitute a claim against the SPV. Without limiting the generality of the foregoing, no payments may be made by the SPV with respect to this Intercompany Note at any time (i) that a Facility Termination Event has occurred and is continuing or (ii) during the period between the Facility Termination Date and the Final Payout Date.

Except as provided in the immediately preceding paragraph, the Parent shall not ask, demand, sue for, take or receive from the SPV, by setoff or in any other manner, the whole or any part of any obligation under this Intercompany Note, unless and until the SPV Obligations shall have been fully paid and satisfied (the temporary reduction of outstanding SPV Obligations not being deemed to constitute full payment or satisfaction thereof). In the event that, notwithstanding the foregoing provision limiting such payment, the Parent shall receive any payment of principal or interest which is not permitted to be made pursuant to the preceding paragraph, such payment shall be received and held in trust by the Parent, as trustee, for the benefit of the Administrative Agent under the Receivables Loan Agreement and the Parent shall forthwith deliver the same to the Administrative Agent (in the form received, except where endorsement or assignment by the Parent is necessary), for application to the SPV Obligations, whether or not then due. Prior to payment in full of the SPV Obligations, the Parent shall have no right to sue for or otherwise exercise any remedies with respect to any payments permitted under Article I (*Amounts and Terms*) of the Receivables Purchase Agreement, or otherwise take any action against the Buyer or the Buyer's property with respect to any such payments. The Parent, by its acceptance hereof, agrees to be so bound.

The Parent, as holder of this Intercompany Note, by its acceptance hereof, agrees that in the event of an Event of Bankruptcy with respect to the SPV, the Parent shall not be subrogated to the rights of any Secured Party to receive payments or distributions from the SPV until one year and one day after payment in full and in cash of all SPV Obligations.

The Parent of this Intercompany Note, by its acceptance hereof, agrees that it will not institute against, or join any other Person in instituting against, the SPV any proceedings of the type referred to in the definition of Event of Bankruptcy in the Receivables Loan Agreement so long as there shall not have elapsed one year plus one day since the Final Payout Date.

If at any time any payment (in whole or in part) made with respect to any SPV Obligation is rescinded or must be restored or returned (whether in connection with any Event of Bankruptcy or otherwise), the subordination provisions contained herein shall continue to be effective or shall be reinstated, as the case may be, as though such payment had not been made. The subordination provisions contained herein shall not be impaired by amendment or modification to the Transaction Documents or any lack of diligence in the enforcement, collection or protection of, or realization on, the SPV Obligations or any security therefor.

The SPV hereby waives diligence, presentment, demand, protest and notice of any kind whatsoever.

5.     Amendments.  This Intercompany Note shall not be amended or modified except in accordance with Clause 5 (*Covenants*) of the Receivables Loan Agreement.  The terms of this Intercompany Note may not be amended or otherwise modified without the prior written consent of the Administrative Agent for the benefit of the Lenders.

6.     GOVERNING LAW.  THIS INTERCOMPANY NOTE SHALL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS AND DECISIONS OF THE STATE OF NEW YORK. WHEREVER POSSIBLE EACH PROVISION OF THIS INTERCOMPANY NOTE SHALL BE INTERPRETED IN SUCH MANNER AS TO BE EFFECTIVE AND VALID UNDER APPLICABLE LAW, BUT IF ANY PROVISION OF THIS INTERCOMPANY NOTE SHALL BE PROHIBITED BY OR INVALID UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE TO THE EXTENT OF SUCH PROHIBITION OR INVALIDITY, WITHOUT INVALIDATING THE REMAINDER OF SUCH PROVISION OR THE REMAINING PROVISIONS OF THIS INTERCOMPANY NOTE.

7.     Waivers.  All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

8.     Assignment.  This Intercompany Note may not be assigned, pledged or otherwise transferred to any party other than Parent without the prior written consent of the Administrative Agent, and any such attempted transfer shall be void.

This Intercompany Note is issued in replacement of the Intercompany Note dated July 1, 2008 issued by  SPV to the Parent (the "Original Intercompany Note").  This Intercompany Note evidences the debt evidenced by the Original Intercompany Note and is not intended to be, nor shall it be deemed to be, a prepayment or novation of such debt or a release of the liens evidenced by such Original Intercompany Note.

TRIBUNE RECEIVABLES, LLC

By:_____
Title:

9207170.17 08141696                      EXHIBIT V - 3

SCHEDULE
TO
INTERCOMPANY NOTE

| Date | Addition to Principal Amount | Amount of Principal Paid or Prepaid | Unpaid Principal Balance | Notation Made by |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

9207170.17 08141696                    EXHIBIT V - 4

## EXHIBIT VI
### Form of Joinder Agreement

[ ], 200_

Reference is made to that Amended and Restated Receivables Purchase Agreement dated as of April 10, 2009 (as amended, supplemented, restated or otherwise modified, the "Receivables Purchase Agreement") among Tribune Receivables, LLC, a Delaware limited liability company, as the "Buyer", Tribune Company, a Delaware corporation, as the "Parent" and certain subsidiaries of the Parent, each such subsidiary as a "Sub-Originator". Capitalized terms used but not defined herein shall have the same meanings as such terms are used in the Receivables Purchase Agreement.

Pursuant to Section 1.10 of the Receivables Purchase Agreement, _____ (the "New Sub-Originator") hereby requests to become, effective on _____, 200__ (the "Effective Date"), a "Sub-Originator" under the Receivables Purchase Agreement.

By executing and delivering this Joinder Agreement, the New Sub-Originator confirms to and agrees with each other party to the Receivables Purchase Agreement that (i) it is a Subsidiary of the Parent, (ii) it has the organizational power to, and is duly authorized to, enter into this Joinder Agreement, (iii) it hereby makes as of the date hereof all representations made by a Sub-Originator in the Receivables Purchase Agreement, (iv) on and after the Effective Date, it will be bound by the Receivables Purchase Agreement as a Sub-Originator, (v) it will perform in accordance with the terms and conditions of the Receivables Purchase Agreement all of its obligations as a Sub-Originator and (vi) the conditions to addition of an Originator in Clause 10.13 (*Limitations on the Addition and Termination of Originators*) of the Receivables Loan Agreement have been met with respect to the New Sub-Originator.

This Joinder Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this Joinder Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

[                              ]

By: _____
Name:
Title:

Acknowledged and consented by

TRIBUNE COMPANY

By: _____
Name:
Title:

TRIBUNE RECEIVABLES, LLC

By: _____
Name:
Title:

BARCLAYS BANK PLC

By:_____
Name:
Title: