**ATTACHMENT 4**

**AMENDED AND RESTATED GUARANTY SECURITY AGREEMENT**

**AMENDED AND RESTATED GUARANTY SECURITY AGREEMENT**

THIS AMENDED AND RESTATED GUARANTY SECURITY AGREEMENT (this "Agreement") dated as of April 10, 2009 is among TRIBUNE COMPANY (the "Parent"); the subsidiaries of the Parent from time to time party hereto (the "Guarantors" and, collectively with the Parent, the "Debtors"); and BARCLAYS BANK PLC ("Barclays"), in its capacity as administrative agent under the RLA referred to below (in such capacity, the "Administrative Agent").

**BACKGROUND**

1.      Tribune Receivables, LLC (the "Borrower"), the Parent as Servicer (in such capacity, the "Servicer"), Barclays as a committed lender, Barclays as a funding agent and the Administrative Agent entered into a Receivables Loan Agreement, dated as of July 1, 2008 (as heretofore amended, the "Original RLA").

2.      The Parent, the Servicer, certain subsidiaries of the Parent (the "Sub-Originators") and the Borrower entered into a Receivables Purchase Agreement, dated as of July 1, 2008 (as heretofore amended, the "Original RPA").

3.      The Borrower, the Servicer, the Persons party thereto as Sub-Servicers and the Administrative Agent entered into a Servicing Agreement, dated as of July 1, 2008 (as heretofore amended, the "Original Servicing Agreement").

4.      In connection with the Original RLA, the Original RPA and the Original Servicing Agreement and the terms of the Financing Orders (as defined below), the Debtors entered into a Guaranty, dated as of December 8, 2008 (the "Original Guaranty", and together with the Original RLA, the Original RPA and the Original Servicing Agreement, the "Original Agreements"), in favor of the Administrative Agent and other Secured Parties, and, in order to secure the obligations of the Debtors under the Original Agreements, the Debtors and the Administrative Agent entered into a Guaranty Security Agreement, dated as of December 8, 2008 (as heretofore amended, the "Original Guaranty Security Agreement").

5.      On December 8, 2008 (the "Filing Date"), the Parent and each of the Guarantors filed, with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

6.      The Lenders have agreed to continue to make available credit to the Borrower notwithstanding the Chapter 11 Case (as defined below) upon the terms and conditions set forth in the Amended Agreements (as defined below) and the other Transaction Documents.

7.      The Borrower, the Servicer, the Lenders from time to time party thereto, the Administrative Agent, Wells Fargo Foothill, LLC, as Documentation Agent and the CIT Group/Business Credit, Inc., as Syndication Agent are amending and restating the Original RLA in its entirety (such agreement, as amended or modified from time to time, the "RLA").

8.    The Parent, the Servicer, the Sub-Originators and the Borrower are amending and restating the Original RPA in its entirety (such agreement, as amended or modified from time to time, the "RPA"). The obligations of the Parent, the Servicer and the Sub-Originators to the Borrower under the RPA are assigned to the Administrative Agent pursuant to the terms of the RLA.

9.    The Borrower, the Servicer, the Sub-Servicers and the Administrative Agent are amending and restating the Original Servicing Agreement in its entirety (such agreement, as amended or modified from time to time, the "Servicing Agreement").

10.    In accordance with the terms of the RLA, the RPA, the Servicing Agreement and the terms of the Financing Orders (as defined below), the Debtors are amending and restating the Original Guaranty in its entirety (such agreement, as amended or modified from time to time, the "Guaranty", and together with the RLA, the RPA and the Servicing Agreement, the "Amended Agreements"), and, in order to continue to secure the obligations of the Debtors under the Guaranty, the Debtors and the Administrative Agent are entering into this Agreement to amend and restate the Original Guaranty Security Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Definitions.  When used herein, (a) the terms Account, Account Debtor, Certificated Security, Chattel Paper, Commercial Tort Claim, Commodity Account, Commodity Contract, Deposit Account, Document, Electronic Chattel Paper, Equipment, Financial Assets, Fixture, Goods, Health-Care-Insurance Receivable, Instrument, Inventory, Investment Property, Letter of Credit Rights, Security, Security Entitlement, Securities Account, Supporting Obligations and Uncertificated Security have the respective meanings assigned thereto in Articles 8 and 9 of the UCC (as defined below), (b) capitalized terms which are not otherwise defined have the respective meanings assigned thereto in the RLA and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

Bankruptcy Court means the United States Bankruptcy Court for the District of Delaware or such other court as shall have jurisdiction over the Chapter 11 Case.

Carve-out has the meaning set forth in the Financing Orders.

Chapter 11 Case means the chapter 11 cases of the Parent and certain of its subsidiaries and affiliates jointly administered under case no. 08-13141 in the Bankruptcy Court.

Collateral means, with respect to any Debtor, all property and rights of such Debtor in which a security interest is granted hereunder.

Default means the occurrence of a Facility Termination Event.

Excluded Assets has the meaning assigned thereto in Section 2.

Filing Date means December 8, 2008.

Financing Orders mean, collectively, the Interim Financing Order, the Final Financing Order and any Subsequent Financing Orders.

General Intangibles means, with respect to any Debtor, all of such Debtor's "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of such Debtor's licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

Intellectual Property means all past, present and future: trade secrets and other proprietary information; customer lists; trademarks, service marks, business names, trade names, designs, logos, indicia, and/or other source and/or business identifiers and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights (including, without limitation, copyrights for computer programs) and copyright registrations or applications for registrations which have heretofore been or may hereafter be issued throughout the world and all tangible property embodying the copyrights; inventions (whether or not patentable); patent applications and patents; industrial designs, industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; mask works; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, source codes, object codes and other physical manifestations, embodiments or incorporations of any of the foregoing; the right to sue for all past, present and future infringements of any of the foregoing; and all common law and other rights throughout the world in and to all of the foregoing.

Non-Tangible Collateral means, with respect to any Debtor, collectively, such Debtor's Accounts and General Intangibles.

Permitted Lien means, with respect to any Collateral, an Adverse Claim on such Collateral permitted to exist under the RPA.

Secured Agreements means the RPA, the Guaranty, the Servicing Agreement, and the other Transaction Documents, excluding the Letter of Credit Agreement. For the avoidance of doubt, it is understood and agreed that the Secured Agreements do not include the Senior Credit Agreement or any hedge agreement between a Debtor and a Secured Party.

Secured Obligations means, as to each Debtor, all obligations (monetary or otherwise) of such Debtor under the Secured Agreements, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

Secured Parties means the Lenders, the Administrative Agent and each other Indemnified Party (each as defined in the RLA).

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, as used in Section 8 hereof, "UCC" shall mean the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

2.    Grant of Security Interest. Pursuant to the Financing Orders, as security for the payment of all Secured Obligations, each Debtor hereby assigns to the Administrative Agent for the

benefit of the Secured Parties, and grants to the Administrative Agent for the benefit of the Secured Parties a continuing security interest in, the following, whether now or hereafter existing or acquired:

All of such Debtor's:

> (i)    Accounts, including Health-Care-Insurance Receivables;
>
> (ii)    Chattel Paper, including Electronic Chattel Paper;
>
> (iii)    Commercial Tort Claims;
>
> (iv)    Deposit Accounts;
>
> (v)    Documents;
>
> (vi)    Financial Assets;
>
> (vii)    General Intangibles;
>
> (viii)    Goods (including, without limitation, all its Equipment, Fixtures and Inventory), together with all embedded software, accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor;
>
> (ix)    Instruments;
>
> (x)    Intellectual Property;
>
> (xi)    Investment Property (including, without limitation, Commodity Accounts, Commodity Contracts, Securities (whether Certificated Securities or Uncertificated Securities), Security Entitlements and Securities Accounts);
>
> (xii)    Letter of Credit Rights;
>
> (xiii)    money (of every jurisdiction whatsoever);
>
> (xiv)    Supporting Obligations; and
>
> (xv)    to the extent not included in the foregoing, all other personal assets and property of any kind or description;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing, all claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, and all proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing. Notwithstanding the foregoing, the Collateral shall not include (i) any property to the extent that such grant of a security interest (x) is prohibited by any applicable law or

governmental authority, or (y) requires a consent not obtained of any governmental authority pursuant to any applicable law, except, in the case if each of clause (x) and (y), to the extent any such law, requirement is rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code as in effect in the State of New York or any other applicable law or principles of equity, (ii) with respect to any shares of capital stock or other ownership interests in any first-tier foreign Subsidiary, the excess over 65% of all of the voting shares of capital stock or equity interests in such foreign subsidiary, (iii) any stock or other ownership interests of any Subsidiary of any first-tier foreign Subsidiary.  To the extent the forgoing prohibits the granting of a lien on particular assets ("Excluded Assets"), the Collateral shall nevertheless include the cash proceeds resulting from any disposition of such Excluded Assets.

The Administrative Agent hereby agrees to (and each other Secured Party by its acceptance of the benefits of any Collateral hereby authorizes the Administrative Agent to) release any Collateral that is permitted to be sold or otherwise transferred to a Person other than a Debtor pursuant to the terms of the Secured Agreements. In addition, with respect to any Debtor that is sold to a Person other than the Parent or any Subsidiary of the Parent in a transaction permitted pursuant to the terms of the Secured Agreements, the Administrative Agent hereby agrees to (and each other Secured Party by its acceptance of the benefits of any Collateral hereby authorizes the Administrative Agent to) (x) release such Debtor from its obligations hereunder and under the Guaranty and (y) release any Collateral of such Debtor. Each Secured Party hereby authorizes the Administrative Agent to execute and deliver to the Debtors, at the Debtors' joint and several cost and expense, any and all releases of liens, termination statements, assignments or other documents reasonably requested by the Debtors in connection with any sale or other disposition of property to the extent such sale or other disposition is permitted by the terms of the Secured Agreements.

Without limiting the generality of the foregoing, the security interest in and lien on the Collateral shall, subject to the Carve-out, (a) pursuant to Section 364(c)(2) of the Bankruptcy Code, be a first priority, perfected security interest in and lien upon all of the Debtors' right, title and interest in, to and under all Collateral that is not otherwise encumbered by a validly perfected security interest or lien on the Filing Date and (b) pursuant to Section 364(c)(3) of the Bankruptcy Code, a junior, perfected security interest in and lien upon all of the Debtors' right, title and interest in, to and under all Collateral which is subject to a Permitted Lien, including, without limitation, a validly perfected security interest or lien in existence as of the Filing Date, or a valid lien perfected (but not granted) after the Filing Date to the extent such perfection in respect of a pre-Filing Date claim is expressly permitted under the Bankruptcy Code.  Pursuant to Section 364(c)(1) of the Bankruptcy Code, the Secured Obligations shall at all times constitute allowed administrative expense claims having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.  The execution and delivery of this Agreement shall not be construed as an acknowledgment by the Administrative Agent or any Lender that such party is adequately protected with respect to its interests in any collateral granted to secure claims arising under the RLA or other Transaction Documents.

3.    Warranties.  (a)  Each Debtor warrants that: (i) such Debtor has full power and authority to execute and deliver this Agreement and perform such Debtor's obligations hereunder, and to subject the Collateral to the security interest hereunder; (ii) all information with respect to the

Collateral and Account Debtors set forth in any schedule, certificate or other writing at any time heretofore or hereafter furnished by such Debtor to the Administrative Agent or any Lender is and will be true and correct in all material respects as of the date furnished; (iii) such Debtor's true legal name as registered in the jurisdiction in which such Debtor is organized or incorporated, jurisdiction of organization or incorporation, federal employer identification number, organizational identification number, if any, as designated by the state of its organization or incorporation, chief executive office and principal place of business are as set forth on Schedule I hereto; (iv) such Debtor is duly organized, validly existing and, if applicable, in good standing under the laws of the jurisdiction of its organization; (v) the execution and delivery of this Agreement and the performance by such Debtor of its obligations hereunder are within such Debtor's corporate powers, have been duly authorized by all necessary corporate action, have received all necessary governmental approval (if any shall be required), and do not and will not contravene or conflict with any provision of law or of the charter or by-laws of such Debtor, which is binding upon such Debtor; and (vi) this Agreement is a legal, valid and binding obligation of such Debtor, enforceable in accordance with its terms, except that the enforceability of this Agreement may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(b)  Each Debtor hereby represents and warrants that (i) the Collateral pledged hereunder includes all of the broadcast stations and real property identified on Schedule II hereto (the "Representative Collateral"), except to the extent the Representative Collateral constitutes Excluded Assets, and (ii) the security interest in and lien on the Representative Collateral in favor of the Administrative Agent is a first priority, perfected security interest in and lien on such Representative Collateral to the extent provided in a valid and enforceable order of the Bankruptcy Court, subject to no other Adverse Claim, pledge or other interest other than Permitted Liens.

4.    Collections. etc.  Until such time during the existence and continuance of a Default as the Administrative Agent shall notify such Debtor of the revocation of such power and authority, each Debtor (a) may, in the ordinary course of its business, at its own expense, sell, lease or furnish under contracts of service any of the Inventory normally held by such Debtor for such purpose, use and consume, in the ordinary course of its business, any raw materials, work in process or materials normally held by such Debtor for such purpose, and use, in the ordinary course of its business (but subject to the terms of the Secured Agreements), the cash proceeds of Collateral and other money which constitutes Collateral, (b) may, to the extent permitted by the Secured Agreements, sell Chattel Paper, (c) may, to the extent permitted by the Secured Agreements, sell Instruments, Investment Property, Documents and the Goods title to which is evidenced by such Documents, Equipment and Fixtures, (d) will, at its own expense, endeavor to collect, as and when due, all amounts due under any of the Non-Tangible Collateral, including the taking of such action with respect to such collection as the Administrative Agent may reasonably request or, in the absence of such request, as such Debtor may deem advisable and (e) may grant, to the extent permitted by the Secured Agreements in the ordinary course of business, to any party obligated on any of the Non-Tangible Collateral, any rebate, refund or allowance to which such party may be lawfully entitled, and may accept, in connection therewith, the return of Goods, the sale or lease of which shall have given rise to such Non-Tangible Collateral. The Administrative Agent, however, may, at any time that a Default exists and is continuing, whether before or after any revocation of such power and

authority or the maturity of any of the Secured Obligations, notify any party obligated on any of the Non-Tangible Collateral to make payment or otherwise render performance to or for the benefit of the Administrative Agent and enforce, by suit or otherwise the obligations of any such party obligated on any Non-Tangible Collateral. In connection therewith, the Administrative Agent may surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby. Upon request of the Administrative Agent during the existence and continuance of a Default, each Debtor will, at its own expense, notify any party obligated on any of the Non-Tangible Collateral to make payment to the Administrative Agent of any amounts due or to become due thereunder.

Upon request by the Administrative Agent during the existence and continuance of a Default, each Debtor will forthwith, upon receipt, transmit and deliver to the Administrative Agent, in the form received, all cash, checks, drafts and other instruments or writings for the payment of money (properly endorsed, where required, so that such items may be collected by the Administrative Agent) which may be received by such Debtor at any time in full or partial payment or otherwise as proceeds of any of the Collateral. Except as the Administrative Agent may otherwise consent in writing, any such items which may be so received by any Debtor will not be commingled with any other of its funds or property, but will be held separate and apart from its own funds or property and upon express trust for the Administrative Agent until delivery is made to the Administrative Agent. Each Debtor will comply with the terms and conditions of any consent given by the Administrative Agent pursuant to the foregoing sentence.

During the existence and continuance of a Default, the Administrative Agent (or any designee of the Administrative Agent) is authorized to endorse, in the name of the applicable Debtor, any item, howsoever received by the Administrative Agent, representing any payment on or other proceeds of any of the Collateral.

5.      Certificates, Schedules and Reports. Each Debtor will from time to time, as the Administrative Agent may request, deliver to the Administrative Agent such schedules, certificates and reports respecting all or any of the Collateral at the time subject to the security interest hereunder, and the items or amounts received by such Debtor in full or partial payment of any of the Collateral, as the Administrative Agent may reasonably request. Any such schedule, certificate or report shall be executed by a duly authorized officer of such Debtor and shall be in such form and detail as the Administrative Agent may specify.

6.      Agreements of the Debtors. Each Debtor (a) will, upon request of the Administrative Agent, authorize the filing of such financing statements and execute such other documents (and pay the cost of filing or recording the same in all public offices reasonably deemed appropriate by the Administrative Agent) and do such other acts and things (including, without limitation, delivery to the Administrative Agent of any Instruments, Certificated Securities which constitute Collateral), all as the Administrative Agent may from time to time reasonably request, to establish and maintain a valid security interest in the Collateral (free of all other liens, claims and rights of third parties whatsoever, other than Adverse Claims permitted under the Secured Agreements) to secure the payment of the Secured Obligations (and each Debtor hereby authorizes the Administrative Agent to file any financing statement that (i) indicates the Collateral (x) as all assets or personal property of such Debtor or words of similar effect, regardless of whether any particular asset in the Collateral

falls within the scope of Article 9 of the UCC of the jurisdiction wherein such financing statement is filed, or (y) as being of an equal or lesser scope or with greater detail, and (ii) contains any other information required by Section 5 of Article 9 of the UCC of the jurisdiction wherein such financing statement is filed regarding the sufficiency or filing office acceptance of any financing statement, including (x) whether such Debtor is an organization, the type of organization and any organizational identification number issued to such Debtor and (y) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates); (b) will not change its state of organization or incorporation and will not change its name, identity or corporate structure if as a result thereof the Administrative Agent's security interest in the Collateral shall cease to be a valid security interest therein, unless such Debtor shall have given the Administrative Agent not less than 30 days' prior notice of such change (provided that this Section 6(b) shall not be deemed authorize any change or transaction prohibited under the Secured Agreements); (c) will keep its records concerning the Non-Tangible Collateral in such a manner as will enable the Administrative Agent or its designees to determine in accordance with clause (e) below the status of the Non-Tangible Collateral; (d) will furnish the Administrative Agent such information concerning such Debtor, the Collateral and the Account Debtors as the Administrative Agent may from time to time reasonably request; (e) will permit the Administrative Agent and its designees, from time to time, on reasonable notice and at reasonable times and intervals during normal business hours (or at any time without notice during the existence and continuance of a Default) to inspect such Debtor's Inventory and other Goods, and to inspect, audit and make copies of and extracts from all records and all other papers in the possession of such Debtor pertaining to the Collateral and the Account Debtors, and will, upon request of the Administrative Agent during the existence and continuance of a Default, deliver to the Administrative Agent all of such records and papers; (f) except for the sale or lease of Inventory in the ordinary course of business and for any sale, lease, assignment or other disposition permitted by the Secured Agreements, will not sell, lease, assign any Collateral or create or permit to exist any Lien on any Collateral other than Permitted Liens; (g) without limiting the provisions of the Secured Agreements, will at all times keep all of its Inventory and other Goods insured under policies maintained with reputable, financially sound insurance companies against loss, damage, theft and other risks to such extent as is customarily maintained by companies similarly situated; (h) will take such actions as are reasonably necessary to keep its Inventory in good repair and condition unless failure to do so would not reasonably be expected to have a Material Adverse Effect; (i) will take such actions as are reasonably necessary to keep its Equipment in good repair and condition and in good working order, ordinary wear and tear excepted unless failure to do so would not reasonably be expected to have a Material Adverse Effect; (j) will promptly pay when due all license fees, registration fees, taxes, assessments and other charges which may be levied upon or assessed against the ownership, operation, possession, maintenance or use of its Equipment and other Goods unless failure to do so would not reasonably be expected to have a Material Adverse Effect; (k) will, upon request of the Administrative Agent following a Default, in the event any of its Equipment is covered by a certificate of title, deliver all such certificates to the Administrative Agent or its designees; (l) will take all steps reasonably necessary to protect, preserve and maintain all of its rights in the Collateral unless failure to do so would not reasonably be expected to have a Material Adverse Effect; (m) will keep all of the tangible Collateral, Deposit Accounts and Investment Property in the United States; (n) will promptly notify the Administrative Agent in writing upon incurring or otherwise obtaining a Commercial Tort Claim which is claiming damages in excess of $1,000,000 after the date hereof

against any third party, and this Agreement shall be amended to include a specific reference (sufficient under Section 9-108 of the UCC) to such Commercial Tort Claim; (o) will promptly notify the Administrative Agent in writing upon becoming the beneficiary under any letter of credit in an amount of greater than $10,000,000 and, at the request of the Administrative Agent, pursuant to an agreement in form and substance reasonably satisfactory to the Administrative Agent, arrange for the issuer and any confirmer or other nominated person of such letter of credit to consent to an assignment to the Administrative Agent of such letter of credit; (p) will promptly notify the Administrative Agent in writing if such Debtor holds or acquires an interest in any Electronic Chattel Paper and, at the request of the Administrative Agent, take such action as the Administrative Agent may reasonably request to vest control, under Section 9-105 of the UCC, of such Electronic Chattel Paper in the Administrative Agent; and (q) acknowledges and agrees that it is not authorized to file any financing statement in favor of the Administrative Agent without the prior written consent of the Administrative Agent and that it will not do so without the prior written consent of the Administrative Agent, subject to such Debtor's rights under Section 9-509(d)(2) of the UCC.

Any expenses incurred in protecting, preserving or maintaining any Collateral shall be borne by the applicable Debtor. Whenever a Default exists and is continuing, the Administrative Agent shall have the right to bring suit to enforce any or all of the Intellectual Property or licenses thereunder, in which event the applicable Debtor shall at the request of the Administrative Agent do any and all lawful acts and execute any and all proper documents required by the Administrative Agent in aid of such enforcement and such Debtor shall promptly, upon demand, reimburse and indemnify the Administrative Agent for all costs and expenses incurred by the Administrative Agent in the exercise of its rights under this Section 6. Notwithstanding the foregoing, the Administrative Agent shall have no obligation or liability regarding the Collateral or any thereof by reason of, or arising out of, this Agreement.

7.    Default. (a)  Whenever a Default exists and is continuing, upon five Business Days' notice to the Debtors (as well as counsel of record for any statutory committee appointed in the Chapter 11 Case (and the Office of the United States Trustee for the District in which the Chapter 11 Case is pending), the automatic stay under Section 362 of the Bankruptcy Code shall be deemed lifted, without further order of or application to the Bankruptcy Court, to permit the Administrative Agent to (A) enforce the liens securing the Secured Obligations, (B) exercise any and all remedies under this Agreement, the Financing Orders, the other Transaction Documents and applicable law available to the Administrative Agent or the Lenders, including but not limited to, all rights and remedies as a secured creditor under the UCC or in equity in respect of the Collateral, (C) take immediate possession of the Collateral and operate the business of the Debtors to protect and preserve the value of the Collateral, the cost of which shall become part of the Secured Obligations and/or (D) set-off or otherwise seize amounts in any account maintained with the Administrative Agent or any Lender or under their control and apply such amounts to the Secured Obligations. The foregoing shall not be construed to limit the Administrative Agent's or any Lender's discretion (to the extent provided in this Agreement) to take the actions described above at any other time. In connection with the exercise by the Administrative Agent or the Lenders of any remedy provided to them under the Transaction Documents or the Financing Orders, the Transaction Parties agree not the object to or otherwise challenge the Administrative Agent's security interest under the Financing Orders.

(b)     Each Debtor agrees, in case of Default, (i) to assemble, at its expense, all its Inventory and other Goods (other than Fixtures) at a convenient place or places acceptable to the Administrative Agent, and (ii) at the Administrative Agent's request, to execute all such documents and do all such other things which may be necessary or desirable in order to enable the Administrative Agent or its nominee to be registered as owner of the Intellectual Property with any competent registration authority.

(c)     Notice of the intended disposition of any Collateral may be given by first-class mail, hand-delivery (through a delivery service or otherwise), facsimile or E-mail, and shall be deemed to have been "sent" upon deposit in the U.S. mails with adequate postage properly affixed, upon delivery to an express delivery service, upon the electronic submission through telephonic services or, if by facsimile transmission, when sent against mechanical confirmation of successful transmission, as applicable. Each Debtor hereby agrees and acknowledges that: (i) with respect to Collateral that is (A) perishable or threatens to decline speedily in value or (B) is of a type customarily sold on a recognized market (including, but not limited to, Investment Property), no notice of disposition need be given; and (ii) with respect to Collateral not described in clause (i) above, notification sent after default and at least ten days before any proposed disposition provides notice within a reasonable time before disposition.

(d)     Each Debtor hereby agrees and acknowledges that a commercially reasonable disposition of Inventory, Equipment or Intellectual Property may be by lease or license of, in addition to the sale of, such Collateral. Each Debtor further agrees and acknowledges that a disposition (i) made in the usual manner on any recognized market, (ii) at the price current in any recognized market at the time of disposition or (iii) in conformity with reasonable commercial practices among dealers in the type of property subject to the disposition shall, in each case, be deemed commercially reasonable.

(e)     Any cash proceeds of any disposition by the Administrative Agent of any of the Collateral shall be applied by the Administrative Agent to payment of expenses in connection with the Collateral, including attorneys' fees and legal expenses, and thereafter to the payment of any and all of the Secured Obligations in such order of application as the Required Lenders may from time to time elect or shall be held as Collateral securing Secured Obligations, including, without limitation, potential Secured Obligations relating to outstanding but undrawn letters of credit, and thereafter any surplus will be paid to the applicable Debtor or as a court of competent jurisdiction shall direct. The Administrative Agent need not apply or pay over for application noncash proceeds of collection and enforcement unless (i) the failure to do so would be commercially unreasonable and (ii) the applicable Debtor has provided the Administrative Agent with a written demand to apply or pay over such noncash proceeds on such basis.

8.     Limitation on Duty in Respect of Collateral. Except to the extent provided by applicable law, the Administrative Agent will have no duty as to any Collateral in its possession or control or in the possession or control of any sub-agent or bailee or any income therefrom or as to the preservation of rights against prior parties or any other rights pertaining thereto. The Administrative Agent will be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession or control if such Collateral is accorded treatment

substantially equal to that which it accords its own property, and will not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of any act or omission of any sub-agent or bailee selected by the Administrative Agent in good faith or by reason of any act or omission by the Administrative Agent pursuant to instructions from the Administrative Agent, except to the extent that such liability arises from the Administrative Agent's gross negligence or willful misconduct.

To the extent that applicable law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Debtor acknowledges and agrees that it is not commercially unreasonable for the Administrative Agent (a) to fail to incur expenses reasonably deemed significant by the Administrative Agent to prepare Collateral for disposition or otherwise to complete raw material or work-in-process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as the Debtors, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, including, without limitation, any warranties of title, (k) to purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of Collateral, or to provide to the Administrative Agent a guaranteed return from the collection or disposition of Collateral or (l) to the extent deemed appropriate by the Administrative Agent, to obtain the services of brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any of the Collateral. Each Debtor acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent would not be commercially unreasonable in the Administrative Agent's exercise of remedies against the Collateral and that other actions or omissions by the Administrative Agent shall not be deemed commercially unreasonable solely on account of not being specifically referred to in this Section. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any right to a Debtor or to impose any duties on the Administrative Agent that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.

9.    General. Each Debtor agrees that a carbon, photographic or other reproduction of this Agreement is sufficient as a financing statement. The Debtors hereby ratify their authorization contained in Section 6(a) for the Administrative Agent to have filed in any Uniform Commercial Code jurisdiction prior to the date hereof any financing statement or amendment thereto filed prior to the date hereof.

All notices hereunder shall be in writing (including facsimile transmission) and shall be sent, in accordance with Clause 8.02 of the RPA.

Each of the Debtors agrees to pay all expenses, including legal fees and expenses paid or incurred by the Administrative Agent or any Secured Party in endeavoring to collect the Secured Obligations of such Debtor, or any part thereof, and in enforcing this Agreement against such Debtor, and all such obligations will themselves be Secured Obligations.

No delay on the part of the Administrative Agent in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Administrative Agent of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

This Agreement shall remain in full force and effect until all Secured Obligations have been paid in full in cash and all commitments under the RLA and the RPA have terminated. If at any time all or any part of any payment theretofore applied by the Administrative Agent or any Lender to any of the Secured Obligations is or must be rescinded or returned by the Administrative Agent or such Lender for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of any Debtor), such Secured Obligations shall, for the purposes of this Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Administrative Agent or such Lender, and this Agreement shall continue to be effective or be reinstated, as the case may be, as to such Secured Obligations, all as though such application by the Administrative Agent or such Lender had not been made.

Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

The rights and privileges of the Administrative Agent hereunder shall inure to the benefit of its successors and assigns.

Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Parent, the Guarantors and the Administrative Agent with the consent of the Required Lenders, provided that such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; and provided further that no such amendment, waiver or consent that shall have the effect of releasing Collateral shall be effective unless (i) such Collateral is being sold, contributed or otherwise transferred to a Person that is not a Guarantor in a transaction permitted under the Receivables Purchase Agreement, in which case the Administrative Agent shall release such Collateral without the consent of any other Person, (ii) if the aggregate fair market value of the Collateral released or to be released under this paragraph (other than pursuant to the foregoing clause (i)) exceeds $50,000,000, the Supermajority Lenders shall have consented to such release, or (iii) if the forgoing clauses (i) and (ii) do not apply, the Required Lenders shall have consented to such release.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement. At any time after the date of this Agreement, one or more additional Persons may become parties hereto by executing and delivering to the Administrative Agent a counterpart of this Agreement together with supplements to the Schedules hereto setting forth all relevant information with respect to such party as of the date of such delivery. Immediately upon such execution and delivery (and without any further action), each such additional Person will become a party to, and will be bound by all the terms of, this Agreement.

10.    GOVERNING LAW; SUBMISSION TO JURISDICTION; APPOINTMENT OF PROCESS AGENT.

(a)    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (except to the extent that, pursuant to New York law, the perfection, the effect of perfection or nonperfection or the priority of any security interest granted hereunder may be determined in accordance with the laws of a different jurisdiction).

(b)    ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, THE LENDERS, THE GUARANTORS OR THE SERVICER SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, ANY STATE OR FEDERAL COURT IN THE STATE OF NEW YORK. EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF AFORESAID COURTS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE TRANSACTION DOCUMENTS, AND EACH PARTY HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS.

(c)    THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THEY MAY EFFECTIVELY DO SO, THE DEFENSE OF INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING. THE PARTIES HERETO AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(d)    EACH OF THE PARTIES HERETO CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO IT AT ITS ADDRESS

SPECIFIED HEREIN.  NOTHING IN THIS SECTION 10(d) SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY MANNER PERMITTED BY LAW.

(e)    THE SUBMISSION TO THE JURISDICTION OF THE COURTS REFERRED TO IN SECTION 10(b) SHALL NOT (AND SHALL NOT BE CONSTRUED SO AS TO) LIMIT THE RIGHT OF ANY PARTY TO TAKE PROCEEDINGS AGAINST ANY OTHER PARTY OR ANY OF ITS RESPECTIVE PROPERTY IN ANY OTHER COURT OF COMPETENT JURISDICTION NOR SHALL THE TAKING OF PROCEEDINGS IN ANY OTHER JURISDICTION PRECLUDE THE TAKING OF PROCEEDINGS IN ANY OTHER JURISDICTION, WHETHER CONCURRENTLY OR NOT.

The Parent, the Guarantors and the Administrative Agent entered into the Original Guaranty Security Agreement.  The parties hereto desire to enter into this Agreement in order to amend and restate the Original Guaranty Security Agreement in its entirety.  Nothing herein shall release the Parent or any Guarantor from any liability it may have accrued under the Original Guaranty Security Agreement, which liability shall be evidenced by this Agreement.  All references to the Original Guaranty Security Agreement in any other agreement or document shall be deemed to be references to this Agreement.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the day and year first above written.

**TRIBUNE COMPANY**

By:_____
Name:  Chandler Bigelow III
Title:    Senior Vice President/Chief Financial Officer

**TRIBUNE PUBLISHING COMPANY**
**INSERTCO, INC.**
as Debtor Subsidiaries


By:_____

Name:  Chandler Bigelow III

Title:    Treasurer


**TMLS I, INC.**
**SOUTHERN CONNECTICUT NEWSPAPERS, INC.**
as Debtor Subsidiaries


By:_____

Name:  Chandler Bigelow III

Title:    President and Assistant Treasurer


**TIMES MIRROR LAND AND TIMBER COMPANY**
as Debtor Subsidiary


By:_____

Name:  Chandler Bigelow III

Title:

**SHEPARD'S INC.**
**TIMES MIRROR SERVICES COMPANY, INC.**
**CANDLE HOLDINGS CORPORATION**
**DISTRIBUTION SYSTEMS OF AMERICA, INC.**
**EAGLE NEW MEDIA INVESTMENTS, LLC**
**EAGLE PUBLISHING INVESTMENTS, LLC**
**FORTIFY HOLDINGS CORPORATION**
**GREENCO, INC.**
**JULIUSAIR COMPANY, LLC**
**JULIUSAIR COMPANY II, LLC**
**STAR COMMUNITY PUBLISHING GROUP, LLC**
**NBBF, LLC**
**TIMES MIRROR PAYROLL PROCESSING**
    **COMPANY, INC.**
**TRIBUNE FINANCE, LLC**
**TRIBUNE FINANCE SERVICE CENTER, INC.**
**TRIBUNE LICENSE, INC.**
**TRIBUNE LOS ANGELES, INC.**
**TRIBUNE MANHATTAN NEWSPAPER**
    **HOLDINGS, INC.**
**TRIBUNE NEW YORK NEWSPAPER HOLDINGS,**
    **LLC**
**TRIBUNE NM, INC.**
**PUBLISHERS FOREST PRODUCTS CO. OF**
    **WASHINGTON**
**NEW RIVER CENTER MAINTENANCE**
    **ASSOCIATION, INC.**
**SIGNS OF DISTINCTION, INC.**
**TRIBUNE BROADCASTING HOLDCO, LLC**
as Debtor Subsidiaries


By:_____
Name:  Chandler Bigelow III
Title:   President and Treasurer

**TRIBUNE INTERACTIVE, INC.**
**FORSALEBYOWNER.COM REFERRAL**
    **SERVICES, LLC**
**INTERNET FORECLOSURE SERVICE, INC.**
**CHICAGOLAND TELEVISION NEWS, INC.**
**TRIBUNE BROADCAST HOLDINGS, INC.**
**TRIBUNE TELEVISION HOLDINGS, INC.**
**WGN CONTINENTAL BROADCASTING**
    **COMPANY**
**WPIX, INC.**
**TRIBUNE TELEVISION NEW ORLEANS, INC.**
**KSWB INC.**
**KTLA INC.**
**TOWER DISTRIBUTION COMPANY**
**TRIBUNE TELEVISION NORTHWEST, INC.**
**TRIBUNE TELEVISION COMPANY**
**CHANNEL 40, INC.**
**CHANNEL 39, INC.**
**LOS ANGELES TIMES COMMUNICATIONS LLC**
**WDCW BROADCASTING, INC.**
**ORLANDO SENTINEL COMMUNICATIONS**
    **COMPANY**
**SUN-SENTINEL COMPANY**
**GOLD COAST PUBLICATIONS, INC.**
**FORUM PUBLISHING GROUP, INC.**
**THE DAILY PRESS, INC.**
**CHICAGO TRIBUNE COMPANY**
**THE BALTIMORE SUN COMPANY**
**THE HARTFORD COURANT COMPANY**
**THE MORNING CALL, INC.**
**435 PRODUCTION COMPANY**
**5800 SUNSET PRODUCTIONS INC.**
**BALTIMORE NEWSPAPER NETWORKS, INC.**
**CALIFORNIA COMMUNITY NEWS**
    **CORPORATION**
**CHANNEL 20, INC.**
**CHICAGO AVENUE CONSTRUCTION COMPANY**
**CHICAGO RIVER PRODUCTION COMPANY**
as Debtor Subsidiaries


By:_____
Name:  Chandler Bigelow III
Title:   Assistant Treasurer

**CHICAGO TRIBUNE NEWSPAPERS, INC.**
**CHICAGO TRIBUNE PRESS SERVICE, INC.**
**CHICAGOLAND MICROWAVE LICENSEE, INC.**
**CHICAGOLAND PUBLISHING COMPANY**
**COURANT SPECIALTY PRODUCTS, INC.**
**DIRECT MAIL ASSOCIATES, INC.**
**FORSALEBYOWNER.COM CORP.**
**HEART & CROWN ADVERTISING, INC.**
**HOMEOWNERS REALTY, INC.**
**HOMESTEAD PUBLISHING CO.**
**HOY, LLC**
**HOY PUBLICATIONS, LLC**
**KIAH INC.**
**KPLR, INC.**
**KWGN INC.**
**LOS ANGELES TIMES INTERNATIONAL, LTD.**
**LOS ANGELES TIMES NEWSPAPERS, INC.**
**MAGIC T MUSIC PUBLISHING COMPANY**
**NEOCOMM, INC.**
**NEW MASS. MEDIA, INC.**
**NEWSCOM SERVICES, INC.**
**NEWSPAPER READERS AGENCY, INC.**
**NORTH MICHIGAN PRODUCTION COMPANY**
**NORTH ORANGE AVENUE PROPERTIES, INC.**
**OAK BROOK PRODUCTIONS, INC.**
**PATUXENT PUBLISHING COMPANY**
**SENTINEL COMMUNICATIONS NEWS**
          **VENTURES, INC.**
**STEMWEB, INC.**
**THE OTHER COMPANY LLC**
**TMLH 2, INC.**
**TMS ENTERTAINMENT GUIDES, INC.**
**TOWERING T MUSIC PUBLISHING COMPANY**
**TRIBUNE BROADCASTING COMPANY**
**TRIBUNE BROADCASTING NEWS NETWORK,**
          **INC.**
**TRIBUNE CALIFORNIA PROPERTIES, INC.**
**TRIBUNE DIRECT MARKETING, INC.**
**TRIBUNE ENTERTAINMENT COMPANY**
as Debtor Subsidiaries


By:_____
Name:  Chandler Bigelow III
Title:    Assistant Treasurer

**TRIBUNE ENTERTAINMENT PRODUCTION
  COMPANY
TRIBUNE MEDIA NET, INC.
TRIBUNE MEDIA SERVICES, INC.
TRIBUNE NETWORK HOLDINGS COMPANY
VALUMAIL, INC.
VIRGINIA COMMUNITY SHOPPERS, LLC
VIRGINIA GAZETTE COMPANIES, LLC
WATL, LLC
WCWN LLC
WLVI INC
WTXX INC.**
as Debtor Subsidiaries


By:_____
Name:  Chandler Bigelow III
Title:    Assistant Treasurer

**BARCLAYS BANK PLC**
as Administrative Agent


By:_____
Title:

The undersigned is executing a counterpart hereof for purposes of becoming a party hereto:

[ADDITIONAL GUARANTOR]

By:_____
   Name:
   Title:

## SCHEDULE I
## TO GUARANTY SECURITY AGREEMENT

### LEGAL NAME, JURISDICTION OF ORGANIZATION, FEDERAL EMPLOYER IDENTIFICATION NUMBER, ORGANIZATION IDENTIFICATION NUMBER, CHIEF EXECUTIVE OFFICE AND PRINCIPAL PLACE OF BUSINESS

| Legal Name | State of Origin | FEIN | State ID # | Principal Place of Business | Additional Places of Business | Prior Names |
|---|---|---|---|---|---|---|
| 435 Production Company | DE | | 2309690 | | | |
| 5800 Sunset Productions | DE | | 2309699 | | | |
| Baltimore Newspaper Networks, Inc. | MD | | D04491312 | | | |
| California Community News Corporation | DE | | 2335002 | | | |
| Candle Holdings Corporation | DE | | 2776567 | | | |
| Channel 20, Inc. | DE | | 2173737 | | | |
| Channel 39, Inc. | DE | 65-0085256 | 2173736 | Chicago, IL | Hollywood, FL | N/A |
| Channel 40, Inc. | DE | 68-0183844 | 2183388 | Chicago, IL | Sacramento, CA | N/A |
| Chicago Avenue Construction Company | IL | | 60755477 | | | |
| Chicago River Production Company | DE | | 2309698 | | | |
| Chicago Tribune Company | IL | 36-2643437 | 48278540 | Chicago, IL | N/A | N/A |
| Chicago Tribune Newspapers, Inc. | IL | | 43713001 | | | |
| Chicago Tribune Press Service, Inc. | IL | | 27981607 | | | |
| ChicagoLand and Microwave Licensee, Inc. | DE | | 2225727 | | | |
| Chicagoland Publishing Company | DE | | 2459210 | | | |
| Chicagoland Television News, Inc. | DE | 36-3801352 | 2270399 | Chicago, IL | Oak Brook, IL | Tribune Regional Programming, Inc. |
| Courant Specialty Products, Inc. | CT | | | | | |
| Direct Mail Associates, Inc. | PA | | 1060557 | | | |
| Distribution Systems of America, Inc. | NY | | N/A | | | |
| Eagle New Media Investments, LLC | DE | | 2899923 | | | |
| Eagle Publishing Investments, LLC | DE | | 2951402 | | | |

| Legal Name | State of Origin | FEIN | State ID # | Principal Place of Business | Additional Places of Business | Prior Names |
|---|---|---|---|---|---|---|
| forsalebyowner.com corp | NY | | N/A | | | |
| ForSaleByOwner.com Referral Services, LLC | FL | | | | | |
| Fortify Holdings Corporation | DE | | 2776565 | | | |
| Forum Publishing Group, Inc. | DE | 65-0612940 | 2542544 | Chicago, IL | Deerfield Beach, FL | South Florida Newspaper Network, Inc. Sun-Sentinel Community News Group, Inc. |
| Gold Coast Publications, Inc. | DE | 59-2145505 | 0929050 | Chicago, IL | Fort Lauderdale, FL | |
| GreenCo., Inc. | DE | | | | | |
| Heart & Crown Advertising, Inc. | CT | | | | | |
| Homeowners Realty, Inc. | UT | | 5361933-0142 | | | |
| Homestead Publishing Co. | MD | | D00196071 | | | |
| Hoy Publication, LLC | DE | | 3686993 | | | |
| Hoy, LLC | NY | | N/A | | | |
| InsertCo, Inc. | NY | | N/A | | | |
| Internet Foreclosure Service, Inc. | NY | | N/A | | | |
| JuliusAir Company II, LLC | DE | | 4227353 | | | |
| JuliusAir Company, LLC | DE | | 3399262 | | | |
| KIAH Inc. | DE | 76-0484014 | 2544438 | Chicago, IL | Houston, TX | KHTV Inc. KHWB Inc. KHCW Inc. |
| KPLR, Inc. | MO | 43-0737943 | 00081556 | Chicago, IL | St. Louis, MO | 220 Television, Inc. Koplar Communications, Inc. Acme Television of Missouri, Inc. |
| KSWB Inc. | DE | 94-2457035 | 0845225 | Chicago, IL | San Diego, CA | Tribune Peninsula, Inc. Peninsula Newspapers Incorporated Tribune Newspapers West, Inc. Peninsula Newspapers, Inc. KYYT Inc. |
| KTLA Inc. | CA | 95-1743404 | C0268059 | Chicago, IL | Los Angeles, CA | KMPC, Inc. KMPC, The Station |

| Legal Name | State of Origin | FEIN | State ID # | Principal Place of Business | Additional Places of Business | Prior Names |
|---|---|---|---|---|---|---|
| | | | | | | of the Stars Golden West Broadcasters Golden West Television, Inc. |
| KWGN Inc. | DE | 84-0565347 | 0630214 | Chicago, IL | Denver, CO | WGN of Colorado, Inc. |
| Los Angeles Times Communications LLC | DE | 36-4371324 | 3237782 | Chicago, IL | Los Angeles, CA | N/A |
| Los Angeles Times International, Ltd. | CA | | C1060758 | | | |
| Los Angeles Times Newspapers, Inc. | DE | | 3233592 | | | |
| Magic T Music Publishing Company | DE | | 2234078 | | | |
| NBBF, LLC | DE | | 4573155 | | | |
| Neocomm, Inc. | DE | | 2372965 | | | |
| New Mass Media, Inc. | MA | | 042529553 | | | |
| New River Center Maintenance Association, Inc. | FL (nfp) | | N40655 | | | |
| Newscom Services, Inc. | DE | | 2494300 | | | |
| Newspaper Readers Agency, Inc. | IL | | 19832678 | | | |
| North Michigan Production Company | DE | | 2309689 | | | |
| North Orange Avenue Properties, Inc. | FL | | | | | |
| Oak Brook Productions, Inc. | DE | | 2480074 | | | |
| Orlando Sentinel Communications Company | DE | 59-1103775 | 0611915 | Chicago, IL | Orlando, FL | Sentinel Star Company Sentinel Communications Company |
| Patuxent Publishing Company | MD | | D04821666 | | | |
| Publishers Forest Products of Washington | WA | | | | | |
| Sentinel Communications News Ventures, Inc. | DE | | 2692913 | | | |
| Shepard's Inc. | DE | | 20844414 | | | |
| Signs of Distinction, Inc. | MD | | D04784591 | | | |
| Southern Connecticut Newspapers, Inc. | CT | | | | | |
| Star Community Publishing Group, LLC | DE | | 3002611 | | | |
| Stemweb, Inc. | NY | | | | | |

| Legal Name | State of Origin | FEIN | State ID # | Principal Place of Business | Additional Places of Business | Prior Names |
|---|---|---|---|---|---|---|
| Sun-Sentinel Company | DE | 59-1022684 | 0598511 | Chicago, IL | Fort Lauderdale, FL | Gore Newspapers Company News and Sun-Sentinel Company |
| The Baltimore Sun Company | MD | 95-4066880 | D02142065 | Chicago, IL | Baltimore, MD | TM Publishing Company |
| The Daily Press, Inc. | DE | 54-1399368 | 2095936 | Chicago, IL | Newport News, VA | N/A |
| The Hartford Courant Company | CT | 06-0383490 | 0121412 | Chicago, IL | Hartford, CT | N/A |
| The Morning Call, Inc. | PA | 23-0337560 | 92851 | Chicago, IL | Allentown, PA | Democrat Publishing Company Allentown Herald Publishing Company Allentown Call Publishing Company Call-Chronicle Newspapers, Inc. |
| The Other Company LLC | DE | | 4505448 | | | |
| Times Mirror Land and Timber Company | OR | | 207533-15 | | | |
| Times Mirror Payroll Processing Company, Inc. | DE | | 2887978 | | | |
| Times Mirror Services Company, Inc. | DE | | 2475462 | | | |
| TMLH 2, Inc. | CA | | C1986763 | | | |
| TMLS l, Inc. | CA | | C1986762 | | | |
| TMS Entertainment Guides, Inc. | DE | | 3206243 | | | |
| Tower Distribution Company | DE | 73-1539066 | 2878374 | Chicago, IL | New York, NY | UVTV, Inc. |
| Towering T Music Publishing Company | DE | | 2826368 | | | |
| Tribune Broadcast Holdings, Inc. | DE | | 0844589 | | | |
| Tribune Broadcasting Company | DE | | 0896433 | | | |
| Tribune Broadcasting Holdco, LLC | DE | | 4348544 | | | |
| Tribune Broadcasting News Network, Inc. | DE | | | | | |
| Tribune California Properties, Inc. | DE | | 2095933 | | | |
| Tribune Direct Marketing, Inc. | DE | | 2254305 | | | |
| Tribune Entertainment Company | DE | | 0641224 | | | |
| Tribune Entertainment Production Company | DE | | 2309691 | | | |
| Tribune Finance | DE | | 3327547 | | | |

| Legal Name | State of Origin | FEIN | State ID # | Principal Place of Business | Additional Places of Business | Prior Names |
|---|---|---|---|---|---|---|
| Service Center, Inc. | | | | | | |
| Tribune Finance, LLC | DE | | 4348546 | | | |
| Tribune License, Inc. | DE | | 2318140 | | | |
| Tribune Los Angeles, Inc. | DE | | 3527987 | | | |
| Tribune Manhattan Newspaper Holdings, Inc. | DE | | 3697856 | | | |
| Tribune Media Net, Inc. | DE | | 3330390 | | | |
| Tribune Media Services, Inc. | DE | | 0322320 | | | |
| Tribune Network Holdings Company | DE | | 2533816 | | | |
| Tribune New York Newspaper Holdings, LLC | DE | | 3697855 | | | |
| Tribune NM, Inc. | DE | | 2622836 | | | |
| Tribune Publishing Company | DE | | 2270941 | | | |
| Tribune Television Company | DE | | 2105947 | | | |
| Tribune Television Holdings, Inc. | DE | | 2095934 | | | |
| Tribune Television New Orleans, Inc. | DE | 36-3234055 | 0937051 | Chicago, IL | Metairie, LA | Tribune Productions Incorporated Shelf Business Corporation WGNO Inc. |
| Tribune Company | DE | 36-1880355 | 0674607 | Chicago, IL | N/A | N/A |
| Tribune Interactive, Inc. | DE | 36-4099100 | 2634608 | Chicago, IL | N/A | Tribune Digital, Inc. |
| Tribune Receivables, LLC | DE | 26-1949042 | 4501307 | Chicago, IL | N/A | N/A |
| Tribune Television Company | DE | 06-1251634 | 2105947 | Chicago, IL | N/A | Renaissance Communications Corp. |
| Tribune Television Holdings, Inc. | DE | 36-3491630 | 2095934 | Chicago, IL | N/A | Danville Cable Company Tribune New York Radio, Inc. |
| Tribune Television Northwest, Inc. | DE | 62-1172975 | 2015097 | Chicago, IL | Seattle, WA | Tribune Broadcasting of Atlanta, Inc. WGNX Inc. KCPQ Inc. |
| ValuMail,Inc. | CT | | 0614783 | | | |
| Virginia Community Shoppers, LLC | DE | | 3612923 | | | |
| Virginia Gazette Companies, LLC | DE | | 3354579 | | | |
| WATL, LLC | DE | | 2453002 | | | |

| Legal Name | State of Origin | FEIN | State ID # | Principal Place of Business | Additional Places of Business | Prior Names |
|---|---|---|---|---|---|---|
| WCWN, LLC | DE | | 3038277 | | | |
| WDCW Broadcasting, Inc. | DE | 36-4308300 | 3076967 | 435N. Michigan Avenue, 6th Floor Chicago, IL. 60611 | Washington, D.C | General DC Acquisition Corp. WBDC Broadcasting, Inc. |
| WGN Continental Broadcasting Company | DE | 36-1919530 | 0608827 | Chicago, IL | N/A | WGN, Inc. |
| WLVI Inc. | DE | | 2352913 | | | |
| WPIX, Inc. | DE | 36-3110191 | 0896279 | Chicago, IL | New York, NY | Tribune Company Communications Tribune Company Communications, Inc. News Building Inc. Tribune New York Properties, Inc. |
| WTXX Inc. | DE | | 2803108 | | | |

**SCHEDULE II**
**TO GUARANTY SECURITY AGREEMENT**

**REPRESENTATIVE COLLATERAL**

[See attached.]