**ATTACHMENT 5**

**AMENDED AND RESTATED SERVICING AGREEMENT**

Dated April 10, 2009

(1)    **TRIBUNE RECEIVABLES, LLC**, as Borrower

(2)    **TRIBUNE COMPANY**, as Servicer

(4)    The Persons set forth on Schedule 1 hereto as Sub-Servicers

(5)    **BARCLAYS BANK PLC**, as Administrative Agent

---

## AMENDED AND RESTATED SERVICING AGREEMENT

---

# CONTENTS

**Clause**                                                                                                              **Page**

1.     Definitions ............................................................................................................. 2
       1.1     Definitions ............................................................................................... 2
       1.2     Interpretation .......................................................................................... 2
2.     Administration and Collections ............................................................................ 2
       2.1     Designation of Servicer; Power of Attorney ............................................ 2
       2.2     Duties of the Servicer .............................................................................. 3
       2.3     Reporting Requirements .......................................................................... 5
       2.4     Transition to Successor Servicer .............................................................. 8
       2.5     Sub-Servicers .......................................................................................... 9
       2.6     Indemnities by Servicer ......................................................................... 13
       2.7     Facility Accounts ................................................................................... 14
       2.8     Investments ........................................................................................... 14
       2.9     Servicer Default ..................................................................................... 15
       2.10    Servicing Fee ......................................................................................... 16
       2.11    Power of Attorney .................................................................................. 16
       2.12    Receivables Loan Agreement Provisions ................................................ 17
3.     Representations and Warranties .......................................................................... 17
       3.1     Representations and Warranties of the Servicer ..................................... 17
4.     Covenants .......................................................................................................... 21
       4.1     Covenants of the Servicer ...................................................................... 21
5.     Miscellaneous ................................................................................................... 25
       5.1     Waiver; Amendments, Etc ...................................................................... 25
       5.2     Notices .................................................................................................. 26
       5.3     Assignments .......................................................................................... 26
       5.4     No Proceedings; Limited Recourse ........................................................ 26
       5.5     Execution in Counterparts ...................................................................... 26
       5.6     Integration; Binding Effect; Survival of Termination; Severability .................. 27
       5.7     GOVERNING LAW; SUBMISSION TO JURISDICTION;
               APPOINTMENT OF PROCESS AGENT ........................................................ 27
       5.8     WAIVER OF JURY TRIAL ...................................................................... 28
       5.9     USA Patriot Act ..................................................................................... 28
       5.10    Waiver of Setoff .................................................................................... 28
       5.11    No Guarantee or Indemnity .................................................................... 28
       5.12    Original Servicing Agreement ................................................................ 29

**Schedules**

1.    Initial Sub-Servicers

**Exhibits**

EXHIBIT A-1   Form of Monthly Report
EXHIBIT A-2   Form of Interim Report
EXHIBIT A-3   Form of Compliance Certificate
EXHIBIT B     Form of Servicer Power of Attorney
EXHIBIT C     Form of Administrative Agent Power of Attorney

**THIS AGREEMENT** is dated April 10, 2009 and made between:

(1)    **TRIBUNE RECEIVABLES, LLC**, a limited liability company organized under the laws of the State of Delaware, as Borrower (the "**Borrower**");

(2)    **TRIBUNE COMPANY**, a corporation incorporated under the laws of Delaware ("**Tribune**"), as the Servicer (as defined below);

(4)    The Persons set forth on Schedule I hereto, as Sub-Servicers (as defined below) (each an "**Originator**" and, collectively, the "**Originators**"); and

(5)    **BARCLAYS BANK PLC**, as Administrative Agent (the "**Administrative Agent**").

**BACKGROUND:**

(A)    The Borrower, the Servicer, the Originators and the Administrative Agent entered into a Servicing Agreement, dated July 1, 2008 (as amended, the "**Original Servicing Agreement**").

(B)    The Borrower, the Servicer, the Originators and the Administrative Agent desire to enter into this Agreement in order to amend and restate the Original Servicing Agreement in its entirety.

(C)    The Borrower shall from time to time acquire Receivables and any Related Security with respect thereto from the Originators pursuant to the Receivables Purchase Agreement, provided that, in the case of Receivables and Related Security originated by Sub-Originators, such Receivables and Related Security shall first be sold by the Sub-Originators to Tribune and then sold or contributed by Tribune to the Borrower.

(D)    Each of the Borrower and the Secured Parties desires that the Servicer conduct the servicing, administration and collection of the Pool Receivables and Related Security with respect thereto on the terms and subject to the conditions set forth in this Agreement.

(E)    Tribune has agreed to act as the initial Servicer in accordance with the terms and subject to the conditions set forth in this Agreement.

(F)    Each of the Sub-Originators has agreed to act as a Sub-Servicer in accordance with the terms and subject to the conditions set forth in this Agreement.

(G)    The Servicer and each Sub-Servicer from time to time appointed in accordance herewith (each a "**Servicer Party**" and, collectively, the "**Servicer Parties**") intend to, and shall, conduct the servicing, administration, collection and management of the Pool Receivables and Related Security with respect thereto on the terms and subject to the conditions set forth in this Agreement.

**IT IS AGREED that:**

1. **DEFINITIONS**

1.1 **Definitions**

Unless otherwise defined herein, capitalized terms which are used herein shall have the meanings assigned to such terms in Clause 1.1 (*Certain Defined Terms*) of the Amended and Restated Receivables Loan Agreement, dated April 10, 2009, among the Borrower, the Servicer, the entities from time to time parties thereto as Lenders, the Administrative Agent, Wells Fargo Foothill, LLC, as Documentation Agent and the CIT Group/Business Credit, Inc., as Syndication Agent (the "**Receivables Loan Agreement**"). In the case of any inconsistency between such terms and the terms defined in this Agreement, the terms defined in this Agreement shall prevail for all purposes of this Agreement.

1.2 **Interpretation**

The principles of interpretation set forth in Clauses 1.2 (*Other Terms*) and 1.3 (*Computation of Time Periods*) of the Receivables Loan Agreement shall apply to this Agreement as if fully set forth herein.

2. **ADMINISTRATION AND COLLECTIONS**

2.1 **Designation of Servicer; Power of Attorney**

    (a)    (i)    The servicing, administration, collection and management of the Pool Receivables shall be conducted by the Person so designated hereunder from time to time (such Person, the "**Servicer**"). Until the Administrative Agent (with the consent or at the direction of the Supermajority Lenders) gives notice to the Borrower of the designation of a new Servicer (which notice shall not be given except at any time following the occurrence and during the continuation of a Trigger Event or Originator Termination Event), Tribune is hereby designated as and is hereby appointed by the Borrower with the consent of the Administrative Agent as, and hereby agrees to perform the duties and obligations of, the Servicer pursuant to the terms of this Agreement and the other Transaction Documents.

        (ii)    Tribune acknowledges that each of the Borrower and the Secured Parties have relied on its agreement to act as Servicer hereunder in making the decision to execute the Transaction Documents to which such Person is a party. Tribune hereby agrees and acknowledges that it may not resign from the obligations and liabilities hereby imposed on it hereunder and under the other Transaction Documents to which it is a party.

    (b)    The Administrative Agent may, and at the direction of the Lenders shall, but only following the occurrence and during the continuation of a Trigger Event or Originator Termination Event, designate as Servicer any Person (including itself)

to succeed Tribune or any successor Servicer, on such terms and conditions as the Administrative Agent and such successor Servicer shall agree.

(c)    Each of the Originators, the Borrower and Tribune (to the extent not then acting as Servicer hereunder) (each a "**Grantor**") hereby agrees that the Servicer may take any and all steps in such Grantor's name and on behalf of such Grantor as are necessary or desirable to collect all amounts due under any and all Pool Receivables and any Related Security with respect thereto, including endorsing such Grantor's respective name on checks and other instruments representing Collections and enforcing such Pool Receivables, Related Security and the related Contracts and to take all such other actions set forth in this Clause 2.  In furtherance of the foregoing, each Grantor hereby agrees to execute and deliver, on or prior to the Closing Date, to the Servicer a power of attorney substantially in the form of Exhibit B (*Form of Servicer Power of Attorney*).  Notwithstanding anything herein to the contrary, the Servicer hereby agrees that it shall only exercise its powers under any such power of attorney if and to the extent the relevant Sub-Servicer or Originator has failed to comply with its duties under this Agreement or any other Transaction Document to which such Person is a party.

(d)    For the avoidance of doubt nothing in this Agreement shall have the effect of making any Servicer Party liable for any Transaction Party Obligations of the Borrower and nothing in this Agreement shall constitute the giving of a guarantee or the assumption of a similar obligation by a Servicer Party in respect of the performance by the Borrower of its Transaction Party Obligations.

2.2    **Duties of the Servicer**

(a)    The Servicer shall take or cause to be taken all such actions as may be necessary or advisable to collect and manage the Pool Receivables and any Related Security, all in accordance with this Agreement and the other Transaction Documents to which it is a party, applicable Laws and the Credit and Collection Policies.  The Borrower with the consent of the Administrative Agent hereby appoints the Servicer, from time to time designated pursuant to Clause 2.1, as its agent to enforce its rights and interests in the Pool Receivables, the Related Security and the related Contracts.  In performing its duties as Servicer, the Servicer shall exercise the care and diligence of a prudent servicer of trade receivables of a similar nature to the Pool Receivables and shall use the same care and apply the same policies as it would exercise and apply if it owned such Pool Receivables. At any time following the occurrence and during the continuation of a Trigger Event or an Originator Termination Event, the Administrative Agent shall have the sole right to direct the Servicer to commence or settle any legal action to enforce collection of any Pool Receivable or any Related Security with respect thereto.

(b)    The Servicer shall perform and shall comply with, and agrees to be bound by, the terms of the Receivables Loan Agreement, the Receivables Purchase Agreement and the other Transaction Documents which are specifically expressed to be

applicable to it as Servicer (as defined herein or therein) in the same manner as if it were a party thereto.

(c)     If no Trigger Event or Originator Termination Event shall have occurred and be continuing, the Servicer, may, in accordance with, and subject to the terms and conditions of, this Agreement, the Receivables Loan Agreement, the Receivables Purchase Agreement (in each case, which are specifically expressed to be applicable to it as Servicer) and the Credit and Collection Policies, extend the maturity or adjust the Unpaid Balance of any Delinquent Receivable or Defaulted Receivable to the extent the Servicer reasonably determines is appropriate to maximize Collections thereof; provided that the classification of any such Pool Receivable as a Delinquent Receivable or Defaulted Receivable shall not be affected by any such extension or adjustment. If a Trigger Event or Originator Termination Event shall have occurred and be continuing, the Servicer may grant such extensions or adjustments only with the prior written consent of the Administrative Agent. In no event shall the Servicer be entitled to make any Lender, the Administrative Agent or any other Secured Party a party to any litigation involving the Transaction Documents or the Receivables without such Lender's, the Administrative Agent's or such Secured Party's prior written consent. In no event shall the Servicer or the Guarantors be entitled to make the Borrower a party to any litigation involving the Transaction Documents or the Receivables without the Borrower's and the Administrative Agent's prior written consent.

(d)     The Servicer shall maintain for the benefit of the Borrower, the Administrative Agent and each Lender all documents, purchase orders, invoices, agreements, books, records, traffic schedules and other information (in each case in its possession or control) which evidence or relate to the Pool Receivables, any Related Security with respect thereto, the applicable Contracts and the related Obligors whether now existing or hereafter arising. The Servicer shall mark its (and shall procure that the relevant Originator marks its) master data processing records evidencing the Pool Receivables with a legend, acceptable to the Administrative Agent, that such Pool Receivables have been sold or otherwise transferred to the Borrower. Except in the case of replacement of the Servicer, Servicer shall, upon the request of Administrative Agent following the occurrence and during the continuation of a Facility Event, deliver to the Administrative Agent copies of all Contracts relating to the Receivables. In the case of a replacement of the Servicer, originals (to the extent the Originators have originals) or copies of all Contracts relating to the Receivables shall be delivered to the Administrative Agent.

(e)     The Servicer shall, as soon as practicable following receipt and identification thereof, and in any event within one Business Day after receipt and identification thereof, turn over or cause to be turned over to the applicable Originator or such other Person as may be entitled thereto any cash collections or other cash proceeds received in the Facility Accounts and not constituting Collections of Pool Receivables, Related Security with respect thereto or any other Collateral.

Without limiting the foregoing, the Servicer shall cause any Collections received in respect of (i) any Receivable repurchased by, or otherwise retransferred to, an Originator pursuant to, and in accordance with, the Receivables Purchase Agreement, or (ii) any Receivable originated by an Originator after the Originator Termination Date with respect to such Originator has occurred, in each case, to be turned over to such Originator as soon as practicable following receipt and identification thereof, and in any event within one Business Day after receipt thereof.

(f)    Each of the parties hereto agrees that with respect to a payment by an Obligor, (i) if application of such payment to a specific Receivable is required by contract or applicable Law or clearly indicated by facts or circumstances or if such Obligor designates that a payment be applied to a specific Receivable, such payment shall be applied to such Receivable, and (ii) otherwise, all Collections from an Obligor shall be applied to the oldest Receivables (whether or not such Receivables are Pool Receivables) of such Obligor.

(g)    Each of the Borrower and the Originators hereby appoints the Administrative Agent, as their agent (in the event that the Servicer breaches any of its obligations hereunder (taking into account any applicable grace periods and rights to remedy any such breach)) to (if it so elects) itself perform, or cause the performance of, such obligations; and the Administrative Agent's costs and expenses incurred in connection therewith shall be payable by the Servicer.

2.3    **Reporting Requirements**

(a)    **Monthly Reports**

No later than 10:00 a.m. (New York time) on each Monthly Reporting Date, the Servicer shall deliver to the Administrative Agent and the Borrower a Monthly Report in the form of Exhibit A-1 hereto (*Form of Monthly Report*), based on information as of the close of business on the last Business Day of the immediately preceding Calculation Period, together with a certificate of the chief financial officer or other appropriate officer of the Servicer in substantially the form attached hereto as Exhibit A-3 (*Form of Compliance Certificate*) (such certificate, a "**Compliance Certificate**") stating, among other things, that no Facility Event or Originator Event has occurred and is continuing (or, if any such event is continuing, describing in reasonable detail such event and the steps, if any, being taken or to be taken by, as applicable, the Servicer, the Parent, the Borrower or the applicable Originator to remedy such event).

(b)    **Interim Reports**

No later than 1:00 p.m. (New York time) on the second Business Day following the end of each Interim Period, the Servicer shall deliver to the Administrative Agent and the Borrower an Interim Report in the form of Exhibit A-2 (*Form of*

*Interim Report*), based on Collections and Receivables conveyances as of the close of business at the end of the immediately preceding Interim Period.

(c)     **List of Receivables, Contact Details**

No later than 10:00 a.m. (i) on the Business Day immediately following a request by the Administrative Agent prior to 1:00 p.m. (New York time) on any Business Day, the Servicer shall deliver to the Administrative Agent and the backup servicer an electronic file containing contact details for each Obligor (such file, a "**Contact Details Report**"), which file shall be in a format reasonably acceptable to the Administrative Agent and backup servicer, based on information as of the close of business on the last Business Day of the immediately preceding Calculation Period (or, in the case of a request by the Administrative Agent, the close of business on the date of such request), provided that the Administrative Agent shall not request a Contact Details Report more than four times in a Calculation Period unless a Facility Event has occurred, and (ii) on each Monthly Reporting Date or, after the occurrence of a Facility Event, on the Business Day immediately following a request by the Administrative Agent prior to 1:00 p.m. (New York time) on any Business Day, the Servicer shall deliver to the Administrative Agent and the backup servicer an electronic file with respect to all Outstanding Receivables (such file, an "**Outstanding Receivables Report**"), containing such data fields as have been contained in files delivered to the Administrative Agent prior to the Closing Date or such other fields as the Administrative Agent shall reasonable request, which file shall be in a format reasonably acceptable to the Administrative Agent and the backup servicer, based on information as of the close of business on the last Business Day of the immediately preceding Calculation Period (or, in the case of a request by the Administrative Agent, the close of business on the date of such request).

(d)     **Transmission of Portfolio Reports**

The Servicer shall transmit each Portfolio Report and Supplemental Report to the Administrative Agent by electronic mail. In addition, the Servicer shall, upon the request of the Administrative Agent, transmit a copy of such Portfolio Report or Supplemental Report to the Administrative Agent by facsimile. Each Portfolio Report and Supplemental Report shall be certified (or, in the case of a Portfolio Report or Supplemental Report delivered by electronic mail, deemed to be certified) by a Responsible Officer of the Servicer (or such other employee of the Servicer as shall have primary responsibility for the preparation of such report and shall have been authorized to certify Portfolio Reports or Supplemental Reports hereunder by a Responsible Officer).

(e)     **Change in Business**

The Servicer shall deliver to the Administrative Agent at least 60 days prior to any material change in the character of any Transaction Party's business, a written

notice describing in reasonable detail any such change in the character of such Transaction Party's business.

(f)    **Notice of Facility or Originator Events**

As soon as possible and in any event within one Business Day after the occurrence of any Facility Event or Originator Event, the Servicer shall furnish or cause to be furnished to the Administrative Agent a statement of a Responsible Officer of the Servicer setting forth details of such Facility Event or Originator Event, and, if applicable, the action that the Servicer or any of the Transaction Parties has taken and proposes to take with respect thereto.

(g)    **Post-Petition PDT Debt**

The Servicer shall furnish or cause to be furnished to the Administrative Agent (i) as soon as possible and in any event within one Business Day after the occurrence thereof, notice that any holder of Post-Petition PDT Debt shall demand payment thereof, or any Post-Petition PDT Debt is paid, declared to be due or otherwise becomes due, or receipt by the Transaction Parties of notice of any other material default in a financing arrangement that could reasonably be expected to result in any Post-Petition PDT Debt being drawn on or becoming due, and (ii) within a reasonable time promptly following the incurrence of any Post-Petition PDT Debt, notice of the material terms thereof (taking into account any confidentiality restrictions as to pricing or other proprietary information of the beneficiaries of such Post-Petition PDT Debt) and (iii) from time to time such other information with respect to such Post-Petition PDT Debt as the Administrative Agent shall reasonably request (taking into account such confidentiality restrictions).

(h)    **Termination or Suspension of Receivables Purchase Agreement**

As soon as possible and in any event within one Business Day after the occurrence thereof, the Servicer shall furnish or cause to be furnished to the Administrative Agent notice that any Originator has stopped selling Receivables originated by such Originator to the Borrower pursuant to the Receivables Purchase Agreement or any other Originator Event has occurred thereunder.

(i)    **Notices Under Transaction Documents**

Concurrently with receipt thereof by the Borrower or the Servicer, the Servicer shall furnish or cause to be furnished to the Administrative Agent copies of all written notices received by the Borrower or the Servicer from any Originator in connection with any Transaction Document to the extent not previously provided to the Administrative Agent by another Transaction Party.

(j)     **Litigation; Material Adverse Effect**

Promptly (and in any event within two (2) Business Days) after the occurrence thereof, the Servicer shall furnish or cause to be furnished to the Administrative Agent notice of:

(i)     (A) the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity or by or before any Official Body against, or any investigation by any Official Body that may exist with respect to (1) the Borrower, the Facility Accounts, the Transaction Documents or the transactions contemplated thereby or (2) any other Transaction Party, which in the case of this subclause (2) could reasonably be expected to have a Material Adverse Effect and (B) any material adverse development (including without limitation any judgement against a Transaction Party) that has occurred with respect to any such previously disclosed litigation, investigation or proceeding; and

(ii)    any other event or condition with respect to any Transaction Party that has had, or could reasonably be expected to have, a Material Adverse Effect.

(k)     **Pro Forma Reports**

On or prior to the date on which the Receivables Purchase Agreement or the right and obligation of any Originator to sell Receivables to the Borrower is to be terminated, the Servicer shall provide to the Administrative Agent a certificate (signed by a Responsible Officer of the Servicer) which attaches a Monthly Report and Interim Report giving pro forma effect to any reduction in the Net Eligible Receivables Balance resulting from the termination of such Originator or Receivables Purchase Agreement and any change in the Total Reserves as set forth in the next sentence, and which certifies that, after giving pro forma effect to such termination and any prepayments of Loans on or prior to the date of such termination, the Percentage Factor does not exceed the Maximum Percentage Factor. In the event any Originator or Receivables Purchase Agreement is so terminated, the ratios used in calculating the Total Reserves shall be determined as if the Receivables of such Originator or Originators under the Receivables Purchase Agreement, as applicable, had never existed.

(l)     **Other Information**

The Servicer shall furnish or cause to be furnished to the Administrative Agent, promptly upon request, such other information respecting the Pool Receivables, the Related Security related thereto, the Facility Accounts, the Collateral or the condition or operations, financial or otherwise, of any Transaction Party as the Administrative Agent may from time to time reasonably request.

2.4 **Transition to Successor Servicer**

(a)     If terminated as Servicer following the occurrence of a Servicer Default, Tribune agrees that it will terminate and, cause each existing Sub-Servicer to terminate, its collection activities in a manner and to the extent requested by the Administrative Agent to facilitate the transition to a new Servicer designated by the Administrative Agent with the consent of the Required Lenders.

(b)     Tribune shall, following the occurrence and during the continuation of a Trigger Event or Originator Termination Event upon request of the Administrative Agent (or its designee), transfer to the Administrative Agent (or its designee), or license, or cause to be licensed, to the Administrative Agent (or its designee) an irrevocable, non-exclusive license (subject to the restrictions contained in any license with respect thereto) to use, without royalty or payment of any kind, all computer tapes, software and programs, data processing software and storage media used by Tribune to account for the Receivables, to the extent necessary or desirable to permit the Borrower to exercise its ownership and other interests in the Pool Receivables and Related Security, and to administer or service such Pool Receivables and Related Security, whether such computer tapes, software and programs, data processing software and storage media are owned by the Servicer or are owned by others and used by the Servicer under license agreements with respect thereto. Any such license granted hereby shall be irrevocable, and shall not terminate until the Final Payout Date. To the extent any such transfer or license would require the payment of any license fee or other amount, Tribune agrees to pay such fee or other amount out of its own funds promptly upon demand by the Administrative Agent.

(c)     Tribune shall cooperate with and assist any backup servicer and/or successor Servicer in the performance of its responsibilities as backup servicer or Servicer hereunder and under the other Transaction Documents, including taking any actions described in Clause 2.4(b) and transferring to such successor Servicer all records and other items of the type described in Clause 2.2(d) (*Duties of Servicer*).

(d)     If, at any time prior to the occurrence of the Final Payout Date, Tribune ceases to be the Servicer, Tribune shall download, prepare and distribute, promptly and effectively, all data relating to the Receivables and Related Security in usable form as requested by any backup servicer, any successor Servicer and/or the Administrative Agent from time to time.

2.5 **Sub-Servicers**

(a)     The Servicer may, with the prior written consent of the Administrative Agent and the Required Lenders (such consent not to be unreasonably withheld), subcontract or delegate with any other Person for the servicing, administration, collection or management of part or all of the Pool Receivables, the Related Security and the

Collateral (each such Person (including for the avoidance of doubt the Original Sub-Servicers as defined in Clause 2.5(b)) a "**Sub-Servicer**"); provided that:

(i)     under no circumstances shall the Servicer be permitted to appoint more than one Sub-Servicer in respect of the same Pool Receivable, Related Security or Collateral;

(ii)    in the case of each such subcontract or delegation (excluding the specific subcontract and delegation by Tribune to the Original Sub-Servicers pursuant to Clause 2.5(b)), such Sub-Servicer shall agree in writing in favor of the other parties hereto to perform and be bound by the duties and obligations of the Servicer so delegated or subcontracted pursuant to the terms hereof and the duties and obligations of the Sub-Servicer hereunder and agrees to make the representations and warranties set forth in Clause 3.1 (*Representations and Warranties of the Servicer*) with respect to itself *mutatis mutandi*; and

(iii)   such written consent of the Administrative Agent and Required Lenders to subcontracting or delegation to any Sub-Servicer is not required for the Original Sub-Servicers, for Hewlett-Packard Costa Rica or for the engagement of collection agents with respect to Defaulted Receivables in the ordinary course of business in a manner consistent with the past practices of the Originators.

Notwithstanding any such subcontract or delegation (including any subcontract or delegation to the Original Sub-Servicers pursuant to Clause 2.5(b)), the Servicer shall continue to remain solely liable for the performance of the duties and obligations of the Servicer pursuant to the terms hereof.  Without limiting the generality of the foregoing and notwithstanding the provision of Clause 2.5(c), any action taken or omitted to be taken by any Person that has entered into a subcontract with the Servicer or to whom the Servicer has delegated any of its duties (including any Original Sub-Servicer) shall be deemed to be an action or omission by the Servicer (including for purposes of determining whether any Pool Receivable is a Diluted Receivable and for purposes of Clause 2.6 (*Indemnities by Servicer*) of this Agreement and Clauses 2.6 (*Application of Collections prior to Facility Termination Date*) or Clause 2.7 (*Application of Collections after Facility Termination Date*) of the Receivables Loan Agreement).  The terms of any agreement with any Sub-Servicer shall provide that, unless the Administrative Agent notifies any Sub-Servicer in writing otherwise, its appointment as Sub-Servicer shall automatically (without any requirement for the giving of notice) be terminated upon the termination of the Servicer hereunder.

(b)     As the initial Servicer, Tribune hereby appoints (with the consent of the Borrower, the Administrative Agent and the Required Lenders) each Originator (each, in such capacity, an "**Original Sub-Servicer**") as its Sub-Servicer to service, administer, collect and manage all of the Pool Receivables, the Related

Security and the Collateral originated by such Original Sub-Servicer.  Each Original Sub-Servicer hereby accepts such appointment and hereby:

(i)   agrees to perform and be bound by the duties and obligations of the Servicer (including without limitation under Clauses 2 and 4 hereof) and the duties and obligations of a Sub-Servicer, in each case, in accordance with the terms and conditions set forth herein and in the other Transaction Documents to which it is a party; and

(ii)   makes, on the Closing Date and as of the date of each Incremental Borrowing and each Repeat Advance (the proceeds of which will be used to purchase or otherwise acquire Receivables from, or make payments under the Intercompany Note with respect to, such Original Sub-Servicer) under the Receivables Loan Agreement and (to the extent provided in Clause 3.1) as of each Reporting Date, the representations and warranties set forth in Clause 3.1 (*Representations and Warranties of the Servicer*);

in each case, to the extent that such duties and obligations relate to such Original Sub-Servicer, the Pool Receivables, the Related Security and the Collateral originated by such Original Sub-Servicer or the servicing, administration, collection or management of the Pool Receivables, the Related Security and the Collateral originated by such Original Sub-Servicer.

(c)   Each Sub-Servicer shall take or cause to be taken all such actions as may be reasonably necessary or advisable to collect and manage the Pool Receivables and Related Security for which it acts as Sub-Servicer, all in accordance with this Agreement and the other Transaction Documents to which it is a party, applicable Laws and the Credit and Collection Policies.  In performing its duties as Sub-Servicer, each Sub-Servicer shall exercise the care and diligence of a prudent servicer of trade receivables of a similar nature to the Pool Receivables and shall use the same care and apply the same policies as it would exercise and apply if it owned such Pool Receivables.

(d)   If a Trigger Event or an Originator Termination Event has occurred and is continuing, the Administrative Agent shall have the sole right to direct the Sub-Servicers to commence or settle any legal action to enforce collection of any Pool Receivable or any Related Security with respect thereto.  Each Sub-Servicer agrees to be bound by the provisions of Clause 2.2(c) (*Duties of Servicer*) to the same extent as if it were the Servicer.

(e)   Each Sub-Servicer shall perform and shall comply with, and agrees to be bound by, the terms of this Agreement, the Receivables Loan Agreement, the Receivables Purchase Agreement and the other Transaction Documents which are specifically expressed to be applicable to it as a Sub-Servicer or to the Servicer (with respect to any matter delegated to such Sub-Servicer by the Servicer, including cash management functions and application of Collections under Clause

2.2(f) (*Duties of Servicer*) of this Agreement) in the same manner as if they were a party thereto.

(f)     Each Sub-Servicer shall maintain for the benefit of the Borrower, the Administrative Agent, the Lenders and each other Secured Party all documents, purchase orders, invoices, agreements, books, records, traffic schedules and other information (in each case in its possession or control) which evidence or relate to the Pool Receivables originated by such Sub-Servicer, and Related Security with respect thereto, the applicable Contracts and the related Obligors whether now existing or hereafter arising.  Each Sub-Servicer shall mark its master data processing records evidencing the Pool Receivables originated by such Sub-Servicer with a legend, acceptable to the Administrative Agent, that such Pool Receivables have been sold to the Borrower.

(g)     Each Sub-Servicer shall, as soon as practicable following receipt and identification thereof, and in any event within one Business Day after receipt and identification thereof, turn over to the applicable Originator or such other Person as may be entitled thereto any cash collections or other cash proceeds received in the Facility Accounts and not constituting Collections of Pool Receivables, Related Security with respect thereto or any other Collateral if cash management functions have been delegated to it by the Servicer.  Without limiting the foregoing, each Sub-Servicer shall cause any collections received in respect of (i) any Receivable repurchased or otherwise retransferred to an Originator pursuant to, and in accordance with, the Receivables Purchase Agreement or (ii) any Receivable originated by an Originator after the Originator Termination Date with respect to such Originator has occurred, in each case, to be turned over to such Originator as soon as practicable following receipt and identification thereof, and in any event within one Business Day after receipt thereof.

(h)     The Borrower and each Servicer Party (including any Original Sub-Servicer) hereby appoint the Administrative Agent, as their agent (in the event that such Sub-Servicer breaches any of its obligations hereunder (taking into account any applicable grace periods and rights to remedy any such breach)) to (if it so elects) itself perform, or cause the performance of, such obligations; and the Administrative Agent's costs and expenses incurred in connection therewith shall be payable by the Sub-Servicer.

(i)     To the extent the Administrative Agent is entitled to exercise any rights or remedies with respect to the Servicer, each Sub-Servicer acknowledges and agrees that the Administrative Agent may exercise the same rights and remedies against such Sub-Servicer with respect to the Pool Receivables and Related Security for which it acts as Sub-Servicer from time to time.

(j)     Without limiting the generality of Clause 2.5(i), each Sub-Servicer hereby acknowledges and agrees that its appointment as Sub-Servicer shall, unless the Administrative Agent notifies it in writing otherwise, be automatically (without any requirement for the giving of notice) terminated upon the termination of the

12

Servicer pursuant to Clause 2.9 (*Servicer Default*), a Trigger Event or Originator Termination Event.

(k)     If terminated as Sub-Servicer following the occurrence of a Trigger Default or Originator Termination Event, each Sub-Servicer agrees that it will terminate its collection activities in a manner and to the extent requested by the Administrative Agent to facilitate the transition to a new Servicer.

(l)     Each Sub-Servicer shall, upon request of the Administrative Agent (or its designee) following the occurrence and during the continuation of a Trigger Event or Originator Termination Event, transfer to the Administrative Agent (or its designee), or license, or cause to be licensed, to the Administrative Agent (or its designee) an irrevocable, non-exclusive license (subject to the restrictions contained in any license with respect thereto) to use, without royalty or payment of any kind, all computer tapes, software and programs, data processing software and storage media used by such Sub-Servicer to account for the Receivables, to the extent necessary or desirable to permit the Borrower to exercise its ownership and other interests Pool Receivables and any Related Security, and to administer or service such Pool Receivables and Related Security, whether such computer tapes, software and programs, data processing software and storage media are owned by such Sub-Servicer or are owned by others and used by such Sub-Servicer under license agreements with respect thereto. Any such license granted hereby shall be irrevocable, and shall not terminate until the Final Payout Date or, in the case of an Original Sub-Servicer, the Originator Payout Date with respect to it. To the extent any such transfer or license would require the payment of any license fee or other amount, the applicable Sub-Servicer agrees to pay such fee or other amount out of its own funds promptly upon demand by the Administrative Agent.

(m)    Each Sub-Servicer shall cooperate with and assist any successor Servicer in the performance of its responsibilities as Servicer hereunder and under the other Transaction Documents, including taking any actions described in Clause 2.5(l) and transferring to such successor Servicer all records and other items of the type described in Clause 2.5(f).

(n)     In the event that Tribune or one of its Subsidiaries is no longer the Servicer or Sub-Servicer, as applicable, at any time prior to the Final Payout Date, such Sub-Servicer hereby agrees to download, prepare and distribute, promptly and effectively all data relating to the Pool Receivables originated by it and any Related Security with respect thereto in usable form as requested by the Borrower or the Administrative Agent from time to time.

2.6    **Indemnities by Servicer**

Without limiting any other rights that the Indemnified Parties (as defined below) may have hereunder, under any other Transaction Document or under applicable Law the Servicer hereby agrees to indemnify and hold harmless each Indemnified Party (as

defined in the Receivables Loan Agreement) and the Borrower (collectively, the "**Indemnified Parties**") from and against any and all damages, losses, claims, liabilities, deficiencies, costs, disbursements and expenses, including interest, penalties, amounts paid in settlement and attorneys' fees and expenses (all of the foregoing being collectively referred to as "**Indemnified Amounts**") awarded against or properly incurred by any Indemnified Party (including in connection with or relating to any investigation by an Official Body, litigation or lawsuit (actual or threatened) or order, consent, decree, judgment, claim or other action of whatever sort (including the preparation of any defense with respect thereto regardless of whether such Indemnified Party is a party thereto)), in each case, arising out of, or resulting from a breach of any representation, warranty, covenant or other obligation of any Servicer Party, excluding, however (a) Indemnified Amounts to the extent that such Indemnified Amounts are finally judicially determined to have resulted from the gross negligence, bad faith or wilful misconduct on the part of such Indemnified Party, (b) recourse (except as otherwise specifically provided in this Agreement or any other Transaction Document) for Pool Receivables that are not collected or collectable on account of the insolvency, bankruptcy or financial inability to pay of the Obligors in respect of such Pool Receivables and (c) Taxes.

2.7     **Facility Accounts**

The Servicer shall cause all Collections deposited into any Facility Account or otherwise received by the Servicer or any other Transaction Party to be applied at the times and in the manner provided in the Receivables Loan Agreement and the other Transaction Documents and, in the case of any Collections received by the Servicer, shall hold any such Collections in trust for the Borrower.  If the bank at which a Facility Account is maintained ceases to be an Eligible Account Bank (each Facility Account maintained at any such Eligible Account Bank, a "**Downgraded Account**"), the Servicer shall promptly and in any event within ten (10) days (or such longer period as the Administrative Agent may agree) establish a new account or accounts to replace such Downgraded Accounts at an Eligible Account Bank and shall cause to be delivered to the Administrative Agent Account Control Agreements covering such new accounts.  Upon such establishment and delivery, all funds on deposit in any Downgraded Account shall be transferred to such replacement Facility Account.

2.8     **Investments**

(a)     The Borrower may invest funds on deposit in any Borrower Account, reinvest proceeds of any such investments which may mature or be sold, and invest interest or other income received from any such investments, in each case in such Permitted Investments (i) prior to the Facility Termination Date and so long as no Trigger Event has occurred and is continuing, as the Borrower may select  and (ii) at any other time, as the Administrative Agent may select in its sole discretion; provided that each such Permitted Investment shall have a maturity date no later than the next succeeding Settlement Date.  Such proceeds, interest or income which are not so invested or reinvested in Permitted Investments shall, except as otherwise provided in this Agreement, be deposited and held in the applicable

Borrower Account; provided that, prior to the Facility Termination Date or the existence of any Facility Termination Event, any interest or income in respect of such Permitted Investments shall, at the direction of the Servicer be deposited into the Collection Account and applied as Collections in accordance with the Receivables Loan Agreement. Neither the Administrative Agent nor any of its Affiliates shall be liable to any Transaction Party, any Lender, any Secured Party or any other Person for, or with respect to, any decline in value of amounts on deposit in any Borrower Concentration Account.

(b)     Except as provided in Clause 2.8(a), funds on deposit from time to time in any other Facility Account may not be invested without the prior written consent of the Administrative Agent, and in the event the Administrative Agent so consents, may only then be invested in Permitted Investments.

(c)     Permitted Investments from time to time purchased and held pursuant to this Clause 2.8 shall be referred to as "**Collateral Securities**" and shall, for purposes of this Agreement and each other Transaction Document, constitute part of the Collateral and the funds held in the applicable Facility Account in amounts equal to their respective outstanding principal amounts. Each such Permitted Investment shall be made in the name of the Borrower or its designee.

(d)     Except as anticipated by any Transaction Document, no Transaction Party or any Person claiming on behalf of or through a Transaction Party shall have any right to withdraw any of the funds held in any Facility Account.

(e)     Subject to the terms and conditions of the Receivables Loan Agreement and the other Transaction Documents, any funds remaining on deposit in any Facility Account on the Final Payout Date shall be paid to (or at the direction of) the Borrower.

2.9     **Servicer Default**

If any one or more of the following events shall occur (each, a "**Servicer Default**"):

(a)     the Servicer shall fail to make any payment or deposit required to be made by it hereunder or under any other Transaction Document to which it is a party when due hereunder or thereunder, and such failure shall continue for ten (10) days after the earlier of written notice to the Servicer or a Responsible Officer of the Servicer having actual knowledge of such failure;

(b)     the Servicer shall fail to deliver any Monthly Report or Supplemental Report within two (2) Business Days of the date when due; provided that if the failure to deliver such report results from a Force Majeure Event, the grace period in this clause shall be three (3) Business Days instead of two (2) Business Days;

(c)     (i) the Servicer shall fail to deliver any Interim Report within one (1) Business Day of the date when due; provided that if the failure to deliver such report results from a Force Majeure Event, the grace period in this clause shall be two

(2) Business Days instead of one (1) Business Day; or (ii) during any calendar month, the Servicer shall fail to deliver more than two Interim Reports on the date when due other than by reason of a Force Majeure Event of less than two weeks in duration;

(d)     other than as addressed in Clauses 2.9(a), (b) and (c), the Servicer shall fail to perform or observe any term, covenant or agreement contained in this Agreement or any other Transaction Document to which the Servicer is a party and, if such failure relates to a Specified Provision and is capable of being remedied, the Servicer shall have failed to remedy such failure within fifteen (15) Business Days after the earlier of the Servicer receiving written notice of such failure or a Responsible Officer of the Servicer having actual knowledge of such failure;

(e)     any representation, warranty, certification or statement made by the Servicer in this Agreement or any other Transaction Document to which the Servicer is a party shall prove to have been incorrect in any material respect when made or deemed made; provided that if such breach relates to a Specified Provision and is capable of being cured, such breach shall not constitute a Servicer Default unless it continues unremedied for five (5) Business Days after the earlier of the Servicer receiving written notice of such breach or a Responsible Officer of a Servicer Party having actual knowledge of such breach;

(f)     a Trigger Event or Facility Termination Event shall occur;

(g)     any Change of Control shall occur; or

(h)     this Agreement or any other Transaction Document to which Tribune is a party in any capacity or any provision hereof or thereof shall cease, for any reason, to be in full force and effect or to be the legally valid, binding and enforceable obligation of Tribune thereto, or Tribune shall so assert in writing or shall otherwise seek to terminate or disaffirm its obligations hereunder or under any other Transaction Document to which it is a party;

then, and in any such event, the Administrative Agent may, in its discretion, and shall, at the direction of the Required Lenders, designate another Person to succeed Tribune as the Servicer.

## 2.10    Servicing Fee

The Servicer shall be paid a Servicing Fee out of Collections available for such purpose pursuant to the Receivables Loan Agreement and subject to the priorities therein and calculated on an arm's length basis for services performed on terms common to servicing arrangements in comparable transactions and in similar circumstances. The Sub-Servicers shall be paid such fees as the Servicer and the Sub-Servicers shall agree to from time to time; provided that such fees shall be the sole responsibility of the Servicer and neither the Borrower nor the Secured Parties shall have any liability therefor.

2.11    **Power of Attorney**

Each of the Servicer, the Sub-Servicer and the Borrower (each a "**Grantor**") hereby agrees that the Administrative Agent and the Borrower (each a "**Grantee**") may take any and all steps in such Grantor's name and on behalf of such Grantor that are necessary or desirable, in the determination of the applicable Grantee or any designee thereof, to collect all amounts due under the Pool Receivables, any Related Security with respect thereto, any Facility Account or any other Collateral, including (a) endorsing such Grantor's name on checks and other instruments representing Collections, (b) enforcing the Pool Receivables, the Related Security, the related Contracts, the Security Documents and the other Transaction Documents, including to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection therewith and (c) to file any claims or take any action or institute any proceedings that the applicable Grantee (or such designee) may deem to be necessary or desirable for the collection thereof or to enforce compliance with the terms and conditions of, or to perform any obligations or enforce any rights of the Borrower or any other Transaction Party in respect of, the Pool Receivables, the Related Security, the Facility Accounts, the Collateral and the other Transaction Documents. In furtherance of the foregoing, each of the Grantors hereby agrees to execute and deliver, on or prior to the Closing Date, to the Grantees a power of attorney substantially in the form of Exhibit C (*Form of Administrative Agent Power of Attorney*) hereto. Neither the Borrower nor the Administrative Agent shall take any action described in this Clause 2.11 or otherwise exercise its rights under any such power of attorney (i) unless a Trigger Event has occurred and is continuing or (ii) after the Final Payout Date.

2.12    **Receivables Loan Agreement Provisions**

Each party to this Agreement hereby acknowledges and agrees that (i) Collections shall be applied as provided in Clauses 2.6 (*Application of Collections prior to Facility Termination Date*) and 2.7 (*Application of Collections after Facility Termination Date*) of the Receivables Loan Agreement and (ii) any right or claim of such party to receive any payment from such Collections is subject to the terms, conditions and priorities of such Clauses and the other applicable terms and conditions of the Transaction Documents.

3.    **REPRESENTATIONS AND WARRANTIES**

3.1    **Representations and Warranties of the Servicer**

The Servicer hereby represents and warrants that, on the Closing Date and as of the date of each Incremental Borrowing and each Repeat Advance under the Receivables Loan Agreement and (except with respect to subclauses (e) or (f)) as of each Reporting Date:

(a)    The Servicer (i) is duly organized and validly existing under the laws of its jurisdiction of organization, (ii) is duly qualified to do business in every jurisdiction where the nature of its business requires it to be so qualified, and (iii) has all corporate or other organizational power, authority and all licenses,

authorizations, consents, approvals and qualifications of and from all Official Bodies and other third parties required to perform its obligations under the Transaction Documents to which it is a party and to carry on its business in each jurisdiction in which its business is conducted, in each case unless the failure to have the same would not be reasonably expected to have a Material Adverse Effect.

(b)     The execution, delivery and performance by the Servicer of this Agreement and any other Transaction Document to which it is a party (i) are within the Servicer's corporate powers, (ii) have been duly authorized by all necessary corporate action, (iii) do not contravene or constitute a default under (A) its Organic Documents, (B) any applicable Law, (C) any contractual restriction binding on or affecting the Servicer or its property or (D) any order, writ, judgment, award, injunction or decree binding on or affecting the Servicer or its property in each case unless such failure would not reasonably be expected to have a Material Adverse Effect and (iv) do not result in or require the creation or imposition of any Adverse Claim upon or with respect to any Pool Receivable, any Related Security, any Collateral or any Facility Account, in each case unless such Adverse Claim would not reasonably be expected to have a Material Adverse Effect. This Agreement and each other Transaction Document to which the Servicer is a party has been duly executed and delivered by the Servicer.

(c)     No authorization or approval or other action by, and no notice to or filing or registration with, any Official Body or official thereof or any third party is required for the due execution, delivery and performance by the Servicer of this Agreement or any other Transaction Document to which it is a party or any other document to be delivered by it hereunder or thereunder, except for the actions taken or referred to in Schedule 4 (*Conditions precedent documents*) to the Receivables Loan Agreement, all of which have been (or on or before the Closing Date will have been) duly made or taken, as the case may be, and are in full force and effect.

(d)     This Agreement and each of the other Transaction Documents to which it is a party constitutes the legal, valid and binding obligation of the Servicer, enforceable against the Servicer in accordance with its terms, subject to any limitation on the enforceability thereof against the Servicer arising from the application of any applicable Insolvency Law or by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(e)     Except as disclosed in reports filed with the Securities and Exchange Commission prior to the Closing Date, there are no actions, suits, investigations, litigation or proceedings at law or in equity or by or before any Official Body now pending or, to the actual knowledge of a Responsible Officer, threatened against or affecting the Servicer or its Subsidiaries or any of its or their business, revenues or other property (i) which question the validity of this Agreement or any other Transaction Document or any of the transactions contemplated hereby or thereby (excluding any litigation or proceeding against any Obligor) or (ii) which

individually or in the aggregate could be reasonably expected to have a Material Adverse Effect, other than the Chapter 11 Cases. It has complied in all respects with all applicable laws, rules, regulations, orders, writs, judgments, injunctions, decrees or awards to which it may be subject, in each case unless the failure to comply with the same would not reasonably be expected to have a Material Adverse Effect. It is not in any respect in default or violation of any order, judgment or decree of any Official Body, in each case unless the failure to comply with the same would not reasonably be expected to have a Material Adverse Effect.

(f)     Eligible Receivables included in the Net Eligible Receivables Balance and owed by an Official Body (other than the U.S. Federal Government) shall not exceed 2% of the Net Eligible Receivables Balance at any time.

(g)     Each Pool Receivable included as an Eligible Receivable in any Portfolio Report was an Eligible Receivable as of the date of such Portfolio Report, and the Percentage Factor does not exceed the Maximum Percentage Factor at the time of any Incremental Borrowing or Repeat Advance.

(h)     (i) Each Portfolio Report and Supplemental Report is complete and accurate in all material respects as of its date and (ii) all other written information, data, exhibits, documents, books, records and reports furnished by or on behalf of the Servicer to the Borrower or any Secured Party in connection with this Agreement, any other Transaction Document or any transaction contemplated hereby or thereby are true and accurate as of the date stated or certified in all material respects and do not contain any material misstatement of fact or omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading, and (iii) all annual and quarterly financial statements which have been furnished by or on behalf of the Servicer fairly present in all material respects the financial condition of the Servicer as of the dates set forth therein and the results of any operations of the Servicer and, if applicable, its consolidated Subsidiaries for the periods ended on such dates, subject to year end adjustments and the absence of footnotes in the case of unaudited statements.

(i)     The principal places of business and chief executive office of Servicer and the offices where it keeps all of its Records are located at the address(es) listed on Schedule 2 to the Receivables Loan Agreement.

(j)     The Servicer has complied with Clauses 2.3 (*Payments Generally*), 2.6 (*Application of Collections prior to Facility Termination Date*), 5.1(f) (*Change in payment instructions to Obligors*), 5.1(g) (*Deposits to Borrower Accounts*) and 5.1(k) (*Nature of Business; Credit and Collection Policies*) of the Receivables Loan Agreement. The names and addresses of all Facility Account Banks, together with the account numbers and ownership of the Facility Accounts at each Facility Account Bank and the post office box number and address of each Lock-Box, are listed on Schedule 5 (*Facility Accounts and Account Banks*) to the

Receivables Loan Agreement.  No Transaction Party has granted any Person, other than the Borrower, the Servicer Parties and the Administrative Agent as contemplated by the Transaction Documents, ownership, dominion or control of any Lock-Box or Facility Account, or the right to take ownership, dominion or control of any such Lock-Box or Facility Account at a future time or upon the occurrence of a future event. All Obligors have been instructed to pay all amounts owed in respect of Receivables to a Collection Account (or the related Lockbox described in Schedule 5 (*Facility Accounts and Account Banks*) of the Receivables Loan Agreement, subject to Transition Exceptions.  The Servicer has taken commercially reasonable efforts to permit only Collections and other amounts payable in respect of Pool Receivables to be deposited into the Borrower Accounts.  Each of the Facility Account Banks is an Eligible Account Bank.

(k)    The Servicer has not made any change to such Credit and Collection Policy except as permitted by Clause 4.1(i) (*Change in Business, Credit and Collection Policies*).

(l)    The Servicer has the systems and data processing capabilities to enable it to report, monitor and administer the Pool Receivables on a timely basis and as required hereby and by the other Transaction Documents, including the ability to report on or otherwise identify the Unpaid Balance of any Receivable, the receipt of any collections or other proceeds with respect to any Receivable or any other relevant information, in each case, on a Receivable by Receivable basis.

(m)    Except in the case of a limited number of Contracts ("**Agency Contracts**") under which the relevant Advertising Agency acts as agent for the relevant Advertising Agency Client in connection with purchases of media space and time, the Originators bill the Advertising Agencies, not the Advertising Agency Clients, for purchases of advertising time and space, and auditors for the Advertising Agencies consult with the Advertising Agencies, not the Advertising Agency Clients, to confirm amounts owing in respect of such purchases.

(n)    The Servicer's obligations under this Agreement and the other Transaction Documents to which it is a party rank at least *pari passu* with all of its unsecured unsubordinated Indebtedness.

(o)    The Security Agreement and the Guaranty Security Agreement, together with the filing of the financing statements contemplated by the Transaction Documents, are effective to transfer to the Administrative Agent for the benefit of the Secured Parties a valid and perfected first priority undivided percentage security interest in each Receivable existing or hereafter arising, the Related Security, Collections with respect thereto, the Facility Accounts and the other Collateral, free and clear of any Adverse Claim, except as created by the Transaction Documents.  There have been duly filed all financing statements or other similar instruments or documents necessary under the UCC (or any comparable law) of all appropriate jurisdictions to perfect the Borrower's and the Administrative Agent's ownership or security interest in the Receivables, the Related Security, the Collections and

the other Collateral.  Except for filings required under the Transaction Documents, no effective financing statement or other instrument similar in effect is filed in any recording office listing any Transaction Party as debtor and listing any Receivables, Related Security, the Facility Accounts or other Collateral, or any interest therein or proceeds thereof.

(p)     Servicer will cause all Collateral, including the Facility Accounts, to be subject at all times to a first priority perfected security interest in favor of the Administrative Agent.

(q)     Servicer owns, directly or indirectly, 100% of the issued and outstanding Equity Interests of Borrower, free and clear of any Adverse Claim.  Such Equity Interests are validly issued, fully paid and nonassessable, and there are no options, warrants or other rights to acquire securities of Borrower.

## 4.     COVENANTS

### 4.1     Covenants of the Servicer

Until the Final Payout Date, the Servicer agrees as follows:

(a)     **Compliance with Laws, Etc.**

The Servicer will comply in all material respects with all applicable Laws and preserve and maintain its corporate existence, rights, franchises, qualifications and privileges, except where failure to do so would not be reasonably expected to have a Material Adverse Effect.

(b)     **Offices, Records and Books of Account**

The Servicer will keep its records concerning the Pool Receivables and the Related Security at (i) the address of the relevant Servicer Parties specified in Clause 5.2 (*Notices*) as of the Closing Date or (ii) upon fifteen (15) days prior written notice to the Administrative Agent, at any other locations in jurisdictions where all actions necessary or requested by the Administrative Agent to protect and perfect its security interest in the Collateral have been taken and completed. The Servicer also will maintain and implement administrative and operating procedures (including an ability to recreate records evidencing Receivables, any Related Security with respect thereto and related Contracts in the event of the loss or destruction of the originals thereof), and keep and maintain all documents, books, records and other information necessary for the collection of all Receivables, Related Security with respect thereto, the Facility Accounts and the other Collateral (including records adequate to permit the daily identification of each Receivable and all Collections thereof and adjustments thereto).  The Servicer shall give the Administrative Agent prompt notice of any change in its administrative and operating procedures referred to in the previous sentence that would materially affect (A) data or calculations included in any Portfolio Report or used to determine the existence of a Facility Event, (B) financial tests, (C)

revenue recognition or (D) otherwise relate to the Collateral, and (ii) any change of the Chief Financial Officer, Treasurer, Controller, Assistant Treasurer or Assistant Controller of Tribune Company or the Chief Financial Officer of the Tribune Publishing Segment and the Chief Financial Officer of the Tribune Broadcasting Segment, and any allegation of criminal misconduct or fraud by any such Person involved in the origination or servicing of Receivables.

(c)     **Notice of Borrower's Interest**

The Servicer shall cause the master computer file for the Originators' billing system to disclose the Borrower's ownership of the Pool Receivables and the Administrative Agent's security interest therein.

(d)     **Sales, Liens, Etc.**

The Servicer will not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to, the Pool Receivables, the Related Security with respect thereto, the Facility Accounts or any other Collateral, or any other asset of the Borrower, or assign its right to receive income in respect thereof; or permit any Equity Interest of the Borrower to be subject to an Adverse Claim.

(e)     **Extension or Amendment of Receivables and Contracts**

Except as provided in Clause 2.2(c) (*Duties of the Servicer*), the Servicer will not (i) extend, amend, waive or otherwise modify the terms and conditions of any Pool Receivable or any Related Security, or (ii) amend, modify, waive or otherwise modify any term or condition of any Contract related thereto in a manner that could reasonably be expected to adversely affect the collectibility of the Pool Receivables or could otherwise reasonably be expected to have a Material Adverse Effect.

(f)     **Change in Payment Instructions to Obligors; Deposits to Collection Accounts**

(i) The Servicer will not take any action inconsistent with, or that if taken by any Originator, the Borrower or any other Transaction Party would be a breach of, Clause 5.1(f) (*Change in payment instructions to Obligors*) or 5.1(g) (*Deposits to Borrower Accounts*) of the Receivables Loan Agreement or Section 4.06 (*Change in payment instructions to Obligors*) or 4.07 (*Deposits to Collection Accounts*) of the Receivables Purchase Agreement or any corresponding or similar Clause of any other Transaction Document. (ii) If the Servicer shall receive any Collections directly, the Servicer shall promptly (and in any event by the time required under the Receivables Loan Agreement) cause such Collections to be deposited into a Collection Account or Borrower Concentration Account.

(g) **Separateness**

Except as provided in the Transaction Documents, the Servicer will not take any action or omit to take any action that would cause the Borrower to cease to be in compliance with Clause 5.1(i) (*Separateness*) of the Receivables Loan Agreement.

(h) **Amendments**

The Servicer will not make or suffer to exist any amendment or other modification to any Transaction Document except in accordance with the amendment provisions thereof and Clause 5.1(j) (*Transaction Documents*) of the Receivables Loan Agreement.

(i) **Change in Credit and Collection Policies**

The Servicer will not make any change in the Credit and Collection Policies without the prior written consent of the Administrative Agent, except, in each case, for any such change (i) that would not (A) impair the collectibility of any Pool Receivables, (B) otherwise have a Material Adverse Effect or (C) adversely affect the interests or remedies of any Secured Party or the Borrower or (ii) as required by applicable Law.

(j) **Change in Accountants or Accounting Policies**

The Servicer shall promptly notify the Administrative Agent of any change in its outside accountants or material change in its accounting policies that relate to the Receivables, that affect the reports required to be delivered hereunder or that could reasonably be expected to have a Material Adverse Effect.

(k) **Power of Attorney**

The Servicer will not voluntarily revoke or attempt to revoke any power of attorney granted by it in connection with the transactions contemplated by the Transaction Documents.

(l) **Instruments**

The Servicer shall not take any action to cause any Receivable not evidenced by a negotiable instrument upon origination to become evidenced by a negotiable instrument, except in connection with the enforcement or collection of a Defaulted Receivable or otherwise in accordance with its standard operating practices.

(m) **Licenses, Etc.**

The Servicer shall maintain in full force and effect all licenses, approvals, authorizations, consents, registrations and notifications which are at any time

required in connection with the performance of its duties and obligations hereunder and under the other Transaction Documents to which it is a party, except where the absence of the same would not have a Material Adverse Effect.

(n)   **Performance and Compliance with Contracts and Credit and Collection Policies; Enforcement of Transaction Documents**

(i)   The Servicer will, at its expense, timely and fully comply in all material respects with the Credit and Collection Policies.

(ii)   The Servicer on behalf of Borrower and the Secured Parties, shall (or shall cause the Servicer Parties to) promptly enforce all covenants and obligations in the Borrower's favor of the other Transaction Parties under the Transaction Documents. The Servicer shall also deliver consents, approvals, acknowledgements, directions, notices, waivers and take such further actions, in each case under the Transaction Documents (other than the Receivables Loan Agreement, the Security Agreement and the Fee Letter) with respect to the rights or remedies of the Borrower or the Administrative Agent as may be directed by the Administrative Agent.

(o)   **Inspections; Agreed Upon Procedures Audit**.

The Servicer during regular business hours as requested by the Administrative Agent and/or any Lender upon (in the absence of a Facility Event) reasonable prior notice, shall permit the Lenders (acting as a group) or their respective agents or representatives (including independent public accountants or consultants, in each case, which have agreed to be bound by Clause 11.6 (*Confidentiality*) of the Receivables Loan Agreement) (i) to conduct periodic audits of, or to perform agreed upon procedures with respect to, the Receivables, the Related Security, the other Collateral and the related books and records, including the Contracts, and collections systems of the Servicer, (ii) to examine and make copies of and abstracts from all documents, purchase orders, invoices, agreements, books, records and other information (including computer programs, tapes, discs, punch cards, data processing software, storage media and related property and rights) in the possession or under the control of the Servicer relating to the Receivables, the Related Security and the other Collateral, including the Contracts and (iii) to visit the offices and properties of the Servicer for the purpose of examining such materials described in Clauses 4.1(n)(i) and (ii), and to discuss matters relating to the Receivables, the Related Security and the other Collateral or the Servicer's performance hereunder and under the other Transaction Documents to which it is a party or under the Contracts with any of the officers or employees of the Servicer, having knowledge of such matters.  It is understood and agreed that any of the actions to be taken by the Lenders pursuant to this Section 4.1(o) shall be initiated by the Administrative Agent on behalf of the Lenders or by the Administrative Agent at the request of the Required Lenders and that any visit to the offices and properties of the Servicer by the Lenders shall be conducted by the Lenders as a group and not by an individual Lender.  So long as no Trigger Event

or Facility Termination Event has occurred and is continuing, no more than two such inspections shall be permitted in any calendar year at the request of the Lenders and neither the Borrower nor any of the Servicer Parties shall be responsible for the costs and expenses of any Lender (other than the costs and expenses of the Administrative Agent) incurred in connection therewith.

(p)     **Collection Capability**

The Servicer will maintain the collection capability of its respective servicing platform as required to collect the Receivables and Related Security, including the ability to report on or otherwise identify the Unpaid Balance of any Receivable, the receipt of any Collections or other proceeds with respect to any Receivable or any other relevant information, in each case, on a Receivables by Receivable basis.

(q)     **Title**

At all times on and after the Closing Date until the Final Payout Date (i) the Servicer shall take all actions necessary in order to perfect and protect the security interests of the Administrative Agent and the other Secured Parties in the Pool Receivables and the Related Security and Collections related thereto, the Facility Accounts and all other Collateral against any Adverse Claim  or the interest of any creditor of or purchaser from any Transaction Party, (ii) the Servicer shall take all actions necessary to ensure that all registrations, financing statements, notices, instruments and documents required to be recorded or filed in order to perfect and protect interests of the Administrative Agent and the other Secured Parties in the Pool Receivables and the Related Security and Collections related thereto, the Facility Accounts and all other Collateral against any Adverse Claim or the interest of any creditor of, or purchaser from, any Transaction Party will have been duly executed, filed or served in or on the appropriate filing office, Official Body or other Person in each jurisdiction necessary for such purpose and (iii) all fees and Taxes, if any, payable in connection with such actions and filings shall have been paid in full when or before due.

5.    **MISCELLANEOUS**

5.1    **Waiver; Amendments, Etc.**

(a)     No failure or delay on the part of the Administrative Agent or the Lenders in exercising any power, right or remedy under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such, power, right or remedy preclude any further exercise thereof or the exercise of any other power, right or remedy.  The rights and remedies herein provided shall be cumulative and non-exclusive of any rights and remedies provided by law.

(b)     Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Required Lenders (and, in the case of any amendment, also signed by the Servicer and others party hereto),

and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

5.2    **Notices**

All communications and notices provided for hereunder shall be provided in the manner described in Schedule 2 (*Address and Notice Information*) to the Receivables Loan Agreement.

5.3    **Assignments**

Except as provided herein, no Servicer Party may assign any of its rights or obligations hereunder or any interest herein without the prior written consent of the Required Lenders.  The Borrower may assign its rights hereunder only to the Administrative Agent for the benefit of the Secured Parties pursuant to the Transaction Documents.  The Administrative Agent may assign any of its rights or obligations hereunder or any interest herein to any successor Administrative Agent appointed pursuant to the terms of the Receivables Loan Agreement.

5.4    **No Proceedings; Limited Recourse**

Each of the parties hereto hereby agrees that:

(a)    it will not institute against, or join any other Person in instituting against, the Borrower any proceeding of the type referred to in the definition of Event of Bankruptcy so long as there shall not have elapsed one year plus one day since the Final Payout Date; and

(b)    notwithstanding anything contained herein or in any other Transaction Document to the contrary, the obligations of the Borrower under the Transaction Documents are solely the obligations of the Borrower and shall be payable by the Borrower solely to the extent of funds which are received by the Borrower pursuant to the Transaction Documents and available for such payment in accordance with the terms of the Transaction Documents and shall be non-recourse other than with respect to such available funds and, without limiting Clause 5.4(a), if ever and until such time as the Borrower has sufficient funds to pay such obligation shall not constitute a claim against the Borrower.  Nothing in this Section 5.4(b) shall limit the obligations of the Guarantors under the Guaranty.

5.5    **Execution in Counterparts**

This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by electronic file in a format that is accessible by the recipient shall be effective as delivery of a manually executed counterpart of this Agreement.

5.6    **Integration; Binding Effect; Survival of Termination; Severability**

This Agreement and the other Transaction Documents executed by the parties hereto contain the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof superseding all prior oral or written understandings. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns (including any trustee in bankruptcy). Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. This Agreement shall create and constitute the continuing obligations of the parties hereto in accordance with its terms and shall remain in full force and effect until the Final Payout Date (or, in the case of any Originator, the Originator Payout Date with respect to such Originator); provided, however, that the provisions of Clauses 2.6 (*Indemnities by Servicer*), 5.4 (*No proceedings; limited recourse*), 5.7 (*Governing law*) and 5.10 (*Waiver of Setoff*) shall survive any termination of this Agreement. If any one or more of the provisions of this Agreement shall for any reason whatsoever be held invalid, then such provisions shall be deemed severable from the remaining provisions of this Agreement and shall in no way affect the validity or enforceability of such other provisions.

5.7    **GOVERNING LAW; SUBMISSION TO JURISDICTION; APPOINTMENT OF PROCESS AGENT**

(a)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK.

(b)    EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT SITTING IN NEW YORK CITY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND EACH PARTY HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.

(c)    THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THEY MAY EFFECTIVELY DO SO, THE DEFENSE OF INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING. THE PARTIES HERETO AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(d)     EACH OF THE PARTIES HERETO CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO IT AT ITS ADDRESS SPECIFIED HEREIN.  NOTHING IN THIS CLAUSE 5.7 SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY MANNER PERMITTED BY LAW.

(e)     THE SUBMISSION TO THE JURISDICTION OF THE COURTS REFERRED TO IN CLAUSE 5.7(b) SHALL NOT (AND SHALL NOT BE CONSTRUED SO AS TO) LIMIT THE RIGHT OF ANY PARTY TO TAKE PROCEEDINGS AGAINST ANY OTHER PARTY OR ANY OF ITS RESPECTIVE PROPERTY IN ANY OTHER COURT OF COMPETENT JURISDICTION NOR SHALL THE TAKING OF PROCEEDINGS IN ANY OTHER JURISDICTION PRECLUDE THE TAKING OF PROCEEDINGS IN ANY OTHER JURISDICTION, WHETHER CONCURRENTLY OR NOT.

5.8     **WAIVER OF JURY TRIAL**

EACH PARTY HERETO HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT.

5.9     **USA Patriot Act**

Borrower hereby notifies each Servicer Party that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) and any similar Law in any relevant jurisdiction (the "**Acts**"), each Lender is required to obtain, verify and record information that identifies the Transaction Parties, which information includes the name and address of each Transaction Party and other information that will allow such Lender to identify such Transaction Party in accordance with the Acts.

5.10    **Waiver of Setoff**

Except as otherwise provided herein, the obligations, liabilities and indemnities of each Servicer Party under this Agreement (collectively, the "**Servicer Obligations**") shall not be subject to deduction of any kind or type, except by payment in full of the amount thereof in accordance with the terms thereof.  Each Servicer Party hereby waives any right it may now or at any time hereafter have to set off any Servicer Obligation against any obligations of the Borrower, any Guarantor, the Administrative Agent or any other Secured Party.

5.11    **No Guarantee or Indemnity**

Neither the Administrative Agent nor any other Secured Party shall have any liability for the obligations of an Obligor under any Contract and nothing in this Agreement shall

constitute the giving of a guarantee or the assumption of a similar obligation by any such Person in respect thereof.

5.12   **Original Servicing Agreement**

The Borrower, the Servicer, the Originators and the Administrative Agent entered into the Original Servicing Agreement.  The parties hereto desire to enter into this Agreement in order to amend and restate the Original Servicing Agreement in its entirety.  Nothing herein shall release Servicer or any Originator from any liability it may have accrued under the Original Servicing Agreement, which liability shall be evidenced by this Agreement.  All references to the Original Servicing Agreement in any other agreement or document shall be deemed to be references to this Agreement.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**TRIBUNE COMPANY**, as Servicer

By:_____
     Name:
     Title:

**TRIBUNE RECEIVABLES, LLC**, as Borrower

By:_____
     Name:
     Title:

**CHICAGOLAND TELEVISION NEWS, INC.,
TRIBUNE BROADCAST HOLDINGS, INC.,
TRIBUNE INTERACTIVE, INC.,
TRIBUNE TELEVISION HOLDINGS, INC.,
WGN CONTINENTAL BROADCASTING
COMPANY,
WPIX, INC.,
TRIBUNE TELEVISION NEW ORLEANS, INC.,
KSWB INC.,
KTLA INC.,
KIAH INC.,
TOWER DISTRIBUTION COMPANY,
TRIBUNE TELEVISION NORTHWEST, INC.,
TRIBUNE TELEVISION COMPANY,
CHANNEL 40, INC.,
CHANNEL 39, INC.,
LOS ANGELES TIMES COMMUNICATIONS LLC,
WDCW BROADCASTING, INC.,
ORLANDO SENTINEL COMMUNICATIONS
COMPANY,
SUN-SENTINEL COMPANY,
GOLD COAST PUBLICATIONS, INC.,
FORUM PUBLISHING GROUP, INC.,
THE DAILY PRESS, INC.,
CHICAGO TRIBUNE COMPANY,
THE BALTIMORE SUN COMPANY,
THE HARTFORD COURANT COMPANY,
THE MORNING CALL, INC.,
and [TRIBUNE MEDIA SERVICES, INC.],** as
Sub-Servicers

By:_____
    Name:
    Title:   Authorized Signer

**BARCLAYS BANK PLC**, as Administrative Agent

By:_____

    Name:

    Title:

CONSENTED AND AGREED:

BARCLAYS BANK PLC,
as a Funding Agent for the Class A
Loans under the Original Agreement

By: _____

Name:

Title:

*Servicing Agreement*

## SCHEDULE 1
## INITIAL SUB-SERVICERS

ChicagoLand Television News, Inc.

Tribune Broadcast Holdings, Inc.

Tribune Interactive, Inc.

Tribune Television Holdings, Inc.

WGN Continental Broadcasting Company

WPIX, Inc.

Tribune Television New Orleans, Inc.

KSWB Inc.

KTLA Inc.

KIAH Inc.

Tower Distribution Company

Tribune Television Northwest, Inc.

Tribune Television Company

Channel 40, Inc.

Channel 39, Inc.

Los Angeles Times Communications LLC

WDCW Broadcasting, Inc.

Orlando Sentinel Communications Company

Sun-Sentinel Company

Gold Coast Publications, Inc.

Forum Publishing Group, Inc.

The Daily Press, Inc.

Chicago Tribune Company

The Baltimore Sun Company

The Hartford Courant Company

The Morning Call, Inc.

Tribune Media Services, Inc.

**EXHIBIT A-1**
**FORM OF MONTHLY REPORT**

**Tribune Receivables Funding LLC**
**Monthly Report**

Monthly Report for the Month ending

**I. Receivable Performance Ratios** (update monthly)

| | Actual | Trigger |
|---|---|---|
| 3M Average Dilution Ratio | % | % |
| *Compliance?* | | |
| 3M Average Delinquency Ratio | % | % |
| *Compliance?* | | |
| 3M Average 91-120 DPI Ratio | % | % |
| *Compliance?* | | |
| 3M Average Days Sales Outstanding | | |
| *Compliance?* | | |

**II. Financial Covenants** (updated in April, June, September and December for the prior quarter)

| | Actual | Trigger |
|---|---|---|
| Consolidated EBITDA/Consolidated Interest Expense | | |
| *Compliance?* | | |
| Total Guaranteed Leverage Ratio | | |
| *Compliance?* | | |
| Capital Expenditures | | |
| *Compliance?* | | |

**III. Receivables Rollforward** (in thousands)

| | |
|---|---|
| Beginning Billed Receivables | $ |
| Earned Revenue | |
| Cash Collections | |
| Billing Adjustments | |
| Cash Discounts | |
| Other Credit Activity | |
| Bad Debt Charge-offs | |
| Recoveries | |
| Debit Billing & Other Adjustments | |
| Total Receivables | $ |

**IV. Receivables Aging** (in thousands)

| | | |
|---|---|---|
| 1-30 DPI | % | |
| 31-60 DPI | % | |
| 61-90 DPI | % | |
| 91-120 DPI | % | |
| 121-150 DPI | % | |
| 151+ DPI | % | |
| Unapplied Cash & Credits | % | |
| Total balance per month end aging | % | |
| Unbilled Receivables | % | |
| Ending Receivables | % | $ |

**V. Eligible Receivables** (in thousands)

| | | |
|---|---|---|
| Total Receivables | | $ |
| Delinquent Receivables (> 90 DPI) | % | |
| 30% Cross Age Test | % | |
| Other Credit Accruals | % | |
| Other Potential Offsets | % | |
| Receivables from Bankrupt, Insolvent or Deceased Obligors | % | |
| *"Hold Back" or "Make Good" Liability Accruals | % | |
| Receivables from Foreign Obligors | % | |
| Receivables from Government Obligors | % | |
| Television Broadcast Rights | % | |
| Other Ineligibles (estimated per annual audit) | % | |
| Total Ineligible Receivables | % | |
| Eligible Receivables Balance | % | $ |

**VI. Net Receivables Balance** (in thousands)

| | |
|---|---|
| Eligible Receivables Balance | |
| Excess Unbilled Receivables | |
| Excess Obligor Concentration Amount | |
| Net Receivables Balance | |

**VII. Capital Availability** (in thousands)

| Net Receivables Balance | | | $ |
|---|---|---|---|
| Loss Reserve (% / $) | | % | |
| Dilution Reserve (% / $) | | % | |
| Yield Reserve (% / $) | | % | |
| Servicing Fee Reserve (% / $) | | % | |
| Commingling Reserve (% / $) | | | |
| Total Reserves (% / $) | | % | $ |
| Net Receivables Balance - Reserves | | | |
| Maximum Funding Amount | | | |
| Aggregate Commitment | | | |
| Max Funding Amount | | | |
| Current Capital Outstanding | | | |
| Capital Available for Funding | | | $ |
| Paydown Required | | | |

**VIII. Loans Outstanding**

| | |
|---|---|
| Current Revolving Outstandings | |
| Request for Incremental Borrowing, Repeat Advance or Paydown of Revolving Loan | |
| Current Term Outstandings | |
| Request for Deposit into Cash Reserve Account or Paydown of Term Loans | |
| Total Outstanding | $ |

The undersigned hereby represents and warrants that the foregoing is accurate accounting in accordance with the Amended and Restated Receivables Loan Agreement dated as of April 10, 2009 and that all representations and warranties are restated and reaffirmed.

TRIBUNE COMPANY

Signature: _____

Name: _____

Title: _____

**EXHIBIT A-2**
**FORM OF INTERIM REPORT**

**Tribune Receivables Funding LLC**
**Interim Report**

Interim Report for the Interim Period ending:

**I. Receivables Rollforward**

| | | |
|---|---|---|
| Beginning Receivables Balance | $ | |
| Daily Earned Revenue | | |
| Cash Collections | | |
| Other Adjustments | | |
| Total Receivables | $ | |
| Unbilled Receivables | $ | |
| Unbilled Receivables (% of Total) | | % |

**II. Eligible Receivables**

| | | |
|---|---|---|
| Total Receivables | | $ |
| Total Ineligible Receivables (from Monthly Report) | % | |
| Eligible Receivables Balance | % | $ |

**III. Net Receivables Balance**

| | | |
|---|---|---|
| Eligible Receivables Balance | | |
|     Unbilled Receivables | | |
|     Unbilled Receivables Limit (50% Eligible Receivables Limit) | % | |
| Excess Unbilled Receivables | | |
| Excess Obligor Concentration Amount (from Monthly Report) | % | |
| Net Receivables Balance | | |

**IV. Capital Availability**

| | | |
|---|---|---|
| Net Receivables Balance | | $ |
| Loss Reserve (% / $) | % | |
| Dilution Reserve (% / $) | % | |
| Yield Reserve (% / $) | % | |
| Servicing Fee Reserve  (% / $) | % | |
| Commingling Reserve (% / $) | | |
| Amount on Deposit in Excess Funding Account | | $ |
| Total Reserves  (% / $) | % | $ |
| Net Receivables Balance - Reserves | | |
| Aggregate Commitment | | |
| Max Funding Amount | | |
| Current Capital Outstanding | | |
| Capital Available for Funding | | $ |
| Paydown Required | | |

EXHIBIT A -2 - 1

**V. Loans Outstanding**

| | |
|---|---|
| Current Revolving Outstandings | |
| Request for Incremental Borrowing, Repeat Advance or Paydown of Revolving Loan | |
| Current Term Outstandings | |
| Request for Deposit into Cash Reserve Account or Paydown of Term Loans | |
| Total Outstanding | $ |

The undersigned hereby represents and warrants that the foregoing is accurate accounting in accordance with the Amended and Restated Receivables Loan Agreement dated as of April 10, 2009 and that all representations and warranties are restated and reaffirmed.

TRIBUNE COMPANY

Signature: _____

Name: _____

Title: _____

9206969.11 08141696                              EXHIBIT A -2 - 2

**EXHIBIT A-3**
**FORM OF COMPLIANCE CERTIFICATE**

To:  Barclays Bank PLC, as Administrative Agent

This Compliance Certificate is furnished pursuant to that certain Amended and Restated Servicing Agreement (the "**Servicing Agreement**") dated as of April 10, 2009 among Tribune Receivables, LLC (the "**Borrower**"), Tribune Company (the "**Servicer**"), the sub-Servicers party thereto and Barclays Bank PLC, as Administrative Agent for the Lenders under the Receivables Loan Agreement (as such terms are defined in the Servicing Agreement.)   Terms not otherwise defined herein shall have the meanings given in the Servicing Agreement or, if not defined therein, the Receivables Loan Agreement.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

1. I am the duly elected  [_____] of Servicer.

2. I have reviewed the terms of the Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of Servicer and its Subsidiaries during the accounting period covered by the attached financial statements.

3. The examinations described in paragraph 2 did not disclose, and I have no knowledge of, the existence of any condition or event which constitutes a Facility Event or Originator Event during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate, except as set forth in paragraph 5 below.

4. Schedule I attached hereto sets forth financial data and computations evidencing the compliance with certain covenants of the Agreement, all of which data and computations are true, complete and correct.

5. Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which Servicer, Parent, Borrower or the relevant Originator has taken, is taking, or proposes to take with respect to each such condition or event:

_____

_____

_____

EXHIBIT A – 3 - 1

The foregoing certifications, together with the computations set forth in Schedule I hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this ___ day of _____, 200____.


By:_____
Name:
Title:

SCHEDULE I TO COMPLIANCE CERTIFICATE

A.      Schedule of Compliance as of _____, _____ with Section ____ of the Servicing
Agreement.  Unless otherwise defined herein, the terms used in this Compliance Certificate have
the meanings ascribed thereto in the Agreement.

This schedule relates to [describe period.]

## EXHIBIT B

## FORM OF SERVICER POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENTS**, that [GRANTOR] (the "**Principal**"), a company organized under the laws of [●] by and through its duly elected representative, [NAME OF SIGNATORY], does hereby nominate, constitute and appoint Hewlett-Packard Company (the "**Grantee**"), and each officer of the Grantee from time to time authorized by the Grantee and each other person or entity from time to time designated by a Grantee or such officer (each an "**Attorney-in-Fact**") with full power of substitution, to act, together or alone, as the Principal's true and lawful agent and attorney-in-fact, for it and in its name, place and stead, to take any and all steps in such Principal's name and on behalf of such Principal as is necessary or desirable, in the judgment of the Grantee (1) to collect all amounts due under any and all Pool Receivables and any Related Security with respect thereto, including endorsing the Principal's name on checks and other instruments representing Collections and enforcing the Pool Receivables, the Related Security and the related Contracts and (2) to otherwise service, administer, collect and manage the Pool Receivables and the Related Security with respect thereto in accordance with the terms of the Amended and Restated Servicing Agreement dated on or about the date hereof between, among others, the Principal, the Grantee and Barclays Bank PLC and the Sub-Servicers from time to time party thereto (the "**Servicing Agreement**").

Unless otherwise defined herein, capitalized terms which are used herein shall have the meanings assigned to such terms in the Servicing Agreement.

Each Attorney-in-Fact shall have full power and authority to do and perform any and all acts and things requisite for the purposes set forth hereinabove as fully for all intents and purposes as the undersigned might or could do in person.

This limited power of attorney is irrevocable and coupled with an interest.

This limited power of attorney may be assigned by each Attorney-in-Fact and any such person or entity designated by each Attorney-in-Fact.

The Principal hereby agrees that any person to whom this limited power of attorney is presented, as authority for an Attorney-in-Fact to take any action or actions contemplated hereby, may rely hereon without further inquiry and shall not be required to inquire into or seek confirmation from the Principal as to the authority of such Attorney-in-Fact to take any action described above, or as to the existence of or fulfillment of any condition to this limited power of attorney, which is intended to grant to each Attorney-in-Fact unconditionally the authority to take and perform the actions contemplated herein, and the Principal irrevocably waives any right to commence any suit or action, in law or equity, against any person or entity that acts in reliance upon or acknowledges the authority granted under this limited power of attorney.

This limited power of attorney shall be governed by and construed in accordance with the internal laws of the State of New York.

EXHIBIT B - 1

**IN WITNESS WHEREOF**, the Principal has executed this Power of Attorney on this ___ day of _____, 2009.

[NAME OF GRANTOR]

By: _____
Name:
Title:

the foregoing instrument was acknowledged before me this _____ day of _____, 2009, by _____ of [NAME OF GRANTOR].

WITNESS my hand and official seal.

_____
Notary Public

[NOTARIAL SEAL]

My commission expires:

_____

EXHIBIT B - 2

## EXHIBIT C

## FORM OF ADMINISTRATIVE AGENT POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENTS**, that **[GRANTOR]** (the "**Principal**"), a company organized under the laws of **[●]** by and through its duly elected representative, **[NAME OF SIGNATORY]**, does hereby nominate, constitute and appoint each of BARCLAYS BANK PLC, as Administrative Agent (the "**Administrative Agent**", together with its successors and assigns) and **[●]** (the "**Borrower**"), (each a "**Grantee**") and each officer of a Grantee from time to time authorized by such Grantee and each other person or entity from time to time designated by a Grantee or such officer (each an "**Attorney-in-Fact**") with full power of substitution, to act, together or alone, as the Principal's true and lawful agent and attorney-in-fact, for it and in its name, place and stead, to take any and all steps in such Principal's name and on behalf of such Principal as is necessary or desirable, in the determination of the applicable Attorney-in-Fact to collect all amounts due under the Pool Receivables, any Related Security with respect thereto, any Facility Account or any other Collateral, including:

(1)     endorsing the Principal's name on checks and other instruments representing Collections;

(2)     enforcing the Pool Receivables, the Related Security, the related Contracts, the Security Documents and the other Transaction Documents, including to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection therewith; and

(3)     to file any claims or take any action or institute any proceedings that the applicable Attorney-in Fact may deem to be necessary or desirable for the collection thereof or to enforce compliance with the terms and conditions of, or to perform any obligations or enforce any rights of the Borrower or any other Transaction Party in respect of, the Pool Receivables, the Related Security, the Facility Accounts, the Collateral and the other Transaction Documents.

Unless otherwise defined herein, capitalized terms which are used herein shall have the meanings assigned to such terms in the Amended and Restated Servicing Agreement dated on or about the date hereof between, among others, the Principal, the Administrative Agent and the Sub-Servicers from time to time party thereto (the "**Servicing Agreement**").

Each Attorney-in-Fact shall have full power and authority to do and perform any and all acts and things requisite for the purposes set forth hereinabove as fully for all intents and purposes as the undersigned might or could do in person.

This limited power of attorney is irrevocable and coupled with an interest.

This limited power of attorney may be assigned by each Attorney-in-Fact and any such person or entity designated by each Attorney-in-Fact.

The Principal hereby agrees that any person to whom this limited power of attorney is presented, as authority for an Attorney-in-Fact to take any action or actions contemplated hereby, may rely hereon without further inquiry and shall not be required to inquire into or seek confirmation from the Principal as to the authority of such Attorney-in-Fact to take any action described above, or as to the existence of or fulfillment of any condition to this limited power of attorney, which is intended to grant to each Attorney-in-Fact unconditionally the authority to take and perform the actions contemplated herein, and the Principal irrevocably waives any right to commence any suit or action, in law or equity, against any person or entity that acts in reliance upon or acknowledges the authority granted under this limited power of attorney.

This limited power of attorney shall be governed by and construed in accordance with the internal laws of the State of New York.

**IN WITNESS WHEREOF**, the Principal has executed this Power of Attorney on this ___ day of _____, 2009.

[NAME OF GRANTOR]


By: _____
Name:
Title:


the foregoing instrument was acknowledged before me this _____ day of _____, 2009, by _____ of [NAME OF GRANTOR].

WITNESS my hand and official seal.


_____
Notary Public


[NOTARIAL SEAL]

My commission expires:


_____