# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, <u>et al.</u>, [1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Objection Deadline: May 5, 2009 at 4:00 p.m. (ET)**<br>**Hearing Date: May 12, 2009 at 10:00 a.m. (ET)** |

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO MAKE CERTAIN PAYMENTS FOR 2008 PURSUANT TO PRE-PETITION INCENTIVE PLANS AND CERTAIN OTHER OBLIGATIONS

Tribune Company (the "Company") and most of its wholly-owned subsidiaries, each of which is a debtor and debtor in possession herein (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>"), hereby move this Court (the "<u>Motion</u>") for entry of an order, in substantially the form attached hereto as <u>Exhibit A</u> (the "<u>Order</u>"), authorizing, but not directing, the Debtors:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Washington Bureau Inc. (f/k/a Tribune Broadcasting News Network Inc.) (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

(1)    pursuant to Sections 105(a) and 363(b) of Title 11 of the United States Code (the "Bankruptcy Code"), to make performance-based cash Management Incentive Program ("MIP") compensation payments for 2008 totaling approximately $12.243 million (representing payout at approximately 38% of target in the aggregate) to approximately 670 participants employed by the Debtors[2] for that year, *excluding* the Company's ten most senior executives ("Top 10"); and

(2)    pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, to pay an aggregate of approximately $1.1 million in cash incentive bonuses and certain other owed amounts for 2008 under various "local" business unit programs and individual agreements to 23 individuals who may technically constitute local business unit "insiders" but who do not participate in the MIP (collectively, the "Remaining Local Payments").

These requests are the product of a collaborative process engaged in by the Debtors and their key creditor constituencies over more than a month in order to address their respective concerns regarding these issues.  In the course of this process, the Debtors shared extensive and detailed supporting information with its constituencies that is highly proprietary and that was produced pursuant to confidentiality agreements.  Among other things, this collaborative process culminated in a reduction of several million dollars to the Debtors' initial aggregate proposed payout.  As a result of this good faith process, the official committee of unsecured creditors (the "Creditors Committee") supports the 2008 MIP payments requested in this Motion.  The Creditors Committee has not taken a position on payment of the Remaining Local Payments, pending its review of further diligence materials.

---

[2] The payout percentage is approximately 45% of target excluding the target payments for the Top 10 executives, who are not included in the payment requests made in this Motion.  An additional aggregate amount of approximately $1.132 million in 2008 MIP awards has been and/or will be paid to approximately 39 non-Top 10 participants employed by non-Debtor entities (the Chicago Cubs and Tribune Interactive).  The Debtors are providing such data for informational purposes only.

## SUMMARY

By this Motion, the Debtors seek to pay incentive compensation pursuant to the 2008 MIP to reward and incentivize the participants for their significant contributions during an exceptionally difficult year.  As detailed below, the proposed 2008 MIP payments represent a reasonable payout at 38% of target in the aggregate, or approximately $12.243 million out of approximately $32 million at target for the Debtors (as noted, the payout is 45% of target if targets for the Top 10 executives are excluded).  The present Motion does not seek authority to pay 2008 MIP awards to the Top 10 executives.  Payment of the 2008 MIP awards requested herein is consistent with the Debtors' ordinary course historical practices, and has been reviewed and approved by the Compensation Committee of the Company's Board of Directors (the "Compensation Committee").  The proposed MIP payments also have been analyzed by an independent compensation consultant, Mercer (U.S.), Inc. ("Mercer"), retained by the Company under the leadership of its Compensation Committee.  Mercer concluded that the requested MIP awards all are within reasonable market ranges and are a common form of compensation for companies in Chapter 11.

These payments are vitally necessary to reward the participants for their extraordinary contributions during an exceptionally difficult year, including implementation of strategic initiatives in 2008 that are expected to generate approximately $425 million in incremental annualized cash flow and the consummation of transactions generating over $1 billion in proceeds.  These payments also are critical to incentivize the Company's leaders going forward to continue to transform the Company during these very difficult economic times.  Maintaining strong incentives for another year of hard work and achievements is of paramount importance in the current environment.  Consistent with that fact, the Company currently is

3

developing and discussing with its key constituencies the continuation of the MIP for 2009, with certain refinements to account for the present business climate, and implementation of a Key Employee Incentive Plan that would create incentive award opportunities for key contributors based on achievement of certain restructuring objectives. However, failure to address expectations and reward efforts for 2008 is likely to have a significant adverse impact on employee performance and morale.

In addition, as Mercer's market analysis confirms (discussed further below), MIP participants generally are undercompensated relative to their peers. Mercer's analysis shows that, absent the 2008 MIP payments sought in this Motion, 2008 total direct compensation[3] for the Debtors' MIP participants (based on a representative sampling by Mercer) would fall *53% below the market median*. See Mercer Report (Exhibit D), at 8. The proposed MIP payments would help close this gap somewhat, to 41% below the median, but the participants generally would still be undercompensated relative to the market. Id. Moreover, as the Mercer report states, long-term incentive compensation grants have long been a core element of the Company's compensation program for many MIP participants, and also are a commonplace competitive practice both in the Debtors' industry and for companies in Chapter 11 proceedings. Id. at 3-4. As discussed below, however, the participants do not currently have any meaningful long-term incentive opportunity because all prior phantom equity grants (the Company's form of long-term incentive compensation) have little, if any, value in light of the Debtors' financial condition. Without meaningful equity grants, the Company's total incentive grants and average per-person incentive grant for 2008 (in each case considering both MIP and equity-based awards, if any) are

---

[3] Total direct compensation consists of base salary plus annual cash incentive opportunity plus long-term incentive opportunity for a given year.

both more than 70% below the Company's total incentive grant and average per-person incentive grant for 2007.

Furthermore, payment of the proposed 2008 MIP awards at a modest 38% of target (45% excluding Top 10 targets) is consistent with industry practice for 2008. As detailed below, 8 of 9 media companies that have released proxies have paid 2008 bonuses to at least some named executive officers ("NEOs"),[4] and thus undoubtedly to various non-NEOs as well. Bonus payout levels for 2008 for the Company's peers ranged from approximately 20% of target opportunity to over 100% of target. Id. at 14. In the Debtors' business judgment, paying the Company's employees below-market compensation when extraordinary effort will be required to transform the Company in such a difficult environment is not a sound business decision.

Finally, payment of the Remaining Local Payments (approximately $1.1 million in the aggregate to 23 individuals) is vital to ensuring fair compensation for various local business unit insiders who do not participate in the MIP, but who contributed to the Debtors' significant achievements in 2008 and warrant similar incentives to enhance future performance. As discussed below, on February 3, 2009, this Court granted an Order permitting similar payments to approximately 3,000 other non-insider local personnel. The remaining local personnel at issue in this Motion were excluded from that Order because they technically may constitute "insiders," even though they are not part of the Company's senior management. The present Motion thus seeks to authorize bonus and certain other payments for these remaining local employees and to complete the process largely accomplished in the Court's February 3, 2009 Order.

---

[4] Those eight peer companies are Gannett Co., New York Times Co., the Washington Post, Cablevision Systems Corp., E.W. Scripps, Thomson-Reuters Corp., Lee Enterprises, Inc. and Meredith Corp. (the ninth is McClatchy Co.).

In sum, the Debtors believe that these incentive and other payments are essential to the success of both their ongoing operations and their restructuring efforts. The Creditors Committee supports the 2008 MIP payments requested in this Motion (and as noted has not taken a position on the Remaining Local Payments pending further diligence review). Additional facts and circumstances supporting this Motion are set forth below and are verified in the Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company, in support of the Motion (the "Bigelow Affidavit") and the Affidavit of John Dempsey, Principal, Mercer (U.S.), Inc., in support of the Motion (the "Dempsey Affidavit"). Copies of the Bigelow Affidavit and the Dempsey Affidavit are attached hereto as Exhibit B and Exhibit C, respectively. A copy of Mercer's analysis and conclusions relating to this Motion is designated as Exhibit D hereto and is being filed under seal.[5] In further support of this Motion, the Debtors respectfully represent as follows:

## STATUS OF THE CASE AND JURISDICTION

1.      On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2.      The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner.

3.      The Creditors Committee was established on December 18, 2008.

---

[5] Concurrently with this Motion, the Debtors are filing the Motion of the Debtors to File Under Seal an Exhibit to Motion of the Debtors for an Order Authorizing the Debtors to Make Certain Payments for 2008 Pursuant to Pre-Petition Incentive Plans and Certain Other Obligations. Pursuant to Del. Bankr. L. R. 9018-1(b) a copy of Exhibit D will be provided to the Judge's chambers in an envelope marked "Documents To Be Kept Under Seal."

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105(a) and 363(b) of the Bankruptcy Code.

## BACKGROUND

### The Debtors' Principal Segments and Business Units

5.      Tribune Company is America's largest employee-owned media and entertainment company and is the ultimate parent company of each of the Debtors.  It reaches more than 80% of U.S. households through its newspapers and other publications, its television and radio broadcast stations and cable channels, and its other entertainment offerings.  The Debtors' operations are conducted through two primary business segments:  (i) Publishing and (ii) Broadcasting and Entertainment.

6.      The Publishing segment currently operates eight (8) major-market daily newspapers, and distributes entertainment listings and syndicated content through its Tribune Media Services business unit.  It also manages the websites of the Debtors' daily newspapers, television stations, and other branded sites targeting specific communities of interests.  As of the Petition Date, the Publishing segment employed approximately 12,000 full-time equivalent employees.

7.      The Broadcasting and Entertainment segment includes 23 television stations in 19 markets, including seven stations in the top 10 U.S. markets and the Chicago area's

first and only 24-hour cable news channel, CLTV.[6]  It also operates the cable "Superstation"

WGN America and Chicago radio station WGN-AM.  As of the Petition Date, the Broadcasting

and Entertainment segment employed approximately 2,600 full-time equivalent employees.

8.      The Debtors also have a Corporate division that includes the senior

management team as well as other corporate-level and centralized administrative personnel,

including finance, legal, accounting, technology and human resources personnel.

**Overview of the MIP and the Debtors' Historical Compensation Practices**

9.      The Debtors have paid incentive compensation as a central component of

employee compensation for many years.  In particular, the current MIP was implemented in 1997

as part of the Tribune Company Incentive Compensation Plan ("Incentive Plan"), a copy of

which is attached hereto as Exhibit E.  The Incentive Plan authorizes the Debtors to make

incentive awards to eligible participants consisting of cash MIP awards and various equity-based

grants.  See Incentive Plan Art. VI.  The Debtors have awarded cash MIP awards under the

Incentive Plan each year since 1997.

10.      Historically, most management employees across the Company's

operations (other than those in sales positions) with cash incentive award targets of at least 15%

of their base salary have participated in the MIP.  There were a total of 1,039 participants in the

MIP for 2004, 1,040 for 2005, 1,010 for 2006, 953 for 2007 and approximately 720 for 2008.[7]

---

[6] In prior years, CLTV was included in the Publishing division.

[7] This 720-participant figure is provided for a better comparison with participation levels for prior years.  Of this amount, approximately 680 participants are employed by Debtor entities, with the remainder employed by non-Debtors.  Excluding non-Debtor employees and (for purposes of this Motion) Top 10 Debtor executives, this Motion seeks authorization to pay 2008 MIP awards to the remaining approximately 670 Debtor employees.

11.     All MIP participants traditionally are eligible to receive an annual cash incentive award.  In addition, the majority of the MIP participants have also been eligible to receive equity-based awards to incentivize long-term performance.  Prior to 2007, such equity-based awards generally were made as option or restricted stock unit ("RSU") grants under the Incentive Plan.  In connection with the merger that returned Tribune Company to private ownership at the end of 2007 (the "2007 Merger"), Tribune Company adopted a new 2007 Management Equity Incentive Plan that provided equity-based compensation through phantom equity (the "2007 MEIP").[8]

12.     Under the Debtors' longstanding compensation philosophy, the total cash compensation of key personnel (base salary and annual cash incentive award) purposefully was kept low relative to market.  Equity-based compensation comprised a substantial component of their compensation to incentivize long-term performance, align managements' and the shareholders' interests, and bring the recipients' total direct compensation (base salary, cash incentive award and long-term equity award) to market levels.

13.     Due to the Debtors' financial condition, however, the equity-based compensation granted under the 2007 MEIP is likely to have little, if any, value.  As a result, key personnel are undercompensated relative to the market, as discussed further below.  Furthermore,

---

[8] On December 20, 2007, the Company completed the 2007 Merger, culminating with the cancellation of all issued and outstanding shares of the Company's common stock, other than shares held by the Company or the newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), and cash-out of any vested "in the money" options and RSUs, as of that date.  The Company and its subsidiaries thereby became wholly owned by the ESOP.

of the approximately 35 new members of upper management hired since the 2007 Merger, all but two did *not* receive any phantom equity.[9]

## Historical Determination of MIP Targets, Awards and Discretionary Payments

14.     The Debtors have used a consistent methodology over the years in setting annual MIP targets and in subsequently determining MIP cash awards.  They consistently have made MIP cash awards *both* to participants whose business units hit their operating goals, *and* on a discretionary basis to participants whose business units did *not* hit one or more of the stated goals (even at threshold levels).

15.     Each MIP participant has an annual target award opportunity expressed as a percentage of his or her base salary.  For example, a participant with a base salary of $100,000 and a 20% MIP target percentage would be eligible for a target MIP award of $20,000.  The Debtors then use these individual targets to determine target bonus pools for each business unit and segment, as well as the consolidated Company-wide target pool.

16.     Within the Publishing segment, each individual newspaper is its own business unit, as is Tribune Media Services.  Within the Broadcasting and Entertainment segment, each television and radio station is its own business unit.  The Corporate division, as well as certain group offices that oversee the entire Publishing segment and Broadcasting and Entertainment segment, respectively, also constitute distinct business units.

17.     In the fourth quarter of each year, a budget and operating plan is developed by each business unit for the following year, as well as a consolidated budget and plan

---

[9] The Debtors are *not* requesting approval to make any equity-based grants pursuant to the 2007 MEIP or, for that matter, the Incentive Plan.  This information is being provided for background and context only.

for the Company as a whole.  These plans include forecasted income statements for each business unit.  The plans also contain other objectives such as, in the case of Broadcasting and Entertainment business units, market share goals.

18.    The operating cash flow goals established in this planning process for a given business unit serve as the primary performance target for that year's MIP:

a.    Publishing:  Each Publishing segment business unit's operating cash flow forecast historically serves as its MIP performance target as well.  Under the Debtors' practice, when a Publishing business unit achieves threshold performance – usually in the range of 75% to 85% of its forecasted cash flow[10] -- a pro forma[11] MIP bonus pool is established for that business unit at 40% of the target pool.[12]  If the business unit meets its operating cash flow goal, a pro forma bonus pool is established at 100% of target.  Operating cash flow between threshold and target amounts typically results in a linearly interpolated pro forma bonus pool achievement (from 40% to 100% of target).  Cash flow in excess of target results in a proportionally increased pro forma achieved pool, up to 200% of target.

b.    Broadcasting and Entertainment:  For Broadcasting and Entertainment business units, operating cash flow and market share goals historically determine

---

[10] Smaller business units typically have a threshold at the lower end of this range because of greater potential variability in their financial results, whereas larger business units typically have a threshold at the higher end.

[11] This and other amounts are referred to as "pro forma" because, as discussed below, the Debtors have always reserved and exercised the discretion to adjust achieved pool and payout amounts.

[12] For example, assume that a Publishing business unit's cash flow target is $10 million, its threshold performance target is 85% of that amount, and its aggregate bonus pool target is $1 million (at 100% achievement of forecasted cash flow).  If this business unit generates cash flow of $8.5 million (85% of target), it would achieve a pro forma bonus pool of $400,000 (40% of the $1 million target pool), subject to further adjustment in the Debtors' discretion.  Notably, payout at the threshold level of 40% of the *target bonus pool* does not result in a payout at 40% of each participant's *base salary*.  To the contrary, while *individual* participants' MIP targets, expressed as a percentage of base salary, vary (see supra ¶ 15), aggregate MIP award payouts as a percentage of base pay (for those participants receiving a bonus and excluding the Top 10) have been well *below* 40%, and indeed have declined from an average of 24% in 2006 to 17% in 2007 to 14% in 2008.

a majority of their achieved MIP pool opportunity, with a portion being determined based on

discretionary factors.

        c.    <u>Publishing and Broadcasting/Entertainment Group Offices</u>:  For

the Publishing group office and the Broadcasting and Entertainment group office, MIP

achievement historically has been based on the aggregate segment level of achievement.

        d.    <u>Corporate Division</u>:  Historically, the Corporate division's MIP

opportunity is based on a blend of the Publishing segment's achievement and the Broadcasting

and Entertainment segment's achievement.

        19.    Given the complexity and breadth of the Debtors' organization, the

diversity of their business units, and the variety of markets in which they operate, however, the

Debtors long ago determined that mechanically applying the foregoing formulas to determine all

business unit and participant awards would not always fairly reflect their contributions or

compensate them for their achievements.  Rather, the Debtors traditionally have exercised

discretion in adjusting actual business unit and segment MIP pool amounts upwards or

downwards relative to achieved pro forma amounts.  They have done so for various reasons in

their business judgment, including for example to account for other unit-specific performance or

business circumstances, to adjust for macroeconomic factors, or to promote internal equity across

business units or segments.

        20.    Consistent with this historical practice, the Incentive Plan itself expressly

authorizes the award of discretionary bonus pools each year to business units that did *not* hit

some or even *any* of their annual performance thresholds for that year: "Notwithstanding

satisfaction of any performance goals, the amount to be paid under an annual management

incentive program bonus may be adjusted by the [Board's Compensation] Committee on the basis of such further considerations as the Committee in its sole discretion shall determine." Incentive Plan § 10.6; see also id. § 3.2 ("The Committee shall have full power to ... determine the size and types of awards and their terms and conditions . . . .").

      21.    The Debtors have made these discretionary awards for many years based on factors deemed appropriate in their business judgment, including to adjust for performance shortfalls that were due to macroeconomic or other factors substantially beyond the business units' control, and to promote relative internal equity. In particular, the Debtors have used discretionary awards to adjust for the substantial industry-wide decline in advertising revenue that has affected the Publishing and the Broadcasting and Entertainment segments over the last several years. In several cases, these discretionary payments *exceeded* the pro forma 40%-of-target-pool amount applicable for threshold performance. Thus, for example:

- In 2004, discretionary bonus pools ranging from approximately 19% to 69% of target (average 35%) were awarded to three Publishing business units that did not hit their minimum thresholds. A fourth business unit, in Broadcasting and Entertainment, also received a discretionary award.

- In 2005, discretionary bonus pools ranging from approximately 32% to 99% of target (average 39%) were awarded to fifteen Broadcasting and Entertainment business units that did not meet their minimum thresholds (including the Broadcasting and Entertainment group office). Of these fifteen business units, five received discretionary pools between approximately 40% and 99% of target. A sixteenth business unit, in Publishing, that missed its threshold performance level also received a discretionary award equal to approximately 65% of its target pool.

- In 2006, discretionary bonus pools of approximately 39% and 48% of target, respectively, were awarded to two Broadcasting and Entertainment business units that did

not meet their minimum thresholds. A discretionary pool of approximately 60% of target also was granted to a Publishing business unit that showed a loss but made other valuable contributions.

- In 2007, discretionary bonus pools ranging from approximately 12% to 43% of target were awarded to ten Broadcasting and Entertainment business units, and to four Publishing business units, that did not meet their minimum thresholds. The average discretionary bonus pool was 28% of target.[13]

22.     Finally, the Debtors historically have exercised discretion in adjusting final MIP awards to individual participants upwards or downwards relative to the achieved performance of their business units, based once again on individual performance, personal circumstances, or other factors deemed relevant by the Debtors in their business judgment.

**2008 Budgeting and Industry Downturn**

23.     Consistent with historical practice, the Debtors' former senior management team developed various financial and operational goals for 2008 in the fourth quarter of 2007 (the Company subsequently transitioned to a new senior management team and Board of Directors). As detailed above, these forecasts and goals, as applicable, historically have served as the business units' MIP performance targets. Normally, the Compensation Committee reviews and approves a given year's budgetary forecasts and operating goals for MIP purposes during the first quarter of that year when it also approves the prior year's MIP awards. However, consideration of such issues for 2008 was deferred and ultimately not revisited.

---

[13] To the extent that any of the Top 10 executives were in any of the business units referenced in this Paragraph 21, the foregoing payout percentage(s) for such business unit(s) would include payouts to such Top 10 executive(s). However, most of the Top 10 executives are in the Corporate division. Thus, a substantial majority of the individual business unit payout percentages contained in this Paragraph would not reflect payments to Top 10 executives in any event.

24.     When the Debtors' former senior management team set these goals and projections in the fourth quarter of 2007, the management team could not have foreseen the unprecedented adverse business conditions that were to occur in 2008 due to the rapidly deteriorating economic climate.  During 2008, Publishing advertising revenue fell approximately 12% during the first month, 15% in the first quarter,[14] 15% in the second quarter, 19% in the third quarter, 21% in the fourth quarter, and 18% for the full year.  Broadcasting and Entertainment weathered the storm for a time, posting 4% revenue growth during the first half of 2008, but then experienced a 6% revenue decline in the third quarter, and a 19% decline in the fourth quarter, resulting in a 4% decline for the full year.

25.     The Debtors did not merely watch passively as these trends continued to worsen.  Rather, the new senior management team took swift and aggressive action across their business units to develop new revenue sources, and reduce expenses, in order to generate incremental cash flow.  With the oversight and approval of the Board of Directors, the Debtors' new senior management implemented numerous strategies to defend the Company against the deteriorating business climate in which the Debtors and the entire industry found themselves.

26.     In total, the strategic initiatives implemented in 2008, mostly during the second half of the year, are expected to generate approximately $425 million of incremental cash flow on an annualized basis.  These initiatives spanned all of the Debtors' business units and involved significant effort and sacrifice in order to maximize the Debtors' operating cash flow:

---

[14] Quarterly figures listed in this Paragraph are relative to the same quarter of 2007.

a.    <u>Publishing</u>:  The Publishing segment's initiatives contributed approximately $285 million of the incremental cash flow on an annualized basis.  These efforts were wide-ranging and included the following, among others:

- The Debtors undertook and completed the major redesign of all eight of their daily newspapers.  These redesigns were an enormous undertaking and were designed to produce fresher-looking newspapers at significantly lower cost.

- These redesigns have resulted in substantial savings on newsprint, compensation and production costs while maintaining readership levels.  In total, the redesigns are expected to save the Debtors approximately $80 million on an annualized basis.

- The Debtors implemented new newspaper circulation programs which resulted in revenue gains.

- The Debtors continue to lead the newspaper industry by executing significant and landmark commercial printing and delivery transactions with other newspaper companies that are expected to generate significant incremental operating cash flow in 2009.

- The Publishing business units aggressively cut costs, including by reducing promotional and discretionary spending.

b.    <u>Broadcasting and Entertainment</u>:  This segment similarly undertook significant value-creation initiatives and aggressively reduced costs:

- The broadcast station business units increased news coverage and took other proactive measures to maintain and even *gain* market share.  In 2008, 21 of 23 television stations and WGN Radio *gained* market share in a down economy.  These stations gained approximately 1.2 total share points not counting political advertising, and a full share point including political advertising – a remarkable achievement in an election year.

- The Debtors rebranded and relaunched their WGN cable "Superstation" on a nationwide basis as WGN America, resulting in many new revenue growth opportunities.

- The Debtors changed their San Diego station network affiliation from CW to Fox, increasing the value of the station.

- Business units developed new direct advertising programs with local businesses, which increased "local direct" sales significantly.

- The Broadcasting and Entertainment segment aggressively controlled promotional and discretionary expenses.

      c.    <u>Corporate</u>:  The Corporate group was instrumental in driving change throughout the entire Debtor group.  It also undertook several corporate-level strategic initiatives, including the closing of transactions that generated over $1 billion in proceeds in 2008 alone, which the Debtors used to pay down debt and sustain their operations.  These transactions included:

- Formation of a partnership with Cablevision Systems Corporation with respect to its Newsday Media Group business, resulting in a special distribution to Tribune of $612 million.

- Securitization of the Debtors' trade receivables, resulting in net proceeds of $218 million.

- Disposition to Gannett Co., Inc. of a 10% interest in CareerBuilder, LLC and of an investment in ShopLocal, LLC for total net proceeds of nearly $130 million.

- Disposition of a Hollywood studio production lot, resulting in net proceeds of $122 million.

- Sale of Connecticut real estate resulting in net proceeds of $29 million.

      27.    Due to the extremely difficult macroeconomic conditions and unprecedented adversity in their businesses, the Debtors quickly pursued initiatives to reduce expenses including the elimination of approximately 2,400 positions, or approximately 13% of

their workforce, in 2008. Over 2,100 reductions occurred in the Publishing segment alone, representing approximately 15% of the Publishing workforce and roughly 25% of its management personnel (many of whom had participated in the MIP). These substantial reductions place significant burdens on the remaining employees, requiring them to do even more work with less overall personnel.

28.    Due to the successful implementation of these strategic initiatives primarily during the second half of the year, the Company has been able to mitigate the unprecedented economic pressure of its businesses. In 2008, the Company's Publishing segment generated $461 million of operating cash flow in 2008 and achieved an operating cash flow margin of approximately 16.7% during one of the worst years in newspaper advertising history. This performance is relatively strong when one considers that several publishers of large metro newspapers operate at significant losses and many are rumored to be considering closures. Others have recently closed money-losing operations and/or dramatically changed the form of their product in an attempt to remain viable. The Rocky Mountain News (E.W. Scripps) has closed operations, the Seattle Post Intelligencer (Hearst) has transformed itself into a purely on-line product, and the Detroit Free Press (Gannett) reduced its home delivery to three days a week.

## RELIEF REQUESTED

### I.    Payment of Proposed 2008 MIP Awards

29.    Given the unprecedented drop-off in advertising revenues and recessionary conditions that took hold in 2008, it is not surprising that many business units, particularly in Publishing, did not meet their budgeted cash flow forecasts set in the fall of 2007.

30.     However, one Publishing business unit, Tribune Media Services, nearly met its cash flow target and is proposed to receive a bonus pool equal to 81% of target. Additionally, several Broadcasting and Entertainment business units met or exceeded their threshold cash flow goals (9 units) and/or market share goals (13 units) and have been designated to receive payouts ranging from approximately 39% to 90% of target.

31.     The Debtors seek authorization to make 2008 MIP awards per their historical practice to these business units that achieved some or all of their budgeted targets at least at threshold levels.  Again, the foregoing payout percentages (like the others in this Motion) are the product of extensive discussions with the Debtors' creditor constituencies regarding the aggregate size and other aspects of the 2008 MIP awards.

32.     Also consistent with their longstanding historical practices, the Debtors seek authorization to make discretionary MIP awards to those business units in the Publishing segment and the Broadcasting and Entertainment segment (including the group offices where applicable) that did not achieve forecasts or operating goals.

33.     The Debtors respectfully submit that, in their business judgment, such awards are vitally necessary to reward these participants for a year of hard work and their significant resulting accomplishments – again including the creation of a projected $425 million of annualized incremental cash flow in the face of extraordinary business conditions beyond their control.

34.     Moreover, the challenges of 2008 were only the beginning, and the Debtors need to ensure at this critical juncture that their key contributors remain motivated throughout the difficult year to come.  MIP awards are and have long been an essential and core

component of the participants' compensation, and a key means of ensuring proper incentives. To that end, as noted, the Company currently is developing and discussing with its key constituencies the continuation of the MIP for 2009, with certain refinements to account for the present business climate, as well as implementation of a Key Employee Incentive Plan that would create incentive award opportunities for key contributors based on achievement of certain restructuring objectives. However, non-payment of 2008 MIP awards would significantly undermine those efforts by defeating the expectations of the participants. Failure to reward their achievements and address their past expectations for 2008 would have a negative effect on employee incentives and morale going forward, as promises of 2009 bonus opportunities for another job well-done may appear empty.

35.    The Debtors have carefully reviewed the contributions of each business unit for which a discretionary award is sought in order to benchmark their respective contributions. For example, Publishing business units were compared to one another based on various revenue, expense control, operating cash flow and headcount reduction metrics, and their relative proposed discretionary awards were determined accordingly. Broadcasting and Entertainment units generally were evaluated based on direct local new business growth, demonstrated leadership, role as change agents, and potential for future growth.

36.    Aggregate proposed discretionary awards for the participants at issue in the Broadcasting and Entertainment segment and the Publishing segment are approximately 29% of target and 36% of target, respectively, with traditional variability among individual business unit awards over and under these average payout levels. As detailed above, this is consistent with the Debtors' historical practice in making discretionary MIP awards to some business units both below and above the 40%-of-target threshold pool amount. The Debtors also propose to

20

award an MIP bonus pool to the participants in the Corporate division equal to approximately 30% of that group's target pool (48% excluding the Top 10 targets) based on relevant composite performance, consistent with historical practice.[15]

37.    In total, the Debtors seek to pay approximately $12.243 million in MIP awards for 2008 (both non-discretionary and discretionary) to approximately 670 participants employed by the Debtors during that year, representing an average payout at roughly 38% of target (45% of target excluding Top 10 targets) across all segments and divisions. Again, the Debtors are not at this time seeking authorization to make any payments to the Top 10 executives. These proposed MIP awards are in line with, or below, historical parameters and are reasonable in their own right:

- The aggregate number of participants – even considering *all* participants in the 2008 MIP (approximately 720 including both Debtor and non-Debtor employees and counting the Top 10 executives as well for comparison purposes) -- is lower than in prior years (between 953 and 1,040 participants from 2004 to 2007), in part due to the Debtors' headcount reductions.

- The total dollars paid under the MIP have declined from approximately $37.5 million in 2006 to $24.5 million in 2007 to $13.375 million (approximately $1.132 million of which is for non-Debtor employees) proposed in 2008 (a 64% 2-year decline and a 45% 1-year decline).

- MIP awards as a percentage of base pay (for those participants receiving a bonus and excluding the Top 10) have declined from 24% in 2006 to 17% in 2007 to 14% in 2008.

---

[15] Again, these and other percentage-of-target-pool figures cited herein do *not* represent the percentage of *base salary* received by participants as MIP awards. As stated, aggregate MIP award payouts as a percentage of base pay (for those participants receiving a bonus and excluding the Top 10) have been lower, and indeed have declined from an average of 24% in 2006 to 17% in 2007 to 14% in 2008.

- The median 2008 MIP award sought for the participants at issue is approximately $9,500. Ex. D, at 8.

- The average proposed MIP award per Debtor participant in this Motion, approximately $18,273 for 2008, is materially less than in recent prior years -- $37,170 in 2006 (a 51% decrease for 2008) and $25,370 in 2007 (a 28% decrease for 2008).

- 84% of all participants included in this Motion would receive awards of less than $30,000, and over 70% of such participants would receive awards of less than $20,000.

- Significantly, these proposed MIP awards generally are the *only* incentive awards of value received by the MIP participants for 2008. Long-term incentive equity-based awards traditionally have comprised a substantial component of many participants' total compensation. However, any equity-based awards granted under the 2007 MEIP have little, if any, value. As a result, the Company's total incentive grants and average per-person incentive grant for 2008 (in each case considering both MIP and equity-based awards, if any) are both more than 70% below the Company's total incentive grant and average per-person incentive grant for 2007.

38.     The Debtors respectfully submit that these awards are fair, reasonable and a valid exercise of their business judgment in order to reward and properly incentivize the participants. The Compensation Committee approved the proposed MIP payouts in early 2009. Furthermore, Mercer, the independent compensation consultant retained by the Company under the leadership of its Compensation Committee, has reviewed the proposed 2008 MIP awards to determine whether they are reasonable relative to market levels. See Exhibit D. The results of Mercer's analysis are designated as Exhibit D hereto and are being filed under seal with this Motion.

39.     Mercer's independent review and analysis has determined that the proposed 2008 MIP payments are reasonable relative to peer market levels, are a common form

of core compensation in the Debtors' industry and in Chapter 11 proceedings, and are critical to

avoid under-compensation.  In particular, Mercer concluded that:

- Without the 2008 MIP awards, the total direct compensation of the 2008 MIP participants (based on a representative sampling by Mercer) would fall *53% below* the market median.  See Ex. D, at 8.

- The requested 2008 MIP awards would help close this gap somewhat, but the participants would still be approximately 41% below the market median even with such awards.  Id.

- Payment of the 2008 MIP awards is consistent with industry practice and is a prevalent practice - recently released proxy statements of Company peers indicate that 8 of 9 reporting media companies paid bonuses to named executive officers for 2008 performance (and thus payments to non-NEOs can be assumed as well).  Id. at 14.

- The Debtors' proposed payout as a percent of target (38% in the aggregate) is well within the spectrum of 2008 awards disclosed by the Company's peers, which ranged from approximately 20% of target opportunity to over 100% of target.  Id.

## II.    Payout of Remaining Local Bonus Payments and Miscellaneous Other Payments[16]

40.    On February 3, 2009, this Court granted the Debtors' Motion For An

Order Authorizing, But Not Requiring, The Debtors To Pay PrePetition Amounts Under Non-

Insider Incentive Programs.  As more fully discussed in that prior motion, these 2008 "local

bonus" programs generally are bonus programs or agreements maintained at the local business

unit level (e.g., individual newspapers and broadcast stations) for employees who do not

participate in the MIP.  The majority of these bonuses are based on revenue generation, though

---

[16] The figures herein also include, for purposes of simplicity only, the portion of these 2008 local payments that constitute post-Petition amounts payable without notice and a hearing based on service during 2008 after the Petition Date (December 8, 2008).

performance factors such as increasing market share, expense targets, and other discretionary factors are also considered in certain instances.

41.    As explained in connection with the above-referenced prior motion, the Debtors have identified 22 participants in these local bonus programs who are not senior management team members, but who may meet the statutory definition of an "insider" and therefore were not included in the above local bonus Order.  Thus, the Debtors are seeking authorization to pay "local bonuses" for 2008 to these remaining employees.[17]  In total, the Debtors seek to pay an aggregate amount of approximately $910,000 to these remaining individuals, with individual bonuses ranging from $750 to $90,625.

42.    The local bonuses are a core component of the recipients' annual compensation.  Payment of these bonuses therefore is necessary to fairly compensate these employees and to ensure that they maintain proper incentives going forward.  Non-payment also would create inequity relative to those individuals whose local bonuses were approved in this Court's February 3, 2009 Order.

43.    The Debtors also owe a total of just under $159,000 in Remaining Local Payments to three individuals (who again technically may constitute "insiders"), including two of those for whom local bonuses are sought, under various pre-petition agreements for a cash advance, a cost of living adjustment and a relocation/housing allowance.  The Debtors seek to honor these prepetition obligations in order to ensure that the employees in question maintain their focus on their core responsibilities in the future.

---

[17] The local incentive bonuses generally are paid based upon annual or quarterly performance, after the conclusion of the applicable measurement period.  Because the Petition Date fell near the end of the 2008 annual bonus period and over two-thirds of the way into the fourth quarter of 2008, the Debtors accrued prepetition obligations to almost all employees participating in the plans, including the individuals at issue in this Motion.

**BASIS FOR RELIEF**

I.      **The 2008 MIP Payments Fall Within The Authority Granted by Sections 105(a) and 363(b) of the Bankruptcy Code**

44.     Payment of the Debtors' proposed 2008 MIP awards falls within the authority granted by Section 363(b)(1) of the Bankruptcy Code, which provides: "The trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1).

45.     In determining whether to authorize the use of property pursuant to this section, the debtor need only demonstrate that a sound business purpose justifies such use. In re: Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); see also In re: Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991). A bankruptcy court is empowered to authorize a debtor to pay prepetition claims if the debtor articulates "some business justification, other than mere appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business." In re: Ionosphere Clubs, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).

46.     Section 105(a) of the Bankruptcy Code also authorizes the payments being sought. This Section empowers a court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. at 175. Payment of prepetition employee compensation fits within a court's equitable powers under Section 105(a): "Certain pre-petition claims *by employees* and trade creditors, however, may need to be paid to facilitate a successful reorganization. Section 105(a) of the Code provides a statutory basis for the payment of

prepetition claims." In re: Just for Feet, 242 B.R. 821, 824 (D. Del. 1999) (emphasis added) (citing In re: Lehigh & New England Railway Co., 657 F.2d 579, 581 (3rd Cir. 1981)).

47.    Consistent with the foregoing principles, several courts have authorized management incentive award payments attributable to pre-petition services (in amounts exceeding the nominal $10,950 cap under Section 507(a)(4)).  See, e.g., In re: Riverstone Networks, Inc., 06-10110 (Sontchi, J.) (Bankr. Del. April 3, 2006) (approving, subject to certain parties' reservation of rights, payment up to an aggregate amount of $1.4 million for 15 members of debtors' senior management team under pre-petition program which was assumed or continued forward on a post-petition basis); In re: Pliant Corp., 06-10001 (Walrath, J.) (Bankr. Del. March 14, 2006) (approving incentive compensation up to $955,100 for amounts earned by 12 insiders under pre-petition management program); In re: Coram Healthcare Corp. and Coram, Inc., 00-3299 (Walrath, J.) (Bankr. Del. Sept. 10, 2001) (authorizing a payment of $2,733,837 in incentive compensation to 46 management employees under the debtor's management incentive plan).

48.    Courts also have approved pre-petition incentive payments pursuant to plans where the performance benchmarks were based on qualitative performance goals.  See Werner Holding Co., Inc., 06-10578 (Carey, J.) (Bankr. Del. August 22, 2006) (approving payments to debtors' executive leadership team, subject to certain procedures and restrictions, pursuant to pre-petition incentive-based bonus plan where the debtors determined that qualitative performance goals had been met despite the company's filing for bankruptcy and failure to meet its financial targets).

49.    Furthermore, courts have authorized discretionary incentive payments in cases where the debtors' employees did not meet their performance goals due to macroeconomic

or other factors, but the debtors determined in their business judgment that incentive payments

were warranted and such payments were consistent with the applicable plan and the debtors'

historical practices.  See, e.g., In re: Pliant Corp., 06-10001 (Walrath, J.) (Bankr. Del. March 14,

2006) (approving payment of bonuses under management incentive plan despite the failure to hit

performance targets where the plan provided for discretionary payments); cf. In re: Nellson

Nutraceutical, 369 B.R. 787 (Bankr. D. Del. 2007) (authorizing the debtor pursuant to Section

363(c) to *retroactively* modify unachieved incentive plan targets downward after the

performance period had already ended, so as to make discretionary incentive awards to

employees whom the debtors determined in their business judgment to merit incentive awards).

      50.    Numerous courts also have approved employee incentive compensation

plans outside the ordinary course of business pursuant to Section 363(b) as appropriate exercises

of the debtors' business judgment based upon a sound business purpose even after the

Bankruptcy Code was amended as of October 2005.  See, e.g., In re Global Home Products, 369

B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance

bonuses are considered the proper exercise of a debtor's business judgment.") (internal citation

omitted); In re: Nobex Corp., 2006 WL 4063024 (Bankr. Del. January 19, 2006) (approving an

incentive plan based on the gross purchase price of the sale of the company's assets); In re:

Movie Gallery, Inc., 07-33849 (Tice, J.) (Bankr. E.D. Va. February 29, 2008) (approving a key

employee incentive plan based on earnings achieved);  In re: Dana Corporation, 358 B.R. 567

(S.D.N.Y. 2006) (approving a long-term incentive plan based on EBITDAR targets); In re:

Sharper Image, 08-10322 (Gross, J.) (Bankr. Del. June 25, 2008) (approving an incentive plan

based on successful wind down of the business); In re: Semcrude, L.P., 08-11525 (Shannon, J.)

(Bankr. Del. January 13, 2009) (approving bonus plan based on EBITDA and substantial sale of the business units).

51.     The 2008 MIP payments constitute a valid exercise of the Debtors' business judgment that is entirely consistent with Sections 105(a) and 363(b).  As stated, several business units actually achieved their relevant financial and operational goals set in late 2007.  The Debtors thus seek to address the expectations of these business units.

52.     For those business units that were unable to meet their targets, and for the Corporate division and group offices whose awards are based in part on aggregate business unit achievements, the Debtors seek authorization to continue their historical practice of making discretionary awards to such business units and groups.  As detailed above, the Debtors carefully evaluated these business units both on quantitative criteria (such as relative financial performance and direct local new business generation) and on qualitative factors relevant to the Debtors' overall strategic initiatives (such as leadership and success in serving as change agents).

53.     In the end, these efforts bore significant fruit in a very short time-period, including the generation of approximately $425 million of projected incremental cash flow on an annualized basis and over $1 billion in net proceeds from transactions executed in 2008 alone.  These are significant achievements in their own right, and they merit even greater consideration due to the speed with which they were accomplished, the managerial and operational flexibility that they required, and the unprecedented obstacles that they surmounted.

54.     The risk of significant damage to employee incentives and morale going forward cannot be overstated if these 2008 MIP awards are not paid.  These accomplishments did not occur in a vacuum.  They represent thousands upon thousands of *extra* hours of very difficult

work by the participants, who literally were asked to do more than they had ever done even as dramatic personnel cuts and expense reductions gave them fewer resources with which to work. These challenges and demands are by no means over. Now more than ever, it is critically important to ensure that the Debtors have the necessary tools to preserve meaningful incentives for all participants as they look forward to another difficult year ahead. For these reasons, as stated, the Company also is diligently working with its key constituencies on continuation of the MIP for 2009 and on a Key Employee Incentive Plan.

55.     Maintaining such incentives and avoiding damage to employee morale is impossible if the Debtors cannot fairly reward their employees for the year of accomplishments and struggle that they have already lived through. As detailed above, MIP awards are not mere "window dressing." These awards are and have always been a core component of the participants' annual compensation. Depriving of them of that essential compensation would be devastating to the employees at precisely the time when they need to redouble their efforts in meeting the challenges that lay ahead.

56.     Again, the awards sought in this Motion do not include awards for any of the Top 10 executives. As also stated, as a result of the collaborative efforts of the Debtors and their key constituencies during more than a month of discussions and information sharing, combined with the material adjustments made by the Debtors to their initial proposal to address creditor concerns, the Creditors Committee supports the 2008 MIP payments requested in this Motion (and, as noted, has not taken a position on the Remaining Local Payments pending further diligence review).

57.     Under these circumstances, it is unquestionably a legitimate exercise of the Debtors' business judgment under Section 363(b), and wholly consistent with Section 105(a), to seek payment of the 2008 MIP payments, including those based on discretionary factors.  As detailed above, the total pool proposed – representing payment at 38% of target on average (45% excluding Top 10 targets) -- and the number of participants are well below historical levels, and are in line with other historical payout parameters including average payout per participant.  See supra ¶ 37.  As also detailed above, total MIP dollars paid as well as MIP awards as a percentage of base pay are lower (in some cases significantly) than in recent prior years.  Id.  Furthermore, proposed discretionary awards for the Broadcasting and Entertainment segment and the Publishing segment in the aggregate are approximately 29% of target and approximately 36% of target, respectively, with traditional variability among individual business unit awards over and under these average payout levels.

58.     Again, these average payout levels, as well as variances from these averages (over and under) for individual business units, also are entirely consistent with the Debtors' historical practices.  See supra ¶ 21 (detailing the Debtors' historical practices of paying discretionary awards since at least 2004, including payments that exceeded the 40%-of-target "threshold" performance level).

59.     Furthermore, the 2008 MIP payments (including discretionary payments) are consistent with the MIP itself (see supra at ¶ 36), have been approved by the Compensation Committee of the Company's Board of Directors, and have been validated by Mercer, the independent compensation consultant retained by the Company under the leadership of its Compensation Committee.  Indeed, Mercer's analysis has concluded that, absent the 2008 MIP payments, the MIP participants at issue:

- Would lack both the short-term and the long-term incentive opportunities that are typical in the Debtors' industry;

- Would be significantly under-compensated relative to market median levels (the 50th percentile) and on average would fall *53% below* the median;

- Would still be under-compensated (41% below the market median on average) even with the requested awards; and

- Would be treated less favorably than employees of the Company's industry peers, as a significant majority of those filing proxies have announced cash incentive awards for 2008 ranging from approximately 20% to over 100% of target.

See Exhibit D, at 8, 14.

60.     Lastly, as discussed in Section III below, the 2008 MIP payments (as well as the other relief requested in this Motion) are wholly consistent with Section 503(c) of the Bankruptcy Code.

61.     The Debtors therefore respectfully request authorization to pay 2008 MIP awards as provided in the draft Order attached hereto as Exhibit A.

## II.     Payment of the Remaining Local Bonuses and other Pre-Petition Amounts is Proper under Sections 105(a) and 363(b).

62.     Payment of "local bonuses" to the remaining 22 local business unit insiders (who, as noted, do not participate in the MIP) is also appropriate under Sections 105(a) and 363(b) as a valid exercise of the Debtors' business judgment.  As detailed above, this Court has already authorized payment of such bonuses to approximately 3,000 other local business unit employees.  The Debtors now seek to honor their commitments to the remaining business unit employees who as a technical matter may constitute insiders.  The aggregate amount of incentive

payments currently due is modest and reasonable, totaling approximately $910,000 in Remaining Local Payments.

63.     The local bonuses are a core component of the recipients' annual compensation.  Payment of these bonuses therefore is necessary to fairly compensate these employees and to ensure that they maintain proper incentives going forward.  Non-payment also would create inequity relative to those individuals whose local bonuses were approved in this Court's February 3, 2009 order.

64.     As detailed above, numerous courts have approved the payment of incentive awards based on pre-petition services under both Section 105(a) and Section 363(b).  See supra ¶¶ 46, 50.  As with the 2008 MIP award payments, payment of such incentive awards is of central importance here.  These employees are among those whose contributions and sacrifices enabled the Debtors to generate $425 million of projected incremental cash flow on an annualized basis and thus to maintain their operations in these extraordinarily difficult economic times.  These employees do not participate in the 2008 MIP, and would be deprived of a significant component of their annual compensation if they are denied these local bonuses.

65.     For the same reasons, the Debtors seek to pay other Remaining Local Payments collectively owing to three local insiders (including two of the foregoing) for a cash advance, a cost of living adjustment and a housing/relocation allowance.  Again, the amount of these payments is modest and reasonable (just under $159,000).  Payment of such amounts is equally important to maintain the focus, motivation and trust of these employees without defeating their expectations.  As such, these payments similarly are warranted under Sections 105(a) and 363(b), and also are consistent with Section 503(c).  See infra Section III.

**III.    The Relief Sought in this Motion is Entirely Consistent with Bankruptcy Code
Section 503(c)**

66.    The Debtors submit that Section 503(c) of the Bankruptcy Code does not

apply to payments for pre-petition services:  "[T]he language of 503(c) is clear and unambiguous

that *only administrative claims* are subject to section 503(c) restrictions."  In re: Dana Corp., 358

B.R. 567, 578 (Bankr. S.D.N.Y. 2006).

67.    However, even if that section were alleged to apply to this Motion, all of

the payments and other relief that the Debtors seek in the instant Motion are permitted by and

entirely consistent with Section 503(c) of the Bankruptcy Code.

68.    None of the payments or programs in question involve "severance" pay

(whether or not to insiders), and thus Section 503(c)(2) is inapplicable.

69.    Furthermore, none of the payments or programs for which authorization is

sought constitute or would provide "retention" payments to insiders under Section 503(c)(1).  It

is well-settled that Section 503(c)(1) only prohibits the allowance or payment of administrative

expense amounts that have the "primary purpose" of retaining insiders.  See In re: Nellson

Nutraceutical, Inc., 369 B.R. 787, 802 (Bankr. D. Del. 2007); Global Home Products, LLC, 369

B.R. 778, 785 (Bankr. D. Del. 2007); In re: Dana Corporation, 358 B.R. 567, 576 (Bankr.

S.D.N.Y. 2006).

70.    By contrast, if an incentive award or other payment or program is sought

"for the primary purpose of motivating employees … the limitations of 503(c)(1) are not

applicable," even if the payment or program would have some incidental retentive *effect*.  In re:

Nellson Nutraceutical, Inc., 369 B.R. at 802; Global Home Products, 369 B.R. at 785; In re:

Dana Corporation, 358 B.R. at 576.  Indeed, the case law recognizes that even *base salary* has some incidental retentive *effect* (one must stay in order to earn it), and thus Section 503(c)(1) cannot bar compensation payments on that basis alone.  See In re: Nellson Nutraceutical, 369 B.R. at 803.

71.     The relief sought clearly passes muster under these standards.  All of the 2008 MIP and local bonus payments for which the Debtors seek approval are bona fide incentive awards that are intended to motivate superior performance.  Indeed, the case law recognizes that, even when a debtor seeks to reward performance *after-the-fact* where targets were missed due to broader economic or industry forces, the payments still can serve an incentive purpose, not a retentive purpose.  See In re: Nellson Nutraceutical, Inc., 369 B.R. at 803 ("the 2006 OCP served its purpose by motivating the employees to do a 'great job' in connection with the matters that those employees could reasonably be expected to influence … [the bonus payments] are not precluded or restricted by 503(c)(1) of the Bankruptcy Code.").  This is especially true where, as in this case, the Debtors have a history of setting meaningful goals and making discretionary awards to personnel who did not hit targets but made their best efforts under difficult circumstances.  Id.  Likewise, the roughly $159,000 in other local "insider" obligations are not "retentive" in nature but rather constitute fair compensation and/or reimbursements to which the Debtors agreed and that they seek to honor.

72.     Finally, even if Section 503(c)(3) were to apply (and it should *not* apply), the Debtors' requested relief would meet that standard.  Section 503(c)(3) requires that transfers or obligations that are outside the ordinary course of business, and for which administrative expense priority is sought, "be justified by the facts and circumstances of the case."  11 U.S.C. § 503(c).

73.     Courts have recognized that, as its literal language reflects, the Section

503(c)(3) "justified by the facts and circumstances" standard simply restates the business

judgment standard applicable to payments made pursuant to Section 363(b)(1).  See In re: Dana

Corp., 358 B.R. at 576 (holding that Section 503(c)(3) test is "no more stringent a test than the

one courts must apply in approving any administrative expense under 503(b)(1)(A)."); In re:

Nobex, No. 05-20500, (Walrath, J.) (Bankr. Del.) (Hearing Tr. Jan. 12, 2006, at 86-87) ( "I find

it [Section 503(c)(3)] quite frankly nothing more than a reiteration of the standard under 363 and

– well, 363 under which courts had previously authorized transfers outside the ordinary course of

business and that is, based on the business judgment of the debtor, the court always considered

the facts and circumstances of the case to determine whether it was justified."); In re: Werner

Holding Co., Inc., No. 06-10578, (Carey, J.) (Bankr. Del.) (Hearing Tr. Dec. 20, 2006, at 55)

("it's more like a business judgment standard than it is like an administrative expense

standard.").

74.     For reasons detailed above, the requested relief falls directly within the

Debtors' valid business judgment, and in any event would be amply "justified by the facts and

circumstances" even if that standard meant something different (which it does not).

Accordingly, the requested relief fully comports with Section 503(c) of the Bankruptcy Code.

## CONCLUSION

75.     For the foregoing reasons, the Debtors respectfully submit that granting

the relief requested herein is well within the Court's authority, is essential to the successful

reorganization of the Debtors, and thus is clearly in the best interests of the Debtors' estates and

creditors.  Accordingly, the Debtors respectfully request that the Court grant the relief requested

herein and enter the Order attached as <u>Exhibit A</u> hereto authorizing, but not directing, them to make the incentive and other payments detailed herein.

## NOTICE

76.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel for the Creditors Committee; (vi) counsel to the Steering Committee for the Debtors' prepetition loan facilities; (vii) counsel to the administrative agent for the Debtors' postpetition financing facility; and (viii) all parties having requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

77.    The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, for the foregoing reasons, the Debtors respectfully seek entry of an Order in substantially the form of the Order attached hereto as <u>Exhibit A</u>:

(i)    authorizing, but not directing, the Debtors:

(1)    pursuant to Sections 105(a) and 363(b) of Title 11 of the Bankruptcy Code, to make performance-based cash MIP payments for 2008 totaling approximately $12.243 million to approximately 670 participants employed by the Debtors for that year (other than the Top 10 executives); and

(2)    pursuant to Sections 105(a) and 363(b) of Title II of the Bankruptcy Code,
to pay an aggregate of approximately $1.1 million in Remaining Local
Payments, comprised of cash incentive bonuses and certain other owed
amounts for 2008 under various "local" business unit programs and
individual agreements, to 23 individuals who may technically constitute
local business unit "insiders" but who do not participate in the MIP; and

(ii)    granting such other and further relief as the Court may deem just and proper.


Dated:    Wilmington, Delaware                Respectfully submitted,

April 22, 2009                              SIDLEY AUSTIN LLP
                                            Bryan Krakauer
                                            Kevin T. Lantry
                                            Brian J. Gold
                                            Jonathan D. Lotsoff
                                            One South Dearborn Street
                                            Chicago, IL  60603
                                            Telephone:  (312) 853-7000
                                            Facsimile:  (312) 853-7036
                                                    -and-

                                            COLE, SCHOTZ, MEISEL,
                                            FORMAN & LEONARD, P.A.

                                            By: _____
                                            Norman L. Pernick (No. 2290)
                                            J. Kate Stickles (No. 2917)
                                            Patrick J. Reilley (No. 4451)
                                            500 Delaware Avenue, Suite 1410
                                            Wilmington, DE  19801
                                            Telephone:  (302) 652-3131
                                            Facsimile:  (302) 652-3117

                                            ATTORNEYS FOR DEBTORS AND DEBTORS IN
                                            POSSESSION