APR 28 2009

April 23, 2009

Honorable Kevin J. Carey
Chief United States Bankruptcy Judge
United States Bankruptcy Court, District of Delaware
824 Market Street
Wilmington, Delaware 19801

Re: Case No. 08-13141 (KJC)

Judge Carey:

I am a Chicago Tribune pensioner and have standing in this case.
Enclosed is a copy of a letter I wrote to Ms. Nola Richard, U.S. Department of Labor, Employee Benefits Security Administration, in Chicago, on Feb. 10, 2009.
This letter spelled out my concerns that Tribune Company executives were using pension fund money for purposes other than pensions. The letter included supporting documents.
According to a Feb. 13, 2008 Editor & Publisher magazine report, Tribune Company executives were using pension fund overages to fund layoffs.
I told Ms. Richard that I thought that was improper use of pension funds. Ms. Richard told me to research Tribune Company pension fund rules and regulations to determine if such expenditures were improper. I did the research and determined that the rules governing the Tribune Company pension fund do not permit pension fund money to be used in such a manner.
You will find supporting documents enclosed.
I understand the U.S. Department of Labor and the United States Attorney's Office recently opened investigations into the management of Tribune Company's employee stock ownership plan and the pension fund.
I offer my letter and supporting information to be entered into the case record, since they seem to have bearing on the case.
Thank you,

Casey Bukro
2445 Cowper Ave.
Evanston, Il. 60201

Feb. 10, 2009

Ms. Nola Richard
U.S. Department of Labor
Employee Benefits Security Administration
200 W. Adams St.
Suite 1600
Chicago, Il. 60606

Dear Ms. Richard:

This letter regards the improper use of Tribune Company pension funds.

I began receiving a Tribune pension as of June 15, 2007, so I have standing in this matter.

Enclosed is a copy of a letter, dated January 30, 2009, which I recently received, saying that the Tribune Company Cash Balance Pension Plan is likely to be between 98 percent and 102 percent funded. At the time I left the Tribune, company officials sent e-mail communication to employees saying the pension fund was overfunded, far in excess of what was needed. This communication was intended to allay concerns among employees over new management under Sam Zell and concerns about the fiscal stability of the company.

My concern is that the Tribune Co. pension fund has gone from being overfunded to borderline funded in a short time, and perhaps an Editor & Publisher magazine article can explain why this happened.

According to the article appearing Feb. 13, 2008, layoffs at Tribune Co. ``were funded with overages from Tribune's employee pension plan.'' E&P described this as ``a novel twist.'' (See enclosed).

This so-called twist seemed to be an illegal use of pension funds.

I brought this to the attention of your office on Sept. 11, 2008. You advised me to determine if the pension plan rules allow for the use of overages in matters not connected with pensions.

My reading of the plan says it does not.
See attachments.

See section 3 of the Tribune Company Cash Balance Pension Plan, page 13 under Contributions. It states that ``all contributions made by Employers shall be used for the exclusive benefit of the Participants and their Beneficiaries and to pay the reasonable expenses of administering the Plan and the Trust Fund..''

See also section 14, under amendments and termination, page 34. It says the pension plan may be amended, ``provided that no such amendment shall reduce a Participant's nonforfeitable interest in his Accrued Benefit or permit any part of the Trust Fund to be used for, or diverted to, purposes other than for the exclusive benefit of the Participants or their Beneficiaries or to pay the reasonable costs of administering the Plan and the Trust Fund..''

This language clearly forbids the use of pension funds for any purpose other than for pensions, and the cost of layoffs are not pension-related.

In a related matter, I would like to draw attention to unreasonable delays by the Hewitt Retirement Center in responding to my requests for information on this matter, which I understand is punishable by fines calculated by every day the violation continued.

Hewitt Retirement Center handles retirement issues for Tribune Company. Hewitt is located at 100 Half Day Rd., P.O. Box 1408, Lincolnshire, Il. 60069.

Pursuant to the Labor Department's request for information on rules governing the Tribune pension plan, the plan document, I first asked Tribune Company for this document, but was referred to Hewitt for all information related to pensions.

I called Hewitt on Sept. 12, 2008, and was referred to a woman who identifies herself only as Katy. Hewitt employees often will not provide their last names. I asked Katy for the plan document, and she offered a copy of the summary plan description. I explained I already had a copy of that, but wanted the full plan document. She said she would get back to me.

Over the next several months, Katy occasionally called to say an analyst was looking into my request. On Nov. 19, 2008, Katy called to say ``there is no such document.'' Practically three months had elapsed.

This was obviously not a satisfactory answer, since if there is a summary plan document, there must be a plan document from which it derives.

The summary plan document states that the agent for service of legal process for Tribune Company is the secretary of Tribune Company. Presently that is David Eldersveld, in the Tribune's law department at 435 N. Michigan Ave., Chicago. I called Mr. Eldersveld and described the document I sought.

Shortly afterward, I was contacted by Mr. Kevin Dansart of the Tribune Benefits Service Center. I told him of my request, and that I had tried to get the document from Hewitt, but was told that it did not exist. Mr. Dansart expressed amazement.

I received a copy of the Tribune Company Cash Balance Pension Plan by mail, postmarked Nov. 24, 2008, three months after I requested it from Hewitt.

My concerns are two-fold: That funds from the Tribune Company Cash Balance Pension Plan are being used for purposes for which they were not intended under rules governing the Tribune Company's Cash Balance Pension Plan, which possibly is a violation of the Employee Retirement Income Security Act of 1974 (ERISA).

Secondly, I am concerned that my case reflects how Tribune pensioners are treated when they request reasonable information related to their pensions, especially by Hewitt. In my case, that involved extreme delay ending in false and misleading information.

That is no way to treat people facing harsh economic times, and who often spent a lifetime working for Tribune Company with the expectation that they would be treated fairly at the end of their working days.

Thank you for your consideration.

Sincerely,

Casey Bukro
2445 Cowper Avenue
Evanston, Il. 60201
847-869-4193

*[signature: Casey Bukro]*

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611

# TRIBUNE

312/222-9100

January 30, 2009

1011985
CASEY BUKRO
2445 COWPER AVENUE
EVANSTON, IL 60201

Dear Tribune Company Cash Balance Pension Plan Participant:

We've received many questions about the funded status of the Tribune Company Cash Balance Pension Plan (including the Tribune and Times Mirror Pension Plans and the Sunpapers Guild Pension Plan) and I want to give you an update. Hewitt Associates, an independent valuation firm, usually determines the funded status of the plan after completing a lengthy review each summer. Because of the Chapter 11 filing, however, this year's review has been accelerated and is currently underway.

Due to the extreme volatility in the public equity and debt markets, Hewitt's preliminary estimate indicates the pension plan is likely to be between 98% and 102% funded. A final determination about the plan's funded status will be completed in late spring.

As a result of our filing and the uncertainty with respect to the plan's funded status, the company is legally required to make some changes for the time being in how participants receive their retirement benefit, once they elect to take it. Until Hewitt completes its review and can certify the plan's funded status, the plan is prevented from offering eligible participants the option of receiving a lump sum (this includes rollovers to other qualified plans) or a level income option. This restriction may be lifted when the plan is certified as fully-funded, or when Tribune emerges from Chapter 11, depending on the plan's funded status at that time. The annuity options available under the plan continue to be offered.

If you are already receiving a benefit payment from the plan, it is not affected by this change.

If you have questions about the pension plan, please contact the Hewitt Retirement Center at 800/872-2222.

Sincerely,

Gerry Spector
Chief Administrative Officer

*This notice is provided in good faith compliance with Code Section 436(d)(2) and ERISA Sections 101(j) and 206(g)(3)(B). The purpose of this notice is to provide you with details about your plan benefit. Eligibility and benefit determinations are governed by the plan documents. In the event of any discrepancy between this material and the plan, the plan documents will govern. Your eligibility for benefits or coverage under the plan does not guarantee continued employment with Tribune Company. Please direct any questions to your local human resources department or the Tribune Benefits Service Center.*



*[Handwritten: Mr. Samborn  U.S. Atty Office]*

# Newspaper Death Watch
Chronicling the Decline of Newspapers and the Rebirth of Journalism
Wednesday, August 27, 2008                                  Newspaper Death Watch

## Layoff log: V-day massacres
By paulgillin | February 15, 2008 - 8:08 am - Posted in Advertising, BusinessModel, Circulation, Layoffs, Newspapers

*[Handwritten: Dept. of Labor Office of Inspector General]*

### Tribune Co. Will Cut Up to 500 Jobs - Editor & Publisher, Feb. 13, 2008
[New Tribune Co. owner Sam Zell initially told employees that he planned to grow the company out of its recent troubles, but those plans are evidently on hold for now. The layoffs only amount to about 2% of the total workforce. In a novel twist, they'll be funded with overages from Tribune's employee pension plan. The struggling LA Times will lose 40 to 50 editors. - Ed.]

*[Handwritten: For Labor Strong areas ✓]*

### Tribune Plans More Cuts; Courant May Lose 45 Jobs — Hartford Courant, Feb. 14, 2008
[The Hartford Courant will get caught up in the Tribune Co. layoffs, losing 45 positions, with 10 of them in the 240-person newsroom. -Ed.]

### Tribune to cut 400 to 500 companywide, 45 at Sun — Baltimore Sun, Feb. 14, 2008
[It appears that 45 is the magic number for layoffs at Tribune Co. papers. The Baltimore Sun also expects to shed that many jobs. - Ed.]

### New York Times Plans to Cut 100 Newsroom Jobs - New York Times, Feb. 14, 2008
[With 1,332 employees, the Times' newsroom is still by far the largest in the industry. No competitor has more than 900 newsroom staffers. Nevertheless, pressure from shareholders can't be ignored. An interesting note in this piece is that Rupert Murdoch says he's committed to making the Wall Street Journal a formidable competitor to the Times and is ready to add to its 750-person newsroom staff in order to do so. - Ed.]

### Star Tribune Sinks Deeper Into Oblivion - True North, Feb. 12, 2008
[The Minneapolis Star Tribune will cut 58 more jobs on top of the 145 positions it cut last spring. That will leave the paper with about 1,900 employees, or about 10% smaller than it was at this time last year. No editorial employees are affected by this round of layoffs. Most of the cuts are due to efficiencies from an outsourcing contract.

In a recent memo, publisher Chris Harte echoed a now-familiar refrain: "Total revenue (print and internet advertising and circulation) is down almost $75 million in the last two years. Classified revenue has been the hardest hit part of our business, and our 2007 classified revenue was down over 50 percent from what it was at the start of the decade." - Ed.]

### Publisher GateHouse to cut 60 Mass. jobs - The Boston Globe, Feb. 14, 2008
GateHouse Media Inc. is cutting 60 positions at its Massachusetts publications, including The Patriot Ledger in Quincy, The Enterprise of Brockton, and dozens of suburban papers, according to an employee briefed on the plans.

*[Handwritten: 312-596-7230]*

### Lost printing contract likely leading to job cuts - Champaign-Urbana News-Gazette, Feb. 9, 2008
The News-Gazette will have to cut costs — and probably jobs — as a result of the Chicago Tribune's decision to print all of its editions in Chicago, News-Gazette Publisher John Foreman said. The News-Gazette will continue printing the Tribune until April 26, when seven of the 24 jobs in the pressroom will be eliminated.

*[Handwritten: Office of Inspector General  1-800-347-3756*
*Office of Labor Racketeering + Fraud Investigations*
*Chgi. Reg. Office - James Vanderberg - 312-353-3342]*

## SECTION 3

### Contributions

**3.1  Contributions by Employers**

Each Employer shall make contributions to the Plan in accordance with the funding policy established for the Plan by the Committee. Except to the extent otherwise provided in Section 14.5, all contributions made by the Employers shall be used for the exclusive benefit of the Participants and their Beneficiaries and to pay the reasonable expenses of administering the Plan and the Trust Fund; provided, that if a contribution is made by an Employer under a mistake of fact, such contribution may be returned to the Employer within one year after the payment of such contribution; if a contribution is conditioned upon its deductibility under Section 404 of the Internal Revenue Code then, to the extent such deduction is disallowed, such contribution may be returned to the Employer within one year after the date of such disallowance; or if an Employer's contribution is conditioned upon the initial qualification of the Plan, as maintained by that Employer, under Section 401(a) of the Internal Revenue Code and the Plan as maintained by that Employer does not so qualify, such contribution may be returned to the Employer within one year after such qualification is denied.



**3.2  Forfeitures**

Forfeitures arising under this Plan for any reason shall be applied to reduce the cost of the Plan and shall not increase the benefits otherwise payable to Participants.

**3.3  Contributions by Participants**

Participants shall not be required or permitted to make contributions to the Plan.

## SECTION 14

### Amendments and Termination

14.1 **Amendments**

    (a)    The Company reserves the right to amend or modify the Plan, in whole or in part, at any time and for any reason, provided that no such amendment shall reduce a Participant's nonforfeitable interest in his Accrued Benefit or permit any part of the Trust Fund to be used for, or diverted to, purposes other than for the exclusive benefit of the Participants or their Beneficiaries or to pay the reasonable costs of administering the Plan and the Trust Fund, except to the extent permitted by Sections 3.1 and 14.5. In amending the Plan, the Company shall act in accordance with the procedures specified in Section 16.2. The Company shall have the right to make any amendment retroactive if it is necessary to qualify the Plan for tax exemption or to bring the Plan into conformity with the Internal Revenue Code or ERISA, or if it is otherwise permitted or required by applicable law.



    (b)    If the Plan is amended in a way that directly or indirectly affects the manner in which a Participant's nonforfeitable percentage of his Accrued Benefit is computed, any active Participant with at least three years of Service may make an irrevocable election during the period described below to have his nonforfeitable percentage of his Accrued Benefit determined without regard to such amendment.

    (c)    The election period shall begin no later than the date the Plan amendment is adopted and shall end no earlier than the last to occur of the following:

        (i)    60 days after the date the Plan amendment is adopted;

        (ii)    60 days after the date the Plan amendment becomes effective; or

        (iii)    60 days after the Participant is issued written notice of the Plan amendment by the Committee.

    (d)    The election described in paragraph (b) above shall not be available to any Participant whose nonforfeitable percentage under the Plan, as amended, cannot at any time be less than such percentage determined without regard to such amendment.

14.2 **Termination**

The Company reserves the right to terminate the Plan, in whole or in part, at any time and for any reason. In terminating the Plan, the Company shall act in accordance with the procedures specified in Section 16.2. If the Plan is terminated with respect to fewer than all