# EXHIBIT B

## *SALE AGREEMENT*

PURCHASE AND SALE AGREEMENT

BY AND BETWEEN

TRIBUNE COMPANY,
a Delaware corporation

AS SELLER

AND

SUMMIT WESTLINE INVESTORS, L.L.C.,
a Missouri limited liability company

AS PURCHASER

FOR

11830 Westline Industrial Drive,
St. Louis, Missouri

Dated as of March _//_, 2009

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "Agreement") is made as of the *IIHH* day of March, 2009 (the "Effective Date") by and between TRIBUNE COMPANY, a Delaware corporation ("Seller"), and SUMMIT WESTLINE INVESTORS, L.L.C., a Missouri limited liability company ("Purchaser").

### ARTICLE I

### PURCHASE AND SALE

1.1    Agreement of Purchase and Sale. Subject to the terms and conditions hereinafter set forth, Seller agrees to sell and convey and Purchaser agrees to purchase the following:

(a)    that certain tract or parcel of land situated in the City of Maryland Heights, County of St. Louis, State of Missouri, more particularly described on Exhibit A attached hereto and made a part hereof, together with all and singular the rights and appurtenances pertaining to such property, including any right, title and interest of Seller in and to adjacent streets, alleys or rights-of-way (the property described in clause (a) of this Section 1.1 being herein referred to collectively as the "Land");

(b)    the buildings, structures, fixtures and other improvements on the Land, including specifically, without limitation, that certain office building located thereon having a street address of 11830 Westline Industrial Drive, Maryland Heights, Missouri (the property described in clause (b) of this Section 1.1 being herein referred to collectively as the "Improvements"); and

(c)    all of Seller's right, title and interest in and to that certain Lease Agreement (the "Lease") to be entered into between Seller, as landlord, and Mosby, Inc., a Missouri corporation, as tenant (together with any successor-in-interest, the "Tenant"), a copy of which has been or will be delivered to Purchaser pursuant to Section 3.1 below.

1.2    Property Defined. The Land and the Improvements are hereinafter sometimes referred to collectively as the "Real Property." The Real Property and the Lease are hereinafter sometimes referred to collectively as the "Property."

1.3    Purchase Price. The purchase price for the Property is Seven Million and No/100 Dollars ($7,000,000.00) (the "Purchase Price").

1.4    Payment of Purchase Price. The Purchase Price, as increased or decreased by prorations and adjustments as herein provided, shall be payable by Purchaser in full at Closing (as hereinafter defined) in cash by wire transfer of immediately available federal funds to a bank account designated by Title Company (as such term is defined in Section 1.5 hereof) in writing to Purchaser prior to the Closing. Said funds shall be so deposited not later than 11:00 a.m., Central Standard Time, on the Closing Date (as hereinafter defined).

1.5    Earnest Money.

1

(a)     Not later than five (5) days after the date hereof, Purchaser shall deposit with St. Louis Title Company (the "Title Company"), having its office at 7701 Forsyth Blvd., Suite 200, St. Louis, Missouri 63105, Attn:  Kelly Cochran, the sum of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "Earnest Money") in good funds, either by certified bank or cashier's check or by federal wire transfer.  Upon the expiration of the Study Period (as hereinafter defined), the Earnest Money shall be non-refundable to Purchaser except as expressly set forth in this Agreement.  Time is of the essence for the delivery of Earnest Money under this Agreement.

(b)     The Earnest Money shall be held in escrow by Title Company in an interest-bearing bank account selected by Title Company and Purchaser on the terms hereinafter set forth.

(c)     On the Closing Date, Title Company shall deliver the Earnest Money to Seller, which Earnest Money (excluding any interest earned thereon) shall be applied against the Purchase Price.  Any interest on the Earnest Money shall be paid to Purchaser, except if the Earnest Money is paid to Seller as a result of Purchaser's default under this Agreement, in which event the interest shall be paid to Seller.

(d)     If Title Company receives instructions signed by Seller instructing Title Company to pay the Earnest Money to Purchaser, or if Title Company receives instructions signed by Purchaser instructing Title Company to pay the Earnest Money to Seller, Title Company shall deliver the Earnest Money in accordance with such instructions.  Except as otherwise expressly provided in this Section 1.5(d), Title Company shall disregard any and all unilateral notices or warnings given by any of the parties hereto, or by any other person, with respect to the disposition of the Earnest Money, but Title Company is hereby expressly authorized to comply with and obey any and all orders, judgments or decrees entered or issued by any court of competent jurisdiction.

(e)     If the Closing fails to occur, Title Company shall continue to hold the Earnest Money until Title Company receives either (i) a notice signed by both Seller and Purchaser stating who is entitled to the Earnest Money, or (ii) a final order of a court of competent jurisdiction directing disbursement of the Earnest Money in a specific manner, in either of which events Title Company shall disburse the Earnest Money in accordance with such notice or order.  Title Company shall not be or become liable in any way or to any person for its refusal to comply with any such requests or demands until and unless it has received a direction of the nature described in (i) or (ii) above.

(f)     If Title Company shall have received at any time before actual disbursement of the Earnest Money a notice signed by either Seller or Purchaser advising that a dispute has arisen between Seller and Purchaser over entitlement to the Earnest Money, or shall otherwise believe in good faith at any time that a disagreement or dispute has arisen between the Seller and Purchaser over entitlement to the Earnest Money (whether or not litigation has been instituted), Title Company shall have the right, upon notice to both Seller and Purchaser, (i) to deposit the Earnest Money with the Clerk of the Court in which any litigation is pending, and/or (ii) to take such affirmative steps as it may, at its option, elect in order to terminate its duties as Title Company, including, but not limited to, the depositing of the Earnest Money with a court of

competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Seller or Purchaser is the losing party, and thereupon Title Company shall be released of and from all liability hereunder except for any previous gross negligence or willful misconduct.

(g)    Title Company shall have no duty to invest all or any portion of the Earnest Money during any period of time Title Company may hold the same prior to disbursement thereof except in one or more interest-bearing accounts as aforesaid, and any disbursements or deliveries of the Earnest Money required herein to be made by Title Company.

(h)    Title Company shall not be liable for any error or judgment or for any act done or omitted by it in good faith, or for any mistake of fact or law, and is released and exculpated from all liability hereunder except for willful misconduct or gross negligence.

(i)    Title Company's obligations hereunder shall be as a depositary only, and Title Company shall not be responsible or liable in any manner whatever for the sufficiency, correctness, genuineness or validity of any notice, written instructions or other instrument furnished to it or deposited with it, or for the form of execution of any thereof, or for the identity or authority of any person depositing or furnishing same.

(j)    Title Company shall not have any duties or responsibilities except those set forth in this Agreement and shall not incur any liability in acting upon any signature, notice, request, waiver, consent, receipt or other paper or document believed by it to be genuine, and Title Company may assume that any person purporting to give any notice or advice on behalf of any party in accordance with the provisions hereof has been duly authorized to do so.  Seller and Purchaser hereby jointly and severally indemnify and agree to hold and save Title Company harmless from and against any and all loss, damage, cost or expense Title Company may suffer or incur as escrow agent hereunder unless caused by its gross negligence or willful misconduct.

(k)    The terms and provisions of this Section 1.5 shall create no right in any person, firm or corporation other than the parties hereto and their respective successors and permitted assigns, and no third party shall have the right to enforce or benefit from the terms hereof.

## ARTICLE II

## TITLE AND SURVEY

2.1    <u>Title Examination; Commitment for Title Insurance</u>.  Purchaser may, at its sole costs and expense, obtain from the Title Company an ALTA title insurance report (the "<u>Title Commitment</u>") covering the Real Property.  Purchaser shall have until the date (the "<u>Title Exam Deadline</u>") which is ten (10) days prior to the expiration of the Study Period to review the Title Commitment and at Closing obtain from the Title Company an Owner's Policy of Title Insurance in the full amount of the Purchase Price pursuant to Section 2.4 hereof.  From and after the Closing Date, Purchaser shall look solely to the Title Company issuing the Title Policy (as hereinafter defined) for any loss, damage or claim attributable to any Permitted Exceptions

(as hereinafter defined).  The provisions of this Section 2.1 shall survive the Closing and the recording of the Deed (as hereinafter defined).

2.2    Survey.  Seller has delivered or shall deliver to Purchaser Seller's existing ALTA survey of the Real Property (the "Existing Survey").  Purchaser may, at its sole cost and expense, update and recertify the Existing Survey or obtain a new survey of the Real Property (either of which is hereinafter referred to as the "Updated Survey").

2.3    Title and Survey Objections; Cure of Title and Survey Objections.  Purchaser shall have until the Title Exam Deadline to notify Seller, in writing, of such objections as Purchaser may have to anything contained in the Title Commitment or the Updated Survey.  Any item contained in the Title Commitment or any matter shown on the Updated Survey to which Purchaser does not object prior to the Title Exam Deadline shall be deemed a Permitted Exception.  In the event Purchaser shall notify Seller of objections to title or to matters shown on the Updated Survey prior to the Title Exam Deadline, Seller shall have the right, but not the obligation, to cure such objections.  Within five (5) days after receipt of Purchaser's notice of objections, Seller shall notify Purchaser in writing whether Seller elects to attempt to cure such objections.  Seller's failure to respond within said five (5) day period shall be deemed to be Seller's election not to cure any such objections.  If Seller elects to attempt to cure, and provided that Purchaser shall not have terminated this Agreement in accordance with Section 3.2 hereof, Seller shall have until the date of Closing to attempt to remove, satisfy or cure the same to Purchaser's reasonable satisfaction and for this purpose Seller shall be entitled to a reasonable adjournment of the Closing if additional time is required, but in no event shall the adjournment exceed sixty (60) days after the date for Closing set forth in Section 4.1 hereof.  If Seller elects not to cure any objections specified in Purchaser's notice, or if Seller is unable to effect a cure prior to the Closing (or any date to which the Closing has been adjourned), Purchaser shall have the following options: (i) to accept a conveyance of the Real Property subject to the Permitted Exceptions, specifically including any matter objected to by Purchaser which Seller is unwilling or unable to cure, and without reduction of the Purchase Price; or (ii) to terminate this Agreement by sending written notice thereof to Seller, and upon delivery of such notice of termination, this Agreement shall terminate and the Earnest Money shall be returned to Purchaser, and thereafter neither party hereto shall have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement.  If Seller notifies Purchaser that Seller does not intend to attempt to cure any title objection, or if having commenced attempts to cure any objection, Seller later notifies Purchaser that Seller will be unable to effect a cure thereof, Purchaser shall, within five (5) days after such notice has been given, notify Seller in writing whether Purchaser shall elect to accept the conveyance under clause (i) or to terminate this Agreement under clause (ii).  Purchaser's failure to respond within said five (5) day period shall be deemed to be Purchaser's election to accept the conveyance under clause (i) above.

2.4    Conveyance of Title.  At Closing, Seller shall convey and transfer to Purchaser such title to the Real Property by special warranty deed so as to enable the Title Company to issue to Purchaser an ALTA Owner's Policy of Title Insurance (the "Title Policy") covering the Real Property, in the full amount of the Purchase Price.  Notwithstanding anything contained herein to the contrary, the Real Property shall be conveyed subject to the following matters (the "Permitted Exceptions"):

4

(a)    the rights of the Tenant, as a tenant only, under the Lease;

(b)    the lien of all ad valorem real estate and similar taxes and assessments;

(c)    local, state and federal laws, ordinances or governmental regulations, including but not limited to, building and zoning laws, ordinances and regulations, now or hereafter in effect relating to the Real Property;

(d)    items appearing of record or shown on the Title Commitment or the Updated Survey and, in either case, not objected to by Purchaser or waived or deemed waived by Purchaser in accordance with Sections 2.3 or 2.5 hereof; and

(e)    any matter created by, through, under or with the consent of Purchaser.

2.5    <u>Pre-Closing "Gap" Title Defects</u>.  Whether or not Purchaser shall have furnished to Seller any notice of title objections pursuant to the foregoing provisions of this Agreement, Purchaser may, at or prior to Closing, notify Seller in writing of any objections to any matter affecting title to the Real Property first raised by the Title Company between (a) the expiration of the Study Period, and (b) the date on which the transaction contemplated herein is scheduled to close.  Notwithstanding anything herein to the contrary, in no event shall Purchaser have the right to object to any such matter if (y) Purchaser had knowledge (whether actual or constructive) of such matter prior to the expiration of the Study Period or (z) such matter was disclosed in any Property Materials (as hereinafter defined), and all of such matters shall be deemed to be "Permitted Exceptions".  With respect to any objections to title set forth in such notice, Seller shall have the same option to cure and Purchaser shall have the same option to accept title subject to such matters or to terminate this Agreement as those which apply to any notice of objections made by Purchaser before the expiration of the Study Period as provided in Section 2.3 above.  If Seller elects to attempt to cure any such matters, the date for Closing shall be automatically extended by a reasonable additional time to effect such a cure, but in no event shall the extension exceed sixty (60) days after the date for Closing set forth in Section 4.1 hereof.

## ARTICLE III

## STUDY PERIOD

3.1    <u>Right of Inspection</u>.  Purchaser acknowledges that Seller has previously delivered to Purchaser (except as otherwise set forth below) the following items (the "<u>Property Materials</u>"):

(a)    A full and accurate unsigned copy of the Lease (a fully-executed copy of which will be delivered to Purchaser during the Study Period).

(b)    Any surveys of the Real Property in Seller's possession.

(c)    Any existing title insurance reports with respect to the Real Property in Seller's possession.

LEGAL_US_E # 81115946.8

(d)    Any and all environmental surveys and/or inspections of the Real Property in Seller's possession.

During the period beginning upon the Effective Date and ending at 6:00 p.m. (Central Standard Time) on the date which is forty-five (45) days thereafter (as the same may be extended as provided below, the "Study Period"), Purchaser shall have the right to make a non-invasive physical inspection of the Real Property and to examine the Property Materials. Notwithstanding anything herein to the contrary, the Property Materials shall exclude materials not directly related to the leasing, current maintenance and/or management of the Property such as, without limitation, Seller's internal memoranda, financial projections, budgets, appraisals, accounting and tax records and similar proprietary, elective or confidential information. Purchaser understands and agrees that any on-site inspections of the Real Property shall be conducted upon at least forty-eight (48) hours' prior written notice to Seller and in the presence of Seller or its representative. Such physical inspection shall not unreasonably interfere with the use of the Real Property by Seller or the Tenant nor shall Purchaser's inspection delay the Real Property in any respect. Such physical inspection shall not be invasive in any respect (unless Purchaser obtains Seller's prior written consent), and in any event shall be conducted in accordance with standards customarily employed in the industry and in compliance with all governmental laws, rules and regulations. Following each entry by Purchaser with respect to inspections and/or tests on the Real Property, Purchaser shall restore the Real Property to a condition which is as near as possible to its original condition as existed prior to any such inspections and/or tests. Seller shall reasonably cooperate with Purchaser in its due diligence but shall not be obligated to incur any liability or expense in connection therewith. Purchaser shall not contact the Tenant without obtaining Seller's prior written consent and shall not disrupt Seller's or the Tenant's activities on the Real Property. Purchaser agrees to indemnify against and hold Seller and its members, managers, officers, directors, shareholders, employees, property managers and agents harmless from any claim for liabilities, costs, expenses (including reasonable attorneys' fees actually incurred), damages or injuries arising out of or resulting from the inspection of the Real Property by Purchaser or its employees, agents or contractors, and notwithstanding anything to the contrary in this Agreement, such obligation to indemnify and hold harmless Seller and its members, managers, officers, directors, shareholders, employees, property managers and agents shall survive Closing or any termination of this Agreement. All inspections shall occur during normal business hours of the Real Property and as agreed upon by Seller and Purchaser. Prior to Purchaser entering the Real Property to conduct the inspections and/or tests described above, Purchaser shall obtain and maintain, at Purchaser's sole cost and expense, and shall deliver to Seller evidence of the following insurance coverage: general liability insurance, from an insurer reasonably acceptable to Seller, in the amount of Two Million and No/100 Dollars ($2,000,000.00) combined single limit for personal injury and property damage per occurrence, such policy to name Seller as an additional insured party or loss payee, as applicable. Notwithstanding anything herein to the contrary, Purchaser shall have the right to extend the Study Period for one (1) additional consecutive thirty (30) day period by delivering a written extension notice to Seller on or before the expiration of the Study Period if and only if Purchaser has not received any and all final governmental approvals and/or special use permits which may be necessary in order to allow DeVry, Inc. (d/b/a DeVry University and Chamberlain College of Nursing) to operate from the Property on terms and conditions reasonably acceptable to DeVry, Inc. and Purchaser. Notwithstanding the foregoing, in no event shall Purchaser cause or permit

6

any such governmental approvals and/or special use permits to be binding against Seller or the Property unless and until the Closing is consummated in accordance with the terms of this Agreement.

3.2    Right of Termination.    Seller agrees that in the event Purchaser determines, in Purchaser's sole discretion, that the Property is not suitable for its purposes, Purchaser shall have the right to terminate this Agreement by giving written notice thereof to Seller prior to the expiration of the Study Period.  If Purchaser gives such notice of termination within the Study Period, this Agreement shall terminate and the Earnest Money shall be returned to Purchaser.  Time is of the essence with respect to the provisions of this Section 3.2.  If Purchaser fails to give Seller a notice of termination prior to the expiration of the Study Period, Purchaser shall no longer have any right to terminate this Agreement under this Section 3.2 and shall be bound to proceed to Closing and consummate the transaction contemplated hereby pursuant to the terms of this Agreement.  Upon any termination of this Agreement by Purchaser as permitted in this Section 3.2, Purchaser shall promptly deliver to Seller all Property Materials received by Purchaser and copies of any and all surveys, studies, reports, evaluations and other materials prepared by third parties in connection with Purchaser's due diligence inspections of the Property.

3.3    Marketing Rights.    Commencing on the Effective Date and continuing until the earlier of the Closing Date or the earlier termination of this Agreement, Purchaser shall have the right to market the Real Property for lease or sale provided that Purchaser discloses in writing to any prospective tenant or purchaser that Purchaser is the "purchaser under contract" and is not the owner of the Real Property.  Purchaser shall provide Seller with a copy of all such written disclosures (provided that Purchaser may redact the names of the parties and the financial terms of any proposed lease or sales agreement) simultaneously with its delivery to any such prospective tenant or purchaser.  Purchaser shall have the right to enter into a written lease or written sales agreement with respect to the Real Property provided that (i) Purchaser delivers a copy of any such lease or sales agreement to Seller before execution thereof (provided that Purchaser may redact the names of the parties and the financial terms of such lease or sales agreement), and (ii) any such lease or sales agreement contains the following terms: (A) that the lease or sales agreement is contingent upon Purchaser's acquisition of the Real Property pursuant to the terms and conditions of this Agreement not later than the Closing Date, (B) that any such lease or sales agreement shall automatically terminate and be of no force or effect upon any termination of this Agreement, and (C) that Seller shall have no obligation or liability of any nature whatsoever under the terms of any such lease or sales agreement.  Purchaser agrees to indemnify and hold Seller and its members, managers, officers, directors, shareholders, employees, property managers and agents harmless from and against any and all claims, actions, causes of action, liabilities, costs, expenses (including reasonable attorneys' fees actually incurred), damages or injuries, known or unknown, seen or unforeseen, arising out of or in any way relating to the marketing of the Real Property by Purchaser or its employees or agents or the entering into of any lease or sales agreement with respect to the Real Property, and notwithstanding anything to the contrary in this Agreement, such obligation to indemnify and hold harmless Seller and its members, managers, officers, directors, shareholders, employees, property managers and agents shall survive Closing or any termination of this Agreement.

7

3.4    Lease.  Purchaser acknowledges and agrees that the Real Property is currently subject to (i) an Amended and Restated Lease Agreement dated September 22, 2006, as amended, by and between Seller (as successor-in-interest to TMCT, LLC), as Landlord, and Seller, as Tenant; (ii) a Sublease Agreement dated August 8, 1997, as amended, by and between Seller (as successor-in-interest to The Times Mirror Company), as Sublandlord, and Tenant, as Subtenant; and (iii) a Lease Clarification Agreement dated December 11, 2007 (the "Lease Clarification Agreement") by and between Seller and Tenant, copies of which have been previously delivered to Purchaser.  Purchaser further acknowledges and agrees that pursuant to the terms of the Lease Clarification Agreement, Seller has the option to enter into a direct lease with Tenant in the form of the Lease and that Seller has exercised the option to enter into such direct lease but the Lease has not yet been executed by Tenant.  Notwithstanding anything herein to the contrary including, without limitation, the provisions of Sections 3.1(a), 4.2(b) and 4.2(g), in the event that Seller fails to deliver to Purchaser a fully-executed copy of the Lease at least one (1) business days prior to the Closing Date, then Purchaser may elect, upon written notice to Seller not later than 11:00 a.m., Central Standard Time, on the Closing Date, as Purchaser's sole and exclusive remedy hereunder and in lieu of any remedies available to Purchaser pursuant to Section 6.2 hereof, to either (i) terminate this Agreement and receive a return of the Earnest Money; or (ii) extend the Closing Date to August 10, 2009.  If Purchaser fails to timely deliver such written notice to Seller, then Purchaser shall be deemed to have elected to extend the Closing Date pursuant to clause (ii) of the immediately preceding sentence.  If Purchaser timely elects (or is deemed to have elected) to extend the Closing Date to August 10, 2009, then the Purchase Price shall be reduced by an amount equal to the quotient of the annual Base Rent payable by the Tenant pursuant to Section 5.3 of the Lease divided by 365 days, multiplied by the number of days beginning on the first calendar day after the originally scheduled Closing Date and ending on and including August 7, 2009.  By way of example, if the originally scheduled Closing Date is June 15, 2009, then the Purchase Price shall be reduced by $437,269.29 [($3,011,382.84 ÷ 365 days) x 53 days = $437,269.29].

## ARTICLE IV

## CLOSING

4.1    Time and Place.  The closing (the "Closing") on the sale and purchase of the Property shall occur on or before the date which is fifteen (15) days after the earlier of (i) expiration of the Study Period or (ii) Purchaser's written waiver of its right to terminate this Agreement pursuant to Section 3.2 hereof, or such later date as the same may be extended pursuant to Sections 2.3, 2.5 or 3.4 hereof (the "Closing Date").  At Closing, Seller and Purchaser shall perform the obligations set forth in, respectively, Section 4.2 hereof and Section 4.3 hereof, the performance of which obligations shall be concurrent conditions.

4.2    Seller's Obligations at Closing.  Not later than 11:00 a.m., Central Standard Time, on the Closing Date, Seller shall deliver to the Title Company:

(a)    a duly executed special warranty deed (the "Deed"), conveying the Real Property, subject only to the Permitted Exceptions;

8

(b)　　four (4) duly executed counterparts of an assignment and assumption agreement as to the Lease in the form of Exhibit B attached hereto;

(c)　　four (4) duly executed originals of a notice in the form of Exhibit C attached hereto which Purchaser shall send to the Tenant informing the Tenant of the sale of the Real Property and of the assignment to Purchaser of Seller's interest in, and obligations under, the Lease (including, if applicable, any security deposits) and directing that all rent and other sums payable under the Lease after the Closing shall be paid as set forth in the notice;

(d)　　four (4) originals of a certificate stating that the representations and warranties of Seller contained in this Agreement are true and correct in all material respects as of the date of Closing (with appropriate modifications of those representations and warranties made in Section 5.1 hereof to reflect any changes therein including without limitation any changes resulting from actions under Section 5.4 hereof) or identifying any representation or warranty which is not, or no longer is, true and correct and explaining the state of facts giving rise to the change. In no event shall Seller be liable to Purchaser for, or be deemed to be in default hereunder by reason of, any breach of representation or warranty which results from any change that (i) occurs between the Effective Date and the date of Closing and (ii) is expressly permitted under the terms of this Agreement or is beyond the reasonable control of Seller to prevent; provided, however, that the occurrence of a change which is not permitted hereunder or is beyond the reasonable control of Seller to prevent shall, if materially adverse to Purchaser, constitute the non-fulfillment of the condition set forth in Section 4.7(b) hereof; provided, further, that if despite changes or other matters described in such certificate, the Closing occurs, Seller's representations and warranties set forth in this Agreement shall be deemed to have been modified by all statements made in such certificate;

(e)　　four (4) duly executed counterparts of an affidavit by Seller stating that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act in the form of Exhibit D attached hereto;

(f)　　a duly executed counterpart of the settlement statement prepared by the Title Company and in form and substance acceptable to Seller and Purchaser (the "Settlement Statement"); and

(g)　　the Lease together with such leasing and property files and records which are material in connection with the continued operation, leasing and maintenance of the Real Property.

4.3　　Purchaser's Obligations at Closing. Not later than 11:00 a.m., Central Standard Time, on the Closing Date, Purchaser shall deliver to Title Company:

(a)　　the full amount of the Purchase Price, as increased or decreased by prorations and adjustments as herein provided, in immediately available wire transferred funds pursuant to Section 1.4 hereof;

(b)　　four (4) duly executed counterparts of the instruments described in Sections 4.2(b) and 4.2(c) hereof; and

9

(c)    a duly executed counterpart of the Settlement Statement.

4.4    <u>Title Company's Obligations at Closing</u>. Intentionally Deleted.

4.5    <u>Credits and Prorations</u>. The following shall be apportioned with respect to the Property as of 12:01 a.m., on the day of Closing, as if Purchaser were vested with title to the Property during the entire day upon which Closing occurs:

(a)    <u>Real Estate Taxes</u>. Except as set forth below in this Section 4.5(a), real estate taxes on the Real Property shall not be prorated as the Tenant under the Lease is responsible for paying real estate taxes. Notwithstanding the foregoing, to the extent that either Seller or Purchaser shall obtain any real estate tax abatement, credit or refund (herein a "<u>Tax Refund</u>") with respect to the Real Property which is applicable to the year in which the Closing occurs, the amount of the net proceeds of such Tax Refund, after deducting the expenses of obtaining such refund, shall be prorated through the Closing Date if, as and when such proceeds are paid or applied (and if applied, Purchaser shall promptly after notice of such application remit to Seller its share) by the applicable governmental authority. Purchaser shall have no rights to any Tax Refund for periods prior to the year in which the Closing occurs (Seller retaining all rights thereto). Seller shall have no rights to any Tax Refund for periods subsequent to the year in which the Closing occurs (Purchaser retaining all rights thereto). Notwithstanding any provisions of this subparagraph to the contrary, Seller shall pay out of such refund it receives such amount, if any, to which the Tenant under the Lease may be entitled (whether by way of refund or rent credit) under the terms of the Lease. Notwithstanding any provision contained herein to the contrary, in the event that there is a Tax Refund with respect to the Real Property for a period of time prior to the Closing, the Tax Refund shall be the property of Seller and Purchaser shall promptly deliver such Tax Refund to Seller.

(b)    <u>Rents</u>.

(i)    <u>Monthly Base Rent</u>. There shall be a credit at the Closing in favor of the Purchaser against the Purchase Price in the amount equal to (A) the total amount of base rent actually collected by the Seller from the Tenant under the Lease prior to the date on which the Closing occurs for the calendar month in which the Closing occurs, (B) multiplied by a fraction, the numerator of which is the number of days from and including the date on which the Closing occurred, to and including the last day of such month, and the denominator of which is the actual number of days in such month.

(ii)    <u>Prepaid Rents</u>. There shall be a credit at the Closing in favor of the Purchaser against the Purchase Price in the total amount of all rents and other amounts paid by the Tenant under the Lease before the Closing to the extent such amounts are applicable to periods on and after the Closing.

(iii)    <u>Delinquent Rents</u>. Unpaid and delinquent rent collected by Seller and Purchaser after the date of Closing shall be delivered as follows: (a) if Seller collects any unpaid or delinquent rent for the Real Property, Seller shall, within fifteen (15) days after the receipt thereof, deliver to Purchaser any such rent which

10

Purchaser is entitled to hereunder relating to the date of Closing and any period thereafter, and (b) if Purchaser collects any unpaid or delinquent rent from the Real Property, Purchaser shall, within fifteen (15) days after the receipt thereof, deliver to Seller any such rent which Seller is entitled to hereunder relating to the period prior to the date of Closing. Seller and Purchaser agree that (i) all rent received by Seller or Purchaser within the first ninety (90) day period after the date of Closing shall be applied first to delinquent rentals, if any, in the order of their maturity, and then to current rentals, and (ii) all rent received by Seller or Purchaser after the first ninety (90) day period after the date of Closing shall be applied first to current rentals and then to delinquent rentals, if any, in inverse order of maturity. Purchaser will make a good faith effort after Closing to collect all rents in the usual course of Purchaser's operation of the Real Property, but Purchaser will not be obligated to institute any lawsuit or other collection procedures to collect delinquent rents. In the event that there shall be any rents or other charges under the Lease which, although relating to a period prior to Closing, do not become due and payable until after Closing or are paid prior to Closing but are subject to adjustment after Closing, then any rents or charges of such type received by Purchaser or its agents or Seller or its agents subsequent to Closing shall, to the extent applicable to a period extending through the Closing, be prorated between Seller and Purchaser as of Closing and Seller's portion thereof shall be remitted promptly to Seller by Purchaser. Nothing in this Section 4.5(b)(iii) shall restrict Seller's right to collect delinquent rents directly from the Tenant by any legal means; provided, however, that Seller shall not seek an eviction of the Tenant from the Real Property.

(iv)    <u>Security Deposit</u>. There shall be a credit at the Closing in favor of Purchaser against the Purchase Price in an amount equal to any security deposit being held by Seller under the Lease.

(c)    <u>Utilities</u>. Prior to the Closing Date, to the extent that any utility accounts are in Seller's name, Purchaser shall open new accounts or otherwise notify the utility companies furnishing water, telephone, steam, electricity, gas and other utility service to the Real Property (collectively, the "<u>Utilities</u>") of the scheduled transfer of the title to the Real Property so that such utility companies may bill Seller directly for the charges for such utilities accrued prior to the Closing Date and Purchaser for such charges accrued from and after the Closing Date.

(d)    <u>Discounts</u>. Seller shall receive the entire advantage of any discounts for the prepayment by it of any taxes, water rates or sewer rents.

(e)    <u>True-Up</u>. In the event that a post closing true-up is necessary, Purchaser shall work diligently with Seller to finalize the prorations within sixty (60) days after the Closing Date. If the Tenant is owed a refund, Seller agrees to refund to Purchaser its proportionate share within forty-five (45) days after receiving notification from Purchaser of such amounts owed; Seller shall have the right to review the true-up and withhold any refund until the completion of said review.

(f)    <u>Survival</u>. The provisions of this Section 4.5 shall survive Closing.

11

4.6     Closing Costs. Seller shall pay (a) the fees of any counsel representing it in connection with this transaction; (b) one-half (1/2) of any escrow fee which may be charged by Title Company, and (c) any transfer tax, documentary stamp tax or similar tax which becomes payable by reason of the transfer of the Real Property. Purchaser shall pay (u) the fees of any counsel representing Purchaser in connection with this transaction; (v) the cost of the Title Commitment and the premium for the Owner's Policy of Title Insurance to be issued to Purchaser by the Title Company at Closing and the costs of any endorsements thereto; (w) the cost of the Updated Survey; (x) the fees for recording the deed conveying the Real Property to Purchaser; (y) one-half (1/2) of any escrow fees charged by Title Company; and (z) any costs and expenses in connection with Purchaser's financing including, without limitation, lender's title policies and mortgage or similar taxes. All other costs and expenses incident to this transaction and the closing thereof shall be paid by the party incurring same.

4.7     Conditions Precedent to Obligation of Purchaser. The obligation of Purchaser to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

(a)     Seller shall have delivered to Purchaser all of the items required to be delivered to Purchaser pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.2 hereof.

(b)     All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the date of Closing (with appropriate modifications permitted under this Agreement or not adverse to Purchaser).

(c)     Seller shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Seller as of the date of Closing.

4.8     Conditions Precedent to Obligation of Seller. The obligation of Seller to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which may be waived by Seller in its sole discretion:

(a)     Seller shall have received the Purchase Price as adjusted pursuant to and payable in the manner provided for in this Agreement.

(b)     Purchaser shall have delivered to Seller all of the items required to be delivered to Seller pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.3 hereof.

(c)     All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the date of Closing.

(d)     Purchaser shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Purchaser as of the date of Closing.

12

## ARTICLE V

## REPRESENTATIONS, WARRANTIES AND COVENANTS

5.1    Representations and Warranties of Seller. Seller hereby makes the following representations and warranties to Purchaser as of the Effective Date:

(a)    Organization and Authority. Seller has been duly organized and is validly existing under the laws of Delaware. Seller has the full right, power and authority to enter into this Agreement and, to transfer all of the Property to be conveyed by Seller pursuant hereto and to consummate or cause to be consummated the transactions contemplated herein to be made by Seller. The person signing this Agreement on behalf of Seller is authorized to do so.

(b)    Pending Actions. To Seller's knowledge, there is no action, suit, arbitration, unsatisfied order or judgment, governmental investigation or proceeding pending against the Property or the transaction contemplated by this Agreement, which, if adversely determined, could individually or in the aggregate have a material adverse effect on title to the Real Property or any portion thereof or which could in any material way interfere with the consummation by Seller of the transaction contemplated by this Agreement.

(c)    Lease. Seller is the lessor or landlord or the successor lessor or landlord under the Lease. There are no other leases or occupancy agreements to which Seller is a party affecting the Real Property. As of the Effective Date, the Lease is in full force and effect and, to the best of Seller's knowledge, there are no current defaults thereunder by Seller or the Tenant under the Lease. Seller does not represent or warrant that the Lease will be in force or effect at Closing or that the Tenant under the Lease will have performed its or their obligations thereunder. To the best of Seller's knowledge, Tenant has no charges, liens, claims or offsets under the Lease against the rents or obligations due or to become due or required under the Lease. Assignor has not assigned or collaterally assigned its rights under the Lease.

(d)    Condemnation. To Seller's knowledge, no condemnation proceedings relating to the Real Property are pending or threatened.

(e)    OFAC. Seller represents and warrants that (a) Seller and, to Seller's actual knowledge, each person or entity owning an interest in Seller is (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "List"), and (ii) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, and (iii) not an "Embargoed Person," (b) to Seller's actual knowledge, none of the funds or other assets of Seller constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as hereinafter defined), and (c) to Seller's actual knowledge, no Embargoed Person has any interest of any nature whatsoever in Seller (whether directly or indirectly). The term "Embargoed Person" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency

13

Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder.

(f)    Service Contracts.    Seller is not a party to any service contracts or equipment leases of any type or nature affecting the Real Property.

(g)    Governmental Approvals.    Seller has not received any written notice from any governmental agency with respect to any violation existing at the Real Property of any federal, state or local law, ordinance or code that has not previously been cured.

5.2    Knowledge Defined.    References to the "knowledge" of Seller shall refer only to the actual knowledge of the Designated Person (as hereinafter defined) of Seller, and shall not be construed, by imputation or otherwise, to refer to the knowledge of Seller, or any affiliate of Seller, to any property manager, or to any other officer, agent, manager, representative or employee of Seller or any affiliate thereof or to impose upon such Designated Person any duty to investigate the matter to which such actual knowledge, or the absence thereof, pertains.  As used herein, the term "Designated Person" shall refer to the following person: Stephanie Pater.  Seller represent to Purchaser that Stephanie Pater holds the office of Director of Real Estate with Seller and is the party who would most likely have knowledge of the Property and those matters being represented in Section 5.1 above.

5.3    Survival of Seller's Representations and Warranties.    The representations and warranties of Seller set forth in Section 5.1 hereof as updated by the certificate of Seller to be delivered to Purchaser at Closing in accordance with Section 4.2(d) hereof, shall survive Closing for a period of six (6) months.  No claim for a breach of any representation or warranty of Seller shall be actionable or payable (a) if the breach in question results from or is based on a condition, state of facts or other matter which was known to Purchaser prior to Closing, (b) unless the valid claims for all such breaches (including, without limitation, all attorneys' fees and court costs) collectively aggregate more than Ten Thousand and No/100 Dollars ($10,000.00), in which event the full amount of such claims shall be actionable, and (c) unless an action shall have been commenced by Purchaser against Seller prior to the expiration of said six (6) month period.  Purchaser agrees to first seek recovery under any insurance policies (including title insurance policies and the Lease prior to seeking recovery from Seller, and Seller shall not be liable to Purchaser if Purchaser's claim is satisfied from such insurance policies or the Lease.  Notwithstanding anything herein to the contrary, in no event shall Seller's aggregate liability to Purchaser under this Agreement, including, without limitation, liability for breach of any representation or warranty of Seller in this Agreement, exceed the amount of Four Hundred Twenty Five Thousand and No/100 Dollars ($425,000.00).

5.4    Covenants of Seller.    Seller hereby covenants with Purchaser as follows:

(a)    From the Effective Date hereof until the Closing or earlier termination of this Agreement, Seller shall use reasonable efforts to operate and maintain the Real Property in a manner generally consistent with the manner in which Seller has operated and maintained the Real Property prior to the date hereof.

14

(b)    Seller shall use commercially reasonable efforts (but without obligation to incur any cost or expense) to obtain and deliver to Purchaser on or prior to the date that is five (5) days prior to the expiration of the Study Period, a written estoppel certificate signed by the Tenant with respect to the Lease in the form proscribed by the terms of the Lease.  A signed certificate is referred to herein as a "Tenant Estoppel".

(c)    Seller will not, during the pendency of this Agreement, amend the Lease or enter into any new leases or occupancy agreements of any type with respect to the Real Property without Purchaser's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned.

(d)    Seller will not accept any rent under the Lease more than thirty (30) days in advance of its due date.

(e)    Seller will deliver to Purchaser any written notice it has received or will receive from any person regarding any pending or threatened condemnation proceedings involving the Real Property.

(f)    During the pendency of this Agreement, Seller shall refrain from transferring or negotiating for the transfer of the Real Property or any interest therein, or from creating on the Real Property any easement, lien, encumbrance, lease or agreement whatsoever (without Purchaser's prior written approval, which approval shall not be unreasonably withheld) that will not be fully released and/or paid in full at or prior to Closing.

(g)    Seller will deliver to Purchaser any written notice it has received during its ownership of the Real Property from any private, governmental or quasi governmental organization, group or individual regarding any:  (i) alleged violation of any private use restriction and/or any federal, state, local or municipal law, zoning, building, fire, water, use, health or other ordinance, code, regulation or restriction regarding the Real Property (including, but not limited to, all such matters pertaining to its environmental condition and the Americans with Disabilities Act) or any other condition of the Real Property, which has not been fully cured; or (ii) proposed or actual special tax assessment or real estate tax increase

(h)    Seller shall file a motion with the United States Bankruptcy Court for the District of Delaware (the "Court") seeking an Order from the Court (the "Order") to be issued at the next available hearing date approving the sale of the Property to Purchaser pursuant to the terms of this Agreement. Seller shall deliver to Purchaser a copy of the Order not later than the Closing Date.  In the event that Seller fails to deliver a copy of the Order to Purchaser on or before the Closing Date, then Purchaser may, as its sole and exclusive remedy hereunder and in lieu of any other remedies available to Purchaser at law or in equity including, without limitation, the remedies available to Purchaser pursuant to Section 6.2 hereof, terminate this Agreement, in which event the Earnest Money shall be returned to Purchaser and Seller shall pay to Purchaser the sum of Thirty Five Thousand and No/100 Dollars ($35,000.00) as reimbursement for Purchaser's out-of-pockets costs and expenses incurred in connection with its due diligence investigations of the Property.

15

    5.5    <u>Representations and Warranties of Purchaser</u>. Purchaser hereby represents and warrants to Seller:

    (a)    <u>ERISA</u>. Purchaser is not acquiring the Property with the assets of a employee benefit plan as defined in Section 3(3) of ERISA.

    (b)    <u>Organization and Authority</u>. Purchaser has been duly organized and is validly existing under the laws of Missouri. Purchaser has the full right, power and authority to purchase the Property as provided in this Agreement and to carry out Purchaser's obligations hereunder, and all requisite action necessary to authorize Purchaser to enter into this Agreement and to carry out its obligations hereunder have been, or by the Closing will have been, taken. The person signing this Agreement on behalf of Purchaser is authorized to do so.

    (c)    <u>Pending Actions</u>. There is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Purchaser which, if adversely determined, could individually or in the aggregate materially interfere with the consummation of the transaction contemplated by this Agreement.

    (d)    <u>OFAC</u>. Purchaser and, to Purchaser's actual knowledge, each person or entity owning an interest in Purchaser is (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the OFAC and/or on any other similar List, (ii) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, and (iii) not an "<u>Embargoed Person</u>", to Purchaser's actual knowledge, none of the funds or other assets of Purchaser constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as hereinafter defined), and to Purchaser's actual knowledge, no Embargoed Person has any interest of any nature whatsoever in Purchaser (whether directly or indirectly).

    5.6    <u>Survival of Purchaser's Representations and Warranties</u>. The representation and warranties of Purchaser set forth in Section 5.5(a) hereof shall survive Closing and shall be a continuing representation and warranty without limitation. All other representations and warranties of Purchaser shall survive Closing for a period of six (6) months.

    5.7    <u>Covenants of Purchaser</u>. Purchaser hereby covenants with Seller that Purchaser shall, in connection with its investigation of the Property during the Study Period, inspect the Real Property for the presence of hazardous substances, and shall furnish to Seller copies of any reports received by Purchaser in connection with any such inspection. Purchaser hereby assumes full responsibility for such inspections and irrevocably waives any claim against Seller arising from the presence of hazardous substances on the Real Property. Purchaser shall also furnish to Seller copies of any other reports received by Purchaser relating to any other inspections of the Real Property conducted on Purchaser's behalf, if any.

## ARTICLE VI

## DEFAULT

6.1   <u>Default by Purchaser</u>.  IF THE SALE OF THE PROPERTY IS NOT CONSUMMATED DUE TO ANY DEFAULT BY PURCHASER HEREUNDER, THEN SELLER SHALL RETAIN THE EARNEST MONEY AS LIQUIDATED DAMAGES. THE PARTIES HAVE AGREED THAT SELLER'S ACTUAL DAMAGES, IN THE EVENT OF A FAILURE TO CONSUMMATE THIS SALE DUE TO PURCHASER'S DEFAULT HEREUNDER, WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE. AFTER NEGOTIATION, THE PARTIES HAVE AGREED THAT, CONSIDERING ALL THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT, THE AMOUNT OF THE EARNEST MONEY IS A REASONABLE ESTIMATE OF THE DAMAGES THAT SELLER WOULD INCUR IN SUCH EVENT.   BY PLACING THEIR INITIALS BELOW, EACH PARTY SPECIFICALLY CONFIRMS THE ACCURACY OF THE STATEMENTS MADE ABOVE AND THE FACT THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED, AT THE TIME THIS AGREEMENT WAS MADE, THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION.   THE FOREGOING IS NOT INTENDED TO LIMIT PURCHASER'S INDEMNITY OBLIGATIONS UNDER OTHER SECTIONS HEREOF.

SELLER: _____   PURCHASER: _____

6.2   <u>Default by Seller</u>.  In the event that Seller fails to consummate this Agreement for any reason other than Purchaser's default hereunder or the permitted termination of this Agreement by Seller or Purchaser as herein expressly provided, Purchaser shall be entitled, as its sole remedy (except as otherwise expressly provided in Section 5.4(h)), either (a) to receive the return of the Earnest Money, which return shall operate to terminate this Agreement and release Seller from any and all liability hereunder, or (b) to enforce specific performance of Seller's obligation to execute the documents required to convey the Property to Purchaser; provided, however, that (i) Purchaser shall only be entitled to such remedy if (A) any such suit for specific performance is filed within six (6) months after Purchaser becomes aware of the default by Seller, (B) Purchaser is not in default under this Agreement, and (C) Purchaser has furnished ten (10) days prior written notice to Seller of its intent and election to seek specific enforcement of this Agreement; (ii) notwithstanding anything to the contrary contained herein, if Purchaser seeks specific performance under this Agreement, Purchaser agrees to accept the Property in its "WHERE IS, AS IS" condition, and (iii) the remedy of specific performance shall not be available to enforce any other obligation of Seller hereunder.  Purchaser hereby agrees that prior to its exercise of any rights or remedies as a result of any defaults by Seller, Purchaser will first deliver written notice of said default to Seller, and if Seller so elects, Seller shall have the opportunity, but not the obligation, to cure such default within ten (10) days after Seller's receipt of such notice.  Purchaser expressly waives its rights to seek money damages in the event of Seller's default hereunder including, without limitation, punitive, consequential or speculative damages.

17

## ARTICLE VI

### DEFAULT

6.1  **Default by Purchaser.**  IF THE SALE OF THE PROPERTY IS NOT CONSUMMATED DUE TO ANY DEFAULT BY PURCHASER HEREUNDER, THEN SELLER SHALL RETAIN THE EARNEST MONEY AS LIQUIDATED DAMAGES. THE PARTIES HAVE AGREED THAT SELLER'S ACTUAL DAMAGES, IN THE EVENT OF A FAILURE TO CONSUMMATE THIS SALE DUE TO PURCHASER'S DEFAULT HEREUNDER, WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE. AFTER NEGOTIATION, THE PARTIES HAVE AGREED THAT, CONSIDERING ALL THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT, THE AMOUNT OF THE EARNEST MONEY IS A REASONABLE ESTIMATE OF THE DAMAGES THAT SELLER WOULD INCUR IN SUCH EVENT.  BY PLACING THEIR INITIALS BELOW, EACH PARTY SPECIFICALLY CONFIRMS THE ACCURACY OF THE STATEMENTS MADE ABOVE AND THE FACT THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED, AT THE TIME THIS AGREEMENT WAS MADE, THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION.  THE FOREGOING IS NOT INTENDED TO LIMIT PURCHASER'S INDEMNITY OBLIGATIONS UNDER OTHER SECTIONS HEREOF.

SELLER: _____    PURCHASER: _____

6.2     Default by Seller.  In the event that Seller fails to consummate this Agreement for any reason other than Purchaser's default hereunder or the permitted termination of this Agreement by Seller or Purchaser as herein expressly provided, Purchaser shall be entitled, as its sole remedy (except as otherwise expressly provided in Section 5.4(h)), either (a) to receive the return of the Earnest Money, which return shall operate to terminate this Agreement and release Seller from any and all liability hereunder, or (b) to enforce specific performance of Seller's obligation to execute the documents required to convey the Property to Purchaser; provided, however, that (i) Purchaser shall only be entitled to such remedy if (A) any such suit for specific performance is filed within six (6) months after Purchaser becomes aware of the default by Seller, (B) Purchaser is not in default under this Agreement, and (C) Purchaser has furnished ten (10) days prior written notice to Seller of its intent and election to seek specific enforcement of this Agreement; (ii) notwithstanding anything to the contrary contained herein, if Purchaser seeks specific performance under this Agreement, Purchaser agrees to accept the Property in its "WHERE IS, AS IS" condition, and (iii) the remedy of specific performance shall not be available to enforce any other obligation of Seller hereunder.  Purchaser hereby agrees that prior to its exercise of any rights or remedies as a result of any defaults by Seller, Purchaser will first deliver written notice of said default to Seller, and if Seller so elects, Seller shall have the opportunity, but not the obligation, to cure such default within ten (10) days after Seller's receipt of such notice.  Purchaser expressly waives its rights to seek money damages in the event of Seller's default hereunder including, without limitation, punitive, consequential or speculative damages.

17

# ARTICLE VII

# RISK OF LOSS

7.1     Minor Damage.  In the event of loss or damage to the Real Property or any portion thereof which is not "major" (as hereinafter defined), this Agreement shall remain in full force and effect.  Purchaser acknowledges that Seller has not obtained casualty insurance with respect to the Real Property and Purchaser shall look solely to the Tenant with respect to any restoration of the Real Property pursuant to the terms of the Lease.  In the event of a condemnation of any portion of the Real Property which is not "major", Seller shall, subject to the terms of the Lease, assign to Purchaser at Closing all of Seller's right, title and interest in and to any claims and proceeds Seller may have with respect to condemnation awards relating to the premises in question.  In no event shall the Purchase Price be reduced as a result of any loss or damage to the Real Property or as a result of any condemnation of any portion of the Real Property.

7.2     Major Damage.  In the event of a "major" loss or damage to the Real Property or any portion thereof, Purchaser may terminate this Agreement by written notice to Seller, in which event the Earnest Money shall be returned to Purchaser and neither party shall have any further obligations or liabilities hereunder except for any obligations or liabilities that are expressly intended to survive any such termination.  If Seller does not receive written notice from Purchaser of Purchaser's election to terminate this Agreement within ten (10) days after Seller sends Purchaser written notice of the occurrence of major loss or damage, then Purchaser shall be deemed to have elected to proceed with Closing.  In such event, Purchaser acknowledges that Seller has not obtained casualty insurance with respect to the Real Property and Purchaser shall look solely to the Tenant with respect to any restoration of the Real Property pursuant to the terms of the Lease.  In the event of a condemnation of any portion of the Real Property which is "major", and provided Purchaser has not terminated this Agreement as provided above in this Section 7.2, Seller shall, subject to the terms of the Lease, assign to Purchaser at Closing all of Seller's right, title and interest in and to any claims and proceeds Seller may have with respect to condemnation awards relating to the premises in question.  Upon Closing, full risk of loss with respect to the Real Property shall pass to Purchaser.  In no event shall the Purchase Price be reduced as a result of any loss or damage to the Real Property or as a result of any condemnation of any portion of the Real Property.

7.3     Definition of "Major" Loss or Damage.  For purposes of Sections 7.1 and 7.2 hereof, "major" loss or damage refers to the following:  (i) loss or damage to the Real Property or any portion thereof such that the cost of repairing or restoring the premises in question to a condition substantially identical to that of the premises in question prior to the event of damage would be, in the opinion of an architect selected by Seller and reasonably approved by Purchaser, equal to or greater than Seven Hundred Fifty Thousand and No/100 Dollars ($750,000.00), and (ii) any loss due to a condemnation which permanently and materially impairs the current use of the Real Property.  If Purchaser does not give notice to Seller of Purchaser's reasons for disapproving an architect within five (5) business days after receipt of notice of the proposed architect, Purchaser shall be deemed to have approved the architect selected by Seller.

18

## ARTICLE VIII

## COMMISSIONS

8.1    Brokerage Commissions.    In the event the transaction contemplated by this Agreement is consummated, but not otherwise, Seller agrees to pay to Gateway Commercial and Cushman and Wakefield of California (the "Brokers") at Closing an aggregate brokerage commission in the amount of two percent (2%) of the Purchase Price pursuant to the terms of a separate written agreement between Seller and the Brokers.    Summit Development Group, L.L.C. ("Summit") is acting as the sole and exclusive agent of the Purchaser and the Purchaser shall be responsible for any and all fees that may be due to Summit in conjunction with the subject transaction.    John S. Ross, Jr. has a partial ownership interest in Gateway Commercial, Summit and Purchaser.    Each party agrees that should any claim be made for brokerage commissions or finder's fees by any broker or finder other than the Brokers or Summit by, through or on account of any acts of said party or its representatives, said party will indemnify and hold the other party free and harmless from and against any and all loss, liability, cost, damage and expense in connection therewith.    The provisions of this Section 8.1 shall survive Closing or earlier termination of this Agreement.

## ARTICLE IX

## DISCLAIMERS AND WAIVERS

9.1    No Reliance on Documents.    Except as expressly stated herein, Seller makes no representation or warranty as to the truth, accuracy or completeness of any materials, data or information delivered by Seller to Purchaser in connection with the transaction contemplated hereby.    Purchaser acknowledges and agrees that all materials, data and information delivered by Seller to Purchaser in connection with the transaction contemplated hereby are provided to Purchaser as a convenience only and that any reliance on or use of such materials, data or information by Purchaser shall be at the sole risk of Purchaser, except as otherwise expressly stated herein.    Without limiting the generality of the foregoing provisions, Purchaser acknowledges and agrees that (a) any environmental or other report with respect to the Real Property which is delivered by Seller to Purchaser shall be for general informational purposes only, (b) Purchaser shall not have any right to rely on any such report delivered by Seller to Purchaser, but rather will rely on its own inspections and investigations of the Property and any reports commissioned by Purchaser with respect thereto, and (c) neither Seller, any affiliate of Seller nor the person or entity which prepared any such report delivered by Seller to Purchaser shall have any liability to Purchaser for any inaccuracy in or omission from any such report or in verbal communication.

9.2    Disclaimers.    EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, IT IS UNDERSTOOD AND AGREED THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE (OTHER THAN SELLER'S LIMITED WARRANTY OF TITLE TO BE SET FORTH

19

IN THE DEED), ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE PROPERTY WITH GOVERNMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF THE PROPERTY MATERIALS OR ANY OTHER INFORMATION PROVIDED BY OR ON BEHALF OF SELLER TO PURCHASER, OR ANY OTHER MATTER OR THING REGARDING THE PROPERTY. PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS", EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT. PURCHASER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY OR RELATING THERETO (INCLUDING SPECIFICALLY, WITHOUT LIMITATION, PROPERTY INFORMATION PACKAGES DISTRIBUTED WITH RESPECT TO THE PROPERTY) MADE OR FURNISHED BY SELLER, THE TENANT, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT. PURCHASER REPRESENTS TO SELLER THAT PURCHASER HAS CONDUCTED, OR WILL CONDUCT PRIOR TO CLOSING, SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS PURCHASER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE REAL PROPERTY AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE REAL PROPERTY, AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN SUCH REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER AS ARE EXPRESSLY SET FORTH IN THIS AGREEMENT. UPON CLOSING, AND EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, PURCHASER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INVESTIGATIONS, AND PURCHASER, UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER (AND SELLER'S MEMBERS, MANAGERS, OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, ADVISORS AND AGENTS) FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH PURCHASER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER (AND SELLER'S MEMBERS, MANAGERS, OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, ADVISORS AND AGENTS) AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR

PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE REAL PROPERTY. PURCHASER AGREES THAT SHOULD ANY CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS ON THE REAL PROPERTY BE REQUIRED AFTER THE DATE OF CLOSING, SUCH CLEAN-UP, REMOVAL OR REMEDIATION SHALL BE THE RESPONSIBILITY OF AND SHALL BE PERFORMED AT THE SOLE COST AND EXPENSE OF PURCHASER AND SELLER SHALL NOT BE LIABLE TO PURCHASER FOR SUCH CLEAN-UP, REMOVAL OR REMEDIATION. AS PART OF THE PROVISIONS OF THIS SECTION 9.2, BUT NOT AS A LIMITATION THEREON, PURCHASER HEREBY AGREES, REPRESENTS AND WARRANTS THAT THE MATTERS RELEASED HEREIN ARE NOT LIMITED TO MATTERS WHICH ARE KNOWN OR DISCLOSED, AND PURCHASER, TO THE FULLEST EXTENT PERMITTED BY LAW, HEREBY WAIVES ANY AND ALL RIGHTS AND BENEFITS WHICH IT NOW HAS, OR IN THE FUTURE MAY HAVE CONFERRED UPON IT, BY VIRTUE OF THE PROVISIONS OF FEDERAL, STATE OR LOCAL LAW, RULES OR REGULATIONS.

9.3    <u>Survival of Disclaimers</u>. Seller and Purchaser agree that the provisions of this Article IX shall survive Closing.

## ARTICLE X

## MISCELLANEOUS

10.1    <u>Confidentiality</u>. Purchaser and its representatives shall hold in strictest confidence all data and information obtained with respect to Seller or its business, whether obtained before or after the execution and delivery of this Agreement, and shall not disclose the same to others; provided, however, that it is understood and agreed that Purchaser may disclose such data and information to the employees, consultants, accountants and attorneys of Purchaser provided that such persons agree in writing to treat such data and information confidentially. In the event this Agreement is terminated or Purchaser fails to perform hereunder, Purchaser shall promptly return to Seller any statements, documents, schedules, exhibits or other written information obtained from Seller in connection with this Agreement or the transaction contemplated herein. It is understood and agreed that, with respect to any provision of this Agreement which refers to the termination of this Agreement and the return of the Earnest Money to Purchaser, such Earnest Money shall not be returned to Purchaser unless and until Purchaser has fulfilled its obligation to return to Seller the materials described in the preceding sentence. In the event of a breach or threatened breach by Purchaser or its agents or representatives of this Section 10.1, Seller shall be entitled to an injunction restraining Purchaser or its agents or representatives from disclosing, in whole or in part, such confidential information. Nothing herein shall be construed as prohibiting Seller from pursuing any other available remedy at law or in equity for such breach or threatened breach. The provisions of this Section 10.1 shall survive Closing.

21

10.2    <u>Public Disclosure</u>. Prior to Closing, any release to the public of information with respect to the sale contemplated herein or any matters set forth in this Agreement will be made only in the form approved by Purchaser and Seller and their respective counsel.

10.3    <u>Discharge of Obligations</u>. The acceptance of the Deed by Purchaser shall be deemed to be a full performance and discharge of every representation and warranty made by Seller herein and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement, except those which are herein specifically stated to survive Closing.

10.4    <u>Assignment</u>. Purchaser may not assign its rights under this Agreement without first obtaining Seller's written approval, which approval may be given or withheld in Seller's sole discretion. Any transfer, directly or indirectly, of any stock, partnership interest or other ownership interest in Purchaser without Seller's written approval, which approval may be given or withheld in Seller's sole discretion, shall constitute a default by Purchaser under this Agreement. Notwithstanding the foregoing, Purchaser may assign its rights under this Agreement to a newly formed limited liability company that is an affiliate of Purchaser. Without limitation of the foregoing, no assignment by Purchaser shall relieve Purchaser of any of its obligations or liabilities pursuant to this Agreement.

10.5    <u>Notices</u>. Any notice pursuant to this Agreement shall be given in writing by (a) personal delivery, or (b) reputable overnight delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, return receipt requested, or (d) legible facsimile transmission sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or, in the case of facsimile transmission, as of the date of the facsimile transmission provided that the party sending such facsimile transmission receives a confirmation of transmission on such date and an original of such facsimile is also sent to the intended addressee by means described in clauses (a), (b) or (c) above. Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement shall be as follows:

If to Seller:                Tribune Company
                             435 North Michigan Avenue
                             Chicago, Illinois 60611
                             Attention: Stephanie Pater
                             E-mail: spater@tribune.com
                             Telephone: (312) 222-5563
                             Facsimile: (312) 222-3148

with a copy to:              Paul, Hastings, Janofsky & Walker, LLP
                             191 N. Wacker Drive, 30th Floor
                             Chicago, Illinois 60606
                             Attention: Jeffrey S. Rheeling, Esq.
                             E-mail: jeffreyrheeling@paulhastings.com

22

Telephone: (312) 499-6083
Facsimile: (312) 499-6183

If to Purchaser:    Summit Westline Investors, L.L.C.
100 S. Brentwood Boulevard, Suite 222
Clayton, Missouri 63105
Attention: John S. Ross, Jr.
E-mail: jross@summitstl.com
Telephone: (314) 863-4447
Facsimile: (314) 863-4407

with a copy to:    Paster, West & Kraner, p.c.
138 N. Meramec Avenue
Clayton, Missouri 63105
Attention: Bryan C. West, Esq.
E-mail: bcw@pwklaw.com
Telephone: (314) 721-7080
Facsimile: (314) 721-2951

10.6    Binding Effect. This Agreement shall not be binding in any way upon Seller unless and until Seller shall execute and deliver the same to Purchaser

10.7    Modifications. This Agreement cannot be changed orally, and no executory agreement shall be effective to waive, change, modify or discharge it in whole or in part unless such executory agreement is in writing and is signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

10.8    Calculation of Time Periods. Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday under the laws of the State in which the Real Property is located, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday or legal holiday. The final day of any such period shall be deemed to end at 6:00 p.m., Central Standard Time. Time is of the essence of each and every provision of this Agreement.

10.9    Successors and Assigns. The terms and provisions of this Agreement are to apply to and bind the permitted successors and assigns of the parties hereto.

10.10    Entire Agreement. This Agreement, including the Exhibits, contains the entire agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

10.11    Further Assurances. Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement (but without expanding the

23

obligations or liability of either party hereunder in any material manner). Without limiting the generality of the foregoing, Purchaser shall, if requested by Seller, execute acknowledgments of receipt with respect to any materials delivered by Seller to Purchaser with respect to the Property. The provisions of this Section 10.11 shall survive Closing.

10.12  <u>Counterparts</u>.  This Agreement may be executed in counterparts, and all such executed counterparts shall constitute the same agreement. It shall be necessary to account for only one such counterpart in proving this Agreement.

10.13  <u>Severability</u>.  If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

10.14  <u>Applicable Law</u>.  THIS AGREEMENT IS PERFORMABLE IN THE STATE IN WHICH THE REAL PROPERTY IS LOCATED AND SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE SUBSTANTIVE FEDERAL LAWS OF THE UNITED STATES AND THE LAWS OF SUCH STATE. SELLER AND PURCHASER HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN THE STATE IN WHICH THE REAL PROPERTY IS LOCATED IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN A STATE OR FEDERAL COURT SITTING IN THE STATE IN WHICH THE REAL PROPERTY IS LOCATED. PURCHASER AND SELLER AGREE THAT THE PROVISIONS OF THIS SECTION 10.14 SHALL SURVIVE THE CLOSING OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT.

10.15  <u>No Third Party Beneficiary</u>.  The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party (including, without limitation, Title Company and Broker), and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing. The provisions of this Section 10.15 shall survive the closing of the transaction contemplated by this Agreement.

10.16  <u>Exhibits and Schedules</u>.  The following schedules or exhibits attached hereto shall be deemed to be an integral part of this Agreement:

    (a)    <u>Exhibit A</u> -    Legal Description of the Land

    (b)    <u>Exhibit B</u> -    Assignment and Assumption of Lease

    (c)    <u>Exhibit C</u> -    Notice to Tenant

    (d)    <u>Exhibit D</u> -    FIRPTA Certificate

24

10.17  Captions. The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any section or any subsection hereof.

10.18  Construction. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

10.19  Termination of Agreement. It is understood and agreed that if either Purchaser or Seller terminates this Agreement pursuant to a right of termination granted hereunder, such termination shall operate to relieve Seller and Purchaser from all obligations under this Agreement, except for such obligations as are specifically stated herein to survive the termination of this Agreement.

10.20  1031 Exchange. Either party hereto may elect to seek to structure its purchase or sale, as applicable, of the Real Property as a tax-deferred exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, and the treasury regulations promulgated thereunder ("1031 Exchange"), subject to the limitations set forth herein. Each party shall reasonably cooperate with the other, at no material cost to such cooperating party, in connection with the same, including, but not limited to, executing and delivering a consent to an assignment to a qualified exchange intermediary of rights (but not obligations) under this Agreement; provided that (i) the party desiring to effectuate a 1031 Exchange shall notify the other party of the same not later than ten (10) days prior to the Closing, (ii) neither party shall be required to incur any additional liabilities or financial obligations as a consequence of such cooperation, (iii) neither party shall be relieved of its obligations, representations or warranties under this Agreement, (iv) any attempt to structure an acquisition or sale of the Real Property as a 1031 Exchange shall not be a condition to, and shall not delay or extend, the Closing, and (v) neither party shall be required to acquire title to any property other than the Real Property. Any risk that such an exchange or conveyance might not qualify as a tax-deferred transaction shall also be borne solely by the party seeking to effectuate the same, and each party acknowledges that the other has not provided, and will not provide, any tax, accounting, legal or other advice regarding the efficacy of any attempt to structure the transaction as a 1031 Exchange. Each party hereby agrees to save, protect, defend, indemnify and hold the other harmless from any and all losses, costs, claims, liabilities, penalties, and expenses, including, without limitation, reasonable attorneys' fees, fees of accountants and other experts, and costs of any judicial or administrative proceeding or alternative dispute resolution to which the other may be exposed, due to any attempt by the indemnifying party to structure the transaction as a 1031 Exchange. The provisions of this Section 10.20 shall survive the Closing.

[Next page is signature page]

25

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

**SELLER:**

TRIBUNE COMPANY, a Delaware corporation

By: _Rodden_

Name: _Jack Rodden_

Its: _VP / Treasurer_

**PURCHASER:**

SUMMIT WESTLINE INVESTORS, L.L.C., a Missouri limited liability company

By: _____
   John S. Ross, Jr. Authorized Representative

26

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

**SELLER:**

TRIBUNE COMPANY, a Delaware corporation

By:_____
Name:_____
Its:_____

**PURCHASER:**

SUMMIT WESTLINE INVESTORS, L.L.C., a Missouri limited liability company

By: _____
    John S. Ross, Jr. Authorized Representative

26

## JOINDER OF TITLE COMPANY

    The undersigned is executing this Agreement solely with respect to its compliance with the provisions of Section 1.5 hereof.

ST. LOUIS TITLE, LLC

By: _____
Name: _Kelly Cochran_____
Its: _Vice President_____

# EXHIBIT A

## LEGAL DESCRIPTION OF THE LAND

Parcel No. 1:

Lot One (1) of MOSBY SUBDIVISION, a tract of land being Lot 2 and Lot 3 of West Port Industrial Subdivision 6th Addition, and Lot 4-A of Lot Split Plat of plat recorded in Plat Book 261 Page 16, recorded in Plat Book 125 Pages 82 and 83, all according to the plat thereof recorded in Plat Book 322 Page 76 of the St. Louis County Records.

EXCEPTING THEREFROM that part conveyed by instrument recorded in Book 9695 Page 974 of the St. Louis County Records.

Parcel No. 2:

A part of Lot One (1) of MOSBY SUBDIVISION, a tract of land being parts of Lots 2 and 3 of West Port Industrial Subdivision Sixth Addition: as per plat recorded in Plat Book 125 Pages 82 and 83 of the St. Louis County Records, and Lot 4-A of Plat recorded in Plat Book 261 Page 16, all according to plat thereof recorded in Plat Book 322 Page 76 and being the same property as conveyed by instrument recorded in Book 9695 Page 974 of the St. Louis County Records.

LEGAL_US_E # 81115946.8

## EXHIBIT B

### ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment") dated as of _____, 2009, is entered into by and between TRIBUNE COMPANY, a Delaware corporation ("Assignor"), and _____, a _____ ("Assignee").

### W I T N E S S E T H

WHEREAS, Assignor is the lessor under that certain Lease identified on Exhibit A attached hereto (the "Lease") executed with respect to that certain real property located at 11830 Westline Industrial Drive, Maryland Heights, Missouri (the "Property") as more fully described in Exhibit B attached hereto;

WHEREAS, Assignor, as Seller, and _____, as Purchaser, are parties to that certain Purchase and Sale Agreement dated as of February ____, 2009 (the "Purchase Agreement") conveying the Property (as defined in the Purchase Agreement); and

WHEREAS, Assignor desires to assign its interest as lessor in the Lease to Assignee, and Assignee desires to accept the assignment thereof;

NOW, THEREFORE, in consideration of the promises and conditions contained herein, the parties hereby agree as follows:

1.     Effective as of the Effective Date (as defined below), Assignor hereby assigns to Assignee all of its right, title and interest in and to the Lease, including, without limitation, all of Assignor's right, title and interest in and to any security deposits received by Seller under the terms of the Lease.

2.     Effective as of the Effective Date, Assignee accepts the foregoing assignment and agrees to, and hereby does, expressly assume and agrees to keep, pay, perform, observe and discharge all of the terms, covenants, conditions, agreements, provisions and obligations stated in the Lease (including any obligations with respect to any security deposits) to be kept, paid, performed, observed and discharged by the landlord under the Lease, arising during or applicable to the period from and after the Effective Date.

3.     Assignee agrees to indemnify Assignor against and hold Assignor harmless from any and all costs, claims, demands, liabilities, losses, damages or expenses, including without limitation, reasonable attorneys' fees, which may be asserted against, imposed on or incurred by Assignor by reason of Assignee's breach, default or failure to perform any of the obligations assumed by Assignee under Paragraph 2 above. Assignor agrees to indemnify Assignee against and hold Assignee harmless from any and all costs, claims, demands, liabilities, losses, damages or expenses, including without limitation, reasonable attorneys' fees, which may be asserted against, imposed on or incurred by Assignee by reason of Assignor's breach, default or failure to perform any of the obligations of Assignor as the landlord under the Lease arising during or applicable to the period prior to the Effective Date.

4.    Any rental and other payments under the Lease shall be prorated between the parties as provided in the Purchase Agreement.

5.    In the event of any litigation arising out of this Assignment, the losing party shall pay the prevailing party's costs and expenses of such litigation, including, without limitation, attorneys' fees.

6.    This Assignment shall be binding on and inure to the benefit of the parties hereto, their heirs, executors, administrators, successors in interest and assigns.

7.    This Assignment shall be governed by and construed in accordance with the laws of the State of Missouri.

8.    Assignee acknowledges that, except as provided in the Purchase Agreement, the conveyance of the Lease herein is specifically made subject to Sections 9.1 and 9.2 of the Purchase Agreement and "as-is, where-is, with all faults," without any representations or warranties express or implied, including, without limitation, implied warranties of fitness for any particular purpose or merchantability or any other warranties whatsoever.  Assignee has not relied and will not rely on, and assignor is not liable for or bound by, any express or implied warranties, guaranties, statements, representations or information pertaining to the Lease or relating thereto (including specifically, without limitation, information packages distributed with respect to the real property) made or furnished by Assignor, the property manager, or any agent or real estate broker representing or purporting to represent Assignor, to whomever made or given, directly or indirectly, orally or in writing.

9.    This Assignment is delivered pursuant to the Purchase Agreement.

10.    For purposes of this Assignment, the "Effective Date" shall be the date of the Closing (as defined in the Purchase Agreement).

11.    This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same document.

[Signature Page Follows]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment the day and year first above written.

ASSIGNOR:

TRIBUNE COMPANY, a Delaware corporation

By:_____

Name:_____

Its:_____


ASSIGNEE:

_____

By:        _____

Name:    _____

Title:     _____

**EXHIBIT A**

**Legal Description of Property**

Parcel No. 1:

Lot One (1) of MOSBY SUBDIVISION, a tract of land being Lot 2 and Lot 3 of West Port Industrial Subdivision 6th Addition, and Lot 4-A of Lot Split Plat of plat recorded in Plat Book 261 Page 16, recorded in Plat Book 125 Pages 82 and 83, all according to the plat thereof recorded in Plat Book 322 Page 76 of the St. Louis County Records.

EXCEPTING THEREFROM that part conveyed by instrument recorded in Book 9695 Page 974 of the St. Louis County Records.

Parcel No. 2:

A part of Lot One (1) of MOSBY SUBDIVISION, a tract of land being parts of Lots 2 and 3 of West Port Industrial Subdivision Sixth Addition: as per plat recorded in Plat Book 125 Pages 82 and 83 of the St. Louis County Records, and Lot 4-A of Plat recorded in Plat Book 261 Page 16, all according to plat thereof recorded in Plat Book 322 Page 76 and being the same property as conveyed by instrument recorded in Book 9695 Page 974 of the St. Louis County Records.

**EXHIBIT B**

Lease

(See Attached)

LEGAL_US_E # 81115946. 8

**EXHIBIT C**

**NOTICE TO TENANT**

_____, 2009

To:    _____
       _____
       _____

       Re:    Notice of Lease Assignment

       Premises:    _____
                    _____

Ladies and Gentlemen:

Please be advised that the Premises have been acquired by, and the Lessor's interest in your lease and your security deposit (if any) have been assigned, to _____ _____ ("New Owner").

All future rental and other payments under your lease shall be paid to New Owner, in accordance with the terms of your lease, to the following address:

_____
_____
_____
_____

Very truly yours,

Prior Owner:        TRIBUNE COMPANY, a Delaware corporation

                    By:    _____
                    Name:  _____
                    Title: _____

New Owner: _____

By: _____
Name: _____
Title: _____

## EXHIBIT D

### CERTIFICATE OF NON-FOREIGN STATUS

Section 1445 of the Internal Revenue Code provides that a transferee (buyer) of a U.S. real property interest must withhold tax if the transferor (seller) is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee (buyer) that withholding of tax is not required upon the disposition of a U.S. real property interest by Tribune Company, a Delaware corporation ("**Seller**"), the undersigned hereby certifies the following on behalf of Seller:

1. Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. Seller is not a disregarded entity as defined in Section 1.1445-2(b)(2)(iii) of the Income Tax Regulations;

3. Seller's U. S. employer identification number is 36-1880355; and

4. Seller's office address is:

> 435 North Michigan Avenue
> Chicago, Illinois 60611

Seller understands that this certification may be disclosed to the Internal Revenue Service by the transferee (buyer) and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, the undersigned declares that he has examined this certification and to the best of his knowledge and belief it is true, correct and complete, and he further declares that he has the authority to sign this document on behalf of Seller.

[Next page is signature page]

LEGAL_US_E # 81115946.8

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the _____ day of _____, 2009.

TRIBUNE COMPANY, a Delaware corporation

By:_____

Name:_____

Its:_____

D-2

## FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

This First Amendment to Purchase and Sale Agreement (the "First Amendment") is made as of the 27th day of April, 2009, by and between **SUMMIT WESTLINE INVESTORS, L.L.C.**, a Missouri limited liability company (hereinafter referred to as "Purchaser") and **TRIBUNE COMPANY**, a Delaware corporation (hereinafter referred to as "Seller").

### W I T N E S S E T H:

WHEREAS, Purchaser and Seller entered into that certain Purchase and Sale Agreement (the "Purchase Agreement"), respecting the purchase and sale of certain property located in the City of Maryland Heights, County of St. Louis, State of Missouri and commonly known as 11830 Westline Industrial Drive, Maryland Heights, Missouri, as more particularly described in the Purchase Agreement as the "Real Property"; and

WHEREAS, Purchaser and Seller desire to amend the Purchase Agreement as hereinafter provided.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, Purchaser and Seller do hereby agree as follows:

1.    **Definitions.** All defined terms used in this First Amendment which are not otherwise defined herein shall have the same meaning in this First Amendment as such terms have in the Purchase Agreement.

2.    **Effective Date/Extension of Study Period.** Purchaser and Seller acknowledge and agree that the "Effective Date" of the Purchase Agreement is March 11, 2009. Section 3.1 of the Purchase Agreement is hereby amended to revise the "forty-five (45) days" for the Study Period to be "fifty-one (51) days", such that the "Study Period" as described in Section 3.1 of the Purchase Agreement ends at 6:00 p.m. (Central Standard Time) on May 1, 2009, but shall be subject to extension as provided in the Purchase Agreement. Purchaser does hereby waive it's right to extend the Study Period by thirty (30) days pursuant to the penultimate sentence contained in Section 3.1 of the Purchase Agreement.

3.    **Transmission of Signatures/Counterparts.** A transmission of an image of this First Amendment showing a signature will have the same binding effect as an original bearing an original signature.   No party may raise the use of a facsimile machine or other image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of this First Amendment. At the request of either party, the parties will confirm signatures by signing and delivering an original document. This First Amendment may be executed in one or more counterparts, each of which shall constitute an original.

4.    **Status of Agreement.** Except as amended hereby, the Purchase Agreement remains in full force and effect.

IN WITNESS WHEREOF, the parties have executed this First Amendment as of the date first above written.

PURCHASER:                          SELLER:

SUMMIT WESTLINE INVESTORS,          Tribune Company, a Delaware corporation
L.L.C., a Missouri limited liability
company
                                    By: _____
                                    Name: _____
By: _____       Title: _____
    John S. Ross, Jr.,
    Authorized Representative

2

## SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT

This Second Amendment to Purchase and Sale Agreement (the "Second Amendment") is made as of the 30th day of April, 2009, by and between **SUMMIT WESTLINE INVESTORS, L.L.C.,** a Missouri limited liability company (hereinafter referred to as "Purchaser") and **TRIBUNE COMPANY,** a Delaware corporation (hereinafter referred to as "Seller").

### W I T N E S S E T H:

**WHEREAS,** Purchaser and Seller entered into that certain Purchase and Sale Agreement, as amended by that certain First Amendment to Purchase and Sale Agreement dated April 27, 2009 (collectively the "Purchase Agreement"), respecting the purchase and sale of certain property located in the City of Maryland Heights, County of St. Louis, State of Missouri and commonly known as 11830 Westline Industrial Drive, Maryland Heights, Missouri, as more particularly described in the Purchase Agreement as the "Real Property"; and

**WHEREAS,** Purchaser and Seller desire to amend the Purchase Agreement as hereinafter provided.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, Purchaser and Seller do hereby agree as follows:

1.    **Definitions.**  All defined terms used in this Second Amendment which are not otherwise defined herein shall have the same meaning in this Second Amendment as such terms have in the Purchase Agreement.

2.    **Effective Date/Extension of Study Period.**  Purchaser and Seller acknowledge and agree that the "Effective Date" of the Purchase Agreement is March 11, 2009.  Section 3.1 of the Purchase Agreement is hereby amended to revise the "forty-five (45) days" for the Study Period to be "fifty-one (58) days", such that the "Study Period" as described in Section 3.1 of the Purchase Agreement ends at 6:00 p.m. (Central Standard Time) on May 8, 2009, but shall be subject to extension as provided in the Purchase Agreement.  Purchaser does hereby waive it's right to extend the Study Period by thirty (30) days pursuant to the penultimate sentence contained in Section 3.1 of the Purchase Agreement.

3.    **Transmission of Signatures/Counterparts.**  A transmission of an image of this Second Amendment showing a signature will have the same binding effect as an original bearing an original signature.  No party may raise the use of a facsimile machine or other image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of this Second Amendment.  At the request of either party, the parties will confirm signatures by signing and delivering an original document.  This Second Amendment may be executed in one or more counterparts, each of which shall constitute an original.

4.    **Status of Agreement.**  Except as amended hereby, the Purchase Agreement remains in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Second Amendment as of the date first above written.

PURCHASER:                              SELLER:

SUMMIT WESTLINE INVESTORS,              Tribune Company, a Delaware corporation
L.L.C., a Missouri limited liability
company
                                        By: _____
                                        Name: _____VP / Treasurer_____
By: _____     Title: ____Jack Rodden_____
      John S. Ross, Jr.
      Authorized Representative

2

## THIRD AMENDMENT TO PURCHASE AND SALE AGREEMENT

This Third Amendment to Purchase and Sale Agreement (the "Third Amendment") is made as of the 5th day of May, 2009 by and between **SUMMIT WESTLINE INVESTORS, L.L.C.**, a Missouri limited liability company (hereinafter referred to as "Purchaser") and **TRIBUNE COMPANY**, a Delaware corporation (hereinafter referred to as "Seller").

### W I T N E S S E T H:

**WHEREAS**, Purchaser and Seller entered into that certain Purchase and Sale Agreement, as amended by that certain First Amendment to Purchase and Sale Agreement dated April 27, 2009 and as amended by that certain Second Amendment to Purchase and Sale Agreement dated April 30, 2009 (collectively the "Purchase Agreement"), respecting the purchase and sale of certain property located in the City of Maryland Heights, County of St. Louis, State of Missouri and commonly known as 11830 Westline Industrial Drive, Maryland Heights, Missouri, as more particularly described in the Purchase Agreement as the "Real Property"; and

**WHEREAS**, Purchaser and Seller desire to further amend the Purchase Agreement as hereinafter provided.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, Purchaser and Seller do hereby agree as follows:

1. **Definitions.** All defined terms used in this Third Amendment which are not otherwise defined herein shall have the same meaning in this Third Amendment as such terms have in the Purchase Agreement.

2. **Purchase Price.** The Purchase Price for the Property set forth in Section 1.3 of the Purchase Agreement is hereby amended by deleting "Seven Million and No/100 Dollars ($7,000,000.00)" therefrom and by replacing it with "Six Million Fifty Thousand and No/100 Dollars ($6,050,000.00)".

3. **Additional Earnest Money.** Section 1.5 of the Purchase Agreement regarding Earnest Money is hereby amended by adding the following at the end of subparagraph (a) thereof: "Within three (3) days after the expiration of the Study Period, Purchaser shall also deposit with Title Company an additional sum of Fifty Thousand and No/100 Dollars ($50,000.00) as additional earnest money deposit. All references to "Earnest Money" shall mean and include collectively, the initial deposit of $250,000.00, the additional deposit of $50,000.00 (if and when deposited) and any and all interest earned on such deposit(s)."

4. **Permitted Exceptions.** Section 2.4 of the Purchase Agreement regarding permitted exceptions is hereby amended by deleting subparagraph (b) in its entirety and by replacing it with the following:

"(b)    The lien of all ad valorem real estate and similar taxes and assessments, not yet due and payable;"

5.     **Lease**. Section 3.1 of the Purchase Agreement is hereby amended by deleting subparagraph (a) therein in its entirety and by replacing it with the following:

"(a)     A full and accurate unsigned copy of the Lease (a fully executed counterpart original of which shall be delivered to Purchaser by Seller during the Study Period)."

6.     **Marketing Rights**. Section 3.3 of the Purchase Agreement is hereby amended by deleting such Section in its entirety and by replacing it with the following:

"Intentionally Deleted."

7.     **Existing Lease**. Section 3.4 of the Purchase Agreement is hereby amended by deleting such Section in its entirety and by replacing it with the following:

"**Existing Lease**. Purchaser acknowledges and agrees that the Real Property is currently subject to (i) an Amended and Restated Lease Agreement dated September 22, 2006, as amended, by and between Seller (as successor-in-interest to TMCT, LLC), as Landlord, and Seller, as tenant (the "Master Lease"); (ii) a Sublease Agreement dated August 8, 1997, as amended, by and between Seller (as successor-in-interest to The Times Mirror Company), as Sublandlord, and Tenant, as Subtenant (the "Sublease Agreement"); and (iii) a Lease Clarification Agreement dated December 11, 2007 (the "Lease Clarification Agreement") by and between Seller and Tenant (the Master Lease, Sublease Agreement and Lease Clarification Agreement are collectively referred to as the "Existing Lease"), copies of which have been previously delivered to Purchaser. Purchaser further acknowledges and agrees that pursuant to the terms of the Lease Clarification Agreement, Seller has the option to enter into a direct lease with Tenant in the form of the Lease and that Seller has exercised the option to enter into such direct lease, but the Lease has not yet been executed by Tenant. Seller covenants and agrees that it shall obtain a fully executed original of the Lease and shall deliver a counterpart original of the same to Purchaser within the Study Period. Such Lease may be contingent upon Court (hereinafter defined) approval, which approval Seller shall seek to obtain as provided in Section 5.4 hereof. Not later than the Closing Date, Seller shall amend the Master Lease (the "Amendment") so as to exclude the Property from the Master Lease and shall present a copy of said Amendment to Purchaser at or prior to Closing."

8.     **Termination of Master Lease**. If the Lease is approved by the Court as provided in Section 5.4(h) of the Purchase Agreement (as amended hereby) but Seller fails to deliver to Purchaser a copy of the Amendment, then Seller and Purchaser hereby agree that, notwithstanding anything to the contrary, the Master Lease is hereby terminated effective as the Closing with respect to such portions of the Master Lease that relate solely to the Real Property.

9.     **Closing**. Section 4.1 of the Purchase Agreement is hereby amended by deleting the first sentence thereof in its entirety and by replacing it with the following:

"The closing (the "Closing") on the sale and purchase of the Property shall occur on a date that is mutually acceptable to both Seller and Purchaser (and Purchaser's lender) on or between May 29, 2009 and June 5, 2009, but in all events on or before

2

June 5, 2009, or such later date as the same may be extended pursuant to Sections 2.3 or 2.5 hereof (the "Closing Date")."

10. **Real Estate Taxes**. Subparagraph 4.5(a) of the Purchase Agreement is hereby amended by adding the following to the end of such provision:

"Prior to Closing, Seller will pay or cause to be paid all real estate taxes on the Real Property for calendar year 2008. Notwithstanding anything herein to the contrary, Seller and Purchaser agree that, at Closing, Purchaser shall receive a credit against the Purchase Price in the amount of $102,500.00 ("Tax Credit") for the real estate taxes for calendar year 2009. Purchaser shall use commercially reasonable efforts to collect from Tenant its proportionate share of real estate taxes for the Real Property for calendar year 2009. If Purchaser collects from Tenant its proportionate share of the real estate taxes due for the 2009 calendar year for the time period January 1, 2009 through and including August 7, 2009, then, in such event, Purchaser shall refund said Tax Credit to Seller within ten (10) days of Purchaser's receipt of Tenant's payment of same. The amount of the Tax Credit is equal to one-half (½) of the parties' estimate of Tenant's proportionate share of the real estate taxes for 2009 based on the 2008 calendar year real estate taxes for the Real Property."

11. **Rents**. Subparagraph 4.5(b) of the Purchase Agreement is hereby amended by adding the following sub-clause thereunder:

"(v)  Adjustments for Closing Date. Notwithstanding anything to the contrary contained in this subparagraph 4.5(b), if Closing occurs after May 29, 2009, then adjustments for the collection of rent shall be based on a Closing Date of May 29, 2009 notwithstanding any actual later Closing hereunder, such that Purchaser shall be entitled to rent credits and rent amounts and other amounts due under the Lease for such additional time period from and between May 29, 2009 and the actual date of the Closing."

12. **Representation Regarding Existing Lease**. Sub-clause (c) of Section 5.1 of the Purchase Agreement is hereby amended by deleting it in its entirety and by replacing it with the following:

"(c)  Lease/Master Lease/Sublease. Seller is both the landlord and the tenant under the Master Lease. Seller is also the sublandlord under the Sublease Agreement. The Sublease Agreement, as it may have been amended and/or modified by the Lease Clarification Agreement, by its terms, expires and terminates on August 7, 2009 and has not been extended nor are there any remaining available renewal terms therein. Except for the Existing Lease (and the Lease when it is executed) there are no other leases or occupancy agreements to which Seller is a party affecting the Real Property. As of the Effective Date, the Existing Lease is in full force and effect and to the best of Seller's knowledge, there are no current defaults thereunder by Seller or Tenant. Notwithstanding anything herein to the contrary, Seller does not represent or warrant that (i) the Lease will be in force or in effect at the Closing, unless approved by the Court; or (ii) Tenant will have performed its obligations under the Existing Lease or the Lease. To the best of Seller's knowledge, Tenant has no charges, liens, claims or offsets under the Existing

3

Lease and/or the Lease against the rents or obligations due or to become due or required under the Existing Lease and/or the Lease. Assignor has not assigned or collaterally assigned its right under the Existing Lease and/or the Lease."

13. **Tenant Estoppel.** Sub-clause (b) of Section 5.4 of the Purchase Agreement is hereby amended by deleting therefrom "on or prior to the date that is five (5) days prior to the expiration of the Study Period" and by replacing it with the following: ", if requested by Seller, on or prior to the Closing Date".

14. **Section 5.4.** Sub-clause (c) of Section 5.4 of the Purchase Agreement is hereby amended by adding the following in front of the word "Lease" in the first line thereof: "Existing Lease or the".

15. **Approval of Bankruptcy Court.** Section 5.4(h) of the Purchase Agreement is hereby amended by deleting the first sentence thereof and by replacing it with the following:

"Seller shall file a motion with the United States Bankruptcy Court for the District of Delaware (the "Court") seeking one or more Orders from the Court (collectively, the "Order") to be issued at a hearing on or about May 28, 2009 approving both the sale of the Property to Purchaser pursuant to the terms of this Agreement, as amended, and approving the Lease in the form of the executed counterpart delivered to Purchaser during the Study Period."

16. **Transmission of Signatures/Counterparts.** A transmission of an image of this Third Amendment showing a signature will have the same binding effect as an original bearing an original signature. No party may raise the use of a facsimile machine or other image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of this Third Amendment. At the request of either party, the parties will confirm signatures by signing and delivering an original document. This Third Amendment may be executed in one or more counterparts, each of which shall constitute an original.

17. **Status of Agreement.** Except as amended hereby, the Purchase Agreement remains in full force and effect.

4

**IN WITNESS WHEREOF,** the parties have executed this Third Amendment as of the date first above written.

**PURCHASER:**                          **SELLER:**

**SUMMIT WESTLINE INVESTORS,**          **TRIBUNE COMPANY, a Delaware**
**L.L.C., a Missouri limited liability**  **corporation**
**company**

By: _____            By: _____
    John S. Ross, Jr.,                 Name:_____
    Authorized Representative          Title:_____

5

**IN WITNESS WHEREOF**, the parties have executed this Third Amendment as of the date first above written.

SUMMIT WESTLINE INVESTORS,                TRIBUNE COMPANY, a Delaware
L.L.C., a Missouri limited liability                corporation
company

By:_____

By:_____                Name: Jack Rodden
    John S. Ross, Jr.,                        Title: VP / Treasurer
    Authorized Representative