```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE


IN RE:                          )   Case No. 08-13141(KJC)
                                )   (JOINTLY ADMINISTERED)
TRIBUNE COMPANY, et al.,        )   Chapter 11
                                )
                                )   Courtroom 5
                                )   824 Market Street
                     Debtors.   )   Wilmington, Delaware 19801
                                )
                                )   May 12, 2009
                                )   10:03 A.M.



                  TRANSCRIPT OF OMNIBUS HEARING
                BEFORE HONORABLE KEVIN J. CAREY
              UNITED STATES CHIEF BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          Cole Schotz Meisel, Forman
                          & Leonard, P.A.
                          By:  NORMAN PERNICK, ESQ.
                          1000 N. West Street, Suite 1200
                          Wilmington, Delaware 19801

                          Sidley Austin LLP
                          By:  JONATHAN LOTSOFF, ESQ.
                               BRIAN GOLD, ESQ.
                               KEVIN LANTRY, ESQ.
                          One South Dearborn
                          Chicago, Illinois 60603



ECRO:                     AL LUGANO

TRANSCRIPTION SERVICE:    TRANSCRIPTS PLUS, INC.
                          435 Riverview Circle
                          New Hope, Pennsylvania 18938
                          Telephone:  215-862-1115
                          Facsimile: 215-862-6639
                          e-mail CourtTranscripts@aol.com


    Proceedings recorded by electronic sound recording, transcript
                  produced by transcription service.
```

APPEARANCES:
(Continued)

| | |
|---|---|
| For Greatbanc: | Womble Carlyle Sandridge & Rice, PLLC<br>By: THOMAS M. HORAN, ESQ.<br>222 Delaware Avenue, Suite 1501<br>Wilmington, Delaware 19801 |
| For Creditors'<br>Committee: | Landis Rath & Cobb LLP<br>By:  MATTHEW MCGUIRE, ESQ.<br>919 Market Street, Suite 1800<br>Wilmington, Delaware 19801 |
| | Chadbourne & Parke LLP<br>By:  DAVID LeMAY, ESQ.<br>30 Rockefeller Plaza<br>New York, New York 10112 |
| The U.S. Trustee: | United States Department of Justice<br>Office of the U.S. Trustee<br>By:  JOSEPH J. McMAHON, JR., ESQ.<br>844 King Street<br>Wilmington, Delaware 19899 |
| For C.W.: | Morris Nichols Arsht & Tunnell, LLP<br>By:  DEREK ABBOTT, ESQ.<br>1201 North Market Street<br>P.O. Box 1347<br>Wilmington, Delaware 19899-1347 |
| | Glickfield, Fields & Jacobson LLP<br>By:  LARRY JACOBSON, ESQ.<br>9401 Wilshire Boulevard, Suite 525<br>Beverly Hills, California 90212-4186 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtor: | Sidley Austin, LLP<br>By:  CANDICE KLINE, ESQ. |

TELEPHONIC APPEARANCES:
(Continued)

For JPMorgan as            Davis Polk & Wardell
Administrative Agent:      By:  DAMIAN SCHAIBLE, ESQ

For Kramer Levin           Kramer Levin Naftalis & Frankel
Naftalis & Frankel:        By:  JENNIFER SHARRET, ESQ.

4

# I N D E X

| WITNESSES FOR THE DEBTORS: | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| CHANDLER BIGELOW | | | | | |
| By Mr. Lotsoff | 17 | | | | |
| By Mr. McMahon | | 30 | | | |
| | | | | | |
| CHANDLER BIGELOW | | | | | |
| By Mr. Lotsoff | 59 | | | | |

| EXHIBITS: | Marked | Received |
|---|---|---|
| A   2008 proposed payouts under the MIP | 20 | 21 |

1          THE COURT:  Good morning, all.

2          MR. PERNICK:  Good morning, Your Honor.  Your Honor,

3  Norman Pernick Cole Schotz on behalf of Tribune Company.

4          I thought if I could just take a moment, Your Honor,

5  to run through the agenda to make sure that we're in sync with

6  the Court on what's going forward and what's been resolved and

7  signed.

8          THE COURT:  All right.

9          MR. PERNICK:  And I'm sure -- I know the Court knows,

10 but we're well aware that we have an hour today.  And so we

11 really just have two matters that are going forward.  So,

12 hopefully we'll be able to complete them.

13         Item Number 1 was the Navistar motion for relief, and

14 to compel in the alternative.  That's continued to the May 28

15 hearing.

16         Item Number 2, you were kind enough to enter an order

17 on cash management.  The Section 345 portion of cash management

18 is on for May 28th, that was continued at the last hearing.

19 But just to make it clear.

20         We did file a CNO on Number 3, which is the post

21 petition station affiliation agreement with C.W. Network and

22 the related Motion Number 4, which is the seal motion.

23         THE COURT:  Yes, I have not seen the certificates

24 of counsel.  But if you have orders, I'm prepared to sign

25 them.

6

1          MR. PERNICK:  I do, Your Honor.  If I may approach?

2          THE COURT:  You may.  Thank you.

3                         (Pause)

4          THE COURT:  I'll just ask briefly for the record

5    whether anyone else wishes to be heard in connection with

6    either of these two motions.

7                    (No audible response heard)

8          THE COURT:  I hear no response.

9                         (Pause)

10         THE COURT:  Those two orders have been signed.

11         MR. PERNICK:  Thank you, Your Honor.

12         That leaves us with three items left:

13         Item Number 5, which is the incentive plan motion.

14         Item Number 6, which is the related seal motion for

15   the incentive plan.

16         And Item Number 7, which is severance plan motion.

17         Brian Gold and John Lotsoff from the Sidley firm are

18   going to handle those matters.  And I did file pro hac vice

19   motions for both of them.

20         THE COURT:  All right.  Thank you.

21         MR. PERNICK:  Thank you.

22         MR. GOLD:  Good morning, Your Honor.  Brian Gold on

23   behalf of the Tribune.

24         Your Honor, as Mr. Pernick noted, we have three

25   matters before you.  One is for the debtors to make certain

1  payments per their 2008 incentive plans.

2          The second are make severance payments for certain

3  employees who were terminated prior to the implementation of

4  the post petition severance plan.

5          And then related to the first motion is the Trustee's

6  objection with respect to the filing under seal.

7          Your Honor, with respect to the two substantive

8  motions, if you will, we have the support of the creditor

9  constituencies, which hopefully you'll be able to hear from in

10  a moment.  We do have an objection from the United States

11  Trustee, as Your Honor I think may be aware with respect to all

12  three matters.

13          We've agreed with the United States Trustee on three

14  things:

15          One is with respect to the motion filed under seal

16  that we will file the report of Mercer, the full report with

17  certain items redacted on Page 8, and file that with the

18  certification of counsel, Your Honor.  So, I think that matter

19  has been effectively disposed of, if Your Honor is okay with

20  that.

21          THE COURT:  I am.  But let me ask how the parties

22  would anticipate its use during the hearing today.

23          MR. GOLD:  We do not, Your Honor.

24          THE COURT:  Okay.

25          MR. GOLD:  Secondly, we -- with respect to the two

1 substantive motions, we have agreed with the United States

2 Trustee on a method to proceed with a live witness, and then a

3 second proffer, Your Honor, with respect to certain testimony.

4 And the United States Trustee can cross examine, as Mr. McMahon

5 sees fit, with respect to that.

6    And then finally before we get to those matters, we

7 wanted to cede the podium to the two creditor constituencies.

8 First, Mr. LeMay, who represents the Creditors' Committee.  And

9 secondly, participating by phone is Mr. Schaible who represents

10 the lender's Steering Committee.

11    And then following that, with Your Honor's

12 permission, we would proceed with the Trustee by my colleague

13 and my partner, Mr. Lotsoff would go ahead with that.

14    If that's an acceptable way to try and complete the

15 hour, if you will, that Your Honor has available, we'd go ahead

16 with that.

17    THE COURT:  That's fine.  I'm hesitating because

18 after review of the submission -- the submissions, I do have

19 some preliminary thoughts.  And I usually try not to express

20 them because often times the evidentiary presentations and the

21 arguments obviate the need for me to say anything.

22    But I think I'm inclined just to give you some

23 preliminary views so that maybe your presentations can address

24 them accordingly.

25    MR. GOLD:  Certainly, Your Honor.

1              THE COURT:  With respect to the motion at Number 5,

2  to make payments according to prepetition incentive plans, it

3  may be really -- it may be the first time that it really is an

4  ordinary course thing and doesn't fall under the 503(c)(3)

5  standard.

6              However, I am interested to see how the evidence

7  addresses the U.S. Trustee's objection about -- well, I'll just

8  leave it at that.

9              With respect to Number 7, the motion to authorize

10  severance pay, I will tell you I think the U.S. Trustee has

11  made a fair objection with respect to whether the necessity of

12  payment doctrine warrants these payments.

13              Now, with respect to the union workers, I guess some

14  argument could be made that because CBA hasn't been assumed to

15  reject it, that the debtor wishes to continue its performance.

16  I guess in addition to that argument, as a practical matter,

17  the number is negligible in terms of the company's overall

18  finances.

19              But with respect to the other employees, I look to

20  see whether the debtor can establish some causal connection

21  between having to make those payments and affect on present

22  employee morale.

23              I will tell you one thought I had about that, again,

24  subject to what the evidence shows.  It's that a better

25  approach might be to reserve those funds for payment under

1  ultimately what hopefully will be confirmed Chapter 11 plan.

2  I, frankly, didn't see any present reason why there couldn't be

3  a separate classification, and that's not to make a plan

4  decision at this stage.  But I did want to -- I did want to

5  express that view before we began.

6          MR. GOLD:  Thank you, Your Honor.  We obviously

7  appreciate those concerns.  We do feel the evidence will

8  address Your Honor's concerns in a favorable way.

9          We also think that having heard from the creditor

10 constituencies, I think who obviously have the most to, if you

11 will, lose by the payments being made, that they share the

12 debtors' concern with respect to the necessity with respect to

13 both payments, in fact.

14          So, if we can cede to them, and then the evidence

15 will, as best we can, Your Honor, address your concerns.

16          THE COURT:  Let's proceed.

17          MR. GOLD:  Thank you.

18          MR. LeMAY:  Your Honor, good morning.  David LeMay

19 from Chadbourne & Parke for the Official Committee of Unsecured

20 Creditors.

21          Your Honor, I'm cognizant of the time constraints.

22 I'm going to be very brief.  And then after my brief remarks,

23 if you have questions, or if at the end of the evidence, you

24 want to hear more from me, of course, I'll be glad to tell you

25 more about what the Committee's thinking.

1          Your Honor, it isn't every morning that I get up to

2    try to persuade a judge to allow money to go out ahead of my

3    clients.  But that, in fact, is actually what I'm here to do

4    today.

5          Obviously with respect to both components, I think

6    the Committee thinking is largely the same.

7          With respect to the 2008 management incentive plan

8    payments, I will note for the Court that the Committee did push

9    back on the original proposal the debtor had made.  The number

10   was a negotiated number.  A lot of work was done by the

11   debtors' -- I'm sorry -- by the Committee's financial advisors.

12   AlixPartners working with the debtor and working with the

13   Committee to try to ensure that the plan that ultimately got in

14   front of the Court was a plan that incented the right people to

15   do the right things in 2009 and going forward.

16         A lot of attention was paid to the concept that even

17   though the payment metric is 2008, the basis for which these

18   payments were measured is 2008, the business goal that the

19   Committee sought to accomplish, and it believes that this plan

20   does accomplish that goal, is to ensure that the right people

21   have the right incentives to work in a pretty tough environment

22   in 2009.  With the contractions that are going on in the

23   industry at large, and also in the Tribune Company, in

24   particular, the people who are still there are being asked to

25   do more.  They're being asked to work harder.  There's a lot of

12

1  uncertainty.  All of the usual things that I'm sure the Court

2  has heard.

3        I guess my point on the 2008 management incentive

4  program, and you'll hear this from the evidence, I'm sure, is

5  that although the measuring metric is 2008, the business goal

6  from the Committee's point of view, and we're convinced, and

7  the Committee is convinced that that goal is achieved, is that

8  this plan, which has been reduced significantly, does create

9  incentives for the right people.

10        With respect to the severance program, obviously that

11  is not as, I think, straightforward or easy a cut.  You will

12  hear the evidence -- you will hear the debtors' arguments.

13        I think from the Committee's point of view -- and

14  I'll remind the Court that the Committee does include a

15  representative of a union, and the Committee also includes a

16  retiree who, in effect, is a retired management, nonunion

17  employee who's got substantial claims against the company.

18        There was a lot of dynamic within the Committee -- a

19  dynamic which is obviously not appropriate to get into in great

20  detail -- around the proposition -- well, around a couple of

21  propositions, I suppose:

22        One, that the continuing ongoing workforce would be

23  rattled if people who have been terminated, granted terminated

24  prepetition, were left completely out in the cold.  That's just

25  a remarkably sort of harsh and cold result.  And if you are

1   someone who's there working at one of the papers, and your

2   best friend lost his job three weeks before the petition and

3   gets nothing, it certainly causes you to wonder what's up

4   with you, and what's up with your future.  You'll hear the

5   evidence --

6           THE COURT:  Well, let me push back a little bit on

7   that.  There is a post petition severance plan in place, is

8   there not?

9           MR. LeMAY:  There is.

10          THE COURT:  Okay.

11          MR. LeMAY:  There is.

12          THE COURT:  And it seems to me that would weigh

13  heavily against somebody having that kind of sentiment,

14  wouldn't you think?

15          MR. LeMAY:  Possibly.  I think what -- I don't want

16  to steal the debtors' thunder on this.  May I propose, Your

17  Honor, on that issue, which is totally valid and should be

18  addressed, why don't I, with the Court's permission, hold that?

19  And then at the end of the evidence, if that's still weighing

20  on the Court, I'll come back up and tell you what I think on

21  that.

22          THE COURT:  All right.

23          MR. LeMAY:  Is that fair?

24          THE COURT:  Yes.

25          MR. LeMAY:  The only other point I was going to make

1  is that with respect to the union versus nonunion issue, I

2  think there really is a matter of fundamental distributive

3  justice there that the Committee saw needs to be addressed.

4  Creating a, oh, in effect, you know, class division, or class

5  warfare between the represented constituency and the nonunion

6  constituency was not, in the Committee's view, the right

7  direction for this case at his time.  It's a pretty delicate

8  place.  We're headed very soon into plan negotiations.  And

9  granted that Your Honor has a legal responsibility, as does the

10 United States Trustee, what I'm seeking to bring in front of

11 the Court is the business perspective.  And after all, that's

12 why the Committee has the seats that it does.  It's a bunch of

13 business people trying to address a business problem.  That's

14 what they asked me to ask you to think about this morning, Your

15 Honor.

16         THE COURT:  Thank you.

17         MR. LeMAY:  Thank you.

18         MR. SCHAIBLE:  Your Honor, if I may, this is Damian

19 Schaible of Davis Polk & Wardell.  I'm appearing on behalf of

20 JPMorgan as administrative agent and as lender under the

21 debtors' prepetition senior credit facility.

22         THE COURT:  Go ahead.

23         MR. SCHAIBLE:  I'm going to take up no time of yours

24 at all, Your Honor, because I know that there's a lot to be

25 done in a short period of time.

1          But based on the debtors' records, the senior lenders

2   are owed in excess of $8.5 billion.  That makes the senior

3   lenders, very unfortunately for them, the biggest creditors in

4   these cases by many, many multiples.

5          As such, the continued fatality and value of the

6   debtors' enterprises are obviously extremely important to the

7   senior lenders.  To Mr. LeMay's point, it is also an odd result

8   when -- or a potentially odd result when a senior prepetition

9   lender is saying that, you know, other -- other prepetition

10  lenders who may not have the same structural or otherwise

11  priority should receive payments ahead of us.

12         But we do believe it is important here, Your Honor.

13  I'm speaking on behalf of the Steering Committee of senior

14  lenders which JPMorgan has put together.  The Steering

15  Committee has been working with the debtors on many, many

16  different things, one of which was these motions.  We've

17  considered the relief requested in the motions, and we've done

18  a lot of our own analysis.  And after all of that analysis, the

19  Committee would support the debtors' requested relief.

20         In addition to believing it's just, frankly, the

21  right thing to do, the Steering Committee is very concerned

22  that not making these payments would have very real potential

23  effects with respect to employee morale and employee retention.

24         I do second a lot of what Mr. LeMay said with respect

25  to both motions.  And so I won't rehash over them.

16

1         But with respect to incentive plans, we just think

2 it's extremely important to provide the right incentive to the

3 people that are doing a lot and helping run these businesses.

4         And then with respect to the severance motion, we do

5 believe that both of Mr. LeMay's concerns are the same concerns

6 we have, frankly.

7         First that, you know, a line guy working on the press

8 is not going to understand necessarily the difference between

9 if he gets severed now when there's a post petition severance

10 agreement in place versus his buddy who is severed three weeks

11 before.  He's just going to think of, you know, of issues of

12 fairness, and morality, and he's going to be concerned and

13 upset, and we could potentially be losing very valuable people.

14         The second really is the union versus nonunion

15 paradigm.  To the extent that the union members are paid, and

16 the nonunion members are not paid, that creates a very

17 dangerous -- potentially dangerous chemistry in the press rooms

18 and at the locations.  And we believe that -- so, in sum, we

19 believe that it would be accretive to the value of the

20 enterprise in general to permit these payments to be made.

21         So, I would than Your Honor for hearing me out on

22 that.

23         THE COURT:  Thank you.

24         MR. GOLD:  Your Honor, with your permission, we'll

25 proceed with testimony of the company's CFO, who hopefully can

1  address Your Honor's concern with respect to both motions.

2          THE COURT:  Very well.

3          MR. GOLD:  And Mr. Lotsoff, my partner, will present

4  that testimony.

5          THE COURT:  All right.  Thank you.

6          MR. LOTSOFF:  Good morning, Your Honor.  Jonathan

7  Lotsoff with Sidley Austin on behalf of the debtors.

8          At this time, we'd like to call Chandler Bigelow on

9  behalf of the company.

10         THE COURT:  All right.

11         CLERK:  Please raise your right hand, place your left

12 hand on the Bible.

13          CHANDLER BIGELOW, DEBTORS' WITNESS, SWORN

14         CLERK:  Please state your full name for the record

15 and spell your last name.

16         THE WITNESS:  Chandler Bigelow, B, as in boy, I-G-E-

17 L-O-W.

18         CLERK:  Thank you.

19                  DIRECT EXAMINATION

20 BY MR. LOTSOFF:

21 Q    Mr. Bigelow, what position do you currently hold with the

22 company?

23 A    I'm Chief Financial Officer of Tribune Company.

24 Q    And how long have you held that position?

25 A    A little more than a year.

1  Q    And could you briefly describe your duties in that

2  position, including any duties related to the restructuring of

3  the company?

4  A    Yes, I'm chiefly responsible for the corporate finance

5  activities of the company, including the Treasury Department

6  and Tax Department, Financial Reporting Department, and I am

7  very involved in the restructuring efforts.  In particular,

8  interacting with the key constituents, the Official Committee,

9  the Senior Lender Steering Committee, as well as any and all

10 constituents related to the restructuring.

11 Q    And what was your position prior to becoming CFO?

12 A    I was Treasurer of the company for about four years.

13 Q    When did you begin your employment with the company?

14 A    1998.

15 Q    Just as a bit of background, does the company have two

16 principal business segments, publishing and then broadcasting

17 and entertainment?

18 A    That's correct.

19 Q    And as of the end of 2008, they had about 15,000

20 employees?

21 A    That's correct.

22 Q    The motion we're here on today requests the following

23 relief, and this is the incentive plan motion, in particular.

24 The authority to pay management incentive program awards for

25 2008 totaling approximately $12.243 million to approximately

Bigelow - Direct                                    19

1  670 debtor participants.  And then the authority to pay

2  approximately $1.1 million in cash incentive bonuses, and

3  certain other owed amounts for 2008 to 23 local officers.  Is

4  that your understanding of the relief that's being requested?

5  A    That's correct.

6  Q    With respect to the MIP payment that's being requested,

7  what percentage of target does the requested payment represent?

8  A    Less than half of the target.  When you factor in all the

9  participants related to the plan, it's roughly 38 percent of

10 the target.  I think as the Court knows, we are not seeking

11 approval to pay any bonuses to the most senior executives of

12 the company, the top 10 executives.  When you exclude the top

13 10 from the denominator in that calculation, it's still less

14 than half, it's about 45 percent.

15 Q    And, Mr. Bigelow, are you one of those top 10 executives

16 for whom a 2008 payment is not being requested in this motion?

17 A    That's correct.

18 Q    And the CEO, I understand, of the company is even separate

19 from the top 10.  Does he participate in the MIP?

20 A    He does not.

21 Q    Does he participate in any incentive program?

22 A    He does not.  He's paid 50 cents a year.

23 Q    How do the requested amounts in these payout percentages

24 that you've articulated compare with MIP payments for prior

25 years?

1  A    They're lower.  The 2008 amounts are lower than the '07

2  and '06 amounts, for example.

3  Q    And did you assist in preparing an exhibit that compared

4  some of the metrics between this year's proposed payout and the

5  payouts for prior years?

6  A    That's correct.

7           MR. LOTSOFF:  Your Honor, with your permission, may I

8  approach with an exhibit?

9           THE COURT:  You may.

10  BY MR. LOTSOFF:

11  Q    Mr. Bigelow, could you briefly walk us through this

12  exhibit and tell us what it shows?

13  A    Yes, the exhibit shows the 2008 proposed payouts under the

14  MIP and compares it to '06 and '07.  As you can see on the

15  exhibit, the total payments, roughly $13 million, is

16  substantially lower than '07 and '06.  The payout as a percent

17  of the target, as I mentioned, for this year, is 38 percent,

18  which is substantially lower than the previous years.  The MIP

19  payout is a percent of base pay is 14 percent for '08, compared

20  to 17 percent last year, and 24 percent for '06.  And as you

21  can see, the average award is substantially less.  The average

22  award for '08 is about $18,000, compared to 25,000 in '07, and

23  37,000 in '06.

24           I'll also point out that the medium award for 2008 is

25  less than $10,000.  And that, you know, most of the awards are

1  less than 30.

2            MR. LOTSOFF:  Your Honor, I move for admission of

3  this exhibit, which I've marked Exhibit A.

4            THE COURT:  Is there any objection?

5            UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

6            THE COURT:  All right.  It's admitted without

7  objection.

8            MR. LOTSOFF:  Thank you, Your Honor.

9  BY MR. LOTSOFF:

10 Q    How do these proposed MIP awards relate to the company's

11 historical compensation philosophy?

12 A    The company's compensation philosophy is that the key

13 managers of the company essentially have three components to

14 their compensation:  Base pay; case incentive awards; and

15 equity incentive awards.  And the philosophy, generally

16 speaking, has to be -- to try and set base pay at a relatively

17 lower level than, you know, industry averages, peer averages so

18 that we can, you know, create a -- maximize the incentive plans

19 through cash compensation and equity compensation.  Generally

20 speaking, you know, that's been the way we've thought about

21 compensation historically speaking.

22 Q    And do the participants in the MIP on whose behalf this

23 motion is brought today, do they have any meaningful equity or

24 other long term incentive compensation for 2008?

25 A    I'd say at this point no.  What little equity has been

1  granted, I would say, at this point has little or no value.

2  Q     And are you aware, Mr. Bigelow, of whether the company at

3  the direction of the Board of Directors Compensation Committee

4  retained an independent compensation consultant to review the

5  proposed 2008 MIP awards?

6  A     Yes.  Mercer was hired, and they're a leading compensation

7  benefits design firm.

8  Q     And we'll present separate evidence on this point, but do

9  you know what Mercer concluded?

10  A     Yes, they've concluded that our proposal is reasonable, is

11  market, is commonplace in these types of proceedings,

12  bankruptcy proceedings.  They've also done some analytics on

13  just -- relative compensation packages to our key managers.

14  And, in fact, have determined that if we make the payments that

15  we're seeking, that the average compensation of these folks

16  would be, you know, about 40 percent below just the average.

17  Q     That's if you make the payments.

18  A     That's if we make the payments.  If we didn't make the

19  payments, the relative average would fall north of 50 percent

20  below the average.

21  Q     Below the market median?

22  A     Yes, that's correct.

23  Q     With respect to the -- we'll call them the local bonus

24  payments that we're also here on today, this Court entered an

25  order in February authorizing incentive payments to about 3,000

1  non-insiders under various local bonus incentive programs that

2  were based on revenue and metrics such as those.  Are the local

3  bonuses at issue today which total just over 900,000 for 22

4  local officers of a similar type?

5  A    They are.

6  Q    And is it your understanding that the motion today also

7  seeks to pay about $160,000 to three local officers?

8  A    That's correct.

9  Q    Including two on whose behalf bonuses are sought under

10  agreements for housing expenses, a cash advance, and a cost of

11  living adjustment?

12  A    That's correct.

13  Q    Why were these individuals excluded from the Court's prior

14  order, to your knowledge?

15  A    These individuals are technically speaking, officers of

16  some of our operating subsidiaries.  And as a result of that,

17  we thought it prudent to delay seeking authority to pay those

18  folks until we had the 2008 MIP presented before the Court.

19          I would say that the fact that they are officers is

20  more an administrative function.  They don't have any

21  unilateral control over the operating subsidiaries, if you

22  will.  They aren't tasked with, you know, designing these

23  benefit programs.  But we thought it was just prudent given

24  their insider status to push that.

25          So, the 3,000 other folks in these plans did get

1  paid.  But these 23 folks, because of their status as officers

2  of operating subs were pushed to this date.

3  Q    And do these local officers, do they have any ability to

4  influence their bonuses?

5  A    No, other than selling.  And these are sales, commission

6  types of plans, so --

7  Q    Has the Compensation Committee of the company's Board of

8  Directors approved the incentive payments that are sought in

9  this motion?

10 A    Yes, they have.

11 Q    Mr. Bigelow, can you tell us why the company is seeking to

12 make these incentive payments?

13 A    Yeah, the company's looking to reward some extraordinary

14 effort from the key managers of the company.  And I'll echo

15 some of the things that have already been said.  In addition to

16 that incentivizing and motivating the key managers in very

17 difficult times is, I think, one of the keys to maximizing

18 value of this estate.  And, you know, given that context, we

19 think it's very important to make these payments.

20 Q    Can you describe some of the principal challenges that the

21 company and these participants faced in 2008?

22 A    Yes.  Briefly, we operate very economically sensitive

23 businesses.  And like anyone that operates those types of

24 businesses, we're confronted with significant revenue pressure

25 in 2008.  For example, publishing advertising revenue last year

1  was off 18 percent.

2          Our broadcasting revenue held in there pretty well

3  for the first six to nine months, but was off nearly 20 percent

4  in the fourth quarter.  And I'll tell you that those trends

5  have gotten worst in 2009.

6          And we operate businesses with an awful lot of

7  operating leverage.  There's -- a tremendous fixed cost

8  business.  And when you're confronted with that kind of revenue

9  pressure, that is a real challenge to retain profitability and

10 to think creatively to mitigate those trends.  So, we have had

11 some serious cyclical pressure on the business.

12         In addition, as I tink, as you're all aware, the

13 newspaper industry faces, you know, a lot of secular pressure.

14 Q    Are these pressures and challenges that you described

15 beyond the control of the participants?

16 A    I'd say a great many of them are.  As I mentioned,

17 economically sensitive businesses will be confronted with very

18 difficult revenue headwinds when the overall economy falls in

19 the recession.  But we need to be incentivizing and motivating

20 our key managers to think of ways to drive revenue and mitigate

21 those trends.

22         And so I'd say by and large, many of the macro trends

23 were out of control -- out of anyone's control.  But that's not

24 to say that we can't defend the company against those trends,

25 and we need to have a motivated incentivized workforce to do

1  so.

2  Q    Can you describe some of the principal accomplishments for

3  2008 of the participants?

4  A    Yeah.  Briefly, based on our estimates, we think the

5  strategic initiatives that we implemented primarily in the

6  second half of the year as trends started to weaken will

7  generate north of $400 million of incremental operating cash

8  flow to the organization.

9       Quick examples of that would be we simultaneously

10  redesigned all eight of our newspapers, and in the process

11  developed what I think, and what I think our readers think is a

12  more compelling product.  But in addition, we're more

13  thoughtful about how we created the product.  And, therefore,

14  saved considerable amounts of money just being more efficient.

15      We're also done some landmark commercial printing and

16  delivery deals with other newspaper companies in our markets,

17  which has created a lot of value for us.  21 of our 23 TV

18  stations increased their local market share from an advertising

19  standpoint.

20      So, those are some of the operating things we did

21  during the year, which I think have gone a long way to

22  transforming the business.

23      In addition to that, we did execute transactions that

24  generated north of a billion dollar of cash proceeds for the

25  estate in 2008.

1  Q    How did the company and its Compensation Committee decide

2  to make the proposed MIP payouts that we're here for today?

3  A    Well, every year our business units have budgets.  And to

4  the extent that they meet those budgets, or come close to

5  meeting those budgets, that would trigger an MIP payment.  To

6  the extent that the business unit were not to meet those

7  budgets or come close to those budgets, we've always had the

8  ability to make discretionary payments.  And in this particular

9  year, we did have a number of business units that met or came

10 close to meeting their budgets.  And, therefore, that triggered

11 a payment.  In addition, we are seeking to make discretionary

12 payments based on many of the reasons I just cited.

13 Q    And my understanding is that the current incentive plan

14 that contains the MIP program has been in place since, I

15 believe, 1997?

16 A    That's correct.

17 Q    And does that plan, to your knowledge, specifically

18 authorize the making of discretionary payments where the

19 company deems appropriate?

20 A    It does.

21       MR. LOTSOFF:  And, Your Honor, I believe that plan is

22 attached for reference as Exhibit E to our motion.

23 Q    What has the company's historical practice been, if any,

24 in paying discretionary awards to participants in business

25 units that didn't hit some or even all of their targets?

1  A    Yes, since 1997, the company's always made discretionary

2  payments to those business units that we felt merited those

3  payments.

4  Q    How did the company's 2008 performance compare to some of

5  its competitors?

6  A    Our performance, generally speaking, I think, is better

7  than our competitors.  We do get revenue data on other large

8  metropolitan newspapers throughout the country.  And I will

9  tell you that by and large, our papers are average or better

10 than average.

11          As I mentioned, 21 of our 23 TV stations actually

12 gained market share in their markets, which is even more --

13 even more noteworthy in a political advertising environment

14 where our stations don't garner a lot of political advertising.

15          So, I think that those two -- those two observations

16 clearly show that our operations are doing better than our

17 peers.

18          The other thing I'd point out is I think there's a

19 lot of media attention called to the profitability of some of

20 the largest newspapers in America.  And in many cases, those

21 large newspapers are losing money.

22          I'll tell you that in 2008, none of our newspapers

23 lost money.  And where we sit today, the first four months of

24 the year, none of our newspapers are losing money.  And I think

25 that's -- one of the reasons why that is is because we

1 implemented so much change in the second half of last year, and

2 really laid the groundwork for transforming this company, which

3 we need to do because it's under a great deal of pressure.  And

4 we are fighting for survival, so, you know, on a relative

5 basis, I think we're doing better than others.

6 Q    Mr. Bigelow, the United States Trustee has argued that

7 there's no need to pay these incentive awards because

8 supposedly no one is going anywhere, I believe is the argument.

9 How do you respond to that?

10 A    I would respond by saying that we are just at the

11 beginning of transforming this business.  And that we need to

12 motivate and incentivize the key people that will implement

13 change.  And it's really important.  I mean we own and operate

14 very important businesses that need to change.  And so I would

15 say that, you know, one of the biggest de-motivating things

16 that could happen is that we don't reward people for their

17 extraordinary effort from last year.  I tell you that that

18 would be very de-motivating.

19        And that we need to, you know, make these payments,

20 incentivize our key people, and continue our effort to, you

21 know, create value for the estate and survive this downturn.

22        In terms of the overall economy, I will tell you

23 we've lost, I think, 15 people in the MIP this year alone, just

24 voluntary separation from the company.  People who have just,

25 you know, moved on to other opportunities.

1          And last year, I think we lost close to 100.  So,

2  these are really good people we're talking about.  These are

3  the best and the brightest of the company and, you know, those

4  people have left voluntarily.

5  Q    And that's out of an MIP population in the neighborhood of

6  700?

7  A    700, 800, yes.

8          MR. LOTSOFF:  May I have one moment, Your Honor?

9          THE COURT:  You may.

10                         (Pause)

11          MR. LOTSOFF:  We have no further questions, Your

12  Honor.

13          THE COURT:  Cross examination.

14                    CROSS EXAMINATION

15  BY MR. McMAHON:

16  Q    Mr. Bigelow, good morning.

17  A    Hi.

18  Q    I'd like to clarify a couple of things about your

19  background.  You're basically a finance guy, would that be an

20  accurate description?

21  A    That would be an accurate description.

22  Q    So, you're not an expert in compensation matters?

23  A    No.

24  Q    You are not an expert in employment trends in the

25  marketplaces in which the Tribune does business?

1  A    Not an expert but certainly as Chairman of the Employee

2  Benefits Committee of Tribune, understand and appreciate

3  compensation generally and retirement, you know, benefits

4  generally at the company.

5  Q    You derive your information from the operation of

6  Tribune's business, correct?

7  A    That's correct.

8  Q    You don't study these matters independent of its affect on

9  Tribune?

10 A    Don't study them, no.  But certainly spend -- have spent a

11 lot of time with Mr. Dempsey, who's in the courtroom, from

12 Mercer, and have spent a lot of time over the past number of

13 years with Hewitt Associates who helps us think about

14 retirement plan design.

15 Q    I want to talk to you about the purpose of the bonuses

16 that are proposed to be paid.  You indicated that there's a

17 reward component, correct?

18 A    That's correct.

19 Q    There's also an incentive component, correct?

20 A    Well, I'd characterize the payment of the award as a

21 reward.  But the principle plan design of our cash incentive

22 plans is to incentivize and motivate people to achieve great

23 things.  And the actual payment of that would be a reward, I

24 would, you know, that's the way I would describe it.

25 Q    Would it be fair to say that the plan has a purpose of

1  retention, as well?  I didn't hear that in your testimony.

2  A    Don't think it has that -- that's not a defined term in

3  the plan.  As I mentioned, a lot of the people in the MIP have

4  left.  So, no, this is a plan that's designed to incentivize

5  and motivate the key folks at the company to work very hard

6  under very challenging situations.

7  Q    Well, in your direct testimony, you indicated that a good

8  number of people north of 100 have left since the 2008 plan has

9  been put in place, correct?

10  A    Yeah, I think the -- I could get you the specific numbers,

11  but I think about 15 have left in 2009.  I think roughly 85 to

12  90 left in 2008.  And then I think, you know, a similar number

13  left in 2007.

14  Q    And these employees left notwithstanding the fact that the

15  company had communicated to them that the 2008 plan was in

16  place, correct?

17  A    Yes, people appreciate that the plan was in place, and

18  they left for, I'm sure, a variety of reasons.  One is they're

19  really good people.  And generally speaking, as I mentioned,

20  our base pay salaries are well below market.  Even if we were

21  to pay these -- pay the MIP, it'd still be well below market,

22  and they're really good people.

23          And I'd also say that there's a lot of uncertainty

24  related to Tribune Company, generally speaking, and has been

25  for a long time.

1  Q    In light of that, I'm trying to understand the company's

2  approach with respect to the motion.  And let me be clear:

3         First, you retained actually two compensation

4  experts:  PricewaterhouseCoopers and Mercer in connection with

5  these plans, correct?

6  A    Yes, PricewaterhouseCoopers was retained early on.  We

7  needed to switch over to Mercer.  Because

8  PricewaterhouseCoopers is our auditor, they would be unable to

9  testify in this Court related to these plans.

10 Q    And with respect to the historical compensation, the

11 review that Mercer did, and I'm referring to the Exhibit A that

12 has been admitted into evidence, did Mercer do an analysis as

13 to whether the years 2006 or 2007 provided for compensation at

14 or below or above market, as the case may be, for the

15 comparable companies referenced in the Mercer report?

16 A    I think that they analyzed that information.  But I think

17 the primary focus was designed to determine what the current

18 compensation package was.  And given the fact that there's very

19 little equity involved in our situation, you know, that was the

20 primary focus.  To discern exactly what the total compensation

21 relative to the market was.

22 Q    And would it be fair to say that you didn't ask Mercer to

23 do like a prior year assessment as to whether the compensation

24 with -- for those given years --

25 A    My primary focus --

1  Q   (Indiscernible - multiple speakers) market?

2  A   My primary focus was on the current situation.  Given how

3  much pressure's on the company, that's -- current pressure on

4  the company, that was my focus and that was our Compensation

5  Committee's focus.  So, we did spend an inordinate amount of

6  time on that information.

7          I mean at the end of the day, that's the question at

8  hand:  How do we motivate and retain people?  How do we

9  motivate and incentivize people today?  And that was, you know,

10 principally what the focus was on.

11 Q   You're proposing to make these payments.  Are they

12 conditioned upon the employee staying with Tribune for any

13 period of time?

14 A   No, they are not.

15 Q   So, in theory, the employee could receive the payment and

16 leave tomorrow?

17 A   Yeah, that could happen.  I will tell you that these are

18 the top managers of the company.  They're very professional,

19 experienced people who have a lot of sweat equity in this

20 situation and who care very passionately about the companies

21 and the assets that we operate.  I'm one of those people.  I

22 don't have any incentives here.  I believe what this company

23 does every day is incredibly important and really ambitious.

24 And that we own, you know, assets that are the voice of record

25 of some of the largest cities in the country that every day are

1  defending the Constitution.  And I think what you'll find as

2  you meet these people is that they're incredibly committed to

3  the situation.

4          But I will tell you that not being rewarded for hard

5  work and hard effort is de-motivating.

6          And so, yes, could that happen?  Certainly could.  I

7  don't expect it to happen.

8  Q    Let me ask you this.  With respect to the 100 or so people

9  that have left since the beginning of 2008, would it be fair to

10 make the same comments about their work quality?

11 A    Yeah.  I think by and large, we've been very pleased and

12 encouraged by the quality of work of all of these people.  You

13 know, you'd have to measure each and every circumstance to

14 appreciate exactly why someone may have left.  But I can tell

15 you that the 600 to 700 people that are here and staying have

16 a, you know, really deep rooted passion to see that the company

17 succeeds.

18 Q    In the Mercer report, did Mercer opine as to whether the

19 proposed bonus payment for --

20          MR. McMAHON:  Well, let me strike that question.  Let

21 me start again.

22 Q    We're talking about a 2008 plan under which some business

23 units met their targets, correct?

24 A    That's correct.

25 Q    And other business units did not.

1 A    That's correct.

2 Q    And for those businesses that -- units that did not, the

3 company exercised its discretion to award certain payments

4 after the fact, notwithstanding the fact that performance was

5 not a target, correct?

6 A    Yeah, per the terms of our longstanding plan, we have the

7 discretion to make or, in this case, seek approval to make

8 payments on a discretionary basis.

9 Q    So, the purpose of this plan really is historical to

10 compensate employees for past performance, correct?

11 A    Yeah, I think in the normal ordinary course, these types

12 of plans are designed to do that.  And normally the payment for

13 these -- these -- the particular plan would be made much closer

14 to the actual, you know, period of time that's being measured.

15 For example, normally these payments would be made in February.

16 Because of our situation, you know, here we are in May talking

17 about those payments.  And I think as a result of the timing,

18 it takes on a slightly different, you know, construct.  Yes, we

19 are rewarding people as part of an incentive plan for 2008 for

20 extraordinary effort.

21        In addition, though, we need to ensure that this

22 group of people is motivated and focused.  And I can't think of

23 another -- you know, a larger de-motivating factor if you go to

24 them in the middle of the year and say, "guess what, guys, all

25 that stuff you did to really save the company last year that

1  I'm asking you to do again this year, and I'm probably going to

2  ask you to do again next year, and the year after because of

3  all the challenges this industry faces, guess what?  I'm not

4  going to pay you for that."  That, in my mind, is pretty de-

5  motivating.

6  Q    Well, to be clear, sir, at the beginning of this, the

7  employees understood that the awards were conditional, correct?

8  A    Say that again?  Sorry.

9  Q    At the beginning of the 2008 process, the employees

10 understood that the awards were conditional, correct?

11 A    Absolutely.  I mean people appreciate that, you know,

12 because of where we are, we needed to work very hard with the

13 official Committee, very hard with the Steering Committee,

14 clearly we need to make, you know, a case here to the Court.

15 And as a result, we've got to thread all those needles before

16 anything can get paid.

17          And I can tell you that there's a great deal of focus

18 on this day.  These employee matters are very important.  And

19 people are focused and interested clearly.

20 Q    Is it your view that if the company doesn't make these

21 payments that the lights are going to go out at the Chicago

22 Tribune, at the Los Angeles Times, and other places?

23 A    It's my view that I just don't want the papers to get out.

24 I want to make this company better.  I want to make the

25 products better.  You know, if the papers just get out, if you

1  will, I think that our chances of survival get less, and less,

2  and less.  We need to transform the company.  And the only way

3  we can do that is if this group of people works very hard to do

4  so.  We need to figure out a way to mitigate all the revenue

5  trends, figure out a way to make the products more efficiently.

6         So, you know, will the paper get out tomorrow?  Yeah.

7  But we need to maximize value.  We need to create change.  And

8  the only way you do that is you motivate people and incentivize

9  people.

10 Q    Well, did Mercer opine as to whether adding the bonus to

11 the base compensation for these people would be sufficient to

12 elicit such performance?

13 A    (No verbal response)

14 Q    I mean, let's be --

15 A    I -- listen, I think that even in -- even making the

16 payments, you know, our relative pay is low.  You know, I think

17 at some point, we do need to address the fact that there is no

18 equity value for these key employees -- employees.  And, you

19 know, hopefully that's something that we'll be able to work

20 with with you all in the future on.

21        But where we sit today, my sense is we've got to make

22 this payment just to get people closer to average.  And then we

23 need to work long term with all of our key constituents to

24 figure out a way to, you know, get everyone to average.  So,

25 this is, you know, step one in my view.

1  Q    So, to be clear in response to my prior question, it's not

2  a lights out issue.  It's a quality issue, correct?

3  A    I think that -- you know, it's not that black and white,

4  with all due respect.  I mean I think that we have a very

5  important company that has a wonderful portfolio of assets

6  that's confronted with some very difficult challenges.  And we

7  need a motivated workforce.  We need an incentivized workforce.

8  You know, that's how I'd answer that question.

9  Q    In Paragraph 39 of your motion, you referenced the fact

10  that even with the awards, based upon Mercer's sampling, that

11  the salaries will be 41 percent below market, correct,

12  approximately?

13  A    Yes.

14  Q    Did the company ask Mercer to opine as to whether the

15  proposed awards would be sufficient to elicit the -- I guess

16  additional productivity from its employees?

17  A    Perhaps not specifically.  But I think that all of our

18  business judgment collectively, everyone involved, the Official

19  Committee, the Steering Committee, all the key managers of the

20  company believe that this type of payment is motivational.  And

21  that we, you know, can build off of this payment, and to

22  continue to motivate and incentivize people.  And, you know, I

23  hope to be before the Court in the not too distant future to

24  talk about a 2009 incentive plan.

25           But this is -- this is an important step towards, you

1  know, keeping our key employees motivated.

2         MR. McMAHON:  Your Honor, I don't have any further

3  questions.

4         THE COURT:  Any redirect?

5         MR. LOTSOFF:  No, Your Honor.  Thank you.

6         THE COURT:  Thank you, sir.  You may step down.

7         MR. BIGELOW:  Thank you.

8         MR. LOTSOFF:  Your Honor, if I may, we have a short

9  proffer of testimony from a Mercer representative.  I estimate

10 it won't take more than five minutes.

11        THE COURT:  Go ahead.

12        MR. LOTSOFF:  If called as a witness, John Dempsey

13 would testify as follows:

14        Dempsey is a principal with Mercer U.S., Inc.  He has

15 been a principal with Mercer for the past nine years.

16        Mercer is a worldwide professional services firm that

17 provides clients with a broad range of human resources,

18 consulting, and outsourcing services.

19        One of Mercer's core service offerings is providing

20 compensation consulting, including the analysis, design and

21 implementation of a broad range of compensation and benefits

22 programs, including incentive compensation programs.

23        Mr. Dempsey has over 20 years of experience in this

24 field, including designing and analyzing incentive programs,

25 and other compensation, and benefits programs to determine

1 whether they are reasonable and competitively market based.

2       Mr. Dempsey also has substantial experience in

3 performing such services for companies undergoing Chapter 11

4 bankruptcy proceedings.

5       He's done so for approximately 10 companies over the

6 past eight years, as well as for other companies that were

7 preparing for possible bankruptcy filings.

8       Tribune Company, under the leadership of the

9 Compensation Committee of its Board of Directors retained

10 Mercer to provide an independent review and analysis of the

11 proposed 2008 MIP payouts that we're here for today.  Mr.

12 Dempsey led this analysis and review, and in doing so, Mercer

13 benchmarked the company's proposed payouts against practices,

14 both for peer companies in the media industry, and that would

15 be both publishing and broadcasting and entertainment, as well

16 as companies in Chapter 11 proceedings.

17       Mercer's analysis and conclusions are set forth in a

18 report dated April 17, 2009, which was submitted in support of

19 the company's motion.

20       On behalf of Mercer, Mr. Dempsey concluded that the

21 requested 2008 awards are within reasonable market ranges, and

22 are a common form of compensation, both for companies in the

23 company's industry, and for companies in Chapter 11 in order to

24 incentivize and motivate performance.

25       Mr. Dempsey also concluded that the proposed MIP

1  payments are reasonable in size.  As you've heard, the median

2  award is approximately $9,500.  84 percent of the individual

3  awards are under $30,000, and over 70 percent of the awards are

4  below $20,000.

5         Mr. Dempsey also determined, as you've heard, that

6  the participants will remain undercompensated relative to the

7  market, even with the requested payments.  But will be even

8  more profoundly undercompensated without them.  Specifically,

9  and this is at Page 8 of Mercer's report, "Due to the lack of

10 any long-term incentives, the participants' total compensation

11 will be 41 percent below the market median even with the

12 proposed payouts that we're seeking here today.  And absent

13 those payments, the total compensation of the participants

14 would fall 53 percent below the market median."

15        The proposed MIP payouts are also consistent with

16 industry practice of 2008.  As indicated on the last page of

17 Mercer's report, eight of nine media companies that had

18 released proxies as of mid-April paid bonuses to named

19 executive officers ranging from 20 percent to 100 percent of

20 target.  And it's typical that if bonuses are paid to named

21 executive officers, they are also paid to others further down

22 in the organization.

23        Since that time, a ninth media company, C.C. Media

24 Holdings, has also announced payments of cash incentive

25 bonuses.

1           Tribune Company's proposed payout percentage for the

2   2008 MIP payments is squarely within this reasonable market

3   range.

4           THE COURT:  Does anyone wish to examine Mr. Dempsey?

5                   (No audible response heard)

6           THE COURT:  I hear no response.  Does the debtor have

7   anything further in support of its motion under Number 5 of the

8   agenda?

9           MR. GOLD:  Your Honor, we have no further testimony

10  on Number 5.

11          In the interest of time, I didn't know if Your Honor

12  wanted to entertain any closing remarks with respect to that

13  issue, or move on to the severance, understanding your

14  calendar?

15          THE COURT:  How do you intend to address the

16  severance motion?

17          MR. GOLD:  I'm sorry, Your Honor?

18          THE COURT:  How do you intend to address the

19  severance motion from an evidentiary --

20          MR. GOLD:  Our intent was to present additional short

21  testimony of Mr. Bigelow, probably about 10 minutes, Your

22  Honor, that would be a guess, without adding whatever cross

23  examination may add to that.

24          THE COURT:  I'm going to ask you to come back at 2

25  o'clock for that motion.

1        MR. GOLD:  Very good, Your Honor.  Can we proceed to

2   address the --

3        THE COURT:  I'd like to conclude that matter now,

4   yes.

5        MR. GOLD:  Okay.  Your Honor, if it please the Court,

6   Your Honor, with respect to that, and with all due respect to

7   the United States Trustee's objections, we -- this company is

8   not peddling shoes, it's not merely trying to keep the lights

9   on.  It's not really just trying to print the newspaper the

10  next day.  And respectfully, we don't believe that's the

11  standard by which the Court ought to judge whether these

12  payments are warranted.

13       It's not a quality issue either.  It's not a

14  difference between whether we have a better quality newspaper,

15  or a better quality product.

16       As Mr. Bigelow indicated, this is about transforming

17  a company in an industry that is under fire, under tremendous

18  adversity, and is fighting, like every media company, for its

19  survival.  These proceedings are evidence of that.

20       And what's needed when you transform a company is to

21  incentivize and motivate.  And those aren't just buzz words,

22  Your Honor, in this instance.  Those are real things that are

23  happening every day at every operating subsidiary of this

24  company for people to get the job done, not to get just the

25  paper out the door, but they've got to do that, as well.  But

45

1  to transform the company and do the kinds of things that they

2  did in 2008 by -- as Mr. Bigelow indicated, with $425 million

3  of savings and other significant accomplishments that are

4  detailed in our motion in order to make this happen.

5          And it would have a profound and distressing affect

6  on this workforce, in terms of moral and disincentivizing the

7  workforce, and being a significant obstacle to this company

8  accomplishing those very goals.

9          The -- we feel we've met that standard abundantly.

10  What we're asking for here in terms of reasonableness of

11  payments, as you compare it from this year to last year, as

12  you've heard the testimony is half of basically what was paid

13  in 2006, a significant reduction of what would have been paid

14  in 2007.  And even then, with those payments, these individuals

15  are below market in terms of their compensation with the

16  payments.  Without the payments, they are 50 percent below the

17  median.  The way I think of it, Your Honor, about 25 percent is

18  where they fall on the range in terms of market even with these

19  payments being made.

20          So, we aren't asking for significant payments to

21  enrich these people.  We're asking, if you will, for the bare

22  minimum to continue to incentivize and motivate them.

23          We aren't asking with respect to the top 10 here

24  today.  That's not part of the motion.  And perhaps most

25  significantly, Your Honor, in addition to hearing from Mr.

1  Bigelow and his perspective on this, you've heard from the

2  creditor constituencies.  It is highly unusual, not just to

3  hear from them, but to hear from them in the way you did.  And

4  to hear from them in terms of their interests are going to be

5  obviously diluted, if you will, if these payments come ahead of

6  them when they don't have any right to come ahead of them.

7  They've made the business judgment, and they are -- they're

8  formed, as Your Honor is well aware, in order to provide the

9  Court with that perspective, and make that business judgment on

10  what's necessary, and I use that term advisedly, necessary to

11  keep this business going.  And, again, not just to put

12  tomorrow's paper out, not just to put out a good paper

13  tomorrow, but to do what's necessary for this company to

14  maximize the value in the returns to those constituencies, and

15  to maximize the long-term prospects for this entity.

16         With that, Your Honor, I think we've abundantly met

17  the standard that the U.S. Trustee has argued.   I think we've

18  -- to the extent this is an ordinary course payment, and we

19  believe that it can meet that standard, obviously, as well, we

20  think Your Honor can really choose what legal standard that you

21  believe is applicable here.

22         But in any event, we think we've met it beyond the

23  standard.

24         Let me just touch on a couple of things that I

25  thought the Trustee was trying to adduce in terms of his

1  testimony just to anticipate them, as well.  I thought he was

2  trying to establish a paradigm that people have left before,

3  now people will leave now.  People before had the incentive,

4  people now could leave with an incentive.  Certainly people

5  could leave with the incentive, and we're not arguing about

6  retention here, Your Honor.  Retention may be an ancillary

7  impact.

8          But we're talking about payments that continue to

9  motivate and incentivize the people who choose to stay.  And

10 that's what this is about.

11         We think that this is, as was pointed out, a

12 conditional program.  Certainly it's a conditional program.

13 But it defies logic to think that people don't have reasonable

14 expectations even with a conditional program when they've

15 accomplished what they've accomplished, as detailed by Mr.

16 Bigelow, in the prior year.

17         So, the fact that it's conditional or a certain

18 program makes no difference in terms of what's happening out at

19 the subsidiaries, out at the operating entities when you talk

20 about what real people's real expectations are.  And as I said,

21 these expectations are rather modest, both in the context of

22 the Tribune's own history and the context of the industry at

23 large.

24         And with that, we respectfully request Your Honor

25 grant this motion.

48

1          THE COURT:  Thank you.  Let me hear from the

2   Committee, if it wishes to be heard, and the Steering

3   Committee, if it wishes to be heard, before I go to the U.S.

4   Trustee.

5          MR. LeMAY:  Your Honor, David LeMay again for the

6   Official Committee of Unsecured Creditors.

7          I think all I want to do while I'm up here now is to

8   briefly think about with you the distinction that's been

9   brought out a little bit this morning between, on the one hand,

10  simply keeping people in their jobs and simply keeping the

11  lights on versus truly motivating them.

12         And in that connection, I'm reminded of an anecdote.

13  When I was in law school, I studied the Soviet legal system.

14  And I remember the professor talking about the fact that in the

15  Soviet Union, of course, there was lifetime job security.  It

16  wasn't a question of people going anywhere.  But nevertheless,

17  it was a profoundly disaffected and a profoundly alienated

18  workforce.  And the maxim that the Soviet employees through all

19  levels of the organization would use about their jobs is that

20  they would say they pretend to pay us and we pretend to work.

21  And that is the situation, Your Honor, that I think Tribune

22  Company is here to try to avoid today.  The Creditors'

23  Committee would like to assist them with that.

24         Thank you, Your Honor.

25         THE COURT:  Thank you.

49

1           MR. SCHAIBLE:  Your Honor, Damian Schaible of Davis

2   Polk.

3           I would just second all of the arguments that were

4   made by the company and by the Creditors' Committee, rather

5   than taking up more of your time, but thank you.

6           THE COURT:  Thank you.  Mr. McMahon?

7           MR. McMAHON:  Your Honor, good morning.  Very

8   quickly, again, the applicable standard in our view, given the

9   timing of the payment relative to when it was put in place is

10  that this is a doctrine of necessity issue primarily.

11          And as the Third Circuit noted in the <u>Lehigh</u>

12  <u>Northeast Railroad</u> case, quoting the reorganization court from

13  Penn Central said this about the doctrine of necessity, "All

14  else aside, the necessity of payment doctrine by its very

15  nature depends for its applicability upon the economic

16  realities of the marketplace, and the dominant or subservient

17  positions of the parties."

18          We're all familiar with the cases, what they say.

19  <u>Just For Feet</u>, Judge McKelvey's decision being the prime

20  example.  Can't run a sneaker store without having sneakers in

21  stock, that's what a payment absolutely, essential, and

22  critical to the reorganization is.  And, therefore, now we come

23  to this record.

24          Notwithstanding the stated views of the parties in

25  interest, the bank group, the Committee, the debtors, they

1  certainly employed in their presentation the touch words that

2  we normally hear in connection with these types of

3  presentations.  Profound affect on morale, productivity, that

4  type of thing.

5          What the evidentiary case needed was causation.  And

6  what we haven't heard is that paying the 2008 bonuses at this

7  juncture, six months into the reorganization cases nearly is

8  going to actually -- is necessary, is critical to keeping the

9  lights on, to keeping the Tribune Company and its debtors

10 operating.

11         And that is essentially what's missing from the

12 evidentiary record.

13         I asked Mr. Bigelow about what he could tell us about

14 2006 and 2007 relative to that point.  And I don't think that

15 we got a fair answer with respect to that.

16         But more than that, with respect to 2008, Your Honor,

17 I think it's important to note that there are some facts here

18 which, looked at a bit differently from the way in which the

19 debtors would have us view them, might lead to a different

20 conclusion.  The debtors themselves offered in their direct

21 presentation that, you know, 100 or so people left the

22 Tribune's employ.  And certainly while people leaving the

23 employ of a company is not necessarily an unusual thing, to the

24 extent that enhanced compensation is designed to keep people

25 working at a high level for the Tribune, I think what the

1  critical thing here is that the -- you know, the payments, even

2  for -- as proposed for 2008, weren't enough to incent people to

3  remain with Tribune and perform at a high level, that that's --

4  that's one issue.

5          The other issue is, Your Honor, from the standpoint

6  of the Mercer report itself, it never -- the company apparently

7  did not ask Mercer, and you will not find that in the report,

8  that Mercer actually did some type of causal link between --

9  analysis between giving the employees this extra piece on top

10  of base salary and obtaining certain results.

11          And, Your Honor, I would note that notwithstanding

12  the fact that the company did establish certain criteria and

13  offered this incentive compensation and target to create

14  results for 2008, putting that aside, the company didn't reach

15  targets.  They didn't accomplish their goals.

16          And while the debtors certainly cite that there may

17  be a number of factors associated with that, certainly one

18  might inquire based upon this record whether or not the absence

19  of sufficient incentives, in terms of employee compensation,

20  contributed to the fact that performance targets were not met,

21  leading to the need for the debtors to ask this Court to have a

22  discretionary award approved.

23          So, from our perspective, Your Honor, this is a

24  burden of proof case.  And it's -- the burden is on the

25  debtors.  And from our perspective, Your Honor, it really is a

1  lights on/lights out issue.

2          And I don't think that the debtors have met their

3  burden insofar as demonstrating that these payments are

4  essential, critical, necessary to keeping the Tribune operating

5  in good performance.

6          Thank you.

7          THE COURT:  Thank you.  I'm prepared to make my

8  ruling.  I'm going to grant the relief that's been requested,

9  and I will explain why.

10         I do agree with the debtor, it doesn't matter what

11 standard I apply, whether it's a business judgment standard,

12 it's a 503(c)(3) standard, which is business judgment plus.  In

13 my view, I don't believe this is subject to the doctrine of

14 necessity.

15         While it is a payment based upon prepetition

16 performance, I don't view it as a payment of a prepetition

17 debt.  It is a payment that the company has proposed to make

18 now, yes, with respect to past performance, but to which it

19 believes the covered employees are presently entitled.

20         The record here amply supports the award of this

21 relief, the grant of this relief.  The plan is consistent with

22 the company's historical practices.  It's not unreasonable in

23 any respect.  Indeed, the record clearly indicates that it's

24 below market.  You look at the industry, and considering the

25 debtors' place in the industry in which it's trying to survive

1   and transform itself in what are truly extraordinary times, and

2   you compare that to what's proposed to be paid in relation to

3   its revenue.  The major creditor constituencies are supportive,

4   others have not objected.

5          And when I say this, I'm careful to inform the U.S.

6   Trustee, and while nobody else said it, the fact that the only

7   objecting party has no economic skin in the game is not

8   relevant to me.  I appreciate the U.S. Trustee's role in this

9   and other matters.  But it doesn't mean it's not important that

10  the major creditor constituencies are supportive, and here they

11  are.

12         Mr. McMahon, I will tell you, and you appear enough

13  in front of me that you know I seldom editorialize from the

14  bench.  I find that as a judge it's generally an unwise thing

15  to do, but I'm going to do so now, and I'll explain why.

16         When Congress passed BAPCPA and included the new

17  provisions of 503, it was in response to what were perceived

18  abuses by debtors in possession in paying bonuses to managers,

19  particularly top managers.

20         Despite what others may say or think, courts,

21  including this one, have made every effort to be true to the

22  congressional intent in applying the new provision.  And as I

23  said before, I appreciate specifically the U.S. Trustee's role

24  and involvement in requests for relief for bonus and incentive

25  plans.  Because often when all of the other constituents come

1 into court holding hands, the U.S. Trustee is the only voice to

2 point out weaknesses or flaws in what's being requested.

3        But I have to tell you, unless the U.S. Trustee was

4 surprised by the record that was made here today, I have to

5 tell you I think your office made a very poor choice in

6 objecting to this plan.  Your cross examination, I think,

7 helped the debtor immeasurably.  And that's not a criticism of

8 the quality of the direct exam.

9        I just -- I'm really baffled, truly, at why the U.S.

10 Trustee would pick this plan to object to.  This is one of the

11 strongest records I've yet had in support of a bonus plan.

12        But maybe in some respect, it's not unlike any other

13 matter in the Bankruptcy Court.  Everyone is entitled to have

14 their say, and the Court is grateful that that's how the

15 process works usually.  I just ask that the U.S. Trustee

16 exercise better judgment in the future with respect to such

17 plans.  I just have this feeling that you find yourself in a

18 box and just keep looking at the same things and fail to

19 recognize the circumstances in which we now find ourselves in

20 the world today.

21        I've been reminded by your office that standards

22 don't change.  No, they don't, unless Congress tells us to

23 change them.  But circumstances change.

24        All right.  I'm finished.  At this point, we'll take

25 a recess.  I have other matters to take up.  We'll consider the

1   remaining motion at 2 o'clock today, or as close as we can get

2   to it based upon my calendar.

3            Court will stand in recess.  I'll consider a form of

4   order for this motion at that time.

5            (Recess 11:18 A.M./Reconvene 2:05 P.M.)

6            THE COURT:  Good afternoon.

7            MR. GOLD:  Good afternoon, Your Honor.  Brian Gold on

8   behalf of the debtors for Tribune.

9            Your Honor, first of all, thank you for accommodating

10  us on your schedule this afternoon.  I appreciate it very much.

11           Just to continue with the severance motion.  What I'd

12  first ask Your Honor is if we could hear from Mr. LeMay briefly

13  for a minute or two to express the creditor constituency

14  support of this motion.  And then we'll go right into direct

15  testimony again of Mr. Bigelow.

16           THE COURT:  Very well.

17           MR. GOLD:  Thank you.

18           MR. LeMAY:  Thank you, Your Honor.  David LeMay for

19  the Official Committee of Unsecured Creditors.

20           Much of the Committee's thinking behind the severance

21  motion is quite similar to the thinking that went into the

22  motion concerning the 2008 MIP.  And we can all agree that

23  perhaps some of the legal positions or principles are a little

24  bit different, and different issues come into play.

25           I wanted to talk a little bit about the Committee's

1  assessment of this motion as a business matter.  Because I

2  think that's the prospective that the Creditors' Committee most

3  uniquely brings to the Court.  And I guess a few observations

4  in that regard:

5          One, you'll hear from the debtors as to the legal

6  justification, you'll hear the evidence.  Some of the things

7  the Committee thought about, though, when it, as a group of

8  businessmen and businesswomen went through this motion were the

9  following:

10         One, looking at the current workforce, a lot of the

11 Committee members felt that this is obviously a stressful time.

12 There is a post petition severance plan in place.

13         But nevertheless, from the point of view of the sort

14 of mainstream of the workforce, people can understand a harsh

15 environment.  And they realize that they're in a harsh

16 environment.

17         What the Committee thought that the employees thought

18 would be very disruptive and very perplexing was not so much a

19 harsh environment, but what was perceived to be an arbitrary

20 one.  And so this motion that the debtors are bringing before

21 you, from the Committee's point of view, is designed to remedy

22 either the reality or the perception of an arbitrary result

23 based on some timing factors.  You'll hear the full background

24 from the debtors, but that's the business issue that the

25 Committee thought about.

57

1         The second thing, I guess, that went into this is

2  that media companies are funny.  They get an undue amount, or

3  perhaps at least a lot of media scrutiny.

4         THE COURT:  The victims of their own success.

5         MR. LeMAY:  Victims of their prominence, I suppose.

6  And one of the things the Committee has noticed from the

7  inception of this case is that matters, and in particular

8  employee matters, get a lot more public play than if this were

9  a widget company.  And so the Committee's position on this

10 motion is reactive to that.

11        Finally, Your Honor, I --

12        THE COURT:  I'm sorry.  Tell me what that means.  So,

13 it gets public play.  Tell me --

14        MR. LeMAY:  Okay.  From --

15        THE COURT:  Tell me why that's a factor.

16        MR. LeMAY:  It is a factor --

17        THE COURT:  Because a lot of cases I see --

18        MR. LeMAY:  Right.

19        THE COURT:  -- get public play.

20        MR. LeMAY:  From the Committee's point of view, press

21 stories that sort of highlight the poignancy of employees or

22 former employees being left out in the cold, disadvantaged, you

23 know, pick your metaphor adjective, are not good for the

24 business, are not good for reorganization --

25        THE COURT:  Okay.  What traditionally we might call

1  bad press.

2         MR. LeMAY:  Bad press.  The final thing, I just

3  wanted to -- and I've already covered this once, I'm not going

4  to say it a whole lot longer.  I totally get Your Honor's

5  thinking about why a severed employee who is subject to a

6  collective bargaining agreement might stand in slightly

7  different legal shoes from a severed employee who was not

8  covered by such an agreement.  I completely understand the

9  Court's line of thinking there.

10        Again, I think what I'm supposed to do is bring to

11  you a business perspective from my clients.  And my clients'

12  business perspective is that that -- anything that engenders at

13  this stage of the case, what I referred to this morning as

14  class warfare, is, A, not good for the business as a business.

15  And, B, will not be good for the plan negotiation process,

16  which we're about to embark on.

17        We envision that really the plan process is about to

18  start, end of May, beginning of June is the timing we're been

19  talking about.  There's a lot of issues and some preliminary

20  issues that have to be gotten through.

21        But one thing the Committee was keen to do was to

22  make sure that a negotiation over several billion dollars of

23  reorganization value not be gummed up, if you will, Your

24  Honor, by ancillary issues.  So, those are the business

25  perspectives.

1          I think what I'll do is let the debtors make their

2   case.  And then if I have some astonishing piece of legal

3   insight to add, I might ask to stand up again.  But I think

4   maybe at this point, it would be good for -- unless others want

5   to speak, and perhaps Mr. Schaible does, for the debtors to

6   make their case on the law and the facts.

7          THE COURT:  All right.

8          MR. LeMAY:  Thank you, Your Honor.

9          THE COURT:  Thank you.

10          MR. SCHAIBLE:  Your Honor, Damian Schaible with Davis

11  Polk.  Nothing from me.

12          THE COURT:  Okay.

13          MR. SCHAIBLE:  I agree fully with what the Creditors'

14  Committee counsel suggested.

15          THE COURT:  All right.  Thank you.

16          MR. LOTSOFF:  Good afternoon, Your Honor.  Jonathan

17  Lotsoff on behalf of the debtors.

18          At this time, we'd like to call Chandler Bigelow to

19  the stand.

20          THE COURT:  All right.  Mr. Bigelow, you may be

21  seated.  And you should consider yourself as still being under

22  oath.

23          MR. BIGELOW:  Thank you, Your Honor.

24      CHANDLER BIGELOW, DEBTORS' WITNESS, PREVIOUSLY SWORN

25                       DIRECT EXAMINATION

1 BY MR. LOTSOFF:

2 Q    Mr. Bigelow, the company has filed a severance motion

3 seeking authority to pay about $2.6 million in severance to 70

4 employees who were laid off prior to the Court's order

5 authorizing a going forward post petition severance plan.  And

6 to reimburse $1,500 in spousal health premium surcharges that a

7 labor arbitrator found improper to three union employees who

8 were also laid off prepetition, is that your understanding of

9 the motion that we're here on today?

10 A    Yes, it is.

11 Q    Okay.  What was the company's severance practice

12 prepetition?

13 A    Generally speaking, the company paid up to two weeks'

14 salary for each year that an individual had worked at the

15 company.  Obviously there were also individual agreements with

16 certain individuals over the course of time.  But generally

17 speaking, it was an up to two weeks pay policy.

18 Q    And in some cases, was severance paid lump sum, and in

19 other cases through salary continuation?

20 A    That's correct.

21 Q    How long, to your knowledge, has that practice been in

22 effect?

23 A    That practice has been in effect ever since I've joined

24 the company, which is more than 10 years.  And I think it was

25 even in practice before that.

1  Q    And the 70 employees that we're here to talk about today,

2  were these among the employees, the broader group of employees

3  that were laid off during 2008?

4  A    That's correct.

5  Q    Approximately how many employees in total were laid off in

6  2008?

7  A    Approximately 2,000.

8  Q    And with respect to the 70 employees that are at issue,

9  had some of them already been receiving severance payments

10 through salary continuation?

11 A    That's correct.

12 Q    This is prior to the petition date when those payments

13 were ceased?

14 A    Yes.

15 Q    And were there others who were scheduled to receive lump

16 sum payouts?

17 A    Yes, people who were severed very close to the filing date

18 were scheduled to receive payments, but those payments were not

19 made.

20 Q    And the other 2,000 or so employees that you mentioned

21 earlier who were also laid off, did all of those employees

22 receive their severance payments in full?

23 A    That's correct.

24 Q    And so these 70 that we're here to talk about today are,

25 in a sense, those who were unfortunate enough to be not only

1  laid off, but laid off close to the petition date?

2  A    That's correct.

3  Q    How many years of service collectively to the company do

4  these 70 employees have?

5  A    Well, the average service for the 70 people was north of

6  20 years.  So, probably in the 15 hundred years range.

7  Q    And can you give us some sense as to who these people are

8  that we're talking about?

9  A    It is a wide variety of different people.  There are union

10 folks, nonunion folks, there is the former publisher of one of

11 the newspapers, but there are a number of other folks who had

12 administrative assistant positions, folks that worked in the

13 plant.  So, it was a wide ranging group of people.

14 Q    And have other prepetition severance related benefits for

15 this same group of 70 already been approved by this Court?

16 A    Yes, salary -- healthcare continuation benefits.

17 Q    And are those benefits part of the severance package that

18 one would have received under the prior severance package?

19 A    Yes, that's correct.

20 Q    Now, with respect to the $1,500 in spousal health benefit

21 surcharges for which the company seeks to make reimbursements,

22 are you aware that the company charged a $75 per month

23 surcharge to certain unionized employees if their spouse had

24 coverage available under another employer's plan?

25 A    Yes.

1  Q    And did the union file a grievance alleging that those

2  surcharges violated the applicable collective bargaining

3  agreement?

4  A    That's correct.

5  Q    And do you know how the arbitrator ruled on that?

6  A    The arbitrator ruled in favor of the union, and we need to

7  settle up on that score.

8  Q    By making reimbursements?

9  A    Yes, exactly.

10 Q    Have the current union employees, those who are still

11 employed by the company, have they received their

12 reimbursements?

13 A    Yes, that's correct.

14 Q    And the three remaining employees that we're talking about

15 today were terminated prepetition.  So, I take it they have

16 not?

17 A    That's right.

18 Q    Mr. Bigelow, can you tell us why does the company seek to

19 make all of these payments that we're here to talk about today?

20 And why does the company believe that they're so important to

21 make?

22 A    Well, I think as we've discussed throughout the day,

23 employees are a very valuable, important asset of the company.

24 We -- the company respects its employees, respects their

25 contributions to the company.  We respect our commitments to

Bigelow - Direct                          64

1  them.

2          In the case of this particular group, we know there's

3  some financial hardship amongst the group.  That hardship and

4  that financial burden, I think, is even more difficult to

5  swallow in the context that everyone else was paid in 2008.

6  It's a very small group of people.  And that burden and

7  hardship has garnered a lot of attention from obviously the

8  company, myself, the senior management of the company, the

9  Official Creditors' Committee, the Steering Committee, unions,

10 other employees.  We've had a considerable amount of dialogue

11 with all those constituents about this group.  In fact, one of

12 the people -- you know, one of the 70 showed up at our

13 345 (sic) hearing and was there and present.

14         And so I think in the context of all of that, we

15 really want to do the right thing.  People are -- you know, the

16 employee group, the employee basis is obviously paying

17 attention to this.  And it's the type of thing that I think if

18 we weren't to be able to pay, would garner a lot of attention

19 and speculation that the company is in a position not to honor

20 its commitments.

21         So, I think all of those reasons are why we think

22 it's important to make these payments.

23 Q   And with respect to your concern about the perception that

24 the company doesn't honor its commitments, is that something

25 that extends not only to the former employees that we're here

Bigelow - Direct                           65

1  today to talk about, but also to the current employee

2  population?

3  A    Yeah, I think that's right.  I think that in many cases,

4  you've got 70 people that work throughout the company.  And

5  obviously, you know, made a great deal of contributions to the

6  company.  And I think current employees are looking at this as

7  just the way former employees are. That this is an important --

8  you know, an important phase of the case.  As I mentioned this

9  morning, any sort of distraction at this point for our employee

10 base is not helpful.  And I think that if we were not able to

11 make the payments, we would cause more distraction, more

12 tension, more uncertainty.

13 Q    There but for the grace of God go I, if you will.

14 A    Yes, yes.

15 Q    Now, do you have any concerns about the prospect of paying

16 only the unionized members of the already distilled subset of

17 70 while not paying the severance obligations to the remainder

18 of that population?

19 A    Yeah, I do.  I think that we've already split a very small

20 piece of this population.  You know, again, we severed nearly

21 2,000 people last year to help try and mitigate all the

22 pressures I discussed this morning, and all of those people

23 were paid.  And we've got this small subset of 70, some have

24 been paid something, but others have been paid nothing.  And I

25 think we've already bifurcated the group a bit.  I think at

1  this point to even,  you know, slice it even further, I'm not

2  sure is something that we ought to consider.

3          My view is, you know, you're talking about maybe

4  three percent of the population here that unfortunately, due to

5  timing, we're unable to pay at this point.  And so I think

6  we've already sort of, you know, put that small piece aside to

7  begin with.

8          So, I don't think splitting it again would be in our

9  best interest.

10 Q   And with respect to the possibility of creating a reserve

11 and paying these amounts, but making the 70 proposed recipients

12 wait for some indeterminate period of time, do you have any

13 concerns about that?

14 A   Well, it's a creative idea.  I think, though, what I'm

15 here to tell the constituents and the Court is that in certain

16 cases, some of these people need the money now.  And I'd like

17 to try and move forward with that and take care of that.  So,

18 that -- it's my perspective of the matter.

19          I think that, again, trying to take care of the 70 in

20 the context that we took care of 2,000 is something that is

21 good for the estate, it's good for the company, good for

22 morale.  And it's just one last distraction that we need to be

23 focused on as we look to try and transform the business.

24 Q   Mr. Bigelow, there was reference to the approved post

25 petition severance program that's currently in place.  Why, in

1  your view, would that not provide adequate protection to

2  address the concerns that you've articulated?

3  A    Well, I think it obviously provides the protection.  But

4  my only concern is that the technicalities of bankruptcy, the

5  nuances of bankruptcy, as Mr. LeMay pointed out, are often

6  times not fully appreciated by, you know, a very large, diverse

7  employee base.  And I think that while I appreciate those

8  protections in place today, I think that if we were not to be

9  able to move forward with paying these 70, the quick headlines

10  in the press would be that the company is not honoring its

11  severance commitments.  And that that message and that theme, I

12  worry, would, you know, permeate its way through the

13  organization.  Notwithstanding the fact that clearly we do have

14  those protections --

15          THE COURT:  I suspect the headline is going to read,

16  "Bankruptcy Court blocks debtors efforts to meet its severance

17  obligations."

18                        (Laughter)

19          THE WITNESS:  It might.

20          MR. LOTSOFF:  Of course we hope that's not the

21  headline.

22          THE COURT:  Forgive me for interrupting.  Please

23  continue.

24          MR. LOTSOFF:  No further questions, Your Honor.

25          THE COURT:  All right.  Cross examination.

1          MR. McMAHON:  None, Your Honor.

2          THE COURT:  Thank you, sir.  You may step down.

3          MR. BIGELOW:  Thank you, Your Honor.

4          MR. GOLD:  Your Honor, I don't think I have a lot to

5   add to what Mr. Bigelow testified about.  I think there's

6   really sort of two parts of this:

7          One part is the impact on these three percent of

8   2,000 people kind of caught in the middle.

9          And the equitable issue of the company's interest,

10  the creditor constituency interest, the logical interest in

11  wanting to take care of them and, if you will, do the right

12  thing by them.

13         I would sort of respectfully state that generically,

14  not with reference to my client or with reference to the

15  creditors' constituency, that's usually not what causes people

16  to get up before Your Honor and ask for this kind of relief

17  when people have economic interests that go the other

18  direction, as is the case in some sense is the Trib itself, and

19  the creditor constituency.

20         So, what -- you know, what the second part is really

21  the critical part, I think, for the Court to consider.  And

22  that is there is a fundamental economic interest that people

23  have assessed with respect to the current workforce population

24  and the impact on it.  I think you've heard well stated from

25  Mr. LeMay, and particularly from Mr. Bigelow in terms of that

1  interest.  People out there hear what they hear, see what they

2  see, and particularly when there's some inequity and

3  arbitrariness involved in a process that they don't fully

4  understand, it creates a level of uncertainty for themselves

5  that is de-motivating, de-incentivizing, and has an impact on

6  the business that all these constituencies, my client and the

7  creditors' constituency alike, are concerned about.

8         And, you know, I think that in terms of the ask, if

9  you will, in the context of a case of this magnitude, the

10 amounts certainly are reasonable, the amounts for any

11 individual are, you know, across the board are, I think, less

12 than $40,000 on average per person.  The Court has already, if

13 you will, taken up this issue in a different context but a

14 similar context in terms of the ongoing healthcare provision

15 for this same exact group of people.

16        And I just think that, you know, you sort of have,

17 Your Honor, the test.  And the test is that we're here asking,

18 and the creditor constituency is here supporting, and there's

19 no reason that they would be doing that unless they've been

20 satisfied that there is this impact on the business itself, not

21 just on these individuals.

22        And with that, Your Honor, we'd respectfully request

23 your approval of the motion.

24        THE COURT:  All right.  Does anyone else wish to

25 speak briefly for it before I get to the U.S. Trustee?

1              (No audible response heard)

2          THE COURT:  All right.  Mr. McMahon?

3          MR. McMAHON:  Good afternoon, Your Honor.  This issue

4   tracks, in terms of legal analysis, our view as to this

5   morning's matter.  And we do believe that for at least all but

6   the two individuals exclusively, and with respect to those two

7   additional employees that were terminated post petition prior

8   to implementation of the February, 2009 program partially, and

9   the doctrine of necessity.

10             And, again, while we appreciate the views of the

11  economic constituencies here, the issue is not whether the

12  payment is reasonable.  The issue is not whether, from our

13  perspective, a $10 billion company may pop up on the Internet

14  some news store which says X, Y, or Z.   The legal standard is

15  whether or not the failure to make these payments will cause

16  the reorganization effort to fail.

17             And, Your Honor, with respect to Mr. Bigelow's

18  testimony, notwithstanding the reference to, I guess, concern

19  about how employees perceive the company, there is no testimony

20  on the record.  In fact, nothing of record to suggest that the

21  company isn't capable of making good with respect to its post

22  petition obligations under the severance plan.

23             Furthermore, there is no suggestion, frankly, from

24  the standpoint of case law or otherwise that the company's

25  concern with respect to press attention has any legal merit

1  insofar as the realm of doctrine of necessity cases issued by

2  the Third Circuit or otherwise.

3           Second point:  It's not as if the employees that are

4  the subject of the instant motion are the only, I guess, prior

5  employee or persons with claims against the company that could

6  use the money.  And by a -- just an example, Your Honor, our

7  office was contacted by a group of deferred compensation plan

8  participants from News Day or prior publication that is

9  claiming that Tribune owes them certain benefits.  And they're

10 not going to be paid pursuant to this motion.

11          And the issue is from a standpoint of fundamental

12 fairness across the group, and that is what the doctrine of

13 necessity is designed to protect, what do I tell that gentleman

14 about the debtors' ability to pay?

15          It's not exactly as if there aren't other consumers

16 or individuals aside from those covered by the severance motion

17 that couldn't use the debtors making them whole.

18          So, when Mr. Bigelow says that he wants to have the

19 perception that the company will honor its commitments, we are

20 five months into a Chapter 11 bankruptcy case.  We are here

21 because the company can't do that.  And ultimately whether or

22 not the company's honorable view that they want to do the right

23 thing by certain individuals is principal is not the issue.

24 The issue is whether the Third Circuit permits it.

25          And based upon the record today, Your Honor, we would

1 submit that that case has not been made.

2       THE COURT:  Thank you.  I've found often as judge

3 that knowing what the right result is under the law is not the

4 hard part.  Actually doing it is sometimes the hard part.  This

5 is one of those occasions.

6       I am going to deny the relief that's been requested,

7 except for with respect to those two employees who were

8 terminated post petition but prior to adoption of the severance

9 plan, to which I understand the U.S. Trustee has no objection.

10      This is not a timing issue, as had been suggested

11 earlier.  This is a policy issue embodied in the Bankruptcy

12 Code by Congress.  The necessity of payment doctrine, which as

13 we all know is employed regularly in this District and

14 permitted to be applied by this Circuit, is judge-made law.

15 And I think that with respect to any judge-made law that may

16 arguably -- and the argument is, from time-to-time made, bump

17 up against what Congress has intended.  I think it's an area in

18 which judges should tread carefully.

19      This is unlike the health benefits that were referred

20 to earlier, which this Court has approved.  These are matters

21 which are continuing post petition and arise post petition.

22 The standard is -- well, I guess the positive way to articulate

23 the standard would be to say that the debtor must demonstrate

24 to me that the payment of these benefits is essential to the

25 continued operation of the business.  I agree with the U.S.

1 Trustee, this record does not support that view under these

2 circumstances.

3          The fact that failure to approve the relief will

4 create more distraction or the granting of the relief would

5 boost morale is not sufficient justification for the relief

6 that's been requested.

7          There is a post petition severance program.  And

8 while I acknowledge that while the sophistication level of

9 various employees may vary from person to person and level to

10 level.  I, frankly, -- well, there is nothing in this record

11 that tells me that as a general matter, those who are now

12 employed by the debtor would be so adversely affected,

13 especially given the existence of the post petition severance

14 program that the operation of the business will be jeopardized.

15 I'm not saying that it might not be impacted, but I don't think

16 it will be jeopardized.

17          And while in many circumstances, and counsel

18 correctly pointed out with respect to the other motion that I

19 did approve today, the relative dollars involved are a

20 consideration, at least they are for me usually.  This is not

21 an issue about the dollars.  It's an issue about what I believe

22 Congress has mandated with respect to having made the policy

23 issues under the Bankruptcy Code.

24          Now, I would consider in the alternative, as I had

25 indicated earlier today, the escrowing of all of these funds,

74

1  dollar for dollar, in anticipation of a plan to be confirmed at

2  a later time.  But I leave that to the debtor and the other

3  constituents here to discuss.  It's not something I'll foist

4  upon you, but something that I would be, based on this record,

5  prepared to authorize in anticipation of the proposal of a

6  plan.

7          Are there any questions?

8                  (No audible response heard)

9          THE COURT:  Okay.  With respect to the earlier

10  motion, if you have a form of order, I'm prepared to consider

11  that now.  With respect to this relief, if you'd prefer to have

12  a discussion based upon what I've indicated, I'll give you time

13  to do that and to submit a form of order under certification.

14  Either way, I'd like you to submit an order under certification

15  which, if there are no -- if the parties don't wish to avail

16  themselves of that alternative, at least saying that the relief

17  was denied for the reasons that I've stated on the record

18  today.

19          I am not without sympathy for those who are impacted

20  by this ruling, but I feel constrained by the current state of

21  the law to have made it.

22          All right.  Is there anything further for today?

23          MR. GOLD:  No, Your Honor.

24          THE COURT:  Thank you, all, very much.  That

25  concludes this hearing.  Court will stand in recess.

75

1          MULTIPLE SPEAKERS:  Thank you, Judge.

2       (Whereupon, at 2:35 P.M. the hearing was adjourned.)

3

4                        CERTIFICATE

5

6    I certify that the foregoing is a correct transcript from

7  the electronic sound recording of the proceedings in the

8  above-entitled matter.

9

10

11   /s/  *Karen Hartmann*    AAERT CET**D0475   Date:  May 13, 2009

12  TRANSCRIPTS PLUS, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1,500-** 60:6 62:20
**$1.1-** 19:2
**$10-** 70:13
**$10,000-** 20:25
**$12.243-** 18:25
**$13-** 20:15
**$160,000-** 23:7
**$18,000-** 20:22
**$2.6-** 60:3
**$20,000-** 42:4
**$30,000-** 42:3
**$40,000-** 69:12
**$400-** 26:7
**$425-** 45:2
**$75-** 62:22
**$8.5-** 15:2
**$9,500-** 42:2

**&**

**&-** 10:19 14:19

**'**

**'06-** 20:2,14,16,20,23
**'07-** 20:1,14,16,22
**'08-** 20:19,22

**/**

**/S/-** 75:11

**1**

**1-** 5:13
**10-** 19:12,13,15,19 41:5 43:21 45:23 60:24
**100-** 30:1 32:8 35:8 42:19 50:21
**11-** 10:1 41:3,16,23 71:20
**11:18-** 55:5
**13-** 75:11
**14-** 20:19
**15-** 29:23 32:11 62:6
**15,000-** 18:19
**17-** 20:20 41:18
**18-** 25:1
**1997-** 27:15 28:1
**1998-** 18:14

**2**

**2-** 5:16 43:24 55:1
**2,000-** 61:7,20 65:21 66:20 68:8
**20-** 25:3 40:23 42:19 62:6
**2006-** 33:13 45:13 50:14
**2007-** 32:13 33:13 45:14 50:14
**2008-** 7:1 11:7,17,18 12:3,5 18:19,25 19:3,16

**20**:1,13,24 21:24 22:5 23:18 24:21,25 26:3,25 28:4,22 32:8,12,15 35:9,22 36:19 37:9 41:11,21 42:16 43:2 45:2 50:6,16 51:2,14 55:22 61:3,6 64:5
**2009-** 11:15,22 25:5 32:11 39:24 41:18 70:8 75:11
**21-** 26:17 28:11
**22-** 23:3
**23-** 19:3 24:1 26:17 28:11
**24-** 20:20
**25-** 45:17
**25,000-** 20:22
**28-** 5:14
**28TH-** 5:18
**2:05-** 55:5
**2:35-** 75:2

**3**

**3-** 5:20
**3,000-** 22:25 23:25
**30-** 21:1
**345-** 5:17 64:13
**37,000-** 20:23
**38-** 19:9 20:17
**39-** 39:9

**4**

**4-** 5:22
**40-** 22:16
**41-** 39:11 42:11
**45-** 19:14

**5**

**5-** 6:13 9:1 43:7,10
**50-** 19:22 22:19 45:16
**503-** 53:17
**503C3-** 9:4 52:12
**53-** 42:14

**6**

**6-** 6:14
**600-** 35:15
**670-** 19:1

**7**

**7-** 6:16 9:9 61:1,8,24 62:4,5,15 64:12 65:4,17,23 66:11,19 67:9
**700-** 30:6,7 35:15

**8**

**8-** 7:17 42:9
**800-** 30:7
**84-** 42:2
**85-** 32:11

**9**

**90-** 32:12
**900,000-** 23:3

**A**

**ABILITY-** 24:3 27:8 71:14
**ABLE-** 5:12 7:9 38:19 64:18 65:10 67:9
**ABOVE-** 33:14
**ABSENCE-** 51:18
**ABSENT-** 42:12
**ABSOLUTELY-** 37:11 49:21
**ABUNDANTLY-** 45:9 46:16
**ABUSES-** 53:18
**ACCEPTABLE-** 8:14
**ACCOMMODATING-** 55:9
**ACCOMPLISH-** 11:19,20 51:15
**ACCOMPLISHED-** 47:15
**ACCOMPLISHING-** 45:8
**ACCOMPLISHMENTS-** 26:2 45:3
**ACCORDING-** 9:2
**ACCORDINGLY-** 8:24
**ACCRETIVE-** 16:19
**ACCURATE-** 30:20,21
**ACHIEVE-** 31:22
**ACHIEVED-** 12:7
**ACKNOWLEDGE-** 73:8
**ACROSS-** 69:11 71:12
**ACTIVITIES-** 18:5
**ACTUAL-** 31:23 36:14
**ADD-** 43:23 59:3 68:5
**ADDING-** 38:10 43:22
**ADDITION-** 9:16 15:20 24:15 25:12 26:12,23 27:11 36:21 45:25
**ADDITIONAL-** 39:16 43:20 70:7
**ADDRESS-** 8:23 10:8,15 14:13 17:1 38:17 43:15,18 44:2 67:2
**ADDRESSED-** 13:18 14:3
**ADDRESSES-** 9:7
**ADDUCE-** 46:25
**ADEQUATE-** 67:1
**ADJECTIVE-** 57:23
**ADJOURNED-** 75:2
**ADJUSTMENT-** 23:11
**ADMINISTRATIVE-** 14:20 23:20 62:12
**ADMISSION-** 21:2

**ADMITTED-** 21:6 33:12
**ADOPTION-** 72:8
**ADVANCE-** 23:10
**ADVERSELY-** 73:12
**ADVERSITY-** 44:18
**ADVERTISING-** 24:25 26:18 28:13,14
**ADVISEDLY-** 46:10
**ADVISORS-** 11:11
**AFFECT-** 9:21 31:8 45:5 50:3
**AFFECTED-** 73:12
**AFFILIATION-** 5:21
**AFTERNOON-** 55:6,7,10 59:16 70:3
**AGAINST-** 12:17 13:13 25:24 41:13 71:5 72:17
**AGENDA-** 5:5 43:8
**AGENT-** 14:20
**AGREE-** 52:10 55:22 59:13 72:25
**AGREED-** 7:13 8:1 16:10 58:6,8 63:3
**AGREEMENT-** 5:21 11:2 14:22 15:11 40:11 46:5,6
**AGREEMENTS-** 23:10 60:15
**AHEAD-** 8:13,15 40:1 46:5,6
**ALIENATED-** 48:17
**ALIKE-** 69:7
**ALIXPARTNERS-** 11:12
**ALLEGING-** 63:1
**ALLOW-** 11:2
**ALONE-** 29:23
**ALTERNATIVE-** 5:14 73:24 74:16
**AM/RECONVENE-** 55:5
**AMBITIOUS-** 34:23
**AMERICA-** 28:20
**AMONG-** 61:2
**AMONGST-** 64:3
**AMOUNT-** 34:5 57:2 64:10
**AMOUNTS-** 19:3,23 20:1,2 26:14 66:11 69:10
**AMPLY-** 52:20
**ANALYSIS-** 18:15 33:12 40:20 41:10,12,17 51:9 70:4
**ANALYTICS-** 22:12
**ANALYZED-** 33:16
**ANALYZING-** 40:24
**ANCILLARY-** 47:6 58:24
**ANECDOTE-** 48:12
**ANGELES-** 37:22
**ANNOUNCED-** 42:24
**ANSWER-** 39:8 50:15
**ANTICIPATE-** 7:22

**47:1**
**ANTICIPATION-** 74:1,5
**ANYONE'S-** 25:23
**ANYWHERE-** 29:8 48:16
**APPARENTLY-** 51:6
**APPEAR-** 53:12
**APPEARING-** 14:19
**APPLICABILITY-** 49:15
**APPLICABLE-** 46:21 49:8 63:2
**APPLIED-** 72:14
**APPLY-** 52:11
**APPLYING-** 53:22
**APPRECIATE-** 10:7 31:2 32:17 35:14 37:11 53:8,23 55:10 67:7 70:10
**APPRECIATED-** 67:6
**APPROACH-** 6:1 9:25 20:8 33:2
**APPROPRIATE-** 12:19 27:19
**APPROVAL-** 19:11 36:7 69:23
**APPROVE-** 73:3,19
**APPROVED-** 24:8 51:22 62:15 66:24 72:20
**APPROXIMATELY-** 18:25 19:2 39:12 41:5 42:2 61:5,7
**APRIL-** 41:18
**ARBITRARINESS-** 69:3
**ARBITRARY-** 56:19,22
**ARBITRATOR-** 60:7 63:5,6
**AREA-** 72:17
**AREN'T-** 23:22 44:21 45:20,23 71:15
**ARGUABLY-** 72:16
**ARGUED-** 29:6 46:17
**ARGUING-** 47:5
**ARGUMENT-** 9:14,16 29:8 72:16
**ARGUMENTS-** 8:21 12:12 49:3
**ARISE-** 72:21
**ARTICULATE-** 72:22
**ARTICULATED-** 19:24 67:2
**ASSESSED-** 68:23
**ASSESSMENT-** 33:23 56:1
**ASSET-** 63:23
**ASSETS-** 34:21,24 39:5
**ASSIST-** 20:3 48:23
**ASSISTANT-** 62:12
**ASSOCIATED-** 51:17
**ASSOCIATES-** 31:13
**ASSUMED-** 9:14

ASTONISHING- 59:2
ATTACHED- 27:22
ATTENTION- 11:16
28:19 64:7,17,18
70:25
ATTORNEY- 21:5
AUDITOR- 33:8
AUSTIN- 17:7
AUTHORITY- 18:24
19:1 23:17 60:3
AUTHORIZE- 9:9
27:18 74:15
AUTHORIZING-
22:25 60:5
AVAIL- 74:15
AVAILABLE- 8:15
62:24
AVERAGE- 20:21
22:15,16,19,20
28:9,10 38:22,24
62:5 69:12
AVERAGES- 21:17
AVOID- 48:22
AWARD-
20:21,22,24 31:20
36:3 42:2 51:22
52:20
AWARDS- 18:24
20:25 21:10,14,15
22:5 27:24 29:7
37:7,10 39:10,15
41:21 42:3
AWARE- 5:10 7:11
22:2 25:12 46:8
62:22
AWFUL- 25:6

B
BACK- 11:9
13:6,20 43:24
BACKGROUND- 18:15
30:19 56:23
BAFFLED- 54:9
BANK- 49:25
BANKRUPTCY- 22:12
41:4,7 54:13
67:4,5,16 71:20
72:11 73:23
BAPCPA- 5:15
BARE- 45:21
BARGAINING- 58:6
63:2
BASE- 20:19
21:14,16 32:20
38:11 51:10 65:10
67:7
BASED- 15:1 23:2
26:4 27:12 39:10
41:1 51:18 52:15
55:2 56:23 71:25
74:4,12
BASIS- 11:17 29:5
36:8 64:16
BECOMING- 18:11
BEGAN- 10:5
BEGINNING- 29:11
35:9 37:6,9 58:18
BEHIND- 55:20
BELIEVES- 11:19

52:19
BELIEVING- 15:20
BELOW-
22:16,20,21
32:20,21 33:14
39:11 42:4,11,14
45:15,16 52:24
BENCH- 53:14
BENCHMARKED-
41:13
BENEFIT- 23:23
62:20
BENEFITS- 22:7
31:2,3 40:21,25
62:14,16,17 71:9
72:19,24
BETWEEN- 9:21
14:5 16:8 20:4
44:14 48:9 51:8,9
BIBLE- 17:12
BIFURCATED- 65:25
BIGELOW-
17:8,13,16,21
19:15 20:11 22:2
24:11 29:6 30:16
40:7 43:21 44:16
45:2 46:1 47:16
50:13 55:15
59:18,20,23,24
60:2 63:18 66:24
68:3,5,25 71:18
BIGELOW'S- 70:17
BIGGEST- 15:3
29:15
BILLION- 15:2
26:24 58:22 70:13
48:9 50:18
55:24,25 65:25
BIT- 13:6 18:15
BLACK- 39:3
BLOCKS- 67:16
BOARD- 22:3 24:7
41:9 69:11
BONUS- 22:23 23:1
35:19 38:10 53:24
54:11
BONUSES- 19:2,11
23:3,9 24:4 31:15
42:18,20,25 50:6
53:18
BOOST- 73:5
BOTH- 6:19 10:13
11:5 15:25 16:5
17:1 41:14,15,22
47:21
BOX- 54:18
BOY- 17:16
BRIAN- 6:17,22
55:7
BRIEF- 10:22
BRIGHTEST- 30:3
BRINGS- 56:3
BROAD- 40:17,21
BROADCASTING-
18:16 25:2 41:15
BROADER- 61:2
BROUGHT- 21:23
48:9
BUDDY- 16:10

BUDGETS-
27:3,4,5,7,10
BUILD- 39:21
BUMP- 72:16
BUNCH- 14:12
BURDEN- 51:24
52:3 64:4,6
BUSINESS- 11:18
12:5 14:11,13
18:16 25:8,11
26:22 27:3,6,9,24
28:2 29:11 30:25
31:6 35:22,25
39:18 46:7,9,11
52:11,12 56:1,24
57:24
58:11,12,14,24
66:23 69:6,20
72:25 73:14
BUSINESSES- 16:3
24:23,24 25:6,17
29:14 36:2
BUSINESSMEN- 56:8
BUSINESSWOMEN-
56:8
BUZZ- 44:21

C
CALCULATION-
19:13
CALENDAR- 43:14
55:2
CALL- 17:8 22:23
57:25 59:18
CALLED- 28:19
40:12
CAN- 8:4,23 9:20
10:14,15 16:25
20:14,21 21:18
24:11,20 26:2
35:14 37:16,17
38:3 39:21 44:1
46:19,20 55:1,22
56:14 62:7 63:18
CAN'T- 25:24
36:22 49:20 71:21
CAPABLE- 70:21
CARE- 34:20
66:17,19,20 68:11
CAREFUL- 53:5
CAREFULLY- 72:18
CASE- 14:7 21:14
33:14 36:7 37:14
49:12 50:5 51:24
57:7 58:13 59:2,6
64:2 65:8 68:18
69:9 70:24 71:20
72:1
CASES- 15:4 28:20
49:18 50:7 57:17
60:18,19 65:3
66:16 71:1
CASH- 5:17 19:2
21:19 23:10
26:7,24 31:21
42:24
CAUGHT- 68:8
CAUSAL- 9:20 51:8
CAUSATION- 50:5

CAUSE- 65:11
70:15
CAUSES- 13:3
68:15
CBA- 9:14
CC- 42:23
CEASED- 61:13
CEDE- 8:7 10:14
CENTRAL- 49:13
CENTS- 19:22
CEO- 19:18
CERTAIN- 6:25
7:2,17 8:3 19:3
36:3 47:17
51:10,12 60:16
62:23 66:15
71:9,23
CERTAINLY- 8:25
13:3 31:1,10 35:6
47:4,12 50:1,22
51:16,17 69:10
CERTIFICATE- 75:4
CERTIFICATES-
5:23
CERTIFICATION-
7:18 74:13,14
CERTIFY- 75:6
CFO- 16:25 18:11
CHADBOURNE- 10:19
CHAIRMAN- 31:1
CHALLENGE- 25:9
CHALLENGES- 24:20
25:14 37:3 39:6
CHALLENGING- 32:6
CHANCES- 38:1
CHANDLER-
17:8,13,16
59:18,24
CHANGE-
29:1,13,14 38:7
54:22,23
CHAPTER- 10:1
41:3,16,23 71:20
CHARACTERIZE-
31:20
CHARGED- 62:22
CHEMISTRY- 16:17
CHICAGO- 37:21
CHIEF- 19:22
CHIEFLY- 18:4
CHOICE- 54:5
CHOOSE- 46:20
47:9
CIRCUIT- 49:11
71:2,24 72:14
CIRCUMSTANCE-
35:13
CIRCUMSTANCES-
54:19,23 73:2,17
CITE- 51:16
CITED- 27:12
CITIES- 34:25
CLAIMING- 71:9
CLAIMS- 12:17
71:5
CLARIFY- 30:18
CLASS- 14:4 58:14
CLASSIFICATION-
10:3

CLEAR- 5:19 33:2
37:6 39:1
CLEARLY- 28:16
37:14,19 52:23
67:13
CLERK-
17:11,14,18
CLIENTS- 11:3
40:17 58:11
CLIENTS'- 58:11
CLOSE- 27:4,7,10
30:1 55:1 61:17
62:1
CLOSER- 36:13
38:22
CLOSING- 43:12
CNO- 5:20
CODE- 72:12 73:23
COGNIZANT- 10:21
COLD- 12:24,25
57:22
COLE- 5:3
COLLEAGUE- 8:12
COLLECTIVE- 58:6
63:2
COLLECTIVELY-
39:18 62:3
COME- 13:20
27:4,7 43:24
46:5,6 49:22
53:25 55:24
COMMENTS- 35:10
COMMERCIAL- 26:15
COMMISSION- 24:5
COMMITMENTS-
63:25 64:20,24
67:11 71:19
COMMITTED- 35:2
COMMITTEE- 8:8,10
10:19
11:6,8,13,19
12:7,14,15,18
14:3,12
15:13,15,19,21
18:8,9 22:3 24:7
27:1 31:2 37:13
39:19 41:9
48:2,3,6,23
49:4,25 55:19
56:2,7,11,17,25
57:6 58:21 59:14
64:9
COMMITTEE'S-
10:25 11:11
12:6,13 14:6 34:5
55:20,25 56:21
57:9,20
COMMON- 41:22
COMMONPLACE-
22:11
COMMUNICATED-
32:15
COMPANIES- 26:16
41:3,5,6,14,16,22
,23
33:15 34:20 42:17
57:2
COMPANY- 5:3
11:23 12:17

17:9,22,23
18:3,5,12,13,15
19:12,18 21:13
22:2 24:11,14,21
25:24 27:1,19
29:2,24 30:3 31:4
32:5,15,24
34:3,4,18,22
35:16 36:3,25
37:20,24 38:2
39:5,14,20 41:8
42:23
44:7,17,18,20,24
45
**COMPANY'S-** 9:17
16:25 21:10,12
24:7,13 27:23
28:1,4 33:1
41:13,19,23 43:1
52:22 60:11 68:9
70:24 71:22
**COMPARABLE-** 33:15
**COMPARE-** 19:24
28:4 45:11 53:2
**COMPARED-**
20:3,19,22
**COMPARES-** 20:14
**COMPEL-** 5:14
**COMPELLING-** 26:12
**COMPENSATE-** 36:10
21:11,12,14,19,21
,24
**COMPENSATION-**
22:3,4,6,13,15
24:7 27:1 30:22
33:3,10,13,18,20,
23
31:3 34:4 38:11
40:20,21,22,25
41:9,22 42:10,13
45:15 50:24
51:13,19 71:7
**COMPETITIVELY-**
41:1
**COMPETITORS-**
28:5,7
**COMPLETE-** 5:12
8:14
**COMPLETELY-** 12:24
58:8
**COMPONENT-**
31:17,19
**COMPONENTS-** 11:5
21:13
**CONCEPT-** 11:16
**CONCERN-** 10:12
17:1 64:23 67:4
70:18,25
**CONCERNED-** 15:21
16:12 69:7
**CONCERNING-** 55:22
**CONCERNS-**
10:7,8,15 16:5
65:15 66:13 67:2
**CONCLUDE-** 44:3
**CONCLUDED-**
22:9,10 41:20,25
**CONCLUDES-** 74:25
**CONCLUSION-** 50:20

**CONCLUSIONS-**
41:17
**CONDITIONAL-**
37:7,10
47:12,14,17
**CONDITIONED-**
34:12
**CONFIRMED-** 10:1
74:1
**CONFRONTED-** 24:24
25:8,17 39:6
**CONGRESS-** 53:16
54:22 72:12,17
73:22
**CONGRESSIONAL-**
53:22
**CONNECTION-** 6:5
9:20 33:4 48:12
50:2
**CONSIDER-** 54:25
55:3 59:21 66:2
68:21 73:24 74:10
**CONSIDERABLE-**
26:14 64:10
**CONSIDERATION-**
73:20
**CONSIDERED-** 15:17
**CONSIDERING-**
52:24
**CONSISTENT-** 42:15
52:21
**CONSTITUENCIES-**
7:9 8:7 10:10
46:2,14 53:3,10
69:6 70:11
**CONSTITUENCY-**
14:5,6 55:13
68:10,15,19
69:7,18
**CONSTITUENTS-**
18:8,10 38:23
53:25 64:11 66:15
74:3
**CONSTITUTION-**
35:1
**CONSTRAINED-**
74:20
**CONSTRAINTS-**
10:21
**CONSTRUCT-** 36:18
**CONSULTANT-** 22:4
**CONSULTING-**
40:18,20
**CONSUMERS-** 71:15
**CONTACTED-** 71:7
**CONTAINS-** 27:14
**CONTEXT-** 24:18
47:21,22 64:5,14
66:20 69:9,13,14
**CONTINUATION-**
60:19 61:10 62:16
**CONTINUE-** 9:15
29:20 39:22 45:22
47:8 55:11 67:23
**CONTINUED-**
5:14,18 15:5
72:25
**CONTINUING-** 12:22
72:21

**CONTRACTIONS-**
11:22
**CONTRIBUTED-**
51:20
**CONTRIBUTIONS-**
63:25 65:5
**CONTROL-** 23:21
25:15,23
**CONVINCED-** 12:6,7
**CORE-** 40:19
**CORPORATE-** 18:4
**CORRECT-** 18:18,21
19:5,17 20:6
22:22 23:8,12
27:16
31:6,7,17,18,19
32:9,16 33:5
35:23,24
36:1,5,10 37:7,10
39:2,11 60:20
61:4,11,23
62:2,19 63:4,13
75:6
**CORRECTLY-** 73:18
**COST-** 23:10 25:7
**COULDN'T-** 10:2
71:17
**COUNSEL-** 5:24
7:18 59:14 73:17
**COUNTRY-** 28:8
34:25
**COUPLE-** 12:20
30:18 46:24
**COURSE-** 9:4 10:24
36:11 46:18 48:15
60:16 67:20
**COURT'S-** 13:18
23:13 58:9 60:4
**COURTROOM-** 31:11
**COURTS-** 53:20
**COVERAGE-** 62:24
**COVERED-** 52:19
58:3,8 71:16
**CREATE-** 12:8
21:18 29:21 38:7
51:13 73:4
**CREATED-** 26:13,17
**CREATES-** 16:16
69:4
**CREATING-** 14:4
66:10
**CREATIVE-** 66:14
**CREATIVELY-** 25:10
**CREDIT-** 14:21
**CREDITOR-** 7:8 8:7
10:9 46:2 53:3,10
55:13 68:10,19
69:18
**CREDITORS-** 10:20
15:3 48:6 55:19
**CREDITORS'-** 8:8
48:22 49:4 56:2
59:13 64:9 68:15
69:7
**CRITERIA-** 51:12
**CRITICAL-** 49:22
50:8 51:1 52:4
68:21
**CRITICISM-** 54:7

**CROSS-** 8:4
30:13,14 43:22
54:6 67:25
**CURRENT-** 27:13
33:17 34:2,3
56:10 63:10
65:1,6 68:23
74:20
**CURRENTLY-** 17:21
66:25
**CUT-** 12:11
**CW-** 5:21
**CYCLICAL-** 25:11

---

**D**

**DAMIAN-** 14:18
49:1 59:10
**DANGEROUS-** 16:17
**DATA-** 28:7
**DATE-** 24:2
61:12,17 62:1
75:11
**DATED-** 41:18
**DAVID-** 10:18 48:5
55:18
**DAVIS-** 14:19 49:1
59:10
**DAY-** 34:7,23,25
37:18 44:10,23
63:22 71:8
**DE-** 37:4
**DEAL-** 29:3 37:17
65:5
**DEALS-** 26:16
**DEBT-** 52:17
**DEBTOR-** 9:15,20
11:9,12 19:1 43:6
52:10 54:7 72:23
73:12 74:2
**DEBTORS-** 6:25
15:15 17:7 49:25
50:9,19,20
51:16,21,25 52:2
53:18 55:8
56:5,20,24
59:1,5,17 67:16
71:17
**DEBTORS'-** 10:12
11:11 12:12 13:16
14:21 15:1,6,19
17:13 52:25 59:24
71:14
**DECIDE-** 27:1
**DECISION-** 10:4
49:19
**DEEMS-** 27:19
**DEEP-** 35:16
**DEFEND-** 25:24
**DEFENDING-** 35:1
**DEFERRED-** 71:7
**DEFIES-** 47:13
**DEFINED-** 32:2
**DEINCENTIVIZING-**
69:5
**DELAY-** 23:17
**DELICATE-** 14:7
**DELIVERY-** 26:16
**DEMONSTRATE-**
72:23

**DEMONSTRATING-**
52:3
**DEMOTIVATING-**
29:15,18 35:5
36:23 69:5
**DEMPSEY-** 31:11
40:12,14,23
41:2,12,20,25
42:5 43:4
**DENIED-** 74:17
**DENOMINATOR-**
19:13
**DENY-** 72:6
**DEPARTMENT-**
18:5,6
**DEPENDS-** 49:15
**DERIVE-** 31:5
**DESCRIBE-** 18:1
24:20 26:2 31:24
**DESCRIBED-** 25:14
**DESCRIPTION-**
30:20,21
**DESIGN-** 22:7
31:14,21 40:20
**DESIGNED-** 32:4
33:17 36:12 50:24
56:21 71:13
**DESIGNING-** 23:22
40:24
**DESPITE-** 53:20
**DETAIL-** 12:20
**DETAILED-** 45:4
47:15
**DETERMINE-** 33:17
40:25
**DETERMINED-** 22:14
42:5
**DEVELOPED-** 26:11
**DIALOGUE-** 64:10
**DIDN'T-** 10:2
22:18 27:25 32:1
33:22 43:11
51:14,15
**DIFFERENCE-** 16:8
44:14 47:18
**DIFFERENT-** 15:16
36:18 50:19 55:24
58:7 62:9 69:13
**DIFFERENTLY-**
50:18
**DIFFICULT-** 24:17
25:18 39:6 64:4
**DILUTED-** 46:5
**DIRECTION-** 14:7
22:3 68:18
**DIRECTORS-** 22:3
24:8 41:9
**DISADVANTAGED-**
57:22
**DISAFFECTED-**
48:17
**DISCERN-** 33:20
**DISCRETION-**
36:3,7
**DISCRETIONARY-**
27:8,11,18,24
28:1 36:8 51:22
**DISCUSS-** 74:3
**DISCUSSED-** 63:22

65:22
DISCUSSION- 74:12
DISINCENTIVIZING-
45:6
DISPOSED- 7:19
DISRUPTIVE- 56:18
DISTANT- 39:23
DISTILLED- 65:16
DISTINCTION- 48:8
DISTRACTION-
65:9,11 66:22
73:4
DISTRESSING- 45:5
DISTRIBUTIVE-
14:2
DISTRICT- 72:13
DIVERSE- 67:6
DIVISION- 14:4
DOCTRINE- 9:12
49:10,13,14 52:13
70:9 71:1,12
72:12
DOESN'T- 9:4
37:20 52:10 53:9
64:24
DOLLAR- 26:24
74:1
DOLLARS- 58:22
73:19,21
DOMINANT- 49:16
DOOR- 44:25
DOWNTURN- 29:21
DRIVE- 25:20
DUE- 39:4 42:9
44:6 66:4
DUTIES- 18:1,2
DYNAMIC- 12:18,19

E
EACH- 35:13 60:14
EARLIER- 61:21
72:11,20 73:25
74:9
EARLY- 33:6
EASY- 12:11
ECHO- 24:14
ECONOMIC- 49:15
53:7 68:17,22
70:11
ECONOMICALLY-
24:22 25:17
ECONOMY- 25:18
29:22
EDITORIALIZE-
53:13
EFFECT- 12:16
14:4 60:22,23
EFFECTIVELY- 7:19
EFFECTS- 15:23
EFFICIENT- 26:14
EFFICIENTLY- 38:5
EFFORT- 24:14
29:17,20 35:5
36:20 53:21 70:16
EFFORTS- 18:7
67:16
EIGHT- 26:10 41:6
42:17
ELECTRONIC- 75:7

ELICIT- 38:12
39:15
EMBARK- 58:16
EMBODIED- 72:11
EMPLOY- 50:22,23
EMPLOYED- 50:1
63:11 72:13 73:12
EMPLOYEE- 9:22
12:17 15:23 31:1
34:12,15 37:18
51:19 57:8 58:5,7
64:16 65:1,9 67:7
71:5
EMPLOYEES- 7:3
9:19 18:20 32:14
36:10 37:7,9
38:18 39:16 40:1
48:18 51:9 52:19
56:17 57:21,22
60:4,7
61:1,2,5,8,20,21
62:4,23
63:10,14,23,24
64:10,25 65:6,7
70:7,19 71:3 72:7
73:9
EMPLOYER'S- 62:24
EMPLOYMENT- 18:13
30:24,25
ENCOURAGED- 35:12
ENGENDERS- 58:12
ENHANCED- 50:24
ENRICH- 45:21
ENSURE- 11:13,20
36:21
ENTER- 5:16
ENTERED- 22:24
ENTERPRISE- 16:20
ENTERPRISES- 15:6
ENTERTAIN- 43:12
ENTERTAINMENT-
18:17 41:15
ENTITIES- 47:19
ENTITLED- 52:19
54:13
ENTITY- 46:15
ENVIRONMENT-
11:21 28:13
56:15,16,19
ENVISION- 58:17
EQUITABLE- 68:9
EQUITY-
21:15,19,23,25
33:19 34:19 38:18
ESCROWING- 73:25
ESPECIALLY- 73:13
ESSENTIAL- 49:21
52:4 72:24
ESSENTIALLY-
21:13 50:11
ESTABLISH- 9:20
47:2 51:12
ESTATE- 24:18
26:25 29:21 66:21
ESTIMATE- 40:9
ESTIMATES- 26:4
EVERYONE- 38:24
39:18 54:13 64:5
EVIDENCE- 9:6,24

10:7,14,23
12:4,12 13:5,19
22:8 33:12 44:19
56:6
EVIDENTIARY- 8:20
43:19 50:5,12
EXACT- 69:15
EXACTLY- 33:20
35:14 63:9 71:15
EXAM- 54:8
EXAMINATION-
17:19 30:13,14
43:23 54:6 59:25
67:25
EXAMINE- 8:4 43:4
EXAMPLE- 20:2
24:25 36:15 49:20
71:6
EXAMPLES- 26:9
EXCEPT- 72:7
EXCESS- 15:2
EXCLUDE- 19:12
EXCLUDED- 23:13
EXCLUSIVELY- 70:6
EXECUTE- 26:23
EXECUTIVE-
42:19,21
EXECUTIVES-
19:11,12,15
EXERCISE- 54:16
EXERCISED- 36:3
EXHIBIT-
20:3,8,12,13,15
21:3 27:22 33:11
EXISTENCE- 73:13
EXPECT- 35:7
EXPECTATIONS-
47:14,20,21
EXPENSES- 23:10
EXPERIENCE- 40:23
41:2
EXPERIENCED-
34:19
EXPERT- 30:22,24
31:1
EXPERTS- 33:4
EXPLAIN- 52:9
53:15
EXPRESS- 8:19
10:5 55:13
EXTENDS- 64:25
EXTENT- 16:15
27:4,6 46:18
50:24
EXTRA- 51:9
EXTRAORDINARY-
24:13 29:17 36:20
53:1

F
FACED- 24:21
FACES- 25:13 37:3
FACILITY- 54:11
FACTORS- 51:17
56:23
FAIL- 54:18 70:16
FAILURE- 70:15
73:3
FAIR- 9:11 13:23

31:25 33:22 35:9
50:15
FAIRNESS- 16:12
71:12
FALL- 9:4 22:19
42:14 45:18
FALLS- 25:18
FATALITY- 15:5
FAVOR- 63:6
FAVORABLE- 10:8
FEBRUARY- 22:25
36:15 70:8
FEEL- 10:7 45:9
74:20
FEELING- 54:17
FEET- 49:19
FELT- 28:2 56:11
FIELD- 40:24
FIGHTING- 29:4
44:18
FIGURE- 38:4,5,24
FILE- 5:20 6:18
7:16,17 63:1
FILED- 7:15 60:2
FILING- 7:6 61:17
FILINGS- 41:7
FINAL- 58:2
FINALLY- 8:6
57:11
FINANCE- 18:4
30:19
FINANCES- 9:18
FINANCIAL- 11:11
17:23 18:6 64:3,4
FIND- 35:1 51:7
53:14 54:17,19
FINE- 8:17
FIRE- 44:17
FIRM- 6:17 22:7
40:16
FIRST- 7:5 8:8
9:3 16:7 25:3
28:23 33:3
55:9,12
FIVE- 40:10 71:20
FIXED- 25:7
FLAWS- 54:2
FLOW- 26:8
FOCUS-
33:17,20,25
34:2,4,5,10 37:17
FOCUSED- 36:22
37:19 66:23
FOIST- 74:3
FOLKS- 22:15
23:18,25 24:1
32:5 62:10,11,12
FOLLOWING- 8:11
18:22 56:9
FOLLOWS- 40:13
FOREGOING- 75:6
FORGIVE- 67:22
FORM- 41:22 55:3
74:10,13
FORMED- 46:8
FORMER- 57:22
62:10 64:25 65:7
FORTH- 41:17
FORWARD- 5:6,11

11:15 60:5 66:17
67:9
FOUND- 60:7 72:2
FOUR- 18:12 28:23
FOURTH- 25:4
FRANKLY- 10:2
15:20 16:6 70:23
73:10
FRIEND- 13:2
FRONT- 11:14
14:10 53:13
FULL- 7:16 17:14
56:23 61:22
FULLY- 59:13 67:6
69:3
FUNCTION- 23:20
FUNDAMENTAL- 14:2
68:22 72:11
FUNDS- 9:25 73:25
FUNNY- 57:2
FURTHER- 30:11
40:2 42:21 43:7,9
66:1 67:24 74:22
FURTHERMORE-
70:23
FUTURE- 13:4
38:20 39:23 54:16

G
GAINED- 28:12
GAME- 53:7
GARNER- 28:14
64:18
GARNERED- 64:7
GENERAL- 16:20
73:11
GENERALLY-
21:15,19 28:6
31:3,4 32:19,24
53:14 60:13,16
GENERATE- 26:7
GENERATED- 26:24
GENERICALLY-
68:13
GENTLEMAN- 71:13
GET- 8:6 11:1
12:19 23:25 28:7
32:10 37:16,23,25
38:1,6,22,24
44:24 55:1
57:2,8,19 58:4
68:16 69:25
GETS- 13:3 16:9
57:13
GIVE- 8:22 62:7
74:12
GIVEN- 23:23
24:18 33:18,24
34:2 49:8 73:13
GLAD- 10:24
GO- 8:13,15 11:2
14:22 36:23 37:21
40:11 48:3 55:14
65:13 68:17
GOAL- 11:18,20
12:5,7
GOALS- 45:8 51:15
GOING- 5:6,11
6:18 10:22

11:15,22 13:25
14:23 16:8,11,12
29:8 37:1,4,21
43:24 46:4,11
48:16 50:8 52:8
53:15 58:3 60:5
67:15 71:10 72:6
**GOLD-** 6:17,22
7:23,25 8:25
10:6,17 16:24
17:3 43:9,17,20
44:1,5 55:7,17
68:4 74:23
**GONE-** 26:21
**GOOD-** 5:1,2 6:22
10:18 17:6
30:2,16
32:7,19,22 44:1
46:12 49:7 52:5
55:6,7 57:23,24
58:14,15 59:4,16
66:21 70:3,21
**GOT-** 11:13 12:17
37:15 38:21 44:25
50:15 65:4,23
**GRACE-** 65:13
**GRANT-** 47:25
52:8,21
**GRANTED-** 12:23
14:9 22:1
**GRANTING-** 73:4
**GRATEFUL-** 54:14
**GRIEVANCE-** 63:1
**GROUNDWORK-** 29:2
**GROUP-** 36:22 38:3
49:25 56:7 61:2
62:13,15
64:2,3,6,11,16
65:25 69:15
71:7,12
**GUESS-** 9:13,16
12:3 36:24 37:3
39:15 43:22 56:3
57:1 70:18 71:4
72:22
**GUMMED-** 58:23
**GUYS-** 36:24

### H

**HAC-** 6:18
**HALF-** 19:8,14
26:6 29:15 45:12
**HAND-** 17:11,12
34:8 48:9
**HANDLE-** 6:18
**HANDS-** 54:1
**HAPPEN-** 29:16
34:17 35:6,7 45:4
**HAPPENING-** 44:23
47:18
**HARD-** 32:5 35:4,5
37:12,13 38:3
72:4
**HARDER-** 11:25
**HARDSHIP-** 64:3,7
**HARSH-** 12:25
56:14,15,19
**HASN'T-** 9:14
**HAVEN'T-** 50:6

**HE'S-** 16:11,12
19:22 41:5
**HEADED-** 14:8
**HEADLINE-**
67:15,21
**HEADLINES-** 67:9
**HEADWINDS-** 25:18
**HEALTH-** 60:6
62:20 72:19
**HEALTHCARE-** 62:16
69:14
**HEAR-** 6:8 7:9
10:24 12:4,12
13:4 32:1 43:6
46:3,4 48:1 50:2
55:12 56:5,6,23
69:1
**HEARD-** 6:5,7 10:9
12:2 42:1,5 43:5
45:12 46:1 48:2,3
50:6 68:24 70:1
74:8
**HEARING-** 5:15,18
7:22 16:21 45:25
64:13 74:25 75:2
**HEAVILY-** 13:13
**HELD-** 17:24 25:2
**HELP-** 65:21
**HELPED-** 54:7
**HELPFUL-** 65:10
**HELPING-** 16:3
**HELPS-** 31:13
**HESITATING-** 8:17
**HEWITT-** 31:13
**HI-** 30:17
**HIGH-** 50:25 51:3
**HIGHLIGHT-** 57:21
**HIGHLY-** 46:2
**HIRED-** 22:6
**HISTORICAL-** 21:11
27:23 33:10 36:9
52:22
**HISTORICALLY-**
21:21
**HISTORY-** 47:22
**HIT-** 27:25
**HOLD-** 13:18 17:21
**HOLDING-** 54:1
**HOLDINGS-** 42:24
**HONOR'S-** 8:11
10:8 17:1 58:4
**HONORABLE-** 71:22
**HONORING-** 67:10
**HOPE-** 39:23 67:20
**HOPEFULLY-** 5:12
7:9 10:1 16:25
38:19
**HOUR-** 5:10 8:15
**HOUSING-** 23:10
**HUMAN-** 40:17
**HUNDRED-** 62:6

### I

**IDEA-** 66:14
**IGE-** 17:16
**IMMEASURABLY-**
54:7
**IMPACT-** 47:7
68:7,24 69:5,20

**IMPACTED-** 73:15
74:19
**IMPLEMENT-** 29:12
**IMPLEMENTATION-**
7:3 40:21 70:8
**IMPLEMENTED-** 26:5
29:1
**IMPORTANT-**
15:6,12 16:2
24:19 29:13,14
34:23 37:18
39:5,25 50:17
53:9 63:20,23
64:22 65:7,8
**IMPROPER-** 60:7
**INC-** 40:14 75:12
**INCENT-** 51:2
**INCENTED-** 11:14
**INCENTIVE-**
6:13,15 7:1 9:2
11:7 12:13 16:1,2
18:23,24 19:2,21
21:14,15,18,24
22:25 23:1
24:8,12 27:13
29:7 31:19,21
36:19 39:24
40:22,24 42:24
47:3,4,5 51:13
53:24
**INCENTIVES-** 11:21
12:9 34:22 42:10
51:19
**INCENTIVIZE-**
29:12,20 31:22
32:4 34:9 38:8
39:22 41:24 44:21
45:22 47:9
**INCENTIVIZED-**
25:25 39:7
**INCENTIVIZING-**
24:16 25:19
**INCEPTION-** 57:7
**INCLINED-** 8:22
**INCREASED-** 26:18
**INCREDIBLY-** 34:23
35:2
**INCREMENTAL-** 26:7
**INDEED-** 52:23
**INDEPENDENT-** 22:4
31:8 41:10
**INDETERMINATE-**
66:12
**INDICATED-** 31:16
32:7 42:16 44:16
45:2 73:25 74:12
**INDICATES-** 52:23
**INDISCERNIBLE-**
34:1
**INDIVIDUAL-** 42:2
60:14,15 69:11
**INDIVIDUALS-**
23:13,15 45:14
60:16 69:21 70:6
71:16,23
**INDUSTRY-** 11:23
21:17 25:13 37:3
41:14,23 42:16
44:17 47:22

52:24,25
**INEQUITY-** 69:2
**INFLUENCE-** 24:4
**INFORM-** 53:5
**INFORMATION-** 31:5
33:16 34:6
**INITIATIVES-** 26:5
**INORDINATE-** 34:5
**INQUIRE-** 51:18
**INSIDER-** 23:24
**INSIGHT-** 59:3
**INSOFAR-** 52:3
71:1
**INSTANCE-** 44:22
**INSTANT-** 71:4
**INTEND-** 43:15,18
**INTENDED-** 72:17
**INTENT-** 43:20
53:22
**INTERACTING-** 18:8
**INTEREST-** 43:11
49:25 66:9
68:9,10,22 69:1
**INTERESTED-** 9:6
37:19
**INTERESTS-** 46:4
68:17
**INTERNET-** 70:13
**INTERRUPTING-**
67:22
**INVOLVEMENT-**
53:24
**ISN'T-** 11:1 70:21
**ISSUE-** 13:17 14:1
23:3 39:2 43:13
44:13 49:10
51:4,5 52:1 56:24
61:8 68:9 69:13
70:3,11,12
71:11,23,24
72:10,11 73:21
**ISSUED-** 71:1
**ISSUES-** 16:11
55:24 58:19,20,24
73:23
**IT'D-** 32:21
**IT'S-** 9:24
14:7,12 15:20
16:2 19:9,13,14
21:6 24:19
29:3,13 37:23
39:1,2,3 42:20
44:8,9,13
47:12,17 50:17
51:24
52:11,12,22,23,25
53:9,14 54:12
64:6,17,22
66:14,18,21,22
71:3,15 72:17
73:21 74:3
**ITEM-** 5:13,16
6:13,14,16
**ITEMS-** 6:12 7:17

### J

**JEOPARDIZED-**
73:14,16
**JOB-** 13:2 44:24

48:15
**JOBS-** 48:10,19
59:16
**JOHN-** 6:17 40:12
60:23
**JOINED-** 60:23
**JONATHAN-** 17:6
59:16
**JPMORGAN-** 14:20
15:14
**JUDGE-** 11:2 44:11
49:19 53:14 72:2
75:1
**JUDGE-MADE-**
72:14,15
**JUDGES-** 72:18
**JUDGMENT-** 39:18
46:7,9 52:11,12
54:16
**JUNCTURE-** 50:7
**JUNE-** 58:18
**JUSTICE-** 14:3
**JUSTIFICATION-**
56:6 73:5

### K

**KEEN-** 58:21
**KEEPING-** 40:1
48:10 50:8,9 52:4
**KEY-** 18:8 21:12
22:13 24:14,16
25:20 29:12,20
32:5 38:18,23
39:19 40:1
**KEYS-** 24:17
**KINDS-** 45:1
**KNOWING-** 72:3
**KNOWLEDGE-** 23:14
27:17 60:21
**KNOWS-** 5:9 19:10

### L

**LABOR-** 60:7
**LACK-** 42:9
**LAID-** 29:2 60:4,8
61:3,5,21 62:1
**LANDMARK-** 26:15
**LARGE-** 11:23
25:22 28:7,9,21
35:11 47:23 67:6
**LARGELY-** 11:6
**LARGER-** 36:23
**LARGEST-** 28:20
34:25
**LATER-** 74:2
**LAUGHTER-** 67:18
**LEAD-** 50:19
**LEADERSHIP-** 41:8
**LEADING-** 22:6
51:21
**LEAVE-** 9:8 34:16
47:3,4,5 74:2
**LEAVES-** 6:12
**LEAVING-** 50:22
**LED-** 41:12
**LEFT-** 6:12 12:24
32:4,8,11,12,13,1
4,18
17:11 30:4
35:9,14 47:2
50:21 57:22

LEGAL- 14:9 46:20
48:13 55:23 56:5
58:7 59:2
70:4,14,25
LEHIGH- 49:11
LEMAY- 8:8 10:18
13:9,11,15,23,25
14:17 15:24 48:5
55:12,18
57:5,14,16,18,20
58:2 59:8 67:5
68:25
LEMAY'S- 15:7
16:5
LENDER- 14:20
15:9 18:9
LENDER'S- 8:10
LENDERS-
15:1,3,7,10,14
15:10
38:14
LEVEL- 21:17
50:25 51:3 69:4
73:8,9,10
LEVELS- 48:19
LEVERAGE- 25:7
LIFETIME- 48:15
LIGHT- 33:1
LIGHTS- 37:21
39:2 44:8 48:11
50:9 52:1
LINE- 16:7 58:9
LINK- 51:8
LOCAL- 19:3 22:23
23:1,2,4,7 24:3
26:18
LOCATIONS- 16:18
LOGIC- 47:13
LOGICAL- 68:10
LONG- 17:24 21:24
26:21 32:25 38:23
60:21
LONGER- 58:4
LONGSTANDING-
36:6
LONG-TERM- 42:10
46:15
LOOK- 9:19 52:24
66:23
LOOKED- 50:18
LOOKING- 24:13
54:18 56:10 65:6
LOS- 37:22
LOSE- 10:11
LOSING- 16:13
28:21,24
LOST- 13:2 28:23
29:23 30:1
LOT- 11:10,16,25
12:18 14:24
15:18,24 16:3
25:6,13 26:17
28:14,19 31:11,12
32:3,23 34:19
56:10 57:3,8,17
58:4,19 64:7,18
68:4
LOTSOFF- 6:17
8:13 17:3,6,7,20

20:7,10 21:2,8,9
27:21 30:8,11
40:5,8,12
59:16,17 60:1
67:20,24
LOW- 17:17 38:16
LOWER- 20:1,16,18
21:17
LUMP- 60:18 61:15

M

MACRO- 25:22
MAGNITUDE- 69:9
MAINSTREAM- 56:14
MAJOR- 53:3,10
MAKING- 5:22
27:18 38:15 63:8
66:11 70:21 71:17
MANAGEMENT- 5:17
11:7 12:3,16
18:24 64:8
MANAGERS- 21:13
22:13 24:14,16
25:20 34:18 39:19
53:18,19
MANDATED- 73:22
MANY- 15:4,15
25:16,22 27:12
28:20 61:5 62:3
65:3 73:17
MARKED- 21:3
MARKET- 22:11,21
26:18 28:12
32:20,21 33:14,21
34:1 39:11
41:1,21
42:7,11,14 43:2
45:15,18 52:24
MARKETPLACE-
49:16
MARKETPLACES-
30:25
MARKETS- 26:16
28:12
MATTER- 7:18 9:16
14:2 44:3 52:10
54:13 56:1 66:18
70:5 73:11 75:8
MATTERS- 5:11
6:18,25 7:12 8:6
30:22 31:8 37:18
53:9 54:25 57:7,8
72:20
MAXIM- 48:18
MAXIMIZE- 21:18
38:7 46:14,15
MAXIMIZING- 24:17
MCKELVEY'S- 49:19
MCMAHON- 8:4
30:15 35:20 40:2
49:6,7 53:12 68:1
70:2,3
MEANINGFUL- 21:23
MEANS- 57:12
MEASURE- 35:13
MEASURED- 11:18
36:14
MEASURING- 12:5
MEDIA- 28:19

41:14 42:17,23
44:18 57:2,3
MEDIAN- 22:21
42:1,11,14 45:17
MEDIUM- 20:24
MEET- 27:4,6 35:2
46:19 67:16
MEETING- 27:5,10
MEMBERS- 16:15,16
56:11 65:16
MERCER- 7:16
33:4,7,11,12,15,2
2
22:6,9 31:12
35:18 38:10 39:14
40:9,14,15,16
41:10,12,20
51:6,7,8
MERCER'S- 39:10
40:19 41:17
42:9,17
MERELY- 44:8
MERIT- 70:25
MERITED- 28:2
MESSAGE- 67:11
MET- 27:9 35:23
45:9 46:16,22
51:20 52:2
METAPHOR- 57:23
METHOD- 8:2
METRIC- 11:17
12:5
METRICS- 20:4
23:2
METROPOLITAN-
28:8
MID-APRIL- 42:18
MILLION- 18:25
19:2 20:15 26:7
45:2 60:3
MINIMUM- 45:22
MIP- 19:6,19,24
20:14,18 21:10,22
22:5 23:18
27:2,5,14 29:23
30:5 32:3,21
41:11,25 42:15
43:2 55:22
MISSING- 50:11
MITIGATE-
25:10,20 38:4
65:21
MODEST- 47:21
MONEY- 11:2 26:14
28:21,23,24 66:16
71:6
MONTH- 62:22
MONTHS- 25:3
28:23 50:7 71:20
MORAL- 45:6
MORALE- 9:22
15:23 50:3 66:22
73:5
MORALITY- 16:12
MORNING- 5:1,2
6:22 10:18 11:1
14:14 17:6 30:16
48:9 49:7 58:13
65:9,22

MORNING'S- 70:5
MOTION- 5:13,22
6:13,14,16 7:5,15
9:1,9 16:4
18:22,23 19:16
21:23 23:6 24:9
27:22 33:2 39:9
41:19
43:7,16,19,25
55:1,4,11,14,21,2
2
45:4,24 47:25
56:1,8,20 57:10
60:2,9 69:23
71:4,10,16 73:18
74:10
MOTIONS- 6:6,19
7:8 8:1
15:16,17,25 17:7
MOTIVATE- 29:12
31:22 32:5 34:8,9
38:8 39:22 41:24
44:21 45:22 47:9
MOTIVATED- 25:25
36:22 39:7 40:1
MOTIVATING- 24:16
25:19 37:5 48:11
MOTIVATIONAL-
39:20
MOVE- 21:2 43:13
66:17 67:9
MOVED- 29:25
MUCH- 29:1 34:3
36:13 55:10,20
56:18 74:24
MULTIPLE- 34:1
75:1
MULTIPLES- 15:4

N

NAMED- 42:18,20
NAVISTAR- 5:13
NECESSARILY- 16:8
50:23
NECESSARY-
46:10,13 50:8
52:4
NECESSITY- 9:11
10:12 49:10,13,14
52:14 70:9
71:1,13 72:12
NEEDED- 33:7
37:12 44:20 50:5
NEEDLES- 37:15
NEGLIGIBLE- 9:17
NEGOTIATED- 11:10
NEGOTIATION-
58:15,22
NEGOTIATIONS-
14:8
NEIGHBORHOOD-
30:5
NETWORK- 5:21
NEVER- 51:6
NEVERTHELESS-
48:16 56:13
NEW- 53:16,22
NEWS- 70:14 71:8
NEWSPAPER- 25:13

26:16 44:9,14
NEWSPAPERS- 26:10
28:8,20,21,22,24
62:11
NINE- 25:3 40:15
42:17
NINTH- 42:23
NOBODY- 53:6
NONINSIDERS- 23:1
NONUNION- 12:16
14:1,5 16:14,16
62:10
NORMAL- 36:11
NORMALLY-
36:12,15 50:2
NORMAN- 5:3
NORTH- 22:19
26:7,24 32:8 62:5
NORTHEAST- 49:12
NOTE- 11:8 50:17
51:11
NOTED- 6:24 49:11
NOTEWORTHY- 28:13
NOTWITHSTANDING-
32:14 36:4 49:24
51:11 67:13 70:18
NUANCES- 67:5
NUMBERS- 32:10

O

OBJECT- 54:10
OBJECTED- 53:4
OBJECTING- 53:7
54:6
OBJECTION- 7:6,10
9:7,11 21:4,5,7
72:9
OBJECTIONS- 44:7
OBLIGATIONS-
65:17 67:17 70:22
OBSERVATIONS-
28:15 56:3
OBSTACLE- 45:7
OBTAINING- 51:10
OBVIATE- 8:21
OBVIOUSLY-
10:6,10 11:5
12:10,19 15:6
46:5,19 56:11
60:15 64:7,16
65:5 67:3
OCCASIONS- 72:5
ODD- 15:7,8
OFFERED- 50:20
51:13
OFFERINGS- 40:19
OFFICE- 54:5,21
71:7
OFFICER- 17:23
OFFICERS- 19:3
23:4,7,15,19
24:1,3 42:19,21
OFFICIAL- 10:19
18:8 37:13 39:18
48:6 55:19 64:9
OFTEN- 8:20 53:25
67:5 72:2
ON/LIGHTS- 52:1
ONE- 6:25 7:15

9:23 12:22 13:1
15:16 19:15 24:17
28:25 29:8,15
30:8 32:18 34:21
38:25 40:19 48:9
51:4,17 53:21
54:10 56:5,10,20
57:6 58:21
62:10,18 64:11,12
66:22 68:7 72:5
**ONGOING-** 12:22
69:14
**OPERATE-** 24:22
25:6 29:13 34:21
**OPERATES-** 24:23
**OPERATING-**
23:16,21 24:2
25:7 26:7,20
44:23 47:19 50:10
52:4
**OPERATION-** 31:5
72:25 73:14
**OPERATIONS-** 28:16
**OPINE-** 35:18
38:10 39:14
**OPPORTUNITIES-**
29:25
**ORDER-** 5:16 22:25
23:14 41:23 45:4
46:8 55:4 60:4
74:10,13,14
**ORDERS-** 5:24 6:10
**ORDINARY-** 9:4
36:11 46:18
**ORGANIZATION-**
26:8 42:22 48:19
67:13
**ORIGINAL-** 11:9
**OTHERWISE-** 15:10
70:24 71:2
**OURSELVES-** 54:19
**OUTSOURCING-**
40:18
**OVERALL-** 9:17
25:18 29:22
**OWED-** 15:2 19:3
**OWES-** 71:9
**OWN-** 15:18 29:13
34:24 47:22 57:4

---

P

---
**PACKAGE-** 33:18
62:17,18
**PACKAGES-** 22:13
**PAID-** 11:16
16:15,16 19:22
24:1 31:16 37:16
42:18,20,21
45:12,13 53:2
60:13,18 64:5
65:23,24 71:10
**PAPERS-** 13:1 28:9
37:23,25
**PARADIGM-** 16:15
47:2
**PARKE-** 10:19
**PARTIALLY-** 70:8
**PARTICIPANTS-**
19:1,9 21:22

24:21 25:15 26:3
27:24 42:6,13
71:8
**PARTICIPANTS'-**
42:10
**PARTICIPATE-**
19:19,21
**PARTICIPATING-**
8:9
**PARTICULAR-** 11:24
18:7,23 27:8
36:13 57:7 64:2
**PARTICULARLY-**
53:19 68:25 69:2
**PARTIES-** 7:21
49:17,24 74:15
**PARTNER-** 8:13
17:3
**PARTS-** 68:6
**PARTY-** 53:7
**PASSED-** 53:16
**PASSION-** 35:16
**PASSIONATELY-**
34:20
**PAST-** 31:12 36:10
40:15 41:6 52:18
**PAUSE-** 6:3,9
30:10
**PAY-** 9:10 18:24
19:1,11 20:19
21:14,16 23:7,17
29:7 32:20,21
37:4 38:16 48:20
60:3,17 64:18
66:5 71:14
**PAYING-** 27:24
50:6 53:18 64:16
65:15,17 66:11
67:9
**PAYMENT-** 9:12,25
11:17 19:6,7,16
27:5,11 31:20,23
34:15 35:19 36:12
38:22 39:20,21
46:18 49:9,14,21
52:15,16,17 70:12
72:12,24
**PAYMENTS-** 7:1,2
9:2,12,21
10:11,13 11:8,18
15:11,22 16:20
22:14,17,18,19,24
,25
19:24 20:15
24:8,12,19
27:8,12,18 28:2,3
29:19 34:11
36:3,8,15,17
37:21 38:16
42:1,7,13,24 43:2
44:12
45:11,14,16,19,20
46:5 47:8 5
**PAYOUT-** 19:23
20:4,16,19 43:1
**PAYOUTS-** 20:5,13
27:2 41:11,13
42:12,15 61:16
**PEDDLING-** 44:8

**PEER-** 21:17 41:14
**PEERS-** 28:17
**PENN-** 49:13
**PEOPLE-**
11:14,20,24
12:9,23 14:13
16:3,13
29:12,16,20,23,24
30:2,4 31:22
32:3,8,17,19,22
34:8,9,19,21
35:2,8,12,15
36:19,22 37:11,19
38:3,8,9,11,22
39:22 44:24 45:21
47:2,3,4,9,13
48:10,16
50:21,22,24 51:2
56
**PEOPLE'S-** 47:20
**PERCEIVE-** 70:19
**PERCEIVED-** 53:17
56:19
**PERCENT-** 19:9,14
20:16,17,19,20
22:16,19 25:1,3
39:11
42:2,3,11,14,19
45:16,17 66:4
68:7
**PERCENTAGE-** 19:7
43:1
**PERCENTAGES-**
19:23
**PERCEPTION-** 56:22
64:23 71:19
**PERFORM-** 51:3
**PERFORMANCE-** 9:15
28:4,6 36:4,10
38:12 41:24 51:20
52:5,16,18
**PERFORMING-** 41:3
**PERHAPS-** 39:17
45:24 55:23 57:3
59:5
**PERIOD-** 14:25
34:13 36:14 66:12
**PERMEATE-** 67:12
**PERMISSION-** 8:12
13:18 16:24 20:7
**PERMIT-** 16:20
**PERMITS-** 71:24
**PERMITTED-** 72:14
**PERNICK-** 5:2,3,9
6:1,11,21,24
**PERPLEXING-** 56:18
**PERSON-** 69:12
73:9
**PERSONS-** 71:5
**PERSPECTIVE-**
14:11 46:1,9
51:23,25 58:11,12
66:18 70:13
**PERSPECTIVES-**
58:25
**PERSUADE-** 11:2
**PETITION-** 5:21
7:4 13:2,7 16:9
56:12 60:5 61:12

62:1 66:25
70:7,22 72:8,21
73:7,13
**PHASE-** 65:8
**PHILOSOPHY-**
21:11,12,15
**PHONE-** 8:9
**PICK-** 54:10 57:23
**PIECE-** 51:9 59:2
65:20 66:6
**PLACE-** 13:7 14:8
16:10 17:11 27:14
32:9,16,17 49:9
52:25 56:12 66:25
67:8
**PLACES-** 37:22
**PLAN-** 6:13,15,16
7:4 10:1,3
11:7,13,14,19
12:8 13:7 14:8
18:23 19:9
27:13,17,21
31:14,21,25
32:3,4,8,15,17
35:22
36:6,9,13,19
39:24 52:21
54:6,10,11 56:12
58:15,17 60:5
62:24 70:22 71:7
72:9 74:1,6
**PLANS-** 7:1 9:2
16:1 21:18 23:25
24:6 31:22 33:5,9
36:12 53:25 54:17
**PLANT-** 62:13
**PLAY-** 55:24
57:8,13,19
**PLEASED-** 35:11
**PM-** 55:5 75:2
**PODIUM-** 8:7
**POIGNANCY-** 57:21
**POINTED-** 47:11
67:5 73:18
**POLICY-** 60:17
72:11 73:22
**POLITICAL-**
28:13,14
**POLK-** 14:19 49:2
59:11
**POOR-** 54:5
**POP-** 70:13
**POPULATION-** 30:5
65:2,18,20 66:4
68:23
**PORTFOLIO-** 39:5
**PORTION-** 5:17
**POSITION-**
17:21,24 18:2,11
57:9 64:19
**POSITIONS-** 49:17
55:23 62:12
**POSITIVE-** 72:22
**POSSESSION-** 53:18
**POSSIBILITY-**
66:10
**POST-** 5:20 7:4
13:7 16:9 56:12
60:5 66:24

70:7,21 72:8,21
73:7,13
**POTENTIAL-** 15:22
**POTENTIALLY-** 15:8
16:13,17
**PRACTICAL-** 9:16
**PRACTICE-** 27:23
42:16
60:11,21,23,25
**PRACTICES-** 41:13
52:22
**PREFER-** 74:11
**PRELIMINARY-**
8:19,23 58:19
**PREMIUM-** 60:6
**PREPARED-** 5:24
52:7 74:5,10
**PREPARING-** 20:3
41:7
**PREPETITION-** 9:2
12:24 14:21
15:8,9 52:15,16
60:8,12 62:14
63:15
**PRESENT-** 9:21
10:2 17:3 22:8
43:20 64:13
**PRESENTATION-**
50:1,21
**PRESENTATIONS-**
8:20,23 50:3
**PRESENTED-** 23:18
**PRESENTLY-** 52:19
**PRESS-** 16:7,17
57:20 58:1,2
67:10 70:25
**PRESSURE-** 24:24
25:9,11,13 29:3
34:3
**PRESSURE'S-** 34:3
**PRESSURES-** 25:14
65:22
**PRETEND-** 48:20
**PREVIOUS-** 20:18
**PREVIOUSLY-** 59:24
**PRICEWATERHOUSE
COOPERS-** 33:4,6,8

---

**PRIMARILY-** 26:5
49:10
**PRIME-** 49:19
**PRINCIPAL-** 18:16
24:20 26:2
40:14,15 71:23
**PRINCIPALLY-**
34:10
**PRINCIPLE-** 31:21
**PRINCIPLES-** 55:23
**PRINT-** 44:9
**PRINTING-** 26:15
**PRIOR-** 7:3 18:11
19:24 20:5 23:13
33:23 39:1 47:16
60:4 61:12 62:18
70:7 71:4,8 72:8

PRIORITY- 15:11
PRO- 6:18
PROBABLY- 37:1
43:21 62:6
PROBLEM- 14:13
PROCEED- 8:2,12
10:16 16:25 44:1
PROCEEDINGS-
22:11,12 41:4,16
44:19 75:7
PROCEEDS- 26:24
PROCESS- 26:10
37:9 54:15
58:15,17 69:3
PRODUCT- 26:12,13
44:15
PRODUCTIVITY-
39:16 50:3
PRODUCTS- 37:25
38:5
PROFESSIONAL-
34:18 40:16
PROFESSOR- 48:14
PROFFER- 8:3 40:9
PROFITABILITY-
25:9 28:19
PROFOUND- 45:5
50:3
PROFOUNDLY- 42:8
48:17
PROGRAM- 12:4,10
18:24 19:21 27:14
47:12,14,18 66:25
70:8 73:7,14
PROGRAMS- 23:1,23
40:22,24,25
PROMINENCE- 57:5
PROOF- 51:24
PROPOSAL- 11:9
22:10 74:5
PROPOSE- 13:16
PROPOSED- 20:4,13
21:10 22:5 27:2
31:16 35:19 39:15
41:11,13,25
42:12,15 43:1
51:2 52:17 53:2
66:11
PROPOSING- 34:11
PROPOSITION-
12:20
PROPOSITIONS-
12:21
PROSPECT- 65:15
PROSPECTIVE- 56:2
PROSPECTS- 46:15
PROTECT- 71:13
PROTECTION-
67:1,3
PROTECTIONS-
67:8,14
PROVIDE- 16:2
41:10 46:8 67:1
PROVIDED- 33:13
PROVIDES- 40:17
67:3
PROVIDING- 40:19
PROVISION- 53:22
69:14

PROVISIONS- 53:17
PROXIES- 42:18
PRUDENT- 23:17,23
PUBLIC-
57:8,13,19
PUBLICATION- 71:8
PUBLISHER- 62:10
PUBLISHING- 18:16
24:25 41:15
PURPOSE- 31:15,25
36:9
PURSUANT- 71:10
PUSH- 11:8 13:6
23:24
PUSHED- 24:2
PUTTING- 51:14

Q
QUALITY- 35:10,12
39:2 44:13,14,15
54:8
QUARTER- 25:4
QUESTIONS- 10:23
30:11 40:3 67:24
74:7
QUICK- 26:9 67:9
QUICKLY- 49:8
QUOTING- 49:12

R
RAILROAD- 49:12
RAISE- 17:11
RANGE- 40:17,21
43:3 45:18 62:6
RANGES- 41:21
RANGING- 42:19
62:13
RATHER- 47:21
49:4
RATTLED- 12:23
REACH- 51:14
REACTIVE- 57:10
READERS- 26:11
REALITIES- 49:16
REALITY- 56:22
REALIZE- 56:15
REALM- 71:1
REASON- 10:2
69:19
REASONABLE- 22:10
41:1,21 42:1 43:2
47:13 69:10 70:12
REASONABLENESS-
45:10
REASONS- 27:12
28:25 32:18 64:21
74:17
RECEIVE- 15:11
34:15 61:15,18,22
RECEIVED- 62:18
63:11
RECEIVING- 61:9
RECESSION- 25:19
RECIPIENTS- 66:11
RECOGNIZE- 54:19
RECORDING- 75:7
RECORDS- 15:1
54:11
REDACTED- 7:17

REDESIGNED- 26:10
REDIRECT- 40:4
REDUCED- 12:8
REDUCTION- 45:13
REFERENCED- 33:15
39:9
REFERRED- 58:13
72:19
REFERRING- 33:11
REGULARLY- 72:13
REHASH- 15:25
REIMBURSE- 60:6
REIMBURSEMENTS-
62:21 63:8,12
REJECT- 9:15
RELATE- 21:10
RELATION- 53:2
RELATIVE-
22:13,19 29:4
33:21 38:16 42:6
49:9 50:14 73:19
RELATIVELY- 21:16
RELEASED- 42:18
RELIEF- 5:13
15:17,19 18:23
19:4 52:8,21
53:24 68:16 72:6
73:3,4,5 74:11,16
REMAIN- 42:6 51:3
REMAINDER- 65:17
REMAINING- 55:1
63:14
REMARKABLY- 12:25
REMARKS- 10:22
43:12
REMEDY- 56:21
REMIND- 12:14
REMINDED- 48:12
54:21
REORGANIZATION-
49:12,22 50:7
57:24 58:23 70:16
REPORT- 7:16
33:15 35:18 41:18
42:9,17 51:6,7
REPORTING- 18:6
REPRESENTATIVE-
12:15 40:9
REPRESENTED- 14:5
REQUEST- 47:24
69:22
REQUESTED-
15:17,19
19:4,6,7,16,23
41:21 42:7 52:8
54:2 72:6 73:6
REQUESTS- 18:22
53:24
RESERVE- 9:25
66:10
RESOLVED- 5:6
RESOURCES- 40:17
RESPECT-
7:6,7,11,15,25
8:3,5
9:1,9,11,13,19
10:12 11:5,7
12:10 14:1
15:23,24 16:1,4

17:1 19:6 22:23
33:2,10 35:8 39:4
43:12 44:6 45:23
50:15,16 52:18,23
54:12,16 61:8
62:20 63:25 64:23
66:10 68:23
70:6,17,21,
RESPECTFULLY-
44:10 47:24 68:13
69:22
RESPECTS- 63:24
RESPOND- 29:9,10
RESPONSE- 6:7,8
38:13 39:1 43:5,6
53:17 70:1 74:8
RESPONSIBILITY-
14:9
RESPONSIBLE- 18:4
RESTRUCTURING-
18:2,7,10
RESULT- 12:25
15:7,8 23:16
36:17 37:15 56:22
72:3
RESULTS- 51:10,14
RETAIN- 25:9 34:8
RETAINED- 22:4
33:3,6 41:9
RETENTION- 15:23
32:1 47:6
RETIRED- 12:16
RETIREE- 12:16
RETIREMENT-
31:3,14
RETURNS- 46:14
REVENUE- 23:2
24:24,25
25:2,8,18,20 28:7
38:4 53:3
REWARD- 24:13
29:16 31:17,21,23
REWARDED- 35:4
REWARDING- 36:19
ROLE- 53:8,23
ROOMS- 16:17
ROOTED- 35:16
RULED- 63:5,6
RULING- 52:8
74:20
RUN- 5:5 16:3
49:20

S
SALARIES- 32:20
39:11
SALARY- 51:10
60:14,19 61:10
62:16
SALES- 24:5
SAMPLING- 39:10
SATISFIED- 69:20
SAVE- 36:25
SAVED- 26:14
SAVINGS- 45:3
SAW- 14:3
SCHAIBLE- 8:9
14:18,19,23 49:1
59:5,10,13

SCHEDULE- 55:10
SCHEDULED-
61:15,18
SCHOOL- 48:13
SCHOTZ- 5:3
SCORE- 63:7
SCRUTINY- 57:3
SEAL- 5:22 6:14
7:6,15
SEATED- 59:21
SEATS- 14:12
SECOND- 7:2 8:3
15:24 16:14 26:6
29:1 49:3 57:1
68:20 71:3
SECONDLY- 7:25
8:9
SECULAR- 25:13
SECURITY- 48:15
SEE- 9:6,20 10:2
20:14,21 35:16
57:17 69:1,2
SEEK- 36:7 63:18
SEEKING- 14:10
19:10 22:15 23:17
24:11 27:11 42:12
60:3
SEEKS- 23:7 62:21
SEEN- 5:23
SEES- 8:5
SEGMENTS- 18:16
SELDOM- 53:13
SELLING- 24:5
SENIOR- 14:21
15:1,2,7,8,13
18:9 19:11 64:8
SENSITIVE- 24:22
25:17
SENTIMENT- 13:13
SEPARATE- 10:3
19:18 22:8
SEPARATION- 29:24
SERIOUS- 25:11
SERVICE- 40:19
62:3,5
SERVICES-
40:16,18 41:3
SET- 21:16 41:17
SETTLE- 63:7
SEVERAL- 58:22
SEVERANCE- 6:16
7:2,4 9:10 12:10
13:7 16:4,9
43:13,16,19
55:11,20 56:12
60:2,3,5,11,18
61:9,22
62:14,17,18 65:17
66:25 67:11,16
70:22 71:16 72:8
73:7,13
SEVERED- 16:9,10
58:5,7 61:17
65:20
SHARE- 10:11
26:18 28:12
SHOES- 44:8 58:7
SHOW- 28:16
SHOWED- 64:12

SHOWS- 9:24
20:12,13
SIDLEY- 6:17 17:7
SIGN- 5:24
SIGNED- 5:7 6:10
SIGNIFICANT-
24:24
45:3,7,13,20
SIGNIFICANTLY-
12:8 45:25
SIMILAR- 23:4
32:12 55:21 69:14
SIMPLY- 48:10
SIMULTANEOUSLY-
26:9
SIT- 28:23 38:21
SITUATION- 33:19
34:2,20 35:3
36:16 48:21
SITUATIONS- 32:6
SIX- 25:3 50:7
SIZE- 42:1
SKIN- 53:7
SLICE- 66:1
SLIGHTLY- 36:18
58:6
SMALL- 64:6
65:19,23 66:6
SNEAKER- 49:20
SNEAKERS- 49:20
SOPHISTICATION-
73:8
SOUGHT- 1:19
23:9 24:8
SOUND- 75:7
SOVIET-
48:13,15,18
SPEAKERS- 34:1
75:1
SPECIFIC- 32:10
SPECIFICALLY-
27:17 39:17 42:8
53:23
SPECULATION-
64:19
SPELL- 17:15
SPEND- 31:10 34:5
SPENT- 31:10,12
SPLIT- 65:19
SPLITTING- 66:8
SPOUSAL- 60:6
62:20
SPOUSE- 62:23
SQUARELY- 43:2
STAGE- 10:4 58:13
STAND- 55:3 58:6
59:3,19 74:25
STANDARD- 9:5
44:11 45:9
46:17,19,20,23
49:8 52:11,12
70:14 72:22,23
STANDARDS- 54:21
STANDPOINT- 26:19
51:5 70:24 71:11
START- 35:21
58:18
STARTED- 26:6
STATE- 17:14

68:13 74:20
STATION- 5:21
STATIONS- 26:18
28:11,14
STATUS- 23:24
24:1
STAY- 47:9
STAYING- 34:12
35:15
STEAL- 13:16
STEERING- 8:10
15:13,14,21 18:9
37:13 39:19 48:2
64:9
STEP- 38:25 39:25
40:6 68:2
STOCK- 49:21
STORE- 49:20
70:14
STORIES- 57:21
STRAIGHTFORWARD-
12:11
STRATEGIC- 26:5
STRESSFUL- 56:11
STRIKE- 35:20
STRONGEST- 54:11
STRUCTURAL- 15:10
STUDIED- 48:13
STUDY- 31:8,10
SUBMISSION- 8:18
SUBMISSIONS- 8:18
SUBMITTED- 41:18
SUBS- 24:2
SUBSERVIENT-
49:16
SUBSET- 65:16,23
SUBSIDIARIES-
23:16,21 47:19
SUBSIDIARY- 44:23
SUBSTANTIAL-
12:17 41:2
SUBSTANTIALLY-
20:16,18,21
SUBSTANTIVE- 7:7
8:1
SUCCEEDS- 35:17
SUCCESS- 57:4
SUFFICIENT- 38:11
39:15 51:19 73:5
SUGGESTED- 59:14
72:10
SUGGESTION- 70:23
SUM- 16:18 60:18
61:16
SUPPORT- 7:8
15:19 41:18 43:7
54:11 55:14 73:1
SUPPORTING- 69:18
SUPPORTIVE-
53:3,10
SUPPORTS- 52:20
SUPPOSE- 12:21
57:5
SUPPOSED- 58:10
SUPPOSEDLY- 29:8
SURCHARGE- 62:23
SURCHARGES- 60:6
62:21 63:2
SURPRISED- 54:4

SURVIVAL- 29:4
38:1 44:19
SURVIVE- 29:21
52:25
SUSPECT- 67:15
SWALLOW- 64:5
SWEAT- 34:19
SWITCH- 33:7
SWORN- 17:13
59:24
SYMPATHY- 74:19
SYNC- 5:5
SYSTEM- 48:13

───────────
T
───────────
TAKING- 49:5
TARGET- 19:7,8,10
20:17 36:5 42:20
51:13
TARGETS- 27:25
35:23 51:15,20
TASKED- 23:22
TAX- 18:6
TECHNICALITIES-
67:4
TECHNICALLY-
23:15
TELLS- 54:22
73:11
TENSION- 65:12
TERM- 21:24 32:2
38:23 46:10
TERMINATED- 7:3
12:23 63:15 70:7
72:8
TERMS- 9:17 29:22
36:6
45:6,10,15,18
46:4,25 47:18
51:19 68:25
69:8,14 70:4
TEST- 69:17
TESTIMONY- 8:3
16:25 17:4 32:1,7
40:9 43:9,21
45:12 47:1 55:15
70:18,19
THEME- 67:11
THEORY- 34:15
THEREFORE- 26:13
27:10 49:22
THIRD- 49:11
71:2,24
THOUGHTFUL- 26:13
THREAD- 37:15
THREE- 6:12,24
7:12,13 13:2
16:10 21:13 23:7
60:7 63:14 66:4
68:7
THUNDER- 13:16
TIME- 9:3 10:21
14:7,23,25 17:8
31:11,12 32:25
34:6,13 36:14
42:23 43:11 49:5
55:4 56:11 59:18
60:16 66:12
74:2,12

TIMES- 8:20 24:17
37:22 53:1 67:6
TIME-TO-TIME-
72:16
TIMING- 36:17
49:9 56:23 58:18
66:5 72:10
TINK- 25:12
TODAY- 5:10 7:22
11:4 18:22 21:23
22:24 23:3,6 27:2
28:23 34:9 38:21
41:11 42:12 45:24
48:22 54:4,20
55:1 60:9 61:1,24
63:15,19 65:1
67:8 71:25
73:19,25 74:18,22
TOGETHER- 15:14
TOMORROW- 34:16
38:6 46:13
TOMORROW'S- 46:12
TOOK- 66:20
TOP- 19:12,15,19
34:18 45:23 51:9
53:19
TOTAL- 20:15 23:3
33:20 42:10,13
61:5
TOTALING- 18:25
TOUCH- 46:24 50:1
TOUGH- 11:21
TOWARDS- 39:25
TRACKS- 70:4
TRADITIONALLY-
57:25
TRANSACTIONS-
26:23
TRANSCRIPT- 75:6
TRANSCRIPTS-
75:12
TRANSFORM- 38:2
44:20 45:1 53:1
66:23
TRANSFORMING-
26:22 29:2,11
44:16
TREAD- 72:18
TREASURER- 18:5
TREASURY- 18:5
TREMENDOUS- 25:7
44:17
TRENDS-
25:4,10,21,22,24
26:6 30:24 38:5
TRIB- 68:18
TRIBUNE- 5:3 6:23
11:23 17:23 30:25
31:2,9 32:24
34:12 37:22 41:8
43:1 48:21
50:9,25 51:3 52:4
55:8 71:9
TRIBUNE'S- 31:6
47:22 50:22
TRIGGER- 27:5
TRIGGERED- 27:10
TRULY- 48:11 53:1
54:9
TRUSTEE- 7:11,13

8:2,4,12 9:10
14:10 29:6
46:17,25 48:4
53:6 54:1,3,10,15
69:25 72:9 73:1
TRUSTEE'S- 7:5
9:7 44:7 53:8,23
TV- 26:17 28:11
TWO- 5:11 6:6,10
7:7,25 8:7 18:15
23:9 28:15 33:3
55:13 60:13,17
68:6 70:6 72:7
TYPES- 22:11
24:6,23 36:11
50:2
TYPICAL- 42:20

───────────
U
───────────
ULTIMATELY- 10:1
11:13 71:21
UNABLE- 33:8 66:5
UNCERTAINTY- 12:1
32:23 65:12 69:4
UNDERCOMPENSATED-
42:6,8
UNDERGOING- 41:3
UNDERSTANDING-
19:4 23:6 27:13
43:13 60:8
UNDERSTOOD-
37:7,10
UNDUE- 57:2
UNFORTUNATE-
61:25
UNFORTUNATELY-
15:3 66:4
UNIDENTIFIED-
21:5
UNILATERAL- 23:21
UNION- 9:13 12:15
14:1 16:14,15
48:15 60:7 62:9
63:1,6,10
UNIONIZED- 62:23
65:16
UNIONS- 64:9
UNIQUELY- 56:3
UNIT- 27:6
UNITED- 7:10,13
8:1,4 14:10 29:6
44:7
UNITS- 27:3,9,25
28:2 35:23,25
36:2
UNLESS- 54:3,22
59:4 69:19
UNLIKE- 54:12
72:19
UNREASONABLE-
52:22
UNSECURED- 10:19
48:6 55:19
UNUSUAL- 46:2
50:23
UNWISE- 53:14
UPSET- 16:13

**V**

**VALID-** 13:17
**VALUABLE-** 16:13
63:23
**VALUE-** 15:5 16:19
22:1 24:18 26:17
29:21 38:7,18
46:14 58:23
**VARIETY-** 32:18
62:9
**VARIOUS-** 23:1
73:9
**VARY-** 73:9
**VERBAL-** 38:13
**VERSUS-** 14:1
16:10,14 48:11
**VICE-** 6:18
**VICTIMS-** 57:4,5
**VIEW-** 10:5
12:6,13 14:6
37:20,23 38:25
49:8 50:19
52:13,16 56:13,21
57:20 66:3 67:1
70:4 71:22 73:1
**VIEWS-** 8:23 49:24
70:10
**VIOLATED-** 63:2
**VOICE-** 34:24 54:1
**VOLUNTARILY-** 30:4
**VOLUNTARY-** 29:24

**W**

**WAIT-** 66:12
**WALK-** 20:11
**WANTING-** 68:11
**WANTS-** 71:18
**WARDELL-** 14:19
**WARFARE-** 14:5
58:14
**WARRANTED-** 44:12
**WARRANTS-** 9:12
**WASN'T-** 48:16
**WAYS-** 25:20
**WE'RE-** 5:5,10
12:6 14:8 18:22
22:15,24 24:24
26:12,15 27:2
29:5 30:2 35:22
41:11 42:12
45:10,21 47:5,8
49:18 58:16,18
60:9 61:1,24 62:8
63:14,19 64:25
66:5 69:17
**WEAKEN-** 26:6
**WEAKNESSES-** 54:2
**WEEKS-** 13:2 16:10
60:17
**WEEKS'-** 60:13
**WEIGH-** 13:12
**WEIGHING-** 13:19
**WEREN'T-** 51:2
64:18
**WHEREUPON-** 75:2
**WHITE-** 39:3
**WHO'S-** 12:17 13:1
31:11

**WHOLE-** 58:4 71:17
**WIDE-** 62:9,13
**WIDGET-** 57:9
**WILL-** 7:8,16 8:15
9:10,23
10:1,7,11,15 11:8
12:11,12 17:3
23:22 25:17 26:6
28:8 29:12,22
34:17 35:4 38:1,6
39:11 42:6,7,11
45:21 46:5 47:3
51:7 52:9 53:12
55:3 58:15,23
65:13 68:11
69:9,13 70:15
71:19 73:3,
**WISH-** 43:4 69:24
74:15
**WISHES-** 6:5 9:15
48:2,3
**WITNESS-** 8:2
17:13,16 40:12
59:24 67:19
**WON'T-** 15:25
40:10
**WONDERFUL-** 39:5
**WORDS-** 44:21 50:1
**WORK-** 11:10,21,25
32:5 35:5,10,12
37:12 38:19,23
48:20 65:4
**WORKED-** 60:14
62:12
**WORKERS-** 9:13
**WORKFORCE-** 12:22
25:25 39:7 45:6,7
48:18 56:10,14
68:23
**WORKING-** 11:12
13:1 15:15 16:7
50:25
**WORKS-** 38:3 54:15
**WORLD-** 54:20
**WORLDWIDE-** 40:16
**WORRY-** 67:12
**WORST-** 25:5
**WOULDN'T-** 13:14

**X**

**X-** 70:14

**Y**

**Y-** 70:14
**YEAR-** 17:25 19:22
20:17,20 24:25
26:6,21 27:3,9
28:24 29:1,17,23
30:1 33:23
36:24,25 37:1,2
45:11 47:16 60:14
65:21
**YEAR'S-** 20:4
**YEARS-** 18:12
19:25 20:5,18
31:13 33:13,24
40:15,23 41:6
60:24 62:3,6
**YOU'D-** 35:13

74:11
**YOU'LL-** 7:9 12:4
13:4 35:1
56:5,6,23
**YOU'RE-** 25:8,12
30:19,22 34:11
66:3
**YOU'VE-** 19:24
42:1,5 45:12 46:1
65:4 67:2 68:24
**YOURS-** 14:23