AMENDMENT TO
NIELSEN STATION INDEX ("NSI") SERVICE AGREEMENT
BETWEEN NIELSEN MEDIA RESEARCH ("NIELSENTV")
AND TRIBUNE BROADCASTING COMPANY ("CLIENT")
EFFECTIVE DATE January 1, 2004

Pursuant to the above agreement ("the Current NSI Agreement"), NielsenTV shall, at the request of Client on behalf of station WTIC-TV, credit and report 100% simultaneously telecast program(s) ("Simulcast Credit") on Broadcast Station ("Originating Station") WTIC-TV and Another Broadcast Station ("Receiving Station") WTXX, provided that NSI Service hereunder for the Originating Station's market has not been terminated, subject to the following terms and conditions:

1.  Simulcast Credit shall commence on **April 10, 2006.** The commencement date of this Amendment shall be **April 1, 2006** ("Commencement Date"). The minimum duration for which Client may request and receive Simulcast Credit is one (1) year from the Commencement Date and such crediting and reporting shall continue thereafter until terminated by NielsenTV or by Client as provided hereunder.

2.  Client understands and agrees that eligibility for Simulcast Credit is pursuant to Client's compliance with all terms, conditions and criteria stated in Appendix "CC" (2005-2006 Local Reference Supplement, which is subject to change at NielsenTV's discretion) at Chapter 4.E.1 under the caption "Simulcast Programming Credit, Broadcast to Broadcast". If those terms, conditions and criteria are not met, e.g. if the Receiving Station does not provide a 100% simulcast of the program, commercials and any other non-program material broadcast by the Originating Station requesting the simulcast reporting, NielsenTV reserves the right to terminate further simulcast reporting for the requesting Originating Station. Furthermore, if in NielsenTV's judgment re-processing and/or re-issuing of the data become necessary as a result of such non-compliance by Client, Client agrees to pay for all reasonable reprocessing, printing and distribution costs incurred by NielsenTV. ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

3.  Client shall be responsible for reaching agreement with the appropriate Receiving Station regarding such crediting of simulcast viewing, and shall provide NielsenTV with a confirmation, in writing, from each Receiving Station that is simulcasting the program(s) prior to the following deadlines for requesting qualifying Simulcast Credit: (A) a minimum of three (3) weeks notice of request in writing prior to the Commencement Date in order to initiate for simulcast crediting for the Originating Station, or (B) a minimum of one (1) week notice of request in writing prior to the Commencement Date  to add, amend or remove any previously applied Simulcast Credit, subject to any applicable terms and conditions if minimum duration requirements for such reporting. The parties hereby acknowledge and agree that as of the execution date of this Amendment, Client has complied with its obligations under this paragraph 3.

4.  Client may terminate Simulcast Credit ██████████████████████████ pursuant to Section B.3 of the Current NSI Agreement entitled "Termination by Client", and/or by serving notice in writing on NielsenTV no less than eight (8) weeks prior to the effective date stated by Client in such notice, provided, however, that,█████████████████████████ Client's termination shall not be effective prior to the expiration of the one (1) year minimum duration specified in paragraph 1 herein. NielsenTV may terminate Simulcast Credit under paragraph 2 herein and/or pursuant to Section B.4 of the Current NSI Agreement entitled "Termination by NielsenTV" which provisions shall apply equally to Simulcast Credit except that the minimum duration for Simulcast Credit is one (1) year as specified in paragraph 1 herein.

5.  The charge for crediting and reporting qualifying simulcast programs that meet the criteria detailed in the 2005-2006 Local Reference Supplement (or any subsequent amendment or version thereof) is ██████████████████████████████
███████████ specified in Appendix "AA", which amount shall be calculated prior to any adjustments or surcharges under the Agreement, and the charge added to Client's monthly invoices hereunder. ████████████████████████████

All other terms and conditions of Client's Current NSI Agreement shall apply to all Simulcast Credit services and data except as otherwise expressly provided herein.

AGREED AND ACCEPTED:

| | |
|---|---|
| NIELSEN MEDIA RESEARCH, INC. | Tribune Broadcasting Company on behalf of WTIC-TV |
| SCHAUMBURG, ILLINOIS | (CLIENT) |
| Signed: _Jane R. Rode_ | Signed: _[signature]_ |
| | Name: |
| Title: Coordinating Vice President | (Print/Type)  Rich Graziano |
| Date: _7/21/0_ | Title: General Manager |
| | Date: _4/10/0_ |

## Amendment

Date: 11/8/07, rev 1/24/08, rev 1/29/08, rev 2/12/08

Reference is made to the Nielsen Station Index Service Agreement for Commerical Television Stations in Diary, Metered and Local People Meter Markets between Tribune Broadcasting Company ("Client") and Nielsen Media Research, Inc. ("Nielsen"), effective October 1, 2003 and as amended (the "Agreement"). For good and valuable consideration, receipt of which is acknowledged by the parties, it is hereby mutually agreed that the Agreement is hereby amended, effective as of October 1, 2007 as follows:

1. Appendix "AA" I. A Target Sample Size, Meter, Local People Meter have been modified to reflect the following:

| Station/Market: | KHWB (through 4/26/06) KHCW (effective as of 4/27/06) | KCPQ | KTWB (through 7/13/06) KMYQ (effective as of 7/14/06) |
|---|---|---|---|
| | Houston | Seattle | Seattle |
| Effective Date: | 1/1/2004-9/30/2007 | 1/1/2004-9/30/2007 | 1/1/2004-9/30/2007 |
| Installed Households: | 400 | 400 | 400 |
| Estimated Average Day In-Tab: | 350 | 350 | 350 |
| Minimum for Publication: | 180 | 180 | 180 |

**Local People Meter**

| Station/Market: | KHWB (through 4/26/06) KHCW (effective as of 4/27/06) | KCPQ | KTWB (through 7/13/06) KMYQ (effective as of 7/14/06) |
|---|---|---|---|
| | Houston | Seattle | Seattle |
| Effective Date: | 10/1/2007 | 10/1/2007 | 10/1/2007 |
| Installed Households: | 600 | 600 | 600 |
| Estimated Average Day In-Tab: | 525 | 525 | 525 |
| Minimum for Publication: | 210 | 210 | 210 |

2. Appendix "AA" I. B Target Sample Size, Diary (Monthly Analysis) has been modified to reflect the following:

| Station/Market: | KHWB (through 4/26/06) KHCW (effective as of 4/27/06) | KCPQ | KTWB (through 7/13/06) KMYQ (effective as of 7/14/06) |
|---|---|---|---|
| | Houston | Seattle | Seattle |
| Effective Date: | 1/1/2004-9/30/2007 | 1/1/2004-9/30/2007 | 1/1/2004-9/30/2007 |
| October | 1210 | 1105 | 1105 |
| November | 1210 | 1150 | 1150 |
| January | n/a | n/a | n/a |
| February | 1210 | 1150 | 1150 |
| March | n/a | n/a | n/a |
| May | 1210 | 1150 | 1150 |
| July | 1210 | 1150 | 1150 |

3. Appendix "AA" III. Base Rate per Month has been modified to reflect the LPM premium for Stations KHCW/Houston and KCPQ & KMYQ/Seattle:

| To | From | KHWB (through 4/26/06) KHCW (effective as of 4/27/06) Houston | KCPQ Seattle | KTWB (through 7/13/06) KMYQ (effective as of 7/14/06) Seattle |
|---|---|---|---|---|
| 1/1/2004 | 12/31/2004 | ■ | ■ | ■ |
| 1/1/2005 | 12/31/2005 | | | |
| 1/1/2006 | 12/31/2006 | | | |
| 1/1/2007 | 9/30/2007 | | | |
| 10/1/2007 | 9/30/2008 | | | |
| 10/1/2008 | 9/30/2009 | | | |
| 10/1/2009 | 9/30/2010 | | | |
| 10/1/2010 | 9/30/2011 | | | |
| 10/1/2011 | 12/31/2011 | | | |

4. Appendix "DD" 1.0 has been modified to reflect the following:

| Station | Market | Monthly Data Analyses per year |
|---|---|---|
| KHWB (through 4/26/06) KHCW (effective 4/27/06) | Houston, TX | 5 (through 9/30/07) 12 (effective 10/1/07) |
| KCPQ | Seattle-Tacoma, WA | 5 (through 9/30/07) 12 (effective 10/1/07) |
| KTWB (through 7/13/06) KMYQ (effective 7/14/06) | Seattle-Tacoma, WA | 5 (through 9/30/07) 12 (effective 10/1/07) |

5. Client acknowledges and agrees that NielsenTV shall change its sampling methods in the San Diego Market to Area Probability starting December 3, 2007, as those methods are described in the then current Local Reference Supplement, that Sub-County Characteristic guarantees will no longer be available after that date, and that the Agreement is hereby amended to delete such Sub-County Characteristic guarantees in Appendix "DD" Section 1.9.

6. With respect to Appendix "DD" 1.9, the attached Characteristics Tolerances and Penalty Specifications have been modified to reflect changes and additions.

Except as expressly set forth in this Amendment, all terms and conditions set forth in the Agreement remain in full force and effect. As of the effective date hereof, all references to the Agreement shall be references to the Agreement as amended by this Amendment.

IN WITNESS WHEREOF, this Amendment has been executed by the parties hereto through their duly authorized representatives whose signatures are set forth below.

AGREED AND ACCEPTED:

NIELSEN MEDIA RESEARCH, INC.
SCHAUMBURG, ILLINOIS

Signed: _Kelly Heneghan_

Name: Kelly A. Heneghan

Title: Coordinating Vice-President

Date: 3/24/08

Tribune Broadcasting Company
(CLIENT-full legal name)

Signed: _Gina M Mazzaferri_
(duly authorized officer or agent)

Name: (Print/Type) Gina M Mazzaferri

Title: Vice President

Date: 2-27-2008

**EFFECTIVE JANUARY 1, 2004 THROUGH SEPTEMBER 30, 2007**

**HOUSTON**
**METERED MARKET**
**KHWB (through 4/26/06) KHCW (effective 4/27/06) CONTRACT RIDER**
**CHARACTERISTIC TOLERANCES**

| CHARACTERISTIC | TOLERANCE RANGE | UE[1] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| RACE:BLACK | | | |
| ORIGIN:HISPANIC | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD: <35 35-54 55+ | | | |
| GEOGRAPHY: HARRIS COUNTY REMAINDER DMA | | | |

**HOUSTON**
**METER MARKET**
**KHWB (through 4/26/06) KHCW (effective 4/27/06) CONTRACT RIDER**
**SPECIFICATIONS**



| | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|
| DISTANCE FROM TOLERANCE BOUNDARY | 1 | 2 | 3 | 4 | 5 | 6+ |
| 0.1 – 1.0 | ■ | ■ | ■ | ■ | ■ | ■ |
| 1.1 – 2.0 | | | | | | |
| 2.1 – 3.0 | | | | | | |
| 3.1 – 4.0 | | | | | | |
| 4.1 – 5.0 | | | | | | |
| 5.1 – 6.0 | | | | | | |
| 6.1+ | ■ | ■ | ■ | ■ | ■ | ■ |

---

[1] UE = 1/1/2006, except CABLE = November, 2005

EFFECTIVE OCTOBER 1, 2007

HOUSTON
LOCAL PEOPLE METER
KHWB (through 4/26/06) KHCW (effective 4/27/06) CONTRACT RIDER
CHARACTERISTIC TOLERANCES

| CHARACTERISTIC | TOLERANCE RANGE | UE$^2$ | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| RACE: BLACK | | | |
| ORIGIN: HISPANIC | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD: | | | |
| <35 | | | |
| 35-54 | | | |
| 55+ | | | |
| GEOGRAPHY: | | | |
| HARRIS COUNTY | | | |
| REMAINDER DMA | | | |

HOUSTON
LOCAL PEOPLE METER
KHWB (through 4/26/06) KHCW (effective 4/27/06) CONTRACT RIDER
SPECIFICATIONS

| | | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6+ |
| DISTANCE FROM TOLERANCE BOUNDARY | 0.1 – 1.0 | | | | | | |
| | 1.1 – 2.0 | | | | | | |
| | 2.1 – 3.0 | | | | | | |
| | 3.1 – 4.0 | | | | | | |
| | 4.1 – 5.0 | | | | | | |
| | 5.1 – 6.0 | | | | | | |
| | 6.1+ | | | | | | |

---

$^2$ UE = 1/1/2006, except CABLE = November, 2005

EFFECTIVE JANUARY 1, 2004 THROUGH SEPTEMBER 30, 2007

**SEATTLE**
**METERED MARKET**
KTWB (through 7/13/06) KMYQ CONTRACT RIDER
CHARACTERISTIC TOLERANCES

| CHARACTERISTIC | TOLERANCE RANGE | UE[3] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD: <br> <35 <br> 35-54 <br> 55+ | | | |
| GEOGRAPHY: <br> KING COUNTY <br> PIERCE COUNTY <br> SNOHOMISH COUNTY <br> REMAINDER DMA | | | |

**SEATTLE**
**METER MARKET**
KTWB (through 7/13/06) KMYQ CONTRACT RIDER
SPECIFICATIONS

---

[3] UE = 1/1/2006, except CABLE = November, 2005

EFFECTIVE OCTOBER 1, 2007

SEATTLE
LOCAL PEOPLE METER
KTWB (through 7/13/06) KMYQ CONTRACT RIDER
CHARACTERISTIC TOLERANCES

| CHARACTERISTIC | TOLERANCE RANGE | UE[4] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD: | | | |
| <35 | | | |
| 35-54 | | | |
| 55+ | | | |
| GEOGRAPHY: | | | |
| KING COUNTY | | | |
| PIERCE COUNTY | | | |
| SNOHOMISH COUNTY | | | |
| REMAINDER DMA | | | |

SEATTLE
LOCAL PEOPLE METER
KTWB (through 7/13/06) KMYQ CONTRACT RIDER
SPECIFICATIONS

| | | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6+ |
| DISTANCE FROM TOLERANCE BOUNDARY | 0.1 – 1.0 | | | | | | |
| | 1.1 – 2.0 | | | | | | |
| | 2.1 – 3.0 | | | | | | |
| | 3.1 – 4.0 | | | | | | |
| | 4.1 – 5.0 | | | | | | |
| | 5.1 – 6.0 | | | | | | |
| | 6.1+ | | | | | | |

---

[4] UE = 1/1/2006, except CABLE = November, 2005

**EFFECTIVE JANUARY 1, 2004 THROUGH SEPTEMBER 30, 2007**

**SEATTLE**
**METERED MARKET**
**KCPQ CONTRACT RIDER**
**CHARACTERISTIC TOLERANCES**

| CHARACTERISTIC | TOLERANCE RANGE | UE[5] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD:<br>   <35<br>   35-54<br>   55+ | | | |
| GEOGRAPHY:<br>   KING COUNTY<br>   PIERCE COUNTY<br>   SNOHOMISH COUNTY<br>   REMAINDER DMA | | | |

**SEATTLE**
**METER MARKET**
**KCPQ CONTRACT RIDER**
**SPECIFICATIONS**

| | | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6+ |
| DISTANCE FROM TOLERANCE BOUNDARY | 0.1 – 1.0 | | | | | | |
| | 1.1 – 2.0 | | | | | | |
| | 2.1 – 3.0 | | | | | | |
| | 3.1 – 4.0 | | | | | | |
| | 4.1 – 5.0 | | | | | | |
| | 5.1 – 6.0 | | | | | | |
| | 6.1+ | | | | | | |

---

[5] UE = 1/1/2006, except CABLE = November, 2005

**EFFECTIVE OCTOBER 1, 2007**

**SEATTLE**
LOCAL PEOPLE METER
**KCPQ** CONTRACT RIDER
CHARACTERISTIC TOLERANCES



| CHARACTERISTIC | TOLERANCE RANGE | UE[6] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD: <br> <35 <br> 35-54 <br> 55+ | | | |
| GEOGRAPHY: <br> KING COUNTY <br> PIERCE COUNTY <br> SNOHOMISH COUNTY <br> REMAINDER DMA | | | |

**SEATTLE**
LOCAL PEOPLE METER
**KCPQ** CONTRACT RIDER
SPECIFICATIONS

| | | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6+ |
| **DISTANCE FROM TOLERANCE BOUNDARY** | 0.1 – 1.0 | ■ | ■ | ■ | ■ | ■ | ■ |
| | 1.1 – 2.0 | | | | | | |
| | 2.1 – 3.0 | | | | | | |
| | 3.1 – 4.0 | | | | | | |
| | 4.1 – 5.0 | | | | | | |
| | 5.1 – 6.0 | | | | | | |
| | 6.1+ | | | | | | |

---

[6] UE = 1/1/2006, except CABLE = November, 2005

EFFECTIVE JANUARY 1, 2004 THROUGH SEPTEMBER 30, 2004

### CHICAGO
### METERED MARKET
### WGN CONTRACT RIDER
### CHARACTERISTIC TOLERANCES

| CHARACTERISTIC | TOLERANCE RANGE | UE[7] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| RACE-BLACK | | | |
| ORIGIN:HISPANIC | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD:<br>  <35<br>  35-54<br>  55+ | | | |
| GEOGRAPHY:<br>  COOK COUNTY<br>  REMAINDER DMA | | | |

### CHICAGO METER MARKET
### WGN CONTRACT RIDER
### ██████ SPECIFICATIONS

| | | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6+ |
| DISTANCE FROM TOLERANCE BOUNDARY | 0.1 – 1.0 | | | | | | |
| | 1.1 – 2.0 | | | | | | |
| | 2.1 – 3.0 | | | | | | |
| | 3.1 – 4.0 | | | | | | |
| | 4.1 – 5.0 | | | | | | |
| | 5.1 – 6.0 | | | | | | |
| | 6.1+ | | | | | | |

---

[7] UE = 1/1/2006, except CABLE = November, 2005

**EFFECTIVE OCTOBER 1, 2004**

**CHICAGO**
**LOCAL PEOPLE METER MARKET**
**WGN CONTRACT RIDER**
**CHARACTERISTIC TOLERANCES**

| CHARACTERISTIC | TOLERANCE RANGE | UE[8] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| RACE-BLACK | | | |
| ORIGIN:HISPANIC | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD: <35 35-54 55+ | | | |
| GEOGRAPHY: COOK COUNTY REMAINDER DMA | | | |

**CHICAGO LOCAL PEOPLE METER MARKET**
**WGN CONTRACT RIDER**
**SPECIFICATIONS**

| DISTANCE FROM TOLERANCE BOUNDARY | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6+ |
| 0.1 – 1.0 | | | | | | |
| 1.1 – 2.0 | | | | | | |
| 2.1 – 3.0 | | | | | | |
| 3.1 – 4.0 | | | | | | |
| 4.1 – 5.0 | | | | | | |
| 5.1 – 6.0 | | | | | | |
| 6.1+ | | | | | | |

---

[8] UE = 1/1/2006, except CABLE = November, 2005

**EFFECTIVE JANAURY 1, 2005 THROUGH DECEMBER 31, 2005**

**DALLAS**
**METERED MARKET**
**KDAF CONTRACT RIDER**
**CHARACTERISTIC TOLERANCES**

| CHARACTERISTIC | TOLERANCE RANGE | UE[9] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| RACE:BLACK | | | |
| ORIGIN:HISPANIC | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD: <35  35-54  55+ | | | |
| GEOGRAPHY: DALLAS COUNTY  TARRANT COUNTY  COLLIN COUNTY  REMAINDER DMA | | | |

**DALLAS METER MARKET**
**KDAF CONTRACT RIDER**
**SPECIFICATIONS**

| | | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6+ |
| **DISTANCE FROM TOLERANCE BOUNDARY** | 0.1 – 1.0 | | | | | | |
| | 1.1 – 2.0 | | | | | | |
| | 2.1 – 3.0 | | | | | | |
| | 3.1 – 4.0 | | | | | | |
| | 4.1 – 5.0 | | | | | | |
| | 5.1 – 6.0 | | | | | | |
| | 6.1+ | | | | | | |

---

[9] UE = 1/1/2006, except CABLE = November, 2005

EFFECTIVE JANUARY 1, 2006

**DALLAS**
LOCAL PEOPLE METER MARKET
KDAF CONTRACT RIDER
CHARACTERISTIC TOLERANCES



| CHARACTERISTIC | TOLERANCE RANGE | UE[10] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| RACE-BLACK | | | |
| ORIGIN:HISPANIC | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD: <br> <35 <br> 35-54 <br> 55+ | | | |
| GEOGRAPHY: <br> DALLAS COUNTY <br> TARRANT COUNTY <br> COLLIN COUNTY <br> REMAINDER DMA | | | |

**DALLAS**
LOCAL PEOPLE METER MARKET
KDAF CONTRACT RIDER
███████████████ SPECIFICATIONS

|  | CONSECUTIVE MONTHS OUT OF TOLERANCE |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6+ |
| 0.1 – 1.0 | | | | | | |
| 1.1 – 2.0 | | | | | | |
| 2.1 – 3.0 | | | | | | |
| 3.1 – 4.0 | | | | | | |
| 4.1 – 5.0 | | | | | | |
| 5.1 – 6.0 | | | | | | |
| 6.1+ | | | | | | |

DISTANCE FROM TOLERANCE BOUNDARY

---

[10] UE = 1/1/2006, except CABLE = November, 2005

**EFFECTIVE JANUARY 1, 2004 THROUGH JULY 31, 2004**

**LOS ANGELES**
**METERED MARKET**
**KTLA CONTRACT RIDER**
**CHARACTERISTIC TOLERANCES**

| CHARACTERISTIC | TOLERANCE RANGE | UE[11] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| ORIGIN: HISPANIC | | | |
| RACE: ASIAN* | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD:<br>    <35<br>    35-54<br>    55+ | | | |
| GEOGRAPHY:<br>    LOS ANGELES COUNTY<br>    ORANGE COUNTY<br>    SAN BERNARDINO CO<br>    REMAINDER DMA | | | |

* Effective August, 2004

**LOS ANGELES METER MARKET**
**KTLA CONTRACT RIDER**
**SPECIFICATIONS**



| | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|
| DISTANCE FROM TOLERANCE BOUNDARY | 1 | 2 | 3 | 4 | 5 | 6+ |
| 0.1 – 1.0 | | | | | | |
| 1.1 – 2.0 | | | | | | |
| 2.1 – 3.0 | | | | | | |
| 3.1 – 4.0 | | | | | | |
| 4.1 – 5.0 | | | | | | |
| 5.1 – 6.0 | | | | | | |
| 6.1+ | | | | | | |

---

[11] UE = 1/1/2006, except CABLE ≈ November, 2005

**EFFECTIVE AUGUST 1, 2004**

**LOS ANGELES**
**LOCAL PEOPLE METER MARKET**
**KTLA CONTRACT RIDER**
**CHARACTERISTIC TOLERANCES**

| CHARACTERISTIC | TOLERANCE RANGE | UE[12] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| ORIGIN: HISPANIC | | | |
| RACE: ASIAN* | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD: | | | |
| <35 | | | |
| 35-54 | | | |
| 55+ | | | |
| GEOGRAPHY: | | | |
| LOS ANGELES COUNTY | | | |
| ORANGE COUNTY | | | |
| SAN BERNARDINO CO | | | |
| REMAINDER DMA | | | |

\* Effective August, 2004

**LOS ANGELES**
**LOCAL PEOPLE METER MARKET**
**KTLA CONTRACT RIDER**
**SPECIFICATIONS**



| | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|
| DISTANCE FROM TOLERANCE BOUNDARY | 1 | 2 | 3 | 4 | 5 | 6+ |
| 0.1 – 1.0 | | | | | | |
| 1.1 – 2.0 | | | | | | |
| 2.1 – 3.0 | | | | | | |
| 3.1 – 4.0 | | | | | | |
| 4.1 – 5.0 | | | | | | |
| 5.1 – 6.0 | | | | | | |
| 6.1+ | | | | | | |

---

[12] UE = 1/1/2006, except CABLE = November, 2005

**EFFECTIVE JANUARY 1, 2004 THROUGH AUGUST 31, 2004**

### NEW YORK
#### METERED MARKET
#### WPIX CONTRACT RIDER
#### CHARACTERISTIC TOLERANCES

| CHARACTERISTIC | TOLERANCE RANGE | UE[13] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| RACE:BLACK | | | |
| ORIGIN:HISPANIC | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD:<br>   <35<br>   35-54<br>   55+ | | | |
| GEOGRAPHY:<br>   KINGS BOROUGH<br>   QUEENS BOROUGH<br>   REMAINDER METRO<br>   REMAINDER DMA | | | |

### NEW YORK METER MARKET
#### WPIX CONTRACT RIDER
#### SPECIFICATIONS



| | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|
| DISTANCE FROM TOLERANCE BOUNDARY | 1 | 2 | 3 | 4 | 5 | 6+ |
| 0.1 – 1.0 | | | | | | |
| 1.1 – 2.0 | | | | | | |
| 2.1 – 3.0 | | | | | | |
| 3.1 – 4.0 | | | | | | |
| 4.1 – 5.0 | | | | | | |
| 5.1 – 6.0 | | | | | | |
| 6.1+ | | | | | | |

---

[13] UE = 1/1/2006, except CABLE = November, 2005

**EFFECTIVE SEPTEMBER 1, 2004**

**NEW YORK**
**LOCAL PEOPLE METER MARKET**
**WPIX CONTRACT RIDER**
**CHARACTERISTIC TOLERANCES**

| CHARACTERISTIC | TOLERANCE RANGE | UE[14] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| RACE: BLACK | | | |
| ORIGIN: HISPANIC | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD: <br> <35 <br> 35-54 <br> 55+ | | | |
| GEOGRAPHY: <br> KINGS BOROUGH <br> QUEENS BOROUGH <br> REMAINDER METRO <br> REMAINDER DMA | | | |

**NEW YORK**
**LOCAL PEOPLE METER MARKET**
**WPIX CONTRACT RIDER**
**SPECIFICATIONS**

| CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6+ |

DISTANCE FROM TOLERANCE BOUNDARY

| | | | | | | |
|---|---|---|---|---|---|---|
| 0.1 – 1.0 | | | | | | |
| 1.1 – 2.0 | | | | | | |
| 2.1 – 3.0 | | | | | | |
| 3.1 – 4.0 | | | | | | |
| 4.1 – 5.0 | | | | | | |
| 5.1 – 6.0 | | | | | | |
| 6.1+ | | | | | | |

---

[14] UE = 1/1/2006, except CABLE = November, 2005

**EFFECTIVE JANAURY 1, 2004 THROUGH JUNE 30, 2005**

**PHILADELPHIA**
**METERED MARKET**
**WPHL CONTRACT RIDER**
**CHARACTERISTIC TOLERANCES**

| CHARACTERISTIC | TOLERANCE RANGE | UE[15] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| RACE:BLACK | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD:<br>    <35<br>    35-54<br>    55+ | | | |
| GEOGRAPHY:<br>    PHILADELPHIA CO<br>    MONTGOMERY CO<br>    REMAINDER METRO<br>    REMAINDER DMA | | | |

**PHILADELPHIA METER MARKET**
**WPHL CONTRACT RIDER**
**SPECIFICATIONS**

| | | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6+ |
| DISTANCE FROM TOLERANCE BOUNDARY | 0.1 – 1.0 | | | | | | |
| | 1.1 – 2.0 | | | | | | |
| | 2.1 – 3.0 | | | | | | |
| | 3.1 – 4.0 | | | | | | |
| | 4.1 – 5.0 | | | | | | |
| | 5.1 – 6.0 | | | | | | |
| | 6.1+ | | | | | | |

---

[15] UE  =  1/1/2006, except CABLE  =  November, 2005

EFFECTIVE JULY 1, 2005

### PHILADELPHIA
### LOCAL PEOPLE METER MARKET
### WPHL CONTRACT RIDER
### CHARACTERISTIC TOLERANCES

| CHARACTERISTIC | TOLERANCE RANGE | UE[16] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| RACE: BLACK | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD:<br>    <35<br>    35-54<br>    55+ | | | |
| GEOGRAPHY:<br>    PHILADELPHIA CO<br>    MONTGOMERY CO<br>    REMAINDER METRO<br>    REMAINDER DMA | | | |

### PHILADELPHIA
### LOCAL PEOPLE METER MARKET
### WPHL CONTRACT RIDER
### SPECIFICATIONS



| DISTANCE FROM TOLERANCE BOUNDARY | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6+ |
| 0.1 – 1.0 | | | | | | |
| 1.1 – 2.0 | | | | | | |
| 2.1 – 3.0 | | | | | | |
| 3.1 – 4.0 | | | | | | |
| 4.1 – 5.0 | | | | | | |
| 5.1 – 6.0 | | | | | | |
| 6.1+ | | | | | | |

---

[16] UE = 1/1/2006, except CABLE = November, 2005

**EFFECTIVE JANUARY 1, 2004 THROUGH JUNE 30, 2005**

**WASHINGTON DC**
**METERED MARKET**
**WBDC (through 4/30/06) WDCW (effective 5/1/06) CONTRACT RIDER**
**CHARACTERISTIC TOLERANCES**

| CHARACTERISTIC | TOLERANCE RANGE | UE[17] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| RACE: BLACK | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD: | | | |
| <35 | | | |
| 35-54 | | | |
| 55+ | | | |
| GEOGRAPHY: | | | |
| FAIRFAX COUNTY | | | |
| MONTGOMERY COUNTY | | | |
| PRINCE GEORGE'S CTY | | | |
| DISTRICT OF COLUMBIA | | | |
| REMAINDER METRO | | | |
| REMAINDER DMA | | | |

**WASHINGTON DC METER MARKET**
**WBDC (through 4/30/06) WDCW (effective 5/1/06) CONTRACT RIDER**
**SPECIFICATIONS**

| | | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6+ |
| DISTANCE FROM TOLERANCE BOUNDARY | 0.1 – 1.0 | | | | | | |
| | 1.1 – 2.0 | | | | | | |
| | 2.1 – 3.0 | | | | | | |
| | 3.1 – 4.0 | | | | | | |
| | 4.1 – 5.0 | | | | | | |
| | 5.1 – 6.0 | | | | | | |
| | 6.1+ | | | | | | |

---

[17] UE = 1/1/2006, except CABLE = November, 2005

**EFFECTIVE JULY 1, 2005**

**WASHINGTON DC**
**LOCAL PEOPLE METER MARKET**
**WBDC (through 4/30/06) WDCW (effective 5/1/06) CONTRACT RIDER**
**CHARACTERISTIC TOLERANCES**

| CHARACTERISTIC | TOLERANCE RANGE | UE[18] | TOLERANCE BOUNDARIES |
|---|---|---|---|
| CABLE: YES | | | |
| RACE:BLACK | | | |
| PRES. CHILD: ANY<18 | | | |
| AGE OF HEAD:<br>    <35<br>    35-54<br>    55+ | | | |
| GEOGRAPHY:<br>    FAIRFAX COUNTY<br>    MONTGOMERY COUNTY<br>    PRINCE GEORGE'S CTY<br>    DISTRICT OF COLUMBIA<br>    REMAINDER METRO<br>    REMAINDER DMA | | | |

**WASHINGTON DC LOCAL PEOPLE METER MARKET**
**WBDC (through 4/30/06) WDCW (effective 5/1/06) CONTRACT RIDER**
**SPECIFICATIONS**

| DISTANCE FROM TOLERANCE BOUNDARY | CONSECUTIVE MONTHS OUT OF TOLERANCE | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6+ |
| 0.1 – 1.0 | | | | | | |
| 1.1 – 2.0 | | | | | | |
| 2.1 – 3.0 | | | | | | |
| 3.1 – 4.0 | | | | | | |
| 4.1 – 5.0 | | | | | | |
| 5.1 – 6.0 | | | | | | |
| 6.1+ | | | | | | |

---

[18] UE = 1/1/2006, except CABLE = November, 2005

NSI Stellar041708

# Nielsen Station Index Service
# Stellar Agreement

Date of Proposal: **May 22, 2008**

**Tribune Broadcasting Company (on behalf of Station WXMI-TV)** , a(n) **MI** **Corporation** with offices at **3117 Plaza Drive N.E., Grand Rapids, MI 49525** ("Client") hereby requests that Nielsen Media Research, Inc. ("Nielsen") provide Stellar service ("Stellar Service") and Nielsen hereby agrees to furnish and license Stellar Service to Client on the terms and conditions of this agreement ("Agreement") and Client's Nielsen Station Index ("NSI") agreement ("NSI Service Agreement").

## A. SCOPE OF SERVICE

1. **Stellar Service.** Stellar Service shall consist of Nielsen's web-based service consisting of a data analytics tool used to evaluate audience delivery across geographic, qualitative and distribution (cable) breaks as measured by Nielsen. Nielsen hereby grants to Client a nonexclusive, nontransferable license for Client to use the Stellar Service, but only for Client's internal purposes for the Minimum Duration specified in Section B.2. herein. Current subscription to the NSI audience measurement service is a prerequisite to obtaining the license for access to and use of Stellar Service.

2. **Definitions.** Capitalized terms which are used herein but which are not defined herein shall have the meanings set forth in the NSI Service Agreement. As used herein, the following definitions shall apply:

   a. **"Authorized Users"** shall mean all employees of Client who are designated by Client as being authorized to access and use Stellar Service in accordance with the terms hereof. Each Authorized User shall be assigned a Stellar Service User ID and security password for the purposes set forth herein.

   b. **"Stellar Database"** shall mean the proprietary NSI database of television audience viewing data and information from which Stellar reports shall be derived. Client's right to use and access the Stellar Database shall be restricted to the sole purpose of initiating searches of the Stellar Database to generate Stellar Reports and Stellar Report Information.

   c. **"Stellar Reports"** shall mean the reports, analyses and information prepared and furnished via Stellar Service in response to specific search requests initiated by Authorized Users. All Stellar Reports shall be delivered to Client in electronic format via the Nielsen Local Ratings Suite.

   d. **"Stellar Report Information"** shall mean all data and information set forth or contained in Stellar Reports, representing information prepared in response to Client's search requests.

   e. **"Stellar Software"** shall mean the web-based Software to which Client shall have access for delivery of the Stellar Data.

   f. **"Documentation"** shall mean all user manuals and related documentation delivered to Client by Nielsen for use in connection with Stellar Service.

## B. COMMENCEMENT, DURATION AND TERMINATION

1. **Commencement Date.** This Agreement, and Stellar Service hereunder, shall commence on **6/1/08** ("Commencement Date").

2. **Duration.** Subject to the provisions of Section B.4., this Agreement, and Stellar Service hereunder, shall have a "Minimum Duration" of **1 Year** and shall continue thereafter until Stellar Service is terminated as provided in Sections B.3 or B.4. herein.

3. **Termination by Client.** This Agreement, and Stellar Service hereunder, may be terminated by Client, for any reason, by serving notice in writing on Nielsen at any time, which notice shall be effective on expiration of the eighth month next following the month during which notice shall have been served or upon such later date as

*NSI Stellar041708*

specified by Client; provided, however, that such termination shall not in any case be effective prior to expiration of the period of Minimum Duration specified in Section B.2.

4. **Termination by Nielsen.** This Agreement, and Stellar Service hereunder, may be terminated by Nielsen, for any reason, by serving notice on Client at any time and by refunding promptly all moneys paid for services not to be rendered, which notice shall not become effective prior to the expiration of the period of Minimum Duration specified in B.2., except, however, that termination may be effective on any date specified by Nielsen upon such notice in the event of non-performance and/or breach by Client of any one or more of its obligations hereunder, or if Nielsen shall be unable for any cause beyond its control to fulfill its obligations hereunder, or if Nielsen shall terminate Stellar Service to all clients then subscribing to Stellar Service. It is understood that, in any event, this Agreement shall automatically terminate upon expiration or termination of the NSI Service Agreement and service thereunder.

5. **Termination of License.** Upon termination or expiration of this Agreement, the license granted to Client hereunder shall automatically terminate and all Authorized User IDs and security passwords shall be immediately revoked. In addition, Client will promptly return to Nielsen all copies of any and all Stellar Reports, Report Information, Documentation and all other information and/or analyses delivered to Client in connection with the Stellar Service and all summaries and abstracts thereof, including any and all copies thereof, in whatever tangible form or format recorded, held or maintained, whether embedded in software or combined with other information and, in each case, except to the extent the same has been returned or destroyed by Client, in which case Client shall promptly provide to Nielsen a written certification to such effect. Further, Client shall certify that all Stellar Software has been deleted from the computer systems of Client and its Authorized Users.

## C. PRICES AND TERMS

1. Client agrees to pay Nielsen for Stellar Service, and the license hereunder to use the Stellar Reports, Stellar Report Information, Stellar Software, and Documentation, for the monthly charge ("Monthly Charge") set forth in Appendix A.



2. ███████████████████████████████████████████████████████████████████

3. Client acknowledges that the Monthly Charge shall be in addition to all fees payable by Client pursuant to its NSI Service Agreement and that Client shall continue to be obligated to pay for any special or customized reports ordered thereunder. Unless otherwise agreed to by the parties in writing, Client shall pay for the cost of obtaining and maintaining all phone lines, modems, Internet connections, or other communications connections, whether analog or digital, and software(other than the Stellar Software) as may be necessary or desirable to facilitate access to and the operation of the Stellar Service by Client and its Authorized Users, and Nielsen shall have no responsibility or liability with respect thereto, Client agreeing to look solely to the provider(s) in the event of any errors or defects in any thereof.

4. Nielsen shall provide maintenance and support for the Stellar Service, consisting of the provision of telephone support during regular Nielsen business hours, provided that Nielsen shall have no obligation to provide support or maintenance of the computers, modems, phone lines, Internet connections or other communications connections, whether analog or digital, of Client or its Authorized Users.

## D. PERMISSIBLE USES

1. Client understands that Stellar Service is furnished and licensed hereunder on the basis of Client's representation that Client has a continuing legitimate business interest in the subject matter thereof.

2. The Stellar Database, Stellar Reports and Stellar Report Information are furnished only to convey the information therein contained, all of which remain the property of Nielsen, in which Nielsen retains all rights (including, but not limited to, all copyrights), made available to Client for its confidential internal use as management guides in connection with the conduct of Client's business within the United States of America only, and subject to the provisions of Client's NSI Service Agreement.

3. Client agrees that it shall, in all tangible expressions of the Stellar Reports and Stellar Report Information, properly and accurately identify Nielsen Media Research, Inc. as the source of the information used by Client, and reference any and all information in a manner not misleading to the reader.

## E. GENERAL PROVISIONS

1. **Intellectual Property Rights.** No rights in the Stellar Service, Stellar Database, Stellar Reports, Stellar Report Information, Stellar Software, Documentation or any other documentation related to any of the foregoing, by whatever tangible means expressed or conveyed, are transferred to Client or to any other person or entity, whether pursuant to this Agreement or otherwise, except for those limited rights specifically granted in this Agreement.

2. **Client Responsibility.**

   a. Client agrees that the Stellar Service, Stellar Database, Stellar Reports, Stellar Report Information and Stellar Software and/or Documentation shall be used solely by Authorized Users on behalf of Client, and not by or on behalf of any third party whatsoever including, without limitation, any person, corporation, partnership, or other entity controlling, controlled by or under common control with Client, regardless of whether such entities are Nielsen licensees, without Nielsen's express prior written consent. Client assumes full responsibility to Nielsen for any violation (whether occurring before or after termination hereof) by any director, partner, officer, employee, consultant, agent or representative of Client of any obligation assumed by Client hereunder and agrees to take all steps necessary to ensure understanding of and compliance with this undertaking by all Authorized Users and any and all other persons having access to the Stellar Service, Stellar Database, Stellar Reports, Stellar Report Information and Stellar Software and/or Documentation, and materials licensed or furnished hereunder. Client shall monitor the activities of its Authorized Users to ensure that they comply with the obligations and restrictions hereunder.  Client shall be fully responsible for maintaining the confidentiality of, and all activities that occur under, any and all of Client's passwords and accounts. Client agrees to comply with user authentication and the security of any and all hosts, networks and accounts. Client will immediately notify Nielsen when a user leaves Client's company and/or is no longer acting on behalf of Client and in the event of any unauthorized access or use of the Service.

   b. Without limiting the generality of the foregoing, Client shall not (and shall take all steps as are necessary to ensure that its Authorized Users and other employees do not) (i) copy, download, decompile, reverse engineer, disassemble or otherwise reduce to human readable form the Stellar Software; (ii) create derivative works based on the Stellar Software or Documentation or any portion thereof; (iii) remove any proprietary or copyright legend from the Stellar Database, Stellar Software and/or Documentation; (iv) resell, rent, lease, loan, sublicense or otherwise distribute or dispose of, or permit or allow the distribution or disposal of, the Stellar Service, Stellar Database, Stellar Reports, Stellar Report InformationData and Stellar Software and/or Documentation; (v) otherwise disclose or permit the use of or access to the Stellar Service, Stellar Database, Stellar Reports, Stellar Report Information, Stellar Software and/or Documentation to or by any person other than an Authorized User, except as expressly permitted hereunder; or (vi) modify, adapt or translate the Stellar Service, Stellar Database, Stellar Reports, Stellar Report Information, and Stellar  Software  and/or Documentation, except as expressly permitted hereunder.

   c. Client acknowledges that a violation of any of the provisions contained or referred to in this Section E.2 or Sections B.5, D, and E.1 hereof will cause irreparable harm to Nielsen's business, for which there is no adequate remedy at law. Accordingly, in the event of any such violation, Client agrees that Nielsen shall be entitled, in addition to and without limiting any other remedies it may have, at law or in equity, to immediate and permanent injunctive relief against Client and any and all Authorized Users, employees, agents, and/or other third parties acting through, for or with any of the foregoing, in any court having jurisdiction.

3. **Disclaimer of Warranty.**  ALL NIELSEN INFORMATION AND DATA IS PROVIDED "AS IS" AND "AS AVAILABLE." NMR MAKES NO WARRANTIES THAT THE DELIVERY OF NIELSEN INFORMATION AND DATA WILL BE ERROR-FREE OR OPERATE WITHOUT INTERRUPTION, OR THAT THE WEBSITE OR THE SERVERS THAT MAKE SUCH MATERIALS AVAILABLE ARE FREE OF VIRUSES OR SIMILAR COMPONENTS OR THAT SECURITY WILL NOT BE BREACHED. NIELSEN DISCLAIMS, AND CLIENT

3

HEREBY WAIVES, ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, TO CLIENT OR ANY THIRD PARTY, WITH RESPECT TO THE STELLAR SERVICE, STELLAR DATABASE, STELLAR REPORTS AND STELLAR REPORT INFORMATIONAND ANY STELLAR SOFTWARE OR OTHER SOFTWARE FURNISHED OR UTILIZED IN CONNECTION HEREWITH, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. The foregoing disclaimer shall neither act as nor constitute an admission by Nielsen that any of the foregoing constitute goods, commodities or tangible personal property under or for the purposes of any applicable law.

4. **Limitation of Liability.** Nielsen shall not be liable for the corruption, unauthorized use or disclosure, or erasure of information or data transmitted, received or stored on its or any third party or Internet service provider system. Nielsen reserves the right to suspend services when, in Nielsen's sole discretion, failure to do so would compromise performance or security. In no event shall Nielsen be liable for any damages or losses, including without limitation any direct, indirect, special, incidental or consequential damages (including, but not limited to, lost profits, loss or corruption of data or costs of procurement of substitute goods or services), however caused and under any theory of liability, including, but not limited to, losses or damages resulting from the loss of, inability to access, or inability to receive or transmit, the information and data caused by or resulting from delays, non-delivery or service interruptions due to circumstances not in the direct control of Nielsen such as users' equipment capabilities, telecommunications failures or Internet service provider limitations. Further, Nielsen shall have no liability, whether in contract, tort or otherwise, and Client expressly waives all claims, for any loss, injury or damage of any kind, whether direct, special, incidental, consequential or otherwise, whether or not Nielsen is on notice as to the possibility thereof, to Client or to third parties, directly or indirectly resulting from any errors or inaccuracies in the Stellar Service and/or Stellar Database, and from any other action or inaction, whether or not negligent, of Nielsen, its agents or employees, either in providing Stellar Service, in compiling, delivering or communicating the Stellar Database, Stellar Reports or information hereunder to Client or others, or from the use or publication thereof by Client or others. The foregoing limitations shall apply notwithstanding the failure of essential purpose of any remedy and whether Nielsen has been advised of the possibility of such damage. If Nielsen fails to perform hereunder, Client shall accept, in lieu of performance, a refund or credit reflecting the services not performed. Client agrees that the remedy set forth in this Section E.4 shall be Client's sole and exclusive remedy, at law and in equity, in the event of the occurrence of any of the events described in or contemplated by this Section E.4.

5. **Improvements, Changes, Etc.** To facilitate improvements in Stellar Service, and to meet changing conditions and unforeseen circumstances, Nielsen shall have the following rights:

   a. To make, without notice, any changes in report formats, schedules, specifications, applications, techniques or information, which: (i) in Nielsen's judgment, will tend to create a net improvement in Stellar Service, or (ii) may be requested by an industry accrediting or auditing organization (if Nielsen is then seeking or has sought and received accreditation for the part or parts of Stellar Service to which such changes relate) or required by Government action.

   b. To serve notice on the Client setting forth such other changes in format, schedules, specifications, applications, techniques or information, or of prices and/or other provisions hereof, as Nielsen shall deem desirable or necessary and stating the effective date thereof, which shall be not less than thirty (30) days after serving such notice. Such changes shall become effective on the stated date; provided, however, that in the case of price changes, Client may notify Nielsen in writing, within thirty (30) days after service of Nielsen's notice, of its refusal to accept such price changes. Client's notice of refusal shall operate as notice of termination of this Agreement as of the effective date of the price changes and in the event of Client's refusal (as aforesaid), such price changes shall not be applicable to Client: provided, however, that Nielsen, solely within its own discretion, may at that time elect to forego such changes in price and continue this Agreement.

6. **Acceptance and Construction.** This Agreement shall be executed by Client within sixty (60) days of the proposal date and, following execution by Client, is subject to acceptance by Nielsen, and until so accepted shall not constitute a contract. The Agreement shall be construed under the laws of the State of Illinois applicable to agreements to be performed entirely therein, and to resolve any controversy or claim arising under or related to this Agreement. Only the Chief Executive Officer, President or Coordinating Vice President of Nielsen shall have the power of acceptance.

7.  **Appendices A (Charges) and B (User Requirements)** are hereby incorporated by reference in this Agreement with the same full force and effect as though specifically set forth herein and acknowledged by Client as having been received.

8.  **Survival of Terms.** The provisions of Sections B.5., C., D. and E hereof shall survive the termination of this Agreement.

9.  **Modification/Waiver.** This Agreement shall not be modified except in writing. Only the Chief Executive Officer, President and Coordinating Vice President are authorized to execute any such modification for Nielsen. No waiver by either party of any breach of this Agreement by the other shall be deemed to be a waiver of any preceding or subsequent breach thereof.

10. **Entire Agreement.** This Agreement when signed by both parties constitutes a final written expression of all the terms of the Agreement and is a complete and exclusive statement of those terms. All other terms and conditions of the NSI Service Agreement, as amended hereafter from time to time, are hereby incorporated into this Agreement with the same full force and effect as though set forth herein. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and replaces all prior negotiations and agreements, whether oral or written, with respect to the subject matter.

AGREED AND ACCEPTED:

Nielsen Media Research, Inc.

Signed: _____

Name: Jane A. Rode

Title: Coordinating Vice-President

**Tribune Broadcasting Company (on behalf of Station WXMI-TV)**
(CLIENT full legal name)

Signed: _____
(duly authorized officer or agent)

Name:
(Print/Type)  X PATTY KALB

Title:  X  VP/GM

5

*NSI Stellar041708*

**Appendix A**

**STELLAR SERVICE AGREEMENT**
**BETWEEN Tribune Broadcasting Company (on behalf of Station WXMI-TV)  ("CLIENT")**
**AND NIELSEN MEDIA RESEARCH, INC. ("NIELSEN")**
**EFFECTIVE AS OF 6/1/08 ("AGREEMENT")**

**Effective Date of Appendix "A": 6/1/08**

**CLIENT: Tribune Broadcasting Company (on behalf of Station WXMI-TV)**

**CLIENT TYPE: Station**

**Term of Agreement: 1 Year**

1. **Monthly Charge for Stellar Service:**

| From | Through | Monthly Amount | Number of Users* | User Surcharge* (if applicable) | Total Monthly Amount |
|------|---------|----------------|------------------|---------------------------------|----------------------|
| 6/1/08 | 5/31/09 | ███████ | ███ | | ██████ |
| ___ | ___ | $ ___ | ___ | $ ___ | $ ___ |
| ___ | ___ | $ ___ | ___ | $ ___ | $ ___ |
| ___ | ___ | $ ___ | ___ | $ ___ | $ ___ |

In each succeeding year following the completion of the Minimum Duration, a new Monthly Charge shall be established by applying a ███████████████ over the prior year's Monthly Charge. Such adjustment shall be applied prior to application or any discounts or surcharges.

*Monthly Charge covers up to ten (10) simultaneous Authorized Users at one (1) site. See Section 2(B) below for charges for additional Authorized Users and sites.

[For stations only] In the event that Client's station specified hereunder has a multiple ownership or operational relationship with another station in the same Market (including, but not limited to, a duopoly, LMA or JSA), such additional station shall receive ███████████████ on the above Monthly Charge.

☐  The Monthly Charges above reflect ███████████ as the station specified herein is an additional station for purposes of this Section. If the specified station ceases to be such an additional station, the Monthly Charges shall be converted to the then current non-discounted Monthly Charges for the applicable level of Stellar Service, as of the first day of the month in which such condition occurs.

2. **Additional Charges**
   **A.** All charges set forth above shall be increased to the extent of any sales, use or other tax now or at any time hereafter payable or required to be collected by Nielsen on or with respect to Stellar Service and/or any Stellar Data, delivery method or media, or information provided hereunder.

   **B.** The Monthly Charge shall cover up to ten (10) simultaneous Authorized Users at one (1) site. During the term of this Agreement, Client shall have the right to request the inclusion of additional simultaneous Authorized Users per site, in which event the then-current Monthly Charge set forth above shall be increased as follows: ███████████████████████████████████████████

   Client chooses to order additional Authorized User(s) and/or sites at the inception of this Agreement, as follows: Additional Authorized User(s): n/a    Additional site(s): n/a

3. **TRAINING.** One session of training provided at no charge.  Additional Nielsen Stellar Training: ███████████
███████████████

6

NSI Stellar041708

4. **HISTORICAL DATA ACCESS.** Client may access data produced before the Effective Date of this Agreement, but only for periods in which Client had a fully executed agreement with Nielsen for NSI local market ratings service in Client's Market(s) listed herein at prices in accordance with Nielsen's then-current rate card.

*NSI Stellar041708*

**Appendix B**

**STELLAR SERVICE AGREEMENT**
**BETWEEN <u>Tribune Broadcasting Company (on behalf of Station WXMI-TV)</u> ("CLIENT")**
**AND NIELSEN MEDIA RESEARCH, INC. ("NIELSEN")**
**EFFECTIVE AS OF <u>6/1/08</u> ("AGREEMENT")**

**STELLAR SERVICE USER REQUIREMENTS**

**Minimum Performance:**
    Microsoft Internet Explorer 5.5
    Microsoft Office 2000  (if Client intends to export data)
    Microsoft Excel
    Adobe Acrobat Reader
    Dial-up Internet connection
    Windows 2000

**Preferred Performance:**
    Microsoft Internet Explorer 6.0
    Microsoft Office 2003 (if Client intends to export data)
    Microsoft Excel
    Adobe Acrobat Reader
    High-speed Internet connection
    Windows XP

**The above requirements are stated as of June 2004 and are subject to change at Nielsen's sole discretion.**



When Dave Calhoun joined Nielsen, he brought to the company his vision of simple, open and integrated. He listened to you, our clients, when you told him you wanted us to operate as "One Nielsen", with single points of contact and easier access to offerings from across all of our business units.

In response to your ideas, we are pleased to inform you that, as part of The Nielsen Company's ongoing efforts to become more simple, open and integrated, we are working to reduce the number of different entities with which you have to deal.

**To that end, as of October 1, 2008, we have consolidated Nielsen Media Research, Inc., with several of our US business units into a single legal entity called The Nielsen Company (US) LLC, which will, by operation of law, assumes all of the rights and obligations, including the provision of services, of our agreements with you.**

In that regard, please direct all future notices under the Agreement to The Nielsen Company (US), LLC, 770 Broadway, New York, NY 10003 ATTN:  Coordinating Vice-President.

By simplifying our structure, we are making it more convenient for you to access the products, services and solutions you need. And by further integrating our operations, we are developing more effective ways to draw from our extensive resources and expertise to deliver even greater value

If you have any questions, please contact your Sales or Client Service Representative.

The Nielsen Company
770 Broadway   New York, New York  10003
tel 646-654-8300
www.nielsen.com

**Amendment**

Date: August 20, 2008

Reference is made to the Nielsen Station Index Service Stellar Agreement between Tribune Brodcasting Company on behalf of Station WXMI-TV ("Client") and Nielsen Media Research, Inc. ("Nielsen"), dated May 22, 2008 (the "Agreement"). For good and valuable consideration, receipt of which is acknowledged by the parties, it is hereby mutually agreed that the Agreement is hereby amended, effective as of June 1, 2008 as follows:

1.      Notwithstanding anything to the contrary contained in this Agreement, references to "Minimum Duration" are hereby deleted and replaced with "Duration".

2.      Section B. 2. is hereby deleted in its entirely and replaced with the following:

**Duration.** Subject to the provisions of Section B.4., this Agreement shall have a Duration of one (1) year.

3.      Section B. 3. has been deleted in its entirely from the Agreement.

4.      Section C. 2. had been deleted in its entirely from the Agreement.

5.      ████████████████████████████████████████████

Except as expressly set forth in this Amendment, all terms and conditions set forth in the Agreement remain in full force and effect. As of the effective date hereof, all references to the Agreement shall be references to the Agreement as amended by this Amendment.

IN WITNESS WHEREOF, this Amendment has been executed by the parties hereto through their duly authorized representatives whose signatures are set forth below.

| The Nielsen Company (US), Inc. | Tribune Brodcasting Company on behalf of Station WXMI-TV |
|---|---|
| | *(CLIENT-full legal name)* |
| Signed: *Jane A. Rode* | Signed: *Patty Kolb* |
| | *(duly authorized officer or agent)* |
| Name:   Jane A. Rode | Name: *PATTY KOLB* (Print/Type) |
| Title:   Coordinating Vice-President | Title: *VP/GM* |

### NIELSEN HOMEVIDEO INDEX

### NHI NATIONAL SERVICE AGREEMENT

Client: **Tribune Broadcasting Company**

Client's Network: **Superstation WGN**

Dated: **May 18, 2006**

Nielsen Media Research, Inc.
150 North Martingale Road
Schaumburg, Illinois 60173-2076

**Tribune Broadcasting Company** ("Client"), a(n) **Delaware** [State]

(check one and client please initial)
- ☒ corporation
- ☐ partnership
- ☐ limited liability company/partnership
- ☐ individual d/b/a _____
- ☐ other

with its principal offices at **2501 West Bradley Place, Chicago, IL 60618**, hereby requests a license from Nielsen Media Research, Inc. ("NielsenTV") for access and use of Nielsen Homevideo Index ("NHI") national service ("NHI National Service") by Client's cable network **Superstation WGN** ("Client's Network"), and NielsenTV hereby agrees to furnish and license NHI National Service to Client on the following terms and conditions ("Agreement"):

**A.    SCOPE OF SERVICE.**    NHI National Service to Client shall consist of the confidential reports, analyses and services as described in Appendix A. attached hereto and made a part hereof, including client service in accordance with NielsenTV's regular practice to assist in the interpretation of NHI reports delivered to Client at no additional cost.  Cable network audiences reported hereunder shall consist of viewing by national people meter ("National People Meter") sample households capable of receiving clients' programming via cable or other means. In the case of Client, cable network audiences are defined as audiences to programming telecast over Client's Network or its successors and simultaneously fed to cable systems or direct broadcast satellite providers.

**B.    PRICES AND TERMS.**

1.    **Charges for NHI National Service.** Client agrees to pay NielsenTV for NHI National Service and the license hereunder to use Nielsen TV reports, analyses and other NielsenTV data (collectively, "NielsenTV Information"), monthly charges as determined in accordance with the provisions set forth in Appendix B, attached hereto and made a part hereof and the adjustments and surcharges then-applicable pursuant to Sections B.2., B.3., B.4. and B.5. hereof. ████████████████████████████████████

2.    **Surcharge for Taxes.**    All net charges hereunder shall be increased to the extent of any sales, use or other tax on NHI National Service or NielsenTV Information hereunder which may be payable or required to be collected by NielsenTV.

3.    **Billing and Payment.**    Each monthly charge is billable on or after the first day of such month, and Client agrees to pay each invoice upon presentation, but in no event later than thirty (30) days thereafter. All amounts not paid within thirty (30) days after presentation shall be considered in default and shall bear interest at the rate of eighteen percent (18%) per annum (or the highest rate allowed by applicable law, if lower) from the date due until paid, payable on demand.

4.  **Default in Payment.**   If Client shall remain in default, with respect to the payment of any invoices rendered in accordance with the provisions of this Agreement (including any interest due as specified in Section B.3. hereof) for a period of more than thirty (30) days following notice from NielsenTV (calling attention to the default and to this Section B.4.), then NielsenTV may, following notice to Client, suspend all services and licenses hereunder without thereby being in default of NielsenTV's obligations under this Agreement.

5.



## C.  <u>USES OF SERVICE.</u>

1.  **Client's Interest.**   Client understands that NielsenTV Information is furnished and licensed hereunder on the basis of Client's representation that Client has a continuing legitimate business interest in the subject matter thereof.

2.  **Access to Reports.**   Client recognizes that all NielsenTV Information is the private property of NielsenTV, licensed hereunder to Client for confidential internal management use in connection with the acquisition of program rights and the sale of advertising time in the conduct of Client's business as a cable network, and Client will prevent all unauthorized persons from having access thereto.  Client agrees to adhere strictly to the provisions set forth in the National Reference Supplement including, without limitation, Appendix G thereof under the caption "Permissible Uses of National Reports" including, without limitation, Client's obligation not to lend, give, sell, lease, exchange or transfer possession of all or any part of any NielsenTV Information furnished hereunder and to limit divulgence to program producers, artists, syndicators, distributors, talent agents, advertisers, advertising agencies, media buyers, networks, stations, cable systems and others with whom negotiations are being conducted.  The obligations of Client herein are not changed in any way by the publication of NielsenTV Information in any manner whatsoever by NielsenTV or others.   NielsenTV Information may be furnished to any persons or entities by NielsenTV, on terms deemed fair by NielsenTV.

3.  **Reproduction of Reports.**  Except as otherwise expressly provided herein, Client agrees it will neither publish, reproduce, copy or extract, nor permit or allow others to publish, reproduce, copy or extract, any NielsenTV Information furnished hereunder, either alone or in combination with any other data, except with NielsenTV's prior written approval in each case (including without limitation the requirement of NielsenTV's prior written approval for quotation of data in advertising).  Such approval may be withheld by NielsenTV in its sole discretion if such publication, etc. is not in accordance with NielsenTV's policies permitting same as indicated by NielsenTV in writing from time to time including, without limitation, the National Reference Supplement, and shall be withheld in any event unless such publication, etc. correctly states the facts in a manner not likely to mislead the reader.  Client may, however, without NielsenTV's consent, reproduce any data reasonably required for use in sales presentations made to individual organizations or small groups and in press releases directly appurtenant thereto if divulgence of such data is otherwise permitted by this Agreement.

4.  **Legal Proceedings.**   Client agrees that neither Client, Client's Network nor any member of Client's or Client's Network's organization will use or attempt, permit or allow the use of any NielsenTV Information in any legal proceedings (including, but not limited to, any use in litigation and/or use with any governmental investigatory, regulatory or other body or authority), except if and to the extent compelled by service of legal process or in response to an official governmental demand; in which case Client (a) shall give NielsenTV prompt advance notice of such proposed use; and (b) shall first obtain appropriate Agreements of Confidentiality, Protective Orders and (where appropriate) Evidentiary Stipulations in form and substance acceptable to NielsenTV.

5.  **Data Processing Uses.**

(a) NielsenTV hereby gives Client permission to convert NielsenTV Information into data processing form by keypunching, direct transfer to computer equipment or any other method ("Converted NielsenTV Information") and to use such Converted NielsenTV Information in computer processing, on the following terms and conditions:

(i)   NielsenTV retains all copyright privileges in any and all such NielsenTV Information, Converted NielsenTV Information and Reissued NielsenTV Information (hereinafter defined) including, without limitation, any and all discs, tapes and/or other computer storage facilities or devices and copies thereof containing same, the use of which is subject to all of the terms and conditions hereof including, without limitation, Section C. hereof.

(ii)   Client agrees to erase or otherwise destroy any and all such NielsenTV Information, Converted NielsenTV Information, Reissued NielsenTV Information, printed reports, discs, tapes and/or other computer storage facilities or devices and copies thereof no later than the date of termination of this Agreement.   Upon written request from NielsenTV, Client will certify in writing such erasure and/or destruction.

(iii) Client's use of a third party processor ("TPP"), either in-house or out-sourced, for the aforementioned NielsenTV Information processing, conversion and reissuing is conditioned upon and subject to such TPP entering into NielsenTV's then-standard form of agreement ("TPP Agreement") to protect the confidential and proprietary nature of NielsenTV Information provided to such TPP and Converted NielsenTV Information and Reissued NielsenTV Information produced therefrom, and such TPP shall deliver an executed copy of such TPP Agreement to NielsenTV for its acceptance on or before delivery of such NielsenTV Information, printed material, discs, tapes and/or other computer storage facilities or devices by Client, Client's Network or NielsenTV to such TPP.   Client shall also make necessary payment determined by NielsenTV in accordance with NielsenTV's then-current rate card for NielsenTV Information supplied to Client, Client's Network and/or such TPP in the form of printed reports, discs, tapes, other computer storage facilities or devices which are in addition to those which Client are entitled to hereunder to be used in a data processing environment.   NielsenTV also reserves the right to make an appropriate charge to such TPP based upon the nature and extent of the NielsenTV Information provided to such TPP.

(iv) Notwithstanding the foregoing, NielsenTV may terminate such permission at any time effective with any date specified by NielsenTV, if NielsenTV reasonably believes that Client, Client's Network and/or such TPP has failed to perform and/or breached any one or more of the terms and conditions hereof including, without limitation, Section C. hereof and/or or such TPP's TPP Agreement, or if NielsenTV is then terminating such permission to all clients then subscribing to NHI National Service.

(b)  From time to time Client may request NielsenTV in writing to furnish such TPP, at NielsenTV's regular charges, printed reports, discs, tapes and/or other computer storage facilities or devices containing NielsenTV Information in accordance with specifications furnished by Client, subject to all of the terms and conditions set forth in this Agreement including, without limitation, Section C.; provided, however, that where NielsenTV Information appears on such printed reports, discs, tapes and/or other computer storage facilities or devices with an indication that such NielsenTV Information is below NielsenTV's minimum reporting standards, Client specifically agrees to include such NielsenTV Information only in combination with reportable NielsenTV Information in any tabulation for a third party.

(c)  Client assumes the responsibility for accuracy of data produced by Client (or by any TPP retained by Client) from NielsenTV Information ("Reissued NielsenTV Information").   Reissued NielsenTV Information shall reflect that NielsenTV is the source thereof.   Client agrees to fully explain to NielsenTV on request, the formulas, designs, and/or mathematical hypotheses involved in the derivation of such data as a part of such Reissued NielsenTV Information.   Client agrees to furnish NielsenTV upon demand copies of data, EDFs and/or other computer storage facilities or devices used in the production of such Reissued NielsenTV Information.

**6.   Delivery Methods; Security.**   The provisions of this Agreement shall apply to all NielsenTV Information supplied to Client in printed, disc or tape formats, or by electronic means including, without limitation, server-to-server access, electronic mail, or Internet delivery.   NielsenTV reserves the right to discontinue any medium of

- 3 -

transmission of NielsenTV Information if the same or similar NielsenTV Information is contained in an alternate form of transmission furnished to Client. In the event Client and/or Client's Network supplies any NielsenTV Information to a TPP via electronic means, including but not limited to server-to-server access, electronic mail or Internet delivery, Client and Client's Network shall be obligated to implement and maintain the security protections, terms, conditions, technical requirements and restrictions specified by NielsenTV, as they may be changed from time to time, and to expressly agree to abide by any additional security protections, terms, conditions, technical requirements and restrictions, if any, applicable to such methods of delivery, which such security protections, terms, conditions, technical requirements and restrictions are subject to change from time to time at NielsenTV's sole discretion. If NielsenTV reasonably believes that Client, Client's Network and/or such TPP has failed to perform and/or breached any one or more of the terms and conditions hereof including, without limitation, Section C. hereof and/or of such TPP's TPP Agreement, NielsenTV reserves the right to take such action as it deems appropriate including, but not limited to, suspension of NHI National Service including, without limitation, the license hereunder to access and use NielsenTV Information and/or termination of this Agreement, the TPP Agreement and/or any and all other legal remedies available to NielsenTV.

**D.   DURATION AND TERMINATION.**

     1.   NHI National Service hereunder shall commence on **July 1, 2006** (the "Commencement Date") and, subject to the provisions of Section D.2.(b) hereof, shall cover the minimum period of **sixty** (**60**) months ("Minimum Initial Commitment"), and shall continue thereafter until this Agreement is terminated as provided in Sections D.2.(a) or (b) hereof.

     2.   This Agreement and NHI National Service rendered pursuant hereto may be terminated:

     (a) by Client:

     (i)   for any reason, by serving written notice upon NielsenTV at any time, which termination shall be effective on expiration of the



full month next following the month during which such notice shall have been served, but in no event shall such termination be effective prior to expiration of the Minimum Initial Commitment; or

     (ii)   in accordance with Section E.7.(b) hereof; or

     (b) by NielsenTV, for any reason, by serving written notice on Client at any time and by refunding promptly all monies paid for services not to be rendered hereunder, which termination shall be effective thirty (30) days following said notice but in no event prior to expiration of the Minimum Initial Commitment; except, however, that termination may be effective prior to or following the Minimum Initial Commitment:

     (i)   in the event of non-performance and/or breach by Client of any one or more of its obligations hereunder

     (ii)   if NielsenTV shall be unable for any cause beyond its control to fulfill its obligations hereunder, or

     (iii)   if NielsenTV shall terminate NHI National Service to all clients then subscribing to NHI National Service.

     3.   **Termination of License**.   Immediately upon termination of this Agreement, any and all license granted hereunder to use NielsenTV Information shall automatically terminate.

**E.   GENERAL PROVISIONS.**

1.  **Non-Exclusive Service.**   NHI National Service is furnished and licensed on a non-exclusive basis, and NielsenTV is not restricted hereunder or otherwise from furnishing to any other person, corporation or other entity any type of NielsenTV Information or service.

2.  **Identity of Sample Homes.** Client agrees that it will not under any circumstances, attempt to ascertain the name, location of, or any other particulars with respect to, or contact, any household furnishing television information to NielsenTV, nor shall NielsenTV be under any obligation to provide Client with access to any such household or information relating hereto.   Client also agrees that if it becomes aware of any information regarding any NielsenTV household it will keep such information confidential and not divulge or use such information and it will promptly report to NielsenTV any such information that has come to its attention, including attempts by such households to voluntarily provide Client or others with information concerning any aspect of their participation in a NielsenTV television survey or offers by third parties of such information. Client also agrees that it will not permit any of its employees to participate in any such survey or to help any participating family with any activity connected with NielsenTV television data collection.

3.  **Client Responsibility.**

    (a) Client assumes full responsibility to NielsenTV for any violation (whether occurring before or after termination hereof) by any director, partner, officer, employee, consultant, agent or representative of Client and/or Client's Network and/or other third parties acting through, for or with any of the foregoing (collectively, "Client Group") of any obligation assumed by Client hereunder and agrees to take all steps necessary to ensure understanding of and compliance with this undertaking by any and all Client Group members having access to NielsenTV Information and materials licensed or furnished hereunder. Client acknowledges that a violation of any of the provisions contained or referred to in this Section or Sections C., D.3., E.2., E.6., E.8. or E.9. hereof will cause irreparable harm to NielsenTV's business, for which there is no adequate remedy at law. Accordingly, in the event of any such violation, Client agrees that NielsenTV shall be entitled, in addition to and without limiting any other remedies it may have, at law or in equity, to immediate and permanent injunctive relief against any one or more Client Group members in any court having jurisdiction.

    (b) Client agrees to indemnify NielsenTV against and to hold NielsenTV harmless from any and all liabilities or claims, actions and/or causes of action (whether or not meritorious, and including without limitation, claims based on the alleged negligence of NielsenTV or any officer, agent or employee of NielsenTV ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ imposed upon or asserted against NielsenTV by any third party, or otherwise incurred by NielsenTV by reason of the use or divulgence by any one or more Client Group members of NHI National Service or NielsenTV Information constituting non-performance and/or breach of the terms and conditions of this Agreement.

4.  **Accuracy, Errors, Etc.**

    (a) **NIELSENTV DISCLAIMS AND CLIENT HEREBY WAIVES, ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, TO CLIENT OR ANY THIRD PARTY, WITH RESPECT TO ANY NIELSENTV INFORMATION AND ANY SOFTWARE FURNISHED HEREUNDER, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.** The foregoing disclaimer shall neither act as nor constitute an admission by NielsenTV that any of the foregoing constitute goods, commodities or tangible personal property under or for the purposes of any applicable law.

    (b) **Effect of Sub-Standard Conditions.**   NielsenTV shall not be obligated to furnish any NielsenTV Information hereunder when conditions (e.g., audience size or unavailability of lineup or cable system information) are not such as to permit NielsenTV techniques to produce NielsenTV Information in accordance with NielsenTV standards, nor shall Client be entitled to any right of termination or abatement of price hereunder by reason of failure by NielsenTV to publish NielsenTV Information for such reasons, except as provided in Section E.4(c)(iv) hereof.

    (c) **Limitation of Liability.**

(i)  Except for the refund or credit specifically provided in Section E.4.(c)(iv) hereof, NielsenTV shall not be liable, and Client hereby expressly waives any claims against NielsenTV, in contract, tort or otherwise, for any loss, cost, expense, injury or damage of any kind, whether direct or indirect, incidental, special or consequential (including, without limitation, lost profits and loss of or damage to good will), even if NielsenTV is advised or has knowledge of the possibility thereof, directly or indirectly resulting from (A) NielsenTV's failure, for any reason, to furnish any NielsenTV Information as required by this Agreement; (B) any errors, inaccuracies or omissions in any NielsenTV Information hereunder; (C) any action or inaction, whether or not negligent, of NielsenTV, or any officer, employee, agent or other person or entity acting on NielsenTV's behalf, in compiling or publishing any NielsenTV Information or in delivering or communicating the same to Client or others, or from the use or publication of the same by Client or others; or (D) contingencies beyond NielsenTV's control ███,



(iv)  if any material errors, inaccuracies or omissions occurring in any NielsenTV Information are discovered by or brought to NielsenTV's attention, it will be NielsenTV's policy, if feasible, to furnish appropriate correction notices.  If NielsenTV shall fail, for any reason, to furnish any report or service required by or in accordance with this Agreement including, without limitation, Sections B.1. and E.4.(b) hereof, Client will accept in lieu thereof a refund or credit in the amount paid for such report or service, ███████████ NielsenTV's liability for not furnishing a report or service required by or in accordance with the terms of this Agreement shall be limited to the said refund or credit, Client agreeing that such remedy shall be Client's sole and exclusive remedy, at law or in equity, in the event of the occurrence of any event described in Sections E.4.(c)(i)(A) through (D) hereof.

5.  **Adjustments of Billing, Etc.**    Upon discovery of any error in billing of or payment for NHI National Service hereunder (exclusive of taxes - see Section B.2. hereof [**Surcharge For Taxes**]), either party hereto may, within nine (9) months following the date of the applicable statement or payment (but not more than three (3) months following delivery of the last report due hereunder) serve written notice on the other party requesting adjustment, and any such claim found to be justified shall be settled promptly.

6.  **Copies of Reports**. Three (3) master copies of each NielsenTV report to which the Client is entitled hereunder will be furnished to Client.  Each such master copy more than two (2) years old shall be returned to NielsenTV promptly if requested unless sooner destroyed.  All copies including extra copies of NielsenTV Reports are subject to the following:

(a)  Client represents that each person designated to receive such reports has a legitimate business interest in the subject, and that possession of said copies by such person is essential to effective use of NHI National Service.

(b)  Client will notify NielsenTV promptly of changes in address.

7.  **Improvements, Changes, Etc.**  To facilitate improvements and changes in NTI or NHI National Service, and to meet changing conditions and unforeseen circumstances, NielsenTV shall have the following rights:

(a)  To make, without notice, any changes in report formats, schedules, specifications, techniques or information, which: (i) in NielsenTV's judgment, will tend to create a net improvement in NTI or NHI National

Service ████████████████████████████████████████████████████████, or (ii) may be
requested by an industry accrediting or auditing organization (if NielsenTV is then seeking or has sought
and received accreditation for the part or parts of NTI or NHI National Service to which such changes
relate) or required by Government action or any changes in the National Reference Supplement, from time
to time.

(b)  To serve notice on the Client setting forth such other changes in format, schedules, specifications,
techniques or information, or of prices ████████████ as NielsenTV shall deem desirable or necessary and
stating the effective date thereof, which shall be not less than thirty (30) days after serving such notice.
Such changes shall become effective on such stated date; provided, however, that Client, within thirty (30)
days after service of such notice, may notify NielsenTV in writing of its refusal to accept any such price
changes.  Such notice of refusal shall operate as Client's notice of termination of this Agreement pursuant
to Section D.2.(a)(i) hereof or effective as of such earlier date as NielsenTV may specify in its aforesaid
notice to Client; provided, further, that in the event of Client refusal and termination (as aforesaid) (i) any
such increase in price which shall have been specified in NielsenTV's notice shall not be applicable to
Client; and (ii) NielsenTV, solely within its own discretion, may at that time elect to forego such price
changes and continue this Agreement.

8.    **Client Cooperation.**    NielsenTV's obligation hereunder to provide NHIL National Service hereunder shall
be conditioned upon fulfillment by Client of the following obligations:

(a)  Client hereby agrees to encode all feeds and to provide feed point information for all feeds for Client's
Network's telecast signals and digital transmissions (including  all cable feeds and syndicated programs)
and DBS, if any, with NielsenTV's then-current coding technology and to comply with all audio and video
encoding procedures as NielsenTV may determine during the Term, including without limitation
responsibility for the acquisition, cost, installation, operation and maintenance of all required encoding
equipment. In the absence of encoding, NielsenTV may produce ratings data, but NielsenTV shall have no
liability with respect to the production and/or accuracy thereof.  NAVE technology encoding is a critical
requirement and component to the production of audience estimates in the more complex digital television
and consumer electronic device environment.  For this reason, to ensure proper crediting and accuracy of
Client's Network's programming viewership, Client's Network must be fully operational with NAVE encoding
equipment for each rated feed or source of programming material no later than the Commencement Date.

(b)  Without limiting Client's obligations above, Client agrees, at NielsenTV's reasonable request but at
Client's expense, to encode all programming with active video and audio codes and such other program or
program-related identification information (including VBI codes) as NielsenTV may reasonably determine.
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████ Should there be for any reason an
interruption in encoding or absence of encoding per se, NielsenTV may produce ratings data, but
NielsenTV shall have no liability with respect to the production and/or accuracy thereof.  Client recognizes
that failure to encode or successful passage or transit of codes could result in an understatement of
television audience estimates.

(c)  Client acknowledge that NielsenTV has announced plans for an enhanced AMOL system, known as
"AMOL2", and that in connection with the rollout and testing of AMOL2, NielsenTV has requested the
temporary use of the following four positions on Client's Network's video signal:

Line 20, field 1
Line 20, field 2
Line 22, field 1
Line 22, field 2

following which NielsenTV will require the permanent use of Line 20, field 1 and Line 22, field 2 for the ongoing operation of AMOL2. Client hereby approves NielsenTV's substitution of the AMOL2 verification system, and the temporary and permanent uses by NielsenTV of the video signal line positions identified above, subject to the following:

(i)  NielsenTV shall discontinue its use of Line 20, field 2 and Line 22, field 1, one (1) year from satisfactory installation and acceptance of the NAVE/AMOL2 (Nielsen Audio/Video Encoders) at Client's Network's premises and upon NielsenTV signoff on full activation of AMOL2, at which time such signal line positions shall revert to Client for its own use.

(ii)  In recognition of time-shifting technologies and digital compression technologies, Client agrees at NielsenTV's request to activate encoding of line 21 packet 13 for an AMOL code within XDS to help measurement of said devices. The NAVE/AMOL2 encoder will be used for said code insertion. This requirement applies to all sources fed from Client's Network.

(iii)  Client agrees to cooperate in creating, contributing to, or passing Metadata, data packets, auxiliary data elements, or other such digital bit-stream identifiers as may be required or may evolve or which may be developed within digital standard setting bodies for the purposes of measuring advanced television.

(iv)  NielsenTV has begun deployment of a new metering system known as the Active/Passive ("A/P") Metering system. This system makes use of active audio and video codes for program verification and for tuning credit. No later than the Commencement Date, Client's Network shall be fully operational with NAVE encoding equipment for each feed or source of programming material. It is acknowledged and understood that NielsenTV has specified that compressed stereo audio should be no more than 192Kbps, and 5.1 audio should be compressed no more than 384Kbps to insure survivability of audio encoding. In the unlikely event that audio encoded programming material originating from non-NielsenTV supported sources causes unacceptable artifacts to the audio or video quality of Client's Network's signal, Client agrees to promptly notify NielsenTV thereof as well as of the sources of such non-NielsenTV audio encoding, so that a remedy action may be taken.

(v)  Client agrees to promptly notify NielsenTV of encoding failures or changes in encoder assignments (or physical feed assignments). This requirement applies to all sources fed from Client's Network.

(d)  In recognition that television technologies today are fluid and dynamic, it is acknowledged by both parties that a successor verification system to AMOL2 will undoubtedly be required, which is likely to include source and/or program-specific identifiers transported via digital bit streams.

(e)  As previously noted, while both NielsenTV and Client agree that even small technical changes to a television measurement system can be costly to everyone, NielsenTV and Client agree that measurement accuracy and meeting overall industry needs are critical to a universal television measurement system and understand that it may be necessary to augment or modify the measurement system by additional advancements as they become available. This pertains largely to the work of digital standard setting bodies which may result in additional identifiers, metadata, data packets, auxiliary data elements, or other such digital bit-stream identifiers as may be required or may evolve. Client agrees to cooperate with respect to these advancements by implementing improvements that NielsenTV requires.

(f)  Additionally, NielsenTV and Client agree to work jointly together to develop a procedure for prompt verification and notification of NAVE encoding failures or changes in encoder assignments (or physical feed assignments).

(g)  Client understands that NielsenTV's ability to achieve report delivery schedules herein is dependent on receiving accurate timely information, which Client agrees to make available for daily verification by telephone or electronic means by NielsenTV, with respect to the following:

(i)  a suitable program name for each quarter hour of telecasting for Client's Network to be reported by NHI, such listings to indicate major changes, substitutions and/or revisions of normal scheduling that

occur during the measured interval. In the event such records as supplied to NielsenTV may prove to have been inaccurate or inadequate so that in NielsenTV's sole judgment a correction notice for published NielsenTV Information becomes necessary, Client agrees to pay for all reasonable reprocessing, printing and distribution charges incurred by NielsenTV in the issuing of a suitable correction notice; and

(ii)  changes in the foregoing information.

(h)  Client agrees to supply NielsenTV with such information regarding Client's Network as NielsenTV may reasonably request including, without limitation, channel carriage, subscriber counts, ad sales information, contact information and other related information required by NielsenTV, and to cooperate with NielsenTV in other techniques reasonably designed to obtain such information.  To be timely, such information must be delivered prior to the end of the report period being measured.  Where timely information is not received, or conflicting information is received, NielsenTV may use the best available information in its judgment, contact the cable system or ADS provider directly or omit the program from the report.  In the event such records are not supplied to NielsenTV within specified deadlines or if previously submitted records need to be changed, Client agrees to pay for all reasonable reprocessing as outlined in the NHI Program Names Policy Document.

9.  **Assignability.**  This Agreement may not be assigned or transferred by Client, whether by contract or by operation of law, without the prior written consent of NielsenTV, provided that no such assignment shall relieve Client of any of its obligations hereunder.  For purposes hereof, any change in control of Client, whether as a result of any merger, sale of voting stock or similar transaction, shall be deemed to be an assignment of this Agreement requiring the prior written consent of NielsenTV hereunder.  As an exception to the foregoing, NielsenTV's consent shall not be required if Client assigns its rights and obligations hereunder to a successor to all or substantially all of Client's or Client's Network business or to an entity controlled by, under common control with or controlling Client.  Any and all assignments of this Agreement shall, in any event, be subject to NielsenTV's timely receipt of written confirmation of such assignment to and assumption by Client's assignee of all of Client's obligations, representations and warranties hereunder signed by authorized representatives of both.  Any purported assignment of this Agreement by Client in violation of this provision shall be ineffective against, and shall not be binding upon, NielsenTV.  Notwithstanding the foregoing, NielsenTV shall have the right to accept payment or performance hereunder from any such purported assignee without waiving its right to enforce the provisions of this Agreement (including, without limitation, all of Client's payment obligations hereunder, it being understood that NielsenTV shall not thereby be entitled to seek double payment for NHI National Service or materials furnished or to be furnished hereunder) against Client at any time.  This Agreement may be assigned by NielsenTV at any time to any person, corporation or other entity controlling, controlled by or under common control with NielsenTV or successor-in-interest to all or substantially all of NielsenTV or its NHI business, and NielsenTV reserves the right to have all services hereunder rendered to Client by any such assignee upon notice to Client.

10.  **Notice.** Each notice required hereunder shall be in writing and deposited in the United States mail addressed by registered or certified mail to Client at:

| | |
|---|---|
| Client Name: | **Tribune Broadcasting Company** |
| Attention/Title: | |
| Address: | **2501 West Bradley Place** |
| City/State/Zip: | **Chicago, IL 60618** |

or, if to NielsenTV, to Nielsen Media Research, Inc., 150 North Martingale Road, Schaumburg, IL 60173-2076, Attn: Coordinating Vice President with a cc to 770 Broadway, New York, NY 10003-9595, Attn: General Counsel, or to such other address as either party hereunder shall subsequently notify the other.  The date of deposit in the United States mail shall be deemed the date of service of such notice.

11. **Acceptance and Construction.**    Following execution by Client, this Agreement is subject to execution by NielsenTV and, until so executed, shall not constitute a contract.  This Agreement shall be governed by, the internal laws of the State of Illinois to resolve any controversy or claim arising under or related to this Agreement. Only the Chief Executive Officer, President or Coordinating Vice President of NielsenTV shall have the power of acceptance or modification hereof on behalf of NielsenTV.  This Agreement may be amended or

- 9 -

modified only by a writing executed by authorized officers of both NielsenTV and Client, respectively. This Agreement shall not be deemed to create any joint venture or partnership between Client and NielsenTV. If any provisions hereof shall be adjudged by a court of competent jurisdiction to be void or unenforceable, the same shall not affect any other provisions hereof or the validity or enforceability of this Agreement.

12. **Definitions and Reminders.**    Client's attention is directed to the definitions and reminders and information concerning sampling methods, sample size, report techniques, statistical interpretations and related information, all as supplied by NielsenTV in the NielsenTV Information furnished hereunder or otherwise including, without limitation, the National Reference Supplement as amended hereafter from time to time, which is hereby incorporated into this Agreement with the same full force and effect as though specifically set forth herein.

13. **Survival of Terms.** The provisions of Sections B., C., E.1., E.2., E.3., E.4., E.5., E.6., E.9., E.10., E.11., E.12., E.14., E.15. and E.16. hereof shall survive the termination of this Agreement.

14. **Relationship of the Parties.**    The parties hereto are independent contractors and nothing contained herein shall be construed to place them in the relationship of partners, principal and agent, employer and employee or joint venturers. Each party hereto agrees that it shall have no power or authority or right to bind or obligate the other, nor shall either party hold itself out as having such power or authority.

15. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

16. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and replaces all prior negotiations and agreements, whether oral or written, express or implied, with respect to the subject matter.

**AGREED AND ACCEPTED:**

NIELSEN MEDIA RESEARCH, INC.
SCHAUMBURG, ILLINOIS

Signed: _~Kelly Hueigh~_

~COORDINATING VICE PRESIDENT~

Title: _____

~JAN 1 8 2007~

Date: _____

TRIBUNE BROADCASTING COMPANY
(CLIENT)

Signed: _Will P. L_____

Name:
(Print/Type): _William P. Shaw_

Title: _VP. G.M. Superstat'on WGN_

Date: _12/21/06_

Nielsen Homevideo Index
National Service

## Appendix A

**A. Nielsen National Television Index ("NTI") Reports.**

1. NielsenTV National TV Ratings Reports

A report issued weekly, each based on one week of data and issued approximately 10 days following the end of each report period. Each report contains estimates of audiences to commercially-sponsored programs carried over the U.S. national television networks as reported by NTI and which meet NielsenTV's reporting standards.

Reports include audience composition information in such form and on such schedule as NielsenTV may deem appropriate from time to time. Such data shall include estimates of viewers for commercially-sponsored network programs deemed reportable by NielsenTV shown in composite and by each of various age and sex categories.

A national television network program is defined as any sponsored program, having at least a 30% national coverage, telecast over the television network of the American Broadcasting Company, CBS, Inc., the National Broadcasting Company, the Fox Broadcasting Company, or the successors of any of them. NielsenTV may but need not expand this definition to include other broadcasting systems which conduct network type operations.

2. NTI Analysis Reports, in the format that NielsenTV then delivers to its NTI clients, which currently include the following, among others, but which may be modified or deleted by NielsenTV to reflect changes in methodology or techniques. The following report frequency and weeks covered are approximate.

    a. Households Using Television Summary: This report is produced four times per year and provides week-by-week, month-by-month, quarterly and annual estimates of U.S. television usage.

    b. Cost per-1000: This report is issued twelve times per year and relates size of household and persons audiences to estimated cost of time and talent.

    c. National Audience Demographics (NAD): This report is issued twelve times per year and provides estimates for age/sex categories by market sections. Data are provided for TV usage by time periods and sponsored national network programs.

**B. NHI Cable Network Pocketpiece Reports.**

An audience report which is produced for each NHI cable network client (including Client), based on National People Meter records, issued monthly and/or quarterly (at Client's election) and delivered as promptly as practicable following the end of each report period. Each report contains estimates of household and/or selected persons audiences to the cable network by dayparts, time periods and/or programs.

**C. Nielsen Television Activity Report (NTAR).**

This report is issued monthly and quarterly and provides household data for 24 dayparts for all national NielsenTV metered viewing options. Ratings, shares and cumulative audiences are reported for specific cable and broadcast networks for total U.S., cable, and pay cable households.

**D. NHI Cable Network Audience Composition Report.**

This report is issued quarterly and provides household ratings and projections, also viewers-per-l000 viewing households (VPVH) for 17 persons demographics for each NHI cable network.

**E. Nielsen Syndication Service TV Ratings Report.**

This report provides household and persons audience estimates on programs distributed by subscribing syndicators and producers for which ratings information was ordered. Issued weekly for all 52 weeks, the report also contains station counts, program coverage and gross average audiences (when ordered by the client).

**F.  NielsenTV Additional Products and Services.**

In addition, Client has the right to purchase:

1.  software products, examples of which are NPOWER™, GALAXY® EXPLORER, MarketBreaks™, and AD*Views;

2.  custom analyses, examples of which are:

    a.  Audience Duplication between dayparts;
    b.  Cumulative Audience to selected telecasts; and
    c.  Audiences by non-standard market sections; and

3.  other ancillary reports as made available by NielsenTV from time-to-time.

**Nielsen Homevideo Index**
**National Service**

**Appendix B**

Client    **TRIBUNE BROADCASTING COMPANY**

Network    **SUPERSTATION WGN**

**Prices for NHI National Service (subject to Discounts and Surcharges).**

1.  Base Charge: ▮▮▮▮▮▮▮▮▮▮▮▮

2. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   A.  Minimum Initial Commitment: ▮▮▮▮▮▮▮

       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   B.  Termination Notice: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

       ▮▮▮▮▮

       ▮▮▮▮▮▮▮▮▮▮▮▮

   C. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3.  Sample Household Surcharge:

   A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   B. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4.  All percentages relating to the Base Charge are applied directly to the Base Charge and the total adjustment is the total of such adjustments taken separately.

5. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ████████████████████████████████████████████████████████████.

7.  Other Charges.

A.  Additional NielsenTV products and services authorized by the Client will be furnished at prices quoted by NielsenTV.

B.  Extra copies of reports furnished hereunder (except NTI Analysis Reports) will be furnished for exclusive use of any reasonable number of directors, partners, or employees of Client whom Client may designate in writing subject to a charge of ███████████ of NHI Cable Network Pocket Piece Reports (for Client's Network or other cable networks), NielsenTV National TV Ratings Reports, and ███████████ of each other quarterly report listed in the Schedule hereto and subject to provisions of Section E.6. of this Agreement.



**Nielsen**
Media Research

## *Nielsen Homevideo Index-Local*
## *Service Agreement*
### *for*
### *Local Cable Origination Channels in Local People Meter Markets*

Dated: <u>**April 29, 2005**</u>

Nielsen Media Research, Inc.
150 North Martingale Road
Schaumburg, IL 60173-2076

<u>**Chicagoland Television News, Inc.**</u> ("Client"), a(n) <u>**Delaware**</u> [*State*]

(check one and Client please initial)
☒ corporation
☐ partnership
☐ limited liability company/partnership
☐ individual d/b/a _____
☐ other _____

with its principal offices at <u>**2000 York Rd., Suite 114, Oakbrook, Illinois 60523**</u>, hereby request(s) a license from Nielsen Media Research, Inc. ("NielsenTV") for Nielsen Homevideo Index-Local ("NHIL") local people meter ("LPM") market service ("NHIL LPM Market Service") covering access and use solely by Client's local cable origination channel <u>**Chicagoland Television News a/k/a CLTV**</u> ("Client's Local Cable Origination Channel") in the <u>**Chicago**</u> market ("Market"), and NielsenTV hereby agrees to furnish and license NHIL LPM Market Service to Client on the following terms and conditions ("Agreement"):

### A. SCOPE OF SERVICE

**1. Description of NHIL LPM Market Service:** NielsenTV shall provide to Client NHIL LPM Market Service comprised of the media service ("Media Service") and reports ("Reports") set forth in Appendix AA hereof for use solely by Client's Local Cable Origination Channel in the Market.

**2. Copies of Reports** shall be furnished to Client as follows:

(a) ▮▮▮▮▮▮▮ each Report are supplied without added charge.

**(b) Extra Copies.** Extra copies of Reports for use by Client's directors, partners, consultants, officers and employees whose names and addresses shall be supplied to NielsenTV by Client, are to be paid for by Client as specified in Section C.1.(d). hereof.

**3. Delivery.** All Reports will be delivered as rapidly as practicable. Access to NHIL Metered Market Overnight Ratings Data will be through a password or passwords and Client ID(s) supplied by NielsenTV.

### B. COMMENCEMENT, DURATION AND TERMINATION

**1. Commencement Date.** This Agreement and NHIL LPM Market Service hereunder, shall commence on <u>August ~~1~~, 2004</u> ("Commencement Date").

**2. Duration.** Subject to the provisions of Section B.3. and B.4. hereof, this Agreement and NHIL LPM Market Service hereunder shall have a duration of <u>**five (5)**</u> years commencing on the Commencement Date and shall expire and terminate on <u>August ~~1~~, 2009</u> ("Duration").

*July 31*

CLTV-NHIL-LPM-LclCblOrigChnlSvcAgrmnt080504Rev2.doc

**3. Termination by Client.** This Agreement and NHIL LPM Market Service hereunder may not be terminated by Client except:

**(a)** as provided Section D.11.(b) hereof; or



**4. Termination by NielsenTV.** This Agreement, NHIL LPM Market Service including, without limitation, Nielsen TV Information (hereinafter defined) and the license hereunder to access and use same may be terminated by NielsenTV by serving notice on Client at any time and by refunding promptly all moneys paid for NHIL LPM Market Service not to be rendered, which termination may be effective on any date specified by NielsenTV in such notice (a) in the event of non-performance and/or breach by Client of any one or more of its obligations hereunder ████████████████████████████████ (b) if Client has previously committed the same or similar nonperformance or breach, (c) if NielsenTV shall be unable for any cause beyond its control to fulfill its obligations hereunder, and/or (d) if NielsenTV shall terminate NHIL LPM Market Service covering the Market to all clients then subscribing to NHIL LPM Market Service.

**5. Termination of License.**    Upon expiration or termination of this Agreement, the license granted hereunder to Client covering use of NHIL Metered Market Service and NielsenTV Information shall automatically terminate.

## C. PRICES AND TERMS

**1. (a) Fees for NHIL LPM Market Service.**    Client agrees to pay NielsenTV for NHIL LPM Market Service and the license hereunder to use Reports, data and information (collectively, "NielsenTV Information") the fees set forth in Section III of Appendix AA. hereof (the "Fee(s)") and the adjustments and surcharges then-applicable pursuant to Sections C.2. through C.5. hereof.

**(b) Extra Copies** of Reports ordered by Client will be furnished at NielsenTV's standard price as announced to clients from time to time.

**2. Surcharge for Taxes.**   All Fees and other charges hereunder shall be increased to the extent of any sales, use or other tax on NHIL LPM Market Service or NielsenTV Information which may be payable or required to be collected by NielsenTV, ████████████████████████████████████████████████████████

**3. Billing and Payment:**

**(a)** Each Monthly Charge is billable on or after the first day of such month.

- 2 -

**(b)** Client agrees to pay each invoice promptly on presentation, but in no event later than thirty (30) days thereafter. All amounts (excluding amounts disputed in good faith) not paid within thirty (30) days after presentation shall bear interest at the rate of 18% per annum (or the highest rate allowed by applicable law, if lower) from the date due until paid, payable on demand.

**4.   Default in Payment.**    If Client shall remain in default with respect to the payment of any invoices rendered in accordance with the provisions of this Agreement (including any interest due as specified in Section C.3.(c) hereof) for a period of more than thirty (30) days following written notice from NielsenTV (calling attention to the default and to this Section C.4.), then NielsenTV may, following written notice to Client, suspend all service and the license hereunder without thereby being in default of NielsenTV's obligations under this Agreement.

**5.   Costs of Enforcement.**    If NielsenTV retains a collection agent and/or counsel for the purpose of enforcing its rights under this Agreement, Client agrees to pay on demand, NielsenTV's costs and fees (including court costs, collection agent and attorney's fees and costs of investigation) in connection therewith.

## D.  GENERAL PROVISIONS

**1.   Non-Exclusive Service.**    NHIL LPM Market Service is furnished and licensed on a non-exclusive basis, and NielsenTV is not restricted hereunder from furnishing, to any other person, any type of information, data or service. The sample households for NHIL LPM Market Service may also be used in common with other NielsenTV services.

**2.   Use of NielsenTV Information.**

**(a)  Client's Interest.**    Client understands that NielsenTV Information is furnished and licensed hereunder on the basis of Client's representation that Client has a continuing legitimate business interest in the subject matter thereof.

**(b)  Access to NielsenTV Information.**    Client recognizes that all NielsenTV Information is the private property of NielsenTV, licensed hereunder to Client for confidential internal management use only in connection with the sale of advertising time in the conduct of the business of Client's Local Cable Origination Channel in the Market, and Client will prevent all unauthorized persons from having access thereto. Client agrees to adhere strictly to the provisions set forth in the Local Reference Supplement under the caption "Permissible Uses of Local Analysis Data", to not lend, give, sell, lease, exchange or transfer possession of all or any part of any NielsenTV Information furnished hereunder and to limit divulgence to those under current license from NielsenTV for the use thereof. The obligations of Client herein are not changed in any way by the publication of NielsenTV Information in any manner whatsoever by NielsenTV or others. NielsenTV Information may be furnished to any persons or entities by NielsenTV, on terms deemed fair by NielsenTV. NielsenTV reserves the right to withhold NielsenTV Information if, in NielsenTV's judgment, Client's use or intended use thereof is in violation of the foregoing or is inconsistent with Nielsen's TV's divulgence policies or the interests of other parties, and Client shall receive no rebate or adjustment of price for such non-delivery.

**(c)  Reproduction of NielsenTV Information.**    Client agrees it will neither publish, reproduce, copy or extract, nor permit or allow Client's Local Cable Origination Channel or others to publish, reproduce, copy or extract, any NielsenTV Information furnished hereunder, either alone or in combination with any other data, except with NielsenTV's prior written approval in each case not to be unreasonably withheld (including without limitation the requirement of NielsenTV's prior written approval not to be unreasonably withheld for quotation of data in advertising). Such approval may, however, be reasonably withheld by NielsenTV in its sole discretion if such publication, etc. is not in accordance with NielsenTV's policies permitting same as indicated by NielsenTV in writing from time to time including, without limitation, the Local Reference Supplement, and shall be withheld in any event unless such publication, etc. correctly states the facts in a manner not likely to mislead the reader. ██████████████████████████████████████████████████████ Client may, however, without NielsenTV's consent, reproduce any data reasonably required for use in sales presentations made to individual organizations or small groups if divulgence of such data is otherwise permitted by this Agreement.

**(d)  Legal Proceedings.**    Client agrees that neither Client, Local Cable Origination Channel or any member of their respective organizations will use or attempt, permit or allow the use of any NielsenTV Information in any legal proceedings (including, but not limited to, any use in litigation and/or use with any governmental investigatory, regulatory or other body or authority), except if and to the extent compelled by service of legal process or in response to an official governmental demand; in which case (and as a condition to any consent by NielsenTV to such use) Client (i) shall give NielsenTV prompt advance notice of such proposed use; and (ii) shall first obtain appropriate Agreements of Confidentiality, Protective Orders and (where appropriate) Evidentiary Stipulations in form and substance acceptable to

- 3 -

NielsenTV.

**(e) Data Processing Use.**

(I)   NielsenTV hereby gives Client permission to convert printed NielsenTV Information furnished hereunder into data processing form (by keypunching, direct transfer to computer equipment or any other method) and to use such converted report material in computer processing, on the following terms and conditions:

(1)   NielsenTV retains all copyright privileges in the NielsenTV Information contained in the printed report material, converted material, magnetic tapes ("tapes") and/or other computer storage facilities or devices and the use of the printed report material, converted material, tapes and/or other computer storage facilities or devices and any data produced therefrom is subject to all of the requirements of Sections D.2.(a) through (d) hereof, except as specifically modified herein.

(2)   Client agrees to erase or otherwise destroy such converted report material, tapes and/or other computer storage facilities or devices and copies thereof no later than the date of expiration or termination of this Agreement.  Upon request from NielsenTV, Client will certify such erasure and/or destruction.

(3)   Client's use of a computer service bureau for the aforementioned data processing is conditioned upon and subject to such computer service bureau entering into NielsenTV's then-standard form of agreement ("Third Party Processor Agreement") to protect the confidential and proprietary nature of the NielsenTV Information provided to such computer service bureau and data produced therefrom, and such computer service bureau shall deliver an executed copy of such Third Party Processor Agreement to NielsenTV for its acceptance on or before delivery of such printed material, tapes and/or other computer storage facilities or devices by Client or NielsenTV to such computer service bureau.  Client shall also make necessary payment determined by NielsenTV for NielsenTV Information supplied to Client and/or such computer service bureau in the form of tapes, other computer storage facilities or devices to be used in a data processing environment.  NielsenTV also reserves the right to make an appropriate charge to such computer service bureau based upon the nature and extent of the NielsenTV Information provided to such computer service bureau.

(4)   Notwithstanding the foregoing, NielsenTV may terminate such permission at any time effective with any date specified by NielsenTV, if NielsenTV reasonably believes that Client, Client's Local Cable Origination Channel and/or such computer service bureau has failed to perform any one or more of the obligations under this Section D.2.(e) and/or such Third Party Processor Agreement or if NielsenTV is then terminating such permission to all local cable origination channels then subscribing to the class of service being rendered to the Client.

(ii)   From time to time Client may request NielsenTV in writing to furnish Client, at NielsenTV's regular charges, tapes and/or other computer storage facilities or devices containing NielsenTV Information in accordance with specifications furnished by Client, subject to all of the terms and conditions set forth herein including, without limitation, Section D.2. hereof, and provided that where NielsenTV Information appears on the tapes and/or other computer storage facilities or devices with an indication that such NielsenTV Information is below NielsenTV's minimum reporting standards, and therefore did not appear in the printed report, Client specifically agrees to include such NielsenTV Information only in combination with reportable NielsenTV Information in any tabulation for a third party.

**3.   Delivery Methods; Security.**   The provisions of this Agreement shall apply to all NielsenTV Information supplied to Client in printed, tape, diskette or compact disk (CD) formats, or by electronic means including, without limitation, server-to-server access, electronic mail, or Internet delivery.  NielsenTV reserves the right to discontinue any medium of transmission of NielsenTV Information if the same or similar NielsenTV Information is contained in an alternate form of transmission furnished to Client.  In the event Client supplies any NielsenTV Information to a computer service bureau via electronic means, including but not limited to electronic mail or Internet delivery, Client shall be obligated to implement and maintain the security protections specified by NielsenTV, as they may be changed from time to time, and to expressly agree to abide by any additional terms, conditions, technical requirements and restrictions, if any, applicable to such methods of delivery, which protections and terms, conditions, technical requirements, restrictions and conditions are subject to change from time to time at NielsenTV's sole discretion.  In the event Client, Client's Local Cable Origination Channel and/or Client's computer service bureau is not in compliance with the provisions hereof including, without limitation, Section D.2. hereof, NielsenTV reserves the right to take such action as it deems appropriate including, but not limited to, suspension of NHIL LPM Market Service and/or the license hereunder to use NielsenTV Information and/or termination of this Agreement, the Third Party Processor Agreement and/or any and all other legal remedies available to NielsenTV.

- 4 -

4.  **Client Responsibility.** Client assumes full responsibility to NielsenTV for any violation (whether occurring before or after termination hereof) by any director, partner, officer, employee, consultant, agent or representative of Client or Client's Local Cable Origination Channel of any obligation assumed by Client hereunder and agrees to take all steps necessary to ensure understanding of and compliance with this undertaking by all persons having access to NielsenTV Information licensed or furnished hereunder.  Client acknowledges that a violation of any of the provisions contained or referred to in this Section or Sections D.2., D.3., D.7., D.8. or D.9. hereof will cause irreparable harm to NielsenTV's business, for which there is no adequate remedy at law.  Accordingly, in the event of any such violation, Client agrees that NielsenTV shall be entitled, in addition to any other remedies it may have, at law or in equity, to immediate and permanent injunctive relief against Client, Client's Local Cable Origination Channel, their respective employees, agents and/or other third parties acting through, for or with any of the foregoing.  Client is responsible for the confidentiality and security of the ID(s) and password(s) provided by NielsenTV for access to NielsenTV Information including, but not limited to, NHIL LPM Market Overnight Ratings Data and all charges based on data files accessed through their use, whether or not authorized by Client.

5.  **Data Regarding Client's Cable Systems.** Client consents to NielsenTV's inclusion of, in NielsenTV Information or other material furnished to Client and/or any other persons, data pertaining to Client's Local Cable Origination Channel as reported by NielsenTV.

6.  **Accuracy, Errors, Non-Performance, Etc.**

    (a) **NIELSENTV DISCLAIMS AND CLIENT HEREBY WAIVES, ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, TO CLIENT OR TO ANY THIRD PARTY, WITH RESPECT TO ANY NIELSENTV INFORMATION PROVIDED HEREUNDER INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR OF FITNESS THEREOF FOR ANY PARTICULAR PURPOSE.**  The foregoing disclaimer shall neither act as nor constitute an admission by NielsenTV that any of the foregoing constitute goods, commodities or tangible personal property under or for the purposes of any applicable law.

    (b) **Effect of Sub-Standard Conditions.**   NielsenTV shall not be obligated to furnish any NielsenTV Information hereunder when, in NielsenTV's opinion, conditions are such as not to permit NielsenTV techniques to produce such NielsenTV Information in accordance with NielsenTV standards, nor shall Client be entitled to any right of termination or abatement of price hereunder by reason of failure by NielsenTV to publish NielsenTV Information for such reasons, except as provided in sub-section D.6.(c)(ii) hereof.

    (b) **Limitation of Liability.**

    (i)   Except for the refund or credit specifically provided in subsection D.6.(c)(ii) hereof, NielsenTV shall not be liable, in contract or tort, for any loss, cost, expense, injury or damage of any kind, including, without limitation, any incidental or consequential damages (including, without limitation, lost profits and loss of or damage to goodwill), even if NielsenTV is advised or has knowledge of the possibility thereof, directly or indirectly resulting from (A) NielsenTV's failure, for any reason, to furnish any NielsenTV Information as required by this Agreement; (B) any errors, inaccuracies or omissions in any NielsenTV Information; (C) any action or inaction, whether or not negligent, of NielsenTV, or any person acting on NielsenTV's behalf, in compiling or publishing any NielsenTV Information or in delivering or communicating the same to Client or others, or from the use or publication of the same by Client or others; or (D) contingencies beyond NielsenTV's control;

    (ii) If any errors, inaccuracies or omissions occur, it will be NielsenTV's policy, if feasible, to furnish appropriate correction notices.  If NielsenTV shall fail, for any reason, to furnish any NielsenTV Information, NielsenTV shall provide Client with a refund or credit (as appropriate) of any amount paid for the subject NielsenTV Information and NielsenTV's liability shall be limited to such refund or credit, Client agreeing that such remedy shall be Client's sole and exclusive remedy, at law or in equity, in the event of the occurrence of any event described in subsection D.6.(c)(i)(A) through (D) hereof.

7.  **Client Cooperation.** Client understands that NielsenTV's ability to achieve report delivery schedules herein is dependent on receiving accurate timely information.  Accordingly:

- 5 -

**(a) Program Names.**   Subject to reportability requirements set forth in the Local Reference Supplement including, without limitation, Section V. thereof entitled "Television Stations/Channels", Client agrees to supply to NielsenTV for Client's Local Cable Origination Channel, at the time(s) requested by NielsenTV, a suitable program name and time for each quarter hour of telecasting, which Client agrees to make available for daily verification via such method as may be prescribed by NielsenTV, such listings to indicate major changes, substitutions and/or revisions of normal scheduling that occur during the measurement interval.   In the event such records as supplied to NielsenTV may prove to have been inaccurate or inadequate so that in NielsenTV's judgment a correction notice for a published Regular Data Analysis becomes necessary, Client agrees to pay for all reasonable reprocessing, printing and distribution charges incurred by NielsenTV in the issuing of a suitable correction notice.



Where timely information is not received or conflicting information is received, NielsenTV may either use the best available information in its judgment, or omit such programs from the report.

**(b)**

(i)

(ii)

**(c) Client's Local Cable Origination Channel Information.**     At Client's sole discretion, Client agrees to supply NielsenTV with such information regarding Client's Local Cable Origination Channel as NielsenTV may reasonably request including, without limitation, channel carriage, subscriber counts (if permitted by Client's MSO agreements covering Client's Network), ad sales contact information, contact information and other related information required by NielsenTV, and to cooperate with NielsenTV in other techniques reasonably designed to obtain such information.   To be timely, such information must be delivered prior to the end of the report period being measured.   Where timely information is not received, or conflicting information is received, NielsenTV may use the best available information in its judgment, or omit Client's Local Cable Origination Channel from the report.

**(d) Encoding.**

(i)   Without limiting Client's obligations under Sections D.7.(a) and (c) hereof, Client agrees, at NielsenTV's request but at Client's expense, to encode all telecasting on Client's Local Cable Origination Channel  and to comply with all encoding procedures as NielsenTV may determine during the Duration, including without limitation Client's responsibility for the acquisition, cost, installation, operation and maintenance of all required encoding equipment.   In the absence of encoding, NielsenTV may produce ratings data for a limited time, but NielsenTV shall have no liability with respect to the production and/or accuracy thereof.

(ii)

(iii)

(e) Client also agrees to cooperate with NielsenTV to enable NielsenTV to connect a metering device to any equipment owned by Client, Client's Local Cable Origination Channel or an affiliate of Client in any NielsenTV sample household.

**8. Identity of Sample Households.** Client agrees that it will not, under any circumstances, attempt to ascertain the name, location of, or other particulars with respect to, or contact, any household furnishing television information to NielsenTV, nor shall NielsenTV be under any obligation to provide Client with access to any such household or information relating thereto. Client also agrees that if it becomes aware of any information regarding any NielsenTV household it will keep such information confidential and not divulge or use such information and it will promptly report to NielsenTV any such information that has come to its attention, including attempts by such households to voluntarily provide Client or others with information concerning any aspect of their participation in a NielsenTV television survey or offers by third parties of such information. Client also agrees that it will not permit any of its employees to participate in any such survey or to help any participating family with any activity connected with NielsenTV television data collection. Client agrees that NielsenTV's remedies at law in the event of a breach of this provision are inadequate and therefore, without limiting NielsenTV's right to damages and other remedies which may be available to NielsenTV, NielsenTV shall be entitled to enjoin such breach of obligations in any court having jurisdiction.

**9. Title to NielsenTV Information.** Client recognizes that all NielsenTV Information including, without limitation, printed or written material or electronic data transmission supplied hereunder is furnished merely to convey the NielsenTV Information therein contained and that such NielsenTV Information remains the property of NielsenTV, licensed to Client for confidential use in accordance with the provisions of the Agreement; and Client agrees to return the master copy, all extra copies, summaries and abstracts thereof to NielsenTV on demand at any time more than two (2) years after the date of delivery, (except that upon termination of this Agreement return shall be made on demand), except that if any such NielsenTV Information has been destroyed prior to such demand, Client shall certify such destruction.

**10. Survival of Terms.** The provisions of Sections C., D.1., D.2., D.3., D.4., D.5., D.6., D.7., D.8., D.9., D.11., D.13., D.14., D.15., D.16., D.17., D.18., D.19. and D.20. hereof shall survive expiration or termination of this Agreement.

**11. Adjustments of Billings, Etc.** Upon discovery of any error in billing of or payment for NHIL LPM Market Service hereunder, either party hereto may, within twelve (12) months following the making of said error, but not more than three (3) months following delivery of the last Report due hereunder, serve notice on the other party, requesting adjustment; and any such claim shall be settled promptly.

**12. Improvements, Changes, etc.** To facilitate improvements and changes in NHIL LPM Market Service and to meet changing conditions and unforeseen circumstances, NielsenTV shall have the following rights:

(a) To make, without notice, any changes in report or analysis formats, schedules, specifications, techniques or information which: (i) in NielsenTV's judgment will tend to create a net improvement in NHIL LPM Market Service, or (ii) may be requested or recommended by the Media Rating Council (or any other industry accrediting or auditing organization if NielsenTV then is seeking or has sought and received such accreditation for the part or parts of NHIL LPM Market Service to which such changes relate) or required by government action or any changes in the Local Reference Supplement, from time to time.

(b) To serve notice on Client at any time, setting forth such other changes of format, specifications, techniques, information, price or other provisions hereof as NielsenTV shall deem necessary or desirable and stating the effective date thereof, which shall be not less than thirty (30) days after service of such notice. Such price changes shall become effective on such stated effective date unless, within thirty (30) days after such notice, Client shall have notified NielsenTV in writing of its refusal to accept such price change. Such notice of refusal shall terminate this Agreement as of the effective date of such price change provided, however, that NielsenTV, solely within its own discretion, may at that time elect to forego such price change and continue this Agreement.

**13. Modification and Waiver.** This Agreement shall not be modified except in a writing signed by both parties. Only the Chief Executive Officer, President or Coordinating Vice President are authorized to execute any such modification for NielsenTV. No waiver by either party of any breach of the Agreement by the other shall be deemed to be a waiver of any preceding or subsequent breach thereof.

**14. Assignability.** This Agreement may not be assigned or transferred by Client, whether by contract or by operation of law, without the prior written consent of NielsenTV (in a form prescribed by NielsenTV) not to be unreasonably withheld, provided that no such assignment shall relieve Client of any of its obligations hereunder. For purposes hereof, any change in control of Client, whether as a result of any merger, sale of voting stock or similar transaction, shall be deemed to be an assignment

- 7 -

of this Agreement requiring the prior written consent of NielsenTV hereunder. Any purported assignment of this Agreement by Client in violation of this provision shall be ineffective against, and shall not be binding upon, NielsenTV. Notwithstanding the foregoing, NielsenTV shall have the right to accept payment or performance hereunder from any such purported assignee without waiving its right to enforce the provisions of this Agreement (including, without limitation, all of Client's payment obligations hereunder) against Client at any time. NielsenTV reserves the right to assign, transfer, set over or sell its rights and obligations hereunder to any successor to NielsenTV or its NHIL business, including without limitation any corporation or other transferee controlling, controlled by or under common control with NielsenTV, and reserves the right to have all services rendered by such successor upon notice to Client.

**16. Notice.** Each notice hereunder shall be in writing and deposited in the United States mail addressed by registered or certified mail, to Client at:

| | |
|---|---|
| Client Name: | **Chicagoland Television News, Inc.** |
| Attention/Title: | **Judy Juds, CFO** |
| Address: | **2000 York Rd., Suite 114** |
| City/State/Zip: | **Oakbrook, Illinois 60523** |

or, if to NielsenTV, to Nielsen Media Research, Inc., 150 North Martingale Road, Schaumburg, IL 60173-2076, Attn: Coordinating Vice President with a cc to 770 Broadway, New York, NY 10003-9595, Attn: General Counsel or to such other address as either party shall subsequently notify the other in writing. The date of deposit in the United States mail shall be deemed the date of service of such notice.

**16. Acceptance and Construction.** This Agreement shall be executed by Client within sixty (60) days of the date hereof and, following execution by Client, is subject to acceptance by NielsenTV in Schaumburg, Illinois, and until so accepted shall not constitute a contract. The Agreement shall be construed under the laws of the State of Illinois applicable to agreements to be performed entirely therein, and to resolve any controversy or claim arising under or related to this Agreement. Only the Chief Executive Officer, President or Coordinating Vice President shall have the power of acceptance.

**17. Appendix "AA" and the Local Reference Supplement,** as amended hereafter from time to time, are hereby incorporated into this Agreement with the same full force and effect as though specifically set forth herein and are hereby acknowledged as received by Client.

**18. Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**19. Relationship of the Parties.** The parties hereto are independent contractors and nothing contained herein shall be construed to place them in the relationship of partners, principal and agent, employer and employee or joint venturers. Each party hereto agrees that it shall have no power or authority or right to bind or obligate the other, nor shall either party hold itself out as having such power or authority.

**20. Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and replaces all prior negotiations and agreements, whether oral or written, with respect to the subject matter hereof.

AGREED AND ACCEPTED:
**NIELSEN MEDIA RESEARCH, INC.
SCHAUMBURG, ILLINOIS**

| | | | |
|---|---|---|---|
| Signed: | *Ronald F Egert* | Signed: | |
| Title: | COORDINATING VICE PRESIDENT | Name: (Print/Type) | DAVID L. UNDERHILL |
| Date: | SEP 1 2 2005 | Title: | PRESIDENT & CEO |
| | | Date: | 7/26/05 |

**Chicagoland Television News, Inc.**
(CLIENT)

APPENDIX "AA"
to
NIELSEN HOMEVIDEO INDEX-LOCAL
SERVICE AGREEMENT
for
*Local Cable Origination Channels in Local People Meter Markets*

**Dated: <u>April 29, 2005</u>**
**Between <u>Chicagoland Television News, Inc.</u> ("Client") and NIELSEN MEDIA RESEARCH, INC. ("NielsenTV") for <u>five</u> (<u>5</u>) years ("Duration") serving <u>Chicagoland Television News a/k/a CLTV</u> ("Client's Local Cable Origination Channel) in the <u>Chicago</u> market ("Market").**
**Commencement Date: <u>August 8, 2004</u>**

I.   LPM Market Sample Size:

| | |
|---|---|
| Market: | **<u>Chicago</u>** |
| Effective Date: | **<u>August 8, 2004</u>** |
| Target Installed Households: | |
| Estimated Average Day In-Tab: | |
| Minimum for Publication: | |

**II.   Scope of NHIL LPM Market Service:**   NHIL LPM Market Service hereunder will consist of the following for use solely by Client's Local Cable Origination Channel in Client's Market:

**A.   Media Service:**
  1.   Areas measured shall be substantially as described in the Local Reference Supplement
  2.   Sampling methods shall be substantially as described in the Local Reference Supplement.
  3.   Measurement methods shall be substantially as described in the Local Reference Supplement.

**B.   Reports:**
  1.   The printed monthly NSI VIP analyses.
  2.   The monthly Total Viewing Sources DVD ("TVS DVD").
  3.   Daily DMA Household and Demographic Ratings Data, not less than 365 Daily DMA Ratings Data per year, via Galaxy Navigator or other access to computer facility for Client's Market, Providence and Hartford.
  4.   NHIL Program Average Data Tape ("PAV Tape") in electronic data output form with one (1) analysis for each of twelve (12) months per year, averaging approximately four (4) weeks of measurement per analysis.
  5.   Total Activity Reports ("TARs") for February, May, July and November.
  6.   Audience Diversion Report for February, May, July and November.
  7.   Black & Hispanic Special Reports.
  8.   Annual County Coverage Report.
  9.   Report on Syndicated Programs for February, May, July and November.
  10.  Monthly net weekly circulation for all viewing sources for February, May, July and November.
  11.  Monthly meter sample characteristics reports.
  12.  Local Market Sports Report.
  13.  All standard reports including Directory of Television Stations, U.S. Television Household Estimates, DMA Market Report and Demographic Rank Report.

**III.   Fees:**

| Year: | Annual: | Monthly: |
|---|---|---|
| 1 | ▮ | ▮ |
| 2 | ▮ | ▮ |
| 3 | ▮ | ▮ |
| 4 | ▮ | ▮ |
| 5 | ▮ | ▮ |

CLTV-NHIL-LPM-LclCblOrigChnlSvcAgrmnt080504Rev2.doc

## *Global Amendment to Certain Nielsen Media Agreements*

Dated: 5/21/09

This agreement ("Global Amendment") is entered into by and between The Nielsen Company (US), LLC ("Nielsen"), successor in interest to Nielsen Media Research, Inc. ("Nielsen Media") and Tribune Broadcasting Company ("Tribune Broadcasting"), Chicagoland Television News, Inc. ("CLTV") and WGN Continental Broadcasting Company ("WGN" and, with Tribune Broadcasting and CLTV, the "Tribune Parties"). Collectively, Nielsen and the Tribune Parties are referred to herein as the "Parties").

WHEREFORE, the Parties are party to certain agreements described more fully below entered into by Nielsen Media or, after the merger of Nielsen Media into Nielsen, by Nielsen; and

WHEREFORE, the Tribune Parties filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the U.S. Bankruptcy Court for the District of Delaware ("Bankruptcy Court") on or about December 8, 2008 ("Petition Date") and the Tribune Parties have continued to operate and maintain their business as debtors in possession; and

WHEREFORE, the Parties have negotiated between them and now wish to amend the agreements.

NOW THEREFORE, for good and valuable consideration, including that certain Settlement and Release Agreement, executed substantially contemporaneously herewith by Nielsen and the Tribune Parties and certain affiliates of the Tribune Parties (the "Settlement Agreement"), and the Tribune Parties' motion in the Bankruptcy Case (to be filed substantially contemporaneously herewith) for authorization to assume, pursuant to Section 365(a) of the Bankruptcy Code, certain pre-petition agreements described herein between the parties, as amended by this Global Amendment and approval of this Global Amendment and the Settlement ("Approval and Assumption Motion"), and other consideration, receipt of which is acknowledged by the Parties, the Parties agree as follows:

I.       This Global Amendment is contingent upon Bankruptcy Court approvals sought in the Approval and Assumption Motion, and shall be of no force or effect unless and until the Bankruptcy Court enters, within 60 days of the date hereof, an order granting the Approval and Assumption Motion ("Approval Order") and the Approval Order becomes final and no longer subject to appeal, provided that such time shall be extended so long as the parties are actively challenging such appeal.

II.      This Global Amendment applies to each and all of the agreements listed below between Nielsen or Nielsen as successor in interest to Nielsen Media, and one or more of the Tribune Parties as specified in the descriptions provided (each, a "Client"), effective with the respective dates listed below (hereinafter the "Agreement(s)"):

(1) Nielsen Station Index Service Agreement for Diary, Metered and Local People Meter Markets between Tribune Broadcasting Company and Nielsen, dated January 1, 2004 and as subsequently amended;
(2) Nielsen Station Index Service Stellar Agreement between Tribune Broadcasting Company and Nielsen on behalf of Station WXMI-TV, dated June 1, 2008;
Nielsen Station Index Service Arianna Software License Agreements between Tribune Broadcasting Company and Nielsen, all dated February 1, 2009, on behalf of (3) Station KCPQ-TV; (4) Station KDAF-TV; (5) Station KIAH-TV; (6) Station KMYQ-TV; (7) Station KSWB-TV; (8) Station KTLA-TV; (9) Station KTXL; (10) Station KWGN; (11) Station WGNO-TV; (12) Station WGN-TV; (13) Station WNOL-TV; (14) Station WPHL-TV; (15) Station WPIX-TV; (16) Station WSFL-TV; (17) Station WTIC and (18) Station WTXX;
(19) Nielsen Homevideo Index-Local Service Agreement for Local Cable Origination Channels in Local People Meter Markets between Chicagoland Television News, Inc. and Nielsen, dated August 1, 2004;
(20) Nielsen Homevideo Index-Local Service Arianna Software License Agreement between Chicagoland TV News, Inc. and Nielsen, dated February 1, 2009;
(21) Nielsen Homevideo Index-Local Monitor-Plus Service Agreement between Chicagoland Television News, Inc. and Nielsen, dated August 1, 2004;
(22) Nielsen Homevideo Index NHI National Service Agreement between Tribune Broadcasting Company and Nielsen for Client's Network Superstation WGN, dated July 1, 2006;

(23) Nielsen Homevideo Index NPower Subscription Agreement between Tribune Broadcasting Company and Nielsen for Client's Network Superstation WGN, dated January 1, 2007;

(24) Nielsen Homevideo Index MarketBreaks Service between Tribune Broadcasting Company and Nielsen for Client's Network Superstation, WGN dated October 1, 2006;

(25) Nielsen Homevideo Index Average Commercial Minute Ratings Data Subscription Service between Tribune Broadcasting Company and Nielsen for Client's Network Superstation WGN, dated October 1, 2007; and

(26) Nielsen Homevideo Index Focus Service and Software License Agreement between Tribune Broadcasting Company and Nielsen, dated November 1, 2007.

III.    The Agreements, and each of them, is hereby amended, **effective as of April 1, 2009** (the "Effective Date"), as follows:

1.   **Extension:** Notwithstanding anything to the contrary contained therein, the term of each and all of the Agreements listed above, except for the Agreement specified as "(1)" (the Nielsen Station Index Service Agreement for Diary, Metered and Local People Meter Markets), is hereby extended to and including December 31, 2011, at which time the Agreements shall expire and terminate.

2.   **Rates:** Notwithstanding anything to the contrary contained in the Agreements, the rates listed in Schedule 1 hereto shall supersede and replace the applicable rates in the Agreements for the identified service(s) as of April 1, 2009.

3.   [REDACTED]

4.   [REDACTED]

IV.    Except as expressly set forth in this Global Amendment, all terms and conditions set forth in each of the Agreements shall remain in full force and effect.  As of the Effective Date hereof, all references to the Agreements shall be references to the Agreements as amended by this Amendment.

V.    The provisions of this Global Amendment may not be modified or amended except in a writing signed by all Parties hereto.  The Global Amendment may be executed in counterparts, each of which shall be deemed an original, and which together shall constitute one and the same Global Amendment.

IN WITNESS WHEREOF, this Amendment has been executed by the parties hereto through their duly authorized representatives whose signatures are set forth below.

**The Nielsen Company (US), LLC**

Signed: _____

Name:    Derek Irwin

Title:     Coordinating Vice-President

Tribune Broadcasting Company
_____
(*CLIENT-full legal name*)

Signed: _____
(*duly authorized officer or agent*)

Name:
(Print/Type) _____

Title: _____

Chicagoland Television News, Inc.
(*CLIENT-full legal name*)

Signed: _____
(*duly authorized officer or agent*

Name:
(Print/Type) _____

Title: _____

WGN Continental Broadcasting Company
_____
(*CLIENT-full legal name*)

Signed: _____
(*duly authorized officer or agent*)

Name:
(Print/Type) _____

Title: _____

\9125188.4

# SCHEDULE 1

[REDACTED]