# EXHIBIT 13

14344pat

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:

TRIBUNE COMPANY, et al.

       Debtors.

_____

THE DEPOSITION OF

DONNA GUTMAN

Taken by the Tribune Company

| | |
|---|---|
| DATE: | Wednesday, June 17, 2009 |
| TIME: | 9:00 a.m. - 11:07 a.m. |
| LOCATION: | Gary, Williams, et al.<br>111 North Orange Avenue<br>Orlando, Florida |
| REPORTER: | Pamela S. Hardy, RMR, CRR, FPR |

2

```
1      A P P E A R A N C E S:

2

3             MANUEL SOCIAS, ESQ., OF:
              Gary, Williams, Parenti, Finney, Lewis,
4             McManus, Watson & Sperando, P.L.
              111 North Orange Avenue, Suite 775
5             Orlando, Florida  32801
              (407)649-7171
```

Page 1

```
                            14344pat
 6                  sociasm@aol.com
                    on behalf of Donna Gutman
 7

 8                  DAVID B. KING, ESQ., and
                    MAYANNE DOWNS, ESQ., OF:
 9                  King, Blackwell, Downs & Zehnder, PA
                    25 East Pine Street
10                  Orlando, Florida 32801
                    (407) 422-2472
11                  dking@kbdzlaw.com
                    mdowns@kbdzlaw.com
12                  on behalf of the Tribune Company

13

                    GUY NEAL, ESQUIRE
14                  1501 K Street NW
                    Washington, D.C. 20005
15                  (202)736-8041
                    on behalf of the Tribune Company
16

17                  DAVID BRALOW, ESQ., OF:
                    Thomas, Locicero & Bralow
18                  220 E. 42nd Street
                    New York, New York  10017
19                  (212)210-2893
                    on behalf of the Tribune Company
20

21

22                  *    *    *    *    *
23

24

25



                  MJC REPORTING, INC.
```

                                                                3

```
 1
                       I N D E X
 2
            Wednesday, June 17, 2009
 3

 4

            TESTIMONY OF:  DONNA GUTMAN
 5
                Direct Examination by Mr. King        3
 6              Cross Examination (None)

 7
            ERRATA                                    73
 8          CERTIFICATE OF OATH                       74
                       Page 2
```

14344pat

CERTIFICATE OF REPORTER                              75

 9

10                      * * * * *

11                   E X H I B I T S

12

13    Exhibit No. 1
        Notice of Taking Deposition                   5

14    Exhibit No. 2
        Affidavit of Donna Gutman                     10

15

16    Exhibit No. 3
        Orlando Sentinel Article 11/30/03             27

17    Exhibit No. 4
        Dr. Gutman's obituary                         58

18

19            *       *       *       *       *

20

21

22

23

24

25

MJC REPORTING, INC.

4

 1              P R O C E E D I N G S

 2    WHEREUPON:

 3                  DONNA GUTMAN

 4    having been first duly sworn to tell the truth, the

 5    whole truth and nothing but the truth, testified as

 6    follows:

 7           THE WITNESS:  Yes.

 8              DIRECT EXAMINATION

 9    BY MR. KING:

09:07  10        Q.   Would you state your name, please, ma'am?

Page 3

14344pat

|       |    |    |                                                        |
|-------|----|----|--------------------------------------------------------|
|       | 11 | A. | Yes.  My name is Donna Gutman.                         |
|       | 12 | Q. | Mrs. Gutman, I'm David King and I'm going to           |

be asking you some questions today.  I'm very sorry

about the death of your husband and I really don't

09:07   15   want to intrude in your life any more than I have to.

But because you filed an affidavit up in the court in

Delaware, I've got to ask you some questions about

that.  Do you understand?

19   A.   I understand, yes.  I would like to say

09:08   20   before we start that I'm hard of hearing so I may be

asking you to repeat a question to be sure that I

understand it.  And I do feel that I have experienced

more hearing loss since my husband died and it may

very well, my doctor said it may very well be due to

09:08   25   stress and grief.

MJC REPORTING, INC.

5

1   Q.   Sure.  Okay.  Well, I'm going to speak

relatively firmly and loudly, and so if you have any

question about hearing me, you just tell me and I will

repeat the question and put it to you so that you can

09:08   5   hear it.

6   A.   All right.

7   Q.   Are you hearing me now okay?

8   A.   I'm hearing you very nicely now.  Thank you.

9   Q.   Good.  And I want to make sure you

09:08   10   understand the question, so if I ask you a question

that you don't understand, will you let me know and I

will rephrase the question and put it to you in a way

that you do understand it?  Okay?

Page 4

14344pat

|       | 14 | A.    All right.                                          |
|-------|----|----------------------------------------------------------|
| 09:09 | 15 |       (Document marked for identification                |
|       | 16 |       Exhibit No. 1).                                     |
|       | 17 | Q.    I show you Exhibit 1 and ask you if                |
|       | 18 | understand this deposition is being taken pursuant to    |
|       | 19 | this notice of taking deposition in the United States    |
| 09:09 | 20 | Bankruptcy Court For the District of Delaware in the     |
|       | 21 | In Re:  Tribune Company bankruptcy.  Do you understand   |
|       | 22 | that, ma'am?                                             |
|       | 23 | A.    I understand that it says here that it's           |
|       | 24 | part of the bankruptcy procedure.                        |
| 09:09 | 25 | Q.    Yes.  Proceeding.                                   |

MJC REPORTING, INC.

6

|       | 1  | A.    Okay.                                              |
|-------|----|----------------------------------------------------------|
|       | 2  | Q.    And you understood that you were going to          |
|       | 3  | appear here today and offer testimony regarding your     |
|       | 4  | participation in the bankruptcy proceeding, correct,     |
| 09:09 | 5  | ma'am?                                                    |
|       | 6  | A.    I understand that I'm here today                   |
|       | 7  | representing Michael.                                     |
|       | 8  | Q.    And is it correct that you are the personal        |
|       | 9  | representative of E. Michael Gutman?                      |
| 09:10 | 10 | A.    Yes.                                                |
|       | 11 | Q.    And you've been appointed by the probate           |
|       | 12 | court to serve as the personal representative; is that   |
|       | 13 | right?                                                    |
|       | 14 | A.    Yes.                                                |
| 09:10 | 15 | Q.    And was that pursuant to a designation in a        |

Page 5

14344pat

16    will?

17         A.    Yes.

18         Q.    Okay.  Dr. Gutman had a will and appointed

19    you as his personal representative in the will?

09:10  20         A.    Yes.

21         Q.    Now, can you tell me what is the current

22    status today of the Gutman Pain and Accident Center?

23         A.    What do you mean by that?

24         Q.    Well, the business Dr. Gutman was operating,

09:10  25    is that closed?


MJC REPORTING, INC.

7

1         A.    That is still open.

2         Q.    Okay.  Who is operating it?

3         A.    Well, it's being operated by -- we have

4    licensed doctors that are operating it at this time.

09:11   5         Q.    Who are the licensed doctors?

6         A.    One is Dr. Garnsey and one is Dr. Babiar.

7         Q.    That's Dr. Hubert Garnsey?

8         A.    Correct.

9         Q.    And he is a -- what is his --

09:11  10         A.    He's a DO.

11         Q.    Doctor of osteopath?

12         A.    That's correct.

13         Q.    And Dr. Babiar, what is his --

14         A.    Dr. Babiar is a chiropractor.

09:11  15         Q.    Is Dr. Ballentine still involved?

16         A.    No.

17         Q.    And is it their intention of closing out

18    Dr. Gutman's practice?

Page 6

14344pat

19      A.    That's still unclear.  It's too early to

09:11  20    make those decisions.

21      Q.    Okay.  Who is in charge at the Pain and

22    Accident Center?

23      A.    And what do you mean by in charge?

24      Q.    Who is managing it?

09:12  25      A.    Robert is managing it and I am managing it


MJC REPORTING, INC.


8


1    because I was appointed by the courts.

2      Q.    Do you go there every day?

3      A.    Yes, I do.

4      Q.    Okay.  And what role do you play in the

09:12   5    management there?

6      A.    I basically take care of the employees.  I

7    open the mail.  I make sure that everything is running

8    smoothly, that we have the supplies that we need.

9      Q.    How many employees do you have now?

09:12  10      A.    Ten.

11      Q.    Have you let some employees go since

12    Dr. Gutman's death?

13      A.    Yes.

14      Q.    How many did you let go?

09:13  15      A.    Two.

16      Q.    Now, what about the Mike Gutman, P.A.?  Is

17    that still operating, MPAC?

18      A.    No.

19      Q.    That's been closed?

09:13  20      A.    It's in the process of being closed.

14344pat

|       | 21 | Q. | Being terminated? |
|-------|----|----|----|

A.    Yes.

Q.    You understand what I mean when I say MPAC and GPAC?

09:13   A.    Yes.


MJC REPORTING, INC.


9


1      Q.    GPAC is the Pain and Accident Center?

2      A.    Yes, it is.

3      Q.    MPAC was the psychiatric practice that

4    Dr. Gutman had?

09:13   5      A.    That's correct.

6      Q.    Okay.  So nobody -- you didn't have anybody

7    to put into the psychiatric practice?

8      A.    No.  We don't have a psychiatrist if that's

9    what you mean.

09:13   10      Q.    Right.  And so that's being closed down now?

11      A.    Yes.

12      Q.    All right.  And so how much has Dr. Garnsey

13    been working in GPAC, in the Pain and Accident Center?

14      A.    He comes in three days a week.  Part days.

09:14   15      Q.    And Dr. Babiar, how much time does he put

16    into it?

17      A.    Four days a week.

18      Q.    And are both of them working out of the

19    location on Colonial?

09:14   20      A.    Yes.

21      Q.    Does Dr. Babiar put in four full days a week

22    or is that part days?

23      A.    Part time.

Page 8

14344pat

|       | 24 |    Q.    Tell me, in 2001 to 2003 what role did you |
|-------|----|--------------------------------------------------------|
| 09:15 | 25 | play in either GPAC or MPAC? |

MJC REPORTING, INC.

10

|       | 1  |    A.    I've always played the role of taking care |
|-------|----|----------------------------------------------------------|
|       | 2  | of the employees, taking care of the staff, making |
|       | 3  | sure that the office, the building was run properly, |
|       | 4  | ordering supplies, opening the mail.  If there was a |
| 09:15 | 5  | leak in the toilet I'd call somebody to fix that.  If |
|       | 6  | the copier broke down, I'd call in a technician.  In |
|       | 7  | other words, that was basically my role, they called |
|       | 8  | me the office mom. |
|       | 9  |    Q.    Did you get involved in patient care? |
| 09:16 | 10 |    A.    Never. |
|       | 11 |    Q.    You didn't assist in Dr. Gutman in caring |
|       | 12 | for his patients? |
|       | 13 |    A.    Never. |
|       | 14 |              (Document marked for identification |
| 09:16 | 15 |              Exhibit No. 2). |
|       | 16 |    Q.    I show you Exhibit 2 and ask you if you |
|       | 17 | recognize that as an affidavit that you have filed in |
|       | 18 | the United States Bankruptcy Court for the District of |
|       | 19 | Delaware in the case regarding In Re:  Tribune |
| 09:16 | 20 | Company, Debtor. |
|       | 21 |    A.    Yes. |
|       | 22 |    Q.    Now, did you prepare this affidavit |
|       | 23 | yourself?  Did you write out the words? |
|       | 24 |    A.    No. |
| 09:17 | 25 |    Q.    Who did that for you? |

Page 9

14344pat

MJC REPORTING, INC.

11

|        |    |    |                                                            |
|--------|----|----|------------------------------------------------------------|
|        | 1  | A. | It was a telephone conference with Jason                   |
|        | 2  |    | Cornell.                                                   |
|        | 3  | Q. | Is he your lawyer up in Delaware?                          |
|        | 4  | A. | Yes.                                                       |
| 09:17  | 5  | Q. | I don't want to ask you about what you and                 |

                   A.   It was a telephone conference with Jason
          Cornell.
                   Q.   Is he your lawyer up in Delaware?
                   A.   Yes.
09:17          Q.   I don't want to ask you about what you and
          Jason Cornell discussed.  But at any rate, you were
          sent this document and you signed it?
                   A.   Yes.
                   Q.   Okay.  Now, in it you indicate that you were
09:17     a director of the psychiatric practice and of the Pain
          and Accident Center; is that right?
                   A.   Just since Michael died.
                   Q.   So you weren't a -- were you a director of
          Mike Gutman, M.D., P.A. before Dr. Gutman's death?
09:18            A.   No.
                   Q.   All right.  Were you a director of the
          Gutman Pain and Accident Center, Inc. a/k/a and/or
          d/b/a Back Pain Institute of Orlando?  Were you a
          director of that corporation before the death of
09:18     Dr. Gutman?
                   A.   No.
                   Q.   Have you undertaken some involvement in
          those two corporations since Dr. Gutman's death?
                   A.   What do you mean by involvement?
09:18            Q.   Well, are you on the board of directors?

MJC REPORTING, INC.

14344pat

12

1  Are you on the board of directors of Mike Gutman,

2  M.D., MPAC, P.A. since Dr. Gutman's death?

3      A.   Well, all of this is new to me and all I can

4  say is that apparently I'm somehow involved with the

09:19   5  P.A. since his death, but I'm not sure how.

6      Q.   All right.  Would it be fair to say that

7  before Dr. Gutman's death he took care of the business

8  affairs regarding his medical practice?

9      A.   Yes.

09:19   10      Q.   And would it be fair to say that you really

11  weren't involved in his business affairs of his

12  medical practice before his death?

13      A.   Yes.

14      Q.   Your role regarding the office practice was

09:19   15  pretty much limited to making sure the employees were

16  well cared for and well treated; is that right?

17      A.   Yes.

18      Q.   And had the supplies they needed to work

19  with?

09:20   20      A.   Yes.

21      Q.   You didn't have any involvement in the

22  treatment or care of the patients?

23      A.   No.

24      Q.   And as far as the business affairs, what the

09:20   25  revenues were, how the business was doing, except on

MJC REPORTING, INC.

☐

13

1  the highest general level, that really wasn't

Page 11

14344pat

2      something you were involved in; is that right?

3          A.   I had no involvement with that as far as the

4      office procedure went so I have to say no, I was not

09:20  5      directly involved in any of the business decisions.

6          Q.   Right.  You were not involved in getting the

7      bills out for Dr. Gutman's work?

8          A.   No.

9          Q.   You were not involved in collecting the

09:20  10     bills of the revenues from the patients?

11         A.   No.

12         Q.   You were not involved in analyzing the

13     results of the work on either a weekly or a monthly or

14     yearly basis; is that right?

09:21  15         A.   No.

16         Q.   You didn't get involved in preparing the tax

17     returns, correct?

18         A.   No.

19         Q.   Now, do you remember the article that led to

09:21  20     the lawsuit that Dr. Gutman filed against the Orlando

21     Sentinel?

22         A.   Is it somewhere in here?

23         Q.   No.  It's referred to in there, but it's not

24     attached.

09:21  25         A.   Which one are you referring to?


MJC REPORTING, INC.

14

1          Q.   I'm talking about -- do you know the one

2      that resulted in the lawsuit?

3          A.   Well, there was more than one.  Which one

4      are you referring to?

14344pat

09:21    5      Q.    Well, do you remember anything about an

6      article that was in the paper on November 30, 2003?

7      A.    Yes.

8      Q.    All right. Let me ask you, you understand

9      that Dr. Gutman at some point filed a lawsuit against

09:22   10     the Orlando Sentinel for defamation, right?

11      A.    Yes.

12      Q.    Did you play any role in that lawsuit?

13      A.    No.

14      Q.    Did you attend any of the depositions in

09:22   15     that lawsuit?

16      A.    No.

17      Q.    Did you have anything to do with dealing

18      with the expert witnesses and arranging for expert

19      witnesses in that lawsuit?

09:22   20     A.    No.

21      Q.    Did you ever -- were you ever -- strike

22      that. Do you know the names of the patients of

23      Dr. Gutman who were -- who the article dealt with?

24      A.    I only know what I read.

09:23   25     Q.    Okay. So your knowledge about the treatment

MJC REPORTING, INC.

15

1      of those patients did not go beyond just reading the

2      article in the paper?

3      A.    That's correct.

4      Q.    Now, you say in this affidavit, quote, "I am

09:23   5     familiar with the contents of the motion." What do

6      you mean by that?

Page 13

14344pat

```
        7          MR. SOCIAS:  Would you point out where

        8      that appears?

        9          MR. KING:  That's on page two paragraph

09:23  10      three.

       11      A.   Are we referring to this affidavit?

       12      Q.   Yes, ma'am.

       13      A.   Yes.

       14      Q.   All right.  What does it mean when it says,

09:24  15      "I am familiar with the contents of motion."  What are

       16      you talking about?

       17      A.   I'm not sure what the motion means, but I am

       18      sure that I'm familiar with the contents of this

       19      affidavit.

09:24  20      Q.   All right.  But what motion are you filing

       21      the affidavit in relation to?

       22      A.   It has to do with bankruptcy hearing in

       23      Delaware.

       24      Q.   What about the bankruptcy hearing in

09:24  25      Delaware?
```

MJC REPORTING, INC.

16

```
        1      A.   It has to do with whether the bankruptcy

        2      hearing should go forward or whether the -- whether

        3      the hearing should be now or whether the hearing

        4      should be in Delaware or whether it should be in

09:25   5      Florida.  That's my understanding.

        6      Q.   Okay.  And that information is based on

        7      something somebody told you?

        8      A.   That information is based on something that

        9      was presented to me I think by -- there was another
```

Page 14

14344pat

09:25 | 10  document.  There was another document.

11       Q.   Okay.  Do you remember what that document

12  was?

13       A.   I don't recall the name of it right now.

14       Q.   Do you remember what the contents of the

09:25 | 15  document were?

16       A.   Had to do with the reason why the bank --

17  why we were -- why the bankruptcy hearing was taking

18  place and why Dr. Gutman's case should be delayed or

19  whether it should go forward.

09:26 | 20       Q.   Okay.  Now, you say in the affidavit,

21  "Except as otherwise indicated, all facts set forth in

22  this affidavit are based on my personal knowledge

23  and/or information supplied to me by my employees,

24  agents or other professionals."  You see that

09:26 | 25  statement?

MJC REPORTING, INC.

17

1       A.   Yes.

2       Q.   Now, would it be correct as a general

3  principle, Mrs. Gutman, that you really don't have

4  much personal knowledge about the defamation lawsuit

09:26 | 5  that your husband filed?

6       A.   You're talking about which -- you're talking

7  about when he filed it?

8       Q.   No.  I'm talking about -- you understand

9  that Dr. Gutman filed a lawsuit against the Sentinel,

09:27 | 10  right?

11       A.   Correct.

Page 15

14344pat

            12        Q.    And then that lawsuit proceeded on with
            13    hearings and motions and pleadings, papers that were
            14    filed in the court, right?
09:27       15        A.    Yes.
            16        Q.    And there were depositions that were taken.
            17    Dr. Gutman gave depositions, a number of days of
            18    depositions and other witnesses gave depositions?
            19        A.    Yes.
09:27       20        Q.    Expert witnesses testified in the case,
            21    right?
            22        A.    Yes.
            23        Q.    You really don't know of your own personal
            24    knowledge anything about that, the proceedings of that
09:27       25    case, do you?


                        MJC REPORTING, INC.

                                                            18

            1         A.    I didn't sit -- I didn't sit in on any of
            2     that.
            3         Q.    Right.
            4         A.    I wasn't like present.
09:27       5         Q.    Right.  So anything you would know about
            6     that case would be something somebody told you about
            7     it, right?
            8         A.    It would be something that my husband and I
            9     would discuss or a phone call from, well, Jason
09:28       10    Cornell.  I've been talking to him since Mike died.
            11        Q.    And I'm sure Mr. Cornell, I'm not asking you
            12    what he said, but I'm sure he's told you things,
            13    correct?
            14        A.    Yes.
                                Page 16

14344pat

09:28 15        Q.   But you just -- it wasn't your
16   responsibility during the course of the lawsuit to be
17   in charge of that lawsuit, right?
18        A.   That's correct.
19        Q.   And your husband was managing the lawsuit,
09:28 20   right?
21        A.   Well, not alone.
22        Q.   Right.  Assisted by his lawyers, right?
23        A.   Correct.
24        Q.   And he was going down and regularly meeting
09:28 25   with his lawyers and talking about the case and

MJC REPORTING, INC.

19

1   planning the strategy for the case, right?
2        A.   Correct.
3        Q.   And you really were not part of that
4   strategy discussion with the lawyers and the
09:29 5   management of the case, correct?
6        A.   Correct.
7        Q.   And so when it comes to the things that
8   you're putting in this affidavit, these were things
9   that you're depending on other people for, correct?
09:29 10        MR. SOCIAS:  I'm going to object.  That
11        question is multiple and compound.
12        MR. KING:  Okay.  I'll withdraw it and
13        try and do a better job.
14        Q.   For example, paragraph four says that, "On
09:29 15   April 30, 2006, the Second Amended Complaint was filed
16   against the various defendants including the Tribune

Page 17

14344pat

```
        17    Company, the Sentinel, Rene Stutzman and Fred Schulte.

        18    Do you see that?

        19        A.   Yes.

09:29   20        Q.   Now, you don't know that of your own

        21    personal knowledge, do you, ma'am?

        22            MR. SOCIAS:  Again.  I'm going to

        23        object.  It's a compound question.  There

        24        are a lot of facts included within that

09:30   25        sentence.  You can answer.
```

MJC REPORTING, INC.

20

```
        1         Q.   Look at paragraph four.  Is that information

        2     that you're aware of of your own personal knowledge?

        3             MR. SOCIAS:  Again, I'm going to

        4         restate my objection.  There are multiple

09:30   5         facts set out in paragraph four.

        6         A.   I'm not sure how to answer that.  I knew

        7     about it.

        8         Q.   Right.

        9         A.   But I don't know what the legal answer is to

09:30   10    that.

        11        Q.   Well, you've been told by someone that

        12    evidently, that a second amended complaint was filed,

        13    right?

        14        A.   Yes.

09:30   15        Q.   Did you know how many complaints were filed

        16    of your own knowledge?

        17        A.   I don't know how to answer that.  I'm sorry.

        18        Q.   I mean, you weren't involved in handling the

        19    complaints, were you?
```

Page 18

14344pat

09:30   20      A.   No.

        21      Q.   And when a complaint needed to be changed

        22   and amended and refiled, you were not involved in that

        23   process, right?

        24      A.   No.

09:31   25      Q.   And so, also, you wouldn't know of your own

MJC REPORTING, INC.

21

         1   knowledge if a second amended complaint was filed,

         2   would you?

         3      A.   Only if I read something.

         4      Q.   Right.  And you don't know that that

09:31    5   happened in that case, do you?

         6      A.   I'm not sure.

         7      Q.   Right.  And so when somebody prepared this

         8   paragraph you're depending on the idea that they got

         9   this down right, correct?

09:31   10           MR. SOCIAS:  Object to the predicate.

        11      You can answer.

        12      A.   Yes.

        13      Q.   I mean, you didn't know that the complaint

        14   was filed on April 30, 2006, did you, of your own

09:31   15   knowledge?

        16      A.   I think my husband told me.

        17      Q.   But you wouldn't know of your own knowledge,

        18   right?  You'd have to depend on somebody to tell you?

        19      A.   Yes.

09:31   20      Q.   And you didn't know who the defendants were

        21   of your own knowledge, did you?

14344pat

          22        MR. SOCIAS:   Again, I'm going to

          23   object.   That's multiple and compound.

          24        Q.   All right.  Did you know who wrote the

09:32     25   articles?


                    MJC REPORTING, INC.

                                                           22


           1        A.   Yes.

           2        Q.   Okay.  What was your source of that

           3   information?

           4        A.   Reading the newspaper.

09:32      5        Q.   Okay.  Did you attend the deposition of the

           6   reporters?

           7        A.   No.

           8        Q.   Have you reviewed the information that they

           9   utilized to come up with the article, the support that

09:32     10   they developed to support their articles, their notes?

          11        A.   No.

          12        Q.   Now, paragraph five, is it correct that

          13   somebody told you the information contained in

          14   paragraph five?

09:33     15        A.   I think my husband told me.

          16        Q.   Okay.  You didn't know of your own knowledge

          17   when a bankruptcy proceeding was filed or even whether

          18   it was filed, right?

          19        A.   Michael told me.

09:33     20        Q.   Okay.  And paragraph six, the information in

          21   paragraph six, did you know that of your own

          22   knowledge?  That's paragraph six at the bottom of page

          23   two.

          24        A.   I knew about that.
                         Page 20

14344pat

MJC REPORTING, INC.

09:34    25          Q.    Well, did you know where the Tribune Company

23

1       and the Tribune Publishing Company were incorporated?

2              A.    I know that there's a mother company in

3       Chicago.

4              Q.    And you understand they are authorized to do

09:34    5       business in the State of Florida?

6              A.    Yes.

7              Q.    Do you know about the ownership of the

8       Orlando Sentinel Communications Company?

9              A.    Yes.

09:34    10             Q.    You think you understand that of your own

11      knowledge?

12             A.    Yes.

13             Q.    Okay.  In paragraph seven it says, "The

14      Florida defendants including the debtors published

09:34    15      false, misleading and defamatory statements."  You

16      understand that?

17             A.    Yes.

18             Q.    And did you make any analysis of the

19      information in the articles to determine whether it

09:35    20      was true or false?

21             A.    It was false.

22             Q.    But I mean, did you do that based on your

23      own analysis --

24             A.    Yes.

09:35    25             Q.    -- or is that just something Dr. Gutman told

14344pat
MJC REPORTING, INC.

24

1    you?

2         A.   No.   Something I -- when I read that, I knew

3    it was false.

4         Q.   Okay.  And in paragraph eight you say,

09:35   5    "Debtors published a series of articles in the

6    Sentinel newspaper claiming that the decedent, among

7    other doctors, was under investigation for

8    overprescribing OxyContin."  Are you aware of that of

9    your own knowledge?

09:35  10         A.   Yes.

11         Q.   All right.  Was there -- tell me how many

12    articles there were that referred to Dr. Gutman.

13         A.   Three.

14         Q.   All right.  There were three?  What were the

09:36  15    dates of those articles?

16         A.   I don't remember.

17         Q.   Well, you referred to articles on November

18    30, 2003, correct?

19         A.   Yes.

09:36  20         Q.   In paragraph nine?

21         A.   Yes.

22         Q.   Are you aware of articles on any other day

23    that dealt with Dr. Gutman and OxyContin?

24         A.   Yes.

09:36  25         Q.   When was that?  Was that before November 30?

MJC REPORTING, INC.

25

Page 22

14344pat

1       A.    After.

2       Q.    After.  Okay.  And what did that -- tell me

3    about that article after.

4       A.    It was a pack of lies.

09:36  5       Q.    What was the article after November 30, 2003

6    that related to Dr. Gutman and was a pack of lies?

7       A.    I can't tell you the exact article, but I

8    read those articles and they did not represent Michael

9    at all.  They were false.

09:37  10       Q.    Now, let me -- I understand that you're

11    complaining about some articles on November 30, 2003.

12    I'm trying to get a grip on this other article, this

13    third article you're talking about.  How long after

14    November 30 was that published?

09:37  15       A.    I'm not sure.

16       Q.    And can you tell me what the substance of

17    that article was?  What did it talk about?

18       A.    All I know is the substance of those

19    articles did not represent my husband in any way, that

09:37  20    they were lies, that they misrepresented him.  He was

21    a man of great character who loved his patients and

22    the wording of those articles made him sound as if he

23    was some kind of criminal.

24       Q.    Do you remember this third article?  Was

09:38  25    there something that was said in the third article

MJC REPORTING, INC.

☐

26

1    that you were concerned about?

2                MR. SOCIAS:  I'm going to object.  It's

Page 23

14344pat

```
          3      been asked and answered.  You can answer it
          4      again.
09:38     5          A.   The third article I cannot recall exactly
          6      what it said, but I do recall it said things that were
          7      untrue.  And my husband was a very caring and loving
          8      and careful doctor who would never do anything to harm
          9      his patients.  And I think that was what I drew from
09:38    10      that article that in some way Michael was harming his
         11      patients.
         12          Q.   Now, in paragraph nine you indicate that "On
         13      November 30, 2003 the Sentinel published false
         14      statements regarding the decedent including the
09:39    15      following."  And the bullet point there is Many Die As
         16      Doctors Exploit Medicaid.  Was that a false statement,
         17      Mrs. Gutman?
         18          A.   False.  Exploit Medicaid.  It's false.  My
         19      husband never exploited anybody or anything.
09:39    20          Q.   Is it correct, Mrs. Gutman, that the article
         21      didn't say that Dr. Gutman exploited Medicaid?
         22              MR. SOCIAS:  I'm going to object.
         23      Argumentative.  You can answer.
         24              MR. KING:  Let me put it another way.
09:39    25          Q.   Did the article say that Dr. Gutman
```

MJC REPORTING, INC.

```
          1      exploited Medicaid, Mrs. Gutman?
          2          A.   It inferred.
          3                  (Document marked for identification
          4                  Exhibit No. 3).
09:40     5          Q.   I show you Exhibit 3 and ask you if you
```

14344pat

6      recognize that as a copy of the article --

7              MR. SOCIAS:  You have another copy of

8          that?

9              MR. KING:  Yes, I do.

09:40   10      Q.    -- on November 30, 2003.

11             MR. SOCIAS:  Let me look at the exhibit

12         before you answer that.  I'm going to object

13         to the reference to a single article.  This

14         exhibit contains two articles.

09:41   15      Q.    You see in the first place, do you recognize

16      the portion of the Orlando Sentinel from November 30,

17      2003 that contains an article by Fred Schulte on the

18      front page and also contains an article written by

19      Rene Stutzman on page A20?  Do you see that,

09:42   20      Mrs. Gutman?

21      A.    Yes.

22      Q.    You understand the article by Mr. Schulte is

23      on the first page of Exhibit 3 and then is, a portion

24      is on the second page and then it's completed on the

09:42   25      third page of the exhibit?  You understand that?  I

MJC REPORTING, INC.

28

1      just want to make sure you're oriented to that

2      article.

3      A.    In other words, Schulte's article is

4      continued on the bottom.

09:42   5      Q.    Yes.  On the front page, the Schulte article

6      starts on the front page and then it goes to the

7      second page down at the bottom under the heading

Page 25

14344pat

8      Christ Vows Reforms, Proposals For Tougher

9      Enforcement?

09:43   10         A.    To the third page.

11         Q.    And then it goes and finishes on the third

12      page, right?

13         A.    Right.  Well, the way this is laid out is

14      not the way I saw it in the paper, but, yes, I

09:43   15      recognize these articles.

16         Q.    All right.  And you also see that the

17      article by Rene Stutzman is set out in its entirety on

18      page two of Exhibit 3; correct?

19         A.    Correct.

09:43   20         Q.    Isn't it correct that in the article

21      entitled Many Die As Doctors Exploit Medicaid, there

22      is no reference to Dr. Gutman except by a paragraph

23      that refers to a separate investigation which refers

24      to the Rene Stutzman article; is that right?         ·

09:44   25         A.    Where do you -- where are you pointing that

MJC REPORTING, INC.

☐

29

1      out to me?

2         Q.    Well, look at the first page.  There isn't

3      any reference to Dr. Gutman in the text of the article

4      of Mr. Schulte on the first page, is there?

09:44   5         A.    Well, what does it say underneath the

6      picture of the prescription bottle?

7         Q.    All right.  That's a reference to the second

8      article by Ms. Stutzman, isn't that correct?

9              MR. SOCIAS:  I'm going to object.  It's

09:44   10         argumentative.

Page 26

14344pat

11      Q.   Isn't the information under "Inside" and the
12  picture of the pill bottle, doesn't that relate to the
13  article by Ms. Stutzman on page A20?
14      A.   I'm still looking at Schulte's article and I
09:44  15  see the name of Dr. Gutman.
16      Q.   All right.
17      A.   In the Schulte article.
18      Q.   What does it say about Dr. Gutman in the
19  Schulte article?
09:45  20      A.   It lumps him in with -- it lumps him in with
21  Many Die As Doctors Exploit Medicaid.
22      Q.   Doesn't it say, isn't it correct that the
23  only reference to Dr. Gutman in the Schulte article is
24  contained in the language that says as follows, quote,
09:45  25  "A separate investigation by the Orlando Sentinel

MJC REPORTING, INC.

30

1   found at least eleven people in Central Florida died
2   in the past three years on prescriptions linked to
3   Orlando psychiatrist and pain specialist E. Michael
4   Gutman.  Gutman said he did nothing wrong."
09:45  5      MR. SOCIAS:   I'm going to object.
6          She's already testified he's mentioned in
7          the first page under the bio picture.  That
8          mischaracterizes her testimony and it's
9          argumentative.
09:46  10      Q.   You can go ahead and answer the question.
11      A.   He's been thrown into an article.  When
12  someone would read that they would believe that he was

Page 27

14344pat

| | | |
|---|---|---|
| | 13 | a part of this article.  Somehow he was, what Schulte |
| | 14 | was talking about and through the whole article, |
| 09:46 | 15 | that's what a person would believe if they read that. |
| | 16 | Q.    So do you have any facts to support the idea |
| | 17 | that it was a false statement when the article says |
| | 18 | Many Die As Doctors Exploit Medicaid? |
| | 19 | MR. SOCIAS:  I'm going to object.  It's |
| 09:46 | 20 | been asked and answered, argumentative.  You |
| | 21 | can go ahead and cover that again. |
| | 22 | A.    It's false. |
| | 23 | Q.    Okay.  And what's the basis of your personal |
| | 24 | knowledge that that's false? |
| 09:47 | 25 | A.    Because the word "exploit," and you threw |

MJC REPORTING, INC.

☐

31

| | | |
|---|---|---|
| | 1 | Michael into this article and Michael is not that kind |
| | 2 | of a doctor and he did not belong in this article. |
| | 3 | He's a good man and a good doctor and he never |
| | 4 | exploited anybody. |
| 09:47 | 5 | Q.    Okay.  Now, the second point says, |
| | 6 | "Overprescribing by small group fuels black market." |
| | 7 | Is there anything false about that statement? |
| | 8 | A.    Yes. |
| | 9 | Q.    What? |
| 09:47 | 10 | A.    The wording of it is so inflammatory.  It |
| | 11 | makes Michael sound like he's done something wrong. |
| | 12 | Q.    But there is no reference to Michael Gutman |
| | 13 | in the text of this article by Mr. Schulte other than |
| | 14 | in a reference to the Rene Stutzman article, is there? |
| 09:48 | 15 | MR. SOCIAS:  I'm going to object. |

Page 28

14344pat

16    That's been asked and answered two or three
17    times already and it mischaracterizes her
18    prior testimony and mischaracterizes the
19    article.  You can go ahead and answer.
09:48  20    A.    I've already answered that.
21    Q.    Okay.  Your position being that that somehow
22 refers to Dr. Gutman?
23         MR. SOCIAS:  I'm going to object to the
24    characterization of her testimony.  Asked
09:48  25    and answered.  You can answer it again.

MJC REPORTING, INC.

32

1    A.    All I know is Michael didn't do any of these
2 things that you're saying he did.
3    Q.    As far as the third bullet point it says,
4 quote, "A small group of Florida doctors is drugging
09:48  5 the poor at taxpayer's expense."  Is that a false
6 statement?
7    A.    Yes, it is.
8    Q.    Do you know that Dr. Gutman was asked that
9 same question in his deposition?
09:49  10    A.    I have no knowledge of that.
11    Q.    Were you aware that Dr. Gutman indicated
12 that he didn't know whether that was a false statement
13 or not?
14    A.    Well, to me it sounds what you are trying to
09:49  15 infer that Dr. Gutman did something wrong and that's
16 false.
17    Q.    So anything that's in that statement you

Page 29

14344pat

18    view -- in the Schulte article you view it as

19    referring to Dr. Gutman; is that correct?

09:49    20         MR. SOCIAS:  Wait.  I'm going to

21         object.  That is multiple and compound.  If

22         you want to answer that, you need to go

23         through each sentence in the article and see

24         if it refers to Dr. Gutman.  Otherwise

09:49    25         it's -- I don't know how you can answer it.


MJC REPORTING, INC.

33

1         Q.   Well, when the first sentence says "A small

2    group of Florida doctors is drugging the poor at

3    taxpayer expense," is it your position that refers to

4    Dr. Gutman?

09:50    5         MR. SOCIAS:  That's been asked and

6         answered.

7         Q.   You can go ahead and answer.

8         MR. SOCIAS:  He's referring to -- if I

9         may.

09:50    10        MR. KING:  Yes.

11        MR. SOCIAS:  -- to this sentence right

12        here.

13        THE WITNESS:  This is by Schulte,

14        right?  Okay.

09:50    15        MR. SOCIAS:  This sentence.

16        A.   Drugging the poor at taxpayer's expense?

17    That's false.  I have no knowledge of that.

18        Q.   You have no knowledge of that?

19        A.   No.

09:50    20        Q.   Do you have any knowledge that it's false?

Page 30

14344pat

21    A.    Yes.

22    Q.    What knowledge would that be?

23    A.    Because my husband was never drugging the

24    poor and he is a Florida doctor.

09:50    25    Q.    But you really were not involved in his


MJC REPORTING, INC.

34


1    treatment and care of patients; is that correct?

2         MR. SOCIAS:  Wait.  Wait.  Wait.  Wait.

3    That's been asked and answered.

4    Argumentative.

09:51    5    Q.    Isn't that correct, ma'am?

6         MR. SOCIAS:  You can answer the

7    question again.

8    A.    I was not involved with his treatment of his

9    patients.

09:51    10    Q.    You don't know how much narcotic medication

11    that he was providing to Manny Ruiz, correct, during

12    2001 and 2002?

13    A.    I know Michael.  My know Michael.  I lived

14    with him for 37 years.  I know his character.

09:51    15    Q.    And you don't know anything about the

16    circumstances of any of the patients that are referred

17    to in Rene Stutzman's article, correct?

18    A.    From a medical standpoint?

19    Q.    Correct.

09:51    20    A.    From a medical standpoint I don't know.  But

21    I know it's false because my husband did not hurt

22    people, he did not hurt his patients, he harmed no one

Page 31

                        14344pat
     23    ever.
     24          Q.    And so the reason you say these allegations
09:52 25    are false is just because of your respect and belief


                    MJC REPORTING, INC.

                                                          35

     1     in your husband, right?
     2           MR. SOCIAS:  Wait.  Wait.  I'm going to
     3           object.  That's a mischaracterization of her
     4           testimony.  You can answer the question in
09:52 5          your own words.  You don't need to agree
     6           with the way he characterizes your
     7           testimony.
     8           MR. KING:  Manny.
     9           MR. SOCIAS:  Unless it's accurate.
09:52 10          MR. KING:  Manny, please don't do that.
     11          That was so uncalled for.  You know what
     12          you're doing.  You're coaching your witness.
     13          You don't need to be coaching your witness.
     14          You should not be coaching your witness.
09:52 15         Don't do that.
     16          MR. SOCIAS:  You shouldn't be arguing
     17          with the witness like this.
     18          MR. KING:  I wasn't arguing.  I asked
     19          her a question that was appropriate and
09:52 20         proper and you just told her how she ought
     21          to answer the question.
     22          MR. SOCIAS:  I don't think so.
     23          MR. KING:  Read the question again.
     24          Remember, you're in a bankruptcy court in
09:53 25         Delaware and you need to limit your
                        Page 32

14344pat

MJC REPORTING, INC.

36

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | objections to the form of the question.                  |
|       | 2  | MR. SOCIAS:  I did.                                       |
|       | 3  | MR. KING:  No, you didn't, and you know                  |
|       | 4  | you didn't.  Would you read the question by              |
| 09:53 | 5  | for her?                                                 |
|       | 6  | (Question read).                                         |
|       | 7  | MR. SOCIAS:  Same objection,                             |
|       | 8  | argumentative and a mischaracterization of               |
|       | 9  | her testimony.  You can answer.                          |
| 09:53 | 10 | Q.   You can answer the question, please.                |
|       | 11 | A.   I've been asked to come here by the courts          |
|       | 12 | to represent Michael and I know what Michael would       |
|       | 13 | say.  So I'm representing him and I'm saying what he      |
|       | 14 | would say and he would say that this is false.  These    |
| 09:54 | 15 | are lies and these are -- it's not a characterization    |
|       | 16 | of the way that he took care of his patients.            |
|       | 17 | Q.   So you think your job here is to try to             |
|       | 18 | answer the questions the way that Dr. Gutman would       |
|       | 19 | have answered them; is that right?                       |
| 09:54 | 20 | A.   My job here is to represent Michael today.          |
|       | 21 | Q.   But you understand when you're questioned           |
|       | 22 | about these events, you don't have the same              |
|       | 23 | information that Dr. Gutman had, correct?                |
|       | 24 | A.   I have the information of his character.            |
| 09:54 | 25 | Q.   Right.                                              |

MJC REPORTING, INC.

14344pat

1          A.   I know he was an honest man.  I know he

2    loved his patients.  I know he never harmed them.

3          Q.   And so your answers are based, not on the

4    specific facts of what occurred, but on your belief in

09:55   5    your husband; isn't that correct?

6          A.   I really don't know that these are facts.

7          Q.   Well, you know that there are underlying

8    events that occurred in the treatment of these eleven

9    patients, correct?

09:55  10          A.   But I don't know they are factually

11   presented in this article.

12          Q.   Right.  Because you don't really know what

13   the facts are about those patients' treatment,

14   correct?

09:55  15          A.   I know my husband never harmed anyone.

16          Q.   And your testimony is in support of your

17   husband but not based on the facts of the individual

18   cases, right?

19          MR. SOCIAS:  I'm going to object.

09:55  20          A.   I think this is false.

21          MR. SOCIAS:  Wait.  It's argumentative,

22   asked and answered.

23          MR. KING:  Read the question back so

24   she can be sure.

09:55  25          (Question read).

MJC REPORTING, INC.

1          A.   I'm not sure what the facts are.  I think
Page 34

14344pat

| | 2 | these articles are a pack of lies. |
| | 3 | Q.    Now, do you see the second paragraph of |
| | 4 | Mr. Schulte's article says, quote, "The doctors are |
| 09:56 | 5 | exploiting the Medicaid system by prescribing hundreds |
| | 6 | of millions of dollars worth of dangerous drugs that |
| | 7 | are feeding a booming black market and adding to a |
| | 8 | torrent of fatal overdoses."  Do you see that |
| | 9 | statement? |
| 09:57 | 10 | A.    How does that relate to my husband?  I'm |
| | 11 | asking you. |
| | 12 | Q.    Well, there's no indication there that it |
| | 13 | does relate to your husband, is there? |
| | 14 | A.    Then why are you asking me if it's true or |
| 09:57 | 15 | false? |
| | 16 | Q.    Because you claim that that's a false |
| | 17 | statement. |
| | 18 | A.    Yes, I do. |
| | 19 | Q.    I'm just asking you what's the basis for |
| 09:57 | 20 | your statement that it's a false statement? |
| | 21 | A.    It's a false statement when it applies to |
| | 22 | Mike Gutman. |
| | 23 | Q.    But you don't know whether it's intended to |
| | 24 | apply to Mike Gutman, do you? |
| 09:57 | 25 | A.    It looks to me like it is. |

MJC REPORTING, INC.

39

| | 1 | Q.    Okay. |
| | 2 | A.    He's named in the article. |
| | 3 | Q.    But he's not named as being one of the |

Page 35

14344pat

```
        4    doctors that's exploiting the Medicaid system, is he?
09:58   5         MR. SOCIAS:  I'm going to object,
        6    argumentative, asked and answered.  You can
        7    answer it again.
        8    A.   I've already answered that.
        9    Q.   Now, there's a statement that says, the next
09:58  10    paragraph, "Even as the state faces a budget crisis in
       11    which Medicaid costs figure prominently, abuse of the
       12    health care system for the poor by doctors and by
       13    willing pharmacists and patients has gone largely
       14    unpunished according to an eight-month investigation
09:58  15    by the South Florida Sun-Sentinel."  Is there anything
       16    false about that?
       17    A.   It's false when it infers through the
       18    lead-in beside that paragraph that it refers to
       19    prominent psychiatrist in Central Florida.  That's
09:59  20    false when it refers to him because that is not what
       21    he did.
       22    Q.   Okay.  But you've left the paragraph we were
       23    talking about.  Is there anything that's false in the
       24    paragraph I just asked you about, paragraph three?
09:59  25    A.   I've already answered that.
```

MJC REPORTING, INC.

40

```
        1    Q.   Well, could you tell me what is false about
        2    paragraph three?  What specific thing that you're
        3    aware of your own personal knowledge is false about
        4    paragraph three?
09:59   5    A.   It's false because it refers right next to
        6    that -- it refers to Mike -- to prominent psychiatrist
```

Page 36

14344pat

          7    in Central Florida.  That's why that paragraph is
          8    false.
          9         Q.    So you're not aware of any of the content of
10:00    10    paragraph three that's false; is that correct?
         11         A.    I think I already answered that.
         12              MR. SOCIAS:  I'm going to object to
         13         that.  That's a mischaracterization of her
         14         testimony.  It's been asked and answered.
10:00    15         Q.    Well, it says, "Even as the state faces a
         16    budget crisis in which Medicaid costs figure
         17    prominently."  Is there something false about that?
         18              MR. SOCIAS:  I'm going to object.  It's
         19         an incomplete reading of the statement.
10:00    20              MR. KING:  We're going to parse it
         21         piece by piece.  We're starting.
         22              MR. SOCIAS:  I'm still objecting.
         23         Q.    All right.  Let me try again.  "Even as the
         24    state faces a budget crisis in which Medicaid costs
10:01    25    figure prominently," is there anything in that phrase

MJC REPORTING, INC.

                                                                    41

          1    of the sentence that's false to your knowledge?
          2              MR. SOCIAS:  I'm going to object to an
          3         incomplete reading of the sentence.  You can
          4         answer the question.
10:01     5         A.    When I read this article it's false to me
          6    because I'm thinking of how it relates to Mike Gutman.
          7         Q.    And regardless of what the facts might be,
          8    you're not going to believe anything bad about

14344pat

|        |    |                                                       |
|--------|----|-------------------------------------------------------|
|        | 9  | Dr. Gutman, right?                                    |
| 10:01  | 10 | A.   That's correct.                                  |
|        | 11 | Q.   Then in the sixth point it says, "A separate     |
|        | 12 | investigation -- in your affidavit, it says, "A       |
|        | 13 | separate investigation by the Orlando Sentinel found  |
|        | 14 | that at least 11 people in Central Florida died in the |
| 10:02  | 15 | past three years on prescriptions linked to Orlando   |
|        | 16 | psychiatrist and pain specialist E. Michael Gutman."  |
|        | 17 | Is there something false about that?                  |
|        | 18 | A.   Where are you?                                    |
|        | 19 | Q.   Well, I'm sorry.  I'm on page three of your       |
| 10:02  | 20 | affidavit which is Exhibit 2 and it's the sixth bullet |
|        | 21 | point, one bullet point from the bottom.              |
|        | 22 | A.   Okay.                                             |
|        | 23 | Q.   You see where it says, "A separate               |
|        | 24 | investigation by the Orlando Sentinel found that at   |
| 10:02  | 25 | least 11 people in Central Florida died in the past   |

MJC REPORTING, INC.

☐

42

|        |    |                                                       |
|--------|----|-------------------------------------------------------|
|        | 1  | three years on prescriptions linked to Orlando        |
|        | 2  | psychiatrist and pain specialist E. Michael Gutman."  |
|        | 3  | You see that statement?                               |
|        | 4  | A.   I see that.                                       |
| 10:02  | 5  | Q.   All right.  Do you have any personal             |
|        | 6  | knowledge that that's not accurate?                   |
|        | 7  | A.   That's false.                                     |
|        | 8  | Q.   And what is the personal knowledge that you      |
|        | 9  | would have that would support your statement that     |
| 10:03  | 10 | that's false?                                          |
|        | 11 | A.   No one knows why those people died.              |

Page 38

14344pat

```
        12      Q.   You certainly don't know why they died,
        13   right?
        14      A.   And neither do you.
10:03   15      Q.   Well, you've never reviewed their autopsy
        16   reports, have you?
        17      A.   No.
        18      Q.   And you've never reviewed their case files,
        19   correct?
10:03   20      A.   No.
        21      Q.   And you don't even know who the eleven
        22   people are, do you?
        23      A.   No.
        24      Q.   Okay.  So your position is just you're not
10:03   25   going to believe anything bad about Dr. Gutman, right?
```

MJC REPORTING, INC.

43

```
        1       A.   I know Dr. Gutman, I know he was a caring
        2    and an excellent doctor, I know that he didn't hurt
        3    people, and I know that he didn't -- that people did
        4    not die just from his medicines, because if my doctor
10:03   5    gives me a prescription and I have a side effect from
        6    it, I don't think my doctor is trying to kill me.
        7       Q.   But you know that Dr. Gutman did prescribe a
        8    lot of narcotic drugs to his patients; is that
        9    correct?
10:04   10      A.   I do not know that.  I know my husband
        11   prescribed many medications for people with different
        12   illnesses.
        13      Q.   Right.  And you know that your husband
```

Page 39

14344pat
```
          14   turned to pain management in 2001?
10:04     15        A.   Yes.
          16        Q.   In other words, he had been a psychiatrist
          17   for many years here in Central Florida, correct?
          18        A.   Yes.
          19        Q.   And the focus of his practice was
10:04     20   psychiatry; isn't that right?
          21        A.   The focus of his practice was psychiatry for
          22   many years.
          23        Q.   Right.  And then Dr. Gutman got into some
          24   financial problems in the '90s with his stock trading;
10:05     25   isn't that right?
```

MJC REPORTING, INC.

44

```
          1         A.   Dr. Gutman lost money on the stock market.
          2         Q.   He lost a lot of money in the stock market,
          3    correct?
          4         A.   He told me he did.
10:05     5         Q.   Right.  You were not involved in his
          6    decisions on his stock trading?
          7         A.   No.  No.
          8         Q.   And he told you that it put you all, it
          9    really imperiled you financially; isn't that right?
10:05     10        A.   For a short period of time.
          11        Q.   And then he started refocusing his practice
          12   on, in a nutritional direction; isn't that correct?
          13        A.   It wasn't because of the stock market.
          14        Q.   You remember going into StarLight?
10:05     15        A.   Yes.
          16        Q.   And that --
                              Page 40
```

14344pat

```
         17        A.    Why are you lumping that in with the stock
         18   market?
         19        Q.    Well, that followed the problems, the
10:05    20   financial problems that he had in the stock market;
         21   isn't that right?
         22        A.    It followed them?
         23        Q.    Yeah.  You got involved in the StarLight
         24   nutritional stuff after the failures in the stock
10:06    25   market, right?
```

MJC REPORTING, INC.

45

```
          1        A.    He didn't get involved in nutritional
          2   because of the failure in the stock market.
          3        Q.    Well, he thought he was going to make a
          4   bunch of money on StarLight, didn't he?
10:06     5             MR. SOCIAS:  Wait.  Wait.  I'm going to
          6        object.  That calls for rank speculation.
          7        Q.    Isn't it a fact that he told you that he
          8   thought he was going to make a lot of money on
          9   StarLight?
10:06    10        A.    I can't be sure.  I don't know how to answer
         11   that.  I don't know.
         12        Q.    But Dr. Gutman ended up getting even deeper
         13   in debt because of a lot of credit card debt that he
         14   took on to get into StarLight, right?
10:06    15        A.    Even deeper in debt.  No, he had a good
         16   practice.
         17        Q.    And then in 2001 would it be fair to say
         18   that Dr. Gutman decided to change the focus of his
```

Page 41

14344pat

|        |    |                                                      |
|--------|----|------------------------------------------------------|
|        | 19 | practice to a pain management practice, right?       |
| 10:07  | 20 | A.   He did change the -- he never changed the       |
|        | 21 | focus of his practice.  He added on.                 |
|        | 22 | Q.   Okay.  He added on a whole new pain             |
|        | 23 | management practice, correct?                        |
|        | 24 | A.   He took on another doctor who was involved      |
| 10:07  | 25 | with -- he was a chiropractor.                       |

MJC REPORTING, INC.

46

|        |    |                                                      |
|--------|----|------------------------------------------------------|
|        | 1  | Q.   Right.  He opened up an office on Colonial      |
|        | 2  | Drive, right?                                        |
|        | 3  | A.   Yes.                                            |
|        | 4  | Q.   Advertising the Pain and Accident Center,       |
| 10:07  | 5  | correct?                                             |
|        | 6  | A.   With Dr. Mountain who was a chiropractor.       |
|        | 7  | So it really wasn't Michael's only focus.            |
|        | 8  | Q.   And do you recall that as he did that           |
|        | 9  | practice he started prescribing narcotic drugs to    |
| 10:08  | 10 | people to manage their pain, right?                  |
|        | 11 | MR. SOCIAS:  I'm going to object to the              |
|        | 12 | predicate.  You can answer the question.             |
|        | 13 | A.   Dr. Gutman prescribed many medications for      |
|        | 14 | many people with many different ailments.  It wasn't |
| 10:08  | 15 | only for pain.  A lot of people had serious          |
|        | 16 | psychiatric problems, so the pain was just a small   |
|        | 17 | adjunct.                                             |
|        | 18 | Q.   Were you aware that Dr. Gutman had deaths       |
|        | 19 | occurring among his patients with significant        |
| 10:08  | 20 | frequency in 2001 and 2002 and 2003?                 |
|        | 21 | MR. SOCIAS:  I'm going to object to                  |

Page 42

14344pat

22    vagueness and ambiguity in the question and

23    it's multiple and compound.  You can answer

24    it.

10:09  25    A.    I think that's a mischaracterization.


MJC REPORTING, INC.

47

1    Q.    So if Dr. Gutman admitted that he had deaths

2  among his patients in sworn testimony in this case

3  occurring with significant frequency in 2001 and 2002

4  and 2003, you would disagree with that?

10:09  5    MR. SOCIAS:  Object to the form and

6    argumentative.

7    A.    I object to the frequency part of your

8  question.  And I don't know how to answer that.

9    Q.    Okay.  Were you aware that Dr. Gutman

10:09  10  admitted that the fact of eleven deaths in his

11  practice was newsworthy?

12    A.    Was what?

13    Q.    Was newsworthy?

14    MR. SOCIAS:  Again, I'm going to object

10:09  15    to the form.  It's argumentative.

16    A.    He admitted it was newsworthy?  That's

17  false.

18    Q.    Were you aware that Dr. Gutman held a press

19  conference after the articles that came out in the

10:10  20  paper on November 30?

21    A.    Yes.

22    Q.    And were you aware that he admitted that

23  ten -- that he had had ten of his patients to die and

Page 43

14344pat

| | 24 | that the eleventh wasn't a patient but had used the |
| 10:10 | 25 | mother's medicines prescribed by Dr. Gutman? |

MJC REPORTING, INC.

⬜

48

| | 1 | MR. SOCIAS:  I'm going to object.  It's |
| | 2 | a multiple and compound question.  You can |
| | 3 | answer it. |
| | 4 | Q.    Were you aware of that? |
| 10:10 | 5 | A.    Would you say it again, please? |
| | 6 | Q.    Were you aware that at the press conference |
| | 7 | on December 3, 2003 Dr. Gutman admitted that he had |
| | 8 | had ten of his patients die and the eleventh was not a |
| | 9 | patient, but used his mother's medicines that had been |
| 10:10 | 10 | prescribed by Dr. Gutman? |
| | 11 | MR. SOCIAS:  Same objection. |
| | 12 | A.    I'm aware that he did nothing wrong. |
| | 13 | Q.    That's because you believe in Dr. Gutman, |
| | 14 | right? |
| 10:11 | 15 | A.    No.  That's because he did nothing wrong. |
| | 16 | Q.    All right.  Were you aware as to whether or |
| | 17 | not Dr. Gutman denied that the deaths of those |
| | 18 | patients were, as to whether he denied they were |
| | 19 | linked to his prescriptions? |
| 10:11 | 20 | MR. SOCIAS:  I'm going to object to the |
| | 21 | form and argumentative.  This is turning |
| | 22 | into a deposition of her knowledge of |
| | 23 | Dr. Gutman's deposition. |
| | 24 | Q.    You can go ahead and answer the question. |
| 10:11 | 25 | A.    I'm not sure what your question is. |

Page 44

14344pat

MJC REPORTING, INC.

49

1       Q.   Okay.  Let me ask you this.  Did Dr. Gutman

2   ever tell you that he considered his pain management

3   practice to be a very dirty business?

4       A.   Dr. Gutman said that some of his patients

10:12   5   were not honest with him.

6       Q.   Did he say his patients were the worst of

7   the worst, that they were dishonest -- some of his

8   patients were dishonest and untrustworthy people?

9       A.   A small percentage.

10:12   10       Q.   Did he tell you that as many as 10 percent

11   of his practice was made up of people that were dirty

12   patients who would sell or lie or cheat to get drugs?

13       A.   No.  No.  That's false.

14       Q.   Did you ever hear him refer to his practice

10:12   15   as being the trash can for patients?

16       A.   He didn't mean that his practice was a trash

17   can.  That's false.

18       Q.   So he never said that?

19       A.   He never said his practice was a trash can.

10:12   20   His practice was not a trash can.  He didn't deal in

21   trash.  He took care of people.  He did his best to

22   make sure that they got the best treatment that he

23   could possibly give them.

24       MR. SOCIAS:  When you come to a

10:13   25       breaking point, if we could take a short

MJC REPORTING, INC.

50

Page 45

14344pat

|        |    |                                                                     |
|--------|----|---------------------------------------------------------------------|
|        | 1  | break.                                                              |
|        | 2  | MR. KING:  Sure.  We'll stop right now.                             |
|        | 3  | (Recess).                                                           |
|        | 4  | BY MR. KING:                                                        |
| 10:29  | 5  | Q.  Okay.  Ready to go, Mrs. Gutman?                                |
|        | 6  | A.  (Witness nods).                                                 |
|        | 7  | Q.  Okay.  Back on the record then.  Mrs.                           |
|        | 8  | Gutman, looking at your affidavit, Exhibit 2, if you'd              |
|        | 9  | look right down at the bottom of page three it says in              |
| 10:29  | 10 | the very last bullet point, quote, "Ten of those who                |
|        | 11 | died were patients of Dr. E. Michael Gutman and all                 |
|        | 12 | had taken drugs he prescribed for the treatment of                  |
|        | 13 | pain or mental disorders, according to the medical                  |
|        | 14 | examiner's reports."  Is that a false statement,                    |
| 10:29  | 15 | Mrs. Gutman?                                                        |
|        | 16 | A.  Yes, because it looks like they died from                       |
|        | 17 | taking his medicines.                                               |
|        | 18 | Q.  Well, are you saying the words that are used                    |
|        | 19 | there, though, are false?                                           |
| 10:30  | 20 | MR. SOCIAS:  Asked and answered.                                    |
|        | 21 | A.  I'm saying this is false.                                       |
|        | 22 | Q.  Okay.  So when it says, "Ten of those who                       |
|        | 23 | died were patients of Dr. Gutman," is that a true                   |
|        | 24 | statement?                                                          |
| 10:30  | 25 | MR. SOCIAS:  I'm going to object to the                             |

MJC REPORTING, INC.

51

|   |   |                                              |
|---|---|----------------------------------------------|
|   | 1 | partial reading.  Argumentative.  You can    |
|   | 2 | answer.                                       |

Page 46

14344pat

3    A.    So what was your question again?

4    Q.    When it says, "Ten of those who died were

10:31    5    patients of Dr. E. Michael Gutman," isn't that a true

6    statement?

7    MR. SOCIAS:  Same objection.

8    A.    Are you just going to take it word by word?

9    Is that what you're doing?

10:31    10    Q.    I took the first twelve words there and

11    asked you --

12    A.    Ten of those who died were patients of

13    Dr. E. Michael Gutman.

14    Q.    Is that a true statement?

10:32    15    MR. SOCIAS:  Same objection.

16    A.    Ten of those.  See, I don't really

17    understand this.  I think it's false.  When it says

18    those, ten of those, those who?  Who died?  I don't

19    understand that.  If it had said Dr. Gutman had some

10:32    20    patients who died or ten patients who died, but not

21    those.  I don't understand "those."

22    Q.    You understand that he had ten patients that

23    died then?

24    A.    He had patients that died, yes.

10:33    25    Q.    Did he have ten patients that died in 2001,

MJC REPORTING, INC.

52

1    2002 and 2003?

2    A.    He had patients who died, yes.

3    Q.    All right.  Well, when they say ten who died

4    were patients of Dr. Gutman, was that a true

14344pat

10:33    5      statement?

6           MR. SOCIAS:  Wait.  I'm going to

7           object.  It's a misreading of the statement.

8           You can answer.

9           A.    I still say I don't know what "those" means.

10:33   10    If it just said ten patients died.  But I think it's

11    false, ten of those who died.

12           Q.    Now, in paragraph ten it says that you had

13    150,000 -- you have paid $150,000 of 278,000 in legal

14    expense arising from the Florida action.  What do you

10:34   15    know about the legal expenses arising from the Florida

16    action, Mrs. Gutman?

17           A.    What is your question?

18           Q.    What do you personally know about the

19    $278,000 in legal expense arising from the Florida

10:34   20    action?

21           A.    Those are costs.

22           Q.    Do you know anything about them?

23           A.    Those are costs.

24           Q.    Is that something somebody told you about?

10:34   25    A.    Yes.


MJC REPORTING, INC.

53

1           Q.    All right.  You don't have any personal

2    knowledge of that?

3           A.    I was told that was legal costs.  What is

4    your exact point of your question?

10:34    5      Q.    Do you know that you paid 150,000 of those

6    costs?

7           A.    Yes.

Page 48

14344pat

8    Q.    All right.  How do you know that?

9    A.    That was the initial fee for obtaining

10:35  10   legal --

11    Q.    Services?

12    A.    (Witness nods).  That was the initial fee.

13    Q.    So in other words, you had to pay your

14   lawyers $150,000 to get them to take the case?

10:35  15   A.    That was the retainer.

16    Q.    Okay.  And did Dr. Gutman have to borrow

17   most of that?

18    A.    He borrowed most of that.

19    Q.    And he got people to donate money to that

10:36  20   fund as well?

21    A.    Yes.  Yes.

22    Q.    And so is that all that -- strike that.

23   Once you paid the $150,000 have you paid any more of

24   the legal expenses?

10:36  25   A.    No.


MJC REPORTING, INC.


54


1    Q.    Is it your understanding the law firm will

2   pay for the legal expenses until the conclusion of the

3   case?

4    A.    I can't hear you.  What are you saying?

10:36  5    Q.    All right.  Is it your understanding the law

6   firm will -- that's representing you will continue to

7   pay your legal costs through the remainder of the

8   case?

9    A.    Yes.

Page 49

14344pat

| | | |
|---|---|---|
| 10:36 | 10 | Q.   And they have already paid $278,000 in |
| | 11 | costs; is that correct? |
| | 12 | A.   That's my understanding. |
| | 13 | Q.   But that's not anything you know of your own |
| | 14 | personal knowledge? |
| 10:37 | 15 | A.   How would I know that personally?  I was |
| | 16 | told that by the attorney.  How would I know that |
| | 17 | personally? |
| | 18 | Q.   Did they provide you a list of the legal |
| | 19 | expenses that they had paid? |
| 10:37 | 20 | A.   I don't know. |
| | 21 | Q.   And it says you've assumed responsibility |
| | 22 | for the remainder of the legal expenses in the future |
| | 23 | as the estate of Dr. Gutman? |
| | 24 | A.   Yes. |
| 10:37 | 25 | Q.   Maybe I didn't ask that question.  But are |

MJC REPORTING, INC.

55

| | | |
|---|---|---|
| | 1 | you the sole personal representative of the estate? |
| | 2 | A.   Yes. |
| | 3 | Q.   Look at paragraph fourteen on page five of |
| | 4 | your affidavit where it says, quote, "After debtors |
| 10:38 | 5 | published their articles regarding decedent, |
| | 6 | decedent's patients began advising him that their |
| | 7 | primary care physicians were encouraging them to |
| | 8 | change pain specialists."  Is that something you're |
| | 9 | personally aware of or is that something you were told |
| 10:38 | 10 | by Dr. Gutman or others? |
| | 11 | A.   I'm personally aware of that. |
| | 12 | Q.   Tell me about your personal knowledge about |

Page 50

14344pat

13    that.

14         A.    I'm in the office every day.  Patients come

10:38  15    up and speak to me and patients talk to me about

16    things.

17         Q.    Do you remember a patient who told you that

18    their primary care physicians were encouraging them to

19    change pain specialists?

10:39  20         A.    I don't remember their names.  I can see

21    their faces.  But I remember them telling me that,

22    yes.

23         Q.    More than one?

24         A.    More than one.

10:39  25         Q.    You remember how many?


MJC REPORTING, INC.

56


1         A.    No.

2         Q.    You remember how soon after the article that

3    was?

4         A.    Right after.

10:39  5         Q.    But your testimony is you don't have any

6    recollection of any of the names of those patients?

7         A.    No, I don't.

8         Q.    Do you have any recollection of the names of

9    any primary care physicians who were encouraging

10:39  10    patients to change away from Dr. Gutman?

11         A.    You know, Mr. King, at one time I might have

12    known that, but since my husband died I've had a hard

13    time focusing.  I have a hard time concentrating.  And

14    there are things that I knew two months ago that I

Page 51

14344pat

10:40   15      don't know today.   I'm worried that I'm going to lock

        16      my keys in my car.   My mind is not focused.   I am

        17      bereaved and grieving.

        18          Q.   Sure.   Have you had to take any medication

        19      to deal with that?

10:40   20          A.   I don't take medication.   I have a doctor

        21      who gave me some sleep medicine, but I have not taken

        22      it.

        23          Q.   So you're not on any drugs or medication

        24      here today?

10:40   25          A.   No.   I never got the script filled.


                        MJC REPORTING, INC.

                                                                    57


        1           Q.   Now, is it also correct that you were not

        2       involved in handling the legal issues involved in this

        3       case?

        4               MR. SOCIAS:   Asked and answered.

10:41   5           A.   I answered that already.

        6           Q.   Well, could you answer it again for me,

        7       please?

        8           A.   What did you say?

        9           Q.   You haven't been dealing with the legal

10:41   10      issues in this case, have you?

        11          A.   I think we already addressed that.

        12          Q.   And you said what?

        13          A.   I said I was not involved.

        14          Q.   Okay.   So if there were motions for summary

10:41   15      judgment that were filed and rulings by the court, you

        16      have not tried to keep up with those; is that correct?

        17          A.   What time?   What's your time frame?
                                Page 52

14344pat

18   Q.   During the last two years.

19   A.   During the last two years?

10:41   20   Q.   Yes.

21   A.   When my husband was alive he handled that.

22   Q.   Do you know what a motion for summary

23   judgment is?

24   A.   Not really.

10:42   25   Q.   Okay.


MJC REPORTING, INC.

58

1   A.   I sort of do.  But, no.  Today I couldn't

2   tell you.

3   Q.   And --

4   A.   I think at one time I knew, but I can't tell

10:42   5   you today.

6                    (Document marked for identification

7                    Exhibit No. 4).

8   Q.   I show you Exhibit 4 and ask you if you

9   recognize that as the obituary that was filed and run

10:43   10   in the paper?

11   A.   Yes.

12   Q.   After the death of your husband?

13   A.   Yes.

14   Q.   Did the estate pay for that obituary to run

10:43   15   in the paper?

16   A.   My son paid for it.

17   Q.   Okay.  Did Dr. Gutman write this obituary

18   himself?

19   A.   Yes.

Page 53

14344pat

10:43   20     Q.  You have, just so can I be sure, I may have
21   asked something about this, but you indicated that
22   Dr. Garnsey and Dr. Babiar are operating the clinic.
23   Are they operating in Dr. Gutman's name now?
24     A.  No.  That's all had to be changed.
10:44   25     Q.  Well, what's the name of the clinic now?

MJC REPORTING, INC.

59

1     A.  The name is still the Gutman.  Is that what
2   you're asking me?
3     Q.  Is it still the Gutman Pain and Accident
4   Center?
10:44   5     A.  Yes.  The lawyer said it could stay, that
6   name could remain.
7     Q.  And so Dr. Garnsey and Dr. Babiar wanted to
8   keep Dr. Gutman's name on the center?
9     A.  That's the name of the -- that's the company
10:44   10   name.
11     Q.  Right.  And they wanted to continue
12   operating under that name?
13     A.  Yes.
14     Q.  And their names are not on the business?
10:44   15     A.  No.
16     MR. SOCIAS:  I'm going to object to
17   vagueness and ambiguity.
18     A.  I'm not really sure what you mean on the
19   business.
10:44   20     Q.  Well, the sign out in front of the business
21   refers to the Gutman Pain and Accident Center, not to
22   Dr. Garnsey or Dr. Babiar; is that correct?

Page 54

14344pat

23      A.   That's true.

24      Q.   Now, look back at the affidavit, paragraph

10:45   25   19, the very last paragraph.  Do you see where it says

MJC REPORTING, INC.

60

1    that, in the second sentence, "Debtors made the above

2    statements about Dr. Gutman, the decedent, with

3    knowledge that such statements were false."   Do you

4    see that?

10:45   5      A.   Yes.

6      Q.   Now, do you have any personal knowledge that

7    Fred Schulte made any statements in his article about

8    any false statements about Dr. Gutman that he knew

9    were false at the time he was making them?

10:46   10      A.   I'm not sure he knew they were true.

11      Q.   Right.  You're just not sure because you

12    don't really have any personal knowledge about that?

13      A.   I don't know his thinking.  I've never

14    talked to him.

10:46   15      Q.   Right.  And you've never read his deposition

16    in this case?

17      A.   No.

18      Q.   And you've never read the material --

19      A.   But I read his articles.

10:46   20      Q.   Right.  But you never read the materials

21    that he developed to support the reporting that he

22    did, correct?

23      A.   I never read those.

24      Q.   Right.  So you don't really know from your

Page 55

14344pat

10:46   25      own personal knowledge whether he thought the


MJC REPORTING, INC.

61


1      article -- the statements were true or false at the

2      time he wrote them, right?

3            A.   If he didn't know they were true, why was he

4      publishing them?  We don't know that he didn't know

10:47   5      they were true or false, so we believe that they were

6      false.

7            Q.   All right.  You believe the statements were

8      false?

9            A.   Yes.

10:47  10            Q.   But you don't know what was in Mr. Schulte's

11      mind at the time he wrote the statements, correct?

12            A.   All I know is what he put in his article.

13            Q.   Right.  You don't know what he thought about

14      what he was putting in his article, right?

10:47  15            A.   I know how he placed it in his article.

16            Q.   Right.  And you don't know what his research

17      indicated at the time he wrote the article, right?

18            A.   I know the statements that he made about

19      Michael put Michael in a false light and then that way

10:48  20      I believe his statements were false.

21            Q.   All right.  But you don't know what was in

22      Fred Schulte's mind at the time he wrote the articles?

23            A.   Why are you asking me that question?

24            Q.   Well, I'm just asking you the question.

10:48  25            A.   I want to know why.

14344pat

62

```
      1         Q.   Could you just answer the question?  If you
      2    don't know the answer to the question, you can simply
      3    say.
      4         A.   I'll say I don't know.
10:48 5         Q.   And would it be also true that you don't
      6    know what Rene Stutzman had developed in her facts and
      7    reporting about this article, right?
      8         A.   I know that what, the statements that she
      9    made in her article were false, that I know Michael
10:49 10   and I know the way he took care of his patients and I
     11    know that he was a caring and careful doctor who would
     12    never harm his patients in any way.  All I know is
     13    what she read in her -- I read and it sounded as if
     14    she believed that he was hurting people and that is
10:49 15   false.
     16         Q.   But you say that she made the statements in
     17    her article with knowledge, that Rene Stutzman had
     18    knowledge that the statements were false.
     19         A.   I think she slanted the truth in such a way
10:50 20   that her statements are false.
     21         Q.   But, again, you've never talked to Rene
     22    Stutzman to try to figure out what she knew at the
     23    time she wrote these articles, did you?  Or have you?
     24         A.   I've never talked with her.
10:50 25        Q.   And you've never read her deposition in this
```

63

Page 57

14344pat

1    case, have you?

2        A.    No.

3        Q.    And you've never looked at the box of

4    information that she developed to support her

10:50    5    articles, have you?

6        A.    I know what she wrote.  I don't know her

7    process of writing her article.

8        Q.    And you certainly don't know that she

9    thought that what she was writing down was false at

10:50    10    the time she wrote it, do you?

11            MR. SOCIAS:  I'm going to object.  It's

12            been asked and answered and it's

13            argumentative.

14        Q.    You can go ahead and answer.

10:50    15            MR. SOCIAS:  You can answer it again.

16        A.    Whatever she wrote in the article was false.

17    I don't know her frame of mind when she wrote the

18    article.

19        Q.    Can you tell me about your highest level of

10:51    20    education that you've attained, Mrs. Gutman?

21        A.    What did you say?

22        Q.    I asked you, what was the highest level of

23    education that you've attained?

24        A.    A year and-a-half of college.

10:51    25        Q.    You graduated from high school?


MJC REPORTING, INC.

64

1        A.    Yes.

2        Q.    And you went to college for a year

3    and-a-half where?

Page 58

14344pat

```
          4        A.    In Southern Missionary College in
10:51     5    Collegedale, Tennessee.
          6        Q.    And did you specialize, or I assume those
          7    were just general courses the first year and-a-half?
          8        A.    Mm-hmm.  Yes.  General courses.
          9        Q.    Already.  And then in your work life did you
10:52    10    ever work -- I mean, did you ever have a job or an
         11    occupation other than raising your children?
         12        A.    Well, that was a job and that was an
         13    occupation.
         14        Q.    I'm sure it was.
10:52    15        A.    I also worked outside the home.
         16        Q.    All right.  What did you do?
         17        A.    I worked at Florida Hospital.
         18        Q.    Okay.  And what did you do at Florida
         19    Hospital?
10:52    20        A.    I worked in the dietary department.
         21        Q.    Okay.  And what were your responsibilities
         22    in that area?
         23        A.    I was secretary to the dietitian.
         24        Q.    And how long did you have that position?
10:52    25        A.    I don't remember how long.
```

MJC REPORTING, INC.

65

```
          1        Q.    You remember what period of time you were
          2    working there?  Was that like the '60s, '70s, '80s,
          3    '90s?
          4        A.    I guess it was the late '60s early '70s.  I
10:52     5    have to guess.  I can't be sure.
```

Page 59

14344pat

6      Q.    Is that the only position outside the home

7   you held other than what you've described you did at

8   Dr. Gutman's office?

9      A.    Yes.

10:53   10           MR. KING:  Just a moment, please.  I

11           think I'm done.  Let's take a break.

12                (Recess).

13   BY MR. KING:

14      Q.    Okay.  Are we ready to finish it up?

10:59   15   Mrs. Gutman, I just want to make sure I understand.

16   Is it correct that as far as the defamation case

17   against the Sentinel is concerned, your lawyers are

18   handling that on a contingent-fee basis?

19      A.    Yes.

10:59   20      Q.    So you don't owe them any attorneys fees as

21   you move forward in that case; is that right?

22      A.    That's right.

23      Q.    And is it also correct that they pay the

24   costs of the case?

11:00   25      A.    Yes.


                    MJC REPORTING, INC.


                                                    66


1      Q.    And you don't have to worry about that until

2   the conclusion of the case?

3      A.    Yes.

4      Q.    Who is the lawyer for your estate?

11:00   5      A.    Her name --

6      Q.    I mean, for the estate of Dr. Gutman.

7      A.    Her name is Teresa Phillips.

8      Q.    And does she practice here in Orlando?
                    Page 60

14344pat

|           | 9  | A. | Winter Park. |
| 11:00 | 10 | Q. | In Winter Park?  Is she in a firm? |
|           | 11 | A. | The firm is Polh & Short. |
|           | 12 | Q. | Are there more assets than liabilities in |
|           | 13 | Dr. Gutman's estate? |
|           | 14 | A. | I don't know. |
| 11:01 | 15 | Q. | Did you receive life -- is -- was there life |
|           | 16 | insurance on the life of Dr. Gutman? |
|           | 17 | A. | I have not received anything. |
|           | 18 | Q. | Is there some life insurance in place? |
|           | 19 | A. | Yes. |
| 11:01 | 20 | Q. | How much will that amount to? |
|           | 21 | A. | I don't know. |
|           | 22 | Q. | And how are you supporting yourself now? |
|           | 23 | A. | Whatever savings we had. |
|           | 24 | Q. | Do you still receive income from the Gutman |
| 11:01 | 25 | Pain and Accident Center? |

MJC REPORTING, INC.

67

|           | 1  | A. | Yes. |
|           | 2  | Q. | And what kind of an arrangement did you work |
|           | 3  | out with Dr. Garnsey and Dr. Babiar as far as the Pain |
|           | 4  | and Accident Center is concerned? |
| 11:01 | 5  | A. | You know, we're reorganizing so I'm not sure |
|           | 6  | of everything because everything is in process. |
|           | 7  | Q. | Based on your savings and the income you |
|           | 8  | receive from the clinic, are you able to pay your |
|           | 9  | bills? |
| 11:02 | 10 | A. | No. |

Page 61

14344pat

| | 11 | Q. | And do you know what your shortfall is |

        11      Q.   And do you know what your shortfall is
        12   there?
        13      A.   I don't know the exact figure.
        14      Q.   And so you're waiting for your life
11:02   15   insurance to be recovered?
        16      A.   Yes.
        17      Q.   Have you already made your claim for the
        18   life insurance?
        19      A.   My attorneys did.
11:03   20      Q.   Do you know how much life insurance there
        21   is?
        22      A.   I'm not sure.
        23      Q.   Is there any dispute about life insurance
        24   coverage?
11:03   25      A.   I'm not aware of any.


                        MJC REPORTING, INC.

☐

                                                              68


        1      Q.   Is the life insurance, is it more than
        2   100,000?
        3      A.   The reason I don't know is because there's
        4   two insurance policies and I don't know what the
11:04   5   outcome is going to be.
        6      Q.   Help me understand.  What's the problem
        7   with -- what do you understand the problem with the
        8   outcome is?
        9      A.   Just still -- it's just still in the
11:04   10  process.  It was just recently submitted.
        11     Q.   Right.  And so you had one insurance policy
        12  through who?
        13     A.   I can't remember the names of the companies.
                              Page 62

14344pat

14   I turned all that over to my attorney.

11:04  15     Q.   Right.  But I assume particularly if you're

16   having a shortfall you're conscious of whether the

17   insurance is going to be helpful to you and help solve

18   some of your financial problems, right?

19     A.   I think so.

11:05  20     Q.   Right.  And do you think the insurance, the

21   life insurance when you receive it will help ease your

22   financial issues right now?

23     MR. SOCIAS:  I'm going to object.

24   Calls for speculation.  You can answer.

11:05  25     A.   I have to wait and see.


MJC REPORTING, INC.

69


1     Q.   You think the life insurance, the total of

2   the two policies is in excess of $100,000?

3     MR. SOCIAS:  I'm going to object.

4   Calls for speculation.  You can answer it.

11:05  5     A.   I'm waiting.  I'm waiting to find out what

6   it's going to be.

7     Q.   Did Dr. Gutman ever mention to you how much

8   insurance, life insurance he had?

9     A.   On me?

11:06  10     Q.   On him.

11     A.   I don't think he even really knew.

12     Q.   But your understanding is that there were

13   two insurance policies that provided life insurance

14   benefits on Dr. Gutman's death; is that correct?

11:06  15     A.   That's correct.

Page 63

14344pat

16          Q.    And these are substantial amounts of life

17    insurance benefits; is that correct?

18               MR. SOCIAS:  I'm going to object.

19          Calls for speculation, asked and answered

11:06  20          and vague and ambiguous.

21          A.    I think you have to talk to my attorneys

22    about that.

23          Q.    And so Teresa Phillips would know the amount

24    of the life insurance?

11:06  25          A.    She probably knows better than I do.


                    MJC REPORTING, INC.

                                                      70

1          Q.    You have any problems with us asking her for

2    the amount of the life insurance, to Teresa Phillips?

3               MR. SOCIAS:  Wait.  I'm going to

4          object.  I think it's improper for you to

11:07  5          basically ask the witness for a stipulation

6          that you can make in direct contact from her attorney.

7               MR. KING:  Let me ask her attorney,

8    Mr. Manuel Socias.

9               MR. SOCIAS:  I will check with our

11:07 10          bankruptcy attorney and then make a decision.

11               MR. KING:  Okay.  But rather than take

12          Ms. Phillips's deposition, you'd be willing

13          to try to shortcut that for us?

14               MR. SOCIAS:  Depending on the input

11:07 15          from the -- I don't practice in bankruptcy

16          court.  I don't know what's appropriate or

17          not appropriate in terms of this hearing.

18          If this is an appropriate area of inquiry, I
                         Page 64

14344pat

19    don't think we would need to come back and

11:07   20    take a deposition to find that out.

21         MR. KING:  We'll adjourn the deposition

22    then now pending the outcome of that issue.

23         MR. SOCIAS:  Okay.

24         (The proceedings adjourned at 11:08 a.m.)

25              *     *     *     *     *


MJC REPORTING, INC.

71

1              E R R A T A   S H E E T

2

3    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

    IN RE:  In Re:  Tribune Company
4
    DEPOSITION OF DONNA GUTMAN taken 6/17/09
5

6    Page      Line      Correction           Reason

7

8

9

10

11

12

13

14

15

16

17    Under penalties of perjury, I declare that I have read
     my deposition and that it is true and correct subject
18    to any changes in form or substance entered here.

19

20    _____        _____

                    Page 65

```
                                14344pat
21      DATE                          DONNA GUTMAN

22
        (Note:  This document not longer needs to be
23      notarized).

24

25



                      MJC REPORTING, INC.

                                                        72


 1                      CERTIFICATE OF OATH

 2

 3      STATE OF FLORIDA      )

 4      COUNTY OF ORANGE      )

 5

 6

 7          I, PAMELA S. HARDY, FPR, RMR, CRR, Notary Public,

 8      State of Florida, certify that DONNA GUTMAN personally

 9      appeared before me this 17 day of June 2009, and was duly

10      sworn.

11

12

13

14                        _____

15                        PAMELA S. HARDY, FPR, RMR, CRR

16                        Notary Public, State of Florida

17                        DD 759844

18                        My commission expires April 17, 2012

19

20              *    *    *    *    *

21

22

23                      Page 66
```

14344pat

24

25

MJC REPORTING, INC.

73

1                CERTIFICATE OF REPORTER

2

3

4    STATE OF FLORIDA    )

5    COUNTY OF ORANGE    )

6

7         I, PAMELA S. HARDY, Registered Merit Reporter and

8    Certified Realtime Reporter, do hereby certify that I was

9    authorized to and did stenographically report the foregoing

10   deposition of DONNA GUTMAN; that a review of the transcript

11   was requested; and that the foregoing transcript, pages 1

12   through 70 is a true record my stenographic notes.

13        I FURTHER CERTIFY that I am not a relative, employee,

14   or attorney, or counsel of any of the parties, nor am I a

15   relative or employee of any of the parties' attorney or

16   counsel connected with the action, nor am I financially

17   interested in the action.

18

19        Dated this 19 day of June 2009 at Orlando,

20   Orange County, Florida.

21

22                    _____

23                    PAMELA S. HARDY, FPR, RMR, CRR

24

25

Page 67

14344pat

MJC REPORTING, INC.