# EXHIBIT 14

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-__________<br><br>(Joint Administration Requested) |

**AFFIDAVIT OF CHANDLER BIGELOW III, SENIOR VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF TRIBUNE COMPANY IN SUPPORT OF FIRST DAY MOTIONS**

STATE OF ILLINOIS )
) ss:
COUNTY OF COOK )

CHANDLER BIGELOW III, being duly sworn, deposes and states:

1. I am a Senior Vice President and the Chief Financial Officer of Tribune Company, a corporation organized under the laws of Delaware and one of the above-captioned

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

debtors and debtors-in-possession (collectively, the "Debtors").[2] Tribune Company is the direct or indirect parent company of the other Debtors herein. I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records.

2. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") (collectively, the "Chapter 11 Cases").

3. The Debtors are operating their business and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed by the Office of the United States Trustee.

4. In order to enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business operations, the Debtors have requested various types of relief in certain "first day" motions (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things: (a) preserving customer relationships; (b) maintaining vendor confidence and employee morale; (c) ensuring the continuation of the Debtors' cash management systems and other business operations without interruption; (d) securing post-petition financing necessary to continue the Debtors' operations; and (e) establishing certain administrative procedures to facilitate a smooth transition into, and uninterrupted operations throughout, the chapter 11 process. Gaining and maintaining the support of the Debtors' customers, employees, vendors and suppliers, and certain other key constituencies, as well as maintaining the Debtors' day-to-day business

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion (as hereinafter defined).

operations with minimal disruption, will be critical to the success of these Chapter 11 Cases and the Debtors' reorganization efforts.

5. I submit this affidavit (the "Affidavit") in support of the First Day Motions. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion (i) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (ii) constitutes a critical element in achieving a successful reorganization of the Debtors; and (iii) is in the best interests of the Debtors, their estates and creditors.

6. Except as otherwise indicated, all facts set forth in this Affidavit are based on my personal knowledge, on information supplied to me by other members of the Debtors' management teams and/or professionals retained by the Debtors, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and present liquidity needs. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Affidavit on behalf of the Debtors.

7. Part I of this Affidavit provides an overview of the Debtors' business operations and describes the Debtors' corporate history and prepetition capital and debt structure and the circumstances surrounding the commencement of these Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Motions.

## PART I

### A. Overview of the Debtors' Business Operations

8. Based in Chicago, Illinois, Tribune Company ("Tribune") is America's largest employee-owned media and entertainment company and is the ultimate parent company of each of the Debtors. Tribune is a media industry leader, reaching more than 80% of U.S.

households through its newspapers and other publications, its television and radio broadcast stations and cable channels, and its other entertainment offerings. Tribune's operations are conducted through two primary business segments: (i) publishing and (ii) broadcasting and entertainment.

**Publishing**

9. The Debtors' publishing segment currently operates eight (8) major-market daily newspapers, distributes entertainment listings and syndicated content through its Tribune Media Services business unit, and manages the Chicago area's first and only 24-hour cable news channel, CLTV. The Debtors publish daily newspapers in two of the three largest metropolitan markets and are the nation's third largest newspaper publisher in terms of revenue and circulation. The daily newspapers published by the Debtors, which have collectively garnered 83 Pulitzer Prizes, include market leading papers such as the Chicago Tribune, the Los Angeles Times, The Sun, the South Florida Sun-Sentinel, the Orlando Sentinel, the Hartford Courant, The Morning Call, and the Daily Press. The Debtors' newspapers collectively have paid circulation of 2.2 million copies daily and 3.3 million copies on Sundays. In addition, the Debtors publish over 100 "niche" publications that target various geographic, ethnographic and demographic audiences and include the upscale Chicago Magazine, the Spanish language newspaper "Hoy," which is published in Chicago and Los Angeles, and Chicago's Redeye, which targets a younger demographic. The Debtors' publishing segment also manages the websites of the Debtors' daily newspapers, television stations, and other branded sites targeting specific communities of interest. Every day, millions of people rely on the Debtors' newspapers, niche publications and websites to help them understand the world and navigate their daily lives. As of the Petition Date, the Debtors' publishing segment employed approximately 12,000 full-time equivalent employees.

**Broadcasting and Entertainment**

10. The Debtors' broadcasting and entertainment segment includes 23 television stations in 19 markets, including seven stations in the top 10 U.S. markets. The Debtors also own and operate the cable "Superstation" WGN America, which is seen in approximately 71 million homes, and Chicago radio station WGN-AM, which first went on the air in 1924 and whose call letters reflect the Chicago Tribune's longtime slogan, "the World's Greatest Newspaper." Long a broadcast innovator -- it was first to broadcast the World Series, the Indianapolis 500 and the Kentucky Derby and broke new ground by introducing microphones in the courtroom during the famous 1925 Scopes "monkey trial" -- WGN is perennially the number one radio station in the Chicagoland market. Through their television stations and WGN America, the Debtors' broadcasting and entertainment segment reaches more than 80 percent of television households in the United States. Thirteen (13) of the Debtors' stations are affiliates of The CW Television Network, America's "fifth" major broadcast network, with affiliate stations located in New York, Los Angeles, Chicago, Dallas, Washington D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, Hartford and New Orleans. The Debtors' broadcasting operations also include seven (7) Fox Broadcasting Network affiliates, located in Seattle, Sacramento, Indianapolis, San Diego, Hartford, Grand Rapids and Harrisburg, and one ABC television affiliate in New Orleans.[3] As of the Petition Date, the Debtors' broadcasting and entertainment segment employed approximately 2,600 full-time equivalent employees.

---

[3] The broadcasting and entertainment segment also includes the subsidiaries that own the Chicago Cubs baseball operations and an equity interest in regional sports network Comcast SportsNet Chicago, LLC, which are not Debtors in these cases.

**Recent Operations**

11. For the quarterly period ended September 28, 2008, the consolidated financial statements of the Debtors and their non-debtor subsidiaries[4] (the "Tribune Entities") reported approximately $7.6 billion in total assets and approximately $13.9 billion in total liabilities. In fiscal year 2007, the Tribune Entities recorded revenues of approximately $5.1 billion, resulting in net income of approximately $87 million. During this time, the publishing segment contributed approximately 72% of the Tribune Entities' revenue and the broadcasting/entertainment segment contributed approximately 28% of the Tribune Entities' revenue. Advertising is the primary source of revenue for both the publishing and broadcasting/entertainment segments. Daily newspaper revenues are derived principally from advertising and circulation sales, which accounted for 78% and 14%, respectively, of the publishing segment's total revenues in 2007. Publishing revenues decreased 9%, or $354 million, in 2007, primarily due to a decrease in advertising revenue, which declined 10%, or $334 million, in 2007, while circulation revenues were down 7%. Broadcasting and entertainment revenues decreased in 2007 by 2%, or $27 million, due to decreased television revenues which, in turn, resulted primarily from a decline in advertising revenues.

12. While the Debtors' performance is comparable, and in some areas superior, to that of their peers, operations have been adversely affected by the general

[4] The non-debtor subsidiaries are: Chicago National League Ball Club, LLC; Chicago Cubs Dominican Baseball Operations, LLC; Diana-Quentin, LLC; Fairfax Media, Inc.; Multimedia Insurance Company; Professional Education Publishers International (Africa) Pty Ltd.; TMS Entertainment Guides Canada Corp.; Tribune (FN) Cable Ventures Inc.; Tribune Hong Kong, Ltd.; Tribune Interactive, Inc.; Tribune Media Services, B.V.; Tribune National Marketing Company; Tribune ND, Inc.; Tribune Receivables LLC; Tribune Sports Network Holdings, LLC; and Wrigley Field Premium Tickets and Services, LLC. For the most part, these entities are either (i) associated with business operations that are co-owned with third parties, (ii) foreign corporations, (iii) businesses subject to disposition, such as the Chicago Cubs baseball operations, or (v) entities for which a bankruptcy filing is not suitable, such as Tribune Receivables, LLC, the special purpose subsidiary which is party to the Debtors' receivables financing facility, and Multimedia Insurance Company. Entities in which the Debtors own less than 100% of the equity are also not included in the bankruptcy filing.

deterioration in the publishing and broadcasting industries, particularly through the continuing severe decline in advertising revenue in this recession. As a result, the Debtors face increasing constraints on their liquidity, including their ability to service the approximately $13 billion in indebtedness owed to their lenders and noteholders. These Chapter 11 Cases were commenced to restructure and strengthen the Debtors' balance sheet, preserve the enterprise for the Debtors' stakeholders, including the employee owners, and improve the Debtors' liquidity going forward.

**B. Corporate History and Structure**

13. Tribune was founded in 1847 and incorporated in Illinois in 1861. In 1968, as a result of a corporate restructuring, Tribune became a holding company incorporated in Delaware. In 1983, after 136 years of private ownership, Tribune became a public company. Throughout the 1980s and 1990s, Tribune grew rapidly through a series of acquisitions spurred by a loosening of federal regulations restricting television and radio ownership. Tribune's most significant acquisition came in 2000, when it merged with The Times Mirror Company, effectively doubling the size of Tribune and securing its position among the top tier of major media companies. The Times Mirror transaction was the largest acquisition in newspaper industry history.

14. Tribune returned to private ownership at the end of 2007. On April 1, 2007, Tribune's board of directors, based on the recommendation of a special committee of the board comprised entirely of independent directors, approved a series of transactions with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company wholly owed by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell designed to return Tribune to private ownership. These transactions ultimately resulted in the transfer of ownership of Tribune and its subsidiaries to the ESOP (the "Merger"). On December 20, 2007, Tribune completed the

Merger, culminating with the cancellation of all issued and outstanding shares of Tribune's common stock as of that date, other than shares held by Tribune or the ESOP, and with Tribune becoming wholly owned by the ESOP. As a result of the Merger, Tribune became the largest employee owned media and entertainment company in the United States.

15. In March of 2008, Tribune filed an election to be treated as a subchapter S corporation under the Internal Revenue Code, which election was effective as of the beginning of the 2008 fiscal year, and also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations, Tribune and its subsidiaries are no longer subject to corporate level federal income tax. Instead, the income of Tribune and its subsidiaries is required to be reported by its shareholders. The ESOP, which is the sole shareholder, does not pay taxes on the share of income that is passed through to it because the ESOP is a qualified employee benefit plan. Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose income taxes at a reduced rate.

16. Tribune directly or indirectly owns all (or virtually all) of the equity in 127 subsidiaries, of which 110 are Debtors in these cases. Tribune and certain of its subsidiaries also have equity interests (which are generally minority interests) in various businesses in which one or more third parties are also equity interest holders; these entities are not Debtors. A summary chart of the equity structure for Tribune and its subsidiaries is attached hereto as Exhibit A.

**C. <u>Summary of Prepetition Indebtedness</u>**

17. In connection with the Merger and in order to fund ongoing general corporate and working capital needs, Tribune entered into financing facilities in May, 2007 and December, 2007, as described below. Tribune is also the obligor on a series of outstanding bond issuances that predated the Merger, as further described below. Accordingly, as of the Petition Date, Tribune owed approximately $13 billion in total funded debt. Additionally, Tribune (in its

capacity as servicer) and Tribune Receivables LLC, a wholly owned special purpose subsidiary which is not a Debtor, are parties to a $300 million trade receivables securitization facility for which Barclays Bank PLC is the administrative agent and Tribune Receivables LLC is the borrower. The outstanding balance under the trade receivables securitization facility is approximately $225 million.

18. The following is a brief overview of Tribune's debt facilities and outstanding note issuances. All of the indebtedness described below -- the Credit Agreement indebtedness, the Bridge Facility indebtedness, the Notes and the PHONES -- are obligations of the parent company, Tribune. This indebtedness is pari passu in payment priority at Tribune, except for the PHONES which are contractually subordinated to all other funded indebtedness at Tribune. The Credit Agreement indebtedness and the Notes are secured at Tribune, equally and ratably, by a stock pledge of the equity in two subsidiaries. Neither the Bridge Facility nor the PHONES is secured. Additionally, the indebtedness under the Credit Agreement and the indebtedness under the Bridge Facility constitute unsecured obligations at those Tribune subsidiaries (the "Guarantor Subsidiaries"),[5] which have guaranteed (i) the Credit Agreement

[5] The Guarantor Subsidiaries are those subsidiaries deemed material under the Credit Agreement, and are comprised of the following: 5800 Sunset Productions Inc.; California Community News Corporation; Channel 39, Inc.; Channel 40, Inc.; Chicago National League Ball Club, LLC; Chicago Tribune Company; Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.; Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC; Forsalebyowner.com corp.; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; Homeowners Realty, Inc.; Homestead Publishing Company; Hoy Publications, LLC; Internet Foreclosure Service, Inc.; KIAH Inc.; KPLR, Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications LLC; New Mass. Media, Inc.; Orlando Sentinel Communications Company; Patuxent Publishing Company; Southern Connecticut Newspapers, Inc.; Star Community Publishing Group, LLC; Stemweb, Inc.; Sun-Sentinel Company; The Baltimore Sun Company; The Daily Press, Inc.; TMLH 2, Inc.; TMLS I, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution Company; Tribune (FN) Cable Ventures, Inc.; Tribune Broadcast Holdings, Inc.; Tribune Broadcasting Company; Tribune Broadcasting Holdco, LLC; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune Entertainment Company; Tribune Finance LLC; Tribune Interactive, Inc.; Tribune Los Angeles, Inc.; Tribune Manhattan Newspaper Holdings, Inc.; Tribune Media Net, Inc.; Tribune Media Services, Inc.; Tribune National Marketing Company; Tribune ND, Inc.; Tribune New York Newspaper Holdings, LLC; Tribune NM, Inc.; Tribune Television Company; Tribune Television Holdings, Inc.; Tribune Television New Orleans, Inc.; Tribune Television Northwest, Inc.; Virginia Gazette Companies, LLC; WDCW Broadcasting, Inc.; WGN Continental Broadcasting Company; WPIX, Inc.; and WTXX Inc.

indebtedness on a senior priority basis, and (ii) the Bridge Facility indebtedness on a subordinate basis to the Credit Agreement indebtedness. Neither the Notes nor the PHONES are guaranteed by, or constitute obligations of, any of the subsidiaries; they are liabilities solely of Tribune. Additionally, Tribune is obligated on a $225 million subordinated promissory note to EGI-TRB LLC and certain permitted assignees of EGI-TRB LLC, which note is subordinate to the indebtedness under the Credit Agreement, the Bridge Facility and the Notes.

**The Senior Credit Facility**

19. On May 17, 2007 Tribune entered into a $8.028 billion Credit Agreement (as amended, the "Credit Agreement") with JPMorgan Chase Bank, N.A. as Administrative Agent, Merrill Lynch Capital Corporation as Syndication Agent, Citicorp North America, Inc., Bank of America, N.A. and Barclays Bank PLC as Co-Documentation Agents, and the Initial Lenders named therein. The Credit Agreement consists of the following facilities: (a) a $1.5 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"), which includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement totals $10.133 billion. As of the Petition Date, the approximate outstanding balances on the Tranche X Facility, Tranche B Facility and the Revolving Credit Facility are $512 million, $7.5 billion and $237 million, respectively. This indebtedness is secured by a pledge of the equity interests of Debtors

Tribune Finance, LLC and Tribune Broadcasting Holdco, LLC ("Stock Pledge"), and is guaranteed, on a senior priority basis, by the Guarantor Subsidiaries.

**The "Bridge" Credit Facility**

20. On December 20, 2007, Tribune entered into (i) a $1.6 billion Senior Unsecured Interim Loan Agreement (the "Interim Credit Agreement") with Merrill Lynch Capital Corporation as Administrative Agent, JPMorgan Chase Bank, N.A. as Syndication Agent, Citicorp North America, Inc. and Bank of America, N.A. as Co-Documentation Agents, and the Initial Lenders named therein, and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement. Pursuant to the Interim Credit Agreement, Tribune borrowed $1.6 billion under a twelve (12) month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by Tribune, among other ways, in connection with the consummation of the Merger and for general corporate purposes. The Bridge Facility indebtedness is unsecured but is guaranteed, on a senior subordinate basis,[6] by the Guarantor Subsidiaries. As of the Petition Date, the approximate outstanding balance of the Bridge Facility is $1.6 billion.

**The Notes and the PHONES**

21. Pursuant to Indentures entered into between 1992 and 1997, Tribune is obligated on various issues of outstanding bonds ("Notes") in the aggregate approximate amount of $1.26 billion. Each outstanding series and the approximate principal amounts owing are as follows:

[6] The guaranty by the Guarantor Subsidiaries of the Bridge Facility indebtedness is subordinate to the guaranty of the Credit Agreement indebtedness.

| Indenture | Interest Rate | Maturity Date | Outstanding Amount |
|---|---|---|---|
| 1992 | 6.25% | November 10, 2026 | $120,000.00 |
| 1995 | 7.25% | March 1, 2013 | $ 82,083,000.00 |
| 1995 | 7.5% | July 1, 2023 | $ 98,750,000.00 |
| 1996 | 6.61% | September 15, 2027 | $ 84,960,000.00 |
| 1996 | 7.25% | November 15, 2096 | $148,000,000.00 |
| 1997 | 4.875% | August 15, 2010 | $450,000,000.00 |
| 1997 | 5.25% | August 15, 2015 | $330,000,000.00 |
| 1997 | 5.67% | December 8, 2008 | $ 69,550,000.00 |

22. The Notes are not guaranteed, but as a result of "equal and ratable" provisions in the various indentures, the Notes are secured by the Stock Pledge on a pari passu basis with the indebtedness under the Credit Agreement.

23. In April, 1999, Tribune issued 8 million Exchangeable Subordinated Debentures due 2029 (the "PHONES") for an aggregate principal amount of approximately $1.3 billion. At the time of issuance, the value of one PHONES was related to the value of one "reference share" of American Online ("AOL") common stock, which was trading at $157 per share at the time. On November 22, 1999, AOL split (2:1), changing the reference to two shares of AOL for each PHONES. On January 11, 2001, AOL and Time Warner merged to form AOL Time Warner Inc. with the merged entity continuing to trade under the ticker AOL. On October 16, 2003, AOL Time Warner Inc. changed its name to Time Warner Inc. and began trading as TWX. As a result of the split and subsequent merger, two shares of TWX common now represent the "reference shares" for each PHONES share. Tribune may redeem the PHONES at any time for the higher of the principal value of the PHONES or the then current market value of two shares of Time Warner common stock, subject to certain adjustments. Holders of PHONES are contractually entitled to exchange a PHONES for an amount of cash equal to 95% (or 100% under certain circumstances) of the then current market value of two shares of Time Warner

stock. As of the Petition Date, the approximate amount of PHONES outstanding was $900,000,000. The PHONES are contractually subordinated in right of payment to all of the funded indebtedness at Tribune.

**D. Circumstances Leading To The Commencement of These Chapter 11 Cases**

24. The newspaper publishing industry generally is in the midst of an unprecedented decline which has only been exacerbated by the current recession. While the Debtors' newspaper advertising revenue continues to be in line with, and in some cases superior to, other large metropolitan newspapers, newspaper advertising revenue generally is in significant decline, down industry-wide approximately 15-20% over last year in major metropolitan markets, and down industry-wide nearly $2 billion, or 18%, in the third quarter of 2008 alone. Further, while the Debtors' television broadcasting stations continue to outperform the broader television broadcasting industry, the Debtors' broadcasting revenue nevertheless lags their 2007 performance, again largely as a result of declining advertising revenue. Through November, Tribune's consolidated revenue was down 10% versus last year, with publishing advertising revenues down 18% and broadcasting and entertainment revenues down 3%. On a consolidated basis, Tribune's operating cash flow (excluding equity compensation, one-time items and discontinued operations) was down 33%.

25. The Debtors have implemented and continue to implement aggressive strategic initiatives to enhance operating cash flow and mitigate the impact of the severe economic downturn. Strategic initiatives aimed at generating incremental cash flow through cost savings include improvements in operating efficiencies, reductions in workforce, web width (newspaper page size) reductions and newspaper redesigns. They also include revenue enhancement initiatives such as entering into arrangements to print and deliver other companies' newspapers, increasing the number of hours of television news programming, and improving the

efficiency and effectiveness of the salesforce. Additionally, in 2008 the Debtors implemented a strategy to monetize various assets, which resulted in the July, 2008 joint venture involving the Newsday operations, the April, 2008 sale of real estate associated with the Debtors' former southern Connecticut newspapers, the January, 2008 sale of a studio production lot in Hollywood, California and the September, 2008 sale of an equity stake in CareerBuilder LLC. The Debtors continue their marketing efforts in connection with the Chicago Cubs baseball operations and related assets, and in June, 2008 hired a real estate company to explore strategic options for both the historic Tribune Tower in Chicago and Times Mirror Square in Los Angeles.

26. Notwithstanding the Debtors' aggressive efforts to enhance revenue, reduce expenses and monetize various assets, the impact of an unprecedented economic downturn has left them with weak operating results and significant liquidity challenges. In December, 2008 alone, the Debtors face debt service and related payments of approximately $200 million, with another $1.3 billion due in 2009, including $512 million in Tranche X debt maturing in June, 2009. Against a backdrop of declining revenues in this recession, uncertainty in the capital markets and substantial debt service requirements, the Debtors have concluded that the most responsible course of action is to restructure their balance sheet in order to restore liquidity and return to financial health. By so doing, the Debtors seek to preserve the value of the enterprise for their stakeholders, including their employee shareholders, and continue the storied and historic Tribune legacy.

**PART II**

27. Concurrently with the filing of these Chapter 11 Cases, the Debtors have filed a number of First Day Motions, consisting of a procedural motion and motions relating to the Debtors' business operations. The Debtors submit that approval of each First Day Motion is