# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:

TRIBUNE COMPANY, et al.

Debtors.

---

THE DEPOSITION OF
DONNA GUTMAN
Taken by the Tribune Company

DATE: Wednesday, June 17, 2009

TIME: 9:00 a.m. - 11:07 a.m.

LOCATION: Gary, Williams, et al.
111 North Orange Avenue
Orlando, Florida

REPORTER: Pamela S. Hardy, RMR, CRR, FPR

A P P E A R A N C E S:

MANUEL SOCIAS, ESQ., OF:
Gary, Williams, Parenti, Finney, Lewis,
McManus, Watson & Sperando, P.L.
111 North Orange Avenue, Suite 775
Orlando, Florida 32801
(407)649-7171
sociasm@aol.com
on behalf of Donna Gutman

DAVID B. KING, ESQ., and
MAYANNE DOWNS, ESQ., OF:
King, Blackwell, Downs & Zehnder, PA
25 East Pine Street
Orlando, Florida 32801
(407) 422-2472
dking@kbdzlaw.com
mdowns@kbdzlaw.com
on behalf of the Tribune Company

GUY NEAL, ESQUIRE
1501 K Street NW
Washington, D.C. 20005
(202)736-8041
on behalf of the Tribune Company

DAVID BRALOW, ESQ., OF:
Thomas, Locicero & Bralow
220 E. 42nd Street
New York, New York 10017
(212)210-2893
on behalf of the Tribune Company

* * * * *

I N D E X

Wednesday, June 17, 2009

TESTIMONY OF: DONNA GUTMAN

| | |
|---|---|
| Direct Examination by Mr. King | 3 |
| Cross Examination (None) | |
| ERRATA | 73 |
| CERTIFICATE OF OATH | 74 |
| CERTIFICATE OF REPORTER | 75 |

* * * * *

E X H I B I T S

| | |
|---|---|
| Exhibit No. 1<br>Notice of Taking Deposition | 5 |
| Exhibit No. 2<br>Affidavit of Donna Gutman | 10 |
| Exhibit No. 3<br>Orlando Sentinel Article 11/30/03 | 27 |
| Exhibit No. 4<br>Dr. Gutman's obituary | 58 |

* * * * *

A. I've always played the role of taking care of the employees, taking care of the staff, making sure that the office, the building was run properly, ordering supplies, opening the mail. If there was a leak in the toilet, I'd call somebody to fix that. If the copier broke down, I'd call in a technician. In other words, that was basically my role. They called me the office mom.

Q. Did you get involved in patient care?

A. Never.

Q. You didn't assist in Dr. Gutman in caring for his patients?

A. Never.

(Document marked for identification Exhibit No. 2).

Q. I show you Exhibit 2 and ask you if you recognize that as an affidavit that you have filed in the United States Bankruptcy Court for the District of Delaware in the case regarding In Re: Tribune Company, Debtor.

A. Yes.

Q. Now, did you prepare this affidavit yourself? Did you write out the words?

A. No.

Q. Who did that for you?

Are you on the board of directors of Mike Gutman, M.D., MPAC, P.A. since Dr. Gutman's death?

A. Well, all of this is new to me and all I can say is that apparently I'm somehow involved with the P.A. since his death, but I'm not sure how.

Q. All right. Would it be fair to say that before Dr. Gutman's death he took care of the business affairs regarding his medical practice?

A. Yes.

Q. And would it be fair to say that you really weren't involved in his business affairs of his medical practice before his death?

A. Yes.

Q. Your role regarding the office practice was pretty much limited to making sure the employees were well cared for and well treated; is that right?

A. Yes.

Q. And had the supplies they needed to work with?

A. Yes.

Q. You didn't have any involvement in the treatment or care of the patients?

A. No.

Q. And as far as the business affairs, what the revenues were, how the business was doing, except on

the highest general level, that really wasn't something you were involved in; is that right?

A. I had no involvement with that as far as the office procedure went. So I have no say now. I was not directly involved in any of the business decisions.

Q. Right. You were not involved in getting the bills out for Dr. Gutman's work?

A. No.

Q. You were not involved in collecting the bills or the revenues from the patients?

A. No.

Q. You were not involved in analyzing the results of the work on either a weekly or a monthly or yearly basis; is that right?

A. No.

Q. You didn't get involved in preparing the tax returns, correct?

A. No.

Q. Now, do you remember the article that led to the lawsuit that Dr. Gutman filed against the Orlando Sentinel?

A. Is it somewhere in here?

Q. No. It's referred to in there, but it's not attached.

A. Which one are you referring to?

Q. I'm talking about -- do you know the one that resulted in the lawsuit?

A. Well, there was more than one. Which one are you referring to?

Q. Well, do you remember anything about an article that was in the paper on November 30, 2003?

A. Yes.

[illegible] right. [illegible] you, you understand that Dr. Gu[illegible] point filed [illegible] against [illegible] Orlando Se[illegible] defamation, right?

A. Yes.

Q. Did [illegible] any role in that [illegible]?

A. No.

Q. Did you attend any of the depositions in [illegible] lawsuit?

A. No.

Q. Did you have anything to do with dealing with the expert [illegible] and arranging for expert witnesses in that [illegible]?

A. No.

[illegible] you ever -- were [illegible] strike that. [illegible] know the names of the patients of Dr. Gutman who were -- who the article dealt with?

A. I only know what I read.

Q. Okay. So your knowledge about the treatment

of those patients did not go beyond just reading the article in the paper?

A. That's correct.

Q. Now, you say in this affidavit, quote, "I am familiar with the contents of the motion." What do you mean by that?

MR. SOCIAS: Would you point out where that appears?

MR. KING: That's on page two paragraph three.

A. Are we referring to this affidavit?

Q. Yes, ma'am.

A. Yes.

Q. All right. What does it mean when it says, "I am familiar with the contents of motion." What are you talking about?

A. I'm not sure what the motion means, but I am sure that I'm familiar with the contents of this affidavit.

Q. All right. But what motion are you filing the affidavit in relation to?

A. It has to do with bankruptcy hearing in Delaware.

Q. What about the bankruptcy hearing in Delaware?

out to me?

Q. Well, look at the first page. There isn't any reference to Dr. Gutman in the text of the article of Mr. Schulte on the first page, is there?

A. Well, what does it say underneath the picture of the prescription bottle?

Q. All right. That's a reference to the second article by Ms. Stutzman, isn't that correct?

MR. SOCIAS: I'm going to object. It's argumentative.

Q. Isn't the information under "Inside" and the picture of the pill bottle, doesn't that relate to the article by Ms. Stutzman on page A20?

A. I'm still looking at Schulte's article and I see the name of Dr. Gutman.

Q. All right.

A. In the Schulte article.

Q. [illegible] does it say [illegible] Dr. Gutman in the Schulte article?

A. It lumps him [illegible] -- it lumps [illegible] with Many [illegible] Doctors Exploit [illegible].

Q. Doesn't it [illegible] isn't it correct that the only reference to Dr. Gutman in the Schulte article is contained in the language that says as follows, quote, "A separate investigation by the Orlando Sentinel

1    found at ████████ven people in Central Florida died

2    in the past ████████ on prescription ████████ to

3    Orlando psyc████████ and pain spec████████chael

4    Gutman ████████ said he did ████████."

5    ████████    MR. SOC████: I'm going to object

6    ████.    She's already testified he's mentioned in

7    ████████ page under the big picture.  That

8    ████████characterizes her testimony and it's

9    ████████argumentative.

10   ████████    You can go ahead and answer the question.

11   ████████A    He's been thro████ in an article.  When

12   ████████ would read that they would believe that he was

13   ████a part of ████article.  Somehow ██ was, what Schu███

14   ████talking ████████ through the ████████article,

15   that's ████████ person would ████████ they read ████

16   ████████you have ████████ to support that ████

17   ████████it was a ████statement what ████article says

18   Many ████doctors Exploit Medicaid?

19   ████████    MR. MOCIAS:  I'm going to object.  It's

20   ████████been asked and answered, argumentative.  You

21   ████████can go ahead and cover that again.

22   ████████    It's false.

23   ████████    Okay.  And what is the basis of your personal

24   knowledge ████that's false?

25   ████A    Because the word 'exploit,' and you threw

31

1    Michael into this ██████ and Michael is not that kind

2    of a doctor and ██ did not belong in this article.

3    He's a good man and good doctor and he never

4    exploited anybody.

5        Q.  ████ Now, the second point says

6    "Overprescr█████ by small group fuels black market."

7    Is ██████████████se about that sta██████

8    ██████████

9    █████████

10    █████ The wording of it is so inflammatory. It

11    makes Michael sou████ he's done something wrong.

12        Q.  But there is no reference to Michael Gutman

13    ██████ of this article by Mr. Schulte other than

14    ██████ance to the Rene Stutzman article, is there?

15        MR. SOCIAS: I'm going to object.

16    ████████been asked and answered two or three

17    times already███ it mischaracterizes her

18    prior testi█████ it mischaracterizes the

19    ████████ You can go ahead █████

20    ████████ I've already answ████

21    Q.  Okay. Your understanding that that somehow

22    █████ to Dr. Gutman?

23    ██████ MR. SOCIAS: I'm going to object to the

24    characterization of her testimony. Asked

25    ████████ You can answer it again.

1    A. All I know is Michael ▓▓▓▓▓▓▓▓▓▓

2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3 ▓▓▓▓▓▓▓▓▓▓ the third bullet point it says

4 quote, "A small group of Florida doctors is drugging

5 the poor at taxpayer's expense." Is that a false

6 statement?

7 ▓▓▓▓▓▓▓▓ Yes, it is.

8 ▓▓▓▓ Q. Do you know that Dr. Gutman was asked that

9 same question in his deposition?

10 ▓▓▓▓▓▓▓▓▓▓▓▓ ledge of that.

11 ▓▓▓▓▓▓▓▓▓▓▓▓ that Dr. Gutman indicated

12 ▓▓▓▓▓▓▓▓▓▓▓▓ was a false statement

13 or not?

14    A. Well, to me it sounds wha▓▓▓▓▓▓▓▓

15 ▓▓▓▓▓▓▓▓▓▓ something wrong and that's

16 false.

17    Q. So anything that's in that▓▓▓▓▓▓▓

18 ▓▓▓▓▓▓▓▓▓▓ article you view it as

19 ▓▓▓▓▓▓▓▓▓▓ is that correct?

20 ▓▓▓▓▓▓▓▓▓▓ Wait. I'm going to

21 ▓▓▓▓▓▓▓ That is multiple and compound, if

22 you want to answer that, you need to go

23 through each sentence in the article and see

24 if it refers to Dr. Gutman. Otherwise

25 ▓▓▓▓▓▓▓▓▓▓▓ know how you can answ▓▓▓▓

Q. Well, when the first sentence says "A small group of Florida doctors is drugging the poor at taxpayer expense," is it your position that refers to Dr. Matman?

MR. SOCIAS: That's been asked and answered.

Q. You can go ahead and answer.

MR. SOCIAS: He's referring to -- if I may --

MR. KING: Yes.

MR. SOCIAS: -- to this sentence right here.

THE WITNESS: This is by Schulte, right? Okay.

MR. SOCIAS: This sentence.

A. Drugging the poor at taxpayer's expense? That is false. I have no knowledge of that.

Q. You have no knowledge of that?

A. No.

Q. Do you have any knowledge that it's false?

A. Yes.

Q. What knowledge would that be?

A. Because my husband was never drugging the poor and he is a Florida doctor.

Q. But you really were not involved in his

34

1    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3        That's been asked and answered.

4    ▓▓▓▓ Argument ▓▓▓▓

5    ▓▓▓▓▓ Q.    Isn't that correct, ma'am?

6    ▓▓▓▓▓▓▓▓▓  MR. SOCIAS:  You can answer the

7    ▓▓▓▓▓ question again.

8    ▓▓▓▓ A.    I was not involved with his treatment of his

9    patients.

10   ▓▓▓▓▓ Q.    You don't know how much narcotic medication

11   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ during

12   ▓▓▓▓▓▓▓▓▓▓▓▓

13   ▓▓▓▓▓ A.    I know Michael.  My know ▓▓▓▓▓▓▓▓▓▓▓

14   ▓▓▓▓▓▓▓▓▓▓ years.  I know his character.

15   ▓▓▓▓▓▓▓ Q.    And you don't know anything about the

16   ▓ circumstances of any of the patients that are referred

17   ▓▓▓▓ in Reed Stephen's murder, correct?

18   ▓▓▓▓ A.    From a medical standpoint?

19   ▓▓▓▓ Q.    Correct.

20   ▓▓▓▓ A.    From a medical standpoint I don't know.  But

21   I know it's false, because my husband did not hurt

22   ▓ people.  He did not hurt his patients, he ▓▓▓▓▓ one

23   ever.

24   ▓▓▓▓▓▓▓ And so the reason you say these allegations

25   are false is just because ▓▓▓▓▓▓▓ and belief

in your husband, right?

MR. SOCIAS: Wait. Wait. I'm going to object. That's a mischaracterization of her testimony. You can answer the question in your own words. You don't need to agree with the way he characterizes your testimony.

MR. KING: Manny.

MR. SOCIAS: Unless it's accurate.

MR. KING: Manny, please don't do that. That was so uncalled for. You know what you're doing. You're coaching your witness. You don't need to be coaching your witness. You should not be coaching your witness. Don't do that.

MR. SOCIAS: You shouldn't be arguing with the witness like that.

MR. KING: I wasn't arguing. I asked her a question that was appropriate and whatever and you just told her how she ought to answer the question.

MR. SOCIAS: I don't think so.

MR. KING: Read the question again. Remember, you're in a bankruptcy court in Delaware and you need to limit your

objections to the form of the question.

MR. SOCIAS: I did.

MR. [illegible]: No, you didn't, and you know you didn't. Would you read the question back for her.

(Question read.)

MR. SOCIAS: Same objection, argumentative and a mischaracterization of her testimony. You can answer.

Q. You can answer the question, please.

A. I've been asked to [illegible] the courts to represent Michael and [illegible] Michael would [illegible]. So I'm representing him and I'm [illegible] what he would say and he would say that this is [illegible] these are [illegible] are -- it's not a characterization of the way that he [illegible] his patients.

Q. So you [illegible] job here is to try to answer the questions the way that Dr. Gutman would have answered them; is that right?

A. My job here is to represent Michael today.

Q. But you understand when you're questioned about these events, you would have the same information that [illegible] had, correct?

A. I have the information of his character.

Q. [illegible]

A. I know he was an honest man. I know he loved his patients. I know he never harmed them.

Q. And so your answers are based, not on the [illegible] of what occurred, but on your belief in your husband, isn't that correct?

A. [illegible] facts. [illegible] that there are underlying events that occurred in the treatment of those eleven patients. [illegible]

A. But I don't know they are factually presented in this article.

Q. Right. Because you don't really know what the [illegible] about those patients' treatment, correct?

A. I know my husband never harmed anyone.

Q. And your [illegible] in support of your [illegible]

MR. SOCIAS: I'm going to object.

[illegible] this is false.

MR. SOCIAS: Wait. It's argumentative, asked and answered.

MR. KING: Read the question back so [illegible] can be heard.

(Question read).

1    A.    I ███████ what ███████ are.  I ████
2    ███ articles ██████ back of ████
3         ███████, do you ███ the second paragraph of
4    Mr. ███████'s article ████, quote, The Doctors are
5    ██ exploiting the Medicaid system by prescribing hundreds
6    ██ millions of ███████ worth of dangerous drugs that
7    ██ ███████ing a booming black market and adding to a
8    ██ torrent ██████ overdoses.  Do you see that
9    ████████ement?
10        ███████ How does ██████ relate to my husband? I'm
11   asking ████
12        ████ Well ████ is no ind███tion there ████ it
13   ██ does re███ to your ██████and, is ████?
14   ██ A.  ████ why are ██ asking me ████ it's true or
15   false?
16   ██ Q.  Be███se you claim that that ██ a false
17   ██████ement.
18   ███████.   Yes, I do.
19        ███ I'm just asking you what's the basis for
20   ██your sta██████ that it's a false statement?
21   ██████ A.  ██████ false statement when it appl██ to
22   ██ ███ Gutman?
23   ████ Q.  ███ you don't know whether it's intended to
24   ██ apply ██ Mike Gut█████ do you?
25   ████. A.  ██ looks to me like it is.

Q. Okay.

[illegible] the article.

[illegible] he's not named as being one of the doctors [illegible] the Medicaid system, is he?

[illegible] SOCIAS: I'm going to object, argumentative, [illegible] answer it again.

[illegible] already answered that.

[illegible] there's a statement that says, the next paragraph, "Even as [illegible] [illegible] figure prominently, abuse of the health care system for the poor by doctors and by willing pharmacists and patients has gone largely unpunished according [illegible] [illegible] Sun-Sentinel." Is there anything [illegible]

[illegible] lead-in beside that paragraph that it refers to [illegible] false when it refers to him because that is not what [illegible]

Q. Okay. But you've left the paragraph we were [illegible] anything that's false in the paragraph I just asked you about, paragraph three?

[illegible] already answered that.

Q. Well, could you tell me what is false about paragraph three? What specific thing that you're aware of your own personal knowledge is false about paragraph three?

A. It's false because it refers right next to that -- it refers to Mike -- to prominent psychiatrist in Central Florida. That's why that paragraph is false.

Q. So you're not aware of any of the content of paragraph three that's false, is that correct?

A. I think I already answered that.

MR. SOCIAS: I'm going to object to that. That's a mischaracterization of her testimony. It's been asked and answered.

Q. Well, it says, "Even as the state faces a budget crisis in which Medicaid costs figure prominently." Is there something false about that?

MR. SOCIAS: I'm going to object. It's an incomplete reading of the statement.

MR. KING: We're going to parse it piece by piece. We're starting.

MR. SOCIAS: I'm still objecting.

All right, let me try again. "Even as the state faces a budget crisis in which Medicaid costs figure prominently," is there anything in that phrase

of the sentence that's false to your knowledge?

MR. SOCIAS: I'm going to object to an incomplete reading of the sentence. You can answer the question.

A. When I read this article it's false to me because I'm thinking of how it relates to Mike Gutman.

Q. And regardless of what the facts might be, you're not going to believe anything bad about Dr. Gutman, right?

A. That's correct.

Q. Then in the sixth point it says, "A separate investigation -- in your affidavit, it says, "A separate investigation by the Orlando Sentinel found that at least 11 people in Central Florida died in the past three years on prescriptions linked to Orlando psychiatrist and pain specialist E. Michael Gutman." Is there something false about that?

A. Where are you?

Q. Well, I'm sorry. I'm on page three of your affidavit which is Exhibit 12 and it's the sixth bullet point, one bullet point from the bottom.

A. Okay.

Q. You see where it says, "A separate investigation by the Orlando Sentinel found that at least 11 people in Central Florida died in the past

42

1  three years on ███████ions linked to ██████

2  psyc██████ and pain spec████████ Michael Gutman.

3  You ██████ statement?

4  ████████ I see that.

5  ████ Q.  ████████ Do you have any personal

6  knowledge ██████████'s not accurate?

7  ████ A.    That's █████

8  ██████████ And what ██ ████████onal knowledge ████ you

9  ███████████ that would █████████ your statement ████

10  that's fal██?

11  ██████████ one knows why ████████ died.

12       Q. ████████rtainly don't ████████ they died

13  ██████?

14       ████ and neither do you██

15  ██████ Well, you've never reviewed their autopsy

16  reports, have ███?

17  ████ A.   No.

18  ████ Q.   And you've never reviewed their case files,

19  correct?

20  ████ A.   No.

21  ████████ And you ██████ even know ████ the eleven

22  people ██████ you?

23       ████ No.

24  ████ Q.  ████  So your position is just you're not

25  ████ to believe anything bad about Dr. Gutman, right?

A. I know Dr. Gutman, I know he was a caring and an [illegible] doctor, I know [illegible] he didn't hurt people, and [illegible] he didn't [illegible] people did not [illegible] from his medic[illegible] because if my doctor [illegible] me a prescr[illegible] I have a side [illegible] from it, I don't [illegible] my doctor is trying to kill me.

Q. But you know that Dr. Gutman did prescribe a lot of narcotic drugs to his patients; is that correct?

A. I do not know that. I know my husband presc[illegible] many medications for people with different [illegible]nesses.

Q. [illegible] And you know that your husband turned to pain management in 2001?

A. [illegible]

Q. In [illegible], he had [illegible] psychiatrist for [illegible] years here in [illegible] Florida, [illegible]

A. Yes.

Q. And the focus of his practice was psychiatry; isn't that right?

A. The focus of his practice was psychiatry for many years.

Q. Right. And then Dr. Gutman got into some financial problems in the '90s with his stock trading; isn't that right?

1    that, in the second sentence, "Debtors made the above

2    statements about Dr. Gutman, the decedent, with

3    knowledge that such statements were false."    Do you

4    see that?

5        A.    Yes.

6        Q.    Now█████████ have any personal knowledge that

7    Fred Sc████ made any statements in his article about

8    ████ false statements about Dr. Gutman that he knew

9    were false ██ the time he was making them?

10        A.    ████ not sure he knew they were true.

11        Q.    █████ You're just not sure because you

12    don't really █████ any personal knowledge about ████

13    ██████ don't know his ████king.   I've ██████

14    talked ██████

15    █████ Q.    Ri█████████ve never ██████ deposi████

16    ████████ case?

17    ██████████████

18    ████ Q.    ███████ve never read the material ██

19    ████ A.    But I read his articles.

20    ████████ight.   But you never read the ███erials

21    ████████ developed ████████port the ████rting that he

22    did. ████████

23    ██████████ I never ████ those.

24    ████ Q.    ███████ So you don't really know from your

25    ██own perso███████owledge wh████ he thought the

article -- the statements were true or false at the time he wrote them, right?

A. If he didn't know they were true, why was he publishing them? We don't know that he didn't know they were true or false, so we believe that they were false.

Q. All right. You believe the statements were false?

A. Yes.

Q. But you don't know what was in Mr. Schulte's mind at the time he wrote the statements, correct?

A. All I know is what he put in his article.

Q. Right. You don't know what he thought about what he was putting in his article, right?

A. I know how he placed it in his article.

Q. Right. And you don't know what his research indicated at the time he wrote the article, right?

A. I know the statements that he made about Michael put Michael in a false light and then that way I believe his statements were false.

Q. All right. But you don't know what was in Fred Schulte's mind at the time he wrote the articles?

A. Why are you asking me that question?

Q. Well, I'm just asking you the question.

A. I want to know why.

Q. Could you just answer the question? If you don't know the answer to the question, you can simply say.

A. I'll say I don't know.

Q. And would it be also true that you don't know what Rene Stutzman had developed in her facts and reporting about this article, right?

A. I know that what, the statements that she made in her article were false, that I know Michael and I know the way he took care of his patients and I know that he was a caring and careful doctor who would never harm his patients in any way. [illegible] know is [illegible] she [illegible] her -- I read and [illegible] as [illegible] believed [illegible] was [illegible] people, and that is false.

Q. But you say that she made the statements in her article with knowledge, that Rene Stutzman had knowledge that the statements were false?

A. I think she slanted the truth in such a way that her statements are false.

Q. But, again, you've never talked to Rene Stutzman to try to figure out what she knew at the time she wrote these articles, did you? Or have you?

A. I've never talked with her.

Q. And you've never read her deposition in this

case, have you?

A. No.

Q. And you you never looked at the box of information that she developed to support her articles, have you?

A. I know what she wrote. I don't know her process of writing her article.

Q. And you certainly don't know that she thought that what she was writing down was false at the time she wrote it, do you?

MR. SOCIAS: I'm going to object. It's been asked and answered and it's argumentative.

Q. You can go ahead and answer.

MR. SOCIAS: You can answer it again.

A. Whatever she wrote in the article was false. I don't know her frame of mind when she wrote the article.

Q. Can you tell me about your highest level of education that you've attained, Mrs. Gutman?

A. What did you say?

Q. I asked you, what was the highest level of education that you've attained?

A. A year and-a-half of college.

Q. You graduated from high school?