**IN THE UNITED BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| | ) | **Case No. 08-13141 (KJC)** |
| | ) | |
| **TRIBUNE COMPANY, et al.,** | ) | **(Jointly Administered)** |
| | ) | |
| | ) | |
| | ) | **Hearing Date:  June 30, 2009 at 1:30 p.m.** |
| Debtors. | ) | |

**TRIAL MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR**
**RELIEF FROM AUTOMATIC STAY WITH RESPECT**
**TO E. MICHAEL GUTMAN, M.D., MIKE**
**GUTMAN, M.D. (MPAC), P.A. AND GUTMAN PAIN/ACCIDENT CENTER, INC.**

Donna Gerhart Gutman ("Mrs. Gutman"), Personal Representative of the Estate of

Decedent E. Michael Gutman, M.D. (the "Decedent"), Mike Gutman, M.D. (MPAC), P.A. and

Gutman Pain/Accident Center, Inc, by and through her undersigned counsel, hereby files this

Trial Memorandum in Further Support of the Motion for Relief from Automatic Stay with

Respect to E. Michael Gutman, M.D., Mike Gutman (MPAC), P.A. and Gutman Pain/Accident

Center, Inc. (the "Motion")[D.I. No. 883].  In further support hereof, Mrs. Gutman represents as

follows:

**PRELIMINARY STATEMENT**

1.      Since the filing of the Motion, circumstances have arisen that increase

substantially the need for this Court to grant the relief requested therein.  In addition, records

from the underlying Florida Action have become available to this Court that further show the

"totality of the circumstances" weigh heavily in favor of granting Mrs. Gutman relief from the

automatic stay.

1

2.      The original Plaintiff, Dr. Michael Gutman, took his life on April 28, 2009. Despite the loss of the Decedent, Mrs. Gutman, as the representative of the Decedent's estate, Plaintiff in the Florida Action and spouse to the Decedent, anxiously seeks the authority from this Court to proceed with the Florida Action and bring all matters arising from the Florida Action to an end.

3.      A review of Mrs. Gutman's finances show that she and Dr. Gutman invested considerable time and assets to bring the Florida Action to trial.  By doing so, the Gutman's sought to correct the wrong committed by the Debtors in publishing articles accusing the Decedent of being responsible for the deaths of several of Decedent's patients.

4.      Debtors will likely argue that with the passing of the Decedent, the urgency in pursuing the Florida Action to trial has diminished.  To the contrary,  Decedent's businesses continue to operate and Mrs. Gutman hopes that through resolution of the Florida Action, she can end the emotional and financial harm caused by Debtors' prior publications.  The Decedent's businesses are also plaintiffs in the Florida action.  As plaintiffs, Decedent's businesses also seek economic damages against the Debtors.

## **BACKGROUND**

### **Introduction**

5.      Mrs. Gutman, as the surviving spouse of the Decedent, was appointed the personal representative of the Decedent's estate on May 18, 2009.  See Affidavit of Donna G. Gutman (D. Gutman Aff.), at ¶ 1, attached hereto as Exhibit "A."  At the time of his death, Decedent was a licensed physician and director of Mike Gutman, M.D. (MPAC), P.A. and Gutman Pain/Accident Center, Inc., commonly referred to as the Back Pain Institute of Orlando. D. Gutman Aff. at ¶ 2.

2

6.    Almost six years ago, on November 30, 2003,  the Orlando Sentinel (the "Sentinel"), one of the Debtors in this bankruptcy proceeding, published two articles concerning the Decedent that contained numerous false, misleading and defamatory statements.  These statements included, but were not limited to, the following:

- Many Die as Doctors Exploit Medicaid

- Overprescribing By Small Group Fuels Black Market

- A small group of Florida doctors is drugging the poor at taxpayer's expense.

- The doctors are exploiting the Medicaid system by prescribing hundreds of millions of dollars worth of dangerous drugs that are feeding a booming black market and adding to a torrent of fatal over-doses.

- Even as the state faces a budget crisis in which Medicaid costs figure prominently, abuse of the health-care system for the poor by doctors – and by willing pharmacists and patients – has gone largely unpunished, according to an eight month investigation by South Florida Sun-Sentinel.

- A separate investigation by the Orlando Sentinel found that at least 11 people in Central Florida died in the past three years on prescriptions linked to Orlando psychiatrist and pain specialist E. Michael Gutman.

- Ten of those who died were patients of Dr. E. Michael Gutman and all had taken drugs he prescribed for the treatment of pain or mental disorders, according to medical examiner's reports.

- 11 Die from Doctor's Prescriptions

- Central Florida's Dr. Michael Gutman is under investigation by three state entities.

- Gutman, a licensed psychiatrist who also operates two Orlando area pain management clinics, is under investigation by the Florida Department of Law Enforcement, the Florida Attorney General's Office and the Florida Board of Medicine, which licenses doctors.

- However, the state records show that a few months after Medicaid fraud investigators with the Attorney General's Office began their inquiry in 2001, Gutman surrendered his Medicaid certificate, meaning he would no

3

longer accept payments from the government program that provides medical care to the needy.

A copy of the November 30th articles are attached hereto as Exhibit "B."

7.     The harm suffered by the Decedent and Mrs. Gutman as a result of the Debtors' publications was immediate and severe.  See Deposition of E. Michael Gutman, M.D. ("M. Gutman Dep."), p. 112, ln. 17-24 (stating that the harm done by the Sentinel "decimated" Decedent's practice, causing his "forensic practice, which used to be quite a prominent part, [to have] dwindled and died.").  Excerpts from the M. Gutman Dep. are attached hereto as Exhibit "C."

8.     In response to the harm done by the Debtors, on May 11, 2005, Decedent commenced a civil action against the Debtors captioned E. Michael Gutman, M.D., Mike Gutman, M.D. (MPAC), P.A. and Gutman Pain/Accident Center, Inc. a/k/a and/or d/b/a Back Pain Institute of Orlando v. Orlando Sentinel Communications Company, Tribune Company of Chicago a/k/a Tribune Company, Tribune Publishing Company, Sentinel Communications News Ventures, Inc., C.A. No. 48-2005-CA-4071- O, in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida (the "Florida Action").

9.     On April 30, 2006, Decedent filed a Second Amended Complaint against the Debtors and various related defendants alleging that the Debtors published false, misleading and defamatory statements that damaged the personal and professional reputation of the Decedent and his businesses.  See Second Amend. Compl. at ¶¶ 24-27, attached hereto as Exhibit "D."

**Procedural Posture in the Florida Action**

10.     Since the commencement of the Florida Action, the parties have engaged in over three years of discovery and motion practice. As reflected in the docket in the Florida Action, the

4

parties have exchanged requests for production, interrogatories, requests for admissions and depositions. The docket further reflects that the court in the Florida Action heard and disposed of motions to dismiss, motions to strike, motions for judgment on the pleadings and a motion for summary judgment. Defendants have already deposed the Plaintiff's economic expert and both of Plaintiff's medical experts. See Affidavit of Manuel Socias, Plaintiff's Counsel in the Florida Action ("Socias Aff."), at ¶¶ 5-6, attached hereto as Exhibit "E."

11.    The Florida Action was initially set for trial on November 17, 2008. On August 20, 2008, the Debtors filed a motion to continue the trial date for a time certain in 2009. The court in the Florida Action granted Debtors' motion to continue and the court rescheduled trial for June 1, 2009. With a trial date then set for June 1, 2009, once Debtors filed their bankruptcy petitions, the parties in the Florida Action had only five (5) months remaining to complete discovery. Socias Aff. at ¶ 7.

<b><u>BASIS FOR RELIEF FROM STAY</u></b>

12.    Mrs. Gutman and the Debtors (the "Parties") agree on the applicable legal standard governing a motion for relief from stay. Specifically, in considering the Motion, this Court should consider whether, based on the totality of the circumstances surrounding the Florida Action, cause exists to lift the automatic stay in Debtors' bankruptcy proceeding. 11 U.S.C. § 362(d)(1). Baldino v. Wilson (In re Wilson), 116 F.3d 87, 90 (3d Cir. 1997). See also, the Parties' Joint Pretrial Memorandum dated June 24, 2009 ("Jt. Pretrial"), at ¶ F(1), attached hereto as Exhibit "F."

13.    In determining whether "cause" exists to grant relief from the automatic stay, the Court should apply a three-prong balancing test:

5

(1)     "Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit."

(2)     "Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor"; and

(3)     "The probability of the creditor prevailing on the merits." Even a "slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case."

In re: SCO Group, Inc., 395 B.R. 852, 857-58 & 859 (Bankr. D. Del. 2007) (citing Izzarelli v. Rexene (In re Rexene Prods. Co.), 141 B.R. 574, 576 (Bankr. D. Del. 1992)).  Jt. Pretrial at ¶ F(3).

14.     In addition, the Court may consider the following general policies underlying the automatic stay when deciding whether to grant a motion to lift the stay.  These policies are: (1) whether this Court has jurisdiction to hear the underlying claims arising from the underlying action.  28 U.S.C. § 157(b)(2)(G); (2) whether granting Movant relief from stay would provide a complete resolution of the issues presented in the underlying action; (3) whether granting the movant relief from the automatic stay would interfere with the debtors' bankruptcy proceeding; (4) whether the interest of judicial economy and the expeditious and economical resolution of litigation weigh in favor of granting the movant relief from the automatic stay; (5) whether the parties are ready for trial in the underlying action; (6) whether the impact the stay has on the movant justifies the relief requested in the Motion.  SCO Group, 395 B.R. at 857 (citing In re Sonnax Indus., Inc. v. Tri Component Prods. Corp., 907 F.2d 1280, 1287 (2d Cir. 1990)).  Jt. Pretrial at ¶ F(4).

6

<u>ANALYSIS</u>

<u>Debtors Will Not Be Greatly Prejudiced Were the Stay Lifted</u>

15.    In their Objection to the Motion, Debtors state that "granting Gutman relief from the automatic stay to continue the [Florida] Action in the tort system would, at a minimum, force the Debtors to incur substantial defense costs." Debtors' Objection ("Objection") at ¶ 1. Further, Debtors claim to have already expended approximately $1.3 million in defense of the Florida Action, and expect to incur additional defense costs "as high as approximately $2 million" were this matter to proceed to trial. Objection at ¶ 2.

16.    Debtors have retained one of the top trial law firms in Orlando to handle the Florida Action.  David King, Debtors' senior litigator in the Florida Action, handles virtually every aspect of the Florida Action.  Socias Aff. at ¶ 8.  Besides Mr. King's law firm, Debtors retained a media law firm, Thomas and LoCicero, to assist in the Florida Action.  Counsel from the Thomas firm observes, but does not actively participate in, almost all proceedings in the Florida Action.  <u>Id.</u>

17.    Debtors' estimation of an additional $2 million in defense costs is highly speculative in light of the fact that the parties have already completed the majority of discovery and were only months away from trial at the time of Debtors' Petition Date.  See Socias Aff. at ¶ 7.  Further,  Debtors have unnecessarily inflated the legal expense associated with the Florida Action as demonstrated by the June 17, 2009 deposition of Mrs. Gutman.  Socias Aff. at ¶ 8.

18.    During Mrs. Gutman's June 17th deposition in Orlando,  Debtors were represented by four attorneys, two from Mr. King's firm and two who traveled from out of town to participate on behalf of the Debtors.  Socias Aff. at ¶ 8.  Of the four attorneys present, only one of the Debtors' attorneys, David King from Orlando, asked questions during the two-hour

7

deposition.  Id.  Debtors may be correct in stating that it will be expensive to defend the Florida

Action through trial, however, such expense is of the Debtors' own making and should not

justify the denial of the relief requested by Mrs. Gutman.

19.     Regardless of whether Debtors try the Florida Action in Florida or in Delaware,

the Debtors are going to incur considerable defense costs.  The Debtors will likely propose

alternative dispute resolution procedures, including mediation.  Mrs. Gutman is not opposed to

participating in mediation in Orlando.  However, in order for mediation to be beneficial to all the

parties, a firm trial date needs to be on the calendar. Mrs. Gutman should not be required to come

back in to this Court, incurring more legal expense, and request relief from stay again should

mediation prove unsuccessful. Further, discovery should not be stayed pending mediation.  The

Debtors have had years to take discovery in the Florida Action and should not receive yet

another extension, to the prejudice of Mrs. Gutman.

20.     Debtors further argue that they are subject to "a significant number of prepetition

litigation cases," forty-five of which are pre-petition media-related cases.  Objection at ¶ 3.

Debtors do not disclose which of these cases are as far along in the litigation process as the

Florida Action, nor do Debtors provide any indication as to the number of parties currently

seeking relief from the automatic stay to proceed with media-related litigation.  Presumably,

many of the cases Debtors refer to are in the initial stages of litigation and have not been before a

court tribunal for four years, like the parties have in the Florida Action.

21.     To appreciate whether Debtors will experience "any great prejudice," were the

stay lifted, it helps to look at why Debtors commenced these bankruptcy proceedings.  Debtors

did not file their petitions due to an onslaught of "media-related" litigation, but instead sought

the protections afforded under the Bankruptcy Code due to "declining revenues in this recession,

8

uncertainty in the capital markets and substantial debt service requirements." Affidavit of

Chandler Bigelow III ("Bigelow Aff.") at ¶ 26, [D.I. 3]. Debtors filed for bankruptcy not to seek

shelter from litigants bringing defamation claims, but instead to seek relief from their $1.3 billion

debt facility. Id.

22.     In addressing the prejudice they will sustain were the stay lifted, Debtors do not

address the costs and expense that would be associated with having to re-litigate the Florida

Action in Delaware. As already stated, the majority of the litigation in the Florida Action has

been completed in Florida, including some briefing and most discovery. Socias Aff. at ¶¶ 6-8.

23.     Pursuant to 28 U.S.C. § 157(b)(2)(G), Mrs. Gutman submits that this Court lacks

jurisdiction to hear the Florida Action as it arises from personal injuries (emotional distress,

anguish, etc.), sustained by the Decedent. See SCO Group, 395 at 857 (recognizing that one of

the policies underlying the automatic stay is the "expeditious and economical resolution of

litigation")(citing In re Sonnax Indus., Inc., v. Tri Components Prods. Corp., 907 F.2d 1280,

1287 (2d Cir. 1990)).

**The Hardship to Mrs. Gutman in Maintaining the**
**Automatic Stay Far Outweighs the Hardship to the Debtors**

24.     Debtors presumably will argue that with the recent death of the Decedent, the

burden imposed by the automatic stay lessens as Dr. Gutman is no longer alive to clear his name.

To the contrary, Mrs. Gutman, as the Decedent's wife and representative of Decedent's estate,

has considerable interest in bringing the Florida Action to a quick and final resolution.

25.     The financial burden imposed by the automatic stay, by itself, is considerable.

The parties do not dispute that the Decedent expended $150,000 as a retainer to Decedent's

counsel in order to commence the Florida Action. Pretrial Memo. at ¶ C(6). Decedent, not his

9

attorneys in Florida, retained and paid for the legal expenses of his Delaware bankruptcy counsel.  With the recent death of the Decedent,  Mrs. Gutman has assumed financial responsibility for the legal expenses of her Delaware bankruptcy counsel.

26.    Mrs. Gutman is the named beneficiary in two life insurance policies entered into by the Decedent.  The first life insurance policy has a face value of $1 million, while the second life insurance policy has a face value of $500,000.  Given the circumstances surrounding the Decedent's death, neither insurer has stated when, or if, they intend to distribute the life insurance proceeds to Mrs. Gutman, despite her being the named beneficiary.

27.    Mrs. Gutman, with the assistance of her son Robert, continues to operate the Gutman Pain and Accident Center.  D. Gutman Dep., p. 6 ln. 21 – p. 8 ln. 16, attached hereto as Exhibit "G".  The Gutman Pain and Accident Center continues to employ a staff of ten, including a licensed osteopath and chiropractor.  It is just as important now, as it was before the Decedent's death, to clear Dr. Gutman's professional reputation, as well as the reputation of his businesses.

28.    In 2008, the Mrs. Gutman and the Decedent received a combined income (including wages and social security) of $92,235.  See Correspondence from Mrs. Gutman's accountant, dated June 23, 2009, and attached hereto as Exhibit "H."  The economic harm sustained by Mrs. Gutman and Decedent arising from the articles published by the Debtors are considerable.

29.    The emotional and financial effects Debtors' publications had on the Decedent are demonstrated by the correspondence Decedent left Mrs. Gutman the day he took his life.  According to the Decedent, "[t]he debts are enormous since we have 5 and ½ years of breaking

10

down and the enormity of the blow to my reputation and income.  We are broke and in debt."
<u>See</u> Correspondence from Decedent, dated April 28, 2009, attached hereto as Exhibit "I."

30.    Faced with the loss of her husband and a precarious financial situation, Mrs.
Gutman requests the Court allow her to bring the Florida Action to a close as quickly as possible.
Looking at the policy considerations recently considered by the Court in <u>SCO Group</u>, several
reasons exist for granting relief. <u>Id.</u>

31.    The "impact of the stay" on Mrs. Gutman, as wife and representative of Decedent
has already been demonstrated.  <u>SCO Group</u>, 395 B.R. at 857.  Mrs. Gutman has limited
resources and an uncertain financial future.  Like the Court recognized in <u>SCO Group</u>, the parties
in the Florida Action are in effect "ready for trial."  <u>Id.</u>  Also like the parties in <u>SCO Group</u>, the
State Court in the Florida Action has "extensive knowledge of the facts and issues and has
already made detailed filings." <u>Id.</u>

32.    The Debtors have filed other objections to movants (movants other than Mrs.
Gutman) in this bankruptcy who seek relief from stay to proceed with state court litigation.  If
the Court looks at why Debtors opposed relief from stay for other state court litigants, it would
seem that the reasons Debtors objected to  in those matters are not present here.  <u>See</u> Debtors'
Objection to J. Clement Motion for Relief From Stay ("Clement Objection")[D.I. 1586].
According to the Debtors, this Court should deny Clement's wrongful termination suit as
Clement was retained on a contingency fee basis, faces no risk of evidence spoliation and will be
in a better position to consider how to proceed in the underlying litigation if the automatic stay
remains in place until Debtors' formulate a plan of reorganization.  Clement Objection at ¶¶ 9-
11.

11

33.    Debtors' reasons for objecting to relief from stay in the Clement Objection are notably absent from their Objection to Mrs. Gutman's Motion.  This is likely due to Debtors' recognition that in the Florida Action, Decedent paid $150,000 out of pocket to retain counsel, spoliation of evidence will continue to be an issue as time passes, and the Florida Action, if successful, will trigger coverage under Debtors' insurance policies.  Unlike the movant in the Clement Motion, Mrs. Gutman has no interest in waiting until a plan is proposed before deciding to proceed with the Florida Action.

**Likelihood of Success on the Merits**

34.    Even with the death of the Decedent, the record established in the Florida Action shows a high likelihood that the Florida Action Plaintiffs will succeed on the merits.  The Parties agree that the standard applied by this Court is that a "slight probability of success on the merits may be sufficient to support lifting an automatic stay _in an appropriate case_."  Pretrial Memo at ¶ F(3), citing In re SCO Group 395 B.R. at 857-59 (internal citations omitted).

35.    Mrs. Gutman submits that the Florida Action is the "appropriate case" to require only a "slight probability" of success on the merits in order to lift the stay.  In re Rexene, 141 B.R. at 578.  The Florida Action is on the eve of trial, Decedent expended considerable resources to initiate the Florida Action, and Mrs. Gutman would like to bring years of controversy to an end (for both financial and emotional reasons).  When considered in whole, the facts surrounding Mrs. Gutman's Motion support applying the "slight probability of success" standard set forth in Rexene.

36.    Although required only to show a slight probability, Movants instead have a high probability of prevailing on the merits.  Debtors, through the Sentinel, published in 2003 that an "investigation by the Orlando Sentinel found that at least 11 people in Central Florida died in the

12

past three years on prescriptions linked to Orlando psychiatrist and pain specialist E. Michael

Gutman." According to the Decedent's deposition, Debtors' allegations were both damaging and

untrue.

37.    During his video-taped deposition, the Decedent testified that the Debtors' article

referenced a patient "who took an overdose of a drug that I didn't give him and he got it from

somebody else." M. Gutman Dep., p. 44, ln. 20-24, attached hereto as Exhibit "C." The record

shows that Dr. Gutman acted reasonably and according to professional standards with his

patients, although Debtors reported to the contrary. See M. Gutman Dep. at p. 46, ln. 14-18

(regarding the death of Manny Ruiz)("And I cut him down to no medicines at all and then he

goes into another doctor or gets another source for his drugs and he takes an overdose and I will

not accept at any point that I didn't handle Manny Ruiz in a very proper fashion.").

38.    Other patient deaths which Debtors linked to Dr. Gutman were also due to

circumstances beyond Dr. Gutman's control, however, Debtors never reported the full story.

Regarding the death of Richard Futchko, Dr. Gutman testified:

> [H]e had an elevated blood level of alcohol and therapeutic range Methadone,
> which was my medicine, so I don't know what I could have done because he
> was following my medical directions.
>
> Now, drinking and taking the drugs was not my medical directions, but that
> is a volitional act on a person acting to get high and drunk and the mixture of
> alcohol and two point two [2.2] – or two nine [2.9] level was – caused his death.

M. Gutman Dep. at p. 47, ln. 10-19, Exhibit "C".

39.    Dr. Gutman further testified that one of the deaths the Debtors linked to him, the

death of Earl Hanson in October of 2002, was due to the patient's suicide that was "totally

unpredicted," as the patient never showed any signs of being suicidal. M. Gutman Dep. at p. 58,

ln. 17-21.

13

40.    Plaintiff's experts provide further support for the Mrs. Gutman's probability for

success on the merits.  Plaintiff's journalism expert, Dr. Gail Baker McCarty, testified as follows

regarding the Debtors' articles concerning the Decedent:

> My opinion is that in these articles,  the two articles in November 30, 2003
> in the Orlando Sentinel, that the articles are written, the headline is written
> in such a way to assign blame for the deaths of people to Dr. Gutman, that
> the articles are framed in such a way as to portray him in a negative light,
> that there is use of inaccurate facts and there are inflammatory words, and
> there are – there is information that is not objective, and that there are – there
> is no balance – there is not balance in the sources in the way that the article –
> articles are written and that they lead the reader to a very specific opinion about
> Dr. Gutman and about his practice, and that that opinion is a negative impression.

Deposition of Dr. Gail Baker McCarty ("G. Baker Dep."), p. 33, ln. 9-23, attached hereto as

Exhibit "J."

41.    Dr. McCarty also testified regarding omissions and inaccuracies by the Debtors in

the articles concerning the Decedent:

> When [the reporter] says that Dr. Gutman surrendered his Medicaid certificate,
> surrendered indicates and implies to the reader that he was under some pressure
> and somebody asked for it.  In her notes she uses the term voluntarily surrendered
> but in the article it just says surrendered and so since it was voluntary in my mind,
> that's an error.  That's an inaccuracy.

G. Baker Dep. at p. 39, ln. 5-11, Exhibit "J."

> In the Rene Stutzman article, again, the headline, any time you talk about a doctor
> and died in the same sentence, that is negative in my opinion.  Then you go to the
> subhead that says he is under investigation by three state entities, which is then
> repeated in the actual caption of the photograph and is also in paragraph one, two,
> three of the story, so three times in a matter of a very short space his
> investigations are brought to the front of the story.  And while it is factual, by
> putting it so high at the top of the story and putting the headline and in the
> photograph, the inference is that he is under investigation for these deaths,
> which is not the case.

G. Baker Dep. at p. 56, ln. 4-16, Exhibit "J."

42.    Plaintiff's economist, Dr. James T. McClave, provides even further support for

14

Mrs. Gutman's "likelihood of success on the merits." In describing the basis for his economic loss projections for the Decedent, Dr. McClave testified as follows:

> I've got two assumptions there. I'm assuming that but for the defamation he would have – instead of seeing a 21 percent reduction in revenue, he would have managed a 10 percent increase, less than he did the year before but a 10 percent increase, and that he would have been able to make earnings equal to percentage-wise what he did in 2003.

Deposition of Dr. James T. McClave ("J. McClave Depo."), p. 84, ln. 25 – p. 85, ln. 5, attached hereto as Exhibit "K."

43.     Mrs. Gutman should prevail on the "success on the merits" prong of the analysis as "[o]nly strong defenses to state court proceedings can prevent a bankruptcy court from granting relief from the stay in cases where, as here, we believe that the decision-making process should be relegated to bodies other than this court." In re Rexene, 141 B.R. at 578, citing Fonseca v. Philadelphia Housing Authority (In re Fonseca), 110 B.R. 191, 196 (Bankr. E.D. Pa. 1990).

44.     The Parties have already completed considerable motion practice in the Florida Action, including motions to dismiss, motions for judgment on the pleadings and a motion for summary judgment. M. Socias Dep. at ¶ 6. Were Debtors able to establish the "strong defenses" to the Florida Action discussed in Rexene, they would have done so by now. Likewise, because this action involves personal injury claims of the Decedent, the "decision-making process" regarding Decedent's claims should remain before the Florida court.

## CONCLUSION

45.     Mrs. Gutman respectfully requests the Court grant her leave from the automatic stay so that she may bring the Florida Action to a expedient and final end. Mrs. Gutman has suffered tremendously due to the harm caused by the Debtors' articles concerning the Decedent.

15

This harm has manifested itself in several ways, including a substantial loss in income, the need to expend considerable funds to retain Florida and Delaware counsel, and ultimately with the loss of the Decedent.

46.     The burden to the Debtors, were the stay lifted, pails in comparison to the burden placed on Ms. Gutman were the stay to remain in place.  According to Debtors' Affidavit, Debtors operate eight (8) major market daily newspapers and are the nation's third largest newspaper publisher in terms of revenue. See Bigelow Aff. at ¶ 9.  Further, Debtors publish over 100 "niche" publications and operate 23 television stations. Id.  It should come as no surprise that a media company with operations as large as the Debtors are subject to various "media-related" lawsuits as described in Debtors' Objection.

47.     Debtors should not be permitted to use a bankruptcy proceeding such as this, commenced due to "substantial debt service requirements," to shield the Debtors from state court actions such as the one brought by the Decedent. Id. In the end, the Debtors are going to have to deal with the allegations arising from the Florida Action.  It would be a waste of judicial resources, as well as the resources of the parties, to require Mrs. Gutman to litigate the Florida Action claims in a Delaware court.  Equally important,  delaying the Florida Action (by not permitting it to go to trial now) will prejudice Mrs. Gutman as she has an uncertain financial future.

48.      Debtors' claims of prejudice were the stay lifted are questionable in light of the way in which Debtors have gone about defending the Florida Action.  Clearly, the Debtors are entitled to assemble a strong and effective defense team.  However, it is hard to appreciate Debtors' prejudice in the form of defense costs when the Debtors choose to staff Mrs. Gutman's two hour deposition with four attorneys, two of which were flown in from out of town.  The

16

Debtors' lack of prejudice is even more obvious when placed in context of Debtors' resources – Debtors' revenues for 2007 exceeded $5 billion.  See Bigelow Aff. at ¶ 9.

WHEREFORE,  Mrs. Gutman as representative of the Decedent, E. Michael Gutman, respectfully requests this Court lift the automatic stay so that she may proceed with the civil action captioned E. Michael Gutman, M.D., Mike Gutman, M.D. (MPAC), P.A. and Gutman Pain/Accident Center, Inc. a/k/a and/or d/b/a Back Pain Institute of Orlando v. Orlando Sentinel Communications Company, Tribune Company of Chicago a/k/a Tribune Company, Tribune Publishing Company, Sentinel Communications News Ventures, Inc. to trial.  Mrs. Gutman further asks this Court to grant her such other relief that this Court finds just and appropriate.

**FOX ROTHSCHILD LLP**

/s/ L. JASON CORNELL, ESQUIRE
L. Jason Cornell, Esquire (No. 3821)
919 North Market Street, Suite 810
Wilmington, DE  19899-2323
302/654-7444; 302/656-8920 (fax)

*Attorneys for Donna Gutman, Estate Representative of Plaintiff E. Michael Gutman, M.D., Mike Gutman, M.D. (MPAC), P.A. and Gutman Pain/Accident Center, Inc.*

Dated:  June 25, 2009

17

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that one (1) copy of the attached pleading was served this 25th day of June, 2009 upon the following individuals in the manner specified below:

**By Electronic Mail**

J. Kate Stickles, Esquire
Cole, Schotz, Meisel,
Forman & Leonard, P.A.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
kstickles@coleschotz.com

Guy S. Neal, Esquire
Sidley Austin LLP
1501 K. Street, N.W.
Washington, D.C. 20005
gneal@sidley.com

**FOX ROTHSCHILD LLP**

/s/ L. JASON CORNELL, ESQUIRE
L. Jason Cornell, Esquire (No. 3821)

18