**Exhibit A**

**Lease (without exhibits and schedules)**

RESTATED AGREEMENT OF LEASE

between

TWO PARK COMPANY,

Landlord

and

TRIBUNE COMPANY,

Tenant

Two Park Avenue
New York, New York

Proskauer Rose LLP
1585 Broadway
New York, New York 10036

## TABLE OF CONTENTS

Page

DEFINITIONS ........................................................................................ 1

ARTICLE 1   DEMISE, PREMISES, TERM, RENT ............................. 14

ARTICLE 2   USE AND OCCUPANCY ............................................... 16

ARTICLE 3   ALTERATIONS ............................................................... 17

ARTICLE 4   REPAIRS - FLOOR LOAD ............................................. 21

ARTICLE 5   WINDOW CLEANING ..................................................... 23

ARTICLE 6   REQUIREMENTS OF LAW ............................................ 23

ARTICLE 7   SUBORDINATION .......................................................... 25

ARTICLE 8   RULES AND REGULATIONS ........................................ 29

ARTICLE 9   INSURANCE, PROPERTY LOSS OR DAMAGE; REIMBURSEMENT .... 29

ARTICLE 10   DESTRUCTION - FIRE OR OTHER CAUSE ................ 32

ARTICLE 11   EMINENT DOMAIN ...................................................... 35

ARTICLE 12   ASSIGNMENT, SUBLETTING, MORTGAGE, ETC. ..... 37

ARTICLE 13   ELECTRICITY ............................................................... 53

ARTICLE 14   ACCESS TO PREMISES ............................................. 55

ARTICLE 15   CERTIFICATE OF OCCUPANCY ................................ 58

ARTICLE 16   DEFAULT ...................................................................... 58

ARTICLE 17   REMEDIES AND DAMAGES ....................................... 61

ARTICLE 18   FEES AND EXPENSES ............................................... 63

ARTICLE 19   NO REPRESENTATIONS BY LANDLORD .................. 63

ARTICLE 20  END OF TERM ........................................................ 64

ARTICLE 21  QUIET ENJOYMENT ................................................ 65

ARTICLE 22  FAILURE TO GIVE POSSESSION ............................ 65

ARTICLE 23  NO WAIVER .......................................................... 65

ARTICLE 24  WAIVER OF TRIAL BY JURY ................................ 66

ARTICLE 25  INABILITY TO PERFORM ...................................... 67

ARTICLE 26  BILLS AND NOTICES ............................................ 67

ARTICLE 27  ESCALATION ........................................................ 68

ARTICLE 28  SERVICES ............................................................ 77

ARTICLE 29  PARTNERSHIP TENANT ...................................... 81

ARTICLE 30  VAULT SPACE ...................................................... 82

ARTICLE 31  INTENTIONALLY OMITTED .................................. 82

ARTICLE 32  CAPTIONS ............................................................ 83

ARTICLE 34  BROKER .............................................................. 83

ARTICLE 35  INDEMNITY .......................................................... 83

ARTICLE 36  ADJACENT EXCAVATION-SHORING .................. 85

ARTICLE 37  MISCELLANEOUS ................................................ 85

ARTICLE 38  RENT CONTROL .................................................. 87

ARTICLE 39  RENTAL VALUE .................................................. 88

ARTICLE 40  INTERIOR IDENTIFICATION ................................ 90

ARTICLE 41  PARKING .............................................................. 91

ARTICLE 42  ANTENNA ............................................................ 91

4698/75979-010 NYLIB1/1401555 v9

Schedule A   -   Alteration Rules and Regulations
Schedule B   -   Building Holidays
Schedule C   -   Rules and Regulations
Schedule D   -   Overtime HVAC Rates
Schedule E   -   Cleaning Specifications
Schedule F   -   Property Description

Exhibit "A"   -   Basement Space
Exhibit "B"   -   Original Lease
Exhibit "C"   -   Space-8
Exhibit "D"   -   Space-9
Exhibit "E"   -   Space-10
Exhibit "F"   -   Space-11A
Exhibit "G"   -   Space-11B
Exhibit "H"   -   Space-11C
Exhibit "I"   -   Space-18A
Exhibit "J"   -   Space-18B

4698/75979-010 NYLIB1/1401555 v9

RESTATED AGREEMENT OF LEASE, made as of the 20th day of September, 2002, between Landlord and Tenant.

## W I T N E S S E T H :

WHEREAS, pursuant to the terms of the Original Lease, Landlord did demise and let unto Tenant's Predecessor, and Tenant's Predecessor did hire and take from Landlord certain portions of the Building inclusive of the Premises;

WHEREAS, the Original Lease was severed into three (3) separate leases pursuant to the terms of the Letter Agreement, which Letter Agreement contemplates that the Original Lease will be restated with respect to the Premises;

WHEREAS, Landlord and Tenant now desire to amend and restate the Original Lease, as severed with respect to the Premises by the Letter Agreement, in its entirety on the terms and conditions set forth herein, with this Lease being the New Tribune Lease as defined therein;

WHEREAS, Landlord and Tenant desire to make the terms of this Lease effective as of September 24, 2001; and

WHEREAS, Landlord and Tenant acknowledge that (i) the original Time4 Sublease included a portion of Space-8, and (ii) subsequent to September 24, 2001, but prior to the date hereof, the Time4 Sublease has been terminated with respect to the portion of Space-8 that formerly constituted a portion of the Time4 Space, and accordingly, the Time4 Space no longer includes any portion of Space-8.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and of the sum of Ten Dollars ($10.00) paid by Tenant to Landlord, and for other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, effective as of September 24, 2001, the parties hereto, for themselves, their legal representatives, successors and assigns, hereby agree as follows.

## DEFINITIONS

"Acceptable AOL-Time Entity" shall have the meaning set forth in Section 12.6(G) hereof.

"Additional Initial 11th Floor Alterations" shall have the meaning set forth in the October 1997 Lease Amendment.

4698/75979-010 NYLIB1/1401555 v9

"Additional Initial 11th Floor Alterations Tenant Fund" shall mean the amount of One Hundred Ninety-Seven Thousand Four Hundred Forty and 00/100 Dollars ($197,440.00) provided to Tenant's Predecessor in connection with the Additional Initial 11th Floor Alterations.

"Affiliate of Landlord" shall mean a corporation or other entity which shall (1) control, (2) be under the control of, or (3) be under common control with Landlord. As used herein, the term "control" shall have the meaning ascribed to it in the definition of Related Entity.

"Alteration Rules and Regulations" shall mean the rules and regulations with respect to the performance of Alterations attached hereto and made a part hereof as Schedule A and such other and further rules and regulations with respect to the performance of Alterations as Landlord or Landlord's agents may from time to time adopt on such notice to be given as Landlord may elect, subject to Tenant's right to dispute the reasonableness thereof as provided in Article 8 hereof.

"Alterations" shall mean alterations, installations, improvements, additions or other physical changes, (other than decorations) in or about the Premises whether such alterations, installations, improvements, additions or other physical changes are incorporated into the Premises by Tenant or Tenant's Predecessor.

"Antenna" shall have the meaning set forth in Section 42.1 hereof.

"Applicable Rate" shall mean the lesser of (x) two (2) percentage points above the then current Base Rate, and (y) the maximum rate permitted by applicable law.

"Appraiser" shall have the meaning set forth in Article 39 hereof.

"Assessed Valuation" shall have the meaning set forth in Section 27.1 hereof.

"Assignment Proceeds" shall have the meaning set forth in Section 12.8 hereof.

"Bankruptcy Code" shall mean 11 U.S.C. Section 101 et seq., or any statute of similar nature and purpose.

"Base Amounts" shall have the meaning set forth in Article 39 hereof.

"Base Electric Rate" shall mean the Cost Per Kilowatt Hour as of January 1, 1988.

"Base Operating Expenses" shall have the meaning set forth in Section 27.1 hereof.

"Base Premises" shall mean the Premises, exclusive of Space-18B.

"Base Rate" shall mean the rate of interest publicly announced from time to time by Chase Manhattan Bank, or its successor, as its "prime rate" (or such other term as may be used by Chase Manhattan Bank, from time to time, for the rate presently referred to as its "prime rate").

"Base Taxes" shall have the meaning set forth in Section 27.1 hereof.

"Basement Space" shall mean, subject to the provisions of Section 14.4 hereof, the portion of the basement of the Building as set forth on the floor plan attached hereto as Exhibit "A".

"Building" shall mean all the buildings, equipment and other improvements and appurtenances of every kind and description now located or hereafter erected, constructed or placed upon the land and any and all alterations, renewals, and replacements thereof, additions thereto and substitutions therefor, known by the address of 2 Park Avenue, New York, New York.

"Building Systems" shall mean the mechanical, electrical, sanitary, heating, air conditioning, ventilating, elevator, plumbing, life-safety and other service systems of the Building.

"Business Days" shall mean all days, excluding Saturdays, Sundays and all days observed by either the State of New York or the Federal Government and by the labor unions servicing the Building as legal holidays, which legal holidays, as of the date hereof, are the days set forth on Schedule B attached hereto and made a part hereof, it being understood and agreed that such legal holidays set forth on Schedule B may change from time to time during the Term hereof.

"Commencement Date" shall have the meaning set forth in Article 1 hereof.

"Consumer Price Index" shall mean the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, New York, N.Y. - Northeastern N.J. Area, All Items (1982-84 = 100), or any successor index thereto, appropriately adjusted. In the event that the Consumer Price Index is converted to a different standard reference base or otherwise revised, the determination of adjustments provided for herein shall be made with the use of such conversion factor, formula or table for converting the consumer Price Index as may be published by the Bureau of Labor Statistics or, if said Bureau shall not publish the same, then with the use of such conversion factor, formula or table as may be published by Prentice-Hall, Inc., or any other nationally recognized publisher of similar statistical information. If the Consumer Price Index ceases to be published, and there is no successor thereto, such other index as Landlord and Tenant shall agree upon in writing shall be substituted for the Consumer Price Index. If Landlord and Tenant are unable to agree as to such substituted index, such matter shall be submitted to the American Arbitration Association or any successor

organization for determination in accordance with the regulations and procedures thereof then obtaining for commercial arbitration.

"Control" shall have the meaning set forth in Section 12.4 hereof.

"Cost Per Kilowatt Hour" shall have the meaning set forth in Section 13.2 hereof.

"Current Year" shall have the meaning set forth in Section 27.4 hereof.

"December 1996 Lease Amendment" shall mean the Amendment of Lease, dated as of December 17, 1996, between Landlord and Times Mirror Company.

"Deficiency" shall have the meaning set forth in Section 17.2 hereof.

"Electric Rate" shall mean the Cost Per Kilowatt Hour from time to time throughout the Term of this Lease.

"Electricity Additional Rent" shall have the meaning set forth in Section 13.2 hereof.

"Electricity Inclusion Charge" shall have the meaning set forth in Section 13.3 hereof.

"Escalation Rent" shall mean the Tax Payment and Operating Payment, collectively.

"Event of Default" shall have the meaning set forth in Section 16.1 hereof.

"Expiration Date" shall mean (x) the Fixed Expiration Date or such earlier or later date on which the Term shall sooner or later end pursuant to any of the terms, conditions or covenants of this Lease or pursuant to law with respect to the Base Premises and (y) the Space-18B Expiration Date or such earlier date on which the Term shall sooner end pursuant to any of the terms, conditions or covenants of this Lease or pursuant to law with respect to Space-18B.

"Fair Market Rent" shall have the meaning set forth in Article 39 hereof.

"Fixed Expiration Date" shall have the meaning set forth in Section 1.1 hereof.

"Fixed Rent" shall have the meaning set forth in Section 1.1 hereof.

"Governmental Authority (Authorities)" shall mean the United States of America, the State of New York, the City of New York, any political subdivision thereof and any agency,

department, commission, board, bureau or instrumentality of any of the foregoing, now existing or hereafter created, having jurisdiction over the Real Property or any portion thereof.

"HVAC" shall mean heat, ventilation and air conditioning.

"HVAC Systems" shall mean the Building Systems providing HVAC.

"Indemnitees" shall mean the Landlord, its partners, shareholders, officers, directors, employees, agents and contractors.

"Initial Alterations" shall mean the alterations performed by Tenant's Predecessor to initially prepare Space-8 and the Basement Space for Tenant's Predecessor's occupancy.

"Initial 11th Floor Alterations" shall have the meaning set forth in the December 1996 Lease Amendment.

"Initial 11th Floor Alterations Tenant Fund" shall mean the amount of Two Hundred Sixty-Five Thousand Two Hundred Forty and 00/100 Dollars ($265,240.00) provided to Tenant's Predecessor in connection with the Initial 11th Floor Alterations.

"Initial 18th Floor Alterations" shall have the meaning set forth in the October 1996 Lease Amendment.

"Initial 18th Floor Alterations Tenant Fund" shall mean the amount of Three Hundred Fifty-Four Thousand Eight Hundred Eighty and 00/100 Dollars ($354,880.00) provided to Tenant's Predecessor in connection with the Initial 18th Floor Alterations.

"Landlord", on the date as of which this Lease is made, shall mean TWO PARK COMPANY, a New York partnership having an office c/o Vornado Office Management LLC, 888 Seventh Avenue, New York, New York 10019, but thereafter, "Landlord" shall mean only the fee owner of the Real Property or if there shall exist a Superior Lease, the tenant thereunder.

"Landlord's Determination" shall have the meaning set forth in Article 39 hereof.

"Lease" shall mean this Restated Agreement of Lease.

"Lessor(s)" shall mean a lessor under a Superior Lease.

"Letter Agreement" shall mean the letter agreement, dated September 21, 2001 between Landlord and Tenant.

"Long Lead Work" shall mean any item of a repair to Tenant's Alterations to be made by Landlord pursuant to Section 10.1 hereof which is not a stock item and must be specially

manufactured, fabricated or is installed or is a material or finish or is made of a material or finish, so that there is a substantial risk that there will be a delay in its manufacture, fabrication, delivery or installation, so that the item of repair in question would delay the completion of the standard items of the repair even though the items of Long Lead Work in question are (1) ordered together with the other items required for the repair and (2) then installed or performed (after the manufacture or fabrication thereof) in order and sequence that such Long Lead Work and other items of repair are normally installed or performed in accordance with good construction practice. If any item of Long Lead Work is delivered in a damaged or defective condition or is improperly manufactured and must be reshipped or redelivered, such items shall be deemed not to have been delivered and shall remain items of Long Lead Work. Notwithstanding the foregoing, if any item which would otherwise be Long Lead Work hereunder is actually delivered to the Premises for installation or performance in sufficient time for such item to be installed and performed in the order and sequence that such item and other items of work are normally installed and/or performed in accordance with good construction practice and scheduling, then such item shall not be deemed a Long Lead Work item. Tenant may, from time to time, suggest to Landlord a substitute for any item(s) of Long Lead Work. If Landlord agrees in writing to such substitution, then the substitute item(s) shall not constitute Long Lead Work, provided such substituted item would not otherwise constitute a Long Lead Work item.

"Mortgage(s)" shall mean any trust indenture or mortgage which may now or hereafter affect the Real Property, the Building or any Superior Lease and the leasehold interest created thereby, and all renewals, extensions, supplements, amendments, modifications, consolidations and replacements thereof or thereto, substitutions therefor, and advances made thereunder.

"Mortgagee(s)" shall mean any trustee, mortgagee or holder of a Mortgage.

"Mutual Determination" shall have the meaning set forth in Article 39 hereof.

"New Time4 Lease" shall have the meaning set forth in Section 12.6(G) hereof.

"Nondisturbance Agreement" shall have the meaning set forth in Section 7.1 hereof.

"October 1996 Lease Amendment" shall mean the Amendment of Lease, dated as of October 8, 1996, between Landlord and Times Mirror Company.

"October 1997 Lease Amendment" shall mean the Amendment of Lease, dated as of October 21, 1997, between Landlord and The Times Mirror Company.

"Office (offices)" shall mean any premises other than premises used as a store or stores for the sale or display, at any time, of goods, wares or merchandise, of any kind, or a restaurant, shop, booth, bootblack or other stand, barber shop, or for other similar purposes or for manufacturing.

"Operating Expenses" shall have the meaning set forth in section 27.1 hereof.

"Operating Payment" shall have the meaning set forth in Section 27.4 hereof.

"Operating Statement" shall have the meaning set forth in Section 27.1 hereof.

"Operating Year" shall have the meaning set forth in Section 27.1 hereof.

"Operation of the Property" shall mean the maintenance, repair and management of the Real Property or the Building and the curbs, sidewalks and areas adjacent thereto.

"Original Lease" shall mean, collectively, the leases set forth on Exhibit "B" attached hereto.

"Overtime Periods" shall have the meaning set forth in Section 28.3 hereof.

"Parties" shall have the meaning set forth in Section 37.2 hereof.

"Partnership Tenant" shall have the meaning set forth in Article 29 hereof.

"Person(s) or person(s)" shall mean any natural person or persons, a partnership, a corporation and any other form of business or legal association or entity.

"Premises" shall mean, subject to the provisions of Sections 14.4 and 12.6(G) hereof, collectively, Space-8, Space-9-10, Space-11A, Space-11B, Space-11C, Space-18A, Space-18B and the Basement Space.

"Prevailing Rate" shall have the meaning set forth in Section 12.6 hereof.

"Real Property" shall mean the Building, together with the plot of land upon which it stands.

"Recapture Space" shall have the meaning set forth in Section 12.6 hereof.

"Recapture Sublease" shall have the meaning set forth in Section 12.6 hereof.

"Related Entity" shall have the meaning set forth in Section 12.4 hereof.

"Rental" shall mean and be deemed to include Fixed Rent, Escalation Rent, all additional rent and any other sums payable by Tenant hereunder.

"Rental Value Period" shall have the meaning set forth in Section 1.1 hereof.

"Rent Commencement Date" shall mean October 1, 2001.

"Rent Notice" shall have the meaning set forth in Article 39 hereof.

"Rent Per Square Foot" shall have the meaning set forth in Section 12.7 hereof.

"Requirements" shall mean all present and future laws, rules, orders, ordinances, regulations, statutes, codes and executive orders, extraordinary as well as ordinary, of all Governmental Authorities now existing or hereafter created, and of any and all of their departments and bureaus, affecting the Real Property, or any street, avenue or sidewalk comprising a part of or in front thereof or any vault in or under the same, or requiring removal of any encroachment, or affecting the maintenance, use or occupation of the Real Property.

"Rules and Regulations" shall mean the rules and regulations attached hereto and made a part hereof as Schedule C, and such other and further rules and regulations as Landlord or Landlord's agents may from time to time adopt on such notice to be given as Landlord may elect, subject to Tenant's right to dispute the reasonableness thereof as provided in Article 8 hereof.

"Settlement Agreement" shall mean the Settlement Agreement, dated as of September 21, 2001, between Landlord and Tenant.

"Severed Leases" shall have the meaning set forth in the Letter Agreement.

"Short Term Sublease" shall have the meaning set forth in Section 12.6 hereof.

"Space Factor" shall mean (i) with respect to Space-8, Forty-Four Thousand Four Hundred Fifteen (44,415), (ii) with respect to Space-9-10, Eighty-Eight Thousand Five Hundred Seventy-Three (88,573), (iii) with respect to Space-11A, Three Thousand Eight Hundred Ninety-Two (3,892), (iv) with respect to Space-11B, One Hundred Five (105), (v) with respect to Space-11C, Seven Thousand Six Hundred Seventy-Five (7,675), (vi) with respect to Space-18A, Eight Thousand Eight Hundred Seventy-Two (8,872), (vii) with respect to Space-18B, Three Thousand Seven Hundred Thirty-One (3,731) and (viii) with respect to the Basement Space, One Thousand Eight Hundred Eighty-Six (1,886).

"Space-8" shall mean, subject to the provisions of Section 14.4 hereof, collectively, the portions of the eighth (8th) floor of the Building as set forth on the floor plan attached hereto as Exhibit "C".

"Space-8 Rental Value" shall have the meaning set forth in Section 39.1 hereof.

"Space-8 Op Share" shall mean Four and Nine Thousand Four Hundred Fifty-Seven ten-thousandths percent (4.9457%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-8 Tax Share" shall mean Four and Six Thousand Three Hundred Ninety ten-thousandths percent (4.6390%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-9" shall mean, subject to the provisions of Section 14.4 hereof, the portion of the ninth (9th) floor of the Building as set forth on the floor plan attached hereto as Exhibit "D".

"Space-9-10" shall mean, collectively, Space-9 and Space-10.

"Space-9-10 Rental Value" shall have the meaning set forth in Section 39.1 hereof.

"Space-9-10 Op Share" shall mean Nine and Eight Thousand Six Hundred Forty ten-thousandths percent (9.8640%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-9-10 Tax Share" shall mean Nine and Two Thousand Four Hundred Twenty ten-thousandths percent (9.2420%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-10" shall mean, subject to the provisions of Section 14.4 hereof, the portion of the tenth (10th) floor of the Building as set forth on the floor plan attached hereto as Exhibit "E".

"Space-11A" shall mean, subject to the provisions of Section 14.4 hereof, the portion of the eleventh (11th) floor of the Building marked as "A" on the floor plan attached hereto as Exhibit "F".

"Space-11A Op Share" shall mean Four Thousand Three Hundred Thirty-Four ten-thousandths percent (0.4334%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-11A Tax Share" shall mean Four Thousand Sixty-Five ten-thousandths percent (0.4065%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-11B" shall mean, subject to the provisions of Section 14.4 hereof, the portion of the eleventh (11th) floor of the Building marked as "B" on the floor plan attached hereto as Exhibit "G".

"Space-11B Op Share" shall mean One Hundred Twenty ten-thousandths percent (0.0120%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-11B Tax Share" shall mean One Hundred ten-thousandths percent (0.0100%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-11C" shall mean, subject to the provisions of Section 14.4 hereof, the portion of the eleventh (11th) floor of the Building marked as "C" on the floor plan attached hereto as Exhibit "H".

"Space-11C Op Share" shall mean Eight Thousand Five Hundred Forty-Six ten-thousandths percent (0.8546%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-11C Tax Share" shall mean Eight Thousand Seventeen ten-thousandths percent (0.8017%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-18A" shall mean, subject to the provisions of Section 14.4 hereof, the portions of the eighteenth (18th) floor of the Building marked as "A" on the floor plan attached hereto as Exhibit "I".

"Space-18A Op Share" shall mean Nine Thousand Eight Hundred Eighty ten-thousandths percent (0.9880%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-18A Tax Share" shall mean Nine Thousand Two Hundred Seventy ten-thousandths percent (0.9270%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-18B" shall mean, subject to the provisions of Section 14.4 hereof, the portion of the eighteenth (18th) floor of the Building marked as "B" on the floor plan attached hereto as Exhibit "J".

"Space-18B Expiration Date" shall have the meaning set forth in Section 1.1 hereof.

"Space-18B Op Share" shall mean Four Thousand One Hundred Sixty ten-thousandths percent (0.4160%), as the same may be increased or decreased pursuant to the terms hereof.

"Space-18B Tax Share" shall mean Three Thousand Nine Hundred ten-thousandths percent (0.3900%), as the same may be increased or decreased pursuant to the terms hereof.

"Specialty Alterations" shall mean Alterations consisting of kitchens, executive bathrooms, raised computer floors, computer installations, the Antenna, vaults, libraries with

reinforced floors, internal staircases, dumbwaiters, pneumatic tubes, theatres and auditoriums which, in either case, consist of more than one (1) story of the Premises, whether such Alterations are incorporated into the Premises by Tenant or Tenant's Predecessor.

"Sublease Expenses" shall have the meaning set forth in Section 12.7 hereof.

"Sublease Profit" shall have the meaning set forth in Section 12.7 hereof.

"Sublease Rent" shall have the meaning set forth in Section 12.7 hereof.

"Sublease Rent Per Square Foot" shall have the meaning set forth in Section 12.7 hereof.

"Sublease Statement" shall have the meaning set forth in Section 12.6 hereof.

"Substantial Completion" or "Substantially Completed" or terms of similar import shall mean with respect to Landlord's repair obligation pursuant to the provisions of Article 10 hereof, the completion of repairs and replacements to the Premises (excluding Specialty Alterations and Tenant's Property) to the condition existing immediately prior to the damage (except as otherwise expressly set forth in the last sentence of Section 10.1(A) hereof), except for Long Lead Work and minor details of construction and mechanical adjustment, the non-completion of which will not interfere (other than to a de minimis extent) with Tenant's use and occupancy of the Premises for Tenant's normal business purposes.

"Superior Lease(s)" shall mean all ground or underlying leases of the Real Property or the Building heretofore or hereafter made by Landlord and all renewals, extensions, supplements, amendments and modifications thereof.

"Taxes" shall have the meaning set forth in Section 27.1 hereof.

"Tax Credit" shall have the meaning set forth in Section 27.6 hereof.

"Tax Payment" shall have the meaning set forth in Section 27.2 hereof.

"Tax Statement" shall have the meaning set forth in Section 27.1 hereof.

"Tax Year" shall have the meaning set forth in Section 27.1 hereof.

"Tenant" on the date as of which this Lease is made, shall mean Tribune Company, a Delaware corporation, having an office at 435 North Michigan Avenue, Chicago, Illinois 60611, but thereafter "Tenant" shall mean only the tenant under this Lease at the time in question, including, without limitation, any Related Entity to whom this Lease shall have been assigned;

provided, however, that the originally named tenant shall not be released from liability hereunder in the event of any assignment of this Lease.

"Tenant Indemnitees" shall have the meaning set forth in Section 35.1 hereof.

"Tenant's Determination" shall have the meaning set forth in Article 39 hereof.

"Tenant Fund" shall mean the amount of One Million Six Hundred Forty-Four Thousand One Hundred Seventy-Seven and 60/100 Dollars ($1,644,177.60) provided to Tenant's Predecessor in connection with the Initial Alterations.

"Tenant's Operating Share" shall mean (i) with respect to Space-8, the Space-8 Op Share, (ii) with respect to Space-9-10, the Space-9-10 Op Share, (iii) with respect to Space-11A, the Space-11A Op Share, (iv) with respect to Space-11B, the Space-11B Op Share, (v) with respect to Space-11C, the Space-11C Op Share, (vi) with respect to Space-18A, the Space-18A Op Share and (vii) with respect to Space-18B, the Space-18B Op Share.

"Tenant's Predecessor" shall mean any predecessor-in-interest to Tenant as the tenant under the Original Lease.

"Tenant's Property" shall mean Tenant's movable fixtures and movable partitions, telephone and other equipment, furniture, furnishings, decorations and other items of personal property.

"Tenant's Tax Share" shall mean (i) with respect to Space-8, the Space-8 Tax Share, (ii) with respect to Space-9-10, the Space-9-10 Tax Share, (iii) with respect to Space-11A, the Space-11A Tax Share, (iv) with respect to Space-11B, the Space-11B Tax Share, (v) with respect to Space-11C, the Space-11C Tax Share, (vi) with respect to Space-18A, the Space-18A Tax Share and (vii) with respect to Space-18B, the Space-18B Tax Share.

"Tenant's Total Operating Share" shall mean the sum Tenant's Operating Share with respect to all portions of the Premises.

"Tentative Monthly Escalation Charge" shall have the meaning set forth in Section 27.4 hereof.

"Term" shall mean (x) a term which shall commence on the Commencement Date and shall expire on the Fixed Expiration Date with respect to the Base Premises and (y) a term which shall commence on the Commencement Date and shall expire on the Space-18B Expiration Date with respect to Space-18B.

"Terminated Space" shall have the meaning set forth in Section 12.6 hereof.

"Termination Date" shall have the meaning set forth in Section 12.6 hereof.

"Termination Notice" shall have the meaning set forth in Section 12.6 hereof.

"Three Month Average" shall have the meaning set forth in Section 13.3 hereof.

"Time4 Direct Tenant" shall have the meaning set forth in Section 12.6(G) hereof.

"Time4 Space" shall mean, subject to the provisions of Section 12.6(G) hereof, collectively, Space-9, Space-10, Space-11A, the Basement Space and a portion of Space-8; provided, however, that if pursuant to the terms of the Time4 Sublease, the Time4 Subtenant terminates the Time4 Sublease with respect to any such space, then from and after the effective date of such termination, the Time4 Space shall not include such space.

"Time4 Sublease" shall have the meaning set forth in Section 12.6(G) hereof.

"Time4 Subtenent" shall mean the subtenant under the Time4 Sublease.

"Tribune Space" shall mean the Premises, exclusive of the Time4 Space.

"Unavoidable Delays" shall have the meaning set forth in Article 25 hereof.

ARTICLE 1
DEMISE, PREMISES, TERM, RENT

Section 1.1   Landlord hereby leases to Tenant and Tenant hereby hires from Landlord (x) the Base Premises for the Term to commence on September 24, 2001 (the "Commencement Date") and to end on September 30, 2010 (the "Fixed Expiration Date") and (y) Space-18B for the Term to commence on the Commencement Date and to end on June 30, 2004 (the "Space-18B Expiration Date"), at an annual rent (the "Fixed Rent") of:

(A)   (1)   Nine Hundred Thirty-Two Thousand Seven Hundred Fifteen and 00/100 Dollars ($932,715.00) in respect of Space-8 during the period commencing on the Rent Commencement Date and ending on June 30, 2004 ($77,726.25 per month); and

(2)   an amount equal to the Space-8 Rental Value in respect of Space-8 during the period commencing on July 1, 2004 and ending on the Fixed Expiration Date (the "Rental Value Period");

(B)   (1)   One Million Eight Hundred Sixty Thousand Thirty-Three and 00/100 Dollars ($1,860,033.00) in respect of Space-9-10 during the period commencing on the Rent Commencement Date and ending on June 30, 2004 ($155,002.75 per month); and

(2)   an amount equal to the Space-9-10 Rental Value in respect of Space-9-10 during the Rental Value Period;

(C)   (1)   Ninety Thousand Four Hundred Ninety-Two and 89/100 Dollars ($90,492.89) in respect of Space-11A during the period commencing on the Rent Commencement Date and ending on November 6, 2002 ($7,541.07 per month);

(2)   One Hundred Two Thousand One Hundred Sixty-Eight and 89/100 Dollars ($102,168.89) in respect of Space-11A during the period commencing on November 7, 2002 and ending on November 6, 2007 ($8,514.07 per month); and

(3)   One Hundred Thirteen Thousand Eight Hundred Forty-One and 00/100 Dollars ($113,841.00) in respect of Space-11A during the period commencing on November 7, 2007 and ending on the Fixed Expiration Date ($9,486.75 per month);

(D)   (1)   Two Thousand Four Hundred Forty-One and 25/100 Dollars ($2,441.25) in respect of Space-11B during the period commencing on the Rent Commencement Date and ending on November 6, 2002 ($203.44 per month);

(2)   Two Thousand Seven Hundred Fifty-Six and 25/100 Dollars ($2,756.25) in respect of Space-11B during the period commencing on November 7, 2002 and ending on November 6, 2007 ($229.69 per month); and

       (3)    Three Thousand Seventy-One and 25/100 Dollars ($3,071.25) in respect of Space-11B during the period commencing on November 7, 2007 and ending on the Fixed Expiration Date ($255.94 per month);

    (E)   (1)    One Hundred Seventy-Six Thousand Five Hundred Twenty-Five and 00/100 Dollars ($176,525.00) in respect of Space-11C during the period commencing on the Rent Commencement Date and ending on the December 16, 2001 ($14,710.42 per month);

       (2)    One Hundred Ninety-Nine Thousand Five Hundred Fifty and 00/100 Dollars ($199,550.00) in respect of Space-11C during the period commencing on December 17, 2001 and ending on the December 16, 2006 ($16,629.17 per month); and

       (3)    Two Hundred Twenty-Two Thousand Five Hundred Seventy-Five and 00/100 Dollars ($222,575.00) in respect of Space-11C during the period commencing on December 17, 2006 and ending on the Fixed Expiration Date ($18,547.92 per month);

    (F)   (1)    Two Hundred Twelve Thousand Nine Hundred Twenty-Eight and 00/100 Dollars ($212,928.00) in respect of the Space-18A during the period commencing on the Rent Commencement Date and ending on the October 7, 2001 ($17,744.00 per month);

       (2)    Two Hundred Thirty-Nine Thousand Five Hundred Forty-Four and 00/100 Dollars ($239,544.00) in respect of Space-18A during the period commencing on October 8, 2001 and ending on the October 7, 2006 ($19,962 per month); and

       (3)    Two Hundred Seventy-Five Thousand Thirty-Two and 00/100 Dollars ($275,032.00) in respect of Space-18A during the period commencing on October 8, 2006 and ending on the Fixed Expiration Date ($22,919.33 per month);

    (G)    Ninety-Three Thousand Two Hundred Seventy-Five and 00/100 Dollars ($93,275.00) in respect of Space-18B during the period commencing on the Rent Commencement Date and ending on the Space-18B Expiration Date ($7,772.92 per month); and

    (H)    Twenty-Two Thousand Six Hundred Thirty-Two and 00/100 Dollars ($22,632.00) in respect of the Basement Space during the period commencing on the Rent Commencement Date and ending on the Fixed Expiration Date ($1,886.00 per month),

which Tenant agrees to pay in lawful money of the United States which shall be legal tender in payment of all debts and dues, public and private, at the time of payment, or by an unendorsed check of Tenant drawn on a bank or trust company which is a member of the New York Clearinghouse Association, in equal monthly installments in advance, on the first (1st) day of each calendar month during the Term commencing on the Commencement Date, at the office of Landlord or such other place as Landlord may designate, without any set-off, offset, abatement or

deduction whatsoever, except as otherwise provided herein and in Section 2 of the Letter Agreement.

## ARTICLE 2
### USE AND OCCUPANCY

Section 2.1    Tenant shall use and occupy the Premises as general and executive offices or any other lawful use in connection with the business of Tenant and any Related Entity (including newsgathering, reporting, editorial, art, promotion and other broadcasting and publishing functions), uses incidental thereto and for no other purpose, provided that Tenant's use and occupancy of the Premises as aforesaid shall at all times be subject to (i) Tenant's complying, at its sole cost and expense, with the certificate of occupancy issued for the Building and the Premises and all other Requirements applicable thereto, and (ii) Tenant's obtaining, at its sole cost and expense, all permits (including, without limitation, all public assembly permits), licenses and approvals required by any Governmental Authorities in connection therewith.

Section 2.2    (A)    Tenant shall not use the Premises or any part thereof, or permit the Premises or any part thereof to be used, (1) for the business of photographic, multilith or multigraph reproductions or offset printing, except in connection with, either directly or indirectly, Tenant's own business and/or activities, (2) for a banking, trust company, depository, guarantee or safe deposit business, (3) as a savings bank, savings and loan association, or as a loan company, (4) for the sale of travelers checks, money orders, drafts, foreign exchange or letters of credit or for the receipt of money for transmission, (5) as a stockbroker's or dealer's office or for the underwriting or sale of securities, (6) by the United States government, the City or State of New York, any foreign government, the United Nations or any agency or department of any of the foregoing, (7) as a restaurant or bar or for the sale of confectionery, soda or other beverages, sandwiches, ice cream or baked goods or for the preparation, dispensing or consumption of food or beverages in any manner whatsoever, except for consumption by Tenant's officers, employees and business guests, (8) as an employment agency, executive search firm or similar enterprise, labor union, school, or vocational training center (except for the training of employees of Tenant intended to be employed at the Premises), or (9) as a barber shop or beauty salon.

(B)    In connection with, and incidental to, Tenant's use of the Premises as provided in this Article 2, Tenant, at its sole cost and expense and upon compliance with all applicable Requirements, may use a portion of the Premises as a kitchen facility for the preparation and dispensing of food to its officers, employees and business guests (but not for use as a public restaurant), provided that in such case Tenant shall install all flues, hood washers, roto-clone fans, vents, grease traps and ansul systems and other similar items reasonably requested by Landlord, and provided further that Tenant shall obtain all permits required by any Governmental Authorities for the operation thereof. Tenant may also install vending machines for the exclusive use of the officers, employees and business guests of Tenant, each of which vending

4698/75979-010 NYLIB1/1401555 v9

16

machines (if it dispenses any beverages or other liquids or refrigerates) shall have a waterproof pan located thereunder, connected to a drain.

## ARTICLE 3
## ALTERATIONS

Section 3.1    (A)    Except as expressly provided herein, Tenant shall not make any Alterations without Landlord's prior consent. Landlord agrees not to unreasonably withhold or delay its consent to any proposed Alterations, provided that such Alterations (i) are not visible from the outside of the Building (excepting therefrom the Antenna), (ii) do not adversely affect any part of the Building other than the Premises, (iii) do not adversely affect any service required to be furnished by Landlord to Tenant or to any other tenant or occupant of the Building, (iv) do not adversely affect the proper functioning of any Building System, (v) do not affect the certificate of occupancy for the Building or the Premises, and (vi) do not adversely affect the structure, or any of the structural components, of the Building. The scope of Landlord's review and approval of any proposed Alterations and the review of Tenant's detailed plans and specifications shall be limited to the foregoing criteria and whether or not such proposed Alterations will comply with all applicable Requirements, provided, however, if Landlord shall consent to any Alterations, such consent shall not be deemed to be a representation or warranty to Tenant or any other Person that such Alterations comply or will comply with all applicable Requirements.

(B)    (1)    Prior to making any Alterations, Tenant shall (i) submit to Landlord detailed plans and specifications (including layout, architectural, mechanical and structural drawings) for each proposed Alteration and shall not commence any such Alteration without first obtaining Landlord's approval of such plans and specifications (except with respect to any Alteration referred to in Section 3.4 hereof for which Landlord's approval is not required), which, in the case of Alterations which meet the criteria set forth in Section 3.1(A) above, shall not be unreasonably withheld or delayed, (ii) at Tenant's expense, obtain all permits, approvals and certificates required by any Governmental Authorities, and (iii) furnish to Landlord duplicate original policies or certificates thereof of worker's compensation (covering all persons to be employed by Tenant, and Tenant's contractors and subcontractors in connection with such Alteration) and comprehensive public liability (including property damage coverage) insurance in such form, with such companies, for such periods and in such amounts as Landlord may reasonably approve, naming Landlord and its agents, any Lessor and any Mortgagee, as additional insureds. Upon completion of such Alteration, Tenant, at Tenant's expense, shall obtain certificates of final approval of such Alteration required by any Governmental Authority and shall furnish Landlord with copies thereof, together with the "as-built" plans and specifications for such Alterations. All Alterations shall be made and performed substantially in accordance with the plans and specifications therefor as approved by Landlord, all Requirements and the Alteration Rules and Regulations. All materials and equipment to be incorporated in the Premises as a result of any Alterations or a part thereof shall be first quality and no such materials or equipment (other

than Tenant's Property) shall be subject to any lien, encumbrance, chattel mortgage or title retention or security agreement (other than inchoate statutory, mechanic's and materialmen's liens, it being understood and agreed however, that should any such liens be filed against the Premises or the Real Property at any time, Tenant shall comply with the provisions of paragraph (E) of this Section 3.1 with respect to the discharge of same). In addition, no Alteration at a cost for labor and materials (as reasonably estimated by Landlord's architect, engineer or contractor) in excess of Three Hundred Twenty-Three Thousand Two Hundred Fifty and 00/100 Dollars ($323,250.00) (which amount shall be increased on each anniversary of the Commencement Date by the annual percentage increase, if any, in the Consumer Price Index from that in effect on the immediately preceding anniversary of the Commencement Date), either individually or in the aggregate with any other Alteration constructed in any twelve (12) month period, shall be undertaken prior to Tenant's delivering to Landlord either (i) a performance bond and labor and materials payment bond (issued by a surety company and in form reasonably satisfactory to Landlord), each in an amount equal to 110% of such estimated cost, or (ii) such other security as shall be reasonably satisfactory to Landlord, taking into consideration Tenant's financial condition at such time. All Alteration(s) requiring the consent of Landlord shall be performed only under the supervision of a licensed architect or licensed engineer.

(2)     If Landlord shall fail to disapprove Tenant's final plans and specifications for any Alteration within ten (10) Business Days or within five (5) Business Days (with respect to any resubmission of disapproved plans), after Landlord's receipt thereof (provided in each instance the same shall be of a scope and scale reasonably susceptible of review in such periods), Landlord shall be deemed to have approved such plans and specifications. Any disapproval given by Landlord shall be ineffective unless accompanied by a statement of the reason for such disapproval. Landlord reserves the right to disapprove any plans and specifications in part, to reserve approval of items shown thereon pending its review and approval of other plans and specifications, and to condition its approval upon Tenant making revisions to the plans and specifications or supplying additional information. Landlord shall not be deemed to be unreasonable with respect to withholding its consent to any proposed structural Alteration which meets the criteria set forth in Section 3.1(A) if the consent of any Lessor or Mortgagee, as the case may be, shall be required, Landlord shall have used its reasonable efforts to obtain such consent, and such Lessor or Mortgagee shall withhold its consent. Landlord agrees that the requirements set forth in any Mortgage or Superior Lease hereafter affecting the Real Property with respect to Alterations shall not be more onerous than the requirements which "institutional" lenders are then actually requiring in mortgages at such time with respect to mortgage loans being made to comparable owners of comparable first class office buildings in Manhattan. Tenant agrees that any review or approval by Landlord of any plans and/or specifications with respect to any Alteration is solely for Landlord's benefit, and without any representation or warranty whatsoever to Tenant or any other Person with respect to the adequacy, correctness or efficiency thereof or otherwise.

(C)     Tenant shall be permitted to perform Alterations during the hours of 8:00 A.M. to 6:00 P.M. on Business Days, provided that such work shall not unreasonably

interfere with or unreasonably interrupt the operation and maintenance of the Building or unreasonably interfere with or unreasonably interrupt the use and occupancy of the Building by other tenants for space in the Building. Otherwise, Alterations shall be performed at Tenant's expense and at such times and in such manner as Landlord may from time to time reasonably designate. The design and decoration of the elevator areas of each entire floor of the Premises demised to Tenant, occupied by more than one (1) occupant and having separate entranceways, and the public corridors of any such floor of the Premises, shall be consistent with the design and decoration of such areas as of the Commencement Date. Any alterations, installations, improvements, additions or other physical changes in or about such areas shall be deemed an Alteration hereunder and otherwise subject to the provisions of this Article 3. All Alterations in and to the Premises which may be made by Tenant at its own cost and expense (whether or not paid for in whole or in part from the Tenant Fund, the Additional Initial 11th Floor Alterations Tenant Fund, the Initial 11th Floor Alterations Tenant Fund, or the Initial 18th Floor Alterations Tenant Fund, as the case may be) prior to and during the Term, shall remain the property of Tenant, and upon the Expiration Date or earlier end of the Term, the Alterations may be abandoned or removed from the Premises by Tenant at Tenant's option. All Tenant's Property shall remain the property of Tenant, and upon the Expiration Date or earlier end of the Term, shall be removed by Tenant from the Premises. Tenant shall repair and restore in a good and workerlike manner to good condition, reasonable wear and tear excepted, any material damage to the Premises and any damage other than immaterial damage to the Building caused by such removal; it being understood and agreed that Tenant shall have no other obligation to repair or restore the Premises pursuant to this Article 3, except as set forth in the immediately succeeding sentence. Notwithstanding the foregoing, however, Landlord, upon notice given at least thirty (30) days prior to the Expiration Date or upon such shorter notice as is reasonable under the circumstances upon the earlier expiration of the Term, may require Tenant to remove any Specialty Alterations other than kitchens, executive bathrooms, raised computer floors and computer installations, and to repair and restore in a good and workerlike manner to good condition, reasonable wear and tear excepted, any material damage to the Premises and any damage other than immaterial damage to the Building caused by such removal; it being understood and agreed that Tenant shall have no other obligation to repair and restore the Premises pursuant to this Article 3, except as set forth in the immediately preceding sentence

(D)    (1)    All Alterations shall be performed by Landlord's contractor(s) or by contractors, subcontractors or mechanics approved by Landlord (which approval shall not be unreasonably withheld or delayed), at Tenant's expense. Prior to making an Alteration, at Tenant's request, Landlord shall furnish Tenant with a list of contractors who may perform Alterations to the Premises on behalf of Tenant. If Tenant engages any contractor set forth on the list, Tenant shall not be required to obtain Landlord's consent for such contractor unless, prior to the submission of such work for bid, the entering into of a contract with such contractor or the commencement of work by the contractor, Landlord shall notify Tenant that such contractor has been removed from the list.

(2)    Notwithstanding the foregoing, with respect to any Alteration affecting any Building System, (i) Tenant shall select a contractor from a list of approved contractors furnished by Landlord to Tenant (containing at least three contractors), and (ii) the Alteration shall, at Tenant's cost and expense, be designed by Tenant's engineer and reviewed and approved by Landlord's engineer for the relevant Building System.

(E)    Any mechanic's lien filed against the Premises or the Real Property for work claimed to have been done for, or materials claimed to have been furnished to, Tenant shall be discharged by Tenant within twenty-five (25) days after Tenant shall have received notice thereof, at Tenant's expense, by payment or filing the bond required by law. Tenant shall not, at any time prior to or during the Term, directly or indirectly employ, or permit the employment of, any contractor, mechanic or laborer in the Premises, whether in connection with any Alteration or otherwise, if such employment would interfere or cause any conflict with other contractors, mechanics or laborers engaged in any construction, maintenance or operation of the Building by Landlord, Tenant or others. In the event of any such interference or conflict, Tenant, upon demand of Landlord, shall cause its contractors, mechanics or laborers to leave the Building as soon as reasonably practicable, if its contractors, mechanics or laborers are causing such interference or conflict. At Tenant's request and at Tenant's sole cost and expense, Landlord shall use its best efforts to assist Tenant in connection with any labor interference or conflict at the Building, provided Landlord shall not be obligated to incur any expense or suffer any liability in connection therewith. If such interference or conflict is being caused by the contractors, mechanics or laborers of Landlord or of another tenant of the Building, Landlord shall cause its contractors, mechanics or laborers or shall cause such other tenant to cause its contractors, mechanics or laborers, as the case may be, to leave the Building as soon as reasonably practicable.

Section 3.2    Intentionally omitted.

Section 3.3    Landlord, at Tenant's expense, and upon the request of Tenant, shall join in any applications for any permits, approvals or certificates required to be obtained by Tenant in connection with any Alteration (provided that the provisions of the applicable Requirement shall require that Landlord join in such application) and shall otherwise cooperate with Tenant in connection therewith, provided that Landlord shall not be obligated to incur any cost or expense or suffer any liability in connection therewith.

Section 3.4    Anything contained in this Lease to the contrary notwithstanding, Landlord's consent shall not be required with respect to any nonstructural Alteration, provided that such Alterations (i) do not affect the outside of the Building, (ii) do not affect any part of the Building other than the Premises, (iii) do not adversely affect any service required to be furnished by Landlord to any other tenant or occupant of the Building, (iv) do not adversely affect the proper functioning of any Building System, (v) do not affect the certificate of occupancy issued for the Building or the Premises, and (vi) the estimated cost of the labor and materials for which shall not exceed One Hundred Sixty-One Thousand Six Hundred Twenty-Five and 00/100 Dollars ($161,625.00), which amount shall be increased on each anniversary of the Commencement Date

by the annual percentage increase, if any, in the Consumer Price Index from that in effect on the immediately preceding anniversary of the Commencement Date, either individually or in the aggregate with other nonstructural Alterations constructed within any twelve (12) month period; provided, however, that at least ten (10) days prior to making any such nonstructural Alteration, Tenant shall submit to Landlord for informational purposes only the plans and specifications for such Alteration, and any such Alteration shall otherwise be performed in compliance with the provisions of this Article 3.

## ARTICLE 4
## REPAIRS - FLOOR LOAD

Section 4.1    Landlord shall operate, maintain and make all necessary repairs (both structural and non-structural) to the part of Building Systems serving the Premises, but not to the distribution portions of such Building Systems located within the Premises, and the public portions of the Building, both exterior and interior in conformance with standards applicable to non-institutional first-class office buildings in Manhattan. Tenant, at Tenant's sole cost and expense, shall take good care of the Premises and the fixtures, equipment and appurtenances therein and make all non-structural repairs thereto as and when needed to preserve them in good working order and condition, except for reasonable wear and tear, obsolescence and damage for which Tenant is not responsible pursuant to the provisions of Article 10 hereof. All elevator areas of each entire floor of the Premises demised to Tenant, occupied by more than one (1) occupant and having separate entranceways, and the public corridors of any such floor of the Premises, shall be maintained to Landlord's reasonable satisfaction. Notwithstanding the foregoing, all damage or injury to the Premises or to any other part of the Building, or to its fixtures, equipment and appurtenances, whether requiring structural or non-structural repairs, caused by or resulting from carelessness, omission, neglect or improper conduct of, or Alterations made by, Tenant, Tenant's agents, employees, invitees or licensees, shall be repaired at Tenant's sole cost and expense (to the extent that any insurance proceeds are inadequate therefor), by Tenant to the reasonable satisfaction of Landlord (if the required repairs are non-structural in nature and do not affect any Building System), or by Landlord (if the required repairs are structural in nature or affect any Building System). Tenant also shall repair all damage to the Building and the Premises caused by the moving of Tenant's Property. All of the aforesaid repairs shall be of first quality and class consistent with non-institutional first-class office building work or construction and shall be made in accordance with the provisions of Article 3 hereof. If Tenant fails after ten (10) days' notice (or such shorter period as may be required due to an emergency) to proceed with due diligence to make repairs required to be made by Tenant, the same may be made by Landlord at the expense of Tenant, and the expenses thereof incurred by Landlord, with interest thereon at the Applicable Rate, shall be forthwith paid to Landlord as additional rent after rendition of a bill or statement therefor. Tenant shall give Landlord prompt notice of any defective condition in any Building System, located in, servicing or passing through the Premises of which it has actual knowledge, it being understood that Tenant shall have no affirmative independent obligation to inspect the Premises to ascertain whether any defective condition exists.

Section 4.2    Tenant shall not place a load upon any floor of the Premises exceeding one hundred twenty (120) pounds per square foot "live load." Tenant shall not move any heavy safe, heavy machinery, heavy equipment, heavy freight, bulky matter or heavy fixtures into or out of the Building without Landlord's prior consent, which consent shall not be unreasonably withheld, and shall make payment to Landlord of Landlord's actual and reasonable out-of-pocket costs in connection therewith (if such move is not part of an Alteration). If such safe, machinery, equipment, freight, bulky matter or fixtures requires special handling (i.e., must be hoisted into the Premises from the outside of the Building), Tenant shall employ only persons holding a Master Rigger's license to do said work. All work in connection therewith shall comply with all Requirements and the Alteration Rules and Regulations, and shall be performed during such hours as Landlord may reasonably designate. Business machines and mechanical equipment shall be placed and maintained by Tenant at Tenant's expense in settings sufficient in Landlord's reasonable judgment to absorb and prevent vibration, noise and annoyance. Except as expressly provided in this Lease, there shall be no allowance to Tenant for a diminution of rental value and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from Landlord, Tenant or others making, or failing to make, any repairs, alterations, additions or improvements in or to any portion of the Building or the Premises, or in or to fixtures, appurtenances or equipment thereof.

Section 4.3    Landlord shall proceed with due diligence and use its reasonable efforts to minimize interference with Tenant's use and occupancy of the Premises in making any repairs, alterations, replacements, additions or improvements; provided, however, that Landlord shall have no obligation to employ contractors or labor at so-called overtime or other premium pay rates or to incur any other over-time costs or expenses whatsoever, except that Landlord, at its expense (but subject to recoupment pursuant to Article 27 hereof), shall employ contractors or labor at so-called overtime or other premium pay rates if necessary to make any repair required to be made by it hereunder to remedy any condition that either (i) results in a denial of access to the Premises, (ii) threatens the health or safety of any occupant of the Premises, or (iii) except in the case of a fire or other casualty, materially interferes with Tenant's ability to conduct its business in the Premises, or the portion of the Premises affected thereby. In addition, notwithstanding the foregoing, Landlord shall perform, or cause to be performed, any alterations or improvements which shall be for the sole benefit of another tenant or occupant of the Building and with respect to which Landlord must enter the Premises or any portion thereof, with contractors or labor during the hours of 6:00 P.M. and 8:00 A.M. on Business Days and at any hours on days other than Business Days. In all other cases, at Tenant's request, Landlord shall proceed with due diligence and shall employ contractors or labor at so-called overtime or other premium pay rates and incur any other overtime costs or expenses in making any repairs, alterations, additions or improvements, and Tenant shall pay to Landlord, as additional rent, within ten (10) Business Days after demand, an amount equal to the difference between the overtime or other premium pay rates and the regular pay rates for such labor.

# ARTICLE 5
## WINDOW CLEANING

Tenant shall not clean, nor require, permit, suffer or allow any window in the Premises to be cleaned from the outside in violation of Section 202 of the Labor Law, or any other applicable law, or of the rules of the Board of Standards and Appeals, or of any other board or body having or asserting jurisdiction.

# ARTICLE 6
## REQUIREMENTS OF LAW

Section 6.1    (A)    Tenant, at its sole expense, shall comply with all Requirements applicable to the use and occupancy of the Premises by Tenant, including, without limitation, the making of any Alterations therein or the result of the making thereof, except that (other than with respect to the making of Alterations or the result of the making thereof) Tenant shall not be under any obligation to make any Alterations in order to comply with any Requirement applicable to the general use of space in the Building by tenants for offices (as opposed to the particular manner of use by Tenant under this Lease) of the Premises, unless otherwise expressly required herein, but nevertheless shall be obligated to comply with such Requirements, subject to Tenant's right to contest such Requirements pursuant to Section 6.2 hereof. Tenant shall not do or permit to be done any act or thing upon the Premises which will invalidate a standard "all-risk" insurance policy; and shall not do, or permit anything to be done in or upon the Premises, or bring or keep anything therein, except as now or hereafter permitted by the New York City Fire Department or other Governmental Authority having jurisdiction and then only in such quantity and manner of storage as not to increase the rate for fire insurance applicable to the Building, or use the Premises in a manner (as opposed to mere use as general "offices") which, in either case, shall increase the rate of fire insurance on the Building or on property located therein, over that in similar type buildings or in effect on the Commencement Date. If by reason of Tenant's failure to comply with the provisions of this Article, the fire insurance rate shall be higher than it otherwise would be, then Tenant shall desist from doing or permitting to be done any such act or thing and shall reimburse Landlord, as additional rent hereunder, for that part of all fire insurance premiums thereafter paid by Landlord which shall have been charged because of such failure by Tenant, and shall make such reimbursement within ten (10) Business Days after demand by Landlord. In any action or proceeding wherein Landlord and Tenant are parties, a schedule or "make up" of rates for the Building or the Premises issued by the New York Fire Insurance Rating Organization, or other body fixing such fire insurance rates, shall be evidence of the facts therein stated and of the several items and charges in the fire insurance rates then applicable to the Building.

(B)    Landlord, at its sole cost and expense (but subject to recoupment as provided in Article 27 hereof), shall comply with all other Requirements applicable to the

Premises and the Building, subject to Landlord's right to contest the applicability or legality thereof.

Section 6.2    Tenant, at its sole cost and expense and after notice to Landlord, may contest by appropriate proceedings prosecuted diligently and in good faith, the legality or applicability of any Requirement affecting the Premises provided that (a) Landlord (or any Indemnitee) shall not be subject to imprisonment or to prosecution for a crime which might result in imprisonment, nor shall the Real Property or any part thereof be subject to being condemned or vacated, nor shall the certificate of occupancy for the Premises or the Building be suspended or threatened to be suspended by reason of such non-compliance or by reason of such contest; (b) before the commencement of such contest, if Landlord or any Indemnitee may be subject to any civil fines or penalties or other criminal penalties as a result of such non-compliance then Tenant shall furnish to Landlord either (i) a bond of a surety company satisfactory to Landlord, in form and substance reasonably satisfactory to Landlord, and in an amount at least equal to one hundred twenty percent (120%) of (A) the cost of such compliance, (B) the criminal or civil penalties or fines that may accrue by reason of such non-compliance (as reasonably estimated by Landlord), and (C) the amount of such liability to independent third parties and shall indemnify Landlord (and any Indemnitee) against the cost of such compliance and liability resulting from or incurred in connection with such contest or non-compliance, (except that Tenant shall not be required to furnish such bond to Landlord if it has otherwise furnished any similar bond required by law to the appropriate Governmental Authority and has named Landlord as a beneficiary thereunder), or (ii) other security reasonably satisfactory in all respects to Landlord taking into consideration Tenant's financial condition at such time; (c) such non-compliance or contest shall not, if done by Landlord, constitute or result in a violation (either with the giving of notice or the passage of time or both) of the terms of any Mortgage or Superior Lease, or if pursuant to the terms of any Superior Lease or Mortgage, Landlord would be required to take any action or fur-nish any security as a condition of such non-compliance or contest by Landlord, such action shall be taken or such security shall be furnished by and at the expense of Tenant; and (d) Tenant shall keep Landlord regularly advised as to the status of such proceedings. Without limiting the applicability of the foregoing, Landlord (or any Indemnitee) shall be deemed subject to prosecution for a crime if Landlord (or any Indemnitee), a Lessor, a Mortgagee or any of their officers, directors, partners, shareholders, agents or employees is charged with a crime of any kind whatsoever unless such charges are withdrawn ten (10) days before Landlord (or any Indemnitee), such Lessor or such Mortgagee or such officer, director, partner, shareholder, agent or employee, as the case may be, is required to plead or answer thereto.


ARTICLE 7
SUBORDINATION

Section 7.1    (A)    Provided that (a) a Mortgagee shall execute and deliver to Tenant an agreement in recordable form to the effect that, if there shall be a foreclosure of its Mortgage or any other action is brought to enforce its rights thereunder, such Mortgagee will not

make Tenant a party defendant to such foreclosure or other action, evict Tenant, disturb Tenant's possession under this Lease, or terminate or disturb Tenant's leasehold estate or rights hereunder provided no Event of Default has occurred and is continuing hereunder, and provided further that Tenant shall agree, at the election and upon demand of such Mortgagee, to attorn to such Mortgagee upon the then executory terms and conditions of this Lease (subject to the provisions hereinafter set forth) for the remainder of the Term, or (b) a Lessor shall execute and deliver to Tenant an agreement in recordable form to the effect that if its Superior Lease shall terminate or be terminated for any reason, Lessor will recognize Tenant as the direct Tenant of such Lessor on the same terms and conditions as are contained in this Lease (subject to the provisions hereinafter set forth) provided no Event of Default shall have occurred and is continuing and Lessor shall not make Tenant a party in any action to terminate such Superior Lease or to remove or evict Tenant from the Premises provided no Event of Default shall have occurred and is continuing, and provided further that Tenant shall agree, at the election and upon demand of such Lessor, to attorn to such Lessor upon the then executory terms and conditions of this Lease (subject to the provisions hereinafter set forth) for the remainder of the Term as if such Lessor were the Landlord hereunder (any such agreement, or any agreement of similar import, from a Mortgagee or a Lessor, as the case may be, being hereinafter called a "Nondisturbance Agreement"); this Lease shall be subject and subordinate to such Superior Lease or to such Mortgage, and to all renewals, extensions, supplements, amendments, modifications, consolidations and replacements thereof or thereto, substitutions therefor, and advances made thereunder. This clause shall be self-operative and no further instrument of subordination shall be required to make the interest of any Lessor or Mortgagee superior to the interest of Tenant hereunder; however, Tenant shall execute and deliver promptly the Nondisturbance Agreement or any certificate that Landlord may request in confirmation of such subordination. If the date of expiration of any Superior Lease shall be the same day as the Expiration Date, the Term shall end and expire twelve (12) hours prior to the expiration of the Superior Lease. If, in connection with the financing of the Real Property, the Building or the interest of the lessee under any Superior Lease, or if in connection with the entering into of a Superior Lease, any lending institution or Lessor shall request reasonable modifications of this Lease that do not increase the monetary obligations of Tenant hereunder, or adversely affect or diminish the rights or increase the other obligations of Tenant under this Lease other than to a de minimis extent, Tenant shall make such modifications.

(B)    Any Nondisturbance Agreement may be made on the condition that neither the Mortgagee nor the Lessor, as the case may be, nor anyone claiming by, through or under such Mortgagee or Lessor, as the case may be, including a purchaser at a foreclosure sale, shall be:

(1)    liable for any act or omission of any prior landlord (including, without limitation, the then defaulting Landlord), or

(2)    subject to any claims, defenses or offsets which Tenant may have against any prior landlord (including, without limitation, the then defaulting Landlord), or

(3)     bound by any payment of Rental in advance of its due date which Tenant may have against any prior landlord (including, without limitation, the then defaulting Landlord), or

(4)     bound by any obligation to perform any work or to make improvements to the Premises, except for (i) repairs and maintenance pursuant to the provisions of Article 4 hereof, (ii) repairs to the Premises or any part thereof as a result of damage by fire or other casualty pursuant to Article 10 hereof, and (iii) repairs to the Premises as a result of a partial condemnation pursuant to Article 11 hereof, but only to the extent that such repairs can be reasonably made from the net proceeds of any award made available to Landlord or such Lessor or Mortgagee, or

(5)     bound by any amendment or modification of this Lease made without its consent (to the extent such consent is required under the Superior Lease or Mortgage, as the case may be, and Tenant had advance notice of such consent requirement) or

(6)     bound to return Tenant's security deposit, if any, until such deposit has come into its actual possession and Tenant would be entitled to such security deposit pursuant to the terms of this Lease.

Notwithstanding the fact that the succession to the rights of Landlord under this Lease by a Mortgagee or Lessor or anyone claiming by, through or under such Mortgagee or Lessor, as the case may be, shall not render such successor Landlord liable for the acts or omissions of any prior landlord as set forth in clause (1) above, or subject to any claims, defenses or offsets which Tenant may have against any prior Landlord as set forth in clause (2) above, neither such non-liability nor such freedom from claims, defenses or offsets shall in any way diminish Tenant's rights hereunder with respect to the continuing failure of such successor landlord to perform the obligations of Landlord under this Lease, including, without limitation, any such obligations which arose or accrued prior to the time such Lessor or Mortgagee or anyone claiming by, through or under such Lessor or Mortgagee shall have become Landlord under this Lease from and after a reasonable period of time during which such failure could have been cured after the date on which such Lessor or Mortgage or anyone claiming by, through or under such Lessor or Mortgagee becomes Landlord hereunder.

(C)     If required by the Mortgagee or the Lessor, Tenant promptly shall join in any Nondisturbance Agreement to indicate its concurrence with the provisions thereof and its agreement set forth in Section 7.3 hereof to attorn to such Mortgagee or Lessor, as the case may be, as Tenant's landlord hereunder. Tenant shall promptly so accept, execute and deliver any Nondisturbance Agreement proposed by any such Mortgagee or Lessor which conforms with the provisions of this Article 7. Any such Nondisturbance Agreement may also contain other terms and conditions as may otherwise be required by such Mortgagee or Lessor, as the case may be, which do not increase Tenant's monetary obligations under this Lease or adversely affect or

diminish the rights or increase the other obligations of Tenant under this Lease other than to a _de minimis_ extent.

(D)    Landlord hereby represents to Tenant that as of the date hereof, there are no Mortgages or Superior Leases affecting the Building.

Section 7.2    Tenant hereby irrevocably waives any and all right(s) it may have in connection with any zoning lot merger or transfer of development rights with respect to the Real Property including, without limitation, any rights it may have to be a party to, to contest, or to execute, any Declaration of Restrictions (as such term is defined in Section 12-10 of the Zoning Resolution of The City of New York effective December 15, 1961, as amended) with respect to the Real Property, which would cause the Premises to be merged with or unmerged from any other zoning lot pursuant to such Zoning Resolution or to any document of a similar nature and purpose, and Tenant agrees that this Lease shall be subject and subordinate to any Declaration of Restrictions or any other document of similar nature and purpose now or hereafter affecting the Real Property. In confirmation of such subordination and waiver, Tenant shall execute and deliver promptly any certificate or instrument that Landlord reasonably may request.

Section 7.3    If at any time prior to the expiration of the Term, any Superior Lease shall terminate or be terminated for any reason or any Mortgagee comes into possession of the Real Property or the Building or the estate created by any Superior Lease by receiver or otherwise, Tenant agrees, at the election and upon demand of any owner of the Real Property or the Building, or of the Lessor, or of any Mortgagee in possession of the Real Property or the Building, to attorn, from time to time, to any such owner, Lessor or Mortgagee or any person acquiring the interest of Landlord as a result of any such termination, or as a result of a foreclosure of the Mortgage or the granting of the deed in lieu of foreclosure, upon the then executory terms and conditions of this Lease, subject to the provisions of Section 7.1 hereof, for the remainder of the Term, provided that such owner, Lessor or Mortgagee, as the case may be, or receiver caused to be appointed by any of the foregoing, shall then be entitled to possession of the Building or the Real Property. This Lease shall not terminate by reason of the termination of any Superior Lease without the prior written consent of the Mortgagee of the Mortgage which is a first mortgage on Landlord's interest in the Real Property. The provisions of Section 7.1 hereof and of this Section 7.3 shall enure to the benefit of any such owner, Lessor or Mortgagee, shall apply notwithstanding that, as a matter of law, this Lease may terminate upon the termination of any such Superior Lease, and shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions. Tenant, however, upon demand of any such owner, Lessor or Mortgagee, shall execute, from time to time, instruments in confirmation of the provisions of Section 7.1 hereof and of this Section 7.3, satisfactory to any such owner, Lessor or Mortgagee, acknowledging such attornment and setting forth the terms

and conditions of its tenancy. Nothing contained in this Section 7.3 shall be construed to (i) impair any right otherwise exercisable by any such owner, Lessor or Mortgagee, or (ii) affect any of Tenant's rights pursuant to any Nondisturbance Agreement.

Section 7.4    If requested by any Mortgagee, any Lessor or Landlord, Tenant agrees to promptly execute and deliver at its own cost and expense any Nondisturbance Agreement, in recordable form, to evidence such subordination.

Section 7.5    From time to time, within ten (10) Business Days next following request by Landlord, any Mortgagee or any Lessor, but not more frequently than four (4) times in any twelve (12) month period, Tenant shall deliver to Landlord, such Mortgagee or such Lessor a written statement executed by Tenant, in form reasonably satisfactory to Landlord, such Mortgagee or such Lessor, (1) stating that this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (2) setting forth the date to which the Fixed Rent, additional rent and other items of Rental have been paid, (3) stating whether or not, to the best knowledge of Tenant (but without having made any investigation), Landlord is in default under this Lease, and, if Landlord is in default, setting forth the specific nature of all such defaults, and (4) as to any other matters reasonably requested by Landlord, such Mortgagee or such Lessor and related to this Lease. Tenant acknowledges that any statement delivered pursuant to this Section 7.5 may be relied upon by any purchaser or owner of the Real Property or the Building, or Landlord's interest in the Real Property or the Building or any Superior Lease, or by any Mortgagee, or by an assignee of any mortgage, or by any Lessor.

Section 7.6    From time to time, within ten (10) Business Days next following request by Tenant but not more frequently than four (4) times in any twelve (12) month period, Landlord shall deliver to Tenant a written statement executed by Landlord (i) stating that this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (ii) setting forth the date to which the Fixed Rent, all additional rent and any other items of Rental have been paid, (iii) stating whether or not, to the best knowledge of Landlord (but without having made any investigation), Tenant is in default under this Lease, and, if Tenant is in default, setting forth the specific nature of all such defaults, and (iv) as to any other matters reasonably requested by Tenant and related to this Lease.

Section 7.7    As long as any Superior Lease or Mortgage shall exist, Tenant shall not seek to terminate this Lease by reason of any act or omission of Landlord until Tenant shall have given written notice of such act or omission to all Lessors and Mortgagees at such addresses as shall have been furnished to Tenant by such Lessors and Mortgagees reasonably in advance and, if any such Lessor or Mortgagee, as the case may be, shall have notified Tenant within ten (10) Business Days following receipt of such notice of its intention to remedy such act or omission, until a reasonable period of time shall have elapsed following the giving of such notice, but not to exceed thirty (30) days unless (i) such act or omission is incapable of cure within such period and such Lessors or Mortgagees shall have commenced and shall thereafter diligently prosecute to completion the remedy of such act or omission, or (ii) such Lessor or Mortgagee is

unable to gain access to any portion of the Premises required for such remedy, in which event such period shall not commence until such Lessor or Mortgagee shall be able to gain access, provided such Lessor or Mortgagee shall use reasonable efforts to gain such access.

## ARTICLE 8
## RULES AND REGULATIONS

Tenant and Tenant's contractors, employees, agents, visitors and licensees shall comply with the Rules and Regulations and the Alteration Rules and Regulations. If Tenant disputes the reasonableness of any additional Rule or Regulation or Alteration Rule or Regulation hereafter adopted by Landlord, the dispute shall be determined by arbitration in the City of New York in accordance with the rules and regulations then obtaining of the American Arbitration Association or its successor. Any such determination shall be final and conclusive upon the parties hereto. The right to dispute the reasonableness of any additional Rule or Regulation or Alteration Rule or Regulation upon Tenant's part shall be deemed waived unless the same shall be asserted by service of a notice upon Landlord within thirty (30) days after receipt by Tenant of notice of the adoption of any such additional Rule or Regulation or Alteration Rule or Regulation. Nothing in this Lease contained shall be construed to impose upon Landlord any duty or obligation to enforce the Rules and Regulations, Alteration Rules and Regulations or terms, covenants or conditions in any other lease against any other tenant, and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its employees, agents, visitors or licensees, except that Landlord shall not enforce any Rule or Regulation or Alteration Rule or Regulation against Tenant which Landlord shall not then be enforcing against all other office tenants in the Building on a non-discriminatory basis. In the event of any inconsistency or conflict between the Rules and Regulations or the Alteration Rules and Regulations and the provisions contained in the body of this Lease, said provisions of this Lease shall govern and control.

## ARTICLE 9
## INSURANCE, PROPERTY LOSS OR DAMAGE; REIMBURSEMENT

Section 9.1    (A)    Any Building employee to whom any property shall be entrusted by or on behalf of Tenant shall be deemed to be acting as Tenant's agent with respect to such property and neither Landlord nor its agents shall be liable for any damage to property of Tenant or of others entrusted to employees of the Building, nor for the loss of or damage to any property of Tenant by theft or otherwise. Neither Landlord nor its agents shall be liable for any injury or damage to persons or property, or interruption of Tenant's business, resulting from fire or other casualty; nor shall Landlord or its agents be liable for any such damage caused by other tenants or persons in the Building or caused by construction of any private, public or quasi-public work; nor shall Landlord be liable for any injury to persons or damage to property caused by any latent defect in the Premises or in the Building (except to the extent Landlord shall be required to repair same pursuant to Article 4 hereof). Anything in this Article 9 to the contrary

notwithstanding, except as set forth in Articles 4, 10, 13, 28 and 35 of this Lease and otherwise as expressly provided herein, Landlord shall not be relieved from responsibility to Tenant for any loss or damage caused to Tenant wholly or in part by the negligent acts or omissions of Landlord, its employees, contractors, licensees, invitees and agents. Nothing in the foregoing shall affect any right of (i) Landlord to the indemnity from Tenant to which Landlord may be entitled under Article 35 hereof in order to recoup for payments made to compensate for losses of third parties, or (ii) Tenant to the indemnity from Landlord to which Tenant may be entitled under Article 35 hereof.

        (B)    If at anytime any windows of the Premises are temporarily closed, darkened or bricked-up by reason of repairs, maintenance, alterations, or improvements to the Building or any of such windows are permanently closed, darkened or bricked-up due to any Requirement, Landlord shall not be liable for any damage Tenant may sustain thereby and Tenant shall not be entitled to any compensation therefor nor abatement of Fixed Rent or any other item of Rental nor shall the same release Tenant from its obligations hereunder nor constitute an eviction. Tenant acknowledges that Landlord has heretofore disclosed to Tenant that some of the windows on the west side of the Building are lot line windows and therefore may have to be temporarily or permanently closed, darkened or bricked-up during the Term.

        (C)    Tenant shall promptly notify Landlord of any fire or accident in the Premises.

    Section 9.2    Tenant shall obtain and keep in full force and effect (i) an "all risk" insurance policy for Tenant's Specialty Alterations and Tenant's Property at the Premises, and (ii) a policy of comprehensive general public liability and property damage insurance with a broad form contractual liability endorsement. Such policies shall provide that Tenant is named as the insured, and Landlord, Landlord's managing agent, Landlord's agent and any Lessors and any Mortgagees (whose names shall have been furnished to Tenant reasonably in advance) are named as additional insureds, and with respect to the insurance required to be carried pursuant to clause (ii) above under which the insurer agrees to indemnify and hold Landlord and such Lessors and Mortgagees harmless from and against all cost, expense and/or liability arising out of or based upon any and all claims, accidents, injuries and damages mentioned in Article 35; it being expressly understood and agreed that Landlord shall not be an additional insured under Tenant's comprehensive general public liability and property damage policy with respect to any damage to property or injury to persons caused by the negligent acts and omissions of Landlord and Landlord's agents. Such policy shall contain a provision that no act or omission of Tenant shall affect or limit the obligation of the insurance company to pay the amount of any loss sustained and that the policy shall be non-cancellable with respect to Landlord and such Lessors and Mortgagees (whose names and addresses shall have been furnished to Tenant reasonably in advance) unless thirty (30) days' written notice shall have been given to Landlord by certified mail, return receipt requested, which notice shall contain the policy number and the names of the insured and additional insureds. The minimum limits of liability shall be a combined single limit with respect to each occurrence in an amount of not less than $5,000,000 for injury (or death) and

damage to property, which amount shall be increased or decreased at the end of every fifth (5th) anniversary of the Commencement Date to that amount of insurance which in Landlord's reasonable judgment is then being customarily required by prudent landlords of first-class non-institutional office buildings in New York City. All insurance required to be carried by Tenant pursuant to the terms of this Lease shall be effected under valid and enforceable policies issued by reputable and independent insurers permitted to do business in the State of New York, and rated in Best's Insurance Guide, or any successor thereto (or if there be none, an organization having a national reputation) as having a general policyholder rating of "A" and a financial rating of at least "13."

Section 9.3    Landlord shall obtain and keep in full force and effect insurance against loss or damage by fire and other casualty to the Building, including Tenant's Alterations (exclusive of Specialty Alterations), as may be insurable under then available standard forms of "all-risk" insurance policies, in an amount equal to one hundred percent (100%) of the replacement value thereof or in such lesser amount as will avoid co-insurance (including an "agreed amount" endorsement). Such policy shall contain a provision that no act or omission of Landlord shall affect or limit the obligation of the insurance company to pay the amount of any loss sustained and that the policy shall be non-cancellable unless thirty (30) days' written notice shall have been given to Tenant by certified mail, return receipt requested, which notice shall contain the policy number and the names of the insured and additional insureds. Notwithstanding the foregoing, Landlord shall not be liable to Tenant for any failure to insure, replace or restore any Alterations unless Tenant shall have notified Landlord of the completion of such Alterations and of the cost thereof (provided, however, that Tenant shall not be required to so notify Landlord of the cost of any Alteration which shall cost less than $10,000, either individually or in the aggregate with other Alterations made within any six (6) month period, provided, however, within thirty (30) days after the end of each calendar year, Tenant shall provide Landlord with an updated itemized schedule of the cost of all of Tenant's Alterations at the Premises), and shall maintain adequate records with respect to such Alterations to facilitate the adjustment of any insurance claims with respect thereto. Tenant shall cooperate with Landlord and Landlord's insurance companies in the adjustment of any claims for any damage to the Building or such Alterations.

Section 9.4    On or prior to the Commencement Date, each party shall deliver to the other party appropriate certificates of insurance, including evidence of waivers of subrogation required pursuant to Section 10.5, required to be carried by each party pursuant to this Article 9. Evidence of each renewal or replacement of a policy shall be delivered by Tenant to Landlord and Landlord to Tenant as soon as practicable, but in either event prior to the expiration of such policy.

## ARTICLE 10
## DESTRUCTION - FIRE OR OTHER CAUSE

Section 10.1    (A)    If the Premises (including Alterations other than Specialty Alterations) shall be damaged by fire or other casualty, and if Tenant shall give prompt notice thereof to Landlord, Landlord shall promptly commence and diligently prosecute to completion the repair of the damages at its own expense, to substantially the condition existing prior to the damage, and until such repairs (excluding Long Lead Work) shall be substantially completed (of which substantial completion Landlord shall promptly notify Tenant) the Fixed Rent, Escalation Rent and Space Factor applicable to each unusable portion of the Premises shall be reduced in the proportion which the area of the part of the Premises which is not usable and actually not used by Tenant for the normal operation of its business bears to the total area of the Premises (taking into account in calculating any such reduction, that the Fixed Rent, Base Taxes and Base Operating Year differ with respect to various portions of the Premises). Upon the substantial completion of such repairs (excluding Long Lead Work), Landlord shall diligently prosecute to completion any items of Long Lead Work remaining to be completed. Landlord shall have no obligation to repair any damage to, or to replace, any Specialty Alterations or Tenant's Property. Landlord shall use its reasonable efforts to minimize interference with Tenant's use and occupancy in making any repairs pursuant to this Section.

(B)    Prior to the substantial completion of any such repair, Landlord shall provide Tenant and Tenant's contractor, subcontractors and materialmen access to the Premises to perform Specialty Alterations on the following terms and conditions (but not to occupy the same for the conduct of business).

(1)    Tenant shall not commence work in any portion of the Premises until the date specified in a notice from Landlord to Tenant stating that the repairs required to be made by Landlord have been or will be completed to the extent reasonably necessary, in Landlord's reasonable discretion, to permit the commencement of the Specialty Alterations then prudent to be performed in accordance with good construction practice in the portion in question without interference with, and consistent with the performance of, the repairs remaining to be performed.

(2)    Such access by Tenant shall be deemed to be subject to all of the applicable provisions of this Lease, including, without limitation, Tenant's obligation to pay to Landlord the Electricity Fee or the Electricity Additional Rent, as more particularly set forth in Article 13 hereof, except that there shall be no obligation on the part of Tenant solely because of such access to pay any Fixed Rent or Escalation Rent with respect to the affected portion of the Premises for any period prior to substantial completion.

(3)    It is expressly understood that if Landlord shall be prevented from substantially completing the repairs due to any acts of Tenant, its agents, servants, employees or contractors, including, without limitation, by reason of the performance of any Specialty Alteration, by reason of Tenant's failure or refusal to comply or to cause its architects, engineers, designers and contractors to comply with any of Tenant's obligations described or referred to in this Lease, or if such repairs are not completed, because under good construction

scheduling practice such repairs should be performed after completion of any Specialty Alteration, then such work shall be deemed substantially complete on the date when the work would have been substantially complete but for such delay and the expiration of the abatement of the Tenant's obligations hereunder shall not be postponed by reason of such delay. Any additional costs to Landlord to complete any work occasioned by such delay shall be paid by Tenant to Landlord within ten (10) Business Days after demand as additional rent.

Section 10.2    Anything contained in Section 10.1 to the contrary notwithstanding, if the Building shall be so damaged by fire or other casualty that, in Landlord's reasonable judgment, substantial alteration, demolition, or reconstruction of the Building shall be required (whether or not the Premises shall have been damaged or rendered untenantable), then Landlord, at Landlord's option, may, not later than ninety (90) days following the damage, give Tenant a notice in writing terminating this Lease, provided that if the Premises are not substantially damaged or rendered substantially untenantable, Landlord may not terminate this Lease if (i) Landlord shall decide to rebuild the Building in substantially the same configuration and for the same use, i.e., as an office building, or (ii) Landlord shall not elect to terminate leases (including this Lease), affecting at least fifty percent (50%) of the rentable area of the office portion of the Building (excluding any rentable area occupied by Landlord or its Affiliates). If Landlord has the option and elects to terminate this Lease, the Term shall expire upon the ninetieth (90th) day after such notice is given (unless a shorter time period shall be required by Requirements, or by Landlord's insurance company or Landlord's engineer, but in no event shall the time period be less than thirty (30) days), and Tenant shall vacate the Premises and surrender the same to Landlord. Upon the termination of this Lease under the conditions provided for in this Section 10.2, Tenant's liability for Fixed Rent and Escalation Rent shall cease and any prepaid portion of Fixed Rent and Escalation Rent for any period after such date shall be promptly refunded by Landlord to Tenant.

Section 10.3    (A)    Within forty-five (45) days after notice to Landlord of any damage described in Section 10.1 hereof, Landlord shall deliver to Tenant a statement prepared by a reputable independent contractor setting forth such contractor's estimate as to the time required to repair such damage, exclusive of time required to repair any Specialty Alterations (which are Tenant's obligation to repair) or to perform Long Lead Work. If the estimated time period exceeds twelve (12) months from the date of such statement, Tenant may elect to terminate this Lease by notice to Landlord not later than thirty (30) days following receipt of such statement. If Tenant makes such election, the Term shall expire upon the ninetieth (90th) day after notice of such election is given by Tenant (unless a shorter time period shall be required by Requirements, or by Landlord's insurance company or Landlord's engineer, but in no event shall the time period be less than thirty (30) days), and Tenant shall vacate the Premises and surrender the same to Landlord in accordance with the provisions of Article 20 hereof. If Tenant shall not have elected to terminate this Lease pursuant to this Article 10 (or is not entitled to terminate this Lease pursuant to this Article 10), the damages shall be diligently repaired as set forth in Section 10.1 hereof.

(B)    Notwithstanding the foregoing, if the Base Premises shall be substantially damaged during the last year of the Term or Space-18B shall be substantially damaged during the last year of the Term with respect thereto, Landlord or Tenant may elect by notice, given within thirty (30) days after the occurrence of such damage, to terminate this Lease with respect to Space-18B or the Base Premises, as the case may be, and if either party makes such election, the Term with respect to Space-18B or the Base Premises, as the case may be, shall expire upon the earlier of (i) the Space-18B Expiration Date with respect to Space-18B or the Expiration Date with respect to the Base Premises, or (ii) the ninetieth (90th) day after notice of such election is given by such party (unless a shorter time period shall be required by Requirements, or by Landlord's insurance company or Landlord's engineer, but in no event shall the time period be less than thirty (30) days) and Tenant shall vacate Space-18B or the Base Premises, as the case may be, and surrender the same to Landlord in accordance with the provisions of Article 20 hereof. Tenant shall have no other options to cancel this Lease under this Article 10. Nothing contained in this Section 10.3(B) shall be deemed to grant to Tenant any termination right with respect to the Base Premises prior to the last year of the Term with respect to the Base Premises.

Section 10.4    This Article 10 constitutes an express agreement governing any case of damage or destruction of the Premises or the Building by fire or other casualty, and that Section 227 of the Real Property Law of the State of New York, which provides for such contingency in the absence of an express agreement, and any other law of like nature and purpose now or hereafter in force shall have no application in any such case.

Section 10.5    The parties hereto shall procure an appropriate clause in, or endorsement on, any fire or extended coverage insurance covering the Premises, the Building and personal property, fixtures and equipment located thereon or therein, pursuant to which the insurance companies waive subrogation or consent to a waiver of right of recovery and having obtained such clauses or endorsements of waiver of subrogation or consent to a waiver of right of recovery, will not make any claim against or seek to recover from the other for any loss or damage to its property or the property of others resulting from fire or other hazards covered by such fire and extended coverage insurance, provided, however, that the release, discharge, exoneration and covenant not to sue herein contained shall be limited by and coextensive with the terms and provisions of the waiver of subrogation clause or endorsements or clauses or endorsements consenting to a waiver of right of recovery. If the payment of an additional premium is required for the inclusion of such waiver of subrogation provision, each party shall advise the other of the amount of any such additional premiums and the other party at its own election may, but shall not be obligated to, pay the same. If such other party shall not elect to pay such additional premium, the first party shall not be required to obtain such waiver of subrogation provision. If either party shall be unable to obtain the inclusion of such clause even with the payment of an additional premium, then such party shall attempt to name the other party as an additional insured (but not a loss payee) under the policy. If the payment of an additional premium is required for naming the other party as an additional insured (but not a loss payee), each party shall advise the other of the amount of any such additional premium and the other party

at its own election may, but shall not be obligated to, pay the same. If such other party shall not elect to pay such additional premium or if it shall not be possible to have the other party named as an additional insured (but not loss payee), even with the payment of an additional premium, then (in either event) such party shall so notify the first party and the first party shall have no obligation to name the other party as an additional insured. Tenant acknowledges that Landlord shall not carry insurance on and shall not be responsible for damage to, Tenant's Property or Specialty Alterations, and that Landlord shall not carry insurance against, or be responsible for any loss suffered by Tenant due to, interruption of Tenant's business.

## ARTICLE 11
## EMINENT DOMAIN

Section 11.1   If the whole of the Real Property, the Building or the Premises shall be acquired or condemned for any public or quasi-public use or purpose, this Lease and the Term shall end as of the date of the vesting of title with the same effect as if said date were the Expiration Date. If only a part of the Real Property or the Building and not the entire Premises shall be so acquired or condemned then, (1) except as hereinafter provided in this Section 11.1, this Lease and the Term shall continue in force and effect but, if a part of the Premises is included in the part of the Real Property so acquired or condemned, from and after the date of the vesting of title, the Fixed Rent, Tenant's Operating Share, Tenant's Tax Share, and the Space Factor shall be reduced in the proportion which the area of the part of the Premises so acquired or condemned bears to the total area of the Premises immediately prior to such acquisition or condemnation (taking into account in calculating any such reduction, that the Fixed Rent, Base Taxes and Base Operating Year differ with respect to various portions of the Premises), and any Escalation Rent which shall have been prepaid for any period subsequent to the vesting of title shall be prorated to the date of the vesting of title; (2) whether or not the Premises shall be affected thereby, Landlord, at Landlord's option, may give to Tenant, within sixty (60) days next following the date upon which Landlord shall have received notice of vesting of title, a thirty (30) days' notice of termination of this Lease if Landlord shall determine, in its reasonable judgment, that it will not be economically feasible to continue to operate the portion of the Building remaining as a first-class office building and Landlord shall elect to terminate leases (including this Lease), affecting at least fifty percent (50%) of the rentable area of the office portion of the Building (excluding any rentable area occupied by Landlord or any of its Affiliates); and (3) if part of the Premises or access thereto shall be so taken and, in Tenant's reasonable judgment, the remaining rentable area of the Premises shall not be (or not be reasonably capable of being rendered) sufficient for Tenant to continue economically feasible operation of its business in a manner similar to its conduct of business prior to such taking, Tenant, at Tenant's option, may give to Landlord, within sixty (60) days next following the date upon which Tenant shall have received notice of vesting of title, a thirty (30) days' notice of termination of this Lease. If any such thirty (30) days' notice of termination is given, by Landlord or Tenant, this Lease and the Term shall come to an end and expire upon the expiration of said thirty (30) days with the same effect as if the date of expiration of said thirty (30) days were the Expiration Date. If a part of the Premises shall be so acquired or

condemned and this Lease and the Term shall not be terminated pursuant to the foregoing provisions of this Section 11.1, Landlord, at Landlord's expense, shall promptly commence and proceed with due diligence to restore that part of the Premises not so acquired or condemned to a self-contained rental unit inclusive of Tenant's Alterations (other than Specialty Alterations). In the event of any termination of this Lease and the Term pursuant to the provisions of this Section 11.1, the Fixed Rent shall be apportioned as of the date of sooner termination and any prepaid portion of Fixed Rent or Escalation Rent for any period after such date shall be refunded by Landlord to Tenant.

Section 11.2    In the event of any such acquisition or condemnation of all or any part of the Real Property, Landlord shall be entitled to receive the entire award for any such acquisition or condemnation, Tenant shall have no claim against Landlord or the condemning authority for the value of any unexpired portion of the Term and Tenant hereby expressly assigns to Landlord all of its right in and to any such award. The foregoing notwithstanding, Tenant shall be entitled to any amount of said award which is specifically allocated to the value of Tenant's Alterations, provided, however, Tenant shall not be entitled to any portion of the award for the taking of Tenant's Alterations until all such sums due to any Mortgagee and/or Lessor have been paid in full, and such award shall be limited to the unamortized portion of Tenant's Alterations which were paid for by Tenant (as opposed to the proceeds of the Tenant Fund, the Additional Initial 11th Floor Alterations Tenant Fund, the Initial 11th Floor Alterations Tenant Fund or the Initial 18th Floor Alterations Tenant Fund), it being expressly understood and agreed that Tenant's right to any portion of such award shall be subordinate to the rights of the Mortgagee and Lessor with respect thereto.  Nothing contained in this Section 11.2 shall be deemed to prevent Tenant from making a separate claim in any condemnation proceedings for the then value of any of Tenant's Property included in such taking, and for any moving expenses.

Section 11.3    If the whole or any part of the Premises shall be acquired or condemned temporarily during the Term for any public or quasi-public use or purpose, Tenant shall give prompt notice thereof to Landlord and the Term shall not be reduced or affected in any way and Tenant shall continue to pay in full all items of Rental payable by Tenant hereunder without reduction or abatement, and Tenant shall be entitled to receive for itself any award or payments for such use, provided, however, that:

(i)    if the acquisition or condemnation is for a period not extending beyond the Term and if such award or payment is made less frequently than in monthly installments, the same shall be paid to and held by Landlord as a fund which Landlord shall apply from time to time to the Rental payable by Tenant hereunder, except that, if by reason of such acquisition or condemnation, changes or alterations are required to be made to the Premises which would necessitate an expenditure to restore the Premises, then a portion of such award or payment considered by Landlord as appropriate to cover the expenses of the restoration shall be retained by Landlord, without application as aforesaid, and applied toward the restoration of the Premises as provided in Section 11.1 hereof; or

(ii)     if the acquisition or condemnation is for a period extending beyond the Term, such award or payment shall be apportioned between Landlord and Tenant as of the Expiration Date; Tenant's share thereof, if paid less frequently than in monthly installments, shall be paid to Landlord and applied in accordance with the provisions of clause (i) above, provided, however, that the amount of any award or payment allowed or retained for restoration of the Premises shall remain the property of Landlord if this Lease shall expire prior to the restoration of the Premises.

## ARTICLE 12
## ASSIGNMENT, SUBLETTING, MORTGAGE, ETC.

Section 12.1   (A)    Except as expressly permitted herein, Tenant, without the prior consent of Landlord in each instance, shall not (a) assign its rights or delegate its duties under this Lease (whether by operation of law, transfers of interests in Tenant or otherwise), mortgage or encumber its interest in this Lease, in whole or in part, (b) sublet, or permit the subletting of, the Premises or any part thereof, or (c) permit the Premises or any part thereof to be occupied, or used for desk space, mailing privileges or otherwise, by any person other than Tenant.

(B)     If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and shall be promptly paid to or turned over to Landlord.

Section 12.2   If Tenant's interest in this Lease is assigned in violation of the provisions of this Article 12, such assignment shall be void and of no force and effect against Landlord; provided, however, that Landlord may collect an amount equal to the then Fixed Rent plus any other item of Rental from the assignee as a fee for its use and occupancy. If the Premises or any part thereof are sublet to, or occupied by, or used by, any person other than Tenant, whether or not in violation of this Article 12, Landlord, after default by Tenant under this Lease, including, without limitation, a subletting or occupancy in violation of this Article 12, may collect any item of Rental or other sums paid by the subtenant, user or occupant as a fee for its use and occupancy, and shall apply the net amount collected to the Fixed Rent and other items of Rental reserved in this Lease. No such assignment, subletting, occupancy or use, nor any such collection or application of Rental or fee for its use and occupancy, shall be deemed a waiver by Landlord of any term, covenant or condition of this Lease or the acceptance by Landlord of such assignee, subtenant, occupant or user as tenant hereunder. The consent by Landlord to any assignment, subletting, occupancy or use shall not relieve Tenant from its obligation to obtain the express

prior consent of Landlord to any further assignment, subletting, occupancy or use. Tenant shall pay to Landlord a processing fee and the reasonable attorneys' fees and disbursements incurred by Landlord in connection with any proposed assignment of Tenant's interest in this Lease or any proposed subletting of the Premises or any part thereof. Except as otherwise expressly provided herein, neither any assignment of Tenant's interest in this Lease nor any subletting, occupancy or use of the Premises or any part thereof by any person other than Tenant, nor any collection of Rental by Landlord from any person other than Tenant as provided in this Section 12.2, nor any application of any such Rental as provided in this Section 12.2 shall, in any circumstances, relieve Tenant of its obligations under this Lease on Tenant's part to be observed and performed. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall execute and deliver to Landlord upon demand an instrument confirming such assumption. No assignment of this Lease shall relieve Tenant of its obligations hereunder and, subsequent to any assignment, Tenant's liability hereunder shall continue notwithstanding any subsequent modification or amendment hereof or the release of any subsequent tenant hereunder from any liability, to all of which Tenant hereby consents in advance, provided, however, if any such subsequent modification or amendment made without its consent shall increase the obligations of Tenant hereunder, Tenant named herein shall not be liable to the extent of any such increase.

Section 12.3    (A)    If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of the Bankruptcy Code to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to the Tenant, then notice of such proposed assignment shall be given to Landlord by Tenant no later than twenty (20) days after receipt by Tenant, but in any event no later than ten (10) days prior to the date that Tenant shall make application to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption. Such notice shall set forth (a) the name and address of such person, (b) all of the terms and conditions of such offer; and (c) adequate assurance of future performance by such person under the Lease, including, without limitation, the assurance referred to in Section 365(b)(3) of the Bankruptcy Code. Landlord shall have the prior right and option, to be exercised by notice to Tenant given at any time prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person, less any brokerage commissions which would otherwise be payable by Tenant out of the consideration to be paid by such person in connection with the assignment of this Lease.

(B)    The term "adequate assurance of future performance" as used in this Lease shall mean that any proposed assignee shall, among other things, (a) deposit with Landlord on the assumption of this Lease the sum of the then Fixed Rent as security for the faithful performance and observance by such assignee of the terms and obligations of this Lease, which sum shall be held in escrow, (b) furnish Landlord with financial statements of such assignee for the prior three (3) fiscal years, as finally determined after an audit and certified as correct by a certified public accountant, which financial statements shall show a net worth of at least six (6)

times the then fixed Rent for each of such three (3) years, (c) grant to Landlord a security interest in such property of the proposed assignee as Landlord shall deem necessary to secure such assignee's future performance under this Lease, and (d) provide such other information or take such action as Landlord, in its reasonable judgment, shall determine is necessary to provide adequate assurance of the performance by such assignee of its obligations under the Lease.

Section 12.4   (A)   Tenant shall have the privilege subject to the terms and conditions hereinafter set forth, without the consent of Landlord and without giving Landlord any right to treat such space as Recapture Space or Terminated Space, to assign its interest in this Lease (i) to any corporation which is a successor to Tenant either by merger or consolidation, (ii) to a purchaser of all or substantially all of Tenant's assets (provided such purchaser shall have also assumed substantially all of Tenant's liabilities), or (iii) to a corporation or other entity which shall (1) control, (2) be under the control of, or (3) be under common control with, Tenant (the term "control" as used herein shall be deemed to mean owner-ship of more than 50% of the outstanding voting stock of a corporation, or other majority equity and control interest if Tenant is not a corporation) (any such entity being a "Related Entity"). Tenant may also sublease all or any portion of the Premises to a Related Entity without the consent of Landlord and without giving Landlord any right to treat such space as Recapture Space or Terminated Space. Any assignment or subletting described above may only be made upon the condition that (a) any such assignee or subtenant shall use the Premises only as permitted under this Lease, (b) the principal purpose of such assignment or sublease is not the acquisition of Tenant's interest in this Lease (except if such assignment or sublease is made to a Related Entity and is made for a valid intracorporate business purpose and is not made to circumvent the provisions of Section 12.1 of this Article), and (c) any such assignee, other than a Related Entity, shall have a net worth and cash flow, determined in accordance with generally accepted accounting principles, consistently applied, after giving effect to such assignment, at least equal to Tenant's net worth and cash flow, as so determined, on the Commencement Date. Tenant shall, within ten (10) Business Days after execution thereof, deliver to Landlord (x) a duplicate original instrument of assignment in form and substance reasonably satisfactory to Landlord, duly executed by Tenant and (y) an instrument in form and substance reasonably satisfactory to Landlord, duly executed by the assignee, in which such assignee shall assume observance and performance of, and agree to be personally bound by, all of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed, or (z) a duplicate original sublease, to the extent a written sublease shall have been executed by Tenant and the subtenant, in form and substance reasonably satisfactory to Landlord, duly executed by Tenant and the subtenant. If this Lease is assigned or all or a portion of the Premises are subleased to a Related Entity and such Related Entity shall no longer (i) control, (ii) be under common control with, or (iii) be under the control of Tenant named herein (or any permitted successor by merger, consolidation or purchase) then such entity and such assignment or sublease must satisfy each of the requirements set forth in clauses, (a), (b) and (c) of this Section 12.4(A), and (y) with respect to a subletting, Tenant and such entity shall execute and deliver to Landlord, within ten (10) Business Days after such entity shall cease to be a Related Entity, a sublease, in form and substance reasonably satisfactory to Landlord, which sublease shall include, without limitation, the provisions of Section 12.6(A)10 hereof, and Landlord shall be

entitled to, and Tenant shall pay to Landlord, fifty percent (50%) of all Sublease Profit with respect to such subletting, and (z) with respect to an assignment, Landlord shall be entitled to, and Tenant shall pay to Landlord, fifty percent (50%) of all Assignment Proceeds with respect to such assignment.

(B)    If Tenant is a partnership, the admission of new partners, the withdrawal, retirement, death, incompetency or bankruptcy of any partner, or the reallocation of partnership interests among the partners shall not constitute an assignment of this Lease. The reorganization of Tenant into a professional corporation if Tenant is a partnership, or the reorganization of Tenant from a professional corporation into a partnership, shall not constitute an assignment of this Lease, provided that immediately following such reorganization the partners of Tenant shall be the same as those existing immediately prior to such reorganization.

(C)    Except as set forth above, either a transfer (including the issuance of treasury stock or the creation and issuance of new stock) of a controlling interest in the shares of Tenant (if Tenant is a corporation or trust) or a transfer of a majority of the total interest in Tenant (if Tenant is a partnership) at any one time or over a period of time through a series of transfers, shall be deemed an assignment of this Lease and shall be subject to all of the provisions of this Article 12, including, without limitation, the requirement, if any, that Tenant obtain Landlord's prior consent thereto. The transfer of shares of Tenant (if Tenant is a corporation or trust) for purposes of this Section 12.4 shall not include the sale of shares by persons other than those deemed "insiders" within the meaning of the Securities Exchange Act of 1934, as amended, which sale is effected through the "over-the-counter market" or through any recognized stock exchange.

Section 12.5    If, at anytime after Tenant may have assigned Tenant's interest in this Lease, this Lease shall be disaffirmed or rejected in any proceeding of the types described in paragraph (E) of Section 16.1 hereof, or in any similar proceeding, or in the event of termination of this Lease by reason of any such proceeding or by reason of lapse of time following notice of termination given pursuant to said Article 16 based upon any of the Events of Default set forth in such paragraph, Tenant, upon request of Landlord given within thirty (30) days next following any such disaffirmance, rejection or termination (and actual notice thereof to Landlord in the event of a disaffirmance or rejection or in the event of termination other than by act of Landlord), shall (1) pay to Landlord all Fixed Rent, Escalation Rent and other items of Rental due and owing by the assignee to Landlord under this Lease to and including the date of such disaffirmance, rejection or termination, and (2) as "tenant", enter into a new lease with Landlord of the Premises for a term commencing on the effective date of such disaffirmance, rejection or termination and ending on the Expiration Date, unless sooner terminated as in such lease provided, at the same Fixed Rent and upon the then executory terms, covenants and conditions as are contained in this Lease, except that (a) Tenant's rights under the new lease shall be subject to the possessory rights of the assignee under this Lease and the possessory rights of any person claiming through or under such assignee or by virtue of any statute or of any order of any court, (b) such new lease shall require all defaults existing under this Lease to be cured by Tenant with due diligence, and

(c) such new lease shall require Tenant to pay all Escalation Rent reserved in this Lease which, had this Lease not been so disaffirmed, rejected or terminated, would have accrued under the provisions of Article 27 hereof after the date of such disaffirmance, rejection or termination with respect to any period prior thereto. If Tenant shall default in its obligation to enter into said new lease for a period of ten (10) days next following Landlord's request therefor, then, in addition to all other rights and remedies by reason of such default, either at law or in equity, Landlord shall have the same rights and remedies against Tenant as if Tenant had entered into such new lease and such new lease had thereafter been terminated as of the commencement date thereof by reason of Tenant's default thereunder.

Section 12.6    (A)    Notwithstanding the provisions of Section 12.1 hereof, if Landlord shall not exercise its rights pursuant to paragraphs (C) or (E) of this Section 12.6 (or if such rights set forth in paragraphs (C) or (E) of this Section 12.6 shall be inapplicable to such proposed sub-letting), Landlord shall not unreasonably withhold its consent to any subletting of the Premises (if Tenant proposes to sublet a portion of the Premises then, unless the context otherwise requires, references in this Section 12.6 to the Premises shall be deemed to refer to the portion of the Premises proposed to be sublet by Tenant), provided that:

(1)    the Premises shall not, without Landlord's prior consent, have been listed or otherwise publicly advertised for subletting at a rental rate less than the prevailing rental rate set by Landlord for comparable space on comparable terms in the Building (the "Prevailing Rate") (provided that if no comparable space shall be available in the Building, the Prevailing Rate shall be determined by Landlord in its reasonable judgment), nor shall Tenant advise in writing or otherwise publicly disseminate any information with respect to such subletting to any broker, agent or finder (other than to an individual broker with respect to a specific transaction) that Tenant intends to sublet the Premises at a rate less than the Prevailing Rate;

(2)    no Event of Default shall have occurred and be continuing;

(3)    the proposed subtenant shall have a financial standing, be of a character, be engaged in a business, and propose to use the Premises in a manner in keeping with the standards in such respects of the other tenancies in the Building;

(4)    if Landlord has or within six (6) months thereafter reasonably expects to have suitable space available in the Building, the proposed subtenant shall not be a tenant, subtenant or assignee of any space in the Building, nor shall the proposed subtenant be a person or entity with whom Landlord is then actively negotiating or from whom or to whom a proposal to lease space in the Building has been submitted; if Tenant shall propose to sublease space and is about to commence negotiations with a tenant, subtenant, assignee or prospective subtenant, Tenant shall advise Landlord of the identity of such tenant, subtenant, assignee or prospective subtenant and Landlord shall promptly advise Tenant if the execution of a sublease with such tenant, subtenant, assignee or prospective subtenant would violate the provisions of this clause (4), in which event Tenant shall not commence negotiations with such

party unless and until Landlord shall notify Tenant that active negotiations between Landlord and such party shall have ceased, of which fact Landlord shall promptly notify Tenant upon the cessation of such negotiations;

(5)    the character of the business to be conducted or the proposed use of the Premises by the proposed subtenant shall not (a) materially increase Landlord's Operating Expenses beyond that which would be incurred for use by Tenant or for use in accordance with the standards of use of other tenancies in the Building; (b) materially increase the burden on existing cleaning services or elevators over the burden prior to such proposed subletting; or (c) violate any provision or restrictions herein relating to the use or occupancy of the Premises;

(6)    the subletting shall be expressly subject to all of the terms, covenants, conditions and obligations on Tenant's part to be observed and performed under this Lease and the further condition and restriction that the sublease shall not be assigned, encumbered or otherwise transferred or the subleased premises further sublet by the subtenant in whole or in part, or any part thereof suffered or permitted by the subtenant to be used or occupied by others, without the prior written consent of Landlord in each instance, which consent shall not be unreasonably withheld provided any proposed further sublease shall meet each of the criteria set forth in this Section 12.6(A) and Tenant pays or causes to be paid to Landlord an amount determined in accordance with Section 12.7 hereof, as if the initial sublease were this Lease and the rent and additional rent under such initial sublease were the Fixed Rent and Escalation Rent under this Lease;

(7)    the subletting shall end no later than one (1) day before the Expiration Date and shall not be for a term of less than two (2) years unless it commences less than two (2) years before the Expiration Date, other than a Short Term Sublease;

(8)    at no time shall there be more than six (6) occupants, excluding Tenant, on any full floor of the Premises, or more than three (3) occupants, excluding Tenant, on any partial floor of the Premises;

(9)    Tenant shall reimburse Landlord, within ten (10) Business Days of demand therefor, for any reasonable and actual direct out-of-pocket costs that may be incurred by Landlord in connection with said sublease for any processing fee and attorneys' fees and disbursements; and

(10)    such sublease shall expressly provide that in the event of termination, re-entry or dispossess of Tenant by Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublessor under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not (i) be liable for any previous act or omission of Tenant under such sublease, (ii) be subject to any offset, not expressly provided in

such sublease, which theretofore accrued to such subtenant against Tenant, (iii) be bound by any previous modification of such sublease or by any previous prepayment of more than one month's rent unless previously approved by Landlord, (iv) be bound by any covenant to undertake or complete any construction of the premises or any portion thereof demised by such sublease, and (v) be bound by any obligation to make any payment to or on behalf of the subtenant, except for services, repairs, maintenance and restoration provided for under the sublease to be performed after the date of such termination, re-entry or dispossess by Landlord under this Lease and which Landlord is required to perform hereunder with respect to the subleased space at Landlord's expense, it being expressly understood, however, that Landlord shall not be bound by any obligation to make payment to or on behalf of a subtenant with respect to construction performed by or on behalf of such subtenant at the subleased premises.

(B)    If there is a dispute between Landlord and Tenant as to the reasonableness of Landlord's refusal to consent to any subletting, Tenant may, at its option, as its sole and exclusive remedy, bring an action or proceeding in a court of competent jurisdiction in connection therewith or submit such dispute to arbitration in the City of New York. If Tenant shall elect to submit such dispute to arbitration, then, within five (5) Business Days next following the giving of any notice by Tenant to Landlord stating that it wishes such dispute to be so determined, Landlord and Tenant each shall give notice to the other setting forth the name and address of an arbitrator designated by the party giving such notice. If either party shall fail to give notice of such designation within said five (5) Business Days, then the arbitrator chosen by the other side shall make the determination alone. If two arbitrators have been designated, such arbitrators shall designate a third arbitrator. If the two arbitrators shall fail to agree upon the designation of a third arbitrator within five (5) Business Days of the designation of the second arbitrator, then either party may apply to the American Arbitration Association or to any successor thereto, for the designation of such arbitrator. All arbitrators shall be persons who shall have had at least fifteen (15) years continuous experience in the business of managing real estate or acting as real estate agents or brokers dealing with first class office buildings located in the Borough of Manhattan, City of New York. The three arbitrators shall conduct such hearings as they deem appropriate, making their determination in writing, and shall give notice to Landlord and Tenant of their determination as soon as practicable, and, if possible, within five (5) Business Days of the designation of the third arbitrator but in no event later than thirty (30) days after such designation; the concurrence of any two of said arbitrators shall be binding upon Landlord and Tenant, or, in the event no two of the arbitrators shall render a concurrent determination, then the determination of the third arbitrator designated shall be binding upon Landlord and Tenant. Any such determination shall be final and binding upon the parties, whether or not a judgment shall be entered in any court. The losing party shall pay the reasonable counsel fees and expenses, if any, of both parties in connection with any arbitration or other action or proceeding brought under this Section 12.6, including the expenses and fees of the arbitrators selected. The arbitrators shall be bound by the provisions of this Lease and shall not add to, subtract from, or otherwise modify such provisions. Notwithstanding any contrary provisions hereof, if Tenant shall bring an action or proceeding or shall submit such dispute to arbitration, then in either case Landlord shall not be liable in damages to Tenant for a breach of Landlord's covenant not unreasonably to withhold

such consent, and Tenant's sole remedy in such event shall be to enter into the proposed subletting.

(C)    At least fifteen (15) Business Days prior to any proposed subletting, other than (i) a subletting to a Related Entity, (ii) a subletting for the remainder or substantially the remainder of the Term, which shall be governed by paragraph (E) of this Section 12.6, unless Tenant shall choose to have such proposed subletting be governed by this paragraph (C) as Recapture Space rather than as Terminated Space by submitting a Sublease Statement to Landlord in lieu of a Termination Notice, and (iii) a Short Term Sublease, Tenant shall submit a statement to Landlord (a "Sublease Statement") containing the following information: (a) the name and address of the proposed subtenant, (b) a description of the portion of the Premises to be sublet, (c) the material terms and conditions of the proposed subletting including the rent payable, (d) the nature and character of the business of the proposed subtenant and (e) any other information that Landlord may reasonably request. Landlord shall have the right (except with respect to a sublease to a Related Entity, a sublease for the remainder or substantially the remainder of the Term, or a Short Term Sublease), exercisable within fifteen (15) Business Days after Landlord's receipt of the Sublease Statement, to sublet (in its own name or that of its designee) such portion of the Premises ("Recapture Space") from Tenant on the terms and conditions set forth in the Sublease Statement, subject to the further provisions of paragraph (D) of this Section 12.6. If Landlord shall fail to notify Tenant within said fifteen (15) Business Day period of Landlord's intention to exercise its rights pursuant to this Section 12.6(C) or of Landlord's consent or disapproval of the proposed subletting pursuant to the Sublease Statement as contemplated by Section 12.6(A), or if Landlord shall have consented to such subletting as provided in Section 12.6(A), Tenant shall be free to sublease that portion of the Premises to such proposed subtenant on the same material terms and conditions set forth in the Sublease Statement, subject to the terms and conditions of this Lease, including paragraph (A) of this Section 12.6. If Tenant shall not enter into such sublease within seventy-five (75) days after the delivery of the Sublease Statement to Landlord, then the provisions of section 12.1 and this Section 12.6 shall again be applicable to any other proposed subletting. If Tenant shall enter into such sublease within seventy-five (75) days as aforesaid, Tenant shall deliver a true, complete and fully executed counterpart of such sublease to Landlord within ten (10) Business Days after execution thereof.

(D)    (1)    If Landlord exercises its option to sublet the Recapture Space, such sublease to Landlord or its designee as subtenant (each, a "Recapture Sublease") shall:

(a)    be at a rental equal to the Rent Per Square Foot with respect to the Recapture Space and otherwise be upon the same terms and conditions as those contained in this Lease (as modified by the Sublease Statement), except such as are irrelevant or inapplicable and except as otherwise expressly set forth to the contrary in this paragraph (D);

(b)    give the subtenant the unqualified and unrestricted right, without Tenant's permission, to assign such sublease and to further sublet the Recapture

Space or any part thereof and to make any and all changes, alterations, and improvements in the Recapture Space, subject to the sole restriction that no such further subletting shall be for a longer term than the term of the Recapture Sublease as the same may be renewed or extended thereunder;

(c)    provide in substance that any such changes, alterations, and improvements made in the Recapture Space may (unless the Sublease Statement provides otherwise) be removed, in whole or in part, prior to or upon the expiration or other termination of the Recapture Sublease provided that any material damage and injury caused thereby shall be repaired;

(d)    provide that (i) the parties to such sublease expressly negate any intention that any estate created under such Sublease be merged with any other estate held by either of said parties, (ii) prior to the commencement of the term of the Recapture Sublease, Tenant, at its expense (unless the Sublease Statement provides otherwise), shall make such alterations as may be required or reasonably deemed necessary by the subtenant to physically separate the Recapture Space from the balance of the Premises and to provide appropriate means of ingress to and egress thereto and to the public portions of the balance of the floor such as toilets, janitor's closets, telephone and electrical closets, fire stairs, elevator lobbies, etc., and (iii) at the expiration of the term of such Sublease, Tenant (unless the Sublease Statement provides otherwise) will accept the Recapture Space in its then existing condition, broom clean; and

(e)    provide that the subtenant or occupant shall use and occupy the Recapture Space in accordance with the provisions of this Lease (without regard to any limitation set forth in the Sublease Statement).

(2)    Performance by Landlord, or its designee, under a Recapture Sublease shall be deemed performance by Tenant of any similar obligation under this Lease and Tenant shall not be liable for any default under this Lease or deemed to be in default hereunder if such default is occasioned by or arises from any act or omission of the subtenant under the Recapture Sublease or is occasioned by or arises from any act or omission of any occupant under the Recapture Sublease.

(3)    If Landlord is unable to give Tenant possession of the Recapture Space at the expiration of the term of the Recapture Sublease by reason of the holding over or retention of possession of any tenant or other occupant, then (w) Landlord shall continue to pay all charges previously payable, and comply with all other obligations, under the Recapture Sublease until the date upon which Landlord shall give Tenant possession of such Recapture Space free of occupancies, (x) neither the Expiration Date nor the validity of this Lease shall be affected, (y) Tenant waives any rights under Section 223-a of the Real Property Law of New York, or any successor statute of similar import, to rescind this Lease and further waives the right to recover any damages from Landlord which may result from the failure of Landlord to deliver possession of the Recapture Space at the end of the term of the Recapture Sublease, and (z)

4698/75979-010 NYLIB1/1401555 v9                45