Landlord, at Landlord's expense, shall use its reasonable efforts to deliver possession of such Recapture Space to Tenant and in connection therewith, if necessary, shall institute and diligently and in good faith prosecute holdover and any other appropriate proceedings against the occupant of such Space to obtain possession thereof and to collect holdover rent as set forth in the immediately succeeding sentence; if Landlord fails to prosecute such proceedings in such manner and such failure continues after reasonable notice thereof by Tenant, Tenant may prosecute such proceedings in Landlord's name and at Landlord's expense. Landlord agrees that any sublease for the Recapture Space shall contain a provision whereby if such subtenant shall hold over in the Recapture Space beyond the expiration of the term of the Recapture Sublease, such subtenant shall be required to pay for use and occupancy of the Recapture Space, an amount equal to at least one and one-half (1-1/2) times the rental payable thereunder on the expiration date, and in such event, Tenant shall be entitled to receive the difference between the holdover rental actually collected and the rent due on the last day of the term of the Recapture Sublease.

(4)     The failure by Landlord to exercise its option under Section 12.6(C) with respect to any subletting to which such option shall apply shall not be deemed a waiver of such option with respect to any extension of such subletting or any subsequent subletting of the Premises affected thereby.

(5)     Landlord hereby agrees that if any Recapture Space shall be comprised of a partial floor of the Premises and Tribune Company or any Related Entity is Tenant hereunder, neither Landlord nor its designee shall assign such Recapture Sublease, or sublet or further sublet such Recapture Space to an entity whose principal business at such Recapture Space at the time of the entering into of the assignment or sublease for the Recapture Space will be the same or similar as the business of Tenant or any Related Entity occupying any portion of such floor (upon request of Landlord, Tenant shall promptly advise Landlord of the business of Tenant or any Related Entity occupying any such portion of the floor).

(E)    (1)     If Tenant shall desire to sublet all or any portion of the Premises for "all or substantially all" of the remainder of the Term, other than to a Related Entity, Tenant shall so notify ("Termination Notice") Landlord, and Landlord shall have the option, exercisable within fifteen (15) Business Days of its receipt of Tenant's notice, to terminate this Lease with respect to such portion of the Premises (the "Terminated Space"). For purposes of this Article 12, a subletting which shall expire within eighteen (18) months of the Expiration Date of this Lease shall be deemed to be for "all or substantially all" of the remainder of the Term.

(2)     If Landlord shall fail to notify Tenant within said fifteen (15) Business Day period of its intention to exercise its option to terminate this Lease with respect to the Terminated Space, or if Landlord shall notify Tenant that it does not desire to terminate the Lease with respect to the Terminated Space, Tenant shall be free to seek a subtenant for such Terminated Space. Any such subletting shall be subject to the approval of Landlord, as more particularly set forth in paragraph (A) of this Section 12.6, it being expressly understood and agreed however, that upon the expiration of such fifteen (15) Business Day period, Landlord shall

have no further right or option to terminate this Lease with respect to the Terminated Space or to designate such space as Recapture Space pursuant to Section 12.6(C), unless within seventy-five (75) days after the expiration of Landlord's fifteen (15) Business Day period, Tenant shall not have submitted to Landlord a Sublease Statement for a proposed subletting of the Terminated Space for all or substantially all of the remainder of the Term for Landlord's review and approval, in which event, Landlord shall once again be entitled to exercise its option under this paragraph (E) if Tenant shall subsequently desire to sublease all or any portion of the Premises for "all or substantially all" of the remainder of the Term.

(3)    If Landlord exercises its option to terminate this Lease with respect to the Terminated Space, this Lease shall remain in full force and effect except:

(a)    from and after the thirtieth (30th) day after Landlord notifies Tenant of the exercise of its option pursuant to this paragraph (E) (the "Termination Date"), this Lease shall come to an end and expire solely with respect to the Terminated Space with the same effect as if the Termination Date were the Expiration Date;

(b)    Landlord shall, at its expense, make such alterations as may be required or reasonably deemed necessary by Landlord to physically separate the Terminated Space from the balance of the Premises and to provide appropriate means of ingress and egress thereto and to the public portions of the balance of the floor such as toilets, janitor's closets, telephone and electrical closets, fire stairs, elevator lobbies, etc.; and

(c)    from and after the Termination Date, (x) the Fixed Rent, Tenant's Operating Share, Tenant's Tax Share, and the Space Factor applicable to Space-8, Space-9-10, Space-11A, Space-11B, Space-11C, Space-18A, Space-18-B and/or the Basement Space shall be reduced in the proportion which any area of the Terminated Space bears to the total area of Space-8, Space-9-10, Space-11A, Space-11B, Space-11C, Space-18A, Space-18-B and/or the Basement Space, as the case may be, immediately prior to the Termination Date, (y) if any portion of the Terminated Space is comprised of a portion of Space-8 and/or Space 9-10, then the Base amounts applicable to Space-8 and/or Space-9-10, as the case may be, shall be reduced in the proportion which such portion of the Terminated Space bears to the total area of Space-8 and/or Space-9-10 comprising a portion of the Terminated Space bears to the total area of Space-8 and/or Space-9-10, as the case may be, on the day immediately prior to the Termination Date and (z) any Escalation Rent which shall have been prepaid for any period beyond the Termination Date shall be promptly refunded to Tenant.

(4)    It is expressly understood and agreed that if Landlord shall exercise its right to terminate this Lease with respect to any Terminated Space, the Terminated Space shall be eliminated from the Premises for all purposes hereunder, and Tenant shall have no further rights or obligations (except for any rights or obligations which arise or accrue prior to the Termination Date) with respect to such Terminated Space.

(5)    Tenant shall have the right to designate that a proposed sublease of all or any portion of the Premises for all or substantially all of the remainder of the Term be treated as Recapture Space under paragraph (C) of this Section 12.6 rather than as Terminated Space by submitting a Sublease Statement to Landlord pursuant to paragraph (C) of this Section 12.6 for such proposed subletting in lieu of submitting a Termination Notice to Landlord.

(F)    "Short Term Sublease" shall mean one or more subleases entered into for a term of not more than three (3) years including all renewal and extension terms contained therein and covering, in the aggregate, not more ten percent (10%) of the Tribune Space. Tenant may enter into Short Term Subleases without the consent of Landlord and without giving Landlord any right to treat the space proposed to be demised under such Short Term Sublease as Recapture Space or Terminated Space. Tenant shall deliver to Landlord a true, complete and fully executed counterpart of such Short Term Sublease within ten (10) Business Days after execution thereof. Notwithstanding the foregoing provisions of this Section 12.6(F), Landlord and Tenant agree that the sublease in effect as of the Commencement Date between Tenant and Mia Vita with respect to approximately seven thousand seven hundred eighty (7,780) rentable square feet of Space-11, and all renewals and extensions thereof, is hereby deemed to be a Short Term Sublease.

(G)    (1)    Landlord hereby acknowledges that Tenant has entered into a sublease (the "Time4 Sublease"), dated October 6, 2000 and as amended on November 30, 2000, with Time4 Media, Inc. (formerly known as Times Mirror Magazines, Inc.) whereby Tenant has sublet the Time4 Space.

(2)    Intentionally omitted.

(3)    In the event that:

(a)    at any time after the Commenement Date, either (x) AOL Time Warner, Inc., or (y) an affiliate of AOL Time Warner, Inc. which has a financial standing which is acceptable to Landlord in its sole discretion (either of such entities in clauses (x) and (y) being referred to as an "Acceptable AOL-Time Entity") shall execute and deliver to Landlord a guaranty satisfactory to Landlord in Landlord's sole discretion whereby such Acceptable AOL-Time Entity guarantees the obligations of the Time4 Subtenant under the Time4 Sublease or shall become the subtenant under the Time4 Sublease, and

(b)    Time4 Subtenant and Tenant shall execute a document terminating the Time4 Sublease, and

(c)    Landlord and either (x) the Time4 Subtenant, if an Acceptable AOL-Time Entity shall guarantee the obligations of the Time4 Subtenant under the Time4 Sublease or (y) an Acceptable AOL-Time Entity, if such Acceptable AOL-Time Entity shall

have become the subtenant under the Time4 Sublease (the Person described in clause (x) or (y) above being referred to as the "Time4 Direct Tenant"), shall enter into a new lease with respect to the Time4 Space in the same form and on all of the same terms and conditions applicable to the Time4 Space under this Lease, except (I) all references to Tribune Company shall be deemed to refer to the Time4 Direct Tenant, (II) the Time4 Direct Tenant shall have the right to enter into Short Term Subleases with respect to not more than 10% of the rentable square footage of the Time4 Space, (III) Time4 Direct Tenant shall have no rights to any parking spaces at the Real Property, expansion rights, renewal or extension rights or signage rights, and (IV) Time4 Direct Tenant shall be entitled to five hundred (500) listings in the computerized Directory in the lobby of the Building (with no programming charge for the first fifty (50) listings) (such new lease being referred to as the "New Time4 Lease");

then this Lease shall be automatically amended so as to terminate this Lease with respect to the Time4 Space, and in accordance therewith, the Base Amounts shall be reduced in the proportion which the area of any portion of Space-8 and Space-9-10 which is then a portion of the Time4 Space bears to the total area of Space-8 and Space-9-10 immediately prior to the termination of the Lease with respect to the Time4 Space. In the event that clauses (a), (b) and (c) of this Section 12.6(G)(3) are satisfied and the Lease is automatically amended as aforesaid, Landlord and Tenant shall enter into a written agreement setting forth the modified terms of this Lease.

(4)    If the Time4 Direct Tenant proposes to enter into the New Time4 Lease, then Landlord shall enter into the New Time4 Lease, provided that Tenant and the Time4 Subtenant shall simultaneously execute a document terminating the Time4 Sublease.

(5)    Tenant shall pay any and all transfer taxes which shall be due and payable in connection with the amendment of this Lease in accordance with the provisions of Section 12.6(G)(3).

Section 12.7    (A)    In connection with any subletting of all or any portion of the Premises, including, without limitation, any Short Term Sublease, Landlord shall be entitled to fifty percent (50%) of any Sublease Profit derived therefrom. The Sublease Profit to be paid to Landlord shall be calculated based upon the Sublease Rent payable under any subleases. All sums payable hereunder by Tenant shall be calculated on an annualized basis, but shall be paid to Landlord, as additional rent, within ten (10) days after receipt thereof by Tenant.

(B)    For purposes of this Lease:

(1)    "Rent Per Square Foot" shall mean the sum of the then Fixed Rent, Escalation Rent and Electricity Additional Rent payable with respect to each of Space-8, Space-9-10, Space-11A, Space-11B, Space-11C, Space-18A, Space-18-CD and/or the Basement Space, as the case may be, to the extent that such portions of the Premises contain any portion of the Premises being sublet by Tenant divided by the sum of the Space Factors applicable to such portions of the Premises containing any portions of the Premises being sublet.

(2)   "Sublease Profit" shall mean the product of (x) the Sublease Rent Per Square Foot less the Rent Per Square Foot, and (y) the number of rentable square feet constituting the portion of the Premises sublet by Tenant.

(3)   "Sublease Rent" shall mean any rent or other consideration paid to Tenant directly or indirectly, by any subtenant, or any other amount received by Tenant from or in connection with any subletting (including, but not limited to, sums paid for the sale or rental, or consideration received on account of any contribution, of Tenant's Property or sums paid in connection with the supply of electricity or HVAC (in excess of amounts paid by Tenant here-under for HVAC for the space covered by such sublease) or any costs which are deducted as Sublease Expenses but thereafter are recouped by Tenant) after deducting therefrom the following sublease expenses (the "Sublease Expenses"):  (i) in the event of a sale of Tenant's Property, the then unamortized or undepreciated cost thereof determined on the basis of Tenant's accounting records, as certified by Tenant's Chief Financial Officer, (ii) the reasonable out-of-pocket cost and expenses of Tenant in making such sublease such as brokers' fees and disbursements, attorneys' fees and disbursements, and advertising fees paid to unrelated third parties, (iii) any sums paid to Landlord pursuant to paragraph (A)(9) of Section 12.6, (iv) improvements or alterations costs including the pro rata portion (based upon the size of the applicable space being sublet) of the then unamortized or undepreciated cost (as determined on the basis of Tenant's accounting records, as certified by Tenant's Chief Financial Officer) of (a) to the extent that any portion of Space-8 is included in the subleased premises, the difference obtained by subtracting the amount of the Tenant Fund from the total cost of the Initial Alterations, (b) to the extent that any portion of Space-11C is included in the subleased premises, the difference obtained by subtracting the amount of the Initial 11th Floor Alterations Tenant Fund from the total cost of the Initial 11th Floor Alterations, (c) to the extent that any portion of Space-11A or Space-11B is included in the subleased premises, the difference obtained by subtracting the amount of the Additional Initial 11th Floor Alterations Tenant Fund from the total cost of the Additional Initial 11th Floor Alterations and/or (d) to the extent that any portion of Space-18A is included in the subleased premises, the difference obtained by subtracting the amount of the Initial 18th Floor Alterations Tenant Fund from the total cost of the Initial 18th Floor Alterations, (v) the unamortized unreimbursed cost of any Tenant's Property leased to and used by such subtenant, (vi) the reasonable out-of-pocket costs incurred by Tenant in connection with terminating such subtenant's lease or sublease at another building or taking an assignment of such subtenant's existing lease or sublease and subletting such space for such subtenant, (vii) the amount of any abatement or rent credit with respect to the fixed rent payable under such Sublease, and (viii) with respect to a Short Term Sublease only, the Fixed Rent and Escalation Rent paid by Tenant to Landlord under this Lease for such sublet space covered by such Short Term Sublease for the period commencing on the date (a) the sublet space in question shall have been vacated by all occupants (including Tenant) and no rent or other consideration shall have been payable to Tenant for such space, and (b) Tenant shall have listed such sublet space for subletting with real estate brokers, and ending on the commencement of the term of such Short Term Sublease, provided that during such period such sublet space shall remain unoccupied and provided further that during such period, Tenant shall have actively marketed such space.  In determining Sublease Rent, the costs set forth in clauses

(ii), (iii) and (vi) (except to the extent such costs if incurred with respect to the portion of the Premises being sublet in clause (vi) would otherwise be amortized hereunder) shall be deducted as and when paid, and the costs set forth in clauses (i), (iv), (v), (vii) and (viii) shall be amortized on a straight-line basis over the term of such Sublease.

(4)    "Sublease Rent Per Square Foot" shall mean the Sublease Rent divided by the rentable square feet of the space demised under a sublease.

(5)    Sublease Profit shall be recalculated from time to time to reflect any corrections in the prior calculation thereof due to (i) subsequent payments received or made by Tenant, (ii) the final adjustment of payments to be made by or to Tenant, or (iii) mistake. Promptly upon the making or receipt of any such payment or the discovery of any such mistake, Tenant shall submit to Landlord a recalculation of the Sublease Profit as the case may be, and an adjustment shall be made between Landlord and Tenant, if applicable with respect thereto on account of prior payments made or credits received pursuant to this Section 12.7.

(6)    As used in this Section 12.7, "Tenant" shall also include any Related Entity.

Section 12.8    "Assignment Proceeds" shall mean all consideration paid to Tenant named herein, directly or indirectly, by any assignee for such assignment, whether paid at the time of such assignment or at the time such assignee ceases to be a Related Entity, or any other amount received by Tenant named herein from or in connection with any assignment (including, but not limited to, sums paid for the sale or rental, or consideration received on account of any contribution, of Tenant's Property) after deducting therefrom: (a) in the event of a sale or contribution of Tenant's Property, the then unamortized or undepreciated cost thereof determined on the basis of Tenant's accounting records, as certified by Tenant's Chief Financial Officer, (b) the reasonable out-of-pocket costs and expenses of Tenant in making such assignment such as brokers' fees and disbursements, attorneys' fees and disbursements, and advertising fees paid to unrelated third parties, (c) any payments required to be made by Tenant in connection with the assignment of its interest in this Lease pursuant to Article 31-B of the Tax Law of the State of New York or any real property transfer tax of the United States or the City or State of New York (other than any income tax), (d) the improvement or alteration costs to prepare the Premises for such assignment and (e) the then unamortized or undepreciated cost (as determined on the basis of Tenant's accounting records, as certified by Tenant's Chief Financial Officer) of (i) the difference obtained by subtracting the amount of the Tenant Fund from the total cost of the Initial Alterations, (ii) the difference obtained by subtracting the amount of the Initial 11th Floor Alterations Tenant Fund from the total cost of the Initial 11th Floor Alterations, (iii) the difference obtained by subtracting the amount of the Additional Initial 11th Floor Alterations Tenant Fund from the total cost of the Additional Initial 11th Floor Alterations and/or (iv) the difference obtained by subtracting the amount of the Initial 18th Floor Alterations Tenant Fund from the total cost of the Initial 18th Floor Alterations. If the consideration paid to Tenant named herein for any assignment shall be

paid in installments, then the expenses specified herein shall be amortized over the period during which such installments shall be payable.

      Section 12.9    In the event of any assignment of this Lease permitted pursuant to the terms of this Article 12:

          (A)    Landlord shall give to Tenant named herein at the address last furnished to Landlord pursuant to the provisions of this Lease, a copy of each notice of default given to the then Tenant simultaneously with the giving of such notice to the then Tenant.

          (B)    Provided that the then Tenant shall have delivered to Landlord an agreement in form and substance reasonably satisfactory to Landlord pursuant to which the then Tenant agrees that Landlord may accept performance by Tenant named herein as performance by the then Tenant, Landlord shall accept performance by Tenant named herein of any term, covenant, agreement, provision, condition or limitation on the then Tenant's part to be performed and observed under this Lease with the same force and effect as if performed and observed by the then Tenant, provided such performance shall occur within the time prescribed therefor in this Lease. The curing or remedying of any default by Tenant named herein within the time period permitted herein shall be deemed to be the curing or remedying thereof; and Tenant named herein may elect that such curing or remedying by Tenant named herein of any default shall be deemed to be the curing or remedying thereof only as to Tenant named herein and not as to then Tenant hereunder, in which case Tenant named herein, subject to the requirements of any Superior Lease or Mortgage, shall be entitled to enforce, by subrogation or otherwise, any and all of the rights of Landlord against the then Tenant, including the right to recover possession of the Premises, as Tenant hereunder, and to recover any rent actually paid by Tenant named herein, but in no event shall Tenant named herein have the right to terminate this Lease.

          (C)    In the event that there is a default under this Lease susceptible of being cured by Tenant named herein and Tenant named herein tenders the curing thereof, Landlord shall have the right, for a period of thirty (30) days after such tender, to reject, in writing, such curing but in such event Tenant named herein shall thereupon be deemed entirely freed and relieved by Landlord of any and all covenants and obligations under or in respect of this Lease and in respect of the Premises.

      Section 12.10    Notwithstanding any other provision of this Lease, neither Tenant nor any direct or indirect assignee or subtenant of Tenant may enter into any lease, sublease, license, concession or other agreement for use, occupancy or utilization of space in the Premises which provides for a rental or other payment for such use, occupancy or utilization based in whole or in part on the net income or profits derived by any person from the property leased, occupied or utilized, or which would require the payment of any consideration which would not fall within the definition of "rents from real property", as that term is defined in Section 856(d) of the Internal Revenue Code of 1986, as amended.

ARTICLE 13
ELECTRICITY

Section 13.1    Tenant shall at all times comply with the rules, regulations, terms and conditions applicable to service, equipment, wiring and requirements of the public utility supplying electricity to the Building. The risers serving the Premises shall be capable of supplying for each floor of the Premises, 9.2 watts of electricity per rentable square foot of such floor of the Premises, exclusive of electricity required to operate the heating, ventilating and air-conditioning equipment of the Building Systems. If by reason of Landlord's supplying electricity to the Premises, exclusive of electricity required to operate the heating, ventilating and air-conditioning equipment of the Building Systems, in excess of 7 watts per rentable square foot of the Premises, Landlord shall be required to install any additional riser, risers, cabling and/or a switch to supply such excess electricity, such installation shall be done by Landlord at Landlord's actual direct out-of-pocket costs and expenses, not to exceed Seventy Eight Thousand Dollars ($78,000), which costs and expenses shall be borne by Tenant. The cost of such installation shall be chargeable and collectible as additional rent and paid within ten (10) Business Days after the rendition of a bill to Tenant therefor. Tenant agrees that Tenant's use of electric current shall not exceed such capacity. In the event that Tenant requires electrical capacity in excess of 9.2 watts per rentable square foot of the Premises, exclusive of electricity required to operate the heating, ventilating and air-conditioning equipment of the Building Systems, at Tenant's request, Landlord shall reasonably determine (taking into consideration the potential needs of present and future tenants of the Building and of the Building itself) if there is sufficient electrical capacity available within the limits of the switchgear. If Landlord shall so determine that there is sufficient electrical capacity available within the limits of the switchgear, Landlord shall make such electrical capacity available, provided that if such excess capacity necessitates the installation of an additional riser, risers or other proper and necessary equipment, the same shall be installed by Landlord, within the limits of the switchgear. Any such installation shall be made at Tenant's sole expense, and shall be chargeable and collectible as additional rent and paid within ten (10) Business Days after the rendition of a bill to Tenant therefor. Except as otherwise provided in this Lease, Landlord shall not be liable in any way to Tenant for any failure or defect in the supply or character of electric service furnished to the Premises by reason of any requirement, act or omission of the utility serving the Building or for any other reason not attributable to the gross negligence of Landlord, whether electricity is provided by public or private utility or by any electricity generation system owned and operated by Landlord.

Section 13.2    (A)    Unless Landlord is required by any Requirement to have Tenant obtain electricity directly from the public utility company furnishing electricity to the Building pursuant to the provisions of Section 13.4 hereof, and subject to the provisions of Section 13.3 hereof, electricity shall be furnished by Landlord to the Premises and Tenant shall pay to Landlord, as additional rent for such service, the sum of (the "Electricity Additional Rent"), (i) the product of (x) Cost Per Kilowatt Hour, and (y) Tenant's demand and consumption of electricity as determined by meters or submeters (installed by Landlord, at Landlord's cost, for the purpose of measuring such consumption), plus (ii) an amount equal to the reasonable out-of-pocket costs and

expenses incurred by Landlord in connection with reading and maintaining the meters and preparing the bills for such electricity.

(B)    "Cost Per Kilowatt Hour" shall mean the total cost for electricity incurred by Landlord to service the Building during a particular time period (including energy charges, demand charges, all applicable surcharges, time-of-day charges, fuel adjustment charges, rate adjustment charges, taxes and any other factors used by the public utility in computing its charges to Landlord) divided by the total kilowatt hours purchased by Landlord during such period.

(C)    Where more than one meter measures the electricity supplied to Tenant, the electricity rendered through each meter may be computed and billed in the aggregate, as if one (1) meter measured the electricity supplied. Bills for the Electricity Additional Rent shall be rendered to Tenant at such time as Landlord may elect, but in no event more frequently than monthly, and Tenant shall pay the amount shown thereon to Landlord within ten (10) Business Days after receipt of such bill.

Section 13.3    If prior to the installation of the electric meters or submeters in the Premises, Tenant shall occupy all or any portion of the Premises for the conduct of business, Landlord shall furnish electric current to the Premises on a "rent inclusion" basis, until said meters or submeters are installed and operational. The Fixed Rent set forth in this Lease does not include a charge for such electric service. Accordingly, Tenant shall pay to Landlord on the first day of each month during such inclusion period, in the same manner as Fixed Rent is payable hereunder, an annual amount equal to $2.50, multiplied by the Space Factor for the applicable portion of the Premises (the "Electricity Inclusion Charge"). If electricity is furnished on a "rent inclusion" basis for less than a twelve (12) month period, the Electricity Inclusion Charge shall be prorated based on the number of days occurring during said twelve (12) month period, and if Landlord is supplying electricity to only a portion of the Premises on a "rent inclusion" basis as aforesaid, the Electricity Inclusion Charge shall be proportionally reduced based on the area of the Premises being supplied with electricity on a "rent inclusion" basis. The parties agree that although the charge for furnishing electrical energy is reflected in the Electricity Inclusion Charge on a so called "rent inclusion" basis, the value to Tenant of such service may not be accurately reflected in such Electricity Inclusion Charge. Accordingly, Landlord and Tenant agree that after the meters and/or submeters are installed and operational and electricity is being furnished to such portion of the Premises pursuant to Section 13.2 hereof for three (3) full calendar months, the Electricity Inclusion Charge shall be adjusted based on the average of the Electricity Additional Rent ("Three Month Average") payable by Tenant for such three (3) month period with respect to the portion of the Premises which was previously being furnished with electricity on a "rent inclusion" basis. If the Three Month Average shall exceed the Electricity Inclusion Charge, Tenant shall, within ten (10) Business Days after demand therefor, pay such excess to Landlord, and if the Electricity Inclusion Charge shall exceed the Three Month Average, Landlord, at its option, shall either promptly refund to Tenant such excess or shall credit such excess against immediately subsequent monthly installments of Fixed Rent next becoming due and payable hereunder.

Section 13.4    If Landlord shall be required by applicable Requirements to discontinue furnishing electricity to Tenant pursuant to Section 13.2 hereof, this Lease shall continue in full force and effect and shall be unaffected thereby, except only that from and after the effective date of such discontinuance, Landlord shall not be obligated to furnish electricity to Tenant and Tenant shall not be obligated to pay the Electricity Additional Rent or the Electricity Fee, as the case may be.  If Landlord so discontinues furnishing electricity to Tenant, Tenant shall diligently obtain electric energy directly from the public utility furnishing electric service to the Building.  The costs of such service shall be paid by Tenant directly to such public utility.  Such electricity may be furnished to Tenant by means of the existing electrical facilities serving the Premises, at no charge, to the extent the same are available, suitable and safe for such purposes as determined by Landlord.  All meters and all additional panel boards, feeders, risers, wiring and other conductors and equipment which may be required to obtain electricity shall be installed by Landlord at Landlord's expense.  Landlord, to the extent permitted by applicable Requirements, shall not discontinue furnishing electricity to the Premises until such installations have been made and Tenant shall be able to obtain electricity directly from the public utility.

## ARTICLE 14
## ACCESS TO PREMISES

Section 14.1    (A)    Tenant shall permit Landlord, Landlord's agents and public utilities servicing the Building to erect, use and maintain, concealed ducts, pipes and conduits in and through the Premises.  Notwithstanding the foregoing, Landlord shall not erect any ducts, pipes or conduits through the walls of the Premises unless necessitated by emergency or unless it is not engineeringly or economically feasible to do so in another portion of the Premises.  Subject to the provisions of Section 14.3 hereof, Landlord and Landlord's agents shall have the right to enter the Premises at all reasonable times upon reasonable prior notice (except in case of emergency), which notice may be oral, to examine the same, to show them to prospective purchasers, Mortgagees or lessees of the Building, and upon prior written notice (except in case of emergency) to make such repairs, alterations, improvements or additions (i) as Landlord may deem necessary or desirable to the Premises or to any other portion of the Building, or (ii) which Landlord may elect to perform ten (10) days after notice following Tenant's failure to commence and diligently proceed to make repairs or perform any work which Tenant is obligated to make or perform under this Lease, or (iii) for the purpose of complying with all Requirements, and Landlord shall be allowed, subject to the provisions of Section 4.3 hereof, to take all material into and upon the Premises that may be required therefor without the same constituting an eviction or constructive eviction of Tenant in whole or in part and the Fixed Rent (and any other item of Rental) shall in no wise abate (except to the extent expressly set forth in Section 14.2 hereof) while said repairs, alterations, improvements or additions are being made, by reason of loss or interruption of business of Tenant, or otherwise.  During the period of one (1) year prior to the Expiration Date, as same may be extended or renewed pursuant to Article 39 hereof, Landlord may exhibit the Premises to prospective tenants thereof.

(B)    Any work performed or installations made pursuant to this Article 14 shall be made with due diligence and otherwise pursuant to Section 4.3 hereof. Landlord shall promptly repair any damage to the Premises or Tenant's Property caused by such work or installations.

(C)    Subject to the provisions of paragraph (A) of this Section 14.1, any pipes, ducts, or conduits installed in or through the Premises pursuant to this Article 14 shall either be concealed behind, beneath or within partitioning, columns, ceilings or floors located or to be located in the Premises, or completely furred at points immediately adjacent to partitioning columns or ceilings located or to be located in the Premises, provided that the installation of such pipes, ducts, or conduits, when completed, shall not reduce the usable area of the Premises beyond a de minimis amount.

Section 14.2    Except as set forth in Section 10.1 hereof, if due to any work or installation performed by Landlord under this Lease or the failure by Landlord to perform its obligations under this Lease (including, without limitation, any interruption, curtailment or failure to supply HVAC, elevator, plumbing, electric or other services provided by the Building Systems of which Landlord is obligated to supply under the terms of this Lease), for any reason whatsoever, (i) Tenant shall be unable for at least five (5) consecutive Business Days to operate its business in the Premises in substantially the same manner as such business was operated prior to the performance of such work or installation or such failure, (ii) Tenant shall actually fail to so operate in the Premises for such five (5) consecutive Business Day period, (iii) such interruption shall occur during business hours, and (iv) Tenant shall have been unable, after using reasonable efforts, to relocate its employees and property located in that portion of the Premises which is the subject of such work or installation or such failure so as to have been able to have continued so to operate its business, the Fixed Rent and the Escalation Rent shall be reduced on a per diem basis in the proportion in which the area of the part of the Premises which is unusable and actually unused bears to the total area of the Premises for each day subsequent to the aforesaid five (5) consecutive Business Day period that such portion of the Premises remains unusable (taking into account in calculating any such reduction, that the Fixed Rent, Base Taxes and Base Operating Year differ with respect to various portions of the Premises). Landlord agrees that it shall perform any work or installation to remedy such condition in accordance with the terms of Section 4.3 hereof.

Section 14.3    Except in the event of an emergency relating to the protection of the Building or the Premises or the health or safety of any tenant or occupant of the Building, including Tenant, or the property of such tenant (including Tenant) or occupant, Landlord shall not enter the Premises unless a representative of Tenant is present, which representative Tenant agrees to have present at the Premises upon reasonable notice from Landlord, and Landlord, in connection with such entry, shall act in accordance with the standards set forth in Section 4.3 hereof. Landlord shall have no liability to Tenant for any failure of Landlord to perform any of its obligations hereunder by reason of Landlord's inability to enter the Premises and Tenant shall indemnify Landlord against, and hold Landlord harmless from, any claim, liability, damage, cost or expense incurred by Landlord by reason of the limitation of Landlord's access to the Premises as

provided in this Section 14.3. If, in an emergency or at any other time (provided Landlord shall have given Tenant the notice required under Section 14.1 hereof), Tenant or its representative shall not be present when entry is necessary by Landlord or Landlord's agent, Landlord or Landlord's agent may enter the same without rendering Landlord or Landlord's agent liable therefor (if during such entry Landlord or Landlord's agents shall act reasonably under the circumstances), and without in any manner affecting this Lease.

Section 14.4   Landlord also shall have the right at any time, without the same constituting an actual or constructive eviction and without incurring any liability to Tenant therefor, to change the arrangement or location of entrances or passageways, doors and doorways, and corridors, elevators (subject to Section 28.1(A) hereof), stairs, toilets, or other public parts of the Building (other than the Premises) and to change the name by which the Building is commonly known, provided any such change does not (a) unreasonably reduce, interfere with or deprive Tenant of access to the Building (except to a de minimis extent), (b) reduce the usable area of the Premises in any manner on any full floor of the Premises, or (c) reduce the usable area of the Premises (except by a de minimis amount) on any partial floor of the Premises. All parts (except surfaces facing the interior of the Premises) of all walls, windows and doors bounding the Premises (including exterior Building walls, exterior core corridor walls, exterior doors and entrances), all balconies, terraces and roofs adjacent to the Premises, all space in or adjacent to the Premises used for shafts, stacks, stairways, chutes, pipes, conduits, ducts, heating, air cooling, plumbing and other mechanical facilities, service closets and other Building facilities are not part of the Premises, and Landlord shall have the use thereof, as well as access thereto (subject to the limitations of Section 14.1 hereof) through the Premises for the purposes of operation, maintenance, alteration and repair.

## ARTICLE 15
### CERTIFICATE OF OCCUPANCY

Tenant shall not at any time use or occupy the Premises in violation of the certificate of occupancy at such time issued for the Premises or for the Building and in the event that any department of the City or State of New York shall hereafter contend or declare by notice, violation, order or in any other manner whatsoever that the Premises are used for a purpose which is a violation of such certificate of occupancy, Tenant shall, upon ten (10) Business Days' written notice from Landlord or any Governmental Authority, immediately discontinue such use of the Premises, subject to Tenant's right to contest same pursuant to, and in accordance with, Section 6.2 hereof. Landlord covenants that on the Commencement Date a temporary or permanent certificate of occupancy covering the Premises will be in force permitting the Premises to be used as "offices," provided, however, neither such certificate, nor any provision of this Lease, nor any act or omission of Landlord, shall be deemed to constitute a representation or warranty that the Premises, or any part thereof, lawfully may be used or occupied for any particular purpose or in any particular manner, in contra distinction to "office" use.

ARTICLE 16
DEFAULT

Section 16.1  Each of the following events shall be an "Event of Default" hereunder:

(A)  if Tenant shall default in the payment when due of any installment of Fixed Rent for ten (10) Business Days after notice of the specific nature of the default, or in the payment when due of any other item of Rental and such default shall continue for ten (10) Business Days after notice of the specific nature of the default is given to Tenant, except that if Landlord shall have given four (4) such notices in any twelve (12) month period, which notices shall specify that same is being rendered pursuant to this Section 16.1, Tenant shall not be entitled to any further notice of its delinquency in the payment of Rental until such time as twelve (12) consecutive months shall have elapsed without Tenant having defaulted in any such payment; or

(B)  Intentionally omitted prior to closing.

(C)  if the Premises shall become abandoned; or

(D)  if Tenant's interest in this Lease shall devolve upon or pass to any person, whether by operation of law or otherwise, except as expressly permitted under Article 12 hereof; or

(E)  (1)  if Tenant shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(2)  if Tenant shall commence or institute any case, proceeding or other action (A) seeking relief on its behalf as debtor, or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property; or

(3)  if Tenant shall make a general assignment for the benefit of creditors; or

(4)  if any case, proceeding or other action shall be commenced or instituted against Tenant (A) seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy,

insolvency, reorganization or relief of debtors, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, which in either of such cases (i) results in any such entry of an order for relief, adjudication of bankruptcy or insolvency or such an appointment or the issuance or entry of any other order having a similar effect, or (ii) remains undismissed for a period of sixty (60) days; or

(5)    if any case, proceeding or other action shall be commenced or instituted against Tenant seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its property which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or

(6)    if Tenant shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clauses (2), (3), (4) or (5) above; or

(7)    if a trustee, receiver or other custodian is appointed for any substantial part of the assets of Tenant which appointment is not vacated or effectively stayed within seven (7) Business Days; or

(F)    if Tenant shall default in the observance or performance of any other term, covenant or condition of this Lease on Tenant's part to be observed or performed and Tenant shall fail to remedy such default within thirty (30) days after notice by Landlord to Tenant of the specific nature of such default, or if such default is of such a nature that it cannot be completely remedied within said period of thirty (30) days and Tenant shall not commence within said period of thirty (30) days, or shall not thereafter diligently prosecute to completion, all steps necessary to remedy such default.

Section 16.2    (A) If an Event of Default (i) described in Section 16.1(E) hereof shall occur, or (ii) described in Sections 16.1(C), (D), or (F) shall occur and Landlord, at any time thereafter, at its option gives written notice to Tenant stating that this Lease and the Term shall expire and terminate on the date specified in such notice, which date shall not be less than twenty (20) days after the giving of such notice, then this Lease and the Term and all rights of Tenant under this Lease shall expire and terminate as if the date on which the Event of Default described in clause (i) above occurred or the date specified in the notice given pursuant to clause (ii) above, as the case may be, were the Fixed Expiration Date and Tenant immediately shall quit and surrender the Premises. Anything contained herein to the contrary notwithstanding, if such termination shall be stayed by order of any court having jurisdiction over any proceeding described in Section 16.1(E) hereof, or by federal or state statute, then, following the expiration of any such stay, or if the trustee appointed in any such proceeding, Tenant or Tenant as debtor-in-possession shall fail to assume Tenant's obligations under this Lease within the period prescribed therefor by law or within one hundred twenty (120) days after entry of the order for relief or as may be allowed by the court, or if said trustee, Tenant or Tenant as debtor-in-possession shall fail to

provide adequate protection of Landlord's right, title and interest in and to the Premises or adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease as provided in Section 12.3(B), Landlord, to the extent permitted by law or by leave of the court having jurisdiction over such proceeding, shall have the right, at its election, to terminate this Lease on ten (10) days' notice to Tenant, Tenant as debtor-in-possession or said trustee and upon the expiration of said ten (10) day period this Lease shall cease and expire as aforesaid and Tenant, Tenant as debtor-in possession or said trustee shall immediately quit and surrender the Premises as aforesaid.

(B)    If an Event of Default described in Section 16.1(A) hereof shall occur, or this Lease shall be terminated as provided in Section 16.2(A) hereof, Landlord, without notice, may reenter and repossess the Premises using such force for that purpose as may be necessary without being liable to indictment, prosecution or damages therefor and may dispossess Tenant by summary proceedings or otherwise.

Section 16.3    If, at any time, (i) Tenant shall comprise two (2) or more persons, or (ii) Tenant's obligations under this Lease shall have been guaranteed by any person other than Tenant, or (iii) Tenant's interest in this Lease shall have been assigned, the word "Tenant," as used in Section 16.1(E), shall be deemed to mean any one or more of the persons primarily or secondarily liable for Tenant's obligations under this Lease. Any monies received by Landlord from or on behalf of Tenant during the pendency of any proceeding of the types referred to in Section 16.1(E) shall be deemed paid as compensation for the use and occupation of the Premises and the acceptance of any such compensation by Landlord shall not be deemed an acceptance of Rental or a waiver on the part of Landlord of any rights under Section 16.2.

ARTICLE 17
REMEDIES AND DAMAGES

Section 17.1    (A)    If there shall occur any Event of Default, and this Lease and the Term shall expire and come to an end as provided in Article 16 hereof or by or under any summary proceeding or any other action or proceeding:

(1)    Tenant shall quit and peacefully surrender the Premises to Landlord, and Landlord and its agents may immediately, or at any time after such default or after the date upon which this Lease and the Term shall expire and come to an end, re-enter the Premises or any part thereof, without notice, either by summary proceedings, or by any other applicable action or proceeding, or by force or otherwise (without being liable to indictment, prosecution or damages therefor), and may repossess the Premises and dispossess Tenant and any other persons from the Premises and remove any and all of their property and effects from the Premises; and

(2)   Landlord, at Landlord's option, may relet the whole or any part or parts of the Premises from time to time, either in the name of Landlord or otherwise, to such tenant or tenants, for such term or terms ending before, on or after the Expiration Date, at such rental or rentals and upon such other conditions, which may include concessions and free rent periods, as Landlord, in its sole discretion, may determine; provided, however, that Landlord shall have no obligation to relet the Premises or any part thereof and shall in no event be liable for refusal or failure to relet the Premises or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon any such reletting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise affect any such liability, and Landlord, at Landlord's option, may make such repairs, replacements, alterations, additions, improvements, decorations and other physical changes in and to the Premises as Landlord, in its sole discretion, considers advisable or necessary in connection with any such reletting or proposed reletting, without relieving Tenant of any liability under this Lease or otherwise affecting any such liability.

(B)   Tenant hereby waives the service of any notice of intention to re-enter or to institute legal proceedings to that end which may otherwise be required to be given under any present or future law. Tenant, on its own behalf and on behalf of all persons claiming through or under Tenant, including all creditors, does further hereby waive any and all rights which Tenant and all such persons might otherwise have under any present or future law to redeem the Premises, or to re-enter or repossess the Premises, or to restore the operation of this Lease, after (a) Tenant shall have been dispossessed by a judgment or by warrant of any court or judge, or (b) any re-entry by Landlord, or (c) any expiration or termination of this Lease and the Term, whether such dispossess, re-entry, expiration or termination shall be by operation of law or pursuant to the provisions of this Lease. The words "re-enter," "re-entry" and "re-entered" as used in this Lease shall not be deemed to be restricted to their technical legal meanings. In the event of a breach or threatened breach by Tenant, or any persons claiming through or under Tenant, of any term, covenant or condition of this Lease, Landlord shall have the right to enjoin such breach and the right to invoke any other remedy allowed by law or in equity as if re-entry, summary proceedings and other special remedies were not provided in this Lease for such breach. The right to invoke the remedies hereinbefore set forth are cumulative and shall not preclude Landlord from invoking any other remedy allowed at law or in equity.

Section 17.2   (A)   If this Lease and the Term shall expire and come to an end as provided in Article 16 hereof, or by or under any summary proceeding or any other action or proceeding, or if Landlord shall re-enter the Premises as provided in Section 17.1, or by or under any summary proceeding or any other action or proceeding, then, in any of said events:

(1)   Tenant shall pay to Landlord all Fixed Rent, Escalation Rent and other items of Rental payable under this Lease by Tenant to Landlord to the date upon which this Lease and the Term shall have expired and come to an end or to the date of re-entry upon the Premises by Landlord, as the case may be;

(2)    Tenant also shall be liable for and shall pay to Landlord, as damages, any deficiency (referred to as "Deficiency") between the Rental for the period which otherwise would have constituted the unexpired portion of the Term and the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of clause (1) of Section 17.1 for any part of such period (first deducting from the rents collected under any such reletting all of Landlord's expenses in connection with the termination of this Lease, Landlord's re-entry upon the Premises and with such reletting, including, but not limited to, all repossession costs, brokerage commissions, legal expenses, attorneys' fees and disbursements, alteration costs and other expenses of preparing the Premises for such reletting); any such Deficiency shall be paid in monthly installments by Tenant on the days specified in this Lease for payment of installments of Fixed Rent, Landlord shall be entitled to recover from Tenant each monthly Deficiency as the same shall arise, and no suit to collect the amount of the Deficiency for any month shall prejudice Landlord's right to collect the Deficiency for any subsequent month by a similar proceeding; and

(3)    whether or not Landlord shall have collected any monthly Deficiency as aforesaid, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord, on demand, in lieu of any further Deficiency as and for liquidated and agreed final damages, a sum equal to the amount by which the Rental for the period which otherwise would have constituted the unexpired portion of the Term exceeds the then fair and reasonable rental value of the Premises for the same period, both discounted to present worth at the Base Rate, less the aggregate amount of Deficiencies theretofore collected by Landlord pursuant to the provisions of clause (A)(2) of this Section 17.2 for the same period; if, before presentation of proof of such liquidated damages to any court, commission or tribunal, the Premises, or any part thereof, shall have been relet by Landlord for the period which otherwise would have constituted the unexpired portion of the Term, or any part thereof, the amount of rent reserved upon such reletting shall be deemed, prima facie, to be the fair and reasonable rental value for the part or the whole of the Premises so relet during the term of the reletting.

(B)    If the Premises, or any part thereof, shall be relet together with other space in the Building, the rents collected or reserved under any such reletting and the expenses of any such reletting shall be equitably apportioned for the purposes of this Section 17.2. Tenant shall in no event be entitled to any rents collected or payable under any reletting, whether or not such rents shall exceed the Fixed Rent reserved in this Lease. Solely for the purposes of this Article 17, the term "Escalation Rent" as used in Section 17.2(A) shall mean the Escalation Rent in effect immediately prior to the Expiration Date, or the date of re-entry upon the Premises by Landlord, as the case may be, adjusted to reflect any increase pursuant to the provisions of Article 27 hereof for the Operating Year immediately preceding such event. Nothing contained in Article 16 hereof or this Article 17 shall be deemed to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages by any statute or rule of law, or of any sums or damages to which Landlord may be entitled in addition to the damages set forth in this Section 17.2.

ARTICLE 18
FEES AND EXPENSES

Section 18.1  If an Event of Default under this Lease shall occur or if Tenant shall fail to comply with its obligations under this Lease and the preservation of property or the safety of any tenant, occupant or other person is threatened, Landlord may (1) perform Tenant's obligations for the account of Tenant, or (2) make any expenditure or incur any obligation for the payment of money, including, but not limited to, reasonable attorneys' fees and disbursements in instituting, prosecuting or defending any action or proceeding, and the cost thereof, with interest thereon at the Applicable Rate, shall be deemed to be additional rent hereunder and shall be paid by Tenant to Landlord within ten (10) Business Days of rendition of any bill or statement to Tenant therefor.

Section 18.2  If Tenant shall fail to pay any installment of Fixed Rent, Escalation Rent or any other item of Rental when due, Tenant shall pay to Landlord, in addition to such installment of Fixed Rent, Escalation Rent or other item of Rental, as the case may be, as a late charge and as additional rent, a sum equal to interest at the Applicable Rate on the amount unpaid, computed from the date such payment was due to and including the date of payment.

ARTICLE 19
NO REPRESENTATIONS BY LANDLORD

Section 19.1  (A)    Landlord and Landlord's agents have made no representations or promises with respect to the Building, the Real Property or the Premises except as herein expressly set forth, and no rights, easements or licenses are acquired by Tenant by implication or otherwise except as expressly set forth herein.  Tenant acknowledges that Tenant (and Tenant's permitted subtenants) are in possession of the Premises as of the Commencement Date, and Tenant accepts continued occupancy of the Premises "as is" and Landlord shall have no obligation to perform any work or make any installations in order to prepare the Premises for Tenant's occupancy or to provide any sums to Tenant in connection with the performance of Alterations at the Premsies.

(B)    (1)    Tenant hereby expressly acknowledges that Landlord has informed Tenant that the Building contains asbestos and asbestos-treated materials which are permitted by applicable Requirements.

(2)    Landlord covenants that the Premises does not contain any asbestos or asbestos-treated materials except for (i) a de minimis amount permitted by applicable Requirements, (ii) asbestos and asbestos-treated materials which are encased in shaftways located in the core areas of the Building which run through the Premises and which are permitted by applicable Requirements and (iii) asbestos and asbestos containing materials incorporated into the Premises by (a) Tenant or Tenant's contractors, subcontractors, mechanics, materialmen or

laborers and/or (b) Tenant's Predecessor or Tenant's Predecessor's contractors, subcontractors, mechanics, materialmen or laborers.

(3)    If at any time during the Term, Tenant shall uncover or discover any asbestos or asbestos-treated materials in the Premises other than as permitted by Paragraph (2) above, Tenant shall have the burden of proof to show that such asbestos or asbestos-treated materials existed in the Premises prior to May 17, 1988 and that none of Tenant's contractors, subcontractors, mechanics, materialmen or laborers are responsible for putting such asbestos or asbestos-treated material in the Premises. In any event, such asbestos shall be promptly removed by Landlord, and both Landlord and Tenant shall comply with the provisions set forth in clause (2) immediately above, at the sole cost and expense of Tenant if Tenant shall fail to meet the burden of proof or at the sole cost and expense of Landlord if Tenant shall successfully meet the burden of proof.

## ARTICLE 20
## END OF TERM

Upon the expiration or other termination of this Lease with respect to any portion of the Premises, Tenant shall quit and surrender to Landlord such portion of the Premises, vacant, broom clean, in good order and condition, ordinary wear and tear and damage for which Tenant is not responsible under the terms of this Lease excepted, and Tenant shall remove all of its property as may be required pursuant to Article 3 hereof; this obligation shall survive the expiration or sooner termination of the Term. If the last day of the Term falls on Saturday or Sunday, this Lease shall expire on the Business Day immediately preceding, Tenant expressly waives, for itself and for any person claiming through or under Tenant, any rights which Tenant or any such person may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules and of any successor law of like import then in force in connection with any holdover summary proceedings which Landlord may institute to enforce the foregoing provisions of this Article 20.

## ARTICLE 21
## QUIET ENJOYMENT

Provided no Event of Default has occurred and is continuing, Tenant may peaceably and quietly enjoy the Premises subject, nevertheless, to the terms and conditions of this Lease including, but not limited to, Section 37.2 hereof and Article 7 hereof.

## ARTICLE 22
## FAILURE TO GIVE POSSESSION

Intentionally omitted.

ARTICLE 23
NO WAIVER

Section 23.1    No act or thing done by Landlord or Landlord's agents during the Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless in writing signed by Landlord. No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the Premises prior to the termination of this Lease. The delivery of keys to any employee of Landlord or of Landlord's agents shall not operate as a termination of this Lease or a surrender of the Premises. In the event Tenant at any time desires to have Landlord sublet the Premises for Tenant's account, Landlord or Landlord's agents are authorized to receive said keys for such purpose without releasing Tenant from any of the obligations under this Lease, and Tenant hereby relieves Landlord of any liability for loss of or damage to any of Tenant's effects in connection with such subletting.

Section 23.2    The failure of Landlord to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease, or any of the Rules and Regulations or Alteration Rules and Regulations set forth or hereafter adopted by Landlord, shall not prevent a subsequent act, which would have originally constituted a violation, from having all of the force and effect of an original violation. The receipt by Landlord of Fixed Rent, Escalation Rent or any other item of Rental with knowledge of the breach of any covenant of this Lease (other than the failure to pay such item of Rental) shall not be deemed a waiver of such breach. Except as otherwise provided herein, the failure of Landlord to enforce any of the Rules and Regulations or Alteration Rules and Regulations set forth, or hereafter adopted, against Tenant or any other tenant in the Building shall not be deemed a waiver of any such Rules and Regulations or Alteration Rules and Regulations, as the case may be. No provision of this Lease shall be deemed to have been waived by Landlord, unless such waiver be in writing signed by Landlord. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly Fixed Rent or other item of Rental herein stipulated shall be deemed to be other than on account of the earliest stipulated Fixed Rent or other item of Rental, or as Landlord may elect to apply same, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Fixed Rent or other item of Rental be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Fixed Rent or other item of Rental or pursue any other remedy in this Lease provided. Except as otherwise provided in (x) Sections 37.10 and 37.11 hereof and (y) the Settlement Agreement, this Lease, together with the Letter Agreement and all other agreements between Landlord and Tenant, made as of the date hereof, contains the entire agreement between the parties and all prior negotiations and agreements are merged herein. Any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of this Lease in whole or in part unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

Section 23.3    The failure of Tenant to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease on Landlord's part to be performed, shall not be deemed a waiver of such breach or prevent a subsequent act which would have originally constituted a violation from having all of the force and effect of an original violation. The payment by Tenant of Fixed Rent, Escalation Rent or any other item of Rental or performance of any obligation of Tenant hereunder with knowledge of any breach of any covenant of this Lease shall not be deemed a waiver of such breach, and payment of the same by Tenant shall be without prejudice to Tenant's right to pursue any remedy against Landlord at law or in equity, as any such rights and remedies may be modified and/or limited by the terms of this Lease.

## ARTICLE 24
### WAIVER OF TRIAL BY JURY

The respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, or for the enforcement of any remedy under any statute, emergency or otherwise. If Landlord commences any summary proceeding against Tenant, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding (unless failure to impose such counterclaim would preclude Tenant from asserting in a separate action the claim which is the subject of such counterclaim), and will not seek to consolidate such proceeding with any other action which may have been or will be brought in any other court by Tenant.

## ARTICLE 25
### INABILITY TO PERFORM

Except as otherwise provided in this Lease, this Lease and the obligation of Tenant to pay Rental hereunder and perform all of the other covenants and agreements hereunder on the part of Tenant to be performed shall in no wise be affected, impaired or excused because Landlord is unable to fulfill any of its obligations under this Lease expressly or impliedly to be performed by Landlord or because Landlord is unable to make, or is delayed in making any repairs, additions, alterations, improvements or decorations or is unable to supply or is delayed in supplying any equipment or fixtures, if Landlord is prevented or delayed from so doing by reason of strikes or labor troubles or by accident, or by any cause whatsoever reasonably beyond Landlord's control, including but not limited to, laws, governmental preemption in connection with a national emergency or by reason of any Requirements of any Governmental Authority or by reason of the conditions of supply and demand which have been or are affected by war or other emergency ("Unavoidable Delays").

Landlord shall promptly notify Tenant of any Unavoidable Delay which prevents or which Landlord anticipates may prevent Landlord from fulfilling any of its obligations under this Lease.

## ARTICLE 26
## BILLS AND NOTICES

Except as otherwise expressly provided in this Lease, any bills, statements, consents, notices, demands, requests or other communications given or required to be given under this Lease shall be in writing and shall be deemed sufficiently given or rendered if delivered by hand (against a signed receipt) or if delivered by registered or certified mail (return receipt requested) addressed

if to Tenant (a) at 435 Michigan Avenue, Chicago, Illinois 60611, Attn.: Real Estate Director, or (c) at any place where Tenant or any agent or employee of Tenant may be found if mailed subsequent to Tenant's abandoning or surrendering the Premises, in each case with a copy to Tribune Company, 435 Michigan Avenue, Chicago, Illinois 60611, Attn.: General Counsel, or

if to Landlord c/o Vornado Office Management LLC, 888 Seventh Avenue, New York, New York, 10019, Attn.: Mr. David E. Green, and with copies to (x) Vornado Realty Trust, 210 Route 4 East, Paramus, New Jersey 07652, Attn.: Mr. Joseph Macnow, (y) Proskauer Rose LLP, 1585 Broadway, New York, New York 10036, Attn.: Lawrence J. Lipson, Esq., and (z) each Mortgagee and Lessor which shall have requested same, by notice given in accordance with the provisions of this Article 26 at the address designated by such Mortgagee or Lessor, or

to such other address(es) as either Landlord or Tenant may designate as its new address(es) for such purpose by notice given to the other in accordance with the provisions of this Article 26, Any such bill, statement, consent, notice, demand, request or other communication shall be deemed to have been rendered or given on the date when it shall have been delivered as provided in this Article 26.

## ARTICLE 27
## ESCALATION

Section 27.1    For the purposes of this Article 27, the following terms shall have the meanings set forth below.

(A)    "Assessed Valuation" shall mean the amount for which the Real Property is assessed pursuant to applicable provisions of the New York City Charter and of the Administrative Code of the City of New York for the purpose of imposition of Taxes.

(B)    "Base Operating Expenses" shall mean the Operating Expenses payable for (i) the Operating Year ending December 31, 1995 with respect to Space-8 and Space-9-10, (ii) the Operating Year ending December 31, 1998 with respect to Space-11A and Space-11B, (iii) the Operating Year ending December 31, 1997 with respect to Space-11C and Space-18A and (iv) the Operating Year ending December 31, 1993 with respect to Space-18B.

(C)    "Base Taxes" shall mean (i) the Taxes payable for the Tax Year commencing July 1, 1989 and ending June 30, 1990 with respect to Space-8 and Space-9-10, (ii) the sum of (x) one-half of the Taxes payable during the Tax Year commencing July 1, 1996 and ending June 30, 1997 and (y) one-half of the Taxes payable during the Tax Year commencing June 30, 1997 and ending June 31, 1998 with respect to Space-11A, Space-11B, Space-11C and Space-18A and (iii) the sum of (x) one-half of the Taxes payable during the Tax Year commencing July 1, 1992 and ending June 30, 1993 and (y) one-half of the Taxes payable during the Tax Year commencing June 30, 1993 and ending June 31, 1994 with respect to Space-18B.

(D)    (1)    "Operating Expenses" shall mean the aggregate of those costs and expenses, without duplication, (and taxes, if any, thereon) paid or incurred by or on behalf of Landlord (whether directly or through independent contractors) in respect of the Operation of the Property which, in accordance with generally accepted accounting principles consistently applied, are properly chargeable to the Operation of the Property, together with and including (without limitation): the costs of gas, oil, steam, water, sewer rental, electricity (for the portions of the Real Property not leased to and occupied by tenants or available for occupancy), HVAC and other utilities furnished to the Building and utility taxes (to the extent not previously charged as an Operating Expense), and the expenses incurred in connection with the Operation of the Property such as insurance premiums, attorneys' fees and disbursements (exclusive of any such fees and disbursements incurred in applying for an abatement of Taxes) and auditing and other professional fees and expenses relating to the Operation of the Property, but specifically excluding:

(i)    Taxes;

(ii)    franchise or income taxes imposed upon Landlord;

(iii)    interest and amortization, except as provided below;

(iv)    leasing commissions;

(v)    capital improvements (except as provided in clause (3) of this Section 27.1(D));

(vi)    the cost of electrical energy furnished directly to Tenant and other tenants of the Building;

(vii)    the cost of tenant installations, improvements and decorations incurred in connection with preparing space for a new tenant or otherwise;

(viii)    salaries of personnel above the grade of Building manager and such Building manager's supervisor, if any, and with respect to such Building manager's supervisor, an amount which is competitive with the amounts being charged by other landlords in comparable buildings;

(ix)    ground rent;

(x)    any expense for which Landlord is otherwise compensated through the proceeds of insurance or is otherwise compensated or has the right to be compensated by any tenant (including Tenant) of the Building for services in excess of the services Landlord is obligated to furnish to Tenant hereunder;

(xi)    legal fees incurred in connection with any negotiation or the enforcement of, or disputes, or evictions arising out of, any space lease in the Building;

(xii)    depreciation;

(xiii)    any fee or expenditure paid (i) to any corporation or entity which controls, is controlled by or is under common control with Landlord, or in which Landlord directly or indirectly owns not less than a fifty percent (50%) interest, or (ii) to any shareholder owning at least fifty percent (50%) of the common stock, any general partner, any officer above the rank of vice president, or member of any board of directors of Landlord or of any corporation or entity described in this clause (xiii) or to any person who is a relative by blood (to the first degree of consanguinity, lineal or lateral) or marriage of any of such persons, in each case in excess of the amount which would be paid in the absence of such relationship (for the purposes of this clause, the term "control" shall be deemed to have the same meaning as set forth in Section 12.4 hereof);

Building;    (xiv)    Landlord's advertising and promotional costs for the

(xv)    financing costs; and

(xvi)    the cost of removal or encapsulation of any asbestos or asbestos treated materials with respect to all non-tenantable areas of the Building;

except, however, that if Landlord is not furnishing any particular work or service (the cost of which if performed by Landlord would constitute an operating Expense) to a tenant who has undertaken to perform such work or service in lieu of the performance thereof by Landlord, then to the extent such work or service was included in Base Operating Expenses, the Base Operating Expenses hereunder shall be reduced by an amount equal to the amount which was included in the Base Operating Expenses for the furnishing of such work or service to such tenant, as reasonably determined by Landlord, it being understood and agreed that Operating Expenses for the Operating Year in question shall not include any amount so deducted from the Base Operating Expenses. Any costs incurred in performing work or furnishing services for any tenant (including Tenant), whether at such tenant's or Landlord's expense, to the extent that such work or service is in excess of any work or service that Landlord is obligated to furnish to Tenant at Landlord's expense shall be deducted from Operating Expenses otherwise chargeable to the Operation of the Property. Any insurance proceeds received with respect to any item previously included as an Operating Expense shall be deducted from Operating Expenses for the Operating Year in which such proceeds are received. Until such time as the electricity supplied to each floor of the Building and the common and public areas of the Building (including, without limitation, the Building Systems) shall be separately metered or submetered. Operating Expenses shall include an amount equal to (x) (i) Landlord's Cost Per Kilowatt Hour of furnishing electric current to the entire Building, multiplied by (ii) the number of kilowatt hours of electric current furnished to the public and common areas of the Building (including, without limitation, the Building Systems) and other areas not available for occupancy as determined by a survey prepared by an independent, reputable electrical engineer selected by Landlord, plus (y) an amount equal to Landlord's or Landlord's agents' reasonable out-of-pocket costs and expenses incurred in connection with such electrical survey.

(2)    In determining the amount of Operating Expenses for any Operating Year, if less than ninety-five percent (95%) of the Building's rentable area shall have been occupied by tenant(s) at any time during any such Operating Year, Operating Expenses shall be determined for such Operating Year to be an amount equal to the like expenses which would normally be expected to be incurred had ninety-five percent (95%) of such areas been occupied throughout such Operating Year.

(3)    (a)    If any capital improvement is made during any Operating Year in compliance with a Requirement, whether or not such Requirement is valid or mandatory, or in lieu of a repair, then the cost of such improvement shall be included in Operating Expenses for the Operating Year in which such improvement was made; provided, however, to the extent the cost of such improvement is required to be capitalized for federal income tax purposes, such cost shall be amortized over the useful life of such improvement as Landlord actually establishes for income tax purposes pursuant to the Internal Revenue Code of 1986, as amended, and the annual amortization, together with interest thereon at the then Base Rate, of such improvement shall be deemed an Operating Expense in each of the Operating Years during which such cost of the improvement is amortized.

(b)    If any capital improvement is made during any Operating Year either for the purpose of saving or reducing Operating Expenses (as, for example, a labor-saving improvement), then the cost of such improvement (which cost shall not exceed the reasonably anticipated savings arising therefrom over the life of the improvement, as estimated by Landlord) shall be included in Operating Expenses for the Operating Year in which such improvement was made; provided, however, to the extent the cost of such improvement is required to be capitalized for federal income tax purposes, such cost shall be amortized over the useful life of such improvement as Landlord actually establishes for income tax purposes pursuant to the Internal Revenue Code of 1986, as amended, and the annual amortization, together with interest thereon at the then Base Rate, of such improvement shall be deemed an Operating Expense in each of the Operating Years during which such cost of the improvement is amortized. Landlord shall provide Tenant with the "back-up" information and reports which it used in making its determination of the reasonably anticipated savings over the life of any such capital improvement.

(E)    "Operating Statement" shall mean a statement in reasonable detail setting forth a comparison of the Operating Expenses for any Operating Year with the Base Operating Expenses, which shall be certified to be true and correct by Landlord. The Base Operating Expenses shall be furnished to Tenant promptly after determined and shall be certified by Landlord as being true and correct.

(F)    "Operating Year" shall mean the calendar year commencing January 1, 2001 and each subsequent calendar year for any part or all of which Escalation Rent shall be payable pursuant to this Article 27.

(G)    "Taxes" shall mean the aggregate amount of real estate taxes and any general or special assessments (exclusive of penalties and interest thereon) imposed upon the Real Property (including, without limitation, (i) assessments made upon or with respect to any "air" and "development" rights now or hereafter appurtenant to or affecting the Real Property, (ii) any fee, tax or charge imposed by any Governmental Authority for any vaults, vault space or other space within or outside the boundaries of the Real Property, and (iii) any assessments levied after the date of this Lease for public benefits to the Real Property or the Building) without taking into account any discount that Landlord may receive by virtue of any early payment of Taxes; provided, that if because of any change in the taxation of real estate, any other tax or assessment, however denominated (including, without limitation, any franchise, income, profit, sales, use, occupancy, gross receipts or rental tax) is imposed upon Landlord or the owner of the Real Property or the Building, or the occupancy, rents or income therefrom, in substitution for any of the foregoing Taxes, such other tax or assessment shall be deemed part of Taxes computed as if Landlord's sole asset were the Real Property. With respect to any Tax Year, all expenses, including attorneys' fees and disbursements, experts' and other witnesses' fees, incurred in contesting the validity or amount of any Taxes or in obtaining a refund of Taxes shall be considered as part of the Taxes for such Tax Year. Anything contained herein to the contrary notwithstanding, Taxes shall not be deemed to include (i) any taxes on Landlord's income,    (ii) franchise taxes, (iii) estate or inheritance taxes, or (iv) any similar taxes imposed on Landlord, unless such taxes are levied, assessed or

imposed in lieu of or as a substitute for the whole or any part of the taxes, assessments, levies, impositions which now constitute Taxes.

(H) "Tax Statement" shall mean a statement in reasonable detail setting forth a comparison of the Taxes for a Tax Year with the Base Taxes.

(I) "Tax Year" shall mean the period July 1 through June 30 (or such other period as hereinafter may be duly adopted by The City of New York as its fiscal year for real estate tax purposes), any portion of which occurs during the Term.

Section 27.2   (A)    If the Taxes payable for any Tax Year subsequent to any Base Tax Year (any part or all of which falls within the Term) with respect to any portion of the Premises shall represent an increase above the Base Taxes with respect to such portion of the Premises, then Tenant shall pay as additional rent for such Tax Year and continuing thereafter until a new Tax Statement is rendered to Tenant, Tenant's Tax Share of such increase (the "Tax Payment") as shown on the Tax Statement with respect to such Tax Year.  Tenant shall not be entitled to any credit against any Tax Payment on account of any discount that Landlord may receive by virtue of an early payment of Taxes, and Taxes shall be calculated without taking into account any such discounts.  The Taxes for the Tax Year in question shall be computed initially on the basis of the Assessed Valuation in effect at the time the Tax Statement is rendered (as the Taxes may have been settled or finally adjudicated prior to such time, and subject to adjustment as provided in Section 27.6) regardless of any then pending application, proceeding or appeal respecting the reduction of any such Assessed Valuation, but shall be subject to subsequent adjustment as provided in Section 27.3(A).

(B)    At any time during or after the Term, Landlord shall render to Tenant, in accordance with the provisions of Article 26 hereof, a Tax Statement or Statements, together with a reproduced copy of the tax bill (or receipted bill, if available) for the Taxes for the current or next succeeding Tax Year (if theretofore issued by the Governmental Authority) showing (i) a comparison of the Taxes for the Tax Year with the Base Taxes, and (ii) the amount of the Tax Payment resulting from such comparison.  Tenant shall pay to Landlord, in two (2) equal installments, in advance, within (10) Business Days after receipt of any Tax Statement, but in no event prior to July 1st and January 1st of each Tax Year, the Tax Payment shown thereon, If Taxes are required to be paid in full or on any other date or dates than as presently required by the Government Authority imposing the same, then the due date of the installments of the Tax Payment shall be correspondingly accelerated or revised so that the Tax Payment (or the two (2) installments thereof) is due at least 30 days prior to the date the corresponding payment is due to the Governmental Authority.  If the Tax Year established by The City of New York shall be changed, any Taxes for the Tax Year prior to such change which are included within the new Tax Year and which were the subject of a prior Tax Statement shall be apportioned for the purpose of calculating the Tax Payment payable with respect to such new Tax Year, Landlord's failure to render a Tax Statement during or with respect to any Tax Year shall not prejudice Landlord's right to render a Tax Statement during or with respect to any subsequent Tax Year, and shall not

eliminate or reduce Tenant's obligation to make Tax Payments pursuant to this Section B for such Tax Year.

(C)    The Tax Payment shall be pro rated for any partial Tax Year in which the Term of this Lease shall commence or expire to correspond to that portion of such Tax Year occurring within the Term. If a Tax Statement is furnished to Tenant after the commencement of the Tax Year in respect of which such Tax Statement is rendered, Tenant shall, within ten (10) Business Days thereafter, pay to Landlord an amount equal to the amount of any underpayment of the Tax Payment with respect to such Tax Year and, in the event of an overpayment, Landlord shall either pay to Tenant or, at Landlord's election, credit against the Fixed Rent next becoming due, the amount of Tenant's overpayment, or, to the extent no further Fixed Rent is due, promptly refund such overpayment to Tenant.

Section 27.3    (A)    Only Landlord shall be eligible to institute tax reduction or other proceedings to reduce the Assessed Valuation. In the event that, after a Tax Statement has been sent to Tenant, an Assessed Valuation which had been utilized in computing the Taxes for a Tax Year is reduced (as a result of settlement, final determination of legal proceedings or otherwise), and as a result thereof a refund of Taxes is actually received by or on behalf of Landlord, then, promptly after receipt of such refund, Landlord shall send Tenant a Tax Statement adjusting the Taxes for such Tax Year (taking into account the expenses mentioned in Section 27.1(G)) and setting forth Tenant's Tax Share of such refund and Tenant shall be entitled to receive such Share either by way of a credit against the Fixed Rent next becoming due after the sending of such Tax Statement or by a prompt refund to the extent no further Fixed Rent is due; provided, however, that Tenant's Tax Share of such refund shall not exceed the Tax Payment, if any, which Tenant had theretofore paid to Landlord attributable to increases in Taxes for the Tax Year to which the refund is applicable on the basis of the Assessed Valuation before it had been reduced. Not earlier than sixty (60) days nor later than forty (40) days before the last day on which tax certiorari proceedings (i.e. the filing of the notice of protest) with respect to the Real Property may be instituted, Tenant may request that Landlord advise it of whether Landlord intends to commence such proceedings and Landlord, by the date which is the later to occur of (x) fifteen (15) Business Days after Tenant shall make such request and (y) five (5) Business Days after Landlord shall have received notice of the Assessed Valuation of the Real Property, shall so advise Tenant. If within such period Landlord either fails to advise Tenant of its intentions or advises Tenant that it does not intend to commence such proceedings, then, if at any time on or before the tenth (10th) day prior to the last date to commence such proceedings, Tenant so requests and provided that, other tenants of the Building which together with Tenant occupy at least fifty percent (50%) of the rentable area of the Building (excluding any rentable area occupied by Landlord or its Affiliates) join Tenant in such request and Tenant agrees to pay Landlord's expenses as herein provided, Landlord shall institute, and in good faith prosecute (which shall include the right of Landlord to settle any such proceeding), tax certiorari proceedings with respect to the Real Property. In the event of the institution of such proceedings, such proceedings shall be at Tenant's sole cost and expense (as to which cost and expense, Tenant may be reimbursed by such other tenants) and Tenant shall promptly reimburse Landlord after request therefor (and such

obligation shall survive the Expiration Date), unless the Assessed Valuation of the Real Property shall be reduced as a result of the institution of such proceedings, in which event, the cost and expense of such proceedings shall be paid by Landlord to the extent of any tax savings obtained as a result of such reduction, subject to Landlord's right to recover its costs and expenses, as more particularly set forth in this Section 27.3.

(B)    In the event that, after a Tax Statement has been sent to Tenant, the Assessed Valuation which had been utilized in computing the Base Taxes is reduced (as a result of settlement, final determination of legal proceedings or otherwise) then, and in such event:    (i) the Base Taxes shall be retroactively adjusted to reflect such reduction, and (ii) all retroactive Tax Payments resulting from such retroactive adjustment shall be due and payable within ten (10) Business Days after billed by Landlord. Landlord promptly shall send to Tenant a revised Tax Statement setting forth the basis for such retroactive adjustment and Tax Payments.

Section 27.4    (A)    If the Operating Expenses for any portion of the Premises for any Operating Year shall be greater than the Base Operating Expenses with respect to such portion of the Premises, then Tenant shall pay as additional rent for such Operating Year and continuing thereafter until a new Operating Statement is rendered to Tenant, Tenant's Operating Share of such increase ("Operating Payment") as hereinafter provided.

(B)    At any time during or after the Term Landlord shall render to Tenant an Operating Statement or Statements showing (i) a comparison of the Operating Expenses for the Operating Year with the Base Operating Expenses, and (ii) the amount of the Operating Payment resulting from such comparison. Landlord's failure to render an Operating Statement during or with respect to any Operating Year in question shall not prejudice Landlord's right to render an Operating Statement during or with respect to any subsequent Operating Year, and shall not eliminate or reduce Tenant's obligation to make Operating Payments. Notwithstanding the foregoing, (a) if an Operating Statement to be given by Landlord is not given within seven (7) months after the end of any Operating Year, Tenant shall have the right to give notice to Landlord requesting such Operating Statement, and if Landlord shall fail to give such Operating Statement within ninety (90) days of the date of the giving of Tenant's written request then, except as otherwise herein provided, Landlord shall be entitled only to the amounts of Operating Payments previously billed for such Operating Year, and Tenant shall be entitled, at its election, to treat such failure as the rendering by Landlord, on such 90th day, of an Operating Statement indicating an Operating Payment for such Operating Year which is identical with the amount of such Operating Payment due with respect to such Operating Year based upon the prior such Operating Year (and Tenant shall have all of the rights it would have had under this Article 27 [including Section 27.5 hereof] if such were the case); and (b) if an Operating Statement to be given by Landlord is not given to Tenant within thirty-six (36) calendar months following the end of the Operating Year in question, and Tenant has not made any demand therefor pursuant to clause (a) of this Paragraph B of this Section 27.4, then Landlord shall be entitled only to the amounts of Operating Payments previously billed for such Operating Year, and each of the parties shall be deemed to have waived any claim for any further payment, credit or refund with respect to the Operating Payments for

4698/75979-010 NYLIB1/1401555 v9                    74

such Operating Year in question. Subject to the foregoing, Tenant's liability for Escalation Rent and Landlord's liability with respect to any credits or refunds of Operating Payments or Tax Payments due under this Article shall survive the expiration or sooner termination of this Lease.

(C)    (1)    On the first day of the month following the furnishing to Tenant of an Operating Statement, provided such Operating Statement has been furnished to Tenant at least ten (10) Business Days in advance of such date (if not, within ten (10) Business Days of the date on which such Statement is furnished), Tenant shall pay to Landlord a sum equal to 1/12th of the Operating Payment shown thereon to be due for the preceding Operating Year multiplied by the number of months of the Term then elapsed since the commencement of the Operating Year for which such Operating Statement is delivered and thereafter, commencing with the then current monthly installment of Fixed Rent and continuing monthly thereafter until rendition of the next succeeding Operating Statement, Tenant shall pay on account of Operating Payments for such Year an amount equal to 1/12th of the Operating Payment shown thereon to be due for the preceding Operating Year. Any Operating Payment shall be collectible by Landlord in the same manner as Fixed Rent.

(2)    Following the rendering of each Operating Statement, a reconciliation shall be made as follows: Tenant shall be debited with any Operating Payments shown on such Operating Statement and credited with the amounts, if any, paid by Tenant on account for the Operating Year in question. Tenant shall pay any net debit balance to Landlord within fifteen (15) days next following rendition by Landlord of an invoice for such net debit balance; any net credit balance shall be applied against the next accruing monthly installments of Fixed Rent.

(D)    (1)    As used in this subsection (D), (i) the words "Tentative Monthly Escalation Charge" shall mean a sum equal to 1/12th of Tenant's Operating Share multiplied by the difference between (x) the Base Operating Expenses and (y) Landlord's estimate of Operating Expenses for the Current Year, and (ii) "Current Year" shall mean the Operating Year in which a demand is made upon Tenant for payment of a Tentative Monthly Escalation Charge.

(2)    At any one time in any Operating Year, Landlord, at its option, in lieu of the payments required under Section 27.4(C)(1), may demand and collect from Tenant, upon not less than ten (10) Business Days after demand, as additional rent, a sum equal to the Tentative Monthly Escalation Charge multiplied by the number of months in said Operating Year preceding the demand, and thereafter, commencing with the month in which the demand is made and continuing thereafter for each month remaining in said Operating Year, the monthly installments of Fixed Rent shall be deemed increased by the Tentative Monthly Escalation Charge.

(3)    After the end of the Current Year and at any time that Landlord renders an Operating Statement or Statements to Tenant as provided in Section 27.4(B) with respect to the comparison of the Operating Expenses for said Current Year, with the Base

Operating Expenses, the amounts, if any, collected by Landlord from Tenant under this Section 27.4(D) on account of the Tentative Monthly Escalation Charge shall be adjusted, and, if the amount so collected is less than or exceeds the amount actually due under said Operating Statement for the Operating Year, a reconciliation shall be made in the same manner as provided in Section 27.4(C)(2). If the aggregate Tentative Monthly Escalation Charges for any Operating Year shall have exceeded the actual increase in Operating Expenses for such Operating Year by more than ten percent (10%), the amount of the overpayment, together with interest at the Applicable Rate, determined as of the respective dates of such payments by Tenant, and calculated from such respective dates to the date on which such amounts are either refunded to Tenant or credited against the monthly installments of Fixed Rent, shall be applied against the next accruing monthly installments of Fixed Rent. Any amount owing to Tenant subsequent to the Term shall be paid to Tenant within ten (10) Business Days after a final determination has been made of the amount due to Tenant.

Section 27.5    Any Operating Statement sent to Tenant shall be conclusively binding upon Tenant unless, within ninety (90) days after such statement is sent, Tenant shall send a written notice to Landlord objecting to such Statement and specifying the categories in which such Statement is disputed. Each Operating Statement shall be prepared with sufficient specificity to allow Tenant to respond as required by the preceding sentence. If such notice is sent, Tenant (together with its independent certified public accountants, provided they are one of the so-called "big-eight" accounting firms) may examine Landlord's books and records relating to the Operation of the Property to determine the accuracy of the Operating Statement. Tenant recognizes the confidential nature of such books and records and agrees to maintain the information obtained from such examination in strict confidence. If after such examination, Tenant still disputes such Operating Statement, either party may refer the decision of the issues raised to a reputable independent firm of certified public accountants, selected by Landlord and approved by Tenant, which approval shall not be unreasonably withheld or delayed as long as such certified public accounting firm is one of the so-called "big-eight" public accounting firms, and the decision of such accountants shall be conclusively binding upon the parties. The fees and expenses involved in such decision shall be borne by the unsuccessful party (and if both parties are partially unsuccessful, the accountants shall apportion the fees and expenses between the parties based on the degree of success of each party). Notwithstanding the giving of such notice by Tenant, and pending the resolution of any such dispute, Tenant shall pay to Landlord when due the amount shown on any such Operating Statement, as provided in Section 27.4 hereof.

Section 27.6    Anything in this Article 27 to the contrary notwithstanding, the Fixed Rent set forth in Article 1 hereof shall in no event be reduced below the amounts set forth therein by reason of any credits, abatements or refunds under this Article 27. In addition, anything contained in this Article 27 to the contrary notwithstanding, in the event that on or before July 1, 1994, Landlord shall sell or transfer ownership of the Real Property, whether through a sale or the exercise of an equity option as part of a convertible financing, Tenant shall be entitled to a credit ("Tax Credit") against Tenant's Tax Share of increases in Tax Payments resulting from an increase in Taxes for any Tax Year commencing on or after the consummation of the sale which is directly

attributable to such sale, and the Taxes being increased as a result thereof. In the event that Tenant believes it is entitled to the Tax Credit and has not received same from Landlord, Tenant shall have the burden of proof to show that the increase in Taxes is a result of such sale. In no event shall Tenant be entitled to any credit against Tenant's Tax Share of Tax Payments for any sale of the Real Property which occurs after July 1, 1994.

Section 27.7   The expiration or termination of this Lease during any Operating Year or Tax Year shall not affect the rights or obligations of the parties hereto respecting any payment of Operating Payments for such Operating Year and payment of Tax Payments for such Tax Year, and any Operating Statement relating to such Operating Payment and any Tax Statement relating to such Tax Payment, may be sent to Tenant subsequent to, and all such rights and obligations shall survive, any such expiration or termination. Subject to the limitations set forth in Section 27.4 hereof, in determining the amount of the Operating Payment for the Operating Year or the Tax Payment for the Tax Year in which the Term shall expire, the payment of the Operating Payment for such Operating Year or the Tax Payment for the Tax Year shall be prorated based on the number of days of the Term which fall within such Operating Year or Tax Year, as the case may be. Any payments due under such Operating Statement or Tax Statement shall be payable within twenty (20) days after such Statement is sent to Tenant.


ARTICLE 28
SERVICES

Section 28.1   (A)    Landlord shall provide at least four (4) passenger elevators to the Premises on Business Days from 8:00 A.M. to 6:00 P.M. and have an elevator subject to call at all other times.

(B)    There shall be one (1) freight elevator serving the Premises on call on a "first come, first served" basis on Business Days from 8:00 A.M. to 5:00 P.M., and on a reservation, "first come, first served" basis from 5:00 P.M. to 8:00 A.M. on Business Days and at any time on days other than Business Days. If Tenant shall use the freight elevators serving the Premises between 5:00 P.M. and 8:00 A.M. on Business Days or at any time on any other days, Tenant shall reimburse Landlord, within ten (10) Business Days after demand therefor, for Landlord's actual out-of-pocket costs and expenses incurred in connection therewith. Landlord shall not be required to furnish any freight elevator services between 5:00 P.M. and 8:00 A.M. on Business Days or at any times on any other days unless Landlord has received advance notice from Tenant requesting such service prior to 2:00 P.M. of the day upon which such freight elevator service is requested or by 2:00 P.M. of the last preceding Business Day if such overtime service is to occur on a day other than a Business Day. If Tenant fails to give Landlord such advance notice, then, failure by Landlord to furnish such freight elevator service during such overtime periods shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rental, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience or annoyance to

Tenant, or injury to or interruption of Tenant's business or otherwise. Notwithstanding the foregoing, commencing on the date Tenant shall occupy the Premises for the conduct of its business, Landlord shall make available to Tenant, between the hours of 5:00 P.M. and 8:00 A.M. on Business Days and at all hours on any other days, one (1) freight elevator which can be accessed by Tenant by a key or card access system, and Tenant shall reimburse Landlord, within ten (10) Business Days after demand therefor, for Landlord's actual direct out-of-pocket costs and expenses incurred in connection therewith. If more than one tenant of the Building requests the same overtime periods for the same freight elevator or services as Tenant, the charge to Tenant shall be adjusted pro rata. With respect to Tenant's initial move into the Premises, Tenant shall be permitted to use two (2) freight elevators at no additional charge unless Tenant shall not have given Landlord at least five (5) Business Days prior notice of the date it intends to initially move into the Premises. In either of such events, Tenant shall reimburse Landlord for the use of such freight elevators in such amounts and in such manner as set forth in the immediately preceding sentence.

Section 28.2    Landlord, at Landlord's expense (but subject to recoupment pursuant to Article 27 hereof), shall furnish and distribute to the Premises through the HVAC System, HVAC on a year round basis from 8:00 A.M. to 6:00 P.M. on Business Days and from 8:00 A.M. to 1:00 P.M. on Saturdays. Subject to the provisions of Article 14 of this Lease, Landlord shall have free access to any and all mechanical installations of Landlord, including but not limited to air-cooling, fan, ventilating and machine rooms and electrical closets; Tenant shall not construct partitions or other obstructions which may interfere with Landlord's free access thereto, or interfere with the moving of Landlord's equipment to and from the enclosures containing said installations. Neither Tenant, nor its agents, employees or contractors shall at any time enter the said enclosures or tamper with, adjust or touch or otherwise in any manner affect said mechanical installations.

Section 28.3    The Fixed Rent does not reflect or include any charge to Tenant for the furnishing or distributing of any necessary HVAC to the Premises during periods ("Overtime Periods") other than the hours and days set forth above. Accordingly, if Landlord shall furnish any such HVAC to the Premises at the request of Tenant during Overtime Periods, Tenant shall pay Landlord additional rent for such HVAC services, within ten (10) Business Days after demand therefor, at the rates set forth on Schedule D attached hereto and made a part hereof and subject to increase as set forth therein. Landlord shall not be required to furnish any HVAC services during any Overtime Periods unless Landlord has received advance notice from Tenant requesting such services prior to 2:00 P.M. of the day upon which HVAC services are requested or by 2:00 P.M. of the last preceding Business Day if such Overtime Periods are to occur on a day other than a Business Day. If Tenant fails to give Landlord such advance notice, then, failure by Landlord to distribute any such HVAC services during such Overtime Periods shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rental, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business or otherwise.

Section 28.4   Landlord, at Landlord's expense, shall cause the Premises, excluding any portions thereof used for the storage, preparation, service or consumption of food or beverages, to be cleaned, substantially in accordance with the standards set forth in Schedule E attached hereto and made a part hereof. If, however, any additional cleaning of the Premises is to be done by Tenant, it shall be done at Tenant's sole expense, in a manner satisfactory to Landlord and no one other than persons reasonably approved by Landlord (provided no union conflict shall arise) shall be permitted to enter the Premises or the Building for such purpose. Tenant shall pay to Landlord the cost of removal of any of Tenant's refuse and rubbish from the Premises and the Building to the extent that the same exceeds the refuse and rubbish usually attendant upon the use of such Premises as general and executive offices which are used in the magazine/newspaper publishing or broadcasting business, other than any excess copies of unsold newspapers and magazines, the cost of removal of which shall be borne by Tenant. Bills for the same shall be rendered by Landlord to Tenant at such time as Landlord may elect and shall be due and payable within ten (10) Business Days of the date rendered, as additional rent. Tenant, at Tenant's expense, shall cause all portions of the Premises used for the storage, preparation, service or consumption of food or beverages to be cleaned daily in a manner reasonably satisfactory to Landlord, and shall cause all portions of the Premises to be exterminated against infestation by vermin, rodents or roaches regularly and, in addition, whenever there shall be evidence of any infestation. Tenant shall not permit any person to enter the Premises or the Building for the purpose of providing such extermination services, other than persons first approved by Landlord, such approval not to be withheld unreasonably.

Section 28.5   If any changes, modifications, alterations or additional sprinkler heads or other equipment are required to be made or supplied to comply with any Requirements by reason of Tenant's business, or the location of the partitions, trade fixtures, or other contents of the Premises, Landlord shall, at Tenant's expense, promptly make and supply such changes, modifications, alterations, additional sprinkler heads or other equipment.

Section 28.6   Landlord shall provide to the Premises hot and cold water for drinking, cleaning and lavatory purposes. If Tenant requires, uses or consumes water for any purpose in addition to drinking, cleaning or lavatory purposes, Landlord may install a water meter and thereby measure Tenant's water consumption for all such additional purposes. In such event (1) Tenant shall pay Landlord for the cost of the meter and the cost of the installation thereof and through the duration of Tenant's occupancy Tenant shall keep said meter and equipment in good working order and repair at Tenant's own cost and expense; (2) Tenant shall pay for water consumed as shown on said meter, within ten (10) Business Days after bills are rendered, as additional rent, and on default in making such payment, Landlord may pay such charges and collect the same from Tenant; and (3) Tenant shall pay the sewer rent, charge or any other tax, rent, levy or charge which now or hereafter is assessed, imposed or shall become a lien upon the Premises or the realty of which they are a part pursuant to any Requirement made or issued in connection with any such metered use, consumption, maintenance or supply of water, water system, or sewage or sewage connection or system. The bill rendered by Landlord for the above shall be based upon

Tenant's consumption and shall be payable by Tenant as additional rent within ten (10) Business Days of rendition.

Section 28.7    Landlord reserves the right to stop, interrupt or curtail service of the HVAC System or the elevator, electrical, plumbing or other mechanical systems or facilities in the Building when necessary, by reason of accident or emergency, or for repairs, additions, alterations, replacements or improvements in the judgment of Landlord desirable or necessary to be made, until said repairs, alterations, replacements or improvements shall have been completed (which repairs, alterations and improvements shall be performed in accordance with Section 4.3 hereof). To the extent reasonably practicable, and except in the case of an emergency, Landlord shall give Tenant reasonable advance notice of its intention to stop, interrupt or curtail service of any of the aforesaid systems. Whether or not any such notice is given by Landlord to Tenant, Landlord shall have no responsibility or liability (except to the extent set forth in Section 14.2 hereof) for interruption, curtailment or failure to supply HVAC, elevator, or plumbing when prevented by Unavoidable Delays or by any Requirement of any Governmental Authority or due to the exercise of its right to stop service as provided in this Section 28.7. The exercise of such right or such failure by Landlord shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any compensation or to any abatement or diminution of Rental (except to the extent set forth in Section 14.2 hereof), or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business, or otherwise. Upon cessation of the condition or upon completion of the repairs, additions, alterations, replacements or improvements which required the stoppage, interruption or curtailment of the aforesaid services, Landlord shall restore such services to the Premises.

Section 28.8    (A)    In connection with Tenant's existing supplementary air conditioning unit at the Premises, Tenant may tap into the existing condenser water pipes of the Building to obtain condenser water for the system. Landlord shall furnish to the floor(s) of the Premises serviced by such system, condenser water to service such system, at such times as Tenant shall request. Any installations required to connect Tenant's supplementary air conditioning system to the condenser water pipes (other than installations that have been installed as of the Commencement Date) shall be made by Landlord and Tenant shall pay to Landlord as additional rent a one time "tap-in" fee of $1,500 per ton for the first five (5) tons so connected and $500 per ton for the balance of the tons so connected, within ten (10) Business Days of rendition of a bill therefor. Tenant shall also pay Landlord for the supply of condenser water, within ten (10) Business Days after rendition of a bill therefor, an annual charge of $200 per ton of cooling capacity of the system so connected. Such amount shall be increased on each anniversary of the Rent Commencement Date by the percentage increase in the cost of providing same to Landlord on each such anniversary of the Rent Commencement Date over the cost of providing same to Landlord on the Commencement Date. Landlord shall not be liable (except to the extent set forth in Section 14.2 hereof) to Tenant for any failure or defect in the supply or character of condenser water supplied to Tenant by reason of any Requirement, act or omission of the public service

company serving the Building or for any other reason not attributable to the negligence or willful misconduct of Landlord, its agents, contractors and employees.

(B)    If Tenant shall reasonably determine that additional supplementary air-conditioning capacity shall be required in connection with the conduct of its business, Landlord shall not unreasonably withhold its consent to an Alteration consisting of the installation by Tenant of an additional supplementary air-conditioning system; it being expressly understood and agreed; however, that Landlord, in making its determination whether to consent to such an Alteration and determining the limitation on the tonnage capacity shall take into consideration, among other factors, the physical capabilities of the Building, the availability of sufficient condenser water and the present and future needs of other present and future tenants and occupants of the Building. All installations and tap-ins shall be governed by the provisions of Section 28.8(A) except that Tenant shall pay to Landlord as additional rent a tap-in fee and annual charge for condenser water as determined by Landlord at such time within ten (10) Business Days of rendition of a bill therefor. Tenant shall reimburse Landlord, within ten (10) Business Days after demand therefor, for Landlord's actual out-of-pocket costs and expenses in connection with supplying such additional capacity and condenser water.

## ARTICLE 29
### PARTNERSHIP TENANT

If Tenant is a partnership (or is comprised of two (2) or more persons, individually or as co-partners of a partnership) or if Tenant's interest in this Lease shall be assigned to a partnership (or to two (2) or more persons, individually or as copartners of a partnership) pursuant to Article 12 hereof (any such partnership and such persons are referred to in this Article 29 as "Partnership Tenant"), the following provisions shall apply to such Partnership Tenant: (a) the liability of each of the parties comprising Partnership Tenant shall be joint and several; (b) each of the parties comprising Partnership Tenant hereby consents to, and agrees to be bound by (x) any written instrument which may hereafter be executed by Partnership Tenant or any successor partnership, changing, modifying, extending or discharging this Lease, in whole or in part, or surrendering all or any part of the Premises to Landlord, and (y) any notices, demands, requests or other communications which may hereafter be given by Partnership Tenant or by any of the parties comprising Partnership Tenant; (c) any bills, statements, notices, demands, requests or other communications given or rendered to Partnership Tenant or to any of such parties shall be binding upon Partnership Tenant and all such parties; (d) if Partnership Tenant shall admit new partners, all of such new partners shall, by their admission to Partnership Tenant, be deemed to have assumed joint and several liability for the performance of all of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed; and (e) Partnership Tenant shall give prompt notice to Landlord of the admission of any such new partners, and upon demand of Landlord, shall cause each such new partner to execute and deliver to Landlord an agreement in form reasonably satisfactory to Landlord, wherein each such new partner shall assume joint and several liability for the performance of all the terms, covenants and conditions of this Lease on

Tenant's part to be observed and performed (but neither Landlord's failure to request any such agreement nor the failure of any such new partner to execute or deliver any such agreement to Landlord shall vitiate the provisions of clause (d) of this Article 29).

## ARTICLE 30
## VAULT SPACE

Notwithstanding anything contained in this Lease or indicated on any sketch, blueprint or plan, any vaults, vault space or other space outside the boundaries of the Real Property are not included in the Premises. Landlord represents that Schedule F attached hereto and made a part hereof is an accurate metes and bounds description of the plot of land upon which the Building stands. All vaults and vault space and all other space outside the boundaries of the Real Property which Tenant may be permitted to use or occupy are to be used or occupied under a revocable license, and if any such license shall be revoked, or if the amount of such space shall be diminished or required by any Governmental Authority or by any public utility company, such revocation, diminution or requisition shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rental, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord. Any fee, tax or charge imposed by any Governmental Authority for any such vaults, vault space or other space occupied by Tenant shall be paid by Tenant.

## ARTICLE 31
## INTENTIONALLY OMITTED

## ARTICLE 32
## CAPTIONS

The captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease nor the intent of any provision thereof.

## ARTICLE 33
## PARTIES BOUND

The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors, and, except as otherwise provided in this Lease, their assigns.

ARTICLE 34
BROKER

Each party represents and warrants to the other that it has not dealt with any broker or Person in connection with this Lease. The execution and delivery of this Lease by each party shall be conclusive evidence that such party has relied upon the foregoing representation and warranty. Tenant shall indemnify and hold Landlord harmless from and against any and all claims for commission, fee or other compensation by any Person who shall claim to have dealt with Tenant in connection with this Lease and for any and all costs incurred by Landlord in connection with such claims, including, without limitation, reasonable attorneys' fees and disbursements. Landlord shall indemnify and hold Tenant harmless from and against any and all claims for commission, fee or other compensation by any Person who shall claim to have dealt with Landlord in connection with this Lease and for any and all costs incurred by Tenant in connection with such claims, including, without limitation, reasonable attorneys' fees and disbursements. This provision shall survive the expiration or earlier termination of this Lease.

ARTICLE 35
INDEMNITY

Section 35.1    (A)    Tenant shall indemnify and save the Indemnitees harmless from and against (a) all claims of whatever nature against the Indemnitees arising from any act, omission or negligence of Tenant, its contractors, licensees, agents, servants, employees, invitees or visitors, (b) all claims against the Indemnitees arising from any accident, injury or damage whatsoever caused to any person or to the property of any person and occurring during the Term in or about the Premises unless caused by the negligent acts or omissions of Landlord, its contractors, licensees, agents, servants, employees, invitees or visitors, (c) all claims against the Indemnitees arising from any accident, injury or damage occurring outside of the Premises but anywhere within or about the Real Property, where such accident, injury or damage results or is claimed to have resulted from an act, omission or negligence of Tenant or Tenant's agents, employees, invitees or visitors, and (d) any breach, violation or non-performance of any covenant, condition or agreement in this Lease set forth and contained on the part of Tenant to be fulfilled, kept, observed and performed. This indemnity and hold harmless agreement shall include indemnity from and against any and all liability, fines, suits, demands, costs and expenses of any kind or nature (including, without limitation, reasonable attorneys' fees and disbursements) incurred in or in connection with any such claim or proceeding brought thereon, and the defense thereof but shall be limited to the extent any insurance is insufficient to satisfy same. Tenant shall have no liability for any consequential damages suffered either by Landlord, any Indemnitee or by any party claiming through Landlord.

(B)    Except as provided in Articles 4, 9, 10, 13, 28, 36 and 37 hereof and otherwise as expressly provided herein, Landlord shall indemnify and save Tenant, its shareholders, directors, officers, partners, employees and agents (collectively, "Tenant Indemnitees") harmless

from and against (a) all claims of whatever nature against the Tenant Indemnitees arising from any act, omission or negligence of Landlord, its contractors, licensees, agents, servants, employees, invitees or visitors, (b) all claims against the Tenant Indemnitees arising from any accident, injury or damage occurring outside of the Premises but anywhere within or about the Real Property, where such accident, injury or damage results or is claimed to have resulted from an act, omission or negligence of Landlord or Landlord's agents, employees, invitees or visitors, and (c) any breach, violation or non-performance of any covenant, condition or agreement in this Lease set forth and contained on the part of Landlord to be fulfilled, kept, observed and performed, except to the extent an express remedy shall otherwise be provided, or Landlord's liability is otherwise limited or prescribed, in this Lease. This indemnity and hold harmless agreement shall include indemnity from and against any and all liability, fines, suits, demands, costs and expenses of any kind or nature (including, without limitation, reasonable attorneys' fees and disbursements) incurred in or in connection with any such claim or proceeding brought thereon, and the defense thereof but shall be limited to the extent any insurance is insufficient to satisfy same. Landlord shall have no liability for any consequential damages suffered either by Tenant, any Tenant Indemnitee or by any party claiming through Tenant.

Section 35.2    If any claim, action or proceeding is made or brought against either party, which claim, action or proceeding the other party shall be obligated to indemnify such first party against, pursuant to the terms of this Lease, then, upon demand by the indemnified party, the indemnifying party, at its sole cost and expense, shall resist or defend such claim, action or proceeding in the indemnified party's name, if necessary, by such attorneys as the indemnified party shall approve, which approval shall not be unreasonably withheld. Attorneys for the indemnifying party's insurer shall hereby be deemed approved for purposes of this Section 35.2. Notwithstanding the foregoing, an indemnified party may retain its own attorneys to defend or assist in defending any claim, action or proceeding if (i) the indemnifying party shall not expressly acknowledge its indemnification obligation pursuant to this Article 35, (ii) the indemnified party, in its reasonable judgment, determines that the indemnifying party or its insurer, as the case may be, would not be financially able to satisfy the claim which is the subject of the indemnification, or (iii) there is a conflict in defenses between the indemnified party and the indemnifying party, and, in any of such events, the indemnifying party shall pay the reasonable fees and disbursements of such attorneys. The provisions of this Article 35 shall survive the expiration or earlier termination of this Lease.

Section 35.3    For purposes of this Article 35, "Tenant" shall be deemed to include any Related Entities of Tenant which are occupants of the Premises.


ARTICLE 36
ADJACENT EXCAVATION-SHORING

If an excavation shall be made upon land adjacent to the Premises, or shall be authorized to be made, Tenant shall, upon reasonable advance notice, afford to the person causing

or authorized to cause such excavation, license to enter upon the Premises for the purpose of doing such work as said person shall deem necessary to preserve the wall or the Building from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Landlord, or diminution or abatement of Rental provided that Tenant shall continue to have access to the Premises and the Building. Landlord shall use reasonable efforts to cause such work to be done in accordance with the provisions of Section 4.3 hereof.

ARTICLE 37

MISCELLANEOUS

Section 37.1    This Lease is offered for signature by Tenant and it is understood that this Lease shall not be binding upon Landlord or Tenant unless and until Landlord and Tenant shall have executed and delivered a fully executed copy of this Lease to each other.

Section 37.2    The obligations of Landlord under this Lease and the Letter Agreement shall not be binding upon Landlord named herein after the sale, conveyance, assignment or transfer by such Landlord (or upon any subsequent landlord after the sale, conveyance, assignment or transfer by such subsequent landlord) of its interest in the Building or the Real Property, as the case may be, to the extent such transferee assumes the obligations of Landlord under this Lease and the Letter Agreement, subject to the terms hereof, and in the event of any such sale, conveyance, assignment or transfer, Landlord shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder and under the Letter Agreement to the extent that such transferee assumes the obligations of Landlord under this Lease and the Letter Agreement, subject to the terms hereof. Neither the partners comprising Landlord, nor the shareholders (nor any of the partners comprising same), partners, directors or officers of any of the foregoing (collectively, the "Parties") shall be liable for the performance of Landlord's obligations under this Lease or the Letter Agreement. Tenant shall look solely to Landlord to enforce Landlord's obligations hereunder and under the Letter Agreement and shall not seek any damages against any of the Parties. Prior to any such sale, conveyance, assignment or transfer, the liability of Landlord for Landlord's obligations under this Lease and the Letter Agreement shall be limited to Landlord's interest in the Real Property and Tenant shall not look to any other property or assets of Landlord or the property or assets of any of the Parties in seeking either to enforce Landlord's obligations under this Lease or the Letter Agreement or to satisfy a judgment for Landlord's failure to perform such obligations. After any such sale, conveyance, assignment or transfer, to the extent that the transferee shall have not assumed Landlord's obligations under this Lease, the liability of Landlord for such obligations shall be limited to the proceeds of such transfer received by it.

Section 37.3    Notwithstanding anything contained in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated Fixed Rent, Escalation Rent, additional rent or Rental, shall constitute rent for the purposes of Section 502(b)(6) of the Bankruptcy Code.

Section 37.4    In any instance in this Lease where the consent or approval of Landlord or Tenant is not to be unreasonably withheld, such consent or approval shall also not be unreasonably delayed, to the extent a specific time period is not otherwise provided or prescribed herein.

Section 37.5    This Lease shall not be recorded; however, simultaneous with the execution of this Lease, Landlord and Tenant shall execute, acknowledge and deliver a memorandum with respect to this Lease sufficient for recording and a termination of any memorandum previously recorded in connection with this Lease or the Original Lease.

Section 37.6    Tenant hereby waives any claim against Landlord for damages which Tenant may have based upon any assertion that Landlord has unreasonably withheld or unreasonably delayed any consent or approval requested by Tenant, and Tenant agrees that its sole remedy shall be an action or proceeding to enforce any related provision or for specific performance, injunction or declaratory judgment. Notwithstanding the foregoing, if it shall be finally determined by a court of competent jurisdiction that Landlord shall have maliciously or otherwise in bad faith withheld any such consent or approval, Tenant may seek damages against Landlord. In the event of such final determination, the requested consent or approval shall be deemed to have been granted; however, Landlord shall have no liability to Tenant for its refusal or failure to give such consent or approval in the absence of a final judicial determination of malice or bad faith on the part of Landlord. The losing party in any such proceeding shall pay the reasonable attorneys' fees and disbursements of both parties.

Section 37.7    Landlord shall make available to Tenant the computerized directory in the lobby of the Building for up to 250 listings, and the programming therefore shall be without charge to Tenant. From time to time, but not more frequently than once every three (3) months, Landlord shall reprogram the computerized directory to reflect such changes in the listings therein as Tenant shall request. At Tenant's request, Landlord shall provide up to 500 additional directory listings to Tenant, provided Tenant shall pay to Landlord, as additional rent hereunder, Landlord's then current reasonable programming charge for each such additional directory listing. If a New Time4 Lease is entered into, then the total number of directory listings made available to Tenant shall be reduced to 250. If Landlord replaces the computerized directory with a standard directory in the lobby of the Building, Tenant shall be entitled to Tenant's Total Operating Share of such listings on such directory.

Section 37.8    All references in this Lease to the consent or approval of Landlord shall be deemed to mean the written consent or approval of Landlord and no consent or approval of Landlord shall be effective for any purpose unless such consent or approval is set forth in a written instrument executed by Landlord.

Section 37.9    The Space Factors applicable to each portion of the Premises set forth herein are conclusive and binding on both Landlord and Tenant and shall not be deemed to be

a representation or warranty by Landlord, nor shall such Space Factors be subject to remeasurement, recalculation or redetermination for any reason whatsoever.

Section 37.10. Landlord and Tenant agree and acknowledge that (i) except as set forth in Section 37.11 hereof, this Lease shall supersede all of the terms and provisions of the Original Lease and the Severed Leases and (ii) the terms and provisions of the Letter Agreement, except for Section 4, Section 5(b), and Section 5(c) thereof, shall remain in full force and effect.

Section 37.11. Landlord and Tenant agree and acknowledge that notwithstanding anything to the contrary contained in this Lease, neither Landlord nor Tenant shall be released from any obligation, covenant, representation or warranty contained in the Original Lease or pursuant to the Severed Leases, except to the extent provided in the Letter Agreement and Settlement Agreement.

## ARTICLE 38
## RENT CONTROL

If at the commencement of, or at any time or times during the Term of this Lease, the Rental reserved in this Lease shall not be fully collectible by reason of any Requirement, Tenant shall enter into such agreements and take such other steps (without additional expense to Tenant) as Landlord may request and as may be legally permissible to permit Landlord to collect the maximum rents which may from time to time during the continuance of such legal rent restriction be legally permissible (and not in excess of the amounts reserved therefor under this Lease). Upon the termination of such legal rent restriction prior to the expiration of the Term, (a) the Rental shall become and thereafter be payable hereunder in accordance with the amounts reserved in this Lease for the periods following such termination, and (b) Tenant shall pay to Landlord, if legally permissible, an amount equal to (i) the items of Rental which would have been paid pursuant to this Lease but for such legal rent restriction, less (ii) the rents paid by Tenant to Landlord during the period or periods such legal rent restriction was in effect.

## ARTICLE 39
## RENTAL VALUE

(A)    The Fixed Rent in respect of Space-8 and/or Space-9-10, as the case may be, for the Rental Value Period shall be an amount equal to the greater of (a) an amount (the "Fair Market Rent") equal to the annual fair market rental value of Space-8 or Space-9-10, as the case may be, on the first day of the Rental Value Period, provided that such amount shall not be (x) less than One Million Sixty-Five Thousand Nine Hundred Sixty and 00/100 Dollars ($1,065,960.00) with respect to Space-8 and Two Million One Hundred Twenty-Five Thousand Seven Hundred Fifty-Two and 00/100 Dollars ($2,125,752.00) with respect to Space-9-10 or (y) greater than One Million Three Hundred Thirty-Two Thousand Four Hundred Fifty and 00/100

Dollars ($1,332,450.00) with respect to Space-8 and Two Million Six Hundred Fifty-Seven Thousand One Hundred Ninety and 00/100 Dollars ($2,657,190.00) with respect to Space-9-10 (the amounts in clauses (x) and (y) as applicable to Space-8 or Space-9-10, as the case may be, are referred to herein as the "Base Amounts") on the first day of the Rental Value Period, or (b) the Fixed Rent payable by Tenant in respect of Space-8 or Space-9-10, as the case may be, on July 1, 2004 (the greater of the amounts described in clauses (a) and (b) above being referred to as the "Space-8 Rental Value" with respect to Space-8 and the "Space-9-10 Rental Value" with respect to Space-9-10).

   (B)  The Fair Market Rent shall be determined as if Space-8 or Space-9-10, as the case may be, were available in the then rental market based upon comparable space in comparable first class office buildings, including the Building, taking into account the condition of such buildings, in the vicinity of the Building and assuming that Landlord has had a reasonable time to locate a tenant who rents with the knowledge of the uses to which Space-8 or Space-9-10, as the case may be, can be adapted, and that neither Landlord nor the prospective tenant is under any compulsion to rent, taking into account:

     (i)  the fact that during the Rental Value Period, the Base Taxes and Base Operating Expenses applicable to Space-8 or Space-9-10, as the case may be, would not change for the purpose of calculating the Escalation Rent payable pursuant to Article 27 hereof;

     (ii)  the fact that as of the commencement of the Rental Value Period, Tenant shall not be required to pay, in addition to the escalation payments presently provided for under this Lease, Tenant's Operating Share of such other escalation payments, if any, which other landlords are then charging tenants under leases or offers for leases in other first-class office buildings which are similarly located to the Building;

     (iii)  the fact that Tenant shall have no right to renew this Lease;

     (iv)  the fact that Tenant shall not be entitled to any credit against the Fixed Rent; and

     (v)  the fact that Landlord shall have no obligation to contribute to or perform any work for Tenant in connection with any Alterations or other improvements in and to Space-8 or Space-9-10, as the case may be.

   (C)  For purposes of determining the Fair Market Rent, the following procedure shall apply:

     (1)  the Fair Market Rent shall be determined on the basis of the highest and best use of Space-8 or Space-9-10, as the case may be, as "offices" assuming that Space-8 or Space-9-10, as the case may be, is free and clear of all leases and tenancies (including this Lease), and, that Space-8 or Space-9-10, as the case may be, is occupied by one (1) tenant or

is subdivided and occupied by more than one (1) tenant (if Space-8 or Space-9-10, as the case may be, is occupied by more than one (1) occupant at the time) whether improved or unimproved.

(2)    Landlord and Tenant shall each simultaneously deliver to the other a written notice (each a "Rent Notice") on a date mutually agreed upon, but in no event later than December 31, 2003, which Rent Notice shall set forth each of their respective determinations of the Fair Market Rent (Landlord's determination of the Fair Market Rent is referred to as "Landlord's Determination" and Tenant's determination of the Fair Market Rent is referred to as "Tenant's Determination"). If Landlord or Tenant shall fail or refuse to give such Rent Notice as aforesaid, Landlord's Determination if Tenant shall fail or refuse to give such Rent Notice or Tenant's Determination if Landlord shall fail or refuse to give such Rent Notice, as the case may be, shall be the Fair Market Rent. If both Landlord and Tenant shall fail or refuse to give such Rent Notice, then the Fair Market Rent shall be deemed to be the Fixed Rent payable by Tenant in respect of Space-8 or Space-9-10, as the case may be, on June 30, 2004.

(3)    If Landlord's Determination and Tenant's Determination are not equal, and either determination exceeds the Fixed Rent payable by Tenant on June 30, 2004 in respect of Space-8 or Space-9-10, as the case may be, Landlord and Tenant shall attempt to agree upon the Fair Market Rent. If Landlord and Tenant shall mutually agree upon the determination (the "Mutual Determination") of the Fair Market Rent, their determination shall be the Fair Market Rent, and shall be final and binding upon the parties. If Landlord and Tenant shall be unable to reach a Mutual Determination within ten (10) days after delivery of both Determinations to each party, Landlord and Tenant shall jointly select an independent real estate appraiser (the "Appraiser") whose fee shall be borne equally by Landlord and Tenant. In the event that Landlord and Tenant shall be unable to jointly agree on the designation of the Appraiser within five (5) days after they are requested to do so by either party, then the parties agree to allow the American Arbitration Association, or any successor organization to designate the Appraiser in accordance with the rules, regulations and/or procedures then obtaining of the American Arbitration Association or any successor organization.

(4)    The Appraiser shall conduct such hearings and investigations as he may deem appropriate and shall, within thirty (30) days after the date of designation of the Appraiser, choose either Landlord's or Tenant's Determination, and such choice by the Appraiser shall be conclusive and binding upon Landlord and Tenant. Each party shall pay its own counsel fees and expenses, if any, in connection with any arbitration under this Section. The Appraiser appointed pursuant to this Article shall be an independent real estate appraiser with at least ten (10) years' experience in leasing and valuation of properties which are similar in character to the Building, and a member of the American Institute of Appraisers of the National Association of Real Estate Boards and a member of the Society of Real Estate Appraisers. The Appraiser shall not have the power to add to, modify or change any of the provisions of this Lease.

(5)    It is expressly understood that any determination of the Fair Market Rent pursuant to this Article shall be based on the criteria stated in Section 39(B) hereof.

(D)    After a determination has been made of the Space-8 Rental Value and/or the Space-9-10 Rental Value for the Rental Value Period, the parties shall execute and deliver to each other an instrument setting forth the Fixed Rent in respect of Space-8 and/or Space-9-10, as the case may be, for the Rental Value Period.

(E)    If the final determination of the Space-8 Rental Value and/or the Space-9-10 Rental value, as the case may be, shall not be made on or before the first day of the Rental Value Period in accordance with the provisions of this Article, then pending such final determination, Tenant shall continue to pay, as the Fixed Rent in respect of Space-8 or Space-9-10, as the case may be, for the Rental Value Period an amount equal to Landlord's Determination (subject to escalation pursuant to Article 27 hereof) with respect to Space-8 or Space-9-10, as the case may be. If, based upon the final determination hereunder of the Space-8 Rental Value or the Space-9-10 Rental Value, as the case may be, the payments made by Tenant on account of the Fixed Rent in respect of Space-8 or Space-9-10, as the case may be, for such portion of the Rental Period were greater than the Fixed Rent payable for the Rental Value Period in respect of Space-8 or Space-9-10, as the case may be, then Landlord shall either promptly refund to Tenant the amount of such excess, with interest thereon at the Base Rate, or, at Landlord's election, credit such overpayments, with interest thereon at the Base Rate, against the installments of Fixed Rent next becoming due.

## ARTICLE 40
## INTERIOR IDENTIFICATION

As long as Tribune Company or a Related Entity of Tribune Company is Tenant hereunder, Tribune Company or any such Related Entity shall have the right to maintain (x) the signage existing as of the Commencement Date on behalf of its subsidiary, Newsday, Inc., consisting of one (1) plaque on the exterior column of the Building and signage on the floor of the Building which Newsday, Inc. occupies or may occupy, (y) the floor signage erected by Tenant or such Related Entity and existing as of the Commencement Date on each floor of the Building occupied by Tenant or any Such Related Entity. The Time4 Subtenant shall have the right to maintain the floor signage erected by the Time4 Subtenant and existing as of the Commencement Date on each floor of the Building occupied exclusively by the Time4 Subtenant. Except as expressly set forth in this Article 40, Tenant and the Time4 Subtenant shall have no other rights to erect signage at the Building.

## ARTICLE 41
## PARKING

Section 41.1    As long as Tribune Company or a Related Entity is Tenant hereunder and as long as a garage continues to be operated in the Building, Landlord shall make available or cause to be made available to Tenant from and after the date on which Tenant shall

occupy the Premises for the conduct of its business, ten (10) parking spaces in the garage of the Building. Such spaces need not be specifically assigned or designated. For each parking space made available to Tenant, Tenant shall pay to Landlord, an Affiliate of Landlord or the operator of the garage, as the case may be, the posted monthly charges in question for each such parking space, it being understood that Landlord or the operator of such garage may from time to time change the monthly charges. Tenant shall pay such monthly charges within ten (10) Business Days after demand therefor and shall comply with all rules and regulations then in effect for the garage promulgated by either Landlord, an Affiliate of Landlord or such operator. If Tenant shall, at any time, desire any additional spaces in the garage, such additional spaces shall be available solely on a "first come, first served" basis, and Tenant shall pay to Landlord, an Affiliate of Landlord, or the operator of the garage, as the case may be, the posted daily charges in question for each such parking space, it being understood that the operator of such garage may from time to time change such daily charges. If Tenant shall, at any time, desire less than the ten (10) parking spaces provided hereby, Landlord shall have the right to take back any such spaces not so desired; it being expressly understood and agreed however, that Tenant shall have no right to any of the spaces taken back by Landlord from and after the date so taken back.

## ARTICLE 42
## ANTENNA

Section 42.1  Landlord acknowledges that Tenant has installed and continues to operate a satellite dish, together with related equipment, mountings and supports (collectively, the "Antenna") on the roof of the Building. Subject to the rights of other tenants in the Building and the provisions of Section 42.4 hereof, Tenant shall be permitted to operate the Antenna at the location on the roof of the Building where the Antenna was installed as of the Commencement Date. In connection therewith, and subject to the rights of other tenants in the Building, Landlord will make available to Tenant access to the roof for the maintenance, repair, operation and use of the Antenna, as well as reasonable space in the Building to run electrical and telecommunications conduits from the Antenna to the Premises. Any modification to the installation of the Antenna shall constitute an Alteration and shall be performed in accordance with, and subject to, the provisions of Article 3 hereof and, except as otherwise expressly set forth in this Article 42, the Antenna shall be deemed for all purposes of this Lease to be a Specialty Alteration. All of the provisions of this Lease with respect to Tenant's obligations hereunder shall apply to the installation, use and maintenance of the Antenna including, without limitation, provisions relating to compliance with Requirements, insurance, indemnity, repairs and maintenance.

Section 42.2  It is expressly understood that Landlord retains the right to use the portion of the roof on which the Antenna is located for any purpose whatsoever provided that Tenant shall have reasonable access to, and Landlord shall not unduly interfere with the use or operation of, the Antenna, Landlord shall not permit any other tenants or occupants of the Building to unduly interfere with the use and operation of the Antenna. Tenant's use of the Antenna shall not interfere with other tenants in the Building, any antenna installed by other tenants in the

Building, any services provided to other tenants in the Building, nor cause any damage to or interference with the operation of the Building or Building Systems. Landlord shall not have any obligations with respect to the Antenna or compliance with any Requirements relating thereto nor shall Landlord be responsible for any damage that may be caused to Tenant or the Antenna by any other tenant or occupant of the Building. Landlord makes no representation that the Antenna will be able to receive or transmit communication signals without interference or disturbance (whether or not by reason of the installation or use of similar equipment by others on the roof) and Tenant agrees that Landlord shall not be liable to Tenant therefor. Tenant's use and operation of the Antenna shall also comply with all Requirements of the Federal Communications Commission or any successor thereto and any state or local Governmental Authority exercising similar jurisdiction. Landlord agrees that to the extent any antenna is installed by Landlord or any other tenant or occupant of the Building, after the installation of the Antenna by Tenant, Landlord shall, in determining the location of any such other antenna, take into account, among other factors, the effect such antenna will have on the receipt and transmission of signals to and from the Antenna.

Section 42.3    Tenant, at Tenant's sole cost and expense, shall paint (provided same does not interfere with the receipt and transmission of signals to and from the Antenna) and maintain the Antenna in white or such other color as Landlord shall determine and shall install such lightning rods or air terminal signals on or about the Antenna as Landlord may determine. Tenant shall (i) be solely responsible for any damage caused as a result of the use, operation or maintenance of the Antenna, (ii) promptly pay any tax, license or permit fees charged pursuant to any Requirements in connection with the maintenance, use or operation of the Antenna and comply with all precautions and safeguards recommended by all Governmental Authorities, and (iii) make necessary repairs, replacements to or maintenance of the Antenna, except that at Landlord's option, Landlord may elect to perform such repairs, replacements or maintenance, and Tenant shall promptly reimburse Landlord for its actual direct out-of-pocket costs in connection therewith.

Section 42.4    Tenant hereby covenants and agrees that the use of the Antenna is solely for the benefit of Tenant and any permitted subtenants, and Tenant shall not permit any other Person, including, without limitation, any other tenant or occupant of the Building to use the Antenna or transmit or receive any broadcast or transmission signals in connection therewith, nor shall Tenant sell or resell any broadcast or transmission signals to any Person, including, without limitation, any tenant or occupant of the Building; provided, however, that if a New Time4 Lease is entered into, then Tenant shall have the right to grant the Time4 Direct Tenant a license to use the Antenna.

Section 42.5    If any of the conditions set forth in this Article 42 are not complied with by Tenant, then, without limiting Landlord's rights and remedies Landlord may otherwise have under this Lease, Tenant shall, upon fifteen (15) Business Days written notice from Landlord, or such longer period as may reasonably be required or such shorter period as may be required by any Requirements or by any Governmental Authority, at Landlord's option, either (i) comply with such condition to Landlord's reasonable satisfaction or, if unable to so comply, immediately discontinue its use of the Antenna and remove the same or (ii) reposition the Antenna to a location

designated by Landlord if Landlord elects to permit such repositioning, all at Tenant's sole cost and expense. Notwithstanding the foregoing, Landlord may at its option, at any time during the Term relocate the Antenna to another area on the roof designated by Landlord, provided that such relocation of the Antenna does not materially interfere with the transmission or receipt of communication signals and such relocation is performed at Landlord's sole cost and expense.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Landlord and Tenant have respectively executed this Restated Agreement of Lease as of the day and year first above written.

TWO PARK COMPANY, Landlord

By:    M/H Two Park Associates L.P., general partner

     By:    Vornado M/H L.L.C., general partner

          By:    Vornado Realty L.P., managing member

               By:    Vornado Realty Trust, general partner

                    By:    _____
                           Joseph Macnow
                           Executive Vice President - Finance and
                           Administration and Chief Financial Officer

TRIBUNE COMPANY, Tenant

By:    _____
      Name:    David J. Grangt
      Title:    VP -- Treasurer

      Fed. Id. No. 36-1880355