<u>Exhibit B</u>

**Letter Agreement**

TWO PARK COMPANY
330 Madison Avenue
New York, New York 10019

September 24, 2001

Tribune Company

Two Park Avenue

Gentlemen:

Reference is made to the leases (such leases as more particularly described on Exhibit A annexed hereto and made a part hereof being referred to collectively as the "Tribune Lease") presently between Two Park Company ("Landlord"), as landlord, and Tribune Company ("Tribune"), as successor in interest to the tenants thereunder. All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Tribune Lease.

The parties hereto agree as follows:

1.    On and as of the date hereof (the "Closing Date"), the Tribune Lease is hereby severed into three non-cross-defaulted separate leases (collectively, the "Severed Leases"); as follows:

    (a)    the severed lease (the "Severed Bender Lease") with respect to the entire 5th and 7th floors and a portion of the 6th floor of Two Park Avenue, more particularly described on Schedule 1-A annexed hereto, presently sublet to Matthew Bender and Company Incorporated (the "Bender Space");

    (b)    the severed lease (the "Severed 6th Floor Lease") with respect to the portion of the 6th floor of Two Park Avenue, more particularly described on Schedule 1-B annexed hereto (the "6th Floor Space"); and

    (c)    the severed lease (the "Severed Tribune Lease") with respect to (i) the entire 9th and 10th floors and portions of the 8th, 11th and basement floors of Two Park Avenue, more particularly described on Schedule 1-C (the "TMM Space"), and (ii) portions of the 8th, 11th and 18th floors of Two Park Avenue, more particularly described on Schedule 1-D (the "Remaining Tribune Space"; and collectively, with the TMM Space, the "Total Tribune Space").

Each Severed Lease shall cover the portion of the premises described above, each of which separate leases shall be on the same terms and conditions as contained in the Tribune Lease except (i) that the Fixed Rent, Tenant's Operating Share, Tenant's Tax Share and Space Factor (as each such capitalized term is defined in the Tribune Lease) with respect to each Severed Lease shall be as set forth on Exhibit C annexed hereto and made a part hereof in the applicable columns opposite the applicable spaces demised under such Severed Lease, and (ii) as otherwise expressly set forth in this Letter Agreement. It is expressly understood and agreed that, except as set forth in the Settlement Agreement between Landlord and Tribune, being executed and delivered simultaneously herewith (the "Settlement Agreement"), neither party shall be released from any obligation, covenant, representation or warranty contained in the Tribune Lease or any of such Severed Leases relating to any period prior to the Closing Date, and, notwithstanding any such severance and any assignment, termination, or release provided for in this Letter Agreement, and, notwithstanding the Settlement Agreement, (x) Landlord shall have the right to look to Tribune for any and all rent, additional rent, costs and expenses arising under the Tribune Lease or any of such Severed Leases relating to the period prior to the Closing Date, and (y) Tribune shall have the right to look to Landlord for any overpayments of rent, additional rent, costs or expenses arising under the Tribune Lease or any of such Severed Leases relating to the period prior to the Closing Date.

Landlord represents and warrants that no Event of Default (as such term is defined in the Tribune Lease) has occurred and is continuing. The parties acknowledge that the Alleged Bender Default and the Alleged TMM Default (as such terms are defined in the Settlement Agreement) have been settled and released pursuant to the Settlement Agreement. Landlord has no knowledge of any default by Tribune in the performance of any of its obligations under the Tribune Lease, which, with the giving of notice or passage of time, or both, would constitute an Event of Default under the Tribune Lease. Tribune represents and warrants that no Event of Default has occurred and is continuing, and, Tribune has no knowledge of any default by Landlord in the performance of any of its obligations under the Tribune Lease.

2:     Landlord and Tribune are entering into this Letter Agreement for purposes of settling a dispute with respect to Tribune's right to enter into the Sublease, dated as of March 1, 1998, between Tribune's predecessor in interest, as sublandlord, and Matthew Bender and Company, Inc., as subtenant (the "Bender Sublease") and the Sublease, dated as of October 6, 2000, between Tribune, as sublandlord, and Times Mirror Magazine, Inc., as subtenant (the "TMM Sublease"). Pursuant to the Tribune Lease, if the Bender Sublease is permissible under the Tribune Lease, the profits arising from the Bender Sublease would be split 50% to Landlord and 50% to Tribune. In order to prevent further litigation, Tribune has agreed to sever the Tribune Lease as provided in Paragraph 1 hereof and surrender its leasehold interest in the Bender Space by (a) assigning to Landlord Tribune's

interest as tenant under the Severed Bender Lease, and (b) assigning to Landlord the sublessor's interest in the Bender Sublease. Accordingly, Tribune hereby assigns to Landlord, without consideration, and Landlord hereby accepts the assignment of, all of Tribune's interest as (i) tenant under the Severed Bender Lease, and (ii) sublandlord under the Bender Sublease (it being agreed that from and after the date of such assignment and acceptance there shall be no merger of Landlord's interest as tenant and landlord under the Severed Bender Lease). Tribune is hereby released as of the Closing Date from all liability of any kind with respect to the Severed Bender Lease and the Bender Space arising from and after the Closing Date, except as otherwise expressly set forth in the Severed Bender Lease or herein. On and as of the Closing Date, all items of rent, additional rent, and sublease profit arising under the Tribune Lease and the Severed Bender Lease with respect to the Bender Sublease have been apportioned between Tribune and Landlord, it being expressly understood and agreed that in apportioning the sublease profit arising under the Tribune Lease and the Severed Bender Lease, such profit has been recalculated from October 1, 2000 based on a profit split of sixty percent (60%) to Landlord and forty percent (40%) to Tribune, and in connection with such recalculation, on the Closing Date, Tribune shall pay to Landlord an amount equal to $303,287.72 on account of such profit split. Thus, the total amount payable by Tribune to Landlord pursuant to the preceding sentence is $308,372.34.

In addition, Tribune has agreed to surrender to Landlord (i) for the period commencing on October 1, 2001 and ending on June 30, 2004, ten percent (10%) of the profits derived from the Bender Sublease (thus retaining forty percent (40%) of such profits) and (ii) for the period commencing on July 1, 2004 and ending on September 30, 2010, eighteen percent (18%) of such profits (thus retaining thirty-two percent (32%) of such profits). Accordingly, Tribune shall be entitled to receive the following portion of the profits from the Bender Sublease: (a) commencing on October 1, 2001 and ending on June 30, 2004, an amount equal to forty percent (40%) of the applicable Net Income (hereinafter defined) for such period, and (b) for the period commencing on July 1, 2004 and ending on September 30, 2010, an amount equal to thirty-two percent (32%) of the applicable Net Income for such period. With respect to each month commencing on October 1, 2001 and ending on September 30, 2010, "Net Income" shall mean the amount set forth on Exhibit B annexed hereto and made a part hereof opposite the applicable period which includes such month. It is agreed that the aforesaid payments owed by Landlord to Tribune shall be offset by Tribune against the monthly installments of fixed rent and additional rent otherwise owed by Tribune to Landlord under the Severed Tribune Lease (or, after the restatement of the Severed Tribune Lease, the New Tribune Lease).

3.    (a)    On or before March 24, 2002, as such date may be extended by Force Majeure (hereinafter defined) (the "Outside Surrender Date"), Tribune shall surrender to Landlord all of Tribune's right, title and interest in and to

the Severed 6th Floor Lease (the date upon which Tribune shall so surrender the 6th Floor Space being referred to herein as the "6th Floor Surrender Date"). Upon such surrender of the 6th Floor Space, all rights and obligations of Tribune and Landlord under the Severed 6th Floor Lease shall terminate and be of no further force and effect, and Tribune and Landlord shall each be released as of the 6th Floor Surrender Date from all liability of any kind with respect to the Severed 6th Floor Lease and the 6th Floor Space arising from and after the 6th Floor Surrender Date, except for any liability or obligations expressly provided to survive the termination of the Severed 6th Floor Lease. On and as of the 6th Floor Surrender Date, all items of rent and additional rent arising under the Tribune Lease and the Severed 6th Floor Lease with respect to the 6th Floor Space shall be apportioned between Tribune and Landlord. In the event that Tribune shall fail to surrender the 6th Floor Space on or before the Outside Surrender Date, Tribune shall be deemed a holdover tenant in such 6th Floor Space and Landlord shall be entitled, as its sole remedy, to terminate the Severed 6th Floor Lease and file appropriate proceedings to recover possession of the 6th Floor Space pursuant to the Severed 6th Floor Lease. In no event will Tribune be liable for damages, including without limitation, consequential, indirect or punitive damages, in connection with its failure to surrender the 6th Floor Space on or before the Outside Surrender Date, unless Tribune's failure to surrender possession on or before the Outside Surrender Date arises from a wilful default by Tribune.

(b)     For purposes hereof, Force Majeure shall mean Tribune's inability to timely surrender the 6th Floor Space by reason of any cause beyond Tribune's reasonable control, including, without limitation, war, acts of God, casualty, strike or work stoppage, inability to obtain labor or materials, governmental preemption in connection with a national emergency, conditions of supply and demand which have been or are affected by war or other emergency, Tribune's inability to obtain on a timely basis any governmental permit or authority required in connection with such work as a result of any of the foregoing. Any dispute with respect to the foregoing shall be determined in accordance with the procedures set forth in the Settlement Agreement.

(c)     Landlord shall cooperate with Tenant in all reasonable respects in connection with Tribune's surrender of the 6th Floor Space and relocation to its premises located on the 8th floor. The response time as set forth in the Tribune Lease for any Landlord approvals of plans and specification, execution of permit applications and similar matters in connection with such relocation shall be reduced to seven (7) business days.

4.    (a)    Tribune shall remain as tenant under the Severed Tribune Lease on all of the same terms and conditions as under the Tribune Lease, except that, from and after the Closing Date, all references in the Severed Tribune Lease to Times Mirror, Newsday or TMM shall be deemed to refer to Tribune, and provided further that (i) Tribune shall have the right to enter into Short Term Subleases (as such term is defined in the Tribune Lease) with respect to not more than 10% of the rentable square feet of the Remaining Tribune Space, (ii) notwithstanding any provisions in the Tribune Lease to the contrary (including without limitation Articles 41 and 42 thereof), (1) Tribune shall retain the right to maintain the same signage on behalf of its subsidiary Newsday, Inc. which Newsday, Inc. has as of the date hereof (consisting of one (1) plaque on the exterior column of Two Park Avenue and signage on the floor of the Building which Newsday, Inc. occupies or may occupy; it being understood that neither Newsday, Inc., Tribune, TMM or the tenant under the New TMM Lease shall retain other rights to any exterior or lobby signs pursuant to the terms of the Tribune Lease), and (2) Tribune and its Related Entities (as such term is defined in the Tribune Lease) and the subtenant of the TMM Space shall have the right to maintain the same floor signage on each full floor occupied by such entities as such entities have as of the date hereof, and Tribune and its Related Entities shall have the right to maintain the same signage on each multi-tenanted floor as such entities have as of the date hereof, (iii) notwithstanding any provisions of the Tribune Lease to the contrary (including without limitation, Article 43 thereof), Tribune shall retain the right to use ten (10) parking spaces in Two Park Avenue at market rates, and shall have no rights to any additional parking spaces located in Two Park Avenue, and (iv) notwithstanding anything in this Letter Agreement or the Tribune Lease to the contrary, Tribune shall not have any further renewal rights, regardless of the number of square feet demised under the Severed Tribune Lease or the New Tribune Lease, as the case may be.

(b)    Landlord and Tribune agree to restate in its entirety the Severed Tribune Lease (the "New Tribune Lease") on the same terms and conditions as the Severed Tribune Lease as amended hereby, as promptly after the Closing Date as is practicable.

(c)    Landlord and Tribune shall negotiate in good faith to agree upon the New Tribune Lease, it being understood that the provisions shall be consistent in all respects with the Tribune Lease, as amended hereby.  In the event that Landlord and Tribune shall be unable to agree upon **a mutually acceptable New Tribune Lease, such dispute shall be determined in accordance with the procedures set forth in the Settlement** Agreement.

(d)   If either party shall fail to execute and deliver the New Tribune Lease within ten (10) business days after the determination in accordance with the procedures set forth in the Settlement Agreement, the other party shall have the right to seek specific performance to require such party to execute the New Tribune Lease. Until the New Tribune Lease has been executed and delivered by both parties, the Severed Tribune Lease shall remain in effect.

(e)   Pursuant to a letter from Bayerische Landesbank Cayman Islands Branch, as Administrative Agent for itself and others ("Lender") to Landlord, Lender has consented to the transactions contemplated by this Letter Agreement and has agreed to provide to Tribune a subordination, nondisturbance and attornment agreement upon execution and delivery of the New Tribune Lease, on Lender's standard form, with such changes as may reasonably be negotiated by Tribune and Lender, which subordination, nondisturbance and attornment agreement shall be in form and substance consistent with the provisions of the Tribune Lease with respect thereto. Landlord hereby represents and warrants that there are no mortgages secured by Two Park Avenue other than the mortgage held by Lender.

(f)   TMM has agreed to surrender to Tribune, its sublandlord, the portion of the TMM Space which is located on the 8th floor of Two Park Avenue. Upon such surrender, Landlord and Tribune agree that such portion of the TMM Space shall be included in Remaining Tribune Space and shall continue to be part of the premises demised under the Severed Tribune Lease (or the New Tribune Lease, if such New Tribune Lease shall have theretofore been executed and delivered).

(g)   Landlord and Tribune acknowledge that Tribune has entered into a Short Term Sublease with Mia Vita, formerly known as Wise Bear, with respect to 7,780 rentable square feet on the 11th floor of the Remaining Tribune Premises. Landlord hereby acknowledges that the Mia Vita sublease, and all renewals or extensions thereof, constitutes a permissible Short Term Sublease (as defined in the Severed Tribune Lease), notwithstanding that the rentable square footage of the Mia Vita premises may exceed the threshhold for Short Term Subleases allowed by the Severed Tribune Lease.

(h)   Any portion of the TMM Space surrendered to Tribune from time to time pursuant to the TMM Sublease shall be included in the Remaining Tribune Space and shall continue to be part of the premises demised under the Severed Tribune Lease (or the New Tribune Lease, if such New Tribune Lease shall have theretofore been executed and delivered).

5.    (a)    Tribune represents and warrants that Time4 Media, Inc., formerly known as Times Mirror Magazines, Inc. ("TMM Tenant") is the subtenant under the TMM Sublease and Tribune has not received notice that such subtenant has assigned its interest thereunder. Tribune represents that TMM Tenant is not a Related Entity (as such term is defined in the Tribune Lease) of Tribune.

    (b)    Landlord and Tribune agree that if, at any time after the date hereof, either (x) AOL Time Warner, Inc., or (y) an affiliate of AOL Time Warner, Inc. which has a financial standing which is acceptable to Landlord in its sole discretion (either of such entities in clauses (x) and (y) being referred to as an "Acceptable AOL-Time Entity") shall guaranty the obligations of the TMM Tenant under the TMM Sublease pursuant to a guaranty satisfactory to Landlord in its sole discretion or shall become the subtenant under the TMM Sublease, then, within thirty (30) days after request therefor by Tribune,

        (i)  upon fulfillment of the conditions set forth in Paragraph 5(c) hereof, the Severed Tribune Lease (or the New Tribune Lease, if such New Tribune Lease shall have theretofore been executed and delivered) shall be severed into two leases, as follows: (1) the severed lease (the "Severed TMM Lease") with respect to the TMM Space (exclusive of any of the TMM Space theretofore surrendered to Tribune in accordance with Paragraphs 4(f) or 4(h) hereof), and (2) the severed lease (the "Severed Remaining Tribune Lease") with respect to the Remaining Tribune Space (inclusive of the any of the TMM Space theretofore surrendered to Tribune in accordance with Paragraphs 4(f) or 4(h) hereof), each of which severed leases shall be on the same terms and conditions as contained in the Severed Tribune Lease (or the New Tribune Lease, as the case may be) except that the Fixed Rent, Tenant's Operating Share, Tenant's Tax Share and Space Factor with respect to each such severed lease shall be as set forth on Exhibit C hereto in the applicable columns opposite the applicable spaces demised under each such severed lease, or if not set forth on Exhibit C, such items shall be allocated pro-rata between the Remaining Tribune Space and the TMM Space.

        (ii) Upon fulfillment of the conditions set forth in Paragraph 5(c) hereof, Tribune shall assign to Landlord, without consideration, and Landlord shall accept the assignment of, all of Tribune's interest as (i) tenant under the Severed TMM Lease, and (ii) sublandlord under the TMM Sublease (it being agreed that from and after the date of such assignment and acceptance (the "TMM Assignment Date") there shall be no merger of Landlord's interests

as tenant and landlord under the Severed TMM Lease).  Upon such assignment and acceptance, Tribune shall by released, as of the TMM Assignment Date, from all liability of any kind with respect to the Severed TMM Lease arising from and after the TMM Assignment Date.

(iii)  On and as of the TMM Assignment Date, all items of rent, additional rent, and sublease profit, if any, arising under the Severed TMM Lease and the TMM Sublease with respect to the TMM Space shall be apportioned between Tribune and Landlord.

(c)    As a condition to the assignment and acceptance of the Severed TMM Lease and the TMM Sublease as set forth in Paragraph 5(b) hereof, (i) Landlord and TMM Subtenant shall simultaneously with such assignment and acceptance execute and deliver a new lease with respect to the TMM Space (the "New TMM Lease"), on the same terms and conditions and in the same form as the Severed Tribune Lease, except (w) all references to Times Mirror or Newsday shall be deemed to refer to TMM Subtenant, (x) other than the surrender rights provided for in Paragraph 4(f) hereof, the New TMM Lease shall not include the provisions in the TMM Sublease, if any, granting to the tenant under the TMM Sublease any rights to surrender all or any portion of the TMM Space, (y) TMM Subtenant shall have the right to enter into Short Term Subleases with respect to not more than 10% of the rentable square footage of the TMM Space, and (z) TMM Subtenant shall have no rights to any parking spaces in Two Park Avenue, expansion rights, renewal or extension rights or signage rights (other than as set forth in Section 41.2 of the Tribune Lease), (ii) if applicable, an Acceptable AOL-Time Entity shall execute and deliver a guaranty of the obligations of the TMM Subtenant under the New TMM Lease, and (iii) TMM Tenant and Tribune shall execute mutual releases with respect to any obligations under the TMM Sublease arising from and after the assignment by Tribune to Landlord of the sublessor's interest in the TMM Sublease.

6.    Tribune shall pay any and all transfer taxes which shall be due in connection with the assignment of the Severed Bender Lease and Bender Sublease, the surrender of the Severed 6th Floor Lease and the assignment of the Severed TMM Lease and TMM Sublease.  Landlord and Tribune shall simultaneously with execution and delivery of this Letter Agreement execute and deliver any and all New York City and New York State transfer tax returns which are required to be filed in connection with the assignments set forth in this Agreement which are being consummated on the date hereof.  Upon consummation of any assignments or surrenders set forth in this Letter Agreement which, by the terms hereof shall be consummated at a future date, Landlord and Tribune shall, simultaneously with the consummation thereof, execute and deliver any and all New York City and

New York State transfer tax returns which are required to be filed in connection with such transactions. Tribune shall indemnify, defend and hold harmless Landlord from and against any and all claims, costs, losses, liability and expenses incurred by Landlord by virtue of Tribune's failure to pay any transfer taxes which shall be due in connection with the transactions set forth in this Agreement, whether such transactions are consummated simultaneously herewith or at a future date in accordance with this Letter Agreement.

This Letter Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Please confirm your agreement with the foregoing by executing this Letter Agreement in the space provided below.

Very truly yours,

TWO PARK COMPANY

By: M/H Two Park Associates, L.P.

By: Vornado M/H L.L.C.

By: Vornado Realty L.P.

By: Vornado Realty Trust

By: _____
Joseph Macnow
Executive Vice President - Finance
and Administration and Chief
Financial Officer

Agreed to:

THE TRIBUNE COMPANY

By: _____

New York State transfer tax returns which are required to be filed in connection with such transactions. Tribune shall indemnify, defend and hold harmless Landlord from and against any and all claims, costs, losses, liability and expenses incurred by Landlord by virtue of Tribune's failure to pay any transfer taxes which shall be due in connection with the transactions set forth in this Agreement, whether such transactions are consummated simultaneously herewith or at a future date in accordance with this Letter Agreement.

This Letter Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Please confirm your agreement with the foregoing by executing this Letter Agreement in the space provided below.

Very truly yours,

TWO PARK COMPANY

By:    M/H Two Park Associates, L.P.

     By:    Vornado M/H L.L.C.

          By:    Vornado Realty L.P.

               By:    Vornado Realty Trust

                    By:    _____
                               Joseph Macnow
                               Executive Vice President - Finance
                               and Administration and Chief
                               Financial Officer

Agreed to:

THE TRIBUNE COMPANY
By:    _____
       CRANE KENNEY, SR. VICE PRESIDENT

## SCHEDULE 1-A

The Bender Space



32ND STREET

PARK AVENUE

2 PARK AVENUE
5TH FLOOR

THE MENDIK COMPANY
330 MADISON AVENUE
NEW YORK N.Y. 10017
(212) 557-1100

33RD STREET

SEP-17-2001  10:03    MENDIK REALTY    2129530971   P.03/03



**32ND STREET**

2 PARK AVENUE
6TH FLOOR

PARK AVENUE

A

B

B

**33RD STREET**

THE MENDIK COMPANY
330 MADISON AVENUE
NEW YORK N.Y. 10017
(212) 557-1100



32ND STREET

2 PARK AVENUE
7TH FLOOR

PARK AVENUE

33RD STREET

THE MENDIK COMPANY
330 MADISON AVENUE
NEW YORK N.Y. 10017
(212) 557-1100

TOTAL P.04