IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## DECLARATION OF JOHN ZELENKA IN SUPPORT OF MOTION AUTHORIZING DEBTOR TRIBUNE MEDIA SERVICES, INC. TO ASSUME CERTAIN PREPETITION LOCAL ADVERTISING SALES AGREEMENTS AND TO ASSIGN PREPETITION AND POSTPETITION LOCAL ADVERTISING SALES AGREEMENTS TO ADVANTAGE NEWSPAPER CONSULTANTS INC.

STATE OF ILLINOIS        )
                         ) ss:
COUNTY OF COOK           )

JOHN ZELENKA hereby states:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

1.    I am a Vice President of Tribune Media Services, Inc. ("TMS"), one of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). I am familiar with TMS's business operations and I make this declaration (the "Declaration") on its behalf in support of the Motion for an Order Pursuant to 11 U.S.C. §§ 365 and 363 Authorizing Debtor Tribune Media Services, Inc. to Assume Certain Prepetition Local Advertising Sales Agreements and to Assign Prepetition and Postpetition Local Advertising Sales Agreements to Advantage Newspaper Consultants Inc. (the "Motion").[2] Unless otherwise stated in this Declaration, I have personal knowledge of the facts as set forth herein.

2.    TMS syndicates entertainment listings and content, and provides industry-leading databases of television, movie, and celebrity information to thousands of companies that in turn serve millions of entertainment consumers through print, broadcast, and interactive media. TMS also syndicates news and features, such as advice columns, political commentary, cartoons, and puzzles. In addition to these core business functions, TMS offers advertising sales support and marketing services to local newspapers—generally in smaller markets—directed at selling local advertisements in the newspapers' television listings pages and weekly TV-listings books.

3.    TMS is party to numerous prepetition and postpetition local advertising sales agreements with such newspapers (collectively, the "LAS Agreements"), which, among other things, provide that TMS's dedicated sales representatives will coordinate with the newspapers' sales staff and apply their knowledge of local publishing markets to identify potential advertisers and to conduct sales presentations. In this way, TMS assists the local

---

[2] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion.

2

newspapers that subscribe to its entertainment listings data to convert existing entertainment content into advertising revenue.

4. The LAS Agreements follow standard terms: TMS's sales representatives undertake an "ad sales effort" to sell one year of advertisements for a specified number of inches in the newspapers' TV-listings books on behalf of the local newspaper customer, in return for a weekly fee or a percentage of revenue. The fees paid by the local newspaper customers to TMS under the LAS Agreements generally range between $225 and $750 per week over the course of the one-year contract term.

5. Newspaper advertising sales across the industry have been affected by recent economic trends, and this is particularly true of the local advertising sales business, given the client base of small newspapers, its dependence on small, local retail advertisers, and a trend of newspaper expense-reduction measures focused on TV-listings books. In light of these trends, TMS has been exploring financial alternatives for this business. To that end, over the past several months, TMS has engaged in discussions with Advantage, a leading newspaper consultancy, to enter into agreements that involve the assignment of TMS's local ad sales contracts in exchange for favorable financial considerations. Advantage operates a sales representation business in local newspaper markets and offers a comprehensive TV-listings book local ad sales program similar to that of TMS. As a result of these discussions, TMS and Advantage negotiated and executed the Assignment Agreement that is attached to the Motion as Exhibit A.[3]

---

[3] In addition to the Assignment Agreement, TMS and Advantage negotiated and executed a Sales Representation Agreement, pursuant to which Advantage will exclusively represent TMS's listings data to Advantage's newspaper market customers, which TMS anticipates could be worth approximately $52,000 in cumulative incremental operating cash flow in its core entertainment listings data business over the next three years.

6. In order to consummate the Assignment Agreement, TMS must first assume fifty-four (54) of its prepetition local advertising sales agreements (the "Prepetition LAS Agreements"). Upon assumption of the Prepetition LAS Agreements, TMS will begin assigning all of the LAS Agreements, comprising the fifty-four (54) assumed Prepetition LAS Agreements and thirteen (13) Postpetition LAS Agreements, to Advantage. TMS will assign the LAS Agreements at predetermined dates over the next several months as set forth in Exhibit A to the Assignment Agreement. The list of Prepetition LAS Agreements that is attached to the Motion as Exhibit B and the list of LAS Agreements that is attached to the Motion as Exhibit C were compiled at my direction and under my supervision.

7. TMS believes, and I agree, that this transaction is the best financial alternative to maximize operating cash flow for its local ad sales business. Entry into the Assignment Agreement will allow TMS to focus on its core business of generating and distributing entertainment listings data and syndicating news and features content. The Assignment Agreement will enable TMS to maximize operating cash flow from the local ad sales business by eliminating operating costs associated with the business, while still allowing TMS to retain a portion of the revenue earned under the LAS Agreements. Specifically, over the next three years, TMS will retain 15% of the gross revenue derived from the LAS Agreements as well as subsequent local ad sales agreements Advantage enters into with former TMS customers, which TMS estimates will result in average operating cash flow of approximately $151,000 per year or $453,000 in the aggregate. In addition, Advantage will pay TMS a one-time sales commission of 12% of first-year revenues for approximately 14 markets in which TMS has agreements to conduct local ad sales efforts, but has not yet completed those sales efforts. TMS estimates these commissions will generate operating cash flow of approximately $34,000 in

2009. Lastly, entry into the Assignment Agreement creates a valuable new strategic partner for TMS's core data business.

8. The Prepetition LAS Agreements are agreements under which TMS receives weekly fees from the local newspaper counterparties, and thus there are no amounts owing by TMS under any of the Prepetition LAS Agreements. TMS is aware of no other non-monetary defaults under any of the Prepetition LAS Agreements. The LAS Agreements contain no restriction on assignment by TMS to third parties.

9. I am familiar with Advantage's reputation as an industry leader in newspaper consulting and in providing local ad sales support to newspapers. Founded in 1996, Advantage's primary business is local ad sales for TV-listings books; Advantage's sales staff is located throughout the country, currently serving over 240 daily newspapers in 48 states. Advantage's clients include several prominent newspaper companies, including CNHI, Gannett, Freedom, Lee Enterprises, Media News Group, Morris Communications, Horizon Publications, Media General, Inc., and Stephens Media Group. TMS has been advised by Advantage that Advantage has the staff, resources, and familiarity with local markets to provide continuing service under the LAS Agreements. Accordingly, TMS believes, and I agree, that the counterparties to the LAS Agreements are adequately assured of Advantage's ability to perform its obligations under the LAS Agreements.

10. In light of the foregoing, the TMS respectfully submits, and I agree, that assuming the Prepetition LAS Agreements and assigning all of the LAS Agreements to Advantage is supported by its sound business judgment and is in the best interests of its estate and creditors.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: July 8, 2009

_____
JOHN ZELENKA