# EXHIBIT A

*Assignment Agreement*

**CONTRACT ASSIGNMENT AND REVENUE SHARE AGREEMENT** dated as of July 8, 2009, (the "Effective Date") between Tribune Media Services, Inc., a Delaware corporation ("TMS"), and Advantage Newspaper Consultants Inc., a North Carolina corporation ("Advantage").

TMS desires to assign to Advantage, and Advantage desires to purchase from TMS certain newspaper advertising sales contracts between TMS and various newspapers, all upon the terms and subject to the conditions of this Agreement.

Certain capitalized terms used in this Agreement are defined in Section 9.06(b). Other capitalized terms are defined elsewhere in this Agreement.

Accordingly, the parties hereby agree as follows:

ARTICLE I

ASSIGNMENT OF NEWSPAPER CONTRACTS

Section 1.01. Assignment. Upon the terms and subject to the conditions set forth in this Agreement, TMS shall assign, transfer, convey and deliver to Advantage, and Advantage shall purchase from TMS all the right, title and interest of TMS in, to and under TMS's Advertising Sales Agreements with various U.S. and Canadian newspapers (the "Newspaper Contracts"), which are listed on Schedule A hereto. The purchase and assignment of the Newspaper Contracts and the assumption of the Assumed Liabilities are referred to in this Agreement collectively as the "Transaction."

Section 1.02. Excluded Assets. The term "Excluded Assets" means all assets that are not specifically included as Newspaper Contracts. Excluded Assets also includes certain accounts receivable under the Newspaper Contracts as set forth in Section 1.08 below and certain rights under the Newspaper Contracts as set forth in Section 1.06 below.

Section 1.03. Assumed Liabilities. After the assignment of each Newspaper Contract as set forth in Section 1.06 below, Advantage shall pay, perform and discharge when due, all liabilities, obligations and commitments of whatever kind and nature, primary or secondary, direct or indirect, absolute or contingent, known or unknown, whether or not accrued, arising out of or relating to the ownership and/or use of the Newspaper Contracts on or after the date of assignment.

Section 1.04. Taxes. Each party will be responsible for all Taxes on its income related to this Agreement and the Newspaper Contracts.

Section 1.05. Consents of Third Parties/Bankruptcy Court Approval. The newspaper counterparties to the Newspaper Contracts (the "Newspapers") have no right to consent or object to the assignment of the Newspaper Contracts under the terms of the Newspaper Contracts. Nonetheless, because TMS is currently a debtor in possession of the Newspaper Contracts in a Chapter 11 bankruptcy proceeding pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), TMS will assume the pre-petition Newspaper Contracts prior to assigning them to Advantage.

Section 1.06. <u>Assignment and Assumption of Newspaper Contracts</u>. (a) On or before July 8, 2009, TMS will file a motion with the Bankruptcy Court to assume the pre-petition Newspaper Contracts (i.e., those entered prior to December 8, 2008). Upon assumption of the pre-petition Newspaper Contracts, TMS will assign the Newspaper Contracts to Advantage pursuant to the schedule set forth in Exhibit A hereto, which sets forth, among other things, the dates on which Advantage will perform an advertising sales effort for a Newspaper under a Newspaper Contract (an "<u>Advertising Sales Effort</u>"). (b) TMS does not require Bankruptcy Court approval to assume post-petition Newspaper Contracts (i.e., those entered after December 8, 2008) but will seek approval to assign the post-petition Newspaper Contracts to Advantage pursuant to the schedule set forth in Exhibit A. Prior to the date of assignment of each Newspaper Contract as set forth in Exhibit A, TMS will continue to own the rights and obligations under that unassigned Newspaper Contract.

Section 1.07. <u>Advantage to Serve as Exclusive Sales Agent</u>. If the date of an Advertising Sales Effort comes due prior to TMS's assumption and assignment of a Newspaper Contract as set forth in Section 1.06 above, Advantage will be the exclusive sales agent to perform the Advertising Sales Effort. The terms under which Advantage will act as the exclusive sales agent for advertising sales and be permitted to represent TMS Listings Data and Zap2it.com Products ("Products") are set forth in the Sales Representation Agreement, which is attached as an Addendum hereto.

Section 1.08. <u>Accounts Receivable</u>. TMS will continue to own any outstanding accounts receivable balances that are a result of prior TMS sales under Newspaper Contracts. TMS will be responsible for invoicing and collection on those accounts receivable balances. Once Advantage performs an Advertising Sales Effort for a Newspaper under a Newspaper Contract and once the outstanding accounts receivable balances that are a result of prior TMS sales under Newspaper Contracts are extinguished, Advantage will own and administer subsequent accounts receivable under that Newspaper Contract.

## ARTICLE II

## REVENUE SHARE

Section 2.01. <u>Revenue Share</u>. During the Term, TMS will receive 15 percent of all the gross local print and online sales revenue received by Advantage from advertising sales associated with either a Newspaper Contract or a contract subsequently entered by Advantage with a newspaper customer that came to Advantage via a Newspaper Contract (the "<u>Revenue Share</u>"). When Advantage makes advertising sales acting as the Exclusive Sales Agent, the parties' share of the revenue shall be governed by the Sales Representation Agreement.

Section 2.02. <u>Commission</u>. For the small number of Newspaper Contracts that TMS has either negotiated or signed as of the Effective Date, but has not completed the Advertising Sales Effort, and which Advantage will complete, Advantage will pay TMS, in addition to the Revenue Share, a one-time commission of 12 percent of the gross annual first-year ad sales revenue payable to Advantage derived from those Newspaper Contracts (the "Commission"). Any commission payable for Advertising Sales Efforts for which Advantage acts as the

exclusive sales agent for shall be governed by the Sales Representation Agreement. Newspaper Contracts subject to this Commission are set forth in Exhibit B.

Section 2.03. Payment Schedule. Advantage will pay TMS the Revenue Share within 30 days of the date by which payment is due from the customer. Advantage will pay TMS the Commission within 30 days of the completion of the first Advertising Sales Effort Advantage performs for the Newspaper.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF TMS

TMS hereby represents and warrants to Advantage as follows.

Section 3.01. Authority. TMS is duly organized, validly existing and in good standing under the laws of the State of Delaware. TMS has the right to assign the post-petition Newspaper Contracts, and, subject to receiving Bankruptcy Court approval, TMS has the right to assign the pre-petition Newspaper Contracts. Subject to the foregoing, TMS has all requisite company power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. All acts and other proceedings required to be taken by TMS to authorize the execution, delivery and performance of this Agreement and to consummate the transactions contemplated hereby and thereby have been or will be duly and properly taken. This Agreement has been duly executed and delivered by TMS and, assuming this Agreement has been duly authorized, executed and delivered by Advantage, constitutes a legal, valid and binding obligation of TMS, enforceable against TMS in accordance with its terms, subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles.

Section 3.02. No Conflicts; Consents. (a) The execution and delivery of this Agreement by TMS does not, and the consummation of the transactions contemplated hereby and compliance with the terms hereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or result in the creation of any lien upon any of the properties or assets of TMS under, any provision of (i) any Contract to which TMS is a party or by which any of its properties or assets are bound or (ii) any judgment, order, or decree, or, subject to the matters referred to in paragraph (b) below, statute, law, ordinance, rule or regulation of any Governmental Entity applicable to TMS or its properties or assets, other than, in the case of clause (iii) above, any such items that, individually or in the aggregate, would not be reasonably likely to have a material adverse effect on the ability of TMS to consummate the Transaction.

(b) Except as otherwise set forth herein with regard to Bankruptcy Court approval, no consent, approval, license, permit, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required to be obtained or made by or with respect to TMS in connection with the execution, delivery and performance of this Agreement, or the consummation of the transactions contemplated hereby.

Section 3.03. <u>Actions and Proceedings</u>. There are no (a) outstanding judgments, orders, injunctions or decrees of any Governmental Entity or arbitration tribunal against TMS, (b) lawsuits, actions or proceedings pending or, to the knowledge of TMS, threatened against TMS, or (c) investigations by any Governmental Entity which are pending or, to the knowledge of TMS, threatened against TMS, which, in the case of each of clauses (a), (b) and (c), have had or would be reasonably likely to have a material adverse effect on the ability of TMS to consummate the Transaction.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF ADVANTAGE

Advantage hereby represents and warrants to TMS as follows:

Section 4.01. <u>Authority</u>. Advantage is a corporation duly organized, validly existing and in good standing under the laws of North Carolina. Advantage has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. All acts and other proceedings required to be taken by Advantage to authorize the execution, delivery and performance of this Agreement and to consummate the transactions contemplated hereby and thereby have been duly and properly taken. This Agreement has been duly executed and delivered by Advantage and, assuming this Agreement has been duly authorized, executed and delivered by TMS, constitutes a legal, valid and binding obligation of Advantage, enforceable against Advantage in accordance with its terms, subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles.

Section 4.02. <u>No Conflicts; Consents</u>. (a) The execution and delivery of this Agreement by Advantage does not, and the consummation of the transactions contemplated hereby and compliance with the terms hereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or result in the creation of any lien upon any of the properties or assets of Advantage under, any provision of (i) any Contract to which Advantage is a party or by which any of its properties or assets are bound or (ii) any judgment, order, or decree, or, subject to the matters referred to in paragraph (b) below, statute, law, ordinance, rule or regulation of any Governmental Entity applicable to Advantage or its properties or assets, other than, in the case of clauses (ii) and (ii) above, any such items that, individually or in the aggregate, would not be reasonably likely to have a material adverse effect on the ability of Advantage to consummate the Transaction.

(b) No consent, approval, license, permit, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required to be obtained or made by or with respect to Advantage in connection with the execution, delivery and performance of this Agreement, or the consummation of the transactions contemplated hereby.

Section 4.03. <u>Actions and Proceedings</u>. There are no (a) outstanding judgments, orders, injunctions or decrees of any Governmental Entity or arbitration tribunal against Advantage, (b) lawsuits, actions or proceedings pending or, to the knowledge of Advantage, threatened

against Advantage, or (c) investigations by any Governmental Entity which are pending or, to the knowledge of Advantage, threatened against Advantage, which, in the case of each of clauses (a), (b) and (c), have had or would be reasonably likely to have a material adverse effect on the ability of Advantage to consummate the Transaction.

## ARTICLE V

## COVENANTS OF ADVANTAGE

Advantage covenants and agrees as follows:

Section 5.01. <u>Confidentiality</u>. Advantage acknowledges that the information being provided to it in connection with the Transaction and the consummation of the other transactions contemplated hereby is subject to the terms of the Non-Disclosure Agreement between Advantage and TMS effective as of April 20, 2009 (the "<u>NDA</u>"). Effective upon the Effective Date, the confidentiality provisions of the NDA shall terminate with respect to information relating solely to the Newspaper Contracts; provided, however, that Advantage acknowledges that any and all other information provided to it by TMS, any Affiliate of TMS or TMS's representatives concerning TMS or any Affiliate of TMS shall remain subject to the terms and conditions of the NDA after the Effective Date.

Section 5.02. <u>No Additional Representations</u>. THE NEWSPAPER CONTRACTS ARE TRANSFERRED "AS IS," "WHERE IS" AND, SUBJECT ONLY TO THE REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE III ABOVE, WITH ALL FAULTS AND WITHOUT ANY OTHER REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE WHATSOEVER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, AND IN PARTICULAR, WITHOUT ANY IMPLIED WARRANTY OR REPRESENTATION AS TO CONDITION, VALUE, MERCHANTABILITY, NONINFRINGEMENT, VALIDITY, COMPLETENESS OR FITNESS OR SUITABILITY FOR ANY SPECIFIC PURPOSE AS TO ANY OF THE NEWSPAPER CONTRACTS. TMS AND ITS AFFILIATES HEREBY DISCLAIM ANY SUCH OTHER OR IMPLIED REPRESENTATIONS OR WARRANTIES, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO ADVANTAGE OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR ANY OTHER DOCUMENT OR INFORMATION PROVIDED TO ADVANTAGE OR ITS REPRESENTATIVES IN CONNECTION WITH THE ASSIGNMENT OF THE NEWSPAPER CONTRACTS IN ANY "DATA ROOM" OR OTHERWISE).

Section 5.03. <u>Non-Assertion</u>. Advantage shall not, and shall cause its Affiliates to not, commence or assert at any time any claim, action, or proceeding, against or with respect to (i) TMS, (ii) any Affiliate of TMS, or (iii) any customer of any of the foregoing to the extent related to products, services or design information provided to such customer by or on behalf of any of the foregoing.

ARTICLE VI

MUTUAL COVENANTS

Section 6.01. Cooperation. Advantage and TMS shall cooperate with each other, and shall cause their respective officers, employees, agents, and representatives to cooperate with each other, during the period of the Advertising Sales Efforts set forth in Exhibit A to ensure the orderly transition of the Newspaper Contracts from TMS to Advantage and to minimize any disruption to the respective businesses of TMS and Advantage that might result from the transactions contemplated hereby.

Section 6.02. Limitations on Remedies. (a) In the event of a breach of any warranty or covenant by TMS or the inaccuracy of any representation of TMS contained in this Agreement (other than Sections 3.01 and 3.03), as finally judicially determined by a court of competent jurisdiction or as mutually agreed by the parties hereto, TMS shall not be liable to Advantage or its Affiliates for any damages relating to any such breaches or inaccuracies until the aggregate of all damages related to such breaches or inaccuracies exceeds $50,000 and then, only for the amount by which damages exceed $50,000. In addition, the maximum amount by which TMS shall be liable to Advantage for the aggregate of damages relating to any such breaches or inaccuracies shall be $100,000.

(b)     Notwithstanding anything to the contrary herein, in no event shall TMS be liable for any punitive, special, consequential or opportunity cost damages of any kind or the loss of anticipated or future business or profits or for the amount of any damages with respect to which Advantage recovers from any third person. Advantage agrees to take all reasonable steps to mitigate its damages upon and after becoming aware of any event or condition which could reasonably be expected to give rise to any damage hereunder.

(c)     No party shall have any liability for any inaccuracy in or breach of any representation or warranty by such party if the other party or any of its officers, employees, counsel or other representatives had actual knowledge on or before the Effective Date of the facts which caused or cause such representation or warranty to be inaccurate or breached.

Section 6.03. Publicity. TMS and Advantage agree that no public release or announcement concerning the transactions contemplated hereby shall be issued by either party or its Affiliates without the prior written consent of the other party (which consent shall not be unreasonably withheld). The forms of the written communication TMS will issue to Newspapers are attached as Exhibit C. The written communications set forth in Exhibit C may not be disseminated prior to July 8, 2009. Notwithstanding, Advantage understands and agrees that TMS will be required to make public filings in the Bankruptcy Court in order to effectuate the assumption and assignment of certain Newspaper Contracts as set forth herein.

## ARTICLE VII

## TERM

Section 7.01. <u>Term</u>. This term of this Agreement shall be three years from the Effective Date.

Section 7.02. <u>Termination</u>. Notwithstanding the foregoing, the ongoing rights and obligations set forth in this Agreement may be terminated: (a) by either party on 30 days written notice in the event of a breach of its terms by the other party provided such breach remains ongoing following the 30-day notice period; or (b) by either party immediately if the other party ceases doing business for any reason excepting Force Majeure. For the avoidance of doubt, termination of this Agreement will not affect the assignment and assumption of the Newspaper Contracts. Termination of the Agreement will be in addition to, and not in lieu of, any equitable or legal remedies available to either party.

## ARTICLE VIII

## EMPLOYEES

Section 8.01. <u>TMS Employees</u>. Advantage will not assume any liability (severance or otherwise) in respect of TMS employees employed in its local ad sales business. Advantage may offer employment to those TMS employees at its discretion at a time mutually agreed upon by both parties during the course of this Transaction.

Section 8.02. <u>Support Staff</u>. TMS may maintain an operational support staff sufficient to accommodate various ad hoc requests and customer support from ongoing active Newspaper Contracts assigned by TMS to Advantage.

Section 8.03. <u>Operational Support</u>. During the Term, TMS may make available upon Advantage's request and at TMS' discretion certain operational support sufficient to create prototypes and/or related sales support activities sufficient to support Advantage sales pitches from time to time. TMS will charge Advantage $250 per prototype, payable within 30 days of Advantage's receipt of the prototype. For example, when Advantage is ready to confirm the next advertising sales effort with a newspaper customer, at Advantage's request, TMS may coordinate with Advantage as to the design and layout of the print TV book prototype that will be used in the sales pitches. Advantage may choose to have more than one prototype per market and the rate TMS will charge for each prototype is $250.

## ARTICLE IX

## MISCELLANEOUS

Section 9.01. <u>Assignment</u>. This Agreement will bind and inure to the benefit of each party's permitted successors and assigns. Neither party shall assign this Agreement (or any part thereof) without the advance written consent of the other party, such consent not to be

unreasonably withheld or delayed, except that either party may assign its rights and obligations under this Agreement to any corporation or other entity controlled by or under common control with such party, or to any entity, which succeeds to substantially all of the business and assets of such party. Any attempt to transfer or assign this Agreement except as expressly authorized under this paragraph will be null and void. ,.

    Section 9.02. <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

    Section 9.03. <u>Expenses</u>. Whether or not the transactions contemplated hereby are consummated, and except as otherwise specifically provided in this Agreement, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs or expenses.

    Section 9.04. <u>Amendments</u>. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto. By an instrument in writing Advantage, on the one hand, or TMS, on the other hand, may waive compliance by the other with any term or provision of this Agreement that such other party was or is obligated to comply with or perform.

    Section 9.05. <u>Notices</u>. All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by prepaid telex, cable or telecopy or sent, postage prepaid, by registered, certified or express mail or reputable overnight courier service and shall be deemed given when so delivered by hand, telexed, cabled or telecopied, or if mailed, three days after mailing (one business day in the case of overnight mail or overnight courier service), as follows:

    (a)    if to Advantage,

            Advantage Newspaper Consultants Inc.
            225 Fairway Drive, Suite A
            Fayetteville, NC  28305
            Attention: Tim Dellinger, President

    (b)    if to TMS,

            Tribune Media Services, Inc.
            435 N. Michigan Avenue, Suite 1500
            Chicago, Illinois 60611
            Attention: John Zelenka, Vice President

with copies to:

>   Tribune Company
>   435 N. Michigan Avenue
>   Chicago, Illinois 60611
>   Attention: General Counsel

Section 9.06. **Interpretation; Exhibits, Certain Definitions**. (a) The definitions of the terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth therein), (ii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iii) all references herein to Articles, Sections, Addenda, or Exhibits shall be construed to refer to Articles, Sections, Addenda and Exhibits of this Agreement and (iv) the headings contained in this Agreement, or any Addendum or Exhibit are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All Addenda and Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Addenda or Exhibit annexed hereto but not otherwise defined therein, shall have the meaning as defined in this Agreement. In the event of an ambiguity or a question of intent or interpretation, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

(b)   For all purposes hereof:

"Affiliate" means, with respect to any specified person, any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person; and for the purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Applicable Law" means any applicable statute, law, ordinance, rule, order or regulation of any Governmental Entity applicable or relating to the Newspaper Contracts.

"Force Majeure" means fire, floods, war, terrorist attacks, and similar acts of God.

"Governmental Entity" means any federal, state or local government or any court of competent jurisdiction, administrative agency or commission or other governmental authority or instrumentality.

"Material Adverse Effect" means a material adverse effect on (i) the Newspaper Contracts, taken as a whole, or (ii) the ability of TMS to consummate the Transaction. For purposes of this Agreement, "Material Adverse Effect" shall exclude any effects to the extent resulting from (A) changes in the United States or foreign economies in general, (B) changes in industries relating to the Newspaper Contracts in general and not specifically relating to the Newspaper Contracts, (C) the announcement by TMS of its intention to assign the Newspaper Contracts, (D) the completion of the Transaction or (E) the execution of this Agreement (including the disclosure of the identity of Advantage) and the consummation of the transactions contemplated hereby.

"Person" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

"Subsidiary" of any person means another person, an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting interests, fifty percent or more of the equity interests of which) is owned directly or indirectly by such first person or by another subsidiary of such person.

"Taxes" shall mean any U.S. federal, state, provincial, local or foreign taxes, custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, including all interest, penalties and additions imposed with respect to such amounts.

Section 9.07. Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.

Section 9.08. Entire Agreement. This Agreement, the NDA and the Addendum contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter, including the Summary of Non Binding Terms dated June 25, 2009. Neither party shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein or in the NDA or in the Addendum.

Section 9.09. Survival. Notwithstanding anything contained herein to the contrary, Articles II, III, IV, V, VI, and IX and any other provision for which survival is equitable will survive any termination or expiration of this Agreement.

Section 9.10. Severability. If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision to any other persons or circumstances.

Section 9.11. <u>Audit</u>. During the Term and for one year thereafter, Advantage will maintain complete and accurate books and records containing of all information necessary to calculate the revenue due to TMS under this Agreement. TMS or its agent will be entitled to review such books and records, during regular business hours and upon reasonable notice, for the purpose of verifying the accuracy of the payments due hereunder. Any such review will be made not more than once each year during the Term, unless for cause. The cost of such audit will be borne by TMS, except that if such audit reveals an underpayment in excess of 5% of amounts due and owing to TMS, then the costs of such audit will be borne by Advantage.

Section 9.12. <u>Consent to Jurisdiction</u>. Each of Advantage and TMS irrevocably submits to the exclusive jurisdiction of either the courts of the State of Illinois and of the United States of America located in the State of Illinois or the courts of the State of North Carolina and of the United States of America located in the State of North Carolina, for any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby (and agree not to commence any action, suit, or proceeding relating thereto except in such courts). Each of Advantage and TMS irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the courts of the State of Illinois and of the United States of America located in the State of Illinois, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 9.13. <u>Waiver of Jury Trial</u>. Each party hereto hereby waives to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or any transaction contemplated hereby. Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce that foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement, as applicable, by, among other things, the mutual waivers and certifications in this Section 9.13.

Section 9.14. **<u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES OF SUCH STATE**

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, TMS and Advantage have duly executed this Agreement as of the date first written above.

TRIBUNE MEDIA SERVICES, INC.

By: *[signature]*
Name: JOHN E. ZELENKA
Title: VICE PRESIDENT, BUSINESS DEVELOPMENT

ADVANTAGE NEWSPAPER CONSULTANTS INC.

By: *[signature]*
Name: TIMOTHY O. DELLINGER
Title: PRESIDENT

# EXHIBIT A

## Contracts to be assigned to Advantage

| | Customer Name | City | State / Country | Estimated Contract Assignment Date | Estimated Final TMS Billing Date | Disclosures |
|---|---|---|---|---|---|---|
| 1 | The Daily Progress | Charlottesville | VA | August 1, 2009 | October 28, 2009 | |
| 2 | News Virginian | Waynesboro | VA | August 1, 2009 | N/A | [4] |
| 3 | Northwest Arkansas Times | Fayetteville | AR | August 1, 2009 | November 16, 2009 | |
| 4 | The Sudbury Star | Sudbury | ON | August 1, 2009 | September 14, 2009 | [3] |
| 5 | The Progress-Index | Petersburg | VA | August 15, 2009 | September 7, 2009 | |
| 6 | The News-Sun | Sebring | FL | September 9, 2009 | October 19, 2009 | |
| 7 | McAlester News-Capital | McAlester | OK | September 9, 2009 | September 7, 2009 | |
| 8 | Daily Herald | St. Maarten | Netherland Antilles | September 12, 2009 | October 5, 2009 | |
| 9 | The Daily Commercial | Leesburg | FL | September 13, 2009 | September 21, 2009 | |
| 10 | Harrison Daily Times | Harrison | AR | September 19, 2009 | September 14, 2009 | |
| 11 | Public Opinion | Chambersburg | PA | September 19, 2009 | August 17, 2009 | |
| 12 | Herald Review | Grand Rapids | MN | September 27, 2009 | November 9, 2009 | |
| 13 | Prince Albert Daily Herald | Prince Albert | SK | September 29, 2009 | October 19, 2009 | |
| 14 | Independent | Show Low | AZ | October 2, 2009 | November 23, 2009 | |
| 15 | Siskiyou Daily News | Yreka | CA | October 2, 2009 | October 26, 2009 | |
| 16 | Times Colonist | Victoria | BC | October 19, 2009 | December 7, 2009 | |
| 17 | Mount Vernon News | Mount Vernon | OH | October 30, 2009 | August 3, 2009 | |
| 18 | The La Porte Herald-Argus | La Porte | IN | November 4, 2009 | September 7, 2009 | |
| 19 | The Hutchinson News | Hutchinson | KS | November 4, 2009 | November 16, 2009 | |
| 20 | The Daily Courier | Kelowna | BC | November 6, 2009 | November 2, 2009 | |
| 21 | Penticton Herald | Penticton | BC | November 6, 2009 | November 2, 2009 | |
| 22 | The Sun Chronicle | Attleboro | MA | November 14, 2009 | November 9, 2009 | |
| 23 | Sturgis Journal | Sturgis | MI | November 24, 2009 | December 14, 2009 | |
| 24 | The Record | Sherbrooke | QC | November 24, 2009 | December 7, 2009 | |
| 25 | Daily News | Red Bluff | CA | December 3, 2009 | December 7, 2009 | |
| 26 | Newport News-Times | Newport | OR | December 3, 2009 | September 28, 2009 | |
| 27 | Times-Standard | Eureka | CA | December 14, 2009 | December 7, 2009 | |
| 28 | Cody Enterprise | Cody | WY | December 15, 2009 | September 28, 2009 | |
| 29 | Medicine Hat News | Medicine Hat | AB | December 17, 2009 | March 1, 2010 | |
| 30 | The Herald | Rock Hill | SC | December 17, 2009 | December 28, 2009 | |
| 31 | The Times News | Lehighton | PA | December 19, 2009 | December 28, 2009 | |
| 32 | Bristol Herald Courier | Bristol | VA | December 19, 2009 | November 23, 2009 | |
| 33 | Wellsville Daily Reporter | Wellsville | NY | January 4, 2010 | December 28, 2009 | |
| 34 | The Lethbridge Herald | Lethbridge | AB | January 7, 2010 | March 1, 2010 | |
| 35 | The Prince George Citizen | Prince George | BC | January 18, 2010 | March 1, 2010 | |
| 36 | Maui News/Wailuku | Wailuku | HI | January 20, 2010 | March 8, 2010 | |
| 37 | The Tampa Tribune | Tampa | FL | January 30, 2010 | February 22, 2010 | |

|    | Customer Name | City | State / Country | Estimated Contract Assignment Date | Estimated Final TMS Billing Date | Disclosures |
|----|---|---|---|---|---|---|
| 38 | The Monroe Times | Monroe | WI | January 31, 2010 | April 26, 2010 | |
| 39 | The Telegram | St. John's | NL | February 2, 2010 | March 1, 2010 | |
| 40 | Pottsville Republican & Herald | Pottsville | PA | February 2, 2010 | March 22, 2010 | |
| 41 | Fairbanks Daily News-Miner | Fairbanks | AK | February 23, 2010 | October 5, 2009 | |
| 42 | The Chronicle-Telegram | Elyria | OH | March 5, 2010 | October 5, 2009 | |
| 43 | The Medina County Gazette | Medina | OH | March 5, 2010 | March 22, 2010 | |
| 44 | The Daily Herald | Columbia | TN | March 18, 2010 | April 5, 2010 | [2] |
| 45 | Cape Breton Post | Sydney | NS | March 26, 2010 | June 12, 2010 | |
| 46 | Thunder Bay Chronicle Journal | Thunder Bay | ON | April 4, 2010 | April 19, 2010 | |
| 47 | Daily News | Rolla | MO | April 6, 2010 | April 19, 2010 | |
| 48 | Temple Daily Telegram | Temple | TX | April 6, 2010 | March 29, 2010 | |
| 49 | Moose Jaw Times Herald | Moose Jaw | SK | April 7, 2010 | April 19, 2010 | |
| 50 | Erie Times | Erie | PA | May 7, 2010 | November 23, 2009 | |
| 51 | Herald | Clinton | IA | May 8, 2010 | May 10, 2010 | |
| 52 | Sandusky Register | Sandusky | OH | May 12, 2010 | May 17, 2010 | |
| 53 | Courier | Ottumwa | IA | June 4, 2010 | May 24, 2010 | |
| 54 | Olney Daily Mail | Olney | IL | June 4, 2010 | August 16, 2010 | |
| 55 | Daily Corinthian | Corinth | MS | June 4, 2010 | May 22, 2010 | |
| 56 | The Times | Ottawa | IL | June 6, 2010 | June 21, 2010 | |
| 57 | The Journal Gazette | Fort Wayne | IN | June 29, 2010 | August 16, 2010 | |
| 58 | The Register-Mail | Galesburg | IL | June 30, 2010 | July 7, 2010 | |
| 59 | Indiana Gazette | Indiana | PA | July 3, 2010 | August 2, 2010 | |
| 60 | Pioneer | Big Rapids | MI | July 10, 2010 | August 16, 2010 | |
| 61 | Manistee News-Advocate | Manistee | MI | July 10, 2010 | August 16, 2010 | |
| 62 | Sierra Vista Herald | Sierra Vista | AZ | July 20, 2010 | July 7, 2010 | |
| 63 | Daily Ledger | Canton | IL | July 30, 2010 | August 9, 2010 | [1] |
| 64 | The Sault Star | Sault Ste. Marie | ON | August 1, 2010 | September 27, 2010 | [1] |
| 65 | Daily Rocket-Miner | Rock Springs | WY | August 2, 2010 | July 27, 2010 | |
| 66 | The Daily Press | Ashland | WI | August 25, 2010 | July 7, 2010 | |
| 67 | Lisbon Morning Journal | Lisbon | OH | August 27, 2010 | May 31, 2010 | |
| 68 | Santa Fe New Mexican | Santa Fe | NM | September 1, 2010 | N/A | [1], [4] |
| 69 | Norman Transcript | Norman | OK | September 19, 2010 | July 14, 2010 | |
| 70 | Green River Star | Green River | WY | December 2, 2010 | December 28, 2010 | |

[1]    Awaiting final signatures on contract.
[2]    Awaiting addendum to executed contract.
[3]    Customer has provided a verbal cancel to TMS, but TMS is still in active negotiations with the customer
[4]    N/A ("Not Applicable; New local ad sales customer for TMS and thus, no previous local ad sales billing.

Remainder of Exhibits Omitted