1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 08-13141-KJC

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


TRIBUNE COMPANY ET AL,


      Debtor.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          824 North Market Street

          Wilmington, Delaware


          June 30, 2009

          1:37 PM


B E F O R E:

HON. KEVIN J. CAREY

U.S. BANKRUPTCY JUDGE


ECR OPERATOR:  BRANDON MCCARTHY

2

1

2    HEARING re Motion for Relief from Automatic Stay With Respect

3    to E. Michael Gutman, M.D., Mike Gutman, M.D. (MPAC), P.A. and

4    Gutman Pain/Accident Center, Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Pnina Eilberg

25

3

1

2    A P P E A R A N C E S :

3    COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

4         Attorneys for Tribune Co.

5         500 Delaware Avenue

6         Suite 1410

7         Wilmington, DE 19801

8

9    BY:   J. KATE STICKLES, ESQ.

10

11

12   SIDLEY AUSTIN LLP

13        Attorneys for Tribune Co.

14        1501 K Street N.W.

15        Washington, DC 20005

16

17   BY:   GUY S. NEAL, ESQ.

18

19

20

21

22

23

24

25

4

1

2     SIDLEY AUSTIN LLP

3          Attorneys for Tribune Co.

4          555 West Fifth Street

5          Los Angeles, CA 90013

6

7     BY:   ARIELLA THAL SIMONDS, ESQ.

8          (TELEPHONICALLY)

9

10

11    FOX ROTHSCHILD LLP

12         Attorneys for Donna Gutman

13         919 North Market Street

14         Suite 1300

15         Wilmington, DE 19899

16

17    BY:   L. JASON CORNELL, ESQ.

18

19

20    CHADBOURNE & PARKE LLP

21         Attorneys for Creditors' Committee

22         30 Rockefeller Plaza

23         New York, NY 10112

24

25    BY:   JASON B. PORTER, ESQ.

5

1

2   LANDIS RATH & COBB LLP

3        Attorneys for Creditors' Committee

4        919 North Market Street

5        Suite 1800

6        Wilmington, DE 19899

7

8   BY:   MATTHEW B. MCGUIRE, ESQ.

9

10

11   KRAMER LEVIN NAFTALIS & FRANKEL LLP

12        Attorneys for Interested Party

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16   BY:   JENNIFER SHARRET, ESQ.

17        (TELEPHONICALLY)

18

19

20

21

22

23

24

25

6

1                    P R O C E E D I N G S

2          THE CLERK:  All rise.  You may be seated.

3          THE COURT:  Good afternoon, everyone.

4          MR. CORNELL:  Good afternoon, Your Honor.  Jason

5    Cornell, Fox Rothschild on behalf of Donna Gutman.

6          Your Honor, this is the time set aside in the Tribune

7    Company bankruptcy for the motion for relief from automatic

8    stay filed by E. Michael Gutman.

9          Just as some initial matters, Your Honor, how we were

10   going to proceed today if the Court will allow, we were going

11   to offer the proffer of Mrs. Gutman.  She is present in the

12   courtroom today with her son, Robert Gutman, and she's

13   available for cross examination.

14         The debtors, I imagine, will have some questions for

15   Mrs. Gutman and then I'd like to reserve some time just to make

16   some points in support of the motion that might not be in the

17   papers and of course, if the Court has any questions initially.

18         We also submitted a joint pretrial memorandum.  That

19   binder contains approximately fourteen exhibits.  I've spoken

20   to Mr. Neal for the debtors and confirmed that the parties

21   stipulate, on the record, for the admissibility of those

22   documents for today's hearing.

23         THE COURT:  Okay.  Are all of those documents attached

24   to the joint pretrial statement?

25         MR. CORNELL:  They are, Your Honor.  And if it helps

7

1    the Court, I have a separate binder, which is an identical

2    copy, that I've put stickers on.  The stickers are marked

3    plaintiff's tabs Exhibit 1 through 14 of each.

4         THE COURT:  I have it.  Not necessary, but thank you.

5         MR. CORNELL:  Thank you.  Your Honor, unless the Court

6    has any questions or if Mr. Neal has some initial remarks,

7    after me, we'd like to go ahead and call introduce our first

8    proffer.

9         THE COURT:  Anything preliminarily?

10        MR. NEAL:  Good afternoon, Your Honor.  Guy Neal,

11   Sidley Austin here with Kate Stickles of the Cole Schotz firm.

12        No preliminary matters, Your Honor.  We'll take it in

13   the order that Mr. Cornell presents it.

14        THE COURT:  Very well.  Let's proceed.

15        MR. CORNELL:  Thank you, Your Honor.  If I may have

16   just one second, please.

17        (Pause)

18        MR. CORNELL:  Your Honor, before I get started, we've

19   prepared a proffer that will last for approximately twelve

20   minutes for the Court.

21        Donna Gutman, if called to testify, would state as

22   follows:  She is seventy-four years old and the surviving

23   spouse of E. Michael Gutman.  Mrs. Gutman's husband passed away

24   on April 28, 2009.  On May 18, 2009 Mrs. Gutman was appointed

25   personal representative of her husband's estate.

8

1    As personal representative Mrs. Gutman assumed

2 responsibility for the operations of her husband's businesses

3 and personal affairs, including the lawsuit filed in the Orange

4 County Circuit court against the Orlando Sentinel, the Chicago

5 Tribune, Renee Stutsman (ph.) and Fred Schultz (ph.).

6    At the time of her husband's death he and Mrs. Gutman

7 were married for thirty-six and a half years.  Besides

8 Mrs. Gutman, Dr. Gutman is survived by six children as well as

9 four step-children, thirteen grandchildren and three great-

10 grandchildren.

11    Prior to Dr. Gutman's death he was a licensed

12 physician who practiced medicine in Orange County, Florida and

13 operated three businesses.  These businesses were E. Michael

14 Gutman, M.D., Mike Gutman, M.D. P.A. and Gutman Pain and

15 Accident Center, also known as the Back Pain Institute of

16 Florida.

17    Mrs. Gutman has worked for her husband's businesses

18 for approximately thirteen years.  As an employee of

19 Dr. Gutman's businesses, Mrs. Gutman's responsibilities include

20 coordinating employee benefits, interviewing new employees and

21 overseeing the day-to-day operations of the office.

22    Since her appointment as personal representative of

23 Dr. Gutman's estate, Mrs. Gutman has begun handling all of Dr.

24 Gutman's prior affairs, including day-to-day business

25 decisions, including the recent termination of two employees

1   due to financial reasons.  Mrs. Gutman has also begun meeting

2   with the doctors who are employees of the practices regarding

3   patient related administrative issues.  She also is responsible

4   for negotiating refinancing regarding the businesses lenders.

5          Two doctors still work for Dr. Gutman's practices,

6   Dr. Hubert Garnsey and Dr. James Babiar.  Dr. Garnsey is an

7   osteopath and Dr. Babiar is a chiropractor.  Both doctors have

8   indicated their intent to remain with the practice, even after

9   Dr. Gutman's death.

10          Besides taking an active role in the management of the

11   businesses, Mrs. Gutman continues to pursue the Florida action

12   commenced by Dr. Gutman against the debtors.  To that end, if

13   called to testify Mrs. Gutman would testify that she has had

14   meetings and numerous phone conversations with Mannie Sosias

15   (ph.) the lead trial attorney handling the Florida action.

16   Mrs. Gutman also participated in a deposition last week that

17   was defended by Mr. Sosias.

18          In preparation for today's hearing, Mrs. Gutman has

19   reviewed the affidavit in support of the motion for relief from

20   the stay, the motion for relief from the stay, the trial

21   memorandum in support of the motion for relief from stay, a

22   portion of Dr. Gutman's deposition transcript, the second

23   amended complaint, debtor's trial brief in support of the

24   objection and the joint pretrial memorandum.

25          Mrs. Gutman is assisted in the day-to-day operations

1    of Dr. Gutman's businesses by her stepson, Robert Gutman, Dr.

2    Gutman's biological son and an employee in the businesses.  If

3    called to testify Mrs. Gutman would testify that Robert Gutman

4    has worked as an employee of Dr. Gutman's businesses for eight

5    years.

6          Robert's responsibilities include coordinating

7    payables and receivables for the businesses.  In addition to

8    working with the businesses Robert has assisted Mrs. Gutman

9    with the affairs of managing Dr. Gutman's estate, including the

10   pursuit of the Florida litigation.  Since Dr. Gutman's death

11   Robert has had to take on more responsibilities with the

12   business, including communicating with the various vendors

13   regarding the businesses' inability to make certain payments.

14         If called to testify, Mrs. Gutman would also testify

15   that before Dr. Gutman's death Mrs. Gutman had knowledge of

16   certain events that transpired in the Florida litigation.

17   However, her knowledge of this matter has increased

18   substantially with the death of Dr. Gutman.

19         Before the Sentinel filed for bankruptcy trial was

20   scheduled for the summer of 2009.  Mrs. Gutman did not attend

21   Dr. Gutman's depositions; however she did discuss his

22   depositions with him.  She is aware that Dr. Gutman attended

23   several days of videotaped depositions.  Had Dr. Gutman and

24   Mrs. Gutman decided to retain an attorney to pursue the Florida

25   action due to the harm that was done to Dr. Gutman's reputation

1  as a result of the articles published by the Sentinel on

2  November 30, 2003.

3       If called to testify, Mrs. Gutman would testify that

4  the articles published by the Sentinel contained false and

5  inaccurate information.  The Gutmans filed a lawsuit to correct

6  the wrong that was done to Dr. Gutman's reputation as well as

7  the reputation of his businesses.

8       By filing the lawsuit, Dr. Gutman hoped to gain his

9  reputation back.  The reporter who wrote these articles

10  interviewed Dr. Gutman beforehand, wherein Dr. Gutman informed

11  her that her information surrounding the deaths of certain

12  patients were incorrect.  Dr. Gutman felt devastated and

13  betrayed when he read the November 30th articles.  He

14  immediately recognized that the Orlando Sentinel was suggesting

15  that Dr. Gutman's patients' deaths were directly linked to his

16  treatment.  The reaction to the article was immediate.  Clients

17  began cancelling appointments.

18       As an employee of Dr. Gutman's offices, Mrs. Gutman

19  would testify that she heard first-hand clients wishing to

20  cancel appointments due to the articles in the papers.

21  Mrs. Gutman would further testify that patients came up to her

22  and said that after reading the articles they had doubts

23  whether they should continue treating with Dr. Gutman.

24       Patients informed Dr. Gutman that their primary care

25  physicians would not recommend they treat with a different pain

1    specialist as a result of the articles.  Mrs. Gutman would

2    testify that insurance companies became unwilling to work with

3    Dr. Gutman on client cases due to the articles.  Attorneys told

4    Dr. Gutman that they could not use him anymore as an expert

5    witness because of the harm done to his reputation from the

6    articles.

7         A substantial part of Dr. Gutman's practice was his

8    work as a double-boarded forensic psychiatrist.  This practice

9    diminished significantly following the publication of the

10   articles.

11        Mrs. Gutman would testify that the publication of the

12   articles had a tremendous effect on her and Dr. Gutman's

13   lifestyle.  After the Sentinel published the articles whenever

14   the Gutmans would go out to dinner it was common for friends,

15   patients, lawyers and/or doctors to ask Dr. Gutman to explain

16   what he did that would cause the Sentinel to publish the

17   articles.

18        At one holiday event a doctor told Dr. Gutman, in

19   front of Mrs. Gutman, that he had to have done something wrong

20   for the Sentinel to have written about him.  As a result of the

21   publicity from the articles, the Gutmans began going out less

22   and less in public.

23        Were Mrs. Gutman to testify regarding the financial

24   effect of the Sentinel's articles she would state that the

25   articles had a definitive negative effect on the income

1    received by Dr. Gutman's businesses.  The loss of income from

2    the businesses resulted in a loss of personal income.  The

3    Gutmans borrowed hundreds of thousands of dollars from friends

4    and families and associates to continue covering their living

5    expenses and to fund the Florida action.

6          Dr. Gutman kept a list of the people who loaned him

7    money to help with the funding of the Florida action.  The

8    Gutmans took a second and third mortgage on the commercial

9    building where the businesses operate.  Mrs. Gutman would

10   testify that the Sentinel's filings for bankruptcy caused

11   Dr. Gutman to feel hopeless and despairing.  Dr. Gutman

12   realized that he owed substantial amounts of money to friends

13   and family and that the bankruptcy filing prevented him from

14   having his day in court.  Mrs. Gutman would testify that he

15   filed the lawsuit in order to obtain his reputation back;

16   however, the bankruptcy filing prevented this.

17         His debt level has grown substantially since the

18   articles first ran five and one half years ago.  Mrs. Gutman

19   would testify that she, not her attorneys in Florida, have

20   assumed the financial responsibility for the legal fees in the

21   Delaware bankruptcy.

22         She would also testify that she asked this Court to

23   lift the bankruptcy stay because her husband wanted to proceed

24   with the litigation.  Mrs. Gutman also wants to see the false

25   information published by the Sentinel corrected.  The Sentinel

14

1  ruined Dr. Gutman's reputation and Mrs. Gutman would like to

2  see the  Sentinel to be held accountable in court, in a public

3  forum.

4       Mrs. Gutman would testify that her children and

5  Dr. Gutman's children also share in the desire to proceed with

6  the Florida action to trial.  The children want this matter

7  resolved as quickly as possible as they too were humiliated by

8  the false information reported in the Sentinel.  The Gutman's

9  children have encouraged Mrs. Gutman to press forward with the

10 Florida litigation and bring the matter to an end.

11      Mrs. Gutman has considered the Sentinel's request to

12 mediate this case through bankruptcy.  She is not opposed to

13 mediation, however Mrs. Gutman would testify that mediation in

14 the Florida action would not have delayed trial.

15      Mrs. Gutman would also testify that she does not want

16 to continue incurring legal fees in the Delaware bankruptcy as

17 such fees may ultimately affect her ability to proceed with the

18 Florida action.

19      In the days prior to this hearing Mrs. Gutman

20 consulted with her attorneys and was informed that Dr. Gutman

21 left two life insurance policies in place.  One policy was for

22 one million dollars and one policy was for 500,000.

23 Mrs. Gutman has been informed by her trust and estate counsel

24 in Florida that the manner that Dr. Gutman died, a suicide,

25 will require an investigation by the insurers before they agree

15

1    to pay any benefits.

2         Mrs. Gutman would further testify that she has not

3    received any life insurance proceeds.  Instead, her estate

4    attorney has advised her to prepare for financial hardship.

5         Mrs. Gutman would further testify that since Dr.

6    Gutman's death she has had to turn to her savings and income to

7    cover living expenses.  She currently has 4,000 dollars in

8    savings.  She receives 1,960 dollars, approximately, weekly

9    from the business as gross income and receives 1,900 dollars

10   per month in Social Security benefits.

11        Mrs. Gutman has had to forego depositing some

12   paychecks she's received from the business in recent weeks due

13   to lack of funds to pay expenses.  Mrs. Gutman has no other

14   sources of income.

15        Were she to testify, Mrs. Gutman would state that she

16   is seeking relief from the stay so she can repair the harm done

17   to her husband's business and professional reputation.  She

18   would also testify that she would like to see all matters

19   relating to the articles written by the Sentinel five years ago

20   brought to an end as quickly as possible.

21        Finally, Mrs. Gutman would testify that the resolution

22   of the Florida action would have a positive impact on Dr.

23   Gutman's businesses.

24        Mrs. Gutman is here today, Your Honor, and available

25   for cross examination.

16

1          THE COURT:  Does anyone wish to cross examine

2   Mrs. Gutman?

3      (Pause)

4          MR. NEAL:  If I may have just one minute, Your Honor,

5   to consult with Florida counsel?

6          THE COURT:  You may.

7          MR. NEAL:  Your Honor, Guy Neal, Tribune Company, law

8   firm Sidley Austin.

9          Your Honor, we elect not to cross examine Ms. Gutman.

10  We have, as Mr. Cornell stated, introduced her deposition

11  testimony into the record.  It's Exhibit 13 to the joint

12  pretrial memorandum.  I'll be making about two references,

13  maybe three, to that deposition transcript during my argument.

14  But I see no need to call her to the stand this afternoon.

15         THE COURT:  All right.  Thank you.  The committee has

16  filed a joinder; does it wish to examine Mrs. Gutman?

17         MR. MCGUIRE:  It does not, Your Honor.

18         THE COURT:  All right.  Thank you.

19         MR. CORNELL:  Your Honor, we set aside two hours on

20  today's calendar and I know the Court's time is valuable so I

21  apologize that we're not -- well, I don't apologize to the

22  Court, you'll be relieved to know we're not going to use the

23  full two hours.  We left the two hours on there because

24  initially when we talked to debtor's counsel weeks ago, they

25  were considering putting on a witness and they did not.  And I

1    still left that on in case we needed time.

2         That being said, Your Honor, I think if I could just

3    walk the Court through some of the legal issues that yes were

4    touched upon in the motion but if possible I'd like to

5    elaborate.

6         THE COURT:  Well let me ask this, does the movant have

7    any other evidence in support of its motion?

8         MR. CORNELL:  Other than the documents that have been

9    submitted, Your Honor, she does not.

10        THE COURT:  All right.

11        MR. CORNELL:  And the testimony that's been submitted.

12        THE COURT:  All right.  Let me ask, does any other

13   party have any evidence to submit?

14        MR. NEAL:  Your Honor, we do not other than, again,

15   what is in the pretrial memo.  And as Your Honor may have

16   noted, what is in the pretrial memo are, I believe, maybe three

17   or four affidavits and some deposition testimony.  So there is

18   testimony in the record, although it's in written form.  We

19   have the affidavit of Jack Roden, vice president and treasurer

20   of Tribune Company as well as the affidavit of May Anne Downs,

21   she's Florida counsel for Tribune and she's in the courtroom

22   with me today.  And we also have introduced the deposition

23   transcript of Donna Gutman.

24        So that would be the testimony component of the

25   hearing, Your Honor.  And then there are a couple other

18

1    exhibits, including the articles themselves as well as the

2    obituary of the decedent that are --

3            THE COURT:  I've read the attachments.

4            MR. NEAL:  -- in the record.  So other than that, Your

5    Honor, from my perspective it would be legal argument that

6    would follow the next phase of this hearing.

7            THE COURT:  All right.  Then let me ask some

8    questions.  First I'll ask the movant, then I'll go to the

9    debtor.  The affidavits concerning what's left to be done

10   before the parties are ready for trial is at great odds.  So

11   let's explore that.

12           The movant says the case was scheduled for trial,

13   we're basically ready for trial, there ain't nearly as much to

14   do as the Tribune says there is.  Respond to that if you can.

15           MR. CORNELL:  Certainly, Your Honor.

16           THE COURT:  And tell me also where mediation would

17   ordinarily fit or would fit going forward if I were to grant

18   the relief that you request?

19           MR. CORNELL:  Your Honor, if the Court were to grant

20   the relief requested, and I'll start with that point first and

21   we'll go back to are we ready for trial.

22           If the Court were to grant relief requested, when this

23   debtor filed for bankruptcy we were five months out from a

24   trial date, it was in June 2009.  So how this would have to

25   move forward is the parties would continue with their

19

1    discovery, I imagine this would be on the calendar of the Court

2    assuming availability in November or December 2009 at the

3    earliest for a trial date.  That puts mediation in late

4    October.  So if the Court were to grant relief, mediation would

5    go forward and Ms. Gutman would like to participate in

6    mediation if it's part of the State Court action and a trial

7    date is looming.  So to answer the question, I think the

8    earliest is end of this year is a trial date, mediation

9    immediately before that.  The insurance company would obviously

10   need to be a party to that mediation as well.

11        THE COURT:  In terms of the timing, does mediation

12   occur in the Florida process after the conclusion of discovery

13   and of the filing of dispositive motions?  Where does it fall

14   in the pretrial process?

15        MR. CORNELL:  Your Honor, I've looked at the

16   scheduling order, and Mr. Neal can correct me and I can

17   actually go back, after I sit down, and look again.  I believe

18   it does not specify, other than the parties shall conduct

19   mediation before trial.

20        And so, it gives deadlines as far as there was a

21   discovery cutoff, Your Honor, and then there is a trial date.

22   I believe the discovery cutoff originally, had this debtor not

23   filed, was in May.  Again, I'm just thinking back from the last

24   time I looked at the scheduling order.

25        But something to put in context to this, Your Honor,

20

1    the debtors asked and received a continuance.  Trial was

2    originally scheduled in December of 2008, I believe, or

3    November of 2008.  We objected to a continuance in the trial

4    date, the Court overruled our objection and it was granted.

5    And it was already continued once to June 2009.

6            So that's how we frame up this motion for relief from

7    stay to allow the stay to continue is to, in essence, to grant

8    them a further continuance to the prejudice of the client.

9            THE COURT:  I saw that, as indicated in the proffer

10   today it was also in the papers, that the insurance company --

11   anyway Mrs. Gutman has been advised the insurance companies

12   aren't going to pay benefits because of the circumstances

13   surrounding Dr. Gutman's death.  But what -- other than that

14   statement, what else can you tell me?  Have such investigations

15   been commenced?  Are there exclusions for suicide under such

16   policies?  What are the details of that?

17           MR. CORNELL:  There are and Your Honor this

18   information is coming to you from my communications with trust

19   and estate counsel and so we realize we waive those

20   conversations in our proffer.

21           What I've been informed by trust and estate counsel

22   are there are exclusions for suicide however those exclusions

23   have passed, as far as trust and estate counsel knows, I have

24   not looked at these documents, have passed the time limitation.

25   I think it's common understanding there's a two year

21

1    limitation.  However, because of the circumstances surrounding

2    the death, they are going to investigate and that investigation

3    has begun.  To paraphrase trust and estate counsel, this could

4    take weeks; this could take years before she sees funds.

5         Now Your Honor, would it help if I circled back to the

6    initial question of the Court and that is the debtors say

7    they're far from trial, the movant says we're ready for trial

8    why the big --

9         THE COURT:  Yes, if you would.

10        MR. CORNELL:  I think the Rexine (ph.) decision which

11   I was going to -- if the Court were going to let me discuss it

12   I was going to talk about that decision because in that

13   decision the Court acknowledged they had more discovery that

14   had to be completed.  And that's the situation here.  The

15   plaintiff's experts have been deposed.  Now, the debtors'

16   experts, I don't know that they have been deposed.  I don't

17   know that they've produced their reports.

18        The plaintiff's witnesses have been deposed.  Dr.

19   Gutman has passed away but he has eight days of videotaped

20   deposition that will go forward in the State Court matter that

21   we will rely upon, plus the Gutman family.  The receptionist of

22   the business has been deposed and she's significant in the fact

23   that she would talk about the cancellations that came through.

24        So the economist, the liability expert as far as, and

25   we've referred to her in our papers, the person who said, you

22

1   know, how they portrayed Dr. Gutman was misleading, she has

2   been deposed.  So of course there will be some last minute

3   motions filed, that's to be expected, but this case in Florida

4   has been before this Court for over three years.

5        There was a motion for summary judgment and that's

6   also where the parties do not see eye to eye.  The debtors tend

7   to believe that the motion for summary judgment ruled that the

8   notice was defective.  We have the court order here today where

9   the Court denied summary judgment as to the count of notice as

10  to defamation.  It sustained summary judgment as to the second

11  count.  So the defamation count as to notice has sustained

12  summary judgment.  Many legal issues have been briefed before

13  this Court, similar to in Rexine.

14       THE COURT:  All right.  So that I make sure I did the

15  math correctly, I understand that Mrs. Gutman receives about

16  2,000 dollars a week gross from the business and about 2,000

17  dollars a month from Social Security?

18       MR. CORNELL:  That's correct.

19       THE COURT:  All right.

20       MR. CORNELL:  Your Honor, if I may, one other point

21  that the Court hasn't asked but that I don't know that it

22  jumped out of the papers.  We tried to share it in the proffer

23  and I think it's important.  If the stay is not lifted Mrs.

24  Gutman has to keep me on as her counsel.  And it is very common

25  practice in this jurisdiction, where the trial firm in the

1    State Court matter will advance the costs for bankruptcy

2    counsel.  That's not the case here.  The record reflects here

3    that Dr. Gutman retained me personally, with his own funds, and

4    now Mrs. Gutman has accepted responsibility for my fees.

5            So I just want to convey to the Court the importance

6    of the fact that it may be problematic if this -- if she's

7    forced to mediate this through the bankruptcy process and

8    retain counsel through that process.

9            I'll let the debtor address the Court's questions.

10           THE COURT:  All right.  Thank you.

11           MR. NEAL:  Your Honor, in order to address the status

12   of the Florida litigation, if I may, if I could have May Anne

13   Downs, Florida counsel, speak to that issue.

14           THE COURT:  Certainly.

15           MR. NEAL:  She's a member in good standing of the

16   Florida bar and her affidavit has been admitted as Exhibit 5 to

17   the joint pretrial.

18           THE COURT:  All right.

19           MS. DOWNS:  Good afternoon, Your Honor.  To address

20   the specific questions this Court directed to Mr. Cornell, as

21   Mr. Neal said I filed my affidavit.  But in response to your

22   specific questions, let me see if I can address them quickly.

23           Mediation can be accomplished by the parties at their

24   determination of the appropriate time in Florida.  But in a

25   case with factual and legal complexities, such as this one, it

1   is very much the norm and almost always the case that a

2   mediation of this nature would occur after the close of

3   discovery or near the close of discovery and often after

4   disposition of the summary judgments which have yet to be filed

5   in this case.

6   There was a limited motion for summary judgment that

7   was filed that was simply a repeat of an argument made at

8   motion to dismiss when we got a new judge, Your Honor.  But the

9   substantial legal issues that will be addressed and will be

10  dispositive in this case include substantial truth, actual

11  malice, the fair reporting privilege and the removal of the

12  numerous corporate defendants against whom plaintiff has

13  introduced no evidence at all.

14  Second, Your Honor, you asked about what else needed

15  to be done to go forward for trial.  We had about six months

16  before trial when the bankruptcy was filed.  We were going to

17  be hard pressed to get all the work done in the time we had

18  allotted.  The prior continuance, Judge, was a joint motion for

19  continuance.  And in fact one of the reasons was that

20  plaintiff's counsel in Florida was unable to give us enough

21  deposition dates because they were busy with another

22  significant defamation trial.

23  Judge, Dr. McClay, the plaintiff's economist is going

24  to have to issue a new report because his report was premised

25  on Dr. Gutman continuing to practice personally.  So his report

1   is now the fundamental assumptions upon which it rests are gone

2   by virtue of Dr. Gutman having passed away.  We still have to

3   take Mrs. Gutman's deposition, we took a very limited

4   deposition only on her affidavit and knowledge as it related,

5   Judge, to this bankruptcy hearing.  We'll need to know what her

6   personal knowledge is about all the things Mr. Cornell handled.

7           We need to take Dr. Mountain (ph.), Dr. Gutman's

8   former partner.  We have not designated, Your Honor, an

9   economics expert.  He's been retained preliminarily.  We

10  haven't even designated him.  They haven't seen his report.  He

11  can't even start on his report until we get Dr. McClay's

12  report.

13          So those are a few of the things that have to be done

14  in addition to filing and scheduling numerous, substantial

15  motions for summary judgment which are going to be critical in

16  this case.

17          I think that addresses the questions that you asked

18  but obviously, Your Honor, if you have any other questions I'd

19  be very pleased to address them.

20          THE COURT:  I do not.

21          MS. DOWNS:  Thank you, Your Honor.

22          THE COURT:  All right.  At this point I'll allow

23  counsel to make brief closing arguments, if you wish.

24          MR. CORNELL:  Thank you, Your Honor.  Again, Jason

25  Cornell on behalf of the movant.

1          Your Honor, the parties do agree what the applicable

2    standard is in this case, and that is to determine whether

3    cause is the totality of the circumstances.  And I won't

4    belabor the law other to point out that the issues here is

5    whether there is great prejudice to the debtors, whether the

6    hardship to Ms. Gutman in keeping the stay in place

7    considerably outweighs that hardship to the debtors and the

8    likelihood of success on the merits.

9          Your Honor, I've already discussed the issue of

10   defense costs.  One thing I haven't discussed, though, is

11   Mrs. Downs' affidavit points out something that's of interest.

12   The debtors object and their basis for objection is the sole

13   prejudice that they would sustain as the cost of defending this

14   action.  Yet Ms. Downs points out that it is highly likely that

15   the disappointed party will exercise appellate rights and sue

16   the appellate court and the Supreme Court.

17         Now while my client has not made any mention of their

18   intention to the appellate rights, I think that the debtors'

19   planning and staging of their appeal process shows twofold,

20   one, they are not prejudice by defense costs if they're already

21   thinking of steps two and three after the jury verdict.  And

22   two, also, if they are planning their appellate rights and feel

23   adamant that they will exercise them, then we need to have the

24   stay lifted now so we can get to trial as quickly as possible

25   because this process then obviously is not going to be over

27

1      with a jury verdict.

2           The record was clear that Mrs. Gutman came here on a

3      contingency basis with her trial attorney but in order to

4      retain that attorney she had to put 150,000 dollars.  That was

5      borrowed money.  I believe she would testify that the list is

6      over almost fifty people who either loaned or gave money in

7      order to help fund Dr. Gutman's retainer.  My cost, Your Honor,

8      will remain assuming that this Court keeps jurisdiction over

9      this matter.

10          Mrs. Gutman's seventy-four years old.  This action has

11     been with her and Dr. Gutman for over five and a half -- I'm

12     sorry, this matter as far as the article is over five and a

13     half years.  The issue is totality of the circumstances and I

14     think there's no way around it, Your Honor, but to consider the

15     death of Dr. Gutman and the note he left behind as a

16     consideration of the totality of the circumstances that support

17     the prejudice, the emotional prejudice, to the client.

18          The debtors argue that with the death of Dr. Gutman

19     there is no need to -- there's no hurry to get to court because

20     Dr. Gutman's reputation is no longer at stake.  The evidence

21     shown clearly is that Mrs. Gutman relies on the business for

22     her income, as does her son Robert, and there are two doctors.

23     I believe there's a total of ten employees still in practice.

24     So that is a going concern that is looking to have this cloud

25     removed from its head.

1        I don't know that we need to get to success on the

2   merits but I'll address it anyway.  Under Rexine you don't get

3   to success on the merits if you're looking to liquidate a claim

4   and that's all we're asking the Court to do, is allow the trial

5   court to liquidate the claim.  But if we do need to get to

6   success on the merits, the records showed that Dr. Gutman in

7   his deposition made very clear that the patients that were

8   reported on by the Orlando Sentinel were either abusing other

9   substances that he had not prescribed or were treating with

10  other doctors.

11       The record is absent of any instance of criminal

12  charges, of any censure or suspension by medical societies.

13  The record also reflects, Your Honor, I believe that the paper,

14  at a later time, made corrective entries regarding their

15  reporting on Oxycontin use.

16       The Court in Rexine talked about the burden of the

17  party moving forward.  In this instance Mrs. Gutman has put on

18  live testimony, the debtor has chosen to put on none.  The

19  reason I point this out to the Court is the debtors have every

20  right to a full and capable legal defense and so they're

21  willing to fly four or have four attorneys attend a two-hour

22  deposition in Florida in the same case that they believe is a

23  financial burden to them.  But they will not produce one

24  witness here to talk about what the burden is in this instance.

25  And I would ask the Court to consider that when considering

29

1    whether the parties have met their burdens.

2          THE COURT:  Well, there's some evidence in the

3    documents that have been submitted of the prejudice that the

4    debtor claims.

5          MR. CORNELL:  Certainly, Your Honor.

6          Rexine notes that if the bankruptcy court has a desire

7    to allow the underlying action to move forward, if that is by

8    itself a reason the Court wants to grant relief from stay, that

9    in itself is a basis to do so.  We think, given the procedural

10   posture of the underlying trial, that in itself is all this

11   Court needs to look at in order to grant the relief.

12         Rexine also looked at the fact that local counsel were

13   present and ready to go in the underlying state court action

14   and so the Court granted relief.  Finally, Rexine considered

15   the fact that if it was to proceed in Delaware it's not clear

16   whether the matter would go forward in the trial court or

17   before the bankruptcy court.  That's something not, I don't

18   believe, addressed by the debtors.  We respectfully take the

19   position that because of the personal injury claims this Court

20   would not have jurisdiction.  So the financial burden the

21   debtors are faced with is going to be even greater if this

22   matter is tried in district court.

23         To wrap up, Your Honor, this is five years.  If the

24   stay is lifted, Mrs. Gutman gets to rely on her personal injury

25   counsel who are her defamation counsel who is now acting on a

1  contingent fee basis, far different then if this matter has to

2  stay before Your Honor.

3        So we thank the Court for the time and the

4  consideration of the information.

5        THE COURT:  Thank you.

6        MR. NEAL:  Your Honor, before I begin my argument I

7  want to let the Court know, I was on Court Call last Thursday,

8  briefly, very briefly.

9        THE COURT:  I was going to ask whether you heard that

10 colloquy I had, Mr. Neal.

11       MR. NEAL:  I was patched in, Your Honor, at the last

12 minute thinking there might be some insight to be gleaned, and

13 there was.  This was the Jane Clement motion for relief from

14 the automatic stay.

15       THE COURT:  I have my notes in front of me.

16       MR. NEAL:  Well then we should probably be reading

17 from the same page, Your Honor.  You stated that you'd give the

18 debtors the benefit of the stay at this time but you did note

19 that we are getting to the point where the debtors will have to

20 make a decision on how to deal with such claims if we're

21 looking to continue to deflect such claims.  Fair point.

22       You also said, and we heard you loud and clear, that

23 you are putting the debtors on notice if there is a time in the

24 near future that an ADR or claims allowance process program

25 will need to be developed and will need to be presented for

1   this Court's approval.  And that we must move along, in your

2   words, with some alacrity.  Again, we heard you Your Honor.  We

3   are working hard with the committee in that regard and the

4   committee counsel will ably speak to that point.

5          But I submit, Your Honor, that less than one week

6   later, the result here should be the same.  The Court should

7   deny the motion.  And though each case presents its unique set

8   of facts and circumstances, we submit here that especially in

9   light of Dr. Gutman's unfortunate passing, the balance of the

10  hardship certainly tips in favor of these debtors.  Obviously

11  this is very unfortunate for his widow and for his children; a

12  very devastating event and our condolences certainly go out to

13  them.

14         But the reality remains that we have, before this

15  Court today, one estate, the Dr. Gutman estate, presenting a

16  very large claim against another estate.  Movant's Florida

17  counsel, it's plaintiff's lawyer Willy Gary and his law firm

18  working on a contingency basis made a 600 million dollar demand

19  at a press conference on May 20th of 2005.  Six hundred

20  million.  This lawsuit names not only the Orlando Sentinel but

21  it names the Tribune Company.  It names Tribune Publishing

22  Company and two individual reporters.

23         Based on that demand alone, it is the largest of the

24  forty-five media related cases that were outstanding as of the

25  petition date.  So this is a matter of some significance which

1    gives rise to the attorneys fees that have been accruing and

2    will accrue if the stay is lifted, which gives rise to the need

3    for the additional discovery over another five to six month

4    window, as Ms. Downs testifies in her affidavit and has

5    represented before this Court.

6            This is not a slip and fall case that was ready to go

7    on the eve of trial when the stay went down.  This is a case

8    that had substantial amount of legwork, both factual, expert

9    discovery as well as dispositive motions.

10           Turn to -- before I turn to the Rexine factors, I will

11   just note, as my partner Janet Henderson noted last week, there

12   is a burden that the movant has to demonstrate, we submit they

13   haven't done so her.

14           We deposed Ms. Gutman.  She has no personal knowledge

15   of the underlying facts in these articles that are at issue in

16   the Florida litigation, I'll get to that in a second.

17           THE COURT:  But tell me why that's relevant?

18           MR. NEAL:  Well it is relevant, certainly, to the

19   third factor in Rexine and I heard, Your Honor, that you don't

20   give tremendous -- you don't consider it to be a very

21   significant hurdle to meet the likelihood of success on the

22   merits prong.

23           THE COURT:  Yeah, very slight, I think, is the phrase

24   that was used in Rexine.

25           MR. NEAL:  Exactly, Your Honor.  And that is in the

1    joint pretrial, that is not a quote that I could run away from.

2    Certainly it is in there but I'll get to that in a minute.

3    Let's just go through the first one, the substantial prejudice

4    to the debtors that would result if the stay is lifted.

5           It's undisputed; it's in the Jack Roden affidavit,

6    Exhibit 2 to the joint pretrial, that if the civil action

7    proceeds in the tort system the debtors will have to expend a

8    significant sum of money.  Real brief Your Honor, civil action

9    as we say in our papers exposes the debtors to not only a one

10   million dollar insurance deductible obligation, but also to

11   significant additional defense costs which are not covered by

12   insurance.

13          THE COURT:  Well let me explore something with you for

14   a moment.

15          MR. NEAL:  Yes.

16          THE COURT:  Let's assume that tomorrow the debtors

17   were to propose and the Court were to approve an ADR process.

18   And I don't know what specifics you have in mind but the

19   typical one that I see doesn't allow for discovery, usually

20   permits -- sets up so there's a demand and response process and

21   then a mediation or arbitration process.  And of course there

22   are variations on all this but that's the prototypical one.

23          So if the debtor is prepared to go through ADR with

24   this plaintiff without further discovery, wouldn't it be

25   willing to go to mediation in the Florida action without

34

1    further discovery?

2         MR. NEAL:  I will answer that in thirty seconds.

3    Before I do, Your Honor, I will note that we're also allowing

4    time for the debtors and the committee to assess all of the

5    claims that have been on file, to assess whatever potential

6    distributions, classification treatment for such claims.  So

7    it's difficult to view this in its isolation.

8         THE COURT:  Actually, the motion requires me to do

9    that.

10        MR. NEAL:  Very well, Your Honor.

11        THE COURT:  In large measure.

12        MR. NEAL:  I understand.  As for this case, Your

13   Honor, the debtors would be willing to proceed through

14   mediation, given the unusual circumstances, the unusual

15   situation that we have here with the decedent and with the

16   decedent's estate, his widow and his children.  We'd be willing

17   to go to mediation, Your Honor, and we would be willing to do

18   so outside of bankruptcy court mediation.  We'd be willing to

19   do so through the Florida court mediation process.  Which,

20   based on my understanding and Ms. Downs can represent to the

21   Court otherwise if I overstep my boundaries.  You proceed with

22   a very well developed, very well baked mediation system in

23   Florida where you have a certified mediator that sits down with

24   those parties.

25        Now we represented that that is atypical in the

35

1    Florida system to do so prior to the full development of fact

2    and expert discovery.  But in this situation, if Your Honor is

3    so inclined, the debtors would not oppose limited relief from

4    the automatic stay to pursue mediation.  In fact, Your Honor,

5    the debtors would be willing, within thirty days, to work with

6    movant's counsel to identify and agree upon an appropriate

7    mediator and to find the earliest available date to go into

8    mediation.

9        We have our -- well, I don't want to prejudge the

10   mediation because without all the dispositive motions on file

11   the parties will be in a different posture then they otherwise

12   would be but there might be value out of that process, both for

13   both the estates -- for both estates, the debtors as well as

14   the decedent's.

15       THE COURT:  Stop there.  Let me ask Mr. Cornell to

16   join you at the podium, that's why we have two microphones, and

17   ask whether we need to go farther?

18       MR. CORNELL:  We do, Your Honor.  Starting first with

19   mediation.  Mediation without a trial date looming in the state

20   court matter is not helpful.  It doesn't make mediation the

21   same mediation it would be had the bankruptcy not been filed,

22   for one.

23       THE COURT:  Well, I would be willing to lift the stay

24   to permit mediation and the fixing of a trial date.  But you

25   would have to come back to me if you wanted to proceed with

1    trial after conclusion of mediation, if mediation were

2    unsuccessful.

3          MR. CORNELL:  And therein brings back the dilemma,

4    Your Honor, of me.  As far as -- I'm retained counsel.  I

5    continue to stay involved in the process.  There is an

6    important desire to nip that and to allow trial counsel to --

7          THE COURT:  Mr. Cornell, I'll tell you what I tell

8    many plaintiffs, your client initiated the lawsuit and it may

9    be with merit and it may be a recovery is deserved.  But that's

10   one of the unfortunate consequences of litigation.  And I hear

11   the numbers; I understand the litigation's been going on.  I

12   understand that the Chapter 11 may very well have added to the

13   frustration that was felt because the litigation in Florida

14   hadn't come to conclusion.  But we are where we are.  And I

15   think that just has to be recognized.

16         MR. CORNELL:  And Your Honor, I would have a counter

17   proposal.  If the Court is concerned about making the debtor go

18   through discovery, I would propose that the parties --

19         THE COURT:  No, I'd allow the debtor to go through

20   discovery but the debtor's telling me it doesn't want to.  So

21   what I'm thinking is that, all right, you don't want to go

22   through discovery, in an effort to move this forward let's go

23   to mediation.  If both parties tell me that it could be

24   meaningful without further discovery.  The mediation process

25   has the benefit of moving your client forward in pursuit of her

1    and their claim and the benefit to the debtor is it reduces,

2    considerably, what time and expense it has to incur in the

3    limited relief I would grant.  It seems to me both parties

4    would benefit if it can be made a meaningful process.

5          MR. CORNELL:  Your Honor, it seems like that's what

6    the Court is inclined to do and if that is the case, we would

7    ask then that that would constitute a carve-out of whatever ADR

8    procedures the debtor would anticipate.

9          MR. NEAL:  We don't oppose that, necessarily Your

10   Honor.  This would be part of the ADR process but it would be,

11   in Mr. Cornell's words, a carve-out to allow it to proceed not

12   through some third party arbitrator designated by this Court or

13   approved by this Court but by a certified mediator in Florida.

14         THE COURT:  And usually --

15         MR. NEAL:  So I think we're saying the same thing.

16         THE COURT:  And usually there are exceptions that the

17   debtor agrees to or is forced upon it even when an ADR process

18   is established.  It would be my intention to see it get to

19   mediation here and then decide what happens after that.

20         MR. CORNELL:  And Your Honor, there was a date or a

21   timeline established in which to accomplish that.  I believe

22   there was some discussion for that.  Is sixty days in which to

23   complete mediation something that is contemplated by the Court?

24         MR. NEAL:  Sixty may be aggressive in terms of the

25   scheduling of the parties.  We can certainly represent that

1    within thirty days we will make a concerted -- we can have it

2    in the order, Your Honor, granting the limited relief that the

3    parties shall work together to select a certified mediator in

4    Florida and mediation shall be scheduled at the earliest

5    possible date that's available to all parties.  You might have

6    a mediator who's not having mediations in August and would be

7    having them September 15th, to pick a date out of the ether.

8    Counsel might have a trial but we would endeavor to get that

9    done as expeditiously as possible with alacrity, Your Honor.

10             MR. CORNELL:  Your Honor, I have to accept because I

11   think I know where the Court is going.  And so --

12             THE COURT:  Well, don't assume too much but because

13   usually when I hear that parties agree on something I like to

14   stop and explore it.  And I hear that there was an agreement

15   and that's why I stopped there.

16             MR. CORNELL:  Well let me then add some color, Your

17   Honor.  The agreement is to -- is where we are, where we

18   started from and why we're here.  Because the debtors, I will

19   concede, have tried to work with us to work out a deal.  The

20   circumstances of this case, Your Honor, make this case light

21   years apart from Clement.  We are familiar with the Clement and

22   the Court's decision on that.

23             THE COURT:  They're not similar in any respect, as far

24   as I'm concerned.  But the principle that I talked about that

25   Mr. Neal referred to when he heard my colloquy with one of his

1    colleagues, I think applies here and that is the 11 is gaining

2    some age.  It's not horribly old but it's getting to the point

3    where the debtor and the Court are being faced with these

4    motions, some of which have been deflected.  And I accept the

5    debtor and the committee at the June 25th hearing at their word

6    that they're working hard on getting a proposal together.

7          But while that's going on, life doesn't stop.  So I'd

8    like to see if we can have some movement here without opening

9    the floodgates as the debtor here argues.  Although I will say

10   to that I know how to stop the floodgates from, you know,

11   remaining open if that were to happen.  So that's of not as

12   much concern to me because each case is different, as Mr. Neal

13   pointed out.

14         So Mr. Cornell, let me ask, are you on board with

15   this?

16         MR. CORNELL:  Your Honor, if we were on board with it,

17   candidly, this was offered to us before and it's why Ms. Gutman

18   is here.  And so do I want to walk away from an opportunity, I

19   would much rather have what's before me then say motion denied.

20   But this opportunity to mediate in Florida without a trial date

21   looming is, candidly --

22         THE COURT:  No, I said I'd be willing to have you fix

23   a trial date but I would not be willing to lift the stay to

24   permit you to go forward with trial unless you come back to me

25   and obtain permission to do that.

1    MR. CORNELL:  And if that is the floor, Your Honor, if

2    that's the most we could get, then we are grateful.  But the

3    reason we are here is the debtors were, other than the trial

4    date, I think the debtor's willing to propose something

5    similar.  And it's that need to have to come back into Court,

6    Your Honor, one we don't think it's going to make mediation as

7    rich as it should be.  We would prefer to have mediation

8    looming a month to two months before trial as it would be --

9    THE COURT:  I'm certain you would prefer that and I

10   understand why.

11   MR. CORNELL:  But two, Your Honor, I'm just going to

12   say it and this is what we tried to spell out with the record,

13   doubtful that a court will see motions for relief from stay in

14   circumstances like this.

15   THE COURT:  Look there are -- I acknowledge that among

16   those types of motions that I get, your clients describe

17   circumstances which I think are compelling but justice must be

18   delivered dispassionately and I'm sure you understand that.

19   MR. CORNELL:  We do, Your Honor.  I think I've shared

20   my client's position.  We will leave it to the Court as far as

21   the Court's decision.  We would ask for more.

22   THE COURT:  Well, okay.  I'll take that as a you're

23   not agreeing.

24   MR. CORNELL:  Correct.

25   THE COURT:  All right.  Let me ask Mr. Neal to finish

1  then.

2        MR. NEAL:  Your Honor, I have nothing else to add.  I

3  certainly have a more well developed argument on likelihood of

4  success on the merits but Your Honor's position was made clear

5  last week and restated again today very well in terms of how

6  serious you value that factor in light of the other factors

7  that are at issue.  Our offer remains open, Your Honor.  We're

8  not asking for you to deny the motion in its entirety.

9        In light of the colloquy that we just had with the

10 Court and with co-counsel, the offer remains open.  To have the

11 motion be denied or actually be granted on a limited basis to

12 allow for the parties to select a certified Florida mediator

13 within the next thirty days and to schedule mediation as

14 expeditiously as possible and to report back to this Court as

15 soon as possible thereafter.  After the conclusion of mediation

16 perhaps this motion could be renoticed to the first available

17 omnibus date after the conclusion of mediation.  And we think

18 that position, as Your Honor stated, balances the interests of

19 both sides.

20        So thank you for your time today, Your Honor.  Now

21 I'll turn this over to committee counsel.

22        THE COURT:  All right.

23        MR. PORTER:  Your Honor, Jason Porter on behalf of the

24 creditors' committee with Chadborne & Parke.

25        Again, you know, we want to say that we're very

1    sympathetic for Mrs. Gutman and her loss and we understand how

2    tough that can be.  And as Your Honor has discussed and has

3    been addressed today, the creditors' committee is concerned

4    about the over a hundred actions out there.  And with the

5    million dollar deductible from each, our concern is at a

6    minimum we can be looking at a hundred million dollars or more

7    of payments made by the debtors.

8         We understand Your Honor is very good at closing the

9    floodgates, however, with those concerns.  And as far as the

10   debtor's proposal goes for the mediation within thirty days,

11   the committee is supportive of that because we would like to

12   see claims settled in an organized fashion.  And we think that

13   in certain circumstances a strict ADR procedure set by the

14   Court might not be appropriate in this case, a mediation might

15   work.  So to that extent, the creditors' committee does support

16   the debtor's proposal and what you had addressed, Your Honor,

17   earlier in the hearing.

18        At the same time, we do want to restate that we

19   believe, with all of these claims, we are working hard with the

20   debtors and its very important now that the claims have been

21   filed and we're starting to understand the contours of what's

22   out there, that we make sure there's an organized ADR procedure

23   in place to insure that we don't look at a hundred million

24   dollars in legal fees going out the door or possible claims

25   that aren't deductible.

43

1        And with that, thank you, Your Honor.

2        THE COURT:  All right.  Thank you.  I'm prepared to

3   make my ruling.  I did have the opportunity to review the

4   submissions prior to taking the bench so I feel like I've got a

5   pretty good handle on the respective positions.

6        The only real dispute, factual dispute, as I see it is

7   how much has to be done before this case is ready for trial,

8   and there are significant differences.  But I am inclined to

9   grant limited relief from the stay to permit the parties, as

10  soon as is possible, to undertake mediation in the context of

11  the Florida litigation.

12       I'm not certain where to go after there.  I mean, I

13  will say what I often say to the debtor in circumstances like

14  this, it's doubtful I'm going to try this case here, even if

15  this is not the type of "personal injury claim that falls

16  within the Title 28 prohibition."  It's going to be likely

17  finished in Florida or tried in the district court here.  And

18  frankly, I'm not sure it makes sense to try it here.

19       But in my mind, what these issues often come down to

20  is a question of timing, not necessarily a question of place

21  although the debtor may have a different view about that, I

22  recognize.

23       But for now, I will grant that limited relief.  I will

24  permit the debtor -- I mean the plaintiff to have a trial date

25  set but I will not grant relief to go to trial without further

44

1    order of this Court.  What I would like to do specifically,

2    however, is have a status hearing at the omnibus hearing in

3    this case scheduled for July 16th at 3:30 just for the parties

4    to tell me where they stand with respect to the progress of the

5    mediation.  And anyone who's not local may join that hearing by

6    telephone so we can avoid travel and unnecessary expense.

7         Is there any question about what should go in the

8    order?

9         MR. CORNELL:  Thank you, Your Honor.  That is

10   understood.

11        As for the July 16th hearing, I will be out of town so

12   I will have a colleague appear and I'll also request my co-

13   counsel to appear telephonically if that's okay.

14        THE COURT:  That's fine.

15        MR. CORNELL:  And Your Honor, as for the --

16        THE COURT:  Just so we're clear, it's not an

17   opportunity to request further relief but simply to tell the

18   Court, hopefully, a report that mediation has been scheduled.

19        MR. CORNELL:  Understood, Your Honor.  And if the

20   Court's order should be structured in a way that the Court

21   allows a lower court to schedule a trial date but the parties

22   are not permitted to conduct any further discovery, is that --

23        THE COURT:  As I understand the debtor's position, it

24   can undertake meaningful mediation without further discovery.

25   So the relief is limited only to pursue the mediation process

45

1    and to allow, but not require, that a trial date be fixed, if

2    you wish to.  I don't know whether, in terms of the state court

3    process from the movant's standpoint that makes sense or it

4    doesn't make sense or the Court's standpoint it makes sense or

5    not but I grant you leave to do it if you wish.

6         MR. CORNELL:  Okay.  Your Honor, unless counsel for

7    the debtors have any questions, I think I understand and I'll

8    circulate an order to the debtors.

9         THE COURT:  All right.  Mr. Neal?

10        MR. NEAL:  Your Honor, we have no further questions.

11   We will note, based on your last concern, we share in the

12   concern of whether or not a trial date can be set.  We

13   appreciate that Your Honor is allowing either movant's counsel

14   or debtor's counsel to obtain a trial date.  It may be tricky

15   in light of the stay issues and the calendaring in Florida but

16   I think the parties can worry about that themselves and we'll

17   pursue, in good faith, this mediation process and report back

18   to the Court at the status hearing.

19        Thank you.

20        THE COURT:  All right.  Anything further for today?

21        MR. CORNELL:  No, Your Honor.  Thank you.

22        THE COURT:  Thank you all very much.  That concludes

23   this hearing.  Court is adjourned.

24        (Proceedings Concluded at 2:34 p.m.)

25

46

1

2                              I N D E X

3

4                              RULINGS

5                                    Page      Line

6    Limited Relief, Granted    43        23

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

47

1

2                     C E R T I F I C A T I O N

3

4       I, Pnina Eilberg, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       Pnina Eilberg

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  July 8, 2009

16

17

18

19

20

21

22

23

24

25