**EXHIBIT 1**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                    :
In re:                              :   Chapter 11
                                    :
TRIBUNE COMPANY, et al.,            :   Case No. 08-13141 (KJC)
                                    :
            Debtors.                :   Jointly Administered
                                    :   Related to Docket No. 1598
-----------------------------------------------------------x
```

## DECLARATION OF MICHAEL A. PARKS

I, Michael A. Parks, hereby declare and state as follows:

1.      I am a partner at Kirkland & Ellis, LLP ("K&E"), with offices located at 300 N. LaSalle, Chicago, Illinois, 60654.  Prior to joining K&E, I was Senior Counsel / Intellectual Property for Tribune Company, the parent company of Tribune Media Services, Inc. ("TMS"), from October 2000 through January 2006.  I submit this Declaration in support of TMS's Objection to Motion for Relief from Stay, Case No. 08-13141 (KJC) (Bankr. D. Del. 2008) [Docket No. 1598].

2.      I have personal knowledge of the facts stated in this Declaration based upon (i) my familiarity with, and oversight of, litigation initiated by Warren Beatty against TMS in 2005 in my role as Senior Counsel / Intellectual Property at Tribune Company; and (ii) my review of court filings and proceedings in that 2005 lawsuit, which are attached hereto.  All exhibits attached in support of my declaration are either public court records or are business records kept by TMS in the ordinary course of its business, with which I was familiar in my role as Senior Counsel at Tribune Company.

3.    TMS is the owner of the copyright and other rights in the "Dick Tracy" property (the "Dick Tracy Property"). In August 1985, TMS and Warren Beatty entered into an agreement (the "Dick Tracy Agreement") whereby TMS "grant[ed] motion picture, television, and customary related rights" in the Dick Tracy Property to Mr. Beatty. A true and correct copy of the Dick Tracy Agreement, is attached hereto as Exhibit A.

4.    In May 1988, the Dick Tracy Agreement was amended in certain respects. A true and correct copy of the amendment, dated May 15, 1988, is attached hereto as Exhibit B. Pursuant to this amendment, Mr. Beatty assigned "his rights and obligations" under the Dick Tracy Agreement "to Walt Disney Pictures," and TMS consented to this assignment. Exh. B., ¶ 1.

5.    I am aware that, in or about 1990, Mr. Beatty and Walt Disney Pictures successfully completed a motion picture entitled "Dick Tracy" under the Dick Tracy Agreement.

6.    Under the Dick Tracy Agreement, TMS could effect reversion of the rights granted thereunder if the contracting party did not continue to produce motion pictures, television series, or television specials within the meaning of and under the timetable set forth in the Agreement. *See* Exhibit A, ¶ 9. Specifically, paragraph 9 of the Dick Tracy Agreement provided in relevant part: "In the event that, within five years after the initial domestic release of the [Dick Tracy] picture, or any subsequent theatrical picture or television series or special, photography has not commenced on either another theatrical motion picture or television series or special, TMS may give Mr. Beatty notice of its intention to effect reversion of all rights granted hereunder ... . If within two years

after receipt of said notice, such principal photography has not commenced, then TMS, by a further written notice to Mr. Beatty, may effect such a reversion."

7.      In September 2002, I informed the Walt Disney Company, by letter, of TMS's position that "the Dick Tracy rights already have reverted to TMS" by operation of previous correspondence with Walt Disney Company and paragraph 9 of the Dick Tracy Agreement.   A true and correct copy of this September 30, 2002 letter is attached hereto as Exhibit C.

8.      On October 12, 2004, I sent a "final reversion notice" under the Dick Tracy Agreement to representatives of the Walt Disney Company, stating that "[a]ll Dick Tracy rights granted under the Agreement have now reverted to TMS."  A true and correct copy of this letter notice of reversion is attached hereto as Exhibit D.

9.      On May 13, 2005, Mr. Beatty filed a complaint in Los Angeles Superior Court against TMS, which was followed four days later with an amended complaint against TMS and certain other parties with whom TMS had been negotiating to exploit the Dick Tracy movie and television rights (the "2005 Lawsuit").  A true and correct copy of the amended complaint is attached hereto as Exhibit E.  In that 2005 Lawsuit, Mr. Beatty sought a declaration that TMS never gave either Walt Disney Company or Mr. Beatty proper written notice of its intent to effect a reversion of the Dick Tracy rights under the Dick Tracy Agreement. *See* Exh. E, ¶ 15.  Mr. Beatty also sought to enjoin TMS from exploiting the Dick Tracy movie and television rights. Exh. E, ¶ 19. The complaint in the 2005 Lawsuit raised no issue as to whether Mr. Beatty (or Walt Disney Company) had commenced principal photography on a qualifying Dick Tracy motion picture, television series, or television special within two years of a reversion

notice under paragraph 9 of the Dick Tracy Agreement.

10.    On May 31, 2005, TMS removed the 2005 Lawsuit to the United States District Court for the Central District of California. A true and correct copy of the federal docket for the 2005 Lawsuit is attached hereto as Exhibit F.

11.    During the course of the 2005 Lawsuit, TMS learned that the Walt Disney Company had purportedly quitclaimed its interests in the Dick Tracy rights to Mr. Beatty in late April 2005. A true and correct copy of the Quitclaim Agreement is attached hereto as Exhibit G. TMS had not consented to the purported transfer of the relevant Dick Tracy rights from the Walt Disney Company to Mr. Beatty.

12.    On June 13, 2005, TMS filed a motion to dismiss the 2005 Complaint (the "Motion to Dismiss"). In the Motion to Dismiss, TMS alleged that Mr. Beatty lacked standing to bring suit against TMS because he had transferred all his rights under the Dick Tracy Agreement to Walt Disney in 1988 and, therefore, had no interest in the suit. TMS also alleged that the purported transfer of Dick Tracy movie and television rights from Walt Disney Company to Mr. Beatty in April 2005 was invalid under federal copyright law because TMS (the copyright holder) had not consented to any such transfer. A true and correct copy of the Motion to Dismiss is attached hereto as Exhibit H.

13.    On August 10, 2005, the Court denied TMS's Motion to Dismiss. In its decision, the Court addressed only whether Mr. Beatty had standing to bring suit against TMS. A true and correct copy of the district court's decision denying dismissal of the 2005 Lawsuit is attached hereto as Exhibit I. As recounted in that decision, TMS had argued that Mr. Beatty did not retain any rights after his transfer of the Dick Tracy

rights to Walt Disney in 1988 and that the purported transfer of Tracy rights from Walt Disney Company to Mr. Beatty in 2005 was invalid under federal copyright law. Exh. I, at 7. In denying TMS's Motion to Dismiss, the district court reasoned that the issue whether a transfer of rights under the Dick Tracy Agreement required TMS's consent was a mixed question of law and fact that would be "more appropriately addressed on a motion for summary judgment." *Id.* at 8.

14.     On February 6, 2006, TMS filed a motion for summary judgment (the "Summary Judgment Motion"). A true and correct copy of the Summary Judgment Motion is attached hereto as Exhibit J. In the Summary Judgment Motion, TMS argued (i) that Mr. Beatty did not retain any rights after his 1988 transfer of the Dick Tracy property to Walt Disney under the Dick Tracy Agreement and (ii) that the purported transfer of rights from Walt Disney Company to Mr. Beatty in 2005 was invalid. Again, TMS's arguments were based on federal copyright law and revolved around whether TMS had assigned the Dick Tracy rights to Mr. Beatty in the Dick Tracy Agreement (Mr. Beatty's position) or had only licensed those rights (TMS's position).

15.     The Summary Judgment Motion did not address the meaning of paragraph 9 of the Dick Tracy Agreement (which sets forth the requirements for reversion). Nor did this Motion raise any issue as to whether Mr. Beatty had commenced principal photography on a television special or other qualified project within the meaning of the Dick Tracy Agreement.

16.     On July 17, 2006, the district court entered an order denying the Summary Judgment Motion (the "Summary Judgment Order"). A true and correct copy of the Summary Judgment Order is attached hereto as Exhibit K. The Summary

5

Judgment Order addressed only whether Mr. Beatty was assigned or licensed the Dick Tracy rights under the Dick Tracy Agreement and whether he had standing to bring suit against TMS.

17.     On November 30, 2006, the Court entered a stipulation for dismissal of the action without prejudice and an order dismissing the case without prejudice.

18.     Only limited discovery was undertaken during the course of the 2005 Lawsuit.  For example, no depositions were taken by either TMS or Mr. Beatty. The only evidentiary materials offered in connection with the Motion for Summary Judgment, besides the relevant written agreements, were written declarations, with myself and Maura J. Wogan submitting declarations on behalf of TMS, and Mr. Beatty and his counsel, Bertram Fields, submitting declarations in support of Mr. Beatty's opposition.

19.     The district court handling the 2005 Lawsuit did not hold any evidentiary hearings or hear any live witness testimony.

20.     At no time during the course of the 2005 Lawsuit did the parties address the meaning of the terms "principal photography" or "television special" under the Dick Tracy Agreement or litigate the time frames or other requirements of the reversion paragraph in the Dick Tracy Agreement once a notice of reversion has been issued.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on _July 14_____, 2009

_Michael A. Parks_____

Michael A. Parks

**EXHIBIT A**

TRIBUNE MEDIA SERVICES, INC.
720 North Orange Avenue
Orlando, Florida 32801


August 26, 1985


Mr. Warren Beatty
c/o Bertram Fields, Esq.
Greenberg, Glusker, Fields,
  Claman & Machtinger
1900 Avenue of the Stars
Suite 2000
Los Angeles, California  90067

          Re:  "Dick Tracy"

Dear Mr. Beatty:

          This letter shall constitute our preliminary agree-
ment regarding the grant of certain rights with respect to the
"Dick Tracy" property:

          1.    Rights to be Granted

          Tribune Media Services, Inc. ("TMS") will grant
motion picture, television, and customary related rights in its
property, "Dick Tracy," including but not limited to all past,
present or future characters and story material (the "pro-
perty"), to Mr. Beatty.

          2.    Term

          (a)  Mr. Beatty will attempt to enter into an
agreement (or agreements) for the financing and distribution of
a feature picture based on the property (the "picture") on
terms satisfactory to him.  Mr. Beatty will either write,
co-write, or supervise the writing of any new screenplay or
revisions of the old screenplay, which he deems necessary to
effect such an agreement.

          (b)  If Mr. Beatty does not enter into such an
agreement within one year beginning August 1, 1985 and expiring

Mr. Warren Beatty
August 28, 1985
Page 2

July 31, 1986, then all rights in the property shall revert to TMS.

(c)  Mr. Beatty will have an option to renew said one year period for an additional six months if he has been unable to complete such a financing/distribution contract within the initial one year period.

(d)  If a financing/distribution agreement is entered into within the time specified in 2(b) or (c), but principal photography of the picture is not commenced within one year from signing of the financing/distribution agreement, then all such rights shall nevertheless revert to TMS, provided that Mr. Beatty will have an option to renew said one year period for the start of principal photography for an additional year upon advance payment of the sum provided for under 3(a)(2) below.

3.  Payments to TMS

If the rights do not revert to TMS, the following shall apply with reference to the picture:

(a)  TMS shall be paid $500,000 as a "rights fee," payable as follows:

(1)  $125,000 on signing the financing/distribution agreement;

(2)  $125,000 on start of principal photography; and

(3)  $250,000 deferment; the term "deferment" as used herein is defined as an amount payable, pari passu with other such deferments, when actual break-even is reached (as customarily defined in the U.S. motion picture business, i.e., the point at which gross receipts less distribution fees and costs equal production costs plus interest) from the first gross receipts after such break-even, less only distribution costs and fees incurred thereafter, and before payment of any share of net profits to any net profit participant.

(b)  The foregoing payments shall be non-refundable.

(c)  In addition to the payments specified under 3(a) above, TMS shall receive a sum equal to 6% of 100% of the net profits of the picture. In determining net profits of the

Mr. Warren Beatty
August 28, 1985
Page 4

(b) TMS warrants that it has the sole and exclusive right to enter into this agreement, and agrees to extend to Mr. Beatty the same representations and warranties that Chester Gould extended to Art Linson Productions, Inc., in their agreement dated October 20, 1977, subject to the listing of previous uses of the property in an updated copyright report to be furnished by Brylawski and Cleary and subject to a listing of rights granted by TMS, Gould and his representatives since October 20, 1977.

8.    Merchandising

(a) Mr. Beatty will receive 20% of the domestic gross merchandising revenue and 27-1/2% of the foreign gross merchandising revenue after deducting any fee paid to a foreign licensing agent not affiliated with TMS. Mr. Beatty's share of such merchandising revenue will be paid to him no less frequently than quarterly, together with a written report on the amounts and sources of such revenues.

(b) "Gross merchandising revenue" as used herein includes the gross payments and other consideration, without deduction of any sort, from manufacturers and other licenses, for or in respect of the right to use (other than in the exhibition of the picture) the "Dick Tracy" characters (whether in cartoon form, photographed or otherwise) and/or "Dick Tracy" story-lines, and/or items or objects of any sort used by or associated with such characters (as portrayed in the picture or otherwise), including but not limited to such use in, on or as books, magazines, games, toys, radios, watches, puzzles, posters, clothing, souvenirs and items and objects of every sort whatsoever.

(c) Comic strip revenues are specifically excluded from merchandising revenue.

(d) TMS may use Mr. Beatty's name and his likeness portraying Dick Tracy in the picture, in merchandising connected with the picture, provided that: (1) such likeness is clearly identifiable as the character "Dick Tracy," rather than simply Mr. Beatty, as himself, (2) the likeness, the objects upon which it is to be used, and the manner of its use are expressly approved in writing by Mr. Beatty (such approval not to be unreasonably withheld), and (3) no license of such rights will extend beyond two years without Mr. Beatty's express written consent.

TMS/2 000005

TMS 0059

Mr. Warren Beatty
August 28, 1985
Page 5


(e)  If TMS intends to license Mr. Beatty's said likeness, TMS will first give Mr. Beatty written notice, setting out the nature and term of that license, enclosing also a sample of the intended merchandise or object, the likeness to be used, and the manner in which said likeness would be used. If Mr. Beatty does not notify TMS of his disapproval of such license within 30 days after his receipt of such written notice and enclosures, he shall be deemed to have approved the same.

(f)  Notices to TMS shall be given at its address listed above. Notices to Mr. Beatty shall be given to him c/o Traubner & Flynn, Business Management, 1849 Sawtelle Boulevard, Suite 500, Los Angeles, California 90025, with a copy to Bertram Fields, Esq., at his address shown above. Except as expressly provided to the contrary, such notices shall be effective on mailing to such addresses by certified or registered mail.

9.    Reversion

In the event that, within five years after the initial domestic release of the picture, or any subsequent theatrical picture or television series or special, photography has not commenced on either another theatrical motion picture or television series or special, TMS may give Mr. Beatty notice of its intention to effect a reversion of all rights granted hereunder, provided that Mr. Beatty will continue to have such non-exclusive rights in the property as may be necessary to permit the continued exploitation in and by any and all media of any motion picture or television series or special produced pursuant to rights granted herein or of rights therein or connected therewith. If within two years after receipt of said notice, such principal photography has not commenced, then TMS, by a further written notice to Mr. Beatty, may effect such a reversion.

10.    Characters

Mr. Beatty recognizes that in creating future cartoons for newspaper or magazine publication in comic strip format, TMS must be free to utilize the characters previously utilized and appearing in the property and any other material and descriptions and incidents relating thereto without fear of claims of infringement from any person participating in the production of a motion picture, television series or special. Accordingly, neither Mr. Beatty nor any writer or other person participating in the preparation of material for, or production of, a motion picture, television series or special pursuant to

TMS 0060

Mr. Warren Beatty
August 28, 1985
Page 6

rights granted hereunder, shall make, or have any right to
make, any claim against TMS or anyone claiming rights through
TMS based upon an allegation that such person, in preparing any
future cartoon for newspaper or magazine publication, has
infringed upon, or made use of, any material created in the
course of preparation for, or production of, a motion picture,
television series or special pursuant to rights granted in this
Agreement. Mr. Beatty agrees to incorporate the provisions of
this Paragraph 10 in any agreement entered into between him and
any writer, producer, director or other person whose services
will include the creation of legally protectible literary
property. Notwithstanding the foregoing, this Paragraph 10
shall not give TMS rights in any new character created for
motion picture or television production or the right to use the
storyline of any such production, and this paragraph shall be
subject to the requirements of the WGA Minimum Basic Agreement
from time to time in force. Should the WGA Minimum Basic
Agreement require some payment or contribution to or for the
benefits of any writer and/or the WGA by reason of the use of
such writer's work by TMS in a newspaper or magazine, TMS will
pay and hold Mr. Beatty harmless from that payment or contri-
bution.

        This letter agreement shall constitute our agreement
until a more detailed contract is prepared and executed by both
parties.

                          Very truly yours,

                          TRIBUNE MEDIA SERVICES, Inc.

                          By: _____
                              ROBERT S. REED, President

ACCEPTED AND AGREED:

_____
        WARREN BEATTY

# EXHIBIT B

May 15, 1988

Robert S. Reed ~~Services~~ Services
Tribune Media ~~Syndicate~~, Inc.
720 North Orlando Avenue
Orlando, Florida  32801

### Re: Dick Tracy - Agreement - Amendment Letter

Dear Mr. Reed:

        Reference is made to that certain letter agreement
("Agreement") dated August 28, 1988 between Tribune Media
Services ~~Syndicate~~, Inc. (TMS) and Warren Beatty ("Mr. Beatty") with
respect to the grant of certain rights to the Dick Tracy
Property.  TMS and Mr. Beatty desire to amend the Agreement
in accordance with the terms and conditions set forth in
this "Amendment Letter".  Unless otherwise indicated,
defined terms in the Agreement shall have the same meaning
herein.

        In consideration for the mutual undertakings set forth
below, and for other good and valuable consideration, ~~WDPc~~ Mr. Beatty
and ~~Lender~~ TMS hereby amend the Agreement as follows:

        1.   Upon the full execution hereof, Mr. Beatty shall
assign his rights and obligations hereunder to Walt Disney
Pictures ("WDPc").  TMS hereby consents to such assignment.

        2.   With respect to Paragraph 1 of the Agreement, the
words "live stage, ~~radio,~~ animation" are inserted after the
word "television" in the 2nd line thereof.  Additionally,
the following sentence is inserted at the end thereof:  "TMS
has not heretofore granted (other than as specifically set
forth in the Brylawski and Cleary Reports dated February 25, 1971; August
1988), and shall not hereafter grant to any third party, any 21, 1985,
of the rights granted hereunder." as updated in May of 1988

        3.   With respect to Paragraph 2 of the Agreement, TMS
hereby acknowledges that Mr. Beatty has entered into an
agreement with WDPc for the financing and distribution of a
feature picture based on the property within the term of the
Agreement, thus satisfying the condition set forth therein.

        4.   With respect to Paragraph 7 of the Agreement, the
word "animation" is deleted from the third line thereof, the
words "merchandising, ~~radio,~~" are deleted from the 6th line
thereof, and the words "live stage rights" are deleted from
the 6th and 7th lines thereof. Additionally, the following sentence shall
be added at the end thereof: "Radio rights shall be frozen as between TMS
and Mr. Beatty (or WDPc) upon Mr. Beatty's assignment of his rights hereunder to WDPc."

**TMS/2 000008**

1                    TMS 0062

5.   With respect to Paragraph 8 of the Agreement, said Paragraph is hereby deleted and replaced with the following:

"8.   Merchandising.

(a)   Grant of Rights.  TMS hereby assigns, grants, and sets over unto Mr. Beatty (who shall assign such rights to WDPc) the sole and exclusive right (subject to the existing licensing agreements set forth in Exhibit "A" *which shall others to make, publish, and vend, or to license* ~~attached hereto~~) to make, publish, and vend, or to license *Exhibit A (This an* commercially, anywhere in the world, any and all items, things and services which employ or use or which are taken from or which are based upon any of the characters, material or title(s) of the property or any part thereof, and/or which employ or use or are taken from or based upon any of the characters, material or title(s) of any of WDPc's motion picture, television or other versions, adaptations or treatments of the property or any part thereof, including but not limited to toys, puppets, fabrics, wallpaper, dolls, games, puzzles, novelties, food products and/or services, phonographic records or other reproductions of the property, magazines, radios, watches, posters, clothing, children's storybooks, picture books, paint books, coloring books, cutout books, novelty books, game books, puzzle books, magazines, booklets, souvenir programs, soft cover movie tie-in books, storytellers, read-alongs, video games, and items and objects of every sort whatsoever, other than comic strips, comic books, and hard cover books based on said comic strips (collectively, the "Merchandise").

— trade paperback books

(b)   Consideration for Merchandising.  In consideration of the grant in this Paragraph 8, TMS shall be entitled to the following sums:

(i)   Non-Movie Merchandising.

(A)   TMS shall be entitled to an amount equal to 35% of the Net Merchandising Receipts derived from Non-Movie Merchandise until such time (if ever) that Cash Breakeven is achieved (if ever).

(B)   TMS shall be entitled to any amount equal to 50% of the Net Merchandising Receipts derived from Non-Movie Merchandise accruing after Cash Breakeven is achieved (if ever).

(ii)   First Picture Movie Merchandise.

(A)   TMS shall be entitled to an amount equal to 12-1/2% of the Net Merchandising Receipts derived from First Picture Movie Merchandise until Cash Breakeven is achieved (if ever).

— *If such merchandising uses a generic ~~likeness~~ likeness, i.e. a likeness other than of the individual playing the part or other than as appeared in ~~the~~ any picture, or artwork used in advertising the picture, TMS shall have approval of such likeness, which approval shall not be unreasonably withheld.*

TMS 0063

TMS/2 000009

(B)   TMS shall be entitled to an amount equal to 25% of the Net Merchandising Receipts derived from First Picture Movie Merchandise accruing after Cash Breakeven (if ever) until Actual Breakeven is achieved (if ever).

(C)   TMS shall be entitled to an amount equal to 30% of the Net Merchandising Receipts derived from First Picture Movie Merchandise accruing after Actual Breakeven is achieved (if ever).

(iii)   Sequel Movie Merchandise.

(A)   TMS shall be entitled to an amount equal to 15% of the Net Merchandising Receipts derived from Sequel Movie Merchandise until such time (if ever) that Cash Breakeven is achieved (if ever).

(B)   TMS shall be entitled to an amount equal to 25% of the Net Merchandising Receipts derived from Sequel Movie Merchandise accruing after Cash Breakeven (if ever) until Actual Breakeven is achieved (if ever).

(C)   TMS shall be entitled to an amount equal to 30% of the Net Merchandising Receipts derived from Sequel Movie Merchandise accruing after Actual Breakeven is achieved (if ever).

(iv)   Theme Park Attractions.
Notwithstanding anything to the contrary contained herein, TMS agrees that, without obligation to make additional payments to TMS, WDPc (upon Mr. Beatty's assignment of his rights hereunder to WDPc) shall have the right, in perpetuity throughout the world, to use footage from the picture, and other elements from the Picture, in any theme parks or studio tours, and to use the character Dick Tracy, or such other characters, elements, or other aspects of the property, in theme parks as the basis for theme park attractions .   (v) Waiver. Mr Beatty hereby waives his right to receive any royalty under Paragraph 8(b) hereof with respect to Non-Movie Movie

(c)   Definitions.

merchandise other the under existing Co

(i)   "Non-Movie Merchandise" shall mean any Merchandise not utilizing the name, logo, plot, likenesses, or other similar items associated with the first picture or any sequel.

Keep the all that subject t this grea

(ii)   "Movie Merchandise" shall mean any Merchandise utilizing the name, logo, plot, likenesses, or other similar items associated with the first picture or any sequel.

(iii)  "First Picture Movie Merchandise" shall mean any Movie Merchandise utilizing the first picture's name, logo, plot, likenesses, character(s) not appearing in any sequel, or other similar items associated with the first picture.

(iv)  "Sequel Movie Merchandise" shall mean any Movie Merchandise utilizing any sequel's name, logo, plot, likenesses, character(s) not appearing in the first picture, or other similar items associated with any sequel.  Notwithstanding anything to the contrary contained herein, all Movie Merchandise sold pursuant to licenses entered into on or after the date which is six months prior to the commencement of principal photography of the first sequel shall be deemed to be Sequel Movie Merchandise. Sequel Movie Merchandise will be allocated to a particular sequel if it is sold pursuant to licenses entered into during the period commencing on the date which is six months prior to the commencement of principal photography on said sequel and terminating on the date which is six months prior to the commencement of principal photography on the next sequel.

(v)  "Net Merchandising Receipts" shall mean monies actually received by WDPc as a license fee for items of Merchandise, less a 20% administration fee ~and less~ (inclusive of subdistributor's fees) ~plus out-of-pocket costs~ (~including, without limitation,~ royalties to third parties for use of name or likeness, including any royalties paid to Mr. Beatty for the use of his name or likeness); provided, however, that all comic strip revenues shall be retained by TMS and are specifically excluded from Net Merchandising Receipts.  [Notwithstanding the foregoing, if WDPc itself purchases, manufactures or otherwise acquires the Merchandise items for resale at the wholesale or retail level by WDPc or one of its "Affiliated Companies" (as defined below) (i.e., Disneyland or WDPc owned Disney stores), then the Net Merchandising Receipts with respect thereto shall be deemed to be seven percent (7%) of fifty percent (50%) of the retail price (less any royalties to third parties for use of name or likeness, including any royalties paid to Mr. Beatty for the use of his name or likeness).

(vi)  "Affiliated Company" shall mean a parent corporation, a subsidiary, a company under common control with WDPc, or a joint venture in which WDPc is a party.

(vii)  "Actual Breakeven" and "Cash Breakeven" shall be defined as such terms are customarily defined in the U.S. motion picture business; provided,

TMS/2 000011

4

TMS 0065

*8. The following new paragraph 11 is hereby added to this Agreement: 11. In connection with any state production incurred by WDPc, TMS shall receive a royalty equal to 35% of the combined royalties payable to the authors but not in any event less than 1/2 of 1% of the producer's gross receipts after breakeven as customarily defined in the business of producing state productions.*

however, that upon Mr. Beatty's assignment of his rights hereunder to WDPc, then such terms shall be defined as follows:

(A)    "Actual Breakeven" shall be defined as the end of the first accounting period in which there are "Net Profits", as defined, computed, and accounted for in accordance with WDPc's standard definition of Net Profits.

(B)    "Cash Breakeven" shall be defined as the end of the accounting period in which Gross Receipts first equals the aggregate of the following: (1) An "off-the-top" Distribution Fee in the amount of 20% on all Gross Receipts; (2) all Distribution Costs; (3) the Cost of Production; (4) Overhead; and (5) Accrued Interest. All capitalized terms in this Paragraph c.vii.B. shall be defined, respectively, in accordance with WDPc's standard definitions thereof."

Except as specifically set forth herein, the Agreement shall remain in full force and effect.

If the foregoing correctly represents your understanding with respect to the matters set forth herein, please so acknowledge and accept as provided below.

*11. → over*

*10. The following new paragraph 12 is hereby added to the Agreement: " 12. The parties shall cooperate to protect their copyrights and trademarks with respect to the characters and material licensed under this Agreement, as amended hereby.*

Sincerely,

*Warren Beatty by B Trias his attorney in fact*

WARREN BEATTY

ACKNOWLEDGED AND ACCEPTED:

Tribune Media/Services/Syndicate, Inc.

By _Robert S. Reed_

Its _President_

*7. With respect to Paragraph 4 of the Agreement the following is added at the end thereof: "provided with respect to each animated sequel and/or remake intended for theatrical release, the $250,000 rights fee shall be payable as follows: (a) $62,500 on commencement of production; (b) $62,500 on commencement of production; (c) $125,000 on the date 3 years following initial theatrical release thereof; (d) there shall be no net profit participation payable in connection with any animated theatrical picture.*

*8. With respect to Paragraph 5 of the Agreement, the following is added at the end thereof: " 5.(c) TMS shall receive 50% of the amount set forth in Paragraph 5(a), and 100% of the amount set forth in Paragraph 5(b), on each animated television program.*

*9. With respect to Paragraph 9 of the Agreement, the following sentence is added at the end thereof: In the event that the rights granted under this Agreement revert to TMS under Paragraph 9 hereof, the merchandising rights granted hereunder shall continue; provided, that if, in any calendar year the exercise of such rights does not result in the payment of $100,000 in royalties to TMS and WDPc does not pay to TMS any amount by which said royalties are less than $100,000, then such merchandising rights shall also revert to TMS, except that license agreements entered into prior to such reverse shall continue in effect for their existing term subject to the payment of the agreed royalties to TMS.*

5

*turn over for Paragraph 11*

11. The following new paragraph 13 shall be added at the end thereof:
"The following shall be attached hereto: (a) Standard WBR Merchandising license contract; (b) sample WBR merchandising royalty statement; (c) WBR standard definition of 'net profits.'

12. The following new paragraph 14 shall be added at the end thereof:
"14. TMS' rights with respect to reporting and auditing of merchandising royalties shall be the same as those rights set forth in WBR's standard definition of 'net profits' except that statements shall continue to be provided quarterly.

# EXHIBIT C

Michael A. Parks
Senior Counsel/Intellectual Property
312/222-4653

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-4206
e-mail: mparks@tribune.com

September 30, 2002

**VIA FACSIMILE - 818-843-7109**

Steve C. Bardwil, Esq.
Senior Vice President, Legal Affairs
The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521

      Re:  Dick Tracy®

Dear Steve:

About two months ago I called you regarding the reversion of Dick Tracy rights to Tribune Media Services ("TMS"). You were kind enough to offer to look through your files for any information regarding the reversion. Before you spend any more time on this effort, I wanted to let you know that we conducted another search of our files here and determined that TMS extended Disney's rights in the Dick Tracy property only until February 1998 (see, e.g., enclosed January 4, 1995 letter from Elyce Goldstein to Robert Osher). Thus, as I told you I believed was the case when we last spoke, the Dick Tracy rights already have reverted to TMS.

Thanks again for your help with this matter. I know how busy everyone is, so I appreciate the time you gave us.

Best regards,

*Michael A. Parks*

Michael A. Parks

MAP:sab

Encls.

# EXHIBIT D

Michael A. Parks
Senior Counsel/Intellectual Property
2/222-4653

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-4208
e-mail: mparks@tribune.com

October 12, 2004

**VIA FACSIMILE AND
FIRST-CLASS MAIL**

Steven C. Bardwil, Esq.
Senior Vice President, Legal Affairs
Buena Vista Motion Picture Group
500 South Buena Vista Street
Burbank, California 91521-0319

Re:    Dick Tracy – Reversion of Rights to Tribune Media Services

Dear Steve:

It has been over two years since Tribune Media Services ("TMS") informed Disney of TMS' intent to effect a reversion of all Dick Tracy rights granted under the August 28, 1985 Dick Tracy agreement and amendments thereto (collectively, the "Agreement"). This letter constitutes the final reversion notice required under the Agreement. All Dick Tracy rights granted under the Agreement have now reverted to TMS, provided that in accordance with the terms of the Agreement, Disney may continue to exploit the Dick Tracy theatrical movie it released in June 1990 and the Disney Ice Skating Special it released in January 1995. Disney has no other rights to the Dick Tracy property.

Please let me know if you have any questions.

Very truly yours,

*Michael A. Parks*

Michael A. Parks

**EXHIBIT E**

1  BERTRAM FIELDS (SBN 024199)
2  GREENBERG GLUSKER FIELDS CLAMAN
   MACHTINGER & KINSELLA LLP
3  1900 Avenue of the Stars, Suite 2100
   Los Angeles, California 90067-4590
4  Telephone: (310) 553-3610
   Fax: (310) 553-0687
5  Attorneys for Plaintiff Warren Beatty

6

7

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

MAY 18 2005

John A. Clarke, Executive Officer/Clerk

By _R. Arruga_, Deputy
        R. Arruga

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   FOR THE COUNTY OF LOS ANGELES

10

11  WARREN BEATTY,                          Case No. BC333430

12              Plaintiff,

13       vs.                                FIRST AMENDED COMPLAINT FOR
                                            DECLARATORY RELIEF, DAMAGES
14                                          FOR BREACH OF CONTRACT AND
                                            INJUNCTIVE RELIEF
15  TRIBUNE MEDIA SERVICES, INC.,
    ROBERT NEWMYER,                         (Jury Trial Demanded)
16  SCOTT STRAUSS, LORENZO
    DI BONAVENTURA, OUTLAW
17  PRODUCTIONS and DOES 1 through
    10,
18
                Defendants.
19

20

21  Plaintiff alleges as follows:

22

23               FIRST CAUSE OF ACTION

24      (Declaratory Relief – Against All Defendants)

25

26      1.    Plaintiff Warren Beatty ("Beatty") is a resident of Los Angeles County and

27  an actor, director, writer and producer of motion pictures.

28

GREENBERG GLUSKER FIELDS CLAMAN
MACHTINGER & KINSELLA LLP
1900 Avenue of the Stars, Suite 2100
Los Angeles, California 90067-4590

2.      Plaintiff is informed and believes that defendant Tribune Media Services, Inc. ("Tribune") is a corporation with its principal place of business in Illinois, that defendants Robert Newmyer ("Newmyer"), Scott Strauss ("Strauss") and Lorenzo di Bonaventura ("di Bonaventura") are residents of Los Angeles County and that Outlaw Productions ("Outlaw") is a California corporation. Tribune does substantial business in the State of California. Defendants Newmyer, Strauss, di Bonaventura and Outlaw are hereinafter called the "Outlaw defendants."

3.      The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as Does 1 through 10 are unknown to plaintiff who therefore sues said defendants by such fictitious names. Plaintiff sues said defendants by such fictitious names and will amend this complaint to show their true names and capacities when the same have been ascertained. Plaintiff is informed and believes and, on that ground, alleges that Does 1 through 10 are purportedly dealing or seeking to deal with Tribune with respect to the rights at issue in this action.

4.      Prior to August 28, 1985, Tribune was the owner of the copyright and other rights in the cartoon character Dick Tracy and in various works embodying that character.

5.      In or about August 28, 1985, by written agreement concluded in California (the "Beatty Agreement"), Tribune assigned to Beatty motion picture, television and other rights in the Dick Tracy character (the "Tracy Rights").

Paragraph 9 of the Beatty Agreement provided, inter alia, that if, within five years after Beatty's production of a Dick Tracy motion picture or other Dick Tracy project, Beatty failed to commence production of another Dick Tracy project, Tribune would have a conditional option to recapture the Tracy Rights by following a specific procedure set out in the Beatty Agreement (the Reversion Procedure"). Tribune's option, the complete exercise of which would cause Beatty's forfeiture of the Tracy Rights, could be exercised only by Tribune's giving Beatty two separate written notices plus a two year opportunity to avoid the forfeiture by producing a Dick Tracy project following

GREENBERG GLUSKER FIELDS CLAMAN
MACHTINGER & KINSELLA LLP
1900 Avenue of the Stars, Suite 2100
Los Angeles, California 90067-4590

2

GREENBERG GLUSKER FIELDS CLAMAN
MACHTINGER & KINSELLA LLP
1900 Avenue of the Stars, Suite 2100
Los Angeles, California 90067-4590

1 the first such notice and before the second such notice.  To begin the Reversion

2 Procedure, Tribune was required by the Beatty Agreement to give Beatty specific written

3 notice of its intention to cause a reversion of the Tracy Rights to Tribune if Beatty did

4 not commence production of a Dick Tracy project within two years following such notice

5 (a "Notice to Produce").  Thereafter, provided Beatty did not commence such production

6 within that two year period (the "Production Period"), Tribune could exercise its option

7 to effect a reversion of the Tracy Rights by a further written notice so stating.

8         In requiring written Notice to Produce and the two year Production Period

9 following such notice before Tribune could exercise its option to effect a forfeiture of the

10 Tracy Rights, the parties intended, first, to give Beatty clear, unequivocal and formal

11 notice warning Beatty that he must commence production of a Dick Tracy project within

12 that two year period or face a forfeiture of the Tracy Rights, second, to give Beatty two

13 full years after such warning notice within which to commence such a production and,

14 third, to avoid any factual dispute as to whether or not some informal communication

15 might constitute notice to produce and permit such a forfeiture of Beatty's rights without

16 his having a real opportunity to commence production during the two year period.

17         Paragraph 8(f) of the Beatty Agreement (the "Notice Provision") provided

18 for the manner in which notices could be given under the agreement, which required not

19 only written notice to Beatty but also to Beatty's lawyer, so that there would be no

20 chance of Beatty's failing to realize that an important notice had been given.

21    6.    On or about March 10, 1988, in a transaction negotiated and concluded in

22 California, Beatty assigned most of his rights under the Beatty Agreement to Walt Disney

23 Pictures ("Disney"), reserving, however, the right to produce, for his own account, a

24 Dick Tracy project during the last eighteen months of the twenty-four month Production

25 Period following receipt of a Notice to Produce from Tribune.  By reserving his right to

26 produce a Dick Tracy project for his own account during the Production Period, Beatty

27 remained the proprietor of valuable substantive rights under the Beatty Agreement.

28

7.      Beatty and Disney have done all things required of them under the Beatty Agreement and are in no manner or respect in breach thereof.

8.      During 1990, Disney released a Dick Tracy motion picture (the "First Tracy Movie"). Beatty was a co-writer and the director and individual producer of the First Tracy Movie, as well as its star. The movie was highly profitable for Disney and for Beatty.

9.      During 1994 and 1995 Disney produced an ice show featuring the Dick Tracy character, which qualified as a Dick Tracy project under the Beatty Agreement.

10.     In July 2002, Tribune, in a letter to Disney in California, informally asked whether Disney would be willing to agree to Tribune's reacquiring the Tracy Rights without "having to undergo the procedural mechanism outlined in paragraph 9 of the agreement," i.e., without having to follow the Reversion Procedure of the Agreement. Disney did not so agree. Nor did Disney waive the contractual requirements of either a Notice to Produce or the Production Period. Disney could not have so agreed or otherwise waived Beatty's continuing rights under the Beatty Agreement and did not purport to do so. Tribune did not give Disney Notice to Produce and gave no notice of any kind to Beatty or his lawyer. By its July 2002 letter to Disney, Tribune admitted that it had not yet begun the two stage Reversion Procedure required by paragraph 9 of the Beatty Agreement.

11.     Nevertheless, in September 2002, Tribune completely reversed its position and claimed, in another letter to Disney in California, that it had already effected a complete reversion of the Tracy Rights and that Disney (and presumably Beatty) had forfeited any further right to produce any Dick Tracy project. Disney rejected Tribune's claim. Tribune did not notify Beatty or his lawyer of this new claim.

12.     In October 2004, in another letter to Disney in California, Tribune claimed once again that the Dick Tracy Rights had reverted to Tribune. Again, Tribune gave neither Beatty nor his lawyer notice of any kind.

GREENBERG GLUSKER FIELDS CLAMAN
MACHTINGER & KINSELLA LLP
1900 Avenue of the Stars, Suite 2100
Los Angeles, California 90067-4590

4

May 20 05 11:19a     Greenberg Glusker Etal.     310-553-1175          p.3

13.     Tribune's claim in September, 2002 that it had already effected a reversion of the Tracy Rights without having given Beatty or Disney Notice to Produce or the opportunity to produce another Disney project during the two year Production Period, and that Disney and Beatty had already forfeited any further right to produce any Dick Tracy project was not a Notice to Produce as required by the Beatty Agreement. It was, instead, a breach and repudiation by Tribune of the Beatty Agreement making it commercially impossible for Beatty to produce a Dick Tracy project once Tribune clouded the title to the Tracy Rights by asserting that claim. Tribune's repudiation of September 2002 was restated and confirmed by its letter to Disney of October 2004. Tribune's repudiation continues to this day to prevent Beatty from producing a Dick Tracy project. Neither Beatty nor Disney has ever been given a Notice to Produce or has ever been afforded the two year Production Period which was a condition to the forfeiture of the Tracy Rights. Nevertheless, Tribune has purported to grant the Outlaw defendants Tracy Rights that are, in fact, owned by Beatty.

14.     During May 2005, Disney reassigned to Beatty the rights under the Beatty Agreement he had previously assigned to Disney, except for the right to continue exploiting previously produced Dick Tracy projects and certain theme park rights. Beatty plans to develop another Dick Tracy motion picture and other Dick Tracy projects. Beatty expects the planned Dick Tracy picture to be even more profitable than the First Tracy Movie. In a further repudiation of the Beatty Agreement, Tribune has denied Beatty's right to produce any such motion picture or project and has announced its intention to exploit, for its own account, the Tracy Rights it transferred to Beatty.

15.     By reason of the foregoing, an actual controversy exists between the parties, in that plaintiff contends (a) that Tribune never gave Disney or Beatty, or either of them, the written Notice to Produce required by the Beatty Agreement putting them on formal notice that they must produce another Dick Tracy project within the two year Production Period, (b) that neither Tribune's informal inquiry in July 2002, admitting that it had not begun to comply with the requirements of the Reversion Procedure, nor

GREENBERG GLUSKER FIELDS CLAMAN
MACHTINGER & KINSELLA LLP
1900 Avenue of the Stars, Suite 2100
Los Angeles, California 90067-4590

5

MAY-20-05   10:26     FROM-Worldwide Network     4155030008     T-617   P.003/011   F-102

1   Tribune's assertion, in September 2002, that it had already effected a complete reversion
2   of the Tracy Rights, complied with either the Reversion Procedure or the Notice
3   Provision of the Beatty Agreement, (c) that the Tracy Rights have not reverted to
4   Tribune, (d) that a Notice to Produce has never been given or the Production Period
5   provided, (e) that the two year Production Period has never started to run, (f) that no re-
6   assignment of the Tracy Rights from Beatty to Tribune could be valid or enforceable
7   without Beatty's signed agreement and (g) that none of defendants have any or all of the
8   Tracy Rights.

9     Tribune contends to the contrary on each such point.  A declaration by the
10   court is necessary so that the parties may know their respective rights and obligations.

11

12   ## SECOND CAUSE OF ACTION

13   (Breach of Contract – Damages – Against Tribune)

14

15   16.   Plaintiff incorporates by reference paragraphs 1 through 14 hereinabove as
16   though fully set forth herein.

17   17.   As a direct and proximate result of Tribune's breach and repudiation of the
18   Beatty Agreement, Beatty has suffered and will suffer substantial monetary damages in
19   an amount as yet unknown to Beatty.  Beatty is informed and believes and, on that
20   ground, alleges that the quantifiable portion of such damages will exceed the sum of
21   $30 million.

22

23   ## THIRD CAUSE OF ACTION

24   (Breach of Contract – Injunction -- Against All Defendants)

25

26   18.   Plaintiff incorporates by reference paragraphs 1 through 14 hereinabove as
27   though fully set forth herein.

28

GREENBERG GLUSKER FIELDS CLAMAN
MACHTINGER & KINSELLA LLP
1900 Avenue of the Stars, Suite 2100
Los Angeles, California 90067-4590

6

19.     Unless enjoined by this court, defendants will seek to exploit the Tracy Rights assigned to Beatty under the Beatty Agreement, which will cause Beatty severe and irreparable harm for which he has no adequate remedy at law, in that (a) such rights are of a unique and creative nature, (b) the loss of such rights cannot be fully or fairly compensated for by monetary damages and (c) the full amount of such damages would be difficult if not impossible to quantify.

WHEREFORE, plaintiff prays judgment as follows:

1.     For a declaration of the rights and interests of the parties in and to the Tracy Rights and under the Beatty Agreement;

2.     For damages in the sum of $30 million or such other sum as is found at trial;

3.     For an injunction precluding defendants, permanently and pending final judgment, from exploiting or seeking to exploit any of the Tracy Rights assigned by Tribune to Beatty under the Beatty Agreement; and

4.     For costs of suit and such other relief as the court deems necessary to afford complete relief or otherwise proper.

DATED: May 19, 2005

GREENBERG GLUSKER FIELDS CLAMAN
MACHTINGER & KINSELLA LLP

By: _____

BERTRAM FIELDS
Attorneys for Plaintiff Warren Beatty

GREENBERG GLUSKER FIELDS CLAMAN
MACHTINGER & KINSELLA LLP
1900 Avenue of the Stars, Suite 2100
Los Angeles, California 90067-4590

7

# EXHIBIT F

(SSx), CLOSED, DISCOVERY

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:05-cv-03938-DDP-SS

| | |
|---|---|
| Warren Beatty v. Tribune Media Services Inc et al | Date Filed: 05/31/2005 |
| Assigned to: Judge Dean D. Pregerson | Date Terminated: 11/30/2006 |
| Referred to: Magistrate Judge Suzanne H. Segal | Jury Demand: None |
| Related Case: 2:08-cv-07662-DDP-SS | Nature of Suit: 820 Copyright |
| Case in other court: Los Angeles County Superior Court, BC333430 | Jurisdiction: Federal Question |
| Cause: 28:1441 Notice of Removal | |

### Plaintiff

**Warren Beatty**                    represented by   **Bertram H Fields**
Greenberg Glusker Fields Claman and
Machtinger LLP
1900 Avenue of the Stars 21st Floor
Los Angeles , CA 90067-4590
310-553-3610
Fax: 310-553-0687
Email: bfields@ggfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles N Shephard**
Greenberg Glusker Fields Claman &
Machtinger
1900 Avenue of the Stars, 21st Fl
Los Angeles , CA 90067-4590
310-553-3610
Fax: 310-553-0687
Email: cshephard@ggfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Tribune Media Services Inc**          represented by   **Cameron A Myler**
Frankfurt Kurnit Klein and Selz
488 Madison Avenue
New York , NY 10022

212-980-0120
Email: cmyler@fkks.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maura J Wogan**
Frankfurt Kurnit Klein & Selz
488 Madison Ave
New York , NY 10022
212-980-0120
Email: mwogan@fkks.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter J Anderson**
Peter J Anderson Law Offices
100 Wilshire Blvd Suite 2010
Santa Monica , CA 90401
310-260-6030
Fax: 310-260-6040
Email: pja@pjanderson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Robert Newmyer**
*TERMINATED: 01/31/2006*

represented by **Cameron A Myler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maura J Wogan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter J Anderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Scott Strauss**
*TERMINATED: 01/31/2006*

represented by **Cameron A Myler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maura J Wogan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                    Peter J Anderson
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Lorenzo Di Bonaventura**              represented by   **Cameron A Myler**
*TERMINATED: 01/31/2006*                                (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Maura J Wogan**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Peter J Anderson**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Outlaw Productions**                  represented by   **Cameron A Myler**
*TERMINATED: 01/31/2006*                                (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Maura J Wogan**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Peter J Anderson**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Does**
*1 through 10*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 05/31/2005 | 1 | NOTICE OF REMOVAL from Los Angeles County Superior Court, case number BC333430 with copy of summons and complaint.Case assigned to Judge Dean D. Pregerson, Discovery to Magistrate Judge Suzanne H. Segal. (Filing fee $ 250 ), filed by defendants Scott Strauss, Lorenzo Di Bonaventura, Outlaw Productions, Tribune Media Services Inc, Robert Newmyer.(rrey, ) |

| | | (Entered: 06/06/2005) |
|---|---|---|
| 05/31/2005 | 2 | NOTICE of Interested Parties filed by Defendants Scott Strauss, Lorenzo Di Bonaventura, Outlaw Productions, Tribune Media Services Inc, Robert Newmyer. (rrey, ) (Entered: 06/06/2005) |
| 06/02/2005 | 3 | APPLICATION AND ORDER of Non-Resident Attorney to Appear in a Specific Case by Cameron A Myler for Outlaw Productions; Tribune Media Services Inc; Robert Newmyer; Scott Strauss and Lorenzo Di Bonaventura, designating Peter J. Anderson as local counsel. Fee Paid. Approved by Judge Dean D. Pregerson.(pbap, ) (Entered: 06/07/2005) |
| 06/02/2005 | 4 | APPLICATION AND ORDER of Non-Resident Attorney to Appear in a Specific Case by Maura J Wogan for Outlaw Productions; Tribune Media Services Inc; Robert Newmyer; Scott Strauss and Lorenzo Di Bonaventura, designating Peter J. Anderson as local counsel. Fee Paid. Approved by Judge Dean D. Pregerson.(pbap, ) (Entered: 06/07/2005) |
| 06/13/2005 | 6 | Notice of Interested Parties filed by Plaintiff Warren Beatty. (pbap, ) (Entered: 06/15/2005) |
| 06/13/2005 | 7 | NOTICE OF MOTION AND MOTION to Dismiss Action Pursuant to Fed.R.Civ.P.12(B)(1) and 12(B)(6) filed by Defendants Scott Strauss, Lorenzo Di Bonaventura, Outlaw Productions, Tribune Media Services Inc, Robert Newmyer. Motion set for hearing on 7/18/2005 at 10:00 AM before Honorable Dean D. Pregerson. (pbap, ) (Entered: 06/16/2005) |
| 06/13/2005 | 8 | MEMORANDUM of Points and Authorities in support of MOTION to Dismiss Amended Complaint 7 filed by defendants Scott Strauss, Lorenzo Di Bonaventura, Outlaw Productions, Tribune Media Services Inc, Robert Newmyer. (ca, ) (Entered: 06/21/2005) |
| 06/13/2005 | 9 | DECLARATION of Micahel A. Parks in support of MOTION to Dismiss 7 filed by defendants Scott Strauss, Lorenzo Di Bonaventura, Outlaw Productions, Tribune Media Services Inc, Robert Newmyer. (ca, ) (Entered: 06/21/2005) |
| 06/13/2005 | 10 | NOTICE OF MOTION AND MOTION to Remand Case to State Court Pursuant to 28:1447(c) filed by plaintiff Warren Beatty. Motion set for hearing on 7/18/2005 at 10:00 AM before Honorable Dean D. Pregerson. (ca, ) (Entered: 06/21/2005) |
| 06/13/2005 | 11 | DECLARATION of Bertram Fields filed in connection with MOTION to Remand 10 filed by plaintiff Warren Beatty. (ca, ) (Entered: 06/21/2005) |
| 06/14/2005 | 5 | MINUTES OF IN CHAMBERS ORDER This action has been assigned to the calendar of Judge Dean D. Pregerson. Counsel are encouraged to review the Central Districts website for additional information. The address is http://www.cacd.uscourts.gov by Judge Dean D. Pregerson. Court Reporter: none.(jc,) (Entered: 06/14/2005) |
| 06/29/2005 | 12 | MEMORANDUM OF POINTS AND AUTHORITIES in Opposition to MOTION to Remand pursuant to 28 U.S.C. 1447(C) 10 filed by defendants Scott Strauss, Lorenzo Di Bonaventura, Outlaw Productions, Tribune Media |

| | | |
|---|---|---|
| | | Services Inc, Robert Newmyer. (jp, ) (Entered: 07/06/2005) |
| 06/29/2005 | 13 | MEMORANDUM OF POINTS AND AUTHORITIES in Opposition to MOTION to Dismiss 7 filed by plaintiff Warren Beatty. (jp, ) (Entered: 07/06/2005) |
| 06/29/2005 | 14 | DECLARATION of BERTRAM FIELDS in Opposition to MOTION to Dismiss 7 filed by plaintiff Warren Beatty. (jp, ) (Entered: 07/06/2005) |
| 07/06/2005 | 15 | STIPULATION AND ORDER FOR CONTINUANCE OF HEARING ON PENDING MOTIONS by Judge Dean D. Pregerson: It is hereby ORDERED that the MOTION to Remand and defendant's MOTION to Dismiss 7 , is hereby continued. Motions set for hearing on 7/25/2005 at 10:00 AM before Honorable Dean D. Pregerson.(ca, ) (Entered: 07/08/2005) |
| 07/08/2005 | 16 | NOTICE OF CLERICAL ERROR - Defendants attorney Maura J Wogan was incorrectly terminated on 6/2/05. Application and order of non-resident attorney filed on 6/2/05 was granted by Judge Dean D Pregerson acknowledging Ms Wogan as attorney associated with defendants.(jag, ) (Entered: 07/08/2005) |
| 07/18/2005 | 18 | MEMORANDUM of Points and Authorities in Further Support of Defendants' MOTION to Dismiss Amended Complaint 7 filed by Defendants Scott Strauss, Lorenzo Di Bonaventura, Outlaw Productions, Tribune Media Services Inc, Robert Newmyer. (pbap, ) (Entered: 07/26/2005) |
| 07/18/2005 | 19 | REPLY MEMORANDUM in Support of MOTION to Remand Case to State Court 10 filed by Plaintiff Warren Beatty. (pbap, ) (Entered: 07/26/2005) |
| 07/20/2005 | 17 | MINUTES OF IN CHAMBERS ORDER by Judge Dean D. Pregerson the MOTION to Dismiss action 7 , and MOTION to Remand Case to State Court 10 are continued from 7/24/05 to 8/8/2005 at 10:00 AM.Court Reporter: none present. (pbap, ) (Entered: 07/21/2005) |
| 08/01/2005 | 20 | NOTICE TO COUNSEL RE: Copyright, Patent and Trademark Reporting Requirements Filed. (pbap, ) (Entered: 08/02/2005) |
| 08/08/2005 | | REPORT ON THE FILING OF AN ACTION REGARDING Copyright (cc: form mailed to Washington, D.C.) (Opening) (pbap, ) (Entered: 08/09/2005) |
| 08/08/2005 | 23 | MINUTES OF PROCEEDINGS (IN CHAMBERS) ORDER by Judge Dean D. Pregerson : Re MOTION to Dismiss action 7 , MOTION to Remand Case to State Court 10 , matters are taken under submission.Court Reporter: Maria Bustillos. (pbap, ) (Entered: 08/12/2005) |
| 08/10/2005 | 21 | ORDER by Judge Dean D. Pregerson : Denying 7 Motion to Dismiss the complaint. (pbap, ) (Entered: 08/10/2005) |
| 08/10/2005 | 22 | ORDER by Judge Dean D. Pregerson : Denying 10 Plaintiff's Motion to Remand Case to State Court. (pbap, ) (Entered: 08/10/2005) |
| 08/24/2005 | 24 | NOTICE OF DISCREPANCY AND ORDER: by Judge Dean D. Pregerson, ORDERING Answer to first amended complaint submitted by (not indicated) received on 8/22/05 is not to be filed but instead rejected. Denial based on: First amended complaint not on file.(pbap, ) (Entered: 09/01/2005) |

| 09/08/2005 | 25 | ORDER by Judge Dean D. Pregerson Setting Scheduling Conference set for 11/21/2005 04:00 AM.(pbap, ) (Entered: 09/09/2005) |
|---|---|---|
| 09/08/2005 | 26 | NOTICE of Filing of Copy of First Amended Complaint filed by Defendants Scott Strauss, Lorenzo Di Bonaventura, Outlaw Productions, Tribune Media Services Inc, Robert Newmyer. (pbap, ) (Entered: 09/12/2005) |
| 09/08/2005 | 27 | ANSWER to First Amend Complaint filed by Defendants Scott Strauss, Lorenzo Di Bonaventura, Outlaw Productions, Tribune Media Services Inc, Robert Newmyer.(pbap, ) (Entered: 09/12/2005) |
| 11/14/2005 | 28 | JOINT REPORT Rule 26(f) Discovery Plan filed; estimated length of trial not indicated. (pbap, ) (Entered: 11/17/2005) |
| 11/21/2005 | 30 | MINUTES OF Scheduling Conference held before Judge Dean D. Pregerson: Court and counsel confer re case status. Court sets trial dates. (Refer to the Scheduling Order to be issued hereafter.) Court Reporter: None present. (ca, ) (Entered: 12/01/2005) |
| 11/23/2005 | 29 | ORDER by Judge Dean D. Pregerson Granting the NOTICE AND REQUEST of Settlement Procedure Selection (Sp1)to Appear Before Magistrate Judge for settlement proceedings.(pbap, ) (Entered: 11/28/2005) |
| 01/05/2006 | 31 | SCHEDULING ORDER by Judge Dean D. Pregerson Pursuant to the Federal Rules of Civil Procedure16(b), the Court issues the following Order: Counsel must agree on the date for the disclosure of expert witness reports pursuant to the Federal Rules of Civil Procedure 26(a)2. The agreed-upon disclosure date must precede the discovery cut-off date such that all discovery, including expert depositions, will be completed prior to the discovery cut-off date, Set Deadlines/Hearings: Discovery cut-off 9/29/2006. Motions due by 10/30/2006. Final Pretrial Conference set for 1/8/2007 04:00 PM before Judge Dean D. Pregerson. Jury Trial set for 1/23/2007 09:00 AM before Judge Dean D. Pregerson.(jc, ) (Entered: 01/05/2006) |
| 01/31/2006 | 37 | STIPULATION AND ORDER TO DISMISSAL OF CERTAIN DEFENDANTS by Judge Dean D. Pregerson. Plaintiff Warren Beaty and defendants Robert Newmyers, Scott Strauss, Lorenzo di Bonaventura and Sofited, Inc., doing business as Outlaw Productions, stipulate to the dismissal of this action, without prejudice, as to the foregoing defendants only. The foregoing defendants shall bear and be responsible for their own costs and attorneys' fees incurred in the action. The parties are entering into this stipulation based on the representations by the dismissed defendants that they no longer have any rights or interests in or to the Dick Tracy property. The action shall continue as to defendant Tribune Media Services, Inc.(pbap, ) (Entered: 02/09/2006) |
| 02/06/2006 | 32 | NOTICE OF MOTION AND MOTION for Summary Judgment filed by defendant Tribune Media Services Inc. Motion set for hearing on 4/3/2006 at 10:00 AM before Judge Dean D. Pregerson. (pbap, ) (Entered: 02/08/2006) |
| 02/06/2006 | 33 | MEMORANDUM of Points and Authorities in Support of MOTION for Summary Judgment 32 filed by defendant Tribune Media Services Inc. (pbap, ) (Entered: 02/08/2006) |

| 02/06/2006 | 34 | DECLARATION of Maura J. Wogan in Support of MOTION for Summary Judgment 32 filed by defendant Tribune Media Services Inc. (pbap, ) (Entered: 02/08/2006) |
|---|---|---|
| 02/06/2006 | 35 | DECLARATION of Michael A. Parks in Support of MOTION for Summary Judgment 32 filed by defendant Tribune Media Services Inc. (pbap, ) (Entered: 02/08/2006) |
| 02/07/2006 | 36 | NOTICE OF DOCUMENT DISCREPANCIES AND ORDER by Judge Dean D. Pregerson ORDERING Motion for summary judgment; memorandum; declaration of Wogan; Declaration of M. Parks and Statement of uncontroverted facts & conclusions submitted by Defendant Tribune Media Services Inc received on 2/6/06 to be filed and processed; filed date to be the date the document was stamped Received but not Filed with the Clerk.(pbap, ) (Entered: 02/08/2006) |
| 03/06/2006 | 38 | OBJECTIONS to Declaration of Michael Parks 35 filed by Plaintiff Warren Beatty. (pbap, ) (Entered: 03/16/2006) |
| 03/06/2006 | 39 | MEMORANDUM of Points and Authorities in Opposition to Defendant's MOTION for Summary Judgment 32 filed by plaintiff Warren Beatty. (pbap, ) (Entered: 03/16/2006) |
| 03/06/2006 | 40 | DECLARATION of Warren Beatty in Opposition to Defendant's MOTION for Summary Judgment 32 filed by plaintiff Warren Beatty. (pbap, ) (Entered: 03/16/2006) |
| 03/06/2006 | 41 | DECLARATION of Bertram Fields in Opposition to Defendant's MOTION for Summary Judgment 32 filed by plaintiff Warren Beatty. (pbap, ) (Entered: 03/16/2006) |
| 03/06/2006 | 42 | STATEMENT Genuine Issues in Dispute filed by Plaintiff Warren Beatty (pbap, ) (Entered: 03/16/2006) |
| 03/27/2006 | 43 | OBJECTIONS to Declaration of Warren Beatty in Opposition to Defendant's MOTION for Summary Judgment 32 filed by defendant Tribune Media Services Inc. (pbap, ) (Entered: 03/28/2006) |
| 03/27/2006 | 44 | OBJECTIONS to Declaration of Bertram Fields in Opposition to Defendant's MOTION for Summary Judgment 32 filed by defendant Tribune Media Services Inc. (pbap, ) (Entered: 03/28/2006) |
| 03/27/2006 | 45 | REPLY DECLARATION of Maura Wogan in Support of Defendant's MOTION for Summary Judgment 32 filed by Defendant Tribune Media Services Inc. (pbap, ) (Entered: 03/28/2006) |
| 03/27/2006 | 46 | REPLY DECLARATION of Michael A. Parks in Support of Defendant's MOTION for Summary Judgment 32 filed by defendant Tribune Media Services Inc. (pbap, ) (Entered: 03/28/2006) |
| 03/27/2006 | 47 | MEMORANDUM of Points and Authorities in Further Support of Defendant's MOTION for Summary Judgment 32 to FED.R.CIV.P.56 filed by defendant Tribune Media Services Inc. (pbap, ) (Entered: 03/28/2006) |

| 04/03/2006 | 48 | MINUTES OF Motion Hearing held before Judge Dean D. Pregerson. Court hears oral argument takes the MOTION for Summary Judgment 32 , under submission. Court Reporter: Maria Bustillos. (pbap, ) (Entered: 04/10/2006) |
| 07/11/2006 | | PLACED IN FILE - NOT USED re proposed judgment submitted by defendant Tribune Media Services Inc. (pbap, ) (Entered: 07/18/2006) |
| 07/11/2006 | | PLACED IN FILE - NOT USED re statement of uncontroverted facts and conclusions of law submitted by defendants Tribune Media Services Inc et al. (pbap, ) (Entered: 07/18/2006) |
| 07/14/2006 | 49 | ORDER DENYING Summary Judgment by Judge Dean D. Pregerson: For the foregoing reasons, the Court denies Defendants motion for summary judgment 32 . (See document for further details.) ((pcl, ) (Entered: 07/17/2006) |
| 07/18/2006 | 50 | NOTICE OF CLERICAL ERROR: Due to clerical error Re: Order Denying Summary Judgment 49 given incorrect ENTERED date. The correct ENTERED date is July 17, 2006. (pcl, ) (Entered: 07/18/2006) |
| 09/21/2006 | 51 | STIPULATION to Continue Discovery and Motion Cut-off dates AND ORDER by Judge Dean D. Pregerson : Resetting deadlines as to Scheduling Order, 31 Resetting Discovery cut-off to 11/29/2006. Motions due by 12/20/2006.(shb, ) (Entered: 09/25/2006) |
| 10/02/2006 | 52 | NOTICE OF MOTION AND MOTION for Leave to to file first amended answer with the counterclaims filed by defendant Tribune Media Services Inc. Motion set for hearing on 10/30/2006 at 10:00 AM before Judge Dean D. Pregerson. Lodged proposed first amended answer with counterclaim. (bp, ) (Entered: 10/04/2006) |
| 10/02/2006 | 53 | MEMORANDUM of Points and Authorities in Support of MOTION for Leave to to file first amended answer with the counterclaims 52 filed by defendant Tribune Media Services Inc. (bp, ) (Entered: 10/04/2006) |
| 10/02/2006 | 54 | DECLARATION of Maura J. Wogan in support of MOTION for Leave to to file first amended answer with the counterclaims 52 filed by defendant Tribune Media Services Inc. (bp, ) (Entered: 10/04/2006) |
| 10/02/2006 | 55 | NOTICE OF MOTION AND MOTION to Disqualify Counsel Bertram Fields filed by defendant Tribune Media Services Inc. Motion set for hearing on 10/30/2006 at 10:00 AM before Judge Dean D. Pregerson. (bp, ) (Entered: 10/05/2006) |
| 10/02/2006 | 56 | MEMORANDUM of points and authorities in Support of MOTION to Disqualify Counsel Bertram Fields 55 filed by defendant Tribune Media Services Inc. (bp, ) (Entered: 10/05/2006) |
| 10/02/2006 | 57 | DECLARATION of Maura J. Wogan in support of MOTION to Disqualify Counsel Bertram Fields 55 filed by defendant Tribune Media Services Inc. (bp, ) (Entered: 10/05/2006) |
| 10/16/2006 | 58 | MEMORANDUM of Points and Authorities in Opposition to MOTION for Leave to to file first amended answer with the counterclaims 52 filed by plaintiff Warren Beatty. (pbap, ) (Entered: 10/23/2006) |

| 10/16/2006 | 59 | DECLARATION of Charles N. Shepard in Opposition to MOTION for Leave to file first amended answer with the counterclaims 52 filed by plaintiff Warren Beatty. (pbap, ) (Entered: 10/23/2006) |
|---|---|---|
| 10/16/2006 | 60 | MEMORANDUM of Points and Authorities in Opposition to MOTION to Disqualify Counsel Bertram Fields 55 ; Declaration of Warren Beatty filed by plaintiff Warren Beatty. (pbap, ) (Entered: 10/23/2006) |
| 10/24/2006 | 62 | REPLY MEMORANDUM IN POITNS AND AUTHORITIES in further support of defendant MOTION to Disqualify Counsel Bertram Fields 55 as trial cou nsel pursuant ot Rule 5-210 of the California Rules of Professional Conduct filed by defendant Tribune Media Services Inc. (jp) (Entered: 11/07/2006) |
| 10/24/2006 | 63 | REPLY MEMORANDUM OF POINTS AND AUTHORITIES in support of defendant MOTION for to amended answer and add counterclaims 52 filed by defendant Tribune Media Services Inc. (jp) (Entered: 11/07/2006) |
| 10/24/2006 | 64 | REPLY DECLARATION of JOSEPH P. THORNTON in support of MOTION to Disqualify Counsel Bertram Fields 55 , and MOTION to amended answer and Add counterclaims 52 filed by defendant Tribune Media Services Inc. (jp) (Entered: 11/07/2006) |
| 10/24/2006 | 65 | REPLY DECLARATION of MAURA J. WOGAN in support of MOTION to Disqualify Counsel Bertram Fields 55 and MOTION to amended answer and add counterclaims 52 filed by defendant Tribune Media Services Inc. (jp) (Entered: 11/07/2006) |
| 10/25/2006 | 61 | MINUTES OF IN CHAMBERS held before Judge Dean D. Pregerson. COUNSEL ARE NOTIFIED that on the Court's own motion the MOTION to Disqualify Counsel Bertram Fields 55 , and MOTION for Leave to file first amended answer with the counterclaims 52 , Motions set for hearing on 10/30/06 are continued to 11/6/2006 at 10:00 AM.Court Reporter: none present. (pbap, ) (Entered: 10/27/2006) |
| 10/25/2006 | 66 | DECLARATION of CARL CHAVIS regarding Filing for Reply Papers 63 , 65 , Reply 62 , 64 filed by Defendant Tribune Media Services Inc. (jp) (Entered: 11/07/2006) |
| 11/06/2006 | 67 | MINUTES OF Motion Hearing held before Judge Dean D. Pregerson RE: MOTION to Disqualify Counsel Bertram Fields 55 , and MOTION for Leave to file first amended answer with the counterclaims 52 . Court hears oral argument and takes the matters under submission.Court Reporter: Maria Bustillos. (pbap, ) (Entered: 11/16/2006) |
| 11/16/2006 | | PLACED IN FILE - NOT USED re first amended answer to first amended complaint for declaratory relief, damages for breach of contract and injunctive relief; counterclaims submitted by defendant Tribune Media Services Inc. (pbap, ) (Entered: 11/17/2006) |
| 11/30/2006 | 68 | STIPULATION AND ORDER FOR DISMISSAL OF ACTION WITHOUT PREJUDICE by Judge Dean D. Pregerson. The parties shall each bear and be responsible for their own attorneys' fees and costs incurred in the litigation. (Made JS-6. Case Terminated.)(pbap, ) (Entered: 12/01/2006) |
| | | |

| 08/06/2007 | REPORT ON THE DETERMINATION OF AN ACTION Regarding a Copyright. (cc: Copyright Office) (Closing) (pbap) (Entered: 08/06/2007) |
|---|---|

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/08/2009 13:25:53 | | | |
| **PACER Login:** | sa0019 | **Client Code:** | 38331-90795-30470 |
| **Description:** | Docket Report | **Search Criteria:** | 2:05-cv-03938-DDP-SS End date: 7/8/2009 |
| **Billable Pages:** | 7 | **Cost:** | 0.56 |

# EXHIBIT G

As of April 28, 2005

Warren Beatty
c/o Greenberg, Gulsker, Fields, Claman, Machtinger & Kinsella, LLP
1900 Avenue of the Stars, Suite 2100
Los Angeles, CA 90067
Attn: Bertran Fields, Esq.

RE:    "DICK TRACY" – Quitclaim Agreement

Mr. Fields:

Reference is made to the memorandum of agreement dated as of March 10, 1988, including all attachments, exhibits and amendments thereto, between WALT DISNEY PICTURES ("WDP") and Mulholland Productions, Inc. ("Lender") (the "Agreement") for: (a) WDP to acquire all right, title and interest in and to the characters, story elements etc. in connection with the character "Dick Tracy" and all properties relating thereto (the "Property"); and (b) the writing, directing, acting and producing services of Warren Beatty ("Artist") in connection with the existing 1 motion picture entitled "DICK TRACY," directed by Artist, and starring Artist, Madonna, Al Pacino, etc. (the "Picture").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Conditions Precedent. WDP shall have no obligation to perform pursuant to this quitclaim agreement ("Quitclaim") and this Quitclaim shall not be effective unless and until WDP receives an executed copy of this Quitclaim (in form and substance acceptable to WDP).

2.    Quitclaim of Rights. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to WDP's "Reserved Rights" (as defined in Paragraph 3. below) and Lender's and Artist's full performance of the terms and conditions of this Agreement, WDP hereby quitclaims back to Artist all of WDP's rights and obligations previously assigned to WDP by Artist pursuant to Paragraph II. of the Agreement, including but not limited to any rights to produce or distribute any Subsequent Project (as defined in Paragraph 4. below), except as herein provided below as to theme parks rights (collectively, the "Rights").

3.    Reserved Rights. WDP reserves for WDP's exclusive use and disposition, and WDP expressly excludes from this Quitclaim of rights to Artist hereunder, the following:

a.    All right, title and interest in and to the Picture and all elements thereof, and all materials created in connection therewith of any kind or nature owned, controlled or retained by WDP as of the date of this Quitclaim ("Picture

1

Materials"), including without limitation, the copyright, the right to distribute, promote, advertise, market, exhibit and otherwise exploit the Picture and Picture Materials throughout the universe, in perpetuity; and any and all allied, ancillary, subsidiary, incidental and related rights, including any New Exploitation Rights (as defined in Paragraph 3.c. below), in and to the Picture and Picture Materials, including, without limitation, all merchandising, literary publishing, music publishing, soundtrack, live stage rights, etc., all subject to and in accordance with the Agreement.

b.    All right, title and interest in and to the "Nancy Kerrigan Ice Skating Special" ("Skating Special") and all elements thereof, and all materials created in connection therewith of any kind or nature owned, controlled or retained by WDP as of the date of this Quitclaim ("Skating Special Materials"), including without limitation, the copyright, the right to distribute, promote, advertise, market, exhibit and otherwise exploit, the Skating Special and Skating Materials throughout the universe, in perpetuity; and any and all allied, ancillary, subsidiary, incidental and related rights, including any New Exploitation Rights (as defined in Paragraph 3.c. below), in and to the Skating Special and Skating Special Materials, including, without limitation, all merchandising, literary publishing, music publishing, soundtrack, live stage rights, etc., all subject to and in accordance with the Agreement.

c.    The right to own and continue to distribute, promote, advertise, market, exhibit and otherwise exploit the Picture and the Skating Special in any and all media now known and unknown and by any means or device now know and unknown in perpetuity, throughout the universe; and any and all allied, ancillary, subsidiary, incidental and related rights in and to the Picture and the Skating Special, including, without limitation, all merchandising, literary publishing, music publishing, soundtrack, live stage rights, etc., all subject to and in accordance with the Agreement. Artist and WDP are aware and hereby acknowledge that new rights to the Picture and the Skating Special may come into being and/or be recognized in the future, under the law and/or in equity (hereafter the "New Exploitation Rights"), and WDP intends to and does hereby retain any and all such New Exploitation Rights to the Picture and the Skating Special. Artist and WDP are also aware and do hereby acknowledge that new (or changed) (1) technology, (2) uses, (3) media, (4) formats, (5) modes of transmission and (6) methods of distribution, dissemination, exhibition or performance (hereafter the "New Exploitation Methods") are being and will inevitably continue to be developed in the future, which would offer new opportunities for exploiting the Picture and the Skating Special. WDP intends and does hereby retain any and all rights to such New Exploitation Methods with respect to the Picture and the Skating Special. Artist hereby agrees to execute any document consistent herewith WDP deems in its interest to confirm the existence of the preceding and to effectuate its purpose to evidence the retention of such rights by WDP, including without limitation the New Exploitation Rights and any and all rights to the New Exploitation Methods. Artist further hereby agrees that Artist will not seek (1) to challenge, through the courts, administrative governmental bodies,

2

private organizations, or in any other manner the rights of WDP to exploit the Picture or the Skating Special by any means whatsoever or (2) to thwart, hinder or subvert the intent of the retention of rights by WDP herein and/or the collection by WDP of any proceeds relating to the rights retained by WDP hereunder;

    d.    Subject to Paragraph III.11. of the Agreement, the sole and exclusive right, in perpetuity, throughout the universe, to exercise all theme park rights with respect to the Picture, the Skating Special, the Property and any Subsequent Project (as defined in Paragraph 4. below), including without limitation the right to use the Picture and the Skating Special, the title of the Picture and the Skating Special, characters therefrom and elements thereof (including, without limitation, characters, scenes, music, costumes and sets and/or footage from the Picture) in WDP's (its parent and the subsidiaries, licensees and affiliates thereof, collectively "Disney" for purposes of this paragraph) existing and future theme parks, resorts, attractions, so-called location-based and/or regional entertainment centers, cruise ships and any of the foregoing licensed or operated by Disney (collectively, "Theme Parks"), and in any Disney-themed variety show (e.g., Disney's World-On-Ice or any Disney Circus) or other arena type show, in any manner and for any use, whether now known or hereafter invented or devised, including but not limited to, in connection with live shows in Theme Parks, theatrical stage performances in Theme Parks, so-called "walk-around" performances or characters and/or as the basis in whole or in part for any ride or attraction in any Theme Park, and to make sponsorship deals in connection with any of the foregoing, with no obligation whatsoever, financial or otherwise, to Artist. For purposes of clarification, WDP shall have no right (subject to WDP's rights as set forth in Paragraph 4. below) to theatrical exhibition or television exhibition of any Subsequent Project (as defined in Paragraph 4. below) based on the rights granted to Artist herein or to sell or rent any audio or audio visual recording of any Subsequent Project, regardless of the location of such exhibition, sale or rental unless as otherwise agreed to by Artist in writing; and

    e.    All right, title and interest in and to any and all materials owned, controlled, or retained by WDP created in connection with the Property, the Skating Special and the Picture, including, without limitation, any copyright, in and to any derivative works and elements thereof, of any kind or nature owned, controlled or retained by WDP as of the date of this Quitclaim, but not including any motion picture sequel, television sequel or other sequel or sequels to the Picture ("Other Materials") and the right to distribute, promote, advertise, market, exhibit and otherwise exploit, including any New Exploitation Rights (as defined in Paragraph 3.c. above), in perpetuity, throughout the universe, the Other Materials in any and all media now known and unknown and by any means or device now know and unknown, including any New Exploitation Methods (as defined in Paragraph 3.c. above) in perpetuity, throughout the universe; and any and all allied, ancillary, subsidiary, incidental and related rights, including any New Exploitation Rights, in and to the Other Materials, including, without limitation, all merchandising, literary publishing, music publishing, soundtrack, live stage rights, etc., all subject to and in accordance with the Agreement.

3

f.    Artist hereby irrevocably appoints WDP, or its nominee, as Artist's attorney-in-fact (which power is acknowledged by Artist to be coupled with an interest), with the right but not the obligation, for the sole benefit of WDP, and at WDP's expense, to bring, prosecute, defend and appear in suits, actions and proceedings of any nature under or concerning all copyrights in and to the Picture, any and all elements thereof, and all renewals thereof, or concerning any infringement of any such copyright or renewal copyright or any interference with any of the rights herein reserved by WDP; and to take such action as WDP may deem advisable to enforce, protect and/or defend any of the rights, privileges and property herein reserved by WDP under any and all such copyrights and renewals thereof, as well as any of the rights, licenses, privileges, warranties and agreements contained and/or set forth in any of the documents herein referred to, insofar as the same relate to the rights, privileges and property herein reserved by WDP; and to litigate, collect and receipt for all damages arising from any infringement of any such rights. Any such action may be taken by WDP in the name of Artist or otherwise, and WDP (at its sole discretion) may join Artist as a party plaintiff or defendant in any such suit, action or proceeding. In the event of the failure of Artist to do or cause to be done any and all acts and things necessary to obtain the renewal of any United States copyright involved, or in the event of the failure of Artist to execute and deliver or cause to be executed and delivered to WDP all instruments required in accordance with the provisions of this Quitclaim, Artist hereby irrevocably appoints WDP, or its nominee, as Artist's attorney-in-fact (which power is acknowledged by Artist to be coupled with an interest) in Artist's name and on Artist's behalf, with the right, but not the obligation, to do any and all acts and things necessary for the obtaining of such renewal copyright, and to execute and deliver all such instruments for the purposes aforesaid.

4.    _Distribution Rights_. WDP (or its affiliates) shall have the first negotiation right "Right of First Negotiation" to acquire the exclusive distribution and exploitation rights, including any New Exploitation Rights (as defined in Paragraph 3.c. above), in perpetuity, in and to any and all subsequent project(s) produced pursuant to the Rights granted to Artist hereunder ("Subsequent Project") in any and all media, now known and unknown and by any means or devise now known and unknown , including any New Exploitation Methods (as defined in Paragraph 3.c. above), as well as the right distribute, promote, market and advertise, exhibit and otherwise exploit by any means or in any manner, including any New Exploitation Methods, any and all allied, ancillary, subsidiary, incidental and related rights including any New Exploitation Rights, in and to the Subsequent Project ("Distribution Rights"), and the Right of First Refusal (as set forth herein below) to meet outside offers received by Artist with respect to the Distribution Rights. WDP's right to negotiate with respect to the Distribution Rights and the right to meet outside offers received by Artist with respect to the Distribution Rights shall be exercised in accordance with and subject to the following procedures:

a.    The term "Right of First Negotiation" means that prior to contacting any third parties, if Artist proposes to sell or otherwise dispose of the Distribution Rights, or any part thereof, Artist will so notify WDP in writing. Within fifteen

4

5.    <u>Assumption of Obligation</u>. In consideration of the Rights herein granted to Artist, Artist shall in WDP's place and stead, assume and fully perform each and all of the executory obligations, including without limitation each and all executory obligations to Tribune Media Services, Inc. in connection with the Rights to be hereafter kept and performed.

6.    <u>Representation and Warranties by Artist</u>. Artist represents and warrants that Artist will not take nor authorize any action which interferes with, infringes upon or, in any way, diminishes WDP's Reserved Rights as set forth in this Quitclaim; provided Artist's exercise of the Rights quitclaimed hereunder shall not be deemed a breach of this paragraph.

7.    <u>Representation and Warranties by WDP</u>. WDP: (a) makes no warranties or representations, express or implied with respect to the Rights except that WDP has not sold, transferred, assigned, or otherwise disposed of any of the Rights; and (b) will not take nor authorize any action which interferes with, infringes upon or, in any way, diminishes Artist's Rights as set forth in this Quitclaim; provided WDP's exercise of its Reserved Rights hereunder shall not be deemed a breach of this paragraph.

8.    <u>Release</u>. Lender and Artist release and discharge WDP and each of its affiliates, and the officers, directors, employees, agents, representatives and employees of each of them, from any and all charges, complaints, claims, demands, liabilities, actions, causes of action of any nature which are known or suspected, relating or referring to: (1) paragraph 9 of the August 28, 1985 agreement between Tribune Media Services, Inc. ("TMS") and Artist (the "Tribune Agreement"), and any amendments thereto; and (2) any and all provisions of the Agreement relating to Lender or Artist's right to produce for his or their own account a motion picture prior to TMS effecting a reversion of any rights pursuant to paragraph 9 of the Tribune Agreement, including but not limited to paragraph 3 of Section IV of the Agreement.

9.    <u>Indemnification by Artist</u>. Artist shall indemnify, and otherwise hold WDP, its officers, directors, employees, agents, representatives, affiliates, successors and assigns, free and harmless from and against any and all liabilities, claims, demands, damages and costs (including reasonable outside attorneys' fees) arising out of or resulting from: (a) the breach of any provisions of this Quitclaim; or (b) the development, production, distribution and exploitation of any Subsequent Project.

10.    <u>Indemnification by WDP</u>. WDP shall indemnify and otherwise hold Artist from and against any and all liabilities, claims, demands, damages and costs (including reasonable outside attorneys' fees) arising out of or resulting from: (a) any breach by WDP of any term or condition of this Quitclaim; or (b) the development, production, distribution and exploitation of WDP's Reserved Rights subject to the Artist's obligations under the Agreement and other applicable provisions of the Agreement.

Except as specifically set forth herein, all provisions of the Agreement shall remain in full force and effect and may not be modified except by a writing executed by

6

all parties to the Agreement. Each capitalized term used herein and not specifically defined herein shall have the meaning ascribed thereto in the Agreement.

If the foregoing correctly represents your understanding of the parties' agreement, please so acknowledge and accept as provided below.

WALT DISNEY PICTURES

By: _____

Its:     KAL J. WALTHERS
         SENIOR VICE PRESIDENT
         BUSINESS AFFAIRS

ACCEPTED AND AGREED:

_____
WARREN BEATTY

7

# EXHIBIT H

Maura J. Wogan Esq.
Cameron A. Myler, Esq..
FRANKFURT KURNIT KLEIN & SELZ, PC
488 Madison Avenue
New York, New York 10022
Telephone: (212) 980-0120
Fax: (212) 593-9175

Peter J. Anderson, Esq., SBN 088891
LAW OFFICES OF PETER J. ANDERSON, A P.C.
100 Wilshire Boulevard, Suite 2010
Santa Monica, CA 90401
Telephone: (310) 260-6030
Fax: (310) 260-6040

Attorneys for Defendants
TRIBUNE MEDIA SERVICES, INC.,
ROBERT NEWMYER, SCOTT STRAUSS, LORENZO
DI BONAVENTURA and SOFITED, INC., dba
OUTLAW PRODUCTIONS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

WARREN BEATTY,

    Plaintiff,

    vs.

TRIBUNE MEDIA SERVICES, INC.,
ROBERT NEWMYER, SCOTT
STRAUSS, LORENZO
DI BONAVENTURA, OUTLAW
PRODUCTIONS and DOES 1 through 10,

    Defendants.

Case No. CV05-3938 DDP(SSx)

DEFENDANTS' NOTICE OF
MOTION AND MOTION TO
DISMISS PURSUANT TO FED. R.
CIV. P. 12(B)(1) AND 12(B)(6)

Date: July 18, 2005
Time: 10:00 a.m.

Courtroom of the Honorable
Dean D. Pregerson
United States District Judge

1  TO PLAINTIFF WARREN BEATTY AND HIS ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that on July 18, 2005, at 10:00 a.m. or as soon

3  thereafter as the matter may be heard by the above-entitled District Court, located at

4  312 North Spring Street, Los Angeles, California 90012, defendants Tribune Media

5  Services, Inc., Robert Newmyer ("Newmyer"), Scott Strauss ("Strauss"), Lorenzo di

6  Bonaventura ("di Bonaventura") and Sofited, Inc. d/b/a Outlaw Productions

7  ("Sofited") will move the Honorable Dean D. Pregerson, United States District Judge,

8  for an Order dismissing this action for lack of subject matter jurisdiction and for failure

9  to state a claim upon which relief can be granted. This motion is made on the grounds

10  that plaintiff Warren Beatty has:

11       1.     no standing to bring any of the claims alleged against Defendants

12  [Fed. R. Civ. P. 12(b)(1)]; or alternatively

13       2.     no standing to bring any of the claims alleged against Defendants

14  [Fed. R. Civ. P. 12(b)(6)]; and

15       3.     failed to state a claim against defendants Newmyer, Strauss, di

16  Bonaventura and Sofited because those defendants are not parties to the

17  agreement at issue in the First Claim for Declaratory Relief and Third Claim for

18  breach of contract. [Fed. R. Civ. P. 12(b)(6)].

19  This Motion is based upon this Notice of Motion and Motion, the Memorandum of

20  Points and Authorities and the Declaration filed with Notice of Motion and Motion, the

21  pleadings and papers on file in this action and such additional matters as may be

22  offered in support of the Motion.

23  ///

24  ///

25  ///

26  ///

27  ///

28

1    This Motion is brought following the conference of defendants' counsel and

2  plaintiff's counsel pursuant to this Court's Local Rule 7-3 and which took place on

3  May 31, 2005.

4

5                                      Respectfully Submitted,

6

7  Dated: June 10, 2005

8                              Maura J. Wogan, Esq.
                               Cameron A. Myler, Esq.
9          FRANKFURT KURNIT KLEIN & SELZ, P.C.

10                              Attorneys for Defendants
                           TRIBUNE MEDIA SERVICES, INC.,
11                        ROBERT NEWMYER, SCOTT STRAUSS,
                            LORENZO DI BONAVENTURA and
12                               SOFITED, INC., dba
                               OUTLAW PRODUCTIONS

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>PROOF OF SERVICE</u>

<u>STATE OF CALIFORNIA, COUNTY OF LOS ANGELES</u>

I am employed in the County of Los Angeles, State of California and my business address is 100 Wilshire Boulevard, Suite 2010, Santa Monica, CA 90401. I am over the age of 18 and not a party to this action.

On June 13, 2005, I served the foregoing document described as **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6)**, on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope at Santa Monica, California, addressed as follows:

Bertram Fields, Esq.
Greenberg Glusker Fields Claman
Machtinger & Kinsella LLP
1900 Avenue of the Stars
Suite 2100
Los Angeles, CA 90067-4590

☐   I caused such envelope with postage thereon fully prepaid to be placed in the United States mail. I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing with the United States Postal Service. Correspondence for mailing is deposited with the United States Postal Service on that same day in the ordinary course of business. The foregoing document was sealed and placed for collection and mailing on the foregoing date, following the firm's ordinary practices. I am aware that on motion of any party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in the affidavit.

☒   I caused such envelope to be hand delivered to the offices of the addressee.

☐   I placed such envelope in a box or other facility regularly maintained by Federal Express, in an envelope or package designated and provided by Federal Express, with delivery fees paid or provided for, addressed to the above-indicated addressees.

☐   I caused a copy of the foregoing document to be faxed to the addressee.

Executed on June 13, 2005 at Santa Monica, California. I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

# EXHIBIT I

FILED
CLERK, U.S. DISTRICT COURT

AUG 1 0 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

✓ **Priority**
✓ **Send**
__ **Clsd**
✓ **Enter**
_NO_ ~~JS-5~~/JS-6
__ **JS-2/JS-3**
__ **Scan Only**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WARREN BEATTY,                    )    Case No. CV 05-03938 DDP (SSx)
                                  )
              Plaintiff,          )    **ORDER DENYING MOTION TO DISMISS**
                                  )
        v.                        )    [Motion filed on 6/13/05]
                                  )
TRIBUNE MEDIA SERVICES,           )
INC., ROBERT NEWMYER, SCOTT       )
STRAUSS, LORENZO DI               )
BONAVENTURA, OUTLAW               )
PRODUCTIONS,                      )
                                  )
              Defendants.         )
_____   )



ENTERED
CLERK, U.S. DISTRICT COURT

AUG 1 0 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

     This matter is before the Court on the defendants' motion to
dismiss the first amended complaint.  After reading the papers
submitted by the parties, and hearing oral argument, the Court
denies the defendants' motion.

## I. Background

     The plaintiff, Warren Beatty, is an actor, writer, and
director of motion pictures.  The defendant, Tribune Media Services
("Tribune"), is a corporation that owned the copyright in the
cartoon character Dick Tracy and held rights in various works

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

1  embodying that character. (First Am. Compl. ("FAC") ¶ 4.)

2  Defendants Robert Newmyer, Scott Strauss, Lorenzo di Bonaventura,

3  and Outlaw Productions (collectively, the "Outlaw Defendants") are

4  parties which Tribune has purportedly licensed to exploit certain

5  Dick Tracy rights. (Mot. at 3.)

6      On August 28, 1985, Tribune granted to the plaintiff, through

7  a written agreement (the "Beatty Agreement"), motion picture,

8  television, and other rights in the Dick Tracy character (the

9  "Tracy Rights"). (FAC ¶ 5.) Paragraph 9 of the Beatty Agreement

10 provided a procedure through which Tribune could recapture the

11 Tracy Rights from the plaintiff. (Id.) The procedure provided

12 that if the plaintiff failed to commence production of a Dick Tracy

13 project within five years after his initial Dick Tracy movie

14 production or project, then Tribune could notify the plaintiff and

15 his attorney in writing that it intended to recapture the rights if

16 the plaintiff did not commence a Dick Tracy project within the next

17 two years. If the plaintiff did not then commence such a project

18 within two years, Tribune could notify the plaintiff and effect a

19 reversion of the Tracy Rights. (Id.)

20     On March 10, 1988, the plaintiff granted certain rights that

21 he had received under the Beatty Agreement to Walt Disney Pictures

22 ("Disney"). (Id. ¶ 6.) The plaintiff contends that he reserved

23 the right to produce, for his own account, a Dick Tracy project

24 during the last eighteen months of the two-year recapture

25 notification period. (Id.) Tribune concedes that it consented to

26 the plaintiff's transfer of rights to Disney, but argues that no

27 reservation of rights occurred, and that if such reservation was

28 attempted, it was not made with Tribune's consent.

2

In 1990, Disney released a Dick Tracy motion picture (the "First Tracy Movie"). (Id. ¶ 8.) During 1994 and 1995, Disney produced an ice show with the Dick Tracy character, which apparently qualified as a project under the Beatty Agreement. (Id. ¶ 9.)

In July 2002, Tribune contacted Disney by letter, inquiring whether Disney would permit Tribune to recapture the Tracy Rights without undergoing the reversion procedures established in the Beatty Agreement. (Id. ¶ 10.) Disney evidently declined to waive its rights under the reversion provision. (Id.) Tribune allegedly did not notify the plaintiff or his attorney of this request. (Id.)

In September 2002, Tribune sent another letter to Disney in which it claimed that it had already effected a reversion of the Tracy Rights and that Disney had forfeited any right to produce another Dick Tracy project. (Id. ¶ 11.) Tribune allegedly did not notify the plaintiff or his attorney of the alleged reversion. (Id.)

In October 2004, Tribune notified Disney in writing that the Tracy Rights had reverted to Tribune. (Id. ¶ 12.) Again, the plaintiff alleges that Tribune did not notify him of its position regarding the alleged reversion. (Id.)

In May 2005, Disney allegedly returned to the plaintiff the Tracy Rights that the plaintiff had granted to it, except for theme park rights and rights to exploit the previously produced Dick Tracy projects. (Id. ¶ 15.)

The parties now dispute who is the current owner of the Tracy Rights. Tribune, which asserts it is the owner, has allegedly

3

1 licensed the rights it previously granted to the plaintiff to the

2 other named defendants, Newmyer, Strauss, di Bonaventura, and

3 Outlaw Productions.  (Mot. to Remand Memo. at 3.)

4     On May 13, 2005, the plaintiff commenced this action in Los

5 Angeles Superior Court.  On May 19, 2005, the plaintiff filed his

6 amended complaint, seeking a declaration of the rights and

7 obligations of the parties, including: a) that Tribune did not give

8 Disney or the plaintiff formal notice to begin the recapture

9 period; b) that Tribune's July 2002 inquiry did not comply with the

10 reversion provision in the Beatty Agreement and that the September

11 2002 did not effect a reversion of the Tracy Rights; c) that the

12 Tracy Rights have not reverted to Tribune; d) that notice to begin

13 the recapture period has never been given; e) that the two year

14 recapture period has never started to run; f) that no assignment of

15 the Tracy Rights from the plaintiff to Tribune is valid or

16 enforceable without the plaintiff's signed agreement; and g) that

17 none of the defendants have any or all of the Tracy Rights.

18 Additionally, the plaintiff seeks damages for Tribune's alleged

19 breach of contract and repudiation of the Beatty Agreement in an

20 amount exceeding $30 million; injunctive relief enjoining the

21 defendants from exploiting any of the Tracy Rights granted to the

22 plaintiff under the Beatty Agreement; and 4) costs and other proper

23 relief.  (FAC ¶ 19).

24     On May 31, 2005, the defendants removed the case to this Court

25 on the grounds that the action arises under the Copyright Act and

26 thus, this Court has subject matter jurisdiction.  This motion to

27 remand was filed on June 13, 2005, the same date on which the

28 defendants filed a concurrent motion to remand the action.

## II. Discussion

### A.  Legal Standards

A Rule 12(b)(1) motion is the proper method to dismiss an action when subject matter jurisdiction is lacking. <u>Demarest v. United States</u>, 718 F.2d 964, 965 (9th Cir. 1983). The existence of disputed material facts does not preclude the court from evaluating the merits of the jurisdictional claims. <u>St. Clair v. City of Chico</u>, 880 F.2d 199, 201 (9th Cir. 1989). When considering a Rule 12(b)(1) motion challenging the substance of jurisdictional allegations, the Court may look beyond the complaint. <u>White v. Lee</u>, 227 F.3d 1214, 1242 (9th Cir. 2000) (district court may consider extrinsic evidence when deciding a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction).

Dismissal under 12(b)(6) is appropriate when it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations set forth in the complaint. <u>Newman v. Universal Pictures</u>, 813 F.2d 1519, 1521-22 (9th Cir. 1987). The court must view all allegations in the complaint in the light most favorable to the non-movant and must accept all material allegations - as well as any reasonable inferences to be drawn from them - as true. <u>North Star Int'l v. Arizona Corp. Comm'n</u>, 720 F.2d 578, 581 (9th Cir. 1983). The court need not accept conclusory legal assertions as true. <u>Benson v. Arizona State Bd. of Dental Exam'rs</u>, 673 F.2d 272, 275-76 (9th Cir. 1982).

### B.  Application

#### 1.  Claims against Tribune

The defendants contend that the plaintiff owns no part of the Tracy Rights and, therefore, that he lacks standing to assert any

5

1 claims against the defendants based on those rights.  Accordingly,

2 the defendants have filed a motion to dismiss the case for lacks of

3 subject matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1).  The

4 defendants also assert that because Beatty owns no part of the

5 Tracy Rights he cannot prove any set of facts that would support

6 his claims.  Therefore, the defendants argue, the Court could also

7 dismiss the complaint for failure to state a claim on which relief

8 can be granted.  See Fed. R. Civ. P. 12(b)(6).

9     According to the defendants, the plaintiff transferred all of

10 the Tracy Rights to Disney in 1988 and no longer owns any part of

11 those rights.  The defendants also argue that the alleged return of

12 Tracy Rights from Disney to the plaintiff in 2005 is invalid under

13 the Copyright Act.  See Gardner v. Nike, Inc., 279 F.3d 774 (9th

14 Cir. 2002) (holding that rights under an exclusive copyright

15 license could not be assigned without the original licensor's

16 consent and holding that assignee lacked standing to sue); see also

17 Silvers v. Sony Pictures Entertainment, Inc., 402 F.3d 881, 887

18 (9th Cir. 2005).

19     The plaintiff's counter-arguments draw attention to the basic

20 factual disputes and issues of contract interpretation that lie at

21 the heart of this case.  The plaintiff argues that when he

22 transferred rights to Disney in 1998, he reserved the right to

23 produce, for his own account, a Dick Tracy project during the last

24 18 months of the two-year recapture period.  He contends that this

25 reserved right confers standing and entitles him to the relief

26 requested.  The defendants contend that no reservation of rights

27 occurred, and, if such a reservation was attempted, it was not made

28 with Tribune's consent.

1    The plaintiff has provided support for his argument that a

2  reservation of rights actually occurred by attaching the agreement

3  between Disney and Beatty.  (Fields Decl., Ex. A, Agreement Between

4  Walt Disney Pictures and Mulholland Productions, Inc. for the

5  Services of Warren Beatty ("1988 Beatty/Disney Agreement") at 7.)

6  The relevant language of the 1988 Beatty/Disney Agreement states:

7        If WDPc fails to exercise such remake and/or sequel
         rights prior to eighteen months before said remake
8        and/or sequel rights expire (but in no event on or
         before 3-1/2 years after release of the prior Picture)
9        then Lender may set up such remake and/or sequel with a
         third party . . . .
10

11  (Id.)  The parties dispute the correct interpretation and effect of

12  this language.  The Court finds that the dispute involves issues of

13  contract interpretation that cannot be adequately addressed on the

14  instant motion to dismiss.  The Court finds, however, that if the

15  plaintiff is ultimately able to show that he did, in fact, reserve

16  a legally-enforceable right to produce a second motion picture

17  based on the Tracy rights, then it follows that he is likely to

18  have a basis for establishing standing and stating certain claims.

19      The plaintiff also argues that he has standing and a legal

20  basis for his claims based on the set of rights that Disney

21  allegedly conveyed back to him in 2005 (the "2005 Rights").  In

22  support of his assertion that this transfer of rights occurred, the

23  plaintiff has attached a copy of the April 28, 2005 Quitclaim

24  Agreement between him and Disney.  (Fields Decl., Ex. B.)

25      As detailed in the concurrent tentative opinion for the

26  plaintiff's motion to remand, the defendants argue that the alleged

27  transfer of the 2005 Rights was analogous to Gardner and was

28  invalid under the Copyright Act.  The plaintiff counters that

7

1  Gardner is inapposite because the transfer of rights in 1985 from

2  Tribune to Beatty constituted an assignment of rights, rather than

3  an exclusive license, and, therefore, that the Copyright Act was

4  not violated when Disney returned the Tracy Rights to Beatty in

5  2005 without Tribune's consent.  Beatty's argument is based on the

6  principle that an assignee, unlike an exclusive licensee, can

7  transfer rights without the original assignor's consent.  If the

8  plaintiff's characterization of the 1985 transfer of rights is

9  correct, then the case at hand may be distinguishable from

10 Gardner and Beatty may possess a set of Tracy rights as a result of

11 the 2005 transfer.  In any event, the nature of the 1985 transfer

12 of rights from Tribune to Beatty contains issues of contract

13 interpretation and mixed questions of fact and law that cannot be

14 properly determined at this stage in the proceedings; such issues

15 are more appropriately addressed on a motion for summary judgment.

16     Based on the foregoing the Court finds that the plaintiff will

17 likely be able to demonstrate standing to state his claims.  The

18 Court finds that the plaintiff has stated claims against the

19 defendants on which relief could be granted.

20          ii.  Outlaw Defendants

21     The defendants argue that the Court should dismiss the

22 plaintiff's claims for declaratory and injunctive relief against

23 the Outlaw Defendants because they are not parties to the

24 contractual agreement on which the plaintiff bases his claims.

25 (Mot. at 15.)  They cite Levine v. McDonald's Corporation for the

26 proposition that declaratory relief is not permitted against

27 defendants who are not party to a contract.  1979 U.S. Dist. LEXIS

28 1171 at *8 (D. Ariz. June 12, 1979) (dismissing defendants who were

1  not parties to the contract at issue because "any declaratory

2  judgment will not affect them.")

3      The plaintiff contends that his claims against the Outlaw

4  Defendants are valid because they claim to hold Tracy Rights that

5  belong to the plaintiff.  (Opp'n at 11-12).  He argues that he

6  should be able to bring claims for declaratory and injunctive

7  relief against anyone who claims ownership rights in conflict with

8  his own.  (Id.)

9  ///

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

9

1  Although the Outlaw Defendants are not parties to the
2  contracts in dispute, they have not disputed the plaintiff's
3  contention that they claim to hold the Tracy Rights and are
4  intending to exploit them.  Injunctive relief is available in
5  copyright actions, even where there has been no past infringement.
6  Nimmer states, "A lawsuit solely for declaratory relief as to
7  future conduct, enforced through an injunctive decree, is a
8  respectable device within the annals of copyright law."  Melville
9  B. Nimmer & David Nimmer, Nimmer on Copyright § 14.06[B] (2004).
10 Further, section 502(a) of the Copyright Act authorizes the court
11 to "grant temporary and final injunctions on such terms as it may
12 deem reasonable *to prevent or restrain* infringement of a
13 copyright." 17 U.S.C. § 502(a) (emphasis added); see also MAI Sys.
14 Corp. v. Peak Computer, Inc., 991 F.2d 511, 520 (9th Cir. 1993)
15 ("While there has been no showing that Peak has actually loaned out
16 an MAI software, the threat of a violation is clear as Peak has MAI
17 computers in its loaner inventory.  The permanent injunction is
18 upheld as it relates to this issue.")  Accordingly, the Court
19 denies the defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss
20 against the Outlaw Defendants.

21
22 **III. Conclusion**
23     For the foregoing reasons, the Court denies the defendants'
24 motion to dismiss the complaint.
25 IT IS SO ORDERED.
26
27 Dated: 8-9-05
28                                          DEAN D. PREGERSON
                                           United States District Judge

10

# EXHIBIT J

1  Maura J. Wogan Esq.
   Cameron A. Myler, Esq.
2  FRANKFURT KURNIT KLEIN & SELZ, PC
   488 Madison Avenue
3  New York, New York 10022
   Telephone: (212) 980-0120
4  Fax: (212) 593-9175

5  Peter J. Anderson, Esq., SBN 088891
   LAW OFFICES OF PETER J. ANDERSON, A P.C.
6  100 Wilshire Boulevard, Suite 2010
   Santa Monica, CA 90401
7  Telephone: (310) 260-6030
   Fax: (310) 260-6040
8
   Attorneys for Defendant
9  TRIBUNE MEDIA SERVICES, INC.,

10

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13                   WESTERN DIVISION

14  WARREN BEATTY,                    )  Case No. CV05-3938 DDP(SSx)
                                      )
15          Plaintiff,               )  DEFENDANT'S NOTICE OF
                                      )  MOTION AND MOTION FOR
16      vs.                          )  SUMMARY JUDGMENT
                                      )
17  TRIBUNE MEDIA SERVICES, INC.,    )
    ROBERT NEWMYER, SCOTT            )
18  STRAUSS, LORENZO                 )  Date:  April 3, 2006
    DI BONAVENTURA, OUTLAW           )  Time:  10:00 a.m.
19  PRODUCTIONS and DOES 1 through 10, )  Place: Courtroom of the Honorable
                                      )         Dean D. Pregerson
20          Defendants.              )         United States District Judge
                                      )
21  _____  )

22

23

24

25

26

27

28

TO PLAINTIFF WARREN BEATTY AND HIS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 3, 2006, at 10:00 a.m., or as soon thereafter as the matter may be heard by the above-entitled District Court, located at 312 North Spring Street, Los Angeles, California 90012, defendant Tribune Media Services, Inc. ("TMS") will move for Summary Judgment, pursuant to Fed. R. Civ. P. 56.

Defendant TMS Motion is made on the grounds that there are no genuine issues as to any material fact and defendant is entitled to a judgment as a matter of law because plaintiff Warren Beatty has no standing to bring any of the claims alleged in the First Amended Complaint against defendant.

This Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Statement of Uncontroverted Facts and the Declarations filed with this Notice of Motion and Motion, the pleadings and papers on file in this action and such additional matters as may be offered in support of the Motion.

This Motion is brought following the conference of defendant's counsel and plaintiff's counsel pursuant to this Court's Local Rule 7-3 and which took place on January 4, 2006 and other occasions.

Respectfully submitted,

Dated: February 6, 2006

Maura J. Wogan
Cameron A. Myler
FRANKFURT KURNIT KLEIN & SELZ, PC
Attorneys for Defendant

TRIBUNE MEDIA SERVICES, INC.

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California and my business address is 100 Wilshire Boulevard, Suite 2010, Santa Monica, CA 90401. I am over the age of 18 and not a party to this action.

On February 6, 2006, I served the foregoing document described as **DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT,** on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope at Santa Monica, California, addressed as follows:

Bertram Fields, Esq.
Greenberg Glusker Fields Claman
 Machtinger & Kinsella LLP
1900 Avenue of the Stars
Suite 2100
Los Angeles, CA 90067-4590

☐     I caused such envelope with postage thereon fully prepaid to be placed in the United States mail. I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing with the United States Postal Service. Correspondence for mailing is deposited with the United States Postal Service on that same day in the ordinary course of business. The foregoing document was sealed and placed for collection and mailing on the foregoing date, following the firm's ordinary practices. I am aware that on motion of any party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in the affidavit.

☒     I caused such document to be delivered by hand to the offices of the addressee.

☐     I placed such envelope in a box or other facility regularly maintained by Federal Express, in an envelope or package designated and provided by Federal Express, with delivery fees paid or provided for, addressed to the above-indicated addressees.

☐     I caused a copy of the foregoing document to be faxed to the addressee.

Executed on February 6, 2006 at Santa Monica, California. I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

1   Maura J. Wogan Esq.
    Cameron A. Myler, ESQ.
2   FRANKFURT KURNIT KLEIN & SELZ, PC
    488 Madison Avenue
3   New York, New York 10022
    Telephone: (212) 980-0120
4   Fax: (212) 593-9175

5   Peter J. Anderson, Esq., SBN 088891
    LAW OFFICES OF PETER J. ANDERSON, A P.C.
6   100 Wilshire Boulevard, Suite 2010
    Santa Monica, CA 90401
7   Telephone: (310) 260-6030
    Fax: (310) 260-6040

8
    Attorneys for Defendants
9   TRIBUNE MEDIA SERVICES, INC.,
    ROBERT NEWMYER, SCOTT STRAUSS, LORENZO
10  DI BONAVENTURA and SOFITED, INC., dba
    OUTLAW PRODUCTIONS

11

12              UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14                    WESTERN DIVISION

15  WARREN BEATTY,                   )  Case No. CV05-3938 DDP(SSx)
                                     )
16            Plaintiff,             )
                                     )  STATEMENT OF
17       vs.                         )  UNCONTROVERTED FACTS AND
                                     )  CONCLUSIONS OF LAW
18  TRIBUNE MEDIA SERVICES, INC.,    )
    ROBERT NEWMYER, SCOTT            )
19  STRAUSS, LORENZO                 )
    DI BONAVENTURA, OUTLAW           )  Date:  April 3, 2006
20  PRODUCTIONS and DOES 1 through 10, )  Time: 10:00 a.m.
            Defendants.              )  Place: Courtroom of the Honorable
21                                   )        Dean D. Pregerson
                                     )        United States District Judge
22  ─────────────────────────────── )

23

24

25

26

27

28

The Motion of defendant Tribune Media Services, Inc. ("TMS") for Summary Judgment on the First Amended Complaint ("FAC") filed by plaintiff Warren Beatty ("Beatty") came on regularly for hearing before the Honorable Dean D. Pregerson, United States District Judge, at 10:00 a.m. on April 3, 2006.  The Court, having considered the papers filed in support of defendant's Motion and in opposition to that Motion, and the argument of counsel, finds that the following facts are uncontroverted:

## UNCONTROVERTED FACTS

**The Dick Tracy Agreement**

1.     TMS is the original and sole owner of the copyright and all other rights in the *Dick Tracy* character, comic strip and certain other derivative works based on the comic strip and character (the "Dick Tracy Property").  Declaration of Michael A. Parks In Support Of Defendant's Motion For Summary Judgment ("Parks Decl.") ¶ 2; Exhibit to Parks Decl. ("Parks Ex.") 1.

2.     On or about August 28, 1985, TMS and Warren Beatty ("Beatty") entered into a written agreement (the "Dick Tracy Agreement"), pursuant to which TMS granted Beatty an exclusive license in the motion picture, television, and customary related rights in the Dick Tracy Property.  Parks Decl. ¶ 3; Parks Ex. 2.

3.     The Dick Tracy Agreement delineated the rights that TMS retained for itself, namely: "all rights in and to the property not specifically granted to Mr. Beatty, including, without limitation, animation, comic strip, publishing . . . merchandising, radio, cartoon syndication, and live stage rights."  Parks Decl. ¶ 4; Parks Ex. 2 ¶ 7.

///
///
///
///

**The Amendment**

4.    On or about May 15, 1988, TMS and Beatty amended the Dick Tracy Agreement "with respect to the grant of certain rights to the Dick Tracy Property" (the "Amendment").  Parks Decl. ¶ 5; Parks Ex. 3, introductory paragraph.

5.    In the Amendment, Beatty and TMS agreed that "[u]pon full execution hereof, Mr. Beatty shall assign his rights and obligations hereunder to Walt Disney Pictures. . . ."  Parks Decl. ¶ 6; Parks Ex. 3 ¶ 1.

6.    The Amendment expressly acknowledged TMS's approval of Beatty's assignment of his rights in the Dick Tracy Property to Walt Disney Pictures: "TMS hereby consents to such assignment."  Parks Decl. ¶ 7; Parks Ex. 3 ¶ 1.

7.    The Amendment included no terms that provided for the retention or reservation of rights by Beatty in the Dick Tracy Property after the execution of the Amendment.  Parks Decl. ¶ 8; *see* Parks Ex. 3.

**The Disney Amendment**

8.    On or about January 25, 1995 TMS and Walt Disney Pictures entered into an agreement to further amend the Dick Tracy Agreement (the "Disney Amendment"). Parks Decl. ¶ 9; *see* Parks Ex. 4.

9.    In the Disney Amendment, TMS and Walt Disney Pictures confirmed that "Beatty assigned his rights and obligations in the [Dick Tracy Agreement], as amended, to Walt Disney Pictures."  Parks Decl. ¶ 10; Parks Ex. 4, introductory paragraph.

///
///
///
///

**Reversion of Rights in the Dick Tracy Property to TMS**

10.    Sometime in 1990, Walt Disney Pictures released a theatrical motion picture entitled *Dick Tracy* based on the Dick Tracy Property (the "Movie").  Parks Decl. ¶ 11; Parks Ex. 5 ¶ 8.

11.    Since the release of the Movie, Walt Disney Pictures' only exploitation of the Dick Tracy Property was a 1995 ice skating show featuring a Dick Tracy character. Parks Decl. ¶ 12; Parks Ex. 5 ¶ 9.

12.    Apart from any continued exploitation of the Movie, Walt Disney Productions has not exploited the Dick Tracy Property since 1995.  Parks Decl. ¶ 13.

13.    In October 2004 (and on several earlier occasions), TMS notified Walt Disney Pictures that the rights to the Dick Tracy Property had reverted to TMS pursuant to the terms of the Dick Tracy Agreement and the Amendment and that TMS intended to exploit those rights.  Parks Decl. ¶ 14; Parks Ex. 5, ¶¶ 10-12.

14.    Beatty claims that the rights in the Dick Tracy Property did not revert to TMS and instead are owned by him.  Parks Decl. ¶ 15; Parks Ex. 5, ¶¶ 13-15.

**The Alleged Reservation of Rights By Beatty Pursuant to the 1988 Disney/Beatty Agreement**

15.    Beatty alleges in the FAC that, at the time he assigned his rights to Walt Disney Pictures in 1988, he reserved certain rights "to produce for his own account, a Dick Tracy project."  Parks Decl. ¶ 16; Parks Ex. 5 ¶ 6.

16.    Beatty's claim that he retained rights in the Dick Tracy Property is based on the so-called "Agreement between Walt Disney Pictures and Mulholland Productions, Inc. (for the Services of Warren Beatty) dated as of March 10, 1988 for the Theatrical Motion Picture entitled Dick Tracy" (the "1988 Disney/Beatty Agreement").  Parks Decl. ¶ 17; *see* Parks Exs. 5 and 6.

17.    However, the 1988 Disney/Beatty Agreement stated that "upon the signing of this Agreement, the rights [under the Dick Tracy Agreement] shall vest in

1  [Beatty] and be assigned to [Walt Disney Pictures] pursuant to the terms hereof."

2  Parks Decl. ¶ 18; Parks Ex. 6, Article IV(1)(h)(i).

3       18.    Thus, on or about September 7, 1988, Warren Beatty executed a "Short

4  Form Assignment," (Exhibit D to the 1988 Disney/Beatty Agreement) which provided

5  that:

6      . . . Warren Beatty and [his personal services corporation] (collectively

7      "Assignors"), do hereby transfer to Walt Disney Pictures ("Assignee") all

8      present and future right, title and interest that Assignors own, control, have

9      obtained, or shall in the future obtain, from the Tribune Media Services . . .

10      and any other party, including without limitation, such worldwide theatrical

11      motion picture, television, and allied and incidental rights, under copyright

12      or otherwise in perpetuity, in and to the characters, story elements, etc. as

13      they have acquired in connection with the character Dick Tracy and all

14      properties relating thereto

15  Parks Decl. ¶ 19; *see* Parks Ex. 7.

16       19.    TMS is not, and has never been, a party to the 1988 Disney/Beatty

17  Agreement. Parks Decl. ¶ 20; See Parks Ex. 6.

18       20.    Prior to this litigation, TMS had not seen the 1988 Disney/Beatty

19  Agreement and was not aware of its contents. Parks Decl. ¶ 21.

20       21.    TMS did not approve of and had not consented to any reservation of rights

21  in the Dick Tracy Property by Beatty. Parks Decl. ¶ 22.

22       22.    The 1988 Disney/Beatty Agreement acknowledged that only "certain"

23  rights were granted to Beatty by TMS under the Dick Tracy Agreement. Parks Decl. ¶

24  23; Parks Ex. 6, Article IV(1)(h).

25  ///

26  ///

27  ///

28  ///

**The Alleged Reversion of Rights to Beatty Pursuant to the 2005 Disney/Beatty Agreement**

23.      Beatty also has alleged in the FAC that, "[d]uring May 2005, Disney reassigned to Beatty the rights under the [Dick Tracy Agreement] that he had previously assigned to Disney. . ." Parks Decl. ¶ 24; Parks Ex. 5 ¶ 14.

24.      Beatty's claim concerning such reassignment is based solely on the so-called "Quitclaim Agreement" between Walt Disney Pictures and Beatty, entered into as of April 28, 2005 (the "2005 Disney/Beatty Agreement"). Parks Decl. ¶ 25; *see* Parks Ex. 8.

25.      Thus, just a few weeks before Beatty commenced this action against TMS, Beatty and Walt Disney Pictures entered into the 2005 Disney/Beatty Agreement pursuant to which Walt Disney Pictures, subject to certain limitations, "quitclaim[ed] back to [Beatty] all of [Walt Disney Pictures'] rights and obligations previously assigned to [Walt Disney Pictures] by [Beatty]" pursuant to the terms of the 1988 Disney/Beatty Agreement. Parks Decl. ¶ 26; Parks Ex. 7 ¶ 2.

26.      TMS is not, and has never been, a party to the 2005 Disney/Beatty Agreement. Parks Decl. ¶ 27; *see* Parks Ex. 7.

27.      TMS did not approve of and has not consented to any "re-assignment" or quitclaim of rights in the Dick Tracy Property from Walt Disney Pictures to Beatty. Parks Decl. ¶ 28.

28.      TMS was not aware until this litigation commenced that Beatty and Walt Disney Pictures had entered into the 2005 Disney/Beatty Agreement. Parks Decl. ¶ 29.

///
///
///
///
///
///

## CONCLUSIONS OF LAW

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because each of the claims asserted by Beatty in the FAC arise under the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*

2.      Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the alleged events or omissions giving rise to Beatty's claims occurred in this District.

3.      The moving party, TMS, bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), and that it is "entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c).

4.      A fact is material if it could affect the outcome of the lawsuit under the governing substantive law. *Anderson*, 477 U.S. at 248.

5.      A defendant who seeks summary judgment on a plaintiff's claim must demonstrate the absence of a genuine issue of material fact by either (1) submitting evidence that negates the existence of a material element of plaintiff's claim, or (2) showing there is no evidence to support an essential element of plaintiff's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

6.      "[S]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 805-06, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999) (*quoting Celotex*, 477 U.S. at 322).

7.      Beatty is no longer a party to the Dick Tracy Agreement and he has no standing to bring his claims for breach of contract and declaratory judgment based on that agreement. *McKinney v. Anheuser-Busch, Inc.*, 1991 U.S. App. LEXIS 30263, *2-3 (9th Cir. December 16, 1991) (plaintiffs who were not parties to an agreement had no

1   standing to assert breach of contract claim); *Killian v. Millard*, 228 Cal. App. 3d 1601,

2   1605 (Cal. Ct. App. 1991) (because defendant had no substantive right in the contract

3   at issue, he lacked standing to bring claim based on that contract).

4         8.    Beatty has assigned all of his rights in the Dick Tracy Property under the

5   Dick Tracy Agreement to Walt Disney Pictures, which as a result now "stands in the

6   shoes" of Beatty. *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 897 (9th Cir.

7   2005) (finding that assignee "stood in the shoes" of the assignor); *Ory v. Country Joe*

8   *McDonald*, 2003 U.S. Dist. LEXIS 24383, at *20 n.14 (C.D. Cal. August 5, 2003)

9   (finding that plaintiff assignee stands in the shoes of her assignor).

10         9.    The undisputed evidence demonstrates that TMS consented to the

11   assignment by Beatty of *all* (not just some) of his rights in the Dick Tracy Property to

12   Walt Disney Pictures. Beatty's alleged "retention" of certain rights in the Dick Tracy

13   Property when he assigned his rights to Walt Disney Pictures in 1988 is invalid as a

14   matter of law because TMS, the copyright holder of the Dick Tracy Property, did not

15   consent to such a "retention." 17 U.S.C. § 201(d)(1); *Gardner v. Nike*, 110 F. Supp. 2d

16   1282, 1285 (C.D. Cal. 2000), *aff'd*, 279 F.3d 774 (9th Cir. 2002).

17         10.    The alleged "reassignment" to Beatty of certain rights by Walt Disney

18   Pictures also is invalid as a matter of law because TMS, the copyright holder of the

19   Dick Tracy Property, did not consent to such a "re-assignment." *Id.*

20         11.    Section §201(d)(2) of the Copyright Act of 1976 (the "1976 Act")

21   precludes any assignment of rights by an exclusive licensee without the consent of the

22   copyright owner (here, TMS). *Gardner*, 279 F.3d at 781 (licensee not permitted to

23   transfer rights under copyright license "absent explicit contractual language to the

24   contrary"); *accord, SMC Promotions, Inc. v. SMC Promotions*, 355 F. Supp. 2d 1127,

25   1133 n.6 (C.D. Cal. 2005) (any attempt by defendant exclusive licensees to transfer

26   rights to third party without plaintiff copyright owners' authorization failed as a matter

27   of law); *Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923, 933 (C.D. Cal. 2004) ("It

28   is well established in ... copyright law that a ... copyright licensee may not sub-license

1  his licensed intellectual property rights without express permission from the
2  licensor.").

3      12.    The principles of *Gardner* apply to all exclusive agreements that, like the
4  Dick Tracy Agreement (the original agreement pursuant to which TMS granted an
5  exclusive license of certain rights in the Dick Tracy Property to Beatty), transfer
6  something less than "the totality of rights commanded by copyright." *Gardner*, 279
7  F.3d at 778, (quoting 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER
8  ON COPYRIGHT § 10.01[C][4] (defining "anything less than an assignment" of all
9  the rights constituting the copyright as a "license")).

10     13.    The undisputed facts demonstrate that pursuant to the Dick Tracy
11  Agreement, Beatty received something less than all of the rights TMS possessed in the
12  Dick Tracy Property (he was only given the motion picture, television and allied
13  rights) and that the rights Beatty was granted were exclusive.  Parks Decl., Ex 4, ¶ 2.

14     14.    Because Beatty has failed to demonstrate that he has standing to bring any
15  of the claims asserted in the FAC, each of those claims should be dismissed. *See*
16  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 107 L. Ed. 2d 603, 110 S. Ct. 596
17  (1990); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1145 (9th Cir. 2003)
18  (because plaintiff lacked standing to assert claims, district court had no subject matter
19  jurisdiction and dismissal was appropriate).

20     15.    Furthermore, as a matter of law, Beatty cannot prevail on his claim for
21  declaratory judgment, because he is not a party to the contract in dispute.  Cal. Code
22  Civ. Proc. § 1060; *Columbia Pictures Corp. v. DeToth*, 26 Cal. 2d 753, 760 (Cal.
23  1945).

24     16.    Under California's declaratory judgment act, a party may ask the court for
25  a declaration of rights or duties and the court may make a binding declaration of those
26  rights.  Cal. Code Civ. Proc. § 1060 *et seq.*

27     17.    "Any person interested . . . under a contract . . . may, in cases of actual
28  controversy relating to the legal rights and duties of the respective parties, bring an

- 9 -

1   original action . . . for a declaration of his or her rights and duties . . . including a

2   determination of any question of construction or validity arising under the instrument

3   or contract." Cal. Code Civ. Proc. § 1060.

4       18.   "A complaint for declaratory relief is legally sufficient if it sets forth facts

5   showing the existence of an actual controversy relating to the legal rights and duties of

6   the respective parties under a contract and requests that these rights and duties be

7   adjudged by the court." *Columbia Pictures Corp. v. DeToth*, 26 Cal. 2d 753, 760 (Cal.

8   1945).

9       19.   Beatty is not a party to the agreement under which he asks the Court to

10   determine the rights of the parties and as a result there is no judiciable dispute to be

11   decided by this Court. *Int'l Brotherhood of Teamsters, etc. v Bekins Van & Storage*

12   *Co.*, 135 Cal. App. 2d 692, 697, 288 P.2d 181 (Cal. App. 2d Dist. 1955) ("An action

13   for declaratory relief will not lie when complaint alleges no facts showing enforceable

14   contractual right in plaintiff"); *Gillies v La Mesa, etc. Irr. Dist.*, 54 Cal. App. 2d 756,

15   762, 129 P.2d 941 (Cal. App. 1942) ("An action for declaratory relief lies when there is

16   an actual *bona fide* dispute between the parties as to a legal obligation arising under the

17   circumstances specified in section 1060 of the Code of Civil Procedure. There must

18   not only be a dispute between the parties but that controversy must be justiciable. ...

19   When the complaint alleges no facts showing an enforceable contractual right in the

20   plaintiffs, and only a judgment for defendant can be entered, there is no judicable

21   dispute and the action will not lie").

22       20.   Because Beatty assigned all of his rights in the Dick Tracy Property to

23   Walt Disney Pictures pursuant to the terms of Amendment and the alleged "retention"

24   by and "re-assignment" to Beatty of rights in the Dick Tracy Property are invalid as a

25   matter of law, Beatty is no longer a party to the Dick Tracy Agreement and summary

26   judgment should be granted in TMS's favor on Beatty's claim for declaratory

27   judgment.

28   ///

21.    As a matter of law, Beatty cannot prevail on his claims for breach of contract, because he is not a party to the contract in dispute. *Amelco Electric v. City of Thousand Oaks*, 38 P.3d 1120, 1129-30 (Cal. 2002). ("Under a breach of contract theory, the plaintiff must demonstrate a contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and damage to the plaintiff."). *See also Roth v. Malson*, 67 Cal. App. 4th 552, 557, 79 Cal. Rptr. 2d 226 (Cal. App. 3d Dist. 1998) ("It is, of course, basic hornbook law that the existence of a contract is a necessary element to an action based on contract, regardless of whether the Plaintiff seeks specific performance or damages for breach of contract.").

22.    Because Beatty assigned all of his rights in the Dick Tracy Property to Walt Disney Pictures pursuant to the terms of Amendment and the alleged "retention" by and "re-assignment" to Beatty of rights in the Dick Tracy Property are invalid as a matter of law, Beatty is no longer a party to the Dick Tracy Agreement and summary judgment should be granted in TMS's favor on Beatty's claims for breach of contract.

23.    There is no triable issue as to Beatty's lack of standing to bring his claims for breach of contract and declaratory relief, and TMS is entitled to Summary Judgment as a matter of law. Fed. Rules Civ. Proc., Rule 56(c).

Dated: February ___, 2006

                                            _____
                                            Honorable Dean D. Pregerson
                                            United States District Court

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California and my business address is 100 Wilshire Boulevard, Suite 2010, Santa Monica, CA 90401. I am over the age of 18 and not a party to this action.

On February 6, 2006, I served the foregoing document described as **STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW** on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope at Santa Monica, California, addressed as follows:

Bertram Fields, Esq.
Greenberg Glusker Fields Claman
 Machtinger & Kinsella LLP
1900 Avenue of the Stars
Suite 2100
Los Angeles, CA 90067-4590

☐    I caused such envelope with postage thereon fully prepaid to be placed in the United States mail. I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing with the United States Postal Service. Correspondence for mailing is deposited with the United States Postal Service on that same day in the ordinary course of business. The foregoing document was sealed and placed for collection and mailing on the foregoing date, following the firm's ordinary practices. I am aware that on motion of any party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in the affidavit.

☒    I caused such envelope to be hand delivered to the offices of the addressee.

☐    I placed such envelope in a box or other facility regularly maintained by Federal Express, in an envelope or package designated and provided by Federal Express, with delivery fees paid or provided for, addressed to the above-indicated addressees.

☐    I caused a copy of the foregoing document to be faxed to the addressee.

Executed on February 6, 2006 at Santa Monica, California. I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

- 12 -

1  Maura J. Wogan Esq.
   Cameron A. Myler, Esq.
2  FRANKFURT KURNIT KLEIN & SELZ, PC
   488 Madison Avenue
3  New York, New York 10022
   Telephone: (212) 980-0120
4  Fax: (212) 593-9175

5  Peter J. Anderson, Esq., SBN 088891
   LAW OFFICES OF PETER J. ANDERSON, A P.C.
6  100 Wilshire Boulevard, Suite 2010
   Santa Monica, CA 90401
7  Telephone: (310) 260-6030
   Fax: (310) 260-6040
8
   Attorneys for Defendant
9  TRIBUNE MEDIA SERVICES, INC.

10

11             UNITED STATES DISTRICT COURT

12           CENTRAL DISTRICT OF CALIFORNIA

13                 WESTERN DIVISION

14  WARREN BEATTY,                    )  Case No. CV05-3938 DDP(SSx)
                                      )
15         Plaintiff,                 )
                                      )  MEMORANDUM OF POINTS AND
16      vs.                           )  AUTHORITIES IN SUPPORT OF
                                      )  DEFENDANT'S MOTION FOR
17  TRIBUNE MEDIA SERVICES, INC.,     )  SUMMARY JUDGMENT
    ROBERT NEWMYER, SCOTT             )  PURSUANT TO FED. R. CIV. P. 56
18  STRAUSS, LORENZO                  )
    DI BONAVENTURA, OUTLAW            )  Date: April 3, 2006
19  PRODUCTIONS and DOES 1 through 10,)  Time: 10:00 a.m.
                                      )  Place: Courtroom of the Honorable
20         Defendants.                )          Dean D. Pregerson
                                      )          United States District Judge
21  _____  )

22

23

24

25

26

27

28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

PRELIMINARY STATEMENT ........................................................................ 1

SUMMARY OF ARGUMENT ......................................................................... 1

STATEMENT OF UNCONTROVERTED FACTS ................................................ 3

    Beatty's Alleged Retention of Rights .......................................................... 5

    Disney's Alleged Re-Assignment of Rights ................................................. 6

ARGUMENT ............................................................................................... 7

SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF TMS ............. 7

    A.    The Standard for Summary Judgment .............................................. 7

    B.    Beatty's Alleged Retention of Rights and Walt Disney Pictures'
           Alleged "Re-assignment" of Rights to Beatty Are Both Invalid
           under Copyright Law ....................................................................... 8

    C.    Beatty Cannot Establish the Requisite Standing to Bring
           His Claim for Declaratory Relief ..................................................... 13

    D.    Beatty Cannot Establish Requisite Standing to Bring his Claims
           for Breach of Contract .................................................................... 15

CONCLUSION ......................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

*Amelco Electric v. City of Thousand Oaks*, 27 Cal.4th 228,
115 Cal. Rptr. 2d 900, 38 P.3d 1120 (2002) ............................................... 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505,
91 L. Ed. 2d 202 (1986) ............................................................................. 7

*Berg v. Kincheloe*, 794 F.2d 457 (9th Cir. 1986) .......................................... 8

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548,
91 L. Ed. 2d 265 (1986) ........................................................................ 7, 8

*Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795,
119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999) ................................................... 8

*Columbia Pictures Corp. v. DeToth*, 26 Cal. 2d 753, 161 P.2d 217 (1945) ............... 14

*Gardner v. Nike*, 110 F. Supp. 2d 1282 (C.D. Cal. 2000),
*aff'd*, 279 F.3d 774 (9th Cir. 2002) ...................................................... 11, 12

*Gardner v. Nike*, 279 F.3d 774 (9th Cir. 2002) ..................................... passim

*Gillies v La Mesa, etc. Irr. Dist.*, 54 Cal. App. 2d 756,
129 P.2d 941 (1942) ............................................................................... 14

*Harris v. Emus Records Corp.*, 734 F.2d 1329 (9th Cir. 1984) .......................... 11

*Int'l Brotherhood of Teamsters, etc. v Bekins Van & Storage Co.*, 135 Cal. App. 2d
692, 288 P.2d 181 (1955) ........................................................................ 14

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,
106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ..................................................... 8

*Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923 (C.D. Cal. 2004) ..................... 9

*Roth v. Malson*, 67 Cal. App. 4th 552, 79 Cal. Rptr. 2d 226 (1998) ..................... 15

*Siemon v. Russell*, 194 Cal. App. 2d 592 (1961) .......................................... 15

*SMC Promotions, Inc. v. SMC Promotions*, 355 F. Supp. 2d 1127 (C.D. Cal. 2005) ..... 9

## STATUTES

Cal. Code Civ. Proc. § 1060.................................................................................14

Copyright Act of 1909, 17 U.S.C. 1 et seq. .....................................................10, 11

Copyright Act of 1976, 17 U.S.C. §§ 101 et seq. ...................................9, 10, 11, 12

## RULES

Fed. R. Civ. P. Rule 12...........................................................................................1

Fed. R. Civ. P. 56 ................................................................................................1, 7

## TREATISES

B. Witkin, California Procedure (4th Ed. 1997) .........................................15

Melville B. Nimmer & David Nimmer, Nimmer on Copyright (2005)..................10, 11

# MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

Defendant Tribune Media Services, Inc. ("TMS") respectfully submits this Memorandum of Points and Authorities in Support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 ("Motion"), on the grounds that as a matter of law plaintiff Warren Beatty ("Beatty") has no standing to bring any of the claims asserted in his First Amended Complaint, filed on May 10, 2005 ("FAC").[1]  In the FAC, Beatty alleges claims for breach of contract and seeks damages, an injunction and declaratory relief.[2]  While TMS previously sought to dismiss Beatty's claims under Fed. R. Civ. P. Rules 12(b)(1) and 12(b)(6), this Court determined that TMS's arguments should be raised in the summary judgment context and invited TMS to bring this Motion.  Order Denying Motion to Dismiss, dated August 9, 2005, at p. 8, a copy of which is attached as Exhibit 10 to the Wogan Decl.

## SUMMARY OF ARGUMENT

The law set forth in the Ninth Circuit's decision in *Gardner v. Nike*, 279 F.3d 774 (9th Cir. 2002) and the cases that follow that precedent governs this case.  The facts of this case (which are almost identical to the facts in *Gardner*) are undisputed.

---

[1]  A copy of the FAC is annexed as Exhibit 5 to the accompanying Declaration of Michael A. Parks in Support of TMS's Motion for Summary Judgment, dated February 3, 2006 ("Parks Decl.")

[2]  On or about January 26, 2006, counsel for Beatty stipulated to the dismissal without prejudice of defendants Robert Newmyer, Scott Strauss, Lorenzo di Bonaventura and Sofited, Inc. d/b/a Outlaw Productions because those defendants no longer have any rights in the Dick Tracy property at issue herein.  A copy of the Stipulation of Dismissal of Certain Defendants and Order is attached as Exhibit 9 to the Declaration of Maura J. Wogan in Support of TMS's Motion for Summary Judgment, dated February 3, 2006 ("Wogan Decl.").

1

1    Like the plaintiff in *Gardner*, plaintiff Warren Beatty cannot establish the prerequisite
2    standing to bring any of the claims set forth in the FAC and TMS's Motion should be
3    granted.

4        Beatty commenced this action against TMS, the owner of the copyright and all
5    other rights in the *Dick Tracy* character, comic strip and certain other works based on
6    the character and comic strip (the "Dick Tracy Property"). Beatty claims that TMS is
7    in breach of an exclusive license agreement granting him the motion picture, television
8    and certain other rights in the Dick Tracy Property, because TMS asserts that the rights
9    in its Dick Tracy Property have reverted to TMS and that it intends to develop a project
10   based on that property. However, Beatty is no longer a party to the license agreement
11   he claims TMS has breached. In 1988, Beatty assigned his rights and obligations
12   under that exclusive license agreement to Walt Disney Pictures with the consent of
13   TMS, so that Walt Disney Pictures could produce and distribute the theatrical motion
14   picture entitled *Dick Tracy*. As a result of that assignment, Beatty was left with no
15   rights in the Dick Tracy Property. Walt Disney Pictures, on the other hand, "stood in
16   the shoes" of Beatty and became the exclusive licensee of all rights previously held by
17   Beatty.

18       In an attempt to assert some sort of interest in the Dick Tracy Property and
19   establish standing to bring the claims set forth in the FAC, Beatty has alleged both that
20   (1) he "retained" certain rights in the Dick Tracy Property when he assigned his rights
21   to Walt Disney Pictures in 1988, and (2) Walt Disney Pictures "reassigned" to him
22   certain rights that Beatty had previously assigned to it. However, these alleged side
23   deals between Beatty and Walt Disney Pictures, made without TMS's knowledge,
24   much less its consent, are invalid because they contravene TMS's well-established
25   right under federal copyright law to control the licensing and sub-licensing of its own
26   copyright.

27       In *Gardner v. Nike*, 279 F.3d 774 (9th Cir. 2002), a case that provides a virtual
28   roadmap for dealing with Beatty's claims here, the Ninth Circuit ruled that an

2

1    exclusive licensee cannot assign, or otherwise transfer, its rights under such a license

2    without the consent of the copyright holder, here TMS. Thus, absent the express

3    consent of TMS (which was neither sought nor granted here), the purported "retention"

4    by Beatty, and "reassignment" by Walt Disney Pictures to Beatty, of the rights in

5    TMS's Dick Tracy Property are invalid.

6        As a result, Beatty is not a party to the agreement in question and cannot

7    establish the standing necessary to bring his breach of contract claims or declaratory

8    judgment claim (seeking a determination of the parties' rights under the agreement)

9    against TMS. Summary judgment is appropriate on each of Beatty's claims because

10    there is no genuine issue of material fact and TMS is entitled to judgment as a matter

11    of law.

12

13    **STATEMENT OF UNCONTROVERTED FACTS**

14        TMS is the original and sole owner of the copyright and other intellectual

15    property rights in the Dick Tracy Property, which includes all of the characters and

16    storylines contained in the Dick Tracy comic strip and certain other derivative works

17    based on the comic strip. Parks Decl. ¶ 2; Exhibit to Parks Decl. ("Parks Ex.") 1.

18        On or about August 28, 1985, TMS and Beatty entered into a written agreement

19    (the "Dick Tracy Agreement"), pursuant to which TMS granted Beatty an exclusive

20    license in the motion picture, television, and customary related rights in the Dick Tracy

21    Property. Parks Decl. ¶ 3; Parks Ex. 2. The Dick Tracy Agreement delineated the

22    rights that TMS retained for itself, namely: "all rights in and to the property not

23    specifically granted to Mr. Beatty, including, without limitation, animation, comic

24    strip, publishing . . . merchandising, radio, cartoon syndication, and live stage rights."

25    Parks Decl. ¶ 4; Parks Ex. 2 ¶ 7. Thus, the grant to Beatty was something less than the

26    entire bundle of rights that constitute the copyright in the Dick Tracy Property. Parks

27    Ex. 2 ¶¶ 1, 7.

28    ///

3

1       On or about May 15, 1988, TMS and Beatty amended the Dick Tracy

2   Agreement "with respect to the grant of certain rights to the Dick Tracy Property" (the

3   "Amendment"). Parks Decl. ¶ 5; Parks Ex. 3, introductory paragraph. In the

4   Amendment, Beatty and TMS agreed that "[u]pon full execution hereof, Mr. Beatty

5   shall assign his rights and obligations hereunder to Walt Disney Pictures. . . ." Parks

6   Decl. ¶ 6; Parks Ex. 3 ¶ 1. The Amendment expressly acknowledged TMS's approval

7   of Beatty's assignment of his rights in the Dick Tracy Property to Walt Disney

8   Pictures: "TMS hereby consents to such assignment." Parks Decl. ¶ 7; Parks Ex. 3 ¶ 1.

9   The Amendment included no terms that provided for the retention or reservation of

10   rights by Beatty in the Dick Tracy Property after the execution of the Amendment.

11   Parks Decl. ¶ 8; *see* Parks Ex. 3.

12       On or about January 25, 1995, TMS and Walt Disney Pictures entered into an

13   agreement to further amend the Dick Tracy Agreement (the "Disney Amendment").

14   Parks Decl. ¶ 9; *see* Parks Ex. 4. In the Disney Amendment, TMS and Walt Disney

15   Pictures confirmed that "Beatty assigned his rights and obligations in the [Dick Tracy

16   Agreement], as amended, to Walt Disney Pictures." Parks Decl. ¶ 10; Parks Ex. 4,

17   introductory paragraph.

18       Thus, TMS originally granted certain rights in the Dick Tracy Property to Beatty

19   pursuant to the Dick Tracy Agreement. Thereafter, in the Amendment, Beatty, with

20   the consent of TMS, agreed to assign all of his rights to Walt Disney Pictures. Finally,

21   in the Disney Amendment, Walt Disney Pictures confirmed that those rights had been

22   assigned to it. TMS was a signatory to each of those documents.

23       Sometime in 1990, Walt Disney Pictures released a theatrical motion picture

24   based on the Dick Tracy Property entitled *Dick Tracy* (the "Movie") and otherwise

25   exploited the rights it had acquired in the Dick Tracy Property. Parks Decl. ¶ 11; Parks

26   Ex. 5 ¶ 8. Since the release of the Movie, Walt Disney Pictures' only exploitation of

27   the Dick Tracy Property was a 1995 ice skating show featuring a Dick Tracy character.

28   Parks Decl. ¶ 12; Parks Ex. 5 ¶ 9. Apart from any continued exploitation of the Movie,

1  Walt Disney Productions has not exploited the Dick Tracy Property since 1995. Parks
2  Decl. ¶ 13.
3          In October 2004 (and on several earlier occasions), TMS notified Walt Disney
4  Pictures that the rights to the Dick Tracy Property had reverted to TMS pursuant to the
5  terms of the Dick Tracy Agreement and the Amendment and that TMS intended to
6  exploit those rights. Parks Decl. ¶ 14; Parks Ex. 5, ¶¶ 10-12. Beatty claims that the
7  rights in the Dick Tracy Property did not revert to TMS and instead are owned by him.
8  Parks Decl. ¶ 15; Parks Ex. 5, ¶¶ 13-15.
9
10  **Beatty's Alleged Retention of Rights**
11          Beatty alleges in the FAC that, at the time he assigned his rights to Walt Disney
12  Pictures in 1988, he reserved certain rights "to produce for his own account, a Dick
13  Tracy project." Parks Decl. ¶ 16; Parks Ex. 5 ¶ 6. Beatty's claim that he retained
14  rights in the Dick Tracy Property is based on the so-called "Agreement between Walt
15  Disney Pictures and Mulholland Productions, Inc. (for the Services of Warren Beatty)
16  dated as of March 10, 1988 for the Theatrical Motion Picture entitled *Dick Tracy*" (the
17  "1988 Disney/Beatty Agreement"). Parks Decl. ¶ 17; *see* Parks Exs. 5 and 6.
18          However, the 1988 Disney/Beatty Agreement stated that "upon the signing of
19  this Agreement, the rights [under the Dick Tracy Agreement] shall vest in [Beatty] and
20  be assigned to [Walt Disney Pictures] pursuant to the terms hereof." Parks Decl. ¶ 18;
21  Parks Ex. 6, Article IV(1)(h)(i). Thus, on or about September 7, 1988, Warren Beatty
22  executed a "Short Form Assignment," (Exhibit D to the 1988 Disney/Beatty
23  Agreement) which provided that:
24          . . . Warren Beatty and [his personal services corporation] (collectively
25          "Assignors"), do hereby transfer to Walt Disney Pictures ("Assignee") all
26          present and future right, title and interest that Assignors own, control,
27          have obtained, or shall in the future obtain, from the Tribune Media
28          Services . . . and any other party, including without limitation, such

5

1   worldwide theatrical motion picture, television, and allied and incidental

2   rights, under copyright or otherwise in perpetuity, in and to the characters,

3   story elements, etc. as they have acquired in connection with the character

4   Dick Tracy and all properties relating thereto.[3]

5   Parks Decl. ¶ 19; *see* Parks Ex. 7.

6       Moreover, TMS was not, and has never been, a party to the 1988 Disney/Beatty

7   Agreement.  Parks Decl. ¶ 20; See Parks Ex. 6.  20.  Prior to this litigation, TMS had

8   not seen the 1988 Disney/Beatty Agreement and was not aware of its contents.  Parks

9   Decl. ¶ 21.  TMS did not approve of and had not consented to any reservation of rights

10  in the Dick Tracy Property by Beatty.  Parks Decl. ¶ 22.

11      The 1988 Disney/Beatty Agreement acknowledged that only "certain" rights

12  were granted to Beatty by TMS under the Dick Tracy Agreement.  Parks Decl. ¶ 23;

13  Parks Ex. 6, Article IV(1)(h).

14

15  **Disney's Alleged Re-Assignment of Rights**

16      Beatty also has alleged in the FAC that, "[d]uring May 2005, Disney reassigned

17  to Beatty the rights under the [Dick Tracy Agreement] that he had previously assigned

18  to Disney. . ."  Parks Decl. ¶ 24; Parks Ex. 5 ¶ 14.  Beatty's claim concerning such

19  reassignment is based on the so-called "Quitclaim Agreement" between Walt Disney

20  Pictures and Beatty, entered into as of April 28, 2005 (the "2005 Disney/Beatty

21  Agreement").  Parks Decl. ¶ 25; *see* Parks Ex. 8.

22      Thus, just a few weeks before Beatty commenced this action against TMS,

23  Beatty and Walt Disney Pictures entered into the 2005 Disney/Beatty Agreement

24  pursuant to which Walt Disney Pictures, subject to certain limitations, "quitclaim[ed]

25

26  [3]     In fact, the Short Form Assignment was precisely what Beatty was obligated to
27  execute pursuant to the terms of the Amendment.  Parks Decl. Ex 3 at ¶ 1 ("Upon full
    execution hereof, Mr. Beatty shall assign his rights and obligations hereunder to Walt
28  Disney Pictures. . . .").

6

1   back to [Beatty] all of [Walt Disney Pictures'] rights and obligations previously

2   assigned to [Walt Disney Pictures] by [Beatty]" pursuant to the terms of the 1988

3   Disney/Beatty Agreement.  Parks Decl. ¶ 26; Parks Ex. 7 ¶ 2.

4        TMS is not a party to the 2005 Disney/Beatty Agreement.  Parks Decl. ¶ 27; *see*

5   Parks Ex. 7.  TMS did not approve any re-assignment or quitclaim of rights in the Dick

6   Tracy Property from Walt Disney Pictures to Beatty and in fact was not aware until

7   this litigation commenced that Beatty and Walt Disney Pictures had entered into the

8   2005 Disney/Beatty Agreement.  Parks Decl. ¶¶ 28, 29.

9

10                                   **ARGUMENT**

11

12                          **SUMMARY JUDGMENT SHOULD BE**

13                          **GRANTED IN FAVOR OF TMS**

14   **A.      The Standard for Summary Judgment.**

15        Summary judgment is proper in any case where "there is no genuine issue as to

16   any material fact and that the moving party is entitled to judgment as a matter of law."

17   Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the

18   absence of a "genuine issue of material fact for trial."  *Anderson v. Liberty Lobby, Inc.*,

19   477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is material if it

20   could affect the outcome of the lawsuit under the governing substantive law.  *Id.* at

21   248.  A defendant who seeks summary judgment on a plaintiff's claim must

22   demonstrate the absence of a genuine issue of material fact by either (1) submitting

23   evidence that negates the existence of a material element of plaintiff's claim, or (2)

24   showing there is no evidence to support an essential element of plaintiff's claim.

25   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

26        The burden then shifts to the nonmoving party to establish, beyond the

27   pleadings, that there is a genuine issue for trial.  *Id.* at 324 ("the plain language of Rule

28   56(c) mandates the entry of summary judgment . . . against a party who fails to make a

1  showing sufficient to establish the existence of an element essential to that party's

2  case, and on which that party will bear the burden of proof at trial"). Thus, "summary

3  judgment for a defendant is appropriate when the plaintiff 'fails to make a showing

4  sufficient to establish the existence of an element essential to [his] case, and on which

5  [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Management Sys.*

6  *Corp.*, 526 U.S. 795, 805-06, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999) (*quoting*

7  *Celotex*, 477 U.S. at 322).

8      The "adverse party [on a motion for summary judgment] may not rest upon the

9  mere allegations or denials of the adverse party's pleadings, but the adverse party's

10  response, by affidavits or as otherwise provided in this rule, must set forth specific

11  facts showing that there is a genuine issue for trial." Fed. R. Civ.P. 56(e). The party

12  opposing a motion for summary judgment cannot sustain its burden by conclusory

13  allegations, *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986), or by demonstrating

14  the "mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252. Instead, a

15  genuine issue exists only if "the evidence is such that a reasonable jury could return a

16  verdict for the nonmoving party," and material facts are those "that might affect the

17  outcome of the suit under the governing law." *Id.* at 247-48. Although the nonmoving

18  party is entitled to "justifiable inferences," *Anderson*, 477 U.S. at 252, "[w]here the

19  record taken as a whole could not lead a rational trier of fact to find for the nonmoving

20  party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

21  *Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

22

23  **B.    Beatty's Alleged Retention of Rights and Walt Disney Pictures' Alleged**

24         **"Re-assignment" of Rights to Beatty Are Both Invalid under Copyright**

25         **Law.**

26      In an attempt to establish his standing to bring his claims against TMS, Beatty

27  has alleged both that (1) he "retained" certain rights in the Dick Tracy Property when

28  he assigned his rights to Walt Disney Pictures in 1988, and (2) Walt Disney Pictures

8

1  "reassigned" to him certain of the rights that Beatty had previously assigned to it. But,

2  as a matter of law, neither the alleged retention of rights by Beatty nor assignment of

3  rights back to Beatty is valid without TMS's consent. Section §201(d)(2) of the

4  Copyright Act of 1976 (the "1976 Act") precludes any assignment of rights by an

5  exclusive licensee without the consent of the copyright owner (here, TMS). *Gardner*,

6  279 F.3d at 781 (licensee not permitted to transfer rights under copyright license

7  "absent explicit contractual language to the contrary"); *accord, SMC Promotions, Inc.*

8  *v. SMC Promotions*, 355 F. Supp. 2d 1127, 1133 n.6 (C.D. Cal. 2005) (any attempt by

9  defendant exclusive licensees to transfer rights to third party without plaintiff copyright

10  owners' authorization failed as a matter of law); *Miller v. Glenn Miller Prods.*, 318 F.

11  Supp. 2d 923, 933 (C.D. Cal. 2004) ("It is well established in … copyright law that a

12  … copyright licensee may not sub-license his licensed intellectual property rights

13  without express permission from the licensor."). Here, TMS did not consent and the

14  purported assignments are invalid, leaving Beatty with no standing to bring his claims.

15      In *Gardner*, the Ninth Circuit considered facts that are remarkably similar to

16  those here. There, Nike and Sony entered into an exclusive license agreement under

17  which Nike (the original copyright owner) granted Sony (the exclusive licensee)

18  certain rights to a cartoon character. *Gardner*, 279 F.3d at 776. Sony then transferred

19  all of its rights in the exclusive license to Gardner, who, in turn, used the cartoon

20  character in various educational materials. *Id.* After Nike threatened legal action

21  against Sony, Gardner, and their proposed licensees, Gardner filed an action seeking a

22  declaration of the parties' rights. *Id.* The district court granted Nike's motion for

23  summary judgment because the transfer of the license to Gardner by Sony, made

24  without Nike's express consent, violated Section 201(d)(2) of the 1976 Act and was

25  therefore invalid. *Id.* at 777.

26      On TMS's Motion to Dismiss in this case, Beatty argued that the Ninth Circuit's

27  rule in *Gardner v. Nike* does not apply in this case because "*Gardner* applies only to a

28  'license,' not an assignment of rights" and that "[n]othing in the Copyright Act suggests

9

1  that an assignee cannot transfer all or part of the assigned rights without the consent of

2  his assignor."  Pl. Opp. Mem. at 6.  Beatty argued that "[The Dick Tracy Agreement]

3  was a grant, i.e., an assignment, of the motion picture and television rights in the Dick

4  Tracy character, not merely a license permitting Beatty to use those rights for a time,"

5  and that therefore *Gardner* does not apply.  *Id.* at 7.

6       However, it is irrelevant whether you call the agreement at issue a "license," a

7  "grant" or an "assignment of [certain] rights."  The principles of *Gardner* apply to all

8  exclusive agreements that, like the Dick Tracy Agreement, transfer something less than

9  "the totality of rights commanded by copyright."  *Gardner*, 279 F.3d at 778, (*quoting* 3

10  MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 10.01[C][4] (2005)

11  (defining "anything less than an assignment" of *all* the rights constituting the copyright

12  as a "license")).[4]  There is no dispute that Beatty received something less than all of the

13  rights TMS possessed in the Dick Tracy Property (he was only given the motion picture

14  television and allied rights).  There is no dispute that the rights Beatty was granted were

15  exclusive.  Thus, the rights granted to Beatty under the Dick Tracy Agreement created

16  an exclusive license—as that term is used in the *Gardner* case and pursuant to relevant

17  copyright law.

18       The distinction Beatty attempts to draw between what he calls a "grant" and what

19  he calls a "license" is irrelevant to the analysis of the issue at hand.  What is significant

20  is how the *Gardner* court uses the term "exclusive license" and how the *Gardner* court

21  interprets the impact of Section 201(d)(2) of the 1976 Act on the ability of an "exclusive

22  licensee" to transfer its rights without the consent of the original copyright holder.

23  *Gardner*, 279 F.3d at 780.

24       The *Gardner* decision describes the distinction, under the Copyright Act of

25  1909 (the "1909 Act"), between a grant of any portion or subdivision of the rights

26  _____

27  [4]     In fact, the agreement at issue in *Gardner* was a "grant" of rights subject only to
    the payment of a royalty.  *Gardner*, 279 F.3d at 776.  ("Nike transferred the exclusive
28  perpetual, worldwide right to Sony to use [the cartoon character at issue].")

10

comprising a copyright (which was termed a "license") and a grant of the *entire* bundle of rights comprising the copyright (which was termed an "assignment"). *Id.* at 778. That distinction arose because, under the 1909 Act, the doctrine of indivisibility prevented a copyright owner from assigning "anything less than the full totality of rights commanded by copyright." 3 NIMMER ON COPYRIGHT § 10.01[A] at 10-5, 6. A transfer of anything less than such totality (such as the Dick Tracy Agreement which conveyed only the motion picture, television and allied rights) was considered a license. Moreover, that distinction was significant because, under the 1909 Act, "a licensee (whether exclusive or not) 'had no right to resell or sublicense the rights acquired unless he had been expressly authorized to do so.'" *Gardner*, 279 F.3d at 778 (*quoting* NIMMER ON COPYRIGHT § 10.01[C][4]). *Accord, Harris v. Emus Records Corp.*, 734 F.2d 1329, 1333 (9th Cir. 1984).

Under the 1976 Act, however, an "exclusive license" is equated with an "assignment" for certain -- *but not all* -- purposes. Unlike under the 1909 Act, the exclusive licensee is regarded as the copyright owner *of the particular rights that have been licensed* (but not as the copyright owner of the underlying property). *See* 17 U.S.C. § 201(d)(1); *Gardner v. Nike*, 110 F. Supp. 2d 1282, 1285 (C.D. Cal. 2000), *aff'd*, 279 F.3d 774 (9th Cir. 2002). But, as the Ninth Circuit held in *Gardner*, the distinction between an exclusive license (like the Dick Tracy Agreement) and an assignment remains significant under the 1976 Act with respect to the right to transfer such rights to another party. *Gardner*, 279 F.3d at 781. The Ninth Circuit squarely held that the owner of a particular right, but something less than all of the rights that constitute a copyright, cannot transfer that right without the consent of the copyright holder. *Id.*

TMS does not dispute that Beatty, and later Walt Disney Pictures, were each for a time owners (whether "exclusive licensees" or "assignees") of the copyright in particular, limited rights in the Dick Tracy Property. But the *Gardner* case is not rendered inapposite by that fact. Rather, the case is directly on point. The Ninth

11

1 Circuit focused on the specific language in Section 201(d)(2), which provides that "the

2 owner of any particular exclusive right is entitled, to the extent of that right, to all of

3 the protection and remedies accorded to the copyright owner by this title," but went on

4 to find that the "protection and remedies" granted to the owner of that exclusive right

5 do not include the right to transfer. *Id.* at 780.[5]

6      Whether Beatty and Walt Disney Pictures choose to call themselves owners,

7 assignees or licensees is inconsequential -- the rights of Beatty and Walt Disney

8 Pictures, like the rights of the exclusive licensees in Gardner, were always confined to

9 particular limited rights in the Dick Tracy Property. Thus, neither Beatty nor Walt

10 Disney Pictures ever had the right (absent TMS's consent) to transfer their rights to

11 anyone else, no matter what they choose to call themselves. *Gardner,* 110 F. Supp. 2d

12 at 1286-87.

13      The Ninth Circuit emphasized that the right of the copyright holder to monitor

14 use of its property provided a strong policy reason for requiring a licensee to obtain the

15 licensor's explicit consent before transferring any rights to another party. *Gardner,*

16 279 F.3d at 781. The *Gardner* court thus held that:

17      Requiring the licensee to get explicit consent from the licensor strikes the

18      balance between the competing interests that underlie the 1976 Act and

19      copyright law in general. On the one hand, the 1976 Act reflects

20      Congress' growing awareness of the need for free alienability and

21 _____

22 [5]    The Court found that the "protection and remedies" granted to the owner of the
exclusive right do not include the right to transfer an exclusive license, reasoning that,

23 at the time the 1976 Act was enacted:

24      Congress was aware that prior to the 1976 Act, licensees could not

25      sublicense their right in an exclusive license [without the express consent

26      of the licensor]. With that knowledge in hand, however, Congress chose
     to limit exclusive licensees' "benefits" under the 1976 Act to "protection

27      and remedies."

28 *Gardner,* 279 F.3d at 780, *quoting Gardner,* 110 F. Supp. 2d at 1287.

1  divisibility. Yet, both Congress and this Circuit have always been aware

2  of the necessity to preserve the rights and control of the owners and

3  creators. *In order to reach the balance between these interests, we hold*

4  *that, under the 1976 Act, an exclusive licensee has the burden of*

5  *obtaining the licensor's consent before it may assign its rights, absent*

6  *explicit contractual language to the contrary.*

7  *Id.* (emphasis added).

8        In this case, TMS was the sole owner of the copyright in the Dick Tracy

9  Property. TMS first granted an exclusive license to Beatty and then consented to the

10  assignment of Beatty's rights to Walt Disney Pictures. In each of those transfers of

11  rights, TMS had the opportunity to control how and to whom its valuable rights in the

12  Dick Tracy Property were licensed.

13        In light of the Ninth Circuit's decision in *Gardner*, it is clear that TMS's express

14  permission was required before Beatty could "retain," or Disney could "reassign," the

15  exclusive rights held in the Dick Tracy Property. There is no evidence that such

16  permission was sought or obtained; and, in fact, TMS never even had knowledge of

17  any alleged retention of rights in the Dick Tracy Property by Beatty or any purported

18  re-assignment of rights from Walt Disney Pictures to Beatty. As a result, any such

19  attempted transfers are invalid. Beatty holds no rights in the Dick Tracy Property.

20

21  **C.    Beatty Cannot Establish the Requisite Standing to Bring His Claim for**

22  **Declaratory Relief.**

23        Beatty's first claim in the FAC asks the Court to determine the rights of the

24  parties under the Dick Tracy Agreement. That claim for declaratory judgment fails,

25  and TMS's Motion should be granted, because there is no evidence that Beatty is a

26  party to the contract at issue and, thus, he has no standing to bring the claim.

27  ///

28  ///

13

1    Under California's declaratory judgment act, a party may seek a declaration of

2    the parties' rights. Cal. Code Civ. Proc. § 1060 *et seq.* Section 1060 provides in part:

3    Any person interested . . . under a contract . . . may, in cases of actual

4    controversy relating to the legal rights and duties of the respective parties,

5    bring an original action . . . for a declaration of his or her rights and duties

6    . . . including a determination of any question of construction or validity

7    arising under the instrument or contract.

8    *Id.* "A complaint for declaratory relief is legally sufficient if it sets forth facts showing

9    the existence of an actual controversy relating to the legal rights and duties of the

10   respective parties under a contract and requests that these rights and duties be adjudged

11   by the court." *Columbia Pictures Corp. v. DeToth*, 26 Cal. 2d 753, 760, 161 P.2d 217

12   (1945).

13   Again, as explained *supra*, Beatty is not a party to the agreement under which he

14   asks the Court to determine the rights of the parties and as a result there is no judiciable

15   dispute to be decided by this Court. *Int'l Brotherhood of Teamsters, etc. v Bekins Van*

16   *& Storage Co.*, 135 Cal. App. 2d 692, 697, 288 P.2d 181 (1955) ("An action for

17   declaratory relief will not lie when complaint alleges no facts showing enforceable

18   contractual right in plaintiff"); *Gillies v La Mesa, etc. Irr. Dist.*, 54 Cal. App. 2d 756,

19   762, 129 P.2d 941 (1942) ("An action for declaratory relief lies when there is an actual

20   bona fide dispute between the parties as to a legal obligation arising under the

21   circumstances specified in section 1060 of the Code of Civil Procedure. There must

22   not only be a dispute between the parties but that controversy must be judicable . . . .

23   When the complaint alleges no facts showing an enforceable contractual right in the

24   plaintiffs, and only a judgment for defendant can be entered, there is no judicable

25   dispute and the action will not lie").

26   Given that Beatty assigned all of his rights to Walt Disney Pictures pursuant to

27   the terms of Amendment and the alleged "retention" by and "re-assignment" to Beatty

28   of rights in the Dick Tracy Property are invalid as a matter of law, Beatty is no longer a

1  party to the Dick Tracy Agreement and summary judgment should be granted in

2  TMS's favor on Beatty's first claim for declaratory relief:

3      "It is not disputed that the summary judgment procedure is appropriate in

4      declaratory relief actions.  The propriety of the application of declaratory

5      relief lies in the trial court's function to render such a judgment when only

6      legal issues are presented for its determination."

7  *Siemon v. Russell*, 194 Cal. App. 2d 592, 595 (Cal. App. 2d Dist. 1961).

8

9  **D.    Beatty Cannot Establish Requisite Standing to Bring his Claims for Breach**

10       **of Contract.**

11      The second and third claims in the FAC for breach of contract[6] against TMS fail

12  for the same reason -- there is no evidence to support Beatty's allegation that he is a

13  party to the contract on which he bases his claims.

14      "Under a breach of contract theory, the plaintiff must demonstrate a contract, the

15  plaintiff's performance or excuse for nonperformance, the defendant's breach, and

16  damage to the plaintiff."  *Amelco Electric v. City of Thousand Oaks*, 27 Cal.4th 228,

17  243, 115 Cal. Rptr. 2d 900, 38 P.3d 1120, 1129-30 (2002), *citing* 4 B. WITKIN,

18  CALIFORNIA PROCEDURE, Pleading, § 476, p. 570 (4th Ed. 1997).  *See also Roth v.*

19  *Malson*, 67 Cal. App. 4th 552, 557, 79 Cal. Rptr. 2d 226 (1998) ("It is, of course, basic

20  hornbook law that the existence of a contract is a necessary element to an action based

21  on contract, regardless of whether the Plaintiff seeks specific performance or damages

22  for breach of contract.").  Here, there is no evidence to support this most basic element

23  of Beatty's claim for breach of contract – that he is a party to the contract at issue.

24  Beatty has no standing to bring the second and third claims in the FAC and TMS's

25  Motion should be granted with respect to those claims too.

26  _____

27  [6]    The second and third claims in the FAC both are for breach of contract and seek

28  damages and an injunction, respectively.

# CONCLUSION

For all of the reasons set forth herein, Beatty has no standing to bring any of the claims asserted in the FAC and TMS is entitled to Summary Judgment.

Respectfully Submitted,

Dated: February 3, 2006

Maura J. Wogan, Esq.
Cameron A. Myler, Esq.
FRANKFURT KURNIT KLEIN & SELZ, P.C.

Attorneys for Defendant
TRIBUNE MEDIA SERVICES, INC.

16

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California and my business address is 100 Wilshire Boulevard, Suite 2010, Santa Monica, CA 90401. I am over the age of 18 and not a party to this action.

On February 6, 2006, I served the foregoing document described as **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56**, on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope at Santa Monica, California, addressed as follows:

Bertram Fields, Esq.
Greenberg Glusker Fields Claman
Machtinger & Kinsella LLP
1900 Avenue of the Stars
Suite 2100
Los Angeles, CA 90067-4590

☐  I caused such envelope with postage thereon fully prepaid to be placed in the United States mail. I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing with the United States Postal Service. Correspondence for mailing is deposited with the United States Postal Service on that same day in the ordinary course of business. The foregoing document was sealed and placed for collection and mailing on the foregoing date, following the firm's ordinary practices. I am aware that on motion of any party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in the affidavit.

☒  I caused such envelope to be hand delivered to the offices of the addressee.

☐  I placed such envelope in a box or other facility regularly maintained by Federal Express, in an envelope or package designated and provided by Federal Express, with delivery fees paid or provided for, addressed to the above-indicated addressees.

☐  I caused a copy of the foregoing document to be faxed to the addressee.

Executed on February 6, 2006 at Santa Monica, California. I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____

17

# EXHIBIT K

ENTERED
CLERK, U.S. DISTRICT COURT

JUN 1 7 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

JUL 1 4 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

☑ Priority
☑ Send
☐ Clsd
NO̶ ̶JS̶-5/JS-6
___ JS-2/JS-3
___ Scan Only

SCANNED

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WARREN BEATTY,                )    Case No. CV 05-03938 DDP (SSx)
                              )
            Plaintiff,        )    ORDER DENYING SUMMARY JUDGMENT
                              )
    v.                        )    [Motion filed on 02/06/06]
                              )
TRIBUNE MEDIA SERVICES,       )
INC., ~~ROBERT NEWMYER, SCOTT~~ )
~~STRAUSS, LORENZO DI~~        )    ┌──────────────────────┐
~~BONAVENTURA, OUTLAW~~        )    │  DOCKETED ON CM       │
~~PRODUCTIONS~~,               )    │                       │
                              )    │   JUL 1 7 2006        │
            Defendants.       )    │                       │
                              )    │  BY _____ 053  │
──────────────────────────────     └──────────────────────┘

    This matter is before the Court on the defendant's motion for
summary judgment. After reviewing the submissions of the parties
and hearing oral argument, the Court denies the motion.


I.    BACKGROUND

    The Plaintiff, Warren Beatty, is an actor, writer, and
director of motion pictures. The Defendant, Tribune Media Services
("Tribune"), is a corporation that owns the copyright in the
cartoon character Dick Tracy and holds rights in various works
embodying that character. (First Am. Compl. ("FAC") ¶ 4.)

1   On August 28, 1985, Tribune and Beatty entered into a written

2   agreement (the "Dick Tracy Agreement") regarding motion picture

3   television, and other rights in the Dick Tracy character (the

4   "Tracy Rights"). Tribune asserts that the Dick Tracy Agreement gave

5   Beatty an exclusive license while Beatty argues that he obtained a

6   grant of rights. (Pl's Statement of Genuine Issues.) The Dick Tracy

7   Agreement also delineated Tribune's retained rights. (Undisputed

8   Fact ("UF") 3.)

9   Paragraph 9 of the Dick Tracy Agreement provided a procedure

10   through which Tribune could recapture the Tracy Rights from Beatty.

11   The procedure provided that if Beatty failed to commence production

12   of a Dick Tracy project within five years after his initial Dick

13   Tracy movie production or project, then Tribune could notify him

14   and his attorney in writing that it intended to recapture the

15   rights if Beatty did not commence a Dick Tracy project within the

16   next two years. If Beatty did not then commence such a project

17   within two years, Tribune could notify Beatty and effect a

18   reversion of the Tracy Rights.

19   On March 10, 1988, Beatty entered into an agreement with Walt

20   Disney Pictures ("Disney"). That agreement purported to grant

21   certain rights Beatty had received under the Dick Tracy Agreement

22   to Disney. In this agreement, Beatty reserved certain rights in the

23   Dick Tracy Property, including the right to produce, for his own

24   account, a Dick Tracy project during the last eighteen months of

25   the two-year recapture notification period. (Fields Decl. ¶¶ 8-11,

26   Ex. A; Beatty Decl. ¶¶ 7,8.)

27   On or about May 15, 1988, Tribune and Beatty amended the Dick

28   Tracy Agreement "with respect to the grant of certain rights to the

2

1  Dick Tracy Property." (UF 4.) In this amendment, the parties agreed

2  that Beatty would assign his rights and obligations to Disney. (UF

3  5.) Tribune consented to Beatty's transfer of rights to Disney. (UF

4  6.) Tribune argues, however, that no reservation of rights

5  occurred, and that if such reservation was attempted, it was not

6  made with Tribune's consent.

7       In 1990, Disney released a Dick Tracy motion picture. (UF 10.)

8  During 1994 and 1995, Disney produced an ice show with the Dick

9  Tracy character, which qualified as a project under the Dick Tracy

10  Agreement. In January 1995, Tribune and Disney entered into an

11  agreement to amend the Dick Tracy Agreement. (UF 8.) This amendment

12  affirmed that Beatty assigned his rights and obligations to Disney.

13  (UF 9.)

14       In July 2002, Tribune contacted Disney by letter, inquiring

15  whether Disney would permit Tribune to recapture the Tracy Rights

16  without undergoing the reversion procedures established in the

17  Beatty Agreement. Disney declined to waive its rights under the

18  reversion provision. Tribune did not notify Beatty or his attorney

19  of this request. In September 2002, Tribune sent another letter to

20  Disney in which Tribune claimed that it had already effected a

21  reversion of the Tracy Rights and that Disney had forfeited any

22  right to produce another Dick Tracy project. Tribune did not notify

23  Beatty or his attorney of the alleged reversion. Disney objected to

24  Tribune's assertion. In October 2004, Tribune notified Disney in

25  writing that the Tracy Rights had reverted to Tribune. Again,

26  Tribune did not notify Beatty of its position regarding the alleged

27  reversion.

28  ///

3

1      In May 2005, Disney reassigned the Tracy Rights to Beatty,

2  except for theme park rights and rights to exploit the previously

3  produced Dick Tracy projects. (UF 23.) Tribune did not consent to

4  this assignment. Tribune argues that because it did not consent to

5  the transfer of rights to Beatty, the transfer is impermissible

6  under the Copyright Act and Ninth Circuit law. Tribune asserts that

7  Beatty does not hold any of the Tracy Rights and thus does not have

8  standing to bring this suit.

9

10  II.   DISCUSSION

11        A.   Legal Standard for Summary Judgment

12      Summary judgment is appropriate where "there is no genuine

13  issue as to any material fact and ... the moving party is entitled

14  to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine

15  issue exists if "the evidence is such that a reasonable jury could

16  return a verdict for the nonmoving party," and material facts are

17  those "that might affect the outcome of the suit under the

18  governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

19  (1986). Thus, the "mere existence of a scintilla of evidence" in

20  support of the nonmoving party's claim is insufficient to defeat

21  summary judgment. Id. at 252. In determining a motion for summary

22  judgment, all reasonable inferences from the evidence must be drawn

23  in favor of the nonmoving party. Id. at 242.

24        B.   Analysis

25      It is undisputed that Tribune conveyed the Tracy Rights to

26  Beatty in 1985. It is disputed, however, whether Beatty maintains

27  any of those rights at this time. Beatty argues that his current

28  rights are derived from two distinct transactions. First, there is

4

1  a set of rights that Beatty contends he reserved when conveying the

2  Tracy Rights to Disney in March 1988. Specifically, Beatty contends

3  he reserved the right to produce a Dick Tracy movie on his own

4  account within the last eighteen months of the two-year recapture

5  period (the "reserved rights"). Second, there is a set of rights

6  that Disney allegedly conveyed back to Beatty in 2005 (the

7  "reassigned rights").

8      In 1985, Beatty and Tribune entered into the Dick Tracy

9  Agreement. (Parks Decl. Ex 2.) This agreement was a "grant of

10  certain rights with respect to the 'Dick Tracy' property." (Id. at

11  29.) The Dick Tracy Agreement delineated the rights bestowed upon

12  Beatty and the rights reserved by Tribune. Paragraph 7 of the Dick

13  Tracy Agreement states that "[e]xcept as otherwise specified herein

14  and subject to rights of reversion, all rights are granted in

15  perpetuity." (Id. at 31.) The agreement also outlined processes

16  whereby the right might revert to Tribune. The agreement refers to

17  the transfer of right as a "grant," not a license. The agreement

18  did not state an intention to establish a joint ownership of the

19  copyright or assert that the Tracy Rights would be a joint work.

20      In May of 1988, Beatty and Tribune amended the Dick Tracy

21  Agreement. (Parks Decl. Ex. 3.) The amendment acknowledged the

22  earlier "grant" of rights to Beatty followed by an agreement that

23  Beatty "shall assign his rights and obligations hereunder" to

24  Disney. (Id. at 35.) The amendment also stated that Tribune

25  "consents to such assignment." Thus, the parties acknowledged

26  Beatty was granted rights and that Beatty assigned those rights to

27  Disney. The amendment does not put any further limitation on the

28  ///

1  rights assigned to Disney nor does it mention retention of rights

2  by Beatty.

3      Complying with this amendment, in September 1988, Beatty

4  executed a Short Form Assignment of Rights which he filed with the

5  copyright office. (Parks Decl. Ex. 7.) Although this short form

6  does not delineate the retention of rights by Beatty, the document

7  states that the transfer is subject to the an agreement dated March

8  10, 1988.

9      On March 10, 1998, Beatty entered in to an agreement with

10 Disney. That March 10th agreement delineates Beatty's reserved

11 rights. Beatty argues that Tribune thus had constructive knowledge

12 of the reserved rights via the assignment agreement that references

13 the March 10th agreement. (Opp'n 18.) Tribune argues that it did

14 not know about the March 10th agreement and, therefore, did not

15 know of or approve Beatty's retention of rights. Tribune argues

16 that as the copyright holder, it controls any assignment of rights.

17 Tribune consented to Beatty's assignment of rights to Disney.

18 Because Beatty did not indicate that he only intended to assign

19 some of those rights, Tribune considered it to be an assignment of

20 all of the rights.

21     The essence of Beatty's argument is the contention that

22 because Tribune "granted" him rights in the Dick Tracy Agreement,

23 he had the ability to enter into any agreements he wished regarding

24 his obtained rights. Thus, Beatty argues, he was free to enter into

25 an agreement with Disney where he only assigned some of his granted

26 rights. Additionally, following this argument, he was under no

27 obligation to inform Tribune of this arrangement let alone obtain

28 its consent.

1   The Dick Tracy Agreement "granted" Beatty rights in the Dick

2 Tracy property. Tribune describes this grant as an exclusive

3 license. (Mot. 10.) Under Ninth Circuit law, the transfer rights of

4 exclusive licensees are limited. <u>Gardner v. Nike</u>, 279 F.3d 774,779-

5 80 (9th Cir. 2002). Therefore, Tribune asserts, Beatty's right to

6 transfer its exclusive license to Disney were limited. However,

7 Tribune also argues that the analysis does not turn on the label

8 given to the Tracy Rights. Tribune asserts that whether Beatty was

9 assigned, granted, or exclusively licensed the rights, he still

10 holds something less than the totality of rights commanded. (Mot.

11 10.) Citing the Ninth Circuit's decision in <u>Gardner</u>, Tribune argues

12 that any copyright that is less than the whole bundle of rights

13 should be considered an exclusive license and therefore limited.

14   The categorization of Beatty's rights granted to him in the

15 Dick Tracy Agreement turn on the interpretation of the Copyright

16 Act of 1976 and the Ninth Circuit precedent in this area laid out

17 by <u>Gardner</u> and <u>Leicester v. Warner Brothers</u>, 232 F.3d 1212 (9th

18 Cir. 2000).

19       1.   The Copyright Act of 1909

20   The Copyright Act of 1909 established the doctrine of

21 indivisibility, prohibiting the dividing of a copyright. <u>Harris v.</u>

22 <u>Emus Records Corp.</u>, 734 F.2d 1329 (9th Cir. 1984). A copyright

23 holder could not grant or assign a portion of its copyright.

24 Copyright owners had the option of assigning their entire

25 copyright, creating joint ownership arrangements, or licensing

26 their copyrights. A "grant" or an "assignment" entailed transfer of

27 an entire copyright. Anything less than a total transfer of a

28 copyright was considered a license. 3 Melville Nimmer & David

1   Nimmer, Nimmer on Copyright § 10.01[A] (2003); Gardner v. Nike, 110

2   F. Supp. 2d 1282, 1285 (C.D. Cal. 2000) (Baird, J.). A licensee had

3   permission to exploit a copyright to the extent agreed upon between

4   the parties, but the copyright owner retained all actual ownership

5   rights. Thus, while an assignment entailed a full transfer of a

6   copyright accompanied by all associated rights and protections, a

7   license was merely an agreement that the copyright owner would not

8   sue the licensee for infringement. Copyright licenses were not

9   transferable under the 1909 Act. Harris v. Emus Records Corp., 734

10  F.2d 1329, 1333 (9th Cir. 1984).

11      The doctrine of indivisibility created multiple problems for

12  licensees. See Gardner, 110 F. Supp. 2d at 1285. For example,

13  licensees had no independent ability to enforce copyrights. If

14  someone was violating the copyright (and thereby reducing the value

15  of their license) only the copyright owner could enforce against

16  the violator. Thus, licensees were dependant on copyright owners to

17  bring infringement actions. Id. Additionally, a licensee had no

18  right to transfer her rights under a license. Based on these

19  complications and others, Congress amended the Act in 1976,

20  essentially eliminating the doctrine of indivisibility.

21          2.   The Copyright Act of 1976

22      The 1976 Copyright Act established the ability to create

23  divisible or partial copyrights. If one views a copyright as a

24  bundle of sticks, the Copyright Act now allows the bundle to be

25  divided up and the sticks dispersed.

26      Section 101 and 201 of the 1976 Act set forth the principle of

27  a divisible copyright. First, section 101 defines a "transfer of

28  copyright ownership" as "an assignment, mortgage, exclusive

1  license, or any other conveyance, alienation, or hypothecation of a

2  copyright <u>or any of the exclusive rights comprised in a copyright</u>,

3  whether or not it is limited in time or place of effect, but

4  including a nonexclusive license." 17 U.S.C. § 101 (emphasis

5  added). Thus, the statute acknowledges the possible ownership of

6  separate rights in a copyright. Further, this definition

7  distinguishes between an "assignment" and an "exclusive license"

8  but acknowledges they are both types of copyright ownership.

9  Neither "assignment" nor "exclusive license" are further defined by

10  the copyright statute.

11      The committee notes accompanying the 1976 amendments describe

12  section 201(d) as "explicit statutory recognition of the principle

13  of a divisible copyright." 17 U.S.C.A. § 201 note (West 1996)

14  (Notes of Comm. on Judiciary, H. Rep. No. 94-1476).

15      (d)   Transfer of Ownership. --
          (1)   The ownership of a copyright may be transferred
16                in whole or <u>in part</u> by any means of conveyance
                  or by operation of law, and may be bequeathed by
17                will   or   pass   as   personal   property   by   the
                  applicable laws of intestate succession.
18      (2)   Any   of   the   exclusive   rights   comprised   in   a
                  copyright,   including   any   subdivision   of   the
19                rights   specified   in   section   106,   may   be
                  transferred as provided by clause (1) and owned
20                separately.   The   owner   of   any   particular
                  exclusive right is entitled to the extent of
21                that   right,   to   all   of   the   <u>protection and</u>
                  <u>remedies</u> accorded to the copyright owner by this
22                title.

23  17 U.S.C. § 201(d) (emphasis added).

24      In subsection (d)(1), this provision acknowledges the

25  possibility of a divided copyright. In subsection (d)(2), the

26  statute sets forth the rights for holders of an "exclusive right"

27  comprised in a copyright. Courts have applied section (d)(2) to

28  ///

1  exclusive licensees. <u>Gardner v. Nike</u>, 279 F.3d 774, 779-80 (9th

2  Cir. 2002).

3     Courts differ on whether the "protection and remedies"

4  acquired by an exclusive licensee include the right, absent

5  permission from the copyright owner, to transfer or sublicense the

6  exclusive right. <u>Compare</u> <u>Gardner v. Nike, Inc.</u>, 110 F. Supp. 2d

7  1282, 1286-87 (C.D. Cal. 2000) (holding that exclusive licensee's

8  unauthorized assignment of rights to third party was invalid, and

9  stating that there is no indication that Congress intended to give

10  exclusive licensees the right to sublicense rights) <u>aff'd</u>, 279 F.3d

11  774, 780 (9th Cir. 2002), <u>with</u> <u>Leicester v. Warner Bros.</u>, 47

12  U.S.P.Q.2d (BNA) 1501, 1504-05 (C.D. Cal. 1998) <u>aff'd</u>, 232 F.3d

13  1212, 1220 (9th Cir. 2000) (holding that exclusive licensee of

14  artist "had the right to sublicense three-dimensional

15  reproductions" of public artwork) and <u>In re Golden Books Family</u>

16  <u>Entm't, Inc.</u>, 269 B.R. 311, 318-19 (D. Del. 2001) (declining to

17  follow <u>Gardner</u> and holding exclusive license assignable because

18  "protection of remedies" in section 201(d)(2) includes all of an

19  owner's rights, including right to assign). <u>See</u> <u>also</u> <u>In re Patient</u>

20  <u>Educ. Media, Inc.</u>, 210 B.R. 237, 240 (Bankr. S.D.N.Y. 1997)

21  (stating in dictum that "the licensee under an exclusive

22  [copyright] license may freely transfer his rights," although a

23  nonexclusive licensee may not do so).

24     Tribune urges the Court to view Beatty as an exclusive

25  licensee limited by section 201(d)(2) as set forth by the Ninth

26  Circuit in <u>Gardner v. Nike, Inc.</u>, 279 F.3d 774 (9th Cir. 2002). In

27  <u>Gardner</u>, the Ninth Circuit held that the holder of an exclusive

28  license did not have the ability to transfer, or sublicense, the

1 right it held. Nike and Sony had entered an exclusive licensing

2 agreement in which Nike granted Sony the right to use a Nike-

3 created cartoon character. Later, and without Nike's consent, Sony

4 conveyed those rights to Gardner. When Nike threatened suit against

5 Gardner, Gardner sued for declaratory relief. The district court

6 granted Nike's motion for summary judgment, finding that the

7 Copyright Act of 1976 did not allow Sony to transfer its rights

8 under the exclusive license without Nike's consent. Gardner, 110 F.

9 Supp. 2d at 1286-87. The Ninth Circuit affirmed the decision.

10 Gardner, 279 F.3d at 777.

11      Tribune argues that the reassigned Tracy Rights are analogous

12 to the rights at issue in Gardner because the rights were

13 transferred by a licensee (Disney) without the consent of the

14 original licensor (Tribune). Accordingly, Tribune argues, the

15 alleged transfer from Disney to Beatty is void under federal law

16 and Beatty does not have standing to bring this suit. Additionally,

17 Tribune argues that Beatty's purported retention of rights is not

18 valid because it was done without Tribunes consent. Tribune

19 specifically consented to and acknowledged Beatty's transfer to

20 Disney, but did not consent to Beatty limiting the transfer.

21      Beatty counters that Gardner is inapposite because Beatty was

22 granted, rather than licensed, rights by Tribune in 1985, and once

23 rights have been granted, the original assignor's consent is no

24 longer needed to render a subsequent transfer of rights effective.

25 The Court agrees.

26      The Dick Tracy Agreement grants the Tracy Rights to Beatty.

27 The language of the agreement tracks a grant or an assignment. The

28 parties specifically used those terms and indeed used the term

11

1  "license" elsewhere in the document, demonstrating that the parties

2  viewed licenses and grants as different rights. The Dick Tracy

3  Agreement grants Beatty the movie and television rights in

4  perpetuity. Although the agreement contains a right of reversion,

5  this does not convert Beatty's grant to a license.

6      When Tribune granted the Tracy Rights to Beatty, Tribune gave

7  away its own ability to exploit or enforce those rights. See Althin

8  CD Med., Inc. v. W. Suburban Kidney Ctr., 874 F. Supp. 837, 842

9  (N.D. Ill. 1994); Imperial Residential Design, Inc. v. Palms Dev.

10 Group, Inc., 70 F.3d 96 (11th Cir. 1995) (transfer of copyright

11 divested former owner of standing to sue for infringements that

12 occurred after transfer). The rights became wholly the property of

13 Beatty.

14     Section 106 of the Copyright Act sets forth the six exclusive

15 rights that make up copyright. 17 U.S.C. § 106. These comprise the

16 right to reproduce, to make derivative works, to distribute copies,

17 to perform, to display, and, in the case of sound recordings, to

18 perform the recorded works publicly. Id. When Beatty gained the

19 Tracy Rights, he received all six of these exclusive rights in

20 relation to the Tracy Rights. Section 201(d)(2) limits the rights

21 for holders of one of these exclusive rights. However, this does

22 not mean that it limits granted rights along the lines of the ones

23 Beatty negotiated. For example, Beatty did not contract merely for

24 the right to distribute or copy a Dick Tracy movie, but for all six

25 of the exclusive rights that make up a copyright.

26     Tribune argues that any right less than an entire copyright is

27 not assignable and should be considered an exclusive license. This

28 contention is not mandated by the statute or the legislative intent

1  of the 1976 amendments. Additionally, <u>Gardner</u> does not require such

2  a finding. In <u>Gardner</u>, the Ninth Circuit and the district court

3  explained that the holding focused on the rights of <u>exclusive</u>

4  <u>licensees</u> to transfer.

5      The circumstances in that case differ from the situation

6  currently before the Court. In <u>Gardner</u>, the parties acknowledged

7  that Sony only held an exclusive license. Nike specifically

8  retained the trademark and copyright to the cartoon character.

9  Anything produced by Sony was to bear the Nike mark. Thus, Nike

10  made clear its intention to be linked to the character and to

11  control the display of the character.

12      When the Ninth Circuit examined partial copyrights in

13  <u>Leicester v. Warner Brothers</u>, the court reached a different

14  conclusion. In <u>Leicester</u>, an artist worked with a building

15  developer to create a sculptural work in a courtyard connected with

16  the building in question. 232 F.3d 1212 (9th Cir. 2000). A contract

17  between the artist and the developer gave the developer a

18  "perpetual irrevocable license to make reproductions" of the

19  sculpture. <u>Id.</u> at 1215. The artists also agreed that he would "not

20  make any duplicate, three-dimensional reproductions" of the

21  sculpture or grant others permission to do so. <u>Id.</u> The Ninth

22  Circuit interpreted this language as conferring on the developer

23  the "exclusive right to make three-dimensional representations" of

24  the sculpture. <u>Id.</u> at 1220. Therefore, the court held, the

25  developer could sublicense that right. <u>Id.</u>

26      It is difficult to reconcile <u>Leicester</u> with <u>Gardner</u>. The

27  <u>Gardner</u> court did not discuss <u>Leicester</u>. Based on the logic

28  outlined in <u>Gardner</u>, the developer should not have had the ability

13

1   to sublicense the right to make three-dimensional representations

2   of the sculpture without the sculptor's consent. However, neither

3   Leicester or Garnder address the ability to transfer rights that

4   have been granted. Both those cases discuss the rights of exclusive

5   licensees. Therefore, the Court need not evaluate these cases. As

6   Beatty's copyright interest was a grant of rights and not an

7   exclusive interest, there was no requirement that Beatty obtain

8   Tribune's consent when structuring a licensing agreement with

9   Disney.

10      The Court also notes that the result urged by Tribune would

11  not be a sensible outcome in light of the practicalities of the

12  motion picture industry. When a studio creates a motion picture or

13  television program, it will necessarily seek to distribute the

14  work. This includes many sublicensing contracts regarding copying,

15  displaying, and distributing the work. To require an underlying

16  copyright holder to approve all such decisions is not practical.

17  Indeed, such control over the work appears to conflict with the

18  Congressional intent of allowing divisibility of copyright. The

19  goals of the 1976 amendments to the copyright act were to allow

20  partial copyright holders security over their right. Requiring

21  consent of the underlying copyright owner for any transaction would

22  allow an underlying copyright holder veto power over a copyright at

23  every transaction.

24      The Dick Tracy Agreement granted Beatty the Tracy Rights.

25  Therefore, Beatty was not required to obtain Tribune's consent

26  before transferring its rights. The fact that Tribune did consent

27  to a transfer to Disney does not show that such consent was

28  required. Additionally, Beatty did not require Tribune's approval

14

1  for any conditions included in a transfer of the rights. Therefore,

2  Beatty's retention of rights was valid. Thus, Beatty still has

3  rights in the disputed property based on this retention and is

4  still bound by the Dick Tracy Agreement with regards to the Tracy

5  Rights. Further, as party to the Dick Tracy agreement, Beatty has

6  standing to bring this case.

7

8  **III. CONCLUSION**

9       For the foregoing reasons, the Court denies the Defendants'

10  motion for summary judgment.

11

12  IT IS SO ORDERED.

13

14

15  Dated:  2-14-06

16                                          DEAN D. PREGERSON
                                            United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28