## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TRIBUNE COMPANY, *et al.*, | ) | Case No. 08-13141 (KJC) |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) | Re: Docket No. 1334 |
|  | ) | **Hearing Date: July 28, 2009 at 1:00pm (ET)** |
|  | ) | **Objection Deadline: July 16, 2009 at 4:00pm (ET)** |

**OBJECTION TO THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR AN ORDER AUTHORIZING THE EXAMINATION OF ROBERT R.
MCCORMICK TRIBUNE FOUNDATION [SIC] AND THE CANTIGNY FOUNDATION
AND THE PRODUCTION OF DOCUMENTS PURSUANT TO BANKRUPTCY RULE
2004**

The Robert R. McCormick Foundation[1] ("McCormick Foundation") and Cantigny

Foundation (together, the "Foundations"), by and through their undersigned counsel, hereby

object to the Motion of the Official Committee of Unsecured Creditors ("Committee") for an

Order Authorizing the Examination of Robert R. McCormick Tribune Foundation [sic] and

Cantigny Foundation and the Production of Documents Pursuant to Bankruptcy Rule 2004

[Docket No. 1334] ("Motion").  In support of their objection, the Foundations respectfully state:

### INTRODUCTION

1.      To be entitled to a Rule 2004 examination of the Foundations, the Committee

must establish good cause, which requires that the examination be necessary to establish a claim

of the Committee and that the necessity of such an examination outweighs the burden on the

Foundations.  *Infra*, § I.  The Committee's Motion should be denied because the Committee fails

to establish good cause to compel the Foundations (public charities) to endure the burden of an

---

[1] In May 2008, the McCormick Foundation changed its name to the "Robert R. McCormick Foundation," omitting
the word "Tribune."

unnecessary production and examination.   The documents sought from the Foundations are either already available as part of the public record, or are more readily available, or have been requested or obtained, from the Debtors themselves or from Samuel Zell or his controlled entities ("Zell").   *See* Motion, ¶ 8.   The Foundations, mere shareholders, should not be required to expend their time and resources and bear the cost of producing duplicative documents so that the Committee can pursue an avoidance claim which the Committee has already identified, but which the Committee as yet has no authority to assert, and which cannot, as a matter of law, result in a judgment against the Foundations.

2.       Although a creditor may use Rule 2004 to pursue appropriate discovery, the discovery sought by the Committee far exceeds the limits of appropriateness under the facts of this case.  The Committee states that its requests are intended to "assess whether the Debtors' estates may have causes of action related [to the Leveraged ESOP Transactions and the Merger]."   (Motion, ¶ 15.)    However, the discovery sought is both unnecessary to the Committee's legitimate enquiry and unduly burdensome to the Foundations.

3.       The Committee fails in its Motion to address the fact that it currently lacks standing to assert a claim on behalf of the Debtors' estates.  Notwithstanding that oversight, it is clear that the Committee nonetheless anticipates bringing a fraudulent conveyance claim against the Foundations.  *See* Motion, ¶ 16.  With that goal in mind, the Committee already has sufficient information to ascertain whether there exists a valid avoidance action against either of the Foundations; further "assessment" is unnecessary.   Rather, the Committee intends through its Motion to use Rule 2004 as an end-run around the protections that would be afforded the Foundations under the Bankruptcy Code once any avoidance action is filed.

## BACKGROUND

4.     The predecessors to the Robert R. McCormick Foundation and Cantigny Foundation were established as charitable trusts under provisions in the last will and testament of Colonel Robert R. McCormick upon the Colonel's death in 1955.  They were subsequently reorganized as charitable corporations under the General Not-For-Profit Corporation Act of Illinois.  Under Colonel McCormick's will, the Foundations received a portion of his Tribune Company ("Tribune") common stock.  In 1985, upon the death of Colonel McCormick's wife, Maryland, the McCormick Foundation received the balance of Tribune stock from a trust created by Colonel McCormick for the benefit of his wife.

5.     The McCormick Foundation has been serving the needs of children and communities for over fifty years, and it is one of the nation's largest public charities.  It is committed to the advancement of the ideals of a free, democratic society and, in furtherance of that mission, has granted more than $1 billion dollars to organizations in local communities across the country, as well as offering its own programs and services to the public.

6.     Cantigny Foundation is a not-for-profit organization committed to serving as the good steward of the Cantigny Park, a 500-acre preserve, which is held for the use of the people of Illinois.  This commitment is reflected in the park's designation as a certified Audubon Cooperative Sanctuary, and in the Cantigny Foundation's partnerships with the Conservation Foundation and Chicago Wilderness, a regional nature reserve.  In addition to caring for and operating the park, Cantigny Foundation offers conservation and nature programs for adults, families, and children, as well as Cantigny First Division Museum, which provides a view of American history as seen through the eyes of the First Infantry Division of the U.S. Army, and the Robert R. McCormick Museum, which preserves, manages, and restores Colonel

McCormick's former home and informs the public on his impact on politics, media, First Amendment issues, industry, philanthropy, and patriotism.

7.       On April 1, 2007, Tribune entered into a Merger Agreement with the newly formed Tribune Employee Stock Ownership Plan (the "ESOP").  Under the Merger Agreement (and subject to shareholder approval and the satisfaction of certain other conditions), Tribune was to become wholly owned by the ESOP.  In order to accomplish the Merger, Tribune undertook a series of transactions referred to, collectively, in Tribune's filings with the Securities and Exchange Commission as the "Leveraged ESOP Transactions."

8.       Two features of the Leveraged ESOP Transactions were (a) a tender offer by Tribune to repurchase up to 126,000,000 shares of its own common stock at $34.00 per share (the "Share Repurchase"); and (b) conversion of the remaining shares (except those held by Tribune and the ESOP) into the right to receive $34.00 per share upon consummation of the Merger.

9.       Along with many other shareholders, the Foundations tendered their shares of Tribune common stock to Tribune, in response to the tender offer.

10.      On May 31, 2007, Tribune announced that it was applying a proration factor of 0.5771140650 to the tendered shares.  Therefore, only a portion of the shares tendered by the Foundations were accepted as part of the Share Repurchase.

11.      More than 97% of the shares voting on the issue of the Merger voted in favor. Following shareholder approval and the satisfaction of the remaining conditions, the Merger became effective.

12.     The remaining outstanding Tribune shares, including the remaining shares held by the McCormick Foundation, were converted into cash consideration of $34.00 per share on December 20, 2007, the effective date of the Merger.

13.     The settlement payments to the Foundations in respect to their tendered shares were made by wire transfer from Bank of America to the Foundations' bank accounts at The Northern Trust.   The settlement payment to the McCormick Foundation as a result of the Merger was also paid via wire transfer from Bank of America to the McCormick Foundation's bank account at the Northern Trust.   Cantigny Foundation received no payment in respect to the Merger because after the tender offer, it had disposed of its remaining Tribune shares through sales in the open market.

14.     Tribune filed this chapter 11 bankruptcy case on December 8, 2008.

## ARGUMENT

## I.      The Committee Has Not Established Good Cause for the Discovery Sought.

15.     The Committee seeks entry of an order (i) compelling the attendance of a representative of the Foundations for examination in Delaware; (ii) requiring the Foundations to produce, in Delaware, those documents delineated in the thirteen-page exhibit to its Motion; and (iii) requiring the document production and in-person deposition to proceed without further objection.   Prior to bringing its Motion, the Committee did not request a personal examination; nor has the Committee indicated in its Motion the scope of the requested examination.   Thus, its request that an examination proceed without further objection is not well founded.

16.     The Committee's justification for the propriety of a Rule 2004 examination is limited to relying on the scope of the inquiry permitted under that Rule as a "fishing expedition" (Motion, ¶ 14), and to alleging that the Foundations must "have material and relevant

information concerning the Merger" (Motion, ¶ 16), because the Foundations were Tribune's "major stockholders" (Motion, ¶ 17).[2]  But having a wide net is not the same as having a permit to cast it: "That documents meet the requirement of relevance does not alone demonstrate that there is good cause for requiring their production," *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991); nor does it entitle the Committee to an order compelling the Foundations to undergo the considerable expense of appearing for examination in person, in Delaware, and producing documents responsive to a thirteen-page request, encompassing thirty-six separate categories of documents.  The costs of compliance will divert monies and resources from the furtherance of the Foundations' charitable missions.

17.     Rather, compelling production under Rule 2004 is discretionary; the Committee must not only show that the information sought is relevant to the affairs of the Debtor, but that good cause exists for the Court to order the examination.  *See*, *e.g.*, Fed. R. Bankr. Pro. 2004(a) ("the court *may* order the examination of any entity") (emphasis added); *In re Express One Int'l, Inc.*, 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998) ("the one seeking to conduct a 2004 examination has the burden of showing good cause for the examination which it seeks"); *In re Hammond*, 140 B.R. 197, 200-201 (S.D. Ohio 1992) ("'May' connotes discretion. . . . [T]he examiner has the burden of establishing that 'good cause' exists for the taking of the examination.").

18.     "Generally, good cause requires a showing that the examination sought is *necessary to establish the claim of the party seeking the examination*, or the denial of such request would cause the proposed examiner *undue hardship or injustice*."  *In re Express One Int'l, Inc.*, 217 B.R. at 217 (emphasis added).  The Committee has done neither. *See In re*

---

[2] This statement is incorrect, as it ignores the fact that the Chandler Trusts (entities unrelated to the Foundations) were the largest shareholders of Tribune common stock.  *See*, *Tribune Company, Form 8-K* filed with the United States Securities and Exchange Commission, April 5, 2007 (hereinafter referred to as "Form 8-K (4/5/07)").

*Wilcher*, 56 B.R. 428, 435 (Bankr. N.D. Ill. 1985) ("[T]he burden of showing good cause is an affirmative one and is not satisfied merely by showing that justice would not be impeded by a production of the requested documents."); *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. at 712.  Even where the requested examination is necessary, the relevance and necessity of the information sought must be balanced against "the extent of inconvenience and intrusion" for the Foundations.  *See In re Kreiss*, 46 B.R. 164, 165 (Bankr. E.D.N.Y. 1985).

19.    Here, the requested examination is not necessary to establish a claim of the Committee (which is the reason offered by the Committee), nor would denial of the request impose any hardship on the Committee (as they have identified none).  Finally, even had the Committee met its burden of establishing good cause, the questionable benefit of the requested examination is greatly outweighed by the considerable burden it would impose on the Foundations.

**A.    The Requested Examination of the Foundations Is Not Necessary Where the Debtors and Zell Can Provide All the Requested Documents.**

20.    The Committee claims that, as parties "involved in the Leveraged ESOP Transactions, [the Foundations] have material and relevant information concerning the Merger." (Motion, ¶ 16.)  This assumption, however, is mere conjecture. The fact that the Foundations received payments for their stock does not by itself establish that they had any information, let alone "material and relevant" information concerning the merger of Tribune with Tesop Corporation – a transaction to which the Foundations were not parties.  Rather, if the Committee wants information from shareholders, it should pursue information from the Chandler Trusts, as they were the "major shareholders" of the Tribune *and* they were parties to a voting agreement

that pertained to the Merger agreement.  See, Form 8-K (4/5/07).  The Committee cannot simply use the buzzwords "material and relevant" to satisfy the requirements of Rule 2004.

21.    The Committee also relies on the possibility of uncovering information relating to "the apparent decline in revenue and poor economic conditions suffered by the Debtors *after the Merger*" (emphasis added) to provide a basis for the requested examination of the Foundations. This is even less than conjecture.  Upon the Merger, the McCormick Foundation's stock was converted into consideration.  Cantigny Foundation did not even have stock to convert, since it sold what shares it held after the tender on the open market prior to the effective date of the Merger.  Thus, neither of the Foundations had any further involvement following the Merger, and neither would therefore have any information regarding the Debtors' economic conditions following the Merger that would not be available from the public record.

22.    If the Committee truly wanted to assess whether the Debtors' estates have any causes of action related to the Leveraged ESOP Transaction and the Merger, it would, at a minimum, first seek and complete an examination of the Debtors, Samuel Zell, or EGI-TRB, L.L.C., the parties to the Leveraged ESOP Transaction, before requiring these charitable Foundations to bear the burden of responding.  Indeed, the requests served on the Foundations appear to have been drafted for the Debtors' response, with no attempt by the Committee to tailor the requests to the Foundations.  Among other things, the Committee seeks, among its thirty-six requests:

- All documents relating to the *assets and liabilities of the Debtors* or the Guarantor Subsidiaries *during the period January 1, 2007 through the Petition Date*, including all balance sheets, financial statements, listing of all cash accounts held by the Debtors or the Guarantor Subsidiaries and the monthly balances for each account, summary and detail supporting all tangible and intangible assets, detailed intercompany receivable and inter-company payable balances and activity, summary and detail supporting all liabilities of each of the Debtors and Guarantor

Subsidiaries, including short-term and long-term liabilities, and other information detailing such assets and liabilities.  (Request No. 2) (emphasis added).

- All Documents relating to the *book value of the assets and liabilities of the Debtors* and Guarantor Subsidiaries and the calculations thereof, including as calculated under GAAP, *during the period January 1, 2007 through the Petition Date*. (Request No. 3) (emphasis added).

- All documents *prepared in connection with the Merger, the Credit Agreement, the Interim Credit Agreement or the Zell Notes*, including documents relating to financial projections, cash flows, income statements, balance sheets, borrowing bases or operating metrics and documents *prepared for or presented to the Board of Directors of Tribune*, any committee thereof, *or any Debtor* in connection with the Merger, the Credit Agreement, the Interim Credit Agreement or the Zell Notes. (Request No. 5) (emphasis added).

- All documents relating to *presentations made* in connection with the Merger, the Credit Agreement, the Interim Credit Agreement or the Zell Notes, including *to the Tribune Board of Directors* or any committees thereof, rating agencies, actual or proposed lenders, financial advisors, or the Tribune Employee Stock Ownership Plan or trustees thereof or advisors thereto. (Request No. 9) (emphasis added).

- All documents relating to *business plans for any Debtor* or Guarantor Subsidiary prepared or in effect *during the period January 1, 2007 through the Petition Date*. (Request No. 14) (emphasis added).

- All documents reflecting interest or principal *payments made under the Credit Agreement, the Interim Credit Agreement or the Zell Notes* on or prior to the Petition Date, including documents showing by whom or on whose behalf such payments were made, to when [sic] such payments were made, the amounts of such payments, the dates of such payments and under which agreements the payments were made. (Request No. 26) (emphasis added).

- All documents, including notes and emails, concerning the analysis, review or consideration *by any director of any Debtor* or Guarantor Subsidiary, of the Merger, the Credit Agreement, the Interim Credit Agreement or the Zell Notes, or any of the transactions contemplated thereunder. (Request No. 29) (emphasis added).

- All documents concerning income *tax returns filed* with any government tax authority *by or on behalf of the Debtors* or Guarantor Subsidiaries for all or any part of 2007 and 2008 as well as any amended returns for the same periods. (Request No. 30) (emphasis added).

23.     It is unclear why the Committee would seek a "listing of all cash accounts held by the Debtors or the Guarantor Subsidiaries and the monthly balances for each account" from the Foundations, just as it is unclear why the Committee would believe the Foundations to have any documents relating to "presentations made . . . to the Tribune Board of Directors . . . or proposed lenders . . . or the Tribune Employee Stock Ownership Plan . . . ." As the Committee knows, the Foundations were not parties to the Credit Agreement, Interim Credit Agreement, Merger, or Zell Notes. The extent of the Foundations' involvement in this transaction was their tender of shares on the same terms as all other shareholders that tendered shares in response to the Tribune's tender offer and (in the case of the McCormick Foundation) the receipt of consideration when the Merger occurred. The Foundations' investigations of the transactions were limited to compliance with their own fiduciary duty to determine whether they would be getting a fair price for their shares.

24.     The documents the Committee has requested from the Foundations were either provided to the Foundations *by the Debtor* or are part of the public record. Tribune was a public company and required to report to the Securities and Exchange Commission in respect to the material aspects of the Leveraged ESOP Transactions and Merger. The specifics of the Leveraged ESOP Transactions and Merger are readily available in the stock purchase agreements, prospectuses, and Schedule 13D amendments, all of which are a matter of public record. To the extent that the Foundations have documents beyond those in the public record, they were provided to the Foundations and the other shareholders *by the Debtors*. The Committee would suffer no hardship if it were required to obtain this information from its source. If its request for an examination of the Foundations were denied, not only would the Committee suffer no hardship, the Committee would actually be better served requesting

information relating to the internal workings and deliberative processes of the Debtors from the Debtors themselves.

25.     In fact, the Committee concedes that it has "sent requests for information surrounding the Leveraged ESOP Transactions and the Merger to, *among others, the Debtors and Zell*." (Motion, ¶ 8) (emphasis added).  However, the Committee fails to report whether it received responses and documents from either the Debtors or Zell, and if so, why it needs from the Foundations the same information it has already requested from those most likely to have it, and which it may already have received.  In fact, the Committee's failure to seek authority for Rule 2004 examinations of the Debtors, Zell, or any other party suggests that the Committee has received the information requested from others.  Instead, the Committee attempts to justify its requests by suggesting that since the same requests were sent to others, the Foundations must also respond.  Having admitted that the same requests were made of Zell and the Debtors, the Committee should be required to disclose what, if any, information it could not obtain from Zell and the Debtors and establish that the only other sources from which to obtain any missing information are the Foundations.  Without such explanation, the Committee fails to satisfy its burden of establishing why the Foundation should be ordered to respond to the same requests made of Zell and the Debtors.

### B.     The Requested Examination of the Foundations Is Not Necessary to Establish a Claim.

26.     The motivation behind the Committee's unnecessary request for a Rule 2004 examination of the Foundations is clear: the Committee is positioning itself to bring a fraudulent transfer claim against the Foundations.  The Committee admits as much, stating that "[a]ny potential causes of action relating to the Leveraged ESOP Transaction and the Merger are assets of the Debtors' estates," citing *2435 Plainfield Ave., Inc. v. Township of Scotch Plains*, 222 B.R.

440, 456 (Bankr. D. N.J. 1998) for the proposition that a proper purpose for a Rule 2004 examination is to expose fraudulent conduct.  (Motion, ¶ 16.)

27.    However, even were such a claim to exist, it would be derivative in nature and the Committee presently lacks standing to assert it.  *See Official Committee of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 568 (3d Cir. 2004) (explaining that "§544(b) allows the trustee [or debtor], but not a creditors' committee, to bring an avoidance action on its own authority, *i.e.*, without court permission" unless the trustee's [or debtor's] delinquency prompts the court to allow the committee to pursue such an action).  If "good cause requires a showing that the examination sought is necessary to establish the claim of the party seeking the examination," then the Committee, which has no claim to establish, cannot rely on establishing a claim of the Debtors' estates as good cause for the requested examination.

28.    Finally, in the event that it is granted standing to bring a fraudulent conveyance claim the Committee already has adequate information to determine whether it could satisfy the requirements of Rule 9011 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 11 of the Federal Rules of Civil Procedure.  Again, Tribune was a public company and the specifics of the Leveraged ESOP Transactions and Merger are laid out in the stock purchase agreements, prospecti, the various amendments to Schedule 13D, and 8K, 10Q, and 10K filings. The Foundations should not be required to expend their time and resources and bear the cost of producing documents so that the Committee can identify a claim which the Committee has already identified and which the Committee as yet has no authority to assert.

      C.      **The Burden of the Requested Examination on the Foundations Outweighs Any Benefit to the Debtors' Estates.**

29.    Even if the discovery sought were necessary to establish a claim of the Committee (which it is not), the Court still must "balance the compelling interests of the parties, weighing

the relevance of and necessity of the information sought by the examination." *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991); *see In re Duque*, 134 B.R. 679, 683, 683 n.3 (S.D. Fla. 1991) (explaining that under the reasonableness consideration of Fed. R. Civ. Pro. 45(b), which still applies in the context of a Rule 2004 examination, courts must consider "whether the information is necessary and unavailable from any other source."). Rule 2004 examinations should not "encompass matters that will be unduly burdensome . . . and duplicative of previously furnished information." *In re Texaco Inc.*, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987). Where the burdens of production outweigh the benefits, courts will deny the requested examination. *In re Express One Int'l, Inc.*, 217 B.R. at 217. Here, the discovery sought by the Committee is both unnecessary to establish a claim and unduly burdensome.

30.    As stated above, to the extent that the Foundations have any documents responsive to the requests, the documents are more readily available from the Debtors, or Zell, or the public record. The Foundations should not be compelled to comb through their files and electronic data in search of documents which the Committee has already requested from the Debtors and Zell. The Committee multiplies the burden that production would place on the Foundations by making the extraordinary requests that the Court compel the Foundations to appear in person *in Delaware*, and "to respond fully and *without objection* to the Committee's Requests for Information" (emphasis added), thereby attempting to forestall reasonable objections to the Committee's overbroad requests. The Committee also failed to abide by Local Rule 2004-1, which requires a conference prior to moving the Court to compel discovery. Although the Committee demanded the production of documents in letters to the Foundations' counsel, the Committee's motion is the first time the Committee has sought to compel personal attendance by the Foundations in Delaware for examination and for production of documents.

The Committee provides no indication as to what areas would be covered by the newly requested depositions, thereby denying the Foundations an opportunity to object.  In addition, the Committee fails to provide any basis for requiring the Foundations to travel to Delaware for questioning.  To the contrary, Federal Rule of Civil Procedure 45(c)(3), which is incorporated in Federal Rule of Bankruptcy Procedure 9016 and applicable to Rule 2004 examinations, would require the Committee to examine the Foundations in Chicago if the Motion is granted.  The burden that the requested production would place on the Foundations dwarfs any benefit to the Committee.

### D.    The Payments Received by the Foundations Are Exempt from Avoidance under 11 U.S.C. §546(e).

31.    The burden of compliance with a Rule 2004 examination is especially significant because, were the Foundations permitted to address the anticipated fraudulent conveyance complaint in the proper forum of an adversarial proceeding, they would be able to avoid the needless expense of discovery altogether.  The Foundations have a complete legal defense to a fraudulent conveyance claim in 11 U.S.C. §546(e), which provides that "[t]he trustee *may not avoid a transfer* that is …*a settlement payment*…made by or to a …stockbroker, *financial institution*, or securities clearing agency… ." (emphasis added).  A "settlement payment" is defined as a "preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement on account, a final settlement payment, or any other similar payment commonly used in the securities trade."  11 U.S.C. § 741(8).  These payments include payments to shareholders in exchange for their stock ownership rights in an LBO.  *See, e.g.*, *In re Resorts International, Inc.*, 181 F.3d 505, 516 (3d Cir. 1999) ("a payment for shares during an LBO is obviously a common securities transaction, and we therefore hold that it is also a settlement payment for the purposes of section 546(e)"); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981,

989 (8th Cir. 2009) (payments defendants received in exchange for their privately held stock were exempt settlement payments); *In re Kaiser Steel Corporation*, 952 F.2d 1230, 1239 (10th Cir. 1991) ("[g]iven the wide scope and variety of securities transactions, we will not interpret the term 'settlement payment' so narrowly as to exclude the exchange of stock for consideration in an LBO"); *Hechinger Inv. Co. v. Fleet Retail Fin. Group*, *et al.*, 274 B.R. 71 (D. Del. 2002); *See In re Comark*, 971 F.2d 322 (9th Cir. 1992) (court adopted broad definition of "settlement payments" in finding that return of government securities was a settlement payment exempt from avoidance); *In re Bevill, Bresler & Schulman Asset Management Corporation*, 878 F.2d 742 (3d Cir. 1989) (transfer of securities pursuant to government repurchase agreements were "settlement payments" protected from avoidance). Settlement payments are unavoidable regardless of whether made for publicly traded or privately traded securities. *In re Plassein Int'l Corp.*, 366 B.R. 318, 324 (Bankr. D. Del. 2007) (explaining that "the plain language of the statute mandated the 'logical conclusion' that the section 546(e) exemption extends to all securities transactions, whether the securities at issue are publicly traded or are securities traded outside the public trading system."). *See In re QSI Holdings, Inc.*, __ F.3d __ 2009 WL 1905237, at *4 (6th Cir. July 6, 2009) (holding that "nothing in the text of §546(e) precludes its application to settlement payments involving privately held securities").

32.    The payments made to the Foundations in exchange and consideration for their Tribune stock were clearly "settlement payments" and, having been made by Bank of America, a financial institution, are exempt from avoidance under §546(e).

33.    The Foundations should be not be compelled to bear the unnecessary burden of producing documents already available to the Committee because §546(e) provides a complete legal defense to any claim the Committee intends to bring. *See Contemporary Indus. Corp.*, 564

F.3d at 988 (debtor and official committee of unsecured creditors cannot recover settlement payments that are unavoidable under §546(e) under an alternative theory, because "allowing recover on these [alternative] claims would render the §546(e) exemption meaningless, and would wholly frustrate the purpose behind that section.").

WHEREFORE, for the foregoing reasons, the Robert R. McCormick Foundation and Cantigny Foundation respectfully request that the Court deny the Motion and grant such other and further relief as may be warranted under the circumstances.

Dated: July 16, 2009
      Wilmington, Delaware

**CIARDI CIARDI & ASTIN**

*/s/ Mary E. Augustine*
Daniel K. Astin (No. 4068)
Mary E. Augustine (No. 4477)
919 Market Street
Suite 700
Wilmington DE 19801
Telephone: (302) 658-1100
Facsimile (302) 658-1300
dastin@ciardilaw.com
maugustine@ciardilaw.com

- and -

Leonard S. Shifflett
Faye B. Feinstein
**QUARLES & BRADY LLP**
300 North LaSalle Street, Suite 4000
Chicago, Illinois 60654
Telephone:  (312) 715-5000
Facsimile:  (312) 715-5155
leonard.shifflett@quarles.com
faye.feinstein@quarles.com

*Counsel to the Robert R. McCormick Foundation and Cantigny Foundation*