UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| TRIBUNE COMPANY, *et al.*, | . | Case No. 08-13141(KJC) |
| | . | (Jointly Administered) |
| | . | **Related to Docket No. 1718** |
| | . | |
| | . | July 16, 2009 |
| | . | 3:30 p.m. |
| Debtors. | . | (Wilmington) |
| | . | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kate J. Stickles, Esq.
                          Cole, Schotz, Meisel, Forman
                          & Leonard, P.A.

                          Kenneth P. Kansa, Esq.
                          Sidley Austin, LLP

For PPF Off 2 Park Ave:   David B. Stratton, Esq.
                          Pepper Hamilton, LLP

                          Alan J. Lipkin, Esq.
                          Willkie, Farr & Gallagher, LLP

VIA TELEPHONE:

For the Debtors:          Guy S. Neal, Esq.
                          Sidley Austin, LLP

Audio Operator:          Al Lugano

Transcriptionist:        Jennifer Ryan Enslen
                         43 Bay Boulevard
                         Newark, De 19702
                         (302)836-1905

Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

1          THE CLERK: All rise.

2          THE COURT: Good afternoon.

3          MS. STICKLES: Good afternoon, Your Honor.  Kate

4    Stickles from Cole Schotz on behalf of the Debtor, Tribune

5    Company, and it's affiliated Debtors.  Also present on behalf

6    of the Debtors this afternoon is Kenneth Kansa from Sidley

7    Austin, Your Honor.  An amended agenda was filed with the

8    Court yesterday.  The agenda reflected that agenda item 1 is

9    continued, and the Court entered orders with respect to

10   agenda items 2 through 6.  The only matters going forward

11   this afternoon are agenda items 7 and 8.  And counsel for the

12   movant is present to address the Court with respect to item

13   7.

14         THE COURT: All right.

15         MR. STRATTON: Your Honor, good afternoon.  David

16   Stratton for Pepper Hamilton.  I'd like to introduce my co-

17   counsel Alan Lipkin from the Willkie Farr firm.  He'll be

18   presenting argument on our motion.

19         THE COURT: Very well.

20         MR. STRATTON: Thank you.

21         MR. LIPKIN: May it please the Court, Alan Lipkin

22   from Willkie, Farr & Gallagher on behalf of the landlord

23   here, PPF Off 2 Park.  Your Honor, we're here on a motion to

24   compel payment of post-petition rent.  There are four

25   separate bases for obligations being owed to the landlord.

1    The first is improper post-petition setoffs by the Debtor.

2    The second is the Debtors' failure to pay rent, timely pay

3    rent in accordance with 365 that came due July 1.  The third

4    is the Debtors' failure to pay, despite rendering invoices,

5    certain additional charges that accrued from January to June

6    2009.  And the fourth is interest and attorney's fees that

7    are due under the lease to the extent the landlord incurred

8    costs in pursuing post-petition payments.  As to the improper

9    setoff - -

10        THE COURT: Can we - - I'm sorry.  Let me ask you to

11   pause and step back for a moment.  At least as I frame the

12   issue, issues in my mind, the heart of the dispute centers

13   around, it seems to me, whether there was an effective

14   rejection on June 30th.  I know that doesn't solve all the

15   issues that you've raised.  So I'd like to start there.

16        MR. LIPKIN: Sure.

17        THE COURT: Because those are the big ticket items.

18        MR. LIPKIN: All right.  That's the biggest dollar

19   item and I'm happy to start there.  All right.  There are

20   certain facts that are undisputed.  There is an order in

21   place that Your Honor signed that's a conditional rejection

22   on the later of June 30th, 2009, or the date the Debtor

23   vacates the premises.

24        THE COURT: Right.  So the key issue then, it seems

25   to me to become when did the Debtor vacate the premises, and

1    what constitutes vacating the premises?

2           MR. LIPKIN: Yes, Your Honor.  All right.  Also

3    undisputed is that the Debtor, there are still hundreds,

4    hundreds, literally hundreds of large items of the Debtors in

5    the premises.  We are talking about air conditioners, vending

6    machines, desks, conference tables, chairs, cabinets, and a

7    whole variety of other things.  Again, no dispute.  Hundreds

8    of items.  The third undisputed fact or matter of law is that

9    the Debtors never abandoned those in the sense that they

10   never sought or obtained any order of this Court authorizing

11   abandonment of any of that personal property.  That's all

12   completely undisputed.  The terms of the rejection order, the

13   personal property that remains, and the fact that it has not

14   been abandoned.  And then we get to the legal issues.

15   Certainly 554 and the cases under it are clear.  You must

16   have a court order in order to abandon.  There is no court

17   order here.

18          THE COURT: Well, let's put it this way.  There's

19   nothing in the papers that tells me, and I understand the

20   parties have come today not intending to make any evidentiary

21   presentations, but from the papers I understand that there

22   has been no abandonment.  Now, I don't know what the Debtors'

23   intentions are with respect to the property.  If it says so

24   in the papers I've missed it.  It may have been their

25   intention not to use it anymore.  And it would have been

1  easier had their been an abandonment with the rejection

2  order, as there frequently is.  Then I think your position

3  might have been far weaker.  Maybe.  But I come back to the

4  question, What constitutes vacating the premises?  Now here

5  the Debtor says, We've turned over the keys.  And after your

6  motion was filed we tried to get back in but you wouldn't let

7  us in.  Now what the Debtor doesn't add to that is, and if

8  we'd been in, we'd have taken all that stuff out before July

9  1st.  They don't say that.  But let's just assume for a moment

10  that someone at some point might tell me that.  If you have a

11  situation in which arguably there's no effective rejection

12  because these things have not been removed, or abandoned, but

13  the landlord has denied access to the premises, what then?

14        MR. LIPKIN: All right.  Well, I guess the point, I

15  guess the way I'd respond to that is twofold.  First, we

16  didn't, they weren't denied access.  And there's nothing in

17  the record about turning over keys or anything else.  All

18  they say is somebody may have had some problem with a

19  security system that's their own security system.  That's

20  number one.  Our declaration says nobody on the landlord side

21  denied access, and I can tell you the standing instruction

22  there was not to deny access to anyone.  Secondly, this

23  alleged event of not getting in, whatever, occurred after the

24  motion was filed.  And the Court can take judicial notice

25  that the motion was filed after 7 p.m. on June 30th.  That

1    allegedly - - and then you can account for the time until

2    somebody received the motion, read it, and maybe told

3    somebody to run over.  So you know, what that means that they

4    had any intent to remove it, or any real intent to do

5    anything other than to come up with some last minute

6    argument, I don't know.  Third that occurred on June 30th.

7    June 30th, they would not dispute, that the lease was still in

8    effect on June 30th.  So if for some reason the landlord

9    denied access, which it didn't, then that would mean that the

10   landlord committed some immaterial breach in this context,

11   and maybe they have some claim for that.  But it would have

12   absolutely nothing to do with what the facts were on July 1,

13   which is the relevant date here.  So if you, the facts that

14   are in the declarations just don't get them there.  But even,

15   Your Honor, to answer your question directly, if you want to

16   assume that the landlord, quote, "denied" access, which by

17   the way they never complained about until these papers

18   suggesting that they couldn't get in.  Not that the landlord

19   denied access, but that maybe there was something with the

20   security system, then they'd have a claim for denial of

21   access.  And I guess maybe that's a fact that they could use

22   to suggest that the landlord viewed it, them having had left,

23   I suppose you could argue maybe there's an inference from

24   that.  But that isn't the fact.  It's not in the papers.  And

25   you know, we absolutely don't concede that.  But even if that

1    were true, I don't think that resolves the issue whatsoever.

2    So we come back to what are the undisputed facts, a

3    conditional rejection order, extensive personal property

4    still in the premises that was not abandoned.  The cases that

5    the Debtor cites, and the way they characterize this is we're

6    trying, we, the landlord, are trying to get, recover based on

7    the argument that they have to clean up the premises after

8    rejection or that they're a holdover tenant.  Those cases are

9    simply irrelevant, because that's not our argument.  That's

10   not what we're saying.  We're saying they have not

11   effectively rejected.  They're still, they still haven't

12   vacated, they still occupy the premises, and on that the law

13   is crystal clear whether they have people running around in

14   there, or they're just storing stuff.  The law is absolutely

15   clear.  Pre-rejection, post-filing must pay in accordance

16   with the lease terms.

17            THE COURT: Well, so that I pin you down

18   specifically, what you're saying is that these premises have

19   not been vacated, and they've not been vacated because of the

20   hundreds of items left and not yet legally abandoned.

21            MR. LIPKIN: Yes.

22            THE COURT: Okay.  Is there any other reason why the

23   property hasn't been vacated?

24            MR. LIPKIN: I don't think we need more than that,

25   but the short answer is not that I'm aware of.

1          THE COURT: Okay.

2          MR. LIPKIN: All right.  So that really covers that

3    first issue on the payments due July 1, which consist of the

4    July rent and the taxes.  I'll go back, then, to what now

5    will be the second argument, which is the improper setoff

6    argument.  Here again, there's not really any disputed facts.

7    There was a pre-petition settlement agreement between the

8    landlord and the tenant.  Under that settlement agreement,

9    when the landlord received certain payments from a former

10   sub-tenant, a portion, a percentage of those payments would

11   be allocable to the tenant, to the Debtors.  But in lieu of

12   the landlord paying that amount over, the tenant Debtors

13   could take a credit against their monthly rent payment.  And

14   that's what they did pre-petition.  Post-petition, despite

15   the protestations of the landlord, the Debtors continued to

16   do that.  And the landlord said, No.  That's our cash

17   collateral.  That's money we hold that you may assert an

18   interest in, perhaps, under this pre-petition settlement

19   agreement.  That's our cash collateral.  You cannot touch

20   that.  And you certainly can't touch it without getting a

21   court order, which presumably will conditioned on getting us

22   adequate protection.  Never sought any court authority

23   whatsoever.  It's clearly cash collateral.  It's clearly our

24   cash.  They may have an interest in it, they may not.  But at

25   most they have an interest in it's our cash collateral.  But

1   again, didn't seek any court order to use cash collateral.

2   They unilaterally setoff.  Or said that they setoff by paying

3   a reduced amount.  Their response first is that it isn't cash

4   collateral, it's, quote, "their cash".  But they make

5   inconsistent statements in their own papers, and I think, I

6   presume they're going to concede now that it's our cash.  And

7   so the second argument they make is the §558 argument.  Under

8   §558, as the Court is aware, certain defenses of the debtor

9   are preserved for the debtor-in-possession or the trustee.

10  And we don't contest that 558 says what it says.  That

11  defenses are preserved.  And those defenses, in certain

12  situations, can include setoff.  We're not arguing, contrary

13  to the Debtors' papers, we are not arguing that the setoff

14  defense was forfeited.  558 is intended to avoid the legal

15  fiction that when you change a debtor into a debtor-in-

16  possession or a trustee that suddenly the pre-petition

17  defenses all evaporate into thin air.  We're not arguing

18  that.  What we're saying is all 558 says is first defenses,

19  defenses are preserved.  It does not say that claims that the

20  Debtor has can be used offensively, and it certainly doesn't

21  say how they may be used or that they can override the

22  protections for cash collateral under the bankruptcy code.

23          THE COURT: Well, let's pause for a minute and talk

24  about that.  The, just for sake of a better word, the up

25  streaming of the rental payments from the sub-tenant to your

1   client were reached as a result of a settlement arrangement.

2   It was always intended, at least from the provisions that the

3   parties point out, and as you say apparently about which

4   there is no dispute, that the Debtors' share of the, that

5   revenue stream could be offset against it's monthly rent

6   obligation.  The Debtor says there's nothing about the filing

7   of the bankruptcy that changes that.  The right to offset is

8   not a, is not only a pre-petition right, it's one that

9   continues through in connection with their lease payments.

10  Now, with respect to the landlord's argument that it's the

11  landlord that's, that it's your cash collateral, I don't

12  gather from the provisions that have been cited that it was

13  taken as security for any other obligation of the tenant.

14  It's not - - well, first the Debtor says, Look you've got it

15  backwards.  It's not cash collateral.  But let's put that

16  aside for a moment.  It's not a fund which was taken to

17  secure any obligation.  At least from the provisions that

18  I've seen.

19          MR. LIPKIN: Well, let me make - - were you

20  finished, Your Honor?

21          THE COURT: Yes.

22          MR. LIPKIN: Yeah, let me make a couple responses to

23  that.  First, I respectfully disagree as to how you construe

24  what happened here, because they could have just as easily

25  have provided that the former sub-tenant make the payments

1    that were allocable to the Debtor tenant directly to the

2    Debtor tenant.  And taken us out of the equation.  The fact

3    that it was done this way in effect protects the landlord and

4    gave that landlord a payable.  Second of all, if you read the

5    settlement agreement, and for that matter 558, it does not

6    say against which payments the amounts will be setoff.  They

7    will be setoff against amounts due from the tenant, from the

8    Debtor, to the landlord.  It will just be different amounts

9    than the Debtor would like to set them off, because it's

10   pennies on the dollar claims instead of hundred cent

11   administrative claim.  So we will still be doing it.  And

12   third, whether or not it was formally held as security, and I

13   think the construct here you get there anyway, because the

14   money flowing through the landlord, there is no question that

15   this is cash collateral as defined under the Bankruptcy Code.

16   Which is simply cash in which both the debtor and a creditor,

17   or third party, assert an interest.  So you don't have, it

18   doesn't have to be under a security agreement, or a mortgage

19   or anything else.  All the definition of cash collateral is

20   under the Bankruptcy Code is cash in which the Debtor and

21   another party assert an interest.  And presumably, I guess,

22   you have to be a creditor, because, but we're certainly a

23   creditor, so that goes without saying here.  So it doesn't

24   have to be done pursuant to a security interest or otherwise,

25   and I think, in any event, the construct of the settlement

1    agreement here effectively does that.  A setoff right is

2    effectively a secured claim.  You don't call it a secured

3    claim.  But that's effectively what it is.  And it deserves

4    the same kind of adequate protections as anything else.  And

5    just think of a landlord with a security deposit under a

6    lease.  I mean, are we going to say that every debtor now,

7    despite 365 that mandates a trustee or debtor-in-possession

8    timely perform under a lease can just say, Well, I've got a

9    million dollars security deposit here, you're holding it,

10   it's a setoff, I'll just not pay my post-petition rent until

11   I use up my security deposit.  This is no different.  I mean,

12   I know the labels here are different.  But as a practical

13   matter, and as legal matter, they are simply no different.

14   The security deposit under a lease, and this amount are

15   simply obligations running from the landlord to the Debtor

16   tenant and they're, and they can be used as setoff.  I'll

17   acknowledge that a security deposit under a lease, you know,

18   there'll be more language describing that in the lease, but

19   the legal effect is exactly the same.  And they simply want

20   to say that 558, which simply preserves defenses, without

21   saying how it can be used, and without reference to the cash

22   collateral statute that they can unilaterally, on their own,

23   without going to court, without providing adequate

24   protection, without getting consent, they can unilaterally

25   just reduce their monthly rent payments, despite the mandate

1    of 365, and make that payment.  That's just wrong.  I realize

2    it takes a while to get there, and I can see Your Honor sort

3    of working it through your head, because frankly it takes a

4    while.  And I've had, I've discussed this with some of, you

5    know, my colleagues and stuff, because you know, on one level

6    you sort of look at first, and you see the lease, and it says

7    setoff, and you say, Hey, well, all they're doing is doing

8    what the settlement agreement and the lease kind of say.  But

9    when you really think it through, it is absolutely

10   inconsistent with the cash collateral rules, and inconsistent

11   with the Code.  And 558 preserves the setoff right, they get

12   to use it, but they don't get to use it the way they just

13   want unilaterally.  They get to use it in accordance with the

14   Bankruptcy Code.  And that is what we say.  And one other

15   point is they go on and they cite some cases under 558 that

16   talk about whether or not you need mutuality and this

17   distinction pre and post.  But if you read those cases

18   carefully, and there aren't a lot of them, there's two groups

19   of those cases.  Either there's cases with loose language,

20   but all they're doing is setting off pre-petition claims

21   against pre-petition claims, so the mutuality issue is really

22   irrelevant, and wasn't addressed or really raised in a

23   litigated sense, or the Court is finding that the setoff is

24   being made, notwithstanding the lack of mutuality, meaning

25   pre, post, because there's no prejudice to the creditor in

1   that situation.  Because in each of those situations there's

2   no description of a pre-petition cents on the dollar claim

3   that the creditor is losing out on.  Now none of those cases

4   are controlling anyway, and I think the analysis I went

5   through governs, regardless.  But even if you want to look at

6   those cases, they simply do not suggest any different result

7   than we have here.

8        THE COURT: I will tell you that given the novelness

9   of the issues, I'm not certain that any of the cases that are

10  cited are directly enough on point that they're helpful.  Now

11  they kind of float around the periphery.

12       MR. LIPKIN: I agree, Your Honor.  I agree.  But,

13  and that's fine with us, because we're looking at the Code.

14  They're the ones who are suggesting that these cases are,

15  control what happens here.  The last two points are very

16  short and sweet.  There are additional amounts, roughly, I'm

17  sorry, 85, roughly 85 thousand - - the way this lease worked

18  is sort of a basic rent every month, and then there's later

19  adjustments that are made, because the landlord picks up

20  various costs for electricity, and cleaning, and all kinds of

21  other services, and so they get billed later on.  There's

22  about $85 thousand of that that's been billed for months to

23  the tenant.  The tenant hasn't paid.  There's another 33

24  thousand of that that's been estimated by the landlord.

25  Hasn't been paid at all.  Beyond that, and we don't have the

1    amounts, of course, absent a court's ruling, there's no

2    question that the lease entitles the landlord to interest and

3    attorney's fees for enforcing its rights under the lease.

4    And we, and it's clear that if the landlord prevails on these

5    other issues, then it's entitled to interest on the amounts

6    awarded as well as attorney's fees.  Thank you, Your Honor.

7            THE COURT: Thank you.

8            MR. KANSA: Good afternoon, Your Honor.  May it

9    please the Court, Ken Kansa of Sidley Austin on behalf of the

10   Debtors, Tribune Company, and it's affiliated Debtors.  Your

11   Honor, the motion, as it's been modified by the reply,

12   presents, I think as Your Honor has pointed out, and as Mr.

13   Lipkin has pointed out, two primary questions.  First, where

14   a tenant has physically relocated it's personnel and

15   operations out of leased premises, and it's only remaining

16   tie to those premises is personal property remaining therein

17   that it assertedly has no intention to retain, store, or

18   otherwise utilize, and I'll come to the point where we have

19   that in our papers, has that property been vacated within the

20   terms of both the plain meaning of the word, and in terms of

21   this Court's order authorizing the rejection, and if so,

22   under this Court's order, that lease has been validly

23   rejected?  Second, where a Debtor has an undisputed

24   contractual right of setoff, does the Debtors' filing of a

25   bankruptcy petition operate in effect to subordinate that

1    contractual right of setoff to, express contractual right of

2    setoff to a asserted common law right of setoff outside of

3    the documents held by the counter party?  We think the answer

4    to our first question is yes, the answer to our second

5    question is no.  The Debtors' position on the vacation issue,

6    Your Honor, is unambiguous.  The Debtor moved all of its

7    personnel and all of it's business operations, together with

8    all of the property it was still using in connection with

9    those operations out of the premises no later than June 29th,

10   2009.  That fact is not disputed here.  None of the Debtors'

11   personnel have used the premises.  None of the Debtors'

12   personnel have set foot in the premises since that date.

13   Other than we had the one aborted attempt to get in, and I

14   think we assert that we were denied access, they assert that

15   they had left explicit instructions to grant us access.

16   Regardless, I think, there is not an issue here that we did

17   not get access.  And we did not set foot or use the premises

18   after the 29th of June.  Webster's defines vacate as to give

19   up the incumbency or occupancy of.  Under a reasonable

20   construct of that definition, the Debtor gave up it's

21   incumbency and its occupancy of the premises before June 29th.

22   We haven't used it, we haven't been there, and Ms. Hackett's

23   declaration at paragraph 5 states that whatever materials are

24   left there the Debtor has no intention to store, utilize or

25   retain.

1          THE COURT: It occurs to me that a starting place

2   for determining whether the premises were vacated would be

3   the applicable state law.  Now I don't think either party

4   argued that in their papers, and that's not a criticism.  As

5   your opponent points out, this is an issue you actually have

6   to think about, and different aspects roll out the more you

7   think about it.  What's the applicable state law here?  I'm

8   assuming it's the place where the property is located.  And

9   - -

10          MR. KANSA: I believe it's New York law, Your Honor.

11          THE COURT: And what, if anything, does New York law

12   say about when a property is vacated?  There must be, I mean,

13   based on my own experience, there's got to be some body of

14   law that discusses that.

15          MR. KANSA: Your Honor, if you afford me one second,

16   I can cite Your Honor to some cases on that point from the

17   state of New York.  Give me one second.

18          THE COURT: Okay.

19          MR. KANSA: Your Honor, if I may cite to the Court.

20   In a non-bankruptcy situation a lease is terminated and

21   surrendered by operation of law, quote, "when the parties to

22   a lease both do some act so inconsistent with the landlord

23   tenant relationship that it indicates their intent to deem

24   the lease terminated."  The cite for that is <u>Riverside</u>

25   <u>Research Institute vs. KMGA Incorporated</u>.  And it's at 497

1    N.E.2d 669 dated 1986.  And then we also have, Your Honor,

2    that an outward refusal to accept repudiation of the lease

3    does not bar a finding that the subsequent conduct of the

4    parties creates an acceptance by operation of law.  That is

5    Gottlieb vs. Taco Bell Corporation, 871 F.Supp. 147 from the

6    Eastern District of New York, 1994.  Your Honor, we'll come

7    in a minute to sort of how the parties have conducted

8    themselves based on the materials before the Court in this

9    matter.  But we come to the point where they really have

10   cited only one case standing for the proposition that where

11   there is nothing more than personal property, then assorted

12   stuff, if you will, in the premises, that there hasn't been a

13   vacancy by operation of law.  And the case they cite simply

14   doesn't stand for that proposition.  It's in the reply.  It's

15   called in re: Cornwell Mills Paper Company at 169 B.R. 844.

16   What that case says on the facts is that yes, the Debtor had

17   left personal property in the space, but they were continuing

18   to reenter the space for over two years after they allegedly

19   surrendered the premises.  They had gotten new keys to the

20   space, they were coming back in, they were selling property

21   out of the space.  They were keeping the proceeds of the

22   property that they were selling out of the space.  In short,

23   they were manifesting an intention to continue using those

24   premises.  And that is different than the situation we have

25   here where the Debtor has walked away from the premises and

1    has not come back whatsoever.  There are simply no operations

2    being conducted there.  If we look at the facts before the

3    Court, Your Honor, they show consistency with a belief by the

4    landlord, they show no actions consistent with a belief by

5    the landlord that the lease remained in force after the 30th

6    of June other than the conclusory statement in Mr. Toro's

7    (phonetic) affidavit, which was filed with the reply that the

8    landlord took no action to accept surrender of the premises.

9    Under the Gottlieb case we've cited to Your Honor, New York

10   law does not require an express act to accept surrender of

11   leased premises.  That is simply not a posit here.

12        THE COURT: Were the, were the keys turned over?

13        MR. KANSA: Your Honor, I'm not even sure there were

14   keys.  To our understanding, and I don't believe we have

15   this, in fairness, in the materials before the Court, the,

16   the relevant keys were mailed to the landlord's personnel and

17   the security system which we've talked about was deactivated

18   on June 29th.  That was a security system maintained by the

19   Debtor.  Your Honor, we think the statement in Mr. Toro's

20   affidavit about not accepting surrender can be rebutted on

21   the facts.  On the facts before the Court, no Tribune

22   personnel set foot in the premises after June 29th.  That's in

23   Ms. Hackett's declaration and that's not, that's unchallenged

24   here.  We know from the preparation of Exhibit D to the

25   landlord's motion that landlord's personnel, without

1    accompanying personnel from Tribune, or without notice to

2    Tribune, had re-entered the premises for purposes of

3    cataloging all of the personal property that allegedly

4    remained in the space as they put it, as of 5 p.m. on June

5    30th.  We haven't been in the space to verify that what they

6    did at 5 p.m. on June 30th or not is in fact accurate.  But

7    the point here is that their personnel went into the space

8    and were purportedly there without our folks on July, on June

9    30th.  Excuse me.  As a matter of common sense, and under the

10   express terms of the lease which was filed with the motion,

11   that is inconsistent with a belief on the part of the

12   landlord that Tribune remained in the space.

13          THE COURT: But I'm not sure that the landlord is

14   arguing that - - well, what the landlord is arguing is

15   basically you left all your stuff.  Now I hear that you say

16   some, some things were taken that the Debtor felt was

17   necessary in connection with the operation of its business,

18   but I mean fairly said, again this is just based on argument

19   really, there was a substantial amount of personal property

20   that remains.  And the landlord, as I take it, is arguing is

21   that's not vacating.  That means you're still there whether

22   people are going in and out of the premises or not.  How do

23   you respond to that?

24          MR. KANSA: I think that's certainly a fair

25   characterization of the argument, and I think our view is

1    that where there has simply been personal property left, we

2    just disagree on the point.  I don't think that the landlord

3    is trying to make an argument, and I won't purport to make

4    Mr. Lipkin's argument for him.  I think their argument goes

5    beyond a this is being left in as an intent to store it.  But

6    they are saying the lease has not been validly rejected and

7    it remains in full force and effect.  And I think they're,

8    they're benefitted by saying that because if they can make

9    the argument that on the 1st of July, under their view of the

10   law, if the lease is enforced on the 1st of July, under the

11   billing date approach adopted by the 3rd Circuit in Montgomery

12   Ward, they can get the $300 thousand semi-annual tax payment

13   that they have argued for.  That's why - -

14          THE COURT: And I think they would be right.

15          MR. KANSA: Understood, Your Honor.  And that is why

16   I think they are going out of their way to disclaim a

17   holdover tenancy argument or a storage argument or an

18   administrative claim argument, although they do make that

19   point in a footnote in their motion.  And we have our

20   disagreements about it.

21          THE COURT: Yeah.  I mean, they're, if the lease

22   were to have been rejected as of the 30th, they still might

23   have an administrative claim for the cost of removal or use

24   and occupancy, arguably, on a holdover basis.  Now the cases,

25   I know, differ on what the status of such a claim should be,

1    and I've yet to rule on that issue, I think.  In any case.

2        MR. KANSA: Yeah.  And we have our disputes on that

3    issue, but we would not, we have our disputes on whether that

4    has been proved up here, I guess is the best way to say it,

5    Your Honor.  But we certainly don't disagree with that

6    analysis of the state of the law.  But what we see here is on

7    June 30th we have a landlord coming in, without a

8    representative of the tenant, and sort of rummaging through

9    the materials that are remained and cataloging them for

10   purposes of filing the motion that the landlord filed later

11   on that evening.  Under §14.3 of the lease the landlord is

12   limited to entering the premises only if a representative of

13   the Debtor is present, or of they've given reasonable notice

14   to the Debtor of the intent to enter the premises.  We know

15   that the landlord was there on June 30th.  We know that no

16   Tribune personnel were there afer June 29th.  We've seen

17   nothing in the papers to suggest that they gave us notice,

18   and we don't know about any notice.  So that is not

19   consistent with the landlord's express view that the lease

20   was in fact still in force and they were complying with it on

21   June 30th.

22       THE COURT: Well, no.  I confess that I have not

23   read the entire lease, which is an extensive document.  I

24   just went to the provisions that the parties had pointed out

25   in their papers.  But I would bet - - put it this way.  I'd

1   be surprised if there weren't a provision somewhere that in

2   circumstances in which the tenant had left the premises, or

3   was no longer there, or there was some other concern the

4   landlord had about the safety or security of the premises

5   that wouldn't permit it to enter at any time, with or without

6   a representative of the tenant.

7        MR. LIPKIN: And that's exactly - - if Mr. Kansa had

8   quoted the whole §14.3, that's exactly, not word for word,

9   the introductory language to that section.

10       MR. KANSA: It is the introductory language, Your

11  Honor, in terms of if there is an emergency either to the

12  property or to the, or to the tenant, or to the landlord.  If

13  there's some sort of crisis, they absolutely have the ability

14  to enter.  We're not disputing that.  The point is if the

15  landlord believed that, Hey, this lease is still in effect,

16  you guys are still occupying the premises, it, there's no

17  emergency that we understand that would cause them to say,

18  Hey we have to go in right now and we can't even give you a

19  phone call.

20       THE COURT: Wait, look.  Nobody's there.  They

21  obviously, do - - this is an office building, is it not?

22       MR. KANSA: Correct.

23       THE COURT: They knew you weren't there anymore.

24  Unless everybody moved out in the middle of the night, and

25  even if they had, they'd still know you'd left.  Maybe you

1    left the water running.  You know, how would they know.

2         MR. KANSA: And if they were coming in, I guess, to

3    inspect the premises, or something, that's one thing.  But

4    they plainly effected, by the preparation of their Exhibit D,

5    they effected a more substantial entry.  And it's much more

6    consistent with what the landlord is entitled to do under

7    §17.1 of the lease, which governs what happens after the

8    lease comes to an end as a result of, among other things,

9    quote, "any other" - - the other won't make sense here.  But,

10   quote, "any other action or proceeding."  Landlord has the

11   right, on that occurrence, to reenter the premises

12   immediately, without notice, and remove all of the tenant's

13   property and effects from premises.  Under the lease, once

14   landlord reenters the premises, tenant no longer has a right

15   to reenter or repossess the premises.  The lease goes on to

16   make very clear that reenter, reentry, and reentered are not

17   restricted to any technical legal meanings, but presumably

18   get a plain meaning.  Here what we have seen, Your Honor, is

19   that landlord reentered the premises in a manner that does

20   not appear to have been in response to, as Your Honor says,

21   the water running or any inability to find the Debtors'

22   personnel, other than at the premises.  Tribune is not a

23   particularly difficult company to locate.  We like to think

24   we're fairly prominent.  And the notion that this is

25   consistent with a landlord believing that I still think

1    Tribune is in there, I still think they're occupying the

2    premises, I still think they're using it, just doesn't hold

3    up on those facts, Your Honor.  Even beyond that, Your Honor,

4    we think that the landlord's argument that simply having

5    items, simply having personalty in the premises constitute,

6    constitutes continued occupancy fails as a matter of law.

7         THE COURT: Well there, you know, there again I feel

8    deficient in not having a fuller briefing of New York law.

9    But just without regard to that for the moment, if you left a

10   chair, that's one thing.  If you left a hundred chairs, that

11   might be something else.  If you left one desk, that might be

12   one thing.  If you left a hundred desks, that might be

13   something else.  I mean, it seems to me there's a, there

14   might be some number or some, I don't know how to describe

15   it, some threshold at which, even if you never intended to

16   return, the amount of things that you leave might bear on

17   whether the property had been vacated.

18        MR. KANSA: And Your Honor we've certainly not seen

19   that standard come out of the law, and nothing we located has

20   said that.  And nothing that Mr. Lipkin has cited in his

21   papers says that.  One would certainly think, however, that

22   while they have trotted out what looks on its face like a

23   very impressive laundry list, as Mr. Lipkin has said, of

24   hundreds and hundreds of items of personalty that had been

25   left in the premises, even accepting as that as true, which

1   we can't verify, this is not left in a, you know, 1000 square

2   foot, or a 6000 square foot space.  This is spread out over

3   an entire floor of a commercial office building in New York

4   City.  This is a very, the scale of personalty and the scale

5   of the property would seem to be relevant to one another,

6   even were that the legal standard, Your Honor.  But we go

7   back to Judge Gerber's decision in Ames which states, very

8   clearly, that Ames' abandonment of the personal property did

9   not amount to a failure to surrender possession.  That same

10  logic applies here.  There is simply nothing in having this

11  property still in the premises that operates to defeat a

12  rejection on the grounds that the Debtor has not vacated the

13  space.

14          THE COURT: Had the property in Ames been abandoned?

15          MR. KANSA: It was, Your Honor, they were, at the

16  same time, as I understand the procedure, the landlords were

17  objecting to the abandonment as a condition of rejection.  So

18  that is the, the debtors there had moved to reject and

19  abandon at the same time.  And Judge Gerber held that the, if

20  the property was abandoned in the space, that did not present

21  a bar to rejection of the lease otherwise.  Your Honor, with

22  all of that, I think I have no more argument on the vacation

23  issue, or on the validity of the rejection issue, and I'd

24  like to turn now to the setoff issue - -

25          THE COURT: Go ahead.

1          MR. KANSA:  - - that's presented.  I think it's

2     important, and I understand Your Honor has already read the

3     papers and is familiar with the relevant provisions, but it's

4     important really to understand how this setoff functions.

5     Landlord here is claiming for monthly rent payments due and

6     owing under the lease.  The lease expressly states that the

7     landlord's payment of the monthly rent is subject to this

8     explicit right of setoff on the part of the Debtor.  It's, it

9     is, the parties go out of their way to preserve this

10    particular provision as a pre-condition or as a setoff from

11    the otherwise applicable amount of monthly rent.

12         THE COURT: In the, the provisions in the settlement

13    letter and the lease that the parties have pointed to tell me

14    clearly that was the intention of the parties.  But what the

15    landlord is arguing here is that well, now, there's a

16    bankruptcy overlay, and that changes things.  And here is

17    has.

18         MR. KANSA: And Your Honor, to come to that express

19    point.  We think the instruction from PSA and from

20    Papercraft, PSA from this district and Papercraft coming from

21    Judge Fitzgerald, both dictate, and we will quote the

22    relevant language, the Court, to quote, "The Court must

23    examine the transaction as though the bankruptcy had not been

24    filed."  And then later, §558, quote, "eliminates the pre-

25    petition , post-petition distinction and in essence

1    obliterates the requirement that mutual debts must both be

2    pre-petition obligations in a §558 context."  End quote.

3    That's from in re: PSA, Inc., 277 B.R. 51.  The jump cite is

4    53 Bankruptcy District of Delaware, 2001.  That is a, that is

5    language that is simply critical to understanding the instant

6    dispute.  If the Court examines this issue by saying the

7    Debtor is entitled to assert this setoff as a defense to the

8    landlord's claim for payment of the monthly rent, in other

9    words the landlord comes in, claims for the full amount of

10   the monthly rent, the Debtor says, I don't have to pay you

11   the full amount of the monthly rent based on my contractual

12   rights of setoff, see §1.1 of the lease.  The command of PSA

13   and Papercraft is to say how does that particular setoff

14   issue come out outside of the bankruptcy.  And outside of the

15   bankruptcy, there's absolutely no dispute how it comes out.

16   The parties lived with the arrangement for seven or eight

17   years under that.  We are simply continuing that arrangement.

18   There is no difference to what we did pre-petition and what

19   the landlord accepted pre-petition, and what we have done

20   post-petition.  And the landlord now says by virtue of the

21   Debtor having filed for bankruptcy, we are entitled to

22   increase at least the monthly cash outlay under the lease,

23   because we need to get ahold of the full amount of the

24   monthly rent and establish that, in effect, is a non-

25   negotiated for security deposit that we can then offset

1    against our pre-petition rejection damages claim.  That is

2    simply not where the law is.  The Debtor cannot manipulate

3    the fact, or the landlord cannot manipulate the fact that the

4    Debtor has filed for bankruptcy as a means of increasing its

5    own level of security outside of what the documents expressly

6    command.  That simply, it makes neither sense as a matter of

7    the explicit language of the Code, nor does it make any sense

8    as a matter of bankruptcy policy encouraging funds to walk

9    out of the estate on a priority basis ahead of other

10   creditors.  All that is being done here is a continuation of

11   the parties' pre-petition arrangement.  The landlord's papers

12   assert that the PSA and Papercraft courts, and the courts

13   that follow them, restricted - - and this is consistent with

14   Mr. Lipkin's argument - - restricted a debtors' ability to

15   take setoffs under 558 to situations where the debtor was

16   using the setoff, quote unquote, "defensively", and where the

17   setoff had no prejudicial effect on the creditor, and that's

18   presumably in the view of the creditor.  Even if those

19   arguments were accepted, and I don't think they are

20   consistent with the case law.  They don't help the landlord.

21   This asserted right of setoff is being asserted defensively

22   by the Debtor.  The landlord has come in and asserted a right

23   for payment of the full monthly amount of the rent, the

24   Debtor has properly asserted its defense to paying a portion

25   of that while continuing to pay the balance of the rent in

1    accordance with the pre-petition arrangement.  And that is

2    based on the express rights of the Debtor under the relevant

3    contracts.  There is nothing in the Bankruptcy Code that

4    suggests a debtor who asserts a setoff right needs to pay the

5    disputed amount first and then go try to get the money out of

6    the third party.  Moreover, there is no unfair prejudice to

7    the landlord here.  The landlord is getting exactly what it

8    bargained for pre-petition.  A monthly amount of rent subject

9    to the Debtors' setoff rights.  What it is now arguing for is

10   that it needs to improve upon that very position by, in

11   essence, compelling the payment of more money over from the

12   Debtor.  The landlord speaks of having an interest in this

13   cash, but they have no contractual interest in these funds.

14   Their contractual right to receive the full amount of monthly

15   rent is subject to the Debtors' contractual rights to setoff

16   the amounts under the settlement agreement from the monthly

17   rent.  They have no possessory interest in this cash.

18   They're here asking Your Honor to give them that possessory

19   interest in cash by compelling payment over that they could

20   then use to offset against their rejection damages claim.

21   That is not the law, and that is not something that should be

22   permitted by the Court.  We think the cash collateral

23   argument that the landlord has advanced is novel, for want of

24   a better word, but really doesn't address the issue that

25   they're not holding cash collateral for anything.  They're

1   asserting that this is cash collateral for a right of setoff

2   that they would like to exercise in the future, or that has

3   been in the past cash collateral for a hypothetical right of

4   setoff if and when the Debtors rejected the lease.  They

5   don't have the ability to withhold payments from the Debtor

6   based on a, based on a future claim or for much of the time

7   they've claimed it a hypothetical claim as to whether there

8   would be a pre-petition rejection damages issue.  In terms of

9   the, turning to a couple of the smaller points.  Your Honor,

10  based on the fact that we have simply sought to continue the

11  parties' pre-petition arrangement and followed the law that

12  we have cited both in our papers and here to the Court today,

13  we don't believe that the landlord is entitled either to

14  post-petition interest or to attorney's fees under the terms

15  of the documents.  And in terms of the additional

16  administrative claims that have sort of cropped up in the

17  landlord's reply, we have not had an opportunity to evaluate

18  those.  The landlord, beyond saying that we have invoiced you

19  for various sundry items, hasn't really delineated what the

20  basis for that is.  And it is not possible for the Debtors at

21  this point to evaluate whether those are necessary and

22  beneficial expenses of the estate.  We don't think there is

23  anything before the Court that permits the Court to make that

24  evaluation at this point.  And as a result, we don't believe

25  those administrative claims should be allowed by the Court at

1    this time.  With that, Your Honor, that's all I have.

2            THE COURT: Thank you.  Briefly.

3            MR. LIPKIN: Your Honor, if you'll permit, I'm going

4    to go in inverse order, because there's less on the later

5    stuff, and more - - as to that last point on the additional

6    post-petition invoices, the invoices are the same invoices

7    that have been rendered throughout the years of this lease.

8    And the tenant has the same ability that was discussed by Mr.

9    Kansa to call up the landlord if he had any questions about

10   these invoices which have been outstanding for months.  So

11   it's the same process they always had.  They don't need to

12   verify charges that are, have nothing to do with inspecting

13   the premises or anything else.  They don't need to do

14   anything other than to look at the same invoices they looked

15   at all along.  As to setoff, and again, there's a lot of

16   facts and things that Mr. Kansa has testified to that are no

17   where in the record and I don't even think are true.  But he

18   says the landlord has no possessory interest in the cash.  No

19   interest in the cash.  The letter agreement, the settlement

20   letter says, quote, "Payments owed by landlord to tenant."

21   And it also talks about the payments from the sub-tenant to

22   the landlord.  The landlord physically receives, either by

23   wire or by a check, the payments.  It holds the money.

24   Similarly, he says, it's not cash collateral.  The landlord

25   holds the money.  The landlord has a setoff right.  That's

1   cash collateral.  He really never addresses it.  And he talks

2   about the Papercraft and the PSA cases.  None of those cases

3   mentioned the word or the phrase cash collateral once.  They

4   don't discuss that issue at all.  And in none of them do they

5   talk about the fact situation here, as Your Honor alluded to,

6   of pre- and post-petition claims being setoff to the

7   prejudice of the landlord.  In other words, if you read those

8   cases, the presumption is that the landlord didn't have pre-

9   petition claims.  So it wasn't being prejudiced.  That's the

10  net import of those cases, in those cases.  So however broad

11  the language, they don't have to wrestle with prejudice to

12  the landlord as we describe it, and they don't have to

13  wrestle with a cash collateral issue.  Because in the

14  Papercraft case what happened was that the, there was a, the

15  creditor both owed money to the - - I'm sorry.  The Debtor

16  both owed money and then had a claim for money.  There was no

17  cash collateral, or any amounts held by the non-debtor party.

18  They are simply inapplicable.  They have some interesting

19  language by loose analogy.  They have no where the

20  significance or relevance that Mr. Kansa suggests.  He's just

21  simply wrong.  And to suggest that the landlord here is

22  manipulating the bankruptcy when all it's saying is it has

23  its setoff rights, it's just nonsensical.  It is the Debtor

24  that's trying to get off.  The Debtor is still getting the

25  benefit of a setoff, still paying it's obligations to the

1    landlord.  The only question is whether the landlord is

2    deprived of its setoff rights and its cash collateral.  All

3    right.  Shifting to the issue, at least, that occupied most

4    of the time about whether or not the Debtor vacated the

5    premises.  First of all, 554 speaks for itself.  There's been

6    no abandonment here.  The Debtors' personal property,

7    hundreds and hundreds of items, are there.  Again, the Debtor

8    says, Mr. Kansa says, Well we couldn't go back and inspect.

9    First of all, they know what they left.  They just left it a

10   day before.  Second of all, they could call up the landlord

11   and go in.  Third, they could have asked for discovery before

12   today.  All the facts that were put in by both parties are

13   the facts before the Court.  It's uncontested.  Hundreds of

14   items are there, and Mr. Kansa has no basis to suggest, Oh,

15   well, we had no access.  Hundreds of items are there, 554 is

16   clear, the custom, certainly my experience in this District,

17   and elsewhere, is that you get an abandonment order.  The

18   Debtor could have done that.

19            THE COURT: And I see that most often.  I would

20   agree with that.  And had there been an abandonment provision

21   included, you know, this way, I wouldn't have, I probably

22   could have found, and would have found, that the property had

23   been vacated.  But that still wouldn't have let the Debtor

24   off the hook.  Because then there would have been the

25   argument about whether under the Gerber decision your cost of

1    removal is a pre-petition rejection damage element or

2    whether, under a Walrath decision, it should be given

3    administrative expense status.  And I haven't, as I said,

4    haven't made that decision.  Okay.

5         MR. LIPKIN: All right.  Well, and speaking of,

6    speaking of Judge Gerber's decision in Ames, again Mr. Kansa

7    just misstated the decision.  I'm going to quote from it.

8    This is open quotes from the Ames decision.  "Without

9    dispute, Ames abandoned the property in question."  So when

10   Mr. Kansa says there was an issue about abandonment.  He's

11   wrong.  He's just wrong.  He recited various New York state

12   cases.  I heard his description of those cases.  I concede

13   I'm not familiar with those particular cases.  But there was

14   nothing in those cases that suggested any different result

15   than what the landlord is asking for here.  The one case on

16   point, and Mr. Kansa has not cited anything to the contrary,

17   is the Cornwell Mills case that he tried to distinguish.  The

18   language of that case is clear.  The fact that property was

19   left is enough to say that the debtor had not vacated the

20   property.  We don't have the luxury here of two years having

21   passed.  And imagine the converse.  Imagine if we, the

22   landlord, with no abandonment order, had gone in and taken

23   that property.  And either taken it for our personal use or

24   sold it.  And then the Debtor came running into the Court and

25   said, Hey, we never abandoned it.  You just violated the

1   automatic stay.  We want damages.  We want sanctions.  What

2   position have you put the landlord in by doing that.  You

3   can't possibly operate like that.  Plus, let's be clear.

4   Another thing that Mr. Kansa misstated is he said, It's not

5   clear what the landlord thought about whether or not the

6   property had been surrendered.  On June 30th, we filed a

7   motion.  June 30th.  The night of June 30th.  Saying the Debtor

8   has not vacated, and we want the rent due July 1.  What more

9   unambiguous statement could you get from the landlord that in

10  its view it has not received possession or accepted

11  possession, or anything else.  And similarly, Mr. Kansa also

12  admitted in his colloquy, he said, as is the case, that the

13  security system is the Debtors' security system, and there's

14  no key.  So the declaration they submitted about there was

15  some problem with the security system, and that's why they

16  couldn't get in, it's their own security system.  So if they

17  couldn't get it, it had nothing to do with the landlord - -

18          THE COURT: Well - -

19          MR. LIPKIN:  - - taking possession.

20          THE COURT:  - - it's, the, I think the affidavit

21  did say that the landlord's management company wouldn't grant

22  access.  They did say that.

23          MR. LIPKIN: Well, it doesn't identify who, when,

24  what, where.  And we have the contrary, specific contrary

25  allegation.

1          THE COURT: True enough.

2          MR. LIPKIN: But if that becomes an issue, we can

3    have an evidentiary hearing on it.  I'm not concerned about

4    it.

5          THE COURT: Well, I tell you, we're going to have an

6    evidentiary hearing.

7          MR. LIPKIN: All right.

8          THE COURT: And I'm not going to rule today.

9    Because I, and again, framing how it's got to be approached

10   from, at least as I see it, I want a better exposition of

11   what New York law says about when a property is vacated or

12   not.  And if you have bankruptcy decisions, Bankruptcy Court

13   decisions that dwell on that subject, I'd be interested in

14   them too.  But I think the starting place probably ought to

15   be the law of the state that governs the lease.

16         MR. LIPKIN: I'm sorry.  And you said New York law

17   on precisely what issue, Your Honor?

18         THE COURT: On when is a property vacated.

19         MR. LIPKIN: Okay.

20         THE COURT: I, and again, if there are Bankruptcy

21   Court decisions on it, I'm interested in that too.  I sit

22   here, I mean, the amount of money involved here is

23   substantial, so I'd like to resolve this before, you know,

24   the next, the first of the next, of next month.  I don't know

25   how the Debtor can help stop the clock from ticking.  One

1   suggestion I have is that the Debtor file an abandonment

2   motion, and ask for expedited hearing on it.  The next

3   omnibus hearing is on the 28th of July. I would intend to

4   bring you back here then to finish this out, and I'll give

5   you some more thoughts about what I think I need.  And with

6   the entry of the abandonment order, I would then give effect

7   to the rejection.  So that we'd at least avoid a claim for

8   August 1 rent.  Now, as I said previously, that doesn't

9   answer the question about how much, if anything, the Debtor

10  will owe the landlord after that, and what the status of that

11  claim is.  So the, that, even with the entry of that order,

12  the Debtor may not be off the hook for future real damages to

13  the landlord.  And I'm not saying they are or they aren't.  I

14  haven't made that decision yet.  But I think what I'd like is

15  a submission of simultaneous briefs on the issue that I've

16  identified, and we'll talk about timing in a moment.  But

17  beyond that, to the extent, based upon the parties' arguments

18  that there are facts which you think are important to your

19  side, you're going to need to bring admissible evidence, even

20  in the form of live witnesses, or other documents which the

21  parties agree can be admitted or otherwise admitted,

22  admissible.  So that I have the necessary facts, based upon

23  which to make the appropriate decision.  I will tell you I'm

24  really impressed with the cash collateral argument.  But the

25  effect of it contains an inherent unfairness, it seems to me.

1    And to the extent fairness matters, I think the Debtors got

2    the better part of that argument with respect to the setoff.

3    But I say that, but haven't, the concept that you advance on

4    that hasn't yet fully percolated through my process.  So I'll

5    spend some time thinking about that between now and the 28th.

6    And the fact that it may mean that with respect to rejection

7    damages you're trading on less than a hundred cents on the

8    dollar, to that extent, you know, you're in the position that

9    many other creditors are.  And that doesn't, that particular

10   element doesn't carry a lot of weight with me.  But as I

11   said, I haven't, I haven't rested on that yet.  And I will

12   devote some more thought to it.  With respect to attorney's

13   fees, I did not look at the attorney's fee provision of the

14   lease.  The Debtors' argument, it seems to me, at least to

15   date has been not that you wouldn't be entitled to attorney's

16   fees for the pursuit of meritorious positions.  What the

17   Debtor has said is your position has no merit, so therefore

18   you should be entitled to no fees.  To the extent there are

19   factual disputes about what types of things are being claimed

20   exist, be prepared, I would say, to submit evidence on that.

21   You don't have to give to me, I guess, a fee application or

22   fee statement at this point.  That will follow.  If I decide

23   by type or task of what was undertaken that you should be

24   paid for that under the terms of the lease.  And those

25   provisions, as you know, are typically strictly construed.

1   It seems to me there is no dispute about the date the real

2   estate taxes are due so that to the extent the lease was not

3   rejected, I ultimately find the lease was not rejected as of

4   July 1st.  Whatever has been billed up to the date of

5   rejection, it seems to me, would be payable as an

6   administrative expense under the present state of the law in

7   this Circuit.  I think that covers the things I think I need.

8   Are there any questions that either party has?

9           MR. LIPKIN: Well, I have one question that is on a

10  personal level.  Which is simply I'm on vacation the week of

11  July 23rd.  So it seems to me if the property is abandoned, I

12  don't know whether they're going to do that, it takes some of

13  the urgency out of it.  I'm, since I'm the one who wants the

14  money, I'm the last one that wants to adjourn it extensively.

15  But at that point, you know, I don't know why - - first of

16  all, maybe for the first time the Debtor will actually have a

17  conversation with us about settlement.  But - -

18          THE COURT: Well, I was going to suggest that, but.

19          MR. LIPKIN: Well we've tried several times without

20  success.  But - -

21          THE COURT: Yeah.  I think you need to try again.

22          MR. LIPKIN: Yeah.  And I think that if we have a

23  little more time, maybe that will happen.  And with my

24  absence, that's going to be harder as well.  So you know,

25  again, I, Your Honor is in control of his calendar,

1    obviously, but I'd certainly appreciate - -

2         THE COURT: I feel less so about that lately, but

3    - -

4         MR. LIPKIN: I can understand it.  For what it's

5    worth, Your Honor, it's true for all bankruptcy lawyers.

6    Maybe more for judges.  But we're all feeling a little out of

7    control at this point.

8         THE COURT: There's a, well the next omnibus hearing

9    after that is August 11th.  I don't, let me see what your time

10   slot is there.  I have an hour at 10 o'clock.  I would be

11   willing to continue it to that date and time - -

12        MR. LIPKIN: Okay.

13        THE COURT: - - if that was acceptable.

14        MR. KANSA: Your Honor, I think we can probably

15   reach some sort of arrangement on abandonment.  I don't want

16   to get too far out of my, out in front of my client without

17   having them here and without having spoken to them on the

18   issue.  But I feel fairly certain we can get an abandonment

19   motion on file very shortly.  And if that's something we can

20   get consented to, we can work with Mr. Lipkin on that and

21   hopefully obviate the August 1 problem.

22        THE COURT: Okay.  Then we'll continue this matter

23   to August 11th at 10 o'clock.

24        MR. LIPKIN: Okay.

25        THE COURT: And I'll just, you'll tell me on the 28th

1  where the parties are with respect to the remaining issues

2  and any settlement discussions.  But let's talk about

3  briefing.  Well let me ask.  Since we put it off to the 11th

4  of August, I would like things in - - well, it's the 16th

5  today.  Ten days enough?  To get something in to me?

6          MR. LIPKIN: I'm sorry.  Are you talking about the

7  briefing?

8          THE COURT: Yes.

9          MR. LIPKIN: Yeah, well, again, it's up to you.  My

10  only problem with that, Your Honor is simply I'd rather spend

11  the next few days trying to reach a settlement rather than

12  doing additional work and running up fees, since the whole

13  idea of a settlement is to avoid the fees.  If you want it

14  within ten days, you know, you're the boss, as they say.  But

15  that's my only suggestion.  If you want it, it's fine.

16          THE COURT: Well, let me ask you this.  How much

17  time do you think you'll need to determine whether or not

18  your can resolve the matter?

19          MR. LIPKIN: Well, I would, it should take five

20  minutes.  But I would say this - - where, what are we?

21  What's today?  Thursday.  Well, I guess until, you know,

22  early next week.  You know, Tuesday of next week, I would

23  hope.

24          THE COURT: Well, I'll tell you what.  Reach out to

25  me by conference telephone no later than Tuesday.  And if the

1   matter is not resolved, we'll decide about timing for

2   filings.  How's that?

3       MR. LIPKIN: We appreciate it.  And I just want to

4   thank you for your patience in hearing us today, Your Honor.

5   It was appreciated.

6       THE COURT: Well, you know, this is like many

7   matters that I hear there.  It's, if it were easy, it would

8   have been resolved already.  It involves interesting issues,

9   and it's well briefed and well argued.

10      MR. LIPKIN: Thank you, Your Honor.

11      MR. KANSA: Thank you, Your Honor.

12      THE COURT: All right.  Anything further?  Oh,

13  there's one more matter for today.  I did enter the order

14  that came in with the certification on matter no. 8.

15      MS. STICKLES: Yes you did, and thank you, Your

16  Honor.  But you also requested at the last hearing the Gutman

17  (phonetic) lift stay actual argument, that there be a, just a

18  brief status on the scheduling of the mediation.  And I

19  believe that Guy Neal is on telephone and can address the

20  Court with respect to that.

21      THE COURT: All right.

22      MR. NEAL (Telephonic): Yes, Your Honor.  Guy Neal

23  of Sidley Austin.  Good news, Your Honor, in addition to

24  agreeing on a form of order, which Your Honor kindly entered

25  yesterday, the attorneys in the Florida litigation have

1    agreed on a mediator, Terry White, and they are in the

2    process of scheduling a mediation to occur in September or in

3    October.

4            THE COURT: All right.  Is the movant represented

5    and do they want to be heard?

6            MR. NEAL (Telephonic): No, Your Honor.  Jason

7    Cornell informed me that he would not be joining the call,

8    but that I could make the representation that I did make.

9            THE COURT: Well I would trust you too, Mr. Neal.

10           MR. NEAL (Telephonic): Thank you, Your Honor.

11           THE COURT: All right.  Anything further for today?

12        (The remainder of the page is intentionally left blank.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        MS. STICKLES: No.  Thank you very much for your

2   time, Your Honor.

3        THE COURT: All right.  Thank you all.  That

4   concludes this hearing.

5        MR. NEAL (Telephonic): Thank you.

6        THE COURT: Court is adjourned.

7      (Whereupon at 4:46 p.m. the hearing in this matter was

8   concluded for this date.)

9

10

11

12

13

14

15

16

17

18        I, Jennifer Ryan Enslen, approved transcriber for

19   the United States Courts, certify that the foregoing is a

20   correct transcript from the electronic sound recording of the

21   proceedings in the above entitled matter.

22

23    _/s/Jennifer Ryan Enslen_                __July 21, 2009__
     Jennifer Ryan Enslen
24   43 Bay Boulevard
     Newark, DE 19702
25   (302)836-1905