# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, <u>et al.</u>,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Objection Deadline: August 4, 2009 at 4:00 p.m. (ET)** |
| | **Hearing Date: August 11, 2009 at 10:00 a.m. (ET)** |

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO IMPLEMENT A 2009 MANAGEMENT INCENTIVE PLAN AND TO PAY EARNED 2008 MANAGEMENT INCENTIVE PLAN AWARDS TO CERTAIN EXECUTIVES

Tribune Company (the "<u>Company</u>") and most of its wholly-owned subsidiaries, each of which is a debtor and debtor in possession herein (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>"), hereby move this Court (the "<u>Motion</u>") for entry of an order, in substantially the form attached hereto as <u>Exhibit A</u> (the "<u>Order</u>"), authorizing, but not directing, the Debtors:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

(1)    to implement a 2009 Management Incentive Plan as described in this Motion, pursuant to
Section 363(b) and, as applicable, Section 363(c) of Title 11 of the United States Code
(the "Bankruptcy Code"), that includes the following incentive benefits for the following
groups of employees:

(a)    a continuation of the Debtors' self-funding[2] ordinary course annual management
incentive program ("MIP") opportunity[3] for 2009 for approximately 720 management
employees, including the Debtors' top 10 executives[4] (the "Top 10"), with an
aggregate payout opportunity of approximately $17.5 million – which represents only
50% of the target pool – if the Company achieves its "planned" 2009 operating cash
flow goal included in the 2009 operating plan that was approved by the Company's
Board of Directors, and an aggregate payout opportunity of approximately $35.0
million – 100% of the target pool – if the Company achieves "stretch" performance
equal to 142% of its "planned" operating cash flow;

(b)    a self-funding pay-for-performance bonus opportunity (the "Transition MIP"), in
addition to the ordinary course MIP opportunity, to incentivize 21 members of the
Debtors' core management team (including the Top 10 executives) to maintain their
focus on delivering strong operating results while performing substantial restructuring
duties, with aggregate payout opportunities of approximately $3.5 million at
"planned" 2009 operating cash flow and approximately $7.5 million at "stretch" 2009
operating cash flow, as well as a discretionary pool of $500,000 at "planned"
performance and $1 million at "stretch" performance for up to 50 other employees

---

[2] See infra note 19 for an overview of the self-funding feature of the 2009 Management Incentive Plan. As
described further in that footnote, actual performance under each component of the 2009 Management Incentive
Plan relative to operating cash flow goals is determined after considering applicable incentive payout costs, making
each such component self-funding.

[3] As detailed below, the Debtors' annual cash incentive program historically has been designated as the MIP. The
proposed 2009 Management Incentive Plan retains this traditional ordinary course annual cash incentive
opportunity, which is generally referred to in this Motion as the "ordinary course MIP." The 2009 Management
Incentive Plan also has two additional components for certain groups of employees with key management and/or
line operations responsibilities – the Transition MIP and the Key Operators Bonus.

[4] The Top 10 executives include the Debtors' Chief Operating Officer; Chief Administrative Officer; Chief
Financial Officer; General Counsel; two Executive Vice Presidents; President of Tribune Broadcasting; Publisher of
the Los Angeles Times; Executive Vice President of Tribune Publishing; and President of Tribune Interactive (a non-
Debtor executive). The Top 10 executives do not include the Debtors' Chief Executive Officer, who receives 50
cents in annual base salary and does not participate in any aspect of the 2009 Management Incentive Plan.

46429/0001-5870497V1

(with a maximum individual award opportunity of $65,000) based on management judgment of their contributions to the Debtors' restructuring efforts; and

(c) a self-funding pay-for-performance bonus opportunity for 23 leaders of key operations[5] (the "Key Operators Bonus" or "KOB"), in addition to the ordinary course MIP opportunity, that incentivizes them to achieve transformation of their respective operations by *exceeding* certain "stretch" level operating cash flow goals for those operations during 2009, with a maximum aggregate opportunity of approximately $9.3 million; and

(2)   pursuant to Section 363(b) and Section 105(a) of the Bankruptcy Code, to make payouts totaling approximately $3.1 million in earned 2008 MIP awards to nine of the Top 10 executives[6] (including one non-Debtor executive), none of whom have yet received any such awards despite payment of 2008 MIP awards to all other participants.

## SUMMARY

At the May 12, 2009 hearing (the "May 12, 2009 Hearing") on the Motion Of The Debtors For An Order Authorizing The Debtors To Make Certain Payments For 2008 Pursuant To Pre-Petition Incentive Plans And Certain Other Obligations (the "2008 MIP Motion"), the Company's Chief Financial Officer testified as follows regarding the importance of ensuring that key executives and managers remain properly incentivized during this critical yet extraordinarily difficult period in the Debtors' history:

---

[5] There is no overlap between the Transition MIP participants and the Key Operators Bonus participants, except for six individuals who have limited cross-opportunities. Two of the Top 10 executives who principally participate in the Transition MIP (the Chief Operating Officer and the Chief Administrative Officer) have modest KOP opportunities (capped at 40% and 33% of base salary, respectively) given their overall responsibility for the Debtors' operating results and the need to maintain competitive levels of incentive compensation. Four other members of the Top 10 (the President of Tribune Broadcasting, Publisher of the *Los Angeles Times*, President of Tribune Interactive (a non-Debtor), and Executive Vice President of Tribune Publishing) principally participate in the KOB given their substantial operating duties for particular businesses, but also have modest Transition MIP opportunities given their restructuring obligations, the importance of their operations to the Company's overall success, and the need to maintain competitive levels of incentive compensation.

[6] One of the Executive Vice Presidents in the Top 10 executives was hired in late 2008 and thus was not eligible for a 2008 MIP award.

[W]e are just at the beginning of transforming this business.  And . . . we need to motivate and incentivize the key people that will implement change.

[. . . .]

I will tell you that these are the top managers of the company.  They're very professional, experienced people who have a lot of sweat equity in this situation and who care very passionately about the companies and the assets that we operate. . . .  I believe what this company does every day is incredibly important and really ambitious . . . . [W]e own . . . assets that are the voice of record of some of the largest cities in the country . . . .  And I think what you'll find as you meet these people is that they're incredibly committed to the situation.

But I will tell you that not being rewarded for hard work and hard effort is de-motivating.

[. . . .]

It's my view that I just don't want the papers to get out.  I want to make this company better.  I want to make the products better . . . .  [I]f the papers just get out, if you will, I think that our chances of survival get less, and less, and less.  We need to transform the company.  And the only way we can do that is if this group of people works very hard to do so.  We need to figure out a way to mitigate all the revenue trends, figure out a way to make the products more efficiently. . . .  [W]e need to maximize value.  We need to create change.  And the only way you do that is you motivate people and incentivize people.

Transcript of May 12, 2009 Hearing, at 29, 34-35, 37-38 (excerpts of this Transcript are attached hereto as Exhibit F).

In granting the 2008 MIP Motion, this Court recognized "the debtors' place in the industry in which it's trying to survive and transform itself in what are truly extraordinary times..." and that "[t]he major creditor constituencies are supportive, others have not objected." Transcript of May 12, 2009 Hearing (Ex. F), at 52-53.  The Court also observed that the 2008 MIP may have been a Section 363(c) "ordinary course" program, even though approval for payments thereunder was sought pursuant to Section 363(b) of the Bankruptcy Code given that the 2008 performance period was largely pre-petition.  See id., at 9 ("With respect to the motion at Number 5, to make payments according to prepetition incentive plans, it may be really – it

4

may be the first time that it really is an ordinary course thing and doesn't fall under the 503(c)(3) standard.").

All of the foregoing statements and sentiments, expressed a few months ago, remain just as true today. The Debtors' need to maintain these incentives for 2009 remains as strong as ever, as its key personnel are still being called upon to surmount significant industry and macroeconomic challenges while at the same time working diligently towards a successful reorganization. The Debtors also need to have competitive incentive plans so that they have the necessary tools to attract top-tier executive and management talent where necessary. Doing so is difficult enough in the bankruptcy context, and those difficulties will be compounded if the Debtors cannot offer a competitive and appropriately incentivizing compensation structure.

The proposed 2009 Management Incentive Plan is carefully tailored to maximize the possibility that the Debtors will be successful in meeting these challenges. Like the 2008 MIP payouts approved by this Court, the 2009 Management Incentive Plan has been reviewed and approved by the Compensation Committee of the Company's Board of Directors (the "Compensation Committee"). It also has been developed with and analyzed by Mercer (U.S.), Inc. ("Mercer"), an independent compensation consulting firm that concluded that the various incentive benefit opportunities provided under the 2009 Management Incentive Plan all are within reasonable market ranges and are common forms of compensation for companies in Chapter 11.[7] Likewise, the proposed 2008 MIP awards for the eligible Top 10 executives have been approved by the Compensation Committee and validated as reasonable by Mercer to reward

---

[7] A copy of Mercer's July 22, 2009 report describing and analyzing the proposed 2009 Management Incentive Plan (the "Mercer Report") is filed under seal and is designated as Exhibit D.

them for their extraordinary work and accomplishments in 2008, alleviate to some extent their significant undercompensation for that year, and reinforce their incentives going forward.

The proposed 2009 Management Incentive Plan and proposed 2008 MIP awards for the eligible Top 10 executives have been extensively vetted and discussed with the Debtors' creditor constituencies, including the official committee of unsecured creditors (the "Creditors Committee") and the steering committee of the Debtors' senior lenders (the "Steering Committee"). In many instances, these dialogues resulted in material *increases* in applicable performance targets, *decreases* in potential payouts by millions of dollars, and structural changes to certain 2009 Management Incentive Plan components for better alignment with expressed creditor constituency interests. See, e.g., Ex. D (Mercer Report) at 1. As a result, the Creditors Committee and the Steering Committee support the relief requested in this Motion.

Ordinary Course MIP Opportunity for 2009

Continuation in 2009 of the ordinary course annual MIP component of the 2009 Management Incentive Plan for approximately 720 participants is entirely consistent with the Debtors' historical practice, which has been to offer an annual cash MIP program every year since at least 1997. Individual participant target bonus opportunities, including for the Top 10 executives, generally are the same as they were for 2008 (other than adjustments for promotions or to correct for inadvertent disparities among participants with similar job responsibilities). The ordinary course MIP, with its traditional operating cash flow performance metric, is an entirely self-funding, pay-for-performance program that is central to transforming the Company and is reasonable in cost, particularly when that cost is considered relative to the Company's revenue. As noted, following extensive discussions with the Debtors' creditor constituencies, the

6

aggregate ordinary course MIP cost is approximately $17.5 million at "planned" performance

and $35.0 million at "stretch" performance, whereas the Company's projected revenue for 2009

is approximately $3.1 billion. <u>See</u> Transcript of May 12, 2009 Hearing (Ex. F), at 53 (the Court

considering, in granting the 2008 MIP Motion, "what's proposed to be paid in relation to its [the

Company's] revenue."). Actual performance relative to MIP operating cash flow goals is

determined *after* considering MIP payout costs, making the MIP self-funding. <u>See</u> <u>infra</u> note 19

(overview of self-funding principles).

      Significantly, the ordinary course MIP incentive benefit under the 2009

Management Incentive Plan is even more conservative than prior years' MIPs in several

respects:

- *First*, an aggregate MIP bonus pool is funded only if the Company achieves at least *"planned"* operating cash flow – there is no provision for an aggregate bonus pool if the Company achieves any level of "threshold" performance below plan, even though all prior years' MIP programs typically funded a partial pool at 40% of target if the Company achieved some minimum threshold of consolidated operating cash flow below "plan."

- *Second*, achievement of 100% of "planned" 2009 consolidated operating cash flow would result in a payout of only *50% of the target pool* – $17.5 million. The median award at "planned" performance is only $13,245. In prior years, achievement of 100% of "planned" operating cash flow typically would fund a pro forma bonus pool at 100% of the target pool. This refined payout structure reflects the Debtors' candid and conservative acknowledgement that the 2009 operating cash flow goal included in the Company's 2009 operating plan, while realistic, represents a significant decline from 2008 because of current industry and economic conditions. Payout at 100% of target requires achievement of a "stretch" goal – 142% of "planned" operating cash flow.

- *Third,* "maximum" performance (200% of "planned" operating cash flow) would fund a "maximum" aggregate pro forma bonus pool that is capped at 130% of the target pool,

whereas prior years' MIPs rewarded a lower "maximum" performance level (120% to 140% of "planned" operating cash flow) with a higher "maximum" aggregate payout opportunity (200% of the target pool).

- *Fourth*, the number of participants and the aggregate cost of the ordinary course MIP at "planned" and "stretch" performance levels remain at or below levels for MIPs in prior years.

- *Fifth*, the 2009 Management Incentive Plan limits the Debtors' discretion to make ordinary course MIP awards when goals are not achieved, as compared to prior years. For 2009, if the Debtors do not reach at least "planned" consolidated operating cash flow, no aggregate MIP pool is funded, no awards to Corporate division participants or segment group office participants (which collectively include eight of the Top 10 executives) may be made, and individual business units that achieve at least "planned" performance will then be eligible only for substantially discounted partial awards. Furthermore, any discretion that is permitted will be exercised within the pay-for-performance framework of the 2009 Management Incentive Plan and with due regard for Company, business unit and individual performance results.

Transition MIP Opportunity

The Transition MIP component of the 2009 Management Incentive Plan also is a reasonable and necessary incentive component. The 21 participants in the Transition MIP (the "TMIP Participants") hold key positions with top-level responsibility, and also have been identified by management and the Compensation Committee as principally responsible for the Debtors' restructuring efforts.[8] As a result, the TMIP Participants have the opportunity and ability to create significant value for the Debtors' estates and their creditor constituencies, both

---

[8] The TMIP Participants are comprised of the Top 10 executives, and the Company's Executive Vice President/Chief Technology Officer, Senior Vice President/Development, Senior Vice President & Deputy General Counsel, Senior Vice President/Financial Operations, Vice President/Tax, Vice President/Human Resources, Vice President/Controller, Senior Vice President/Administration & Chief Financial Officer of the Broadcasting/Entertainment Segment, Vice President/Treasurer, Senior Vice President/Strategy, and Senior Vice President/Corporate Relations.

46429/0001-5870497V1

through their efforts to increase operating cash flow and through their day-to-day focus on the Debtors' restructuring. It is axiomatic that increased profitability enhances the Debtors' prospects for a successful reorganization. However, the consistent and dedicated performance of such varied and substantial duties requires tremendous effort by these key individuals on a daily basis.

The Transition MIP is a self-funded, pay-for-performance plan that incentivizes the TMIP Participants to maintain a strong focus on operating results and on generating value through the Debtors' restructuring. Like the ordinary course MIP, the Transition MIP motivates strong operating performance by offering incentive opportunities based on the level of 2009 operating cash flow relative to the Company's 2009 operating plan. The TMIP Participants generally have cash award opportunities at "planned", "stretch" and "maximum" operating cash flow levels that resulted from extensive discussion with the Debtors' creditor constituencies, and that are based on factors such as position, centrality to the Debtors' operating results, criticality to the restructuring, and market pay levels for their roles. As discussed further below, aggregate incentive award opportunities for the TMIP Participants under the 2009 Management Incentive Plan as a whole (including but not limited to the Transition MIP component) generally are at or below the applicable market median at all levels of performance.

The aggregate Transition MIP opportunities at "planned" and "stretch" operating performance – approximately $4.0 million and $8.5 million, respectively – are reasonable to ensure proper incentives and to bring the participants' compensation on average closer to market. These amounts include a discretionary pool of $500,000 at "planned" performance and $1 million at "stretch" performance from which management may make awards to up to 50 employees who materially contribute to the Debtors' restructuring efforts (with no individual

9

award to exceed a maximum of $65,000). These payout opportunities are even more reasonable

when compared to the approximately $7.5 million per month that the Debtors' estates are paying

for professionals fees and expenses related to the bankruptcy. As with the ordinary course MIP,

actual performance relative to Transition MIP operating cash flow goals is determined *after*

considering applicable incentive payout costs under the 2009 Management Incentive Plan,

making the Transition MIP self-funding. See infra note 19 (for an overview of self-funding

principles).

   Key Operators Bonus Opportunity

          Implementing the Key Operators Bonus component of the 2009 Management

Incentive Plan similarly is vital in order to motivate 23 key operating leaders to continue to focus

on transformation of their respective businesses throughout 2009. The Key Operators Bonus is a

self-funded, pay-for-performance incentive plan that provides these 23 leaders (the "KOB

Participants"), six of whom are members of the Top 10, with the opportunity to participate

directly in a successful transformation by sharing in a modest percentage (1% to 3%) of the

*incremental* amount – if any – by which the operating cash flow of their respective operations for

2009 *exceeds* certain "stretch" operating cash flow goals for 2009. Once again, actual

performance relative to KOB operating cash flow goals is determined *after* considering

applicable incentive payout costs under the 2009 Management Incentive Plan, making the KOB

self-funding. See infra note 19 (for an overview of self-funding principles).

          Each of the KOB Participants (other than the Chief Operating Officer and the

Chief Administrative Officer, as discussed below) must exceed an individualized "stretch"

operating cash flow goal set for the particular operations for which he or she is responsible.

Each of these KOB Participants is eligible to receive 2% to 3% of any incremental operating cash flow above this threshold, with KOB awards for such individuals capped at one times base salary. For the Chief Operating Officer and the Chief Administrative Officer, the applicable "stretch" goal under the KOB is 165% of "planned" consolidated operating cash flow – *higher* even than the "stretch" goal for purposes of the ordinary course MIP and the Transition MIP (which is 142% of "planned" operating cash flow). These two executives are eligible to receive 1% of any incremental operating cash flow above this threshold, with their individual KOB awards capped at 40% and 33% of base salary, respectively.

The KOB Participants are *not* rewarded if their respective operations do not exceed these "stretch" operating cash flow goals, and thus the Key Operators Bonus involves *no cost* to the Debtors' estates unless and until the operations for which a given KOB Participant is responsible achieve demonstrably superior financial performance. In the case of the Chief Operating Officer and the Chief Administrative Officer, the Company's performance as a whole must excel (even beyond "stretch" MIP and Transition MIP goals), creating strong incentives for the two Top 10 executives who have the greatest control over and opportunity to influence the Company's overall day-to-day operations. Given the foregoing payout caps, the maximum aggregate KOB award opportunity is approximately $9.3 million.

Together, the ordinary course MIP, Transition MIP and KOB opportunities under the 2009 Management Incentive Plan create strong incentives for the Debtors' key management team to continue to drive operating results and transform the Company. They also are critically important to bring the participants' total compensation closer to market levels given the lack of any long-term incentive opportunities.

11

<u>Payment of Earned 2008 MIP Awards to Eligible Top 10 Executives</u>

With the support of the Creditors Committee and the Steering Committee, the Debtors also are seeking approval to pay approximately $3.1 million in earned 2008 MIP awards to the nine eligible members of the Top 10 who have yet to receive those awards.  <u>See</u> <u>supra</u> note 6.  This amount includes contractually required payouts (ranging from 50% to 100% of target) to three executives who have pre-existing bonus guarantees, and payouts to the remaining executives at 38% to 46% of their respective target opportunities.  Notably, these payout percentages for those without contractual guarantees incorporate the same percentage *reduction* that had been negotiated with the Debtors' creditor constituencies for 2008 MIP payments to all other participants.

As discussed, this Court granted the Debtors' motion to pay 2008 MIP awards to all non-Top 10 participants at the May 12, 2009 Hearing, finding that those awards were well-justified by the applicable facts and circumstances, indeed may have been ordinary course payments, and were *present entitlements* of the participants:  "While it [the 2008 MIP award proposal] is a payment based upon prepetition performance, I don't view it as a payment of a prepetition debt.  It is a payment that the company has proposed to make now, yes, with respect to past performance, but to which it believes the covered employees are presently entitled."  Transcript of May 12, 2009 Hearing (Ex. F), at 52.  The Court also stated that:  "This is one of the strongest records I've yet had in support of a bonus plan."  Transcript of May 12, 2009 Hearing (Ex. F), at 54.

The Debtors respectfully submit that the same considerations and principles apply to the unpaid 2008 MIP awards of the Debtors' Top 10 executives.  The Compensation

12

Committee has approved these awards for the Top 10 executives, who were the principal architects and drivers of the Company's efforts to generate operating cash flow, reduce costs and start transforming their businesses in 2008 and who remain chiefly responsible for delivering results going forward.  In order to expedite consideration and payment of 2008 MIP awards for non-Top 10 participants, the Debtors excluded the Top 10 executives from their 2008 MIP Motion pending further discussions with their creditor constituencies about 2008 MIP awards for the Top 10 as well as 2009 incentive plans.  The Debtors have since conducted extensive discussions with their creditor constituencies on such matters, and have the support of the Creditors Committee and the Steering Committee for all such payments and programs as a means of rewarding the Top 10 executives for their 2008 performance, which laid the foundations for the Company's future success, and of partially remedying the dramatic undercompensation that they face for 2008 and 2009.

There can be no serious debate about whether the Top 10 executives have earned their 2008 MIP awards.  As detailed in the 2008 MIP Motion, despite extraordinary challenges in 2008 that gravely affected many of the Debtors' competitors, the Debtors' management team took swift and aggressive action across their business units to develop new revenue sources, reduce expenses and defend the Company against the deteriorating business climate in which the Debtors and the entire industry found themselves.  They implemented strategic initiatives (such as major redesigns of all eight of their newspapers, new newspaper circulation programs, rebranding/repositioning of several broadcasting stations, and headcount reductions) that are expected to generate approximately $425 million of incremental operating cash flow on an annualized basis, including approximately $285 million in the Publishing segment alone. Twenty-one of the Company's twenty-three television stations and WGN Radio *gained* market

13

share in a down economy. Furthermore, the Corporate division closed transactions that generated over $1 billion in proceeds in 2008 alone, which the Debtors used to pay down debt and sustain operations.

* * * * * * *

Implementation of the 2009 Management Incentive Plan with its ordinary course MIP, Transition MIP and KOB payout opportunities, as well as payout of 2008 MIP awards to the Top 10 executives, thus are eminently reasonable given the Debtors' demonstrated ability to deliver strong operating performance where proper incentives exist, and their continuing need to motivate robust performance in light of industry and macroeconomic conditions. Indeed, in 2009, the Company continues to mitigate the unprecedented economic pressures facing its businesses and remains profitable. This performance is relatively strong when one considers that several publishers of large metropolitan newspapers operate at significant losses and many are rumored to be considering closures. Others have recently closed money-losing operations and/or dramatically changed the form of their product in an attempt to remain viable.

Although the Debtors' management team thus has the clear capability to deliver strong performance under extraordinary adversity, the fact remains that doing so involves incredible effort, focus and dedication, and requires strong yet reasonable incentives in order to motivate and fairly compensate these key personnel to optimize the successful pursuit of the Company's businesses for the benefit of all constituencies. The Debtors have taken a thoughtful and conservative approach with the 2009 Management Incentive Plan and the remaining 2008 MIP awards to ensure these proper incentives, to bring the participants' compensation closer to the market median relative to their peers, and to avoid the substantial undercompensation and

14

dilution of incentives that otherwise would occur. As detailed below and as confirmed by Mercer:

- Without any component(s) of the 2009 Management Incentive Plan, total direct compensation[9] for the Top 10 executives would fall on average to *40% of the market median* and for other key executives[10] would fall on average to *44% of the market median*. Ex. D at 13-14.

- Approval of only the ordinary course MIP component of the 2009 Management Incentive Plan will not close this gap – at *"planned"* performance, MIP payouts would be just 50% of target and thus with the ordinary course MIP alone, aggregate total direct compensation would remain at only 59% of the market median for the Top 10 executives and only 55% of the market median for other key executives; even at *"stretch"* performance (142% of "planned" operating cash flow and ordinary course MIP payout at 100% of target), aggregate total direct compensation would be only 77% of the market median for the Top 10 executives and only 66% of the market median for other key executives. Ex. D at 14-15.

- Approval of the Transition MIP and the KOB, in addition to the ordinary course MIP opportunity, results in a compensation package that is both reasonable and market-based:

  - With the Transition MIP in addition to the ordinary course MIP opportunities, aggregate total direct compensation at "planned" performance would rise to 73% of the market median for the Top 10 executives and 61% of the market median for other key executives. Ex. D at 14.

  - At "stretch" performance (142% of "planned" operating cash flow), aggregate total direct compensation would be closer to or at market levels – 108% of the market median for the Top 10 executives and 79% of the market median for the other key executives –

---

[9] Total direct compensation is comprised of base salary, short-term (e.g., annual) cash incentives and long-term (e.g., equity-based) incentives, if any. See Ex. D (Mercer Report) at 13-16, 39.

[10] Other key executives, when referred to for purposes of compensation benchmarking, include TMIP and KOP Participants outside the Top 10 executives.

46429/0001-5870497V1

particularly given the fact that under normal market practice, above-plan performance
typically results in payouts above the market median.[11] Ex. D at 15, 18.

- Even at "maximum" performance (and even taking into account the "maximum" KOB
  payments for those few TMIP Participants who also have KOB opportunities, see supra
  note 5), the Debtors' proposed compensation structure is reasonable and conservative –
  aggregate total direct compensation is 98% of the market median for maximum total
  direct compensation for the Top 10 executives, and 76% of the market median for
  maximum total direct compensation for other key executives. Ex. D at 16.

- Approval of the Key Operators Bonus will not increase the KOB Participants'
  compensation relative to the market median, or involve any costs to the Company, for
  anything other than superior Company performance because the KOB does not pay out
  unless and until a KOB Participant exceeds his or her applicable "stretch" operating cash
  flow goal.

- The maximum aggregate Transition MIP costs as a percentage of revenue are below the
  average and the median costs as a percentage of revenue for comparable plans offered by
  other companies in Chapter 11 proceedings (Tribune: 0.259%; Average: 0.348%;
  Median: 0.339%). Ex. D at 18-20. Adding the maximum Key Operators Bonus payouts
  makes costs as a percentage of revenue somewhat higher (0.461%), but still within a
  reasonable and appropriate market range – Mercer confirms that it is consistent with
  market practice to pay above-median compensation for above-plan performance (which is
  required for "maximum" Transition MIP and KOB awards); three of eight comparables
  had plans with higher maximum costs as a percentage of revenue; the Key Operators
  Bonus has no cost until a KOB Participant's operations exceed "stretch" performance;
  and participants receive only 1% to 3% of incremental operating cash flow above the
  "stretch" level, with the remaining 97% to 99% accruing to the Company. Id. at 18-20.

---

[11] As Mercer notes in its Report (attached as Exhibit D), competitive pay is generally defined as a range, not a point,
due to inherent variations in market data. Therefore, Mercer typically considers total compensation to be
competitive if it falls within 15% of the market median. Ex. D at 13.

- Lastly, failure to approve payment of earned 2008 MIP awards for the Top 10 executives would compound their undercompensation for that year, placing their aggregate total direct compensation for 2008 at *43%* of the market median. Ex. D at 22-23. Payment of earned 2008 MIP awards would ameliorate such undercompensation somewhat, but still would leave their aggregate total direct compensation for 2008 at 64% of the market median. <u>Id.</u> Furthermore, recently filed 2009 proxy statements by the Company's peers indicate that 9 out of 10 reporting peer media companies paid bonuses to named executive officers for 2008 performance, and did so at percentage-of-target payout ranges (a low of 19% to a high of 123%) that are fully consistent with the percentage-of-target payouts proposed for the Top 10 executives (65% in the aggregate including three executives with contractual bonus guarantees, or 38% to 46% considering only those without guarantees). <u>Id.</u> at 22-23, 48.

In sum, the Debtors believe in their business judgment that implementation of the 2009 Management Incentive Plan and payout of the remaining earned 2008 MIP awards to the Top 10 executives is essential to the success of both their ongoing operations and their restructuring efforts. Additional facts and circumstances supporting this Motion are set forth below and are verified in the Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company, in support of the Motion (the "<u>Bigelow Affidavit</u>") and the Affidavit of John Dempsey, Principal, Mercer (U.S.), Inc., in support of the Motion (the "<u>Dempsey Affidavit</u>"). Copies of the Bigelow Affidavit and the Dempsey Affidavit are attached hereto as <u>Exhibit B</u> and <u>Exhibit C</u>, respectively. A copy of the Mercer Report is designated as <u>Exhibit D</u> hereto and is being filed under seal herewith.[12] In further support of this Motion, the Debtors respectfully represent as follows:

---

[12] Concurrently with this Motion, the Debtors are filing the Motion of the Debtors to File Under Seal an Exhibit to Motion Of The Debtors For An Order Authorizing The Debtors To Implement A 2009 Management Incentive Plan And To Pay Earned 2008 Management Incentive Plan Awards To Certain Executives. Pursuant to Del. Bankr. L. R. 9018-1(b), a copy of <u>Exhibit D</u> will be provided to the Judge's chambers in an envelope marked "Documents To Be Kept Under Seal."

## STATUS OF THE CASE AND JURISDICTION

1.      On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2.      The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner.

3.      The Creditors Committee was established on December 18, 2008.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are Sections 105(a), 363(b) and 363(c) of the Bankruptcy Code.

## BACKGROUND

### The Debtors' Principal Segments and Business Units

5.      The Company is America's largest employee-owned media and entertainment company and is the ultimate parent company of each of the Debtors.  It reaches more than 80% of U.S. households through its newspapers and other publications, its television and radio broadcast stations and cable channels, and its other entertainment offerings.  The Debtors' operations are conducted through two primary business segments:  (i) Publishing and (ii) Broadcasting and Entertainment.

46429/0001-5870497V1

6.      The Publishing segment currently operates eight (8) major-market daily newspapers, and distributes entertainment listings and syndicated content through its Tribune Media Services business unit.  It also manages the websites of the Debtors' daily newspapers, television stations, and other branded sites targeting specific communities of interests.  As of the Petition Date, the Publishing segment employed approximately 12,000 full-time equivalent employees.

7.      The Broadcasting and Entertainment segment includes 23 television stations in 19 markets, including seven stations in the top 10 U.S. markets and the Chicago area's first and only 24-hour cable news channel, CLTV.  It also operates the cable "Superstation" WGN America and Chicago radio station WGN-AM.  As of the Petition Date, the Broadcasting and Entertainment segment employed approximately 2,600 full-time equivalent employees.

8.      The Debtors also have a Corporate division that includes the senior management team as well as other corporate-level and centralized administrative personnel, including legal, finance, accounting, technology and human resources personnel.

**Overview of the MIP and the Debtors' Historical Compensation Practices**

9.      The Debtors have paid incentive compensation as a central component of employee compensation for many years.  As part of that practice, in 1997, they implemented the MIP as part of the Tribune Company Incentive Compensation Plan (the "Incentive Plan"), a copy of which is attached hereto as Exhibit E.[13]  The Incentive Plan authorizes the Debtors to make incentive awards to eligible participants consisting of annual cash incentive awards through the

---

[13] As explained above and below, the MIP in prior years is equivalent to the ordinary course annual MIP component of the 2009 Management Incentive Plan.

MIP and various equity-based grants. See Ex. E (Incentive Plan) Art. VI. The Debtors have awarded cash incentive awards under the MIP each year since 1997.

10.    Historically, most management employees across the Company's and its affiliates' operations (other than those in sales positions) with target cash incentive award opportunities of at least 15% of their base salary have participated in the Debtors' annual cash incentive plan. There were a total of approximately 1,039 participants in the MIP for 2004, 1,040 for 2005, 1,010 for 2006, 953 for 2007 and 720 for 2008.

11.    The Debtors have used a consistent methodology over the years in setting annual cash incentive award targets and in subsequently determining such awards. Each participant has an annual target award opportunity expressed as a percentage of his or her base salary. For example, a participant with a base salary of $100,000 and a 20%-of-salary cash incentive award target percentage would be eligible for a target award of $20,000. The Debtors then use these individual bonus opportunities to determine target bonus pools for each business unit and segment, as well as the consolidated Company-wide target pool.[14]

12.    Within the Publishing segment, each individual newspaper is its own business unit, as is Tribune Media Services. Within the Broadcasting and Entertainment segment, each television and radio station is its own business unit. The Corporate division, as well as certain group offices that oversee the entire Publishing segment and Broadcasting and Entertainment segment, respectively, also constitute distinct business units.

---

[14] As discussed below, the "target" annual cash incentive award opportunity of a given participant, expressed as a percentage-of-salary, is *different* in concept from the "target" level annual MIP *pool* as a whole. While individual participants' percentage-of-salary cash incentive award targets historically have varied under the MIP, they typically have been *lower* than *aggregate* cash MIP pool payouts as a percentage of the target pool. For example, even though "threshold" level Company performance typically resulted in a pro forma bonus pool equal to 40% of the target pool (see infra ¶ 14(a)), individual awards from that pool as a percentage of salary generally were significantly lower than 40%.

13.    In the fourth quarter of each year, a budget and operating plan is developed by each business unit for the following year, as well as a consolidated budget and plan for the Company as a whole. These plans include forecasted income statements for each business unit, as well as other objectives such as, in the case of Broadcasting and Entertainment business units, market share goals.

14.    The operating cash flow goals established in this planning process for the business units also historically served as the primary performance target for that year's MIP:

a.    Publishing:  Each Publishing segment business unit's operating cash flow forecast historically served as its annual cash incentive award performance target as well. Under the Debtors' practice:

- When a Publishing business unit achieved threshold performance – usually in the range of 75% to 85% of its forecasted operating cash flow – a pro forma[15] annual cash incentive bonus pool was established for that business unit at 40% of the target pool (as discussed below, the ordinary course MIP component of the 2009 Management Incentive Plan eliminates any such "threshold" pool or other interpolated payment opportunity for anything less than "planned" operating performance).[16]  See infra ¶ 23.

- Historically, if the business unit met its operating cash flow goal, a pro forma bonus pool was established at 100% of target (as discussed below, the ordinary course MIP component of the 2009 Management Incentive Plan is more conservative than prior

---

[15] This and other amounts are referred to as "pro forma" because, as discussed below, the Debtors have always reserved and exercised the discretion to adjust achieved pool and payout amounts.

[16] For example, assume that a Publishing business unit's operating cash flow target was $10 million, its threshold performance target was 85% of that amount, and its aggregate bonus pool target was $1 million (at 100% achievement of forecasted operating cash flow). If this business unit generated operating cash flow of $8.5 million (85% of target), it would achieve a pro forma bonus pool of $400,000 (40% of the $1 million target pool), subject to further adjustment in the Debtors' discretion. As discussed, payout at the threshold level of 40% of the target bonus pool did *not* result in a payout at 40% of each participant's base salary. To the contrary, while individual participants' annual cash incentive bonus targets, expressed as a percentage of base salary, vary (see supra ¶ 11), aggregate annual cash incentive award payouts under past years' MIP programs as a percentage of base pay have been well below 40%.

years' MIP programs in that achievement of 100% of "planned" operating cash flow would fund an aggregate pro forma bonus pool of only 50% of the target pool).  See infra ¶ 23.  Operating cash flow between a minimum threshold and the "planned" goal historically would result in a linearly interpolated pro forma bonus pool achievement from 40% to 100% of target.

- Operating cash flow in excess of a business unit's "planned" goal historically resulted in a proportionally increased pro forma achieved pool, up to 200% of target for "maximum" performance of at least 120% to 140% of "planned" operating cash flow depending on the business unit (as also discussed below, the 2009 Management Incentive Plan would set a higher "maximum" performance requirement of 200% of "planned" operating cash flow and then cap the "maximum" aggregate MIP pool for such "maximum" performance at 130% of target, not 200%).  See infra ¶ 23.

        b.     Broadcasting and Entertainment:  For Broadcasting and Entertainment business units, operating cash flow and market share goals historically have determined a majority of their achieved annual cash incentive bonus pool opportunity, with a portion being determined based on discretionary factors.

        c.     Publishing and Broadcasting/Entertainment Group Offices:  For the Publishing group office and the Broadcasting and Entertainment group office, their annual cash incentive bonus pool achievement levels historically have been based, respectively, on a weighted average of the bonus achievement levels for the various individual business units within the Publishing segment and the Broadcasting and Entertainment segment.

        d.     Corporate Division:  Historically, the Corporate division's annual cash incentive pool opportunity has been based on a blend of the Publishing segment's

achievement, the Broadcasting and Entertainment segment's achievement, and individual goals including equity investment income achievement.

15.     Given the complexity and breadth of the Debtors' organization, the diversity of their business units, and the variety of markets in which they operate, the Debtors traditionally have exercised discretion in adjusting actual business unit and segment annual cash incentive pool amounts, as well as individual awards, upwards or downwards relative to achieved pro forma amounts. This includes making discretionary awards, where deemed appropriate, to business units that did not meet their goals. The Incentive Plan expressly authorizes such exercises of discretion. See Ex. E (Incentive Plan) §§ 3.2, 10.6. As discussed below, the ordinary course MIP component of the 2009 Management Incentive Plan is more conservative than prior years' MIP programs in that it imposes significant limitations on this historical discretion, including by *eliminating any discretion* to fund an aggregate bonus pool or to make awards to Corporate division or segment group office participants if the Company does not achieve at least "planned" consolidated operating cash flow. See infra ¶ 26.

16.     In addition to their annual cash incentive awards, a majority of MIP participants historically have been eligible to receive equity-based awards to incentivize long-term performance. Prior to 2007, such equity-based awards were made as option or restricted stock unit grants under the Incentive Plan. Following the merger that returned the Company to private ownership at the end of 2007, the Company awarded phantom equity through a new Management Equity Incentive Plan.

17.     Under the Debtors' longstanding compensation philosophy, the total cash compensation of key personnel (base salary and annual cash incentive award) purposefully was

23

kept low relative to market. Equity-based compensation comprised a substantial component of their compensation to incentivize long-term performance, align managements' and the shareholders' interests, and bring the recipients' total direct compensation (base salary, cash incentive award and long-term equity award) to market.

18.    However, as detailed in the 2008 MIP Motion, the Debtors have been unable to provide meaningful equity compensation to their key personnel, including the Top 10 executives, since 2007 due to prevailing adverse economic circumstances, including their Chapter 11 filing. In addition, the Top 10 executives' earned MIP awards for 2008 have not been paid. As a result, the Top 10 executives and other key personnel are significantly under-compensated relative to the market, as discussed above and further below.

## REQUESTED RELIEF AND BASIS FOR RELIEF

### I.    Implementation of the 2009 Management Incentive Plan

19.    The Debtors seek approval to implement the 2009 Management Incentive Plan as described in this Motion. This request includes continuing the ordinary course annual MIP opportunity for 2009 in accordance with the Debtors' historical practice of offering a pay-for-performance annual cash incentive award program, with certain refinements that make that component of the 2009 Management Incentive Plan even more conservative than MIP programs in prior years. The Debtors also seek approval to implement a Transition MIP and a Key Operators Bonus as part of the 2009 Management Incentive Plan for those key employees who are vitally important to the Debtors' operational and restructuring efforts. The 2009 Management Incentive Plan is described further in the Mercer report designated as Exhibit D hereto and filed under seal.

24

A.    <u>**Ordinary Course Continuation of Annual MIP Opportunity**</u>

20.    At the May 12, 2009 Hearing, this Court approved payment of annual cash incentive awards pursuant to the 2008 MIP (excluding the Top 10). As demonstrated at that hearing, without an annual cash incentive bonus as a material component of their compensation, the Company's management team would be severely undercompensated and would not have proper incentives to continue to transform the Company in the face of significant cyclical and secular pressure. Not having meaningful incentives would be detrimental at a time when the Company's challenges remain great and when significant staffing and expense cuts have required the remaining employees to face these challenges with fewer and fewer resources.

21.    The Debtors therefore propose to continue their ordinary course annual cash MIP opportunity under the 2009 Management Incentive Plan, consistent with their historical MIP programs, for a comparable number of key managers and individual contributors as in 2008 (approximately 720), as well as any newly hired or promoted employees who become eligible for the MIP.[17] See Ex. D at 5-7. Applicable ordinary course MIP performance levels, related payout percentages and aggregate pool amounts for the 2009 performance period are set forth in the chart below (percentages and pool amounts in between the stated reference points are determined by linear interpolation):

---

[17] Any increases in the number of MIP participants will not increase the aggregate ordinary course MIP payout at any given performance level. Ex. D at 5.

|                                               | Planned                   | Stretch                              | Maximum                              |
| --------------------------------------------- | ------------------------- | ------------------------------------ | ------------------------------------ |
| Performance (operating cash flow) [18]        | Planned Performance       | 142% of Planned Performance          | 200% of Planned Performance          |
| Payout as a % of target                       | 50%                       | 100%                                 | 130%                                 |
| Aggregate Payout Dollars (approximate, in millions) | $17.5             | $35.0                                | $45.6                                |

Ex. D at 6.  As stated, to determine actual performance for purposes of the MIP, operating cash

flow is calculated *net* of any applicable incentive payouts, making the MIP self-funding.[19] Id.

       22.     The foregoing payout amounts make sound business sense, in the Debtors'

judgment, to incentivize and reward participants for superior performance.  Indeed, the Debtors'

---

[18] Actual dollar amounts for these operating cash flow goal levels are set forth in the Mercer Report (Exhibit D), which is being filed under seal herewith. Ex. D at 6.

[19] The following is an overview of the self-funding feature of the ordinary course MIP, Transition MIP and KOB award opportunities:

- Ordinary course MIP payouts are permissible only to the extent that actual consolidated operating cash flow meets or exceeds the applicable threshold goals.  Actual consolidated operating cash flow used to measure bonus achievement will reflect an appropriate level of MIP bonus expense, consistent with the Company's historical accounting practices.  For example, achieving "planned" operating cash flow for 2009 funds an ordinary course MIP pool of 50% of target, or $17.5 million.  In this case, the achievement of "planned" operating cash flow would be determined net of a $17.5 million bonus expense (i.e., actual operating cash flow before bonus expense must equal "planned" operating cash flow plus $17.5 million).  The MIP bonus expense, or "funding" for MIP bonuses, increases up to 130% of target as the Company's actual operating cash flow increases up to the "maximum" target.  To achieve a "maximum" MIP bonus pool of $45.6 million, actual operating cash flow needs to equal 200% of "planned" operating cash flow, net of a $45.6 million "maximum" MIP bonus expense (i.e., actual operating cash flow before bonus expense must equal "maximum" operating cash flow plus $45.6 million).

- Award determinations and the accounting for the Transition MIP generally will be the same as for the ordinary course MIP described above, as the "planned," "stretch" and "maximum" operating cash flow targets are the same as for the ordinary course MIP.  The only change to the above examples is that the amount of bonus that needs to be expensed, or "funded," increases in all cases.  For example, the aggregate Transition MIP opportunity at "planned" performance totals approximately $4.0 million.  To achieve "planned" operating cash flow for purposes of the Transition MIP, actual operating cash flow will need to cover a bonus expense of approximately $21.5 million (i.e., "planned" operating cash flow plus $17.5 million of ordinary course MIP expense plus $4.0 million for Transition MIP expense).

- Lastly, award determinations and the accounting for the Key Operators Bonus are essentially the same, except that the achievement of operating cash flow at or above the applicable "stretch" level for KOB purposes is determined net of applicable MIP, Transition MIP and KOB bonus expense at each such level.

26

Publishing business units are generating positive operating cash flow at a time when some

metropolitan newspapers are losing money.  For example, according to the 2009 Annual Report

on American Journalism published by the Pew Research Center's Project for Excellence in

Journalism:

> [A] number of major metropolitan papers have reported that they are now losing
> money to the tune of $1 million per week, the *Atlanta Journal-Constitution*, the
> *Boston Globe* and the *San Francisco Chronicle* among them.  The *Seattle Times*,
> the stronger paper in its joint operating agreement with the *Post-Intelligencer*, is
> also operating at a loss.  The *Denver Post*, the stronger of the papers in another
> joint operating agreement, is also losing money and could lose even more as its
> former partner, the *Rocky Mountain News*, has ceased publication.

Similarly, the Chairman of the Board and Chief Executive Officer of The Washington Post

Company said in his 2009 Annual Letter to Shareholders that *The Washington Post* newspaper

"…will lose substantial money in 2009."  In addition, the Company's twenty-three television

stations in the aggregate have gained advertising market share year-to-date in 2009.

          23.     The Debtors must continue to implement strategic change throughout their

organization.  It remains critically important to maintain strong incentives for the 720 key

managers to continue such performance, particularly given the fact (as clearly demonstrated in

2008) that industry and macroeconomic conditions can change rapidly.  The annual operating

cash flow performance metric used in the ordinary course MIP component of the 2009

Management Incentive Plan is consistent with historical practice and motivates performance

towards realistic goals for which participants have a clear "line of sight."  As stated, however,

the Debtors have taken a conservative approach in formulating the MIP payout structure relative

to prior years' MIP programs, recognizing that their 2009 "planned" operating cash flow goal is

not optimal due to current economic and industry conditions:

27

- The ordinary course MIP only funds a Company-wide bonus pool if the Company achieves at least "planned" operating cash flow – there is no longer any partial payment opportunity for "threshold" (or other below-"plan") performance, as there has always been in prior years' MIP programs.

- Performance at 100% of the Company's "planned" 2009 consolidated operating cash flow goal would result in an aggregate pro forma MIP pool of only *50% of target* – $17.5 million of a target pool of approximately $35.0 million – instead of a bonus pool equal to 100% of target as has been the Debtors' historical practice.

- Payout for 2009 at 100% of the target bonus pool would require achievement of a "stretch" goal over and above the Debtors' forecasted financial performance – specifically, 142% of "planned" operating cash flow.

- Furthermore, to fund a "maximum" aggregate MIP bonus pool, the Debtors must achieve 200% of "planned" operating cash flow, instead of 120% to 140% as in prior years. Even then, the "maximum" bonus pool is capped at 130% of the target MIP opportunity, well below the historical MIP "maximum" opportunity of 200% of the target pool.

See Ex. D at 6.

24.    Both the 100%-of-target pool size at "stretch" performance (approximately $35.0 million) and the participant level (approximately 720) for 2009 are consistent with, if not lower than, historical levels. As stated, there were approximately 1,039 participants in the MIP for 2004, 1,040 for 2005, 1,010 for 2006, 953 for 2007 and 720 for 2008. Additionally, aggregate target pools over the past several years were $37.9 million for 2004, $39.3 million for 2005, $41.9 million for 2006, $39.8 million for 2007, and $35.1 million for 2008. Furthermore, the reduced payout opportunity of approximately $17.5 million at *"planned"* performance (50% of target) is well below target pools for prior years. The median

award at "planned" performance (based on a payout at 50% of each individual participant's target award opportunity) is only $13,245.

25.    Once funded, management will allocate the ordinary course MIP pool to business units based on a formula that includes operating cash flow, a blend of financial, operational and strategic metrics, and some discretion based on manager assessment of individual business unit performance. See Ex. D at 7. Specifically, 50% of the MIP pool will be allocated based on each business unit's operating cash flow; 25% to 30% will be allocated based on business-unit-specific operational goals; and the remaining 20% to 25% will be reserved for management discretion to recognize innovation, leadership, change management, and other measures of success and value creation. See Ex. D at 7; id. at 25-27 (providing further detail on allocation guidelines).

26.    As a further recognition of creditor constituency concerns and the current economic environment, the Debtors also have incorporated significant limitations for 2009 on their historical discretion to make annual cash incentive awards in the event that goals are not achieved. See Ex. D at 5-6, 28. Specifically:

- If consolidated operating cash flow does not reach the "planned" level, no aggregate MIP pool will be funded for 2009, and participants in the Corporate division, the Publishing group office and the Broadcasting and Entertainment group office (which collectively include eight of the Top 10 executives) will not receive any MIP award. Ex. D at 5.

- Even if "planned" consolidated operating cash flow is achieved, a given business unit that does not achieve at least "planned" operating cash flow will not be allocated an MIP pool. Ex. D at 5-6, 28. Such a business unit then will only be eligible for a partial discretionary MIP award if that award is paid out of one or more other business units' discretionary awards (thereby reducing those other discretionary awards), or out of

29

"excess" aggregate MIP pool amounts that have funded (due to consolidated Company performance) but that the Company has elected in its discretion not to award to other business units.

27.    At the same time, the Debtors have taken care to ensure that continued economic pressure and inability to achieve *consolidated* operating goals do not dampen the incentives of those individual business units that remain successful in achieving their goals. Accordingly, in the event that "planned" performance is *not* achieved on a consolidated basis, an individual business unit will remain eligible for an MIP award if, and only if, it achieves its individual operating cash flow goal at least at the "planned" level. See Ex. D at 5-6, 28. Even then, however, individual business unit awards would be reduced by *60%* relative to pro forma pool amounts that potentially would have been payable had consolidated performance goals been achieved.[20] Id.

28.    As with past practice, any ordinary course MIP payouts earned for 2009 are payable within the first two-and-a-half months of 2010. Also as in prior years, a participant must be employed on the date of payment to receive an MIP award, except in cases of death, disability and retirement, which would result in a pro-rated payment based on length of service during the year. See Ex. E (Incentive Plan) § 10.5.

29.    Sections 363(c) and, in the alternative, 363(b) of the Bankruptcy Code fully support continuation in 2009 of the ordinary course MIP component of the 2009

---

[20] Thus, for example, if consolidated goals are not achieved but a business unit achieves "planned" or "stretch" performance, it would be eligible for an MIP pool of 20% (calculated as 40% x 50%) or 40% (calculated as 40% x 100%) of target, respectively.

46429/0001-5870497V1

Management Incentive Plan.[21]  Under Section 363(c)(1) of the Bankruptcy Code, "[i]f the business of the debtor is authorized to be operated under … this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of the estate without notice or hearing." 11 U.S.C. § 363(c)(1). A transaction is within the ordinary course of business if it is an ordinary transaction when looked at from horizontal and vertical dimensions.  See In re: Roth American, Inc., 975 F.2d 949, 952 (3rd Cir. 1992).

30.      From the horizontal dimension, a transaction is within the ordinary course of business if, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry.  Id. at 953.  The ordinary course MIP component of the 2009 Management Incentive Plan clearly meets the horizontal standard.  As the Mercer Report reflects, it is commonplace for businesses within the Debtors' industry to provide ongoing short-term performance-based cash compensation such as the MIP, including during a Chapter 11 proceeding.  See Ex. D.  Numerous cases also demonstrate that short-term cash incentive programs are a common form of compensation, including for debtors in possession. See, e.g., In re: Dana Corporation, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) (approving annual cash incentive program); In re: Propex, Inc., No. 08-10249 (Cook, J.) (Bankr. E.D. Tenn. Apr. 9, 2008) (approving annual cash incentive program).

---

[21] The Debtors are filing the instant Motion with respect to the ordinary course MIP component of the 2009 Management Incentive Plan out of an abundance of caution because some participants are statutory insiders, notwithstanding their position that Section 363(c) authorizes the continuation of that program component without the need for notice and a hearing.

31.     From the vertical dimension, a transaction is within the ordinary course of business if, from the hypothetical creditor's perspective, the transaction does not subject the creditor to economic risk of a nature different from those accepted when it decided to extend credit. See In re: Roth American, Inc., 975 F.2d at 952 (noting that primary focus is on the debtor's pre-petition business practices and conduct). Continuation of the Debtors' historical ordinary course MIP for 2009 also easily meets this standard. As detailed above, the MIP is self-funding, is reasonable in cost and participant levels relative to prior years' MIP programs, and is quite conservative in its payout curve, including a bonus pool of only 50% of target for "planned" performance. See supra ¶¶ 21, 23-24. In these respects, the ordinary course MIP component of the proposed 2009 Management Incentive Plan is very similar to the 2008 MIP, which the Court noted at the May 12, 2009 Hearing may have been a Section 363(c) "ordinary course" program. See Transcript of May 12, 2009 Hearing (Ex. F), at 9 ("With respect to the motion at Number 5, to make payments according to prepetition incentive plans, it may be really – it may be the first time that it really is an ordinary course thing and doesn't fall under the 503(c)(3) standard.").

32.     While the Debtors have made certain refinements to the ordinary course MIP as described above relative to prior years' MIP programs, those refinements are *beneficial* to the Debtors' creditor constituencies and responsive to their concerns, including the *elimination* of any discretion to fund an aggregate bonus pool or to make awards to Corporate division or segment group office participants (which includes 8 of the Top 10 executives) if the Company does not achieve at least "planned" consolidated performance. See supra ¶ 26. Furthermore, refined provisions allowing individual business units to qualify for MIP pools (at reduced levels) even if *consolidated* results are not achieved are reasonable, consistent with historical practice,

and necessary to ensure that otherwise successful business units do not have their incentives diminished by an overall Company downturn.  See supra ¶ 27.  Indeed, the Company's *past* overall operating performance no doubt would have been far worse, and going-forward performance no doubt would be significantly dampened, if individual business units did not and do not have confidence that their successes will be rewarded even if other business units do not achieve their goals.

33.     Courts routinely approve historical incentive plans as ordinary course transactions even when they are modified cyclically to tailor the plans to current circumstances. See, e.g., In re: Nellson Nutraceutical, Inc., 369 B.R. 787, 800-01 (Bankr. D. Del. 2007) (approving ordinary course modification of incentive plan targets where payment of the bonuses "'made good business sense' notwithstanding the failure to achieve the lowest threshold for payment of bonuses under the original plan."); In re: Dana Corporation, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) (approving continuation of short-term incentive program, slightly refined from the prior year, as ordinary course transaction); In re: Buffets Holdings, Inc., No. 08-10141 (Walrath, J.) (Bankr. D. Del. May 14, 2008) (approving continuation of prepetition plan, modified due to changed circumstances, in the ordinary course of business).

34.     Because continuation of the Debtors' annual cash incentive program through the 2009 Management Incentive Plan thus falls squarely within the scope of ordinary course transactions authorized by Section 363(c) of the Bankruptcy Code, a court "will not entertain an objection to the transaction, provided that the conduct involves a business judgment made in good faith upon a reasonable basis and within the scope of authority under the Bankruptcy Code." Nellson, 369 B.R. at 799.  Meeting this standard for ordinary course programs is a "relatively light evidentiary burden . . . . " Id. at 800.  The ordinary course MIP

33

opportunity clearly meets this business judgment standard given its sound objectives, its

conservative cost and payout structure, and the Debtors' strong operating performance relative to

their peers in the face of adversity when management has proper incentives.

35.    Additionally, Mercer has independently validated that the Debtors' key

management team members would be severely undercompensated relative to their peer group

without annual cash incentive opportunities.  See infra ¶ 45.  The Company (like its peers)

remains under significant industry and macroeconomic pressures to transform its businesses.

Doing so requires a highly motivated executive and management team of the highest caliber,

including the attraction of new talent where circumstances warrant.  The Company cannot meet

these challenges effectively if it cannot remain at least competitive with its peers in terms of

compensation.  Without any incentive programs for 2009, the Top 10 executives' average total

direct compensation would be *60% below* the market median, while that of other key executives

on average would fall *56% below* the market median.  Ex. D at 13-14.  Even with an ordinary

course MIP award opportunity alone, key management members' total direct compensation on

average would still remain materially below the applicable market median for payouts at

"planned" or "stretch" performance.  See Ex. D at 13-15 (Top 10:  59% of median (at "plan");

77% of median (at "stretch"); Other Key Executives:  55% of median (at "plan"); 66% of median

(at "stretch")).

36.    Even if continuation of the Debtors' annual cash incentive program

through the 2009 Management Incentive Plan did not constitute an ordinary course transaction

under Section 363(c), it unquestionably would qualify as a valid exercise of the Debtors'

business judgment under Section 363(b) for reasons stated.  See 11 U.S.C. §363(b)(1) ("The

trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of

34

business, property of the estate."). In determining whether to authorize the use of property

pursuant to Section 363(b), the debtor need only demonstrate that a sound business purpose

justifies such use. In re: Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999);

see also In re: Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991).

37.     The same considerations and incentives underlying the 2008 MIP awards,

which this Court approved under Sections 105(a) and 363(b) of the Bankruptcy Code at the May

12, 2009 Hearing, warrant granting of the present request as a valid exercise of the Debtors'

business judgment. As the Debtors stated in the 2008 MIP Motion, the MIP participants'

challenges and demands are by no means over. Now more than ever, it is critically important to

ensure that the Debtors have the necessary tools to appropriately compensate and attract top-tier

executive and management talent, and to preserve meaningful incentives for all participants as

they look forward to another difficult year.

38.     Consistent with the foregoing, since the amendments to the Bankruptcy

Code went into effect in October 2005, numerous courts in addition to this Court have approved

employee compensation programs outside the ordinary course of business pursuant to Section

363(b). See e.g., In re: Nobex Corp., No. 05-20050, 2006 WL 4063024 (Bankr. Del. Jan. 19,

2006) (approving an incentive plan based on the gross purchase price of the sale of the

company's assets); In re: Movie Gallery, Inc., No. 07-33849 (Tice, J.) (Bankr. E.D. Va. Feb. 29,

2008) (approving a key employee incentive plan based on earnings achieved); In re: Dana

Corporation, 358 B.R. 567 (S.D.N.Y. 2006) (approving a long-term incentive plan based on

EBITDAR targets); In re: Sharper Image, No. 08-10322 (Gross, J.) (Bankr. Del. Jun. 25, 2008)

(approving an incentive plan based on successful wind down of the business); In re: Semcrude,

L.P., No. 08-11525 (Shannon, J.) (Bankr. Del. Jan. 13, 2009) (approving bonus plan based on EBITDA and substantial sale of the business units).

39.    The Debtors therefore respectfully request authorization to continue their historical ordinary course annual MIP program under the 2009 Management Incentive Plan, with the refinements described herein, as provided in the draft Order attached hereto as Exhibit A.

### B.    Transition MIP

40.    Implementation of the Transition MIP component of the 2009 Management Incentive Plan also is crucial to ensure proper incentives going forward and to enhance the value of the Debtors' estates by incentivizing key management members to maximize operating cash flow while also maintaining focus on their substantial restructuring duties.  As stated, the Transition MIP results from extensive discussions and give-and-take with the Debtors' creditor constituencies, has the support of the Creditors Committee and the Steering Committee, and has been approved by the Compensation Committee.

41.    The 21 TMIP Participants have tremendous potential to create value for the Debtors' estates and their creditor constituencies, both through their day-to-day top-level operating responsibilities and through their continued diligence in pursuing the Debtors' restructuring efforts.  It goes without saying that enhancing the Company's profitability, while maintaining focus on restructuring activities, is crucial in driving a successful emergence from Chapter 11.  As the Debtors made clear at the 2008 MIP Hearing, simultaneously accomplishing both of these objectives requires an enormous and sustained effort, which in turn requires proper incentives to motivate and fairly compensate the TMIP Participants.  The Debtors also need

competitive incentive plans in order to attract top-tier executive and management talent where necessary, which is difficult enough for a company in Chapter 11.

42.     The Transition MIP is carefully tailored to achieve these core objectives. It reinforces incentives to maximize operating performance by tying payout opportunities directly to the level of operating cash flow for 2009 relative to the Company's 2009 operating plan.  At the same time, it compensates the TMIP Participants for the substantial additional duties that they must perform due to the Debtors' restructuring.  The Transition MIP creates individual incentive opportunities for the TMIP Participants at "planned," "stretch" and "maximum" operating cash flow levels that resulted from extensive discussion with the Debtors' creditor constituencies, and that are based on factors such as position, centrality to the Debtors' operating results, criticality to the restructuring, and market pay levels for their roles.  See Ex. D at 9.  It also creates a discretionary pool for up to 50 other employees based on management judgment of their contributions to the Debtors' restructuring efforts.  See Ex. D at 4, 8.

43.     Approximate aggregate payout opportunities and discretionary pools under the Transition MIP at various performance levels are as follows (amounts in between the stated reference points are determined by linear interpolation):

46429/0001-5870497V1

|  | Planned | Stretch | Maximum |
|---|---|---|---|
| Performance (operating cash flow) | Planned Performance | 142% of Planned Performance | 200% of Planned Performance |
| Aggregate payouts to individual TMIP Participants | $3.5 million | $7.5 million | $10.6 million |
| Discretionary pool | $500,000 <br> ($25,000 individual award cap) | $1.0 million <br> ($50,000 individual award cap) | $1.3 million <br> ($65,000 individual award cap) |
| Total Cost | $4.0 million | $8.5 million | $11.9 million |

Ex. D at 4, 9. Again, to determine actual performance for purposes of the Transition MIP, operating cash flow is calculated *net* of applicable incentive payouts under the 2009 Management Incentive Plan, making the Transition MIP self-funding at all levels. See supra note 19.

44.    Mercer's analysis demonstrates that the traditional ordinary course MIP opportunity alone is not sufficient to achieve the foregoing objectives. It would still leave the key management team significantly undercompensated – approximately 23% to 45% below the market median given the lack of any long-term incentive plan – regardless of whether the Company achieves "planned" or "stretch" performance. See Ex. D at 13-15 (Top 10: 59% of median (at "plan"); 77% of median (at "stretch"); Other Key Executives: 55% of median (at "plan"); 66% of median (at "stretch")).

45.    The Transition MIP would ameliorate these problems and directly promote the Debtors' core business objectives. Mercer has confirmed that the Transition MIP is a reasonable pay-for-performance incentive plan that is consistent with industry practice and practices of companies in Chapter 11; that its operating cash flow metric is consistent with

38

market practice and appropriate; and that the payout opportunities under the Transition MIP are reasonable in order to bring the participants' total direct compensation closer to the market median (see Ex. D at 1, 3-4, 8-9, 13-20, 31-36):

- With the Transition MIP in addition to the ordinary course MIP opportunities, aggregate total direct compensation at "planned" performance would rise to 73% of the market median for the Top 10 executives and 61% of the market median for other key executives. Ex. D at 14.

- At "stretch" performance (142% of "planned" operating cash flow), aggregate total direct compensation would be closer to or essentially at market levels – 108% of the market median for the Top 10 executives and 79% of the market median for the other key executives – particularly given the fact that above-plan performance typically results in payouts above the market median under normal market practices.[22] Ex. D at 15, 18.

- Even at "maximum" performance (and even taking into account the "maximum" KOB payments for those few TMIP Participants who also have KOB opportunities, see supra note 5), the Debtors' proposed compensation structure is reasonable and conservative – aggregate total direct compensation is 98% of the market median for maximum total direct compensation for the Top 10 executives, and 76% of the market median for maximum total direct compensation for other key executives. Ex. D at 16.

- The maximum aggregate Transition MIP costs as a percentage of revenue are below the average and the median costs as a percentage of revenue for comparable plans offered by other companies in Chapter 11 proceedings (Tribune: 0.259%; Average: 0.348%; Median: 0.339%). Ex. D at 18-20. Adding the maximum Key Operators Bonus payouts makes costs as a percentage of revenue somewhat higher (0.461%), but still within a reasonable and appropriate market range – Mercer confirms that it is consistent with market practice to pay above-median compensation for above-plan performance (which is required for "maximum" Transition MIP and KOB awards); three of eight comparables

---

[22] As discussed, see supra note 11, Mercer typically considers total compensation to be competitive if it falls within 15% of the market median given inherent variations in compensation data.

had plans with higher maximum costs as a percentage of revenue; the Key Operators Bonus has no cost until a KOB Participant's operations exceed "stretch" performance; and participants receive only 1% to 3% of incremental operating cash flow above the "stretch" level, with the remaining 97% to 99% accruing to the Company. Ex. D at 18-20.

46.    Any Transition MIP award that becomes payable will be paid out upon the date of effectiveness of a plan of reorganization for the Debtors (the "Plan Effectiveness Date") that constitutes a valid "change in control" for purposes of Internal Revenue Code Section 409A ("Section 409A") or June 30, 2011, whichever is earlier (such payment date referred to as the "Payment Date").[23] Ex. D at 30.  A TMIP Participant who is not employed as of December 31, 2009 will not be eligible to receive any Transition MIP award, unless his or her employment terminates before that date due to death, disability, retirement, termination without cause, or leave of absence.  In that event, the TMIP Participant would be eligible for a prorated payment based on his or her length of service during 2009, payable on the Payment Date. Ex. D at 30.  A TMIP Participant who is employed on December 31, 2009 but not the Payment Date will not be eligible to receive his or her Transition MIP award, unless his or her employment terminates before that date due to death, disability, retirement, termination without cause, resignation with good reason, or leave of absence, in which event he or she will receive such payment on the Payment Date. Ex. D at 30.

---

[23] A TMIP Participant's Transition MIP award would only be paid on June 30, 2011, as opposed to the Plan Effectiveness Date, if: (a) plan effectiveness does not constitute a valid "change in control" for purposes of Section 409A, or (b) the Plan Effectiveness Date otherwise has not occurred by June 30, 2011. Ex. D at 30. In the event that plan effectiveness does not constitute a valid "change in control" for purposes of Section 409A, Section 409A would not permit the Transition MIP awards to be paid upon the Plan Effectiveness Date. However, Section 409A would permit payment upon a fixed date-certain as an alternative. Ex. D at 30. While the Debtors believe that plan effectiveness is likely to constitute a change in control for purposes of Section 409A, the Transition MIP includes a "failsafe" date-certain for payment of June 30, 2011 – which is conservatively set well beyond what the Debtors anticipate to be the actual Plan Effectiveness Date – to ensure that participants are not unfairly disadvantaged and denied their Transition MIP payouts entirely by circumstances beyond their control in the unlikely event that plan effectiveness does not constitute a change in control for Section 409A purposes. Ex. D at 30.

47.    Given the foregoing, it is eminently reasonable for the Debtors to seek to implement the Transition MIP pursuant to Section 363(b) of the Bankruptcy Code as a means of transforming their businesses, incentivizing performance toward key operating objectives, fairly compensating TMIP Participants for their substantial additional restructuring duties, and promoting a market-based compensation structure, particularly given the absence of any long-term compensation program. In re: Montgomery Ward Holding Corp., 242 B.R. at 153; In re: Delaware & Hudson Railway Co., 124 B.R. at 173. Indeed, several courts in addition to this Court have approved of incentive programs under Section 363(b) based on financial operating results, see supra ¶ 38, as well programs that focus on transformative goals during Chapter 11 proceedings. See e.g., In re: Semcrude, No. 08-11525 (Shannon, J.) (Bankr. Del. Jan. 13, 2009) (approving bonus plan based on EBITDA and substantial sale of the business units); In re: Nortel Networks, Inc., No. 09-10138 (Gross, J.) (Bankr. Del. Mar. 20, 2009) (approving incentive plan with awards tied among other things to achievement of cost reduction plan, achievement of parameters that would result in a leaner and more focused organization); see also Ex. D at 18-20.

48.    The Debtors therefore respectfully request authorization to implement the Transition MIP component of the 2009 Management Incentive Plan as provided in the draft Order attached hereto as Exhibit A.

### C.    Key Operators Bonus

49.    Implementation of the Key Operators Bonus component of the 2009 Management Incentive Plan similarly is necessary and reasonably tailored to give 23 key operating leaders (including six of the Top 10 executives, see supra note 5) proper incentives to transform the Debtors in bankruptcy into an enterprise that can emerge with the capacity to

41

generate sustainable operating cash flow.  See Ex. D at 10-12.  Like the Transition MIP, the Key

Operators Bonus results from extensive discussions and give-and-take with the Debtors' creditor

constituencies, has the support of the Creditors Committee and the Steering Committee, and has

been approved by the Compensation Committee.

50.    Seventeen KOB Participants (who are not in the Top 10) are the heads of

seven of the Debtors' newspapers and Tribune Media Services, and the General Managers of

their largest television stations.  Ex. D at 10; see supra note 5.  They do not participate in the

Transition MIP.  The Company's Chief Operating Officer and Chief Administrative Officer have

modest participation opportunities in the KOB given their principal overall responsibility for the

Company's day-to-day operations and operating results.  Id.  Four other KOB Participants who

also are in the Top 10 have key operator responsibilities for specific operations of the Company

– the President of Tribune Broadcasting, the Publisher of the Los Angeles Times, the Executive

Vice President of Tribune Publishing, and the President of Tribune Interactive.  Id.

51.    The Key Operators Bonus provides for a potential payout if and only if the

2009 operating cash flow for which a KOB Participant is responsible exceeds such participant's

individualized "stretch" goal for 2009.  See Ex. D at 10-12.  For each of twenty-one KOB

Participants who have principal responsibility for particular key operations, the applicable KOB

threshold is a level of "stretch" operating cash flow for that participant's operations.  Id.  For the

Chief Operating Officer and the Chief Administrative Officer, this "stretch" goal is 165% of

consolidated "planned" operating cash flow (higher than the 142%-of-plan "stretch" goal under

the ordinary course MIP).  Id.  As noted, achievement of these performance targets is determined

net of applicable incentive payouts under the 2009 Management Incentive Plan, making the KOB

self-funding.  See supra note 19.

42

52.     If a KOB Participant exceeds his or her "stretch" target during the performance period, he or she receives a modest percentage of every additional dollar of operating cash flow above the "stretch" amount – 2% to 3% for twenty-one of the KOB Participants, and 1% in the case of the Chief Operating Officer and Chief Administrative Officer. Id. The KOB Participants' awards generally are capped at one times the participant's base salary, except that the Chief Operating Officer's and Chief Administrative Officer's KOB awards are capped at 40% and 33% of base salary, respectively.  Id.  Given these caps, the aggregate "maximum" Key Operators Bonus incentive opportunity is approximately $9.3 million.  Id. at 4, 12.

53.     Because the KOB Participants receive an incentive award only if they exceed "stretch" operating cash flow for their respective operations, and because any awards are payable only out of *incremental* operating cash flow above the "stretch" goal, the Key Operators Bonus is self-funding and involves no cost to the Debtors' estates unless and until a KOB Participant achieves demonstrably superior performance.

54.     Any KOB award that becomes payable is paid in the same manner, and subject to the same payment, proration and employment termination provisions, as any Transition MIP awards, with payment made on the Payment Date.  See supra ¶ 46 and note 23.

55.     Mercer has confirmed that the Key Operators Bonus is a reasonable pay-for-performance incentive plan intended to drive transformative results in key operations; that transformation incentive programs are common in Chapter 11 proceedings in addition to other cash incentives; and that the operating cash flow metric used in the Key Operators Bonus is reasonable and consistent with market practice.  Ex. D at 1, 3-4, 10-12, 18-20, 31-36.  As

43

detailed above, Mercer also has confirmed that the total *"maximum"* incentive award costs of the Key Operators Bonus and Transition MIP combined are reasonable, and that the key executives' total direct compensation will be at or below the market median for maximum total direct compensation even at "maximum" payout levels under the Key Operators Bonus and Transition MIP.  See supra ¶ 45.

56.    Given the foregoing, Section 363(b) of the Bankruptcy Code fully authorizes implementation of the Key Operators Bonus as a valid exercise of the Debtors' business judgment, as confirmed by numerous cases that have approved transformative incentive plans in the Chapter 11 context under Section 363(b).  See, e.g., cases cited at supra ¶ 47; Ex. D at 18-20; see also In re: Montgomery Ward Holding Corp., 242 B.R. at 153; In re: Delaware & Hudson Railway Co., 124 B.R. at 173.

57.    The Debtors therefore respectfully request authorization to implement the Key Operators Bonus component of the 2009 Management Incentive Plan as provided in the draft Order attached hereto as Exhibit A.

## II.    Payment of Earned 2008 MIP Awards to the Top 10 Executives

58.    With the support of the Creditors Committee and the Steering Committee, and the approval of the Compensation Committee, the Debtors also are seeking authority to pay earned 2008 MIP awards to the eligible Top 10 executives totaling approximately $3.1 million. As detailed in the 2008 MIP Motion and summarized above, the Debtors' senior executive team overcame enormous challenges and delivered extraordinary results in 2008, including by spearheading initiatives and strategic dispositions that have enabled the Company to generate

positive operating cash flow during one of the most difficult operating environments for local

advertising-based businesses.

59.     This Court acknowledged the magnitude of these accomplishments at the

May 12, 2009 Hearing in approving 2008 MIP awards for all participants other than the Top 10,

stating that: "This is one of the strongest records I've yet had in support of a bonus plan."

Transcript of May 12, 2009 Hearing (Ex. F), at 54.  The Court also observed that the 2008 MIP

may have been a Section 363(c) "ordinary course" program, even though approval was sought

for payments thereunder based on pre-petition performance.  See Transcript of May 12, 2009

Hearing (Ex. F), at 9.  Furthermore, the Court recognized that the participants had a *present*

*entitlement* to the 2008 MIP payouts being sought for their hard work and dedication: "While it

is a payment based upon prepetition performance, I don't view it as a payment of a prepetition

debt.  It is a payment that the company has proposed to make now, yes, with respect to past

performance, but to which it believes the covered employees are presently entitled."  Transcript

of May 12, 2009 Hearing (Ex. F), at 52.

60.     The Debtors respectfully submit that these observations and principles

apply equally to the Top 10 executives and their unpaid 2008 MIP awards, which as stated have

been approved by the Compensation Committee.  There can be no question as to whether the

Top 10 executives have earned their 2008 MIP awards, just as the other participants did, since

these executives were the architects and drivers of these accomplishments.  The Debtors had

excluded the Top 10 executives from the 2008 MIP Motion not because the Top 10 were

somehow undeserving of these awards, but rather out of sensitivity to creditor constituency

interests and to expedite payment for all other participants.  Several among the Debtors' creditor

constituencies had expressed a desire to consider the Top 10 executives' 2008 MIP awards as

46429/0001-5870497V1

part of a global incentive compensation package that also included 2009 incentive plans, and to

gain further insights into management's ability to sustain its positive operating performance into

2009. As an accommodation of these concerns, and to avoid delaying the payment of earned

2008 MIP awards to non-Top 10 participants, the Top 10 executives voluntarily excluded

themselves from the 2008 MIP Motion.

61.     Since then, the Debtors' key management team has continued the

Company's performance achievements into 2009, including sustained positive consolidated

operating cash flow and increases in market share. As discussed above, they also have spent

considerable time working with the Debtors' creditor constituencies, including both the Creditors

Committee and the Steering Committee, towards the development of incentive plans for 2009.

As such, the Creditors Committee and the Steering Committee now support payment of the Top

10 executives' 2008 MIP awards, in addition to implementation of the proposed 2009

Management Incentive Plan.

62.     Doing so is entirely fair and reasonable. Maintaining proper incentives is

critical to achieving results, and as the Company's Chief Financial Officer aptly testified at the

May 12, 2009 Hearing, nothing is more demotivating than not being fairly compensated for

extraordinarily difficult work and accomplishments. Mercer's Report also confirms the

reasonableness and necessity of the proposed awards. Without the 2008 MIP awards, the Top 10

executives will have received only their base salaries for 2008, leaving their aggregate 2008 total

direct compensation at only *43%* of the market median. Ex. D at 22-23. The Debtors' proposed

2008 MIP awards, totaling approximately $3.1 million, represent a payout at 46% of target for

the Corporate division participants and one non-Debtor participant (the head of Tribune

Interactive), a payout at 38% of target for the head of the Publishing segment, and payouts

46

ranging from 50% to 100% of target for three Top 10 executives who have pre-existing contractual bonus guarantees for 2008.[24] Ex. D at 23. The aggregate payout, considering all nine eligible Top 10 executives together, is approximately 65% of target. Id. Notably, the percentage payouts for Top 10 members who do not have pre-existing contractual bonus guarantees incorporate the same payout reduction that was negotiated with the Debtors' creditor constituencies and applied to all non-Top 10 participants for 2008.

63.     Payment of the 2008 MIP awards to the Top 10 executives would not by any means eliminate their undercompensation for 2008, but would bring their aggregate 2008 total direct compensation up to 64% of the market median. Ex. D at 22-23. Furthermore, payment of such awards still compares favorably with prior years' MIP programs even when aggregated with the previously approved 2008 MIP awards for non-Top 10 participants. With the proposed payouts, total 2008 MIP payouts would be approximately $16.475 million,[25] representing an aggregate payout of approximately 47% of the target pool. This payout percentage remains substantially below the percentage-of-target payouts under the MIP for 2006 of approximately 90% of target, and for 2007 of approximately 62% of target.

64.     Furthermore, recently filed 2009 proxy statements by the Company's peers reconfirm that the proposed 2008 MIP awards are consistent with competitive market practice. Ex. D at 22-23, 48. Nine out of 10 reporting peer media companies paid bonuses to named executive officers for 2008 performance at percentage-of-target payout ranges (a low of 19% to a high of 123%) that are fully consistent with the percentage-of-target payouts proposed

---

[24] Awards are prorated for three Top 10 executives without pre-existing guarantees who were hired during 2008.

[25] This amount consists of $12.243 million in 2008 MIP payouts approved for non-Top 10 Debtor participants at the 2008 MIP Hearing, an additional $1.132 million in 2008 MIP payouts made to non-Top 10 non-Debtor participants, and the proposed $3.1 million payout to the Top 10.

47

for the Top 10 executives (as noted, 65% in the aggregate including three executives with

contractual bonus guarantees, or 38% to 46% considering only those without guarantees).  Id.

        65.    Payout of the requested earned 2008 MIP awards to the eligible Top 10

executives is entirely consistent with Sections 363(b) and 105(a) of the Bankruptcy Code, even if

the Court applies those standards rather than the Section 363(c) ordinary course standard that it

noted could conceivably have applied at the May 12, 2009 Hearing.  See Transcript of May 12,

2009 Hearing (Ex. F), at 9.  Indeed, the Court held at the May 12, 2009 Hearing that the

Bankruptcy Code authorized the payment of awards under the 2008 MIP for 2008 performance,

and that such awards were *not* pre-petition debts and were *not* subject to the "doctrine of

necessity".  Transcript of May 12, 2009 Hearing, at 52 (stating that "In my view, I don't believe

this is subject to the doctrine of necessity," and that "[w]hile it is a payment based upon

prepetition performance, I don't view it as a payment of a prepetition debt."); see also 11 U.S.C.

§ 363(b); 11 U.S.C. § 105(a) (empowering bankruptcy court to "issue any order, process, or

judgment that is necessary to carry out the provisions of [the Bankruptcy Code]."); accord In re:

Ionosphere Clubs, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (holding that Section 363(b)

authorizes a debtor even to pay prepetition claims as long as the debtor articulates "some

business justification, other than mere appeasement of major creditors, for using, selling or

leasing property out of the ordinary course of business.").

        66.    Consistent with the foregoing principles, several courts have authorized

management incentive award payments (above the Section 507(a)(4) cap) attributable to

prepetition services, including under plans that utilized qualitative performance goals and plans

where participants received discretionary payouts despite missing performance targets.  See, e.g.,

In re: Riverstone Networks, Inc., No. 06-10110 (Sontchi, J.) (Bankr. Del. Apr. 3, 2006)

46429/0001-5870497V1

(approving, subject to certain parties' reservation of rights, payment up to $1.4 million total for

15 senior management members under pre-petition program continued post-petition); In re:

Pliant Corp., No. 06-10001 (Walrath, J.) (Bankr. Del. Mar. 14, 2006) (approving incentive

awards up to $955,100 for 12 insiders under pre-petition bonus program despite the failure to hit

performance targets where the plan provided for discretionary payments); In re: Coram

Healthcare Corp. and Coram, Inc., No. 00-3299 (Walrath, J.) (Bankr. Del. Sept. 10, 2001)

(authorizing payment of $2,733,837 in bonuses to 46 management employees under the debtor's

MIP); Werner Holding Co., Inc., No. 06-10578 (Carey, J.) (Bankr. Del. Aug. 22, 2006)

(approving payments to debtors' executive leadership team, subject to certain procedures and

restrictions, pursuant to pre-petition incentive-based bonus plan where the debtors determined

that qualitative performance goals had been met despite the company's filing for bankruptcy and

failure to meet its financial targets); cf. In re: Nellson Nutraceutical, 369 B.R. 787 (Bankr. D.

Del. 2007) (authorizing debtor pursuant to Section 363(c) to retroactively modify unachieved

incentive plan targets downward after the performance period had already ended, so as to make

discretionary incentive awards to employees whom the debtors determined in their business

judgment to merit incentive awards).

67.    These and other courts also have approved employee incentive

compensation plans or payments outside the ordinary course of business pursuant to Section

363(b) as appropriate exercises of the debtors' business judgment based upon a sound business

purpose even after the Bankruptcy Code was amended as of October 2005. See, e.g., In re

Global Home Products, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of

incentives and performance bonuses are considered the proper exercise of a debtor's business

judgment.") (internal citation omitted); In re: Nobex Corp., 2006 WL 4063024 (Bankr. Del. Jan.

49

19, 2006) (approving an incentive plan based on the gross purchase price of the sale of the

company's assets); In re: Movie Gallery, Inc., No. 07-33849 (Tice, J.) (Bankr. E.D. Va. Feb. 29,

2008) (approving a key employee incentive plan based on earnings achieved); In re: Dana

Corporation, 358 B.R. 567 (S.D.N.Y. 2006) (approving a long-term incentive plan based on

EBITDAR targets); In re: Sharper Image, No. 08-10322 (Gross, J.) (Bankr. Del. Jun. 25, 2008)

(approving an incentive plan based on successful wind down of the business); In re: Semcrude,

L.P., No. 08-11525 (Shannon, J.) (Bankr. Del. Jan. 13, 2009) (approving bonus plan based on

EBITDA and substantial sale of the business units).

68.    The Debtors therefore respectfully request authorization to pay earned

2008 MIP awards to eligible Top 10 executives as provided in the draft Order attached hereto as

Exhibit A.

### III.    The Relief Sought in this Motion is Entirely Consistent with Bankruptcy Code Section 503(c)

69.    Finally, all of the relief that the Debtors seek in the instant Motion is

permitted by and entirely consistent with Section 503(c) of the Bankruptcy Code, to the extent

that section applies.

70.    None of the payments or programs in question involve "severance" pay

(whether or not to insiders), and thus Section 503(c)(2) is inapplicable.

71.    Furthermore, none of the payments or programs for which authorization is

sought constitute or would provide "retention" payments to insiders under Section 503(c)(1). It

is well-settled that Section 503(c)(1) only prohibits the allowance or payment of administrative

expense amounts that have the "primary purpose" of retaining insiders. See In re: Nellson

50

Nutraceutical, Inc., 369 B.R. 787, 802 (Bankr. D. Del. 2007); Global Home Products, LLC, 369

B.R. 778, 785 (Bankr. D. Del. 2007); In re: Dana Corporation, 358 B.R. 567, 576 (Bankr.

S.D.N.Y. 2006).

72.    By contrast, if an incentive award or other payment or program is sought

"for the primary purpose of motivating employees … the limitations of 503(c)(1) are not

applicable," even if the payment or program would have some incidental retentive *effect*.   In re:

Nellson Nutraceutical, Inc., 369 B.R. at 802; Global Home Products, 369 B.R. at 785; In re:

Dana Corporation, 358 B.R. at 576.   Indeed, the case law recognizes that even *base salary* has

some incidental retentive *effect* (one must stay in order to earn it), and thus Section 503(c)(1)

cannot bar compensation payments on that basis alone.   See In re: Nellson Nutraceutical, 369

B.R. at 803.

73.    The relief sought clearly passes muster under these standards.   All of the

programs and payments for which the Debtors seek approval are bona fide incentive programs

and awards based on real performance targets that are intended to motivate superior

performance.

74.    To the extent that Section 503(c)(3) applies – and it should *not* apply with

respect to the ordinary course MIP opportunity – the Debtors' requested relief also would meet

that standard.   Section 503(c)(3) requires that transfers or obligations that are outside the

ordinary course of business, and for which administrative expense priority is sought, "be justified

by the facts and circumstances of the case."   11 U.S.C. § 503(c)(3).   Section 503(c)(3) by its

plain language does *not* apply to payments made in the ordinary course of business, such as MIP

awards.   See In re: Nellson Nutraceutical, 369 B.R. at 803-04.

51

75.    At the May 12, 2009 Hearing, this Court characterized the Section

503(c)(3) "justified by the facts and circumstances" standard as a "business judgment plus"

standard, and held that the Debtors' proposed 2008 MIP awards met that standard.    Transcript of

the May 12, 2009 Hearing (Ex. F), at 52-53; see also In re: Dana Corp., 358 B.R. at 576 (holding

that Section 503(c)(3) test is "no more stringent a test than the one courts must apply in

approving any administrative expense under 503(b)(1)(A)."); In re: Nobex, No. 05-20500,

(Walrath, J.) (Bankr. Del.) (Hearing Tr. Jan. 12, 2006, at 86-87) ( "I find it [Section 503(c)(3)]

quite frankly nothing more than a reiteration of the standard under 363 and – well, 363 under

which courts had previously authorized transfers outside the ordinary course of business and that

is, based on the business judgment of the debtor, the court always considered the facts and

circumstances of the case to determine whether it was justified."); In re: Werner Holding Co.,

Inc., No. 06-10578, (Carey, J.) (Bankr. Del.) (Hearing Tr. Dec. 20, 2006, at 55) ("it's more like a

business judgment standard than it is like an administrative expense standard.").

76.    For reasons detailed above, the requested relief falls directly within the

Debtors' valid business judgment, and is amply "justified by the facts and circumstances" to the

extent that standard is applicable.    Accordingly, the requested relief fully comports with Section

503(c) of the Bankruptcy Code.

## CONCLUSION

77.    For the foregoing reasons, the Debtors respectfully submit that granting

the relief requested herein is well within the Court's authority, is essential to the successful

reorganization of the Debtors, is a valid exercise of the Debtors' business judgment, and thus is

clearly in the best interests of the Debtors' estates and creditors.    Accordingly, the Debtors

52

respectfully request that the Court grant the relief requested herein and enter the Order attached as Exhibit A hereto authorizing, but not directing, them to implement the 2009 Management Incentive Plan and to pay earned but unpaid 2008 MIP awards to eligible Top 10 executives.

## NOTICE

78.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel for the Creditors Committee; (vi) counsel to the Steering Committee for the Debtors' prepetition loan facilities; (vii) counsel to the administrative agent for the Debtors' postpetition financing facility; and (viii) all parties having requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

79.     The Debtors have not previously sought the relief requested herein from this or any other Court (other than the 2008 MIP Motion).

WHEREFORE, for the foregoing reasons, the Debtors respectfully seek entry of an Order in substantially the form of the Order attached hereto as Exhibit A:

(1)     authorizing, but not directing, the Debtors to implement a 2009 Management Incentive Plan as described in this Motion, pursuant to Section 363(b) and, as applicable, Section 363(c) of the Bankruptcy Code, that includes the following incentive benefits for the following groups of employees:

53

(a) a continuation of the Debtors' self-funding ordinary course annual MIP opportunity for 2009 for approximately 720 management employees, including the Top 10 executives, with an aggregate payout opportunity of approximately $17.5 million – which represents only 50% of the target pool – if the Company achieves its "planned" 2009 operating cash flow goal included in the 2009 operating plan that was approved by the Company's Board of Directors, and an aggregate payout opportunity of approximately $35.0 million – 100% of the target pool – if the Company achieves "stretch" performance equal to 142% of its "planned" operating cash flow;

(b) a self-funding pay-for-performance Transition MIP opportunity, in addition to the ordinary course MIP opportunity, to incentivize 21 members of the Debtors' core management team (including the Top 10 executives) to maintain their focus on delivering strong operating results while performing substantial restructuring duties, with aggregate payout opportunities of approximately $3.5 million at "planned" 2009 operating cash flow and approximately $7.5 million at "stretch" 2009 operating cash flow, as well as a discretionary pool of $500,000 at "planned" performance and $1 million at "stretch" performance for up to 50 other employees (with a maximum individual award opportunity of $65,000) based on management judgment of their contributions to the Debtors' restructuring efforts; and

(c) a self-funding pay-for-performance Key Operators Bonus opportunity for 23 leaders of key operations, in addition to the ordinary course MIP opportunity, that incentivizes them to achieve transformation of their respective operations by *exceeding* certain "stretch" level operating cash flow goals for those operations during 2009, with a maximum aggregate opportunity of approximately $9.3 million; and

(2)    authorizing, but not directing, the Debtors pursuant to Section 363(b) and Section 105(a) of the Bankruptcy Code to make payouts totaling approximately $3.1 million in earned 2008 MIP awards to nine of the Top 10 executives (including one non-Debtor executive), none of whom have yet received any such awards despite payment of 2008 MIP awards to all other participants; and

54

(3)  granting such other and further relief as the Court may deem just and proper.


Dated:  Wilmington, Delaware                Respectfully submitted,

       July 22, 2009                                SIDLEY AUSTIN LLP
                                       Bryan Krakauer
                                       Kevin T. Lantry
                                       Brian J. Gold
                                       Jonathan D. Lotsoff
                                       One South Dearborn Street
                                     Chicago, Illinois  60603
                                     Telephone:  (312) 853-7000
                                     Facsimile:  (312) 853-7036

                                            -and-

                                     COLE, SCHOTZ, MEISEL,
                                     FORMAN & LEONARD, P.A.

                                     By: _____
                                     Norman L. Pernick (No. 2290)
                                     J. Kate Stickles (No. 2917)
                                     Patrick J. Reilley (No. 4451)
                                     500 Delaware Avenue, Suite 1410
                                     Wilmington, Delaware  19801
                                     Telephone:  (302) 652-3131
                                     Facsimile:  (302) 652-3117

                                     ATTORNEYS FOR DEBTORS
                                     AND DEBTORS IN POSSESSION

46429/0001-5870497V1
CHI 4775900v.1