**EXHIBIT F**

**EXCERPT OF MAY 12, 2009 HEARING TRANSCRIPT**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          )  Case No. 08-13141(KJC)
                                )  (JOINTLY ADMINISTERED)
TRIBUNE COMPANY, _et al.,_      )  Chapter 11
                                )
                                )  Courtroom 5
                                )  824 Market Street
                     Debtors.   )  Wilmington, Delaware 19801
                                )
                                )  May 12, 2009
                                )  10:03 A.M.


TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES CHIEF BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          Cole Schotz Meisel, Forman
                          & Leonard, P.A.
                          By:  NORMAN PERNICK, ESQ.
                          1000 N. West Street, Suite 1200
                          Wilmington, Delaware 19801

                          Sidley Austin LLP
                          By:  JONATHAN LOTSOFF, ESQ.
                               BRIAN GOLD, ESQ.
                               KEVIN LANTRY, ESQ.
                          One South Dearborn
                          Chicago, Illinois 60603


ECRO:                     AL LUGANO

TRANSCRIPTION SERVICE:    TRANSCRIPTS PLUS, INC.
                          435 Riverview Circle
                          New Hope, Pennsylvania 18938
                          Telephone:  215-862-1115
                          Facsimile: 215-862-6639
                          e-mail CourtTranscripts@aol.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES:
(Continued)

For Greatbanc:                 Womble Carlyle Sandridge & Rice, PLLC
                               By: THOMAS M. HORAN, ESQ.
                               222 Delaware Avenue, Suite 1501
                               Wilmington, Delaware 19801

For Creditors'                 Landis Rath & Cobb LLP
Committee:                     By:  MATTHEW MCGUIRE, ESQ.
                               919 Market Street, Suite 1800
                               Wilmington, Delaware 19801

                               Chadbourne & Parke LLP
                               By:  DAVID LeMAY, ESQ.
                               30 Rockefeller Plaza
                               New York, New York 10112

The U.S. Trustee:              United States Department of Justice
                               Office of the U.S. Trustee
                               By:  JOSEPH J. McMAHON, JR., ESQ.
                               844 King Street
                               Wilmington, Delaware 19899

For C.W.:                      Morris Nichols Arsht & Tunnell, LLP
                               By:  DEREK ABBOTT, ESQ.
                               1201 North Market Street
                               P.O. Box 1347
                               Wilmington, Delaware 19899-1347

                               Glickfield, Fields & Jacobson LLP
                               By:  LARRY JACOBSON, ESQ.
                               9401 Wilshire Boulevard, Suite 525
                               Beverly Hills, California 90212-4186


TELEPHONIC APPEARANCES:

For the Debtor:                Sidley Austin, LLP
                               By:  CANDICE KLINE, ESQ.

TELEPHONIC APPEARANCES:
(Continued)

For JPMorgan as            Davis Polk & Wardell
Administrative Agent:      By:  DAMIAN SCHAIBLE, ESQ

For Kramer Levin           Kramer Levin Naftalis & Frankel
Naftalis & Frankel:       By:  JENNIFER SHARRET, ESQ.

4

# I N D E X

| WITNESSES FOR THE DEBTORS: | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| CHANDLER BIGELOW | | | | | |
| By Mr. Lotsoff | 17 | | | | |
| By Mr. McMahon | | 30 | | | |
| | | | | | |
| CHANDLER BIGELOW | | | | | |
| By Mr. Lotsoff | 59 | | | | |

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| A    2008 proposed payouts under the MIP | | 20 | 21 |

1  payments per their 2008 incentive plans.

2         The second are make severance payments for certain

3  employees who were terminated prior to the implementation of

4  the post petition severance plan.

5         And then related to the first motion is the Trustee's

6  objection with respect to the filing under seal.

7         Your Honor, with respect to the two substantive

8  motions, if you will, we have the support of the creditor

9  constituencies, which hopefully you'll be able to hear from in

10 a moment.  We do have an objection from the United States

11 Trustee, as Your Honor I think may be aware with respect to all

12 three matters.

13        We've agreed with the United States Trustee on three

14 things:

15        One is with respect to the motion filed under seal

16 that we will file the report of Mercer, the full report with

17 certain items redacted on Page 8, and file that with the

18 certification of counsel, Your Honor.  So, I think that matter

19 has been effectively disposed of, if Your Honor is okay with

20 that.

21        THE COURT:  I am.  But let me ask how the parties

22 would anticipate its use during the hearing today.

23        MR. GOLD:  We do not, Your Honor.

24        THE COURT:  Okay.

25        MR. GOLD:  Secondly, we -- with respect to the two

1  substantive motions, we have agreed with the United States

2  Trustee on a method to proceed with a live witness, and then a

3  second proffer, Your Honor, with respect to certain testimony.

4  And the United States Trustee can cross examine, as Mr. McMahon

5  sees fit, with respect to that.

6       And then finally before we get to those matters, we

7  wanted to cede the podium to the two creditor constituencies.

8  First, Mr. LeMay, who represents the Creditors' Committee.  And

9  secondly, participating by phone is Mr. Schaible who represents

10 the lender's Steering Committee.

11      And then following that, with Your Honor's

12 permission, we would proceed with the Trustee by my colleague

13 and my partner, Mr. Lotsoff would go ahead with that.

14      If that's an acceptable way to try and complete the

15 hour, if you will, that Your Honor has available, we'd go ahead

16 with that.

17      THE COURT:  That's fine.  I'm hesitating because

18 after review of the submission -- the submissions, I do have

19 some preliminary thoughts.  And I usually try not to express

20 them because often times the evidentiary presentations and the

21 arguments obviate the need for me to say anything.

22      But I think I'm inclined just to give you some

23 preliminary views so that maybe your presentations can address

24 them accordingly.

25      MR. GOLD:  Certainly, Your Honor.

1          THE COURT:  With respect to the motion at Number 5,

2 to make payments according to prepetition incentive plans, it

3 may be really -- it may be the first time that it really is an

4 ordinary course thing and doesn't fall under the 503(c)(3)

5 standard.

6          However, I am interested to see how the evidence

7 addresses the U.S. Trustee's objection about -- well, I'll just

8 leave it at that.

9          With respect to Number 7, the motion to authorize

10 severance pay, I will tell you I think the U.S. Trustee has

11 made a fair objection with respect to whether the necessity of

12 payment doctrine warrants these payments.

13          Now, with respect to the union workers, I guess some

14 argument could be made that because CBA hasn't been assumed to

15 reject it, that the debtor wishes to continue its performance.

16 I guess in addition to that argument, as a practical matter,

17 the number is negligible in terms of the company's overall

18 finances.

19          But with respect to the other employees, I look to

20 see whether the debtor can establish some causal connection

21 between having to make those payments and affect on present

22 employee morale.

23          I will tell you one thought I had about that, again,

24 subject to what the evidence shows.  It's that a better

25 approach might be to reserve those funds for payment under

1          But with respect to incentive plans, we just think

2    it's extremely important to provide the right incentive to the

3    people that are doing a lot and helping run these businesses.

4          And then with respect to the severance motion, we do

5    believe that both of Mr. LeMay's concerns are the same concerns

6    we have, frankly.

7          First that, you know, a line guy working on the press

8    is not going to understand necessarily the difference between

9    if he gets severed now when there's a post petition severance

10   agreement in place versus his buddy who is severed three weeks

11   before.  He's just going to think of, you know, of issues of

12   fairness, and morality, and he's going to be concerned and

13   upset, and we could potentially be losing very valuable people.

14         The second really is the union versus nonunion

15   paradigm.  To the extent that the union members are paid, and

16   the nonunion members are not paid, that creates a very

17   dangerous -- potentially dangerous chemistry in the press rooms

18   and at the locations.  And we believe that -- so, in sum, we

19   believe that it would be accretive to the value of the

20   enterprise in general to permit these payments to be made.

21         So, I would than Your Honor for hearing me out on

22   that.

23         THE COURT:  Thank you.

24         MR. GOLD:  Your Honor, with your permission, we'll

25   proceed with testimony of the company's CFO, who hopefully can

1  address Your Honor's concern with respect to both motions.

2          THE COURT:  Very well.

3          MR. GOLD:  And Mr. Lotsoff, my partner, will present

4  that testimony.

5          THE COURT:  All right.  Thank you.

6          MR. LOTSOFF:  Good morning, Your Honor.  Jonathan

7  Lotsoff with Sidley Austin on behalf of the debtors.

8          At this time, we'd like to call Chandler Bigelow on

9  behalf of the company.

10         THE COURT:  All right.

11         CLERK:  Please raise your right hand, place your left

12 hand on the Bible.

13          CHANDLER BIGELOW, DEBTORS' WITNESS, SWORN

14         CLERK:  Please state your full name for the record

15 and spell your last name.

16         THE WITNESS:  Chandler Bigelow, B, as in boy, I-G-E-

17 L-O-W.

18         CLERK:  Thank you.

19                     DIRECT EXAMINATION

20 BY MR. LOTSOFF:

21 Q   Mr. Bigelow, what position do you currently hold with the

22 company?

23 A   I'm Chief Financial Officer of Tribune Company.

24 Q   And how long have you held that position?

25 A   A little more than a year.

1  Q    And could you briefly describe your duties in that

2  position, including any duties related to the restructuring of

3  the company?

4  A    Yes, I'm chiefly responsible for the corporate finance

5  activities of the company, including the Treasury Department

6  and Tax Department, Financial Reporting Department, and I am

7  very involved in the restructuring efforts.  In particular,

8  interacting with the key constituents, the Official Committee,

9  the Senior Lender Steering Committee, as well as any and all

10 constituents related to the restructuring.

11 Q    And what was your position prior to becoming CFO?

12 A    I was Treasurer of the company for about four years.

13 Q    When did you begin your employment with the company?

14 A    1998.

15 Q    Just as a bit of background, does the company have two

16 principal business segments, publishing and then broadcasting

17 and entertainment?

18 A    That's correct.

19 Q    And as of the end of 2008, they had about 15,000

20 employees?

21 A    That's correct.

22 Q    The motion we're here on today requests the following

23 relief, and this is the incentive plan motion, in particular.

24 The authority to pay management incentive program awards for

25 2008 totaling approximately $12.243 million to approximately

1  Q    How did the company and its Compensation Committee decide

2  to make the proposed MIP payouts that we're here for today?

3  A    Well, every year our business units have budgets.  And to

4  the extent that they meet those budgets, or come close to

5  meeting those budgets, that would trigger an MIP payment.  To

6  the extent that the business unit were not to meet those

7  budgets or come close to those budgets, we've always had the

8  ability to make discretionary payments.  And in this particular

9  year, we did have a number of business units that met or came

10  close to meeting their budgets.  And, therefore, that triggered

11  a payment.  In addition, we are seeking to make discretionary

12  payments based on many of the reasons I just cited.

13  Q    And my understanding is that the current incentive plan

14  that contains the MIP program has been in place since, I

15  believe, 1997?

16  A    That's correct.

17  Q    And does that plan, to your knowledge, specifically

18  authorize the making of discretionary payments where the

19  company deems appropriate?

20  A    It does.

21           MR. LOTSOFF:  And, Your Honor, I believe that plan is

22  attached for reference as Exhibit E to our motion.

23  Q    What has the company's historical practice been, if any,

24  in paying discretionary awards to participants in business

25  units that didn't hit some or even all of their targets?

1  A    Yes, since 1997, the company's always made discretionary

2  payments to those business units that we felt merited those

3  payments.

4  Q    How did the company's 2008 performance compare to some of

5  its competitors?

6  A    Our performance, generally speaking, I think, is better

7  than our competitors.  We do get revenue data on other large

8  metropolitan newspapers throughout the country.  And I will

9  tell you that by and large, our papers are average or better

10 than average.

11        As I mentioned, 21 of our 23 TV stations actually

12 gained market share in their markets, which is even more --

13 even more noteworthy in a political advertising environment

14 where our stations don't garner a lot of political advertising.

15        So, I think that those two -- those two observations

16 clearly show that our operations are doing better than our

17 peers.

18        The other thing I'd point out is I think there's a

19 lot of media attention called to the profitability of some of

20 the largest newspapers in America.  And in many cases, those

21 large newspapers are losing money.

22        I'll tell you that in 2008, none of our newspapers

23 lost money.  And where we sit today, the first four months of

24 the year, none of our newspapers are losing money.  And I think

25 that's -- one of the reasons why that is is because we

1  implemented so much change in the second half of last year, and

2  really laid the groundwork for transforming this company, which

3  we need to do because it's under a great deal of pressure.  And

4  we are fighting for survival, so, you know, on a relative

5  basis, I think we're doing better than others.

6  Q    Mr. Bigelow, the United States Trustee has argued that

7  there's no need to pay these incentive awards because

8  supposedly no one is going anywhere, I believe is the argument.

9  How do you respond to that?

10 A    I would respond by saying that we are just at the

11 beginning of transforming this business.  And that we need to

12 motivate and incentivize the key people that will implement

13 change.  And it's really important.  I mean we own and operate

14 very important businesses that need to change.  And so I would

15 say that, you know, one of the biggest de-motivating things

16 that could happen is that we don't reward people for their

17 extraordinary effort from last year.  I tell you that that

18 would be very de-motivating.

19        And that we need to, you know, make these payments,

20 incentivize our key people, and continue our effort to, you

21 know, create value for the estate and survive this downturn.

22        In terms of the overall economy, I will tell you

23 we've lost, I think, 15 people in the MIP this year alone, just

24 voluntary separation from the company.  People who have just,

25 you know, moved on to other opportunities.

1           And last year, I think we lost close to 100.  So,

2  these are really good people we're talking about.  These are

3  the best and the brightest of the company and, you know, those

4  people have left voluntarily.

5  Q    And that's out of an MIP population in the neighborhood of

6  700?

7  A    700, 800, yes.

8           MR. LOTSOFF:  May I have one moment, Your Honor?

9           THE COURT:  You may.

10                          (Pause)

11          MR. LOTSOFF:  We have no further questions, Your

12 Honor.

13          THE COURT:  Cross examination.

14                    CROSS EXAMINATION

15 BY MR. McMAHON:

16 Q    Mr. Bigelow, good morning.

17 A    Hi.

18 Q    I'd like to clarify a couple of things about your

19 background.  You're basically a finance guy, would that be an

20 accurate description?

21 A    That would be an accurate description.

22 Q    So, you're not an expert in compensation matters?

23 A    No.

24 Q    You are not an expert in employment trends in the

25 marketplaces in which the Tribune does business?

1  Q    (Indiscernible - multiple speakers) market?

2  A    My primary focus was on the current situation.  Given how

3  much pressure's on the company, that's -- current pressure on

4  the company, that was my focus and that was our Compensation

5  Committee's focus.  So, we did spend an inordinate amount of

6  time on that information.

7         I mean at the end of the day, that's the question at

8  hand:  How do we motivate and retain people?  How do we

9  motivate and incentivize people today?  And that was, you know,

10  principally what the focus was on.

11  Q    You're proposing to make these payments.  Are they

12  conditioned upon the employee staying with Tribune for any

13  period of time?

14  A    No, they are not.

15  Q    So, in theory, the employee could receive the payment and

16  leave tomorrow?

17  A    Yeah, that could happen.  I will tell you that these are

18  the top managers of the company.  They're very professional,

19  experienced people who have a lot of sweat equity in this

20  situation and who care very passionately about the companies

21  and the assets that we operate.  I'm one of those people.  I

22  don't have any incentives here.  I believe what this company

23  does every day is incredibly important and really ambitious.

24  And that we own, you know, assets that are the voice of record

25  of some of the largest cities in the country that every day are

1  defending the Constitution.  And I think what you'll find as

2  you meet these people is that they're incredibly committed to

3  the situation.

4          But I will tell you that not being rewarded for hard

5  work and hard effort is de-motivating.

6          And so, yes, could that happen?  Certainly could.  I

7  don't expect it to happen.

8  Q    Let me ask you this.  With respect to the 100 or so people

9  that have left since the beginning of 2008, would it be fair to

10 make the same comments about their work quality?

11 A    Yeah.  I think by and large, we've been very pleased and

12 encouraged by the quality of work of all of these people.  You

13 know, you'd have to measure each and every circumstance to

14 appreciate exactly why someone may have left.  But I can tell

15 you that the 600 to 700 people that are here and staying have

16 a, you know, really deep rooted passion to see that the company

17 succeeds.

18 Q    In the Mercer report, did Mercer opine as to whether the

19 proposed bonus payment for --

20         MR. McMAHON:  Well, let me strike that question.  Let

21 me start again.

22 Q    We're talking about a 2008 plan under which some business

23 units met their targets, correct?

24 A    That's correct.

25 Q    And other business units did not.

1  I'm asking you to do again this year, and I'm probably going to

2  ask you to do again next year, and the year after because of

3  all the challenges this industry faces, guess what?  I'm not

4  going to pay you for that."  That, in my mind, is pretty de-

5  motivating.

6  Q    Well, to be clear, sir, at the beginning of this, the

7  employees understood that the awards were conditional, correct?

8  A    Say that again?  Sorry.

9  Q    At the beginning of the 2008 process, the employees

10 understood that the awards were conditional, correct?

11 A    Absolutely.  I mean people appreciate that, you know,

12 because of where we are, we needed to work very hard with the

13 official Committee, very hard with the Steering Committee,

14 clearly we need to make, you know, a case here to the Court.

15 And as a result, we've got to thread all those needles before

16 anything can get paid.

17         And I can tell you that there's a great deal of focus

18 on this day.  These employee matters are very important.  And

19 people are focused and interested clearly.

20 Q    Is it your view that if the company doesn't make these

21 payments that the lights are going to go out at the Chicago

22 Tribune, at the Los Angeles Times, and other places?

23 A    It's my view that I just don't want the papers to get out.

24 I want to make this company better.  I want to make the

25 products better.  You know, if the papers just get out, if you

1  will, I think that our chances of survival get less, and less,

2  and less.  We need to transform the company.  And the only way

3  we can do that is if this group of people works very hard to do

4  so.  We need to figure out a way to mitigate all the revenue

5  trends, figure out a way to make the products more efficiently.

6         So, you know, will the paper get out tomorrow?  Yeah.

7  But we need to maximize value.  We need to create change.  And

8  the only way you do that is you motivate people and incentivize

9  people.

10 Q   Well, did Mercer opine as to whether adding the bonus to

11 the base compensation for these people would be sufficient to

12 elicit such performance?

13 A   (No verbal response)

14 Q   I mean, let's be --

15 A   I -- listen, I think that even in -- even making the

16 payments, you know, our relative pay is low.  You know, I think

17 at some point, we do need to address the fact that there is no

18 equity value for these key employees -- employees.  And, you

19 know, hopefully that's something that we'll be able to work

20 with with you all in the future on.

21        But where we sit today, my sense is we've got to make

22 this payment just to get people closer to average.  And then we

23 need to work long term with all of our key constituents to

24 figure out a way to, you know, get everyone to average.  So,

25 this is, you know, step one in my view.

1  critical thing here is that the -- you know, the payments, even
2  for -- as proposed for 2008, weren't enough to incent people to
3  remain with Tribune and perform at a high level, that that's --
4  that's one issue.

5          The other issue is, Your Honor, from the standpoint
6  of the Mercer report itself, it never -- the company apparently
7  did not ask Mercer, and you will not find that in the report,
8  that Mercer actually did some type of causal link between --
9  analysis between giving the employees this extra piece on top
10 of base salary and obtaining certain results.

11         And, Your Honor, I would note that notwithstanding
12 the fact that the company did establish certain criteria and
13 offered this incentive compensation and target to create
14 results for 2008, putting that aside, the company didn't reach
15 targets.  They didn't accomplish their goals.

16         And while the debtors certainly cite that there may
17 be a number of factors associated with that, certainly one
18 might inquire based upon this record whether or not the absence
19 of sufficient incentives, in terms of employee compensation,
20 contributed to the fact that performance targets were not met,
21 leading to the need for the debtors to ask this Court to have a
22 discretionary award approved.

23         So, from our perspective, Your Honor, this is a
24 burden of proof case.  And it's -- the burden is on the
25 debtors.  And from our perspective, Your Honor, it really is a

1  lights on/lights out issue.

2         And I don't think that the debtors have met their

3  burden insofar as demonstrating that these payments are

4  essential, critical, necessary to keeping the Tribune operating

5  in good performance.

6         Thank you.

7         THE COURT:   Thank you.   I'm prepared to make my

8  ruling.   I'm going to grant the relief that's been requested,

9  and I will explain why.

10        I do agree with the debtor, it doesn't matter what

11  standard I apply, whether it's a business judgment standard,

12  it's a 503(c)(3) standard, which is business judgment plus.   In

13  my view, I don't believe this is subject to the doctrine of

14  necessity.

15        While it is a payment based upon prepetition

16  performance, I don't view it as a payment of a prepetition

17  debt.   It is a payment that the company has proposed to make

18  now, yes, with respect to past performance, but to which it

19  believes the covered employees are presently entitled.

20        The record here amply supports the award of this

21  relief, the grant of this relief.   The plan is consistent with

22  the company's historical practices.   It's not unreasonable in

23  any respect.   Indeed, the record clearly indicates that it's

24  below market.   You look at the industry, and considering the

25  debtors' place in the industry in which it's trying to survive

1  and transform itself in what are truly extraordinary times, and

2  you compare that to what's proposed to be paid in relation to

3  its revenue.  The major creditor constituencies are supportive,

4  others have not objected.

5          And when I say this, I'm careful to inform the U.S.

6  Trustee, and while nobody else said it, the fact that the only

7  objecting party has no economic skin in the game is not

8  relevant to me.  I appreciate the U.S. Trustee's role in this

9  and other matters.  But it doesn't mean it's not important that

10  the major creditor constituencies are supportive, and here they

11  are.

12          Mr. McMahon, I will tell you, and you appear enough

13  in front of me that you know I seldom editorialize from the

14  bench.  I find that as a judge it's generally an unwise thing

15  to do, but I'm going to do so now, and I'll explain why.

16          When Congress passed BAPCPA and included the new

17  provisions of 503, it was in response to what were perceived

18  abuses by debtors in possession in paying bonuses to managers,

19  particularly top managers.

20          Despite what others may say or think, courts,

21  including this one, have made every effort to be true to the

22  congressional intent in applying the new provision.  And as I

23  said before, I appreciate specifically the U.S. Trustee's role

24  and involvement in requests for relief for bonus and incentive

25  plans.  Because often when all of the other constituents come

1  into court holding hands, the U.S. Trustee is the only voice to

2  point out weaknesses or flaws in what's being requested.

3          But I have to tell you, unless the U.S. Trustee was

4  surprised by the record that was made here today, I have to

5  tell you I think your office made a very poor choice in

6  objecting to this plan.  Your cross examination, I think,

7  helped the debtor immeasurably.  And that's not a criticism of

8  the quality of the direct exam.

9          I just -- I'm really baffled, truly, at why the U.S.

10 Trustee would pick this plan to object to.  This is one of the

11 strongest records I've yet had in support of a bonus plan.

12         But maybe in some respect, it's not unlike any other

13 matter in the Bankruptcy Court.  Everyone is entitled to have

14 their say, and the Court is grateful that that's how the

15 process works usually.  I just ask that the U.S. Trustee

16 exercise better judgment in the future with respect to such

17 plans.  I just have this feeling that you find yourself in a

18 box and just keep looking at the same things and fail to

19 recognize the circumstances in which we now find ourselves in

20 the world today.

21         I've been reminded by your office that standards

22 don't change.  No, they don't, unless Congress tells us to

23 change them.  But circumstances change.

24         All right.  I'm finished.  At this point, we'll take

25 a recess.  I have other matters to take up.  We'll consider the

1  dollar for dollar, in anticipation of a plan to be confirmed at

2  a later time.  But I leave that to the debtor and the other

3  constituents here to discuss.  It's not something I'll foist

4  upon you, but something that I would be, based on this record,

5  prepared to authorize in anticipation of the proposal of a

6  plan.

7          Are there any questions?

8              (No audible response heard)

9      THE COURT:  Okay.  With respect to the earlier

10  motion, if you have a form of order, I'm prepared to consider

11  that now.  With respect to this relief, if you'd prefer to have

12  a discussion based upon what I've indicated, I'll give you time

13  to do that and to submit a form of order under certification.

14  Either way, I'd like you to submit an order under certification

15  which, if there are no -- if the parties don't wish to avail

16  themselves of that alternative, at least saying that the relief

17  was denied for the reasons that I've stated on the record

18  today.

19          I am not without sympathy for those who are impacted

20  by this ruling, but I feel constrained by the current state of

21  the law to have made it.

22          All right.  Is there anything further for today?

23      MR. GOLD:  No, Your Honor.

24      THE COURT:  Thank you, all, very much.  That

25  concludes this hearing.  Court will stand in recess.