# EXHIBIT A

# Amendment to LLC Operating Agreement

# AMENDMENT NO. 1
# TO
# METROMIX LLC
# LIMITED LIABILITY COMPANY AGREEMENT

THIS AMENDMENT NO. 1 (this "<u>Amendment</u>") to the Limited Liability Company Agreement of Metromix LLC, is entered into this 22nd day of July, 2009 by and among Metromix LLC, a Delaware limited liability company (the "<u>Company</u>"), Tribune Company, a Delaware corporation ("<u>Tribune Parent</u>"), Chicago Tribune Company, an Illinois corporation ("<u>Chicago Tribune</u>"), Tribune Interactive, Inc., a Delaware corporation ("<u>Tribune Interactive</u>" and together with Tribune Parent and Chicago Tribune, "<u>Tribune</u>"), and Gannett Satellite Information Network, Inc., a Delaware corporation ("<u>Gannett</u>").

## W I T N E S S E T H:

**WHEREAS**, Tribune and Gannett are parties to that certain Limited Liability Company Agreement of the Company, dated October 29, 2007 (the "<u>Operating Agreement</u>"), and constitute the Members of the Company; and

**WHEREAS**, on July 22, 2009, the Board of Directors adopted a resolution which declared as advisable an amendment to the Operating Agreement to reflect certain changes in the operating and governance procedures of the Company.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements contained herein and in the Operating Agreement and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows (all capitalized terms used but not defined herein shall have the meanings specified in the Operating Agreement):

1.  The definition of "Affiliate Agreements" in <u>Section 1.1</u> is hereby deleted in its entirety and amended to read as follows:

    "**Affiliate Agreement**" shall mean the affiliate agreement, dated as of October 29, 2007, between the Company and Gannett Co., Inc."

2.  The definition of "Appraised Value" in Section 1.1 is hereby deleted in its entirety.

3.  The definition of "Capital Contribution" in <u>Section 1.1</u> is hereby deleted in its entirety and amended to read as follows:

    "**Capital Contribution**" means the total amount of cash and property, including Initial Capital Contributions and Optional Additional Cash Contributions, if any, contributed to the Company or deemed contributed to the Company by all the Members or any one Member, as the case may be."

4.  The definition of "Mandatory Contribution" in <u>Section 1.1</u> is hereby deleted in its entirety.

5.  The definition of "Metromix Rights" in <u>Section 1.1</u> is hereby deleted in its entirety.

6.  The definition of "Metromix Rights Notice" in <u>Section 1.1</u> is hereby deleted in its entirety.

7.  The definition of "Non-Defaulting Member" in <u>Section 1.1</u> is hereby deleted in its entirety.

8.  <u>Section 2.5(c)</u> is hereby amended to replace the reference therein to "435 N. Michigan Avenue, Chicago, Illinois, 60611" with "225 N. Michigan Avenue, Suite 1600, Chicago, Illinois 60601."

9.  The text of <u>Section 4.2</u> is hereby deleted in its entirety and amended to read as follows:

    "[Reserved]"

10. The first sentence of Section 4.3(a) is hereby deleted in its entirety and amended to read as follows:

    "In the event that the Board of Directors by the affirmative vote or consent of a majority of the Directors determines that the Company requires additional funds for proper Company purposes other than making distributions to Members, the Board of Directors may make one or more written requests for the Members to make optional additional cash contributions ("<u>Optional Additional Cash Contributions</u>")."

11. The first sentence of <u>Section 8.2(c)</u> is hereby deleted in its entirety and amended to read as follows:

    "(c)    So long as Tribune and Gannett own (together with their respective Affiliates) the Membership Interest percentage in the Company in the range set forth below, each such Member shall have the right to designate the number of Directors set forth opposite such range of percentages:

    | | |
    |---|---|
    | 37.5% or over | 2 Directors |
    | 20% but less than 37.5% | 1 Director |
    | Less than 20% | 0 Directors |

12. <u>Section 8.2(c)</u> is hereby amended to add the following sentence at the end thereof:

    "In the event the number of Directors that either Gannett or Tribune is entitled to designate pursuant to this Section 8.2(c) is reduced to zero, so long as such Member (together with its respective Affiliates) holds any Membership Interest in the Company, such Member shall have the right to designate an observer who shall have the right to notice of, and to attend, all meetings of the Board or any

committee thereof and receive all materials distributed to the Board of Directors or any committee thereof."

13.    Section 8.4(a)(v) is hereby deleted in its entirety and amended to read as follows:

"(v)    making any material change in the terms of any operational agreement (including, without limitation, the Affiliate Agreement) between the Company and a Member (or the Affiliate of a Member) relating to the business relationship of such parties a consequence of which is to disproportionately adversely affect the economic rights or benefits of any or all of the other Members under this Agreement, including, without limitation, any such other Member's rights to receive distributions of Distributable Funds and/or allocations of income and loss from the Company (taking into account for purposes of such determination the collective rights and benefits of each Member (together with its respective Affiliates) under this Agreement and such operational agreement after giving effect to such material change)."

14.    Section 8.4(b) is hereby deleted in its entirety and amended to read as follows:

"(b)    Without the consent of a majority of the disinterested Directors voting in favor thereof, the Company shall not enter into or be a party to any related or Affiliate party transaction or arrangement a consequence of which is to disproportionately adversely affect the economic rights or benefits of any or all of the other Members under this Agreement, including, without limitation, any such other Member's rights to receive distributions of Distributable Funds and/or allocations of income and loss from the Company (taking into account for purposes of such determination the collective rights and benefits of each Member (together with its Affiliates) under this Agreement and such related or Affiliate party transaction or arrangement)."

15.    The first sentence of Section 8.8 is hereby deleted in its entirety and amended to read as follows:

"At all meetings of the Board of Directors, three (3) Directors (which must include (a) at least one (1) Director designated by Tribune so long as Tribune has the right to designate two (2) Directors pursuant to Section 8.2(c) and (b) at least one (1) Director designated by Gannett so long as Gannett has the right to designate two (2) Directors pursuant to Section 8.2(c)) shall constitute a quorum for the transaction of any business of the Board of Directors."

16.    The last sentence of Section 10.9 is hereby deleted in its entirety and amended to read as follows:

"The Tax Matters Member shall be Gannett."

17. <u>Section 12.1</u> is hereby deleted in its entirety and amended to read as follows:

   "**Section 12.1  Events Causing Dissolution.**  The Company shall be dissolved upon the written consent of all Members at any time to dissolve and wind up the affairs of the Company.  The death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event under the Act that terminates the continued membership of a Member in the Company shall not cause a dissolution of the Company."

18. <u>Section 12.2(a)(iv)</u> is hereby deleted in its entirety and amended to read as follows:

   "(iv)  Dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions;"

19. <u>Section 12.2(c)</u> is hereby deleted in its entirety and amended to read as follows:

   "[Reserved]"

20. The first sentence of <u>Section 12.4(a)</u> is hereby amended to delete the parenthetical "(including any sale pursuant to <u>Section 12.2(c)</u>)."

21. <u>Schedule I</u> to the Operating Agreement is hereby amended to read in its entirety as set forth on <u>Schedule I</u> to this Amendment.

22. Notwithstanding any provision to the contrary contained in the Operating Agreement or this Amendment, each party hereto (i) agrees and acknowledges that the filing for bankruptcy made by Tribune Parent on December 8, 2008 (the "<u>Bankruptcy</u>") shall not constitute an event of dissolution with respect to the Company pursuant to <u>Section 12.1(b)</u> of the Operating Agreement, and (ii) consents to the continuation of the business of the Company.  Each of the parties hereto hereby waives any and all rights triggered by the Bankruptcy which such party has or may have had pursuant to the terms of <u>Section 12.1(b)</u> the Operating Agreement.

23. Notwithstanding any provision of the Operating Agreement or this Amendment to the contrary, this Amendment and the changes to the Operating Agreement embodied in this Amendment are conditioned upon and strictly subject to the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") approving, by a final order, Debtors' (as defined below) motions to (a) assume pursuant to Section 365 of the Bankruptcy Code the Operating Agreement, as amended hereby, and (b) approve pursuant to Section 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 (i) the Settlement Agreement, of even date herewith, by and among the Company, Gannett, Tribune Parent and Tribune Interactive, (ii) the Transition Services Agreement, of even date herewith, by and between Tribune Parent and the Company, (iii) the Trademark Assignment, of even date herewith, by and between the Company and

Tribune Parent, and (iv) the Agreement, of even date herewith, by and among Tribune Parent, Tribune Interactive and the Company. In the event the Bankruptcy Court does not approve such motions by a final order, this Amendment and the changes to the Operating Agreement embodied herein shall forthwith become null and void. For purposes of this Amendment, "Debtors" shall mean Tribune Parent and each of its affiliated entities whose voluntary petitions for relief under the Bankruptcy Code were consolidated with that of Tribune Parent for administrative purposes.

24.   Except to the extent expressly amended herein, all of the terms and conditions of the Operating Agreement shall remain and continue in full force and effect and are hereby confirmed in all respects. From and after the date of this Amendment, all references to the Operating Agreement shall be deemed to be references to the Operating Agreement as amended and supplemented by this Amendment. To the extent any terms of this Amendment conflict with the terms of the Operating Agreement, the terms of this Amendment shall govern.

25.   Each of the parties hereto, for itself, its successors, assigns and affiliates, hereby generally, irrevocably, unconditionally and completely releases the other parties hereto for all unpaid obligations as of the date hereof with respect to any mandatory cash contributions required by the Operating Agreement prior to effectiveness of this Amendment.

26.   This Amendment shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives and successors.

27.   This Amendment shall be governed by and construed in accordance with the local, internal laws of the State of Delaware (without regard to principles of conflicts of laws).

28.   This Amendment may be executed in one or more counterparts, and by the different parties in separate counterparts, each of which when executed shall be deemed an original, but all of which shall constitute one and the same agreement. This Amendment may be executed and delivered by facsimile or other electronic transmission.


**[Remainder of page intentionally left blank.]**

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first written above.

**TRIBUNE COMPANY**

By: _____
Name:
Title:

**CHICAGO TRIBUNE COMPANY**

By: _____
Name:
Title:

**TRIBUNE INTERACTIVE, INC.**

By: _____
Name:
Title:

**GANNETT SATELLITE INFORMATION NETWORK, INC.**

By: _____
Name:
Title:

**METROMIX LLC**

By: _____
Name:
Title:

**METROMIX LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

**Dated as of October 29, 2007**

ARTICLE I
    GENERAL DEFINITIONS ....................................................................................5

        Section 1.1     Definitions ....................................................................5
        Section 1.2     Interpretation.................................................................12

ARTICLE II
    ORGANIZATION ...............................................................................................13

        Section 2.1     Formation....................................................................13
        Section 2.2     Name..........................................................................13
        Section 2.3     Purposes; Scope of Business ..........................................13
        Section 2.4     Duration .....................................................................13
        Section 2.5     Registered Office and Registered Agent; Principal Office........13
        Section 2.6     No State-Law Partnership.............................................13

ARTICLE III
    MEMBERS .........................................................................................................13

        Section 3.1     Initial Members............................................................13
        Section 3.2     Admission of Additional Members ..................................14

ARTICLE IV
    CAPITAL CONTRIBUTIONS ...........................................................................14

        Section 4.1     Initial Capital Contributions ..........................................14
        Section 4.2     Required Subsequent Capital Contributions........................14
        Section 4.3     Optional Additional Cash Contributions .............................15
        Section 4.4     Capital Accounts...........................................................17
        Section 4.5     Return of Capital Contributions........................................20
        Section 4.6     Interest .......................................................................20
        Section 4.7     Loans From Members ....................................................20

ARTICLE V
    ALLOCATIONS AND DISTRIBUTIONS .........................................................20

        Section 5.1     Allocations of Income, Gain, Loss, Deduction and Credit From
                      Operations and Interim Capital Transactions .....................20
        Section 5.2     Allocations on Dissolution and Winding Up.........................20
        Section 5.3     Book/Tax Disparities; Section 754 Elections; Etc...................20
        Section 5.4     Allocation of Nonrecourse Deductions ..............................21
        Section 5.5     Allocation of Member Nonrecourse Deductions ...................21
        Section 5.6     Minimum Gain Chargeback .............................................21
        Section 5.7     Member Minimum Gain Chargeback ..................................22
        Section 5.8     Qualified Income Offset .................................................22
        Section 5.9     Limitations on Loss Allocation .......................................22
        Section 5.10    Curative Allocations .....................................................22

i

Section 5.11  Interest in Company Profits ...................................................22
Section 5.12  Distributions in Kind ............................................................22
Section 5.13  Allocations and Distributions to Transferred Interests ...............23
Section 5.14  Distributions of Distributable Funds .....................................23
Section 5.15  Order of Application............................................................24

ARTICLE VI
        RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS .........................24

Section 6.1  Authority; Liability to Third Parties ........................................24
Section 6.2  Transfer of Membership Interests...........................................24
Section 6.3  Right of First Offer ..............................................................25
Section 6.4  Tag-Along Rights .................................................................26
Section 6.5  Drag Along Rights ...............................................................27
Section 6.6  Admission of Transferee as Member........................................27
Section 6.7  Transfers in Violation of Agreement .......................................28
Section 6.8  Confidentiality ....................................................................28

ARTICLE VII
        MEETINGS OF MEMBERS .............................................................29

Section 7.1  Place of Meetings ................................................................29
Section 7.2  Meetings ............................................................................29
Section 7.3  Notice.................................................................................29
Section 7.4  Waiver of Notice..................................................................29
Section 7.5  Quorum ..............................................................................29
Section 7.6  Voting ................................................................................29
Section 7.7  Conduct of Meetings.............................................................29
Section 7.8  Action by Written Consent .....................................................30

ARTICLE VIII
        MANAGEMENT OF THE COMPANY..................................................30

Section 8.1   Management of Business .......................................................30
Section 8.2   Board of Directors; Number and Election of Directors; Additional
              Committees.........................................................................30
Section 8.3   General Powers of Board of Directors......................................31
Section 8.4   Limitations on Powers of Board of Directors.............................31
Section 8.5   Place of Meetings ...............................................................32
Section 8.6   Regular Meetings.................................................................32
Section 8.7   Special Meetings.................................................................32
Section 8.8   Quorum of and Action by Board of Directors ............................32
Section 8.9   Compensation .....................................................................32
Section 8.10  Removal and Vacancies........................................................33
Section 8.11  Action by Written Consent ....................................................33
Section 8.12  Other Business ...................................................................33
Section 8.13  Standard of Care; Liability ...................................................33

CH1 3900211v.17

Section 8.14    Appointment of Officers; Chief Executive Officer ...................................33
Section 8.15    Committees; Executive Committee ........................................................33
Section 8.16    Resolution of Material Deadlocks ..........................................................34

ARTICLE IX
OWNERSHIP OF PROPERTY ............................................................................35

Section 9.1    Company Property ....................................................................................35
Section 9.2    Ownership of Member Intellectual Property ............................................35

ARTICLE X
FISCAL MATTERS; BOOKS AND RECORDS ..............................................35

Section 10.1    Bank Accounts; Investments .................................................................35
Section 10.2    Records Required by Act; Right of Inspection.............................................36
Section 10.3    Books and Records of Account ..............................................................36
Section 10.4    Tax Returns and Information....................................................................36
Section 10.5    Delivery of Financial Statements to Members .........................................36
Section 10.6    Audits.......................................................................................................36
Section 10.7    Fiscal Year ...............................................................................................37
Section 10.8    Tax Elections ...........................................................................................37
Section 10.9    Tax Matters Member ...............................................................................37

ARTICLE XI
INDEMNIFICATION AND INSURANCE.........................................................37

Section 11.1    Indemnification and Advancement of Expenses .......................................37
Section 11.2    Insurance..................................................................................................39
Section 11.3    Limit on Liability of Members ................................................................40

ARTICLE XII
DISSOLUTION AND WINDING UP ................................................................40

Section 12.1    Events Causing Dissolution.....................................................................40
Section 12.2    Winding Up ..............................................................................................40
Section 12.3    Compensation of Liquidator ...................................................................42
Section 12.4    Distribution of Company Property and Proceeds of Sale Thereof ...........42
Section 12.5    Final Audit ...............................................................................................42
Section 12.6    Deficit Capital Accounts..........................................................................42

ARTICLE XIII
CONVERSION TO CORPORATION IN CONNECTION WITH AN INITIAL
PUBLIC OFFERING.........................................................................................43

Section 13.1    Conversion to Corporation in Connection With an Initial Public
              Offering..............................................................................................43

iii

ARTICLE XIV
    MISCELLANEOUS PROVISIONS ................................................................44

    Section 14.1   Conference Telephone Meetings .............................................44
    Section 14.2   Counterparts...........................................................................44
    Section 14.3   Entire Agreement....................................................................44
    Section 14.4   Partial Invalidity ...................................................................44
    Section 14.5   Amendment.............................................................................44
    Section 14.6   Binding Effect........................................................................44
    Section 14.7   Governing Law .......................................................................44
    Section 14.8   Effect of Waiver or Consent ..................................................45
    Section 14.9   Further Assurances .................................................................45

CH1 3900211v.17

**METROMIX LLC**
**a Delaware Limited Liability Company**

**LIMITED LIABILITY COMPANY AGREEMENT**

THIS AGREEMENT is made and entered into as of October 29, 2007, by and among Metromix LLC, a Delaware limited liability company (the "Company"), Tribune Company, a Delaware corporation ("Tribune Parent"), as a Member of the Company, Chicago Tribune Company, an Illinois corporation ("Chicago Tribune"), as a Member of the Company, Tribune Interactive, Inc., a Delaware corporation ("Tribune Interactive", and together with Tribune Parent and Chicago Tribune, "Tribune"), as a Member of the Company and Gannett Satellite Information Network, Inc., a Delaware corporation ("Gannett"), as a Member of the Company (each of Tribune and Gannett being herein referred to individually as a "Member" and collectively, together with any additional Members who may be admitted pursuant to this Agreement, as the "Members").

PRELIMINARY STATEMENT

**WHEREAS**, a Certificate of Formation organizing the Company as a limited liability company under and pursuant to the Delaware Limited Liability Company Act was filed with the Secretary of State of the State of Delaware on October 10, 2007;

**WHEREAS**, each of Tribune and Gannett is the owner of a fifty percent (50%) Membership Interest (as herein defined) in the Company; and

**WHEREAS**, in accordance with the Delaware Limited Liability Company Act, the Company and the Members desire to set forth their mutual understandings regarding the respective rights, powers and interests of the Members with respect to the Company and the respective Membership Interests therein and to provide for the management of the business and operations of the Company.

**NOW, THEREFORE**, in consideration of the mutual promises and agreements made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I**
**GENERAL DEFINITIONS**

**Section 1.1    Definitions**. As used in this Agreement, the following terms shall each have the meaning set forth in this Article I (unless the context otherwise requires):

"**Act**" means the Delaware Limited Liability Company Act, as it may be amended from time to time, and any successor to such Act.

"**Additional Tag-Along Membership Interests**" has the meaning specified in Section 6.4(c).

"**Adjusted Capital Account**" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after: (i) crediting to such Capital Account any amounts that such Member is treated as obligated to restore pursuant to Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations or the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations and (ii) debiting to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

"**Adjusted Property**" means any property the Carrying Value of which has been adjusted pursuant to Section 4.4(e).

"**Affiliate**" shall mean with respect to a specified Person, any Person directly or indirectly controlling, controlled by or under common control with, the specified Person. For purposes of this Agreement, (x) "**control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise, (y) it shall be further understood that Gannett Co., Inc. and its Affiliates shall be deemed to be Affiliates of Gannett and (z) it shall be further understood that Chicago Tribune and Tribune Interactive shall be deemed to be Affiliates of Tribune Parent.

"**Affiliate Agreements**" shall mean (a) the affiliate agreement, dated as of the date hereof, between the Company and Tribune Parent and (b) the affiliate agreement, dated as of the date hereof, between the Company and Gannett Co., Inc.

"**Aggregate Contributions**" means, at any time, the sum of the Capital Contributions of all Members theretofore made to the Company.

"**Agreed Value**" means the fair market value of Contributed Property, as determined by the Majority Vote of the Board of Directors using any reasonable method of valuation.

"**Agreement**" means this Limited Liability Company Agreement, including Schedule I, as originally executed and as subsequently amended from time to time in accordance with the provisions hereof.

"**Appraised Value**" has the meaning specified in Section 12.2(c).

"**Board of Directors**" means, at any time, the Board of Directors designated in accordance with Section 8.2.

"**Capital Account**" means the Capital Account maintained for each Member pursuant to Section 4.4 of this Agreement.

"**Capital Contribution**" means the total amount of cash and property, including Initial Capital Contributions, Mandatory Contributions and Optional Additional Cash Contributions, if any, contributed to the Company or deemed contributed to the Company by all the Members or any one Member, as the case may be.

"**Carrying Value**" means (a) with respect to a Contributed Property, the Agreed Value of such property reduced (but not below zero) by all depreciation, cost recovery and amortization deductions charged to the Capital Accounts pursuant to Section 4.4(d) with respect to such property, as well as any other reductions as a result of sales, retirements and other dispositions of assets included in a Contributed Property, as of the time of determination, (b) with respect to an Adjusted Property, the value of such property immediately following the adjustment provided in Section 4.4(e) reduced (but not below zero) by all depreciation, cost recovery and amortization deductions charged to the Capital Accounts pursuant to Section 4.4(d) with respect to such property, as well as any other reductions as a result of sales, retirements or dispositions of assets included in Adjusted Property, as of the time of determination and (c) with respect to any other property, the adjusted basis of such property for federal income tax purposes as of the time of determination.

"**Certificate of Formation**" means the Certificate of Formation of the Company described in Section 2.1.

"**Chicago Tribune**" has the meaning specified in the first paragraph of this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as now in effect or as hereafter amended.

"**Company**" has the meaning specified in the first paragraph of this Agreement.

"**Company Intellectual Property**" has the meaning specified in Section 9.1(b).

"**Company Property or Properties**" means all interests, properties, whether real or personal, and rights of any type owned or held by the Company, whether owned or held by the Company at the date of its formation or thereafter acquired. Company Property shall include Company Intellectual Property.

"**Contributed Property**" means property or other consideration (other than cash) contributed to the Company in exchange for Membership Interests.

"**Conversion**" has the meaning specified in Section 13.1(a).

"**Directors**" means at any time the Persons elected in accordance with Section 8.2 to serve on the Board of Directors.

"**Disposition**" has the meaning specified in Section 6.5.

"**Distributable Funds**" means all proceeds received (or released from reserves) by the Company during any period (including all interest income from temporary investments made by the Company pending distribution of the foregoing proceeds), as reduced by funds used during such period (a) to pay all costs and expenses incurred during such period, including all expenses incurred in any sale or disposition transaction, (b) to discharge during such period any indebtedness or liabilities of the Company for which such proceeds are to be used and (c) to create or increase during such period such reserves as the Board of Directors may determine for

the discharge of known or existing liabilities or obligations of the Company or otherwise for the Company's present or future obligations, needs or business opportunities.

"**Drag Along Right**" has the meaning specified in Section 6.5.

"**Executive Committee**" has the meaning specified in Section 8.15(b).

"**First Request**" has the meaning specified in Section 4.3(a).

"**Gannett**" has the meaning specified in the first paragraph of this Agreement.

"**Initial Capital Contribution**" has the meaning specified in Section 4.1.

"**Initial Member**" means each Person listed on Schedule I of this Agreement, and any Affiliate of such Person that, at the time of determination, holds Membership Interests.

"**Initial Public Offering**" has the meaning specified in Section 13.1(a).

"**Initiating Member**" has the meaning specified in Section 8.16(a).

"**Intellectual Property**" means all domestic and foreign copyrights, copyrightable works, and mask work, whether registered or unregistered, and registrations and pending applications to register the same; patents, patent applications, continuations, continuations-in-part, divisions, reissues, reexaminations, extensions, patent disclosures, inventions (whether or not patentable or reduced to practice) and improvements thereto; trademarks, service marks, logos, trade dress, trade names and corporate names, domain names and universal resource locators, whether registered or unregistered, and registrations and pending applications to register the foregoing; confidential ideas, trade secrets, know-how, concepts, methods, processes, formulae, reports, data, customer lists, supplier lists, mailing lists, business plans or other proprietary information; and all agreements, contracts, licenses, sublicenses, assignments and indemnities which relate or pertain to any of the foregoing.

"**Interim Capital Transaction**" means (a) a transaction pursuant to which the Company borrows funds, including a refinancing of any Company debt, (b) a sale, condemnation or other disposition of all or a portion of the Company assets or (c) the receipt of insurance proceeds or other damage recoveries by the Company, in any such case which does not result in and is not entered into in connection with the dissolution and termination of the Company.

"**Liquidator**" has the meaning specified in Section 12.2(a).

"**Majority Vote**" means, (i) with respect to actions to be taken by the Board of Directors, the affirmative vote or consent of at least a majority of the Directors present at a meeting of the Board of Directors at which a quorum is present; provided, that so long as Tribune has the right to designate two (2) Directors pursuant to Section 8.2(c), a Majority Vote of Directors must include at least one (1) Director designated by Tribune and so long as Gannett has the right to designate two (2) Directors pursuant to Section 8.2(c), a Majority Vote of Directors must include at least one (1) Director designated by Gannett and (ii) with respect to

CH1 3900211v.17

actions to be taken by the Members, the affirmative vote or consent of Members holding at least a majority of the Membership Interests then outstanding.

"**Mandatory Contribution**" has the meaning specified in <u>Section 4.2(b)</u>.

"**Material Deadlock**" means any dispute among the Directors regarding the interpretation or application of any material provision of this Agreement or the performance thereof, or failure to reach a consensus with respect to any action that requires a Majority Vote of the Board of Directors for which the failure to resolve such deadlock, in any such case, in the judgment of the Initiating Member, (i) would inhibit the Chief Executive Officer's ability to supervise, coordinate and manage the day-to-day activities and business of the Company, (ii) would prevent the Board of Directors from electing a Chief Executive Officer, (iii) would threaten the Company with material injury or (iv) would otherwise be detrimental in any material respect to the Company.

"**Member**" has the meaning specified in the first paragraph of this Agreement.

"**Member Intellectual Property**" has the meaning specified in <u>Section 9.2</u>.

"**Member Nonrecourse Debt**" means any liability (or portion thereof) of the Company that constitutes debt which, by its terms, is nonrecourse to the Company and the Members for purposes of Section 1.1001-2 of the Treasury Regulations, but for which a Member bears the economic risk of loss, as determined under Section 1.704-2(b)(4) of the Treasury Regulations.

"**Member Nonrecourse Debt Minimum Gain**" means an amount of gain characterized as "partner nonrecourse debt minimum gain" under Section 1.704-2(i)(2) and 1.704-2(i)(3) of the Treasury Regulations. Subject to the preceding sentence, Member Nonrecourse Debt Minimum Gain shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability.

"**Membership Interest**" means, with respect to any Member at any time, the entire interest of such Member in the Company at such time. Such interest includes, without limitation, (a) all rights of a Member to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under this Agreement and (b) all management rights, voting rights or rights to consent.

The Membership Interest of each Member at the time of the Initial Capital Contribution shall be determined by the ratio which such Member's Initial Capital Contribution bears to the Aggregate Contributions of the Members, as established on <u>Schedule I</u>. In the event of a non-pro rata Subsequent Capital Contribution (including a Capital Contribution by a new Member), or a non-pro rata distribution of cash or property to any Member, the Membership Interest of each Member shall be adjusted so as to equal the ratio of such Member's Capital Account (as adjusted pursuant to <u>Section 4.4(e)</u> in connection with such contribution or distribution) to the sum of all Member's Capital Accounts (as so adjusted). In any event, <u>Schedule I</u> shall be revised accordingly to reflect the then applicable Membership Interest of each Member.

9

"**Member Parent**" means the Person who owns, directly or indirectly, all of the outstanding capital stock of, or otherwise controls, a Member; provided, that if more than one Person directly or indirectly owns all of the outstanding capital stock of, or otherwise controls, such Member then the Member Parent shall be the ultimate parent entity of such Persons (it being understood that, as of the date hereof, Tribune Parent is the Member Parent of Chicago Tribune and Tribune Interactive and Gannett Co., Inc. is the Member Parent of Gannett).

"**Metromix Rights**" has the meaning specified in Section 12.2(c).

"**Metromix Rights Notice**" has the meaning specified in Section 12.2(c).

"**Minimum Gain**" means the amount determined by computing with respect to each Nonrecourse Liability of the Company the amount of gain, if any, that would be realized by the Company if it disposed of the property securing such liability in full satisfaction thereof, and by then aggregating the amounts so computed.

"**Newco**" has the meaning specified in Section 13.1(a).

"**Non-Defaulting Member**" has the meaning specified in Section 4.2(c).

"**Nonrecourse Liability**" means a liability (or that portion of a liability) with respect to which no Member bears the economic risk of loss as determined under Section 1.704-2(b)(3) of the Treasury Regulations.

"**Notification**" means all notices permitted or required to be given to any Person hereunder. Such Notifications must be given in writing and will be deemed to be duly given on the date of delivery if delivered in person or sent by facsimile transmission or email or on the earlier of actual receipt or three (3) days after the date of mailing if mailed by registered or certified mail, first class postage prepaid, return receipt requested, to such Person, at the last known address of such Person on the Company records.

"**Optional Additional Cash Contributions**" has the meaning specified in Section 4.3(a).

"**Permitted Transfer**" shall mean a Public Sale or a Transfer by a Member to an Affiliate of such Member.

"**Person**" means any general partnership, limited partnership, limited liability partnership, corporation, limited liability company, joint venture, trust, business trust, governmental agency, cooperative, association, individual or other entity, and the heirs, executors, administrations, legal representatives, successors and assigns of such person, as the context may require.

"**Proposal Notice**" has the meaning specified in Section 6.5.

"**Proposing Members**" has the meaning specified in Section 6.5.

"**Pro Rata Transfer Price**" has the meaning specified in Section 6.3(a)(i).

"**Public Sale**" means any sale of Membership Interests (including Newco capital securities issued in connection with a Conversion) pursuant to a registration statement in compliance with the Securities Act or pursuant to Rule 144 promulgated under the Securities Act.

"**Purchaser**" has the meaning specified in Section 6.5.

"**Revised Supplemental First Request**" has the meaning specified in Section 4.3(c).

"**Schedule I**" means the schedule attached hereto and labeled "Schedule I."

"**Section 705(a)(2)(B) Expenditure**" means any expenditure of the Company described in Section 705(a)(2)(B) of the Code and any expenditure considered to be an expenditure described in Section 705(a)(2)(B) of the Code pursuant to Section 704(b) of the Code and the Treasury Regulations thereunder.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subsequent Capital Contribution**" means a Capital Contribution of any Member or of all the Members, as the case may be, other than an Initial Capital Contribution.

"**Super-Majority Vote**" means, with respect to actions to be taken by the Board of Directors, the affirmative vote or consent of at least three (3) of the Directors then serving on the Board of Directors, including (i) at least one (1) Director designated by Tribune, so long as Tribune has the right to designate at least one (1) Director pursuant to Section 8.2(c), and (ii) at least one (1) Director designated by Gannett, so long as Gannett has the right to designate at least one (1) Director pursuant to Section 8.2(c).

"**Supplemental First Request**" has the meaning specified in Section 4.3(b).

"**Tag-Along Allotment Percentage**" has the meaning specified in Section 6.4(b).

"**Tag-Along Member**" has the meaning specified in Section 6.4(a).

"**Tag-Along Notice**" has the meaning specified in Section 6.4(a).

"**Tag-Along Response**" has the meaning specified in Section 6.4(c).

"**Tag-Along Sale**" has the meaning specified in Section 6.4(a).

"**Tax Matters Member**" has the meaning specified in Section 10.9.

"**Transfer**" has the meaning specified in Section 6.2.

"**Transfer Date**" has the meaning specified in Section 6.3(a)(iv).

"**Transfer Membership Interests**" has the meaning specified in Section 6.3(a)(i).

11

"**Transfer Notice**" has the meaning specified in <u>Section 6.3(a)</u>.

"**Transfer Price**" has the meaning specified in <u>Section 6.3(a)(ii)</u>.

"**Transferee Party**" has the meaning specified in <u>Section 6.3(a)</u>.

"**Transferring Member**" has the meaning specified in <u>Section 6.3(a)</u>.

"**Treasury Regulations**" means the regulations promulgated by the U.S. Treasury Department pursuant to the Code.

"**Tribune**" has the meaning specified in the first paragraph of this Agreement.

"**Tribune Interactive**" has the meaning specified in the first paragraph of this Agreement.

"**Tribune Parent**" has the meaning specified in the first paragraph of this Agreement.

"**Unrealized Gain**" means the excess (attributable to a Company Property), if any, of the fair market value of such property as of the date of determination (as reasonably determined by the Board of Directors (or pursuant to the procedure specified in <u>Section 4.3</u> under the circumstances described therein)) over the Carrying Value of such property as of the date of determination (prior to any adjustment to be made pursuant to <u>Section 4.4(e)</u> as of such date).

"**Unrealized Loss**" means the excess (attributable to a Company Property), if any, of the Carrying Value of such property as of the date of determination (prior to any adjustment to be made pursuant to <u>Section 4.4(e)</u> as of such date) over its fair market value as of such date of determination (as reasonably determined by the Board of Directors (or pursuant to the procedure specified in <u>Section 4.3</u> under the circumstances described therein)).

"**Valuation Firm**" has the meaning specified in <u>Section 4.3(c)</u>.

**Section 1.2    Interpretation.** Each definition in this Agreement includes the singular and the plural, and reference to the neuter gender includes the masculine and feminine where appropriate. References to any statute or Treasury Regulations means such statute or regulations as amended at the time and include any successor legislation or regulations. The headings to the Articles and Sections are for convenience of reference and shall not affect the meaning or interpretation of this Agreement. Except as otherwise stated, reference to Articles, Sections and Schedules mean the Articles, Sections and Schedules of this Agreement. The Schedules are hereby incorporated by reference into and shall be deemed a part of this Agreement. For purposes of this Agreement, (i) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation," (ii) the word "or" is not exclusive and (iii) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.

CH1 3900211v.17

## ARTICLE II
## ORGANIZATION

**Section 2.1    Formation.**  The Company has been organized as a Delaware limited liability company under and pursuant to the Act by the filing on October 10, 2007 of a Certificate of Formation with the Office of the Secretary of State of Delaware as required by the Act.  In the event of a conflict between the terms of this Agreement and the Certificate of Formation, the terms of the Certificate of Formation shall prevail.

**Section 2.2    Name.**  The name of the Company is Metromix LLC.  To the extent permitted by the Act, the Company may conduct its business under one or more assumed names deemed advisable by the Board of Directors by Majority Vote.

**Section 2.3    Purposes; Scope of Business.**  The purposes of the Company are to engage in any activity and/or business for which limited liability companies may be formed under the Act.  The Company shall have all the powers necessary or convenient to effect any purpose for which it is formed, including all powers granted by the Act.

**Section 2.4    Duration.**  The Company shall continue in existence indefinitely, until dissolved and terminated in accordance with the Act or this Agreement.

**Section 2.5    Registered Office and Registered Agent; Principal Office.**  (a) The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Board of Directors by Majority Vote may designate from time to time in the manner provided by the Act.

(b)    The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Board of Directors by Majority Vote may designate in the manner provided by the Act.

(c)    The principal office of the Company shall be at 435 North Michigan Avenue, Chicago, Illinois, 60611 or at such place as the Board of Directors by Majority Vote may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain records there for inspection as required by the Act.  The Company may have such other offices as the Board of Directors by Majority Vote may designate from time to time.

**Section 2.6    No State-Law Partnership.**  No provisions of this Agreement (including the provisions of Article VIII) shall be deemed or construed to constitute the Company a partnership (including a limited partnership) or joint venture, or any Member or Director a partner or joint venturer of or with any other Member or Director, for any purposes other than federal and state tax purposes.

## ARTICLE III
## MEMBERS

**Section 3.1    Initial Members.**  The Initial Members of the Company are listed on Schedule I of this Agreement and the addresses of such Initial Members are as set forth on

13

such <u>Schedule I</u>. As of the date hereof, there are no other Members of the Company and no other Person has any right to take part in the ownership of the Company.

        **Section 3.2    Admission of Additional Members**. Additional Members of the Company may be admitted from time to time pursuant to <u>Section 4.3(e)</u>, <u>Section 6.7</u> or as otherwise contemplated by this Agreement. Any additional Member must execute a counterpart of, or an agreement adopting, this Agreement. Upon admission of an additional Member, such additional Member shall have, to the extent of the Membership Interest acquired, the rights and powers and shall be subject to the restrictions and liabilities of a Member under this Agreement, the Certificate of Formation and the Act.

**ARTICLE IV**
**CAPITAL CONTRIBUTIONS**

        **Section 4.1    Initial Capital Contributions**. The contribution of each Initial Member to the capital of the Company is set forth as such Member's Initial Capital Contribution (the "<u>Initial Capital Contribution</u>") on <u>Schedule I</u>. Each Member holds the Membership Interests set forth opposite such Member's name on <u>Schedule I</u>. <u>Schedule I</u> shall be revised from time to time to reflect any changes in the Membership Interests held by the Members, any additional Members and any additional Membership Interests.

        **Section 4.2    Mandatory Cash Contributions.** (a) On or after January 1, 2008, the Chief Executive Officer of the Company may deliver written requests (which may be made by electronic transmission) to the Members (a "<u>Mandatory Contribution Request</u>") for additional cash contributions in an aggregate amount not to exceed $17,564.000; provided, that, unless otherwise agreed to by a Majority Vote of either the Board of Directors or the Members, the amount of any Mandatory Contribution Request shall not exceed the Company's reasonably anticipated cash needs for the ninety (90) day period following such request and no Mandatory Contribution Request may be delivered less than sixty (60) days after the previous Mandatory Contribution Request. Upon receipt of a Mandatory Contribution Request, each Member shall be obligated to deliver to the Company, within fifteen (15) days of receipt of the Mandatory Contribution Request, by wire transfer of immediately available funds to the account specified by the Company an amount equal to the aggregate amount requested in the Mandatory Contribution Request multiplied by such Member's Membership Interest (a "<u>Mandatory Contribution</u>").

        (b)    In the event one (1) or more Members fail to make such Member's full Mandatory Contribution when due, the Board of Directors shall make successive requests for Mandatory Contributions equal to the amount of the shortfall only from those Members that made their required Mandatory Contributions (each one, a "<u>Non-Defaulting Member</u>"), and the contribution date shall not be earlier than fifteen (15) days) after delivery of such request. In the event the Board of Directors fails to make such a request with fifteen (15) days of such due date, as a result of the inability to obtain a quorum, a deadlock, or for any other reason, such requests shall be deemed made, but shall in any event be sent out by the Non-Defaulting Member that has the greatest Membership Interest. Each Non-Defaulting Member shall have a right to contribute cash in the amount of such shortfall determined on a pro rata basis in accordance with each such Non-Defaulting Member's Membership Interest in the Company at the time of such

14

request.  If fewer than all Non-Defaulting Members agree to contribute cash equal to their pro rata share of the shortfall, Non-Defaulting Members may elect to contribute cash on a pro rata basis in accordance with each such Member's Membership Interest in the Company.  The successive requests provided by this subsection (b) may be continued until no Non-Defaulting Member wishes to make a Mandatory Contribution.  In making any request to satisfy a shortfall of Mandatory Contributions, the Board of Directors shall follow such procedures as it shall deem to be reasonable and fair to all Members.

(c)     Notwithstanding the provisions of <u>Section 4.2(b)</u>, in the event that any Member fails to make its Mandatory Contribution when due, the Company and each other Member shall be entitled to specifically enforce by judicial action, the defaulting Member's obligation to make the Mandatory Contribution.  In such event, the defaulting Member shall pay all costs of and expenses (including attorneys' fees and expenses) incurred by the Company to recover the amount of the Mandatory Contribution.

(d)     Except as provided in this <u>Section 4.2</u>, no Member shall be obligated to make any contributions to the capital of the Company other than the Initial Capital Contribution.

(e)     In the event that any Member fails to make such Member's full Mandatory Contribution, but any other Member or Person makes a Mandatory Contribution, the Membership Interest of each Member shall be adjusted so as to equal the ratio of such Member's capital Account (as adjusted pursuant to <u>Section 4.4(e)(i)</u> in connection with such Mandatory Contributions) to the sum of all Members' Capital Accounts (as so adjusted).  Each Member shall be limited in its right to provide further additional capital in proportion to such Member's Membership Interest as so revised.  Upon the making of any such non-pro rata Mandatory Contributions, Schedule I shall be revised in accordance with the definition of Membership Interest in <u>Section 1.1</u> to reflect the then applicable Membership Interest of each Member.

**Section 4.3     Optional Additional Cash Contributions**.  (a) In the event that the Board of Directors by Majority Vote determines that the Company requires additional funds for proper Company purposes other than making distributions to the Members, the Board of Directors may make one or more written requests for the Members to make optional additional cash contributions ("<u>Optional Additional Cash Contributions</u>").  The respective portion of any Optional Additional Cash Contributions which may be contributed by any Member shall be determined on a pro rata basis in accordance with each Member's Membership Interest in the Company at the time of such request.  Members shall have the right to make no cash contribution, or to make all or any portion of their full requested Optional Additional Cash Contributions.  Such request shall specify the date on or before which the contributions must be delivered to the Company, which date shall not be earlier than fifteen (15) days after delivery of such request to all Members.  Any request made in accordance with this subsection (a) may be made via electronic transmission and shall be referred to as a "<u>First Request</u>."

(b)     Within five (5) days after receiving a First Request, any Member shall have the right to request that the First Request be supplemented with the Board of Director's determination as to the fair market value of the Company's net assets to be taken into account in adjusting the Members' Capital Accounts under <u>Section 4.4(e)(i)</u> in the event that not all Members make the full Optional Additional Cash Contribution.  As soon as possible thereafter,

the Board of Directors shall cause the First Request, as so supplemented (the "Supplemental First Request"), to be delivered to each Member via electronic transmission or as otherwise permitted under this Agreement.  The Supplemental First Request shall specify the due date for the requested contribution, which shall not be earlier than fifteen (15) days after delivery of the Supplemental First Request to all Members.  The Supplemental First Request may request Optional Additional Cash Contributions from the Members that are larger, smaller or the same amounts as those requested pursuant to the First Request, but in all events the amounts requested shall include each Member's proportionate share of the interest expense (through the due date of the requested contribution) on any advances made by Members pursuant to Section 4.3(d).

(c)    Within five (5) days after receiving a Supplemental First Request, any Member may request that the fair market value of the Company's net assets be determined by a nationally recognized investment bank or business valuation firm that is unaffiliated with the Company or any Member (a "Valuation Firm") approved by the Board of Directors by Super-Majority Vote.  The Valuation Firm shall make such determination within sixty (60) days of appointment by the Board of Directors and the determination of the Valuation Firm shall be binding on the Company and all Members.  The cost of the Valuation Firm shall be borne by the Company, unless a valuation pursuant to this subsection shall have been delivered to the Board of Directors within the six months preceding the date of the Supplemental First Request and the Valuation Firm's determination varies by less than 10% from the fair market value determined by the Board of Directors in the Supplemental First Request, in which case the cost of the Valuation Firm shall be borne by the requesting Member.  Promptly following receipt of the Valuation Firm's determination, the Board of Directors shall cause the Supplemental First Request, revised to replace the determination of the Board of Directors as to the fair market value of the Company's net assets with that of the Valuation Firm (the "Revised Supplemental First Request"), to be delivered to each Member via electronic transmission or as otherwise permitted under this Agreement.  The Revised Supplemental First Request shall specify the due date for the requested contribution, which shall not be earlier than fifteen (15) days after delivery of the Revised Supplemental First Request to all Members.  The Revised Supplemental First Request may request Optional Additional Cash Contributions from the Members that are larger, smaller or the same amounts as those requested pursuant to the Supplemental First Request, but in all events the amounts requested shall include each Member's proportionate share of the interest expense (through the due date of the requested contribution) on any advances made by Members pursuant to Section 4.3(d).

(d)    At any time on or after the date specified in the First Request, any Member or Members may advance funds to the Company in an aggregate amount not exceeding the aggregate Optional Additional Cash Contributions requested in the First Request, upon such terms as the Board of Directors may approve.  The Company shall repay any such advances from the proceeds of the Optional Additional Cash Contributions, not later than five (5) days after such contributions are received by the Company.

(e)    In the event one (1) or more Members fail to make such Member's full Optional Additional Cash Contribution upon a First Request, Supplemental First Request or Revised Supplemental First Request, as appropriate (all such requests being referred to in this Section 4.3(e) as a "First Request"), the Board of Directors by Majority Vote may, in its sole discretion, make successive requests for Optional Additional Cash Contributions, equal to the

16

amount of the shortfall in such First Request, in the same manner as described in subsection (a), but only from those Members that make contributions in response to the First Request, and the contribution date shall not be earlier than five (5) days (rather than fifteen (15) days) after delivery of such request. The successive requests provided by this subsection (e) may be continued until no Member wishes to make an Optional Additional Cash Contribution, at which point the Board of Directors by Majority Vote shall have the right to seek contributions through the admission of new Members whose aggregate initial cash contributions to the Company shall not exceed the amount of the last request to existing Members for Optional Additional Cash Contributions, plus a proportionate share of the interest expense (through the due date of the requested contribution) on any advances made by Members pursuant to Section 4.3(d), and who shall have all of the rights, duties and obligations of a Member as provided in this Agreement. In making any request for Optional Additional Cash Contributions, the Board of Directors shall follow such procedures as it shall deem to be reasonable and fair to all Members. In the event that the Board of Directors shall have made a Supplemental First Request or a Revised Supplemental First Request, the requests for additional contributions described in this subsection (e) shall be consistent in all respects to the latest of such Supplemental First Request or Revised Supplemental First Request, and the Members shall not have the right to cause the Board of Directors to further revise or supplement such requests.

(f)      In the event that a Member commits to make an Optional Additional Cash Contribution pursuant to the provisions of this Section 4.3 but fails to make such payment when due, each other Member shall be entitled to specifically enforce, by court action, the defaulting Member's obligation to make the required payment. In such event, the defaulting Member shall (i) pay all costs of the suit including attorneys' fees and all expenses incurred in recovering the amount (including interest) due and (ii) continue to be bound by the terms of this Agreement until such defaulting Member ceases to be a Member of the Company in accordance with the terms of this Agreement.

(g)      In the event that any Member fails to make such Member's full Optional Additional Cash Contribution, but other Members or Persons make Optional Additional Cash Contributions, the Membership Interest of each Member shall be adjusted so as to equal the ratio of such Member's Capital Account (as adjusted pursuant to Section 4.4(e)(i) in connection with such Optional Additional Cash Contributions) to the sum of all Members' Capital Accounts (as so adjusted). Each Member shall be limited in its right to provide further additional capital in proportion to such Member's Membership Interest as so revised. Upon the making of any such Optional Additional Cash Contributions, Schedule I shall be revised in accordance with the definition of Membership Interest in Section 1.1 to reflect the then applicable Membership Interest of each Member.

(h)      The parties to this Agreement acknowledge and agree that in the event the primary purpose of a sale or issuance of Membership Units is to raise capital for the Company, the procedures set forth in this Section 4.3 shall apply; provided, however, that nothing in this Section 4.3 shall be deemed to limit or restrict the ability of the Company to issue or sell Membership Interests to a third party for any other purpose.

**Section 4.4      Capital Accounts.** (a) A Capital Account shall be established and maintained for each Member. Each Member's Capital Account (i) shall be increased by (A) the

amount of cash contributed or deemed contributed by that Member to the Company, (B) the Agreed Value of Contributed Property contributed or deemed contributed by that Member to the Company (net of liabilities secured by the Contributed Property that the Company is considered to assume or take subject to Section 752 of the Code) and (C) allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Section 1.704-1(b)(2)(iv)(g) of the Treasury Regulations, but excluding income and gain described in Section 1.704-1(b)(4)(i) of the Treasury Regulations and (ii) shall be decreased by (A) the amount of cash distributed to that Member by the Company, (B) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to Section 752 of the Code), (C) allocations to that Member of Section 705(a)(2)(B) Expenditures and (D) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Section 1.704-1(b)(2)(iv)(g) of the Treasury Regulations, but excluding items described in clause (a)(ii)(C) of this paragraph and loss or deduction described in Section 1.704-1(b)(4)(i) or Section 1.704-1(b)(4)(iii) of the Treasury Regulations.  The initial Capital Account of each Member is set forth on <u>Schedule I</u> hereto.

      (b)    Except as otherwise provided herein, whenever it is necessary to determine the Capital Account of any Member for purposes of this Agreement, the Capital Account of the Member shall be determined after giving effect to (i) all Capital Contributions made or deemed made to the Company on or after the date of this Agreement, (ii) all allocations of income, gain, deduction and loss pursuant to <u>Article V</u> for operations and transactions effected on or after the date of this Agreement and prior to the date such determination is required to be made under this Agreement and (iii) all distributions made or deemed made on or after the date of this Agreement and prior to the time as of which such determination is required to be made.

      (c)    Upon the Transfer of any Membership Interests in the Company after the date of this Agreement, if such Transfer does not cause a termination of the Company within the meaning of Section 708(b)(1)(B) of the Code, the Capital Account of the transferor Member that is attributable to the transferred interest will be carried over to the transferee Member but, if the Company has an election in effect under Section 754 of the Code, the Capital Account will be adjusted to reflect any adjustment required as a result thereof by the Treasury Regulations promulgated pursuant to Section 704(b) of the Code.

      (d)    The realization, recognition and classification of any item of income, gain, loss or deduction for Capital Account purposes shall be the same as its realization, recognition and classification for federal income tax purposes; provided, however, that:

      (i)    Any deductions for depreciation, cost recovery or amortization attributable to Contributed Property shall be determined for Capital Account purposes as if the adjusted tax basis of such property on the date it was acquired by the Company was equal to the Agreed Value of such property.  Upon adjustment pursuant to <u>Section 4.4(e)</u> of the Carrying Value of the Company Property subject to depreciation, cost recovery or amortization, any further deductions for such depreciation, cost recovery or amortization shall be determined for Capital Account purposes as if the adjusted tax basis of such property was equal to its Carrying Value immediately following such adjustment.  Any deductions for depreciation, cost recovery or amortization under this <u>Section 4.4(d)</u> shall

18

be computed in accordance with Section 1.704-1(b)(2)(iv)(g)(3) of the Treasury Regulations.

(ii)    Any income, gain or loss attributable to the taxable disposition of any property shall be determined by the Company as if the adjusted tax basis of such property as of such date of disposition was equal in amount to the Carrying Value of such property as of such date.

(iii)    All items incurred by the Company that can neither be deducted nor amortized under Section 709 of the Code shall, for purposes of Capital Accounts, be treated as an item of deduction and shall be allocated among the Members pursuant to Article V.

(e)    (i) Upon the contribution or deemed contribution to the Company by a new or existing Member of cash or Contributed Property as consideration for an interest in the Company, the Capital Accounts of all Members and the Carrying Values of all Company Properties immediately prior to such contribution shall be adjusted (consistent with the provisions hereof and with the Treasury Regulations under Section 704 of the Code) upward or downward to reflect any Unrealized Gain or Unrealized Loss attributable to each Company Property, as if such Unrealized Gain or Unrealized Loss had been recognized upon an actual sale of each such Company Property immediately prior to such issuance and had been allocated to the Members in accordance with Article V of this Agreement.

(ii)    Immediately prior to the distribution of any Company Property (other than cash) or the distribution of cash to a retiring or continuing Member as consideration for an interest in the Company, the Capital Accounts of all Members and the Carrying Value of all Company Property shall be adjusted (consistent with the provisions hereof and Treasury Regulations under Section 704 of the Code) upward or downward to reflect any Unrealized Gain or Unrealized Loss attributable to each Company Property, as if such Unrealized Gain or Unrealized Loss had been recognized upon an actual sale of each such Company Property immediately prior to such distribution and had been allocated to the Members at such time in accordance with Article V of this Agreement.

(f)    In addition to the adjustments required by the foregoing provisions of this Section 4.4, the Capital Accounts of the Members shall be adjusted in accordance with the capital account maintenance rules of Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

(g)    The foregoing provisions of this Section 4.4 are intended to comply with Section 1.704-1(b)(2)(iv) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board of Directors, by Majority Vote, shall determine that it is prudent to modify the manner in which the Capital Accounts are computed in order to comply with Section 1.704-1(b)(2)(iv) of the Treasury Regulations, the Board of Directors, by Majority Vote, may make such modification, provided that such modification is not likely to have a material effect on the amounts distributable to any Member pursuant to Article V and the Board of Directors provides a Notification to the Members of such modification prior to its effective date, and provided further that the Board of Directors shall

CH1 3900211v.17

have no liability to any Member for any failure to exercise any such discretion to make any modifications permitted under this <u>Section 4.4(g)</u>.

(h)    The Capital Account balance of any Member who receives a "guaranteed payment" (as determined under Section 707(c) of the Code) from the Company shall be adjusted only to the extent of such Member's allocable share of any Company deduction or loss resulting from such guaranteed payment.

**Section 4.5    <u>Return of Capital Contributions</u>.**  Except as otherwise provided herein or in the Act, no Member shall have the right to withdraw, or receive any return of, all or any portion of such Member's Capital Contribution.

**Section 4.6    <u>Interest</u>.**  No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts.

**Section 4.7    <u>Loans From Members</u>.**  Loans by a Member to the Company shall not be considered Capital Contributions.  If any Member shall advance funds to the Company in excess of the amounts required hereunder to be contributed by such Member to the capital of the Company, the making of such advances shall not result in any increase in the amount of the Capital Account of such Member.  The amounts of any such advances shall be a debt of the Company to such Member and shall be payable or collectible only out of the Company assets in accordance with the terms and conditions upon which such advances are made.  The repayment of loans from a Member to the Company upon liquidation shall be subject to the order of priority set forth in <u>Section 12.4</u>.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

**Section 5.1    <u>Allocations of Income, Gain, Loss, Deduction and Credit From Operations and Interim Capital Transactions</u>.**  Except as otherwise provided in this <u>Article V</u>, items of income, gain, loss, deduction and credit of the Company from operations and Interim Capital Transactions for the year shall be allocated to the Members for Capital Account and federal income tax purposes in accordance with their respective Membership Interests.

**Section 5.2    <u>Allocations on Dissolution and Winding Up</u>.**  Except as otherwise provided in this <u>Article V</u>, after adjusting the Capital Accounts for distributions under <u>Section 5.14</u> and allocations under <u>Section 5.1</u> for the year, gain or loss resulting from a sale of the Company's assets under <u>Section 12.2</u> or otherwise upon the dissolution and termination of the Company shall be allocated to the Members for Capital Account and federal income tax purposes in accordance with their respective Membership Interests.

**Section 5.3    <u>Book/Tax Disparities; Section 754 Elections; Etc.</u>**  (a) In the case of Contributed Property, items of income, gain, loss, deduction and credit, as determined for federal income tax purposes, shall be allocated for federal income tax purposes first in a manner consistent with the requirements of Section 704(c) of the Code to take into account the difference between the Agreed Value of such property and its adjusted tax basis at the time of contribution. The method under Section 704(c) of the Code and the Treasury Regulations thereunder shall be

the traditional allocation method provided by §1.704-3(b) of the Treasury Regulations, unless a different method shall be adopted by the Majority Vote of the Board of Directors.

(b)     In the case of Adjusted Property, such items shall be allocated in a manner consistent with the principles of Section 704(c) of the Code to take into account the difference between the Carrying Value of such property and its adjusted tax basis. In the event that the Adjusted Property was originally Contributed Property, the allocation required by this <u>Section 5.3(b)</u> also shall take into account the requirements of <u>Section 5.3(a)</u>.

(c)     All items of income, gain, loss, deduction and credit recognized by the Company for federal income tax purposes and allocated to the Members in accordance with the provisions hereof shall be determined without regard to any election under Section 754 of the Code which may be made by the Company; provided, however, that such allocations, once made, shall be adjusted as necessary or appropriate to take into account those adjustments permitted by Sections 734 and 743 of the Code.

(d)     Whenever the income, gain and loss of the Company allocable hereunder consists of items of different character for tax purposes (e.g., ordinary income, long-term capital gain, interest expense, etc.), the income, gain and loss for tax purposes allocable to each Member shall be deemed to include its pro rata share of each such item. Notwithstanding the foregoing, if the Company realizes depreciation recapture income pursuant to Section 1245 or Section 1250 (or other comparable provision) of the Code as the result of the sale or other disposition of any asset, the allocations to each Member hereunder shall be deemed to include the same proportion of such depreciation recapture as the total amount of deductions for tax depreciation of such asset previously allocated to such Member bears to the total amount of deductions for tax depreciation of such asset previously allocated to all Members. This <u>Section 5.3(d)</u> shall be construed to affect only the character, rather than the amount, of any items of income, gain and loss.

**Section 5.4     <u>Allocation of Nonrecourse Deductions</u>.** Items of loss, deduction and Section 705(a)(2)(B) Expenditures attributable, under Section 1.704-2(c) of the Treasury Regulations, to increases in the Company's Minimum Gain shall be allocated, as provided in Section 1.704-2(e) of the Treasury Regulations, to the Members in accordance with their respective Membership Interests.

**Section 5.5     <u>Allocation of Member Nonrecourse Deductions</u>.** Notwithstanding the provisions of <u>Sections 5.1</u> and <u>5.2</u>, items of loss, deduction and Section 705(a)(2)(B) Expenditures attributable, under Section 1.704-2(i) of the Treasury Regulations, to Member Nonrecourse Debt shall (prior to any allocation pursuant to <u>Section 5.1</u> or <u>5.2</u>) be allocated, as provided in Section 1.704-2(i) of the Treasury Regulations, to the Members in accordance with the ratios in which they bear the economic risk of loss for such debt for purposes of Section 1.752-2 of the Treasury Regulations.

**Section 5.6     <u>Minimum Gain Chargeback</u>.** In the event that there is a net decrease in the Company's Minimum Gain during a taxable year of the Company, the minimum gain chargeback described in Sections 1.704-2(f) and (g) of the Treasury Regulations shall apply.

21

**Section 5.7**     **Member Minimum Gain Chargeback.**  If during a taxable year of the Company there is a net decrease in Member Nonrecourse Debt Minimum Gain, any Member with a share of that Member Nonrecourse Debt Minimum Gain (determined under Section 1.704-2(i)(5) of the Treasury Regulations) as of the beginning of the year must be allocated items of income and gain for the year (and, if necessary, for succeeding years) equal to that Member's share of such net decrease in accordance with Section 1.704-2(i) of the Treasury Regulations.

**Section 5.8**     **Qualified Income Offset.**  Pursuant to Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations, income of the Company shall be allocated, after the allocations required by Sections 5.6 and 5.7 but before any other allocation required by this Article V, to the Members with deficit balances in their Adjusted Capital Accounts in an amount and manner sufficient to eliminate such deficit balances as quickly as possible.  This Section 5.8 is intended to satisfy the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

**Section 5.9**     **Limitations on Loss Allocation.**  Notwithstanding any other provision of this Agreement to the contrary, no item of loss or deduction of the Company shall be allocated to a Member if such allocation would result in a negative balance in such Member's Adjusted Capital Account.  Such loss or deduction shall be allocated first among the Members with positive balances in their Adjusted Capital Accounts in proportion to (and to the extent of) such positive balances and thereafter in accordance with their interests in the Company as determined under Section 1.704-1(b)(3) of the Treasury Regulations.

**Section 5.10**     **Curative Allocations.**  If any items of income and gain (including gross income) or loss, deduction and Section 705(a)(2)(B) Expenditures are allocated to a Member pursuant to Section 5.4, 5.5, 5.6, 5.7, 5.8 or 5.9, then, prior to any allocation pursuant to Section 5.1 or 5.2 and subject to Sections 5.4, 5.5, 5.6, 5.7, 5.8 and 5.9, the Board of Directors by Majority Vote may allocate items of income and gain (including gross income) and items of loss, deduction and Section 705(a)(2)(B) Expenditures for subsequent periods shall be allocated to the Members in a manner designed to result in each Member's Capital Account having a balance equal to what it would have been had such allocation of items of income and gain (including gross income) or loss, deduction and Section 705(a)(2)(B) Expenditures not occurred under Section 5.4, 5.5, 5.6, 5.7, 5.8 or 5.9.  In exercising its discretion under this Section 5.10, the Board of Directors shall take into account future allocations under Sections 5.6 and 5.7 that, although not yet made, are likely to offset other allocations previously made under Sections 5.4 and 5.5.

**Section 5.11**     **Interest in Company Profits.**  Pursuant to Section 1.752-3(a)(3) of the Treasury Regulations, the Members' interests in Company profits for purposes of determining the Members' proportionate shares of the excess nonrecourse liabilities (as defined in Section 1.752-3(a)(3) of the Treasury Regulations) of the Company shall be determined in accordance with their respective Membership Interests.

**Section 5.12**     **Distributions in Kind.**  If any assets of the Company are distributed in kind pursuant to Section 12.4, such assets shall be distributed to the Members entitled thereto in the same proportions as if the distribution were in cash.  Such assets shall be

22

valued at their then fair market value as reasonably determined by the Board of Directors by Majority Vote. The amount of Unrealized Gain or Unrealized Loss attributable to any asset to be distributed in kind to the Members shall, to the extent not otherwise recognized by the Company, be taken into account in computing gain or loss of the Company for purposes of allocation of gain or loss under Sections 5.1 and 5.2, and distributions of proceeds to the Members under Sections 5.14 and 12.4. If the assets of the Company are sold in a transaction in which, by reason of the provisions of Section 453 of the Code or any successor thereto, gain is realized but not recognized, such gain shall be taken into account in computing gain or loss of the Company for purposes of allocations and distributions to the Members pursuant to this Article V, notwithstanding that the Members may elect to continue the Company pending collection of deferred purchase money obligations received in connection with such sale.

      **Section 5.13    Allocations and Distributions to Transferred Interests.**  (a) If any interest in the Company is transferred, increased or decreased during the year, all items of income, gain, loss, deduction and credit recognized by the Company for such year shall be allocated among the Members to take into account their varying interests during the year in any manner the Board of Directors shall approve by Majority Vote, in its sole discretion, as then permitted by the Code.

      (b)      Distributions under Sections 5.14 and 12.4 shall be made only to Members and assignees who, according to the books and records of the Company, are Members or assignees on the actual date of distribution. Neither the Company nor the Board of Directors (or any Director serving thereon) shall incur any liability for making distributions in accordance with this Section 5.13(b).

      **Section 5.14    Distributions of Distributable Funds.**  (a) If the Board of Directors believes in its reasonable discretion that funds are available for distribution in advance of the due date for the payment of quarterly estimated income tax, the Board of Directors shall make distributions to Members to the extent possible to satisfy their respective anticipated quarterly estimated income tax liabilities arising from the operation of the Company's business. Notwithstanding the preceding sentence, any distributions made pursuant to the preceding sentence shall be in accordance with the Members' respective Membership Interests.

      (b)      Except as provided in subsection (a) above or in Section 12.4 hereof relating to distributions upon the dissolution and liquidation of the Company, Distributable Funds shall be distributed to the Members in accordance with their respective Membership Interests. Any such distributions shall be made only to the extent approved by the Board of Directors in accordance with Section 8.4. To the extent that the Board of Directors approves any distribution pursuant to this Section 5.14 that consists of a consideration of a type or in a form other than cash, the types and forms of such consideration shall be allocated in an equitable manner among the Members entitled thereto, in the proportions and amounts provided for herein, such that each Member shall, except for immaterial variances, receive the same type or form of consideration. The Company shall not make any distribution to the Members if, immediately after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members with respect to their Membership Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of Company Property, except that the fair value of Company Property that is subject to a liability for which

23

recourse of creditors is limited shall be included in the Company assets only to the extent that the fair value of that Company Property exceeds that liability.

        **Section 5.15    Order of Application.**  For purposes of this Article V, the listed provisions shall be applied in the order in which they are listed below (from first to last):

>    1.      Section 5.3;
>
>    2.      Section 5.14;
>
>    3.      Section 5.7;
>
>    4.      Section 5.6;
>
>    5.      Section 5.5;
>
>    6.      Section 5.4;
>
>    7.      Section 5.9;
>
>    8.      Section 5.8;
>
>    9.      Section 5.1;
>
>    10.     Section 5.2; and
>
>    11.     Section 5.10.

## ARTICLE VI
## RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS

        **Section 6.1    Authority; Liability to Third Parties.**  No Member has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.  No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

        **Section 6.2    Transfer of Membership Interests.**  A Member shall not, directly or indirectly, voluntarily or involuntarily, by operation of law or will or the laws of descent or distribution, sell, assign, pledge, mortgage, exchange, encumber, hypothecate or otherwise transfer ("Transfer") any Membership Interests except for a Permitted Transfer; provided, however, that (i) any sale or transfer of all or substantially all of the assets of a Member Parent in any transaction or series of related transactions, (ii) any merger, consolidation or reorganization to which a Member Parent is a party, (iii) any sale or series of sales of shares of a Member Parent's capital stock by the holders thereof or any issuance or series of issuances of capital stock of a Member Parent which results in any Person or group of affiliated Persons owning capital stock holding a majority of the voting power of such Member Parent or (iv) any other "change of control" transaction involving a Member Parent shall not constitute a Transfer for

24

purposes of this Agreement.  In the event a Member desires to Transfer all or part of such Member's Membership Interest or any interest therein, such Member will be responsible for compliance with all conditions of Transfer imposed by this Agreement and under applicable law and for any expenses incurred by the Company for legal and/or accounting services in connection with reviewing any proposed Transfer or issuing opinions in connection therewith. Until the transferee is admitted as a Member pursuant to Section 6.6, the transferor Member shall continue to be a Member and to be entitled to exercise any rights or powers of a Member with respect to the Membership Interest transferred.

Section 6.3    **Right of First Offer.**  (a) Prior to any proposed Transfer (other than a Permitted Transfer), a Member that desires to Transfer any Membership Interests (the "Transferring Member") shall deliver to the other Members and the Company a Notification (the "Transfer Notice") of its intention to Transfer such Membership Interests, which Transfer Notice shall be irrevocable for a period of thirty (30) days after the delivery thereof and shall state (i) the total amount of Membership Interests which such Member intends to Transfer (the "Transfer Membership Interests"), (ii) the proposed Transfer price (the "Transfer Price"), (iii) the proposed transferee (the "Transferee Party"), (iv) the proposed date of Transfer (the "Transfer Date") and (v) any other information reasonably requested by the other Members to fully describe and confirm the bona fide nature of the proposed Transfer.  The Transfer Membership Interests shall be transferred in the following order of priorities:

(i)    First, the Members (excluding any Transferring Member) shall have the right and option to purchase the Transfer Membership Interests in whole for the Transfer Price in proportion to each such Member's ownership interest in the Company (excluding for purposes of calculating such Member's proportionate ownership interest in the Company, Membership Interests held by the Transferring Member) by giving a Notification of the exercise of such right to the Transferring Member within ten (10) days of delivery of the Transfer Notice.  Should one or more of the Members elect not to participate, then the Transfer Membership Interests may be purchased in whole or in part for the Transfer Price (or such pro rata portion thereof (the "Pro Rata Transfer Price") if only a portion of the Transfer Membership Interests is desired) by all interested Members in proportion to each such interested Member's ownership interest in the Company (excluding for purposes of calculating such Member's proportionate ownership interest in the Company, Membership Interests held by the Transferring Member and Membership Interests held by Members who are not participating in the purchase) or such other method of allocation as otherwise agreed to by such interested Members.  The closing of the sale of Transfer Membership Interests pursuant to this Section 6.3(a)(i) shall take place at the offices of the Company no later than sixty (60) days after the delivery of the Transfer Notice.  Each Member purchasing Transfer Membership Interest shall pay their pro rata portion of the Transfer Price or Pro Rata Transfer Price, as the case may be, by wire transfer of immediately available funds to the account specified by the Transferring Member.  The Transferring Member shall deliver the Transfer Membership Interests free and clear of all liens, security interests and competing claims, and shall deliver to the participating Members such instruments of transfer and other documents as such Members shall reasonably request.

25

(ii)     Second, if all or any portion of the Transfer Membership Interests shall have thereafter not been purchased by the Members, the Transferring Member shall have the right, subject to Section 6.4, for a period of ninety (90) days from the date of the Transfer Notice, to sell all or the remainder of the Transfer Membership Interests to the Transferee Party for no less than the Transfer Price (or the Pro Rata Transfer Price, as the case may be). If the Transferring Member does not consummate the Transfer within such ninety (90) day period, the Transfer Membership Interests shall remain subject to this Section 6.3 and the Transferring Member shall not thereafter Transfer any such Membership Interests to any Person without again first complying with all of the provisions of this Section 6.3.

(b)     Should the Transferring Member subsequently determine to change the amount of the Transfer Membership Interests to be sold or the Transfer Price, the Transferring Member shall be required to follow the same procedures set forth in clause (a) of this Section 6.3.

**Section 6.4     Tag-Along Rights.** (a) Each Transferring Member who proposes to make a Transfer, directly or indirectly, of such Transferring Member's Membership Interests representing 15% or more of the outstanding Membership Interests (a "Tag-Along Sale") shall afford each of the other Members (each, a "Tag-Along Member") the opportunity to participate therein in accordance with this Section 6.4. The obligations of a Transferring Member under this Section 6.4 are in addition to the obligations under Section 6.3, but shall not apply if all of the Transfer Membership Interests are sold to subscribing Members pursuant to Section 6.3. The obligations of a Transferring Member under this Section 6.4 shall not apply to a Permitted Transfer or a Public Sale. The Transferring Member shall deliver to each Member a Notification (the "Tag-Along Notice") which discloses the amount of Membership Interests such Transferring Member is permitted to sell after complying with the procedures of Section 6.3.

(b)     With respect to each Tag-Along Sale, each Tag-Along Member shall have the right and option to Transfer up to that percentage of such Tag-Along Member's Membership Interests which will allow such Tag-Along Member to participate on a pro rata basis, based on the respective Membership Interests (the "Tag-Along Allotment Percentage"), for the same price and form of consideration to be received by the Transferring Member and otherwise on the same terms and conditions as are applicable to the proposed Transfer.

(c)     Each Tag-Along Member who wishes to participate in the Tag-Along Sale shall provide a Notification (the "Tag-Along Response") to the Transferring Member no less than ten (10) days after delivery of the Tag-Along Notice. The Tag-Along Response shall set forth the amount of Membership Interests that such Tag-Along Member elects to include in the Transfer, which shall not exceed such Tag-Along Member's Tag-Along Allotment. The Tag-Along Response shall also specify the aggregate Membership Interests owned by such Tag-Along Member as of the close of business on the second day immediately preceding the date on which the Tag-Along Response is given by such Tag-Along Member, if any, that such Tag-Along Member also desires to include in the Transfer (the "Additional Tag-Along Membership Interests") if there is any under-subscription for the entire amount of all Tag-Along Members' Tag-Along Allotments. If there is an under-subscription by the Tag-Along Members for any portion of the aggregate Tag-Along Member's Tag-Along Allotments, the Transferring Member

26

shall apportion the under-subscribed Tag-Along Member's Tag-Along Allotments among the Tag-Along Members whose Tag-Along Responses specified an amount of Additional Tag-Along Membership Interests, which apportionment shall be on a pro rata basis among such Tag-Along Members in accordance with the number of Additional Tag-Along Membership Interests specified by all such Tag-Along Members in their Tag-Along Responses. The Tag-Along Responses given by the Tag-Along Members shall constitute their binding agreements to sell such Membership Interests on the terms and conditions applicable to the Transfer.

(d)    The Transferring Member shall Transfer all or any portion of the Transfer Membership Interests only if the Transferring Member makes arrangements for the Transfer, on the same terms and conditions, of all Membership Interests for which Tag-Along Responses were timely delivered (up to the full amount of the aggregate Tag-Along Allotments). Transfer of all or any portion of the Transfer Membership Interests by the Transferring Member shall only be made, however, on terms and conditions no more favorable to the Transferring Member than as stated in the Tag-Along Notice and only if such Transfer occurs within ninety (90) days of the Transfer Date. Any such Membership Interests not so transferred during such ninety (90) day period shall thereafter again be subject to the Tag-Along Sale rights of each of the Members.

**Section 6.5    Drag Along Rights.** If any Member or any group of Members acting together or pursuant to a common plan or arrangement propose to sell or otherwise dispose of to a party unaffiliated with such Members (a "Purchaser") Membership Interests that constitute at least 70% of the outstanding Membership Interests (a "Disposition"), such Member(s) (the "Proposing Members") shall provide a Notification of such proposed Disposition to each of the other Members (a "Proposal Notice"), and the Proposing Members shall have the right (a "Drag Along Right") to require such other Members to sell the Membership Interests owned by them to the Purchaser at the same price and upon the same terms as are applicable to the sale of Membership Interests by the Proposing Members by delivery of a Notification within ten (10) days of the Proposal Notice. Each Member agrees that it shall cooperate in good faith and waive any and all available appraisal, dissenters' or similar rights in connection with the exercise of a Drag Along Right by the Proposing Members. The Proposal Notice shall set forth: (i) the identity of the Purchaser(s); (ii) the price and the other general terms of the proposed Disposition; and (iii) the Drag Along Right sale date. Sections 6.3 and 6.4 shall not apply to sales of Membership Interests by Members pursuant to the exercise of a Drag Along Right in accordance with this Section 6.5.

**Section 6.6    Admission of Transferee as Member.** A transferee of a Membership Interest desiring to be admitted as a Member must execute a counterpart of, or an agreement adopting, this Agreement. Upon admission of the transferee as a Member, the transferee shall have, to the extent of the Membership Interest transferred, the rights and powers and shall be subject to the restrictions and liabilities of a Member under this Agreement, the Certificate of Formation and the Act. The transferee shall also be liable, to the extent of the Membership Interest transferred, for the unfulfilled obligations, if any, of the transferor Member to make Capital Contributions, but shall not be obligated for liabilities unknown to the transferee at the time such transferee was admitted as a Member and that could not be ascertained from this Agreement. Whether or not the transferee of a Membership Interest becomes a Member, the transferor Member is not released from any liability to the Company under this Agreement, the Certificate of Formation or the Act.

**Section 6.7    Transfers in Violation of Agreement.**  Any purported Transfer of any Membership Interest in violation of the provisions of this Agreement shall be wholly void and shall not effectuate the Transfer contemplated thereby.  Notwithstanding anything contained herein to the contrary, (i) no Member may Transfer any Membership Interest in violation of any provision of this Agreement or in violation of the Securities Act and any applicable state securities laws, (ii) no Transfer of any Membership Interest may be effected if such Transfer would cause a dissolution of the Company under the Act, unless the Members unanimously approve such Transfer and (iii) no Transfer of any Membership Interest may be effected if such Transfer would cause a termination of the Company under Section 708(b)(1)(B) of the Code, unless the Members unanimously approve of the Transfer.

**Section 6.8    Confidentiality.**  (a) Each Member agrees not to divulge, communicate, use to the detriment of the Company or for the benefit of any other Person, or misuse in any way, any confidential information or trade secrets of the Company or any subsidiary of the Company, or any other Member or its Affiliates, including personnel information, secret processes, know-how, customer lists, formulas or other technical data, provided, however, that this prohibition shall not apply to (i) any information that (x) was already in such Member's possession prior to the disclosure thereof by the Company (other than through disclosure by any other Person known by such Member to be subject to a duty of confidentiality), (y) was then generally known to the public or (z) was disclosed to such Member by a third Person not known by such Member to be bound by an obligation of confidentiality or (ii) disclosures made as required by law or legal process or to any Person exercising regulatory authority over such Member or its Affiliates.  If such Member, in the opinion of its counsel, is compelled to disclose information concerning the Company to any tribunal or governmental body or agency or else stand liable for contempt or suffer other censure or penalty, such Member may disclose such information to such tribunal or government body or agency without liability hereunder.  If such Member is compelled, pursuant to the preceding sentence, to disclose confidential information concerning the Company, such Member will provide a Notification regarding such disclosure to the Company and will, at the Company's expense, join the Company in seeking a protective order.

(b)    It is agreed between the parties that the Company would be irreparably damaged by reason of any violation of the provisions of this Section 6.8, and that any remedy at law for a breach of such provisions would be inadequate.  Therefore, the Company shall be entitled to seek and obtain injunctive or other equitable relief (including a temporary restraining order, a temporary injunction or a permanent injunction) against any Member, such Member's agents, assigns or successors for a breach or threatened breach of such provisions and without the necessity of proving actual monetary loss.  It is expressly understood among the parties that this injunctive or other equitable relief shall not be the Company's exclusive remedy for any breach of this Section 6.8 and the Company shall be entitled to seek any other relief or remedy that either may have by contract, statute, law or otherwise for any breach hereof, and it is agreed that the Company shall also be entitled to recover its attorneys' fees and expenses in any successful action or suit against any Member relating to any such breach.

## ARTICLE VII
## MEETINGS OF MEMBERS

**Section 7.1**    **Place of Meetings.**  All meetings of Members shall be held at the principal office of the Company as provided in Section 2.5(c), or at such other place as may be designated by the Majority Vote of the Board of Directors or by the Members calling the meeting.

**Section 7.2**    **Meetings.**  Meetings of the Members shall be held only as required by the Act or by applicable law.

**Section 7.3**    **Notice.**  A Notification of all meetings, stating the place, day and hour of the meeting and in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) days before the meeting to each Member entitled to vote.

**Section 7.4**    **Waiver of Notice.**  Attendance of a Member at a meeting shall constitute a waiver of Notification of the meeting, except where such Member attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.  Notification of a meeting may also be waived in writing. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the Notification of the meeting but not so included, if the objection is expressly made at the meeting.

**Section 7.5**    **Quorum.**  The presence of Members holding at least seventy-five percent (75%) of the Membership Interests is required to constitute a quorum at any meeting of the Members.

**Section 7.6**    **Voting.**  (a) All Members shall be entitled to vote on any matter submitted to a vote of the Members.  Each Member shall be entitled to one vote for each full percentage of the Membership Interests held by such Member.  Fractional votes shall be permitted.

(b)    With respect to any matter other than a matter for which the affirmative vote of Members owning a specified percentage of the Membership Interests is required by the Act, the Certificate of Formation or this Agreement, the affirmative vote of the holders of at least seventy-five percent (75%) of the Membership Interests at a meeting at which a quorum is present shall be the act of the Members.

(c)    No provision of this Agreement requiring that any action be taken only upon approval of Members holding a specified percentage of the Membership Interests may be modified, amended or repealed unless such modification, amendment or repeal is approved by Members holding at least such percentage of the Membership Interests.

**Section 7.7**    **Conduct of Meetings.**  The Board of Directors shall have full power and authority concerning the manner of conducting any meeting of the Members, including the determination of Persons entitled to vote, the existence of a quorum, the satisfaction of the requirements of this Article VII, the conduct of voting and the determination

of any controversies, votes or challenges arising in connection with or during the meeting or voting. The Board of Directors by Majority Vote shall designate a Person to serve as chairperson of any meeting and shall further designate a Person to take minutes of any meeting. The chairperson of the meeting shall have the power to adjourn the meeting from time to time, without notice, other than announcement of the time and place of the adjourned meeting. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

> **Section 7.8**    **Action by Written Consent.** Any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed and dated by Members holding the percentage of Membership Interests required to approve such action under the Act, the Certificate of Formation or this Agreement. Such consent shall have the same force and effect as a vote of the signing Members at a meeting duly called and held pursuant to this Article VII. No prior notice from the signing Members to the Company or other Members shall be required in connection with the use of a written consent pursuant to this Section 7.8. Notification of any action taken by means of a written consent of Members shall, however, be sent within a reasonable time after the date of the consent by the Company to all Members who did not sign the written consent.

## ARTICLE VIII
## MANAGEMENT OF THE COMPANY

> **Section 8.1**    **Management of Business.** Except as otherwise expressly provided in this Agreement, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, a board of directors (the "Board of Directors") as described herein.

> **Section 8.2**    **Board of Directors; Number and Election of Directors; Additional Committees.** (a) The Board of Directors shall consist of five (5) Directors. Subject to Section 8.2(c), (i) Tribune shall have the right to designate two (2) Directors to serve on the Board of Directors, which Directors shall initially be Timothy Landon and Brigid Kenney, (ii) Gannett shall have the right to designate two (2) Directors to serve on the Board of Directors, which Directors shall initially be John Williams and Josh Resnik, and (iii) the Chief Executive Officer of the Company shall also serve as a member of the Board of Directors.

> (b)    The Members shall take all actions necessary to appoint all Directors designated by a Member in accordance with Section 8.2(a). The Members shall take all other actions necessary, including the exercise of voting rights, to effect the intent of this Section 8.2.

> (c)    So long as Tribune and Gannett own (together with their respective Affiliates) the Membership Interest percentage in the Company in the range set forth below, each such Member shall have the right to designate the number of Directors set forth opposite such range of percentages:

| | |
|---|---|
| 37.5% or over | 2 Directors |
| 10% but less than 37.5% | 1 Director |
| Less than 10% | 0 Directors |

If the number of Directors that any Member is entitled to designate is reduced pursuant to this Section 8.2(c), then the size of the Board of Directors shall be decreased to reflect such occurrence; provided, that if any Member relinquishes the right to designate one (1) or more Directors pursuant to this Section 8.2(c) as a result of a Transfer in accordance with this Agreement, it shall have the right (but not the obligation) to transfer to such transferee the right to designate up to the number of Directors as has been relinquished by such Member as a result of such Transfer and, in such case, the size of the Board of Directors shall not be decreased. By way of example, if a Member with a 50% Membership Interest in the Company shall transfer a 25% Membership Interest as a result of a Transfer in accordance with this Agreement, such Member shall relinquish the right to designate one (1) director and may transfer the right to designate one (1) Director to the transferee.

**Section 8.3    General Powers of Board of Directors.**  Except as may otherwise be expressly provided in this Agreement, the Board of Directors shall have complete and exclusive discretion in the management and control of the business and affairs of the Company, including the right to make and control all ordinary and usual decisions concerning the business and affairs of the Company. The Board of Directors shall, subject to Section 8.4, possess all power, on behalf of the Company, to do or authorize the Company or to direct the executive officers of the Company on behalf of the Company to do all things necessary or convenient to carry out the business and affairs of the Company.

**Section 8.4    Limitations on Powers of Board of Directors.**  (a) The enumeration of powers in this Agreement shall not limit the general or implied powers of the Board of Directors or any additional powers provided by law. Notwithstanding the foregoing and any other provision contained in this Agreement to the contrary, no act shall be taken, sum expended, decision made, consent provided, obligation incurred or power exercised by the Company, or the officers or the Board of Directors on behalf of the Company, in each case without the affirmative Super-Majority Vote of the Board of Directors, with respect to any of the following:

     (i)    any merger (after the consummation of which the Members or the Company, as applicable, own less than 80% equity ownership of the surviving entity) or consolidation, or a sale, disposition or encumbrance of all or substantially all of the assets of the Company;

     (ii)    the sale to third parties of Membership Interests in excess of 20% of the outstanding equity ownership of the Company on the date of this Agreement in a single transaction or a series of related transactions;

     (iii)    the commencement of any voluntary proceeding seeking reorganization or other relief with respect to the Company under any bankruptcy or other similar law or seeking the appointment of a trustee, receiver, custodian or other similar official of the Company or any substantial part of its property, or causing the Company to make a general assignment for the benefit of creditors;

     (iv)    the dissolution of the Company; and

31

(v)    making any material change in the terms of any operational agreement (including, without limitation, any of the Affiliate Agreements) between the Company and a Member (or the Affiliate of a Member) relating to the business relationship of such parties.

(b)    Without the consent of a majority of the disinterested Directors voting in favor thereof, the Company shall not enter into or be a party to any related or Affiliate party transaction or arrangement.

**Section 8.5    Place of Meetings.**  Meetings of the Board of Directors may be held either within or without the State of Delaware at whatever place is specified in the call of the meeting.  In the absence of specific designation, the meetings shall be held at the principal office of the Company as provided in Section 2.5(c).  The Directors serving on the Board of Directors, by Majority Vote, may appoint from among themselves a chairperson to preside at meetings of the Board of Directors.  Any Director shall be permitted to attend any meeting of the Board of Directors in person or by conference call pursuant to Section 14.1.

**Section 8.6    Regular Meetings.**  The Board of Directors shall meet at least quarterly.  No Notification need be given to Directors of regular meetings for which the Directors have previously designated a time and place for the meeting.

**Section 8.7    Special Meetings.**  Special meetings of the Board of Directors may be held at any time upon the request of the Chief Executive Officer of the Company or at least two (2) of the Directors.  A Notification of any special meeting shall be sent to the last known address of each Director at least two (2) days before the meeting.  Notification of the time, place and purpose of such meeting may be waived in writing before or after such meeting, and shall be equivalent to the giving of a Notification.  Attendance of a Director at such meeting shall also constitute a waiver of Notification thereof, except where such Director attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting.

**Section 8.8    Quorum of and Action by Board of Directors.**  At all meetings of the Board of Directors, three (3) Directors (which must include at least one Director designated by each of Tribune and Gannett) shall constitute a quorum for the transaction of any business of the Board of Directors.  Except as otherwise expressly set forth in this Agreement, any action to be taken or approved by the Board of Directors hereunder must be taken or approved by a Majority Vote of the Board of Directors, and any action so taken or approved shall constitute the act of the Board of Directors.

**Section 8.9    Compensation.**  The Directors shall serve without compensation; provided, however, that, subject to the provisions of Section 8.4(b), nothing contained herein shall preclude any Director from receiving compensation pursuant to any employment agreement with the Company for services rendered to the Company.

32

**Section 8.10    Removal and Vacancies.**  The Member that designated a Director shall have the sole right to remove such Director, with or without cause, from the Board of Directors.  Such removal shall be effective immediately upon delivery of a Notification of such removal to the Company by such designating Member.  Any vacancy on the Board of Directors shall be filled by the Member that designated the vacating Director.

**Section 8.11    Action by Written Consent.**  Any action that may be taken at a meeting of the Board of Directors may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all of those Directors entitled to vote at that meeting, and such consent shall have the same force and effect as a unanimous vote of the Board of Directors at a meeting duly called and held.  No Notification shall be required in connection with the use of a written consent pursuant to this <u>Section 8.11</u>.

**Section 8.12    Other Business.**  The Directors may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others.  Neither the Company nor the Members shall have any rights in or to such independent ventures of the Directors or the income or profits therefrom by virtue of this Agreement.

**Section 8.13    Standard of Care; Liability.**  Every Director shall discharge his or her duties as a Director in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the best interests of the Company.  A Director shall not be liable for any monetary damages to the Company for any breach of such duties except for receipt of a financial benefit to which the Director is not entitled; voting for or assenting to a distribution to Members in violation of this Agreement or the Act; or a knowing violation of law.

**Section 8.14    Appointment of Officers; Chief Executive Officer.**  The Board of Directors shall, in accordance with the provisions of <u>Section 8.3</u>, have the right to appoint officers of the Company, including a Chief Executive Officer of the Company, to assist with the day-to-day management of the business affairs of the Company.  The initial Chief Executive Officer shall be Kara Walsh.  The Chief Executive Officer shall not have greater power and authority than the Board of Directors and shall not, on behalf of the Company, authorize, engage in or enter into any of the transactions or actions specified in <u>Section 8.4</u> without the requisite prior consent of the Board of Directors in respect thereof.  The Board of Directors shall have the right to remove any Chief Executive Officer of the Company, either for or without cause, at any time; provided, however, that nothing contained herein shall limit any rights of the Chief Executive Officer under any employment agreement which such Chief Executive Officer may have entered into with the Company.  In addition to the Chief Executive Officer, the Company may have additional executive officers.  The appointment of officers shall be made by the Board of Directors.

**Section 8.15    Committees; Executive Committee.**  (a) The Board of Directors may create such committees as the Board of Directors, from time to time, deems desirable.  Each committee of the Board of Directors, to the extent provided in the resolutions creating the committees or in this Agreement, shall have the powers of the Board of Directors in the management of the business and affairs of the Company.  In the event that additional committees

of the Board of Directors are formed, the Members shall be entitled to the same representation on any such additional committee as such Members receive on the Board of Directors.

(b)    The Company shall have an executive committee of the Board of Directors (the "Executive Committee"). The Executive Committee shall have all of the power and authority of the Board of Directors except as to matters described in Section 8.4. The Executive Committee shall consist of three (3) members. Tribune and Gannett shall each have the right to designate one of the Directors designated by it to serve as a member of the Executive Committee. The Chief Executive Officer shall also serve as a member of the Executive Committee. At all meetings of the Executive Committee, all members shall constitute a quorum for the transaction of any business of the Executive Committee. Any action to be taken or approved by the Executive Committee must be taken or approved by the vote of all of the members of the Executive Committee, and any action so taken or approved shall constitute the act of the Executive Committee.

Section 8.16    Resolution of Material Deadlocks. (a) In the event of a Material Deadlock, any Member (the "Initiating Member") shall have the right (but not the obligation) to initiate the following procedures:

(i)    the Initiating Member shall give each other Member and the Company Notification setting forth the provision or action that is the subject of such Material Deadlock;

(ii)    the Initiating Member and the other Members shall negotiate reasonably and in good faith in order to resolve such Material Deadlock for a period of not less than thirty (30) days following receipt of the Notification described in clause (i) above, with such negotiations to include discussions among the chief executive officers of the Member Parents of the Members; and

(iii)    if the Material Deadlock has not been resolved by negotiation pursuant to clause (ii) above, the Initiating Member or any other Member may submit the Material Deadlock to arbitration in accordance with Section 8.16(b).

(b)    Any Material Deadlock which has not been resolved pursuant to Section 8.16(a) shall, upon Notification by a Member to the other Members and the Company, be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect on the date of this Agreement. The arbitration panel shall consist of three (3) independent and impartial arbitrators. Each of Tribune and Gannett shall select one (1) arbitrator and the two (2) arbitrators selected by the Members shall select the third arbitrator. The place of the arbitration shall be Chicago, Illinois. The arbitrators are not empowered to award punitive, exemplary, consequential or other special damages in such arbitration and each Member hereby irrevocably waives any right to recover punitive, exemplary, consequential or other special damages in such arbitration. The procedures specified in this Section 8.16 are the sole and exclusive procedures for the resolution of a Material Deadlock arising out of or relating to this Agreement but shall not affect the rights of the Company or the Members to bring action or seek judicial relief with respect to any other dispute relating to this Agreement, the Company or the Members.

34

## ARTICLE IX
## OWNERSHIP OF PROPERTY

**Section 9.1** **Company Property.** (a) Company Property shall be deemed to be owned by the Company as an entity, and no Member or Director, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Board of Directors by Majority Vote may determine. All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

(b)      To the extent the Company develops or creates its own ideas, concepts, software, patents, designs, trademarks, trade secrets, text, plans or other material or Intellectual Property ("Company Intellectual Property"), the Company shall own and retain all rights, title and interest in and to all such Company Intellectual Property. Such rights shall include the exclusive right to own and register the Company Intellectual Property in the Company's name.

**Section 9.2** **Ownership of Member Intellectual Property.** Each Member shall retain all rights, title and interest in and to all Intellectual Property that such Member provides to, contributes to, or makes available for use in connection with the provision of services by the Company ("Member Intellectual Property"). Subject to the previous sentence, each Member hereby grants to the Company a worldwide, non-exclusive license to use or authorize others to use all Member Intellectual Property provided to, contributed to, or made available for use in connection with the provision of services by the Company to do any of the following: (i) to prepare derivative works based upon the Member Intellectual Property for use in connection with the provision of services by the Company only; (ii) to disseminate, distribute and transmit electronically copies of the Member Intellectual Property as part of the provision of services by the Company; and (iii) display the Member Intellectual Property publicly as part of the provision of services by the Company. The Company shall have no implied or express license in any Member Intellectual Property other than the limited license granted in the second sentence of this Section 9.2. For avoidance of doubt, (i) none of the rights of Tribune or its Affiliates that are included in the License Agreement dated the date hereof between Tribune Interactive and the Company and (ii) none of the rights of any Member or its Affiliates under the Affiliate Agreements shall be considered Member Intellectual Property for purposes of this Section 9.2.

## ARTICLE X
## FISCAL MATTERS; BOOKS AND RECORDS

**Section 10.1** **Bank Accounts; Investments.** Capital Contributions, revenues and any other Company funds shall be deposited by the Company in a bank account established in the name of the Company, or shall be invested by the Company, at the direction of the Board of Directors, in furtherance of the purposes of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company's purposes, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

CH1 3900211v.17

**Section 10.2** **Records Required by Act; Right of Inspection.** (a) During the term of the Company's existence and for a period of four (4) years thereafter, there shall be maintained in the Company's principal office specified pursuant to Section 2.5(c) all records required to be kept pursuant to the Act, including a current list of the names, addresses and Membership Interests held by each of the Members (including the dates on which each of the Members became a Member), copies of federal, state and local information or income tax returns for each of the Company's tax years, copies of this Agreement and the Certificate of Formation, including all amendments or restatements, and correct and complete books and records of account of the Company.

(b) On written request stating the purpose, a Member may examine and copy in person, at any reasonable time, for any proper purpose reasonably related to such Member's interest as a Member of the Company, and at the Member's expense, records required to be maintained under the Act and such other information regarding the business, affairs and financial condition of the Company as is just and reasonable for the Member to examine and copy. Upon written request by any Member made to the Company at the address of the Company's principal office specified in Section 2.5(c), the Company shall provide to the Member without charge true copies of (i) this Agreement and the Certificate of Formation and all amendments or restatements and (ii) any of the tax returns of the Company described above.

**Section 10.3** **Books and Records of Account.** The Company shall maintain adequate books and records of account that shall be maintained on the accrual method of accounting and on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each class of Membership Interests held by each Member.

**Section 10.4** **Tax Returns and Information.** The Members intend for the Company to be treated as a partnership for tax purposes. The Company shall prepare or cause there to be prepared all federal, state and local income and other tax returns that the Company is required to file. Within seventy-five (75) days after the end of each calendar year, the Company shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of such Person's federal income tax return and state income and other tax returns.

**Section 10.5** **Delivery of Financial Statements to Members.** As to each of the first three fiscal quarters of the Company and each fiscal year of the Company, the Company shall send to each Member a copy of (a) the balance sheet of the Company as of the end of the fiscal quarter or year, (b) an income statement of the Company for such quarter or year and (c) a statement of cash flows of the Company in respect of such quarter or year. Such financial statements shall be delivered no later than forty-five (45) days following the end of the fiscal quarter to which the statements apply, except that the financial statements relating to the end of the fiscal year shall be delivered no later than ninety (90) days following the end of such fiscal year. Each Member shall also have the right to receive copies of the operating plan, strategic plan and capital expenditure budget of the Company for any fiscal year upon request.

**Section 10.6** **Audits.** The fiscal year-end financial statements to be delivered pursuant to Section 10.5 shall be audited if the Board of Directors, by Majority Vote, determines

that an audit is advisable.  The audit shall be performed by an accounting firm approved by the Board of Directors.

Section 10.7  **Fiscal Year.**  The Company's fiscal year shall end on December 31 of each calendar year.  Each fiscal year shall consist of four quarters ending on March 31, June 30, September 30 and December 31 of each fiscal year.  Each such quarter shall be referred to as a "fiscal quarter."

Section 10.8  **Tax Elections.**  If permitted by the Code, the Company shall make the following elections on the appropriate tax returns:

      (a)     to adopt the calendar year as the Company's fiscal year;

      (b)     to adopt the accrual method of accounting;

      (c)     to elect, pursuant to Section 754 of the Code, to adjust the basis of Company Properties;

      (d)     to elect to amortize the organizational expenses of the Company ratably over a period of sixty (60) months; and

      (e)     any other election the Board of Directors may deem appropriate and in the best interests of the Members.

Neither the Company, the Board of Directors nor any Member or Director may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law.

Section 10.9  **Tax Matters Member**.  The Board of Directors shall designate one Member to be the "tax matters partner" (the "Tax Matters Member") of the Company pursuant to Section 6231(a)(7) of the Code.  Such Member shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code.  Such Member shall inform each other Member of all significant matters that may come to its attention in its capacity as "Tax Matters Member" by giving a Notification thereof on or before the tenth day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity.  Such Member may not take any action contemplated by Sections 6222 through 6234 of the Code without the consent of all Members but this sentence does not authorize such Member to take any action left to the determination of an individual Member under Sections 6222 through 6234 of the Code.  The initial Tax Matters Member shall be Tribune Parent.

# ARTICLE XI
# INDEMNIFICATION AND INSURANCE

Section 11.1  **Indemnification and Advancement of Expenses.**  (a) The Company shall indemnify any Person who was or is a party or is threatened to be made a party to

any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company), by reason of the fact that he, she or it is or was a Director, Member, officer, employee, representative or agent of the Company, or is or was serving at the request of the Company as a director, officer, manager, employee, representative or agent of another corporation, limited liability company, general partnership, limited partnership, joint venture, trust, business trust or other enterprise or entity, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him, her or it in connection with such action, suit or proceeding if he, she or it acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his, her or its conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such Person did not act in good faith and in a manner which he, she or it reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his, her or its conduct was unlawful.

(b)    The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that he, she or it is or was a Director, Member, officer, employee, representative or agent of the Company, or is or was serving at the request of the Company as a director, officer, manager, employee, representative or agent of another corporation, limited liability company, general partnership, limited partnership, joint venture, trust, business trust or other enterprise or entity, against expenses (including attorneys' fees) actually and reasonably incurred by him, her or it in connection with the defense or settlement of such action or suit if he, she or it acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company, except that no indemnification shall be made in respect of any claim, issue or matter as to which such Person shall have been adjudged to be liable to the Company unless and only to the extent that a Delaware state court or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

(c)    To the extent that a Director, Member, officer, employee, representative or agent of the Company has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in paragraphs (a) and (b) of this Section 11.1, or in defense of any claim, issue or matter therein, he, she or it shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him, her or it in connection therewith.

(d)    Any indemnification under paragraphs (a) and (b) of this Section 11.1 (unless ordered by a court of competent jurisdiction) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the Director, Member, officer, employee, representative or agent is proper in the circumstances because he, she or it has met the applicable standard of conduct set forth in paragraphs (a) and (b) of this Section 11.1. Such determination shall be made (i) by the Board of Directors by a majority vote

38

of Directors who were not parties to such action, suit or proceeding (even if such Directors constitute less than a quorum of Directors), (ii) if a majority of disinterested Directors so directs, by independent legal counsel in a written opinion or (iii) by the Members.

(e)    Expenses (including attorneys' fees) incurred by a Director or Member in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such Director or Member to repay such amount if it shall ultimately be determined that he, she or it is not entitled to be indemnified by the Company pursuant to this Section 11.1.  Such expenses (including attorneys' fees) incurred by other officers, employees, representatives and agents shall be so paid upon such terms and conditions, if any, as the Board of Directors deems appropriate.

(f)    The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 11.1 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any by-law, agreement, vote of Members or disinterested Directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office.

(g)    For purposes of this Section 11.1, any reference to the "Company" shall include, in addition to the resulting or surviving corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, managers, members, employees, representatives or agents, so that any Person who is or was a director, officer, manager, member, employee, representative or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, manager, employee, representative or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Section 11.1 with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

(h)    The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 11.1 shall continue as to a Person who has ceased to be a Director, Member, officer, employee, representative or agent and shall inure to the benefit of the heirs, executors and administrators of such Person.

(i)    Notwithstanding anything in this Article XI to the contrary, the Company will not have the obligation of indemnifying any Person with respect to proceedings, claims or actions initiated or brought voluntarily by such Person and not by way of defense.

Section 11.2    **Insurance.**  The Company may purchase and maintain insurance or another arrangement on behalf of any Person who is or was a Director, Member, officer, employee, agent or other Person identified in Section 11.1 against any liability asserted against such Person or incurred by such Person in such a capacity or arising out of the status of such a Person, whether or not the Company would have the power to indemnify such Person against that liability under Section 11.1 or otherwise.

CH1 3900211v.17

Section 11.3    <u>Limit on Liability of Members</u>.  The indemnification set forth in this <u>Article XI</u> shall in no event cause the Members to incur any personal liability beyond their total Capital Contributions, nor shall it result in any liability of the Members to any other Person.

## ARTICLE XII
## DISSOLUTION AND WINDING UP

Section 12.1    <u>Events Causing Dissolution</u>.  The Company shall be dissolved upon the first of the following events to occur:

(a)    the written consent of all Members at any time to dissolve and wind up the affairs of the Company;

(b)    the death, retirement, resignation, expulsion, Bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company, unless the business of the Company is continued by the consent of all remaining Members within ninety (90) days following the occurrence of any such event; or

(c)    the occurrence of any other event that requires the dissolution of a limited liability company under the Act.

Section 12.2    <u>Winding Up</u>.  If the Company is dissolved pursuant to <u>Section 12.1</u>, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a)    The winding up of the Company's affairs shall be supervised by a liquidator (the "<u>Liquidator</u>").  The Liquidator shall be the Board of Directors or, if the Members prefer, a liquidator or liquidating committee selected by the holders of at least a majority of the Membership Interests.

(b)    In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, in the name of and for and on behalf of the Company to:

(i)    Prosecute and defend civil, criminal or administrative suits;

(ii)    Collect Company assets, including obligations owed to the Company;

(iii)    Settle and close the Company's business;

(iv)    Subject to <u>Section 12.2(c)</u>, dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions;

(v)    Pay all reasonable selling costs and other expenses incurred in connection with the winding up out of the proceeds of the disposition of Company Property;

(vi)     Discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

(vii)    Distribute any remaining proceeds from the sale of Company Property to the Members;

(viii)   Prepare, execute, acknowledge and file articles of dissolution under the Act and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and

(ix)    Exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Board of Directors under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions. The Liquidator (if not a Director or the Board of Directors) shall not be liable as a Director to the Members and shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in the Certificate of Formation and in Article XI.

(c)    Prior to the sale of any Company Property pursuant to Section 12.2(b)(iv) in connection with the winding up of the Company upon dissolution, Tribune shall have the right, at its option, to purchase either or both of (i) the Metromix name and all Intellectual Property and goodwill related thereto, including the trademarks and domain name registrations contributed to the Company by Tribune pursuant to the Assignment and Assumption Agreement among Tribune Parent, Tribune Interactive and the Company dated October 29, 2007 (the "Metromix IP Rights"), and (ii) the rights granted to the Company under the License Agreement between the Company and Tribune Interactive dated October 29, 2007 (the "ExtroVert License Rights"). The Liquidator shall give Notification to Tribune of the winding up of the affairs of the Company along with the appraised value of each of the Metromix IP Rights and the ExtroVert License Rights (the "Appraised Value") established by an appraisal thereof conducted by a national valuation firm selected by the Liquidator; provided, however, that the Liquidator shall not have such an appraisal conducted or deliver the Appraised Value if the sale of Company Property occurs within two (2) years following the date hereof. Tribune shall deliver Notification to the Liquidator (the "Metromix Rights Notice") within fifteen (15) days of receipt of the Liquidator's Notification and the Appraised Value, if applicable, if Tribune desires to purchase either or both of the Metromix IP Rights and the ExtroVert License Rights and the Metromix Rights Notice shall specify whether Tribune proposes to purchase either the Metromix IP Rights or the ExtroVert License Rights or both (such assets proposed to be purchased by Tribune being referred to herein as the "Metromix Rights"). The purchase price to be paid by Tribune for the Metromix Rights shall be an amount in cash equal to the Appraised Value of the Metromix IP Rights and/or the ExtroVert License Rights, as the case may be; provided, however, that if Tribune purchases the Metromix Rights within two (2) years following the date hereof, the purchase price to be paid by Tribune for the Metromix Rights shall be an amount in cash equal to the Initial Capital Contribution allocated to the Metromix IP Rights and/or the ExtroVert License Rights, as applicable, on Schedule I. The closing of any purchase of the Metromix Rights shall

CH1 3900211v.17

take place at the offices of the Company no later than thirty (30) days after the date Tribune delivers the Metromix Rights Notice to the Liquidator.  At such closing, Tribune shall pay the purchase price for the Metromix Rights by wire transfer of immediately available funds to the account specified by the Liquidator.  The Company shall deliver the Metromix Rights to Tribune free and clear of all liens, security interests and competing claims, and shall deliver to Tribune such instruments of transfer and other documents as Tribune shall reasonably request.

> Section 12.3    **Compensation of Liquidator.**  The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and the holders of at least a majority of the Membership Interests.

> Section 12.4    **Distribution of Company Property and Proceeds of Sale Thereof.**  (a) Upon completion of all desired sales of Company Property (including any sale pursuant to Section 12.2(c)), and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

> > (i)    to satisfy Company liabilities to creditors, including Members and Directors who are creditors, to the extent otherwise permitted by law (other than for past due Company distributions), whether by payment or establishment of reserves;

> > (ii)    to satisfy Company obligations to Members and former Members to pay past due Company distributions; and

> > (iii)    to the Members, in accordance with the positive balances in their respective Capital Accounts determined after allocating all items for all periods prior to and including the date of distribution, including items relating to sales and distributions pursuant to this Article XII.

> All distributions required under this Section 12.4 shall be made to the Members by the end of the taxable year in which the liquidation occurs or, if later, within ninety (90) days after the date of such liquidation.

> (b)    The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group.  If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Membership Interests of each Member in such group.

> Section 12.5    **Final Audit.**  Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to each of the Members a statement that shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to Section 12.4.

> Section 12.6    **Deficit Capital Accounts.**  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from

42

or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Membership Interests, upon dissolution of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute any portion of such amount to the Company to reduce the deficit balance of such Member's Capital Account.

**ARTICLE XIII**
**CONVERSION TO CORPORATION IN CONNECTION WITH AN INITIAL PUBLIC OFFERING**

      **Section 13.1   Conversion to Corporation in Connection With an Initial Public Offering.** (a) In anticipation of or otherwise in connection with an initial public offering registered under the Securities Act of securities of the Company (an "Initial Public Offering"), the Board of Directors shall, by Super-Majority Vote, have the power and authority to effect the conversion of the Company's business form from a limited liability company to a Delaware corporation or the merger of the Company with or into a new or previously established but dormant Delaware corporation having no assets or liabilities, debts or other obligations of any kind whatsoever other than those that are *de minimus* in amount and that are associated with its formation and initial capitalization (such conversion or merger being referred to as a "Conversion" and such Delaware corporation being referred to as "Newco"). No Member shall have the power to veto such decision of the Board of Directors to effect a Conversion. Upon any such Conversion, the terms of this Agreement and all of the parties rights and obligations hereunder with respect to the Membership Interests shall continue in effect, *mutatis mutandis*, with respect to the Newco capital securities issued on account of the Membership Interests as provided in this Section 13.1. Any such Conversion shall result in no change to the business or operations of the Company.

      (b)     Upon the consummation of a Conversion, the Membership Interests held by each holder thereof shall thereupon be converted into, or exchanged for, a number of shares of one or more classes of Newco's capital securities containing the economic and other terms and rights relative to each other holder of Membership Interests as the Board of Directors by a Super-Majority Vote shall determine to be as nearly as practicable in all material respects the same as such holder's Membership Interests as provided herein, including, without limitation, the proportionate ownership interests of the Members in Newco. The determination by the Board of Directors by Super-Majority Vote of the number of shares of Newco capital securities that each Member receives upon a Conversion shall be final and binding on the holders of Membership Interests absent manifest arithmetic error.

      (c)     In connection with an Initial Public Offering, each Member hereby covenants and agrees to take any and all actions, and to execute and deliver any and all documents and instruments, to effect a Conversion as may be reasonably requested by the Board of Directors, including transferring or tendering such Member's Membership Interests to Newco in exchange or consideration for shares of capital stock or other equity interests of Newco. No Member shall have or be entitled to exercise any dissenter's rights, appraisal rights or any other similar rights in connection with such Conversion. The restrictions on Transfer set forth in Article VI will expire immediately prior to the closing of any such Initial Public Offering and the shares of stock or other equity interests issued to Members in connection with any such

43

Conversion shall be subject to (i) applicable restrictions under federal and state securities laws and (ii) any restrictions set forth in the agreements and other instruments relating to the Initial Public Offering and/or any Conversion entered into in anticipation or contemplation of such Initial Public Offering.

**ARTICLE XIV**
**MISCELLANEOUS PROVISIONS**

**Section 14.1   Conference Telephone Meetings.**  Meetings of the Members or the Board of Directors may be held by means of conference telephone or similar communications equipment so long as all Persons participating in the meeting can hear each other.  Participation in a meeting by means of conference telephone shall constitute presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business thereat on the ground that the meeting is not lawfully called or convened.

**Section 14.2   Counterparts.**  This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same.

**Section 14.3   Entire Agreement.**  This Agreement constitutes the entire agreement among the parties hereto and contains all of the agreements among such parties with respect to the subject matter hereof.  This Agreement supersedes any and all other agreements, either oral or written, between such parties with respect to the subject matter hereof.

**Section 14.4   Partial Invalidity.**  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

**Section 14.5   Amendment.**  Except as expressly provided herein, this Agreement may be amended only by a written agreement executed by all Members; provided, however, the Board of Directors shall be permitted to amend this Agreement, by Majority Vote, in order to cure any ambiguity, omission, defect or inconsistency; provided that such amendment does not disproportionately adversely affect the rights or interests of any Member relative to the other Members.

**Section 14.6   Binding Effect.**  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and shall inure to the benefit of the parties, and their respective distributees, heirs, successors and assigns.

**Section 14.7   Governing Law.**  This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Delaware.  In particular, this Agreement is intended to comply with the requirements of the Act and the Certificate of Formation.  In the event of a direct conflict between the provisions of this Agreement and the

44

mandatory provisions of the Act or any provision of the Certificate of Formation, the Act and the Certificate of Formation, in that order of priority, will control.

Section 14.8   **Effect of Waiver or Consent.**   A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.   Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

Section 14.9   **Further Assurances.**   In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

*  *  *  *  *  *

CH1 3900211v.17

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the dates set below their names, to be effective on the date first above written.

**TRIBUNE COMPANY**

By: _____
Name: Timothy J. Landon
Title: Authorized Officer

**CHICAGO TRIBUNE COMPANY**

By: _____
Name: Timothy J. Landon
Title: Authorized Officer

**TRIBUNE INTERACTIVE, INC.**

By: _____
Name: Timothy J. Landon
Title: Authorized Officer

**GANNETT SATELLITE INFORMATION NETWORK, INC.**

By: _____
Name:
Title:

CH1 3900211v.17