UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, *et al.*,[1] ) | |
| ) | (Jointly Administered) |
| Debtor. ) | |
| ) | Hearing date: August 11, 2009 at 10:00 a.m. |
| ) | Objection deadline: August 4, 2009 at 4:00 p.m. |
| ) | Re: D.I. Nos. 1800 & 1801 |

**OBJECTION OF WASHINGTON-BALTIMORE NEWSPAPER GUILD TO (1) THE MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO IMPLEMENT A 2009 MANAGEMENT INCENTIVE PLAN AND TO PAY EARNED 2008 MANAGEMENT INCENTIVE PLAN AWARDS TO CERTAIN EXECUTIVES AND (2) THE MOTION OF THE DEBTORS TO FILE UNDER SEAL AN EXHIBIT TO MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO IMPLEMENT A 2009 MANAGEMENT INCENTIVE PLAN AND TO PAY EARNED 2008 MANAGEMENT INCENTIVE PLAN AWARDS TO CERTAIN EXECUTIVES AND MOTION TO CONTINUE THE AUGUST 11, 2009 HEARING**

Washington-Baltimore Newspaper Guild ("WBNG"), by and through the undersigned counsel, hereby submits this objection (the "Objection") to the (1) Motion of the Debtors for an Order Authorizing the Debtors to Implement a 2009 Management Incentive Plan and to Pay Earned 2008 Management Incentive Plan Awards to Certain Executives (the "MIP Motion") and (2) the Motion of the Debtors to File Under Seal an Exhibit to Motion of the Debtors for an Order Authorizing the Debtors to Implement a 2009 Management Incentive Plan and to Pay Earned 2008 Management Incentive Plan Awards to Certain Executives (the "Seal Motion"). Additionally, WBNG respectfully requests that this Court adjourn the hearing to consider the MIP Motion and the Seal Motion currently scheduled for August 11, 2009 until such time as WBNG has time to complete discovery on the issues raised thereby. In support hereof, WBNG respectfully states as follows:

---

[1] The Debtors in these Chapter 11 cases are identified in footnote 1 to the MIP Motion [D.I. No. 1800].

## PRELIMINARY STATEMENT

1. At a time when media businesses are suffering incomparable losses and struggling to survive, the Debtors have proposed spending $69.9 million to reward their top management for financial performance that, year-over-year, evidences declining fortunes. While creditors face limited recovery on their claims, and most rank-and-file employees live with frozen pay and benefits, the Debtors believe a proper exercise of business judgment results in millions of dollars distributed to management. The Debtors – media companies which generally tolerate few secrets of others – have proposed this expense with limited notice, under seal, and without providing discovery sufficient for creditors and parties in interest to determine (1) the factual basis giving rise to the bonuses, (2) the factual basis giving rise to the Debtors' exercise of sound business judgment, and (3) the merits of such a program.

## BACKGROUND

2. The Washington-Baltimore Newspaper Guild, Local 32035 of the Communications Workers of America-The Newspaper Guild, AFL-CIO, has served as the collective bargaining representative of a unit of employees of The Baltimore Sun since 1949. The Guild represents 225 employees in the non-production areas of The Baltimore Sun, including the news and editorial departments, business departments, advertising department, and the building department.

3. Collectively, the Debtors are America's largest employee-owned media and entertainment company. Their businesses include cable channels, newspapers and other publications and television and radio broadcast stations.

4. By and through the MIP Motion, the Debtors seek to pay more than $45.6 million in bonuses through the annual management incentive program ("MIP") for 2009 for

approximately 720 management employees. (MIP Mot. at 2.) The proposed MIP constitutes a payout at approximately 50% of target for achieving its "planned" 2009 operating cash flow goal, 100% of target for achieving its "stretch" performance goal, or 130% of target for achieving its "maximum" performance. (Id.)

5.  The Debtors also seek to pay a pay-for-performance bonus (the "Transition MIP") of $10.6 million for 21 employees of Debtors' core management team, plus a discretionary 1.3 million for 50 other employees. (MIP Mot. at 2-3.).

6.  The Debtors seek to pay a pay-for-performance bonus (the "Key Operating Business" or "KOB") of $9.3 million to just 23 employees. (MIP Mot. at 3.)

7.  As further background, on [date], this Court approved $13.4 million in MIP payments for 2008, a year when Tribune had $3.9 billion in total revenue. For 2009, when Tribune projects $3.1 billion in revenue, *a decline of about 20 percent from 2008*, the Debtors are proposing MIP and other bonus payments totaling $21.5 million for "minimum" performance and $66.8 million for "maximum" performance.[2]

8.  The MIP is based on targets for Planned Operating Cash Flow, Stretch Operating Cash Flow and Maximum Operating Cash Flow. The Debtors have set goals for Planned Operating Cash Flow, Stretch Operating Cash Flow and Maximum Operating Cash Flow that are unreasonably low, such that achieving them is all but guaranteed. Further, the current operating cash flow goals are calculated in such a way that excludes reorganization costs and "non-

---

[2] Revenue data from p. 37 of redacted Mercer Report (Capitalized terms not defined herein are ascribed the definition given in the MIP Motion). The Debtors have provided WBNG with a heavily redacted version of the Mercer Report. As of the date of this Objection, WBNG does not have access to the full Mercer Report and complete operating cash flow figures, believed to illustrate this point further. WBNG has requested the production of this information informally and by way of its First Requests for Production and First Set of Interrogatories Directed to the Debtors.

3

operating items and special items." Although the Mercer report compares the Debtors' incentives to peers as a percentage of *revenue*, it does not show the incentives as a percentage of *cash flow*. Despite requests to do so, the Debtors have not provided the WBNG with any information concerning previous goals and operating cash flow numbers. Without publicly disclosing more about how these are calculated, the Debtors cannot establish the reasonableness of the goals.

9. What little is known about the Debtors' cash flow figures shows that the targets are simply a "lay-up" for management, resulting in bigger bonuses despite decreased performance. The WBNG believes that discovery will demonstrate the 2009 cash flow target is substantially less than the actual cash flow in 2008. Accordingly, the Debtors' MIP appears to be more of a guaranteed payment plan for management than performance-based bonuses.

10. The MIP proposes management bonuses at a time when the Debtors' businesses have been shedding employees and cutting back the size of product because of: *declining revenue*. The bonus money could have been used to improve the existing products and invest in new products. Withholding bonuses would show a real commitment to austerity and shared sacrifice. The Debtors fired about 2,000 employees in 2008[3], and many more in 2009. While the Debtors have not produced the 2009 employee termination numbers, there has been extensive press reports about layoffs at the Debtors' properties.[4]

---

[3] Bigelow testimony at last bonus hearing, page 65 of transcript.
[4] At the Baltimore Sun, 60 of 200 newsroom personnel were terminated in April/May. The Hartford Courant announced 100 layoffs in February, bringing its newsroom staff to about half the size it was a year earlier. (http://www.editorandpublisher.com/eandp/news/article_display.jsp?vnu_content_id=1003944795). The Chicago Tribune laid off 53 newsroom employees in April, more than 10% of its news staff. (http://newsblogs.chicagotribune.com/towerticker/2009/04/chicago-tribune-reduces-newsroom-staff.html). This follows a smaller layoff and shutting of the Jerusalem bureau in February. (http://www.huffingtonpost.com/2009/02/12/ichicago-tribunei-cuts-

11. The MIP also proposes management bonuses in a time of severe economic crises when most employees in the Debtors' companies have had pay frozen. A memo to all employees from Gerry Spector, EVP/CAO, in February 2009, justified the salary freeze as "shared sacrifice." Across the board, the Debtors have taken the position with labor organizations with which they are engaged in ongoing contract negotiations, that the Debtors need a wage freeze at least for the next two years[5]. (A true and correct copy of the Spector Memo is attached as Exhibit "A".) The Debtors cannot justify a $69.9 million payout to seven hundred-plus executives, including the top ten, while simultaneously pleading financial difficulties to the lower level workers who report and write the stories, sell the ads, produce the paper, and handle the broadcasts. In addition to the company-wide freeze for unrepresented employees, the Debtors insisted on a two-year wage freeze with the Newspaper Guild of New York for employees at WPIX, and have not offered a wage increase to Teamster Mailers in Baltimore in months of negotiations.

12. The proposed bonuses to the top executives are excessive and may, in fact, have a detrimental effect on motivating others who contribute to the bottom line. Indeed, the payment of disproportionate bonuses to a select group of executives may have the opposite effect on the rank-and-file employees. Based on the redacted Mercer report made available to WBNG, the following is the distribution of bonuses:

---

12_n_166498.html). The Allentown Morning Call eliminated 70 positions. (http://www.lehighvalleylive.com/allentown/index.ssf/2009/05/morning_call_to_eliminate_70_p.html); the publisher's memo called the cuts "painful." (http://www.poynter.org/forum/view_post.asp?id=13926). The Sun-Sentinel in South Florida laid off 30 people, after a layoff of 50 in July, 2008. (http://www.editorandpublisher.com/eandp/news/article_display.jsp?vnu_content_id=1003975725).

[5] The Debtors are tendering increases in pay required by any current collective bargaining agreement.

|  | Number | Total payout (08&09 MIP, TMIP, KOB) | Average per person |
|---|---|---|---|
| Top ten | 10 | $20,611,000 | $2,061,100 |
| "Other key execs" | 29 | $15,713,000 | $541,828 |
| "Rank-and-file bosses" | 681 | $32,297,000 | $47,426 |
| Discretionary TMIP | Up to 50 | $1,300,000 | Unknown |
| Total Payout |  | $69,921,000 |  |

The top ten executives are to receive over $20 million of the close to $70 million payout. This differs from the 2008 MIP this Court approved because that MIP did not allocate any bonuses to this group. Now, the Debtors seek authorization to pay the 2008 bonus to this group which, if approved, would result in their receipt of 20% of the 2008 pool. The Debtors also seek 30% of the 2009 pool for this group.

13.  The proposed distribution of the bonuses among various employees within a certain category is unknown, and has not been proved by the Debtors to be reasonable. It is possible that the bonuses will be paid disproportionately and will not achieve the stated motivation purpose for those employees receiving below average bonuses.

## OBJECTION TO MANAGEMENT INCENTIVE PLAN

14.  The Debtors suggest that the MIP is necessary to preserve employee morale and incentivize employees. However, the Debtors have not proven a causal link between payment of bonuses under the proposed MIP and the Debtors' ability to continue operating their businesses. Accordingly, WBNG leaves this burden of proof to Debtors and reserves the right to be heard on the substance of the relief requested.

15. WBNG objects to the proposed MIP because it contravenes the provisions of Section 503(c) of the Bankruptcy Code. 11 U.S.C. § 503(c) provides, in part:

> Notwithstanding subsection (b) [allowing the payment of administrative expenses in certain circumstances], there shall neither be allowed, not paid —
>
> (1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based upon evidence in the record that —
> (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
> (B) the services provided by the person are essential to the survival of the business; and
> (C) either
> (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagment employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
> (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred; [or]
>
> * * * * *
>
> (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers or consultants hired after the date of filing of the petition.

16. Congress enacted Section 503(c) of the Bankruptcy Code to govern and limit post-petition retention payment made to insiders. *See In re Dana Corp.*, 351 B.R. 96, 100-01 (Bankr. S.D.N.Y. 2006) ("*Dana I*"); *In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006) ("*Dana II*"). Section 503(c) limits the payment of retention bonuses to insiders and

prohibits transfers outside the ordinary course of business unless justified by the facts and circumstances of the case. Accordingly, employee compensation programs should be limited to and based upon actual demonstrable need, not speculation.

17. By the proposed MIP, the Debtors propose to make payments to "insiders." The Debtors may not make retention payments to insiders unless this Court makes the requisite findings under 11 U.S.C. § 503(c)(1). Based on the information currently available to WBNG, the MIP is essentially a disguised retention plan because the Debtors have set the bonus thresholds at levels which virtually guarantee that bonuses are payable if the insiders are employed by the Debtors of the vesting date. The MIP is not designed to drive employee performance towards challenging goals which are subject to the risks of the marketplace. Rather, the MIP is designed to reward insiders for remaining in the Debtors' employ through the end of the MIP period. *Cf. In re Dana Corp.*, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) (court found that benchmarks for the debtors' long-term incentive plan "are difficult targets to reach and are clearly not 'lay-ups.'"). While touted in part as a reward for performance, the Debtors seek to justify an expense of $69.9M on bonuses as necessary to retain good workers. (MIP Mot. at 3-4, 11). But under the Bankruptcy Code, a debtor must make a specific showing in order for a court to approve a retention bonus. No such showing has been made here. The Debtors have offered no evidence in support of the predicate findings for allowing and/or paying retention bonuses under 11 U.S.C. § 503(c)(1) and, therefore, this Court should deny the Motion.

18. Here, simply labeling a program as an incentive or performance bonus does not remove it from the scope of Section 503(c) where the program is actually designed to retain employees. Section 503(c) prohibits transfers to, or obligations incurred for the benefit of, insiders "for the purpose of inducing such persons to remain with the debtor's business." On

information and belief, and as expected to be shown by responses to WBNG's discovery requests, the targets proposed by the MIP are such that, given the Debtors' operating cash flow for 2009, the payments are in reality just increases in compensation - and not, in any meaningful way, geared either to performance or incentives. The WBNG believes the Debtors set the performance goals so low that, given its performance to date in light of the millions of expenses saved by virtue of the elimination of hundreds of jobs across all properties, a "stretch" or even "maximum" payout is virtually guaranteed.

19. Furthermore, the MIP is not justified by the facts and circumstances of this case. Under Section 503(c)(3), a debtor may not make transfers to its officers, other managment, or consultants which are outside the ordinary course of business unless such payments are shown to be "justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). The Debtors do not meet that burden. The Debtors propose to compensate certain employees with increased bonuses for diminished performance results as compared to prior years.

## OBJECTION TO MOTION TO FILE UNDER SEAL

20. On July 22, 2009, the Debtors filed a companion motion to the MIP Motion, seeking an Order pursuant to 11 U.S.C § 107(b) authorizing the filing under seal of Exhibit D (the "Mercer Report") to the MIP Motion, D.I No. 1801 (the "Seal Motion").

21. The Debtors argue that the Mercer Report contains "confidential" and "individualized" information regarding the identities and proposed bonus payouts of certain of the recipients. The Debtors maintain that if the names of the aforementioned recipients are disclosed, competitors in the Debtors' industry may use such information in an attempt to recruit and hire key management employees away from the Debtors. Moreover, the Debtors state that the disclosure of the recipients' names may lead to "resentment" among certain employees of the

9

Debtors when the employees view each recipient's income. Finally, the Debtors state that dissemination of the Debtors' operating plan and performance goals "would likely" prejudice the Debtors' interests by giving competitors insight into operational planning and performance expectations.

    22.    11 U.S.C. § 107(b) provides:

> On request of a party in interest, the bankruptcy court shall, and, on the courts own motion, the bankruptcy court may (1) protect an entity with respect to a trade secret or confidential research, development or commercial information; or (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

11 U.S.C § 107(b).

    23.    Federal Rule of Bankruptcy Procedure 9018 provides:

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information, (2) to protect any entity against scandalous or defamatory matter contained in any paper filed in a case under the Code, or (3) to protect governmental matters that are made confidential by statute or regulation. If an order is entered under this rule without notice, any entity affected thereby may move to vacate or modify the order, and after a hearing on notice the court shall determine the motion.

FRBP 9018.

    24.    There is a strong, compelling presumption of open access to judicial records and proceedings in civil matters. *See* 11 U.S.C. § 107(a) ("Except as provided in subsections (b) and (c) of this section and subject to section 112, a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge."). *United States v. Continental Airlines, Inc. (In re Continental Airlines)*, 150 B.R. 334, 340 (D. Del. 1993). The burden is on the moving party to show that a request to place documents under seal falls within the parameters of Section 107(b) and FRBP

9018 by demonstrating "...that the interest in secrecy outweighs the presumption in favor of access." *Id.* at 340. The relevant inquiry, therefore, is whether the matter sought to be placed under seal fits within any of the categories included.

25. Here, aside from the bare allegations contained in the Motion to Seal, the Debtors have not provided any factual evidence that the information contained in the Mercer Report is protected or, if disclosed, would cause an unfair advantage in favor of their competitors. WBNG finds it ironic that a media company whose mission is to explore, investigate, and expose facts, seeks in this case to hide behind a veil of secrecy. Further, WBNG finds it incomprehensible that the Debtors would promote a plan that they say would cause resentment among employees.

26. Accordingly, the Debtors have not met the burden imposed by Section 107(b) and FRBP 9018 and the Mercer Report the Court should deny the Debtors' Motion to file the Mercer Report under seal.

## REQUEST FOR CONTINUED HEARING

27. WBNG requests to continue the hearing scheduled for August 11, 2009 at 10:00 a.m. because WBNG has discovery requests to Debtors outstanding, the responses to which will supplement this Objection by WBNG.

28. Upon the filing of the MIP Motion, WBNG served the Debtors with informal discovery requests. The Debtors have only provided limited responses to previously served informal requests, much of which is incomplete and/or redacted. Contemporaneously with the filing of this Objection, WBNG is serving Debtors with Interrogatories and Requests for Production of Documents, which seek further information related to the issues addressed in this Objection. In the interests of justice, WBNG requests to continue the hearing on the MIP Motion so that it can fully explore the claims made by the Debtors in the MIP Motion.

## **CONCLUSION**

WHEREFORE, the Washington-Baltimore Newspaper Guild requests that this Court issue an order denying the Motions or granting other and further relief consistent with this objection.

Dated: August 4, 2009

CROSS & SIMON, LLC

By: _____
Christopher P. Simon (No. 3697)
Michael J. Joyce (No. 4563)
Ryan M. Ernst (No. 4788)
913 North Market Street, 11th Floor
P.O. Box 1380
Wilmington, Delaware 19899-1380
(302) 777-4200 (Telephone)
(302) 777-4224 (Facsimile)
csimon@crosslaw.com

-and-

Robert E. Paul, Esquire
Zwerdling, Paul, Kahn & Wolly, P.C.
1025 Connecticut Avenue NW, Suite 712
Washington, D.C. 20036-5420
(202) 857-5000 (Telephone)
(202) 223-8417 (Facsimile)

*Counsel to Washington-Baltimore Newspaper Guild, TNG-CWA*