# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRIBUNE COMPANY, et al.,[1]

Debtors.

Chapter 11

Case No. 08-13141 (KJC)

Jointly Administered

**Related to Docket Nos. 1800 and 1801**
**Objection Deadline: TBA**
**Hearing Deadline: TBA[2]**

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR A PROTECTIVE ORDER WITH REGARD TO DISCOVERY PROPOUNDED BY THE WASHINGTON-BALTIMORE NEWSPAPER GUILD

The debtors and debtors in possession in the above-captioned cases (the

"Debtors") hereby submit this motion (the "Motion") for a protective order (i) quashing the

discovery requests served by the Washington-Baltimore Newspaper Guild (the "Guild")

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

[2] Contemporaneously herewith, the Debtors are filing a motion to set an expedited hearing on the Motion.

purportedly in connection with the Debtors' Motion for an Order Authorizing, But Not

Directing, the Debtors to Implement a 2009 Management Incentive Plan and to Pay Earned 2008

Management Incentive Plan Awards to Certain Executives (the "2009 Incentive Plan Motion")

[Docket No. 1800], or in the alternative (ii) directing that information requested by the Guild

only be produced under conditions of professionals-eyes-only confidentiality, as further set forth

in the Proposed Protective Order submitted herewith, but that the hearing on the 2009 Incentive

Plan Motion proceed as scheduled on August 11, 2009.  In support of this Motion, the Debtors

respectfully represent as follows:

## PRELIMINARY STATEMENT

1.       Since at least March of 2009, the Debtors have heavily negotiated the

proposed incentive plans and awards that are the subject of the 2009 Incentive Plan Motion with

the Official Committee of Unsecured Creditors (the "Official Committee") and the steering

committee of the Debtors' senior lenders (the "Steering Committee").  The Debtors fully

responded to all information requests by the Official Committee and the Steering Committee

concerning these plans and awards, and shared a wealth of sensitive information with them in the

process – subject to confidentiality agreements – including a significant amount of the

information the Guild now claims it needs.  As a result of this extensive collaborative process,

the Official Committee and the Steering Committee support the 2009 Incentive Plan Motion,

which is scheduled for hearing on August 11, 2009.

2.       As one of the Debtors' labor unions, the Guild is represented on the

Official Committee and thus had a full opportunity, through its Official Committee

representative and the Committee's financial advisors, to request and review information during

these four and a half months of review and negotiations.  Notwithstanding these facts, the Guild

2

now seeks at the eleventh hour to delay the hearing on the 2009 Incentive Plan Motion through untimely last-minute discovery requests seeking highly confidential information that is not necessary to its objection or obtainable through collective bargaining. As discussed below, it also makes hollow claims that it supposedly has been denied discovery by the Debtors – which it has not. As a member of the Official Committee, the Guild obviously takes these actions with full knowledge that it is going against the collective decision of the official fiduciary of all creditors in these proceedings.

3.      Furthermore, the Guild seeks to leverage its requests by inappropriately demanding that the information sought be produced without any confidentiality protections whatsoever, even though the Official Committee and the Steering Committee have agreed to such protections as a condition of receiving that information. The requested information includes, for example, person-by-person compensation information, details on how the Debtors set the operating cash flow objectives in their 2009 operating plan, and a wealth of other confidential and competitively sensitive information. As detailed below, public disclosure of such information is unnecessary to the Guild's objection, would invade the privacy of the individuals whose compensation would be disclosed, and would pose significant risks of competitive harm to the Debtors, including by giving their competitors valuable data and insights into the Debtors' individualized compensation structure and its operational goals and strategies. See supra ¶¶ 42-43.

4.      The Guild distorts the posture of its untimely discovery requests, misrepresents the Debtors' cooperative offer to allow the Guild access to the very information it claims it has been denied, and attempts to misuse the discovery provisions of the Bankruptcy Rules. The Debtors already have been working in good faith to provide the Guild with

3

responsive non-confidential information, including a redacted copy of the Mercer Report filed in support of the 2009 Incentive Plan Motion and requested layoff information. To avoid a discovery dispute, the Debtors also offered to make available to the Guild's attorneys, financial advisors and the Guild's representative who is a member of the Official Committee all requested information that was provided to the Official Committee, if only they would agree to an appropriate confidentiality agreement restricting further dissemination to union representatives/members, limiting its use to the Guild's objection and not other matters such as collective bargaining, and filing any confidential information used in their objection under seal.

5.      However, rather than receiving information under an obligation of confidentiality – as the Official Committee and Steering Committee have done – the Guild unreasonably insisted that it should receive all of its requested discovery *free from any obligation of confidentiality whatsoever*. By totally obscuring that fact in its objection to the 2009 Incentive Plan Motion, the Guild sets up a "straw man" argument in a transparent attempt to delay the hearing: it claims that the Debtors have refused to provide it with information necessary to object to the 2009 Incentive Plan Motion, and therefore the hearing should be delayed so it can obtain discovery. But, in fact, the Debtors have never taken the position that the Guild cannot have access to the information it claims is being withheld.

6.      The Guild's unreasonable demands to make public, among other things, individual compensation information and detailed business-unit-level projections, belie its purported need for additional information to support its objections. Its transparent efforts to delay these proceedings must be rejected, and its discovery requests should be quashed in their entirety. Should this Court nevertheless be inclined to permit discovery (which the Debtors

respectfully submit it should not), it should do so only under professionals-eyes-only
confidentiality protections.

## STATUS OF THE CASE AND JURISDICTION

7.    On December 8, 2008 (the "Petition Date"), the Debtors each filed a
voluntary petition for relief under chapter 11 of the Bankruptcy Code.

8.    On December 10, 2008, the Bankruptcy Court entered an order
consolidating the Debtors' chapter 11 cases for procedural purposes only pursuant to Bankruptcy
Rule 1015(b).

9.    The Debtors have continued in possession of their respective properties
and have continued to operate and maintain their businesses as debtors in possession pursuant to
sections 1107(a) and 1108 of the Bankruptcy Code.

10.    On December 18, 2008, the United States Trustee for the District of
Delaware appointed the Official Committee.  No request has been made for the appointment of a
trustee or examiner.

11.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157
and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this
Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief
sought herein are sections 107(b) of the Bankruptcy Code and Rule 9018 of the Federal Rules of
Bankruptcy Procedure (the "Bankruptcy Rules"), as well as Federal Rule of Civil Procedure
26(c), as made applicable herein under Rules 7026 and 9014 of the Bankruptcy Rules.

## RELIEF REQUESTED

12.    By this Motion, the Debtors respectfully request that the Court enter a
protective order (i) denying the Guild's discovery requests in their entirety, or in the alternative

(ii) directing that any documents produced by Debtors in response to such requests be subject to appropriate conditions of professionals-eyes-only confidentiality as set forth in the Proposed Protective Order submitted herewith, and that the hearing on the 2009 Incentive Plan Motion proceed as scheduled on August 11, 2009.

## BASIS FOR RELIEF

### I.    Factual Background

13.    As detailed in the 2009 Incentive Plan Motion itself, the Debtors have requested authority to implement a 2009 Management Incentive Plan that: (a) continues the Debtors' ordinary course pay-for-performance annual management incentive program ("MIP") opportunity for 2009 for approximately 720 management employees; (b) implements a pay-for-performance bonus opportunity (the "Transition MIP"), in addition to the ordinary course MIP opportunity, to incentivize 21 members of the Debtors' core management team (including the Top 10 executives) to maintain their focus on delivering strong operating results while performing substantial restructuring duties; and (c) implements a pay-for-performance bonus opportunity for 23 leaders of key operations (the "Key Operators Bonus"), in addition to the ordinary course MIP opportunity, that incentivizes them to exceed certain "stretch" performance goals for their respective operations. The Debtors also have sought approval to make partial earned 2008 MIP awards to nine members of the "top 10" executives who have not yet received such awards.

14.    The performance targets used in the incentive plans are based on the 2009 operating cash flow goal included in the operating plan that was approved in February 2009 by the Company's Board of Directors. As noted, the Debtors have heavily negotiated the proposed

incentive plans and awards that are the subject of the 2009 Incentive Plan Motion with their creditor constituencies since March of 2009, including the Official Committee and the Steering Committee. The Debtors first presented their proposed 2009 incentive plans to the financial advisors for the Official Committee and the Steering Committee at an in-person meeting on or about March 17, 2009. Since that time, representatives of the Debtors have had numerous meetings and conversations with representatives of these Committees in order to negotiate and refine the Debtors' proposed plans.

15.    During this process, the Debtors have shared extensive and detailed information with the Official Committee and the Steering Committee and/or their financial advisors, including, without limitation, individualized compensation information regarding executives and key managers, and strategic business information about the Debtors' overall and business-unit-specific targets and objectives. Official Committee and Steering Company representatives also have had numerous opportunities to meet with senior management of the Debtors and to conduct individualized site visits in order to understand the Debtors' operations and business objectives. Significantly, all such information was produced pursuant to confidentiality agreements with all involved.

16.    As a result of these negotiations, applicable award opportunities were decreased by millions of dollars, performance targets were raised by millions of dollars, and certain plan structural aspects were modified in response to expressed concerns of the Official Committee and the Steering Committee. For example:

a.    The initially proposed aggregate bonus pool opportunity for the 720 participants under the ordinary course MIP for achieving "planned" operating cash flow performance was approximately $26.4 million. As a result of negotiations, it is now approximately $17.5 million.

b.      Consistent with historical practice, the initially proposed ordinary course MIP program for 2009 would have permitted discretionary funding of a consolidated MIP bonus pool even if the Debtors did not achieve their "planned" operating cash flow.  As result of these negotiations, the 2009 Management Incentive Plan limits the Debtors' discretion to make ordinary course MIP awards when goals are not achieved, as compared to prior years.  For 2009, if the Debtors do not reach at least "planned" consolidated operating cash flow, no aggregate MIP pool is funded, no awards to Corporate division participants or segment group office participants (which collectively include eight of the Top 10 executives) may be made, and individual business units that achieve at least "planned" performance will then be eligible only for substantially discounted partial awards.

c.      The Debtors initially proposed a Key Employee Incentive Plan ("KEIP") that provided incentive opportunities to approximately 22 key executives based solely on the timing of confirmation of the Debtors' Plan of Reorganization.  The purpose was to incentivize an expeditious plan confirmation and emergence from Chapter 11.  Based on concerns expressed by the Official Committee and the Steering Committee, this plan element ultimately was eliminated and the current proposed Transition MIP was developed.  The Transition MIP provides incentives based on achievement of consolidated operating cash flow targets that are consistent with the ordinary course MIP targets and with the Debtors' Board-approved 2009 operating plan from February 2009.

d.      Also based on creditor constituency concerns, the Debtors moved several key operators (participants who principally have operating responsibility for specific business operations) out of the then-KEIP (and largely excluded them from the Transition MIP as well) and into a negotiated Key Operators Bonus program, which has a different incentive structure that is tailored to their specific business circumstances.

17.      As a result of this extensive collaborative process, the Official Committee and the Steering Committee support the 2009 Incentive Plan Motion, which is scheduled for

8

hearing on August 11, 2009. Time is of the essence, as the 2009 performance period covered by the proposed plans is well underway and maintaining incentives for the key management team is critical.

18.    The Guild, as a member of the Official Committee, has had a full and fair opportunity to review the proposed plans and awards, to review the information produced by the Debtors, to request additional information, and to raise any concerns. Its interests have been protected throughout this process.

19.    Notwithstanding these facts, the Guild now seeks at the eleventh hour to delay the hearing on the 2009 Incentive Plan Motion through its false claims that it has been denied discovery. In arguing as much, the Guild distorts the posture of its untimely discovery requests and misrepresents the Debtors' cooperative offer to allow the Guild access to the very information it claims it has been denied.

20.    While the Guild states that it served "informal" discovery requests "upon the filing of the MIP Motion," (see Guild Obj. at ¶ 11), in actuality, the Guild waited nearly a week after the Debtors' July 22nd filing of its MIP Motion before serving approximately 20 informal requests by letter dated July 28, 2009, which the Debtors' received on July 29th (copy attached as Exhibit A). Those informal requests asked the Debtors to produce voluminous categories of documents with no clear connection to any substantive issue, such as various correspondence with the Official Committee and the Steering Committee, materials that were "referred to or relied upon" by Mercer, documents "provided to or made available to" the Official Committee and the Steering Committee, and documents "evidencing the process" of setting performance targets or "evidencing Debtors' due diligence."

46429/0001-5907611v1

21.     On July 30, 2009, counsel for the Debtors produced to counsel for the Guild a redacted version of the Mercer Report filed in support of the 2009 Incentive Plan Motion (attached as Exhibit B).  While the Debtors redacted individual-specific compensation information as well as competitively sensitive information regarding business targets and objectives, the redacted version of the report retains incentive plan payout and benchmarking information (with such data separately provided, for example, for potential payouts to the "top 10" executives and to other key executives) and a wealth of other detailed information describing and justifying the relief requested in the 2009 Incentive Plan Motion.

22.     In a further good faith effort to resolve this discovery dispute and avoid delay, the Debtors' counsel also offered during a telephone conference with the Guild's counsel on July 30th – one day after receiving the Guild's requests – to provide the Guild's attorneys, financial advisors, and its Official Committee representative access to *all information they requested that had been provided to the Official Committee*, if only they would agree to an appropriate confidentiality agreement.

23.     During a follow-up telephone conference with the Debtors' counsel on July 31st, the Guild's counsel refused this offer, without even first reviewing or considering a draft confidentiality agreement.  Instead, the Guild has insisted that it be given the unfettered right to distribute and broadcast the Debtors' confidential compensation and commercial information as it sees fit.

24.     On Monday, August 3rd, the Guild submitted a second informal discovery request, abandoning some of its requests while dramatically expanding others and adding entirely new demands (attached as Exhibit C).  The same day of the Guild's second informal request, the parties conferred again through counsel.  During that call, counsel for the Debtors

10

reiterated that they could not produce much of the information requested by the Guild without an appropriate confidentiality agreement. The Guild's counsel maintained that the Guild would not agree to any restrictions in order to obtain access to the information.

25.    On August 4th, the Guild served its objection to the 2009 Incentive Plan Motion and, at the same time, served a notice of service of formal discovery requests. The Debtors did not actually receive these discovery requests until today (attached as Exhibit D). The requests further expanded the Guild's fishing expedition, by now seeking data such as cash flow and MIP performance targets going back *ten* years. With its objection, the Guild included a request to delay the hearing on the 2009 Incentive Plan Motion, purportedly because the "Debtors have only provided limited responses to previously served informal discovery requests, much of which is incomplete and/or redacted." (Guild Obj. ¶ 28.) The Guild's objection and request for a continuance does not even mention the confidentiality issue, much less the fact that it had well over four months to seek the data that it now requests through the Official Committee and its financial advisors but never did so.

26.    Notably, the Guild's objection completely fails to address why any of the information it claims to need must be produced without confidentiality restrictions. The Guild's objection articulates a need for only the following purportedly withheld items:

- "the full Mercer Report and complete operating cash flow figures" (Guild Obj. at p. 3 n.3);
- information concerning previous years' performance goals and operating cash flow achievement (Guild Obj. at ¶¶ 8-9);
- information concerning peer companies' incentives as a percentage of cash flow (Guild Obj. at ¶ 8);
- "2009 employee termination numbers" (Guild Obj. ¶ 10); and
- "[t]he proposed distribution of the bonuses among various employees" (Guild Obj. ¶ 13).

46429/0001-5907611v1

The Debtors produced layoff information to the Guild today (without waiving any relevance or other objections). With the exception of the information concerning peer companies' cash flow (which is outside the control of the Debtors and equally available to the Guild), the Debtors are willing to produce reasonable information responsive to the bullet-pointed items above in this paragraph under appropriate confidentiality protections and made that clear to the Guild during the meet-and-confer process. The Debtors have responded in full to all information requests submitted by the Official Committee, the Steering Committee and their financial advisors, and indeed have already provided much of this information to these Committees – both of which support the 2009 Incentive Plan Motion.

27.     If this information were disclosed to the Guild without any obligation of confidentiality, then the Guild (and any other unions who receive the information from the Guild) can reasonably be expected to leverage the information in collective bargaining negotiations. For example, the Guild or other unions might disclose or threaten to disclose the compensation information of individual managers in order to bring additional negotiating pressure or sway public opinion. The discovery provisions of the Bankruptcy Rules are not intended to subject debtors to such improper tactics.

28.     Indeed, the fact that the Official Committee supports the 2009 Incentive Plan Motion after over four months of thorough financial advisor review, and that the Guild's primary goal seems to be to obtain the same information the Official Committee reviewed *without* any obligation of confidentiality, strongly suggests that the Guild seeks this information for improper and irrelevant purposes (possibly including use in future labor negotiations), and not in aid of any challenge to the 2009 Incentive Plan Motion. Accordingly, if the Guild is to

46429/0001-5907611v1

review such information at all, disclosure must be appropriately limited to outside counsel and the Guild's professional advisers.

## II.    **Legal Argument**

### A.    **The Debtors Have Good Cause for Protection from The Guild's Vexatious and Unduly Burdensome Requests.**

29.     Federal Rule of Civil Procedure 26(c)(1) is made applicable by Bankruptcy Rules 7026 and 9014, and among other things permits a Court for good cause shown to quash discovery that would harass or unduly burden the recipient:

> Upon motion by a party or by the person from whom discovery is sought, accompanied by a certificate that the Movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense[.]

Fed. R. Civ. P. 26(c)(1); Pansy v. Borough of Stroudsberg, 869 F.2d 194, 199 (3d Cir. 1989) (protective order may be entered for good cause). Courts have made clear that protective orders will be entered when justice so requires. See, e.g., Maloney v. Gordon, 2004 U.S. Dist. LEXIS 8072 (D. Del. May 4, 2004). What constitutes "good cause" and when justice requires a protective order to issue will vary from case to case depending on the facts and circumstances involved. See id. at *8. The determination of what constitutes "good cause" for a protective order is left to the discretion of the court. See VISX, Inc. v. Lasersight, Inc., 2001 U.S. Dist. LEXIS 25579, at *3 (D. Del. Jan. 30, 2001).

30.     As set forth above, the Debtors offered to produce a substantial amount of the information that the Guild has identified in its objection – subject to appropriate confidentiality restrictions. The Guild rejected that offer and insisted that the information would be made public even though accepting the information on a confidential basis (or even on a

13

provisional confidential basis) would have permitted the Guild to use that information to make a complete and timely objection. The only logical conclusion one can draw from the Guild's behavior is that it propounded its discovery requests for improper purposes of delay unrelated to the substance of the 2009 Incentive Plan Motion. Indeed, by waiting a week to suggest any discovery, initially serving informal requests for voluminous correspondence, shifting the focus of its discovery demands, refusing even to entertain a confidentiality agreement, and waiting to serve formal discovery with its objection, the Guild avoided any realistic chance of compromise prior to the deadline for filing its objection. The Court should not countenance the Guild's request for time to resolve a purported situation that is of its own making.

31.    Moreover, the Guild's discovery requests also pry into matters that are simply not relevant to the decision to approve the 2009 Incentive Plan Motion. For example, the Guild's objection claims it is inappropriate to offer incentive compensation to management employees when layoffs have occurred and the Debtors have refused union requests for wage increases. But there is no legitimate reason why the Guild needs individualized management compensation information to make such an argument. It already has information regarding incentive opportunities and market benchmarking broken out for the "top 10" executives and for other key executives, as well as total cost information – and it has trumpeted that information in its objection. It has no need to review – much less publicly disclose – the base salary or incentive opportunities for the Chief Operating Officer, Chief Financial Officer or other individual executives other than to invade their privacy and try to pressure them in public.

32.    The Guild's last-minute gamesmanship is particularly inappropriate in light of the fact that the Official Committee and the Steering Committee, along with their financial advisors, have had a full and fair opportunity to understand and test the Debtors' 2009

14

operating plan, the business targets and objectives set forth therein, and the operating cash flow targets used in the 2009 Management Incentive Plan. It is unjust and inappropriate for the Guild to seek to "reinvent the wheel" at this late date with a flurry of unfocused discovery requests.

33.    Moreover, the Guild tellingly did not file any objection to the Debtors' request to pay 2008 MIP awards to the non-top 10 MIP participants, which similarly was supported by the Official Committee and the Steering Committee, and was granted by the Court at the May 12, 2009 hearing. Its contradictory about-face with respect to the earned top 10 MIP awards for 2008 is revealing and again highlights its apparent motivation to harass the Debtors and their management team for some improper tactical advantage.

34.    In sum, the resolution of the 2009 Incentive Plan Motion should not be delayed based on purported discovery disputes manufactured by the Guild at the eleventh hour. The Guild unreasonably failed to take the opportunity offered by the Debtors to review requested materials in confidence. A delay in the resolution of the 2009 Incentive Plan Motion could undermine the very point of the 2009 incentive programs, that is, to incentivize key employees to meet performance targets *in 2009*.

35.    Accordingly, the Debtors respectfully request that the Court enter a protective order quashing the Guild's discovery requests in their entirety

**B.    Even if this Court were to Permit the Guild's Discovery Requests to Go Forward, the Debtors' Confidential Commercial Information Must Be Protected From Disclosure or Use Beyond the Guild's Professionals.**

36.    Section 107(b) of the Bankruptcy Code provides courts with the power to issue orders that will protect entities from potential harm that may result from the disclosure of certain confidential information. That section provides, in relevant part:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may—

46429/0001-5907611v1

(1)    protect an entity with respect to a trade secret of confidential research, development or commercial information . . .

11 U.S.C. § 107(b)

37.    Bankruptcy Rule 9018 defines the procedures by which a party may move for relief under the Bankruptcy Code Section 107(b), and provides that "[o]n motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . ." Fed.R. Bankr. P. 9018.

38.    Unlike its counterpart in Rule 26(c) of the Federal Rules of Civil Procedure, Section 107(b) of the Bankruptcy Code does not require an entity seeking protection to demonstrate "good cause." See, e.g., Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 28 (2d Cir. 1994); Phar-Mor, Inc., v. Defendants Named Under Seal (In re Phar-Mor, Inc.), 191 B.R. 675, 679 (Bankr. N.D. Ohio 1995). Rather, if the material sought to be protected satisfies one of the categories identified in Section 107(b), "the court is required to protect a requesting party and has no discretion to deny the application." See In re Orion Pictures Corp., 21 F.3d at 27.

39.    The Debtors submit that the information sought by the Guild satisfies Section 107(b) because it constitutes confidential commercial information within the meaning of Section 107(b) and Bankruptcy Rule 9018. In order to conclude that the requested information is confidential commercial information, "[d]isclosure of the information must reasonably be expected to cause the entity commercial injury." In re Alterra Healthcare Corp., 353 B.R. 66, 75 (Bankr. D. Del 2006) (internal quotations omitted); see also In re Global Crossing Ltd., 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003) ("The whole point of [Rule 9018] is to protect business entities

from disclosure of information that could reasonably be expected to cause the entity commercial injury.'").

40.    Commercial information has generally been defined as information that would cause "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." In re Orion Pictures Corp., 21 F.3d at 27.  Courts have also noted that information that might not necessarily benefit competitors, but rather, place the estate at a disadvantage with counterparties, is also within the scope of Section 107(b) and Rule 9018.  See In re Farmland Industries, 290 B.R. 364 (Bankr.W.D. Mo. 2003) (holding that information regarding deadlines for sale of debtors' assets and debtors' monetary liquidity was "commercial information" that was deserving of protection in order to prevent potential counterparties from gaining "substantial leverage over the Debtors"); see also In re Global Crossing Ltd., 295 B.R. at 725 (holding that information "must be viewed from the practical perspective of damage to the estate or its creditors, and squarely includes information that could prejudice either of them").

41.    Notably, similar information regarding key employees' compensation was protected from disclosure in the case of In re Georgetown Steel, 306 B.R. 542 (D.S.C. 2004).  In that case, in connection with a motion to approve an employee retention plan, the debtor sought to protect a "list of the proposed Key Employees, their current positions and proposed payments under the Retention Plan to individual Key Employees, and potential termination dates of such Key Employees." Id., 306 B.R. at 547.  The court found that disclosure of the information might damage the estate, observing:

> If the information is made public, Debtor will be placed at a further competitive disadvantage in retaining Key Employees needed to meet administrative requirements associated with the bankruptcy case and to provide necessary information and transition to attract buyers to Debtor's

46429/0001-5907611v1

assets. Finally, such disclosure would subject the Key Employees to the
possibility of serious repercussions [from other employees]

Id.

42.     Absent a protective order here, the Guild would gain an unfettered ability

to distribute confidential and sensitive information relating to the compensation of several

officers and management-level employees of the Debtors.  Public dissemination of such

confidential compensation information would provide the Debtors' competitors with a

substantial and unfair competitive advantage, including in the recruiting and hiring of talent, to

the severe detriment of the Debtors and their estates, and could also affect employee morale.

43.     Similarly, dissemination of specific business-unit-level information

regarding the Debtors' operating plan and performance goals also would likely prejudice the

Debtors' interests by giving their competitors insights into the Debtors' financial and operational

planning and performance expectations.  Courts routinely recognize that such business planning

information is deserving of protection during legal proceedings.  See, e.g., In re Alterra

Healthcare Corp., 353 B.R. at 76 (collecting cases protecting commercial information under

Bankruptcy Rule 9018, including "pricing formulae, short and long term marketing strategies

and the terms of agreements with suppliers"); see also Joint Stock Society v. UDV North

America, Inc., 104 F. Supp. 2d 390, 396 (D. Del. 2000) (denying production of "strategic plans,

potential advertising and marketing campaigns or financial information" in non-bankruptcy case

because "federal courts have consistently held that this type of sensitive commercial information

is entitled to confidential protection").

44.     No legitimate purpose would be served by the dissemination of the

Debtors' confidential compensation information or business projections.  At bottom, the Guild is

only seeking to gain a "hammer" that it can threaten to drop on the Debtors whenever the Guild

18

decides that such a threat is to its advantage. That the Guild is seeking such unfettered access without any legitimate purpose underscores the fact that disclosure of the information at issue would harm the Debtors and their estates, such that the protection of Section 107(b) and Bankruptcy Rule 9018 is particularly appropriate.

45.    Notably, the Guild would ordinarily never have access to this type of information in the collective bargaining process. Courts have limited union access to employer finances to the most basic information concerning the employer's financial condition, and even then, only allow such access when the employer places its financial condition at issue by claiming that it is financially unable to meet the union's wage demands (which the Debtors have not done here). See NLRB v. Truitt Mf'g Co., 351 U.S. 149, 153 (1956) (holding that "a refusal to attempt to substantiate a claim of inability to pay increased wages may support a finding of a failure to bargain in good faith" but noting that "[w]e do not hold, however, that in every case in which economic inability is raised as an argument against increased wages it automatically follows that the employees are entitled to substantiating evidence"); Nielsen Lithographing Co., 305 NLRB 697, 698-700 (1991) (holding that union did not have the right to, inter alia, "[c]harts of all supervisory employees and total compensation," and that "an employer's obligation to open its books does not arise unless the employer has predicated its bargaining stance on assertions about its inability to pay").

46.    Thus, the Guild's gambit to snatch an unlimited right to use the information at issue on this Motion would provide the Guild (and any union receiving the information from the Guild) with an unwarranted advantage in future collective bargaining negotiations. This could disadvantage the Debtors vís a vís their competitors negotiating with the same unions, potentially resulting in an unjustified, higher cost structure.

46429/0001-5907611v1

47.    The Debtors respectfully and strongly reiterate that the Guild's discovery requests should be denied and quashed in their entirety for reasons stated.  The Guild already has received a redacted version of the Mercer Report with (among other data and information) aggregated incentive and cost information, and has no legitimate need for the remaining information requested to support its objection.  However, if the Court were inclined to permit certain additional discovery, then for all of the foregoing reasons, the Court should order pursuant to Bankruptcy Rule 9018 that any disclosures of information deemed confidential by the Debtors be subject to conditions of professionals-eyes-only confidentiality, as further set forth in the Proposed Protective Order submitted herewith.  Furthermore, the hearing on the 2009 Incentive Plan Motion should proceed as scheduled in any event on August 11th.

## NOTICE

48.    The Debtors have provided notice of the Motion to the following parties: (i) the United States Trustee; (ii) counsel for the Official Committee; (iii) counsel to the administrative agent for the Debtors' prepetition loan facilities; (iv) counsel to the Steering Committee; (v) counsel to the Guild; and (vi) all parties having requested notice pursuant to Bankruptcy Rule 2002.  The Debtors believe that such notice is adequate and sufficient under the circumstances of these cases.

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7026-1(c)

49.    As required by Federal Rule of Civil Procedure 26(c)(1) and Local Rule 7026-1(c), the Debtors have conferred with counsel to the Guild in an attempt to resolve the issues presented by this Motion.  In particular, counsel for the Debtors spoke with counsel for the Guild by telephone on Thursday July 30, 2009, Friday, July 31, 2009 and Monday, August 3, 2009, in an attempt to resolve the issues presented by this Motion.  Those discussions were

20

unsuccessful and therefore it has become necessary for the Debtors to seek a protective order

from this Court. An appropriate certification has been filed concurrently herewith. (See

Declaration of Jonathan D. Lotsoff, Esq. ¶ 3.)

WHEREFORE, the Debtors respectfully request that the protective order

described herein be entered, and that the Court grant such other and further relief as is just and

proper.

Dated:   Wilmington, Delaware
August 5, 2009

Respectfully submitted,

SIDLEY AUSTIN LLP
Bryan Krakauer
Kevin T. Lantry
Brian J. Gold
Jonathan D. Lotsoff
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION