**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Hearing Date: August 11, 2009 at 10:00 a.m. (ET) Related to Docket No. 1800** |

**DEBTORS' REPLY TO OBJECTIONS TO THE MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO IMPLEMENT A 2009 MANAGEMENT INCENTIVE PLAN AND TO PAY EARNED 2008 MANAGEMENT INCENTIVE PLAN AWARDS TO CERTAIN EXECUTIVES**

Tribune Company (the "Company") and most of its wholly-owned subsidiaries, each of which is a debtor and debtor in possession herein (each a "Debtor" and collectively, the "Debtors"), hereby submit this Reply ("Reply") to the Objections filed by the Washington-

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Baltimore Newspaper Guild (the "Guild") [Docket No. 1889], Teamsters Local Union No. 355 and Teamsters Local No. 888 [Docket No. 1891], the Newspaper Guild of New York, CWA Local 31003 [Docket No. 1890] (the foregoing entities, collectively, the "Unions"), and the U.S. Trustee [Docket No. 1893] (together with the Unions, the "Objectors"), to the Motion of the Debtors for an Order Authorizing the Debtors to Implement a 2009 Management Incentive Plan and to Pay Earned 2008 Management Incentive Plan Awards to Certain Executives (the "2009 Incentive Plan Motion") [Docket No. 1800].[2]

**ARGUMENT**

Paragraph 14 of the Guild's Objection succinctly captures the essence of the Unions', and indeed the U.S. Trustee's, position as to the Debtors' 2009 Incentive Plan Motion: "[T]he Debtors have not proven a causal link between payment of bonuses under the proposed MIP and the Debtors' ability to continue operating their businesses." This misguided assertion is emblematic of the Unions' and the U.S. Trustees' unfounded efforts to impose upon the Debtors elevated legal burdens that they do not in fact bear. Neither the foregoing standard (which is virtually equivalent to the "doctrine of necessity" standard which the Court stated does not apply)[3] nor the other heightened legal standards urged (explicitly or implicitly) by the Objectors are applicable here.

Rather, the law is clear that the Debtors need only show that the proposed plan is an exercise of their business judgment. In re: Nellson Nutraceutical, Inc., 369 B.R. 787, 799-800 (Bankr. D. Del. 2007); In re: Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); see also In re: Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991); 11

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the 2009 Incentive Plan Motion. This Reply is not intended to be an exhaustive reply to the Objectors' Objections or to limit the arguments or proof that the Debtors may offer at the hearing on the 2009 Incentive Plan Motion.

[3] See Transcript of May 12, 2009 Hearing (Ex. F to 2009 Incentive Plan Motion), at 52 (stating that "In my view, I don't believe this [2008 MIP payment] is subject to the doctrine of necessity," and that "[w]hile it is a payment based upon prepetition performance, I don't view it as a payment of a prepetition debt.")

U.S.C. §§ 363(b)-(c). Even the much-hyped Section 503(c)(3) "justified by the facts and circumstances" standard – which does not even apply to the ordinary course MIP program – is, as the Court described it at the May 12, 2009 Hearing, a "business judgment plus" standard and not the de facto "beyond a reasonable doubt" standard that the Objectors erroneously characterize it to be. Transcript of the May 12, 2009 Hearing (Ex. F to the 2009 Incentive Plan Motion), at 52-53; see also id. at 9 (Court stating that "With respect to the motion at Number 5, to make payments according to prepetition [2008 MIP] incentive plans, it may be really – it may be the first time that it really is an ordinary course thing and doesn't fall under the 503(c)(3) standard.").

In the 2009 Incentive Plan Motion, the Debtors amply meet these burdens, as the upcoming hearing on that Motion will confirm. The Debtors have demonstrated, including through expert proof, that the MIP, Transition MIP and Key Operators Bonus programs under the proposed 2009 Management Incentive Plan utilize performance metrics that are consistent with competitive market practice, and provide incentive opportunities that are consistent with peer companies and that are critical to ensure that the Debtors' businesses not only survive, but thrive. Such proof of comparable behavior by peer enterprises is quintessential evidence of sound business judgment. See, e.g., In re: Nellson Nutraceutical, 369 B.R. at 797-98 (crediting expert testimony comparing debtor's incentive program to those of peer companies and finding compensation program passed business judgment test); In re Global Home Products, 369 B.R. 778, 783, 786-87 (Bankr. D. Del. 2007) (same); In re: Montgomery Ward Holding Corp., 242 B.R. at 150, 155 (same).

In response to this proof, the Objectors baldly assert that market-based incentive programs, competitively benchmarked compensation opportunities, and the Debtors' undeniable

need to maintain strong incentives in the face of fiercely adverse business conditions are insufficient reasons for granting the 2009 Incentive Plan Motion. Instead, they myopically argue that the only relevant comparison is to *past* years' performance and targets, and claim that such a comparison would suggest that the Debtors' incentive targets are a "lay-up." As a threshold matter, the Objectors ignore the crucial fact that both the Creditors Committee and the Steering Committee support the 2009 Incentive Plan Motion and thus do not buy into the Objectors' argument. The Creditors Committee and the Steering Committee gave their support only after their sophisticated financial advisor experts spent months scrutinizing and negotiating the proposed programs with the Debtors and reviewing the extensive information provided by the Debtors relating to those programs. This is telling given that both Committees have clear economic incentives to ensure that the Debtors' performance incentives are *real* and do not constitute the "hand-out" that the Objectors claim.

The Objectors also overlook their own concessions about the unprecedented, seismic shifts in the media industry. Given these undisputed business circumstances, no media company in the Debtors' position would ever pass the "test" urged by the Objectors. In essence, they argue for an unreachable bar, knowing that any superficial comparison of performance in today's incredibly difficult environment to performance in the world before the "Great Recession" will necessarily suggest that management is underperforming. This flimsy analysis cannot stand up in light of the Debtors' compelling evidence, including reasoned expert proof, that the proffered incentives are consistent with other companies' practices and will provide management with proper incentives to put in the effort and personal sacrifice necessary for the Debtors' businesses to excel in the brave new media world.

Nor can the Objectors prevail based on the Unions' misplaced "fairness" arguments, which conveniently ignore the undisputed fact confirmed by Mercer that management will be *profoundly undercompensated* without the incentive programs at issue. These arguments are not proper bases on which to challenge the legitimacy of the Debtors' business judgment in proposing their heavily negotiated and Committee-supported incentive plans. Lastly, the Objectors' attacks on the Debtors' legitimate confidentiality concerns are unfounded for reasons detailed in the Debtors' recently filed Motion of Debtors and Debtors in Possession for a Protective Order with regard to Discovery Propounded by the Washington-Baltimore Newspaper Guild (the "Protective Order Motion") [Docket No. 1900], as well as the Motion of the Debtors to File Under Seal an Exhibit to Motion of the Debtors for an Order Authorizing the Debtors to Implement a 2009 Management Incentive Plan and to Pay Earned 2008 Management Incentive Plan Awards to Certain Executives ("Motion to Seal") [Docket No. 1801].

## I. The 2009 Management Incentive Plan is Comprised of Legitimate Incentive Programs, and is Not a Retention Plan.

The Debtors' 2009 Incentive Plan Motion provides abundant support for the Court to conclude that the primary purpose of the 2009 Management Incentive Plan is to incentivize performance, not merely to keep bodies in their seats. The Objectors effectively ignore the applicable legal standard – if an incentive award or other payment or program is sought "for the primary purpose of motivating employees … the limitations of 503(c)(1) are not applicable," even if the payment or program would have some incidental retentive effect. In re: Nellson Nutraceutical, Inc., 369 B.R. at 802; Global Home Products, LLC, 369 B.R. at 785; In re: Dana Corporation, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006). All components of the 2009 Management Incentive Plan are self-funded, pay for performance programs that incentivize the

participants by making payments only if they achieve certain levels of 2009 operating cash flow relative to the Company's Board-approved 2009 operating plan, or in the case of the KOB relative to a further-heightened "stretch" goal set for each KOB Participant's particular operations.

In the face of the detailed support establishing both the strong incentives created and the importance of meeting these goals in relation to the Debtors' successful reorganization, the Objectors assert that the targets in the 2009 Management Incentive Plan are "lay ups" or otherwise not "real," and that the programs are really prohibited "retention" plans. The Objectors further suggest, without any justification whatsoever, that the Debtors purportedly are hiding their targets, which according to them must be vetted not only by the Court and the Objectors, but also by the public-at-large and the Debtors' competitors before they can be considered *bona fide*. As noted, the Objectors also appear to contend that the Debtors' incentive targets are *per se* invalid if they are lower in any respects than prior years.

These arguments are flat wrong, and Section 503(c)(1) is wholly inapplicable because the proposed plans are not "retention" plans. *First*, the Objectors are hard-pressed to argue that the Debtors have "rigged" their targets in light of the fact that the "planned" operating cash flow level upon which all targets are based was included in the 2009 operating plan approved by the Debtors' Board of Directors *in February 2009*, nearly half-a-year before the Debtors filed their 2009 Incentive Plan Motion. And as noted, the 2009 Management Incentive Plan generally eliminates discretionary payouts if the Company achieves less than "planned" performance.

*Second*, as detailed in the Protective Order Motion, the 2009 Incentive Plan Motion and the incentive opportunities thereunder were heavily negotiated for over four months

with the Creditors Committee and the Steering Committee, both of which support the 2009 Incentive Plan Motion. It is ludicrous to contend that the Committees would sanction a "lay-up" or a handout. To the contrary, as a result of these negotiations, applicable award opportunities were *decreased* by millions of dollars and performance targets were raised by millions of dollars.[4]

*Third*, the Debtors have candidly acknowledged that their "planned" 2009 operating cash flow is not as high as in past years, and there is every legitimate reason for this business forecast. This is not a *Debtor-specific* issue, and it does not make the 2009 Management Incentive Plan a "lay-up." It is an *industry-wide* reality, and it makes the plan realistic and appropriate in light the undisputed adverse macro-economic and industry forces now facing the Debtors and their peers. Given the Objectors' admission that the entire industry is in a state of extreme upheaval and is struggling to redefine itself, such apples-to-oranges comparisons with the past are meaningless and unfair. It strains credulity for the Objectors to argue mechanically, as they do, that the only appropriate incentive plan is one that sets goals comparable to prior years' goals – regardless of the fact that such goals would be *utterly*

---

[4] For example:

* The proposed aggregate bonus pool opportunity for the 720 ordinary course MIP participants for achieving "planned" operating cash flow performance was reduced from approximately $26.4 million to $17.5 million.

* Contrary to the Debtors' historical practice, if the Debtors do not reach at least "planned" consolidated operating cash flow for 2009, no aggregate MIP pool is funded, no awards to Corporate division participants or segment group office participants (which collectively include eight of the Top 10 executives) may be made, and individual business units that achieve at least "planned" performance will then be eligible only for substantially discounted partial awards.

* The Debtors initially proposed a Key Employee Incentive Plan ("<u>KEIP</u>") that provided incentive opportunities based solely on the timing of confirmation of the Debtors' Plan of Reorganization. Through negotiations, this plan element was eliminated and the current proposed Transition MIP was developed, which utilizes targets consistent with the ordinary course MIP targets and the Debtors' Board-approved 2009 operating plan from February 2009.

* Also based on creditor constituency concerns, the Debtors moved several key operators out of the then-KEIP (and largely excluded them from the Transition MIP as well) and into a negotiated Key Operators Bonus program, which has a different incentive structure that is tailored to their specific business circumstances.

*unattainable*, unrelated to the actual business world in which the Debtors and their peers now operate, and destructive of the very incentives that the 2009 Management Incentive Plan is meant to foster.

Under the circumstances, the support of the Creditors Committee and the Steering Committee along with the analysis contained in the expert Mercer Report – i.e. a comparison to peer behavior – is the best evidence of the *bona fide* incentive nature of the programs. To the extent that the Debtors' management team has weathered the storms thus far in 2009 (as noted, the Company remains profitable while many of its peers are not), it means only that the incentives established in the Debtors' February 2009 operating plan have been *working* and that management is on its way to *earning* whatever incentive opportunities it may ultimately achieve under the 2009 Management Incentive Plan.

*Fourth*, the Debtors have by no means obfuscated the targets in the 2009 Management Incentive Plan, as the Objectors imply. Those actual dollar targets are set forth in full in the Mercer Report, which has been filed under seal due to the confidential and competitive nature of the information in question, as discussed in both the Protective Order Motion and Motion to Seal. As also detailed in the Protective Order Motion, the Debtors offered to provide an unredacted copy of the Mercer Report to the Guild (in addition to other confidential information that it requested) if the Guild would only agree to reasonable confidentiality terms.[5] The Guild unreasonably refused to do so, and cannot now cry foul due to circumstances of its own making. The Unions' argument is nothing more than the suggestion that unseen evidence *might* support their position, yet the Guild willfully shut its eyes to such evidence before coming to the Court.

---

[5] A redacted copy of the Mercer Report was provided to the Guild and is attached as Exhibit B to the Protective Order Motion.

*Lastly*, the Objectors "lay-up" and "retention" arguments fall under their own weight. The same economic conditions that the Objectors readily acknowledge further undermine their argument that the Debtors would be primarily concerned with retention, as opposed to incentivizing their employees to meet or exceed critical performance goals. For example, if, as the Newspaper Guild of New York, CWA Local 31003 argues in its Objection, any rational employer cannot be particularly concerned with employee attrition in today's incredibly challenging business and labor market, the Objectors cannot reasonably argue out of the other side of their mouths that "retention" is the true motivation of the Debtors' plans (see Newspaper Guild of N.Y. Obj. at ¶ 4 ("[G]iven the profound problems in the media industry . . . . it is unlikely that . . . management employees eligible for bonuses under this program at issue would have significant opportunities elsewhere . . . There is no retention-based need for the compensation programs . . .")). Thus, the Objectors' argument is contrary to common sense – and the considerable judgment of the Creditors Committee and the Steering Committee.

## II. Arguments that Management Incentives Are Inappropriate in Today's Economy Are Plainly Irrelevant.

The Unions in particular contend that it is absurd to even contemplate management "bonuses" in the midst of the ongoing economic crisis. (Guild Obj. at ¶ 11; Newspaper Guild of N.Y. Obj. at ¶ 4.) Indeed, in an apparent effort to vilify management, the Unions characterize the proposed programs as give-aways to management, misleadingly citing the *maximum* payout figures throughout their Objections – which become payable only upon *maximum performance* that in some cases requires *double* the Debtors' "planned" operating cash flow – as if they were simple "proposed bonuses." (Guild Obj. at ¶¶ 1, 4-6, 11-13.) The Unions then contrast those supposedly "disproportionate bonuses" with the pay freezes certain unions



46429/0001-5908705V1

agreed to in collective bargaining. These arguments are irrelevant to these proceedings, and moreover, they are wrong.

As detailed in the Mercer Report and the 2009 Incentive Plan Motion, the management employees who stand to earn incentive pay under the proposed programs will be significantly undercompensated relative to the market for their services in the absence of those programs. None of the Objectors refute that fact. Furthermore, layoffs affected management/non-management and union/non-union groups alike – there have been cuts across the board. Likewise, as Exhibit A to the Guild's Objection makes plain, the pay freezes noted in that memorandum also were applicable to *non-union* employees.

Furthermore, like their other contentions, the Unions' "fairness" argument ignores the applicable legal standard for consideration of the Debtors motion. As stated, the test is not whether the proposed payments purportedly serve management interests at the expense of organized labor (which they do not, in any event), but whether the award opportunities are a valid exercise of the Debtors' business judgment ("justified by the facts and circumstances," to the extent Section 503(c)(3) applies). (See 2009 Incentive Plan Motion at ¶ 75 (collecting cases).) Distilled to their essence, the facts and circumstances here reveal the 2009 Management Incentive Plan to be an incentive plan that the Debtors, the Creditors Committee and the Steering Committee have all determined is in the best interest of the long-term future of the Company to incentivize management. The Unions' argument that the Court should not allow management to get a "slice of the pie" because they believe it may reduce the size of their own slice is simply irrelevant to the Court's evaluation of the "business judgment" (or "business judgment plus") standard. Moreover, the Court can and should take judicial notice of the obvious fact that,

without a meaningful and realistic plan for future success, a key driver of which is an appropriate incentive plan, there might be no more "pie" to divvy up in the future.

## III. The Objectors' Argument That They Need to Consider the Debtors' Confidential Information in View of the Public Is Wrong.

In their Objections, the Unions issue an unexplained pronouncement that the Debtors purportedly cannot meet their burden on the 2009 Incentive Plan Motion "without publicly disclosing" sensitive business information, including, as the Guild has requested, confidential business-unit-level projections and individual managers' compensation. (Guild Obj. ¶ 8.) Likewise, the U.S. Trustee asserts, with no discussion of the facts at issue or the Debtors' arguments in their Motion to Seal, that the Mercer Report must be disclosed in its entirety for public viewing. All such assertions are simply wrong for the reasons detailed in the Protective Order Motion and the Motion to Seal (and the Unions' underlying motivation for such an argument is particularly suspect). Of course, the Court can and does hear evidence out of public view when the law requires. The Debtors have articulated in their Protective Order Motion and the Motion to Seal how disclosure of such information would invade the privacy of the individuals whose compensation would be disclosed, and would pose significant risks of competitive harm to the Debtors, including by giving their competitors valuable data and insights into the Debtors' individualized compensation structure and its operational goals and strategies. None of the Objectors refute or otherwise provide any analysis to address those entirely legitimate concerns, and their Objections therefore must be rejected.

## IV. The Objectors Do Not Effectively Challenge the 2008 MIP Awards.

None of the Objectors mounts any real challenge to the payment of earned 2008 MIP awards for the Top 10 executives, which plainly meet the business judgment standard. As explained in the Debtors' 2009 Incentive Plan Motion, the Court previously held that awards to

non-Top-10 participants were *not* pre-petition debts, were *not* subject to the "doctrine of necessity," and may even have been ordinary course payments. See Transcript of May 12, 2009 Hearing (2009 Incentive Plan Motion Ex. F), at 9, 52. Even if the "ordinary course" standard were not applied to the remaining 2008 MIP awards for the Top 10, the Debtors' proof would amply meet the "business judgment" (and indeed "business judgment plus") standard, and the Objectors' rhetoric fails to undermine that fact.

## CONCLUSION

For the foregoing reasons, and for the reasons explained in the Debtors' 2009 Incentive Plan Motion, the Debtors respectfully submit that granting the 2009 Incentive Plan Motion is well within the Court's authority, is a valid exercise of the Debtors' business judgment, and thus is clearly in the best interests of the Debtors' estates and creditors. Accordingly, the Debtors respectfully request that the Court grant the 2009 Incentive Plan Motion in its entirety.

Dated: Wilmington, Delaware
August 6, 2009

Respectfully submitted,

SIDLEY AUSTIN LLP
Bryan Krakauer
Kevin T. Lantry
Brian J. Gold
Jonathan D. Lotsoff
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: ______________________________
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION