# EXHIBIT A

# LLC Operating Agreement and Amendment to LLC Operating Agreement

LIMITED LIABILITY COMPANY AGREEMENT

of

CLASSIFIED VENTURES, LLC

A Delaware Limited Liability Company

Dated as of September 30, 2001

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

Page

ARTICLE I    GENERAL DEFINITIONS ....................................................2
    Section 1.1    Definitions.........................................................................2
    Section 1.2    Interpretation....................................................................13
    Section 1.3    Voting Rights....................................................................13

ARTICLE II    ORGANIZATION ..........................................................14
    Section 2.1    Formation ........................................................................14
    Section 2.2    Name ...............................................................................14
    Section 2.3    Purposes ..........................................................................14
    Section 2.4    Duration ..........................................................................14
    Section 2.5    Registered Office, Registered Agent and Principal
                  ffice. ...............................................................................14
    Section 2.6    Qualification in Other Jurisdictions .................................15
    Section 2.7    No State-Law Partnership .................................................15
    Section 2.8    Member Units; Voting Rights...........................................15
    Section 2.9    Issuance of Additional Units and Interests .......................30

ARTICLE III  MEMBERS...................................................................30
    Section 3.1    Founding and Non-Founding Class A Members ...............30
    Section 3.2    Admission of Additional Class A Members ......................31
    Section 3.3    Investment Representations ..............................................31
    Section 3.4    Unit Certificate Legend....................................................32

ARTICLE IV  CAPITAL CONTRIBUTIONS, CAPITAL ACCOUNTS
           AND ALLOCATIONS..............................................................33
    Section 4.1    Capital Contributions.......................................................33
    Section 4.2    Additional Capital Contributions.....................................33
    Section 4.3    Issuances and Valuation of Units......................................34
    Section 4.4    Capital Accounts..............................................................34
    Section 4.5    Return of Capital Contributions.......................................36
    Section 4.6    Interest.............................................................................36
    Section 4.7    Loans From Members.......................................................36

ARTICLE V    ALLOCATIONS TO CAPITAL ACCOUNTS.................36
    Section 5.1    Allocations to Capital Accounts.......................................36
    Section 5.2    Regulatory and Related Allocations .................................38
    Section 5.3    Tax Allocations................................................................40

ARTICLE VI  DISTRIBUTIONS .........................................................41

i

Section 6.1    Distributions of Distributable Funds.................................................41
Section 6.2    Board Approval...........................................................................41

ARTICLE VII RIGHTS, POWERS AND OBLIGATIONS OF
         MEMBERS .........................................................................................42
Section 7.1    Transfer of Class A Units ............................................................42
Section 7.2    Transfer of Class A Preferred Units..............................................46
Section 7.3    Transfer of Class B Units............................................................50
Section 7.4    Member Transferees ...................................................................51
Section 7.5    Invalid Transfers ........................................................................52
Section 7.6    Drag-Along Rights.......................................................................52
Section 7.7    Member Put Right........................................................................53
Section 7.8    Confidentiality. ...........................................................................54

ARTICLE VIII MEETINGS OF MEMBERS............................................................55
Section 8.1    Place of Meetings........................................................................55
Section 8.2    Meetings.....................................................................................55
Section 8.3    Notice.........................................................................................55
Section 8.4    Waiver of Notice .........................................................................55
Section 8.5    Quorum .......................................................................................55
Section 8.6    Voting. ........................................................................................55
Section 8.7    Conduct of Meetings ...................................................................56
Section 8.8    Action by Written Consent ..........................................................56
Section 8.9    Proxies.......................................................................................56

ARTICLE IX MANAGEMENT OF THE COMPANY .................................................57
Section 9.1    Board of Directors.......................................................................57
Section 9.2    Nomination of Directors; Election of Directors;
               Voting of Directors. .....................................................................57
Section 9.3    Meetings.....................................................................................58
Section 9.4    Action by Written Consent ..........................................................59
Section 9.5    Increase or Decrease in Number of Directors...............................59
Section 9.6    Committees. ................................................................................59
Section 9.7    Limitations on Powers of the Company and the Chief
               Executive Officer ........................................................................60
Section 9.8    Limitations on Powers of the Board of Directors ..........................62
Section 9.9    Quorum of Board of Directors ......................................................62
Section 9.10   Resignation, Replacement and Removal .....................................63
Section 9.11   Vacancies...................................................................................63
Section 9.12   Compensation ............................................................................63
Section 9.13   Other Business ...........................................................................63
Section 9.14   Standard of Care; Liability...........................................................63

ii

Section 9.15   Appointment of Chief Executive Officer and Chief
               Financial Officer; Officers ................................................64
Section 9.16   Reliance upon Records ....................................................64
Section 9.17   Interested Directors ........................................................64

ARTICLE X   OWNERSHIP OF COMPANY PROPERTY ...............................65

ARTICLE XI  FISCAL MATTERS; BOOKS AND RECORDS ......................66
Section 11.1   Bank Accounts; Investments ...........................................66
Section 11.2   Records Required by Act; Right of Inspection. ...............66
Section 11.3   Tax Returns and Information ...........................................66
Section 11.4   Delivery of Financial Statements to Members ................67
Section 11.5   Audits ..............................................................................67
Section 11.6   Fiscal Year .......................................................................67
Section 11.7   Tax Elections ...................................................................67
Section 11.8   Tax Matters Member .......................................................68

ARTICLE XII  INDEMNIFICATION AND INSURANCE .............................68
Section 12.1   Indemnification and Advancement of Expenses. ............68
Section 12.2   Insurance .........................................................................70
Section 12.3   Limit on Liability of Members .........................................71

ARTICLE XIII DISSOLUTION AND WINDING UP ....................................71
Section 13.1   Events Causing Dissolution ............................................71
Section 13.2   Winding Up ......................................................................71
Section 13.3   Compensation of Liquidator ...........................................73
Section 13.4   Distribution of Company Property and Proceeds of
               Sale Thereof. ....................................................................73
Section 13.5   Final Audit .......................................................................74

ARTICLE XIV REMEDIES ...........................................................................74
Section 14.1   Breaches of Obligations .................................................74
Section 14.2   Contribution Default .......................................................74
Section 14.3   Remedies Upon Default. .................................................75
Section 14.4   Buyout Option. ................................................................76
Section 14.5   Appraisal Mechanism .....................................................77

ARTICLE XV NEWSPAPER COMMITMENT; NON-COMPETITION .......79
Section 15.1   Certain Definitions ..........................................................79
Section 15.2   Newspaper Commitment; Right to Participate. ..............80
Section 15.3   Non-Newspaper Affiliates ..............................................81
Section 15.4   Non-Competition. ...........................................................81
Section 15.5   Policy Committee ............................................................83

iii

ARTICLE XVI MISCELLANEOUS PROVISIONS...................................................83
    Section 16.1   Term.................................................................................83
    Section 16.2   Counterparts......................................................................83
    Section 16.3   Entire Agreement...............................................................84
    Section 16.4   Partial Invalidity...............................................................84
    Section 16.5   Amendments......................................................................84
    Section 16.6   Binding Effect...................................................................84
    Section 16.7   Governing Law..................................................................84
    Section 16.8   Offset................................................................................85
    Section 16.9   Effect of Waiver or Consent................................................85
    Section 16.10   Further Assurances..........................................................85

**CLASSIFIED VENTURES, LLC**
**a Delaware Limited Liability Company**

**LIMITED LIABILITY COMPANY AGREEMENT**

THIS LIMITED LIABILITY COMPANY AGREEMENT is made and entered into as of September 30, 2001 by and among Classified Ventures, LLC, a Delaware limited liability company (the "Company"), Tribune Company, a Delaware corporation ("Tribune"), Tribune National Marketing Company, a Delaware corporation ("TNMC"), and a wholly owned subsidiary of Tribune, Washingtonpost.Newsweek Interactive Company, LLC, a Delaware limited liability company ("WPNI"), and a wholly owned subsidiary of The Washington Post Company, a Delaware corporation ("Washington Post"), Gannett On-line Partner, LLC, a Delaware limited liability company ("Gannett"), and an indirect wholly owned subsidiary of Gannett Co., Inc., a Delaware corporation ("GCI"), Knight Ridder Digital, a Delaware corporation ("KR"), and a wholly owned subsidiary of Knight-Ridder, Inc., a Florida corporation ("Knight-Ridder"), The McClatchy Company, a Delaware corporation ("McClatchy"), The New York Times Company, a New York corporation ("NYT"), and any other Person who shall hereafter execute this Agreement as a Member of the Company, all in accordance with the provisions set forth below and as set forth in Schedule I hereto. Washington Post, GCI and Knight-Ridder are entering into this Agreement solely for the limited purposes of Article XV of this Agreement.

WHEREAS, Classified Ventures, Inc., the sole Member holding one Class A Unit (the "Original Company"), has caused the Company to be formed on April 20, 2001 as a limited liability company under the Act;

WHEREAS, the Original Company and its stockholders previously entered into that certain Second Amended and Restated Stockholders Agreement, dated as of May 1, 2001 (the "Stockholders Agreement"), which provides for, among other things, the governance of the Original Company, the rights and obligations of its stockholders and certain restrictions on the transfer of equity interests in the Original Company;

WHEREAS, the Board of Directors of the Original Company determined that it is advisable and in the best interests of the Original Company and its stockholders to effectively convert the Original Company into a limited liability company by merger of the Original Company with and into a newly formed limited liability company;

WHEREAS, the Original Company merged with and into the Company (the "Merger"), pursuant to the terms of that certain Agreement and Plan of Merger, dated as of September 30, 2001, by and between the Company and the Original Company (the "Merger Agreement"); and

WHEREAS, the Company and the Members believe it to be in the best interests of the Company that the terms and conditions contained in the Stockholders Agreement be maintained in order to provide for the continuity and stability of the ownership and the harmonious management of the affairs of the Company and, to that end, and the Company and each of the Members does hereby adopt this Agreement as the Limited Liability Company Agreement of the Company.

NOW, THEREFORE, in consideration of the mutual promises and agreements made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

## GENERAL DEFINITIONS

Section 1.1    Definitions.  As used in this Agreement, the following terms shall each have the meaning set forth in this Article I (unless the context otherwise requires).

"Act" means the Delaware Limited Liability Company Act, as it may be amended from time to time, and any successor to such Act.

"Additional Capital Contributions" has the meaning specified in Section 4.2.

"Additional Units" has the meaning specified in Section 2.8(e)(iii).

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Period, after giving effect to the following adjustments: (a) credit to such Capital Account any amounts that such Member is obligated to restore or is deemed to be obligated to restore pursuant to the Treasury Regulations under Section 704 of the Code and (b) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-l(b)(2)(ii)(d)(4), (5) and (6).  The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Adjusted Property" means any property, the Carrying Value of which has been adjusted pursuant to Section 4.4(c).

2

"Affiliate" means, when used with reference to a specific Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specific Person.

"Affiliate Agreement" has the meaning specified in Section 15.2(a).

"Agreed Value" means the fair market value of Contributed Property, as determined by the Majority Vote of the Board of Directors or the Executive Committee using any reasonable method of valuation.

"Agreement" means this Limited Liability Company Agreement, including Schedules I through IV, as originally executed and as subsequently amended from time to time in accordance with the provisions hereof.

"Applicable Rate" means the sum of (i) the annual prime rate announced from time to time by Citibank, N.A. as its base rate at its New York office (or if such rate is not being quoted, the rate which is the successor to such rate) plus (ii) three percentage points; such rate shall be compounded annually.

"Appraised Value" has the meaning specified in Section 14.5.

"Appraiser's Report" has the meaning specified in Section 14.5.

"Board of Directors" means, at any time, the Board of Directors of the Company.

"Business Day" means any day other than a Saturday, Sunday and those legal public holidays specified in 5 U.S.C. § 6103(a), as may be amended from time to time.

"Business Plan" means an annual business plan proposed by the Chief Executive Officer and adopted by Majority Vote of the Board of Directors or the Executive Committee (subject to Section 9.6(b)) pursuant to Section 9.7 hereof prior to the start of each fiscal year of the Company containing a statement of the Company's goals and targets for such fiscal year and the strategy by which it proposes to achieve them, including but not limited to a month-by-month cash flow projection, a capital expenditure plan for the Company, a projection of funds to be allocated to consummate acquisitions during such fiscal year and a projection of Capital Contributions for such fiscal year, which Business Plan may be revised by Majority Vote of the Board of Directors or the Executive Committee pursuant to Section 9.7 of this Agreement from time to time during any fiscal year.

"Buyout Notice" has the meaning specified in Section 14.4(a)(i).

3

"Buyout Option" has the meaning specified in Section 14.1.

"Capital Account" means the capital account maintained for each Member with respect to a class of interests pursuant to Section 4.4 of this Agreement.

"Capital Contribution" means the total amount of cash and property, including Additional Capital Contributions, if any, contributed to the Company by all the Members or any one Member, as the case may be.

"Carrying Value" means (a) with respect to a Contributed Property, the Agreed Value of such property reduced (but not below zero) by all depreciation, cost recovery and amortization deductions charged to the Capital Accounts pursuant to Section 4.4(b) with respect to such property, as well as any other reductions as a result of sales, retirements and other dispositions of assets included in a Contributed Property, as of the time of determination, (b) with respect to an Adjusted Property, the value of such property immediately following the adjustment provided in Section 4.4(c) reduced (but not below zero) by all depreciation, cost recovery and amortization deductions charged to the Capital Accounts pursuant to Section 4.4(b) with respect to such property, as well as any other reductions as a result of sales, retirements or dispositions of assets included in Adjusted Property, as of the time of determination, and (c) with respect to any other property, the adjusted basis of such property for federal income tax purposes as of the time of determination

"Certificate of Formation" means the Certificate of Formation of the Company as filed with the Office of the Secretary of State of Delaware as required by the Act, as amended from time to time.

"Chief Executive Officer" means the Chief Executive Officer of the Company appointed in accordance with Section 9.15 hereof.

"Chief Financial Officer" means the Chief Financial Officer of the Company appointed in accordance with Section 9.15 hereof.

"Class A Members" has the meaning specified in Section 2.8(c).

"Class A Preferential Amount" has the meaning specified in Section 2.8(e).

"Class A Preferred Units" means Units having the rights and obligations specified in this Agreement with respect to Class A Preferred Units.

"Class A Redemption Price" has the meaning specified in Section 2.8(e)(iii).

4

"Class A Units" means Units having the rights and obligations specified in this Agreement with respect to Class A Units.

"Class B Drag-Along Right" has the meaning specified in Section 7.6(c).

"Class B Members" has the meaning specified in Section 2.8(d).

"Class B Units" means Units having the rights and obligations specified in this Agreement with respect to Class B Units.

"Code" means the Internal Revenue Code of 1986, as now in effect or as hereafter amended.

"Common Units" shall mean the Class A Units and the Class B Units of the Company, including profits interests related thereto, and into which any series of Class A Preferred Units may be convertible pursuant to the terms of this Agreement.

"Common Members" shall mean Members holding Common Units.

"Common Membership Interest" means, with respect to any Member, such Member's pro rata share, expressed as a percentage, of all of the outstanding Common Units of the Company.

"Company" has the meaning specified in the recitals hereto.

"Company Property or Properties" means all interests, properties, whether real or personal, and rights of any type owned or held by the Company, whether owned or held by the Company at the date of its formation or thereafter acquired.

"Company Services" has the meaning specified in Section 15.1.

"Contributed Property" means property or other consideration (other than cash) contributed to the Company in exchange for Units.

"Contribution Default" has the meaning specified in Section 14.2.

"Conversion Price" has the meaning specified in Section 2.8(e)(iii).

"Conversion Rights" has the meaning specified in Section 2.8(e)(iii).

"Core Categories" means, with respect to providing national classified listings, information and ancillary services to Internet users, the apartment, automotive, real estate (resale and new construction), general merchandise, and personals business segments.

5

"Core Category Opportunity" has the meaning specified in Section 15.1.

"Defaulting Member" has the meaning specified in Section 14.1.

"Deficiency Amount" has the meaning specified in Section 5.1(c).

"Determination Date" has the meaning specified in Section 14.5.

"Directors" means at any time the Persons nominated and elected in accordance with Section 9.2 to serve on the Board of Directors.

"Distributable Funds" means all proceeds received (or released from reserves) by the Company during any period (including all interest income from temporary investments made by the Company pending distribution of the foregoing proceeds), as reduced by funds used during such period (a) to pay all costs and expenses incurred during such period, including all expenses incurred in any sale or disposition transaction, (b) to discharge during such period any indebtedness or liabilities of the Company for which such proceeds are to be used including any outstanding Member Loans and (c) to create or increase during such period such reserves as the Board of Directors may determine for the discharge of known or existing liabilities or obligations of the Company or otherwise for the Company's present or future obligations, needs or business opportunities.

"Drag-Along Right" has the meaning specified in Section 7.6(a).

"Election Period" has the meaning specified in Section 2.8(e)(iii)(C)(2).

"Excess Amount" has the meaning specified in Section 5.1(c).

"Executive Committee" has the meaning specified in Section 9.6(b).

"Fiscal Period" shall mean the period commencing on September 30, 2001, and thereafter each period commencing on the day immediately following the last day of the preceding Fiscal Period, and ending at the close of business on the first to occur of the following dates:

(i)      December 31 of such period; and

(ii)     any other day as determined in the sole and absolute discretion of the Tax Matters Member.

"Founding Class A Member Directors" has the meaning specified in Section 9.2(a).

6

"Founding Class A Members" means Tribune, TNMC, WPNI, Gannett and KR for so long as they hold Units and any other parties who may hereafter become a Founding Class A Member pursuant to this Agreement in accordance with Section 3.2.

"Hedging Transaction" means any short sale (whether or not against the box) or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any security (other than a broad-based market basket or index) that includes, relates to or derives any significant part of its value from the Company's securities.

"Initial Appraiser" has the meaning specified in Section 14.5.

"Interim Capital Transaction" means (a) a transaction pursuant to which the Company borrows funds, including, without limitation, a refinancing of any Company debt, (b) a sale, condemnation or other disposition of all or a portion of the company assets or (c) the receipt of insurance proceeds or other damage recoveries by the Company, in any such case which does not result in and is not entered into in connection with the dissolution and termination of the Company.

"IPO" means the Company's first sale of its securities in a bona fide, firm commitment underwriting pursuant to a registration statement under the Securities Act.

"Liquidator" has the meaning specified in Section 13.2(a).

"Majority Holders" has the meaning specified in Section 7.6(a).

"Majority Vote" means, with respect to actions to be taken by Members, the affirmative vote or consent of Members holding at least a majority of the Units then outstanding and entitled to vote and, with respect to actions to be taken by the Board of Directors or the Executive Committee, the affirmative vote or consent of at least a majority of the Directors then serving on the Board of Directors or the Executive Committee, as the case may be.

"Media Members" means the Founding Class A Members, the Non-Founding Class A Members and the Preferred Members.

"Member Loan" has the meaning specified in Section 14.3(a).

"Member Nonrecourse Debt" means any liability (or portion thereof) of the Company that constitutes debt which, by its terms, is nonrecourse to the Company and the Members for purposes of Section 1.1001-2 of the Treasury Regulations, but for which a Member bears the economic risk of loss, as determined under Section 1.704-2(b)(4) of the Treasury Regulations.

7

"Member Nonrecourse Debt Minimum Gain" means an amount of gain characterized as "partner nonrecourse debt minimum gain" under Section 1.704-2(i)(2) and 1.704-2(i)(3) of the Treasury Regulations.

"Member Offerees" has the meaning specified in Section 7.1(c).

"Member Put Right" has the meaning specified in Section 7.7.

"Members" means the Founding Class A Members, the Non-Founding Class A Members, the Class B Members, the Preferred Members and any other Person who executes a counterpart of this Agreement as a Member and each of the parties who may hereafter become a Member pursuant to this Agreement.

"Membership Interest" means, with respect to any Member, such Member's pro rata share, expressed as a percentage, of all of the outstanding Units of the Company (assuming conversion of the Class A Preferred Units into Class A Units).

"Merged Group" has the meaning specified in Section 9.2(c).

"Merger" has the meaning specified in Section 9.2(c).

"Merger Agreement" has the meaning specified in the recitals hereto.

"Merging Member" has the meaning specified in Section 9.2(c).

"Minimum Gain" means the amount determined by computing with respect to each Nonrecourse Liability of the Company the amount of gain, if any, that would be realized by the Company if it disposed of the property securing such liability in full satisfaction thereof, and by then aggregating the amounts so computed.

"National Online Classified Listings" has the meaning specified in Section 15.1.

"Net Loss" means the net loss of the Company with respect to a Fiscal Period, as determined for federal income tax purposes, provided that:

(i)    Any deductions for depreciation, cost recovery or amortization attributable to a Contributed Property shall be determined as if the adjusted tax basis of such property on the date it was acquired by the Company was equal to the Agreed Value of such property. Upon adjustment pursuant to Section 4.4(d) of the Carrying Value of the Company Property subject to depreciation, cost recovery or amortization, any further deductions for such depreciation, cost recovery or amortization shall be determined as if the adjusted

8

tax basis of such property was equal to its Carrying Value immediately following such adjustment. Any deductions for depreciation, cost recovery or amortization shall be computed in accordance with Section 1.704-1(b)(2)(iv)(g)(3) of the Treasury Regulations.

(ii)    Any income, gain or loss attributable to the taxable disposition of any property shall be determined by the Company as if the adjusted tax basis of such property as of such date of disposition was equal in amount to the Carrying Value of such property as of such date.

(iii)    All items incurred by the Company that can neither be deducted nor amortized under Section 709 of the Code shall, for purposes of Capital Accounts, be treated as an item of deduction and shall be allocated among the Members pursuant to Article V.

"Net Profit" means the net income of the Company with respect to a Fiscal Period, as determined for federal income tax purposes, provided that:

(i)    Any deductions for depreciation, cost recovery or amortization attributable to a Contributed Property shall be determined as if the adjusted tax basis of such property on the date it was acquired by the Company was equal to the Agreed Value of such property. Upon adjustment pursuant to Section 4.4(d) of the Carrying Value of the Company Property subject to depreciation, cost recovery or amortization, any further deductions for such depreciation, cost recovery or amortization shall be determined as if the adjusted tax basis of such property was equal to its Carrying Value immediately following such adjustment. Any deductions for depreciation, cost recovery or amortization shall be computed in accordance with Section 1.704-1(b)(2)(iv)(g)(3) of the Treasury Regulations.

(ii)    Any income, gain or loss attributable to the taxable disposition of any property shall be determined by the Company as if the adjusted tax basis of such property as of such date of disposition was equal in amount to the Carrying Value of such property as of such date.

(iii)    All items incurred by the Company that can neither be deducted nor amortized under Section 709 of the Code shall, for purposes of Capital Accounts, be treated as an item of deduction and shall be allocated among the Members pursuant to Article V.

"Newspaper Affiliate" has the meaning specified in Section 15.1.

"Newspaper Market" has the meaning specified in Section 15.1.

9

"Non-Founding Class A Member Directors" has the meaning specified in Section 9.2(a).

"Non-Founding Class A Members" means McClatchy, NYT and any other Person who shall hereafter execute this Agreement as a Member holding Class A Units or Class A Preferred Units and who is not otherwise designated a Founding Class A Member.

"Non-Newspaper Affiliate" has the meaning specified in Section 15.1.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(l).

"Nonrecourse Liability" means a liability (or that portion of a liability) with respect to which no Member bears the economic risk of loss as determined under Section 1.704-2(b)(3) of the Treasury Regulations.

"Notice of Election" has the meaning specified in Section 2.8(e)(iii)(C)(2).

"Notice of Merger" has the meaning specified in Section 9.2(d).

"Notice of Preferred Transfer" has the meaning specified in Section 7.2(c).

"Notice of Transfer" has the meaning specified in Section 7.1(c).

"Notification" means all notices permitted or required to be given to any Person hereunder. Such Notifications must be given in writing and will be deemed to be duly given on the date of delivery if delivered in person or sent by facsimile or other electronic (e.g., e-mail) transmission or on the earlier of actual receipt or three (3) Business Days after the date of mailing if mailed by registered or certified mail, first class postage prepaid, return receipt requested, to such Person, at the last known address of such Person on the Company records.

"Original Company" has the meaning specified in the recitals hereto.

"Outstanding Units" has the meaning specified in Section 2.8(e)(iii).

"Parent" has the meaning specified in Section 15.1.

"Partnership Minimum Gain" shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(2).

"Partner Nonrecourse Debt" shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

10

"Partner Nonrecourse Debt Minimum Gain" shall have the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"Partner Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulations Section 1.704-2(i).

"Person" means any general partnership, limited partnership, corporation, limited liability company, joint venture, trust, business trust, governmental agency, cooperative, association, individual or other entity, and the heirs, executors, administrations, legal representatives, successors and assigns of such person, as the context may require.

"Policy Committee" has the meaning specified in Section 15.1.

"Preferred Member Offerees" has the meaning specified in Section 7.2(c).

"Preferred Membership Interest" means, with respect to any Member, such Member's pro rata share, expressed as a percentage, of all of the outstanding Class A Preferred Units of the Company.

"Preferred Members" has the meaning specified in Section 2.8(e).

"Preliminary Appraised Value" has the meaning specified in Section 14.5.

"Proposed Preferred Purchaser" has the meaning specified in Section 7.2(c).

"Proposed Purchaser" has the meaning specified in Section 7.1(c).

"Purchase Date" has the meaning specified in Section 2.8(e)(iii).

"Put Right" has the meaning specified in Section 7.7(b).

"Put Sale Price" shall mean the fair market value of the Class B Units, as determined as of the most recent appraisal of the Class B Units held by Class B Members, by a nationally recognized independent appraiser, provided such appraisal was not performed prior to July 1, 2002. If an appraisal has not occurred within such time period, the fair market value of the Class B Units shall be determined by a nationally recognized independent appraiser reasonably selected by the Company. The appraisal shall be without application of discount for lack of marketability, but shall include discount for minority interest, and shall be conclusive and binding on the parties unless a notice of dispute of appraised fair market value ("Dispute") has been provided to the Company in writing within thirty (30) days following receipt by the Class B Member of

the dollar figure (but not payment) of the Put Sale Price. In the event of a Dispute, the parties shall first attempt to settle the Dispute by mediation in accordance with and under the auspices of the mediation procedures of the American Arbitration Association, with any such mediation proceeding to occur in Chicago, Illinois if it cannot reasonably occur by telephonic or other means of communication. If the Dispute is not resolved through such mediation, the Dispute shall be settled by arbitration in Chicago, Illinois, or any other location mutually agreeable to the parties. Said arbitration shall be conducted in accordance with the Rules of Commercial Arbitration of the American Arbitration Association or it successor. There shall be one arbitrator, who shall be experienced in the matters of corporate law and corporate valuations. The decision of the arbitrator shall be conclusive and binding upon the parties and judgment upon the award rendered by the arbitration may be entered in any court having jurisdiction.

"Qualified Public Offering" has the meaning specified in Section 2.8(e)(iii).

"Qualifying IPO" has the meaning specified in Section 7.7(b).

"Regulatory Allocations" shall have the meaning set forth in Section 5.2(h) of this Agreement.

"Relevant Content" has the meaning specified in Section 15.1.

"Second Appraiser" has the meaning specified in Section 14.5.

"Section 705(a)(2)(B) Expenditure" means any expenditure of the Company described in Section 705(a)(2)(B) of the Code and any expenditure considered to be an expenditure described in Section 705(a)(2)(B) of the Code pursuant to Section 704(b) of the Code and the Treasury Regulations thereunder.

"Securities Act" means the Securities Act of 1933, as amended.

"Selling Preferred Member" has the meaning specified in Section 7.2(b).

"Stockholders Agreement" has the meaning specified in the recitals hereto.

"Tax Matters Member" has the meaning specified in Section 11.8.

"Third Appraiser" has the meaning specified in Section 14.5.

"Transfer" means any change in the record or beneficial ownership of a Unit, whether made voluntarily or involuntarily by operation of law.

12

"Transferor Member" has the meaning specified in Section 7.1(a).

"Transferor Preferred Member" has the meaning specified in Section 7.2(a).

"Treasury Regulations" means the regulations promulgated by the U.S. Treasury Department pursuant to the Code.

"Units" means, with respect to any Member at any time, an interest in the Company's capital, income, gains, losses, deductions and expenses and the right to vote (if any) on certain Company matters as provided in this Agreement.  The Units shall, as of the date of this Agreement, be composed of the Class A Units, Class B Units and Class A Preferred Units.  Each Member's initial Units and the percentage thereof of all Units expressed as such Member's Membership Interest and Preferred Membership Interest shall be set forth on Schedule I hereto.

"Unit Equivalents" has the meaning specified in Section 2.8(e)(iii).

"Unrealized Gain" means the excess (attributable to a Company Property), if any, of the fair market value of such property as of the date of determination (as reasonably determined by the Board of Directors) over the book value of such property as of the date of determination (prior to any adjustment to be made pursuant to Section 4.4(c) as of such date).

"Unrealized Loss" means the excess (attributable to a Company Property), if any, of the book value of such property as of the date of determination (prior to any adjustment to be made pursuant to Section 4.4(c) as of such date) over its fair market value as of such date of determination (as reasonably determined by the Board of Directors).

Section 1.2     Interpretation. Each definition in this Agreement includes the singular and the plural, and reference to the neuter gender includes the masculine and feminine where appropriate. The headings to the Articles and Sections of this Agreement are for convenience of reference and shall not affect the meaning or interpretation of this Agreement. The Schedules are hereby incorporated by reference into and shall be deemed a part of this Agreement.

Section 1.3     Voting Rights. The holder of each Preferred Unit shall have the right to one vote for each Class A Unit into which such Preferred Unit could then be converted, and with respect to such vote, such holder shall have full voting rights and powers equal to the voting rights and powers of the holders of Class A Units, and shall be entitled, notwithstanding any provision hereof, to notice of any Members' meeting in accordance with this Agreement, and shall be entitled to vote (or consent),

13

together with holders of Class A Units, with respect to any question upon which holders of Class A Units have the right to vote (or consent). Fractional votes shall not, however, be permitted and any fractional voting rights available on an as-converted basis (after aggregating all Class A Units into which Class A Preferred Units held by each holder could be converted) shall be rounded to the nearest whole number (with one-half being rounded upward).

## ARTICLE II

## ORGANIZATION

Section 2.1     Formation.  The Company has been organized as a Delaware limited liability company under and pursuant to the Act by the filing of a Certificate of Formation with the Office of the Secretary of State of the State of Delaware as required by the Act. In the event of a conflict between the terms of this Agreement and the Certificate of Formation, the terms of the Certificate of Formation shall prevail.

Section 2.2     Name.  The name of the Company is Classified Ventures, LLC.  To the extent permitted by the Act, the Company may conduct its business under one or more assumed names deemed advisable by the Board of Directors by Majority Vote.

Section 2.3     Purposes.  The purposes of the Company are to engage in any activity and/or business for which limited liability companies may be formed under the Act. The Company shall have all the powers necessary or convenient to effect any purpose for which it is formed, including all powers granted by the Act.

Section 2.4     Duration.  The Company shall continue in existence in perpetuity or until the Company shall be dissolved and its affairs wound up in accordance with the Act or this Agreement.

Section 2.5     Registered Office, Registered Agent and Principal Office.

(a)     The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Board of Directors by Majority Vote may designate from time to time in the manner provided by the Act.

(b)     The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Board of Directors by Majority Vote may designate

14

in the manner provided by the Act.

(c)     The principal office of the Company shall be at 175 West Jackson, Suite 800, Chicago, Illinois 60604, or at such place as the Board of Directors by Majority Vote may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain records there for inspection as required by the Act. The Company may have such other offices as the Board of Directors by Majority Vote may designate from time to time.

Section 2.6     Qualification in Other Jurisdictions. The Board of Directors shall have authority to cause the Company to do business in jurisdictions other than the State of Delaware if such jurisdiction has enacted a limited liability company statute, and the Board of Directors by Majority Vote shall have approved the qualification of the Company under such statute to do business as a foreign limited liability company in such jurisdiction.

Section 2.7     No State-Law Partnership. No provisions of this Agreement shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member or Director a partner or joint venturer of or with any other Member or Director, for any purposes other than federal and state tax purposes.

Section 2.8     Member Units; Voting Rights.

(a)     Each Member's interest in the Company, including such Member's interest, if any, in the capital, income, gains, losses, deductions and expenses of the Company and the right to vote, if any, on certain Company matters as provided in this Agreement shall be represented by "Units." Initially, the Units shall be comprised of Class A Units, Class B Units and Class A Preferred Units. The Board of Directors may cause the Company to issue to the Members certificates representing the Units held by such Members.

(b)     No Right of Redemption. Except as set forth in Section 7.7 and Section 2.8(e), no Member shall have the right to force or cause the Company to redeem, retire or otherwise repurchase, any or all of such Member's Units.

(c)     Class A Units.  Except as otherwise required by law, with respect to all matters upon which Members are entitled to vote, every holder of outstanding Class A Units (the "Class A Members") shall be entitled to cast thereon one vote in person or by proxy for each Class A Unit standing in his or her name.

(d)     Class B Units.

15

(i)    <u>Voting Rights</u>. Except as otherwise required by law, the holders of outstanding Class B Units (the "<u>Class B Members</u>") shall not be entitled to any vote upon any matter presented to Members.

(ii)    <u>Conversion</u>. At the option of the Company, all outstanding Class B Units shall be converted into Class A Units at a ratio of one Class A Unit for each Class B Unit so converted and with such adjustments as shall be stated in the resolution providing for such conversion adopted by the Board of Directors by Majority Vote.

(e)    <u>Class A Preferred Units</u>.

(i)    <u>Distribution Provisions</u>. Subject to the rights of series of preferred Units which may from time to time come into existence, the holders of Class A Preferred Units ("<u>Preferred Members</u>") shall be entitled to receive distributions prior and in preference to any distributions or payments on the other Units of the Company, at the rate of $0.1095 per Class A Preferred Unit per annum on each outstanding Class A Preferred Unit when and as declared by Majority Vote of the Board of Directors. Whether or not declared or paid by the Board of Directors, such distributions shall be cumulative and will accrue on each Class A Preferred Unit from the date of issuance thereof. Subject to compliance with the protective provisions of <u>Section 2.8(e)(v)</u> hereof and the rights of any other series of preferred Units that may from time to time be designated by Majority Vote of the Board of Directors, distributions must be declared and paid with respect to the Class A Preferred Units and all other series of preferred Units contemporaneously, and if less than full distributions are declared, the same percentage of the applicable distribution will be payable to each such series of preferred Units.

(ii)    <u>Liquidation Preference</u>.

(A)    In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, subject to the rights of series of preferred Units that may from time to time come into existence, Preferred Members shall be entitled to receive, prior and in preference to any distribution of any of the assets of the Company or payments to the holders of Class A Units or Class B Units by reason of their ownership thereof, an amount per Preferred Unit (the "<u>Class A Preferential Amount</u>") equal to the greater of (i) $0.73 per Preferred Unit (subject to appropriate adjustment in the event of any distribution, split,

16

combination or similar recapitalization affecting such Class A Preferred Units) plus an amount equal to all accrued but unpaid distributions thereon, or (ii) such amount per Preferred Unit as would have been payable had each such Preferred Unit been converted to a Class A Unit immediately prior to such liquidation, dissolution or winding up. If, upon the occurrence of such event, the assets and funds thus distributed among the Preferred Members shall be insufficient to permit the payment to such Preferred Members of the full aforesaid Class A Preferential Amount, then, subject to the rights of series of the preferred Units that may from time to time come into existence, the entire assets and funds of the Company legally available for distribution shall be distributed ratably among the Preferred Members in proportion to the Class A Preferential Amount each such Preferred Member is otherwise entitled to receive.

(B)    <u>Remaining Assets</u>.  After the distributions described in <u>Section 2.8(e)(ii)(A)</u> above have been paid, the remaining assets of the Company available for distribution to Members shall be distributed pursuant to Section 13.4 (a)(iv) and Section 13.4 (a)(v) hereof.

(C)    <u>Certain Acquisitions and Dispositions</u>.

(1)    <u>Deemed Liquidation</u>.  For purposes of this <u>Section 2.8(e)(ii)(C)</u>, a liquidation, dissolution or winding up of the Company shall be deemed to be occasioned by, or to include (A) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation, but excluding any merger effected exclusively for the purpose of changing the domicile of the Company) or (B) a sale of all or substantially all of the assets of the Company, unless, in the case of either (A) or (B), the Company's Members immediately prior to such acquisition or sale will, immediately after such acquisition or sale (by virtue of securities issued as consideration for the Company's acquisition or sale or otherwise) hold at least 50% of the voting power of the surviving or acquiring entity in approximately the same relative percentages after such acquisition or sale as before such acquisition or sale.

(2)    <u>Valuation of Consideration</u>.  In the event of a deemed liquidation as described in <u>Section 2.8(e)(ii)(C)(1)</u> above, if the consideration received by the Company or the Company's Members is other than cash, its value will be deemed its fair market value as determined in good faith by Majority Vote of the Board of Directors or

17

the Executive Committee, subject to the provisions of this <u>Section 2.8(e)(ii)(C)(2)</u>. Any securities received as consideration shall be valued as follows:

      A. Securities not subject to investment letter or other similar restrictions on free marketability:

      1. ' If traded on a securities exchange or The Nasdaq Stock Market, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty trading day period ending three (3) trading days prior to the closing;

      2. If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the thirty trading day period ending three (3) trading days prior to the closing; and

      3. If there is no active public market for such securities, the value shall be the fair market value thereof, as determined by Majority Vote of the Board of Directors or the Executive Committee in their sole discretion.

      B. The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined in <u>Section 2.8(e)(ii)(C)(2)A</u> above to reflect the approximate fair market value thereof, as determined by Majority Vote of the Board of Directors or the Executive Committee in their sole discretion.

      (3)    <u>Notice of Transaction</u>. The Company shall give each Preferred Member written notice of such impending transaction not later than five (5) Business Days prior to the Members' meeting called to approve such transaction, or five (5) Business Days prior to the closing of such transaction, whichever is earlier, and shall also promptly notify such Preferred Members in writing of the final approval of such transaction. The first of such notices shall describe the material terms and conditions of the impending transaction and the provisions of this <u>Section 2.8(e)(ii)(C)</u>, and the Company shall thereafter give such Preferred Members prompt notice of any material changes. The transaction shall in no event take place sooner than five (5) Business Days after the Company has given the first notice provided for herein or sooner than three (3) Business Days after the Company has

18

given notice of any material changes provided for herein; provided, however, that such periods may be shortened upon the written consent of the Preferred Members that are entitled to such notice and that represent at least a majority of the voting power of all then outstanding Class A Preferred Units.

(4)    Effect of Noncompliance.  In the event the Company shall have not complied with the requirements of this Section 2.8(e)(ii)(C), the Company shall either cause the closing of the transaction to be postponed until such time as the Company shall have complied with the requirements of this Section 2.8(e)(ii)(C), or cancel such transaction, in which event the rights, preferences and privileges of the Preferred Members shall revert to and be the same as such rights, preferences and privileges existing immediately prior to the date of the first notice referred to in Section 2.8(e)(ii)(C)(3) hereof.

(iii)    Conversion and Redemption.  The Preferred Members shall have conversion rights (the "Conversion Rights") and redemption rights as follows:

(D)    Right to Convert.  Subject to Section 2.8(e)(iii)(C) below, each Preferred Unit shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such Preferred Unit, at the office of the Company or any transfer agent for such Preferred Unit, into such number of fully paid and nonassessable Class A Units as is determined by dividing the Class A Redemption Price (as hereinafter defined) per Preferred Unit by the Conversion Price applicable to such Preferred Unit, determined as hereafter provided, in effect on the effective date of the conversion of such Class A Units.  The initial Conversion Price per Class A Preferred Unit shall be $0.73.  Such initial Conversion Price shall be subject to adjustment as set forth in Section 2.8(e)(iii)(D) below.

(E)    Automatic Conversion or Redemption.

(1)    Upon the earlier to occur of (i) the Company's sale of its Class A Units in a firm commitment underwritten public offering, pursuant to a registration statement under the Securities Act (except as provided below in Section 2.8(e)(iii)(C)), the public offering price of which is not less than $1.00 per unit (adjusted to reflect subsequent distributions, splits or recapitalization) and which results in aggregate cash proceeds to the Company of $100,000,000 (net of underwriting discounts and commissions) (a "Qualified Public Offering")

19

or (ii) the date specified by written consent or agreement of the Preferred Members holding at least sixty-six and two-thirds percent (66 2/3%) of the outstanding Class A Preferred Units, each Preferred Unit shall, at the election of the Preferred Members, be:

A. redeemed by the Company at a price equal to $0.73 per Preferred Unit (subject to appropriate adjustment in the event of any distribution, split, combination or similar recapitalization), plus all accrued but unpaid distributions thereon (the "Class A Redemption Price"); or

B. immediately converted into such number of fully paid and nonassessable Class A Units (or the common stock of a successor corporation) as is determined by dividing the Class A Redemption Price by the Conversion Price applicable to such Preferred Unit in effect on the date the certificate is surrendered for conversion.

(F)    Mechanics of Conversion and Redemption.

(1)    Optional Conversion. Before any Preferred Member shall be entitled to convert its Class A Preferred Units into Class A Units pursuant to Section 2.8(e)(iii)(A), such Preferred Member shall give written notice to the Company, at its principal corporate office, of the election to convert the same, state therein the name or names in which the certificate or certificates for Class A Units are to be issued and surrender the certificate or certificates therefor, duly endorsed, at the office of the Company or of any transfer agent for the Class A Preferred Units. The Company shall, as soon as practicable thereafter, issue and deliver at such office to such Preferred Member, or to the nominee or nominees of such Preferred Member, a certificate or certificates for the number of Class A Units to which such Preferred Member shall be entitled as aforesaid and cash, as provided in Section 2.8(e)(iii)(H) below, in respect of any fractional Class A Unit issuable upon such conversion. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the Class A Preferred Units to be converted, and the person or persons entitled to receive the Class A Units issuable upon such conversion shall be treated for all purposes as the holder or holders of such Class A Units as of such date.

(2)    Conversion or Redemption Outside a Qualified Public Offering. In the event that holders of 66 2/3% of the outstanding Class A Preferred Units elect to cause the Class A Preferred Units to be converted into Class A Units or redeemed pursuant to Section

20

2.8(e)(iii)(B), such holders shall give written notice to the Company, at its principal corporate office, of such election. The Company shall thereafter send a Notification to all Preferred Members that their Class A Preferred Units will be converted or redeemed as provided in this subparagraph (2) pursuant to Section 2.8(e)(iii)(B). Each Preferred Member shall give the Company written notice of its election ("Notice of Election") to receive cash or Class A Units for its Class A Preferred Units within ten (10) Business Days after receipt of such Notification (the "Election Period"); provided, that if a Preferred Member does not provide such Notice of Election within such Election Period, such Preferred Member shall be deemed to have elected conversion into Class A Units pursuant to Section 2.8(e)(iii)(B)(1). Such Notice of Election shall include the name or names in which the certificate or certificates for Class A Units are to be issued, in the case of conversion to Class A Units, or the payment is to be made, in the case of redemption. As soon as practicable thereafter, such Preferred Member shall surrender the certificate or certificates therefor, duly endorsed, at the office of the Company or of any transfer agent for the Class A Preferred Units. The Company shall, as soon as practicable thereafter, deliver to such Preferred Member, or to the nominee or nominees of such Preferred Member, (i) in the case of conversion, a certificate or certificates for the number of Class A Units to which such Preferred Member shall be entitled as aforesaid and cash, as provided in Section 2.8(e)(iii)(H) below, in respect of any fractional Class A Unit issuable upon such conversion, or (ii) in the case of redemption, the Class A Redemption Price for such Class A Preferred Units payable to the order of such Preferred Member, or nominee or nominees of such Preferred Member, as specified in the Notice of Election. Such conversion or redemption shall be deemed to have been made immediately prior to the close of business on the last Business Day prior to the end of the Election Period. From and after the expiration of the Election Period, each Class A Preferred Unit shall represent only the right to receive Class A Units (and cash in lieu of fractional interests), in the case of a conversion, or the Class A Redemption Price, in the case of a redemption.

(3)     Redemption and Conversion in a Qualified Public Offering. In connection with a Qualified Public Offering, each Preferred Member shall give the Company written notice of its election to receive cash or Class A Units for its Class A Preferred Units within ten (10) Business Days after receipt of notice of a proposed Qualified Public Offering by the Company; provided, that if a Preferred Member does not provide such notice within such ten (10) Business Day period, such Preferred Member shall be deemed to have elected

conversion into Class A Units pursuant to Section 2.8(e)(iii)(B)(1). Such notice shall include the name or names in which the certificate or certificates for Class A Units are to be issued, in the case of conversion to Class A Units, or the payment is to be made, in the case of redemption. Such Preferred Member shall surrender the certificate or certificates therefor, duly endorsed, at the office of the Company or of any transfer agent for the Class A Preferred Units on or prior to the closing of the Qualified Public Offering, and the Company shall, as soon as practicable after the closing of the Qualified Public Offering, deliver to such Preferred Member, or to the nominee or nominees of such Preferred Member, (i) in the case of conversion, a certificate or certificates for the number of Class A Units to which such Preferred Member shall be entitled as aforesaid and cash, as provided in Section 2.8(e)(iii)(H) below, in respect of any fractional Class A Unit issuable upon such conversion, or (ii) in the case of redemption, the Class A Redemption Price for such Class A Preferred Units payable to the order of such Preferred Member, or nominee or nominees of such Preferred Member. The conversion or redemption shall become effective immediately prior to the closing of the Qualified Public Offering and from and after such date, each Class A Preferred Unit shall represent only the right to receive Class A Units (or the common stock of a successor corporation) (and cash in lieu of fractional interests), in the case of a conversion, or the Class A Redemption Price, in the case of a redemption.

(4)     Priority.  If, at any time that Class A Preferred Units are required to be redeemed pursuant to this Section 2.8(e)(iii)(C), the funds of the Company legally available for redemption of the Class A Preferred Units, as determined under the Act, are insufficient to redeem the number of Class A Preferred Units required to be redeemed, those funds which are so legally available shall be used to redeem pro rata (in proportion to the number of Class A Preferred Units owned by such Preferred Members) the maximum possible number of such Class A Preferred Units required to be redeemed at such time pursuant to this Section 2.8(e)(iii)(C). At any time thereafter, when additional funds of the Company become legally available for the redemption of Class A Preferred Units, such funds shall forthwith be used to redeem pro rata (in proportion to the number of Class A Preferred Units owned by such Preferred Members) the maximum possible number of Class A Preferred Units which the Company has become obligated to redeem pursuant to this Section 2.8(e)(iii)(C), but which it has not redeemed.

22

(5)    <u>Effect of Redemption</u>.  Any Class A Preferred Units redeemed shall be permanently retired, shall no longer be deemed outstanding and shall not under any circumstances be reissued.

(G)    <u>Conversion Price Adjustments of Class A Preferred Units for Certain Dilutive Issuances, Splits and Combinations</u>.  The Conversion Price of the Class A Preferred Units shall be subject to adjustment from time to time as follows:

(1)    A.  If the Company shall issue, after the date upon which any Class A Preferred Units were first issued (the "<u>Purchase Date</u>"), any Additional Units (as defined below) without consideration or for a consideration per Unit less than the Conversion Price for such Class A Preferred Units in effect immediately prior to the issuance of such Additional Units, the Conversion Price for such Class A Preferred Units in effect immediately prior to each such issuance shall automatically (except as otherwise provided in this clause (1)) be reduced to a price (calculated to the nearest cent) determined by multiplying such Conversion Price by a fraction, the numerator of which shall be the number of Class A Preferred Units outstanding immediately prior to such issuance (the "<u>Outstanding Units</u>") plus the number of Units that the aggregate consideration received by the Company for such issuance (as provided for in <u>Section 2.8(e)(iii)(D)(1)C</u> and <u>Section 2.8(e)(iii)(D)(1)D</u>) would purchase at such Conversion Price, and the denominator of which shall be the number of Outstanding Units plus the number of such Additional Units.  For purposes of the above calculation, Outstanding Units shall be calculated on a fully diluted basis, as if all Class A Preferred Units had been converted into Class A Units immediately prior to such issuance and any outstanding warrants, options or other rights for the purchase of Units had been fully exercised immediately prior to such issuance as of such date.

B.  No adjustment of the Conversion Price shall be made in an amount less than one cent per Preferred Unit provided that any adjustments which are not required to be made by reason of this sentence shall be carried forward and shall be taken into account in any subsequent adjustment made prior to three years from the date of the event giving rise to the adjustment being carried forward.  Except to the limited extent provided for in <u>Sections 2.8(e)(iii)(D)(1)E.3.</u> and  <u>2.8(e)(iii)(D)(1)E.4.</u>, no adjustment of such Conversion Price pursuant to this <u>Section 2.8(e)(iii)(D)(1)</u> shall have the effect of increasing the Conversion Price

23

above the Conversion Price in effect immediately prior to such adjustment.

      C.  In the case of the issuance of Units for cash, the consideration shall be deemed to be the amount of cash paid therefor before deducting any reasonable discounts, commissions or other expenses allowed, paid or incurred by the Company for any underwriting or otherwise in connection with the issuance and sale thereof.

      D.  In the case of an issuance of Units for consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair value thereof as determined in good faith by Majority Vote of the Board of Directors or the Executive Committee irrespective of any accounting treatment.

      E.  In the case of the issuance (whether before, on or after the applicable Purchase Date) of options to purchase or rights to subscribe for Units, securities by their terms convertible into or exchangeable for Units or options to purchase or rights to subscribe for such convertible or exchangeable securities, the following provisions shall apply for all purposes of this Section 2.8(e)(iii)(D)(1) and 2.8(e)(iii)(D)(2):

      1.  The aggregate maximum number of Units deliverable upon exercise (assuming the satisfaction of any conditions to exercisability, including without limitation, the passage of time, but without taking into account potential antidilution adjustments) of such options to purchase or rights to subscribe for Units shall be deemed to have been issued at the time such options or rights were issued and for a consideration equal to the consideration (determined in the manner provided in Sections 2.8(e)(iii)(D)(1)C and 2.8(e)(iii)(D)(1)D), if any, received by the Company upon the issuance of such options or rights plus the minimum exercise price provided in such options or rights (without taking into account potential antidilution adjustments) for the Units covered thereby.

      2.  The aggregate maximum number of Units deliverable upon conversion of or in exchange (assuming the satisfaction of any conditions to convertibility or exchangeability, including, without limitation, the passage of time, but without taking into account potential antidilution adjustments) for any such convertible or exchangeable securities or upon the exercise of options to purchase or rights to subscribe for such convertible or exchangeable securities and subsequent conversion or exchange thereof shall be deemed to have been issued at the time such

24

securities were issued or such options or rights were issued and for a consideration equal to the consideration, if any, received by the Company for any such securities and related options or rights (excluding any cash received on account of accrued interest or accrued distributions), plus the minimum additional consideration, if any, to be received by the Company (without taking into account potential antidilution adjustments) upon the conversion or exchange of such securities or the exercise of any related options or rights (the consideration in each case to be determined in the manner provided in Sections 2.8(e)(iii)(D)(1)C and 2.8(e)(iii)(D)(1)D).

3.    In the event of any change in the number of Units deliverable or in the consideration payable to the Company upon exercise of such options or rights or upon conversion of or in exchange for such convertible or exchangeable securities, including, but not limited to, a change resulting from the antidilution provisions thereof, the Conversion Price of the Class A Preferred Units, to the extent in any way affected by or computed using such options, rights or securities, shall be recomputed to reflect such change, but no further adjustment shall be made for the actual issuance of Units or any payment of such consideration upon the exercise of any such options or rights or the conversion or exchange of such securities.

4.    Upon the expiration of any such options or rights, the termination of any such rights to convert or exchange or the expiration of any options or rights related to such convertible or exchangeable securities, the Conversion Price of the Class A Preferred Units, to the extent in any way affected by or computed using such options, rights or securities or options or rights related to such securities, shall be recomputed to reflect the issuance of only the number of Units (and convertible or exchangeable securities which remain in effect) actually issued upon the exercise of such options or rights, upon the conversion or exchange of such securities or upon the exercise of the options or rights related to such securities.

5.    The number of Units deemed issued and the consideration deemed paid therefor pursuant to Sections 2.8(e)(iii)(D)(1)E.1 and 2 shall be appropriately adjusted to reflect any change, termination or expiration of the type described in either Sections 2.8(e)(iii)(D)(1)E.3 or 4.

(2)    "Additional Units" shall mean any Units issued (or deemed to have been issued pursuant to Section

25

2.8(e)(iii)(D)(1)E) by the Company after the Purchase Date other than:

       A.  Units issued pursuant to a transaction described in Section 2.8(e)(iii)(D)(3) hereof,

       B.  Units issuable or issued to employees, consultants or directors of the Company directly or pursuant to an option plan or restricted Unit plan approved by Majority Vote of the Board of Directors or the Executive Committee, not to exceed 1,000,000 Units,

       C.  Units issuable upon exercise of warrants outstanding as of the date of this Agreement,

       D.  Units issued or issuable upon conversion of the Class A Preferred Units, and

       E.  Units issued or issuable in a public offering prior to or in connection with which all outstanding shares of Class A Preferred Units will be converted to Class A Units.

       (3)    In the event the Company should, at any time or from time to time after the Purchase Date, fix a record date for the effectuation of a split or subdivision of the outstanding Class A Units or the determination of holders of Class A Units entitled to receive a distribution payable in additional Class A Units or other securities or rights convertible into, or entitling the holder thereof to receive directly or indirectly, additional Class A Units (hereinafter referred to as "Unit Equivalents") without payment of any consideration by such holder for the additional Class A Units or the Unit Equivalents (including the additional Class A Units issuable upon conversion or exercise thereof), then, as of such record date (or the date of such distribution, split or subdivision, if no record date is fixed), the Conversion Price of the Class A Preferred Units shall be proportionately decreased or increased, as appropriate.

       (4)    If the number of Units outstanding at any time after the Purchase Date is decreased by a combination of the outstanding Units, then, following the record date of such combination (or the date of such combination if no record date is fixed), the Conversion Price for the Class A Preferred Units shall be appropriately increased so that the number of Class A Units issuable on conversion of each share of such Preferred Unit shall be decreased in proportion to such decrease in outstanding Class A Units.

(H)    <u>Other Distributions</u>.  In the event the Company shall declare a distribution payable in securities of other persons, evidences of indebtedness issued by the Company or other persons, assets (excluding cash distributions) or options or rights not referred to in <u>Section 2.8(e)(iii)(D)(3)</u>, then, in each such case for the purpose of this <u>Section 2.8(e)(iii)(E)</u>, the Preferred Members shall be entitled to a proportionate share of any such distribution as though they were the holders of the number of Class A Units of the Company into which their Class A Preferred Units are convertible as of the record date fixed for the determination of the holders of Class A Units of the Company entitled to receive such distribution.

(I)    <u>Recapitalizations</u>.  If at any time or from time to time, there shall be a recapitalization of the Class A Units (other than a subdivision, combination or merger or sale of assets transaction provided for elsewhere in this <u>Section 2.8(e)(iii)</u> or in <u>Section 2.8(e)(ii)</u>), provision shall be made so that the Preferred Members shall thereafter be entitled to receive, upon conversion of the Class A Preferred Units, the number of Class A Units or other securities or property of the Company or otherwise, to which a holder of the amount of Class A Units deliverable upon conversion would have been entitled on such recapitalization.  In any such case, appropriate adjustment shall be made in the application of the provisions of this <u>Section 2.8(e)(iii)</u> with respect to the rights of the Preferred Members after the recapitalization to the end that the provisions of this <u>Section 2.8(e)(iii)</u> (including adjustment of the Conversion Price then in effect for and the number of Class A Units to be received upon conversion of the Class A Preferred Units) shall be applicable after the event and be as nearly equivalent as practicable to those in effect immediately prior to such recapitalization.

(J)    <u>No Impairment</u>.  The Company will not, by amendment of its Certificate of Formation or this Agreement or through any reorganization, recapitalization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this <u>Section 2.8(e)(iii)</u> and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the Preferred Members against impairment.

(K)    <u>No Fractional Class A Units; Certificate as</u>

27

to Adjustments.

(1)     No fractional Class A Units shall be issued upon the conversion of any Class A Preferred Units. All Class A Units (including fractions thereof) issuable upon conversion of more than one Preferred Unit by a holder thereof shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional Class A Units. If, after the aforementioned aggregation, the conversion would result in the issuance of a fractional Class A Unit, the Company shall, in lieu of issuing a fractional Class A Unit, pay the holder otherwise entitled to such fraction a sum in cash equal to the fair market value of such fraction on the date of conversion, as determined in good faith by Majority Vote of the Board of Directors or the Executive Committee.

(2)     Upon the occurrence of each adjustment or readjustment of the Conversion Price of the Class A Preferred Units pursuant to this Section 2.8(e)(iii), the Company, at its sole expense, shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each Preferred Member a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, upon the written request at any time of any Preferred Member, furnish or cause to be furnished to such Preferred Member a like certificate setting forth (A) such adjustment and readjustment, (B) the Conversion Price for such Class A Preferred Units in effect at that time, and (C) the number of Class A Units and the amount, if any, of other property, which at that time would be received upon the conversion of a Preferred Unit.

(L)     Notices of Record Date. In the event of any taking by the Company of a record of the holders of any class of Units for the purpose of determining the holders thereof who are entitled to receive any distribution, any right to subscribe for, purchase or otherwise acquire any Units or of any other securities or property, or to receive any other right, the Company shall mail to each Preferred Member, at least ten (10) Business Days prior to the date specified therein, a Notification specifying the date on which any such record is to be taken for the purpose of such distribution or right, and the amount and character of such distribution or right.

(iv)     Voting Rights. The holder of each Preferred

28

Unit shall have the right to one vote for each Class A Unit into which such Preferred Unit could then be converted, and with respect to such vote, such holder shall have full voting rights and powers equal to the voting rights and powers of the holders of Class A Units, and shall be entitled, notwithstanding any provision hereof, to notice of any Members' meeting in accordance with this Agreement, and shall be entitled to vote, together with holders of Class A Units, with respect to any question upon which holders of Class A Units have the right to vote. Fractional votes shall not, however, be permitted and any fractional voting rights available on an as-converted basis (after aggregating all Class A Units into which Class A Preferred Units held by each holder could be converted) shall be rounded to the nearest whole number (with one-half being rounded upward).

(v)    <u>Protective Provisions</u>.  So long as any Class A Preferred Units are outstanding, the Company shall not, without first obtaining the approval (by vote or written consent, as provided by law) of the Preferred Members holding at least sixty-six and two-thirds percent (66 2/3%) of the then outstanding Class A Preferred Units, voting together as a class:

(M)    sell, lease, transfer or otherwise dispose of any material portion of its assets, other than in the ordinary course of business;

(N)    merge, consolidate, dissolve or liquidate the Company (other than a merger or liquidation of any subsidiary of the Company into the Company) or consummate any other fundamental change in the structure of the Company (including, without limitation, any transaction or series of transactions, in which more than fifty percent (50%) of the Company's voting power is disposed of);

(O)    alter or change the rights, preferences or privileges of the Class A Preferred Units so as to affect adversely said Class A Preferred Units;

(P)    authorize or issue, obligate itself to issue, or reclassify any existing Unit into any security or instrument, including, without limitation, any security convertible into or exercisable for any Unit or other security, having a preference over or pari passu to the Class A Preferred Units with respect to voting, distributions or upon liquidation or having protective provision rights superior or pari passu to the Class A Preferred Units;

29

(Q)    take any action which would require the approval of the Class A Preferred Units, whether or not as a class, pursuant to the Act;

(R)    redeem, purchase or otherwise acquire (or pay into or set aside for a sinking fund for such purpose) any Class A Preferred Units, Class A Units or Class B Units or any Units or other securities junior to the Class A Preferred Units other than pursuant to existing contractual obligations of the Company;

(S)    amend this Agreement in a manner adverse to the Preferred Members;

(T)    declare or pay distributions on its Units junior to the Class A Preferred Units; or

(U)    amend or waive any of the provisions of this Section 2.8(e)(v).

(vi)    Status of Converted Units.  In the event any Class A Preferred Units shall be converted pursuant to Section 2.8(e)(iii) hereof, the Class A Preferred Units so converted shall be canceled and shall not be issuable by the Company.

Section 2.9    Issuance of Additional Units and Interests.  Subject to the provisions of Section 2.8(e)(v) and Article IV hereof, the Board of Directors shall have the right to cause the Company to issue (a) additional Units of the Company (including other classes or series thereof having different rights), (b) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Units of the Company and (c) warrants, options, or other rights to purchase or otherwise acquire Units of the Company; provided that at any time following the date hereof, the Company shall not issue Units to any Person unless such Person shall have executed a counterpart to this Agreement.

## ARTICLE III

## MEMBERS

Section 3.1    Founding and Non-Founding Class A Members.  The names and addresses of the Founding Class A Members and the Non-Founding Class A Members, respectively, of the Company are listed on Schedule I of this Agreement. As of the date hereof, there are no other Founding Class A Members or Non-Founding Class A Members.  In the event that any additional Person is  added as a Founding Class A

30

Member or a Non-Founding Class A Member, Schedule I shall be revised to reflect any such additional Member and shall specify whether such Member is a Founding Class A Member or a Non-Founding Class A Member. The Class B Members consist of former stockholders of Market Drive Interactive, Inc., a California corporation.

Section 3.2    Admission of Additional Founding Class A Members and Non-Founding Class A Members. Additional Founding Class A Members of the Company may only be added if the addition of any such proposed additional Founding Class A Member is approved, prior to such admission, by all of the then existing Founding Class A Members. Such an additional Founding Class A Member shall have all of the rights and duties of a Founding Class A Member hereunder and shall execute a counterpart of, or an agreement adopting this Agreement, prior to admission as a Founding Class A Member hereunder. Non-Founding Class A Members of the Company may only be added if the addition of any such proposed additional Non-Founding Class A Member is approved, prior to such admission, by a Majority Vote of the then existing Media Members and such additional Non-Founding Class A Member executes a counterpart of, or an agreement adopting this Agreement, prior to admission as a Non-Founding Class A Member hereunder, and, in the case of a transferee Media Member, such proposed additional Media Member satisfies the requirements of Section 7.4. In the event that the addition of a proposed additional Non-Founding Class A Member would result in a reduction in the Membership Interests of any Founding Class A Member to a level below 16.9%, then the addition of such additional Non-Founding Class A Member shall be subject to the prior written consent of such Founding Class A Member.

Section 3.3    Investment Representations. Upon the issuance of any Units pursuant to this Agreement, each Member, as of the date of such issuance, shall represent and warrant as follows:

(a)    Such Member is acquiring its Units for investment, solely for such Members own account and not for distribution, transfer or sale to others in connection with any distribution or public offering.

(b)    Such Member is financially able to bear the economic risk of its investment in the Company and has no need for liquidity in this investment. Furthermore, the financial capacity of such Member is of such a proportion that the total costs of such Member's investment in the Company is not material when compared with such Member's total financial capacity.

(c)    Such Member has such knowledge, experience and skill in financial and business matters in general and with respect to investments of a nature similar to an investment in the Company so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, the investment.

31

(d)    Such Member (i) has received all information that such Member deems necessary to make an informed investment decision with respect to its investment in the Company; (ii) has had the unrestricted opportunity to make such investigation as such Member desires pertaining to the Company and its investment therein and to verify any information furnished to such Member; and (iii) has had the opportunity to ask questions of representatives of the Company concerning the Company and such Member's investment.

(e)    Such Member understands that such Member must bear the economic risk of its investment in the Company for an indefinite period of time because (i) the Units have not been registered under the Securities Act and applicable state securities laws and (ii) the Units may not be sold, transferred, pledged or otherwise disposed of except in accordance with this Agreement and then only if they are subsequently registered in accordance with the provisions of the Securities Act and applicable state securities laws or registration under the Securities Act or any applicable state securities laws is not required.

(f)    Such Member understands that the Company is not obligated to register the Units for resale under the Securities Act or any applicable state securities laws and that the Company is not obligated to supply such Member with information or assistance in complying with any exemption under the Securities Act or any applicable state securities laws. Upon the request of the Company, such Member will provide the Company with an opinion of counsel satisfactory to the Company that a proposed resale of the Units complies with the Securities Act or any applicable state securities laws.

Section 3.4    Unit Certificate Legend. Each certificate representing Units now held or hereinafter acquired by any Member shall, for as long as this Agreement is effective, bear a legend substantially in the following form:

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAW, IF ANY, AND NEITHER THE UNITS NOR ANY INTEREST THEREIN MAY BE SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SAID ACT OR LAW AND THE RULES AND REGULATIONS THEREUNDER. BY ITS ACCEPTANCE THEREOF, THE HOLDER OF THIS CERTIFICATE REPRESENTS THAT IT IS ACQUIRING THESE UNITS FOR INVESTMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT

32

TO A LIMITED LIABILITY COMPANY AGREEMENT (THE "AGREEMENT") AMONG THE COMPANY AND ITS MEMBERS. NO TRANSFER OR VOTING OF SUCH UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE AGREEMENT. A COPY OF THE AGREEMENT IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY AND MAY BE OBTAINED WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY.

## ARTICLE IV

### CAPITAL CONTRIBUTIONS, CAPITAL ACCOUNTS AND ALLOCATIONS

Section 4.1      Capital Contributions.  Schedule I attached hereto and made a part hereof sets forth the capital contributed by and the Units issued to date to each of the Members.

Section 4.2      Additional Capital Contributions.

(a)      In the event that, subject to Section 9.7, the Board of Directors by Majority Vote shall determine that the Company requires funds for proper Company purposes in excess of the capital received by the Company to date (including additional working capital and any funds for acquisitions in excess of those funds allocated to consummate acquisitions in the Business Plan), other than making distributions to the Members, the Chief Executive Officer shall call for each of the Media Members to make additional capital contributions ("Additional Capital Contributions") in order to carry out such actions and, upon such call having been properly given to the Media Members, each of the Media Members shall be required to make Additional Capital Contributions to the extent so called for by the Board of Directors in accordance with this Section 4.2. The respective portion of any Additional Capital Contributions to be contributed by each Media Member shall be determined on a pro rata basis (in proportion to the number of Units owned by such Media Member) at the time of such call. Any such call for Additional Capital Contributions from the Media Members shall be evidenced in a Notification which shall specify the amount of such Additional Capital Contributions required from each such Media Member. On or prior to the 20th day following the delivery of such written call notice, the Media Members shall contribute or cause to be contributed to the Company an amount (in cash and/or Contributed Property at its Agreed Value) equal to such Media Member's required portion of the Additional Capital Contributions so called for by the Board of Directors. Failure to make any such Additional Capital Contribution shall give rise to the remedies set forth in Article XIV.

(b)      Notwithstanding anything to the contrary contained in this

33

Agreement, and notwithstanding any custom or rule of law to the contrary, upon liquidation, dissolution or winding up of the Company, Members shall not be obligated to contribute any amount to the Company in respect of any deficit in such Member's Capital Account.

(c)    The respective rights and obligations of any Media Member pursuant to this <u>Section 4.2</u> may be assigned by such Media Member to any Affiliate of such Media Member upon prior written notice to the Company and the other Media Members; <u>provided</u>, <u>however</u>, that unless otherwise agreed in writing by the Company and the other Media Members, no such assignment shall relieve or release any Media Member from its obligations pursuant to this <u>Section 4.2</u>, and no such assignment shall cause such Affiliate to become a Media Member except upon satisfaction of the provisions of <u>Section 3.2</u>.

Section 4.3        <u>Issuances and Valuation of Units</u>.

(a)    Subject to <u>Section 2.8(e)(v)(D)</u>, each Media Member making an Additional Capital Contribution shall be issued such number and class of Units as shall be determined by Majority Vote of the Board of Directors or the Executive Committee based upon the fair market value of such Units at the time of such issuance using any value approved by the Board of Directors or the Executive Committee by Majority Vote, and each Media Member's Membership Interest shall thereafter be adjusted to reflect the purchase of such additional Units.

(b)    Notwithstanding <u>Section 4.3(a)</u> and except as contemplated in <u>Article XIV</u> with respect to any Contribution Default, in the event that the issuance of Class A Units to a new Class A Member in accordance with this <u>Section 4.3</u> would result in a reduction of any Founding Class A Member's Class A Unit ownership to a level below 16.9% of all Class Units, then the issuance of such Units shall be subject to the prior written consent of such Founding Class A Member.

(c)    The Members shall take any and all actions necessary to facilitate the issuance of Units in accordance with this <u>Section 4.3</u>; provided, that the foregoing shall not require the Preferred Holders to approve Units or other securities having a preference over or pari passu to the Class A Preferred Units as provided in <u>Section 2.8(e)(v)(D)</u>.

Section 4.4        <u>Capital Accounts</u>. (a)  A Capital Account shall be established and maintained for each class of Units held by each Member. Each Member's Capital Accounts (i) shall be increased by (A) the amount of money contributed by that Member to the Company, (B) the Agreed Value of Contributed Property contributed by that Member to the Company (net of liabilities secured by the Contributed Property that the Company is considered to assume or take subject to under

34

Section 752 of the Code), (C) allocations to that Member of Net Profit (or items thereof), and (D) any other increases required by the Treasury Regulations, and (ii) shall be decreased by (A) the amount of money distributed to that Member by the Company, (B) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Code), (C) allocations to that Member of Section 705(a)(2)(B) expenditures, (D) allocations of Company Net Loss (or items thereof), and (E) any other decreases required by the Treasury Regulations.

(b)    Except as otherwise provided herein, whenever it is necessary to determine the Capital Account of any Member for purposes of this Agreement, the Capital Account of the Member shall be determined after giving effect to (i) all Capital Contributions made or deemed to have been made to the Company on or after the date of this Agreement, (ii) all allocations pursuant to Article V for operations and transactions effected on or after the date of this Agreement and prior to the date such determination is required to be made under this Agreement and (iii) all distributions made on or after the date of this Agreement.

(c)    (i)  Upon the issuance of additional Units in the Company for cash or Contributed Property or upon the contribution to the Company by a new or existing Member of cash or Contributed Property other than Capital Contributions made by all existing Members in accordance with their respective Membership Interests, the Capital Accounts of all Members and the Carrying Values of all Company Properties immediately prior to such contribution shall be adjusted (consistent with the provisions hereof and with the Treasury Regulations under Section 704 of the Code) upward or downward to reflect any Unrealized Gain or Unrealized Loss attributable to each Company Property, as if such Unrealized Gain or Unrealized Loss had been recognized upon an actual sale of each such Property immediately prior to such issuance and had been allocated to the Members in accordance with Article V of this Agreement.

(ii)    Immediately prior to the actual or deemed distribution of any Company Property (other than cash) or the distribution of cash to a retiring or continuing Member as consideration for an interest in the Company, the Capital Accounts of all Members and the Carrying Value of all Company Property shall be adjusted (consistent with the provisions hereof and Treasury Regulations under Section 704 of the Code) upward or downward to reflect any Unrealized Gain or Unrealized Loss attributable to each Company Property, as if such Unrealized Gain or Unrealized Loss had been recognized upon an actual sale of each such Company Property immediately prior to such distribution and had been allocated to the Members at such time in accordance with Article V of this Agreement.

35

(d)    In addition to the adjustments required by the foregoing provisions of this <u>Section 4.4</u>, the Capital Accounts of the Members shall be adjusted in accordance with the capital account maintenance rules of Section 1.704-1(b)(2)(iv) of the Treasury Regulations. The foregoing provisions of this <u>Section 4.4</u> are intended to comply with the Treasury Regulations and shall be interpreted and applied in a manner consistent therewith. If the Board of Directors, by Majority Vote, shall determine that it is prudent to modify the manner in which the Capital Accounts are computed in order to comply with the Treasury Regulations, the Board of Directors, by Majority Vote, may make such modification, provided that the Board of Directors notifies the Members in writing of such modification prior to its effective date, and provided further that the Board of Directors shall have no liability to any Member for any failure to exercise any such discretion to make any modifications permitted under this <u>Section 4.4(d)</u>.

(e)    The Capital Account balance of any Member who receives a "guaranteed payment" (as determined under Section 707(c) of the Code) from the Company shall be adjusted only to the extent of such Member's allocable share of any Company deduction or loss resulting from such guaranteed payment.

Section 4.5    <u>Return of Capital Contributions</u>.  Except as otherwise provided herein or in the Act, no Member shall have the right to withdraw, or receive any return of, all or any portion of such Member's Capital Contribution.

Section 4.6    <u>Interest</u>.  No interest shall be paid by the company on Capital Contributions or on balances in Members' Capital Accounts.

Section 4.7    <u>Loans From Members</u>.  Loans by a Member to the Company shall not be considered Capital Contributions.  If any Member shall advance funds to the Company in excess of the amounts to be contributed by such Member to the capital of the Company pursuant to <u>Article IV</u>, the making of such advances shall not result in any increase in such Member's Membership Interest. The amounts of any such advances shall be a debt of the Company to such Member and shall be payable or collectible only out of the Company assets in accordance with the terms and conditions upon which such advances are made.  The repayment of loans from a Member to the Company upon liquidation shall be subject to the order of priority set forth in <u>Section 13.4</u>.

# ARTICLE V

## ALLOCATIONS TO CAPITAL ACCOUNTS

Section 5.1    <u>Allocations to Capital Accounts</u>.

(a)    <u>General Rule</u>.  Except as provided in this Agreement, Net

36

Profit (and items thereof) and Net Loss (and items thereof) for any Fiscal Period shall be allocated among the Members in a manner that the Board of Directors reasonably deems necessary or appropriate in order to effectuate the intended economic sharing arrangement of the Members as reflected in Article VI and Article XIII hereof.  In furtherance and not in limitation of the preceding sentence or Section 5.2(g), Net Loss (and items of loss, deduction and expense thereof) shall first  be allocated with respect to Common Units until  the Capital Account balances associated with such Common Units have been reduced to zero, and then to the Capital Accounts associated with Class A Preferred Units.

        (b)    Special Allocations Relating to Preferred Interests.  Notwithstanding any other provision of this Article V (other than the Regulatory Allocations herein), if any Class A Preferred Units are redeemed by the Company, (i) Net Profit (and items of income and gain thereof) shall be allocated to each Capital Account with respect to such redeemed Class A Preferred Units to the extent that the Redemption Price with respect to such redeemed Class A Preferred Units exceeds the Capital Account balance with respect to such redeemed Class A Preferred Units (such excess being a "Deficiency Amount" and such allocation being pro rata to all such Capital Accounts with respect to such redeemed Class A Preferred Units in accordance with each such Capital Account's respective Deficiency Amount if there is insufficient Net Profit (and items of income and gain thereof) to eliminate all Deficiency Amounts) and (ii) Net Loss (and items of loss, deduction and expense thereof) shall be allocated to each Capital Account with respect to such redeemed Class A Preferred Units to the extent that the Capital Account balance with respect to such redeemed Class A Preferred Units exceeds the Redemption Price with respect to such redeemed Class A Preferred Units (such excess being an "Excess Amount") (such allocation being pro rata to all such Capital Accounts with respect to such redeemed Class A Preferred Units in accordance with each such Capital Account's respective Excess Amount if there is insufficient Net Loss (and items of loss, deduction and expense thereof) to eliminate all Excess Amounts).

        (c)    Special Allocations Relating to Conversion of Units.  If, as a direct or indirect result of the conversion of any Units of the Company, the Company or any Member not issued Units in the conversion, realizes any items of income, gain, loss, deduction or expense, then notwithstanding any other provision of this Article V (other than the Regulatory Allocations herein) such items shall, by Majority Vote of the Board of Directors, be taken into account in allocating Company items of income, gain, loss, deduction or expense so that, to the extent possible, the net amount of such items to such Members shall be equal to the net amount that would have been allocated to each such Member if the items realized as a direct or indirect result of the conversion not been realized.

(d)    <u>Conversion Units.</u> In the event that the Company issues Units upon the conversion of any other Units, the person acquiring such Units, each Member and the Company each agrees to treat such issuance as a tax-free transaction. The Board of Directors is authorized to make adjustments and/or allocations to Capital Accounts in a manner that they reasonably deem necessary or appropriate in order to effectuate the intended economic sharing arrangement with respect to a convertible Unit.

Section 5.2    <u>Regulatory and Related Allocations</u>.  Notwithstanding any other provision in this Agreement to the contrary, the following special allocations shall be made in the following order:

(a)    <u>Minimum Gain Chargeback</u>.  Except as otherwise provided in Treasury Regulations Section 1.704-2, if there is a net decrease in Partnership Minimum Gain during any Fiscal Period, each Member shall be specially allocated items of Company income and gain for such Fiscal Period (and, if necessary, subsequent Fiscal Periods) in an amount equal to such Member's share of the net decrease in such Partnership Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to the Members pursuant thereto.  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2.  This <u>Section 5.2(a)</u> is intended to comply with the minimum gain chargeback requirements in such Treasury Regulations and shall be interpreted consistently therewith.

(b)    <u>Member Minimum Gain Chargeback</u>.  If there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to Partner Nonrecourse Debt during any Fiscal Period, each Member shall be specially allocated items of Company income and gain for such Fiscal Period (and, if necessary, subsequent Fiscal Periods) in an amount equal to such Member's share, if any, of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Member's Partner Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2.  This <u>Section 5.2(b)</u> is intended to comply with the minimum gain chargeback requirements in such Treasury Regulations and shall be interpreted consistently therewith.

(c)    <u>Qualified Income Offset</u>.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) with respect to such Member's Capital Account, items of Company income and gain shall be specially

38

allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided, however, that an allocation pursuant to this Section 5.2(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV have been tentatively made as if this Section 5.2(c) were not in this Agreement.  This Section 5.2(c) is intended to constitute a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(ii)(d) and shall be interpreted consistently therewith.

(d)     Gross Income Allocation.  In the event any Member has an Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such Member's Adjusted Capital Account Deficit as quickly as possible; provided, however, that an allocation pursuant to this Section 5.2(d) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 5.2 (other than Section 5.2(c)) have been tentatively made as if this Section 5.2(d) were not in this Agreement.

(e)     Nonrecourse Deductions.  Any Nonrecourse Deductions for any Fiscal Period shall be allocated to the Members in accordance with their respective Membership Interests.

(f)     Partner Nonrecourse Deductions.  Any Partner Nonrecourse Deductions for any Fiscal Period shall be allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2.

(g)     Loss Allocation Limitation.  So long as any Member's Capital Account balance is positive, no allocation of Net Loss (or items thereof) shall be made to any Member to the extent that such allocation would create or increase an Adjusted Capital Account Deficit with respect to such Member.

(h)     Curative Allocations.  The allocations set forth in Section 5.2(a) through 5.2(g) (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulations under Section 704 of the Code.  Notwithstanding any other provision of this Article V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other Company items of income, gain, loss, deduction and expense among the Members so that, to the extent possible, the net amount of such allocations of other Company items and the Regulatory Allocations shall be equal to the net amount that would have been allocated to the Members pursuant to Article V if the Regulatory Allocations had not occurred.

39

(i)     Section 754 Adjustments. Pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to the extent an adjustment to the adjusted tax basis of any Company asset under Section 734(b) or 743(b) of the Code is required to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Treasury Regulations.

(j)     Transfer of or Change in Interests. A Majority Vote of the Board of Directors is required to adopt any convention or combination of conventions which it reasonably believes would be upheld for federal income tax purposes regarding the allocation and/or special allocation of items of Company income, gain, loss, deduction and expense with respect to a newly issued Unit, a transferred Unit and a redeemed Unit. Upon admission as a substitute Member, a transferee of a Unit shall succeed to the Capital Account of the transferor Member to the extent it relates to the transferred Unit, in accordance with Treasury Regulations. Distributions under Articles VI and XIII shall be made only to Members and assignees who, according to the books and records of the Company, are Members or assignees on the actual date of distribution. Neither the Company nor the Board of Directors (or any Director serving thereon) shall incur any liability for making distributions in accordance with this Section 5.2(j).

(k)     Syndication, Organization and Operating Expenses. Syndication and organization expenses as defined in Section 709 of the Code and Operating Expenses shall be allocated to the Capital Accounts of the Members based upon relative capital contributions or in any other manner reasonably deemed equitable by Majority Vote of the Board of Directors.

(l)     Allocation Periods and Unrealized Items. Subject to applicable Treasury Regulations and notwithstanding anything expressed or implied to the contrary in this Agreement, the Board of Directors may, by Majority Vote, determine allocations to Capital Accounts based on an annual, quarterly or other period and/or on realized and unrealized net increases or net decreases (as the case may be) in the fair market value of Company property.

Section 5.3     Tax Allocations.

(a)     Items of Company income, gain, loss, deduction and expense shall be allocated, for federal, state and local income tax purposes, among the Members in the same manner as the Net Profit (and items thereof) and Net Loss (and items thereof) of which such items are components were allocated pursuant to the preceding sections of Article V; provided, however, that solely for federal, state and

40

local income tax purposes, allocations shall be made in accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, to the extent so required thereby. Such allocations shall be made in such manner and utilizing such permissible tax elections as determined by the Majority Vote of the Board of Directors.

(b)    Allocations pursuant to this <u>Section 5.3</u> are solely for federal, state and local tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profit (and items thereof) or Net Loss (and items thereof).

(c)    The Members are aware of the tax consequences of the allocations made by this <u>Section 5.3</u> and hereby agree to be bound by the provisions of this <u>Section 5.3</u> in reporting their shares of items of Company income, gain, loss, deduction and expense and any corresponding credits.

ARTICLE VI

DISTRIBUTIONS

Section 6.1    <u>Distributions of Distributable Funds</u>. Except as provided in <u>Section 2.8 (e) (iii) (E)</u> or <u>Section 13.4</u> relating to distributions upon the dissolution and liquidation of the Company, Distributable Funds shall be distributed to the Members from time to time as approved by the Board of Directors in the following order and priority:

(a)    First, <u>pro rata</u> to Members holding Class A Preferred Units in accordance with <u>Section 2.8(e)(i)</u>;

(b)    Second, <u>pro rata</u> to Members holding Common Units in accordance with their respective Common Membership Interests.

Section 6.2    <u>Board Approval</u>. Any such distributions shall be made only to the extent approved by the Board of Directors in accordance with <u>Section 9.7</u>. To the extent that the Board of Directors approves any distribution pursuant to <u>Section 6.1</u> that consists of a consideration of a type or in a form other than cash, the types and forms of such consideration shall be allocated in an equitable manner among the Members entitled thereto, in the proportions and amounts provided for herein, such that each Member shall, except for immaterial variances, receive the same type or form of consideration and the same proportions as each other Member. The Company shall not make any distribution to the Members if, immediately after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members with respect to their Units or Membership Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of Company

41

Property, except that the fair value of Company Property that is subject to a liability for which recourse of creditors is limited shall be included in the Company assets only to the extent that the fair value of that Company Property exceeds that liability.

## ARTICLE VII

### RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS

Section 7.1      Transfer of Class A Units. This Section 7.1 governs the Transfer of a Member's Class A Units in the Company.

(a)      No Class A Units may be transferred by any Member to any Person, except upon compliance with the terms of this Section 7.1. In the event a Member desires to Transfer all or part of such Member's Class A Units, such Member (the "Transferor Member") will be responsible for compliance with all conditions of transfer imposed by this Agreement and under applicable law and for any expenses incurred by the Company for legal and/or accounting services in connection with reviewing any proposed Transfer or issuing opinions in connection therewith. Until the transferee is approved as a Class A Member pursuant to Section 7.4 hereof, the Transferor Member shall continue to be a Member and to be entitled to exercise any rights or powers of a Member with respect to the Class A Units transferred.

(b)

(i)      Notwithstanding the provisions of Section 7.1(c) below, any Member may effect a Transfer of its Class A Units to an Affiliate of such Member; provided, that any such Transfer shall not relieve such Member of any of its obligations hereunder.

(ii)      Notwithstanding the provisions of Section 7.1(c) below, a Non-Founding Class A Member desiring to Transfer any of its Class A Units must first offer to Transfer such Class A Units to the Founding Class A Members on a pro rata basis (in proportion to the number of Units owned by such Founding Class A Members) and must Transfer such Class A Units to any Founding Class A Member who accepts such offer as set forth below. In the event any such Non-Founding Class A Member desires to Transfer such Class A Units to such Founding Class A Member in accordance with this clause (ii), such Non-Founding Class A Member shall deliver a Notification of such desire to the Company and each of the Founding Class A Members that are Members of the Company at such time setting forth the number of Class A Units proposed to be Transferred, the proposed purchase price for such Class A Units and all pertinent terms and conditions of such offer. For a period of

42

30 days commencing on the date of its receipt of any such Notification, each Founding Class A Member shall have the exclusive right to purchase all or any portion of its pro rata share of such Class A Units (in proportion to the number of Units owned by such Founding Class A Member) proposed to be Transferred upon the terms and conditions set forth in such Notification. If any Founding Class A Member desires to purchase such Class A Units, it shall give Notification of such desire to such Non-Founding Class A Member confirming such desire and the proposed terms of purchase. In the event that any Founding Class A Member does not purchase its full pro rata share of any such Class A Units proposed to be Transferred, such unpurchased Class A Units shall be offered by such Non-Founding Class A Member to the other Founding Class A Members subscribing to purchase Class A Units on a pro rata basis (in proportion to each such subscribing Founding Class A Member's ownership of Units relative to the other subscribing Founding Class A Members' ownership of Units) on similar terms of purchase. In the event that, after compliance with the foregoing provisions of this Section 7.1(b), the Founding Class A Members, taken together, fail to purchase all of the Class A Units proposed to be Transferred by such Non-Founding Class A Member, then such Non-Founding Class A Member may offer to Transfer any of the Class A Units described in the Notification which the Founding Class A Members are not purchasing to any Person; provided, however, that any such Transfer must be made in accordance with the procedures set forth in Section 7.1(c) below. The closing of any purchase by the Founding Class A Members of any offered Class A Units as provided in this Section 7.1(b) shall take place at the executive offices of the Company on such date as designated by the Founding Class A Members occurring within 15 days after receipt by such Non-Founding Class A Member of Notification from the Founding Class A Member of the exercise of the Founding Class A Member's right to purchase hereunder. At such closing, the Non-Founding Class A Member shall deliver to the Founding Class A Member certificates representing the offered Class A Units, which shall be duly executed and such other documentation as such Founding Class A Member shall reasonably request to evidence the Transfer of such offered Class A Units, against payment therefor by the Founding Class A Member, and the Company shall evidence such Transfer on the books of the Company and, if necessary, shall issue new certificates representing any of the Class A Units to be transferred to the Founding Class A Member hereby, and any Class A Units retained by any such Non-Founding Class A Member.

(c)

43

(i)    In the event that any Class A Member desires to Transfer any of its Class A Units to any Person who shall have made a written <u>bona fide</u> offer to purchase such Class A Units, the Transferor Member shall promptly furnish to the Company and all other Members holding Class A Units (the "<u>Member Offerees</u>") a Notification (the "<u>Notice of Transfer</u>") of such desire to Transfer such Class A Units and of the <u>bona fide</u> offered price for such Class A Units proposed to be Transferred, the method of payment of such offered price, the identity of the prospective purchaser or purchasers (the "<u>Proposed Purchaser</u>") and all other pertinent terms and conditions of such <u>bona fide</u> offer.

(ii)    For a period of 30 days commencing on the date of its receipt of the Notice of Transfer, subject to <u>Section 2.8(e)(v)</u>, the Company shall have the exclusive right by a Majority Vote of the Board of Directors or the Executive Committee, to agree to purchase all or any portion of such Class A Units proposed to be Transferred upon the same terms and conditions as described in the Notice of Transfer. If the Company desires so to purchase such Class A Units it shall give Notification of such desire to the Transferor Member and all other Member Offerees confirming such desire and the proposed terms of purchase.

(iii)    In the event that the Company does not purchase, in accordance with the provisions of clause (ii) above, all of the Class A Units proposed to be Transferred by the Transferor Member, then for an additional period of 15 days commencing on the earlier of the date that (A) the Company's right to purchase such Class A Units has expired or the Company notifies the Transferor Member and Member Offerees in writing that the Company has determined not to exercise such right or (B) the Company has determined to exercise such right only with respect to a portion of such Class A Units, the Member Offerees shall have the right to purchase all or any portion of the Class A Units not so purchased by the Company on the same terms and conditions and at the <u>bona fide</u> offer price at which the Company was so entitled to purchase such Class A Units. The specific portion of such Class A Units which each Member Offeree shall be so entitled to purchase shall be determined on a <u>pro rata</u> basis (in proportion to the number of Units owned by such Member Offeree). Any Member Offeree desiring so to purchase Class A Units shall give Notification of such desire to the Transferor Member, the Company and all Member Offerees confirming such desire and the proposed terms of purchase. In the event that any Member Offeree does not purchase its full <u>pro rata</u> share of any such Class A Units proposed to

44

be Transferred, such unpurchased Class A Units shall be offered by the Transferor Member to the Member Offerees subscribing to purchase the Class A Units on a pro rata basis (in proportion to each such subscribing Member Offeree's ownership of Units relative to the other subscribing Member Offerees' ownership of Units) on similar terms of purchase. No such Class A Units shall be made available for purchase by any non-Member pursuant to the remaining provisions of this Section 7.1(c) unless and until all Member Offerees shall have had an opportunity to purchase all such Class A Units in accordance with the provisions of this clause (iii).

(iv)   The closing of any purchase by the Company or any Member Offerees of any offered Class A Units as provided in this Section 7.1(c) shall take place at the executive offices of the Company on such date as designated by the Company or such Member Offeree occurring within 15 days after receipt by the Transferor Member of Notification from the Company or such Member Offeree of the exercise of the Company's or such Member Offeree's right to purchase hereunder. At such closing, the Transferor Member shall deliver to the Company or such Member Offeree, as the case may be, certificates representing the offered Class A Units, which shall be duly executed and such other documentation as the Company or such Member Offeree shall reasonably request to evidence the Transfer of such offered Class A Units, against payment therefor by the Company or such Member Offeree, and the Company shall evidence such Transfer on the books of the Company and, if necessary, shall issue new certificates representing the Class A Units to be transferred and any Class A Units retained by the Transferor Member.

(v)   In the event that, after compliance with the foregoing provisions of this Section 7.1(c), (A) the Company and the Member Offerees, taken together, fail to purchase all of the Class A Units proposed to be Transferred by the Transferor Member and (B) the Class A Members approve such Transfer by Majority Vote, then for a period of 60 days commencing on the date that neither the Company nor any Member Offeree remains entitled to exercise its right to purchase any offered Class A Units in accordance with the foregoing provisions of this Section 7.1(c), the Transferor Member may Transfer to the Proposed Purchaser any of the Class A Units described in the Notice of Transfer which the Company and the Member Offerees are not purchasing; provided, however, that (1) any such Transfer to the Proposed Purchaser must be made for the consideration and upon the terms and conditions set forth in the Notice of Transfer, and (2) at the closing of any such

45

Transfer, the Proposed Purchaser executes and delivers to the Company a counterpart of, or an agreement adopting, this Agreement. If the Transferor Member shall not consummate the Transfer of such remaining Class A Units to the Proposed Purchaser within such 60-day period, such Class A Units shall remain subject to the provisions of this Agreement and the Transferor Member shall not thereafter Transfer any such Class A Units to any Person without again first complying with all of the provisions of this Agreement.

Section 7.2    Transfer of Class A Preferred Units.  This Section 7.2 governs the Transfer of a Preferred Member's Class A Preferred Units in the Company.

(a)    No Class A Preferred Units may be transferred by any Preferred Member to any Person, except upon compliance with the terms of this Section 7.2. In the event a Preferred Member desires to Transfer all or part of such Preferred Member's Class A Preferred Units, such Preferred Member (the "Transferor Preferred Member") will be responsible for compliance with all conditions of transfer imposed by this Agreement and under applicable law and for any expenses incurred by the Company for legal and/or accounting services in connection with reviewing any proposed Transfer or issuing opinions in connection therewith.

(b)    (i)  Notwithstanding the provisions of Section 7.2(c) below, any Preferred Member may effect a Transfer of its Class A Preferred Units to an Affiliate of such Preferred Member; provided, that any such Transfer shall not relieve such Preferred Member of any of its obligations hereunder.

(ii)    Notwithstanding the provisions of Section 7.2(c) below, a Preferred Member desiring to Transfer any of its Class A Preferred Units (a "Selling Preferred Member") must first offer to Transfer such Class A Preferred Units to the other Preferred Members on a pro rata basis (in proportion to the number of Class A Preferred Units owned by such Preferred Members) and must Transfer such Class A Preferred Units to any Preferred Member who accepts such offer as set forth below. In the event any such Selling Preferred Member desires to Transfer such Class A Preferred Units to such Preferred Member in accordance with this clause (ii), such Selling Preferred Member shall deliver a Notification of such desire to the Company and each of the Preferred Members of the Company at such time, setting forth the number of Class A Preferred Units proposed to be Transferred, the proposed purchase price for such Class A Preferred Units and all pertinent terms and conditions of such offer.  For a period of 30 days commencing on the date of its receipt of any such Notification, each Preferred Member shall

46

have the exclusive right to purchase all or any portion of its pro rata share (in proportion to the number of Class A Preferred Units owned by such Preferred Member) of such Class A Preferred Units proposed to be Transferred upon the terms and conditions set forth in such Notification. If any Preferred Member desires to purchase such Class A Preferred Units it shall give Notification of such desire to such Selling Preferred Member confirming such desire and the proposed terms of purchase. In the event that any Preferred Member does not purchase its full pro rata share of any such Class A Preferred Units proposed to be Transferred, such unpurchased Class A Preferred Units shall be offered by such Selling Preferred Member to the other Preferred Members subscribing to purchase Class A Preferred Units on a pro rata basis (in proportion to each such subscribing Preferred Member's ownership of Class A Preferred Units relative to the other subscribing Preferred Members' ownership of Class A Preferred Units) on similar terms of purchase. In the event that, after compliance with the foregoing provisions of this Section 7.2(b), the Preferred Members, taken together, fail to purchase all of the Class A Preferred Units proposed to be Transferred by such Selling Preferred Member, then such Selling Preferred Member may offer to Transfer any of the Class A Preferred Units described in the Notification which the Preferred Members are not purchasing to any Person; provided, however, that any such Transfer must be made in accordance with the procedures set forth in Section 7.2(c) below. The closing of any purchase by the Preferred Members of any offered Class A Preferred Units as provided in this Section 7.2(b) shall take place at the executive offices of the Company on such date as designated by the Preferred Members occurring within 15 days after receipt by such Selling Preferred Member of Notification from the exercising Preferred Member of the exercise of such Preferred Member's right to purchase hereunder. At such closing, the Selling Preferred Member shall deliver to the exercising Preferred Member certificates representing the offered Class A Preferred Units, which shall be duly executed and such other documentation as such Preferred Member shall reasonably request to evidence the Transfer of such offered Class A Preferred Units, against payment therefor by the exercising Preferred Member, and the Company shall evidence such Transfer on the books of the Company and, if necessary, shall issue new certificates representing any of the Class A Preferred Units to be transferred to the exercising Preferred Member hereby, and any Class A Preferred Units retained by any such Selling Preferred Member.

      (c)    (i)  In the event that any Preferred Member desires to Transfer any of its Class A Preferred Units to any Person who shall have made a written

47

bona fide offer to purchase such Class A Preferred Units, the Transferor Preferred Member shall promptly furnish to the Company and all other Preferred Members (the "Preferred Member Offerees") a Notification (the "Notice of Preferred Transfer") of such desire to Transfer such Class A Preferred Units and of the bona fide offered price for such Class A Preferred Units proposed to be Transferred, the method of payment of such offered price, the identity of the prospective purchaser or purchasers (the "Proposed Preferred Purchaser") and all other pertinent terms and conditions of such bona fide offer.

   (ii) For a period of 30 days commencing on the date of its receipt of the Notice of Preferred Transfer, subject to Section 2.8(e)(v), the Company shall have the exclusive right by a Majority Vote of the Board of Directors or the Executive Committee, to agree to purchase all or any portion of such Class A Preferred Units proposed to be Transferred upon the same terms and conditions as described in the Notice of Preferred Transfer. If the Company desires so to purchase such Class A Preferred Units it shall give Notification of such desire to the Transferor Preferred Member and all other Preferred Members confirming such desire and the proposed terms of purchase.

   (iii) In the event that the Company does not purchase, in accordance with the provisions of clause (ii) above, all of the Class A Preferred Units proposed to be Transferred by the Transferor Preferred Member, then for an additional period of 15 days commencing on the earlier of the date that (A) the Company's right to purchase such Class A Preferred Units has expired or the Company notifies the Transferor Preferred Member and the Preferred Member Offerees in writing that the Company has determined not to exercise such right or (B) the Company has determined to exercise such right only with respect to a portion of such Class A Preferred Units, the Preferred Member Offerees shall have the right to purchase all or any portion of the Class A Preferred Units not so purchased by the Company on the same terms and conditions and at the bona fide offer price at which the Company was so entitled to purchase such Class A Preferred Units. The specific portion of such Class A Preferred Units which each Preferred Member Offeree shall be so entitled to purchase shall be determined on a pro rata basis (in proportion to the respective total Class A Preferred Units of each Preferred Member Offeree desiring to purchase the offered Class A Preferred Units remaining available for purchase). Any Preferred Member Offeree desiring so to purchase Class A Preferred Units shall give Notification of such desire to the Transferor Preferred Member, the Company and all Preferred Member Offerees confirming such desire and the proposed

48

terms of purchase.  In the event that any Preferred Member Offeree does not purchase its full pro rata share of any such Class A Preferred Units proposed to be Transferred, such unpurchased Class A Preferred Units shall be offered by the Transferor Preferred Member to the Preferred Member Offerees subscribing to purchase Class A Preferred Units on a pro rata basis (in proportion to each such subscribing Preferred Member Offeree's ownership of Class A Preferred Units relative to the other subscribing Preferred Members Offerees' ownership of Class A Preferred Units) on similar terms of purchase.  No such Class A Preferred Units shall be made available for purchase by any non-Preferred Member pursuant to the remaining provisions of this Section 7.2(c) unless and until all Preferred Member Offerees shall have had an opportunity to purchase all such Class A Preferred Units in accordance with the provisions of this clause (iii).

(iv)   The closing of any purchase by the Company or any Preferred Member Offerees of any offered Class A Preferred Units as provided in this Section 7.2(c) shall take place at the executive offices of the Company on such date as designated by the Company or such Preferred Member Offeree occurring within 15 days after receipt by the Transferor Preferred Member of Notification from the Company or such Preferred Member Offeree of the exercise of the Company's or such Preferred Member Offeree's right to purchase hereunder. At such closing, the Transferor Preferred Member shall deliver to the Company or such Preferred Member Offeree, as the case may be, certificates representing the offered Class A Preferred Units, which shall be duly executed and such other documentation as the Company or such Preferred Member Offeree shall reasonably request to evidence the Transfer of such offered Class A Preferred Units, against payment therefor by the Company or such Preferred Member Offeree, and the Company shall evidence such Transfer on the books of the Company and, if necessary, shall issue new certificates representing the Class A Preferred Units to be transferred and any Class A Preferred Units retained by the Transferor Preferred Member.

(v)   In the event that, after compliance with the foregoing provisions of this Section 7.2(c), (A) the Company and the Preferred Member Offerees, taken together, fail to purchase all of the Class A Preferred Units proposed to be Transferred by the Transferor Preferred Member, and (B) the Preferred Members approve such Transfer by Majority Vote, then for a period of 60 days commencing on the date that neither the Company nor any Preferred Member Offeree remains

49

entitled to exercise its right to purchase any offered Class A Preferred Units in accordance with the foregoing provisions of this Section 7.2(c), the Transferor Preferred Member may Transfer to the Proposed Preferred Purchaser any of the Class A Preferred Units described in the Notice of Preferred Transfer which the Company and the Preferred Member Offerees are not purchasing; provided, however, that (1) any such Transfer to the Proposed Preferred Purchaser must be made for the consideration and upon the terms and conditions set forth in the Notice of Preferred Transfer and (2) at the closing of any such Transfer, the Proposed Preferred Purchaser executes and delivers to the Company a counterpart of, or an agreement adopting, this Agreement. If the Transferor Preferred Member shall not consummate the Transfer of such remaining Class A Preferred Units to the Proposed Preferred Purchaser within such 60-day period, such Class A Preferred Units shall remain subject to the provisions of this Agreement and the Transferor Preferred Member shall not thereafter Transfer any such Class A Preferred Units to any Person without again first complying with all of the provisions of this Agreement.

Section 7.3    Transfer of Class B Units.

(a)    Without the express prior written consent of the Company, each Class B Member agrees it shall not, directly or indirectly, offer to sell or sell, pledge, contract to sell (including any short sale), loan, grant any option for the purchase of, or otherwise dispose of in any manner whatsoever, any securities of the Company held by such Class B Member or enter into any Hedging Transaction relating to any securities of the Company prior to the date of the Company's IPO. Without limiting the foregoing, any transfer of such securities shall be pursuant to an applicable registration or exemption therefrom in compliance with both state and federal securities laws, and a Class B Member shall not transfer, pledge or otherwise dispose of any such securities in any manner which would (i) require the Company to file any registration statement with the Securities and Exchange Commission (or any similar filing under state law), or to amend or supplement any such filing, (ii) violate or cause the Company to violate state or federal securities laws, or the rules and regulations promulgated thereunder, or any other state or federal law, or (iii) cause any securities law exemption to be unavailable to the Company with regard to future sales.

(b)    In addition to the restrictions contained in Section 7.3(a), in connection with the Company's IPO, each Class B Member, if requested in good faith by the Company and the managing underwriter of the Company's securities, shall further agree not to directly or indirectly, offer to sell or sell, pledge, contract to sell (including any sort sale), loan, grant any option to purchase or otherwise dispose of in any manner

50

whatsoever, any securities of the Company held by him, her or it or enter into any Hedging Transaction relating to any securities of the Company until such time as reasonably approved by the managing underwriter, but in any event not to exceed 180 days after the effective date of the registration statement for such public offering; provided, that all officers and directors of the Company and holders of five percent (5%) or more of the issued and outstanding Units of the Company enter into similar agreements.

       (c)    In order to enforce the foregoing, the Company may impose stop-transfer instructions with respect to such securities of the Class B Members (and the securities of every other person subject to the foregoing restrictions) until the end of such period.

       (d)    Notwithstanding anything to the contrary herein, any Class B Member which is a partnership may distribute Class B Units to its equity holders either prior to or after any public offering of Class B Units, but only if each such equity holder enters into a written agreement binding it to each of the distributing Class B Member's obligations hereunder. Thereafter, each such distributee or transferee shall be deemed to be a Class B Member for purposes of this Section 7.3 with respect to the securities so distributed.

       Section 7.4    Member Transferees. Upon the closing of any Transfer of Class A Units or Class A Preferred Units to a transferee pursuant to Section 7.1 or Section 7.2 hereof, such transferee shall have, to the extent of the Class A Units or Class A Preferred Units transferred, the rights and powers and shall be subject to the restrictions and liabilities of the Class A Members or Preferred Members, as applicable, under this Agreement, the Certificate of Formation and the Act; provided, however, a transferee shall not have any of the rights of a Founding Class A Member or a Non-Founding Class A Member pursuant to Article IX hereto, unless (i) the transferee purchases all of the Class A Units and Class A Preferred Units of a Founding Class A Member or Non-Founding Class A Member and (ii) all of the Founding Class A Members (other than the Transferor Member) approve the transfer of such rights to such transferee. The transferee shall also be liable, to the extent of the Class A Units or Class A Preferred Units transferred, for the unfulfilled obligations, if any, of the Transferor Member or the Transfer or Preferred Member, as applicable, to make Capital Contributions, but shall not be obligated for liabilities unknown to the transferee at the time such Transfer and that could not be ascertained from this Agreement. Notwithstanding the foregoing sentence, the Transferor Member or Preferred Transferor Member, as applicable, is not released from any liability to the Company arising prior to such Transfer under this Agreement, the Certificate of Formation or the Act.

Section 7.5     Invalid Transfers.  Any purported Transfer of any Units in violation of the provisions of this Agreement shall be wholly void and shall not effectuate the Transfer contemplated thereby.  Notwithstanding anything contained herein to the contrary, no Member may Transfer any Units in violation of any provision of this Agreement, in violation of the Act, the Securities Act or any applicable state securities laws, or in any manner that would cause the Company to be treated as a "publicly traded partnership" within the meaning of Section 469(k)(2) of the Code or Section 7704(b) of the Code.

Section 7.6     Drag-Along Rights.

(a)     If, at any time during the term of this Agreement, the holders of at least 80% of the Class A Units and Class A Preferred Units then outstanding  (the "Majority Holders") propose to Transfer all of their Class A Units and Class A Preferred Units to any third party or parties in connection with a sale of the Company to such third party or parties, such Majority Holders shall have the right (the "Drag-Along Right") to require all of the other Members to sell, or cause to be sold, all of their Class A Units and Class A Preferred Units in such sale transaction for the same price and form of consideration and otherwise on the same terms and conditions as are applicable to each such class of Units held by the Majority Holders.

(b)     If the Majority Holders desire to exercise the Drag-Along Right pursuant to Section 7.6(a), they must give a Notification to each Class A Member and Preferred Member of the proposed transaction giving rise to the  Drag-Along Right at least 20 days prior to the consummation thereof.

(c)     The Company, with the approval of 66-2/3% of the Directors then serving on the Board of Directors, shall have the right (the "Class B Drag-Along Right") to require all of the holders of Class B Units to sell, or cause to be sold, all of the outstanding Class B Units in connection with the sale of Class A Units or Class A Preferred Units pursuant to Section 7.6(a) for the equivalent price per Unit and form of consideration and otherwise on the same terms and conditions as are applicable to the Class A Members in respect of their Class A Units.

(d)     If the Company desires to exercise a Class B Drag-Along Right pursuant to Section 7.6(c), it must give notice to each Class B Member of the proposed transaction giving rise to the Class B Drag-Along Right at least 20 days prior to the consummation thereof.

(e)     At the closing of any sale of Units pursuant to the exercise of a Drag-Along Right or Class B Drag-Along Right, such selling Members shall deliver certificates representing such Units, which shall be duly executed and such other documentation as the Company or such third party or parties shall reasonably request to

52

evidence the transfer of Units to be purchased from such Members pursuant to the Drag-Along Right or Class B Drag-Along Right.

Section 7.7    Member Put Right.

(a)    Each Media Member shall have the right to put its Class A Units and Class A Preferred Units (a "Member Put Right") to the Company after the date hereof in accordance with the provisions of this Section 7.7. Any Media Member desiring to so exercise its Member Put Right shall deliver a Notification of such desire to the Company and each other Media Member. Any such Notification of the exercise of a Member Put Right delivered (i) prior to March 4, 2004 shall be consummated on the first anniversary of the date of receipt of such Notification by the Company, and (ii) on or after March 4, 2004 shall be consummated promptly upon receipt of such Notification by the Company; provided, in each case, that no such exercise of a Member Put Right shall be effective if such Media Member has not fully satisfied all of its obligations to make any Additional Capital Contributions requested by the Company and approved by such Media Member's representative or representatives on the Board of Directors prior to the date of effectiveness of such exercise. At the closing of any such exercise of a Member Put Right, the exercising Media Member shall receive no consideration for its outstanding Class A Units and Class A Preferred Units, all accrued and unpaid distributions on Class A Preferred Units shall be forfeited and such Class A Units and Class A Preferred Units shall be transferred to the Company, such Media Member's applicable Membership Interest in the Company shall be reduced to zero and Schedule I hereto and the books of the Company shall be revised to reflect such Transfer and the proportionate increase in the applicable Membership Interest of each remaining Class A Member and Preferred Member. Notwithstanding the foregoing, any such exercise shall not relieve any such Media Member from any liability incurred prior thereto as a Member of the Company and any such exercise shall not terminate or otherwise affect any rights or obligations with respect to any Affiliate Agreement entered into by any Newspaper Affiliate (as defined in Article XV hereof) of such Media Member, including, without limitation, any non-competition provisions thereunder.

(b)    In the event that the consummation of a sale by the Company of its securities in a bona fide, firm commitment underwriting pursuant to a registration statement under the Securities Act at an aggregate offering price of not less than $25,000,000 (a "Qualifying IPO") has not occurred prior to September 30, 2002, each Class B Member shall have the right to sell to the Company such Class B Member's Class B Units (exclusive of such Class B Units that were, as shares of Class B Common Stock of the Original Company prior to conversion in the Merger, subject to a put right on September 30, 2001 pursuant to Section 10.1 of that certain Investor Rights Agreement entered into as of May 2, 2000 by and among the Original Company and the signatories thereto) at the Put Sale Price as of September 30, 2002 (the "Put Right").

Section 7.8     Confidentiality.

(a)    The Company and each Member agree not to divulge, communicate, use to the detriment of the Company or for the benefit of any other Person, or misuse in any way, any confidential information or trade secrets of the Company or any subsidiary of the Company or any Member or its Affiliates, including personnel information, secret processes, know-how, customer lists, formulas or other technical data, except as may be required by law, provided, however, that this prohibition shall not apply to (i) any information which, through no improper action of the Company or any such Member, is publicly available or generally known in the industry or (ii) any information which is disclosed upon a Majority Vote of the Board of Directors or the Executive Committee. Each Member acknowledges and agrees that any information or data such Member has acquired on any of these matters or items were received in confidence and as a fiduciary of the Company.

(b)    It is agreed between the parties that the Company and the Members would be irreparably damaged by reason of any violation of the provisions of this Section 7.8, and that any remedy at law for a breach of such provisions would be inadequate. Therefore, the Company and the Members shall be entitled to seek and obtain injunctive or other equitable relief (including, but not limited to, a temporary restraining order, a temporary injunction or a permanent injunction) against the Company or any Member, or the Company's or any such Member's agents, assigns or successors, for a breach or threatened breach of such provisions and without the necessity of proving actual monetary loss. It is expressly understood among the parties that this injunctive or other equitable relief shall not be the exclusive remedy of the Company or the Members for any breach of this Section 7.8 and the Company and the Members shall be entitled to seek any other relief or remedy that either may have by contract, statute, law or otherwise for any breach hereof, and it is agreed that the Company and any such Member shall also be entitled to recover its attorneys' fees and expenses in any successful action or suit against the Company or any Member relating to any such breach.

(c)    Notwithstanding the foregoing, the participation or involvement of any Member in the Company shall not confer upon the Company or otherwise entitle the Company or any Member or Director thereof to use or otherwise disclose in connection with the Company and its business and affairs the name of such Member without such Member's prior consent.

54

## ARTICLE VIII

## MEETINGS OF MEMBERS

Section 8.1    Place of Meetings. All meetings of Members shall be held at the principal office of the Company as provided in Section 2.5, or at such other place as may be designated by the Majority Vote of the Board of Directors or the Executive Committee or the Members calling the meeting.

Section 8.2    Meetings.

(a)    An annual meeting of the Members for the transaction of such business as may properly come before the Meeting shall be held at such place, on such date and at such time as the Board of Directors shall determine.

(b)    Special meetings of the Members for any proper purpose or purposes may be called at any time by a Majority Vote of the Board of Directors or by a Majority Vote of the Units then outstanding and action may be taken at any such special meeting only with respect to such purpose or purposes.

(c)    At any properly called meeting of Members pursuant to Section 8.2(a) or 8.2(b) above, the Members shall have the right to take any of the actions permitted to be taken by the Members under and pursuant to this Agreement or the Act.

Section 8.3    Notice. A Notification of all annual meetings of Members, stating the place, day and hour of the meeting and in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) days before the meeting to each Member entitled to vote.

Section 8.4    Waiver of Notice. Attendance of a Member at a meeting shall constitute a waiver of Notification of the meeting, except where such Member attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Notification of a meeting may also be waived in writing. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the Notification of the meeting but not so included, if the objection is expressly made at the meeting.

Section 8.5    Quorum. The presence, either in person or by proxy, of Members holding at least 51% of the Units entitled to vote is required to constitute a quorum at any properly called meeting of the Members.

Section 8.6    Voting.

55

(a)     Voting at meetings of Members need not be by written ballot. Members may vote either in person or by proxy at any meeting. Unless otherwise provided herein, by law or by the Certificate of Formation, each Member shall be entitled to one vote for each Unit held by such Member at the time of such vote which has voting power on the matter in question.

(b)     With respect to any matter other than a matter for which the affirmative vote of Members owning a specified percentage of the Units is required by the Act, the Certificate of Formation or this Agreement, a Majority Vote of the Members at a meeting at which a quorum is present shall be the act of the Members.

(c)     No provision of this Agreement requiring that any action be taken only upon approval of Members holding a specified percentage of the Units may be modified, amended or repealed unless such modification, amendment or repeal is approved by Members holding at least such percentage of the Units.

Section 8.7     Conduct of Meetings. The Board of Directors shall have full power and authority concerning the manner of conducting any meeting of the Members, including, without limitation, the determination of Persons entitled to vote, the existence of a quorum, the satisfaction of the requirements of this Article VIII, the conduct of voting, the validity and effectiveness of any proxies, and the determination of any controversies, votes or challenges arising in connection with or during the meeting or voting. The Chief Executive Officer shall serve as chairperson of any meeting and shall further designate a person to take minutes of any meeting. The chairperson of the meeting shall have the power to adjourn the meeting from time to time, without notice, other than announcement of the time and place of the adjourned meeting. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

Section 8.8     Action by Written Consent. Any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed and dated by Members holding the percentage of Units required to approve such action under the Act, the Certificate of Formation or this Agreement. Such consent shall have the same force and effect as a vote of the signing Members at a meeting duly called and held pursuant to this Article VIII.

Section 8.9     Proxies. A Member may vote either in person or by proxy executed in writing by the Member. A facsimile, telegram, telex, cablegram or similar transmission by the Member or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section 8.9. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the

56

Company before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Board of Directors who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairperson of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more Persons to act as proxies, unless such instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Units that are the subject of such proxy are to be voted with respect to such issue.

ARTICLE IX

MANAGEMENT OF THE COMPANY

Section 9.1    Board of Directors.  The Board of Directors shall consist of eleven Directors and the initial Board of Directors shall be composed of the individuals set forth on Schedule II hereto.

Section 9.2    Nomination of Directors; Election of Directors; Voting of Directors.

(a)    Gannett, KR and WPNI shall each have the right to designate two (2) nominees for election as Directors and Tribune and TNMC each shall have the right to designate one (1) nominee for election as a Director (the "Founding Class A Member Directors"), at least one of whom, if serving as a Director, shall at all times be a senior executive officer of such Founding Class A Member or its Parent in the case of TNMC, WPNI or KR. Each Non-Founding Class A Member shall have the right to designate one (1) nominee for election as a Director (the "Non-Founding Class A Member Directors") who, if serving as a Director, shall at all times be a senior executive officer of said Non-Founding Class A Member.  Each Member entitled to vote shall designate the Chief Executive Officer as a nominee for election as a Director (together with the Founding Class A Member Directors and the Non-Founding Class A Member Directors, the "Directors").

(b)    At each meeting (or written action in lieu of a meeting) of

57

the Members at or by which Directors are to be elected, each Member entitled to vote shall vote all of its Units to elect, as Directors, the nominees designated pursuant to Section 9.2(a).

(c)    If, at any time during the term of this Agreement, any two or more Founding Class A Members or a Founding Class A Member and a Non-Founding Class A Member enter into any transaction in which such Members or any of their Affiliates merge, consolidate or otherwise combine (a "Merger") such that all of the Class A Units held by such combining Members (each, a "Merging Member") immediately prior to such Merger are, upon consummation of any such Merger, beneficially owned by any one such Merging Member and/or its Affiliates (a "Merged Group"), then the Merged Group shall be entitled to appoint only two Directors to the Board of Directors in accordance with Section 9.2(a) and only one Director to the Executive Committee. In addition, the Members shall take such action to reduce the size of the Board of Directors and/or the Executive Committee to reflect such reduced number of Directors.

(d)    Upon the consummation of any Merger contemplated by Section 9.2(c), the Merged Group shall promptly furnish to the Company and all other Members a Notification (a "Notice of Merger") of the consummation of such Merger.

(e)    At each properly called meeting of the Board of Directors, each Director shall be entitled to one vote.

Section 9.3    Meetings.

(a)    Meetings of the Board of Directors may be held at whatever place is specified in the call of the meeting. In the absence of specific designation, all meetings of the Board of Directors shall be held at the principal office of the Company. The Directors serving on the Board of Directors, by Majority Vote of the Board of Directors, may appoint from among themselves a chairperson to preside at meetings of the Board of Directors.

(b)    The Board of Directors shall meet three times a year unless the Board of Directors approves a different meeting schedule by Majority Vote. No notice need be given to Directors of regular meetings of which the Directors have previously received Notification.

(c)    Special meetings of the Board of Directors may be held at any time upon the request of the Chief Executive Officer of the Company or at least four (4) Directors. Notification of the time, place and purpose of such meeting may be waived in writing before or after such meeting and shall be equivalent to the giving of a Notification. Attendance of a Director at such meeting shall also constitute a waiver of

Notification thereof, except where such Director attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

Section 9.4     Action by Written Consent. Any action that may be taken at a meeting of the Board of Directors may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed and dated by all of the Directors. Such consent shall have the same force and effect as a vote of the signing Directors at a meeting duly called and held.

Section 9.5     Increase or Decrease in Number of Directors. Members holding not less than 66-2/3% of the Units then outstanding and entitled to vote thereon shall be entitled to increase the size of the Board of Directors and to nominate additional Directors from time to time to fill any vacancies created by any such increase. In the event any additional Founding Class A Members are added as Members, the Members shall take all necessary actions to increase the size of the Board of Directors and such additional Founding Class A Member shall be entitled to designate two (2) nominees for election as Directors pursuant to Section 9.2. In the event any Media Member Transfers its Class A Units and/or Class A Preferred Units to the Company through the exercise of a Member Put Right pursuant to Section 7.7 or otherwise Transfers its Class A Units and/or Class A Preferred Units to any Person that is not approved as a Founding Class A Member pursuant to Section 3.2 and Section 7.4 hereof or in the event of any Merger involving Media Members as described in Section 9.2(c), the Members shall take all necessary actions to decrease the size of the Board of Directors to reflect any such Transfer or Merger and the Board of Directors shall take all necessary actions to decrease the size of any Committees of the Board of Directors to reflect any such Transfer or Merger.

Section 9.6     Committees.

(a)     The Board of Directors may, by resolution passed by Majority Vote of the Directors, designate one or more committees, each committee to consist of one or more Directors of the Company. Any such committee, to the extent permitted by law and provided in the resolution of the Board of Directors designating such committee, or an amendment to such resolution, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Company.

(b)     In the event that committees of the Board of Directors are formed by the Company, each of the Media Members shall be entitled to designate one Director to serve on any such committee unless such Media Member waives such right to designate a Director upon the formation of such committee. An Executive Committee of the Board of Directors (the "Executive Committee") shall be formed and shall meet

59

eight times a year in the months of January, March, April, June, July, September, October and December unless a majority of the Executive Committee approves a different meeting schedule. The Executive Committee shall be comprised of a Director designated by each of the Media Members (other than TNMC), together with the Chief Executive Officer. The designees comprising the Executive Committee as of the date of this Agreement are set forth on Schedule II attached hereto. The Company shall distribute to the Directors copies of the proposed agenda and resolutions reasonably prior to each meeting of the Executive Committee and minutes of each meeting thereof reasonably thereafter. The Executive Committee shall have authority identical to the Board of Directors other than the authority to approve matters described in Sections 9.7(c) (to the extent such annual Business Plan includes the approval of a Capital Contribution), (f), (g), (h), (k), (l), (m) or Section 9.8 hereof or required by applicable law to be submitted by the Board of Directors to the Members for approval.

Section 9.7    Limitations on Powers of the Company and the Chief Executive Officer. The enumeration of powers in this Agreement shall not limit the general or implied powers of the Board of Directors or any additional powers provided by law. Notwithstanding the foregoing and any other provision contained in this Agreement to the contrary, no act shall be taken, sum expended, decision made, obligation incurred or power exercised by the Company, or the Chief Executive Officer on behalf of the Company, in each case without the approval of the Board of Directors or the Executive Committee by Majority Vote, subject to Section 9.6 hereof, with respect to any of the following (except for any such action which has been previously approved by the Board of Directors or the Executive Committee by Majority Vote in connection with the approval of the annual Business Plan in accordance with subsection (c) below):

(a)    the entry into by the Company of any agreement, contract, license, lease or employee benefit plan that exceeds $1,500,000 or which is otherwise material to the Company other than the entry by the Company into an on-line distribution agreement provided: (i) the agreement has a term that does not exceed three years; (ii) average annual payments owing thereunder do not exceed $3,000,000; and (iii) the costs of the agreement together with other similar agreements do not exceed the amount budgeted in the Company's annual budget or three year plan;

(b)    the entry into by the Company of any employment contract with the Chief Executive Officer or the creation, modification or termination of any incentive or income-based employee benefit program (including any plan to issue equity or phantom equity to any employees of the Company or its vertical subsidiaries) or similar executive benefit, bonus or incentive plan;

(c)    the approval of the annual Business Plan and the approval of any material deviations therefrom, including, without limitation, the approval of any

60

Capital Contributions contemplated thereby, provided in the event that a Business Plan has not received the requisite approval of the Board of Directors or the Executive Committee within thirty (30) days prior to the start of any fiscal year of the Company, then the Chief Executive Officer shall operate the Company in accordance with the Business Plan originally proposed by the Chief Executive Officer until such time as a Business Plan for any such fiscal year of the Company is properly approved by the Board of Directors or the Executive Committee.

(d)     any merger or consolidation involving any subsidiary of the Company (other than a merger or liquidation of any subsidiary of the Company into the Company) or any other fundamental change in the structure of any subsidiary of the Company;

(e)     the declaration, setting aside or the payment of any distributions by the Company to any Member or other equity holder;

(f)     any issuance of additional Units or other equity interests in the Company (including any interests convertible into equity interests) or any split, combination or reclassification of any Units or any such equity interests; provided, however, that except as contemplated in Article XIV with respect to any Contribution Default, no such issuance may be effected that would have the result of diluting any Founding Class A Member's Membership Interest to a level below 16.9% unless such Founding Class A Member shall have consented to such issuance or all Founding Class A Members are proportionately diluted;

(g)     any request for Additional Capital Contributions pursuant to Section 4.2;

(h)     the selection of an independent accounting firm to audit the financial statements of the Company;

(i)     the appointment or termination of the Chief Executive Officer (whether or not provided for in the Chief Executive Officer's employment contract);

(j)     the approval of a Transfer of Units in accordance with Article VII;

(k)     any initial registered public offering of any equity interests of the Company and any actions in preparation therefor; the entry into by the Company of any contract or agreement with a Member or any Affiliate of a Member outside the ordinary course of business;

61

(l)    the undertaking of any material new business venture opportunity by the Company;

(m)    the identification of any Core Category as a Company Service;

(n)    approval of the terms and conditions of the affiliate agreements the Company or approval of amendments to such standard form of Affiliate Agreement and range of variations therefrom;

(o)    the exercise of any remedy set forth in Article XIV that requires a vote of the Board of Directors or the Executive Committee;

(p)    any determination of the fair market value of Units required to be made by the Board of Directors or the Executive Committee pursuant to any provision of this Agreement;

(q)    any determination with respect to indemnification required by Article XII; or

(r)    the approval of the terms of any Member Loan as contemplated by Section 14.3(a).

Section 9.8    Limitations on Powers of the Board of Directors. Notwithstanding the provisions of Section 9.7 or any other provision contained in this Agreement to the contrary, no act shall be taken, sum expended, decision made, obligation incurred or power exercised by the Company, or the Chief Executive Officer or the Board of Directors on behalf of the Company, in each case without the approval of at least 66-2/3% of the Directors then serving on the Board of Directors with respect to any of the following:

(a)    the sale, lease, transfer or other disposition by the Company of any material portion of its assets, other than in the ordinary course of business; or

(b)    any merger or consolidation involving the Company (other than a merger or liquidation of any subsidiary of the Company into the Company) or any other fundamental change in the structure of the Company.

Section 9.9    Quorum of Board of Directors. The presence in person of at least six (6) Directors, which shall include at least one Founding Class A Member Director from a majority of the then-existing Founding Class A Members, with Tribune and TNMC being treated as a single Founding Class A Member for purposes of this

62

Section 9.9, shall constitute a quorum for the transaction of business of any properly held meeting of the Board of Directors.

Section 9.10    Resignation, Replacement and Removal. Any Director may resign at any time and, subject to Section 9.2, the Member that nominated such Director may designate a new nominee for election as Director at any time. Any such resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Company. If any Media Member gives Notification to all of the other Members and the Company that it desires to remove, either for or without cause, its nominee as a Director, each of the other Members shall use its best efforts to ensure that such nominee is duly removed as a Director, and the Company shall use its best efforts to ensure that a meeting of Members is promptly called for such purpose. Upon the removal of a Director, the Media Member that designated such nominee shall have the right to appoint a replacement for such Director until another Director shall be nominated and elected by the Members pursuant to Section 9.2.

Section 9.11    Vacancies. Any vacancies occurring with respect to a Director shall result in the election of a new Director pursuant to the procedures set forth in Section 9.2.

Section 9.12    Compensation. The Directors shall serve without compensation; provided, however, that, subject to the provisions of Section 9.7, nothing contained herein shall preclude any Director from receiving compensation pursuant to any employment agreement with the Company for services rendered to the Company. Directors shall be entitled to reimbursement for their reasonable out-of-pocket expenses incurred in attending any meeting.

Section 9.13    Other Business. Subject to the provisions of Section 7.8, the Directors may engage in or possess an interest in other business ventures (unconnected with the business of the Company) of every kind and description, independently or with others. Neither the Company nor the Members shall have any rights in or to such independent ventures of the Directors or the income or profits therefrom by virtue of this Agreement.

Section 9.14    Standard of Care; Liability. Every Director shall discharge his or her duties as a manager in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the best interests of the Company. A Director shall not be liable for any monetary damages to the Company for any breach of such duties except for receipt of a financial benefit to which the Director is not entitled, voting for or assenting to a distribution to Members in violation of this Agreement or the Act, or a knowing violation of the law.

63

Section 9.15    <u>Appointment of Chief Executive Officer and Chief Financial Officer; Officers</u>. The initial officers of the Company shall be the officers of the Original Company immediately prior to the Merger. The Board of Directors shall, in accordance with the provisions of <u>Section 9.7</u>, have the right to appoint a Chief Executive Officer and a Chief Financial Officer of the Company. The Chief Executive Officer shall, in accordance with the Business Plan, have the right to appoint officers of the Company to assist with the day-to-day management of the business affairs of the Company. Any Chief Executive Officer so appointed shall be subject at all times to the direction of the Board of Directors. The Chief Executive Officer shall not have greater power and authority than the Board of Directors and shall not, on behalf of the Company, authorize, engage in or enter into any of the transactions or actions specified in <u>Section 9.7</u> without the requisite prior consent of the Board of Directors in respect thereof. The Chief Financial Officer shall, in accordance with the Business Plan, direct the day-to-day financial affairs of the Company. Any Chief Financial Officer so appointed shall be subject at all times to the direction of the Chief Executive Officer and the Board of Directors. The Board of Directors shall have the right to remove any Chief Executive Officer or Chief Financial Officer of the Company, either for or without cause, at any time; <u>provided</u>, <u>however</u>, that nothing contained herein shall limit any rights of the Chief Executive Officer or Chief Financial Officer under any employment agreement which such officer may have entered into with the Company.

Section 9.16    <u>Reliance upon Records</u>. Every Director, and every member of any committee of the Board of Directors, shall, in the performance of his or her duties, be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any of its officers or employees, or committees of the Board of Directors, or by any other person as to matters the Director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including, but not limited to, such records, information, opinion, reports or statements as to the value and amount of the assets, liabilities and/or net profits of the Company, or any other facts pertinent to the existence and amount of surplus or other funds from which distributions might properly be paid, or with which the Company's Units might properly be purchased or redeemed.

Section 9.17    <u>Interested Directors</u>.
(a)    Subject to the provisions of Article 12, each Director, officer and Member of the Company (together with their representatives and agents, a "Covered Person") shall be subject to the fiduciary duties of care and loyalty to the full extent that such duties would be imposed on, or applicable to, a similarly situated director, officer or stockholder, respectively, of a corporation organized and existing pursuant to the General Corporation Law of the State of Delaware and the Limited Liability Act of Delaware (including legislative history and judicial interpretations and applications

64

thereof "Delaware Law"); provided (i) no Covered Person acting under this Agreement shall be liable to the Company or, with respect to any matter relating to the Company or its business, to any other Covered Person for its good faith reliance on the provisions of this Agreement; and (ii) a Director who is directly or indirectly a party to a contract or transaction with the Company, or is a manager, director or officer of or has a financial interest in any other corporation, partnership, association or other organization which is a party to a contract or transaction with the Company, (A) may be counted in determining whether a quorum is present at any meeting of the Board of Directors or a committee thereof at which such contract or transaction is considered or authorized and (B) may participate in such meeting and vote on such authorization to the extent permitted by Delaware Law.

(b)    A Director shall not be personally liable to the Company or its Members for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the Director's duty of loyalty to the Company or its Members, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) for any breach of law involving unlawful distributions, redemptions or other transfers involving Units or (iv) for any transaction from which the director derived an improper personal benefit. If the Limited Liability Company Act of Delaware is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a Director shall be eliminated or limited to the fullest extent permitted by the Limited Liability Company Act, as so amended. Any repeal or modification of this Section 9.17(b) by the Members of the Company shall not adversely affect any right or protection of a Director existing at the time of such repeal or modification.


## ARTICLE X

## OWNERSHIP OF COMPANY PROPERTY

Company Property shall be deemed to be owned by the Company as an entity, and no Member or Director, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Board of Directors by Majority Vote may determine. All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

ARTICLE XI

FISCAL MATTERS; BOOKS AND RECORDS

Section 11.1    Bank Accounts; Investments. Capital Contributions, revenues and any other Company funds shall be deposited by the Company in a bank account established in the name of the Company, or shall be invested by the Company, at the direction of the Board of Directors, in furtherance of the purposes of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company's purposes, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

Section 11.2    Records Required by Act; Right of Inspection.

(a)    During the term of the Company's existence and for a period of 4 years thereafter, there shall be maintained in the Company's principal office all records required to be kept pursuant to the Act, including, without limitation, a current list of the names, addresses and Units held by each of the Members (including the dates on which each of the Members became a Member), copies of federal, state and local information or income tax returns for each of the Company's tax years, copies of this Agreement and the Certificate of Formation, including all amendments or restatements, and correct and complete books and records of account of the Company.

(b)    On written request stating the purpose, a Member may examine and copy in person, at any reasonable time, for any proper purpose reasonably related to such Member's interest as a Member of the Company, and at the Member's expense, records required to be maintained under the Act and such other information regarding the business, affairs and financial condition of the Company as is just and reasonable for the Member to examine and copy. Upon written request by any Member made to the Company at the address of the Company's principal office, the Company shall provide to the Member without charge true copies of (i) this Agreement and the Certificate of Formation and all amendments or restatements, and (ii) any of the tax returns of the Company described above.

Section 11.3    Tax Returns and Information. The Members intend for the Company to be treated as a partnership for tax purposes. The Company shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file. Within 75 days after the end of each calendar year, the Company shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by

66

such Person of such Person's federal income tax return and state income and other tax returns.

Section 11.4    Delivery of Financial Statements to Members. As to each of the first three fiscal quarters of the Company and each fiscal year of the Company, the Company shall send to each Class A Member and Preferred Member a copy of (a) the balance sheet of the Company as of the end of the fiscal quarter or year, (b) an income statement of the Company for such quarter or year, and (c) a statement showing the revenues distributed by the Company to Members in respect of such quarter or year. Such financial statements shall be delivered no later than 45 days following the end of the fiscal quarter to which the statements apply, except that the financial statements relating to the end of the fiscal year shall be delivered no later than 90 days following the end of such fiscal year. Each Class A Member and Preferred Member shall also have the right to receive copies of the Business Plan of the Company for any fiscal year upon request.

Section 11.5    Audits. The fiscal year-end financial statements to be delivered pursuant to Section 11.4 shall be audited. The audit shall be performed by an accounting firm approved by the Board of Directors or the Executive Committee in accordance with Section 9.7.

Section 11.6    Fiscal Year. The Company's fiscal year shall end on December 31 of each calendar year. Each fiscal year shall consist of four quarters ending on March 31, June 30, September 30 and December 31 of each fiscal year. Each such quarter shall be referred to as a "fiscal quarter."

Section 11.7    Tax Elections. The Company shall make the following elections on the appropriate tax returns:

(a)    to adopt the calendar year as the Company's fiscal year, if permitted by the Code;

(b)    to adopt the accrual method of accounting, if permitted by the Code, and to keep the Company's books and records on the accrual method;

(c)    if a distribution of Company Property as described in Section 734 of the Code occurs or if a Transfer of any Unit as described in Section 743 of the Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Code, to adjust the basis of Company Properties;

(d)    to elect to amortize the organizational expenses of the Company ratably over a period of 60 months as permitted by Section 709(b) of the Code; and

67

        (e)    any other election the Board of Directors may deem appropriate and in the best interests of the Members.

Neither the Company, the Board of Directors nor any Member or Director may make an election for the Company to be treated as an association taxable as a corporation or otherwise excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law.

        Section 11.8    Tax Matters Member. The Board of Directors shall designate one Member to be the "tax matters partner" (the "Tax Matters Member") of the Company pursuant to Section 6231(a)(7) of the Code. Such Member shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code. Such Member shall inform each other Member of all significant matters that may come to its attention in its capacity as Tax Matters Member by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Such Member may not take any action contemplated by Sections 6222 through 6232 of the Code without the consent of all Members and this sentence does not authorize such Member to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Code. The initial Tax Matters Member shall be Tribune.

## ARTICLE XII

## INDEMNIFICATION AND INSURANCE

        Section 12.1    Indemnification and Advancement of Expenses.

        (a)    The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company), by reason of the fact that he, she or it is or was a Director, Member, officer, employee, representative or agent of the Company, or is or was serving at the request of the Company as a manager, officer, employee, representative or agent of another corporation, limited liability company, general partnership, limited partnership, joint venture, trust, business trust or other enterprise or entity, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him, her or it in connection with such action, suit or proceeding if he, she or it acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his,

her or its conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement or conviction, or upon a plea of <u>nolo contendere</u> or its equivalent, shall not, of itself, create a presumption that such Person did not act in good faith and in a manner which he, she or it reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his, her or its conduct was unlawful.

(b)    The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that he, she or it is or was a Director, Member, officer, employee, representative or agent of the Company, or is or was serving at the request of the Company as a manager, officer, employee, representative or agent of another corporation, limited liability company, general partnership, limited partnership, joint venture, trust, business trust or other enterprise or entity, against expenses (including attorneys' fees) actually and reasonably incurred by him, her or it in connection with the defense or settlement of such action or suit if he, she or it acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company, except that no indemnification shall be made in respect of any claim, issue or matter as to which such Person shall have been adjudged to be liable to the Company unless and only to the extent that a Delaware state court or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

(c)    To the extent that a Director, Member, officer, employee, representative or agent of the Company has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in paragraphs (a) and (b) of this <u>Section 12.1</u>, or in defense of any claim, issue or matter therein, he, she or it shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him, her or it in connection therewith.

(d)    Any indemnification under paragraphs (a) and (b) of this <u>Section 12.1</u> (unless ordered by a court of competent jurisdiction) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the Director, Member, officer, employee, representative or agent is proper in the circumstances because he, she or it has met the applicable standard of conduct set forth in paragraphs (a) and (b) of this <u>Section 12.1</u>. Such determination shall be made (i) by the Board of Directors by a Majority Vote of the Directors who were not parties to such action, suit or proceeding (even if such Directors constitute less than a quorum of Directors), (ii) if a quorum of disinterested Directors so directs, by independent legal counsel in a written opinion or (iii) by the Members.

69

(e)     Expenses (including attorneys' fees) incurred by a Director or Member in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such Director or Member to repay such amount if it shall ultimately be determined that he, she or it is not entitled to be indemnified by the Company pursuant to this Section 12.1. Such expenses (including attorneys' fees) incurred by other officers, employees, representatives and agents shall be so paid upon such terms and conditions, if any, as the Board of Directors deems appropriate.

(f)     The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 12.1 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any by-law, agreement, vote of Members or disinterested Directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office.

(g)     For purposes of this Section 12.1, any reference to the Company shall include, in addition to the resulting or surviving corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its Directors, officers, members, employees, representatives or agents, so that any Person who is or was a manager, officer, member, employee, representative or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a manager, officer, employee, representative or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Section 12.1 with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

(h)     The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 12.1 shall continue as to a Person who has ceased to be a Director, Member, officer, employee, representative or agent and shall inure to the benefit of the heirs, executors and administrators of such Person.

(i)     Notwithstanding anything in this Article to the contrary, the Company will not have the obligation of indemnifying any Person with respect to proceedings, claims or actions initiated or brought voluntarily by such Person and not by way of defense.

Section 12.2    Insurance. The Company may purchase and maintain insurance or another arrangement on behalf of any Person who is or was a Director,

70

Member, officer, employee, agent or other Person identified in Section 12.1 against any liability asserted against such Person or incurred by such Person in such a capacity or arising out of the status of such a Person, whether or not the Company would have the power to indemnify such Person against that liability under Section 12.1 or otherwise.

Section 12.3    Limit on Liability of Members. The indemnification set forth in this Article XII shall in no event cause the Members to incur any personal liability beyond their total Capital Contributions, nor shall it result in any liability of the Members to any third party.

ARTICLE XIII

DISSOLUTION AND WINDING UP

Section 13.1    Events Causing Dissolution. The Company shall be dissolved upon the first of the following events to occur:

(a)    The expiration of the term of the Company set forth in the Certificate of Formation, if any;

(b)    The written consent of the holders of 66-2/3% of the Class A Units and Class A Preferred Units outstanding at any time to dissolve and wind up the affairs of the Company; or

(c)    The occurrence of a "deemed liquidation" event described in Section 2.8(d)(ii)(C).

The bankruptcy, death, dissolution, expulsion, incapacity or withdrawal of any Member, or the occurrence of any other event under the Act that terminates the continued membership of any Member in the Company, shall not cause a dissolution of the Company.

Section 13.2    Winding Up. If the Company is dissolved pursuant to Section 13.1, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a)    The winding up of the Company's affairs shall be supervised by a liquidator (the "Liquidator"). The Liquidator shall be the Board of Directors or, if the Members prefer, a liquidator or liquidating committee selected by a Majority Vote of the Members.

(b)    In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, in the name of and for and on behalf of the

71

Company to:

> (i) Prosecute and defend civil, criminal or administrative suits;

> (ii) Collect Company assets, including obligations owed to the Company;

> (iii) Settle and close the Company's business;

> (iv) Dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions;

> (v) Pay all reasonable selling costs and other expenses incurred in connection with the winding up of the proceeds of the disposition of Company Property;

> (vi) Discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed 5 years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

> (vii) Distribute any remaining proceeds from the sale of Company Property to the Members;

> (viii) Prepare, execute, acknowledge and file a certificate of cancellation under the Act and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and

> (ix) Exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Board of Directors under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions. The Liquidator (if not a Director or the Board of Directors) shall not be liable as a Director to the Members and shall, while acting such capacity on behalf of the Company, be entitled to the indemnification rights set forth in <u>Article XII</u>.

Section 13.3     Compensation of Liquidator. The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and a Majority Vote of the Members.

Section 13.4     Distribution of Company Property and Proceeds of Sale Thereof.

(a)     Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

(i)     first, to satisfy Company liabilities to creditors, including Members and Directors who are creditors (including the amount of any outstanding Member Loan together with all accrued and unpaid interest thereon), to the extent otherwise permitted by law (other than for past due Company distributions), whether by payment or establishment of reserves;

(ii)     second, to satisfy Company obligations to Members and former Members to pay past due Company distributions;

(iii)     third, to the Preferred Members, in accordance with the positive balances in their respective Capital Accounts associated with Class A Preferred Units determined after allocating all items for all periods prior to and including the date of distribution, including items relating to sales and distributions pursuant to this Article XIII and (without limitation) items allocated pursuant to Section 5.1(b) in order to effectuate the intended economic sharing arrangement of the Members reflected in (and to as nearly as possible bring such Capital Accounts to the appropriate balance under) Section 2.8 (e) (ii);

(iv)     fourth, to the Class A Members, in accordance with the positive balances in their respective Capital Accounts determined after allocating all items for all periods prior to and including the date of distribution, including items relating to sales and distributions pursuant to this Article XIII; and

(v)     fifth, to the Class B Members, in accordance with the positive balances in their respective Capital Accounts determined after allocating all items for all periods prior to and including the date of distribution, including items relating to sales and distributions pursuant to this Article XIII.

73

All distributions required under this <u>Section 13.4</u> shall be made to the Members by the end of the taxable year in which the liquidation occurs or, if later, within 90 days after the date of such liquidation.

(b)    The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group. If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the positive balances in their respective Capital Accounts or Units of each Member in such group.

Section 13.5    <u>Final Audit</u>. Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to each of the Members a statement that shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's <u>pro rata</u> portion of distributions pursuant to <u>Section 13.4</u>.

ARTICLE XIV

REMEDIES

Section 14.1    <u>Breaches of Obligations</u>. Notwithstanding any other provisions set forth herein, in the event that any Member (a "<u>Defaulting Member</u>") fails to fulfill any of its obligations hereunder (other than a Contribution Default (as defined below)) or otherwise materially breaches any of the terms and conditions of this Agreement, the Board of Directors and the Executive Committee shall have the right (the "<u>Buyout Option</u>") by Majority Vote of the Directors designated by the non-Defaulting Members, to cause the Defaulting Member to sell to the Company or the non-Defaulting Members on a <u>pro rata</u> basis (in proportion to the number of Units owned by such non-Defaulting Member) all of the Units then held by such Defaulting Member for an aggregate purchase price in cash equal to the lesser of (i) 75% of the aggregate Capital Contributions contributed to the Company by such Defaulting Member, less the aggregate amount of distributions distributed to such Defaulting Member (whether in cash or property) prior to such time or (ii) 75% of the fair market value of such Units as determined by the appraisal mechanism set forth in <u>Section 14.5</u> below.

Section 14.2    <u>Contribution Default</u>. Notwithstanding any other obligations set forth herein, in the event that any Member shall default in the payment of all or any portion of any Capital Contribution required pursuant to any properly authorized Notification (a "<u>Contribution Default</u>"), when required to be made, and shall fail to make such payment within 10 days following the date specified in such

74

Notification, then such Member shall be a "Defaulting Member" under the terms of this Agreement.

Section 14.3    Remedies Upon Default.

(a)    In the event of a Contribution Default with respect to any Additional Capital Contribution, if any Director designated by the Defaulting Member on the Board of Directors did not vote in favor of such Additional Capital Contribution, the sole remedy of the Company and all its Members with respect to such Contribution Default shall be that the non-Defaulting Members shall be permitted to provide the amount of such Defaulting Member's Additional Capital Contribution on a pro rata basis in proportion to their Membership Interests in the form of a loan (a "Member Loan"). In the event that any non-Defaulting Member does not incur a Member Loan in its full pro rata amount, such unloaned amount shall be offered as a Member Loan on a pro rata basis to each non-Defaulting Member that incurred a Member Loan (in proportion to each such non-Defaulting Member's ownership of Units relative to the such other non-Defaulting Members' ownership of Units). A Member Loan shall bear interest at the Applicable Rate, shall be convertible at the election of the holder of such Member Loan into such number and class of Units as shall have been acquirable by such Member at the time of issuance of the Member Loan if such Member had made an Additional Capital Contribution rather than a loan at such time (such number and class of Units to be issued upon conversion to be determined by the Board of Directors or the Executive Committee in the same manner as set forth in Section 4.3(a)) and shall otherwise be on such terms and conditions as the Board of Directors or the Executive Committee by Majority Vote shall approve. No distribution shall be made until all Member Loans, together with all accrued and unpaid interest thereon, have been paid in full. Prior to any conversion of a Member Loan, a Member Loan by a Member shall not increase such Member's Capital Contribution, Membership Interest or number of Units, unless such Member Loan is converted into Units in accordance with the second preceding sentence. The repayment by the Company of a Member Loan or any portion thereof and any accrued and unpaid interest thereon shall be made in accordance with the terms and conditions of such Member Loan.

(b)    In the event of a Contribution Default with respect to any Additional Capital Contribution, if any Director designated by the Defaulting Member on the Board of Directors voted in favor of such Additional Capital Contribution, then the Board of Directors or the Executive Committee by Majority Vote of the Directors designated by the non-Defaulting Members, may cause the Company to take the following actions: (i) enforce the Defaulting Member's contribution obligation by legal action; and/or (ii) authorize the exercise of a Buyout Option requiring such Defaulting Member to sell to the Company or such non-Defaulting Members on a pro rata basis (in proportion to the number of Units owned by such non-Defaulting Members) all of the

75

Units then held by such Defaulting Member for an aggregate purchase price in cash equal to the lesser of (A) 75% of the aggregate Capital Contributions contributed to the Company by such Defaulting Member, less the aggregate amount of distributions distributed to such Defaulting Member (whether in cash or property) or (B) 75% of the fair market value of such Units as determined by the appraisal mechanism set forth in Section 14.5 below.

(c)    Except in the case of a Contribution Default with respect to an Additional Capital Contribution described in Section 14.3(a) hereof, during any period in which a Contribution Default shall occur and be continuing, no Director designated by such Defaulting Member on the Board of Directors shall be entitled to vote with respect to any matter considered by the Board of Directors or any committee thereof. In the event that any Defaulting Member shall cure any Contribution Default, all voting privileges of any such Director designated by such Defaulting Member shall be reinstated. For purposes of this Section 14.3, a Contribution Default shall not be deemed to be cured until the earlier of (i) the date on which such Contribution Default is cured by payment to the Company of the amount of such Contribution Default or (ii) the closing date of the Transfer of any Units of any Defaulting Member pursuant to the exercise of a Buyout Option.

Section 14.4    Buyout Option.

(a)    In the event that the Board of Directors or the Executive Committee elects to authorize the exercise of a Buyout Option with respect to any Defaulting Member, pursuant to Section 14.1 or 14.3(b) hereof, the following procedures shall be applicable:

(i)    The Company shall provide a Notification to the Defaulting Member (the "Buyout Notice") that the Board of Directors or the Executive Committee has authorized the exercise of the Buyout Option which shall state whether such Buyout Option shall be exercised by the Company or the non-Defaulting Members and the purchase price per Unit applicable to such Buyout Option. If any Buyout Option is to be exercised by the non-Defaulting Members, each non-Defaulting Member shall have the right to purchase its pro rata share (in proportion to the number of Units owned by such non-Defaulting Member) of such Defaulting Member's Units. Any non-Defaulting Member desiring so to purchase Units shall give Notification to the Company and the Defaulting Member confirming such desire. In the event that any non-Defaulting Member does not purchase its full pro rata share of any such Units, such unpurchased Units shall be offered to the non-Defaulting Members subscribing to purchase Units on a pro rata basis (in proportion to each

76

such subscribing non-Defaulting Member's ownership of Units relative to the other subscribing non-Defaulting Members' ownership of Units). Any Units remaining unpurchased after complying with the foregoing procedures shall no longer be subject to the Buyout Option and any such Defaulting Members shall be entitled to retain such Units.

(ii)  The closing of any Transfer of the Defaulting Member's Units to the Company or the non-Defaulting Members, as the case may be, pursuant to a Buyout Option shall take place at the executive offices of the Company on a date occurring within 60 days of the date of the Buyout Notice. Such Defaulting Member shall cooperate with the Company to consummate such sale during such 60-day period or any extension thereof pursuant to the terms of this Agreement. At such closing, the Defaulting Member shall deliver to the Company or such non-Defaulting Members certificates representing the Defaulting Member's Units to be transferred, which shall be duly executed and such other documentation as the Company or such non-Defaulting Members shall reasonably request to evidence the Transfer of such Units, against payment therefor by the Company or the non-Defaulting Members, as the case may be, and the Company shall evidence such Transfer on the books of the Company and, if necessary, shall issue new certificates representing the Units to be transferred and any Units retained by the Defaulting Member.

Section 14.5   Appraisal Mechanism. In the event of a breach of this Agreement which requires a determination of the fair market value of Units in accordance with Section 14.1 or 14.3 above, the Board of Directors or the Executive Committee shall designate an appraiser (which shall be an investment banking or appraisal firm of nationally recognized standing, with expertise in appraising Internet-related properties in the United States) for the purpose of determining the "Appraised Value" of the Company in accordance with the methodology set forth herein. The "Preliminary Appraised Value" of the Company to be determined shall be that amount in dollars which shall represent the fair market value of the assets and business of the Company (determined on a going concern basis and assuming a bona fide sale to an unaffiliated third party of all assets of the Company and the assumption by such third party of all liabilities of the Company (whether actual or contingent, including any liabilities for expenses that would be incurred in connection with such a sale of assets and liquidation of the Company)). The appraiser (the "Initial Appraiser") shall as of the last day of the calendar month immediately preceding any such breach (the "Determination Date") set forth its Preliminary Appraised Value of the Company in writing (together with reasonable detail showing the method of calculation thereof) and shall deliver a copy of such written determination (an "Appraiser's Report") to the

77

Company and the Defaulting Member, not later than the 30th day following its retention. If the Defaulting Member objects to such Preliminary Appraised Value, such Member may designate a second appraiser (the "Second Appraiser"), with similar qualifications, to make its own independent determination of the Preliminary Appraised Value as of the Determination Date. If the determined amount of the Preliminary Appraised Value of the Company as of the Determination Date as set forth in the Appraiser's Report is at least 85% of the determined amount of the Preliminary Appraised Value of the Company as of the Determination Date as set forth in the Appraiser's Report of the Second Appraiser, then the determinations of the Initial Appraiser and the Second Appraiser shall be averaged and the amount resulting from such averaging shall constitute the "Appraised Value" of the Company for purposes of this Section 14.5. Otherwise, the Initial Appraiser and the Second Appraiser shall mutually designate a third appraiser (the "Third Appraiser"), with similar qualifications, to make its own independent determination of the Preliminary Appraised Value of the Company as of the Determination Date in accordance with the same methodology as set forth above. The Third Appraiser shall use its best efforts to complete its determination as soon as practicable, and in any event within 30 days of its retention. The determination by the Third Appraiser of the Preliminary Appraised Value of the Company shall be set forth in an Appraiser's Report delivered to the Company and the Defaulting Members promptly after the preparation thereof. In the event that the determination by the Third Appraiser of the Preliminary Appraised Value of the Company as of the Determination Date falls between such determination by the Initial Appraiser and the Second Appraiser, then the determination by the Third Appraiser and the determination of the Initial or Second Appraiser which is closest in value to such determination of the Third Appraiser shall be averaged and the amount resulting from such averaging shall constitute the Appraised Value of the Company for purposes of this Section 14.5. In the event, however, that the determination by the Third Appraiser is higher than the highest determination of the Initial Appraiser and the Second Appraiser or is lower than the lowest of such determinations, then the determination by the prior Appraiser which is closest in value to the determination by the Third Appraiser shall be deemed to constitute the Appraised Value of the Company for purposes of this Section 14.5. The amount of the Appraised Value of the Company finally determined in the manner described above shall be binding and conclusive on all parties hereto. The fair market value of such Defaulting Member's Units shall be determined by reference to the per Unit amount which such Defaulting Member would receive for its Units if the Company's assets had been sold and all liabilities assumed at the Determination Date for an amount equal to the Appraised Value of the Company and the Company thereupon had been liquidated in accordance with the provisions of the Act. Promptly upon final determination of the Appraised Value of the Company, the Company shall calculate such fair market value and give notice thereof to the Defaulting Member. The Company shall be responsible for the costs and expenses of the Initial Appraiser selected by it, the Defaulting Member shall be responsible for the costs and expenses of the Second Appraiser, if any, and the

Company, on the one hand, and the Defaulting Member, on the other hand, shall each pay one-half of the costs and expenses of the Third Appraiser, if any.

## ARTICLE XV

## NEWSPAPER COMMITMENT; NON-COMPETITION

Section 15.1    Certain Definitions. For purposes of this Article XV, the following terms have the following definitions:

"Company Services" means the business of providing National Online Classified Listings in the Core Categories of auto, apartment, and real estate, together with such offerings of listings in other Core Categories as shall be identified by Majority Vote of the Board of Directors from time to time pursuant to Section 9.7(m); provided, that with respect to any Media Member, Company Services shall not include any Core Category identified from time to time as a Company Service pursuant to Section 9.7(m) for which such Media Member shall not have voted to approve such Core Category as a Company Service.

"Core Category Opportunity" means, with respect to any Non-Newspaper Affiliate, an opportunity to create, form, own, operate or otherwise invest in any entity or venture that is engaged, directly or indirectly (or proposes to engage directly or indirectly), in any business, taken as a whole, whose primary purpose is, or is proposed to be, the provision of one or more of the Company Services.

"National Online Classified Listings" means the business of aggregating classified listings and/or related Core Category information and ancillary services other than online Directors (unless otherwise agreed by the Company and a Newspaper Affiliate with respect to such Newspaper Affiliate) across multiple newspaper markets online through the world wide web or otherwise.

"Newspaper Affiliate" means, from time to time with respect to any Media Member, (i) each local daily newspaper affiliated with such Media Member or Parent thereof which has a daily circulation in excess of 100,000 within its Newspaper Market and (ii) any local daily newspaper affiliated with such Media Member or Parent thereof with a daily circulation of less than 100,000 within its Newspaper Market which, at the discretion of such Media Member or Parent, enters into an Affiliate Agreement with the Company.

79

"Newspaper Market" means a newspaper designated market (as used by the U.S. Audit Bureau of Circulations or other similar organization) or other geographic market designation used by the newspaper for the purposes of publicly reporting newspaper circulation.

"Non-Newspaper Affiliate" means, with respect to any Media Member, any Affiliate of such Media Member, other than any Newspaper Affiliate of such Media Member.

"Parent" means, with respect to any Media Member, the ultimate parent entity of such Media Member, which parent entity shall have executed a signature page to this Agreement solely for the purposes of being bound by the provisions of this Article XV.

"Policy Committee" means a duly appointed Committee of the Board of Directors, which shall be formed from time to time for the purpose of interpreting the intent and scope of the provisions of this Article XV and which shall be composed of three or more Directors, each of which shall be disinterested in any matter brought before any such Committee pursuant to this Article XV.

"Relevant Content" means, with respect to each Newspaper Affiliate, the content of the automotive section (or any substantially similar section) of such Newspaper Affiliate's newspaper(s) or Internet web site(s) with respect to the Company's auto business segment and the content of the home and real estate sections (or any substantially similar sections) of such Newspaper Affiliate's newspaper(s) or Internet web site(s) with respect to the Company's real estate and apartment business segments, in each case, including but not limited to editorial content and liteface classified listings, together with content from such section or sections of such newspaper(s) or Internet web site(s) as shall be relevant to any additional Company Services that may be identified by Majority Vote of the Board of Directors from time to time pursuant to Section 9.7(m); provided, that with respect to any such Internet web site which is not consumer focused, any Media Member that controls such web site shall be permitted to request the consent of the Company to exclude the content of any such web site from the foregoing definition for purposes of this Agreement, which consent shall not be unreasonably withheld by the Company.

Section 15.2     Newspaper Commitment; Right to Participate.

(a)     Each Media Member and each Parent of such Media

80

Member hereby agrees to cause each Newspaper Affiliate of such Media Member or Parent to affiliate with the Company by executing, as soon as is practicable after the date of this Agreement, the Classified Ventures Affiliate Agreement in the form approved by Majority Vote of the Board of Directors (each, an "Affiliate Agreement"); provided, that in the event an Affiliate Agreement is in place with each Newspaper Affiliate (or party that can bind said Newspaper Affiliate) of a Media Member or Parent prior to the date of this Agreement, new Affiliate Agreements need not be executed by such Media Member's Newspaper Affiliates. Each Media Member and each Parent of such Media Member shall also cause each Newspaper Affiliate to agree to (i) carry each Company Service, with the appropriate brand related to such Company Service, on its Internet web site or sites, and prohibit such Newspaper Affiliate from carrying any competitive product or brand on such web site or sites, (ii) promote the products and brands of the Company Services on its Internet web site or sites and in its local newspapers and not to promote any competitive product or brand on such web site or sites or in such local newspaper (other than editorial content or through paid newspaper advertising or paid banner ads online that appear outside the Core Category pages of its Internet web site or sites), and (iii) upon request of the Company, contribute its Relevant Content to each Company Service, subject to any existing limitations on any Newspaper Affiliate's rights to contribute such Relevant Content (provided that such Newspaper Affiliate shall use good faith efforts (which efforts shall not include the payment of additional compensation or other consideration) to secure such rights).

(b) Each of the Media Members and each Parent of such Media Member also hereby agrees that it shall cause each Newspaper Affiliate to co-brand the relevant portion of its Internet web site or sites with each Company Service within 90 days of receipt of Notification from the Company that the Company is prepared to provide a Company Service to such Newspaper Affiliate.

Section 15.3   Non-Newspaper Affiliates. Each Media Member and each Parent of such Media Member hereby agrees that, from time to time, it shall discuss potential opportunities with respect to the Company Services or any extension thereof with its Non-Newspaper Affiliates and shall encourage (but shall not be obligated to cause) any Non-Newspaper Affiliate which desires to pursue a Core Category Opportunity to discuss such Core Category Opportunity with the Company.

Section 15.4   Non-Competition.

(a) Each of the Media Members hereby acknowledges that its investment in the Company is intended to be the primary investment vehicle for its Newspaper Affiliates with respect to each of the Company Services. Accordingly, except as set forth in Schedule III hereof, no Media Member or Parent shall permit any Newspaper Affiliate of such Media Member (or any other Affiliate of such Media

81

Member or Parent on behalf of any such Newspaper Affiliate) to own, acquire, or agree to acquire any controlling interest in (as member, joint venturer or partner) any Person who is engaged in the business of providing any of the Company Services without the prior written consent of the Company.

(b)     Except as set forth in Schedule III hereto, Media Member or Parent shall permit any Newspaper Affiliate to enter into any agreement to provide Core Category listings to any Person other than the Company that is engaged in the business of providing any of the Company Services; provided, that no Newspaper Affiliate shall be prohibited from providing any such Core Category listings to any Affiliate for use in any business other than National Online Classified Listings in the Core Categories.

(c)     No Media Member or Parent shall permit any Newspaper Affiliate to (i) grant to any Person which, as of the time of such grant, is, or is proposed to be, engaged in the business of providing any of the Company Services, the right to use its trade name, or any trademark owned or controlled by it, as a brand or co-brand in connection with such Person's National Online Classified Listings in the Core Categories or (ii) actively promote, directly or indirectly, any Person's National Online Classified Listings in the Core Categories (other than editorial content or through paid newspaper advertising or paid banner ads on-line that appear outside the classified advertising areas of its Internet web site or sites); provided, that no Media Member, Newspaper Affiliate or Parent shall be prohibited by any of the foregoing from granting any such right to, or promoting the activities of, any of their Affiliates in connection with any business other than National Online Classified Listings in the Core Categories.

(d)     The Media Members hereby acknowledge that any breach of this Section 15.4 will result in irreparable damage to the Company for which an adequate monetary remedy does not exist and a remedy at law may prove to be inadequate. Accordingly, in the event of any actual or threatened breach by any Media Member of the provisions of this Section 15.4, the Company shall, in addition to any other remedies permitted by law, be entitled to seek, and the Media Members hereby consent to, equitable remedies, including, without limitation, specific performance, injunctive relief, a temporary restraining order and/or a permanent injunction in any court of competent jurisdiction, to prevent or otherwise restrain a breach of any of the provisions of this Section 15.4, without the necessity of proving damages, posting a bond or other security, and to recover all costs and expenses, including reasonable counsel fees, incurred in enforcing the provisions of this Section 15.4 against such Media Member. Such relief shall be in addition to and not in substitution of any other remedies available to the Company.

(e)     Without limiting the generality of this Section 15.4, if the final judgment of a governmental body of competent jurisdiction declares that any term

82

or provision of this <u>Section 15.4</u> is invalid or unenforceable, the governmental body making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of such term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision of this <u>Section 15.4</u> with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

(f)    In the event that any Newspaper Affiliate is operated as a division of any Media Member or Parent, the foregoing restrictions shall only be applicable to the operations of such Newspaper Affiliate and shall not be applicable to any such Media Member or Parent.

Section 15.5    <u>Policy Committee</u>. Notwithstanding the express provisions set forth above in this <u>Article XV</u>, the purpose of this <u>Article XV</u> is to express the understanding of the Media Members with respect to certain restrictions on investments and business development opportunities that may be available from time to time to any Media Member, its Parent or any of its Newspaper Affiliates which may compete, or propose to compete, in certain respects with any of the Company Services. In accordance with the foregoing, each Media Member and Newspaper Affiliate, or any Parent on behalf of such Media Member or Newspaper Affiliate, hereby agrees to provide a Notification (subject to applicable non-disclosure or confidentiality provisions or procedures) to the Board of Directors of any such potential investments and opportunities which may conflict with the intent and scope of this <u>Article XV</u>. Upon receipt of such Notification, the Board of Directors shall as soon as reasonably practicable form a Policy Committee to reasonably promptly discuss with such Media Member and/or its Parent whether the pursuit of any such investment or opportunity would be in the best interests of the Company in the context of the provisions of this <u>Article XV</u>.

## ARTICLE XVI

## MISCELLANEOUS PROVISIONS

Section 16.1    <u>Term</u>. This Agreement shall terminate on the earlier of (a) the closing of a sale of all outstanding Units of the Company to an independent third party or (b) the unanimous written agreement of all of the Class A Members and Preferred Members.

Section 16.2    <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same.

83

Section 16.3    Entire Agreement. Except as set forth in Schedule IV hereto, this Agreement constitutes the entire agreement among the parties hereto and contains all of the agreements among such parties with respect to the subject matter hereof and this Agreement supersedes any and all other agreements, either oral or written, between such parties with respect to the subject matter hereof.

Section 16.4    Partial Invalidity. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

Section 16.5    Amendments. The unanimous affirmative vote or written consent of the Class A Members and Preferred Members shall be required to amend (i) any provisions hereof which expressly grant any Member or Members specific rights with respect to any matter (e.g., the definition of Company Services contained in Section 15.1), (ii) Section 7.7 hereof, or (iii) this Section 16.5. Except as provided above, this Agreement may be amended only upon the express written approval of the holders of not less than 66-2/3% of the Class A Units and Class A Preferred Units then outstanding; provided, however, that if any such amendment has the effect of affecting the rights or obligations hereunder of any Member in a manner that is disproportionate to that of other Members (taking into account for such purpose the respective Membership Interests held by Members), then such amendment shall be effectuated only by a written agreement executed by all the Members disproportionately affected. Notwithstanding the foregoing, Section 7.2 hereof may be amended upon the express written approval of the Preferred Members holding not less than 66-2/3% of the Class A Preferred Units then outstanding, voting separately as a class.

Section 16.6    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and shall inure to the benefit of the parties, and their respective distributees, heirs, successors and assigns.

Section 16.7    Governing Law. This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Delaware. In particular, this Agreement is intended to comply with the requirements of the Act and the Certificate of Formation. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the Act or any provision of the

Certificate of Formation, the Act and the Certificate of Formation, in that order of priority, will control.

Section 16.8    Offset. Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

Section 16.9    Effect of Waiver or Consent. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute of limitations period has run.

Section 16.10    Further Assurances. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement, to be effective on the date first above written.

CLASSIFIED VENTURES, LLC

By: _____

Its:  President and Chief Executive Officer

**Founding Class A Members:**

TRIBUNE COMPANY

By: _____

Its: _____

TRIBUNE NATIONAL
   MARKETING COMPANY

By: _____

Its: _____

WASHINGTONPOST.NEWSWEEK
   INTERACTIVE COMPANY, LLC
(f/k/a
   DIGITAL INK CO.)

By: _____

Its: _____

GANNETT ON-LINE PARTNER, LLC

By: _____

Its: _____

86

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement, to be effective on the date first above written.

**CLASSIFIED VENTURES, LLC**

By: _____
Its:  President and Chief Executive Officer

**Founding Class A Members:**

**TRIBUNE COMPANY**

By: _____
Its:  President, Tribune Interactive, Inc.

**TRIBUNE NATIONAL**
**MARKETING COMPANY**

By: _____
Its:  Vice President

**WASHINGTONPOST.NEWSWEEK**
**INTERACTIVE COMPANY, LLC**
**(f/k/a**
    **DIGITAL INK CO.)**

By: _____
Its:

**GANNETT ON-LINE PARTNER, LLC**

By: _____
Its:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, to be effective on the date first above written.

CLASSIFIED VENTURES, LLC

By: _____
Its:  President and Chief Executive Officer

**Founding Class A Members**:

TRIBUNE COMPANY

By: _____
Its:

TRIBUNE NATIONAL
    MARKETING COMPANY

By: _____
Its:

WASHINGTONPOST.NEWSWEEK
    INTERACTIVE COMPANY, LLC
(f/k/a
    DIGITAL INK CO.)

By: Caroline H. Little /cs
Its: Chief Operating Officer .

GANNETT ON-LINE PARTNER, LLC

By: _____
Its:

86

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement, to be effective on the date first above written.

CLASSIFIED VENTURES, LLC

By: _____

Its:  President and Chief Executive Officer

**Founding Class A Members:**

**TRIBUNE COMPANY**

By: _____

Its:

**TRIBUNE NATIONAL
    MARKETING COMPANY**

By: _____

Its:

**WASHINGTONPOST.NEWSWEEK
    INTERACTIVE COMPANY, LLC
(f/k/a
    DIGITAL INK CO.)**

By: _____

Its:

**GANNETT ON-LINE PARTNER, LLC**

By: _____

Its:  Vice President

86

**KNIGHT RIDDER DIGITAL**

By: _____

Its: President

<u>**Non-Founding Class A Members**</u>:

**THE McCLATCHY COMPANY**

By: _____

Its:

**THE NEW YORK TIMES COMPANY**

By: _____

Its:

87

**KNIGHT RIDDER DIGITAL**

By: _____
Its:

**Non-Founding Class A Members:**

**THE McCLATCHY COMPANY**

By: _____
Its: *VP, Finance and CFO*

**THE NEW YORK TIMES COMPANY**

By: _____
Its:

87

**KNIGHT RIDDER DIGITAL**

By: _____
Its:

**Non-Founding Class A Members:**

**THE McCLATCHY COMPANY**

By: _____
Its:

**THE NEW YORK TIMES COMPANY**

By: _~~Mich M~~_____
Its:    Vice Chairman & Senior Vice President

89

**Parents:**

**THE WASHINGTON POST COMPANY**

(Solely for the limited purposes of Article
XV of this Agreement)

By: _____
Its: _____ Vice President - Planning & Development

**KNIGHT-RIDDER, INC.**

(Solely for the limited purposes of Article
XV of this Agreement)

By: _____
Its:

**GANNETT CO., INC.**

(Solely for the limited purposes of Article
XV of this Agreement)

By: _____
Its:

88

**Parents:**

**THE WASHINGTON POST COMPANY**

(Solely for the limited purposes of Article XV of this Agreement)

By: _____
Its:

**KNIGHT-RIDDER, INC.**

(Solely for the limited purposes of Article XV of this Agreement)

By: _____
Its:

**GANNETT CO., INC.**

(Solely for the limited purposes of Article XV of this Agreement)

By: _____
Its:

**Parents**:

## THE WASHINGTON POST COMPANY

(Solely for the limited purposes of Article
XV of this Agreement)


By: _____
Its:


## KNIGHT-RIDDER, INC.

(Solely for the limited purposes of Article
XV of this Agreement)


By: _____
Its:


## GANNETT CO., INC.

(Solely for the limited purposes of Article
XV of this Agreement)


By: _____
Its: Vice President

88

**THIRD AMENDMENT**
**TO**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**CLASSIFIED VENTURES, LLC**

This Third Amendment to the Limited Liability Company Agreement of Classified Ventures, LLC (this "Amendment"), is made and entered into as of August [_], 2009, by and among Classified Ventures, LLC, a Delaware limited liability company (the "Company"), Belo Enterprises, Inc., a Delaware corporation ("Belo"), Tribune Company, a Delaware corporation ("Tribune"), Tribune National Marketing Company, a Delaware corporation ("TNMC"), Washingtonpost.Newsweek Interactive Company, LLC, a Delaware limited liability company ("WNPI"), Gannett Satellite Information Network, Inc., a Delaware corporation and successor by merger to Gannett On-line Partner, LLC, a Delaware limited liability company ("Gannett"), and The McClatchy Company, a Delaware corporation ("McClatchy").

## RECITALS

WHEREAS, the Company, Belo, Tribune, TNMC, WNPI, Gannett, McClatchy, and certain other parties entered into a Limited Liability Company Agreement of the Company, dated as of September 30, 2001, as amended by the First Amendment to the Limited Liability Company Agreement, dated as of November 20, 2001 and the Second Amendment to the Limited Liability Company Agreement, dated March 1, 2009 (the "Agreement"); and

WHEREAS, the parties now desire to amend the Agreement as set forth in this Amendment.

NOW, THEREFORE, in consideration of their mutual promises set forth below, the parties hereby agree that the Agreement shall hereby be amended as follows:

1. Capitalized terms not otherwise defined herein shall have the same meanings given to them in the Agreement.

2. Section 7.4 of the Agreement is amended in its entirety to read as follows:

"Member Transferees. Upon the closing of any Transfer of Class A Units or Class A Preferred Units to a transferee pursuant to Section 7.1 or Section 7.2 hereof, such transferee shall have, to the extent of the Class A Units or Class A Preferred Units transferred, the rights and powers and shall be subject to the restrictions and liabilities of the Class A Members or Preferred Members, as applicable, under this Agreement, the Certificate of Formation and the Act; provided, however, a transferee shall not have any of the rights of a Founding Class A Member or a Non-Founding Class A Member pursuant to Article IX hereto, unless (i) the transferee purchases all of the Class A Units and Class A Preferred Units of a Founding Class A Member or Non-Founding Class A Member and (ii) all of the Founding Class A Members (other than the Transferor

Member) approve the transfer of such rights to such transferee (provided, that no such approval pursuant to this clause (ii) shall be required in the case of a Transfer of Class A Units or Class A Preferred Units from a Member to the ultimate parent entity of such Member or to a Person that is wholly-owned, directly or indirectly, by the ultimate parent entity of such Member).   The transferee shall also be liable, to the extent of the Class A Units or Class A Preferred Units transferred, for the unfulfilled obligations, if any, of the Transferor Member or the Transfer or Preferred Member, as applicable, to make Capital Contributions, but shall not be obligated for liabilities unknown to the transferee at the time such Transfer and that could not be ascertained from this Agreement.  Notwithstanding the foregoing sentence, the Transferor Member or Preferred Transferor Member, as applicable, is not released from any liability to the Company arising prior to such Transfer under this Agreement, the Certificate of Formation or the Act." For the avoidance of doubt, for purposes of this Section 7.4, the "ultimate parent entity" of:

> (i)  Tribune, TNMC or any other Person that is wholly-owned, directly or indirectly, by Tribune shall be Tribune;

> (ii)  WNPI or any other Person that is wholly-owned, directly or indirectly, by Washington Post shall be Washington Post;

> (iii)  Gannett or any other Person that is wholly-owned, directly or indirectly, by GCI shall be GCI;

> (iv)  McClatchy or any Person that is wholly-owned, directly or indirectly, by McClatchy shall be McClatchy; and

> (v)  Belo or any other Person that is wholly-owned, directly or indirectly, by A.H. Belo Corporation, a Delaware corporation ("A.H. Belo") shall be A.H. Belo.

3.  The parties hereby agree that, where necessary, the Agreement is hereby further amended or modified so that the Agreement is consistent with, and reflects the intent of, this Amendment.

4.  Except to the extent expressly amended herein, the terms and provisions of the Agreement shall continue in full force and effect.  To the extent any terms of this Amendment conflict with the terms of the Agreement, the terms of this Amendment shall govern.

IN WITNESS WHEREOF, the parties have duly executed and delivered this Amendment as of the date set forth above.

**CLASSIFIED VENTURES, LLC**

By: _____
    Its:

**TRIBUNE COMPANY**

By: _____
    Its:

**TRIBUNE NATIONAL MARKETING COMPANY**

By: _____
    Its:

**GANNETT SATELLITE INFORMATION NETWORK, INC.**

By: _____
    Its:

**THE McCLATCHY COMPANY**

By: _____
    Its:

**BELO ENTERPRISES, INC.**

By: _____
    Its:

**WASHINGTONPOST.NEWSWEEK INTERACTIVE COMPANY, LLC**

By: _____
    Its: