# EXHIBIT B

## Representative Form of Affiliate Agreement

## CLASSIFIED VENTURES – AFFILIATE AGREEMENT

THIS AFFILIATE AGREEMENT ("Agreement") is made effective as of _____, 1998 (the "Effective Date"), by and between Classified Ventures, L.L.C. ("CV"), a Delaware limited liability company with its principal place of business at 30 South Wacker Drive, Suite 4000, Chicago, Illinois 60606, and _____ ("Affiliate"), a _____corporation with its principal place of business at _____.

## RECITALS

WHEREAS, CV operates a network of online classified listing advertising programs and offers related products and services; and

WHEREAS, Affiliate and CV seek to establish a mutually beneficial relationship under which the parties intend that CV will provide products, services, tools and training, and national promotion and distribution, and Affiliates will provide local content, sales support and promotion, with the objective of integrating classified listing advertising in Affiliate's territory with CV's national network of such advertising; and

WHEREAS, CV operates business units in the apartments ("Apartments.com"), autos ("cars.com"), new homes ("NewHomeNetwork.com") and resale real estate ("HomeHunter.com") categories and may add business units in other categories (each a "Vertical Business Unit" or "Vertical");

NOW, THEREFORE, in consideration of the obligations, terms and conditions set forth below and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Affiliate and CV agree as follows:

## 1. DEFINITIONS

As used in this Agreement and each of the Schedules attached hereto, all capitalized terms shall each have the meaning set forth in Schedule A, attached hereto and made a part hereof (unless the context otherwise requires).

## 2. CV RESPONSIBILITIES

2.1. National Version. CV will develop, host and maintain a central web site for each Vertical Category Solution (the "National Version," as defined in Schedule A). The National Version for each Vertical Category Solution will include certain navigational features and other design elements as provided in the Affiliation Guidelines. Subject to the

1

National/Regional Sales Policy, CV will sell and display advertising and/or sponsorships in all areas of the National Version.

2.1.1. CV will develop, host and maintain web pages accessible through the National Version, which pages (i) will display Affiliate Sourced Content (as such term is defined in the Affiliation Guidelines) and (ii) are displayed as a result of a geographic search ("Affiliate Territory Pages"). Subject to the Affiliation Guidelines, certain Affiliate Territory Pages will be co-branded and/or provide for Design Elements, Navigation Elements (including links to the Affiliate Site), banner advertising specifications, and CV content.

2.1.2. CV will assign to Affiliate that percentage of banner advertisement space on the Affiliate Territory Pages as is set forth in the Affiliation Guidelines. Affiliate may utilize or sell such banner advertising space in such manner and at such prices as it may independently determine in its sole discretion and shall retain all revenues from the sales of such space. In the event any banner advertisement on an Affiliate Territory Page conflicts with a stated banner advertisement policy of a party, such party shall have the right to require the other party to remove the applicable banner advertisement within one (1) business day after notice thereof. CV may sell any banner advertisement space assigned to but not utilized by Affiliate and shall retain all revenue therefrom.

2.2. Affiliate Version.

2.2.1. CV will develop, host and maintain a version of each Vertical Category Solution, which pages will be co-branded with Affiliate's logo and the applicable CV product name in a manner which enables end-users to access particular Vertical Category Solutions through Affiliate's web site (the "Affiliate Version"). The functionality, navigation and design of each Affiliate Version shall be consistent with the Affiliation Guidelines.

2.2.2. CV will determine and develop the look and feel of each Vertical Category Solution, including, but not limited to, categories of content and look and feel for the Affiliate Version. Subject to the Affiliation Guidelines and other terms of this Agreement, Affiliate shall be permitted to add features, links or editorial content appropriate for its own market (e.g., neighborhood descriptions), or to delete content that it deems inappropriate for its own market. Subject to the exclusivity provisions of Section 4.2 herein and the reasonable technical constraints of the applicable Vertical Business Unit, in the event CV has not deployed certain enhancements, features and technologies, Affiliate shall be permitted to develop and implement (through a hyperlink or other reasonable deployment on the Affiliate Version) its own applicable product enhancements, feature enhancements and technologies.

2.2.3. Subject to the foregoing, each Vertical Category Solution, and thus the applicable Affiliate Version, may include any or all of the following: the National Database; inventory data and other information obtained through the sale of Customer Packages; Liteface Listings uploaded from CV affiliate newspapers; private-party

online-only advertisements; directories of ancillary services; banner advertisements; sponsorships; e-mail search notification and saved searches; analytic tools (*e.g.*, loan-rate calculators); editorial and other value-add features (*e.g.*, car reviews); and transactional components (*e.g.*, referral services, car and title insurance, or home loans companies). Subject to the Affiliation Guidelines, CV shall be responsible, at its own expense, for the purchase, maintenance and operation of all software and equipment required to host and operate the Affiliate Version.

2.3. <u>National Database</u>. CV will develop, host and operate a database of classified advertisements and related information comprising data from various customers with which CV or its various affiliates will contract (the "National Database), which database will be accessible to visitors of Affiliate's web site.

2.4. <u>Customer Packages</u>.

2.4.1. Each Vertical Business Unit will develop, maintain, and distribute to Affiliate for resale the Customer Packages.

2.4.2. The functionality of the Customer Packages shall be determined and developed for Affiliate by or on behalf of the relevant Vertical Business Unit. Customer Packages may (but are not required to) include, web sites ("Infosites") that permit Customers to display photos, maps, virtual reality views and other information in support of their products and services, including, where applicable, access to the advertiser's inventory of listings (*e.g.*, a car dealer's used-car inventory).

2.4.3. CV and each Vertical Business Unit will establish procedures and provide Affiliate with such applicable training, tools and other support as CV makes available generally to similarly situated CV affiliates to assist in the sale of Customer Packages.

2.4.4. Each Vertical Business Unit will build and host the Customer Packages on terms set forth in the Customer Packages. Where applicable, each Vertical Business Unit will offer training and technical assistance to Affiliates with respect to the collection of Infosite information.

2.5. <u>Promotion</u>. CV will promote each Vertical Category Solution, the goal of which shall be to develop high user traffic numbers, using such means as CV deems reasonably appropriate, including Internet based promotion and advertisement (*e.g.*, search engine registrations, cross-promotion of CV offerings or banner advertisements on related sites) and other media, generally consistent with promotion conducted by CV to date (*e.g.*, distribution agreements with America Online and Excite).

2.6. <u>Reserved Rights</u>. Each Vertical Business Unit reserves the right, subject to the National / Regional Sales Policy and/or the Territorial Guidelines, to offer any of its products and services to Customers located within the Territory, at prices to be determined solely by CV, using its own sales representatives rather than the Affiliate as a re-seller.

2.7. <u>Performance Requirements</u>.   CV shall use reasonable commercial efforts to develop each Vertical Category Solution into a unique, national online service for the mutual benefit of CV and Affiliate and other CV affiliates through, among other things, developing or acquiring Intellectual Property and technology, providing guidelines for CV affiliates, and developing, improving and adding to each Vertical Category Solution as dictated by business conditions.   CV shall also be required to meet the specific performance criteria set forth in the Performance Requirements.   Within four (4) months after the execution of this Agreement, CV shall present to its Board of Directors for approval a set of specific performance standards, such standards to apply to, among other things, server uptime, server response time, creation of customer microsites, accuracy of customer inventory/data, CV promotion plans and traffic reporting with respect to Affiliate Territory Pages.   Upon the Board of Directors' approval, such performance standards shall be deemed incorporated herein and made a part hereof.

2.8. <u>Traffic Data</u>.   CV shall provide Affiliate with such information regarding navigation and other use of the National Version by end-users as is set forth in the Performance Requirements.

2.9. <u>Equal Treatment of Affiliates</u>.  Except with respect to the terms and conditions of the Affiliate Supplement and any Renewal Supplement, the terms and conditions of affiliation with CV for each other CV affiliate shall be substantially the same as those set forth in this Agreement; provided that Schedules may differentiate among CV affiliates based on factors such as newspaper circulation, web site traffic and historical performance, as long as such differences are applied to all similarly situated CV affiliates.

## 3.  AFFILIATE RESPONSIBILITIES

3.1. <u>Affiliate Version</u>.

3.1.1. Affiliate will integrate the Affiliate Version of each Vertical Category Solution with its existing and future web sites in accordance with the Affiliation Guidelines.  During the Term of this Agreement and other than through (i) the Affiliate Version or (ii) the Affiliate Territory Pages and except as allowed pursuant to Section 4.2.2 herein or Schedule H attached hereto, Affiliate shall not provide any other offering of online classified listing services (including classified listings, information and ancillary services, and directories as mutually agreed) covered by the general category of each of the Vertical Category Solutions.

3.1.2. Affiliate may integrate the Affiliate Version with the National Version, in the manner and to the extent provided in the Affiliation Guidelines.

3.1.3. Subject to the terms of this Agreement and the Affiliation Guidelines, Affiliate shall be permitted to add features, links or editorial content appropriate for its own market (*e.g.*, neighborhood descriptions), or to delete content that it deems inappropriate for its own market.

3.1.4. With respect to each Vertical Category Solution, Affiliate (i) must carry on the Affiliate Version, on an exclusive basis, all categories of CV content listed on

Schedule H attached hereto as "Must Carry-Exclusive," (ii) must carry on the Affiliate Version, on a non-exclusive basis, all categories of CV content listed on Schedule H attached hereto as a "Must Carry Non-Exclusive," and (iii) may carry on the Affiliate Version, at its option, all categories of CV content listed on Schedule H attached hereto as "May Carry."

3.2. Advertising and Promotion.  Affiliate shall promote the Affiliate Version (and/or, at Affiliate's option, the National Version) on its own web sites (e.g., through the use of banner advertisements or links on the front page and interior pages of the site) and in its newspaper(s) in accordance with the Performance Requirements and consistent with the Affiliation Guidelines.

3.3. Sponsorships/E-Commerce.  Affiliate's responsibility with respect to sponsorships and e-commerce on the Affiliate Version shall be governed in accordance with the Affiliation Guidelines and the Sponsorship/E-Commerce Guidelines (attached hereto as Schedule I, as revised by CV from time to time upon reasonable notice to Affiliate).

3.4. Banner Advertisements.  Affiliate will assign to CV that percentage of the banner advertisement impressions on the Affiliate Version as is set forth in the Affiliation Guidelines. CV may utilize or sell such banner advertising space to national advertisers at such prices as it may determine, consistent with the National / Regional Sales Policy, and shall retain all revenues from the sales of such space; provided that, in the event any such banner advertisement conflicts with a stated Affiliate banner advertisement policy, Affiliate shall have the right to require CV to remove the applicable banner advertisement within one (1) business day after notice thereof. Affiliate may sell any banner advertisement space assigned to but not utilized by CV at prices to be determined solely by Affiliate and shall retain all revenue therefrom.

3.5. Liteface Listings.  Within 30 days of the execution of this Agreement, Affiliate will provide CV with generic text listings (no graphics or photographs) of classified listing advertisements ("Liteface Listings") constituting Relevant Content for inclusion in the National Database.  All listings will be provided to CV electronically in accordance with technical specifications provided by CV from time to time.

3.6. Customer Packages.

3.6.1. Affiliate shall purchase Customer Packages from CV at the prices and on the terms set forth in the Affiliate Supplement or any Renewal Supplement for each Vertical Business Unit (as such price may be discounted by the applicable Vertical Business Unit at its sole discretion); provided that, upon ninety (90) days prior written notice, CV may increase the wholesale price of a Customer Package with respect to new Customer Packages.  CV shall at all times charge the same wholesale price to all similarly situated CV affiliates.

3.6.2. Affiliate may sell Customer Packages to Customers within the Territory and, subject to the Multi-Market Sales Policy, to Customers located outside the

Territory. Subject to Section 3.6.4, Affiliate may sell Customer Packages at such prices as Affiliate shall, in its sole discretion, determine.

3.6.3. Affiliate shall sell Customer Packages to Customers pursuant to minimum one-year contracts (or, if and at such time supported by the applicable Vertical Business Unit, six (6) month contracts); provided that such contracts may be of a shorter duration upon CV's prior written approval. CV shall provide to Affiliate form customer contracts which Affiliate may use at its discretion. In any event, such contracts shall (i) subject the applicable Customer to an early cancellation or set-up fee, and (ii) contain substantially those terms and conditions outlined under "Required Contract Terms and Conditions" in the Performance Requirements. Notwithstanding the foregoing, during the first year of this Agreement only, Affiliate shall have the ability to offer Customer Packages pursuant to introductory three (3) month contracts, provided that CV may, at its discretion, raise its wholesale prices for Customer Packages offered pursuant to such introductory contracts (in the case of a CV Owned and Operated Territory, CV may decrease Affiliate's commission rate). In the event a Customer extends the term of an introductory contract to six (6) months or one (1) year, as the case may be, CV shall rebate to Affiliate any applicable premium.

3.6.4. If Affiliate acts as CV's sales representative to solicit orders for Customer Packages pursuant to (i) the National / Regional Sales Policy or (ii) rules regarding Owned and Operated Territories (as described in the Territorial Guidelines), Affiliate shall solicit orders only at prices and on terms determined by CV. Such orders shall be subject to CV's acceptance, on terms decided by CV. Affiliate shall receive a commission for any such sales, as further described in the National / Regional Sales Policy and as published by CV from time to time.

3.6.5. Affiliates shall cooperate and follow the reasonable procedures and specifications provided by the applicable Vertical Business Unit in gathering from Customers all information and data to be included in the Customer Package (*e.g.*, photos or floor plans), including, but not limited to, the completion of the applicable Vertical Business Unit fulfillment form, as supplied by such Vertical Business Unit from time to time.

3.7. <u>Hardware and Software</u>. Except for the Affiliate Version, which will be hosted by CV, and except as otherwise provided herein, Affiliate will be solely responsible for the purchase, installation, maintenance, and use of any and all hardware, software and services required for the hosting and operation of its web sites (including integration and use of the Affiliate Version therewith), Affiliate's interaction with the National Database and the performance of its obligations pursuant to this Agreement.

3.8. <u>Traffic Data</u>. Affiliate shall provide CV with such information regarding navigation and other use of the Affiliate Version by end-users as is set forth in the Performance Requirements. Notwithstanding the fact that CV provides hosting services for the Affiliate Version, all Affiliate Version traffic ownership shall be retained by Affiliate for purposes of third party reporting.

3.9. Performance Requirements. Affiliate shall be required to meet the performance criteria set forth herein and in the Performance Requirements. Penalties for Affiliate's failure to achieve any requirement set forth in the Performance Requirements are stated therein. CV shall not impose any additional penalties for such failure unless and until such time as CV undertakes specific performance requirements with respect to its servers, products and customer service.

3.10. Affiliate Content. Subject to any existing limitations on Affiliate's rights to provide such Relevant Content, CV may require Affiliate to provide to CV a license for the right to use (on the National Version or on any Affiliate Version) certain of its Relevant Content (including content licensed to Affiliate by a third party); provided, that, (i) CV shall bear the costs (incremental or otherwise) associated with obtaining such Relevant Content, including, but not limited to, any necessary sublicense that may be required, and (ii) CV shall properly display the source of such Relevant Content. In the event CV is required to obtain a sublicense from a third party in order to use any such Relevant Content, Affiliate shall provide to CV all relevant contact information Affiliate possesses with respect to such third party. Upon Affiliate's written request to CV, CV shall not make available such Relevant Content on the Affiliate Version of a CV affiliate with the right to solicit orders for CV products and services in a Territory which is geographically adjacent to Affiliate's Territory.

3.11. Editorial Content. Notwithstanding anything in this Agreement or any applicable Schedule, if Affiliate, in its reasonable discretion, deems any of the editorial content that comes to its attention on the Affiliate Version either inappropriate for its web site or otherwise objectionable, Affiliate has the right, but not the obligation, to have CV remove such editorial content from the Affiliate Version. Affiliate shall also have the right, in its reasonable discretion, to require CV to remove its name or logo on Affiliate Territory Pages. Further, Affiliate and CV shall comply with all applicable laws relating to the placement of content and advertising on the Affiliate Version and on Affiliate Territory Pages.

## 4. TERRITORY; EXCLUSIVITY

4.1. Territory. Subject to Section 2.6 and the Territorial Guidelines and in order for CV to optimize its effort to achieve market penetration, CV grants to Affiliate the authority to solicit orders for and sell designated CV products and services (including, but not limited to, Customer Packages) in the Territory.

4.2. Exclusivity:

4.2.1. Certain Definitions. For purposes of this Section 4.2 only the following terms have the following definitions:

"Company Services" means the business of providing National Online Classified Listings in the Core Categories of auto, apartment, and real estate, together with such offerings of listings in other Core Categories as shall be approved by CV's Board of Directors and identified by CV with respect to Affiliate upon six (6) months prior notice.

7

"Core Categories" means, with respect to providing national classified listings, information and ancillary services to Internet users, the apartment, automotive, real estate (resale and new construction), general merchandise and personals business segments.

"National Online Classified Listings" means the business of aggregating classified listings and/or related Core Category information and ancillary services other than directories (unless otherwise agreed by CV and Affiliate) across multiple newspaper markets online through the World Wide Web or otherwise.

"Person" means any general partnership, limited partnership, corporation, limited liability company, joint venture, trust, business trust, governmental agency, cooperative, association, individual or other entity, and the heirs, executors, administrations, legal representatives, successors and assigns of such person as the context may require.

4.2.2. Non-Competition. (a) During the term of this Agreement, and except as expressly permitted pursuant to Article 14 of the Classified Ventures Amended and Restated Limited Liability Company Agreement ("Operating Agreement"), Affiliate shall not own, acquire or agree to acquire any controlling interest in (as stockholder, member, joint venturer or partner) any Person who is engaged in the business of providing any of the Company Services without the prior written consent of CV.

(b) Except as expressly permitted pursuant to Article 14 of the Operating Agreement, Affiliate shall not enter into any agreement to provide Core Category classified listings to any Person other than CV that is engaged in the business of providing any of the Company Services; provided, that Affiliate shall not be prohibited from providing any such Core Category classified listings to any of its affiliates for use in any business other than National Online Classified Listings in the Core Categories.

(c) Except as expressly permitted pursuant to Article 14 of the Operating Agreement, Affiliate shall not, other than to or through CV, (i) grant to any Person which, as of the time of such grant, is, or is proposed to be, engaged in the business of providing any of the Company Services, the right to use its trade name, or any trademark owned or controlled by it, as a brand or co-brand in connection with such Person's National Online Classified Listings business in the Core Categories or (ii) actively promote, directly or indirectly, any Person's National Online Classified Listings business in the Core Categories (other than editorial content or through paid newspaper advertising or paid banner ads on-line that appear outside the classified advertising areas of its Internet web site or sites); provided, that Affiliate shall not be prohibited by any of the foregoing from granting any such right to, or promoting the activities of, any of its affiliates in connection with any business other than National Online Classified Listings in the Core Categories.

(d) Without limiting the generality of this Section 4.2.2, if the final judgment of a governmental body of competent jurisdiction declares that any term or provision of

this Section 4.2.2 is invalid or unenforceable, the governmental body making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of such term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision of this Section 4.2.2 with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

(e) Notwithstanding anything in this Agreement to the contrary, the restrictions in this Section 4.2.2 shall not apply to any business owned or operated by Affiliate other than Affiliate's affiliated local daily newspaper(s) and web site(s) associated with such affiliated local daily newspaper(s).

## 5.  FEES

5.1.  Annual Affiliate Fee.  There shall be no annual fee due or payable with respect to the first year of the Agreement.  Thereafter, CV reserves the right to assess an annual fee in such amount as approved by CV's Board of Directors and set forth in the Renewal Supplement; provided that such annual fee will not be assessed in the event it would subject CV to state franchise laws.

5.2.  Wholesale Prices.  Subject to Section 3.6.1, CV shall invoice Affiliate at the applicable wholesale prices set forth in the Affiliate Supplement or Renewal Supplement, as applicable, for any CV products and services purchased by Affiliate for its own use or for resale to Affiliate's Customers, including, but not limited to, Customer Packages and online-only advertisements.  Each invoice shall be due and payable in U.S. dollars within thirty (30) calendar days after Affiliate's receipt of such invoice (which invoice shall be sent monthly by CV, beginning on the month in which the Customer Package becomes enabled) and shall thereafter accrue a late charge, until paid, at the lesser of 1.5% per month or the maximum interest rate permitted under applicable law.  CV shall make reasonable efforts to accompany such invoices with ad management reports as well as the required monthly traffic report. Other than with respect to Customer Packages sold by Affiliate as CV's sales representative, Affiliate shall be solely and completely responsible for the collection of proceeds from the retail sales by Affiliate of Customer Packages and other products sold to Affiliate's Customers, and Affiliate's failure to collect payment from any such Customer shall in no way impact Affiliate's obligation to pay CV's invoices when due.  Notwithstanding the foregoing, Affiliate shall not be obligated to pay CV amounts withheld by a Customer solely as a result of a failure by CV to perform an obligation herein.

5.3.  New Products and Services.   Notwithstanding any other provision of this Agreement, CV will from time to time notify Affiliate of new products and services offered by CV to Affiliate, including prices and other terms for such new products and services.

## 6.  TERM AND TERMINATION

6.1. <u>Term</u>.    The term of this Agreement shall be three (3) years (the "Term"); provided that each of the parties shall make its best commercial efforts to execute a Renewal Supplement no later than ninety (90) days prior to each yearly anniversary of the Effective Date, the terms and conditions of which shall govern the relationship between the parties with respect to the specific subject matter contained therein (including, but not limited to, the imposition of financial penalties in the event of a party's failure to achieve a requirement set forth in the Performance Requirements).    In the event Affiliate and CV are not able to agree on the financial terms and conditions of a Renewal Supplement within thirty (30) days prior to such yearly anniversary, and Affiliate is of the reasonable opinion that CV's proposed financial terms will not allow Affiliate a commercially reasonable profit opportunity, Affiliate may refer the matter to a neutral third party as follows (it being expressly understood that the below described mediation shall not be available for disputes regarding criteria to be used in determining Affiliate's Minimum Sales Goals, which goals shall be no more onerous than the average of those goals of similarly situated CV affiliates):

6.1.1. Affiliate shall provide CV with written notice in accordance with Section 11.4 setting forth Affiliate's position.

6.1.2. Within ten (10) business days after said notice is delivered, the parties shall jointly select a neutral third party to act as a mediator ("Mediator").    The Mediator party shall be a business person or university professor with substantial experience in marketing.

6.1.3. The Mediator shall set a date and location for a hearing within ten (10) business days after being selected.

6.1.4. At the hearing, each party shall have not more than two (2) hours to present its position.    After the conclusion of the presentations, the Mediator shall take not longer than four (4) hours to select either the Affiliate's position or CV's position. The Mediator may not impose any compromise position.

6.1.5. The party whose position is not chosen by the Mediator shall pay the Mediator's expenses in participating in the hearing.

6.1.6. Notwithstanding Section 6.1.5 above, each party shall bear its respective expenses in connection with its participation in such hearing.

6.1.7. The decision entered by the Mediator may not be the matter of dispute resolution under Section 11.10 hereof.

No later than nine (9) months prior to the end of the Term, CV shall provide notice (a "Renewal Notice") to Affiliate, which notice shall contain material terms and conditions under which the parties may extend the Agreement.    Upon Affiliate's receipt of such Renewal Notice, the parties shall negotiate in good faith in order to execute an extension of the Agreement.    If the parties are unable to execute an extension of the Agreement within three (3) months prior to the end of the Term, the Term shall be extended for a wind-down period equal

to one (1) year on the terms and conditions applicable to the year immediately preceding and thereafter shall terminate, unless otherwise agreed by the parties.

6.2. <u>Termination for Cause</u>.  In addition to any other remedies available to it, either in law or in equity, either party may terminate this Agreement; (i) upon the filing of any voluntary or involuntary petition against the other party under the bankruptcy or insolvency laws of any jurisdiction, which petition is not dismissed within thirty (30) days after filing, or upon any appointment of a receiver for all or any portion of the other party's business or operations, or any assignment of all or substantially all the assets of such other party for the benefit of creditors; or (ii) upon a material breach of this Agreement by the other party (including, but not limited to, the material failure to achieve a requirement set forth in the Performance Requirements) if such other party fails to cure such material breach within sixty (60) days after receiving written notice of such breach.  Notwithstanding the foregoing, it is expressly understood that (i) until the first anniversary of the Effective Date, neither party may terminate this Agreement solely due to the other party's failure to achieve a requirement set forth in the Performance Requirements, (ii) CV's sole remedy for Affiliate's failure to achieve a minimum sales goal shall be as stated in the Performance Requirements, (iii) CV may terminate this Agreement immediately upon Affiliate's material breach of the covenants contained in Section 4.2.2 herein, and (iv) either party may terminate this Agreement as provided in Section 8.5 herein.  In lieu of exercising its right to terminate the Agreement in any of the foregoing situations, CV may instead elect to continue the Agreement with the sole right to (a) in the case of an Exclusive Territory, immediately convert such Exclusive Territory to an Owned and Operated Territory or another CV–affiliate Exclusive Territory, or (b) in the case of an Owned and Operated Territory, withdraw Affiliate's designation as a CV sales representative or designate another CV affiliate sales representative.

6.3. <u>Effect of Termination</u>.   Upon the effective date of any termination of this Agreement:

6.3.1.  Subject to Sections 6.3.2, 6.3.3, 6.3.6 and 7.2.2, each party's rights and obligations under this Agreement shall terminate;

6.3.2.  Each party shall be entitled to retain amounts properly paid by the other party prior to such termination and collect from such other party amounts owed by it but not paid prior to such termination;

6.3.3.  CV shall be entitled to retain all listings in the National Database and shall grant to Affiliate a license to use such listings;

6.3.4.  Each party shall be entitled, without interference of any kind by the other party, to contact any Customer who acquired Customer Packages from Affiliate with regard to any transition of services or any other matter related to the Customer's purchase of Customer Packages;

6.3.5.  Affiliate must immediately cease soliciting orders for Customer Packages and advertisements or sponsorships for the Affiliate Version and the Affiliate

Territory Pages and CV may immediately reassign all or any part of the Territory at its sole discretion;

6.3.6. the provisions of Sections 7.2, 8, 9, 10 and 11 shall survive such expiration or termination;

6.3.7. each party shall return or, at the other party's request, destroy, all copies of Confidential Information, Intellectual Property and all other property belonging to and/or received from the other party; and

6.3.8. except as otherwise stated herein, each party may pursue any claims it may have against the other for any breach of the terms of this Agreement.

## 7. PROPRIETARY RIGHTS

7.1. Intellectual Property

7.1.1. Definition. For the purposes hereof, "Intellectual Property" shall be defined as any patent, copyright, trademark, service mark (and any application or registration relating thereto), trade secret, proprietary know-how and other intellectual property right of any kind, including without limitation any intellectual property right in any of the following: content, software (in both source code and object code form), program materials, flow charts, technical and functional specifications, technical data, production data, data formats, database structures, file formats, data compilations, program summaries, program listings, program logic, programming tools, specifications, screen designs, templates, drawings, manuals, reports, user guides, operation guides, installation guides, technical designs, detailed designs, test data and results, drawings, designs, graphs, diagrams, notes, outlines, formulas, processes, algorithms, ideas, inventions, "know-how," techniques, trademarks, service marks, logos, internet domain names, and the classification, selection, coordination and arrangement of data, images, content, copy, collateral documentation and materials, and all other intellectual property which is conceptually related to the Vertical Business Unit.

7.1.2. Ownership.  Unless otherwise agreed in writing, each party will exclusively own all rights in and to all Intellectual Property to the extent developed or previously owned (or licensed) by it (other than with respect to Affiliate's Marks, for which CV is being granted a license herein).  Each party will use best efforts to insure that any and all work performed by employees, outside contractors, customers or vendors, where such work in any way involves Intellectual Property of the other party or a component thereof, will be done under a written agreement identifying such other party as the owner of such Intellectual Property or components. In specific situations where this may be inappropriate or not attainable from a third party, such party will immediately notify the other party of such circumstances and make a good faith attempt to negotiate for the most favorable licensing terms possible from the third party. During the term of this Agreement, each party grants to the other a royalty free, worldwide, limited license to use its Intellectual Property for the purposes

contemplated in this Agreement. If one party lawfully creates a derivative work based on the other's Intellectual Property, the former party shall own such derivative work consistent with federal copyright laws. It is expressly understood that all Customer Packages are considered to be developed solely by CV. Nothing herein will affect Intellectual Property previously owned or independently developed by either party.

7.2. Usage Data.

7.2.1. Definition. For the purposes herein, "Usage Data" shall be defined as any and all Customer or user data compiled or available from the sale of Customer Packages (which shall not include the information in the Customer Package itself), the server logs or any other system that records information regarding persons accessing the National Version or the Affiliate Site, including, but not limited to, search entries, search results, information downloaded or viewed, originating URL and domain, e-mail addresses of users, date and time of day the National Database is accessed, and any other information directly or indirectly obtained from such persons. It is expressly understood that "Usage Data" does not include traffic data, as described in Sections 2.8 and 3.8 herein.

7.2.2. Delivery and License. Each party shall deliver to the other party all applicable Usage Data and hereby grants to the other party a perpetual, worldwide, nonexclusive, nontransferable, royalty-free license to use the Usage Data; provided that neither party shall sublicense or assign such right; and provided further that Affiliate's license of and right to receive Usage Data shall include only that Usage Data with respect to persons accessing the Affiliate Territory Pages or the Affiliate Site. Each of CV and Affiliate may use such data for purposes outside the fulfillment of its obligations hereunder, including, but not limited to, use in its own print products or direct marketing, but only consistent with CV's Privacy Policy, attached hereto as Schedule G.

7.3. Trademarks and Service Marks.

7.3.1. Each party hereby grants to the other party a limited, worldwide, nonexclusive, nontransferable, royalty-free license during the Term to use its Marks solely in connection with co-branding and for the marketing, advertising and distribution of the products and services set forth herein.

7.3.2. Neither party shall in any way dispute, impugn or in any way damage the validity of, or the owner's right to use and control the use of, any or all of such owner's Marks, either during the Term or thereafter, nor shall either party act or permit action in any way that would impair the rights of the owner in such owner's Marks. Each party acknowledges that its use of the Marks of the other party shall not create in it any right, title or interest in such Mark.

7.3.3. Each party's use of such other party's Marks shall be consistent with the Affiliation Guidelines and reasonable business judgment. In the case the Affiliation Guidelines are silent as to or are inconsistent with a party's use of the other party's

Mark, the holder of such Mark shall have a right to revoke the license granted in Section 7.3.1 above with respect to such use of its Mark(s) by written notice to the other party and the other party shall immediately cease using such Mark in the manner found objectionable by the holder of such Mark.

7.3.4. Each party has the right to monitor the quality of the other party's use of its Marks, and to inspect such use on its own or, upon reasonable advance notice, on the premises of the other party. Each party has the right to request from time to time samples of the other party's use of the licensing party's Marks.

## 8. CONFIDENTIALITY

8.1. <u>Confidential Information</u>. The parties acknowledge that it will be necessary for each of them to disclose or make available to the other information and materials (collectively the "Confidential Information") that may be confidential or proprietary or may contain valuable trade secrets, and that some such information may already have been disclosed to the other party prior to the Effective Date. Prior to such disclosure to the other party, the disclosing party shall use reasonable efforts to designate all Confidential Information by marking the information with the word "Confidential" or similar legend. However, CV and Affiliate agree that even if not so marked, the National Database software, National Version software, Affiliate Version software, Intellectual Property, product pricing information, all terms and conditions of this Agreement (including all schedules hereto), and all other information relating to the business of the disclosing party is Confidential Information, as is all documentation, descriptions, and embodiments of any of them.

8.2. <u>Non-Disclosure</u>. Both during and after the term of this Agreement, each of the parties agrees: (a) to use commercially reasonable efforts to protect the Confidential Information of the other party from unauthorized use or disclosure and to use at least the same degree of care with regard thereto as it uses to protect its own Confidential Information of a like nature; (b) to use and reproduce the Confidential Information of the other party only as permitted under this Agreement and as needed to perform its duties hereunder; and (c) not to disclose or otherwise permit access to the Confidential Information of the other party to any third party, without the other party's prior written consent.

8.3. <u>Non-Solicitation</u>. In order to encourage each of the parties to allow maximum access to the other's employees in furtherance of the objectives stated herein, both during and for a period of twelve (12) months after the term of this Agreement, neither party shall, for itself or for the benefit of, or in connection with, any other entity solicit (other than through general solicitation), any employee of the other party who has personally participated in the activities described herein in order to cause such employee to terminate his or her employment with such other party.

8.4. <u>Exceptions</u>. Information will not be considered to be Confidential Information hereunder if it: (a) is already, or otherwise becomes, generally known by third parties within the industry of either party, not as a result of an act or omission of the receiving party; (b) is lawfully received, after disclosure hereunder, from a third party having the right to disseminate the information without restriction on disclosure; (c) is furnished to others by the

14

disclosing party without restriction on disclosure; or (d) can be shown by the receiving party to have been independently developed by such party, as evidenced by adequate documentation. Furthermore, it is understood that each party shall be free to use any ideas, concepts, know-how and techniques related to the scope of its business, provided they contain no specific or identifiable elements unique to the other party hereto or its operations.

8.5.    <u>Injunctive Relief</u>.  The parties agree that any breach by either party or any of its officers, directors, or employees, of any provisions of this Section 8 may cause immediate and irreparable injury to the other party and that, in the event of such breach, the injured party will be entitled to (i) immediately terminate this Agreement, (ii) seek injunctive relief as well as (iii) any and all other remedies available at law or in equity.

## 9.  REPRESENTATIONS AND WARRANTIES

9.1.    <u>Affiliate</u>.  Affiliate hereby represents and warrants to CV that:

9.1.1.  Affiliate is the owner of or otherwise has all necessary and sufficient rights to use, distribute and grant to CV the rights set forth herein with respect to its Marks, the content of the Affiliate web sites, its Liteface Listings, and all other materials and methodologies provided by it to be used in connection with fulfilling its obligations hereunder; and

9.1.2.  Affiliate has all rights necessary to post to its web site all material it posts to such site and that no content made available to the National Database for use in the National Version or the Affiliate Version shall violate or infringe any common law or statutory rights of any person or other entity including, without limitation, any contractual rights, proprietary rights, copyright rights, trademark, service mark or patent rights, or any rights of privacy or publicity, nor shall it violate any law or regulation.  Affiliate further represents and warrants that no content made available by Affiliate to the National Database for use in the National Version or the Affiliate Version, as provided by Affiliate for its proposed purpose, shall be unlawful or libelous or infringe proprietary rights, nor shall it contain any instructions, recipes or formulas that, if implemented, would result in injury.

9.2.    <u>CV</u>.  CV hereby represents and warrants to Affiliate that

9.2.1.  (i) CV is the owner of or otherwise has all necessary and sufficient rights to use, distribute and grant to Affiliate the rights set forth herein with respect to its Marks, the National Database software, National Version, Affiliate Version, Customer Packages, Affiliation Guidelines, and all other materials and methodologies used in connection with fulfilling its obligations hereunder, (ii) no content made available by it for use in the National Version or the Affiliate Version (to the extent such content was not made available to CV by Affiliate) shall be unlawful or libelous or infringe proprietary rights, nor shall it contain any instructions, recipes or formulas that, if implemented, would result in injury; and

15

9.2.2. CV has taken or will take all steps necessary to assure that none of the computer systems owned or operated by CV contain software which is incapable of recognizing and correctly calculating dates on and after January 1, 2000, or which would otherwise cause such computer systems to fail to perform properly their intended functions in connection with data containing any date on or after January 1, 2000 (the "Year 2000 Problem). Additionally, CV has taken or will take all steps necessary to assure that its vendors, customers, lenders and other third parties for which a business failure or material business interruption would have a material adverse effect on CV or its business ("Key Third Parties") have implemented reasonable procedures to minimize the risk that the computer systems operated by such Key Third Parties, recognize and correctly calculate dates on or after January 1, 2000.

9.3.    Mutual. Each party represents and warrants to the other party that:

9.3.1. Such party has the full corporate rights, power and authority to enter into this Agreement and to perform the acts required of it hereunder.

9.3.2. The execution of this Agreement by such party and the performance by such party of its obligations and duties hereunder do not and shall not violate any agreement by which such party is bound;

9.3.3. When executed and delivered by such party, this Agreement shall constitute the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms; and

9.3.4. Each party will comply with all applicable federal, state and local laws in the performance of its obligations hereunder.

9.4.    Disclaimers.

9.4.1. Security. Each party acknowledges that electronic communications and databases are subject to errors, tampering and break-ins and that, while such party will implement reasonable security precautions to attempt to prevent such occurrences, it does not guarantee or warrant that such events will not take place.

9.4.2. Continuous Service. CV does not represent or warrant that the National Database, National Version, Affiliate Version, Customer Packages, or any other software, services or documentation provided by CV pursuant to this Agreement will meet Affiliate's requirements or the requirements of any Customers. CV does not represent or warrant that the operation of the National Database, National Version, Affiliate Version, Customer Packages, or any other software, services or documentation provided by CV pursuant to this Agreement will be uninterrupted or error-free or that any defect therein can be or will be corrected.

9.4.3. General. THE FOREGOING WARRANTIES BY EACH PARTY ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A

PARTICULAR PURPOSE. NEITHER PARTY SHALL HAVE ANY LIABILITY WHATSOEVER FOR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES, INCLUDING LOST PROFITS, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 10. INDEMNIFICATION

10.1.  Indemnification.  Each party agrees to defend, indemnify and hold harmless the other party, its directors, officers, employees, affiliates and agents, against any claim, demand, cause of action, debt or liability, including reasonable attorneys' fees, to the extent that: (i) it is based upon a breach of such party's representations, warranties, or agreements hereunder; (ii) it arises out of the gross negligence or willful misconduct of such party; (iii) it is based upon any content, Mark, or other materials or services provided by such party hereunder infringing or violating any proprietary rights of any third party; (iv) it is based upon such party's purchase, use, misuse, or mishandling of any products offered for sale or rent on the National Database or the failure of any such products to meet any legal or regulatory requirements; (v)  it is based upon such party's use or misuse of Usage Data; (vi) it is based on any claim of false or deceptive advertising by such party; (vii) it is based on the violation by such party of state or federal consumer protection laws; (viii) it is unrelated to the actions of the other party and arises solely out of such party's relationship with any Customer or prospective customer; or (ix) it arises with respect to any actual or alleged tax obligations of such party.

10.2.  Notice of Claim.  In claiming any indemnification hereunder, the indemnified party shall promptly provide the indemnifying party with written notice of any claim which the indemnified party believes falls within the scope of the foregoing paragraphs. The indemnifying party thereafter shall have sole control of the defense of any such claim and all negotiations for settlement; provided, however, that the indemnified party may, at its own expense, participate in the defense if it so chooses, provided that the indemnifying party shall control such defense and all negotiations relative to the settlement of any such claim and further provided that any settlement intended to bind the indemnified party in any way other than the payment of a financial settlement within the scope of the indemnity shall not be final without the indemnified party's written consent, which shall not be unreasonably withheld.

10.3.  Option to Avoid Infringement.  Should any of the materials provided by either party hereunder become, or in such party's opinion, be likely to become the subject of any third-party claim for infringement of proprietary rights (an "Infringement Claim") as such materials are used in accordance with the terms of this Agreement, such party (the "Notifying Party" shall, at its option: (a) instruct the other party to continue using the allegedly infringing materials at the sole risk of the Notifying Party (b) procure, at no cost to the other party, the right to continue to used the allegedly infringing item; or (c) require the Other Party to replace (with materials provided by the Notifying Party), remove and/or modify the allegedly infringing materials to make them non-infringing. Notwithstanding the foregoing, each party may, in its sole discretion, remove the allegedly infringing material from the National Database or National or Affiliate Version and/or suspend the performance of this Agreement

(to the extent necessitated by the Infringement Claim) in whole or in part until the claim is resolved to the reasonable satisfaction of such party; provided that such party shall cooperate and/or act in good faith to resolve such matter. Neither party shall have any obligations to the other with respect to any actions taken pursuant to the preceding sentence.

10.4.  Survival of Indemnification Obligation.    Each party's indemnification obligations shall survive any termination or expiration of the term of this Agreement.

## 11. MISCELLANEOUS

11.1.  Force Majeure.  Neither party shall be deemed in default of this Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed or prevented by reason of any act outside the reasonable control of either party, such as acts of God, fire, natural disaster, accident, act of government, labor disputes or the widespread failure of networks and equipment (*e.g.*, the Internet) ("Force Majeure") provided that such party gives the other party written notice thereof promptly and, in any event, within five (5) days of discovery thereof and uses its best commercial efforts to cure the delay.  In the event of such a Force Majeure, the time for performance or cure shall be extended for a period equal to the duration of the Force Majeure, provided however that if the Force Majeure continues for longer than sixty (60) days, the party not affected by the Force Majeure may terminate this Agreement without any liability upon written notice to the other party.

11.2.  Partial Invalidity.  If any part of this Agreement shall be adjudged by any court of competent jurisdiction to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not be affected or impaired thereby and shall be enforced to the maximum extent permitted by applicable law.  The parties agree to replace any invalid provision with a valid provision which most closely approximates the intent and economic effect of the invalid provision.  If any remedy set forth in this Agreement is determined to have failed of its essential purpose, then all other provisions of this Agreement, including the limitations of liability and exclusion of damages, shall remain in full force and effect.

11.3.  No Waiver.  The failure of either party to partially or fully exercise any right with respect to this Agreement, or the waiver by either party of any breach of this Agreement, shall not prevent a subsequent exercise of such right or be deemed a waiver of any subsequent breach of the same or any other term of this Agreement.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

11.4.  Notices.  Any notice required or permitted hereunder to the parties hereto will be deemed to have been duly given only if in writing and delivered by certified U.S. mail postage prepaid, return receipt requested, or via overnight courier, to the address of the receiving party as set forth on the initial page hereof or such other address as may be specified by such party in a notice delivered to the other party in accordance with this Section.  Notices shall be deemed delivered when received by the party being notified.

11.5.  Binding Effect; Assignment.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their permitted successors and assigns.  Except as

otherwise expressly provided herein, Affiliate may not assign, transfer, convey, or encumber this Agreement, any interest herein, or any rights granted hereunder, or delegate any obligations herein, whether voluntarily or by operation of law, without the prior written consent of CV, which consent shall not be unreasonably withheld.

11.6.  No Third Party Benefit.  The provisions of this Agreement are for the sole benefit of the parties hereto.  This Agreement confers no rights, benefits or claims upon any person or entity not a party hereto.

11.7.  No Construction Against Drafter.  If an ambiguity or question of intent arises with respect to any provision of this Agreement, the Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring either party by virtue of authorship of any of the provisions of this Agreement.

11.8.  Entire Agreement.  This Agreement, including all Schedules and Exhibits attached hereto, sets forth the entire agreement between the parties on this subject and supersedes all prior negotiations, understandings and agreements between the parties concerning the subject matter hereof.  In the event of a conflict between this Agreement and any Schedule, the language in this Agreement shall be controlling.  No amendment or modification of this Agreement shall be made except by a writing duly executed by both parties. The terms of the Affiliate Supplement and, if applicable, the then effective Renewal Supplement shall govern the relationship between the parties with respect to the subject matter contained therein.

11.9.  Governing Law.  This Agreement shall be deemed to have been made in, and shall be construed pursuant to the laws of, the State of Illinois, without regard to its conflict of laws or principles.

11.10.  Dispute Resolution.  In the event of any controversy or claim arising out of or relating to this Agreement or the breach thereof (other than with respect to a controversy or claim arising out of Affiliate and CV not being able to agree on the financial terms and conditions to be agreed upon at such time as a Renewal Supplement is to be executed (including, but not limited to, criteria to be used for determination of Affiliate's Minimum Sales Goals)), the parties, upon written request of either party, shall each within ten (10) days designate a representative to attempt in good faith to settle such controversy or claim.  To this effect, the representatives shall consult and negotiate with each other, in good faith and, recognizing their mutual interests, attempt to reach a just and equitable solution satisfactory to both parties.  If they do not reach such solution within a period of thirty (30) days, then upon written notice by either party to the other, the controversy or claim shall be finally and conclusively settled by arbitration, in accordance with the Federal Arbitration Act and the provisions of the Commercial Arbitration Rules of the American Arbitration Association ("AAA").  If the claim asserted is for $1 million or more, the Supplementary Procedures for Large, Complex Commercial Disputes of the AAA also shall apply and the arbitration award shall be in writing and shall specify the factual and legal bases for the award.  Nothing in this Section 11.10 shall toll the 60-day period prescribed in Section 6.2 during which a party in material breach must cure such breach to avoid termination of this Agreement by the non-breaching party.

If the amount of the claim or combined claims or combined claims is $500,000 or less, unless otherwise agreed by the parties, the arbitration proceedings shall be conducted before a single neutral arbitrator to be selected in accordance with the Commercial Arbitration Rules of the AAA. The arbitrator shall be an attorney in practice for no less than ten (10) years and is at such time actively engaged in the practice of law as it relates to online services, the Internet, and related new technologies. If the amount of the claim or combined claims is greater than $500,000, unless otherwise agreed by the parties, the arbitration proceedings shall be conducted before three (3) neutral arbitrators to be selected in accordance with the Commercial Arbitration Rules of the AAA. The chairperson of the arbitration panel shall be selected from a panel of attorneys in practice for no less than ten (10) years and actively engaged in the practice of law as it relates to online services, the Internet, and related new technologies. The remaining two arbitrators shall be selected from a panel of persons having experience with and knowledge of the law as it relates to newspaper publishing, broadcast television affiliation agreements and/or online services, the Internet, and related new technologies. In selecting the three arbitrators, each party shall be entitled to strike five names on a peremptory basis from the panel for selection of the chairperson and from the panel for the selection of the remaining two arbitrators, for a total of ten peremptory challenges. In any case, no arbitrator shall be a director, officer, member, employee or attorney of or for either party or any company related to either party.

The location of the arbitration proceedings shall be Chicago, Illinois, unless otherwise agreed by the parties. The arbitrators shall render their award by majority vote, shall be bound and governed in their determination solely by the wording and intention of the parties as evidenced by this Agreement, and shall determine the rights and obligations of the parties according to the substantive laws of Illinois. The arbitrators shall endeavor to issue their award within three months after the appointment of the third arbitrator. Any arbitration award shall be stated and paid in U.S. currency. The arbitrators shall specify in their award the costs to be borne by each party. The arbitration award shall be final and binding on all parties. Judgment upon the award may be entered in any court having jurisdiction.

Either party may, without inconsistency with this Agreement, seek from a court any interim or provisional relief that may be necessary to protect the rights or property of that party pending the arbitral tribunal's determination of the merits of the controversy.

Neither party nor the arbitrators may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

The parties hereto recognize, and any arbitrator, mediator or judge is affirmatively advised, that certain provisions of this Agreement describe the right of CV to take (or refrain from taking) certain actions in the exercise of its business judgment based on its assessment of the overall best interests of CV. Where such discretion has been exercised, and is supported by the business judgment of CV, neither an arbitrator, a mediator, nor a judge shall substitute his or her judgment for the judgment so exercised by CV.

11.11. <u>Headings</u>. Section headings are provided for convenience of reference only and do effect the interpretation of or not constitute any part of this Agreement. Any references to a particular section of this Agreement shall be deemed to include reference to any and all subsections thereof.

11.12. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall be taken together and deemed to be one instrument.

11.13. <u>Allocation of Risk</u>. Affiliate acknowledges and agrees that the fees charged by CV in this Agreement reflect an allocation of risk between the parties, including, but not limited to, the limitation of liability and exclusion of remedies described in this Agreement. A modification of the allocation of risks set forth in this Agreement would affect the fees charged by CV, and in consideration of such fees, Affiliate agrees to such allocation of risk

11.14. <u>No Joint Venture</u>. Neither this Agreement nor Affiliate's status as an affiliate of CV shall be deemed or construed to create any partnership, joint venture, or agency relationship between Affiliate and CV, nor shall Affiliate be deemed to have been granted a franchise by CV. Except to the extent expressly provided, neither party is, nor shall either party hold itself out to be, vested with any power, or right to bind the other party contractually or to act on behalf of the other party as its contracting broker, agent or otherwise.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first above written.


**CLASSIFIED VENTURES, L.L.C.**            **[AFFILIATE]**


By: _____    By: _____

    Name:                                                    Name:

    Title:                                                    Title: