# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | Objection Deadline: August 28, 2009 at 12:00 p.m. (ET) (requested) |
| | Hearing Date: August 31, 2009 at 2:00 p.m. (ET) (requested) |

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION PURSUANT TO SECTIONS 105(a), 363(b) AND 503(b) OF THE BANKRUPTCY CODE AND FED. R. BANKR. P. 2002, 6004 AND 9007 FOR AN ORDER (I) APPROVING FORM AND SCOPE OF NOTICE OF PROPOSED BUSINESS COMBINATION INVOLVING CUBS BUSINESS TO CREDITORS AND PARTIES-IN-INTEREST OF TRIBUNE DEBTORS AND CUBS ENTITIES, (II) APPROVING TRANSACTION PROCESS AND SETTING TRANSACTION HEARING AND RELATED DEADLINES, AND (III) APPROVING CERTAIN INVESTOR PROTECTIONS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

The debtors and debtors in possession in the above-captioned chapter 11 cases ("Tribune Debtors") hereby submit this motion (the "Motion") requesting that the court enter an order (i) approving the forms of the proposed notice to be given of that certain Motion for Orders Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 (I) Authorizing Tribune Debtors and CNLBC to (A) Enter Into and Perform Obligations under Formation Agreement and Ancillary Agreements, (B) Effect Proposed Business Combination Respecting Cubs-Related Assets, Including Interests in Wrigley Field, Comcast Sports Network and Related Assets Free and Clear of All Liens, Claims, Rights, Interests and Encumbrances, (C) Assume and Assign Executory Contracts; (II) Authorizing Debtor Tribune Company to Enter Into Guarantees of Debt Financing; (III) Authorizing Debtors WGN Continental Broadcast Company and Tribune Company to Enter Into and Perform Obligations Under Radio and Television Broadcast Agreements; and (IV) Granting Related Relief, filed contemporaneously herewith (the "Tribune Transaction Approval Motion"),[2] and of, as defined below, the CNLBC Transaction Approval Motion (together with the Tribune Transaction Approval Motion, the "Transaction Approval Motions"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the scope of the notice to be provided by the Tribune Debtors of the Tribune Transaction Approval Motion; (ii) approving the transaction process involving the Cubs Business (as described below) and setting hearings to consider the Transaction Approval Motions; and (iii) approving certain investor protections in favor of Ricketts Acquisition LLC, the bidder for the Cubs Business (the "Bidder"), pursuant to sections 105(a), 363(b) and 503(b) of the Bankruptcy Code.  In support of this Motion, the Tribune Debtors respectfully represent as follows:

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Tribune Transaction Approval Motion or the Formation Agreement, as applicable.

## INTRODUCTION

1.      By this Motion, the Tribune Debtors seek this Court's approval for the first step of a two-step process that will, in the end, provide good and proper notice to all creditors and other parties-in-interest of the contribution of the business, assets and operations of the Chicago Cubs Major League Baseball franchise (including, without limitation, its spring training, Major League Baseball and Dominican baseball operations), Wrigley Field, certain real property, including parking lots used for game day parking, the business conducted by Wrigley Field Premium Tickets, LLC and the ownership interest in Comcast SportsNet Chicago, LLC ("CSN Chicago") (collectively, the "Cubs Business") to a newly-formed Delaware limited liability company, Chicago Baseball Holdings, LLC ("Newco"), in which the Tribune Debtors and the Cubs Entities will collectively retain a 5% common ownership interest (the "Proposed Business Combination").[3] The Cubs Business is one of the most valuable assets of Tribune and its affiliates, and this process is the culmination of an extensive, thorough and wide-ranging marketing program for the Cubs Business that has lasted for nearly two-and-a-half years and has methodically reduced a field of more than 100 candidates (the "Prospective Bidders") to a single transaction partner (i.e., the Bidder), and an intensive and lengthy process of negotiation with the Bidder leading to the Proposed Business Combination.

2.      This introduction provides an overview of the proposed process and procedures for giving notice to parties in interest of both the Tribune Debtors and CNLBC (defined below) of the Proposed Business Combination.  The details of the Proposed Business

---

[3] Certain of the assets that are part of the Proposed Business Combination will be contributed directly by Tribune and the Cubs Entities to Chicago Cubs National League Ball Club, LLC ("Cubs Newco Sub"), rather than to Newco. See Formation Agreement § 1.1(c)(i).  The Formation Agreement also contemplates that immediately after the contribution by the Tribune Debtors and the Cubs Entities of the assets of the Cubs Business to Newco, Newco will sell or otherwise convey the assets of the Cubs Business to its various subsidiaries (the "Newco Subs").  See id. at § 1.1(c)(iv).  Approval for the transfer of the assets of the Cubs Business from Newco to the Newco Subs, to the extent necessary, is also sought by the Tribune Transaction Approval Motion.

46429/0001-5943962v1

Combination are contained in the various filings with the Court that have been made concurrently with this Motion (most notably the Tribune Transaction Approval Motion), or will be made in the weeks leading up to the final hearing on the Proposed Business Combination.

3.        The Tribune Debtors and CNLBC will seek Court approval for the Proposed Business Combination in two separate but related and sequenced motions and hearings thereon, which will be jointly noticed immediately following entry of the order approving this Motion.[4] First, the Tribune Debtors will seek approval of the Proposed Business Combination in their currently-pending chapter 11 proceedings. This approval is required for at least two reasons. First, Tribune is the present direct or indirect equity owner of CNLBC and the other Cubs Entities and is required to provide its consent in that capacity for the Proposed Business Combination to be consummated. Although Tribune's consent, as owner, to the Proposed Business Combination is a matter of Tribune's reasonable business judgment, as Tribune has described in the Declarations in support of this Motion and the Tribune Transaction Approval Motion, the proposed transaction is fair and reasonable, represents the best overall proposed transaction for the Cubs Business, and is in the best interest of creditors and other parties-in-interest. However, the Proposed Business Combination is outside of the ordinary course of business and Tribune's consent and participation are therefore contingent upon this Court finding, among other things, that the Proposed Business Combination is permissible under section 363 of the Bankruptcy Code as fair and reasonable and in the best interests of creditors and other parties-in-interest.

---

[4] The Tribune Transaction Approval Motion is available to all parties free of charge on the claims and noticing agent's website for the Tribune Debtors' chapter 11 cases at http://chapter11.epiqsystems.com/ tribune, and electronic notice with a link to the documents was, upon filing, automatically emailed by the clerk of the Court to parties-in-interest that customarily receive notice of all motions in the Tribune Debtors' chapter 11 cases.

4.      Second, certain aspects of the Proposed Business Combination involve the transfer of assets directly owned by one or more of the Tribune Debtors, or otherwise involve a transaction outside the ordinary course of business to be entered into by one or more of the Tribune Debtors.  For example, the Proposed Business Combination contemplates that (i) Debtor WGN Continental Broadcasting Company ("WGN") will enter into certain restated radio and television broadcast agreements for Cubs games, and (ii) Tribune will execute guarantees of certain of the debt facilities to be entered into by Newco in connection with the Proposed Business Combination.[5]  Each of these contemplated actions also requires Bankruptcy Court approval pursuant to section 363 of the Bankruptcy Code.

5.      Should the Court enter an order in the Tribune Debtors' currently-pending chapter 11 cases approving the consummation of the Proposed Business Combination as to the Tribune Debtors, the Formation Agreement – the principal document governing the Proposed Business Combination – provides that the parties will, subject to satisfaction of applicable conditions, thereafter execute and deliver certain agreements, certificates and other documents required to consummate the Proposed Business Combination (the "Escrow Documents") into escrow.  Also at that time, the Bidder will cause the lenders providing the debt financing for the Proposed Business Combination to fund that debt financing to a senior lender agent or the closing escrow agent, as specified in the Formation Agreement, and the equity financing for the Proposed Business Combination will be funded to the closing escrow agent.  See Formation Agreement at § 1.1(b).

---

[5] In addition to WGN entering into restated radio and television broadcast agreements, it is also expected that Tribune will enter into the Superstation Extension relating to certain other television broadcasts of Cubs games, as described in the Tribune Transaction Approval Motion.  Entry into the Superstation Extension is not a condition precedent to closing under the Formation Agreement and is likely within the ordinary course of Tribune's business; however, out of an abundance of caution and for the avoidance of doubt, authority is sought under the Tribune Transaction Approval Motion for Tribune to enter into the Superstation Extension.

6.     Following the Escrow Closing, the second step of the process will occur when Chicago National League Ball Club, LLC ("CNLBC"), one of the Cubs Entities, (i) files a chapter 11 petition in order to effectuate the Proposed Business Combination and (ii) files a motion substantially similar to the motion attached as Exhibit Y to the Formation Agreement (the "CNLBC Transaction Approval Motion") seeking immediate Court approval for the Proposed Business Combination in its chapter 11 case.  In fact, the Formation Agreement anticipates that CNLBC will seek and obtain such approval promptly after it commences its chapter 11 case, so long as the various other conditions to closing remain satisfied.  See Formation Agreement at §§ 4.15(l), 7.4(a).  The Escrow Documents and the funds held by the Senior Lender Agent and the Closing Agent will only be disbursed upon satisfaction of all conditions to Closing, as set forth in Section 7.4 of the Formation Agreement, being satisfied or waived.

7.     An important consequence of the Proposed Business Combination will be that Newco will assume substantially all liabilities and obligations of the Cubs Entities, with the exception of (i) lenders to Tribune who assert guarantee claims against CNLBC, (ii) certain creditors of the Tribune Debtors who assert that some or all of the Cubs Entities are jointly and severally liable for their claims against the Tribune Debtors, and (iii) the Cubs Excluded Liabilities identified in the Formation Agreement, which broadly consist of certain tax, certain employee-related, certain intercompany, and other miscellaneous liabilities.  The overwhelming majority of creditors and parties-in-interest who deal directly with the Cubs Business will not have their claims or other interests respecting the Cubs Business impaired in any discernable manner.

8.     The notice procedures proposed in this Motion are designed to serve two functions.  First, notice will be provided to relevant parties in interest in the Tribune Debtors'

6

chapter 11 cases, as is typical whenever Section 363 relief is sought for transactions outside the ordinary course of business.  Second, the Tribune Debtors will provide at the same time written, mailed notice of the Proposed Business Combination, in the form attached hereto as <u>Exhibit A</u>, to (i) creditors of and other parties in interest respecting CNLBC and the other Cubs Entities (even though only CNLBC is likely to commence a chapter 11 case), (ii) counterparties to all executory contracts and unexpired leases of nonresidential property to which CNLBC is a party and certain executory contracts and unexpired leases to which Tribune and other Tribune Debtors are a party relating to the Cubs Business (the "<u>Cubs Executory Contracts</u>"), and (iii) other significant stakeholders with respect to the Cubs Entities.[6]  This additional mailed notice will ensure that these parties will receive actual notice <u>now</u> of (i) the scheduled times and dates for hearings on approval of the Proposed Business Combination in the Tribune Debtors' currently-pending chapter 11 cases and in any chapter 11 case that may be commenced by CNLBC; (ii) the substantive consequences of failing to object to the Proposed Business Combination; and (iii) the details of the Proposed Business Combination necessary for any person or entity receiving such notice to have sufficient information on which to determine whether or not to object to the Proposed Business Combination.

9.    For the avoidance of doubt, the Tribune Debtors are not seeking – nor would this Court provide – an order pursuant to this Motion in a chapter 11 proceeding that has not yet been commenced.  However, any chapter 11 process other than a very brief one would be extremely detrimental to CNLBC, as discussed in detail at ¶¶ 69-76, <u>infra</u>, and in the declaration of Crane H. Kenney, Chairman of CNLBC, attached hereto as <u>Exhibit D</u> (the "<u>Kenney</u>

---

[6] Creditors of or other parties-in-interest respecting the Cubs Entities will be able to obtain copies of all documents filed with the Bankruptcy Court (other than those filed under seal) relating to the Proposed Business Combination by going to the Tribune Debtors' chapter 11 website at http://chapter11.epiqsystems.com/tribune or upon request to counsel for the Tribune Debtors.

Declaration"). Accordingly, what the Tribune Debtors seek by this Motion is an order in the Tribune Debtors' chapter 11 cases stating that the proposed notice of the Transaction Approval Motions and the hearings thereon, provided in accordance with the procedures detailed in this Motion, shall be good and effective notice of the Transaction Approval Motions and the hearings thereon to all parties to which that notice is provided – whether they are creditors or other parties-in-interest relating to the Tribune Debtors, CNLBC, or both.[7] As explained herein, this notice program is appropriate and legally sufficient in the present circumstances to support approval of the relief sought in both Transaction Approval Motions. Accordingly, the relief sought in this Motion should be granted.

## STATUS OF THE CASE AND JURISDICTION

10.    On December 8, 2008 (the "Petition Date"), the Tribune Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

11.    On December 10, 2008, the Bankruptcy Court entered an order consolidating the Tribune Debtors' chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). [Docket No. 43].

12.    The Tribune Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13.    On December 18, 2008, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors in the Tribune Debtors' chapter

---

[7] As a matter of procedure, CNLBC intends to file a motion immediately after the commencement of its chapter 11 case that will formally ask the Court to recognize the notice that has already been provided to creditors of CNLBC and the other Cubs Entities in accordance with this Motion and to conclude that good and proper notice of the relief sought in CNLBC's case and the hearing thereon has already been provided and that no other or further notice is necessary.

11 cases (the "Creditors' Committee").  No request has been made for the appointment of a trustee or examiner.

14.        The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b) and 503(b) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9007.

## FACTUAL BACKGROUND CONCERNING THE MOTION

I.    **Marketing Process for the Cubs Business**

  A.    *Introduction*

15.        The Cubs Business has been the subject of one of the most extensive marketing processes for a business ever presented to a bankruptcy court.  The Cubs Business and its attendant assets have been professionally and comprehensively marketed for nearly two-and-a-half years.  That marketing process began with an announcement that made headlines or was otherwise featured in virtually every sports-related and sports-containing general-interest publication, news website and broadcast media outlet in North America and ended with the August 21, 2009 announcement that Tribune and the Ricketts Family had signed definitive documents relating to the Proposed Business Combination, an announcement that also received extensive and widespread media coverage.[8]  Both prior and subsequent to the Petition Date, the Tribune Debtors and CNLBC have exercised the utmost diligence and effort in ensuring that the Proposed Business Combination realizes the maximum value for the Tribune Debtors and CNLBC and, as a result, their estates, creditors, and stakeholders.

---

[8] See, e.g., "Cubs Deal -- Signed" Chicago Tribune, August 22, 2009; "Sale of Cubs and Wrigley Clears Important Hurdle," N.Y. Times, August 22, 2009; "Deal is Signed to Sell the Cubs," L.A. Times, August 22, 2009.

46429/0001-5943962v1

### B.    *Process Launch and Initial Solicitations of Interest (Early-to-Mid 2007)*

16.    Tribune first announced its intention to divest an interest in the Cubs Business and its attendant assets in April 2007, on the same day and as part of the same press release in which Tribune announced the completion of its strategic review process and its decision to convert from a public company to a privately-held company.  See Press Release dated April 2, 2007 (available at http://www.tribune.com/pressroom/releases/2007/04032007.html) (announcing Tribune's intention to dispose of a controlling interest in the Cubs Business).  This announcement received widespread and extensive media coverage throughout the United States and beyond.  See, e.g., "For Sale by Owner: Cubs Headed for Block in Wake of Tribune Sale," Chicago Tribune, Apr. 3, 2007; "Tribune Plans to Sell Chicago Cubs," N.Y. Times, Apr. 2, 2007; "Tribune to Sell Cubs After the 2007 Season," Pittsburgh Post-Gazette, Apr. 3, 2007; "Tribune May Field Many Offers for Cubs," L.A. Times, Apr. 3, 2007; "Cubs are On the Block and They'll Fetch Plenty," Akron Beacon Journal, Apr. 3, 2007; "Tribune Plans to Sell Chicago Cubs," Associated Press, Apr. 2, 2007; "Tribune Says it Plans to Sell Chicago Cubs After 2007 Season," Canadian Press, Apr. 2, 2007.  As a result, parties interested in acquiring the Cubs Business and attendant assets have doubtless had actual notice for more than two years that Tribune was seeking to enter into a transaction involving the Cubs Business similar to the Proposed Business Combination.

17.    Following the considerable initial notice of Tribune's intention to enter into such a transaction, Tribune and CNLBC acted to identify parties that were both likely to have an interest in acquiring the Cubs Business and assets and the financial resources to complete such a transaction.  In furtherance of those efforts, Tribune engaged J.P. Morgan Securities Inc. ("JPMSI") to assist it in identifying suitable bidders and to act as Tribune's financial advisor in

10

connection with the proposed transaction involving the Cubs Business in July 2007.[9] See

Declaration of Christopher J. Martell, Vice President of J.P. Morgan Securities Inc. (attached

hereto as Exhibit B) (the "Martell Declaration") at ¶¶ 4-6.

18.     After the retention of JPMSI by Tribune in July 2007, Tribune and JPMSI

sought initial solicitations of interest with respect to both the entirety of the Cubs Business and,

apart from that, in two separate transactions, one of which would have been principally focused

on real estate and would have involved Wrigley Field and certain real estate assets (a "Cubs Real

Estate Transaction"), and the second of which would have involved the remaining assets of the

Cubs Business, including the Chicago Cubs Major League Baseball franchise and the 25.34%

stake in CSN Chicago indirectly owned by Tribune. See id. at ¶ 8.

19.     Tribune initially asked JPMSI to advise it in connection with the

identification of parties likely to be interested in any such transactions, and JPMSI provided such

services accordingly. JPMSI identified potentially-interested parties through several means,

focusing on (i) high net-worth individuals in the Chicago area, (ii) high net-worth individuals

outside of the Chicago area with an expressed interest in sports either publicly or through prior

discussions with colleagues at JPMSI and certain of its affiliates, (iii) parties involved in prior

transactions relating to sports franchises, (iv) owners of other professional sports teams, and (v)

parties that contacted Tribune or JPMSI independently to express their interest in being involved

with a transaction relating to the Cubs Business. In the first four situations, JPMSI reached out

---

[9] By order of the Bankruptcy Court entered on February 20, 2009 [D.I. 434], the engagement letter between Tribune and JPMSI was transferred to CNLBC. Because JPMorgan Chase Bank, N.A. ("JPMC"), an affiliate of JPMSI, acts as Administrative Agent and in other capacities under that certain Credit Agreement dated May 17, 2007 among Tribune, various lenders, and a number of financial institutions as agents (the "Credit Agreement"), and because JPMC serves on the Committee, JPMSI was only willing to continue its engagement with the consent of the Committee (excluding JPMC for these purposes), which was obtained. JPMSI has additionally advised Tribune that throughout its engagement, JPMSI has maintained an "ethical wall" between the JPMSI personnel engaged under the Engagement Letter and those individuals that are primarily responsible for the Tribune credit exposure (including through the Credit Agreement) and that sit on the Committee.

11

to make contact with the parties through connections available to it, while in the fifth situation JPMSI responded to the inquiries in order to evaluate the background and financial means of the parties in question.  JPMSI also examined certain scenarios in which Tribune and CNLBC would team with a corporate strategic partner with a potential interest in the Cubs Business and certain of the assets thereof.  See id. at ¶ 9.

20.    JPMSI's evaluations of all parties focused on individuals and entities that were likely to have the financial means to consummate a transaction involving the Cubs Business and/or a Cubs Real Estate Transaction and, with respect to the transactions involving the Cubs Business, who would likely be acceptable to Major League Baseball as the potential owner of a controlling interest in the Cubs Business.  In situations where a party did not appear to have the financial means on their own to effect a transaction relating to the Cubs Business, or one of the related separate transactions, JPMSI attempted, if the party's financial circumstances warranted, to put that party in contact with other potential bidders for purposes of forming a bidding partnership that could fashion a transaction.  See id. at ¶ 10.

21.    In the initial solicitation phase of the process, Tribune and/or JPMSI contacted or were contacted by in excess of 100 parties with respect to a possible transaction involving the Cubs Business, and contacted or were contacted by in excess of 60 parties with respect to a potential separate Cubs Real Estate Transaction.  The majority of parties contacted in both respects, as is common with an initial solicitation, did not ultimately manifest an interest in either potential transaction, although discussions with many of such parties occurred during this initial phase as a means of gauging any potential interest they might have.  See id. at ¶ 11.

*C.*    ***Prepatory Phase and Phase I (Second Half 2007 – Mid-2008)***

22.    A number of the parties with which Tribune and JPMSI had contact,

however, elected to pursue a potential transaction involving either the Cubs Business or a Cubs

Real Estate Transaction, with many of the parties forming bidding groups as described above.

Those bidding groups then began the second stage of the process, which commenced in the

second half of 2007.  At that time, a number of the bidding groups entered into non-disclosure

agreements and delivered initial Major League Baseball applications to JPMSI, which were then

forwarded by JPMSI to Major League Baseball.  See id. at ¶ 12.

23.    The initial applications – known as "Phase I" applications – included, among

other items, background information concerning the individuals and entities that were potentially

interested in submitting a bid for the Cubs Business and financial disclosure for such individuals

and entities.  The Phase I applications provided necessary preliminary information as to whether

the bidding groups were legitimate candidates to acquire a controlling interest in the Cubs

Business, both on financial grounds and in terms of their likelihood of ultimately being approved

by Major League Baseball, in accordance with Major League Baseball's rules and regulations, as

potential holders of a controlling interest in a Major League Baseball franchise.  See id. at ¶ 13.

24.    Major League Baseball also conducted background checks on each

individual or entity associated with bidding group, and where necessary conducted telephone

interviews with the parties to clarify certain items of their disclosure.  During this phase, Major

League Baseball, after reviewing the Phase I applications and the results of the background

checks, informed Tribune and JPMSI of certain affiliations or other considerations under the

rules and regulations of Major League Baseball that would have prevented certain individuals

and entities taking part in those applications from being approved as owners of a Major League

13

Baseball franchise or would have required their divestiture of certain ownership interests in other businesses in order to proceed further under Major League Baseball's rules and regulations. None of those individuals or entities were leading proposed contributors of their respective bidding groups. See id. at ¶ 14.

25.    While the Phase I applications were being prepared, Tribune, CNLBC and JPMSI were preparing certain descriptive memoranda respecting both the transaction involving the Cubs Business and the Cubs Real Estate Transaction.[10] Those memoranda were subject to comment and approval by Major League Baseball. At the conclusion of this initial evaluation and application process, in June 2008, ten (10) bidding groups, comprised of 96 individuals or entities were cleared to receive the descriptive memorandum with respect to the Cubs Business, while another 26 bidding groups received the descriptive memorandum with respect to a Cubs Real Estate Transaction. This began "Phase I" of the bidding process. At this time, all of the bidding groups participating in the process were provided with the opportunity to speak with or meet management of Tribune and the Cubs Entities, if they so requested, as part of Phase I, and most of the bidding groups elected to do so. The bidders were also advised that it was Tribune's expectation that the Cubs would have a long-term media agreement with WGN-TV, WGN Radio and WGN America and that the terms of that agreement were included in the financial forecast provided. See id. at ¶ 15.

26.    Each of the parties receiving a descriptive memorandum was asked to submit a preliminary non-binding indication of interest by mid-July 2008. All of the bidding groups that received the descriptive memorandum with respect to the Cubs Business provided written

---

[10] During this period, Tribune, with input from JPMSI and Tribune's special advisor SportsCorp Ltd., also evaluated various structural alternatives to the proposed transaction process, such as a public/private partnership involving Wrigley Field. Those alternatives did not materialize into substantive alternatives to the potential transactions involving the Cubs Business and the Cubs Real Estate Transaction then being proposed.

indications of interest in further pursuing a transaction involving the Cubs Business, while six of

the 26 groups that received the descriptive memorandum respecting a Cubs Real Estate

Transaction elected to pursue such a transaction further.  See id. at ¶ 16.

### D.   Phase II (Mid-2008 to Late 2008)

27.   Following submission of the first-round bids, Tribune, with input from

JPMSI and other advisers, evaluated each of the bids based on the following principal (but not

exclusive) criteria:

- the total value of the transaction (often referred to as the "headline value");

- whether the bidder was interested in all or some portion of the assets;

- the amount of equity to be contributed by the bidding group to the new entity to own the Cubs franchise;

- the likelihood that Major League Baseball would grant approval for a particular bid, based on the identity of the bidding group and the economic terms of the bid;

- any bidder-specific issues relating to the conditionality of their proposed transaction; and

- the willingness of the bidding group to work with the preferred transaction structure proposed by Tribune.

See id. at ¶ 17.  In considering the bids, none of those factors was considered by Tribune or

CNLBC as dispositive.  Instead, the merits of each bid were evaluated with respect to all of the

above factors viewed in their totality relative to the other bids.  See id.

28.   The evaluation made clear the bids had varying degrees of desirability from

Tribune's economic perspective.  Several bids, for example, offered a value that was

substantially lower than other bids.  Other bids proposed low levels of equity commitment on the

part of the bidding group or significant conditionality related to their equity, meaning that their

15

bids did not offer the desired certainty as compared to others under consideration. Still other

bids reflected an unwillingness to work with the structure proposed by Tribune. At this phase,

JPMSI was in contact with all of the various bidding groups to discuss Tribune's evaluation of

their bids and ways in which each bid could be improved in light of the factors set forth above.

See id. at ¶ 18.

29.    As a result of this process, the Phase I participants – ten (10) bidders

respecting the entire Cubs Business and six (6) bidders pursuing a Cubs Real Estate Transaction

– were narrowed to five (5) bidding groups with respect to the Cubs Business and three (3)

bidding groups with respect to a Cubs Real Estate Transaction. Those bidding groups then began

to participate in "Phase II" of the transaction process.[11] All five (5) bidding groups respecting

the Cubs Business satisfied the primary factors described in ¶ 27 above. See id. at ¶ 19.

30.    Those bidding groups then went through an extensive diligence phase with

respect to the Cubs Business or a Cubs Real Estate Transaction, as applicable, intended to permit

them to formulate bids. During this diligence period, bidder groups with respect to the Cubs

Business received access to over 1,500 financial, legal, insurance, real estate, and operational

documents, and bidder groups with respect to a Cubs Real Estate Transaction received access to

approximately 900 real estate, financial, legal and insurance documents. Bidder groups also

received access to Cubs management, and several bidder groups engaged third party consultants

to conduct evaluations with respect to Wrigley Field. All five bidder groups with respect to the

Cubs Business participated in management presentations at Wrigley Field. In addition, if those

groups requested, they met with senior officials from Major League Baseball, MLB Advanced

---

[11] During Phase II of the transaction process, JPMSI also participated in discussions with a party concerning a potential transaction in which that party would take a substantial minority position in the Cubs franchise in order to allow a partial monetization of the value of the Cubs Business by Tribune and CNLBC. Those discussions ultimately did not result in a formal transaction proposal.

16

Media and MLB Network concerning those businesses and their relationship with the Cubs.  See id. at ¶ 20.

31.     During this process, one of the five potential bidders for the Cubs Business made clear that it had several concerns respecting the proposed structure of the transaction.  A second potential bidder for the Cubs Business also expressed concern about the proposed transaction that ultimately resulted in it not submitting a further bid.  Several of the groups that had been interested in a Cubs Real Estate Transaction also ceased participating further in the process.  See id. at ¶ 21.

32.     As a result, at the end of Phase II, following several months of intensive diligence efforts and discussions concerning the Cubs Business and Wrigley Field, Tribune received three (3) bids for the Cubs Business in November 2008, as well as one (1) bid respecting a Cubs Real Estate Transaction.  Each of those bids contained, among other things, markups of the proposed Formation Agreement, as well as a confirmation that the overall structure of the proposed bid conformed with the structure proposed by Tribune, and information regarding the status of the particular bidder's discussions with potential financing sources.  In addition, the bidders had been previously provided with draft media agreements in proposed final form.  In submitting their proposals, bidders provided various degrees of comments on those documents.  See id. at ¶ 22.

**E.      Phase III (Late 2008 – Early 2009)**

33.     Following submission of the definitive bids and related materials, Tribune and CNLBC, with input from JPMSI and other advisers, then began a detailed analysis and evaluation of each of the bids.  The evaluation of those bids was done using similar criteria to the evaluation of the bids received in the prior round (discussed at ¶ 27, above), while also taking into account as principal factors (i) the net upfront after-tax cash component of the bid, (ii) the

17

total present value of all forms of consideration for the proposed transaction, (iii) the terms and

value of ongoing radio and television broadcast relationships; (iv) the certainty that the

transaction could be closed based on the likelihood for each bidder securing committed financing

for the transaction, (v) the likelihood of Major League Baseball approval for the transaction, (vi)

the markups of the transaction documents submitted by the bidders, and (vii) the tax benefits, if

any, to be provided to Tribune and CNLBC in the event a particular bid was implemented.  As

with the evaluations at the preceding round, no single factor was viewed as dispositive by JPMSI

(or Tribune and CNLBC); rather, each bid was evaluated in its totality relative to the other bids.

See id. at ¶ 23.

34.    Tribune concluded that each of the three bids for the Cubs Business should

be pursued further.  Accordingly, Tribune and CNLBC, with input from JPMSI and other

advisers, engaged the three (3) bidding groups that submitted bids at the end of Phase II for the

Cubs Business to determine whether those bids could be improved and, if so, how the terms of

the bids might be revised.  This process was extended beyond the period originally envisioned as

a result of Tribune's chapter 11 filing on December 8, 2008.  At this time, Tribune advised

JPMSI that it had determined that a transaction involving the entire Cubs Business was

preferable to separate transactions involving the Cubs Business on the one hand and a Cubs Real

Estate Transaction on the other hand and accordingly only the three potential transactions

respecting the entire Cubs Business were pursued further, with JPMSI terminating discussions

with other parties.  See id. at ¶ 24.

35.    Following evaluation of the bids by Tribune and CNLBC, and discussions

between the remaining bidders, on the one hand, and Tribune and CNLBC, on the other hand,

each of the remaining three (3) bidding groups for the Cubs Business submitted improved and

18

revised bids for the Cubs Business on or about January 13, 2009. Those revised bids were then evaluated by Tribune, CNLBC, and JPMSI using the same criteria that were used in evaluating the definitive bids received in November 2008. See id. at ¶ 25.

36.     As a result of evaluation of the revised bids, and after consultation with the Creditors' Committee and the Steering Committee of Tribune's pre-bankruptcy lenders, Tribune determined in January 2009 – as was the subject of public reports at the time – that it should pursue negotiations toward the Proposed Business Combination with the Bidder. CNLBC at that time also entered into a fee reimbursement agreement with the Bidder. See id. at ¶ 26. The decision to pursue a transaction with the Bidder was based on the entirety of the Bidder's proposal, and was subject to finalization of the transaction documents, but the Bidder's proposal was selected for further pursuit because, among other things, (i) it offered the highest amount of cash proceeds of any of the final round of bids, (ii) the Bidder's ability to finance the transaction, including the equity component thereof, (iii) the Bidder's markups of the transaction documents suggested a high likelihood that the transaction would be able to close with a structure acceptable to Tribune, and (iv) the likelihood of Major League Baseball approval for the proposed transaction. See Bigelow Declaration at ¶ 15.

37.     Tribune and CNLBC, as advised by JPMSI and its outside professionals, and the Bidder have been engaged in intensive negotiations since January 2009 to finalize the Proposed Business Combination. In May 2009, given that the Proposed Business Combination had not been finalized and was not likely to be imminently finalized at that time in light of open issues that then remained with respect to the Proposed Business Combination, the fee reimbursement arrangement between CNLBC and the Bidder was terminated. Tribune and CNLBC also restarted discussions with one of the other two parties that had submitted bids in

19

January 2009 in an effort to determine whether a transaction involving the Cubs Business with that bidder would be possible. See Martell Declaration at ¶ 27.

38.    In furtherance of that second possible transaction, a separate fee reimbursement agreement was entered into with the second bidder, and the second bidder was once again provided access to Tribune and CNLBC's electronic data room of diligence materials. From May 2009 through early August 2009, representatives of Tribune and CNLBC negotiated with both the Bidder and the alternative bidder in an attempt to finalize a transaction respecting the Cubs Business. Tribune and CNLBC's professionals engaged with both bidders on all aspects of the Proposed Business Combination, including exchanging numerous drafts of documentation and assisting in both parties' financing efforts respecting the transaction. Tribune and its professionals also met with representatives of Major League Baseball during this period in order to apprise them of the status of the potential bids and the Proposed Business Combination. See id. at ¶ 28. At various points during this period, numerous press reports were made regarding the status of one or both of the potential transactions. Over this period, neither JPMSI nor Tribune or CNLBC received any additional substantive inquiries from third parties who were interested in participating in the process or reengaging therein. See id.

39.    In late July 2009, the Bidder advised Tribune and CNLBC that if definitive documentation were not reached by August 7, 2009, the Bidder would withdraw from the bidding process and would not participate in further efforts to conclude the Proposed Business Combination. Tribune recognized the Bidder's position on this timeframe as credible and sought to meet that timeframe with the Bidder while also continuing to negotiate with the second bidder on the contractual and economic terms of its offer. As a result, Tribune and CNLBC, with input

20

from JPMSI and other advisers, negotiated intensively with both the Bidder and the alternative
bidder during late July and early August 2009. <u>See</u> <u>id.</u> at ¶ 29.

40.     As of August 7, 2009, Tribune and CNLBC, together with the Bidder, had
negotiated and documented the Proposed Business Combination to a degree that was largely
complete, but remained subject to finalization on various terms. The process with the alternative
bidder was also well advanced as of that date, but was not final on all material terms and would
require additional time after that date to complete. Given those facts and the view of the
management of Tribune and CNLBC, as described below, that the Proposed Business
Combination represented the highest and best offer for the Cubs Business, Tribune and CNLBC
entered into a two-week exclusive negotiating period with the Bidder on August 7, 2009.[12] At
the conclusion of that negotiating period, Tribune and the Cubs Entities executed the Formation
Agreement, and had reached agreement on all material terms of numerous agreements ancillary
to the Formation Agreement, which will be entered into in connection with the Escrow Closing.
<u>See</u> <u>id.</u> at ¶ 30. These agreements include the Tribune Guarantees and WGN Agreements, which
– together with many other transaction documents – provide the means by which the Proposed
Business Combination will be accomplished (collectively, the "<u>Ancillary Agreements</u>").

41.     On August 20, 2009, near the end of the two-week exclusive negotiating
period with the Bidder, Tribune and JPMSI received an unsolicited letter from the alternative
bidder. That letter clarified and detailed certain components of the alternative bidder's offer for
the Cubs Business, but did not contain enhanced pricing terms or other material improvements to
the alternative bidder's offer. Tribune consulted with JPMSI and its other advisers concerning
the letter, advised the alternative bidder of the terms of its exclusivity arrangement with the

---

[12] The basis for Tribune and CNLBC's conclusion that the Proposed Business Combination with the Bidder
represented the most advantageous transaction for Tribune respecting the Cubs Business is set forth in the Martell
Declaration at ¶¶ 23 – 26; 30 – 31 and in the Bigelow Declaration at ¶¶ 15 – 20.

Bidder, and advised the Bidder of the letter.  Tribune, with the input of JPMSI and its other advisers, concluded that the letter did not materially change or enhance the alternative bidder's proposal.  See id. at ¶ 31.

42.    As a result of all of these facts, no further marketing or auction process for the Cubs Business is necessary for at least three reasons: (i) the Cubs Business has already been thoroughly, professionally and rigorously marketed for over two years; (ii) few parties are likely to be (a) interested in bidding on the Cubs Business, (b) able financially and logistically to do so, and (c) able to obtain the necessary approval from Major League Baseball; and (iii) Tribune has already conducted intense and continuous negotiations with the Bidder and other interested parties.  Therefore it is highly implausible that any further and additional process could identify any other party with a realistic interest in the Cubs Business, a likelihood of assembling the necessary financial support and Major League Baseball approval, and a willingness to exceed sufficiently the consideration offered by the Bidder.

## RELIEF REQUESTED

### I.    Approval of Notice Procedures and Establishment of Hearing Dates

43.    The Tribune Debtors respectfully seek approval from this Court for the form and scope of notice to be given of the Proposed Business Combination (as described herein, the "Notice Procedures").  Specifically, the Tribune Debtors seek an order of this Court providing that implementation of the proposed program (i.e., mailing the Transaction Notice to parties-in-interest at least twenty (20) days prior to the date scheduled for the hearing on the Tribune Transaction Approval Motion (the "Transaction Hearing")) will provide proper and adequate notice of the Tribune Transaction Approval Motion and Transaction Hearing to such parties.   In addition to this program of mailed notice, the Tribune Debtors will also publish

notice of the Proposed Business Combination, which notice will be substantially in the form attached hereto as <u>Exhibit C</u>, in the <u>Chicago Tribune</u> once at least fifteen (15) days prior to the date scheduled for the Transaction Hearing.  The Tribune Debtors and CNLBC will also prepare and disseminate appropriate press releases providing general notice of the Proposed Business Combination and of the date and time of the Transaction Hearing.  The publication notice and press releases will be in addition to the considerable media coverage that will doubtless be generated by the announcement of the Transaction Hearing.

44.      Beyond the mailed notice program described above for parties-in-interest in the Tribune Debtors' chapter 11 cases, the Tribune Debtors and CNLBC will also cause the Transaction Notice to be mailed at the same time to a wide range of creditors and other parties-in-interest respecting the Cubs Entities.  Specifically, the Tribune Debtors and CNLBC will cause the Transaction Notice to be mailed to (a) creditors of the Cubs Entities (as identified through the Tribune Debtors' and the Cubs Entities' best efforts); (b) counterparties to Cubs Executory Contracts (as identified through the Tribune Debtors' and the Cubs Entities' best efforts); (c) all Phase II bidders for the Cubs Business and interested parties respecting a Cubs Real Estate Transaction in Phase II; (d) the Office of the United States Trustee; (e) counsel for the Creditors' Committee; (f) counsel for the Steering Committee of lenders under Tribune's prepetition loan facilities; (g) counsel for the administrative agents for the Tribune Debtors' postpetition loan facilities; (h) state and local taxing authorities to whom the Cubs Entities customarily make tax payments in the ordinary course of business; and (i) representatives of Major League Baseball.

45.      The Tribune Debtors intend for this notice program to provide detailed, complete and timely notice of the Proposed Business Combination to all necessary parties-in-

23

interest that may have an interest respecting the Cubs Business. The Tribune Debtors further intend and request that the order approving this Motion provide that any creditor or other party-in-interest that wishes to object to the Proposed Business Combination or the implementation of any of the transactions contemplated by the Formation Agreement or any of the Ancillary Agreements shall be required to file and serve a written objection to the Tribune Transaction Approval Motion in the Tribune Debtors' chapter 11 cases by the deadline for submitting objections to the Tribune Transaction Approval Motion. Any creditor or party-in-interest that does not do so shall be estopped from doing so at the later hearing to consider approval of the CNLBC Transaction Approval Motion.

46.     The Tribune Debtors and CNLBC propose to supplement this program of extensive mailed notice with additional outreach to significant parties-in-interest. Specifically, the Tribune Debtors and CNLBC will mail a letter to all season ticket holders of the Cubs. Although the season ticket holders are not per se creditors of CNLBC, the Tribune Debtors, or any of the Cubs Entities, that letter will notify those season ticket holders of the proposed change in ownership of the Cubs and other pertinent information concerning the Proposed Business Combination. The letter will also provide the season ticket holders with all relevant information concerning the hearing(s) to consider approval of the Tribune Transaction Approval Motion.

47.     The forms of mailed and publication notice have been designed to apprise creditors and other parties-in-interest of both the Tribune Debtors and CNLBC of the Proposed Business Combination. The Tribune Debtors do not presently seek affirmative approval for this notice program as it respects only CNLBC; however, the Tribune Debtors intend that the order approving this Motion shall provide that any party receiving the Transaction Notice shall be deemed to have actual notice of the Proposed Business Combination, including those elements

24

thereof that are anticipated to occur in CNLBC's chapter 11 case. Once the Proposed Business Combination has been approved in the Tribune Debtors' chapter 11 cases, and CNLBC's chapter 11 case is commenced, CNLBC will ask the Court to recognize that actual notice of the Proposed Business Combination has already been provided to creditors and parties in interest of CNLBC and the other Cubs Entities, and accordingly will further request that the Court approve the Proposed Business Combination in CNLBC's chapter 11 case on an expedited basis (i.e., on the same day or within one or two days of CNLBC's chapter 11 filing). The basis for that request will be that all creditors and other parties-in-interest of CNLBC have already received adequate notice of the Proposed Business Combination through the mailed notice program described above and will have had a full opportunity to raise any objections with respect thereto at the Transaction Hearing. There will thus be no cause to justify delaying the Proposed Business Combination for a second 20-day notice period in CNLBC's chapter 11 case.

48.    The Tribune Debtors also seek approval of the form of notice for the Tribune Transaction Approval Motion and the hearing thereon, which will be substantially in the form attached hereto as Exhibit A (the "Transaction Notice"). The proposed form of Transaction Notice (i) provides recipients with a summary of the relief sought at the hearing on the Tribune Transaction Approval Motion; (ii) provides recipients with the date, time and place of the hearing on the Tribune Transaction Approval Motion, as well as the deadline for filing objections to the Tribune Transaction Approval Motion; and (iii) provides recipients with the date, time and place of the hearing on the Cubs Transaction Approval Motion. The Transaction Notice further makes clear that the Tribune Debtors and CNLBC intend that following approval by the Bankruptcy Court of the Tribune Transaction Approval Motion, CNLBC intends immediately to commence its own chapter 11 cases and move immediately to obtain Bankruptcy

25

Court approval of the Proposed Business Combination on an expedited basis in CNLBC's

chapter 11 case.  In short, the proposed form of notice provides creditors and other parties-in-

interest with precisely what notice is intended to accomplish; namely, it apprises "interested

parties of the pendency of the action and afford(s) them an opportunity to present their

objections."  Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950); see also

Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir. 1995).

## II.    Approval of Transaction Process and Investor Protections

### A.    Transaction Process

#### 1.    Establishment of Hearing Dates

49.    The Tribune Debtors also seek certain rulings from the Court concerning

the process of consummating the Proposed Business Combination.  The Tribune Debtors request

that the order approving this Motion establish a date and time for the Transaction Hearing and a

deadline for the filing and service of written objections with respect to the Tribune Transaction

Approval Motion.  Establishing such dates and deadlines is an essential element of providing

proper and adequate notice to potential parties-in-interest of the Proposed Business Combination.

50.    Specifically, the Tribune Debtors request that a hearing date on the Tribune

Transaction Approval Motion be established more than 20 days after the date of the order

granting this Motion.  The Tribune Debtors further request that two potential hearing dates be

established for the Cubs Entities Transaction Approval Motion – one shortly after the date set for

the hearing on the Tribune Transaction Approval Motion and a second approximately two weeks

later.  In the event the conditions to the Escrow Closing can be satisfied quickly after the hearing

on the Tribune Transaction Approval Motion – assuming such motion is approved – CNLBC

would seek approval of the Proposed Business Combination at the first hearing date.  In the

event the conditions to the Escrow Closing could not be satisfied so quickly, CNLBC would seek approval of the Proposed Business Combination at the second hearing date.

51.        In the proposed forms of notice, the Tribune Debtors assume that the hearing will be set on the first of the two dates.  The Tribune Debtors, and CNLBC, request authority to, if necessary, re-notice the CNLBC Transaction Approval Hearing to parties that had previously received notice of that hearing without further order of the Court.  Such re-noticing would be accomplished by (i) posting a notice on the Tribune Debtors' website at http://chapter11.epiqsystems.com/tribune providing the date, time and place of the rescheduled hearing, and a mailed notice to all parties that have requested to receive notices in the Tribune Debtors' chapter 11 cases (including any creditors or parties-in-interest of CNLBC that have made such a request to receive notices).

### 2.    *Approval of Transaction Process*

52.        The Tribune Debtors further seek a ruling that no other or further marketing or auction process for the Cubs Business is required as a precondition to consideration and approval of the Tribune Transaction Approval Motion or the CNLBC Transaction Approval Motion.  The far-reaching and extraordinarily public auction process already conducted for the Cubs Business, as described at length above (at ¶¶ 17 – 40) and in further detail in the Martell Declaration, in addition to the Tribune Debtors' proposal to provide notice to all parties who previously expressed a serious interest in acquiring the Cubs Business, renders any such additional process unnecessary, and the Tribune Debtors therefore request that no additional process – which would be superfluous at best and which may jeopardize through delay the value of the Cubs Business – be required.

53.        It is essential to note that the continued participation of the Bidder in the transaction process, and the ability of the Tribune Debtors and the Cubs Entities to obtain the

27

benefits of the Proposed Business Combination, is predicated upon this process being approved

and that an additional auction process not be imposed. Indeed, in the event an additional auction

process is imposed, various deadlines set forth in the Formation Agreement to consummate the

Proposed Business Combination will almost certainly expire, giving rise to a termination right on

the part of the Bidder and the potential obligation on the part of Tribune to pay one of the

Payment Amounts (described below) to the Bidder.

### B.    Investor Protections

54.    The Tribune Debtors also seek this Court's approval for certain protections

in favor of the Bidder (as detailed herein and in Sections 4.15 and 9.3 of the Formation

Agreement, the "Investor Protections"). Pursuant to those Investor Protections, Tribune and the

Cubs Entities will, on a joint and several basis, pay certain amounts to the Bidder (the "Payment

Amounts") in the event that the Formation Agreement is terminated by the Bidder and that

termination follows the occurrence of certain events detrimental to the Bidder, as detailed in the

Formation Agreement and described below. The Investor Protections for which Court approval

is sought are part of a more comprehensive set of transaction protections negotiated extensively

at arm's-length and in good faith between Tribune and the Bidder that provide each of those

parties with assurance that the other will act in a timely and appropriate manner to consummate

the Proposed Business Combination described in the Formation Agreement and the Ancillary

Agreements and allocates the risk of a failure to consummate the Proposed Business

Combination in a commercially appropriate manner among the parties. The Investor Protections,

and the comparable protections in favor of Tribune and the Cubs Entities under the Formation

Agreement are intended to ensure that in the event of a failure to close, the party that did not bear

the risk of specified events that preceded that failure to close is compensated appropriately for its

efforts and costs expended in pursuing the Proposed Business Combination.

28

55.    Reduced to their essentials, the Investor Protections provide for payments of varying degrees in favor of the Bidder if the Formation Agreement is terminated and, prior to that termination, certain events occur (i) within the chapter 11 proceeding, such as certain objections to the Proposed Business Combination filed by either the Creditors' Committee or the Steering Committee, (ii) relating to a failure to meet certain bankruptcy and transaction-related time schedules, and (iii) relating to material alternative bids for the Cubs Business.  In addition, the Formation Agreement provides that the Bidder will make payments to Tribune and the Cubs Entities in the event certain financing conditions are not satisfied.

56.    The Investor Protections in favor of the Bidder for which approval is sought hereby are divided into three monetary categories.  Those categories are identified in Section 4.15 of the Formation Agreement as "Major Tribune Payment Triggers", "Middle Tribune Payment Triggers", and "Minor Tribune Payment Triggers" (collectively, the "Payment Triggers").  As their names imply, the various categories of Payment Triggers impose different levels of payment obligations upon Tribune and the Cubs Entities in favor of the Bidder, depending upon the materiality of the occurrence.  In each case, the Investor Protections in favor of the Bidder only come into play after the Termination Date has passed and the Formation Agreement has been terminated pursuant to Section 9.1(b) thereof.  As defined in the Formation Agreement, the "Termination Date" means (a) November 30, 2009 if prior to the Escrow Closing Date (unless certain extensions of the debt financing commitments are obtained by the Bidder, in which case the Termination Date may, in certain circumstances, be extended as far as December 31, 2009, with any further extensions requiring Tribune's consent), or (b) 45 business days after the Escrow Closing, with the potential for certain additional extensions with Tribune's consent.

46429/0001-5943962v1

57.    A Major Tribune Payment Trigger occurs if, prior to the Termination Date:

(i)    either of the Tribune Committees timely files with the Bankruptcy Court an objection to the consummation of the Transactions (excluding the Newco Sale) (other than an objection (A) to preserve rights with respect to the treatment or disposition of proceeds received as a result of the Transactions, (B) to prevent an implied waiver of any other rights in the Bankruptcy Case not associated with the Transactions, (C) with respect to non-material elements of the Transactions, or (D) to a material amendment to or material waiver of this Agreement or any other Transaction Document), and such objection is not withdrawn within two (2) Business Days of its filing;

(ii)    Tribune or any of the Cubs Entities (A) engages in any act intended to be in furtherance of an Acquisition Transaction with any Person other than Bidder or any Affiliate of Bidder, other than as permitted by Section 4.7(b) of the Formation Agreement, (B) seeks entry of an order by the Bankruptcy Court authorizing an Acquisition Transaction with any Person other than Bidder or any Affiliate of Bidder, or (C) withdraws any of the Tribune Transaction Approval Motion or the CNLBC Transaction Approval Motion;

(iii)    a motion or other court filing seeking an order authorizing the disposition or transfer of the Cubs Business or the Cubs Contributed Assets, or any material portion of either, to any Person other than Bidder or any Affiliate of Bidder is filed in the Tribune Debtors' chapter 11 cases and/or the CNLBC chapter 11 case, and Tribune or CNLBC, as applicable, does not promptly file and pursue in good faith an objection to such motion or other court filing (other than orders providing for a transfer to any other wholly-owned Subsidiary of Tribune in accordance with the terms of the Formation Agreement provided that (A) such Subsidiary is bound by all obligations under the Formation Agreement applicable to the transferring entity, (B) such transfer does not materially and adversely impair Tribune and the Cubs Entities' (after giving effect to such transfer) ability to perform their obligations under the Formation Agreement, and (C) if such transfer is to be made prior to Closing, such transfer does not materially adversely affect Bidder, Newco or any Direct Newco Sub with respect to the assets to be contributed to or the liabilities to be assumed by Newco or such Direct Newco Sub pursuant to this Agreement or adversely affect, in any material respect, the economic terms or other material terms of the Transactions with respect to Bidder, Newco or any Direct Newco Sub);

(iv)    an order is entered by the Bankruptcy Court authorizing or directing the disposition or transfer of the Cubs Business or the Cubs Contributed Assets, or any material portion of either, to any Person other than Bidder or any Affiliate of Bidder (other than an order providing for a transfer to any other wholly-owned Subsidiary of Tribune in accordance with the terms of the Formation Agreement provided that (A) such Subsidiary is bound by all obligations under the Formation Agreement applicable to the transferring entity, (B) such transfer does not materially and adversely impair Tribune and the Cubs

30

Entities' (after giving effect to such transfer) ability to perform their obligations under the Formation Agreement, and (C) if such transfer is to be made prior to Closing, such transfer does not materially adversely affect Bidder, Newco or any Direct Newco Sub with respect to the assets to be contributed to or the liabilities to be assumed by Newco or such Direct Newco Sub pursuant to the Formation Agreement or adversely affect, in any material respect, the economic terms or other material terms of the Transactions with respect to Bidder, Newco or any Direct Newco Sub);

(v)     Major League Baseball notifies Tribune in writing that it does not intend to grant, in whole or in part, MLB Approvals due, in whole or in part, to a failure by the Tribune Parties, in bad faith, to disclose, or an intentional misrepresentation by the Tribune Parties of, material information relating to the Transactions not known to Major League Baseball as of the date hereof, in violation of MLB Rules and Regulations, and after Tribune has had a reasonable opportunity to address Major League Baseball's objections, the MLB Approvals are not granted primarily as a result of such failure to disclose or intentional misrepresentation;

(vi)     the Escrow Closing does not occur within five (5) Business Days after all of the conditions set forth in Sections 7.1 (Conditions Precedent of all Parties to Escrow Closing), 7.2 (Conditions Precedent of Bidder to Escrow Closing) and 7.3 (Conditions Precedent of Tribune Parties to Escrow Closing) of the Formation Agreement (other than the condition set forth in Section 7.2(h) (Additional Filing Assurance) and those conditions which by their nature require the delivery of a document or the taking of an action (including the actual funding of the Senior Debt Financing (other than the Revolver) to the Closing Agent) at the Escrow Closing) have been satisfied or waived by the applicable parties; or

(vii)     the Escrow Closing has occurred and CNLBC's chapter 11 case has not commenced or the CNLBC Transaction Approval Motion has not been filed, in each case within four (4) Business Days thereafter.

See Formation Agreement at § 4.15(e).

58.     A Middle Tribune Payment Trigger occurs if prior to termination any of the following occur:

(i)     the Tribune Parties materially breach their obligations under Section 4.11(d) of the Formation Agreement, such material breach is not cured within five (5) Business Days after Bidder delivers written notice of such breach to Tribune, and such material breach is the primary cause of the failure of the conditions set forth in Sections 7.2(g) (Senior Debt Financing) and 7.3(e) (Debt and Equity Financing) of the Formation Agreement to be satisfied; or

31

(ii)    (A) (I) an objection to any of the Approval Motions or Additional Filer Motions is filed by or on behalf of a Competing Bidder in the Tribune Debtors' chapter 11 cases and/or CNLBC's chapter 11 case that supports such Competing Bidder or any Affiliate of such Competing Bidder, (II) a motion or other court filing is filed by or on behalf of a Competing Bidder in the Tribune Debtors' chapter 11 cases and/or CNLBC's chapter 11 case seeking an order authorizing the disposition or transfer of the Cubs Business or the Cubs Contributed Assets, or any material portion of either, to such Competing Bidder or any Affiliate of such Competing Bidder, or (III) an appeal of the Notice and Procedures Approval Order, the Tribune Transaction Approval Order or the Additional Filers Transaction Approval Order is filed by or on behalf of a Competing Bidder that supports such Competing Bidder or any Affiliate of such Competing Bidder, and (B) the action taken in clause (A) was the primary cause of the Closing not occurring.

See Formation Agreement at § 4.15(g).

59.    The Minor Tribune Payment Triggers consist of the following:

(i)    Major League Baseball notifies Bidder or Tribune in writing that Major League Baseball does not intend to grant, in whole or in part, the MLB Approvals due, in whole or in part, to the amount of the Debt Financing, after Tribune and Bidder have had a reasonable opportunity to address Major League Baseball's objections, the MLB Approvals are not granted primarily as a result of such reason; or

(ii)    the Tribune Transaction Approval Order is not entered by the Bankruptcy Court on or before November 6, 2009, and all of the conditions to the Escrow Closing set forth in Sections 7.1 (Conditions Precedent of all Parties to Escrow Closing) and 7.3 (Conditions Precedent of Tribune Parties to Escrow Closing) of the Formation Agreement have been satisfied (other than the condition to the Escrow Closing set forth in Section 7.1(d) (Tribune Transaction Approval Order), the conditions in Section 7.3(e) (Debt and Equity Financing) and those conditions which by their nature require the delivery of a document or the taking of an action at the Escrow Closing) or waived by the applicable parties.

See Formation Agreement at § 4.15(i).

60.    In the event that any of the Major Tribune Payment Triggers ultimately applies, Tribune and the Cubs Entities would, on a joint and several basis, be responsible to pay $20,000,000 to the Bidder.  In the event any of the Middle Tribune Payment Triggers or Minor Tribune Payment Triggers apply, the respective amount would be $10,000,000 or $5,000,000, as applicable.  To the extent that payment of any Payment Amount is made by a Tribune Debtor or

32

CNLBC in its chapter 11 case, the payment will be made on a final, and not provisional or interim, basis, and will be treated as an administrative priority claim pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, without further order of the Bankruptcy Court.

61.     The obligation of Tribune and the Cubs Entities to make any payments under the Investor Protections are subject to the limitations in Section 4.15(k) of the Formation Agreement, which provides as follows:

(i)     If a Finance Major Bidder Payment Trigger has occurred after the date of the Agreement but prior to termination of thereof pursuant to Section 9.1(b) of the Formation Agreement, then, regardless of whether any Major Tribune Payment Triggers, Middle Tribune Payment Triggers or Minor Tribune Payment Triggers have also occurred, (A) the Bidder shall be obligated under Section 4.15(f) of the Formation Agreement to pay to Tribune and the Cubs Entities (in the aggregate) the Major Bidder Payment Amount and no other Bidder Payment Amount(s) and (B) the Tribune Parties shall have no obligation to pay any Tribune Payment Amounts;

(ii)     If one or more Middle Bidder Payment Triggers (but no Major Bidder Payment Triggers) and one or more Major Tribune Payment Triggers have occurred after the date of the Formation Agreement but prior to termination thereof pursuant to Section 9.1(b) of the Formation Agreement, neither the Bidder, on the one hand, nor Tribune and the Cubs Entities, on the other hand, shall have any liability to pay any Payment Amounts in respect of any Payment Triggers, except that if one of such Major Tribune Payment Triggers is a Covered Major Tribune Payment Trigger, then Tribune and the Cubs Entities shall be obligated to pay to the Bidder the Major Tribune Payment Amount and no other Tribune Payment Amount(s), and the Bidder shall have no obligation to pay any Bidder Payment Amounts;

(iii)     Except as otherwise set forth in Sections 4.15(k)(i) and (ii) of the Formation Agreement, if (A) one or more Bidder Payment Triggers and one or more Tribune Payment Triggers have occurred after the date of the Formation Agreement but prior to termination of the Formation Agreement pursuant to Section 9.1(b) thereof, and (B) (I) the highest Bidder Payment Amount due under any of such Bidder Payment Triggers (or the sole Bidder Payment Amount if there is only one Bidder Payment Trigger) is equal to the highest Tribune Payment Amount due under any of such Tribune Payment Triggers (or the sole Tribune Payment Amount if there is only one Tribune Payment Trigger), then neither the Bidder, on the one hand, nor Tribune and the Cubs Entities, on the other hand, shall have any obligation to pay any Payment Amounts; (II) the highest Bidder Payment Amount due under any of such Bidder Payment Triggers (or the sole Bidder Payment Amount if there is only one Bidder Payment Trigger)

33

is greater than the highest Tribune Payment Amount due under any of such Tribune Payment Triggers (or the sole Tribune Payment Amount if there is only one Tribune Payment Trigger), then the Bidder shall be obligated to pay to Tribune and the Cubs Entities (in the aggregate) such highest Bidder Payment Amount and no other Bidder Payment Amount(s), and Tribune Parties shall have no obligation to pay any Tribune Payment Amounts; and (III) the highest Tribune Payment Amount due under any of such Tribune Payment Triggers (or the sole Tribune Payment Amount if there is only one Tribune Payment Trigger) is greater than the highest Bidder Payment Amount due under any of such Bidder Payment Triggers (or the sole Bidder Payment Amount if there is only one Bidder Payment Trigger), then Tribune and the Cubs Entities (collectively) shall be obligated to pay to the Bidder such highest Tribune Payment Amount and no other Tribune Payment Amount(s), and the Bidder shall have no obligation to pay any Bidder Payment Amounts;

(iv)    Without duplication of Section 4.15(k)(i) of the Formation Agreement, if more than one Bidder Payment Trigger and no Tribune Payment Triggers have occurred after the date of the Formation Agreement but prior to termination of the Formation Agreement pursuant to Section 9.1(b) thereof, then the Bidder shall pay to Tribune and the Cubs Entities (in the aggregate) the highest Bidder Payment Amount in respect of such Bidder Payment Triggers and no other Bidder Payment Amount(s), and Tribune and the Cubs Entities shall have no liability for any Tribune Payment Amounts; and

(v)    If more than one Tribune Payment Trigger and no Bidder Payment Triggers have occurred after the date of the Formation Agreement but prior to termination of the Formation Agreement pursuant to Section 9.1(b) thereof, then Tribune and the Cubs Entities (collectively) shall pay to the Bidder the highest Tribune Payment Amount in respect of such Tribune Payment Triggers and no other Tribune Payment Amount(s), and the Bidder shall have no liability for any Bidder Payment Amounts.

See Formation Agreement at § 4.15(k).

62.    The Formation Agreement also provides that if it is terminated in certain circumstances, and within three months thereafter, Tribune, CNLBC, or any of their affiliates enter into a written agreement providing for an Acquisition Transaction with any party other than the Bidder or its affiliates that results in the Tribune and the Cubs Entities receiving or retaining in the aggregate certain consideration prior to, at or within 225 days following consummation of such Acquisition Transaction that exceeds the Final Special Distribution Amount that Tribune Parties would have received under the Formation Agreement had the Transactions been

34

consummated as of the termination date (assuming there are no Retained Cubs Current Assets), then Tribune and the Cubs Entities will jointly and severally pay the Bidder $10,000,000, less the amount of any payment to the Bidder pursuant to Section 4.15 of the Formation Agreement.

## BASIS FOR RELIEF REQUESTED

I.    **Provision of Actual Notice to Parties-in-Interest Relating to the Proposed Business Combination As Proposed Herein is Good and Proper**

### A. *The Proposed Scope of Notice of the Proposed Business Combination is Reasonable and Proper and Should be Approved*

63.    Bankruptcy courts in this District have observed that "notice is of paramount importance" and therefore "it is fundamental that notice should be sent to all parties whose interests may be affected by" any transfer of assets. In re Pinnacle Brands, Inc., 259 B.R. 46, 53 (Bankr. D. Del. 2001).[13] The Third Circuit has observed that good and proper notice of an asset transaction, for purposes of satisfying due process requirements, includes notice of (i) the time and place of a particular asset transaction, (ii) the terms and conditions thereof, (iii) the time for filing objections thereto, and (iv) if real estate is being disposed of, a general description of the property. Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 265 (3d Cir. 2000). Due process requires notice of an intended action to be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Folger Adam, 209 F.3d at 265 (citing Mullane, 339 U.S. at 314-15). The notice also must "reasonably convey the required information." Id. Although interested parties must have sufficient information and time to determine whether they need to defend their interests and object to the proposed transaction, see In re Ex-Cel Concrete

---

[13] Pursuant to section 363(b)(1) of the Bankruptcy Code, the debtor-in-possession may use, sell, or lease property of the estate outside the ordinary course of business "after notice and a hearing." 11 U.S.C. § 363(b)(1). The Bankruptcy Code states that "after notice and hearing" means "after such notice as is appropriate in the particular circumstances and such opportunity for hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A).

Co., Inc., 178 B.R. 198, 204-05 (9th Cir. B.A.P. 1995), the Third Circuit has observed that the provision of good and proper actual notice does not require that any party potentially affected by an action be provided with notice. Rather, provision of actual notice requires notice to parties whose identities are "reasonably ascertainable" in the exercise of proper diligence by a party. See Chemetron Corp. v. Jones, 72 F.3d 341, 348 (3d Cir. 1995).

64.    The Third Circuit and the Supreme Court have further observed that the touchstone of due process is the provision of "notice and an opportunity for hearing appropriate to the nature of the case." In re Mansaray-Ruffin, 530 F.3d 230, 239 (3d Cir. 2008) (quoting Mullane, 339 U.S. at 313). Mansaray-Ruffin's holding accords fully with the Supreme Court's oft-cited statement in Mullane that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, *under all the circumstances*, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 339 U.S. at 314; see also id. at 314-15 ("[I]f *with due regard for the practicalities and peculiarities of the case* these conditions are reasonably met the constitutional requirements are satisfied." (emphasis added)).

65.    The notice procedures proposed and sought to be approved herein accomplish the goals of notice and satisfy the requirements of due process for all creditors and other parties-in-interest respecting both the Tribune Debtors and CNLBC. Those creditors and other parties-in-interest will have at least twenty (20) days' actual notice of the Proposed Business Combination and the date, time and place of the hearings thereon, as well as a full and fair opportunity to object thereto. Those creditors and other parties-in-interest will also be apprised through the form of notice that substantially all of the liabilities of the Cubs Business will be assumed by the entities to which the Cubs Business will be transferred, and substantially all

executory contracts and leases relating to the Cubs Business (whether a Tribune Debtor or

CNLBC is the counterparty) are expected to be assumed and assigned to the relevant entity

holding that portion of the Cubs Business following consummation of the Proposed Business

Combination.[14] See Tribune Transaction Approval Motion at ¶¶ 18 – 19.  In short, the

requirements of due process concerning notice of the Proposed Business Combination will be

satisfied through the Notice Procedures.  No other or further notice to parties that receive notice

thereunder should be required once CNLBC commences its chapter 11 case, because all creditors

and other parties-in-interest with respect to CNLBC will by definition have received actual

notice at least equal to that which would be provided in a standard asset transaction under Fed.

R. Bankr. P. 2002.

   66. The forms of supplemental notice being provided by the Tribune Debtors and

CNLBC in respect of the Proposed Business Combination further compel the conclusion that the

requirements of due process are satisfied by the procedures contemplated by this Motion.  The

Tribune Debtors and CNLBC will cause notice of the Proposed Business Combination to be

published in the <u>Chicago Tribune</u> and will issue appropriate press releases containing all

pertinent information about the Proposed Business Combination and the proposed hearing on the

Tribune Transaction Approval Motion.  Those press releases are expected to be widely

disseminated, and will be in addition to the intense media attention that will likely focus on the

Proposed Business Combination, and that has already accompanied the process that has led to

the Proposed Business Combination.  As one prominent bankruptcy court has recently observed,

where events leading up to a chapter 11 filing and a proposed 363 transaction have been highly

publicized, the notice and due process provided to creditors and parties-in-interest are enhanced.

---

[14] Contracts to which non-filing Cubs Entities are a party will also be assigned in connection with the Proposed
Business Transaction.  While guaranty claims of Tribune's prepetition lenders will not be transferred to Newco, the
Steering Committee of those lenders has long been aware of and supports the Proposed Business Combination.

See In re Chrysler, LLC, 405 B.R. 84, 109 (Bankr. S.D.N.Y. 2009), aff'd, ___ F.3d ___, 2009
WL 2382766 (2d Cir. Aug. 5, 2009) (citing as a basis for expedited notice that "even prior to the
bankruptcy filing, the circumstances of these Debtors were under scrutiny and the events leading
up to the filing, including the proposal for the sale of the assets was highly publicized").

        67.     In addition to the notice program described above, the Tribune Debtors and
CNLBC will provide a letter notice to all season ticket holders of the Cubs announcing the
proposed change in ownership for the Cubs Business and further providing details as to the
timing and location of the hearings on the Tribune Transaction Approval Motion and CNLBC
Transaction Approval Motion.  Although the season ticket holders are not per se creditors of
CNLBC, the Tribune Debtors, or any of the Cubs Entities, the letter will also make clear that
season tickets will be unaffected by the Proposed Business Combination.  Such notice will be
provided notwithstanding the fact that the Cubs' season ticket holders are not creditors of the
Cubs Business and hence fall outside the normal scope of notice.

        68.     The Tribune Debtors and CNLBC propose herein to provide notice of the
Proposed Business Combination that goes far beyond the requirements of due process.  The
proposed notice procedures have been crafted to provide extensive and wide-ranging notice to all
creditors and other parties-in-interest with a plausible interest in the Proposed Business
Combination.  Those notice procedures should be approved by the Court.

**B.      *The Court Should Exercise its Authority to Tailor Notice of the Proposed
         Business Combination as Proposed by the Notice Procedures***

        69.     The facts and circumstances of the instant matter are like none other
previously faced by a bankruptcy court.  The Tribune Debtors are seeking to monetize an interest
in a valuable asset of their present overall business (i.e., the Cubs Business), which is held in
certain affiliates that are not Tribune Debtors, pursuant to an intricate and exhaustively-

38

negotiated transaction structure. Realizing the full value of the Cubs Business requires that the Proposed Business Combination occur through a chapter 11 proceeding, so that (i) the various aspects of the Proposed Business Combination that are required to be undertaken by the existing Tribune Debtors are properly approved by the Court; (ii) the majority of assets comprising the Cubs Business may be contributed to Newco (and, where applicable, to Cubs Newco Sub) free and clear of all liens, claims, encumbrances and interests; (iii) executory contracts with respect to the Cubs Business to which any of the Tribune Debtors or CNLBC is a party may be assumed and assigned to Newco and/or the Newco Subs; and (iv) various related relief may be granted by the Bankruptcy Court.

70.    Any chapter 11 process for CNLBC that requires the Cubs to operate for more two or three business days in chapter 11 is not consistent with the timeframe contemplated by the Formation Agreement, nor do the Tribune Debtors believe such delay is acceptable to the Bidder, the lenders who will provide the financing necessary to the Proposed Business Combination or to Major League Baseball. Moreover, a lengthy chapter 11 process for CNLBC would have severely detrimental effects on CNLBC's unique business.

71.    As set forth in the Kenney Declaration, the Cubs are one of the most storied franchises in all of sports, and the Cubs have spent more than a century developing a near-iconic level of identity and loyalty within the Chicago area and among fans around the world. That identity and loyalty are essential elements of the Cubs franchise and its value, and maintaining that identity intact is a critical element of any major business matter involving the Cubs, such as player personnel decisions and other transactions affecting the business as a whole. See Kenney Declaration at ¶ 5.

72.     Preserving the Cubs' unique identity must also be a foremost consideration in the chapter 11 process involving the Cubs.  Any chapter 11 process for the Cubs lasting more than a very brief period presents a material risk of causing lasting damage to many aspects of the Cubs Business and presents an overriding risk to the quality and uniqueness of the Cubs' identity.  The Cubs Business will suffer lasting harm if operations while in chapter 11 are required for more than a brief period until the Cubs can announce that the Proposed Business Combination has been consummated.  See id. at ¶ 6.

73.     In addition to the lasting harm to the Cubs' brand that would result from operating in chapter 11 for more than a few days, the Cubs would also suffer irreparable harm from a stay in chapter 11 for any appreciable period of time because many of the actions taken by a Major League Baseball franchise are difficult, if not impossible, to adapt to a chapter 11 environment.  For example, after the 2009 World Series concludes, the Cubs will be required to make numerous decisions relating to their baseball operations that are arguably outside the ordinary course of business, including tendering contracts to existing players, potential player trades, free agent signings and potential prosecution of player salary arbitration cases.  The process of competing for player talent in Major League Baseball is incomparably fierce, and by operating in chapter 11 the Cubs would face a severe competitive disadvantage in their ability to retain, acquire or trade for players, based on the perception that the transaction would require Bankruptcy Court approval or might be unwound at a later date.  Other teams may refuse to engage in trades with the Cubs and players may simply refuse to play for a team in chapter 11 based on perceived risks, regardless of explanations.  See id. at ¶ 7.

74.     In a situation where multiple teams may be competing for a particular player's services, the uncertainty of chapter 11 could be determinative.  Given that decisions concerning

40

player staffing and similar matters are made at a particular time to influence matters beyond one baseball season, the competitive disadvantage in competing for players could have ramifications for the club for many years, potentially affecting the overall value of the franchise and effecting an irreparable harm thereon. See id. at ¶ 8.

75.     In addition, a lengthy chapter 11 process would adversely affect necessary actions to be taken by CNLBC off the field as well. CNLBC is already in the process of negotiating and attempting to finalize numerous sponsorship agreements for the 2010 Major League Baseball season (and in some cases beyond that season). Those sponsorship agreements account for a substantial portion of the team's annual revenue. See id. at ¶ 9. Potential sponsors will doubtless be reluctant to direct their advertising spending towards an entity in chapter 11, regardless of the assurances that are provided about that process. This factor, however, will apply with exceptional force in connection with professional sports advertising, where potential sponsors will necessarily want to be associated with a perceived "winner," and any uncertainty about the ability of a team to field a top-level product will have negative consequences on sponsorship efforts, with resulting financing consequences to the franchise. See id.

76.     A lengthy chapter 11 process for the Cubs Entities in order to allow parties that have already participated in the transaction process to continue participating – after two-and-a-half years – is also not warranted and may jeopardize the Proposed Business Combination. As set forth in the Martell Declaration (at ¶ 32), Major League Baseball will not, as a practical matter, permit more than one bid for the Cubs Business (or any other Major League Baseball franchise) to be considered for Major League Baseball approval at one time. It is also unlikely that financing for more than one bid for the Cubs Business can be syndicated at any one time, given the relatively limited number of parties that participate in professional sports-related

41

financing efforts and given that potential lenders into debt financing to be established by a professional sports franchise will want to be assured that the essential requirement of league approval can be obtained before committing to such financing. See id. As a result of these considerations, multiple bids for a single Major League Baseball franchise cannot practicably proceed to conclusion at one time. Accordingly, the Proposed Business Combination should be permitted to proceed without requiring a continuation (or attempted restarting) of an already-exhaustive auction process.

77.     As a result of the foregoing considerations, anything more than a brief period for CNLBC in chapter 11 is unnecessary and presents a material risk of causing the Proposed Business Combination to fail and the going concern value of the Cubs Business to greatly diminish. See Kenney Declaration at ¶ 10. A failure to consummate the Proposed Business Combination could have serious consequences for the Tribune Debtors' reorganization process, most notably on their efforts to develop and fund a plan of reorganization. Such a setback would, in turn, directly harm the Tribune Debtors' estates, creditors, and other stakeholders, each of whom has a real and significant interest in seeing the Tribune Debtors' reorganization progress in a timely fashion.

78.     The Tribune Debtors and CNLBC have thus sought to address these concerns through the relief sought in this Motion and request that the Court tailor the notice program for the Proposed Business Combination accordingly. Section 363(b) of the Bankruptcy Code permits the transfer of estate property outside the ordinary course of business after "notice and a hearing." Section 102(1) makes clear that the notice required by section 363(b) is to be determined by the Court's judgment of what is "appropriate in the particular circumstances." The Court also has the statutory authority to regulate notice under section 105(a) of the

Bankruptcy Code, which grants bankruptcy courts broad authority and discretion to enforce the provisions of the Bankruptcy Code either under specific statutory authority or under equitable common law principles.  Specifically, section 105(a) provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).  In addition, procedural authority to regulate notice is provided by Fed. R. Bankr. P. 9007, which provides that "[w]hen notice is to be given under these rules, the court shall designate, if not otherwise specified herein, the time within which, the entities to whom, and the form and manner in which the notice shall be given. When feasible, the court may order any notices under these rules to be combined."

79.    It has long been held that "the mode of effecting service rests with the court," subject to due process requirements.  In re Greyling Realty Corp., 74 F.2d 734, 738 (2d Cir. 1935) (citing Flexner v. Farson, 248 U.S. 289 (1919)).  The level of notice to be given "depends on the interest at issue because 'due process is flexible and calls for such procedural protections as the particular situation demands.'"  Taylor v. Slick (In re Taylor), 178 F.3d 698, 703 (3d Cir. 1999) (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)); see also OAN Serv. v. Official Comm. of Unsecured Creds. (In re Parcel Consultants, Inc.), 58 Fed. Appx. 946 (3d Cir. 2003) (unpublished opinion); Wilkinson v. Abrams, 627 F.2d 650, 664 (3d Cir. 1980) (citing Morrissey and listing three factors generally considered in determining due process: (i) the interest that will be affected by the official action; (ii) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural

safeguards; and (iii) other interests and the fiscal and administrative burdens that any additional or substitute procedural requirement would entail).

80.     Here, the Bankruptcy Court should tailor notice of the Transaction Approval Motions and determine that notice of such motions and the hearings thereof and the Proposed Business Combination provided in accordance with the Notice Procedures constitutes good and sufficient notice thereof.  In doing so, the Court will ensure that all identifiable creditors and other parties-in-interest respecting the Cubs Business will have actual and sufficient notice of the Proposed Business Combination and a full opportunity to raise objections or other concerns with respect thereto.  The Tribune Debtors, CNLBC and the Bidder, with the support of the Creditors' Committee and the Steering Committee of the Tribune Debtors' prepetition lenders, believe that it is essential to secure the Court's approval of the notice process, procedures, and structure before the process of noticing the Transaction Approval Motions and hearings thereon are commenced, so that an orderly process is established for the Proposed Business Combination upon which all interested or affected parties may rely.

81.     The Tribune Debtors intend, and request that the order approving this Motion provide, that any creditor or party-in-interest (including without limitation creditors of and parties-in-interest respecting the Cubs Entities) that wishes to object to the Proposed Business Combination or the transactions contemplated by the Formation Agreement and/or any of the Ancillary Agreements shall be required to file their objection thereto by the objection deadline established by the Bankruptcy Court for objections to this Motion, or be estopped from pursuing any such objection at the hearing to consider the Proposed Business Combination in CNLBC's chapter 11 case.  The Tribune Debtors further request that any adjudication of any objection to the Proposed Business Combination that is heard and adjudicated at the hearing on this Motion

be binding at the subsequent hearing on the Proposed Business Combination in CNLBC's

chapter 11 case, so as to prevent creditors or other parties-in-interest from re-litigating objections

already ruled upon.

82.     Through this process, while remaining entirely consistent with fundamental

notions of due process, the Bankruptcy Court will ensure that parties receiving actual notice of

the Proposed Business Combination raise their objections in a timely fashion and with a full and

fair opportunity to be heard thereon, while avoiding the potential dissipation of value that would

result from a lengthy chapter 11 process for CNLBC.  As noted above (at ¶¶ 52 – 53), the

Formation Agreement requires approval of the Proposed Business Combination on an expedited

basis.  A failure to obtain such approval in the time required by the Formation Agreement as a

result of CNLBC being forced to operate for a protracted period in chapter 11 would be severely

harmful to the value of the Cubs Business, while conferring no benefit on creditors or other

stakeholders.  As a result, the Bankruptcy Court should order that objections to the Proposed

Business Combination by any party receiving actual notice of the Proposed Business

Combination should be filed, served and heard in the Tribune Debtors' chapter 11 cases.

83.     In situations such as the one presented here, courts have held that actual notice

can substitute for a statutory notice requirement and can provide a court with grounds to

otherwise modify statutory or procedural notice requirements.  For example, in Matter of

Holtkamp, 669 F.2d 505 (7th Cir. 1982), a debtor was faced with a motion to lift the automatic

stay to allow a previously-scheduled litigation, of which the debtor was well aware, to proceed.

The bankruptcy court shortened notice of the hearing on the motion to one day, with only three

hours' "actual" notice to the debtor of the motion.  The Seventh Circuit ruled that the shortening

of time was justified, because the debtor had already known of the hearing in the previously-

scheduled litigation, and hence the motion to lift the stay was (or should have been) expected by the debtor. 669 F.2d at 509.

84.    Likewise, in In re Lehman Brothers Holdings, Inc., 2009 WL 667301 (S.D.N.Y. Mar. 13, 2009), the district court affirmed the bankruptcy court's order approving a sale of the debtor's assets two days after the debtor's chapter 11 cases were commenced. In so affirming, the district court focused on the fact that notice of the sale of Lehman's assets had plainly been in the public domain for a significant period regardless of the expedited sale timetable. As the court observed, the evidence showed that "financial markets participants had known for months that Lehman's assets were for sale," and that "'there's no question that parties-in-interest and parties who are just plain interested know about today's hearing.'" See id. at *2. The district court affirmed the bankruptcy court's judgment that good and sufficient notice of the sale had been provided. See id.

85.    The instant circumstance affords actual notice that far exceeds that provided in Holtkamp and Lehman and that is at least equal to the notice required under the Bankruptcy Rules with respect to asset transactions. All creditors and other parties-in-interest of the Tribune Debtors and CNLBC (or both) will have actual notice more than twenty (20) days prior to the Transaction Hearing (and even more notice of the proposed analogue to the Transaction Hearing in CNLBC's chapter 11 case) as to when the Tribune Transaction Approval Motion will be considered, when objections to the Proposed Business Combination need to be submitted, and all other essential procedural points. Moreover, the Tribune Debtors, CNLBC, and the Bidder all expect that the Proposed Business Combination will receive intense media coverage and that the time and date of the hearings to consider approval of the Proposed Business Combination will be widely covered. Indeed, it is reasonable to expect that the consummation of the Proposed

Business Combination by the Tribune Debtors and the Cubs Entities will be among the most-thoroughly covered matters ever brought to a Bankruptcy Court for approval. Accordingly, this Court should (i) recognize that all creditors and parties-in-interest respecting the Cubs Business and CNLBC will doubtless have substantial actual notice of the details of the Proposed Business Combination long before the hearings thereon, (ii) approve the scope of the notice being provided, and (iii) hold that no other or further notice concerning the details of the Proposed Business Combination need be given.

## II.    The Form of Notice Should be Approved

86.    The Court should approve the form of mailed notice of the Proposed Business Combination attached hereto as <u>Exhibit A</u> and the form of publication notice of the Proposed Business Combination attached hereto as <u>Exhibit C</u>. The form of mailed notice provides creditors and other parties-in-interest with all of the fundamental requirements outlined by the Third Circuit as necessary for actual notice: (i) the time and place of the hearing on the Tribune Transaction Approval Motion, (ii) the fundamental terms and conditions thereof, (iii) the time for filing objections thereto in a timely manner in order for them to be considered at the hearing, and (iv) a general description of the property subject to the transaction. See <u>Folger Adam</u>, 209 F.3d at 265. Similarly, the proposed form of publication notice also provides all creditors and other parties-in-interest respecting both the Tribune Debtors and CNLBC with the essential information necessary to apprise them of the Proposed Business Combination and, if necessary, to lodge an objection thereto in an appropriate and timely fashion.

87.    Although the Tribune Debtors will provide notice of the Proposed Business Combination, the Transaction Hearing, and related matters to all creditors and other parties-in-interest in their chapter 11 cases and to all creditors and other parties-in-interest of the Cubs

47

Entities, counterparties to Cubs Executory Contracts, and similar persons, the Tribune Debtors

do not anticipate including a copy of the Tribune Transaction Approval Motion with that notice.

The Tribune Debtors and CNLBC will provide a copy of the Tribune Transaction Approval

Motion upon request to any party-in-interest, and the Tribune Transaction Approval Motion and

filings in connection therewith will also be made available to all parties free of charge on the

claims and noticing agent's website for the Tribune Debtors' chapter 11 cases at

http://chapter11.epiqsystems.com/tribune.  The Tribune Transaction Approval Motion and all

related filings will, in addition, be available from the PACER system on the Bankruptcy Court's

website.  Accordingly, the Tribune Transaction Approval Motion and all filings relating thereto

will be readily available to any creditors or other parties-in-interest of CNLBC that wish more

information concerning the Proposed Business Combination than they receive from the proposed

form of notice and the doubtless-extensive media coverage concerning the Proposed Business

Combination.

### III.    The Court Should Order That the Process for the Proposed Business Combination is Proper and That No Further Marketing Efforts or Auction Process for the Cubs Business is Required

88.    It is appropriate for the Proposed Business Combination to proceed without

the need for a further auction or other bidding process.[15]  Pursuant to Fed. R. Bankr. P. 6004(f),

the Tribune Debtors and CNLBC may consummate a transaction relating to the Cubs Business in

either a public fashion (i.e., an auction process overseen by the Bankruptcy Court) or privately,

as circumstances warrant.  In the instant circumstance, as described in detail above at ¶¶ 16 - 40

and in the Martell Declaration, the Cubs Business has been extensively marketed from the

---

[15] Disclosure in this section that no auction process in the Bankruptcy Court is anticipated for the Cubs Business (and, indeed, the Tribune Debtors request that the Court order no such process shall occur here) is intended to satisfy the requirements of Del. Bankr. LR 6004-1(b)(iv)(D) (requiring disclosure by a debtor where no "shopping" of an asset to be transferred is anticipated).

moment that Tribune publicly announced its intention to enter into a transaction involving the Cubs Business over two years ago. That marketing process, assisted by JPMSI, went through several layers of process and diligence over that two-year period, and the number of potential interested parties has been reduced gradually from over a hundred Prospective Bidders down to the Bidder. Tribune then undertook intensive negotiations with the Bidder beginning in late January 2009 – more than 20 months after the process began, but over six months ago. See Martell Declaration at ¶ 27. Given (i) the exceptionally thorough, professional and rigorous marketing process for the Cubs Business, (ii) the limited number of parties that are likely to have an interest in bidding on that business and the financial and logistical means with which to do so, who also could obtain approval from Major League Baseball, and (iii) the intense and continuous negotiations Tribune has already conducted with the Bidder, it is highly implausible that a further marketing process and/or an additional auction process could identify any other party with a realistic interest in the Cubs Business, a likelihood of assembling the necessary financial support, a likelihood of obtaining Major League Baseball approval, and a willingness to exceed sufficiently the consideration offered by the Bidder.

89.    Moreover, the formal marketing process for the Cubs Business, while exceptional, is dwarfed by the level of informal notice that has been provided for that process through the world's media for the last two years. There have been hundreds, if not thousands, of detailed stories and articles in major media outlets concerning potential transactions involving the Cubs Business that have featured interviews with certain of the interested parties and bidders, speculated on the ultimate outcome of the process, and opined as to the likely consideration eventually to be received by Tribune. See, e.g., "Review of Cubs Sale Likely," Espn.com, Jan. 23, 2009 (discussing the impact of a bankruptcy court reviewing the sale); "Winner in Cubs Sale

Process to be Picked this Week," <u>Reuters UK</u>, Jan. 6, 2009; "As Cubs narrow field of buyers,

sale has record-setting potential," <u>Chicago Business</u>, July 23, 2008.[16] Significant events in the

process, such as the announcement of Tribune's intention to enter into a transaction involving the

Cubs Business and the selection of the Bidder as the negotiating party, have been the subject of

widely-covered press releases and follow-on articles. <u>See, e.g.</u>, "Ricketts Picked as Cubs

Buyer," <u>The Wall Street Journal</u>, Jan. 23, 2009. This exceptional level of press and media

attention has afforded the Proposed Business Combination a level of informal notice that is

among the very highest for an asset transaction brought before a bankruptcy court for approval.

90.    The likelihood that an auction process would succeed in identifying a credible

bidder willing to exceed the consideration afforded by the Proposed Business Combination that

has not already made its interest known in response to this extensive media coverage is

essentially nonexistent. The Court should rule that the Proposed Business Combination is

appropriate and that no further marketing process is appropriate or needed.

**IV.    The Investor Protections are Reasonable in Scope and Amount, and Should be Approved by the Bankruptcy Court**

91.    The Tribune Debtors further request that the Court approve the investor

protections contained in Sections 4.15 and 9.3 of the Formation Agreement and authorize

Tribune and, following the commencement of any chapter 11 case for CNLBC, CNLBC to pay

the Payment Amounts in the event that the relevant circumstances specified in Section 4.15 or

9.3, as applicable, occur.[17] The Third Circuit has addressed the appropriateness of investor

protections or bidding incentives in the context of bankruptcy, and set forth a standard by which

---

[16] Several prominent press articles have put forth the opinion that the transaction process involving the Cubs Business was not proceeding fast enough. <u>See, e.g.</u>, "Cubs Owners Hold Out for 11th Inning Sale," <u>Financial Week</u>, Oct. 15, 2007. The Tribune Debtors have located no articles suggesting that the process was proceeding too quickly to permit identification of the highest and best bid.
[17] The Bidder is not a "stalking horse" or initial bidder for the Cubs Business; however, the disclosure herein nonetheless comports with the requirements of Del. Bankr. LR 6004-1(c)(i)(C)(2) that any "break up" fees or bid protections should be disclosed to the Court.

these protections should be approved.  Although the business judgment standard applies to investor protections outside of bankruptcy, investor protections are governed by the administrative expense provisions in section 503(b) of the Bankruptcy Code in the bankruptcy context.  See In re O'Brien Envtl. Energy, Inc., 181 F.3d 527 (3d Cir. 1999).  The Third Circuit requires that the party requesting certain investor protections, such as break-up fees and expenses, demonstrate that the protections were actually necessary to preserve the value of the estate.  Id. at 535; see also In re Women First Healthcare, Inc., 332 B.R. 115 (Bankr. D. Del. 2005) (stating that the Third Circuit requires a post-petition transaction between the party claiming the administrative expense for the investor protections and the estate and a benefit to the estate).

92.      The Third Circuit also stated in O'Brien, however, that while the business judgment rule is not the standard in the Third Circuit when considering investor protections, the consideration underlying the debtor's judgment can be relevant to the court's determination of whether the investor protections are appropriate under section 503(b).  Id.  The court considered several factors to determine whether the investor protection was necessary to determine the value of the debtor's estate.  In reaching its decision, the court asked the following questions:

> (1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price; (4) did the . . . bidder . . . place the estate in a sales configuration mode to attract other bidders to the auction; (5) did the request for a break-up fee serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders; (6) does the fee requested correlate with a maximization of value to the Debtor's estate; (7) are the principal secured creditors and the official creditors committee supportive of the concession; (8) were safeguards beneficial to the debtor's estate available; and (9) was there a substantial adverse impact on unsecured creditors[ from approval of the administrative expense], where such creditors are in opposition to the break-up fee?

46429/0001-5943962v1

Id. at 536. The court also considered whether the availability of such protections was designed to induce a bidder to research the value of the assets and set a dollar figure on which other bidders could rely, thereby "increasing the likelihood that the price at which the [assets are] sold will reflect [their] true worth." Id.

93.    These factors are similar to the factors considered under the business judgment rule adopted in other jurisdictions. See In re Integrated Res., Inc., 147 B.R. 650 (S.D.N.Y. 1992).   Under the business judgment rule, the determination of whether the investor protections are appropriate focuses on whether the relationship of the parties who negotiated the protections was tainted by self-dealing or manipulation, whether the fee hampers or encourages bidding, and whether the amount of the fee is unreasonable relative to the value of assets being transferred as part of the transaction. Id. at 657.

94.    The investor protections are appropriate under the circumstances and will provide a benefit to the Tribune Debtors' estates and to CNLBC. The Investor Protections were extensively negotiated by the parties at arm's-length and in good faith, with the recognition by the parties that the Bidder has expended considerable time and resources conducting due diligence and negotiating the terms of the Proposed Business Combination, and that the Bidder requires the proposed Investor Protections as part of the overall agreements contained in the Formation Agreement against the potential failure to consummate the Proposed Business Combination.  Those protections are limited in scope to discrete, specified circumstances in which the Proposed Business Combination is not consummated, and do not require the Tribune Debtors or the Cubs Entities to make payment of the Payment Amounts in the event that the Proposed Business Combination is not consummated based on circumstances where the risk of

non-closing has been allocated to the Bidder (for example, with respect to most financing-related conditions).  <u>See</u> Formation Agreement at § 4.15(f), (h), (j).

95.    The Payment Amounts are also reasonable and should be approved.  The parties have agreed for purposes of the Formation Agreement that the value of the Cubs Business being transferred pursuant thereto is $844,740,000; the Bidder will hold a 95% equity interest in the entity purchasing the Cubs Business, and Tribune and the Cubs Entities will collectively retain a 5% equity interest therein.  <u>See</u> Formation Agreement at § 1.1(c)(vii).  The maximum Payment Amount thus represents approximately 2.49% of the value of the interest in the Cubs Business to be transferred to the Bidder under the Formation Agreement and the Ancillary Agreements (<u>i.e.</u>, $20,000,000 divided by $802,503,000, which represents 95% of the agreed-upon value of the Cubs Business being contributed to Newco), while the Payment Amounts triggered by the Middle Tribune Payment Trigger and the Minor Tribune Payment Trigger represents, respectively, approximately 1.24% and 0.62% of the value of the Cubs Business being transferred (<u>i.e.</u>, $10,000,000 and $5,000,000 divided in each case by $802,503,000).

96.    Courts in this District and this Circuit, as well as other courts, have generally recognized that break-up fees and other transaction protection expenses similar in nature to the Investor Protection Fee are reasonable and standard within a range of 2% - 3% of the total value of the assets or other property sought to be disposed.  <u>See</u>, <u>e.g.</u>, <u>In re Dura Auto. Sys., Inc.</u>, Case No. 06-11202-KJC (Bankr. D. Del. July 24, 2007) (approving break-up fee of up to 3.0% on consideration of $160.2 million); <u>In re Advanced Marketing Servs., Inc.</u>, Case No. 06-11480-CSS (Bankr. D. Del. Feb. 16, 2007) (approving break-up fee representing approximately 2.62% on consideration of $76.25 million); <u>In re Radnor Holdings Corp.</u>, Case No. 06-10894-PJW (Bankr. D. Del. Sept. 22, 2006) (approving break-up fee of 3% of final purchase price); <u>see also</u>

In re Adelphia Commc'ns Inc., Case No. 02-41729-reg (Bankr. S.D.N.Y. June 16, 2006) (approving break-up fee of 2.5% on consideration of over $17 billion).

97.    In the instant case, the Investor Protections are generally more favorable to the Tribune Debtors and CNLBC than those approved in the above-cited cases, because the Payment Amounts are not payable solely on any failure to close the transactions contemplated by the Formation Agreement, but are instead payable only in defined circumstances where, as a business matter, Tribune and CNLBC have agreed to accept the risk of non-closing. Moreover, in various other circumstances where closing under the Formation Agreement does not occur, the parties have negotiated for the Bidder to assume the risk of non-closing and make comparable payments to Tribune and the Cubs Entities. Accordingly, the Payment Amounts are reasonable and should be approved by the Court.

## NOTICE

98.    Notice of this Motion has been provided to (i) the Office of the United States Trustee; (ii) counsel to the Creditors' Committee; (iii) counsel to the Steering Committee; (iv) counsel to the administrative agents for the prepetition lenders; (v) counsel for the indenture trustees for the Tribune Debtors' prepetition notes; and (vi) all parties entitled to receive notice in these Chapter 11 cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Tribune Debtors submit that no further notice need be given.

## NO PREVIOUS RELIEF REQUESTED

99.    The Tribune Debtors have not previously sought the relief requested herein from this Court or any other court.

54

WHEREFORE, the Tribune Debtors respectfully request that this Court enter an order, substantially in the form attached hereto, (i) approving the notice to be given of the Tribune Transaction Approval Motion and the Proposed Business Combination, (ii) approving the transaction process with respect to the Proposed Business Combination, (iii) approving payment of the Payment Amounts in the event that payment of such fees is otherwise triggered under the Formation Agreement, and (iv) granting such other and further relief as the Court may deem proper.

Dated: Wilmington, Delaware
      August 24, 2009

Respectfully submitted,

SIDLEY AUSTIN LLP
Bryan Krakauer
James F. Conlan
Kenneth P. Kansa
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 574-2101

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

46429/0001-5943962v1
CH1 4842838v.3