# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Objection Deadline: September 17, 2009 at 4:00 p.m. (ET)**<br>**Hearing Date: September 24, 2009 at 10:00 a.m. (ET)** |

## MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363 AND 365 (I) AUTHORIZING TRIBUNE DEBTORS AND CNLBC TO (A) ENTER INTO AND PERFORM OBLIGATIONS UNDER FORMATION AGREEMENT AND ANCILLARY AGREEMENTS, (B) EFFECT PROPOSED BUSINESS COMBINATION RESPECTING CUBS-RELATED ASSETS, INCLUDING INTERESTS IN WRIGLEY FIELD, COMCAST SPORTS NETWORK AND RELATED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, INTERESTS AND ENCUMBRANCES, AND (C) ASSUME AND ASSIGN EXECUTORY CONTRACTS; (II) AUTHORIZING DEBTOR TRIBUNE COMPANY TO ENTER INTO GUARANTEES OF DEBT FINANCING; (III) AUTHORIZING DEBTORS WGN CONTINENTAL BROADCAST COMPANY AND TRIBUNE COMPANY TO ENTER INTO AND PERFORM OBLIGATIONS UNDER RADIO AND TELEVISION BROADCAST AGREEMENTS; AND (IV) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

1.     By this motion (the "Motion"), Tribune Company, one of the debtors and debtors in possession in the above-captioned chapter 11 cases ("Tribune" and, collectively with the other debtors in such cases, the "Tribune Debtors"), the other Tribune Debtors, and Chicago National League Ball Club, LLC ("CNLBC"), one of Tribune's current non-Debtor affiliates, ask this Court to approve a number of related transactions by which the business, assets and operations of the Chicago Cubs Major League Baseball franchise (collectively, the "Cubs Business") and related assets will be contributed by Tribune and its affiliates to a joint venture which will be controlled by a third-party bidder, but in which the Tribune Debtors and the Cubs Entities (defined at ¶ 4, below) collectively will retain an interest (as described in this Motion and the related agreements in more detail, the "Proposed Business Combination"). That joint venture, Chicago Baseball Holdings, LLC ("Newco") and its subsidiaries (collectively, the "Newco Subs") will thereafter own and operate the Cubs Business.

2.     The Cubs Business is one of the most valuable assets of the Tribune group of companies. The Cubs were founded in 1876 as the Chicago White Stockings and are a charter member of Major League Baseball's National League. The Cubs have won 16 National League pennants and two World Series championships during their history, and are the two-time defending champions of the National League's Central Division. Thirty-seven (37) members of the Baseball Hall of Fame played with the Cubs for all or part of their careers. Wrigley Field, the Cubs' 41,118-seat stadium on the north side of Chicago, has been the Cubs' home park since 1913 and is the anchor and namesake of Chicago's Wrigleyville neighborhood. The Cubs have consistently been considered one of Major League Baseball's most valuable teams, and have

46429/0001-5944013V1

been described as a "premier franchise."[2] Tribune has owned the Cubs since 1981, when it acquired the team from William Wrigley.

3. The Cubs Business includes, but is not limited to, the Cubs' Major League Baseball, spring training, and Dominican Republic baseball operations. In addition, among the most prominent assets of the Cubs Business – each of which is sought to be included in the Proposed Business Combination described in this Motion and the accompanying transaction documents – are Wrigley Field, several pieces of real property located in Chicago that are used as parking lots near Wrigley Field or for other Cubs-related purposes, and the 25.34% stake indirectly owned by Tribune in Comcast SportsNet Chicago, LLC, a Delaware limited liability company that operates a local sports programming network in the Chicago area ("CSN Chicago").

4. The Cubs Business is conducted principally by five direct or indirect subsidiaries of Tribune (together, the "Cubs Entities"): (i) CNLBC; (ii) Tribune Sports Network Holdings, LLC; (iii) Wrigley Field Premium Ticket Services, LLC; (iv) Diana-Quentin, LLC; and (v) Chicago Cubs Dominican Baseball Operations, LLC. Although all five Cubs Entities will participate in the Proposed Business Combination, as described further below, only CNLBC is anticipated to file a petition under chapter 11 in connection with effectuating the transaction. In addition, Tribune and certain of its direct and indirect subsidiaries other than the Cubs Entities own certain limited assets that are used solely in connection with the Cubs Business.[3]

---

[2] See "Cubs for Sale, But is Wrigley Field?", Chicago Tribune, Apr. 3, 2007 (quoting Chicago White Sox Chairman Jerry Reinsdorf as saying "[t]he Cubs are a premier franchise").

[3] The assets used in connection with the Cubs Business that are owned by Tribune and its direct and indirect subsidiaries that are not Cubs Entities will be contributed to Newco as part of the Proposed Business Combination (save certain assets that will be contributed directly to a subsidiary of Newco). In addition, Tribune and certain of its subsidiaries also own and operate certain additional assets that are used in connection with both the Cubs Business and other businesses of Tribune. Those assets will not be transferred to Newco, but will be made available

5.     An additional element of the Cubs Business relates to licensing of the radio and television broadcast rights to Cubs baseball games. The Cubs have had a radio broadcast relationship with WGN-AM, a radio station operated by WGN Continental Broadcasting Company ("WGN"), one of the Tribune Debtors in these chapter 11 cases, since 1925. The Cubs have also had a television broadcast relationship with WGN-TV, a television station operated by WGN, and WGN America, a television superstation operated by WGN, since 1948. WGN-TV and WGN America today broadcast a majority of Cubs baseball games.

## BACKGROUND CONCERNING THE MOTION

### I.     Overview of the Proposed Business Combination

6.     The Tribune Debtors submit this Motion for entry of orders pursuant to 11 U.S.C. §§ 105(a), 363 and 365, substantially in the forms submitted herewith, (i) authorizing the Tribune Debtors, together with CNLBC, which is not currently a party to these chapter 11 cases, but which is anticipated to commence its own chapter 11 case as a final step in effectuating the transactions described herein, to (a) enter into and perform their obligations under that certain Formation Agreement (the "Formation Agreement") dated as of August 21, 2009; (b) enter into and perform their obligations pursuant to certain agreements ancillary to the Formation Agreement that collectively effect the transactions described herein (together with the Closing Escrow Agreement, the "Ancillary Agreements");[4] (c) effect the Proposed Business Combination on the terms set forth in the various agreements; and (d) assume and assign substantially all

---

on a transitional basis for a limited period after consummation of the Proposed Business Combination pursuant to the Transition Services Agreement (discussed at ¶¶ 39 – 40, below).

[4] Capitalized terms not defined herein shall have the meanings ascribed to them in the Formation Agreement and the Ancillary Agreements, as applicable. For the avoidance of doubt, the term Ancillary Agreements, as used in this Motion and in the form of proposed order approving this Motion, includes, without limitation, (i) the Tribune Debt Guarantees, (ii) the WGN Agreements, (iii) the Superstation Extension, (iv) the Newco LLC Agreement, (v) the Tax Matters Agreement, (vi) the Transition Services Agreement, (vii) the Closing Escrow Agreement, and (viii) the Indemnity Escrow Agreement. In addition, for the further avoidance of doubt, the Tribune Debtors clarify that they seek authority to enter into and perform all of their obligations under each of the foregoing agreements and the other Ancillary Agreements by this Motion.

4

executory contracts to which CNLBC is a party and certain executory contracts to which Tribune and other Tribune Debtors are a party relating to the Cubs Business (primarily relating to certain terms of employment of employees of the Cubs Business) (collectively, the "Cubs Executory Contracts"); (ii) authorizing Tribune to enter into guarantees of certain debt financing to be entered into by Newco and the Newco Subs in connection with the transactions contemplated hereby; (iii) authorizing WGN to enter into and perform its obligations under two (2) restated broadcast rights agreements concerning radio and television broadcasts of Chicago Cubs baseball games, and Tribune to enter into and perform its obligations under the "Superstation Extension," which governs the broadcast of Cubs baseball games on WGN America; and (iv) granting related relief.[5]

7.      The Tribune Debtors, the Cubs Entities and Ricketts Acquisition LLC, a Delaware limited liability company (the "Bidder"), have agreed for purposes of structuring the Formation Agreement and the Ancillary Agreements that the Cubs Business has an enterprise value of $844,740,000. That amount forms the basis for the consideration to be received by CNLBC and, indirectly, the Tribune Debtors, in exchange for contributing the Cubs Business and related assets to Newco. See Formation Agreement at Preamble, §(H).

8.      The Proposed Business Combination will be consummated as follows: (a) the Cubs Entities and certain Tribune Debtors will contribute the Cubs Business to Newco (with

---

[5] On December 8, 2008 (the "Petition Date"), the Tribune Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On December 10, 2008, the Bankruptcy Court entered an order consolidating the Tribune Debtors' chapter 11 cases for procedural purposes only. The Tribune Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner in the Tribune Debtors' chapter 11 cases.

On December 18, 2008, the Office of the United States Trustee appointed an official committee of unsecured creditors in the Tribune Debtors' chapter 11 cases.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105(a), 363 and 365.

the exception of certain assets (the "Direct Cubs Contributed Assets") that will be contributed directly by the Cubs Entities to Chicago Cubs National League Ball Club, LLC (the "Cubs Newco Sub"));[6] (b) Newco will obtain debt and equity financing in the amounts specified in the Formation Agreement, with certain of such debt financing being guaranteed by Tribune; and (c) Tribune and the Cubs Entities will receive a membership interest in Newco and CNLBC will receive a special distribution of cash (initially $823,750,000, to be modified by certain amounts as set forth in the Formation Agreement) at the closing of the transaction (the "Estimated Special Distribution Amount"). The Estimated Special Distribution Amount will thereafter be modified by certain post-closing adjustments to arrive at the Final Special Distribution Amount, which will be the cash component of the consideration to be received as part of the Proposed Business Combination. See Formation Agreement at § 1.5. Tribune and the Cubs Entities will collectively retain a 5% membership interest in Newco, while the remaining 95% membership interest in Newco will be held by the Bidder. Following all adjustments to the Special Distribution Amount (as described below), the Tribune Debtors and CNLBC expect that CNLBC will receive a distribution of approximately $740,000,000 in cash, subject to certain adjustments, from the Proposed Business Combination, as well as the 5% equity stake in Newco to be retained by Tribune and the Cubs Entities.

       9.      The Estimated Special Distribution Amount will be distributed by Newco to CNLBC. The 5% membership interest in Newco will be distributed to Tribune and the Cubs Entities in proportions reflecting the value of the assets of the Cubs Business they contributed to

---

[6] Under the Formation Agreement, the majority of the assets of the Cubs Business will be contributed to Newco, excepting only the Direct Cubs Contributed Assets, which will be contributed to the Cubs Newco Sub. See Formation Agreement at § 1.1(c)(i). For ease of drafting, in this Motion, the Tribune Debtors will refer to the contribution of the assets of the Cubs Business to Newco without qualifying at every point the exception of the Direct Cubs Contributed Assets; however, such omission is not intended to alter or recharacterize the proposed treatment of the Direct Cubs Contributed Assets under the Formation Agreement.

46429/0001-5944013V1

Newco. CNLBC will thereafter hold the cash consideration in a segregated account or accounts separate from the integrated cash management system it shares with Tribune and various of Tribune's affiliates. That cash consideration will remain in those accounts pending confirmation of a chapter 11 plan for CNLBC or further order of the Bankruptcy Court.

10. As part of the Proposed Business Combination, after the assets of the Cubs Business are contributed by the Tribune Debtors and the Cubs Entities to Newco and the Cubs Executory Contracts are assumed and assigned to Newco, Newco will then sell the Cubs Contributed Assets and assign the Cubs Executory Contracts to the Newco Subs (the "Newco Sale"). The Newco Sale is a disregarded transaction for Federal income tax purposes. As the Newco Sale is an element of the Proposed Business Combination, authority to consummate the Newco Sale is sought as part of the relief contemplated by this Motion.

## II. Structuring of the Proposed Business Combination and Process

11. The Tribune Debtors and the Cubs Entities will consummate the Proposed Business Combination through a two-step process. First, through this Motion, the Tribune Debtors seek approval of the Proposed Business Combination, including, without limitation, the assumption and assignment of any Cubs Executory Contracts to which they are a party, the entry by Tribune into and the performance by Tribune of its obligations under the Tribune Debt Guarantees, and the entry by WGN and Tribune into and the performance by them of their obligations under the WGN Agreements and the Superstation Extension, respectively. Contemporaneously with the filing of this Motion, the Tribune Debtors have also filed the Notice and Procedures Approval Motion,[7] pursuant to which the Tribune Debtors will provide notice of

---

[7] The full title of the Notice and Procedures Approval Motion is the Motion Of Debtors And Debtors In Possession Pursuant To Sections 105(a), 363(b) And 503(b) Of The Bankruptcy Code And Fed. R. Bankr. P. 2002, 6004 And 9007 For An Order (I) Approving Form And Scope Of Notice Of Proposed Business Combination Involving Cubs

the Proposed Business Combination to parties-in-interest in the Tribune Debtors' chapter 11 cases and publication notice of the Proposed Business Combination and, in addition, will provide actual mailed notice of the Proposed Business Combination to creditors of the Cubs Entities, counterparties to Cubs Executory Contracts, and other parties-in-interest respecting CNLBC.

12.     The first step of the Proposed Business Combination will be completed when the Bankruptcy Court enters the order approving this Motion as to the Tribune Debtors. Following the Bankruptcy Court's entry of such order and the succeeding Escrow Closing (described below at ¶¶ 22 - 27), CNLBC will commence its own chapter 11 case in the Bankruptcy Court for the limited purpose of consummating the Proposed Business Combination. The Tribune Debtors have submitted herewith separate forms of order approving the relief requested herein as to the Tribune Debtors and as to CNLBC. CNLBC will seek substantially the same relief in its own chapter 11 case – on an expedited basis given the actual notice already proposed to be provided to creditors and parties in interest respecting CNLBC under the Notice and Procedures Approval Motion – as that sought by the Tribune Debtors in this Motion (the "CNLBC Transaction Approval Motion"). CNLBC will also seek authority in the CNLBC Transaction Approval Motion for certain relief respecting any discrete elements of the Proposed Business Combination that are applicable solely to CNLBC. That relief will include a request by CNLBC to be allowed to make any payments necessary to operate the Cubs Business during the period between the granting of the CNLBC Transaction Approval Motion and the Closing under the Formation Agreement, subject to (i) the limitations set forth in the Formation Agreement and (ii) the rules and regulations of Major League Baseball.

---

Business To Creditors And Parties-In-Interest Of Tribune Debtors And Cubs Entities, (II) Approving Transaction Process And Setting Transaction Hearing And Related Deadlines, And (III) Approving Certain Investor Protections.

8

46429/0001-5944013V1

13.     As described in more detail in the Notice and Procedures Approval Motion, the Tribune Debtors and CNLBC are providing actual notice of the relief sought in this Motion and to be sought by CNLBC in the CNLBC Transaction Approval Motion, as well as of the Proposed Business Combination generally, to those parties that may plausibly have standing to object to the Proposed Business Combination as it affects the Tribune Debtors and/or CNLBC. The intended procedures will provide actual notice of the Proposed Business Combination to stakeholders in respect of CNLBC, including creditors, counterparties to Cubs Executory Contracts, and other parties-in-interest of CNLBC as well as the standard notice parties in the Tribune Debtors' chapter 11 cases, to the maximum extent practicable. See Notice and Procedures Approval Motion at ¶¶ 8, 42-46. The Tribune Debtors and CNLBC will make substantial efforts to ensure that appropriate parties-in-interest in the Tribune Debtors' cases, and creditors and parties-in-interest respecting CNLBC, receive full notice of all proceedings relating to the Proposed Business Combination in connection with the filing of this Motion so that such parties will have at least twenty (20) days' notice of (i) the hearing to approve the Proposed Business Combination and (ii) CNLBC's intended commencement of its chapter 11 case as a final step in consummating the Proposed Business Combination, so that CNLBC will face little or no delay in attempting to obtain approval of the Proposed Business Combination in its chapter 11 case on an expedited basis. See id. at ¶¶ 46-47, 64, 83.

14.     In this regard, it is important to note the Proposed Business Combination contemplates that Newco will honor the claims of the overwhelming majority of the creditors of CNLBC, other than certain Tribune creditors who assert guarantee claims or other joint and several claims against CNLBC. Those creditors of Tribune that also assert guarantee claims and other joint and several claims against CNLBC are principally if not exclusively holders of

Tribune's prepetition debt obligations. The largest holders of those obligations are already actively participating in the Tribune Debtors' chapter 11 cases through a Steering Committee of lenders (the "Steering Committee"). The Steering Committee has been fully apprised of the terms of the Proposed Business Combination prior to the filing of this Motion, and has advised the Tribune Debtors that they fully support the transaction.

15. The Proposed Business Combination, if approved and consummated, will monetize an interest in one of the principal assets of the Tribune group of companies and will represent a very substantial step forward in Tribune's reorganization process. Recognizing that fact, the Tribune Debtors and Cubs have engaged the most significant organized creditor representatives in these cases – the Official Committee of Unsecured Creditors (the "Creditors Committee") and the Steering Committee – with respect to the Proposed Business Combination. Each of those groups fully supports the Proposed Business Combination on the terms described in this Motion, the Formation Agreement and the Ancillary Agreements.[8] In addition, the Tribune Debtors anticipate that the required approvals of Major League Baseball for the Proposed Business Combination will be obtained in advance of the hearing on this Motion. The most significant stakeholders and other parties respecting the Proposed Business Combination thus either already support the relief sought herein or are expected to do so prior to the consideration of this Motion by the Court.

## TERMS OF THE PROPOSED BUSINESS COMBINATION AND RELEVANT AGREEMENTS

16. The Proposed Business Combination will be effected through numerous related agreements, the principal one of which is the Formation Agreement. A copy of the Formation Agreement is attached hereto as Exhibit A. The Formation Agreement, in turn,

---

[8] Prior to the filing of this Motion, the Tribune Debtors also conferred with the Office of the United States Trustee (the "UST") respecting the relief sought herein.

includes as exhibits most of the remaining agreements and other documents necessary to effect the Proposed Business Combination, other than a guaranty of certain obligations of the Bidder and certain of its affiliates (the "Ricketts Guaranty") by a Ricketts family trust with sufficient assets to satisfy the Ricketts Guaranty. Although it is not practicable to summarize all of the supporting agreements and documents herein, the most significant are discussed below in Section II, "Ancillary Agreements."

17.     In addition, in connection with the Proposed Business Combination, WGN will enter into amended and restated radio and television broadcast rights agreements with Newco, pursuant to which WGN-AM and WGN-TV will continue to broadcast certain Cubs baseball games following the implementation of the Proposed Business Combination (the "WGN Agreements").[9] Tribune will also, subject to the agreement of Major League Baseball, enter into the "Superstation Extension," pursuant to which WGN America will continue to broadcast certain Cubs baseball games. Tribune will also enter into certain guarantees of the debt financing to be provided to Newco in connection with these transactions, while Tribune and the Cubs Entities, subject to consent requirements, will pledge the 5% membership interest they will collectively retain in Newco as security for certain of the debt financing to be provided to Newco in connection with the Proposed Business Combination. See Formation Agreement at § 4.11(d). Each of the agreements mentioned in this paragraph are discussed in detail immediately below.

---

[9] The descriptions of the Formation Agreement, the Ancillary Agreements, the WGN Agreements, and the Superstation Extension provided in this Motion are necessarily in summary form. Each of those agreements is qualified by reference to the entirety of the agreements in question. In the event of a conflict between the descriptions herein and the terms of such agreements, the terms of the agreements shall control.

## I.     The Formation Agreement

### A.     *Assets and Liabilities Covered by the Formation Agreement*

18.     The Proposed Business Combination as embodied in the Formation Agreement and its schedules and exhibits involves (a) the contribution by the Cubs Entities and certain Tribune Debtors of the Cubs Business to Newco (or, with respect to the Direct Cubs Contributed Assets, to Cubs Newco Sub), (b) the receipt by Newco of certain debt and equity financing, certain of which debt financing will be guaranteed by Tribune, and (c) the receipt by Tribune and the Cubs Entities of a five percent (5%) membership interest in Newco and a special distribution of cash to CNLBC, which distribution will approximate $740,000,000, subject to certain adjustments in accordance with the terms of the Formation Agreement.[10]  Thereafter, ninety-five percent (95%) of the membership interests in Newco will be held by the Bidder and the remaining five percent (5%) of the membership interests in Newco will be held collectively by Tribune and the Cubs Entities.  The specific assets comprising the Cubs Business are extensive, but include in material part:  (i) the Chicago Cubs Major League Baseball franchise; (ii) Wrigley Field; (iii) the 25.34% interest in CSN Chicago currently owned directly by Tribune Sports Network Holdings, LLC, one of the Cubs Entities, and indirectly owned by Tribune; (iv)

---

[10] The principal assets constituting or used in connection with the Cubs Business are presently owned by the Cubs Entities, while Tribune owns certain additional assets that constitute part of the Cubs Business.  The Tribune Debtors and CNLBC seek express authorization to transfer such assets to the extent held by those entities, but as the property held by the other Cubs Entities is not property of any of the Tribune Debtors' estates, nor property of CNLBC, relief is not sought with respect to those transfers of property.  Moreover, it is possible that certain other Tribune Debtors presently own or control assets that constitute part of the Cubs Business, although the Tribune Debtors and CNLBC do not believe that such assets are material in value, either individually or in the aggregate. For the avoidance of doubt, the Tribune Debtors and CNLBC also seek authorization by this Motion for those Tribune Debtors to contribute to Newco any assets in their ownership or control that are determined to constitute part of the Cubs Business.

In addition to the assets being contributed by the Tribune Debtors and the Cubs Entities and transferred to Newco or the applicable Newco Sub as part of the Proposed Business Combination, certain real property, which consists of parking lots located near Wrigley Field and used for parking during Cubs home games, is also anticipated to be transferred to Newco, or the relevant Newco Sub, by certain Trusts.  Those Trusts are non-Debtor affiliates of Tribune.  Accordingly, as the property held by those Trusts is not property of any of the Tribune Debtors' estates, nor property of CNLBC, relief is not sought with respect to those transfers of real property.

various parcels of real property owned by the Cubs Entities located on the north side of Chicago near Wrigley Field (including the so-called "Triangle Property"), most of which consist of parking lots used for game-day parking for Cubs baseball games;[11] (v) intellectual property owned by the Cubs Entities; (vi) certain partial ownership interests in various entities that in large part comprise the business of Major League Baseball; (vii) all goodwill relating to the Cubs Business; (viii) accounts receivable other than those specifically being retained by the Cubs Entities; and (ix) other day-to-day assets used by the Cubs Entities in operating the Cubs Business (collectively, the "Cubs Contributed Assets"). Pursuant to the Formation Agreement, the Tribune Debtors and CNLBC will assign all of the Cubs Contributed Assets contributed by those entities free and clear of all liens, claims, interests and encumbrances (other than Permitted Liens and subject to certain other exceptions noted in the Formation Agreement) to Newco. See Formation Agreement at § 1.1(c)(i).

19. Assets explicitly excluded from contribution to Newco under the Formation Agreement, which will accordingly remain with Tribune and/or the Cubs Entities, as applicable, include without limitation: (i) most cash, cash equivalents, and short-term investments; (ii) the Excluded Contracts and related rights and claims; (iii) certain insurance policies placed by Tribune; (iv) two buildings owned by one of the Cubs Entities (the Mueller Building and the T-Building), which will be leased by that Cubs Entity to one of the Newco Subs; and (v) certain tax refunds. See Formation Agreement at Exhibit A – Definitions, "Cubs Excluded Assets." In addition, the Cubs Entities may elect to retain certain accounts receivable and other current assets in exchange for a corresponding reduction of the Special Distribution Amount. The Tribune Debtors and CNLBC will also, pursuant to the orders approving the

---

[11] Three of the parcels of real property addressed in the Formation Agreement are held by trusts under which CNLBC is the sole beneficiary. CNLBC has the authority and power to direct the trustees of those trusts to transfer title to those properties to the applicable Newco Sub(s). See Formation Agreement at § 2.11(g)-(h).

Proposed Business Combination, assume the Cubs Executory Contracts and assign those contracts and leases to Newco, subject to the terms of the Formation Agreement. The non-Debtor Cubs Entities will further assign other specific contracts to Newco.

20.     The Tribune Debtors and the Cubs Entities will receive aggregate consideration for the contribution of the Cubs Business to Newco based on an enterprise value for the Cubs Business of $844,740,000, which will then be subject to adjustments as set forth in the Formation Agreement to take account of working capital fluctuations, similar valuation issues, and other adjustments described therein. See Formation Agreement at § 1.5. This consideration will be comprised primarily of cash, in addition to the five percent (5%) membership interest to be collectively retained by Tribune and the Cubs Entities as described above. Ultimately, however, the Tribune Debtors and the Cubs Entities expect that the cash distribution resulting from the Proposed Business Combination will approximate $740,000,000, subject to certain adjustments. As discussed in paragraph 9 above, upon receipt, CNLBC will keep all cash consideration received separated from the integrated cash management system it shares with Tribune and various of Tribune's affiliates pending confirmation of a chapter 11 plan for CNLBC or further order of the Bankruptcy Court.

21.     In addition to the consideration described above, Newco will also assume or pay numerous liabilities relating to the Cubs Business as part of the Proposed Business Combination. In particular, Newco will assume substantially all of the liabilities of the Cubs Entities existing as of the Closing (excepting guaranties entered into by CNLBC of Tribune's obligations under its pre-bankruptcy credit facilities and other exceptions set forth in the

14

Formation Agreement).[12] See Formation Agreement at § 1.1(c)(i) (Newco to assume all Cubs Liabilities, which include most liabilities relating to the Cubs Business). Those liabilities being assumed include substantially all obligations to players and all current officers and employees of the Cubs Business, including the Chairman of CNLBC and other officers. The contract of the Chairman of CNLBC is being modified and assumed in connection with consummation of the Formation Agreement. Newco and the Newco Subs will also offer employment to substantially all employees of the Cubs Entities on substantially the same terms as those under which they are currently employed. See id. at § 5.1(a). Additionally, Newco and the Newco Subs will pay (i) all State of Illinois, Cook County, Illinois, and City of Chicago real estate transfer taxes relating to the transfer under the Formation Agreement of real property owned by the Cubs Entities and (ii) all sales, use and similar taxes incurred in connection with the contribution of the Cubs Business to Newco and the Newco Sale. See Formation Agreement at §§ 6.3, 6.4.

**B.    Escrow Closing and Closing of the Formation Agreement**

22.    The Formation Agreement contemplates that the Proposed Business Combination will first have most of its material elements closed into escrow, pending (i) the obtaining of an order of the Bankruptcy Court approving the Proposed Business Combination as to CNLBC and granting related relief, and (ii) the satisfaction of all conditions precedent to obtaining the Senior Debt Financing (as described below). See Formation Agreement at § 7.4. Once those two additional conditions to the Closing are satisfied, the Closing under the Formation Agreement will occur.

23.    Prior to the Escrow Closing, the Bidder will have entered into commitments for two tranches of debt financing for the transaction: the Senior Debt Financing

---

[12] Liabilities explicitly excluded from transfer to Newco and the Newco Subs include, but are not limited to, certain tax liabilities, certain severance obligations, liabilities of the Cubs Entities to Tribune, and specified Cubs Expenses (as defined in the Formation Agreement).

15

and the Subordinated Debt Financing, which are currently anticipated to be in amounts of $450,000,000 (including a $25,000,000 revolving facility that will be available to the Cubs Business after the closing) and $248,750,000, respectively. In addition, the Bidder will have obtained commitments for the Equity Financing, which is currently anticipated to be in an additional amount of $150,000,000 plus all transaction expenses necessary to consummate the transaction. See Formation Agreement at § 3.4. Each of the Debt Financing and the Equity Financing are subject to adjustment as described in the Formation Agreement. See id. at § 4.11. The Formation Agreement obligates the Bidder and its affiliates to use their reasonable best efforts to obtain and enter into the Debt Financing and the Equity Financing, as well as to consummate the funding of the Debt Financing and the Equity Financing to the appropriate agents on the Escrow Closing Date. See id. at § 4.11(a). In addition, it is a condition to the Escrow Closing that the Subordinated Debt Financing and the Equity Financing be obtained and funded into escrow and the Senior Debt Financing to be funded to the Senior Lender Agent in trust for the Senior Lenders, ensuring that adequate funding will exist to consummate the Proposed Business Combination. See id. at § 7.3(e).[13]

      24.     Once this Court has entered an order approving the relief sought in this Motion as to the Tribune Debtors, and upon satisfaction of the financing and other conditions to the Escrow Closing specified in the Formation Agreement (as defined in the Formation Agreement, the "Escrow Closing Date"), but before CNLBC commences any chapter 11 case, the parties will do the following:

---

[13] Tribune and the Cubs Entities agree in the Formation Agreement that they will use reasonable best efforts to provide all cooperation reasonably requested by Bidder in connection with obtaining the Debt Financing, including (i) the provision of certain financial information and projections; (ii) assisting with the obtaining of ratings for the Debt Financing; (iii) making the Cubs Entities' officers and advisors available for meetings with prospective lenders; (iv) assisting in the preparation of credit documents and ancillary materials; (v) and seeking the consent of the other parties owning interests in CSN Chicago in pledging the Tribune Debtors' interest therein in connection with the Debt Financing. See Formation Agreement at § 4.11(d).

- the Bidder will cause (a) the lenders providing the Senior Debt Financing to fund the principal amount of the term loan portion of the Senior Debt Financing to the Senior Lender Agent, (b) the lenders providing the remainder of the Senior Debt Financing to fund an amount equal to the Senior Debt Financing (excluding the portion thereof comprised of the revolving credit facility), if any, to the Senior Lender Agent and the lenders providing the Subordinated Debt Financing to deposit an amount equal to the proceeds thereof with the Closing Agent, and (c) the Equity Financing to be deposited with the Closing Agent;

- the Escrow Documents, which are specified in Section 1.4 of the Formation Agreement, will be deposited with the Closing Agent, and the Bidder will cause the Senior Lender Agent and the Subordinated Debt Lenders to deposit the Senior Debt Documents that become effective on the Closing Date and the Subordinated Debt Documents, respectively, with the Closing Agent;

- all other documents specified in Section 1.4 of the Formation Agreement will be delivered; and

- the Bidder will deliver fully executed copies of the Escrow Closing Execution Senior Debt Documents effective on or prior to the Escrow Closing to Tribune.

See Formation Agreement at Preamble, §(G) and § 1.1(b). The materials delivered to the Closing Agent will be placed by the parties into escrow pursuant to that certain Closing Escrow Agreement attached to the Formation Agreement as Exhibit T thereto.

25. The escrowed documents and funds will remain in the Closing Escrow Account and the funds provided by the Senior Lenders will remain with the Senior Lender Agent until after (i) the conditions to consummating the Closing set forth in the Formation Agreement are satisfied, (ii) CNLBC commences a chapter 11 case, (iii) the Court enters an order approving the Proposed Business Combination as to CNLBC and (iv) Newco satisfies certain conditions precedent to the Senior Debt Financing. See id. at §§ 1.3(b), 7.4. Thereafter, the Cubs Entities will contribute the Cubs Business to Newco in exchange for the 5% membership interest in Newco to be held by Tribune and the Cubs Entities, and immediately thereafter, among other things, the Senior Lender Agent will deliver the Senior Debt Financing to the Closing Agent and the Closing Agent will distribute the Estimated Special Distribution Amount to CNLBC and the

17

Closing Agent will deliver all escrowed documents and the remainder of the escrowed funds in accordance with the Closing Escrow Agreement, such that Closing of the transaction will occur. See Formation Agreement at Preamble, §(H) and §§ 1.3(b), 7.5. CNLBC will keep the funds received separated from the integrated cash management system it shares with Tribune and various of Tribune's affiliates pending the coming into effect of a chapter 11 plan for CNLBC or further order of the Bankruptcy Court.

26. Out of the funds provided by the Senior Debt Financing, the Subordinated Debt Financing and the Equity Financing, Newco will on the Closing Date distribute the Estimated Special Distribution Amount less the Indemnity Escrow Initial Amount (i.e., $15,000,000) to CNLBC. The Estimated Special Distribution Amount is equal to $823,750,000, as (i) increased or decreased (as specified in the Formation Agreement) by the working capital held by the Cubs Business at the time the Proposed Business Combination is consummated, compared to a target, (ii) increased by Estimated Petty Cash (as defined in the Formation Agreement) and (iii) downwardly adjusted by various amounts, such as for deferred revenue, accounts receivable and other current assets retained by the Cubs Entities, transaction expenses paid by the Bidder, and additional items. See Formation Agreement at Exhibit A – definition of Estimated Special Distribution Amount. As set forth in the Formation Agreement, the Estimated Special Distribution Amount will be adjusted following the Closing Date to reach a Final Special Distribution Amount, which will fix the amount of cash consideration to be provided to the Cubs Entities in connection with the Proposed Business Combination. See Formation Agreement at § 1.5. Following application of the adjustments provided for in Section 1.5 of the Formation Agreement, the Tribune Debtors and the Cubs Entities anticipate that the Final Special Distribution Amount will be approximately $740,000,000, subject to certain adjustments.

18

27.     The Bidder's pre-Closing obligations under the Formation Agreement, as well as the Bidder's obligations with respect to the Estimated Special Distribution Amount and the Final Special Distribution Amount (as set forth in Section 1.5 of the Formation Agreement) and the obligations of the Bidder and its affiliates under the Equity Commitment Letter, shall be guaranteed by the Joe and Marlene Ricketts Grandchildren's Trust (the "Bidder Trust"). See Formation Agreement at Preamble, §(C). The Bidder Trust is the owner of all outstanding membership interests in the Bidder.

### C.     *Additional Terms of the Formation Agreement*

28.     The Formation Agreement addresses a number of further terms necessary to effect the Proposed Business Combination. Although it is not practicable to describe all of those terms herein, and hence reference is made to the full text of the Formation Agreement for such terms, the Tribune Debtors apprise the Court and parties-in-interest of the following material terms:

- Indemnification. Following the Closing, CNLBC (together with the other Cubs Entities) will indemnify Newco and the Newco Subs (and, in certain cases, the Bidder Parties) against certain events and occurrences, including, without limitation, (i) the inaccuracy or breach of certain representations and warranties contained in the Formation Agreement or the breach of covenants or agreements contained in the Formation Agreement (subject to limitations set forth in the Formation Agreement) and (ii) any Cubs Excluded Liabilities. With certain exceptions for breaches of specified representations and for fraud, the indemnification obligations of Tribune and the Cubs Entities with respect to breaches of representations and warranties are not triggered until the aggregate amount of indemnified losses exceeds $8 million, and are subject to an aggregate cap of $125 million.[14] See Formation Agreement at § 8.2(a).

---

[14] The Bidder provides an indemnification in favor of Tribune and the Cubs Entities under the Formation Agreement for the inaccuracy or breach of any representations or warranties, or breaches of covenants, in the Formation Agreement, any Cubs Liabilities, or any untrue statements or omissions made by the Bidder in connection with obtaining the Debt Financing. These indemnification obligations with respect to breaches of representations and warranties are not triggered until the aggregate amount of indemnified losses exceeds $8 million, and are subject to an aggregate cap of $125 million.

- As assurance for the Cubs Entities' indemnification obligations under the Formation Agreement, $15 million in proceeds from the Proposed Business Combination will be placed into escrow pursuant to the Formation Agreement (the "Indemnity Escrow Initial Amount"). Under the Indemnity Escrow Agreement, a copy of which is attached to the Formation Agreement as Exhibit S thereto, Newco and the Newco Subs will draw on such portion of the Indemnity Escrow Initial Amount as remains in the Indemnity Escrow Account at the relevant time to satisfy any indemnification obligations of the Cubs Entities under section 8.2(a) of the Formation Agreement. See id. at § 8.4(a). If the amount in the Indemnity Escrow Account is insufficient to satisfy any indemnification obligation, in addition to directly recovering such amount from the Cubs Entities and Tribune pursuant to the indemnification obligation described above, the Formation Agreement provides that Newco has the option to setoff that obligation against any distribution or other payment to be made by Newco to any of the Tribune Parties. See id. at § 8.4(b).

- As further support for the Cubs Entities' indemnification obligations under the Formation Agreement, the Cubs Entities commit under the Formation Agreement that at least $110 million[15] of the proceeds from the Proposed Business Combination will remain in one segregated account for all of the Cubs Entities until the effective date of a plan of reorganization for Tribune and its affiliates. Such amounts shall be held in a segregated account separate from the centralized cash management system of Tribune and its affiliates. See id. at § 8.9.

- Following the effective date of the plan of reorganization for Tribune and its affiliates, the Formation Agreement provides that Tribune, in addition to the Cubs Entities, will be liable for any remaining indemnification obligations contained in Section 8.2(a) of the Formation Agreement. See id. at § 8.2.

- Negotiations. The Formation Agreement obligates Tribune and the Cubs Entities to negotiate exclusively and in good faith with the Bidder concerning the Proposed Business Combination. See Formation Agreement at § 4.7(a). Tribune and the Cubs Entities agree not to solicit or initiate alternative proposals for the acquisition or purchase of the Cubs Business, participate in discussions concerning any such proposals, or enter into any agreements respecting any such proposals, and further agree to notify the Bidder in the event any such proposals are received. See id. Notwithstanding those provisions, if Tribune or any of the Cubs Entities receives an acquisition proposal or any communication that may reasonably be expected to lead to or otherwise relates to a potential acquisition proposal, Tribune and the Cubs Entities shall be entitled to advise the Bankruptcy Court of such acquisition proposal and shall be permitted to take any action or refrain from taking any action ordered or directed by the Bankruptcy Court with respect to such

---

[15]This figure consists of the $125 million Cap Amount less the $15 million Indemnity Escrow Initial Amount.

acquisition proposal, provided that Tribune and the Cubs Entities shall continue to use reasonable best efforts to obtain entry of the orders approving the Proposed Business Combination. See id. at § 4.7(b).

- Pledge of Newco Membership Interest. As partial security for Newco's debt financing obligations, Tribune will pledge any portion of the membership interest in Newco to be received by it as part of the Proposed Business Combination, subject to receiving the necessary consents to such a pledge. See Formation Agreement at § 4.11(d).

- Post-Closing Access and Cooperation. The parties will provide one another with reasonable access post-Closing to relevant books and records relating to the pre-Closing period for the purpose of preparing financial statements or discharging and defending relevant liabilities. See Formation Agreement at § 4.10.

- Termination. The Formation Agreement can be terminated prior to the Closing by mutual consent. See Formation Agreement at § 9.1(a). In addition, the Formation Agreement may be terminated by either the Bidder, on the one hand, or Tribune and the Cubs Entities, on the other hand, prior to the Escrow Closing if (A) the other party has materially breached any covenant, representation or warranty in the Formation Agreement that would result in the conditions to the Escrow Closing not being satisfied unless cured prior to the Escrow Closing Date, and (B) (I) the other party has not waived such breach in writing, (II) provided written notice to the breaching party of such material default or breach, and (III) the breaching party has not cured such material default or breach within ten (10) business days after receiving written notice thereof from the other party. See id. at § 9.1(c), (d). In addition, the Formation Agreement may be terminated by the Bidder, on the one hand, or the Tribune Parties on the other hand, if the Escrow Closing has not occurred by the Termination Date. See id. at § 9.1(b). As defined in the Formation Agreement, the Termination Date means (a) November 30, 2009 if prior to the Escrow Closing Date (unless certain extensions of the debt financing commitments are obtained by the Bidder, in which case the Termination Date may be extended as far as December 31, 2009, with any further extensions requiring Tribune's consent), or (b) 45 business days after the Escrow Closing, with the potential for an additional 30 day extension, subject to Tribune's consent, if certain extensions of the debt financing commitments are obtained by the Bidder (with any further extensions requiring Tribune's consent).

In the event the Formation Agreement is terminated pursuant to Section 9.1(b) thereof, the Formation Agreement provides that Tribune and the Cubs Entities may be required to make a payment to the Bidder, or the Bidder to make a payment to Tribune and the Cubs Entities, depending on whether certain

factors occurred prior to the Termination Date, as set forth in Section 4.15 of the Formation Agreement. See Formation Agreement at § 4.15.

**D.** *Approval of the Proposed Business Combination by Major League Baseball*

29.     A critical element in consummating the Proposed Business Combination is approval thereof by Major League Baseball. Major League Baseball, which is an unincorporated association of the Cubs and twenty-nine (29) other member clubs in North America, produces a unique entertainment product; namely, an annual series of professional baseball games that culminates in the World Series and the determination of a World Series Champion. Each member club operates within a particular geographic location. Major League Baseball is governed by the Major League Constitution, which prescribes rules and procedures addressing, among other things, franchise ownership and the transfer of ownership interests in the member clubs.

30.     The transfer of ownership of a Major League Baseball franchise is understandably a matter of critical importance to Major League Baseball, given the unique place professional sports franchises in general, and Major League Baseball franchises more specifically, hold within our society. See Statement of Position of the Office of the Commissioner of Baseball, In re Dewey Ranch Hockey, LLC, Case No. 09-09488 (RTB) (Bankr. D. Ariz. May 19, 2009) (stating that the Major League Constitution's procedures governing franchise ownership transfers are "critical to the MLB member clubs' ability to produce the collective MLB baseball product and to the success of the League as a whole"). A Major League Baseball franchise reflects a license to serve the fans of Major League Baseball within a particular geographic area and to play games against other Major League Baseball franchises. It is crucial to the success of the entire league that ownership of its franchises be stable, well-financed, and committed to enhancing the team's role within the league and the larger

22

community. The 30 Major League Baseball member clubs are inherently interdependent, with each club having a fundamental and compelling interest in the structure and identity of the owner of every other club.

31. As a result of these interests, any proposed relocation or ownership transfer of a Major League Baseball club (other than certain intra-family ownership transfers, which require the approval of a majority of all Major League Baseball clubs) requires the approval of three-quarters of all Major League Baseball clubs. Such approval can be obtained only after extensive diligence by Major League Baseball aimed at ensuring that the proposed transfer of ownership is likely to serve the best interests of the league as a whole. That diligence, which often takes months to complete, includes a detailed assessment of the proposed new owner's financial circumstances, current and former business relationships, and personal background, as well as the potential owner's likely compliance with league rules. A potential new owner must also covenant in writing that, if the proposed transfer of ownership is approved, he or she will comply with all league rules, including rules governing franchise relocation and rules governing transfers of ownership interests.

32. Given these substantial considerations, the Proposed Business Combination as contemplated by the Formation Agreement and the Ancillary Agreements, as well as the entry into and performance of many of the other agreements in connection with the Proposed Business Combination, is subject to the express approval of Major League Baseball in its sole and absolute discretion. See Formation Agreement at § 4.14. Tribune, the Cubs Entities and the Bidder have conferred extensively with Major League Baseball concerning the terms of the Proposed Business Combination, and prior to the date of this Motion, Tribune has submitted the Formation Agreement and the transactions contemplated therein and in the Ancillary

Agreements to Major League Baseball for its review and approval. See id. at § 4.14(a). Tribune and the Cubs Entities, together with the Bidder, will act as promptly as possible to obtain final Major League Baseball approval for the Proposed Business Combination, including the furnishing of information or other materials. See id. at § 4.14(b). Based on their discussions with Major League Baseball throughout the transaction process, the Tribune Debtors are hopeful that approval for the Proposed Business Combination will be obtained in advance of the hearing to consider approval of this Motion as to the Tribune Debtors.

## II.    The Ancillary Agreements

33.    The Formation Agreement is the principal agreement by which the Proposed Business Combination will be effected. The Formation Agreement contemplates, however, that the Bidder, Newco, the Newco Subs, certain of the Tribune Debtors and/or the Cubs Entities will enter into a number of Ancillary Agreements that will effect various elements of the Proposed Business Combination. The most significant of the Ancillary Agreements are described briefly below.

### A.    *Newco LLC Agreement*

34.    The Bidder, Tribune and the Cubs Entities will enter into an Amended and Restated Limited Liability Company Agreement for Newco in connection with the Proposed Business Combination (the "Newco LLC Agreement"). The Newco LLC Agreement is the principal document governing Newco and delineating the ongoing rights and responsibilities that Tribune and the Cubs Entities will have as holders of a 5% membership interest in Newco. The Newco LLC Agreement affirms that Tribune and the Cubs Entities will each contribute assets, as well as certain assumed liabilities, to Newco in exchange for membership interests in Newco,

while the Bidder will contribute cash to Newco in exchange for membership interests.  See Newco LLC Agreement at § 1.3.

35.     The principal terms and conditions of the Newco LLC Agreement are as follows:

- Call/Put re: Tribune and Cubs Entities' interests.[16]  The Newco LLC Agreement provides that the Bidder will have certain call rights on membership interests held by the Cubs Entities in Newco, while Tribune and the Cubs Entities will have certain rights to put their membership interests in Newco to the Bidder. Specifically, at any time during the one year periods beginning on January 1, 2018 and January 1, 2024, the Bidder will have right to acquire all of the membership interests in Newco held by the Cubs Entities at fair market value, for cash consideration payable, at the option of the Bidder, either immediately or in equal annual installments over a four-year period at 6.5% interest per annum.  See Newco LLC Agreement at § 7.2(a) and (b).

  At any time during the one-year periods beginning on January 1, 2021 and January 1, 2027, Tribune and the Cubs Entities will have the right to put all of their membership interests in Newco to the Bidder at fair market value.  That consideration, as with the consideration under the call option, is payable in cash and, at the option of the Bidder, either immediately or in annual installments over a four-year period at 6.5% interest per annum.  See id.

- Bidder's Right of First Refusal.  If Tribune and the Cubs Entities receive an offer from a third party to purchase their membership interests in Newco, they will provide notice to the Bidder, who will have 45 days after receipt of that notice to acquire the membership interests on the same terms as offered by the third party. If the Bidder does not exercise the right to purchase the membership interests, Tribune and the Cubs Entities may dispose of their interests to the third party within 90 days after expiration of Bidder's right of first refusal.  The Bidder's right of first refusal is not triggered in the event of a transfer to an affiliate, disposition of the membership interests pursuant to a plan of reorganization for Tribune and/or its affiliates.  See id. at § 7.3.

- Tag-Along; Drag-Along Rights.  Following January 1, 2018, the Bidder will have customary drag along rights in connection with any transfer of its membership interests in Newco to a third party.  Tribune and the Cubs Entities shall at all times have customary tag along rights with respect to any transfer by Bidder of an interest in Newco to a third party that would reduce Bidder's interest in Newco below 50%.  See id. at § 7.4.

---

[16] The Newco LLC Agreement accounts for the possibility that ownership of the contributed membership interests may later shift among Tribune and the Cubs Entities and allocates rights accordingly.

- In all cases involving the put and call options, the fair market value of Tribune's and the Cubs' Entities' interests in Newco will be determined based on what the Cubs Entities would receive if all assets of Newco were sold at fair market value and will be determined by the Board of Newco, subject to the determination of a neutral appraiser in the event that the Cubs Entities do not accept the determination of the Board of Newco. See id. at § 7.5.

- Capital Contributions. The Newco LLC Agreement contemplates that additional capital contributions will not be sought from Newco's members except in certain limited circumstances. See id. at §§ 1.6, 2.2. If the board of directors of Newco determines that additional financing is needed, and determines further that third party debt financing cannot be reasonably obtained, it may issue a capital call requesting the members of Newco to contribute the funds pro rata in accordance with their membership interests. If the Cubs Entities fail to fund their pro rata share, the Cubs Entities' aggregate membership interest would be diluted on a fair market value basis. See id. at § 2.2.

- Governance. Except for actions requiring unanimous approval of the members, Newco will be governed by a board of directors, which shall act by majority vote. The board may consist of between two (2) and twenty (20) members, one of whom will be appointed by the Cubs Entities and the remainder of whom will be appointed by Bidder. See id. at § 3.2. The number of directors may be increased from time to time, provided that if the number of directors exceeds twenty (20), the Cubs Entities will have the right to appoint an additional director if the Cubs Entities' aggregate membership interest in Newco is at least 3% at such time. See id. at § 3.2.

- Distributions, Net Income and Net Loss. Newco shall distribute net cash flow to the members pro rata, subject to reserves for expenses, as determined by the board of directors and the terms of the loan documents. See id. at § 5.4. Net income and loss, and items of income, gain, loss and deduction shall generally be allocated to the members pro rata.

- Section 704(c) Methodology. Newco shall use the Code Section 704(c) "remedial allocation method" for making allocations of items of income, gain, loss and deduction with respect to the Cubs Business, resulting in annual allocations of ordinary income to the Cubs Entities. See id. at § 5.3(a).

- Tax Returns; Tax Matters Member. CNLBC will be the Tax Matters Member for the first taxable year of Newco and Bidder will be the Tax Matters Member thereafter. CNLBC shall have the right to review and comment on Newco's tax returns at least thirty (30) days prior to filing. See id. at § 6.6.

### B. Tax Matters Agreement

36.     The Bidder, Newco, Tribune, and the Cubs Entities will enter into a Tax Matters Agreement in connection with the Proposed Business Combination. Pursuant to that agreement, Newco agrees on behalf of itself and its affiliates that it will not directly or indirectly sell, transfer, exchange or dispose of certain assets contributed by Tribune and the Cubs Entities in any transaction taxable for Federal income tax purposes until after January 1, 2018, subject to certain limited carve-outs. See Tax Matters Agreement at § 2(a). In addition, Newco and the Ricketts-affiliated parties to the agreement agree that they will not take any actions resulting in certain tax shortfall amounts, again subject to certain limited carve-outs. See id. The parties also agree that Newco will maintain certain minimum debt levels until January 2, 2018, subject to certain limited carve-outs. See id. at § 2(b).

37.     If any of those agreements are breached, Newco and the other Ricketts-affiliated parties to the Tax Matters Agreement indemnify Tribune and the Cubs Entities for the net present value cost to them of any Federal, state or local income tax liabilities resulting from that breach, with the liability of GuarantyCo under such indemnity capped at $20 million. GuarantyCo will deposit $20 million of cash and cash equivalents into a blocked securities account to secure GuarantyCo's obligations to Tribune and the Cubs Entities under the Tax Matters Agreement. See id. at § 10(c). Newco's liability under such indemnity is not subject to any cap. Any indemnity payment owing to Tribune and the Cubs Entities shall be paid no later than ten (10) days after the delivery by Tribune and the Cubs Entities of the computation of the indemnity payment, or, if Newco, Bidder and GuarantyCo do not agree with such computation, within ten (10) days after the resolution of the disagreement under a dispute resolution procedure, plus 10% interest on the unpaid amount, compounded monthly.

38.     The Tax Matters Agreement also contains an agreement between the parties on how to report for tax purposes any indemnity payment owed to Tribune and the Cubs Entities.  See id. at § 5.  Newco, Bidder and GuarantyCo shall have the right to contest, at their own expense, any claim by a taxing authority that could result in an obligation of Newco, Ricketts Member and GuarantyCo to make an indemnity payment, or increase the amount of any such indemnity payment.  Tribune shall have the right to contest, at its own expense, any claim by a taxing authority that could result in the disallowance of the tax treatment of contributions to Newco and the Final Special Distribution Amount.

## C.     *Transition Services Agreement*

39.     Tribune and Newco are also entering into a Transition Services Agreement to facilitate the transfer of the Cubs Business to Newco.  Pursuant to the Transition Services Agreement, Newco will engage Tribune as an independent contractor to provide certain transition services as delineated in the agreement.  Those services include, among others, payroll services, accounting services, cash management, human resources-related services, information services, travel programs, and other comparable services.  Newco will use the services for the same purposes and in substantially the same manner as they were used by the Cubs Entities prior to the transfer of the Cubs Business, and Tribune is only obligated to provide the services in a manner that is consistent with past practice.  See Transition Services Agreement at § 1.  Tribune makes no representations or warranties with respect to its provision of the services, other than a limited warranty that the services will be performed in accordance with past practice.  In addition, Tribune's aggregate liability under the Transition Services agreement is capped at the amount paid by Newco for the services, except in limited circumstances.

46429/0001-5944013V1

40.     Tribune may, subject to certain limitations, cause one or more of its affiliates or may hire one or more subcontractors or third parties to perform any or all of its services due under the Transition Services Agreement. See id. Each service provided by Tribune or its designee, as applicable, will continue through a set duration (each, a "Services Period"), as set forth in Schedule A to the Transition Services Agreement. Newco may cancel any particular service prior to the end of its applicable Services Period, but must pay and reimburse Tribune for certain enumerated categories of costs and expenses arising from such cancellation. See id. at § 2.

### D.     Closing Escrow Agreement

41.     Tribune, the Cubs Entities, Bidder, Newco, certain lenders providing financing necessary to fund the Proposed Business Combination, by and through their agents (as applicable) and JPMorgan Chase Bank, N.A., as Closing Agent, will be entering into the Closing Escrow Agreement to facilitate the closing of the Proposed Business Combination.[17] Under the Closing Escrow Agreement, the Equity and Subordinated Debt Financing and executed but undated documents necessary to consummate the Proposed Business Combination (subject to certain limitations) (the "Closing Escrow Deliverables") will be delivered in accordance with the Formation Agreement to the Closing Agent. Upon receipt by the Closing Agent of a joint certificate executed by representatives of the Bidder and Tribune certifying that the conditions to Closing set forth in Section 7.4 of the Formation Agreement have been satisfied and setting forth the Specified Amount and the Special Distribution Amount, the Closing will be deemed to have occurred. See Closing Escrow Agreement at § 10. Thereafter, the Senior Lender Agent will

---

[17] While Tribune, the Cubs Entities, Bidder and Newco have, as among themselves, agreed upon the terms of the Closing Escrow Agreement, those terms have not been finalized with the Closing Escrow Agent. Accordingly, the terms of the Closing Escrow Agreement may change, based on input received from the Closing Escrow Agent, prior to the Escrow Closing. However, the Tribune Debtors do not anticipate that these changes will adversely affect any of the Tribune Debtors or CNLBC.

make the Senior Debt Financing available to the Closing Agent for disbursement in accordance with the terms of the Closing Escrow Agreement. The Closing Agent will thereafter date the executed documents it received as of the Closing Date and will deliver and disburse the Closing Escrow Deliverables in accordance with the Formation Agreement and Closing Escrow Agreement. See id.

### E. Indemnity Escrow Agreement

42.    The Cubs Entities, Newco, and JPMorgan Chase Bank, N.A., as Indemnity Escrow Agent, are also entering into the Indemnity Escrow Agreement to provide a limited fund for the Cubs Entities' indemnification obligations contained in Section 8.2 of the Formation Agreement. Pursuant to the Indemnity Escrow Agreement, the Indemnity Escrow Agent will hold in an escrow account (the "Indemnity Escrow Account") fifteen million dollars ($15,000,000) (the "Initial Escrow Amount") received from the Closing Agent pursuant to the Closing Escrow Agreement.

43.    At any time, CNLBC and Newco may jointly deliver a release certificate in substantially the form of Exhibit A to the Indemnity Escrow Agreement, directing the Indemnity Escrow Agent on the disposition of the amounts remaining in the Indemnity Escrow Account, or any portion thereof, and the Indemnity Escrow Agent will comply as directed within one (1) business day. At any time prior to the Release Date (which shall be the date that is twelve (12) months from the Escrow Closing Date, as defined in the Formation Agreement), Newco may submit a request to the Indemnity Escrow Agent for funds in satisfaction of any pending indemnification claim it has asserted under the Formation Agreement. CNLBC has the right to contest any such request by 5:00 pm CST on the fifteenth (15th) business day after Newco has made any such request. The Indemnity Escrow Agent shall disburse the funds

requested by Newco unless CNLBC contests the request; if CNLBC contests the request, the Indemnity Escrow Agent shall pay to Newco or its designee the uncontested portion of such request and shall retain any portion of such request (the "Disputed Amounts") pending formal or consensual resolution of the dispute in accordance with Section 6(b) of the Indemnity Escrow Agreement. Within two (2) Business Days following the Release Date, the Indemnity Escrow Agent shall disburse to the Cubs Entities any amounts remaining in the Indemnity Escrow Account which are not Disputed Amounts.

## III.    The Tribune Guarantees

44.    Under the Tribune Guarantees, Tribune will guarantee the repayment of principal, interest and a premium under (i) a $425 million term loan, which will be fully drawn at Closing of the Proposed Business Combination (the "Closing"), and a $25 million revolver, which will not be drawn at Closing (collectively, the "Senior Debt"); and (ii) $248.75 million of subordinated debt Newco will incur at the Closing (the "Subordinated Debt"); each as may be adjusted in accordance with the terms of the Formation Agreement (which adjusted amounts, in the aggregate, will not be more than the total of the Debt Financing contemplated by the Formation Agreement as of August 21, 2009).

45.    The principal terms of the Tribune Guarantees are as follows:

- Scope of Guaranty. Each Guaranty is a guaranty of collection, which requires exhaustion of all lender remedies against Newco, all other guarantors and all collateral prior to a payment obligation owing by Tribune. Under each Guaranty, Tribune's liability is capped at the unpaid principal amount plus unpaid interest and premium (the "Cap").

- Lenders' Remedies. Foreclosure by the lenders will not be deemed to effect an exhaustion of their remedies until the value of that collateral has been reduced to cash. If the lenders retain collateral twenty-four (24) months after foreclosure and there are no ongoing diligent attempts to sell the foreclosed collateral, Tribune may require a valuation of the collateral, and the value of the foreclosed collateral will be treated as a payment of principal for purposes of the Cap.

31

- <u>Subrogation and Related Rights</u>. No rights of subrogation, indemnity, contribution, or similar rights that Tribune has as a result of a payment under any Guaranty can be exercised until the prior payment in full of all obligations owed by Newco under the Senior Debt and Subordinated Debt and until all commitments under the Senior Debt and Subordinated Debt have been terminated.

- <u>Release of Lenders Under Senior Debt</u>. Tribune, for itself and its affiliates, releases the lenders, their agents and affiliates under the Senior Debt for all claims which might exist for matters existing on or before the date of the Senior Debt Guaranty. With respect to matters arising after the date of the Senior Debt Guaranty, Tribune retains the ability to maintain claims based on gross negligence or willful misconduct (but otherwise releases the lenders, their agents and affiliates for claims that would arise after the date of the Guaranty.)

## IV.    The WGN Agreements and the Superstation Extension

46.    In addition to the various other Ancillary Agreements, and as part of the overall transactions encompassing the Proposed Business Combination, Newco and WGN are entering into a Restated Radio Broadcast Rights Agreement (the "<u>Radio Agreement</u>") and a Restated Television Broadcast Rights Agreement (the "<u>TV Agreement</u>" and, collectively with the Radio Agreement, the "<u>WGN Agreements</u>"). Tribune will also enter into, subject to the approval of Major League Baseball, an extension (the "<u>Superstation Extension</u>") of a letter agreement between Cubs and Major League Baseball with respect to the broadcasting of Cubs baseball games on WGN America outside of the Cubs' home television territory (which is prescribed under Major League Baseball rules) (the "<u>Superstation Agreement</u>").

47.    Many of the particular terms of the WGN Agreements and the Superstation Extension are commercially sensitive, and the Tribune Debtors have accordingly requested authority from the Bankruptcy Court by separate motion to file certain exhibits and schedules, including those agreements, under seal. However, in terms of providing a general description of the broad terms of the WGN Agreements, under those agreements WGN will retain its exclusive rights (subject to limitations required by Major League Baseball) to broadcast

or control the broadcast of certain Cubs games until October 31, 2022, subject to certain circumstances in which that period could be terminated earlier. WGN-AM will continue to broadcast all Cubs games. This continues the long-standing broadcasting relationship between WGN and the Cubs, which has been ongoing since the 1920s for radio broadcasts and 1948 in the case of television broadcasts. Contractual relationships concerning those broadcasts have existed since at least 1982 (following the acquisition of the Cubs Business by Tribune), and the current radio and television contracts between the Cubs and WGN were entered into in 1998. Each of the Agreements is subject and subordinate to the rights of Major League Baseball, and is subject to the prior written approval of the Commissioner of Major League Baseball.

48.     In essence, the WGN Agreements provide that WGN-AM and WGN-TV, respectively, have the exclusive right to broadcast all pre-season, regular season, and post-season Cubs games, other than (i) for both WGN-AM and WGN-TV, those which WGN is precluded from broadcasting by Major League Baseball, and (ii) for WGN-TV only, those which are broadcast by Comcast SportsNet pursuant to a Rights Agreement between Comcast SportsNet and Cubs. In exchange for such exclusive broadcast rights, WGN-AM and WGN-TV each pay certain fees to Cubs. In addition, under the Radio Agreement, WGN has the right to authorize radio stations outside of the Chicago metropolitan area to broadcast Cubs games as part of the Cubs radio network. And under the TV Agreement, WGN-TV has the right to grant certain rights to network television stations in the Cubs home television territory.

49.     Also in connection with the Proposed Business Combination, Newco, Tribune, and Major League Baseball will likely enter into the Superstation Extension, which extends the current Superstation Agreement between the Cubs and Major League Baseball. The Superstation Agreement relates to certain of the Tribune Debtors' operation of WGN America, a

"Superstation" that broadcasts over cable and satellite systems outside of the Chicago market. Pursuant to the Superstation Agreement, Major League Baseball has permitted the Cubs to authorize the broadcast of a certain number of Cubs games per season outside of the Cubs' home television territory on WGN-America.

50. Entry into the Superstation Extension is not a condition precedent to closing under the Formation Agreement and is likely within the ordinary course of Tribune's business; however, out of an abundance of caution and for the avoidance of doubt, authority is sought hereunder for Tribune to enter into the Superstation Extension. As of the date of this Motion, that extension has not yet been entered into; however, the Formation Agreement obligates the Bidder to use its best efforts to obtain Major League Baseball approval for the Superstation Extension. See Formation Agreement at § 4.14(g). Given that the Superstation Extension would benefit the Tribune Debtors and would be merely a continuation of an arrangement to which the Tribune Debtors are now already a party, Tribune should be authorized to enter into such an extension and continue the existing superstation broadcast relationship.

## V.  Assumption and Assignment of Cubs Executory Contracts

51. To facilitate and effectuate the Proposed Business Combination, approval by the Bankruptcy Court is sought for the assumption by CNLBC (or, in certain limited circumstances, the relevant Tribune Debtor) of the Cubs Executory Contracts and the assignment of those executory contracts and unexpired leases to Newco.[18]  The Cubs Executory Contracts cover a wide range of business arrangements of the Cubs Business, including but not limited to (i) advertising and sponsorship contracts; (ii) leases for certain of the Cubs' baseball facilities in the Dominican Republic and their spring training facility in Mesa, Arizona; (iii) various parking

---

[18] The Cubs Entities other than CNLBC may also assume certain contracts and leases and assign them to Newco; however, as those entities are not anticipated to commence chapter 11 cases, approval of such assumption and assignment is not sought by this Motion.

garage licenses; and (iv) similar items. The Cubs Executory Contracts also include that certain Amended and Restated Rights Agreement, dated December 2, 2003, between CSN Chicago and WGN, which governs the relationship between those parties.

52.     The Cubs Executory Contracts are an essential element of the Cubs Business, and their assumption and assignment in connection with the Proposed Business Combination is crucial to ensuring that the Cubs Business will operate without disruption.[19] In addition, the Cubs Executory Contracts collectively represent a substantial element of value associated with the Cubs Business, because CNLBC and the other Cubs Entities realize significant revenues thereunder. Accordingly, assumption and assignment of the Cubs Executory Contracts should be approved as a component of the Proposed Business Combination.[20]

## THE PROPOSED BUSINESS COMBINATION COMPLIES WITH APPLICABLE LAW AND SHOULD BE APPROVED

**I.     The Proposed Business Combination Should be Approved Pursuant to Section 363 of the Bankruptcy Code**

### A.     *The Proposed Business Combination is a Sound Exercise of the Tribune Debtors' and CNLBC's Business Judgment*

53.     The Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not specify a standard for

---

[19] In the event the assignment of any contract under the Formation Agreement without the consent of any third party constitutes a breach thereof notwithstanding the effect of the orders approving this Motion, then Tribune and the Cubs Entities will use their reasonable best efforts to cooperate with Newco to perform the obligations under that contract and provide Newco with the benefits of that contract after Closing. None of Tribune, CNLBC, or the other Cubs Entities will have any liability to the Bidder, Newco or any Newco Sub if any consent is not obtained, or if Newco or a Newco Sub is not able to obtain the benefits under a particular contract. See Formation Agreement at § 1.6.

[20] If any amounts are paid by a contract counterparty to Tribune or a Cubs Entity post-Closing, Tribune or the applicable Cubs Entity will pay such amounts over to Newco or the applicable Newco Sub within five (5) business days, unless the amounts constitute an account receivable retained by the Cubs Entities under the Formation Agreement. See Formation Agreement at § 1.6.

determining when it is appropriate for a court to authorize such a transaction, courts routinely authorize debtors to use assets outside the ordinary course of business if such use is based upon the sound business judgment of the debtor. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1996); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 174 (D. Del. 1991).

54.     Courts typically consider the following factors in determining whether a proposed transaction outside the ordinary course of business satisfies this standard: (a) whether a sound business justification exists for the transaction, (b) whether adequate and reasonable notice of the transaction has been given to interested parties, (c) whether the transaction will produce a fair and reasonable price for the property, and (d) whether the parties to the transaction have acted in good faith. See, e.g., Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

55.     Furthermore, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Resources Inc. (In re Integrated Resources Inc.), 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992). Accordingly, absent a particularized showing of bad faith or arbitrary and capricious behavior in taking a business action to use assets outside the ordinary course of

business, courts will defer to the debtor's business judgment. See In re Global Crossing, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

*I.*     *The Tribune Debtors and CNLBC Have a Sound Business Purpose in Disposing of an Interest in the Cubs Business*

56.     The decision to enter into and manner of executing the Proposed Business Combination unquestionably result from the informed business judgment of the Tribune Debtors and CNLBC and should be approved. Tribune announced in April 2007, on the same day that it announced approval of a leveraged buyout transaction, that it intended to dispose of an interest in the Cubs Business. See Declaration of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company (the "Bigelow Declaration"), attached hereto as Exhibit B, at ¶ 5. Tribune made the decision to dispose of that interest, and has continued to pursue that disposal, for several reasons.

57.     First, and most significantly, disposing of an interest in the Cubs Business permits Tribune and its affiliates to re-focus their business efforts. The core business of Tribune and its affiliates is the creation and distribution of news, entertainment, and other content through Tribune's publishing, broadcasting, and interactive businesses. Although the Cubs Business is a very valuable asset of the Tribune group of companies, the Cubs Business is not a core business of the Tribune group of companies. See id. at ¶ 6.

58.     Focusing on Tribune's core media businesses is a central element of the Company's current business plan. As Tribune has sought to restructure its overall business, both before and after it and certain of its affiliates commenced their chapter 11 cases, it has attempted to re-allocate its resources to its core businesses and achieve efficiencies that go along with operating a core of complementary businesses. Tribune has sought to effect this re-allocation by entering into transactions respecting its non-core businesses wherever achievable on terms that

46429/0001-5944013V1

are in the best interests of the Tribune group of companies and the stakeholders therein (as evidenced in this situation through the support of the Creditors Committee and the Steering Committee for the Proposed Business Combination). Entering into the Proposed Business Combination is consistent with, and is indeed a major step forward in, re-focusing the Tribune group of companies on its media businesses as part of Tribune's long-term business plan. See Bigelow Declaration at ¶ 7.

59. The primary relationship between the Cubs Business and the rest of Tribune's businesses is largely related to the Cubs providing a source of radio and television programming for WGN. The Proposed Business Combination is attractive to Tribune because, among many other considerations, it preserves a substantial financial benefit for the Tribune group of companies by ensuring that the radio and television broadcast relationships between the Cubs and WGN are maintained. Cubs baseball games are a critical component of WGN's radio and television programming, accounting for substantial portions of WGN's listeners and viewership. See id. at ¶ 8.

60. Under the broadcast agreements to be entered into as part of the Proposed Business Combination, WGN will continue to have radio and television broadcast rights for Cubs baseball games until October 31, 2022, subject to earlier termination under limited circumstances. These long-term media arrangements ensure that essential elements of WGN's businesses and the financial benefits attending those elements are preserved in the long-term for the benefit of the Tribune Debtors' estates, preserving the key benefit of the Cubs relationship for the Tribune Debtors. See id. at ¶ 9.

61. Entering into the Proposed Business Combination also permits the Tribune group of companies to enhance the overall financial posture of the group because it provides the

Tribune Debtors and CNLBC with substantial financial benefits not otherwise obtainable. Through the Proposed Business Combination, the Tribune group of companies will dispose of an interest in the Cubs Business and receive a cash distribution of approximately $740,000,000, subject to certain adjustments. Professional sports franchises are businesses presently valued at high multiples of cash flow, and Tribune believes – with the support of its major stakeholders – that it is an opportune time to lock in that value. In addition, with the acquisition of a controlling interest in the Cubs Business by the Bidder, Tribune will limit its financial obligations and responsibility for a business that is inherently capital intensive (for example, with respect to player contracts and stadium maintenance) and can be volatile depending upon a team's performance. See id. at ¶ 10.

62.    In addition to the benefits to be received from monetizing an interest in the Cubs Business, Tribune and CNLBC will also be freed going forward from the need to commit significant new capital to the Cubs Business. In Tribune's view, maximizing the value of the Cubs Business in the future will likely require significant expenditures of new capital even beyond player contracts and stadium maintenance. Tribune believes that such capital can be better deployed in Tribune's core media businesses and in pursuing opportunities to enhance those businesses, in which Tribune may benefit from the efficiencies relating to its core businesses. See id. at ¶ 11.

63.    In the judgment of Tribune's management and board of directors, following consultation with and with the support of the principal stakeholders in Tribune's chapter 11 cases, the Proposed Business Combination provides the Tribune group of companies with the ability to monetize a non-core business at an attractive value, generating cash proceeds that can be used in connection with the Debtors' reorganization and ongoing core businesses.

46429/0001-5944013V1

The Proposed Business Combination permits the Tribune group of companies to achieve these benefits while preserving WGN's broadcast relationships with the Cubs, which will be extended for a significant period into the future. Based on these factors, Tribune's management and board of directors, and the management and boards of the relevant affiliates of Tribune, believe that it is in the best interests of Tribune and its affiliates to consummate the Proposed Business Combination, and that that business judgment should be approved by the Bankruptcy Court. See id. at ¶ 12.

2.    *The Proposed Business Combination Maximizes Recoveries to the Tribune Debtors and CNLBC*

64.    Tribune and its affiliates have also pursued the Proposed Business Combination in a good-faith manner fashioned to maximize recoveries to Tribune, CNLBC, and their affiliates as a result thereof. The process of marketing the Cubs Business, evaluating the bids therefor and ultimately negotiating with the Bidder has been deliberative and thorough, and has in all aspects taken place at arm's-length and in good faith. As described in detail in the Notice and Procedures Approval Motion, that process spanned more than two years, in which an initial group of more than one hundred potential bidders was gradually reduced through various stages of evaluation until a single Bidder, a third party with no pre-existing ties to the Tribune Debtors or the Cubs Entities, was chosen. See Notice and Procedures Approval Motion at ¶¶ 16 – 36; Declaration of Christopher J. Martell, Vice President of J.P. Morgan Securities Inc. (attached to Notice and Procedures Approval Motion as Exhibit B thereto at ¶¶ 7 - 30) (the "Martell Declaration") (describing marketing and negotiation processes in detail). Throughout the process, the Tribune Debtors and CNLBC exercised sound business judgment in connection with the process of soliciting bids, narrowing the field of bidders, obtaining highest and best offers from each of the potential bidders, comparing and evaluating bids, obtaining further bids

40

from the narrowed field, and reaching terms of the Proposed Business Combination with the Bidder. See Notice and Procedures Approval Motion at ¶¶ 17 – 40; Martell Declaration at ¶¶ 7 – 30. The Tribune Debtors, CNLBC and the other Cubs Entities have negotiated intensively with the Bidder over the terms of the Formation Agreement and the Ancillary Agreements for virtually the entire length of the Tribune Debtors' chapter 11 cases to date. See Notice and Procedures Approval Motion at ¶¶ 34 – 40; Martell Declaration at ¶¶ 25 – 30.

65. The Proposed Business Combination also provides the Tribune Debtors and CNLBC with substantial financial benefits not otherwise obtainable. See Bigelow Declaration at ¶ 10. The Tribune Debtors and CNLBC expect that the Final Special Distribution Amount, representing the cash portion of the consideration for the Proposed Business Combination, will approximate $740,000,000, subject to certain adjustments. The Tribune Debtors and the Cubs Entities will also retain a 5% membership interest in Newco, conferring further value from the Proposed Business Combination on them. In connection with the Proposed Business Combination, WGN will also secure radio and television broadcast rights until 2022 (subject to certain early termination rights provided in the WGN Agreements) for Cubs baseball games, providing a significant benefit for the Tribune Debtors' collective ongoing business. See Bigelow Declaration at ¶ 9.

66. The ultimate selection of the Proposed Business Combination as the preferred transaction respecting the Cubs Business is also a product of the informed business judgment of the Tribune Debtors and CNLBC and should be approved. Tribune's management and board of directors, CNLBC, with input from J.P. Morgan Securities Inc., as financial adviser, considered several factors in evaluating the Bidder's offer and comparing that offer to other offers received by Tribune for the Cubs Business. These factors included, but were not limited

to (i) the total value of the transaction to Tribune; (ii) the amount of net after-tax cash proceeds to be received as a result of the transaction; (iii) the terms and value of the ongoing radio and television broadcast agreements to be provided to WGN; (iv) the certainty that the proposed transaction would be consummated, including the strength of the bidding parties' financing arrangements, and the net worth of the bidding parties; (v) the likelihood that the proposed owner or ownership group, and the proposed transactional documents and structure, would receive approval from Major League Baseball; (vi) the debt guarantees, if any, required to be provided by Tribune or its affiliates to a bidding group; and (vii) tax considerations relating to the proposed transaction structure. See Bigelow Declaration at ¶ 14-16.

67. Based on these principal factors, in the determination of Tribune and CNLBC's management and Tribune's board of directors, the Proposed Business Combination is the best overall transaction respecting the Cubs Business. Pursuant to the Proposed Business Combination, Tribune and CNLBC, as applicable, will receive the highest amount of net cash proceeds as compared to other bids. The Bidder has obtained executed financing commitments for a proposed transaction involving the Cubs Business. The Bidder is also the party that has made the most progress towards obtaining approval of Major League Baseball for the proposed transaction. See id. at ¶ 17.

68. Furthermore, the structure of the Proposed Business Combination affords numerous tax and other financial benefits. An affiliate of the Bidder will provide $35 million in financial support on a subordinated basis for Newco under the Operating Support Agreement, providing assurance to Major League Baseball that the Proposed Business Combination will maintain the financial strength of the Cubs franchise, and further providing assurance that the Cubs Business will continue operations uninterrupted and that counterparties to contracts that are

42

part of the Cubs Business will have any obligations under those contracts paid in the ordinary course. In addition, the provision of an indemnity by Bidder and certain of its affiliates in the event certain provisions of the Proposed Business Combination are breached (as described in the Tax Matters Agreement), which indemnity is secured up to $20 million by cash and cash equivalents, provides certainty for Tribune and its affiliates. Beyond these points, the Proposed Business Combination is acceptable to Tribune and CNLBC with respect to all other criteria for the proposed transaction. See id. at ¶ 18.

69.     Tribune and CNLBC also do not believe that there are any substantive issues that would prevent the Bidder from receiving the necessary approvals from Major League Baseball as an owner of the Chicago Cubs Major League Baseball franchise. See id. at ¶ 19.

70.     The Tribune Debtors' business judgment in seeking to enter into the Proposed Business Combination has also been, or is expected to be, affirmed by the most significant stakeholders in respect of the Cubs Business in general and the Proposed Business Combination in particular.  The Creditors Committee and the Steering Committee have both been apprised of the status and terms of the Proposed Business Combination on a continuous basis prior to the filing of this Motion, and support the relief requested herein.  In addition, as discussed previously in this Motion, the Proposed Business Combination, the Formation Agreement, and the related transactions are subject to the approval of Major League Baseball in its discretion.  See discussion at ¶¶ 29-32, supra.  The Bidder, Tribune, and the Cubs Entities are working diligently and in concert to secure that approval, and expect that the approval will be received before the hearing to consider approval of this Motion with respect to the Tribune Debtors.  The Tribune Debtors' business judgment is thus well-supported by the other

stakeholders most directly affected by the Proposed Business Combination, further supporting the conclusion that such transaction should be approved by the Court.

### B. The Contribution of the Assets of the Cubs Business to Newco Should be Approved Free and Clear of Liens, Claims, Encumbrances and Interests

71.     The contribution of the assets of the Cubs Business held by the Tribune Debtors and CNLBC to Newco should be approved free and clear of liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code, except for such liabilities as are expressly being assumed by Newco pursuant to the Formation Agreement and related documents, including Permitted Liens (as defined in the Formation Agreement).[21] Section 363(f) of the Bankruptcy Code provides that a debtor in possession may transfer property "free and clear of any interest in such property of an entity other than the estate," only if (i) applicable nonbankruptcy law permits a transfer of such property free and clear of such interest; (ii) such entity consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. See 11 U.S.C. § 363(f).

72.     The term "any interest," as used in section 363(f), is not defined in the Bankruptcy Code. See Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 259 (3d Cir. 2000). In Folger Adam, the Third Circuit expressly addressed the scope of the term "any interest." 209 F.3d at 258. The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is "towards a broader interpretation which includes other obligations that may flow from

---

[21] Permitted Liens under the Formation Agreement include, without limitation, (i) certain tax liens; (ii) mechanics' liens, workers' liens and similar statutory liens; (iii) certain interests under operating leases or license agreements; and (iv) liens securing capital lease obligations.

44

ownership of the Property." Id. (citing 3 Collier on Bankruptcy ¶ 363.06[1] (15th ed. rev. 2007);

see also In re Trans World Airlines, Inc., 322 F.3d 283 (3d Cir. 2003) (reading § 363(f) broadly

and permitting sale of airline's assets free and clear of, among other things, travel voucher

claims); In re Chrysler, LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) (following TWA and

holding that a sale under 363(f) is free and clear of in personam interests as well as in rem

interests). As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573,

581-82 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in Folger

Adam, the scope of section 363(f) is not limited to in rem interests.

73. Here, most liabilities relating to the Cubs Business are being expressly

assumed by Newco. See Formation Agreement at § 1.1(c)(i) (Newco to assume all Cubs

Liabilities). The Tribune Debtors are unaware of any material liens or similar interests that will

remain with CNLBC following the consummation of the Proposed Business Combination, and

believe that the limited number of liabilities that are not being assumed by the Bidder fall within

the scope of section 363(f), such that the assets comprising the Cubs Business which are

transferred by the Tribune Debtors and CNLBC may be contributed to Newco free and clear of

any liens, claims, encumbrances and interests.[22] The Formation Agreement expressly

contemplates that the contribution of such assets to Newco will be free and clear of any liens,

claims, encumbrances or interests, except for those liabilities that are being expressly assumed

by Newco, such as Permitted Liens. See Formation Agreement at § 1.1(c)(i). Instead, pursuant

to the order approving this Motion, such liens, claims, encumbrances and interests will attach to

---

[22] For the avoidance of doubt, the Tribune Debtors expressly request that any party asserting a claim or interest against, in or to any of the Cubs Entities or the assets of the Cubs Business to be transferred by the Tribune Debtors or CNLBC as part of the Proposed Business Combination that does not timely object to the relief sought in this Motion be deemed to have consented to the Proposed Business Combination and the transactions thereunder free and clear of any such interest, pursuant to section 363(f)(2) of the Bankruptcy Code.

the net consideration to be received by the Tribune Debtors and CNLBC with the same rights and priorities therein.

74.     CNLBC is a guarantor of Tribune's obligations under Tribune's prepetition credit agreements. That guarantee is not secured by any of the assets of CNLBC. That guarantee will remain in place at CNLBC and will not be assumed by Newco or any of Newco's affiliates.

C.     **The Bidder Has Acted in Good Faith and Is Entitled to the Protections of Section 363(m) of the Bankruptcy Code, and the Proposed Business Combination Does Not Violate Section 363(n) of the Bankruptcy Code**

75.     Pursuant to section 363(m) of the Bankruptcy Code, the reversal or modification on appeal of an authorization under sections 363(b) or 363(c) of the Bankruptcy Code does not affect the validity of a disposition under that authorization to an entity that has acted in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the relevant transaction were stayed pending the appeal. See 11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Third Circuit has held that

> [t]he requirement that [an acquiror] act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy [an acquiror's] good faith status … involves fraud, collusion between [the acquiror] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986) (quotation marks omitted); see also In re Kabro Assocs. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) (same).

76.     In the instant circumstance, the Bidder is unaffiliated with either the Tribune Debtors or the Cubs Entities and has prevailed in an extensive bidding process that has extended for more than two years. See Notice and Procedures Approval Motion at ¶¶ 16 - 40;

46

Martell Declaration at ¶¶ 7 – 30.  The terms of the Proposed Business Combination have been fashioned through thorough arm's-length negotiations between the Bidder, on the one hand, and the Tribune Debtors and the Cubs Entities, on the other hand.  See Notice and Procedures Approval Motion at ¶¶ 34 - 40; Martell Declaration at ¶¶ 25 – 30.  Additionally, the Proposed Business Combination has been approved and is supported by the Creditors Committee and the Steering Committee.  Final approval from Major League Baseball is also expected before entry of the orders approving this Motion.  These facts demonstrate beyond reasonable dispute that the Bidder and all parties respecting the Proposed Business Combination have acted in good faith with respect to the negotiation, formulation, and implementation of the Proposed Business Combination.  Accordingly, the Court should rule that the protections of section 363(m) of the Bankruptcy Code apply, and that the prohibitions contained in section 363(n) of the Bankruptcy Code have not been violated.[23]

## II.  Assumption and Assignment of the Cubs Executory Contracts Complies with Section 365 of the Bankruptcy Code and Should be Authorized

77.  Pursuant to section 365(a) of the Bankruptcy Code, a debtor in possession "subject to the court's approval may assume or reject any executory contracts or unexpired leases

---

[23] Section 363(n) of the Bankruptcy Code provides that

> [t]he trustee may avoid a sale under this section if the sale process was controlled by an agreement among the potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.  In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

11 U.S.C. § 363(n).  Here, the evidence concerning the marketing process demonstrates conclusively that the formulation, development, and anticipated implementation of the Proposed Business Combination have been conducted at arm's-length and in good faith, and that the Bidder has not exercised any control over or engaged in any collusion regarding the Proposed Business Combination.  Accordingly, the Tribune Debtors and CNLBC request that the order granting the relief sought in this Motion provide that Section 363(n) has not been violated.

of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies

the requirements for assuming an executory contract or unexpired lease, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the [debtor in possession] may not assume such contract or lease unless, at the time of assumption of such contract or lease, the [debtor in possession] –
>
> (A) cures or provides adequate assurance that the [debtor in possession] will promptly cure, such default …;
>
> (B) compensates, or provides adequate assurance that the [debtor in possession] will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provide adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

78. While the Bankruptcy Code does not specify a particular standard of

review to be used by a court in determining whether to approve the assumption or rejection of an

executory contract, courts have also applied the business judgment standard in evaluating the

propriety of a debtor's decision to assume or reject an executory contract. See, e.g., In re

Federal-Mogul Global Inc., 293 B.R. 124, 126 (D. Del. 2003) ("motions to reject executory

contracts are evaluated under the business judgment test"); see also In re Pinnacle Brands, Inc.,

259 B.R. 46, 53-54 (Bankr. D. Del. 2001); Nat'l Labor Relations Board v. Bildisco (In re

Bildisco), 682 F.2d 72, 79 (3d Cir. 1982), aff'd 465 U.S. 513 (1984) ("The usual test for

rejection of an executory contract is simply whether rejection would benefit the estate, [under]

the 'business judgment' test"); Sharon Steel, 872 F.2d at 39-40 (propriety of a debtor-in-

possession's decision to reject an executory contract evaluated under traditional "business

judgment test"). Under the business judgment standard, courts generally will not second-guess a

debtor's business judgment concerning the assumption or rejection of an executory contract. See Federal-Mogul, 293 B.R. at 126; Phar-Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract." (citation omitted)).

79.     The decision to assume and assign the Cubs Executory Contracts is a well-justified exercise of the business judgment of the Tribune Debtors and CNLBC. The Cubs Business is being contributed to Newco as an operating business, so that it will operate in a largely unchanged manner under its new ownership from the manner in which it operates under its existing ownership. The revenue and benefits derived by CNLBC and the other Cubs Entities from the Cubs Executory Contracts contribute a substantial portion of the overall value of the Cubs Business. The Cubs Executory Contracts consist of the Cubs Entities' key sponsorship agreements, real property leases, operating agreements, and numerous other agreements essential to the ongoing, uninterrupted operation of the Cubs Business.

80.     CNLBC is current on its obligations under all or nearly all of the Cubs Executory Contracts to which it is a party. Furthermore, most of the Cubs Executory Contracts involve payments to CNLBC and the other Cubs Entities, rather than payments to the counterparty. As a result, the Tribune Debtors and CNLBC will incur few if any costs in connection with assuming and assigning the Cubs Executory Contracts. Moreover, the Bidder has bargained for assignment of the Cubs Executory Contracts to Newco as part of the Proposed Business Combination and has bargained for subsequent performance by Newco (and, following the Newco Sale, by the relevant Newco Subs) of obligations arising from those Cubs Executory Contracts. See Formation Agreement at Exhibit A, "Cubs Contributed Assets" (providing that all Cubs Contracts to which any of the Tribune Debtors or CNLBC are a party be assumed and

assigned to the Bidder and that all Cubs Contracts to which any non-debtor Cubs Entity is a party also be assigned to the Bidder). Assumption and assignment of the Cubs Executory Contracts will thus provide value to the Tribune Debtors, CNLBC and the other Cubs Entities by increasing the value of the Cubs Business to the Bidder and thereby increasing the consideration obtained from the Bidder, while imposing few if any costs. The business judgment of the Tribune Debtors and CNLBC should be affirmed, and assumption and assignment of the Cubs Executory Contracts should be approved.

81. A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (citation omitted); In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance need not be absolute assurance); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Adequate assurance may be demonstrated, among many other ways, by demonstrating the assignee's financial health. See In re Bygraph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

46429/0001-5944013V1

82.     In the instant case, the Cubs Business is being contributed to Newco as a going concern. It will have essentially the same structure immediately after the Proposed Business Combination (including the Newco Sale) is completed as it has today, except that it will be owned through a joint venture (i.e., Newco) between the Bidder (owning 95%) and the Tribune Debtors and the Cubs Entities (collectively retaining 5%). The revenues and financial performance of the Cubs Business are not anticipated to be materially affected as a result of the contribution of the Cubs Business to Newco. Accordingly, the counterparties to the Cubs Executory Contracts have at least substantially identical assurances of continued performance and payment under those contracts going forward as they do at the present time.

83.     Moreover, in one material respect the counterparties' assurances of future performance will be enhanced. Newco will have significant new financing as set forth in the Formation Agreement, including a $25,000,000 revolving credit facility available to fund operating expenses. It follows that the counterparties to the Cubs Executory Contracts should be found to be adequately assured of future performance, and the assumption and assignment of the Cubs Executory Contracts to Newco should be approved.

84.     The Tribune Debtors and CNLBC seek certain other relief with respect to the assumption and assignment of the Cubs Executory Contracts. Specifically, to facilitate the assumption and assignment of the Cubs Executory Contracts, the Tribune Debtors request that the Court order that the assumption and assignment of the Cubs Executory Contracts is permissible notwithstanding any provisions therein, or in otherwise applicable law, that purport to prohibit, restrict or condition the assignment of any of the Cubs Executory Contracts, consistent with section 365(f) of the Bankruptcy Code. Section 365(f)(1) of the Bankruptcy

46429/0001-5944013V1

Code permits a debtor to assign executory contracts and unexpired leases free from such anti-assignment restrictions, providing in pertinent part that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the [debtor in possession] may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1). This section invalidates contractual or other provisions that prohibit, restrict or condition assignment of an executory contract or unexpired lease. See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re Circle K Corp.), 127 F.3d 904, 911 (9th Cir. 1997), cert. denied, 522 U.S. 1148 (1998) ("[N]o principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365."). In addition, section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating a right to terminate a lease because it is being assumed and/or assigned; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

85. Courts have recognized that provisions having the effect of restricting assignments cannot be enforced. See, e.g., In re Rickel Home Ctrs., Inc., 240 B.R. 826, 831 (D. Del. 1998) (noting that in interpreting section 365(f)(3), "courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-

assignment provisions"). Similarly, in <u>In re Mr. Grocer, Inc.</u>, 77 B.R. 349, 354 (Bankr. D.N.H. 1987), the court observed:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves <u>ipso facto</u> anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

Accordingly, the Tribune Debtors and CNLBC request that any anti-assignment provisions in any of the Cubs Executory Contracts, whether or not explicitly stated, be deemed not to restrict, limit, or prohibit the assumption and assignment of the Cubs Executory Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

86. The Tribune Debtors and CNLBC further request that, as provided in section 365(k) of the Bankruptcy Code, the Court order that the Tribune Debtors, CNLBC and their estates shall be relieved from any liability for any breach of any Cubs Executory Contract following its assumption and assignment to the relevant Newco Sub.

**III. The WGN Agreements and the Superstation Extension Are Essential Components of the Transactions Contemplated in this Motion and Should be Approved**

A. *The WGN Agreements and the Superstation Extension Should be Approved*

87. The WGN Agreements and the Superstation Extension are essential components of the Proposed Business Combination and the entry into and performance of those agreements should be approved. Through the WGN Agreements and the Superstation Extension, WGN will continue its long-standing radio and television broadcasting relationships with the Cubs. Those broadcasting relationships have historically been beneficial to the Tribune Debtors,

53

and have yielded particular benefits to WGN during the past year, in which broadcasts of Cubs games have drawn high ratings on both radio and television.[24] Given those benefits, it is a reasonable and prudent exercise of the Tribune Debtors' business judgment to seek to extend the term of those agreements. Accordingly, the Court should recognize the Tribune Debtors' business judgment in this matter, and also hold that entry into the WGN Agreements and the Superstation Extension is appropriate.

### B. The Tribune Guarantees Should be Approved

88. The Tribune Guarantees are also a bargained-for component of the Proposed Business Combination and should be approved. Each of the Tribune Guarantees is a guaranty of collection, which requires exhaustion of all lender remedies against Newco, all other guarantors and all collateral prior to any payment obligation owing by Tribune. Under each Guaranty the Guarantor's liability is capped at the original principal amount plus unpaid interest and premium. Based on these facts, and on the Tribune Guarantees being a necessary component of the overall Proposed Business Combination, the Tribune Guarantees are reasonable and their entry into by Tribune should be approved.

## THE RELIEF SOUGHT HEREIN SHOULD BE APPROVED AS TO BOTH THE TRIBUNE DEBTORS AND CNLBC

89. Together with this Motion, the Tribune Debtors have submitted two forms of proposed order, one of which approves the relief requested herein as to the Tribune Debtors, and the second of which approves the relief requested herein as to CNLBC. CNLBC has not yet commenced its chapter 11 case. However, as discussed in detail in the Notice and Procedures

---

[24] See "WGN, WGCI Dominate Chicago Radio Landscape," Chicago Tribune, July 23, 2008 (noting that WGN is the top-rated radio station in the Chicago market and observing that Cubs programming is the principal element of WGN's significant ratings growth in 2008); "'08 Success Kicks Up the Intensity", Chicago Tribune, June 20, 2008 (noting that television ratings for Cubs games on WGN in 2008 were up 33% for the year and up 15% on CSN Chicago).

46429/0001-5944013V1

Approval Motion (at ¶¶ 6, 46-47), CNLBC intends to commence such case following entry of the order granting the relief requested herein as to the Tribune Debtors. As part of the notice program relating to this motion, and prior to CNLBC's commencement of any chapter 11 case, notice of the Proposed Business Combination – in most cases through direct mailed service of a copy of this Motion – will be provided to all creditors of the Cubs Entities, counterparties to the Cubs Executory Contracts, and numerous other significant parties-in-interest respecting the Cubs Entities.

90.     At the same time as CNLBC's chapter 11 case is commenced, CNLBC intends to file the CNLBC Transaction Approval Motion,[25] a copy of which is attached to the Formation Agreement as Exhibit Y. The CNLBC Transaction Approval Motion will substantively track the instant Motion, as each seeks approval of the Proposed Business Combination. In addition, certain limited relief that is only applicable to CNLBC shall be sought in the CNLBC Transaction Approval Motion.

91.     As detailed in the Notice and Procedures Approval Motion (at ¶¶ 42 – 47), and as described above, the Tribune Debtors intend for a single notice program to provide notice of the Proposed Business Combination. CNLBC, following commencement of its chapter 11 case, intends to ask the Court to recognize the actual notice of the Proposed Business Combination already provided to its creditors, contract counterparties, and other parties in interest, and grant approval in CNLBC's chapter 11 case on an expedited basis (i.e., one or two days following the chapter 11 filing). Such recognition will be appropriate given that sufficient and actual notice of the relief sought in the CNLBC Transaction Approval Motion, and a full

---

[25] Upon commencement of CNLBC's chapter 11 case, CNLBC will also file a motion to have its chapter 11 case jointly administered with those of the Tribune Debtors. Assuming that motion is granted, this Motion will then also be deemed to be filed in CNLBC's chapter 11 case, which will further put the relief requested herein before the Bankruptcy Court in CNLBC's chapter 11 case.

opportunity to be heard in connection therewith, will already have been provided through the procedures established by the order approving the Notice and Procedures Approval Motion.

92.    For all of the reasons detailed in the Notice and Procedures Approval Motion, this proposed structure accomplishes the twin goals of providing actual notice of the proposed transactions herein to all creditors and parties-in-interest with respect to the Cubs Business, while preserving the value of the Cubs Business, for the benefit of all stakeholders, including creditors of the Tribune Debtors, creditors of CNLBC and the Bidder. See Notice and Procedures Approval Motion at ¶¶ 71 - 79. Accordingly, the Court should approve the structure described herein and in the Notice and Procedures Approval Motion, and enter separate forms of order granting the relief requested herein as regards the Tribune Debtors and, after commencement of CNLBC's chapter 11 case, with respect to CNLBC.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

93.    As described in the Notice and Procedures Approval Motion and elsewhere in this Motion, the Tribune Debtors and CNLBC intend for the relief herein to be granted in CNLBC's chapter 11 case immediately following the commencement of that case. Fed. R. Bankr. P. 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003. In other words, a bankruptcy court may grant such relief at the outset of a chapter 11 case, but a proper showing of harm is required.

94.    That harm is present given the unique circumstances here. Absent consummation of the Proposed Business Combination immediately following the commencement of CNLBC's chapter 11 case, as described in the Declaration of Crane H.

Kenney, Chairman of Chicago National League Ball Club, LLC (attached to the Notice and Procedures Motion as Exhibit D) (the "Kenney Declaration"), the Cubs Business may be irreparably harmed as a result of damage to the Cubs' unique brand and the uncertain, and potentially severe, ramifications on a Major League Baseball franchise from an extended stay in bankruptcy. See Kenney Declaration at ¶ 7.

95.     Although the immediate and irreparable harm standard of Fed. R. Bankr. P. 6003 is satisfied here, it is also noteworthy that the policies underlying that Rule's restrictions on certain transactions are not implicated here. CNLBC's chapter 11 case will not be a conventional case, but rather will be a case commenced several months after its parent company commenced its own chapter 11 proceedings. Even more significantly, while the restrictions of Fed. R. Bankr. P. 6003 are animated by a concern over excessive requests for "first day" relief in chapter 11 cases, which occur with little or no notice, here there will have been wide-ranging and thorough notice of the Proposed Business Combination and the hearings thereon given more than twenty days prior to the date of that hearing.[26] Similarly, in a conventional chapter 11 case a creditors' committee may not even have selected professionals twenty days into the case; here there are organized creditors' constituencies in place that have thoroughly evaluated and support the relief requested. In other words, there can be no concern that far-reaching relief is being sought from this Court without full procedural protections being afforded to all parties in interest. Accordingly, the Court should approve the relief requested.

---

[26] See Advisory Committee Notes to Fed. R. Bankr. P. 6003 (noting as bases for the Rule that "[t]here can be a flurry of activity during the first days of a bankruptcy case" and "[t]his activity frequently takes place prior to the formation of a creditors' committee…" before stating that "[t]his rule is intended to alleviate some of the time pressures present at the start of a case so that full and close consideration can be given to matters that may have a fundamental impact on the case." Those concerns are not present here, given that a full opportunity for notice and a hearing concerning all the relief requested, as well as the full involvement of the Tribune Debtors' organized creditors' constituencies, has occurred.

## REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(h) AND 6006(d)

96.     Pursuant to Fed. R. Bankr. P. 6004(h), an "order authorizing the use, sale, or lease of property is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  In addition, Fed. R. Bankr. P. 6006(d) provides that an "order authorizing the [debtor in possession] to assign an executory contract or unexpired lease … is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."

97.     Here, the Tribune Debtors, the Cubs Entities, and the Bidder are all able to close the transactions described herein promptly upon receiving the orders approving the Proposed Business Combination as to both the Tribune Debtors and CNLBC.  This will ensure that CNLBC promptly receives approximately $740,000,000 in cash consideration, subject to adjustments, as specified under such transactions, and will further ensure a minimum of disruption to the Cubs Business.  Accordingly, the Tribune Debtors request that the orders approving the Proposed Business Combination as to the Tribune Debtors and CNLBC be effective immediately upon the entry of such orders by providing that the ten-day stay not apply.

## NOTICE

98.     Notice of this Motion shall be provided in accordance with the Bankruptcy Court's order approving the Notice and Procedures Approval Motion.

## NO PRIOR REQUEST

99.     Other than the Notice and Procedures Approval Motion, which is being filed with the Court contemporaneously with this Motion, no motion seeking or concerning the relief requested herein has been previously submitted to this or to any other court.

46429/0001-5944013V1

WHEREFORE, the Tribune Debtors respectfully request that the Court enter orders granting this Motion and (i) authorizing the Tribune Debtors and CNLBC to (a) enter into and perform their obligations under that certain Formation Agreement and the Ancillary Agreements, (b) consummate the Proposed Business Combination on the terms set forth in the Formation Agreement and the Ancillary Agreements, and (c) assume and assign all Cubs Executory Contracts to Newco; (ii) authorizing Tribune to enter into and perform its obligations under the Tribune Guarantees; (iii) authorizing WGN and Tribune, respectively, to enter into and perform their obligations under the WGN Agreements and the Superstation Extension; and (iv) granting such other relief as the Court deems just and proper.

Dated: Wilmington, Delaware
August 24, 2009

Respectfully submitted,

SIDLEY AUSTIN LLP
Bryan Krakauer
James F. Conlan
Kenneth P. Kansa
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 574-2101

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

46429/0001-5944013V1