## Exhibit A – Formation Agreement

**EXECUTION VERSION**

FORMATION AGREEMENT

dated as of August 21, 2009

among

RICKETTS ACQUISITION LLC,

RAC EDUCATION TRUST OSA, LLC,

TRIBUNE COMPANY,

CHICAGO NATIONAL LEAGUE BALL CLUB, LLC,

WRIGLEY FIELD PREMIUM TICKET SERVICES, LLC,

DIANA-QUENTIN, LLC,

TRIBUNE SPORTS NETWORK HOLDINGS, LLC

and

CHICAGO CUBS DOMINICAN BASEBALL OPERATIONS, LLC

# TABLE OF CONTENTS

**Page**

ARTICLE I       CONTRIBUTION TRANSACTION; SPECIAL DISTRIBUTION; CLOSING ................................................................................................ 3

Section 1.1      Contribution Transaction ................................................................. 3
Section 1.2      [Intentionally omitted] ................................................................... 5
Section 1.3      Escrow Closing and Closing ........................................................... 5
Section 1.4      Escrow Closing Deliveries .............................................................. 6
Section 1.5      Adjustment ................................................................................... 10
Section 1.6      Consent of Third Parties ............................................................... 15
Section 1.7      Allocation of Value Among Cubs Contributed Assets .................... 16

ARTICLE II      REPRESENTATIONS AND WARRANTIES OF TRIBUNE PARTIES ................................................................................................ 16

Section 2.1      Organization; Good Standing ......................................................... 16
Section 2.2      Ownership of Cubs Entities/Investments ....................................... 17
Section 2.3      Authority ..................................................................................... 18
Section 2.4      Non-Contravention ....................................................................... 18
Section 2.5      Legal Matters ............................................................................... 19
Section 2.6      Financial Statements ..................................................................... 20
Section 2.7      Absence of Undisclosed Liabilities ................................................ 22
Section 2.8      Absence of Certain Changes .......................................................... 22
Section 2.9      Assets; Title ................................................................................. 23
Section 2.10      Intellectual Property ..................................................................... 24
Section 2.11      Real Property ............................................................................... 25
Section 2.12      Employee Benefits ....................................................................... 26
Section 2.13      Labor Matters .............................................................................. 29
Section 2.14      Environmental Matters ................................................................. 30
Section 2.15      Taxes .......................................................................................... 31
Section 2.16      Insurance .................................................................................... 32
Section 2.17      Contracts ..................................................................................... 32
Section 2.18      Transactions with Insiders/Affiliate Transactions ......................... 36
Section 2.19      No Brokerage .............................................................................. 36
Section 2.20      Major League Baseball Matters ..................................................... 36
Section 2.21      Player Matters ............................................................................. 37
Section 2.22      Suites .......................................................................................... 37
Section 2.23      No Other Representations and Warranties ..................................... 38

ARTICLE III      REPRESENTATIONS AND WARRANTIES OF BIDDER ...................... 38

Section 3.1      Organization; Good Standing ......................................................... 38
Section 3.2      Authority ..................................................................................... 39
Section 3.3      Non-Contravention ....................................................................... 39
Section 3.4      Financing .................................................................................... 39
Section 3.5      No Brokerage .............................................................................. 40

# TABLE OF CONTENTS
### (continued)

Page

Section 3.6      Title and Survey ........................................................ 40
Section 3.7      Bidder Trust Documents .............................................. 41
Section 3.8      Information Provided to Major League Baseball ............... 41
Section 3.9      Newco .................................................................... 41
Section 3.10     No Other Representations and Warranties ...................... 41

ARTICLE IV     COVENANTS ............................................................. 41

Section 4.1      Conduct of Cubs Business ........................................... 41
Section 4.2      Reasonable Best Efforts; HSR ..................................... 44
Section 4.3      Public Announcements ................................................ 46
Section 4.4      Non-Solicitation ....................................................... 46
Section 4.5      Confidential Information ............................................. 47
Section 4.6      Access .................................................................... 48
Section 4.7      Negotiations ............................................................ 49
Section 4.8      Certain Matters ........................................................ 50
Section 4.9      Disposition, Transfer or Destruction of Records ............. 51
Section 4.10     Post-Closing Access and Cooperation ........................... 51
Section 4.11     Financing ................................................................ 52
Section 4.12     Certain Bidder Covenants ........................................... 58
Section 4.13     Insurance ................................................................ 58
Section 4.14     Compliance with Baseball Rules; MLB Approvals ........... 59
Section 4.15     Bankruptcy Court Approval and Related Matters ............ 61
Section 4.16     Title ...................................................................... 74
Section 4.17     Name Change ........................................................... 74
Section 4.18     Chicago Cubs Charities .............................................. 75
Section 4.19     Retained Cubs Current Assets; Cubs Contributed Assets ... 75
Section 4.20     Entry of Contracts .................................................... 76
Section 4.21     Transaction Expense Notice/Cubs Expense Notice ........... 76
Section 4.22     Revenue Sharing ....................................................... 76
Section 4.23     Consent to Pledge of CSN Interests .............................. 77
Section 4.24     Authority ................................................................ 77

ARTICLE V     EMPLOYEE MATTERS ................................................. 77

Section 5.1      Employees ............................................................... 77
Section 5.2      Employee Benefits ..................................................... 79
Section 5.3      Severance and Bonus ................................................. 80
Section 5.4      Pension Plans ........................................................... 80
Section 5.5      Savings Plan ............................................................ 80
Section 5.6      Vacation and Sick Days .............................................. 81
Section 5.7      COBRA ................................................................... 81
Section 5.8      Post-Retirement Benefit Liabilities ............................... 81
Section 5.9      Transferred Benefit Plans ........................................... 82

# TABLE OF CONTENTS
(continued)

Section 5.10    Multiemployer Pension Plan.................................................. 82
Section 5.11    WARN Act ...................................................................... 83
Section 5.12    Deferred Compensation ..................................................... 83
Section 5.13    Cooperation.................................................................... 83

ARTICLE VI    TAX MATTERS ............................................................. 83

Section 6.1    Retention of Tax Returns ................................................... 83
Section 6.2    Tax Cooperation ............................................................. 84
Section 6.3    Transaction Taxes............................................................ 84
Section 6.4    Real Estate Transfer Tax ................................................... 84

ARTICLE VII    CONDITIONS PRECEDENT............................................ 84

Section 7.1    Conditions Precedent of all Parties to Escrow Closing ................. 85
Section 7.2    Conditions Precedent of Bidder to Escrow Closing ...................... 85
Section 7.3    Conditions Precedent of Tribune Parties to Escrow Closing............ 86
Section 7.4    Conditions Precedent to Closing ........................................... 87
Section 7.5    Effect of Closing............................................................. 88

ARTICLE VIII    SURVIVAL; INDEMNIFICATION ..................................... 88

Section 8.1    Survival........................................................................ 88
Section 8.2    Indemnification............................................................... 89
Section 8.3    Indemnification Procedures ................................................ 91
Section 8.4    Set-Off ........................................................................ 93
Section 8.5    Exclusive Remedy ........................................................... 94
Section 8.6    Mitigation ..................................................................... 94
Section 8.7    Separate Recovery of Losses ............................................... 94
Section 8.8    Characterization of Indemnification Payments .......................... 94
Section 8.9    Indemnity Reserve ........................................................... 95

ARTICLE IX    TERMINATION.............................................................. 95

Section 9.1    Termination.................................................................... 95
Section 9.2    Effect of Termination ....................................................... 95
Section 9.3    Acquisition Transaction Post-Termination................................ 96

ARTICLE X    MISCELLANEOUS .......................................................... 97

Section 10.1    Counterparts.................................................................. 97
Section 10.2    Governing Law .............................................................. 97
Section 10.3    Entire Agreement; No Third Party Beneficiary............................ 98
Section 10.4    Expenses ...................................................................... 99
Section 10.5    Notices ...................................................................... 100
Section 10.6    Successors and Assigns ................................................... 101
Section 10.7    Headings .................................................................... 101

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| Section 10.8 | Amendments and Waivers | 101 |
| Section 10.9 | Interpretation; Absence of Presumption | 102 |
| Section 10.10 | Severability | 103 |
| Section 10.11 | Further Assurances | 103 |
| Section 10.12 | Business Days | 103 |
| Section 10.13 | Schedules | 104 |
| Section 10.14 | Specific Performance | 104 |
| Section 10.15 | Bulk Transfer | 104 |
| Section 10.16 | Payments by Tribune Parties | 104 |
| Section 10.17 | Payments in Cash | 104 |

# SCHEDULES

Schedule 1.1(c)(i)        Direct Cubs Contributed Assets
Schedule 1.3(b)          Payment of Special Distribution Amount to Cubs Entities
Schedule 1.4(e)(ii)       Owned Real Property Valuations
Schedule 2.1(a)          Organization; Good Standing of Tribune
Schedule 2.1(b)          Organization; Good Standing of other Tribune Parties
Schedule 2.1(c)          Cubs Entities' Certificates of Formation and Limited Liability Company
                         Agreements
Schedule 2.2(a)          Ownership of Cubs Entities
Schedule 2.2(b)          Investments
Schedule 2.4            Non-Contravention
Schedule 2.5(a)          Legal Matters
Schedule 2.5(b)          Compliance with Laws
Schedule 2.5(c)          Notice of Noncompliance
Schedule 2.5(d)          Permits
Schedule 2.6(a)          Cubs Entity Financial Statements
Schedule 2.6(b)          CSN Chicago Financial Statements
Schedule 2.6(c)          Exceptions to GAAP in Cubs Entity Financial Statements
Schedule 2.6(e)          Allocation of Expenses
Schedule 2.6(g)          Off-Balance Sheet Transactions
Schedule 2.7            Undisclosed Liabilities
Schedule 2.8            Absence of Certain Changes
Schedule 2.9(a)          Assets; Condition
Schedule 2.9(b)          Assets; Title
Schedule 2.10(a)         Cubs Intellectual Property
Schedule 2.10(b)         MLB Cubs Intellectual Property
Schedule 2.10(c)         Outstanding IP Licenses
Schedule 2.10(d)         IP Infringement
Schedule 2.11(a)         Owned Real Property
Schedule 2.11(b)         Leased Real Property
Schedule 2.11(d)         Tax Reduction Proceedings
Schedule 2.11(e)         Construction Contracts
Schedule 2.11(j)         Structural Deficiencies
Schedule 2.11(k)         Real Property Insurance Claims
Schedule 2.12(a)         Benefit Plans
Schedule 2.12(c)         Benefit Plan Breach
Schedule 2.12(f)         Multiemployer Plans
Schedule 2.12(g)         Reportable Events
Schedule 2.12(h)         Benefit Plan Actions
Schedule 2.12(l)         Acceleration; Bonus; Parachute Payments
Schedule 2.12(m)         Foreign Benefit Plans
Schedule 2.12(p)         Certain Payments to Cubs Employees
Schedule 2.13(a)         Employees
Schedule 2.13(b)         Employment Matters
Schedule 2.13(c)         Collective Bargaining Agreements
Schedule 2.14(a)         Environmental Matters

Schedule 2.14(b)        Environmental Reports
Schedule 2.15(b)        Tax Liens, Deficiencies, and Adjustments
Schedule 2.15(c)        Pending Tax Audits
Schedule 2.16           Insurance
Schedule 2.17(a)        Contracts
Schedule 2.17(b)        Contracts Not Provided
Schedule 2.17(c)        Breaches, Defaults
Schedule 2.17(d)        Transition Services Contracts
Schedule 2.18           Contracts with Insiders/Affiliates
Schedule 2.19           No Brokerage
Schedule 2.20(b)        Major League Baseball Defaults
Schedule 2.20(e)        Issues with Major League Baseball Contract Filings
Schedule 2.20(f)(i)     Major League Baseball Revenue Sharing Rulings
Schedule 2.20(f)(ii)    Pending Requests for Revenue Rulings
Schedule 2.20(f)(iii)   Years Subject to Revenue Sharing Audit
Schedule 2.20(g)        Investment Vehicles
Schedule 2.21           Cubs Player Employees and Service Time
Schedule 2.22           Suites
Schedule 3.6            Title and Survey
Schedule 4.1            Conduct of Cubs Business
Schedule 4.14(b)        Bidder Investment Group
Schedule 4.15           Conditions Precedent Classes
Schedule 5.1(c)         Certain Employment Agreements
Schedule 5.3            Severance and Bonus
Schedule 5.12           Deferred Compensation

Schedule A-1            Cubs Material Adverse Effect

# EXHIBITS

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B-1 | Form of Cubs Newco Sub Certificate of Formation |
| Exhibit B-2 | Form of Dominican Newco Sub Certificate of Formation |
| Exhibit B-3 | Form of Premium Tickets Newco Sub Certificate of Formation |
| Exhibit B-4 | Form of DQ Newco Sub Certificate of Formation |
| Exhibit C-1 | Form of Newco LLC Agreement |
| Exhibit C-2-A | Form of Cubs Newco Sub LLC Agreement |
| Exhibit C-2-B | Form of Dominican Newco Sub LLC Agreement |
| Exhibit C-2-C | Form of Premium Tickets Newco Sub LLC Agreement |
| Exhibit C-2-D | Form of DQ Newco Sub LLC Agreement |
| Exhibit D-1 | Form of Cubs Bill of Contribution (Tribune) |
| Exhibit D-2 | Form of Cubs Bill of Contribution (Cubs LLC) |
| Exhibit D-3 | Form of Cubs Bill of Contribution (Dominican LLC) |
| Exhibit D-4 | Form of Cubs Bill of Contribution (Premium Tickets LLC) |
| Exhibit D-5 | Form of Cubs Bill of Contribution (Tribune Sports LLC) |
| Exhibit D-6 | Form of Cubs Bill of Contribution (DQ LLC) |
| Exhibit D-7 | Form of Cubs Bill of Contribution (WGN) |
| Exhibit D-8 | Form of Cubs Bill of Contribution (for Direct Cubs Contributed Assets) (Generic Form for Direct Newco Sub) |
| Exhibit E-1 | Form of Cubs Assumption Agreement (Tribune) |
| Exhibit E-2 | Form of Cubs Assumption Agreement (Cubs LLC) |
| Exhibit E-3 | Form of Cubs Assumption Agreement (Dominican LLC) |
| Exhibit E-4 | Form of Cubs Assumption Agreement (Premium Tickets LLC) |
| Exhibit E-5 | Form of Cubs Assumption Agreement (Tribune Sports LLC) |
| Exhibit E-6 | Form of Cubs Assumption Agreement (DQ LLC) |
| Exhibit E-7 | Form of Cubs Assumption Agreement (for Cubs Liabilities Associated with Direct Cubs Contributed Assets) (Generic Form from a Tribune Party to a Direct Newco Sub) |
| Exhibit F-1 | Certain Cubs Contributed Assets |
| Exhibit F-2 | Certain Cubs Excluded Assets |
| Exhibit F-3 | Permitted Liens |
| Exhibit F-4 | Excluded Contracts |
| Exhibit F-5 | Cubs Liabilities |
| Exhibit F-6 | Certain Cubs Excluded Liabilities |
| Exhibit G-1(A) | Form of Special Warranty Deed (Cubs LLC as grantor) |
| Exhibit G-1(B) | Form of Special Warranty Deed (DQ LLC as grantor) |
| Exhibit G-1(C) | Form of Trustee's Deed (Racine Trust as grantor) |
| Exhibit G-1(D) | Form of Trustee's Deed (Clark Trust as grantor) |
| Exhibit G-2 | Pro Forma Title Policies |
| Exhibit G-3 | Real Estate Transfer Declaration Forms |
| Exhibit H | Form of Tax Matters Agreement |
| Exhibit I | Form of Transition Services Agreement |
| Exhibit J-1 | Description of Triangle Property |
| Exhibit J-2 | Description of Wrigley Field |
| Exhibit K-1 | Tribune Senior Debt Guarantee |

| | |
|---|---|
| Exhibit K-2 | Tribune Subordinated Debt Guarantee |
| Exhibit L | Form of Ricketts Subordinated Loan Commitment Agreement |
| Exhibit M-1 | Equity Commitment Letter |
| Exhibit M-2 | Senior Debt Commitment Letter |
| Exhibit M-3 | Subordinated Debt Commitment Letter |
| Exhibit N | Form of Subordinated Debt Financing Documents |
| Exhibit O | Working Capital Sample Calculation |
| Exhibit P-1 | Restated Radio Broadcast Rights Agreement |
| Exhibit P-2 | Restated TV Broadcast Rights Agreement |
| Exhibit Q | [Intentionally omitted] |
| Exhibit R | Form of Tribune Transaction Approval Order |
| Exhibit S | Form of Indemnity Escrow Agreement |
| Exhibit T | Form of Closing Escrow Agreement |
| Exhibit U | Form of Additional Filers Transaction Approval Order |
| Exhibit V | Form of Notice and Procedures Approval Order |
| Exhibit W | Form of Notice and Procedures Approval Motion |
| Exhibit X | Form of Tribune Transaction Approval Motion |
| Exhibit Y | Form of Additional Filer Motion |
| Exhibit Z-1 | Newco Senior Debt Escrow Closing Certificate |
| Exhibit Z-2 | Senior Lenders Escrow Closing Certificate |
| Exhibit AA | Transaction Expenses |
| Exhibit BB | Sample Calculation of Player Payroll |
| Exhibit CC | Mueller Building and T-Building Property |
| Exhibit DD | Mueller Building and T-Building Property Lease |
| Exhibit EE | Mueller Building and T-Building Property Memorandum of Lease |
| Exhibit FF | CSN Assignment and Assumption |
| Exhibit GG | MLB Interests |
| Exhibit HH | CSN Consent |
| Exhibit II | Superstation Extension |
| Exhibit JJ | Form of Bidder Financing Affidavits |

# FORMATION AGREEMENT

This Formation Agreement dated as of August 21, 2009 (this "**Agreement**") is entered into by and among Ricketts Acquisition LLC, a Delaware limited liability company ("**Bidder**"), RAC Education Trust OSA, LLC (the "**Ricketts Lender**") (solely for purposes of Sections 1.4(c), 3.1 to 3.3, 4.2(a), 4.11, and 4.14 and Article VIII, in each case only to the extent expressly relating to the Ricketts Lender as set forth therein), Tribune Company, a Delaware corporation ("**Tribune**"), Tribune Sports Network Holdings, LLC, a Delaware limited liability company ("**Tribune Sports**"), Chicago National League Ball Club, LLC, a Delaware limited liability company ("**Cubs LLC**"), Wrigley Field Premium Ticket Services, LLC, a Delaware limited liability company ("**Premium Tickets LLC**"), Diana-Quentin, LLC, a Delaware limited liability company ("**DQ LLC**"), and Chicago Cubs Dominican Baseball Operations, LLC, a Delaware limited liability company ("**Dominican LLC**," and together with Tribune Sports, Cubs LLC, Premium Tickets LLC and DQ LLC, the "**Cubs Entities**," and the Cubs Entities together with Tribune are collectively referred to herein as "**Tribune Parties**"). Capitalized terms used but not defined in this Agreement are defined in Exhibit A.

(A)    On December 8, 2008, Tribune and certain of its Affiliates (collectively, the "**Debtors**") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") seeking relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). The Chapter 11 proceedings of the Debtors are jointly administered for procedural purposes under Case No. 08-13141(KJC) (the "**Bankruptcy Case**"). It is contemplated in this Agreement that Cubs LLC, immediately after entry of orders by the Bankruptcy Court approving Tribune's motions for approval of the Transactions, will file voluntary petitions and related motions in the Bankruptcy Court to further effectuate and facilitate the consummation of such Transactions. The bankruptcy cases so initiated will be part of the Bankruptcy Case and the filing Cubs Entities will thereafter be Debtors for purposes of such Bankruptcy Case and this Agreement.

(B)    (i) Tribune owns all of the issued and outstanding membership interests of Cubs LLC, DQ LLC and Premium Tickets LLC, (ii) WGN Continental Broadcasting Company, a Delaware corporation and wholly owned indirect subsidiary of Tribune ("**WGN**"), owns all of the issued and outstanding membership interests of Tribune Sports, (iii) Tribune Sports owns all of the issued and outstanding membership interests of CSN Chicago that are owned directly or indirectly by Tribune, and (iv) Cubs LLC owns all of the issued and outstanding membership interests of Dominican LLC. The Cubs Entities and, to the extent applicable, the other Contributing Tribune Entities, together own or lease and operate the business, assets and operations of the Chicago Cubs Major League Baseball franchise (including its spring training, Major League Baseball and Dominican baseball operations), Wrigley Field, the Triangle Property, parking lots used by certain Contributing Tribune Entities for gameday parking, Premium Tickets and DQ LLC (collectively, the "**Cubs Business**").

(C)    David K. Larson, not individually, but as trustee ("**Bidder Trust Trustee**") of the Joe and Marlene Ricketts Grandchildren's Trust ("**Bidder Trust**") owns all of the issued and outstanding membership interests of Bidder. Bidder Trust pursuant to a certain guaranty entered into by Bidder Trust Trustee as of the date hereof is guaranteeing (i) the performance of Bidder's obligations under this Agreement that require performance prior to or at the Closing, (ii) if this

Agreement is terminated prior to Closing, the payment of any amounts payable by Bidder or Ricketts Lender as a result of the non-performance or breach by Bidder or Ricketts Lender of any of their representations, warranties or covenants in this Agreement or the termination of this Agreement prior to Closing, including the payment of any amounts payable to the Tribune Parties pursuant to Section 4.15 as a result of the termination of this Agreement prior to Closing, and (iii) prior to or at the Closing, the performance of Bidder's obligations pursuant to the Equity Commitment Letter.

(D)      The Contributing Tribune Entities and Bidder desire to contribute certain assets and liabilities to Newco and certain Newco Subs pursuant to the terms of this Agreement and as more fully described below.

(E)      Immediately after such contribution to Newco, Newco desires to sell or otherwise transfer certain of such assets and liabilities to Newco Subs pursuant to the terms of this Agreement, the Newco Sale Documents and as more fully described below.

(F)      After the date hereof, but on or prior to the Escrow Closing Date, (i) Bidder, certain Affiliates of Bidder, Newco or Newco Subs, as the case may be, will execute the Pre-Escrow Closing Senior Debt Documents along with all Persons providing Senior Debt Financing, which will be effective prior to the Escrow Closing, and (ii) Bidder, certain Affiliates of Bidder, Newco or Newco Subs, as the case may be, will execute the Pre-Escrow Closing Subordinated Debt Documents, together with all Persons providing Subordinated Debt Financing, which will be effective prior to the Escrow Closing.

(G)      Once all of the conditions to the Escrow Closing (as described below) are satisfied, (i) the parties will execute and deliver the Closing Escrow Agreement and Real Estate Escrow Agreement and all other documents (including the Escrow Closing Senior Debt Documents and the Escrow Closing Subordinated Debt Documents), and take all actions, required in connection with the Escrow Closing pursuant to the terms of this Agreement, (ii) Bidder shall deliver the Equity Financing to the Closing Agent, (iii) the Senior Lenders will (A) execute the Closing Senior Debt Documents, (B) deliver the Closing Senior Debt Documents included in the Closing Escrow Documents to the Closing Agent and make the Senior Debt Financing (other than the Revolver) available to the Senior Lender Agent, and (C) deliver the Closing Senior Debt Documents included in the Real Estate Escrow Documents to the Real Estate Escrow Agent, (iv) the Subordinated Lenders will (A) execute the Closing Subordinated Debt Documents, and (B) deliver the Closing Subordinated Debt Documents and an amount equal to the Subordinated Debt Financing to the Closing Agent, and (v) Bidder shall cause the Ricketts GuarantyCo Capital Contribution and the Ricketts Lender Capital Contribution (collectively, the "**Ricketts GuarantyCo and Ricketts Lender Equity Financing**") to be deposited with the Closing Agent.

(H)      Upon satisfaction of the conditions to the Closing set forth in Section 7.4, (i) the Cubs Entities will contribute the Cubs Business (including all Cubs Contributed Assets) with an agreed upon enterprise valuation of $844,740,000 to Newco and certain Newco Subs in exchange for a membership interest in Newco; (ii) immediately thereafter, the contribution under the Equity Financing and the loans under the Debt Financing will become effective, the Senior

-2-

Lender Agent will make the Senior Debt Financing (other than the Revolver) available to the Closing Agent for distribution, and all funds under the Equity Financing and Debt Financing will be made available to Newco; (iii) immediately thereafter, the Closing Agent, on behalf of Newco, will distribute (x) the Estimated Special Distribution Amount minus the Indemnity Escrow Initial Amount directly to the Cubs Entities and (y) the Indemnity Escrow Initial Amount to the Escrow Agent; (iv) the Cubs Entities in the aggregate shall thereafter retain a 5% membership interest in Newco; (v) after Newco grants to the Persons providing the Senior Debt Financing a first-priority perfected lien on and security interest in all of the Cubs Contributed Assets contributed to Newco, Newco will sell or otherwise convey the Cubs Business (including all such Cubs Contributed Assets other than the CSN Interests) to Newco Subs pursuant to an installment sale agreement and other instruments of conveyance; (vi) the Closing Agent will deliver the Closing Escrow Documents and the remainder of the Closing Funds (including the Ricketts GuarantyCo and Ricketts Lender Equity Financing) to the parties in accordance with the terms of the Closing Escrow Agreement; and (vii) the Real Estate Escrow Agent will deliver the Real Estate Escrow Documents in accordance with the terms of the Real Estate Escrow Agreement.

In consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I

CONTRIBUTION TRANSACTION; SPECIAL DISTRIBUTION; CLOSING

Section 1.1     <u>Contribution Transaction</u>.

(a)     Prior to the Escrow Closing:

(i)     Bidder shall cause Newco to execute (but not date) the Amended and Restated Limited Liability Company Agreement in the form attached as <u>Exhibit C-1</u> (the "**Newco LLC Agreement**");

(ii)     Bidder shall cause each Newco Sub to be formed with Certificates of Formation in the forms attached as <u>Exhibits B-1-4</u> (and another Certificate of Formation in substantially the same form as <u>Exhibits B-1-4</u> for each Additional Newco Sub, if any) (the "**Newco Subs Certificates of Formation**"), respectively, and Limited Liability Company Agreements in the forms attached as <u>Exhibits C-2(A)-(D)</u> (and another Limited Liability Company Agreement in substantially the same form as <u>Exhibit C-2(D)</u> for each Additional Newco Sub, if any) (the "**Newco Subs LLC Agreements**"), respectively (it being understood that each Newco Sub shall be a direct or indirect, wholly owned subsidiary of Newco); and

(iii)     Bidder shall cause Newco and Newco Subs to execute the Joinder to this Agreement.

-3-

(b)  On the terms and subject to the conditions set forth in this Agreement, on the Escrow Closing Date, (i) the parties shall execute and deliver the Closing Escrow Agreement and Real Estate Escrow Agreement, (ii) Bidder shall cause (A) the Senior Lenders to fund the entire amount of the Senior Debt Financing (excluding the Revolver) to the Senior Lender Agent, (B) the Subordinated Lenders to deposit an amount equal to the Subordinated Debt Financing with the Closing Agent in accordance with the Closing Escrow Agreement, (C) in addition to the amounts deposited pursuant to clause (B), MMR Investors LLC ("**MMR Investors**") to deposit $20,000,000 for the capitalization of Ricketts GuarantyCo (the "**Ricketts GuarantyCo Capital Contribution**") with the Closing Agent in accordance with the Closing Escrow Agreement, (D) the Equity Financing (the amount of which will be based on the Transaction Expense Notice) to be deposited with the Closing Agent in accordance with the Closing Escrow Agreement, and (E) an amount equal to $35,000,000 for the capitalization of Ricketts Lender (the "**Ricketts Lender Capital Contribution**") to be deposited with the Closing Agent in accordance with the Closing Escrow Agreement (collectively, funds described in clauses (A), (B), (C), (D) and (E) are the "**Closing Funds**"), (iii) the parties shall deposit all the Closing Escrow Documents, and Bidder shall cause the Senior Lender Agent and Subordinated Lenders to deposit the Closing Senior Debt Documents included in the Closing Escrow Documents and the Closing Subordinated Debt Documents, respectively, with the Closing Agent, (iv) the parties shall deposit all the Real Estate Escrow Documents, and Bidder shall cause the Senior Lender Agent to deposit the Closing Senior Debt Documents included in the Real Estate Escrow Documents with the Real Estate Escrow Agent, (v) the parties shall deliver all other documents required by Section 1.4 and (vi) Bidder shall deliver fully executed copies of the Escrow Closing Senior Debt Documents, Pre-Escrow Closing Senior Debt Documents, Escrow Closing Subordinated Debt Documents and Pre-Escrow Closing Subordinated Debt Documents to Tribune.

(c)  On the terms and subject to the conditions set forth in this Agreement, at the Closing in the manner and order set forth in the Closing Escrow Agreement and Real Estate Escrow Agreement, as applicable:

(i)  In exchange for the issuance to the Tribune Member of the Tribune Newco Interest, (A) each of the Tribune Parties shall, and shall cause each of the other Contributing Tribune Entities to, contribute, transfer, assign and deliver the Cubs Contributed Assets owned by them (other than the Direct Cubs Contributed Assets) to Newco, free and clear of all Liens, other than Permitted Liens, and Newco shall assume the Cubs Liabilities (other than any Cubs Liabilities associated with the Direct Cubs Contributed Assets), and (B) each of the Tribune Parties shall contribute, transfer, assign and deliver the Cubs Contributed Assets listed on Schedule 1.1(c)(i) (as the same may be revised by Bidder at any time upon written notice to Tribune at least five (5) Business Days prior to the Escrow Closing or such later date to which Tribune consents) (the "**Direct Cubs Contributed Assets**") owned by it to such Newco Sub(s) as are listed on such Schedule (as it may be revised by Bidder in accordance with this Section 1.1(c)(i)) with respect to each such Direct Cubs Contributed Asset (each, a "**Direct Newco Sub**"), free and clear of all Liens, other than Permitted Liens, and each such Direct Newco Sub shall assume the Cubs Liabilities arising from the Direct Cubs Contributed Assets assigned to such Direct Newco Sub, in each case (for clauses (A) and (B) pursuant to the terms of this

-4-

Agreement (collectively, the "**Cubs Contribution**"). Notwithstanding anything in this Agreement to the contrary, Newco and Newco Subs will not assume or be bound by or be obligated or responsible for any Cubs Excluded Liabilities, and none of the Cubs Excluded Assets will be contributed to Newco or any of the Newco Subs.

(ii)    The Senior Lender Agent will deliver the Senior Debt Financing (excluding the Revolver) to the Closing Agent.

(iii)    The Specified Amount (based on the Transaction Expense Notice) that was delivered to the Closing Agent at the Escrow Closing pursuant to Section 1.1(b) shall be delivered to Newco in exchange for the issuance to Bidder of a 95% membership interest in Newco.

(iv)    Immediately after the Cubs Contribution (and after Newco grants to the Persons providing the Senior Debt Financing a first-priority lien on and security interest in all of the Cubs Contributed Assets contributed to Newco), Newco shall sell or otherwise convey the Cubs Business (including all such Cubs Contributed Assets other than the CSN Interests) to Newco Subs, and Newco Subs shall assume the Cubs Liabilities that had been assumed by Newco as part of the Cubs Contribution, in each case pursuant to the terms of the Newco Sale Documents (collectively, the "**Newco Sale**").  Notwithstanding the two-step Transaction in Section 1.1(c)(iii) and this Section 1.1(c)(iv), the parties intend that the Cubs Contribution and Newco Sale be treated as a single assignment for purposes of Sections 363 and 365 of the Bankruptcy Code.  The parties acknowledge and agree that for Federal income Tax purposes the Newco Sale shall be disregarded.

(v)    The Closing Agent shall disburse the Closing Funds pursuant to the Closing Escrow Agreement, including (A) on behalf of Newco, distributing to the Tribune Member the Estimated Special Distribution Amount less the Indemnity Escrow Initial Amount, (B) on behalf of MMR Investors LLC, distributing to Ricketts GuarantyCo the Ricketts GuarantyCo Capital Contribution, and (C) on behalf of Bidder, distributing to Ricketts Lender the Ricketts Lender Capital Contribution.

(vi)    The Closing Agent will deliver the Closing Escrow Documents in accordance with the terms of the Closing Escrow Agreement and the Real Estate Escrow Agent will deliver the Real Estate Escrow Documents in accordance with the terms of the Real Estate Escrow Agreement.

(vii)    After giving effect to the transactions contemplated in Section 1.1(c)(i) through (c)(vi), the Tribune Member will own a membership interest in Newco that represents 5% of the issued and outstanding membership interests in Newco, and Bidder will own a membership interest in Newco that represents 95% of the issued and outstanding membership interests in Newco.

Section 1.2    [Intentionally omitted]

Section 1.3    <u>Escrow Closing and Closing</u>.

(a)    On the terms and subject to the conditions set forth in this Agreement, the transactions contemplated by this Agreement to be completed into the "Escrow Closing" shall occur at the offices of McDermott Will & Emery LLP, 227 West Monroe Street, Chicago, Illinois 60606 at 10:00 a.m., Chicago time, within one Business Day following the day that the conditions to the Escrow Closing set forth in <u>Sections 7.1</u>, <u>7.2</u> and <u>7.3</u> (other than those conditions that by their terms require the delivery of any documents or the taking of other action at the Escrow Closing but subject to the satisfaction or waiver thereof) are satisfied or waived or on such other date and time as the parties to this Agreement shall agree in writing (the "**Escrow Closing**"). The date on which the Escrow Closing occurs is herein referred to as the "**Escrow Closing Date**." If the Escrow Closing is completed, any conditions to the Escrow Closing set forth in <u>Section 7.1</u>, <u>7.2</u> or <u>7.3</u> that are not satisfied will be deemed to be irrevocably waived.

(b)    On the date on which the conditions to the Closing set forth in <u>Section 7.4</u> are satisfied, (w) the Senior Lender Agent will make the Senior Debt Financing (other than the Revolver) available to the Closing Agent for distribution as set forth in clause (y) of this <u>Section 1.3(b)</u>; (x) Bidder and Tribune shall jointly execute and deliver a certificate to each of the Closing Agent and the Real Estate Escrow Agent certifying that the conditions to Closing set forth in <u>Section 7.4</u> have been satisfied or waived; (y) the Closing Agent, pursuant to the terms of the Closing Escrow Agreement, shall (i) on behalf of Newco, distribute the Estimated Special Distribution Amount less the Indemnity Escrow Initial Amount to the Cubs Entities as set forth on <u>Schedule 1.3(b)</u>, which Schedule may be updated by Tribune Parties by written notice to Bidder and the Closing Agent at least three (3) Business Days prior to the Closing; (ii) on behalf of Newco or Newco Subs, pay the Cubs Expenses in accordance with the Cubs Expense Notice; (iii) on behalf of Newco or Newco Subs, pay the Covered Transaction Expenses in accordance with the Final Transaction Expense Notice; (iv) on behalf of Newco, transfer the Indemnity Escrow Initial Amount to the Indemnity Escrow Account pursuant to the Indemnity Escrow Agreement; (v) on behalf of all parties, date all undated Closing Escrow Documents the date of the Closing Date; (vi) on behalf of Tribune Parties, release all Tribune Escrow Documents included in the Closing Escrow Documents to Bidder in accordance with the terms of the Closing Escrow Agreement; (vii) on behalf of Bidder, release all Bidder Escrow Documents included in the Closing Escrow Documents to the Tribune Parties in accordance with the terms of the Closing Escrow Agreement; and (viii) on behalf of Newco and Newco Subs, release all Newco Escrow Documents included in the Closing Escrow Documents in accordance with the terms of the Closing Escrow Agreement; and (z) the Real Estate Escrow Agent, pursuant to the terms of the Real Estate Escrow Agreement, shall, on behalf of the parties, release all Real Estate Escrow Documents and take such other actions, in each case, in accordance with the terms of the Real Estate Escrow Agreement. The date on which the Closing occurs is herein referred to as the "**Closing Date**."

Section 1.4    <u>Escrow Closing Deliveries</u>.

(a)    In addition to the other requirements set forth herein, at the Escrow Closing, Tribune Parties shall deliver, or cause to be delivered, to the Closing Agent the following (the "**Tribune Escrow Documents**"):

-6-

        (i)       the Closing Escrow Agreement, duly executed by each Tribune Party, dated as of the Escrow Closing Date;

        (ii)      certificates evidencing the good standing of each Tribune Party in its jurisdiction of organization as of a recent date;

        (iii)     an amendment (in a form sufficient to be filed with the Delaware Secretary of State) to the certificate of formation of each Cubs Entity (other than Tribune Sports) changing the name of such Cubs Entity in accordance with Section 4.17, duly executed by such Cubs Entity and to be undated, with the understanding that Bidder will file such amendments with the applicable Government Authorities on or after the Closing Date;

        (iv)     each Cubs Bill of Contribution, duly executed by each applicable Contributing Tribune Entity, and any other standard instrument of assignment reasonably requested by Bidder (including any copyright, trademark, service mark, domain name or lease assignment, certificate evidencing the transfer of title of a vehicle, or stock power or other equity transfer power), duly executed by the applicable Contributing Tribune Entities, all in such form as is reasonably requested by Bidder in order to evidence the contribution of the Cubs Contributed Assets by each Contributing Tribune Entity to Newco or a Direct Newco Sub, as the case may be, in accordance with this Agreement, each to be undated;

        (v)      the Assumption Agreements substantially in the forms attached hereto as Exhibits E-1, E-2, E-3, E-4, E-5, E-6 and E-7 (and another Assumption Agreement in substantially the same form as Exhibits E-7 for each additional Direct Newco Sub, if any) (each a "**Cubs Assumption Agreement**"), duly executed by the applicable Tribune Party, each to be undated;

        (vi)     affidavits meeting the requirements of Section 1445(b) of the Code, duly executed by each Contributing Tribune Entity, each to be undated;

        (vii)    the Transition Services Agreement, duly executed by Tribune, to be undated;

        (viii)   the Newco LLC Agreement, duly executed by the Tribune Member, to be undated;

        (ix)     the Tax Matters Agreement, duly executed by Tribune and the Tribune Member, to be undated and, to the extent applicable, undated copies, duly executed by the applicable Tribune Parties, of the Account Control Agreement and Pledge and Security Agreement and Assignment of Account that are attached as exhibits to the Tax Matters Agreement;

        (x)      the Tribune Guarantees, duly executed by Tribune, each to be undated;

        (xi)     Schedule 2.13(a) (Employees), updated as of the Business Day immediately prior to the Escrow Closing Date, pursuant to Section 5.1;

-7-

(xii)    completed forms necessary to transfer control of all domain names listed under "Cubs Domain Names" in Schedule 2.10(a) to Newco, duly executed by each applicable Contributing Tribune Entity, to be undated;

(xiii)    a certified copy of the Tribune Transaction Approval Order entered by the Bankruptcy Court, with the understanding that Bidder (or the Unaffiliated Third Party Lenders) shall be permitted to file UCC-3 termination statements with such Tribune Transaction Approval Order as an attachment with the applicable Government Authorities on or after the Closing Date to evidence the release of Liens in accordance with such Tribune Transaction Approval Order;

(xiv)    the WGN Agreements, duly executed by WGN, to be undated;

(xv)    a certificate of an officer of each Contributing Tribune Entity certifying (A) the organizational documents of such entity, and (B) resolutions or approvals of its trustee, board of directors, manager or board of managers, as applicable, authorizing the Transactions (other than the Newco Sale) and the execution, delivery and performance of obligations under this Agreement and the other Transaction Documents, as applicable (collectively, the "**Cubs Authorizing Resolutions**"), dated as of the Escrow Closing Date;

(xvi)    the Cubs Expense Notice;

(xvii)    the Indemnity Escrow Agreement, duly executed by the Cubs Entities and the Escrow Agent, to be undated;

(xviii)    the Mueller Building and T-Building Property Lease, together with the Memorandum of Lease, each duly executed by DQ LLC, to be undated;

(xix)    the Subordination Agreement, duly executed by Tribune and each Cubs Entity, to be undated;

(xx)    the CSN Assignment and Assumption Agreement, duly executed by WGN, to be undated;

(xxi)    each Tribune-Related Debt Document, duly executed by the applicable Tribune Parties (or, in the case of the legal opinion, by Tribune's counsel), and either to be dated as of the Escrow Closing Date if such document is to be effective as of such date or to be undated if such document is to be effective as of the Closing Date; and

(xxii)    all other certificates, documents and instruments that are reasonably requested by Bidder (including on behalf of Newco or any Newco Sub) that are necessary in order to complete the Transactions (other than the Newco Sale) (it is understood and agreed that whether there is sufficient time to prepare and deliver any such certificate, document or instrument without delaying the Escrow Closing shall be taken into account when determining whether any such request is reasonable), to be undated.

CHI99 5155442-3.022182.0015

(b)     In addition to the other requirements set forth herein, at the Escrow Closing, Tribune Parties shall deliver, or cause to be delivered, to Bidder the following:

(i)     the certificate contemplated by Section 7.2(c), duly executed by Tribune, dated as of the Escrow Closing Date (the "**Tribune Escrow Closing Certificate**"); and

(ii)     the Additional Filing Assurance.

(c)     In addition to the other requirements set forth herein, at the Escrow Closing, Bidder shall and, with respect to Section 1.4(c)(vii), the Ricketts Lender shall deliver, or cause to be delivered, to the Closing Agent (with respect to any Closing Escrow Documents) and to the Real Estate Agent (with respect to any Real Estate Escrow Documents) the following (the "**Bidder Escrow Documents**"):

(i)     the Closing Escrow Agreement, duly executed by Bidder, Newco, an agent for the Subordinated Lenders, Senior Lender Agent and MMR Investors, dated as of the Escrow Closing Date;

(ii)     the Tax Matters Agreement, duly executed by Bidder, Ricketts GuarantyCo and Newco, to be undated, and duly executed and undated copies of the Account Control Agreement and Pledge and Security Agreement and Assignment of Account that are attached as exhibits to the Tax Matters Agreement;

(iii)     the Newco Certificate of Formation and the Newco Subs Certificates of Formation, each as filed with the Secretary of State of Delaware;

(iv)     (A) each Cubs Assumption Agreement to be executed by Newco, duly executed by Newco, to be undated, and (B) the Cubs Assumption Agreement to be executed by each Direct Newco Sub, duly executed by such Direct Newco Sub, to be undated;

(v)     the Transition Services Agreement, duly executed by Newco, to be undated;

(vi)     the Newco LLC Agreement, duly executed by Bidder and Newco, and the Newco Subs LLC Agreements, duly executed by Newco and/or the applicable Newco Sub, to be undated;

(vii)     the Ricketts Subordinated Loan Commitment Agreement, duly executed by the Ricketts Lender, Newco and Cubs Newco Sub, to be undated;

(viii)     the Closing Subordinated Debt Documents, duly executed by each party thereto, to be undated;

(ix)     the Closing Senior Debt Documents, duly executed by each party thereto, to be undated;

(x)     the WGN Agreements, duly executed by Newco, to be undated;

-9-

(xi)    the Indemnity Escrow Agreement, duly executed by Newco, to be undated;

(xii)    the Mueller Building and T-Building Property Lease, together with the Memorandum of Lease, each duly executed by Newco, to be undated;

(xiii)    the Subordination Agreement, duly executed by Bidder, Newco and Newco Subs, to be undated;

(xiv)    the CSN Assignment and Assumption Agreement, duly executed by Newco, to be undated;

(xv)    the Transaction Expense Notice; and

(xvi)    all other certificates, documents and instruments that are reasonably requested by Tribune Parties that are necessary in order to complete the Transactions (other than the Newco Sale) (it is understood and agreed that whether there is sufficient time to prepare and deliver any such certificate, document or instrument without delaying the Escrow Closing shall be taken into account when determining whether any such request is reasonable), to be undated.

(d)    In addition to the other requirements set forth herein, at the Escrow Closing, Bidder shall deliver, or cause to be delivered, to Tribune Parties the certificate contemplated by Section 7.3(c), duly executed by Bidder, dated as of the Escrow Closing Date (the "**Bidder Escrow Closing Certificate**").

(e)    In addition to the other requirements set forth herein, at the Escrow Closing, Tribune Parties and Bidder, as applicable, shall deliver, or cause to be delivered, the following to an escrow agent for the Real Estate Escrow Documents mutually agreed to by Bidder and Tribune (the "**Real Estate Escrow Agent**") to be handled in a manner consistent with the Closing Escrow Agreement and this Agreement under an agreement to be negotiated and executed (effective as of the Escrow Closing Date) by Bidder and Tribune acting reasonably and in good faith (the "**Real Estate Escrow Agreement**"):

(i)    the special warranty deeds, or in the case of the Trusts, Trustee's Deeds (each, a "**Deed**") for the Cubs Contributed Owned Real Property, duly executed by the applicable Tribune Party or, in the case of the Clark Property and the Racine Property, the applicable Trust, which Deeds shall be substantially in the forms attached hereto as Exhibits G-1(A) (form of special warranty deed (Cubs LLC as grantor)), G-1(B) (form of special warranty deed (DQ LLC, grantor)), G-1(C) (form of Trustee's Deed (Racine Trust as grantor)) and G-1(D) (form of Trustee's Deed (Clark Trust as grantor)), each to be undated; and

(ii)    the transfer tax declarations required in connection with the contribution of the Cubs Contributed Owned Real Property to Newco substantially in the forms attached hereto as Exhibit G-3 (the "**Real Estate Transfer Declaration Forms**"), duly executed

-10-

by the applicable Tribune Entity or Trustee and Newco, and based on the valuations set forth on Schedule 1.4(e)(ii) attached hereto.

(f)     In addition to the other requirements set forth herein, at the Escrow Closing, Bidder shall cause Newco and Newco Subs to deliver to the Closing Agent (with respect to any Closing Escrow Documents) and to the Real Estate Escrow Agent (with respect to any Real Estate Escrow Documents) the Newco Sale Documents, duly executed by Newco and Newco Subs, to be undated (the "**Newco Escrow Documents**").

(g)     In addition to the other requirements set forth herein, at the Escrow Closing, Bidder shall cause Newco to deliver the following to Tribune Parties:

(i)     the Senior Lenders Escrow Closing Certificate, duly executed by the Senior Lender Agent;

(ii)    the Newco Senior Debt Escrow Closing Certificate, duly executed by Newco; and

(iii)   fully executed and effective copies of all Escrow Closing Senior Debt Documents, Pre-Escrow Closing Senior Debt Documents, Escrow Closing Subordinated Debt Documents and Pre-Escrow Closing Subordinated Debt Documents.

Section 1.5     Adjustment.

(a)     On or prior to the third Business Day prior to the Closing Date, Tribune Parties shall prepare and deliver to Bidder a written statement (the "**Preliminary Statement**") setting forth in reasonable detail (A) the calculation by Tribune Parties of the Estimated Closing Working Capital, Estimated Petty Cash and the Estimated Deferred Revenue Amount, (B) a listing and calculation by Tribune Parties of the Retained Cubs Current Assets, (C) a listing and calculation by Tribune Parties of all other components reflected in the definition of Estimated Special Distribution Amount, and (D) based on such amounts, a calculation by Tribune Parties of the Estimated Special Distribution Amount. The Preliminary Statement shall be prepared in accordance with Section 1.5(f) and shall include calculations in a level of detail consistent with Exhibit O in all material respects, as applicable. For the avoidance of doubt, if the amount of a component of the Estimated Special Distribution Amount is not yet known on the date on which Tribune Parties deliver the Preliminary Statement, then, for purposes of the Preliminary Statement, Tribune Parties shall include their good faith estimate of the amount of such component based on information that is at the time reasonably available to the Tribune Parties.

(b)     Within 90 days after the Closing Date, Bidder shall prepare and deliver to Tribune Parties a written statement (the "**Statement**") setting forth in reasonable detail (i) the calculation by Bidder of the Closing Working Capital, the Petty Cash and the Deferred Revenue Amount, (ii) a listing and calculation by Bidder of the Retained Cubs Current Assets, (iii) a listing and calculation by Bidder of all other components reflected in the definition of Final Special Distribution Amount, and (iv) based on such amounts, a calculation by Bidder of the Final Special Distribution Amount. The Statement shall be prepared in accordance with Section

-11-

1.5(f) and shall include calculations in a level of detail consistent with Exhibit O in all material respects, as applicable. Following the receipt by Tribune Parties of the Statement and until all disputes under this Section 1.5 are finally resolved and the Final Special Distribution Amount is finally determined in accordance with this Agreement, Tribune Parties and their Representatives shall be permitted to review during normal business hours and make copies reasonably required of (A) the working papers of Bidder and, if relevant, their independent auditors relating to the preparation of the Statement (but only after Tribune Parties and their Representatives shall have provided to such independent auditors any customary indemnities and waivers that such independent auditors shall request), and (B) any supporting schedules, supporting analyses and other supporting documentation and underlying data relating to the preparation of the Statement. The Statement shall become final and binding upon the parties on the 45th day following delivery thereof, except to the extent that Tribune Parties, at their option (and without any obligation to do so), give written notice of disagreement with the Statement (the "**Notice of Disagreement**") to Bidder prior to such date. Any Notice of Disagreement shall specify in reasonable detail, based on information that is at the time reasonably available to the Tribune Parties, the nature of any disagreement so asserted (any such disagreement to be limited to whether such calculation of Closing Working Capital, the Petty Cash, the Deferred Revenue Amount, the Retained Cubs Current Assets, any other components reflected in the definition of Final Special Distribution Amount and the Final Special Distribution Amount are mathematically correct and/or have been prepared in accordance with Section 1.5(f)), and, based on such disagreement, the Tribune Parties' calculation of Closing Working Capital, the Petty Cash, the Deferred Revenue Amount, the Retained Cubs Current Assets (including a listing thereof), any other components reflected in the definition of Final Special Distribution Amount and the Final Special Distribution Amount based thereon. The Notice of Disagreement shall be prepared in accordance with Section 1.5(f) and shall include calculations in a level of detail consistent with Exhibit O in all material respects to the extent applicable to the disputes set forth therein. If a Notice of Disagreement is received by Bidder in a timely manner, then the Statement (as revised in accordance with clause (I) or (II) below) shall become final and binding upon the parties on the earlier of (I) the date Bidder and Tribune Parties resolve in writing any differences they have with respect to the matters specified in the Notice of Disagreement or (II) the date any disputed matters are finally resolved in writing by the Accounting Firm in accordance with Section 1.5(c).

(c)     During the 30-day period following the delivery of a Notice of Disagreement, Bidder and Tribune Parties shall seek in good faith to resolve in writing any differences which they may have with respect to the matters specified in the Notice of Disagreement. Following the receipt by Bidder of the Notice of Disagreement and until all disputes under this Section 1.5 are finally resolved and the Final Special Distribution Amount is finally determined in accordance with this Agreement, Bidder and its independent auditors shall be permitted to review and make copies reasonably required of (i) the working papers of Tribune Parties and, if relevant, their independent auditors (if any) relating to the preparation of the Notice of Disagreement (but only after Bidder and its Representatives shall have provided to such independent auditors any customary indemnities and waivers that such independent auditors shall request), and (ii) any supporting schedules, supporting analyses and other supporting documentation relating to the preparation of the Notice of Disagreement. If, at the end of such

-12-

30-day period, the differences as specified in the Notice of Disagreement are not resolved, Tribune Parties and Bidder shall have the right to (and each shall have the right to require the other to) within ten (10) Business Days following the end of such 30-day period, engage Ernst & Young (or, if Ernst & Young is unable or unwilling to accept such engagement, Deloitte & Touche or, if Deloitte & Touche is unable or unwilling to accept such engagement, a nationally recognized independent accounting firm mutually and reasonably acceptable to Tribune Parties and Bidder) (the "**Accounting Firm**") and submit to the Accounting Firm for review and resolution of any and all matters which remain in dispute and which were included in the Notice of Disagreement.  As part of the submission of the dispute to the Accounting Firm, (A) Bidder shall submit an updated Statement (the "**Updated Statement**") which will reflect its calculations of the Final Special Distribution Amount (the "**Bidder Submitted Final Special Distribution Amount**"), the Closing Working Capital, Petty Cash, Retained Cubs Current Assets (including a listing thereof), Deferred Revenue Amount, and all other components reflected in the definition of Final Special Distribution Amount, which will be the amounts set forth in the Statement as revised, if at all, to reflect any items upon which the parties were able to agree during their discussions regarding any differences they had with respect to the matters specified in the Notice of Disagreement prior to submission to the Accounting Firm; and (B) Tribune Parties shall submit an updated Notice of Disagreement (the "**Updated Notice of Disagreement**") which will reflect their calculations of the Final Special Distribution Amount (the "**Tribune Submitted Final Special Distribution Amount**"), the Closing Working Capital, Petty Cash, Retained Cubs Current Assets (including a listing thereof), Deferred Revenue Amount, and all other components reflected in the definition of Final Special Distribution Amount, which will be the amounts set forth in the Notice of Disagreement as revised, if at all, to reflect any items upon which the parties were able to agree during their discussions regarding any differences they had with respect to the matters specified in the Notice of Disagreement prior to submission to the Accounting Firm.  The Updated Statement and Updated Notice of Disagreement shall each be prepared in accordance with Section 1.5(f) and shall include calculations in a level of detail consistent with Exhibit O.  In resolving any disputed item, the Accounting Firm shall: (I) be bound by the provisions of this Agreement and the definitions of Final Special Distribution Amount, Closing Working Capital, Petty Cash, Retained Cubs Current Assets, Deferred Revenue Amount and the definitions included or referred to therein; (II) limit its review to matters still in dispute as set forth in the Notice of Disagreement or Updated Notice of Disagreement, as the case may be; (III) further limit its review solely to whether the Statement or Updated Statement, as the case may be, has been prepared in accordance with this Agreement; and (IV) make its own calculation of the Final Special Distribution Amount, which must be an amount equal to the Bidder Submitted Final Special Distribution Amount or the Tribune Submitted Final Special Distribution Amount or between them.  The Accounting Firm's determination of the Petty Cash, Deferred Revenue Amount, Retained Cubs Current Assets and any item that is a component of Closing Working Capital or of the Final Special Distribution Amount and is the subject of a dispute shall not be in excess of, or less than, the greatest or lowest value, respectively, claimed for such item in the Statement or Updated Statement, as applicable, on the one hand, or the Notice of Disagreement or Updated Notice of Disagreement, as applicable, on the other hand. Notwithstanding the foregoing, the Accounting Firm may (x) adjust the Deferred Revenue Amount, Petty Cash, Retained Cubs Current Assets and all other components of Closing Working Capital or of the Final Special Distribution Amount that is not in dispute and (y) make

-13-

adjustments to Deferred Revenue Amount, Petty Cash, Retained Cubs Current Assets and all other components of Closing Working Capital or of the Final Special Distribution Amount that are in dispute, in each case, that are in excess of, or less than, the range of values claimed for such item by the parties, if such adjustments are related to the resolution of one or more of the items that are in dispute and the Accounting Firm determines that such adjustments are necessary to properly calculate Closing Working Capital or the Final Special Distribution Amount. Tribune Parties and Bidder shall use reasonable best efforts to cause the Accounting Firm to render a decision resolving the matters in dispute within 30 days following the submission of such matters to the Accounting Firm. The fees and expenses of the Accounting Firm in connection with the Accounting Firm's determination of the Final Special Distribution Amount pursuant to this <u>Section 1.5</u> (collectively, the "**Accounting Firm Expenses**") shall be borne as follows: (1) Tribune Parties shall pay an amount equal to the Accounting Firm Expenses multiplied by a fraction, the numerator of which is (x) the amount, if any, by which the Tribune Submitted Final Special Distribution Amount exceeds the Final Special Distribution Amount as determined by the Accounting Firm, and the denominator of which is (y) the amount by which the Tribune Submitted Final Special Distribution Amount exceeds the Bidder Submitted Final Special Distribution Amount; and (2) Bidder shall pay an amount equal to the Accounting Firm Expenses multiplied by a fraction, the numerator of which is (x) the amount, if any, by which the Final Special Distribution Amount as determined by the Accounting Firm exceeds the Bidder Submitted Final Special Distribution Amount, and the denominator of which is (y) the amount by which the Tribune Submitted Final Special Distribution Amount exceeds the Bidder Submitted Final Special Distribution Amount. The fees and expenses of the independent auditors (if any) of Bidder incurred in connection with the issuance of the Statement and Updated Statement (if applicable) and review of the Notice of Disagreement and Updated Notice of Disagreement (if applicable) shall be borne by Bidder, and the fees and expenses of the independent auditors (if any) of Tribune Parties incurred in connection with their review of the Statement and Updated Statement (if applicable) and their preparation of the Notice of Disagreement and Updated Notice of Disagreement (if applicable) shall be borne by the Tribune Parties. The Accounting Firm shall not be required to apply to or seek approval of the Accounting Firm Expenses from the Bankruptcy Court or any applicable court.

(d)     If the Final Special Distribution Amount is less than the Estimated Special Distribution Amount, then the Cubs Entities shall, within five (5) Business Days after the final determination thereof, make a payment to Newco by wire transfer of immediately available funds and/or transfer to Newco Retained Cubs Current Assets, which payment and/or transfer are in the aggregate in an amount equal to such deficiency, together with interest thereon at the Interest Rate, calculated on the basis of the actual number of days elapsed and a 360-day year, from the Closing Date to the date of actual payment/transfer, compounded annually; provided, however, that if Retained Cubs Current Assets are not transferred to Newco (or the value of such Retained Cubs Current Assets so transferred is less than the payment required to be made pursuant to this <u>Section 1.5(d)</u>), then, at the option of Bidder, (i) the Cubs Entities will make a payment to Newco of such amount or (ii) the parties shall instruct the Escrow Agent to make a payment of such amount to Newco from the Indemnity Escrow Account. For the purpose of determining the amount of Retained Cubs Current Assets to be transferred to Newco in connection with this <u>Section 1.5(d)</u>, such Retained Cubs Current Assets shall have a value equal

-14-

to the additional amount that would have been reflected on the Statement, as of the Closing Date, if such assets had been included in the Cubs' Contributed Assets.

(e)     If the Final Special Distribution Amount is more than the Estimated Special Distribution Amount, then Newco shall, within five (5) Business Days after the final determination thereof, distribute to the Cubs Entities, by wire transfer of immediately available funds, an amount equal to such excess, together with interest thereon at the Interest Rate, calculated on the basis of the actual number of days elapsed and a 360-day year, from the Closing Date to the date of actual payment, compounded annually.

(f)     The Preliminary Statement, the Statement, the Updated Statement, the Notice of Disagreement, the Updated Notice of Disagreement and any submissions by the parties to the Accounting Firm pursuant to Section 1.5(c) (and all calculations of Closing Working Capital, Petty Cash, Retained Cubs Current Assets, Deferred Revenue Amount and all other components reflected in the definitions of Estimated Special Distribution Amount and Final Special Distribution Amount) shall be prepared and calculated in accordance with the Accounting Principles, except that the Statement, Preliminary Statement, Updated Statement, Notice of Disagreement, Updated Notice of Disagreement and any submissions by the parties to the Accounting Firm pursuant to Section 1.5(c) (and all calculations of Closing Working Capital, Petty Cash, Retained Cubs Current Assets, Deferred Revenue Amount and all other components reflected in the definitions of Estimated Special Distribution Amount and Final Special Distribution Amount) shall: (i) not include any purchase accounting or other adjustment arising out of the consummation of the Transactions (including the Newco Sale), (ii) exclude the effect of any act or decision of Bidder, Newco or any Newco Sub occurring on or after the Closing, (iii) include only the line items set forth on Exhibit O (but, to the extent GAAP would require a new line item for an amount otherwise reflected in the Cubs Entity Interim Financial Statements rather than including such amount under a general or miscellaneous line item, including such line items), (iv) not reflect, directly or indirectly, any additional reserve or accrual that is not reflected on the Cubs Entity Interim Financial Statements (except (x) those that result from additional material facts and circumstances not known by the Tribune Parties at the time of the preparation of the Cubs Entity Interim Financial Statements that become Known to the Tribune Parties, or new events occurring, after such date and prior to the Closing, and (y) they shall include an accrual for accrued and unused vacation for Transferred Employees as described in Section 5.6), (v) in the case of the calculations of Closing Working Capital, not include any Cubs Excluded Assets (other than Retained Cubs Current Assets) or Cubs Excluded Liabilities and shall include only Cubs Contributed Assets (other than Petty Cash), Retained Cubs Current Assets and Cubs Liabilities (other than the Deferred Revenue Amount) and (vi) be calculated as of Effective Time but shall not include any Debt Financing, any Equity Financing or any expenses incurred in connection with the consummation of the Transactions (including the Newco Sale), except that the calculation of Estimated Special Distribution Amount and Final Special Distribution Amount shall include Cubs Expenses to the extent they are paid by Newco or Newco Subs pursuant to Section 1.3(b). The calculations of Closing Working Capital (or, in the case of the Preliminary Statement, Estimated Closing Working Capital), Petty Cash (or, in the case of the Preliminary Statement, Estimated Petty Cash), and Deferred Revenue Amount (or, in the case of the Preliminary Statement, Estimated Deferred Revenue Amount) included in the Preliminary

Statement, Statement, Updated Statement, Notice of Disagreement and Updated Notice of Disagreement shall be presented in a form consistent with the form of Exhibit O, which is included for illustrative purposes only.

(g)     Tribune Parties and Bidder agree that the decisions of the Accounting Firm pursuant to Section 1.5(c) shall be final and binding on the parties and shall not be subject to appeal, review or reconsideration by any court in the absence of manifest error by the Accounting Firm in rendering its decision, and that judgment may be entered upon the determination of the Accounting Firm by the Applicable Court.

Section 1.6     Consent of Third Parties. If (a) after giving effect to the Transaction Approval Orders, the assignment of any Cubs Contract or Cubs Business Permit or any claim or right or any benefit arising thereunder or resulting therefrom to Newco (other than with respect to Direct Cubs Contributed Assets) or any Direct Newco Sub (with respect to Direct Cubs Contributed Assets assigned or attempted to be assigned to such Direct Newco Sub), without the consent of a third Person, would constitute a breach thereof, and (b) such consent is not obtained prior to Closing (each such Cubs Contract or Cubs Business Permit, a "**Specified Document**"), then Tribune Parties shall use reasonable best efforts to cooperate with Newco and the applicable Receiving Newco Sub in order to allow the applicable Receiving Newco Sub to perform the obligations under such Specified Document and in turn to provide such applicable Receiving Newco Sub with the benefits under such Specified Document from and after the Closing. Tribune Parties shall pay or cause to be paid to such applicable Receiving Newco Sub within five (5) Business Days of receipt all monies received by any Tribune Party or other Contributing Tribune Entity after the Closing under any Specified Document (except in each case to the extent such monies represent collections of Retained Cubs Accounts Receivable that have not previously been transferred to a Newco Sub pursuant to Section 1.5(d), in which case such monies shall be retained by the Tribune Parties) and shall use reasonable best efforts to provide such applicable Receiving Newco Sub with any claim, right or benefit arising under any such Specified Document. The provisions of this Section 1.6 shall in no way limit the obligation of Tribune Parties pursuant to this Agreement to seek such consents prior to the Closing. If and when any such consents shall be obtained, Tribune Parties shall promptly assign their rights, or cause the other Contributing Tribune Entities to assign their rights, thereunder to Newco (with respect to Specified Documents other than the Direct Cubs Contributed Assets, which Specified Documents Newco will, in turn, immediately assign to the applicable Newco Sub) or the applicable Direct Newco Sub (with respect to the Direct Cubs Contributed Assets assigned or attempted to be assigned to such Direct Newco Sub) without payment of consideration, and Newco or such Direct Newco Sub, as applicable, shall, without payment of any consideration therefor, assume from and after the date of such assignment the obligations of Tribune Parties or the other Contributing Tribune Entities, as the case may be, thereunder. It is understood and agreed that, notwithstanding anything to the contrary in the foregoing, so long as Tribune Parties use their reasonable best efforts (which shall not require the payment of any fee) to obtain the consents and to cooperate with Newco (other than with respect to Direct Cubs Contributed Assets) and each Direct Newco Sub (with respect to Direct Cubs Contributed Assets) as contemplated by this Section 1.6, Tribune Parties will not have any liability or obligation to Newco, any Receiving Newco Sub or Bidder if any consent is not obtained or if a Receiving

-16-

Newco Sub is not able to obtain the benefits referred to above. From and after the Closing Date, (a) if Newco or a Receiving Newco Sub receives the primary benefits under any Specified Document or if Newco, but for the Newco Sale, would reasonably have been expected to receive such benefits, then from and after such time Newco or such Receiving Newco Sub shall perform all obligations pursuant to such Specified Document and be responsible for all Cubs Liabilities thereunder regardless of any limitations on assignment or assumption thereof; and (b) if neither Newco nor a Receiving Newco Sub receives the primary benefits under any Specified Document (unless such Receiving Newco Sub would reasonably have been expected to receive the primary benefits thereunder but for the Newco Sale), then neither Newco nor such Receiving Newco Sub shall be obligated to perform any obligations pursuant to such Specified Document, such Specified Document shall be deemed a Cubs Excluded Asset and neither Newco nor such Receiving Newco Sub shall be responsible for any Cubs Liabilities thereunder, and all such obligations and Cubs Liabilities shall remain with the Tribune Parties or other Contributing Tribune Entities, as the case may be, except that, upon notice to Bidder, the Tribune Parties may terminate or cause to be terminated such Specified Document. The provisions of this <u>Section 1.6</u> do not apply to any collective bargaining or similar agreements, which are addressed in <u>Article V</u>. Notwithstanding the foregoing, no Tribune Party shall have any liability to Bidder, Newco or any Receiving Newco Sub with respect to the Newco Sale, including with respect to the transfer of any Cubs Contributed Assets (other than Direct Cubs Contributed Assets) from Newco to Newco Subs in connection with the Newco Sale, the failure to give notice to or receive consent from any other Person in connection with the Newco Sale or the failure to comply with any other requirements pursuant to any Cubs Contract or Cubs Business Permit (other than a Direct Cubs Contributed Asset) with respect thereto. In addition, all Specified Documents shall be deemed Cubs Contributed Assets once contributed to Newco or a Direct Newco Sub, as the case may be, regardless of whether such Cubs Contributed Assets can be contributed by Newco to a Newco Sub in connection with the Newco Sale or whether a Newco Sub (other than a Direct Newco Sub with respect to the Direct Cubs Contributed Assets assigned to it) can get the benefits thereunder.

Section 1.7    <u>Allocation of Value Among Cubs Contributed Assets</u>. The total valuation of the Cubs Contributed Assets shall be allocated among the Cubs Contributed Assets pursuant to and in accordance with the Newco LLC Agreement and Tax Matters Agreement, which, to the extent applicable, shall be in accordance with <u>Schedule 1.4(e)(ii)</u>.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF TRIBUNE PARTIES

Tribune Parties jointly and severally represent and warrant to and for the benefit of Bidder Parties, Newco and Newco Subs as of the date of this Agreement, the Escrow Closing Date and the Closing Date as follows:

Section 2.1    <u>Organization; Good Standing</u>.

(a)    Tribune is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite corporate power and authority to own, lease and operate all of its assets and to conduct its business, subject to the jurisdiction of the Bankruptcy Court over the Bankruptcy Case. Except as set forth on <u>Schedule 2.1(a)</u>, Tribune is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the conduct of its business or the ownership of its properties requires such qualification or licensing, except for such failures to be qualified and in good standing that, individually and in the aggregate, do not have, and are not reasonably likely to have, a Cubs Material Adverse Effect.

(b)    Each Tribune Party, other than Tribune, is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite corporate or limited liability company power and authority to own, lease and operate the Cubs Contributed Assets and to conduct the Cubs Business, subject to the jurisdiction of the Bankruptcy Court over any Additional Bankruptcy Cases. Except as set forth on <u>Schedule 2.1(b)</u>, each Tribune Party, other than Tribune, is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the conduct of its business or the ownership of its properties related to the Cubs Business requires such qualification or licensing, except for such failures to be qualified and in good standing that, individually and in the aggregate, do not have, and are not reasonably likely to have, a Cubs Material Adverse Effect.

(c)    Prior to the date of this Agreement, Tribune Parties have made available to Bidder copies of the certificate of formation and limited liability company agreement of each Cubs Entity, each as in effect on the date hereof, all of which are listed on <u>Schedule 2.1(c)</u>.

(d)    Each Non-Cubs Contributing Tribune Entity is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of the state of its organization, and has all requisite corporate or limited liability company power and authority to own, lease and operate the Cubs Contributed Assets which it owns, leases or operates and to conduct its business, subject to the jurisdiction of the Bankruptcy Court over the Bankruptcy Case.

Section 2.2    <u>Ownership of Cubs Entities/Investments</u>. Tribune directly or indirectly owns all of the issued and outstanding membership interests of each Cubs Entity and all of the issued and outstanding membership interests, capital stock or other equity interest, as applicable, of all other Non-Cubs Contributing Tribune Entity. <u>Schedule 2.2(a)</u> sets forth for each Cubs Entity, (i) the name of the Person that owns a direct ownership interest in such Cubs Entity and (ii) a description of the percentage interest or number of units in such Cubs Entity held by such Person (along with the total number of issued and outstanding units). No Cubs Entity has an obligation to issue any equity interests (whether pursuant to any security convertible into any equity interest or otherwise) that is a Cubs Liability. <u>Schedule 2.2(b)</u> sets forth (i) the name of each Person (other than a Cubs Entity) in which a Cubs Entity, directly or indirectly, owns an equity interest (the "**Investments**") together with a description of the percentage interest or number of units or shares held by such Cubs Entity (along with the total number of issued and outstanding units or shares) (the "**Investment Equity**") and (ii) a description of any other rights to equity interests of the Investments (including any options, warrants or other securities

-18-

convertible into such equity interests) and the respective holders of such rights; provided, however, that (A) with respect to any Investment that is a Major League Baseball Entity (a "**MLB Interest**"), Schedule 2.2(b) contains only a list of the interests held by Tribune Parties and this representation and warranty is only being made to the Knowledge of the Tribune Parties and based solely on information provided on behalf of the Office of the Commissioner of Baseball, attached hereto as Exhibit GG, and (B) with respect to CSN Chicago, the representation in clause (ii) is only being made to the Knowledge of the Tribune Parties.  The applicable Cubs Entity listed on Schedule 2.2(b) has not directly or indirectly transferred such Investment Equity (including the MLB Interests) set forth opposite such Cubs Entity's name, or pledged or otherwise caused a Lien to encumber such Investment Equity.  Other than with respect to the MLB Interests or Liens pursuant to the Amended and Restated Limited Liability Company Agreement of CSN Chicago (as such may be amended), the applicable Cubs Entity listed on Schedule 2.2(b) directly or indirectly owns all of the Investment Equity described on Schedule 2.2(b) free and clear of all Liens.  Immediately after the Closing, except as disclosed on Schedule 2.2(b) and other than through the Cubs Entities' ownership of a membership interest of Newco, Tribune and its Affiliates will not directly or indirectly own any equity interests in the Investments or in any Major League Baseball Entity or any rights to such equity interests (including any options, warrants or other securities convertible into such equity interests).

        Section 2.3    Authority.  Subject to the entry of the Approval Orders by the Bankruptcy Court and obtaining the MLB Approvals, each Contributing Tribune Entity has all requisite corporate, trust or limited liability company power and authority to execute and deliver this Agreement (if applicable) and the other Transaction Documents to which it is or will be a party, to perform its obligations hereunder (if applicable) and thereunder and to consummate the Transactions (other than the Newco Sale).  The execution and delivery by each Contributing Tribune Entity of this Agreement (if applicable) and the other Transaction Documents to which it is or will be a party, the performance by each Contributing Tribune Entity of its obligations hereunder (if applicable) and thereunder and the consummation by each Contributing Tribune Entity of the Transactions (other than the Newco Sale) have been duly and validly authorized by all necessary corporate, trust or limited liability company action on the part of each Contributing Tribune Entity and, except for the Approval Orders, no other proceedings on the part of any Contributing Tribune Entity or its direct or indirect stockholders (including Tribune's employee stock ownership plan), members or trustees are required to authorize this Agreement or the other Transaction Documents to which it is or will be a party or for any Contributing Tribune Entity to consummate the Transactions (other than the Newco Sale).  This Agreement (if applicable) has been, and, upon execution and delivery thereof by the applicable Contributing Tribune Entity, each of the other Transaction Documents to which any Contributing Tribune Entity is or will be a party shall be, duly and validly executed and delivered by such Contributing Tribune Entity and, assuming the due and valid authorization, execution and delivery by the other parties thereto, subject to obtaining the Approval Orders, constitute, or in the case of each such other Transaction Document, shall constitute, a valid and binding obligation of such Contributing Tribune Entity, enforceable against such Contributing Tribune Entity in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights and general principles of equity.

Section 2.4    Non-Contravention.  Except as set forth on Schedule 2.4, the execution and delivery by each Contributing Tribune Entity of this Agreement (if applicable) and the other Transaction Documents to which it is or will be a party, the performance by each Contributing Tribune Entity of its obligations hereunder (if applicable) and thereunder, and the consummation by each Contributing Tribune Entity of the Transactions (other than the Newco Sale), and the compliance by each Contributing Tribune Entity with any of the provisions hereof (if applicable) and thereof, does not and shall not: (a) conflict with or violate any provision of the certificate of incorporation or bylaws (or comparable organizational documents) of any Contributing Tribune Entity; (b) other than the Approval Orders, require on the part of any Contributing Tribune Entity any material notice or material filing with, or any material Permit, or other material authorization of, or any material exemption by, any Government Authority, except in connection with or in compliance with the provisions of the HSR Act; (c) after giving effect to the Approval Orders, conflict with, result in a violation or breach of, constitute a default under, result in the acceleration of, give rise to any right to accelerate, terminate, modify or cancel, or require any notice, consent, authorization, approval or waiver under, or create or change any rights or obligations under, (x) any Cubs Business Permit, Cubs Contract, Cubs Contributed Asset or Cubs Liability or (y) any Contract or Permit of Tribune or any other Contributing Tribune Entity (other than a Cubs Entity) that (in the case of clause (y)) could materially and adversely affect their ability to consummate the Transactions (other than the Newco Sale); (d) result in the creation or imposition of any Lien upon, or any Person obtaining any right to acquire, any of the Cubs Contributed Assets; (e) violate or breach the terms of or cause any default under any Law applicable to (x) the Cubs Business or the Cubs Contributed Assets or (y) Tribune or any other Contributing Tribune Entity (other than a Cubs Entity) that (in the case of clause (y)) could materially and adversely affect their ability to consummate the Transactions (other than the Newco Sale) or comply with their obligations under this Agreement; or (f) with the passage of time, the giving of notice or the taking of any action by another Person, have any of the effects described in clauses (a) through (e) of this Section 2.4, with such exceptions in the case of clauses (c) through (f) as, individually and in the aggregate, do not have, and are not reasonably likely to have, a Cubs Material Adverse Effect.

Section 2.5    Legal Matters.

(a)    Except as set forth in Schedule 2.5(a) and with such exceptions that do not have, and are not reasonably likely to have, individually and in the aggregate, a Cubs Material Adverse Effect: (i) there is no Action pending against, or, to the Knowledge of Tribune Parties, threatened against or affecting, any Contributing Tribune Entity insofar as it is applicable or relates to any of the Cubs Contributed Assets, Cubs Liabilities or the Cubs Business, at law or in equity, before or by any court, arbitrator, panel or other Government Authority; and (ii) none of the Contributing Tribune Entities is operating under, or subject to, any judgment, decree, writ, injunction, ruling, award, stipulation, determination or order of any Government Authority that is applicable or relates to the Cubs Contributed Assets, Cubs Liabilities or the Cubs Business. Schedule 2.5(a) also lists all Actions that were pending against any Contributing Tribune Entity at any time since January 1, 2007 that related to any of the Cubs Contributed Assets, Cubs Liabilities or the Cubs Business, at law or in equity, before or by any court, arbitrator, panel or other Government Authority, except for such Actions that did not have and, if they would now

-20-

be pending, would not have, and would not be reasonably likely to have, individually and in the aggregate, a Cubs Material Adverse Effect.

(b)     Except as set forth on Schedule 2.5(b): (i) the Cubs Entities and, with respect to the Cubs Business, all other Contributing Tribune Entities are in all material respects in compliance with all applicable Laws, (ii) the Cubs Business and Cubs Contributed Assets are being conducted and operated in all material respects in compliance with all applicable Laws, (iii) at all times since January 1, 2007, the Cubs Entities and, with respect to the Cubs Business, all other Contributing Tribune Entities have been in all material respects in compliance with all applicable Laws, except for any such noncompliance that has been cured without ongoing material consequence to the operation of the Cubs Business and is not part of a pattern or course of conduct that would reasonably be expected to continue after the Escrow Closing Date and to have a material adverse impact on the Cubs Business or the Cubs Contributed Assets (taken as a whole), and (iv) at all times since January 1, 2007, the Cubs Business and Cubs Contributed Assets have been conducted and operated in all material respects in compliance with all applicable Laws, except for any such noncompliance that has been cured without ongoing material consequence to the operation of the Cubs Business and is not part of a pattern or course of conduct that would reasonably be expected to continue after the Escrow Closing Date and to have a material adverse impact on the Cubs Business or the Cubs Contributed Assets (taken as a whole).

(c)     Except as set forth on Schedule 2.5(c), since January 1, 2007, no Contributing Tribune Entity has received any written notice asserting any noncompliance in any material respect with any Law applicable to the Cubs Business or any of the Cubs Contributed Assets, Cubs Liabilities or Cubs Business Permits, which noncompliance (i) has not been cured, (ii) has been cured but with ongoing material consequence to the operation of the Cubs Business, or (iii) has been cured but is part of a pattern or course of conduct that could reasonably be expected to continue after the Escrow Closing Date and to have a material adverse impact on the Cubs Business. Except as set forth on Schedule 2.5(c), to the Knowledge of Tribune Parties, no Contributing Tribune Entity is currently under any investigation by any Government Authority involving the Cubs Business, the Cubs Contributed Assets or Cubs Liabilities.

(d)     Except as set forth on Schedule 2.5(d), the Cubs Entities own, or have full rights under, all material Permits that are used or held for use in connection with, or that are required to operate the Cubs Business and Cubs Contributed Assets in compliance with law. Schedule 2.5(d) lists all such Permits that (i) are owned or held by Cubs Entities or (ii) are not owned or held by a Cubs Entity that are material to the operations of the Cubs Business and Cubs Contributed Assets. The applicable Cubs Entities are in all material respects in compliance with all such Permits. To the Knowledge of the Tribune Parties, the Tribune Parties have not taken any action that would reasonably be expected to result in any material modification, revocation, non-renewal or termination of any such Permit other than expiration thereof upon the end of the term thereof. Since January 1, 2007, the Tribune Parties have not received a written notice from any Governmental Authority that any such Permit may be materially modified or revoked or that such Governmental Authority does not intend to permit the renewal thereof.

Section 2.6     Financial Statements.

-21-

(a)     Attached to Schedule 2.6(a) are copies of: (i) the audited consolidated balance sheets of Cubs LLC and Dominican LLC at December 28, 2008 and December 30, 2007 and the related audited consolidated statements of income and cash flow of Cubs LLC and Dominican LLC for the years ended December 28, 2008 and December 30, 2007 (the "**Cubs Audited Financial Statements**"), (ii) the unaudited balance sheets of each of Premium Tickets LLC and DQ LLC each at December 28, 2008 and the related unaudited statements of income of each of Premium Tickets LLC and DQ LLC each for the year ended December 28, 2008, (iii) the unaudited balance sheets of (A) Cubs LLC and Dominican LLC (on a consolidated basis) and (B) each of Premium Tickets LLC and DQ LLC, each at June 28, 2009 (the "**Balance Sheet Date**"), and (iv) the related unaudited statements of income of (Y) Cubs LLC and Dominican LLC (on a consolidated basis) and (Z) each of Premium Tickets LLC and DQ LLC each for the six-month period ended June 28, 2009 (the foregoing financial statements in clauses (iii) and (iv) are collectively referred to as the "**Cubs Entity Interim Financial Statements**" and the foregoing financial statements in clauses (i), (ii), (iii) and (iv) are collectively referred to as the "**Cubs Entity Financial Statements**").

(b)     Attached to Schedule 2.6(b) are copies of: (i) the audited balance sheets of CSN Chicago at September 30, 2008 and 2007, and the related audited statements of income and cash flow of CSN Chicago for the years ended September 30, 2008 and 2007, respectively (the "**CSN Chicago Audited Financial Statements**"), (ii) the unaudited balance sheet of CSN Chicago at June 30, 2009, and (iii) the related unaudited statement of income of CSN Chicago for the nine-month period ended June 30, 2009 (the foregoing financial statements in clauses (ii) and (iii) are collectively referred to as the "**CSN Chicago Unaudited Financial Statements**" and the foregoing financial statements in clauses (i), (ii) and (iii) are collectively referred to as the "**CSN Chicago Financial Statements**"), each in the form that they were provided to Tribune by CSN Chicago.

(c)     The Cubs Entity Financial Statements were prepared from and are consistent with the books and records of the applicable Cubs Entities (it being understood that the Cubs Entity Financial Statements do not reflect Tribune Sports).  The Cubs Entity Financial Statements have been prepared in accordance with GAAP consistently applied (except (i) as set forth on Schedule 2.6(c), (ii) that the Cubs Entity Interim Financial Statements are subject to normal recurring year-end adjustments none of which, if the applicable Accounting Principles are used, would, in the aggregate, be material, and (iii) all Cubs Entity Interim Financial Statements do not have footnotes as required by GAAP) and on that basis present fairly, in all material respects, the financial position and results of operations of the relevant Cubs Entity as of the dates and for the periods indicated.

(d)     Tribune's representative on the Board of Managers of CSN Chicago has not been provided with any notice from CSN Chicago that the CSN Chicago Financial Statements have not been prepared in accordance with GAAP consistently applied (other than that unaudited CSN Chicago Financial Statements are subject to normal recurring year-end adjustments, and do not have footnotes as required by GAAP).

(e)     Except as set forth on Schedule 2.6(e), each item of income or expense included in the Cubs Entity Financial Statements that represents an allocation of such item by

-22-

Tribune or its Affiliates in part to the Cubs Business and in part to other businesses was allocated in good faith.

(f)    The books of account and other financial records of Tribune Parties with respect to the Cubs Business have been maintained in all material respects in accordance with reasonable business practice and in the aggregate accurately reflect their transactions and the disposition of their assets.

(g)    Except as set forth on Schedule 2.6(g), there are no off-balance sheet transactions, arrangements or other relationships relating to the Cubs Business, the Cubs Contributed Assets or the Cubs Liabilities between and/or among Tribune or any of its Affiliates and any unconsolidated Person in which Tribune or any of its Affiliates has any direct or indirect interest, including any structured finance, special purpose or limited purpose entity.

(h)    The Club's report concerning revenues and expenses filed with Major League Baseball on December 15, 2008 for purposes of complying with MLB Rules and Regulations was, on such date (including as it relates to revenue sharing), (i) prepared in all material respects in a manner that is consistent with the Club's past policies and practices with respect to such reports, and (ii) prepared in a manner that was consistent, in all material respects, with any written mandates, directives or other rulings made or issued by Major League Baseball to the Club in connection with its past audits of the Club and any other written mandates, directives or rulings that are otherwise applicable to, and received by, the Club.

Section 2.7    Absence of Undisclosed Liabilities.  None of the Tribune Parties or the Trusts (as it relates to the Cubs Contributed Owned Real Property owned by them) has any obligations, liabilities or commitments of any nature (whether direct or indirect, fixed or contingent, known or unknown, due or to become due, accrued or otherwise, and whether or not determined or determinable) relating to the Cubs Business or Cubs Contributed Assets that will be a Cubs Liability following the consummation of the Transactions (other than those arising as a result of the Newco Sale), except for obligations, liabilities and commitments (a) reflected or reserved against in the Cubs Entity Interim Financial Statements, (b) incurred in the Ordinary Course after the Balance Sheet Date that, individually and in the aggregate, do not have, and are not reasonably likely to have, a Cubs Material Adverse Effect, and (c) consisting of future performance obligations under Cubs Contracts or Transferred Benefit Plans (other than any future performance obligations that relate to the breach of, or default under, any Cubs Contract or Transferred Benefit Plan that occurred prior to Closing), provided that, for the avoidance of doubt, nothing in this Section 2.7(c) affects the representations and warranties contained in Sections 2.12 or 2.17(a), and (d) listed on Schedule 2.7.

Section 2.8    Absence of Certain Changes.  Except (w) as expressly contemplated by this Agreement, (x) as set forth in Schedule 2.8, and (y) to the extent occurring after the date hereof and permitted pursuant to Section 4.1, since December 30, 2007 (other than in the case of Section 2.8(f), which shall be since December 28, 2008), the Contributing Tribune Entities have conducted the Cubs Business in all material respects only in the Ordinary Course and there has been no:

-23-

(a)     (i) other than with respect to Wrigley Field, development, change, event or occurrence that, individually or in the aggregate, has had, or is reasonably likely to have, a Cubs Material Adverse Effect, or (ii) with respect to Wrigley Field, development, change, event or occurrence that, individually or in the aggregate, to the Knowledge of the Tribune Parties, has had a Cubs Material Adverse Effect;

(b)     amendment or other change to the certificate of formation or limited liability company agreement of any of the Cubs Entities;

(c)     other than commitments for capital expenditures that do not exceed $200,000 individually or $500,000 in the aggregate, making of any capital expenditure commitments (to the extent unpaid) with respect to the Cubs Business that are not contemplated by the 2008 or 2009 capital budgets for the Cubs Business that Tribune has made available to Bidder prior to the date of this Agreement;

(d)     establishment, adoption, entering into, amendment or materially increasing benefits under, or termination of: (i) any collective bargaining agreement covering Cubs Non-Player Employees except, in the case of this clause (i), for the resolution of grievances in the Ordinary Course; or (ii) other than in the Ordinary Course, any benefit plan or compensation plan, arrangement or agreement (including bonus, profit sharing, pension or retirement, stock option or other equity right, deferred compensation, severance or post-employment benefits) for any Cubs Non-Player Employee;

(e)     other than in the Ordinary Course or pursuant to a Contract with any Non-Player Employee set forth in Schedule 2.17, increase in the base salary of, or payment of any bonus to, such Cubs Non-Player Employee;

(f)     change in any method of accounting or accounting practice relating to the Cubs Business, except, after the date of this Agreement, as required by Law;

(g)     material Tax election or change in Tax accounting, Tax calculating or Tax reporting methods or practices relating to the Cubs Business that would be binding on Newco or any of its Subsidiaries for any taxable period (or portion thereof) ending on or after the Closing;

(h)     material change or material modification to any of the following insofar as they relate to the Cubs Business: (i) written billing and collection policies, procedures and practices with respect to accounts receivable or unbilled charges; (ii) written policies, procedures and practices with respect to the provision of discounts, rebates or allowances; or (iii) written payment policies, procedures and practices with respect to accounts payable; or

(i)     any authorization, approval, agreement or commitment to do any of the foregoing.

Section 2.9     Assets; Title.

(a)     Except as set forth on Schedule 2.9(a), the Cubs Contributed Assets (other than the Owned Real Property and Leased Real Property, the structural and physical condition

-24-

and suitability of which is addressed in Section 2.11(j) and other sections expressly referred to in Section 2.11(j)) that are tangible assets of any kind or description are in good operating condition and repair, ordinary wear and tear excepted, and suitable in all material respects for their current and intended use.

(b)    Except as set forth on Schedule 2.9(b) and except for Cubs Excluded Assets, the Cubs Contributed Assets and the assets, properties and rights used to provide services pursuant to the Transition Services Agreement constitute all the material assets, real property, properties and rights (i) owned, used, or held for use in connection with, or that are otherwise required for the conduct of, the Cubs Business as currently conducted and, (ii) subject to any assets disposed of or abandoned in the Ordinary Course since January 1, 2008, owned, used, or held for use in connection with, or that were otherwise required for the conduct of, the Cubs Business as conducted at any time since January 1, 2008. Except as set forth on Schedule 2.9(b) and except for Cubs Excluded Assets, all of the assets reflected on the latest balance sheet included in the Cubs Entity Interim Financial Statements are included in the Cubs Contributed Assets unless disposed of or abandoned in the Ordinary Course after the date of the Cubs Entity Interim Financial Statements and prior to the date hereof or in the Ordinary Course and in compliance with this Agreement after the date hereof. All Cubs Contributed Assets reflected on the Cubs Entity Interim Financial Statements are owned by the Cubs Entities unless disposed of in the Ordinary Course after the date thereof.

(c)    The Contributing Tribune Entities have good title to, or hold valid and existing leases or licenses for, all of the Cubs Contributed Assets (other than the Owned Real Property and Leased Real Property, which is addressed in Section 2.11), free and clear of all Liens, other than Permitted Liens and any Liens that will be extinguished by the Transaction Approval Orders. Contributing Tribune Entities will at the Closing convey, or cause to be conveyed, to Newco (other than with respect to the Direct Cubs Contributed Assets, which will be conveyed to Direct Newco Subs) and Direct Newco Subs (with respect to the Direct Cubs Contributed Assets) good title to, or a valid leasehold interest in or license for, all of the Cubs Contributed Assets (other than the Owned Real Property and Leased Real Property, which is addressed in Section 2.11), free and clear of all Liens, other than Permitted Liens.

Section 2.10    Intellectual Property.

(a)    Schedule 2.10(a) lists all Cubs Intellectual Property owned by a Tribune Party for which registration has issued or has been applied for and is pending.

(b)    Schedule 2.10(b) lists all registrations and pending applications for MLB Cubs Intellectual Property.

(c)    Schedule 2.10(c) lists all material IP Licenses, identifying all of the parties thereto (and indicating which party is the licensor and which party is the licensee) and the date thereof.

(d)    Neither the operation of the Cubs Business nor any of the Cubs Intellectual Property infringes, misappropriates or violates the Intellectual Property Rights of any

-25-

Person in a manner that would reasonably be expected to result in a Tribune Party becoming liable for any material damages or subject to an injunction of any kind (whether temporary, preliminary, permanent or otherwise). There are no pending or, to the Knowledge of the Tribune Parties, threatened claims against the Contributing Tribune Entities alleging that the operation of the Cubs Business materially infringes, materially misappropriates or materially violates the Intellectual Property Rights of any Person. The Cubs Intellectual Property will not be materially adversely affected by the execution and delivery of this Agreement or the consummation of the Transactions (other than the Newco Sale). Except as set forth on <u>Schedule 2.10(d)</u>, to the Knowledge of the Tribune Parties, no Person is infringing any of the Cubs Intellectual Property which, individually or in the aggregate with all other infringements of the Cubs Intellectual Property, is reasonably likely to have a Cubs Material Adverse Effect.

(e)    The Cubs Intellectual Property, MLB Cubs Intellectual Property and any Intellectual Property Rights used in connection with providing services under the Transition Services Agreement together include all Intellectual Property Rights material to and currently used in the operation of the Cubs Business.

(f)    Except with such exceptions as, individually and in the aggregate, do not have and are not reasonably likely to have, a Cubs Material Adverse Effect, (i) each registered item of the Cubs Intellectual Property owned by a Tribune Party (other than MLB Cubs Intellectual Property) is valid and enforceable, and all registrations thereof are valid and subsisting, and (ii) all necessary documents and certificates in connection with such registered Cubs Intellectual Property have been filed with the relevant patent, trademark, domain name registrar or other authority in the United States, foreign jurisdiction or administrative agency, as the case may be, for the purposes of registering or maintaining such Cubs Intellectual Property.

None of the representations and warranties set forth in this <u>Section 2.10</u> or otherwise is made or otherwise applicable to the Designated Cubs Historical Broadcast Rights.

Section 2.11    <u>Real Property</u>.

(a)    (i) Set forth on <u>Schedule 2.11(a)</u> is a list of all Real Property (indicating the owner of each parcel) owned by the Cubs Entities or the Trusts (the "**Owned Real Property**"). With respect to the Owned Real Property, (i) the applicable owner listed in <u>Schedule 2.11(a)</u> has good and marketable indefeasible fee simple title to the Owned Real Property listed as owned by it on <u>Schedule 2.11(a)</u> and to all buildings, structures and other improvements thereon, free and clear of all Liens other than Permitted Liens and any Liens that will be extinguished by the Transaction Approval Orders, (ii) except as set forth on <u>Schedule 2.11(a)</u>, such owner has not leased or otherwise granted to any Person the right to use or occupy the Owned Real Property except in the ordinary course of business and in a manner that will not materially interfere with the operation of the Cubs Business in the Ordinary Course and (iii) there are no outstanding options, rights of first offer or rights of first refusal to purchase any Owned Real Property or any portion thereof or interest therein.

(ii)    Other than Liens (A) relating to actions approved by Bidder in writing, or (B) for which title insurance is provided pursuant to the Title Policies as set forth in

-26-

Section 4.16, or (C) that are otherwise Permitted Liens, no new material Liens shall be created on any of the Cubs Contributed Owned Real Property or Insured Leased Real Property after the date hereof and prior to or on the Closing Date.

(b)    Schedule 2.11(b) lists all Real Property (listing the corresponding Real Property Lease and indicating the lessor and lessee for each parcel) leased, subleased or licensed by any Cubs Entity (the "**Leased Real Property**"). Except as set forth on Schedule 2.11(b), all of the Real Property Leases are in writing, and copies of all Real Property Leases and all material amendments thereto have been made available to Bidder (all of which are listed on Schedule 2.11(b)) prior to the date of this Agreement.

(c)    As of the date hereof, no Tribune Party or, to the Knowledge of the Tribune Parties, a Trust has received written notices of any special assessments for public improvement pending or threatened against the Owned Real Property.

(d)    As of the date hereof, except as set forth on Schedule 2.11(d), no Tribune Party or, to the Knowledge of the Tribune Parties, a Trust has received written notice of any material tax reduction proceedings pending against the Owned Real Property.

(e)    Except as set forth on Schedule 2.11(e), no Tribune Party or Trust has outstanding construction contracts for work to be done on the Owned Real Property, and no construction work has been done on the Owned Real Property in the past six months, pursuant to which there is more than $300,000 (in the aggregate for all Owned Real Property) owed to the contractors performing such work.

(f)    Tribune has made available to Bidder true, correct and complete copies of (i) all material engineering reports prepared by or on behalf of Tribune or any of its Subsidiaries at any time since January 1, 2007 that relate to the Owned Real Property and (ii) all material engineering reports prepared by or on behalf of Tribune, any of its Subsidiaries or the Trusts at any time on or before January 1, 2007 and since January 1, 2005 of which the Tribune Parties have Knowledge that relate to the Owned Real Property.

(g)    Cubs LLC is the sole beneficiary under a Trust Agreement, dated May 21, 1992 and known as Trust Number 115551-09 (the "**Clark Trust**"), of which Chicago Title Land Trust Company ("**Trustee**") is trustee, which owns fee title to certain real property more formally known as 3811-3815 N. Clark Street, Chicago (the "**Clark Property**"). Cubs LLC has the authority and power to direct Trustee to convey title to the Clark Property to Newco.

(h)    Cubs LLC is the sole beneficiary under a Trust Agreement, dated August 27, 1991 and known as Trust Number 114447-00 (the "**Racine Trust**"), of which Trustee is trustee, which owns fee title to certain real property more formally known as 3822 N. Racine Street, Chicago (the "**Racine Property**"). Cubs LLC has the authority and power to direct Trustee to convey title to the Racine Property to Newco.

(i)    No Contributing Tribune Entity is identified in the Office of Foreign Assets Control Specially Designated Nationals and Blocked Persons list, or any comparable list

-27-

prepared by the Office of Foreign Assets Control, Department of Homeland Security, Department of State, or Department of the Treasury, or is in violation of any anti-money laundering or anti-terrorism law.

(j)        Except as set forth on Schedule 2.11(j), no Tribune Party has any Knowledge of an actual structural deficiency at Wrigley Field with respect to which a qualified third Person expert retained by or on behalf of a Tribune Party has advised the Cubs Entities requires significant repair such that failure to repair would reasonably be expected to cause a Cubs Material Adverse Effect during the 2009 or 2010 baseball season.  For the avoidance of doubt, this Section 2.11(j) and Sections 2.5, 2.8(a), 2.9(b) and 2.14 (in each case, to the extent such sections relate to the Cubs Contributed Owned Real Property) are the sole and exclusive representations or warranties with respect to the structural and physical condition of any Cubs Contributed Owned Real Property or sufficiency of any Cubs Contributed Owned Real Property for its current or intended use.  Notwithstanding anything in this Agreement to the contrary, no item contained in any Schedule to this Agreement shall be deemed an exception to this Section 2.11(j) unless such disclosure is specifically set forth on Schedule 2.11(j).

(k)        Except as set forth on Schedule 2.11(k), as of the date hereof there are no current/pending material insurance claims with respect to any of the Owned Real Property.

Section 2.12    Employee Benefits.

(a)        Schedule 2.12(a) lists each Benefit Plan.

(b)        Prior to the date of this Agreement, Tribune Parties have made available to Bidder copies or summaries of each material Benefit Plan.  For each Transferred Benefit Plan, the Tribune Parties have made available to Bidder copies of, (i) the current summary plan description, (ii) summaries of material modifications, (iii) related trust agreements (or other funding arrangements) or insurance contracts, (iv) the latest IRS determination letter, (v) the latest annual financial statements (including both accounting statements and complete actuarial reports for all defined benefit plans), and (vi) the latest annual reports on Form 5500 (including all required schedules and accountants' opinions).

(c)        Except as provided on Schedule 2.12(c), each Benefit Plan is and has been operated and administered in all material respects in accordance with its terms, the terms of any collective bargaining agreement, and all applicable Laws.  Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code has a current favorable determination letter or is entitled to rely on an opinion letter from the IRS as to its tax-qualified status, and to the Knowledge of the Tribune Parties, there are no circumstances that could reasonably be expected to result in revocation of such favorable determination letter or that would adversely affect the qualified status of such plan.  No Tribune Party has utilized the Employee Plans Compliance Resolution System to remedy any qualification failure of any Benefit Plan or the U.S. Department of Labor's Voluntary Fiduciary Correction Program to correct any fiduciary violations under any Benefit Plan, other than corrections that do not require a filing with the IRS or the Department of Labor.

-28-

(d)     All contributions and premium payments required to be paid under or with respect to any Transferred Benefit Plan have been timely paid and any amounts withheld from employees for pension, welfare, or other benefits have been timely deposited into the appropriate trust accounts.

(e)     The Tribune Parties have made all contributions required to be made by them to any Multiemployer Plan.

(f)     Except as provided in Schedule 2.12(f), none of the Cubs Entities has during the last six years maintained or contributed to, or had an obligation to contribute to, or has any liability or obligation under a Multiemployer Plan with respect to any Cubs Employee.

(g)     With respect to any "defined benefit plan," within the meaning of Section 3(35) of ERISA, maintained or contributed to by Tribune Parties or any ERISA Affiliate for the benefit of any Cubs Employee: (i) no liability to the Pension Benefit Guaranty Corporation ("**PBGC**") has been incurred (other than for premiums not yet due); (ii) no notice of intent to terminate any such plan has been filed with the PBGC or distributed to participants and no amendment terminating any such plan has been adopted; (iii) no proceedings to terminate any such plan have been instituted by the PBGC, and to the Knowledge of the Tribune Parties, no event or condition has occurred which would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any such plan; (iv) no "accumulated funding deficiency," within the meaning of Section 302 of ERISA or Section 412 of the Code, whether or not waived, has been incurred; (v) except as provided on Schedule 2.12(g), no "reportable event" within the meaning of Section 4043 of ERISA (for which the 30-day notice requirement has not been waived by the PBGC) has occurred within the last six years; (vi) no Liens on assets of Cubs Entities have arisen or are likely to arise under ERISA or the Code; and (vii) there has been no cessation of operations at a facility subject to the provisions of Section 4062(e) of ERISA within the last six years.

(h)     Except as provided in Schedule 2.12(h), there are no actions, suits or claims (other than routine claims for benefits) with respect to any Benefit Plan pending or, to the Knowledge of Tribune Parties, threatened, which could give rise to a material liability of Newco or any Newco Sub, and Tribune Parties have no Knowledge of any facts which are reasonably likely to give rise to any such actions, suits or claims (other than routine claims for benefits). Except as set forth on Schedule 2.12(h), there is currently no audit or Action by any Government Authority against or involving any Benefit Plan and, to the Knowledge of Tribune Parties, there is no such audit contemplated or under consideration, or any investigation pending, contemplated or under consideration, by any such Government Authority.

(i)     No event has occurred and no condition exists with respect to any Benefit Plan that is reasonably likely to subject Bidder, Newco, any Newco Sub or any of their respective employees, agents, directors, or Affiliates, directly or indirectly (through indemnification or otherwise), to a liability for breach of fiduciary duty, a "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code, or any tax, penalty, or fine under Section 502 or 4071 of ERISA or Subtitle D, Chapter 43 of the Code.

-29-

(j)     No event has occurred and no condition exists with respect to any employee benefit plan or arrangement currently or previously maintained or contributed to by any ERISA Affiliate of Tribune which could subject Bidder, Newco, any Newco Sub or any of their respective Affiliates or employees, directly or indirectly (through an indemnification agreement or otherwise), to liability, including liability under Sections 412, 4971 or 4980B of the Code or Title IV of ERISA.

(k)     Each "plan" (within the meaning of such term as used in Treas. Reg. § 1.409A-1(c)) that covers any Cubs Employee and that is a "non-qualified deferred compensation plan" (within the meaning of Section 409A(d)(1) of the Code and Treas. Reg. § 1.409A-1(a)) and is otherwise subject to Section 409A of the Code (a "**409A Plan**") that was in effect prior to January 1, 2009, (i) between the later of January 1, 2005 and the effective date of such 409A Plan and December 31, 2008, was operated in compliance with Section 409A of the Code based on a good faith, reasonable interpretation of the statute and applicable Internal Revenue Service guidance, (ii) since January 1, 2009 has been operated in full compliance with Section 409A and the final regulations promulgated thereunder, and (iii) was amended prior to January 1, 2009 to fully comply with the requirements of the final regulations promulgated under Section 409A of the Code and to eliminate all provisions that violate, or could give rise to a violation of, Section 409A. Each 409A Plan adopted or entered into on or after January 1, 2009 has, since it first became effective, fully complied in form and operation with the requirements of Section 409A of the Code and the final regulations promulgated thereunder. No "non-qualified deferred compensation plan" that covers any Cubs Employee that would be a 409A Plan but for the effective date provisions applicable to Section 409A of the Code as set forth in Section 885(d) of the American Jobs Creation Act of 2004, as amended (the "**AJCA**"), has been "materially modified" within the meaning of Section 885(d)(2)(B) of the AJCA after October 3, 2004. Since January 1, 2005, each Tribune Party has fully complied with all withholding or reporting obligations imposed on it under Section 409A. No Tribune Party has any actual or potential liability with respect to any 409A Plan, including, but not limited to, any obligation to make any gross-up, make-whole, or other additional payment with respect to taxes, interests or penalties imposed under Section 409A of the Code, other than for the payment of normal benefits in accordance with the terms of such 409A Plan.

(l)     Except as set forth on Schedule 2.12(l), neither the execution and delivery of this Agreement nor the consummation of the Transactions (other than the Newco Sale) (either alone or in conjunction with any other event) will, with respect to any Cubs Employee, or as provided in Article V: (i) increase any benefits otherwise payable under any Benefit Plan; (ii) result in any acceleration of the time of payment or vesting of any such benefits; (iii) result in the payment of any retention, stay bonus, change of control, enhanced severance, or similar payments becoming due to, or with respect to, any Cubs Employee; (iv) limit or prohibit the ability to amend or terminate any Benefit Plan; (v) require the funding of any trust or other funding vehicle; or (vi) renew or extend the term of any agreement in respect of compensation for an employee of a Cubs Entity or the Cubs Business, in each case that would create any liability to Bidder, Newco or any Newco Sub. Except as set forth on Schedule 2.12(l), no payment or series of payments that would constitute a "parachute payment" (within the meaning of Section 280G of the Code) has been made or will be made by Tribune or any of its Affiliates,

-30-

directly or indirectly, to any Cubs Employee in connection with the execution of this Agreement or as a result of the consummation of the Transactions (other than the Newco Sale).

(m)     Except as set forth on Schedule 2.12(m), no Benefit Plan is maintained outside the United States or provides a benefit to any Cubs Employee whose principal place of employment is outside the United States.

(n)     Cubs Entities, Tribune and any other applicable Affiliate of Tribune have, in good faith, properly classified for all purposes (including for Tax purposes and for purposes of determining eligibility to participate in any Benefit Plan) all Persons who have performed services for or on behalf of the Cubs Business and have properly withheld and paid all applicable Taxes and made appropriate filings in connection with services provided by such Persons to the Cubs Business in accordance with such classifications.

(o)     Other than Cubs Entities, neither Tribune nor any Affiliate of Tribune is a contributing employer to any of the Transferred Benefit Plans.

(p)     Schedule 2.12(p) sets forth any bonus or other amount payable to a Cubs Employee (i) as a result of the Transactions (other than the Newco Sale) (including, for the avoidance of doubt, any bonus or other amount payable pursuant to Section 5.3), or (ii) under Tribune's Management Equity Incentive Plan.

(q)     Notwithstanding the foregoing, other than as set forth in Section 2.12(e) or (f), any representation or warranty being made in this Section 2.12 relating to any Multiemployer Plan or Transferred Benefit Plan included in the definition of Benefit Plan is only being made to the Knowledge of the Tribune Parties.

Section 2.13    Labor Matters.

(a)     Tribune Parties have delivered to the Bidder by e-mail, dated August 20, 2009, from Ryan D. Harris of McDermott Will & Emery LLP to Kevin R. Schulz of Foley & Lardner LLP a list of all Cubs Non-Player Employees, as of August 19, 2009, 2009, including for each such employee, his or her: (i) name, (ii) job title, (iii) department, (iv) base salary or wage rate, (v) date of hire, (vi) status as a full-time or part-time employee, (vii) location, (viii) 2008 bonus or commission, (ix) exempt or non-exempt status, and (x) status as a bargaining unit or non-bargaining unit employee.  Such list also lists each Cubs Non-Player Employee who was on a leave of absence as of August 19, 2009.  Set forth on Schedule 2.13(a) is a list of all Cubs Player Employees and Cubs Non-Player Employees, identifying each as either a Cubs Player Employee or Cubs Non-Player Employee, as of the date hereof.

(b)     Except (i) as set forth on Schedule 2.13(b), (ii) for general corporate and finance services and (iii) for employees that have provided the types of services to be provided pursuant to the Transition Services Agreement, in the twelve months prior to the date of this Agreement, no employee of Tribune or any of its Affiliates (other than Cubs Entities) has performed material services in connection with the operation of the Cubs Business, other than

-31-

such services provided in connection with this Agreement and the Transactions (other than the Newco Sale).

(c)    Except as set forth on <u>Schedule 2.13(c)</u>, with respect to Cubs Non-Player Employees, no Cubs Entity is a party to or bound by any collective bargaining agreement, nor, since January 1, 2007, has any Cubs Entity experienced any strikes, grievances, claims of unfair labor practices, arbitrations, or other collective bargaining disputes with respect to the Cubs Non-Player Employees, nor, to the Knowledge of the Tribune Parties, is any such action threatened. Except as set forth on <u>Schedule 2.13(c)</u>, to the Knowledge of the Tribune Parties, there is no organizational effort currently being made or threatened by or on behalf of any labor union with respect to the Cubs Non-Player Employees.

Section 2.14    <u>Environmental Matters</u>.

(a)    Except as set forth on <u>Schedule 2.14(a)</u> and with such exceptions as, individually and in the aggregate, do not have and are not reasonably likely to have, a Cubs Material Adverse Effect:

(i)    the Cubs Business and the Cubs Real Property are in compliance with all applicable Environmental Laws;

(ii)    any environmental Permits required in connection with the operations of the Cubs Business as currently conducted have been obtained, the Cubs Business is in compliance with the terms and conditions of such Permits, and no actions or proceedings are pending or, to the Knowledge of Tribune Parties, threatened, to revoke, modify or terminate any environmental Permit;

(iii)    (A) there are no underground storage tanks on the Mueller Building and T-Building Property and no Hazardous Materials have been spilled or released in, on or under the Mueller Building and T-Building Property by Tribune Parties in an amount that would trigger a current reporting or remediation obligation under current Environmental Laws, and (B) to the Knowledge of Tribune Parties, there are no underground storage tanks on any of the Cubs Real Property and, to the Knowledge of Tribune Parties, no Hazardous Materials have been spilled or released in, on or under any of the Cubs Real Property (other than the Mueller Building and T-Building Property) by Tribune Parties in an amount that would trigger a current reporting or remediation obligation under current Environmental Laws;

(iv)    no Tribune Party or, to the Knowledge of the Tribune Parties, either Trust has received written notice of, and Tribune Parties have no Knowledge of, any order, directive, claim or demand from any Government Authority that remains outstanding or unresolved with respect to any actual or potential liability under Environmental Law on the part of any Cubs Entity or related to the Cubs Business or any of the Cubs Contributed Assets;

(v)    none of the Cubs Entities, Tribune, Non-Cubs Contributing Tribune Entities, or, to the Knowledge of the Tribune Parties, the Trusts is the subject of any outstanding written notice, order, directive, claim or demand or Contract with any Government

-32-

Authority or other Person relating to the Cubs Business or any of the Cubs Contributed Assets respecting any: (A) Environmental Laws; (B) Remedial Action; or (C) any release or threatened release of Hazardous Material; and

(vi)    none of the Cubs Entities, Tribune, Non-Cubs Contributing Tribune Entities, or, to the Knowledge of the Tribune Parties, the Trusts is currently in any negotiations, agreements or undertakings with any Person relating to any Remedial Action on the Cubs Real Property or otherwise relating to the Cubs Business.

(b)    Tribune Parties have made available to Bidder (and listed in full on Schedule 2.14(b)) prior to the date of this Agreement (i) copies of all material reports, studies, tests, and any results of monitoring programs, in each case commissioned by a Tribune Party and in the possession of Tribune or any of its Subsidiaries, within the last two years, pertaining to the generation, storage, use, handling, transportation, treatment, emission, spillage, disposal, release or removal of Hazardous Materials at, in, on or under the Owned Real Property or the Leased Real Property; (ii) copies of any environmental investigations or assessments of the Owned Real Property or the Leased Real Property conducted by Tribune or its Subsidiaries or any environmental consultant engaged by either of them since January 1, 2007; and (iii) copies of any environmental investigations or assessments of the Owned Real Property or the Leased Real Property conducted by Tribune or its Subsidiaries or any environmental consultant engaged by either of them on or before January 1, 2007 of which the Tribune Parties have Knowledge.

Section 2.15    Taxes.

(a)    Each Tribune Party and any consolidated, combined or unitary group of which any Tribune Party is or was a member has timely filed all material Tax Returns which are required to be filed by it in respect of the Cubs Business; and such Tribune Party (or consolidated, combined, or unitary group) has timely paid all Taxes shown as due on such Tax Returns. All such Tax Returns were correct and complete in all material respects.

(b)    Except as set forth on Schedule 2.15(b), there are no Liens for Taxes (except for Taxes not yet due or for which adequate reserves have been established on the Cubs Entity Interim Financial Statements in accordance with GAAP) upon any of the Cubs Contributed Assets.

(c)    Except as set forth on Schedule 2.15(c), there are no federal, state, local or foreign Tax Audits currently pending with regard to any Taxes or Tax Returns of any of the Tribune Parties (or any consolidated, combined or unitary group of which any Tribune Party is or was a member) in which a Taxing Authority has raised an issue that relates to the Cubs Business, and, to the Knowledge of Tribune Parties, no such Tax Audit is threatened. Except as set forth on Schedule 2.15(c), to the Knowledge of Tribune Parties, no claim has ever been made by a Taxing Authority in a jurisdiction where any Tribune Party does not file Tax Returns that it is or may be subject to taxation by that jurisdiction as a consequence of operating the Cubs Business. Prior to the date of this Agreement, Tribune Parties have made available to Bidder copies of all Tax Returns, or portions thereof, relating to the Cubs Business of the Tribune Parties and their

-33-

predecessors (and any consolidated, combined or unitary group of which any Tribune Party or predecessor is or was a member) for all taxable periods ending after December 31, 2005.

(d)     No power of attorney has been granted by any of the Tribune Parties that is currently in force with respect to any matter relating to Taxes and that will be binding on Newco or any Subsidiary thereof for any taxable period (or portion thereof) ending after the Closing. No Tribune Party has requested or received a ruling from, or entered into a closing or other agreement with, any Taxing Authority (nor has any such ruling been requested or received or any agreement been entered into by any other party that binds or would bind any Tribune Party) that will be binding on Newco or any Subsidiary thereof for any taxable period (or portion thereof) ending after the Closing.

(e)     There are no elections with respect to Taxes affecting the Cubs Business that will bind Newco or any Subsidiary thereof for any taxable period (or portion thereof) ending after the Closing, other than elections shown on or in the Tax Returns that have prior to the date of this Agreement been made available to Bidder.

(f)     Tribune Parties have complied with all applicable Laws relating to the withholding of Taxes and have paid to the proper Taxing Authority on a timely basis all Taxes required to have been withheld and paid in connection with amounts paid, or deemed to have been paid in connection with the Cubs Business, or owing to any employee, independent contractor or other Person employed or contracted by a Tribune Party in connection with the Cubs Business.

Section 2.16    Insurance.  Schedule 2.16 contains a list of all insurance policies owned or held by any Tribune Party or any of its Subsidiaries that covers the Cubs Business, any Cubs Player Employees or any Cubs Contributed Assets, including any insurance policies obtained through Major League Baseball, and indicates the owner of each such policy and whether it is a Cubs Contributed Asset.  All such policies are in full force and effect, all premiums with respect thereto have been paid to the extent due, and no written notice of cancellation, termination or non-renewal has been received by Tribune or any of its Subsidiaries with respect to any such policy.

Section 2.17    Contracts.

(a)     Schedule 2.17(a) lists as of the date of this Agreement all of the following written, and a brief description of all oral, Cubs Contracts (all of the Cubs Contracts required to be listed on Schedule 2.17(a), together with the Real Property Leases, the Contracts that are required to be listed on Schedule 2.11(b) and the Contracts required to be listed on Schedule 2.18, the "**Material Contracts**"):

(i)     any mortgage, indenture, note, installment obligation or other instrument, agreement or arrangement for or relating to any Debt;

-34-

(ii)     any guaranty, direct or indirect, primary or secondary, of any obligation for borrowings or otherwise (other than endorsements for collection or deposit made in the Ordinary Course);

(iii)     any collective bargaining agreement relating to any Cubs Non-Player Employee, complete with any material still-active written agreements or confirmations of agreement with any union that modify or explain the parties' respective rights and/or obligations pursuant to such collective bargaining Contract, such as material memoranda of understanding, letter agreements, letters of understanding, grievance settlements, side agreements, and any similar documents that purport to memorialize in writing a material agreement between the applicable employer and union;

(iv)     any Cubs Contract granting any Person a Lien, other than a Permitted Lien, on any of the Cubs Contributed Assets;

(v)     any Cubs Contract providing for the grant of any rights to purchase or lease any of the Cubs Contributed Assets (other than in the Ordinary Course);

(vi)     any Cubs Contract for the use of personal property involving payments in excess of $50,000 per annum;

(vii)     any Cubs Contract with a remaining term in excess of 12 months that provides for annual aggregate payments by the Cubs Entities (contingent or otherwise, including milestones, earn-outs, contingent payments and other future payment obligations) that exceed, have exceeded or would reasonably be expected to exceed $500,000 (other than Contracts with Cubs Player Employees and Cubs Non-Player Employees), other than Contracts that are terminable by a Tribune Party on less than 91 days' notice (without imposing any material obligation or liability on a Tribune Party);

(viii)     any Cubs Contract with a remaining term in excess of 12 months that provides for annual aggregate payments to any Cubs Entities (contingent or otherwise, including milestones, earn-outs, contingent payments and other future payment obligations) that exceed, have exceeded or would reasonably be expected to exceed $350,000, other than Contracts that are terminable by a Tribune Party on less than 91 days' notice (without imposing any material obligation or liability on a Tribune Party);

(ix)     any Cubs Contract: (A) containing non-competition, non-solicitation or other similar limitations restricting the conduct of the Cubs Business, or the ability of the Cubs Business (including Newco or any of its Subsidiaries after the Closing) to compete with any Person or to solicit the employees or customers of any Person; (B) that grants to the other party "most favored nation" status; or (C) that grants to the other party any material exclusive right or rights;

(x)     all Cubs Contracts pursuant to which any Cubs Entity licenses software that is material to the operation of the Cubs Business (other than COTS Software);

-35-

(xi)    any Contract imposing any material restrictions or limitations on the sale or other transfer of any of the Cubs Contributed Assets, other than for purposes of this clause (xi), anti-assignment provisions;

(xii)    any Cubs Contract for a partnership, joint venture or similar agreement;

(xiii)    any Cubs Contracts involving any obligation or liability (whether direct or indirect, fixed or contingent, known or unknown, due or to become due, accrued or otherwise, and whether or not determined or determinable) as surety, co-signer, endorser, co-maker, indemnitor or otherwise in respect of the obligations of any Person (other than a Cubs Entity) (other than endorsements for collection or deposit made in the Ordinary Course);

(xiv)    any Cubs Contract containing or providing for any Tax sharing, Tax allocation or Tax indemnification;

(xv)    any purchase, license or sale agreement, other than IP Licenses, relating to the pending acquisition, licensing or disposition of any business or, other than in the Ordinary Course, any Cubs Contributed Assets or Cubs Liabilities;

(xvi)    any marketing or advertising Cubs Contract (A) with anticipated revenue to a Cubs Entity in any 12-month period reasonably expected to be greater than $100,000 or (B) granting any material exclusive rights;

(xvii)    any written Contract with any Cubs Player Employees involving payments in excess of $250,000 per year;

(xviii)    other than Benefit Plans, any written Contract with any Cubs Non-Player Employees relating to employment or compensation;

(xix)    any Cubs Contract with any independent contractor that performs services in connection with the Cubs Business with a remaining term of longer than 12 months or involving the payment of more than $100,000 per year, other than Contracts that either (i) are terminable by either party on less than 91 days' notice without imposing any material obligation or liability on a Cubs Entity or (ii) do not require any material future payments by a Cubs Entity;

(xx)    any material Contracts pursuant to which material services remain to be performed with developers, architects, contractors, tenants or potential tenants, or licensees relating to the Triangle Property (including any building proposed to be built thereon) or to any of the following relating to Wrigley Field: left field expansion and club, right field expansion and club, terrace reserved club, upgrade of current mezzanine boxes, addition of upper deck boxes, addition of management boxes, behind home lounge, left field upper deck expansion, and right field upper deck expansion;

(xxi)    any Contract that would change the name of, or grant the right to any Person to change the name of, Wrigley Field (including by adding the association with another name);

-36-

(xxii)   any Contract that would grant the right to any Person to name the Triangle Property or any buildings or assets to be located thereon or to associate the name of such Person or any other Person with the Triangle Property, any other Owned Real Property or any buildings or assets to be located thereon;

(xxiii)  any Contracts involving royalty payments to any Cubs Entity with respect to the live, in-person viewing of any Major League Baseball game from a building adjacent to Wrigley Field (the "**Rooftop Agreements**") or any Contract that affects in any material respect any royalty payments under a Rooftop Agreement or that will otherwise require any Cubs Entity to refund any material royalty payments or otherwise make any material payments under a Rooftop Agreement;

(xxiv)  any Contracts related to non-baseball events scheduled to occur after the date hereof at Wrigley Field pursuant to which a Tribune Party or any of its Subsidiaries will or would reasonably be expected to receive $350,000 or more;

(xxv)   other than pursuant to any MLB Rules and Regulations, any Cubs Contracts granting any rights to broadcasts, whether radio, television or otherwise, of Major League Baseball games in which the Club is a participant;

(xxvi)  any Contracts providing for concession services at Wrigley Field or the Triangle Property providing for annual payments to any Cubs Entity that would reasonably be expected to exceed $100,000 during any baseball season;

(xxvii) any Contracts the primary purpose of which is to provide space for parking multiple vehicles on days of Major League Baseball games or other events at Wrigley Field;

(xxviii)        any Contracts the primary purpose of which is to provide services or systems related to the sale, exchange or resale of tickets;

(xxix)  any written Player Development Agreements with any minor league ball clubs; and

(xxx)   any power of attorney.

(b)      Except as set forth on Schedule 2.17(b), Tribune Parties have prior to the date of this Agreement made available to Bidder copies of all written Material Contracts, in each case together with all material modifications, amendments and supplements thereto.

(c)      With such exceptions as, individually and in the aggregate, do not have, and are not reasonably likely to have, a Cubs Material Adverse Effect and except as listed on Schedule 2.17(c): (i) all of the Material Contracts are in full force and effect and are valid and binding on and enforceable against the applicable Contributing Tribune Entities, in accordance with their terms and, to the Knowledge of Tribune Parties, on and against the other parties thereto; (ii) none of the Contributing Tribune Entities is, nor to the Knowledge of Tribune Parties, is any other party to any Material Contract, in breach of, or default under, any such

-37-

Material Contract; (iii) neither Tribune nor any of its Subsidiaries has waived any material future right under any Material Contract; (iv) no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, any Material Contract; and (v) since January 1, 2007, neither Tribune nor any of its Subsidiaries has given to or received from any other Person, any written notice or other written communication regarding any actual or alleged violation or breach of, or default under, any Material Contract that has not been resolved.  Notwithstanding the foregoing, with respect to any Material Contracts entered into on behalf of Cubs LLC by a third party pursuant to authority granted to such third party by the Major League Baseball Documents, such representations and warranties are made to Tribune's Knowledge.

(d)      Except for Contracts that are entered into in connection with the services being provided under the Transition Services Agreement and as set forth on <u>Schedule 2.17(d)</u>, neither Tribune nor any of its Affiliates (other than the Cubs Entities) are parties to any Contract that is primarily used in the Cubs Business or material to the operation of the Cubs Business.

Section 2.18    <u>Transactions with Insiders/Affiliate Transactions</u>.  <u>Schedule 2.18</u> lists all Contracts: (a) between (i) a Cubs Entity, on the one hand, and (ii) Tribune or one or more Affiliates of a Tribune Party (each of the foregoing Persons in this clause (a)(ii) being referred to hereafter as an **"Insider"**), on the other hand (other than agreements entered into in the Ordinary Course relating to the purchase of tickets at the same price as such tickets are offered to the general public); and (b) to the Knowledge of the Tribune Parties, to which an Insider is a party that affects the Cubs Business or any of the Cubs Contributed Assets or Cubs Liabilities or under which the Cubs Business or any of the Cubs Contributed Assets or Cubs Liabilities has received any benefits.  <u>Schedule 2.18</u> describes the material services provided to the Cubs Business by Tribune and those of its Affiliates that are not Cubs Entities.

Section 2.19    <u>No Brokerage</u>.  Except as set forth on <u>Schedule 2.19</u>, all of the fees of which shall be borne by the Cubs Entities (and none of which shall be Cubs Liabilities), there is no investment banker, broker, finder or other similar intermediary who has been retained by or on behalf of any Tribune Party or any of its Affiliates who might be entitled to any fee, commission or other payment from Newco, any Newco Sub or any of their respective Subsidiaries or from Bidder or any of their respective Affiliates upon consummation of the Transactions (including the Newco Sale).

Section 2.20    <u>Major League Baseball Matters</u>.

(a)      Cubs LLC is the owner, holder and operator of a valid, subsisting and effective Major League Baseball franchise, which permits and authorizes Cubs LLC to operate a professional Major League Baseball team currently known as the "Chicago Cubs."

(b)      Except as set forth on <u>Schedule 2.20(b)</u>, none of Tribune Parties is in default in any material respect under the provisions of the Major League Baseball Documents. To the Tribune Parties' Knowledge, the Club is not subject to any pending investigation by Major League Baseball nor is any investigation involving the Club, the Cubs Business or the Cubs Contributed Assets threatened by Major League Baseball.

-38-

(c)      Since January 1, 2007, Tribune Parties have made all required and currently due contributions to, and paid all material assessments, fines and other charges (including revenue sharing payments) which have been assessed by Major League Baseball and which are due, and there are no material outstanding unpaid contributions to, or assessments, fines or other charges, which will not be included in the Statement and have been assessed by Major League Baseball against Tribune Parties but have not been paid. Since January 1, 2005, the Tribune Parties have made all required revenue sharing payments to Major League Baseball, except for any instances which have been cured without ongoing material consequence to the operation of the Cubs Business and are not part of a pattern or course of conduct that would reasonably be expected to continue after the Escrow Closing and to have a material adverse impact on the Cubs Business.

(d)      [Intentionally omitted]

(e)      Except as set forth on Schedule 2.20(e), all Material Contracts and Club player contracts required to be filed with Major League Baseball since January 1, 2007 have been filed with Major League Baseball, and no such Material Contract or Club player contract has been disapproved or rejected by Major League Baseball. Since January 1, 2007, Major League Baseball has not notified Tribune Parties in writing that any of those Material Contracts or Club player contracts violates Major League Baseball's substantive requirements in any material respects, including the requirements set forth in the MLB Rules and Regulations.

(f)      Schedule 2.20(f)(i) lists and attaches all Major League Baseball revenue sharing rulings issued to the Club since January 1, 1999. Schedule 2.20(f)(ii) lists all pending requests by the Club for a revenue sharing ruling. Schedule 2.20(f)(iii) lists all years subject to a revenue sharing audit, and with respect to each year, identifies the issues under review.

(g)      Schedule 2.20(g) sets forth a true and complete list of all annuities, life insurance policies and other investment vehicles as in effect as of the date hereof (collectively, the "**Investment Vehicles**") purchased by Tribune Parties to discharge an obligation to any past or present player or coach, and the amount to be discharged by such Investment Vehicles. All such Investment Vehicles are in the name of Tribune Parties. Tribune Parties have paid all premiums and made all investment contributions required in connection with the Investment Vehicles.

Section 2.21   Player Matters. To Tribune Parties' Knowledge, except as disclosed on Schedule 2.21, no Cubs Player Employee is subject to suspension by the Club or Major League Baseball, and no Cubs Player Employee is subject to any investigation by Major League Baseball or the Club that may result in suspension, expulsion or material fines. Schedule 2.21 sets forth a list of each Cubs Player Employee and his service time under the Major League Rules.

Section 2.22   Suites. Set forth on Schedule 2.22 is a list of all Suite Licenses to which any of the Tribune Parties is a party with a term that extends beyond the 2009 Major League Baseball season other than Contracts regarding marketing or sponsorship that provide for the use of suites for longer periods, which are listed on Schedule 2.17(a). No Insider has any unsatisfied

-39-

obligation to pay a Tribune Party pursuant to a Suite License for the 2009 Major League Baseball season, regardless of whether such obligation was due prior to the date hereof or is due on or after the date hereof.

Section 2.23    No Other Representations and Warranties. Except for the representations and warranties contained in this Article II, in Section 4.14(d), in the Tribune Escrow Closing Certificate or in any other Transaction Documents, (a) no Tribune Party, and none of their respective Affiliates and no other Person, makes any representations or warranties, written or oral, statutory, express or implied, with respect to the Cubs Business, the Cubs Contributed Assets, the Cubs Liabilities, Cubs Entities or their respective business, assets, liabilities, results of operation or financial condition, and (b) without limiting the foregoing, no Tribune Party, and none of their respective Affiliates and no other Person, is making any representation or warranty to Bidder with respect to the Newco Sale (except as otherwise expressly set forth in Section 2.19) or any financial projection or forecast relating to the business, assets, liabilities, results of operation or financial condition of the Cubs Business or the information contained in the Data Room, any confidential information memorandum or similar document relating to the Cubs Business or contained in any other written or oral presentation by management, discussion or other commentary of Tribune or any Cubs Entity. Bidder, Newco and any Newco Sub each hereby expressly waives any other claims and causes of action and any other representations or warranties, express, implied, at common law, by Law or otherwise, in each case relating to the accuracy, completeness or materiality of any other information, data or other materials (written or oral) heretofore furnished to them and their Representatives by or on behalf of Tribune or any of its Subsidiaries. Nothing in this Section 2.23 shall limit the right of any Bidder Indemnified Person with respect to fraud or the inaccuracy or breach of any of the representations and warranties contained in this Article II, in Section 4.14(d) or in the Tribune Escrow Closing Certificate and the indemnity obligations for inaccuracy or breach thereof pursuant to Section 8.2(a)(i).

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF BIDDER

Bidder represents and warrants to and for the benefit of Tribune Parties, and the Ricketts Lender represents and warrants to and for the benefit of Tribune Parties only with respect to Sections 3.1 to 3.3 and only then as such sections relate to the Ricketts Lender, as of the date of this Agreement, the Escrow Closing Date and the Closing Date as follows:

Section 3.1    Organization; Good Standing. Bidder is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Bidder Trust is an irrevocable trust that was created under the laws of the State of Nebraska and is currently administered under the laws of the State of Delaware. Each of Bidder, Bidder Trust and Ricketts Lender (collectively, the "**Bidder Parties**") is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the conduct of its business requires such qualification or licensing, except for such failures to be qualified and in good standing that, individually or in the aggregate, do not have, and are not reasonably likely to have, a material adverse effect on the ability of Bidder Parties to perform their obligations, if any, under this

-40-

Agreement or any of the other Transaction Documents to which they are a party. Bidder Trust owns all of the issued and outstanding equity interests of Bidder.

Section 3.2    Authority. Each Bidder Party has all requisite power and authority to execute and deliver this Agreement (if applicable) and the other Transaction Documents to which it is or will be a party, to perform its obligations, if any, hereunder and thereunder and to consummate the Transactions. The execution and delivery by each Bidder Party of this Agreement (if applicable) and the other Transaction Documents to which it is or will be a party, the performance by each Bidder Party of its obligations, if any, hereunder and thereunder and the consummation by each Bidder Party of the Transactions have been duly and validly authorized by all necessary action on the part of each Bidder Party and no other proceedings on the part of either Bidder Party, its members, trustee, beneficiaries or otherwise is required to authorize this Agreement (if applicable) or other Transaction Documents to which either Bidder Party is or will be a party or for either Bidder Party to consummate the Transactions. This Agreement (if applicable) has been, and, upon execution and delivery thereof by each Bidder Party, each of the other Transaction Documents to which either Bidder Party is or will be a party shall be, duly and validly executed and delivered by each Bidder Party and, assuming the due and valid authorization, execution and delivery by the other parties thereto, constitute, or in the case of each such other Transaction Document, shall constitute, a valid and binding obligation of each Bidder Party, enforceable against it in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights and general principles of equity.

Section 3.3    Non-Contravention. The execution and delivery by each Bidder Party of this Agreement (if applicable) and the other Transaction Documents to which it is or will be a party, the performance by each Bidder Party of its obligations hereunder (if applicable) and thereunder, the consummation by each Bidder Party of the Transactions, and the compliance by each Bidder Party with any of the provisions hereof (if applicable) and thereof, does not and shall not: (a) conflict with or violate any provision of the certificate of incorporation or bylaws (or comparable organizational documents) of Bidder or Ricketts Lender or (ii) the Bidder Trust Governing Documents; (b) require on the part of Bidder Party any material notice or material filing with, or any material Permit, or other material authorization of, or any material exemption by, any Government Authority, except in connection with or in compliance with the provisions of the HSR Act; (c) conflict with, result in a violation or breach of, constitute a default under, result in the acceleration of, give rise to any right to accelerate, terminate, modify or cancel, or, except for the MLB Approvals as provided under this Agreement, require any notice, consent, authorization, approval or waiver under, or create or change any rights or obligations under, any Contract to which any Bidder Party is a party or any Permit by which any of the assets or businesses is bound; or (d) with the passage of time, the giving of notice or the taking of any action by another Person, have any of the effects described in clauses (a) through (c) of this Section 3.3, with such exceptions as, individually and in the aggregate, do not have, and are not reasonably likely to have, a material adverse effect on the ability of Bidder to perform its obligations, if any, under this Agreement or any of the other Transaction Documents to which it is a party.

-41-

Section 3.4    <u>Financing</u>.  Attached hereto as <u>Exhibit M-1</u> is a true and complete copy of an equity commitment letter (the "**Equity Commitment Letter**"), dated the date of this Agreement, which provides for (a) an amount to be funded to the Closing Agent on the Escrow Closing Date and released to Newco as an equity contribution to Newco on the Closing Date equal to the sum of (i) $150,000,000, plus (ii) an amount, if any, equal to the Transaction Expense Shortfall, and (b) an amount to be funded to the Closing Agent on the Escrow Closing Date and released to Ricketts Lender as an equity contribution to Ricketts Lender on the Closing Date equal to $35,000,000.  Attached hereto as <u>Exhibit M-2</u> is a true and complete copy of an amended and restated debt commitment letter, dated as of August 21, 2009 (the "**Senior Debt Commitment Letter**"), which in the aggregate provides for Senior Debt Financing of $450,000,000 (subject to reduction as set forth in <u>Section 4.11(e)</u>) for Newco, of which an amount equal to $425,000,000 (subject to reduction as set forth in <u>Section 4.11(e)</u>) would be funded to the Senior Lender Agent on the Escrow Closing Date and released to the Closing Agent on the Closing Date.  Attached hereto as <u>Exhibit M-3</u> is a true and complete copy of the commitment (the "**Subordinated Debt Commitment Letter**," and together with the Equity Commitment Letter and the Senior Debt Commitment Letter, are referred to as the "**Commitment Letters**"; the Commitment Letters other than the Equity Commitment Letter are referred to as the "**Debt Commitment Letters**"), dated on or prior to the date of this Agreement, which provides for (x) Subordinated Debt Financing for Newco in an amount of $248,750,000 (which amount may be increased in accordance with the terms of <u>Section 4.11(e)</u>), which amount will be funded to the Closing Agent on the Escrow Closing Date and released on the Closing Date upon the issuance of such Subordinated Debt Financing, and (y) $20,000,000 to be funded to the Closing Agent on the Escrow Closing Date and released on the Closing Date to capitalize Ricketts GuarantyCo.  The Commitment Letters are in full force and effect and are valid and binding on the financing sources parties thereto; provided, however, that after the date of this Agreement, Commitment Letters may be replaced in accordance with <u>Section 4.11(c)</u> or <u>(e)</u>, and on the Escrow Closing Date, the Senior Debt Commitment Letter will expire and be replaced by the Bank Credit Agreement.  The obligations of the financing sources to fund the commitments under the Commitment Letters are not subject to any condition other than as set forth in the Commitment Letters or, following execution thereof in accordance with the Commitment Letters, the Bank Credit Agreement.  The Lead Arrangers (as defined in the Senior Debt Commitment Letter) and the Lenders (as defined in the Senior Debt Commitment Letter) have received (i) the full amount of the Initial Payment (as defined in the Senior Debt Commitment Letter) and (ii) all Initial Costs (as defined in the Senior Debt Commitment Letter).  To the Knowledge of Bidder, no event has occurred that (with or without notice, lapse of time, or both) would constitute a breach or default under the Commitment Letters by any party thereto.  Bidder has no Knowledge of any facts or circumstances that are reasonably likely to result in (i) any of the conditions set forth in the Commitment Letters not being satisfied or (ii) the funding to Newco contemplated in the Commitment Letters not being made available to Newco on a timely basis in order to consummate the Transactions.

Section 3.5    <u>No Brokerage</u>.  Other than GSP Securities LLC and Barclays Capital Inc. (as successor to Lehman Brothers Inc.), all of the fees of which (in their capacities as investment banker, broker, finder or other similar intermediary) are to be borne by Bidder or one of its Affiliates (other than Newco or its Subsidiaries), there is no investment banker, broker, finder or

-42-

other similar intermediary who has been retained (in such capacity) by or on behalf of any Bidder Party or any of its Subsidiaries who might be entitled to any fee, commission or other payment from Newco, any Newco Sub or any of their respective Subsidiaries or from any Tribune Party or any of their respective Affiliates upon consummation of the Transactions.

Section 3.6    Title and Survey.  Bidder has received and is satisfied with (a) (i) the pro forma owners title insurance policies with respect to each parcel of Cubs Contributed Owned Real Property and (ii) the pro forma leasehold title insurance policies with respect to each parcel of Insured Leased Real Property, all as attached hereto as Exhibit G-2 (collectively, the "**Pro Forma Title Policies**") and all as issued by Chicago Title Insurance Company (the "**Title Company**") and (b) the surveys for the Cubs Contributed Owned Real Property, in each case described on Schedule 3.6.

Section 3.7    Bidder Trust Documents.  Prior to the date of this Agreement, Bidder has delivered to Tribune true and complete copies of the Bidder Trust Governing Documents, each as in effect on the date hereof.  Bidder Trust owns 100% of the equity interest of Bidder.

Section 3.8    Information Provided to Major League Baseball.  Bidder has provided all information to Major League Baseball concerning itself and its Affiliates required by Major League Baseball in compliance with the MLB Rules and Regulations, which information is accurate in all material respects and does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements therein not misleading.

Section 3.9    Newco.  Newco has not conducted any business or taken any actions (and prior to Closing will not conduct any business or take any actions) other than in furtherance of the consummation of the Transactions contemplated hereby.

Section 3.10    No Other Representations and Warranties.  Except for the representations and warranties contained in this Article III, in the Bidder Escrow Closing Certificate or in any other Transaction Documents, (a) no Bidder Party and none of their respective Affiliates and no other Person, makes any representations or warranties, written or oral, statutory, express or implied, with respect to any Bidder Party or any of their respective Affiliates or their respective business, assets, liabilities, results of operation or financial condition, and (b) without limiting the foregoing, no Bidder Party, and none of their respective Affiliates and no other Person, is making any representation or warranty to Tribune Parties with respect to any financial projection or forecast relating to any Bidder Party or any of their respective Affiliates or their respective business, assets, liabilities, results of operation or financial condition or the information contained in any proposals submitted by or on behalf of any Bidder Party to Tribune.  Tribune Parties each hereby expressly waive any claims and causes of action and any other representations or warranties, express, implied, at common law, by Law or otherwise, in each case relating to the accuracy, completeness or materiality of any other information, data or other materials (written or oral) heretofore furnished to them and their Representatives by or on behalf of any Bidder Party or any of their respective Affiliates.  Nothing in this Section 3.10 shall limit the right of any Tribune Party with respect to fraud or the inaccuracy or breach of any of the representations and warranties contained in this Article III or in the Bidder Escrow Closing

-43-

Certificate and the indemnity obligations for inaccuracy or breach thereof pursuant to <u>Section 8.2(b)(i)</u>.

ARTICLE IV

COVENANTS

Section 4.1    <u>Conduct of Cubs Business</u>.  Except (w) as set forth on <u>Schedule 4.1</u>, (x) as required by applicable Law (provided that Tribune will to the extent permissible under Law and the MLB Rules and Regulations provide notice to Bidder), (y) as otherwise expressly required or permitted by this Agreement, or (z) with the prior written consent of Bidder (which consent shall not be unreasonably withheld, conditioned or delayed; otherwise, such consent may be withheld in Bidder's sole discretion), from and after the date of this Agreement and until the Closing, Tribune Parties shall, and Tribune shall cause each Contributing Tribune Entity to:

(a)    except to the extent restricted by the terms of this Agreement (including the remainder of this <u>Section 4.1</u>), conduct the Cubs Business in the Ordinary Course in all material respects;

(b)    subject to the limitations imposed by the remainder of this <u>Section 4.1</u>, use reasonable best efforts consistent with past practice to: (A) preserve intact the Cubs Business; (B) keep available to Bidder the services of all Cubs Non-Player Employees (without obligation to increase or pay additional compensation to any such Cubs Non-Player Employees); (C) preserve for Bidder the goodwill of sponsors, advertisers and broadcasters of the Cubs Business, which shall not require the Tribune Parties to renew any Contracts or exercise any rights thereunder outside of the Ordinary Course; (D) not shorten or lengthen the customary payment cycles for any of its payables or receivables; and (E) continue in full force and effect all insurance listed as placed by "Cubs" and, to the extent that Tribune Parties can control the continuation of such policies, "MLB" on <u>Schedule 2.16</u> covering any of the Cubs Business or any Cubs Contributed Assets; in each case, in all material respects;

(c)    promptly deliver notice to Bidder in writing of any specific event or circumstance of which they have Knowledge, or of which they receive notice, that: (A) has resulted or could reasonably be expected to result in any of the conditions set forth in <u>Section 7.1</u>, <u>Section 7.2</u> or <u>Section 7.4</u> not being satisfied; (B) with respect to any such event or circumstance occurring on or after the Escrow Closing, would have resulted or would have reasonably been expected to result in any of the conditions set forth in <u>Section 7.1</u> or <u>Section 7.2</u> not being satisfied if such event or circumstance had occurred prior to the Escrow Closing; (C) any Action is pending or, to the Knowledge of Tribune Parties, threatened that relates to the Transactions (including the Newco Sale); or (D) any of the covenants or agreements of Tribune Parties contained in this Agreement is breached in any material respect;

(d)    not establish, adopt, enter into or institute any material increase or material change in any Benefit Plan with respect to the Cubs Non-Player Employees, except to the extent required by the terms of such benefit plan or to comply with the terms of this Agreement or to comply with notice and bargaining obligations under federal labor law; provided, however, that

-44-

Tribune Parties may amend any Benefit Plan with respect to Cubs Non-Player Employees if (A) such amendment applies generally to similarly situated employees of Tribune or its Affiliates participating in such Benefit Plan who are not Cubs Non-Player Employees or (B) such amendment does not materially increase the cost of providing such benefits;

      (e)    use reasonable best efforts to obtain all consents required from third parties whose consent or approval is required pursuant to any Material Contract, or otherwise to consummate the Transactions (other than the Newco Sale), including all MLB Approvals; provided, however, that notwithstanding anything to the contrary in this Agreement, such action shall not include any requirement of Tribune Parties or any of their Affiliates to pay money to any third Person, commence or participate in any litigation, offer or grant any accommodation or undertake any obligation or liability (in each case financial or otherwise) to any third Person (including any Government Authority);

      (f)    not enter into (A) any advertisement or sponsorship Contract with any Person for any Major League Baseball season after the 2009 season if (I) such Contract involves revenues over the life of the Contract in excess of $5,000,000, (II) such Contract was not negotiated on an arm's length basis, (III) such Contract involves a disproportionate payment of the revenues under such Contract in the 2009 season, (IV) the period of sponsorship or advertisement thereunder includes any baseball season after the 2010 season or (V) such Person has a material business relationship with Tribune or any of its Affiliates (other than the Cubs Entities) and under such Contract the Cubs Entities will receive terms that are below market in any material respect in respect of the Cubs Business and Tribune or any of its Affiliates (other than the Cubs Entities) will (whether or not under such Contract) receive terms with respect to any other business relationship that are better in any material respect than the terms that the Tribune or any of such Affiliates would have received absent such Contract, (B) any Contract of the type described in Sections 2.17(a)(xxi) or (xxii), (C) any Contract of the type described in Section 2.17(a)(xx) that, individually or in the aggregate with other such Contracts entered into after the date of this Agreement, requires the payment of more than $250,000 after Closing, or (D) any Contract pursuant to which any Newco Sub will have liability for capital expenditures after the Effective Time in excess of $1,000,000 in the aggregate; provided that the restriction in this clause (C) shall not apply to (I) amounts set forth or provided for in the most recent versions of the 2008 and/or 2009 budgets for the Cubs Business made available to Bidder prior to the date of this Agreement, or (II) amounts to the extent otherwise reasonably necessary to address a public safety issue;

      (g)    complete ordinary and necessary repairs on the Owned Real Property in the Ordinary Course, continue capital expenditure projects on the Owned Real Property in accordance with the Club's 2009 capital expenditure budget, and operate each parcel of Owned Real Property in a manner consistent with the manner in which such parcel is currently used in connection with the Cubs Business in each case in all material respects;

      (h)    maintain the confidentiality of Confidential Information, except (A) to the extent of any disclosures made by the Cubs Entities in the Ordinary Course, (B) to the extent necessary in connection with the administration of the Bankruptcy Case or obtaining the Approval Orders (including, but not limited to, by providing such information to committees or

-45-

professionals representing constituencies in the Bankruptcy Case), (C) in connection with the obligations pursuant to Sections 4.7, 4.11 or 4.14, (D) to Bidder, its Affiliates and their representatives, (E) otherwise in furtherance of consummating the Transactions (other than the Newco Sale), or (F) to any Major League Baseball Entities;

(i)    not enter into or amend any employment agreement with a Cubs Non-Player Employee;

(j)    if any material claims arise from or after the date of this Agreement until the Closing, or otherwise exist, of which the Tribune Parties have Knowledge, that the Tribune Parties have Knowledge, or should have Knowledge, are covered under any Policy, then, to the extent consistent with past practice, use their reasonable best efforts to report all such claims within such time and in such manner as required under the Policies, and shall further use their reasonable best efforts to pursue recovery on all such claims consistent with past practice;

(k)    not settle any disputes set forth as item numbers 5, 11, 12 and 26 on Schedule 2.5(a) if such settlement would reasonably be expected to have a direct and material adverse impact on the Cubs Business after the Closing; and

(l)    not settle any Tax Audits set forth on Schedule 2.15(c) (other than any such Tax Audits involving Tribune's federal income taxes or any Benefit Plans of Tribune the liabilities of which will not be included in the Cubs Liabilities) if such settlement would reasonably be expected to have a direct and material adverse impact on the Cubs Business after the Closing.

Notwithstanding the foregoing, nothing herein shall limit or otherwise impair Tribune Parties' operation of the Club, or give Bidder, directly or indirectly, any right to control or direct the operations of the Club, including, but not limited to (i) the making or not making of any player trades, acquisitions, dispositions, waivers, drafts, or the like, (ii) hiring or firing of any manager, coach or other Cubs Player Employee and (iii) the conduct of, performance or management of any baseball activities; provided, however, that prior to (A) entering into any Contract with any Cubs Player Employee which provides for (I) potential payments during any season in an amount greater than $1,000,000 or a signing bonus which will not be paid prior to the Escrow Closing in an amount greater than $1,000,000, or (II) potential payments over the life of the Contract in an aggregate amount greater than $5,000,000 or (III) a remaining term of three years or more, (B) hiring or firing any manager of the Club, or (C) trading any Cubs Player Employee who has been on the Club's 40-man roster during the 2009 season, in each case (with respect to clauses (A), (B) or (C)), prior to the taking of any such action, to the extent reasonably practicable and in compliance with MLB Rules and Regulations, the Tribune Parties shall give reasonable notice thereof to Bidder and shall consult with Bidder with respect thereto but, for the avoidance of doubt, the taking of any action set forth in clauses (A)-(C) (following such notice and consultation to the extent reasonably practicable and in compliance with MLB Rules and Regulations) shall not be a breach of this Agreement.

-46-

Section 4.2     Reasonable Best Efforts; HSR.

(a)     Each Tribune Party, Bidder and the Ricketts Lender (but, with respect to the Ricketts Lender, only to the extent the Ricketts Subordinated Loan Commitment Agreement is implicated) agrees to (and to cause its Affiliates to) cooperate with the other parties and to use its reasonable best efforts to take, or cause to be taken, all actions, and do, or cause to be done, all things, necessary, proper or advisable, in each case, as promptly as practical, to (i) cause the conditions to the Escrow Closing and Closing to be satisfied and to consummate, as promptly as practical, the Transactions (including, for purposes of this Section 4.2, to prevent the occurrence of, in the case of Tribune Parties, any Major Tribune Payment Trigger, Middle Tribune Payment Trigger or Minor Tribune Payment Trigger or, in the case of Bidder, Major Bidder Payment Trigger, Middle Bidder Payment Trigger or Minor Bidder Payment Trigger), (ii) provide all notices to, and obtain all approvals, consents, waivers, registrations, Permits and other authorizations from, any Governmental Authority or other Person necessary, proper or advisable to consummate such Transactions, and (iii) furnish the other parties and their counsel with such information and assistance as may be reasonably required in order to effectuate the foregoing actions.

(b)     In furtherance and not in limitation of the foregoing, each party hereto agrees to (i) make all pre-closing notification filings required under the HSR Act or any other applicable Law within five (5) Business Days after the date of this Agreement, (ii) keep the other party informed on a reasonably current basis of any material communication received by such party from, or given by such party to, any Government Authority and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the Transactions (including by promptly providing the other party with copies of any written (including email) communications with any Government Authority or private party), (iii) permit the other party to review and incorporate the other party's reasonable comment to, any material communication delivered to, and consult with the other party in advance of any meeting or conference with, any Government Authority relating to the Transactions or in connection with any proceeding by a private party, and give the other party the opportunity to attend and participate in such meetings and conferences (to the extent permitted by such Government Authority or private party), (iv) respond to and comply with, as promptly as practical, any request for information or documentary material pursuant to the HSR Act and take or cause to be taken, all other actions necessary to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as practicable, but in no event later than the Termination Date and (v) use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things, necessary, proper or advisable to (A) resolve objections, if any, as may be asserted by a Governmental Authority or other Person with respect to the Transaction, and (B) defend any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Transactions, including by seeking to have any stay or temporary restraining order entered into by any court or other Government Authority vacated or reversed. No party to this Agreement shall consent to any voluntary delay of the consummation of the Transactions at the behest of any Government Authority without the prior written consent of the other party to this Agreement, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that for purposes

-47-

of this sentence, a consent will not be considered voluntary if the failure to give it will result in adverse consequence for such party from the Government Authority (including, for example, a fine or other penalty).

(c)    The parties shall not and shall cause their respective Affiliates not to (i) directly or indirectly, acquire, purchase, lease or license (or agree to acquire, purchase, lease or license) any business or collection of assets of any kind or nature if doing so would reasonably be expected to delay consummation of the Transactions (including the Newco Sale), or (ii) take any action that would reasonably be expected to prevent or delay the obtaining of clearance or any necessary approval of any Government Authority or the expiration of any waiting period.

(d)    Each party agrees to (and shall cause its Affiliates to) use reasonable best efforts to take any and all action necessary in order to bring about the expiration or termination of the waiting period under the HSR Act, or any other Law.  In the event that any action is threatened or instituted challenging the Transactions as violative of any Law, each party shall use (and shall cause its Affiliates to use) reasonable best efforts to take all action necessary to avoid or resolve such action.

Section 4.3    Public Announcements.  From and after the date of this Agreement, except as required by Law or MLB Rules and Regulations or directions from any Major League Baseball Entity or the Commissioner, no party to this Agreement will issue, or permit any of its Affiliates or Representatives to issue, any press release or otherwise make any public statements with respect to this Agreement and the Transactions (including the Newco Sale) without the prior written consent of the other party (or parties); provided, however, that, to the extent permitted by MLB Rules and Regulations and in compliance with all directions by any Major League Baseball Entity and the Commissioner, the parties shall be permitted to issue or make, and permit their respective Affiliates and Representatives to issue or make, statements to the extent reasonable and appropriate to (a) complete the Debt Financing or obtain the Approval Orders or (b) satisfy their obligations under applicable Law, including under federal labor law with respect to notice to a union and/or bargaining unit regarding the decision to enter into and/or the effects of this Agreement and the other Transaction Documents.

Section 4.4    Non-Solicitation.

(a)    During the period beginning on the date of this Agreement and ending on the second anniversary of the Closing Date, Tribune Parties will not, and they will cause their Subsidiaries not to, directly or indirectly, solicit for employment, recruit or hire any Cubs Non-Player Employee with a position (prior to, on or after the Closing) of sales manager or director or above to become an employee or consultant of, or otherwise provide services to, Tribune or any Subsidiary thereof; provided, however, that this Section 4.4(a) shall not prohibit: (i) a solicitation by way of a broad-based advertisement that is not targeted at employees of Newco, any Newco Sub or any of their respective Subsidiaries or the hiring of any such Person who responds to such solicitation; or (ii) the solicitation or employment of any employee after the employment of such employee was terminated by Newco or any Newco Sub, and not by such employee.

-48-

(b)     During the period beginning on the date of this Agreement and ending on the second anniversary of the Closing Date, Bidder, Newco, and the Newco Subs will not, and they will cause their Subsidiaries not to, directly or indirectly, solicit for employment, recruit or hire any employee of Tribune and its Subsidiaries (prior to, on or after the Closing) whose primary responsibilities relate to sales to become an employee or consultant of, or otherwise provide services to, the Bidder Parties, Newco, any Newco Sub or any Subsidiary thereof; provided, however, that this Section 4.4(b) shall not prohibit: (i) a solicitation by way of a broad based advertisement that is not targeted at employees of Tribune or any of its Subsidiaries or the hiring of any such Person who responds to such solicitation; or (ii) the solicitation or employment of any employee after the employment of such employee was terminated by Tribune or any of its Subsidiaries, and not by such employee.

(c)     It is the desire and intent of the parties hereto that the provisions of this Section 4.4 shall be enforced to the fullest extent permitted under the Laws and public policies of each jurisdiction in which enforcement is sought. Without limitation of Bidder's rights under Section 10.14, if any court determines that any provision of this Section 4.4 is unenforceable, then such court will have the power to reduce the duration or scope of such provision, as the case may be, and, in reduced form, such provision shall be enforceable; it is the intention of the parties hereto that the foregoing restrictions shall not be terminated, unless so terminated by a court, but shall be deemed amended to the extent required to render them valid and enforceable, such amendment to apply only with respect to the operation of this Section 4.4 in the jurisdiction of the court that has made the adjudication.

(d)     The parties acknowledge and agree that the restrictions contained in this Section 4.4 are a reasonable and necessary protection of the immediate interests of the parties, and any violation of these restrictions would cause substantial injury to the parties and that the parties would not have entered into this Agreement without receiving the additional consideration offered hereby in binding themselves to these restrictions. In the event of a breach or a threatened breach by any party or any of their Affiliates of these restrictions, the non-breaching party will be entitled to seek an injunction restraining such parties from such breach or threatened breach (without the necessity of proving the inadequacy as a remedy of money damages or the posting of a bond); provided, however, that the right to injunctive relief will not be construed as prohibiting the non-breaching party from pursuing any other available remedies, whether at law or in equity, for such breach or threatened breach.

Section 4.5     Confidential Information.

(a)     From and after the Closing, Tribune Parties shall, and shall cause their Affiliates and Representatives to, maintain the confidentiality of, and shall not use for the benefit of themselves or others, any confidential information relating primarily to the Cubs Business, the Cubs Contributed Assets or the Cubs Liabilities (the "**Confidential Information**"); provided, however, that Confidential Information shall be deemed not to include information that (i) is or becomes generally available to the public other than as a result of a disclosure, in violation of this Agreement, by Tribune Parties or any of their Affiliates or Representatives, (ii) is or becomes available to Tribune Parties on a non-confidential basis from a source not known by such party to be bound by an obligation or duty of confidentiality, or (iii) is independently

-49-

developed by Tribune or its Affiliates (other than the Cubs Entities) or their Representatives after the consummation of the Closing without use of any of the Confidential Information.

(b)      (i) From and after the date hereof until Closing, Bidder shall, and shall cause its Affiliates and Representatives to, maintain the confidentiality of, and shall not use for the benefit of themselves or others, any Confidential Information (which will include for this purpose any of the terms of this Agreement and the other Transaction Documents), and (ii) from and after the Closing Date, Bidder, Newco and each Newco Sub shall, and shall cause their Affiliates and Representatives to, maintain the confidentiality of, and shall not use for the benefit of themselves or others, any confidential information of Tribune and its Affiliates (other than Confidential Information but including any of the terms of this Agreement and the other Transaction Documents) ("**Tribune Confidential Information**"); provided, however, that Tribune Confidential Information for purposes of this Section 4.5(b) shall be deemed not to include information that (A) is or becomes generally available to the public other than as a result of a disclosure, in violation of this Agreement, by Bidder Parties, Newco, any Newco Sub or any of their Affiliates or Representatives, (B) is or becomes available to Bidder Parties, Newco or Newco Sub on a non-confidential basis from a source not known by such party to be bound by an obligation or duty of confidentiality, or (C) is independently developed by Bidder Parties, Newco or Newco Sub or any of their Affiliates or their Representatives after the consummation of the Closing without use of any of the Tribune Confidential Information.

(c)      In the event that any party or any of their Subsidiaries, Affiliates or Representatives are required by interrogatories, requests for information or documents, subpoenas, demand or similar process to disclose any Confidential Information or Tribune Confidential Information of the other party, such party shall provide the other party with prompt prior written notice of such request or requirement so that the other party may seek an appropriate protective order (and provide and cause their Subsidiaries, Affiliates and Representatives to provide such cooperation, at the requesting party's expense, as the requesting party shall reasonably request). If, in the absence of a protective order, a party or any of its Affiliates, Subsidiaries or Representatives are nonetheless required to disclose Confidential Information or Tribune Confidential Information, as the case may be, such party or its Affiliates, Subsidiaries or Representative, as the case may be: (x) may, and will cause each of its Affiliates, Subsidiaries and Representatives to, disclose only that portion of the Confidential Information or Tribune Confidential Information, as the case may be, that such party or its Subsidiaries, Affiliates or Representative is legally compelled to disclose; and (y) shall, and shall cause each of its Affiliates, Subsidiaries and Representatives to, at the request of the requesting party, use its reasonable best efforts, at the requesting party's expense, to obtain assurance that confidential treatment will be accorded such Confidential Information or Tribune Confidential Information, as the case may be. The parties agree to keep the terms of this Agreement confidential except that the parties may disclose such terms to their respective accountants, lenders, investors and other representatives to the extent necessary in connection with consummation of the Transactions and in accordance with MLB Rules and Regulations (so long as such Persons are advised that they must keep the terms of this Agreement confidential).

(d)      Notwithstanding anything to the contrary in this Agreement, (i) Tribune or any of its Subsidiaries may disclose or use any Confidential Information to the extent necessary

-50-

to (A) discharge, settle or resolve any Cubs Excluded Liabilities, (B) perform services pursuant to the Transition Services Agreement, (C) collect Retained Cubs Accounts Receivable, or (D) prepare its financial statements or respond to any audit, (ii) the parties may disclose or use any Confidential Information to the extent necessary to comply with their respective obligations under this Agreement, including in connection with the obtaining of any consents pursuant to Section 1.6 or the taking of any actions pursuant to Sections 4.2 or 4.11, and (iii) the parties and their Affiliates may disclose or use any Confidential Information to the extent necessary in connection with the administration of the Bankruptcy Case or obtaining the Approval Orders (including, but not limited to, by providing such information to committees or professionals representing constituencies in the Bankruptcy Case).

(e)     The Tribune Parties and Bidder shall use their respective reasonable best efforts to (i) maintain and continue the confidentiality and protection of the information related to the Transactions (including the Newco Sale) filed under seal pursuant to orders of the Bankruptcy Court, whether pursuant to Section 107 of the Bankruptcy Code, Bankruptcy Rule 9018 or otherwise, and (ii) oppose any effort to terminate or modify such confidentiality and protection.

Section 4.6     Access. From and after the date of this Agreement and until the Closing, Tribune Parties will give Bidder and its Representatives, upon reasonable notice and during normal business hours, reasonable access to the properties, facilities, Contracts, senior managers and books and records of the Tribune Parties or Trusts related to the Cubs Business, the Cubs Contributed Assets and the Cubs Liabilities, and they will, and will cause their respective Representatives to, furnish to Bidder all other documents, records and information (and copies thereof) relating to the Cubs Business, as Bidder may reasonably request; provided, however, that (a) Tribune Parties and Trusts shall not be required to provide such access to the extent that it would subject any of the properties of Tribune or any of its Subsidiaries to invasive physical testing or violate applicable Laws, (b) competitively sensitive information, if any, shall only be provided in accordance with applicable Law pursuant to the Confidentiality Agreement and (c) all such access shall be in compliance with all applicable MLB Rules and Regulations. From and after the date of this Agreement and until the Closing, upon a reasonable request from Bidder, Tribune Parties shall in good faith request CSN Chicago to provide Bidder reasonable access to the Contracts, senior managers and books and records of CSN Chicago. No investigation or receipt of information by Bidder Parties pursuant to, or in connection with, this Agreement will diminish or obviate any of the representations, warranties, covenants or agreements of Tribune Parties under this Agreement or the conditions to the obligations of Bidder under this Agreement.

Section 4.7     Negotiations.

(a)     From and after the date of this Agreement until the termination of this Agreement in accordance with its terms: (i) Tribune Parties shall, and they shall cause their Representatives and Affiliates to, negotiate exclusively and in good faith with Bidder with respect to any Acquisition Transaction; and (ii) Tribune Parties shall not, and shall cause their Representatives and Affiliates not to: (A) solicit or initiate or knowingly encourage any inquiries, proposals or offers (an **"Acquisition Proposal"**) from any Persons other than Bidder and Bidder

-51-

Trust and their respective Affiliates and Representatives for or relating to (or which may reasonably be expected to lead to) any investment in, acquisition of, transfer of, purchase of or other disposition of, directly or indirectly (other than sales of debt or equity of Tribune), all or any portion of the ownership interests or any of the assets of the Cubs Business or any of the Cubs Contributed Assets, whether by way of merger, business combination, reorganization, joint venture, sale of stock, sale of assets (other than (1) sales of assets in the Ordinary Course not expressly prohibited by this Agreement and (2) any such transfer to any other wholly owned Subsidiary of Tribune in accordance with the terms of this Agreement so long as such Subsidiary is bound by all obligations under this Agreement applicable to the transferring entity and such transfer does not materially adversely affect Bidder or Newco with respect to the assets to be contributed to or the liabilities to be assumed by Newco pursuant to this Agreement or adversely affect, in any material respect, the economic terms or other material terms of the Transactions (including the Newco Sale) with respect to Bidder or Newco) or otherwise (any of the foregoing, an "**Acquisition Transaction**"); (B) participate in any discussions, conversations, negotiations or other communications with any Person other than Bidder and Bidder Trust and their respective Affiliates and Representatives regarding, or furnish to or continue to provide access to (whether directly or indirectly through third party hosting sites or other means) any Person other than Bidder and Bidder Trust and their respective Affiliates and Representatives any information with respect to, or afford access to the business, properties, assets, books or records of the Cubs Business or any of the Cubs Contributed Assets in connection with, or otherwise assist or participate in, or knowingly facilitate or encourage any effort or attempt by any other Person relating to or in connection with, any Acquisition Proposal; or (C) enter into any agreement, arrangement or understanding with any other Person with respect to or in connection with any Acquisition Proposal.  Tribune Parties shall immediately cease and cause to be terminated all existing discussions, conversations, access to information, negotiations and other communications with any Persons other than Bidder and Bidder Trust and their respective Affiliates and Representatives, with respect to any Acquisition Proposal.  Upon the receipt by any Tribune Party of any bona fide written Acquisition Proposal, Tribune Parties shall notify Bidder in writing as soon as practicable (such notice to include the terms of such Acquisition Proposal and the identity of the Person making the Acquisition Proposal), and shall promptly notify the Person making the Acquisition Proposal of Tribune Parties' obligations under this Section 4.7.

      (b)     Notwithstanding the foregoing or any other provisions of this Agreement, if any Tribune Party receives an Acquisition Proposal or any communication that may reasonably be expected to lead to or otherwise relates to a potential Acquisition Proposal, the Tribune Parties shall be entitled, but not obligated, to advise the Bankruptcy Court of such Acquisition Proposal and shall be permitted to take any action or refrain from taking any action ordered (or otherwise directed) by the Bankruptcy Court with respect thereto, provided that Tribune Parties shall continue to use reasonable best efforts to obtain entry of the Approval Orders and to otherwise carry out the provisions hereof unless otherwise directed by order or direction on the record of the Bankruptcy Court.  Advising the Bankruptcy Court of any Acquisition Proposal or communication relating thereto and/or compliance with any resulting order or direction on the record of the Bankruptcy Court shall not be a breach or default of this

Agreement and, except as provided in <u>Section 4.15</u>, shall not create any liability under this Agreement.

(c)        After Closing, upon the request of Bidder, Tribune Parties shall promptly request all other Persons previously provided with information, documentation and other materials (whether in hard copy or electronic format) relating to any Acquisition Proposal either to return all such tangible documentation and other materials (including such Person's notes) to Tribune or to destroy, and certify the destruction of, such tangible documentation and other materials.

Section 4.8    <u>Certain Matters</u>.  Without limitation of the rights of Indemnified Parties under <u>Article VIII</u> and except with respect to any Action between a Tribune Party, on the one hand, and a Bidder, Newco or any Newco Sub, on the other hand:

(a)        Tribune Parties agree that, following the Closing, they shall, upon Bidder's reasonable request, use reasonable best efforts to cooperate, at Bidder's expense, with Bidder and its Affiliates in connection with any claim, defense, negotiation or settlement of any Cubs Liability or any Action relating to the Cubs Contributed Assets, the Cubs Liabilities or the Cubs Business; and

(b)        Bidder (and, from and after the time they shall execute the Joinder to this Agreement, Newco and each Newco Sub) agrees that, following the Closing, it shall, upon Tribune Parties' reasonable request, use reasonable best efforts to cooperate, at Tribune Parties' expense, with Tribune Parties and their Affiliates in connection with any claim, defense, negotiation or settlement of any Cubs Excluded Liability or any Action relating to the Cubs Contributed Assets or the Cubs Business.

Section 4.9    <u>Disposition, Transfer or Destruction of Records</u>.  Without limitation of rights and obligations of the parties under <u>Section 6.1</u> or <u>Article VIII</u>, for a period of seven years after the Closing:

(a)        Tribune Parties shall provide Bidder with 90 days prior written notice of any disposition or destruction of any financial or accounting books and records relating to the Cubs Business, the Cubs Contributed Assets or the Cubs Liabilities that are not included in the Cubs Contributed Assets, and Tribune Parties shall provide Bidder a reasonable opportunity to copy the relevant portions of such books and records prior to any such disposition, transfer or destruction; provided, however, that (i) for any books and records that contain information or data related to the Cubs Business, the Cubs Contributed Assets or the Cubs Liabilities that is combined with information relating to Tribune and its Subsidiaries (other than the Cubs Entities) that are capable of being redacted, at Bidder's reasonable request, Tribune Parties shall provide Bidder a reasonable opportunity to copy the relevant portions of such books and records redacted to remove such information relating to Tribune and its Subsidiaries (other than the Cubs Entities), and (ii) for any books and records that contain information or data related to the Cubs Business, the Cubs Contributed Assets or the Cubs Liabilities that is combined with information relating to Tribune and its Subsidiaries (other than the Cubs Entities) that are not capable of

-53-

being redacted, Bidder's right to copy such books and records under this Section 4.9(a) shall not apply; and

(b)    Bidder, Newco and each Newco Sub shall provide Tribune Parties with 90 days prior written notice of any disposition or destruction of any financial or accounting books and records relating to the Cubs Excluded Assets or the Cubs Excluded Liabilities that are included in the Cubs Contributed Assets, and Bidder shall provide Tribune Parties a reasonable opportunity to copy the relevant portions of such books and records prior to any such disposition, transfer or destruction.

Section 4.10    Post-Closing Access and Cooperation.  Without limitation of the rights and obligations of the parties under Section 6.2 (Tax Cooperation) and Article VIII, and except with respect to any Action between a Tribune Party, on the one hand, and Bidder, Newco or any Newco Sub, on the other hand, after the Closing Date:

(a)    Newco and its Subsidiaries shall provide Tribune and its Subsidiaries, for a period consistent with the record retention policies and practices of Newco, reasonable access to those records of Newco and its Subsidiaries insofar as they are Cubs Contributed Assets that relate to periods prior to the Closing, during normal business hours and on at least three (3) Business Days' prior written notice (or such shorter time period as reasonably necessitated by the urgency of the underlying facts and circumstances), in order to enable Tribune and its Subsidiaries to prepare financial statements or to discharge and defend any Cubs Excluded Liabilities; and

(b)    Tribune Parties shall provide Newco and its Subsidiaries, for a period consistent with the record retention policies and practices of Tribune Parties, reasonable access to those records of Tribune or any of its Subsidiaries insofar as they are Cubs Excluded Assets that relate to periods before or after the Escrow Closing, during normal business hours and on at least three (3) Business Days' prior written notice (or such shorter time period as reasonably necessitated by the urgency of the underlying facts and circumstances), in order to enable Newco and its Affiliates to prepare financial statements or to discharge and defend any Cubs Liabilities.

Section 4.11    Financing.

(a)    Bidder shall (and shall cause its Affiliates to) use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange and consummate the Debt Financing, Equity Financing and Ricketts GuarantyCo and Ricketts Lender Equity Financing on the terms and conditions described in the Commitment Letters, including (i) using reasonable best efforts to (x) satisfy on a timely basis all terms, covenants and conditions set forth in the Commitment Letters and Bank Credit Agreement; (y) enter into definitive agreements with respect thereto on terms and conditions substantially similar to the terms and conditions contemplated by the Commitment Letters; and (z) consummate the funding of (A) the Equity Financing, the Ricketts GuarantyCo and Ricketts Lender Equity Financing and an amount equal to the Subordinated Debt Financing to the Closing Agent and (B) an amount equal to the Senior Debt Financing (other than the Revolver) to the Senior Lender Agent, in each case, on the Escrow Closing Date as contemplated

-54-

by Section 1.1; and (ii) using reasonable best efforts to seek to enforce its rights under the Commitment Letters and Bank Credit Agreement. To the extent the Ricketts Subordinated Loan Commitment Agreement is implicated, the Ricketts Lender shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange and consummate the Debt Financing on the terms and conditions described in the Commitment Letters. Bidder will furnish correct and complete copies of all such definitive agreements to Tribune promptly upon their execution. Bidder shall not, nor shall it permit its Affiliates to, amend or alter, or agree to amend or alter, the Equity Commitment Letter or, except for an amendment to provide for an increase in the amount of Subordinated Debt to be provided thereunder to the extent permitted in Section 4.11(e), the Subordinated Debt Commitment Letter without the prior written consent of Tribune.

(b)       Each of the Bidder Covered Parties shall keep Tribune informed on a reasonably current basis with respect to all material activity of which Bidder has Knowledge concerning the status of their efforts to arrange and consummate the Debt Financing, Equity Financing and the Ricketts GuarantyCo and Ricketts Lender Equity Financing and shall give Tribune prompt notice of any material adverse change with respect thereto of which Bidder has Knowledge. Bidder shall provide Tribune, on a reasonably current basis, copies of all material documents and agreements prepared in connection with the Debt Financing, Equity Financing and the Ricketts GuarantyCo and Ricketts Lender Equity Financing that are provided to or from the lenders or the administrative agent for the lenders (in each case, including any drafts thereof provided to or from the lenders or the administrative agent for the lenders, but not any internal drafts). For the avoidance of doubt, such copies of material agreements (including drafts thereof) shall be deemed "Company Confidential Information" under the Confidentiality Agreement and shall be treated by Tribune Parties accordingly. Without limiting the foregoing, Bidder agrees to provide written notice to Tribune promptly, and in any event within three (3) Business Days, if at any time (i) any Commitment Letter or any lender's commitment under the Bank Credit Agreement shall expire or be terminated for any reason (other than the expiration of the Senior Debt Commitment Letter upon the execution of the Credit Agreement providing for $450,000,000 (subject to reduction as set forth in Section 4.11(e)) of Senior Debt Financing and, in the case of any lender's commitment under the Bank Credit Agreement, other than if such commitment when terminated is simultaneously replaced by the commitment of another lender or lenders that are Unaffiliated Third Party Lenders on the same terms and for the same aggregate amount or if such commitment is terminated or reduced as of Closing and is simultaneously replaced by the funding by another lender or lenders that are Unaffiliated Third Party Lenders for the aggregate amount subject to the termination or reduction on the terms of the Senior Notes), (ii) any financing source that is a party to a Commitment Letter or Credit Agreement notifies Bidder that such source no longer intends to provide financing to Bidder on substantially the terms set forth therein, (iii) any financing source that is a party to a Commitment Letter or Credit Agreement communicates information to Bidder that should reasonably cause Bidder to believe that a condition to such financing source's obligation to provide the Debt Financing is reasonably likely to not be satisfied or waived by such financing source, or (iv) Bidder, to its Knowledge, believes in good faith that it will be unable to obtain all or any portion of the Debt Financing, Equity Financing or Ricketts GuarantyCo and Ricketts Lender Equity Financing on substantially the terms described in the Commitment Letters or

-55-

Credit Agreement, as applicable, provided that in the case of clauses (ii) and (iv), Bidder shall not be required to provide such notice to Tribune as a result of the parties providing the financing under the Commitment Letters or Credit Agreement, as applicable, proposing new or additional terms for such financing that are more favorable to Newco than the terms contained in the Commitment Letters or Credit Agreement, as applicable. The Bidder Covered Parties shall not, and shall not permit any of their Affiliates to, take any action or enter into any merger, acquisition, joint venture, disposition or other material transaction, that could reasonably be expected to materially impair, delay or prevent consummation of the financing contemplated by the Debt Financing, the Equity Financing or the Ricketts GuarantyCo and Ricketts Lender Equity Financing or take any other action with the purpose of, or which would reasonably be expected to have the effect of, materially impairing, delaying or preventing consummation of the financing contemplated by the Commitment Letters or Credit Agreement. Bidder shall not, without the prior consent of Tribune, amend or alter, or agree to amend or alter, the Senior Debt Commitment Letter or Bank Credit Agreement in any manner that (x) would be reasonably likely to prevent or materially impair or delay the consummation of Transactions; (y) relates to the following terms of such Senior Debt Financing: (A) amount of such Senior Debt Financing (not more than 110% and not less than 100% of the aggregate amount set forth in the definition of Senior Debt Financing (other than as set forth in <u>Section 4.11(e)</u>), (B) maturity of any of the Senior Debt Financing earlier than four (4) years or later than nine (9) years after Escrow Closing (but in the case of Senior Notes, not later than twelve (12) years after Closing), (C) any amortization within the first four (4) years after Closing or any other amortization in excess of the permitted amortization under the Tax Matters Agreement, (D) the terms of the Ricketts Subordinated Loan Commitment Agreement or the terms and conditions of any other credit enhancements that provide for or require commitments to fund capital, contractual obligations such as guarantees, indemnifications, reimbursement agreements, providing collateral for loans other than the assets of Newco or Newco Subs and other obligations running directly to creditors of Newco or Newco Subs from someone other than Newco or Newco Subs (for the avoidance of doubt, the terms of such Senior Debt Financing shall provide that the creditors' rights thereunder to repayment must be limited solely to the assets of Newco or Newco Subs and pursuing remedies under the Tribune Guarantees), (E) identity of lenders if other than Unaffiliated Third Party Lenders or (F) interest rate if less than the applicable federal funds rate or in excess of ten percent (10%); or (z) contemplates that the amount of principal or interest on any such indebtedness would be determined in any respect by the profits or distributions of the Newco or Newco Subs (the standards set forth in subparts (x), (y) and (z) are referred to as the "**Key Debt Terms**").

        (c)      If any portion of the Debt Financing, Equity Financing or Ricketts GuarantyCo and Ricketts Lender Equity Financing becomes unavailable on terms and conditions substantially similar to the terms and conditions contemplated in the Debt Commitment Letters or any of the Debt Commitment Letters shall be terminated (other than the expiration of the Senior Debt Commitment Letter upon the execution of the Bank Credit Agreement) or, unless Tribune otherwise consents in writing, if any of the Key Debt Terms are modified (collectively, the "**Unavailable/Modified/Terminated Commitment Letters**"), the Bidder Covered Parties shall (and shall cause their Affiliates to) use their reasonable best efforts to obtain and, if obtained, will promptly provide Tribune with a copy of, a new financing commitment (the "**New

**Commitment Letter**") from alternative sources on terms and conditions substantially similar to the terms and conditions contemplated in the Debt Commitment Letters being replaced or on any other terms and conditions acceptable to Tribune in its reasonable discretion ("**Alternate Financing**"). Any such Alternate Financing with respect to Debt Financing must be used to fund all or a portion of the Estimated Special Distribution Amount and Final Special Distribution Amount. In addition, the Alternate Financing shall not contain any changes to the Key Debt Terms from those set forth in the Debt Commitment Letters as of the date hereof without Tribune's prior written consent, provided that Tribune shall not have a right to consent to any changes to the Key Debt Terms to the extent any such Key Debt Term is within a range for such term set forth in the definition of Key Debt Terms or, if there is no such range, is otherwise consistent with the Key Debt Terms. To the extent applicable, Bidder shall (and shall cause its Affiliates to) use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange promptly and consummate the Alternate Financing on the terms and conditions described in any New Commitment Letter, including (i) using reasonable best efforts to (x) satisfy on a timely basis all terms, covenants and conditions set forth in the New Commitment Letter; (y) enter into definitive agreements with respect thereto on terms and conditions substantially similar to the terms and conditions contemplated by the New Commitment Letter; and (z) consummate the funding of the Alternate Financing to the Closing Agent on the Escrow Closing Date as contemplated by <u>Section 1.1</u> and (ii) using reasonable best efforts to seek to enforce its rights under the New Commitment Letter. To the extent applicable and to the extent the Ricketts Subordinated Loan Commitment Agreement is implicated, the Ricketts Lender shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange and consummate the Alternate Financing on the terms and conditions described in any New Commitment Letter. In the event Alternate Financing is obtained in accordance with this <u>Section 4.11(c)</u> or <u>Section 4.11(e)</u> and a New Commitment Letter is entered into, references in this Agreement to the Commitment Letters shall be deemed to include the New Commitment Letter and to exclude the Unavailable/Modified/Terminated Commitment Letter(s) it replaces, as applicable. In addition, in the event Alternate Financing is obtained, references in this Agreement to the Debt Financing, Equity Financing or Ricketts GuarantyCo and Ricketts Lender Equity Financing, as applicable, shall be deemed to include the Alternate Financing and to exclude the Debt Financing, Equity Financing or Ricketts GuarantyCo and Ricketts Lender Equity Financing, as applicable, that the Alternate Financing replaces.

      (d)    The Tribune Parties agree to use their reasonable best efforts to provide all cooperation reasonably requested by Bidder in connection with the Debt Financing (including, as applicable, any Alternate Financing), including: (i) providing and causing their advisors to provide all available information reasonably deemed necessary by Bidder or the providers of such Debt Financing to complete syndication of the Debt Financing, including available financial information that is customarily provided in such financings and is deemed necessary by Bidder or the providers of such Debt Financing for the consummation of such Debt Financing; (ii) assisting in the preparation and updating of materials to be used in connection with the Debt Financing and any related syndication efforts, including, as applicable, participating in due diligence and drafting sessions; (iii) cooperating in procuring any requisite rating for the Debt Financing from an accredited rating agency, including by having senior management of Cubs

Entities participating in meetings with ratings agencies; (iv) making the officers and advisors of Cubs Entities and their respective Subsidiaries available from time to time to attend and make presentations regarding their respective businesses and prospects at one or more meetings of prospective lenders; (v) assisting in the preparation of credit and other definitive financing agreements and other certificates and documents, including solvency certificates, opinions of Bidder's counsel, officers' certificates demonstrating compliance with restrictive covenants, consents, pledge and security documents and perfection certificates, as may be reasonably requested in connection with the foregoing; (vi) seeking consent of the members of CSN Chicago, other than Tribune Sports, to the pledge of the CSN Interests in connection with the Debt Financing as provided in Section 4.23, provided that such reasonable best efforts shall not require the payment by the Tribune Parties of any fee or other amount; (vii) seeking to obtain all consents necessary to pledge their membership interest in Newco in favor of the Senior Lenders during the term of the Credit Agreement (and any refinancing thereof) and any Senior Notes issued at Closing, provided that such reasonable best efforts shall not require the payment by the Tribune Parties of any fee or other amount; and (viii) executing (or in the case of the legal opinion, causing to be executed by Tribune's counsel) the Tribune Guarantees, Subordination Agreement, a legal opinion of counsel to Tribune (regarding the due authorization of the execution, delivery and performance of the Tribune Guarantees and the Pledge Agreement, if applicable, and the valid, binding and enforceable (subject to customary exceptions) nature of such documents) reasonably acceptable to the Senior Lenders (to be dated as of the Escrow Closing) and, to the extent Tribune obtains the consent of its lenders to pledge its membership interest in Newco, a Pledge Agreement, together with any incumbency, perfection certificate or closing certificate reasonably requested by the Senior Lender Agent, in each case, in a customary form typically provided in similar financings by pledgors and guarantors that do not materially increase Tribune's liability to the Senior Lenders beyond the terms of the Subordination Agreement, such pledge agreements or Tribune Guarantees (all such documents are referred to as the "**Tribune-Related Debt Documents**"); provided, however, that with respect to all matters described in this Section 4.11(d) the Tribune Parties and their officers, directors and advisors shall not be required to execute any other document or make any statements, certifications, or analysis for the benefit of Newco, Bidder Parties or any other Person.

(e)     Notwithstanding anything in Section 4.11(c) to the contrary, prior to the Escrow Closing, Bidder may elect to replace up to $150,000,000 of the Senior Debt Financing with Subordinated Debt Financing pursuant to the Subordinated Debt Documents, provided that Bidder shall send prompt written notice thereof to Tribune together with a copy of the duly executed Subordinated Debt Commitment Letter with respect thereto, which shall be in full force and effect as of such date.

(f)     Notwithstanding anything in this Agreement to the contrary, in no event shall the reasonable best efforts of either Bidder Covered Party under this Section 4.11 require either Bidder Covered Party (or their respective Affiliates), directly or indirectly, to contribute, make available (including through the Ricketts Subordinated Loan Commitment Agreement) or otherwise become liable for (including by way of a guarantee), including on a contingent basis, any additional capital beyond what is contemplated by the terms of the Equity Commitment Letter or the Subordinated Debt Commitment Letter.

-58-

(g)     Each Tribune Party acknowledges and agrees, on behalf of itself and each of its Affiliates, that none of J.P.  Morgan Securities Inc., JPMorgan Chase Bank, N.A., Citibank, N.A., Banc of America Securities LLC, Bank of America, N.A., any of the other Senior Lenders or any of their respective Affiliates, successors or assigns (collectively, the "**Senior Lender Parties**") shall have any duty (including any fiduciary duty or any other express or implied duty), liability, obligation or responsibility whatsoever to any Tribune Party or any of their Affiliates arising from, in connection with or relating to (i) the Senior Debt Financing, (ii) the Senior Debt Commitment Letter, or (iii) any of the transactions contemplated by this Agreement, the Senior Debt Commitment Letter or any of the Senior Debt Documents, including any actual or alleged breach, misrepresentation or failure to perform any of their respective duties or obligations (including any failure to fund or otherwise extend credit) under the Senior Debt Commitment Letter or any Senior Debt Document (clauses (i)-(iii), collectively, the "**Financing Matters**").  No Senior Lender Party shall be liable to any Tribune Party or any of their respective Affiliates for any action taken or not taken by such Senior Lender Party in connection with any of the Financing Matters.  Each Tribune Party hereby waives, releases and forever discharges each of the Senior Lender Parties from any and all actions, causes of action, suits, debts, losses, costs, controversies, damages, liabilities, judgments, claims and demands whatsoever, in law or equity, whether known or unknown (collectively, "**Claims**") directly or indirectly arising out of or relating to any of the Financing Matters, that any of the Tribune Parties or their Affiliates ever had, now has or hereafter can, shall or may have against any of Senior Lender Parties. Furthermore, the Tribune Parties jointly and severally covenant not to sue any Senior Lender Party in connection with or assert, and agree to cause their respective Affiliates not to sue any Senior Lender Party in connection with or assert, any Claims which they or any other party now or may hereafter have in connection with any Financing Matter.  Each of the Senior Lender Parties shall be an intended third party beneficiary of this <u>Section 4.11(g)</u> and may enforce the terms of this <u>Section 4.11(g)</u> as if such Senior Lender Party were a direct party to this Agreement, and this <u>Section 4.11(g)</u> may not be amended, supplemented, waived or otherwise modified without the prior written consent of each of JPMorgan Chase Bank, N.A., Citibank, N.A. and Bank of America, N.A.

(h)     Bidder and Newco shall deliver a true and complete copy of each of the Newco Senior Debt Escrow Closing Certificate and the Senior Lenders Escrow Closing Certificate to Tribune promptly upon receipt thereof.

(i)     Bidder shall seek to extend the term of the commitments under the Senior Debt Commitment Letter or Bank Credit Agreement, if at all, as follows:

(i)     At any time prior to the Escrow Closing Date, Tribune may request that Bidder seek to extend the expiration date of the Senior Debt Commitment Letter.  If Tribune makes such a request, then Bidder shall use its reasonable best efforts to obtain such extension, provided that: (A) any such extension must be on terms and conditions reasonably satisfactory to Tribune and Bidder, and (B) no such extension shall extend past December 31, 2009, unless Bidder in its sole discretion agrees to such extension.  If the Senior Lenders require that any Incremental Financing Costs be paid to obtain such extension, Bidder shall not be required to pay such Incremental Financing Costs.  If Bidder elects not to pay such Incremental Financing Costs, then it will provide written notice of such election to Tribune and then Tribune shall have the

-59-

option of paying the Incremental Financing Costs, and in such event Bidder shall use its reasonable best efforts to take all other actions reasonably necessary to complete such extension.

(ii)    At any time prior to the Escrow Closing Date, Bidder may seek to extend the expiration date of the Senior Debt Commitment Letter, provided that (A) if the only change to the Senior Debt Commitment Letter is a change in the expiration date, then Bidder may obtain such extension without Tribune's consent and (B) if any of the other terms or conditions of the Senior Debt Commitment Letter are amended or changed in connection with such extension, then any such extension must be on terms and conditions reasonably satisfactory to Tribune and Bidder.  If the Senior Lenders require that any Incremental Financing Costs be paid in order to obtain such extension, Bidder shall not be required to pay such Incremental Financing Costs.

(iii)    An extension of the expiration date of the Senior Debt Commitment Letter obtained in accordance with clauses (i) or (ii) of this Section 4.11(i) is referred to as a "**Senior Debt Commitment Letter Extension**".

(iv)    At any time after the Escrow Closing Date, Tribune may request that Bidder seek to extend the commitment of the Senior Lenders to provide the Senior Debt Financing under the Bank Credit Agreement beyond the date that is forty-five (45) Business Days after the completion of the Escrow Closing.  If Tribune makes such a request, then Bidder shall use its reasonable best efforts to obtain such an extension, which reasonable best efforts for purposes of this clause (iv) shall require the payment by Bidder of up to $4,000,000 of Incremental Financing Costs, provided that: (A) any extension must be on terms and conditions satisfactory to Tribune and Bidder, and (B) no such extension shall extend such commitment for more than thirty (30) days beyond the date that is forty-five (45) Business Days after the completion of the Escrow Closing, unless Bidder in its sole discretion agrees to such extension.

(v)    At any time after the Escrow Closing Date, Bidder may seek to extend the commitment of the Senior Lenders to provide the Senior Debt Financing under the Bank Credit Agreement beyond the date that is forty-five (45) Business Days after the completion of the Escrow Closing, provided that any such extension must be on terms and conditions satisfactory to Tribune.  To the extent the Senior Lenders require that any Incremental Financing Costs be paid to obtain such extension Bidder shall have the option to pay such Incremental Financing Costs.

(vi)    An extension of the Senior Lenders' commitment under the Bank Credit Agreement obtained in accordance with clauses (iv) or (v) of this Section 4.11(i) is referred to as a "**Credit Agreement Extension**".

(vii)    The parties acknowledge that the Senior Lenders shall have no obligation to extend their respective commitments under the Senior Debt Commitment Letter, the Bank Credit Agreement or any other Senior Debt Document and may elect to extend or not extend such commitments in their sole and absolute discretion (except for any extensions provided for under the express terms of the Senior Debt Commitment Letter or the Bank Credit Agreement, as applicable).

-60-

(j)    Unless otherwise agreed to in writing by Tribune and Bidder, Bidder shall exercise its right to extend the "**Escrow End Date**" (as defined in the Senior Debt Commitment Letter) pursuant to the terms of the Bank Credit Agreement (as described in the term sheet attached to the Senior Debt Commitment Letter) for each of the two 15 Business Day extensions provided for therein.

Section 4.12    Certain Bidder Covenants.  From and after the date of this Agreement and until the Closing, Bidder shall promptly deliver notice to Tribune in writing of any specific event or circumstance of which Bidder has Knowledge, or of which Bidder receives written notice, that (a) has resulted or could reasonably be expected to result in any of the conditions set forth in Section 7.1, Section 7.3 or Section 7.4 not being satisfied or (b) with respect to any such event or circumstance occurring on or after the Escrow Closing, would have resulted or would have reasonably been expected to result in any of the conditions set forth in Section 7.1 or Section 7.3 not being satisfied if such event or circumstance had occurred prior to the Escrow Closing.

Section 4.13    Insurance.

(a)    To the extent any Policy listed as placed by MLB on Schedule 2.16 provides "occurrence based" liability insurance, the Tribune Parties shall use their reasonable best efforts, prior to the Escrow Closing, to cause Bidder, Newco and the Newco Subs to be added as additional insureds, on a primary and noncontributory basis, under such Policy for the current policy year and the preceding six policy years solely with respect to pre-closing occurrences, injury and/or damage.  Additionally, unless and until Bidder advises Tribune otherwise, to the extent any Policy provides "claims made" Directors and Officers or Fiduciary liability insurance coverage, the Tribune Parties shall use reasonable best efforts to ensure that such Policy or any renewal, replacement or extension thereof that is obtained by Tribune continues to provide similar coverage, in all material respects, for pre-Closing wrongful acts, errors or omissions arising from or relating to the Cubs Business for a period of not less than six (6) years following the Closing; provided, that, Tribune may provide Newco with written notice of any out-of-pocket costs incurred after Closing by Tribune outside Tribune's ordinary course renewal, if any, of such coverage, and to the extent such costs are reasonably allocable to the continued coverage described in this Section 4.13 applicable to the Cubs Business, such costs shall be paid by Newco.  Notwithstanding the foregoing, (i) in the case of Healthcare Professional liability insurance, upon request by Newco, Tribune shall use reasonable best efforts (which shall not include the payment of any fee) to provide Newco, to the extent available, with an insurer's quote for continuing such coverage or purchasing a tail insurance policy with respect thereto, and Tribune shall only be required to maintain such coverage or purchase such tail if Newco pays in advance the costs of such insurance, and (ii) in the case of Directors and Officers and Fiduciary liability insurance, if Tribune does not renew, replace or extend such policy with a policy that includes coverage for pre-Closing wrongful acts, errors or omissions arising from or relating to the Cubs Business, then Tribune shall use reasonable best efforts (which shall not include the payment of any fee) to provide Newco with an insurer's quote for purchasing a tail insurance policy with respect thereto  (which tail shall include coverage for pre-Closing wrongful acts, errors or omissions arising from or relating to the Cubs Business for not less than 6 years following the Closing) and Tribune shall only be required to purchase such tail if Newco pays in advance the costs of such insurance.

-61-

(b)     If Newco provides a written notice to Tribune after the Closing that any claim has arisen, or otherwise exists, that is covered under any Directors' and Officers', Fiduciary or Healthcare Professional liability insurance listed on Schedule 2.16 as placed by "Tribune," including any extension of "claims made" liability coverage as referenced in Section 4.13(a), then promptly following receipt of such written request from Newco the Tribune Parties shall use their reasonable best efforts, consistent with past practice for submitting Tribune Party claims, to report all such claims within such time and in such manner as required under the insurance policies (to the extent such time period has not expired), shall further use their reasonable best efforts consistent with their past practices to pursue recovery on all such claims, and upon the receipt by any Cubs Entities of any insurance proceeds, the Cubs Entities shall, and Tribune shall cause the Cubs Entities to, promptly pay Newco such proceeds (but only to the extent those proceeds represent payment or reimbursement by an insurer for any losses, damages or other amounts borne by Newco or a Newco Sub arising from such claims); provided, however, that Newco shall be responsible for and reimburse the Tribune Parties for any out-of-pocket costs (which shall include a reasonable charge for wages, salaries, benefits or other overhead expenses associated with the Tribune Parties' own employees) incurred by the Tribune Parties in pursuing any claims for the benefit of Newco or any Newco Sub pursuant to their obligations under this Section 4.13(b), along with the amount of any deductibles, self-insured retentions, coinsurance or similar expenses that would otherwise be borne by the Tribune Parties as a result of any such claims.

(c)     To the extent that any of the Cubs Entities' rights to insurance under the Policies and condemnation proceeds relating to the damage, destruction, taking or other impairment of any Cubs Contributed Assets prior to the Closing, including insurance for direct property loss and business interruption or other time element losses, are not assignable, upon a written notice from Newco, the Cubs Entities shall, and Tribune shall cause the Cubs Entities to, use their reasonable best efforts consistent with Tribune's past practice to pursue recovery on all such claims. Upon the receipt by any Cubs Entities of any such insurance and condemnation proceeds relating thereto, the Cubs Entities shall, and Tribune shall cause the Cubs Entities to, promptly pay Newco such proceeds (but only to the extent those proceeds represent payment or reimbursement by an insurer for any damage, destruction, other impairment or other time element losses actually suffered by Newco or a Newco Sub, or the costs of repair borne by Newco or a Newco Sub). Additionally, the Tribune Parties may withhold from any such payments any out-of-pocket costs (which shall include a reasonable charge for wages, salaries, benefits or other overhead expenses associated with the Tribune Parties' own employees) incurred by the Tribune Parties in pursuing such recovery for the benefit of Newco or any Newco Sub along with the amount of any deductibles, self-insured retentions, coinsurance or similar expenses (other than increases in premiums) that are otherwise borne by the Tribune Parties as a result of any such claims.

Section 4.14    Compliance with Baseball Rules; MLB Approvals.

(a)     Tribune and Bidder shall, as promptly as practicable, submit all materials necessary to obtain all MLB Approvals.

-62-

(b)     Bidder Covered Parties and Tribune Parties shall (and shall cause their Affiliates to) use their reasonable best efforts to take, or cause to be taken, all actions, and do, or cause to be done, all things, necessary, proper or advisable, in each case, as promptly as possible, to obtain all MLB Approvals, including becoming a party to any and all agreements required by the Commissioner, the Major League Clubs, the Office of the Commissioner of Baseball or any other MLB Entity and divesting any interest of Bidder or Bidder's Affiliates in conflicting businesses and sports teams.  In connection with the foregoing, Bidder and Tribune Parties shall (and shall cause their Affiliates to) furnish Major League Baseball with all information and assistance as may be required in order to obtain all MLB Approvals.  Bidder Covered Parties shall (and shall cause their Affiliates to) use their reasonable best efforts to respond to any requests for modifications or changes by Major League Baseball to the Debt Financing provided that such modifications or changes are approved in advance by Tribune, and to otherwise comply with all requirements of Major League Baseball.  The parties' obligations under this <u>Section 4.14</u> shall include, if necessary, making amendments or modifications to, or agreeing to any changes to, the form and/or structure of the transactions contemplated by this Agreement or Bidder, Newco or any Subsidiary of Newco, this Agreement, any Transaction Document (including any revisions required to form agreements to be entered into at the Escrow Closing or Closing) or any agreement or document relating to the Debt Financing.  The parties acknowledge that, as a condition to granting the MLB Approvals, Major League Baseball may require modifications to be made to the form and/or structure of the transactions contemplated by this Agreement or Bidder, Newco or any Subsidiary of Newco and in order to obtain the MLB Approvals, it shall be necessary to implement such modifications.  Notwithstanding anything in this Agreement to the contrary (including in the first sentence of this <u>Section 4.14(b)</u>), neither the Bidder Covered Parties nor the Tribune Parties, without Bidder's (in the case of Bidder Covered Parties) or Tribune's (in the case of Tribune Parties) prior written consent, shall be required to take any action under this <u>Section 4.14(b)</u> if such action in the aggregate with all other changes requested by Major League Baseball after the date hereof (i) adversely affects, in any material respect, the economic terms or other material terms of the Transactions with respect to such party, including the transactions contemplated by the Debt Financing, or (ii) has or would reasonably be expected to have a material adverse effect on the operation of the Cubs Business.  Bidder shall not add any equity investors to its ownership group who would reasonably be expected to cause any material delay in the receipt of, or reversal of, any MLB Approvals and any equity investor not listed on <u>Schedule 4.14(b)</u> who is subsequently added to Bidder's ownership group who is not acceptable to Major League Baseball shall be removed from Bidder's ownership group and Bidder shall cause all equity financing that would have been contributed by such removed investor to be satisfied.

(c)     At or prior to Closing, Newco shall pay to Major League Baseball the unpaid amount of all documented expenses of Major League Baseball related to the Transactions, including those related to background checks performed by Major League Baseball in connection with consideration of Bidder, Bidder Trust and their respective Affiliates, and outside legal counsel for the transaction, except that with respect to bankruptcy legal counsel fees and expenses relating to the Transactions, Newco shall only be obligated to pay up to $187,500 of such fees and expenses (collectively, the "**Covered MLB Transaction Expenses**"). At or prior to the Closing, Tribune Parties shall pay to Major League Baseball the unpaid amount

-63-

of (i) all fees, costs and expenses of Major League Baseball associated with any other contemplated Acquisition Transaction (whenever contemplated) with any Person other than Bidder, Bidder Trust or their respective Affiliates, including all fees and expenses of any legal counsel engaged by Major League Baseball to review any other Acquisition Transaction, all expenses related to background checks and investigations performed by Major League Baseball in connection with consideration of various bidders, other than Bidder, Bidder Trust and their respective Affiliates, (ii) all fees, costs and expenses of Major League Baseball associated with a contemplated Acquisition Transaction generally and without reference to any particular Person, and (iii) all fees and expenses of Major League Baseball for bankruptcy legal counsel relating to the Transactions with Bidder, Bidder Trust and their respective Affiliates in excess of $187,500 (the fees, costs and expenses in clauses (i), (ii) and (iii) are collectively referred to as the "**Cubs Excluded MLB Expenses**").

(d)     The parties are aware of the provisions contained in the Major League Constitution and the "Control Interest Transfers -- Guidelines & Procedures" issued by the Commissioner on November 9, 2005 (as the same may be amended, supplemented or otherwise modified from time to time, the "**Guidelines**"). Tribune, as required by the MLB Rules and Regulations, represents to Major League Baseball and Bidder that it has notified the Commissioner and the Office of the Commissioner of Baseball of the proposed transaction and has applied for approval of such transaction pursuant to the Major League Constitution, the Guidelines and any other applicable MLB Rules and Regulations. Such approval, as required by the MLB Rules and Regulations, is recognized by the parties to be in the sole and absolute discretion of the Commissioner, the Office of the Commissioner of Baseball and the Major League Clubs, as applicable. Each party, as required by the MLB Rules and Regulations, represents to Major League Baseball that to date it has acted, and covenants to Major League Baseball that it will continue to act, in full and strict compliance with the Major League Constitution and the Guidelines in connection with the proposed transaction. Each party, as required by the MLB Rules and Regulations, further represents to Major League Baseball that all information contained in documents or statements provided, or to be provided, by or on behalf of it or its Affiliates to the Commissioner, the Office of the Commissioner of Baseball or any other Major League Baseball Entity shall be true, complete and correct in all material respects and, to its Knowledge, shall not contain any untrue or misleading information.

(e)     Each party, as required by the MLB Rules and Regulations, acknowledges and agrees that the Escrow Closing is conditioned upon and subject to the prior approval of the Commissioner, the Office of the Commissioner of Baseball and the Major League Clubs, in each case, in its or their sole and absolute discretion under the Major League Constitution, the Guidelines and any other applicable MLB Rules and Regulations.

(f)     Bidder shall have the right to designate a member of the Ricketts family as the "control person" of the Club, including a member of the Ricketts family to replace Tom Ricketts as the intended "control person" if MLB Approval cannot be obtained for Tom Ricketts as the "control person" of the Club. Bidder shall continue to have the same rights as to each member of the Ricketts family that Bidder designates as the successor nominee as "control person" of the Club.

-64-

(g)     From and after Closing, Bidder shall and shall cause Newco, Newco Subs and its Affiliates to use best efforts (which shall not in any event include the expenditure of money or incurrence of a liability that will not be borne by WGN) to obtain the approval from Major League Baseball of the Superstation Extension. Upon approval by Major League Baseball of the Superstation Extension, Cubs Newco Sub shall execute and deliver the Superstation Extension to Tribune.

(h)     If Bidder or Tribune Parties have a reasonable basis to believe that MLB Approval is not likely to be obtained on a timely basis, such party shall promptly, upon becoming aware of such basis, notify the other thereof.

Section 4.15     Bankruptcy Court Approval and Related Matters.

(a)     From and after the execution of this Agreement, the Tribune Parties shall use their reasonable best efforts to keep Bidder informed on a current basis with respect to all material objections to approval or consummation of the Transactions (including the Newco Sale) raised by or on behalf of the Creditors Committee or the Steering Committee (the "**Tribune Committees**") of which the Tribune Parties have Knowledge. Without limiting the foregoing, Tribune will deliver written notice to Bidder promptly, and in any event within three (3) days, if at any time the Tribune Parties believe in good faith that either of the Tribune Committees or any creditor with a material claim against any of the Tribune Parties will object to the approval and consummation of the Transactions (including the Newco Sale). Upon Bidder's request, the Tribune Parties shall use their reasonable best efforts to facilitate meetings and communications among Bidder, the Tribune Parties and either of the Tribune Committees. Bidder shall not communicate (whether in writing, orally or otherwise) with the Tribune Committees, the members thereof, or their respective Representatives, in such capacities, unless such communication is in the presence of Tribune and its Representatives, or Tribune has approved of such communication in advance, with such approval not to be unreasonably withheld by Tribune. If Bidder or any of its Representatives is contacted by any members of the Tribune Committees or any of their respective Representatives, in such capacities, in connection with the Transactions (including the Newco Sale), then Bidder or its Representatives will promptly notify Tribune of such communication (such notice to include the identity of the party, a summary of any oral communication and a copy of any written communication). The Tribune Parties shall use reasonable best efforts (which, for this purpose, shall not be deemed to include any requirement that any Tribune Party expend any money or pay any fees or agree to any delay in having the Transaction Approval Orders entered or becoming final and non-appealable orders) to seek approval by the Bankruptcy Court of the Newco Sale in connection with the Bankruptcy Court's approval of the Approval Orders; provided, however, the Parties agree and acknowledge that (i) approval of the Newco Sale by the Bankruptcy Court is not a condition precedent to any Party's obligation to complete the Transactions, (ii) Tribune will not have any liability or obligation under this Agreement (including under this Section 4.15) by virtue of such approval not being obtained, and (iii) if such approval is not obtained, references in this Section 4.15 related to the approval of the Bankruptcy Court of the Transactions shall be deemed to exclude the Newco Sale.

(b)      Within five (5) Business Days after the date of this Agreement, Tribune shall file (i) motions with the Bankruptcy Court seeking entry of the Notice and Procedures Approval Order and related procedural orders (the "**Notice and Procedures Approval Motions**"), and (ii) a motion pursuant to Bankruptcy Code Sections 105, 363 and 365 seeking Bankruptcy Court approval of this Agreement, the Transactions (including the Newco Sale), and the entry of the Tribune Transaction Approval Order (the "**Tribune Transaction Approval Motion**," and together with the Notice and Procedures Approval Motions, the "**Approval Motions**"). Except as Tribune and Bidder may otherwise agree in writing, the Notice and Procedures Approval Motions shall be in substantially the form(s) attached hereto as Exhibit W and the Tribune Transaction Approval Motion shall be in substantially the form attached hereto as Exhibit X. The Tribune Parties will use their reasonable best efforts to obtain entry of the Approval Orders and any other orders mutually agreed upon by Tribune and Bidder that are necessary to consummate the Transactions (including the Newco Sale, which, for this purpose, shall not be deemed to include any requirement that any Tribune Party expend any money or pay any fees or agree to any delay in having the Transaction Approval Orders entered or becoming final and non-appealable orders). Bidder will use its reasonable best efforts to (and will cause its Affiliates to use their reasonable best efforts to) assist the Debtors and the Additional Filers in obtaining entry of the Approval Orders and any other orders mutually agreed upon by Tribune and Bidder that are necessary to consummate the Transactions. Bidder and the Tribune Parties shall not, and shall not permit any of their respective Affiliates to, take any actions, or fail to take any actions, that could reasonably be expected to materially impair, delay or prevent the entry of the Approval Orders or any other orders mutually agreed upon by Tribune and Bidder that are necessary to consummate the Transactions, unless required to do so by an order or a direction on the record of the Bankruptcy Court, provided that both Bidder and the Tribune Parties shall use their reasonable best efforts to oppose entry of such an order. Tribune shall have the option to file the Bidder Financing Affidavits with the Bankruptcy Court. If Tribune does elect not to file one or more of the Bidder Financing Affidavits, then Bidder shall have the option to file such Bidder Financing Affidavit(s) with the Bankruptcy Court. Tribune shall as promptly as practicable, and in any event at least eight (8) Business Days prior to the original scheduled hearing date on the Tribune Transaction Approval Motion, notify Bidder in writing of such scheduled hearing date. If the scheduled hearing date is thereafter changed, then Tribune shall as promptly as practicable, and in any event at least three (3) Business Days prior to the new scheduled hearing date, notify Bidder in writing of such new scheduled hearing date. The scheduled hearing date, whether the original or a rescheduled date, shall not, without Bidder's consent, be prior to September 24, 2009. Notwithstanding the foregoing, if at any time Bidder has informed Tribune pursuant to Section 4.11(b) that (i) any Commitment Letter or any lender's commitment under the Bank Credit Agreement has expired or terminated for any reason (other than the expiration of the Senior Debt Commitment Letter upon the execution of a Bank Credit Agreement providing for $450,000,000 (subject to reduction as set forth in Section 4.11(e)) of Senior Debt Financing and, in the case of any lender's commitment under the Bank Credit Agreement, other than if such commitment when terminated is simultaneously replaced by the commitment of another lender or lenders that are Unaffiliated Third Party Lenders on the same terms and for the same aggregate amount or if such commitment is terminated or reduced as of Closing and is simultaneously replaced by the funding by another lender or lenders that are Unaffiliated Third Party Lenders for the aggregate amount subject to the termination or reduction

-66-

on the terms of the Senior Notes), (ii) any financing source that is a party to a Commitment Letter or Bank Credit Agreement has notified Bidder that such source no longer intends to provide financing to Bidder on substantially the terms set forth therein, (iii) any financing source that is a party to a Commitment Letter or Bank Credit Agreement or any Senior Lender communicates information to Bidder that should reasonably cause Bidder to believe that it is reasonably likely that a condition to such financing source's obligation to provide the Debt Financing will not be satisfied or waived by such financing source or (iv) Bidder, to its Knowledge, believes in good faith that it will be unable to obtain all or any portion of the Debt Financing, Equity Financing or Ricketts GuarantyCo and Ricketts Lender Equity Financing on substantially the terms described in the Commitment Letters or Credit Agreement (clauses (i) through (iv) are collectively referred to as the "**Financing Tolling Events**"), then, except as otherwise set forth in the next sentence, until Bidder has notified Tribune in writing that the Financing Tolling Events referred to in such notice have been cured or otherwise resolved (including by obtaining New Commitment Letters pursuant to Section 4.11(c) or, to the extent Senior Debt Financing is implicated, replacing such Senior Debt Financing pursuant to Section 4.11(e)), the Tribune Parties shall not be required to seek to obtain entry of the Approval Orders or any other orders related to the Transactions and any related deadlines (including the deadline provided for in Section 4.15(i)(ii)) for the entry or effectiveness of such orders shall be extended for such number of days equal to the number of days that elapse after the date that Tribune has been informed of the Financing Tolling Events until Tribune receives written notice that the Financing Tolling Events have been cured or otherwise resolved.  Notwithstanding the preceding sentence, if (x) in Bidder's notice to Tribune regarding one or more Financing Tolling Events, Bidder claims that a breach of this Agreement by any Tribune Party is a material cause of a Financing Tolling Event and (y) such Tribune Party has breached this Agreement as so claimed and such breach is a material cause of such Financing Tolling Event, and (z) such breach is not cured within five (5) Business Days thereafter (provided that no Tribune Party shall have the benefit of such five (5) Business Day cure period if Bidder had delivered written notice of such breach to the Tribune Party at least five (5) Business Days prior to the notice of the Financing Tolling Event and such breach had not been cured within five (5) Business Days after receipt of such earlier written notice), then Tribune Parties shall continue to be required to seek to obtain entry of the Approval Orders and any other orders related to the Transactions (including the Newco Sale) and any related deadlines (including the deadline provided for in Section 4.15(i)(ii)) for the entry or effectiveness of such orders shall not be extended.

      (c)    If the Notice and Procedures Approval Order is not entered by the Bankruptcy Court on or before the date that is the earlier to occur of (x) fourteen (14) days after the date the Notice and Procedures Approval Motions are filed or (y) twenty (20) days after the date of this Agreement, then thereafter Bidder or Tribune, at their respective option, may terminate this Agreement by written notice to the other parties so long as the Notice and Procedures Approval Order has not been entered by the Bankruptcy Court prior to the delivery of such notice.  Following termination of this Agreement pursuant to this Section 4.15(c), the Cubs Entities, jointly and severally, shall pay Bidder an amount equal to

      (i)    the lesser of (x) the Bidder Covered Expenses (as hereinafter defined) or (y) $1,700,000, plus

(ii)    fifty percent (50%) of any underwriting fees or capital commitment fees (including any advisory fees related to capital commitments) paid by Bidder or its Affiliates (including those paid after termination of this Agreement) to the Senior Lenders as a result of Bidder or its Affiliates entering into the Senior Debt Commitment Letter (such underwriting fees and capital commitment fees are collectively referred to as the "**Commitment Fees**"), provided, however, that the amount that the Cubs Entities are obligated to pay to Bidder pursuant to this clause (ii) shall not exceed, in the aggregate, an amount equal to (x) $1,800,000 minus (y) any amounts previously paid by any of the Cubs Entities to Bidder or any of its Affiliates pursuant to the Fee Reimbursement Agreement as reimbursement of Commitment Fees.

Any Bidder Covered Expenses shall be paid, jointly and severally, by the Cubs Entities to Bidder within five (5) Business Days after such termination of this Agreement.  The portion of the Commitment Fees payable pursuant to clause (ii) above shall be payable by the Cubs Entities at the later of five (5) Business Days after such termination of this Agreement or two (2) Business Days after Bidder has delivered to the Cubs Entities evidence reasonably satisfactory to the Cubs Entities that Bidder or its Affiliates have paid such Commitment Fees.

(d)    [Intentionally omitted]

(e)    If, after the Notice and Procedures Approval Order has been entered by the Bankruptcy Court, this Agreement has been terminated pursuant to Section 9.1(b) and any of the following has occurred after the date of this Agreement but prior to such termination of this Agreement (each, a "**Major Tribune Payment Trigger**"):

(i)    either of the Tribune Committees timely files with the Bankruptcy Court an objection to the consummation of the Transactions (excluding the Newco Sale) (other than an objection (A) to preserve rights with respect to the treatment or disposition of proceeds received as a result of the Transactions, (B) to prevent an implied waiver of any other rights in the Bankruptcy Case not associated with the Transactions, (C) with respect to non-material elements of the Transactions, or (D) to a material amendment to or material waiver of this Agreement or any other Transaction Document), and such objection is not withdrawn within two (2) Business Days of its filing;

(ii)    any Tribune Party (A) engages in any act intended to be in furtherance of an Acquisition Transaction with any Person other than Bidder or any Affiliate of Bidder, other than as permitted by Section 4.7(b), (B) seeks entry of an order by the Bankruptcy Court authorizing an Acquisition Transaction with any Person other than Bidder or any Affiliate of Bidder, or (C) withdraws any of the Tribune Transaction Approval Motion or Additional Filer Motions;

(iii)    a motion or other court filing seeking an order authorizing the disposition or transfer of the Cubs Business or the Cubs Contributed Assets, or any material portion of either, to any Person other than Bidder or any Affiliate of Bidder is filed in the Bankruptcy Case and/or any Additional Bankruptcy Case, and Tribune or the Additional Filers, as applicable, do not promptly file and pursue in good faith an objection to such motion or other

-68-

court filing (other than orders providing for a transfer to any other wholly-owned Subsidiary of Tribune in accordance with the terms of this Agreement provided that (A) such Subsidiary is bound by all obligations under this Agreement applicable to the transferring entity, (B) such transfer does not materially and adversely impair the Tribune Parties' (after giving effect to such transfer) ability to perform their obligations hereunder, including Article VIII, and (C) if such transfer is to be made prior to Closing, such transfer does not materially adversely affect Bidder, Newco or any Direct Newco Sub with respect to the assets to be contributed to or the liabilities to be assumed by Newco or such Direct Newco Sub pursuant to this Agreement or adversely affect, in any material respect, the economic terms or other material terms of the Transactions (including the Newco Sale) with respect to Bidder, Newco or any Direct Newco Sub);

(iv)    an order is entered by the Bankruptcy Court authorizing or directing the disposition or transfer of the Cubs Business or the Cubs Contributed Assets, or any material portion of either, to any Person other than Bidder or any Affiliate of Bidder (other than an order providing for a transfer to any other wholly-owned Subsidiary of Tribune in accordance with the terms of this Agreement provided that (A) such Subsidiary is bound by all obligations under this Agreement applicable to the transferring entity, (B) such transfer does not materially and adversely impair the Tribune Parties' (after giving effect to such transfer) ability to perform their obligations hereunder, including Article VIII, and (C) if such transfer is to be made prior to Closing, such transfer does not materially adversely affect Bidder, Newco or any Direct Newco Sub with respect to the assets to be contributed to or the liabilities to be assumed by Newco or such Direct Newco Sub pursuant to this Agreement or adversely affect, in any material respect, the economic terms or other material terms of the Transactions (including the Newco Sale) with respect to Bidder, Newco or any Direct Newco Sub);

(v)    Major League Baseball notifies Tribune in writing that it does not intend to grant, in whole or in part, MLB Approvals due, in whole or in part, to a failure by the Tribune Parties, in bad faith, to disclose, or an intentional misrepresentation by the Tribune Parties of, material information relating to the Transactions not known to Major League Baseball as of the date hereof, in violation of MLB Rules and Regulations, and after Tribune has had a reasonable opportunity to address Major League Baseball's objections, the MLB Approvals are not granted primarily as a result of such failure to disclose or intentional misrepresentation;

(vi)    the Escrow Closing does not occur within five (5) Business Days after all of the conditions set forth in Sections 7.1 (Conditions Precedent of all Parties to Escrow Closing), 7.2 (Conditions Precedent of Bidder to Escrow Closing) and 7.3 (Conditions Precedent of Tribune Parties to Escrow Closing) (other than the condition set forth in Section 7.2(h) (Additional Filing Assurance) and those conditions which by their nature require the delivery of a document or the taking of an action (including the actual funding of the Senior Debt Financing (other than the Revolver) to the Closing Agent) at the Escrow Closing) have been satisfied or waived by the applicable parties; or

(vii)    the Escrow Closing has occurred and the Additional Bankruptcy Cases are not commenced or the Additional Filer Motions are not filed, in each case within four (4) Business Days thereafter,

CHI99 5155442-3.022182.0015

then, subject to <u>Section 4.15(k)</u>, within five (5) Business Days following such termination of this Agreement, Tribune Parties, jointly and severally, shall (in the aggregate) pay Bidder a liquidated sum of $20,000,000 (the "**Major Tribune Payment Amount**"), which payment, if made by a Debtor, shall be treated as payment of an allowed (on a final, and not provisional or interim, basis) administrative priority claim pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, without further order of the Bankruptcy Court, and shall be included in any plan filed by Tribune Parties.  The Major Tribune Payment Triggers described in clauses (ii), (iii) and (iv) are referred to as the "**Covered Major Tribune Payment Triggers.**"

      (f)     If, after the Notice and Procedures Approval Order has been entered by the Bankruptcy Court, this Agreement has been terminated pursuant to <u>Section 9.1(b)</u> and any of the following has occurred after the date of this Agreement but prior to such termination of this Agreement (each a "**Major Bidder Payment Trigger**"):

      (i)     (A) all of the conditions to the Escrow Closing set forth in <u>Sections 7.1</u> (Conditions Precedent of all Parties to Escrow Closing) and <u>7.2</u> (Conditions Precedent of Bidder to Escrow Closing) were satisfied (other than the condition to Escrow Closing described in <u>Section 7.2(g)</u> (Senior Debt Financing) and those conditions which by their nature require the delivery of a document or the taking of an action at the Escrow Closing) or waived by the applicable parties, (B) the Tribune Transaction Approval Order has been entered and either is final and non-appealable or both the Senior Lenders and the Tribune Parties have waived any requirement that it be final and non-appealable, (C) the Escrow Closing does not occur by the earlier of (x) eight (8) Business Days following the date on which the Tribune Parties notify Bidder that all of such conditions (including the satisfaction of the condition in clause (B)) were satisfied or waived by the applicable parties or (y) the Termination Date, and (D) a Class III Debt Condition Precedent Failure occurs;

      (ii)     (A) the Escrow Closing has occurred, all of the conditions to the Closing set forth in <u>Section 7.4</u> (Conditions Precedent to Closing) were satisfied (other than those conditions which by their nature require the delivery of a document or the taking of an action at the Closing) or waived by the applicable parties, (B) the Closing does not occur by the earlier of (x) seven (7) Business Days following the date on which the Tribune Parties notify Bidder that all of such conditions were satisfied or waived by the applicable parties or (y) the Termination Date, and (C) a Class III Debt Condition Precedent Failure occurs;

      (iii)     at least two (2) Business Days prior to the scheduled hearing date on the Tribune Transaction Approval Motion, Bidder has not delivered, or caused to be delivered, to the Tribune Parties each of the three affidavits in substantially the forms attached hereto as <u>Exhibit JJ</u> (collectively, the "**Bidder Financing Affidavits**"), and any one of the Bidder Financing Affidavits was not delivered either (A) due, in whole or in part, to any such affiant's good faith reasonable determination that a Class III Debt Condition Precedent Failure will exist on the Anticipated Escrow Closing Date (as defined in the Bidder Financing Affidavits) or (B) for any reason other than the good faith reasonable determination by such affiant (s)that a Class I Debt Condition Precedent Failure, a Class II Debt Condition Precedent Failure, a Special Class II Debt Condition Precedent Failure or a Class III Debt Condition Precedent Failure will exist on the Anticipated Escrow Closing Date;

-70-

(iv)     Major League Baseball notifies Bidder in writing that it does not intend to grant, in whole or in part, the MLB Approvals due, in whole or in part, to a failure by Bidder or any of its Affiliates, in bad faith, to disclose, or an intentional misrepresentation by Bidder or any of its Affiliates of, material information not known to Major League Baseball as of the date hereof, in violation of MLB Rules and Regulations, and after Bidder has had a reasonable opportunity to address Major League Baseball's objections, the MLB Approvals are not granted primarily as a result of such failure to disclose or intentional misrepresentation;

(v)     there is a breach of the Subordinated Debt Commitment Letter; or

(vi)     there is a breach of the Equity Commitment Letter,

then, subject to Section 4.15(k), within five (5) Business Days following such termination of this Agreement, Bidder shall pay the Tribune Parties (in the aggregate and as directed by Tribune) a liquidated sum of $20,000,000 (the "**Major Bidder Payment Amount**").  The Major Bidder Payment Triggers described in clauses (i), (ii), (iii), (v) and (vi) are referred to as the "**Finance Major Bidder Payment Triggers.**"

(g)     If, after the Notice and Procedures Approval Order has been entered by the Bankruptcy Court, this Agreement has been terminated pursuant to Section 9.1(b) and any of the following has occurred after the date of this Agreement but prior to such termination of this Agreement (each, a "**Middle Tribune Payment Trigger**"):

(i)     the Tribune Parties materially breach their obligations under Section 4.11(d), such material breach is not cured within five (5) Business Days after Bidder delivers written notice of such breach to Tribune, and such material breach is the primary cause of the failure of the conditions set forth in Sections 7.2(g) (Senior Debt Financing) and 7.3(e) (Debt and Equity Financing) to be satisfied; or

(ii)     (A) (I) an objection to any of the Approval Motions or Additional Filer Motions is filed by or on behalf of a Competing Bidder in the Bankruptcy Case and/or Additional Bankruptcy Case that supports such Competing Bidder or any Affiliate of such Competing Bidder, (II) a motion or other court filing is filed by or on behalf of a Competing Bidder, the Bankruptcy Case and/or any Additional Bankruptcy Case seeking an order authorizing the disposition or transfer of the Cubs Business or the Cubs Contributed Assets, or any material portion of either, to such Competing Bidder or any Affiliate of such Competing Bidder, or (III) an appeal of the Notice and Procedures Approval Order, the Tribune Transaction Approval Order or the Additional Filers Transaction Approval Order is filed by or on behalf of a Competing Bidder that supports such Competing Bidder or any Affiliate of such Competing Bidder, and (B) the action taken in clause (A) was the primary cause of the Closing not occurring,

then, subject to Section 4.15(k), within five (5) Business Days following such termination of this Agreement, Tribune Parties, jointly and severally, shall (in the aggregate) pay Bidder a liquidated sum of $10,000,000 (the "**Middle Tribune Payment Amount**"), which payment, if made by a Debtor, shall be treated as payment of an allowed (on a final, and not provisional or

-71-

interim, basis) administrative priority claim pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, without further order of the Bankruptcy Court, and shall be included in any plan filed by Tribune Parties.

(h)     If, after the Notice and Procedures Approval Order has been entered by the Bankruptcy Court, this Agreement has been terminated pursuant to <u>Section 9.1(b)</u> and any of the following has occurred after the date of this Agreement but prior to such termination of this Agreement (each a "**Middle Bidder Payment Trigger**"):

(i)     (A) all of the conditions to the Escrow Closing set forth in <u>Sections 7.1</u> (Conditions Precedent of all Parties to Escrow Closing) and <u>7.2</u> (Conditions Precedent of Bidder to Escrow Closing) were satisfied (other than the condition to Escrow Closing described in <u>Section 7.2(g)</u> (Senior Debt Financing) and those conditions which by their nature require the delivery of a document or the taking of an action at the Escrow Closing) or waived by the applicable parties, (B) the Tribune Transaction Approval Order has been entered and either is final and non-appealable or both the Senior Lenders and the Tribune Parties have waived any requirement that it be final and non-appealable, (C) the Escrow Closing does not occur by the earlier of (x) eight (8) Business Days following the date on which the Tribune Parties notify Bidder that all of such conditions (including the satisfaction of the condition in clause (B)) were satisfied or waived by the applicable parties or (y) the Termination Date, and (D) a Class II Debt Condition Precedent Failure occurs;

(ii)     (A) the Escrow Closing has occurred, all of the conditions to the Closing set forth in <u>Section 7.4</u> (Conditions Precedent to Closing) were satisfied (other than those conditions which by their nature require the delivery of a document or the taking of an action at the Closing) or waived by the applicable parties, (B) the Closing does not occur by the earlier of (x) seven (7) Business Days following the date on which the Tribune Parties notify Bidder that all of such conditions were satisfied or waived by the applicable parties or (y) the Termination Date, and (C) a Class II Debt Condition Precedent Failure occurs;

(iii)     at least two (2) Business Days prior to the scheduled hearing date on the Tribune Transaction Approval Motion, Bidder does not deliver to Tribune one or more of the Bidder Financing Affidavits due, in whole or in part, to any such affiant's good faith reasonable determination that a Class II Debt Condition Precedent Failure will exist on the Anticipated Escrow Closing Date,

then, subject to <u>Section 4.15(k)</u>, within five (5) Business Days following such termination of this Agreement, Bidder shall pay the Tribune Parties (in the aggregate and as directed by Tribune) a liquidated sum of $10,000,000 (the "**Middle Bidder Payment Amount**").

(i)     If, after the Notice and Procedures Approval Order has been entered by the Bankruptcy Court, this Agreement has been terminated pursuant to <u>Section 9.1(b)</u> and any of the following has occurred after the date of this Agreement but prior to such termination of this Agreement (each a "**Minor Tribune Payment Trigger**"):

-72-

(i)  Major League Baseball notifies Bidder or Tribune in writing that Major League Baseball does not intend to grant, in whole or in part, the MLB Approvals due, in whole or in part, to the amount of the Debt Financing, after Tribune and Bidder have had a reasonable opportunity to address Major League Baseball's objections, the MLB Approvals are not granted primarily as a result of such reason; or

(ii)  the Tribune Transaction Approval Order is not entered by the Bankruptcy Court on or before November 6, 2009, and all of the conditions to the Escrow Closing set forth in Sections 7.1 (Conditions Precedent of all Parties to Escrow Closing) and 7.3 (Conditions Precedent of Tribune Parties to Escrow Closing) have been satisfied (other than the condition to the Escrow Closing set forth in Section 7.1(d) (Tribune Transaction Approval Order), the conditions in Section 7.3(e) (Debt and Equity Financing) and those conditions which by their nature require the delivery of a document or the taking of an action at the Escrow Closing) or waived by the applicable parties,

then, subject to Section 4.15(k), within five (5) Business Days following such termination of this Agreement, Tribune Parties, jointly and severally, shall (in the aggregate) pay Bidder the liquidated sum of $5,000,000 (the "**Minor Tribune Payment Amount**"), which payment, if made by a Debtor, shall be treated as payment of an allowed (on a final, and not provisional or interim, basis) administrative priority claim pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, without further order of the Bankruptcy Court, and shall be included in any plan filed by Tribune Parties.

(j)  If, after the Notice and Procedures Approval Order has been entered by the Bankruptcy Court, this Agreement has been terminated pursuant to Section 9.1(b) and any of the following has occurred after the date of this Agreement but prior to such termination of this Agreement (a "**Minor Bidder Payment Trigger**"):

(i)  Major League Baseball notifies Bidder or Tribune in writing that Major League Baseball does not intend to grant, in whole or in part, the MLB Approvals due, in whole or in part, to a failure by Major League Baseball (i) to approve the Ricketts family as controlling owner of the Cubs Business and/or (ii) to approve Thomas Ricketts or another member of the Ricketts family designated by Bidder as the "control person," and after Bidder has had a reasonable opportunity to address Major League Baseball's objections, the MLB Approvals are not granted primarily as a result of either or both of such reasons;

(ii)  (A) all of the conditions to the Escrow Closing set forth in Sections 7.1 (Conditions Precedent of all Parties to Escrow Closing) and 7.2 (Conditions Precedent of Bidder to Escrow Closing) were satisfied (other than the condition to Escrow Closing described in Section 7.2(g) (Senior Debt Financing) and those conditions which by their nature require the delivery of a document or the taking of an action at the Escrow Closing) or waived by the applicable parties, (B) the Tribune Transaction Approval Order has been entered and either is final and non-appealable or both the Senior Lenders and the Tribune Parties have waived any requirement that it be final and non-appealable, (C) the Escrow Closing does not occur by the earlier of (x) eight (8) Business Days following the date on which the Tribune Parties notify Bidder that all of such conditions (including the satisfaction of the condition in clause (B)) were

-73-

satisfied or waived by the applicable parties or (y) the Termination Date, and (D) a Special Class II Debt Condition Precedent Failure occurs;

(iii)    (A) the Escrow Closing has occurred, all of the conditions to the Closing set forth in <u>Section 7.4</u> (Conditions Precedent to Closing) were satisfied other than those conditions which by their nature require the delivery of a document or the taking of an action at the Closing) or waived by the applicable parties, (B) the Closing does not occur by the earlier of (x) seven (7) Business Days following the date on which the Tribune Parties notify Bidder that all of such conditions were satisfied or waived by the applicable parties or (y) the Termination Date, and (C) a Special Class II Debt Condition Precedent Failure occurs; or

(iv)    at least two (2) Business Days prior to the scheduled hearing date on the Tribune Transaction Approval Motion Bidder does not deliver to Tribune one or more of the Bidder Financing Affidavits due, in whole or in part, to any such affiant's good faith reasonable determination that a Special Class II Debt Condition Precedent Failure will exist on the Anticipated Escrow Closing Date,

then, subject to <u>Section 4.15(k)</u>, within five (5) Business Days following such termination of this Agreement, Bidder shall pay the Tribune Parties (in the aggregate and as directed by Tribune) the liquidated sum of $5,000,000 (the "**Minor Bidder Payment Amount**").

(k)    The obligation to pay any Payment Amount in respect of a Payment Trigger under this <u>Section 4.15</u> is subject to the following:

(i)    If a Finance Major Bidder Payment Trigger has occurred after the date of this Agreement but prior to termination of this Agreement pursuant to <u>Section 9.1(b)</u>, then, regardless of whether any Major Tribune Payment Triggers, Middle Tribune Payment Triggers or Minor Tribune Payment Triggers have also occurred, (A) Bidder shall be obligated under <u>Section 4.15(f)</u> to pay to the Tribune Parties (in the aggregate) the Major Bidder Payment Amount and no other Bidder Payment Amount(s) and (B) the Tribune Parties shall have no obligation to pay any Tribune Payment Amounts.

(ii)    If one or more Middle Bidder Payment Triggers (but no Major Bidder Payment Triggers) and one or more Major Tribune Payment Triggers have occurred after the date of this Agreement but prior to termination of this Agreement pursuant to <u>Section 9.1(b)</u>, then neither Bidder nor Tribune Parties shall have any liability to pay any Payment Amounts in respect of any Payment Triggers, except that if one of such Major Tribune Payment Triggers is a Covered Major Tribune Payment Trigger, then the Tribune Parties shall be obligated to pay to Bidder the Major Tribune Payment Amount and no other Tribune Payment Amount(s), and Bidder shall have no obligation to pay any Bidder Payment Amounts.

(iii)    Except as otherwise set forth in <u>Sections 4.15(k)(i)</u> and <u>4.15(k)(ii)</u>, if (A) one or more Bidder Payment Triggers and one or more Tribune Payment Triggers have occurred after the date of this Agreement but prior to termination of this Agreement pursuant to <u>Section 9.1(b)</u>, and (B) (I) the highest Bidder Payment Amount due under any of such Bidder Payment Triggers (or the sole Bidder Payment Amount if there is only one Bidder Payment

-74-

Trigger) is equal to the highest Tribune Payment Amount due under any of such Tribune Payment Triggers (or the sole Tribune Payment Amount if there is only one Tribune Payment Trigger), then neither Bidder nor Tribune Parties shall have any obligation to pay any Payment Amounts; (II) the highest Bidder Payment Amount due under any of such Bidder Payment Triggers (or the sole Bidder Payment Amount if there is only one Bidder Payment Trigger) is greater than the highest Tribune Payment Amount due under any of such Tribune Payment Triggers (or the sole Tribune Payment Amount if there is only one Tribune Payment Trigger), then Bidder shall be obligated to pay to the Tribune Parties (in the aggregate) such highest Bidder Payment Amount and no other Bidder Payment Amount(s), and Tribune Parties shall have no obligation to pay any Tribune Payment Amounts; and (III) the highest Tribune Payment Amount due under any of such Tribune Payment Triggers (or the sole Tribune Payment Amount if there is only one Tribune Payment Trigger) is greater than the highest Bidder Payment Amount due under any of such Bidder Payment Triggers (or the sole Bidder Payment Amount if there is only one Bidder Payment Trigger), then the Tribune Parties shall be obligated to pay to Bidder such highest Tribune Payment Amount and no other Tribune Payment Amount(s), and Bidder shall have no obligation to pay any Bidder Payment Amounts.

(iv)    Without duplication of Section 4.15(k)(i), if more than one Bidder Payment Trigger and no Tribune Payment Triggers have occurred after the date of this Agreement but prior to termination of this Agreement pursuant to Section 9.1(b), then Bidder shall pay to the Tribune Parties (in the aggregate) the highest Bidder Payment Amount in respect of such Bidder Payment Triggers and no other Bidder Payment Amount(s), and Tribune Parties shall have no liability for any Tribune Payment Amounts.

(v)    If more than one Tribune Payment Trigger and no Bidder Payment Triggers have occurred after the date of this Agreement but prior to termination of this Agreement pursuant to Section 9.1(b), then the Tribune Parties shall (in the aggregate) pay to Bidder the highest Tribune Payment Amount in respect of such Tribune Payment Triggers and no other Tribune Payment Amount(s), and Bidder shall have no liability for any Bidder Payment Amounts.

(l)    Promptly following consummation of the Escrow Closing, and in no event more than four (4) Business Days following consummation of the Escrow Closing, Cubs LLC shall file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "**Additional Filer**"). Upon at least two (2) days' prior written notice to Bidder, Tribune shall also have the option to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code for some or all of the other Cubs Entities so long as appropriate notice is delivered to creditors of such other Cubs Entities (any such other entities which do file, collectively with Cubs LLC are also referred to as the "**Additional Filers**"). The Additional Filers will then file motions with the Bankruptcy Court seeking the joint administration of such bankruptcy cases with Tribune's Bankruptcy Case (each an "**Additional Bankruptcy Case**" and, collectively, the "**Additional Bankruptcy Cases**") and the entry of the Additional Filers Transaction Approval Order (the "**Additional Filer Motions**"). Except as otherwise mutually agreed in writing by Tribune and Bidder, the Additional Filer Motions shall be in substantially the form(s) attached hereto as Exhibit Y, with such changes as are mutually agreed upon by Tribune and Bidder, with neither party to unreasonably withhold, condition or delay its agreement, provided that any

-75-

Additional Filer Motion, if not already attached as part of Exhibit Y, will seek relief to implement the Tribune Transaction Approval Order and this Agreement and shall be consistent in all material respects with Exhibit Y. Bidder hereby consents to any such filings and agrees that the completion of such filings shall (i) not result in or constitute a breach of any of the representations and warranties contained herein (and any such representation or warranty that could be made untrue as a result of such filing or the effects thereof will be deemed amended in all respects such that there shall not be a breach thereof), (ii) not be considered when determining if there is a Cubs Material Adverse Effect and (iii) not be prohibited by Section 4.1 or any other provision of this Agreement. Any Cubs Entities that are not Additional Filers shall be bound by, and subject to the relief in, the Transaction Approval Orders and any other orders entered in the Bankruptcy Case and any case commenced by an Additional Filer.

(m)    Notwithstanding anything in this Agreement to the contrary, (i) a party may not terminate this Agreement pursuant to Section 4.15(c) if such party breached its obligations under this Agreement, such breach was not cured within five (5) Business Days after the other party delivers written notice of such breach to such breaching party and such breach was a material cause of the Notice and Procedure Approval Order not being entered when required under Section 4.15(c), (ii) Bidder shall not be entitled to any payment under Section 4.15(e), (g) or (i) if Bidder breached its obligations under this Agreement, such breach was not cured within five (5) Business Days after Tribune delivers written notice of such breach to Bidder and such breach was a material cause of the Major Tribune Payment Trigger, Middle Tribune Payment Trigger or Minor Tribune Payment Trigger, respectively, that is being asserted as the basis for such payment to occur and (iii) no Tribune Party shall be entitled to any payment under Section 4.15(f), (h) or (j) if any Tribune Party breached its obligations under this Agreement, such breach was not cured within five (5) Business Days after Bidder delivers written notice of such breach to such Tribune Party and such breach was a material cause of the Major Bidder Payment Trigger, Middle Bidder Payment Trigger or Minor Bidder Payment Trigger, respectively, that is being asserted as the basis for such payment to occur.

(n)    The parties acknowledge and agree that the agreements contained in this Section 4.15 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, the parties would not enter into this Agreement. If a party fails to pay the amount due by it pursuant to this Section 4.15 within five (5) Business Days, interest shall accrue on such amount from the date such payment was required to be paid pursuant to the terms of this Agreement until the date of payment at the Interest Rate. If, to obtain such payment, the other party commences a suit that results in judgment for such party for such amount, the defaulting party shall pay the other party its reasonable costs and expenses (including reasonable attorneys' fees and expenses) incurred in connection with such suit. Each of the parties hereto further acknowledges that the payment of the amounts specified in this Section 4.15 are not a penalty, but are liquidated damages in a reasonable amount that will compensate the parties, in the circumstances in which such amounts are payable, for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions (including the Newco Sale), which amount would otherwise be impossible to calculate with precision. Notwithstanding anything to the contrary in this Agreement, the parties agree that, following termination of this

Agreement pursuant to Section 9.1(b), the monetary remedies after the result of the operation of Section 4.15(k) with respect to subsections (c), (e), (f), (g), (h), (i) or (j) in this Section 4.15, other than the monetary remedies provided for as a result of the occurrence of the events described in Section 4.15(f)(v) or (vi) for which this limitation on remedies shall not apply, shall be the sole and exclusive remedies of:

(i)       the Tribune Parties against Bidder or any of its Affiliates or any Senior Lender Party for any loss suffered by the Tribune Parties in connection with the failure of the Closing to be consummated following the occurrence of any of the Major Bidder Payment Triggers, Middle Bidder Payment Triggers or Minor Bidder Payment Triggers specified in Section 4.15(f), 4.15(h) or 4.15(j), respectively, and Bidder and its Affiliates shall have no further liability or obligation relating to or arising out of a termination of this Agreement pursuant to Section 9.1(b) after the occurrence of the events specified in Section 4.15(f), 4.15(h) or 4.15(j), regardless of whether a payment is actually required to be made pursuant to Section 4.15(k), except in the case of fraud or a knowing and intentional breach by Bidder of any of its covenants, representations or warranties contained in this Agreement; and

(ii)       Bidder against the Tribune Parties or any of its Affiliates for any loss suffered in connection with the failure of the Notice and Procedures Order to be entered by the Bankruptcy Court when required pursuant to Section 4.15(c) or the failure of the Closing to be consummated following the occurrence of any of the Major Tribune Payment Triggers, Middle Tribune Payment Triggers or Minor Tribune Payment Triggers specified in Section 4.15(e), 4.15(g) or 4.15(i), respectively, and none of the Tribune Parties nor any of their Affiliates shall have any further liability or obligation relating to or arising out of a termination of this Agreement for the reasons specified in Section 4.15(c) (but only if the Tribune Parties have satisfied their payment obligation under Section 4.15(c)) or pursuant to Section 9.1(b) after the occurrence of the events specified in Section 4.15(e), 4.15(g) or 4.15(i), regardless of whether a payment is actually required to made pursuant to Section 4.15(k), except in the case of fraud or a knowing and intentional breach by the Tribune Parties of any of their covenants, representations or warranties contained in this Agreement.

(o)       Any plan under Subchapter II of Chapter 11 of the Bankruptcy Code filed by any of the Tribune Parties in the Bankruptcy Case and any Additional Bankruptcy Cases shall not be materially inconsistent with the terms of this Agreement, the other Transaction Documents, the Tribune Transaction Approval Order or the Additional Filers Transaction Approval Order and any such plan shall not disallow or impair any allowed administrative priority claims granted to Bidder, Newco or the Newco Subs under and in accordance with the terms of this Agreement or the other Transaction Documents.  The Tribune Parties shall use reasonable best efforts to oppose the inclusion of any provision in any plan for any of the Tribune Parties in the Bankruptcy Case and any Additional Bankruptcy Cases, whether or not proposed by the Tribune Parties, that is materially inconsistent with the terms of this Agreement, the other Transaction Documents, the Tribune Transaction Approval Order, the Additional Filers Transaction Approval Order, and the consummation and carrying out of the Transactions.

Section 4.16    Title.  Prior to the Escrow Closing and continuing thereafter to the Closing, the parties shall use reasonable best efforts to obtain (a) an owners policy of title

insurance for each parcel of Cubs Contributed Owned Real Property (or a Pro Forma Title Policy, signed by the Title Company and accompanied by a commitment from the Title Company to issue an owners policy of title insurance for each parcel of Cubs Contributed Owned Real Property following recordation of the applicable Deed), in each case, in the forms identical to the Pro Forma Title Policies (as such may be updated in accordance with this Section 4.16), and (b) a leasehold policy of title insurance for each parcel of Insured Leased Real Property (or a Pro Forma Title Policy, signed by the Title Company and accompanied by a commitment from the Title Company to issue a leasehold policy of title insurance for each parcel of Insured Leased Real Property following the Escrow Closing), in each case, in the forms identical to the Pro Forma Title Policies (as such may be updated in accordance with this Section 4.16) (with respect to the policies referred to in clauses (a) and (b), each, a "**Title Policy**" and collectively, the "**Title Policies**"). With respect to each parcel of Cubs Contributed Owned Real Property, each Title Policy shall have named as its insured Newco, and with respect to each Insured Leased Real Property each Title Policy shall have named as its insured the entity selected by Bidder to hold title or lessee's interest in the Insured Leased Real Property in accordance with Section 4.19(c). If Newco sells or otherwise transfers any of the Cubs Contributed Owned Real Property to Newco Subs pursuant to the Newco Sale, the Tribune Parties shall use reasonable best efforts to cooperate with Newco and the applicable Newco Sub to which Newco desires to sell or otherwise transfer any of the Cubs Contributed Owned Real Property in order that each Title Policy shall have named as its insured the entity selected by Bidder to hold title to such Cubs Contributed Owned Real Property. Upon reasonable request from Bidder, the Tribune Parties shall order "bring-down" Pro Forma Title Policies from time to time between the date hereof and the Closing. To the extent an exception is disclosed on a Pro Forma Title Policy or otherwise arises after the Pro Forma Title Policy's "effective date" (the date set forth on the Pro Forma Title Policy attached hereto as Exhibit G-2) and prior to the Escrow Closing that is not a Permitted Lien or a Lien that will be extinguished by the Tribune Transaction Approval Order or the Additional Filers Transaction Approval Order, Tribune (subject to the limitations below), Bidder and Newco shall use reasonable best efforts to cause the Title Company to provide title insurance coverage under the Title Policies over any such Liens, which efforts shall include the payment by Newco to the Title Company of the title endorsement fees with respect to such Liens, which shall not, without Bidder's consent, exceed $10,000 in the aggregate. Any such additional payment by Newco to the Title Company shall be considered a Transaction Expense hereunder. For any amount of charges payable to the Title Company with respect to such Liens in excess of $10,000 in the aggregate, Tribune may elect to pay such excess amount, which excess amount shall not be considered a Transaction Expense. Notwithstanding the foregoing, (1) in no event will the Tribune Parties be obligated to provide any additional indemnification, payments or deposits to or with the Title Company, which shall be made, if at all, by Newco or a Newco Sub, and (2) to the extent such a Lien (A) relates to actions approved by Bidder in writing or (B) is a Permitted Lien, Tribune shall have no obligations pursuant to this Section 4.16 with respect thereto.

Section 4.17  Name Change. Each Cubs Entity (other than Tribune Sports) shall, and Tribune shall cause each such Cubs Entity to, take all action needed to amend its certificate of formation and operating agreement to change its name upon the Closing to a name that does not include any of the following: "Cubs," "Wrigley Field," "Premium Ticket," "Premium Ticket

-78-

Services," "Diana Quentin," any Cubs Intellectual Property, MLB Cubs Intellectual Property or any name, trademark, service mark or logo related thereto or any part or variation of any of the foregoing.

Section 4.18    Chicago Cubs Charities.  Promptly after the Closing, the parties hereto shall make reasonable best efforts to cause Chicago Cubs Charities to adopt an amendment to its bylaws to eliminate references to Tribune therein and to elect such members, directors and officers as directed by Newco.

Section 4.19    Retained Cubs Current Assets; Cubs Contributed Assets.

(a)    When and as provided for pursuant to the Transition Services Agreement or in any event, following the expiration or termination of the Transition Services Agreement, at Bidder's request, Bidder and Tribune Parties shall send a joint notice of Closing to all obligors of the Cubs Business directing such obligors to remit all funds (which shall include funds related to Retained Cubs Current Assets) to the applicable Newco Subs.  Tribune Parties shall (w) notify Bidder of any funds that Tribune Parties receive in respect of Cubs Contributed Assets or Retained Cubs Current Assets and (x) promptly forward to the applicable Newco Subs all such proceeds that do not represent proceeds of Retained Cubs Current Assets.  Bidder shall and shall cause Newco and the Newco Subs to (i) promptly forward or cause to be forwarded to the Cubs Entities any and all proceeds from Retained Cubs Current Assets (net of all reasonable out-of-pocket expenses of collections incurred by Bidder or Newco Subs pursuant to clause (iv) of this Section 4.19(a) to collect such Retained Cubs Current Assets) that are received by Bidder, Newco or Newco Subs after the Closing, (ii) permit the Cubs Entities, upon notice to Newco, to collect and to endorse for payment in the name of Bidder, Newco or Newco Subs all checks and other items which Tribune or any of its Subsidiaries may receive related to the Retained Cubs Current Assets, (iii) continue to collect, at Newco's expense, all Retained Cubs Current Assets in a manner consistent with the Cubs Business' prior practices, and (iv) at the Cubs Entities' expense, take such other actions reasonably requested by the Cubs Entities to collect the Retained Cubs Current Assets not consistent with such prior practices with respect thereto.  All funds received by any Tribune Party or Newco or any of the Newco Subs from the obligor of any Retained Cubs Accounts Receivable will be allocated to the Retained Cubs Accounts Receivable until such receivables are fully paid up to the value equal to the amount for such receivables reflected on the Statement, after which all excess proceeds shall be forwarded to Newco.

(b)    Following the Closing, Tribune Parties shall and shall cause the Contributing Tribune Entities to (i) promptly forward or cause to be forwarded to Newco any and all proceeds from or in respect of Cubs Contributed Assets (other than Retained Cubs Current Assets) that are received by Tribune Parties or other Contributing Tribune Entities after the Closing, and (ii) permit Newco, upon notice to Tribune, to collect and to endorse for payment in the applicable Contributing Tribune Entity's name all checks and other items which Newco or any Newco Sub may receive related to the Cubs Contributed Assets that are in the name of Contributing Tribune Entities.

(c)    At least five (5) Business Days prior to the Escrow Closing, Bidder shall provide a written notice to the Tribune Parties specifying (i) whether, aside from the Newco Subs

-79-

contemplated as of the date of this Agreement, it will form any other Delaware limited liability companies to be wholly owned, either directly or indirectly, by Newco (each an "**Additional Newco Sub**") and (ii) whether it will be changing the names of Newco or any of the Newco Subs from the respective names set forth for such Persons in this Agreement. Bidder will determine in its sole discretion which Cubs Contributed Assets Newco sells to which Newco Subs as part of the Newco Sale.

Section 4.20    Entry of Contracts.  Tribune Parties shall promptly disclose to Bidder any Contract that is entered into with respect to the Cubs Business after the date of this Agreement that the Tribune Parties would have been required to disclose as a Material Contract if such Contract existed as of the date of this Agreement.

Section 4.21    Transaction Expense Notice/Cubs Expense Notice.

(a)    No less than two (2) Business Days prior to the Escrow Closing, Bidder shall deliver to the Closing Agent and Tribune a notice substantially in the form of, and containing each of the items set forth on, Exhibit AA setting forth Bidder's good faith estimate of all Covered Transaction Expenses that will not have been paid by Newco prior to the Closing (the "**Transaction Expense Notice**") and will include good faith comments from Tribune (based on items to be included in Covered Transaction Expenses by virtue of the definition of Transaction Expenses in Section 10.4) with respect to the determination of Covered Transaction Expenses for purposes of calculating the Equity Financing required to be included in the Closing Funds. Bidder shall update the Transaction Expense Notice as of Closing and shall provide a draft of such updated Transaction Expense Notice to Tribune at least four (4) Business Days prior to Closing. Bidder will include good faith comments from Tribune (based on items to be included in Covered Transaction Expenses by virtue of the definition of Transaction Expenses in Section 10.4) on the updated Transaction Expense Notice (as revised in accordance with this Section 4.21(a), the "**Final Transaction Expense Notice**"). At least two (2) Business Days prior to Closing, Bidder shall deliver the Final Transaction Notice to Tribune and the Closing Agent, and if the Specified Amount based on the Final Transaction Expense Notice exceeds the Specified Amount based on the Transaction Expense Notice, then Bidder shall deliver immediately available funds in the amount of the excess to the Closing Agent at Closing. If the Specified Amount based on the Final Transaction Expense Notice is less than the Specified Amount based on the Transaction Expense Notice, then the Tribune Parties and Bidder shall jointly instruct the Closing Agent to release funds in the amount of the difference to Bidder at Closing in accordance with the terms of the Closing Escrow Agreement.

(b)    No less than two (2) Business Days prior to the Escrow Closing, Tribune shall deliver the Cubs Expense Notice to Bidder and the Closing Agent. No less than two (2) Business Days prior to the Closing, Tribune shall deliver to Bidder an updated Cubs Expense Notice. The Cubs Expenses at any time shall be deemed to be those expenses set forth in the last delivered Cubs Expense Notice as of such time in accordance with this Section 4.21(b).

Section 4.22    Revenue Sharing.  Bidder, Newco and Newco Subs shall cooperate with the Tribune Parties with respect to Major League Baseball's review of the Club's 2006, 2007 and 2008 potential revenue sharing liability with respect to payments made by WGN to Cubs LLC

-80-

pursuant to the Broadcast Agreement between Cubs LLC and WGN dated March 8, 1982, as amended (the "**Open WGN Revenue Sharing Review**").  Tribune Parties shall direct (and have the right to control) the Club's participation in the Open WGN Revenue Sharing Review, including any appeal thereof.  Bidder, Newco and Newco Subs shall not (i) communicate with Major League Baseball with respect to the Open WGN Revenue Sharing Review without the consent of or the participation of a representative of Tribune in such communication, or (ii) finalize, settle or otherwise agree to any liability of the Club to Major League Baseball with respect to the Open WGN Revenue Sharing Review without the prior written consent of Tribune.  Bidder, Newco and Newco Subs shall provide Tribune with prompt notice of any communication from Major League Baseball with respect to, or which otherwise might impact the results of, the Open WGN Revenue Sharing Review.  Tribune Parties shall provide Bidder with prompt notice of any communication with Major League Baseball with respect to, or which would reasonably be expected to materially impact the results of, the Open WGN Revenue Sharing Review.  Tribune Parties shall use reasonable best efforts to have the Open WGN Revenue Sharing Review completed and finally settled prior to the Escrow Closing.

Section 4.23    Consent to Pledge of CSN Interests.  Tribune Parties and Bidder shall use their respective reasonable best efforts to obtain a consent from all of the members of CSN Chicago, other than Tribune Sports (or its successor as member of CSN Chicago), in the form attached hereto as Exhibit HH (with such changes required by the members of CSN Chicago that are mutually agreed to by Tribune, Bidder and the Senior Lender Agent, each in their reasonable discretion), to the pledge of the CSN Interests as part of the Debt Financing, as contemplated by the Senior Debt Commitment Letter, provided that such reasonable best efforts shall not require the payment by the Tribune Parties of any fee or other amount.

Section 4.24    Authority.

(a)    At or prior to the Closing, no Tribune Party shall allow any of the Cubs Authorizing Resolutions to be amended or revoked to the extent any such amendment or revocation would cause any of the representations or warranties contained in Section 2.3, as of the date of such amendment or revocation or thereafter, to be untrue.

(b)    If between Escrow Closing and Closing any person who on behalf of any party to this Agreement executed any Transaction Documents held in escrow pursuant to the Closing Escrow Agreement or Real Estate Escrow Agreement ceases to be an authorized signatory for such party as of the Closing Date (including because of the death of such person), then Tribune Parties, with respect to any such person executing on behalf of a Tribune Party, and Bidder, with respect to any such person executing on behalf of Bidder, shall cause each such Transaction Document so executed to be re-executed by a person authorized to sign on behalf of such party as of the Closing Date.

## ARTICLE V

## EMPLOYEE MATTERS

Section 5.1    Employees.

-81-

(a)      Tribune Parties shall update Schedule 2.13(a) as of the Business Day immediately prior to the Escrow Closing Date for any changes thereto and deliver the updated Schedule 2.13(a) to Bidder at the Escrow Closing.  In addition, within two (2) Business Days after Closing, Tribune Parties shall be permitted to update Schedule 2.13(a) for changes between the Escrow Closing and Closing.  For the avoidance of doubt, changes to such Schedule 2.13(a) pursuant to this Section 5.1(a), whether before, on or after the Escrow Closing Date, shall be made only in compliance with Section 4.1.  Effective upon consummation of the Closing, the Newco Subs shall (and which of the Newco Subs amongst the Newco Subs shall be as determined by Bidder), and Bidder shall cause such Newco Subs to, offer employment to the Cubs Employees listed on such updated Schedule 2.13(a) other than Cubs Non-Player Employees on long-term disability leave.  Any such offer of employment to a Cubs Non-Player Employee who is on a leave of absence other than long-term disability leave, on the Closing Date, including short-term disability, family, maternity or military leave, whether such leave is paid, unpaid or other ("**Inactive Cubs Employee**"), may be conditioned upon: (i) the Closing occurring, and (ii) such Inactive Cubs Employee commencing active employment with a Newco Sub on a date that is not later than nine months after the Closing Date or if such Cubs Employee is on military leave, commencing employment within any longer time period required with respect thereto pursuant to Law.  As to any Cubs Employee employed pursuant to an employment agreement with a Cubs Entity, Newco, Tribune or one of its Affiliates, such offer of employment shall be in accordance with such employment agreement and at the Closing such Newco Sub shall assume and shall thereafter honor and be deemed the successor under such employment agreement, including, for the avoidance of doubt, the employment agreements and letter agreements listed on Schedule 5.1(c).  As to any Cubs Employee represented by a labor organization set forth on Schedule 2.13(c), such offer of employment by the applicable Newco Sub shall be in accordance with any applicable collective bargaining agreement set forth on Schedule 2.13(c), including any side agreement or collectively bargained employee benefit plan contained or referenced therein or maintained pursuant thereto set forth on Schedule 2.13(c) ("**Collective Bargaining Agreement**"), and at the Closing the applicable Newco Sub, shall assume and shall from and after the Closing honor and be deemed the successor under such Collective Bargaining Agreement.

(b)      All Cubs Non-Player Employees listed on Schedule 2.13(a) who actually commence employment with a Newco Sub (including all Inactive Cubs Employees commencing employment with a Newco Sub in accordance with Section 5.1(a)), as well as all Cubs Player Employees, are referred to as "**Transferred Employees.**"  As used in this Agreement, a "**Rejecting Employee**" means any Cubs Non-Player Employees listed on Schedule 2.13(a) who: (i) rejects employment with a Newco Sub after being offered employment under terms and conditions that are in the aggregate substantially similar to the then-current terms and conditions of his or her employment with a Cubs Entity; (ii) rejects employment with a Newco Sub for any reason (regardless of the terms of the offer of employment from a Newco Sub) and who is, within 180 days after the Closing, employed by Tribune or its Affiliates; or (iii) is an Inactive Cubs Employee as of the Closing Date and does not commence employment with a Newco Sub on a date that is within nine months after the Closing Date or, in the case of an Inactive Cubs Employee on military leave, within any longer time period required with respect thereto pursuant to Law (unless such Inactive Cubs Employee received an offer on terms and conditions that are

-82-

not in the aggregate substantially similar to such employee's then current terms and conditions of employment, in which case, he or she will be considered a Declining Employee). As used in this Agreement, a "**Declining Employee**" means any Cubs Non-Player Employee listed on <u>Schedule 2.13(a)</u> who declines employment with a Newco Sub after being offered employment under terms and conditions that are not in the aggregate substantially similar to the then-current terms and conditions of his or her employment with a Cubs Entity, and who is not, within 180 days after the Closing, employed by Tribune or its Affiliates; provided that any such Cubs Non-Player Employee who becomes so employed by Tribune or its Affiliates shall be deemed a Declining Employee effective upon consummation of the Closing through the date immediately preceding the date on which he or she is so employed by Tribune or its Affiliates (it being understood that all Cubs Employees employed pursuant to an employment agreement that is included in the Cubs Contributed Assets or covered by a Collective Bargaining Unit shall be either Transferred Employees or Rejecting Employees).

(c)     Except as provided under any employment agreement set forth on <u>Schedule 5.1(c)</u> that is included in the Cubs Contributed Assets or as required by a Collective Bargaining Agreement, nothing in this Agreement shall obligate any Newco Sub to continue the employment of any Transferred Employee after the Closing; provided, however, that the Newco Subs shall be responsible for the payments and benefits to be provided to Transferred Employees and Declining Employees in accordance with <u>Section 5.3</u> and continuation coverage for Transferred Employees in accordance with <u>Section 5.7</u>, as well as any other potential liability relating to any discontinuation of the employment of any Transferred Employees or Declining Employees on or after the Closing Date, other than any liability that is a Cubs Excluded Liability. None of Bidder, Newco or any Newco Sub shall have any obligation whatsoever to provide severance benefits, continuation coverage or any other benefit to any Rejecting Employee. Bidder shall provide Tribune with written notice of its determination of all Cubs Non-Player Employees (other than Inactive Cubs Employees) who did not accept the offer of employment made by Newco Sub within one (1) Business Day after the Closing. Any Cubs Non-Player Employee who is not on such list (other than Inactive Cubs Employees) shall be deemed a Transferred Employee.

Section 5.2     <u>Employee Benefits</u>.

(a)     Except as otherwise provided in this <u>Article V</u> or as a result of negotiations with a labor organization regarding the effects of the Transactions, to the extent any Transferred Employee was eligible to participate in any of the Benefit Plans effective as of the Closing Date, to the extent set forth in the Transition Services Agreement, such Transferred Employee shall continue active participation in such Benefit Plans through December 31, 2009 or such earlier date, if any, as may be specified by Newco ("**Bidder Plan Participation Date**"). Effective as of the applicable Bidder Plan Participation Date, Transferred Employees shall be eligible to participate in such benefit plans as may be offered to similarly situated employees of Newco or the Newco Subs (or their respective Affiliates) in accordance with the terms of such plans ("**Newco Benefit Plans**"); provided, <u>however</u>, that the Inactive Cubs Employees shall remain in the Benefit Plans as Cubs Employees unless and until they (i) are terminated by a Cubs Entity and not hired by a Newco Sub (and such Inactive Cubs Employees will not in any event participate in the Newco Benefit Plans) or (ii) become Transferred Employees upon their

-83-

commencement of active employment with the Newco Sub, whereupon under this clause (ii) they shall commence participation in Newco Benefit Plans in accordance with the terms and conditions of such Newco Benefit Plans or Benefit Plans adopted by Newco. Following the Closing, Tribune shall continue to satisfy when due all outstanding obligations to Transferred Employees under the Benefit Plans (including the payment of all amounts triggered by the termination of the employment of Transferred Employees with Tribune), other than obligations assumed by Newco or a Newco Sub pursuant to this Article V.

(b)     Transferred Employees shall be credited for their length of service with Tribune or its Affiliates and for any service recognized by Tribune or its Affiliates for purposes of determining eligibility to participate in, satisfying any waiting period, and vesting under, any Newco Benefit Plans, to the extent they earned credit (or were credited with service) under comparable employee benefit plans maintained by Tribune or its Affiliates. Except as provided under the terms of any Transferred Benefit Plan, Transferred Employees shall not be entitled to receive such credit for benefit accrual purposes under any Newco Benefit Plan that is a "defined benefit plan" within the meaning of Section 3(35) of ERISA. Any preexisting condition clause in any of the health coverages (including medical and dental coverage) included in Newco Benefit Plans shall be waived for the Transferred Employees to the extent waived or satisfied under the applicable Benefit Plan immediately prior to Closing. Newco Subs shall, and Bidder shall cause Newco Subs to, ensure that each Transferred Employee receives credit under any Newco Benefit Plan that is a welfare benefit plan (other than any flexible spending accounts) for any deductibles or co-payments paid by such Transferred Employee and his or her dependents for the calendar year in which the Closing Date occurs under a plan maintained by Tribune or its Affiliates.

Section 5.3     Severance and Bonus. Newco Subs shall: (a) provide severance benefits to Declining Employees and Transferred Employees (other than Cubs Player Employees) (i) in accordance with the terms set forth on Schedule 5.3 or (ii) by assuming and complying with the separate severance agreements listed on Schedule 2.12(a), and (b) pay any annual cash bonus amounts payable to a Transferred Employee or Declining Employee after the Closing, but, with respect to amounts relating to fiscal year 2009 or any prior period, only to the extent specifically reflected, accrued for or reserved for and included in the calculation of Final Closing Working Capital.

Section 5.4     Pension Plans. Tribune's relevant Benefit Plan shall retain all assets and liabilities under any Benefit Plan that is a defined benefit pension plan (other than a Transferred Benefit Plan described in Section 5.9), including but not limited to the Tribune Company Cash Balance Pension Plan (f/k/a Times Mirror Pension Plan and the Tribune Company Pension Plan) and the Tribune Company Hourly Pension Plan, whether qualified or non-qualified.

Section 5.5     Savings Plan. Except as otherwise provided in this Article V, Tribune's relevant Benefit Plans shall retain all assets and liabilities under all Benefit Plans that are defined contribution plans, including but not limited to the Tribune Company 401(k) Savings Plan ("**Tribune Savings Plan**"). Tribune shall cause each Transferred Employee to be 100% vested in his or her benefits under the Tribune Savings Plan effective as of the date such individual commences employment with a Newco Sub. During the term of the Transition Services

-84-

Agreement, Newco shall adopt the Tribune Savings Plan for the benefit of its employees. Newco shall be permitted to direct Tribune to amend the terms of the Tribune Savings Plan to increase or decrease employer contributions on behalf of Newco's employees provided that Newco provides Tribune with at least 10 Business Days advance written notice of such amendment.  As soon as practicable following the expiration of the period during which Transferred Employees continue to participate in the Tribune Company 401(k) Savings Plan pursuant to the Transition Services Agreement, Tribune and Newco shall cooperate to effectuate a plan-to-plan transfer of assets and corresponding liabilities related to Newco Employees' accounts in such plan to one or more tax-qualified defined contribution plans maintained by Newco or Newco Subs in which the Transferred Employees participate.

      Section 5.6    <u>Vacation and Sick Days</u>.  Effective as of the date of hire (which shall be the Closing Date, except for Inactive Cubs Employees), the applicable Newco Sub that hires a Transferred Employee shall recognize and be responsible for all accrued, but unpaid, vacation time and sick days of such Transferred Employee, but in the case of vacation only to the extent specifically reflected, accrued for or reserved for and included in the calculation of Final Closing Working Capital.

      Section 5.7    <u>COBRA</u>.  Tribune Parties shall continue to provide continuation coverage required under the applicable requirements of Section 4980B(f) of the Code and Sections 601 to 608 of ERISA ("**COBRA Coverage**") to (a) all current and former employees of the Cubs Business (and the qualified beneficiaries and other covered individuals of such persons) who are entitled to such coverage with respect to "qualifying events" (within the meaning of Section 4980B(f) of the Code) which occur prior to the Closing, (b) all Rejecting Employees, Declining Employees and Inactive Cubs Employees who never commence active employment with Newco, and (c) all Transferred Employees who have a "qualifying event" after the Closing and while participating in a group medical plan maintained by Tribune.  At Tribune's request, Newco Subs will claim, on Newco Subs' quarterly federal employment tax return(s), the federal subsidy provided for under the provisions of the American Recovery and Reinvestment Act of 2009 ("**ARRA**") for a portion of the COBRA Coverage premiums paid by Tribune with respect to those Transferred Employees described in clause (c) above who qualify as "assistance eligible individuals" under ARRA.  Newco Subs will pay over to Tribune, as soon as practicable after filing of such quarterly employment tax return, the amount of the federal COBRA Coverage subsidy, as provided by Section 3001 of ARRA, claimed by Newco Subs with respect to such Transferred Employees.  Newco Subs shall be responsible for providing COBRA Coverage to any Transferred Employee (and his or her qualified beneficiaries and other covered individuals) who has a "qualifying event" while participating in a Newco Benefit Plan that provides group medical plan benefits.

      Section 5.8    <u>Post-Retirement Benefit Liabilities</u>.  Subject to the terms of the applicable plans, and Tribune's right to amend or terminate the plans, Tribune Parties shall retain responsibility for providing, and shall continue to provide, post-retirement medical and life insurance benefits with respect to: (a) employees of the Cubs Business who have retired prior to or on the Closing Date and are receiving or entitled to receive post-retirement medical and life insurance benefits; and (b) Transferred Employees who (i) have satisfied the eligibility requirements for post-retirement medical and life insurance benefits as of the Closing Date and

-85-

(ii) elect within 31 days after the Closing Date to receive such benefits. Neither Newco nor any Newco Sub shall have any obligation under or pursuant to this Agreement to provide any post-retirement medical or life insurance benefits to Transferred Employees or any other employees of the Cubs Business.

Section 5.9    Transferred Benefit Plans. Effective as of the Closing, Bidder shall cause Cubs Newco Sub to adopt the Major League Baseball Pension Plan for Non-Uniformed Personnel ("**NUPP**"), the Minor League Players Pension Plan, MLB College Scholarship Program and the Minor League Players Health and Welfare Plan (the "**Transferred Benefit Plans**") and any related trust, but only for the benefit of Cubs Employees who are minor league ballplayers who have accrued benefits under such plans as maintained by Cubs LLC or former employees of the Cubs Business who have accrued benefits under such plans, and Cubs LLC shall cause all right, title, interest, duties and authorities of Cubs LLC in, to and under the Transferred Benefit Plans and the related trust to be transferred to Cubs Newco Sub. At the Closing, the parties shall execute and deliver such documents and instruments as may be required to effect such assumption and transfer and to reflect the parties' intent that the Transferred Benefit Plans not be deemed to be terminated or partially terminated as a result of this Agreement or the Transactions and that all assets and liabilities of the Transferred Benefit Plans be transferred.

Section 5.10    Multiemployer Pension Plan. Tribune and Bidder recognize that the Closing would, absent compliance with Section 4204 of ERISA, result in a complete withdrawal of the Tribune Parties as a contributing employer to the Major League Baseball Players Pension Plan ("**MEPPA Plan**"), thereby resulting in the MEPPA Plan assessing withdrawal liability against the Tribune Parties in accordance with Section 4203 of ERISA. The parties hereto agree to comply with Section 4204 of ERISA as follows:

(a)    Bidder agrees that after Closing it shall cause Cubs Newco Sub, and Cubs Newco Sub agrees, to make contributions to the MEPPA Plan with respect to the operations of the Cubs Contributed Assets for at least substantially the same number of contribution base units for which the Cubs Entities had an obligation to contribute within the meaning of Section 4204(a)(1)(A) of ERISA.

(b)    To the extent required by ERISA Section 4204(A)(I)(B) and the regulations issued thereunder, Bidder shall cause Cubs Newco Sub to provide to the MEPPA Plan a bond, letter of credit or amount in escrow in such form and amount as is necessary to comply with the requirements of Section 4204(a)(1)(B) of ERISA. To the extent reasonably requested by Bidder, Tribune will cooperate with Bidder in preparing and submitting a request for waiver of such bond obligation to the PBGC.

(c)    If Cubs Newco Sub withdraws from the MEPPA Plan in a complete withdrawal, or a partial withdrawal with respect to the operations represented by the Cubs Contributed Assets, during the first five plan years commencing with the first plan year that begins after the Closing, (i) Bidder shall pay, or cause Cubs Newco Sub to pay, any withdrawal liability Cubs Newco Sub incurs to the MEPPA Plan and (ii) to the extent required by ERISA Section 4204(a)(1)(C) and the regulations issued thereunder, Tribune shall be secondarily liable

-86-

to the MEPPA Plan for any withdrawal liability the Tribune Parties would have had to the MEPPA Plan with respect to such operations (but for this Section and compliance with Section 4204 of ERISA) if the liability of the Cubs Newco Sub with respect to the MEPPA Plan is not paid. If the liability of Cubs Newco Sub with respect to the MEPPA Plan is not paid by Cubs Newco Sub, Bidder shall notify Tribune as soon as practicable following Cubs Newco Sub's withdrawal from the MEPPA Plan, and Newco and the Newco Subs agree to jointly and severally indemnify and hold harmless Tribune for, from, and against any such withdrawal liability that arises due to Cubs Newco Sub's withdrawal as described in this Section 5.10(c) and to which Tribune or any of its Subsidiaries becomes secondarily liable to the MEPPA Plan.

        (d)      To the extent required by Section 4204(a)(3)(A) of ERISA, if, all, or substantially all, of the Tribune Parties' assets are distributed, or if the Tribune Parties are liquidated before the end of the five plan year period commencing with the first plan year that begins after Closing, then Tribune shall provide to the MEPPA Plan a bond or amount in escrow equal to the present value of the withdrawal liability the Tribune Parties would have to the MEPPA Plan but for this Section and compliance with Section 4204 of ERISA.

        (e)      If only a portion of the Tribune Parties' assets are distributed during the period described in Section 5.10(d) above, then Tribune shall provide a bond or an amount in escrow as required by Section 4204 of ERISA and the regulations thereunder.

      Section 5.11   WARN Act. The parties do not anticipate that there will be any "employment losses" as a consequence of the Transactions that trigger obligations under the WARN Act or under any similar provision of any federal, state, regional, foreign, or local law, rule, or regulation (collectively, "**WARN Act Obligations**"). Notwithstanding the foregoing, Tribune Parties and their respective Affiliates shall be solely liable for any WARN Act Obligations resulting from an "employment loss" (as defined in the WARN Act) occurring on or prior to the Closing Date, provided that the Newco Subs satisfy their obligations under Section 5.1. Cubs Newco Sub or other applicable Newco Sub(s) shall be solely liable for any WARN Act Obligations resulting from any such "employment loss" occurring on or after the Closing Date with respect to Transferred Employees.

      Section 5.12   Deferred Compensation. At the Closing, Bidder shall cause Cubs Newco Sub to assume all liabilities and obligations with respect to the deferred compensation arrangements listed on Schedule 5.12. Tribune shall deliver or cause to delivered notice of the Approval Motions to anyone who receives or is entitled to deferred compensation.

      Section 5.13   Cooperation. Upon request, prior to and following the Closing, Tribune Parties shall provide Bidder, and Bidder shall provide Tribune Parties, such documents, data and information as may reasonably be necessary to implement the provisions of this Article V and to administer their respective benefit plans.

ARTICLE VI

TAX MATTERS

-87-

Section 6.1    <u>Retention of Tax Returns</u>. Tribune and Newco each shall retain all Tax Returns, schedules and work papers, records and other documents in its possession (or in the possession of its Affiliates) relating to Tax matters relevant to the Cubs Business, Cubs Contributed Assets or Cubs Liabilities for each taxable period first ending after the Closing and for all prior taxable periods until the later of: (a) the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to the extensions except to the extent notified by the other party in writing of such extensions for the respective Tax periods; and (b) six years following the due date (with extension) for such Tax Returns. For the avoidance of doubt, the provisions of <u>Section 4.9</u> shall thereafter apply to such documents.

Section 6.2    <u>Tax Cooperation</u>. Newco, on the one hand, and Tribune Parties, on the other hand, will each (and Bidder will cause Newco to): (i) provide the other with such assistance as may reasonably be requested in connection with the preparation of any Tax Return relating to the Cubs Business, Cubs Contributed Assets or Cubs Liabilities, any audit or other examination by any Taxing Authority or any judicial or administrative proceeding with respect to Taxes relating to the Cubs Business, Cubs Contributed Assets or Cubs Liabilities; and (ii) provide the other with any records or other information as may be reasonably requested relevant to such return, audit, examination or proceeding.

Section 6.3    <u>Transaction Taxes</u>. If the Closing occurs, Newco and the Newco Subs shall pay all sales, use, transfer, conveyance, recordation and filing fees, Taxes and assessments, including fees in connection with the recordation of instruments related thereto and other similar transaction Taxes however designated (but not including income, franchise or gains Taxes), that are properly levied by any Taxing Authority and are required by Law (any such Taxes or fees, the "**Cubs Transaction Taxes**") applicable to, imposed upon or arising out of the transfers of the Cubs Contributed Assets contemplated by this Agreement in connection with both the Cubs Contribution and the Newco Sale. In connection with the Cubs Contribution, Tribune Parties shall prepare and file any Tax Return (and, in the case of Leased Real Property, detail (and supporting documents, if applicable) of the manner in which (x) market-rental valuations were determined and (y) Cubs Transaction Taxes were computed) required to be filed with respect to such Cubs Transaction Taxes and shall provide Bidder with evidence of the timely filing of such Tax Return; provided, however, that the preparation of any such Tax Return shall be subject to the prior review and approval of Bidder (not to be unreasonably withheld, delayed or conditioned) prior to filing by Tribune Parties under this <u>Section 6.3</u>.

Section 6.4    <u>Real Estate Transfer Tax</u>. If the Closing occurs, Newco and the Newco Subs shall pay the amount of any State of Illinois, Cook County and all City of Chicago Taxes imposed on the transfers of the title to the Cubs Contributed Owned Real Property (both for the Cubs Contribution and the Newco Sale). With respect to the Cubs Contribution, Tribune shall furnish completed state, county and city Real Estate Transfer Declaration Forms signed by applicable Tribune Party or Trust or their agent required by any state, county or local ordinance with regard to a transfer or transaction tax, and based on the valuations to be set forth on <u>Schedule 1.4(e)(ii)</u>. If after the Closing it is determined by an applicable Government Authority that any additional Taxes (of the type described in this <u>Section 6.4</u>) are payable by a Tribune Party in connection with the Transactions (including the Newco Sale) relating to the transfer of

the title for any parcel of Cubs Contributed Owned Real Property, Newco and Newco Subs agree to promptly reimburse such Tribune Party therefor upon receipt of evidence of payment thereof.

## ARTICLE VII

## CONDITIONS PRECEDENT

Section 7.1    Conditions Precedent of all Parties to Escrow Closing.  The obligations of each party to this Agreement (including, for these purposes, Newco and Newco Subs) to consummate the Escrow Closing are subject to the satisfaction, on or prior to the Escrow Closing Date, of each of the following conditions precedent:

(a)    HSR Act.  All applicable waiting periods under the HSR Act, including any extensions thereof, shall have expired or been terminated.

(b)    Injunction; Litigation.  Other than relating to an Approval Order, the Bankruptcy Case or the Additional Bankruptcy Cases, (i) no party hereto shall be subject to any order or injunction (whether preliminary or permanent) restraining or prohibiting the consummation of the Transactions (excluding the Newco Sale); (ii) no Action by a Government Authority shall be pending before any arbitrator, court or other Government Authority to restrain or prohibit, or to obtain substantial damages in respect of, the consummation of the Transactions (excluding the Newco Sale); and (iii) no action shall have been taken, or no Law or order shall have been promulgated or enacted by any Government Authority, which would prevent or make illegal the consummation of the Transactions (excluding the Newco Sale).  No party to this Agreement may assert that the condition precedent set forth in the preceding clauses (i) or (ii) has not been satisfied unless such party shall have used its reasonable best efforts to have any order, or injunction or Action referred to therein vacated or any Action referred to therein dismissed.

(c)    Approval by Major League Baseball.  All MLB Approvals shall have been received.

(d)    Tribune Transaction Approval Order.  The Bankruptcy Court shall have entered the Tribune Transaction Approval Order.

Section 7.2    Conditions Precedent of Bidder to Escrow Closing.  The obligations of Bidder (and Newco and Newco Subs) to consummate the Escrow Closing are subject to the satisfaction, on or prior to the Escrow Closing Date, of each of the following conditions precedent:

(a)    Representations and Warranties.  The representations and warranties of Tribune Parties contained in this Agreement shall be true and correct in all respects both as of the date of this Agreement and as of the Escrow Closing Date, as if made on the Escrow Closing Date (except for representations and warranties expressly made as of an earlier date, in which case such representations and warranties need only be true and correct as of such earlier date), except where the failure of such representations and warranties to be true and correct in all

-89-

respects (without giving effect to any limitation as to "**materiality**" or "**Cubs Material Adverse Effect**" or another similar qualifier) does not have, and would not reasonably be expected to have, individually and in the aggregate, a Cubs Material Adverse Effect.

(b)    Covenants.  Tribune Parties shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by them at or prior to the Escrow Closing.

(c)    Escrow Closing Certificate.  Tribune Parties shall have furnished Bidder with a certificate dated the Escrow Closing Date and signed by each Tribune Party to the effect that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied.

(d)    Escrow Documents and Other Escrow Closing Documents.  Tribune Parties shall have delivered (i) to the Closing Agent, all of the Tribune Escrow Documents, (ii) to the Real Estate Escrow Agent, all of the Real Estate Escrow Documents required to be delivered or caused to be delivered by Tribune Parties pursuant to Section 1.4(e), and (iii) to Bidder, all of the documents set forth in Section 1.4(b).

(e)    Title Policies.  Title Policies shall have been delivered to the Real Estate Escrow Agent substantially in the form of Exhibit G-2 (as updated, if at all, pursuant to Section 4.16), with no Liens added thereto other than such additional Liens that have arisen from the effective date of each respective Pro Forma Title Policy until the Escrow Closing Date that individually and in the aggregate would not reasonably be expected to have a Cubs Material Adverse Effect.

(f)    No Cubs Material Adverse Effect.  Since the date hereof to the Escrow Closing Date, there shall not have been any circumstance, state of facts or matters, effect, change, event, occurrence, action or omission that, individually or in the aggregate, have had or are reasonably likely to have a Cubs Material Adverse Effect.

(g)    Senior Debt Financing.  All of the conditions precedent to the consummation of the Escrow Closing with respect to the Senior Debt Financing shall have been satisfied or waived (where the waiver is by those Persons required to provide such waiver pursuant to the Senior Debt Financing) and the lenders under the Senior Debt Financing shall have either funded or are prepared to fund an amount equal to the Senior Debt Financing (exclusive of the Revolver) to the Senior Lender Agent.

(h)    Additional Filing Assurance.  The Tribune Parties shall have furnished Bidder with a certificate dated the Escrow Closing Date and duly executed by each Tribune Party to the effect that each of the Additional Filers is prepared to file, and will file, the petition for relief under Chapter 11 of the Bankruptcy Code and the Additional Filer Motions (the "**Additional Filing Assurance**").

Section 7.3    Conditions Precedent of Tribune Parties to Escrow Closing.  The obligation of Tribune Parties to consummate the Escrow Closing are subject to the satisfaction, on or prior to the Escrow Closing Date, of each of the following conditions precedent:

(a)    <u>Representations and Warranties</u>.  The representations and warranties of Bidder contained in this Agreement shall be true and correct in all respects both as of the date of this Agreement and as of the Escrow Closing Date, as if made on the Escrow Closing Date (except for representations and warranties expressly made as of an earlier date, in which case such representations and warranties need only be true and correct as of such earlier date), except in each instance where the failure of such representations and warranties to be true and correct in all respects (without giving effect to any limitation as to "materiality" or another similar qualifier) does not have, and would not reasonably be expected to have, individually and in the aggregate, a material adverse effect on the ability of Bidder to perform its obligations under this Agreement or any of the other Transaction Documents to which it is a party.

(b)    <u>Covenants</u>.  Bidder shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed and complied with by Bidder at or prior to the Escrow Closing Date.

(c)    <u>Escrow Closing Certificate</u>.  Bidder shall have furnished Tribune Parties with a certificate dated the Escrow Closing Date and signed by Bidder to the effect that the conditions set forth in <u>Section 7.3(a)</u> and <u>(b)</u> have been satisfied.

(d)    <u>Escrow Documents and Other Escrow Closing Documents</u>.  Bidder shall have delivered (i) to the Closing Agent, all of the Bidder Escrow Documents (to the extent not included in the Real Estate Escrow Documents) and the Newco Escrow Documents (to the extent not included in the Real Estate Escrow Documents), (ii) to the Real Estate Escrow Agent, all of the Real Estate Escrow Documents required to be delivered or caused to be delivered by Bidder pursuant to <u>Sections 1.4(c)</u> (to the extent included in the Real Estate Escrow Documents), <u>1.4(e)</u> and <u>1.4(f)</u> (to the extent included in the Real Estate Escrow Documents), and (iii) to Tribune Parties, all of the documents set forth in <u>Sections 1.4(d)</u> and <u>1.4(g)</u>.

(e)    <u>Debt and Equity Financing</u>.  (i) All of the conditions precedent to the consummation of the Escrow Closing with respect to the Senior Debt Financing, the Subordinated Debt Financing and the Equity Financing shall have been satisfied or waived (where the waiver is by those Persons required to provide such waiver pursuant to the Debt Financing or Equity Financing, as applicable) and those Persons providing such Debt Financing and Equity Financing shall have either funded or are prepared to fund to the Senior Lender Agent or the Closing Agent (as applicable) and (ii) there shall be no conditions precedent to the Closing and the release of the proceeds of the Debt Financing and the Equity Financing to Newco (other than those conditions precedent to the funding of the Senior Debt Financing described in the Senior Lenders Escrow Closing Certificate) and Tribune shall have received a certificate to that effect from Bidder, which certificate shall also certify Bidder's good faith belief that all conditions precedent to the funding of the Senior Debt Financing set forth in the Senior Lenders Escrow Closing Certificate (other than the Final CNLBC Bankruptcy Court Approval (as defined in the Senior Debt Commitment Letter)) will be satisfied as of the Closing Date.

(f)    <u>Bidder Financing Affidavits</u>.  Tribune shall have received all three Bidder Financing Affidavits.

-91-

(g)    <u>Final Order</u>.  The Tribune Transaction Approval Order shall have become a final, non-appealable order.

Section 7.4    <u>Conditions Precedent to Closing</u>.  The obligations of each party to this Agreement (including for these purposes, Newco and each Newco Sub) to consummate the Closing are subject to the satisfaction, at or prior to the Closing, of each of the following conditions precedent:

(a)    <u>Additional Filers Transaction Approval Order</u>.  Entry by the Bankruptcy Court of the Additional Filers Transaction Approval Order.

(b)    <u>Debt Financing</u>.  All of the conditions precedent to the consummation of the Senior Debt Financing set forth in the Senior Lenders Escrow Closing Certificate shall have been satisfied or waived (where the waiver is by those Persons required to provide such waiver pursuant to the Senior Debt Financing).

Section 7.5    <u>Effect of Closing</u>.  Upon satisfaction of the conditions precedent in <u>Section 7.4</u>, the Closing shall automatically be deemed to have occurred, all funds under the Debt Financing and the Equity Financing will be made available to Newco, all Closing Escrow Documents and Closing Funds (including the Ricketts GuarantyCo and Ricketts Lender Equity Financing) shall be released from escrow pursuant to the terms of the Closing Escrow Agreement, and all Real Estate Escrow Documents shall be released from escrow pursuant to the terms of the Real Estate Escrow Agreement.

ARTICLE VIII

SURVIVAL; INDEMNIFICATION

Section 8.1    <u>Survival</u>.  All of the representations, warranties, covenants and agreements of the parties contained in this Agreement shall survive the Escrow Closing and the Closing, subject to this <u>Section 8.1</u>, and any investigation conducted by any party hereto and any information that any party may receive.  The representations and warranties contained in or made pursuant to this Agreement, the indemnity obligations for the inaccuracy or breach of such representations and warranties contained in <u>Sections 8.2(a)(i)</u> and <u>8.2(b)(i)</u>, all covenants and agreements to be performed prior to or in connection with the Escrow Closing and the indemnity obligations for the breach of any such covenant, shall terminate on, and no claim or Action with respect thereto may be brought after, the date that is the 12-month anniversary of the Escrow Closing Date.  Notwithstanding the foregoing, (i) claims for a fraudulent breach of a representation or warranty or fraudulent breach of a covenant or agreement to be performed prior to or in connection with the Escrow Closing shall survive indefinitely, (ii) the representations and warranties contained in <u>Section 2.11(a)(i)</u> shall terminate at the Closing, (iii) the representations and warranties contained in (A) <u>Sections 2.1(a)</u> (first sentence only), <u>2.1(b)</u> (first sentence only), <u>2.1(d)</u> [Organization; Good Standing], <u>2.2</u> (last sentence only) [Ownership of Cubs Entities/Investments], <u>2.3</u> [Authority], <u>2.9(c)</u> [Assets; Title], <u>2.11(a)(ii)</u> [Real Property], <u>2.15</u> [Taxes], and <u>2.19</u> [No Brokerage], and in the Tribune Escrow Closing Certificate with respect to the foregoing matters in this clause (A), and (B) <u>Sections 3.1</u> (first sentence only)

-92-

[Organization; Good Standing], 3.2 [Authority] and 3.5 [No Brokerage], and in the Bidder Escrow Closing Certificate with respect to the foregoing matters in this clause (B), and (C) the indemnity obligations for the inaccuracy or breach of the representations and warranties in clauses (A) and (B) contained in Sections 8.2(a)(i) and 8.2(b)(i), as applicable, shall survive until 60 days after the end of the applicable statutes of limitations, (iv) the representations and warranties contained in Section 2.14 [Environmental Matters] with respect to the Mueller Building and T-Building Property only shall survive until the fifth anniversary of the Escrow Closing Date and (v) the representations and warranties contained in Section 2.14 [Environmental Matters] (other than with respect to the Mueller Building and T-Building Property) shall survive until the third anniversary of the Escrow Closing Date. Notwithstanding anything in this Section 8.1 to the contrary, the representations and warranties and the applicable indemnity obligations for breach thereof that terminate pursuant to this Section 8.1, and the liability of any party to this Agreement with respect thereto pursuant to this Article VIII, shall not terminate with respect to any claim, whether or not fixed as to liability or liquidated as to amount, with respect to which the Indemnifying Party has been given written notice from the Indemnified Party setting forth the facts upon which the claim for indemnification is based prior to the expiration of the applicable survival period.

Section 8.2    Indemnification.

(a)    From and after the consummation of the Closing, the Cubs Entities jointly and severally agree, and from and after the date of confirmation of the Plan of Reorganization, the Tribune Parties jointly and severally agree, to indemnify and hold harmless, in the case of Sections 8.2(a)(i), 8.2(a)(iii) and 8.2(a)(iv), Newco and each Newco Sub, and in the case of Section 8.2(a)(ii), Newco, any Newco Sub or any Bidder Party, as applicable, to whom the benefit of such covenant or agreement is owed (collectively, as applicable, the "**Bidder Indemnified Persons**") for, from, and against all Losses incurred or suffered by such Bidder Indemnified Persons based upon, arising out of, asserted against, resulting from, imposed on, in connection with, or otherwise in respect of:

(i)    the inaccuracy or breach of any representation or warranty of any Tribune Party contained in or made pursuant to Article II or Section 4.14(d), as of the date of this Agreement, as of the Escrow Closing Date or as of the Closing Date, or in the Tribune Escrow Closing Certificate (except, in each case, for representations and warranties expressly made as of an earlier date, in which case the inaccuracy or breach of such representations and warranties as of such earlier date), provided, that for purposes of determining if there is any such inaccuracy or breach and for purposes of calculating any Losses arising from such inaccuracy or breach, to the extent any representation or warranty is qualified by any reference to "material," "materiality," or "Cubs Material Adverse Effect" contained in such representation or warranty, such representation or warranty shall be treated as if it did not contain any such qualification, provided further that such qualifications shall not be disregarded in the following Sections: Section 2.5(d) (second sentence), Section 2.6(c), Section 2.7, the lead-in to Section 2.8, Section 2.8(a) and Section 2.11(a)(ii);

-93-

(ii)     the breach by any Tribune Party of, or the failure by any Tribune Party to perform, any of their respective covenants or other agreements contained in this Agreement;

(iii)    any Cubs Excluded Liabilities; and

(iv)    any applicable bulk transfer Law of any jurisdiction in connection with the Transactions (including as a result of any non-compliance therewith).

Notwithstanding any other provision herein to the contrary, except with respect to the inaccuracy or breach of the Tribune Specified Representations (for which the Basket Amount and Cap Amount shall not apply) and for fraud (in which case the Basket Amount and Cap Amount shall not apply): (A) Tribune Parties shall not be required, pursuant to Section 8.2(a)(i), to indemnify and hold harmless the Bidder Indemnified Persons until the aggregate amount of the Bidder Indemnified Persons' Losses under Section 8.2(a)(i) exceeds $8,000,000 (the "**Basket Amount**"), after which Tribune Parties will only be obligated to indemnify for Losses under Section 8.2(a)(i) in excess of the Basket Amount; and (B) the cumulative aggregate indemnity obligations of Tribune Parties under Section 8.2(a)(i) (excluding indemnification obligations with respect to the Tribune Specified Representations) shall in no event exceed $125,000,000 (the "**Cap Amount**").

Notwithstanding the foregoing, no Tribune Party shall have any liability to indemnify the Bidder Indemnified Persons for (i) any Losses to the extent such Losses are specifically reflected, accrued for or reserved for and included in the calculation of Final Closing Working Capital or (ii) any Cubs Liabilities arising in the Ordinary Course after the Target Closing Date (even if such Cubs Liabilities or the facts giving rise to such Cubs Liabilities constitute a breach of a representation or warranty as of the Escrow Closing Date). For the avoidance of doubt, clause (ii) shall have no effect on Bidder's remedies for fraud, if any, on the part of a Cubs Entity in respect of a breach of a representation or warranty as of the Escrow Closing Date or Closing Date.

Notwithstanding anything in this Agreement to the contrary, the breach by Tribune Parties of Section 1.4(b)(i) by delivery of a certificate at the Escrow Closing that is not in accordance with Section 7.2(c) shall be deemed a breach of a representation or warranty in such certificate under Section 8.2(a)(i), and not a breach of a covenant under Section 8.2(a)(ii).

For the avoidance of doubt, from and after the effective date of the Plan of Reorganization, the Tribune Parties, jointly and severally, shall be obligated to perform all obligations of the Cubs Entities under this Article VIII that remain outstanding as of the date of confirmation of the Plan of Reorganization.

(b)     From and after the consummation of the Closing, in the case of Section 8.2(b)(i), Bidder, in the case of Sections 8.2(b)(iii), 8.2(b)(iv) and 8.2(b)(v), Newco and Newco Subs, and in the case of Sections 8.2(b)(ii) and 8.2(b)(vi), Newco, Newco Subs and/or Bidder (and in the case of Section 8.2(b)(ii), depending on the party in breach, with it being understood that Bidder is responsible for Section 8.2(b)(ii) as it applies to any breach by any of the Bidder

-94-

Covered Parties) (collectively, as applicable, the "**Bidder Indemnifying Persons**") agree to indemnify and hold harmless Tribune Parties for, from and against all Losses incurred or suffered by such Tribune Parties based upon, arising out of, asserted against, resulting from, imposed on, in connection with, or otherwise in respect of:

       (i)      the inaccuracy or breach of any representation or warranty contained in or made pursuant to Article III, as of the date of this Agreement, as of the Escrow Closing Date or as of the Closing Date, or in the Bidder Escrow Closing Certificate (except, in each case, for representations and warranties expressly made as of an earlier date, in which case the inaccuracy or breach of such representations and warranties as of such earlier date);

       (ii)     the breach by any Bidder Covered Party, Newco or any Newco Sub of, or failure by any Bidder Covered Party, Newco or any Newco Sub to perform, any of its covenants or other agreements contained in this Agreement;

       (iii)    any Cubs Liabilities;

       (iv)    any untrue statement or omission or alleged untrue statement or omission contained in any information memorandum or other materials used in connection with obtaining the Debt Financing or Equity Financing; provided, however, that the indemnity contained in this Section 8.2(b) shall not relieve Tribune Parties of any liability under Section 8.2(a);

       (v)     any action taken or information provided pursuant to Section 4.11(d); and

       (vi)    all liabilities and obligations of Newco or any Newco Sub (or any Affiliate thereof) under the Mueller Building and T-Building Property Lease.

Notwithstanding any other provision herein to the contrary, except with respect to the inaccuracy or breach of the Bidder Specified Representations (for which the Bidder Basket Amount and Bidder Cap Amount shall not apply) and for fraud (in which case the Bidder Basket Amount and Bidder Cap Amount shall not apply): (A) the Bidder Indemnifying Persons shall not be required, pursuant to Section 8.2(b)(i), to indemnify and hold harmless the Tribune Parties until the aggregate amount of the Tribune Parties' Losses under Section 8.2(b)(i) exceeds $8,000,000 (the "**Bidder Basket Amount**"), after which the Bidder Indemnifying Persons will only be obligated to indemnify for Losses under Section 8.2(b)(i) in excess of the Bidder Basket Amount; and (B) the cumulative aggregate indemnity obligations of the Bidder Indemnifying Persons under Section 8.2(b)(i) (excluding indemnification obligations with respect to the Bidder Specified Representations) shall in no event exceed $125,000,000 (the "**Bidder Cap Amount**").

Notwithstanding anything in this Agreement to the contrary, in no event shall the Ricketts Lender or the Bidder Trust have any obligation or liability under this Article VIII.

Notwithstanding anything in this Agreement to the contrary, the breach by Bidder of Section 1.4(d) by delivery of a certificate at the Escrow Closing that is not in accordance with

Section 7.3(c) shall be deemed a breach of a representation and warranty in such certificate under Section 8.2(b)(i), and not a breach of a covenant under Section 8.2(b)(ii).

(c)      Notwithstanding anything in this Agreement to the contrary, except for fraud (in which case the following limitation shall not apply), the cumulative aggregate obligation of Bidder, Newco and Newco Subs, on the one hand, or Tribune Parties, on the other hand, for any and all Losses based upon, arising out of, asserted against, resulting from, imposed on, in connection with, or otherwise in respect of the inaccuracy or breach of any of their representations or warranties contained in this Agreement or in the Tribune Escrow Closing Certificate or Bidder Escrow Closing Certificate (as the case may be) shall in no event exceed the Final Special Distribution Amount.

Section 8.3      Indemnification Procedures.

(a)      If any Bidder Indemnified Persons, on the one hand, or any Tribune Party, on the other hand (the "**Indemnified Party**"), has a claim or receives actual notice of any claim, or the commencement of any Action that could give rise to an obligation on the part of Tribune Parties, on the one hand, or Bidder (or Newco and any Newco Sub, as the case may be), on the other hand, other than a Third Party Claim (as defined below), to provide indemnification (the "**Indemnifying Party**") pursuant to this Article VIII, the Indemnified Party shall promptly give the Indemnifying Party notice thereof (the "**Indemnification Claim Notice**"); provided, however, that the failure to give such prompt notice shall not prevent any Indemnified Party from being indemnified hereunder for any Losses, except to the extent that the failure to so promptly notify the Indemnifying Party actually materially damages the Indemnifying Party.

(b)      Upon receipt by an Indemnified Party of actual notice of a claim, or the commencement of any Action, by a third Person that could give rise to an obligation to provide indemnification pursuant to this Article VIII (a "**Third Party Claim**"), the Indemnified Party will give the Indemnifying Party prompt written notice thereof (the "**Third Party Indemnification Claim Notice**"); provided, however, that the failure of the Indemnified Party to so promptly notify the Indemnifying Party shall not prevent any Indemnified Party from being indemnified for any Losses, except to the extent that the failure to so promptly notify the Indemnifying Party actually materially damages the Indemnifying Party or materially prejudices the Indemnifying Party's ability to defend against such claim.

(c)      Any Indemnification Claim Notice or Third Party Indemnification Claim Notice will describe the claim in reasonable detail.  If the Indemnifying Party demonstrates to the Indemnified Party's reasonable satisfaction that, as of such time, the Indemnifying Party has sufficient financial resources in order to indemnify for the full amount of any potential liability in connection with such claim, then the Indemnifying Party may elect to assume control over the compromise or defense of such Third Party Claim at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, which counsel will be reasonably satisfactory to the Indemnified Party.  If the Indemnifying Party so elects to assume control over the compromise and defense of such Third Party Claim, the Indemnifying Party shall promptly notify the Indemnified Party of such Indemnifying Party's intent to do so, and the Indemnified Party shall cooperate, at the expense of the Indemnifying Party, in the compromise of, or defense against,

-96-

such Third Party Claim; provided, however, that: (i) the Indemnified Party may, if such Indemnified Party so desires, employ counsel at such Indemnified Party's own expense to assist in the handling (but not control the defense) of any Third Party Claim; (ii) the Indemnifying Party shall keep the Indemnified Party advised of all material events with respect to any Third Party Claim; and (iii) no Indemnifying Party will, without the prior written consent of each Indemnified Party, settle or compromise or consent to the entry of any judgment in any pending or threatened action in respect of which indemnification may be sought hereunder (whether or not any such Indemnified Party is a party to such action), unless such settlement, compromise or consent by its terms obligates the Indemnifying Party to pay the full amount of the liability in connection with such Third Party Claim and includes an unconditional release of all such Indemnified Parties from all liability arising out of such claim or Action.

(d)     Subject to <u>Section 8.3(f)</u>, the Indemnifying Party shall not be entitled to have sole control over (and if it so desires, the Indemnified Party shall have sole control over) the defense, settlement, adjustment or compromise of (but the Indemnifying Party shall nevertheless be required to pay all Losses incurred by the Indemnified Party in connection with such defense, settlement or compromise to the extent required pursuant to this <u>Article VIII</u>): (i) any Third Party Claim that seeks an order, injunction or other equitable relief against any Indemnified Party or any of its Affiliates; (ii) any Third Party Claim in which both the Indemnifying Party and the Indemnified Party are named as parties and either the Indemnifying Party or the Indemnified Party reasonably determines with advice of counsel that there may be one or more legal defenses available to it that are different from or additional to those available to the other party or that a conflict of interest between such parties is reasonably likely to exist in respect of such Action; (iii) any Third Party Claim pursuant to <u>Section 8.2(a)(i)</u> prior to such time as the aggregate amount of the Losses of Bidder Indemnified Persons pursuant to such claims under <u>Section 8.2(a)(i)</u> are reasonably expected to exceed the Basket Amount or after such time as the aggregate amount of the Losses of Bidder Indemnified Persons pursuant to such Third Party Claim and all prior claims pursuant to <u>Section 8.2(a)(i)</u> are reasonably expected to exceed the Cap Amount; and (iv) any matter relating to Taxes of Bidder or any of its Affiliates, other than any matter that (A) might give rise to an indemnification obligation of Tribune Parties pursuant to <u>Section 8.2(a)</u> and (B) would not increase the Tax liability of Bidder or any of its Affiliates, other than a Tax liability subject to indemnification hereunder, for any Tax period (or portion thereof) ending after the Closing.

(e)     If the Indemnifying Party elects not to assume the defense, settlement, adjustment or compromise of an asserted liability, fails to timely and properly notify the Indemnified Party of its election as herein provided, at any time after assuming such defense, fails to defend against such Third Party Claim in good faith, fails to have sufficient financial resources to pay the full amount of such potential liability in connection with such Third Party Claim or if the Indemnified Party is otherwise entitled pursuant to this Agreement to have control over the defense, settlement or compromise of any Third Party Claim, the Indemnified Party may, subject to <u>Section 8.3(f)</u>, at the Indemnifying Party's expense, pay, defend, settle or compromise such asserted liability (but the Indemnifying Party shall nevertheless be required to pay all Losses incurred by the Indemnified Party in connection with such payment, defense, settlement or compromise in accordance herewith). In connection with any defense of a Third

-97-

Party Claim (whether by the Indemnifying Parties or the Indemnified Parties), all of the parties hereto shall, and shall cause their respective Affiliates to, cooperate in the defense or prosecution thereof and to in good faith retain and furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested by a party hereto in connection therewith.

(f)     With respect to any Third Party Claim to the extent that the Indemnified Party is entitled to indemnification under this Article VIII, if the Indemnifying Party demonstrates that it has sufficient financial resources to pay the full amount of any indemnifiable Losses in connection with a Third Party Claim, then no Indemnified Party will, without the prior written consent of the Indemnifying Party (not to be unreasonably withheld, conditioned or delayed), settle or compromise or consent to the entry of any judgment with respect to such Third Party Claim.

(g)     Unless and until an Indemnifying Party assumes the defense of the Third Party Claim, the Indemnified Party may defend against the Third Party Claim in any manner it reasonably may deem appropriate.

Section 8.4     Set-Off.

(a)     If any Indemnified Party becomes entitled to indemnification from an Indemnifying Party pursuant to this Agreement, then such indemnification payment will be made in cash upon demand by the Indemnified Party; provided, however, that if any Bidder Indemnified Person becomes entitled to indemnification from any of the Tribune Parties and if the Indemnity Escrow Amount is then greater than zero, then Tribune Parties shall satisfy such indemnification obligation through a distribution to such Bidder Indemnified Person pursuant to the Indemnity Escrow Agreement. For the avoidance of doubt, to the extent the entire indemnification obligation is not satisfied by the Indemnity Escrow Amount, any balance shall remain an outstanding indemnification obligation.

(b)     If the Indemnity Escrow Amount is not sufficient to satisfy such indemnification obligation, without the need to obtain any further relief from the Bankruptcy Court in the Bankruptcy Case or any Additional Bankruptcy Cases, Newco may, at its option (at any time and from time to time), reduce any distribution or other payment to be made to any Tribune Party or Tribune Member under or pursuant to the Newco LLC Agreement by all or part of any amount owed by any Tribune Party or Tribune Member to any of the Bidder Parties, Newco or Newco Subs under this Agreement (whether pursuant to this Article VIII or otherwise) or any other Transaction Document (the "**Set-Off Amount**"). If Newco exercises its rights pursuant to this Section 8.4(b) by reducing any distribution to be made to any Tribune Party or Tribune Member under the Newco LLC Agreement, then the Tribune Member shall be treated for all purposes as if such Set-Off Amount were received by the Tribune Member as a distribution from Newco and the Tribune Member paid such Set-Off Amount to Newco in satisfaction of such Tribune Party's or the Tribune Member's applicable obligation hereunder.

Section 8.5     Exclusive Remedy. From and after the consummation of the Closing, other than with respect to claims based on fraud, the resolution of disputes pursuant to Section

1.5 and any Action seeking injunctive relief pursuant to Section 10.14, indemnification in accordance with this Article VIII shall be the sole and exclusive remedy of any Indemnified Party for Losses based upon, arising out of, asserted against, resulting from, imposed on, in connection with, or otherwise in respect of: (a) the inaccuracy or breach of any of the representations and warranties contained in or made pursuant to this Agreement; (b) the breach or failure to perform any of the covenants or obligations contained in this Agreement; (c) the Cubs Excluded Liabilities and the Cubs Liabilities; and (d) the failure to comply with any provision of applicable bulk sales or similar Laws in connection with the Transactions. The parties may not avoid the limitations on liability set forth in this Article VIII by seeking damages for breach of contract or tort or pursuant to any other theory or liability.

Section 8.6    Mitigation.  Any party entitled to seek indemnification shall take all steps to mitigate their respective Losses to the extent required by Applicable Law.

Section 8.7    Separate Recovery of Losses.  If any Indemnified Party or any of its Affiliates recovers any amounts in respect of Losses from any third Person at any time after the Indemnifying Party has paid all or a portion of such Losses to such Indemnified Party pursuant to the provisions of this Article VIII, the Indemnified Party shall (and Tribune Parties, Bidder, Newco and each Newco Sub shall cause their respective Affiliates and Representatives to) promptly (and in any event within three (3) Business Days of receipt) pay over to the Indemnifying Party the amount so received (to the extent previously paid by such Indemnifying Party).

Section 8.8    Characterization of Indemnification Payments.  The parties hereto agree to treat any payment made under this Article VIII as an adjustment to the Final Special Distribution Amount.

Section 8.9    Indemnity Reserve.  At Closing, the Cubs Entities shall, collectively among them and not on an individual basis, deposit an amount of cash, marketable securities, or other short-term investments with a value not less than the Cap Amount less the Indemnity Escrow Initial Amount in one segregated account for all of the Cubs Entities that is separate from the centralized cash management system maintained by Tribune for the use of itself and its Affiliates, which amount shall be so held through the effective date of the Plan of Reorganization.  Prior to such date, none of the Cubs Entities shall be authorized, or become obligated, to remove, transfer or encumber such amount from the segregated account absent further order of the Bankruptcy Court in form and substance acceptable to Bidder, except to satisfy their indemnification obligations under this Agreement, and the Cubs Entities shall promptly provide Bidder statements or other information regarding such segregated account within a reasonable period of time of Bidder's request with respect thereto.

ARTICLE IX

TERMINATION

Section 9.1    Termination.  In addition to, and without limiting or modifying, the termination rights pursuant to Section 4.15(c), this Agreement may be terminated at any time:

-99-

(a)     prior to the Closing, by the written consent of both (i) Bidder, on the one hand, and (ii) Tribune Parties, on the other hand;

(b)     by Bidder, on the one hand, or Tribune Parties on the other hand, if the Closing has not occurred by the close of business on the Termination Date;

(c)     prior to the Escrow Closing, by Bidder, if (A) there has been a material default or material breach by the Tribune Parties of any covenant, representation or warranty contained in this Agreement which would result in any of the conditions precedent set forth in Sections 7.1 or 7.2 not being satisfied if such default or breach were not cured prior to the Escrow Closing Date, and (B) (I) such material default or material breach has not been waived in writing by Bidder, (II) Bidder provided written notice to Tribune Parties of such material default or material breach, and (III) Tribune Parties have not cured such material default or material breach within ten (10) Business Days after receiving written notice thereof from Bidder; or

(d)     prior to the Escrow Closing, by Tribune Parties, if (A) there has been a material default or material breach by Bidder of any covenant, representation or warranty contained in this Agreement which would result in any of the conditions precedent set forth in Sections 7.1 or 7.3 not being satisfied if such default or breach were not cured prior to the Escrow Closing Date and (B) (I) such material default or material breach has not been waived in writing by Tribune Parties, (II) Tribune Parties have provided written notice to Bidder of such material default or material breach, and (III) Bidder has not cured such material default or material breach within ten (10) Business Days after receiving written notice thereof from Tribune Parties.

Section 9.2    Effect of Termination.

(a)     Any terminating party shall provide written notice of termination to the other parties specifying in reasonable detail the reason for such termination. Any termination in accordance with Section 4.15(c) or 9.1 shall be effective immediately upon delivery of such written notice to the other party (or, if later, upon expiration of any applicable cure period). This Agreement shall thereupon terminate, and the Transactions (including the Newco Sale) shall be abandoned without further action by the parties hereto and there shall be no liability or obligation on the part of any party, except that (i) the provisions of Article X, Section 4.3 and this Section 9.2 shall survive; (ii) any applicable provisions in Section 4.15 providing for consequences upon termination of this Agreement pursuant to Section 9.1(b) shall survive; (iii) except as provided in Section 4.15(n), nothing in this Agreement shall relieve any party hereto from any claims for damages or other liability arising from any breach of any covenant or other agreement contained in this Agreement occurring prior to or in connection with such termination; and (iv) the provisions of the Notice and Procedures Approval Order and any Transaction Approval Order related to this Agreement shall remain enforceable.

(b)     Upon termination of this Agreement, no party shall be entitled to reimbursement of any Incremental Financing Costs that such party may have incurred pursuant to this Agreement.

-100-

Section 9.3    <u>Acquisition Transaction Post-Termination</u>.  If:

(a)    this Agreement is terminated by Tribune pursuant to <u>Section 4.15(c)</u>, by Bidder pursuant to <u>Section 9.1(c)</u>, or by Bidder or any Tribune Party pursuant to <u>Section 9.1(b)</u> (unless, as a result of such termination pursuant to Section 9.1(b), Bidder is obligated under <u>Section 4.15</u> to pay the Tribune Parties (in the aggregate) a Bidder Payment), and

(b)    at any time during the period from the date of this Agreement to the date that is three (3) months after the date on which this Agreement is terminated as described above, any Tribune Party or any of its Affiliates (including, if applicable, after the Cubs Business is internally reorganized among Tribune and its Affiliates) enters into a written definitive agreement providing for an Acquisition Transaction with any Person other than Bidder or its Affiliates (an "**Acquisition Transaction Agreement**"), and

(c)    the Acquisition Transaction contemplated by the Acquisition Transaction Agreement results in the Tribune Parties: (i) receiving amounts of cash or cash equivalents, (ii) retaining, including in the manner contemplated by this Agreement, non-cash current assets, or (iii) receiving the benefit of the assumption of debt, in each case (for clauses (i) through (iii)), at or within two hundred and twenty-five (225) days following consummation of such Acquisition Transaction, and if such amounts that are received at consummation or within such two hundred and twenty-five (225) day period are, in the aggregate, in excess of the Hypothetical Special Distribution Amount (a "**Superior Acquisition Transaction**"),

then, within five (5) Business Days following the consummation of the transactions contemplated by the Acquisition Transaction Agreement which remains a Superior Acquisition Transaction (or, if later, within five (5) Business Days following the first date on which, as a result of receipt or retention of amounts during the period set forth in <u>Section 9.3(c)</u>, such Acquisition Transaction becomes a Superior Acquisition Transaction), Tribune Parties, jointly and severally, shall pay Bidder (in the aggregate) the liquidated sum of $10,000,000 less the amount of any payment to Bidder pursuant to <u>Section 4.15</u> (which difference, for the avoidance of doubt, may be zero or a negative number, in which case, no additional payment shall be due to Bidder).  As used herein, the "**Hypothetical Special Distribution Amount**" means the Final Special Distribution Amount that Tribune Parties would have received under this Agreement had the Transactions been consummated on the date this Agreement was terminated assuming that there are no Retained Cubs Current Assets.

## ARTICLE X

## MISCELLANEOUS

Section 10.1    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and will become effective when one or more counterparts have been signed by a party and delivered to the other parties.  Copies of executed counterparts transmitted by telecopy, telefax or other electronic transmission service shall be considered original executed counterparts for purposes of this <u>Section 10.1</u>, provided that receipt of copies of such counterparts is confirmed.

-101-

Section 10.2    <u>Governing Law</u>.

(a)    This Agreement and (except as expressly set forth therein) the other Transaction Documents, and any disputes arising hereunder or (except as expressly set forth therein) thereunder or controversies related hereto, or thereto, shall be governed by and construed in accordance with the laws of the State of Delaware (other than with respect to title to the Owned Real Property or leasehold interest in the Leased Real Property in Illinois, which shall be governed by and construed in accordance with Illinois law) that apply to contracts made and performed entirely within such state without regard to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) to the extent they would result in the application of the Laws of another jurisdiction.

(b)    Other than with respect to the matters that must be resolved by the Accounting Firm pursuant to (and to the extent provided in) <u>Section 1.5(c)</u>, any Action with respect to this Agreement or any other Transaction Document and any matter arising out of or in connection with this Agreement or any other Transaction Document shall be brought exclusively in and determined by (i) the Bankruptcy Court if the Bankruptcy Case is pending or (ii) the state or federal courts sitting in the State of Delaware if the Bankruptcy Case is not pending (in either case, the "**Applicable Court**"), but the foregoing shall not bind Persons who are not parties to this Agreement, including the Senior Lender Parties.  By execution and delivery of this Agreement, each party hereto hereby accepts (other than with respect to the matters that must be resolved by the Accounting Firm pursuant to (and to the extent provided in) <u>Section 1.5(c)</u>) for itself and in respect of such Person's property, generally and unconditionally, the sole and exclusive jurisdiction of the Applicable Court (and any appellate courts thereof).  Each party hereto irrevocably consents to service of process in any Action in the Applicable Court by the mailing of copies thereof by registered or certified mail, postage prepaid, or by recognized overnight delivery service, to such party at such party's address referred to in <u>Section 10.5</u>.  Each party hereto hereby irrevocably and unconditionally waives any objection which such Person may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement or any other Transaction Document brought in the Applicable Court and hereby further irrevocably waives and agrees, to the extent permitted by applicable Law, not to plead or claim in any such court that any such Action brought in the Applicable Court has been brought in an inconvenient forum.  Nothing herein shall affect the right of any party hereto to serve process in any other manner permitted by Law. Notwithstanding anything in this <u>Section 10.2(b)</u> to the contrary, each party agrees that a final judgment in any such Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)    <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO, FOR ITSELF AND ITS AFFILIATES, HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ALL RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THE ACTIONS OF THE PARTIES HERETO OR THEIR RESPECTIVE AFFILIATES PURSUANT TO THIS AGREEMENT OR (EXCEPT AS

-102-

EXPRESSLY SET FORTH THEREIN) ANY OTHER TRANSACTION DOCUMENT IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF AND THEREOF. WITHOUT LIMITING THE FOREGOING, EACH PARTY HERETO, FOR ITSELF AND ITS AFFILIATES, FURTHER AGREES THAT ITS RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION THAT SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF.

Section 10.3    Entire Agreement; No Third Party Beneficiary.  This Agreement, the other Transaction Documents (including the Schedules and Exhibits hereto and thereto) and the Approval Orders contain the entire agreement by and among the parties with respect to the subject matter hereof and all prior negotiations, writings and understandings relating to the subject matter of this Agreement and the other Transaction Documents (written or oral) (including the letter, dated July 18, 2008, from the Ricketts Family known as the "Preliminary Proposal" and the letter, dated November 26, 2008, from the Ricketts Family known as the "Definitive Proposal," as amended by the confidential presentation entitled "Project North Side Revised Bid Terms," dated January 9, 2009, the various term sheets proposed by the parties and the "Ricketts July 9, 2009 Offer" among Bidder, Tribune and Cubs LLC) are merged in and are superseded and canceled by, this Agreement and the other Transaction Documents; provided, however, that the Confidentiality Agreement shall continue in effect after the date of this Agreement but shall terminate upon the consummation of the Closing, except that the Confidentiality Agreement shall continue to apply after Closing to the confidential information of Tribune Parties and Bidder Parties that in each case does not relate to the Transactions (including the Newco Sale), the Cubs Business, the Cubs Contributed Assets or the Cubs Liabilities (which such provisions survive in accordance with the terms of the Confidentiality Agreement).  For the avoidance of doubt, the Fee Reimbursement Agreement shall terminate on the date hereof and shall be of no further force or effect and no party shall be entitled to any amounts thereunder.  This Agreement is not intended to confer upon any Person not a party hereto (or their successors and permitted assigns), including any current or former employees of Tribune or of any of its Affiliates, any Trust or Non-Cubs Contributing Tribune Entity, or any creditors of Tribune or its Affiliates (other than (i) the Indemnified Parties under Article VIII, (ii) the Senior Lender Parties under Section 4.11(g), (iii) the Major League Baseball under Section 4.14 and (iv) Bidder Trust under Section 10.8), any rights or remedies hereunder.

Section 10.4    Expenses.  If and only if the Closing is consummated, Newco and Newco Subs shall pay all of the following (without duplication) out-of-pocket fees, costs, expenses, and Taxes (and, in the case of clause (vi) below, other amounts as contemplated therein) payable by any of the parties in connection with this Agreement, the other Transaction Documents and the Transactions (including the Cubs Contribution and the Newco Sale), even if any such tax, fee, cost or expense would be an obligation of Tribune or any of its Subsidiaries under applicable Law (the "**Transaction Expenses**"): (i) except for the escrow agent fees under the Real Estate Escrow Agreement pursuant to clause (ix) below, all costs and expenses payable in connection with obtaining the Pro Forma Title Policies, Title Policies and Co-insurance (if any) as well as any endorsements to the Title Policy (if available to Bidder, Newco or Newco Subs, as applicable, but in all events without cost, undertaking or indemnity from any of the Tribune

-103-

Parties, except as otherwise set forth in this Agreement), (ii) all of the filing fees required to be paid in connection with the HSR Act filing by any party, (iii) the payment of Taxes pursuant to Sections 6.3 and 6.4, (iv) any filing, registration or recordation fees and expenses, (v) any out-of-pocket fees and expenses associated with the Commitment Letters, Debt Financing, Equity Financing and other financing arrangements of Bidder, Newco or Newco Subs (including any Post-Escrow Closing Fees and any fees associated with obtaining any related credit opinions and credit ratings as well as any hedging rate agreements), (vi) any debt service or interest reserve or similar amount required to be provided by or on behalf of Newco or any Newco Sub pursuant to the Debt Financing at or promptly following the time of the funding of the Debt Financing, (vii) any legal fees and expenses of Bidder or any provider of financing to Bidder, Newco or Newco Subs to be paid by Newco or any Newco Sub, (viii) all Covered MLB Transaction Expenses, and (ix) all escrow agent fees under the Closing Escrow Agreement, Indemnity Escrow Agreement and Real Estate Escrow Agreement. The Cubs Entities shall be solely responsible for all Cubs Expenses (other than those to be paid by Newco pursuant to Section 1.3(b)(ii)). For the avoidance of doubt, the Transaction Expenses do not include any Cubs Expenses. If any Transaction Expenses are actually paid by Tribune Parties (but only with respect to clauses (i), (ii), (iii), (iv) or (viii) above), Bidder or an Affiliate of Bidder (other than Newco or Newco Subs), then Newco or a Newco Sub will reimburse Tribune Parties (but only with respect to clauses (i), (ii), (iii), (iv) or (viii) above), Bidder or such Affiliate, respectively, therefor; provided, however, that with respect to any Transaction Expenses that are actually paid by Bidder or any Affiliates of Bidder (other than Newco or Newco Subs) (collectively, the "**Bidder Paid Transaction Expenses**"), Newco and Newco Subs shall only be obligated to, and shall only, reimburse Bidder and any such Affiliates of Bidder (in the aggregate) an amount equal to the lesser of (A) the amount of the Bidder Paid Transaction Expenses or (B) the greater of (I) zero or (II) the amount equal to (1) $46,000,000 minus (2) the total amount of Transaction Expenses other than Bidder Paid Transaction Expenses. Upon the Escrow Closing and Closing, except as otherwise set forth in this Agreement (including this Section 10.4), each of the parties shall bear its own expenses and the expenses of its counsel and other agents in connection with the Transactions (including the Newco Sale). Notwithstanding anything in this Section 10.4 to the contrary, if the Closing does not occur, then except as otherwise provided in Section 4.15, each of the parties shall bear its own expenses and the expenses of its counsel and other agents in connection with the Transactions (including the Newco Sale). It is understood and agreed that any payment of expenses pursuant to this Section 10.4 shall in no way affect the ownership percentage of any party in Newco. If the Covered Transaction Expenses exceed $46,000,000 and if it is determined after Closing that the amount of Covered Transaction Expenses exceeds the amount of Covered Transaction Expenses used to determine the amount of Equity Financing contributed by Bidder to Newco at Closing, then Bidder shall make an additional capital contribution to Newco equal to such excess for the purpose of satisfying any such Covered Transaction Expenses, which shall not affect the ownership interests of the parties in Newco. Following the Closing, no party shall be entitled to reimbursement of any Incremental Financing Costs that such party may have incurred pursuant to this Agreement, and no such Incremental Financing Costs, whether incurred by Bidder or Tribune Parties, shall be included in the Transaction Expenses for purposes of this Agreement.

CHI99 5155442-3.022182.0015

Section 10.5   Notices.  All notices and other communications hereunder will be in writing and given by certified or registered mail, return receipt requested, nationally recognized overnight delivery service, such as Federal Express, or facsimile (or like transmission) with confirmation of transmission by the transmitting equipment or personal delivery against receipt to the party to whom it is given, in each case, at such party's address or facsimile number set forth below or such other address or facsimile number as such party may hereafter specify by notice to the other parties hereto given in accordance herewith.  Any such notice or other communication shall be deemed to have been given as of the date so personally delivered or transmitted by facsimile or like transmission (with confirmation of receipt), on the next Business Day when sent by overnight delivery services or five days after the date so mailed if by certified or registered mail.

If to Bidder or, after the Joinder to this Agreement is executed and delivered, to Newco or any Newco Sub, to:

> Ricketts Acquisition LLC
> c/o Incapital LLC
> 200 S.  Wacker, Suite 3700
> Chicago, IL 60606
> Fax No.: (312) 379-3701
> Attention: Thomas Ricketts
>
> with copies to:
>
> Hugo Enterprises LLC
> 1395 S.  Platte River Drive
> Denver, CO 80223
> Fax No.: (303) 200-7086
> Attention: Alfred P.  Levitt
>
> and
>
> Foley & Lardner LLP
> 777 E.  Wisconsin Avenue
> Milwaukee, WI 53202
> Fax No.: (414) 297-4900
> Attention: Mary K.  Braza and Patrick G.  Quick
>
> If to any Tribune Party, to:
>
> Tribune Company
> 435 North Michigan Avenue
> Chicago, IL 60611
> Fax No.: (312) 222-4206
> Attention: General Counsel

-105-

with a copy to:

McDermott Will & Emery LLP
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Fax No.: (312) 984-7700
Attention: Brooks B. Gruemmer and Ryan D. Harris

Section 10.6   <u>Successors and Assigns</u>.  This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that no party hereto may, in whole or in part, assign its rights or delegate its obligations under this Agreement without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld, conditioned or delayed, except that the Tribune Parties can assign their rights and obligations under the Transaction Documents without the consent of Bidder Parties, in connection with a Plan of Reorganization that provides for an assignment to one or more other wholly owned Subsidiaries of Tribune in accordance with the terms of this Agreement provided that (a) each such Subsidiary is bound by all obligations under this Agreement applicable to the transferring entity, (b) such assignment does not materially and adversely impair the Tribune Parties' (after giving effect to such assignment) ability to perform their obligations hereunder, including in <u>Article VIII</u> , as compared to prior to such assignment, and (c) if such assignment is to be made prior to Closing, such assignment does not materially adversely affect Bidder, Newco or any Direct Newco Sub with respect to the assets to be contributed to or the liabilities to be assumed by Newco or such Direct Newco Sub pursuant to this Agreement or adversely affect, in any material respect, the economic terms or other material terms of the Transactions (including the Newco Sale) with respect to Bidder, Newco or any Direct Newco Sub. No such delegation or assignment shall relieve the delegating or assigning party of its obligations hereunder in the absence of an express written novation signed by the other parties to this Agreement. Any purported assignment or delegation in violation of this Agreement shall be null and void *ab initio*.

Section 10.7   <u>Headings</u>.  The Section, Article and other headings contained in this Agreement are inserted for convenience of reference only and will not affect the meaning or interpretation of this Agreement.

Section 10.8   <u>Amendments and Waivers</u>.  This Agreement may not be modified or amended except by an instrument or instruments in writing signed by Bidder, Bidder Trust, Tribune and, with respect to any modification or amendment of <u>Section 4.11(g)</u>, JPMorgan Chase Bank, N.A., Citibank, N.A. and Bank of America, N.A. (and, after the Joinder to this Agreement is executed and delivered, by Newco and each Newco Sub with respect to any modifications or amendments to this Agreement). The parties agree not to execute any modification or amendment without first submitting it to the Office of the Commissioner of Baseball for its review and comment. Any party hereto may, only by an instrument in writing, waive compliance by any other party or parties hereto with any term or provision hereof on the part of such other party or parties hereto to be performed or complied with. No failure or delay of any party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor will any single or partial exercise of any right or power, or any abandonment or discontinuance

-106-

of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The waiver by any party hereto of a breach of any term or provision hereof shall not be construed as a waiver of any subsequent breach. The rights and remedies of the parties hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have hereunder.

Section 10.9    Interpretation; Absence of Presumption.

(a)    For the purposes hereof: (i) words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires; (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole (including all of the Schedules and Exhibits) and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits, and Schedules to this Agreement unless otherwise specified; (iii) the word "including" and words of similar import when used in this Agreement shall mean "including, without limitation," unless the context otherwise requires or unless otherwise specified; (iv) the word "or" shall not be exclusive unless used in conjunction with the word "either;" (v) unless the context otherwise requires, any reference to "the parties hereto" or "the parties to this Agreement" shall mean Bidder, on the one hand, and Tribune Parties, on the other hand; and (vi) provisions in this Agreement which impose liabilities and obligations on the "Tribune Parties", including obligations prior to Closing, shall be the joint and several liabilities and obligations of each Tribune Party, provided, however, that in no event shall any obligations or liabilities of Tribune be included in the Cubs Liabilities except as expressly set forth on Exhibit F-5. "Made available" when used herein shall mean a true, correct and complete copy of the applicable document has been uploaded onto the Data Room (with online access being given to Bidder or any of its Representatives to view such document) (A) at least one (1) Business Day prior to the date hereof and retained in the Data Room through the Escrow Closing Date, (B) in the case of any representation or warranty that is remade as of the Escrow Closing Date because it is contained in or made pursuant to Article II or Section 4.14(d) as of the Escrow Closing Date or pursuant to the Tribune Escrow Closing Certificate, at least one (1) Business Day prior to the Escrow Closing Date and retained in the Data Room through the Escrow Closing Date, or (C) in the case of any representation or warranty that is remade as of the Closing Date because it is contained in or made pursuant to Article II or Section 4.14(d) as of the Closing Date, at least one (1) Business Day prior to the Closing Date and retained in the Data Room through the Closing Date. "Entered by the Bankruptcy Court" (or similar derivations) when used herein with respect to any document shall mean that such document has been both signed by the Bankruptcy Court judge and entered on the docket of the clerk of the Bankruptcy Court. For the avoidance of doubt, all representations and warranties in Article II, in Section 4.14(d) or in the Tribune Escrow Closing Certificate pertaining to a Cubs Entity shall also be deemed to pertain to the corresponding Predecessor Cubs Entity. Bidder acknowledges and agrees that any condition, covenant, Payment Trigger, representation or warranty or other agreement of the Tribune Parties relating to the Transactions shall not include the Newco Sale, except where the covenant, representation or warranty or other provision expressly refers to including the Newco Sale.

-107-

(b)    With regard to each and every term and condition of this Agreement and any and all agreements and instruments subject to the terms hereof, the parties hereto understand and agree that the same have been mutually negotiated, prepared and drafted, and if at any time the parties hereto desire or are required to interpret or construe any such term, condition, agreement or instrument, no consideration will be given to the issue of which party hereto actually prepared, drafted or requested such term, condition, agreement or instrument.

Section 10.10  Severability.  Any provision hereof that is held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction shall be ineffective only to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof; provided, however, that the parties will attempt in good faith to reform this Agreement in a manner consistent with the intent of any such ineffective provision for the purpose of carrying out such intent.

Section 10.11  Further Assurances.  From time to time after the Closing Date, each party shall, upon the reasonable request of the others, execute and deliver or cause to be executed and delivered such further instruments of conveyance, assignment, transfer and assumption, and take or cause to be taken such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of this Agreement.  Without limiting the generality of the foregoing, after the Closing, Tribune Parties shall, upon request by Newco, (a) promptly deliver to Newco, or take such actions reasonably requested by Newco to implement the transfer of, all domain name registrar account names, account numbers, login names, passwords, authorization codes or other information needed to release, unlock, and transfer (as applicable) control over any domain names included in the Cubs Intellectual Property and (b) promptly deliver to Newco a report generated by Tribune Parties' accounting systems listing the Cubs Contributed Assets (to the extent included in such accounting systems) and their corresponding book values, which presentations may or may not be on an individual asset by asset basis but aggregated with other assets in a manner consistent with Tribune's prior practice of preparing such reports.  In addition, other than with respect to the Designated Cubs Historical Broadcast Rights (which is separately addressed in the WGN Agreements), upon the discovery by Tribune or Bidder after the Closing Date of a failure by Tribune to deliver any of the Cubs Contributed Assets, the Tribune Parties shall use their reasonable best efforts to deliver to Newco the omitted asset in substantially the same condition in which it existed at Closing (normal wear and tear excepted).  After the Closing, no Tribune Party shall contest the validity of Newco's or any Newco Sub's ownership of the copyrights or other proprietary rights in the Designated Cubs Historical Broadcast Rights nor Newco's or any Newco Sub's rights in them.  After the Closing, no Tribune Party shall commit, or authorize any other Person to commit, any act that may impair Newco's or any Newco Sub's copyrights or other proprietary rights in the Designated Cubs Historical Broadcast Rights.  The parties acknowledge and agree that with respect to Exhibits R, U, V, W, X, Y and JJ the parties will act reasonably and in good faith to finalize such Exhibits as promptly as reasonably practicable after the date hereof, including reasonably and in good faith considering changes reasonably requested by the Senior Lender Agent.

Section 10.12  Business Days.  If any date provided for in this Agreement shall fall on a day that is not a Business Day, the date provided for shall be deemed to refer to the next Business Day.

Section 10.13 <u>Schedules</u>. The Schedules to this Agreement shall be arranged in sections and subsections corresponding to the numbered section and lettered subsections of this Agreement, and the exceptions and disclosures in each such section and subsection of the Schedules shall, except as provided in the next sentence, apply only to the correspondingly numbered section and lettered subsection of this Agreement. The information contained in any Schedule shall be deemed to be incorporated by reference in other applicable Schedules if the applicability of such information to such other Schedules is reasonably apparent on its face. No representation or warranty shall be qualified or otherwise affected by any fact or item disclosed on any Schedule unless such representation or warranty contains a reference to a Schedule or it is reasonably obvious on the face of a disclosure that such disclosure applies to a representation or warranty that does not reference a Schedule.

Section 10.14 <u>Specific Performance</u>. Each party (Tribune Parties, on the one hand, and Bidder, on the other hand) acknowledges that the other would suffer irreparable damage and would not have an adequate remedy at law for money damages in the event that any of the covenants or agreements set forth in this Agreement were not performed by such other party in accordance with its terms and therefore, each party agrees that in the event of any breach or threatened breach by any other party of any of the covenants or agreements contained in this Agreement, the non-breaching party shall be entitled to specific performance, injunctive and other equitable relief (in addition to any other remedies to which it may be entitled at law or in equity) (without the necessity of proving the inadequacy as a remedy of money damages or the posting of a bond or other security). Each of the Bidder, Newco and the Tribune Parties hereby waive any and all defenses it may have on the ground of lack of jurisdiction or competence of the Applicable Court to grant such an injunction or other equitable relief.

Section 10.15 <u>Bulk Transfer</u>. The parties hereto hereby waive compliance with the provisions of any applicable bulk transfer Law of any jurisdiction in connection with the Transactions (including the Newco Sale) and no representation, warranty or covenant contained in this Agreement shall be deemed to have been breached as a result of such non-compliance; provided, however, that the indemnity set forth in <u>Section 8.2(a)(iv)</u> shall remain in full force and effect.

Section 10.16 <u>Payments by Tribune Parties</u>. Any payments to be made by any Tribune Party (to the extent that it is a Debtor) pursuant to this Agreement (including, to the extent applicable, pursuant to <u>Section 1.5(d)</u>, <u>Section 4.15</u> or <u>Article VIII</u>) shall be treated as payment of an allowed (on a final, and not provisional or interim, basis) administrative priority claim pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, without further order of the Bankruptcy Court, and shall be included, and deemed approved, in any budget otherwise subject to approval by the Bankruptcy Court or by any other party in interest, shall not be subject to discharge, modification or impairment in any plan filed by Tribune Parties, and shall not be subject to disallowance or estimation and shall not be discharged or affected by any Plan of Reorganization.

Section 10.17 <u>Payments in Cash</u>. Except as otherwise set forth in this Agreement, all payment obligations under this Agreement from one party to another shall be paid in cash.

[The next page is the signature page]

-110-

The parties have executed and delivered this Formation Agreement as of the date first written above.

RICKETTS ACQUISITION LLC

By: David K.  Larson, as trustee of the Joe and Marlene Ricketts Grandchildren's Trust, its Sole Member


By: _____
Name: David K.  Larson
Title: Trustee

RAC EDUCATION TRUST OSA, LLC

By: Ricketts Acquisition LLC, its Sole Member

By: David K.  Larson, as trustee of the Joe and Marlene Ricketts Grandchildren's Trust, its Sole Member

By:_____
Name: David K.  Larson
Title:  Trustee

*[Signature page to Formation Agreement]*

TRIBUNE COMPANY

By:_____
Name:
Title:


CHICAGO NATIONAL LEAGUE BALL
CLUB, LLC

By:_____
Name:
Title:


WRIGLEY FIELD PREMIUM TICKET
SERVICES, LLC

By:_____
Name:
Title:


DIANA-QUENTIN, LLC

By:_____
Name:
Title:


CHICAGO CUBS DOMINICAN BASEBALL
OPERATIONS, LLC

By:_____
Name:
Title:


TRIBUNE SPORTS NETWORK HOLDINGS,
LLC

By:_____
Name:
Title:


*[Signature page to Formation Agreement]*

# JOINDER
# TO
# FORMATION AGREEMENT

The undersigned hereby agree to become a party to, and be bound by the provisions specifically applicable to each of the undersigned (i.e., any specific reference to "Newco," "Newco Subs" and any other defined term incorporating such terms, other than the generic term "parties") under, that certain Formation Agreement dated as of August 7, 2009 among Ricketts Acquisition LLC, a Delaware limited liability company, Tribune Company, a Delaware corporation, and certain other parties thereto.

Dated: _____, 2009

**NEWCO**:

CHICAGO BASEBALL HOLDINGS, LLC

By: Ricketts Acquisition LLC, its Sole Member
By: Joe and Marlene Ricketts Grandchildren's Trust, its Sole Member

By: _____
       Name: David K. Larson
       Title: Trustee

**NEWCO SUBS**:

[CUBS NEWCO SUB]

By: _____
       Name:
       Title:

[DOMINICAN NEWCO SUB]

By: _____
       Name:
       Title:

[PREMIUM TICKETS NEWCO SUB]

By: _____
       Name:
       Title:

[DQ NEWCO SUB]

By: _____
     Name:
     Title:

[ANY ADDITIONAL NEWCO SUB]

By: _____
     Name:
     Title:

The Exhibits and Schedules to the Formation Agreement are voluminous.  Accordingly, only the material Exhibits to the Formation Agreement, such as those that are described in the Tribune Transaction Approval Motion, have been filed with the Bankruptcy Court. The Tribune Debtors will make Exhibits and Schedules to the Formation Agreement available for review by creditors and other parties-in-interest with a legitimate interest in such materials upon reasonable request; provided, however, that the Tribune Debtors do not waive any of their rights to seek to file any Exhibits or Schedules to the Formation Agreement under seal, or in a redacted form, or otherwise to seek appropriate protective relief from the Bankruptcy Court before providing any of such material to a requesting creditor or party-in-interest.