**EXHIBIT C-1**

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

Dated as of [_____]

BETWEEN

RICKETTS ACQUISITION LLC,

CHICAGO NATIONAL LEAGUE BALL CLUB, LLC,

WRIGLEY FIELD PREMIUM TICKET SERVICES, LLC,

DIANA-QUENTIN, LLC,

TRIBUNE SPORTS NETWORK HOLDINGS, LLC,

AND

CHICAGO CUBS DOMINICAN BASEBALL OPERATIONS, LLC

# TABLE OF CONTENTS

**Page**

ARTICLE 1      THE COMPANY ........................................................... 2

    Section 1.1      Formation ................................................ 2
    Section 1.2      Name ..................................................... 2
    Section 1.3      Organizational Contributions and Actions ......... 2
    Section 1.4      Registered Office; Chief Executive Office ......... 2
    Section 1.5      Purpose; Duration ..................................... 3
    Section 1.6      Liability of the Members Generally ............... 3
    Section 1.7      Compliance with MLB Rules and Regulations ..... 4
    Section 1.8      Issuance of New MLB Rules and Regulations ..... 4
    Section 1.9      Certain Covenants ..................................... 4

ARTICLE 2      CAPITALIZATION ............................................... 7

    Section 2.1      Members and Percentage Shares ................... 7
    Section 2.2      Capital Requirements; Capital Contributions ..... 7
    Section 2.3      Resignation; Withdrawal ............................ 9

ARTICLE 3      MANAGEMENT AND OPERATIONS OF THE COMPANY ..... 9

    Section 3.1      Management of the Company's Affairs ............ 9
    Section 3.2      Board .................................................... 10
    Section 3.3      Meetings and Voting ................................. 10
    Section 3.4      Officers ................................................ 11

ARTICLE 4      MEMBERS ....................................................... 12

    Section 4.1      Certain Restrictions ................................. 12
    Section 4.2      Powers of Members ................................. 12
    Section 4.3      Meetings of Members ............................... 14
    Section 4.4      Member Status ....................................... 15

ARTICLE 5      DISTRIBUTIONS AND ALLOCATIONS .............. 16

    Section 5.1      Capital Accounts ..................................... 16
    Section 5.2      Book Allocations ..................................... 16
    Section 5.3      Allocations with Respect to Contributed Property; Agreed Value Adjustments, Depreciation Recapture and Excess Nonrecourse Liabilities ................................. 19
    Section 5.4      Distributions .......................................... 20
    Section 5.5      No Interest; No Return of Capital ................. 20

ARTICLE 6      ACCOUNTING AND TAXATION ...................... 20

    Section 6.1      Fiscal Year ............................................ 20
    Section 6.2      Maintenance of Books and Records ............... 21
    Section 6.3      Access to Books of Account ........................ 21

# TABLE OF CONTENTS
(continued)

Page

Section 6.4     Financial Statements ........................................................ 21
Section 6.5     Taxation ............................................................................ 22
Section 6.6     Tax Matters Member ........................................................ 22

ARTICLE 7     RESTRICTIONS ON DISPOSITION OF COMPANY INTERESTS ......... 23

Section 7.1     Limitations on Disposition of Company Interests ............ 23
Section 7.2     Call/Put ............................................................................ 23
Section 7.3     Right of First Refusal ...................................................... 25
Section 7.4     Tag- and Drag-Along ...................................................... 26
Section 7.5     Valuation Amount or Agreed Value Determination Mechanism ...... 28
Section 7.6     Additional Provisions Relating to Permitted Dispositions ............... 28
Section 7.7     Effect of Permitted Dispositions ...................................... 29
Section 7.8     Effect of Prohibited Dispositions ..................................... 30

ARTICLE 8     OTHER ACTIVITIES; CONFIDENTIALITY ......................................... 30

Section 8.1     Other Activities ................................................................ 30
Section 8.2     Confidentiality .................................................................. 31

ARTICLE 9     DISSOLUTION AND WINDING-UP OF THE COMPANY ..................... 32

Section 9.1     Dissolution ....................................................................... 32
Section 9.2     Winding-Up Procedures ................................................... 32
Section 9.3     Deficit Capital Accounts .................................................. 33

ARTICLE 10     BOARD DUTIES; INDEMNIFICATION ............................................. 33

Section 10.1     Board Duties .................................................................... 33
Section 10.2     Indemnification ................................................................ 33
Section 10.3     Insurance for Article 10 Matters ...................................... 34

ARTICLE 11     MISCELLANEOUS ...................................................................... 34

Section 11.1     Waiver of Rights of Partition and Dissolution ................. 34
Section 11.2     Entire Agreement; No Third Party Beneficiary ................ 34
Section 11.3     Governing Law ................................................................ 34
Section 11.4     Amendments and Waivers ............................................... 35
Section 11.5     Notices ............................................................................ 36
Section 11.6     Counterparts .................................................................... 37
Section 11.7     Successors and Assigns ................................................... 37
Section 11.8     Headings .......................................................................... 37
Section 11.9     Interpretation; Absence of Presumption .......................... 37
Section 11.10     Further Assurances .......................................................... 38
Section 11.11     Business Days .................................................................. 38
Section 11.12     Severability ...................................................................... 38

# AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT

## OF

# CHICAGO BASEBALL HOLDINGS, LLC

This Amended and Restated Limited Liability Company Agreement (this "**Agreement**") dated as of _____, 2009 is among Chicago Baseball Holdings, LLC, a Delaware limited liability company (the "**Company**"), Ricketts Acquisition LLC, a Delaware limited liability company ("**Ricketts Member**"), Chicago National League Ball Club, LLC, a Delaware limited liability company (which will change its name to _____, LLC) ("**Cubs LLC**"), Tribune Sports Network Holdings, LLC, a Delaware limited liability company (which will change its name to _____, LLC) ("**Tribune Sports**"), Wrigley Field Premium Ticket Services, LLC (which will change its name to _____, LLC) ("**Premium Tickets LLC**"), Diana-Quentin, LLC, a Delaware limited liability company (which will change its name to _____, LLC) ("**DQ LLC**"), and Chicago Cubs Dominican Baseball Operations, LLC (which will change its name to _____, LLC)("**Dominican LLC**", together with Cubs LLC, Tribune Sports, Premium Tickets LLC and DQ LLC, the "**Tribune Members**" and each a "**Tribune Member**").  Capitalized terms used but not defined elsewhere herein shall have the meanings assigned to them in Exhibit A.

WHEREAS, Chicago Baseball Holdings, LLC was formed under Delaware law pursuant to a Certificate of Formation filed with the Delaware Secretary of State on or about July 8, 2009, and a Limited Liability Company Agreement dated as of July 8, 2009 (the "Original Agreement");

WHEREAS, Ricketts Member, the Tribune Members and Tribune Company, a Delaware corporation ("**Tribune**"), are parties to a Formation Agreement dated as of _____, 2009 (as the same may be amended from time to time, the "**Formation Agreement**");

WHEREAS, pursuant to the Formation Agreement, each of Ricketts Member and the Tribune Members will contribute, or cause to be contributed, to the Company certain assets and liabilities in exchange for a membership interest in the Company;

WHEREAS, the Company, the Members, Tribune and certain of their Affiliates are parties to that certain Tax Matters Agreement that governs certain rights and obligations of the parties hereunder; and

WHEREAS, the Members desire to enter into this Agreement, which shall constitute the limited liability company agreement of the Members under the Act, for the purpose of setting forth the agreements of the Members as to the affairs of the Company and the conduct of its Business.

NOW THEREFORE, in consideration of the premises and other covenants and conditions contained herein, the parties agree as follows:

# ARTICLE 1
## The Company

Section 1.1    Formation.

(a)    A certificate of formation of the Company was filed in the office of the Secretary of State of the State of Delaware on July 8, 2009.  The Members confirm their agreement that, from and after the date hereof, the Company shall be governed by the terms of this Agreement and the Act.  Any previous agreement for the formation, organization, and governance of the Company, including (without limitation) the Original Agreement, is hereby superseded and amended by substituting this Agreement therefor in its entirety.  To the extent permitted under the Act, in the case of any conflict between the terms of this Agreement and the Act, the terms of this Agreement shall prevail.

(b)    The Tribune Members and Ricketts Member hereby agree to be, and are hereby, admitted as Members of the Company.

(c)    As of the date of this Agreement, after giving effect to the transactions described in Section 1.3, (i) the Tribune Members shall own an aggregate Percentage Share equal to 5%, and (ii) Ricketts Member shall own a Percentage Share equal to 95%.

Section 1.2    Name.  The name of the Company shall be "Chicago Baseball Holdings, LLC" or such other name as may be determined by the Board from time to time.

Section 1.3    Organizational Contributions and Actions.  On the Closing Date, the following actions are taking place pursuant to the Formation Agreement:

(a)    The Tribune Members are contributing to the Company or one or more of its Subsidiaries all of the Cubs Contributed Assets and Cubs Assumed Liabilities.  The Members agree that the Cubs Contributed Assets, Cubs Assumed Liabilities and any Retained Cubs Current Asset transferred to the Company or any Subsidiary shall have an Agreed Value (inclusive of any amount paid to, or any Retained Cubs Current Assets transferred to, the Company pursuant to Section 1.5 of the Formation Agreement) of $_____.

(b)    Ricketts Member is contributing $_____ in cash to the Company.

(c)    The Company and its Subsidiaries are entering into the Debt Financing.

(d)    The Company is making an aggregate special distribution to the Tribune Members in the amount of the Estimated Special Distribution Amount, which may be adjusted pursuant to Section 1.5 of the Formation Agreement  (the "**Special Distribution**").

Section 1.4    Registered Office; Chief Executive Office.  The Company shall maintain a registered office and registered agent in Delaware to the extent required by the Act, which office and agent shall be as determined by the Board from time to time.  Initially (and until otherwise determined by the Board), the registered office in Delaware, and the name and address of the Company's registered agent in Delaware, shall be as specified in the certificate of formation of

2

the Company as originally filed.  The chief executive office of the Company shall be located at such place as shall be determined by Board from time to time.

Section 1.5    Purpose; Duration.

(a)    Subject to the limitations contained elsewhere in this Agreement, the purpose of the Company is limited solely to engaging in (i) the Cubs Business and (ii) any other business or activity incidental thereto, provided such business or activity does not conflict with or violate the terms of the Loan Documents, the Note Documents, or the MLB Rules and Regulations.  Subject to the limitations set forth in Sections 1.7, 1.9, and 3.5 the Company shall have all the powers necessary or convenient to accomplish such purposes of the Company or consistent with the furtherance thereof.

(b)    Subject to Section 9.1, the Company shall have perpetual existence.

(c)    Notwithstanding anything to the contrary in this Agreement (including, without limitation, Sections 8.1(c) and 8.1(d)), the Company is authorized to execute, deliver, and perform all of its obligations under or in connection with the Obligations, the Credit Agreement, the Note Purchase Agreement, and the other Loan Documents and Note Documents (subject in all events to Section __ of the Credit Agreement and all similar provisions in any Loan Document or Note Document to which the Company is a party), including, without limitation, any prepayment or repayment of the Obligations required under the Credit Agreement, the Note Purchase Agreement, or the other Loan Documents or Note Documents and any foreclosure upon or disposition of the Company's assets undertaken in connection with the Secured Parties' exercise of remedies thereunder, regardless of whether any of the foregoing gives rise to an obligation to make a payment under the Tax Matters Agreement. Notwithstanding anything to the contrary in this Agreement (including, without limitation, Sections 8.1(c) and 8.1(d)), the Act or any applicable law, rule or regulation, the Company (and any Officer or Director on behalf of the Company) may enter into and perform the Credit Agreement, the Note Purchase Agreement, and any other Loan Document or Note Document (subject in all events to Section __ of the Credit Agreement and all similar provisions of any other Loan Document or Note Document to which the Company is a party) and any and all other documents, agreements, certificates or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any Director or Member of the Company or any other Person (except as expressly provided in Section 3.5).  The existence of any other provision of this Agreement that may conflict with or be inconsistent with this Section 1.5(c) shall not impair or affect the authorization of the Company or any Director, Member or Officer of the Company from performing the Company's obligations under the Loan Documents or Note Documents (including, without limitation, repayment or prepayment of the Obligations as and when required under the applicable Loan Documents or Note Documents).  The foregoing authorization shall not be deemed a restriction on the powers of the Board to enter into other agreements on behalf of the Company.

(d)    The Members further expressly acknowledge and agree that (i) the Company may not engage in any business or activity other than as set forth in Sections 1.5(a) and 1.5(c) above, and (ii) for so long as any of the Obligations are outstanding, the Company may not incur any Indebtedness except to the extent permitted under the Credit Agreement, the

3

Note Purchase Agreement, and any other Loan Document or Note Document (subject in all events to Section __ of the Credit Agreement and all similar provisions of any other Loan Document or Note Document to which the Company is a party).

Section 1.6    Liability of the Members Generally.  Except as otherwise expressly provided in this Agreement or the Act, no Member (or former Member) shall be obligated to make any contribution of capital to the Company or have any liability for the debts and obligations of the Company.  This Section 1.6 is in furtherance of, and not in limitation of, Section 18-303(a) of the Act.

Section 1.7    Compliance with MLB Rules and Regulations.

(a)    Notwithstanding anything to the contrary herein (other than Section 3.5), each Member (solely in its capacity as a member of the Company) and the Company acknowledge that the Club, the Company and its Subsidiaries, this Agreement, and the rights and obligations of the parties hereunder are subject to all MLB Rules and Regulations, which, among other things, require that certain Major League Baseball Entities must consent to sales, transfers, assignments, gifts or bequests, grants of security interests, pledges, encumbrances and other transactions involving the ownership of the Club or the Company or its Subsidiaries, in each case to the extent set forth and described in the MLB Rules and Regulations.  Any such sale, transfer, assignment, gift or bequest, grant of a security interest, pledge, encumbrance or other transaction involving the ownership of the Club or the Company or its Subsidiaries shall be subject to, and made in accordance with, the MLB Rules and Regulations and, to the extent any such transaction requires the consent of any of the Commissioner or any Major League Baseball Entity pursuant to the MLB Rules and Regulations, such transaction shall be null and void ab initio unless all applicable consents required pursuant to the MLB Rules and Regulations are obtained in advance pursuant to the requirements of the MLB Rules and Regulations.  Each Member (solely in its capacity as a member of the Company) acknowledges that the preceding sentence may, to the extent set forth in the MLB Rules and Regulations, apply to any proposed transfer of all or any portion of any interest in the Company, including, without limitation, such Member's economic rights.

(b)    To the extent there is any conflict between the terms hereof (other than Section 3.5) and the MLB Rules and Regulations, the MLB Rules and Regulations shall govern such conflict.  Each Member shall, and shall cause its Affiliates to, at all times comply with the MLB Rules and Regulations.

(c)    Whenever MLB Approval is required under the applicable MLB Rules and Regulations, such approval may be granted or withheld at the sole and absolute discretion of the applicable Major League Baseball Entity or the Commissioner and may be subject to such terms and conditions as Major League Baseball shall, in its sole and absolute discretion, impose.

(d)    The Members acknowledge that (i) under the MLB Rules and Regulations, the Club is obligated to designate a single individual who is accountable for the operation of the Club and for the compliance with all MLB Rules and Regulations and who is the single individual with ultimate authority and responsibility for making all Club decisions, including, without limitation, all decisions relating to the participation of TeamCo as a member of Major

4

League Baseball (the "**MLB Control Person**") and (ii) Section 5.2 of the TeamCo LLC Agreement is the operative provision pursuant to which the MLB Control Person for the Club shall be so designated; provided, however, that the MLB Control Person shall not take, or cause the Company to take, any action set forth in Section 4.2(b) unless such action is necessitated by the MLB Control Person's obligation to comply with MLB Rules and Regulations.

Section 1.8    Issuance of New MLB Rules and Regulations.

(a)    The Ricketts Member, the Bidder Directors and their Affiliates (i) shall not solicit or encourage any Major League Baseball Entity to issue any MLB Rules and Regulations that, without regard to Section 1.7(b), would conflict with or supersede the terms of this Agreement, and (ii) will use reasonable best efforts to cause any Major League Baseball Entity to waive or limit the scope of any MLB Rules and Regulations that are issued after the date hereof that, without regard to Section 1.7(b), would conflict with or supersede the terms of this Agreement.

Section 1.9    Certain Covenants.  Notwithstanding any provision contained in this agreement to the contrary, during the period that any Obligations are outstanding, none of the Board, any officer, or any Member shall permit the Company to directly or indirectly:

(a)    Own or acquire any property or any other assets other than (i) the Cubs Business and (ii) real, personal, and intangible property incidental to the Cubs Business and necessary to carry out the purposes of the Company described in Section 1.5(a);

(b)    Engage in any business, other than as specified in Section 1.5(a);

(c)    Incur any Indebtedness for borrowed money or other liabilities, contingent or otherwise, other than as expressly permitted by the Credit Agreement and the Note Purchase Agreement;

(d)    Guarantee or otherwise hold itself or its credit (expressly or implicitly) out to be responsible for the debts or obligations of any Affiliate or any other Person or take or omit to take any action that could reasonably be interpreted to make the Company responsible for the debts of any Affiliate or any other Person, in each case other than as expressly permitted by Section 6.04 of the Credit Agreement and Section __ of the Note Purchase Agreement;

(e)    Acquire obligations or securities of its Members, Directors or other Persons;

(f)    Pledge its assets for the benefit of any other Person or make any loan or advance to any Affiliate or other Person, other than as expressly permitted by Section 6.04 of the Credit Agreement and Section __ of the Note Purchase Agreement;

(g)    Except as expressly permitted by Section 6.09 of the Credit Agreement and Section __ of the Note Purchase Agreement, enter into any transaction, contract or agreement with any of its Affiliates, any of its constituent parties or any Affiliate of any constituent party, except upon terms and conditions that are intrinsically fair, commercially reasonable, and substantially similar to those that would be available on an arm's-length basis

5

with third parties, and all such transactions, contracts, and agreements will be entered into in the name of the entities that are parties thereto and will be formally documented in writing;

(h)     Except as expressly permitted by the Credit Agreement and the Note Purchase Agreement, commingle its monies, funds, other assets, and liabilities with those of any Affiliate or constituent party or any Affiliate of any constituent party or any other Person;

(i)     Except as expressly permitted by the Credit Agreement and the Note Purchase Agreement, amend, modify or otherwise change or suffer any constituent party to amend, modify or otherwise change the provisions of its Certificate or this Agreement if such amendment, modification or other change could materially adversely affect any of the requirements of the Credit Agreement or the Note Purchase Agreement applicable to it;

(j)     Except as expressly permitted by the Credit Agreement and the Note Purchase Agreement, engage in any dissolution, winding up, termination, liquidation, consolidation or merger of the Company (in whole or in part), any sale, transfer, or other disposition of all or substantially all of the Company's assets, or any issuance of ownership interests in the Company or any change in the Company's legal structure;

(k)     Except as expressly permitted by the Credit Agreement and the Note Purchase Agreement, make or permit to remain outstanding any loan or advance to, own or acquire any stock or securities of, make any equity or similar investment in, or hold any debt security of, any Affiliate or other Person;

(l)     Form, acquire or hold any subsidiary (whether corporate, partnership, limited liability company or other form of entity), other than any Subsidiary (as defined in the Credit Agreement);

(m)     Except as expressly permitted by the Credit Agreement and the Note Purchase Agreement, permit the obligations of the Company to be guaranteed by any Affiliate or any other Person; and

(n)     Fail to do any of the following:

(i)     remain solvent and pay its debts and liabilities (including employment and overhead expenses) from its assets as and when the same shall become due;

(ii)     observe all appropriate limited liability company formalities;

(iii)     correct any known misunderstanding regarding the Company's separate identity;

(iv)     maintain books and records, bank accounts, financial statements, and other entity documents separate from those of any other Person (including its Affiliates, any constituent party and any Affiliate of any constituent party) and, to the extent required as a matter of law or otherwise determined to be in the best interests of the Company, file its own tax returns;

6

(v)     hold itself out to the public as a legal entity separate and distinct from any other Person (including any of its Affiliates, any of its constituent parties or any Affiliate of any constituent party) and not as a division or part of any Affiliate, conduct business and hold its own assets solely in its own name, and act solely through its own managers, members, authorized officers and agents (as set forth in this Agreement);

(vi)     maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(vii)     maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any Affiliate of any constituent party or any other Person;

(viii)     use separate stationery, purchase orders, invoices and checks (and not those of any Affiliate or any other Person);

(ix)     to the extent the Company and any other Person jointly contract or do business with other Persons or share overhead expenses, allocate fairly, appropriately, non-arbitrarily, and reasonably any costs and expenses incurred between or among such entities, with the result that each such entity bears its fair share of all such costs and expenses;

(x)     pay its liabilities (including, without limitation, salaries of its own employees) only from its own funds, and maintain a sufficient number of employees in light of its contemplated business operations;

(xi)     preserve the existence of the Company as an entity duly formed, validly existing and in good standing under the laws of the State of Delaware; and

(xii)     pay or bear the cost of the preparation of its stand-alone financial statements, and have such financial statements audited annually by an independent certified public accounting firm. The Company's financial position, assets, results of operations and cash flows may be included in consolidated financial statements of any Person in accordance with GAAP or as required by Major League Baseball; provided, however, that (i) appropriate notation will be made on such consolidated financial statements to indicate the separateness of the Company and such Affiliates and to indicate that its assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) the assets of the Company will also be listed on its own separate balance sheet.

Failure of the Company, or of any Member, Director, or Officer on behalf of the Company, to comply with any of the foregoing covenants or any other covenants contained in this Agreement shall not affect the status of the Company as a separate legal entity or the limited liability of any Member, Director, or Officer of the Company.

**ARTICLE 2**
**Capitalization**

7

Section 2.1    <u>Members and Percentage Shares</u>.  <u>Exhibit C</u> sets forth a list of all Members and the Percentage Shares and Common Capital held by the Members as of the date hereof after giving effect to the transactions described in Section 1.3.  <u>Exhibit C</u> shall be updated from time to time to reflect changes in the Members or their respective Company Interests, each as permitted by this Agreement.

Section 2.2    <u>Capital Requirements; Capital Contributions</u>.

(a)    Except as provided in Section 1.3(a) and Section 1.3(b), no Member shall be obligated to make Capital Contributions to the Company.  If the Board determines, after taking into account any loan required to be made to the Company pursuant to the Ricketts Subordinated Loan Commitment Agreement, in its reasonable discretion that additional funds (the "**Required Additional Funds**") are needed to pay, or to create reserves to pay, any of the Company's debts, operating expenses and/or other obligations, or for purposes of capital investment or expansion or any other business reason, the Board shall endeavor to obtain debt financing from third parties on a basis that is (x) nonrecourse to the Members in the amount of the Required Additional Funds and (y) in compliance with the Loan Documents, the Note Documents, and MLB Rules and Regulations.  For the avoidance of doubt, the term "financing" as used in this Section 2.2(a) shall not include the issuance of any instrument or security convertible into, or exchangeable for, a capital interest in the Company.  If the Board determines in good faith that third party financing in an amount equal to the Required Additional Funds cannot be reasonably obtained by the Company (with the amount of the Required Additional Funds that cannot be funded through such debt financing being referred to as the "**Required Funding**") and, if the Board determines to obtain such funds through capital contributions, then the Board shall give written notice (an "**Additional Capital Notice**") to each such Member requesting that each Member make an additional Capital Contribution equal to such Member's Percentage Share of the Required Funding.  The Additional Capital Notice shall be delivered to each Member at least thirty (30) Business Days prior to the date on which such Capital Contributions are due.  Each Additional Capital Notice shall: (i) set forth the total amount of the additional Capital Contributions requested; (ii) request that each Member contribute an amount equal to its Percentage Share of the Required Funding (the "**Requested Contribution**"); (iii) set forth the Company FMV determined by the Board as described below, and (iv) set forth the date by which the Members must make their Requested Contribution if they so elect.  Each Member shall have the option, but not the obligation, to make a capital contribution in an amount equal to or less than its Requested Contribution.  If a Member elects to make a capital contribution pursuant to an Additional Capital Notice such Member must provide written notice of such election to the Company within twenty (20) Business Days of receipt of the Additional Capital Notice.

(b)    If any Member does not make a capital contribution in the full amount of its Requested Contribution, then within twenty-five (25) Business Days of the date of the Additional Capital Notice the Company shall send written notice thereof to all of the other Members who elected to make the full amount of their Requested Contribution (the "**Fully Participating Members**"), which notice shall set forth the total amount of additional Capital Contributions remaining to be funded.  Fully Participating Members shall have the right, but not the obligation, to make an additional capital contribution in an amount equal to the portion of the Required Funding that was not funded by the other Members pursuant to Section 2.2(a) above

8

(the "**Unfunded Required Funding**"). If more than one Fully Participating Member elects to make additional capital contributions pursuant to the prior sentence which in the aggregate exceed the Unfunded Required Funding, then each such Fully Participating Member shall contribute an amount equal to the lesser of (i) the amount that the Fully Contributing Member elected to contribute and (ii) the product of (x) the Unfunded Required Funding multiplied by (y) such Fully Participating Members Percentage Share divided by the sum of the Percentage Shares of such Fully Participating Members (the "**Pro Rata Share**") and any remaining portion of the Unfunded Required Funding shall be allocated among the Fully Participating Members that elected to contribute more than their Pro Rata Share in proportion to the Percentage Shares (until the entire amount of the Unfunded Required Funding has been allocated to such Fully Participating Members). Such additional capital contributions shall be made within ten (10) Business Days of the date on which the original Capital Contributions were due. If, after following the process set forth in Section 2.2(a) and 2.2(b), the Company has not received Capital Contributions from its Members in an amount equal to the Required Funding then, for a period of ninety (90) days thereafter, the Company may seek to obtain additional capital contributions from other persons, on the same terms and conditions as were offered to the Members, in the amount of such shortfall. If the Company seeks any capital contributions after such ninety (90) day period, or if the Company changes the terms and conditions for the issuance of such capital contributions, then the Company will again re-offer to the Members, pursuant to Sections 2.2(a) and 2.2(b), the opportunity to make such capital contributions.

(c)     If each Member funds the full amount of its Requested Contributions, then no adjustments shall be made to the Members' relative Percentage Shares. If any Member does not fund the full amount of such Member's Requested Contribution, then each Member's Percentage Share shall be adjusted to reflect a change to each Members' Company Interest, with the new Percentage Share of each Member (including any Persons admitted as new Members after making the additional Capital Contribution) being equal to:

(Member's initial Percentage Share * Company FMV) + Member's additional Capital Contribution
(Company FMV + sum of additional Capital Contributions)

"**Company FMV**" means the Fair Market Value of all the Company's assets reduced by all of the Company's liabilities, expenses, contingencies, obligations, indemnities, and undertakings, determined as of the date of the additional Capital Contribution but prior to giving effect to any additional Capital Contribution. Company FMV shall be determined in good faith by the Board (subject to Section 7.5); provided, however, that if the aggregate amount of the Required Funding as set forth in the Additional Capital Notice does not exceed $20 million, the Fair Market Value of all the Company's assets shall be deemed to be the difference between (i) the product of the EBITDA of the Company for the four full calendar quarters ending immediately before the delivery of the Additional Capital Notice, multiplied by (ii) the greater of (A) 18, minus the number of full 12-month periods between the Closing Date and the date of delivery of the Additional Capital Notice, and (B) 10.

(d)     Except as provided in Section 2.2(b), the Company and the Board are expressly prohibited from soliciting or accepting Capital Contributions from non-Member Persons. Prior to issuing any security that is convertible into or exchangeable for Company

9

Interests the Company must first comply with the provisions of this Section 2.2, the terms of the Loan Documents and the Note Documents, and all MLB Rules and Regulations.

Section 2.3    Resignation; Withdrawal. So long as any Obligation remains outstanding, no Member shall have the right to resign or withdraw from the Company (except for a resignation or withdrawal under Section 7.7(a)(iv) that results from a Disposition of a Company Interest to any Person (other than the Company) that is permitted under Section 7.1) or to demand a return of its Capital Contribution. If a Member is permitted to resign pursuant to this Section 2.3, and such Member was the sole Member of the Company, an additional member of the Company shall be admitted to the Company, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

## ARTICLE 3
## Management and Operations of the Company

Section 3.1    Management of the Company's Affairs. Subject to Sections 1.5 and 1.9, and subject to the procedure set forth in Section 3.5 with respect to obtaining consent for the taking of an Insolvency Action after a decision has been made by the Board and/or the MLB Control Person to pursue such an action, and except as otherwise expressly provided herein, (a) the management of the Company is vested exclusively in the Board, (b) the Board shall have full and complete authority to manage and control the business and affairs of the Company and to make all decisions and take all actions as it deems necessary or appropriate to accomplish the purposes of the Company as set forth herein, all in accordance with the terms of this Agreement, the Loan Documents, the Note Documents, the Tax Matters Agreement, and all MLB Rules and Regulations, and (c) no Member, by virtue of its status as a Member, shall have any management power over the business and affairs of the Company.

Section 3.2    Board. There is hereby established a Board of the Company (the "**Board**"). The initial number of members of the Board (each member of the Board is referred to herein as a "**Director**") shall be at least two (2) but not more than twenty (20) of whom up to nineteen (19) shall be appointed by Ricketts Member (the "**Bidder Directors**") and one (1) shall be appointed by the Tribune Members (a "**Tribune Director**"). The initial Directors are set forth on Exhibit B. The Member(s) entitled to appoint any Director may, at any time and from time to time, change the Directors appointed by such Member(s), provided, however, that the Tribune Members may not replace the Tribune Director with any Person who has not been approved by a majority of the Bidder Directors. An individual may serve as a Director notwithstanding any other position he or she may hold with the Company. Notwithstanding the foregoing, the Board may increase the number of Bidder Directors, provided, however, that if the number of Bidder Directors exceeds twenty (20), then the Tribune Members shall have the right to appoint an additional Tribune Director; provided further that the Tribune Members shall not have the right to appoint any Director for any period of time during which the Tribune Members' aggregate Percentage Share is less than three percent (3%).

Section 3.3    Meetings and Voting.

10

(a)    The Board shall hold meetings on such specific dates, and at such times, as shall be determined by a majority of the Directors, upon at least two (2) days advance written notice to all directors.  Any Director may waive notice to such Director of a meeting of the Board, in writing, before, at or after the meeting.  The attendance of any Director at a meeting of the Board shall constitute a waiver of notice to such Director of such meeting, except when the Director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the grounds that the meeting is not lawfully called or convened.  Directors may participate in any meeting of the Board by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other simultaneously, and such participation in a meeting will constitute presence in person at such meeting.

(b)    The presence of a majority of the Directors shall constitute a quorum at all meetings of the Board.

(c)    Subject to Section 3.5, action may be taken by the Board by approval of a majority of all Directors present at any meeting at which a quorum exists.

(d)    Subject to Section 3.5, any action may be taken by the Board without a meeting thereof and without prior notice to the Directors if the approval for such action is set forth in one or more written consents executed by a majority of the Directors.  If any written consents are provided to any Director (or to members of any committee formed pursuant to Section 3.3(f)) for execution, a copy of such written consent (and any related materials) shall at the same time be provided to all Directors.  In addition, within two (2) Business Days of execution, a copy of all executed written consents shall be provided to all Directors, including any Director who did not execute such written consent.  Written consents shall be filed with the minutes of the proceedings of the Board; provided, that, the failure to file, or any delay in filing, any such written consent shall not affect the validity of any action in fact taken by the Board by such written consent.

(e)    Any Director may appoint a proxy (including any Officer) to act on his or her behalf and to vote in his or her stead at any meeting of the Board or to execute any written consent if he or she delivers notice thereof, signed by the Director, to the Company.  Every proxy shall be revocable by the Director; provided, however, that any revocation of a proxy shall not invalidate or otherwise affect actions taken under such proxy prior to revocation.

(f)    The Board may in its sole discretion appoint one or more committees consisting of such members of the Board, Officers or other Persons as shall be designated by the Board, which committee(s) shall have and may exercise such (or all) of the powers and authority of the Board with respect to the management of the business and affairs of the Company or as provided under this Agreement (other than, for the avoidance of doubt, as set forth in Section 3.5) as shall be provided in a written resolution of the Board.  Where the Board so delegates any authority provided to it under this Agreement, the relevant reference to the Board in this Agreement describing such authority shall be deemed to be a reference to the committee(s), Officers or Person(s) to which such authority is delegated.  Any committee designated pursuant to this Section 3.3(f) shall fix its own rules or procedures and shall meet at such times and at such place or places as may be provided by such rules, or by resolution of such committee or

11

resolution of the Board. Such committee(s) may take action by written consent in the same manner as provided in paragraph (d) above. If a Tribune Director is not a member of any such committee, then the Tribune Director shall (i) receive written notice of any meeting or other proceeding of such committee at the same time such notice is provided to members of such committee, (ii) receive any other materials or reports provided to members of such committee at the same time such materials or reports are provided to such members, and (iii) have the right to attend all meetings of such committee.

(g)     The Board and each committee shall keep reasonably detailed minutes of its activities and proceedings. Copies of the minutes and written consents of the Board and each committee shall be provided to each Director on a timely basis or within two (2) Business Days upon request.

(h)     Subject to the provisions of this Agreement, the Board may regulate its proceedings (and such committee(s) may regulate the proceedings of such committee) as the Board (or such committee(s)) reasonably determines.

Section 3.4     Officers.

(a)     Powers and Duties. The Board may from time to time appoint officers of the Company (the "**Officers**"). The Officers shall have such titles and authority as the Board shall determine from time to time.

(b)     Titles and Number. The Officers may (without limitation) include a Chief Executive Officer, Chief Financial Officer, one or more Vice Presidents, a Secretary, a Treasurer and one or more Assistant Secretaries and Assistant Treasurers. Any person may hold two or more offices. Each Officer shall perform such duties and exercise such other powers as are commonly incident to a similarly titled officer of a corporation; provided, however, that any term of this Agreement (other than the terms of Sections 1.7 and 3.5) to the contrary notwithstanding, each Officer shall be subject to the control of the Board and the authority and responsibilities of each Officer shall be subject to the limitations, if any, imposed by any agreement between the Company and such Officer or any determination by the Board.

(c)     Appointment and Term of Office. The Officers shall be appointed at such time and for such term as the Board shall determine. Any Officer may be removed, with or without cause, only by the Board. Vacancies in any office may be filled only by the Board.

Section 3.5     Review of Insolvency Actions. Notwithstanding any other provision of this Agreement or any other agreement, instrument or document to the contrary, upon the Board (as managers of an entity that owns a Major League Club subject to all MLB Rules and Regulations), or the MLB Control Person (as the "control person" of a Major League Club under the MLB Rules and Regulations), making a decision to take any Insolvency Action, and the Tribune Members approving such decision pursuant to Section 4.2(b), neither the Board nor the MLB Control Person shall take such Insolvency Action without first (i) informing the Office of the Commissioner of Baseball of such decision and (ii) obtaining the prior written consent of the Office of the Commissioner of Baseball. The Company shall not, and shall not have the power or authority and shall not be authorized to, take any Insolvency Action absent the written approval

12

of the Tribune Members pursuant to Section 4.2(b) and the written consent of the Office of the Commissioner of Baseball.  All of the Members shall be deemed to have consented to the provisions of this Section by virtue of the Member's purchase, holding or other acquisition of interests in the Company, and no further act or deed of any Member shall be required to evidence such consent.  When acting under this Section 3.5, the Office of the Commissioner of Baseball shall not be deemed to be engaged in the management of the Company or owe any obligation to the Members, the Company, or any creditor of the Members or the Company.

## ARTICLE 4
### Members

Section 4.1    Certain Restrictions.  No Member may, without the written consent of the other Member(s), unilaterally dissolve, terminate, liquidate or wind up the affairs of the Company, except to the extent expressly permitted or required under Article 9.

Section 4.2    Powers of Members.

(a)    Subject to Section 3.5, the Members shall have all rights and powers granted to the Members pursuant to the express terms of this Agreement, provided they must comply with all MLB Rules and Regulations.  The approval or consent of the Members shall not be required in order to authorize the taking of any action by the Company, unless and then only to the extent that, (i) this Agreement shall expressly provide therefor, (ii) such approval or consent shall be required by non-waivable provisions of the Act or (iii) the Board in its reasonable discretion shall determine that obtaining such approval or consent would be appropriate or desirable.  The Members, as such, shall have no power to bind the Company.  Except as may otherwise be provided by the Act or this Agreement, and subject to Section 3.5, the affirmative vote of the Members holding a majority of Percentage Shares shall be required for action by the Members.

(b)    Notwithstanding anything to the contrary (but subject to the provisions of Sections 1.5, 1.7, 1.9, and 3.5), the Company shall not, and shall not permit any of its Subsidiaries to, take any of the following actions, without the prior written approval of the Tribune Members:

(i)    declaring or making any distributions to a Member or Members other than (x) the Special Distribution and (y) distributions made in accordance with Article 5 and Article 7;

(ii)    directly or indirectly redeeming, purchasing or otherwise acquiring any Company Interests or other equity securities in the Company other than a redemption of the Tribune Members' Company Interests in accordance with Article 7;

(iii)    altering a Member's interest in Net Income, Net Loss and other items of income, gain, loss and deduction, or any distribution (except as provided in Section 2.2);

(iv)    without limiting Section 3.5 above, voluntarily filing a bankruptcy petition or similar proceeding for the Company or any Subsidiary of the Company;

13

(v)        amending the certificate of formation of the Company or this Agreement or waiving or failing to enforce any rights of the Company under this Agreement;

(vi)        entering into, amending, modifying or supplementing any agreement (other than any Loan Document or Note Document) with any of the Members of the Company or any of their respective Affiliates (including but not limited to the Ricketts Subordinated Loan Commitment Agreement) or waiving or failing to enforce any of the Company's rights under any of such agreements, or engaging in any transaction of any kind with a Member or any of its Affiliates, whether or not in the ordinary course of business (including the purchase, sale, lease or exchange of any property or the rendering of any service) or making any payment of any type to any Member or any of its Affiliates, provided that the following shall not require the Tribune Member's prior consent:  (1) payments pursuant to, and in accordance with the terms of, Articles 1, 5, 7 or 9, (2) transactions that are on fair and reasonable terms that are no less favorable to the Company (or its Subsidiaries) than those that would be obtained in an arms' length transaction between unrelated parties, (3) entering into and complying with the terms of the Transition Services Agreement entered into in connection with the Formation Agreement and (4) entering into and complying with the terms of the Ricketts Subordinated Loan Commitment Agreement;

(vii)        during the Protected Period (except for entering into the Loan Documents and the Note Documents and incurring the Obligations thereunder), borrowing money or incurring Indebtedness on behalf of the Company unless (1) such Indebtedness is subordinated to or pari passu with (including, but not limited to, with respect to maturity, priority of payment and rights to collateral) the Senior Debt Financing or any Refinancing Debt with respect to the Senior Debt Financing and the aggregate amount of Indebtedness that is senior (including, but not limited to, with respect to maturity, priority of payment and rights to collateral) to the Subordinated Debt Financing does not exceed the original principal amount of the Senior Debt Financing or (2) such Indebtedness is subordinated to or pari passu with (including, but not limited to, with respect to maturity, priority of payment and rights to collateral), on terms reasonably acceptable to the Tribune Members, the Subordinated Debt Financing and any Refinancing Debt with respect to the Subordinated Debt Financing;

(viii)        during the Protected Period, except as provided in Section 1.5(c), borrowing money or incurring Indebtedness on behalf of any Subsidiary unless such Indebtedness is allocable under the rules of Treasury Regulations Section 1.163-8T to capital expenditures with respect to the property owned by such Subsidiary;

(ix)        except as provided in Section 1.5(c), permitting the Company or any of its Subsidiaries to directly or indirectly guarantee or otherwise become liable for the Indebtedness of another Person;

(x)        issuing or selling to an Affiliate of a Member, or authorizing or entering into any agreement with an Affiliate of a Member, providing for the issuance or sale of any interest in any Subsidiary or any securities convertible into or exercisable or exchangeable for, any interest in a Subsidiary;

(xi)        agreeing or committing to do any of the foregoing.

14

Section 4.3    <u>Meetings of Members</u>.

(a)    <u>Meetings; Notice of Meetings</u>. Meetings of the Members, including any special meeting, may be called by the Board or by Members holding a majority of the Percentage Shares from time to time. Notice of any such meeting shall be given to all Members not less than ten (10) nor more than thirty (30) Business Days prior to the date of such meeting and shall state the location, date and hour of the meeting and the agenda for the meeting. Meetings shall be held at the location (within or without the State of Delaware), date and hour set forth in the notice of the meeting. Members may participate in any meeting of the Members by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other simultaneously, and such participation in a meeting will constitute presence in person at such meeting.

(b)    <u>Waiver of Notice</u>. No notice of any meeting of Members need be given to any Member that submits a signed waiver of notice, whether before or after the meeting. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Members need be specified in a written waiver of notice. The attendance of any Member at a meeting of Members shall constitute a waiver of notice of such meeting, except when the Member attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c)    <u>Quorum</u>. Except as otherwise required by the Delaware Act or this Agreement, the presence in person or by proxy of the holders of record of a majority of the Percentage Shares shall constitute a quorum for the transaction of business at such meeting.

(d)    <u>Voting</u>. If (i) the Board has fixed a record date, every holder of record of Company Interests entitled to vote at a meeting of Members or to consent in writing in lieu of a meeting of Members shall be entitled to vote pro rata in accordance with their respective Percentage Share, in such Member's name at the close of business on such record date or (ii) no record date has been so fixed, every holder of record of such Company Interests entitled to vote at a meeting of Members or to consent in writing in lieu of a meeting of Members shall be entitled to vote pro rata in accordance with their respective Percentage Share, in such Member's name on the close of business on the day next preceding the day on which notice of the meeting is given or the first consent in respect of the applicable action is executed and delivered to the Company, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. Except as otherwise required by the Act or this Agreement, but subject to Section 3.5, the vote of Members holding a majority of Percentage Shares at any meeting at which a quorum is present shall be sufficient for the transaction of any business at such meeting.

(e)    <u>Proxies</u>. Each Member may authorize any Person to act for such Member by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or such Member's attorney-in-fact. No proxy shall be valid after the expiration of three years from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Member executing it unless otherwise provided in such proxy; <u>provided</u>,

15

however, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.  The Tribune Members shall at all times authorize a single Person to act by proxy for the Tribune Members.  The Tribune Members each hereby appoint the Tribune Director as their proxy pursuant to this Section 4.3(e) (the "**Tribune Proxy**"), who shall continue to be the Tribune Members' proxy until the Tribune Members replace such Tribune Proxy by  providing written notice to the Company signed by each of the Tribune Members, such change effective as of the date such notice has been deemed to have been given in accordance with Section 11.5 hereof.  The Tribune Proxy shall have the authority to make all decisions and determinations and to take all actions required or permitted hereunder on behalf of each of the Tribune Members, and any such action, decision or determination so made or taken shall be deemed the action, decision or determination of each Tribune Member, and any notice, communication or document required to be given hereunder shall be deemed so given if given to the Tribune Member.  A decision, act, consent or instruction of the Tribune Proxy will constitute a decision of all Tribune Members and will be final, binding and conclusive upon each Tribune Member.

(f)  <u>Organization</u>.  Each meeting of Members shall be conducted by such Person as the Board may in its sole discretion designate from time to time.

(g)  <u>Action Without a Meeting</u>.  Any action that may be taken at any meeting of the Members may be taken without a meeting if, subject to Section 3.5, the approval for such action is set forth in a written consent executed by Members owning a majority of the Percentage Shares, which shall be filed with the minutes of the proceedings of Members.  When written consents are provided to any Member for execution, a copy of such written consent (and any related material) shall at the same time be provided to all Members.  In addition, within two (2) Business Days of execution, a copy of all executed written consents shall be provided to all Members, including any Member who did not execute such written consent.

Section 4.4  <u>Member Status</u>.  Notwithstanding Section 18-304 of the Act, a Member shall not cease to be a member, or lose any of its rights hereunder, if the Member (i) makes an assignment for the benefit of creditors, (ii) is adjudged bankrupt or insolvent, (iii) files or answers a petition seeking any reorganization, arrangement, dissolution or similar relief under any statute, law or regulation, (iv) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator or (v) engages in, or is subject to, any of the other actions that could result in a member losing its status as such pursuant to Section 18-304 of the Act.

## ARTICLE 5
### Distributions and Allocations

Section 5.1  <u>Capital Accounts</u>.

(a)  A Capital Account shall be maintained for each Member in accordance with the rules of Treasury Regulations Sections 1.704-1(b)(2)(iv).  The Capital Account of each Member shall be credited with: (i) the amount of any Capital Contribution made in cash by such Member; (ii) the Agreed Value (net of any liabilities the Company is considered to assume or take subject to under Section 752 of the Code) of any Capital Contribution made in property other than cash by such Member; (iii) allocations to such Member of Net Income pursuant to

16

Section 5.2; and (iv) any other item required to be credited for proper maintenance of capital accounts by the Treasury Regulations under Section 704(b) of the Code. A Member's Capital Account shall be debited with: (w) the amount of any cash distributed to such Member; (x) the Agreed Value (net of liabilities that such Member is considered to assume or take subject to under Section 752 of the Code) of any property other than cash distributed to such Member; (y) allocations to such Member of Net Loss pursuant to Section 5.2; and (z) any other item required to be debited for proper maintenance of capital accounts by the Treasury Regulations under Section 704(b) of the Code. Each Member's Capital Account shall be adjusted as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(f) to reflect a revaluation of Company Property at Agreed Value upon the occurrence of any event described in Treasury Regulation Section 1.704-1(b)(2)(iv)(f)(5)(i) or (ii) based upon the manner in which gain or loss upon a sale of all the assets of the Company for Agreed Value would be allocated.

(b)    In the event that any Company Interest is transferred in accordance with this Agreement, the transferee(s) of such Company Interest shall succeed to all of the transferor's Capital Account with respect to such transferred Company Interest. For purposes of Section 5.2, any allocations theretofore made to a transferring Member with respect to a transferred Company Interest shall be deemed to have been made to the transferee for purposes of making future allocations.

Section 5.2    Book Allocations.

(a)    Allocations of Net Income and Net Loss.

(i)    Net Income. Net Income for each fiscal year shall be allocated:

(1)    First, in the same proportions as the aggregate Net Loss (if any) for all previous years was allocated among the Members pursuant to Section 5.2(a)(ii)(2), until the aggregate Net Income allocated to each Member pursuant to this Section 5.2(a)(i)(1) for such year and all previous fiscal years is equal to the aggregate Net Loss allocated to such Member pursuant to Section 5.2(a)(ii)(2) for all previous fiscal years; and

(2)    Thereafter, the balance, if any, to the Members in proportion to their respective Percentage Shares.

(ii)    Net Loss. Net Loss for each fiscal year shall be allocated:

(1)    First, in the same proportions as the aggregate Net Income (if any) for all previous fiscal years was allocated among the Members pursuant to Section 5.2(a)(i)(2), until the aggregate Net Loss allocated to each Member pursuant to this Section 5.2(a)(ii)(1) for such year and all previous years is equal to the aggregate Net Income allocated to such Member pursuant to Section 5.2(a)(i)(2) for all previous fiscal years; and

(2)    Thereafter, the balance, if any, to the Members in proportion to their respective Percentage Shares.

(iii)    In the event that the Percentage Shares of the Members shall change pursuant to the terms of this Agreement, there shall be an interim closing of the books of

17

the Company as of the close of the day of such change (the "**Interest Change Date**"). The Net Income or Net Loss of the Company for the period ending on the Interest Change Date shall be allocated to the Members in accordance with this Section 5.2(a) taking into account their respective Percentage Shares in effect prior to the Interest Change Date. The Net Income or Net Loss of the Company for any period commencing after the Interest Change Date shall be allocated to the Members in accordance with this Section 5.2(a) taking into account their respective Percentage Shares in effect after the Interest Change Date. Notwithstanding the foregoing, if the Interest Change Date is not the last day of a month, Net Income or Net Loss of the Company for the month in which the Interest Change Date occurs shall be prorated on a daily basis between the portion of the month ending on the Interest Change Date and the remainder of such month.

        (b)    Special Allocation Rules. Notwithstanding any other provision of this Article 5:

        (i)    Nonrecourse Deductions. The Nonrecourse Deductions for each fiscal year of the Company shall be allocated among the Members in accordance with their respective Percentage Shares.

        (ii)    Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain or in Member Nonrecourse Debt Minimum Gain during a Company fiscal year, each Member shall be specially allocated items of income and gain in accordance with Treasury Regulations Section 1.704-2(f) and 1.704-2(i)(4). It is intended that this Section 5.2(b)(ii) shall constitute a "minimum gain chargeback" described in Treasury Regulation Section 1.704-2(f) and 1.704-2(i)(4).

        (iii)    Limitation on Loss Allocations and Qualified Income Offset. A Member shall not be allocated items of loss or deduction to the extent such an allocation would cause or increase a deficit Capital Account balance for such Member as of the close of any taxable year in excess of the amount of such balance the Member is obligated or deemed obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) or 1.704-2(i)(5). In determining the Capital Account balance of a Member for this purpose, adjustments, allocations and distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4),(5) and (6) shall be taken into account. Any items of loss or deduction not allocated to a member under this Section 5.2(b)(iii) shall be allocated first, to the remaining Members with positive Capital Account balances (adjusted in accordance with the preceding sentence and after adding back each Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain determined pursuant to Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5)), in proportion to, and to the extent of, such positive Capital Account balances and thereafter, as provided in applicable Treasury Regulations. In the event that any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4),(5) or (6), which results in a negative Capital Account balance in excess of any deficit balance which the Member is obligated or deemed obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) or 1.704-2(i)(5), items of Company income and gain (consisting of a pro rata portion of each items of Company income, including gross income, and gain) shall be allocated to such Member in an amount and manner sufficient to eliminate the excess deficit balance as quickly as possible.

CHI99 5155874-1.022182.0010

This Section 5.2(b)(iii) is intended to be a "qualified income offset" described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and is to be interpreted and applied in a manner consistent therewith.

(iv)    <u>Member Nonrecourse Deductions</u>.  Any Member Nonrecourse Deductions for each fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(v)    <u>Basis Adjustments</u>.  To the extent that an adjustment to the adjusted tax basis of any Company Property pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*)(2) or Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution to a Member, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the Company Property) or loss (if the adjustment decreases the basis of the Company Property), and such gain or loss shall be allocated to the Members in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4), as the case may be.

(vi)    <u>Curative Allocations</u>.

(1)    <u>Loss Limit Curative Allocations</u>.  The special allocation set forth in Section 5.2(b)(iii) herein (the "**Loss Limit Allocations**") are intended to comply with certain requirements of Treasury Regulations Section 1.704-1(b).  Notwithstanding any other provisions of this Article 5 (other than the provisions of this Section 5.2(b) and Section 5.3), the Loss Limit Allocations shall be taken into account in allocating other Net Income, Net Loss and items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other Net Income, Net Loss and other items and the Loss Limit Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Loss Limit Allocations had not occurred.

Section 5.3    <u>Allocations with Respect to Contributed Property; Agreed Value Adjustments, Depreciation Recapture and Excess Nonrecourse Liabilities</u>.

(a)    <u>Contributed Property</u>.  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income gain, loss and deduction (and any item thereof) with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take into account any variation at the time of contribution between the adjusted basis of such property to the Company for Federal income tax purposes and the Agreed Value of the contributed property at the time of contribution ("**Section 704(c) Allocations**").  The Tax Matters Member shall elect the method under which Section 704(c) Allocations will be made for each item of contributed property.  Notwithstanding the foregoing, the Tax Matters Member shall cause the Company to elect the "remedial allocation method" within the meaning of Treasury Regulations Section 1.704-3(d) with respect to the Cubs Contributed Assets.

19

(b)    Agreed Value Adjustments.  In the event the Agreed Value of any Company Property is adjusted so as to differ from its adjusted basis for Federal income tax purposes, such asset shall, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4), take account of any variation between the adjusted basis of such asset for Federal income tax purposes and the Agreed Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder ("**Reverse Section 704(c) Allocations**").  The Tax Matters Member shall elect the method under which Reverse Section 704(c) Allocations will be made for each item of property whose Agreed Value is adjusted; provided, however, that, unless otherwise required by law, the Tax Matters Member may not elect a method for any Cubs Contributed Asset that would have a material effect on the amount or timing of the remedial allocations to be made to the Tribune Members pursuant to Section 5.3(a) hereof and Treasury Regulations Section 1.704-3(d).

(c)    Depreciation Recapture.  Pursuant to Treasury Regulations Section 1.1245-1(e), to the extent the Company recognizes gain as a result of a sale, exchange or other disposition of Company assets which is taxable as ordinary income under Code Section 1245 or Code Section 1250, such ordinary income shall be allocated among the Members in the same proportion as the depreciation giving rise to such ordinary income was allocable among the Members.  In no event, however, shall any Member be allocated ordinary income hereunder in excess of the amount of gain allocated to the Member under this Agreement.  Any ordinary income that is not allocated to a Member due to the gain limitation described in the previous sentence shall be allocated among those Members whose shares of total gain on the sale, exchange or other disposition of the property exceed their share of depreciation from the Company assets, in proportion to their relative shares of the total allocable gain.

(d)    Excess Nonrecourse Liabilities.  For purposes of determining a Member's proportional share of the Company's "excess nonrecourse liabilities" within the meaning of Treasury Regulation Section 1.752-3(a)(3), each Member's interest in Net Income shall be such Member's Percentage Share.

Section 5.4    Distributions.

(a)    In addition to the distribution of the Estimated Special Distribution Amount to the Tribune Members (as may be adjusted pursuant to Section 1.5 of the Formation Agreement), but subject to any limitations on Company distributions under the Loan Documents, the Note Documents, and any other agreement to which the Company is a party or by which it or any of its properties is bound, on or before the thirtieth (30th) day following the last day of each calendar quarter, the Company shall distribute all Operating Cash Flow and Capital Proceeds to the Members in accordance with Section 5.4(b) and (c).

(b)    Distributions of Operating Cash Flow.  Distributions of Operating Cash Flow shall be made to the Members in the ratio of their Percentage Shares.

(c)    Distributions of Capital Proceeds.  Distributions of Capital Proceeds shall be made to the Members in the following order and priority:

20

          (i)     First, to the Members, pro rata in accordance with each Member's Unreturned Common Capital until each Member's Unreturned Common Capital has been reduced to zero; and

          (ii)     The balance, if any, to the Members in the ratio of their Percentage Shares.

          (d)     The Company shall, to the extent required by applicable law, withhold taxes from distributions made to any Member or pay taxes on behalf of any Member pursuant to Section 1446 of the Code or any similar provision of federal, state, local, or foreign law. Any taxes so withheld or paid by the Company shall be deemed to have been distributed to such Member or, to the extent that any such tax is not withheld from a distribution, such Member shall promptly reimburse the Company therefor.

          (e)     To the extent that the proceeds of any debt financing or refinancing are to be distributed to the Members pursuant to Section 5.4(c), the Tribune Members shall have the right, but not the obligation, to guarantee such debt financing or refinancing on terms acceptable to the Tribune Members in their sole discretion and such debt financing or refinancing shall be allocated to the Tribune Members pursuant to Treasury Regulations Section 1.752-2.

     Section 5.5    <u>No Interest; No Return of Capital</u>.  No interest shall be payable on the Capital Contributions, or in respect of the Capital Accounts, of the Members.  Except as expressly set forth herein, no Member shall have the right to require that any portion of its Capital Contributions or Capital Account be returned or otherwise paid over to it.

**ARTICLE 6**
**Accounting and Taxation**

     Section 6.1    <u>Fiscal Year</u>.  The books and records of the Company shall be kept on an accrual basis and the fiscal year of the Company shall be the calendar year, unless the Board otherwise determines in its sole discretion.

     Section 6.2    <u>Maintenance of Books and Records</u>.  At all times during the continuance of the Company, the Company shall keep or cause to be kept, at the chief executive office of the Company, full and complete books of account. The books of account shall be maintained in a manner that provides sufficient assurance that:

          (a)     transactions of the Company are executed in accordance with the general or specific authorization consistent with the provisions of this Agreement; and

          (b)     transactions of the Company are recorded in such form and manner as will: (i) permit preparation of federal, state and local income and franchise tax returns and information returns in accordance with this Agreement and as required by law; and (ii) permit preparation of the Company's financial statements in accordance with GAAP.

     Section 6.3    <u>Access to Books of Account</u>.  In addition to the rights provided under Section 18-305(a) of the Act, (i) the Members shall, upon reasonable notice and during normal business hours, have reasonable access to the books and records of the Company and its

21

Subsidiaries and shall be permitted to, without limitation, review and make copies of the books, records, and other data of the Company and its Subsidiaries relating to their business, and (ii) to the extent permitted by the Board in its reasonable discretion, upon reasonable notice and during normal business hours, the Members shall have access to properties, contracts and senior managers of the Company and its Subsidiaries.

Section 6.4    Financial Statements.

(a)    Annual Statements.  As soon as practicable, but in any event by no later than ninety (90) days, after the end of each fiscal year of the Company, the Company shall prepare and deliver to each Member an audited consolidated balance sheet for the Company and its Subsidiaries and an audited consolidated statement of operations for the Company and its Subsidiaries and a statement of each Member's Capital Account as at the end of, and for, such fiscal year, prepared in accordance with GAAP.

(b)    Quarterly Statements.  As soon as practicable, but in any event by no later than forty-five (45) days, after the end of each of the first three fiscal quarters of each fiscal year of the Company, the Company shall prepare and deliver to each Member (i) (x) unaudited consolidated statements of operations of the Company and its Subsidiaries for such fiscal quarter and for the entire current fiscal year through the end of such fiscal quarter and (y) an unaudited consolidated balance sheet of the Company and its Subsidiaries as at the end of such fiscal quarter and (ii) a statement of each Member's Capital Account as of the end of such fiscal quarter, prepared in accordance with GAAP except such statements shall not include footnotes.

(c)    Other Financial Statements.  For so long as the Tribune Guarantees have not expired or have not otherwise been terminated, the Company shall also deliver to each Member (i) an annual budget, at the same time it is delivered to the Board, (ii) a copy of any financial statements, budgets, compliance certificates and other reports required to be delivered to the agent or the lenders under the instruments governing the Debt Financing or Refinancing Debt at the same time that such documents are delivered to such agents or lenders and (iii) any offering memorandums or similar materials prepared by the Company or its advisors delivered to potential investors or financing sources.

Section 6.5    Taxation.

(a)    The Members intend that the Company shall be treated as a "partnership" for United States federal, state, local and foreign income and franchise tax purposes and each Member agrees to take all reasonable actions, including the execution of such amendments of this Agreement and the execution or amendment of other documents, to enable the Company to qualify for and receive such treatment as a "partnership" for such purposes.

(b)    The Company shall timely file a Code Section 754 election with its initial tax return, and shall not thereafter revoke such election without the unanimous consent of all Members.

(c)    Except as otherwise provided herein, all elections by the Company for federal, state and local income and franchise tax purposes shall be determined by the Tax Matters Member, except where law provides that the election shall be made by the Members.  The Tax

Matters Member (at the expense of the Company) shall prepare and file or cause to be prepared and filed all income tax and other tax returns required to be filed by the Company and the Tax Matters Member shall provide copies of any such income tax returns to the other Members for their review and comment at least thirty (30) days prior to filing. Notwithstanding the foregoing, the Tax Matters Member shall not make any election not otherwise required by this Agreement or file any tax return without first obtaining the Board's approval of such election or tax return. Each Member shall notify all of the Member(s) upon receipt of any notice of tax examination of the Company by Federal, state or local authorities.

Section 6.6    Tax Matters Member.

(a)    Cubs LLC is hereby designated as the Tax Matters Member for the first taxable year of the Company, and Ricketts Member is hereby designated the Tax Matters Member for all periods thereafter.

(b)    The Tax Matters Member shall be authorized to incur expenses in the performance of its duties pursuant to this Agreement. Notwithstanding the foregoing, the Tribune Members shall indemnify the Company for any expenses (including, without limitation, legal and accounting fees and expense) incurred by the Company related to an administrative or judicial proceeding with respect to the tax consequences of the transactions set forth in Section 1.3 hereof.

(c)    Each Member reserves the right to participate in an administrative or judicial proceeding.

(d)    The Tax Matters Member shall keep each other Member informed of all administrative and judicial proceedings as provided in Section 6223(g) of the Code and the Treasury Regulations issued thereunder, except that notice to Members shall be given within ten (10) days of learning of an event. Notice of any meeting with the Internal Revenue Service shall be given at least thirty (30) days prior to the date of the meeting or, if shorter, within ten (10) days after the Tax Matters Member has been notified of the meeting.

(e)    Unless the Ricketts Member consents, Cubs LLC shall not settle or propose to settle any administrative or judicial proceeding that may have a material adverse effect on the Ricketts Member. Any settlement or proposal to settle an administrative or judicial proceeding with respect to the tax consequences of the transactions set forth in Section 1.3 hereof shall not be deemed to have a material adverse effect on the Ricketts Member.

## ARTICLE 7
## Restrictions on Disposition of Company Interests

Section 7.1    Limitations on Disposition of Company Interests.

(a)    Notwithstanding any other provision of this Article 7, no Member shall Dispose of all or any part of its Company Interest without first obtaining all required MLB Approvals. Any such Disposition is prohibited and shall be null and void *ab initio* unless all required MLB Approvals are obtained in advance. Each Member and its legal and beneficial owners will, at any time upon request of the Company, certify to the Company (and Major

23

League Baseball, if requested) the names and addresses of all Persons having any legal or beneficial ownership interest in such Member and the amount of such ownership interest.

(b)     The Members may not Dispose of all or any part of their Company Interest except for (a) Dispositions pursuant to this Article 7, (b) Dispositions to Affiliates, provided that any Disposition by a Tribune Member to an Affiliate of such Tribune Member must be of such Tribune Member's entire Company Interest, (c) Dispositions by a Tribune Member of its entire Company Interest pursuant to a Plan of Reorganization, and (d) pledges of Company Interests as security for the Obligations.  Notwithstanding the foregoing, the Ricketts Member may Dispose of all or any part of its Company Interest, but only if it complies with Sections 7.4, 7.6 and 7.7 in connection with such Disposition.  Any  Disposition by the Ricketts Member permitted hereunder shall not release Ricketts Member or its Affiliates from its obligations under this Agreement, the Formation Agreement or the Tax Matters Agreement; provided further that such Disposition shall only be effective if the transferee of the Company Interest also executes an amendment to this Agreement, the Formation Agreement and the Tax Matters Agreement agreeing to be bound by the terms and conditions of this Agreement, the Formation Agreement and the Tax Matters Agreement.  For purposes of this Article 7, any Change of Control of a Member or a Person who directly or indirectly Controls a Member shall be deemed a Disposition of such Member's Company Interest; provided, that, neither a sale of equity of Tribune Company, nor a transaction that results in the sale or disposition of all or substantially all of the properties and assets of Tribune Company and its Subsidiaries, shall be deemed a Disposition by a Tribune Member of its Company Interest for purposes of this Article 7.

Section 7.2     Call/Put.

(a)     Call of Tribune Members' Company Interests.  At any time during the period commencing on January 1, 2018, and ending on December 31, 2018 or the period commencing on January 1, 2024 and ending on December 31, 2024 (each such period, the "**Call Period**"), Ricketts Member (or its designee(s)) shall, subject to the terms and conditions of this Section 7.2, have the right (the "**Call**") to purchase all (but not less than all) of the Tribune Members' Company Interests for an amount equal to the Fair Market Value of such Company Interests determined as of the date of the Call Notice (the "**Call Price**").  To exercise the Call, Ricketts Member shall give written notice (the "**Call Notice**") to the Tribune Members and the Board within the Call Period, which notice shall request the Board to determine the Call Price in accordance with this Agreement, specifically Section 7.5(a).  The Call Price shall be paid in full in cash at the closing of the Call or, at the option of the Ricketts Member, in four equal cash installment payments made on the Call Closing Date and the first, second and third anniversaries of the Call Closing Date together with interest accrued on the unpaid amount of the Call Price at a rate of six and one-half percent (6.5%) per annum (compounded monthly) from the Call Closing Date to the date such installment payment is made.  The closing of the Call shall occur on the date which is the thirtieth (30th) day following the date that the Tribune Members receive the Call Notice, or (if not a Business Day) the next following Business Day (the "**Call Closing Date**"), subject to extension as provided in Section 7.2(c) below.

(b)     Put of Tribune Members' Company Interests.  At any time during the period commencing on January 1, 2021, and ending on December 31, 2021, or the period

24

commencing January 1, 2027 and ending on December 31, 2027 (each such period, the "**Put Period**"), the Tribune Members shall have the right (the "**Put**") to sell to the Company or, in Ricketts Member's sole discretion, to the Ricketts Member (or its designee(s)) all of the Tribune Members' Company Interests for an amount equal to the Fair Market Value of such Company Interests as of the date of the Put Notice (the "**Put Price**").  To exercise the Put, the Tribune Members shall give written notice (the "**Put Notice**") to the Company and Ricketts Member within the Put Period, which notice shall request the Board to determine the Put Price.  The closing of the Put shall occur on the date which is the thirtieth (30th) day following the date of the Put Notice or (if not a Business Day) the next following Business Day (the "**Original Put Closing Date**"), subject to extension as provided in Section 7.2(c) below.  Notwithstanding the foregoing, in the event that, at the time that the Tribune Members exercise the Put, the Company is prohibited by applicable Law or by the terms of a Company debt financing from purchasing the applicable Company Interests (and the Ricketts Member does not elect to purchase or have a designee purchase such Company Interests), (i) the Company shall provide written notice to the Tribune Members stating that the Company is prohibited by applicable Law or by the terms of a Company debt financing from purchasing the Tribune Members' Company Interests, and (ii) the Put Period shall be extended to the date that is six months following the date on which the Company gives the Tribune Members written notice (the "**Put Completion Notice**"),  that the Company is no longer prohibited from purchasing the Tribune Members Company Interests.  In the event the Put Period is extended, the Tribune Members may, at the Tribune Members' option, revoke the Put Notice and retain the option to exercise the Put at any time during the Put Period, as extended, by delivering a new Put Notice.  In the event of such an extension of the Put Period, the Closing of the Put shall occur on the date which is the thirtieth (30th) day following the later of the date of the Put Completion Notice or the date of the effective Put Notice, or (if not a Business Day) the next following Business Day (the "**Deferred Put Closing Date**"), subject to extension as provided in Section 7.2(c) below.  On the Original Put Closing Date or Deferred Put Closing Date, as the case may be, the Tribune Members shall be paid cash from the Company (or the Ricketts Member if it so elects to purchase such Company Interest) in the amount of the Put Price, plus interest on the Put Price accruing at a rate of six and one-half percent (6.5%) per annum (compounded monthly), from the date of the Original Put Closing Date.  The Company or the Ricketts Member, as the case may be, may elect to pay the amount of the Put Price in four equal cash installment payments made on the Original Put Closing Date or Deferred Put Closing Date, as the case may be, and the first, second and third anniversaries of the Original Put Closing Date or Deferred Put Closing Date, as the case may be, plus interest accrued on the unpaid amount of the Put Price at a rate of six and one-half percent (6.5%) per annum (compounded monthly) from the Original Put Closing Date.

(c)     The closing of the purchase and sale or redemption of Company Interests pursuant to this Section 7.2 (the "**Call/Put Closing**") shall be held at the principal office of the Company on the Applicable Closing Date, or at such other place or on such other date as the parties may agree. At the Call/Put Closing, (i) Ricketts Member or the Company, as the case may be, shall purchase (or cause its designee(s) to purchase) all but not less than all of the Tribune Members' Company Interests for the Call Price or Put Price, as the case may be, and (ii) against payment of the Call Price or Put Price, as the case may be, in cash, the Tribune Members shall execute a standard assignment and assumption agreement transferring such Company Interests to the Company or to Ricketts Member, as applicable, which shall not contain any representations or warranties other than with respect to authority, due execution and ownership

25

of such Company Interests, free and clear of all Security Liens, other than Security Liens that secure the Obligations and Security Liens created by this Agreement.  Provided that the Company, the Board and Ricketts Member make best efforts with respect thereto, the obligation of Ricketts Member or the Company, as the case may be, and the Tribune Members to proceed with the Call/Put Closing shall be conditioned upon, and the scheduled Applicable Closing Date shall be extended to ten (10) days following the later to occur of, (x) the receipt of all material Governmental Actions/Filings and MLB Approvals that may be required in connection with the purchase, sale or redemption of such Company Interests and (y) the final determination of the Call Price or Put Price, as applicable, in accordance with the procedure set out in Section 7.5. The Tribune Members shall have the right to revoke a Put Notice and Ricketts Member shall have the right to revoke a Call Notice, in each case, by delivering written notice of such revocation to the other party within ten (10) days of receiving the final determination of the Call Price or Put Price, as applicable, pursuant to Section 7.5.

Section 7.3    Right of First Refusal.

(a)    Except as provided in Section 7.3(e), in the event that, at any time, a Tribune Member receives and desires to accept a written offer (a "**Third Party Offer**") from a Third Party (a "**Third Party Purchaser**") to purchase for cash all or any portion of its Company Interest (the Company Interest of the Tribune Member that is subject to the Third Party Offer being the "**Transfer Interests**"), such Tribune Member shall promptly provide written notice to Ricketts Member, which notice shall describe the price for such Transfer Interest and the other material terms of such Third Party Offer.

(b)    Ricketts Member (or its designee(s)) shall have the option, exercisable by written notice to such Tribune Member (the "**ROFR Notice**") within forty-five (45) days after receipt of notice of the Third Party Offer from such Tribune Member, to purchase (or to have its designee(s) purchase) such Tribune Member's Transfer Interest, at the same price and on the same terms as contained in the Third Party Offer.

(c)    The closing of any purchase and sale of such Tribune Member's Transfer Interest as provided in Section 7.3(b) shall occur within twenty (20) days after the receipt by such Tribune Member of the ROFR Notice (which date shall be extended to ten (10) days following the receipt of all material Governmental Actions/Filings and MLB Approvals that may be required in connection with the purchase and sale of such Tribune Member's Transfer Interest), at a location, to be agreed upon by Ricketts Member and such Tribune Member.  At the closing of any such purchase and sale, such Tribune Member shall execute and deliver a standard assignment document to transfer its Transfer Interest to Ricketts Member (or its designee(s)), free and clear of all Security Liens, other than with respect to the Obligations and those created by this Agreement.  Such Assignment document shall not contain any representations or warranties other than with respect to authority, due execution and ownership of such Transfer Interest free and clear of all Security Liens other than with respect to the Obligations and those created by this Agreement.

(d)    If Ricketts Member shall fail to elect pursuant to the terms of this Section 7.3 to purchase a Tribune Member's Transfer Interest or shall fail to purchase such Transfer Interest, in each case in accordance with this Section 7.3, then, such Tribune Member shall be

26

free, for a period of ninety (90) days (which date shall be extended to ten (10) days following receipt of all material Governmental Actions/Filings and any MLB Approvals that may be required in connection with the purchase and sale of such Member's Transfer Interest) thereafter, to sell its Transfer Interest to the Third Party Purchaser identified in the notice of the Third Party Offer, but only to that Third Party Purchaser and only for a Price not materially less favorable to such Tribune Member than that contained in the Third Party Offer.

(e)     Notwithstanding the foregoing, the Tribune Member shall not be required to comply with this Section 7.3 in connection with a (a)Disposition of Company Interests to an Affiliate, (b) Disposition pursuant to a Plan of Reorganization or (c) pledge of its Company Interest.

Section 7.4    Tag- and Drag-Along.

(a)     If Ricketts Member determines to sell all or part of its Company Interest to a Third Party purchaser (a "**Specified Sale**"), Ricketts Member (x) shall give the Tribune Members at least thirty (30) days advance written notice of the scheduled closing date of such transaction (a "**Potential Tag Notice**") and (y) may, with respect to a Specified Sale that will be completed after January 1, 2018, elect to exercise the Drag, by giving the Tribune Members at least thirty (30) days advance written notice of the scheduled closing date of such Specified Sale (a "**Drag Notice**"), which notice shall include a description of the terms and conditions of such transaction.  If requested by Ricketts Member in the Drag Notice, the Tribune Members shall be obligated to sell (a "**Drag**") a portion (which may be 100%) of their Company Interests equal to the same percentage of the Percentage Share of the Ricketts Member being sold in such transaction (e.g. if the Ricketts Member is selling 50% of its Company Interest, then it may Drag 50% of the Company Interests of the Tribune Members, and if Ricketts Member is selling 100% of its Company Interests, then Ricketts Member may include all of the other Members' Company Interests in such Drag).  To the extent a Specified Sale would reduce the Ricketts Member's Percentage Share below 50%, if requested by a Tribune Member by written notice to Ricketts Member (a "**Tag Notice**") delivered within ten (10) days of such Tribune Member's receipt of a Potential Tag Notice, such Tribune Member shall be permitted to sell (a "**Tag**") a portion of such Tribune Member's Company Interest such that the aggregate Percentage Share held by the Tribune Members is the same Percentage of the Ricketts Member's Percentage Share after such Specified Sale as it was before such Specified Sale.  The closing of any Tag or Drag described in this Section 7.4(a) shall be at the same time and on the same terms and conditions as Ricketts Member sells its Company Interest) and subject to the terms and conditions set forth in this Section 7.4 and, if applicable, Section 7.5.

(b)     Notwithstanding the foregoing, in connection with any Specified Sale:

(i)     a Tribune Member will not be required to make any representations and warranties in connection with the Specified Sale other than representations and warranties related to authority, ownership and the ability to convey title to its Company Interest free and clear of all Security Liens other than Security Liens that secure the Obligations and Security Liens created by this Agreement;

27

(ii) the Tribune Members shall not be liable for the inaccuracy of any representation or warranty made by the Company or any other Person in connection with the Specified Sale;

(iii) the liability for indemnification, if any, of the Tribune Members in the Specified Sale and for the inaccuracy of any representations and warranties in connection with such Specified Sale, will be several and not joint with any other Person, and will be pro rata in proportion to the amount of consideration paid to such Tribune Member in connection with such Specified Sale; and

(iv) the aggregate indemnification liability with respect to each Tribune Member shall in no event exceed the amount of consideration received by each Tribune Member in connection with such Specified Sale.

(c) If any portion of the consideration that would otherwise be paid to a Tribune Member for its Company Interest in connection with a Tag or a Drag is not cash, then, at Ricketts Member's option (which, in the case of a Drag, shall be exercised in the Drag Notice or, in the event of a Tag, shall be exercised by written notice delivered within ten (10) days of Ricketts Member's receipt of such Tribune Member's Tag Notice (a "**Tag Response**")), (i) such Tribune Member shall at the closing of the transaction be paid in cash the Fair Market Value of the non-cash consideration which would otherwise be payable for such Tribune Member's Company Interest (in lieu of such non-cash consideration) (the "**Tag/Drag-Along Price**"), as determined in accordance with the procedure set out in Section 7.5, and (ii)Ricketts Member's Drag Notice or Tag Response, as applicable, shall specify Ricketts Member's determination of the Tag/Drag-Along Price (the "**Ricketts Member Tag/Drag-Along Price**").

Section 7.5 <u>Valuation Amount or Agreed Value Determination Mechanism</u>.

(a) Whenever it is necessary to determine a Valuation Amount or an Agreed Value, the Board shall, within twenty (20) Business Days of a request for such determination by any Member, make such determination in good faith and shall provide the Members with a reasonably detailed written summary of the analysis used by the Board to determine such amount. If a Tribune Member disagrees with the Board's determination of a Valuation Amount or Agreed Value (the notice setting forth such Valuation Amount or Agreed Value delivered to such Tribune Member is referred to herein as the "**Initiating Notice**"), such Tribune Member shall deliver to the other Member(s) notice of such dispute within ten (10) days of its receipt of the Initiating Notice (a "**Dispute Notice**"). The Dispute Notice shall set forth the initial determination of such Tribune Member of the Valuation Amount or Agreed Value.

(b) The Members shall then negotiate in good faith for ten (10) days (or for such longer period as they mutually agree) in an effort to reach agreement on the Valuation Amount or Agreed Value. If such negotiation is unsuccessful, the Members shall promptly designate an Appraiser (and, if the parties are unable to agree upon an Appraiser within seven (7) days of the end of such negotiation period, the Members agree that either Member may apply to the American Arbitration Association solely to appoint such Appraiser, and the Person so appointed by the American Arbitration Association shall be the Appraiser).

28

(c)    On the fifth (5th) day after appointment of the Appraiser, each Member shall simultaneously deliver to the Appraiser a written notice of its final determination of the Valuation Amount or Agreed Value (each, a "**Valuation Notice**"). The Appraiser shall be instructed to determine within thirty (30) days of its receipt of all Valuation Notices which of the Valuation Amounts or Agreed Values submitted by the Members in their Valuation Notice is closer to the actual Valuation Amount or Agreed Value, and whichever is determined to be closer shall be the final Valuation Amount or Agreed Value, as applicable. In making such determination, the Appraiser (x) shall be instructed that the initial determinations of the Valuation Amount or Agreed Value set forth in the Initiation Notice and the Dispute Notice shall not be used as evidence of the actual Valuation Amount or Agreed Value or the correctness of either Member's determination of the Valuation Amount or Agreed Value set forth in the Valuation Notice and (y) may request additional submissions of information from the Members (and the Members shall promptly comply). Such Appraiser's decision will be final and binding on the parties and the costs for the appraisal (and the fees of the American Arbitration Association, if any) will be borne by the party whose Valuation Amount or Agreed Value was not determined by the Appraiser to be closer to the actual Valuation Amount or Agreed Value.

Section 7.6    Additional Provisions Relating to Permitted Dispositions.

(a)    Each Member shall, to the extent requested from time to time by another Member, (i) use its best efforts to, as promptly as practical, give all notices and obtain all consents, approvals and waivers (including all Governmental Actions/Filings, MLB Approvals, and any approvals that may be required under the Loan Documents or Note Documents) that may be required in connection with a proposed Permitted Disposition, and (ii) cooperate and cause its Affiliates to cooperate (and, together with the requesting Member, cause the Company and the Company's Subsidiaries to cooperate) with the requesting Member promptly to (and, in the case of a Member, to cause the Company to) give all such notices and obtain all such consents, approvals and waivers; provided, however, that in connection with seeking any such consent, approval or waiver the non-transferring Members shall not be obligated to take, or to cause their Affiliates, the Company or the Company's Subsidiaries to take, any action that such non-transferring Member reasonably determines would reasonably be expected to result in a material adverse effect on the business, financial condition, properties, value or prospects of such non-transferring Member (or any of its Affiliates) or the Company.

(b)    The transferee in a Permitted Disposition shall deliver to the Company an agreement, in form and substance reasonably satisfactory to the Company, by which such transferee shall: (i) agree to become a party to and be bound by this Agreement as a "Member" (with the same effect as if the transferee had initially been named herein as the Member making the transfer); (ii) assume and agree to perform when due all of the obligations of the transferring Member under this Agreement; (iii) assume and agree to perform all of the obligations of the transferring Member under the Loan Documents and Note Documents; and (iv) make appropriate representations regarding compliance with the Securities Act of 1933, as amended, and the rules and regulations thereunder as they apply to the Disposition and such other representations as are reasonable and customary in such a transaction.

Section 7.7    Effect of Permitted Dispositions.

(a)    Upon consummation of any Permitted Disposition:

(i)    the transferee, upon compliance by the transferee with Section 7.6(b)) and Section 7.1, if applicable, shall be admitted as a member in the Company and be deemed to be a party to this Agreement as a "Member" (with the same effect as if the transferee had initially been named herein as the Member making the transfer) and succeed to the applicable portion of the Company Interest (including the applicable portion of the Percentage Share) at the time of the transferring Member;

(ii)    the transferred Company Interest shall continue to be subject to all the provisions of this Agreement;

(iii)    the Capital Account (whether positive or negative) of the transferring Member (in proportion to the portion of its Percentage Share transferred) shall be transferred to the name of such transferee Member at the close of business on the effective date of such Permitted Disposition; and

(iv)    if the transferring Member has transferred all of its Company Interest subject to Section 7.1, Section 7.7(b) and Section 11.7, the transferring Member shall cease to be a Member (and accordingly, except as expressly otherwise provided in Section 7.1, Section 7.7(b) or Section 11.7, shall cease to be responsible for the performance of any of the obligations of a Member under this Agreement).

(b)    No Permitted Disposition (and no resulting withdrawal or resignation of the transferring Member from the Company) shall:

(i)    relieve the transferring Member of any of the liabilities or obligations of the transferring Member under this Agreement required to have been paid or performed prior to the consummation of such Permitted Disposition (or of any liability it may have arising out of any breach, misrepresentation, violation or default by the transferring Member prior to such consummation);

(ii)    result in the termination of, or relieve the transferring Member (or any of its Affiliates) of, or otherwise affect, any of the liabilities or obligations of the transferring Member or its Affiliates under, any agreement between the Company and any Member or any of its Affiliates (each such agreement to continue in effect in accordance with its terms); or

(iii)    dissolve the Company.

Section 7.8    Effect of Prohibited Dispositions.  No actual or purported Disposition of any Company Interest of a Member (or any portion thereof), or of any other right or interest of a Member under this Agreement, whether voluntary or involuntary, in violation of any provision of this Agreement shall be valid or effective.

## ARTICLE 8
## Other Activities; Confidentiality

Section 8.1    Other Activities.

(a)     Without limiting any obligation owed by a Member to the other Member(s) or the Company pursuant to any Contract, but except as otherwise provided in this Agreement, each Member shall have the same duties and obligations to the Company and the other Members as a stockholder would have to a corporation and the other stockholders under Delaware law.  For this purpose, any action that may be taken without the consent of the Tribune Members pursuant to Section 4.2(b)(vi) shall be deemed to comply with the standard set forth in the preceding sentence.

(b)     Notwithstanding anything to the contrary contained in Section 8.1(a) or any other provision of this Agreement (other than the provisions of Section 1.7 or Section 1.9), except to the extent otherwise expressly provided in any Contract between any Person and the Company (including without limitation any Transaction Document), (i) any Member or Affiliate of any Member may separately engage, directly or indirectly (including, without limitation, through an equity or profits interest in any other Person), in businesses or ventures of any nature or description without regard to whether such businesses or ventures are or may be deemed to be related to, complementary with, or competitive with the Cubs Business, and (ii) no Member or Affiliate of any Member or member of the Board shall be obligated to present or offer to the Company, any Member or any of their respective Affiliates any particular investment or business opportunity, regardless of whether the Company, such Member or such Affiliate could take advantage of such opportunity if it were to be presented to the Company, such Member or such Affiliate, but may avail itself of any such opportunity for its own account.

(c)     The parties hereto agree that, subject to Sections 1.5(c) and 3.5, the Company shall not repay the amounts outstanding under the Debt Financing except as provided in the Tax Matters Agreement.

(d)     During the Protected Period, subject to Sections 1.5(c) and 3.5, the Company shall not directly or indirectly consummate an Asset Transfer (other than a pledge or other encumbrance in respect of the Debt Financing) of the Cubs Contributed Assets except (i) as provided in the Tax Matters Agreement, (ii) Asset Transfers made in the ordinary course of business (including Asset Transfers as a result of replacement due to normal wear and tear, obsolescence, or discarding of worn out or useless items), and (iii) Asset Transfers required to be made in compliance with the MLB Rules and Regulations. Without the consent of the Tribune Member, the Company shall not (and shall not permit any Subsidiary to) solicit or encourage any Major League Baseball Entity to issue any order or directive requiring an Asset Transfer; provided, however, that a request that a prior oral order or directive by any Major League Baseball Entity be delivered in writing shall not be considered a solicitation or encouragement of such order or directive if the Company consults with the Tribune Members regarding such request prior to making such request or as soon as reasonably practicable thereafter.  The Company shall inform the Tribune Members promptly after receipt of any communication from any Major League Baseball Entity indicating that a written order or directive requiring an Asset Transfer may be forthcoming.

Section 8.2     Confidentiality.  From and after the date of this Agreement, each Member shall, and shall cause its Affiliates to, maintain the confidentiality of, and shall not use for the benefit of themselves or others, any confidential information concerning the Company or its business (the "**Confidential Information**"); provided, however, that this Section 8.2 shall not

31

restrict:  (a) any disclosure by a Member or Affiliate thereof of any Confidential Information required to be disclosed by applicable Law or any securities exchange (but only such portion of the Confidential Information that it is legally required to disclose), but if permitted by applicable Law, such Member or Affiliate shall give the Company prompt notice and a reasonable opportunity to contest such disclosure or seek an appropriate protective order; (b) any disclosure on a confidential basis to the attorneys, accountants and other advisors of such Member or Affiliate; (c) any disclosure of information that:  (i) is publicly available as of the date of this Agreement; (ii) after the date of this Agreement, becomes publicly available through no fault of the disclosing party; or (iii) is received by such Member or Affiliate from a third party not, to the knowledge of such Member of Affiliate, subject to any obligation of confidentiality with respect to such information; (d) any disclosure of information to lenders or other financing sources or potential purchasers of the Company or Company Interests provided such Person executes a confidentiality agreement with respect to such information; (e) any disclosure of information to Major League Baseball; (f) in the case of the Tribune Members, to the extent permitted to use Confidential Information pursuant to Section 4.5 of the Formation Agreement; and (g) in the case of any Member, any use (but not the publication) of confidential information by such Member or any Affiliate of such Member that is incidental to activities permitted by Section 8.1(b).

## ARTICLE 9
### Dissolution and Winding-Up of the Company

Section 9.1    Dissolution.

(a)    Subject to the MLB Rules and Regulations, the Company shall be liquidated and dissolved and its affairs wound up in the manner hereinafter provided only upon the happening of any of the following events:

(i)    the happening of any event that triggers a liquidation of the Company under the Act that cannot be waived by the Members following the indefeasible payment in full of the Obligations;

(ii)    there being no members of the Company, unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act;

(iii)    the determination of Members holding a majority of the Percentage Shares to liquidate the Company in compliance with the MLB Rules and Regulations and the Loan Documents and Note Documents; or

(iv)    the sale of substantially all of the Company's assets following the indefeasible payment in full of the Obligations.

(b)    The Bankruptcy of a Member shall not cause the Member to cease to be a member of the Company, and upon the occurrence of such an event or the dissolution, incapacity, death, insolvency or disability of a Member, the Company shall continue without dissolution.  Each Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of a Member or the occurrence of an event that causes a Member to cease to be a member of the Company

32

Section 9.2    <u>Winding-Up Procedures</u>. If a dissolution of the Company pursuant to Section 9.1 occurs, subject to the exercise by the Members of any rights they might have under the terms and conditions of this Agreement or the Act, the Board shall proceed as promptly as practicable to wind up the affairs of the Company in an orderly and businesslike manner and distribute the assets thereof, within the time required by Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2) (or any successor thereto) if applicable. A final accounting shall be made by the Members. As part of the winding up of the affairs of the Company, the following steps will be taken:

(a)    The assets of the Company shall be sold (and the Capital Accounts of each Member adjusted in accordance with Section 5.1 to take into account the Net Income, Net Loss and items of income, gain, loss or deduction on such sale or sales).

(b)    The Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of its assets in an orderly manner), and the assets of the Company shall be applied in the manner and order of priority set forth in Section 18-804(b) of the Act.

(c)    Distributions of the assets of the Company after a dissolution of the Company shall be conducted as follows:

(i)    to creditors, including Members and Officers who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof) other than liabilities for which reasonable provision for payment has been made and liabilities for distributions to Members and former Members under Section 18-601 of the Act;

(ii)    to Members and former Members in satisfaction of liabilities (if any) for distributions under Section 18-601 of the Act; and

(iii)    thereafter, to the Members pro rata in accordance with their positive Capital Account balances.

Section 9.3    <u>Deficit Capital Accounts</u>. No Member shall have any obligation to restore any negative balance in its Capital Account upon dissolution or liquidation of the Company.

**ARTICLE 10**
**Board Duties; Indemnification**

Section 10.1    <u>Board Duties</u>. Each member of the Board, in his or her capacity as such, must act (or refrain from acting) solely according to the interests of the Company and its Members (as a group). Each member of the Board shall owe such duties to the Company and the Members as a director of a Delaware corporation would owe to such corporation and such corporation's stockholders. Notwithstanding anything to the contrary in this Section 10.1 or any other provision of this Agreement (but subject to Section 1.7), it shall not be a breach of the duties of any member of the Board to approve (i) any transaction described in Section 4.2(b)(vi) that does not require the approval of the Tribune Member, (ii) any business or venture by a Member or an Affiliate of a Member that is described in Section 8.1(b) (or any decision that the

33

Company will not engage in such business or venture), (iii) the Company's (or any Subsidiary's) borrowing of money or incurring of Indebtedness under the circumstances permitted by Section 4.2(b)(vii) or Section 4.2(b)(viii), (iv) any call for additional capital contributions under the circumstances permitted by Section 2.2, or (v) the establishment of any reserves.

Section 10.2    Indemnification.

(a)    To the maximum extent permitted by applicable Law, the Company will indemnify the Directors, the Officers and Members (each, an "Indemnified Person") and hold them harmless from and against all Damages suffered or incurred by them in the course of serving in any office of, or otherwise representing or acting for or on behalf of the Company (in each case within the scope of their authority); provided, however, that, any other provision hereof notwithstanding (but subject to Section 1.7), (a) any such indemnification will be solely from the net assets of the Company, and no Member will be required to make any capital contribution or otherwise pay any amount from such Member's own assets as a result thereof and (b) the Company shall not indemnify any Person for intentional misconduct, bad faith or gross negligence.  Upon making a claim for indemnification, an Indemnified Person may request in writing that the Company advance to him the expenses of defending the claim, action, suit or proceeding giving rise to such indemnification claim and the Company will advance such expenses.  The Indemnified Person shall agree to return to the Company amounts advanced by the Company in the event that a judgment or other final adjudication (in each case which is not subject to appeal) is rendered holding that he is or was not entitled to be indemnified by the Company in accordance with this Agreement.  The Company will enter into a written indemnification with the Tribune Directors reflecting the terms of this Section 10.2(a) and such other terms and conditions as the Tribune Member reasonably requests.

(b)    Notwithstanding Section 10.2(a), during an Event of Default (as defined in any Loan Document or Note Document), the Company's obligations under Section 10.2(a) shall not be paid and shall be fully subordinated to the Obligations.

Section 10.3    Insurance for Article 10 Matters.  For any periods during which there is a Tribune Director, the Company will purchase and maintain standard Directors and Officers liability insurance covering the Tribune Directors with coverage limits, and subject to exclusions, deductibles and other material terms that are no less favorable to the insured than any Directors and Officers liability insurance obtained for any of the Bidder Directors or any of the Ricketts Member's Board of Directors or any of the Board of Directors of any other Member that is an Affiliate of the Ricketts Member, provided however that such policy shall have coverage limits of at least One Million Dollars ($1,000,000), with a self-insured retention amount of zero dollars ($0), and be on a "pay on behalf of" basis.

Section 10.4    Subordination.  All liabilities and obligations of the Company under this Article 10 (other than the obligations of the Company under Section 10.3) are fully subordinated to the Obligations and are non-recourse to the Company and its assets (other than cash flow in excess of amounts necessary to pay the holders of the Obligations ("Excess Funds")) and, to the fullest extent permitted by law, does not constitute a claim against the Company to the extent the Excess Funds are insufficient to pay the liability.

# ARTICLE 11
## Miscellaneous

Section 11.1    <u>Waiver of Rights of Partition and Dissolution</u>.  Each of the Members hereby irrevocably waives all rights it may have at any time to maintain any action for dissolution of the Company, or division or sale of the Company Property, as now or hereafter permitted under the Act or any other applicable Law.  Each Member hereby waives and renounces its rights to seek a court decree of dissolution or to seek the appointment of a court receiver for the Company as now or hereafter permitted under the Act or any other applicable law.  Subject to provisions of Law that cannot be waived by the Members and to circumstances involving a breach of this Agreement by the other Member, each Member covenants that it will not (except with the consent of the Board) file a bill for Company accounting.  Nothing in this Section 11.1 limits the right of either Member to institute or maintain an appropriate action to enforce or exercise any right expressly granted to it under this Agreement.

Section 11.2    <u>Entire Agreement; No Third Party Beneficiary</u>.  This Agreement and the other Transaction Documents contain the entire agreement by and among the parties with respect to the subject matter hereof and all prior negotiations, writings and understandings relating to the subject matter of this Agreement (including the Original Agreement), are merged in and are superseded and canceled by, this Agreement and the other Transaction Documents. Subject to the remainder of this Section 11.2, (a) none of the provisions of this Agreement shall be for the benefit of or enforceable by any Person not a party to this Agreement, including by any creditor of the Company or by any creditor of any Member, and (b) nothing in this Agreement shall be deemed to confer upon any Person not a party hereto (or its successors or permitted assigns), and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person; provided that (x) each Indemnified Person may rely upon and enforce the provisions of this Agreement for its benefit and (y) the Office of the Commissioner of Baseball may rely upon and enforce the provisions of Section 3.5.

Section 11.3    <u>Governing Law</u>.

(a)    This Agreement and any disputes arising hereunder or controversies related hereto shall be governed by and construed in accordance with the laws of the State of Delaware that apply to contracts made and performed entirely within such state, except to the extent that the Act is mandatorily applicable.

(b)    Any Action with respect to this Agreement, any matter arising out of or in connection with this Agreement shall be brought exclusively in the state or federal courts sitting in the state of Delaware.  By execution and delivery of this Agreement, each party hereto hereby accepts for itself and in respect of such Person's property, generally and unconditionally, the sole and exclusive jurisdiction of the aforesaid courts and appellate courts thereof.  Each party hereto irrevocably consents to service of process in any Action in any of the aforementioned courts by the mailing of copies thereof by registered or certified mail, postage prepaid, or by recognized overnight delivery service, to such party at such party's address referred to in Section 11.5.  Each party hereto hereby irrevocably and unconditionally waives any objection which such Person may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and

35

hereby further irrevocably waives and agrees, to the extent permitted by applicable Law, not to plead or claim in any such court that any such Action brought in any such court has been brought in an inconvenient forum. Nothing herein shall affect the right of any party hereto to serve process in any other manner permitted by Law. Notwithstanding anything in this Section 11.3(b) to the contrary, each party agrees that a final judgment in any such Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)    WAIVER OF JURY TRIAL. EACH PARTY HERETO, HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ALL RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THE ACTIONS OF THE PARTIES HERETO PURSUANT TO THIS AGREEMENT IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

Section 11.4    Amendments and Waivers. This Agreement and the certificate of formation of the Company may only be modified or amended pursuant to a written agreement executed by all Members; provided that, while any Obligations remain outstanding, the Company may not amend, alter, waive, repeal, or otherwise modify the provisions of this Agreement without first obtaining the consents required under the Loan Documents and Note Documents. Any Member may, only by an instrument in writing (and subject to the proviso in the preceding sentence), waive compliance by any other Member with any term or provision hereof on the part of such other Member to be performed or complied with. No failure or delay of any Member in exercising any right or remedy hereunder shall operate as a waiver thereof, nor will any single or partial exercise of any right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The waiver by any Member of a breach of any term or provision hereof shall not be construed as a waiver of any subsequent breach. The rights and remedies of the Members hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have hereunder. Notwithstanding the foregoing, any amendment to this Agreement is subject to first obtaining any applicable MLB Approval and any consent required under the Loan Documents and Note Documents; and no amendment to this Agreement that is in violation of a requirement of the MLB Rules and Regulations or any Loan Document or Note Document at the time it is executed shall have any force or effect. The Members and the Company hereby acknowledge that the MLB Rules and Regulations currently require that all amendments to this Agreement be submitted for MLB Approval.

Section 11.5    Notices. All notices and other communications hereunder will be in writing and given by certified or registered mail, return receipt requested, nationally recognized overnight delivery service, such as Federal Express or facsimile (or like transmission) with confirmation of transmission by the transmitting equipment or personal delivery against receipt to the party to whom it is given, in each case, at such party's address or facsimile number set forth below or such other address or facsimile number as such party may hereafter specify by notice to the other parties hereto given in accordance herewith. Any such notice or other communication shall be deemed to have been given as of the date so personally delivered or

36

transmitted by facsimile or like transmission, on the next Business Day when sent by overnight delivery services or five (5) days after the date so mailed if by certified or registered mail.

If to the Company or the Ricketts Member:

c/o Incapital LLC
200 S. Wacker, Suite 3700
Chicago, IL 60606
Fax No.: (312) 379-3701
Attention: Thomas Ricketts

Hugo Enterprises LLC
1395 S. Platte River Drive
Denver, CO 80223
Fax No.: (303) 200-7086
Attention: Alfred P. Levitt

and

Foley & Lardner LLP
777 E. Wisconsin Avenue
Milwaukee, WI 53202
Fax No.: (414) 297-4900
Attention: Mary K. Braza and John B. Palmer

If to Tribune Members:

Tribune Company
435 North Michigan Avenue
Chicago, IL 60611
Fax No.: (312) 222-4206
Attention: General Counsel

with a copy to:

McDermott Will & Emery LLP
227 West Monroe Street
Chicago, IL 60606
Fax No.: (202) 756-8424
Attention: Blake D. Rubin and Andrea M. Whiteway

If to the Office of the Commissioner of Baseball:

Office of the Commissioner of Baseball
245 Park Avenue
New York, NY 10167
Fax No. (212) 949-5653
Attention: General Counsel

Section 11.6    Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and will become effective when one or more counterparts have been signed by a party and delivered to the other parties. Copies of executed counterparts transmitted by telecopy, telefax or other electronic transmission service shall be considered original executed counterparts for purposes of this Section 11.6, provided that receipt of copies of such counterparts is confirmed.

Section 11.7    Successors and Assigns. This Agreement will be binding upon and inure to the benefit of the Members and their respective successors and permitted assigns; provided, however, that, except in connection with Permitted Dispositions that are completed in accordance with Article 7, no Member may assign its rights or delegate its obligations, in whole or in part, under this Agreement without the prior written consent of all of the other Members and any consents required under the Loan Documents or Note Documents. Any purported assignment or delegation in violation of this Agreement shall be null and void ab initio.

Section 11.8    Headings. The Section, Article and other headings contained in this Agreement are inserted for convenience of reference only and will not affect the meaning or interpretation of this Agreement.

Section 11.9    Interpretation; Absence of Presumption.

(a)    For the purposes hereof: (i) words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires; (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole (including all of the Schedules and Exhibits) and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits, and Schedules to this Agreement unless otherwise specified; (iii) the word "including" and words of similar import when used in this Agreement shall mean "including, without limitation," unless the context otherwise requires or unless otherwise specified; (iv) the word "or" shall not be exclusive; and (v) unless the context otherwise requires, any reference to "the parties hereto" or "the parties to this Agreement" shall mean Ricketts Member, on the one hand, and Tribune Member, on the other hand.

(b)    With regard to each and every term and condition of this Agreement and any and all agreements and instruments subject to the terms hereof, the parties hereto understand and agree that the same have or has been mutually negotiated, prepared and drafted, and if at any time the parties hereto desire or are required to interpret or construe any such term or condition or any agreement or instrument subject hereto, no consideration will be given to the issue of which party hereto actually prepared, drafted or requested any term or condition of this Agreement or any agreement or instrument subject hereto.

Section 11.10    Further Assurances.

(a)    From time to time after the date of this Agreement, upon the reasonable request of Ricketts Member, Tribune Member shall, and shall cause its Controlled Affiliates to, execute and deliver or cause to be executed and delivered such further documents and take such

further action as Ricketts Member may reasonably request in order more effectively to consummate the transactions contemplated by this Agreement and to carry out the provisions of this Agreement.

(b)    From time to time after the date of this Agreement, upon the reasonable request of Tribune Member, Ricketts Member shall, and shall cause its Controlled Affiliates to, execute and deliver or cause to be executed and delivered such further documents and take such further action as Tribune Member may reasonably request in order more effectively to consummate the transactions contemplated by this Agreement and to carry out the provisions of this Agreement.

Section 11.11  <u>Business Days</u>.  If any date provided for in this Agreement shall fall on a day that is not a Business Day, the date provided for shall be deemed to refer to the next Business Day.

Section 11.12  <u>Severability</u>.  Any provision hereof that is held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, shall be ineffective only to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof, <u>provided</u>, <u>however</u>, that the parties will attempt in good faith to reform this Agreement in a manner consistent with the intent of any such ineffective provision for the purpose of carrying out such intent.

[The next page is the signature page]

CHI99 5155874-1.022182.0010

The parties have caused this Limited Liability Company Agreement to be executed as of the date first written above.

CHICAGO BASEBALL HOLDINGS, LLC

By: Ricketts Acquisition LLC

By:_____

Name:_____

Title: _____


RICKETTS ACQUISITION LLC

By:_____

Name:_____

Title: _____


CHICAGO NATIONAL LEAGUE BALL CLUB, LLC

By:_____

Name:_____

Title: _____


WRIGLEY    FIELD    PREMIUM    TICKET SERVICES, LLC

By:_____

Name:_____

Title: _____

40

DIANA-QUENTIN, LLC


By:_____

Name:_____

Title: _____


TRIBUNE SPORTS NETWORK HOLDINGS, LLC


By:_____

Name:_____

Title: _____


CHICAGO CUBS DOMINICAN BASEBALL OPERATIONS, LLC


By:_____

Name:_____

Title: _____

41

**Exhibits**

Exhibit A – Certain Definitions
Exhibit B – Initial Directors
Exhibit C – Members, Percentage Shares, and Common Capital

CHI99 5155874-1.022182.0010

EXHIBIT A

Certain Definitions

1.    As used in the Agreement, the following terms have the following meanings (terms defined in the singular to include the plural and vice versa and references in this Exhibit A to sections constitute references to sections of the Agreement unless otherwise expressly indicated):

"**Act**" means the Delaware Limited Liability Company Act, 6 Del. C. §§18-101 et seq.

"**Action**" means any actual or threatened action (at law or in equity), suit, arbitration, hearing, review, inquiry, proceeding or investigation.

"**Affiliate**" means, with respect to any specified Person, (a) any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, (b) any officer, director, equity holder, manager or partner of such Person or any of the Persons referred to in clause (a), and (c) any parent, sibling, descendant or spouse of such Person or of any of the Persons referred to in clauses (a) or (b) or anyone sharing a home with such Person or any of the Persons referred to in clauses (a) or (b).  For purposes of this definition, "control" (including the terms "controlled by" and "under common control with"), means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.  The parties agree that (x) any Person owning 20% or more of the outstanding equity of an entity shall be deemed to "control" such entity and (y) the Ricketts Family shall be deemed Affiliates of the Company.  For purposes of this definition, "Ricketts Family" shall mean one or more of Joe Ricketts, Laura Ricketts, Peter Ricketts, Todd Ricketts or Thomas Ricketts, one or more trusts established for the benefit of one or more of them and/or entities directly or indirectly controlled by one or more of the foregoing.

"**Agent**" means, with respect to any specified Person, the officers (or persons performing similar functions), directors (or persons performing similar functions), employees, attorneys, auditors and agents of such specified Person.

"**Agreed Value**" means: (a) with respect to all property transferred to the Company as a Capital Contribution, the Fair Market Value of the property on the date that it is contributed to the Company as set forth in Section 1.3 hereof, and in all other cases, as determined by the Board (subject to Section 7.5); and (b) with respect to the revaluation of Company Property in accordance with the last sentence of Section 5.1(a), the Fair Market Value of such Company Property at the time of the event requiring such revaluation as determined by the Board.

"**Applicable Closing Date**" means the Call Closing Date or Put Closing Date, as applicable.

-A-1

"**Appraiser**" means an independent appraiser of national reputation with experience in valuing businesses such as the Company, and who has no material relationship with any Member or any Affiliate thereof.

"**Asset Transfer**" means any sale, transfer, disposition, exchange, assignment, pledge, hypothecation or gift of any direct or indirect interest in any entity owned by the Company or any asset or portion of an asset owned directly or indirectly by the Company.

"**Auditors**" means the registered public accountant of the Company.

"**Bankruptcy**" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors; (ii) files a voluntary petition in bankruptcy; (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature; (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties; or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.  The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"**Business Day**" means any day except a Saturday, Sunday or other day on which commercial banks in Chicago, Illinois are required or authorized by law to close.

"**Capital Account**" means the capital account of a Member in the Company, calculated as set forth in Section 5.1(a).

"**Capital Contributions**" means the sum of the amount of cash and the Agreed Value of property contributed by a Member to the capital of the Company pursuant to Section 1.3(a), Section 1.3(c). or Section 2.2.

"**Capital Proceeds**" means the cash or property received by the Company from any of the following (i) a sale, exchange, transfer, assignment, or other disposition of all or a portion of the Company Property (but not including occasional sales in the ordinary course of business of inventory, operating equipment or furniture, fixtures and equipment); (ii) any financing or refinancing of, or with respect to, any Company Property; (iii) any condemnation proceeds or deeding in lieu of condemnation of all or a portion of any Company Property; (iv) a collection in respect of property, hazard, or casualty insurance (but not business interruption insurance) or any damage award except to the extent proceeds are used to repair or replace the assets so damaged or destroyed; or (v) any other transactions which under GAAP, would be capital in nature, in

each case after reducing such proceeds by the amount of any cash used to pay or establish reserves for all expenses of the Company, pay debt service, capital improvements, compensation, replacements, and contingencies, all as determined by the Board in its sole discretion.

"**Change of Control**" means, with respect to a Member or a Person who directly or indirectly Controls a Member, the direct or indirect transfer (in a single transaction or series of related transactions) of such Member to any Third Party or group of Third Parties pursuant to which such Third Party or group of Third Parties acquires directly or indirectly (a) the power to Control such Member or Person or (b) all or substantially all of the assets of such Member or Person.

"**Claims**" means any and all actions, claims, demands, causes of action, suits at law or in equity, verdicts, or judgments, including any of the foregoing based upon Contract, breach of Contract, breach of warranty (express or implied) or covenant, tort, negligence, gross negligence, recklessness, fault, strict liability, misrepresentation, fraud, quantum meruit, breach of fiduciary duty, violation of statutes or administrative regulations or any other legal or equitable theory, whether presently known or unknown, developed or undeveloped, discovered or undiscovered.

"**Club**" means the Chicago Cubs Major League Baseball Club.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Commissioner**" means the Commissioner of Baseball as elected under the Major League Constitution or, in the absence of a Commissioner, any Person succeeding to the powers and duties of the Commissioner pursuant to the Major League Constitution.

"**Common Capital**" means, with respect to each Member, the amount set forth on Schedule C attached hereto plus any additional Capital Contributions made to the Company pursuant to Section 2.2.

"**Company**" means Chicago Baseball Holdings, LLC, a Delaware limited liability company.

"**Company Interest**" means, with respect to any particular Member: (a) (x) such Member's rights to share in the income, gain, loss, deductions and credits of, and the right to receive distributions from, the Company, and (y) all other rights, benefits and privileges enjoyed by such Member (under the Act, this Agreement or otherwise) in its capacity as a Member, including rights to vote, consent and approve or otherwise participate in the management of the Company (but in the case of a partial transfer of the Ricketts Member's Company Interest, other than rights granted specifically to the Ricketts Member).

"**Company Minimum Gain**" means, with respect to each Nonrecourse Liability of the Company, the amount of gain (of whatever character) that would be realized by the Company if it disposed of the Company Property subject to such liability in a taxable transaction in full satisfaction of such liability (and for no other consideration), and by then aggregating the amounts so computed. It is further understood that Company Minimum Gain shall be determined in a manner consistent with the rules of Treasury Regulation Section 1.704-2(d), including without limitation the requirement that if the book value of property (as determined for

CHI99 5155874-1.022182.0010

purposes of computing Net Income and Net Loss) subject to one or more Nonrecourse Liabilities differs from its adjusted tax basis, Company Minimum Gain shall be determined with reference to such book value.

"**Company Property**" means all property, whether real or personal, tangible or intangible, owned by the Company (or treated as owned by the Company for federal income tax purposes).

"**Contract**" means any oral or written agreement, instrument, contract, undertaking, mortgage, indenture, lease, license or other binding understanding.

"**Control**" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise. The term "**Controlled**" shall have a correlative meaning.

"**Controlled Affiliates**" means (i) in the case of Ricketts Member, Affiliates of Ricketts Member that are Controlled by Bidder, and (ii) in the case of the Tribune Members, Affiliates of the Tribune Members that are Controlled by Tribune Company.

"**Credit Agreement**" means the Credit Agreement dated ____, 2009, among the Member, the lenders party thereto, and JP Morgan Chase Bank, N.A., as Administrative Agent.

"**Cubs Assumed Liabilities**" has the meaning set forth in the Formation Agreement.

"**Cubs Business**" has the meaning set forth in the Formation Agreement.

"**Cubs Contributed Assets**" has the meaning set forth in the Formation Agreement.

"**Damages**" means any loss, liability, damage, or expense (including, but not limited to, amounts paid pursuant to a judgment, award, or settlement, reasonable attorneys' fees, and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding, or claim).

"**Debt Financing**" has the meaning set forth in the Formation Agreement.

"**Depreciation**" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period for Federal income tax purposes, except that if the Agreed Value of an asset differs from its adjusted basis for Federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Agreed Value as the Federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the Federal income tax depreciation, amortization or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Agreed Value using any reasonable method selected by the Board. With respect to any asset of the Company for which depreciation is calculated in accordance with Treasury Regulations Section 1.704-3(d), Depreciation shall be computed in the same manner.

"**Disposition**" means: (a) any sale, assignment, alienation, gift, exchange, conveyance, transfer, pledge, hypothecation, granting of a security interest or other disposition or attempted disposition whatsoever, whether voluntary or involuntary; or (b) the coming into existence, whether voluntarily or involuntarily, of any Security Lien other than a Security Lien (as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced) for taxes, assessments and governmental charges or levies, or any other Security Lien imposed or arising by operation of law for any liabilities or obligations, which taxes, assessments, governmental charges or levies, or other liabilities or obligations, as the case may be, are either (w) not yet due and payable, (x) due but payable without penalty, (y) not overdue for a period of more than thirty (30) days or (z) being contested in good faith and by appropriate proceedings and as to which appropriate reserves are being maintained. For the avoidance of doubt, it is understood and agreed that a statutory conversion of a Person into another form of Person does not constitute a Disposition. The term "**Dispose**" means to make or consummate a "Disposition."

"**Dollar**" or "**$**" means lawful currency of the United States of America.

"**EBITDA**" means for any period an amount determined for the Company equal to (i) consolidated net income, plus (ii) all cash distributions received directly or indirectly by the Company from Comcast SportsNet Chicago, LLC, a Delaware limited liability company, to the extent not included in (i), plus (iii) consolidated interest expense, net of any interest income, plus (iv) provisions for taxes based on income, plus (v) total depreciation expense, plus (vi) total amortization expense (other than amortization expense attributable to player signing bonuses or other player compensation), minus (vii) cash paid as deferred compensation to Samuel Sosa, minus (viii) cash withheld from the dividends and distributions of any income from equity investments, to the extent included in consolidated net income, and plus or minus (ix) losses or gains on sales of equity investments, to the extent included in consolidated net income, in each case determined on a consolidated basis in accordance with GAAP, consistently applied.

"**Estimated Special Distribution Amount**" has the meaning set forth in the Formation Agreement.

"**Fair Market Value**" means, as to any Company Interest or other property, the cash purchase price at which a willing seller would sell and a willing buyer would buy such property as of the applicable valuation determination date (without taking into account events subsequent to that date) in an arm's-length transaction, with each party having full knowledge of the relevant facts, without either party having time constraints, without either party being under any compulsion to buy or sell without discount for lack of consent or minority discount, and, assuming that (i) the parties will be bound by representations, warranties, covenants, indemnities, and undertakings that are then associated with owning the Company, including those pursuant to the Tax Matters Agreement and the Subordinated Loan Commitment Agreement (or any similar agreements in effect at such time) and (ii) all Major League Baseball, regulatory, governmental and other approvals are attainable. For purposes of Section 7.2, the Fair Market Value of a Tribune Member's Company Interest shall be the amount that such Tribune Member would receive with respect to such Company Interest if the Company sold all of its assets at Fair Market Value, paid or reserved for all liabilities, expenses, contingencies, obligations, indemnities, and undertakings, and liquidated.

CHI99 5155874-1.022182.0010

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time, as applied by the Company from time to time.

"**Governmental Action/Filing**" means any authorization, consent, order, clearance (including expiration or termination of a specified waiting period), permit, license, waiver, approval or similar action of, or registration, declaration or other filing with, any Governmental Authority.

"**Governmental Authority**" means any governmental or quasi-governmental authority, including: (a) the United States or any other country, any state, province, territory or possession of the United States or any other country, and any local or other governmental body, or other political subdivision, in or of any of the foregoing; and (b) any agency, board, bureau, court, commission, department, instrumentality or administration of any of the foregoing.

"**Guidelines**" means the Control Interest Transfers – Guidelines & Procedures issued by the Commissioner on November 9, 2005 as the same may be amended, supplemented or otherwise modified from time to time.

"**Indebtedness**" means, with respect to any Person:  (a) indebtedness for borrowed money of such Person and its Subsidiaries (including any overdrafts); (b) obligations of such Person and its Subsidiaries evidenced by notes, bonds, debentures or similar instruments (other than capital lease obligations); (c) indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person or any of its Subsidiaries; (d) obligations of such Person or any of its Subsidiaries under acceptance, letter of credit or similar facilities; (e) capital lease obligations of such Person and its Subsidiaries; (f) indebtedness of the type described in clause (a) above guaranteed directly or indirectly in any manner by such Person or any of its Subsidiaries including interest and penalties thereon; and (g) indebtedness of the type described in clauses (a) and (b) above secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Security Lien on assets or property owned by such Person or any of its Subsidiaries.

"**Insolvency Action**" means to (i) commence any case, proceeding or other action on behalf of the Company under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization, relief from debts or the protection of debtors generally; (ii) institute proceedings to have the Company adjudicated as bankrupt or insolvent; (iii) consent to the institution of bankruptcy or insolvency proceedings against the Company; (iv) file a petition or consent to a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution (to the fullest extent permitted by law), composition, liquidation or other relief on behalf of the Company of its debts under any federal or state law relating to bankruptcy or insolvency; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or similar official for the Company or a substantial portion of its properties; (vi) make any assignment for the benefit of the Company's creditors; or (vii) take any action in furtherance of any of the foregoing.

"**Law**" or "**Laws**" means all statutes, codes, ordinances, decrees, rules, regulations, municipal by-laws, judicial or arbitral or administrative or ministerial or departmental or regulatory judgments, orders, decisions, rulings or awards, policies, or any provisions or

-A-6

interpretations of the foregoing, including general principles of common and civil law and equity, binding on or affecting the Person referred to in the context in which such word is used.

"**Loan Documents**" has the meaning set forth in the Credit Agreement.

"**Major League Baseball**" means, depending on the context, any or all of (a) the Office of the Commissioner of Baseball, each other Major League Baseball Entity, and/or all boards and committees thereof, including, without limitation, the Ownership Committee and/or (b) the Major League Clubs, acting collectively.

"**Major League Baseball Documents**" means, collectively, the following documents as in effect from time to time and any amendments, supplements or other modifications thereto and all replacement or successor documents thereto that may in the future be entered into: (a) the Major League Constitution, (b) the Basic Agreement between the Major League Clubs and the Major League Baseball Players Association, (c) the Professional Baseball Agreement between the Office of the Commissioner of Baseball, on behalf of itself and the Major League Clubs, and the National Association of Professional Baseball Leagues, (d) the Major League Rules (and all attachments thereto), (e) the Interactive Media Rights Agreement, effective as of January 20, 2000, by and among the Office of the Commissioner of Baseball, the various Major League Clubs, MLB Advanced Media, L.P. and various other Major League Baseball Entities and (f) each agency agreement and operating guidelines among the Major League Clubs and any Major League Baseball Entity, including the Amended and Restated Agency Agreement, effective as of November 1, 2006, by and among Major League Baseball Properties, Inc. and the various Major League Clubs, the American and National Leagues of Professional Baseball Clubs and the Office of the Commissioner of Baseball (and the Operating Guidelines related thereto).

"**Major League Baseball Entity**" means any entity, whether now existing or formed after the date hereof, that is owned, directly or indirectly, by a majority of the Major League Clubs and/or one or more of the entities directly or indirectly owned by a majority of the Major League Clubs, including each of the following entities:  the Office of the Commissioner of Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., MLB Advanced Media, L.P., MLB Network Holdings, LLC, The MLB Network, LLC and each of their respective present and future affiliates, successor or assigns.

"**Major League Club**" means any Major League Baseball club that is entitled to the benefits, and bound by the terms, of the Major League Constitution

"**Major League Constitution**" means the Major League Constitution (which amended and superseded the Major League Agreement dated January 1, 1975, the Agreement in re Major Leagues Central Fund dated as of December 8, 1983, as amended, and the respective constitutions of the former American and National Leagues of Professional Baseball Clubs) as the same may be amended, supplemented or otherwise modified from time to time in the manner provided therein and all replacement or successor agreements that may in the future be entered into by the Major League Clubs.

"**Members**" means the Tribune Members, Ricketts Member and any other Person admitted as a member of the Company, in each case so long as such Person remains a member of the Company.

"**Member Nonrecourse Debt**" has the meaning ascribed to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" has the meaning ascribed to the term "Partner Nonrecourse Debt Minimum Gain" in Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" has the meaning ascribed to the term "Partner Nonrecourse Deductions" in Treasury Regulations Section 1.704-2(i)(2).

"**MLB Approvals**" means any approval from the Commissioner or Major League Baseball that is required to be obtained pursuant to MLB Rules and Regulations (as exercised in the sole and absolute discretion of the Commissioner and/or Major League Baseball).

"**MLB Rules and Regulations**" means (i) the Major League Baseball Documents, (ii) any present or future agreements or arrangements entered into by, or on behalf of, the Office of the Commissioner of Baseball, any other Major League Baseball Entity or the Major League Clubs acting collectively, including agreements or arrangements entered into pursuant to the Major League Baseball Documents and (iii) the present and future mandates, rules, regulations, policies, practices, bulletins, by-laws or directives issued or adopted by, or behalf of, the Commissioner, the Office of the Commissioner of Baseball or any other Major League Baseball Entity as in effect from time to time, including the Guidelines.

"**Newco Subs**" has the meaning set forth in the Formation Agreement.

"**Net Income or Net Loss**" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

       (a)     Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Net Income or Net Loss shall be added to such taxable income or loss;

       (b)     Any expenditure of the Company described in Code Section 705(a)(2)(B) or treated as a Code Section 705(a)(2)(B) expenditure pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Income or Net Loss shall be subtracted from such taxable income or loss;

       (c)     In the event the Agreed Value of any Company asset is adjusted pursuant to the last sentence of Section 5.1(a) hereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Income or Net Loss for the fiscal year in which such adjustment occurs;

(d)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Agreed Value (as reduced by Depreciation) of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Agreed Value;

(e)     In lieu of depreciation, amortization and other cost recovery deductions taken into account in computing Federal taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period; and

(f)     Notwithstanding any other provision, any items which are specially allocated pursuant to Section 5.2(b) hereof shall not be taken into account in computing Net Income or Net Loss.  Nevertheless, such items shall be taken into account in adjusting Capital Accounts pursuant to Section 5.2(a) hereof.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Note Documents**" has the meaning set forth in the Note Purchase Agreement.

"**Note Purchase Agreement**" means the Note Purchase Agreement dated _____, 2009, among the Member, the lenders party thereto, and any administrative or other lender agents and any other Persons that will be parties thereto.

"**Obligations**" means, collectively, (i) the "Obligations," as such term is defined in the Credit Agreement, and (ii) the "Obligations", as such terms is defined in the Note Purchase Agreement.

"**Office of the Commissioner of Baseball**" means the Office of the Commissioner of Baseball, an unincorporated association comprised of the Major League Clubs who are party to the Major League Constitution, and any successor organization thereto.

"**Operating Cash Flow**" means, for any period, all gross cash proceeds of the Company less cash used to pay or establish reserves for all expenses of the Company, pay debt service, capital improvements, compensation, replacements, and contingencies, all as determined by the Board in its sole discretion.  Operating Cash Flow shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established by the first sentence of this definition.  Operating Cash Flow shall not include Capital Contributions or Capital Proceeds.

"**Option Period**" means the period commencing on the date Tribune Member gives notice of a Third Party Offer to Ricketts Member and ending on the date that Ricketts Member gives Tribune Member the ROFR Notice or, if no ROFR Notice is given, twenty (20) days following the date Tribune Member gives notice of a Third Party Offer to Ricketts Member.

-A-9

"**Percentage Share**" means the Percentage Share set forth for each Member on Exhibit C attached hereto, subject to adjustment as provided in this Agreement.

"**Permitted Disposition**" means, with respect to a Member, a Disposition of all or any part of such Member's Company Interest that is permitted under Article VII.

"**Person**" means any individual, corporation, partnership (including any general, limited or limited liability partnership), limited liability company, joint venture, joint-stock company, trust, estate, unincorporated organization, governmental or regulatory body or other entity or association.

"**Plan of Reorganization**" shall mean a bankruptcy plan of reorganization of Tribune Company and certain of its subsidiaries that have filed or will file for relief under Chapter 11 of Title 11 of the United States Code.

"**Protected Period**" has the meaning set forth in the Tax Matters Agreement.

"**Plan of Reorganization**" shall mean a bankruptcy plan of reorganization of the Tribune Company and certain of its subsidiaries that have filed or will file for relief under Chapter 11 of Title 11 of the United States Code.

"**Refinancing Debt**" has the meaning set forth in the Tax Matters Agreement.

"**Retained Cubs Current Assets**" has the meaning set forth in the Formation Agreement.

"**Revolver**" has the meaning set forth in the Formation Agreement.

"**Ricketts Subordinated Loan Commitment Agreement**" means that certain Subordinated Loan Commitment Agreement of even date herewith between [Ricketts Affiliate] and the Company.

"**Secured Parties**" has the meaning set forth in the Credit Agreement.

"**Security Lien**" means any pledge, lien, mortgage or security interest (of any nature whatsoever) securing the payment or performance of any liability or other obligation.

"**Senior Debt Financing**" shall have the meaning set forth in the Formation Agreement.

"**Subordinated Debt Financing**" has the meaning set forth in the Formation Agreement.

"**Subsidiary**" means, with respect to any specified Person, each of: (a) any other Person not less than a majority of the overall equity in which is beneficially owned, directly or indirectly, by such specified Person; (b) any other Person in respect of which such specified Person has the power, directly or indirectly, to elect a majority of the board of directors or other persons performing similar functions (it being understood that such other persons performing similar functions may include, for example and without limitation, the board of directors of the sole, or managing, corporate general partner of a limited partnership or the members of a

-A-10-

management committee of a partnership, limited partnership or limited liability company performing functions similar to that of a board of directors); and (c) without limitation of clauses (i) and (ii), any other Person who or which, directly or indirectly, is Controlled by such specified Person (it being understood, with respect to each of clauses (a) and (b), that a pledge for collateral security purposes of an equity interest in a Person shall not be deemed to affect the ownership of such equity interest except to the extent that the pledgee exercises its remedies and disposes of such equity interest).

"**Successor**" means: (a) with respect to any current Member, any future Member which is a direct or indirect transferee (whether by Permitted Disposition, merger, consolidation or otherwise) of the Company Interest of such current Member; and (b) with respect to any former Member, the current Member which is the direct or indirect transferee (whether by Permitted Disposition, merger, consolidation or otherwise) of the Company Interest of such former Member.

"**Tax Matters Agreement**" means that certain Tax Matters Agreement of even date herewith by and among the Company, the Members and certain of their Affiliates.

"**Tax Matters Member**" means the "tax matters partner" (as defined in Section 6231(a)(7) of the Code) of the Company.

"**TeamCo**" means _____, a Delaware limited liability company organized by the Company for the sole purpose of acquiring, owning, and operating the Club and owned 100% by the Company.

"**TeamCo LLC Agreement**" means the limited liability company agreement for TeamCo.

"**Third Party**" means any Person other than a Member, an Affiliate of any Member or a Person in which a Member or an Affiliate of any Member has any direct or indirect interest.

"**Transaction Documents**" has the meaning set forth in the Formation Agreement.

"**Treasury Regulations**" means final and temporary regulations promulgated under the Code.

"**Tribune Guarantees**" has the meaning set forth in the Formation Agreement.

"**Unreturned Common Capital**" means, with respect to each Member, an amount equal to such Member's Common Capital minus distributions to such Member pursuant to Section 5.4(c)(i) hereof.

"**Valuation Amount**" means (i) the Company FMV, (ii) the Call Price, (iii) the Put Price, (iv) the Tag/Drag-Along Price, (v) the Excess Asset Value of Excess Assets or (vi) the Excess Distribution Value of Excess Distributions, as applicable.

"**WGN**" means WGN Continental Broadcasting Company.

2.      The following Glossary of Defined Terms sets forth the location of the definitions of certain other defined terms used in the Agreement:

CHI99 5155874-1.022182.0010

# GLOSSARY OF DEFINED TERMS

Additional Capital Notice 2.2(a)
Agreement Preamble
Bidder Directors 3.2
Board 3.2
Call 7.2(a)
Call Closing Date 7.2(a)
Call Notice 7.2(a)
Call Period 7.2(a)
Call Price 7.2(a)
Call/Put Closing 7.2(e)
Company Preamble
Company FMV 2.2(b)
Confidential Information 8.2
Cubs LLC Preamble
Deferred Put Closing Date .7.2(b)
Director 3.2
Dispute Notice 7.5(a)
Dominican LLC Preamble
DQ LLC Preamble
Drag 7.4(a)
Drag Notice 7.4(a)
Formation Agreement Recitals
**Indemnified Person 34**
Initiating Notice 7.5(a)
Interest Change Date 5.2(a)(iii)
Loss Limit Allocations 5.2(b)(vi)(1)
**MLB Control Person  1.7**
Officers 3.4(a)
Original Put Closing Date .7.2(b)
Potential Tag Notice 7.4(a)
Premium Tickets LLC Preamble
Put 7.2(b)
Put Completion Notice .7.2(b)
Put Notice 7.2(b)
Put Period 7.2(b)
Put Price 7.2(b)
**Required Additional Funds *2.2(a)***
**Reverse Section 704(c) Allocations 5.3(b)**
Ricketts Member Preamble
Ricketts Member Tag/Drag-Along Price 7.4(b)
ROFR Notice 7.3(b)
**Section 704(c) Allocations 5.3(a)**
Special Distribution 1.3(d)

-A-13-

CHI99 5155874-1.022182.0010

Specified Sale 7.4(a)
Tag 7.4(a)
Tag Notice 7.4(a)
Tag Response 7.4(b)
Tag/Drag-Along Price 7.4(b)
Third Party Offer 7.3(a)
Third Party Purchaser 7.3(a)
Tribune Recitals
Tribune Director 3.2
Tribune Member Preamble
Tribune Members Preamble
Tribune Proxy 4.3(e)
Tribune Sports Preamble
Valuation Notice 7.5(c)

CHI99 5155874-1.022182.0010

EXHIBIT B

<u>Initial Directors</u>

CHI99 5155874-1.022182.0010

EXHIBIT C

Members, Percentage Shares, and Common Capital

| Member | Percentage Share | Common Capital |
|---|---|---|
| Ricketts Member | 95% | |
| Cubs LLC | | |
| Tribune Sports | | |
| Premium Tickets LLC | | |
| DQ LLC | | |
| Dominican LLC | | |

C-1