**EXHIBIT H**

# TAX MATTERS AGREEMENT

THIS TAX MATTERS AGREEMENT ("Agreement"), dated as of_____, 2009, is made by Ricketts Acquisition LLC, a Delaware limited liability company ("Ricketts"), MMR TMA GuarantyCo, LLC ("GuarantyCo" and, together with Ricketts, the "Ricketts Parties"), Chicago Baseball Holdings, LLC, a Delaware limited liability company (the "Company"), Tribune Company, a Delaware corporation ("Tribune"), Chicago National League Ball Club, LLC, a Delaware limited liability company (which will change its name to _____, LLC) ("Cubs LLC"), Tribune Sports Network Holdings, LLC, a Delaware limited liability company (which will change its name to _____, LLC) ("Tribune Sports"), Wrigley Field Premium Ticket Services, LLC, a Delaware limited liability company (which will change its name to _____, LLC) ("Premium Tickets LLC"), Diana-Quentin, LLC, a Delaware limited liability company (which will change its name to _____, LLC) ("DQ LLC"), and Chicago Cubs Dominican Baseball Operations, LLC, which will change its name to _____, LLC) (together with Cubs LLC, Tribune Sports, Premium Tickets LLC and DQ LLC, the "Tribune Members").

WHEREAS, pursuant to the Formation Agreement, Ricketts, Tribune and the Tribune Members, which are disregarded as entities separate from Tribune for Federal tax purposes, have contributed certain assets to the Company (or its wholly owned subsidiaries that are disregarded as entities separate from the Company for Federal tax purposes) in exchange for membership interests in the Company;

WHEREAS, pursuant to the Formation Agreement, the Company and Ricketts have agreed to make certain undertakings to the Protected Members as provided herein;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1.    Definitions.  All capitalized terms used and not otherwise defined in this Agreement shall have the meaning set forth in the Formation Agreement.  As used herein, the following terms have the following meanings:

"Blocked Account" has the meaning set forth in Section 10(c).

"Cash Equivalents" means,  as of any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States; (ii) marketable direct obligations issued by any State of the United States of America or any political subdivision of any such State or any public instrumentality thereof which, at the time of acquisition, have one of the two highest ratings obtainable from either S&P or Moody's; (iii) commercial paper  having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances issued or accepted by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary

Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $500,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

"Closing Date" has the meaning set forth in the Formation Agreement.

"Code" means the Internal Revenue Code of 1986, as amended, and corresponding provisions of any successor law.

"Company Operating Agreement" means the Amended and Restated Limited Liability Company Agreement of the Company, dated as of the date hereof.

"Computation Statement" has the meaning set forth in Section 3(a)(iv) hereof.

"CSN Chicago" has the meaning set forth in the Formation Agreement.

"Cubs Contributed Assets" has the meaning set forth in the Formation Agreement.

"Cubs Newco Sub" has the meaning set forth in the Formation Agreement.

"Debt Financing" has the meaning set forth in the Formation Agreement.

"Estimated Special Distribution Amount" has the meaning set forth in the Formation Agreement.

"Final Special Distribution Amount" has the meaning set forth in the Formation Agreement.

"Formation Agreement" means that certain Formation Agreement dated as of _____, 2009, by and among Ricketts, RAC Education Trust OSA, LLC, a Delaware limited liability company, Tribune and the Tribune Members.

"Indemnitors" means the Company and the Ricketts Parties.

"Indemnity Escrow Account" has the meaning set forth in the Formation Agreement.

"Indemnity Escrow Agreement" has the meaning set forth in the Formation Agreement.

"Indemnity Escrow Amount" has the meaning set forth in the Formation Agreement.

"LLC Debt" means the Debt Financing and any Refinancing Debt.

"Loan Documents" has the meaning set forth in the Company Operating Agreement.

"Major League Baseball" has the meaning set forth in the Formation Agreement.

"Major League Baseball Entity" has the meaning set forth in the Formation Agreement.

- 2 -

"Major League Clubs" has the meaning set forth in the Formation Agreement.

"Make-Whole Payment" means a payment in an amount equal to the sum of the Base Amount and the Gross-Up Amount, as those terms are defined in Section 3 hereof.

"Maximum Guaranty Amount" means Twenty Million Dollars ($20,000,000).

"Member" has the meaning set forth in the Company Operating Agreement.

"Membership Interests" means membership interests in the Company.

"Mueller Building and the T-Building Property" has the meaning set forth in the Formation Agreement.

"Minimum Debt Amount" means, with respect to the periods set forth on Exhibit A hereof, LLC Debt with an outstanding principal amount as set forth on Exhibit A hereof.

"MLB Interest" has the meaning set forth in the Formation Agreement.

"Moody's" means Moody's Investors Service, Inc.

"Obligations" has the meaning set forth in the Company Operating Agreement.

"Permitted Disposition" has the meaning set forth in the Company Operating Agreement.

"Person" has the meaning set forth in the Company Operating Agreement.

"Plan of Reorganization" has the meaning set forth in the Company Operating Agreement.

"Protected Member" means each of the Tribune Members, Tribune and any permitted successors or assigns.

"Protected Period" means the period beginning on the Closing Date and ending on January 1, 2018.

"Protected Properties" means each of the Tribune Cubs Contributed Assets that was owned by Tribune and its Affiliates on December 31, 2007, and any property acquired by the Company or any entity in which the Company holds a direct or indirect interest in exchange for any such Protected Property that is "substituted basis property" as defined in Section 7701(a)(42) of the Code with respect to any such Protected Property.

"Purchased Asset Value" means an amount, if any, equal to the Estimated Special Distribution Amount minus the net proceeds of the Debt Financing received by the Company.

"Refinancing Debt" means debt treated as indebtedness for Federal income tax purposes that meets all of the following conditions:  The debt is (i) allocable under the rules of Treasury Regulations Section 1.163-8T to payments discharging all or part of the Debt Financing or an earlier Refinancing Debt; (ii) owed by the Company (or an entity that is disregarded as an entity

- 3 -

separate from the Company for Federal income tax purposes) to a Person that is not related within the meaning of Treasury Regulations Section 1.752-4(b) to any Member of the Company, and (iii) is subject to a guarantee obligation of Tribune substantially in the form of the Tribune Guarantee in favor of the lender or lenders with respect to such indebtedness. Notwithstanding the foregoing, Refinancing Debt shall include (A) any indebtedness that would be Refinancing Debt but for Tribune's breach of its obligation under Section 6 hereof; (B) any indebtedness that would be Refinancing Debt but for the fact that it is owed to a Person that is related within the meaning of Treasury Regulations Section 1.752-4(b) to a Member of the Company, but only if and to the extent that the total amount of such related Person indebtedness does not exceed the sum of (1) the total amount of related Person indebtedness that was included in the Debt Financing, and (2) the amount of any Debt Financing owed to a Person that is not related within the meaning Treasury Regulations Section 1.752-4(b) to a Member of the Company that is required to be repaid to comply with any Written MLB Requirement relating to the maximum amount of indebtedness that the Company and its subsidiaries may maintain; and (C) any indebtedness that would be Refinancing Debt with respect to indebtedness included in the Debt Financing but for a final judicial or administrative determination that such indebtedness does not constitute indebtedness for Federal income tax purposes, but only if such indebtedness is Substitute Debt.

"Remedial Reduction Amount" has the meaning set forth in Section 5(g).

"Remedial Shortfall Amount" means, as of the last day of any taxable year of the Company, a positive amount, if any, equal to (i) the original principal amount of the Debt Financing minus the Minimum Debt Amount as of such date, minus (ii) the cumulative amount of remedial items of income and gain allocated to the Tribune Members by the Company pursuant to Treasury Regulation Section 1.704-3(d) as of such date.

"Ricketts Subordinated Loan Commitment Agreement" has the meaning set forth in the Company Operating Agreement.

"S corporation" has the meaning ascribed thereto in Section 1361(a)(1) of the Code.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation.

"Schedule 5(f)" has the meaning set forth in Section 5(f) hereof.

"Senior Debt Financing" has the meaning set forth in the Formation Agreement.

"Substitute Debt" means indebtedness evidenced by a promissory note that (a) provides for a fixed rate of interest or a variable rate of interest that constitutes a "qualified floating rate" within the meaning of Treasury Regulations Section 1.1275-5(b); (b) provides a fixed maturity date for the payment of all unpaid principal and interest; (c) does not allow for the deferment of the payment of any principal or interest to a greater extent than the LLC Debt with respect to which such indebtedness would be Refinancing Debt; (d) does not determine the amount or time for payment of principal or interest based on the profits or distributions of the Company or any subsidiary of the Company; (e) has a term that is not more than the greater of six (6) years or the term of the LLC Debt with respect to which such indebtedness would be Refinancing Debt; (f)

- 4 -

provides terms of, and remedies for, default that are substantially identical to the LLC Debt with respect to which such indebtedness would be Refinancing Debt; (g) does not provide rights to the lender with respect to management of the Company or assets owned directly or indirectly by the Company to a greater extent than the LLC Debt with respect to which such indebtedness would be Refinancing Debt; (h) provides terms related to subordination, security, collateral, guarantees and other credit enhancements that are substantially identical to the LLC Debt with respect to which such indebtedness would be Refinancing Debt; (i) is not convertible into equity of the Company or any subsidiary of the Company; and (j) prior to a final judicial or administrative determination that such indebtedness does not constitute indebtedness for Federal income tax purposes, is characterized and reported by the Company, the lender(s) and any other party to such indebtedness as indebtedness for state law and for Federal, state and local income tax purposes.

"Treasury Regulations" means final and temporary regulations promulgated under the Code.

"Tribune Cubs Contributed Assets" has the meaning set forth in Section 5(a)(i) hereof.

"Tribune Guarantee" shall have the meaning set forth in the Formation Agreement.

"Trigger Event" shall have the meaning set forth in Section 3(a) hereof.

"Unpaid Portion" shall have the meaning set forth in Section 3(a)(iii) hereof.

"Wrigley Field" has the meaning set forth in the Formation Agreement.

"Written MLB Requirement" means any provision of any Major League Baseball Governing Document or any order or directive of any Major League Baseball Entity which is set forth in writing to Cubs Newco Sub, provided that (i) no such order or directive shall be considered a Written MLB Requirement (A) to the extent that Cubs Newco Sub or any of its affiliates solicits or encourages the Major League Baseball Entity to issue such order or directive, or (B) if such order or directive relates to an asset of the Company or any of its subsidiaries (other than an MLB Interest) or the maximum amount of indebtedness that the Company and its subsidiaries may maintain, the Company and Cubs Newco Sub have not used reasonable best efforts to cause the Major League Baseball Entities to waive or limit the scope of such requirement, (ii) with respect to any interest in any MLB Interest, such order or directive shall be considered a Written MLB Requirement only to the extent that all or substantially all Major League Clubs are participating pro rata in the applicable transaction, and (iii) such order or directive does not involve Cubs Newco Sub's ownership interest in CSN Chicago or any parent or successor thereto or Wrigley Field.  For purposes of determining whether an order or directive is a Written MLB Requirement, (x) a request that a prior oral order or directive be delivered in writing shall not be considered a solicitation or encouragement of such order or directive if the Company consults with the Protected Member regarding such request prior to making such request or as soon as reasonably practicable thereafter; and (y) if any Major League Club is subject to any legal or contractual restriction on the disposition of an MLB Interest which restriction is not generally applicable to all Major League Clubs, such Major League Club shall

CHI99 5155877-1.022182.0015
8/24/09 12:19 PM

not be taken into account in determining whether the condition set forth in clause (ii) hereof is satisfied.

    2.    <u>Restrictions on Triggering Tax Gain</u>

        (a)

        (i)    At all times throughout the Protected Period, (A) the Company agrees, for the benefit of each Protected Member, that neither the Company nor any entity in which the Company holds a direct or indirect interest will (1) directly or indirectly sell, transfer, exchange, or otherwise dispose (including any transaction that is deemed to be or is treated as a sale, transfer, exchange or disposition for Federal income tax purposes) of any Protected Property in a taxable transaction for Federal income tax purposes (including for this purpose a transaction described in Section 704(c)(1)(B) or Section 737 of the Code), or (2) directly or indirectly contribute any Protected Property to an entity, including a transaction that is deemed to be or is treated as a contribution to an entity for Federal income tax purposes (including, but not limited to, the issuance of an interest in an entity disregarded as separate from its owner for Federal income tax purposes to a Person that results in such entity being treated as a partnership for Federal income tax purposes and any election to treat an entity as a corporation for Federal income tax purposes), in a nontaxable transaction other than to an entity that is and remains throughout the Protected Period either an entity that is disregarded as separate from the Company for Federal tax purposes or an entity that is treated as a partnership for Federal income tax purposes, and (B) the Indemnitors agree, for the benefit of each Protected Member, that none of Ricketts, Ricketts' members, nor the Company will directly or indirectly take any action or fail to take any action if such action or inaction results in a Remedial Shortfall Amount for a taxable year.

        (ii)    Section 2(a)(i) hereof shall not apply with respect to a sale, transfer, exchange or other disposition of Protected Property as a result of an involuntary conversion within the meaning of Section 1033 of the Code, and the Company shall have no obligation to replace such Protected Property in a manner that allows the gain to be deferred under section 1033 of the Code, but if such Protected Property is in fact replaced in a manner that would allow the gain to be deferred under Code Section 1033, the Company shall elect under Code Section 1033 to defer such gain.

        (iii)    Section 2(a)(i) hereof shall not apply with respect to the sale, transfer, exchange or other disposition  of (A) inventory or other assets in the ordinary course of operating the business of the Company and its Subsidiaries, provided that the total amount of "recognized built-in gain" (within the meaning of Section 1374(d)(3) of the Code) allocable to Tribune (or, if Tribune is a C corporation, income and gain allocated directly or indirectly to Tribune under Section 704(c) of the Code to the extent such income or gain would be "recognized built-in gain (within the meaning of Section 1374(d)(3) of the Code) if Tribune were an S corporation) with respect to such dispositions but excluded pursuant to this Section 2(a)(iii)(A) shall not exceed One Million Dollars ($1,000,000) in any taxable year of the Company, (B) player contracts, provided that the total amount of "recognized built-in gain" (within the meaning of Section 1374(d)(3) of the Code) allocable to Tribune (or, if Tribune is a C corporation, income and gain allocated directly or indirectly to Tribune under Section 704(c)

- 6 -

of the Code to the extent such income or gain would be "recognized built-in gain (within the meaning of Section 1374(d)(3) of the Code) if Tribune were an S corporation) with respect to such dispositions but excluded pursuant to this Section 2(a)(iii)(B) shall not exceed Twenty Million Dollars ($20,000,000) in any taxable year of the Company and Forty Million Dollars ($40,000,000) in the aggregate during the Protected Period, and (C) the Company's interest in any Protected Property if such sale, transfer, exchange, or disposition is required to be made to comply with any Written MLB Requirement.

(b)       At all times throughout the Protected Period, the Company agrees, for the benefit of each Protected Member to maintain, on a continuous basis, an amount of LLC Debt equal to or greater than the Minimum Debt Amount; provided, however, that it shall not be a breach of this Section 2(b) to the extent the failure to maintain an amount of LLC Debt equal to or greater than the Minimum Debt Amount results from (i) the rejection or invalidation of a Tribune Guarantee, (ii) the declaration that any Tribune Guarantee is unenforceable by any court under any provision of the United States Bankruptcy Code or any other law of the United States or of any State, or (iii) the repayment of any indebtedness as required to comply with any Written MLB Requirement relating to the maximum amount of indebtedness that the Company and its subsidiaries may maintain, provided, however, that in the event that such repayment is made with proceeds received directly or indirectly from the Ricketts Parties or any Affiliate, such repayment shall be made with proceeds from Refinancing Debt from such Ricketts Parties or any such Affiliate, and provided further that, to the extent such repayment is made with proceeds received directly or indirectly from a Person that is not a Ricketts Party or Affiliate, then the Ricketts Parties shall utilize their reasonable best efforts to make such repayment with Refinancing Debt.

(c)       Each Protected Member hereby acknowledges and agrees that none of the Company, any Indemnitor, or any party affiliated with or related to any of them makes any representation or warranty regarding the Federal, state or local income tax consequences of the formation of the Company or the payment of the Estimated Special Distribution Amount or Final Special Distribution Amount.

3.       Indemnity for Breach of Obligations Set Forth in Section 2

(a)

(i)       In the event that the Company breaches its obligation set forth in Section 2 hereof to any Protected Member (a "Trigger Event"), Indemnitors shall be jointly and severally obligated to pay to such Protected Member as damages an amount (the "Base Amount") equal to the aggregate Federal, state and local income taxes incurred by such Protected Member thereof as a result of the income and gain recognized by or directly or indirectly allocated under Section 704(c) of the Code (to the extent based upon the difference between fair market value and adjusted basis of the Tribune Cubs Contributed Assets on the Closing Date, and without regard to income or gain in excess of such built-in gain) to such Protected Member by reason of such Trigger Event plus an additional amount (the "Gross-Up Amount") so that, after the payment by such Protected Member of all taxes on amounts received pursuant to this Section 3(a), such Protected Member retains an amount equal to the Base Amount. Notwithstanding the foregoing, GuarantyCo's obligation to make any Make-Whole

- 7 -

Payment under this Section 3 shall not, in the aggregate, exceed the Maximum Guaranty Amount.

(ii)     In the event that Indemnitors become aware of a breach of Section 2 hereof with respect to a Protected Member, Indemnitors shall (1) promptly notify such Protected Member in writing of such Trigger Event and of the sales price or other amount realized for income tax purposes in connection therewith, the Remedial Shortfall Amount, or the amount by which the Minimum Debt Amount exceeded the outstanding principal amount of LLC Debt and (2) provide the Protected Member with copies of all operative documents relating to the Trigger Event and such other relevant materials as may be reasonably requested by the Protected Member.

(iii)     After receipt of such notice, the Protected Member shall provide Indemnitors with any information reasonably requested by Indemnitors of the Protected Member to enable Indemnitors to verify the computation of the Make-Whole Payment. The Protected Member shall provide such information within thirty (30) days of such request.

(iv)     The Protected Member shall prepare a computation of the Make-Whole Payment owing to such Protected Member under this Section 3 with respect to a taxable year (a "Computation Statement"), which shall be delivered to Indemnitors no later than the later of (A) sixty (60) days after the end of any taxable year for which a Make-Whole Payment is due and (B) thirty (30) days after the delivery of the information required to be delivered pursuant to Section 3(a)(iii). Indemnitors shall make any required Make-Whole Payment owing to the Protected Member pursuant to this Section 3 no later than ten (10) days after delivery by the Protected Member of such computation. Notwithstanding the foregoing, if the Indemnitors do not agree with such computation, within ten (10) days after delivery by the Protected Member of such computation (x) the Indemnitors shall pay the undisputed amount of any Make-Whole Payment to the Protected Member and (y) the Indemnitors shall deliver to such Protected Member a reasonably detailed description of the matters in dispute and the Indemnitor's proposed calculation of the Make-Whole Payment. Within ten (10) days after resolution of such disagreement pursuant to Section 3(f) hereof, the Indemnitors shall pay the balance of any Make-Whole Payment owing to the Protected Member (the "Unpaid Portion"), if any, plus interest on such Unpaid Portion at the annual rate of ten percent (10%), compounded monthly, computed from the date that is ten (10) days after delivery by the Protected Member of such computation through and including the date that such Unpaid Portion is paid.

(b)     For purposes of determining the amount of the Make-Whole Payment payable by Indemnitors, if a Trigger Event occurs in a taxable year (x) for which Tribune is a C corporation (within the meaning of Section 1361(a)(2) of the Code) or (y) if any Protected Member assigns its rights under this Agreement in accordance with Section 15, for which the income or gain with respect to which the Base Amount is calculated is reportable by a C corporation:

(i)     All income arising from a Trigger Event and all payments under this Section 3 shall be treated as subject to the highest marginal rate of tax applicable to corporations for Federal income tax purposes and a 6.2% state tax rate, adjusted to reflect the deductibility of state taxes for Federal income tax purposes. Any amounts giving rise to a

- 8 -

payment pursuant to Section 3(a) hereof will be determined assuming that the Trigger Event was the only transaction or event reported on the Protected Member's tax return (i.e., without giving effect to any loss carry forwards or other deductions attributable to such Protected Member).

              (ii)      The Base Amount with respect to a Trigger Event shall be reduced by the sum of (x) the present value of the Federal and state taxes (applying the tax rates set forth in Section 3(b)(i)) that would have been incurred by the Protected Member with respect to the Remedial Reduction Amount that results from such Trigger Event during the period from the date on which such Trigger Event occurs to the last day of the Protected Period, discounted from the last day of the taxable years in which such Remedial Reduction Amount would have otherwise been allocated to the Protected Member to the last day of the taxable year in which the tax liability with respect to such Trigger Event is incurred by such Protected Member, and (y) the present value, discounted from the last day of the Protected Period to the last day of the taxable year in which the additional tax liability with respect to such Trigger Event is incurred, of the excess of (A) the Base Amount, over (B) the aggregate Federal and state taxes (applying the tax rates set forth in Section 3(b)(i)) that would have been incurred by such Protected Member with respect to the Remedial Reduction Amount described in clause (x) of this Section 3(b)(ii). The present values computed under this Section 3(b)(ii) shall be determined by applying a discount rate of ten percent (10%) per annum, compounded annually. If, pursuant to a change in law after the date hereof or a final judicial or administrative determination, the Protected Member must recognize any portion of the Remedial Reduction Amount resulting from such Trigger Event with respect to any taxable year, the Base Amount computed pursuant to this Section 3(b)(ii) shall be adjusted so that such recognized Remedial Reduction Amount is not taken into account in such computation of the Base Amount with respect to such Trigger Event.

              (c)      For purposes of determining the Make-Whole Payment payable by Indemnitors if a Trigger Event occurs in a taxable year to which subsection (b) of this Section 3 does not apply:

              (i)      The Base Amount payable to Tribune shall equal (a) the amount of "built-in gains tax" under Section 1374 of the Code and payable by Tribune as a result of such Trigger Event assuming the application of the highest Federal tax rates applicable to such gain and that Tribune's "net recognized built-in gain" for such year equals the amount of "recognized built-in gain" triggered by such event plus, (b) any state tax payable as a result of such Trigger Event determined by applying a 4.65% state tax rate applicable to the amount of built-in gain as determined under Section 3(c)(i)(a) hereof and making the same assumption regarding the amount of "net recognized built-in gain," provided, however, that the portion of the Base Amount payable to Tribune for any taxable year shall not exceed the amount of tax payable by Tribune with respect to its actual "net recognized built-in gain" under Section 1374 of the Code for such taxable year assuming the same Federal and state tax rates set forth in Sections 3(c)(i)(a) and (b) apply to such "net recognized built-in gain." Any unpaid portion of the Base Amount payable to Tribune for a taxable year shall be payable in the next succeeding taxable year(s) to the extent of the amount of tax payable by Tribune with respect to its "net recognized built-in gain" under Section 1374 of the Code for such taxable year(s) assuming the same Federal and state tax rates set forth in Section 3(c)(i)(a) and (b) apply to such "net recognized built-in gain." The amount of Tribune's "net recognized built-in gain" under Section 1374 for a taxable year, as certified by Tribune's Chief Financial Officer, shall be set forth in the Computation Statement

for such taxable year. For the avoidance of doubt, if a Trigger Event occurring in the 2010 taxable year triggered $10 million of "recognized built-in gain," and Tribune in the 2010 taxable year also had $20 million of "recognized built-in loss," no portion of the Base Amount would be payable for the 2010 taxable year. If in the 2011 taxable year, Tribune had $10 million of "net recognized built-in gain" and its taxable income (within the meaning of Section 1374(d)(2)(A)(ii) of the Code) for the 2011 taxable year were $6 million, then a portion of the Base Amount equal to the tax on $6 million (assuming the same Federal and state tax rates set forth in Section 3(c)(i)(a) and (b)) would be payable for the 2011 taxable year. If in the 2012 taxable year, Tribune had no additional "recognized built-in gain or loss" and its taxable income (within the meaning of Section 1374(d)(2)(A)(ii) of the Code) for the 2012 taxable year were $10 million, then a portion of the Base Amount equal to the tax on $4 million (assuming the same Federal and state tax rates set forth in Section 3(c)(i)(a) and (b)) would be payable for the 2012 taxable year.

(ii)    No Gross-Up Amount shall be payable to the extent that the receipt of the Base Amount by Tribune does not give rise to "recognized built-in gain" under Section 1374 of the Code.

(iii)    For purposes of this Section 3(c), Tribune shall be deemed to include any of its qualified subchapter S subsidiaries as defined in Section 1361(b)(3) of the Code.

(d)    Notwithstanding anything to the contrary herein, if a Trigger Event occurs in a taxable year in which Tribune is not the sole Protected Member or is not an S corporation, the aggregate Make-Whole Payments made to all Protected Members shall not exceed the Make-Whole Payment that would have been due to Tribune if it were at all times the sole Protected Member and an S corporation.

(e)    The sole and exclusive rights and remedies of a Protected Member for a breach or violation of the covenants set forth in Section 2 shall be a claim for money indemnification against Indemnitors in the form of the Make-Whole Payment, computed as set forth in Section 3, and no Protected Member shall be entitled to pursue a claim for any other damages or for specific performance of the covenant set forth in Section 2 or bring a claim against any Person that acquires a Protected Property from the Company in violation of Section 2. No Protected Member shall have any right to indemnification by Indemnitors for taxes other than as provided in this Agreement. Notwithstanding the foregoing, each Tribune Member shall have all rights and remedies available to it as a Member of the Company pursuant to the Newco LLC Agreement in its capacity as a Member of Newco with respect to any actions by or relating to Newco.

(f)    If the Company has breached or violated the covenant set forth in Section 2 (or a Protected Member asserts that the Company has breached or violated the covenant set forth in Section 2), Indemnitors and the Protected Member agree to negotiate in good faith to resolve any disagreements regarding any such breach or violation and the amount of the Make-Whole Payment, if any, payable to such Protected Member under this Section 3, including the amount of built-in gain under Sections 1374 and 704(c) of the Code to report on the tax returns to be filed by the parties hereto as a result of the Trigger Event. If any such disagreement as to

- 10 -

tax and Make-Whole Payment calculations cannot be resolved by the Indemnitors and such Protected Member within thirty (30) days after the delivery by the Protected Member of the Computation Statement referred to in Section 3(a)(iv) hereof, Indemnitors and the Protected Member shall jointly retain a nationally recognized independent public accounting firm that has not provided substantial professional services to any Indemnitor or Protected Member in the preceding three years (the "Accounting Firm") to act as an arbitrator to resolve as expeditiously as possible all points of any such disagreement (including, without limitation, whether a breach of the covenant set forth in Section 2 hereof has occurred and, if so, the amount of Make-Whole Payment to which the Protected Member is entitled as a result thereof, determined as set forth in this Section 3). All determinations made by the Accounting Firm with respect to the resolution of any breach or violation of the covenant set forth in Section 2 hereof and the amount of the Make-Whole Payment payable to the Protected Member under this Section 3 shall be final, conclusive and binding on Indemnitors and the Protected Member. Fifty-two and Sixty-Four Hundredths Percent (52.64%) of the fees and expenses of the Accounting Firm incurred in connection with any such determination shall be borne by the Company, and Forty-Seven and Thirty-Six Hundredths Percent (47.36%) of such fees and expenses shall be borne by the Protected Member. In the event that Indemnitors and the Protected Member, each having acted in good faith and with its best efforts to select an Accounting Firm, are unable to retain an Accounting Firm within sixty (60) days after the thirty (30) day period mentioned above, then following the expiration of such sixty (60) day period, any disagreement may be settled in any court of competent jurisdiction, subject to Section 9 hereof.

4.    Section 704(c) Method; Nonrecourse Liability Allocation Method. The Company shall use, and shall cause any other entity in which the Company has a direct or indirect interest to use the "remedial method" under Regulations Section 1.704-3(d) for purposes of making allocations under Section 704(c) of the Code with respect to each of the Cubs Contributed Assets pursuant to Treasury Regulations Sections 1.704-1(b)(2)(iv)(f), 1.704-1(b)(2)(iv)(g), and 1.704-3(a)(6). Except as provided in the preceding sentence, the Company shall use, and shall cause any other entity in which the Company has a direct or indirect interest to use, any permissible method selected by the Ricketts Parties for purposes of making allocations under Section 704(c) of the Code with respect to all other property contributed to the Company and with respect to any revaluation of property (excluding the Cubs Contributed Assets) pursuant to Treasury Regulations Sections 1.704-1(b)(2)(iv)(f), 1.704-1(b)(2)(iv)(g), and 1.704-3(a)(6). "Excess nonrecourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3) shall be allocated in accordance with Percentage Shares (as defined in the Company Operating Agreement).

5.    Certain Tax Reporting

(a)    For Federal, state and local income tax purposes, the contributions to the Company and the distribution of the Estimated Special Distribution Amount pursuant to Section 1.1 and Section 1.2 of the Formation Agreement shall be reported by all parties hereto as follows:

(i)    Tribune shall be treated as contributing an undivided interest in each Cubs Contributed Asset shown on Schedule 5(f) on the date hereof to the Company in a

- 11 -

nontaxable contribution pursuant to Section 721(a) of the Code (the "Tribune Cubs Contributed Assets").

(ii)    The Company shall be treated as purchasing from Tribune an undivided interest in each Cubs Contributed Asset with an aggregate value equal to the Purchased Asset Value for an amount of cash equal to the Purchased Asset Value.

(iii)    The Mueller Building and the T-Building Property shall be treated as a Cubs Contributed Asset.

(iv)    The distribution of the portion of the Estimated Special Distribution Amount equal to the amount of the net proceeds of the Debt Financing received by the Company shall be treated as a nontaxable distribution to a partner pursuant to Section 731 of the Code and Treasury Regulations Section 1.707-5(b) without separate disclosure pursuant to Section 6662(d)(2)(B)(ii) or any other provision of the Code or Treasury Regulations or similar provisions of state and local law except as required by a change in law after the date hereof.

(v)    The portion of the Estimated Special Distribution Amount equal to the Indemnity Escrow Amount that is placed into the Indemnity Escrow Account pursuant to the Indemnity Escrow Agreement shall be treated as distributed to the Tribune Members on the date that it is placed in the Indemnity Escrow Account.

(b)    Pursuant to Notice 89-35, 1989-1 C.B. 675, for purposes of applying the interest tracing rules of Treasury Regulations Section 1.163-8T, (i) the Company shall treat the distribution of the portion of the Estimated Special Distribution Amount equal to the net proceeds of the Debt Financing received by the Company as being made from the proceeds of the Debt Financing, and (ii) the Company shall treat the distribution of the amount referred to in Section 5(a)(iv) hereof as not being made from the proceeds of the Debt Financing to the extent that the Estimated Special Distribution Amount exceeds the amount of the Debt Financing. Interest expense on such proceeds shall be allocated in accordance with the general allocation rule of section V.A. of Notice 89-35.

(c)    Reserved.

(d)    Except with respect to any Refinancing Debt that is not guaranteed by Tribune, all tax returns filed by the Company shall report the outstanding principal amount of all LLC Debt as a recourse liability allocable solely to the Protected Members except as required by a change in law after the date hereof.

(e)    For Federal, state and local tax purposes, the LLC Debt shall not be treated as "partner nonrecourse debt" nor as a "partner nonrecourse liability" within the meaning of Treasury Regulations Section 1.704-2(b)(4) except as required by a change in law after the date hereof.

(f)    As promptly as practicable after the date hereof, the parties shall cooperate in preparing schedules ("Schedule 5(f)") setting forth the amount of built-in gain within the meaning of Section 704(c) of the Code with respect to the Tribune Cubs Contributed Assets as of the Closing Date and the allocation of such built-in gain among the Tribune Cubs Contributed

- 12 -

Assets. Schedule 5(f) shall be consistent with the allocation of the fair market value of the Cubs Contributed Assets as set forth in Exhibit B attached hereto. The parties acknowledge that Tribune intends to report the amount of net unrealized built-in gain within the meaning of Section 1374 of the Code with respect to the Protected Property as of December 31, 2007, as being equal to the amount of built-in gain within the meaning of Section 704(c) of the Code with respect to the Tribune Cubs Contributed Assets as of the Closing Date. The parties shall file their tax returns in a manner consistent with Schedule 5(f).

(g)     For Federal, state and local tax purposes, any gain recognized by the Protected Member with respect to the Protected Member's membership interest in the Company pursuant to Section 731(a) of the Code that gives rise to a positive adjustment to the basis of a Tribune Cubs Contributed Asset pursuant to Section 734(b) of the Code shall be treated as reducing the remedial income allocations under Treasury Regulations Section 1.704-3(d) that would otherwise be made to the Protected Member with respect to such Tribune Cubs Contributed Asset (the amount of such reduction to such allocation of remedial income to the Protected Member, the "Remedial Reduction Amount"), except as required by a change in law after the date hereof.

6.     Refinancing Debt.

(a)     Tribune shall enter into a guarantee obligation as described in paragraph (iii) of the definition of Refinancing Debt extending through the date that is six months and one day after the end of the Protected Period with respect to any indebtedness that meets the requirements of paragraphs (i) through (ii) of the definition of Refinancing Debt.

(b)     For the avoidance of doubt, any significant modification (within the meaning of Treasury Regulations Section 1.1001-3(e)) of an LLC Debt shall be treated as the incurrence of new indebtedness for purposes of this Agreement and must satisfy the requirements set forth in the definition of Refinancing Debt.

7.     Tax Contests

(a)     In the event that the Internal Revenue Service or any other tax authority asserts a claim or raises an issue in the course of an audit or other tax proceeding involving a Protected Member that could result in an obligation of Indemnitors to make a Make-Whole Payment (or increase the amount of any Make-Whole Payment), the Protected Member shall promptly notify Indemnitors. Indemnitors shall have the right to contest, at their own expense, any such claim or issue through appropriate administrative and judicial proceedings, and the Protected Member shall cooperate with Indemnitors in connection with the conduct of any such contest and shall not settle or otherwise compromise such contest without the consent of Indemnitors.

(b)     In the event that the Internal Revenue Service or any other taxing authority makes a claim or raises an issue in any partnership-level audit or other proceeding of the Company which could result in disallowance of the tax treatment set forth in Section 5(a) hereof or would result in any LLC Debt not being treated as indebtedness for Federal tax purposes, the Company shall promptly notify Tribune. Tribune shall have the right to contest, at its own

- 13 -

expense, any such claim or issue through appropriate administrative or judicial proceedings, and Indemnitors shall cooperate with Tribune in connection with the conduct of any such contest and shall not settle or otherwise compromise such contest without the consent of Tribune.

8.    Governing Law. This Agreement and any disputes arising hereunder or controversies related hereto shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in such State without regard to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) to the extent they would result in the application of the laws of another jurisdiction.

9.    Submission to Jurisdiction; Consent to Service of Process

(a)    Any Action with respect to this Agreement shall be brought exclusively in the state or federal courts sitting in the State of Delaware. By execution and delivery of this Agreement, each party hereto hereby accepts for itself and in respect of such party's property, generally and unconditionally, the sole and exclusive jurisdiction of the aforesaid courts and appellate courts thereof. Each party hereto hereby irrevocably and unconditionally waives any objection which such party may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and hereby further irrevocably agrees, to the extent permitted by applicable law, not to plead or claim in any such court that any such Action brought in any such court has been brought in an inconvenient forum. Notwithstanding anything in this Section 9(a) to the contrary, each party agrees that a final judgment in any such Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. For purposes of this Section 9, "Action" shall mean any pending action (at law or in equity), suit, arbitration, or proceeding.

(b)    Each of the parties hereto irrevocably consents to service of process in any of the aforementioned courts by the mailing of copies thereof by registered or certified mail, postage prepaid, or by recognized overnight delivery service, to such party at such party's address referred to in Section 12. Nothing herein shall affect the right of any party hereto to serve process in any other manner permitted by law.

10.    Certain Restrictions and Covenants.

(a)    GuarantyCo hereby covenants that it will not become a party to (or assume any obligations under) the Ricketts Subordinated Loan Commitment Agreement.

(b)    Company covenants that it will not borrow money or refinance existing indebtedness (other than the Senior Debt Financing, any Refinancing Debt with respect to the Senior Debt Financing, and any loan pursuant to the Ricketts Subordinated Loan Commitment Agreement to the extent such loan does not exceed Thirty-Five Million Dollars ($35,000,000)) unless the obligation to repay said indebtedness is subordinated (including, but not limited to, with respect to maturity, priority of payment, and rights to collateral), on terms reasonably acceptable to the Protected Members, to the Company's obligations under this Agreement.

(c)    The Ricketts Parties hereby covenant that GuarantyCo holds, and shall continue to hold, cash and Cash Equivalents with a value at least equal to (i) the Maximum

- 14 -

Guaranty Amount, minus (ii) the aggregate amount of any Make-Whole Payments made by GuarantyCo to the Protected Members pursuant to this Agreement; provided that (A) the Ricketts Parties further hereby covenant that an amount of such assets having a liquidation value (taking into account any breakage costs associated therewith) of at least the foregoing difference (i.e., the foregoing clause (i) minus clause (ii) above) shall be held by GuarantyCo in a securities account (the "Blocked Account") with respect to which a blocked account control agreement and a security agreement in the forms attached hereto as Exhibits C-1 and C-2 (with such changes thereto as shall be acceptable to the Protected Members in their sole and absolute discretion) are and remain in effect for the benefit of the Protected Members and (B) with respect to Cash Equivalents held in the Blocked Account, at no time shall more than $2.0 million of such Cash Equivalents have a maturity greater than one (1) year from such time.  The Protected Members agree that (w) they will not deliver a notice of exclusive control under the blocked account control agreement attached hereto as Exhibit C-1 unless and until a breach of this Agreement has occurred and is continuing; and (x) the Protected Members shall send written notice rescinding said notice of exclusive control upon a cure of any such breach.  The Protected Members shall provide written notification to all the parties to said blocked account control agreement upon the termination of the Tax Matters Agreement or the Protected Members' security interest in the Account.

(d)    GuarantyCo shall not exercise any right of subrogation, contribution, indemnity or reimbursement or any other rights it may have now or hereafter have, and any and all rights of recourse to the Company or Ricketts or any of the Company's or Ricketts' assets with respect to any payment it makes under this Agreement until (i) all of the Obligations (other than contingent indemnification obligations not yet asserted by the Person entitled thereto) shall have been indefeasibly paid in cash, and (ii) no Person has any further right to obtain any loans, advances or other extensions of credit under any of the Loan Documents.

(e)    The Ricketts Parties shall inform the Protected Member promptly after receipt of any communication from any Major League Baseball Entity indicating that a Written MLB Requirement may be forthcoming.

11.    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including any of the schedules and exhibits hereto) contains the entire agreement by and between the parties hereto with respect to the subject matter hereof and all prior negotiations, writings and understandings relating to the subject matter of this Agreement, are merged in and are superseded and cancelled by, this Agreement.  This Agreement may not be modified or amended except by an instrument or instruments in writing signed by Ricketts, GuarantyCo, the Company and Tribune.  Any party hereto may, only by an instrument in writing, waive compliance by any other party or parties hereto with any term or provision hereof on the part of such other party or parties hereto to be performed or complied with.  No failure or delay of any party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor will any single or partial exercise of any right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The waiver by any party hereto of a breach of any term or provision hereof shall not be construed as a waiver of any subsequent breach.  The rights and remedies of the parties hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have hereunder.  In the event any provision in any other Transaction Document shall

- 15 -

in any way conflict with the provisions of this Agreement (except where a provision therein expressly provides that it is intended to take precedence over this Agreement), this Agreement shall control.

12.    Notices.  All notices and other communications hereunder will be in writing and given by certified or registered mail, return receipt requested, nationally recognized overnight delivery service, such as Federal Express or facsimile (or like transmission) with confirmation of transmission by the transmitting equipment or personal delivery against receipt to the party to whom it is given, in each case, at such party's address or facsimile number set forth below or such other address or facsimile number as such party may hereafter specify by notice to the other parties hereto given in accordance herewith.  Any such notice or other communication shall be deemed to have been given as of the date so personally delivered or transmitted by facsimile or like transmission (with confirmation of receipt), on the next Business Day when sent by overnight delivery services or five days after the date so mailed if by certified or registered mail.

If to the Ricketts Parties or the Company, to:

c/o Incapital LLC
200 S. Wacker, Suite 3700
Chicago, IL 60606
Fax No.:  (312) 379-3701
Attention:  Thomas Ricketts

With a copy (which shall not constitute notice) to:

Hugo Enterprises LLC
1395 S. Platte River Drive
Denver, CO 80223
Fax No.: (303) 200-7806
Attention: Alfred P. Levitt

and

Foley & Lardner LLP
777 E. Wisconsin Avenue
Milwaukee, WI 53202
Fax No.: (414) 297-4900
Attention: Mary K. Braza and Patrick G. Quick

If to any of the Protected Members, to:

Tribune Company
435 North Michigan Avenue
Chicago, Illinois
Facsimile No.:  (312) 222-4206
Attention:  General Counsel

- 16 -

With a copy (which shall not constitute notice) to:

McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, D.C. 20005
Facsimile No.: (202) 756-8087
Attention:    Blake D. Rubin and
              Andrea M. Whiteway

    13.    <u>Severability</u>.  Any provision hereof that is held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, shall be ineffective only to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof, so long as the economic or legal substance of the transaction, contemplated by this Agreement is not affected in any manner materially adverse to any party; <u>provided</u>, <u>however</u>, that the parties will attempt in good faith to reform this Agreement in a manner consistent with the intent of any such ineffective provision for the purpose of carrying out such intent.

    14.    <u>Binding Effect; Third-Party Beneficiaries</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Agreement is not intended to confer upon any Person not a party hereto (or their successors and permitted assigns)  any rights or remedies hereunder.  No Protected Member other than the Tribune Members shall have any right under this Agreement (including any right to receive Make-Whole Payments) unless such Protected Member agrees in writing to be bound by all the provisions of this Agreement.

    15.    <u>Assignment</u>.  No party hereto may assign its rights or delegate its obligations hereunder, directly or indirectly (by operation of law or otherwise), without the prior written approval of the other parties hereto and any purported assignment or delegation in violation of this Agreement shall be null and void <u>ab initio</u>; provided however, that (i) if a Protected Member makes a Permitted Disposition of all or any portion of its Membership Interest (including, but not limited to, an assignment by the Tribune Members pursuant to a Plan of Reorganization) and (ii) the adjusted tax basis of such Membership Interest to the assignee is determined in whole or in part by reference to the adjusted tax basis of such Membership Interest in the hands of such Protected Member, then such Protected Member's rights under this Agreement may be assigned to such assignee without such prior written approval.  The amount payable to any assignee of a Protected Member's rights under this Agreement shall take into account any positive adjustment under Section 743(b) of the Code with respect to such assignee.  No transfer or assignment, whether permitted or otherwise, of any party's Membership Interest shall operate to relieve any party of its obligations hereunder.

    16.    <u>Neutral Construction</u>.  With regard to each and every term and condition of this Agreement and any and all agreements and instruments subject to the terms hereof, the parties hereto understand and agree that the same have been mutually negotiated, prepared and drafted, and if at any time the parties hereto desire or are required to interpret or construe any such term or condition of this Agreement or any agreement or instrument subject hereto, no consideration will be given to which party hereto actually prepared, drafted or requested any term or condition

- 17 -

of this Agreement or any agreement or instrument subject hereto. Any reference to any law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

17.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, all of which shall be considered one and the same agreement, and will become effective when one or more counterparts have been signed by a party and delivered to the other parties. Copies of executed counterparts transmitted by telecopy, telefax or other electronic transmission service shall be considered original executed counterparts for purposes of this Section 17, provided that receipt of copies of such counterparts is confirmed.

18.    <u>Waiver of Jury Trial</u>. EACH PARTY HERETO, FOR ITSELF AND ITS AFFILIATES, HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ALL RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THE ACTIONS OF THE PARTIES HERETO OR THEIR RESPECTIVE AFFILIATES PURSUANT TO THIS AGREEMENT OR IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF. . THE PARTIES AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

**\*\* REMAINDER OF PAGE INTENTIONALLY LEFT BLANK \*\***

CHI99 5155877-1.022182.0015
8/24/09 12:19 PM

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

RICKETTS ACQUISITION LLC

By:_____
    Name:
    Title:

MMR TMA GUARANTYCO, LLC

By:_____
    Name: Thomas Ricketts
    Title: Manager

CHICAGO BASEBALL HOLDINGS, LLC

By:_____
    Name:
    Title:

TRIBUNE COMPANY

By:_____
    Name:
    Title:

CHICAGO NATIONAL LEAGUE BALL CLUB, LLC

By:_____
Name:
Title:

WRIGLEY FIELD PREMIUM TICKET SERVICES, LLC

By:_____
Name:
Title:

DIANA-QUENTIN, LLC

By:_____
Name:
Title:


TRIBUNE SPORTS NETWORK
HOLDINGS, LLC

By:_____
Name:
Title:


CHICAGO CUBS DOMINICAN
BASEBALL OPERATIONS, LLC

By:_____
Name:
Title: