## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | **Chapter 11 Cases** |
| | : | **Case No. 08-13141 (KJC)** |
| **TRIBUNE COMPANY, et al.,** | : | **(Jointly Administered)** |
| | : | |
| **Debtors.** | : | **Hearing Date:  September 4, 2009 at 10:00 a.m. (ET)** |

-------------------------------------------------x  **Objections Deadline:  September ____, 2009 at 4:00 p.m. (ET)**

## MOTION OF LAW DEBENTURE TRUST COMPANY OF NEW YORK FOR LEAVE TO CONDUCT DISCOVERY PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE OF TRIBUNE COMPANY, ITS AFFILIATES, AND CERTAIN THIRD PARTIES, OR ALTERNATIVELY, FOR THE APPOINTMENT OF AN EXAMINER

Law Debenture Trust Company of New York ("Law Debenture"), successor trustee under that certain Indenture, dated March 19, 1996, between Tribune Company ("Tribune" and with its subsidiaries, the "Debtors"[1]) (successor to The Times Mirror Company) and Citibank, N.A., for the 6.61% Debentures due 2027 and the 7 1/4 % Debentures due 2096 (as amended, the "Indenture"), as fiduciary for the interests of more than 18% of the Debtors' bondholders, pursuant to sections 105(a), 343, 1109(b), title 11, United States Code (the "Bankruptcy Code") and Fed. R. Bankr. Proc. 2004 ("Rule 2004"), moves this Court for the entry of an order authorizing and directing creditor discovery relating to Tribune's leveraged buyout transaction consummated in 2007 (the "LBO"), or, alternatively, the appointment of an examiner.[2]  In support of its motion, Law Debenture respectfully represents as follows:

---

[1]      For ease of reference Law Debenture uses the term "Debtors" to include Tribune's debtor and nondebtor guarantor affiliates.

[2]      Law Debenture has supplied alternative forms of orders as Exhibits 1 (Bankruptcy Rule 2004) and 1A (examiner appointment).

## PRELIMINARY STATEMENT

The LBO[3] -- and the unsustainable debt burden it imposed on a business already in a secular decline -- undoubtedly caused the Debtors' demise.  The architects of the LBO now concede that the transaction was a "mistake" based on assessments of the Debtors' business that were "too optimistic."[4]  Tribune commenced these chapter 11 cases within a year of the LBO, leaving billions of dollars of pre-LBO debt unpaid.  The LBO did not provide the Debtors with reasonably equivalent value in exchange for the $11.2 billion in secured debt they incurred:  the majority of the LBO debt served only to cash out former shareholders for no consideration at all.  Accordingly, the LBO and the obligations incurred in connection therewith are *prima facie* fraudulent transfers within the meaning of sections 544 and 548 of the Bankruptcy Code, applicable state law, and Third Circuit precedent.

Bankruptcy Rule 2004 was designed specifically for purposes of examining the acts, conduct, property (*i.e.* valuable claims), liabilities, and financial condition (*i.e.* insolvency) of debtors or any matter affecting the administration of a debtors' estates and any other matter relevant to chapter 11 cases.  Moreover, Rule 2004 and section 343 of the Bankruptcy Code

---

[3]    Capitalized terms in this Preliminary Statement have the meanings ascribed to them *infra*.

[4]    *See Zell Calls Tribune Co. Buy A 'Mistake'*, Boston Globe, April 16, 2009, http://www.boston.com/ae/media/articles/2009/04/16/zell_calls_tribune_co_buy_a_mistake. *See also* Andrew Ross Sorkin, *Workers Pay for Debacle at Tribune*, New York Times, Dec. 8, 2009, http://www.nytimes.com/2008/12/09/business/media/09sorkin.html?scp=1&sq=workers%20pay%20for%20debacle%20at%20tribune&st=cse ("Mr. Zell literally mortgaged the future of Tribune's employees to pursue what one analyst .. . . called 'a childhood fantasy.'");Emily Thornton, Michael Arndt, and Ronald Grover, *Sam Zell's Deal from Hell*, Business Week, July 30, 2008, http://www.businessweek.com/magazine/content/08_32/b4095000408330.htm (quoting Zell discussing Tribune's many operating subsidiaries:  "When we first undertook this project, we viewed Tribune as 60 ways to get lucky . . . ." and subsequently recognizing "the reality of [Tribune's] significant debt levels"); *Is Tribune's Leveraged ESOP Worth The Risk?*, New York Times, April 3, 2007, http://dealbook.blogs.nytimes.com/2007/04/03/is-tribunes-leveraged-esop-worth-the-risk/?scp=1&sq=Is%20Tribune%E2%80%99s%20Leveraged%20ESOP%20Worth%20The%20Risk&st=cse (noting transaction "comes with some big risks …. Tribune will be taking on an especially heavy debt load …. A Fitch analyst suggested the proposed deal would leave the company with 'little room to withstand a significant economic downturn'").   A copy of these articles is attached to the Declaration of David S. Rosner, dated August 26, 2009 (the "Rosner Decl.") as Exhibit A.

permit *any creditor* to conduct discovery concerning any matter involving property of the estate. For these reasons alone, Law Debenture, as fiduciary for one of the biggest creditor constituencies in these cases, and the constituency most harmed by the LBO, is entitled to the requested discovery.  But it is especially true given the significant conflicts and process flaws in these cases.

Neither the Debtors nor the Official Committee of Unsecured Creditors (the "Committee") has conducted a complete factual investigation into the circumstances surrounding the LBO, including, without limitation, the knowledge and intent of the bank lending group before the funding and consummation of the transaction.  Despite the normal expectation that the Committee would immediately probe deeply into the facts and circumstances surrounding the leveraged buyout, after nine months, nothing of substance addressing recoveries has transpired and no claims have been brought.

The LBO -- and its potential avoidance -- should be the principal focus of these cases.  It should be of particular concern to the Committee, which, as fiduciary, is charged with protecting the interests of *all* unsecured creditors.  Surprisingly, however, the potential litigation has not received any real and substantive attention in Court in these cases.  To the contrary, at the inception of these cases, the Committee (which includes two of the LBO-banks) retained counsel unable to prosecute LBO claims.  Only recently, at the urging of Law Debenture nine months after these cases were commenced, did the Committee attempt to rectify this problem, by voting to retain special counsel -- on the same day the Debtors and the banks were negotiating plan distributions without the Committee, apparently addressing the LBO claims, if at all, with a "sliver of equity" (*see infra* n.6).  Committee counsel believes that it can "negotiate" on behalf of the Committee and represent the Committee's interests zealously, fully, and without bias,

purportedly while simultaneously representing the LBO-banks' interests in other matters with the same zeal.  Common sense dictates that counsel will be unable to satisfy its obligations to both clients.

Based on press reports that Tribune has committed to exiting chapter 11 by year-end and has proposed a plan to the lenders (but not to the pre-LBO creditors) that will deliver all but a sliver of the reorganized equity to the LBO lenders, the process has been set up to steamroll a settlement or ignore the LBO claims without the consent of affected creditors.  However, an $11.2 billion LBO cannot simply be brushed aside as "negotiated" and "settled" without due regard for the scope and importance of the issues at hand.  For these claims to be potentially white-washed and swept under the rug would make this case a travesty.  Chapter 11 clearly should not be a vehicle to deliver reorganized equity to the lenders that caused the Debtors' demise.  To the contrary, it should be a vehicle to remedy prepetition acts that damaged the Debtors for the benefit of the creditors harmed.

Law Debenture, as a fiduciary for parties actually damaged by the LBO, has asked for reasonable access to information relating to the LBO, the contemporaneous views of the participants,[5] the claims and defenses arising therefrom, the remedies, and the recoveries pre-LBO debt should expect.  Unfortunately, the parties have consistently and affirmatively ring-fenced Law Debenture out of any process to obtain and use discovery to protect its bondholders' rights in these cases.  Law Debenture tried for weeks to reach an agreement on discovery to

---

[5]       Upon information and belief, the Committee's investigation thus far relies solely on certain of the LBO participants' and the Debtors' documents informally produced but not to date emails and communications (though JPMC has said it will produce emails), as well as interviews of key participants, that are, of course, central to the determination of knowledge, motive, foreseeability, and the reasonableness of projections.  *See, e.g., Official Committee of Unsecured Creditors, on behalf of [Lyondell Chemical Company, et al.] v. Citibank, N.A., London Branch, et al.*, Adv. Proc. No. 09-01375 (REG) (United States Bankruptcy Court, Southern District of New York) (focusing almost entirely on email communications among the leveraged purchase participants).

avoid the filing of this motion.  Lead bank, JPMorgan Chase, N.A. nominally agreed to provide

to Law Debenture documents that the Committee has and will receive relating to the LBO, but

restricted Law Debenture from actually questioning confidentiality designations and using these

documents in this Court.[6]  Such an agreement is virtually meaningless and would defeat the very

purpose of the discovery.  Astonishingly, Law Debenture has been advised that the Committee

agreed to these restrictions.

      Law Debenture respectfully submits that it, as a fiduciary for a large portion of pre-LBO

creditors to whom a "sliver of equity" has been proposed by the Debtors,[7] must have access to

the information currently withheld from it so that it has all available information from which to

determine the best way to have the Court address the LBO-related claims.  Law Debenture

therefore seeks Rule 2004 discovery so that these bankruptcy proceedings do not become a

paradigm for allowing the LBO and its participants to avoid the light of full, fair, and open court

proceedings.

      The remedying of the LBO will most certainly dictate the economic outcome of these

chapter 11 cases.  It is imperative that Law Debenture examine the documents and witnesses

pertinent to the LBO to examine the conduct of the Debtors and LBO participants and to realize

on related claims to protect their legitimate creditor interests.  Moreover, because the Lenders

apparently have already compiled and produced most of the documents to the Committee and the

Lenders have agreed to produce the documents to Law Debenture that they gave to the

Committee, this will cause no prejudice at all.  However, notwithstanding this agreement, the

---

[6]      Merrill Lynch may not be imposing the same restrictions.

[7]      *See* Tribune Presents Restructuring Term Sheet To Lenders, Sources Say, Debtwire, August 6, 2009 ("Under the plan, a sliver of equity would also be distributed to holders of the debtor's USD 1.26bn in unsecured bonds").  Remarkably, even this report allegedly is out of date.  Apparently the Debtors delivered their term sheet, without Committee involvement, weeks ago.  A copy of the article is attached to the Rosner Decl. as <u>Exhibit B</u>.

Lenders have not agreed to provide documents to Law Debenture if they have not provided them to the Committee, even though relevant and called for by Law Debenture's requests.  Moreover, certain Lenders have placed restrictions on use and even the ability to contest confidentiality designations or the right to file confidential documents under seal.  Indeed, Law Debenture merely asks that it have the right (i) to obtain all of the documents it has requested, (ii) to use the relevant documents it has requested in proceedings with this Court, and (iii) to have the right to examine witnesses about the LBO.

The Bankruptcy Code and Rules permit Law Debenture to obtain the requested Rule 2004 discovery even in the absence of conflict.  But here, the existence of conflicts only enhances the need for the requested discovery.  The Debtors are plainly conflicted:  they consummated the LBO, and their attorneys have disclosed disabling conflicts of interest on these issues.  Such conflicts of interest include those of their "conflicts" counsel, which  represented Mr. Zell and related entities *in connection with their investment in Tribune*, and which also represents Merrill Lynch & Co. ("Merrill") and Chase Insurance (a JPMorgan Chase ("JPMC") affiliate).  Committee counsel, which regularly represents Merrill and JPMC, is likewise conflicted.  Both law firms retained by the Committee disclosed their inability to initiate litigation against banks like JPMC and Merrill (which lead counsel acknowledged it cannot even investigate).  Though the Committee now seeks to retain special counsel, the results of the investigation it is handing to this new counsel was accomplished by firms investigating claims against their own clients.

Granting 2004 discovery will benefit the estates and will not unduly prejudice any parties in interest.  Law Debenture will work cooperatively with the Debtors, Committee, and other parties to ensure that its Rule 2004 discovery proceeds smoothly and efficiently and utilizes any

LBO-related documents and testimony that parties have produced thus far and agreed to produce

to Law Debenture with unreasonable restrictions.

# I.

## BACKGROUND OF THE LBO

**A.**    **Pre-LBO Note Issuances.**

    1.    Between 1992 and 1997, Tribune issued various notes and debentures, currently

outstanding in the aggregate principal amount of approximately $1.26 billion (the "Notes," and

the holders of such Notes, the "Noteholders").[8]  When issued, the Notes were unsecured

obligations of Tribune, though their respective indentures contain provisions requiring Tribune to

grant equal and ratable liens for the benefit of the Noteholders if Tribune granted liens to third

parties.[9]  Law Debenture serves as indenture trustee in a fiduciary capacity for the Noteholders

under the Indenture.

**B.**    **The LBO Transaction.**

    2.    On or about April 1, 2007, Tribune's Board of Directors approved the LBO

pursuant to which Tribune would cash out its existing shareholders and emerge with a new

owner, the newly-formed Tribune Employee Stock Ownership Plan (the "ESOP").  Samuel Zell

---

[8]    Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financing Officer of Tribune Company In Support of Bigelow Motions ("Bigelow Affidavit") ¶ 21 [Docket No. 3].  The Notes include the 4.875% Notes due 2010, the 7.25% Debentures due 2013, the 5.25% Notes due 2015, the 7.5% Debentures due 2023, the 6.61% Debentures due 2027, the 7.75% Debentures due 2096, the 5.6% (average) Medium-Term Note due 2008, the 7.25% Notes due 2013 and the 6.25% Notes dues 2026.  Id.; Tribune Form 10-K for the fiscal year ended December 30, 2007 (the "2007 10-K") at 110.  A copy of the 2007 10-K is attached to the Rosner Decl. as Exhibit C.

[9]    See, e.g., Indenture dated January 30, 1995 among New TMC Inc. (Issuer) and First Interstate Bank of California (Trustee) (the "January 1995 Indenture"); Indenture dated March 19, 1996 among The Time Mirror Company (Issuer) and Citibank, N.A. (Trustee) (the "March 1996 Indenture"); Indenture dated January 1, 1997 among Tribune Company (Issuer) and Bank of Montreal Trust Company (Trustee); First Supplemental Indenture dated October 19, 1999 supplementing and amending March 1996 Indenture; First Supplemental Indenture Dated June 12, 2000 supplementing and amending January 1995 Indenture; Second Supplemental Indenture dated June 12, 2000 supplementing and amending March 1996 Indenture; First Supplemental Indenture dated June 12, 2000

became a director on Tribune's Board of Directors on May 9, 2007 and Chairman of the Board

and Chief Executive Officer on December 20, 2007.[10]  EGI-TRB, L.L.C., an entity formed for

the benefit of Mr. Zell and his family (the "Zell Entity") received warrants to purchase

approximately 40% of Tribune's common stock.[11]  The LBO spanned eight months,

commencing in April 2007 ("Phase 1") and ending in December 2007 ("Phase 2").

**(1)    PHASE 1**

3.      Phase 1 involved the execution of new credit facilities and a cash tender offer for

nearly 50% of Tribune's outstanding common stock.

4.      **CREDIT AGREEMENT**.  To finance the tender offer, Tribune entered into the

$8.028 billion senior secured credit agreement dated May 17, 2007, with JPMC, Merrill as

Syndication Agent, and Citicorp North America, Inc. ("Citi"), Bank of America, N.A. ("BofA")

and Barclays Bank PLC ("Barclays") as Co-Documentation Agents (as amended on June 4,

2007, the "Credit Agreement," and the lenders thereunder, the "Credit Agreement Lenders").

The Credit Agreement initially consisted of:

- a $1.5 billion Senior Tranche X Term Loan Facility (the "Term X Facility");

- a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility");

- a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility");

---

supplementing and amending Indenture dated April 15, 1997 between The Times Mirror Company (Issuer) and Citibank, N.A. (Trustee).  A copy of these indentures is attached to the Rosner Decl. as Exhibit D.

[10]      2007 10-K at 204.

[11]      Tribune Form S-3 dated April 25, 2007 (the "2007 S-3") at 2 (identifying Zell Entity as a wholly owned subsidiary of Sam Investment Trust ("a trust established for the benefit of Samuel Zell and his family")); 2007 10-K at 204 (describing Zell Entity as having been "formed solely for purposes of entering into and consummating the [Leveraged Buyout];" identifying Zell as President).  A copy of the 2007 S-3 is attached to the Rosner Decl. as Exhibit E.

- a $750 million Revolving Credit Facility (the "<u>Revolving Facility</u>"); and

- a commitment for an additional $2.105 billion (the "<u>Incremental Facility</u>").[12]

5.       **SUBSIDIARY GUARANTEES.**  A number of Tribune's domestic subsidiaries --
many of which are Debtors -- provided unsecured guarantees (the "<u>Subsidiary Guarantees</u>") of
Tribune's indebtedness under the Credit Agreement.[13]  Tribune granted the Noteholders an equal
and ratable lien as required under the Indentures but did not grant them subsidiary guarantees.
Accordingly, the Credit Agreement Lenders obtained a structurally senior claim to the assets of
the Subsidiary Guarantors.

6.       **SECURITY INTERESTS.**  As security for its obligations under the Credit
Agreement, Tribune pledged its equity interests in newly-formed subsidiaries, Tribune
Broadcasting Holdco LLC and Tribune Finance LLC (hereinafter, the "<u>Pledged Equity
Interests</u>").  Consistent with the provisions in the Indenture, Tribune also provided the Pledged

---

[12]      2007 10-K at 111; Bigelow Aff. at 10 (¶ 19).

[13]      2007 10-K at 113; Bigelow Aff. at 9-11 (¶¶ 18-19) ("[T]he indebtedness under the Credit Agreement and
the indebtedness under the Bridge Facility constitute unsecured obligations at those Tribune subsidiaries … which
have  guaranteed (i) the Credit Agreement indebtedness on a senior priority basis, and (ii) the Bridge Facility
indebtedness on a subordinate basis to the Credit Agreement indebtedness …").

        The subsidiary guarantors are 5800 Sunset Productions Inc.; California Community News Corporation;
Channel 39, Inc.; Channel 40, Inc.; Chicago National League Ball Club, LLC; Chicago Tribune Company;
Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.;
Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC;
Forsalebyowner.com Corp.; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; Homeowners Realty, Inc.;
Homestead Publishing Company; Hoy Publications, LLC; Internet Foreclosure Service, Inc.; KIAH Inc.; KPLR,
Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications, LLC; New Mass. Media, Inc.;
Orlando Sentinel Communications Company; Patuxent Publishing Company; Southern Connecticut Newspapers,
Inc.; Star Community Publishing Group, LLC; Stemweb, Inc.; Sun-Sentinel Company; The Baltimore Sun
Company; The Daily Press, Inc.; TMLH 2, Inc.; TMLS 1, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution
Company; Tribune (FN) Cable Ventures, Inc.; Tribune Broadcast Holdings, Inc.; Tribune Broadcasting Company;
Tribune Broadcasting Holdco, LLC; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune
Entertainment Company; Tribune Finance LLC; Tribune Interactive, Inc.; Tribune Los Angeles, Inc.; Tribune
Manhattan Newspaper Holdings, Inc.; Tribune New York Newspaper Holdings, LLC Tribune NM, Inc.; Tribune
Television Company; Tribune Television Holdings, Inc.; Tribune Television of New Orleans, Inc.; Tribune
Television Northwest, Inc.; Virginia Gazette Companies, LLC; WDCW Broadcasting, Inc.; WGN Continental
Broadcasting Company; WPIX, Inc.; and WTXX Inc.  (hereinafter, the "<u>Subsidiary Guarantors</u>").

Equity Interests as security for its indebtedness with respect to the Notes on an equal and ratable

basis.  Thus, the interests of the Noteholders and the Credit Agreement Lenders rank <u>pari</u> <u>passu</u>

with respect to Debtor Tribune's assets.[14]

      7.     **PHASE 1 TRANSACTIONS**.  Phase 1 consisted of the following transactions:

- Tribune launched a tender offer to purchase up to 126 million shares of its common stock at $34 per share; the offer expired on May 24, 2007;

- the ESOP purchased approximately 8.9 million shares of common stock at $28 per share, issuing a $250 million promissory note to Tribune with a 30-year maturity;

- the Zell Entity invested $250 million in Tribune (the "<u>Initial Zell Investment</u>") in exchange for (a) approximately 1.5 million shares of common stock valued at $34 per share and (b) a $200 million unsecured subordinated exchangeable promissory note from Tribune to be repaid immediately upon consummation of the Transaction (<u>i.e.</u>, at the completion of Phase 2);[15] and

- the proceeds from the Tranche X Facility ($1.5 billion) and the Tranche B Facility ($5.515 billion) (a) financed the repurchase of the 126 million shares of common stock on June 4, 2007 paying Tribune's shareholders and (b) refinanced the former five-year credit agreement and bridge credit agreement (pursuant to which Tribune (and not its subsidiaries) was a borrower).[16]

---

[14]     *See* 2007 10-K at 113 ("The Company's other senior notes and senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as required by the indentures governing such notes and debentures"); Bigelow Aff. at 9-10 (¶ 18) "[T]he Credit Agreement indebtedness, the Bridge Facility indebtedness, the Notes and the PHONES -- are … <u>pari passu</u> in payment priority at Tribune . . . .  The Credit Agreement indebtedness and the Notes are secured at Tribune, equally and ratably, by a stock pledge of the equity in two subsidiaries").

[15]     2007 S-3 at 2.

[16]     *See* 2007 10-K at 99 (indicating shares were retired on June 4, 2007); at 111 ("The proceeds from the Tranche X Facility and the Tranche B Facility were used … in connection with the consummation of the Share Repurchase … and to refinance the Company's former five-year credit agreement and former bridge credit agreement"); at 114 ("On June 19, 2006, the Company entered into a five-year credit agreement [providing for a $1.5 billion unsecured term facility and a $750 million unsecured revolving facility] and a 364-day bridge credit agreement [providing for a $2.15 billion unsecured bridge facility] …. On June 4, 2007, the Company repaid its obligations under the five-year credit agreement and bridge credit agreement with proceeds from the Credit Agreement"); Tribune Form 10-Q, dated May 9, 2007 at 17 ("As of April 1, 2007, the Company had outstanding borrowings of $1.5 billion and $1.325 billion under the term facility and the bridge facility, respectively, and the Company had no borrowings under the revolving facility").  A copy of the Tribune Form 10-Q, dated May 9, 2007, is attached to the Rosner Decl. as <u>Exhibit F</u>.

8.     The following appears to constitute the salient "sources and uses" of the financing with respect to Phase 1:

| Sources (Phase 1) | | Uses (Phase 1) | |
|---|---|---|---|
| Tranche X Facility | $1.500 billion | Share Repurchase | $4.288 billion |
| Tranche B Facility | $5.515 billion | Refinance Existing Tribune Debt | $2.825 billion |
| Zell Investment | $0.250 billion | Estimated Fees and Expenses[17] | $0.152 billion |
| **Total** | **$7.265 billion** | **Total** | **$7.265 billion** |

(2)    **PHASE 2**

9.     Phase 2 involved Tribune's entry into additional credit facilities, the repurchase of any remaining common stock, and the issuance of a $225 million subordinated Note in favor of Mr. Zell, with warrants to purchase Tribune's common stock.

10.    **BRIDGE FACILITY.**  On December 20, 2007, Tribune entered into the Interim Loan Agreement (hereinafter, the "Bridge Facility Agreement," and the lenders thereunder, the "Bridge Facility Lenders") among the same agent banks that participated in the Credit Agreement, i.e., Merrill as Administrative Agent, JPMC as Syndication Agent, and Citi, BofA and Barclays as Co-Documentation Agents.  Under that agreement, the Bridge Facility Lenders extended a $1.6 billion unsecured "bridge" facility (the "Bridge Facility").[18]  The amount of the Bridge Facility was reduced by $500 million in the days immediately prior to the closing,

---

While a portion of these former facilities appears to have been to repay then-existing debt (e.g., $250 million to refinance certain medium-term notes), the clear majority appears to have been used to repurchase stock. See id.

[17]    Tribune Form 8-K, dated April 5, 2007, Ex. 10.10.  A copy of the Tribune Form 8-K, dated April 5, 2007 is attached to the Rosner Decl. as Exhibit G.  The estates need to investigate potential claims against the recipients of this $152 million in fees in connection with value to the estates and adherence to professional and fiduciary duties.

[18]    2007 10-K at 111 ("On December 20, 2007, the Company entered into (i) a $1.6 billion unsecured Bridge Facility Agreement … and (ii) a number of increase joinders pursuant to which the Incremental Facility became part of the Tranche B Facility"); Bigelow Aff. at 11 (¶ 20).

ostensibly to give the Bridge Facility Lenders "a little breathing room."[19]  Obligations under the

Bridge Facility Agreement are guaranteed, albeit on a subordinated basis to the Credit

Agreement obligations, by the Subsidiary Guarantors.[20]

      11.    **INCREMENTAL TRANCHE B FACILITY.**  As noted, the Credit Facility included a

provision to increase Tranche B by $2.105 billion (as defined above, the "Incremental Facility").

On December 20, 2007, Tribune entered into a number of "increase joinders" pursuant to which

the Incremental Facility became part of the Tranche B Facility.

      12.    **PHASE 2 TRANSACTIONS.**  Phase 2 included the following transactions:

- on December 20, 2007, a wholly-owned subsidiary of the ESOP serving as the "Merger Sub" merged into Tribune, with Tribune emerging as the surviving company post-merger;[21]

- with certain exceptions, on December 20, 2007, the remaining shares of Tribune common stock were cancelled and automatically converted into $34 in cash; an aggregate consideration of approximately $4.0 billion was paid, funded by the Bridge and Incremental Facilities;[22]

- the Zell Entity received cash for the shares of common stock it held (1.5 million shares) and repayment of the Initial Zell Investment, with interest and fees ($261 million); and

---

[19]    Amy Thomas and Shannon D. Harrington, *Being Like Zell in August Means 35% in Tribune Deal*, Bloomberg.com, December 13, 2007, *available at* http://www.bloomberg.com/apps/news? pid=2060187&sid=aYd0rJItZnRg&dlbk (last visited on 7/21/09).  A copy of this article is attached to the Rosner Decl. as Exhibit H.

[20]    2007 10-K at 113 ("Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the company's direct and indirect U.S. subsidiaries"); Bigelow Aff. at 11 (¶ 20) ("The Bridge Facility indebtedness is unsecured but is guaranteed, on a senior subordinate basis, by the [Subsidiary Guarantors]").

[21]    2007 10-K at 98-99.

[22]    Tribune Form 8-K, dated December 28, 2007, at 6 ("On December 20, 2007, pursuant to the terms of the Merger Agreement, the Merger of Merger Sub with and into the Company was consummated …. The aggregate consideration paid with respect to the cancelled shares of Company Common Stock was approximately $4.0 billion. The aggregate consideration was funded by the Second Step Credit Facilities, the purchase by EGI-TRB of the Subordinated Note and the Warrant … and available cash on hand").  A copy of the Tribune Form 8-K, dated December 28, 2007, is attached to the Rosner Decl. as Exhibit I.

- the Zell Entity purchased, for $315 million (the "Second Zell Investment"), a $225 million subordinated promissory note and a 15-year warrant entitling it to purchase approximately 43.4 million shares of Tribune's common stock, representing approximately 40% of the economic equity interest in Tribune.[23]

13.     Although there may have been certain minor amendments to the transaction[24] as disclosed that are not illustrated, the following appears to constitute the salient "sources and uses" of financing in Phase 1 and Phase 2:

| SOURCES | | USES | |
|---|---|---|---|
| | **Phase 1** | | **Phase 1** |
| Tranche X Facility | $1.500 billion | Share Purchase | $4.288 billion |
| Tranche B Facility | $5.515 billion | Refinance Existing Tribune Debt | $2.825 billion |
| Initial Zell Investment | $0.250 billion | Estimated Fees and Expenses | $0.152 billion |
| | **Phase 2** | | **Phase 2** |
| Bridge Facility | $1.600 billion | Purchase Remaining Shares | $4.000 billion |
| Incremental Facility | $2.105 billion | Initial Zell Investment/Shares | $0.261 billion |
| Second Zell Investment | $0.315 billion | Estimated Fees And Expenses[25] | $0.224 billion |
| **Total** | **$11.285 billion** | **Total** | **$11.750 billion** |

14.     Thus, the LBO saddled the Debtors with an overwhelming debt burden of more than $11 billion. Approximately $8.3 billion of loan proceeds went to cash out shareholders while pre-existing creditors were left unpaid -- and with what appears to have been little prospect of being repaid. Before the LBO, the ratio of indebtedness to EBITDA was 4.8:1. After the LBO, it leaped to an extraordinary 11.8:1.[26] At that time, comparable diversified publishing companies were trading publicly at a significantly smaller average ratio of *total* enterprise value

---

[23]     2007 10-K at 99. *See also* Bigelow Aff. ¶ 18 ("Tribune is obligated on a $225 million subordinated promissory note to … [the Zell Entity and certain of its permitted assignees,] which note is subordinate to the indebtedness under the Credit Agreement, the Bridge Facility and the Notes").

[24]     For example, the Bridge Facility was originally contemplated and disclosed to be in an amount equal to $2.1 billion, but was subsequently downsized to $1.6 billion.

[25]     Tribune Form 8-K, April 5, 2007, Ex. 10.11. Again, the estates need investigate potential claims against the recipients of this $224 million in fees in connection with value to the estates and adherence to professional and fiduciary duties.

[26]     Tribune Form 10-Q, dated May 9, 2007; 2007 10-K.

(debt *plus* equity) to EBITDA.[27]  Moreover, there was essentially no equity in the deal -- $250

million -- representing approximately only 2% of the total value of the transaction.  Interestingly,

the Debtors have never published any solvency opinion in connection with Phase 2 of the LBO,

which casts substantial doubt on the solvency opinions delivered in connection with Phase 1 of

the LBO.  Upon information and belief, the Phase I solvency opinions, done on a consolidated

basis, were based on the same assumptions that Tribune has conceded were "too optimistic" at

the time.

15.     As a result of the transaction, the bond ratings plummeted, indicating that it was

unlikely that Tribune would have the financial capacity to pay interest and repay principal with

respect to its new found debt burden.  Upon announcement and after the close of the LBO,

Tribune's bond ratings plummeted.  For example, specifically with respect to the 5 ¼% notes,

S&P and Moody's lowered the ratings to CCC+ and Caa2, respectively, whereas prior to the

LBO the ratings were BB+ and Ba1, respectively.  According to Moody's, its Caa2 rating means

the bonds are of "poor standing," "may be in default," or there "may be present elements of

danger with respect to principal and interest."  Accordingly, the LBO forced both ratings

agencies to doubt the future viability of Tribune as a going concern.

**C.     The Debtors' Financial Demise.**

16.     The Bigelow Affidavit asserted the following reasons for the bankruptcy filing:

- Advertising was down industry-wide in 2008 by approximately 15% to 20% in metropolitan markets.
- The Debtors' broadcasting revenue in 2008 lagged 2007 performance.
- Revenue was down 10% through November 2008 versus 2007 with advertising revenues down 18% and broadcasting revenues down 3%.
- Tribune's operating cash flow was down 33% (excluding one-time items).

---

[27]     Tribune Form SC TO-I, April 25, 2007, Ex. C.10.  A copy of the Tribune Form SC TO-1, dated April 25, 2007, is attached to the Rosner Decl. as Exhibit J.

- "The Debtors face increasing constraints on liquidity, including the ability to service the approximately $13 billion of indebtedness owed to their lenders and noteholders."

Bigelow Affidavit ¶¶ 12, 24.

17.     The negative trends that led to the Debtors' bankruptcy filings identified in the Bigelow Affidavit started well before the LBO.  The fact that the Debtors could not have picked a worse time to leverage the business with a massive amount of debt was not unexpected.  At least one analyst, Peter Appert at Goldman Sachs, concluded that the LBO put Tribune "in a precarious financial position" from the start.[28]  The Annual Report on American Journalism stated at the start of 2007 that the tension "between managing decline and maneuvering through transition will become even greater" in 2007.[29]  Specifically, the report declared bluntly that "[t]he fundamentals are all problematic" and "[t]he entire business model of journalism may be in flux in a few years."[30]  The report added, with respect to the newspaper business in particular, that "[t]he year 2006 was terrible in many respects, and there seems little prospect that 2007 will be much better."[31]

18.     Of course, if the Debtors' indebtedness did not include the $8.3 billion used to cash out former shareholders, the Debtors would have been able to withstand this predictable downturn in the publishing business.  Assuming a conservative 4.0% interest rate for all of the

---

[28]     Frank Ahrens, *Zell in Talks with Geffen on Deal for L.A. Times*, Wash. Post, Apr. 5, 2007, at D1, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/04/04/AR2007040402591.html.  A copy of this article is attached to the Rosner Decl. as Exhibit K.

[29]     The State of the News Media 2007:  An Annual Report on American Journalism, http://www.stateofthemedia.org/2007/narrative_overview_economics.asp?cat=4&media=1 (last visited on 7/22/09).  A copy of this article is attached to the Rosner Decl. as Exhibit L.

[30]     *Id.*

[31]     The State of the News Media 2007:  An Annual Report on American Journalism, http://www.stateofthemedia.org/2007/narrative_newspapers_economics.asp?cat=3&media=3 (last visited on 7/22/09).  A copy of this article is attached to the Rosner Decl. as Exhibit M.

LBO facilities, the Debtors would have saved $332 million in annual interest expense.  Indeed, according to the Bigelow Affidavit, without the LBO debt, the Debtors' would have positive book equity value.  Bigelow Affidavit ¶ 11.  There is no doubt that the LBO debt led to the filing of these chapter 11 cases.

## II.

## CHAPTER 11 CASES

19.     On December 8, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Neither a trustee nor an examiner has been appointed in these Chapter 11 cases.

20.     On December 18, 2008, the Office of the United States Trustee appointed the nine-member statutory Committee.  Two members -- including JPMC and Merrill -- are Credit Agreement Lenders and/or Bridge Facility Lenders.[32]  In their List Of Creditors Holding The Thirty Largest Unsecured Claims (the "Top 30 List") the Debtors identify (a) JPMC as the largest unsecured creditor in its capacity as a Credit Agreement Lender ($1,045,833,000 claim) and a Bridge Facility Lender ($437,371,428 claim) and (b) Merrill as one of the largest unsecured creditors in its capacity as a Bridge Facility Lender ($437,371,428 claim).[33]  As LBO

---

[32]     The remaining Committee members are Deutsche Bank Trust Company Americas, as Indenture Trustee, Warner Bros. Television, William Niese, Pension Benefit Guaranty Corporation, Washington-Baltimore Newspaper Guild, Local 32035, Buena Vista Television, and Wilmington Trust Company.  See Second Amended Notice of Appointment of Committee of Unsecured Creditors, dated May 26, 2009 (Docket No. 1238).

[33]     Consolidated List of Creditors Holding the Thirty Largest Unsecured Claims Against the Debtors, dated December 8, 2008 (Docket No. 1); see Debtwire, Tribune's Bank Lenders May Seek Unsecured Committee Seats Tomorrow, December 17, 2008 ("In an unusual twist, Tribune's bank lenders may seek a seat at the table at tomorrow's formation meeting for the official committee of unsecured creditors …. The lenders potential push for committee representation stems from the atypically loose security package backing their debt").  A copy of this article is attached to the Rosner Decl. as Exhibit N.

lenders, their presence on the Committee and status as clients of Committee counsel disable

Committee counsel from investigating and negotiating fairly from the pre-LBO creditors'

perspective and pursuing claims if any are found to exist.  Such a dynamic supports Law

Debenture's independent analysis of the LBO.

21.     The following chart summarizes where each of these creditors appears in the

Debtors' capital structure.

| COMMITTEE MEMBER | CAPACITY IN WHICH APPOINTED | OTHER CAPACITIES |
|---|---|---|
| JPMC | Credit Agreement/ Bridge Facility Lender to Tribune Company | -- Administrative Agent under Credit Agreement<br>-- Syndication Agent under Bridge Facility Agreement |
| Merrill | Bridge Facility Lender to Tribune Company | -- Syndication Agent under Credit Agreement<br>-- Administrative Agent under Bridge Facility Agreement |

## A.     The Committee's And Debtors' Retained Professionals.

22.     The Committee retained two law firms, Chadbourne & Parke, LLP

("Chadbourne") and Landis, Rath & Cobb LLP ("LRC" and with Chadbourne, "Committee

Counsel").  Both firms list various affiliates of JPMC as current clients.[34]  Chadbourne also

currently represents Merrill and affiliates.[35]

23.     Both firms supplemented their disclosures to advise they are unable to initiate or

pursue litigation against JPMC (or, in the case of Chadbourne, JPMC and Merrill) due to

---

[34]     *See* Affidavit Of David M. Lamay in support of retention application (Docket No. 243) ("Lamay Affidavit") at Ex. 2 (listing, as "Active Unrelated Representations" for unsecured creditors, for the pre-petition lenders, and for agents under pre-petition credit agreements:  JPMorgan Chase & Co., JPMorgan Securities, Inc., JPMorgan Capital Corporation and JPMorgan Bank, S.A., Institution Of Multiple BA); Affidavit Of Adam G. Landis In Support of retention application (Docket No. 242) at Exhibit 2 (disclosing, with respect to JPMC, that LRC "represents this entity or an affiliated or related entity in matters unrelated to the Chapter 11 cases").

[35]     Lamay Aff. at Ex. 2 (listing "Active Unrelated Representations" for unsecured creditors, for pre-petition lenders and for agents under pre-petition credit agreements Merrill Lynch & Co.).

conflicts arising out of pre-existing relationships with these entities or their affiliates.  Both

advise they had received written confirmation from JPMC (or, in the case of Chadbourne, JPMC

and Merrill) of their ability "to *review and investigate* certain possible avoidance and litigation

issues potentially arising in connection with the (i) [Credit Agreement and (ii) Bridge Facility

Agreement] … and to *negotiate* with [them] … concerning such issues," but that neither is "able

to initiate or pursue litigation against [them] … relating to such issues."[36]  Little comfort for the

pre-LBO creditors.

24.     Contrary to these assertions, if conflicted counsel is unable to prosecute claims

against its clients, it logically would be unable to investigate and negotiate against the same

clients.  Both Delaware and New York law are consistent with this view.  Delaware law provides

that "a lawyer shall not represent a client if the representation involves a concurrent conflict of

interest.  A concurrent conflict of interest exists if:  (1) the representation of one client will be

directly adverse to another client; or (2) there is a significant risk that the representation of one or

more clients will be materially limited by the lawyer's responsibilities to another client, a former

client or a third person or by a personal interest of the lawyer."  Del. R. Prof. Resp. 1.7.

Similarly, New York law provides that a "lawyer shall decline proffered employment if the

exercise of independent professional judgment in behalf of a client will be or is likely to be

adversely affected by the acceptance of the proffered employment, or if it would be likely to

involve the lawyer in representing differing interests, except to the extent permitted under DR 5-

105.  N.Y. Code Prof. Resp. DR 5-105(A).  The Second Circuit has held that it is "prima facie

improper" for an attorney to represent simultaneously a client and another party with interests

---

[36]     First Supplemental Affidavits Of David Lamay (Docket No. 395) ("Lamay Supp. Aff.") and Adam Landis (Docket No. 404) ("Landis Supp. Aff.") at 2-3 (¶ 4) and 3-4 (¶ 9), respectively (emphasis added).

directly adverse to that client.  *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir.

1976).  The attorney "must be prepared to show, at the very least, that there will be no actual or

apparent conflict in loyalties or diminution in the vigor of his representation."  *Id.*

25.      AlixPartners, LLP, financial advisor to the Committee, also has indicated that

JPMC, Merrill, and/or their respective affiliates are current clients of the firm.  In a supplemental

declaration, AlixPartners stated that while it is "not prohibited by any ethical rules from

reviewing, investigating and testifying" in connection with the LBO "as a business practice and

to preserve client relations AlixPartners may not be in a position to pursue such investigation or

otherwise support the litigation."[37]  Yet Law Debenture is advised that AlixPartners is reviewing

the all too critical solvency issue.  Plainly that leaves Law Debenture and other creditors without

a financial advisor to investigate the highly technical financial transaction.

26.      The Office of the United States Trustee asked Committee Counsel whether it can

investigate and pursue malpractice claims against advisors in the LBO transaction, specifically

Citigroup Global Markets, Inc. (financial advisor to Tribune), Merrill Lynch, Pierce, Fenner &

Smith Incorporated (financial advisor to Tribune), Morgan Stanley & Co., Inc. (financial advisor

to the Special Committee of the Board of Directors) and Valuation Research Corporation

(advisor to the Board of Directors concerning solvency).  Except with respect to Valuation

Research Corporation, Chadbourne cannot conduct such an investigation, and instead

recommended that the Committee either retain additional counsel or enlist LRC.[38]

27.      Now, as indicated, the Committee finally has sought to retain special counsel.

However its role appears at the outset to be quite limited:  (1) to assist the Committee in the

---

[37]      First Supplemental Declaration of Alan D. Holtz of AlixPartners, LLP as Financial Advisors to the Official
Committee of Unsecured Creditors (Docket No. 425) ¶ 4.

[38]      Lamay Supp. Aff. at 3-5 (¶¶ 5-9); Landis Supp. Aff. at 4-5 (¶¶ 9-11), respectively.

analysis of the potential causes of action; (2) to participate in negotiations with the lenders and the Debtors; and (3) if necessary, prosecute such causes of action as described above to the extent, by subsequent motion, the Committee may be authorized to bring such causes of action.[39] Importantly, it does not appear that special counsel is performing these functions independent of the Committee's general counsel -- instead, Law Debenture is quite concerned that the function of special counsel may simply be a salve for the appearance of independence, particularly if it turns out that special counsel is relying on the work done by the conflicted advisors.

28.     While the Debtors retained a number of law firms, their primary bankruptcy counsel is Sidley Austin LLP ("Sidley") (assisted by Delaware co-counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A.).  The Debtors also retained Jenner & Block LLP ("Jenner") as "special counsel for certain litigation matters" pursuant to section 327(e) of the Bankruptcy Code.  Sidley currently represents JPMC, Merrill, and Merrill Lynch & Co.  Jenner's current clients include (a) the Zell Entity, Equity Group Investments LLC, and Zell -- whom they represent "in connection with an investment made to the Debtors," as well as Merrill and Chase Insurance (which Jenner submits is "related" to JPMC).[40]

29.     A summary of the various professionals and the limitations on their ability to initiate causes of action relating to the LBO appears below:

---

[39]     Application of the Official Committee of Unsecured Creditors  of Tribune Company, et al. Pursuant to 11 U.S.C. §§ 328 and 1103 and Fed. R. Bankr. P. 2014 for an Order Authorizing the Employment and Retention of Zuckerman Spaeder LLP as Special Counsel Nunc Pro Tunc to August 6, 2009, dated August 12, 2009 (Docket No. 1953) at 5 (¶ 13).

[40]     See 2007 10-K at 204 (noting Zell Entity was formed "solely for the purposes of entering into [the Leveraged Buyout]"); Declaration Of David J. Bradford in support of Jenner retention application (Docket No. 142) at ¶ 15 & Ex. B ("Jenner represented Sam Zell, Equity Group Investments, LLC and EGI-TRB, LLC in connection with an investment made in the Debtors.  Jenner represents or has represented entities that are directly or indirectly related to Mr. Zell or Equity Group Investments, LLC, including, but not limited to Equity Lifestyle Properties, Ltd., Equity Group Investments, and E.R.P.").

| FIRM | RETENTION | CONFLICTS |
|---|---|---|
| Chadbourne | Committee Counsel | --      Currently represents JPMC, Merrill and/or their respective subsidiaries<br>--      Cannot initiate or pursue litigation against JPMC or Merrill relating to such issues<br>--      Cannot investigate, initiate, pursue possible malpractice claims against most transaction advisors, *e.g.*, Citigroup Global Markets Inc.; Merrill Lynch, Pierce, Fenner & Smith, and Morgan Stanley & Co., Inc. |
| LRC | Committee Counsel | --      Currently represents JPMC and Citicorp USA |
| AlixPartners | Financial Advisors to the Committee | --      Currently represents JPMC, Merrill and/or their respective subsidiaries |
| Sidley | Debtors' 327(a) Counsel | --      Currently represents JPMC and Merrill |
| Jenner | Debtors' 327(e) "Special Litigation" Counsel | --      Represented Mr. Zell and Zell Entity "in connection with an investment made in the Debtors;"<br>--      Currently represents Zell affiliates<br>--      Currently represents Merrill Lynch & Co. and Chase Insurance |

30.     Law Debenture points out the foregoing to highlight for the Court its overriding concern, informed by the passage of the entirety of these cases and the retention of new counsel only after the Debtors presented the LBO Lenders with a plan, that the LBO-related claims may be grossly undervalued.  Accordingly, Law Debenture respectfully suggests pre-LBO creditors must separately analyze the claims and, if necessary, seek authority to bring them.

## III.

### RELIEF REQUESTED

31.     Law Debenture respectfully requests entry of an order, pursuant to Sections 105(a), 343, and 1109(b) of the Bankruptcy Code and Bankruptcy Rule 2004, authorizing and directing (a) the production of documents by (i) the Debtors; (ii) Merrill and JPMC (collectively, the "Pre-Petition Agents"); and (iii) Citigroup Global Markets, Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley, and Valuation Research Corporation

(collectively, the "Pre-Petition Advisors") in response to the document requests attached as

Exhibits 2A-2C, and (b) the deposition(s) of the representatives who are most knowledgeable

about the matters for examination set forth in Exhibits 2A-2C.

32.     Law Debenture previously sought this discovery consensually.  Indeed, JMPC and

other parties had agreed to provide Law Debenture with all documents produced to the

Committee.  However, JPMC refused to allow Law Debenture to use the documents in this Court

and refused to provide Law Debenture with any additional documents or any depositions.[41]

Counsel to the Committee apparently agreed to this arrangement with JPMC.  Production in that

manner does not permit the documents to be put to any meaningful use.

## IV.

## ARGUMENT

### THE COURT SHOULD GRANT 2004 DISCOVERY TO A FIDUCIARY FOR A MAJOR CREDITOR CONSITUENCY

**A.     STANDARDS APPLICABLE TO REQUESTS FOR RULE 2004 DISCOVERY.**

33.     Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the

court may order the examination of any entity."  Fed. R. Bankr. P. 2004(a).  Similarly, section

343 of the Bankruptcy Code provides "[c]reditors … may examine the debtor."  11 U.S.C. § 343.

A Rule 2004 examination is not limited to the debtor, though here Law Debenture seeks it from

parties-in-interest including the Debtors.  The examination may be made of any entity with

knowledge of the debtor's acts, property, liabilities, and financial affairs relating to the debtor's

bankruptcy proceedings.  *In re Valley Forge Plaza Assocs.*, 109 B.R. at 674; *In re Fearn*, 96

B.R. 135, 138 (Bankr. S.D. Ohio 1989).  Emphasizing the broad purpose of Rule 2004, courts

---

[41]     Merrill did not require the same restrictions on the use of the documents as JPMC but did not agree to depositions.

have been inclined to allow examination of any third party who can be shown to have had

dealings with the debtor. *In re Ionosphere Clubs, Inc.*, 156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17

F.3d 600 (2d Cir. 1994).

34.    Rule 2004 is recognized as the "basic discovery device used [in] bankruptcy

cases." *In re French*, 145 B.R. 991, 992 (Bankr. D.S.D. 1992).  The purpose of Rule 2004 is to

permit a broad investigation into the financial affairs of the debtors to assure the proper

administration of bankruptcy estates, to discover assets (including claims), and to expose any

improper conduct. *In re Wash. Mut., Inc.*, 08-12229, 2009 WL 1851120, at *3 (Bankr. D. Del.

2009) (stating that "[l]egitimate goals of Rule 2004 examinations include discovering assets,

examining transactions, and determining whether wrongdoing has occurred."); *In re Recoton*

*Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); *In re Symington*, 209 B.R. 678, 683 (Bankr.

D. Md. 1997); *Valley Forge Plaza Assocs.*, 109 B.R. at 674.

35.    Rule 2004(b) provides that the scope of the examination may relate to the "acts,

conduct, or property or to the liabilities and financial condition of the debtor, or to any matter

which may affect the administration of the debtor's estate, or to the debtor's right to a

discharge." Fed. Bankr. R. 2004(b).  In addition, "the examination may also relate to the

operation of any business and the desirability of its continuance, the source of any money or

property acquired or to be acquired by the debtor for purposes of consummating a plan and the

consideration given or offered therefore, and any other matter relevant to the case or to the

formulation of a plan." *Id.*

36.    The scope of a Rule 2004 examination is much broader than discovery under the

Federal Rules of Civil Procedure. *In re Ecam Pubs., Inc.*, 131 B.R. 556, 559 (Bankr. S.D.N.Y.

1991) (noting that the scope of Rule 2004 questioning was extremely broad); *see also In re*

*Corso*, 328 B.R. 375, 383 (Bankr. E.D.N.Y. 2005) (same); *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (same).  Indeed, courts have recognized that the scope of Rule 2004 examinations is broad, unfettered, and can legitimately be in the nature of a "fishing expedition."  *Wash. Mut.*, 2009 WL 1851120, at *3; *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008); *In re Lev*, 2008 WL 207523, at *3 (Bankr. D.N.J. 2008); *In re Bakalis*, 199 B.R. 443, 447 (Bankr. E.D.N.Y. 1996); *In re Valley Forge Plaza Assocs.*, 109 B.R. at 674; *In re Wilcher*, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985); *In re Johns-Manville Corp.*, 42 B.R. 362, 364 (S.D.N.Y. 1984) (same).

37.     Rule 2004 discovery is not limited to use by debtors and official committees.  To the contrary, courts have repeatedly recognized that individual creditors and other parties in interest may obtain Rule 2004 discovery consistent with specific language of the rule.  *In re Lehman Bros. Inc.*, 2008 WL 5423214 (Bankr. S.D.N.Y. 2008); *In re Poirier*, 214 B.R. 53, (Bankr. D. Conn. 1997) ("The broad scope and ready availability of a Rule 2004 Examination *provides a forum for an individual creditor* to question a debtor at great length on all matters relevant to the debtor's financial affairs. . . .") (emphasis added).

**B.     THE LBO REQUIRES A THOROUGH INVESTIGATION.**

38.     The discovery requested herein will provide critical information with respect to the LBO to evaluate what appear to be *prima facie* viable claims,[42] including, but not limited to actual and constructive fraudulent conveyance claims, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.  The proposed discovery relates to the LBO, and the

---

[42]     The relief sought herein is without prejudice to Law Debenture's right to seek standing to prosecute such claims or other remedies if an estate representative fails to promptly commence a lawsuit based on publicly available information.

Respondents (*i.e.*, the Debtors, the Pre-Petition Agents, and the Financial Advisors) undeniably played critical roles in the transaction.

39.    The LBO was a complex transaction that requires a thorough investigation with all pertinent facts brought openly and publicly to the Court's attention.  This is simply not a matter for a quick Bankruptcy Rule 9019 settlement, in a plan, with a perfunctory recitation of the underlying case.  *See In re Spansion Corp.*, Case No. 09-10690, 2009 WL 1531788 (Bankr. D. Del. June 2, 2009) (KJC) (denying approval of settlement pursuant to Bankruptcy Rule 9019 based where court found it unlikely that parties undertook a reasonable evaluation of the merits of the litigation and the record was inadequate to allow the court to properly evaluate the strengths and weaknesses of the litigation or the appropriateness of the proposed settlement payment).  The LBO spanned more than eight months, involving the execution of credit facilities totaling more than $11 billion, the distribution of at least $8.3 billion in loan proceeds to shareholders, and the payment of more than $370 million in fees and expenses.[43]  It also entailed various transactions among the Zell Entity, the ESOP, and Tribune, including share repurchases and the issuance of more than $500 million in promissory notes.

40.    Standing alone, the publicly available information concerning the LBO strongly suggests that the estates easily have colorable claims, including those for constructive fraudulent conveyance, that should be prosecuted by the injured parties.  Rule 2004 discovery concerning the facts and circumstances surrounding the LBO and its impact on the Debtors plainly relates

---

[43]    Based upon prevailing decisions of the Third Circuit in the area of settlement payments under section 546 of the Bankruptcy Code, it may be prudent, if not required, pursuant to section 554 of the Bankruptcy Code for the estates to abandon claims, if any, for recovery from shareholders back to creditors for pursuit under state law.  *See Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 516 (3d Cir. 1999) (holding that "[d]espite the fact that payments to shareholders in an LBO are not the most common securities transaction ,we see no absurd result from the application of the statute's plain language and will not disregard it.  We hold, therefore, that section 546 applies to the transaction and prevents its avoidance under section 548(a)(1)(B).").  Accordingly, Law Debenture reserves the right to move for abandonment of these claims.

"to the acts, conduct or property or to the liabilities and financial condition of the debtor."  Fed.

R. Bankr. P. 2004.

41.    The first critical issue with respect to a constructive fraudulent conveyance claim

is the debtor's solvency.  11 U.S.C. § 548(a)(1)(B)(ii)(I).  Here, there is reason to believe that, if

not insolvent, the LBO rendered the Debtors insolvent or with unreasonably small capital.  In

addition to increasing the ratio of its indebtedness to Tribune's EBITDA from under five times to

over eleven times, the Debtors' projections relied on obviously unrealistic assumptions showing

a reversal in the negative operational and financial trends with the Debtors' business.  According

to one news report, the projected EBITDA for 2008, calculated by Valuation Research

Corporation as part of their May 9, 2007 Solvency Opinion Analysis, was already off by 24% by

December 5, 2007 (still two weeks before phase two of the LBO closed).[44]  Even the solvency

analysis provided by the Valuation Research Corporation on May 9, 2007 is suspect as there is

no indication that the Debtors 2007 first quarter numbers – which reflected a 12% decline in

operating cash flow and a 16% decline in operating profit from the first quarter of 2006 – were

taken into account.[45]  Mr. Zell admitted in a public interview that the Board had relied on

projections indicating a 6% decline in revenues though obvious signs pointed to a much steeper

decline.[46]

42.    There was no cataclysmic change in the Debtors' businesses in the months after

the LBO.  Just the opposite, upon the incurrence of its massive debt load, the Debtors'

---

[44]    Dennis K. Berman, *How Solvent is Tribune Co.?*, WSJ Blogs, Deal Journal, December 5, 2007, available at http://blogs.wsj.com/deals/2007/12/06/how-solvent-is-tribune-co.  A copy of this article is attached to the Rosner Decl. as Exhibit O.

[45]    *Compare* Press Release, Tribune Company, Tribune Reports 2007 First Quarter Results (Apr. 19, 2007) and Valuation Research Corporation, Tribune Company, Solvency Opinion Analysis (May 9, 2007).  Copies of these documents are attached to the Rosner Decl. as Exhibit P.

bankruptcy was the natural consequence of prevailing business trends affecting the Debtors' and

the entire publishing industry caused by the decline in newspaper circulation that started years

before the LBO.  As one press report indicated:

> Other newspaper companies have also struggled with heavy debt, a
> downturn in advertising and the loss of readers to the Internet, but
> the Tribune Co. was something of a special case.
>
> Tribune's debt was so outsized and so disproportional to its cash
> flow compared to these other companies that it can be the sore
> thumb sticking out rather than an example of the industry," said
> Ken Doctor, media analyst with Outsell Inc.
>
> Most of the company's debt comes from the complex deal
> engineered by Zell.  The company's lending agreements require it
> to keep its debt at a certain point relative to its cash flow.  Those
> deals became harder to meet as revenue declined because of the
> poor economy and competition from the Internet.[47]

Critical information like solvency opinions relating to Phase 2 of the transaction have not been

made publicly available, and there should be a detailed inquiry concerning the assumptions and

bases of the financial projections underlying the LBO, especially in light of the concerns that the

Bridge Facility Lenders had prior to Phase 2 of the LBO.

43.     The other critical issue in a constructive fraudulent conveyance claim is whether

the debtor received reasonably equivalent value in exchange for the transfers made and

obligations incurred.  11 U.S.C. § 548(a)(1)(B)(i).  As a matter of law, Tribune did not receive

reasonably equivalent value for the obligations it assumed under the Credit and Bridge Facilities

inasmuch as 74% of the proceeds were used to cash out existing shareholders.  *Mellon Bank,*

*N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991); *U.S. v. Tabor Ct. Realty*

---

[46]     *See* http://www.cnbc.com/id/15840232?video=958439696&play=1 (Dec. 10, 2008 CNBC interview of Mr.
Zell).

[47]     *Tribune Bankruptcy Buys Time To Fix Finances*, Chicago Daily Herald, December 9, 2008,
http://www.dailyherald.com/story/?id=256755.  A copy of this article is attached to the Rosner Decl. as Exhibit Q.

*Corp.*, 803 F.2d 1288 (3d Cir. 1986) (holding that funds from lender that merely "passed through" to repay shareholders did not provide debtor with fair consideration).[48]

44.     Rule 2004 discovery also will determine whether there are viable claims for avoidance of intentional fraudulent conveyances. While courts consider whether transactions bear the "badges of fraud" in the analysis of fraudulent conveyance claims, *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 550 (D. Del. 2005); *In re Computer Personalities Systems, Inc.*, 362 B.R. 669, 674 (Bankr. E.D. Pa. 2006), the parties' intent can be clarified through otherwise undisclosed emails, communications and documents and through depositions.

45.     Here, the requested discovery is narrowly tailored to balance the need for information with the goal of conducting the investigation on a cost-effective basis. Compliance with the annexed requests can be achieved without undue hardship, and Law Debenture will cooperate with the Debtors and the Committee to obtain copies of any documents previously produced (and already offered to Law Debenture albeit with unacceptable strings attached) and any other helpful information already found. [49]

46.     Accordingly, as major a party in interest in these cases, Law Debenture is entitled to the requested discovery.

**C.     FIDUCIARY CONFLICT SUPPORTS INDIVIDUAL CREDITOR DISCOVERY.**

47.     Though the Bankruptcy Code and Bankruptcy Rules permit Law Debenture the requested discovery even in the absence of conflict, here, the fact that no estate fiduciary is fully

---

[48]     Bankruptcy Code section 548(c) permits the retention of a transfer or obligation to the extent of the value received by the Debtors and the good faith of the transferee or obligee. State law may not provide this credit. And, even if the Court were to credit $2.8 used to repay pre-LBO debt, the banks may have difficulty proving their good faith based on what appears to have been known or knowable at the time.

[49]     Law Debenture reserves the right to serve additional supplemental document requests and to pursue additional depositions at a future date and to seek to uncover the facts from additional parties, including, but not limited to current and former shareholders.

capable of faithfully investigating the LBO with an eye toward actually pursuing or fairly negotiating any resulting claims enhances the need for the requested discovery.  The Committee is populated by potential targets and represented by conflicted counsel.  Law Debenture believes that conflicted counsel continues to be involved in the substantive inquiry and potential "negotiation" relating to the LBO though it has belatedly hired special counsel whose role may be limited.

48.     Additionally, Chadbourne has failed to disclose publicly to the Court and other parties-in-interest (it is unknown whether it has advised the Committee) that Chadbourne currently is defending Citigroup North America, Inc. in an adversary proceeding commenced by the Official Committee of Unsecured Creditors of TOUSA, Inc. (Bankr. S.D. Fla. (Adv. Pro. No. 08-1435)).  In that proceeding, Chadbourne is defending fraudulent conveyance claims on behalf of its bank client based on defenses that Chadbourne supposedly would reject here.  The potential conflict it faces (in addition to the business and ethical limitations) puts any investigation or negotiation it is involved in at question.

49.     Also, as stated above, two members of the Committee are themselves targets of the investigation and another five members of the Committee represent creditors of operating companies possessing only approximately $200 million in debt that will most likely be paid in whole or in substantial part in any plan.  In contrast, the Committee includes only two indenture trustees, representing creditors holding over $2.3 billion in pre-LBO debt issued by the Tribune Company.[50]  This creates a significant possibility that the operating company creditors can be compensated through a plan of reorganization at the expense of Tribune Company creditors such as those represented by Law Debenture.

---

[50]     Law Debenture requested membership on the Committee, but was denied.

50.    Creditors of the estates are entitled to more than an investigation conducted by parties represented by counsel who are precluded, because of conflicts, from actually commencing litigation and prosecuting claims.  Indeed, it is unclear whether a Committee counsel is permitted to investigate claims it cannot pursue and be compensated for it.  The ability of the Committee due to its constituent members and the advisors it has chosen raises the substantial question of whether the estates' valuable LBO claims will be brought into the Court's light.

51.    Critically, bankruptcy cases must not only be fair, they must appear fair.  *See Trone v. Smith*, 621 F.2d 994, 1001-02 (9th Cir. 1980) (disqualifying trustee's counsel who previously had represented defendant, stating that "the appearance of a fair trial . . . cannot be guaranteed while [counsel] is present in the courtroom on behalf of plaintiffs, even as co-counsel."); *cf. Wheat v. United States*, 486 U.S. 153, 160-61 (1988) ("Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them").

52.    In addition to its right to 2004 discovery as a substantial creditor of the estate, Law Debenture respectfully suggests that the Court authorize it to conduct discovery also as a check and balance to guard against these conflicts.  *Cf. In re Adelphia Comm. Corp.*, 330 B.R. 664, 673 (Bankr. S.D.N.Y. 2005) ("The practice of authorizing the prosecution of actions by committees, *and even by individual creditors*, . . . is one of long standing and nearly universally recognized.") (emphasis added).  As the representative of the only class of creditors likely to be impaired, Law Debenture has a critical need to examine the documents to protect its constituencies.

**D.    LAW DEBENTURE'S ATTEMPTS TO OBTAIN
VOLUNTARY DISCOVERY HAVE PROVEN UNSUCCESSFUL.**

53.    In the age of electronic discovery and the ease of "burning" of multiple sets of compact discs containing all necessary non-testimony discovery, there is virtually no burden on entities that have already produced documents and little on those who have not even been asked. But even if viewed as duplicative of the Committee's efforts, courts have permitted duplicative production through a Rule 2004 investigation where the use of such investigation is legitimate. *See In re Kelton*, 389 B.R. 812, 820-21 (Bankr. S.D. Ga. 2008) (stating that "the mere fact that the Debtor produced some of the documents to the independent auditor does not relieve the Debtor from providing the UST with the requested documentation").

54.    Perhaps this is why JPMC and other discovery targets agreed to provide the documents produced or to be produced to the Committee.  Unfortunately, JPMC has taken the position that Law Debenture cannot actually use any documents in this Court.  Nor have the discovery targets agreed that Law Debenture can depose any witnesses.  Accordingly, if not resolved, Law Debenture respectfully seeks this Court's intervention.

**IF THE COURT DENIES THE RULE 2004 REQUEST,
THE COURT SHOULD APPOINT AN EXAMINER[51]**

55.    Law Debenture's request simply is for Rule 2004 discovery.  But, as indicated above, there are troubling aspects regarding the timing and process of fiduciary evaluation of the LBO.  Accordingly, only if the Court denies Law Debenture's Bankruptcy Rule 2004 request, Law Debenture respectfully submits that an examiner should analyze the LBO claims.  In that instance, an examiner would be necessary to protect the integrity of these proceedings.

---

[51]    Notwithstanding that Law Debenture makes this examiner request in the alternative, Law Debenture reserves the right later to seek appointment of a trustee or examiner based on, among other things, the LBO and the

Accordingly, Law Debenture requests in the alternative the appointment of an examiner to examine the LBO, the potential claims arising therefrom, and the manner in which the estates have addressed such potential claims.

**A.    APPOINTMENT OF AN EXAMINER IS PRUDENT
PURSUANT TO SECTION 1104(C) OF THE BANKRUPTCY CODE.**

56.    Pursuant to section 1104(c) there exist two standards by which a court is permitted to appoint an examiner.  The appointment of an examiner is this case is prudent under either standard.  Section 1104(c)(1) provides that's an examiner may be appointed "for cause" when the moving party has made a showing that such appointment is in the interests of creditors, equity security-holders and the estate.  Section 1104(c)(2) provides that the appointment of a trustee is mandatory, upon motion by a party in interest, if "the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services or taxes, or owing to an insider, exceed $5,000,000."

**1.    Examiner Appointment Is Mandatory
Under Section 1104(c)(2) of the Bankruptcy Code.**

57.    Appointment of an examiner is mandatory in these cases under Section 1104(c)(2) of the Bankruptcy Code.  In this regard, the Bankruptcy Code provides:

> (c)    If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, *the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate*, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
> . . . .
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

---

manner in which the estates address potential claims arising therefrom.  Accordingly no party may later claim surprise or tardiness in such request.

11 U.S.C. § 1104(c)(2) (emphasis added).

58.    Congress used plain language to make appointment mandatory. *See, e.g., In re Loral Space & Commc'n, Ltd.,* 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004) (hereinafter, "*Loral*"); *see also In re Revco D.S., Inc.*, 898 F.2d 498, 500-01 (6th Cir. 1990) (holding that appointment of examiner is mandatory when the "fixed, liquidated, unsecured debt is greater than $5 million"); *In re UAL Corp.*, 307 B.R. 80, 86 (Bankr. N.D. Ill. 2004) (same); *In re Mechem Fin. of Ohio, Inc.*, 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988) (same); *In re The Bible Speaks*, 74 B.R. 511, 514 (Bankr. D. Mass. 1987) (same); *In re 1243 20th St., Inc.*, 6 B.R. 683, 685, n.3 (Bankr. D.D.C. 1980) (same); *In re Lenihan*, 4 B.R. 209, 211 (Bankr. D.R.I. 1980) (same).

59.    The legislative history behind the antecedent to section 1104(c) confirms the mandatory nature of section 1104(c)(2):

> [T]o insure that adequate investigation of the debtor is conducted to determine fraud or wrongdoing on the part of present management, an examiner *is required to be appointed in all cases* in which the debtor's fixed, liquidated, and unsecured debts, other than debts for goods, services, or taxes, or owing to an insider exceed $5 million. *This should adequately represent the needs of public security holders in most cases.*

124 Cong. Rec. H11,100 (Daily ed. Sept. 28, 1978), *reprinted in* 1978 U.S.C.C.A.N. 6465, *reprinted in* D Collier on Bankruptcy App. Pt. 4-2458 (L. King 15th ed. 2003); 124 Cong. Rec. S17,417 (Daily ed. Oct. 6, 1978), *reprinted in* 1978 U.S.C.C.A.N. 6456, *reprinted in* D Collier on Bankruptcy App. Pt. 4-2572 (L. King 15th ed. 2003); statements of Rep. Edwards and Sen. DeConcini (emphasis added).

60.    While a few courts have declined to appoint an examiner under section 1104(c)(2) in extraordinary situations not relevant here, virtually all courts have applied the Bankruptcy Code as written and appointed the requested examiner. *See Loral*, *supra*.

61.    In *Loral,* an ad hoc committee moved for appointment of an official equity committee.  The Bankruptcy Court denied the motion.  *Loral*, 2004 WL 2979785, at *1.  The ad hoc group then sought an examiner, relying on meeting the debt threshold and arguing that the debtor's undervaluation of its assets required investigation.  *Id*.  Although the Bankruptcy Court recognized that the debt threshold in section 1104(c)(2) was met, it nevertheless denied the motion.  *Id*.  On appeal, the District Court reversed, holding that "the Bankruptcy Court had no discretion to deny appointment of an examiner where, as here, the $5,000,000 debt threshold is met and shareholders of a public company have moved for appointment of an examiner."  *Id*. at *5.

62.    Here, there is no dispute that "the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000" and the Court has not appointed a trustee.  11 U.S.C. § 1104(c)(2).  Accordingly, Law Debenture has the right, sought alternatively, to the appointment of an examiner.

### 2.    The Best Interests Of These Estates Warrant Appointment Of An Examiner.

63.    Additionally, should Law Debenture be denied Rule 2004 discovery, appointment of an examiner is appropriate under Section 1104(c)(1) of the Bankruptcy Code as there is no question that a complete, unconflicted, thoroughly independent investigation of the LBO and its ramifications is in the best interests of these estates.  *See In re New Century TRS Holdings, Inc*., No 07-10416 (KJC) (Bankr. D. Del. June 1, 2007) (appointing an examiner was in the best interest of the estate to investigate accounting and financial irregularities which led to the debtor's need to restate its financial statements); *Keene Corp. v. Coleman* (*In re Keene Corp*.), 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994) (appointing examiner in best interest of creditors where allegations existed that estate property was being diverted in fraud of creditors); *In re*

*First Am. Health Care of Ga., Inc*., 208 B.R. 992, 994-95 (Bankr. S.D. Ga. 1996) (appointing examiner where allegations of fraud existed).

64.      In the instant case, the appointment of an examiner may be critical because, if the Court denies Law Debenture its Bankruptcy Rule 2004 request, there will not be any opportunity for a separate investigation by non-LBO participant advisors into the LBO.  Moreover, allowing the Debtors to negotiate with the LBO participants with an ineffective or unwilling Committee permits the LBO potentially to be largely ignored.

65.      The Bankruptcy Code permits no such result.  Though, in its structure, debtors are left in possession, the Court will strictly enforce prohibitions on self-interested settlements of material causes of action.  Usually a court can rely on a Committee for support.  Not so here. The reasons set forth above supporting Law Debenture's Bankruptcy Rule 2004 request (other than its simple, unqualified right) equally support examiner appointment under the best interests of the estates standard.

66.      *All* parties in interest will benefit from an examiner's report.  *See In re FiberMark, Inc.*, 339 B.R. 321, 325 (Bankr. D. Vt. 2006) ("The benefit of appointing an independent examiner is that he or she will act as an objective nonadversarial party who will review the pertinent transactions and documents, thereby allowing the parties to make an informed determination as to their substantive rights."); *In re Apex Oil Co.*, 101 B.R. 92, 99 (Bankr. E.D. Mo. 1989) ("The Examiner is appointed to act as an independent party to review, without monetary interest, transactions and documents.  He is first and foremost disinterested and nonadversarial.  The benefits of his investigative efforts flow solely to the debtor and to its creditors and shareholders.") (citations omitted).

**3.**     **The Proposed Scope Of The Examiner's Investigation Is Appropriate.**

67.     An examiner's investigative powers are extremely broad.  "Bankruptcy Rule 2004 likewise gives the [e]xaminer scope to investigate which is broader than that of civil discovery under Rule 26" and "investigation of an examiner in bankruptcy, unlike civil discovery under Rule 26(c), is supposed to be a "fishing expedition," as exploratory and groping as appears proper to the Examiner."  *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993); *In re FiberMark, Inc.*, 339 B.R. at 325 (same).  This Court has some discretion to establish the scope of duties and tasks of an examiner to ensure that the "investigation of the debtor . . . is appropriate."  11 U.S.C. § 1104(c); *see also UAL Corp.*, 307 B.R. at 86 (holding that "appointment of an examiner is mandatory if the four conditions [of section 1104(c)(2)] are met, but the court retains the discretion to determine the nature and the scope").  However, courts have generally declined to limit the scope of an examiner's investigation holding that the scope "should remain broad."  *See, e.g., In re Granite Broadcasting Corp.*, 06-12984 (Bankr. S.D.N.Y.), Transcript of Feb. 15, 2007 hearing, at 75.[52]

68.     Here, the proposed investigation by the examiner comports with the intended role of examiners in bankruptcy cases.  "The purpose of an examiner's investigation in bankruptcy is to discover whatever assets may exist for the estate of the bankrupt, just as one purpose for the appointment of a trustee is so that a trustee may use statutory powers conferred by the Bankruptcy Code to collect all property belonging to the debtor for the benefit of the debtor's creditors."  *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993).

---

[52]     The relevant part of this transcript is attached to the Rosner Decl. as Exhibit Q.

## NOTICE

69.     Notice of this Motion has been given to:  (a) counsel to the Debtors; (b) the Office of the United States Trustee; (c) counsel to the Committee; (d) all Respondents; and (e) all parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, Law Debenture submits that no further or other notice is required.

## WAIVER OF MEMORANDUM OF LAW

70.     Inasmuch as Law Debenture has set forth the reasons and authorities on which it relies, Law Debenture requests that the Court waive compliance with Local Rule regarding the filing of a separate memorandum of law.

## NO PRIOR REQUEST

71.     No prior application for the relief requested in this motion has been made to this or any other court.

## CONCLUSION

For the reasons set forth above, Law Debenture respectfully requests that the Court enter the Proposed Order granting its Bankruptcy Rule 2004 request in its entirety, alternatively, appointing an examiner to examine the LBO, the potential claims arising therefrom, and the manner in which the estates have to date but should address such potential claims, and grant Law Debenture such other, further relief as this Court deems appropriate.

Dated: August 26, 2009                                  Respectfully submitted,
       Wilmington, Delaware


                                   By: /s/ Garvan F. McDaniel
                                   **BIFFERATO GENTILOTTI LLC**
                                   Garvan F. McDaniel (No. 4167)
                                   800 N. King Street, Plaza Level
                                   Wilmington, Delaware 19801
                                   Tel:  (302) 429-1900
                                   Fax:  (302) 429-8600

                                      – and –

                                   David S. Rosner
                                   Andrew K. Glenn
                                   Matthew B. Stein
                                   Kasowitz, Benson, Torres & Friedman LLP
                                   1633 Broadway
                                   New York, New York 10019
                                   Tel:  (212) 506-1700

                                   *Co-Counsel for Law Debenture Trust Company*
                                    *of New York*