# EXHIBIT C



# FORM 10-K

## TRIBUNE CO - TRBCQ

**Filed: March 20, 2008 (period: December 30, 2007)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

10-K - 10-K

## PART I

| ITEM 1. | BUSINESS. |
| ITEM 1A. | RISK FACTORS. |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS. |
| ITEM 2. | PROPERTIES. |
| ITEM 3. | LEGAL PROCEEDINGS. |
| ITEM 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS. |

## PART II

| ITEM 5. | MARKET FOR REGISTRANT S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES. |
| ITEM 6. | SELECTED FINANCIAL DATA. |
| ITEM 7. | MANAGEMENT S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS. |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK. |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA. |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE. |
| ITEM 9A. | CONTROLS AND PROCEDURES |
| ITEM 9B. | OTHER INFORMATION |

## PART III

| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE. |
| ITEM 11. | EXECUTIVE COMPENSATION. |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS. |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE. |
| ITEM 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES. |

## PART IV

| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES. |

SIGNATURES

EXHIBIT INDEX

EX-3.1(II) (EX-3.1(II))

EX-10.6 (EX-10.6)

EX-10.9 (EX-10.9)

EX-21 (EX-21)

EX-23 (EX-23)

EX-31.1 (EX-31.1)

EX-31.2 (EX-31.2)

EX-32.1 (EX-32.1)

EX-32.2 (EX-32.2)

EX-99.1 (EX-99.1)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-K

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
## OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 30, 2007**

**Commission file number 1-8572**

# TRIBUNE COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **36-1880355** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **435 North Michigan Avenue** **Chicago, Illinois** | **60611** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(312) 222-9100**
Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| 2% Exchangeable Subordinated Debentures Due 2029 | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (check one):

Large Accelerated Filer ☐   Accelerated Filer ☐   Non-Accelerated Filer ☒   Smaller Reporting Company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ☐ No ☒

Aggregate market value of the Company's voting and non-voting common equity held by non-affiliates on June 29, 2007, based upon the closing price of the Company's Common Stock as reported on the New York Stock Exchange Composite Transactions list for such date: approximately $3,480,700,000.

Source: TRIBUNE CO, 10-K, March 20, 2008

On December 20, 2007, each share of the Company's common equity held by non-affiliates as of that date was cancelled and converted into the right to receive $34.00 per share in cash.  The Company's Common Stock was also suspended from trading on the New York Stock Exchange on that date.

At March 20, 2008, there were 56,521,739 shares of the Company's Common Stock ($.01 par value per share) outstanding, each of which were held by the Tribune Employee Stock Ownership Plan.

Source: TRIBUNE CO, 10-K, March 20, 2008

## INDEX TO TRIBUNE COMPANY
## 2007 FORM 10-K

| Item No. | | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business | 1 |
| | Significant Events | 1 |
| | Business Segments | 8 |
| | Publishing | 9 |
| | Broadcasting and Entertainment | 15 |
| | Investments | 18 |
| | Non-Operating Items | 19 |
| | Governmental Regulation | 19 |
| | Employees | 20 |
| | Executive Officers of the Company | 21 |
| | Available Information | 22 |
| 1A. | Risk Factors | 23 |
| 1B. | Unresolved Staff Comments | 29 |
| 2. | Properties | 30 |
| 3. | Legal Proceedings | 32 |
| 4. | Submission of Matters to a Vote of Security Holders | 36 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 37 |
| 6. | Selected Financial Data | 37 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 38 |
| 7A. | Quantitative and Qualitative Disclosures About Market Risk | 74 |
| 8. | Financial Statements and Supplementary Data | 78 |
| | Report of Independent Registered Public Accounting Firm | 79 |
| | Consolidated Statements of Income for each of the three fiscal years in the period ended Dec. 30, 2007 | 81 |
| | Consolidated Balance Sheets at Dec. 30, 2007 and Dec. 31, 2006 | 82 |
| | Consolidated Statements of Shareholders' Equity (Deficit) for each of the three fiscal years in the period ended Dec. 30, 2007 | 84 |
| | Consolidated Statements of Cash Flows for each of the three fiscal years in the period ended Dec. 30, 2007 | 86 |
| | Notes to Consolidated Financial Statements | |
| | Note 1: Summary of Significant Accounting Policies | 87 |
| | Note 2: Changes in Operations and Non-Operating Items | 94 |
| | Note 3: Leveraged ESOP Transactions | 98 |
| | Note 4: Discontinued Operations and Assets Held for Sale | 100 |
| | Note 5: *Newsday* and *Hoy*, New York Charge | 102 |
| | Note 6: Inventories | 103 |
| | Note 7: Goodwill and Other Intangible Assets | 104 |
| | Note 8: TMCT and TMCT II | 106 |
| | Note 9: Investments | 108 |
| | Note 10: Debt | 110 |
| | Note 11: Contracts Payable for Broadcast Rights | 117 |

Source: TRIBUNE CO, 10-K, March 20, 2008

| Item No. | | Page |
|---|---|---|
| | Note 12: Fair Value of Financial Instruments | 117 |
| | Note 13: Commitments and Contingencies | 117 |
| | Note 14: Income Taxes | 118 |
| | Note 15: Pension and Other Postretirement Benefits | 123 |
| | Note 16: Capital Stock | 127 |
| | Note 17: Incentive Compensation and Stock Plans | 129 |
| | Note 18: Comprehensive Income | 135 |
| | Note 19: Business Segments | 136 |
| | 2007 Quarterly Results (Unaudited) | 139 |
| | 2006 Quarterly Results (Unaudited) | 140 |
| | Five Year Financial Summary | 141 |
| | Financial Statement Schedule for each of the three fiscal years in the period ended Dec. 30, 2007 | |
| | Schedule II Valuation and Qualifying Accounts and Reserves | 143 |
| | Consolidated Financial Statements of Tribune Broadcasting Holdco, LLC and Subsidiaries | 144 |
| | Financial Statements of Tribune Finance, LLC | 167 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 175 |
| 9A. | Controls and Procedures | 175 |
| 9B. | Other Information | 175 |

**PART III**

| 10. | Directors, Executive Officers and Corporate Governance | 175 |
| 11. | Executive Compensation | 178 |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 201 |
| 13. | Certain Relationships and Related Transactions, and Director Independence | 203 |
| 14. | Principal Accountant Fees and Services | 206 |

**PART IV**

| 15. | Exhibits and Financial Statement Schedules | 207 |

* * * * *

| | Signatures | 208 |
| | Exhibit Index | 209 |
| | Consent of Independent Registered Public Accounting Firm | 213 |
| | Certifications of Chief Executive Officer and Chief Financial Officer | 214 |

PART I

## ITEM 1. BUSINESS.

Tribune Company ("Tribune" or the "Company") is a media and entertainment company. Through its subsidiaries, the Company is engaged in newspaper publishing, television and radio broadcasting and entertainment. The Company was founded in 1847 and incorporated in Illinois in 1861. As a result of a corporate restructuring in 1968, the Company became a holding company incorporated in Delaware. References in this report to "the Company" include Tribune Company and its subsidiaries, unless the context otherwise indicates. The information in this Item 1 should be read in conjunction with the information contained in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the Company's consolidated financial statements and related notes thereto included in Item 8. Certain prior year amounts have been reclassified to conform with the 2007 presentation. These reclassifications had no impact on reported prior year total revenues, operating profit or net income.

This Annual Report on Form 10-K ("Form 10-K") contains certain forward-looking statements that are based largely on the Company's current expectations. Forward-looking statements are subject to certain risks, trends and uncertainties that could cause actual results and achievements to differ materially from those expressed in the forward-looking statements including, but not limited to, the items discussed in Item 1A, "Risk Factors." Such risks, trends and uncertainties, which in some instances are beyond the Company's control, include: our ability to generate sufficient cash to service the significant debt levels and other financial obligations as a result of the Leveraged ESOP Transactions (as defined below); potential impacts to operations and liquidity as a result of restrictive covenants under our senior credit facilities; our dependency on dividends and distributions from our subsidiaries to make payments on our indebtedness; increased interest rate risk due to variable rate indebtedness; our ability to maintain subchapter S corporation status; changes in advertising demand, circulation levels and audience shares; regulatory and judicial rulings; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in accounting standards; adverse results from litigation, governmental investigations or tax related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, investments and divestitures; the Company's reliance on third-party vendors for various services; and other events beyond the Company's control that may result in unexpected adverse operating results.

The words "believe," "expect," "anticipate," "estimate," "could," "should," "intend" and similar expressions generally identify forward-looking statements. Readers are cautioned not to place undue reliance on such forward-looking statements, which are being made as of the date of this filing. The Company undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

### Significant Events

**Leveraged ESOP Transactions**—On April 1, 2007, the Company's board of directors (the "Board"), based on the recommendation of a special committee of the Board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company (the "Zell Entity") wholly owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions which culminated in the cancellation of all issued and outstanding shares of the Company's common stock as of that date, other than shares held by the Company or the ESOP, and the Company becoming wholly owned by the ESOP.

1

The Leveraged ESOP Transactions consisted of a series of transactions that included the following:

- On April 1, 2007, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust which forms a part of the ESOP, Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and the Zell Entity (solely for the limited purposes specified therein) providing for Merger Sub to be merged with and into the Company, and following such merger, the Company to continue as the surviving corporation wholly owned by the ESOP (the "Merger").

- On April 1, 2007, the ESOP purchased 8,928,571 shares of the Company's common stock from the Company at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger (as described below), the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represent the only outstanding shares of capital stock of the Company after the Merger. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007.

- On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of the Company's common stock at a price of $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million, which the Company repaid immediately prior to the Merger (as described below).  Pursuant to the Zell Entity Purchase Agreement, on May 9, 2007, Mr. Zell was appointed as a member of the Board.

- On April 25, 2007, the Company commenced a tender offer to repurchase up to 126 million shares of the Company's common stock that were then outstanding at a price of $34.00 per share in cash (the "Share Repurchase"). The tender offer expired on May 24, 2007 and 126 million shares of the Company's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Credit Agreement (as defined in the "New Credit Agreements" section below).

- The Company granted registration rights to Chandler Trust No. 1 and Chandler Trust No. 2 (together, the "Chandler Trusts"), which were significant shareholders of the Company prior to the Company's entry into the Leveraged ESOP Transactions. On April 25, 2007, the Company filed a shelf registration statement in connection with the registration rights granted to the Chandler Trusts.

- On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman, Sachs & Co. ("Goldman Sachs") and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of the Company's common stock, which represented the remainder of the shares of the Company's common stock owned by them following the Share Repurchase, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to the shelf registration statement filed by the Company on April 25, 2007. Following the closing of this transaction, the Chandler Trusts no longer owned any shares of the Company's common stock. On June 4, 2007, Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. resigned as members of the Board. Messrs. Chandler, Goodan and Stinehart served on the Board as representatives of the Chandler Trusts, which agreed to cause the resignations of Messrs. Chandler, Goodan and Stinehart effective upon the consummation of the Share Repurchase.

2

Source: TRIBUNE CO, 10-K, March 20, 2008

- On Dec. 20, 2007, the Company completed its merger with Merger Sub, with the Company surviving the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of the Company, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by the Company, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes, and the Company became wholly owned by the ESOP.

- In the Merger, the Zell Entity received cash for the shares of the Company's common stock it had acquired pursuant to the Zell Entity Purchase Agreement and the Company repaid the exchangeable promissory note held by the Zell Entity including approximately $6 million of accrued interest. In addition, the Company paid to the Zell Entity a total of $5 million in legal fee reimbursements, of which $2.5 million was previously paid following the Share Repurchase described above. Following the consummation of the Merger, the Zell Entity purchased from the Company, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. For accounting purposes, the subordinated promissory note and 15-year warrant were recorded at fair value based on the relative fair value method. The warrant entitles the Zell Entity to purchase 43,478,261 shares of the Company's common stock (subject to adjustment), which represents approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to share equivalents granted under a new management equity incentive plan which is described in Note 17 to the consolidated financial statements in Item 8). The warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees. See Part III, Items 12 and 13, hereof for further information on the assignment of the minority interests in the subordinated promissory note and the warrant.

- On Dec. 20, 2007, the Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated. The Company requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of the market on Dec. 20, 2007, and that the NYSE file with the Securities and Exchange Commission an application on Form 25 to report that the shares of the Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

The Company currently intends to dispose of an interest in the Chicago Cubs and the Company's 25% equity interest in Comcast SportsNet Chicago. The Company currently expects that proceeds from such dispositions will be used to pay down Company debt. The disposition of an interest in the Cubs is subject to the approval of Major League Baseball.

**New Credit Agreements**—On May 17, 2007, the Company entered into a $8.028 billion senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consists of the following facilities: (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement equals $10.133 billion.

3

Source: TRIBUNE CO, 10-K, March 20, 2008

On June 4, 2007, proceeds from the Tranche X Facility and the Tranche B Facility were used by the Company in connection with the consummation of the Share Repurchase (as defined in "Leveraged ESOP Transactions" above) and to refinance the Company's former five-year credit agreement and former bridge credit agreement.

The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. Borrowings under the Revolving Credit Facility may be used for working capital and general corporate purposes. The Company intends to use the Delayed Draw Facility to refinance approximately $263 million of its medium-term notes as they mature during 2008. In February 2008, the Company refinanced $25 million of such medium-term notes with borrowings under the Delayed Draw Facility.

On Dec. 20, 2007, the Company entered into (i) a $1.6 billion senior unsecured interim loan agreement (the "Interim Credit Agreement") and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement (the Incremental Facility and Tranche B Facility are hereinafter referred to collectively as the Tranche B Facility). The Interim Credit Agreement contains a $1.6 billion twelve-month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by the Company, among other ways, in connection with the consummation of the Merger, and for general corporate purposes.

Prior to the consummation of the Merger, the Tranche X Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. Pursuant to the terms of the Credit Agreement, following the closing of the Merger (as defined above in the description of the Leveraged ESOP Transactions), the margins applicable to the Tranche X Facility increased to 175 basis points and 275 basis points, respectively.

The Tranche B Facility, Delayed Draw Facility and Revolving Credit Facility bear interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 200 basis points or LIBOR plus a margin of 300 basis points. All undrawn amounts under the Delayed Draw Facility and the Revolving Credit Facility accrue commitment fees at a per annum rate of 75 basis points and 50 basis points, respectively. With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts are subject to decreases based on a leverage-based grid.

On June 29, 2007, the Company repaid $100 million of the $1.5 billion of borrowings under the Tranche X Facility. The remaining principal balance of the Tranche X Facility must be repaid in an aggregate amount of $650 million on Dec. 4, 2008, which amount may be adjusted to reflect additional prepayments or other mandatory prepayments (described below) applied thereto, and the remaining outstanding amount of the Tranche X Facility, if any, must be repaid on June 4, 2009.

The Tranche B Facility is a seven-year facility which matures on June 4, 2014 and amortizes at a rate of 1.0% per annum (payable quarterly). The Delayed Draw Facility automatically becomes part of the Tranche B Facility as amounts are borrowed and amortizes based upon the Tranche B Facility amortization schedule. The Revolving Facility is a six-year facility and matures on June 4, 2013.

Prior to June 4, 2008, optional prepayments on the Tranche X Facility and the Tranche B Facility with the proceeds of a substantially concurrent issuance of loans under any senior secured credit facilities pursuant to the Credit Agreement must be accompanied by a prepayment fee equal to 1.0% of the aggregate amount of such prepayments if the interest rate spread applicable to such new loans is less than the interest rate applicable to the Tranche X Facility or the Tranche B Facility. Except as described in the immediately preceding sentence,

4

borrowings under the Credit Agreement are prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

The Bridge Facility bears interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points; provided that such margins will increase by 50 basis points per annum each quarter beginning on March 20, 2008, subject to specified caps, a portion of which interest may be payable through an interest payable-in-kind feature. Subject to certain prepayment restrictions contained in the Credit Agreement, the Bridge Facility is prepayable at any time prior to maturity without penalty, including in connection with the issuance of up to $1.6 billion of high-yield notes.

If any loans under the Bridge Facility remain outstanding on Dec. 20, 2008, the lenders thereunder will have the option, subject to the terms of the Interim Credit Agreement, at any time and from time to time to exchange such initial loans for senior exchange notes that the Company will issue under a senior indenture, and the maturity date of any initial loans that are not exchanged for senior exchange notes will, unless a bankruptcy event of default has occurred and is continuing on such date, automatically be extended to Dec. 20, 2015 (the "Final Interim Credit Agreement Maturity Date"). The senior exchange notes will also mature on the Final Interim Credit Agreement Maturity Date. Holders of the senior exchange notes will have registration rights.

Loans under the Tranche X Facility, Tranche B Facility and Revolving Loan Facility are required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leverage-based grid ranging from 50% to 0%, and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Credit Agreement.

Loans under the Bridge Facility are required be required to be repaid with the following proceeds, in each case after the obligations under the Credit Agreement have been repaid, either as required by the Credit Agreement or repaid at the election of the Company, subject to certain exceptions and exclusions set forth in the Interim Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of certain debt for borrowed money by the Company or any subsidiary, (b) 100% of the net cash proceeds of any equity issuance consummated by the Company and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Interim Credit Agreement.

Borrowings under the Credit Agreement are guaranteed on a senior basis by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the equity interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company. Audited financial statements of these two subsidiaries are included in Part II, Item 8, hereof. The Company's other senior notes and senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as required by the terms of the indentures governing such notes and debentures. Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the Company's direct and indirect U.S. subsidiaries.

The Credit Agreement and the Interim Credit Agreement contain representations and warranties, affirmative and negative covenants, including restrictions on capital expenditures, and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. If an event of default occurs,

Source: TRIBUNE CO, 10-K, March 20, 2008

the lenders under the Credit Agreement and the Interim Credit Agreement will be entitled to take certain actions, including acceleration of all amounts due under the facilities.

Further, pursuant to the Credit Agreement, the Company is required to comply, on a quarterly basis, with a maximum total guaranteed leverage ratio and a minimum interest coverage ratio. For the twelve-month period ending Dec. 30, 2007, the maximum permitted "Total Guaranteed Leverage Ratio" and the minimum permitted "Interest Coverage Ratio" (each as defined in the Credit Agreement) were 9.00 to 1.0 and 1.10 to 1.0, respectively. Both financial covenant ratios are measured on a rolling four-quarter basis and become more restrictive on an annual basis as set forth in the Credit Agreement. At Dec. 30, 2007, the Company was in compliance with these financial covenants. The Company's ability to remain in compliance with these financial covenants will be impacted by a number of factors, including the Company's ability to continue to generate sufficient revenues and cash flows, changes in interest rates, the impact of future purchase, sale, joint venture or similar transactions involving the Company or its business units and the other risks and uncertainties set forth in Part I, Item 1A, "Risk Factors."

The Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code on March 13, 2008, which election is effective as of the beginning of the Company's 2008 fiscal year. The Credit Agreement and the Interim Credit Agreement contain affirmative covenants which required the Company to make such election and that the election be effective for fiscal 2008. The Credit Agreement and Interim Credit Agreement further provide that if the Company fails to maintain the S corporation election for any year beginning with 2009, the Company will be required in each such year to obtain an investment in the Company in the form of common stock or subordinated debt in an amount of up to $100 million. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and Interim Credit Agreement.

Under the terms of the Credit Agreement, the Company is required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. On July 2, 2007, the Company entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and, on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays Bank, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to $750 million in notional amount. The Swap Documents effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points.

**Sales of *Hoy*, New York, SCNI and Recycler**—On Feb. 12, 2007, the Company announced an agreement to sell the New York edition of *Hoy*, the Company's Spanish-language daily newspaper ("*Hoy*, New York"), to ImpreMedia, LLC. The Company completed the sale of *Hoy*, New York on May 15, 2007 and recorded a pretax gain on the sale of $2.5 million ($.1 million after taxes) in the second quarter of 2007. On March 6, 2007, the Company announced an agreement to sell its Southern Connecticut Newspapers—*The Advocate* (Stamford) and *Greenwich Time* (collectively "SCNI") to Gannett Co., Inc. On May 25, 2007, the Company announced the termination of this agreement following an arbitrator's ruling that the Company could not sell SCNI unless Gannett Co., Inc. assumed an existing collective bargaining contract as a condition of the sale, which Gannett Co., Inc. declined to do. The Company simultaneously announced that it would immediately begin the process of soliciting offers for SCNI with the intention of completing a sale as soon as possible. On Oct. 25, 2007, the Company announced an agreement to sell SCNI to Hearst Corporation for $62.4 million. The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which the Company plans to sell separately. In the first quarter of 2007, the Company recorded a pretax loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to sell. In the

6

third quarter of 2007, the Company recorded a favorable $3 million after-tax adjustment to the loss on the sale of SCNI. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of one of its subsidiaries, EZ Buy & EZ Sell Recycler Corporation ("Recycler"), to Target Media Partners. Recycler publishes a collection of free classified newspapers in Southern California. The sale of Recycler closed on Oct. 17, 2007. The Company recorded a pretax loss on the sale of the stock of Recycler of $1 million in the third quarter of 2007. Due to the Company's high tax basis in the Recycler stock, the sale generated a significantly higher capital loss for income tax purposes. As a result, the Company recorded a $65 million income tax benefit in the third quarter of 2007, resulting in an after-tax gain of $64 million.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations for each of these businesses are reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income have been reclassified to conform to the current year presentation of discontinued operations.

**Matthew Bender and Mosby Tax Liability—During** 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in the United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in Tax Court.

On Sept. 27, 2005, the Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions totaled approximately $1 billion. Over time, deductions for state taxes and interest were expected to reduce the net cash outlay to approximately $840 million.

The Company appealed the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. On June 1, 2007, the Company announced that an offer of settlement was pending in its appeal. The Company finalized the settlement during the third quarter of 2007. As a result of the settlement, the Company received refunds of federal income taxes and interest of $4 million on Sept. 26, 2007 and $340 million on Oct. 1, 2007. After consideration of income taxes on the interest received, the net cash proceeds totaled approximately $286 million. These refunds, together with related state income tax benefits of $29 million, were accounted for as a $91 million reduction in 2007 income tax expense and a $224 million reduction in goodwill recorded on the Company's consolidated balance sheet.

7

Source: TRIBUNE CO, 10-K, March 20, 2008

**Business Segments**

The Company's operations are divided into two industry segments: publishing and broadcasting and entertainment. These segments operate primarily in the United States. Certain administrative activities are not included in either segment, but are reported as corporate expenses. These segments reflect the way the Company sells its products to the marketplace, manages operations and makes business decisions.

The Company's fiscal year ends on the last Sunday in December. Fiscal years 2007 and 2005 encompassed a 52-week period. Fiscal year 2006 encompassed 53 weeks. For 2006 compared to 2005, the additional week increased consolidated operating revenues and operating expenses by approximately 1.5% and consolidated operating profit by approximately 2%. The following table sets forth operating revenues and operating profit information for each segment of the Company for 2007, 2006 and 2005 (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Operating revenues: | | | |
| Publishing | $ 3,664,590 | $ 4,018,418 | $ 4,012,413 |
| Broadcasting and entertainment | 1,398,394 | 1,425,146 | 1,414,433 |
| Total operating revenues | $ 5,062,984 | $ 5,443,564 | $ 5,426,846 |
| Operating profit (loss)(1): | | | |
| Publishing | $ 368,193 | $ 748,940 | $ 753,781 |
| Broadcasting and entertainment | 357,341 | 391,533 | 416,891 |
| Corporate expenses | (91,617) | (55,712) | (49,413) |
| Total operating profit | $ 633,917 | $ 1,084,761 | $ 1,121,259 |

(1) Operating profit for each segment excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes.

The following table sets forth asset information for each industry segment (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Assets: | | |
| Publishing(1) | $ 8,131,591 | $ 8,512,512 |
| Broadcasting and entertainment(2) | 4,017,255 | 3,987,449 |
| Corporate(3) | 1,000,873 | 900,811 |
| Total assets | $ 13,149,719 | $ 13,400,772 |

(1) Publishing assets at Dec. 30, 2007 and Dec. 31, 2006 included $10 million and $9 million of assets held for sale, respectively, and at Dec. 31, 2006, $26 million of idled assets (See Note 4 to the Company's consolidated financial statements in Item 8).

(2) Broadcasting and entertainment assets at Dec. 30, 2007 included $23 million of assets held for sale. (See Note 4 to the Company's consolidated financial statements in Item 8).

(3) Corporate assets include cash and cash equivalents, marketable securities and other investments.

The Company's results of operations, when examined on a quarterly basis, reflect the seasonality of the Company's revenues. Second and fourth quarter advertising revenues are typically higher than first and third quarter revenues. Results for the second quarter reflect spring advertising revenues, while the fourth quarter includes advertising revenues related to the holiday season.

Source: TRIBUNE CO, 10-K, March 20, 2008

**Publishing**

The publishing segment represented 72% of the Company's consolidated operating revenues in 2007. For the six months ended September 2007, total average paid circulation for Tribune's nine metro newspapers averaged 2.7 million copies daily (Mon.-Fri.) and 3.9 million copies Sunday, a decline of 2.7% and 3.9%, respectively, from 2006. The Company's primary daily newspapers are the *Los Angeles Times, Chicago Tribune, Newsday, South Florida Sun-Sentinel, Orlando Sentinel, The Sun, Hartford Courant, The Morning Call* and *Daily Press*. The Company's publishing segment manages the websites of the Company's daily newspapers and television stations, as well as other branded sites targeting specific communities of interest. The Company also owns entertainment listings, a newspaper syndication and media marketing company, a Chicago-area cable television news channel and other publishing-related businesses.

For 2006 compared to 2005, the additional week increased publishing advertising revenues, circulation revenues, and operating profit by approximately 2% and increased operating expenses by approximately 1.5%. Operating revenues for the Company's three largest newspapers, including their related businesses, for the last three years were as follows (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Operating revenues: | | | |
| Los Angeles Times(1) | $ 999,311 | $ 1,095,622 | $ 1,078,919 |
| Chicago Tribune(1) | 828,480 | 882,182 | 892,270 |
| Newsday(1) | 498,677 | 541,074 | 574,864 |
| Other newspapers and businesses | 1,338,122 | 1,499,540 | 1,466,360 |
| Total publishing revenues | $ 3,664,590 | $ 4,018,418 | $ 4,012,413 |

(1)  Includes the daily newspaper and other related businesses.

The following table provides a breakdown of operating revenues for the publishing segment for the last three years (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Advertising: | | | |
| Retail | $ 1,247,755 | $ 1,327,095 | $ 1,306,528 |
| National | 686,549 | 730,038 | 767,295 |
| Classified | 926,715 | 1,137,835 | 1,097,953 |
| Total advertising | 2,861,019 | 3,194,968 | 3,171,776 |
| Circulation | 526,529 | 567,326 | 585,093 |
| Other(1) | 277,042 | 256,124 | 255,544 |
| Total | $ 3,664,590 | $ 4,018,418 | $ 4,012,413 |

(1)  Primarily includes revenues from advertising placement services; the syndication of columns, features, information and comics to newspapers; commercial printing operations; delivery of other publications; direct mail operations; cable television news programming; distribution of entertainment listings; and other publishing-related activities.

9

Source: TRIBUNE CO, 10-K, March 20, 2008

The following table sets forth information concerning the Company's advertising volume for its daily newspapers for the last three years (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Advertising inches |  |  |  |
| Full run: |  |  |  |
|   Retail | 5,263 | 5,466 | 5,380 |
|   National | 2,798 | 3,132 | 3,461 |
|   Classified | 7,874 | 9,437 | 9,236 |
|     Total full run | 15,935 | 18,035 | 18,077 |
| Part run | 18,134 | 21,217 | 20,113 |
| Total advertising inches | 34,069 | 39,252 | 38,190 |
| Preprint pieces | 14,500,271 | 14,814,093 | 14,818,375 |

The following table sets forth information concerning the Company's circulation for its primary daily newspapers (in thousands):

|  | Average Paid Circulation For the Six Months Ended September(1) | | | | | |
|---|---|---|---|---|---|---|
|  | Daily(2) | | | Sunday | | |
|  | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| Los Angeles Times | 780 | 776 | 843 | 1,112 | 1,172 | 1,248 |
| Chicago Tribune | 559 | 576 | 586 | 918 | 938 | 951 |
| Newsday (Long Island) | 388 | 411 | 432 | 454 | 475 | 496 |
| South Florida Sun-Sentinel | 202 | 222 | 227 | 286 | 305 | 322 |
| Orlando Sentinel | 213 | 214 | 220 | 318 | 317 | 331 |
| The Sun (Baltimore) | 233 | 236 | 247 | 365 | 381 | 419 |
| Other daily newspapers(3) | 357 | 374 | 386 | 495 | 521 | 531 |
| Total Net Paid Circulation(4) | 2,732 | 2,809 | 2,941 | 3,948 | 4,109 | 4,298 |
| Total Individually Paid Circulation(4) | 2,635 | 2,693 | 2,727 | 3,882 | 4,031 | 4,133 |

(1) Circulation data is based on internal records, is subject to audit by the Audit Bureau of Circulations ("ABC") and may be updated in subsequent filings.

(2) Average daily circulation is based on a five-day (Mon.-Fri.) average.

(3) Other daily newspapers include *Hartford Courant, The Morning Call* and *Daily Press*.

(4) Individually paid circulation includes home delivery and single copy sales. This circulation is more highly valued by advertisers and represented 96% of total daily circulation and 98% of total Sunday circulation for the six months ended September 2007. Total net paid circulation includes both individually paid and other paid (education, sponsored, hotels) copies.

Each of the Company's newspapers operates independently to most effectively meet the needs of the community it serves. Local management establishes editorial policies. The Company coordinates certain aspects of operations and resources in order to provide greater operating efficiency and economies of scale.

The Company's newspapers compete for readership and advertising with other metropolitan, suburban and national newspapers, and also with television, radio, Internet services and other media. Competition for newspaper advertising is based upon circulation levels, readership demographics, price, service and advertiser results, while competition for circulation is based upon the content of the newspaper, service and price.

The *Los Angeles Times, Chicago Tribune, South Florida Sun-Sentinel, Orlando Sentinel, Daily Press* and *The Morning Call* are printed in Company-owned production facilities. *Newsday, The Sun* and *Hartford Courant* are printed on Company-owned presses in production facilities leased from an affiliate (see Note 8 to the

10

Source: TRIBUNE CO, 10-K, March 20, 2008

Company's consolidated financial statements in Item 8). The principal raw material is newsprint. In 2007, the Company's newspapers consumed approximately 614,000 metric tons of standard newsprint, 45.0 gram basis weight. Average newsprint prices decreased 9% in 2007 from 2006 reflecting lower market prices. Average newsprint prices increased 10% in 2006 and 12% in 2005.

The Company is party to an agreement with AbitibiBowater Inc., expiring in 2009, to supply newsprint. Under the current agreement, the Company purchased approximately 360,000 metric tons of newsprint in 2007, representing 58% of the Company's newsprint purchases and has agreed to purchase 369,000 metric tons in 2008 and 2009, subject to certain limitations, based on market prices at the time of purchase.

### Los Angeles Times and Related Businesses

The *Los Angeles Times* has been published continuously since 1881. The newspaper has won 38 Pulitzer Prizes and is the largest daily metropolitan newspaper in the United States in circulation. The Los Angeles market ranks second in the nation in terms of households. In its primary circulation areas of Los Angeles, Orange, Ventura, San Bernardino and Riverside counties, the *Los Angeles Times* competes for advertising and circulation with 18 local daily newspapers and three daily national newspapers, with its largest local competitor having almost 280,000 in average daily circulation. For the six-month period ended September 2007, the *Los Angeles Times* ranked fourth and second in the country for average daily and Sunday circulation, respectively, according to ABC. Approximately 79% and 81% of the paper's daily and Sunday circulation, respectively, was home delivered in 2007, with the remainder primarily sold at newsstands and vending boxes.

In addition to the daily edition covering the Los Angeles metropolitan area, the *Los Angeles Times* publishes Orange County, San Fernando Valley, Inland Empire and Ventura County editions. Daily and semi-weekly community newspapers are either inserted into the paper in selected geographic areas or distributed to homes and through vending boxes to provide targeted local news coverage. The company operates latimes.com, an online expanded version of the newspaper, providing local, national and international news, calendarlive.com, covering entertainment, reviews and things to do in Southern California, and theenvelope.com, a comprehensive year-round entertainment awards website. In conjunction with MediaNews Group, Inc., the company owns 50% of California Independent Postal Systems ("CIPS"), which provides alternative distribution services for advertising preprints. MediaNews Group, Inc. owns the other 50% of CIPS. The company also operates a free Spanish-language newspaper, *Hoy*, which provides local, national and international news and features of interest to the largest Hispanic market in the U.S.

### Chicago Tribune and Related Businesses

Founded in 1847, the *Chicago Tribune* is the flagship publication of the Chicago Tribune Company. The newspaper has won 24 Pulitzer Prizes and is the largest circulation paper in the Midwest. It ranks eighth among U.S. daily newspapers with an average daily paid circulation of approximately 559,000; and third among U.S. Sunday newspapers with an average Sunday paid circulation of approximately 918,000. Approximately 86% of its weekday newspapers and 76% of its Sunday newspapers are home delivered with the remainder primarily sold at newsstands and vending boxes. Considered an industry leader in journalism and innovation, Chicago Tribune Company has grown into a multi-product, multi-channel news and information source. It also operates chicagotribune.com, the web edition of the newspaper and *RedEye*, a free daily newspaper in Chicago targeting young, urban commuters.

Other businesses owned by Chicago Tribune Company include Tribune Direct, which provides integrated and comprehensive direct mail services, and Chicagoland Publishing Company, which publishes a number of free guides in the real estate, automotive and help wanted categories and the monthly magazine *Chicago*. Chicago Tribune Company also operates CLTV, a local 24-hour cable news channel serving Chicagoland. CLTV was launched in January 1993 and currently is available to more than 1.5 million cable households in the Chicago market. Chicago Tribune Company also operates a free Spanish-language newspaper, *Hoy*, which provides local, national and international news and features of interest to the fourth largest Hispanic market in the U.S.

11

Source: TRIBUNE CO, 10-K, March 20, 2008

### Newsday and Related Businesses

*Newsday* is published daily and circulated primarily in Nassau and Suffolk counties on Long Island, New York, and in the borough of Queens in New York City. The paper has been published since 1940 and has won 19 Pulitzer Prizes. The New York metropolitan area ranks first among U.S. markets in terms of households. *Newsday* competes with two major metropolitan newspapers, daily regional editions of several national newspapers and numerous daily, weekly and semiweekly local newspapers and free distribution newspapers. Approximately 70% of the paper's daily and 66% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes. See Note 5 to the Company's consolidated financial statements in Item 8 for a discussion of charges recorded related to the settlement with advertisers regarding misstated circulation at *Newsday*.

Newsday, Inc., publisher of *Newsday*, also publishes *Distinction*, a magazine serving Long Island's households, issued 10 times per year; *Parents & Children*, a magazine for Long Island families, issued 12 times per year; *Long Island Weddings*, a magazine for brides-to-be, published three times per year; and *Wellness*, a magazine serving Long Island's 40+ health and fitness market, published eight times per year. Newsday, Inc.'s subsidiary, Star Community Publishing Group, LLC, publishes 181 pennysaver editions in Nassau and Suffolk counties on Long Island, New York, and in the boroughs of Queens, Brooklyn and Staten Island in New York City. Newsday, Inc. also publishes *amNew York*, a free daily newspaper in New York City targeting young, urban commuters. In addition, Newsday, Inc. operates several websites including newsday.com and amny.com, which are online versions of the newspapers.

### Other Newspapers

The Company's other primary daily newspapers are *South Florida Sun-Sentinel, Orlando Sentinel, The Sun, Hartford Courant, Daily Press,* and *The Morning Call.*

The *South Florida Sun-Sentinel* is the major daily newspaper serving the Broward/Palm Beach County market, leading in both circulation and readership. The Miami/Fort Lauderdale/Miami Beach metropolitan area, which includes Broward and Palm Beach counties, ranks seventh in the nation in terms of households. Approximately 80% of the paper's daily and 76% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

Sun-Sentinel Company, publisher of the *South Florida Sun-Sentinel*, also serves the news and information needs of South Florida through sun-sentinel.com, its breaking news and information website; *El Sentinel*, a weekly Spanish language newspaper; *Teenlink*, a weekly newspaper distributed in Broward County high schools; weekly community newspapers; niche publications; and television and radio partnerships, including its close working relationship with Tribune Broadcasting's WSFL-TV, Miami, The CW Network affiliate serving South Florida.

Other publications produced by Sun-Sentinel Company include: *City & Shore*, a bimonthly lifestyle magazine; *City Link*, an alternative weekly newspaper; *Florida New Homes & Condo Guide*, a comprehensive bimonthly guide to South Florida real estate; *Jewish Journal*, a collection of weekly newspapers serving South Florida's Jewish community; and *South Florida Parenting*, a monthly magazine providing parenting information and resources for local families.

The *Orlando Sentinel* primarily serves a six-county area in central Florida. The newspaper is the only major daily newspaper in the Orlando market, although it competes with other Florida and national newspapers, as well as with other media. The *Orlando Sentinel* has been published since 1876 and has won 3 Pulitzer Prizes. The Orlando market ranks 26th among U.S. markets in terms of households. Approximately 79% of the paper's daily and 74% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

12

Orlando Sentinel Communications Company, publisher of the *Orlando Sentinel* and orlandosentinel.com, also publishes *ShopLocal*, a free weekly publication used to distribute advertising and content to newspaper non-subscribers. The company publishes the weekly, Spanish-language newspaper, *El Sentinel*, and its companion website, elsentinel.com, as well as six weekly Forum community newspapers. The company's multimedia portfolio also includes free-distribution, niche products in the central Florida market including *Job Xtra* and *AutoFinder* magazines. Orlando Sentinel Communications offers direct marketing/direct mail services through Tribune Direct/Orlando in addition to distribution services for other publications.

*The Sun,* Maryland's largest newspaper, has won 15 Pulitzer Prizes since it began publishing a daily newspaper in 1837. The Baltimore market ranks 20th in the United States in number of households. For the six-month period ending Sept. 25, 2006, *The Sun* was ranked the 25th largest newspaper in the country by Sunday circulation according to ABC. *The Sun* competes with *Baltimore Examiner* as well as *The Washington Post* in Anne Arundel and Howard counties, with *The Annapolis Capital* in Anne Arundel County and with *The Carroll County Times* in Carroll County. It also competes with regional editions of national daily newspapers, as well as other local dailies and weeklies. Approximately 83% of the paper's daily and 71% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

The Baltimore Sun's subsidiaries, Patuxent Publishing and Homestead Publishing, publish 30 community newspapers and magazines throughout the region. The largest of these weekly newspapers are *The Columbia Flier, The Towson Times, The Owings Mills Times* and *The Aegis*. The Baltimore Sun also operates a market-leading website, baltimoresun.com, which is the online version of the newspaper. The Sun and its subsidiaries comprise the The Baltimore Sun Media Group, which reaches 1.4 million readers each week in the Baltimore market, making it the region's most widely read source of news and information.

*Hartford Courant,* founded in 1764, is the oldest continuously published newspaper in the United States. It is the most widely circulated and read newspaper in Connecticut and the strongest medium in the state for advertisers and readers alike. Winner of 2 Pulitzer Prizes and twice named among the best-designed newspapers in the world, *Hartford Courant* is published in the state's capital, Hartford, and serves the state's northern and central regions. The Hartford Courant's primary market is the Hartford market, which includes Hartford, Tolland and Middlesex counties. The Hartford market ranks 44th among U.S. markets in terms of households. Hartford Courant Company, publisher of *Hartford Courant*, has one of the most extensive zoning operations in the country, publishing eight editions of *Hartford Courant* zoned for local news and advertising. The company also operates courant.com, Connecticut's leading online news site, and ctnow.com, a statewide entertainment website. It also owns two subsidiaries: New Mass Media, Inc., a publisher of three weekly alternative newspapers in Connecticut and Massachusetts, and ValuMail, Inc., a shared-mail company that distributes advertising supplements to more than one million households in Connecticut and Massachusetts. Approximately 90% of the paper's daily and 78% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

Founded in 1896, the *Daily Press* serves the Virginia Peninsula market, which includes Newport News, Hampton, Williamsburg and eight other cities and counties. This market, together with Norfolk, Portsmouth and Virginia Beach, is the 34th largest U.S. market in terms of population. *Daily Press* is the only major daily newspaper in its primary market, although it competes with other regional and national newspapers, as well as with other media. Approximately 84% of the paper's daily and 80% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes. The Daily Press, Inc., publisher of *Daily Press*, also owns *The Virginia Gazette*, which is published twice weekly and primarily serves Williamsburg, Va., and surrounding counties. The *Daily Press* serves the Internet community through its online affiliates dailypress.com, hrvarsity.com, hrgardening.com and hrtownsquare.com.

*The Morning Call,* published since 1895, is the dominant regional newspaper for nine counties in eastern Pennsylvania and New Jersey. The Morning Call, Inc., publisher of *The Morning Call*, offers free publications serving the recruitment, real estate and automotive markets, and selected high-income households.  Subsidiaries of The Morning Call, Inc. offer full service direct marketing and saturation preprint delivery through

13

non-subscriber distribution. In addition, The Morning Call Inc. owns and operates the premier regional website, themorningcall.com. Allentown-Bethlehem-Easton is the 60th largest U.S. market in terms of households. Approximately 83% of the paper's daily and 79% of its Sunday circulation is sold through home delivery, with the remainder primarily sold at newsstands and vending boxes.

### *Other Publishing Related Businesses*

The Company also owns Tribune Media Services, Inc. ("TMS"), which creates, aggregates and distributes news, information and entertainment content that reaches millions of users through print, online and on-screen media. The TMS Entertainment Products division creates TV and movie guide products for major media companies and consumers, and sells data for entertainment guides to newspapers, cable, satellite operators and consumer electronics manufacturers. The TMS News and Features division licenses content to media companies from more than 600 writers, artists, newspaper and magazine publishers, and wire services. TMS serves approximately 7,000 media customers worldwide.

14

Source: TRIBUNE CO, 10-K, March 20, 2008

**Broadcasting and Entertainment**

The broadcasting and entertainment segment represented 28% of the Company's consolidated operating revenues in 2007. At Dec. 30, 2007, the segment included The CW Television Network ("The CW Network") affiliates located in New York, Los Angeles, Chicago, Dallas, Washington, D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, San Diego, Hartford, and New Orleans; the FOX Network television affiliates in Seattle, Sacramento, Indianapolis, Hartford, Grand Rapids and Harrisburg; MyNetworkTV affiliates in Philadelphia and Seattle; an ABC television affiliate in New Orleans; one radio station in Chicago; the Chicago Cubs baseball team; and Tribune Entertainment, a company that distributes its own programming together with programming licensed from third parties.

For 2006 compared to 2005, the additional week increased operating revenues, operating expenses and operating profit by approximately 1%. The following table shows sources of operating revenues for the broadcasting and entertainment segment for the last three years (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Television | $ 1,136,224 | $ 1,178,104 | $ 1,165,821 |
| Radio/entertainment | 262,170 | 247,042 | 248,612 |
| Total | $ 1,398,394 | $ 1,425,146 | $ 1,414,433 |

15

*Television*

In 2007, television contributed 81% of the broadcasting and entertainment segment's operating revenues. The Company's television stations compete for audience and advertising with other television and radio stations, cable television and other media serving the same markets. Competition for audience and advertising is based upon various interrelated factors including programming content, audience acceptance and price. Selected data for the Company's television stations are shown in the following table:

| | National Rank | Market(1) % of U.S Households | FCC % | Analog Channel | Affiliation | Major Over-the Air Stations in Market(2) | Expiration of FCC License(3) | Year Acquired |
|---|---|---|---|---|---|---|---|---|
| WPIX—New York, NY | 1 | 6.6 | 6.6 | 11-VHF | CW | 7 | 2015(4) | 1948(5) |
| KTLA—Los Angeles, CA | 2 | 5.0 | 5.0 | 5-VHF | CW | 8 | 2014(4) | 1985 |
| WGN—Chicago, IL | 3 | 3.1 | 3.1 | 9-VHF | CW | 8 | 2013 | 1948(5) |
| WPHL—Philadelphia, PA | 4 | 2.6 | 1.3 | 17-UHF | MNTV | 7 | 2015 | 1992 |
| KDAF—Dallas, TX | 5 | 2.2 | 1.1 | 33-UHF | CW | 9 | 2014 | 1997 |
| WDCW—Washington, D.C. | 9 | 2.0 | 1.0 | 50-UHF | CW | 7 | 2012 | 1999 |
| KHCW—Houston, TX | 10 | 1.8 | 0.9 | 39-UHF | CW | 9 | 2014 | 1996 |
| KCPQ—Seattle, WA | 14 | 1.6 | 1.6 | 13-VHF | FOX | 8 | 2015 | 1999 |
| KMYQ—Seattle, WA | 14 | — | — | 22-UHF | MNTV | 8 | 2015 | 1998 |
| WSFL—Miami, FL | 16 | 1.4 | 0.7 | 39-UHF | CW | 7 | 2013(4) | 1997 |
| KWGN—Denver, CO | 18 | 1.3 | 1.3 | 2-VHF | CW | 7 | 2014 | 1966 |
| KTXL—Sacramento, CA | 20 | 1.2 | 0.6 | 40-UHF | FOX | 7 | 2014 | 1997 |
| KPLR—St. Louis, MO | 21 | 1.1 | 1.1 | 11-UHF | CW | 6 | 2014 | 2003 |
| KRCW—Portland, OR | 23 | 1.0 | 0.5 | 32-UHF | CW | 7 | 2015 | 2003 |
| WTTV—Indianapolis, IN | 26 | 1.0 | 1.0 | 4-VHF | CW | 7 | 2013 | 2002 |
| WXIN—Indianapolis, IN | 26 | — | — | 59-UHF | FOX | 7 | 2013 | 1997 |
| KSWB—San Diego, CA | 27 | 0.9 | 0.5 | 69-UHF | CW | 7 | 2014 | 1996 |
| WTIC—Hartford, CT | 29 | 0.9 | 0.4 | 61-UHF | FOX | 7 | 2015(4) | 1997 |
| WTXX—Hartford, CT | 29 | — | — | 20-UHF | CW | 7 | 2015(4) | 2001 |
| WXMI—Grand Rapids, MI | 39 | 0.7 | 0.3 | 17-UHF | FOX | 7 | 2013 | 1998 |
| WPMT—Harrisburg, PA | 41 | 0.6 | 0.3 | 43-UHF | FOX | 5 | 2015 | 1997 |
| WGNO—New Orleans, LA | 53 | 0.5 | 0.3 | 26-UHF | ABC | 7 | 2013 | 1983 |
| WNOL—New Orleans, LA | 53 | — | — | 38-UHF | CW | 7 | 2013 | 2000 |

(1)  Source: Nielsen Station Index (DMA Market and Demographic Rank Report, September 2007). Ranking of markets is based on number of television households in DMA (Designated Market Area).

(2)  Source: Nielsen Station Index (Viewers in Profile Reports, 2007). Major over-the-air stations program for a broad, general audience in the market.

(3)  See "Governmental Regulation."

(4)  See "Governmental Regulation" for discussion of the Federal Communications Commission ("FCC") television/newspaper cross-ownership rule.

(5)  Founded by the Company.

Programming emphasis at the Company's stations is placed on network-provided shows, syndicated series, feature motion pictures, local and regional sports coverage, news, and children's programs. These stations acquire most of their programming from outside sources, including The CW Network, the FOX Network and MyNetworkTV, although a significant amount is produced locally. Superstation WGN programming is delivered by cable or satellite outside of the Chicago area and includes syndicated series, movies and first-run programming. Contracts for purchased programming generally cover a period of one to five years, with payment also typically made over several years. The expense for amortization of television broadcast rights in 2007 was $347 million, which represented approximately 31% of total television operating revenues.

Source: TRIBUNE CO, 10-K, March 20, 2008

Average audience share information for the Company's television stations for the past three years is shown in the following table:

| | | Average Audience Share(1) | | | | | |
| | | Total Market Year Ended December | | | In-Market Stations(2) Year Ended December | | |
| | Affiliation | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
|---|---|---|---|---|---|---|---|
| WPIX—New York | CW | 4.1% | 4.4% | 5.1% | 11.2% | 11.1% | 12.4% |
| KTLA—Los Angeles | CW | 3.2 | 3.6 | 4.0 | 9.1 | 9.9 | 10.7 |
| WGN—Chicago | CW | 6.3 | 5.9 | 6.2 | 14.6 | 12.9 | 13.2 |
| WPHL—Philadelphia | MNTV | 3.0 | 3.7 | 4.0 | 7.2 | 8.4 | 8.5 |
| KDAF—Dallas | CW | 4.5 | 4.3 | 4.3 | 9.9 | 9.2 | 9.1 |
| WDCW—Washington | CW | 2.8 | 3.2 | 4.2 | 7.6 | 8.2 | 9.5 |
| KHCW—Houston | CW | 4.6 | 4.5 | 4.8 | 10.9 | 9.9 | 9.8 |
| KCPQ—Seattle | FOX | 5.6 | 5.7 | 6.7 | 13.3 | 12.3 | 13.7 |
| KMYQ—Seattle | MNTV | 1.2 | 2.0 | 2.5 | 2.9 | 4.3 | 5.0 |
| WSFL—Miami | CW | 3.8 | 3.9 | 5.2(3) | 11.0 | 11.0 | 13.9(3) |
| KWGN—Denver | CW | 3.2 | 3.2 | 3.9 | 7.8 | 7.8 | 9.4 |
| KTXL—Sacramento | FOX | 5.7 | 5.2 | 5.7 | 14.2 | 10.3 | 13.3 |
| KPLR—St. Louis | CW | 5.3 | 5.5 | 5.0 | 10.7 | 10.4 | 9.5 |
| KRCW—Portland | CW | 2.8 | 3.3 | 3.7 | 6.5 | 7.2 | 7.9 |
| WTTV—Indianapolis | CW | 2.5 | 2.7 | 3.7 | 5.5 | 5.9 | 7.8 |
| WXIN—Indianapolis | FOX | 6.3 | 5.8 | 6.5 | 13.9 | 12.8 | 13.7 |
| KSWB—San Diego | CW | 2.6 | 2.6 | 3.1 | 7.3 | 6.8 | 7.7 |
| WTIC—Hartford | FOX | 5.2 | 5.4 | 6.3 | 13.2 | 12.6 | 14.5 |
| WTXX—Hartford | CW | 2.1 | 2.1 | 2.1 | 5.3 | 4.9 | 4.7 |
| WXMI—Grand Rapids | FOX | 6.9 | 6.4 | 7.1 | 13.7 | 12.2 | 13.6 |
| WPMT—Harrisburg | FOX | 5.9 | 5.5 | 6.1 | 13.2 | 11.8 | 13.9 |
| WGNO—New Orleans | ABC | 3.6(5) | —(4) | 4.6(3) | 9.3(5) | —(4) | 9.8(3) |
| WNOL—New Orleans | CW | 2.5(5) | —(4) | 3.8(3) | 6.4(5) | —(4) | 8.2(3) |
| 23 Station Unweighted Average (6) | | 4.1 | 4.2 | 4.7 | 9.8 | 9.5 | 10.4 |

---

(1) Represents the estimated number of television households tuned to a specific station as a percent of total viewing households in a defined area. The percentages shown reflect the average Nielsen ratings shares for the February, May, July and November measurement periods for 7 a.m. to 1 a.m. daily.

(2) Excludes cable, satellite, public broadcasting, foreign language and minor independent channels.

(3) Nielsen did not release November 2005 data for WSFL-TV, WGNO-TV and WNOL-TV as a result of hurricanes in these areas. The 2005 shares for these markets reflect the average of ratings for the February, May and July measurement periods only.

(4) Nielsen did not release 2006 ratings data for WGNO-TV and WNOL-TV as a result of Hurricane Katrina.

(5) Nielsen did not release February or May 2007 data for WGNO-TV and WNOL-TV. The 2007 shares for these markets reflect the average of ratings for the July and November measurement periods only.

(6) 2006 unweighted station average is for 21 stations rather than 23, since New Orleans was not measured in 2006.

Average audience shares are shown on two bases: total market, which includes all channels, and in-market stations, which includes only the major over-the-air stations. Average in-market shares are a more relevant benchmark to determine the stations' performance in their respective markets as they compare the stations' performance to their primary programming and sales competition. In 2007, the average total market share declined slightly versus 2006 while the average in-market share increased. All of the FOX stations increased their in-market positions in 2007 due to stronger FOX network ratings and growing ratings for new syndicated programming ("Two and a Half Men" and "Family Guy"). These strong syndicated programs also helped the majority of the CW stations to maintain or increase their in-market shares despite soft CW network ratings.

17

Source: TRIBUNE CO, 10-K, March 20, 2008

### *Radio/Entertainment*

In 2007, radio/entertainment operations contributed 19% of the broadcasting and entertainment segment's operating revenues. WGN-AM, Chicago, is the only radio station owned by the Company. Selected information for WGN-AM, Chicago, is shown in the following table:

| | Format | Frequency | National Market Rank(1) | Number of Operating Stations in Market(2) | Audience Share(3) |
|---|---|---|---|---|---|
| WGN-AM, Chicago | Personality/Infotainment/Sports | 720-AM | 3 | 39 | 5.8% |

(1) Source: Radio markets ranked by Arbitron Metro Survey Area, Arbitron Company 2007.

(2) Source: Arbitron Company Radio Market Report Fall 2007 (Reporting stations only).

(3) Source: Average of Winter, Spring, Summer and Fall 2007 Arbitron shares for persons 12 years old and over, 6 a.m. to midnight daily during the period measured.

Entertainment includes Tribune Entertainment Company ("Tribune Entertainment") and the Chicago Cubs baseball team. The Chicago Cubs were acquired in 1981. Cubs games are broadcast on WGN-TV and WGN-AM. Tribune Entertainment is a distributor of programming in the United States syndicated television, cable television and ancillary markets. Tribune Entertainment distributes its own programming together with programming licensed from third parties.

Tribune Entertainment is party to a variety of distribution, marketing, and advertiser sales relationships with major suppliers such as DreamWorks SKG for the exclusive domestic syndication and ad sales of their film library, FremantleMedia, Hearst Entertainment, Rigel Entertainment, Telco Productions, Debmar-Mercury Entertainment, DIC Entertainment and Carlton America. These relationships comprise over 400 television and theatrical motion pictures and more than 1,300 episodes of various television series and specials including "South Park," "Family Feud," "American Idol Rewind," "Soul Train," "The Soul Train Music Awards," and "Ron Hazelton's House Calls." Tribune Entertainment also distributes its television series productions of "Andromeda," "Earth Final Conflict," "Beastmaster," "Mutant X," and "Nightman."

Tribune California Properties, a subsidiary of Tribune Entertainment, owned and maintained a 10.5-acre studio production lot in Hollywood. Tribune Studios, also a subsidiary of Tribune Entertainment, managed the site that included nine state-of-the art digital sound stages and associated production office space which was rented to third parties. During the third quarter of 2007, the Company commenced a process to sell the real estate and related assets of the studio production lot. The Company completed the sale on Jan. 30, 2008.

## Investments

The Company has investments in several public and private companies. See Note 9 to the Company's consolidated financial statements in Item 8 for further discussion of the Company's cost and equity method investments.

The Company's principal equity method investments currently include CareerBuilder, Classified Ventures, Television Food Network, G.P. ("TV Food Network"), Comcast SportsNet Chicago, ShopLocal, Topix.net and Metromix, LLC. CareerBuilder, an online recruiting company formed in 2000, is owned 40.8% by the Company, 40.8% by Gannett Co., Inc., 14.4% by The McClatchy Co., Inc. and 4% by Microsoft Corporation. Classified Ventures is a network of automotive and real estate classified advertising websites. TV Food Network is a 24-hour cable/satellite television network focusing on food and entertaining. Comcast SportsNet Chicago is a 24-hour cable/satellite television network, which began programming in the fall of 2004, focusing on Chicago sports teams, including the Chicago Cubs. ShopLocal transforms traditionally print-based retail promotions into search-based interactive formats. The Company, Gannett Co., Inc. and The McClatchy Co., Inc. each own a 42.5%, 42.5% and 15% interest in ShopLocal, respectively. Topix.net is an online news and information aggregation website that continuously monitors breaking news from over 10,000 online sources and categorizes daily news content into over 300,000 topics, 24 hours a day. The ownership of Topix, LLC is approximately

18

33.7% for both the Company and Gannett Co., Inc., 11.9% for The McClatchy Co., Inc. and 20.7% for management of Topix, LLC. Metromix, LLC, formed in 2007, operates a network of local online entertainment guides targeting young adults in each of the Company's newspaper markets. Metromix, LLC is owned 50% by the Company and 50% by Gannett Co., Inc.

On Sept. 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. As a result, the Company's interests in each of TMCT and TMCT II were reduced to approximately 5%. On Sept. 28, 2007, the Company sold its remaining interests in TMCT and TMCT II to the Chandler Trusts. The Company's former investments in TMCT and TMCT II are further discussed in Note 8 to the Company's consolidated financial statements in Item 8.

**Non-Operating Items**

The Company reported several non-operating items in 2007, 2006 and 2005, which included changes in the fair values of the Company's PHONES derivatives and related Time Warner investment, gains and losses resulting from investment transactions, strategic transaction expenses, and income tax adjustments, including those related to the Matthew Bender and Mosby income tax case. Non-operating items are further discussed in Note 2 to the Company's consolidated financial statements in Item 8.

**Governmental Regulation**

Various aspects of our operations are subject to regulation by governmental authorities in the United States. Our television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act of 1934, as amended. FCC rules, among other things, govern the term, renewal and transfer of radio and television broadcasting licenses, and limit concentrations of broadcasting control inconsistent with the public interest. Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs.

On Nov. 30, 2007, the FCC issued an order (the "Order") granting applications of the Company to transfer control of the Company from the shareholders to the Company's Employee Stock Ownership Plan. In the Order, the FCC granted the Company temporary waivers of the newspaper/broadcast cross-ownership rule in Miami, Florida (WSFL-TV and the *South Florida Sun-Sentinel*); Hartford, Connecticut (WTXX-TV/WTIC-TV and the *Hartford Courant*); Los Angeles, California (KTLA-TV and the *Los Angeles Times*); and New York, New York (WPIX-TV and *Newsday*), for a six-month period beginning Jan. 1, 2008. The six-month waiver could be automatically extended under two conditions: (1) if the Company appeals the Order, the waivers are extended for the longer of two years or six months after the conclusion of the litigation over the Order; or (2) if the FCC adopts a revised newspaper-broadcast cross-ownership rule prior to Jan. 1, 2008, the waivers are extended for a two-year period to allow the Company to come into compliance with any revised rule, provided that in the event the revised rule is the subject of a judicial stay, the waiver is extended until six months after the expiration of any such stay.

The Order also granted the Company a permanent waiver of the newspaper-broadcast cross-ownership rule to permit continued common ownership of WGN-AM, WGN-TV and the Chicago Tribune in Chicago, Illinois; a permanent "failing station" waiver of the television duopoly rule to permit continued common ownership of WTIC-TV and WTXX-TV in Hartford, Connecticut; and granted satellite station status to WTTK-TV, Kokomo, Indiana to permit continued common ownership with WTTV-TV, Bloomington, Indiana.

The Company filed an appeal of the Order in the United States Court of Appeals for the District of Columbia Circuit on Dec. 3, 2007, thus automatically extending the waivers for two years or until six months after the conclusion of that appeal, whichever is longer. Intervenors have filed a motion to dismiss the appeal, as well as a motion to hold the appeal in abeyance; the Company and others have filed oppositions to these motions. Various parties have filed petitions for reconsideration of the Order with the FCC; the Company has filed oppositions to such filings with the FCC.

19

On Dec. 18, 2007, the FCC announced in an FCC news release the adoption of revisions to the newspaper/broadcast cross-ownership rule. The FCC, on Feb. 4, 2008, released the full text of the rule.  The revised rule establishes a presumption that the common ownership of a daily newspaper of general circulation and either a television or a radio broadcast station in the top 20 Nielsen Designated Market Areas ("DMAs") would serve the public interest, provided that, if the transaction involves a television station, (i) at least eight independently owned and operating major media voices (defined to include major newspapers and full-power commercial television stations) would remain in the DMA following the transaction and (ii) the cross-owned television station is not among the top-four ranked television stations in the DMA. Other proposed newspaper/broadcast transactions would be presumed not to be in the public interest, except in the case of a "failing" station or newspaper, or in the event that the proposed transaction results in a new source of news in the market. The FCC did not further relax the television-radio cross-ownership rules, the radio local ownership rules, or the television duopoly rules. Under the rule adopted, the Company would be entitled to a presumption in favor of common ownership in three of the four of the Company's cross-ownership markets (New York, NY, Los Angeles, CA, Miami, FL) not covered by the FCC's grant of a permanent waiver (Chicago, IL). Various parties, including the Company, have sought judicial review of the FCC's order adopting the new rule.

Congress removed national limits on the number of broadcast stations a licensee may own in 1996. However, federal law continues to limit the number of radio and television stations a single owner may own in a local market, and caps the percentage of the national television audience that may be reached by a licensee's television stations in the aggregate at 39%.

Television and radio broadcasting licenses are subject to renewal by the FCC, at which time they may be subject to petitions to deny the license renewal applications. At Dec. 30, 2007, the Company had FCC authorization to operate 23 television stations and one AM radio station.  In order to expedite the renewal grants, the Company entered into tolling agreements with the FCC for WPIX-TV, New York, WDCW-TV, Washington, D.C., WGNO-TV, New Orleans, WXIN-TV, Indianapolis, WXMI-TV, Grand Rapids, WGN-TV, Chicago, WPHL-TV, Philadelphia, KWGN-TV, Denver, KHCW-TV, Houston, KTLA-TV, Los Angeles, KTXL-TV, Sacramento, KSWB-TV, San Diego, KCPQ-TV, Seattle/Tacoma, WTIC-TV, and WPMT-TV Harrisburg, Pennsylvania).  The tolling agreements would allow the FCC to penalize the Company for rule violations that occurred during the previous license term notwithstanding the grant of renewal applications.

The television industry is in the final stages of the transition to digital television ("DTV"). By law, the transition to DTV is to occur by Feb. 17, 2009. The FCC has issued an order with the final, post-transition DTV channel assignments for every full power television station in the U.S. It also recently completed a proceeding that established the operating rules for DTV stations just before and after the transition in February 2009. Conversion to digital transmission requires all television broadcasters, including those owned by the Company, to invest in digital equipment and facilities. At Dec. 30, 2007, all of the Company's television stations were operating DTV stations in compliance with the FCC's rules.

The FCC still has not resolved a number of issues relating to the operation of DTV stations, including the possible imposition of additional "public interest" obligations attached to broadcasters' use of digital spectrum.

From time to time, the FCC revises existing regulations and policies in ways that could affect the Company's broadcasting operations. In addition, Congress from time to time considers and adopts substantive amendments to the governing communications legislation. The Company cannot predict what regulations or legislation may be proposed or finally enacted or what effect, if any, such regulations or legislation could have on the Company's broadcasting operations.

**Employees**

The average number of full-time equivalent employees of the Company in 2007 was approximately 19,600, approximately 1,400 less than the average for 2006 due to employee reductions and the sales of discontinued

20

operations. The Company eliminated approximately 700 positions at various times during 2007 and approximately 450 positions during 2006. The eliminations in 2006 included approximately 100 positions related to discontinued operations prior to the sales of those businesses (see Note 4 to the Company's consolidated financial statements in Item 8 for additional information on the sales of discontinued operations).

During 2007, the Company's publishing segment employed an average of approximately 16,500 full-time equivalent employees. About 16% of these employees were represented by unions covered under 19 labor contracts. Contracts with unionized employees of the publishing segment expire at various times through June 2012.

The broadcasting and entertainment segment had an average of approximately 3,000 full-time equivalent employees in 2007. Approximately 24% of these employees were represented by unions covered under 20 labor contracts. Contracts with unionized employees of the broadcasting and entertainment segment expire at various times through December 2010.

**Executive Officers of the Company**

Information with respect to the executive officers of the Company as of March 20, 2008, is set forth below. Their ages are indicated in parentheses. The descriptions of the business experience of these individuals include the principal positions held by them since March 2003. Unless otherwise indicated, all references to positions are to officers of the Company.

Samuel Zell (66)
Chairman and Chief Executive Officer since December 2007; Director since May 2007. Chairman of Equity Group Investments, L.L.C. since 1999 and President since 2006. Chairman of Equity Office Properties Trust from October 1996 until its acquisition in February 2007; Chief Executive Officer from April 2002 to April 2003; President from April 2002 until November 2002.

Randy Michaels (55)
Executive Vice President and Chief Executive Officer of Tribune Interactive, Inc.* and Tribune Broadcasting Company* since December 2007. Chief Executive Officer of Local TV, LLC from early 2007 until December 2007. Chairman and Chief Executive Officer of Clear Channel Communications from 1999 until 2002. After leaving Clear Channel Communications, Mr. Michaels started several private broadcast firms, including RadioActive and Product 1st. Mr. Michaels then began working with Oak Hill Capital partners in early 2005 on acquisition opportunities, culminating in the creation of Local TV, LLC in 2007.

Gerald A. Spector (61)
Executive Vice President and Chief Administrative Officer since December 2007. Trustee and Executive Vice President of Equity Residential from March 1993 until December 2007; Chief Operating Officer from February 1995 until December 2007.

Donald C. Grenesko (59)
Senior Vice President/Finance and Administration.

Crane H. Kenney (45)
Senior Vice President, General Counsel and Secretary.

Scott C. Smith (57)
President of Tribune Publishing Company* since January 2005 and Publisher of Chicago Tribune Company* since October 2006; Chief Operating Officer of Tribune Publishing Company* from November 2004 until January 2005; President of Chicago Tribune Company* until November 2004.

_____
\*    A subsidiary or a division of the Company

21

Source: TRIBUNE CO, 10-K, March 20, 2008

**Available Information**

The Company maintains an Internet website at www.tribune.com where the Company's Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and all amendments to those reports are available without charge, as soon as reasonably practicable following the time that they are filed with or furnished to the Securities and Exchange Commission.

22

Source: TRIBUNE CO, 10-K, March 20, 2008