TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The significant accounting policies of Tribune Company and subsidiaries (the "Company"), as summarized below, conform with accounting principles generally accepted in the United States of America and reflect practices appropriate to the Company's businesses.

**Nature of Operations**—The Company is a media and entertainment company. Through its subsidiaries, the Company is engaged in newspaper publishing, television and radio broadcasting and entertainment.

**Fiscal Year**—The Company's fiscal year ends on the last Sunday in December. Fiscal years 2007 and 2005 encompassed a 52-week period. Fiscal year 2006 encompassed a 53-week period.

**Principles of Consolidation**—The consolidated financial statements include the accounts of Tribune Company and all majority-owned subsidiaries. In general, investments comprising 20 to 50 percent of the voting stock of companies and certain partnership interests are accounted for using the equity method. All other investments are generally accounted for using the cost method. All significant intercompany transactions are eliminated.

The Company evaluates its investments and other transactions for consolidation under the provisions of Financial Accounting Standards Board ("FASB") Interpretation No. 46R, "Consolidation of Variable Interest Entities" ("FIN 46R"). The Company holds significant variable interests, as defined by FIN 46R, in Classified Ventures, LLC, ShopLocal, LLC and Topix, LLC, but the Company has determined that it is not the primary beneficiary of these entities. The Company's maximum loss exposure related to these entities is limited to its equity investments in Classified Ventures, LLC, ShopLocal, LLC and Topix, LLC, which were $48 million, $32 million, and $24 million, respectively, at Dec. 30, 2007. At Dec. 31, 2006, the Company's equity investments in Classified Ventures, LLC, ShopLocal, LLC and Topix, LLC were $44 million, $31 million and $26 million, respectively.

**Presentation**—On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions, as defined and discussed in Note 3. The Company has significant continuing public debt and has accounted for these transactions as a leveraged recapitalization and, accordingly, has maintained a historical cost presentation in its consolidated financial statements.

On Feb. 12, 2007, the Company announced an agreement to sell the New York edition of *Hoy*, the Company's Spanish-language daily newspaper, to ImpreMedia, LLC. The Company completed the sale of *Hoy*, New York on May 15, 2007.   On Oct. 25, 2007, the Company announced an agreement to sell its Southern Connecticut Newspapers—*The Advocate* (Stamford) and *Greenwich Time* (collectively "SCNI") to Hearst Corporation. The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which the Company plans to sell separately. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of one of its subsidiaries, EZ Buy & EZ Sell Corporation ("Recycler"), to Target Media Partners.  Recycler publishes a collection of free classified newspapers in Southern California.  The sale of Recycler closed on Oct. 17, 2007.  On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta and on June 19, 2006 announced the sale of WCWN-TV, Albany. The sale of WATL-TV, Atlanta closed on Aug. 7, 2006. On Sept. 14, 2006, the Company announced the sale of WLVI-TV, Boston. The Albany and Boston station sales closed on Dec. 6, 2006 and Dec. 19, 2006, respectively. The results of operations of each of these businesses have been reported as discontinued operations in the accompanying consolidated statements of income.  Prior year consolidated statements of income have been reclassified to conform to the presentation of these businesses as discontinued operations.  See Note 4 for further discussion.  In addition, certain other prior year financial information has been reclassified to conform to the current year presentation.

87

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Revenue Recognition**—The Company's primary sources of revenue are from the sales of advertising space in published issues of its newspapers and on interactive websites owned by, or affiliated with, the Company; distribution of preprinted advertising inserts in its newspapers; sales of newspapers to distributors and individual subscribers; and sales of airtime on its television and radio stations. Newspaper advertising revenue is recorded, net of agency commissions, when advertisements are published in newspapers. Website advertising revenue is recognized ratably over the contract period or as services are delivered, as appropriate. Proceeds from subscriptions are deferred and are included in revenue on a pro-rata basis over the term of the subscriptions. Broadcast revenue is recorded, net of agency commissions, when commercials are aired. The Company records rebates when earned as a reduction of advertising revenue.

**Use of Estimates**—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates.

**Cash and Cash Equivalents**—Cash and cash equivalents are stated at cost, which approximates market value. Investments with original maturities of three months or less at the time of purchase are considered to be cash equivalents.

**Accounts Receivable**—The Company's accounts receivable are primarily due from advertisers. Credit is extended based on an evaluation of each customer's financial condition, and generally collateral is not required. The Company maintains an allowance for uncollectible accounts, rebates and volume discounts. This allowance is determined based on historical write-off experience and any known specific collectibility exposures.

**Inventories**—Inventories are stated at the lower of cost or market. Cost is determined on the last-in, first-out ("LIFO") basis for newsprint and on the first-in, first-out ("FIFO") basis for all other inventories.

**Broadcast Rights**—Broadcast rights consist principally of rights to broadcast syndicated programs, sports and feature films and are stated at the lower of cost or estimated net realizable value. The total cost of these rights is recorded as an asset and a liability when the program becomes available for broadcast. Syndicated program rights that have limited showings are generally amortized using an accelerated method as programs are aired. Sports and feature film rights are amortized using the straight-line method. The current portion of broadcast rights represents those rights available for broadcast that are expected to be amortized in the succeeding year.

The Company maintains an allowance for programming that is not expected to be aired by the end of the contract period. This allowance for excess programming inventory is based on a program-by-program review of the Company's five-year broadcast plans and historical write-off trends. The total reserve balance at Dec. 30, 2007 and Dec. 31 2006 was $3 million and $4 million, respectively. Actual write-offs in 2007 and 2006 were $.9 million and $.4 million, respectively. Future write-offs can vary based on changes in consumer viewing trends and the availability and costs of other programming.

**Properties**—Property, plant and equipment are stated at cost. The Company capitalizes major property, plant and equipment additions, improvements and replacements, as well as interest incurred during construction of major facilities and equipment. Depreciation is computed using the straight-line method over the following estimated useful lives: 10 to 40 years for buildings, 7 to 20 years for newspaper printing presses and 3 to 10 years for all other equipment. Expenditures for repairs and maintenance of existing assets are charged to expense as incurred.

**Goodwill and Other Intangible Assets**—Goodwill and other intangible assets are summarized in Note 7. The Company reviews goodwill and certain intangible assets no longer being amortized for impairment annually, or more frequently if events or changes in circumstances indicate that an asset may be impaired, in accordance with Financial Accounting Standard ("FAS") No. 142, "Goodwill and Other Intangible Assets." Under FAS

88

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

No. 142, the impairment review of goodwill and other intangible assets not subject to amortization must be based on estimated fair values.

The Company performs its annual impairment review in the fourth quarter of each year. The estimated fair values of the reporting units to which goodwill has been allocated is determined using many critical factors, including operating cash flows, revenue and market growth, market multiples, and discount rates. The estimated fair values of other intangible assets subject to the annual impairment review, which include newspaper mastheads and Federal Communications Commission ("FCC") licenses, are generally calculated based on projected future discounted cash flow analyses. The development of market multiples, operating cash flow projections and discount rates used in these analyses requires the use of assumptions, including assumptions regarding revenue and market growth as well as specific economic factors in the publishing and broadcasting industries. These assumptions reflect the Company's best estimates, but these items involve inherent uncertainties based on market conditions generally outside of the Company's control.

In the fourth quarter of 2007, the Company recorded a pretax impairment charge of $130 million ($79 million after taxes) related to one of its masthead intangible assets in connection with its annual impairment review under FAS No. 142. This impairment was primarily due to a decrease in actual and projected newspaper advertising revenues as a result of the continued difficult advertising environment.

On March 13, 2008, the Company filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. As a result, essentially all of the Company's net deferred tax liabilities will be eliminated and such adjustment will be recorded as a reduction in the Company's provision for income taxes in the first quarter of 2008. This adjustment will increase the carrying values of the Company's reporting units. The Company has experienced declines in its consolidated operating results during 2007 as compared to the prior year, particularly in its publishing reporting unit. Adverse changes in expected operating results and/or unfavorable changes in other economic factors used to estimate fair values could result in additional non-cash impairment charges in the future under FAS No. 142.

**Impairment Review of Long-Lived Assets**—In accordance with FAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," the Company evaluates the carrying value of long-lived assets to be held and used whenever events or changes in circumstances indicate that the carrying amount of a long-lived asset or asset group may be impaired. The carrying value of a long-lived asset or asset group is considered impaired when the projected future undiscounted cash flows to be generated from the asset or asset group over its remaining depreciable life are less than its current carrying value.

**Investments**—The Company records its investments in debt and equity securities at fair value, except for debt securities that the Company intends to hold to maturity and equity securities that are accounted for under the equity method or that are issued by private companies. Except for 16 million Time Warner shares (see "Derivative Instruments" below), investments are currently classified as available-for-sale, and accordingly, the difference between cost and fair value, net of related tax effects, is recorded in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit).

**Derivative Instruments**—FAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," requires all derivative instruments to be recorded on the balance sheet at fair value. Changes in the fair value of derivative instruments are recognized periodically in income or other comprehensive income (loss) as described below. The provisions of FAS No. 133 affect the Company's accounting for its 8 million Exchangeable Subordinated Debentures due 2029 ("PHONES"), its three interest rate swaps related to a $2.5 billion notional amount of its variable rate borrowings, and its interest rate swap related to its $100 million 7.5% debentures (see Note 10 for further information on the Company's PHONES and interest rate swaps).

Under the provisions of FAS No. 133, the initial value of the PHONES was split into a debt component and a derivative component. Changes in the fair value of the derivative component of the PHONES are recorded in

89

Source: TRIBUNE CO, 10-K, March 20, 2008

## TRIBUNE COMPANY AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

the statement of income. Beginning in the second quarter of 1999, changes in the fair value of the related 16 million Time Warner shares are also recorded in the statement of income and should at least partially offset changes in the fair value of the derivative component of the PHONES. However, there have been, and may continue to be, periods with significant non-cash increases or decreases to the Company's net income pertaining to the PHONES and the related Time Warner shares.

The interest rate swaps related to $2.5 billion of the Company's variable rate borrowings are cash flow hedges. Under FAS No. 133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. While there will be some ineffectiveness in the future, the Company's cash flow hedges are deemed to be highly effective, and therefore gains and losses resulting from changes in the fair value of these hedges, other than changes resulting from hedge ineffectiveness, are recorded in other comprehensive income (loss), net of taxes.

The Company's interest rate swap on its $100 million 7.5% debentures is a fair value hedge and is used to manage exposure to market risk associated with changes in interest rates. The changes in fair value of the swap agreement and the related debt instrument are recorded in income.

The Company has classified the fair value of its hedging instruments in long-term debt in its consolidated balance sheet.

**Pension Plans and Other Postretirement Benefits**—Retirement benefits are provided to employees through pension plans sponsored either by the Company or by unions. Under the Company-sponsored plans, pension benefits are primarily a function of both the years of service and the level of compensation for a specified number of years, depending on the plan. It is the Company's policy to fund the minimum for Company-sponsored pension plans as required by ERISA. Contributions made to union-sponsored plans are based upon collective bargaining agreements.

The Company also provides certain health care and life insurance benefits for retired employees. The expected cost of providing these benefits is accrued over the years that the employees render services. It is the Company's policy to fund postretirement benefits as claims are incurred.

In September 2006, the FASB issued FAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106 and 132(R)", which requires an employer to recognize the overfunded or underfunded status of a defined benefit pension or other postretirement plan (other than a multiemployer plan) as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which changes occur through comprehensive income. The Statement also requires an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions. The Company adopted the provisions of FAS No. 158 as of Dec. 31, 2006. Additional information pertaining to the Company's pension plans and other postretirement benefits is provided in Note 15.

**Self-Insurance**—The Company self-insures for certain employee medical and disability income benefits, workers' compensation costs and automobile and general liability claims. The recorded liabilities for self-insured risks are calculated using actuarial methods and are not discounted. The recorded liabilities for self-insured risks totaled $100 million and $115 million at Dec. 30, 2007 and Dec. 31, 2006, respectively.

**Deferred Income**—Deferred income arises in the normal course of business from advance subscription payments for newspapers, interactive advertising sales and prepaid ticket revenue related to the Chicago Cubs. Deferred income is recognized in the period it is earned.

**Employee Stock Ownership Plan ("ESOP")—As defined and described in Note 3, on April 1, 2007, the Company established a new ESOP as a long-term employee benefit plan. On that date, the ESOP purchased 8,928,571 shares of the Company's common stock. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the**

90

## TRIBUNE COMPANY AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger (as defined in Note 3), the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007.

The Company's policy is to present unallocated shares held by the ESOP at book value, net of unearned compensation, and allocated shares at fair value in the Company's consolidated balance sheet. Pursuant to the terms of the ESOP, following the Merger, participants who receive distributions of shares of the Company's common stock can require the Company to repurchase those shares within a specified time period following such distribution. Accordingly, the shares of the Company's common stock held by the ESOP are classified outside of shareholders' equity (deficit), net of unearned compensation, in the Company's consolidated balance sheet. See Note 17 for further information.

**Stock-Based Compensation**—In the first quarter of 2006, the Company adopted FAS No. 123R, "Share-Based Payment," which superseded Accounting Principles Board ("APB") Opinion No. 25, FAS No. 123 and related interpretations. FAS No. 123R requires the Company to expense stock-based compensation in its income statement. Under FAS No. 123R, stock-based compensation cost is measured at the grant date for equity-classified awards and at the end of each reporting period for liability-classified awards based on the estimated fair value of the award. See Note 17 for further information on the Company's adoption of FAS 123R.

The Company granted stock options to employees in 2006 and prior years. The Company used the Black-Scholes option-pricing model to determine the fair value of each stock option it granted. The Black-Scholes model included assumptions regarding dividend yields, expected volatility, expected lives and risk-free interest rates. These assumptions reflected the Company's best estimates, but they involved certain risks, trends and uncertainties, which in some instances were outside of the control of the Company. As a result, if other assumptions had been used, stock-based compensation could have been materially impacted. The Company adopted FAS No. 123R utilizing the modified prospective application method and did not restate prior years. Additional information on the accounting for stock-based compensation in accordance with FAS No. 123R is provided in Note 17.

Prior to the adoption of FAS No. 123R, the Company accounted for its stock-based compensation plans in accordance with APB No. 25 and related interpretations. Under APB No. 25, no compensation expense was recorded because the exercise price of employee stock options equaled the market price of the underlying stock on the date of grant. Under the provisions of APB No. 25, the Company was not required to recognize compensation expense for its Employee Stock Purchase Plan.

91

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Under FAS No. 123, "Accounting for Stock-Based Compensation," as amended by FAS No. 148, compensation cost was measured at the grant date based on the estimated fair value of the award and was recognized as compensation expense over the vesting period. Had compensation cost for the Company's stock-based compensation plans been determined consistent with FAS No. 123 prior to the adoption of FAS No. 123R in 2006, the Company's 2005 net income would have been reduced to the following pro forma amounts (in thousands):

|  | 2005 |
|---|---|
| Net income, as reported | $ 534,689 |
| Less: Pro forma stock-based employee compensation expense, net of tax: | |
| General options | (89,508) |
| Replacement options | (1,242) |
| Employee Stock Purchase Plan | (3,361) |
| Total pro forma stock-based employee compensation expense, net of tax | (94,111) |
| Pro forma net income | $ 440,578 |

In determining the pro forma compensation cost under the fair value method of FAS No. 123, using the Black-Scholes option-pricing model, the following weighted average assumptions were used for general awards and replacement options:

| | 2005 | |
|---|---|---|
| | General Awards | Replacement Options |
| Risk-free interest rate | 3.7% | 3.3% |
| Expected dividend yield | 1.8% | 1.8% |
| Expected stock price volatility | 28.1% | 22.8% |
| Expected life (in years) | 5 | 3 |
| Weighted average fair value | $ 10.49 | $ 6.96 |

On June 24, 2005, the Company accelerated the vesting of certain stock options granted on Feb. 11, 2003 and Feb. 10, 2004, totaling 2.4 million in each year. Unvested stock options awarded to the then current executive officers of the Company on these grant dates, which aggregated .8 million and .6 million, respectively, were not accelerated at that time. On Dec. 16, 2005, the Company accelerated the vesting of all stock options granted on Feb. 8, 2005, totaling 3.5 million, and the remaining unvested stock options granted to the then current executive officers of the Company on Feb. 11, 2003 and Feb. 10, 2004, totaling .4 million in both years. No other terms and conditions of the stock option grants were changed.

In accordance with APB No. 25 and related interpretations, the acceleration of vesting of these stock options did not require accounting recognition in the Company's income statement. The exercise prices of the 2003, 2004 and 2005 grants were $45.90, $52.05 and $40.59, respectively, and the Company's closing stock prices on the June 24, 2005 and Dec. 16, 2005 dates of acceleration were $35.64 and $30.80, respectively. The impact of the accelerated vesting was to increase pro forma stock-based compensation by $82 million, or $50 million net of tax, in 2005.

The accelerated vesting of these stock options was one of several actions taken by the Company in 2004 and 2005 to reduce the stock-based compensation expense that would have otherwise been recorded with the adoption of FAS No. 123R. The Company reduced the number of stock options granted in 2004 and 2005 by approximately 45%. Also, beginning in 2004, option grants had 8-year terms, down from 10 years for grants in previous years, and did not have a replacement option feature.

92

Source: TRIBUNE CO, 10-K, March 20, 2008

### TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Income Taxes**—Provisions for federal and state income taxes are calculated on reported pretax earnings based on current tax laws and also include, in the current period, the cumulative effect of any changes in tax rates from those used previously in determining deferred tax assets and liabilities. Taxable income reported to the taxing jurisdictions in which the Company operates often differs from pretax earnings because some items of income and expense are recognized in different time periods for income tax purposes. The Company provides deferred taxes on these temporary differences in accordance with FAS No. 109, "Accounting for Income Taxes." Taxable income also may differ from pretax earnings due to statutory provisions under which specific revenues are exempt from taxation and specific expenses are not allowable as deductions. The Company establishes reserves for income tax when it is probable that one or more of the taxing authorities will challenge and disallow a position taken by the Company in its income tax returns and the resulting liability is estimable. The consolidated tax provision and related accruals include estimates of the potential taxes and related interest as deemed appropriate. These estimates are reevaluated and adjusted, if appropriate, on a quarterly basis. Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

On Jan. 1, 2007, the Company adopted the provisions of FASB Interpretation ("FIN") No. 48, "Accounting for Uncertainty in Income Taxes." FIN 48 addresses the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. Under FIN 48, a company may recognize the tax benefit of an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. FIN 48 requires the tax benefit recognized in the financial statements to be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods and disclosure. See Note 14 for further discussion of the Company's adoption of FIN 48.

**Comprehensive Income**—Comprehensive income consists of net income and other gains and losses affecting shareholders' equity that, under accounting principles generally accepted in the United States of America, are excluded from net income. Prior to 2007, the Company's other comprehensive income (loss) primarily included gains and losses on marketable securities classified as available-for-sale and the change in minimum pension liabilities. Beginning in the Company's 2007 fiscal year, and as a result of the Company's adoption of FAS No. 158 as of Dec. 31, 2006, other comprehensive income (loss) no longer includes the change in minimum pension liabilities, but does include changes in unrecognized benefit cost gains and losses. In addition, beginning in the Company's 2007 third quarter, other comprehensive income (loss) includes gains and losses on cash flow hedging instruments as a result of the interest rate swap agreements the Company entered into in July 2007 (see Note 10 for further information on the Company's interest rate swap agreements). The Company's comprehensive income (loss) is summarized in Note 18.

**New Accounting Standards**—In September 2006, the FASB issued FASB Statement No. 157, "Fair Value Measurements," ("FAS No. 157"), which defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. In February 2008, the FASB issued Staff Position No. 157-2 which defers the effective date of FAS No. 157 for all nonfinancial assets and liabilities, except those items recognized or disclosed at fair value on an annual or more frequently recurring basis, until one year after the adoption of FAS No. 157. The provisions of FAS No. 157, as amended, are effective for financial statements issued for fiscal years beginning after Nov. 15, 2007 and interim periods beginning within these fiscal years. Accordingly, the Company will be required to adopt FAS No. 157 in the first quarter of 2008. The Company is currently evaluating the impact of adopting FAS No. 157 on its consolidated financial statements.

In February 2007, the FASB issued FASB Statement No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities ("FAS No. 159"). FAS No. 159 permits entities to choose to measure many

93

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

financial instruments and certain other items at fair value. Unrealized gains and losses on items for which the fair value option has been elected will be recognized in earnings at each subsequent reporting date. The provisions of FAS No. 159 are effective for financial statements issued for fiscal years beginning after Nov. 15, 2007 and interim periods beginning within these fiscal years. Accordingly, the Company will become subject to the provisions of FAS No. 159 in the first quarter of 2008. The Company is currently evaluating the impact of adopting FAS No. 159 on its consolidated financial statements.

In December 2007, the FASB issued FASB Statement No. 160, "Noncontrolling Interests in Consolidated Financial Statements, an Amendment of ARB No. 51" ("FAS No. 160"), which provides accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. It clarifies that an ownership interest in a subsidiary should be reported as a separate component of equity in the consolidated financial statements, requires consolidated net income to be reported at amounts that include the amounts attributable to both the parent and the noncontrolling interest and provides for expanded disclosures in the consolidated financial statements. FAS No. 160 is effective for financial statements issued for fiscal years beginning after Dec. 15, 2008 and interim periods beginning within these fiscal years. The Company is currently evaluating the impact of adopting FAS No. 160 on its consolidated financial statements.

## NOTE 2: CHANGES IN OPERATIONS AND NON-OPERATING ITEMS

**Acquisitions**—The Company had no significant acquisitions in 2007, 2006 and 2005. The results of acquired companies are included in the consolidated statements of income since their respective dates of acquisition.

**Supplemental Cash Flow Information**—Information for acquisitions made in 2007, 2006 and 2005 is summarized in the table below (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Fair value of assets acquired(1) | $    15,801 | $    48,144 | $    4,207 |
| Liabilities assumed | — | — | — |
| Net cash paid | $    15,801 | $    48,144 | $    4,207 |

(1)  Includes intangible assets, net of acquisition-related deferred taxes.

94

Source: TRIBUNE CO, 10-K, March 20, 2008

## TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Cash paid (received) for interest and income taxes in 2007, 2006 and 2005 is summarized below (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Interest | $    511,792 | $    238,894 | $    134,955 |
| Income taxes(1) | $    (183,643) | $    408,507 | $    1,157,243 |

(1)  In 2005, the Company paid $880 million to the Internal Revenue Service, representing the federal tax and interest owed as a result of an unfavorable Tax Court ruling on the Matthew Bender and Mosby transactions. In 2007, the Company received a refund of $344 million of federal tax and interest as a result of settling its appeal of the Tax Court ruling (see Note 14).

**Change in Control Payments**—On Dec. 20, 2007, the Company consummated the Merger, as defined and described in the discussion of the Leveraged ESOP Transactions in Note 3.  As a result, the Company was required to make payments pursuant to change in control provisions contained in certain of the Company's deferred compensation, incentive compensation and company-sponsored pension plans. The Company recorded a $64 million pretax charge in the fourth quarter of 2007, including $53 million related to the cash settlement of its outstanding stock-based awards and $3 million of early termination payments made pursuant to the Management Equity Incentive Plan (see Note 17), related to these change in control payments. This $64 million pretax charge is included in selling, general and administrative expenses in the Company's consolidated statement of income for the year ended Dec. 30, 2007.

**Consolidation of *Los Angeles Times*' Production Operations**—In December 2005, the *Los Angeles Times* announced it would close its San Fernando Valley printing facility in January 2006 and consolidate production at its remaining three facilities in Los Angeles, Costa Mesa, and Irwindale, California. The closing of the printing facility resulted in the elimination of approximately 120 positions from across the *Los Angeles Times'* production facilities.

As a result of the facility closing, the Company recorded a $2 million pretax charge in the fourth quarter of 2005 to reduce the carrying value of the San Fernando Valley printing facility's land and building to $24 million, representing the estimated fair value of the assets less costs to sell the assets. On Oct. 30, 2006, the Company sold the San Fernando Valley land and building for net proceeds of approximately $24 million.

The Company evaluated the machinery and equipment at the San Fernando Valley printing facility and determined that press and other related equipment with a net book value of $16 million would be abandoned. Therefore, the Company reduced its estimate of the useful life of the press and other related equipment and recorded accelerated depreciation of $16 million in the fourth quarter of 2005. The Company idled the remaining San Fernando Valley machinery and equipment, which had a net book value of $26 million at Dec. 31, 2006 and $34 million at Dec. 25, 2005. Since the time of the facility closing, the Company continued to depreciate and evaluate alternative uses of the idled assets. In the fourth quarter of 2006, the Company disposed of and wrote off $4 million of the idled equipment that had previously been designated for redeployment at Dec. 25, 2005. During the second quarter of 2007, the Company decided to dispose of the remaining idled assets and recorded a charge of $24 million to reduce the carrying value of the assets to estimated fair value, less costs to sell.  The remaining idled assets were sold in the third quarter of 2007 for net proceeds of approximately $1 million.

**Acquisition of Additional Equity in CareerBuilder, ShopLocal and Topix**—In August 2006, the Company completed its acquisition of additional equity interests in each of CareerBuilder, LLC, ShopLocal, LLC  and Topix, LLC for an aggregate purchase price of $155 million. The negotiated equity purchases followed the exercise of call options by the Company and Gannett Co., Inc. on Knight-Ridder, Inc.'s equity ownership in the three online businesses after The McClatchy Co., Inc's announcement of its proposed acquisition of Knight-Ridder, Inc. As a result of this transaction, the Company and Gannett Co., Inc. each increased their respective ownership of CareerBuilder, LLC and ShopLocal, LLC to 42.5% with The McClatchy Co., Inc. retaining a 15%

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

interest in both entities. In addition, as a result of this transaction and subsequent funding in 2006, the ownership of Topix, LLC is approximately 33.7% for both the Company and Gannett Co., Inc., 11.9% for The McClatchy Co., Inc. and 20.7% for management of Topix, LLC. In May 2007, Microsoft Corporation acquired a 4% equity interest in CareerBuilder, LLC, thereby reducing the respective ownership interest of the Company and Gannett Co., Inc. to 40.8% and The McClatchy Co., Inc. to 14.4%.

**Employee Reductions**—The Company reduced its staffing levels by approximately 700 positions in 2007 and recorded a pretax charge of $55 million ($40 million at publishing and $15 million at corporate). In 2006, the Company reduced its staffing levels by approximately 450 positions, primarily at publishing, and recorded a pretax charge of $9 million. The eliminations in 2006 included approximately 100 positions and a pretax charge of approximately $1 million related to discontinued operations. In 2005, the Company reduced its staffing levels by approximately 900 positions and recorded a pretax charge of $45 million ($43 million at publishing, $1 million at broadcasting and entertainment and $1 million at corporate). The eliminations in 2005 included 120 positions as a result of closing the *Los Angeles Times*' San Fernando Valley printing facility, as discussed above. The Company had a current liability of approximately $21 million at Dec. 30, 2007 and $7 million at Dec. 31, 2006 related to these employee reductions.

**Non-Operating Items**—Fiscal years 2007, 2006 and 2005 included several non-operating items.

Non-operating items for 2007 are summarized as follows (in thousands):

|  | Proceeds | Pretax Gain (Loss) | After-tax Gain (Loss) |
|---|---|---|---|
| Loss on change in fair values of derivatives and related investments | $    — | $ (96,806) | $ (59,051) |
| Strategic transaction expenses | — | (85,131) | (77,184) |
| Gain on TMCT transactions | 73,706 | 8,003 | 4,882 |
| Gain on other investment transactions, net | 3,111 | 31,578 | 5,465 |
| Other, net | 11,557 | 5,137 | 1,183 |
| Income tax adjustment | — | — | 90,704 |
| Total non-operating items | $ 88,374 | $ (137,219) | $ (34,001) |

The 2007 change in the fair values of derivatives and related investments pertained entirely to the Company's PHONES and related Time Warner investment. The $97 million non-cash pretax loss resulted primarily from an $82 million decrease in the fair value of 16 million shares of Time Warner common stock and a $12 million increase in the fair value of the derivative component of the Company's PHONES.

Strategic transaction expenses in 2007 included costs related to the Company's strategic review and the Leveraged ESOP Transactions approved by the Company's board of directors on April 1, 2007. These expenses included a $13.5 million loss from refinancing certain credit agreements (see Note 10).

The gain on TMCT transactions in 2007 related to the redemption of the Company's remaining interests in TMCT, LLC and TMCT II, LLC (see Note 8).

Other investment transactions resulted in a net pretax gain of $32 million ($5 million after taxes) in 2007. Approximately $28 million of the net pretax gain ($3 million after taxes) resulted from the restructuring of certain investments. These restructured investments were established in 1998 when Times Mirror disposed of its Matthew Bender and Mosby subsidiaries. As a result of the restructuring, the Company will not realize the $25 million of deferred income tax assets relating to tax credits generated by its low income housing investments. The

96

## TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

tax credits were available only to offset income taxes of certain affiliates. After the restructuring, those affiliates no longer exist and the tax credits are no longer available. Accordingly, the Company has increased its 2007 consolidated income tax expense by $25 million to write-off these deferred income tax assets. After consideration of the $25 million income tax adjustment, the investment restructuring increased 2007 net income by $3 million.

Other, net in 2007 included an $18 million gain from the settlement of the Company's Hurricane Katrina insurance claim that was largely offset by a $15 million charge for the civil forfeiture payment related to *Newsday* and *Hoy*, New York (see Note 5). The favorable income tax adjustment in 2007 related to the settlement of the Company's Matthew Bender and Mosby income tax appeal (see Note 14).

Non-operating items for 2006 are summarized as follows (in thousands):

|  | Proceeds | Pretax Gain (Loss) | After-tax Gain (Loss) |
|---|---|---|---|
| Gain on change in fair values of derivatives and related investments | $  — | $ 11,088 | $ 6,764 |
| Strategic transaction expenses | — | (3,466) | (2,520) |
| Gain on TMCT transactions, net | — | 59,596 | 47,988 |
| Gain on other investment transactions, net | 82,903 | 36,732 | 22,339 |
| Other, net | — | (981) | 1,476 |
| Income tax adjustments | — | — | 33,563 |
| Total non-operating items | $ 82,903 | $ 102,969 | $ 109,610 |

The 2006 change in the fair values of derivatives and related investments pertained entirely to the Company's PHONES and related Time Warner investment. The $11 million non-cash pretax gain resulted primarily from a $66 million increase in the fair value of 16 million shares of Time Warner common stock, which was partially offset by a $52 million increase in the fair value of the derivative component of the Company's PHONES.

In 2006, the Company recorded a one-time gain of $48 million, net of tax, as a result of transactions related to its investments in TMCT, LLC and TMCT II, LLC (see Note 8). In addition, the Company sold 2.8 million shares of Time Warner common stock unrelated to the PHONES for net proceeds of $46 million and recorded a pretax gain on sale of $19 million, and sold its investment in BrassRing for net proceeds of $27 million and recorded a pretax gain of $17 million.

Also in 2006, the Company recorded favorable income tax expense adjustments of $34 million, most of which related to the Company's PHONES as a result of reaching an agreement with the Internal Revenue Service appeals office pertaining to the deduction of interest expense on the PHONES (see Note 14).

Non-operating items for 2005 are summarized as follows (in thousands):

|  | Proceeds | Pretax Gain | After-tax Gain (Loss) |
|---|---|---|---|
| Gain on change in fair values of derivatives and related investments | $  — | $ 62,184 | $ 37,932 |
| Gain on other investment transactions, net | 17,368 | 6,780 | 4,136 |
| Other, net | 5,166 | 897 | 547 |
| Income tax adjustments | — | — | (138,664) |
| Total non-operating items | $ 22,534 | $ 69,861 | $ (96,049) |

97

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The 2005 change in the fair values of derivatives and related investments pertained entirely to the Company's PHONES and related Time Warner investment. The $62 million non-cash pretax gain resulted primarily from an $87 million decrease in the fair value of the derivative component of the Company's PHONES, which was partially offset by a $23 million decrease in the fair value of 16 million shares of Time Warner common stock.

. As a result of the United States Tax Court opinion issued on Sept. 27, 2005 related to the Matthew Bender and Mosby tax dispute, the Company recorded additional income tax expense of $150 million in the third quarter of 2005 (see Note 14). In the first quarter of 2005, the Company reduced its income tax expense and liabilities by a total of $12 million as a result of favorably resolving certain other federal income tax issues.

## NOTE 3: LEVERAGED ESOP TRANSACTIONS

On April 1, 2007, the Company's board of directors (the "Board"), based on the recommendation of a special committee of the Board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company (the "Zell Entity") wholly owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. **On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions which culminated in the cancellation of all issued and outstanding shares of the Company's common stock as of that date, other than shares held by the Company or the ESOP, and the Company becoming wholly owned by the ESOP.** The Company has accounted for these transactions as a leveraged recapitalization and, accordingly, has maintained a historical cost presentation in its consolidated financial statements.

The Leveraged ESOP Transactions consisted of a series of transactions that included the following:

- On April 1, 2007, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust which forms a part of the ESOP, Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and the Zell Entity (solely for the limited purposes specified therein) providing for Merger Sub to be merged with and into the Company, and following such merger, the Company to continue as the surviving corporation wholly owned by the ESOP (the "Merger").

- On April 1, 2007, the ESOP purchased 8,928,571 shares of the Company's common stock from the Company at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger (as described below), the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represent the only outstanding shares of capital stock of the Company after the Merger. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007.

- On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of the Company's common stock at a price of $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million, which the Company repaid immediately prior to the Merger (as described below). Pursuant to

98

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENT(Continued)**

the Zell Entity Purchase Agreement, on May 9, 2007, Mr. Zell was appointed as a member of the Board.

- On April 25, 2007, the Company commenced a tender offer to repurchase up to 126 million shares of the Company's common stock that were then outstanding at a price of $34.00 per share in cash (the "Share Repurchase"). The tender offer expired on May 24, 2007 and 126 million shares of the Company's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Credit Agreement (as defined in the "New Credit Agreements" section contained in Note 10).

- The Company granted registration rights to Chandler Trust No. 1 and Chandler Trust No. 2 (together, the "Chandler Trusts"), which were significant shareholders of the Company prior to the Company's entry into the Leveraged ESOP Transactions. On April 25, 2007, the Company filed a shelf registration statement in connection with the registration rights granted to the Chandler Trusts.

- On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman, Sachs & Co. ("Goldman Sachs") and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of the Company's common stock, which represented the remainder of the shares of the Company's common stock owned by them following the Share Repurchase, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to the shelf registration statement filed by the Company on April 25, 2007. Following the closing of this transaction, the Chandler Trusts no longer owned any shares of the Company's common stock. On June 4, 2007, Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. resigned as members of the Board. Messrs. Chandler, Goodan and Stinehart served on the Board as representatives of the Chandler Trusts, which agreed to cause the resignations of Messrs. Chandler, Goodan and Stinehart effective upon the consummation of the Share Repurchase.

- On Dec. 20, 2007, the Company completed its merger with Merger Sub, with the Company surviving the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of the Company, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by the Company, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes, and the Company became wholly owned by the ESOP.

- In the Merger, the Zell Entity received cash for the shares of the Company's common stock it had acquired pursuant to the Zell Entity Purchase Agreement and the Company repaid the exchangeable promissory note held by the Zell Entity including approximately $6 million of accrued interest. In addition, the Company paid to the Zell Entity a total of $5 million in legal fee reimbursements, of which $2.5 million was previously paid following the Share Repurchase described above. Following the consummation of the Merger, the Zell Entity purchased from the Company, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. For accounting purposes, the subordinated promissory note and 15-year warrant were recorded at fair value based on the relative fair value method. The warrant entitles the Zell Entity to purchase 43,478,261 shares of the Company's common stock (subject to adjustment), which represents approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to share equivalents granted under a new management equity incentive plan which is described in Note 17). The warrant has

99

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENT(Continued)**

an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees. See Part III, Items 12 and 13, hereof for further information on the assignment of the minority interests in the subordinated promissory note and the warrant.

- On Dec. 20, 2007, the Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated. The Company requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of the market on Dec. 20, 2007, and that the NYSE file with the Securities and Exchange Commission an application on Form 25 to report that the shares of the Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

The Company currently intends to dispose of an interest in the Chicago Cubs and the Company's 25% equity interest in Comcast SportsNet Chicago. The Company currently expects that proceeds from such dispositions will be used to pay down Company debt. The disposition of an interest in the Cubs is subject to the approval of Major League Baseball.

<u>**NOTE 4: DISCONTINUED OPERATIONS AND ASSETS HELD FOR SALE**</u>

**Sales of *Hoy*, New York, SCNI and Recycler**—On Feb. 12, 2007, the Company announced an agreement to sell *Hoy*, New York to ImpreMedia, LLC. The Company completed the sale of *Hoy*, New York on May 15, 2007 and recorded a pretax gain on the sale of $2.5 million ($.1 million after taxes) in the second quarter of 2007. On March 6, 2007, the Company announced an agreement to sell SCNI to Gannett Co., Inc. On May 25, 2007, the Company announced the termination of this agreement following an arbitrator's ruling that the Company could not sell SCNI unless Gannett Co., Inc. assumed an existing collective bargaining contract as a condition of the sale, which Gannett Co., Inc. declined to do. The Company simultaneously announced that it would immediately begin the process of soliciting offers for SCNI with the intention of completing a sale as soon as possible. On Oct. 25, 2007, the Company announced an agreement to sell SCNI to Hearst Corporation for $62.4 million. The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which the Company plans to sell separately. In the first quarter of 2007, the Company recorded a loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to sell. In the third quarter of 2007, the Company recorded a favorable $3 million after-tax adjustment to the loss on the sale of SCNI. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of Recycler to Target Media Partners. Recycler publishes a collection of free classified newspapers in Southern California. The sale of Recycler closed on Oct. 17, 2007. The Company recorded a pretax loss on the sale of the stock of Recycler of $1 million in the third quarter of 2007. Due to the Company's high tax basis in the Recycler stock, the sale generated a significantly higher capital loss for income tax purposes. As a result, the Company recorded a $65 million income tax benefit in the third quarter of 2007, resulting in an after-tax gain of $64 million.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations for each of these businesses are reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income have been reclassified to conform to the current year presentation of these businesses as discontinued operations.

100

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENT(Continued)**

**Sales of WATL-TV, Atlanta, WCWN-TV, Albany and WLVI-TV, Boston**—On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. for $180 million. The sale closed on Aug. 7, 2006. On June 19, 2006, the Company announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on Dec. 6, 2006. On Sept. 14, 2006, the Company announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million. The sale closed on Dec. 19, 2006.

These businesses were considered components of the Company's broadcasting and entertainment segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations of each of these businesses have been reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income were reclassified to conform to the presentation of these businesses as discontinued operations.

In conjunction with the sales of WATL-TV, Atlanta and WCWN-TV, Albany, the Company recorded in the second quarter of 2006 a pretax loss totaling $90 million to write down the net assets of the stations to estimated fair value, less costs to sell. The Company subsequently reduced the pretax loss on the sales of the Atlanta and Albany stations during the third quarter of 2006 by $1 million. In addition, the Company recorded in the fourth quarter of 2006 a pretax gain of $41 million for the sale of the Boston station. The net pretax loss on the sales of the three stations sold during 2006 was $48 million.

**Summarized Financial Information**—Selected financial information related to discontinued operations for 2007, 2006 and 2005 is summarized as follows (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Operating revenues | $ 49,441 | $ 139,014 | $ 168,771 |
| | | | |
| Operating profit (loss)(1) | $ (2,482) | $ 2,549 | $ 25,564 |
| Loss on sales of discontinued operations | (21,220) | (48,238) | — |
| Income (loss) from discontinued operations before income taxes | (23,702) | (45,689) | 25,564 |
| Income taxes(2) | 55,309 | (21,489) | (10,259) |
| Income (loss) from discontinued operations, net of tax | $ 31,607 | $ (67,178) | $ 15,305 |

(1)    Operating profit for 2006 included $6 million of severance and related charges incurred as a result of the sales of the three television stations.

(2)    Income taxes for 2007 included a $65 million income tax benefit from the sale of Recycler, as the Company's high tax basis in the Recycler stock generated a significantly higher capital loss for income tax purposes. Income taxes for 2006 included an income tax benefit of only $12 million related to the $89 million pretax loss on sales of the Atlanta and Albany stations. The pretax loss included $80 million of allocated television group goodwill, most of which is not deductible for income tax purposes. Income taxes for 2006 also included a tax expense of $32 million related to the $41 million pretax gain on sale of the Boston station. The pretax gain included $45 million of allocated television group goodwill, most of which is not deductible for income tax purposes.

**Assets Held for Sale**—During the third quarter of 2007, the Company commenced a process to sell the real estate and related assets of its studio production lot located in Hollywood, California. Accordingly, the $23 million carrying value of the land, building and equipment of the studio production lot is included in assets held for sale at Dec. 30, 2007. The sale of the studio production lot closed on Jan. 30, 2008 and the Company received net proceeds of approximately $121 million. Simultaneous with the closing of the sale, the Company entered into a five-year operating lease for a portion of the studio production lot currently utilized by the Company's KTLA-TV station. The sale resulted in a total pretax gain of approximately $98 million. The pretax gain related to the portion of the studio production lot currently utilized by the Company's KTLA-TV station is approximately $13 million and will be amortized as reduced rent expense over the five-year life of the related operating lease. The remaining pretax gain of $85 million will be recorded in income in the first quarter of 2008.

101

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENT(Continued)

As noted above, the Company plans to sell the SCNI real estate in Stamford and Greenwich, Connecticut and as such, the $5 million carrying value is included in assets held for sale at Dec. 30, 2007. In December 2006, the Company entered into a non-binding agreement to sell the land and building of one of its other facilities.  The $5 million carrying value of the land and building approximates fair value less costs to sell and is also included in assets held for sale at Dec. 30, 2007 and at Dec. 31, 2006.

In February 2007, the Company sold its interactive program guide assets, including software and a portfolio of patents (collectively the "IPG intellectual property"). The $4 million carrying value of the intangible assets related to the IPG intellectual property had been included in assets held for sale at Dec. 31, 2006. The Company received net proceeds of approximately $10 million and recorded a pretax gain on sale of approximately $6 million in the first quarter of 2007.

## NOTE 5: *NEWSDAY* AND *HOY,* NEW YORK CHARGE

In February 2004, a purported class action lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* and *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications. The purported class action also alleges that entities that paid a *Newsday* subsidiary to deliver advertising flyers were overcharged. The Company is vigorously defending this suit.  In July 2004, another lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* alleging damages resulting from inflated *Newsday* circulation numbers as well as federal and state antitrust violations.  On Feb. 11, 2008, this suit was settled with all defendants.

On June 17, 2004, the Company publicly disclosed that it would reduce its reported circulation for both *Newsday* and *Hoy*, New York for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004. The circulation adjustments were the result of a review of reported circulation at *Newsday* and *Hoy*, New York, conducted by the Company's internal audit staff and the Audit Bureau of Circulations ("ABC"). Subsequent to the June 17th disclosure, the Company continued its internal review and found additional misstatements for these time periods, as well as misstatements that impacted the 12-month period ending Sept. 30, 2002. On Sept. 10, 2004, the Company announced additional revisions to the circulation figures for *Newsday* and *Hoy*, New York, for the 12-month period ending Sept. 30, 2003 and the six-month period ending March 31, 2004.

As a result of the misstatements of reported circulation at *Newsday* and *Hoy*, New York, the Company recorded a total pretax charge of $90 million in 2004 as its estimate of the probable cost to settle with advertisers.  Approximately $80 million of the charge pertained to *Newsday* and is included in selling, general and administrative expenses in 2004. The remaining $10 million pertained to *Hoy*, New York and is reflected in discontinued operations in 2004. In the fourth quarter of 2007, the Company recorded an additional pretax charge of $3 million pertaining to *Newsday*.  The Company will continue to evaluate the adequacy of the advertiser settlement accrual on an ongoing basis.

A summary of the activity with respect to the *Newsday* and *Hoy*, New York, advertiser settlement accrual is as follows (in millions):

| | |
|---|---:|
| Advertiser settlement accrual balance at Dec. 26, 2004 | $        49 |
| 2005 payments | (34) |
| Advertiser settlement accrual balance at Dec. 25, 2005 | 15 |
| 2006 payments | (8) |
| Advertiser settlement accrual balance at Dec. 31, 2006 | 7 |
| 2007 accrual increase | 3 |
| 2007 payments | (1) |
| Advertiser settlement accrual balance at Dec. 30, 2007 | $         9 |

102

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENT(Continued)

In addition to the advertiser lawsuits, several class action and shareholder derivative suits were filed against the Company and certain of its current and former directors and officers as a result of the circulation misstatements at *Newsday* and *Hoy*, New York. These suits alleged breaches of fiduciary duties and other managerial and director failings under Delaware law, the federal securities laws and ERISA. The consolidated shareholder derivative suit filed in Illinois state court in Chicago was dismissed with prejudice on March 10, 2006. The appeal of this dismissal to the Illinois State Court of Appeals was voluntarily dismissed by the plaintiff following the closing of the Company's going private transaction. The consolidated securities class action lawsuit and the consolidated ERISA class action lawsuit filed in Federal District Court in Chicago were both dismissed with prejudice on Sept. 29, 2006, and the dismissals are currently being appealed to the United States Court of Appeals for the Seventh Circuit. Oral arguments of the consolidated securities and ERISA class action appeals were heard on Jan. 23, 2008. The Company continues to believe these suits are without merit and will continue to vigorously defend them.

On May 30, 2006, the Securities and Exchange Commission ("SEC") concluded its inquiry into circulation practices at *Newsday* and *Hoy*, New York. In closing its inquiry, the SEC ordered the Company to cease and desist from violating statutory provisions related to its record keeping and reporting. No fines or other sanctions were levied against the Company. The Company consented to the order without admitting or denying any of the Commission's findings. The SEC acknowledged the prompt internal investigation and remedial acts undertaken by the Company and the cooperation the Company afforded the Commission's staff throughout its investigation.

On Dec. 17, 2007, *Newsday* and *Hoy*, New York reached a non-prosecution agreement with the United States Attorneys' Office for the Eastern District of New York that ended the federal inquiry into the circulation practices of *Newsday* and *Hoy*, New York. The agreement recognized *Newsday's* and *Hoy*, New York's full cooperation with the investigation; the implementation of new practices and procedures to prevent fraudulent circulation practices, the payment of approximately $83 million in restitution to advertisers, and a civil forfeiture payment of $15 million, which is available for additional restitution. The $15 million civil forfeiture payment is included in 2007 non-operating expense (see Note 2). Nine former employees and contractors of *Newsday* and *Hoy*, New York have pleaded guilty to various criminal charges in connection with the fraudulent circulation practices uncovered by the Company. They are awaiting the imposition of sentence.

## NOTE 6: INVENTORIES

Inventories consisted of the following (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Newsprint | $ 28,664 | $ 28,629 |
| Supplies and other | 12,011 | 12,333 |
| Total inventories | $ 40,675 | $ 40,962 |

Newsprint inventories valued under the LIFO method were less than current cost by approximately $10 million at Dec. 30, 2007 and $15 million at Dec. 31, 2006.

103

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

## NOTE 7: GOODWILL AND OTHER INTANGIBLE ASSETS

Goodwill and other intangible assets at Dec. 30, 2007 and Dec. 31, 2006 consisted of the following (in thousands):

| | Dec. 30, 2007 | | | Dec. 31, 2006 | | |
|---|---|---|---|---|---|---|
| | Gross Amount | Accumulated Amortization | Net Amount | Gross Amount | Accumulated Amortization | Net Amount |
| **Intangible assets subject to amortization** | | | | | | |
| Subscribers (useful life of 15 to 20 years) | $ 189,879 | $ (81,698) | $ 108,181 | $ 190,660 | $ (72,126) | $ 118,534 |
| Network affiliation agreements (useful life of 40 years)(1) | 278,034 | (29,552) | 248,482 | 278,034 | (22,614) | 255,420 |
| Other (useful life of 3 to 40 years) | 25,381 | (11,707) | 13,674 | 25,128 | (8,717) | 16,411 |
| Total | $ 493,294 | $ (122,957) | 370,337 | $ 493,822 | $ (103,457) | 390,365 |
| **Goodwill and other intangible assets not subject to amortization** | | | | | | |
| Goodwill | | | | | | |
| Publishing | | | 4,138,685 | | | 4,395,967 |
| Broadcasting and entertainment | | | 1,441,241 | | | 1,441,241 |
| Total goodwill | | | 5,579,926 | | | 5,837,208 |
| Newspaper mastheads | | | 1,412,937 | | | 1,575,814 |
| FCC licenses | | | 871,946 | | | 871,946 |
| Tradename | | | 7,932 | | | 7,932 |
| Total | | | 7,872,741 | | | 8,292,900 |
| Total goodwill and other intangible assets | | | $ 8,243,078 | | | $ 8,683,265 |

(1)  Network affiliation agreements, net of accumulated amortization, included $174 million related to Fox affiliations, $72 million related to CW affiliations and $3 million related to MyNetworkTV affiliations as of Dec. 30, 2007.

104

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

The changes in the carrying amounts of intangible assets during the years ended Dec. 30, 2007 and Dec. 31, 2006 were as follows (in thousands):

| | Publishing | Broadcasting and Entertainment | Total |
|---|---:|---:|---:|
| **Intangible assets subject to amortization** | | | |
| Balance as of Dec. 25, 2005 | $ 85,223 | $ 334,100 | $ 419,323 |
| Amortization expense | (8,208) | (11,555) | (19,763) |
| Assets held for sale, net (IPG intellectual property) | (4,002) | — | (4,002) |
| Amortizable intangibles acquired during year | 6,452 | — | 6,452 |
| Sales of discontinued operations (see Note 4) | (50) | (11,595) | (11,645) |
| Balance as of Dec. 31, 2006 | $ 79,415 | $ 310,950 | $ 390,365 |
| Amortization expense | (8,315) | (11,518) | (19,833) |
| Amortizable intangibles acquired during year | 380 | — | 380 |
| Sales of discontinued operations (see Note 4) | (575) | — | (575) |
| Balance as of Dec. 30, 2007 | $ 70,905 | $ 299,432 | $ 370,337 |
| | | | |
| **Goodwill** | | | |
| Balance as of Dec. 25, 2005 | $ 4,380,483 | $ 1,566,659 | $ 5,947,142 |
| Goodwill acquired during year | 45,477 | — | 45,477 |
| Sales of discontinued operations (see Note 4) | — | (125,418) | (125,418) |
| Adjustment for tax resolutions(1) | (28,186) | — | (28,186) |
| Other | (1,807) | — | (1,807) |
| Balance as of Dec. 31, 2006 | $ 4,395,967 | $ 1,441,241 | $ 5,837,208 |
| Goodwill acquired during year | 15,801 | — | 15,801 |
| Sales of discontinued operations (see Note 4) | (48,993) | — | (48,993) |
| Adjustment related to settlement of Matthew Bender and Mosby Tax Court appeal (see Note 14) | (224,149) | — | (224,149) |
| Other | 59 | — | 59 |
| Balance as of Dec. 30, 2007 | $ 4,138,685 | $ 1,441,241 | $ 5,579,926 |
| | | | |
| **Other intangible assets not subject to amortization** | | | |
| Balance as of Dec. 25, 2005 | $ 1,583,746 | $ 1,084,654 | $ 2,668,400 |
| Sales of discontinued operations (see Note 4) | — | (212,708) | (212,708) |
| Balance as of Dec. 31, 2006 | $ 1,583,746 | $ 871,946 | $ 2,455,692 |
| Sales of discontinued operations (see Note 4) | (32,877) | — | (32,877) |
| Write-down of newspaper masthead assets | (130,000) | — | (130,000) |
| Balance as of Dec. 30, 2007 | $ 1,420,869 | $ 871,946 | $ 2,292,815 |
| | | | |
| Total goodwill and other intangibles as of Dec. 30, 2007 | $ 5,630,459 | $ 2,612,619 | $ 8,243,078 |

(1)  Adjustment for the resolution of uncertain income tax positions related to the Times Mirror Company acquisition.

In the fourth quarter of 2007, the Company recorded a pretax impairment charge of $130 million ($79 million after taxes) related to one of its newspaper masthead intangible assets in connection with its annual impairment review under FAS No. 142. This impairment was primarily due to a decrease in actual and projected newspaper advertising revenues as a result of the continued difficult advertising environment.

On March 13, 2008, the Company filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. As a result, essentially all of the Company's net deferred tax liabilities will be eliminated and such adjustment will be recorded as a reduction in the Company's provision for income taxes in the first quarter of 2008. This adjustment will increase the carrying values of the Company's reporting units. The Company has experienced declines in its

105

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

consolidated operating results during 2007 as compared to the prior year, particularly in its publishing reporting unit. Adverse changes in expected operating results and/or unfavorable changes in other economic factors used to estimate fair values could result in additional non-cash impairment charges in the future under FAS No. 142. See Note 1 for a description of the Company's accounting policy for measuring impairments of its intangible assets in accordance with FAS No. 142.

Estimated annual amortization expense will be approximately $20 million for each of the next five years, excluding the effects of any acquisitions or dispositions subsequent to Dec. 30, 2007.

## NOTE 8: TMCT and TMCT II

As a result of the Company's acquisition of The Times Mirror Company ("Times Mirror") in 2000, the Company acquired investment interests in TMCT, LLC ("TMCT") and TMCT II, LLC ("TMCT II"). TMCT and TMCT II were formed in 1997 and 1999, respectively, as a result of transactions involving agreements between Times Mirror and its largest shareholders, Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "Chandler Trusts"). The Times Mirror acquisition resulted in the Chandler Trusts becoming significant shareholders of the Company. As a result of the Leveraged ESOP Transactions, the Chandler Trusts are no longer shareholders of the Company (see Note 3). The TMCT and TMCT II LLC agreements had no specific term, and the dissolution, determination of liquidation values and distribution of assets required the mutual consent of the Company and the Chandler Trusts. On Sept. 28, 2007, the Company sold its remaining interests in TMCT and TMCT II (as described below).

The collective assets of TMCT and TMCT II as of Dec. 25, 2005 included approximately 51.4 million shares of the Company's common stock and 1.1 million shares of the Company's preferred stock, representing all of the Company's then issued Series C, D-1 and D-2 preferred stock. The TMCT and TMCT II assets also include a variety of fixed income and equity investments. In addition, TMCT owns eight real properties that are leased to the Company. Additional financial information pertaining to TMCT and TMCT II is provided below.

**TMCT Transactions**—On Sept. 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on Sept. 22, 2006, a total of 38.9 million shares of the Company's common stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. As a result, the Company's interests in each of TMCT and TMCT II were reduced to approximately 5%. The Sept. 21, 2006 agreements also provided for certain put and call options, which were exercisable at fair market value beginning in September 2007, relating to the Company's remaining ownership interests in TMCT and TMCT II. As a result of the transactions, the Company in the third quarter of 2006 recorded a non-operating gain of $48 million, net of tax; increased its common treasury stock by $161 million and its preferred treasury stock by $107 million; and reduced its combined investment in TMCT and TMCT II by $195 million.

On Oct. 20, 2006, the remaining 12.4 million shares of the Company's common stock held by TMCT and TMCT II were distributed to the Company and the Chandler Trusts in accordance with their respective ownership interests. The Company received 0.6 million shares and the Chandler Trusts received 11.8 million shares.

The Company and the Chandler Trusts shared in the cash flows of the various assets held by TMCT and TMCT II. Prior to the Sept. 22, 2006 transactions, the cash flows from the Tribune common and preferred shares held by TMCT and TMCT II were largely allocated to the Company, while the cash flows from the other assets were largely allocated to the Chandler Trusts. As a result, the Company included in treasury stock 80% of the Tribune common and preferred shares held by TMCT and TMCT II. In addition, 80% of the dividends on the preferred and common shares held by TMCT and TMCT II were effectively eliminated. Following the Sept. 22, 2006 transactions and until the Oct. 20, 2006 distribution, the Company included in treasury stock approximately 5% of the Tribune common shares held by TMCT and TMCT II. As a result of the transactions, the Company no longer has any shares of its Series C, D-1 and D-2 preferred stock outstanding, and the Company's common shares outstanding increased by 1.6 million.

106

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

On Sept. 21, 2007, the Company gave notice of its intent to exercise its put rights with respect to its remaining interests in TMCT and TMCT II.  The sale of the Company's remaining interests in TMCT and TMCT II to the Chandler Trusts was consummated on Sept. 28, 2007.  The Company received $73.7 million in proceeds from the sale and recorded a non-operating gain of $5 million, net of tax.

TMCT—At Dec. 31, 2006, the assets of TMCT included eight real properties ("Real Properties") leased to the Company and a portfolio of fixed income and equity investments ("TMCT Portfolio"). The TMCT assets at Dec. 25, 2005 also included 13 million shares of the Company's common stock and 442,596 shares of the Company's Series C preferred stock (collectively, "TMCT Shares"). As discussed above, all of the TMCT Shares were distributed to the Company and the Chandler Trusts in 2006. TMCT has no outstanding debt. The estimated fair market value of the TMCT Portfolio at Dec. 31, 2006 was $265 million.

The Company has accounted for the Real Properties lease as a property financing obligation in its consolidated balance sheet.  In connection with the TMCT restructuring discussed above, the Company and TMCT amended the lease agreement on Sept. 22, 2006. Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company exercised this option on Jan. 29, 2008 and expects to complete this acquisition in April 2008.

Summarized income and expense information for TMCT is shown in the following table for the period of Jan. 1, 2007 through Sept. 28, 2007 and for the years ended Dec. 31, 2006 and Dec. 25, 2005 (in thousands):

| | TMCT Income and Expense Information (unaudited) | | |
|---|---|---|---|
| | Jan. 1, 2007 – Sept. 28, 2007 | Dec. 26, 2005 – Dec. 31, 2006 | Dec. 27, 2004 – Dec. 25, 2005 |
| TMCT Shares dividend income | $ — | $ 20,030 | $ 26,706 |
| Real Properties lease income | 18,124 | 24,166 | 24,166 |
| TMCT Portfolio interest and dividend income | 8,790 | 12,040 | 9,508 |
| TMCT Portfolio net realized gains | 5,971 | 3,943 | 835 |
| Total | $ 32,885 | $ 60,179 | $ 61,215 |
| TMCT operating expenses | $ (6,809) | $ (8,922) | $ (9,301) |

The Company accounted for its investment in the TMCT Portfolio under the equity method. The Company's investment in TMCT totaled $24 million at Dec. 31, 2006.  The Company recognized equity income of $.4 million in 2007 and $2 million in 2006 and 2005 related to the TMCT Portfolio.

TMCT II—At Dec. 31, 2006, the assets of TMCT II included a portfolio of fixed income investments that were funded with the proceeds from the redemption of six unrelated real estate investment trust interests in 2004 and two in 2005 ("REIT Portfolio"); a portfolio of fixed income and equity investments ("TMCT II Portfolio"); and a portfolio of venture capital and private equity investments ("Venture Capital Portfolio"). The TMCT II assets at Dec. 25, 2005 also included 39 million shares of the Company's common stock, 380,972 shares of the Company's Series D-1 preferred stock and 245,100 shares of the Company's Series D-2 preferred stock (collectively, "TMCT II Shares"). As discussed above, all of the TMCT II Shares were distributed to the Company and the Chandler Trusts in 2006. TMCT II has no outstanding debt. The estimated fair market values of the REIT Portfolio, the TMCT II Portfolio, and the Venture Capital Portfolio at Dec. 31, 2006 were $592 million, $115 million, and $223 million, respectively.

107

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

Summarized income and expense information for TMCT II is shown in the following table for the period of Jan. 1, 2007 through Sept. 28, 2007 and for the years ended Dec. 31, 2006 and Dec. 25, 2005 (in thousands):

| | TMCT II Income and Expense Information (unaudited) | | |
| --- | --- | --- | --- |
| | Jan. 1, 2007 – Sept. 28, 2007 | Dec. 26, 2005 – Dec. 31, 2006 | Dec. 27, 2004 – Dec. 25, 2005 |
| TMCT II Shares dividend income | $        — | $    37,203 | $    48,853 |
| REIT Portfolio income | 28,179 | 37,457 | 38,417 |
| TMCT II Portfolio and Venture Capital Portfolio interest and dividend income | 5,269 | 8,849 | 8,244 |
| TMCT II Portfolio, Venture Capital Portfolio and REIT Portfolio net realized gains (losses) | 5,958 | (60,019) | (778) |
| Total | $    39,406 | $    23,490 | $    94,736 |
| TMCT II operating expenses | $    (3,756) | $    (11,169) | $    (11,319) |

The Company accounted for its investments in the REIT Portfolio, the TMCT II Portfolio and the Venture Capital Portfolio under the equity method. The Company's investment in TMCT II totaled $42 million at Dec. 31, 2006 and $196 million at Dec. 25, 2005. The Company recognized equity income related to the REIT Portfolio, TMCT II Portfolio and Venture Capital Portfolio investments of $1 million in 2007, $6 million in 2006, and $8 million in 2005.

## NOTE 9: INVESTMENTS

Investments consisted of the following (in thousands):

| | Dec. 30, 2007 | Dec. 31, 2006 |
| --- | --- | --- |
| Time Warner stock related to PHONES debt | $    266,400 | $    348,480 |
| Other cost method investments | 5,642 | 14,150 |
| Equity investments in TMCT and TMCT II(1) | — | 66,016 |
| Other equity method investments | 502,563 | 484,584 |
| Total investments | $    774,605 | $    913,230 |

---

(1)  See Note 8 for further discussion.

Cost method investments in public companies and debt securities were recorded at fair value in the consolidated balance sheets. At Dec. 30, 2007, the Company's cost method investments included public companies, mainly Time Warner, and private companies. In the third quarter of 2006, the Company sold 2.8 million shares of Time Warner common stock unrelated to the PHONES for net proceeds of $46 million and recorded a pretax gain on sale of $19 million. The cost basis of the Time Warner shares sold was determined using the specific identification method. The investment in Time Warner at Dec. 30, 2007 consisted of 16.2 million shares, mostly related to the PHONES (see Notes 1 and 10).

108

## TRIBUNE COMPANY AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

The Company's equity method investments at Dec. 30, 2007 included the following private companies:

| Company | % Owned |
|---|---|
| CareerBuilder, LLC | 41% |
| California Independent Postal Systems | 50% |
| Classified Ventures, LLC | 28% |
| Comcast SportsNet Chicago | 25% |
| Consumer Networks | 17% |
| Legacy.com | 39% |
| Metromix, LLC | 50% |
| ShopLocal, LLC | 43% |
| Topix, LLC | 34% |
| Television Food Network, G.P. | 31% |

The Company does not guarantee any indebtedness or other obligations for any of its investees other than certain immaterial amounts related to its investment in CareerBuilder, LLC. In the third quarter of 2007, the Company recorded a pretax gain of $8 million related to the redemption of its remaining interest in TMCT, LLC and TMCT II, LLC (see Note 8). In the third quarter of 2006, the Company recorded a one-time gain of $48 million, net of tax, as a result of transactions related to its investments in TMCT, LLC and TMCT II, LLC (see Note 8). In the fourth quarter of 2006, the Company sold its 27% interest in BrassRing, resulting in a pretax gain of $17 million. During 2005, the Company sold certain investments resulting in a pretax gain of $7 million.

The Company's investment in Television Food Network, G.P. ("TV Food Network") totaled $148 million, $129 million, and $95 million at Dec. 30, 2007, Dec. 31, 2006 and Dec. 25, 2005, respectively. The Company recognized equity income from TV Food Network of $82 million in 2007, $72 million in 2006 and $55 million in 2005. TV Food Network owns and operates a 24-hour television network focusing on food and entertaining. Its programming is distributed by cable and satellite television systems.

Summarized financial information for selected equity investments is as follows (in thousands):

| | Fiscal Years | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| Revenues, net | $ 1,176,199 | $ 963,823 | $ 737,539 |
| Operating income | $ 323,783 | $ 258,490 | $ 174,632 |
| Net income | $ 336,727 | $ 276,771 | $ 177,395 |

| | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Current assets | $ 642,277 | $ 482,924 |
| Non-current assets | $ 437,371 | $ 430,503 |
| Current liabilities | $ 225,210 | $ 167,689 |
| Non-current liabilities | $ 14,958 | $ 14,459 |

For investments classified as available-for-sale and recorded at fair value under FAS No. 115, the aggregate cost basis, unrealized gain and fair value were as follows (in thousands):

| | Dec. 30, 2007 | | | Dec. 31, 2006 | | |
|---|---|---|---|---|---|---|
| | Cost Basis | Unrealized Gain | Fair Value | Cost Basis | Unrealized Gain | Fair Value |
| Marketable equity securities | $ 2,332 | $ 2,976 | $ 5,308 | $ 2,335 | $ 11,562 | $ 13,897 |

The difference between cost and fair value, net of related tax effects, is recorded in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) and amounted to a net gain of $1.8

109

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

million at Dec. 30, 2007 and $7 million at Dec. 31, 2006. The cost bases of the investments in the tables above are net of write-downs recorded in the consolidated statements of income.

<u>NOTE 10: DEBT</u>

Debt consisted of the following (in thousands):

| | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Tranche B Facility due 2014, interest rate of 7.91% | $ 7,587,163 | $ — |
| Tranche X Facility due 2008-2009, interest rate of 7.99% | 1,400,000 | — |
| Bridge Facility due 2008, interest rate of 9.43% | 1,600,000 | — |
| Former bridge credit facility due June 19, 2007, interest rate of 6.2% | — | 1,310,000 |
| Former term loan due June 20, 2011, interest rate of 6.2% | — | 1,500,000 |
| Commercial paper, weighted average interest rate of 5.9% | — | 97,019 |
| Medium-term notes due 2008, weighted average interest rate of 5.6% in 2007 and 2006 | 262,585 | 262,585 |
| Property financing obligation, effective interest rate of 7.7%, expiring 2009 (see Note 8) | 35,676 | 55,711 |
| 4.875% notes due 2010, net of unamortized discount of $410 and $564, respectively | 449,589 | 449,436 |
| 7.25% debentures due 2013, net of unamortized discount of $1,794 and $2,137, respectively | 80,289 | 79,946 |
| 5.25% notes due 2015, net of unamortized discount of $1,205 and $1,362, respectively | 328,795 | 328,638 |
| 7.5% debentures due 2023, net of unamortized discount of $3,732 and $3,969, respectively | 95,016 | 94,781 |
| 6.61% debentures due 2027, net of unamortized discount of $2,095 and $2,200, respectively | 82,864 | 82,760 |
| 7.25% debentures due 2096, net of unamortized discount of $17,926 and $18,116, respectively | 130,073 | 129,884 |
| Subordinated promissory note due 2018, effective interest rate of 17%, net of unamortized discount of $165,000 | 60,315 | — |
| Interest rate swaps | 119,029 | 24,600 |
| Other notes and obligations | 15,091 | 16,898 |
| Total debt excluding PHONES | 12,246,485 | 4,432,258 |
| 2% PHONES debt related to Time Warner stock, due 2029 | 597,040 | 572,960 |
| Total debt | $ 12,843,525 | $ 5,005,218 |

110

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

Debt was classified as follows in the consolidated balance sheets (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---:|---:|
| Current Liabilities: | | |
| PHONES debt related to Time Warner stock | $    253,080 | $         — |
| Other debt due within one year | 750,239 | 1,429,007 |
| Total current debt | 1,003,319 | 1,429,007 |
| Long-Term Debt: | | |
| PHONES debt related to Time Warner stock | 343,960 | 572,960 |
| Other long-term debt | 11,496,246 | 3,003,251 |
| Total long-term debt | 11,840,206 | 3,576,211 |
| Total Debt | $  12,843,525 | $  5,005,218 |

**New Credit Agreements**—On May 17, 2007, the Company entered into a $8.028 billion senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consists of the following facilities: (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement equals $10.133 billion.

On June 4, 2007, proceeds from the Tranche X Facility and the Tranche B Facility were used by the Company in connection with the consummation of the Share Repurchase (as defined in the discussion of the Leveraged ESOP Transactions in Note 3) and to refinance the Company's former five-year credit agreement and former bridge credit agreement.

The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. As of Dec. 30, 2007, the Company had $65 million of letters of credit outstanding. Borrowings under the Revolving Credit Facility may be used for working capital and general corporate purposes. The Company intends to use the Delayed Draw Facility to refinance approximately $263 million of its medium-term notes as they mature during 2008. In February 2008, the Company refinanced $25 million of such medium-term notes with borrowings under the Delayed Draw Facility.

On Dec. 20, 2007, the Company entered into (i) a $1.6 billion senior unsecured interim loan agreement (the "Interim Credit Agreement") and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement (the Incremental Facility and Tranche B Facility are hereinafter referred to collectively as the Tranche B Facility). The Interim Credit Agreement contains a $1.6 billion twelve-month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by the Company, among other ways, in connection with the consummation of the Merger (as defined and discussed in Note 3), and for general corporate purposes.

Prior to the consummation of the Merger, the Tranche X Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. Pursuant to the terms of the Credit Agreement, following the closing of the Merger, the margins applicable to the Tranche X Facility increased to 175 basis points and 275 basis points, respectively.

The Tranche B Facility, Delayed Draw Facility and Revolving Credit Facility bear interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 200 basis points or

111

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

LIBOR plus a margin of 300 basis points. All undrawn amounts under the Delayed Draw Facility and the Revolving Credit Facility accrue commitment fees at a per annum rate of 75 basis points and 50 basis points, respectively. With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts are subject to decreases based on a leverage-based grid.

On June 29, 2007, the Company repaid $100 million of the $1.5 billion of borrowings under the Tranche X Facility. The remaining principal balance of the Tranche X Facility must be repaid in an aggregate amount of $650 million on Dec. 4, 2008, which amount may be adjusted to reflect additional prepayments or other mandatory prepayments (described below) applied thereto, and the remaining outstanding amount of the Tranche X Facility, if any, must be repaid on June 4, 2009.

The Tranche B Facility is a seven-year facility which matures on June 4, 2014 and also amortizes at a rate of 1.0% per annum (payable quarterly). The Delayed Draw Facility automatically becomes part of the Tranche B Facility as amounts are borrowed and amortizes based upon the Tranche B Facility amortization schedule. The Revolving Facility is a six-year facility and matures on June 4, 2013.

Prior to June 4, 2008, optional prepayments on the Tranche X Facility and the Tranche B Facility with the proceeds of a substantially concurrent issuance of loans under any senior secured credit facilities pursuant to the Credit Agreement must be accompanied by a prepayment fee equal to 1.0% of the aggregate amount of such prepayments if the interest rate spread applicable to such new loans is less than the interest rate applicable to the Tranche X Facility or the Tranche B Facility. Except as described in the immediately preceding sentence, borrowings under the Credit Agreement are prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

The Bridge Facility bears interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points; provided that such margins will increase by 50 basis points per annum each quarter beginning on March 20, 2008, subject to specified caps, a portion of which interest may be payable through an interest payable-in-kind feature. Subject to certain prepayment restrictions contained in the Credit Agreement, the Bridge Facility is prepayable at any time prior to maturity without penalty, including in connection with the issuance of up to $1.6 billion of high-yield notes.

If any loans under the Bridge Facility remain outstanding on Dec. 20, 2008, the lenders thereunder will have the option, subject to the terms of the Interim Credit Agreement, at any time and from time to time to exchange such initial loans for senior exchange notes that the Company will issue under a senior indenture, and the maturity date of any initial loans that are not exchanged for senior exchange notes will, unless a bankruptcy event of default has occurred and is continuing on such date, automatically be extended to Dec. 20, 2015 (the "Final Interim Credit Agreement Maturity Date"). Accordingly, the Company has classified the borrowings under the Bridge Facility as long-term at Dec. 30, 2007. The senior exchange notes will also mature on the Final Interim Credit Agreement Maturity Date. Holders of the senior exchange notes will have registration rights.

Loans under the Tranche X Facility, Tranche B Facility and Revolving Loan Facility are required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leverage-based grid ranging from 50% to 0% and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Credit Agreement.

112

Source: TRIBUNE CO, 10-K, March 20, 2008

## TRIBUNE COMPANY AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

Loans under the Bridge Facility are required to be repaid with the following proceeds, in each case after the obligations under the Credit Agreement have been repaid, either as required by the Credit Agreement or repaid at the election of the Company, subject to certain exceptions and exclusions set forth in the Interim Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of certain debt for borrowed money by the Company or any subsidiary, (b) 100% of the net cash proceeds of any equity issuance consummated by the Company and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Interim Credit Agreement.

Borrowings under the Credit Agreement are guaranteed on a senior basis by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the equity interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company. Audited financial statements of these two subsidiaries are included in this Item 8. The Company's other senior notes and senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as required by the terms of the indentures governing such notes and debentures. Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the Company's direct and indirect U.S. subsidiaries.

The Credit Agreement and the Interim Credit Agreement contain representations and warranties, affirmative and negative covenants, including restrictions on capital expenditures, and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. If an event of default occurs, the lenders under the Credit Agreement and the Interim Credit Agreement will be entitled to take certain actions, including acceleration of all amounts due under the facilities.

Further, pursuant to the Credit Agreement, the Company is required to comply, on a quarterly basis, with a maximum total guaranteed leverage ratio and a minimum interest coverage ratio. For the twelve-month period ending Dec. 30, 2007, the maximum permitted "Total Guaranteed Leverage Ratio" and the minimum permitted "Interest Coverage Ratio" (each as defined in the Credit Agreement) were 9.00 to 1.0 and 1.10 to 1.0, respectively. Both financial covenant ratios are measured on a rolling four-quarter basis and become more restrictive on an annual basis as set forth in the Credit Agreement. At Dec. 30, 2007, the Company was in compliance with these financial covenants. The Company's ability to remain in compliance with these financial covenants will be impacted by a number of factors, including the Company's ability to continue to generate sufficient revenues and cash flows, changes in interest rates, the impact of future purchase, sale, joint venture or similar transactions involving the Company or its business units and the other risks and uncertainties set forth in Part I, Item 1A, "Risk Factors."

The Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code on March 13, 2008, which election is effective as the beginning of the Company's 2008 fiscal year. The Credit Agreement and the Interim Credit Agreement contain affirmative covenants which required the Company to make such election and that the election be effective for fiscal 2008. The Credit Agreement and Interim Credit Agreement further provide that if the Company fails to maintain the S corporation election for any year beginning with 2009, the Company will be required in each such year to obtain an investment in the Company in the form of common stock or subordinated debt in an amount of up to $100 million. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and Interim Credit Agreement.

Under the terms of the Credit Agreement, the Company is required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. On July 2, 2007, the Company entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and, on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays Bank, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to

113

Source: TRIBUNE CO, 10-K, March 20, 2008

### TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

$750 million in notional amount. The Swap Documents effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points. The Company accounts for these interest rate swaps as cash flow hedges in accordance with FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("FAS No. 133"). Under FAS No. 133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. While there will be some ineffectiveness in the future, the cash flow hedges covered by the Swap Documents are deemed to be highly effective, and therefore gains and losses resulting from changes in the fair value of these hedges, other than changes resulting from hedge ineffectiveness, are recorded in other comprehensive income (loss), net of taxes.

As of Dec. 30, 2007, the Company had outstanding borrowings of $7.6 billion under the Tranche B Facility, $1.4 billion under the Tranche X Facility, and $1.6 billion under the Bridge Facility. As of Dec. 30, 2007, the applicable interest rate was 7.91% on the Tranche B Facility, 7.99% on the Tranche X Facility and 9.43% on the Bridge Facility.

**Former Credit Agreements**—On June 19, 2006, the Company entered into a five-year credit agreement and a 364-day bridge credit agreement, both of which were amended and restated on June 27, 2006. The five-year credit agreement provided for a $1.5 billion unsecured term facility, of which $250 million was used to refinance the medium-term notes that matured on Nov. 1, 2006, and a $750 million unsecured revolving facility. The 364-day bridge credit agreement provided for a $2.15 billion unsecured bridge facility.

The Company entered into these agreements to finance the Company's tender offer initiated on May 30, 2006 ; to repurchase shares of the Company's common stock from the Robert R. McCormick Tribune Foundation and Cantigny Foundation; to repurchase shares of the Company's common stock pursuant to open market or privately negotiated transactions; to refinance certain indebtedness; and to pay fees and expenses incurred in connection with the repurchases. In addition, the revolving facility was available for working capital and general corporate purposes, including acquisitions.

On June 4, 2007, the Company repaid its obligations under the five-year credit agreement and bridge credit agreement with proceeds from the Credit Agreement, the terms of which are described above.

In general, borrowings under the five-year and bridge credit agreements bore interest at a rate equal to LIBOR plus a spread ranging from 35 to 125 basis points. The applicable spread was determined on the basis of the Company's debt ratings by Standard and Poor's ("S&P") and Moody's Investor Services ("Moody's"). The Company's debt ratings were also used in determining the annual facility fee, which ranged from 0.07% to 0.25% of the aggregate unused commitments. In addition, the Company agreed to pay customary fees to the lenders under the five-year and bridge credit agreements.

**Medium-Term Notes**—Notes issued under these programs may not be redeemed by the Company prior to maturity.

**Subordinated Promissory Note**—Following the consummation of the Merger, the Zell Entity purchased from the Company a $225 million subordinated promissory note due Dec. 20, 2018 at a stated interest rate of 4.64%. Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note to certain permitted assignees. The note was recorded at an estimated fair value of $60 million, resulting in a discount of $165 million. The discount will be amortized and included in interest expense over the term of the note using an effective interest rate of 17%. At Dec. 30, 2007, the net book value of the note was $60.3 million and included $.3 million of payable in-kind interest.

**Interest Rate Swaps**—As noted above, the Company is party to three interest rate swaps covered under the Swap Documents. At Dec. 30, 2007, the fair value of these swaps had declined since their inception date of July 3, 2007 by $91 million, which is included in long-term debt. The Company determined that $1.7 million of this

114

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

change resulted from hedge ineffectiveness and therefore included the $1.7 million in interest expense. The remaining $89 million change in fair value of these swaps was included, net of taxes, in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) at Dec. 30, 2007 (see Note 18). The Company is also party to an additional interest rate swap agreement related to the $100 million 7.5% debentures due in 2023 which effectively converts the fixed 7.5% rate to a variable rate based on LIBOR.

**Debt Due Within One Year**—Debt due within one year at Dec. 30, 2007 included $650 million of borrowings under the Tranche X Facility, $76 million of borrowings under the Tranche B Facility, $253 million related to PHONES, and $24 million of property financing and other obligations. The Company expects to fund interest and principal payments due in 2008 through a combination of cash flows from operations, available borrowings under the Revolving Credit Facility, and, if necessary, dispositions of assets or operations. The Company's ability to make scheduled payments or prepayments on its debt and other financial obligations will depend on future financial and operating performance and the ability to dispose of assets on favorable terms. There can be no assurances that the Company's businesses will generate sufficient cash flows from operations or that future borrowings under the Revolving Credit Facility will be available in an amount sufficient to satisfy debt maturities or to fund other liquidity needs or that any such asset dispositions can be completed. The Company's financial and operating performance is subject to prevailing economic and industry conditions and to financial, business and other factors, some of which are beyond the control of the Company.

If the Company's cash flows and capital resources are insufficient to fund debt service obligations, the Company will likely face increased pressure to reduce or delay capital expenditures, dispose of assets or operations, further reduce the size of its workforce, seek additional capital or restructure or refinance its indebtedness. These actions could have a material adverse effect on the Company's business, financial condition and results of operations. In addition, the Company cannot assure the ability to take any of these actions, that these actions would be successful and permit the Company to meet scheduled debt service obligations or that these actions would be permitted under the terms of the Company's existing or future debt agreements, including the Credit Agreement and the Interim Credit Agreement. For example, the Company may need to refinance all or a portion of its indebtedness on or before maturity. There can be no assurance that the Company will be able to refinance any of its indebtedness on commercially reasonable terms or at all. In the absence of improved operating results and access to capital resources, the Company could face substantial liquidity problems and might be required to dispose of material assets or operations to meet its debt service and other obligations. The Credit Agreement and the Interim Credit Agreement restrict the Company's ability to dispose of assets and use the proceeds from the disposition. The Company may not be able to consummate those dispositions or to obtain the proceeds realized. Additionally, these proceeds may not be adequate to meet the debt service obligations then due.

If the Company cannot make scheduled payments or prepayments on its debt, the Company will be in default and, as a result, among other things, the Company's debt holders could declare all outstanding principal and interest to be due and payable and the Company could be forced into bankruptcy or liquidation or required to substantially restructure or alter business operations or debt obligations.

**Exchangeable Subordinated Debentures due 2029 ("PHONES")**—In 1999, the Company issued 8 million PHONES for an aggregate principal amount of approximately $1.3 billion. The principal amount was equal to the value of 16 million shares of Time Warner common stock at the closing price of $78.50 per share on April 7, 1999. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. The Company records both cash and non-cash interest expense on the discounted debt component of the PHONES. The PHONES debenture agreement requires principal payments equal to any dividends declared on the 16 million shares of Time Warner common stock. Time Warner declared total dividends of $.24 per share in 2007 and $.21 per share in 2006. The Company records the dividends it receives on its Time Warner common stock as dividend income and accounts for the related payment to the PHONES holders as principal reduction.

The Company may redeem the PHONES at any time for the higher of the principal value of the PHONES ($155.99 per PHONES at Dec. 30, 2007) or the then market value of two shares of Time Warner common stock,

115

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

subject to certain adjustments. At any time, holders of the PHONES may exchange a PHONES for an amount of cash equal to 95% (or 100% under certain circumstances) of the market value of two shares of Time Warner common stock. At Dec. 30, 2007, the market value per PHONES was $52.50, and the market value of two shares of Time Warner common stock was $33.30. The amount PHONES holders could have received if they had elected to exchange their PHONES for cash on Dec. 30, 2007 was $253 million, which is included in current liabilities at Dec. 30, 2007. Deferred income taxes related to the current portion of the PHONES is also included in current liabilities as of Dec. 30, 2007. At Dec. 31, 2006, the PHONES were classified entirely as long-term because if the PHONES were exchanged on that date, the Company had the ability and the intent to refinance the PHONES on a long-term basis through its then existing revolving credit facility.

Under the provisions of FAS No. 133, the PHONES consist of a discounted debt component, which is presented at book value, and a derivative component, which is presented at fair value. Changes in the fair value of the derivative component of the PHONES are recorded in the statement of income. Prior to 2007, the Company calculated the fair value of the derivative component of the PHONES debt as the difference between the quoted market value of the PHONES and the estimated fair value of the discounted debt component of the PHONES. The fair value of the discounted debt component of the PHONES was calculated based on an estimate of the current interest rate available to the Company for debt of the same remaining maturity and similar terms to the PHONES. At Dec. 30, 2007, the Company performed a direct valuation of the derivative component of the PHONES utilizing the Black-Scholes option-pricing model. Had the Company utilized the Black-Scholes option pricing model to value the derivative component of the PHONES at Dec. 31, 2006, the resulting valuation would have been approximately $20 million higher than the $108 million recorded at Dec. 31, 2006. The book value of the discounted debt component is based on the prevailing interest rate (8.125%) at issuance of the PHONES. The market value of the PHONES, which are traded on the New York Stock Exchange, was $420 million and $549 million at Dec. 30, 2007 and Dec. 31, 2006, respectively.

The discounted debt component and derivative component of the PHONES were as follows (in thousands):

| | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| PHONES Debt: | | |
| Discounted debt component (at book value) | $ 477,360 | $ 465,280 |
| Derivative component (at estimated fair value) | 119,680 | 107,680 |
| Total | $ 597,040 | $ 572,960 |
| Time Warner stock related to PHONES (at fair value) | $ 266,400 | $ 348,480 |

**Maturities**—Debt at Dec. 30, 2007 matures as shown below (in thousands):

| | |
|---|---|
| 2008 | $ 1,003,319 |
| 2009 | 857,222 |
| 2010 | 563,074 |
| 2011 | 78,309 |
| 2012 | 118,324 |
| Thereafter | 10,223,277 |
| Total | $ 12,843,525 |

116

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

## NOTE 11: CONTRACTS PAYABLE FOR BROADCAST RIGHTS

Contracts payable for broadcast rights are classified as current or long-term liabilities in accordance with the payment terms of the contracts. Required payments under contractual agreements for broadcast rights recorded at Dec. 30, 2007 are shown in the table below (in thousands):

| | |
|---|---:|
| 2008 | $ 339,909 |
| 2009 | 188,748 |
| 2010 | 139,270 |
| 2011 | 66,724 |
| 2012 | 20,113 |
| Thereafter | 17,538 |
| Total | $ 772,302 |

## NOTE 12: FAIR VALUE OF FINANCIAL INSTRUMENTS

Estimated fair values and carrying amounts of the Company's financial instruments are as follows (in thousands):

| | Dec. 30, 2007 | | Dec. 31, 2006 | |
|---|---:|---:|---:|---:|
| | Fair Value | Carrying Amount | Fair Value | Carrying Amount |
| Cost method investments | $ 272,042 | $ 272,042 | $ 365,445 | $ 362,630 |
| Debt | $ 11,473,131 | $ 12,843,525 | $ 4,904,390 | $ 5,005,218 |
| Contracts payable for broadcast rights | $ 724,945 | $ 772,302 | $ 696,363 | $ 743,872 |

The following methods and assumptions were used to estimate the fair value of each category of financial instruments.

**Cost Method Investments**—Cost method investments in public companies were recorded at fair value in the consolidated balance sheets (see Notes 1 and 9). Cost method investments in private companies were recorded at cost, net of write-downs, and fair value was generally estimated based on prices recently paid for shares in those companies.

**Debt**—Fair value was estimated based on quoted market prices for the Company's debt securities or similar issues or on current rates available to the Company for debt of the same remaining maturities and similar terms. The carrying value of the Company's derivative instruments approximates fair value. The fair value of the PHONES was determined by reference to the market value resulting from trading on a national securities exchange.

**Contracts Payable for Broadcast Rights**—Fair value was estimated using the discounted cash flow method.

## NOTE 13: COMMITMENTS AND CONTINGENCIES

The Company has entered into commitments for broadcast rights that are not currently available for broadcast and are therefore not included in the financial statements. These commitments totaled $473 million at Dec. 30, 2007. Payments for broadcast rights generally commence when the programs become available for broadcast.

The Company had commitments totaling $652 million at Dec. 30, 2007 related to the purchase of property, plant and equipment and talent contracts. In addition, under its current agreement with AbitibiBowater Inc., the Company has a commitment to purchase 369,000 metric tons of newsprint each year over the next two years based on market prices at the time of purchase. The Company leases certain equipment and office and production

117

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

space under various operating leases. Net lease expense from continuing operations was $57 million in 2007, $55 million in 2006 and $55 million in 2005. The table below presents the future minimum lease payments to be made under non-cancelable operating leases at Dec. 30, 2007 (in thousands):

| | |
|---|---:|
| 2008 | $ 62,851 |
| 2009 | 57,941 |
| 2010 | 45,000 |
| 2011 | 35,627 |
| 2012 | 27,538 |
| Thereafter | 57,191 |
| Total | $ 286,148 |

The Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations. In addition, the Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies. See Note 5 for a discussion of potential liability related to *Newsday* and *Hoy*, New York, and see Note 14 for a discussion of potential income tax liabilities. The Company does not believe that any other matters or proceedings presently pending will have a material adverse effect on its consolidated financial position, results of operations or liquidity.

## NOTE 14: INCOME TAXES

The following is a reconciliation of income taxes computed at the U.S. federal statutory rate to income taxes reported for continuing operations in the consolidated statements of income (in thousands):

| | 2007 | 2006 | 2005 |
|---|---:|---:|---:|
| Income from continuing operations before income taxes | $ 37,104 | $ 1,008,746 | $ 1,084,677 |
| Federal income taxes at 35% | $ 12,986 | $ 353,061 | $ 379,637 |
| State and local income taxes, net of federal tax benefit | 6,535 | 30,097 | 37,431 |
| Interest on uncertain tax positions, net of tax | 8,605 | 17,820 | 19,288 |
| Manufacturing and production activities deduction | (4,079) | (5,710) | (2,349) |
| Merger, restructuring and disposition transactions | 18,678 | (10,237) | — |
| Matthew Bender/Mosby adjustment | (90,704) | — | 150,493 |
| Income tax settlements and adjustments | — | (33,563) | (11,829) |
| Deferred income tax asset write-off | 24,699 | — | — |
| Other | 5,046 | (3,895) | (7,378) |
| Income taxes reported | $ (18,234) | $ 347,573 | $ 565,293 |
| Effective tax rate | (49.1%) | 34.5% | 52.1% |

In 2007, the Company recorded a favorable $91 million income tax expense adjustment due to the settlement of its appeal of the Matthew Bender and Mosby Tax Court decision (see "Matthew Bender and Mosby Tax Liability" discussion below). The Company incurred non-deductible expenses and other costs in 2007 in connection with merger, restructuring and disposition transactions. In addition, the Company increased its income tax expense by $25 million in 2007 due to the write-off of tax credit carryforwards related to its low income housing investments (see Note 2). The Company reports interest on uncertain tax positions as part of its income tax expense. After-tax interest on uncertain tax positions increased 2007 income tax expense by $9 million. In 2006, the Company recorded a favorable $34 million income tax expense adjustment, most of which related to the Company's PHONES as a result of reaching an agreement with the Internal Revenue Service appeals office pertaining to the deduction of interest expense on the PHONES (see "PHONES Interest" discussion below). After-tax interest on uncertain tax positions increased income tax expense by $18 million in

118

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

2006. The Company recorded a non-taxable gain in 2006 related to certain restructuring transactions. In 2005, the Company increased its income tax expense by $150 million as a result of the Matthew Bender Tax Court decision and reduced its income tax expense by $12 million as a result of resolving certain federal income tax issues. After-tax interest on uncertain tax positions increased income tax expense by $19 million in 2005.

Components of income tax expense (benefit) charged to income from continuing operations were as follows (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Currently payable: |  |  |  |
| U.S. federal | $ (86,764) | $ 287,600 | $ 434,502 |
| State and local | 4,022 | 43,193 | 44,043 |
| Sub-total | (82,742) | 330,793 | 478,545 |
| Deferred: |  |  |  |
| U.S. federal | 58,476 | 13,639 | 72,716 |
| State and local | 6,032 | 3,141 | 14,032 |
| Sub-total | 64,508 | 16,780 | 86,748 |
| Total | $ (18,234) | $ 347,573 | $ 565,293 |

Significant components of the Company's net deferred tax liabilities were as follows (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Net properties | $ 196,267 | $ 214,770 |
| Net intangible assets | 1,160,384 | 1,209,999 |
| Pensions | 179,073 | 74,891 |
| Investments | 363,541 | 406,409 |
| PHONES interest | 216,126 | 219,552 |
| Other future taxable items | 23,114 | 18,325 |
| Total deferred tax liabilities | 2,138,505 | 2,143,946 |
| Postretirement and postemployment benefits other than pensions | (50,296) | (54,990) |
| Deferred compensation | (34,245) | (84,288) |
| Other accrued liabilities | (69,780) | (55,270) |
| Federal capital loss and tax credit carryforwards | (41,355) | (24,699) |
| Accounts receivable | (12,281) | (13,211) |
| Other future deductible items | (10,768) | (6,352) |
| Tax benefits from future payments of uncertain tax positions | (42,413) | — |
| State operating loss carryforwards | (46,084) | (42,371) |
| Valuation allowances on state operating loss carryforwards | 40,886 | 37,457 |
| Total deferred tax assets | (266,336) | (243,724) |
| Net deferred tax liability | $ 1,872,169 | $ 1,900,222 |

**Federal Capital Loss and Tax Credit Carryforwards**—At Dec. 30, 2007, the Company had a capital loss of approximately $120 million that will be carried back to offset net capital gains reported in earlier tax years. The Company will file a claim for the refund of previously paid taxes after it files its 2007 federal income tax return. Capital losses can only be used to offset capital gains. As a result of the Recycler disposition (see Note 4), capital losses exceeded capital gains in 2007. At Dec. 31, 2006, the Company had approximately $25 million of tax credit carryforwards relating to its low income housing investments. As a result of restructuring certain investments during the fourth quarter of 2007 (see Note 2), the Company no longer expects to realize any tax benefits from the tax credit carryforwards and therefore wrote off the related deferred tax assets in the fourth quarter of 2007.

119

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

**Operating Loss Carryforwards**—At Dec. 30, 2007, the Company had approximately $895 million of operating loss carryforwards for state income tax purposes. These carryforwards arose in certain states primarily as a result of intercompany interest expense, royalty expense and management fees allocated to the Company's various subsidiaries, and expire between 2008 and 2027. The deferred tax assets related to these carryforwards totaled approximately $46 million, net of federal taxes, at Dec. 30, 2007. However, the Company believes it is more likely than not that $41 million of the deferred tax assets will not be realized because the related carryforwards will expire before being utilized. Therefore, in accordance with FAS No. 109, "Accounting for Income Taxes," the Company has established valuation allowances of $41 million on the deferred tax assets related to the state carryforwards. The state operating loss carryforwards increased in 2007 because the Company generated additional tax losses in certain states.

**Matthew Bender and Mosby Tax Liability**—During 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in the United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in Tax Court.

On Sept. 27, 2005, the Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions totaled approximately $1 billion. Over time, deductions for state taxes and interest were expected to reduce the net cash outlay to approximately $840 million.

The Company appealed the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. On June 1, 2007, the Company announced that an offer of settlement was pending in its appeal. The Company finalized the settlement during the third quarter of 2007. As a result of the settlement, the Company received refunds of federal income taxes and interest of $4 million on Sept. 26, 2007 and $340 million on Oct. 1, 2007. After consideration of income taxes on the interest received, the net cash proceeds totaled approximately $286 million. These refunds, together with related state income tax benefits of $29 million, were accounted for as a $91 million reduction in 2007 income tax expense and a $224 million reduction in goodwill recorded on the Company's 2007 consolidated balance sheet.

Times Mirror established a tax reserve of $180 million in 1998 when it entered into the transactions. The reserve represented Times Mirror's best estimate of the amount the expected IRS and state income tax claims could be settled for based upon an analysis of the facts and circumstances surrounding the issue. In accordance with Emerging Issues Task Force ("EITF") Issue No. 93-7, "Uncertainties Related to Income Taxes in a Purchase Business Combination," the Company treated this item as an uncertain tax position at the time of the Times Mirror acquisition in 2000 and concluded that the estimate determined by Times Mirror was the most appropriate estimate of the exposure. The Company maintained this initial reserve, plus interest, and evaluated the adequacy of the reserve on a periodic basis. At Dec. 26, 2004, the reserve, including pretax interest of $66 million, totaled $246 million ($221 million after considering the tax benefit of the interest). In 2005, prior to the Tax Court ruling, the Company recorded additional after-tax interest of $7 million on the reserve.

As a result of the Tax Court ruling, the Company increased its tax reserve by an additional $609 million in the third quarter of 2005 by recording additional income tax expense of $150 million, representing additional after-tax interest applicable to the post-acquisition period, and goodwill of $459 million. In accordance with EITF No. 93-7, the Company adjusted goodwill because the tax contingencies existed at the time of the Times Mirror acquisition. On Sept. 30, 2005, the Company paid $880 million to the IRS, representing the federal tax and interest owed on the transactions, and financed the payment through the issuance of commercial paper. On Feb. 10, 2006, the Company made a California state tax and interest payment of approximately $86 million ($55

120

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

million after considering the federal tax benefit of the state taxes and interest). The remaining liability was $35 million at Dec. 31, 2006 and consisted of state tax and interest accruals. As a result of the Matthew Bender/Mosby settlement, the liability was adjusted to $24 million at Dec. 30, 2007.

The September and October 2007 refunds of the previously paid income taxes and interest were accounted for in accordance with EITF No. 93-7. The portion of the refunds representing after-tax interest applicable to periods following the acquisition of Times Mirror reduced income tax expense, and the remainder reduced goodwill.

A summary of the activity with respect to the Matthew Bender and Mosby tax liability is as follows (in millions):

| | |
|---|---:|
| Liability at Dec. 26, 2004: | |
| Tax | $ 180 |
| After-tax interest ($66 million pretax) | 41 |
| Liability at Dec. 26, 2004 | 221 |
| After-tax interest recorded in income tax expense in the first three quarters of 2005 ($11 million pretax) | 7 |
| Additional reserve recorded as a result of the Tax Court ruling: | |
| Charged to income tax expense | 150 |
| Additional goodwill | 459 |
| Liability at Sept. 25, 2005 | 837 |
| Federal tax and interest paid on Sept. 30, 2005: | |
| Federal tax | (542) |
| After-tax interest ($338 million pretax) | (210) |
| After-tax interest recorded in income tax expense in the fourth quarter of 2005 ($3 million pretax) | 2 |
| Liability at Dec. 25, 2005 | 87 |
| After-tax interest ($4 million pretax) | 3 |
| California tax and interest paid in February 2006: | |
| State tax ($55 million pretax) | (36) |
| After-tax interest ($31 million pretax) | (19) |
| Liability at Dec. 31, 2006 (included in "other current liabilities") | $ 35 |
| After-tax interest ($4 million pretax) | 2 |
| Adjustment recorded as a result of settling the appeal of the Tax Court decision | (9) |
| State tax and interest paid in 2007: | |
| State tax ($4 million pretax) | (3) |
| After-tax interest ($2 million pretax) | (1) |
| Liability at Dec. 30, 2007 (included in "other current liabilities") | $ 24 |

**PHONES Interest**—In connection with the routine examination of the Company's federal income tax returns for 2000 through 2003, the IRS proposed that the Company capitalize the interest on the PHONES as additional tax basis in the Company's 16 million shares of Time Warner common stock, rather than allowing the Company to currently deduct such interest. The National Office of the IRS has issued a Technical Advice Memorandum that supports the proposed treatment. The Company disagrees with the IRS's position and requested that the IRS administrative appeals office review the issue. The effect of the treatment proposed by the IRS would be to increase the Company's tax liability by approximately $189 million for the period 2000 through 2003 and by approximately $245 million for the period 2004 through 2007.

During the fourth quarter of 2006, the Company reached an agreement with the IRS appeals office regarding the deductibility of the PHONES interest expense. The agreement will apply for the tax years 2000 through the 2029 maturity date of the PHONES. In December of 2006, under the terms of the agreement reached with the IRS appeals office, the Company paid approximately $81 million of tax plus interest for tax years 2000 through

121

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

2005. The tax payments were recorded as a reduction in the Company's deferred tax liability, and the interest was recorded as a reduction in the Company's income tax reserves. The agreement reached with the appeals office is being reviewed by the Joint Committee on Taxation. A decision from the Joint Committee on Taxation is expected by the end of the second quarter of 2008.

**Adoption of New Income Tax Accounting Standard**—On January 1, 2007, the Company adopted the provisions of FIN 48, "Accounting for Uncertainty in Income Taxes." FIN 48 addresses the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. Under FIN 48, a company may recognize the tax benefit of an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. FIN 48 requires the tax benefit recognized in the financial statements to be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, and disclosure.

Due to the adoption of FIN 48, the Company was required to make certain reclassifications in its consolidated balance sheet as of Jan. 1, 2007. In the aggregate, these reclassifications increased the Company's liability for unrecognized tax benefits by $73 million and decreased its net deferred tax liabilities by $73 million. The adoption of FIN 48 had no impact on the Company's Jan. 1, 2007 consolidated retained earnings.

The amount of unrecognized tax benefits at Jan. 1, 2007 and Dec. 30, 2007, totaled $128 million and $138 million, respectively. If all of the unrecognized tax benefits at Jan. 1, 2007 and Dec. 30, 2007 were recognized, there would be a favorable $48 million and $52 million impact on the Company's effective tax rate respectively, after consideration of the federal effect of state income taxes.

The liability for unrecognized tax benefits at Jan. 1, 2007 and Dec. 30, 2007 included $38 million and $43 million, respectively, related to the PHONES issue discussed in the preceding "PHONES Interest" section. The Company expects to resolve this issue within the next twelve months. If the issue is definitively resolved on the terms agreed to with the appeals office, the $43 million liability at Dec. 30, 2007 would be reclassified to deferred income tax liabilities.

The Company does not expect that changes in the amount for unrecognized tax benefits during the next twelve months will have a significant impact on the Company's consolidated results of operations or financial position.

As allowed by FIN 48 and consistent with the Company's prior accounting policy, the Company recognizes accrued interest and penalties related to uncertain tax positions in income tax expense. As of Jan. 1, 2007 and Dec. 30, 2007, the Company's accrued interest and penalties related to uncertain tax positions totaled $26 million and $36 million, respectively.

The IRS is currently auditing the Company's federal income tax returns for the 2004 and 2005 fiscal years. The IRS has completed its audits of the Company's returns for all fiscal years prior to 2004. With the exception of the PHONES matter discussed above, the Company and the IRS have reached agreement on all issues raised during the prior audits. State income tax returns are generally subject to examination for a period of three to five years after they are filed, although many states often receive extensions of time from the Company. In addition, states may examine the state impact of any federal changes for a period of up to one year after the states are formally notified of the changes. The Company currently has various state income tax returns in the process of examination or administrative appeals.

122

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

The following summarizes the changes in unrecognized tax benefits during 2007 (in thousands):

| | |
|---|---:|
| Uncertain tax benefits at Jan. 1, 2007 | $ 127,652 |
| Gross increase as a result of tax positions taken during a prior period | 9,625 |
| Gross increase as a result of tax positions taken during the current period | 5,428 |
| Decreases related to settlements with taxing authorities | (4,624) |
| Uncertain tax benefits at Dec. 30, 2007 | $ 138,081 |

Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

On March 13, 2008, the Company filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. As a result, essentially all of the Company's net deferred tax liabilities will be eliminated and such adjustment will be recorded as a reduction in the Company's provision for income taxes in the first quarter of 2008.

## NOTE 15: PENSION AND OTHER POSTRETIREMENT BENEFITS

**Employee Pension Plans**—In connection with the establishment of the Tribune Company ESOP in 1988, Tribune amended its company-sponsored pension plan for employees not covered by a collective bargaining agreement. The Tribune Company pension plan continued to provide substantially the same pension benefits as under the pre-amended plan until December 1998. After that date, Tribune pension benefit credits were frozen in terms of pay and service.

In connection with the Times Mirror acquisition, the Company assumed defined benefit pension plans and various other contributory and non-contributory retirement plans covering substantially all of Times Mirror's former employees. In general, benefits under the Times Mirror defined benefit plans were based on years of service and the employee's compensation during the last five years of employment. In December 2005, the pension plan benefits for former Times Mirror non-union and non-Newsday employees were frozen. As a result of the plan freeze, a pretax curtailment gain of $18 million was recorded in 2005. On March 31, 2006, the pension plan benefits for Newsday union and non-union employees were frozen. Benefits provided by Times Mirror's Employee Stock Ownership Plan ("Times Mirror ESOP") are coordinated with certain pension benefits and, as a result, the defined benefit plan obligations are net of the actuarially equivalent value of the benefits earned under the Times Mirror ESOP. The maximum offset is equal to the value of the benefits earned under the defined benefit plan.

Effective Jan. 1, 2008, the Tribune Company pension plan was amended to include a cash balance plan to provide a tax-qualified, non-contributory guaranteed pension benefit for eligible employees. In addition, effective Dec. 31, 2007, the Tribune Company pension plan was amended to provide a special one-time initial cash balance benefit for eligible employees.

The Company also maintains several small plans for other employees. The Company's portion of assets and liabilities for multi-employer union pension plans is not determinable.

**Postretirement Benefits Other Than Pensions**—The Company provides postretirement health care and life insurance benefits to eligible employees under a variety of plans. The various plans have significantly different provisions for lifetime maximums, retiree cost-sharing, health care providers, prescription drug coverage and other benefits.

**Obligations and Funded Status**—As discussed in Note 1, the Company adopted FAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB

123

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

Statements No. 87, 88, 106 and 132(R)", as of Dec. 31, 2006. FAS No. 158 requires the Company to recognize the overfunded or underfunded status of its defined benefit pension and other postretirement plans as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which changes occur through comprehensive income. Prior to Dec. 31, 2006, the Company accounted for its defined benefit pension plans under FAS No. 87, "Employers' Accounting for Pensions" and accounted for its other postretirement benefit plans under FAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions"...

Summarized information for the Company's defined benefit pension and other postretirement plans is provided below (in thousands):

| | Pension Plans | | Other Postretirement Plans | |
|---|---|---|---|---|
| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 30, 2007 | Dec. 31, 2006 |
| Change in benefit obligations: | | | | |
| Projected benefit obligations, beginning of year | $ 1,546,911 | $ 1,599,129 | $ 139,832 | $ 140,465 |
| Service cost | 1,957 | 3,934 | 1,291 | 1,335 |
| Interest cost | 83,984 | 84,349 | 7,825 | 7,367 |
| Special termination benefits | 1,067 | 1,382 | — | — |
| Impact of Medicare Reform Act | — | — | 1,200 | 1,200 |
| Actuarial (gain) loss | (190,437) | (57,317) | (4,549) | 3,471 |
| Benefits paid | (92,108) | (84,566) | (14,768) | (14,006) |
| Projected benefit obligations, end of year | 1,351,374 | 1,546,911 | 130,831 | 139,832 |
| | | | | |
| Change in plans' assets: | | | | |
| Fair value of plans' assets, beginning of year | 1,764,470 | 1,598,398 | — | — |
| Actual return on plans' assets | 116,854 | 243,209 | — | — |
| Employer contributions | 17,322 | 7,429 | 14,768 | 14,006 |
| Benefits paid | (92,108) | (84,566) | (14,768) | (14,006) |
| Fair value of plans' assets, end of year | 1,806,538 | 1,764,470 | | |
| Funded (under funded) status of the plans | $ 455,164 | $ 217,559 | $ (130,831) | $ (139,832) |

Amounts recognized in the statement of financial position consisted of (in thousands):

| | Pension Plans | | Other Postretirement Plans | |
|---|---|---|---|---|
| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 30, 2007 | Dec. 31, 2006 |
| Prepaid pension costs | $ 514,429 | $ 293,455 | $ — | $ — |
| Employee compensation and benefits | (5,899) | (6,163) | | |
| Deferred compensation and benefits | (53,366) | (69,733) | (130,831) | (139,832) |
| Net amount recognized | $ 455,164 | $ 217,559 | $ (130,831) | $ (139,832) |

The accumulated benefit obligation, which excludes the impact of future compensation increases, for all defined benefit pension plans was $1,349 million and $1,543 million at Dec. 30, 2007 and Dec. 31, 2006, respectively. The projected benefit obligation at Dec. 30, 2007 includes $1,292 million related to the Company's qualified pension plans and $59 million related to its non-qualified plans. The Company's non-qualified plans are not funded.

124

Source: TRIBUNE CO, 10-K, March 20, 2008