TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The components of net periodic benefit cost (credit) for Company-sponsored plans were as follows (in thousands):

| | Pension Plans | | | Other Postretirement Plans | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| Service cost | $ 1,957 | $ 3,934 | $ 25,160 | $ 1,291 | $ 1,335 | $ 1,469 |
| Interest cost | 83,984 | 84,349 | 81,436 | 7,825 | 7,367 | 7,774 |
| Expected return on plans' assets | (139,364) | (128,836) | (127,346) | — | — | — |
| Recognized actuarial loss | 47,080 | 67,018 | 59,095 | 180 | (127) | — |
| Amortization of prior service costs | 220 | 220 | (1,415) | (1,445) | (1,444) | (1,444) |
| Amortization of transition asset | — | (1) | (5) | — | — | (439) |
| Special termination benefits(1) | — | 1,382 | 1,434 | — | — | — |
| Settlement gain(2) | (1,227) | — | — | — | — | — |
| Curtailment gain | — | — | (17,825) | — | — | — |
| Net periodic benefit cost (credit) | $ (7,350) | $ 28,066 | $ 20,534 | $ 7,851 | $ 7,131 | $ 7,360 |

(1) Costs related to position eliminations.
(2) Gain related to change in control settlement payments made in connection with the consummation of the Merger (see Note 3).

The changes in minimum pension liabilities included in other comprehensive income (loss) for Company-sponsored plans were as follows (in thousands):

| | Pension Plans | | | Other Postretirement Plans | | |
|---|---|---|---|---|---|---|
| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 25, 2005 | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 25, 2005 |
| Change in minimum pension liabilities included in other comprehensive income, net of tax | $ — | $ 18,987 | $ (20,597) | $ — | $ — | $ — |

Amounts included in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) for Company-sponsored plans following the adoption of FAS No. 158 were as follows (in thousands):

| | Pension Plans | | Other Postretirement Plans | | Total | |
|---|---|---|---|---|---|---|
| | Dec. 31, 2007 | Dec. 30, 2006 | Dec. 31, 2007 | Dec. 30, 2006 | Dec. 31, 2007 | Dec. 30, 2006 |
| Unrecognized net actuarial gains (losses), net of tax | $ (253,562) | $ (384,859) | $ 8,411 | $ 5,527 | $ (245,151) | $ (379,332) |
| Unrecognized prior service costs, net of tax | (2,790) | (1,400) | 5,078 | 5,959 | 2,288 | 4,559 |
| Total | $ (256,352) | $ (386,259) | $ 13,489 | $ 11,486 | $ (242,863) | $ (374,773) |

In accordance with FAS No. 87, unrecognized net actuarial gains and losses will be recognized in net periodic pension expense over approximately 11 years, representing the estimated average remaining service period of active employees expected to receive benefits, with corresponding adjustments made to accumulated other comprehensive income (loss) in accordance with FAS No. 158. The Company's policy is to incorporate asset-related gains and losses into the asset value used to calculate the expected return on plan assets and into the calculation of amortization of unrecognized net actuarial loss over a four-year period.

During 2008, the Company expects to recognize as part of its net periodic pension benefit cost approximately $25 million of net actuarial losses and $1 million of prior service credits that are included, after

125

Source: TRIBUNE CO, 10-K, March 20, 2008

## TRIBUNE COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

taxes, in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) at Dec. 30, 2007.

**Assumptions**—Weighted average assumptions used each year in accounting for pension benefits and other postretirement benefits were:

| | Pension Plans | | Other Postretirement Plans | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Discount rate for expense | 5.75% | 5.50% | 5.75% | 5.50% |
| Discount rate for obligations | 6.65% | 5.75% | 6.30% | 5.75% |
| Increase in future salary levels for expense | 3.50% | 3.50% | — | — |
| Increase in future salary levels for obligations | 3.50% | 3.50% | — | — |
| Long-term rate of return on plans' assets | 8.50% | 8.50% | — | — |

The Company used a building block approach to determine its current 8.5% assumption for the long-term expected rate of return on pension plan assets. Based on historical market studies, the Company's long-term expected returns for equity and fixed income securities approximate 10% and 6%, respectively. The Company's current 2008 target asset allocation for pension plan assets is 70% in equity securities and 30% in fixed income securities and other. Prior to Dec. 30, 2007, the Company based the rate used for discounting future benefit obligations and calculating interest cost on an index of Aa-rated corporate bonds. The duration of the bonds in this index approximated the timing of future payments for the Company's benefit obligations. Beginning on Dec. 30, 2007, the Company uses the Citigroup Above Median yield curve for discounting future benefit obligations and calculating interest cost. The Citigroup Above Median yield curve represents yields on high quality corporate bonds that more closely match the cash flows of the estimated payouts for the Company's benefit obligations.

**Plan Assets**—The Company's pension plans' asset allocations at Dec. 30, 2007 and Dec. 31, 2006 were as follows (in millions):

| | Plan Assets | | | |
|---|---|---|---|---|
| Asset Category | Dec. 30, 2007 | | Dec. 31, 2006 | |
| Equity securities | $ 1,316 | 72.8% | $ 1,344 | 76.2% |
| Fixed income securities | 405 | 22.4% | 334 | 18.9% |
| Other | 86 | 4.8% | 86 | 4.9% |
| Total | $ 1,807 | 100% | $ 1,764 | 100% |

**Health Care Cost Trend Rates**—For purposes of measuring 2007 postretirement health care costs, a 8.25% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2007. The rate was assumed to decrease gradually to 5% for 2012 and remain at that level thereafter. For purposes of measuring health care obligations at Dec. 30, 2007, a 6.7% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2008. The rate was assumed to decrease gradually to 5% for 2012 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported for health care plans. As of the date of this report, a 1% change in assumed health care cost trend rates would have the following effects (in thousands):

| | 1% Increase | | 1% Decrease | |
|---|---|---|---|---|
| Service cost and interest cost | $ | 357 | $ | (319) |
| Projected benefit obligation | $ | 5,559 | $ | (4,983) |

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Cash Flows**—The Company contributed $17 million to certain of its union and non-qualified pension plans, including $10 million of contributions made pursuant to change in control provisions contained in certain of the Company's non-qualified pensions plans upon consummation of the Merger, and $15 million to its other postretirement plans in 2007. The Company plans to contribute $6 million to certain of its union and non-qualified pension plans and $13 million to its other postretirement plans in 2008.

**Expected Future Benefit Payments**—The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid (in thousands):

|  | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| 2008 | $    87,205 | $    14,746 |
| 2009 | 91,420 | 14,798 |
| 2010 | 95,207 | 14,804 |
| 2011 | 98,976 | 14,832 |
| 2012 | 102,946 | 14,487 |
| 2013-2017 | $    576,314 | $    66,598 |

## NOTE 16: CAPITAL STOCK

On Dec. 20, 2007, the Company consummated the Merger Agreement, as defined and discussed in Note 3. Pursuant to the Merger Agreement, each share of the Company's common stock issued and outstanding immediately prior to the Merger, other than shares held by the Company, the ESOP or Merger Sub immediately prior (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes.

The Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated and requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of market on Dec. 20, 2007, and that the NYSE file with the Securities and Exchange Commission an application on Form 25 to report that the shares of the Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

Following the consummation of the Merger, the Company had no shares of common stock issued other than 56,521,739 shares held by the ESOP. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007. See Note 17 for further information on the classification of the shares of the Company's common stock held by the ESOP in the Company's consolidated balance sheet at Dec. 30, 2007.

**Series C, D-1 and D-2 Convertible Preferred Stock**—In connection with the June 12, 2000 merger with Times Mirror, outstanding shares of Times Mirror cumulative, non-voting preferred stock were converted into shares of Tribune preferred stock with similar terms. A total of 213,733 shares of the Company's Series C-1, D-1 and D-2 convertible preferred stock, net of treasury stock, were issued due to the conversion. The Series C, D-1 and D-2 convertible preferred stocks related to Times Mirror recapitalization transactions whereby TMCT, LLC and TMCT II, LLC (see Note 8) were formed. In connection with a restructuring of TMCT, LLC and TMCT II, LLC, all of these preferred shares were distributed to the Company on Sept. 22, 2006. As a result, the Company had no preferred shares outstanding effective as of Sept. 22, 2006, other than 137,643 treasury shares of Series D-1 convertible preferred stock held by a subsidiary of the Company. These remaining shares of convertible preferred stock were retired prior to the completion of the Merger.

Series C convertible preferred stock was cumulative, non-voting preferred stock, which was entitled to annual dividends of 8%, based on liquidation value. Dividends for Series D-1 and D-2 preferred stock were paid

127

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

at the annual rate of 6.91% and 6.67% in 2006 and 2005, respectively. The Series C, D-1 and D-2 preferred stocks were convertible into the Company's common stock in 2025 and thereafter. The conversion factor was calculated by dividing $500 plus accrued and unpaid dividends by the average closing prices of the Company's common stock for the 20 trading days immediately preceding the conversion date.

**Common Stock Repurchases**—As defined and discussed in the description of the Leveraged ESOP Transactions in Note 3, the Company completed two common stock repurchases in 2007. The following table summarizes the Company's common stock repurchases during 2007 (in thousands):

|  | Shares | Cost |
|---|---|---|
| June 4, 2007 Share Repurchase | 126,007 | $ 4,289,192 |
| Dec. 20, 2007 Merger consummation | 118,586 | 4,032,081 |
| Total common stock repurchases | 244,593 | $ 8,321,273 |

The following table summarizes the Company's common stock repurchases during 2006 (in thousands):

|  | Shares | Cost |
|---|---|---|
| Repurchases in the first quarter | 4,604 | $ 137,746 |
| Tender offer repurchases | 45,027 | 1,468,270 |
| Repurchases from the Robert R. McCormick Tribune Foundation and Cantigny Foundation | 10,000 | 325,300 |
| Repurchases subsequent to the tender offer | 11,053 | 330,952 |
| Total common stock repurchases | 70,684 | $ 2,262,268 |

On May 30, 2006, the Company initiated a modified "Dutch Auction" tender offer to repurchase up to 53 million shares of its common stock at a price per share not greater than $32.50 and not less than $28.00. The tender offer closed on June 26, 2006, and the Company acquired 45 million shares of its common stock on July 5, 2006 at a price of $32.50 per share before transaction costs. The Company also acquired 10 million shares of its common stock from the Robert R. McCormick Tribune Foundation and the Cantigny Foundation on July 12, 2006 at a price of $32.50 per share before transaction costs. The Robert R. McCormick Tribune Foundation and the Cantigny Foundation were affiliated non-profit organizations, which together held 13.6% of the Company's outstanding shares when the tender offer was launched. In connection with the tender offer, the Board also authorized the repurchase of an additional 12 million shares of the Company's common stock commencing on the eleventh business day following the completion of the tender offer. In the third quarter of 2006, the Company repurchased an additional 11.1 million shares under that authorization at a weighted average cost of $29.94 per share. In addition, the Company repurchased and retired 4.6 million shares of its common stock in the first quarter of 2006.

During 2005, the Company repurchased and retired 12.2 million shares of its common stock in the open market for $440 million.

**Stock Purchase Warrants**—As defined and discussed in the description of the Leveraged ESOP Transactions contained in Note 3, following the consummation of the Merger, the Zell Entity purchased from the Company a 15-year warrant. The warrant entitles the Zell Entity to purchase 43,478,261 shares of the Company's common stock (subject to adjustment), which represents approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to the share equivalents granted under the Management Equity Incentive Plan as defined and discussed in Note 17). The warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted

128

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

assignees. See Part III, Items 12 and 13, hereof for further information on the assignment of the minority interests in the subordinated promissory note and the warrant. The Company recorded the warrants at an estimated fair value of $255 million, which is presented as a separate component of shareholders' equity (deficit) in the Company's consolidated balance sheet at Dec. 30, 2007.

## NOTE 17: INCENTIVE COMPENSATION AND STOCK PLANS

   **Defined Contribution Plans**—The Company maintains various qualified 401(k) savings plans, which permit eligible employees to make voluntary contributions on a pretax basis. The plans allow participants to invest their savings in various investments. In 2004, the Company enhanced its primary 401(k) plan to include a larger Company contribution. This new plan was designed to replace the Company's Employee Stock Ownership Plan that was established in 1988 and fully allocated at the end of 2003. In 2006, the Company amended its primary 401(k) plan to make a portion of the Company's contributions discretionary. Amounts charged to expense for all of the Company's defined contribution plans totaled $35 million in 2007, $65 million in 2006, and $59 million in 2005.

   **Employee Stock Purchase Plan**—This plan permitted eligible employees to purchase the Company's common stock at 85% of market price. In April 2007, the Company suspended future contributions to the plan. The Company incurred charges of $.1 million in 2007 and $.2 million in 2006 and 2005 related to the administration of this plan. During 2007, 2006, and 2005, 175,687, 598,186, and 682,624 shares, respectively, were sold to employees under this plan. The weighted average fair value of shares sold in 2007 was $30.70. The Plan was discontinued as of Dec. 20, 2007 following the consummation of the Merger (see Note 3).

   **Employee Stock Ownership Plan ("ESOP")**—As defined and described in Note 3, on April 1, 2007, the Company established a new ESOP as a long-term employee benefit plan. On that date, **the ESOP purchased 8,928,571 shares of the Company's common stock. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger, the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock.**

   The ESOP provides for the allocation of the Company's common shares it holds on a noncontributory basis to eligible employees of the Company. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007. Beginning in fiscal year 2008, as the Company repays the ESOP loan, shares will be released and allocated to eligible employees in proportion to their eligible compensation. The shares that are released for allocation on an annual basis will be in the same proportion that the current year's principal and interest payments bear in relation to the total remaining principal and interest payments to be paid over the life of the $250 million ESOP loan. The Company will recognize compensation expense based on the estimated fair value of the shares of the Company's common stock that are allocated in each annual period.

129

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company's policy is to present unallocated shares held by the ESOP at book value, net of unearned compensation, and allocated shares at fair value in the Company's consolidated balance sheet. Pursuant to the terms of the ESOP, following the Merger, participants who receive distributions of shares of the Company's common stock can require the Company to repurchase those shares within a specified time period following such distribution. Accordingly, the shares of the Company's common stock held by the ESOP are classified outside of shareholders' equity (deficit), net of unearned compensation, in the Company's consolidated balance sheet. The amounts at Dec. 30, 2007 were as follows (in thousands):

|  | Dec. 30, 2007 |
|---|---|
| Unallocated ESOP shares (at book value) | $ 250,000 |
| Unearned compensation related to ESOP | (250,000) |
| Common shares held by ESOP, net of unearned compensation | $ — |

At Dec. 30, 2007, the fair value of the unallocated shares held by the ESOP was approximately $593 million. In accordance with the terms of the ESOP, the fair value of the Company's common stock was determined by the trustee of the ESOP.

**Tribune Company Incentive Compensation Plan**—In 1997, the 1992 Long-Term Incentive Plan was replaced with the 1997 Incentive Compensation Plan, which was amended and restated in 2004 as the Tribune Company Incentive Compensation Plan (the "Incentive Plan"). The Incentive Plan provides for the granting of awards to eligible employees in any one or combination of stock options, performance equity program awards and annual management incentive program bonuses.

On Dec. 20, 2007, the Company consummated the Merger, as defined and described in the description of the Leveraged ESOP Transactions in Note 3. Pursuant to the Merger Agreement, the Company redeemed for cash all outstanding stock awards, each of which vested in full upon completion of the Merger, with positive intrinsic value relative to $34.00 per share. Accordingly, the Company recorded additional stock-based compensation expense of $53 million, or $35 million net of taxes, in the fourth quarter of 2007 in connection with the cash settlement of its outstanding stock awards (see below for further discussion of amounts recorded for stock-based compensation following the adoption of FAS 123R). All remaining outstanding stock awards under the Incentive Plan as of Dec. 20, 2007 that were not cash settled pursuant to the Merger Agreement were cancelled. Following the Merger, the Company does not intend to grant any new equity awards under the Incentive Plan.

**Tribune Company Management Equity Incentive Plan**—On Dec. 20, 2007, the Board approved the Company's 2007 Management Equity Incentive Plan (the "Management Equity Incentive Plan"). The Management Equity Incentive Plan provides for phantom units (the "Units") that generally track the value of a share of the Company's common stock after the effective date of the Merger. Awards have been made to eligible members of the Company's management and other key employees at the discretion of the Board. Under the terms of the Management Equity Incentive Plan, awards are classified as First Tranche Units or Second Tranche Units.

The First Tranche Units represent approximately 5% of the Company's fully-diluted outstanding common stock, including after giving effect to the stock purchase warrants (see Note 16) and the First Tranche Units and Second Tranche Units authorized under the Management Equity Incentive Plan (5,434,652 First Tranche Units authorized, subject to customary anti-dilution adjustments). First Tranche Units vest ratably over a three-year period beginning on the date of grant. Unvested First Tranche Units vest upon a change in control of the Company or upon termination of employment due to death or disability. Unvested First Tranche Units will be cancelled upon a termination of a participant's employment for any reason other than death or disability.

The Second Tranche Units represent approximately 3% of the fully-diluted outstanding common stock, including after giving effect to the stock purchase warrants (see Note 16) and the First Tranche Units and Second Tranche Units authorized under the Management Equity Incentive Plan (3,261,000 Second Tranche Units authorized, subject to customary anti-dilution adjustments). Fifty percent of the Second Tranche Units vested upon grant and the remaining fifty percent will vest on the one year anniversary of the grant date. Any unvested

130

Source: TRIBUNE CO, 10-K, March 20, 2008

## TRIBUNE COMPANY AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Second Tranche Units will become fully vested upon a change in control of the Company, an involuntary termination of employment or a termination of employment due to a Plan participant's death or disability. Unvested Second Tranche Units will be cancelled upon a termination of a participant's employment for any reason other than an involuntary termination of employment or a termination of employment due to death or disability. Participants receiving Second Tranche Units will be entitled to a gross-up for the payment of excise taxes, if any, in connection with the Merger.

In general, one-third of vested Units subject to an award (whether First Tranche Units or Second Tranche Units) will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date or, if sooner, upon the occurrence of a change in control or a termination of employment based on the fair market value of the Company's common stock on the December 31 immediately following the settlement event. With respect to Second Tranche Units only, in the event of a termination of a Plan participant's employment prior to Dec. 20, 2008, such participant will receive his or her pro rata share (based upon the amount of his or her vested Second Tranche Units relative to all Second Tranche Units outstanding and reserved for issuance) of $25 million, payable within ten business days following such termination of employment.

The Company accounts for the Units issued under the Management Equity Incentive Plan as liability-classified awards in accordance with FAS No. 123R (see below for further information regarding the Company's adoption of FAS No. 123R). The Company recorded $19 million of compensation expense in 2007 in connection with the Management Equity Incentive Plan, including $3 million of early termination payments made immediately following the Merger. As required by the terms of the plan, the remaining $16 million of expense was based on the estimated fair value of the Company's common stock as of Dec. 30, 2007 as determined by the trustee of the ESOP and is included in other non-current liabilities on the Company's consolidated balance sheet at Dec. 30, 2007.

**Stock-Based Compensation**—In the first quarter of 2006, the Company adopted FAS No. 123R which requires the Company to expense stock-based compensation in its income statement. Under FAS No. 123R, stock-based compensation cost is measured at the grant date for equity-classified awards and at the end of each reporting period for liability-classified awards based on the estimated fair value of the awards. The Company adopted FAS No. 123R using the modified prospective application method and did not restate prior years. FAS No. 123R requires stock-based compensation expense to be recognized over the period from the date of grant to the date when the award is no longer contingent on the employee providing additional service (the "substantive vesting period"). The Incentive Plan provided that awards generally vested upon the death, disability or retirement of an employee. As a result, stock-based grants issued to retirement eligible employees under the Incentive Plan were required to be expensed immediately. The Units issued under the Management Equity Incentive Plan do not contain a retirement eligibility provision and are therefore expensed ratably over the contractual vesting period of each Unit.

Prior to the adoption of FAS No. 123R, the Company accounted for its stock-based compensation plans in accordance with APB No. 25 and related interpretations. Under APB No. 25, no compensation expense was recorded because the exercise price of employee stock options equaled the market price of the underlying stock on the date of grant. Under the provisions of APB No. 25, the Company was not required to recognize compensation expense for its Employee Stock Purchase Plan. See Note 1 for pro forma stock-based compensation expense calculated under FAS No. 123 for 2005.

131

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The following table summarizes the impact of the adoption of FAS 123R on the Company's consolidated statement of income for the years ended Dec. 30, 2007 and Dec. 31, 2006 (in thousands):

|  | 2007 | 2006 |
|---|---|---|
| Stock-based compensation expense: | | |
| Options (1) | $ 4,935 | $ 8,747 |
| Restricted stock units(1)(2) | 86,392 | 19,975 |
| Management Equity Incentive Plan(2)(3) | 18,568 | — |
| Employee stock purchase plan | 800 | 2,681 |
| Total stock-based compensation expense | 110,695 | 31,403 |
| Income tax benefit | (40,108) | (12,247) |
| Total impact on net income from continuing operations | (70,587) | (19,156) |
| Impact on discontinued operations, net of tax | 11 | (251) |
| Total impact on net income | $ (70,576) | $ (19,407) |

(1)     Option and restricted stock unit expense for 2007 includes accelerated compensation amounts recorded in connection with the consummation of the Merger of $2.5 million and $50.3 million, respectively.

(2)     Expense for restricted stock units and the Management Equity Incentive Plan would have been recorded under APB No. 25.

(3)     Expense for the Management Equity Incentive Plan includes $2.9 million of early termination payments made immediately following the Merger.

Total stock-based compensation costs included $.2 million and $.1 million of capitalized costs and less than $.1 million and $.4 million of costs related to discontinued operations in 2007 and 2006, respectively.

As of Dec. 30, 2007, the Company had not yet recognized compensation cost on the following non-vested awards (in thousands):

|  | Nonvested Compensation | Weighted Average Recognition Period |
|---|---|---|
| Management Equity Incentive Plan | $ 57,623 | 1.48 years |

In determining the fair value of compensation cost for equity-classified awards granted under the Incentive Plan, the Company valued restricted stock unit awards at the quoted closing market price on the date of grant. The fair value of stock option awards was determined using the Black-Scholes option-pricing model, which incorporated the assumptions in the following table for general and replacement awards granted during 2006 and 2005. There were no general awards or replacement awards granted in 2007. The risk-free rate was based on the U.S. Treasury yield curve in effect at the time of grant. Expected volatility was based on actual historical volatility. Expected life was based on historical experience and consideration of changes in option terms.

|  | 2006 | | 2005 | |
|---|---|---|---|---|
|  | General Awards | Replacement Awards | General Awards | Replacement Awards |
| Risk-free interest rate | 4.6% | * | 3.7% | 3.3% |
| Expected dividend yield | 2.5% | * | 1.8% | 1.8% |
| Expected stock price volatility | 22.0% | * | 28.1% | 22.8% |
| Expected life (in years) | 4 | * | 5 | 3 |
| Weighted average fair value | $ 5.96 | * | $ 10.49 | $ 6.96 |

*No replacement awards were granted in 2006.

Under the Incentive Plan, the exercise price of a stock option award could not be less than the market price of the Company's common stock at the time the stock option award was granted. Stock option awards were exercisable not less than six months or more than 10 years after the date the stock option award was granted. General stock option awards granted after 2003 had an 8-year term. General stock option awards granted under the Plan prior to 2006 vested in annual 25% increments beginning one year from the date of the grant. General

Source: TRIBUNE CO, 10-K, March 20, 2008

# TRIBUNE COMPANY AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

stock option awards granted under the Plan in 2006 vested in annual 33% increments beginning one year from the date of the grant.

Under certain circumstances, replacement options were granted when a participant paid the exercise price of a stock option and related tax withholding obligations with previously acquired shares of common stock. The number of replacement options granted was equal to the number of shares used to pay the exercise price and related tax withholding obligations. The exercise price of a replacement option was equal to the market price of the underlying stock on the date of grant, and the term was equal to the remaining term of the original option. Replacement options vested one year from the date of grant. Beginning in 2004, general stock option awards did not have a replacement stock option award feature.

A summary of activity and weighted average exercise prices and fair values related to general stock option awards follows (shares in thousands):

| | General Options(1) | | | | | | | | |
| | 2007 | | | 2006 | | | 2005 | | |
| | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| Outstanding, beginning of year | 33,442 $ | 38.30 $ | 14.38 | 34,489 $ | 38.35 $ | 15.03 | 32,991 $ | 37.92 $ | 15.59 |
| Granted | — | — | — | 1,938 | 31.16 | 5.96 | 3,780 | 40.30 | 10.64 |
| Exercised | (3,351) | 22.77 | 20.23 | (1,101) | 21.24 | 20.25 | (993) | 23.96 | 18.40 |
| Canceled/forfeited | (2,470) | 41.38 | 13.56 | (1,884) | 42.13 | 13.57 | (1,289) | 43.57 | 13.68 |
| Cash settled in Merger | (5,254) | 26.31 | 15.12 | — | | | — | | |
| Canceled in Merger | (22,367) | 43.01 | 13.48 | — | | | — | | |
| Outstanding, end of year | — | — | — | 33,442 | 38.30 | 14.38 | 34,489 | 38.35 | 15.03 |
| Exercisable, end of year | — | — | — | 31,469 $ | 38.75 $ | 14.93 | 32,993 | 38.28 | 15.08 |

(1) Includes options assumed in the Times Mirror acquisition.

A summary of activity and weighted average exercise prices and fair values related to replacement options follows (shares in thousands):

| | Replacement Options | | | | | | | | |
| | 2007 | | | 2006 | | | 2005 | | |
| | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| Outstanding, beginning of year | 7,185 $ | 48.10 $ | 8.04 | 9,520 $ | 47.79 $ | 8.06 | 10,845 $ | 47.79 $ | 8.11 |
| Granted | — | — | — | — | — | — | 13 | 41.83 | 6.96 |
| Exercised | — | — | — | — | — | — | (20) | 42.20 | 8.43 |
| Canceled/forfeited | (4,501) | 47.90 | 8.11 | (2,335) | 46.83 | 8.13 | (1,318) | 47.93 | 8.46 |
| Canceled in Merger | (2,684) | 48.40 | 7.90 | — | | | — | | |
| Outstanding, end of year | — | — | — | 7,185 | 48.10 | 8.04 | 9,520 | 47.79 | 8.06 |
| Exercisable, end of year | — | — | — | 7,185 $ | 48.10 $ | 8.04 | 9,507 $ | 47.80 $ | 8.06 |

The total intrinsic value (the excess of the market price over the exercise price) was approximately $49 million for general and replacement stock option awards outstanding and exercisable as of Dec. 31, 2006. The total intrinsic value for stock options exercised in 2007 prior to the Merger and in 2006 was approximately $43 million and $11 million, respectively. The Company realized approximately $21 million of tax benefits from the exercise and cash settlement of stock options in 2007. In addition, the Company received approximately $77 million from the exercise of stock options in 2007. In 2006, the Company realized approximately $4 million of tax benefits and received approximately $22 million from the exercise of stock options. Pursuant to the Merger

133

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Agreement, the Company paid $135 million in connection with the cash settlement of its outstanding stock awards.

The Incentive Plan also allowed the Company to grant restricted stock units. The Company did not grant restricted stock units prior to 2006. In 2006, the Company granted restricted stock units which vested either in annual 33% increments beginning one year from the date of the grant, or 100% three years from the date of grant. Each restricted stock unit represented the Company's obligation to deliver to the holder one share of common stock upon vesting.

Holders of restricted stock also received dividend equivalent units until the restricted stock units vested. The number of dividend equivalent units granted for each restricted stock unit was calculated based on the value of the dividends per share paid on Tribune's common stock and the closing price of Tribune stock on the dividend payment date. The dividend equivalent units vested with the underlying restricted stock units.

A summary of restricted stock unit and dividend equivalent unit activity and weighted average fair values follows (shares in thousands):

| | 2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| | Shares | Weighted Avg. Fair Value | Shares | Weighted Avg. Fair Value | Shares | Weighted Avg. Fair Value |
| Outstanding and nonvested, beginning of year | 1,524 | $ 31.18 | — | | — | |
| Restricted stock units granted | 1,837 | 30.41 | 1,523 | $ 31.18 | — | |
| Dividend equivalent units granted | 11 | — | 34 | — | — | |
| Forfeited | (135) | 30.29 | (33) | $ 31.16 | — | |
| Vested and issued | (410) | 30.65 | — | | — | |
| Cash settled in Merger | (2,827) | 34.00 | — | | — | |
| Outstanding and nonvested, end of year | — | | 1,524 | $ 31.18 | — | |

As described above, the Company issued Units under the Management Equity Incentive Plan following the consummation of the Merger. The fair value of the Units is based on the estimated fair value of the Company's common stock at the end of each reporting period, other than for Second Tranche Units that are cash settled due to early terminations prior to Dec. 20, 2008.

A summary of 2007 activity under the Management Equity Incentive Plan and weighted average fair values follows (Units in thousands):

| | 2007 | |
|---|---|---|
| | Units | Weighted Avg. Fair Value |
| Outstanding, beginning of year | — | |
| First Tranche Units granted | 4,163 | $ 10.50 |
| Second Tranche Units granted | 3,196 | 10.50 |
| Cash settled due to early terminations | (380) | 7.67 |
| Outstanding, end of year | 6,979 | 10.50 |
| Vested, end of year | 1,408 | $ 10.50 |

134

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 18: COMPREHENSIVE INCOME

Comprehensive income reflects all changes in the net assets of the Company during the period from transactions and other events and circumstances, except those resulting from stock issuances, stock repurchases and dividends. The Company's comprehensive income includes net income and other gains and losses. Prior to 2007, the Company's other comprehensive income (loss) primarily included gains and losses on marketable securities classified as available-for-sale and the change in minimum pension liabilities. Beginning in the Company's 2007 fiscal year, and as a result of the Company's adoption of FAS No. 158 as of Dec. 31, 2006, other comprehensive income (loss) no longer includes the change in minimum pension liabilities, but does include changes in unrecognized benefit cost gains and losses. In addition, beginning in the Company's 2007 third quarter, other comprehensive income (loss) includes gains and losses on cash flow hedging instruments as a result of the interest rate swap agreements the Company entered into in July 2007 (see Note 10 for further information on the Company's interest rate swap agreements). The Company's comprehensive income was as follows (in thousands):

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Net income | $ 86,945 | $ 593,995 | $ 534,689 |
| Change in unrecognized benefit cost loss, net of taxes of $66,850 | 104,560 | — | — |
| Adjustment for previously unrecognized benefit cost (gains) and losses included in net income, net of taxes of $17,486 | 27,350 | — | — |
| Change in minimum pension liabilities, net of taxes of $12,139 and ($13,168), respectively | — | 18,987 | (20,597) |
| Unrealized gain (loss) on marketable securities: | | | |
| Unrealized holding gain (loss) arising during the period, net of taxes of ($3,414), $1,234, and ($2,098), respectively | (5,340) | 1,929 | (3,282) |
| Adjustment for gain on investment sales included in net income, net of taxes of ($7,241) and ($116), respectively | — | (11,325) | (181) |
| Unrealized gain (loss) on marketable securities, net of taxes | (5,340) | (9,396) | (3,463) |
| Unrecognized losses on cash flow hedging instruments: | | | |
| Change in losses on cash flow hedging instruments, net of taxes of ($35,440) | (55,431) | — | — |
| Adjustment for losses on cash flow hedging instruments included in net income, net of taxes of $661 | 1,033 | — | — |
| Unrecognized losses on cash flow hedging instruments, net of taxes | (54,398) | — | — |
| Change in foreign currency translation adjustments, net of taxes of $373, $117 and ($45), respectively | 584 | 183 | (70) |
| Other comprehensive income (loss) | 72,756 | 9,774 | (24,130) |
| Comprehensive income | $ 159,701 | $ 603,769 | $ 510,559 |

135

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Accumulated other comprehensive income (loss) is a separate component of shareholders' equity (deficit) on the Company's consolidated balance sheet. A reconciliation of the components of accumulated other comprehensive income (loss) is as follows (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Minimum pension liabilities, net of tax: |  |  |  |
| Balance, beginning of year | $ — | $ (27,901) | $ (7,304) |
| Current year change prior to adoption of FAS No. 158 | — | 18,987 | (20,597) |
| Change due to adoption of FAS No. 158 | — | 8,914 | — |
| Balance, end of year | — | — | (27,901) |
| Unrecognized benefit cost gains and (losses), net of tax: |  |  |  |
| Balance, beginning of year | (374,773) | — | — |
| Current year change | 131,910 | — | — |
| Change due to adoption of FAS No. 158 | — | (374,773) | — |
| Balance, end of year | (242,863) | (374,773) | — |
| Unrealized gain (loss), net of tax, on marketable securities: |  |  |  |
| Balance, beginning of year | 7,051 | 16,447 | 19,910 |
| Current year change | (5,340) | (9,396) | (3,463) |
| Balance, end of year | 1,711 | 7,051 | 16,447 |
| Foreign currency translation adjustments, net of tax: |  |  |  |
| Balance, beginning of year | 337 | 154 | 224 |
| Current year change | 584 | 183 | (70) |
| Balance, end of year | 921 | 337 | 154 |
| Unrecognized losses on cash flow hedging instruments, net of tax: |  |  |  |
| Balance, beginning of year | — | — | — |
| Current year change | (54,398) | — | — |
| Balance, end of year | (54,398) | — | — |
| Accumulated other comprehensive income (loss) | $ (294,629) | $ (367,385) | $ (11,300) |

The adoption of FAS No. 158 resulted in a net increase in accumulated other comprehensive loss, and a corresponding net decrease in shareholders' equity, of $366 million at Dec. 31, 2006 (see Note 15 for additional information on the impact of the adoption of FAS No. 158).

## NOTE 19: BUSINESS SEGMENTS

Tribune Company is a media and entertainment company that conducts its operations through two business segments: publishing and broadcasting and entertainment. In addition, certain administrative activities are reported and included under corporate. These segments reflect the manner in which the Company sells its products to the marketplace and the manner in which it manages its operations and makes business decisions.

**Publishing**—Tribune Publishing currently operates nine market-leading daily newspapers and related businesses, distributes entertainment listings and syndicated content, operates a 24-hour cable news channel, and manages the websites of Tribune's daily newspapers and television stations, along with other branded sites targeting specific communities of interest. The daily newspapers are the *Los Angeles Times*; *Chicago Tribune*; *Newsday*, serving Nassau and Suffolk counties on Long Island, New York and the borough of Queens, New York; *South Florida Sun-Sentinel*; *Orlando Sentinel*; *The Sun*, serving the metropolitan Baltimore, Maryland market; *Hartford Courant*, *The Morning Call*, serving Pennsylvania's Lehigh Valley; and *Daily Press*, serving the Virginia Peninsula.

136

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Broadcasting and Entertainment**—The Company's broadcasting operations currently consist of The CW Network affiliates in New York, Los Angeles, Chicago, Dallas, Washington D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, San Diego, Hartford, and New Orleans; FOX television affiliates in Seattle, Sacramento, Indianapolis, Hartford, Grand Rapids and Harrisburg; MyNetwork affiliates in Philadelphia and Seattle; an ABC television affiliate in New Orleans; and one radio station in Chicago. Entertainment operations include Tribune Entertainment, which distributes its own programming together with programming licensed from third parties, and the Chicago Cubs baseball team.

No single customer provides more than 10% of the Company's revenue. In determining operating profit for each segment, none of the following items have been added or deducted: interest and dividend income, interest expense, equity income and loss, non-operating items or income taxes. Assets represent those tangible and intangible assets used in the operations of each segment. Corporate assets include cash and the Company's investment portfolio.

137

Source: TRIBUNE CO, 10-K, March 20, 2008

### TRIBUNE COMPANY AND SUBSIDIARIES
### BUSINESS SEGMENTS
### (In thousands of dollars)

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Operating Revenues** | | | |
| Publishing | $ 3,664,590 | $ 4,018,418 | $ 4,012,413 |
| Broadcasting and entertainment | 1,398,394 | 1,425,146 | 1,414,433 |
| Total operating revenues | $ 5,062,984 | $ 5,443,564 | $ 5,426,846 |
| **Operating Profit(1)** | | | |
| Publishing(2) | $ 368,193 | $ 748,940 | $ 753,781 |
| Broadcasting and entertainment | 357,341 | 391,533 | 416,891 |
| Corporate expenses | (91,617) | (55,712) | (49,413) |
| Total operating profit | $ 633,917 | $ 1,084,761 | $ 1,121,259 |
| **Depreciation** | | | |
| Publishing(3) | $ 167,600 | $ 163,467 | $ 181,081 |
| Broadcasting and entertainment | 39,553 | 39,815 | 36,828 |
| Corporate | 1,084 | 1,380 | 1,630 |
| Total depreciation | $ 208,237 | $ 204,662 | $ 219,539 |
| **Amortization of Intangible Assets** | | | |
| Publishing | $ 8,315 | $ 8,208 | $ 7,181 |
| Broadcasting and entertainment | 11,518 | 11,555 | 11,657 |
| Total amortization of intangible assets | $ 19,833 | $ 19,763 | $ 18,838 |
| **Capital Expenditures** | | | |
| Publishing | $ 104,732 | $ 173,459 | $ 163,317 |
| Broadcasting and entertainment | 38,793 | 42,227 | 36,851 |
| Corporate | 2,476 | 6,221 | 5,777 |
| Total capital expenditures | $ 146,001 | $ 221,907 | $ 205,945 |
| **Assets** | | | |
| Publishing | $ 8,131,591 | $ 8,512,512 | $ 8,637,176 |
| Broadcasting and entertainment | 4,017,255 | 3,987,449 | 4,425,135 |
| Corporate | 1,000,873 | 900,811 | 1,483,931 |
| Total assets | $ 13,149,719 | $ 13,400,772 | $ 14,546,242 |

(1) Operating profit for each segment excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes.

(2) Publishing operating profit for 2007 includes an impairment charge of $130 million to write-down one of its masthead intangible assets to fair value (see Note 7).

(3) Publishing depreciation for 2005 includes $16 million of accelerated depreciation expense related to the shut down of the *Los Angeles Times'* San Fernando Valley printing facility (see Note 2).

138

Source: TRIBUNE CO, 10-K, March 20, 2008

### TRIBUNE COMPANY AND SUBSIDIARIES
### 2007 QUARTERLY RESULTS (Unaudited)
### (In thousands of dollars)

|  | Quarters | | | | 2007 |
|  | First | Second | Third | Fourth | Total |
|---|---|---|---|---|---|
| **Operating Revenues** | | | | | |
| Publishing | $ 926,371 | $ 915,052 | $ 870,848 | $ 952,319 | $ 3,664,590 |
| Broadcasting and entertainment | 283,008 | 392,959 | 406,051 | 316,376 | 1,398,394 |
| Total operating revenues | $ 1,209,379 | $ 1,308,011 | $ 1,276,899 | $ 1,268,695 | $ 5,062,984 |
| **Operating Profit** | | | | | |
| Publishing(1) | $ 140,176 | $ 102,455 | $ 122,543 | $ 3,019 | $ 368,193 |
| Broadcasting and entertainment | 61,382 | 107,734 | 117,787 | 70,438 | 357,341 |
| Corporate expenses | (19,641) | (13,932) | (11,329) | (46,715) | (91,617) |
| Total operating profit | 181,917 | 196,257 | 229,001 | 26,742 | 633,917 |
| Net income on equity investments | 12,684 | 28,710 | 26,559 | 32,266 | 100,219 |
| Interest and dividend income | 3,154 | 3,830 | 4,924 | 9,919 | 21,827 |
| Interest expense | (83,249) | (115,905) | (186,771) | (195,715) | (581,640) |
| Gain (loss) on change in fair values of derivatives and related investments(2) | (69,780) | (27,395) | (84,969) | 85,338 | (96,806) |
| Strategic transaction expenses(2) | (14,473) | (20,925) | (3,160) | (46,573) | (85,131) |
| Gain on TMCT transactions(2) | — | — | 8,329 | (326) | 8,003 |
| Gain on other investment transactions, net(2) | 73 | 443 | — | 31,062 | 31,578 |
| Other non-operating gain (loss), net(2) | 465 | 5,534 | 1,936 | (2,798) | 5,137 |
| **Income (Loss) from Continuing Operations Before Income Taxes** | 30,791 | 70,549 | (4,151) | (60,085) | 37,104 |
| Income taxes(2) | (19,441) | (34,764) | 89,966 | (17,527) | 18,234 |
| **Income (Loss) from Continuing Operations** | 11,350 | 35,785 | 85,815 | (77,612) | 55,338 |
| **Income (Loss) from Discontinued Operations, net of tax(3)** | (34,645) | 491 | 66,950 | (1,189) | 31,607 |
| **Net Income (Loss)** | $ (23,295) | $ 36,276 | $ 152,765 | $ (78,801) | $ 86,945 |

**Notes to Quarterly Results:**

(1) In the fourth quarter of 2007, the Company recorded a $130 million pretax impairment charge related to one of its masthead intangible assets. See Note 7 to the Company's consolidated financial statements for further information.

(2) See Note 2 to the Company's consolidated financial statements for information pertaining to non-operating items recorded in 2007 and 2006.

(3) See Note 4 to the Company's consolidated financial statements for information pertaining to discontinued operations.

139

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**2006 QUARTERLY RESULTS (Unaudited)**
**(In thousands of dollars)**

| | Quarters | | | | 2006 |
| | First | Second | Third | Fourth | Total |
|---|---|---|---|---|---|
| **Operating Revenues** | | | | | |
| Publishing | $ 977,534 | $ 1,008,659 | $ 939,614 | $ 1,092,611 | $ 4,018,418 |
| Broadcasting and entertainment | 284,102 | 392,886 | 392,555 | 355,603 | 1,425,146 |
| Total operating revenues | $ 1,261,636 | $ 1,401,545 | $ 1,332,169 | $ 1,448,214 | $ 5,443,564 |
| **Operating Profit** | | | | | |
| Publishing | $ 170,121 | $ 208,603 | $ 143,774 | $ 226,442 | $ 748,940 |
| Broadcasting and entertainment | 67,451 | 110,396 | 107,800 | 105,886 | 391,533 |
| Corporate expenses | (20,363) | (14,020) | (13,718) | (7,611) | (55,712) |
| Total operating profit | 217,209 | 304,979 | 237,856 | 324,717 | 1,084,761 |
| Net income on equity investments | 6,548 | 26,017 | 18,743 | 29,465 | 80,773 |
| Interest and dividend income | 2,180 | 2,472 | 4,678 | 4,815 | 14,145 |
| Interest expense | (48,772) | (47,279) | (84,324) | (93,527) | (273,902) |
| Gain (loss) on change in fair values of derivatives and related investments(2) | (10,317) | (6,121) | (17,746) | 45,272 | 11,088 |
| Strategic transaction expenses(2) | — | — | — | (3,466) | (3,466) |
| Gain on TMCT transactions(2) | | | 59,596 | | 59,596 |
| Gain (loss) on other investment transactions, net(2) | 3,466 | (161) | 17,507 | 15,920 | 36,732 |
| Other non-operating gain (loss), net(2) | (6,846) | (442) | 4,168 | 2,139 | (981) |
| **Income from Continuing Operations Before Income Taxes** | 163,468 | 279,465 | 240,478 | 325,335 | 1,008,746 |
| Income taxes(2) | (64,232) | (116,205) | (75,179) | (91,957) | (347,573) |
| **Income from Continuing Operations** | 99,236 | 163,260 | 165,299 | 233,378 | 661,173 |
| **Income (Loss) from Discontinued Operations, net of tax(3)** | 3,528 | (75,426) | (959) | 5,679 | (67,178) |
| **Net Income** | $ 102,764 | $ 87,834 | $ 164,340 | $ 239,057 | $ 593,995 |

140

Source: TRIBUNE CO, 10-K, March 20, 2008

### TRIBUNE COMPANY AND SUBSIDIARIES
### FIVE YEAR FINANCIAL SUMMARY
### (In thousands of dollars)

| | 2007 | 2006 |
|---|---|---|
| **Operating Revenues** | | |
| Publishing | $ 3,664,590 | $ 4,018,418 |
| Broadcasting and entertainment | 1,398,394 | 1,425,146 |
| Total operating revenues | $ 5,062,984 | $ 5,443,564 |
| **Operating Profit** | | |
| Publishing | $ 368,193 | $ 748,940 |
| Broadcasting and entertainment | 357,341 | 391,533 |
| Corporate expenses | (91,617) | (55,712) |
| Total operating profit | 633,917 | 1,084,761 |
| Net income on equity investments | 100,219 | 80,773 |
| Interest and dividend income | 21,827 | 14,145 |
| Interest expense | (581,640) | (273,902) |
| Non-operating items(1) | (137,219) | 102,969 |
| **Income from Continuing Operations Before Income Taxes and Cumulative Effect of Change in Accounting Principle** | 37,104 | 1,008,746 |
| Income taxes(1) | 18,234 | (347,573) |
| **Income from Continuing Operations Before Cumulative Effect of Change in Accounting Principle** | 55,338 | 661,173 |
| Income (Loss) from Discontinued Operations, net of tax(2) | 31,607 | (67,178) |
| Cumulative effect of changes in accounting principle, net of tax(3) | — | — |
| **Net Income** | $ 86,945 | $ 593,995 |
| | | |
| **Financial Ratios** | | |
| Operating profit margin | 12.5% | 19.9% |
| Debt to capital(4) | 116% | 44% |
| | | |
| **Financial Position and Other Data** | | |
| Total assets | $ 13,149,719 | $ 13,400,772 |
| Long-term debt | 11,840,206 | 3,576,211 |
| Shareholders' equity (deficit) | (3,513,940) | 4,319,616 |
| Capital expenditures | 146,001 | 221,907 |

---

(1) See Note 2 to the Company's consolidated financial statements for information pertaining to non-operating items recorded in 2007, 2006 and 2005. Fiscal year 2004 included the following after-tax non-operating items: loss on early debt retirement of $88 million, loss on changes in fair values of derivatives and related investments of $11 million, gain on sales of investments of $12 million, and an other non-operating loss of $4 million, totaling a loss of $90 million. Fiscal year 2003 included the following after-tax non-operating items: gain on changes in fair values of derivatives and related investments of $52 million, gain on sales of subsidiaries and investments of $90 million, loss on investment write-downs of $6 million, gain on insurance recoveries of $14 million, an other non-operating loss of $2 million and a favorable income tax settlement adjustment of $25 million, totaling a gain of $173 million.

(2) See Note 4 to the Company's consolidated financial statements for information pertaining to discontinued operations.

141

Source: TRIBUNE CO, 10-K, March 20, 2008

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Operating Revenues** | | | |
| Publishing | $ 4,012,413 | $ 4,041,014 | $ 3,983,292 |
| Broadcasting and entertainment | 1,414,433 | 1,501,581 | 1,457,496 |
| Total operating revenues | $ 5,426,846 | $ 5,542,595 | $ 5,440,788 |
| **Operating Profit** | | | |
| Publishing | $ 753,781 | $ 729,037 | $ 878,388 |
| Broadcasting and entertainment | 416,891 | 513,289 | 491,733 |
| Corporate expenses | (49,413) | (52,218) | (53,351) |
| Total operating profit | 1,121,259 | 1,190,108 | 1,316,770 |
| Net income on equity investments | 41,209 | 17,931 | 5,590 |
| Interest and dividend income | 7,539 | 3,053 | 6,048 |
| Interest expense | (155,191) | (153,118) | (198,123) |
| Non-operating items(1) | 69,861 | (145,044) | 241,247 |
| **Income from Continuing Operations Before Income Taxes and Cumulative Effect of Change in Accounting Principle** | 1,084,677 | 912,930 | 1,371,532 |
| Income taxes(1) | (565,293) | (356,524) | (506,356) |
| **Income from Continuing Operations Before Cumulative Effect of Change in Accounting Principle** | 519,384 | 556,406 | 865,176 |
| Income (Loss) from Discontinued Operations, net of tax(2) | 15,305 | 16,918 | 26,203 |
| Cumulative effect of changes in accounting principle, net of tax(3) | — | (17,788) | — |
| **Net Income** | $ 534,689 | $ 555,536 | $ 891,379 |
| | | | |
| **Financial Ratios** | | | |
| Operating profit margin | 20.7% | 21.5% | 24.2% |
| Debt to capital(4) | 26% | 22% | 22% |
| | | | |
| **Financial Position and Other Data** | | | |
| Total assets | $ 14,546,242 | $ 14,155,432 | $ 14,280,152 |
| Long-term debt | 2,959,262 | 2,317,933 | 2,381,617 |
| Shareholders' equity (deficit) | 6,725,551 | 6,836,844 | 7,028,124 |
| Capital expenditures | 205,945 | 217,348 | 193,535 |

---

(3) The cumulative effect of adopting a new accounting pronouncement for the valuation of certain intangible assets decreased net income by $18 million in 2004.

(4) Capital comprises total debt, non-current deferred income taxes and shareholders' equity (deficit).

142

Source: TRIBUNE CO, 10-K, March 20, 2008

## TRIBUNE COMPANY AND SUBSIDIARIES
## SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS AND RESERVES
### (In thousands of dollars)

| Description | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Additions Recorded Upon Acquisitions | Deductions(1) | Balance at End of Period |
|---|---|---|---|---|---|
| Accounts receivable allowances: | | | | | |
| Year ended Dec. 30, 2007 | $ 33,771 | $ 70,283 | $ — | $ 71,824 | $ 32,230 |
| Year ended Dec. 31, 2006 | $ 42,558 | $ 80,553 | $ 55 | $ 89,395 | $ 33,771 |
| Year ended Dec. 25, 2005 | $ 49,507 | $ 80,514 | $ — | $ 87,463 | $ 42,558 |

(1)    Deductions for the years ended Dec. 30, 2007 and Dec. 31, 2006 included approximately $.9 million and $.5 million, respectively, due to the sales of discontinued operations. See Note 4 to the Company's consolidated financial statements for additional information on the sales of discontinued operations.

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**INDEX TO FINANCIAL STATEMENTS**
**AND FINANCIAL STATEMENT SCHEDULE**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 145 |
| Consolidated Statements of Income for each of the three fiscal years in the period ended Dec. 30, 2007 | 146 |
| Consolidated Balance Sheets at Dec. 30, 2007 and Dec. 31, 2006 | 147 |
| Consolidated Statements of Membership Equity for each of the three fiscal years in the period ended Dec. 30, 2007 | 148 |
| Consolidated Statements of Cash Flows for each of the three fiscal years in the period ended Dec. 30, 2007 | 149 |
| Notes to Consolidated Financial Statements | |
| Note 1: Description of Business and Basis of Presentation | 150 |
| Note 2: Summary of Significant Accounting Policies | 151 |
| Note 3: Non-Operating Items | 156 |
| Note 4: Transactions with Tribune and Affiliates | 156 |
| Note 5: Debt Due to Affiliates | 159 |
| Note 6: Investments | 159 |
| Note 7: Discontinued Operations and Assets Held for Sale | 159 |
| Note 8: Capital Lease Obligations | 160 |
| Note 9: Contracts Payable for Broadcast Rights | 161 |
| Note 10: Commitments and Contingencies | 161 |
| Note 11: Goodwill and Other Intangible Assets | 162 |
| Note 12: Income Taxes | 163 |
| Note 13: Pledge of Membership Interest | 165 |
| Schedule II Valuation and Qualifying Accounts and Reserves | 166 |

Source: TRIBUNE CO, 10-K, March 20, 2008

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Member of Tribune Broadcasting Holdco, LLC:

In our opinion, based on our audits and the report of other auditors, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Tribune Broadcasting Holdco, LLC and its subsidiaries at December 30, 2007 and December 31, 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 30, 2007 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the consolidated financial statements. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We did not audit the financial statements of TV Food Network, an equity method investee of Tribune Broadcasting Holdco, LLC and its subsidiaries, for the year ended December 30, 2007. The Company's consolidated financial statements include income from this equity investment of $82 million for the year ended December 30, 2007. The financial statements of TV Food Network were audited by other auditors whose report thereon has been furnished to us and our opinion on the financial statements, insofar as it relates to the equity income from TV Food Network for the year ended December 30, 2007, is based solely on the report of the other auditors. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits and the report of other auditors provide a reasonable basis for our opinion.

The Company is a subsidiary of Tribune Company ("Tribune") and consequently, as discussed in Notes 1 and 4, these financial statements have been derived from the accounting records of Tribune and reflect certain assumptions and allocations. Moreover, as discussed in Note 4, the Company relied on Tribune for certain administrative, management and other services. Accordingly, these consolidated financial statements do not necessarily reflect the financial position, results of operations and cash flows of the Company had it been a separate standalone entity, independent of Tribune. Furthermore, as discussed in Notes 4 and 5 to the financial statements, the Company has entered into significant transactions with Tribune and its subsidiaries.

As discussed in Note 2 to the consolidated financial statements, the Company changed the manner in which it accounts for share-based compensation in 2006.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Chicago, Illinois
March 14, 2008

145

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
**(In thousands of dollars)**

| | Year Ended | | |
| --- | --- | --- | --- |
| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 25, 2005 |
| **Operating Revenues** | | | |
| Television: | | | |
| Advertising | $ 976,597 | $ 1,044,146 | $ 1,052,944 |
| Other | 173,408 | 146,160 | 123,862 |
| Total | 1,150,005 | 1,190,306 | 1,176,806 |
| Radio and entertainment | 57,993 | 60,979 | 79,031 |
| Total operating revenues | 1,207,998 | 1,251,285 | 1,255,837 |
| | | | |
| **Operating Expenses** | | | |
| Cost of sales (exclusive of items shown below) | 584,834 | 600,463 | 578,173 |
| Selling, general and administrative | 257,320 | 247,389 | 236,563 |
| Depreciation | 33,808 | 35,111 | 33,209 |
| Amortization of intangible assets | 11,518 | 11,555 | 11,658 |
| Total operating expenses | 887,480 | 894,518 | 859,603 |
| | | | |
| **Operating Profit** | 320,518 | 356,767 | 396,234 |
| Net income on equity investments | 102,075 | 82,596 | 57,410 |
| Interest expense: | | | |
| Related party | (22,306) | (77,065) | (102,077) |
| Other | (1,417) | (1,601) | (1,907) |
| Total | (23,723) | (78,666) | (103,984) |
| Gain on sale of investment | — | — | 5,143 |
| Other non-operating gain (loss), net | 21,538 | — | (318) |
| **Income From Continuing Operations Before Income Taxes** | 420,408 | 360,697 | 354,485 |
| Income taxes | (162,557) | (139,156) | (138,185) |
| **Income from Continuing Operations** | 257,851 | 221,541 | 216,300 |
| **Income (Loss) from Discontinued Operations, net of tax (Note 7)** | (258) | (68,421) | 9,733 |
| **Net Income** | $ 257,593 | $ 153,120 | $ 226,033 |

See Notes to Consolidated Financial Statements.

146

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands of dollars)**

| | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---:|---:|
| **Assets** | | |
| | | |
| **Current Assets** | | |
| Cash | $ 8,174 | $ 4,434 |
| Accounts receivable (net of allowances of $4,697 and $4,372) | 247,281 | 253,097 |
| Broadcast rights | 287,045 | 271,995 |
| Deferred income taxes | 5,698 | 1,975 |
| Prepaid expenses and other | 27,349 | 28,658 |
| Due from Parent, net | 670,507 | — |
| Total current assets | 1,246,054 | 560,159 |
| | | |
| **Properties** | | |
| Machinery, equipment, and furniture | 354,970 | 354,335 |
| Buildings and leasehold improvements | 95,675 | 94,131 |
| | 450,645 | 448,466 |
| Accumulated depreciation | (311,596) | (301,158) |
| | 139,049 | 147,308 |
| Land | 11,909 | 14,248 |
| Construction in progress | 21,456 | 10,979 |
| Net properties | 172,414 | 172,535 |
| | | |
| **Other Assets** | | |
| Broadcast rights | 301,263 | 295,186 |
| Goodwill | 1,440,627 | 1,440,627 |
| Other intangible assets, net | 1,171,376 | 1,182,894 |
| Investments | 165,815 | 146,806 |
| Assets held for sale | 2,540 | — |
| Other | 44,826 | 69,950 |
| Total other assets | 3,126,447 | 3,135,463 |
| Total assets | $ 4,544,915 | $ 3,868,157 |
| | | |
| **Liabilities and Membership Equity** | | |
| | | |
| **Current Liabilities** | | |
| Capital lease obligations due within one year | $ 1,137 | $ 1,025 |
| Debt due to affiliates within one year | 15,268 | 199,960 |
| Due to Parent, net | — | 388,953 |
| Accounts payable | 20,675 | 17,040 |
| Employee compensation and benefits | 16,604 | 29,650 |
| Contracts payable for broadcast rights | 339,909 | 319,822 |
| Other | 51,684 | 70,788 |
| Total current liabilities | 445,277 | 1,027,238 |
| | | |
| **Non-Current Liabilities** | | |
| Contracts payable for broadcast rights | 432,393 | 424,050 |
| Capital lease obligations | 9,529 | 10,644 |
| Deferred income taxes | 528,836 | 508,118 |
| Debt due to affiliates | — | 532,201 |
| Other non-current liabilities | 30,490 | 43,495 |
| Total non-current liabilities | 1,001,248 | 1,518,508 |
| | | |
| **Commitments and Contingent Liabilities (Note 10)** | — | — |
| | | |
| **Membership Equity** | | |
| Membership paid-in capital | 1,863,019 | 344,633 |
| Retained earnings | 1,235,371 | 977,778 |
| Total membership equity | 3,098,390 | 1,322,411 |

Source: TRIBUNE CO, 10-K, March 20, 2008

| | | | |
|---|---|---|---|
| Total liabilities and membership equity | $ | 4,544,915 | $ 3,868,157 |

See Notes to Consolidated Financial Statements.

147

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF MEMBERSHIP EQUITY**
**(In thousands of dollars)**

| | Total | | Retained Earnings | | Membership Paid-in Capital |
|---|---|---|---|---|---|
| Balance at Dec. 26, 2004 | $ 1,183,258 | $ | 838,625 | $ | 344,633 |
| Net income | 226,033 | | 226,033 | | — |
| Dividends declared | (135,000) | | (135,000) | | |
| Balance at Dec. 25, 2005 | $ 1,274,291 | $ | 929,658 | $ | 344,633 |
| Net income | 153,120 | | 153,120 | | — |
| Dividends declared | (105,000) | | (105,000) | | |
| Balance at Dec. 31, 2006 | $ 1,322,411 | $ | 977,778 | $ | 344,633 |
| Capital contribution from Parent (Note 1) | 1,518,386 | | — | | 1,518,386 |
| Net income | 257,593 | | 257,593 | | — |
| Balance at Dec. 30, 2007 | $ 3,098,390 | $ | 1,235,371 | $ | 1,863,019 |

See Notes to Consolidated Financial Statements.

148

Source: TRIBUNE CO, 10-K, March 20, 2008

### TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF CASH FLOWS
**(In thousands of dollars)**

| | Year Ended | | |
| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 25, 2005 |
|---|---|---|---|
| **Operations** | | | |
| Net income | $ 257,593 | $ 153,120 | $ 226,033 |
| Adjustments to reconcile net income to net cash provided by operations: | | | |
| Stock-based compensation | 19,045 | 5,169 | — |
| Depreciation | 33,808 | 37,252 | 35,681 |
| Amortization of intangible assets | 11,518 | 11,744 | 11,966 |
| Net income on equity investments | (102,075) | (82,596) | (57,410) |
| Distributions from equity investments | 80,706 | 53,106 | 38,924 |
| Gain on sales of investments, net | — | — | (5,143) |
| Other non-operating (gain) loss, net | (3,435) | — | 318 |
| Loss on sales of discontinued operations | 67 | 48,238 | — |
| Changes in working capital items excluding effects from dispositions: | | | |
| Accounts receivable | 7,182 | 13,420 | 36,233 |
| Prepaid expenses and other current assets | (59) | (48) | (1,260) |
| Accounts payable, accrued expenses, and other current liabilities | (28,515) | 3,339 | (4,422) |
| Change in broadcast rights, net of liabilities | 7,303 | 2,056 | (16,329) |
| Deferred income taxes | 16,995 | (11,282) | 35,479 |
| Other, net | 16,235 | 8,000 | 5,477 |
| Net cash provided by operations | 316,368 | 241,518 | 305,547 |
| | | | |
| **Investments** | | | |
| Capital expenditures | (34,614) | (24,646) | (27,760) |
| Investments | — | (29) | (1,678) |
| Proceeds from sales of subsidiaries and investments | — | 325,102 | 14,000 |
| Net cash provided by (used for) investments | (34,614) | 300,427 | (15,438) |
| | | | |
| **Financing** | | | |
| Repayments of capital lease obligations | (1,003) | (921) | (816) |
| Dividends paid to Parent | — | (105,000) | (135,000) |
| Repayments of promissory notes due to affiliates | (716,892) | (335,667) | (311,407) |
| Capital contribution from Parent (Note 1) | 1,518,386 | | |
| Net change in due to/from Parent | (1,078,505) | (101,909) | 155,717 |
| Net cash used for financing | (278,014) | (543,497) | (291,506) |
| | | | |
| **Net Increase (Decrease) in Cash** | 3,740 | (1,552) | (1,397) |
| Cash, beginning of year | 4,434 | 5,986 | 7,383 |
| Cash, end of year | $ 8,174 | $ 4,434 | $ 5,986 |

See Notes to Consolidated Financial Statements.

149

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION

**Business Operations**—Tribune Broadcasting Holdco, LLC ("Holdco") is a single member limited liability company wholly owned by Tribune Company ("Tribune" or "Parent"). Holdco was established in 2007 pursuant to a credit agreement for senior secured credit facilities entered into by Tribune on May 17, 2007 and subsequently amended on June 4, 2007 (collectively, the "Credit Agreement"). For further information regarding the terms and conditions of the Credit Agreement, see Note 10 to Tribune's consolidated financial statements in Item 8. Pursuant to the terms of the Credit Agreement, Tribune contributed all the outstanding shares of capital stock in Tribune Broadcasting Company ("TBC") to Holdco. Since the reorganization of TBC was between related parties, Holdco's basis in TBC was the same as Tribune's historical cost basis in TBC at the time of the contribution. During 2007, Tribune contributed $1.5 billion of membership capital to Holdco in order to pay off $739 million of TBC's existing debt due to affiliates (see Note 5) and to settle $779 million of Holdco's intercompany obligations.

Holdco and its subsidiaries (the "Company") consist primarily of (i) twenty-three network affiliated television stations operating in geographically diverse markets in the United States; (ii) Superstation WGN, a television station whose programming is delivered by cable or satellite outside of the Chicago area; (iii) a radio station in Chicago, IL; (iv) a Chicago-area cable television news channel; (v) a company that distributes its own programming together with programming licensed from third parties; and (vi) equity investments.

**Fiscal Year**—The Company's fiscal year ends on the last Sunday in December. Fiscal years 2007 and 2005 encompassed a 52-week period. Fiscal year 2006 encompassed a 53-week period.

**Principles of Consolidation**—The Company's consolidated financial statements have been derived from the accounting records of Tribune and reflect the consolidated results of operations, financial position and cash flows of the Company as it was historically managed. All significant intercompany accounts within the Company have been eliminated. All significant intercompany transactions between the Company and Tribune and its affiliates have been included within the consolidated financial statements and are considered to be effectively settled for cash at the time the transaction is recorded. The total net effect of these intercompany transactions, including the settlement of the Company's debt due to affiliates, is reflected in the consolidated statement of cash flows as a financing activity. The due from Parent, net amount on the Company's consolidated balance sheets represents the accumulated net effect of a variety of intercompany transactions.

Tribune uses a centralized approach to cash management and the financing of its operations. Under this centralized cash management program, Tribune and the Company advance funds to each other. These intercompany net advances are classified as a long-term asset or liability and are non-interest bearing. Accordingly, none of Tribune's cash or cash equivalents have been assigned to the Company in the consolidated financial statements. Cash in the consolidated balance sheets represents either cash not yet swept to Tribune or cash held locally by certain subsidiaries of the Company.

The consolidated financial statements include allocations of Tribune corporate expenses and centralized services, as described further in Note 4. The expense and cost allocations to the Company have been determined on bases that management considers to be a reasonable reflection of the utilization of services provided or the benefit received by the Company during the periods presented. The financial information in these financial statements does not include all expenses that would have been incurred had the Company operated as a separate stand-alone entity and accordingly may not reflect the Company's results of operations, financial position and cash flows had the Company been a stand-alone entity during the periods presented.

150

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

In general, investments held by the Company comprising 20 to 50 percent of the voting stock of companies and certain partnership interests are accounted for using the equity method. All other investments are generally accounted for using the cost method.

The Company evaluates its investments and other transactions for consolidation under the provisions of Financial Accounting Standards Board ("FASB") Interpretation No. 46R, "Consolidation of Variable Interest Entities" ("FIN 46R"). The Company does not hold any significant variable interests, as defined by FIN 46R.

**Presentation**—On June 5, 2006, Tribune announced the sale of WATL-TV, Atlanta and on June 19, 2006 announced the sale of WCWN-TV, Albany. The sale of WATL-TV, Atlanta closed on Aug. 7, 2006. On Sept. 14, 2006, Tribune announced the sale of WLVI-TV, Boston. The Albany and Boston station sales closed on Dec. 6, 2006 and Dec. 19, 2006, respectively. The results of operations of each of these businesses have been reported as discontinued operations in the Company's consolidated statements of income. Prior year consolidated statements of income have been reclassified to conform to the presentation of these businesses as discontinued operations. See Note 7 for further discussion. In addition, certain other prior year financial information has been reclassified to conform to the current year presentation.

## NOTE 2: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The significant accounting policies of the Company, as summarized below, conform with accounting principles generally accepted in the United States of America and reflect practices appropriate to the Company's businesses.

**Revenue Recognition**—The Company's primary sources of revenue are from sales of airtime on its television and radio stations. Advertising revenue is recorded, net of agency commissions, when commercials are aired.

Other television revenue sources include barter revenue associated with the Company's syndicated programming and distribution fees for carriage rights of Superstation WGN on cable and satellite outside of the Chicago designated market. Barter and distribution revenues are recognized on a straight-line basis over the term of the rights agreements.

Entertainment revenues are primarily from the sale and distribution of syndicated programming and rental of sound stages.

**Use of Estimates**—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates.

**Accounts Receivable**—The Company's accounts receivable are primarily due from advertisers. Credit is extended based on an evaluation of each customer's financial condition, and generally collateral is not required. The Company maintains an allowance for uncollectible accounts and certain sales allowances. The allowance for uncollectible accounts is determined based on historical write-off experience and any known specific collectibility exposures.

**Broadcast Rights**—Broadcast rights consist principally of rights to broadcast syndicated programs, sports and feature films and are stated at the lower of unamortized cost or estimated net realizable value. The total cost of these rights is recorded as an asset and a liability when the program becomes available for broadcast. Syndicated program rights that have limited showings are generally amortized using an accelerated method as programs are aired. Sports and feature film rights are amortized using the straight-line method.

The current portion of broadcast rights represents those rights available for broadcast that are expected to be amortized in the succeeding year. Broadcast rights amortization expense in 2007 and 2006, excluding barter transactions, was $283 million and $292 million, respectively. Additional rights for programs that became available for broadcast were $372 million in 2007 and $347 million in 2006.

The Company maintains an allowance for programming that is not expected to be aired by the end of the contract period. This allowance for excess programming inventory is based on a program-by-program

151

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

review of the Company's five-year broadcast plans and historical write-off trends. The total reserve balance at Dec. 30, 2007 and Dec. 31 2006 was $3.2 million and $4.0 million, respectively. Actual write-offs in 2007 and 2006 were $.2 million and $.4 million, respectively. Future write-offs can vary based on changes in consumer viewing trends and the availability and costs of other programming.

**Barter and Trade Transactions**—The Company, in the ordinary course of business, enters into barter transactions whereby a portion of the commercial airtime within a syndicated program is exchanged for broadcast rights to that program. Barter program rights and payables are recorded when the program is available for broadcast. Revenue and expenses associated with these barter transactions are generally recorded when the programming is aired at the fair market value of the commercial airtime relinquished. Barter revenues and expenses associated with third parties were $77.3 million, $76.1 million and $67.7 million in fiscal years 2007, 2006 and 2005, respectively, which is included in other television revenue in the consolidated statements of income.

Trade transactions represent the exchange of commercial airtime for merchandise or services. Trade transactions are recorded at the more determinable of the fair market value of services rendered or received. Revenue and expense from trade transactions are recognized when the commercials are aired or the merchandise or services are utilized.

**Properties**—Property, plant and equipment are stated at cost. The Company capitalizes major property, plant and equipment additions, improvements and replacements. Depreciation is computed using the straight-line method over the following estimated useful lives: 10 to 30 years for broadcast towers and buildings, 3 to 15 years for broadcast equipment and 3 to 10 years for all other equipment and furniture. Expenditures for repairs and maintenance of existing assets are charged to expense as incurred.

**Goodwill and Other Intangible Assets**—Goodwill and other intangible assets are summarized in Note 11. The Company reviews goodwill and certain intangible assets no longer being amortized for impairment annually, or more frequently if events or changes in circumstances indicate that an asset may be impaired, in accordance with Financial Accounting Standard ("FAS") No. 142, "Goodwill and Other Intangible Assets." Under FAS No. 142, the impairment review of goodwill and other intangible assets not subject to amortization must be based on estimated fair values.

The Company performs its annual impairment review in the fourth quarter of each year. The estimated fair values of the reporting units to which goodwill has been allocated is determined using many critical factors, including operating cash flows, revenue and market growth, market multiples, and discount rates. The estimated fair values of other intangible assets subject to the annual impairment review, which include Federal Communications Commission ("FCC") licenses, are generally calculated based on projected future discounted cash flow analyses. The development of market multiples, operating cash flow projections and discount rates used in these analyses requires the use of assumptions, including assumptions regarding revenue and market growth as well as specific economic factors in the broadcasting industry. These assumptions reflect the Company's best estimates, but these items involve inherent uncertainties based on market conditions generally outside of the Company's control.

**Impairment Review of Long-Lived Assets**—In accordance with FAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," the Company evaluates the carrying value of long-lived assets to be held and used whenever events or changes in circumstances indicate that the carrying amount of a long-lived asset or asset group may be impaired. The carrying value of a long-lived asset or asset group is considered impaired when the projected future undiscounted cash flows to be generated from the asset or asset group over its remaining depreciable life are less than its current carrying value.

**Advertising Expense**—Advertising costs are expensed as incurred. Advertising expense, net of co-op advertising credits, is included in selling, general and administrative expense within the Company's consolidated statements of income and amounted to $28.6 million, $27.7 million and $28.3 million in fiscal years 2007, 2006 and 2005, respectively.

**Pension Plans and Other Postretirement Benefits**—Retirement benefits are provided to eligible employees of the Company through several pension plans sponsored either by Tribune or by unions. Under Tribune-sponsored plans, pension benefits are primarily a function of both the years of service and the level of compensation for a specified number of years, depending on the plan.

152

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

It is Tribune's policy to fund the minimum for Tribune-sponsored pension plans as required by ERISA. Contributions made to union-sponsored plans are based upon collective bargaining agreements.

Tribune also provides certain health care and life insurance benefits for retired Company employees. The expected cost of providing these benefits is accrued over the years that the employees render services. It is Tribune's policy to fund postretirement benefits as claims are incurred.

All obligations pursuant to the Tribune-sponsored pension and post retirement plans have historically been an obligation of Tribune. Therefore, the Company accounts for costs associated with these plans as a participant in multi-employer plans in accordance with FAS No. 87 "Employers' Accounting for Pensions" and FAS No. 106 "Employers' Accounting for Postretirement Benefits Other Than Pensions," respectively, as amended. FAS No. 87 provides that an employer that participates in a multi-employer defined benefit plan is not required to report a liability beyond the contributions currently due and unpaid to the plan. Therefore, no assets or liabilities relative to the obligations under these retirement plans have been included in the consolidated balance sheets.

**Stock-Based Compensation**—The Company's employees have historically been eligible to participate in Tribune's incentive compensation and stock purchase plans. In the first quarter of 2006, Tribune adopted FAS No. 123R, "Share-Based Payment," which superseded Accounting Principles Board ("APB") Opinion No. 25, FAS No. 123 and related interpretations. FAS No. 123R requires the Company to expense stock-based compensation in its income statement. Under FAS No. 123R, stock-based compensation cost is measured at the grant date for equity-classified awards and at the end of each reporting period for liability-classified awards based on the estimated fair value of the award.

Tribune granted stock options to employees in 2006 and prior years. Tribune used the Black-Scholes option-pricing model to determine the fair value of each stock option it granted. The Black-Scholes model included assumptions regarding dividend yields, expected volatility, expected lives and risk-free interest rates. These assumptions reflected Tribune's best estimates, but they involved certain risks, trends and uncertainties, which in some instances were outside of the control of Tribune. As a result, if other assumptions had been used, stock-based compensation could have been materially impacted. The Company adopted FAS No. 123R utilizing the modified prospective application method and did not restate prior years.

Stock-based compensation expense allocated to the Company and included in selling, general and administrative expense in the Company's consolidated statement of income was $19.0 million, or $12.1 million net of tax, for 2007, and $5.0 million, or $3.2 million net of tax, for 2006. The expense for 2007 included a charge related to the cash settlement of the Company's outstanding stock-based awards (see discussion below).

Prior to the adoption of FAS No. 123R, Tribune accounted for its stock-based compensation plans in accordance with APB No. 25 and related interpretations. Under APB No. 25, no compensation expense was recorded because the exercise price of employee stock options equaled the market price of the underlying stock on the date of grant. Under the provisions of APB No. 25, Tribune was not required to recognize compensation expense for its employee stock purchase plan.

Under FAS No. 123, "Accounting for Stock-Based Compensation," as amended by FAS No. 148, compensation cost was measured at the grant date based on the estimated fair value of the award and was recognized as compensation expense over the vesting period.

153

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Had compensation cost for Tribune's stock-based compensation plans been determined consistent with FAS No. 123 prior to the adoption of FAS No. 123R in 2006, the Company's 2005 net income would have been reduced to the following pro forma amount (in thousands):

|  | 2005 |
|---|---|
| Net income, as reported | $    226,033 |
| Less: Pro forma stock-based employee compensation expense, net of tax: | |
| General options | (20,121) |
| Replacement options | (279) |
| Employee Stock Purchase Plan | (819) |
| Total pro forma stock-based employee compensation expense, net of tax | (21,219) |
| Pro forma net income | $    204,814 |

In determining the pro forma compensation expense under the fair value method of FAS No. 123, using the Black-Scholes option-pricing model, the following weighted average assumptions were used for general awards and replacement options:

| | 2005 | |
|---|---|---|
| | General Awards | Replacement Options |
| Risk-free interest rate | 3.7% | 3.3% |
| Expected dividend yield | 1.8% | 1.8% |
| Expected stock price volatility | 28.1% | 22.8% |
| Expected life (in years) | 5 | 3 |
| Weighted average fair value | $    10.49 | $    6.96 |

On June 24, 2005, Tribune accelerated the vesting of certain stock options granted on Feb. 11, 2003 and Feb. 10, 2004, totaling 2.4 million in each year. Unvested stock options awarded to the then current executive officers of Tribune on these grant dates, which aggregated .8 million and .6 million, respectively, were not accelerated at that time. On Dec. 16, 2005, Tribune accelerated the vesting of all stock options granted on Feb. 8, 2005, totaling 3.5 million, and the remaining unvested stock options granted to the then current executive officers of the Company on Feb. 11, 2003 and Feb. 10, 2004, totaling .4 million in both years. No other terms and conditions of the stock option grants were changed. Of these amounts, stock options totaling 1.2 million and .8 million accelerated on June 24, 2005 and Dec. 16, 2005, respectively, were related to Company employees.

In accordance with APB No. 25 and related interpretations, the acceleration of vesting of these stock options did not require accounting recognition in the Company's income statement. The exercise prices of the 2003, 2004 and 2005 grants were $45.90, $52.05 and $40.59, respectively, and Tribune's closing stock prices on the June 24, 2005 and Dec. 16, 2005 dates of acceleration were $35.64 and $30.80, respectively. The impact of the accelerated vesting was to increase the Company's pro forma stock-based compensation expense by $20 million, or $12 million net of tax, in 2005.

On Dec. 20, 2007, Tribune consummated the Merger, as defined and described in the description of the Leveraged ESOP Transactions in Note 3 to Tribune's consolidated financial statements in Item 8. Pursuant to the Merger Agreement, the Company redeemed for cash all outstanding stock awards, each of which vested in full upon completion of the Merger, with positive intrinsic value relative to $34.00 per share. Accordingly, the Company recorded additional stock-based compensation expense of $11.9 million, or $8 million net of taxes, in the fourth quarter of 2007 in connection with the cash settlement of its outstanding stock awards. All remaining outstanding stock awards under the Tribune Company Incentive Compensation Plan (the "Incentive Plan") as of Dec. 20, 2007 that were not cash settled pursuant to the Merger Agreement were cancelled. Following the Merger, Tribune does not intend to grant any new equity awards under the Incentive Plan.

154

Source: TRIBUNE CO, 10-K, March 20, 2008

## TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Income Taxes**—The Company has elected to be taxed as a disregarded entity and does not file a separate tax return. The Company's operations are included in Tribune's consolidated United States federal and state income tax returns. The Company has computed income taxes as if it were filing separate returns. Current income taxes payable is settled with Tribune through the "Due to parent, net" account. Deferred income tax assets and liabilities are recorded on the Company's balance sheet.

Provisions for federal and state income taxes are calculated on reported pretax earnings based on current tax laws and also include, in the current period, the cumulative effect of any changes in tax rates from those used previously in determining deferred tax assets and liabilities. Taxable income reported to the taxing jurisdictions in which the Company operates often differs from pretax earnings because some items of income and expense are recognized in different time periods for income tax purposes. The Company provides deferred taxes on these temporary differences in accordance with FAS No. 109, "Accounting for Income Taxes." Taxable income also may differ from pretax earnings due to statutory provisions under which specific revenues are exempt from taxation and specific expenses are not allowable as deductions. The Company establishes reserves for income taxes when it is probable that one or more of the taxing authorities will challenge and disallow a position taken by the Company in its income tax returns and the resulting liability is estimable. The consolidated tax provision and related accruals include estimates of the potential taxes and related interest as deemed appropriate. These estimates are reevaluated and adjusted, if appropriate, on a quarterly basis. Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

On Jan. 1, 2007 the Company adopted the provisions of FASB Interpretation ("FIN") No. 48, "Accounting for Uncertainty in Income Taxes." FIN 48 addresses the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. Under FIN 48, a Company may recognize the tax benefit of an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. FIN 48 requires the tax benefit recognized in the financial statements to be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods and disclosure. The adoption of FIN 48 had no material effect on the Company's consolidated financial statements.

**New Accounting Standards**—In September 2006, the FASB issued FASB Statement No. 157, "Fair Value Measurements," ("FAS No. 157"), which defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. In February 2008, the FASB issued Staff Position No. 157-2 which defers the effective date of FAS No. 157 for all nonfinancial assets and liabilities, except those items recognized or disclosed at fair value on an annual or more frequently recurring basis, until one year after the adoption of FAS No. 157. The provisions of FAS No. 157, as amended, are effective for financial statements issued for fiscal years beginning after Nov. 15, 2007 and interim periods beginning within these fiscal years. Accordingly, the Company will be required to adopt FAS No. 157 in the first quarter of 2008. The Company is currently evaluating the impact of adopting FAS No. 157 on its consolidated financial statements.

In February 2007, the FASB issued FASB Statement No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities ("FAS No. 159"). FAS No. 159 permits entities to choose to measure many financial instruments and certain other items at fair value. Unrealized gains and losses on items for which the fair value option has been elected will be recognized in earnings at each subsequent reporting date. The provisions of FAS No. 159 are effective for financial statements issued for fiscal years beginning after Nov. 15, 2007 and interim periods beginning within these fiscal years. Accordingly, the Company will become subject to the provisions of FAS No. 159 in the first quarter of 2008. The Company is currently evaluating the impact of adopting FAS No. 159 on its consolidated financial statements.

In December 2007, the FASB issued FASB Statement No. 160, "Noncontrolling Interests in Consolidated Financial Statements, an Amendment of ARB No. 51" ("FAS No. 160"), which provides accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. It clarifies that an ownership interest in a subsidiary should be reported as a separate component of equity in the consolidated financial statements, requires consolidated net income

155

TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

to be reported at amounts that include the amounts attributable to both the parent and the noncontrolling interest and provides for expanded disclosures in the consolidated financial statements. FAS No. 160 is effective for financial statements issued for fiscal years beginning after Dec. 15, 2008 and interim periods beginning within these fiscal years. The Company is currently evaluating the impact of adopting FAS No. 160 on its consolidated financial statements.

## NOTE 3: NON-OPERATING ITEMS

Fiscal years 2007 and 2005 included certain non-operating items.

Non-operating items for 2007 are summarized as follows (in thousands):

|  | Proceeds | Pretax Gain | After-tax Gain |
|---|---|---|---|
| Settlement of Hurricane Katrina insurance claim | $ — | $ 18,103 | $ 11,043 |
| Other, net | — | 3,435 | 2,094 |
| Total non-operating items | $ — | $ 21,538 | $ 13,137 |

The settlement of the Company's Hurricane Katrina insurance claim in 2007 resulted in an after-tax gain of $11 million. Other, net in 2007 primarily included a non-cash gain on the exchange of certain television broadcasting equipment.

Non-operating items for 2005 are summarized as follows (in thousands):

|  | Proceeds | Pretax Gain (Loss) | After-tax Gain (Loss) |
|---|---|---|---|
| Gain on sale of investment | $ 14,000 | $ 5,143 | $ 3,137 |
| Other, net | — | (318) | (194) |
| Total non-operating items | $ 14,000 | $ 4,825 | $ 2,943 |

In 2005, the Company recorded a one-time gain of $3.1 million, net of tax, as a result of transactions related to one of its equity investments.

## NOTE 4:  TRANSACTIONS WITH TRIBUNE AND AFFILIATES

All related party transactions with Tribune are eliminated in the Tribune consolidated financial statements.

**Support Services**—The Company receives allocated charges from Tribune for certain corporate support services, which are principally recorded within selling, general and administrative expenses in the Company's consolidated statements of income.  Management believes that the basis used for the allocation is reasonable and reflects the portion of such costs attributed to the Company's operations; however, these amounts may not be representative of the costs necessary for the Company to operate as a separate stand-alone company.  These costs are summarized in the following table (in thousands):

|  | Fiscal Years | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| Corporate management fee | $ 12,420 | $ 12,488 | $ 11,090 |
| Service center support costs | 3,037 | 3,102 | 3,427 |
| General insurance | 2,387 | 2,792 | 3,528 |
| Occupancy | 2,436 | 2,625 | 2,800 |
| Other support costs | 2,138 | 2,754 | 1,747 |
| Total | $ 22,418 | $ 23,761 | $ 22,592 |

The corporate management fee relates to the support the Company receives from Tribune for certain corporate activities including: (i) strategic management, (ii) corporate development, (iii) investor relations, (iv) legal, (v) human resources, (vi) finance and financial reporting, (vii) treasury, and (viii) other Tribune corporate and infrastructure costs.  For these services, the Company was charged a management fee based upon the Company's net revenue as a percentage of total Tribune revenue in each fiscal year.

156

Source: TRIBUNE CO, 10-K, March 20, 2008

### TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Service center support costs relates to Tribune service centers, which centrally manage and process (for all Tribune business units) certain (i) financial transactions (e.g. payroll, accounts payable, etc.), (ii) human resources activities (e.g. employee relations, recruitment, etc.), and (iii) technology cost activities (e.g. networks, email, etc.). Allocations of these support service costs were determined using a proportional cost allocation method based on either number of payments processed, headcount or other volume measures, such as the number of information technology department users.

General insurance relates to the Company's participation in Tribune-sponsored risk management plans for (i) general liability, (ii) auto liability, and (iii) other insurance such as property and media. Costs are allocated based on either actuarially determined historical loss experience or, depending upon insurance type, revenue, vehicle count, and headcount.

Occupancy costs are charged to the Company based on actual square footage utilized for facility rent, maintenance, security, and other occupancy related costs incurred to manage the properties.

Other support costs relate to charges to the Company from other Tribune business units for website maintenance costs, audit fees and other support services. Such costs are allocated using a proportional cost method based on percentage of revenue and headcount.

**Medical and Worker's Compensation Benefit Plans**—The Company participates in Tribune-sponsored employee benefit plans including medical and worker's compensation. Allocations of benefit plan costs varies by plan type and are based on actuarial valuations of cost and/or liability, premium amounts and payroll. Total benefit plan costs allocated to the Company and recorded within selling, general and administrative expenses in the consolidated statements of income amounted to $12.8 million, $12.2 million and $13.1 million in 2007, 2006 and 2005, respectively. While management believes the cost allocation methods utilized for the benefit plans are reasonable and reflects the portion of such costs attributed to the Company, the amounts may not be representative of the costs necessary for the Company to operate as a stand-alone company.

**Retirement Plans**—Annual contributions to Tribune-sponsored pension plans, which totaled $.6 million, $2.1 million and $.3 million in fiscal years 2007, 2006 and 2005, respectively, is based upon a specific allocation of actuarially determined service costs plus an allocation of the remaining net periodic pension cost components based upon the Company's proportional share of the pension liability. Annual contributions made to union-sponsored plans, which totaled $2.7 million, $2.8 million and $2.6 million, in fiscal years 2007, 2006 and 2005, respectively are based upon collective bargaining agreements. See also Note 3, "Pension Plans and Other Retirement Benefits."

Tribune also provides certain health care and life insurance benefits for retired employees for which the Company's annual contribution, which totaled $.6 million in 2007, and $.5 million in each of 2006 and 2005, is a specific allocation of actuarially determined service cost and a proportional cost allocation of the remaining expense.

While management believes the cost allocation methods utilized for the Tribune-sponsored pension plans, health care and life insurance benefit plans are reasonable and reflects the portion of such costs attributed to the Company, the amounts may not be representative of the costs necessary for the Company to operate as a stand-alone company.

**Defined Contribution Plans**—Company employees have historically participated in various Tribune qualified 401(k) savings plans, which permit eligible employees to make voluntary contributions on a pretax basis. The plans allow participants to invest their savings in various investments. In 2004, Tribune enhanced its primary 401(k) plan to include a larger Tribune contribution. This new plan was designed to replace the Tribune's Employee Stock Ownership Plan that was fully allocated at the end of 2003. In 2006, Tribune amended its primary 401(k) plan to make a portion of Tribune's contributions discretionary. Amounts charged to expense by the Company for contribution to all of Tribune's 401(k) savings plans totaled $7.5 million, $9.0 million and $11.8 million in fiscal years 2007, 2006 and 2005, respectively.

**Tribune Company Management Equity Incentive Plan**—Certain of the Company's key employees are eligible to participate in Tribune's 2007 **Management Equity Incentive Plan (the "Management Equity Incentive Plan"). The Management Equity Incentive Plan provides for phantom units (the "Units") that generally track the value of a share of Tribune's common stock after the effective date of the Merger. Awards were made to eligible members of the Company's management and other key employees at the**

157

Source: TRIBUNE CO, 10-K, March 20, 2008

### TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

discretion of the Board. Under the terms of the Management Equity Incentive Plan, awards are classified as First Tranche Units or Second Tranche Units.

The First Tranche Units represent approximately 5% of Tribune's fully-diluted outstanding common stock, including after giving effect to the stock purchase warrants (see Note 16 to Tribune's consolidated financial statements in Item 8) and the First Tranche Units and Second Tranche Units authorized under the Management Equity Incentive Plan (5,434,652 First Tranche Units authorized, subject to customary anti-dilution adjustments). First Tranche Units vest ratably over a three-year period beginning on the date of grant. Unvested First Tranche Units vest upon a change in control of the Tribune or upon termination of employment due to death or disability. Unvested First Tranche Units will be cancelled upon a termination of a participant's employment for any reason other than death or disability.

The Second Tranche Units represent approximately 3% of Tribune's fully-diluted outstanding common stock, including after giving effect to the stock purchase warrants (see Note 16 to Tribune's consolidated financial statements in Item 8) and the First Tranche Units and Second Tranche Units authorized under the Management Equity Incentive Plan (3,261,000 Second Tranche Units authorized, subject to customary anti-dilution adjustments). Fifty percent of the Second Tranche Units vested upon grant and the remaining fifty percent will vest on the one year anniversary of the grant date. Any unvested Second Tranche Units will become fully vested upon a change in control of Tribune, an involuntary termination of employment or a termination of employment due to a Plan participant's death or disability. Unvested Second Tranche Units will be cancelled upon a termination of a participant's employment for any reason other than an involuntary termination of employment or a termination of employment due to death or disability. Participants receiving Second Tranche Units will be entitled to a gross-up for the payment of excise taxes, if any, in connection with the Merger.

In general, one-third of vested Units subject to an award (whether First Tranche Units or Second Tranche Units) will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date or, if sooner, upon the occurrence of a change in control or a termination of employment based on the fair market value of Tribune's common stock on the December 31 immediately following the settlement event. With respect to Second Tranche Units only, in the event of a termination of a Plan participant's employment prior to Dec. 20, 2008, such participant will receive his or her pro rata share (based upon the amount of his or her vested Second Tranche Units relative to all Second Tranche Units outstanding and reserved for issuance) of $25 million, payable within ten business days following such termination of employment.

The Company accounts for the Units issued under the Management Equity Incentive Plan as liability-classified awards in accordance with FAS No. 123R (see Note 2 for further information regarding the Company's adoption of FAS No. 123R). The Company recorded $3.0 million of compensation expense in 2007 in connection with the Management Equity Incentive Plan, which was based on the estimated fair value of Tribune's common stock as of Dec. 30, 2007 as determined by the trustee of Tribune's ESOP (see Note 17 to Tribune's consolidated financial statements in Item 8) and is included in other non-current liabilities on the Company's consolidated balance sheet at Dec. 30, 2007.

**Advertising**—From time to time, the Company's stations have exchanged unsold advertising air time for print advertising with Tribune's wholly-owned publishing affiliates in non-cash barter transactions. The related party advertising revenue and related advertising expense is not recorded in the Company's consolidated statements of income as (i) the exchanged services were not negotiated at arms length, and (ii) Tribune did not historically determine the fair value of the exchange contemporaneous with the occurrence of the transactions. The Company has estimated the approximate value of the advertising provided to Tribune publishing affiliates at $2.5 million, $3.5 million, and $4.3 million in 2007, 2006 and 2005, respectively, which management believes is comparable to the value of the print advertising received.

**Sports Programming**—The Company contracts with the Chicago Cubs baseball team, a wholly-owned subsidiary of Tribune, for certain television and radio broadcast rights for WGN-TV and WGN-AM. The agreement between the Company and the Chicago Cubs is subject to review and approval by Major League Baseball. The amounts paid for the broadcast rights are an immaterial component of the broadcast rights amortization expense in the Company's consolidated statements of income.

158

TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 5: DEBT DUE TO AFFILIATES

Tribune and its various affiliates and subsidiaries have provided loans in the form of promissory notes to the Company. On June 4, 2007, simultaneous with the reorganization of TBC as a subsidiary of Holdco, Tribune contributed $739 million of additional capital for the purpose of paying accrued interest of $22.0 million and the principal balance of $716.9 million of outstanding short-term and long-term debt with Tribune and its affiliates. The remaining intercompany note balance of $15.3 million will be settled in 2008 and is classified as a current liability on the Company's consolidated balance sheet at Dec. 30, 2007. Interest on this note was accrued through June 2007 at an average annual rate of 5.35%.

## NOTE 6: INVESTMENTS

Investments consisted of the following (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Television Food Network, G.P. | $ 148,167 | $ 128,928 |
| Comcast SportsNet Chicago | 17,648 | 17,470 |
| Total equity method investments | 165,815 | 146,398 |
| Cost method investments | — | 408 |
| Total investments | $ 165,815 | $ 146,806 |

The Company's equity method investments at Dec. 30, 2007 included ownership of 31% of Television Food Network, G.P. ("TV Food Network") and 25% of Comcast SportsNet Chicago. Both companies are privately owned. The Company does not guarantee any indebtedness for any of its investees. In 2005, the Company sold, for $14.0 million, an equity method investment. The sale resulted in a $5.1 million gain (after-tax gain of $3.1 million).

The Company's investment in TV Food Network totaled $148 million, $129 million, and $95 million at Dec. 30, 2007, Dec. 31, 2006 and Dec. 25, 2005, respectively. The Company recognized equity income from its investment in TV Food Network of $82 million in 2007, $72 million in 2006 and $55 million in 2005. TV Food Network owns and operates a 24-hour television network focusing on food and entertaining. Its programming is distributed by cable and satellite television systems.

Summarized financial information for selected equity investments is as follows (in thousands):

|  | Fiscal Years | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| Revenues, net | $ 668,382 | $ 604,233 | $ 504,804 |
| Operating income | $ 320,737 | $ 282,650 | $ 219,212 |
| Net income | $ 327,804 | $ 288,159 | $ 221,179 |

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Current assets | $ 424,988 | $ 379,095 |
| Non-current assets | $ 134,586 | $ 141,775 |
| Current liabilities | $ 36,063 | $ 26,832 |
| Non-current liabilities | $ 6,751 | $ 11,659 |

## NOTE 7: DISCONTINUED OPERATIONS AND ASSETS HELD FOR SALE

**Sales of WATL-TV, Atlanta, WCWN-TV, Albany and WLVI-TV, Boston**—On June 5, 2006, Tribune announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. for $180 million plus working capital. The sale closed on Aug. 7, 2006. On June 19, 2006, Tribune announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on Dec. 6, 2006. On Sept. 14, 2006, Tribune announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million plus working capital. The sale closed on Dec. 19, 2006.

159

TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

These businesses were considered components of the Company's business as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations of each of these businesses have been reported as discontinued operations in the Company's consolidated statements of income.

In conjunction with the sales of WATL-TV, Atlanta and WCWN-TV, Albany, the Company recorded in 2006 a pretax loss totaling $89 million to write down the net assets of the stations to estimated fair value, less costs to sell. In addition, the Company recorded in 2006 a pretax gain of $41 million for the sale of WLVI-TV, Boston. The net pretax loss on sales of the three stations sold during 2006 was $48 million.

**Summarized Financial Information**—Selected operating results related to discontinued operations for fiscal years 2007, 2006 and 2005 is summarized as follows (in thousands):

| | Fiscal Years | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| Operating revenues | $ 148 | $ 64,870 | $ 84,334 |
| | | | |
| Operating profit (loss)(1) | $ (340) | $ 2,300 | $ 19,632 |
| Loss on sales of discontinued operations | (67) | (48,238) | — |
| Income (loss) from discontinued operations before interest and income taxes | (407) | (45,938) | 19,632 |
| Interest (2) | (24) | (2,558) | (3,301) |
| Income taxes(3) | 173 | (19,925) | (6,598) |
| Income (loss) from discontinued operations, net of tax | $ (258) | $ (68,421) | $ 9,733 |

(1) Operating profit for 2006 included $6 million of severance and related charges incurred as a result of the sales of the three television stations.

(2) Interest was allocated to the discontinued operations in a manner consistent with the allocation of interest expense from Tribune to the Company as described in Note 5.

(3) Income taxes for 2006 included a tax benefit of $12 million related to the $90 million pretax loss on sales of the Atlanta and Albany stations. The pretax loss included $80 million of allocated television group goodwill, most of which is not deductible for income tax purposes. Income taxes for 2006 also included a tax expense of $32 million related to the $41 million pretax gain on sale of the Boston station. The pretax gain included $45 million of allocated television group goodwill, most of which is not deductible for income tax purposes.

**Assets Held for Sale**—During the third quarter of 2007, the Company commenced a process to sell its studio located in Hollywood, California. Accordingly, the $2.5 million carrying value of the building and equipment of the studio is included in assets held for sale at Dec. 30, 2007. The sale of the studio closed on Jan. 30, 2008 and the Company received net proceeds of approximately $4.4 million and will record a pretax gain on sale of approximately $1.9 million in the first quarter of 2008.

## NOTE 8: CAPITAL LEASE OBLIGATIONS

The Company had capital lease obligations totaling $10.7 million at Dec. 30, 2007 and $11.7 million at Dec. 30, 2006. The carrying value of the Company's capital lease obligations at Dec. 30, 2007 and Dec. 31, 2006 approximates fair value. The capital lease obligations relate primarily to the lease expiring in 2015 of a transponder used to transmit certain of the Company's television signals. The equipment associated with the capital leases is recorded within property, plant, and equipment and had a net book value of $9.3 million and $10.7 million (net of accumulated depreciation of $3.9 million and $2.6 million) at Dec. 30, 2007 and Dec. 31, 2006, respectively.

160

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The following are the minimum lease payments to be made in each of the years indicated for the Company's capital lease obligations at Dec. 30, 2007 (in thousands):

| | |
|---|---:|
| 2008 | $ 2,200 |
| 2009 | 2,202 |
| 2010 | 2,202 |
| 2011 | 2,175 |
| 2012 | 2,160 |
| Thereafter | 4,380 |
| Less: interest | (4,653) |
| Total | $ 10,666 |

### NOTE 9:  CONTRACTS PAYABLE FOR BROADCAST RIGHTS

Contracts payable for broadcast rights are classified as current or long-term liabilities in accordance with the payment terms of the contracts. Required payments under contractual agreements for broadcast rights recorded at Dec. 30, 2007 are shown in the table below (in thousands):

| | |
|---|---:|
| 2008 | $ 339,909 |
| 2009 | 188,748 |
| 2010 | 139,270 |
| 2011 | 66,724 |
| 2012 | 20,113 |
| Thereafter | 17,538 |
| Total | $ 772,302 |

The fair value of the contracts payable for broadcast rights, as shown in the table below, was estimated using the discounted cash flow method (in thousands):

| | Dec. 30, 2007 | | Dec. 31, 2006 | |
|---|---:|---:|---:|---:|
| | Fair Value | Carrying Amount | Fair Value | Carrying Amount |
| Contracts payable for broadcast rights | $ 724,945 | $ 772,302 | $ 696,363 | $ 743,872 |

### NOTE 10:  COMMITMENTS AND CONTINGENCIES

The Company has entered into commitments for broadcast rights that are not currently available for broadcast and are therefore not included in the Company's consolidated financial statements. These commitments totaled $473 million at Dec. 30, 2007. Payments for broadcast rights generally commence when the programs become available for broadcast.

161