The Company had commitments totaling $159 million at Dec. 30, 2007 related primarily to talent and other news contracts. The Company leases certain equipment and office and production space, under a number of operating leases, expiring at various dates through 2024. Lease expense from continuing operations, excluding related party lease expense, was $15.5 million, $15.9 million and $16.3 million in fiscal years 2007, 2006 and 2005, respectively. The table below presents the future minimum lease payments to be made under non-cancelable operating leases at Dec. 30, 2007, excluding related party leases (in thousands):

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

| | |
|---|---:|
| 2008 | $ 13,523 |
| 2009 | 13,210 |
| 2010 | 9,212 |
| 2011 | 7,118 |
| 2012 | 6,892 |
| Thereafter | 25,117 |
| Total | $ 75,072 |

The Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations. In addition, the Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies. See Note 14 for a discussion related to FCC rulemaking and cross-ownership matters. The Company does not believe that any other matters or proceedings presently pending will have a material adverse effect on its consolidated financial position or results of operations.

## NOTE 11:  GOODWILL AND OTHER INTANGIBLE ASSETS

Goodwill and other intangible assets at Dec. 30, 2007 and Dec. 30, 2006, all related to television operations and consisted of the following (in thousands):

| | Dec. 30, 2007 | | | Dec. 31, 2006 | | |
|---|---:|---:|---:|---:|---:|---:|
| | Gross Amount | Accumulated Amortization | Net Amount | Gross Amount | Accumulated Amortization | Net Amount |
| **Intangible assets subject to amortization** | | | | | | |
| Network affiliation agreements (useful life of 40 years)(1) | $ 278,034 | $ (29,552) | $ 248,482 | $ 278,034 | $ (22,614) | $ 255,420 |
| Subscribers (useful life of 20 years) | 66,080 | (22,163) | 43,917 | 66,080 | (18,860) | 47,220 |
| Other (useful life of 10 to 40 years) | 13,550 | (6,519) | 7,031 | 13,550 | (5,242) | 8,308 |
| Total | $ 357,664 | $ (58,234) | $ 299,430 | $ 357,664 | $ (46,716) | $ 310,948 |
| **Goodwill and other intangible assets not subject to amortization** | | | | | | |
| Goodwill | 1,440,627 | | | 1,440,627 | | |
| FCC licenses | 871,946 | | | 871,946 | | |
| Total | 2,312,573 | | | 2,312,573 | | |
| Total goodwill and other intangible assets | | | $ 2,612,003 | | | $ 2,623,521 |

---

(1)   Network affiliation agreements, net of accumulated amortization, included $174 million related to FOX affiliations, $72 million related to CW affiliations and $3 million related to MyNetworkTV affiliations as of Dec. 30, 2007.

Source: TRIBUNE CO, 10-K, March 20, 2008

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The changes in the carrying amounts of intangible assets during the years ended Dec. 30, 2007 and Dec. 31, 2006 were as follows (in thousands):

| | |
|---|---:|
| **Intangible assets subject to amortization** | |
| Balance as of Dec. 25, 2005 | $ 334,098 |
| Amortization expense | (11,555) |
| Sales of discontinued operations (see Note 7) | (11,595) |
| Balance as of Dec. 31, 2006 | $ 310,948 |
| Amortization expense | (11,518) |
| Balance as of Dec. 30, 2007 | $ 299,430 |
| | |
| **Goodwill** | |
| Balance as of Dec. 25, 2005 | $ 1,566,045 |
| Sales of discontinued operations (see Note 7) | (125,418) |
| Balance as of Dec. 31, 2006 and Dec. 30, 2007 | $ 1,440,627 |
| | |
| **Other intangible assets not subject to amortization** | |
| Balance as of Dec. 25, 2005 | $ 1,084,654 |
| Sales of discontinued operations (see Note 7) | (212,708) |
| Balance as of Dec. 31, 2006 and Dec. 30, 2007 | $ 871,946 |
| | |
| Total goodwill and other intangibles as of Dec. 30, 2007 | $ 2,612,003 |

Estimated annual amortization expense will be approximately $11.5 million for each of the next five years, excluding the effects of any acquisitions or dispositions subsequent to Dec. 30, 2007.

## NOTE 12:  INCOME TAXES

The following table reconciles the Company's income taxes computed at the U.S. federal statutory rate to income taxes reported for continuing operations in the Company's consolidated statements of income (in thousands):

| | Fiscal Years | | |
|---|---:|---:|---:|
| | **2007** | **2006** | **2005** |
| Income from continuing operations before income taxes | $ 420,408 | $ 360,697 | $ 354,485 |
| Federal income taxes at 35% | $ 147,143 | $ 126,244 | $ 124,070 |
| State and local income taxes, net of federal tax benefit | 14,527 | 12,017 | 13,067 |
| Other, net | 887 | 895 | 1,048 |
| Income taxes reported | $ 162,557 | $ 139,156 | $ 138,185 |
| Effective tax rate | 38.7% | 38.6% | 39.0% |

163

Source: TRIBUNE CO, 10-K, March 20, 2008

### TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Components of income tax expense charged to income from continuing operations were as follows (in thousands):

| | Fiscal Years | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| Currently payable: | | | |
| U.S. federal | $ 136,050 | $ 108,620 | $ 106,313 |
| State and local | 17,809 | 16,410 | 18,143 |
| Subtotal | 153,859 | 125,030 | 124,456 |
| Deferred: | | | |
| U.S. federal | 6,990 | 12,049 | 11,769 |
| State and local | 1,708 | 2,077 | 1,960 |
| Subtotal | 8,698 | 14,126 | 13,729 |
| Total | $ 162,557 | $ 139,156 | $ 138,185 |

The Company has elected to be taxed as a disregarded entity and does not file a separate tax return. The Company's operations are included in Tribune's consolidated United States federal and state income tax returns. The Company has computed income taxes as if it were filing separate returns. Current income taxes payable is settled with Tribune through the "due to Parent, net" account. On March 13, 2008, Tribune filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code, which election is effective as of the beginning of Tribune's 2008 fiscal year. As a result, essentially all of the Company's net deferred tax liabilities will be eliminated and such adjustment will be recorded as a reduction in the Company's provision for income taxes in the first quarter of 2008.

Significant components of the Company's net deferred tax liabilities were as follows (in thousands):

| | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Net properties | $ 9,506 | $ 11,130 |
| Net intangible assets | 525,648 | 511,373 |
| Other future taxable items | 4,620 | 6,317 |
| Total deferred tax liabilities | 539,774 | 528,820 |
| Broadcast rights | (12,691) | (16,635) |
| Other future deductible items | (3,945) | (6,042) |
| State operating loss carryforwards | (14,454) | (14,454) |
| Valuation allowances on state operating loss carryforwards | 14,454 | 14,454 |
| Total deferred tax assets | (16,636) | (22,677) |
| Net deferred tax liability | $ 523,138 | $ 506,143 |

**Operating Loss Carryforwards**—At Dec. 30, 2007, the Company had operating loss carryforwards for state income tax purposes. These carryforwards arose in certain states primarily as a result of intercompany interest expense and management fees allocated to the Company's various subsidiaries, and expire between 2008 and 2027. The Company believes it is more likely than not that the deferred tax assets will not be realized because the related carryforwards will expire before being utilized. Therefore, in accordance with FAS No. 109, "Accounting for Income Taxes," the Company has established valuation allowances of $14 million on the deferred tax assets related to the state carryforwards. The state operating loss carryforwards increased in 2007 because the Company generated additional tax losses in certain states.

164

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 13:  PLEDGE OF MEMBERSHIP INTEREST**

On June 4, 2007, Tribune pledged 100% of its membership interest in the Company on an equal and ratable basis as security for the payment and performance of Tribune's obligations under the Credit Agreement and its outstanding public notes and debentures (other than the PHONES), including all future advances and re-advances under those borrowings.

165

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE BROADCASTING HOLDCO, LLC AND SUBSIDIARIES**
**SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS AND RESERVES**
**(In thousands of dollars)**

| Description | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Deductions(1) | Balance at End of Period |
|---|---|---|---|---|
| Accounts receivable allowances: | | | | |
| Year ended Dec. 30, 2007 | $    4,372 | $    5,599 | $    5,274 | $    4,697 |
| Year ended Dec. 31, 2006 | $    7,785 | $    6,717 | $    10,130 | $    4,372 |
| Year ended Dec. 25, 2005 | $    7,663 | $    8,819 | $    8,697 | $    7,785 |

(1)   Deductions for the year ended Dec. 31, 2006 included approximately $.5 million due to the sales of discontinued operations. See Note 7 to the Company's consolidated financial statements for additional information on the sales of discontinued operations.

166

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE FINANCE, LLC**
**INDEX TO FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 168 |
| Statement of Income for the period June 4, 2007 to Dec. 30, 2007 | 169 |
| Balance Sheet at Dec. 30, 2007 | 170 |
| Statement of Membership Equity for the period June 4, 2007 to Dec. 30, 2007 | 171 |
| Statement of Cash Flows for the period June 4, 2007 to Dec. 30, 2007 | 172 |
| Notes to Financial Statements | |
|     Note 1: Description of Business and Basis of Presentation | 173 |
|     Note 2: Summary of Significant Accounting Policies | 173 |
|     Note 3: Transactions with Tribune and Affiliates | 173 |
|     Note 4: Debt Due from Affiliates | 173 |
|     Note 5: Income Taxes | 173 |
|     Note 6: Pledge of Membership Interest | 174 |

167

Source: TRIBUNE CO, 10-K, March 20, 2008

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Member of Tribune Finance, LLC:

In our opinion, the accompanying balance sheet and the related statements of income, membership equity and cash flows present fairly, in all material respects, the financial position of Tribune Finance, LLC at December 30, 2007, and the results of its operations and its cash flows for the period from June 4, 2007 (formation) to December 30, 2007 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

As discussed in Note 3 and 4 to the financial statements, the Company has entered into significant transactions with Tribune Company and its subsidiaries.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Chicago, Illinois
March 14, 2008

168

**TRIBUNE FINANCE, LLC**
**STATEMENT OF INCOME**
**For the period June 4, 2007 to Dec. 30, 2007**
**(In thousands of dollars)**

| | | |
|---|---|---:|
| Interest income from related parties | $ | 145,049 |
| **Income Before Income Taxes** | | 145,049 |
| Income taxes | | (57,744) |
| **Net Income** | $ | 87,305 |

See Notes to Financial Statements.

169

**TRIBUNE FINANCE, LLC**
**BALANCE SHEET**
Dec. 30, 2007
(In thousands of dollars)

| Assets | | |
|---|---|---|
| Cash | $ | — |
| Interest receivable from affiliates | | 7,251 |
| Total assets | $ | 7,251 |
| | | |
| **Liabilities and Membership Equity** | | |
| | | |
| **Liabilities** | | |
| Due to Parent | $ | 2,887 |
| Total liabilities | | 2,887 |
| **Membership Equity** | | |
| Membership paid-in capital | | 3,000,000 |
| Promissory demand notes due from affiliates | | (3,000,000) |
| Retained earnings | | 4,364 |
| Total membership equity | | 4,364 |
| Total liabilities and membership equity | $ | 7,251 |

See Notes to Financial Statements.

170

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE FINANCE, LLC**
**STATEMENT OF MEMBERSHIP EQUITY**
**For the period June 4, 2007 to Dec. 30, 2007**
**(In thousands of dollars)**

| | Total | Retained Earnings | Promissory Demand Notes Due From Affiliates | Membership Paid-in Capital |
|---|---|---|---|---|
| Capital contribution from Parent | $ 3,000,000 | $ — | $ — | $ 3,000,000 |
| Loans to affiliates in exchange for promissory demand notes | (3,000,000) | — | (3,000,000) | — |
| Net income | 87,305 | 87,305 | — | — |
| Dividends declared | (82,941) | (82,941) | — | — |
| Balance at Dec. 30, 2007 | $ 4,364 | $ 4,364 | $ (3,000,000) | $ 3,000,000 |

See Notes to Financial Statements.

171

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE FINANCE, LLC**
**STATEMENT OF CASH FLOWS**
**For the period June 4, 2007 to Dec. 30, 2007**
**(In thousands of dollars)**

| | | |
|---|---|---:|
| **Operations** | | |
| Net income | $ | 87,305 |
| Adjustments to reconcile net income to net cash provided by operations: | | |
| Interest receivable from affiliates | | (7,251) |
| Net cash provided by operations | | 80,054 |
| | | |
| **Investments** | | |
| Loans to affiliates in exchange for promissory demand notes | | (3,000,000) |
| Net cash used for investments | | (3,000,000) |
| | | |
| **Financing** | | |
| Capital contribution from Parent | | 3,000,000 |
| Dividends paid to Parent | | (82,941) |
| Net change in due to/from Parent | | 2,887 |
| Net cash provided by financing | | 2,919,946 |
| | | |
| **Net Increase (Decrease) in Cash** | | — |
| Cash, beginning of period | | — |
| Cash, end of year | $ | — |

See Notes to Financial Statements.

172

Source: TRIBUNE CO, 10-K, March 20, 2008

## TRIBUNE FINANCE, LLC
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 1: DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION

**Business Operations**—Tribune Finance, LLC ("Tribune Finance") is a single-member limited liability company wholly owned by Tribune Company ("Tribune" or "Parent"). Tribune Finance was established in 2007 pursuant to a credit agreement for senior secured credit facilities entered into by Tribune on May 17, 2007 and subsequently amended on June 4, 2007 (collectively, the "Credit Agreement"). For further information regarding the terms and conditions of the Credit Agreement, see Note 10 to Tribune's consolidated financial statements in Item 8. Pursuant to the terms of the Credit Agreement, Tribune contributed $3 billion to Tribune Finance for the purpose of providing $3 billion of loans to certain of Tribune's subsidiaries.

Tribune Finance has no employees. Tribune provides administrative services to Tribune Finance at no charge. The value of such services is not material.

**Fiscal Year**—Tribune Finance's fiscal year ends on the last Sunday in December. Tribune Finance's 2007 fiscal year encompassed the period June 4, 2007 to Dec. 30, 2007.

### NOTE 2: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The significant accounting policies of Tribune Finance, as summarized below, conform with accounting principles generally accepted in the United States of America and reflect practices appropriate to Tribune Finance.

**Use of Estimates**—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates.

**Interest Income**—Tribune Finance's primary source of income is interest on promissory notes from affiliated companies, which is computed on a monthly basis.

**Income Taxes**—Tribune Finance has elected to be taxed as a disregarded entity and does not file a separate tax return. Tribune Finance's operations are included in Tribune's consolidated United States federal and state income tax returns. Tribune Finance has computed income taxes as if it were filing separate returns. Current income taxes payable are settled with Tribune through the "due to Parent" account. Tribune Finance's operations generate only current taxable income, therefore no deferred tax assets or liabilities are required.

### NOTE 3: TRANSACTIONS WITH TRIBUNE AND AFFILIATES

All related party transactions with Tribune are eliminated in the Tribune consolidated financial statements.

**Dividends**—Tribune Finance pays dividends to Tribune in an amount equal to the interest income received by Tribune Finance from the affiliated companies under the terms of the promissory notes net of income taxes.

### NOTE 4: DEBT DUE FROM AFFILIATES

On June 4, 2007, pursuant to the terms of the Credit Agreement, Tribune Finance provided loans in the form of promissory demand notes totaling $3 billion to various subsidiaries of Tribune. Tribune Finance presents the promissory demand notes as a separate component of membership equity.

Tribune Finance earns interest income on these promissory notes at a rate equal to the rate on certain of Tribune's borrowings under its senior secured credit facilities. The average interest rate on the promissory notes was 8.29% during the period June 4, 2007 to Dec. 30, 2007 and was 7.91% at Dec 30, 2007.

### NOTE 5: INCOME TAXES

In 2007, the statutory federal income tax rate was 35 percent. For 2007, the effective tax rate differed from the statutory rate due to state income taxes (net of federal benefit).

173

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE FINANCE, LLC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Tribune Finance has elected to be taxed as a disregarded entity and does not file a separate tax return. Tribune Finance's operations are included in Tribune's consolidated United States federal and state income tax returns. Tribune Finance has computed income taxes as if it were filing separate returns. Current income taxes payable are settled with Tribune through the "due to Parent" account. Tribune Finance's operations generate only current taxable income, therefore no deferred tax assets or liabilities are required.

## NOTE 6: PLEDGE OF MEMBERSHIP INTEREST

On June 4, 2007, Tribune pledged 100% of its membership interest in the Company on an equal and ratable basis as security for the payment and performance of Tribune's obligations under the Credit Agreement and its outstanding public notes and debentures (other than the PHONES), including all future advances and re-advances under those borrowings.

174

Source: TRIBUNE CO, 10-K, March 20, 2008

ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.

None.

### ITEM 9A.    CONTROLS AND PROCEDURES

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of its disclosure controls and procedures, as such term is defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as of Dec. 30, 2007. Based upon that evaluation, the principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective.

**Management's Report on Internal Control Over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of the effectiveness of the design and operation of internal control over financial reporting based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on that evaluation, the Company's management concluded that internal control over financial reporting was effective as of Dec. 30, 2007.

The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may deteriorate.

PricewaterhouseCoopers, LLP, the Company's independent registered public accounting firm, has issued an attestation report on the Company's internal control over financial reporting. This report appears on pages 79 and 80.

**Changes in Internal Control Over Financial Reporting**

There has been no change in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended Dec. 30, 2007 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

### ITEM 9B.    OTHER INFORMATION

None.

## PART III

### ITEM 10.    DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.

**Board of Directors of the Company**

Information with respect to the directors of the Company as of March 20, 2008, is set forth below.

**Jeffrey S. Berg**

Mr. Berg is Chairman and Chief Executive Officer of International Creative Management, Inc., a talent and literary agency representing clients in the fields of publishing, motion pictures, television, music and theater. Mr.Berg was named President of ICM in 1980 and became Chairman in 1985. Mr. Berg is also a director of Oracle Corporation (NASDAQ: ORCL). Mr. Berg, 60, has been a director of the Company since December 2007.

175

Source: TRIBUNE CO, 10-K, March 20, 2008

**Brian L. Greenspun**

Mr. Greenspun is Chairman and Chief Executive Officer of The Greenspun Corporation, a privately owned firm based in Henderson, Nevada, with interests in media and commercial real estate development. He also is President and Editor of the Las Vegas Sun, the oldest family-owned newspaper in Nevada. Mr. Greenspun, 61, has been a director of the Company since December 2007.

**Betsy D. Holden**

Ms. Holden has been a senior advisor to McKinsey & Company since April 2007. Ms. Holden served as President-Global Marketing and Category Development of Kraft Foods Inc. (NYSE: KFT), a food business unit of Altria Group Inc., from January 2004 through June 2005. Further, Ms. Holden was the Co-Chief Executive Officer of Kraft Foods Inc. from March 2001 until December 2003 and President and Chief Executive Officer of Kraft Foods North America from May 2000 until December 2003. Ms. Holden is also a director of Western Union Company (NYSE: WU). Ms. Holden, 52, has been a director of the Company since 2002.

**William A. Osborn**

Mr. Osborn is Chairman of Northern Trust Corporation (NASDAQ: NTRS), a multibank holding company, and its principal subsidiary, The Northern Trust Company, since October 1995. From October 1995 through Dec. 31, 2007, Mr. Osborn also held the position of Chief Executive Officer of Northern Trust Corporation. Mr. Osborn is also a director of Caterpillar Inc. (NYSE: CAT) and Northern Trust Corporation. Mr. Osborn, 60, has been a director of the Company since 2001.

**William C. Pate**

Mr. Pate is a Managing Director and the Chief Investment Officer for Equity Group Investments, L.L.C. ("EGI"), a privately held investment company controlled by Sam Zell. He has served in various capacities for EGI since 1994, and in his present position since 2000. Mr. Pate is also a director of Covanta Holding Corporation (NYSE: CVA) and Exterran Holdings, Inc. (NYSE: EXH). Mr. Pate, 44, has been a director of the Company since December 2007.

**Mary Agnes Wilderotter**

Ms. Wilderotter is Chairman and Chief Executive Officer of Citizens Communications Company (NYSE: CZN), a full-service communications provider and the second-largest rural local exchange telephone company in the country. Ms. Wilderotter joined Citizens Communications in 2004 as President and Chief Executive Officer and was named Chairman in 2006. Further, Ms. Wilderotter was the Senior Vice President of Worldwide Public Sector, Microsoft Corporation (NASDAQ: MSFT) from 2002-2004 and the President and Chief Executive Officer of Wink Communications Inc. from 1996-2002. Ms. Wilderotter is also a director of Yahoo! Inc. (NASDAQ: YHOO) and Xerox Corporation (NYSE: XRX). Ms. Wilderotter, 53, has been a director of the Company since December 2007.

**Frank E. Wood**

Mr. Wood is Chief Executive Officer of Secret Communications, LLC, a Cincinnati-based venture capital firm. He is a 33-year veteran of the radio broadcast industry. He is Chairman of 8e6 Technologies, an Internet filtering company headquartered in Orange, California. Mr. Wood is also a director of Chemed Corporation (NYSE:CHE). Mr. Wood, 65, has been a director of the Company since December 2007.

**Samuel Zell**

Mr. Zell has served as a director of Tribune Company since May 2007 and as Chairman and Chief Executive Officer since December 2007. Mr. Zell has served as Chairman of EGI since 1999 and its President since 2006. Mr. Zell was a Trustee and Chairman of the Board of Trustees of Equity Office Properties Trust, an equity real estate investment trust primarily focused on office buildings, from October 1996 until its acquisition in February 2007, its Chief Executive Officer from April 2002 to April 2003, and its President from April 2002 until November 2002. Mr. Zell has been Chairman of the Board of Covanta Holding Corporation (NYSE: CVA), a waste-to-energy and specialty insurance services company, since

176

---

September 2005, served as its President, Chairman and Chief Executive Officer from July 2002 until December 2004, and was a director from 1999 until 2004. For more than the past five years, Mr. Zell has been Chairman of Equity Lifestyle Properties, Inc. (NYSE: ELS), an equity real estate investment trust primarily engaged in the ownership and operation of manufactured home resort communities; Chairman of the Board of Trustees of Equity Residential (NYSE: EQR), an equity real estate investment trust that owns and operates multi-family residential properties; and Chairman of Capital Trust, Inc. (NYSE: CT), a specialized finance company. Mr. Zell has been a director of Anixter International Inc. (NYSE: AXE) since 1984 and its Chairman since 1985. Mr. Zell is 66.

### Executive Officers of the Company

The information contained under the heading "Executive Officers of the Company" in Item 1 hereof is incorporated herein by reference.

### Code of Ethics

Tribune has in place a Code of Ethics for its chief executive officer, chief financial officer and controller and persons performing similar functions that is designed to promote honest and ethical conduct and full, fair, accurate, timely and understandable disclosure in public filings and other communications. The Code of Ethics is available on Tribune's website at www.tribune.com and in print to any person who requests a copy. Requests for printed copies of the Code of Ethics should be directed to Corporate Relations Department, Tribune Company, 435 Michigan Avenue, Chicago, Illinois 60611, telephone (800) 757-1694.

### Procedures for Security Holders to Recommend Nominees to the Board of Directors

Our governing documents do not set forth procedures pursuant to which security holders may recommend nominees to the Company's Board of Directors. However, the Investor Rights Agreement dated April 1, 2007 among Tribune, EGI-TRB, L.L.C. (the "Zell Entity") and GreatBanc Trust Company (on behalf of the ESOP) provides, among other things, that (1) the Board of Directors will consist of nine members, (2) the initial directors on the Board of Directors following the Merger will serve until the third annual election following the consummation of the Merger, (3) there will be two directors designated by the Zell Entity and (4) there will be one director who shall be the chief executive officer of the Company. Further, our Bylaws provide that five directors shall be independent and one director shall be without qualification. Director independence is discussed in Item 13 of this Annual Report on Form 10-K.

### Audit Committee of the Board of Directors

The Board of Directors has a standing Audit Committee whose function includes reviewing and monitoring Tribune's financial reporting and accounting practices and internal controls. Betsy D. Holden, William A. Osborn (chairman) and Frank E. Wood currently serve on the Audit Committee. The Board has determined each member of the Audit Committee is an "audit committee financial expert" and "independent" as defined in applicable securities laws, rules and regulations.

177

Source: TRIBUNE CO, 10-K, March 20, 2008

## ITEM 11.   EXECUTIVE COMPENSATION.

### Compensation Discussion and Analysis

This section provides information regarding the 2007 compensation program for our principal executive officer, our former principal executive officer, our principal financial officer and the three most highly-compensated executive officers other than the principal executive officer and principal financial officer (collectively, the "NEOs"). It includes information regarding, among other things, the overall objectives of our 2007 compensation program and each element of compensation that was provided in 2007.

As required by the rules of the Securities and Exchange Commission ("SEC"), this discussion focuses on our 2007 compensation program. On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions (as further defined and described in Note 3 to the Company's consolidated financial statements included in Part II, Item 8, hereof), pursuant to which the Company became wholly owned by the ESOP. At that time, the structure and composition of our Board of Directors changed, and Mr. Zell was appointed as Chairman of our Board of Directors and Chief Executive Officer. As a part of such restructuring, Ms. Wilderotter and Messrs. Greenspun and Pate joined our Board of Directors and were appointed to the Compensation Committee (the "Committee"). As such, the current members of the Committee did not participate in or approve the elements or structure of the 2007 compensation program. The current members of the Committee, along with the other members of our current Board of Directors and our executive officers, are currently evaluating our compensation program for 2008 and beyond.

Mr. Zell was appointed Chief Executive Officer on Dec. 20, 2007, has agreed to be paid a salary and bonus of $0.50 per year and does not participate in any of the Company's benefit plans. Accordingly, the discussion below regarding our compensation objectives and the elements of our compensation program do not apply to Mr. Zell.

**Objectives of Our Compensation Program**—The Committee has the responsibility to review annually and approve corporate goals and objectives relevant to the compensation of our principal executive officer, to evaluate our principal executive officer's performance in light of those goals and objectives and, based on that evaluation, to determine and approve the principal executive officer's compensation level. The Committee also has the responsibility to review annually with the principal executive officer and approve the compensation for the other senior executive officers, including the NEOs. The Committee acts pursuant to a charter that has been approved by the Board. As discussed above, the current members of the Committee joined our Board and the Committee on Dec. 20, 2007.

The 2007 compensation program for our NEOs and other senior executive officers was designed to attract and retain top-quality management employees who can contribute to our long-term success and thereby increase the value of our company. Elements of the 2007 compensation program were designed to reflect the performance of Tribune as a whole, the individual performance of the employee and the competitive conditions in the lines of business and geographic areas in which Tribune operates. As stated above, the Committee is evaluating which, if any, of the elements of the 2007 compensation program will be retained.

The 2007 program was organized by the former Committee members around four fundamental principles:

*A Substantial Portion of NEO Compensation Should Be Performance-Based.* The 2007 compensation program was designed to reward targeted performance and to accomplish that goal in a number of ways. In terms of cash compensation, annual cash bonus targets for each NEO under the management incentive plan ("MIP") provisions of the Tribune Company Incentive Compensation Plan (the "Incentive Plan") were established by the former Committee members based on a percentage of an NEO's base compensation. Whether and to what extent MIP bonuses were paid with respect to fiscal 2007 depended on the extent to which the company-wide, group and/or individual goals set by the former Committee members were achieved during the year. Annual salary increases or decreases and the size and type of equity awards for NEOs have typically been determined by the Committee in February based on company-wide, group and/or individual performance during the prior year. In addition, in 2007, as discussed in more detail below, initial awards under the new Management Equity Incentive Plan ("MEIP") were made on Dec. 20, 2007 immediately following the completion of the Leveraged ESOP Transactions.

178

Source: TRIBUNE CO, 10-K, March 20, 2008

*NEO Compensation Should Motivate Long-Term Value Creation.* With respect to 2007, the former Committee members sought to establish a compensation program for our NEOs that would provide incentives to increase the value of the Company. Prior to the completion of the Leveraged ESOP Transactions, the equity compensation provided to each NEO consisted of restricted stock units and stock options that, in each case, were scheduled to vest based on the passage of time and continued employment. Under our new MEIP, NEOs will be eligible to receive awards of share equivalents pursuant to which they will receive the equivalent value of our common stock (as determined annually by GreatBanc Trust Company, the ESOP trustee) in cash subject to vesting requirements based on the passage of time and continued employment.

*Our Compensation Program for NEOs Should Enable Us to Compete for and Retain First-Rate Executive Talent.* We believe that our Company is most successful when we can attract and retain talented executives with compensation packages that are competitive and fair. For 2007, in order to assist in retaining executive talent, the former Committee members established compensation packages for NEOs that included both a short- and long-term component, with vesting requirements for equity-based awards dependent on the passage of time and continued employment. Further, the former Committee members sought to create compensation packages for NEOs that delivered total compensation that would be competitive with the total compensation delivered by certain peer companies with which the Company competes for executive talent. To ensure that the compensation packages for NEOs were competitive, for 2007, the former Committee members utilized the Towers Perrin Media Industry Executive Compensation Survey and other executive compensation surveys, which provide data concerning relative compensation of other companies. In addition, for 2007, the former Committee members engaged Frederic W. Cook, & Co., Inc., a nationally-known compensation consulting firm, to provide information regarding compensation levels and practices of peer companies including, specifically, Belo Corp., Clear Channel Communications, Inc., Dow Jones & Company, Inc., Gannett Co., Inc., Hearst-Argyle Television, Inc., IAC/InterActive Corp., The McClatchy Co., Inc., McGraw-Hill Companies, Inc., The New York Times Company, The E.W. Scripps Company and The Washington Post Company (the "Peer Group").

*Our Compensation Program for NEOs Should Be Fair and Perceived as Such, Both Internally and Externally.* We endeavor to create a compensation program that is fair and perceived as fair, both internally and externally. For 2007, the former Committee members accomplished this by comparing the compensation to be provided to our NEOs to the compensation provided to officers of the other companies included in the survey data and those in the Peer Group, as a means to measure external fairness. The former Committee members also compared compensation of the NEOs to other senior employees of the Company, as a means to measure internal fairness.

**Elements of Our 2007 Compensation Program**—This section describes the various elements of our 2007 compensation program for NEOs, together with a discussion of various matters relating to those items, including why each item was included in the compensation program. The 2007 compensation program for NEOs was designed by the former Committee members to achieve an appropriate balance with respect to the pursuit of both short and long-term performance goals. Further, the mix of cash and equity-based compensation described below was intended to motivate our NEOs to increase the value of the Company, while also providing the Company with a mechanism for retaining executive talent. As discussed above, following the completion of the Leveraged ESOP Transactions, the Committee, along with the other members of our current Board and our executive officers, is currently evaluating our compensation program for 2008 and beyond.

*Cash Compensation*

Cash compensation for 2007 was paid in the form of salary and bonuses. Salary has been included in the Company's NEO compensation package so that a portion of the compensation provided to NEOs would be provided in a form that is fixed and liquid. Annual performance-based bonuses, have been paid pursuant to the MIP, were included in the package in order to provide incentives to our NEOs to pursue objectives that are consistent with the overall goals and strategic direction that the Board has set for the Company. The amount of cash compensation for 2007 that was paid in the form of salary as compared to annual performance-based bonuses was determined by the former Committee members in a manner designed to achieve the four fundamental principles set forth above.

179

Source: TRIBUNE CO, 10-K, March 20, 2008

The components comprising the cash portion of total compensation for 2007 are described below.

Salary. Base salaries for NEOs for any given year have been generally approved by the Committee at its meeting in February. In 2007, the former Committee made its final determination with respect to the other NEOs and other senior executive officers based on the recommendation of, and after discussions with, Mr. FitzSimons, our then-Chairman, President and Chief Executive Officer. For 2007, changes in base salary were dependent on the former Committee's assessment of company-wide, group and/or individual performance and the salary levels of our executives as compared to the other companies included in the survey data and those in the Peer Group.

MIP. The MIP provides cash compensation to NEOs to the extent that performance conditions set by the Committee are met. Target bonuses under the MIP for 2007 were set by the former Committee members in February 2007. Under the terms of the Leveraged ESOP Transactions, payments pursuant to the MIP for 2007 were required to be paid according to the targets established by the former Committee members.

For fiscal 2007, consistent with prior years, the former Committee members considered several factors in determining the amount of target bonuses under the MIP, including:

- the desire to tie a substantial portion of total compensation to company-wide, group and/or individual performance;

- the relative level of cash compensation, at target and actual achievement levels, of our executives as compared to the other companies included in the survey data and Peer Group; and

- the advice of Frederic W. Cook & Co., Inc. as to compensation practices at other companies in the Peer Group.

Performance objectives for the MIP for 2007 were developed through an iterative process. Based on a review of business plans, management, including the NEOs, developed preliminary recommendations for the former Committee members to review. The former Committee members reviewed management's preliminary recommendations and established final goals. In establishing final goals, the former Committee members sought to ensure that the incentives provided pursuant to the MIP were consistent with the strategic goals set by the Board, that the goals set were sufficiently ambitious so as to provide a meaningful incentive and that bonus payments, assuming target levels of performance were attained, would be consistent with the overall NEO compensation program.

In February 2007, the former members of the Committee, based on management's preliminary recommendation, approved the financial performance criteria and the individual performance goals that were used to determine whether and to what extent NEOs received payments under the MIP. For fiscal 2007, the former Committee members selected operating cash flow plus income on equity investments as the relevant financial performance criteria. These measures were selected for fiscal 2007 because operating cash flow is an important indicator of the operational strength and performance of the Company's businesses and equity investment results are important to the future growth of the Company. Target bonuses for NEOs with respect to bonuses paid for fiscal 2007 ranged from 60% to 125% of base salary and were based on the NEO's level of responsibility and ability to affect the Company's results. MIP bonuses for corporate executives, including Messrs. FitzSimons, Grenesko and Kenney, were based on the level of achievement of consolidated goals as set forth below. The MIP bonus for Mr. Smith was based on the level of achievement of the specific goals established for the Chicago Tribune Company and the MIP bonus for Mr. Reardon was based on the level of achievement of the specific goals established for the broadcasting group.

180

For fiscal 2007, the target level of operating cash flow plus equity income established by the former Committee members and the actual level of achievement by the Company, on a consolidated basis, were as follows:

| ($ in millions) | Actual (2) | Target (2) | Achievement % |
|---|---|---|---|
| Consolidated Operating Cash Flow(1) | $ 1,160 | $ 1,265 | |
| Net Income on Equity Investments | 100 | 67 | |
| Total | $ 1,260 | $ 1,332 | 78% |

(1)  Operating cash flow is defined as operating profit before depreciation and amortization.

(2)  Actual and target operating cash flow figures exclude the results of Southern Connecticut Newspapers, *Hoy*, New York and EZ Buy & EZ Sell Recycler Corporation, each of which were sold in 2007. Further, actual and target operating cash flow figures exclude certain extraordinary one-time items consistent with the terms of the MIP.

Actual payments under the MIP can range, on the basis of financial performance, from 0% (threshold) to 200% (maximum) of the target bonus established by the Committee as follows:

| Company or Group Performance Level | Payment Level |
|---|---|
| Below 85% of goal | Discretionary |
| At 85% of goal | 40% of target |
| Every 1% increase between 85% and 100% of goal | An additional 4% of target |
| At 100% of goal | 100% of target |
| Every 1% increase between 100% and 115% of goal | An additional 6 2/3% of target (to a maximum of 200%) |

Awards granted to the NEOs for fiscal 2007 are reflected in the Summary Compensation Table set forth below.

*Equity-Based Compensation*

The Company believes that a meaningful portion of each NEO's compensation should consist of equity-based awards that provide incentives to increase the value of the Company. In addition, in order to assist in retaining executive talent, these equity-based awards include vesting requirements based on the passage of time and continued employment. To this end, effective upon the completion of the Leveraged ESOP Transactions, the Board adopted the MEIP in December 2007. For information on other compensation received by the NEOs in connection with the Leveraged ESOP Transactions, see "Compensation Related to the Leveraged ESOP Transactions" below.

The MEIP, which is administered by the Committee, provides for phantom units (the "Units") that generally track the value of a share of common stock of the Company's common stock. Awards are made to eligible members of Company management and other key employees at the discretion of the Board. Awards under the MEIP are classified as First Tranche Units and Second Tranche Units. All grants to NEOs under the MEIP in 2007 consisted of Second Tranche Units.

The First Tranche Units represent the value of approximately 5% of the fully-diluted outstanding common stock of the Company (subject to customary anti-dilution adjustments), or 5,434,652 Units. First Tranche Units vest ratably over a three-year period beginning on the date of grant. Unvested First Tranche Units will vest upon a change in control of the Company or upon termination of employment due to death or disability (each as defined in the MEIP). Unvested First Tranche Units will be forfeited upon a termination of a participant's employment for any reason other than death or disability. A portion of the First Tranche Units were granted upon the consummation of the Leveraged ESOP Transactions on Dec. 20, 2007, and the remaining portion will be granted in future years.

The Second Tranche Units represent the value of approximately 3% of the fully-diluted outstanding common stock of the Company (subject to customary anti-dilution adjustments), or 3,261,000 Units. Fifty percent of the Second Tranche Units were fully vested upon grant and the remaining fifty percent will vest on the one year anniversary of the grant date. Any unvested Second Tranche Units will become fully vested upon a change in control of the Company, an involuntary termination of employment or a termination of employment due to a participant's death or disability (each as defined in the MEIP). Unvested Second Tranche Units will be forfeited upon a termination of a participant's employment for any reason other than an involuntary termination of employment or a termination of employment due to death or disability. Participants

Source: TRIBUNE CO, 10-K, March 20, 2008

receiving Second Tranche Units will be entitled to a gross-up for the payment of excise taxes, if any, in connection with the Leveraged ESOP Transactions.

In general, one-third of vested Units subject to an award (whether First Tranche Units or Second Tranche Units) will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date or, if sooner, upon the occurrence of a change in control or a termination of employment based on the fair market value of our common stock on the December 31 immediately following the settlement event. With respect to Second Tranche Units only, in the event of a termination of a participant's employment prior to Dec. 20, 2008, such participant will receive his or her pro rata share (based upon the amount of his or her vested Second Tranche Units relative to all Second Tranche Units outstanding or reserved for issuance) of $25 million, payable within ten business days following such termination of employment.

*Perquisites*

In 2007, our NEOs received certain perquisites provided by or paid for by the Company. These perquisites included financial planning services, memberships in social and professional clubs, car allowances and gross up payments equal to the taxes payable on certain perquisites.

The former Committee members provided these perquisites because, in many cases, the perquisite was deemed to make our executives more efficient and effective and thereby has been a benefit to the Company. In addition, these perquisites are provided by many companies in the Peer Group to their named executive officers and the former Committee members believed it was necessary for retention and recruitment purposes that the Company do the same. The Committee, along with the other members of our current Board of Directors and our executive officers, is currently evaluating what perquisites, if any, will remain in place as a part of our compensation program for 2008 and beyond.

*Deferred Compensation Plan*

Prior to the completion of the Leveraged ESOP Transactions, our Bonus Deferral Plan allowed certain employees, including the NEOs, to defer receipt of MIP bonus payments. Participants could defer up to 100% of bonus payments into a cash-based account or into an account that tracked Tribune common stock. The cash-based account appreciated at a rate equal to 120% of the long-term applicable federal rate, compounded quarterly, which is determined periodically by the Internal Revenue Service. Amounts deferred into Tribune common stock accounts were credited with earnings or losses based on the return on Tribune common stock. The Company did not "match" amounts that were deferred by employees pursuant to the Bonus Deferral Plan. All amounts that had been deferred pursuant to the Bonus Deferral Plan were paid out in connection with the completion of the Leveraged ESOP Transactions. The Bonus Deferral Plan has been suspended and no deferrals of MIP bonus payments for 2007 were made under the plan. The Committee is currently evaluating whether the Bonus Deferral Plan will remain in place as part of our compensation program for 2008 and beyond.

*Employee Stock Ownership Plan*

The ESOP was formed in connection with the Leveraged ESOP Transactions. It is a tax-qualified retirement plan that currently owns all of our outstanding common stock. The assets of the ESOP are held in a trust within which individual accounts will be maintained for each participating employee, including the NEOs. The Company initially expects to allocate shares of its common stock having a value equal to 5% of eligible pay each year to the individual employee accounts, beginning in 2009 for the 2008 plan year. Participants will vest 20% each year beginning with their second year of service with the Company and vesting fully after their sixth year of service. Participants may take distributions from their ESOP accounts beginning in the year following their retirement (if they retire at age 65 or older) or beginning the later of six years following their termination of service or in 2018 (if they leave the Company prior to retirement). The ESOP is funded solely through company contributions and may borrow funds to purchase additional shares of our common stock.

At the time of a distribution, the Company will purchase the shares of our common stock from the participant's individual ESOP account at their fair market value and make payments in installments over five years with interest. Accordingly, the ESOP provides the opportunity for our employees to share in the value of our common stock, creating a direct link between company interests and employee interests and providing an incentive for participating employees,

Source: TRIBUNE CO, 10-K, March 20, 2008

including the NEOs, to increase the long-term value of our company, even though our common stock is no longer publicly traded.

*Post-Termination Compensation*

Transitional Compensation Plan. The NEOs do not have employment agreements and are considered "at-will" employees who may be terminated at any time by the Company. While the Company has not entered into formal severance agreements with any of the NEOs, the former Committee established a Transitional Compensation Plan for Executive Employees (the "Transitional Compensation Plan") under which all the NEOs, other than Mr. Zell, are covered. The Transitional Compensation Plan provides for benefits, upon a qualifying event or circumstances after there has been a "change-in-control" (as defined in the Transitional Compensation Plan) of the Company. The Leveraged ESOP Transactions qualified as a change-in-control under the Transitional Compensation Plan. Additional information regarding the Transitional Compensation Plan, including a definition of key terms and a quantification of benefits that would have been received by our NEOs had termination occurred on Dec. 31, 2007 (or, in the case of Messrs. FitzSimons and Reardon, the benefits actually received under the Transitional Compensation Plan), is found below under the heading "Potential Payments upon Termination or Change-in-Control."

Pension Plan and Supplemental Pension Plan. The Tribune Company Pension Plan (the "Pension Plan") is a funded, tax-qualified, noncontributory defined-benefit pension plan that covers all non-union employees who had met the relevant age and service requirements, including the NEOs. The Company also maintains The Tribune Company Supplemental Retirement Pension Plan (the "Supplemental Pension Plan"), an unfunded plan that provides payments substantially equal to the difference between the amount that would have been payable under the Pension Plan, in the absence of legislation limiting pension benefits and earnings that may be considered in calculating pension benefits, and the amount actually payable under the Pension Plan.

Both plans were "frozen" on Dec. 31, 1998 (the "freeze date"), and no additional service and compensation credit has accrued since the freeze date. Benefits payable under the Pension Plan are based upon the employee's years of service (up to a maximum of 35 years) and the employee's average earnings for a five calendar-year period with us and our affiliated companies as of the freeze date. Benefits are payable after retirement in the form of an annuity or a lump sum. Earnings, for purposes of the calculation of benefits under the Pension Plan, include base salary and commissions, if any. The amount of annual earnings considered in calculating benefits under the Pension Plan is limited by law. Contributions to the Pension Plan are made entirely by us and are paid into a trust fund from which the benefits of participants will be paid. Additional information regarding the Pension Plan and the Supplemental Pension Plan is found under the heading "2007 Pension Benefits." As a result of the completion of the Leveraged ESOP Transactions, amounts accrued under the Supplemental Pension Plan were paid as a lump sum at the end of fiscal 2007.

Effective Jan. 1, 2008, the Pension Plan was amended and restated as the Tribune Company Cash Balance Pension Plan (the "Cash Balance Plan"). Under the Cash Balance Plan, existing benefits under the Pension Plan will remain frozen. However, the Company plans to utilize surplus funding from the Pension Plan in order to provide for accruals on behalf of eligible employees, including the NEOs, under the Cash Balance Plan. In March 2008, the Company provided for an initial Cash Balance Plan accrual, effective as of Dec. 31, 2007, on behalf of eligible employees, including the NEOs, equal to two percent of the employees' eligible compensation. Further, beginning in 2009 with respect to the 2008 plan year, the Company plans to provide for accruals on behalf of eligible employees, including the NEOs, equal to three percent of the employees' eligible compensation. The Company is currently evaluating whether it will maintain a Supplemental Pension Plan in connection with the Cash Balance Plan.

Savings Plan and Supplemental Savings Plan. Under the Tribune Company 401(k) Savings and Profit Sharing Plan (the "Savings Plan"), a tax-qualified retirement savings plan, non-union employees, including our NEOs, may contribute eligible base compensation on a before-tax basis, up to Internal Revenue Service limits. For calendar year 2007, the maximum contribution by employees to the Savings Plan was $15,500, plus an additional $5,000 for those employees who had attained age 50. In 2007, the Company provided a regular company contribution equal to 4% of eligible compensation (generally, base compensation). In prior years, the Company also provided an annual profit-sharing contribution of between 2% and 5% of base compensation depending on the financial performance of the Company for the year. No profit-sharing contributions were made for 2007. Amounts held in Savings Plan accounts may not be withdrawn

183

Source: TRIBUNE CO, 10-K, March 20, 2008

except in the event of hardship prior to the employee's termination of employment, or such earlier time as the employee reaches the age of 59½ years, subject to certain exceptions set forth in Internal Revenue Service regulations.

Pursuant to Internal Revenue Service rules, effective for 2007, the Savings Plan limits the "annual additions" that can be made to a participating employee's account to $45,000 per year. "Annual additions" include company contributions, profit-sharing contributions and salary reduction contributions made by us under Section 401(k) of the Internal Revenue Code. In addition, no more than $225,000 of annual compensation may be taken into account in computing benefits under the Savings Plan. For 2007 and prior years, the Company previously maintained a Supplemental Defined Contribution Plan (the "Supplemental Savings Plan") paid out of the Company's general assets, which credited eligible Savings Plan participants with an amount substantially equal to the difference between the amount that, in the absence of legislation limiting company contributions to the Savings Plan, would have been allocated to an employee's company contributions and profit-sharing contributions and the amount actually allocated under the Savings Plan.

For 2008 and beyond, the Company will no longer make regular annual or profit-sharing contributions pursuant to the Savings Plan. These benefits have been replaced by the benefits under the Cash Balance Plan and the ESOP. The Company is currently evaluating whether to provide a supplemental plan in connection with the ESOP.

The Company maintained and will continue to maintain the 401(k) portion of the Savings Plan for our employees, including our NEOs, in order to encourage our employees to save some percentage of their cash compensation for their eventual retirement. The Savings Plan permits employees to make such savings in a manner that is relatively tax efficient.

## Compensation Related to the Leveraged ESOP Transactions

*Cash Transaction Bonus Pool and MEIP*

In connection with the Board's review of strategic alternatives for the Company beginning in September 2006, the former Board members authorized certain compensation awards to motivate management to seek a transaction that would provide the maximum return to the Company's shareholders despite the risks such a transaction would pose to management's continued employment. In connection with the approval of the Leveraged ESOP Transactions, on April 1, 2007, the former Board members approved a cash transaction bonus pool in an aggregate amount of $6,500,000 for 32 individuals. Subsequently, management increased the number of recipients to 40 and reduced the bonus pool to $5,400,000. Payment of these cash bonuses was conditioned upon the consummation of the Leveraged ESOP Transactions and such amounts were paid to a select group of management and other key employees who played a critical role in overseeing the completion of the Leveraged ESOP Transactions (not including Messrs. FitzSimons and Smith, who each voluntarily elected not to participate in this cash bonus pool).

In addition to the cash transaction bonus pool, the Board also adopted the MEIP, as discussed above under "Equity-Based Compensation."

*Stock Options, Restricted Stock and Other Equity Awards*

Prior to the completion of the Leveraged ESOP Transactions, a meaningful portion of each NEO's compensation was in the form of equity awards, as such awards served to align more directly the interests of NEOs and our shareholders. Equity awards to our NEOs were made pursuant to the Incentive Plan, which allowed for the use of a wide variety of equity-based awards, including stock options, restricted stock and restricted stock units. In February 2007, the former Committee members approved equity awards for each NEO, each of which is disclosed in the 2007 Grants of Plan-Based Awards Table. As further detailed in the section below entitled "Narrative to the Summary Compensation Table and 2007 Grants of Plan-Based Awards Table," pursuant to the terms of the Incentive Plan and individual equity awards, upon the completion of the Leveraged ESOP Transactions, all outstanding equity awards immediately vested and were settled in cash.

184

**Compensation Committee Report**

The Compensation Committee of the Board of Directors of Tribune Company (the "Committee") oversees Tribune Company's compensation program on behalf of the Board. As described above, the 2007 compensation program was administered by the former Committee members until Dec. 20, 2007, at which time the Leveraged ESOP Transactions were completed and the new Committee members were appointed. In fulfilling its oversight responsibilities, the Committee reviewed and discussed with management the Compensation Discussion and Analysis included in this Annual Report on Form 10-K.

In reliance on the review and discussions referred to above, the Committee recommended to the Board that the Compensation Discussion and Analysis be included in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007 filed with the Securities and Exchange Commission.

Brian L. Greenspun
William C. Pate
Mary Agnes Wilderotter

185

**Summary Compensation Table**

The following table summarizes compensation awarded to, earned by or paid to the NEOs in fiscal 2007 and 2006, except for Messrs. Zell and Kenney, who were not NEOs in 2006. Accordingly, only amounts for fiscal 2007 are reported for Messrs. Zell and Kenney. The above section entitled "Compensation Discussion and Analysis" describes in greater detail the information reported on this table.

| Name and Principal Position | Year | Salary (1)($) | Stock Awards (2)($) | Option Awards (3)($) | Non-Equity Incentive Plan Compensation ($)(4) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($)(5) | All Other Compensation ($)(6) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Samuel Zell Chairman & Chief Executive Officer | 2007 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Dennis J. FitzSimons Former Chairman, President and Chief Executive Officer | 2007 | 1,026,346 | 7,687,826 | 0 | 989,625 | 0 | 16,269,848 | 25,973,645 |
| | 2006 | 999,327 | 1,869,600 | 1,942,707 | 1,400,000 | 17,790 | 106,983 | 6,336,407 |
| Donald C. Grenesko Senior Vice President/Finance and Administration | 2007 | 606,721 | 3,345,646 | 0 | 743,454 | 0 | 91,546 | 4,787,367 |
| | 2006 | 574,346 | 872,480 | 559,200 | 440,325 | 17,197 | 55,616 | 2,519,164 |
| Crane H. Kenney Senior Vice President, General Counsel and Corporate Secretary | 2007 | 486,779 | 3,092,412 | 258,934 | 821,130 | 0 | 40,292 | 4,699,547 |
| Scott C. Smith President, Tribune Publishing and Publisher, Chicago Tribune Company | 2007 | 612,087 | 3,256,668 | 0 | 293,781 | 0 | 351,211 | 4,513,747 |
| | 2006 | 578,365 | 934,800 | 579,718 | 425,000 | 15,865 | 73,281 | 2,607,029 |
| John E. Reardon Former President, Tribune Broadcasting Company | 2007 | 532,212 | 2,546,787 | 257,193 | 560,500 | 0 | 76,114 | 3,972,806 |
| | 2006 | 509,615 | 185,745 | 131,336 | 525,000 | 3,829 | 69,697 | 1,425,222 |

---

(1) For 2007, the amounts represent base salary for the 52 week fiscal year beginning Jan. 1, 2007 through Dec. 30, 2007 and for 2006, the amounts represent base salary for the 53 week fiscal year beginning Dec. 26, 2005 through Dec. 31, 2006. Mr. Zell will earn a salary and bonus of $0.50 in fiscal 2008.

(2) For fiscal 2007, the amounts shown in this column include the compensation expense recorded by the Company with respect to restricted stock unit awards under the Incentive Plan and awards under the MEIP, each as determined pursuant to Financial Accounting Standards Board Statement of Financial Accounting Standards No. 123 (revised 2004), "Share-Based Payment" ("FAS No. 123R"). For fiscal 2006, the amounts shown in this column include the expense recorded by the Company with respect to restricted stock unit awards as determined pursuant to FAS No. 123R. See Note 17 to the Company's consolidated financial statements included in Part II, Item 8, hereof for a discussion of the relevant assumptions used in calculating compensation expense pursuant to FAS No. 123R.

*Restricted Stock Units*: The 2007 amounts shown in this column for each NEO include the entire grant date fair value of the restricted stock units awarded in 2007 plus an adjustment to reflect the fact that each grant awarded in 2007, the unvested portion of each grant awarded in 2006 and related dividend equivalent units were each settled in cash for a per share amount which was higher than the grant date fair value in connection with the completion of the Leveraged ESOP Transactions. For fiscal 2007, compensation expense recorded by the Company pursuant to FAS No. 123R with respect to all such restricted stock unit awards was as follows: Mr. Zell: $0; Mr. FitzSimons: $4,771,159; Mr. Grenesko: $1,875,962; Mr. Kenney: $1,622,728; Mr. Smith: $1,786,984; and Mr. Reardon: $1,488,615. The 2006 amounts shown in this column for Messrs. FitzSimons, Grenesko and Smith include the entire grant date fair value of the restricted stock units granted to them in 2006, without regard to vesting requirements, because the entire grant date fair value of such awards was expensed in the year it was awarded due to the fact that each of these individuals had reached the minimum retirement age and the required years of service and therefore the award would vest in full upon the NEO's retirement at any time. The 2006 amount shown in this column for Mr. Reardon includes the compensation expense recorded in 2006 with respect to the restricted stock units granted to Mr. Reardon in 2006, plus an assumed

forfeiture amount which was subtracted from the full fair value of the award when determining

186

Source: TRIBUNE CO, 10-K, March 20, 2008

the required expense. For further information on the 2007 restricted stock unit awards, see the 2007 Grants of Plan-Based Awards table.

*MEIP Second Tranche Unit Awards*: The 2007 amounts shown in this column for each NEO include fifty percent of the fair value at Dec. 30, 2007 of each unit awarded under the MEIP to such NEO, to reflect the fact that fifty percent of each NEO's units were vested on such date, plus an additional 1.5 percent of the fair value at Dec. 30, 2007 of each such unit to record the ratable expense related to their unvested units. With respect to Mr. FitzSimons, the amount includes an adjustment to reflect the fact that the entire award was settled in cash pursuant to the terms of the MEIP in connection with the termination of his employment. For fiscal 2007, the expense recorded by the Company pursuant to FAS No. 123R with respect to the MEIP awards granted to the NEOs was as follows: Mr. Zell: $0; Mr. FitzSimons: $2,916,667; Mr. Grenesko: $1,469,684; Mr. Kenney: $1,469,684; Mr. Smith: $1,469,684; and Mr. Reardon: $1,058,172. For further information on the 2007 MEIP awards, see the 2007 Grants of Plan-Based Awards table.

(3)  The amounts shown in this column represent the compensation expense recorded by the Company with respect to stock option awards determined pursuant to FAS No. 123R. See Note 17 to the Company's consolidated financial statements included in Part II, Item 8, hereof for a discussion of the relevant assumptions used in calculating compensation expense pursuant to FAS No. 123R, including the calculation of the grant date fair value of stock options. No stock option awards were granted to NEOs in respect of fiscal 2007. The amounts shown in this column for Messrs. FitzSimons, Grenesko and Smith for 2006 include the entire grant date fair value of the stock options granted to them in 2006 under the Incentive Plan, without regard to vesting requirements, because the entire grant date fair value of such awards was expensed in 2006 due to the fact that each of these individuals had reached the minimum retirement age and the required years of service and therefore the award would vest in full upon the NEO's retirement at any time. The amounts shown in this column for Messrs. Kenney and Reardon for 2007 include the compensation expense recorded in such year with respect to the stock options granted to them in 2006 plus an adjustment to reflect the fact that each stock option awarded in 2006 was settled in cash in connection with the completion of the Leveraged ESOP Transactions. The amount shown in this column for Mr. Reardon for 2006 includes the compensation expense recorded in that year with respect to stock options granted to Mr. Reardon in 2006 plus an assumed forfeiture amount which is subtracted from the full grant date fair value of the award when determining the required compensation expense. For further information on the 2007 stock option awards, see the 2007 Grants of Plan-Based Awards table.

(4)  The amounts shown in this column constitute payments made under the MIP and awards under the cash transaction bonus pool. The cash transaction bonus pool awards for Messrs. Grenesko, Kenney and Reardon were $400,000, $600,000 and $200,000, respectively. Messrs. FitzSimons and Smith declined to receive cash transaction bonus awards. For further information regarding the MIP and the cash transaction bonus awards, see "Compensation Discussion and Analysis."

(5)  The amounts shown in this column include the aggregate of the increase in actuarial values of the benefits for Messrs. FitzSimons, Grenesko, Kenney, Smith and Reardon under the Pension Plan and Supplemental Pension Plan. Because the Pension Plan and Supplemental Pension Plan were frozen with respect to continued service and compensation credits effective as of Dec. 31, 1998, any increase in actuarial values results solely from the reduction in the period of discounting over the prior year and the change in the required discount rate. For 2007, the changes in actuarial values for each NEO were as follows (amounts in parentheses indicate negative numbers): Mr. FitzSimons: ($248,522); Mr. Grenesko: ($82,361); Mr. Kenney: ($8,132); Mr. Smith: ($343,143); and Mr. Reardon: ($65,758). Because these amounts were negative, they are reflected as zeros in this column in accordance with SEC rules. None of the NEOs earned above-market or preferential earnings on deferred compensation in 2006 or 2007.

(6)  The amounts shown in this column consist of perquisites, reimbursement for the payment of taxes, payments under Supplemental Pension Plan and company contributions under Tribune's qualified and non-qualified defined contribution plans. For 2007, perquisites for the NEOs included: (i) an automobile allowance to Messrs. Grenesko, Kenney, Smith and Reardon; (ii) a club allowance to Messrs. FitzSimons, Kenney and Smith and (iii) personal financial counseling for Mr. FitzSimons. For fiscal 2007, the following NEOs received the following tax reimbursements with respect to certain perquisites: Mr. FitzSimons: $17,410; Mr. Grenesko: $204; and Mr. Kenney: $874. Upon completion of the Leveraged ESOP Transactions, the present value of the accrued benefit under the Supplemental Pension Plan was paid to all participants, including the NEOs, pursuant to the terms of the plan in the following amounts: Mr. Zell: $0; Mr. FitzSimons: $206,824; Mr. Grenesko: $53,976; Mr. Kenney: $674; Mr. Smith: $307,639; and Mr. Reardon: $41,618. Each NEO, other than Mr. Zell, received a company contribution of $9,000 under the Tribune Company 401(k) Savings and Profit Sharing Plan, a qualified defined contribution plan. The company

187

contributions credited to the NEOs under Tribune's non-qualified defined contribution plan were: Mr. Zell: $0; Mr. FitzSimons: $31,369; Mr. Grenesko: $14,366; Mr. Kenney: $9,744; Mr. Smith: $14,572; and Mr. Reardon: $11,496. In the case of Mr. FitzSimons, the amount shown also includes a cash payment under the Tribune Transitional Compensation Plan of $15,978,121. For more information regarding this payment, see "Potential Payments Upon Termination or Change in Control" below.

188

**2007 Grants of Plan-Based Awards**

The following table summarizes 2007 awards granted to the NEOs under the MIP, Incentive Plan and MEIP. Each NEO participates in the MIP, a cash incentive plan, and the annual cash incentive award actually earned by each NEO is included in the Summary Compensation Table under the "Non-Equity Incentive Plan Compensation" column. The MIP, Incentive Plan and MEIP are each described in greater detail above in the section entitled "Compensation Discussion and Analysis."

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards (1) | | | All Other Stock Awards: Number of Shares of Stock or Units (#)(2) | Grant Date Fair Value ($)(3) |
|------|------------|-----------|--------|---------|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) | | |
| Samuel Zell | | $          0 | $          0 | $          0 | 0$ | 0 |
| Dennis J. FitzSimons | | 0 | 1,268,750 | 2,537,500 | | |
| | 2/13/2007 | | | | 135,000 | 4,104,000 |
| | 3/8/2007 | | | | 1,058.0427 | 31,667 |
| | 12/20/2007 | | | | 380,450 | 2,916,667 |
| Donald C. Grenesko | | 0 | 440,325 | 880,650 | | |
| | | 0 | 400,000 | 400,000 | | |
| | 2/13/2007 | | | | 52,750 | 1,603,600 |
| | 3/8/2007 | | | | 432.1143 | 12,933 |
| | 12/20/2007 | | | | 271,750 | 2,853,375 |
| Crane H. Kenney | | 0 | 283,500 | 567,000 | | |
| | | 0 | 600,000 | 600,000 | | |
| | 2/13/2007 | | | | 40,000 | 1,216,000 |
| | 3/8/2007 | | | | 322.6167 | 9,656 |
| | 12/20/2007 | | | | 271,750 | 2,853,375 |
| Scott C. Smith | | 0 | 473,840 | 947,680 | | |
| | 2/13/2007 | | | | 50,000 | 1,520,000 |
| | 3/8/2007 | | | | 423.7728 | 12,684 |
| | 12/20/2007 | | | | 271,750 | 2,853,375 |
| John E. Reardon | | 0 | 360,500 | 721,000 | | |
| | | 0 | 200,000 | 200,000 | | |
| | 2/13/2007 | | | | 40,000 | 1,216,000 |
| | 3/8/2007 | | | | 322.6167 | 9,656 |
| | 12/20/2007 | | | | 195,660 | 2,054,430 |

---

(1)  The amounts in the first row for each NEO set forth cash bonus award parameters under the MIP. The amount set forth as the maximum bonus payable under the MIP to each NEO equals 200% of the NEO's target bonus. For Messrs. Grenesko, Kenney and Reardon, the amounts in the second row set forth the cash transaction awards paid to them in connection with the consummation of the Leveraged ESOP Transactions. In each case, the amount actually earned by each NEO is reported as Non-Equity Incentive Plan Compensation in the Summary Compensation Table.

(2)  The grants made on Feb. 13, 2007 and March 8, 2007 consist of restricted stock units and dividend equivalent units awarded under the Incentive Plan. The dividend equivalents accumulated in 2007 were granted on March 8, 2007 and are reflected immediately following the related restricted share unit grant. Also consists of grants of Second Tranche Units under the Tribune MEIP effective Dec. 20, 2007. The terms of the restricted stock units and grants under the

Source: TRIBUNE CO, 10-K, March 20, 2008

MEIP are described in more detail below in the section entitled "Narrative to Summary Compensation Table and 2007 Grants of Plan-Based Awards Table."

(3)    Amounts in this column consist of (i) the grant date fair value of the restricted stock units and the related dividend equivalent units or (ii) the fair value as of Dec. 30, 2007 of the Second Tranche Units under the MEIP, each determined pursuant to FAS No. 123R.

**Narrative to Summary Compensation Table and 2007 Grants of Plan-Based Awards Table**

*Employment Agreements*

During 2007, each of the NEOs was an at-will employee and none of them was a party to an employment agreement with the Company.

*Awards*

In February 2007, the former Committee members established 2007 MIP bonus targets for Messrs. FitzSimons, Grenesko, Kenney, Smith and Reardon. The amount of the potential bonus payouts was tied to satisfaction of financial performance goals relating to operating cash flow and income from equity investments as well as the satisfaction of pre-determined individual performance goals. Under the terms of the Leveraged ESOP Transactions, payments pursuant to the MIP for 2007 were required to be paid according to the targets established by the former Committee members. In each case, the MIP bonuses paid to the NEOs are reported as "Non-Equity Incentive Plan Compensation" in the Summary Compensation Table.

On Feb. 13, 2007, the former Committee members granted restricted stock units to each of our NEOs, other than Mr. Zell, pursuant to the Incentive Plan. Dividend equivalents on the restricted stock units were earned on the same terms and at the same rate as dividends paid to our common shareholders. Pursuant to the terms of the Incentive Plan and individual equity awards, upon completion of the Leveraged ESOP Transactions, all outstanding equity awards immediately vested and were settled in cash.

In connection with the approval of the Leveraged ESOP Transactions, the former Board members approved a cash transaction bonus pool for a select group of management and other key employees who played a critical role in overseeing the completion of the Leveraged ESOP Transactions. As described in the Summary Compensation Table, upon completion of the Leveraged ESOP Transactions, Messrs. Grenesko, Kenney and Reardon received payments pursuant to the cash transaction bonus pool. Messrs. FitzSimons and Smith voluntarily elected not to participate in this cash bonus pool. See "Compensation Discussion and Analysis" for a more detailed discussion of the cash transaction bonus pool.

Further, on Dec. 20, 2007 in connection with the completion of the Leveraged ESOP Transactions, Messrs. FitzSimons, Grenesko, Kenney, Smith and Reardon each received grants of Second Tranche Units under the MEIP. Fifty percent of the Second Tranche Units were fully vested upon grant and the remaining fifty percent will vest on the one year anniversary of the grant date (Dec. 20, 2008). In general, one-third of vested units will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date. However, any unvested Second Tranche Units will become fully vested upon a change in control of the Company, an involuntary termination of employment or a termination of employment due to a participant's death or disability (each as defined in the MEIP). Unvested Second Tranche Units will be forfeited upon a termination of a participant's employment for any reason other than an involuntary termination of employment or a termination of employment due to death or disability. With respect to Second Tranche Units only, in the event of a termination of a participant's employment prior to Dec. 20, 2008, such participant will receive his or her pro rata share (based upon the amount of his or her vested Second Tranche Units relative to all Second Tranche Units outstanding or reserved for issuance) of $25 million, payable within ten business days following such termination of employment.

*Salary and Bonus in Proportion to Total Compensation*

The former Committee members believed that a meaningful portion of each NEO's compensation should be in the form of equity awards. The 2007 compensation program was designed by the former Committee members to motivate long-term value creation, while also providing incentives to the NEOs to pursue specific short and long-term performance goals. See "Compensation Discussion and Analysis" for a description of the objectives of our 2007 compensation program and overall

190

Source: TRIBUNE CO, 10-K, March 20, 2008

compensation philosophy. As discussed above, the current Committee members, along with the other members of our Board of Directors and our executive officers, are currently evaluating our compensation program for 2008 and beyond.

191

Source: TRIBUNE CO, 10-K, March 20, 2008

**2007 Outstanding Equity Awards at Fiscal-Year-End**

The following table summarizes the outstanding equity awards held by the NEOs at the end of 2007. As noted above, pursuant to the terms of the Incentive Plan and individual equity awards, upon completion of the Leveraged ESOP Transactions, all equity awards outstanding at that time immediately vested and were settled in cash.

| | Stock Awards | |
| Name | Number of Shares or Units of Stock That Have Not Vested (1)(#) | Market Value of Shares or Units of Stock That Have Not Vested ($) |
| --- | --- | --- |
| Samuel Zell | 0 | $ 0 |
| Dennis J. FitzSimons | 0 | 0 |
| Donald C. Grenesko | 135,875 | 1,426,687 |
| Crane H. Kenney | 135,875 | 1,426,687 |
| Scott C. Smith | 135,875 | 1,426,687 |
| John E. Reardon | 97,830 | 1,027,215 |

(1) Amounts shown in this column consist of the unvested portion of the Second Tranche Units granted on Dec. 20, 2007 to the NEOs under the MEIP. All of the Second Tranche Units that were granted to Mr. FitzSimons were settled in cash pursuant to the terms of the MEIP in connection with the termination of his employment in December 2007. In addition, all of the Second Tranche Units that were granted to Mr. Reardon, including those set forth in the table above, were settled in cash pursuant to the terms of the MEIP in connection with the termination of his employment in February 2008. The terms of the grants under the MEIP are described in more detail above in the section entitled "Narrative to Summary Compensation Table and 2007 Grants of Plan-Based Awards Table."

**2007 Option Exercises and Stock Vested**

| | Option Awards | | Stock Awards | |
| Name | Number of Shares Acquired on Exercise (1)(#) | Value Realized on Exercise (1)($) | Number of Shares Acquired on Vesting (2)(#) | Value Realized on Vesting (3)($) |
| --- | --- | --- | --- | --- |
| Samuel Zell | 0 | $ 0 | 0 | $ 0 |
| Dennis J. FitzSimons | 0 | 0 | 197,451 | 6,646,222 |
| Donald C. Grenesko | 0 | 0 | 81,832 | 2,750,977 |
| Crane H. Kenney | 0 | 0 | 60,787 | 2,044,388 |
| Scott C. Smith | 0 | 0 | 81,120 | 2,724,531 |
| John E. Reardon | 0 | 0 | 60,787 | 2,044,388 |

(1) As noted above, pursuant to the terms of the Incentive Plan and individual equity awards, upon completion of the Leveraged ESOP Transactions, all equity awards outstanding at that time immediately vested and were settled in cash. No options were exercised and no shares were received, however, outstanding stock options granted to NEOs in 2006 were settled for the difference between the grant price of the option and $34 multiplied by the number of options outstanding. This resulted in cash payments as follows: Mr. FitzSimons: $852,000; Mr. Grenesko: $241,400; Mr. Kenney: $170,400; Mr. Smith: $255,600; and Mr. Reardon: $170,400. All other outstanding options held by the NEOs prior to completion of the Leveraged ESOP Transactions had exercise prices in excess of $34 per share and were canceled without payment of any consideration.

(2) Consists of the gross number of restricted stock units and dividend equivalent units for each NEO that vested on Feb. 14, 2007 and Dec. 20, 2007. As noted above and as discussed further in footnote 3 below, pursuant to the terms of the Incentive Plan and individual equity awards, upon completion of the Leveraged ESOP Transactions, all restricted stock units and dividend equivalent units outstanding at that time immediately vested and were settled in cash.

192

Source: TRIBUNE CO, 10-K, March 20, 2008

(3) For purposes of this table, restricted stock units and dividend equivalent units that vested on Feb. 14, 2007 are valued at $30.72 per share, the closing trading price on such date. As noted above, on Dec. 20, 2007, in connection with the completion of the Leveraged ESOP Transactions, all other restricted stock units and dividend equivalent units granted to NEOs in 2006 and 2007 were settled for an amount equal to $34 multiplied by the number of restricted stock units and dividend equivalent units outstanding at that time. This resulted in cash payments as follows:  Mr. FitzSimons: $6,017,559; Mr. Grenesko: $2,457,626; Mr. Kenney: $1,834,865; Mr. Smith $2,410,184; and Mr. Reardon: $1,834,865. The amounts in this column do not include the value of the vested Second Tranche Units under the MEIP which are settled in cash. As discussed above, fifty percent of the Second Tranche Units were fully vested upon grant and the remaining fifty percent will vest on the one year anniversary of the grant date. Other than with respect to Messrs. FitzSimons and Reardon, the value realized by the NEOs upon the grant of the Second Tranche Units was as follows: Mr. Zell: $0; Mr. Grenesko: $1,426,687; Mr. Kenney: $1,426,687; and Mr. Smith: $1,426,687. All of the Second Tranche Units that were granted to Messrs. FitzSimons and Reardon were settled in cash pursuant to the terms of the MEIP in connection with the termination of their employment.

193

---

Source: TRIBUNE CO, 10-K, March 20, 2008

**2007 Pension Benefits**

| Name | Plan Name | Number of Years Credited Service (#) | Present Value of Accumulated Benefit ($) | Payment During Last Fiscal Year (1)($) |
|---|---|---|---|---|
| Samuel Zell | Tribune Company Pension Plan | 0 | $ 0 | $ 0 |
| | Tribune Company Supplemental Retirement Plan | 0 | 0 | 0 |
| Dennis J. FitzSimons | Tribune Company Pension Plan | 16 | 657,579 | 0 |
| | Tribune Company Supplemental Retirement Plan | 16 | 0 | 206,824 |
| Donald C. Grenesko | Tribune Company Pension Plan | 18 | 649,633 | 0 |
| | Tribune Company Supplemental Retirement Plan | 18 | 0 | 53,976 |
| Crane H. Kenney | Tribune Company Pension Plan | 4 | 43,231 | 0 |
| | Tribune Company Supplemental Retirement Plan | 4 | 0 | 674 |
| Scott C. Smith | Tribune Company Pension Plan | 21 | 489,517 | 0 |
| | Tribune Company Supplemental Retirement Plan | 21 | 0 | 307,639 |
| John E. Reardon | Tribune Company Pension Plan | 13 | 273,601 | 0 |
| | Tribune Company Supplemental Retirement Plan | 13 | 0 | 41,618 |

(1)  Upon completion of the Leveraged ESOP Transactions, the present value of the accrued benefit under the Supplemental Pension Plan was paid to all participants in a lump sum in accordance with the terms of the plan. These amounts are included in the "All Other Compensation" column in the Summary Compensation Table.

The NEOs, other than Mr. Zell, participate in the Pension Plan and the Supplemental Pension Plan. Because the Internal Revenue Code places certain limitations on the amount of pension benefits that may be paid under qualified plans, any benefits payable in excess of those limitations were paid under the Supplemental Pension Plan. These amounts were estimated on the assumption that the executive will commence receiving benefits at age 62, the executive's unreduced retirement age, and that the executive will receive pension benefits in the form of a life annuity with no surviving benefits.

Until Dec. 31, 1998, the annual pension benefit under the plans, taken together, was generally determined by the executive's credited years of service (up to a maximum of 35 years) multiplied by a percentage of the executive's final average compensation (compensation during the final five years of employment). Compensation for this purpose is generally defined as a participant's base compensation plus commissions, if any. The Pension Plan and the Supplemental Pension Plan were frozen at Dec. 31, 1998 so that participants' service and compensation after that date will not be counted in computing benefits. The NEOs, other than Mr. Zell, will be entitled to receive under the Pension Plan annual benefits upon retirement at age 65 until death as follows: Mr. FitzSimons: $83,121; Mr. Grenesko: $73,761; Mr. Kenney: $12,220; Mr. Smith: $62,881; and Mr. Reardon: $43,558.

The Pension Plan covering the NEOs provides for an early retirement subsidy for those individuals who have attained age 55 with ten years of service under the plan. For purposes of early retirement eligibility, attained age and years of service both before and after the "freeze date" are counted. The early retirement subsidy provides for a benefit at age 62 equal to 100% of the benefit payable at age 65; a benefit payable at age 60 equal to 92% of the benefit payable at age 65; and a benefit at age 55 equal to 67% of the benefit payable at age 65. As of Dec. 31, 2007, Messrs. FitzSimons, Grenesko and Smith had met the eligibility requirements for the early retirement subsidy. Messrs. Kenney and Reardon had not yet met the age requirement for the early retirement subsidy.

Benefits under the Pension Plan were calculated under separate formulas for service prior to 1989 and for service between Jan. 1, 1989 and Dec. 31, 1998. For service and compensation prior to 1989, the benefit was equal to the participant's years of credited service prior to 1989 multiplied by the sum of (i) 0.8% percent of the participant's average earnings for the five-year period prior to Dec. 31, 1998 up to Social Security covered compensation plus (ii) 1.2% of the participant's average earnings in that period in excess of Social Security covered compensation. For service and compensation between Jan. 1, 1989 and Dec. 31, 1998, the benefit was equal to the participant's years of credited service during that period multiplied by the sum of (i) 1.2% percent of the participant's average earnings during that period up to Social Security covered compensation plus (ii) 1.6% of the participant's final five year average earnings during that period

194

Source: TRIBUNE CO, 10-K, March 20, 2008

in excess of Social Security covered compensation. Mr. FitzSimons and Mr. Grenesko had more credited service under the formula generally applicable to service between Jan. 1, 1989 and Dec. 31, 1998 as a result of their service at business units where the formula was in effect for a longer period. Years of service under these formulas cannot exceed 35. Contributions to the Pension Plan are made entirely by us and are paid into a trust fund from which the benefits of participants will be paid.

The unfunded Supplemental Pension Plan provided out of our general assets an amount substantially equal to the difference between the amount that would have been payable under the Pension Plan, in the absence of laws or regulations limiting pension benefits and earnings that may be considered in calculating pension benefits, and the amount actually payable under the Pension Plan. The NEOs were not provided with extra years of credited service under the Pension Plan or the Supplemental Pension Plan beyond service actually earned with Tribune. Upon completion of the Leveraged ESOP Transactions, the present value of the accrued benefit under the Supplemental Pension Plan was paid to all participants in a lump sum in accordance with the terms of the plan.

In the table above, the present value of the current accrued benefits with respect to each NEO under both the Pension Plan and the Supplemental Pension Plan is based on the following assumptions:

- Discount rate: 6.65%

- Mortality Table: RP-2000 Combined Healthy Mortality Table

- Pension Plan Measurement Date: Disclosure of the actuarial present value of the NEO's accumulated benefit under each plan and the number of years of service credited to the NEO under each plan reported in the table is computed as of the same pension plan measurement date for financial statement reporting purposes with respect to the audited financial statements for the Company's last completed fiscal year.

- Early Retirement Age: 62

195

Source: TRIBUNE CO, 10-K, March 20, 2008

**2007 Nonqualified Deferred Compensation**

| Name | Plan Name | Executive Contributions in Last FY ($) | Registrant Contributions in Last FY (1)($) | Aggregate Earnings in Last FY (2)($) | Aggregate Withdrawals/ Distributions (3)($) | Aggregate Balance at Last FYE (4)($) |
|---|---|---|---|---|---|---|
| Samuel Zell | Bonus Deferral | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| | Supplemental Savings Plan | 0 | 0 | 0 | 0 | 0 |
| Dennis J. FitzSimons | Bonus Deferral | 0 | 0 | 67,991 | 2,977,451 | 0 |
| | Supplemental Savings Plan | 0 | 31,369 | 32,259 | 799,647 | 1,563 |
| Donald C. Grenesko | Bonus Deferral | 0 | 0 | 48,491 | 1,537,542 | 0 |
| | Supplemental Savings Plan | 0 | 14,366 | 17,570 | 434,591 | 904 |
| Crane H. Kenney | Bonus Deferral | 0 | 0 | 22,228 | 524,524 | 0 |
| | Supplemental Savings Plan | 0 | 9,744 | 9,442 | 235,344 | 728 |
| Scott C. Smith | Bonus Deferral | 0 | 0 | 21,191 | 500,053 | 0 |
| | Supplemental Savings Plan | 0 | 14,572 | 17,386 | 430,281 | 912 |
| John E. Reardon | Bonus Deferral | 0 | 0 | 7,544 | 334,132 | 0 |
| | Supplemental Savings Plan | 0 | 11,496 | 13,682 | 338,923 | 793 |

(1)  Amounts in this column are included in the "All Other Compensation" column in the Summary Compensation Table.

(2)  Amounts in this column are not included in the Summary Compensation Table.

(3)  Pursuant to the terms of the Tribune Bonus Deferral Plan and the Tribune Supplemental Savings Plan, upon completion of the Leveraged ESOP Transactions, the account balances in the plans were paid to all plan participants in a lump sum and the plans were suspended.

(4)  Amounts in this column are included in the "Registrant Contributions in Last FY" column in this table.

The 2007 Nonqualified Deferred Compensation table presents amounts that were deferred under the Company's Bonus Deferral Plan, which allowed certain employees, including the NEOs, to defer receipt of MIP bonus payments. Prior to the completion of the Leveraged ESOP Transactions, participants could defer up to 100% of bonus payments into a cash-based account or into an account that tracked Tribune common stock. The cash-based account appreciated at a rate equal to 120% of the long-term applicable federal rate, compounded quarterly, which is determined periodically by the Internal Revenue Service. The rate was reset by the Company on March 1 of each year and for 2007 was 5.9%. Amounts deferred into Tribune common stock accounts were credited with earnings or losses based on the return on Tribune common stock. The investment alternative was selected by the participants in the plan, and participants who elected the Tribune stock return equivalent could not move an investment out of a Tribune stock return equivalent once it had been selected. The Company did not "match" amounts that were deferred by employees pursuant to the Bonus Deferral Plan. Distributions were paid in a lump sum distribution or in annual installments on or about March 1 each year commencing in the calendar year following the termination of the employee's employment with the Company.

The table also presents amounts deferred under our Supplemental Savings Plan. Under the Supplemental Savings Plan, participants were credited with an amount substantially equal to the difference between the amount that, in the absence of legislation limiting company contributions to our Savings Plan, would have been allocated to an employee's account as company contributions or profit-sharing contributions, minus the amount actually allocated under the Savings Plan. In this way, participants received the same percentage of earnings under the Savings Plan and Supplemental Savings Plan as were provided to participants not subject to legislation limiting additions to the Savings Plan. Deferred amounts were credited with earnings or losses under substantially the same terms as were provided under the Deferred Compensation Plan.

196

Source: TRIBUNE CO, 10-K, March 20, 2008

**Potential Payments upon Termination or Change-in-Control**

The Company has not entered into employment or severance agreements with the NEOs and they are generally not contractually entitled to any additional compensation or benefits following termination of employment. However, as noted under "Compensation Discussion and Analysis—Post-Termination Compensation—Transitional Compensation Plan," each of our NEOs, other than Mr. Zell who does not participate in the plan, is eligible for benefits under a Transitional Compensation Plan, which was approved by the former Committee and provides for payments and other benefits if the NEO is terminated under circumstances specified in the Transitional Compensation Plan within three years following a Change in Control of Tribune Company.

Under the Transitional Compensation Plan, NEOs covered by the plan become entitled to benefits only if the Company has undergone a Change in Control during the three-year period prior to the NEO's termination of employment. The Leveraged ESOP Transactions triggered a Change in Control for purposes of the Transitional Compensation Plan. Under the Transitional Compensation Plan, each NEO covered by the plan is eligible for benefits upon termination of employment within 36 months following a Change in Control. A participant is eligible for benefits for termination prior to a Change in Control if the termination was at the request of any third party participating in or causing the Change in Control or otherwise in anticipation of a Change in Control. In addition, Transitional Compensation Plan benefits will only be available if the participant's termination of employment was not:

- on account of his death;

- on account of a physical or mental condition that would entitle him to long-term disability benefits under the Tribune Company Long-Term Disability Plan;

- for conduct involving dishonesty or willful misconduct which, in either case, is detrimental in a significant way to the business of Tribune Company or any of its subsidiaries; or

- on account of the employee's voluntary resignation.

For purposes of the NEOs covered under the Transitional Compensation Plan, a resignation shall not be considered to be "voluntary": (a) if the resignation by Mr. Grenesko occurs during the 30-day period immediately following the first anniversary of the Change in Control; or (b) if the resignation occurs after a successor refuses to assume and agree to perform Tribune Company's obligations under the Plan or (c) if, subsequent to the Change in Control and prior to such resignation, there has been a reduction in the nature or scope of the participant's authority or duties, a reduction in the participant's compensation or benefits or a change in the city in which he is required to perform his duties.

Mr. FitzSimons received a payment under the Transitional Compensation Plan in 2007 as a result of his termination of employment in December 2007. Mr. Reardon received a payment under the Transitional Compensation Plan in 2008 as a result of his termination of employment in February 2008. The amounts paid to Messrs. FitzSimons and Reardon under the Transitional Compensation Plan are described in more detail below.

197

**Payment Obligations under Transitional Compensation Plan upon Termination of Employment of NEO**

Upon a termination under the circumstances outlined above, NEOs covered by the Transitional Compensation Plan would be entitled to a lump sum payment equal to three times the sum of (1) the highest annual rate of the executive's base salary in effect within three years of the date of the participant's termination; plus (2) 200% of the participant's target bonus payable for the year in which the change in control occurs. The Transitional Compensation Plan would also provide outplacement benefits and continuation of medical, life insurance and disability benefits for up to three years. This table shows the amounts that would be paid under those circumstances to Messrs. Grenesko, Kenney and Smith and shows the amounts that were actually paid to Messrs. FitzSimons and Reardon in connection with the termination of their employment. For Messrs. Grenesko, Kenney and Smith, the amounts in the table are based on an assumption that the terminations took place on Dec. 31, 2007 and that benefits costs continue at 2007 levels.

| | Mr. FitzSimons | Mr. Grenesko | Mr. Kenney | Mr. Smith | Mr. Reardon |
|---|---|---|---|---|---|
| Severance Payment | $ 10,657,500 | $ 4,403,250 | $ 3,118,500 | $ 4,619,940 | $ 3,708,000 |
| Outplacement | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Benefits Continuation | 40,827 | 28,168 | 38,473 | 28,190 | 38,658 |

Under the Transitional Compensation Plan, the NEOs covered by the Transitional Compensation Plan would also be eligible to receive a "gross-up" payment from us to the extent that they incur excise taxes under Section 4999 of the Internal Revenue Code and to account for the income tax liability resulting from the "gross-up." Had a payment been made to the NEOs under the Transitional Compensation Plan as a result of termination as of Dec. 31, 2007, they would have been entitled to receive a "gross-up" payment in the following amounts: Mr. Grenesko: $2,747,914; Mr. Kenney: $2,632,387; and Mr. Smith: $2,565,866. Messrs. FitzSimons and Reardon received gross-up payments of $5,308,621 and $2,410,449, respectively.

In addition, upon a termination under the circumstances outlined above as of Dec. 31, 2007, Messrs. Grenesko, Kenney and Smith would each be entitled to receive $2,083,333 in respect of the Second Tranche Units held by them under the MEIP. Mr. Zell does not hold any units under the MEIP. In connection with their respective terminations, all MEIP Second Tranche Units held by Messrs. FitzSimons and Reardon were settled in cash for $2,916,667 and $1,500,000, respectively. Further, as noted above, pursuant to the terms of the Incentive Plan and individual equity awards, upon completion of the Leveraged ESOP Transactions, all outstanding equity awards immediately vested and were settled in cash.

As noted above, pursuant to their terms and as a result of the Leveraged ESOP Transactions, accrued amounts under the Supplemental Pension Plan, Supplemental Savings Plan, and Deferred Bonus Plan were paid in a lump sum to all plan participants, including the NEOs.

Execution of a release of claims is not a prerequisite to the receipt of payments under the Transitional Compensation Plan. The Transitional Compensation Plan does not include noncompete, nonsolicit, nondisparagement or confidentiality requirements.

198

Source: TRIBUNE CO, 10-K, March 20, 2008

## 2007 Non-Employee Director Compensation

Directors who are our employees receive no additional compensation for service as a director. In 2007, the non-employee directors received a combination of cash payments and equity-based compensation as shown in the table below and were also reimbursed for actual out-of-pocket expenses incurred in attending meetings. For 2008, non-employee directors will receive a $100,000 cash retainer. Further, the Audit Committee chair will be paid an additional $15,000 cash retainer and each member of the Audit Committee, including the chair, will be paid an additional $6,000 cash retainer. The current members of the Committee are currently evaluating the non-employee director compensation program for future years. The Company does not expect to pay any equity compensation to our non-employee directors.

| Name (1)(2) | Fees Earned or Paid in Cash ($) | Stock Awards (3)($) | Total ($) |
|---|---|---|---|
| Jeffrey S. Berg* | $ 0 | $ 0 | $ 0 |
| Jeffrey Chandler | 0 | 0 | 0 |
| Roger Goodan | 0 | 0 | 0 |
| Brian L. Greenspun* | 0 | 0 | 0 |
| Enrique Hernandez, Jr. | 85,000 | 75,000 | 160,000 |
| Betsy D. Holden* | 81,000 | 75,000 | 156,000 |
| Robert S. Morrison* | 85,000 | 75,000 | 160,000 |
| William A. Osborn* | 96,000 | 75,000 | 171,000 |
| William C. Pate* | 0 | 0 | 0 |
| J. Christopher Reyes | 81,000 | 75,000 | 156,000 |
| William Stinehart, Jr. | 0 | 0 | 0 |
| Dudley S. Taft | 81,000 | 75,000 | 156,000 |
| Miles D. White | 75,000 | 75,000 | 150,000 |
| Mary Agnes Wilderotter* | 0 | 0 | 0 |
| Frank E. Wood* | 0 | 0 | 0 |
| Samuel Zell* (4) | 75,000 | 75,000 | 150,000 |

---

(1)  Current members of the Board of Directors are noted with an asterisk (*).

(2)  Messrs. Chandler, Goodan and Stinehart served on the Board of Directors from Jan. 1 through June 4, 2007. Mr. Zell joined the Board on May 9, 2007 and was appointed Chairman and Chief Executive Officer of the Company on Dec. 20, 2007. Mr. Reyes served on the Board until July 18, 2007. Mr. White served on the Board until Aug. 6, 2007. On Dec. 20, 2007, Messrs. Hernandez, Morrison and Taft resigned from the Board and Ms. Wilderotter and Messrs. Berg, Greenspun, Pate and Wood were elected to serve on the Board along with Ms. Holden and Messrs. Osborn and Zell, who each continued as directors.

(3)  The amounts shown in this column include the compensation expense recorded by the Company with respect to the stock awards as determined pursuant to FAS No. 123R. Such amounts also equal the grant date fair value of these awards. No director held any stock or options as of Dec. 30, 2007.

(4)  Amounts shown in this table for Mr. Zell were paid to Mr. Zell solely in his capacity as a member of the Board of Directors and prior to his appointment as Chairman and Chief Executive Officer of the Company. Accordingly, these amounts are not reflected in the Summary Compensation Table.

## 2007 Director Compensation

*Cash retainer.* In 2007, each non-employee director received a $75,000 cash retainer.

*Attendance Fees.* Directors did not receive fees for attendance at Board or committee meetings in 2007.

*Committee Chairs and Membership.* In light of the significant responsibilities imposed on certain Board committee members, in 2007 the Audit Committee chair was paid an additional $15,000 cash retainer and the chairs of each of the former Compensation & Organization Committee and the former Nominating & Governance Committee were paid an

Source: TRIBUNE CO, 10-K, March 20, 2008

additional $10,000 cash retainer. In addition, in 2007, all Audit Committee members, including the chairman of the Audit Committee, received an additional $6,000 cash retainer.

*Stock Awards*.  In 2007, each non-employee director received a $75,000 stock award. The number of shares awarded was based on the closing price of Tribune stock on the date of the annual meeting, May 9, 2007.

**Compensation Committee Interlocks and Insider Participation**—Jeffrey Chandler is a trustee and a beneficiary of the Chandler Trusts. The Chandler Trusts and the Company engaged in certain transactions in connection with the Leveraged ESOP Transactions, which are described in further detail in "Item 1. Business – Significant Events" and "Item 13. Transactions with Related Persons, Promoters and Certain Control Persons." Mr. Chandler served on Tribune's Compensation & Organization Committee in 2007 through June 4, 2007.

200

Source: TRIBUNE CO, 10-K, March 20, 2008

**ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.**

**Security Ownership of Certain Beneficial Owners and Management**

The following table shows the beneficial ownership of Tribune common stock by each director, each current and former executive officer named in the summary compensation table included in Item 11 hereof, and by all directors and executive officers as a group, in each case as of March 20, 2008. Unless otherwise indicated, the address of each person listed is c/o Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611. Except as otherwise noted, the persons named in the table below have sole voting and investment power with respect to all shares shown as beneficially owned by them.

| Name of Beneficial Owner | Shares of Common Stock (1) | Warrants Exercisable within 60 days (2) | Percentage of Shares (3) |
|---|---|---|---|
| **5% Shareholders:** | | | |
| Tribune Employee Stock Ownership Plan | | | |
| c/o GreatBanc Trust Company | | | |
| 801 Warrenville Road, Suite 500 | | | |
| Lisle, IL 60532 | 56,521,739 | 0 | 100% |
| EGI-TRB, L.L.C. (2) | | | |
| 2 North Riverside Plaza | | | |
| Chicago, IL 60606 | 0 | 30,997,777 | 35.42% |
| **Directors and Executive Officers:** | | | |
| Jeffrey S. Berg | 0 | 0 | * |
| Dennis J. FitzSimons | 0 | 0 | * |
| Brian L. Greenspun (4) | 0 | 6,901,311 | 10.88% |
| Donald C. Grenesko | 0 | 0 | * |
| Betsy D. Holden | 0 | 0 | * |
| Crane H. Kenney | 0 | 0 | * |
| William A. Osborn | 0 | 0 | * |
| William C. Pate (5) | 0 | 941,965 | 1.64% |
| John E. Reardon | 0 | 0 | * |
| Scott C. Smith | 0 | 0 | * |
| Mary Agnes Wilderotter | 0 | 0 | * |
| Frank E. Wood | 0 | 0 | * |
| Samuel Zell (6) | 0 | 0 | * |
| Directors and Executive Officers as a group (15 persons) | 0 | 7,843,276 | 12.19% |

---

\*    Less than 1% of the issued and outstanding common stock.

(1)    As of March 20, 2008, there were 56,521,739 shares of common stock issued and outstanding, all of which were held by the Tribune Employee Stock Ownership Plan (the "ESOP"). On Dec. 20, 2007, the Board approved the Company's Management Equity Incentive Plan which provides for 8,695,652 phantom units (the "Units") that may be awarded to eligible members of Company management and other key employees at the discretion of the Board. In the aggregate, the Units represent approximately 8% of the fully diluted outstanding our common stock (subject to customary anti-dilution adjustments). Although the value of the Units is based on the value of our common stock, the Units do not give the holder the right to acquire any common stock, or other securities of the Company, at any time. Accordingly, the Units are disregarded for purposes of determining the figures that appear under the column headings "Shares of Common Stock" and "Percentage of Shares."

(2)    On Dec. 20, 2007, immediately following the consummation of the Merger, the Zell Entity purchased from the Company, pursuant to the Securities Purchase Agreement dated April 1, 2007 by and among the Company, the Zell Entity and Mr. Zell, a 15-year warrant to purchase 43,478,261 shares of common stock (subject to adjustment). Immediately thereafter, the Zell Entity transferred interests in the initial warrant, totaling warrants to purchase 12,480,484 shares, to certain permitted assignees, including entities controlled by each of Mr. Greenspun, Mr. Pate and

201

Source: TRIBUNE CO, 10-K, March 20, 2008

certain senior employees of EGI, an affiliate of the Zell Entity. The warrants are exercisable, in whole or in part, at any time from Dec. 20, 2007 through Dec. 20, 2022 and have an initial aggregate exercise price of $500 million ($11.50 per share), increasing by $10 million per year, up to a maximum aggregate price of $600 million ($13.80 per share), in each case, subject to adjustment. The Company, the ESOP, the Zell Entity and each holder of a warrant is party to the Investor Rights Agreement, which is described in further detail in, and filed as an exhibit to, this Annual Report on Form 10-K.

(3)  These figures have been calculated in accordance with SEC rules by dividing (i) the number of shares of common stock beneficially owned by such person or entity, including shares that may be acquired by exercise of the warrant held by such person or entity, by (ii) the number of common shares held by the ESOP *plus* the number of shares of common stock that may be purchased in connection with the exercise of the warrant held by such person or entity. If all of the warrants were deemed exercised and all of the underlying shares were deemed outstanding, the percentages in this column would be as follows: ESOP: 56.52%; EGI-TRB, L.L.C.: 31%; Mr. Greenspun: 6.9%; Mr. Pate: 0.94%; and all directors and executive officers as a group: 7.84%.

(4)  As described in footnote 2, following the Merger, the Zell Entity transferred warrants representing the right to acquire 6,901,311 shares of common stock to an entity controlled by Mr. Greenspun.

(5)  As described in footnote 2, following the Merger, the Zell Entity transferred warrants representing the right to acquire 941,965 shares of common stock to an entity controlled by Mr. Pate.

(6)  Samuel Zell is the chairman and chief executive officer of the Company. As disclosed in the table above and described in footnote 2, the Zell Entity holds a warrant pursuant to which it may purchase 30,997,777 shares of our common stock. Sam Investment Trust ("SIT"), the sole member of the Zell Entity, is a trust established for the benefit of Mr. Zell and his family. Chai Trust Company, LLC, an Illinois limited liability company ("Chai Trust"), is the trustee of SIT and has investment control with respect to SIT. Mr. Zell is not a managing director or officer of Chai Trust, and does not otherwise exercise investment control with respect to SIT or the Zell Entity. As such, the amount of shares indicated as beneficially owned by Mr. Zell does not include the securities of the Company beneficially owned by the Zell Entity.

**Equity Compensation Plan Information Table**

The following table provides information as of Dec. 30, 2007 regarding the number of shares of Tribune common stock that may be issued under Tribune's equity compensation plans.

| Plan Category | (a)<br>Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b)<br>Weighted-average exercise price of outstanding options, warrants and rights | (c)<br>Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | — | N/A | — |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | — | N/A | — |

202

Source: TRIBUNE CO, 10-K, March 20, 2008

ITEM 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

**Policy Regarding Related Person Transactions**

We or one of our subsidiaries may occasionally enter into transactions with certain "related persons." Related persons include our executive officers, directors, 5% or more beneficial owners of our common stock, immediate family members of these persons and entities in which one of these persons has a direct or indirect material interest. We refer to transactions with these related persons as "related person transactions." Beginning in February 2007, the Audit Committee became responsible for the review and approval of each related person transaction exceeding $120,000. The Audit Committee considers all relevant factors when determining whether to approve a related party transaction including, without limitation, whether the terms of the proposed transaction are at least as favorable to us as those that might be achieved with an unaffiliated third party. Among other relevant factors, the Audit Committee considers the following:

- The size of the transaction and the amount payable to a related person.

- The nature of the interest of the related person.

- Whether the transaction may involve a conflict of interest.

- Whether the transaction involves the provision of goods or services to us that are available from unaffiliated third parties and, if so, whether the proposed transaction is on terms and made under circumstances that are at least as favorable to us as would be available in comparable transactions with or involving unaffiliated third parties.

The policies and procedures relating to the Audit Committee approval of related person transactions are available on our website at www.tribune.com. All of the related person transactions occurring during 2007 and described below under the heading "Transaction with Related Persons, Promoters and Certain Control Persons" were approved by the Audit Committee or by the full Board of Directors.

**Transactions with Related Persons, Promoters and Certain Control Persons**

*Chandler Trusts.* Jeffrey Chandler, Roger Goodan and William Stinehart, Jr., formerly members of our Board, are trustees of Chandler Trust No. 1 and Chandler Trust No. 2 (the "Chandler Trusts"). Mr. Chandler and Mr. Goodan are also beneficiaries of these trusts. The Chandler Trusts were the principal shareholders of The Times Mirror Company ("Times Mirror") prior to the merger of Times Mirror into the Company on June 12, 2000. In connection with the merger in 2000, the Chandler Trusts exchanged their Times Mirror common stock for 36,304,135 shares of the Company's common stock and the Company amended its bylaws to grant the Chandler Trusts the right to nominate three directors, one for each of the Board's three classes. Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. were the Chandler Trusts' initial nominees and became directors of the Company following the merger. Mr. Chandler and Mr. Goodan are cousins.

Pursuant to the terms of a Registration Rights Agreement dated April 1, 2007 among the Company and the Chandler Trusts, the Chandler Trusts tendered into the Company's tender offer commenced on April 25, 2007 (the "Tender Offer") all shares of the Company's common stock held by them at the expiration of the Tender Offer, and caused Messrs. Chandler, Goodan and Stinehart, each of whom were serving on the Board as a representative of the Chandler Trusts, to resign as directors of the Company, effective June 4, 2007. On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman Sachs and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of the Company's common stock, the remainder of the shares owned by them following the Tender Offer, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to a shelf registration statement that the Company filed with the Securities and Exchange Commission that became effective on April 25, 2007. Following the closing of this transaction on June 7, 2007, the Chandler Trusts no longer owned any shares of the Company's common stock.

In 1997, the Chandler Trusts and Times Mirror entered into a transaction which, through the formation of TMCT, LLC ("TMCT"), enabled Times Mirror to retire for accounting purposes a substantial block of Times Mirror stock. Times Mirror and its affiliates contributed to TMCT real property used in Times Mirror's business operations and cash and the Chandler Trusts contributed Times Mirror stock. Times Mirror leased back the real property under long-term leases. Upon completion

203

of the merger of Times Mirror into the Company, the Company assumed these leases, and the Times Mirror stock held by the limited liability company was converted into shares of the Company's common stock.

In 1999, the Chandler Trusts and Times Mirror formed TMCT II, LLC ("TMCT II") and entered into a similar transaction that again enabled Times Mirror to retire for accounting purposes a substantial block of stock. Times Mirror's contribution to TMCT II consisted of cash and securities. The Chandler Trusts again contributed Times Mirror stock that was converted into shares of the Company's common stock upon completion of the merger of Times Mirror into the Company.

On Sept. 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on Sept. 22, 2006, a total of 38.9 million shares of the Company's common stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. Following the distributions by TMCT and TMCT II, the Company's interests in each of TMCT and TMCT II were reduced to approximately five percent. The agreements also provided for certain put and call options relating to the Company's then remaining ownership interests in TMCT and TMCT II. In September 2007, the Company exercised these put rights and sold its remaining interests in TMCT and TMCT II to the Chandler Trusts.

In addition, on Sept. 22, 2006, the Company and TMCT amended the lease agreement for the eight properties the Company leases from TMCT. Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company was also granted an option to acquire the leased properties from Feb. 8, 2008 to three months prior to the expiration of the amended lease at the higher of fair market value or $195 million. In addition, the amendment extended the properties' current fixed rental rate through Aug. 7, 2021. The Company exercised the option to acquire the eight properties for $175 million on Jan. 29, 2008 and expects to close on the acquisition in April 2008. In 2007, the Company made $23.181 million of lease payments to TMCT.

The remaining 12.4 million shares of the Company's common stock held by TMCT and TMCT II were distributed on October 20, 2006 to the Company and the Chandler Trusts in accordance with their respective ownership interests. The Company received 0.6 million shares and the Chandler Trusts received 11.8 million shares. Information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 8 to the Company's consolidated financial statements in Part II, Item 8, hereof.

*EGI-TRB, L.L.C. and Equity Group Investments, L.L.C.* EGI-TRB, L.L.C. (the "Zell Entity") was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions and is wholly owned by Sam Investment Trust ("SIT"), a trust established for the benefit of Sam Zell and his family. The trustee of SIT is Chai Trust Company, LLC, an Illinois limited liability company ("Chai Trust"). Equity Group Investments, L.L.C. ("EGI") is a private corporate and real estate investment firm co-founded by Mr. Zell in 1968, and is owned by trusts established for the benefit of Mr. Zell and his family, but not SIT. EGI provides investment advisory services to Chai Trust, however, EGI does not have investment control over Chai Trust or the assets held by the trusts controlled by Chai Trust. As such, EGI has no ownership or beneficial interest in either the Zell Entity or SIT, is not a party to any of the agreements entered into in connection with the Leveraged ESOP Transactions and has no beneficial interest therein.

In connection with the Leveraged ESOP Transactions, Sam Zell was appointed to the Company's Board of Directors on May 9, 2007 and elected to serve as Chairman of the Board and Chief Executive Officer on Dec. 20, 2007. Mr. Zell is the President of the Zell Entity and the President and Chairman of EGI. Further, William C. Pate was also appointed to the Company's Board of Directors on Dec. 20, 2007. Mr. Pate is a Vice President of the Zell Entity and the Chief Investment Officer and a Managing Director of EGI.

As more fully described in "Item 1. Business – Significant Events," the Zell Entity made certain investments in the Company. The Zell Entity is also party to certain of the agreements entered into in connection with the Leveraged ESOP Transactions and had an interest in the Leveraged ESOP Transactions. In particular, on Dec. 20, 2007, immediately following the consummation of the Merger, the Zell Entity purchased from the Company, pursuant to the Securities Purchase Agreement (the "Securities Purchase Agreement") dated April 1, 2007 by and among the Company, the Zell Entity and Mr. Zell, a $225 million subordinated promissory note and a 15-year warrant to purchase 43,478,261 shares of the Company's common stock (subject to adjustment). Immediately thereafter, the Zell Entity transferred interests in the initial subordinated promissory note and warrant, totaling approximately $64.6 million of the aggregate principal amount of the subordinated promissory note and warrants to purchase 12,480,484 shares, to certain permitted assignees, including entities controlled by each of Mr. Greenspun, a member of the Company's Board of Directors, Mr. Pate and certain senior

204