employees of EGI, an affiliate of the Zell Entity. The warrants are exercisable, in whole or in part, at any time from Dec. 20, 2007 through Dec. 20, 2022 and have an initial aggregate exercise price of $500 million ($11.50 per share), increasing by $10 million per year, up to a maximum aggregate price of $600 million ($13.80 per share), in each case, subject to adjustment. Pursuant to the Securities Purchase Agreement, the Company also reimbursed the Zell Entity for $5 million of expenses incurred in connection with the Leveraged ESOP Transactions.

*Investor Rights Agreement.* Each of the Zell Entity and the Trustee (on behalf of the ESOP) are a party to that certain Investor Rights Agreement (the "Investor Rights Agreement") dated as of April 1, 2007 to which each of the Zell Entity and the Trustee (on behalf of the ESOP) have agreed to vote their shares such that (i) the initial directors on the Board following the Merger shall serve until the third annual election following the consummation of the Merger, (ii) there shall be two directors designated by the Zell Entity and (iii) there shall be one director who shall be the chief executive officer of the Company. The Investor Rights Agreement also contains provisions governing the transfer of the shares of Company common stock held by the Zell Entity and the ESOP, preemptive rights granted to the Zell Entity and the ESOP by the Company, and specified actions requiring the approval of a majority of the entire Board, including a majority of the independent directors and one designee of the Zell Entity. The parties to the Investors Rights Agreement also have agreed to take all actions necessary to enable the Company to maintain its election for subchapter S status under the Internal Revenue Code.

*The ESOP and the Trustee.* Pursuant to the terms of the ESOP Purchase Agreement, on April 1, 2007, the Company sold 8,928,571 shares of Company Common Stock to the ESOP at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP executed by GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee (the "Trustee") in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through the ESOP's use of annual contributions from the Company to the ESOP or distributions paid on the shares of Company Common Stock held by the ESOP. On the same date, the Company and the Trustee, on behalf of the ESOP, entered into the ESOP Loan Agreement, which documents the extension of credit from the Company to the ESOP evidenced by the ESOP Note. The ESOP Note contemplates payment by the ESOP to the Company in 30 annual installments with an annual interest rate of approximately 5%. The Trustee, on behalf of the ESOP, also entered into the ESOP Pledge Agreement with the Company whereby the ESOP has agreed to pledge the shares of Company Common Stock acquired by the ESOP from the Company as collateral for the Company's extension of credit to the ESOP.

**Director Independence**

Pursuant to the Company's Amended and Restated Bylaws, the Board of Directors must have five independent directors. The Bylaws provide that a director shall be deemed "independent" if such director would be independent under the New York Stock Exchange listing standards. Further, a director is "independent" under the New York Stock Exchange listing standards if the Board affirmatively determines that the director has no material relationship with Tribune directly or as a partner, shareholder or officer of an organization that has a relationship with Tribune.

The Board has reviewed the independence of our current non-employee directors and found that each of them, namely Jeffrey S. Berg, Brian L. Greenspun, Betsy D. Holden, William A. Osborn, William C. Pate, Mary Agnes Wilderotter and Frank E. Wood, is independent within the meaning of the rules of the New York Stock Exchange. In making these determinations, the Board considered the relationships described above under "Transactions with Related Person, Promoters and Certain Control Persons." With respect to Mr. Greenspun, the Board considered the fact that, from time to time, entities in which Mr. Greenspun has an ownership interest have purchased and may continue to purchase, in the ordinary course of business, advertising from the Company's subsidiaries and affiliates. With respect to Mr. Osborn, the Board considered the fact that he is the Chairman of Northern Trust Corporation, which in 2007, together with its subsidiaries, provided trust, custody, cash management and related services to Tribune and certain of its employee benefit plans and was one of several lenders under Tribune's former credit facilities. The Board has determined that these relationships are not material and do not cause any non-employee director to be considered not independent under the rules of the New York Stock Exchange.

In addition, the Board reviewed the independence of Jeffrey Chandler, Roger Goodan, Enrique Hernandez, Jr., Robert S. Morrison, J. Christopher Reyes, William Stinehart, Jr., Dudley S. Taft and Miles D. White, who each resigned their directorships in 2007, and found that each of them was independent within the meaning of the rules of the New York Stock Exchange through the date of his or her resignation. In making these determinations, the Board considered the relationships

Source: TRIBUNE CO, 10-K, March 20, 2008

described above under "Transactions with Related Persons, Promoters and Certain Control Persons." With respect to Mr. Stinehart, the Board considered the fact that he was a partner in the law firm of Gibson, Dunn & Crutcher LLP until his retirement in December 2004. Gibson, Dunn & Crutcher LLP was external corporate counsel to Times Mirror and has, from time to time, provided legal services to Tribune since the merger. The Board has determined that these relationships were not material and do not cause any such former non-employee director to be considered not independent under the rules of the New York Stock Exchange through the date of his or her resignation.

Other than the matters described above and the matters described under "Transactions with Related Persons, Promoters and Certain Control Persons," there were no related person transactions, relationships or arrangements involving our current or former directors that were considered by the Board in evaluating and determining the independence of the current and former non-employee directors named above.

## ITEM 14.   PRINCIPAL ACCOUNTANT FEES AND SERVICES.

### Policy on Audit Committee Pre-Approval of Audit, Audit-Related and Permissible Non-Audit Services of Independent Accountants

The Audit Committee has responsibility for appointing, setting fees, and overseeing the work of the independent accountants. In recognition of this responsibility, the Audit Committee has established a policy to pre-approve all audit, audit-related and permissible non-audit services provided by the independent accountants, subject to de minimis exceptions for non-audit services that are approved by the Audit Committee prior to the completion of the audit. The projects and categories of service that the Audit Committee pre-approves are as follows:

*Audit Services.* Audit services include work performed in connection with the audit of the consolidated financial statements, as well as work that is normally provided by the independent accountants in connection with statutory and regulatory filings or engagements. These services include work performed in connection with the audit of internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002.

*Audit-Related Services.* These services are for assurance and related services that are traditionally performed by the independent accountants and that are reasonably related to the work performed in connection with the audit, including due diligence related to mergers and acquisitions, employee benefit plan audits and audits of subsidiaries and affiliates.

*Tax Services.* These services are related to tax compliance, tax advice and tax planning.

*Other Services.* These services include all other permissible non-audit services provided by the independent accountants and are pre-approved on an engagement-by-engagement basis.

Prior to the engagement of the independent accountants, the Audit Committee pre-approves these services by category of service. The fees are budgeted and the Audit Committee requires the independent accountants and management to report actual fees versus the budget periodically throughout the year by category of service. During the year, circumstances may arise when it may become necessary to engage the independent accountants for additional services not contemplated in the original pre-approval for which advance approval is required. In those instances, the Audit Committee pre-approves the services before engaging the independent accountants.

The Audit Committee has delegated pre-approval authority to the chair of the committee. The chair must report, for informational purposes only, any pre-approval decisions to the Audit Committee at its next scheduled meeting.

206

Source: TRIBUNE CO, 10-K, March 20, 2008

**Fees Paid to Independent Accountants**

The fees for all services provided by the independent accountants for the fiscal years ended Dec. 30, 2007 and Dec. 31, 2006 are shown below (in thousands):

|  | 2007 | 2006 |
|---|---|---|
| Audit fees (1) | $    2,225 | $    2,435 |
| Audit-related fees (2) | 1,487 | 1,543 |
| Tax fees | — | — |
| All other fees: | | |
|    Employee benefit plan filings | 172 | 160 |
|    Accounting research software license | 2 | 2 |
| Total all services | $    3,886 | $    4,140 |

_____

(1)  Fees for the integrated audit of Tribune's annual consolidated financial statements and internal controls over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002. Fees also include reviews of quarterly Forms 10-Q.

(2)  Includes audits of Tribune's employee benefit plans, audits of certain Tribune affiliates and audits of subsidiary financial statements.

## PART IV

## ITEM 15.   EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.

(a)(1)&(2)  Financial Statements and Financial Statement Schedule filed as part of this report. Also included are the financial statements and related notes of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company whose equity interests collateralize certain registered securities of the Company, and the related reports of the independent registered public accounting firm.

See Index to Financial Statements and Financial Statement Schedule on page 78 hereof.

(a)(3)  Index to Exhibits filed as part of this report

See Exhibit Index on pages 209 to 212 hereof.

(b)  Exhibits

See Exhibit Index on pages 209 to 212 hereof.

(c)  Financial Statement Schedule

See Index to Financial Statements and Financial Statement Schedule on page 78 hereof.

Source: TRIBUNE CO, 10-K, March 20, 2008

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on March 20, 2008.

TRIBUNE COMPANY
(Registrant)

/s/ SAMUEL ZELL
Samuel Zell
Chairman and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 20, 2008.

| Signature | Title |
|---|---|
| /s/ SAMUEL ZELL<br>Samuel Zell | Chairman, Chief Executive Officer and Director |
| /s/ DONALD C. GRENESKO<br>Donald C. Grenesko | Senior Vice President/Finance and Administration (principal financial officer) |
| /s/ R. MARK MALLORY<br>R. Mark Mallory | Vice President and Controller (principal accounting officer) |
| /s/ BETSY D. HOLDEN<br>Betsy D. Holden | Director |
| /s/ WILLIAM A. OSBORN<br>William A. Osborn | Director |
| /s/ WILLIAM C. PATE<br>William C. Pate | Director |
| /s/ FRANK E. WOOD<br>Frank E. Wood | Director |

208

Source: TRIBUNE CO, 10-K, March 20, 2008

# TRIBUNE COMPANY

## EXHIBIT INDEX

Exhibits marked with an asterisk (*) are incorporated by reference to documents previously filed by Tribune Company with the Securities and Exchange Commission, as indicated. Exhibits marked with a circle (o) are management contracts or compensatory plan contracts or arrangements filed pursuant to Item 601(b)(10)(iii)(A) of Regulation S-K. All other documents listed are filed with this Report.

| Number | Description |
|---|---|
| 3.1(i) * | Amended and Restated Certificate of Incorporation of Tribune Company (Exhibit 3.1 to Current Report on Form 8-K dated Dec. 20, 2007) |
| 3.1(ii) | Amended and Restated Bylaws of Tribune Company (as amended and in effect as of Feb. 12, 2008) |
| 4.1 * | Indenture, dated as of March 1, 1992, between Tribune Company and Citibank, N.A. (successor to Bank of New York, Bank of Montreal Trust Company and Continental Bank, N.A.), as Trustee (Exhibit 4.1 to Registration Statement on Form S-3, Registration No. 333-02831) |
| 4.2 * | Indenture, dated as of Jan. 1, 1997, between Tribune Company and Citibank, N.A. (successor to Bank of New York), as Trustee (Exhibit 4 to Current Report on Form 8-K dated Jan. 14, 1997) |
| 4.3 * | Indenture, dated as of April 1, 1999, between Tribune Company and Citibank, N.A. (successor to Bank of New York and Bank of Montreal Trust Company), as Trustee for the PHONES securities (Exhibit 4 to Current Report on Form 8-K dated April 5, 1999) |
| 4.4 * | Indenture, dated Jan. 30, 1995, between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A. (successor to The Bank of New York, Wells Fargo Bank, N.A. and First Interstate Bank of California), as Trustee for the $7\frac{1}{4}\%$ Debentures due 2013 and $7\frac{1}{2}\%$ Debentures due 2023 (Exhibit 4.1 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.5 * | First Supplemental Indenture, dated as of June 12, 2000, among Tribune Company, The Times Mirror Company and The Bank of New York, as Trustee (Exhibit 4.13 to Current Report on Form 8-K dated June 12, 2000) |
| 4.6 * | Indenture, dated March 19, 1996, between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A., as Trustee for the 6.61% Debentures due 2027 and the $7\frac{1}{4}\%$ Debentures due 2096 (Exhibit 4.1 to The Times Mirror Company's Current Report on Form 8-K dated March 13, 1996) |
| 4.7 * | First Supplemental Indenture, dated as of Oct. 19, 1999, between The Times Mirror Company and Citibank, N.A., as Trustee (Exhibit 4.3 to The Times Mirror Company's Current Report on Form 8-K dated Oct. 19, 1999) |
| 4.8 * | Second Supplemental Indenture, dated as of June 12, 2000, among Tribune Company, The Times Mirror Company and Citibank, N.A., as Trustee (Exhibit 4.12 to Current Report on Form 8-K dated June 12, 2000) |
| 4.9 * | Agreement of Resignation, Appointment and Assumption, dated as of Sept. 4, 2002, among Tribune Company, The Bank of New York and Citibank, N.A., appointing Citibank, N.A. as Trustee under the Indentures dated March 1, 1992, Jan. 30, 1995, Jan. 1, 1997 and April 1, 1999 (Exhibit 4.7 to Annual Report on Form 10-K for 2004) |

Source: TRIBUNE CO, 10-K, March 20, 2008

| Number | Description |
|---|---|
| 4.10 * | Form of Exchangeable Subordinated Debenture due 2029 relating to the PHONES securities (Exhibit 4 to Current Report on Form 8-K dated April 13, 1999) |
| 4.11 * | Specimen Note for 7¼% Debenture due 2013 (Exhibit 4.2 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.12 * | Specimen Note for 7½% Debenture due 2023 (Exhibit 4.3 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.13 * | Officers' Certificate, dated Nov. 13, 1996, establishing the terms of the 7¼% Debentures due 2096 and attaching the specimen Form of Debenture (Exhibit 4.2 to The Times Mirror Company's Current Report on Form 8-K dated Nov. 7, 1996) |
| 4.14 * | Officers' Certificate, dated Sept. 9, 1997, establishing the terms of the 6.61% Debentures due 2027, and the specimen Form of Debenture (Exhibit 4.2 to The Times Mirror Company's Current Report on Form 8-K dated Sept. 4, 1997) |
| 4.15 * | Form of Note relating to Tribune Company's 4.875% Notes due 2010 (Exhibit 4.1a to Current Report on Form 8-K dated Aug. 10, 2005) |
| 4.16 * | Form of Note relating to Tribune Company's 5.25% Notes due 2015 (Exhibit 4.1b to Current Report on Form 8-K dated Aug. 10, 2005) |
| 4.17 * | Credit Agreement, dated as of May 17, 2007, by and among Tribune Company, as borrower, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, Citicorp North America, Inc., Bank of America, N.A., and Barclay's Bank plc, as co-documentation agents and J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner and Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners (Exhibit 4.1 to Current Report on Form 8-K dated May 17, 2007) |
| 4.18 * | Amendment No. 1 to Credit Agreement, dated as of June 4, 2007, by and among Tribune Company, as borrower, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, Citicorp North America, Inc., Bank of America, N.A., and Barclays Bank PLC, as co-documentation agents, and J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner and Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners (Exhibit 4.1 to Current Report on Form 8-K dated June 4, 2007) |
| 4.19 * | Form of Increase Joinder, by and among Tribune Company, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, and the various lenders party thereto (Exhibit 4.2 to Current Report on Form 8-K dated Dec. 20, 2007) |
| 4.20 * | Unsecured Interim Loan Agreement, dated as of Dec. 20, 2007, by and among Tribune Company, as borrower, the lenders party thereto, Merrill Lynch Capital Corporation, as administrative agent, JPMorgan Chase Bank, N.A., as syndication agent, Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, and J.P. Morgan Securities Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners (Exhibit 4.1 to Current Report on Form 8-K dated Dec. 20, 2007) |

Source: TRIBUNE CO, 10-K, March 20, 2008

| Number | Description |
|--------|-------------|
| 10.1 o* | Tribune Company Directors' Deferred Compensation Plan, as amended and restated effective as of Jan. 1, 2005 (Exhibit 10.2 to Current Report on Form 8-K dated Dec. 22, 2005) |
| 10.2 o* | The Times Mirror Company Deferred Compensation Plan for Non-Employee Directors (Exhibit 10.7 to The Times Mirror Company's Annual Report on Form 10-K for 1994) |
| 10.3 o* | Tribune Company Bonus Deferral Plan, as amended and restated as of Oct. 18, 2006 (Exhibit 10.1 to Current Report on Form 8-K dated Oct. 18, 2006) |
| 10.4 o* | Tribune Company Transitional Compensation Plan for Executive Employees, amended and restated effective as of July 19, 2006 (Exhibit 10.7 to Annual Report on Form 10-K for 2006) |
| 10.5 o* | Tribune Company Supplemental Defined Contribution Plan, as amended and effective as of Oct. 18, 2006 (Exhibit 10.2 to Current Report on Form 8-K dated Oct. 18, 2006) |
| 10.6 o | Tribune Company 1996 Nonemployee Director Stock Compensation Plan, as amended and restated effective as of Dec. 20, 2007 |
| 10.7 o* | Tribune Company Incentive Compensation Plan, as amended and restated effective May 12, 2004 (Exhibit 10.1 to Quarterly Report on Form 10-Q for the quarter ended June 27, 2004) |
| 10.8 * | Amended and Restated Lease Agreement between TMCT, LLC and Tribune Company, dated Sept. 22, 2006 (Exhibit 10.5 to Current Report on Form 8-K dated Sept. 21, 2006) |
| 10.9 o | Tribune Company's 2007 Management Equity Incentive Plan, effective as of Dec. 20, 2007 |
| 10.10 * | Subordinated Promissory Note, dated as of Dec. 20, 2007, issued by Tribune Company to EGI-TRB, L.L.C. (Exhibit (d)(45) to the final amendment to Schedule 13E-3 filed by Tribune Company with the Securities and Exchange Commission on Dec. 20, 2007) |
| 10.11 * | Warrant to Purchase Shares of Common Stock, dated Dec. 20, 2007, issued by Tribune Company to EGI-TRB, L.L.C. (Exhibit (d)(46) to the final amendment to Schedule 13E-3 filed by Tribune Company with the Securities and Exchange Commission on Dec. 20, 2007) |

211

| Number | Description |
|--------|-------------|
| 10.12 * | ESOP Purchase Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust created under the Tribune Employee Stock Ownership Plan (Exhibit 10.6 to Current Report on Form 8-K dated April 1, 2007) |
| 10.13 * | ESOP Loan Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan (Exhibit 10.7 to Current Report on Form 8-K dated April 1, 2007) |
| 10.14 * | ESOP Note, dated as of April 1, 2007, executed by GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan in favor of Tribune Company (Exhibit 10.8 to Current Report on Form 8-K dated April 1, 2007) |
| 10.15 * | ESOP Pledge Agreement, dated as of April 1, 2007, between the Company and GreatBanc Trust Company, not in its individual or corporate capacity but solely in its capacity as trustee of the Tribune Employee Stock Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan (Exhibit 10.9 to Current Report on Form 8-K dated April 1, 2007) |
| 10.16 * | Investor Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (Exhibit 10.12 to Current Report on Form 8-K dated April 1, 2007) |
| 10.17 * | Tribune Employee Stock Ownership Plan (Exhibit 10.14 to Current Report on Form 8-K dated April 1, 2007) |
| 10.18 * | Tribune Employee Stock Ownership Trust, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust (Exhibit 10.15 to Current Report on Form 8-K dated April 1, 2007) |
| 14 * | Code of Ethics for CEO and Senior Financial Officers (Exhibit 14 to Annual Report on Form 10-K for 2003) |
| 21 | Table of Subsidiaries of Tribune Company |
| 23 | Consent of Independent Registered Public Accounting Firm |
| 31.1 | Rule 13a-14 Certification of Chief Executive Officer |
| 31.2 | Rule 13a-14 Certification of Chief Financial Officer |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer |
| 99.1 | Report of Deloitte & Touche, LLP, Independent Registered Public Accounting Firm, dated March 11, 2008, on the financial statements of Television Food Network, G.P., a subsidiary of the E.W. Scripps Company, as of and for the year ended Dec. 31, 2007. |

212

Source: TRIBUNE CO, 10-K, March 20, 2008

Exhibit 3.1(ii)

**Amended and Restated Bylaws**

**of**

**Tribune Company**

**(a Delaware Corporation)**

**(As amended and in effect as of February 12, 2008)**

## ARTICLE I

Offices

The corporation may have offices at such places both within and without the State of Delaware as the board of directors may from time to time determine or the business of the corporation may require.

## ARTICLE II

Meetings of Stockholders

Section 1.       All meetings of the stockholders shall be held at such place, in or out of the state of Delaware, as may be fixed from time to time by the board of directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof.

Section 2.       Annual meetings of stockholders shall be held at such date and time as shall be designated by the board of directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof, at which the stockholders shall elect by a plurality vote a board of directors, and transact such other business as may properly be brought before the meeting.  Unless otherwise provided in the certificate of incorporation, voting at all elections for directors need not be by ballot and shall not be cumulative.  If the election of directors shall not be held on the day designated for any annual meeting, or at any adjournment thereof, the board of directors shall cause the election to be held at a special meeting of the stockholders as soon thereafter as convenient.  At such meeting, the stockholders may elect directors and transact other business with the same force and effect as at an annual meeting.

Section 3.       Written notice of the annual meeting stating the place, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.

Section 4.       The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a

complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

Section 5.        Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the certificate of incorporation, may be called by the chief executive officer, president or chairman, and shall be called by the president or secretary at the request in writing of a majority of the board of directors, or at the request in writing of stockholders owning ten percent (10%) or more of the entire capital stock of the corporation issued and outstanding and entitled to vote. Such request shall state the purpose or purposes of the proposed meeting.

Section 6.        Written notice of a special meeting stating the place, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting and the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, to each stockholder entitled to vote at such meeting.

Section 7.        Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 8.        The holders of a majority of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the certificate of incorporation; provided that if a separate class vote is required with respect to any matter, the holders of a majority of the outstanding shares of such class, present in person or by proxy, shall constitute a quorum of such class, and, except as otherwise provided by law or the certificate of incorporation, the affirmative vote of a majority of shares of such class so present shall be the act of such class. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

2

Source: TRIBUNE CO, 10-K, March 20, 2008

Section 9.       When a quorum is present at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which by express provision of statute or of the certificate of incorporation a different vote is required, in which case such express provision shall govern and control the decision of such question.

Section 10.       Each stockholder shall, at every meeting of the stockholders, be entitled to one vote in person or by proxy for each share of the capital stock having voting power held by such stockholder, but no proxy shall be voted on after three years from its date, unless the proxy provides for a longer period.

Section 11.       Any action required to be taken at any annual or special meeting of stockholders of the corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

Section 12.       _Inspectors._ At any meeting of the stockholders, the board of directors may, or upon the request of any one or more stockholders or proxies holding or representing not less than 10 percent of the outstanding shares shall, appoint one or more persons as inspectors for such meeting. Such inspectors shall ascertain and report the number of shares represented at the meeting, based upon their determination of the validity and effect of proxies, count all votes and report the results, and do all such other acts as are proper to conduct the election and voting with impartiality and fairness. Each report of an inspector shall be in writing and signed by the inspector or by a majority of them if there be more than one inspector acting at such meeting. If there is more than one inspector, the report of a majority shall be the report of the inspectors. The report of the inspector or inspectors on the number of shares represented at the meeting and the results of the voting shall be prima facie evidence thereof.

ARTICLE III

Directors

Section 1.       The number of directors which shall constitute the whole board shall consist of nine directors. Subject to the last sentence of this paragraph, the following qualifications for directors shall apply: two (2) directors shall be persons designated by EGI-TRB, L.L.C. ("_EGI-TRB_") pursuant to that certain Investor Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, solely as trustee of the Tribune Employee Stock

3

Source: TRIBUNE CO, 10-K, March 20, 2008

Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan (such directors referred to as the "EGI-TRB Designees"); five (5) directors shall be "Independent Directors" as such term is defined below; one (1) director shall be the chief executive officer of the corporation for so long as such person serves in such capacity; and, subject to the immediately following sentence, one (1) director shall be without qualification. Notwithstanding the foregoing, the two (2) EGI-TRB Designees shall become directors without qualification when EGI-TRB and its permitted transferees no longer hold of record and/or beneficially own an aggregate of at least ten percent (10%) of the outstanding shares of common stock, par value $0.01 per share, of the corporation (including shares underlying that certain Warrant initially issued to EGI-TRB by the corporation pursuant to that certain Securities Purchase Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB and Samuel Zell) on a fully diluted basis. Not more than two (2) of the directors other than the director serving as the chief executive officer of the corporation shall be Affiliates of EGI-TRB, and not more than two (2) directors shall be officers or employees of the corporation, it being understood that for these purposes the chairman of the board of directors shall not be deemed to be an officer or employee of the corporation.

For purposes hereof, the term "Independent Director" shall mean a director that has no material relationship with the corporation directly or as a partner, shareholder or officer of an organization that has a relationship with the corporation as determined under the director independence standards of the New York Stock Exchange, as amended from time to time. For purposes hereof, the term "Affiliate" shall mean, with respect to a person, another person who, directly or indirectly, controls, is controlled by or is under common control with such person, including, without limitation, any general partner, officer, director, or manager of such person; provided that no entity for whom the trustee of the corporation's employee stock ownership trust which forms part of the corporation's employee stock ownership plan serves as a trustee shall be deemed to be an Affiliate of such trustee.

Section 2.        The directors shall be elected at the annual meeting of the stockholders, and each initial director shall be elected to serve until the next annual meeting of stockholders, until the director's successor is elected and qualified or until the director's earlier resignation or removal. From and after the third annual meeting of the stockholders following the Merger (as such term is defined in that certain Agreement and Plan of Merger, dated as of April 1, 2007, by and among GreatBanc Trust Company, solely as trustee of the Tribune Employee Stock Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan, Tribune Company and EGI-TRB), the board shall be divided into three classes, with each class consisting of three directors, or as nearly equal in number as the then total number of directors constituting the entire board permits, to serve for staggered three-year terms. The initial term of office of the first class shall expire at the fourth annual meeting of the stockholders following the Merger. The initial term of office of the second class shall expire at the fifth annual meeting of the stockholders following the Merger. The initial term of office of the third class shall expire at the sixth annual meeting of the stockholders following the Merger. The directors elected at an annual meeting of stockholders to succeed those whose terms

4

Source: TRIBUNE CO, 10-K, March 20, 2008

then expire shall be identified as being directors of the same class as the directors whom they succeed, and each of them shall hold office until the third succeeding annual meeting of the stockholders and until such director's successor shall have been elected and qualified. Directors need not be stockholders.

Section 3.        Vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by the sole remaining director, or by the affirmative vote of a majority of stockholders then entitled to vote thereon, and each director so chosen shall hold office in accordance with Section 1 of this Article. If there are no directors in office, then an election of directors may be held in the manner provided by statute..

Section 4.        At any duly called and held special meeting of the stockholders, any director or directors may, by the affirmative vote of the holders of a majority of all the shares of stock outstanding and entitled to vote in an election of directors, be removed from office for cause; provided, however, that, if the stockholders of the corporation are entitled under the provisions of the certificate of incorporation to exercise cumulative voting rights in the election of directors, then no removal shall be effective if the holders of that proportion of the shares of stock outstanding and entitled to vote for an election of directors as could elect to the full board as then provided by these bylaws the director or directors sought to be removed shall vote against removal. The successor or successors to any director or directors so removed may be elected by the stockholders at the meeting at which removal was effectuated. The remaining directors may, to the extent vacancies are not filled by election by the stockholders, fill any vacancy or vacancies created by the removal.

Section 5.        The business of the corporation shall be managed by or under the direction of the board of directors which may exercise all such powers of the corporation and do all such lawful acts as are not by statute or by the certificate of incorporation or by these bylaws directed or required to be exercised or done by the stockholders.

Section 6.        The corporation shall have standing Audit and Compensation Committees of the board, each composed of three members, in each case, with such rights, duties and obligations as are customarily possessed by such committees at similarly situated companies. Each of the Audit and Compensation Committees will have at least two Independent Directors as members. At least one member of each of the Audit Committee and Compensation Committee shall be an EGI-TRB Designee. The board may, in its discretion, by the affirmative vote of a majority of the whole board, designate one or more additional committees, each committee to consist of one or more of the directors. The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. At all committee meetings, a majority of the total number of members shall constitute a quorum for the transaction of business and the act of a majority of the members present at any meeting at which there is a quorum shall be the act of such committee. In the absence or disqualification of any member of a committee, the

5

Source: TRIBUNE CO, 10-K, March 20, 2008

member or members thereof present at any meeting and not disqualified from voting, whether he or they constitute a quorum, may unanimously appoint another member of the board to act at the meeting in the place of the absent or disqualified member provided such member meets the qualification requirements set forth herein. Except as otherwise provided by law or these bylaws, any committee, to the extent provided by resolution of the board, shall have and may exercise all the powers and authority of the board. No committee shall have or exercise the powers and authority of the board with respect to filling vacancies among the directors or in any committee of the directors, amending the certificate of incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease, or exchange of all or substantially all of the corporation's property and assets, recommending to the stockholders a dissolution of the corporation or a revocation of a dissolution, amending the bylaws, or, unless the resolution of the board expressly so provides, declaring a dividend or authorizing the issuance of stock. A majority of the members of a committee may determine its action and fix the time and place of its meetings, unless the board shall otherwise provide. The board shall have the power at any time to fill vacancies in, to change the membership of, or to discharge any committee.

## ARTICLE IV

### Meetings of the Board of Directors

Section 1.        The board of directors of the corporation may hold meetings, both regular and special, either within or without the State of Delaware.

Section 2.        The first meeting of each newly elected board of directors shall be held at such time and place as shall be fixed by the vote of the stockholders at the annual meeting and no notice of such meeting shall be necessary to the newly elected directors in order legally to constitute the meeting, provided a quorum shall be present. In the event of the failure of the stockholders to fix the time or place of such first meeting of the newly elected board of directors, or in the event such meeting is not held at the time and place so fixed by the stockholders, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the board of directors, or as shall be specified in a written waiver of notice signed by all of the directors.

Section 3.        Regular meetings of the board of directors may be held without notice at such time and at such place as shall from time to time be determined by the board, and no notice need be given as to any regular meeting.

Section 4.        Special meetings of the board may be called by the chairman, president or chief executive officer on two (2) days' notice to each director, either personally or by mail or by telegram; special meetings shall be called by the chairman, president or chief executive officer in like manner and on like notice on the written request of two or more directors. Meetings may be held at any time without notice if all

6

Source: TRIBUNE CO, 10-K, March 20, 2008

the directors are present or if, at any time before or after the meeting, those not present waive notice of the meeting in writing.

Section 5.        At all meetings of the board a majority of the total number of directors shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the board of directors, except as may be otherwise specifically provided by statute or by the certificate of incorporation.  If a quorum shall not be present at any meeting of the board of directors the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 6.        Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting, if all members of the board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the board or committee.

Section 7.        The directors may be paid their expenses, if any, of attendance at each meeting of the board of directors and may be paid a fixed sum for attendance at each meeting of the board of directors or a stated salary as director.  No such payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor.  Members of special or standing committees may be allowed like compensation for attending committee meetings.

Section 8.        Unless otherwise restricted by the certificate of incorporation, members of the board of directors or of any committee designated by the board may participate in a meeting of the board or any such committee by means of conference telephone or similar communications equipment whereby all persons participating in the meeting can hear each other.  Participation in any meeting by such means shall constitute presence in person at such meeting.

Section 9.        A director who is present at a meeting of the board at which action on any corporate matter is taken shall be conclusively presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to the action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward his written dissent by registered mail to the secretary immediately after the adjournment of the meeting.  The right to dissent shall not apply to a director who voted in favor of the action.

7

Source: TRIBUNE CO, 10-K, March 20, 2008

ARTICLE V

Notices

Section 1.        Whenever, under the provisions of the statutes or of the certificate of incorporation or of these bylaws, notice is required to be given to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, by mail, addressed to such director or stockholder, at his address as it appears on the records of the corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail. Notice to directors may also be given by telegram, facsimile or by electronic transmission.

Section 2.        Whenever any notice is required to be given under the provisions of the statutes or of the certificate of incorporation or of these bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Attendance by a director or stockholder at a meeting shall constitute a waiver of notice of such meeting except when the director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened.

ARTICLE VI

Officers

Section 1.        The officers of the corporation shall be chosen by the board of directors and shall be a president, secretary and treasurer. The board of directors may elect a chairman of the board, chief executive officer, a chief operating officer, a chief financial officer, one or more vice presidents and one or more assistant secretaries and assistant treasurers. Any number of offices may be held by the same person, unless the certificate of incorporation or these bylaws otherwise provide.

Section 2.        The board of directors at its first meeting and after each annual meeting of stockholders shall choose a president, a secretary and a treasurer and shall choose a chairman of the board.

Section 3.        The board of directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the board.

Section 4.        The officers of the corporation shall hold office until their successors are chosen and qualify. Any officer elected or appointed by the board of

8

directors may be removed at any time by the affirmative vote of a majority of the board of directors. Any vacancy occurring in any office of the corporation may be filled by the board of directors.

Section 5.        The Chairman of the Board. The chairman of the board, if there be a chairman, shall preside at all meetings of the stockholders, of the board of directors and of the executive committee, if any, and he shall have such other powers and duties as the board of directors may from time to time prescribe. He may execute contracts in the name of the corporation. He may sign, with the secretary, assistant secretary, treasurer or assistant treasurer, certificates for shares of the corporation, and may sign any policies, deeds, mortgages, bonds, contracts, or other instruments which the board of directors have authorized to be executed except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these bylaws to some other officer or agent of the corporation, or shall be required by law to be otherwise signed or executed.

Section 6.        The Chief Executive Officer. The chief executive officer of the corporation shall have the general direction of the affairs of the corporation except as otherwise prescribed by the board of directors. In the absence of the chairman of the board, he shall preside at all meetings of the stockholders, of the board of directors and of the executive committee, if any, and shall designate the acting secretary for such meetings to take the minutes thereof for delivery to the secretary. He may sign, with the secretary, assistant secretary, treasurer or assistant treasurer, certificates for shares of the corporation, and may sign any policies, deeds, mortgages, bonds, contracts, or other instruments which the board of directors have authorized to be executed except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these bylaws to some other officer or agent of the corporation, or shall be required by law to be otherwise signed or executed, appoint and discharge agents and employees of the corporation, and in general, shall perform all duties incident to the office of chief executive officer.

Section 7.        The President. The president along with the chief executive officer of the corporation shall have the general direction of the affairs of the corporation except as otherwise prescribed by the board of directors. He may sign, with the secretary, assistant secretary, treasurer or assistant treasurer, certificates for shares of the corporation, and may sign any policies, deeds, mortgages, bonds, contracts, or other instruments which the board of directors have authorized to be executed except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these bylaws to some other officer or agent of the corporation, or shall be required by law to be otherwise signed or executed, appoint and discharge agents and employees of the corporation, and in general, shall perform all duties incident to the office of president. In the absence of the chief executive officer or in the event of his inability or refusal to act, the president, if there be any, shall perform the duties of the chief executive officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the chief executive officer.

9

Section 8.        The Vice-Presidents.  In the absence of the chief executive officer or president in the event of his inability or refusal to act, the vice-president, if there be any, (or in the event there be more than one vice-president, the vice-presidents in the order designated, or in the absence of any designation, then in the order of their election) shall perform the duties of the chief executive officer or president, and when so acting, shall have all the powers of and be subject to all the restrictions upon the chief executive officer or president.  The vice-presidents shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.

Section 9.        The Secretary.  The secretary shall attend all meetings of the board of directors and all meetings of the stockholders and record all the proceedings of the meetings of the corporation and of the board of directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required.  He shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the board of directors, and shall perform such other duties as may be prescribed by the board of directors or president, under whose supervision he shall be.  He shall have custody of the corporate seal of the corporation and he, or an assistant secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by his signature or by the signature of such assistant secretary.  The board of directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by his signature.

Section 10.        The Assistant Secretary.  The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the board of directors (or if there be no such determination, then in the order of their election) shall, in the absence of the secretary or in the event of his inability or refusal to act, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.

Section 11.        The Treasurer.  The treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the corporation in such depositories as may be designated in accordance with Section 1 of Article VIII below.

He shall disburse the funds of the corporation as may be ordered by the board of directors, taking proper vouchers for such disbursements, and shall render to the president and the board of directors, at its regular meetings, or when the board of directors so requires, an account of all his transactions as treasurer and of the financial condition of the corporation.

If required by the board of directors, he shall give the corporation a bond (which shall be renewed every six (6) years) in such sum and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of his office and for the restoration to the corporation, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other

10

Source: TRIBUNE CO, 10-K, March 20, 2008

property of whatever kind in his possession or under his control belonging to the corporation.

Section 12.     <u>The Assistant Treasurer</u>.  The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the board of directors (or if there be no such determination, then in the order of their election), shall, in the absence of the treasurer or in the event of his inability or refusal to act, perform the duties and exercise the powers of the treasurer and shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.

ARTICLE VII

<u>Certificates of Stock</u>

Section 1.      Every holder of stock in the corporation shall be entitled to have a certificate, signed by, or in the name of the corporation by the chief executive officer or president or a vice president and the treasurer or an assistant treasurer, or the secretary or an assistant secretary of the corporation, certifying the number of shares owned by him in the corporation.  In case any such officer who has signed, or whose facsimile signature has been placed upon, a stock certificate shall have ceased to be such before such certificate is issued, it may be issued with the same effect as if such officer had not ceased to be such at the time of its issuance.

If the corporation shall be authorized to issue more than one class of stock or more than one series of any class, the designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in Section 202 of the General Corporation Law of Delaware, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, a statement that the corporation will furnish without charge to each stockholder who so requests the designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

Section 2.      Where a certificate is countersigned (i) by a transfer agent other than the corporation or its employee, or (ii) by a registrar other than the corporation or its employee, any of or all the signatures of the officers of the corporation may be a facsimile.  In case any officer who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be an officer before such certificate is issued, it may be issued by the corporation with the same effect as if he were such officer at the date of issue.

11

Source: TRIBUNE CO, 10-K, March 20, 2008

Section 3.        Lost Certificates.  The board of directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of the fact by the person claiming the certificate of stock to be lost, stolen or destroyed.  When authorizing such issue of a new certificate or certificates, the board of directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or to give the corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

Section 4.        Transfers of Stock.  Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

Section 5.        Fixing Record Date.  In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the board of directors may fix, in advance, a record date, which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the board of directors may fix a new record date for the adjourned meeting.

Section 6.        Failure to Fix Record Date.  If no record date is fixed in accordance with Section 5 of this Article VII:

(a)        The record date for determining stockholders entitled to notice or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or if the notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(b)        The record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the board is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to the place where the proceedings of the corporation are recorded and the custodian of such proceedings.  When prior action by the board is required by law, the record date shall be at the close of business on the day on which the board adopts the resolution taking such prior action.

12

Source: TRIBUNE CO, 10-K, March 20, 2008

(c)      The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the board adopts the resolution relating thereto.

Section 7.      <u>Registered Stockholders</u>.  The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

ARTICLE VIII

<u>Miscellaneous</u>

Section 1.      <u>Bank Deposits and Check Authorization</u>.  The funds of the corporation shall be deposited to its credit in such banks, trust companies or other financial institutions as may be determined from time to time by the chairman or president or any executive vice president and the secretary of the corporation, evidenced by joint written action.  By such joint written action, filed with the minutes of the board of directors, the chairman or president or any executive vice president together with the secretary may authorize (a) the opening of one or more deposit accounts at any such institution and (b) the designation of, or a change in the designation of, the officers or employees upon whose signature checks may be written or funds withdrawn on any corporation account at any such institution, provided that the signature of one person other than the chairman, president or any executive vice president and secretary shall be required therefor.  By the adoption of this Section 1 of Article VIII of these bylaws, the board of directors adopts the form of any resolution or resolutions requested by or acceptable to any financial institution in connection with the foregoing actions, provided that the secretary of the corporation (x) believes that the adoption of such resolution or resolutions is necessary or advisable and (y) files such resolution or resolutions with the minutes of the board of directors.

Section 2.      <u>Fiscal Year</u>.  The fiscal year of the corporation shall be as determined by the board of directors.  In the absence of such determination, the fiscal year shall begin on the first Monday after the last Sunday in December each year and end on the last Sunday in the following December.

Section 3.      <u>Corporate Seal</u>.  The board of directors may provide a suitable seal, including duplicates thereof, containing the name of the corporation.

13

ARTICLE IX

Amendments

These bylaws may be amended, altered, or repealed and new bylaws adopted by the affirmative vote of the holders of at least 67% of the voting power of the shares entitled to vote, or at any meeting of the board of directors by a majority vote if the certificate of incorporation shall confer such power to adopt, amend, alter, or repeal the bylaws upon the directors.  The fact that the power to adopt, amend, alter, or repeal the bylaws has been conferred upon the board of directors shall not divest the stockholders of the same powers.

14

Source: TRIBUNE CO, 10-K, March 20, 2008

EXHIBIT 10.6

TRIBUNE COMPANY
1996 NONEMPLOYEE DIRECTOR STOCK COMPENSATION PLAN
(As amended and restated effective December 20, 2007)

## ARTICLE I
## GENERAL

1.1    **Purpose.**  Tribune Company, a Delaware corporation (the "Company"), hereby amends and restates the 1996 Nonemployee Director Stock Compensation Plan (the "Plan"). The purpose of the Plan has been to increase the stock ownership of nonemployee directors, to further align their interests with those of the Company's other stockholders and to foster and promote the long-term financial success of the Company by attracting and retaining outstanding nonemployee directors by enabling them to participate in the Company's growth through stock ownership.  Effective December 20, 2007 the Plan is hereby amended to reflect the leveraged acquisition of Tribune Company by the Tribune Employee Stock Ownership Plan and the resulting cessation of trading of Tribune common shares on the New York Stock Exchange (collectively, the "going-private transaction").

1.2    **Participation.**  Only directors of the Company who at the time an award is made meet the following criteria ("Directors") shall receive awards under the Plan: (a) the director is not an employee of the Company or any subsidiary of the Company and (b) the director is a "disinterested person" as such term is defined in Rule 16b-3 promulgated under the Securities Exchange Act of 1934 (the "Exchange Act") or any similar rule which may subsequently be in effect ("Rule 16b-3").

1.3    **Shares Subject to the Plan.**  Shares of stock covered by awards under the Plan may be in whole or in part authorized and unissued or treasury shares of the Company's common stock or such other shares as may be substituted pursuant to Section 4.2 ("Common Stock").  The maximum number of shares of Common Stock, which may be issued for all purposes under the Plan, shall be 300,000 (subject to adjustment pursuant to Section 4.2).

## ARTICLE II
## STOCK AWARDS

2.1    **Stock Awards.**  Effective on the day after the date of each annual meeting of the stockholders of the Company at which Directors are elected ("Annual Meeting"), commencing with the Annual Meeting in 2005, each Director in office on adjournment of said meeting will automatically be awarded shares of Common Stock which on the date of the Annual Meeting have a Fair Market Value of $75,000 (the "Stock Award").   A Director who is not initially elected at the Annual Meeting shall receive an award for a pro rata portion of the Stock Award on the day following his or her becoming a Director based on the number of months remaining from such date until the anniversary date for the most recent Annual Meeting of the Company divided by twelve.

2.2      **Definition of Fair Market Value.**  The term "Fair Market Value" unless otherwise required by any applicable provision of the Internal Revenue Code of 1986, as amended, (the "Code")or any regulations issued hereunder shall mean, as of any date, the closing price of the Common Stock as reported on the New York Stock Exchange Composite Transactions List (or such other consolidated transaction reporting system on which the Common Stock is primarily traded) for such day, or if the Common Stock was not traded on such day, then the next preceding day on which the stock was traded, as reported by such source as the Board of Directors may select.  If the Common Stock is not readily tradeable on a national securities exchange or other market system, its Fair Market Value shall be set under procedures established by the Board of Directors on the advice of an investment advisor.

**ARTICLE III**
**DEFERRAL OF STOCK AWARDS**

3.1      **Deferral.**  Each Director may elect to defer receipt of part or all of any stock awards hereunder.  Any such election must be made in writing prior to the beginning of the calendar year in which an award is earned.  The deferred award will be credited to an account established in the Director's name and held subject to the following terms and conditions:

(a)      If the Company pays a cash dividend with respect to its Common Stock at any time while there is a balance in the Director's account, the Company will determine the cash dividend which the Director would have received had the Director been the actual owner of the number of shares shown in the account at the time of the dividend payment.  The Company will then determine the additional shares of Common Stock that could have been purchased with the dividend at the fair market value of the stock on the date of dividend payment and add this number to the Director's account.

(b)      The number of whole shares in a Director's account at the time the Director terminates service on the Board shall be delivered in a lump sum on the February 15 following the year in which the Director terminates Board service or in no more than ten equal annual installments commencing on the February 15 following the year in which the Director terminates Board service in accordance with the Director's original or amended deferral election.  The value of any fractional shares shall be paid in cash upon termination.  An election made under this paragraph 3.1(b) with respect to deferrals credited to a Director's account after December 31, 2004 (and any investment gains or losses attributable thereto) shall be irrevocable, provided that a Director may amend an election no later than December 31, 2005. A Director may amend an election with respect to the manner of the delivery of shares deferred to a Director's account prior to January 1, 2005 (and any investment gains or losses attributable thereto) at any time up to six months prior to the date of termination of service.

(c)      If a Director dies or becomes legally incapacitated, the Company will deliver the shares to the persons designated by the Director by a writing filed with the Company.

2

Source: TRIBUNE CO, 10-K, March 20, 2008

(d)    The Company's obligations with respect to the deferred stock awards shall not be funded or secured in any manner nor shall the Director's right to receive shares be assignable or transferable voluntarily or involuntarily except as expressly provided herein. However, nothing shall prevent the Company from establishing a rabbi trust to provide a Director additional assurance that the shares subject to a deferred award will be delivered in a timely fashion in accordance with the Director's election.

**3.2    Going-Private Transaction.** As a result of the going-private transaction, Directors' deferred share awards under this Plan or under the Tribune Incentive Compensation Plan which are denominated in Tribune stock shall be converted to a cash equivalent based on the price provided to shareholders pursuant to the transaction. Converted account balances shall bear interest, at an annual rate equal to 120% of the long-term Applicable Federal Rate (compounded  quarterly), which rate shall be updated on an annual basis.

**3.3    Change in Election.** In connection with the application of Section 409A of the Code to the Plan, the Tribune Company Employee Benefits Committee or its delegate may offer Directors the opportunity to elect a revision to their existing payment election under the Plan so as to accelerate the payment of their account balance following termination of Board service.  Such revised payment election shall be determined in the sole discretion of the Committee or its delegate.  Such revisions shall be provided and operate in compliance with the transition rules under Section 409A and shall be offered and elected prior to December 31, 2007.

## ARTICLE IV
## MISCELLANEOUS PROVISIONS

**4.1    Nontransferability.** No shares awarded under the Plan shall be sold for a period of six months and one day after the date of the award.

**4.2    Adjustments Upon Certain Changes.** If any of the events described in Sections 14.1 or 14.2 of the Company's 1997 Incentive Compensation Plan (As Amended and Restated Effective May 12, 2004) shall occur, the number of shares authorized by the Plan, shall be automatically adjusted on the same basis to give the proper effect to such change so as to prevent the dilution or enlargement of the shares available under Section 1.3 hereof.

**4.3    Amendment or Discontinuation of Plan.** Subject to Code Section 409A, the Board of Directors may amend the Plan at any time or suspend or discontinue the Plan at any time, but no such action shall adversely affect any prior award; provided that this Plan may not be amended more frequently than once every six months and no amendment shall be adopted which would result in any Director losing his or her status as a "disinterested" administrator under Rule 16b-3 with respect to any employee benefit plan of the Company or result in the Plan losing its status as a protected plan under Rule 16b-3.

3

Source: TRIBUNE CO, 10-K, March 20, 2008

4.4     **Plan Not Exclusive.** The adoption of the Plan does not supersede the 1995 Nonemployee Director Stock Option Plan and shall not preclude the adoption by appropriate means of any other stock or other compensation plan for Directors.

4.5     **Other Provisions; Securities Registration.** The grant of any award under the Plan may also be subject to other provisions as counsel to the Company deems appropriate, including, without limitation, such provisions as may be appropriate to comply with federal or state securities laws and stock listing requirements.

4.6     **Rights of Directors.** Nothing in the Plan shall confer upon any Director any right to serve as a Director for a period of time or to continue his or her present or any other rate of compensation.

4.7     **Requirements of Law; Governing Law.** The awarding and the issuance of shares of Common Stock shall be subject to all applicable laws, rules and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required. The Plan, and all agreements hereunder, shall be construed in accordance with and governed by the laws of the State of Delaware.

4.8     **Effective Date.** The Plan was approved by the holders of a majority of the votes of all shares present, or represented, and entitled to be cast on the matter at the 1996 Annual Meeting and became effective as of such Annual Meeting. No grants shall be made hereunder after May 31, 2006.

IN WITNESS WHEREOF, the Tribune Company Employee Benefits Committee has caused the foregoing to be executed on behalf of Tribune Company by the undersigned duly authorized Chairman of the Committee this 20th day of December, 2007.

TRIBUNE COMPANY

By:     /s/ Donald C. Grenesko
        Chairman of Tribune Company
        Employee Benefits Committee

4

EXHIBIT 10.9

**TRIBUNE COMPANY**

**2007 MANAGEMENT EQUITY INCENTIVE PLAN**

**SECTION 1.**      **Purpose**

The purpose of the Plan is to enable Tribune Company (the "*Company*") to attract, retain and motivate employees and to provide the Company and its Subsidiaries with a unit plan providing incentives directly linked to increases in Company shareholder value.

**SECTION 2.**      **Definitions**

For purposes of the Plan, the following terms are defined as set forth below:

a.      *"1934 Act"* means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

b.      "*Administrator*" means the Board or any committee of the Board authorized by the Board to perform the duties of the Administrator hereunder.

c.      "*Applicable Participant Ratio*" means (1) the number of Participant's vested Second Tranche Units (including any such Second Tranche Units that vest by virtue of a Termination of Service) divided by (2) 3,261,000, as each of clauses (1) and (2) may be adjusted pursuant to Section 4(c).

d.      *"Award"* means a grant of Units pursuant to the Plan.

e.      *"Board"* means the Board of Directors of the Company.

f.      *"Cause"* means conduct involving dishonesty or willful misconduct which, in either case, is detrimental in a significant way to the business of the Company or any of its Subsidiaries.

g.      *"Change of Control"* means (i) the acquisition, other than from the Company, by any person, entity or "group" (within the meaning of Section 13(d)(3) or 14(d)(2) of the 1934 Act), excluding for this purpose the Company, any employee benefit plan (or related trust) sponsored or maintained by the Company or its Subsidiaries, the ESOP, EGI, Samuel Zell and their respective affiliates, of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the 1934 Act) of 40% or more of either the then outstanding shares of Common Stock or the combined voting power of the Company's then outstanding voting securities entitled to vote generally in the election of directors; (ii) a liquidation or dissolution of the Company, or (iii) the sale of all or substantially all of the assets of the Company.

h.      *"Closing"* means the completion of the merger of Tesop Corporation with and into the Company.

i.      *"Code"* means the U.S. Internal Revenue Code of 1986, as amended from time to time, and any successor thereto.

j.      *"Common Stock"* means the common stock of the Company, par value $0.01.

k.      *"Credit Agreement"* means that certain Credit Agreement, entered into as of May 17, 2007, among Tribune Company, each lender from time to time party hereto, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp.North America, Inc.  and Bank of America, N.A., as co-documentation agents, J.P. Morgan Securities Inc, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC., together with any amendments thereto, as in effect as of the effective date of this Plan.

l.      *"Disability"* means (i) the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months; underlined provided that such Participant has been unable to work for at least one hundred eighty (180) days in any twelve (12) month period, or (ii) receipt of income replacement benefits for a period of not less than three months under an accident and health plan covering employees of the Company, by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months.  Whether a Participant has incurred a "Disability" shall be determined by a physician selected by the Administrator or the Company's insurers, which physician shall be reasonably acceptable to a Participant (or Participant's legal representative).

m.      *"EGI"* means EGI-TRB, L.L.C.

n.      *"EGI-TRB Director"* shall have the meaning given to such term in that certain Investor Rights Agreement, dated April 1, 2007, by and among the Company, EGI and the ESOP.

o.      *"Eligible Individuals"* means employees and non-employee directors of the Company or a Subsidiary; underlined provided, that no individual may be an Eligible Individual to the extent that his or her participation in the Plan would prevent the Plan from being a Top Hat Plan.

p.      *"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended.

q.      *"ESOP"* means the Tribune Employee Stock Ownership Plan, effective as of January 1, 2007, as amended.

2

Source: TRIBUNE CO, 10-K, March 20, 2008

r.       *"Fair Market Value"* as of any date means (i) if such date precedes the occurrence of a Change of Control, the fair market value of Common Stock as determined by the Trustee (as defined in the ESOP) after consultation with an independent appraiser, as defined in Section 401(a)(28)(C) of the Code, in accordance with the terms of the Trust (as defined in the ESOP), the ESOP and the provisions of Section 3(18) of ERISA, or (ii) if such date is the date of, or subsequent to, a Change of Control, the fair market value of the consideration received in respect of a share of Common Stock in the Change of Control transaction, as determined by the Administrator in its good faith discretion.

s.       *"Fair Market Value Reference Date"* means the date as of which the Fair Market Value of a share of Common Stock is determined.

t.       *"Good Reason"* means (i) a material reduction in the nature or scope of the Participant's employment duties (but excluding any change in the Participant's service as a member of any board of directors of any Subsidiary or any committee thereof), (ii) a reduction in the Participant's base salary or target annual bonus, (iii) an adverse and disproportionate change (relative to similarly situated employees of the Company) in the aggregate benefits available to the Participant , or (iv) a change in the city in which Participant is required to perform his or her duties.  For the avoidance of doubt, a change in the Participant's line of reporting resulting from organizational changes, including the interposition of additional employees in the Participant's line of reporting, will not by itself constitute "Good Reason."

u.       *"Involuntary Termination"* means a termination of a Participant's employment by the Company without Cause or a termination of a Participant's employment by the Participant for Good Reason.

v.       *"Participant"* means any Eligible Individual who receives a Unit Award.

w.       *"Person"* means an individual, entity or group (within the meaning of Sections 13(d)(3) or 14(d)(2) of the 1934 Act).

x.       *"Plan"* means this Tribune Company 2007 Unit Plan, as set forth herein and as hereinafter amended from time to time.

y.       *"Section 409A Change of Control"* means a Change of Control that constitutes (i) a change in the ownership of the Company, (ii) a change in effective control of the Company or (iii) a change in the ownership of a substantial portion of the assets of the Company (each as defined in Section 409A of the Code and the final regulations promulgated thereunder (*"Section 409A"*).

z.       *"Subsidiary"* means any corporation, partnership, joint venture or other entity during any period in which at least a 20% voting or profits interest is owned, directly or indirectly, by the Company or any successor to the Company.

3

aa.    *"Subsidiary Change of Control"* means, with respect to a Participant, a "change in the ownership" of (i) the Subsidiary that employs Participant or (ii) any corporation (other than the Company) in a chain of corporations in which each corporation is a "majority shareholder" of another corporation in the chain, ending in the Subsidiary that employs Participant. For purposes of this definition, "change in the ownership" and "majority shareholder" shall have the meanings ascribed to them in Section 409A.

bb.    *"Termination of Service"* means the termination of a Participant's employment by or service to the Company or any Subsidiary. A Participant employed by or providing service to a Subsidiary shall also be deemed to incur a Termination of Service if the Subsidiary experiences a Subsidiary Change of Control and the Participant does not immediately thereafter become an employee of the Company or another Subsidiary.

cc.    *"Top Hat Plan"* means a plan described in Sections 201(2), 301(a)(3) and 401(a)(1) of ERISA.

dd.    *"Tranche One Participants"* means Participants who receive First Tranche Unit Awards.

ee.    *"Tranche Two Participants"* means Participants who receive Second Tranche Unit Awards.

ff.    *"Unit"* means a contingent right to receive U.S. dollars equal to the Fair Market Value of one share of Common Stock upon satisfaction of the conditions for vesting as provided in Section 5 of this Agreement and subject further to the terms of the Plan and the additional terms and conditions of any Unit Agreement.

**SECTION 3.    Administration**

(a)    The Plan shall be administered by the Administrator in accordance with the terms of the Plan. The Administrator shall have full power to construe and interpret the Plan and to make all other determinations which may be necessary or advisable for the administration of the Plan, in each case, to the extent not inconsistent with the terms of the Plan.

(b)    The Administrator shall have the full power to (i) select Tranche One Participants and Tranche Two Participants and to determine the size of Awards and their terms and conditions and (ii) vary the terms and treatment of the First Tranche Units and the Second Tranche Units in individual cases as warranted by circumstances, in each case, subject to the terms of this Plan; provided, however, that in addition to approval by the Administrator, with respect to (A) all Tranche One Participants and First Tranche Units and (B) Tranche Two Participants and Second Tranche Units (other than the Tranche Two Participants and Second Tranche Units set forth on Exhibit B to the Plan), each of the items contemplated by clause (i) and clause (ii) shall require the approval or written consent of at least one EGI-TRB Director, to the extent one or more EGI-TRB Director then serves as a member of the Board.

4

Source: TRIBUNE CO, 10-K, March 20, 2008

(c)    All determinations of the Administrator shall be final and conclusive on all persons, including the Company, its stockholders and Participants, and their estates and beneficiaries.

## SECTION 4.    Units Subject to Plan

(a)    No more than 8,695,652 Units may be granted under the Plan, subject to adjustment in accordance with Section 4(c).  If any Unit is forfeited, or if any Unit terminates, expires, or lapses without being settled or if any Unit is settled pursuant to Section 5(c)(i), it shall again be available for grant under the Plan; provided, however, that any Second Tranche Units (defined below) which so become available again for grant under the Plan shall automatically convert into the same number of First Tranche Units (defined below) upon so becoming again available for grant under the Plan.

(b)    5,434,652 Units shall be designated as First Tranche Units (the "*First Tranche Units*") and 3,261,000 Units shall be designated as Second Tranche Units (the "*Second Tranche Units*"), subject in each case to adjustment in accordance with Section 4(c) and conversion of Second Tranche Units into First Tranche Units as described in Section 4(a) above.  4,174,080 of the First Tranche Units shall initially be allocated at Closing among the individuals set forth on *Exhibit A* to the Plan.  The remaining 1,260,572 First Tranche Units, any awarded but forfeited First Tranche Units and any First Tranche Units converted from Second Tranche Units as described in Section 4(a) above may be granted by the Administrator from time to time under the Plan.  The Second Tranche Units shall be allocated at Closing among the individuals set forth on *Exhibit B* to the Plan.

(c)    In the event of any change in corporate capitalization (including, but not limited to, a change in the number of shares outstanding), such as a stock split or a corporate transaction, such as any merger, consolidation, separation, including a spin-off, or other distribution of shares or property of the Company (including cash), any reorganization (whether or not such reorganization comes within the definition of such term in Section 368 of the Code) or any partial or complete liquidation of the Company, the Administrator shall make such substitution or adjustments in the aggregate number and kind of Units reserved for issuance under the Plan, the numbers and kind of Units designated as First Tranche Units and Second Tranche Units and the number of Units subject to outstanding Awards, and/or such other equitable substitutions or adjustments as it may determine to be appropriate in its sole discretion.

## SECTION 5.    Units

Each Award shall be confirmed by, and be subject to, the terms of a written Unit agreement (the "*Unit Agreement*") duly executed by the Company and the Participant.  The terms and provisions of Unit Agreements need not be the same for each Participant, but, subject to Section 3(b), shall be consistent with the terms of the Plan.  The grant of a Unit shall occur on the date (the "*Grant Date*") the Administrator selects an Eligible Individual to receive a grant of Units.  Unless otherwise determined by the Administrator in accordance with Section 3(b) and as

5

Source: TRIBUNE CO, 10-K, March 20, 2008

provided in the applicable Unit Agreement, Units granted under the Plan shall be subject to the following terms and conditions:

(a)    *Vesting/Forfeiture of First Tranche Unit Awards.*

(i)    Subject to Section 5(a)(ii) and subject to Participant's continuous employment with the Company or any of its Subsidiaries through the applicable vesting date, each First Tranche Unit Award shall become vested as follows:

| Number of Units Vesting | Vesting Date |
| --- | --- |
| 1/3 (rounded to the nearest whole number) | First Anniversary of Grant Date |
| 1/3 (rounded to the nearest whole number) | Second Anniversary of Grant Date |
| Remainder | Third Anniversary of Grant Date |

(ii)    All unvested First Tranche Units will immediately vest upon a Change of Control or a Termination of Service due to a Participant's death or Disability.

(iii)    Upon a Termination of Service for any reason other than death or Disability, any then unvested First Tranche Units shall be forfeited.

(b)    *Vesting/Forfeiture of Second Tranche Unit Awards.*

(i)    Each Second Tranche Unit Award shall be vested with respect to 1/2 of the Units covered thereby (rounded to the nearest whole number) on the Grant Date and, subject to a Participant's continuous employment with the Company or any of its Subsidiaries through the vesting date, the remainder of such Units shall become vested on the first anniversary of the Grant Date.

(ii)    All unvested Second Tranche Units will immediately vest upon a Change of Control or a Termination of Service due to a Participant's death, Disability or Involuntary Termination.

(iii)    Upon a Termination of Service for any reason, other than death, Disability or an Involuntary Termination, any then unvested Second Tranche Units shall be forfeited.

(c)    *Settlement of Unit Awards.*

(i)    With respect to vested Second Tranche Units (including those Second Tranche Units that vest as a result of a Termination of Service) held by any Participant who experiences a Termination of Service prior to the one-year anniversary of the Closing (such Units, *"Early Termination Second Tranche Units"*), subject to Section 5(e), the Company shall pay to such Participant in respect of such Participant's Early Termination Second Tranche Units an amount

6

Source: TRIBUNE CO, 10-K, March 20, 2008

in U.S. dollars equal to the product of (A) $25,000,000 and (B) the Applicable Participant Ratio, such amount to be paid to the Participant or Participant's estate within ten business days following the Participant's Termination of Service for any reason, whether voluntary or involuntary, with or without Cause or Good Reason, including without limitation by reason of Death or Disability; provided that such Termination of Service must constitute a "separation from service" (as defined in Section 409A) or must involve a Subsidiary Change of Control.  Any amounts payable pursuant to this Section 5(c)(i) shall bear interest, from and including the eleventh business day following the Participant's Termination of Service through and including the date of payment at the prime rate in effect on such sixth business day following the Participant's Termination of Service (as reported in the Wall Street Journal, national edition).

(ii)      Subject to Section 5(e), except as otherwise provided in any Unit Agreement, and other than with respect to the Early Termination Second Tranche Units, which shall be settled in accordance with the immediately preceding clause (i) above, each vested First Tranche Unit and each vested Second Tranche Unit will be settled and paid in U.S. dollars as follows: (A) (1) 1/3 of the vested First Tranche Units and vested Second Tranche Units (rounded to the nearest whole number) will be settled and paid in U.S. dollars as soon as practicable (but in no event later than March 31) in the first calendar year that begins after the fourth anniversary of the Grant Date (or such later anniversary of the Grant Date designated pursuant to a valid subsequent deferral election as contemplated by Section 5(d)) based on the Fair Market Value of a share of Common Stock on December 31 of the year in which the fourth anniversary of the Grant Date occurs (or such later anniversary of the Grant Date designated pursuant to a valid subsequent deferral election as contemplated by Section 5(d) occurs), (2) 1/3 of the vested First Tranche Units and vested Second Tranche Units (rounded to the nearest whole number) will be settled and paid in U.S. dollars as soon as practicable (but in no event later than March 31) in the first calendar year that begins after the sixth anniversary of the Grant Date (or such later anniversary of the Grant Date designated pursuant to a valid subsequent deferral election as contemplated by Section 5(d)) based on the Fair Market Value of a share of Common Stock on December 31 of the year in which the sixth anniversary of the Grant Date occurs (or such later anniversary of the Grant Date designated pursuant to Section 5(d) occurs), and (3) the remainder of the vested First Tranche Units and vested Second Tranche Units will be settled and paid in U.S. dollars as soon as practicable (but in no event later than March 31) in the first calendar year that begins after the eighth anniversary of the Grant Date (or such later anniversary of the Grant Date designated pursuant to a valid subsequent deferral election as contemplated by Section 5(d)) based on the Fair Market Value of a share of Common Stock on December 31 of the year in which the eighth anniversary of the Grant Date occurs (or such later anniversary of the Grant Date designated pursuant to a valid subsequent deferral election as contemplated by Section 5(d) occurs) or (B) if earlier, as soon as practicable (but in no event later than March 31) and without giving effect to any subsequent deferral election pursuant to Section 5(d) below, in the first calendar year that begins after  a Section 409A Change of Control or a Participant's Termination of Service for any reason, whether voluntary or involuntary, with or without Cause or Good Reason, including without limitation by reason of Death or Disability (provided that such Termination of Service must constitute a "separation from service" (as defined in Section

7

409A) or must involve a Subsidiary Change of Control) based on the Fair Market Value of a share of Common Stock on December 31 of the year in which the Section 409A Change of Control or a Participant's Termination of Service, as applicable, occurs; provided, however, that if the Section 409A Change of Control involves the acquisition of Common Stock solely for U.S. dollars, any vested portion of the First Tranche Units Award or Second Tranche Units Award will be settled and paid as soon as practicable after the Section 409A Change of Control, but in no event later than thirty (30) days after such Section 409A Change of Control.  Any amounts payable pursuant to this Section 5(c)(ii) shall bear interest, from and including April 1 of the year in which such Units are designated to be settled (taking into account any subsequent deferral election) through and including the date of payment at the prime rate in effect on such April 1 (as reported in the Wall Street Journal, national edition); provided, however, that if the settlement is triggered by virtue of a Section 409A Change of Control, amounts payable pursuant to this Section 5(c)(ii) shall bear interest, from and including the thirty-first day following the occurrence of the Section 409A Change of Control through and including the date of payment at the prime rate in effect on such thirty-first day following the occurrence of the Section 409A Change of Control.

(d)      *Subsequent Deferral Election.*  A Participant who is an employee of the Company may elect, by providing written notice to the Company, to defer payment of some or all of such Participant's First Tranche Unit Award or Second Tranche Unit Award in accordance with the following requirements; provided, however, that any such deferral shall be expressed in whole Units:

(i)      Any such election shall not take effect until at least twelve months after the date on which the election is made.

(ii)      Any such election must be made at least twelve months prior to the first day of the calendar year in which settlement was scheduled to occur, absent the election.

(iii)      Any such election must defer payment of the First Tranche Unit Award or Second Tranche Unit Award until at least five years beyond the first day of the calendar year in which settlement was scheduled to occur, absent the election.

(e)      *Limitations on Payment.*

(i)      Any settlement payment in respect of any Units may be delayed where the Company reasonably anticipates that the making of the payment will violate federal securities laws or other applicable law; provided that the payment is made at the earliest date at which the Company reasonably anticipates that the making of the payment will not cause such violation.

(ii)      Any settlement payment in respect of any Units shall be delayed to the extent such payment would have, or on a Pro Forma Basis (as defined in the Credit Agreement) taking into account the payment would have, caused the Company to exceed the objective and nondiscretionary limitations set forth in Section 5.02(i)(A) and (B) of the Credit Agreement, such that the Company would have been in breach, or in breach on a Pro Forma Basis, of the

8

terms thereof (the "*Limitations*"); provided, however, that any such payment shall be made during the first taxable year of the Participant in which the making of such payment would not cause the Company to exceed the foregoing objective and nondiscretionary limitations.  In any given year, the maximum aggregate amount payable in respect of the settlement of Units without running afoul of the Limitations shall be referred to as the "*Annual Limit.*"  In the event the Company's obligations pursuant to Section 5(c) exceed the Annual Limit in any given year, the Company will settle Units of each Participant entitled to a cash payment during such year (any such amount, the "*Settlement Amount*") based on the proportion that each Participant's Settlement Amount bears to the aggregate Settlement Amount for such year for all Participants and any unsettled obligation during such year shall be settled during the following year, subject to the Annual Limit applicable to such following year; provided, however, that this Section 5(e)(ii) shall not apply following a Section 409A Change of Control.

(iii)    The Company may delay any payment the making of which would jeopardize the ability of the Company to continue as a going concern; provided that any such payment is made during the first taxable year of the Participant in which the making of the payment would not have such effect.

(iv)    In order to comply with Section 409(p) of the Code and the final regulations promulgated thereunder, the Administrator may at any time permit the Plan to provide one or more distribution(s) to any Participants in an amount sufficient to avoid a "nonallocation year" as defined in Section 409(p) of the Code.

(v)    Any amounts payable pursuant to Section 5(c) or Section 5(d)(ii) shall bear interest from and including the February 1 immediately following the Fair Market Value Reference Date through and including the date of payment at the prime rate in effect on such February 1 (as reported in the Wall Street Journal, national edition); provided, however, that amounts payable due to the occurrence of a Section 409A Change of Control shall bear interest from and including the thirty-first day after the Section 409 Change of Control through and including the date of payment at the prime rate in effect on such thirty-first day after the Change of Control.

(f)    *Nontransferability of Units.*  No Unit shall be transferable (by means of sale, assignment, exchange, encumbrance, hypothecation, pledge or otherwise) by a Participant other than by will or by the laws of descent and distribution or as otherwise expressly permitted by the Administrator, nor may a Participant sell, assign, transfer, pledge, or encumber such Participant's interest in a Unit. In the event a Participant transfers a Unit in violation of this Section 5(h), the Administrator may, in its discretion, cause such Unit to be forfeited.

(g)    *Gross-Up Payments.*  Unit Agreements with respect to Second Tranche Unit Awards shall provide that if any amounts payable to a Participant in respect of the Second Tranche Unit Awards together with any other payment or distribution in the nature of compensation (within the meaning of Section 280G(b)(2) of the Code) to or for the benefit of the Participant, whether paid or payable in respect of the Second Tranche Unit Awards or otherwise

9

Source: TRIBUNE CO, 10-K, March 20, 2008

are deemed to be "excess parachute payments" within the meaning of Section 280G(b)(1) of the Code, the Company shall pay to such Participant in addition to any amounts payable in respect of the Second Tranche Unit Awards or otherwise an amount which, after all federal, state and local taxes imposed on the Participant with respect to such amount are subtracted therefrom, is equal to the excise taxes imposed on such excess parachute payment pursuant to Section 4999 of the Code. Any gross-up payment shall be paid no later than the end of the Participant's taxable year next following the Participant's taxable year in which the excise tax (and any income or other related taxes or interest or penalties thereon) on a payment are remitted to the Internal Revenue Service or any other applicable taxing authority.

(h)    *Dividends.* As of each date on which the Company pays a cash dividend to record owners of shares of Common Stock (a "*Dividend Date*") (excluding for this purpose any amounts distributed to the ESOP for purposes of repaying the ESOP Note, dated April 1, 2007, in principal amount of $250,000,000, as amended), an amount equal to the per share dividend amount shall be credited (each such amount, a "*Dividend Credit*") to an account on behalf of each Participant in respect of each Unit subject to an Award. Dividend Credits shall bear interest at the prime rate in effect on the first business day following the applicable Dividend Date (as reported in the Wall Street Journal, national edition) from and including the Dividend Date through and including the date of payment. Dividend Credits and any related interest shall vest at such time as the Units to which the Dividend Credits pertain vest and Dividend Credits and any related interest shall be settled and paid in U.S. dollars at such time as the Units to which the Dividend Credits pertain are settled and paid.

## SECTION 6.    Amendment and Termination

(a)    The Plan will terminate on the tenth anniversary of the Effective Date, and no Units shall be granted after such date. Awards outstanding on the tenth anniversary of the Effective Date shall not be affected or impaired by the termination of the Plan.

(b)    The Administrator may amend or terminate the Plan, but no amendment or termination shall be made which would adversely impair the rights of a Participant under any Award theretofore granted without the Participant's consent, except such an amendment made to comply with applicable law, stock exchange rules or accounting rules. In addition, no amendment shall be made without the approval of the Company's shareholders to the extent such approval is required by applicable law or stock exchange rules. Subject to Section 3(b), the Administrator may amend the terms of any Award theretofore granted, but no amendment shall be made that would adversely impair the rights of any Participant without the Participant's consent except such an amendment made to cause the Plan or Award to comply with applicable law, stock exchange rules or accounting rules.

## SECTION 7.    General Provisions

(a)    This Plan is intended to constitute a Top Hat Plan and it shall at all times be interpreted and administered accordingly. Notwithstanding any other provision of this Plan,

10

Source: TRIBUNE CO, 10-K, March 20, 2008

subject to Section 3(b), the Administrator may make such amendments to this Plan, and to any procedures established under this Plan, as it may determine to be necessary to comply with any applicable law, regulation or requirement, including without limitation the rules governing Top Hat Plans, and such amendments need not apply uniformly to all Participants.

(b)     Nothing contained in the Plan shall prevent the Company or any Subsidiary from adopting other or additional compensation arrangements for its employees and consultants.

(c)     The Plan shall not constitute a contract for employment or services, and adoption of the Plan shall not confer upon any individual any right to continued employment, nor shall it interfere in any way with the right of the Company or any Subsidiary to terminate the employment or services of any individual at any time.

(d)     The Participant shall pay to the Company, or make arrangements satisfactory to the Company regarding the payment of, any U.S. (federal, state, or local) or non-U.S. taxes of any kind required by law to be withheld with respect to any payment hereunder. The obligations of the Company under the Plan shall be conditional on such payment or arrangements, and the Company and its Subsidiaries shall, to the extent permitted by law, have the right to deduct any such taxes from any payment otherwise due to the Participant.

(e)     The Administrator shall establish such procedures as it deems appropriate for a Participant to designate a beneficiary to whom any amounts payable in the event of the Participant's death are to be paid or by whom any rights of the Participant, after the Participant's death, may be exercised.

(f)     The Plan, Unit Agreements, and all actions taken thereunder shall be governed by and construed in accordance with the laws of the State of Delaware without reference to principles of conflict of laws.

(g)     Subject to Section 3(b), within the time period permitted by the applicable Treasury Regulations, the Administrator may modify the Plan in the least restrictive manner necessary in order to cause the provisions of the Plan to comply with the requirements of Section 409A, so as to avoid the imposition of taxes and penalties pursuant to Section 409A.

(h)     Subject to Section 3(b), in the event an Award is granted to a Participant who is employed or providing services outside the United States and who is not compensated from a payroll maintained in the United States, the Administrator may, in its sole discretion, modify the provisions of the Plan as they pertain to such individual to comply with applicable non-U.S. law.

(i)     Each Unit Agreement shall provide that if a Participant engages in any act of fraud, insider trading or other securities law violation then: (i) Participant shall immediately forfeit, effective as of the date Participant engages in such conduct, all vested and unvested Units; and (ii) with respect to Units, if any, that were cash settled prior to the date Participant engaged in such conduct, Participant shall return to the Company the cash proceeds received with respect to such Units.

11

Source: TRIBUNE CO, 10-K, March 20, 2008

**SECTION 8.**     **Effective Date of Plan**

      The Plan was adopted by the Board on December 20, 2007, to be effective December 20, 2007 (the "*Effective Date*"). Termination of this Plan shall not affect the terms or conditions of any Award granted on, or prior to, the termination date.

12

Source: TRIBUNE CO, 10-K, March 20, 2008

Exhibit 21

## TRIBUNE COMPANY—LIST OF SUBSIDIARIES

### PUBLISHING

| Subsidiary | Jurisdiction of Incorporation | Other names under which subsidiary does business |
|---|---|---|
| Tribune Finance, LLC | Delaware | |
| Tribune Publishing Company | Delaware | |
| The Baltimore Sun Company | Maryland | The Sun; baltimoresun.com |
|   Homestead Publishing Company | Maryland | The Aegis; The Record; APG News; The Weekenders; Harford Magazine; Harford Business Ledger; TheAegis.com; harfordledger.com |
|   Patuxent Publishing Company | Maryland | Eldersburg Eagle; Westminster Eagle; Howard County Times; Columbia Flier; Laurel Leader; SoundOff; Catonsville Times; Arbutus Times; Owings Mills Times; Baltimore Messenger; Towson Times; Northeast Booster; Northwest Reporter; North County News; Jeffersonian; The View — Ellicott City; The View — West Howard County; The View — Catonsville; The View — Elkridge; Maryland Family; ChesapeakeHome Magazine; Howard/Columbia Magazine; Baby Steps Magazine; Pet Tracks (copyright application pending). Patuxent Directories — 8 community directories: Howard County, Olney, Bowie, Crofton, Carroll County, Harford County, Catonsville, and Laurel. The Weekenders; arbutustimes.com; baltimoremessenger.com; catonsvilletimes.com; columbiaflier.com; ftmeadesoundoff.com; howardcountytimes.com; laurelleader.com; lifetimesmd.com; northconews.com; northeastbooster.com; northeastreporter.com; owingsmillstimes.com; theeldersburgeagle.com; thejeffersonian.com; theviewnewspapers.com; thewestminstereagle.com; towsontimes.com; classifido.net; patuxentpublicnotices.com; connect2mdhomes.com |
|   Baltimore Newspaper Network, Inc. | Maryland | |
| Chicago Tribune Company | Illinois | Chicago Tribune; chicagotribune.com; RedEye chicagosports.com |
|   Chicagoland Publishing Company | Delaware | Apartments.com Magazine; Cars Magazine; Chicago Fashion Magazine; Chicago Home and Garden Magazine; Chicago Magazine; JobFinder; New Homes Guide; TribLocal; |

Source: TRIBUNE CO, 10-K, March 20, 2008

| | | |
|---|---|---|
| Chicago Tribune Newspapers, Inc. | Illinois | Chicago Tribune |
| Chicago Tribune Press Service, Inc. | Illinois | Tribune Newspaper Network |
| Newspaper Readers Agency, Inc. | Illinois | |
| Tribune Direct Marketing, Inc. | Delaware | Tribune Direct Marketing |
| | | |
| The Daily Press, Inc. | Delaware | Daily Press; dailypress.com |
| Virginia Gazette Companies, LLC | Delaware | Virginia Gazette; vagazette.com |
| Virginia Community Shoppers, LLC | Delaware | |
| Forum Publishing Group, Inc. | Delaware | Jewish Journal, Shalom, The Coupon Book, EastSider, Hi-Riser, Deerfield Beach Forum, Delray Beach Forum, Pompano Beach Forum, West Boca Forum, Boca Forum, Davie and Cooper City Gazette, Plantation Forum, Sunrise Forum, Weston Gazette, Margate/Coconut Creek Forum, Coral Springs Forum, Parkland Gazette, Tamarac Forum, Boynton Beach Forum, Lake Worth Forum, Wellington Forum, Oakland Park Gazette |
| | | |
| The Hartford Courant Company | Connecticut | Hartford Courant; courant.com; |
| | | |
| Courant Specialty Products, Inc. | Connecticut | |
| | | |
| New Mass Media, Inc. | Massachusetts | Fairfield Weekly; Hartford Advocate; New Haven Advocate; |
| | | |
| Heart & Crown Advertising, Inc. | Connecticut | |
| TMLH 2, Inc. | California | |
| Hoy Publications, LLC | Delaware | Hoy; Hola Hoy; hoyinternet.com |
| | | |
| Orlando Sentinel Communications Company | Delaware | Orlando Sentinel; orlandosentinel.com; Orlando City Book; El Sentinel; Sentinel Express; elsentinel.com |
| | | |
| Neocomm, Inc. | Delaware | Neocomm of Delaware, Inc. |
| | | |
| Sentinel Communications News Ventures, Inc. | Delaware | |
| The Morning Call, Inc. | Pennsylvania | Morning Call; mcall.com |
| Direct Mail Associates, Inc. | Pennsylvania | |
| | | |
| Southern Connecticut Newspapers, Inc. | Connecticut | |
| | | |
| TMLS I, Inc. | California | |
| | | |
| Sun-Sentinel Company | Delaware | Sun-Sentinel; sun-sentinel.com |
| | | |
| Gold Coast Publications, Inc. | Delaware | City Link; City & Shore; Teen Link; Sun-Sentinel Direct; El Sentinel; South Florida Parenting; Florida New Homes Guide |
| Newsday, Inc. | New York | Newsday; newsday.com; amny; amny.com; |
| Distribution Systems of America, Inc. | New York | Island Publications. Newsday Media Group |
| Star Community Publishing Group, LLC | Delaware | Huntington Pennysaver; Results Media; Shopper's Guide; This Week; Yankee Trader |

| | | |
|---|---|---|
| Hoy, LLC | New York | |
| Tribune Interactive, Inc. | Delaware | metromix.com; FSBO.com |
| Tribune Los Angeles, Inc. | Delaware | |
| Los Angeles Times Communications LLC | Delaware | The Burbank Leader; latimes.com; Glendale-News Press; La Canada Valley Sun; La Crescenta Valley Sun; Laguna Beach Coastline; Newport Beach/ Costa Mesa Daily Pilot; Times Community News |
| Los Angeles Times Newspapers, Inc. | Delaware | |
| Tribune Manhattan Newspaper Holdings, Inc. | Delaware | |
| Tribune New York Newspaper Holdings, LLC | Delaware | amNewYork |
| Tribune Media Services, Inc. | Delaware | Tribune Media Services International; tms.tribune.com; Zap2It; Zap2it.com; Tribune Media Services Entertainment Products; Tribune Media Services Publishing; Tribune Media Services Specialty Products, Tribune Media Services International-Hong Kong |
| TMS Entertainment Guides, Inc. | Delaware | |
| TMS Entertainment Guides Canada Corp. | Canada | |
| Tribune Media Services, BV | Netherlands | |
| Tribune Media Net, Inc. | Delaware | |
| Tribune National Marketing Company | Delaware | |

Source: TRIBUNE CO, 10-K, March 20, 2008

**BROADCASTING AND ENTERTAINMENT**

| | | |
|---|---|---|
| Tribune Broadcasting Holdco, LLC | Delaware | |
| Tribune Broadcasting Company | Delaware | Tribune Cable; Tribune Creative Services Group; Tribune Plus; Tribune Plus Corporate Sales; Tribune Television |
| ChicagoLand Microwave Licensee, Inc. | Delaware | |
| ChicagoLand Television News, Inc. | Delaware | ChicagoLand Television/CLTV News; cltv.com |
| KHCW Inc. | Delaware | KHCW-TV; khcw.com HOUSTONCW.COM THECWHOUSTON.COM |
| KSWB Inc. | Delaware | KSWB-TV; sandiegocw.com SANDIAGOSCW.COM SANDIEGOSCW.COM YOVIO.COM SANDIEGOCW.COM |
| KPLR, Inc. | Missouri | KPLR-TV; cw11tv.com CW11STLOUIS.COM CWSTLOUIS.COM KPLR11CW.COM KPLRCW.COM STLOUISCW.COM |
| KTLA Inc. | California | KTLA-TV; ktla.com CWLOSANGELES.COM LOSANGELESCW.COM |
| KWGN Inc. | Delaware | KWGN-TV; cw2.com COLORADOSCW.COM COLORADOSCW2.COM DENVERSCW.COM DENVERSCW2.COM KWGNCW.COM 2NEWSCOLORADO.COM CW2COLORADO.COM DENVERS2NEWS.COM |
| Oak Brook Productions, Inc. | Delaware | |
| Tower Distribution Company | Delaware | WGN Cable; Superstation WGN; wgncable.com |
| Tribune Broadcasting News Network, Inc. | Delaware | TribNet |
| Tribune Broadcast Holdings, Inc. | Delaware | KRCW-TV; WTTV-TV; thecw4.com; WTTK-TV CWPORTLAND.COM PORTLANDSCW.COM CWINDIANA.COM CWINDIANAPOLIS.COM INDIANAPOLISCW.COM INDIANASCW.COM WTTVCW.COM WB4.COM |
| Tribune Entertainment Company | Delaware | |
| Magic T Music Publishing Company | Delaware | |
| Tribune Entertainment Production Company | Delaware | |
| 435 Production Company | Delaware | |
| 5800 Sunset Productions Inc. | Delaware | |
| Chicago River Production Company | Delaware | |
| North Michigan Production Company | Delaware | |
| The Other Company, LLC | Delaware | |
| Towering T Music Publishing Company | Delaware | |
| Tribune (FN) Cable Ventures, Inc. | Delaware | |
| Tribune Network Holdings Company | Delaware | |

| | | |
|---|---|---|
| Tribune Television Company | Delaware | WPMT-TV; wpmt.com; WXIN-TV; fox59.com; WTIC-TV; fox61.com; KDAF-TV; cw33.com WPHL-TV; myphl17.com; KDAFCW.COM TEXASCW.COM WB33.COM CW33TV.COM KDAFTV.COM TEXASWB.COM WB17.COM CW4TV.COM THECW4.COM MYPHL17.COM MYPHL17.NET MYPHL17.TV MYPHLTV.COM MYPHLTV.NET MYPHLTV.TV MYWPHL17.COM MYWPHL17.NET MYWPHL17.TV MYWPHLTV.COM MYWPHLTV.NET MYWPHLTV.TV WXIN.COM |
| Channel 20, Inc. | Delaware | |
| Channel 40, Inc. | Delaware | KTXL-TV; fox40.com KTXL.COM |
| Channel 39, Inc. | Delaware | WSFL-TV; cwsfl.com MIAMICW.COM SOUTHFLORIDASCW.COM WB39.COM |
| WDCW Broadcasting, Inc. | Delaware | WDCW-TV; thecwdc.com CW50.COM WASHINGTONSCW.COM WBDCCW.COM WBDC.COM |
| WTXX Inc. | Delaware | WTXX-TV; wtxx.com CONNECTICUTSCW.COM CW20.COM CWCONNECTICUT.COM CWHARTFORD.COM HARTFORDSCW.COM WTXXWB.COM CONNECTICUTSCW20.COM CTCW20.COM CW20WTXX.COM WTXXCW.COM |
| Tribune Television Holdings, Inc. | Delaware | WXMI-TV, wxmicom; KMYQ-TV; myq2.com MYQ2.TV MYQ2TV.COM |
| Tribune Television New Orleans, Inc. | Delaware | WGNO-TV; wgno.com; WNOL-TV; wnol.com WB38.COM CWNEWORLEANS.COM NEWORLEANSCW.COM WNOLCW.COM |

| | | |
|---|---|---|
| Tribune Television Northwest, Inc. | Delaware | KCPQ-TV; q13.com Q13FOX.COM<br>KCPQ.COM<br>KCPQ13.COM<br>Q13REPORTS.COM |
| WGN Continental Broadcasting Company | Delaware | WGN-TV; wgntv.com; WGN Radio; wgnradio.com;<br>Tribune Radio Network CHICAGOSCW.COM<br>WGNCW.COM<br>WGNTVCW.COM<br>WGNCABLE.COM |
| Tribune Sports Network Holdings, LLC | Delaware | |
| WPIX, Inc. | Delaware | WPIX-TV; cw11.com THEWB11.COM<br>NEWYORKSCW.COM<br>WPIXCW.COM |
| Chicago National League Ball Club, LLC | Delaware | Chicago Cubs; cubs.com |
|    Chicago Cubs Dominican Baseball<br>     Operations, LLC | Delaware | |
| Diana-Quentin, LLC | Delaware | |
| Tribune California Properties, Inc. | Delaware | |

**MISCELLANEOUS**

| | |
|---|---|
| California Community News Corporation | Delaware |
| Chicago Avenue Construction Company | Illinois |
| Eagle New Media Investments, LLC | Delaware |
|     Stemweb, Inc. | New York |
|         ForSaleByOwner.com | New York |
|         Homeowners Realty, Inc. | Utah |
|         Internet Foreclosure Service, Inc. | New York |
|     Newport Media, Inc. | Delaware |
|     ValuMail, Inc. | Connecticut |
| Eagle Publishing Investments, LLC | Delaware |
| GreenCo, Inc. | Delaware |
| Los Angeles Times International, Ltd. | California |
| JuliusAir Company LLC | Delaware |
| JuliusAir Company II, LLC | Delaware |
| Multimedia Insurance Company | Vermont |
| Riverwalk Center I Joint Venture | Florida (Partnership) |
| Tribune License, Inc. | Delaware |
| Tribune Finance Service Center, Inc. | Delaware |
| Wrigley Field Premium Ticket Services, LLC | Delaware |

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statement on Form S-3 (File No. 333-135905) of Tribune Company of our report dated March 14, 2008, relating to the consolidated financial statements, financial statement schedule, and the effectiveness of internal control over financial reporting, which appears in this Form 10-K. We also consent to the reference to us under the heading "Selected Financial Data" in this Form 10-K.

We also hereby consent to the incorporation by reference in the above registration statement of our reports dated March 14, 2008 relating to the financial statements of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC which also appear in this Form 10-K.

/s/ PRICEWATERHOUSECOOPERS LLP
PricewaterhouseCoopers LLP

Chicago, Illinois
March 14, 2008

1

Source: TRIBUNE CO, 10-K, March 20, 2008

EXHIBIT 31.1

### Form 10-K Certification

I, Samuel Zell, certify that:

1.   I have reviewed this annual report on Form 10-K of Tribune Company;

2.   Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.   Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this annual report;

4.   Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

    a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)   Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

    d)   Disclosed in this annual report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.   Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

    a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

    b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

/s/ SAMUEL ZELL
Samuel Zell
Chairman and
Date: March 20, 2008                    Chief Executive Officer

1

Source: TRIBUNE CO, 10-K, March 20, 2008

**EXHIBIT 31.2**

## Form 10-K Certification

I, Donald C. Grenesko, certify that:

1.   I have reviewed this annual report on Form 10-K of Tribune Company;

2.   Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.   Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this annual report;

4.   Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

   d)   Disclosed in this annual report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.   Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

/s/ DONALD C. GRENESKO
Donald C. Grenesko
Senior Vice President/
Finance and Administration

Date: March 20, 2008

1

EXHIBIT 32.1

**CERTIFICATION PURSUANT TO
18 UNITED STATES CODE SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Samuel Zell, the Chairman and Chief Executive Officer of Tribune Company, certify that (i) Tribune Company's Form 10-K for the year ended Dec. 30, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-K for the year ended Dec. 30, 2007 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

/s/ SAMUEL ZELL
Samuel Zell
Chairman and Chief Executive Officer

March 20, 2008

1

Source: TRIBUNE CO, 10-K, March 20, 2008

**EXHIBIT 32.2**

## CERTIFICATION PURSUANT TO
## 18 UNITED STATES CODE SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Donald C. Grenesko, the Senior Vice President/Finance and Administration of Tribune Company, certify that (i) Tribune Company's Form 10-K for the year ended Dec. 30, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-K for the year ended Dec. 30, 2007 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

/s/ DONALD C. GRENESKO
Donald C. Grenesko
Senior Vice President/
Finance and Administration

March 20, 2008

1

Exhibit 99.1

# Deloitte.

**Deloitte & Touche LLP**
250 East 5th Street
Suite 1900
Cincinnati, OH 45202-5109
USA

Tel: +1 513 784 7100
Fax: +1 513 784 7204
www.deloitte.com

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Partners of Television Food Network, G.P.:

We have audited the accompanying balance sheet of Television Food Network, G.P. ("Food Network" – a subsidiary of The E.W. Scripps Company) as of December 31, 2007, and the related statements of income and comprehensive income, cash flows, and partners' equity for the year then ended. These financial statements are the responsibility of the Food Network's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Food Network is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Food Network's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, such financial statements present fairly, in all material respects, the financial position of the Food Network at December 31, 2007, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

*Deloitte & Touche LLP*

March 11, 2008

Member of
**Deloitte Touche Tohmatsu**

Created by 10KWizard   www.10KWizard.com