

# FORM 8-K

## TRIBUNE CO - TRBCQ

**Filed: April 05, 2007 (period: April 01, 2007)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K - 8-K

**ITEM 1.01.**    ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT.

**ITEM 5.02.**    DEPARTURE OF DIRECTORS OR CERTAIN OFFICERS; ELECTION OF DIRECTORS; APPOINTMENT OF CERTAIN OFFICERS; COMPENSATORY ARRANGEMENTS OF CERTAIN OFFICERS.

**ITEM 8.01.**    OTHER EVENTS.

**ITEM 9.01.**    FINANCIAL STATEMENTS AND EXHIBITS.

SIGNATURE
EXHIBIT INDEX
EX-4.1 (EX-4.1)

EX-4.2 (EX-4.2)

EX-4.3 (EX-4.3)

EX-10.1 (EX-10.1)

EX-10.2 (EX-10.2)

EX-10.3 (EX-10.3)

EX-10.4 (EX-10.4)

EX-10.5 (EX-10.5)

EX-10.6 (EX-10.6)

EX-10.7 (EX-10.7)

EX-10.8 (EX-10.8)

EX-10.9 (EX-10.9)

EX-10.10 (EX-10.10)

EX-10.11 (EX-10.11)

EX-10.12 (EX-10.12)

EX-10.13 (EX-10.13)

EX-10.14 (EX-10.14)

EX-10.15 (EX-10.15)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 8-K

## CURRENT REPORT PURSUANT TO SECTION 13 OR 15(d)
## OF THE SECURITIES EXCHANGE ACT OF 1934

**DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED):**
**April 1, 2007**

**Commission file number 1-8572**

# TRIBUNE COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **36-1880355** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **435 North Michigan Avenue** | |
| **Chicago, Illinois** | **60611** |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: **(312) 222-9100**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the obligation of the registrant under any of the following provisions:

☐      Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒      Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐      Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☒      Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: TRIBUNE CO, 8-K, April 05, 2007

**ITEM 1.01.        ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT.**

_Overview of Leveraged ESOP Transaction_

On April 2, 2007, Tribune Company (the "Company") announced that the Company's board of directors (the "Board"), based upon the recommendation of a special committee of the Board comprised entirely of independent directors (the "Special Committee"), on April 1, 2007 approved the Company's entry into a series of transactions (collectively, the "Leveraged ESOP Transaction") with (1) a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), (2) EGI-TRB, L.L.C. ("EGI-TRB"), a limited liability company wholly owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family) and (3) Samuel Zell ("Zell"). Representatives of Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "Chandler Trusts") on the Board abstained from voting as directors. The description of the Leveraged ESOP Transaction set forth below is qualified in its entirety by reference to the Exhibits filed with this Report on Form 8-K, which are incorporated herein by reference.

The Leveraged ESOP Transaction is comprised of a series of transactions, including the following:

- On April 1, 2007, EGI-TRB agreed to invest $250,000,000 in the Company in exchange for (i) 1,470,588 shares of the Company's common stock, par value $0.01 per share ("Company Common Stock") at $34 per share and (ii) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200,000,000, which is required to be repaid immediately prior to the Merger (as defined below). These transactions are more fully described below under the heading "Securities Purchase Agreements". The promissory note will be exchangeable at the Company's option, or automatically under certain circumstances, into an aggregate of 5,882,353 shares of Company Common Stock, subject to antidilution adjustments. Zell will be appointed, effective upon the closing of this investment in the Company by EGI-TRB, as a member of the Board.

- On April 1, 2007, the ESOP purchased 8,928,571 shares of Company Common Stock from the Company at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250,000,000, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of Company Common Stock held by the ESOP.

- The Company has agreed to launch a tender offer to repurchase up to approximately 126,000,000 shares of Company Common Stock that are currently outstanding at a price of $34.00 per share (the "Share Repurchase"). The Company's obligations to consummate the Share Repurchase are subject to various conditions, certain of which are more fully described below under the heading "Share Repurchase."

2

- The Company has entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company (the "Trustee"), not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust which forms a part of the ESOP, Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and EGI-TRB (solely for the limited purposes specified therein) providing for Merger Sub to be merged with and into the Company, and following such merger, the Company to continue as the surviving corporation wholly owned by the ESOP (the "Merger"). In connection with the Merger, all outstanding shares of Company Common Stock (other than those held by the ESOP) will receive consideration of $34.00 per share. If the Merger does not close by January 1, 2008, shareholders will receive an additional 8% annualized "ticking fee," calculated from January 1, 2008 through the date of closing of the Merger, all as more fully described below under the heading "Agreement and Plan of Merger." The Merger is subject to various conditions as described below.

- In the Merger, EGI-TRB will receive cash for the shares of Company Common Stock it owns and, immediately prior to the Merger, the Company will repay the exchangeable promissory note held by EGI-TRB. Following the consummation of the Merger, EGI-TRB has agreed that it will purchase from the Company a $225,000,000 subordinated promissory note and a 15-year warrant for $90,000,000. The warrant will entitle EGI-TRB to purchase 43,478,261 shares of Company Common Stock (subject to adjustment), which will represent approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to phantom shares under a management equity incentive plan to be established as described under Item 5.02 below). The warrant will have an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment).

- The Company has agreed to grant EGI-TRB and the ESOP registration rights with respect to the shares of Company Common Stock that EGI-TRB and the ESOP, respectively, purchased from the Company, as more fully described below under the heading "Registration Rights Agreements."

- The Company has secured financing commitments from certain lenders to provide the Company with the ability to borrow the amounts required for purposes of financing the Leveraged ESOP Transaction, to refinance certain indebtedness of the Company, including indebtedness under its existing credit facilities, and for working capital and general corporate purposes of the Company, as more fully described below under the heading "Financing Commitments."

- The Company's largest stockholders, the Chandler Trusts, have entered into a voting agreement whereby the Chandler Trusts have committed to vote all of the shares of Company Common Stock that such stockholders beneficially own in favor of the approval and adoption of the Merger Agreement and the transactions

3

contemplated thereby, as more fully described below under the heading "Voting Agreement."

### *Agreement and Plan of Merger*

On April 1, 2007, the Company entered into the Merger Agreement with the Trustee (on behalf of the ESOP), Merger Sub, and EGI-TRB (solely for the limited purposes specified therein). Pursuant to the terms of the Merger Agreement, Merger Sub will be merged with and into the Company in the Merger, and as a result the Company will continue as the surviving corporation wholly owned by the ESOP.

At the effective time of the Merger, each outstanding share of Company Common Stock, other than shares owned by (i) the ESOP and Merger Sub and (ii) by any stockholders who are entitled to and who properly exercise appraisal rights under Delaware law, will be cancelled and converted into the right to receive $34.00 in cash, plus additional per share consideration, if any, equal to (x) $34.00 multiplied by (y) an 8% annual accretion factor, calculated on an annualized basis from January 1, 2008 to the date of the closing of the Merger (collectively, the "Merger Consideration"). Each option to purchase shares of Company Common Stock and Company stock-based awards, in each case whether vested or unvested, and each award of restricted Company Common Stock and all shares issued under the Company's Employee Stock Purchase Plan will be converted into the right to receive an applicable portion of the aggregate Merger Consideration.

The Company has made customary representations and warranties and covenants in the Merger Agreement, including among others, subject to the exceptions described below, not to (i) solicit inquiries with respect to a competing transaction, (ii) participate in discussions or negotiations with, or furnish nonpublic information to, any person with respect to a competing transaction or (iii) approve, endorse or recommend a competing transaction or enter into any letter of intent or agreement with respect to a competing transaction. As exceptions to this covenant, the Company may participate in discussions and negotiations with, and furnish non-public information to, a party that has made a competing proposal, if the Special Committee or the Board determines in good faith, after consultation with financial and legal advisors, and considering such factors as the Special Committee or the Board considers to be appropriate, that such proposal could reasonably be expected to result in a transaction or transactions that are more favorable to the Company and its stockholders than the transactions contemplated by the Merger Agreement (hereinafter referred to as a "Superior Proposal"). The Company, EGI-TRB and the ESOP have agreed that the provisions of any standstill agreement entered into between the Company and any third party will not be deemed to prohibit the third party from submitting competing proposals to the Special Committee or the Board. The Merger Agreement is subject to various closing conditions, including among others, approval of the Merger Agreement by the holders of a majority of the outstanding Company Common Stock, the expiration or termination of any waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), receipt of necessary consents and approvals from the Federal Communications Commission and Major League Baseball, receipt of the financing contemplated by the financing commitments, and receipt of a solvency opinion from a nationally recognized valuation firm.

4

Source: TRIBUNE CO, 8-K, April 05, 2007

The Merger Agreement grants certain termination rights to the parties, including (i) the right of the Company or the ESOP to terminate for failure to obtain the requisite stockholder approval or if the Merger does not close by May 31, 2008, (ii) subject to certain requirements, the right of the Company to terminate, subject to certain restrictions, if the Board or the Special Committee determines to accept a Superior Proposal prior to obtaining the requisite stockholder approval of the Merger, (iii) the right of the ESOP to terminate if, prior to obtaining the requisite stockholder approval, the Board fails to recommend the adoption of the Merger Agreement by the Company's stockholders or changes its recommendation to the Company's stockholders in a manner adverse to the ESOP and (iv) the right of the Company to terminate in the event that the Step One Purchase Transaction (described below under the heading "Securities Purchase Agreements — EGI-TRB Purchase Agreement") has not been consummated on or prior to August 17, 2007 or if the EGI-TRB Purchase Agreement is terminated prior to the consummation of the Merger.

The foregoing description of the Merger Agreement is qualified in its entirety by reference to the complete terms and conditions of the Merger Agreement, which is attached hereto as Exhibit 10.1, and incorporated herein by reference.

## *Securities Purchase Agreements*

### *EGI-TRB Purchase Agreement*

On April 1, 2007, the Company concurrently with its entry into the Merger Agreement entered into a Securities Purchase Agreement (the "EGI-TRB Purchase Agreement") with EGI-TRB and Zell. Pursuant to the terms of the EGI-TRB Purchase Agreement, the Company has agreed to sell to EGI-TRB (i) 1,470,588 newly issued shares of Company Common Stock for a purchase price of $50,000,000, and (ii) an unsecured subordinated exchangeable promissory note in the principal amount of $200,000,000, which is exchangeable at the option of the Company, or automatically under certain circumstances, into 5,882,353 shares of Company Common Stock (the "Exchangeable Note"), for a purchase price of $200,000,000 (the "Step One Purchase Transaction"). In the Merger, EGI-TRB will receive the Merger Consideration for its shares of Company Common Stock and, immediately prior to the Merger, the Company will repay the Exchangeable Note. The EGI-TRB Purchase Agreement also provides that immediately following the consummation of the Merger, EGI-TRB will purchase from the Company for an aggregate purchase price of $315,000,000, (i) an unsecured subordinated promissory note in the principal amount of $225,000,000 (the "Subordinated Note") and (ii) a 15-year warrant (the "Warrant") to purchase 43,478,261 shares of Company Common Stock (subject to adjustment), which will represent approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to phantom shares under a management equity incentive plan to be established as described under Item 5.02 below) (the "Step Two Purchase Transaction" and, together with the Step One Purchase Transaction, the "Purchase Transactions"). The Warrant will have an initial aggregate exercise price of $500

5

Source: TRIBUNE CO, 8-K, April 05, 2007

million, increasing by $10 million per year for the first 10 years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment).

Certain representations, warranties and covenants made by the Company in the Merger Agreement are incorporated by reference and made by the Company in the EGI-TRB Purchase Agreement, including among others, the covenants described above with respect to solicitation or negotiation of competing proposals. The EGI-TRB Purchase Agreement also provides that Zell will be appointed to serve as a member of the Board following the consummation of the First Step Purchase Transaction, and be elected to serve as Chairman of the Board effective as of the date of the consummation of the Second Step Purchase Transaction. The Company has also agreed to reimburse EGI-TRB for up to $2,500,000 of unreimbursed expenses following consummation of the Step One Purchase Transaction and up to an additional $2,500,000 of unreimbursed expenses following consummation of the Step Two Purchase Transaction. The Purchase Transactions are subject to various closing conditions, including, in the case of the Step One Purchase Transaction, the expiration or termination of any waiting period under the HSR Act, and in the case of the Step Two Purchase Transaction, consummation of the Merger.

The EGI-TRB Purchase Agreement grants certain termination rights to the parties, including (i) the right of the Company or EGI-TRB to terminate (A) upon termination of the Merger Agreement, (B) if the Step One Purchase Transaction has not been consummated on or prior to August 17, 2007, or (C) if an injunction or other similar proceeding prohibiting the consummation of the Merger or the transactions contemplated by the EGI-TRB Purchase Agreement has become final and non-appealable, and (ii) the right of EGI-TRB to terminate if (A) the Merger has not been consummated on or prior to May 31, 2008, (B) prior to obtaining the requisite stockholder approval, the Board fails to recommend the adoption of the Merger Agreement by the Company's stockholders in the Company's proxy statement or changes its recommendation to the Company's stockholders in a manner adverse to EGI-TRB, (C) the Company fails to obtain the requisite stockholder approval of the Merger Agreement at the meeting of the Company's stockholders or (D) the Board or the Special Committee determines to accept a Superior Proposal.

The EGI-TRB Purchase Agreement provides that if the EGI-TRB Purchase Agreement is terminated under certain specified circumstances, the Company may be required to pay EGI-TRB a termination fee of $25,000,000, including in the event of termination due to (i) certain breaches by the Company, (ii) a change in recommendation by the Board or the Special Committee, (iii) a determination by the Board or the Special Committee to accept a Superior Proposal or (iv) stockholder disapproval under certain circumstances if the Company then enters into an alternative transaction within a year after termination. In addition, under certain specified circumstances EGI-TRB may be required to pay the Company a termination fee of $25,000,000, including in the event of termination due to (i) certain breaches by EGI-TRB or (ii) failure to obtain the financing for the transactions unless the failure is due to a breach by the Company or the ESOP.

6

Pursuant to the terms of the EGI-TRB Purchase Agreement, until the earlier of (i) the date of consummation of the Merger and (ii) the date on which the Merger Agreement is terminated, EGI-TRB has agreed to vote all of the shares of Company Common Stock that it beneficially owns in favor of the approval and adoption of the Merger Agreement and the transactions contemplated thereby. The EGI-TRB Purchase Agreement also provides that Zell will provide a guarantee of payment to the Company of the obligations of EGI-TRB under the EGI-TRB Purchase Agreement.

The Exchangeable Note will accrue interest on the unpaid principal amount at the rate of 4.81% per annum, which may be paid in additional notes. The Exchangeable Note is subordinated to the senior obligations of the Company. The Exchangeable Note is exchangeable at any time, at the option of the Company, into an aggregate of 5,882,353 shares of Company Common Stock, subject to antidilution adjustments. In the event of such an exchange, the Company will pay cash to EGI-TRB in an amount equal to 40% of the interest on the Exchangeable Note that has accrued or has been paid in additional notes, and the remaining 60% will be considered to be additional exchange price for the shares of Company Common Stock issued on the exchange. The Exchangeable Note matures on the date of the closing of the Merger and the Company is required to pay the outstanding principal amount of the Exchangeable Note, together with all accrued and unpaid interest thereon, immediately prior to the consummation of the Merger.

As described above, the Subordinated Note is an unsecured subordinated promissory note in the principal amount of $225,000,000. The Subordinated Note will bear interest at the "Long-Term Applicable Federal Rate" on the date of issuance. As also noted above, the Warrant is exercisable for a period of 15 years from the date of issuance and provides for the aggregate issuance of 43,478,261 shares of Company Common Stock. The Warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the Warrant, for a maximum aggregate exercise price of $600 million. The number of shares and the exercise price are subject to adjustment in certain circumstances.

The foregoing descriptions of the EGI-TRB Purchase Agreement, the Exchangeable Note, the Subordinated Note and the Warrant are qualified in their entirety by reference to the complete terms and conditions of the EGI-TRB Purchase Agreement and the forms of the Exchangeable Note, the Subordinated Note and the Warrant which are attached hereto as Exhibits 10.2, 10.3, 10.4 and 10.5, respectively, and incorporated herein by reference.

*ESOP Purchase Agreement*

On April 1, 2007, the Company concurrently with its entry into the Merger Agreement entered into an ESOP Purchase Agreement (the "ESOP Purchase Agreement" and, together with the EGI-TRB Purchase Agreement, the "Purchase Agreements") with the Trustee (on behalf of the ESOP). Pursuant to the terms of the ESOP Purchase Agreement, the Company sold 8,928,571 shares of Company Common Stock to the ESOP at a price of $28.00 per share. The ESOP paid for this purchase with a promissory

7

Source: TRIBUNE CO, 8-K, April 05, 2007

note of the ESOP executed by the Trustee in favor of the Company in the principal amount of $250,000,000 (the "ESOP Note") to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of Company Common Stock held by the ESOP.

On April 1, 2007, the Company and the Trustee (on behalf of the ESOP) entered into an ESOP Loan Agreement (the "ESOP Loan Agreement"). The ESOP Loan Agreement provides for the Company to extend the ESOP a loan of $250,000,000 evidenced by the ESOP Note to be used by the ESOP to purchase the shares of Company Common Stock contemplated by the ESOP Purchase Agreement. The ESOP Note contemplates payment by the ESOP to the Company in 30 annual installments with an interest rate of approximately 5%. The Trustee (on behalf of the ESOP) also entered into a pledge agreement (the "ESOP Pledge Agreement") with the Company whereby the ESOP agreed to pledge the shares of Company Common Stock acquired by the ESOP from the Company as collateral for the Company's loan to the ESOP.

The foregoing descriptions of the ESOP Purchase Agreement, the ESOP Loan Agreement, the ESOP Note and the ESOP Pledge Agreement are qualified in their entirety by reference to the complete terms and conditions of the ESOP Purchase Agreement, the ESOP Loan Agreement, the ESOP Note and the ESOP Pledge Agreement, which are attached hereto as Exhibits 10.6, 10.7, 10.8 and 10.9, respectively, and incorporated herein by reference.

### _Financing Commitments_

In connection with the Board's decision to pursue the Leveraged ESOP Transaction, the Company entered into a commitment letter on April 1, 2007, which was amended and restated on April 5, 2007 (the "First Step Commitment Letter"), with J.P. Morgan Securities Inc. ("JPMorgan"), JPMorgan Chase Bank, N.A. ("JPMCB"), Merrill Lynch Capital Corporation ("Merrill Lynch"), Citigroup Global Markets Inc. ("CGMI"), on behalf of certain of its affiliates, Bank of America, N.A. ("Bank of America") and Banc of America Securities LLC ("BAS") with respect to new $8.028 billion senior secured credit facilities (the "First Step Credit Facilities") to be used by the Company, among other ways, in connection with the consummation of the Share Repurchase, to refinance certain existing indebtedness of the Company and for general corporate purposes. Pursuant to the First Step Commitment Letter, JPMorgan, Merrill Lynch, and one or more affiliates of CGMI and BAS will act as joint lead arrangers and bookrunners, JPMCB will act as sole and exclusive administrative agent, Merrill Lynch will act as sole and exclusive syndication agent and one or more affiliates of CGMI and Bank of America will act as co-documentation agents for the First Step Credit Facilities. The First Step Credit Facilities are anticipated to consist of (i) a $7.015 billion seven-year term loan facility (the "First Step Term Loan"), (ii) a $263 million delayed draw term loan facility maturing at the time the First Step Term Loan matures and (iii) a $750 million six-year revolving credit facility. Additionally, the documentation governing the First Step Credit Facilities will provide, on an uncommitted basis, for the Incremental Facility (as defined below) to be used to consummate the Merger. The First Step Credit Facilities are expected to be guaranteed by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the capital stock of certain specified subsidiaries of the Company. Certain outstanding senior notes of the Company (the "Existing Notes") will be secured on an

8

equal and ratable basis with the First Step Credit Facilities and the Incremental Facility as required by the terms of the indentures governing such Existing Notes. The First Step Commitment Letter provides, among other things, that the closing of the First Step Credit Facilities is subject to certain conditions. Upon closing, the First Step Credit Facilities will replace the Company's existing credit facility. The foregoing description of the First Step Commitment Letter is qualified in its entirety by reference to the complete terms and conditions of the First Step Commitment Letter, which is attached hereto as Exhibit 10.10, and incorporated herein by reference.

In addition, the Company entered into an additional commitment letter on April 1, 2007, which was amended and restated on April 5, 2007 (the "Second Step Commitment Letter" and, together with the First Step Commitment Letter, the "Commitment Letters"), with JPMorgan, JPMCB, Merrill Lynch, CGMI, on behalf of certain of its affiliates, Bank of America, Banc of America Bridge LLC ("Banc of America Bridge") and BAS with respect to a $2.105 billion incremental term loan facility which will be included in the First Step Credit Facilities and mature at the time the First Step Term Loan matures (the "Incremental Facility") and a $2.1 billion senior unsecured bridge facility (the "Senior Bridge Facility" and, together with the Incremental Facility, the "Second Step Facilities"). The Company may issue $2.1 billion senior notes or senior subordinated notes (the "New Notes") in lieu of drawing under the Senior Bridge Facility or to refinance the Senior Bridge Facility at a later date. The proceeds from these borrowings or issuances will in all cases be used by the Company, among other ways, in connection with the payment of the Merger Consideration pursuant to the terms of the Merger Agreement. Pursuant to the Second Step Commitment Letter, JPMorgan, Merrill Lynch, and one or more affiliates of CGMI and BAS will act as joint lead arrangers and bookrunners, Merrill Lynch will act as sole and exclusive administrative agent, JPMCB will act as sole and exclusive syndication agent and one or more affiliates of CGMI and Banc of America Bridge will act as co-documentation agents for the Senior Bridge Facility. The Incremental Facility will be guaranteed and secured on the same basis as the First Step Credit Facilities. The Senior Bridge Facility or the New Notes, as applicable, are expected to be guaranteed on a senior subordinated basis by all of the Company's subsidiaries which guarantee the First Step Credit Facilities and the Incremental Facility. The Second Step Commitment Letter provides, among other things, that the closing of the Second Step Facilities is subject to certain conditions. The Second Step Facilities are expected to close simultaneously with the consummation of the Merger. The foregoing description of the Second Step Commitment Letter is qualified in its entirety by reference to the complete terms and conditions of the Second Step Commitment Letter, which is attached hereto as Exhibit 10.11, and incorporated herein by reference.

### *Share Repurchase*

Pursuant to the terms of the Merger Agreement, the Company has agreed to launch a tender offer to repurchase up to approximately 126,000,000 shares of Company Common Stock that are currently outstanding at a price of $34.00 per share. The completion of the tender offer will be subject to certain conditions, including receipt by the Company of the financing proceeds contemplated by the First Step Commitment Letter, consummation of the Step One Purchase Transaction under the EGI-TRB Purchase Agreement, and the Company's receipt of a solvency opinion from a nationally recognized valuation firm. The Chandler Trusts have agreed to tender all shares of

9

Company Common Stock then owned by them, so long as the tender offer is at a cash price equal to at least $34.00 per share.

### Investor Rights Agreement

On April 1, 2007, the Company entered into an Investor Rights Agreement (the "Investor Rights Agreement") with EGI-TRB and the Trustee (on behalf of the ESOP). Each of the stockholders who are a party to the Investor Rights Agreement have agreed to vote their shares such that (i) the initial directors on the Board following the Merger shall serve until the third annual election following the consummation of the Merger, (ii) there shall be two directors designated by EGI-TRB and (iii) there shall be one director who shall be the chief executive officer of the Company. The Investor Rights Agreement also contains provisions governing the transfer of the shares of Company Common Stock held by EGI-TRB and the ESOP, preemptive rights granted to EGI-TRB and the ESOP by the Company, and specified actions requiring the approval of a majority of the entire Board, including a majority of the independent directors and one designee of EGI-TRB. The parties to the Investor Rights Agreement also have agreed to take all actions necessary to enable the Company to make an election to be treated as a subchapter-S corporation under the Internal Revenue Code, following the date of consummation of the Merger, and to maintain an election for subchapter-S status. The Investor Rights Agreement is not effective with respect to the Company until the closing of the Merger. The foregoing description of the Investor Rights Agreement is qualified in its entirety by reference to the complete terms and conditions of the Investor Rights Agreement, which is attached hereto as Exhibit 10.12, and incorporated herein by reference.

### Voting Agreement

On April 1, 2007, the Company entered into a Voting Agreement (the "Voting Agreement") with the Chandler Trusts, pursuant to which the Chandler Trusts have committed to vote all of the shares of Company Common Stock that they beneficially own in favor of the Merger Agreement, whether or not recommended by the Board, and, among other things, against any competing transaction, against any other agreement or action that is intended or would reasonably be expected to prevent, impede, or, in any material respect, interfere with, delay, postpone or discourage the transactions contemplated by the Merger Agreement, and against any action, agreement, transaction or proposal that would result in a breach of any representation, warranty, covenant, agreement or other obligation of the Company in the Merger Agreement or any of the Purchase Agreements. The Chandler Trusts have also agreed to certain restrictions on their ability to, among other things, (i) solicit inquiries with respect to a competing transaction, (ii) participate in discussions or negotiations with, or furnish nonpublic information to, any person with respect to a competing transaction or (iii) approve, endorse or recommend a competing transaction or enter into any letter of intent or agreement with respect to a competing transaction. The foregoing description of the Voting Agreement is qualified in its entirety by reference to the complete terms and conditions of the Voting Agreement, which is attached hereto as Exhibit 10.13, and incorporated herein by reference.

10

## *Registration Rights Agreements*

On April 1, 2007, the Company entered into a registration rights agreement (the "EGI-TRB/ESOP Registration Rights Agreement") with EGI-TRB and the Trustee (on behalf of the ESOP), pursuant to which the Company granted to EGI-TRB and the ESOP certain demand and piggyback registration rights for the registration and sale of shares of Company Common Stock held by EGI-TRB or the ESOP, respectively, in the event that the Merger Agreement is terminated without consummation of the Merger. The registration rights granted pursuant to the EGI-TRB/ESOP Registration Rights Agreement will not become effective in the case of the ESOP until the first anniversary of the date on which the ESOP purchased the shares of Company Common Stock from the Company pursuant to the ESOP Purchase Agreement. The registration rights applicable to EGI-TRB will not become effective until the third anniversary of the date on which EGI-TRB purchased shares of Company Common Stock and the Exchangeable Note from the Company pursuant to the EGI-TRB Purchase Agreement. The EGI-TRB/ESOP Registration Rights Agreement will terminate upon consummation of the Merger. The foregoing description of the EGI-TRB/ESOP Registration Rights Agreement is qualified in its entirety by reference to the complete terms and conditions of the Registration Rights Agreement, which is attached hereto as Exhibit 4.1, and incorporated herein by reference.

On April 1, 2007, the Company entered into a registration rights agreement with the Chandler Trusts (the "Chandler Trusts Registration Rights Agreement" and, together with the EGI-TRB/ESOP Registration Rights Agreement, the "Registration Rights Agreements") pursuant to which the Company granted to the Chandler Trusts certain shelf registration rights for the registration and sale of Company Common Stock the Chandler Trusts currently own. These shelf registration rights will terminate no later than November 22, 2007, and may terminate earlier under certain circumstances. The foregoing description of the Chandler Trusts Registration Rights Agreement is qualified in its entirety by reference to the complete terms and conditions of the Chandler Trusts Registration Rights Agreement, which is attached hereto as Exhibit 4.2, and incorporated herein by reference.

## *ESOP Plan Documents*

In connection with the Leveraged ESOP Transaction, the Board adopted the ESOP on April 1, 2007, effective as of January 1, 2007. The ESOP is intended to be qualified under Sections 401(a), 409 and 4975 of the Internal Revenue Code, and the trust portion thereof (the "ESOP Trust") is intended to be tax-exempt under Section 501(a) of the Internal Revenue Code. According to the terms of the ESOP, an employee is eligible to participate as of the first pay period after he or she has completed a year of service (including pre-effective date service) and attained age 21, with certain exclusions. Participating subsidiaries of the Company may make contributions for any year in such amounts as the Company may determine in its sole discretion, subject to the terms of the ESOP Loan Agreement, which provides that contributions will be made to the ESOP and distributions will be made on the shares of Company Common Stock held by the ESOP in an aggregate amount that is sufficient to enable the Trustee to pay principal and interest on the ESOP Note when due.

As of each December 31, stock will be allocated under the ESOP to the accounts of eligible employees who either (i) have completed 1000 hours during the year and are employed on the last day of the year or (ii) have retired, died or become disabled during the year. Allocations will be pro rata based on each employee's relative compensation, including base salary, wages and commissions, but excluding bonus and overtime. Participants will vest 20% per year between years 2-6 and pre-effective date service will be counted. Participants who have reached age 55 and completed 10 years of plan participation can elect to "diversify" a portion of their account by having the account cashed out. Pre-effective date service will not count for this purpose.

Participants' accounts will be distributed as follows: (i) upon retirement (age 65), death or disability, accounts will be distributed in the year following the year of termination of employment; or (ii) upon termination of employment for other reasons, accounts will be distributed in the year following the year that is the later of (A) 2018 or (B) six years after the year in which termination of employment occurs, but no later than the year following the year in which the participant attains age 65. The stock will be distributed in a lump sum and the participant or the ESOP will sell it back to the Company at the then fair market value, with payment by the Company in installments over five years with interest pursuant to the terms of an adequately secured promissory note. The first payment will be at the time of distribution.

The ESOP will be administered by the Tribune Company Employee Benefits Committee. Stock in the ESOP will be voted as follows: (i) while the stock is publicly traded, voting will be passed through to participants on all matters and the Trustee will vote undirected and unallocated shares; (ii) during any period the stock is not publicly traded, the Trustee will vote the shares in its discretion, provided that if the vote relates to certain events specified by law (merger, consolidation, recapitalization, reclassification, liquidation, dissolution or sale of substantially all assets in a trade or business), participants will have the right to direct the vote of the shares allocated to their account and the Trustee will vote all unallocated and undirected shares; (iii) the Trustee will determine how to respond to tender offers, but has agreed under the terms of the ESOP Purchase Agreement not to tender the shares of Company Common Stock that it purchased from the Company in connection with the Share Repurchase. The foregoing description of the ESOP and the ESOP Trust is qualified in its entirety by reference to the complete terms and conditions of the ESOP and the ESOP Trust, which are attached hereto as Exhibits 10.14 and 10.15, respectively, and incorporated herein by reference.

## *Amendment of Stockholder Rights Plan*

In connection with the Leveraged ESOP Transaction, the Company has entered into Amendment No. 3, dated as of April 1, 2007, to the Rights Agreement, dated as of December 12, 1997, between the Company and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent, as amended by Amendment No. 1 to Rights Agreement, dated as of June 12, 2000, and Amendment No. 2 to Rights Agreement, dated as of September 21, 2006 (as amended, the "Rights Agreement"), to clarify that no person shall be deemed to be an Acquiring Person (as defined in the Rights Agreement) solely by virtue of the execution, delivery or performance of any of the Merger Agreement, the EGI-TRB Purchase Agreement, the ESOP Purchase Agreement, the Investor Rights Agreement, the Voting Agreement, the Registration Rights Agreements and other agreements

11

contemplated by the foregoing or necessary to implement the Leveraged ESOP Transaction. The foregoing description of Amendment No. 3 to the Rights Agreement is qualified in its entirety by reference to the complete terms and conditions of Amendment No. 3 to the Rights Agreement, which is attached hereto as Exhibit 4.3, and incorporated herein by reference.

* * * * *

The Merger Agreement and each of the Purchase Agreements have been included as exhibits to this Form 8-K to provide investors and security holders with information regarding their terms. They are not intended to provide any other factual information about the Company. The representations, warranties and covenants contained in the Merger Agreement and each of the Purchase Agreements were made only for purposes of that respective agreement and as of specific dates, were solely for the benefit of the parties to the Merger Agreement and each of the Purchase Agreements, respectively, and may be subject to limitations agreed upon by the contracting parties, including being qualified by confidential disclosures made for the purposes of allocating contractual risk between the parties to the Merger Agreement and each of the Purchase Agreements instead of establishing these matters as facts, and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. Investors are not third-party beneficiaries under the Merger Agreement or either of the Purchase Agreements and should not rely on the representations, warranties and covenants or any descriptions thereof as characterizations of the actual state of facts or condition of the Company, the ESOP, Merger Sub, EGI-TRB, Zell or any of their respective subsidiaries or affiliates. Moreover, information concerning the subject matter of the representations and warranties contained in the Merger Agreement or either of the Purchase Agreements may change after the date of the Merger Agreement or such Purchase Agreements, which subsequent information may or may not be fully reflected in the Company's public disclosures.

### ITEM 5.02.    DEPARTURE OF DIRECTORS OR CERTAIN OFFICERS; ELECTION OF DIRECTORS; APPOINTMENT OF CERTAIN OFFICERS; COMPENSATORY ARRANGEMENTS OF CERTAIN OFFICERS.

The EGI-TRB Purchase Agreement provides for, and on April 1, 2007, the Board authorized, Samuel Zell to be elected to the Board, effective upon the consummation of the Step One Purchase Transaction. The EGI-TRB Purchase Agreement also provides for Samuel Zell to be elected Chairman of the Board, effective upon the consummation of the Step Two Purchase Transaction.

In connection with the Chandler Trusts Registration Rights Agreement, the Chandler Trusts have agreed to cause Jeffrey Chandler, Roger Goodan and William Stinehart, Jr., each of whom are currently serving on the Board as representatives of the Chandler Trusts, to resign as directors of the Company, effective upon the acceptance for purchase of shares of Company Common Stock in the Share Repurchase or, if earlier, upon the Article VIII Termination Date (as defined in Section 8.1 of the Company's By-Laws).

#### *Compensation Awards*

In connection with the Board's review of strategic alternatives for the Company beginning in September 2006, the Compensation Committee of the Board authorized the creation of a transaction bonus pool to motivate management to seek a transaction that would provide the maximum return to the Company's shareholders despite the risks such transaction would pose to management's continued employment. In connection with the approval of the Leveraged ESOP Transaction, on April 1, 2007, the Board approved certain cash compensation awards and a phantom equity plan for members of management and other key employees of the Company conditioned upon the consummation of the Merger. The Company's principal executive officer, Dennis J. FitzSimons, and the Company's principal financial officer, Donald C. Grenesko, along with Scott C. Smith, President, Tribune Publishing Company, Luis E. Lewin, Senior Vice President Human Resources and John E. Reardon, President, Tribune Broadcasting Company (who are the three most-highly compensated executive officers other than Messrs. FitzSimons and Grenesko), will participate in certain of the awards as more fully described below.

#### *Cash Transaction Bonus Pool*

On April 1, 2007, the Board approved a cash transaction bonus pool in an aggregate amount of $6,500,000 for 38 individuals. This cash bonus pool will be used in lieu of approximately 285,000 restricted stock units that were authorized for issuance. Payment of these cash bonuses is conditioned upon the consummation of the Merger and will be payable to a select group of management and other key employees who are playing a critical role in overseeing the completion of the Leveraged ESOP Transaction (not including the Company's Chairman, President and Chief Executive Officer, Mr. FitzSimons, who voluntarily elected not to participate in this cash bonus pool). It is currently contemplated that the named executive officers in the Company's annual proxy statement ("NEOs"), other than Mr. FitzSimons, will be allocated amounts from this cash bonus pool as follows: Donald C. Grenesko: $600,000; Scott C. Smith: $400,000; John E. Reardon: $350,000; and Luis E. Lewin: $50,000.

#### *Proposed Tribune Management Equity Incentive Plan*

The Merger Agreement contemplates the establishment of a new Tribune Company Management Equity Incentive Plan (the "Plan") to be effective following the consummation of the Merger. The Plan will provide two tranches of phantom stock awards to be granted to certain members of management and other key employees. The first tranche of awards ("Tranche One Awards") will include shares of phantom stock with an economic value equal to 5% of the outstanding Company Common Stock (calculated after giving effect to the Warrant and subject to typical anti-dilution adjustments) and will be awarded upon consummation of the Merger to eligible members of Company management (including the NEOs) and other key employees. Tranche One Awards will vest ratably over a 3-year period beginning on the date of grant and, subject to a redeferral election by individual plan participants, will be payable in cash on the fifth anniversary of the grant date.

Following the grant of Tranche One Awards, the unvested portion of any Tranche One Awards will become fully vested upon a change in control of the Company or termination of employment due to death, disability or retirement from the Company. Upon a change in control of the Company or a Plan participant's termination of employment due to death or disability, the entire Tranche One Award will be payable as soon as practicable following such event. Upon a Plan participant's termination of employment for any reason other than a change in control, death or disability, the participant will be entitled to retain the then vested portion of any Tranche One Award, with payment to be made on the fifth anniversary of the grant date. The unvested portion of any Tranche One Award upon such termination will be cancelled.

The second tranche of awards ("Tranche Two Awards") will include shares of phantom stock with an economic value equal to 3% of the outstanding Company Common Stock (calculated after giving effect to the Warrant and subject to typical anti-dilution adjustments) to be awarded upon consummation of the Merger to a select group of management and other key employees. Tranche Two Awards will be accompanied by a gross-up for the payment of excise taxes, if any, by the participants receiving Tranche Two awards. Fifty percent of Tranche Two Awards will be fully vested upon grant and the remaining fifty percent of Tranche Two Awards will vest on the one year anniversary of the grant date. The unvested portion of any Tranche Two Awards will become fully vested upon a change in control of the Company, involuntary termination of employment or termination of employment due to death, disability or retirement from the Company. Upon a change in control of the Company or a Plan participant's involuntary termination of employment or termination of employment due to death or disability, the entire Tranche Two Award will be payable in cash as soon as practicable following such event. In all other instances and subject to a redeferral election by individual plan participants, one-third of the Tranche Two Awards will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date.

Source: TRIBUNE CO, 8-K, April 05, 2007

ITEM 8.01.        OTHER EVENTS.

On April 2, 2007, the Company issued a press release announcing the Leveraged ESOP Transaction. The press release also announced that the Company plans, following the 2007 baseball season, to sell the Chicago Cubs baseball team as well as the Company's interest in Comcast SportsNet Chicago. The Company furnished a copy of the press release on Schedule 14A on April 2, 2007, and such press release is incorporated herein by reference. On April 2, 2007, the Company issued an additional press release relating to the Company's plan to sell the Chicago Cubs baseball team and the Company's interest in Comcast SportsNet Chicago. The Company furnished a copy of the press release on Schedule 14A on April 2, 2007, and such press release is incorporated herein by reference.

\*    \*    \*    \*    \*

Important Additional Information Regarding the Merger and the Tender Offer will be filed with the SEC:

In connection with the proposed Merger, the Company will file a proxy statement and other documents with the Securities and Exchange Commission (the "SEC"). BEFORE MAKING ANY VOTING DECISION WITH RESPECT TO THE PROPOSED MERGER, INVESTORS AND SECURITY HOLDERS ARE URGED TO READ THE PROXY STATEMENT AND OTHER RELEVANT MATERIALS WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. Investors and security holders may obtain a free copy of the proxy statement (when available) and other documents filed by the Company with the SEC at the SEC's website at http://www.sec.gov. The definitive proxy statement and other relevant documents may also be obtained free of charge on the Company's website at www.tribune.com or by directing a request to Tribune Company, 435 North Michigan Avenue, Chicago, IL 60611, Attention: Investor Relations. You may also read and copy any reports, statements and other information filed by the Company with the SEC at the SEC public reference room at 450 Fifth Street, N.W. Room 1200, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 or visit the SEC's website for further information on its public reference room.

The Company and its directors and executive officers may be deemed to be "participants" in the solicitation of proxies from the stockholders of the Company in connection with the proposed Merger. Information about the Company and its directors and executive officers and their ownership of Company Common Stock is set forth in the proxy statement for Tribune's Annual Meeting of Shareholders, which Tribune is required to file with the SEC. Stockholders and investors may obtain additional information regarding the interests of the Company and its directors and executive officers in the Merger, which may be different than those of the Company's stockholders generally, by reading the proxy statement and other relevant documents regarding the Merger, which will be filed with the SEC.

13

\* \* \* \* \*

The disclosures included in this Current Report on Form 8-K are for informational purposes only and are not an offer to buy or the solicitation of an offer to sell any shares of Company Common Stock. The solicitation of offers to buy the Company Common Stock will only be made pursuant to the offer to purchase and related materials that the Company will be sending to its stockholders (when available). Stockholders should read those materials carefully (when available) because they will contain important information, including the various terms and conditions of the offer. Stockholders will be able to obtain copies of the offer to purchase, related materials filed by the Company as part of the statement on Schedule TO and other documents when filed with the SEC through the SEC's internet address at http://www.sec.gov without charge. Stockholders will also be able to obtain copies of the offer to purchase and related materials, when and as filed with the SEC (excluding exhibits), without charge from the Company or by written or oral request directed to the information agent identified in the offer to purchase.

## ITEM 9.01.      FINANCIAL STATEMENTS AND EXHIBITS.

(d)

### Exhibits to this Form 8-K

| Exhibit No. | Description |
| --- | --- |
| 4.1 | Registration Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual capacity or corporate capacity but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan |
| 4.2 | Registration Rights Agreement, dated as of April 1, 2007, by and between Tribune Company and each of Chandler Trust No. 1 and Chandler Trust No. 2 |
| 4.3 | Amendment No. 3, dated as of April 1, 2007, to the Rights Agreement between Tribune Company and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent, as amended by Amendment No. 1, dated as of June 12, 2000, and Amendment No. 2, dated as of September 21, 2006 |
| 10.1 | Agreement and Plan of Merger, dated as of April 1, 2007, by and among Tribune Company, Tesop Corporation, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan and EGI-TRB, L.L.C. (solely for the limited purposes of Section 8.12 thereof) |
| 10.2 | Securities Purchase Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and Samuel Zell |

14

Source: TRIBUNE CO, 8-K, April 05, 2007

| | |
|---|---|
| 10.3 | Form of Subordinated Exchangeable Promissory Note of Tribune Company |
| 10.4 | Form of Subordinated Promissory Note of Tribune Company |
| 10.5 | Form of Warrant Agreement |
| 10.6 | ESOP Purchase Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust created under the Tribune Employee Stock Ownership Plan |
| 10.7 | ESOP Loan Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan |
| 10.8 | ESOP Note, dated as of April 1, 2007, executed by GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan in favor of Tribune Company |
| 10.9 | ESOP Pledge Agreement, dated as of April 1, 2007, between the Company and GreatBanc Trust Company, not in its individual or corporate capacity but solely in its capacity as trustee of the Tribune Employee Stock Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan |
| 10.10 | Amended and Restated First Step Commitment Letter, dated as of April 5, 2007, by and among Tribune Company, J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Banc of America Securities LLC and Bank of America, N.A. |
| 10.11 | Amended and Restated Second Step Commitment Letter, dated as of April 5, 2007, by and among Tribune Company, J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Banc of America Securities LLC, Banc of America Bridge LLC and Bank of America, N.A. |
| 10.12 | Investor Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan |
| 10.13 | Voting Agreement, dated as of April 1, 2007, by and among Tribune Company, and each of Chandler Trust No. 1 and Chandler Trust No. 2 |
| 10.14 | Tribune Employee Stock Ownership Plan |
| 10.15 | Tribune Employee Stock Ownership Trust, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust |
| 99.1 | Press Release of Tribune Company, dated April 2, 2007 (Leveraged ESOP Transaction) (Incorporated by reference to Tribune Company's Schedule 14A filed on April 2, 2007) |
| 99.2 | Press Release of Tribune Company, dated April 2, 2007 (Sale of Chicago Cubs) (Incorporated by reference to Tribune Company's Schedule 14A filed on April 2, 2007) |

15

Source: TRIBUNE CO, 8-K, April 05, 2007

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

TRIBUNE COMPANY
(Registrant)

Date: April 5, 2007

/s/ Mark W. Hianik
Mark W. Hianik
Vice President/Assistant General Counsel

16

Source: TRIBUNE CO, 8-K, April 05, 2007

## EXHIBIT INDEX

**Exhibits to this Form 8-K**

| Exhibit No. | Description |
|---|---|
| 4.1 | Registration Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan |
| 4.2 | Registration Rights Agreement, dated as of April 1, 2007, by and between Tribune Company and each of Chandler Trust No. 1 and Chandler Trust No. 2 |
| 4.3 | Amendment No. 3, dated as of April 1, 2007, to the Rights Agreement between Tribune Company and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent, as amended by Amendment No. 1, dated as of June 12, 2000, and Amendment No. 2, dated as of September 21, 2006 |
| 10.1 | Agreement and Plan of Merger, dated as of April 1, 2007, by and among Tribune Company, Tesop Corporation, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan and EGI-TRB, L.L.C. (solely for the limited purposes of Section 8.12 thereof) |
| 10.2 | Securities Purchase Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and Samuel Zell |
| 10.3 | Form of Subordinated Exchangeable Promissory Note of Tribune Company |
| 10.4 | Form of Subordinated Promissory Note of Tribune Company |
| 10.5 | Form of Warrant Agreement |
| 10.6 | ESOP Purchase Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust created under the Tribune Employee Stock Ownership Plan |
| 10.7 | ESOP Loan Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan |
| 10.8 | ESOP Note, dated as of April 1, 2007, executed by GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan in favor of Tribune Company |

| | |
|---|---|
| 10.9 | ESOP Pledge Agreement, dated as of April 1, 2007, between the Company and GreatBanc Trust Company, not in its individual or corporate capacity but solely in its capacity as trustee of the Tribune Employee Stock Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan |
| 10.10 | Amended and Restated First Step Commitment Letter, dated as of April 5, 2007, by and among Tribune Company, J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Banc of America Securities LLC and Bank of America, N.A. |
| 10.11 | Amended and Restated Second Step Commitment Letter, dated as of April 5, 2007, by and among Tribune Company, J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Banc of America Securities LLC, Banc of America Bridge LLC and Bank of America, N.A.Banc of America Securities LLC and Banc of America Bridge LLC, Bank of America, N.A. |
| 10.12 | Investor Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan |
| 10.13 | Voting Agreement, dated as of April 1, 2007, by and among Tribune Company, and each of Chandler Trust No. 1 and Chandler Trust No. 2 |
| 10.14 | Tribune Employee Stock Ownership Plan |
| 10.15 | Tribune Employee Stock Ownership Trust, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust |
| 99.1 | Press Release of Tribune Company, dated April 2, 2007 (Leveraged ESOP Transaction) (Incorporated by reference to Tribune Company's Schedule 14A filed on April 2, 2007) |
| 99.2 | Press Release of Tribune Company, dated April 2, 2007 (Sale of Chicago Cubs) (Incorporated by reference to Tribune Company's Schedule 14A filed on April 2, 2007) |

Exhibit 4.1

[EXECUTION COPY]

## REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT (this "Agreement") is made and entered into as of April 1, 2007 between Tribune Company, a Delaware corporation (the "Company"), EGI-TRB, L.L.C., a Delaware limited liability company ("EGI-TRB"), and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee (the "ESOP Fiduciary") of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP," and together with EGI-TRB, the "Initial Stockholders" and each, an "Initial Stockholder").

WHEREAS, the Company, EGI-TRB and Samuel Zell, as Guarantor, have concurrently herewith entered into that certain Securities Purchase Agreement, dated April 1, 2007 (the "Securities Purchase Agreement"), pursuant to which EGI-TRB will purchase from the Company, as soon as practicable following the execution and delivery of this Agreement, (i) an aggregate of 1,470,588 newly-issued shares (the "EGI-TRB Purchased Shares") of the Company's common stock, par value $0.01 per share (the "Common Stock"), and (ii) an unsecured subordinated exchangeable promissory note in the principal amount of $200 million, which shall be exchangeable into shares of Common Stock (the "Exchangeable Note").

WHEREAS, the Company and the ESOP Fiduciary, not in its individual or corporate capacity, but solely as trustee of the ESOP, have concurrently herewith entered into that certain ESOP Purchase Agreement, dated April 1, 2007 (the "ESOP Purchase Agreement"), pursuant to which the ESOP will purchase from the Company, as soon as practicable following the execution and delivery of this Agreement, an aggregate of 8,928,571 newly-issued shares of Common Stock (the "ESOP Purchased Shares" and together with the EGI-TRB Purchased Shares, the "Purchased Shares").

WHEREAS, EGI-TRB, the ESOP Fiduciary, not in its individual or corporate capacity, but solely as trustee of the ESOP, Tesop Corporation, a Delaware corporation ("Merger Sub"), and the Company have concurrently herewith entered into that certain Agreement and Plan of Merger, dated as of April 1, 2007 (the "Merger Agreement"), pursuant to which Merger Sub, a wholly owned subsidiary of the ESOP, will be merged with and into the Company, with the Company surviving the Merger (the "Merger"), on the terms and subject to the conditions set forth therein.

WHEREAS, in order to induce EGI-TRB and the ESOP Fiduciary, not in its individual or corporate capacity, but solely as trustee of the ESOP, to enter into the Securities Purchase Agreement and ESOP Purchase Agreement, respectively, the Company hereby agrees that this Agreement shall govern the rights of the Stockholders to cause the Company to register shares of Common Stock owned by or issuable to the Stockholders, and shall govern certain other matters as set forth in this Agreement.

1

Source: TRIBUNE CO, 8-K, April 05, 2007

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

SECTION 1. <u>Definitions</u>. In addition to the terms that are defined elsewhere in this Agreement, the following terms shall have the following meanings:

"<u>Affiliate</u>" means, with respect to a Person, another Person who, directly or indirectly, controls, is controlled by or is under common control with such Person, including, without limitation, any general partner, officer, director, or manager of such Person; <u>provided, however,</u> that no Person for whom the ESOP Fiduciary serves as trustee shall be deemed to be an Affiliate of the ESOP Fiduciary.

"<u>Agreement</u>" has the meaning specified in the first paragraph of this Agreement.

"<u>Business Day</u>" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in The City of Chicago are authorized or obligated by law or executive order to close.

"<u>Chandler Registration Rights Agreement</u>" has the meaning specified in Section 10.

"<u>Common Stock</u>" has the meaning specified in the recitals to this Agreement.

"<u>Company</u>" has the meaning specified in the first paragraph of this Agreement.

"<u>Deferral Notice</u>" has the meaning specified in Section 3(i).

"<u>Deferral Period</u>" has the meaning specified in Section 3(i).

"<u>Demand Registration</u>" has the meaning specified in Section 2(a)(i).

"<u>EGI Transferee</u>" means any direct or indirect Affiliate of EGI-TRB, Equity Group Investments, L.L.C. or Samuel Zell, and any senior employee of Equity Group Investments, L.L.C. and any direct or indirect Affiliate thereof.

"<u>EGI-TRB</u>" has the meaning specified in the first paragraph of this Agreement.

"<u>EGI-TRB Purchased Shares</u>" has the meaning specified in the recitals to this Agreement.

"<u>EGI-TRB Restriction Termination Date</u>" has the meaning set forth in Section 2(a)(i).

2

Source: TRIBUNE CO, 8-K, April 05, 2007

"EGI-TRB Stockholders Representative" has the meaning specified in Section 9(a).

"ESOP" has the meaning specified in the first paragraph of this Agreement.

"ESOP Fiduciary" has the meaning specified in the first paragraph of this Agreement.

"ESOP Purchase Agreement" has the meaning specified in the recitals to this Agreement.

"ESOP Purchased Shares" has the meaning specified in the recitals to this Agreement.

"ESOP Restriction Termination Date" has the meaning set forth in Section 2(a)(i).

"ESOP Stockholders Representative" has the meaning specified in Section 9(a).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Exchangeable Note" has the meaning specified in the recitals to this Agreement.

"Initial Stockholders" and "Initial Stockholder" have the meaning specified in the first paragraph of this Agreement.

"Issuer Free Writing Prospectus" has the meaning specified in Section 2(d).

"Lock-up Period" has the meaning specified in Section 2(c).

"Material Event" has the meaning specified in Section 3(i).

"Merger" has the meaning specified in the recitals to this Agreement.

"Merger Agreement" has the meaning specified in the recitals to this Agreement.

"Merger Sub" has the meaning specified in the recitals to this Agreement.

"**Merger Termination Date**" means the date the Merger Agreement is terminated, without consummation of the Merger, pursuant to Article VII thereof.

"Permitted Transferee" means any EGI Transferee and any member of the Zell Family Group.

3

"Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organization or government or other agency or political subdivision thereof.

"Piggyback Registration" has the meaning specified in Section 2(b)(i).

"Prospectus" means the prospectus included in any Registration Statement, as amended or supplemented by all amendments and prospectus supplements, including post-effective amendments, and all materials incorporated by reference or explicitly deemed to be incorporated by reference in such Prospectus.

"Purchase Date" means the date on which the purchase and sale of the Purchased Shares and the Exchangeable Note are consummated at the First Closing (as defined in the Securities Purchase Agreement).

"Purchased Shares" has the meaning specified in the recitals to this Agreement.

"Registrable Securities" means (a) the Purchased Shares, (b) any shares of Common Stock issued by the Company to the Stockholders pursuant to the Exchangeable Note or (c) any equity security issued with respect to any shares of Common Stock referred to in clauses (a) or (b) above upon any stock dividend, split, merger or similar event. As to any particular Registrable Securities, such securities shall cease to be Registrable Securities on the earliest of the date on which such securities: (x) have been effectively registered under the Securities Act and disposed of in accordance with a Registration Statement; (y) have been sold to the public pursuant to Rule 144 or may be sold or transferred pursuant to Rule 144(k) (or any similar provision then in force, but not Rule 144A) under the Securities Act; or (z) cease to be outstanding (whether as a result of redemption, repurchase and cancellation, conversion or otherwise).

"Registration Statement" means any registration statement of the Company that covers any of the Registrable Securities pursuant to the provisions of this Agreement, including the Prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits, and all materials incorporated by reference or explicitly deemed to be incorporated by reference in such registration statement.

"Restriction Termination Dates" has the meaning set forth in Section 2(a)(i).

"Rule 144" means Rule 144 under the Securities Act, as such Rule may be amended from time to time, or any similar or successor rule or regulation hereafter adopted by the SEC having substantially the same effect as such Rule.

"Rule 145" means Rule 145 under the Securities Act, as such Rule may be amended from time to time, or any similar or successor rule or regulation hereafter adopted by the SEC having substantially the same effect as such Rule.

"SEC" means the United States Securities and Exchange Commission and any successor agency.

4

Source: TRIBUNE CO, 8-K, April 05, 2007

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated by the SEC thereunder.

"Securities Purchase Agreement" has the meaning specified in the recitals to this Agreement.

"Stockholders" means the Initial Stockholders and any Permitted Transferees of the Initial Stockholders to whom Registrable Securities and/or the Exchangeable Note are properly transferred and, in each case, who continue to be entitled to the rights of a Stockholder hereunder.

"Stockholder Indemnified Person" has the meaning specified in Section 6(a).

"Stockholder Representatives" and "Stockholder Representative" have the meaning specified in Section 9(a).

"Zell Family Group" shall mean Samuel Zell and his spouse, lineal ancestors and descendants (whether natural or adopted), and any trust or retirement account primarily for the benefit of Samuel Zell and/or his spouse, lineal ancestors and descendants.

SECTION 2. Registrations and Transfer Restrictions.

(a) Demand Registrations.

(i) Each Stockholder Representative may, subject to Sections 2(a)(ii) and 2(a)(iv), request up to three registrations under the Securities Act of all or any portion of (A) its Registrable Securities and (B) any Registrable Securities of a Stockholder to whom such Stockholder Representative has properly assigned its rights under this Section 2(a) (each such registration request, a "Demand Registration"), subject to a minimum of $50 million of Registrable Securities in any Demand Registration; provided that, in the case of a Demand Registration requested by the EGI-TRB Stockholders Representative, the Company shall not be required to file such requested registration prior to the third anniversary of the Purchase Date (the "EGI-TRB Restriction Termination Date") and, in the case of a Demand Registration requested by the ESOP Stockholders Representative, the Company shall not be required to file such requested registration prior to the first anniversary of the date hereof (the "ESOP Restriction Termination Date" and, together with the EGI-TRB Restriction Termination Date, the "Restriction Termination Dates"); provided, further, that each Stockholder Representative may make such request up to 90 days prior to the applicable Restriction Termination Date for a filing on or after the applicable Restriction Termination Date. Each request for a Demand Registration shall specify the number of Registrable Securities requested to be registered and the intended method of distribution thereof (it being understood that no Demand Registration shall require the Company to effect a shelf registration statement).

(ii) A registration requested pursuant to this Agreement shall be deemed to have been effected for purposes of Section 2(a)(i) if (A) it has been declared effective by the SEC, (B) at least 80% of the Registrable Securities requested to be included in such Demand Registration (after giving effect to any reduction pursuant to Section 2(a)(iii)) shall have been

5

registered and, in the case of an underwritten offering, sold, (C) it has not failed to remain effective for the period set forth in Section 3(c) and (D) the offering of Registrable Securities pursuant to such Demand Registration has not been subject to any stop order or injunction or other order or requirement of the SEC lasting more than 45 days and preventing the offering of Registrable Securities thereunder.

(iii) In connection with a Demand Registration pursuant to which an underwritten public offering is requested as the intended method of distribution pursuant to Section 2(a)(i), if the managing underwriters advise the Company in writing, with a copy to be delivered to the requesting Stockholder Representative, that, in their opinion, the number of Registrable Securities requested to be included in such offering exceeds the largest number of securities which can be sold therein without adversely affecting the marketability of the offering and within a price range reasonably acceptable to the requesting Stockholder Representative, the Company shall include in such registration the amount of Registrable Securities requested to be included which in the opinion of such underwriters can be sold without adversely affecting the marketability of the offering; provided, that if the number of Registrable Securities to be included in the registration is less than 75% of the number requested to be so included, the requesting Stockholder Representative shall be entitled to withdraw its request for a Demand Registration in lieu of the registration of such lesser amount of Registrable Securities and, if such request is withdrawn, such Demand Registration shall not count as one of the permitted Demand Registrations hereunder.

(iv) The Company shall not be obligated to effect any Demand Registration within (A) 180 days after the effective date of a previous Demand Registration or (B) 120 days after the date of a previous Piggyback Registration in which the Stockholder participates pursuant to Section 2(b). The Company may postpone or suspend, as applicable, for no more than two periods in any 12-month period aggregating not more than 120 days in such 12-month period the filing, effectiveness or use of a registration statement for a Demand Registration (and the Stockholder agrees not to offer or sell any Registrable Securities pursuant to such Registration Statement during such deferral or suspension), pursuant to this Section 2(a)(iv) or clause (C) of Section 3(i), if the Company's board of directors determines in good faith that such filing or effectiveness would (A) interfere with or adversely affect in any material respect the negotiation or completion of any material transaction or other Material Event that is being contemplated by the Company or (B) involve initial or continuing disclosure obligations relating to a Material Event, the disclosure of which could, in the reasonable judgment of the Company, be materially adverse to its interests; provided, that in the event of such a postponement of registration, each requesting Stockholder Representative shall be entitled to withdraw its request for a Demand Registration and, if such request is withdrawn, such Demand Registration shall not count as one of the permitted Demand Registrations hereunder. In the event the Company shall exercise its deferral or suspension rights hereunder following the effectiveness of a registration statement filed in response to the request for a Demand Registration, the applicable time period during which the registration statement is to remain effective under Section 3(c) shall be extended by a period of time equal to the duration of such deferral or suspension. The number and length of deferral and suspension periods in any 12-month period under this Section 2(a)(iv) shall be aggregated with the number and the length of Deferral Periods under clause (C) of Section 3(i), such that the Company shall not be permitted to postpone or suspend, for more

6

than two periods in any 12-month period aggregating not more than 120 days in such 12-month period the filing, effectiveness or use of a registration statement for a Demand Registration pursuant to this Section 2(a)(iv) and/or clause (C) of Section 3(i) taken together.

(v) In connection with any Demand Registration, the requesting Stockholder Representative shall have the right to designate a nationally recognized underwriter or underwriters as the lead or managing underwriter(s) of such underwritten offering who shall be reasonably acceptable to the Company.  In connection with any such underwritten offering, each Stockholder holding Registrable Securities to be included in such registration and the Company agree that they will each enter into a customary underwriting agreement with the underwriter(s) selected pursuant to the preceding sentence.

(b) Piggyback Registrations.

(i) If the Company proposes to register Common Stock (for its own account or for the account of any other holder of its securities) under the Securities Act (other than pursuant to a Demand Registration which shall be governed by Section 2(a), and registrations on Form S-4 or Form S-8 or on any successor or other form promulgated for similar purposes or relating to a Rule 145 transaction) at any time after the applicable Restriction Termination Date and the registration form to be used may be used for the registration of Registrable Securities for sale to the public under the Securities Act (a "Piggyback Registration"), then the Company shall give prompt written notice to each applicable Stockholder Representative of its intention to effect such a registration and, subject to the terms hereof, shall use reasonable best efforts to include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein from such Stockholder Representative (which request shall specify the number of Registrable Securities intended to be disposed of by such Stockholder Representative and any Registrable Securities of a Stockholder to whom such Stockholder Representative has properly assigned its rights under this Section 2(b)) within 20 days after such Stockholder Representative receives the Company's notice; provided, that (A) if, at any time after giving written notice of its intention to register any securities and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to proceed with the proposed registration, the Company may, at its election, give written notice of such determination to the applicable Stockholder Representatives and thereupon shall be relieved of its obligation to register any Registrable Securities in connection with such registration, (B) if such registration involves an underwritten offering by the Company, each Stockholder holding Registrable Securities to be included in such registration must sell its Registrable Securities to such underwriters who shall have been selected by the Company on the same terms and conditions as apply to the Company, with such differences, including any with respect to indemnification and contribution, as may be customary or appropriate in combined primary and secondary offerings and (C) if such registration involves an underwritten secondary offering on behalf of holders of the Company's securities other than the Stockholders pursuant to a demand or similar registration right, each applicable Stockholder Representative may, in lieu of exercising its rights on its own behalf and/or on behalf of other Stockholders under this Section 2(b), elect (by written notice sent to the Company within ten (10) Business Days from the date of the Company's notice pursuant to this Section 2(b)(i)) to include all or a portion of its Registrable Securities and any

7

Source: TRIBUNE CO, 8-K, April 05, 2007

Registrable Securities of a Stockholder to whom such Stockholder Representative has properly assigned its rights under Section 2(a) in such demand registration (it being understood that, subject to Section 2(a)(ii), such a registration shall be deemed to be one of such Stockholder Representative's Demand Registrations).

(ii) If a Piggyback Registration is an underwritten primary offering on behalf of the Company, and the managing underwriters advise the Company in writing that in their opinion the number of securities requested to be included in such offering exceeds the largest number of securities which can be sold therein without adversely affecting the marketability of the offering and within a price range reasonably acceptable to the Company, the Company shall include in such registration (A) first, the securities the Company proposes to sell and (B) second, the Registrable Securities requested to be included in such registration by the applicable Stockholder Representatives and any other securities requested to be included in such registration, pro rata among the holders of all such securities (including the Registrable Securities of the Stockholders) on the basis of the number of securities of the Company owned by each such holder.

(iii) If a Piggyback Registration is an underwritten secondary offering on behalf of holders of the Company's securities other than the Stockholders, and the managing underwriters advise the Company in writing that in their opinion the number of securities requested to be included in such offering exceeds the largest number of securities which can be sold in such offering without adversely affecting the marketability of the offering and within a price range reasonably acceptable to the holders of the Company's securities requesting such registration other than the Stockholders, the Company shall include in such registration (A) first, the securities requested to be included therein by the holders of registrable securities requesting such registration, including Registrable Securities included therein pursuant to Section 2(b)(i)(C), pro rata among the holders of all such securities on the basis of the number of securities of the Company owned by each such holder and (B) second, Registrable Securities requested to be included in such registration by the applicable Stockholder Representatives (other than Registrable Securities included pursuant to clause (A) above) and any other securities requested to be included in such registration, pro rata among the holders of all such securities on the basis of the number of securities of the Company owned by each such holder.  For the avoidance of doubt, the parties hereto agree that the Company may offer registration rights in the future that have reciprocal piggyback registration provisions that permit the holder of such registration rights to exercise one of its demand registrations following a Demand Registration request from a Stockholder Representative and be treated pari passu with the Stockholders participating in such Demand Registration in the event of an underwritten offering cutback of the type contemplated by this paragraph (iii).

(iv) The Company shall have the right to select the investment banker(s) and/or manager(s) to administer the offering in connection with any Piggyback Registration.

(v) Each Stockholder holding Registrable Securities to be included in a registration pursuant to this Section 2(b) agrees that it will execute such other customary agreements as the Company may reasonably request to further accomplish the purposes of this Section 2(b).

8

(c) Holdback Agreement.  Upon the written request of the underwriters managing an underwritten registered public offering of the Common Stock, the Stockholders shall not effect any public sale or distribution (including sales pursuant to Rule 144) of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, during the 7 days prior to, and during the 90-day period beginning on, the effective date of the registration statement relating to such underwritten offering (the "Lock-Up Period"); provided, however, that if (i) during the last 17 days of the initial Lock-Up Period, the Company releases earnings results or a Material Event relating to the Company occurs or (ii) prior to the expiration of the initial Lock-Up Period, the Company announces that it will release earnings results during the 16-day period beginning on the last day of the initial Lock-Up Period, then in either case the Lock-Up Period will be extended until the expiration of the 18-day period beginning on the date of release of the earnings results or the occurrence of the Material Event, as applicable, unless the underwriters managing such underwritten registered public offering of the Common Stock waive, in writing, such extension.

(d) Issuer Free-Writing Prospectuses.  The Company represents and agrees that, unless it obtains the prior consent of each of the Stockholder Representatives or the approval of the counsel for each of the Stockholder Representatives, and each of the Stockholders represents and agrees that, unless it obtains the prior consent of the Company, it will not make any offer relating to the Registrable Securities that would constitute an "issuer free writing prospectus," as defined in Rule 433 under the Securities Act (an "Issuer Free Writing Prospectus"), or that would otherwise constitute a "free writing prospectus," as defined in Rule 405 under the Securities Act, required to be filed with the SEC.  The Company represents that any Issuer Free Writing Prospectus will not include any information that conflicts with the information contained in a Registration Statement or Prospectus and that any Issuer Free Writing Prospectus, when taken together with the information in the Registration Statement and the Prospectus, will not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(e) Transfer Restrictions.  Notwithstanding anything to the contrary contained herein, EGI-TRB hereby agrees that from the Merger Termination Date until the EGI-TRB Restriction Termination Date, it shall not and shall not offer to, directly or indirectly (including by means of a transfer of EGI-TRB), sell, assign, give, mortgage, pledge, hypothecate, hedge, issue, bequeath or in any manner encumber or dispose of, or permit to be sold, assigned, encumbered, attached or otherwise disposed of in any manner, whether voluntarily, involuntarily or by operation of law, with or without consideration, the Exchangeable Note or the Registrable Securities (without giving effect to the second sentence of the definition of Registrable Securities) held by EGI-TRB, other than to a Permitted Transferee who agrees to be bound by these transfer restrictions.

9

SECTION 3.  Registration Procedures.  Whenever a Stockholder Representative has properly requested that any Registrable Securities be registered pursuant to this Agreement, the Company shall use reasonable best efforts to effect the registration under the Securities Act of the offering and sale of such Registrable Securities as soon as reasonably practicable after the date of such request, and pursuant thereto the Company shall:

(a)  Before filing any Registration Statement or Prospectus or any amendments or supplements thereto with the SEC, furnish to each of the Stockholder Representatives copies of all such documents proposed to be filed and use reasonable efforts to reflect in each such document when so filed with the SEC such comments as each Stockholder Representative reasonably shall propose within five (5) Business Days of the delivery of such copies to each of the Stockholder Representatives.

(b)  Prepare and file with the SEC a Registration Statement and such amendments and supplements as may be necessary with respect to such Registrable Securities and, subject to the deferral and suspension provisions of Section 2(a)(iv) and Section 3(i), use its reasonable best efforts to cause such registration statement to become effective as soon as reasonably practicable after the date of filing; provided, that the Company may delay or discontinue any registration of its securities which is being effected pursuant to Section 2(b) at any time prior to the effective date of the Registration Statement relating thereto; provided, further, that the Company shall not be required to cause any Demand Registration to become effective prior to the date that is three years following the Purchase Date.

(c)  As promptly as reasonably practicable (i) give notice to each of the Stockholder Representatives of the effectiveness of each Registration Statement filed hereunder and, in the case of a Demand Registration, prepare and file with the SEC such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for a period of not less than 60 days (or until the distribution described in the Registration Statement has been completed or such lesser period of time as the Company or the Stockholders may be required under the Securities Act to deliver a Prospectus in connection with any sale of Registrable Securities and to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the Stockholders set forth in such Registration Statement) and use its reasonable best efforts to comply with the provisions of the Securities Act with respect to the disposition of securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the Stockholders set forth in such Registration Statement, (ii) give notice to each of the Stockholder Representatives of any request, following the effectiveness of a Registration Statement under the Securities Act, by the SEC or any other federal or state governmental authority for amendments or supplements to any Registration Statement or related Prospectus or for additional information, (iii) give notice to each of the Stockholder Representatives of the issuance by the SEC or any other federal or state governmental authority of any stop order or injunction suspending or enjoining the use of any Prospectus or the effectiveness of any Registration Statement or the initiation of any proceedings for that purpose, (iv) give notice to each of the Stockholder Representatives of the receipt by the

10

Source: TRIBUNE CO, 8-K, April 05, 2007

Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for offering or sale under the securities or "blue sky" laws in any jurisdiction or the initiation of any proceeding for such purpose and (v) give notice to each of the Stockholder Representatives of the occurrence of (but not the nature of or details concerning) a Material Event (provided, however, that no notice by the Company shall be required pursuant to this clause (v) in the event that the Company promptly files a Prospectus supplement to update the Prospectus or the Company files a Current Report on Form 8-K or other appropriate Exchange Act report that is incorporated by reference into the applicable Registration Statement, which, in either case, contains the requisite information with respect to such Material Event that results in such Registration Statement no longer containing any untrue statement of material fact or omitting to state a material fact necessary to make the statements contained therein not misleading, which notice may, at the discretion of the Company (or as required pursuant to Section 3(i)), state that it constitutes a Deferral Notice, in which event the provisions of Section 3(i) shall apply.

(d)  In the event of the issuance of any stop order suspending the effectiveness of a Registration Statement, or of any order suspending or preventing the use of any related Prospectus or suspending the qualification of any Common Stock included in such Registration Statement for sale in any jurisdiction, the Company shall use its reasonable best efforts promptly to obtain the withdrawal of such order.

(e)  Furnish to each Stockholder such number of copies of such Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary prospectus) and such other documents as such Stockholder may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such Stockholder.

(f)  Enter into and perform under such customary agreements (including underwriting agreements in customary form) and take all such other actions as the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities, except to the extent any such agreement or other action would materially interfere with the conduct of the Company's business.

(g)  In the case of an underwritten offering, use its reasonable best efforts to (i) make available the executive officers of the Company to participate with the Stockholders and any underwriters in any "road show" presentations or investor telephone conference calls that may be reasonably requested by the Stockholders or underwriters in connection with distribution of the Registrable Securities and (ii) furnish, at the request of any Stockholder Representative requesting registration of Registrable Securities, on the date that such Registrable Securities are delivered to the underwriter(s) for sale, (A) an opinion, dated as of such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters and (B) a "comfort" letter dated as of such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters.

11

Source: TRIBUNE CO, 8-K, April 05, 2007

(h)  Subject to Section 3(i), prior to any public offering of the Registrable Securities pursuant to a Registration Statement, use reasonable best efforts to register or qualify or cooperate with the Stockholder in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities for offer and sale under the securities or "blue sky" laws of such jurisdictions within the United States as each Stockholder reasonably requests in writing, it being agreed that no such registration or qualification will be made unless so requested; provided, that the Company will not be required to (i) register or qualify as a foreign corporation or as a dealer in securities in any jurisdiction where it is not otherwise qualified or where it would be subject to income tax as a foreign corporation, or to take any action that would subject it to the service of process in any jurisdiction where it is not now so subject or (ii) take any action that would subject it to general or unlimited service of process in suits or to taxation in any such jurisdiction where it is not then so subject.

(i)  Upon (A) the issuance by the SEC of a stop order suspending the effectiveness of a Registration Statement or the initiation of proceedings with respect to a Registration Statement under Section 8(d) or 8(e) of the Securities Act, (B) the occurrence or existence of any development, event, fact, situation or circumstance (a "Material Event") as a result of which any Registration Statement shall contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, or any Prospectus shall contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (including, in any such case, as a result of the non-availability of financial statements), or (C) the occurrence or existence of any Material Event relating to the Company that, in the sole discretion of the Company acting in good faith, makes it appropriate to suspend the availability of such Registration Statement and the related Prospectus, (i) in the case of clause (B) above, subject to the next sentence, as promptly as practicable prepare and file a post-effective amendment to such Registration Statement or a supplement to the related Prospectus or any document incorporated therein by reference or file any other required document that would be incorporated by reference into such Registration Statement and Prospectus so that such Registration Statement does not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and such Prospectus does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder, and, in the case of a post-effective amendment to a Registration Statement, subject to the next sentence, use reasonable efforts to cause it to be declared effective as promptly as is reasonably practicable, and (ii) give notice to each of the Stockholders that the availability of such Registration Statement is suspended (a "Deferral Notice") and, upon receipt of any Deferral Notice, each Stockholder agrees that it shall not sell any Registrable Securities pursuant to the Registration Statement until the Stockholder receives copies of the supplemented or amended Prospectus provided for in clause (i) above, or until it is advised in writing by the Company that the Prospectus may be used, and has received copies of any additional or supplemental filings that are incorporated or deemed incorporated by reference in such Prospectus. The Company will use reasonable efforts to ensure that the use of the Prospectus

12

may be resumed (x) in the case of clause (A) above, as promptly as is practicable, (y) in the case of clause (B) above (unless caused by a development covered by clause (C) above), following the time when the Company has prepared an amendment or supplement to such Registration Statement or Prospectus necessary to cure the defects thereto; it being agreed, that the Company shall promptly prepare such amendment or supplement, and (z) in the case of clause (C) above, as soon as, in the discretion of the Company acting in good faith, such suspension is no longer appropriate. In connection with a Material Event, the Company shall be entitled to exercise its right under this Section 3(i) to suspend the availability of a Registration Statement or any Prospectus (the "Deferral Period") for no more than 60 days during any three-month period or an aggregate of 120 days during any 12-month period; provided, that in the case of Demand Registrations, the Company's right to suspend under clause (C) above shall be subject to the restrictions on the number and length of any deferrals or suspensions in any 12-month period set forth in Section 2(a)(iv) and shall be aggregated with the number and the length of deferral and suspension periods under Section 2(a)(iv), such that the Company shall not be permitted to postpone or suspend, for more than two periods in any 12-month period aggregating not more than 120 days in such 12-month period the filing, effectiveness or use of a Registration Statement for a Demand Registration pursuant to Section 2(a)(iv) and/or clause (C) of this Section 3(i) taken together. Notwithstanding the foregoing, to the extent a Material Event relates to a previously undisclosed proposed or pending material business transaction, the disclosure of which the Company's board of directors determines in good faith would be reasonably likely to materially impede the Company's ability to consummate such transaction, the Company may extend a Deferral Period from 60 days to 90 days. The Company shall not be required to specify in the written notice to each of the Stockholders the nature of the event giving rise to the Deferral Period. In the event that the Company shall exercise its rights hereunder, the applicable time period during which the Registration Statement is to remain effective pursuant to Section 3(c) shall be extended by a period of time equal to the duration of the Deferral Period.

(j)    In the case of an underwritten offering, make available for inspection by each of the Stockholders, any underwriter participating in any disposition pursuant to such Registration Statement, and any attorney, accountant or other agent retained by any of the Stockholders or such underwriter, at the offices where normally kept, during normal business hours, all pertinent financial and other records, pertinent corporate documents and properties of the Company, and cause the Company's officers, employees and independent accountants to supply all information reasonably requested by each of the Stockholders or any such underwriter, attorney, accountant or agent in connection with such Registration Statement, in each case as is necessary or reasonably advisable (based on the reasonable advice of their respective counsel) to enable each of the Stockholders or such underwriter to exercise their due diligence responsibilities and defenses under the Securities Act; provided, however, that (i) each of the Stockholders and any such underwriter shall have entered into a customary confidentiality agreement reasonably acceptable to the Company and (ii) each of the Stockholders and any such underwriter shall use their respective reasonable best efforts to minimize the disruption to the Company's business and coordinate any such investigation of the books, records and properties of the Company and any discussions with the Company's officers and accountants so that all such investigations occur at the same time.

13

(k)  Use its reasonable best efforts to comply with all applicable rules and regulations of the SEC to the extent and so long as they are applicable to the offer and sale of Registrable Securities by the Stockholders from time to time in accordance with the methods of distribution set forth in the Registration Statement, and make generally available to its securityholders earning statements (which need not be audited) covering the period of at least twelve months beginning with the first day of the Company's first full calendar quarter after the effective date of the Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder (or any similar rule promulgated under the Securities Act).

(l)  Provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by a Registration Statement from and after a date not later than the effective date of such Registration Statement.

(m)  Use its commercially reasonable efforts to cause all Registrable Securities to be listed on each securities exchange and/or quotation system on which the Common Stock is then listed and/or quoted.

SECTION 4.  Stockholders' Obligations.

(a)  Each Stockholder agrees that, upon receipt of any Deferral Notice from the Company of the existence of any fact of the kind described in Section 3(i)(B) hereof, such Stockholder will forthwith discontinue disposition of Registrable Securities pursuant to any Registration Statement until:

> (i)       such Stockholder has received copies of the supplemented or amended Prospectus contemplated by Section 3(i) hereof; or

> (ii)      such Stockholder is advised in writing by the Company that the use of the Prospectus may be resumed, and has received copies of any additional or supplemental filings that are incorporated by reference in the Prospectus (unless such filings are made pursuant to the requirements of Section 13 or Section 15 of the Exchange Act and such filings are available through the SEC's EDGAR system).

If so directed by the Company, each of the Stockholders will deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Stockholder's possession, of the Prospectus covering such Registrable Securities that was current at the time of receipt of such Deferral Notice.

(b)  Each of the Stockholders agrees promptly to furnish to the Company in writing all information required to be disclosed in order to make any information previously furnished to the Company by such Stockholder not misleading, any other information regarding such Stockholder and the distribution of any Registrable Securities as may be required by the Company to be disclosed in the Registration Statement under applicable law or pursuant to SEC comments and any information otherwise required by the Company to comply with applicable law or regulations. Any sale of any Registrable Securities by a Stockholder shall constitute a representation and warranty by such Stockholder that the

14

Source: TRIBUNE CO, 8-K, April 05, 2007

information relating to such Stockholder is as set forth in the Prospectus delivered by such Stockholder in connection with such disposition, that such Prospectus does not as of the time of such sale contain any untrue statement of material fact relating to or provided by such Stockholder and that such Prospectus does not as of the time of such sale omit to state any material fact relating to or provided by such Stockholder necessary to make the statements in such Prospectus, in the light of the circumstances under which they were made, not misleading.

SECTION 5.  Registration Expenses.  The Company shall bear all fees and expenses incurred in connection with the performance by the Company of its obligations under Sections 2 and 3 of this Agreement (whether with respect to a Demand Registration or Piggyback Registration) whether or not any of the Registration Statements are declared effective.  Such fees and expenses shall include (i) all registration and filing fees (including, without limitation, fees and expenses (x) with respect to filings required to be made with the National Association of Securities Dealers, Inc. and the SEC's registration fees and (y) of compliance with federal and state securities or "blue sky" laws to the extent such filings or compliance are required pursuant to this Agreement (including, without limitation, reasonable fees and disbursements of the counsel specified in the next sentence in connection with "blue sky" qualifications of the Registrable Securities under the laws of such jurisdictions as the Stockholder may designate)), (ii) printing expenses, (iii) duplication expenses relating to copies of any Registration Statement or Prospectus delivered to the Stockholders hereunder, (iv) fees and disbursements of counsel for the Company in connection with any Demand Registration or Piggyback Registration, (v) reasonable "road show" or other marketing expenses (provided that this Section 5 shall not adversely affect the Company's arrangements with any underwriters), (vi) fees and expenses of the Company's independent certified public accountants (including the fees and expenses of any comfort letters required by or incident to the performance and compliance with this Agreement), (vii) reasonable expenses of underwriters, other than discounts and commissions attributable to the Registrable Securities included in such registration, and (viii) reasonable fees and disbursements of the registrar and transfer agent for the Common Stock.  Such fees and expenses shall not include the fees and expenses of legal counsel to the Stockholders.  In addition, the Company shall pay its internal expenses (including, without limitation, all salaries and expenses of officers and employees performing legal or accounting duties), and its expenses for any annual audit, the fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange on which the same securities of the Company are then listed and the fees and expenses of any person, including special experts, retained by the Company.  The Stockholders shall pay all underwriting discounts and commissions and transfer taxes, if any, relating to the sale or disposition of Registrable Securities pursuant to any Registration Statement, and any fees and expenses of legal counsel to the Stockholders.

SECTION 6.  Indemnification: Contribution.

(a)  In connection with any Demand Registration or Piggyback Registration, the Company agrees to indemnify and hold harmless each of the Stockholder Representatives, each of the Stockholders and each Person, if any, who controls each of the Stockholder Representatives and Stockholders within the meaning of either Section 15 of the

15

Source: TRIBUNE CO, 8-K, April 05, 2007

Securities Act or Section 20 of the Exchange Act (each, a "Stockholder Indemnified Person") against any and all loss, liability, claim and damage, as incurred, arising out of any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement (or any amendment thereto), or the omission or alleged omission therefrom of a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading or arising out of any untrue statement or alleged untrue statement of a material fact included in any preliminary prospectus or any Prospectus (or any amendment or supplement thereto) or Issuer Free Writing Prospectus (or any amendment or supplement thereto), or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, and agrees to reimburse any Stockholder Indemnified Person as promptly as practicable upon demand for any legal or other expenses reasonably incurred by such Stockholder Indemnified Person in connection with investigating, defending or paying any such loss, claim, damage, liability or action; provided, however, that this indemnity agreement shall not apply to any loss, liability, claim or damage to the extent arising out of any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with information furnished to the Company by or on behalf of the Stockholder or any Person, if any, who controls the Stockholder for use in any Registration Statement (or any amendment thereto), or any preliminary prospectus or Prospectus (or any amendment or supplement thereto) or any Issuer Free Writing Prospectus (or any amendment or supplement thereto).

(b)  In connection with any Demand Registration or Piggyback Registration, each participating Stockholder agrees to indemnify and hold harmless the Company, and each person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act against any and all loss, liability, claim and damage described in the indemnity contained in subsection (a) of this Section 6, as incurred, but only with respect to untrue statements or omissions, or alleged untrue statements or omissions, made in any Registration Statement (or any amendment thereto) or any preliminary prospectus or Prospectus (or any amendment or supplement thereto) in reliance upon and in conformity with information furnished to the Company by or on behalf of such Stockholder for use in the Registration Statement (or any amendment thereto) or such preliminary prospectus or Prospectus (or any amendment or supplement thereto).

(c)  Each indemnified party shall give notice as promptly as reasonably practicable to each indemnifying party of any action or proceeding commenced against it in respect of which indemnity may be sought hereunder, but failure to so notify an indemnifying party shall not relieve such indemnifying party from any liability hereunder to the extent it is not prejudiced as a result thereof and in any event shall not relieve it from any liability which it may have otherwise than on account of these indemnity provisions.  In case any such action shall be brought against any indemnified party and it shall notify an indemnifying party of the commencement thereof, such indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and, after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, such indemnifying party

16

shall not be liable to such indemnified party under this Section 6 for any legal expenses of other counsel or any other expenses, in each case subsequently incurred by such indemnified party, in connection with the defense thereof. No indemnifying party shall, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever in respect of which indemnification or contribution is sought under this Section 6 (whether or not the indemnified parties are actual or potential parties thereto), unless such settlement, compromise or consent (i) includes an unconditional release of each indemnified party from all liability arising out of such litigation, investigation, proceeding or claim and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any indemnified party. No indemnified party shall, without the prior written consent of the indemnifying party, effect any settlement of any commenced or threatened litigation, investigation, proceeding or claim in respect of which any indemnification is sought hereunder.

(d)  If the indemnification provided for in this Section 6 from the indemnifying party is unavailable to an indemnified party hereunder in respect of any losses, claims, damages or liabilities referred to in this Section 6:

(i) The indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages, liabilities or expenses, (i) in such proportion as is appropriate to reflect the relative fault of the indemnifying party and indemnified parties in connection with the actions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the indemnifying party and the indemnified party from the offering of the securities covered by such Registration Statement in connection with which the actions resulting in such losses, claims, damages or liabilities occurred. The relative fault of such indemnifying party, on the one hand, and the indemnified party, on the other hand, shall be determined by reference to, among other things, whether any such untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The amount paid or payable by a party as a result of the losses, claims, damages or liabilities referred to above shall be deemed to include, subject to the limitations set forth in Section 6(a) and Section 6(b), any legal or other fees or expenses reasonably incurred by such party in connection with any investigation or proceeding.

(ii) If indemnification is available under this Section 6, the indemnifying parties shall indemnify each indemnified party to the full extent provided in this Section 6 without regard to the relative fault of such indemnifying party or indemnified party or any other equitable consideration referred to in this Section 6(d).

17

Source: TRIBUNE CO, 8-K, April 05, 2007

(iii) No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(iv) For purposes of this Section 6(d), each Person, if any, who controls a Stockholder within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act shall have the same rights to contribution as such Stockholder, and each person, if any, who controls the Company within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act shall have the same rights to contribution as the Company.

(e) The obligations of the Company and the Stockholders under this Section 6 shall survive the completion of any offering of Registrable Securities pursuant to any Registration Statement under this Agreement.

SECTION 7.  Participation in Underwritten Registrations.  Each of the Stockholders agrees that it may not participate in any registration hereunder which is underwritten unless such Stockholder (a) agrees to sell its Registrable Securities on the basis provided in any underwriting arrangements approved by the Company and (b) completes and executes all questionnaires, powers of attorney and other documents reasonably required under the terms of such underwriting arrangements.

SECTION 8.  Rule 144 Reporting.  With a view to making available the benefits of certain rules and regulations of the SEC which may at any time permit the sale of any Registrable Securities to the public without registration, the Company agrees to use commercially reasonable efforts to:

(a) File, as and when applicable, with the SEC in a timely manner all reports and other documents required of the Company under the Exchange Act.

(b) If the Company is not required to file reports pursuant to the Exchange Act, upon the request of any Stockholder, make publicly available the information specified in subparagraph (c)(2) of Rule 144.

(c) So long as any Stockholder owns any Registrable Securities, furnish to such Stockholder, upon request and at such Stockholder's expense, a written statement by the Company as to its compliance with the reporting requirements of Rule 144.

SECTION 9.  Stockholders Representatives.

(a)        Each Stockholder who is a permitted transferee of Registrable Securities initially held by the ESOP, and who has properly been assigned any rights hereunder in accordance with Section 12(c), hereby designates the ESOP Fiduciary as the "ESOP Stockholders Representative" and each Stockholder who is a permitted transferee of Registrable Securities initially held by EGI-TRB, and who has been properly assigned any rights hereunder in accordance with Section 12(c), hereby designates EGI-TRB as the "EGI-TRB Stockholders Representative."  The ESOP Stockholders Representative and the EGI-TRB Stockholders Representative are collectively referred to herein as the "Stockholders

18

<u>Representatives</u>" and individually as a "<u>Stockholders Representative</u>."

(b)        Except as provided in Section 6(b), none of the Stockholders Representatives will incur any liability with respect to any action taken or suffered by it in reliance upon any notice, direction, instruction, consent, statement or other document believed by him to be genuine and to have been signed by the proper person (and shall have no responsibility to determine the authenticity thereof), nor for any other action or inaction, except his own gross negligence, willful misconduct or bad faith.  In all questions arising under this Agreement, each of the Stockholders Representatives may rely on the advice of counsel, and none of the Stockholders Representatives will be liable to anyone for anything done, omitted or suffered in good faith by such Stockholders Representative based on such advice.  Except as expressly provided herein, none of the Stockholders Representatives will be required to take any action involving any expense unless the payment of such expense is made or provided for in a manner reasonably satisfactory to him.

SECTION 10.  <u>Limitations on Registration of Other Securities</u>.  From and after the date of this Agreement, the Company shall not, without the prior written consent of each of the Stockholders Representatives, enter into any agreement with any holder or prospective holder of any securities of the Company giving such holder or prospective holder any registration rights the terms of which are as or more favorable taken as a whole than the registration rights granted to the Stockholders hereunder unless the Company shall also give such rights to the Stockholders hereunder.  Prior to the date hereof, the Company has provided the Initial Stockholders with true and correct copies of any agreement (or summaries of unwritten agreements or arrangements) pursuant to which the Company has given any holder or prospective holder of any securities of the Company any registration rights.  The Stockholders Representatives hereby consent to the Registration Rights Agreement, dated the date hereof, between Chandler Trust No. 1, Chandler Trust No. 2 and the Company (the "<u>Chandler Registration Rights Agreement</u>"), and agree that such Registration Rights Agreement does not violate the terms of this Agreement.

SECTION 11.  <u>No Inconsistent Agreements</u>.  The Company will not hereafter enter into any agreement with respect to its securities, which is inconsistent, or in conflict, in any material respect with the rights granted to the Stockholders in this Agreement.

SECTION 12.  <u>Miscellaneous</u>.

(a)  <u>Amendments and Waivers</u>.  The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless such amendment, modification, supplement, waiver or consent is agreed to by each of the parties hereunder.  Each of the parties hereto shall be bound by any such amendment, modification, supplement, waiver or consent effected pursuant to this Section 12(a), whether or not any notice, writing or marking indicating such amendment, modification, supplement, waiver or consent appears on the Registrable Securities.

(b)  <u>Notices</u>.  All notices and other communications provided for or permitted hereunder shall be made in writing by hand delivery, by telecopier, by courier guaranteeing

19

overnight delivery or by first-class mail, return receipt requested, and shall be deemed given (i) when made, if made by hand delivery, (ii) upon confirmation, if made by telecopier, (iii) one (1) Business Day after being deposited with such courier, if made by overnight courier, or (iv) on the date indicated on the notice of receipt, if made by first-class mail, to the parties as follows:

if to the Company, to:

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
Attention: General Counsel
Telecopy: (312) 222-4206

with a copy (which shall not constitute notice) to:

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Attention: Larry A. Barden
Telecopy: (312) 853-7036

and

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attn: Steven A. Rosenblum
Tel: (212) 403-1221
Fax: (212) 403-2000

if to EGI-TRB, to:

EGI-TRB, L.L.C.
c/o Equity Group Investments, L.L.C.
Two North Riverside Plaza, Suite 600
Chicago, IL 60606
Attn: Joseph M. Paolucci and Marc D. Hauser
Tel: (312) 466-3885 and (312) 466-3281
Fax: (312) 454-0335

with a copy (which shall not constitute notice) to:

Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL 60611
Attn: Joseph P. Gromacki
Tel: (312) 923-2637
Fax: (312) 923-2737

20

Source: TRIBUNE CO, 8-K, April 05, 2007

if to the ESOP, to:

> Tribune Employee Stock Ownership Trust
> c/o Greatbanc Trust Company, Trustee
> 1301 West 22nd Street, Suite 702
> Oak Brook, Il 60523
> Attn: Marilyn Marchetti and Danielle Montesano
> Tel: (630) 572-5121 and (630) 572-5120
> Fax: (630) 571-0599

with a copy (which shall not constitute notice) to:

> K & L Gates
> 535 Smithfield Street
> Pittsburgh, PA 15222
> Attn: Charles R. Smith, Esq.
> Tel: (412) 355-6536
> Fax: (412) 355-6501

or to such other address as such person may have furnished to the other persons identified in this Section 12(b) in writing in accordance herewith.

(c) <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties hereto. The Initial Stockholders shall not be permitted to assign or transfer any of its rights or obligations under this Agreement to any Person, other than by operation of law to a successor-in-interest of the Initial Stockholder until the applicable Restriction Termination Date at which time the Initial Stockholders shall be permitted to assign or transfer its rights and obligations under this Agreement to any permitted transferee of Registrable Securities, but only to the extent necessary to give such transferees the rights and obligations of Stockholders as contemplated hereunder with respect to the Registrable Securities transferred to such transferees. Notwithstanding the foregoing, at all times, EGI-TRB shall be entitled to transfer its rights and obligations under this Agreement to a Permitted Transferee, but only to the extent necessary to give such Permitted Transferee the rights and obligations of Stockholders as contemplated hereunder with respect to the Registrable Securities transferred to such Permitted Transferee. For the avoidance of doubt, in no event shall any transferee be a Stockholders Representative hereunder.

(d) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be original and all of which taken together shall constitute one and the same agreement.

(e) <u>Headings</u>. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

21

Source: TRIBUNE CO, 8-K, April 05, 2007

(f)  Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO CONFLICTS OF LAWS PROVISIONS THEREOF.

(g)  Severability.  If any term, provision, covenant or restriction of this Agreement is held to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, and the parties hereto shall use their reasonable best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction, it being intended that all of the rights and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law.

(h)  Entire Agreement.  This Agreement is intended by the parties hereto as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and the registration rights granted by the Company with respect to the Registrable Securities.  The Stockholders acknowledge and agree that there are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein, with respect to the registration rights granted by the Company with respect to the Registrable Securities.  This Agreement supersedes all prior agreements and undertakings among the parties hereto with respect to such registration rights.

(i)  Effectiveness and Termination.  This Agreement shall become effective upon the Merger Termination Date.  This Agreement and the obligations of the parties hereunder shall terminate upon the earlier to occur of (i) the time when there shall be no Registrable Securities remaining and (ii) the consummation of the Merger, except, in the case of termination pursuant to clause (i) above, for any liabilities or obligations under Section 5 or 6 hereof, each of which shall remain in effect in accordance with its terms.

*    *    *    *

22

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

TRIBUNE COMPANY

By: /s/ Dennis J. FitzSimons
    Name:  Dennis J. FitzSimons
    Title:   Chairman, President and
           Chief Executive Officer

Agreed and accepted as of the date
first above written:

EGI-TRB, L.L.C.

By:/s/ Philip G. Tinkler
    Name: Philip G. Tinkler
    Title:  Vice President

GREATBANC TRUST COMPANY,
not in its individual or corporate
capacity, but solely as trustee of the
TRIBUNE EMPLOYEE STOCK
OWNERSHIP TRUST, which forms a
part of the TRIBUNE EMPLOYEE
STOCK OWNERSHIP PLAN

By:/s/ Marilyn H. Marchetti
    Name: Marilyn H. Marchetti
    Title:  Senior Vice President

Registration Rights Agreement Signature Page

Exhibit 4.2
[EXECUTION COPY]

## REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT (this "Agreement") is made and entered into as of April 1, 2007 between Chandler Trust No. 1 ("Trust 1"), Chandler Trust No. 2 ("Trust 2" and collectively with Trust 1, the "Chandler Trusts" and together with any Permitted Transferee, the "Stockholders"), and Tribune Company, a Delaware corporation (the "Company").

WHEREAS, concurrently herewith, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee (the "ESOP Fiduciary") of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), TESOP Corporation, a Delaware corporation and wholly owned subsidiary of the ESOP ("Merger Sub"), and the Company have entered into an Agreement and Plan of Merger (as amended from time to time, the "Merger Agreement") pursuant to which the ESOP will acquire the Company by merging Merger Sub with and into the Company (the "Merger"), with the Company surviving the Merger as the surviving corporation (the "Surviving Corporation"); and

WHEREAS, concurrently herewith, the Company has entered into a Voting Agreement (the "Voting Agreement") with the Chandler Trusts, pursuant to which the Chandler Trusts have agreed, subject to the terms and conditions thereof, to vote in favor of the Merger Agreement and the Merger.

NOW, THEREFORE, the Company agrees with the Stockholders, for their benefit as holders of the Company's Common Stock (as defined herein), and the Stockholders agree with the Company, as follows:

SECTION 1.     Definitions.  In addition to the terms that are defined elsewhere in this Agreement, the following terms shall have the following meanings:

"Agreement" has the meaning specified in the first paragraph of this Agreement.

"Business Day" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in The City of Chicago are authorized or obligated by law or executive order to close.

"Chandler Trusts" has the meaning specified in the first paragraph of this Agreement.

"Common Stock" means any of the common stock, par value $0.01 per share, of the Company.

"Company" has the meaning specified in the first paragraph of this Agreement.

"Deferral Notice" has the meaning specified in Section 3(g).

"Deferral Period" has the meaning specified in Section 3(g).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Form S-3" means such form under the Securities Act as is in effect on the date hereof or any successor registration form under the Securities Act subsequently adopted by the SEC which permits inclusion or incorporation of substantial information by reference to other documents filed by the Company with the SEC.

"Issuer Free Writing Prospectus" has the meaning specified in Section 2(d).

"Material Event" has the meaning specified in Section 3(g).

"Permitted Transferee" means (i) any person to whom Registrable Securities are transferred in connection with a derivative or hedging transaction and (ii) any trust to which Registrable Securities are transferred and which has the same trustees as the Chandler Trusts.

"Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organization or government or other agency or political subdivision thereof.

"Prospectus" means the prospectus included in any Registration Statement, as amended or supplemented by all amendments and prospectus supplements, including post-effective amendments, and all materials incorporated by reference or explicitly deemed to be incorporated by reference in such Prospectus.

"Registrable Securities" means (1) any shares of Common Stock held by the Stockholders as of the date hereof, (2) any shares of Common Stock of the Company issued as (or issuable upon the conversion or exercise of any warrant, right or other security which is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, any shares of Common Stock owned by the Stockholders, and (3) any shares of Common Stock owned, held, borrowed or sold by underwriters or counterparties in connection with derivative or hedging transactions with respect to any shares of Common Stock held by the Stockholders. As to any particular Registrable Securities, such securities shall cease to be Registrable Securities on the earliest of the date on which such securities: (i) have been effectively registered under the Securities Act and disposed of in accordance with a Registration Statement; (ii) have been sold to the public pursuant to Rule 144 or may be sold or transferred pursuant to Rule 144(k) (or any similar provision then in force, but not Rule 144A) under the Securities Act; or (iii) cease to be outstanding (whether as a result of redemption, repurchase and cancellation, conversion or otherwise).

"Registration Statement" means any registration statement of the Company that covers any of the Registrable Securities pursuant to the provisions of this Agreement, including the Prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits, and all materials incorporated by reference or explicitly deemed to be incorporated by reference in such registration statement.

2

Source: TRIBUNE CO, 8-K, April 05, 2007

"Rule 144" means Rule 144 under the Securities Act, as such Rule may be amended from time to time, or any similar or successor rule or regulation hereafter adopted by the SEC having substantially the same effect as such Rule.

"SEC" means the United States Securities and Exchange Commission and any successor agency.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated by the SEC thereunder.

"Stockholders" has the meaning specified in the first paragraph of this Agreement.

"Stockholder Indemnified Person" has the meaning specified in Section 6(a).

"Trust 1" has the meaning specified in the first paragraph of this Agreement.

"Trust 2" has the meaning specified in the first paragraph of this Agreement.

SECTION 2.    Form S-3 Registration.

(a)    Shelf Registration. The Company shall, immediately following the commencement of the Offer (as defined in the Merger Agreement), (i) effect an automatic shelf Registration Statement on Form S-3 pursuant to Section 415 of the Securities Act and any related qualification or compliance with respect to all of the Registrable Securities owned by the Stockholders, or (ii) file a post-effective amendment to the Company's outstanding effective Form S-3 Registration Statement covering all or a portion of the Registrable Securities; *provided* that the Stockholders agree not to sell, offer for sale or otherwise directly or indirectly act as a distribution participant (as defined in Regulation M under the Exchange Act ("Regulation M")) with respect to any Registrable Securities pursuant to such Registration Statement prior to the consummation or termination of the Offer unless outside counsel to the Company and outside counsel to the Chandler Trusts reasonably mutually agree that such actions by the Stockholders would not cause the Offer or purchases of shares of Common Stock by the Company pursuant to the Offer to violate Regulation M. The Company shall cause such Registration Statement, or an amendment or replacement thereto, to remain effective until the earliest of (1) each Closing, as defined in (A) that certain Put/Call Letter Agreement with respect to TMCT, LLC, dated as of September 21, 2006, by and among the Company, the Stockholders and the other parties named therein and (B) that certain Put/Call Letter Agreement with respect to TMCT II, LLC, dated as of September 21, 2006, by and among the Company, the Stockholders and the other parties named therein, shall have occurred, (2) November 22, 2007 or (3) the Effective Time (as defined in the Merger Agreement).

(b)    Plan and Method of Distribution. The Stockholders shall have the right to determine the plan and method of distribution for the Registrable Securities to be reflected in the shelf Registration Statement, which plan and method shall comply with all applicable laws, and the Stockholders shall provide the Company with all necessary information with respect thereto for inclusion in such Registration Statement. If the plan or method of distribution for any

3

Source: TRIBUNE CO, 8-K, April 05, 2007

Registrable Securities is to be an underwritten offering, the selection of the underwriters shall be subject to the Company's reasonable approval.

        (c)     <u>Suspension</u>.  The Company may suspend for a period of no more than 90 days in any 12-month period, effectiveness or use of such Registration Statement (and the Stockholders agree not to offer or sell any Registrable Securities pursuant to such Registration Statement during such deferral or suspension), pursuant to this Section 2(c) or clause (C) of Section 3(g), if the Company determines in good faith that the sale of Registrable Securities pursuant to such Registration Statement might (A) interfere with or adversely affect the negotiation or completion of any material transaction or other Material Event that is being contemplated by the Company or (B) involve initial or continuing disclosure obligations relating to a Material Event, the disclosure of which would, in the reasonable judgment of the Company, be materially adverse to its interests.

        (d) <u>Issuer Free-Writing Prospectuses</u>.  The Company represents and agrees that, unless it obtains the prior consent of the Stockholders or the approval of the counsel for the Stockholders, and the Stockholders represent and agree that, unless they obtain the prior consent of the Company, it will not make any offer relating to the Registrable Securities that would constitute an "issuer free writing prospectus," as defined in Rule 433 under the Securities Act (an "<u>Issuer Free Writing Prospectus</u>"), or that would otherwise constitute a "free writing prospectus," as defined in Rule 405 under the Securities Act, required to be filed with the SEC.  The Company represents that any Issuer Free Writing Prospectus will not include any information that conflicts with the information contained in a Registration Statement or Prospectus and that any Issuer Free Writing Prospectus, when taken together with the information in the Registration Statement and the Prospectus, will not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

SECTION 3.     <u>Registration Procedures</u>.  The Company shall:

(a)  Before filing any Prospectus or any amendments or supplements to the Registration Statement with the SEC, furnish to the Stockholders copies of all such documents proposed to be filed and use reasonable efforts to reflect in each such document when so filed with the SEC such comments as the Stockholders reasonably shall propose within three (3) Business Days of the delivery of such copies to the Stockholders.

(b)  As promptly as reasonably practicable (i) give notice to the Stockholders of the effectiveness of the Registration Statement filed hereunder and, prepare and file with the SEC such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for the period described in Section 2(a) above (or until the distribution described in the Registration Statement has been completed or such lesser period of time as the Company or the Stockholders may be required under the Securities Act to deliver a Prospectus in connection with any sale of Registrable Securities and to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the Stockholders set forth in such Registration Statement) and use its reasonable best efforts to comply with the provisions of the

4

Securities Act with respect to the disposition of securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the Stockholders set forth in such Registration Statement, *provided* that the Company shall not be required to amend the Registration Statement to reflect an addition or change in the identities of selling stockholders more than once in any 60-day period, (ii) give notice to the Stockholders of any request, following the effectiveness of a Registration Statement under the Securities Act, by the SEC or any other federal or state governmental authority for amendments or supplements to any Registration Statement or related Prospectus or for additional information, (iii) give notice to the Stockholders of the issuance by the SEC or any other federal or state governmental authority of any stop order or injunction suspending or enjoining the use of any Prospectus or the effectiveness of any Registration Statement or the initiation of any proceedings for that purpose, (iv) give notice to the Stockholders of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for offering or sale under the securities or "blue sky" laws in any jurisdiction or the initiation of any proceeding for such purpose and (v) give notice to the Stockholders of the occurrence of (but not the nature of or details concerning) a Material Event (provided, however, that no notice by the Company shall be required pursuant to this clause (v) in the event that the Company promptly files a Prospectus supplement to update the Prospectus or the Company files a Current Report on Form 8-K or other appropriate Exchange Act report that is incorporated by reference into the applicable Registration Statement, which, in either case, contains the requisite information with respect to such Material Event that results in such Registration Statement no longer containing any untrue statement of material fact or omitting to state a material fact necessary to make the statements contained therein not misleading, which notice may, at the discretion of the Company (or as required pursuant to Section 3(g)), state that it constitutes a Deferral Notice, in which event the provisions of Section 3(g) shall apply.

(c)   In the event of the issuance of any stop order suspending the effectiveness of a Registration Statement, or of any order suspending or preventing the use of any related Prospectus or suspending the qualification of any Common Stock included in such Registration Statement for sale in any jurisdiction, the Company shall use its reasonable best efforts promptly to obtain the withdrawal of such order.

(d)   Furnish to the Stockholders such number of copies of such Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary prospectus) and such other documents as the Stockholders may reasonably request in order to facilitate the disposition of the Registrable Securities owned by the Stockholders.

(e)   Enter into such customary agreements (including underwriting agreements in customary form) and take all such other actions as the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities, except to the extent any such agreement or other action would materially interfere with the conduct of the Company's business.

(f)   Subject to Section 3(g), use reasonable best efforts to register or qualify or cooperate with the Stockholders in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities for offer and

5

sale under the securities or "blue sky" laws of such jurisdictions within the United States as the Stockholders reasonably request in writing, it being agreed that no such registration or qualification will be made unless so requested; provided, that the Company will not be required to (i) register or qualify as a foreign corporation or as a dealer in securities in any jurisdiction where it is not otherwise qualified or where it would be subject to income tax as a foreign corporation, or to take any action that would subject it to the service of process in any jurisdiction where it is not now so subject or (ii) take any action that would subject it to general or unlimited service of process in suits or to taxation in any such jurisdiction where it is not then so subject.

(g)   Upon (A) the issuance by the SEC of a stop order suspending the effectiveness of a Registration Statement or the initiation of proceedings with respect to a Registration Statement under Section 8(d) or 8(e) of the Securities Act, (B) the occurrence or existence of any development, event, fact, situation or circumstance (a "Material Event") as a result of which any Registration Statement shall contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, or any Prospectus shall contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (including, in any such case, as a result of the non-availability of financial statements), or (C) the occurrence or existence of any Material Event relating to the Company that, in the sole discretion of the Company acting in good faith, makes it appropriate to suspend the availability of such Registration Statement and the related Prospectus, (i) in the case of clause (B) above, subject to the next sentence, as promptly as practicable prepare and file a post-effective amendment to such Registration Statement or a supplement to the related Prospectus or any document incorporated therein by reference or file any other required document that would be incorporated by reference into such Registration Statement and Prospectus so that such Registration Statement does not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and such Prospectus does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder, and, in the case of a post-effective amendment to a Registration Statement, subject to the next sentence, use reasonable efforts to cause it to be declared effective as promptly as is reasonably practicable, and (ii) give notice to the Stockholders that the availability of such Registration Statement is suspended (a "Deferral Notice") and, upon receipt of any Deferral Notice, the Stockholders agree that it shall not sell any Registrable Securities pursuant to the Registration Statement until the Stockholders receive copies of the supplemented or amended Prospectus provided for in clause (i) above, or until it is advised in writing by the Company that the Prospectus may be used, and has received copies of any additional or supplemental filings that are incorporated or deemed incorporated by reference in such Prospectus.  The Company will use reasonable efforts to ensure that the use of the Prospectus may be resumed (x) in the case of clause (A) above, as promptly as is practicable, (y) in the case of clause (B) above (unless caused by a development covered by clause (C) above), following the time when the Company has prepared an amendment or supplement to such Registration Statement or Prospectus necessary to cure the defects thereto; it being agreed, that the Company shall promptly prepare such amendment or supplement, and (z) in the case of clause (C) above, as soon as, in the

6

discretion of the Company acting in good faith, such suspension is no longer appropriate.  In connection with a Material Event, the Company shall be entitled to exercise its right under this Section 3(g) to suspend the availability of a Registration Statement or any Prospectus (the "Deferral Period") for no more than 90 days during any 12-month period.  The Company shall not be required to specify in the written notice to the Stockholders the nature of the event giving rise to the Deferral Period.  In the event that the Company shall exercise its rights hereunder, the applicable time period during which the Registration Statement is to remain effective pursuant to Section 3(b) shall be extended by a period of time equal to the duration of the Deferral Period.

(h)  In the case of an underwritten offering, make available for inspection by the Stockholders, any underwriter participating in any disposition pursuant to such Registration Statement, and any attorney, accountant or other agent retained by any of the Stockholders or such underwriter, at the offices where normally kept, during normal business hours, all pertinent financial and other records, pertinent corporate documents and properties of the Company, and cause the Company's officers, employees and independent accountants to supply all information reasonably requested by the Stockholders or any such underwriter, attorney, accountant or agent in connection with such Registration Statement, in each case as is necessary or reasonably advisable (based on the reasonable advice of their respective counsel) to enable the Stockholders or such underwriter to exercise their due diligence responsibilities and defenses under the Securities Act; provided, however, that (i) the Stockholders and any such underwriter shall have entered into a customary confidentiality agreement reasonably acceptable to the Company and (ii) the Stockholders and any such underwriter shall use their respective reasonable best efforts to minimize the disruption to the Company's business and coordinate any such investigation of the books, records and properties of the Company and any discussions with the Company's officers and accountants so that all such investigations occur at the same time.

(i)   Use its reasonable best efforts to comply with all applicable rules and regulations of the SEC to the extent and so long as they are applicable to the offer and sale of Registrable Securities by the Stockholders from time to time in accordance with the methods of distribution set forth in the Registration Statement, and make generally available to its securityholders earning statements (which need not be audited) covering the period of at least twelve months beginning with the first day of the Company's first full calendar quarter after the effective date of the Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder (or any similar rule promulgated under the Securities Act).

(j)   Provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by a Registration Statement from and after a date not later than the effective date of such Registration Statement.

(k)  Use its commercially reasonable efforts to cause all Registrable Securities to be listed on each securities exchange and/or quotation system on which the Common Stock is then listed and/or quoted.

(l)      In the case of an underwritten offering, use its reasonable best efforts to furnish, at the request of any Stockholders requesting registration of Registrable Securities, on the date that such Registrable Securities are delivered to the underwriter(s) for sale, (i) an

7

opinion, dated as of such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters and (ii) a "comfort" letter dated as of such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters.

SECTION 4.     Stockholders' Obligations.

(a)     The Stockholders agree that, upon receipt of any Deferral Notice from the Company of the existence of any fact of the kind described in Section 3(g)(B) hereof, the Stockholders will forthwith discontinue disposition of Registrable Securities pursuant to any Registration Statement until:

>     (i)     the Stockholders have received copies of the supplemented or amended Prospectus contemplated by Section 3(g) hereof; or

>     (ii)     the Stockholders are advised in writing by the Company that the use of the Prospectus may be resumed, and has received copies of any additional or supplemental filings that are incorporated by reference in the Prospectus (unless such filings are made pursuant to the requirements of Section 13 or Section 15 of the Exchange Act and such filings are available through the SEC's EDGAR system).

If so directed by the Company, the Stockholders will deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in the Stockholders' possession, of the Prospectus covering such Registrable Securities that was current at the time of receipt of such Deferral Notice.

(b) The Stockholders agree promptly to furnish to the Company in writing all information required to be disclosed in order to make any information previously furnished to the Company by the Stockholders not misleading, any other information regarding the Stockholders and the distribution of any Registrable Securities as may be required by the Company to be disclosed in the Registration Statement under applicable law or pursuant to SEC comments and any information otherwise required by the Company to comply with applicable law or regulations. Any sale of any Registrable Securities by the Stockholders shall constitute a representation and warranty by the Stockholders that the information relating to the Stockholders is as set forth in the Prospectus delivered by the Stockholders in connection with such disposition, that such Prospectus does not as of the time of such sale contain any untrue statement of material fact relating to or provided by the Stockholders and that such Prospectus does not as of the time of such sale omit to state any material fact relating to or provided by the Stockholders necessary to make the statements in such Prospectus, in the light of the circumstances under which they were made, not misleading.

SECTION 5.     Registration Expenses.   The Company shall bear all fees and expenses incurred in connection with the performance by the Company of its obligations under Sections 2 and 3 of this Agreement.  Such fees and expenses shall include (i) all registration and filing fees (including, without limitation, fees and expenses (x) with respect to filings required to

8

Source: TRIBUNE CO, 8-K, April 05, 2007

be made with the National Association of Securities Dealers, Inc. and the SEC's registration fees and (y) of compliance with federal and state securities or "blue sky" laws to the extent such filings or compliance are required pursuant to this Agreement (including, without limitation, reasonable fees and disbursements of the counsel specified in the next sentence in connection with "blue sky" qualifications of the Registrable Securities under the laws of such jurisdictions as the Stockholders may designate)), (ii) printing expenses, (iii) duplication expenses relating to copies of any Registration Statement or Prospectus delivered to the Stockholders hereunder, (iv) fees and disbursements of counsel for the Company in connection with the performance and compliance with this Agreement, (v) reasonable "road show" or other marketing expenses (provided that this Section 5 shall not adversely affect the Company's arrangements with any underwriters), (vi) fees and expenses of the Company's independent certified public accountants (including the fees and expenses of any comfort letters required by or incident to the performance and compliance with this Agreement), (vii) reasonable expenses of underwriters, other than discounts and commissions attributable to the Registrable Securities included in such registration, and (viii) reasonable fees and disbursements of the registrar and transfer agent for the Common Stock. In addition, the Company shall pay its internal expenses (including, without limitation, all salaries and expenses of officers and employees performing legal or accounting duties), and its expenses for any annual audit, the fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange on which the same securities of the Company are then listed and the fees and expenses of any person, including special experts, retained by the Company. The Stockholders shall pay all underwriting discounts and commissions and transfer taxes, if any, relating to the sale or disposition of Registrable Securities pursuant to any Registration Statement, and any fees and expenses of legal counsel to the Stockholders.

SECTION 6.    Indemnification; Contribution.

(a)  The Company agrees to indemnify and hold harmless the Stockholders and each Person, if any, who controls the Stockholders within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act (each, a "Stockholder Indemnified Person") against any and all loss, liability, claim and damage, as incurred, arising out of any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement (or any amendment thereto), or the omission or alleged omission therefrom of a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading or arising out of any untrue statement or alleged untrue statement of a material fact included in any preliminary prospectus or any Prospectus (or any amendment or supplement thereto) or Issuer Free Writing Prospectus (or any amendment or supplement thereto), or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, and agrees to reimburse any Stockholder Indemnified Person as promptly as practicable upon demand for any legal or other expenses reasonably incurred by such Stockholder Indemnified Person in connection with investigating, defending or paying any such loss, claim, damage, liability or action; provided, however, that this indemnity agreement shall not apply to any loss, liability, claim or damage to the extent arising out of any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with information furnished to the Company by or on behalf of the Stockholders or any Person, if any, who controls the Stockholders for use in any Registration

9

Source: TRIBUNE CO, 8-K, April 05, 2007

Statement (or any amendment thereto), or any preliminary prospectus or Prospectus (or any amendment or supplement thereto) or any Issuer Free Writing Prospectus (or any amendment or supplement thereto).

(b)  The Stockholders agree, jointly and severally, to indemnify and hold harmless the Company, and each person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act against any and all loss, liability, claim and damage described in the indemnity contained in subsection (a) of this Section 6, as incurred, but only with respect to untrue statements or omissions, or alleged untrue statements or omissions, made in any Registration Statement (or any amendment thereto) or any preliminary prospectus or Prospectus (or any amendment or supplement thereto) in reliance upon and in conformity with information furnished to the Company by or on behalf of the Stockholders for use in the Registration Statement (or any amendment thereto) or such preliminary prospectus or Prospectus (or any amendment or supplement thereto).

(c)  Each indemnified party shall give notice as promptly as reasonably practicable to each indemnifying party of any action or proceeding commenced against it in respect of which indemnity may be sought hereunder, but failure to so notify an indemnifying party shall not relieve such indemnifying party from any liability hereunder to the extent it is not prejudiced as a result thereof and in any event shall not relieve it from any liability which it may have otherwise than on account of these indemnity provisions.  In case any such action shall be brought against any indemnified party and it shall notify an indemnifying party of the commencement thereof, such indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and, after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, such indemnifying party shall not be liable to such indemnified party under this Section 6 for any legal expenses of other counsel or any other expenses, in each case subsequently incurred by such indemnified party, in connection with the defense thereof.  No indemnifying party shall, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever in respect of which indemnification or contribution is sought under this Section 6 (whether or not the indemnified parties are actual or potential parties thereto), unless such settlement, compromise or consent (i) includes an unconditional release of each indemnified party from all liability arising out of such litigation, investigation, proceeding or claim and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any indemnified party.  No indemnified party shall, without the prior written consent of the indemnifying party, effect any settlement of any commenced or threatened litigation, investigation, proceeding or claim in respect of which any indemnification is sought hereunder.

(c)  If the indemnification provided for in this Section 6 from the indemnifying party is unavailable to an indemnified party hereunder in respect of any losses, claims, damages or liabilities referred to in this Section 6:

10

(i) The indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages, liabilities or expenses, (i) in such proportion as is appropriate to reflect the relative fault of the indemnifying party and indemnified parties in connection with the actions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the indemnifying party and the indemnified party from the offering of the securities covered by such Registration Statement in connection with which the actions resulting in such losses, claims, damages or liabilities occurred. The relative fault of such indemnifying party, on the one hand, and the indemnified party, on the other hand, shall be determined by reference to, among other things, whether any such untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The amount paid or payable by a party as a result of the losses, claims, damages or liabilities referred to above shall be deemed to include, subject to the limitations set forth in Section 6(a) and Section 6(b), any legal or other fees or expenses reasonably incurred by such party in connection with any investigation or proceeding.

(ii) If indemnification is available under this Section 6, the indemnifying parties shall indemnify each indemnified party to the full extent provided in this Section 6 without regard to the relative fault of such indemnifying party or indemnified party or any other equitable consideration referred to in Section 6(d).

(iii) No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(iv) For purposes of this Section 6(d), each Person, if any, who controls the Stockholders within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act shall have the same rights to contribution as the Stockholders, and each person, if any, who controls the Company within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act shall have the same rights to contribution as the Company.

(e) The obligations of the Company and the Stockholders under this Section 6 shall survive the completion of any offering of Registrable Securities pursuant to any Registration Statement under this Agreement.

11

SECTION 7.    Rule 144 Reporting.  With a view to making available the benefits of certain rules and regulations of the SEC which may at any time permit the sale of any Registrable Securities to the public without registration, the Company agrees to use commercially reasonable efforts to:

(a) File, as and when applicable, with the SEC in a timely manner all reports and other documents required of the Company under the Exchange Act.

(b) If the Company is not required to file reports pursuant to the Exchange Act, upon the request of the Stockholders, make publicly available the information specified in subparagraph (c)(2) of Rule 144.

(c) So long as the Stockholders own any Registrable Securities, furnish to the Stockholders, upon request and at the Stockholders' expense, a written statement by the Company as to its compliance with the reporting requirements of Rule 144.

SECTION 8.    The Offer and Board Resignations or Removals.

(a)  The Offer.  The Stockholders agree that they will duly and validly tender into the Offer (and not withdraw), no later than 12 hours prior to expiration of the Offer (as it may be extended from time to time), all shares of Company Common Stock beneficially owned by them as of such time; *provided* that the price paid by the Company for shares of Company Common Stock tendered in the Offer is no less than $34.00 in cash.

(b)  Board Resignations or Removals.  Promptly upon the first to occur of (i) the purchase of shares by the Company pursuant to the Offer or (ii) the occurrence of the Article VIII Termination Date (as defined in Section 8.1 of the Company's By-Laws), the Stockholders shall take such actions as may be necessary to cause the CT Directors (as defined in Section 8.2 of the Company's By-Laws) to resign or be removed from the Board of Directors of the Company (and any committees thereof).  For the avoidance of doubt, the Stockholders also acknowledge that the date of the purchase of shares by the Company pursuant to the Offer in accordance with its terms shall constitute the Article VIII Termination Date unless the Article VIII Termination Date has occurred prior thereto.

SECTION 9.    Miscellaneous.

(a)  Amendments and Waivers.  The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless such amendment, modification, supplement, waiver or consent is agreed to by each of the parties hereunder. Each of the parties hereto shall be bound by any such amendment, modification, supplement, waiver or consent effected pursuant to this Section 9(a), whether or not any notice, writing or marking indicating such amendment, modification, supplement, waiver or consent appears on the Registrable Securities.

(b)    No Registration Rights to Third Parties.  Without the prior written consent of the Chandler Trusts, the Company covenants and agrees that it shall not grant, or cause or permit to be created, for the benefit of any person or entity any registration rights of any kind

12

Source: TRIBUNE CO, 8-K, April 05, 2007

(whether similar to the demand, "piggyback" or Form S-3 shelf registration rights described herein, or otherwise) relating to shares of the Company's Common Stock or any other voting securities of the Company, other than rights that are on a parity with or subordinate in right to the Stockholders.

(c)  Notices.  All notices and other communications provided for or permitted hereunder shall be made in writing by hand delivery, by telecopier, by courier guaranteeing overnight delivery or by first-class mail, return receipt requested, and shall be deemed given (i) when made, if made by hand delivery, (ii) upon confirmation, if made by telecopier, (iii) one (1) Business Day after being deposited with such courier, if made by overnight courier, or (iv) on the date indicated on the notice of receipt, if made by first-class mail, to the parties as follows:

if to the Company, to:

> Tribune Company
> 435 North Michigan Avenue
> Chicago, Illinois 60611
> Attention: General Counsel
> Telecopy: (312) 222-4206

with a copies (which shall not constitute notice) to:

> Sidley Austin LLP
> One South Dearborn Street
> Chicago, Illinois 60603
> Attention: Larry A. Barden
> Telecopy: (312) 853-7036

and

> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, New York 10019
> Attn: Steven A. Rosenblum
> Telecopy: (212) 403-1221

if to the Stockholders, to:

> c/o Chandler Trust No. 1
> 350 West Colorado Blvd. Suite 230
> Pasadena, California 91105
> Attn: William Stinehart, Jr.
> Telecopy: 310-552-7027

13

Source: TRIBUNE CO, 8-K, April 05, 2007

with a copy (which shall not constitute notice) to:

> Gibson, Dunn & Crutcher LLP
> 333 S. Grand Ave.
> Los Angeles, California 90071
> Attn:  Andrew E. Bogen
>        Peter W. Wardle
> Telecopy: 213-229-6159

or to such other address as such person may have furnished to the other persons identified in this Section 9(c) in writing in accordance herewith.

(d)  Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns, including Permitted Transferees, of each of the parties hereto.  Except as otherwise set forth herein, the Stockholders shall not be permitted to assign or transfer any of its rights or obligations under this Agreement to any Person, other than by operation of law to a successor-in-interest of the Stockholders.

(e)  Counterparts.  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be original and all of which taken together shall constitute one and the same agreement.

(f)  Headings.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

(g)  Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO CONFLICTS OF LAWS PROVISIONS THEREOF.

(h)  Severability.  If any term, provision, covenant or restriction of this Agreement is held to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, and the parties hereto shall use their reasonable best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction, it being intended that all of the rights and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law.

(i)  Entire Agreement.  This Agreement is intended by the parties hereto as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and the registration rights granted by the Company with respect to the Registrable Securities.  The Stockholders acknowledge and agree that there are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein, with respect to the registration rights granted by the Company with respect to the Registrable Securities.  This

14

Source: TRIBUNE CO, 8-K, April 05, 2007

Agreement supersedes all prior agreements and undertakings among the parties hereto with respect to such registration rights.

(j)   Termination.  This Agreement and the obligations of the parties hereunder shall terminate upon the earliest to occur of (i) the time when there shall be no Registrable Securities remaining, (ii) the time the Closings referred to in the last sentence of Section 2(a) have occurred, (iii) November 22, 2007 or (iv) the Effective Time (as defined in the Merger Agreement), except for any liabilities or obligations under Section 5 or 6 hereof and for the obligations of the Stockholders under Section 8 hereof, each of which shall remain in effect in accordance with its terms.

15

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

TRIBUNE COMPANY

By:     /s/ Dennis J. FitzSimons
        Name:   Dennis J. FitzSimons
        Title:    Chairman, President and Chief
                  Executive Officer

[*Signature Page to Registration Rights Agreement*]

Source: TRIBUNE CO, 8-K, April 05, 2007

CHANDLER TRUST NO. 1

By:     /s/ Susan Babcock
              Susan Babcock, as Trustee of Chandler
              Trust No. 1 under Trust Agreement dated
              June 26, 1935

By:     /s/ Jeffrey Chandler
              Jeffrey Chandler, as Trustee of Chandler
              Trust No. 1 under Trust Agreement dated
              June 26, 1935

By:     /s/ Camilla Chandler Frost
              Camilla Chandler Frost, as Trustee of
              Chandler Trust No. 1 under Trust
              Agreement dated June 26, 1935

By:     /s/ Roger Goodan
              Roger Goodan, as Trustee of Chandler Trust
              No. 1 under Trust Agreement dated June 26,
              1935

By:     /s/ William Stinhart, Jr.
              William Stinehart, Jr., as Trustee of
              Chandler Trust No. 1 under Trust
              Agreement dated June 26, 1935

By:     /s/ Judy C. Webb
              Judy C. Webb, as Trustee of Chandler Trust
              No. 1 under Trust Agreement dated June 26,
              1935

By:     /s/ Warren B. Williamson
              Warren B. Williamson, as Trustee of
              Chandler Trust No. 1 under Trust
              Agreement dated June 26, 1935

*[Signature Page to Registration Rights Agreement]*

CHANDLER TRUST NO. 2

By:  /s/ Susan Babcock
     Susan Babcock, as Trustee of Chandler
     Trust No. 2 under Trust Agreement dated
     June 26, 1935

By:  /s/ Jeffrey Chandler
     Jeffrey Chandler, as Trustee of Chandler
     Trust No. 2 under Trust Agreement dated
     June 26, 1935

By:  /s/ Camilla Chandler Frost
     Camilla Chandler Frost, as Trustee of
     Chandler Trust No. 2 under Trust
     Agreement dated June 26, 1935

By:  /s/ Roger Goodan
     Roger Goodan, as Trustee of Chandler Trust
     No. 2 under Trust Agreement dated June 26,
     1935

By:  /s/ William Stinehart, Jr.
     William Stinehart, Jr., as Trustee of
     Chandler Trust No. 2 under Trust
     Agreement dated June 26, 1935

By:  /s/ Judy C. Webb
     Judy C. Webb, as Trustee of Chandler Trust
     No. 2 under Trust Agreement dated June 26,
     1935

By:  /s/ Warren B. Williamson
     Warren B. Williamson, as Trustee of
     Chandler Trust No. 2 under Trust
     Agreement dated June 26, 1935

[*Signature Page to Registration Rights Agreement*]

Exhibit 4.3

[EXECUTION COPY]

## AMENDMENT NO. 3 TO RIGHTS AGREEMENT

This Amendment No. 3 to Rights Agreement (this "<u>Amendment No. 3</u>"), dated as of April 1, 2007, by and between Tribune Company, a Delaware corporation (the "<u>Company</u>"), and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent (the "<u>Rights Agent</u>"), amends the Rights Agreement, dated as of December 12, 1997, as previously amended by Amendment No. 1 thereto, dated as of June 12, 2000, and Amendment No. 2 thereto, dated as of September 21, 2006 (the "<u>Rights Agreement</u>"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such term in the Rights Agreement.

RECITALS

WHEREAS, the Company and the Rights Agent have executed and entered into the Rights Agreement;

WHEREAS, pursuant to Section 27 of the Rights Agreement, the Company and the Rights Agent may from time to time supplement or amend the Rights Agreement in accordance with the provisions of Section 27 thereof;

WHEREAS, the Company proposes to enter into: (1) an Agreement and Plan of Merger with GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP, and, for the limited purposes set forth therein, EGI-TRB, L.L.C., a Delaware limited liability company ("Tower Acquisition"); (2) a Securities Purchase Agreement with Tower Acquisition and Mr. Samuel Zell, as guarantor; (3) an ESOP Purchase Agreement with the ESOP; (4) an Investor Rights Agreement with Tower Acquisition and the ESOP; (5) a voting agreement with Chandler Trust No. 1 and Chandler Trust No. 2; (6) registration rights agreements with (a) Tower Acquisition and the ESOP, and (b) Chandler Trust No. 1 and Chandler Trust No. 2; and (7) other agreements contemplated by the foregoing or necessary to implement the transactions contemplated by the foregoing (such agreements in clauses (1) through (7), the "<u>Transaction Agreements</u>"); and

WHEREAS, the Board of Directors of the Company has determined that it is in the best interest of the Company and its stockholders to amend the Rights Agreement as set forth below to provide that the execution, delivery and performance of the Transaction Agreements and the transactions contemplated thereby will not result in any Person becoming an Acquiring Person;

NOW, THEREFORE, the Rights Agreement is hereby amended as follows:

1.      The definition of Acquiring Person in Section 1(a) of the Rights Agreement, as previously amended, is hereby further modified and amended by adding the following sentence at the end of the last sentence thereof:

1

Notwithstanding anything in this Agreement to the contrary, no Person shall be deemed to be an Acquiring Person solely by virtue of the execution, delivery or performance of any of the Transaction Agreements or the transactions contemplated thereby.

2.      A new Section 1(ee) is hereby added to Section 1 of the Rights Agreement, which shall read in its entirety as follows:

"Transaction Agreements" shall mean the following agreements dated as of April 1, 2007: (1) an Agreement and Plan of Merger by and among the Company, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP, and, for the limited purposes set forth therein, EGI-TRB, L.L.C., a Delaware limited liability company ("Tower Acquisition"); (2) the Securities Purchase Agreement by and among the Company, Tower Acquisition and Mr. Samuel Zell, as guarantor; (3) the ESOP Purchase Agreement by and between the Company and the ESOP; (4) the Investor Rights Agreement by and among the Company, Tower Acquisition and the ESOP; (5) the Voting Agreement by and among the Company, Chandler Trust No. 1 and Chandler Trust No. 2; (6) the Registration Rights Agreements by and among the Company and (a) Tower Acquisition and the ESOP, and (b) Chandler Trust No. 1 and Chandler Trust No. 2; and (7) other agreements contemplated by the foregoing agreements or necessary to implement the transactions contemplated by the foregoing agreements.

3.      This amendment may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same instrument.

4.      This Amendment shall be deemed to be a contract made under the laws of the State of Delaware and for all purposes shall be governed by and construed in accordance with the laws of such State applicable to contracts to be made and performed entirely within such State.

2

Source: TRIBUNE CO, 8-K, April 05, 2007

IN WITNESS WHEREOF, this Amendment has been duly executed by the Company and the Rights Agent as of the day and year first written above.

TRIBUNE COMPANY

By:  /s/   Crane H. Kenney
Name:    Crane H. Kenney
Title:    Senior Vice President and General Counsel

COMPUTERSHARE TRUST COMPANY, N.A.

By:  /s/   Tammie J. Marshall
Name:    Tammie J. Marshall
Title:    Senior Account Manager

3

Source: TRIBUNE CO, 8-K, April 05, 2007