sale, pledge, disposition or encumbrance of, any shares of its capital stock or other ownership interest in the Company or any Subsidiaries or any securities convertible into or exchangeable for any such shares or ownership interest, or any rights, warrants or options to acquire or with respect to any such shares of capital stock, ownership interest or convertible or exchangeable securities or take any action to cause to be exercisable any otherwise unexercisable option under any existing stock option plan (except as otherwise expressly provided by the terms of this Agreement or the express terms of any unexercisable options outstanding on the date hereof), other than (A) issuances of shares of Company Common Stock in respect of any exercise of Company Stock Options and settlement of any Company Stock-Based Awards (each as hereinafter defined) outstanding on the date hereof or as may be granted after the date hereof as permitted under this Section 5.1(b), (B) issuances of up to 75,000 shares of Company Common Stock in the ordinary course of business pursuant to the Company Benefit Plans, (C) the sale of shares of Company Common Stock pursuant to the exercise of options to purchase Company Common Stock permitted under this Section 5.1(b) if necessary to effectuate an optionee direction upon exercise or for withholding of Taxes and (D) issuances of shares of Company Common Stock and other Company securities pursuant to the Tribune Purchase Agreement and the ESOP Purchase Agreement;

(vii)    except for transactions among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, purchase, redeem or otherwise acquire any shares of its capital stock or other equity securities or any rights, warrants or options to acquire any such equity securities;

(viii)    shall not, and shall not permit any of its Subsidiaries to, incur, assume, guarantee, prepay or otherwise become liable for any indebtedness for borrowed money (directly, contingently or otherwise), except for (A) any indebtedness for borrowed money among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, (B) indebtedness for borrowed money incurred to replace, renew, extend, refinance or refund any existing indebtedness for borrowed money (x) on materially no less favorable terms and so long as such indebtedness is voluntarily prepayable or redeemable without premium or penalty or (y) with borrowings under and pursuant to the (1) Amended and Restated Credit Agreement and the Amended and Restated Bridge Credit Agreement, each dated as of June 27, 2006, among the Company, the banks, financial institutions and other institutional lenders party thereto, and Citicorp North America, Inc., as administrative agent (together, the "Existing Credit Agreements") or the (2) definitive credit agreements (the "New Credit Agreements") to be entered into by the Company pursuant to the Financing Commitments, (C) guarantees by the Company of indebtedness for borrowed money of Subsidiaries of the Company, which indebtedness is incurred in compliance with this Section 5.1(b), (D) indebtedness for borrowed money in an amount necessary to effect the exercise of the purchase option for the properties currently owned by TMCT, LLC and leased to the Company and its Subsidiaries, (E) indebtedness for borrowed money in an amount not to exceed $100 million in aggregate principal amount outstanding at any time, incurred as (x) a "Revolving Credit Advance" or a "Swing Line Advance" and "Term Advances" under and pursuant to the Existing Credit Agreements or (y) as an advance under the revolving credit facility to be included in the New Credit Agreements; provided that any amount borrowed pursuant to this clause (E) shall reduce the amount of borrowings permitted under clause (G) below, (F) indebtedness for borrowed

29

Source: TRIBUNE CO, 8-K, April 05, 2007

money as required to consummate the Offer, the Merger and the transactions contemplated hereby or by the New Credit Agreements and (G) other unsecured indebtedness for borrowed money not to exceed $100 million in aggregate principal amount outstanding at any time other than in accordance with clauses (A)-(F) above, so long as such indebtedness is voluntarily prepayable or redeemable (without premium or penalty) upon no more than three business days' notice; provided that any amount borrowed pursuant to this clause (G) shall reduce the amount of borrowings permitted under clause (E)(y) above;

(ix)     except for transactions among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, shall not sell, lease, license, transfer, exchange or swap, mortgage or otherwise encumber (including securitizations), or subject to any Lien (other than Permitted Liens) or otherwise dispose of any material portion of its properties or assets, including the capital stock or equity securities of Subsidiaries, except (A) sales of inventory in the ordinary course of business, (B) pursuant to existing agreements in effect prior to the execution of this Agreement and (C) as set forth on Section 5.1(b) of the Company Disclosure Schedule;

(x)     shall not, and shall not permit any of its Subsidiaries to, modify, amend, terminate or waive any rights under any Company Material Contract in any material respect in a manner which is adverse to the Company;

(xi)     shall not, and shall not permit any of its Subsidiaries to, enter into any Company Material Contracts;

(xii)     shall not, and shall not permit any of its Subsidiaries to, (A) make, change or revoke any material Tax election, (B) file any amended Tax Return, or (C) settle or compromise any liability for Taxes or surrender any claim for a refund of Taxes, other than in the case of clauses (B) and (C) hereof in respect of any Taxes that have been identified in the reserves for Taxes in the Company's GAAP financial statements;

(xiii)     shall not acquire, except in respect of any mergers, consolidations, business combinations among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, including by merger, consolidation or acquisition of stock or assets, any corporation, partnership, limited liability company, other business organization or any division thereof, or any material amount of assets in connection with acquisitions or investments with a purchase price of $120 million in the aggregate; provided that without the ESOP's consent (which consent may not be unreasonably withheld), the Company shall not acquire or make any investment (or agree to acquire or to make any investment) in any entity that holds, or has an attributable interest in, any license, authorization, permit or approval issued by the FCC;

(xiv)     shall not adopt or enter into a plan of restructuring, recapitalization or other reorganization (other than as contemplated in this Agreement);

(xv)     shall not settle or compromise any claim, suit, action, arbitration, or other proceeding, whether administrative, civil or criminal, in law or in equity, including in connection with the Matthew Bender and Mosby Tax litigation, except for claims that consist

30

Source: TRIBUNE CO, 8-K, April 05, 2007

solely of monetary damages in an amount not to exceed $20 million individually and $75 million in the aggregate;

(xvi)    shall not make any capital expenditures other than in accordance with the Company's budget consistent with past practice and other than expenditures necessary in response to emergencies such as natural disasters or acts of terrorism, in each case in accordance with past practice;

(xvii)    shall not enter into any transaction, agreement, arrangement or understanding between (A) the Company or any Subsidiary, on the one hand, and (B) any affiliate of the Company (other than the Subsidiaries), on the other hand, of the type that would be required to be disclosed under Item 404 of Regulation S-K promulgated by the SEC;

(xviii)    shall not knowingly take any action that would be reasonably likely to prevent or cause a material delay in the satisfaction of the conditions contained in Sections 6.1 and 6.3 or the consummation of the Merger; and

(xix)    shall not, and shall not permit any of its Subsidiaries to, agree, in writing or otherwise, to take any of the foregoing actions.

(c)    The Company (on behalf of itself and its Subsidiaries and affiliates) agrees that, between the date hereof and the Effective Time, they shall not, and shall not permit any of their respective Subsidiaries or affiliates to enter into or consummate any agreements or arrangements for an acquisition (via stock purchase, merger, consolidation, purchase of assets or otherwise) of any ownership interest attributable to the ESOP or any of its affiliates under the FCC Rules in any radio or television broadcast licensee, or the publisher of any English language daily newspaper of general circulation, if the ownership of such interest would reasonably be expected (A) to result in any delay in obtaining, or failure to obtain, the FCC Order or (B) to require the FCC to issue additional waivers of its ownership rules in prior to granting the FCC Order.

Section 5.2    Investigation. The Company shall afford to the ESOP and its accountants, consultants, legal counsel, financial advisors, and agents and other representatives (collectively, "Representatives") reasonable access during normal business hours, throughout the period prior to the earlier of the Effective Time and the Termination Date, to its and its Subsidiaries' officers, employees, properties, contracts, commitments, books and records and any report, schedule or other document filed or received by it pursuant to the requirements of applicable Laws and shall furnish the ESOP with financial, operating and other data and information as the ESOP, through its respective officers, employees or other authorized Representatives, may from time to time reasonably request in writing.  Notwithstanding the foregoing, the Company shall not be required to afford such access if it would unreasonably disrupt the operations of the Company or any of its Subsidiaries, would cause a violation of any agreement to which the Company or any of its Subsidiaries is a party, would cause a material risk of a loss of privilege to the Company or any of its Subsidiaries or would constitute a violation of any applicable Law, nor shall the ESOP or any of its Representatives be permitted to perform any onsite procedure (including any onsite environmental study) with respect to any property of the Company or any of its Subsidiaries, except, with respect to any onsite procedure,

31

Source: TRIBUNE CO, 8-K, April 05, 2007

with the Company's prior written consent (which consent shall not be unreasonably withheld, delayed or conditioned if such procedure is necessary for the Financing).

Section 5.3        No Solicitation.

(a)        Subject to Section 5.3(b)-(e), (i) the Company shall, and shall cause its Subsidiaries to, and shall direct its and their respective Representatives to, immediately cease any discussions or negotiations with any parties that may be ongoing with respect to any Alternative Proposal and (ii) during the period beginning on the date hereof and continuing until the Effective Time or, if earlier, the termination of this Agreement in accordance with Article VII, the Company agrees that neither it nor any Subsidiary of the Company shall, and that it shall direct its and their respective Representatives not to, directly or indirectly, (A) solicit, initiate or knowingly facilitate or encourage any inquiry with respect to, or the making, submission or announcement of, any Alternative Proposal (as hereinafter defined), (B) participate in any negotiations regarding an Alternative Proposal with, or furnish any nonpublic information regarding an Alternative Proposal or access to its properties, books, records or personnel in connection therewith to, any person that has made or, to the Company's knowledge, is considering making an Alternative Proposal, (C) engage in discussions regarding an Alternative Proposal with any person that has made or, to the Company's knowledge, is considering making an Alternative Proposal, except to notify such person as to the existence of the provisions of this Section 5.3, (D) approve, endorse or recommend any Alternative Proposal, (E) enter into any letter of intent or agreement in principle or any agreement providing for any Alternative Proposal (except for confidentiality agreements permitted under Section 5.3(b)), (F) otherwise cooperate with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any person (other than the ESOP, Merger Sub, Tribune Acquisition or their Representatives) with respect to, or which would reasonably be expected to result in, an Alternative Proposal, or (G) exempt any person from the restrictions contained in any state takeover or similar laws, including Section 203 of the DGCL or otherwise cause such restrictions not to apply.  The Company shall promptly inform its Representatives, and shall cause its Subsidiaries promptly to inform their respective Representatives, of the obligations under this Section 5.3(a).  Without limiting the foregoing, it is understood that any action of any Subsidiary of the Company or Representative of the Company or any of its Subsidiaries that would be a violation if taken by the Company shall be deemed to be a breach of this Section 5.3 by the Company.

(b)        Notwithstanding the limitations set forth in Section 5.3(a), at any time from the date hereof and continuing until the earlier of the receipt of the Company Shareholder Approval and the Termination Date, if the Company receives a bona fide written Alternative Proposal that was not solicited after the execution and delivery hereof (i) which (A) constitutes a Superior Proposal or (B) the Special Committee or the Board of Directors of the Company determines in good faith could reasonably be expected to result in a Superior Proposal, and (ii) which the Special Committee or the Board of Directors of the Company determines in good faith, after consultation with the Special Committee's or the Company's outside legal counsel, that the failure of the Special Committee or the Board of Directors of the Company to take the actions set forth in clauses (x) and (y) below with respect to such Alternative Proposal would be inconsistent with the directors' exercise of their fiduciary obligations to the Company's shareholders under applicable Law, then the Company may take the following actions:

32

Source: TRIBUNE CO, 8-K, April 05, 2007

(x) furnish nonpublic information to the third party (including its Representatives) making such Alternative Proposal (if, and only if, prior to so furnishing such information, the Company receives from the third party an executed agreement having provisions requiring such party to keep such information confidential that, subject to Section 5.3(d), are substantially similar to the comparable confidentiality provisions of that certain Confidentiality Agreement, dated as of November 8, 2006, by and between the Company and Equity Group Investments, L.L.C. (the "Confidentiality Agreement"), it being understood that such agreement with such third party need not have comparable standstill provisions), (y) engage in discussions or negotiations with the third party (including its Representatives) with respect to the Alternative Proposal, and (z) approve, recommend and enter into an agreement with the third party with respect to the Alternative Proposal and exempt such third party from the restrictions contained in any state takeover or similar laws, including Section 203 of the DGCL or otherwise cause such restrictions not to apply to such Alternative Proposal, in each case in connection with the termination of this Agreement pursuant to and in accordance with the terms of Section 7.1(g); provided, however, that (1) the ESOP shall be entitled to receive an executed copy of such confidentiality agreement prior to or substantially simultaneously with the Company furnishing information to the person making such Alternative Proposal or its Representatives and (2) the Company shall substantially simultaneously provide or make available to the ESOP any written material nonpublic information concerning the Company or any of its Subsidiaries that is provided to the person making such Alternative Proposal or its Representatives which was not previously provided or made available to the ESOP.

(c)      Except as provided in the next sentence, neither the Special Committee nor the Board of Directors of the Company shall (i) withdraw or modify, or propose publicly to withdraw or modify in a manner adverse to the ESOP, the approval or recommendation by the Special Committee or the Board of Directors of the Company of the Merger or this Agreement or the other transactions or agreements contemplated by this Agreement (including the Offer), (ii) approve, adopt or recommend, or propose publicly to approve, adopt or recommend, any Alternative Proposal, (iii) recommend that shareholders of the Company tender their shares in connection with any tender offer or exchange offer (other than the Offer) or (iv) exempt any person from the restrictions contained in any state takeover or similar laws, including Section 203 of the DGCL (each of the foregoing, a "Change of Recommendation"). Notwithstanding the foregoing, but subject to Section 5.4(c), the Special Committee or the Board of Directors of the Company may, at any time, make a Change of Recommendation if the Special Committee or the Board of Directors of the Company has concluded in good faith, after consultation with the Company's or the Special Committee's outside legal counsel and financial advisors, that the failure of the Special Committee or the Board of Directors of the Company to effect a Change of Recommendation would be inconsistent with the directors' exercise of their fiduciary obligations to the Company's shareholders under applicable Law; provided, however, that no Change of Recommendation shall change the approval of the Special Committee or the Board of Directors of the Company for purposes of (A) causing any state takeover statute or other state law to be inapplicable to the transactions contemplated by this Agreement or (B) rendering the Rights issued pursuant to the Rights Agreement inapplicable to the Merger and the execution and operation of this Agreement.

(d)      The Company promptly (and in any event within 48 hours) shall advise the ESOP orally and in writing of (i) any Alternative Proposal after the date hereof or indication

33

or inquiry after the date hereof with respect to or that would reasonably be expected to lead to any Alternative Proposal, (ii) any request after the date hereof for nonpublic information relating to the Company or its Subsidiaries, other than requests for information not reasonably expected to be related to an Alternative Proposal, or (iii) any inquiry or request after the date hereof for discussion or negotiation regarding an Alternative Proposal, including in each case the identity of the person making any such Alternative Proposal or indication or inquiry and the material terms of any such Alternative Proposal or indication or inquiry (including copies of any document or correspondence evidencing such Alternative Proposal or inquiry). The Company shall keep the ESOP reasonably informed on a current basis (and in any event within 48 hours of the occurrence of any material changes or developments) of the status (including the material terms and conditions thereof and any material change thereto) of any such Alternative Proposal or indication or inquiry, including furnishing copies of any written revised proposals. Without limiting the foregoing, the Company shall promptly (and in any event within 48 hours) notify the ESOP orally and in writing if it determines to begin providing information or to engage in discussions or negotiations concerning an Alternative Proposal. The Company shall not, and shall cause its Subsidiaries not to, enter into any confidentiality agreement with any person subsequent to the date of this Agreement which prohibits the Company from providing such information to the ESOP as required by this Section 5.3(d).

(e)        Nothing contained in this Agreement shall prohibit the Company or its Board of Directors from (i) disclosing to its shareholders a position contemplated by Rules 14d-9 and 14e-2(a) promulgated under the Exchange Act, or from issuing a "stop, look and listen" statement pending disclosure of its position thereunder, or (ii) making any disclosure to its shareholders if the Board of Directors determines in good faith, after consultation with the Company's outside legal counsel, that the failure of the Board of Directors of the Company to make such disclosure would be inconsistent with the directors' exercise of their fiduciary obligations to the Company's shareholders under applicable Law; provided, however, that neither the Company, the Board of Directors nor the Special Committee may effect a Change of Recommendation unless permitted by Section 5.3(c).

(f)        As used in this Agreement, "Alternative Proposal" shall mean any bona fide proposal or offer (including any proposal or offer from or to the Company's shareholders) made by any person or group of persons prior to the receipt of the Company Shareholder Approval (other than a proposal or offer by the ESOP, Merger Sub and Tribune Acquisition and other than the Offer) for (i) a merger, reorganization, share exchange, consolidation, business combination, recapitalization, dissolution, liquidation or similar transaction involving the Company, (ii) the direct or indirect acquisition in a single transaction or series of related transactions by any person of assets representing twenty percent (20%) or more of the consolidated assets, revenues or earnings of the Company and its Subsidiaries, (iii) the direct or indirect acquisition in a single transaction or series of related transactions by any person of twenty percent (20%) or more of the outstanding shares of Company Common Stock or (iv) any tender offer or exchange offer that if consummated would result in any person beneficially owning twenty percent (20%) or more of the outstanding shares of Company Common Stock.

(g)        As used in this Agreement "Superior Proposal" shall mean an Alternative Proposal (with all percentages in the definition of Alternative Proposal increased to 50%) on terms that the Special Committee or the Board of Directors of the Company determines in good

34

Source: TRIBUNE CO, 8-K, April 05, 2007

faith, after consultation with the Company's or the Special Committee's outside legal and financial advisors, and considering such factors as the Special Committee or the Board of Directors of the Company, as applicable, consider to be appropriate (including the timing and likelihood of consummation of such proposal, financial and regulatory aspects, and any alterations to this Agreement agreed to in writing by the ESOP in response thereto), is more favorable to the Company and its shareholders than the transactions contemplated by this Agreement.

Section 5.4      <u>Proxy Statement; Company Meeting</u>.

(a)      The Company, the ESOP and Merger Sub shall each use their reasonable best efforts to take or cause to be taken such actions as may be required to be taken under the Exchange Act or any other federal securities Laws, and under any applicable state securities or "blue sky" Laws, in connection with the Merger and the other transactions contemplated by this Agreement, including the Proxy Statement and the Schedule 13E-3. In connection with the Merger and the Company Meeting, the Company shall prepare and concurrently file with the SEC the Proxy Statement and the Schedule 13E-3 relating to the Merger and the other transactions contemplated by this Agreement, and the Company and the ESOP shall use all reasonable best efforts to respond to the comments of the SEC and to cause the Proxy Statement to be mailed to the Company's shareholders, all as promptly as reasonably practicable; provided, however, that prior to the concurrent filing of the Proxy Statement and the Schedule 13E-3 the Company shall consult with the ESOP with respect to such filings and shall afford the ESOP and its respective Representatives reasonable opportunity to review and comment thereon. The ESOP and Merger Sub shall provide the Company with any information for inclusion in the Proxy Statement or the Schedule 13E-3 which may be required under applicable Law and/or which is reasonably requested by the Company. The Company shall notify the ESOP of the receipt of comments of the SEC and of any request from the SEC for amendments or supplements to the Proxy Statement or the Schedule 13E-3 or for additional information, and will promptly supply the ESOP with copies of all correspondence between the Company or its Representatives, on the one hand, and the SEC or members of its staff, on the other hand, with respect to the Proxy Statement, the Schedule 13E-3 or the Merger. Each of the Company, the ESOP and Merger Sub shall use its respective reasonable best efforts to resolve all SEC comments with respect to the Proxy Statement, the Schedule 13E-3 and any other required filings as promptly as practicable after receipt thereof. Each of the Company, the ESOP and Merger Sub agree to correct any information provided by it for use in the Proxy Statement or the Schedule 13E-3 which shall have become false or misleading. If at any time prior to the Company Meeting any event should occur which is required by applicable Law to be set forth in an amendment of, or a supplement to, the Proxy Statement or the Schedule 13E-3, the Company will promptly inform the ESOP. In such case, the Company, with the cooperation of the ESOP, will, upon learning of such event, promptly prepare and file such amendment or supplement with the SEC to the extent required by applicable Law and shall mail such amendment or supplement to the Company's shareholders to the extent required by applicable Law; provided, however, that prior to such filing, the Company shall consult with the ESOP with respect to such amendment or supplement and shall afford the ESOP and its Representatives reasonable opportunity to comment thereon. Notwithstanding the foregoing, the Company shall have no obligation to notify the ESOP of any matters to the extent that the Special Committee or the Board of Directors of the Company determines in good faith, after consultation with the Company's or the

35

Special Committee's legal counsel, that to do so would be inconsistent with the directors' exercise of their fiduciary obligations to the Company's shareholders under applicable Law.

(b)    Subject to the other provisions of this Agreement, the Company shall (i) take all action necessary in accordance with the DGCL and its amended and restated certificate of incorporation and by-laws to duly call, give notice of, convene and hold a meeting of its shareholders as promptly as reasonably practicable for the purpose of obtaining the Company Shareholder Approval (the "Company Meeting") (including mailing the Proxy Statement as soon as reasonably practicable after the SEC has cleared the Proxy Statement and holding the Company Meeting no later than 45 days after mailing the Proxy Statement, unless a later date is mutually agreed by the Company and the ESOP), and (ii) subject to any Change of Recommendation of the Board of Directors or the Special Committee in accordance with Section 5.3(c), (A) include in the Proxy Statement the recommendation of the Board of Directors of the Company, based on the unanimous recommendation of the Special Committee, that the shareholders of the Company vote in favor of the adoption of this Agreement, and the written opinions referred to in Section 3.18 hereof, dated as of the date of this Agreement (unless the Company shall have been notified of the withdrawal of either such opinion) and (B) use all reasonable best efforts to solicit from its shareholders proxies in favor of the approval of this Agreement and the transactions contemplated by this Agreement.

(c)    Notwithstanding anything herein to the contrary, unless this Agreement is terminated in accordance with Article VII, the Company will take all of the actions contemplated by Section 5.4(a) and Section 5.4(b) regardless of whether the Board of Directors of the Company (acting through the Special Committee, if then in existence) has approved, endorsed or recommended an Alternative Proposal or has made a Change of Recommendation, and will submit this Agreement for adoption by the shareholders of the Company at the Company Meeting.  Notwithstanding anything to the contrary contained in this Agreement, the Company shall not be required to hold the Company Meeting if this Agreement is terminated in accordance with Article VII.

Section 5.5       Stock Options and Other Stock-Based Awards; Employee Matters.

(a)    Stock Options and Other Stock-Based Awards.

(i)    Each option to purchase shares of Company Common Stock (each, a "Company Stock Option") granted under the Company Stock Plans, whether vested or unvested, that is outstanding immediately prior to the Effective Time shall, as of the Effective Time, become fully vested and be converted into the right to receive at the Effective Time an amount in cash in U.S. dollars equal to the product of (x) the total number of shares of Company Common Stock subject to such Company Stock Option and (y) the excess, if any, of the amount of the Merger Consideration over the exercise price per share of Company Common Stock subject to such Company Stock Option, with the aggregate amount of such payment rounded to the nearest cent (the aggregate amount of such cash hereinafter referred to as the "Option Consideration") less such amounts as are required to be withheld or deducted under the Code or any provision of U.S. state or local Tax Law with respect to the making of such payment.

36

Source: TRIBUNE CO, 8-K, April 05, 2007

(ii)    At the Effective Time, each right of any kind, contingent or accrued, to receive shares of Company Common Stock or benefits measured in whole or in part by the value of a number of shares of Company Common Stock granted under the Company Stock Plans or Company Benefit Plans (including restricted stock units, phantom units, deferred stock units, stock equivalents and dividend equivalents), other than Restricted Shares (as hereinafter defined), any rights under the Stock Purchase Plan, and Company Stock Options (each, other than Restricted Shares, rights under the Stock Purchase Plan and Company Stock Options, a "Company Stock-Based Award"), whether vested or unvested, which is outstanding immediately prior to the Effective Time shall cease to represent a right or award with respect to shares of Company Common Stock, shall become fully vested and shall entitle the holder thereof to receive, at the Effective Time an amount in cash equal to the Merger Consideration in respect of each Share underlying a particular Company Stock-Based Award (the aggregate amount of such cash, together with the Option Consideration, hereinafter referred to as the "Option and Stock-Based Consideration") less such amounts as are required to be withheld or deducted under the Code or any provision of U.S. state or local Tax Law with respect to the making of such payment.

(iii)    Immediately prior to the Effective Time, each award of restricted Company Common Stock (the "Restricted Shares") shall vest in full and be converted into the right to receive the Merger Consideration as provided in Section 2.1(a), less such amounts as are required to be withheld or deducted under the Code or any provision of U.S. state or local Tax Law with respect to the making of such payment.

(iv)    As soon as practicable following the date of this Agreement, the Board of Directors of the Company (or, if appropriate, any committee of the Board of Directors of the Company administering the Company's Employee Stock Purchase Plan (the "Stock Purchase Plan")) will adopt such resolutions and take such other actions as may be required to provide that with respect to the Stock Purchase Plan: (A) participants in the Stock Purchase Plan may not increase their payroll deductions or purchase election from those in effect on the date of this Agreement, (B) no purchase period will be commenced after the date of this Agreement (it being understood that any purchase period in effect on the date of the Agreement may continue in accordance with its terms), (C) the Stock Purchase Plan shall be terminated effective immediately prior to the Effective Time and (D) the amount of the accumulated contributions of each participant under the Stock Purchase Plan as of immediately prior to the Effective Time shall be refunded to such participant as promptly as practicable following the Effective Time (without interest).

(v)    The Compensation & Organization Committee of the Board of Directors of the Company shall make such adjustments and amendments to or make such determinations with respect to Company Stock Options, Company Stock-Based Awards, Restricted Shares and rights under the Stock Purchase Plan to implement the foregoing provisions of this Section 5.5.

(b)    Employee Matters.

(i)    From and after the Effective Time, the Surviving Corporation shall honor all Company Benefit Plans and compensation arrangements and agreements in accordance

37

with their terms as in effect immediately before the Effective Time (without giving effect to any amendments thereto after the Effective Time except if consented to by the affected party). Notwithstanding any other provision of this Agreement to the contrary, (A) the Surviving Corporation shall provide each current and former employee of the Company and its Subsidiaries other than such employees covered by collective bargaining agreements ("Company Employees") whose employment terminates during the one-year period following the Effective Time with severance benefits at the levels and pursuant to the terms of the Company's severance plans and policies as in effect immediately prior to the Effective Time (it being understood that Company Employees whose severance benefits are otherwise addressed in Section 5.5(b)(iv) of the Company Disclosure Schedule will be governed thereby), and (B) during such one-year period following the Effective Time, severance benefits offered to Company Employees shall be determined without taking into account any reduction after the Effective Time in compensation paid to Company Employees. Except as provided in the last sentence of this Section 5.5(b)(i) or in Section 5.5(b)(iv) or (v), nothing contained in this Agreement shall be construed as requiring the Surviving Corporation to establish, maintain or continue any specific plans. Furthermore, except as provided in the last sentence of this Section 5.5(b)(i) or in Section 5.5(b)(iv) or (v), no provision of this Agreement shall be construed as prohibiting or limiting the ability of the Surviving Corporation to amend, modify or terminate, any plans, programs, policies, arrangements, agreements or understandings of the Surviving Corporation or the Company. Without limiting the scope of Section 8.10, nothing herein shall confer any rights or remedies of any kind or description upon any current or former employee of the Company and its Subsidiaries or any other Person other than the ESOP, the Company and their respective successors and assigns; provided, however, that the last sentence of this Section 5.5(b)(i) shall be enforceable by and on behalf of the beneficiaries of the Company's Transitional Compensation Plan, as in effect as of the date hereof (the "Transitional Compensation Plan"), and their respective successors and assigns. Notwithstanding anything to the contrary contained in this Agreement, the Surviving Corporation shall honor, fulfill and discharge the Company's obligations under the Transitional Compensation Plan, without any amendment or change that is adverse to any beneficiary of such Transitional Compensation Plan.

(ii)    For all purposes (including purposes of vesting, eligibility to participate and level of benefits) under any new employee benefit plans of Surviving Corporation and its Subsidiaries providing benefits to any Company Employees after the Effective Time (the "New Plans"), each Company Employee shall be credited with his or her years of service with the Company and its Subsidiaries and their respective predecessors before the Effective Time, to the same extent as such Company Employee was entitled, before the Effective Time, to credit for such service under any similar Company employee benefit plan in which such Company Employee participated or was eligible to participate immediately prior to the Effective Time; provided that the foregoing shall not apply with respect to benefit accrual under any defined benefit pension plan or to the extent that its application would result in a duplication of benefits with respect to the same period of service. In addition, and without limiting the generality of the foregoing, (A) each Company Employee shall be immediately eligible to participate, without any waiting time, in any and all New Plans to the extent coverage under such New Plan is comparable to a Company Benefit Plan in which such Company Employee participated immediately before the Effective Time (such plans, collectively, the "Old Plans"), and (B) for purposes of each New Plan providing medical, dental, pharmaceutical and/or vision benefits to any Company Employee, all pre-existing condition exclusions and actively-at-work requirements

38

Source: TRIBUNE CO, 8-K, April 05, 2007

of such New Plan shall be waived for such employee and his or her covered dependents, unless such conditions would not have been waived under the comparable Old Plans of the Company or its Subsidiaries in which such employee participated immediately prior to the Effective Time and any eligible expenses incurred by such employee and his or her covered dependents during the portion of the plan year of the Old Plan ending on the date such employee's participation in the corresponding New Plan begins shall be taken into account under such New Plan for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such employee and his or her covered dependents for the applicable plan year as if such amounts had been paid in accordance with such New Plan.

(iii)      The ESOP and the Surviving Corporation each hereby acknowledges that a "change of control" (or similar phrase) within the meaning of the Company Stock Plans and the Company Benefit Plans, as applicable, will occur at or prior to the Effective Time, as applicable.

(iv)      Notwithstanding anything to the contrary contained in this Agreement, the Surviving Corporation agrees to the additional matters set forth on Section 5.5(b)(iv) of the Company Disclosure Schedule.

(v)       Immediately following the Closing, the Surviving Corporation shall adopt an incentive plan in accordance with the term sheet set forth in Section 5.5(b)(v) of the Company Disclosure Schedule.  This Section 5.5(b)(v) shall be enforceable by and on behalf of the beneficiaries of the Transitional Compensation Plan.

Section 5.6      Reasonable Best Efforts.

(a)      Subject to the terms and conditions set forth in this Agreement, each of the Company, the ESOP and Merger Sub shall use (and cause its affiliates to use) its reasonable best efforts (subject to, and in accordance with, applicable Law) to take promptly, or cause to be taken promptly, all actions, and to do promptly, or cause to be done promptly, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Merger and the other transactions contemplated by this Agreement, including (i) the obtaining of all necessary actions or nonactions, waivers, consents and approvals, including the Company Approvals and the ESOP Approvals, from Governmental Entities and the making of all necessary registrations and filings and the taking of all steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Entity, (ii) the obtaining of all necessary consents, approvals or waivers from third parties and all consents, approvals and waivers from third parties reasonably requested by the ESOP to be obtained in respect of the Company Material Contracts in connection with the Merger, this Agreement or the transactions contemplated by this Agreement (it being understood that the failure to receive any such consents, approvals or waivers shall not be a condition to the ESOP's and Merger Sub's obligations hereunder, except with respect to the consents set forth on Section 6.1(d) of the Company Disclosure Schedule), (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Merger or the other transactions contemplated by this Agreement and (iv) the execution and delivery of any additional instruments necessary to consummate the Merger and the other transactions contemplated by this

39

Source: TRIBUNE CO, 8-K, April 05, 2007

Agreement; provided, however, that in no event shall the ESOP, Merger Sub, the Company or any of its Subsidiaries be required to pay prior to the Effective Time any fee, penalty or other consideration to any third party for any consent or approval required for the consummation of the transactions contemplated by this Agreement under any contract or agreement.

(b)        Subject to the terms and conditions herein provided and without limiting the foregoing, the Company and the ESOP shall (i) promptly, (A) but in no event later than fifteen (15) days after the date hereof, make their respective filings and thereafter make any other required submissions under the HSR Act, and (B) but in no event later than thirty (30) days after the date hereof, make their respective filings and thereafter make any other required submissions under the with the FCC to obtain the FCC Order (the "FCC Applications"), (ii) use reasonable best efforts to cooperate with each other in (x) determining whether any filings are required to be made with, or consents, permits, authorizations, waivers or approvals are required to be obtained from, any third parties or other Governmental Entities in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and (y) timely making all such filings and timely seeking all such consents, permits, authorizations or approvals, (iii) use reasonable best efforts to take, or cause to be taken, all other actions and do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective the transactions contemplated hereby, including taking all such further action as reasonably may be necessary to resolve such objections, if any, as the FCC, the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, state antitrust enforcement authorities or competition authorities of any other nation or other jurisdiction or any other person may assert under Regulatory Law (as hereinafter defined) with respect to the transactions contemplated hereby, and to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Entity with respect to the Merger so as to enable the Closing to occur as soon as reasonably possible (and in any event no later than the End Date (as hereinafter defined)), including, without limitation (x) proposing, negotiating, committing to and effecting, by consent decree, hold separate order, trust or otherwise, the sale, divestiture or disposition of such assets or businesses of the ESOP or its Subsidiaries or affiliates or of the Company or its Subsidiaries and (y) otherwise taking or committing to take actions that after the Closing Date would limit the freedom of the ESOP or its Subsidiaries' (including the Surviving Corporation's) or affiliates' freedom of action with respect to, or its ability to retain, one or more of its or its Subsidiaries' (including the Surviving Corporation's) businesses, product lines or assets, in each case as may be required in order to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any suit or proceeding which would otherwise have the effect of preventing or materially delaying the Closing, (iv) promptly inform the other party upon receipt of any material communication from the FCC, the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice or any other Governmental Entity regarding any of the transactions contemplated by this Agreement and (v) subject to applicable legal limitations and the instructions of any Governmental Entity, keep each other apprised of the status of matters relating to the completion of the transactions contemplated thereby, including promptly furnishing the other with copies of notices or other communications received by the Company or the ESOP, as the case may be, or any of their respective Subsidiaries, from any third party and/or any Governmental Entity with respect to such transactions.  The Company and the ESOP shall permit counsel for the other party reasonable opportunity to review in advance, and consider in good faith the views of the other party in connection with, any proposed written

40

communication to any Governmental Entity. Each of the Company and the ESOP agrees not to (A) participate in any substantive meeting or discussion, either in person or by telephone, with any Governmental Entity in connection with the proposed transactions unless it consults with the other party in advance and, to the extent not prohibited by such Governmental Entity, gives the other party the opportunity to attend and participate, (B) extend any waiting period under the HSR Act without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed) or (C) enter into any agreement with any Governmental Entity not to consummate the transactions contemplated by this Agreement without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed).

(c)      In furtherance and not in limitation of the covenants of the parties contained in this Section 5.6, if any administrative or judicial action or proceeding, including any proceeding by a private party, is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as violative of any Regulatory Law, each of the Company and the ESOP shall cooperate in all respects with each other and shall use their respective reasonable best efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the transactions contemplated by this Agreement. Notwithstanding the foregoing or any other provision of this Agreement, nothing in this Section 5.6 shall limit a party's right to terminate this Agreement pursuant to Section 7.1(b) or 7.1(c) so long as such party has, prior to such termination, complied with its obligations under this Section 5.6.

(d)      For purposes of this Agreement, "Regulatory Law" means the Communications Act, the Sherman Act of 1890, the Clayton Antitrust Act of 1914, the HSR Act, the Federal Trade Commission Act of 1914 and all other federal, state or foreign statutes, rules, regulations, orders, decrees, administrative and judicial doctrines and other Laws, including without limitation any antitrust, competition or trade regulation Laws, that are designed or intended to (i) prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition, (ii) regulate media ownership or (iii) protect the national security or the national economy of any nation.

(e)      The ESOP and the Company acknowledge that license renewal applications (each, a "Renewal Application") may be pending before the FCC with respect to one or more Company Stations (each, a "Renewal Station"). In order to avoid disruption or delay in the processing of the FCC Applications, the ESOP and the Company agree, as part of the FCC Applications, to request that the FCC apply its policy permitting the processing of license assignments and transfers in transactions involving multiple markets, notwithstanding the pendency of one or more license renewal applications. The ESOP and the Company agree to make such representations and undertakings as are reasonably necessary or appropriate to invoke such policy, including undertakings to assume the position of applicant with respect to any pending Renewal Application, and to assume the risks relating to such Renewal Application. To the extent reasonably necessary to expedite grant of a Renewal Application, and thereby facilitate grant of the FCC Applications, the ESOP and the Company shall enter into tolling agreements with the FCC with respect to the relevant Renewal Application as reasonably

41

Source: TRIBUNE CO, 8-K, April 05, 2007

necessary or appropriate to extend the statute of limitations for the FCC to determine or impose a forfeiture penalty against such Renewal Station in connection with any pending complaints, investigations, letters of inquiry or other proceedings, including complaints that such Renewal Station aired programming that contained obscene, indecent or profane material (a "Tolling Agreement"). The ESOP and the Company shall consult in good faith with each other prior to entering into any such Tolling Agreement. Section 5.6(e) of the Company Disclosure Schedule sets forth each Renewal Application pending as of the date of this Agreement and describes any challenge, petition or investigation that, to the knowledge of the Company, is pending or threatened by or before the FCC against such Renewal Application.

Section 5.7    Takeover Statute. If any "fair price," "moratorium," "control share acquisition" or other form of antitakeover statute or regulation shall become applicable to the transactions contemplated hereby, each of the Company and the ESOP and the Board of Directors of the Company shall grant such approvals and take such actions as are reasonably necessary so that the transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of such statute or regulation on the transactions contemplated hereby.

Section 5.8    Public Announcements. The Company and the ESOP will consult with and provide each other the reasonable opportunity to review and comment upon any press release or other public statement or comment prior to the issuance of such press release or other public statement or comment relating to this Agreement or the transactions contemplated herein and shall not issue any such press release or other public statement or comment prior to such consultation except as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange. The ESOP and the Company agree to issue a joint press release, together with Tribune Acquisition, announcing this Agreement.

Section 5.9    Indemnification and Insurance.

(a)    For a period of six (6) years from the Effective Time, the Surviving Corporation shall maintain in effect the exculpation, indemnification and advancement of expenses provisions no less favorable than those of the Company's and any Company Subsidiary's certificate of incorporation and by-laws or similar organization documents in effect immediately prior to the Effective Time or in any indemnification agreements of the Company or its Subsidiaries with any of their respective directors, officers or employees in effect immediately prior to the Effective Time, and shall not amend, repeal or otherwise modify any such provisions in any certificate of incorporation, by-laws or similar organizational documents, for a period of six (6) years from the Effective Time, in any manner that would adversely affect the rights thereunder of any individuals who at the Effective Time were current or former directors, officers or employees of the Company or any of its Subsidiaries (it being understood that any indemnification agreement shall remain in effect in accordance with its terms); provided, however, that all rights to indemnification in respect of any Action (as hereinafter defined) pending or asserted or any claim made within such period shall continue until the disposition of such Action or resolution of such claim.

(b)    The Surviving Corporation shall, to the fullest extent permitted under applicable Law, indemnify and hold harmless (and advance funds in respect of each of the

42

foregoing) each current and former director, officer or employee of the Company or any of its Subsidiaries and each person who served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise at the request of the Company, in and to the extent of their capacities as such and not as shareholders and/or equity holders of the Company or its Subsidiaries or otherwise (each, together with such person's heirs, executors or administrators, an "Indemnified Party") against any costs or expenses (including advancing attorneys' fees and expenses in advance of the final disposition of any claim, suit, proceeding or investigation to each Indemnified Party to the fullest extent permitted by law), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative (an "Action"), arising out of, relating to or in connection with any action or omission occurring or alleged to have occurred whether before or after the Effective Time (including acts or omissions in connection with such persons serving as an officer, director or other fiduciary in any entity if such service was at the request or for the benefit of the Company).  In the event of any such Action, the Surviving Corporation shall cooperate with the Indemnified Party in the defense of any such Action.

(c)      For a period of six (6) years from the Effective Time, the Surviving Corporation shall cause to be maintained in effect the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and its Subsidiaries with respect to matters arising on or before the Effective Time; provided, however, that after the Effective Time, the ESOP shall not be required to pay annual premiums in excess of 200% of the last annual premium paid by the Company prior to the date hereof in respect of the coverages required to be obtained pursuant hereto (such 200% amount, the "Maximum Premium"), but in such case shall purchase as much coverage as reasonably practicable for such amount.  At the Company's option, after consultation with the ESOP, the Company may purchase prior to the Effective Time, a six-year prepaid "tail" policy or policies (at an aggregate cost not exceeding the Maximum Premium times six) on terms and conditions providing substantially equivalent benefits as the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and its Subsidiaries with respect to matters arising on or before the Effective Time, covering without limitation the transactions contemplated hereby.  If such "tail" prepaid policy or policies has or have been obtained by the Company prior to the Effective Time, the Surviving Corporation shall cause such policies to be maintained in full force and effect, for its full term, and cause all obligations thereunder to be honored by the Surviving Corporation, and no other party shall have any further obligation to purchase or pay for insurance hereunder.  The Company represents that the Maximum Premium is $7,915,164.

(d)      The Surviving Corporation shall pay all reasonable expenses, including reasonable attorneys' fees, that may be incurred by any Indemnified Party in enforcing the indemnity and other obligations provided in this Section 5.9.

(e)      The rights of each Indemnified Party hereunder shall be in addition to, and not in limitation of, any other rights such Indemnified Party may have under the certificate of incorporation or by-laws or other organization documents of the Company or any of its Subsidiaries or the Surviving Corporation, any other indemnification agreement or arrangement, the DGCL or otherwise.  The provisions of this Section 5.9 shall survive the consummation of

43

the Merger in accordance with their terms and expressly are intended to benefit, and are enforceable by, each of the Indemnified Parties.

(f)        In the event the Surviving Corporation or any of its successors or assigns (i) consolidates with or merges into any other person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any person, then, and in either such case, proper provision shall be made so that the successors and assigns of the Surviving Corporation shall assume the obligations set forth in this Section 5.9.

Section 5.10        Control of Operations.  Nothing contained in this Agreement shall give the ESOP, directly or indirectly, the right to control or direct the Company's operations prior to the Effective Time.  Prior to the Effective Time, the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its operations.

Section 5.11        Financing.

(a)        Section 5.11 of the Company Disclosure Schedule sets forth a true, accurate and complete copy of those certain commitment letters, letter agreements and related fee letters (collectively, the "Debt Commitment Letters"), dated April 1, 2007, from Merrill Lynch Capital Corporation, Citigroup Global Markets Inc. and JPMorgan Securities Inc. to the Company (the "Financing Commitments") pursuant to which, and subject to the terms and conditions thereof, certain lenders have committed to provide the Company with loans in the amounts described therein, the proceeds of which may be used to consummate the Merger, the Offer and the other transactions contemplated hereby (the "Financing").  The Company shall use reasonable best efforts to obtain the Financing on the terms and conditions described in the Financing Commitments, including using reasonable best efforts (i) to negotiate definitive agreements with respect thereto on the terms and conditions contained in the Financing Commitments, (ii) to satisfy on a timely basis all conditions applicable to the Company in such Financing Commitments, including, without limitation, conditions related to the payment of fees and expenses of the lead arrangers, the preparation and delivery to the lead arrangers of offering materials related to the Senior Notes (as defined in the Debt Commitment Letters), and the provision of information relating to the financial and operating results of the Company, (iii) to comply with its obligations under the Financing Commitments and (iv) to enforce its rights under the Financing Commitments.  The Company shall give the ESOP prompt notice upon becoming aware of any material breach by any party of the Financing Commitments or any termination of the Financing Commitments.  Upon reasonable request, the Company shall inform the ESOP in reasonable detail of the status of its efforts to arrange the Financing and shall not permit any amendment or modification to be made to, or any waiver of any material provision or remedy under, the Debt Commitment Letter if such amendment, modification, waiver or remedy reduces the aggregate amount of the Financing, or amends the conditions to the drawdown of the Financing or any other terms thereof in any respect that could be reasonably expected to affect the availability of the Financing or delay the Closing, in each case, in any material respect.  In the event that the Company becomes aware of any event or circumstance that makes procurement of any portion of the Financing unlikely to occur in the manner or from the sources

44

substantially consistent with the Financing Commitments, the Company shall promptly notify the ESOP and shall use reasonable best efforts to arrange any such portion from alternative sources.

(b)      The ESOP will and will cause its Representatives to, at the Company's sole expense, cooperate reasonably with the Company and its authorized Representatives in connection with the arrangement, negotiation and closing of the Financing and the issuance of the Senior Notes (as defined in the Debt Commitment Letters), including (i) participation in a reasonable number of meetings on reasonable advance notice, (ii) furnishing information (including any financial statements) reasonably required to be included in the preparation of offering memoranda, private placement memoranda, prospectuses and similar documents, and (iii) cooperation and assistance in respect of the preparation, negotiation, execution and closing of any underwriting or placement agreements, indentures, credit agreements, pledge and security documents, other definitive financing documents; provided, that, without limiting the obligations of the ESOP under this Section 5.11(b), the ESOP shall not be required to become subject to any obligations relating to such activities prior to the Closing; and provided, further, that any information provided to the Company pursuant to this Section 5.11(b) shall be subject to the applicable Confidentiality Agreement other than information included in any offering memoranda, private placement memoranda, prospectuses and similar documents.

Section 5.12      Specified Divestitures. The Company shall, and/or shall cause one or more of its Subsidiaries to: (a) promptly after the date hereof, use commercially reasonable efforts (at the Company's sole expense) to commence a process by which the Company will or will cause one or more of its Subsidiaries to sell all of the assets or equity or other ownership interests owned or held by the Company and/or any of its Subsidiaries in the businesses identified on Section 5.12 of the Company Disclosure Schedule (the "Divestitures" and each a "Divestiture"), (b) coordinate with the ESOP and its advisors on all material aspects of the sale process and strategy in effecting the Divestitures, including any public announcements related thereto, (c) coordinate with the ESOP and its advisors on all material terms, conditions and obligations of a proposed Divesture, including transaction structure and timing, price, form of consideration, tax considerations, representations and warranties, indemnification obligations and other material terms, conditions and obligations, and (d) provide the ESOP and its advisors with a reasonable opportunity to review and comment upon any material transaction documents related to a proposed Divestiture. Nothing in this Agreement shall be deemed to require the Company to consummate any such Divestiture or to enter into any agreement for such Divestiture that is not conditioned on the closing of the Merger.

Section 5.13      FCC Matters. During the period from the date of this Agreement to the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Article VII, the Company shall, and shall cause each of its Subsidiaries to: (i) comply in all material respects with all material requirements of the FCC applicable to the construction or operation of a Company Station, (ii) promptly deliver to the ESOP copies of any material reports, applications, petitions, objections or responses filed with the FCC with respect to a Company Station, (iii) promptly notify the ESOP of any material inquiry, investigation or proceeding initiated by the FCC relating to a Company Station, (iv) maintain in effect all of the Company FCC Licenses material to the operation of a Company Station and (v) not make or revoke any election with the FCC if such election or revocation would be material and adverse, individually or in the aggregate, to the Company or any of its Subsidiaries.

45

Source: TRIBUNE CO, 8-K, April 05, 2007

Section 5.14    Company Offer.

(a)    As promptly as reasonably practicable after the date hereof, the Company shall commence (within the meaning of Rule 14d-2 under the Exchange Act) a tender offer (as it may be amended from time to time in accordance with this Agreement, the "Offer") to purchase up to approximately 126 million shares of Company Common Stock at a price of $34 per share (such amount, or any different amount per share offered pursuant to the Offer in accordance with the terms of this Agreement, the "Offer Price"). The Offer shall be subject to the conditions set forth in Section 5.14 of the Company Disclosure Schedule. The Company expressly reserves the right (subject to the terms of the Tribune Purchase Agreement) to waive any of the conditions to the Offer and to make any change in the terms of or conditions to the Offer. Subject to the terms and conditions of this Agreement and the Offer, the Offer shall expire at midnight, New York City time, on the date that is 20 business days (for this purpose calculated in accordance with Section 14d-1(g)(3) under the Exchange Act) after the date that the Offer is commenced, unless extended.

(b)    As soon as practicable on the date of commencement of the Offer, the Company shall (i) file with the SEC (A) a Tender Offer Statement on Schedule TO with respect to the Offer (together with all amendments and supplements thereto and including exhibits thereto, the "Schedule TO") that shall include the summary term sheet required thereby and, as exhibits or incorporated by reference thereto, the Offer to Purchase and forms of letter of transmittal and summary advertisement, if any, in respect of the Offer (collectively, together with any amendments or supplements thereto, the "Offer Documents") and (B) a Rule 13E-3 Transaction Statement on Schedule 13E-3 (the "TO Schedule 13E-3"), if required, and (ii) cause the Offer Documents to be disseminated to holders of Company Common Stock. The ESOP and its counsel shall be given a reasonable opportunity to review and comment on the Schedule TO, the Offer Documents and the TO Schedule 13E-3 each time before any such document is filed with the SEC, and the Company shall give reasonable and good faith consideration to any comments made by the ESOP and its counsel.

(c)    If the Offer is not consummated, this Agreement shall nevertheless remain in full force and effect in accordance with the terms hereof, and the Merger shall be consummated in accordance with the terms and subject to the conditions hereof.

Section 5.15    Eagles Exchange. In the event that any shares of Company Common Stock or Series D-1 Preferred Stock are owned or held by the Eagle Entities on any day that is less than 20 business days prior to Closing, the Company shall, and the Company shall cause the Eagle Entities to, (a) enter into an Exchange Agreement substantially in the form attached hereto as Exhibit C, which provides for Eagle New Media and Eagle Publishing to agree, on the terms and subject to the conditions set forth in the form of Exchange Agreement, to exchange (the "Exchange") all of the outstanding Company Common Stock and Series D-1 Preferred Stock held by them for shares of newly designated and issued Series E Preferred Stock, without par value, of the Company (the "Series E Preferred Stock"), with such terms and conditions as are necessary to provide for a fair value exchange and are reflected in a form of Certificate of Designation that will be attached as an exhibit to the Exchange Agreement (the "Certificate of Designation"), and (b) to consummate the Exchange prior to Closing.

46

Source: TRIBUNE CO, 8-K, April 05, 2007

## ARTICLE VI

## CONDITIONS TO THE MERGER

Section 6.1    <u>Conditions to Each Party's Obligation to Effect the Merger</u>. The respective obligations of each party to effect the Merger shall be subject to the fulfillment (or waiver by all parties) at or prior to the Effective Time of the following conditions (<u>provided</u>, <u>however</u>, that neither the ESOP nor Merger Sub shall be permitted to waive any condition hereunder without the express written consent of Tribune Acquisition):

(a)    The Company Shareholder Approval shall have been obtained.

(b)    No restraining order, injunction or other order by any court or other tribunal of competent jurisdiction which prohibits the consummation of the Merger shall have been entered and shall continue to be in effect.

(c)    Any applicable waiting period under the HSR Act shall have expired or been earlier terminated and the FCC Order shall have been obtained.

(d)    The consents and approvals set forth on Section 6.1(d) of the Company Disclosure Schedule shall have been received.

(e)    The Exchange shall have been consummated in accordance with the terms of the Exchange Agreement, unless the Eagle Entities do not then own or hold any shares of Company Common Stock or Series D-1 Preferred Stock as a result of a liquidation, distribution or otherwise.

(f)    All of the conditions precedent to the consummation of the purchase of the Subordinated Note and the Warrant contemplated by the Tribune Purchase Agreement shall have been satisfied or waived (other than consummation of the Merger) such that such purchases shall occur immediately following the consummation of the Merger.

(g)    The Company shall have obtained the Financing on the terms set forth in the Financing Commitments, or alternative financing on substantially similar terms that are not materially more onerous than the terms reflected in such Financing Commitments, sufficient to consummate the Merger and the transactions contemplated by this Agreement.

Section 6.2    <u>Conditions to Obligation of the Company to Effect the Merger</u>. The obligation of the Company to effect the Merger is further subject to the fulfillment of the following conditions:

(a)    The representations and warranties of the ESOP and Merger Sub set forth herein shall be true and correct both when made and at and as of the Closing Date, as if made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" qualifiers set forth therein) would not have, individually or in the aggregate, an ESOP Material Adverse Effect.

47

Source: TRIBUNE CO, 8-K, April 05, 2007

(b)        The ESOP shall have in all material respects performed all obligations and complied with all covenants required by this Agreement to be performed or complied with by it prior to the Effective Time.

(c)        The FCC Order shall not impose any condition on the ESOP, the Company or any Subsidiary of the Company that, individually or in combination with one or more other conditions, would reasonably be expected to have a material adverse effect on the business, assets, financial condition, results of operations on an ongoing basis or continuing operations of the broadcasting business of the Company and its Subsidiaries, taken as a whole.

(d)        The ESOP shall have delivered to the Company a certificate, dated the Effective Time and signed on its behalf by the ESOP Fiduciary, certifying to the effect that the conditions set forth in Sections 6.2(a) and 6.2(b) have been satisfied.

(e)        The Company shall have obtained an opinion from Valuation Research Corporation or another nationally recognized firm reasonably satisfactory to the Company, in form and substance reasonably satisfactory to the Company, as to the solvency of the Company after giving effect to the transactions contemplated by this Agreement (including any financing in connection with the transactions contemplated hereby and including the closing of the transactions contemplated by the Tribune Purchase Agreement and the ESOP Purchase Agreement).

Section 6.3        Conditions to Obligations of the ESOP and Merger Sub to Effect the Merger. The obligations of the ESOP and Merger Sub to effect the Merger is further subject to the fulfillment of the following conditions (provided, however, that neither the ESOP nor Merger Sub shall be permitted to waive any condition hereunder without the express written consent of Tribune Acquisition):

(a)        (i) The representations and warranties of the Company set forth in Section 3.2(a) and (d) shall be true and correct in all material respects, (ii) the representations and warranties of the Company set forth in Sections 3.10(a)(ii) and (b) shall be true and correct in all respects and (iii) the other representations and warranties of the Company set forth herein shall be true and correct both when made and at and as of the Closing Date, as if made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" qualifiers set forth therein) would not have, individually or in the aggregate, a Company Material Adverse Effect.

(b)        The Company shall have in all material respects performed all obligations and complied with all covenants required by this Agreement to be performed or complied with by it prior to the Effective Time.

(c)        The Company shall have delivered to the ESOP a certificate, dated the Effective Time and signed by its Chief Executive Officer or another senior officer, certifying to the effect that the conditions set forth in Sections 6.3(a) and (b) have been satisfied.

48

Source: TRIBUNE CO, 8-K, April 05, 2007

Section 6.4      <u>Frustration of Closing Conditions</u>. Neither the Company nor the ESOP may rely, either as a basis for not consummating the Merger or terminating this Agreement and abandoning the Merger, on the failure of any condition set forth in Sections 6.1, 6.2 or 6.3, as the case may be, to be satisfied if such failure was caused by such party's breach of any provision of this Agreement or failure to use its reasonable best efforts to consummate the Merger and the other transactions contemplated hereby, as required by and subject to Section 5.6.

## ARTICLE VII

## TERMINATION

Section 7.1      <u>Termination or Abandonment</u>. Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated and abandoned at any time prior to the Effective Time, as follows:

(a)      by the mutual written consent of the Company and the ESOP;

(b)      by either the Company or the ESOP if (i) the Effective Time shall not have occurred on or before May 31, 2008 (the "<u>End Date</u>") and (ii) the party seeking to terminate this Agreement pursuant to this Section 7.1(b) shall not have breached in any material respect its obligations under this Agreement in any manner that shall have proximately caused the failure to consummate the Merger on or before such date;

(c)      by either the Company or the ESOP if an injunction, order, decree or ruling shall have been entered permanently restraining, enjoining or otherwise prohibiting the consummation of the Merger and such injunction, order, decree or ruling shall have become final and non-appealable, <u>provided</u> that the party seeking to terminate this Agreement pursuant to this Section 7.1(c) shall have used its reasonable best efforts to remove such injunction, order, decree or ruling; and <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this Section 7.1(c) shall not be available to a party if such final, non-appealable injunction, order, decree or ruling was primarily due to the failure of such party to perform any of its obligations under this Agreement;

(d)      by either the Company or the ESOP if the Company Meeting (including any adjournments or postponements thereof) shall have concluded and the Company Shareholder Approval contemplated by this Agreement shall not have been obtained;

(e)      by the Company, if the Company is not in material breach of any of its representations, warranties, covenants or other agreements contained in this Agreement and if the ESOP shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform by the ESOP (i) would result in a failure of a condition set forth in Section 6.1 or 6.2 and (ii) cannot be cured by the End Date; <u>provided</u> that the Company shall have given the ESOP written notice, delivered at least thirty (30) days prior to such termination, stating the Company's intention to terminate this Agreement pursuant to this Section 7.1(e) and the basis for such termination;

49

(f)        by the ESOP, if the ESOP is not in material breach of any of its representations, warranties, covenants or other agreements contained in this Agreement and if the Company shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform by the Company (i) would result in a failure of a condition set forth in Section 6.1 or 6.3 and (ii) cannot be cured by the End Date; provided that the ESOP shall have given the Company written notice, delivered at least thirty (30) days prior to such termination, stating the ESOP's intention to terminate this Agreement pursuant to this Section 7.1(f) and the basis for such termination;

(g)        by the Company, prior to the Company Shareholder Approval, if the Board of Directors of the Company or the Special Committee determines to accept a Superior Proposal; provided, however, that (i) the Company shall have provided written notice to the ESOP (a "Notice of Superior Proposal") advising the ESOP that the Board of Directors of the Company or the Special Committee has received a Superior Proposal, specifying in writing the material terms and conditions of such Superior Proposal and the identity of the person making the proposal and providing the ESOP with a copy thereof (if in writing), (ii) at least three (3) business days following receipt by the ESOP of the Notice of Superior Proposal, and taking into account any revised proposal made by the ESOP since receipt of the Notice of Superior Proposal, the Board of Directors of the Company or the Special Committee shall have concluded that such Superior Proposal remains a Superior Proposal; provided that during such three (3) business day period, at the ESOP's request, the Company shall cooperate and negotiate with the ESOP in connection with the ESOP's efforts to make such a revised proposal; and provided, further, that in the event of any material change to the terms of such Superior Proposal, the Board of Directors of the Company or the Special Committee shall deliver to the ESOP an additional Notice of Superior Proposal, and the three (3) business day period referenced above shall be extended for an additional forty-eight (48) hours, (iii) the Company shall be in compliance with Section 5.3, (iv) the Board of Directors of the Company shall concurrently approve, and the Company shall concurrently enter into, a definitive agreement providing for the implementation of such Superior Proposal and (v) the Company shall have given the ESOP forty-eight (48) hours' written notice of its intention to terminate this Agreement pursuant to this Section 7.1(g), which notice period may run concurrently with any notice period contemplated by clause (ii) above;

(h)        by the ESOP, prior to the Company Shareholder Approval, if the Board of Directors of the Company has failed to make the Recommendation in the Proxy Statement or has effected a Change of Recommendation in a manner adverse to the ESOP; and

(i)        by the Company, if the consummation of the purchase of Company Common Stock and the Subordinated Exchangeable Note pursuant to the Tribune Purchase Agreement shall not have occurred on or prior to August 17, 2007 or if the Tribune Purchase Agreement is terminated in accordance with its terms prior to the Effective Time.

          In the event of termination of this Agreement pursuant to this Section 7.1, this Agreement shall terminate (except for Article VIII, which shall survive such termination), and there shall be no other liability on the part of the Company, the ESOP or Merger Sub, except as provided in Section 8.20 of the Tribune Purchase Agreement.

50

Source: TRIBUNE CO, 8-K, April 05, 2007

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1        No Survival of Representations and Warranties. None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Merger.

Section 8.2        Expenses. Whether or not the Merger is consummated, all costs and expenses incurred by the Company, the ESOP, the ESOP Fiduciary or Merger Sub in connection with the Merger, this Agreement and the transactions contemplated hereby shall be paid by the Company.

Section 8.3        Counterparts; Effectiveness. This Agreement may be executed in two or more consecutive counterparts (including by facsimile), each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties and delivered (by telecopy or otherwise) to the other parties.

Section 8.4        Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

Section 8.5        Jurisdiction; Enforcement. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware). In addition, each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by the other party hereto or its successors or assigns, shall be brought and determined exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware). Each of the parties hereto hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the aforesaid courts. Each of the parties hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason

51

other than the failure to serve in accordance with this Section 8.5, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by the applicable law, any claim that (i) the suit, action or proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Section 8.6      WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.7      Notices. Any notice required to be given hereunder shall be sufficient if in writing, and sent by facsimile transmission (provided that any notice received by facsimile transmission or otherwise at the addressee's location on any business day after 5:00 p.m. (addressee's local time) shall be deemed to have been received at 9:00 a.m. (addressee's local time) on the next business day), by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows:

>    To the ESOP or Merger Sub:
>
>>    Tribune Employee Stock Ownership Trust
>>    c/o Greatbanc Trust Company, Trustee
>>    1301 West 22nd Street, Suite 702
>>    Oak Brook, Il 60523
>>    Attn: Marilyn Marchetti and Danielle Montesano
>>    Tel: (630) 572-5121 and (630) 572-5120
>>    Fax: (630) 571-0599
>
>    with copies to:
>
>>    K & L Gates
>>    535 Smithfield Street
>>    Pittsburgh, PA 15222
>>    Attn: Charles R. Smith, Esq.
>>    Tel: (412) 355-6536
>>    Fax: (412) 355-6501
>
>    and with additional copies to Tribune Acquisition and its copied parties.
>
>    To the Company:
>
>>    Tribune Company
>>    435 North Michigan Avenue
>>    Chicago, IL 60611

52

Attn: c/o Crane H. Kenney
Senior Vice President, General Counsel & Secretary
Tel: (312) 222-2491
Fax: (312) 222-4206

with copies to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attn: Steven A. Rosenblum and Peter E. Devine
Tel: (212) 403-1000
Fax: (212) 403-2000

and

Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Attn: Thomas A. Cole and Larry A. Barden
Tel: (312) 853-7473 and (312) 853-7785
Fax: (312) 853-7036

and

Skadden, Arps, Slate, Meagher & Flom LLP
Suite 2100
333 West Wacker Drive
Chicago, IL 60606
Attn: Charles W. Mulaney, Jr.
Tel: (312) 407-0700
Fax: (312) 407-0411

and

McDermott, Will & Emery
227 West Monroe Street
Chicago, IL 60606
Attn: William W. Merten
Tel: (312) 984-7647
Fax: (312) 984-7700

To Tribune Acquisition:

EGI-TRB, L.L.C.
c/o Equity Group Investments, L.L.C.
Two North Riverside Plaza, Suite 600

53

Source: TRIBUNE CO, 8-K, April 05, 2007

Chicago, IL 60606
Attn: Joseph M. Paolucci and Marc D. Hauser
Tel: (312) 466-3885 and (312) 466-3281
Fax: (312) 454-0335

with copies to:

Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL 60611
Attn: Joseph P. Gromacki
Tel: (312) 923-2637
Fax: (312) 923-2737

or to such other address as any party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated, personally delivered or mailed. Any party to this Agreement may notify any other party of any changes to the address or any of the other details specified in this paragraph; provided, however, that such notification shall only be effective on the date specified in such notice or five (5) business days after the notice is given, whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

Section 8.8      Assignment; Binding Effect. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

Section 8.9      Severability. Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

Section 8.10     Entire Agreement; Third-Party Beneficiaries. This Agreement (including the exhibits and schedules hereto) and the Confidentiality Agreement constitute the entire agreement, and supersede all other prior agreements and understandings, both written and oral, between the parties, or any of them, with respect to the subject matter hereof and thereof and, except for the provisions of Section 2.1(a), Section 5.5(a), Section 5.5(b)(v), Section 5.9, and the last two sentences of Section 5.5(b)(i), is not intended to and shall not confer upon any person other than the parties hereto any rights or remedies hereunder.

Section 8.11     Amendments; Waivers. At any time prior to the Effective Time, any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by the Company, the ESOP and

54

Source: TRIBUNE CO, 8-K, April 05, 2007

Merger Sub, or in the case of a waiver, by the party against whom the waiver is to be effective; provided, however, that after receipt of Company Shareholder Approval, if any such amendment or waiver shall by applicable Law or in accordance with the rules and regulations of the New York Stock Exchange require further approval of the shareholders of the Company, the effectiveness of such amendment or waiver shall be subject to the approval of the shareholders of the Company. Notwithstanding the foregoing, no failure or delay by the Company or the ESOP in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

Section 8.12      Tribune Acquisition Rights. Notwithstanding anything to the contrary contained herein, it is expressly acknowledged and agreed that neither the ESOP nor Merger Sub may, without the prior written consent of Tribune Acquisition, either (a) waive or amend any provision of this Agreement (including, without limitation, any condition under Section 6.1 or 6.3 hereof), including by the exercise of any consent rights, or (b) agree to, or exercise any right to, terminate this Agreement under Section 7.1(a) or 7.1(h).

Section 8.13      Headings. Headings of the Articles and Sections of this Agreement are for convenience of the parties only and shall be given no substantive or interpretive effect whatsoever. The table of contents to this Agreement is for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14      Interpretation. When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Each of the parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

Section 8.15      No Recourse. This Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against, the entities that are expressly identified as parties hereto and no past, present or future affiliate, director, officer, employee, incorporator, member, manager, partner, stockholder, agent, attorney or Representative of any party hereto shall have any liability for any obligations or liabilities of

55

Source: TRIBUNE CO, 8-K, April 05, 2007

the parties to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

Section 8.16        Definitions.

(a)        References in this Agreement to "Subsidiaries" of any party shall mean any corporation, partnership, association, trust or other form of legal entity of which (i) more than 50% of the outstanding voting securities are on the date hereof directly or indirectly owned by such party, or (ii) such party or any Subsidiary of such party is a general partner (excluding partnerships in which such party or any Subsidiary of such party does not have a majority of the voting interests in such partnership). References in this Agreement (except as specifically otherwise defined) to "affiliates" shall mean, as to any person, any other person which, directly or indirectly, controls, or is controlled by, or is under common control with, such person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise. References in this Agreement (except as specifically otherwise defined) to "person" shall mean an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity, group (as such term is used in Section 13 of the Exchange Act) or organization, including, without limitation, a Governmental Entity, and any permitted successors and assigns of such person. As used in this Agreement, "knowledge" means (i) with respect to the ESOP, the actual knowledge of the individuals listed on Section 8.16(a) of the Company Disclosure Schedule and (ii) with respect to the Company, the actual knowledge of the individuals listed on Section 8.16(a) of the Company Disclosure Schedule. As used in this Agreement, "business day" shall mean any day other than a Saturday, Sunday or a day on which the banks in New York are authorized by law or executive order to be closed. References in this Agreement to specific laws or to specific provisions of laws shall include all rules and regulations promulgated thereunder. Any statute defined or referred to herein or in any agreement or instrument referred to herein shall mean such statute as from time to time amended, modified or supplemented, including by succession of comparable successor statutes.

(b)        Each of the following terms is defined on the pages set forth opposite such term:

| | |
|---|---|
| Action | 43 |
| Additional Per Share Consideration | 4 |
| affiliates | 56 |
| Agreement | 1 |
| Alternative Proposal | 34 |
| Annualized Portion | 4 |
| Book-Entry Shares | 5 |
| business day | 56 |
| Cancelled Shares | 4 |
| Certificate of Designation | 46 |

56

Source: TRIBUNE CO, 8-K, April 05, 2007

Certificate of Merger . . . . . . . . . . 2
Certificates . . . . . . . . . . 5
Change of Recommendation . . . . . . . . . . 33
Closing . . . . . . . . . . 2
Closing Date . . . . . . . . . . 2
Code . . . . . . . . . . 6
Communications Act . . . . . . . . . . 12
Company . . . . . . . . . . 1
Company Approvals . . . . . . . . . . 12
Company Benefit Plans . . . . . . . . . . 17
Company Common Stock . . . . . . . . . . 3
Company Disclosure Schedule . . . . . . . . . . 7
Company Employees . . . . . . . . . . 38
Company FCC Licenses . . . . . . . . . . 15
Company Financial Advisors . . . . . . . . . . 23
Company Joint Venture . . . . . . . . . . 7
Company Material Adverse Effect . . . . . . . . . . 8
Company Material Contracts . . . . . . . . . . 23
Company Meeting . . . . . . . . . . 36
Company Permits . . . . . . . . . . 15
Company Preferred Stock . . . . . . . . . . 9
Company SEC Documents . . . . . . . . . . 13
Company Shareholder Approval . . . . . . . . . . 22
Company Station . . . . . . . . . . 16
Company Stock Option . . . . . . . . . . 36
Company Stock Plans . . . . . . . . . . 9
Company Stock-Based Award . . . . . . . . . . 37
Confidentiality Agreement . . . . . . . . . . 33
control . . . . . . . . . . 56
Debt Commitment Letters . . . . . . . . . . 44
DGCL . . . . . . . . . . 2
Dissenting Shares . . . . . . . . . . 4
Divestiture . . . . . . . . . . 45
Divestitures . . . . . . . . . . 45
Eagle Entities . . . . . . . . . . 8
Eagle New Media . . . . . . . . . . 8
Eagle Publishing . . . . . . . . . . 8
Effective Time . . . . . . . . . . 2
Employees . . . . . . . . . . 21
End Date . . . . . . . . . . 49
Environmental Law . . . . . . . . . . 16
ERISA . . . . . . . . . . 17
ERISA Affiliate . . . . . . . . . . 18
ESOP . . . . . . . . . . 1
ESOP Approvals . . . . . . . . . . 25
ESOP Fiduciary . . . . . . . . . . 1

Source: TRIBUNE CO, 8-K, April 05, 2007

| | |
|---|---|
| ESOP Material Adverse Effect | 24 |
| ESOP Purchase Agreement | 1 |
| Exchange | 46 |
| Exchange Act | 11 |
| Exchange Agreement | 9 |
| Exchange Fund | 5 |
| Existing Credit Agreements | 29 |
| FAA | 15 |
| FCC | 11 |
| FCC Applications | 40 |
| FCC Order | 12 |
| FCC Rules | 12 |
| Financing | 44 |
| Financing Commitments | 44 |
| GAAP | 13 |
| Governmental Entity | 11 |
| Hazardous Substance | 17 |
| HSR Act | 11 |
| Indemnified Party | 43 |
| Information Memorandum | 27 |
| Intellectual Property | 22 |
| Investor Rights Agreement | 1 |
| IRS | 18 |
| knowledge | 56 |
| Law | 14 |
| Laws | 14 |
| Lien | 12 |
| Maximum Premium | 43 |
| Merger | 1 |
| Merger Consideration | 4 |
| Merger Sub | 1 |
| MVPDs | 24 |
| New Credit Agreements | 29 |
| New Plans | 38 |
| Notice of Superior Proposal | 50 |
| Offer | 46 |
| Offer Documents | 46 |
| Offer Price | 46 |
| Old Plans | 38 |
| Option and Stock-Based Consideration | 37 |
| Option Consideration | 36 |
| Paying Agent | 5 |
| Permitted Lien | 13 |
| person | 56 |
| Proxy Statement | 19 |
| Recommendation | 11 |

Source: TRIBUNE CO, 8-K, April 05, 2007

Regulatory Law ............................................................................................................... 41
Release ............................................................................................................................ 17
Renewal Application ...................................................................................................... 41
Renewal Station ............................................................................................................. 41
Representatives .............................................................................................................. 31
Restricted Shares ........................................................................................................... 37
Rights ............................................................................................................................. 20
Rights Agreement .......................................................................................................... 20
Sarbanes-Oxley Act ....................................................................................................... 14
Schedule 13E-3 .............................................................................................................. 19
Schedule TO ................................................................................................................... 46
SEC ................................................................................................................................ 13
Securities Act ................................................................................................................. 13
Series D-1 Preferred Stock ............................................................................................. 9
Series E Preferred Stock ................................................................................................ 46
Share ................................................................................................................................ 3
Special Committee ........................................................................................................... 1
State Commissions ......................................................................................................... 11
Stock Purchase Plan ....................................................................................................... 37
Subordinated Exchangeable Note ................................................................................... 1
Subordinated Note ........................................................................................................... 1
Subsidiaries .................................................................................................................... 56
Superior Proposal ........................................................................................................... 34
Surviving Corporation ..................................................................................................... 2
Tax Return ...................................................................................................................... 21
Taxes .............................................................................................................................. 21
Termination Date ........................................................................................................... 27
TO Schedule 13E-3 ........................................................................................................ 46
Tolling Agreement ......................................................................................................... 42
Transitional Compensation Plan .................................................................................... 38
Tribune Acquisition ......................................................................................................... 1
Tribune Purchase Agreement .......................................................................................... 1
Warrant ............................................................................................................................ 1

59

Source: TRIBUNE CO, 8-K, April 05, 2007

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

> GREATBANC TRUST COMPANY, not in its individual or corporate capacity, but solely as trustee of the TRIBUNE EMPLOYEE STOCK OWNERSHIP TRUST, which forms a part of the TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN
>
> By:  /s/ Marilyn H. Marchetti
>     Name:  Marilyn H. Marchetti
>     Title:  Senior Vice President
>
> TESOP CORPORATION
>
> By:  /s/ Marilyn H. Marchetti
>     Name:  Marilyn H. Marchetti
>     Title:  President
>
> TRIBUNE COMPANY
>
> By:  /s/ Dennis J. FitzSimons
>     Name:  Dennis J. FitzSimons
>     Title:  Chairman, President and
>         Chief Executive Officer
>
> EGI-TRB, L.L.C.
> (solely for the limited purposes of Section 8.12 hereof)
>
> By:  /s/ Philip G. Tinkler
>     Name:  Philip G. Tinkler
>     Title:  Vice President

**Signature Page to the Agreement and Plan of Merger**

Source: TRIBUNE CO, 8-K, April 05, 2007