**Exhibit 10.2**
[EXECUTION COPY]

SECURITIES PURCHASE AGREEMENT

by and among

TRIBUNE COMPANY,

EGI-TRB, L.L.C.

and

SAMUEL ZELL

Dated as of April 1, 2007

Source: TRIBUNE CO, 8-K, April 05, 2007

SECURITIES PURCHASE AGREEMENT

SECURITIES PURCHASE AGREEMENT, dated as of April 1, 2007 (the "Agreement"), among Tribune Company, a Delaware corporation (the "Company"), EGI-TRB, L.L.C., a Delaware limited liability company ("EGI-TRB") and Samuel Zell, as guarantor ("Guarantor").

WITNESSETH:

WHEREAS, concurrently herewith, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee (the "ESOP Fiduciary") of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), the Company and, for limited purposes, EGI-TRB, have entered into that certain Agreement and Plan of Merger (the "Merger Agreement") pursuant to which, subject to the terms and conditions therein, the Merger Sub will be merged with and into the Company (the "Merger"), with the Company surviving the Merger and becoming wholly owned by the ESOP (the "Surviving Corporation").

WHEREAS, capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Merger Agreement.

WHEREAS, concurrently herewith, the Company, EGI-TRB and the ESOP Fiduciary, on behalf of the ESOP, have entered into that certain Investor Rights Agreement (the "Investor Rights Agreement") pursuant to which the parties thereto will have certain rights and obligations, among others, regarding the Surviving Corporation following the Merger.

WHEREAS, concurrently herewith, the Company, EGI-TRB and the ESOP Fiduciary, on behalf of the ESOP, have entered into that certain Registration Rights Agreement (the "Registration Rights Agreement") pursuant to which the Company has granted EGI-TRB and the ESOP certain registration rights.

WHEREAS, pursuant to the terms and subject to the conditions set forth in this Agreement, the Company desires to sell to EGI-TRB, and EGI-TRB desires to purchase from the Company, as soon as practicable following the execution and delivery of this Agreement, (i) an aggregate of 1,470,588 newly-issued shares (the "Purchased Shares") of the Company's common stock, par value $0.01 per share (the "Company Common Stock," which term shall also apply to the common stock, par value $0.01 per share, of the Surviving Corporation following the Merger) and (ii) an unsecured subordinated exchangeable promissory note in the principal amount of $200,000,000, which shall be exchangeable at the option of the Company, or automatically under certain circumstances, into 5,882,353 shares of Company Common Stock (the "Exchangeable Note Shares"), subject to adjustment as provided therein, and otherwise in the form attached hereto as Exhibit A (the "Exchangeable Note").

WHEREAS, pursuant to the terms and subject to the conditions set forth in this Agreement, the Company desires to sell to EGI-TRB, and EGI-TRB desires to purchase from the Company, immediately following the consummation of the Merger, (i) an unsecured

2

Source: TRIBUNE CO, 8-K, April 05, 2007

subordinated promissory note in the principal amount of $225,000,000 and otherwise in the form attached hereto as <u>Exhibit B</u> (the "<u>Note</u>") and (ii) warrants to purchase 43,478,261 shares of Company Common Stock ("<u>Warrants</u>") pursuant to a Warrant Agreement in the form attached hereto as <u>Exhibit C</u> (the "<u>Warrant Agreement</u>").

WHEREAS, the Company and EGI-TRB desire that Samuel Zell be appointed to the Board of Directors of the Company at the First Closing (as defined below), and be elected to serve as the Chairman of the Company's Board of Directors effective as of, and from and after, the Second Closing Date (as defined below).

WHEREAS, the Company, EGI-TRB and Guarantor desire to make certain representations, warranties, covenants and agreements specified herein in connection with this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, the Company, EGI-TRB and Guarantor agree as follows:

## ARTICLE I

### SALE AND PURCHASE

Section 1.1        <u>Sale and Purchase of the Purchased Shares and Exchangeable Note</u>.  On the terms and subject to the conditions set forth in this Agreement, the Company hereby agrees to sell to EGI-TRB at the First Closing (as defined below), and EGI-TRB agrees to purchase from the Company at the First Closing, (a) the Purchased Shares at a price of $34 per share for an aggregate purchase price of $50,000,000 (the "<u>Purchased Shares Purchase Price</u>") and (b) the Exchangeable Note for an aggregate purchase price of $200,000,000 (the "<u>Exchangeable Note Purchase Price</u>").

Section 1.2        <u>Sale and Purchase of the Note and Warrants</u>.  On the terms and subject to the conditions set forth in this Agreement, the Company hereby agrees to sell to EGI-TRB at the Second Closing (as defined below), and EGI-TRB agrees to purchase from the Company at the Second Closing, (i) the Note for an aggregate purchase price of $225,000,000 (the "<u>Note Purchase Price</u>") and (ii) the Warrants for an aggregate purchase price of $90,000,000 (the "<u>Warrants Purchase Price</u>").

## ARTICLE II

### CLOSING DATES; DELIVERIES

Section 2.1        <u>First Closing</u>.

(a)        The closing of the purchase and sale of the Purchased Shares and the Exchangeable Note (the "<u>First Closing</u>") shall take place at the offices of Wachtell, Lipton, Rosen & Katz, 51 West 52 nd Street, New York, New York at 10:00 a.m., local time, on a date to be specified by the parties (the "<u>First Closing Date</u>") which shall be no later than the third business day after the satisfaction or waiver of the conditions set forth in Article VI (other than

3

Source: TRIBUNE CO, 8-K, April 05, 2007

those conditions that by their nature are to be satisfied at the First Closing, but subject to the satisfaction or waiver of such conditions), or at such other place, date and time as the Company, EGI-TRB and Guarantor may agree in writing.

(b)     At the First Closing, (i) the Company shall deliver to EGI-TRB (A) certificates representing the Purchased Shares, (B) the Exchangeable Note, duly executed on behalf of the Company, and (C) the item contemplated to be delivered at the First Closing under clause (c) of Section 6.3 and (ii) EGI-TRB shall deliver to the Company (A) the Purchased Shares Purchase Price and the Exchangeable Note Purchase Price by wire transfer of immediately available funds to an account designated in writing by the Company not later than two business days prior to the First Closing Date, and (B) the item contemplated to be delivered at the First Closing under clause (c) of Section 6.2.

Section 2.2     Second Closing.

(a)     The closing of the purchase and sale of the Note and the Warrants (the "Second Closing") shall take place, subject to the satisfaction or waiver of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Second Closing, but subject to the satisfaction or waiver of such conditions), at the offices of Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York, immediately following the consummation of the Merger (the "Second Closing Date").

(b)     At the Second Closing, (i) the Company shall deliver to EGI-TRB the Note and a copy of the Warrant Agreement, each duly executed on behalf of the Company, and (ii) EGI-TRB shall deliver to the Company (A) the Note Purchase Price and the Warrants Purchase Price by wire transfer of immediately available funds to an account designated in writing by the Company not later than two business days prior to the Second Closing Date, and (B) a copy of the Warrant Agreement, duly executed on behalf of EGI-TRB.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as disclosed in the disclosure schedule delivered by the Company to EGI-TRB and Guarantor immediately prior to the execution of this Agreement (the "Company SPA Disclosure Schedule"), the Company represents and warrants to EGI-TRB and Guarantor as follows:

Section 3.1     Authority; No Violation.

(a)     The Company has all requisite corporate power and authority to enter into and to consummate the transactions contemplated by this Agreement, the Investor Rights Agreement, the Registration Rights Agreement, the Exchangeable Note, the Note and the Warrant Agreement (such agreements and instruments being hereinafter collectively referred to as the "Company Transaction Documents"). The determinations, approvals and resolutions by the Board of Directors of the Company are sufficient to render inapplicable to the Merger the restrictions on "business combinations" contained in Section 203 of the General Corporation Law of the State of Delaware and, to the knowledge of the Company, no "fair price,"

4

Source: TRIBUNE CO, 8-K, April 05, 2007

"moratorium," "control share acquisition," "business combination" or other similar antitakeover statute or regulation enacted under state or Federal laws in the United States applicable to the Company is applicable to EGI-TRB and Guarantor as a result of this Agreement or the Merger Agreement or transactions contemplated hereby or thereby. No other corporate proceedings on the part of the Company are necessary to authorize the Company Transaction Documents or the consummation of the transactions contemplated thereby. This Agreement, the Exchangeable Note, the Investor Rights Agreement and the Registration Rights Agreement have been duly and validly executed and delivered by the Company and, assuming that this Agreement, the Investor Rights Agreement and the Registration Rights Agreement constitute the legal, valid and binding agreements of the other parties thereto, this Agreement, the Exchangeable Note, the Investor Rights Agreement and the Registration Rights Agreement constitute the legal, valid and binding agreements of the Company, enforceable against the Company in accordance with their respective terms. The Note, the Exchangeable Note and the Warrant Agreement, when executed and delivered by the Company, and assuming that the Warrant Agreement constitutes the legal, valid and binding agreement of the other party thereto, will constitute the legal, valid and binding agreements of the Company, enforceable against the Company in accordance with their respective terms.

(b)       The execution, delivery and performance by the Company of the Company Transaction Documents and the consummation of transactions contemplated thereby by the Company do not and will not require any consent, approval, license, authorization, order or permit of, action by, filing with or notification to any Federal, state, local or foreign governmental or regulatory agency, commission, court, body, entity or authority (each, a "<u>Governmental Entity</u>"), other than compliance with the applicable requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>") with respect to the exchange of the Exchangeable Note into Company Common Stock or the exercise of the Warrant for Company Common Stock.

(c)       The execution, delivery and performance by the Company of the Company Transaction Documents and the consummation by the Company of the transactions contemplated thereby do not and will not (i) contravene or conflict with the organizational or governing documents of the Company, any of its Subsidiaries or any Company Joint Ventures, (ii) assuming compliance with the matters referenced in Section 3.1(b), contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Company or any of its Subsidiaries or any of their respective properties or assets, (iii) conflict with, contravene, result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any material obligation or to the loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, any loan, guarantee of indebtedness or credit agreement, note, bond, mortgage, indenture, lease, agreement, contract, instrument, permit, concession, franchise, right or license to which the Company or any of the Company's Subsidiaries is a party or by which any of their respective properties or assets are bound, or (iv) result in the creation of any liens, claims, mortgages, encumbrances, pledges, security interests, equities or charges of any kind (each; a "<u>Lien</u>"), other than any such Lien (A) for Taxes or governmental assessments, charges or claims of payment not yet due, being contested in good faith or for which adequate accruals or reserves have been established on the most recent consolidated balance sheet included in Company SEC Documents filed prior to the date hereof,

5

Source: TRIBUNE CO, 8-K, April 05, 2007

(B) which is a carriers', warehousemen's, mechanics', materialmen's, repairmen's or other similar lien arising in the ordinary course of business, (C) which is disclosed on the most recent consolidated balance sheet of the Company or notes thereto or securing liabilities reflected on such balance sheet or (D) which was incurred in the ordinary course of business since the date of the most recent consolidated balance sheet of the Company (each of the foregoing, a "Permitted Lien"), upon any of the properties or assets of the Company or any of the Company's Subsidiaries, other than, in the case of clauses (ii) and (iii), any such items that would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.2        Authorization.  The Purchased Shares have been duly authorized by the Company, and when the Purchased Shares are issued in accordance with this Agreement against payment therefor, such Purchased Shares will be validly issued, fully paid and nonassessable.  The Company Common Stock issuable upon exercise of the Warrants (the "Warrant Shares") has been duly authorized by the Company, and when the Warrant Shares are issued in accordance with the Warrants against payment therefor, such Warrant Shares will be validly issued, fully paid and nonassessable.  The Exchangeable Note Shares have been duly authorized by the Company, and when they are issued in accordance with the terms of the Exchangeable Note, such Exchangeable Note Shares will be validly issued, fully paid and nonassessable.  None of the Purchased Shares, the Exchangeable Note Shares or the Warrant Shares will be issued in violation of the preemptive or other similar rights of any securityholder of the Company nor will they trigger any anti-dilution or similar rights under any instrument or agreement to which the Company is subject or bound.

Section 3.3        Finders or Brokers.  Except for Morgan Stanley & Co. Incorporated, Merrill Lynch & Co., Inc. and Citigroup Global Markets Inc. (the "Company Financial Advisors"), neither the Company nor any of its Subsidiaries has employed any investment banker, broker or finder in connection with the transactions contemplated by this Agreement who might be entitled to any fee or any commission in connection with or upon consummation of the transactions contemplated hereby.  The Company has made available to EGI-TRB an accurate and complete summary of the fee arrangements with the Company Financial Advisors.

Section 3.4        Private Placement.  Subject to the accuracy of EGI-TRB's representations set forth in this Agreement, the offer, sale and issuance of the Purchased Shares, the Exchangeable Note, the Note and the Warrants as contemplated by this Agreement are exempt, and the issuance of the Warrant Shares upon the exercise of the Warrants and the Exchangeable Note Shares upon exchange of the Exchangeable Note will be exempt, from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act").

Section 3.5        Rights Plan.  The Board of Directors of the Company has resolved to, and the Company promptly after the execution of this Agreement will, take all action necessary to render the rights to purchase shares of Series A Junior Participating Preferred Stock of the Company, issued pursuant to the terms of the Rights Agreement, dated as of December 12, 1997, as amended, between the Company and Computershare Trust Company, N.A. (formerly First Chicago Trust Company of New York), as Rights Agent, inapplicable to the execution and operation of this Agreement, the Merger Agreement and the transactions contemplated thereby.

6

Source: TRIBUNE CO, 8-K, April 05, 2007

Section 3.6        Merger Agreement Representations and Warranties.  Reference is hereby made to the representations and warranties of the Company set forth in Sections 3.1, 3.2, 3.4 through 3.12, and 3.14 through 3.25 of the Merger Agreement (the "Merger Agreement Representations and Warranties").  The Company hereby makes, subject to the qualifications set forth in the introduction to Article III of the Merger Agreement, each of such Merger Agreement Representations and Warranties to EGI-TRB and Guarantor as if each of such Merger Agreement Representations and Warranties were hereinafter set forth in full.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF EGI-TRB AND GUARANTOR**

EGI-TRB and Guarantor jointly and severally represent and warrant to the Company as follows:

Section 4.1        Qualification, Organization, Subsidiaries, etc.  EGI-TRB is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite limited liability company power and authority to own, lease, hold and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing in each jurisdiction where the ownership, leasing, holding or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay or materially impair the ability of EGI-TRB to consummate the transactions contemplated by this Agreement (a "EGI-TRB Material Adverse Effect").

Section 4.2        Authority; No Violation.

(a)        Each of EGI-TRB and Guarantor has all requisite power and authority to enter into and to consummate the transactions contemplated by this Agreement, the Investor Rights Agreement, the Registration Rights Agreement and the Warrant Agreement (such agreements being hereinafter collectively referred to as the "EGI-TRB Transaction Documents").  The execution and delivery of the EGI-TRB Transaction Documents and the consummation of the transactions contemplated thereby have been duly and validly authorized by Guarantor and by the sole member of EGI-TRB, and no other limited liability company proceedings on the part of EGI-TRB are necessary to authorize the EGI-TRB Transaction Documents or the consummation of the transactions contemplated thereby.  This Agreement has been duly and validly executed and delivered by EGI-TRB and Guarantor and, assuming this Agreement constitutes the legal, valid and binding agreement of the other parties thereto, this Agreement constitutes the legal, valid and binding agreement of EGI-TRB and Guarantor, enforceable against EGI-TRB and Guarantor in accordance with its terms.  The Investor Rights Agreement and the Registration Rights Agreement have been duly and validly executed and delivered by EGI-TRB and, assuming the Investor Rights Agreement and the Registration Rights Agreement constitute the legal, valid and binding agreements of the other parties thereto, the Investor Rights Agreement and the Registration Rights Agreement constitute the legal, valid and binding agreements of EGI-TRB, enforceable against EGI-TRB in accordance with their respective

7

Source: TRIBUNE CO, 8-K, April 05, 2007

terms. The Warrant Agreement, when executed and delivered by EGI-TRB, and assuming that the Warrant Agreement constitutes the legal, valid and binding agreement of the other party thereto, will constitute the legal, valid and binding agreement of EGI-TRB, enforceable against EGI-TRB in accordance with its terms.

(b)       The execution, delivery and performance by EGI-TRB and Guarantor of the EGI-TRB Transaction Documents to which they are parties and the consummation of the transactions contemplated thereby by EGI-TRB and Guarantor do not and will not require any consent, approval, license, authorization, order or permit of, action by, filing with or notification to any Governmental Entity, other than compliance with the applicable requirements of the HSR Act with respect to the exchange of the Exchangeable Note into Company Common Stock or the exercise of the Warrant for Company Common Stock.

(c)       The execution, delivery and performance by EGI-TRB and Guarantor of the EGI-TRB Transaction Documents to which they are parties and the consummation by EGI-TRB and Guarantor of the transactions contemplated thereby do not and will not (i) contravene or conflict with the organizational or governing documents of EGI-TRB, (ii) assuming compliance with the matters referenced in Section 4.2(b), contravene or conflict with or result in violation of any provision of any Law binding upon or applicable to EGI-TRB or Guarantor or any of their respective properties or assets, or (iii) result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any material obligation or to the loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, any loan, guarantee of indebtedness or credit agreement, note, bond, mortgage, indenture, lease, agreement, contract, instrument, permit, concession, franchise, right or license to which EGI-TRB or Guarantor is a party or by which any of their properties or assets are bound, or (iv) result in the creation of any Lien (other than Permitted Liens) upon any of the properties or assets of EGI-TRB or Guarantor, other than, in the case of clause (ii) through (iv), any such items that would not, individually or in the aggregate, reasonably be expected to have an EGI-TRB Material Adverse Effect.

Section 4.3       Finders or Brokers. Except for J.P. Morgan Chase, neither EGI-TRB, nor any of its Subsidiaries nor Guarantor has employed any investment banker, broker or finder in connection with the transactions contemplated by this Agreement who is entitled to any fee or any commission in connection with or upon consummation of the transactions contemplated hereby.

Section 4.4       Lack of Ownership of Company Common Stock. Except as contemplated by this Agreement, neither EGI-TRB, nor any of its Subsidiaries nor Guarantor beneficially owns or, since December 31, 2006 has beneficially owned, directly or indirectly, any shares of Company Common Stock or other securities convertible into, exchangeable into or exercisable for shares of Company Common Stock. Except for the Voting and Proxy Agreements entered into in connection with, and contemplated by, the Merger Agreement, there are no voting trusts or other agreements or understandings to which EGI-TRB, any of its Subsidiaries or Guarantor is a party with respect to the voting of the capital stock or other equity interest of the Company or any of its Subsidiaries.

8

Section 4.5        Accredited Investor.

(a)        Each of EGI-TRB and Guarantor is a financially sophisticated investor and is an "accredited investor" (as defined in Rule 501 of Regulation D under the Securities Act) that is experienced in financial matters. Each of EGI-TRB and Guarantor understands that the securities purchased hereunder have not been registered under the Securities Act.

(b)        EGI-TRB is aware that it must bear the economic risk of the investment contemplated by this Agreement for an indefinite period of time since, in the view of the Securities and Exchange Commission, the statutory basis for exemption from registration under the Securities Act would not be present if such representation meant merely that the present intention of EGI-TRB is to hold these securities for a deferred sale or for any fixed period in the future. EGI-TRB can afford to bear such economic risk and can afford to suffer the complete loss of its investment hereunder.

(c)        EGI-TRB is purchasing the securities to be purchased hereunder (including securities to be acquired on exercise or exchange of securities purchased hereunder) for its own account, for investment purposes only and not with a view to, or for resale in connection with, the distribution or other disposition thereof or with any present intention of distributing or reselling any portion thereof in violation of the Securities Act or any other applicable securities law.

(d)        EGI-TRB acknowledges that (i) it has been provided with such information as it deems necessary to evaluate the merits and risks of investing in the securities contemplated by this Agreement (including, without limitation, financial and other information regarding the Company), (ii) has read and understands the restrictions and limitations set forth in this Agreement, and (iii) has been afforded the opportunity to ask such questions as it deemed necessary, and to receive answers from, representatives of the Company concerning the merits and risk of investing in such securities.

Section 4.6        No Additional Representations.

(a)        Each of EGI-TRB and Guarantor acknowledges that it and its officers, employees, accountants, consultants, legal counsel, financial advisors, prospective financing sources and agents and other representatives (collectively, "Representatives") have received access to such books and records, facilities, equipment, contracts and other assets of the Company which it and its Representatives have desired or requested to review, and that it and its Representatives have had full opportunity to meet with the management of the Company and to discuss the business and assets of the Company.

(b)        Each of EGI-TRB and Guarantor acknowledges that neither the Company nor any other person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company furnished or made available to EGI-TRB, Guarantor or their Representatives except as expressly set forth in or incorporated by reference into Article III, and neither the Company nor any other person shall be subject to any liability to EGI-TRB or any other person resulting from the Company's making available to EGI-TRB or EGI-TRB's use of such information.

9

Source: TRIBUNE CO, 8-K, April 05, 2007

Section 4.7    Absence of Arrangements with Management.  Other than this Agreement, the Merger Agreement, the other EGI-TRB Transaction Documents and the agreements contemplated hereby and thereby, as of the date hereof, there are no contracts, undertakings, commitments, agreements or obligations between EGI-TRB or Guarantor or any of their affiliates, on the one hand, and any member of the Company's management or Board of Directors, on the other hand, relating to the transactions contemplated by this Agreement, the Merger Agreement and the other EGI-TRB Transaction Documents after the Effective Time.

Section 4.8    Available Funds.  EGI-TRB or Guarantor has available, or will have available, (a) at the First Closing, all funds necessary for the payment of the Purchased Shares Purchase Price and the Exchangeable Note Purchase Price, (b) at the Second Closing, all funds necessary for the payment of the Note Purchase Price and the Warrants Purchase Price, and (c) funds that are otherwise sufficient for the satisfaction of all of EGI-TRB's and Guarantor's obligations under this Agreement.

Section 4.9    FCC Matters.  Each of EGI-TRB and Guarantor is legally, financially and otherwise qualified to acquire control of the Company under the Communications Act and the FCC Rules, and is legally, financially and otherwise qualified under the Communications Act and the FCC Rules to acquire and hold its interest in Surviving Corporation and, through its interest in Surviving Corporation, an indirect interest in the Company FCC Licenses as proposed in and pursuant to the terms of this Agreement.  This representation shall not be deemed an acknowledgment that EGI-TRB or Guarantor will acquire control of the Company or the Surviving Corporation by virtue of the transactions contemplated by this Agreement.

**ARTICLE V**

**COVENANTS AND AGREEMENTS**

Section 5.1    Agreement to Vote.  EGI-TRB irrevocably and unconditionally hereby agrees that from and after the date hereof until the earlier of (a) the consummation of the Merger and (b) any date of termination of the Merger Agreement in accordance with its terms (the "Expiration Time"), at any meeting (whether annual or special and each adjourned or postponed meeting) of the Company's shareholders, however called, or in connection with any written consent of the Company's shareholders, EGI-TRB will (i) appear at such meeting or otherwise cause its Owned Shares (as defined below) to be counted as present thereat for purposes of calculating a quorum and (ii) vote or cause to be voted (including by written consent, if applicable) all of the Company Common Stock beneficially owned, or whose vote is otherwise controlled by proxy or otherwise, by EGI-TRB, including, for the avoidance of doubt, the Purchased Shares (the "Owned Shares"), (A) for approval and adoption of the Merger Agreement, whether or not recommended by the Company's Board of Directors, and the transactions contemplated by the Merger Agreement,  (B) against any agreement, amendment of any agreement (including the Company's certificate of incorporation or by-laws), or any other action that is intended or would reasonably be expected to prevent, impede, or, in any material respect, interfere with, delay, postpone or discourage the transactions contemplated by the Merger Agreement, other than those specifically contemplated by this Agreement, the Merger

10

Source: TRIBUNE CO, 8-K, April 05, 2007

Agreement or the other agreements contemplated thereby and (C) against any action, agreement, transaction or proposal that would result in a breach of any representation, warranty, covenant, agreement or other obligation of the Company in this Agreement, the Merger Agreement or the ESOP Purchase Agreement.

Section 5.2     Restrictions on Transfers.

(a)     Except as necessary to comply with Section 5.12, EGI-TRB hereby agrees that, from the date hereof until the third anniversary of the First Closing Date, it shall not and shall not offer to, directly or indirectly, sell, assign, give, mortgage, pledge, hypothecate, hedge, issue, bequeath or in any manner encumber or dispose of, or permit to be sold, assigned, encumbered, attached or otherwise disposed of in any manner, whether voluntarily, involuntarily or by operation of law, with or without consideration, the Exchangeable Note or any Purchased Shares or Exchangeable Note Shares (collectively, "Transfer") other than pursuant to this Agreement or the Merger Agreement (including in the Merger but not including the Offer contemplated by the Merger Agreement) and except that after the first to occur of the termination of this Agreement, the termination of the Merger Agreement or the consummation of the Merger, EGI-TRB may make Transfers to Permitted Transferees after compliance with the last sentence of this Section 5.2(a).  Guarantor and EGI-TRB hereby agree that, from the date hereof until the third anniversary of the First Closing Date, no membership or other interest in EGI-TRB shall be issued or otherwise Transferred, directly or indirectly, and any such issuance or Transfer occurring thereafter shall comply with Section 5.12; provided, however, that in the event of Guarantor's death prior to the third anniversary of the First Closing Date, the membership or other interests of Guarantor in EGI-TRB may be Transferred subject to Section 5.12 in accordance with Guarantor's estate.  For purposes of this Section 5.2(a), "Permitted Transferee" shall mean any direct or indirect affiliate of EGI-TRB, Equity Group Investments, L.L.C. or Samuel Zell; any direct or indirect member of EGI-TRB and any direct or indirect affiliate thereof; any senior employee of Equity Group Investments, L.L.C. and any direct or indirect affiliate thereof; and Samuel Zell and his spouse, lineal ancestors and descendants (whether natural or adopted), any trust or retirement account primarily for the benefit of Samuel Zell and/or his spouse, lineal ancestors and descendants and any private foundation formed by Samuel Zell.  Prior to any Transfer pursuant to this Section 5.2(a), each Permitted Transferee shall enter into an agreement in form and substance reasonably satisfactory to the Company agreeing to be bound by the provisions of this Agreement as if it were the transferor.

(b)     The certificates for the Purchased Shares and the Exchangeable Note Shares, if and when issued, will be imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER APPLICABLE STATE SECURITIES LAWS, AND ARE BEING OFFERED AND SOLD PURSUANT TO AN EXEMPTION FROM THOSE LAWS THAT LIMITS THE DISPOSITION AND THE TRANSFER OF THE SECURITIES.  THEREFORE, THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THOSE TRANSFER LIMITATIONS.  THE SECURITIES MAY NOT BE TRANSFERRED UNLESS, IN THE OPINION OF COUNSEL TO THE COMPANY, REGISTRATION UNDER THE ACT OR APPLICABLE STATE

11

SECURITIES LAWS IS NOT REQUIRED OR UNLESS THE SECURITIES ARE SO REGISTERED."

Section 5.3        Irrevocable Proxy.  EGI-TRB hereby revokes any and all previous proxies granted with respect to its Owned Shares.  Subject to the last two sentences of this Section 5.3, EGI-TRB hereby irrevocably appoints the Company or its designee as EGI-TRB's agent, attorney and proxy, to vote (or cause to be voted) its Owned Shares in favor of approval of the Merger Agreement, the Merger and the transactions contemplated by the Merger Agreement, as applicable, and otherwise in accordance with Section 5.1 hereof.  This proxy is irrevocable and coupled with an interest and is granted in consideration of EGI-TRB and the Company entering into this Agreement, the ESOP and the Company entering into the ESOP Purchase Agreement and the Company, the ESOP, Merger Sub and EGI-TRB entering into the Merger Agreement.  In the event that EGI-TRB fails for any reason to vote its Owned Shares in accordance with the requirements of Section 5.1 hereof, then the proxyholder shall have the right to vote such EGI-TRB's Owned Shares in accordance with the provisions of the second sentence of this Section 5.3.  The vote of the proxyholder shall control in any conflict between the vote by the proxyholder of EGI-TRB's Owned Shares and a vote by EGI-TRB of its Owned Shares.  Notwithstanding the foregoing, the proxy granted by EGI-TRB shall be automatically revoked upon termination of this Agreement in accordance with its terms.

Section 5.4        Inconsistent Agreements.  EGI-TRB hereby agrees that it shall not enter into any agreement, contract or understanding with any person prior to the termination of the Merger Agreement directly or indirectly to vote, grant a proxy or power of attorney or give instructions with respect to the voting of EGI-TRB's Owned Shares in any manner which is inconsistent with this Agreement.

Section 5.5        Information.  EGI-TRB hereby agrees that all information provided to it or its Representatives in connection with the EGI-TRB Transaction Documents and the Merger Agreement and the consummation of the transactions contemplated hereby and thereby shall be deemed to be Evaluation Material, as such term is used in, and shall be treated in accordance with, the Confidentiality Agreement.

Section 5.6        Filings.  The Company and EGI-TRB shall each use their reasonable best efforts to take or cause to be taken such actions as may be required by them to be taken under the Exchange Act or any other federal securities Laws, and under any applicable state securities or "blue sky" Laws, in connection with the Merger and the transactions contemplated to the Filings or the Merger Agreement and the Company Transaction Documents, including with respect to the Schedule TO, the Offer Documents, the TO Schedule 13E-3, the Proxy Statement and the Schedule 13E-3 (collectively, and together with any other filings required in connection therewith, the "Filings").  EGI-TRB shall provide the Company with any information for inclusion in the Filings which may be required under applicable Law and/or which is reasonably requested by the Company.  The Company shall notify EGI-TRB of the receipt of comments of the SEC and of any request from the SEC for amendments or supplements to the Filings or for additional information, and will promptly supply EGI-TRB with copies of all correspondence between the Company or its Representatives, on the one hand, and the SEC or members of its staff, on the other hand, with respect to the Filings or the Merger.  Each of the Company and EGI-TRB shall use its respective reasonable best efforts to resolve all SEC

12

comments with respect to the Filings as promptly as practicable after receipt thereof. Each of the Company and EGI-TRB agree to correct any information provided by it for use in the Filings which shall have become false or misleading. If at any time prior to the Company Meeting any event should occur which is required by applicable Law to be set forth in an amendment of, or a supplement to, the Proxy Statement or the Schedule 13E-3, the Company will promptly inform EGI-TRB. In such case, the Company, with the cooperation of EGI-TRB, will, upon learning of such event, promptly prepare and file such amendment or supplement with the SEC to the extent required by applicable Law and shall mail such amendment or supplement to the Company's shareholders to the extent required by applicable Law; provided, however, that prior to such filing, the Company shall consult with EGI-TRB with respect to such amendment or supplement and shall afford EGI-TRB and its Representatives reasonable opportunity to comment thereon.

Section 5.7    Reasonable Best Efforts.

(a)    Subject to the terms and conditions set forth in this Agreement, each of the Company and EGI-TRB shall use (and cause its affiliates to use) its reasonable best efforts (subject to, and in accordance with, applicable Law) to take promptly, or cause to be taken promptly, all actions, and to do promptly, or cause to be done promptly, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Merger and the transactions contemplated by this Agreement, including (i) the obtaining of all necessary actions or nonactions, waivers, consents and approvals, including the Company Approvals and the ESOP Approvals, from Governmental Entities and the making of all necessary registrations and filings and the taking of all steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Entity, (ii) the obtaining of all necessary consents, approvals or waivers from third parties and all consents, approvals and waivers from third parties reasonably requested by EGI-TRB to be obtained in respect of the Company Material Contracts in connection with the Merger, this Agreement or the transactions contemplated by this Agreement (it being understood that the failure to receive any such consents, approvals or waivers shall not be a condition to EGI-TRB's obligations hereunder), (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Merger or the transactions contemplated by this Agreement, (iv) the execution and delivery of any additional instruments necessary to consummate the Merger and the transactions contemplated by this Agreement and (v) the obtaining of the Financing on the terms and conditions described in the Financing Commitments; provided, however, that in no event shall EGI-TRB, the Company or any of their Subsidiaries be required to pay prior to the Effective Time any fee, penalty or other consideration to any third party for any consent or approval required for the consummation of the transactions contemplated by this Agreement under any contract or agreement. Guarantor covenants and agrees to the matters set forth on Section 5.7(a) of the Company SPA Disclosure Schedule.

(b)    Subject to the terms and conditions herein provided and without limiting the foregoing, the Company and EGI-TRB shall (i) promptly, (A) but in no event later than fifteen (15) days after the date hereof, make their respective filings and thereafter make any other required submissions under the HSR Act, and (B) but in no event later than thirty (30) days after the date hereof, make their respective filings and thereafter make any other required submissions with the FCC to obtain the FCC Order (the "FCC Applications"), (ii) use reasonable best efforts

13

to cooperate with each other in (x) determining whether any filings are required to be made with, or consents, permits, authorizations, waivers or approvals are required to be obtained from, any third parties or other Governmental Entities in connection with the execution and delivery of this Agreement, the Merger Agreement or the consummation of the transactions contemplated thereby and (y) timely making all such filings and timely seeking all such consents, permits, authorizations or approvals, (iii) use reasonable best efforts to take, or cause to be taken, all other actions and do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective the Merger and transactions contemplated by this Agreement, including taking all such further action as reasonably may be necessary to resolve such objections, if any, as the FCC, the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, state antitrust enforcement authorities or competition authorities of any other nation or other jurisdiction or any other person may assert under Regulatory Law with respect to the Merger or transactions contemplated by this Agreement, and to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Entity with respect to the Merger or transactions contemplated by this Agreement, so as to enable the First Closing, the Second Closing and the Effective Time to occur as soon as reasonably possible (and in any event no later than the First Closing End Date (as hereinafter defined), in the case of the First Closing, and no later than the End Date, in the case of the Second Closing and the Effective Time), including, without limitation (x) proposing, negotiating, committing to and effecting, by consent decree, hold separate order, trust or otherwise, the sale, divestiture or disposition of such assets or businesses of EGI-TRB or its Subsidiaries or affiliates or of the Company or its Subsidiaries and (y) otherwise taking or committing to take actions that after the Effective Time would limit the freedom of EGI-TRB or its Subsidiaries' (including the Surviving Corporation's) or affiliates' freedom of action with respect to, or its ability to retain, one or more of its or its Subsidiaries' (including the Surviving Corporation's) businesses, product lines or assets, in each case as may be required in order to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any suit or proceeding which would otherwise have the effect of preventing or materially delaying the Closing, (iv) promptly inform the other party upon receipt of any material communication from the FCC, the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice or any other Governmental Entity regarding any of the transactions contemplated by this Agreement and (v) subject to applicable legal limitations and the instructions of any Governmental Entity, keep each other apprised of the status of matters relating to the completion of the transactions contemplated thereby, including promptly furnishing the other with copies of notices or other communications received by the Company or EGI-TRB, as the case may be, or any of their respective Subsidiaries, from any third party and/or any Governmental Entity with respect to such transactions. The Company and EGI-TRB shall permit counsel for the other party reasonable opportunity to review in advance, and consider in good faith the views of the other party in connection with, any proposed written communication to any Governmental Entity. Each of the Company and EGI-TRB agrees not to (A) participate in any substantive meeting or discussion, either in person or by telephone, with any Governmental Entity in connection with the proposed transactions unless it consults with the other party in advance and, to the extent not prohibited by such Governmental Entity, gives the other party the opportunity to attend and participate, (B) extend any waiting period under the HSR Act without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed) or (C) enter into any agreement with any

14

Governmental Entity not to consummate the transactions contemplated by this Agreement without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed).

(c)    In furtherance and not in limitation of the covenants of the parties contained in this Section 5.7, if any administrative or judicial action or proceeding, including any proceeding by a private party, is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement or the Merger Agreement as violative of any Regulatory Law, each of the Company and EGI-TRB shall cooperate in all respects with each other and shall use their respective reasonable best efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the transactions contemplated by this Agreement. Notwithstanding the foregoing or any other provision of this Agreement, nothing in this Section 5.7 shall limit a party's right to terminate this Agreement pursuant to Section 8.19(b) or 8.19(f) or EGI-TRB's right to terminate this Agreement pursuant to Section 8.19(g) so long as such party has, prior to such termination, complied with its obligations under this Section 5.7.

(d)    EGI-TRB and the Company acknowledge that license renewal applications (each, a "Renewal Application") may be pending before the FCC with respect to one or more Company Stations (each, a "Renewal Station"). In order to avoid disruption or delay in the processing of the FCC Applications, EGI-TRB and the Company agree, as part of the FCC Applications, to request that the FCC apply its policy permitting the processing of license assignments and transfers in transactions involving multiple markets, notwithstanding the pendency of one or more license renewal applications. EGI-TRB and the Company agree to make such representations and undertakings as are reasonably necessary or appropriate to invoke such policy, including undertakings to assume the position of applicant with respect to any pending Renewal Application, and to assume the risks relating to such Renewal Application. To the extent reasonably necessary to expedite grant of a Renewal Application, and thereby facilitate grant of the FCC Applications, EGI-TRB and the Company shall enter into tolling agreements with the FCC with respect to the relevant Renewal Application as reasonably necessary or appropriate to extend the statute of limitations for the FCC to determine or impose a forfeiture penalty against such Renewal Station in connection with any pending complaints, investigations, letters of inquiry or other proceedings, including complaints that such Renewal Station aired programming that contained obscene, indecent or profane material (a "Tolling Agreement"). EGI-TRB and the Company shall consult in good faith with each other prior to entering into any such Tolling Agreement.

Section 5.8    Control of Operations. Nothing contained in this Agreement shall by its terms give EGI-TRB or Guarantor, directly or indirectly, the right to control or direct the Company's operations.

Section 5.9    Shareholder Litigation. The Company shall give EGI-TRB the opportunity to participate, subject to a customary joint defense agreement, in, but not control, the defense or settlement of any shareholder litigation against the Company or its directors or officers relating to the transactions contemplated by this Agreement or the Merger Agreement; provided, however, that no such settlement for an amount in excess of available insurance

15

Source: TRIBUNE CO, 8-K, April 05, 2007

coverage shall be agreed to without the consent of EGI-TRB, which consent shall not be unreasonably withheld or delayed.

Section 5.10    Merger Agreement Covenants.  Reference is hereby made to the covenants of the Company set forth in Sections 2.1(e) [Dissenters' Rights]; 5.1 [Conduct of Business by the Company], 5.2 [Investigation], 5.3 [No Solicitation], 5.4 [Proxy Statement; Company Meeting], Section 5.5 [Stock Options and Other Stock-Based Awards; Employee Matters], 5.11 [Financing], 5.12 [Specified Divestitures], 5.13 [FCC Matters], 5.14 [Company Offer], Section 5.15 [Eagles Exchange] and in the provisos to Section 7.1(g) of the Merger Agreement.  The Company hereby makes each of such covenants to EGI-TRB and Guarantor as if each such covenant were hereinafter set forth in full, with references therein to the ESOP being changed to references to EGI-TRB and Guarantor.  EGI-TRB and Guarantor agree that all information provided to it or its Representatives pursuant to Section 5.2 of the Merger Agreement as incorporated herein shall be deemed to be Evaluation Material, as such term is used in, and shall be treated in accordance with, the Confidentiality Agreement.  With respect to the Offer, in addition to the covenants set forth in Section 5.14 of the Merger Agreement, the Company agrees that without the prior written consent of EGI-TRB, no change will be made to the Offer that changes the form of consideration to be paid pursuant to the Offer, increases the Offer Price or the number of Company Shares sought in the Offer, or waives any of the conditions to the Offer set forth in Section 5.14 of the Company Disclosure Schedule.

Section 5.11    Board Appointment.  The Company agrees to cause Samuel Zell to be appointed to its Board of Directors effective as of the First Closing Date, and be elected to serve as the Chairman of the Company's Board of Directors effective as of, and from and after, the Second Closing Date, in each case if he is willing and able to serve in such capacity.  In connection therewith, the Company agrees to appoint Mr. Zell to the class of directors whose terms expire the furthest from the date of this Agreement and to use its reasonable best efforts to enable Mr. Zell to serve as the Chairman of the Board until at least the third anniversary of the date of this Agreement, in each case, if he is willing and able to serve in such capacity.

Section 5.12    S-Corporation Eligibility.  Guarantor represents, warrants and covenants that, as of the date hereof and at all times during the term of this Agreement, each of the successors-in-interest to any membership or other interest in EGI-TRB in the event of Guarantor's death are and will all be eligible to hold interests in an S-Corporation and, in the aggregate, will not exceed twenty such eligible successors.  For purposes of this Section 5.12, all eligible successors treated as a single shareholder pursuant to Section 1361(c)(1) of the Code shall be treated as a single eligible successor.

## ARTICLE VI

## CONDITIONS TO THE FIRST CLOSING

Section 6.1    Conditions to Each Party's Obligation to Effect the First Closing.  The respective obligations of each party to consummate the transactions contemplated by the First Closing shall be subject to the fulfillment (or waiver by all parties) at or prior to the First Closing of the following conditions:

16

(a)        No restraining order, injunction or other order by any court or other tribunal of competent jurisdiction which prohibits the consummation of the transactions contemplated by the First Closing shall have been entered and shall continue to be in effect.

(b)        Any applicable waiting period under the HSR Act with respect to the acquisition of the Purchased Shares and the Exchangeable Note Shares shall have expired or been earlier terminated.

Section 6.2        Conditions to Obligation of the Company to Effect the First Closing. The obligation of the Company to effect the transactions contemplated by the First Closing is further subject to the fulfillment of the following conditions:

(a)        The representations and warranties of EGI-TRB and Guarantor set forth herein shall be true and correct both when made and at and as of the First Closing Date, as if made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" qualifiers set forth therein) would not have, individually or in the aggregate, an EGI-TRB Material Adverse Effect.

(b)        EGI-TRB and Guarantor shall have in all material respects performed all obligations and complied with all covenants required by this Agreement to be performed or complied with by them prior to the First Closing.

(c)        EGI-TRB shall have delivered to the Company a certificate, dated the date of the First Closing and signed by its Chief Executive Officer or another senior officer, and Guarantor shall have delivered to the Company a certificate, dated the date of the First Closing, in each case certifying to the effect that the conditions set forth in Sections 6.2(a) and 6.2(b) have been satisfied.

Section 6.3        Conditions to Obligations of EGI-TRB to Effect the First Closing. The obligations of EGI-TRB to effect the transactions contemplated by the First Closing is further subject to the fulfillment of the following conditions:

(a)        (i) The representations and warranties of the Company set forth in Sections 3.1 through 3.5 shall be true and correct, (ii) the representations and warranties of the Company set forth in Section 3.2(a) and (d) of the Merger Agreement and incorporated herein by reference shall be true and correct in all material respects, (iii) the representations and warranties of the Company set forth in Sections 3.10(a)(ii) and (b) of the Merger Agreement and incorporated herein by reference shall be true and correct in all respects and (iv) the other representations and warranties of the Company set forth in the Merger Agreement, to the extent incorporated herein by reference, shall be true and correct, in each case both when made and at and as of the First Closing Date, as if made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such date), except in the case of clauses (i) and (iv) where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" qualifiers set forth therein) would not have, individually or in the aggregate, a Company Material Adverse Effect.

17

Source: TRIBUNE CO, 8-K, April 05, 2007

(b)      The Company shall have in all material respects performed all obligations and complied with all covenants required by this Agreement to be performed or complied with by it prior to the First Closing.

(c)      The Company shall have delivered to EGI-TRB a certificate, dated the date of the First Closing and signed by its Chief Executive Officer or another senior officer, certifying to the effect that the conditions set forth in Sections 6.3(a) and 6.3(b) have been satisfied.

            (d)      The Merger Agreement shall have not been terminated in accordance with its terms by any of the parties thereto.

            (e)      The Purchased Shares and the Exchangeable Note Shares shall have been authorized for listing on the New York Stock Exchange, subject to official notice of issue.

## ARTICLE VII

### CONDITIONS TO THE SECOND CLOSING

Section 7.1      Conditions to Each Party's Obligation to Effect the Second Closing.  The respective obligations of each party to consummate the transactions contemplated by the Second Closing shall be subject to the fulfillment (or waiver by all parties) at or prior to the Second Closing of the following conditions:

(a)      No restraining order, injunction or other order by any court or other tribunal of competent jurisdiction which prohibits the consummation of the transactions contemplated by the Second Closing shall have been entered and shall continue to be in effect.

(b)      The Merger shall have occurred.

(c)      Samuel Zell shall have been elected as the Chairman of the Board, if he is willing and able to serve in such capacity, as of the Second Closing Date.

## ARTICLE VIII

### MISCELLANEOUS

Section 8.1      Merger Agreement; Exchange Agreement.  The Company agrees that it will not amend, waive, or otherwise modify (including by the exercise of any consent rights) any provision of, or any of the rights and obligations under, the Merger Agreement.  The Company further agrees that it will not amend, waive obligations under, or otherwise modify (including by the exercise of any consent rights) or terminate the Exchange Agreement or the ESOP Purchase Agreement.

Section 8.2      Takeover Statute.  If any "fair price," "moratorium," "control share acquisition" or other form of antitakeover statute or regulation shall become applicable to the transactions contemplated hereby, each of the Company and EGI-TRB and, if applicable, the

18

Source: TRIBUNE CO, 8-K, April 05, 2007

members of their respective Boards of Directors shall grant such approvals and take such actions as are reasonably necessary so that the transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of such statute or regulation on the transactions contemplated hereby.

Section 8.3        Public Announcements.  The Company and EGI-TRB will consult with and provide each other the reasonable opportunity to review and comment upon any press release or other public statement or comment prior to the issuance of such press release or other public statement or comment relating to this Agreement or the transactions contemplated herein and shall not issue any such press release or other public statement or comment prior to such consultation except as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange.  EGI-TRB and the Company agree to issue, together with the ESOP, a joint press release announcing this Agreement.

Section 8.4        Termination of Representations and Warranties.  The representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall terminate if and when the First Closing occurs; provided, that the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall be deemed to survive solely for the purposes of determining whether any of the termination fee provisions of Section 8.20 have been triggered.  Nothing in this Agreement shall be deemed to be a waiver by EGI-TRB of any rights it may have against the Company pursuant to Rule 10b-5 under the Exchange Act in connection with the transactions contemplated hereby.

Section 8.5        Expenses.  Except as set forth in Section 8.20, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring or required to incur such expenses; provided, however, that:

(a)        After consummation of the First Closing, the Company shall pay to EGI-TRB an amount equal to EGI-TRB's Expenses incurred through and including the fifteenth (15th) day after the consummation of the First Closing for which EGI-TRB has not theretofore been reimbursed by the Company; provided that such Expenses shall not exceed $2.5 million.  The term "Expenses" includes all reasonable out-of-pocket expenses (including all fees and expenses of financing sources, counsel, accountants, investment bankers, experts and consultants to EGI-TRB and any of its affiliates) incurred by EGI-TRB or on its behalf in connection with or related to the authorization, preparation, negotiation, execution, performance and completion of this Agreement and the transactions contemplated hereby.  Such payment shall be made not later than two (2) business days after delivery to the Company of a documented itemization setting forth in reasonable detail all previously unreimbursed Expenses of EGI-TRB (which itemization may be supplemented and updated from time to time by EGI-TRB until the fifteenth (15th) day after consummation of the First Closing).

(b)        After consummation of the Second Closing, the Company shall pay to EGI-TRB an amount equal to EGI-TRB's Expenses incurred from and after the fifteenth (15th) day after the consummation of the First Closing through and including the fifteenth (15th) day after the consummation of the Second Closing for which EGI-TRB has not theretofore been reimbursed by the Company pursuant to Section 8.5(a); provided that such Expenses shall not exceed $2.5 million.  Such payment shall be made not later than two (2) business days after

19

Source: TRIBUNE CO, 8-K, April 05, 2007

delivery to the Company of a documented itemization setting forth in reasonable detail all previously unreimbursed Expenses of EGI-TRB (which itemization may be supplemented and updated from time to time by EGI-TRB until the fifteenth (15th) day after consummation of the Second Closing).

(c)    In the event that either party initiates any action or proceeding to enforce its rights under this Agreement and prevails in such action or proceeding, such party shall be entitled to recover its costs and reasonable attorneys' fees from the other party with respect to such action or proceeding.

Section 8.6    Counterparts; Effectiveness.  This Agreement may be executed in two or more consecutive counterparts (including by facsimile), each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties and delivered (by telecopy or otherwise) to the other party.

Section 8.7    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

Section 8.8    Jurisdiction; Enforcement.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware). In addition, each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by the other party hereto or its successors or assigns, shall be brought and determined exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware). Each of the parties hereto hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the aforesaid courts. Each of the parties hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment

20

or otherwise) and (c) to the fullest extent permitted by the applicable law, any claim that (i) the suit, action or proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject mater hereof, may not be enforced in or by such courts.

Section 8.9     WAIVER OF JURY TRIAL.   EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.10     Notices.  Any notice required to be given hereunder shall be sufficient if in writing, and sent by facsimile transmission (provided that any notice received by facsimile transmission or otherwise at the addressee's location on any business day after 5:00 p.m. (addressee's local time) shall be deemed to have been received at 9:00 a.m. (addressee's local time) on the next business day, by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows:

To EGI-TRB:

EGI-TRB, L.L.C.
c/o Equity Group Investments, L.L.C.
Two North Riverside Plaza, Suite 600
Chicago, IL 60606
Attn: Joseph M. Paolucci and Marc D. Hauser
Tel: (312) 466-3885 and (312) 466-3281
Fax: (312) 454-0335

with copies to:

Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL 60611
Attn: Joseph P. Gromacki
Tel: (312) 923-2637
Fax: (312) 923-2737

To the Company:

Tribune Company
435 North Michigan Avenue
Chicago, IL 60611
Attn: c/o Crane H. Kenney
Senior Vice President, General Counsel & Secretary
Tel: (312) 222-2491
Fax: (312) 222-4206

21

Source: TRIBUNE CO, 8-K, April 05, 2007

with copies to:

    Wachtell, Lipton, Rosen & Katz
    51 West 52nd Street
    New York, NY 10019
    Attn: Steven A. Rosenblum and Peter E. Devine
    Tel: (212) 403-1000
    Fax: (212) 403-2000


    and

    Sidley Austin LLP
    One South Dearborn Street
    Chicago, Illinois 60603
    Attention:  Thomas A. Cole and Larry A. Barden
    Tel: (312) 853-7473 and (312) 853-7785
    Fax: (312) 853-7036

    and

    Skadden, Arps, Slate, Meagher & Flom LLP
    Suite 2100
    333 West Wacker Drive
    Chicago, Illinois 60606
    Attn: Charles W. Mulaney, Jr.
    Tel: (312) 407-0700
    Fax: (312) 407-0411

or to such other address as any party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated, personally delivered or mailed.  Any party to this Agreement may notify any other party of any changes to the address or any of the other details specified in this paragraph; provided, however, that such notification shall only be effective on the date specified in such notice or five (5) business days after the notice is given, whichever is later.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

Section 8.11    Assignment; Binding Effect.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other party.  Subject to the preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, beneficiaries, executors, successors and assigns.

Section 8.12    Severability.  Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the

22

extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

Section 8.13    Entire Agreement; No Third-Party Beneficiaries.  This Agreement (including the exhibits and schedules hereto), the Merger Agreement, the Investor Rights Agreement, the Registration Rights Agreement and the Confidentiality Agreement, dated as of November 8, 2006, between the Company and Equity Group Investments, L.L.C., constitute the entire agreement, and supersede all other prior agreements and understandings, both written and oral, between the parties, or any of them, with respect to the subject matter hereof and thereof and is not intended to and shall not confer upon any person other than the parties hereto any rights or remedies hereunder.

Section 8.14    Amendments; Waivers.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by the Company and EGI-TRB, or in the case of a waiver, by the party against whom the waiver is to be effective.  Notwithstanding the foregoing, no failure or delay by the Company or EGI-TRB in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

Section 8.15    Headings.  Headings of the Articles and Sections of this Agreement are for convenience of the parties only and shall be given no substantive or interpretive effect whatsoever.

Section 8.16    Interpretation.  When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.  Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  Each of the parties has participated in the drafting and negotiation of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

23

Source: TRIBUNE CO, 8-K, April 05, 2007

Section 8.17      No Recourse. This Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against, the entities that are expressly identified as parties hereto and no past, present or future affiliate, director, officer, employee, incorporator, member, manager, partner, stockholder, agent, attorney or Representative of any party hereto shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

Section 8.18      Guarantee.

(a)      Guarantor absolutely, unconditionally and irrevocably guarantees (the "Guarantee") to the Company each and every representation, warranty, covenant and agreement of EGI-TRB and the full and timely observance, payment, performance and discharge of its obligations under the provisions of the EGI-TRB Transaction Documents (the "Obligations") and not of their collectibility only. This Guarantee shall remain in force and effect until performance in full of all the Obligations, and is in no way conditioned upon any requirement that the Company first attempt to collect any of the Obligations from EGI-TRB or resort to any collateral security or other means of obtaining payment.

(b)      If any of the Obligations have become irrecoverable from or unenforceable against EGI-TRB in whole or in part by reason of EGI-TRB's insolvency, bankruptcy or reorganization, or if the collection or enforcement of any of the Obligations shall be stayed, or the Obligations shall be discharged, in each case in any insolvency, bankruptcy or reorganization of EGI-TRB, this Guarantee shall notwithstanding any of the preceding nevertheless be binding on Guarantor and the enforceability of this Guarantee in accordance with its terms shall not be affected thereby.

(c)      Guarantor waives promptness, diligence, presentment, demand, protest, notice of acceptance, any right to require the marshalling of assets of EGI-TRB, and all suretyship defenses generally. Without limiting the generality of the foregoing, Guarantor agrees that its obligations hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure of the Company to assert any claim or demand or to enforce any right or remedy against EGI-TRB; (ii) the addition, substitution or release of any entity or other person primarily or secondarily liable for any Obligation; (iii) the adequacy of any other means the Company may have of obtaining repayment of any of the Obligations; or (iv) other acts or omissions which might in any manner or to any extent vary the risk of Guarantor or otherwise operate as a release or discharge of Guarantor. The agreements and waivers of Guarantor set forth above in this Section 8.18(c) shall not operate to waive, affect or impair (x) any of the rights of EGI-TRB under the Merger Agreement, this Agreement or any of the other EGI-TRB Transaction Documents, including but not limited to any right to receive notice, or prejudice any right of the Obligor to assert any defense, counterclaim or setoff otherwise applicable to any of the Obligations, or (y) any right of Guarantor to receive notice under the Merger Agreement, this Agreement or any of the other Transaction Documents. The Obligations shall be determined in accordance with the provisions of the Merger Agreement, this Agreement or any of the other EGI-TRB Transaction Documents. Without limiting the generality of the foregoing, (A) if an Obligation is compromised in accordance with the provisions of the Merger

24

Agreement, this Agreement or any of the other EGI-TRB Transaction Documents, such Obligation shall be compromised for purposes of this Guarantee, and (B) if EGI-TRB is entitled to assert a defense, counterclaim or right of setoff to an Obligation in accordance with the provisions of the Merger Agreement, this Agreement or any of the other EGI-TRB Transaction Documents, Guarantor shall be entitled to assert the same defense, counterclaim or right of offset under this Guarantee.

(d)        Until the final payment and performance in full of all of the Obligations, Guarantor shall not exercise and hereby waives any rights against EGI-TRB arising as a result of payment by Guarantor hereunder, by way of subrogation, reimbursement, restitution, contribution or otherwise, and will not file or assert any claim in competition with the Company in respect of any payment hereunder in any bankruptcy, insolvency or reorganization case or proceedings of any nature involving EGI-TRB, nor will Guarantor assert any setoff, recoupment or counterclaim to any of its obligations hereunder in respect of any liability of EGI-TRB to Guarantor.

Section 8.19        Termination.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated and abandoned at any time prior to the First Closing or the Second Closing as follows:

(a)        by the mutual written consent of the Company and EGI-TRB;

(b)        by either the Company or EGI-TRB if an injunction, order, decree or ruling shall have been entered permanently restraining, enjoining or otherwise prohibiting the consummation of the Merger or the transactions contemplated hereby and such injunction, order, decree or ruling shall have become final and non-appealable;

(c)        by either the Company or EGI-TRB upon termination of the Merger Agreement in accordance with its terms;

(d)        by the Company, if EGI-TRB or Guarantor shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i)(A) would result in a failure of a condition set forth in Section 6.1 or 6.2 and (B) cannot be cured by the First Closing End Date (as hereinafter defined), or (ii)(A) would result in a failure of a condition set forth in Section 7.1 and (B) cannot be cured by the End Date, provided that the Company shall have given EGI-TRB written notice, delivered at least thirty (30) days prior to such termination, stating the Company's intention to terminate this Agreement pursuant to this Section 8.19(d) and the basis for such termination;

(e)        by the EGI-TRB, if the Company shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i)(A) would result in a failure of a condition set forth in Section 6.1 or 6.3 and (B) cannot be cured by the First Closing End Date, or (ii)(A) would result in a failure of a condition set forth in Section 7.1 and (B) cannot be cured by the End Date, provided that EGI-TRB shall have given the Company written notice,

25

Source: TRIBUNE CO, 8-K, April 05, 2007

delivered at least thirty (30) days prior to such termination, stating EGI-TRB's intention to terminate this Agreement pursuant to this Section 8.19(e) and the basis for such termination;

(f)      by either the Company or EGI-TRB if (i) the First Closing shall not have occurred on or before August 17, 2007 (the "First Closing End Date") and (ii) the party seeking to terminate this Agreement pursuant to this Section 8.19(f) shall not have breached in any material respect its obligations under this Agreement in any manner that shall have proximately caused the failure to consummate the purchase and sale of the Purchased Shares and the Exchangeable Note on or before such date;

(g)      by EGI-TRB if (i) the Merger shall not have occurred by the End Date and (ii) EGI-TRB shall not have breached in any material respect its obligations under this Agreement in any manner that shall have proximately caused the failure to consummate the Merger on or before such date;

(h)      by EGI-TRB, prior to the Company Shareholder Approval, if the Board of Directors of the Company has failed to make the Recommendation in the Proxy Statement or has effected a Change of Recommendation in a manner adverse to EGI-TRB;

(i)      by EGI-TRB if the Company Meeting (including any adjournments or postponements thereof) shall have concluded and the Company Shareholder Approval shall not have been obtained; and

(j)      by EGI-TRB if the Board of Directors of the Company or the Special Committee determines to accept a Superior Proposal.

In the event of termination of this Agreement pursuant to this Section 8.19, this Agreement shall terminate (except for the provisions of Section 5.2 (excluding references to Section 5.12 contained therein) and this Article VIII, each of which shall survive such termination in accordance with its terms), and there shall be no other liability on the part of the Company, EGI-TRB or Guarantor.

Section 8.20      Termination Fees.

(a)      In the event that (i) any of the representations or warranties of the Company contained in this Agreement or the Merger Agreement, as applicable, was materially false when made or the Company shall have failed to perform in any material respect any of its covenants or other agreements contained in this Agreement or the Merger Agreement, as applicable, and, as a result thereof, (A) EGI-TRB terminates this Agreement pursuant to Section 8.19(e), (B) EGI-TRB terminates this Agreement pursuant to Section 8.19(c) where the Merger Agreement has been terminated pursuant to Section 7.1(f) thereof, or (C) EGI-TRB terminates this Agreement pursuant to Section 8.19(g) and such materially false representation or warranty of the Company or such failure by the Company to perform in any material respect any of such covenants was the proximate cause of the failure of the Merger to close by the End Date, (ii) the Company or EGI-TRB terminates this Agreement pursuant to Section 8.19(c) where the Merger Agreement has been terminated pursuant to Section 7.1(g) or Section 7.1(h) thereof or EGI-TRB terminates this Agreement pursuant to Section 8.19(h) or 8.19(j), or (iii) after the date of this

26

Source: TRIBUNE CO, 8-K, April 05, 2007

Agreement, any bona fide Alternative Proposal (substituting for purposes of this Section 8.20(a) 50% for the 20% thresholds set forth in the definition of "Alternative Proposal" in the Merger Agreement) (a "Qualifying Transaction") is publicly proposed or publicly disclosed prior to the time of the Company Meeting and not permanently abandoned prior to the time of the Company Meeting, and the Company or EGI-TRB terminates this Agreement pursuant to Section 8.19(c) where the Merger Agreement has been terminated pursuant to Section 7.1(d) thereof or EGI-TRB terminates this Agreement pursuant to Section 8.19(i), and, within twelve (12) months after any such termination, the Company enters into any Qualifying Transaction, then in any such event set forth in clauses (i), (ii) or (iii) above, the Company shall pay to EGI-TRB a fee of $25 million in cash (the "Company Termination Fee"). Payment of the Company Termination Fee shall be made five (5) business days after termination of this Agreement under the circumstances described in clauses (i) or (ii) of the preceding sentence or within five (5) business days after the entering into of the Qualifying Transaction under the circumstances described in clause (iii) of the preceding sentence. In no event shall the Company be required to pay the Company Termination Fee on more than one occasion.

(b)        In the event that any of EGI-TRB's or Guarantor's representations or warranties contained in this Agreement was materially false when made or EGI-TRB or Guarantor shall have failed to perform in any material respect any of its covenants or other agreements contained in this Agreement and, as a result thereof, (A) the Company terminates this Agreement pursuant to Section 8.19(d), or (B) the Company terminates this Agreement pursuant to Section 8.19(c) where the Merger Agreement has been terminated pursuant to Section 7.1(b) thereof and such materially false representation or warranty of EGI-TRB or Guarantor or such failure by EGI-TRB or Guarantor to perform in any material respect any of such covenants was the proximate cause of the failure of the Merger to close by the End Date, then in any such event EGI-TRB shall pay to the Company a fee of $25 million in cash (the "EGI-TRB Termination Fee"). EGI-TRB shall also pay to the Company the EGI-TRB Termination Fee if (i) this Agreement is terminated by the Company or EGI-TRB pursuant to Section 8.19(c), (ii) the primary factor leading to the underlying termination of the Merger Agreement was the failure to satisfy the financing condition set forth in Section 6.1(g) of the Merger Agreement and (iii) the failure to satisfy the financing condition set forth in Section 6.1(g) of the Merger Agreement was not the result of the breach or failure by the Company or the ESOP to perform in any material respect any of their respective covenants or other agreements contained in this Agreement, the Merger Agreement or the Debt Commitment Letters, as applicable, or any of the other documents delivered by either the Company or the ESOP in connection therewith, or the result of the Company's or the ESOP's representations or warranties contained in any such agreements or documents having been materially false when made. Payment of the EGI-TRB Termination Fee shall be made five (5) business days after termination of this Agreement under the circumstances described in either of the two preceding sentences. In no event shall EGI-TRB be required to pay the EGI-TRB Termination Fee on more than one occasion.

(c)        Each of the parties hereto acknowledges that the agreements contained in this Section 8.20 are an integral part of the transactions contemplated by this Agreement and that none of the fees contemplated under this Section 8.20 is a penalty, but rather is liquidated damages in a reasonable amount that will compensate EGI-TRB or the Company, as the case may be, for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the

27

transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.  Notwithstanding anything to the contrary in this Agreement, and except as otherwise provided in the next succeeding sentence, (i) the Company's right to receive payment of the EGI-TRB Termination Fee pursuant to this Section 8.20 shall be the exclusive remedy of the Company against EGI-TRB for (A) the loss suffered as a result of the failure of the transactions contemplated hereby or by Merger Agreement to be consummated and (B) any other losses, damages, obligations or liabilities suffered as a result of or under this Agreement and the transactions contemplated hereby, and upon payment of the EGI-TRB Termination Fee in accordance with this Section 8.20, neither EGI-TRB nor any of its equityholders, partners, members, directors, officers or agents, as the case may be, shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby (except as provided for in the Confidentiality Agreement); and (ii) EGI-TRB's right to receive payment of the Company Termination Fee pursuant to this Section 8.20 shall be the exclusive remedy of EGI-TRB for (A) the loss suffered as a result of the failure of the transactions contemplated hereby or by the Merger Agreement to be consummated and (B) any other losses, damages, obligations or liabilities suffered as a result of or under this Agreement and the transactions contemplated hereby, and upon payment of the Company Termination Fee in accordance with this Section 8.20, neither the Company nor any of its stockholders, directors, officers or agents, as the case may be, shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby (except as provided for in the Confidentiality Agreement).  If the Company fails to pay EGI-TRB any amounts due to EGI-TRB pursuant to this Section 8.20 within the time periods specified in this Section 8.20 or EGI-TRB fails to pay the Company any amounts due to the Company pursuant to this Section 8.20 within the time periods specified in this Section 8.20, the Company or EGI-TRB, as applicable, shall pay the costs and expenses (including reasonable legal fees and expenses) incurred by EGI-TRB or the Company, as applicable, in connection with any action, including any lawsuit, taken to collect payment of such amounts, together with interest on such unpaid amounts at the prime lending rate prevailing during such period as published in *The Wall Street Journal*, calculated on a daily basis from the date such amounts were required to be paid until the date of actual payment.

*     *     *     *

28

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

**EGI-TRB, L.L.C.**

By:  /s/ Philip G. Tinkler
      Name: Philip G. Tinkler
      Title:  Vice President

**SAMUEL ZELL**

/s/ Samuel Zell

**TRIBUNE COMPANY**

By:  /s/ Dennis J. FitzSimons
      Name: Dennis J. FitzSimons
      Title:  Chairman, President and
             Chief Executive Officer

**Signature Page to the Securities Purchase Agreement**

Source: TRIBUNE CO, 8-K, April 05, 2007

Exhibit 10.3

EXHIBIT A
[FINAL FORM]

### SUBORDINATED EXCHANGEABLE PROMISSORY NOTE

[            ], 2007                                                                                                    $200,000,000.00

Tribune Company, a Delaware corporation located at 435 North Michigan Avenue, Chicago, Illinois 60611 ("**Maker**"), for value received, hereby promises to pay to the order of EGI-TRB, L.L.C., a Delaware limited liability company located at Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606 (the "**Holder**") or its successors or permitted assigns, the principal amount of TWO HUNDRED MILLION DOLLARS ($200,000,000.00) (the "**Original Principal Amount**") together with interest thereon calculated from the date hereof in accordance with the provisions of this Subordinated Exchangeable Promissory Note (this "**Note**"). This Note is being issued pursuant to that certain Securities Purchase Agreement by and among Maker, Holder and Sam Zell, as guarantor, entered into in connection with that certain Agreement and Plan of Merger by and among GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "**ESOP**"), Tesop Corporation and Maker and, for the limited purposes set forth therein, the Holder (the "**Merger Agreement**"). Capitalized terms used and not otherwise defined herein shall have the meaning given to such terms in the Merger Agreement.

1.    Payments.

(a)    Interest on the unpaid principal amount of this Note outstanding from time to time shall accrue at the rate of 4.81% *per annum* calculated on the basis of a 365-day year and the actual number of days elapsed in any year (the "**Interest Rate**"), or (if less) at the highest rate then permitted under applicable law. Interest on the unpaid principal amount hereunder shall be payable in-kind on the last day of each calendar quarter beginning            , 2007 (each, a "**Payment Date**") and, subject to earlier acceleration or exchange under Section 4, ending on, and including, the Maturity Date (as defined below), through the issuance of additional Notes ("**PIK Notes**"). Such PIK Notes shall be in an aggregate principal amount equal to the amount of interest that has accrued with respect to this Note (less any cash interest payments), and such PIK Notes shall be identical to this Note, except that such PIK Notes shall not include the provisions of Section 4 hereof but shall provide that the provisions of Section 4 of this Note will operate to reduce the principal amount of such PIK Notes and otherwise have the effect on such PIK Notes as is set forth in Section 4 hereof. Except as expressly provided herein, the term "**Note**" shall include all PIK Notes that may be issued pursuant to this Section 1(a) and all references to the principal amount or principal outstanding under this Note shall include the principal amount of the PIK Notes.

(b)    Payments of principal outstanding under this Note shall be made as follows:

(i)    immediately prior to consummation of the Merger (the date of consummation of the Merger is referred to herein as the "**Maturity Date**"), Maker shall pay the outstanding principal amount of this Note, together with all accrued and unpaid interest hereon, and any costs and expenses incurred by Holder in connection herewith; and

(ii)      to the extent not prohibited by the terms of Section 2 hereof, at any time and from time to time, Maker may prepay, without premium or penalty, all or any portion of the outstanding principal amount of this Note, any such prepayment to be applied first, to all accrued but unpaid interest on this Note and second, to outstanding principal.

(c)      If any payment is due, or any time period for giving notice or taking action expires, on a day which is a Saturday, Sunday or legal holiday in the State of New York, the payment shall be due and payable on, and the time period shall automatically be extended to, the next business day immediately following such Saturday, Sunday or legal holiday, and interest shall continue to accrue at the required rate hereunder until any such payment is made. Except as provided in Section 1(a) above, all payments to be made to the Holder shall be made in the lawful money of the United States of America in immediately available funds, free and clear of all taxes and charges whatsoever. Payments shall be delivered to the Holder at the address set forth above or to such other address or to the attention of such other person as specified by prior written notice to Maker or by wire transfer pursuant to wire instructions as specified by prior written notice to Maker.

2.      Subordination.

(a)      The Subordinated Obligations (as defined below) are subordinate and junior in right of payment to all Senior Obligations (as defined below). No part of the Subordinated Obligations (or any other obligations hereunder) shall have any claim to the assets of Maker on a parity with or prior to the claim of the Senior Obligations. Unless and until the obligations to extend credit to Maker under the Senior Documents shall have been irrevocably terminated and the Senior Obligations have been paid in full in cash, the Holder will not take, demand or receive from Maker, and Maker will not make, give or permit, directly or indirectly, by set-off, redemption, purchase or in any other manner, any payment of (of whatever kind or nature, whether in cash, property, securities or otherwise), whether in respect of principal, interest or otherwise, or security for the whole or any part of the Subordinated Obligations. The Holder agrees that the Subordinated Obligations (and all other obligations of Maker hereunder) are unsecured and that Holder shall not take any liens or security interests in any assets or property of Maker, any of its subsidiaries or otherwise to secure the Subordinated Obligations or any other obligations of Maker hereunder. All payments or distributions upon or with respect to any Subordinated Obligation which are made by or on behalf of Maker or received by or on behalf of the Holder in violation of or contrary to the provisions of this Section 2 shall be received in trust for the benefit of the holders of Senior Obligations and shall be paid over upon demand to such holders for application to the Senior Obligations until the Senior Obligations shall have been paid in full in cash. The provisions of this Section 2 shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Senior Obligations is rescinded or must otherwise be returned by the any holder of Senior Obligations for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of Maker or any of its subsidiaries) all as though such payments had not been made.

(b)      At no time shall the Holder take or continue any action, or exercise any rights, remedies or powers under the terms of this Note, or exercise or continue to exercise any other right or remedy at law or in equity that the Holder might otherwise possess, to collect any Subordinated Obligation, including, without limitation, the acceleration of the Subordinated

2

Source: TRIBUNE CO, 8-K, April 05, 2007

Obligations, the commencement of any action to enforce payment or foreclosure on any lien or security interest, the filing of any petition in bankruptcy or the taking advantage of any other insolvency law of any jurisdiction.  Notwithstanding the foregoing, the Holder may file a proof of claim in any bankruptcy or similar proceeding instituted by another entity and may vote such claim in a manner not inconsistent with the terms hereof.  If the Holder shall attempt to enforce, collect or realize upon any of the Subordinated Obligations in violation of the terms hereof, any holder of Senior Obligations may, by virtue of the terms hereof, restrain any such enforcement, collection or realization, either in its own name or in the name of Maker.

        (c)        The holders of Senior Obligations shall be entitled to rely upon, and shall be intended beneficiaries of the subordination provisions contained in this Section 2, and such holders shall be entitled to enforce the same.  The holders of all or any portion of the Senior Obligations may, at any time, in their discretion, renew, amend, refinance, extend or otherwise modify the terms and provisions of Senior Obligations so held (including, without limitation, the terms and provisions relating to the principal amount outstanding thereunder, the rate of interest thereof, the payment terms thereof and the provisions thereof regarding default or any other matter) or exercise (or refrain from exercising) any of their rights under the Senior Obligations, all without notice to or consent from the Holder.  The Holder covenants and agrees that it will not, at any time, contest the validity, perfection, priority or enforceability of the subordination provisions of this Section 2, the Senior Obligations, the Senior Documents or the security interests or liens granted pursuant thereto.

        (d)        Notwithstanding any other provision of this Note to the contrary, this Section 2 and the subordination provisions hereof (i) shall not apply to the principal and interest payments contemplated by Section 1(b)(i) or to the issuance of PIK Notes, (ii) shall not apply to or otherwise restrict, limit or modify the provisions of Section 4 or Section 5 hereof or the enforcement thereof, and (iii) shall not prevent or restrict Maker or Holder from taking any action or refraining from taking any action as required by or pursuant to, or otherwise complying with or exercising or enforcing any right under, Section 4 or Section 5 hereof.  Nothing herein shall prohibit Maker from making payments under Section 1(b)(ii) to the extent not prohibited by any Senior Documents.

        (e)        For purposes hereof, the following terms shall have the following meanings:

        **"Senior Documents"** means, collectively, those documents, instruments and agreements evidencing, securing or otherwise relating to any of the Senior Obligations.

        **"Senior Obligations"** means all obligations, indebtedness and other liabilities of the Maker other any such obligations, indebtedness or liabilities that by its express terms ranks pari passu or junior to the Maker's obligations under this Note, in each case, whether incurred on or prior to the date hereof or hereafter incurred.

        **"Subordinated Obligations"** means the collective reference to the unpaid principal of and interest on this Note and all other obligations and liabilities of Maker to the Holder, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, in each case, arising under this Note; provided that the term "Subordinated Obligations" shall not include (a) the principal and interest payments contemplated by

3

Source: TRIBUNE CO, 8-K, April 05, 2007

Section 1(b)(i) hereof, (b) payments of interest through the issuance of PIK Notes, and (c) the rights, obligations and liabilities of Maker and Holder under Section 4 or Section 5 hereof.

3.      Events of Default.

(a)      For purposes of this Note, an "**Event of Default**" shall be deemed to have occurred if:

(i)      Maker fails to make any payment of principal of, or interest on, this Note when due and payable and such default remains uncured for a period of more than five (5) business days after written notice to Maker; provided that the failure by Maker to make a principal or interest payment hereunder when due shall not constitute an Event of Default if Maker is prohibited from making such payment under the terms of Section 2 hereof; or

(ii)      Maker makes an assignment for the benefit of creditors or admits in writing its inability to pay its debts generally as they become due; or an order, judgment or decree is entered adjudicating Maker bankrupt or insolvent; or any order for relief with respect to Maker is entered under Title 11 of the United States Code, 11 U.S.C. §§101 *et. seq.*; or Maker petitions or applies to any tribunal for the appointment of a custodian, trustee, receiver or liquidator of Maker, or of any substantial part of the assets of Maker, or commences any proceeding (other than a proceeding for the voluntary liquidation and dissolution of any subsidiary of Maker) relating to Maker under any bankruptcy reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction; or any such petition or application is filed, or any such proceeding is commenced, against and, in any such case, either (A) Maker consents thereto or acquiesces therein or (B) such petition, application or proceeding is not dismissed within sixty (60) days.

The foregoing shall constitute Events of Default whatever the reason or cause for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

(b)      Upon the occurrence of an Event of Default:

(i)      if an Event of Default of the type described in Section 3(a)(i) of this Note has occurred, the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto) shall become immediately due and payable upon written notice from the Holder to Maker, and, to the extent not prohibited by the provisions of Section 2 hereof, Maker shall immediately pay to the Holder all amounts due and payable with respect to this Note;

(ii)      if an Event of Default of the type described in Section 3(a)(ii) of this Note has occurred, the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto) shall become immediately due and payable without any action on the part of the Holder, and, to the

4

extent not prohibited by the provisions of Section 2 hereof, Maker shall immediately pay to the Holder all amounts due and payable with respect to this Note; and

(iii)    subject to the terms of Section 2 hereof, the Holder shall have all rights and remedies set forth herein and under any applicable law or in equity. No such remedy is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or thereunder or now or hereafter existing at law or in equity or by statute or otherwise. Subject to the terms of Section 2 hereof, the Holder shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Note and to exercise all other rights granted by law.

4.      Exchange.

(a)    At the option of Maker, any portion or all of the outstanding Original Principal Amount of this Note shall be exchangeable at any time and from time to time prior to the Maturity Date, for such number of fully paid and non-assessable shares of common stock of Maker, par value $0.01 per share ("**Common Stock**"), as shall be determined by dividing (i) the portion of the Original Principal Amount of this Note being exchanged under this Section 4 by Maker by (ii) $34.00 (the "**Exchange Price**"), subject to adjustment in accordance with Section 4(d) below. On the date of any exchange of any or all of the outstanding Original Principal Amount of this Note pursuant to this Section 4(a), Maker shall make a cash payment to the Holder in an amount equal to 40% of the sum of (i) all accrued and unpaid interest on the portion of the Original Principal Amount of this Note being exchanged that has accrued from the Payment Date immediately preceding such exchange date to such exchange date and (ii) the amount of interest on the portion of the Original Principal Amount being exchanged that has been paid-in-kind through the issuance of PIK Notes including PIK Notes paid in respect of any previously issued PIK Notes relating to such portion of the Original Principal Amount and accrued but unpaid interest on such PIK Notes (such outstanding principal balance of PIK Notes, the "**PIK Interest Amount**" and, together with the accrued and unpaid interest amounts referenced in clauses (i) and (ii) above, the "**Interest Amount**"). Upon such cash payment, the outstanding principal balance of the PIK Notes shall be decreased by an amount equal to the PIK Interest Amount, the accrued and unpaid interest referred to in clauses (i) and (ii) above shall be deemed fully discharged and 60% of the Interest Amount shall be allocated as additional consideration for the applicable exchange of the outstanding Original Principal Amount of this Note.

(b)    Immediately upon termination of the Merger Agreement pursuant to Article VII thereof, and without any further action of Maker or the Holder, any outstanding portion of the Original Principal Amount of this Note shall be exchanged for such number of fully paid and non-assessable shares of Common Stock as shall be determined by dividing (i) the then outstanding portion of the Original Principal Amount of this Note by (ii) the Exchange Price, subject to adjustment in accordance with Section 4(d) below. On the date of any exchange of any outstanding Original Principal Amount of this Note pursuant to this Section 4(b), Maker shall make a cash payment to the Holder in an amount equal to 40% of the sum of (i) all accrued and unpaid interest on the then outstanding portion of the Original Principal Amount of this Note that has accrued from the Payment Date immediately preceding such exchange date to such

5

Source: TRIBUNE CO, 8-K, April 05, 2007

exchange date and (ii) the outstanding principal balance of all PIK Notes including PIK Notes paid in respect of any previously issued PIK Notes and accrued but unpaid interest on such PIK Notes (such outstanding principal balance of all PIK Notes and accrued but unpaid interest thereon, together with the amount referenced in clause (i) above, the "**Total Interest Amount**"). Upon such cash payment, the outstanding principal balance of all PIK Notes shall be deemed paid, the accrued and unpaid interest referred to in clauses (i) and (ii) above shall be deemed fully discharged, and 60% of the Total Interest Amount shall be allocated as additional consideration for the exchange of the outstanding Original Principal Amount of this Note. For the avoidance of doubt, the term Original Principal Amount of this Note shall be deemed to refer only to the original $200,000,000 principal amount of this Note originally issued and shall not include the principal amount of any PIK Notes whenever issued.

(c)     As soon as reasonably practicable after an exchange under this Section 4 in whole or in part, Maker at its expense will cause to be issued in the name of, and delivered to, the Holder, or as the Holder may direct: (i) a certificate or certificates (with appropriate restrictive legends) for the number of shares of Common Stock to which the Holder shall be entitled in such denominations as may be requested by the Holder; and (ii) in case such exchange is in part only, in accordance with Section 4(a), a new subordinated exchange promissory note (dated the date hereof) of like tenor, calling in the aggregate on the face thereof for a principal amount equal to the principal amount plus accrued and unpaid interest thereon described in this Note minus the amount exchanged by Maker or deemed paid or discharged in accordance with Section 4(a) above. Maker shall at all times reserve for issuance a sufficient number of shares of Common Stock to be issued upon exchange of this Note, and upon issuance thereof, such shares shall be fully paid and non-assessable, and free from all taxes, liens and charges with respect to the issue thereof.

(d)     The number and kind of shares of Common Stock issuable upon exchange of this Note under this Section 4 and the Exchange Price shall be subject to adjustment from time to time as follows; provided that no action taken by Maker in compliance with the terms of the Merger Agreement and the Tower Purchase Agreement prior to consummation of the Merger or termination of the Merger Agreement shall give rise to any adjustment:

(i)     If Maker shall at any time subdivide its Common Stock, by split-up or otherwise, or combine its Common Stock, or issue additional shares of its Common Stock as a dividend or distribution with respect to any shares of its Common Stock, the number of shares issuable upon exchange under this Section 4 shall forthwith be proportionately increased in the case of a subdivision or stock dividend or distribution, or proportionately decreased in the case of a combination. Any adjustment under this Section 4(d)(i) shall become effective at the close of business on the date the subdivision or combination becomes effective, or as of the record date of such dividend, or in the event that no record date is fixed, upon the making of such dividend.

(ii)     In the event of any corporate reclassification, capital reorganization, consolidation, spin-off, merger, transfer of all or a substantial portion of Maker's properties or assets or any dissolution, liquidation or winding up of Maker (other than as a result of a subdivision, combination, dividend or distribution provided for in Section 4(d)(i) above) (a "**Corporate Transaction**"), then, as a condition of such event,

6

Source: TRIBUNE CO, 8-K, April 05, 2007

provision shall be made, and duly executed documents evidencing the same from Maker and any surviving or acquiring person (the "**Successor Company**") shall be delivered to the Holder, so that the Holder shall have the right to receive upon exchange under this Section 4 the same number of shares of Common Stock and amount of cash and other property that the Holder would have been entitled to receive upon such Corporate Transaction had an exchange of this Note been effected immediately prior to the effective time of such Corporate Transaction. Maker shall provide that any Successor Company in such Corporate Transaction shall enter into an agreement with Maker confirming the Holder's rights pursuant to this Note, assuming Maker's obligations under this Note, jointly and severally with Maker if Maker shall survive such Corporate Transaction, and providing after the date of such Corporate Transaction for adjustments, which shall be as equivalent as possible to the adjustments provided for in this Section 4. Maker shall ensure that the Holder is a beneficiary of such agreement and shall deliver a copy thereof to the Holder. The provisions of this Section 4(d)(ii) shall apply similarly to successive Corporate Transactions involving any Successor Company. In case of any Corporate Transaction in which all or a portion of the consideration payable to holders of Common Stock is cash, Maker or any Successor Company, as the case may be, shall make available any funds necessary to pay to the Holder the amount to which the Holder is entitled as described above in the same manner and at the same time as holders of Common Stock would be entitled to such funds.

(iii)        In the event that Maker at any time or from time to time declares, orders, pays or makes any dividend or other distribution on the Common Stock, including, without limitation, distributions of cash, evidence of its indebtedness, Options, Convertible Securities, other securities or property or rights to subscribe for or purchase any of the forgoing, and whether by way of dividend, spin-off, reclassification, recapitalization, similar corporate reorganization or otherwise, other than a dividend or distribution payable in additional shares of Common Stock that gives rise to an adjustment pursuant to Section 4(d)(i) hereof, then, and in each such case, the Exchange Price shall be reduced to a number determined by dividing the previously applicable Exchange Price by a fraction (which must be greater than one (1), otherwise no adjustment is to be made pursuant to this Section 4(d)(x)) (i) the numerator of which shall be the fair market value per share of Common Stock on the record date for such dividend or other distribution, and (ii) the denominator of which shall be the excess, if any, of (x) such fair market value per share of Common Stock, over (y) the sum of the amount of any cash distributed per share of Common Stock plus the positive fair market value, if any, per share of Common Stock of any such evidences of indebtedness, Options, Convertible Securities, other securities or property or rights to be so distributed. Such adjustments shall become effective as of the close of business on the record date therefor. "**Options**" means rights, options or warrants to subscribe for, purchase or otherwise acquire, directly or indirectly, shares of Common Stock, including, without limitation, Convertible Securities. "**Convertible Securities**" means any evidences of indebtedness, shares of capital stock or any other securities convertible into or exchangeable for, directly or indirectly, shares of Common Stock.

(iv)        If any event occurs as to which the provisions of this Section 4(d) are not strictly applicable or if strictly applicable would not fairly protect the rights of the Holder in

7

Source: TRIBUNE CO, 8-K, April 05, 2007

accordance with such provisions, then the board of directors of Maker shall make an adjustment in the number of shares of Common Stock exchangeable under this Section 4, the Exchange Price or the applicability of such provisions so as to protect such rights. The adjustment shall be such as will give the Holder upon exchange under this Section 4 the total number of shares of Common Stock as the Holder would have owned had this Note been exchanged prior to the event and had the Holder continued to hold such Common Stock until after the event requiring the adjustment, but in no event shall any such adjustment have the effect of increasing the Exchange Price.

(v)       The adjustments required by the preceding subsections of this Section 4(d) shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the Exchange Price or the number of shares of Common Stock issuable upon exchange under this Section 4 that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made decreases the Exchange Price immediately prior to the making of such adjustment by at least $0.01 or increases or decreases the number of shares issuable upon exchange immediately prior to the making of such adjustment by at least one share. Any adjustment representing a change of less than such minimum amount shall be carried forward and made as soon as such adjustment, together with other adjustments required by this Section 4(d) and not previously made, would result in the requisite minimum adjustment.

(e)       In the case of any adjustment in the number of shares issuable upon exchange under this Section 4 or the Exchange Price, Maker, at its sole expense, shall promptly (i) compute such adjustment in accordance with the terms of this Note and, if the Holder so requests in writing from Maker within 30 days of receipt of such computations from Maker, cause independent certified public accountants of recognized national standing to verify such computation (other than any determination of the fair market value), (ii) prepare a report setting forth such adjustment and showing in reasonable detail the method of calculation thereof and the facts upon which such adjustment is based, including, without limitation, (A) the event or events giving rise to such adjustment, (B) the consideration received by Maker for any Additional Shares of Common Stock issued or sold or deemed to have been issued or sold, (C) the number of shares of Common Stock outstanding or deemed to be outstanding prior and subsequent to any such transaction, (D) the method by which any such adjustment was calculated (including a description of the basis on which the board of directors of Maker made any determination of fair market value required thereby) and (E) the number of shares of Common Stock issuable upon exchange under this Section 4 and the Exchange Price in effect immediately prior to such event or events and as adjusted, (iii) mail a copy of each such report to the Holder and, upon the request at any time of the Holder, furnish to the Holder a like report setting forth the number of shares of Common Stock issuable upon exchange under this Section 4 and the Exchange Price at the time in effect and showing in reasonable detail how they were calculated and (iv) keep copies of all such reports available at the principal office of Maker for inspection during normal business hours by the Holder.

(f)       Maker shall not, by amendment of its certificate of incorporation or other organizational document or through any sale or other issuance of securities, capital reorganization, reclassification, recapitalization, consolidation, merger, transfer of assets,

8

dissolution, liquidation, winding-up, any similar transaction or any other voluntary action, solely to avoid or solely to seek to avoid the observance or performance of any of the terms of this Note, but will at all times in good faith assist in the carrying out of all terms hereunder and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against dilution or other impairment in a manner that is consistent with Maker's obligations hereunder.  Without limiting the generality of the foregoing, Maker (i) will not permit the par value of any shares of Common Stock receivable upon exchange to exceed the Exchange Price and (ii) will take all such action as may be necessary or appropriate in order that Maker may validly and legally issue fully paid and nonassessable shares of Common Stock upon exchange under this Section 4.  Without limiting the generality of the foregoing, before taking any action that would cause a reduction of the Exchange Price pursuant to Section 4(d) hereof below the then par value (if any) of the Common Stock, Maker shall take any and all corporate action (including, without limitation, a reduction in par value) which shall be necessary to validly and legally issue fully paid and nonassessable shares of Common Stock, as the case may be, at the Exchange Price as so reduced.

(g)      If the Holder shall, in good faith, disagree with any determination by the board of directors of Maker of the fair market value made pursuant to this Note, and such disagreement is in respect of securities not traded on a national securities exchange or quoted on an automated quotation system or other property valued by the board of directors of Maker at more than $1,000,000, then the Holder may by notice to Maker (an "**Appraisal Notice**"), given within 30 days after written notice to the Holder of such determination, elect to contest such determination; provided, however, that the Holder may not seek appraisal of any determination of fair market value to the extent that Maker has received a fairness opinion or other appraisal from an independent nationally recognized investment bank or other qualified financial institution acceptable to Maker and the Holder (the "**Appraiser**") in connection with the transaction giving rise to such determination.  Within 20 days after an Appraisal Notice, Maker shall engage an Appraiser to make an independent determination of such fair market value (the "**Appraiser's Determination**"), who shall deliver to Maker and the Holder a report describing its methodology and results in reasonable detail within 30 days of such engagement.  In arriving at its determination, the Appraiser shall base any valuation upon:  (i) in the case of the fair market value of shares of Common Stock, the fair market value of Maker and its subsidiaries on the basis of an arm's length sale of a going concern between an informed and willing buyer and an informed and willing seller, under no compulsion to buy or sell, taking into account all the relevant facts and circumstances then prevailing, and without consideration of (A) the lack of an actively trading public market for the Common Stock, (B) any restrictions on the transfer of shares of Common Stock or (C) any control premium or minority discount, and (ii) in the case of the fair market value of any other property, the fair market value of such other property assuming that such other property was sold in an arm's length transaction between an informed and willing buyer and an informed and willing seller, under no compulsion to buy or sell, taking into account all the relevant facts and circumstances then prevailing.  The Holder shall be afforded reasonable opportunities to discuss the appraisal with the Appraiser.  The Appraiser's Determination shall be final and binding on Maker and the Holder, absent manifest error.  The costs of conducting an appraisal shall be borne by Maker.

(h)      In the event Maker proposes, other than pursuant to the transactions contemplated by the Merger Agreement, to:  (i) pay, distribute, or take a record of the holders of any class of

9

securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution, or any right to subscribe for, purchase or otherwise acquire any shares of capital stock or any other securities or property, or (ii) consummate any capital reorganization, reclassification, recapitalization, consolidation, merger, transfer of all or substantially all of its assets, dissolution, liquidation or winding-up, or any similar transaction then, at least 20 days prior to the earlier of any applicable record date or such event, as the case may be, Maker shall mail to the Holder a notice specifying: (A) the date or expected date on which any such payment or distribution is to be made or record is to be taken and the amount and character of any such dividend, distribution or right, (B) the date or expected date on which any such reorganization, reclassification, recapitalization, consolidation, merger, transfer, dissolution, liquidation, winding-up or similar transaction is to take effect and any record date therefor, (C) the time as of which any holders of record of shares of Common Stock and/or any other class of securities shall be entitled to exchange their shares of Common Stock and/or other securities for the securities or other property deliverable upon such reorganization, reclassification, recapitalization, consolidation, merger, transfer, dissolution, liquidation, winding-up or similar transaction and a description in reasonable detail of such transaction and (D) in each case, the expected effect on the number of shares issuable upon exchange under this Section 4 of this Note and the Exchange Price of each such transaction or event.  Maker shall update any such notice to reflect any change in the foregoing information.

(i)     No fractional shares of Common Stock shall be issued in connection with any exchange under this Section 4, but in lieu of such fractional shares Maker shall make a cash payment therefor based on the fair market value thereof.

(j)     For the avoidance of doubt and notwithstanding any other provision of this Note to the contrary, Section 2 hereof (including, without limitation, any subordination provisions thereof) shall not apply to or otherwise restrict or modify the provisions of this Section 4.

(k)     Prior to exchange of this Note for Common Stock under this Section 4, the Holder shall not be entitled to any rights of a stockholder with respect to the shares of Common Stock, including (without limitation) the right to vote such shares, receive dividends or other distributions thereon, exercise preemptive rights or be notified of stockholder meetings, and, except as otherwise provided in this Note or any other arrangement with, or undertaking by, Maker, the Holder shall not be entitled to any stockholder notice or other communication concerning the business or affairs of Maker.

(l)     Shares of Common Stock issuable upon exchange of this Note under this Section 4 shall be subject to that certain Registration Rights Agreement dated as of April 1, 2007 by and between Maker, the Holder and the ESOP.

5.     Regulatory Requirements.

10

Source: TRIBUNE CO, 8-K, April 05, 2007

(a)    If any filing or notification becomes necessary pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), in connection with the exchange of this Note or any portion hereof under Section 4 above, Maker shall notify the Holder prior to such exchange, and the Holder and Maker shall file with the proper authorities all forms and other documents necessary to be filed pursuant to the HSR Act, as promptly as possible and shall cooperate with each other in promptly producing such additional information as those authorities may reasonably require to allow early termination of the notice period provided by the HSR Act or as otherwise necessary to comply with requirements of the Federal Trade Commission or the Department of Justice.  Maker and the Holder agree to cooperate with each other in connection with such filings and notifications, and to keep each other informed of the status of the proceedings and communications with the relevant authorities.  Maker and Holder shall each pay its own filing fees in connection with any filings required under the HSR Act as a result of the exchange of this Note under Section 4 above.

(b)    If the Holder or, upon the advice of counsel, Maker determines that the exchange of this Note or any portion hereof under Section 4 above would require notice to, or the consent or approval by, the Federal Communications Commission or any other regulatory agency that is vested with jurisdiction over Maker, Maker and the Holder shall make all necessary filings and notifications required, and shall have received all required consents, approvals, orders or otherwise, prior to effecting the exchange of this Note or any portion thereof.  Maker and Holder shall each pay its own filing fees in connection with such filings and notifications.

6.    General.

(a)    The terms of this Note may be waived, altered or amended, and Maker may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only by an instrument in writing duly executed by Maker and the Holder.  Any such amendment or waiver shall be binding upon the Holder, Maker and their respective successors and permitted assigns.

(b)    Maker hereby waives diligence, presentment, protest and demand and notice of protest and demand, dishonor and nonpayment of this Note, and expressly agrees that this Note, or any payment hereunder, may be extended from time to time, all without in any way affecting the liability of Maker hereunder.

(c)    All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Note shall be in writing and shall be deemed to have been given when delivered personally to the recipient, sent to the recipient by reputable overnight courier service (charges prepaid), transmitted by facsimile (receipt confirmed) or three days after mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid.  Such notices, demands and other communications shall be sent to Maker and the Holder at the address set forth above or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

11

(d)        If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Holder in order to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

(d)        This Note shall be binding upon and inure to the benefit of the respective successors and permitted assigns of each of the parties hereto.  Subject to compliance with applicable federal and state securities laws, this Note and all rights hereunder are transferable, in whole or in part, by the Holder to any Permitted Transferee upon written notice to Maker.  For purposes hereof, "**Permitted Transferee**" shall have the meaning set forth in the Investor Rights Agreement.  Except as provided in the immediately preceding sentence, neither the Holder nor Maker shall assign or transfer its rights or duties hereunder without the prior written consent of the other party hereto.

(e)        It is the intention of Maker and the Holder to conform strictly to all applicable usury laws now or hereafter in force, and any interest payable under this Note shall be subject to reduction to the highest amount not in excess of the maximum legal amount allowed under the applicable usury laws as now or hereafter construed by the courts having jurisdiction over such matters.  If the maturity of this Note is accelerated by reason of an election by the Holder resulting from an Event of Default or otherwise, then earned interest may never include more than the maximum amount permitted by law, computed from the date hereof until payment, and any interest in excess of the maximum amount permitted by law shall be canceled automatically and, if theretofore paid, shall at the option of the Holder either be rebated to Maker or credited on the principal amount of this Note, or if this Note has been paid, then the excess shall be rebated to Maker.  The aggregate of all interest (whether designated as interest, service charges, points or otherwise) contracted for, chargeable, or receivable under this Note shall under no circumstances exceed the maximum legal rate upon the unpaid principal balance of this Note remaining unpaid from time to time.  If such interest does exceed the maximum legal rate, it shall be deemed a mistake and such excess shall be canceled automatically and, if theretofore paid, rebated to Maker or credited on the principal amount of this Note, or if this Note has been repaid, then such excess shall be rebated to Maker.

(f)        This Note shall be governed by and interpreted in accordance with the laws of the State of Delaware, without giving effect to any laws or principles of conflicts of laws that would cause the laws of any other jurisdiction to apply.

(G)        MAKER HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR DELAWARE STATE COURT IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE AND MAKER HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM.  NOTHING HEREIN SHALL LIMIT

12

THE RIGHT OF THE HOLDER TO BRING PROCEEDINGS AGAINST MAKER IN THE COURTS OF ANY OTHER JURISDICTION.  ANY JUDICIAL PROCEEDING BY MAKER AGAINST THE HOLDER OR ANY AFFILIATE THEREOF INVOLVING DIRECTLY OR INDIRECTLY ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTION WITH THIS NOTE SHALL BE BROUGHT ONLY IN A COURT IN DELAWARE.

(H)      MAKER AND THE HOLDER EACH WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.  MAKER AND THE HOLDER EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS NOTE OR ANY PROVISION HEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE.

{*Signature Page Follows*}

13

IN WITNESS WHEREOF, Maker has executed and delivered this Note on this    day of          , 2007.

TRIBUNE COMPANY

By: _____
Name: _____
Its: _____


Acknowledged and agreed to as of
this    day of          , 2007

EGI-TRB, L.L.C.


By: _____
Name: _____
Its: _____


**Signature Page to Subordinated Exchangeable Promissory Note**

Source: TRIBUNE CO, 8-K, April 05, 2007

Exhibit 10.4

EXHIBIT B
[FINAL FORM]

## SUBORDINATED PROMISSORY NOTE

, 2007                                                                                    $225,000,000.00

Tribune Company, a Delaware corporation located at 435 North Michigan Avenue, Chicago, Illinois 60611 ("**Maker**"), hereby promises to pay to the order of EGI-TRB, L.L.C., a Delaware limited liability company located at Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606 (the "**Holder**") or its successors or permitted assigns, the principal amount of TWO HUNDRED TWENTY-FIVE MILLION AND NO/100 DOLLARS ($225,000,000.00) together with interest thereon calculated from the date hereof in accordance with the provisions of this Subordinated Promissory Note (this "**Note**").

1.      Payments.

(a)      Interest on the unpaid principal amount of this Note outstanding from time to time shall accrue at the rate of      (1) percent (   %) *per annum* calculated on the basis of a 365-day year and the actual number of days elapsed in any year, or (if less) at the highest rate then permitted under applicable law (the "**Interest Rate**"). At all times during the occurrence of an Event of Default, and at all times after          , 2018 (the "**Maturity Date**"), all of the obligations and liabilities of Maker to the Holder hereunder shall accrue interest at a rate equal to the Interest Rate plus two percent (2%) (the "**Default Rate**") to the extent permitted under applicable law. Interest on the unpaid principal amount hereunder shall be payable on the last day of each calendar quarter (each, a "**Payment Date**") as follows:

(i)      to the extent the payment of such interest payment is not prohibited by the terms of any applicable subordination agreement or intercreditor agreement (if any) made by and among the Holder and the financial institutions, agents and other persons party thereto from time to time (any such agreement or agreements, as amended, restated or otherwise modified from time to time, collectively, the "**Intercreditor Agreement**") as of such Payment Date, Maker shall pay to the Holder all accrued and unpaid interest as of such Payment Date in cash in accordance with the terms of Section 1(c) below (each, a "**Cash Interest Payment**"); and

(ii)      to the extent the payment of such interest payment is prohibited pursuant to the terms of the Intercreditor Agreement as of such Payment Date, all accrued and unpaid interest as of such Payment Date shall be capitalized as principal outstanding on this Note by adding the amount of such interest payment to the outstanding principal amount of this Note.

(b)      Payments of principal outstanding from time to time under this Note shall be made as follows, each to the extent not prohibited by the terms of the Intercreditor Agreement:

(i)        on each Payment Date, Maker shall make principal payments to the Holder in the amount of two hundred fifty thousand and no/100 Dollars ($250,000.00), commencing on                2007 and through and including the Maturity Date;

(ii)        on the Maturity Date hereof, Maker shall pay the outstanding principal amount of this Note, together with all accrued and unpaid interest hereon, and any costs and expenses incurred by Lender in connection herewith; and

(iii)        at any time and from time to time, Maker may, prepay, without premium or penalty, all or any portion of the outstanding principal amount of this Note, any such prepayment to be applied first, to all accrued but unpaid interest on this Note; second, to scheduled installments of principal in the direct order of maturity; and third, to outstanding principal (including, without limitation, capitalized interest).

(c)        If any payment is due, or any time period for giving notice or taking action expires, on a day which is a Saturday, Sunday or legal holiday in the State of New York, the payment shall be due and payable on, and the time period shall automatically be extended to, the next business day immediately following such Saturday, Sunday or legal holiday, and interest shall continue to accrue at the required rate hereunder until any such payment is made. All payments to be made to the Holder shall be made in the lawful money of the United States of America in immediately available funds, free and clear of all taxes and charges whatsoever. Payments shall be delivered to the Holder at the address set forth above or to such other address or to the attention of such other person as specified by prior written notice to Maker or by wire transfer pursuant to wire instructions as specified by prior written notice to Maker.

2.        Subordination.

All of the obligations and liabilities of Maker to the Holder evidenced by this Note (including, without limitation, principal, interest and costs and expenses) are qualified by, limited and expressly subordinated in accordance with the terms and conditions set forth in the Intercreditor Agreement.

3.        Events of Default.

(a)        For purposes of this Note, an **"Event of Default"** shall be deemed to have occurred if:

(i)        Maker fails to make any payment of principal of, or interest on, any Note when due and payable and such default remains uncured for a period of more than five (5) business days; provided, that, the failure by Maker to make a principal or interest payment hereunder when due shall not constitute an Event of Default if Maker is prohibited from making such payment under the terms of the Intercreditor Agreement; or

(ii)        Maker or any its subsidiaries or any guarantor of Maker's obligations hereunder makes an assignment for the benefit of creditors or admits in writing its inability to pay its debts generally as they become due; or an order, judgment or decree is entered adjudicating Maker or any such subsidiary or guarantor bankrupt or insolvent; or any order for relief with respect to Maker or any such subsidiary or guarantor is entered

2

Source: TRIBUNE CO, 8-K, April 05, 2007

under Title 11 of the United States Code, 11 U.S.C. §§101 *et. seq.*; or Maker or any such subsidiary or guarantor petitions or applies to any tribunal for the appointment of a custodian, trustee, receiver or liquidator of Maker or any such subsidiary or guarantor, or of any substantial part of the assets of Maker or any such subsidiary or guarantor, or commences any proceeding (other than a proceeding for the voluntary liquidation and dissolution of any subsidiary of Maker) relating to Maker or any such subsidiary or guarantor under any bankruptcy reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction; or any such petition or application is filed, or any such proceeding is commenced, against Maker or any such subsidiary or guarantor and either (A) Maker or any such subsidiary or guarantor by any act indicates its approval thereof, consent thereto or acquiescence therein or (B) such petition, application or proceeding is not dismissed within sixty (60) days.

The foregoing shall constitute Events of Default whatever the reason or cause for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

(b)    Upon the occurrence of an Event of Default:

(i)    if an Event of Default of the type described in Section 3(a)(i) of this Note has occurred, the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto, including, without limitation, any costs and expenses incurred by Lender in connection herewith) shall become immediately due and payable upon written notice from the Holder to the Maker, and, to the extent not prohibited by the provisions of the Intercreditor Agreement, Maker shall immediately pay to the Holder all amounts due and payable with respect to this Note;

(ii)    if an Event of Default of the type described in Section 3(a)(ii) of this Note has occurred, the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto, including, without limitation, any costs and expenses incurred by Lender in connection herewith) shall become immediately due and payable without any action on the part of the Holder, and, to the extent not prohibited by the provisions of the Intercreditor Agreement, Maker shall immediately pay to the Holder all amounts due and payable with respect to this Note; and

(iii)    subject to the terms of the Intercreditor Agreement, the Holder shall have all rights and remedies set forth herein and under any applicable law or in equity. No such remedy is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or thereunder or now or hereafter existing at law or in equity or by statute or otherwise. Subject to the terms of the Intercreditor Agreement, any Holder having any rights under any provision of this Note shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Note and to exercise all other rights granted by law.

3

Source: TRIBUNE CO, 8-K, April 05, 2007

4.      General.

(a)      The terms of this Note may be waived, altered or amended, and Maker may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only by an instrument in writing duly executed by Maker and the Holder. Any such amendment or waiver shall be binding upon the Holder, Maker and their respective successors and permitted assigns.

(b)      Maker hereby waives diligence, presentment, protest and demand and notice of protest and demand, dishonor and nonpayment of this Note, and expressly agrees that this Note, or any payment hereunder, may be extended from time to time, all without in any way affecting the liability of Maker hereunder.

(c)      All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Note shall be in writing and shall be deemed to have been given when delivered personally to the recipient, sent to the recipient by reputable overnight courier service (charges prepaid), transmitted by facsimile (receipt confirmed) or three days after mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid. Such notices, demands and other communications shall be sent to Maker and the Holder at the address set forth above or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

(d)      If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (a) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Holder in order to carry out the intentions of the parties hereto as nearly as may be possible and (b) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

(d)      This Note shall be binding upon and inure to the benefit of the respective successors and permitted assigns of each of the parties hereto, provided, that neither Holder nor Maker shall assign or transfer its rights or duties hereunder without the prior written consent of the other party hereto.

(e)      It is the intention of Maker and the Holder to conform strictly to all applicable usury laws now or hereafter in force, and any interest payable under this Note shall be subject to reduction to the amount not in excess of the maximum legal amount allowed under the applicable usury laws as now or hereafter construed by the courts having jurisdiction over such matters. If the maturity of this Note is accelerated by reason of an election by the Holder resulting from an Event of Default, voluntary prepayment by Maker or otherwise, then earned interest may never include more than the maximum amount permitted by law, computed from the date hereof until payment, and any interest in excess of the maximum amount permitted by law shall be canceled automatically and, if theretofore paid, shall at the option of the Holder either be rebated to Maker or credited on the principal amount of this Note, or if this Note has been paid, then the excess shall be rebated to Maker. The aggregate of all interest (whether designated as interest, service charges, points or otherwise) contracted for, chargeable, or receivable under this Note shall under no circumstances exceed the maximum legal rate upon the

4

unpaid principal balance of this Note remaining unpaid from time to time. If such interest does exceed the maximum legal rate, it shall be deemed a mistake and such excess shall be canceled automatically and, if theretofore paid, rebated to Maker or credited on the principal amount of this Note, or if this Note has been repaid, then such excess shall be rebated to Maker.

(f)     This Note shall be governed by and interpreted in accordance with the laws of the State of Delaware, without giving effect to any laws or principles of conflicts of laws that would cause the laws of any other jurisdiction to apply.

(G)     MAKER HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR DELAWARE STATE COURT IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE AND MAKER HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF HOLDER TO BRING PROCEEDINGS AGAINST MAKER IN THE COURTS OF ANY OTHER JURISDICTION. ANY JUDICIAL PROCEEDING BY MAKER AGAINST HOLDER OR ANY AFFILIATE THEREOF INVOLVING DIRECTLY OR INDIRECTLY ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR IN CONNECTION WITH THIS NOTE SHALL BE BROUGHT ONLY IN A COURT IN DELAWARE.

(H)     MAKER AND HOLDER EACH WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. MAKER AND HOLDER EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS NOTE OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE.

*{Signature Page Follows}*

5

IN WITNESS WHEREOF, Maker has executed and delivered this Note on this    day of        , 2007.

TRIBUNE COMPANY

By: _____

Name: _____

Its: _____

Acknowledged and agreed to as of
this    day of        , 2007

EGI-TRB, L.L.C.


By: _____

Name: _____

Its: _____


Signature Page to Subordinated Promissory Note

Source: TRIBUNE CO, 8-K, April 05, 2007

**Exhibit 10.5**

EXHIBIT C
[FINAL FORM]

THIS WARRANT AND THE SECURITIES ISSUABLE UPON THE EXERCISE HEREOF HAVE NOT BEEN
REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED
FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN
EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN
OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER
SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT.  THIS WARRANT IS SUBJECT TO
THE TERMS OF AN INVESTOR RIGHTS AGREEMENT AMONG THE COMPANY, EGI-TRB, L.L.C., AND
GREATBANC TRUST COMPANY, SOLELY AS TRUSTEE OF THE TRIBUNE EMPLOYEE STOCK OWNERSHIP
TRUST WHICH FORMS PART OF THE TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN.

Date of Issuance ("Issue Date"):                                                           Void after:
[          ], 200[7]                                                                        [          ], 202[  ]

                                                                                           Certificate No. W-____

### WARRANT TO PURCHASE SHARES OF COMMON STOCK

        For value received, the receipt and sufficiency of which is hereby acknowledged, this Warrant is issued to
EGI-TRB, L.L.C., a Delaware limited liability company (the "Holder"), by Tribune Company, a Delaware corporation (the
"Company").

1.    **Purchase of Shares**.

(a)    Number of Shares.  Subject to the terms and conditions set forth herein, the Holder shall be entitled, at any time, from time
to time, upon surrender of this Warrant, to purchase from the Company an aggregate of 43,478,261 duly authorized, validly issued,
fully paid and nonassessable shares (the "Shares") of the Company's common stock, par value $0.01 per share (the "Common
Stock").  The term "Warrant" as used herein shall be deemed to include any warrants issued upon transfer or partial exercise of this
Warrant unless the context clearly requires otherwise.

(b)    Exercise Price.  In respect of any exercise, in whole or in part, of the Warrant pursuant to Section 1(a) above, the exercise
price per Share issuable upon such exercise shall be $11.50 (the "Exercise Price").  Notwithstanding the immediately preceding
sentence, the Shares and the Exercise Price shall be subject to adjustment pursuant to Section 8 hereof.  In addition, on each of the first
ten anniversary dates of the Issue Date, the Exercise Price in effect immediately prior to such anniversary date (the "Prior Exercise
Price") shall be increased by an amount equal to the Prior Exercise Price multiplied by the percentage set forth opposite the applicable
anniversary date as hereinafter set forth.  For the avoidance of doubt, the applicable Exercise Price for each period, assuming no other
adjustments in accordance with Section 8, is set forth below under the heading "Exercise Price Without Section 8 Adjustment" with
respect to the year that commences on the anniversary date indicated.

| Anniversary Date | Percentage Increase to Exercise Price | Exercise Price Without Section 8 Adjustment | |
|---|---|---|---|
| First anniversary of Issue Date | 2.000000% | $ | 11.73 |
| Second anniversary of Issue Date | 1.960784% | $ | 11.96 |
| Third anniversary of Issue Date | 1.923077% | $ | 12.19 |
| Fourth anniversary of Issue Date | 1.886792% | $ | 12.42 |
| Fifth anniversary of Issue Date | 1.851852% | $ | 12.65 |
| Sixth anniversary of Issue Date | 1.818182% | $ | 12.88 |
| Seventh anniversary of Issue Date | 1.785714% | $ | 13.11 |
| Eighth anniversary of Issue Date | 1.754386% | $ | 13.34 |
| Ninth anniversary of Issue Date | 1.724138% | $ | 13.57 |
| Tenth anniversary of Issue Date | 1.694915% | $ | 13.80 |

Following the tenth anniversary of the Issue Date, there shall be no further changes to the Exercise Price, except as provided in Section 8 hereof.

(c)      Vesting and Exercisability of Shares. This Warrant shall be fully vested and exercisable as of the date of issuance set forth above.

2.      **Exercise Period**. This Warrant shall be exercisable, in whole or in part, during the term commencing on the date hereof and ending on [          ], 202[    ].(1)

3.      **Method of Exercise**.

(a)      While this Warrant remains outstanding and exercisable in accordance with Section 2 above, the Holder may exercise, in whole or in part, the purchase rights evidenced hereby.  Such exercise shall be effected by:

(i)      the surrender of the Warrant, together with a duly executed copy of the Notice of Exercise attached hereto, to the Secretary of the Company at its principal office (or at such other place as the Company shall notify the Holder in writing);

(ii)      the delivery to the Company of a written opinion of counsel to the Holder in form and substance reasonably satisfactory to the Company that the transferee of the Warrant will be an eligible S corporation holder; and

(iii)      except in connection with a Net Exercise (as defined below) pursuant to Section 4 below, the payment to the Company by wire transfer to an account designated by the Company of an amount equal to the aggregate Exercise Price for the number of Shares being purchased.

(b)      Each exercise of this Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which this Warrant is surrendered to the Company as provided in Section 3(a) above. At such time, the person or persons in whose name or names any certificate for the Shares shall be issuable upon such

---

(1)      Such date to be the fifteenth (15th) anniversary of the issuance date of the Warrant.

2

Source: TRIBUNE CO, 8-K, April 05, 2007

exercise as provided in Section 3(c) below shall be deemed to have become the holder or holders of record of the Shares represented by such certificate. As used in this Warrant, "person" means any individual, partnership, limited liability company, corporation, association, joint stock company, trust, joint venture, unincorporated organization or any federal, state, county or municipal governmental or quasi-governmental agency, department, commission, board, bureau or instrumentality or any other entity.

(c)    As soon as reasonably practicable after the exercise of this Warrant in whole or in part, the Company at its expense will cause to be issued in the name of, and delivered to, the Holder, or as the Holder may direct:

(i)    a certificate or certificates (with appropriate restrictive legends) for the number of Shares to which the Holder shall be entitled in such denominations as may be requested by the Holder; and

(ii)    in case such exercise is in part only, a new warrant or warrants (dated the date hereof) of like tenor, calling in the aggregate on the face or faces thereof for the number of Shares equal to the number of such Shares described in this Warrant minus the number of such Shares purchased by the Holder upon all exercises made in accordance with Section 3(a) above or Section 4 below.

(d)    Notwithstanding any other provisions hereof, if an exercise of any portion of this Warrant is to be made in connection with the consummation of a sale of the Company's Common Stock or other securities pursuant to a registration statement under the Securities Act of 1933, as amended (the "Act") (other than a registration statement relating either to a sale of securities to employees of the Company pursuant to its stock option, stock purchase or other similar plan or to a Securities and Exchange Commission ("SEC") Rule 145 transaction) (the "Public Offering"), or a Sale of the Company (as defined below), the exercise of any portion of this Warrant may, at the election of the Holder hereof, be conditioned upon the consummation of the Public Offering or Sale of the Company, in which case such exercise shall not be deemed to be effective until the consummation of such transaction. A "Sale of the Company" shall mean (i) the closing of the sale, lease, transfer or other disposition of all or substantially all of the Company's assets, (ii) the consummation of a merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of capital stock of the Company immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the capital stock of the Company or the surviving or acquiring entity), (iii) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons not affiliated with the Company (other than an underwriter of the Company's securities), of the Company's securities if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting stock of the Company (or the surviving or acquiring entity) or (iv) a liquidation, dissolution or winding up of the Company, whether voluntary or involuntary; provided, however, that a transaction described in (i), (ii) or (iii) above shall not constitute a Sale of the Company if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately prior to such transaction. For purposes of this Warrant, "affiliate" shall mean, with respect to any specified person, any other person that

3

Source: TRIBUNE CO, 8-K, April 05, 2007

directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified person.

              (e)        Notwithstanding anything else to the contrary herein, in connection with a proposed Sale of the Company, the Holder shall, upon ten days prior written notice to the Company, have the right (but not the obligation) to require the Company to redeem (and the Company shall redeem) in connection with consummation of such Sale of the Company all or any portion of the Warrant, without exercising it, for consideration equal to the same number of shares of Common Stock and amount of cash and other property that the Holder would have been entitled to receive upon such Sale of the Company had this Warrant (or any portion thereof) been exercised immediately prior to consummation of such Sale of the Company using the Net Exercise procedures specified in Section 4.

4.      **Net Exercise**. In lieu of exercising this Warrant for cash, the Holder may elect to receive Common Stock (or other cash or property the Holder may be entitled to pursuant to Section 8(b)) equal to the value of this Warrant (or the portion thereof being exercised) (a "Net Exercise"). Upon a Net Exercise, the Holder shall have the rights described in Sections 3(b) and 3(c) hereof, and the Company shall issue to the Holder a number of Shares computed using the following formula:

$$X = Y \frac{(A - B)}{A}$$

      Where

          $X =$      The number of Shares to be issued to the Holder.

          $Y =$      The number of Shares purchasable under this Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being exercised (at the date of such calculation).

          $A =$      The Fair Market Value of one (1) Share (at the date of such calculation).

          $B =$      The Exercise Price (as adjusted to the date of such calculation).

      For purposes of this Warrant, the "Fair Market Value" of a Share shall mean the average of the closing prices of the Shares quoted in the over-the-counter market in which the Shares are traded or the closing price quoted on any exchange or electronic securities market on which the Shares are listed, whichever is applicable, as published in *The Wall Street Journal* for the thirty (30) trading days prior to the date of determination of fair market value (or such shorter period of time during which such Shares were traded over-the-counter or on such exchange). In the event that this Warrant is exercised pursuant to this Section 4 in connection with the consummation of the Company's sale of its Common Stock or other securities pursuant to a Public Offering, the Fair Market Value per Share shall be the per share offering price to the public of the Public Offering. In the event this Warrant is redeemed pursuant to Section 3(e) above or exercised pursuant this Section 4, in each case, in connection with consummation of a Sale of the Company, the Fair Market Value per Share shall be equal to the Fair Market Value of the consideration per Share that the Holder would have been entitled to receive upon such Sale of

4

the Company had this Warrant been redeemed or exercised immediately prior to the effective time of the Sale of the Company. If the Shares are not traded on the over-the-counter market, an exchange or an electronic securities market, the Fair Market Value shall be the price per Share that the Company could obtain from a willing buyer for Shares sold by the Company from authorized but unissued Shares, as such prices shall be reasonably determined in good faith by the trustee (the "ESOP Trustee") of the Company's employee stock ownership trust which forms part of the Company's employee stock ownership plan (the "ESOP") based upon a written valuation of the Company's shares of Common Stock prepared by an independent appraiser retained by the Company to determine the Fair Market Value of the Shares for purposes of the ESOP and delivered to the Holder.

For purposes of this Warrant, the "Fair Market Value" of property (including, without limitation, securities) other than Shares shall mean the fair market value thereof, as shall be reasonably determined in good faith by the Board of Directors of the Company (the "Board") and set forth in a written resolution delivered to the Holder. Any determination of Fair Market Value of property other than Shares shall be subject to the Holder's contest and appraisal rights set forth in Section 8(h) hereof. Furthermore, at any time prior to the consummation of a Net Exercise other than in connection with a Sale of the Company, the Holder shall have the right in its sole and absolute discretion to (a) rescind its election to exercise the Warrant pursuant to Section 3(a) above or (b) rescind its election to effect a Net Exercise and instead pay to the Company the aggregate Exercise Price in accordance with Section 3(a) for the number of Shares being purchased.

5.    **Regulatory Requirements**.

(a)    Hart-Scott-Rodino. If any filing or notification becomes necessary pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), based upon the planned exercise of this Warrant or any portion hereof, the Holder shall notify the Company of such requirement, and the Holder and the Company shall file with the proper authorities all forms and other documents necessary to be filed pursuant to the HSR Act, as promptly as possible and shall cooperate with each other in promptly producing such additional information as those authorities may reasonably require to allow early termination of the notice period provided by the HSR Act or as otherwise necessary to comply with requirements of the Federal Trade Commission or the Department of Justice. The Holder and the Company agree to cooperate with each other in connection with such filings and notifications, and to keep each other informed of the status of the proceedings and communications with the relevant authorities. Each of the Holder and the Company shall pay its own filing fee in connection with any filings required under the HSR Act as a result of the exercise of Warrants and shall each bear its own expenses incurred in connection with any filing required pursuant to the HSR Act. Each Holder by acceptance of this Warrant or any portion hereof agrees to comply with the provisions of this Section 5(a).

(b)    Other Regulatory Requirements. If the Holder or, upon the advice of counsel, the Company, determines that the exercise of this Warrant would require prior notice to, or the consent or approval by, the Federal Communications Commission or any other regulatory agency that is vested with jurisdiction over the Company, the Holder and the Company shall make all necessary filings and notifications required, and shall have received all

5

Source: TRIBUNE CO, 8-K, April 05, 2007

required consents, approvals, orders or otherwise, prior to effecting the exercise of this Warrant. The Company shall be required to pay all filing fees in connection with such filings and notifications.

6.  **Representations and Warranties of the Company**. In connection with the transactions provided for herein, the Company hereby represents and warrants to the Holder that:

(a)  Organization, Good Standing, and Qualification. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified and is authorized to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

(b)  Authorization. All corporate action on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Warrant by the Company, the performance of all obligations of the Company hereunder, and the authorization, issuance (or reservation for issuance), sale and delivery of the Shares issuable hereunder has been taken, and this Warrant constitutes a valid and legally binding obligation of the Company, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c)  Compliance with Other Instruments. The authorization, execution and delivery of the Warrant will not constitute or result in a material default or violation of any law or regulation applicable to the Company or any material term or provision of the Company's current certificate of incorporation or bylaws, or any material agreement or instrument by which it is bound or to which its properties or assets are subject.

(d)  Valid Issuance of Common Stock. The Shares, when issued, sold, and delivered in accordance with the terms of this Warrant for the consideration expressed herein, will be duly authorized, validly issued, fully paid and nonassessable and free from all preemptive rights, taxes, liens and charges with respect to the issuance thereof. Based in part upon the representations and warranties of the Holder in this Warrant, the offer, sale and issuance of this Warrant and the issuance of Shares upon exercise of this Warrant, are and will be exempt from the registration requirements of any applicable state and federal securities laws, and neither the Company nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemption.

7.  **Representations and Warranties of the Holder**. In connection with the transactions provided for herein, the Holder hereby represents and warrants to the Company that:

(a)  Authorization. The Holder has full power and authority to enter into this Warrant, and this Warrant constitutes its valid and legally binding obligation, enforceable in accordance with its terms except (i) as limited by applicable bankruptcy,

6

Source: TRIBUNE CO, 8-K, April 05, 2007

insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(b)    Accredited Investor.  The Holder is an "accredited investor" within the meaning of Rule 501 of Regulation D, as presently in effect, as promulgated by the SEC.

(c)    Restricted Securities.  The Holder understands that the securities are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration only in certain limited circumstances.  In this connection, the Holder represents that it is familiar with Rule 144, as presently in effect, as promulgated by the SEC ("Rule 144"), and understands the resale limitations imposed thereby and by the Act.

(d)    Legends.  It is understood that the Shares may bear the following legend:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT   UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT.  THESE SECURITIES ARE SUBJECT TO THE TERMS OF AN INVESTOR RIGHTS AGREEMENT AMONG THE COMPANY, EGI-TRB, L.L.C. AND GREATBANC TRUST COMPANY, SOLELY AS TRUSTEE OF THE TRIBUNE EMPLOYEE STOCK OWNERSHIP TRUST WHICH FORMS PART OF THE TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN."

8.    **Adjustment of Exercise Price and Number of Shares**.  The number and kind of Shares purchasable upon exercise of this Warrant and the Exercise Price shall be subject to adjustment from time to time as follows:

(a)    Subdivisions, Combinations and Other Issuances.  If the Company shall at any time after the issuance but prior to the expiration of this Warrant subdivide its Common Stock, by split-up or otherwise, or combine its Common Stock, or issue additional shares of its Common Stock as a dividend or distribution with respect to any shares of its Common Stock, the number of Shares issuable on the exercise of this Warrant shall forthwith be proportionately increased in the case of a subdivision or stock dividend or distribution, or proportionately decreased in the case of a combination.  The Exercise Price in effect prior to such subdivision, combination or issuance shall forthwith be proportionately decreased in the case of a subdivision or stock dividend or distribution, or proportionately increased in the case of a combination, but the aggregate Exercise Price payable for the total number of Shares purchasable under this Warrant (as adjusted) shall remain the same.  Any adjustment under this

7

Section 8(a) shall become effective at the close of business on the date the subdivision or combination becomes effective, or as of the record date of such dividend, or in the event that no record date is fixed, upon the making of such dividend.

(b)     Reclassification, Reorganization and Consolidation.  In the event of any corporate reclassification, capital reorganization, consolidation, spin-off, merger, transfer of all or a substantial portion of the Company's properties or assets or any dissolution, liquidation or winding up of the Company (other than as a result of a subdivision, combination, dividend or distribution provided for in Section 8(a) above) (a "Corporate Transaction"), then, as a condition of such event, provision shall be made, and duly executed documents evidencing the same from the Company and any surviving or acquiring person (the "Successor Company") shall be delivered to the Holder, so that the Holder shall have the right to receive upon exercise of this Warrant the same number of shares of Common Stock and amount of cash and other property that the Holder would have been entitled to receive upon such Corporate Transaction had this Warrant been exercised immediately prior to the effective time of such Corporate Transaction.  The Company shall provide that any Successor Company in such Corporate Transaction shall enter into an agreement with the Company confirming the Holder's rights pursuant to this Warrant, assuming the Company's obligations under this Warrant, jointly and severally with the Company if the Company shall survive such Corporate Transaction, and providing after the date of such Corporate Transaction for adjustments, which shall be as nearly equivalent as possible to the adjustments provided for in this Section 8.  The Company shall ensure that the Holder is a beneficiary of such agreement and shall deliver a copy thereof to the Holder.  The provisions of this Section 8(b) shall apply similarly to successive Corporate Transactions involving any Successor Company.  In the event of a Corporate Transaction in which consideration payable to holders of Common Stock is payable solely in cash, then the Holder shall be entitled to receive in exchange for this Warrant cash in an amount equal to the amount the Holder would have received had the Holder exercised this Warrant immediately prior to such Corporate Transaction, less the aggregate Exercise Price for this Warrant then in effect.  In case of any Corporate Transaction described in the immediately preceding sentence of this Section 8(b), the Company or any Successor Company, as the case may be, shall make available any funds necessary to pay to the Holder the amount to which the Holder is entitled as described above in the same manner and at the same time as holders of Common Stock would be entitled to such funds.

(c)     Dividends and Distributions.  In the event that the Company at any time or from time to time declares, orders, pays or makes any dividend or other distribution on the Common Stock, including, without limitation, distributions of cash, evidence of its indebtedness, Options, Convertible Securities, other securities or property or rights to subscribe for or purchase any of the forgoing, and whether by way of dividend, spin-off, reclassification, recapitalization, similar corporate reorganization or otherwise, other than (x) a dividend or distribution payable in additional shares of Common Stock that gives rise to an adjustment pursuant to Section 8(a) hereof, or (y) any dividend or distribution paid in cash out of retained earnings of the Company to the ESOP only to the extent subsequently paid to the Company to fund repayment of then-outstanding ESOP debt, then, and in each such case, the Exercise Price of this Warrant shall be reduced to a number determined by dividing the previously applicable Exercise Price by a fraction (which must be greater than 1, otherwise no adjustment is to be made pursuant to this Section 8(c)) (i) the numerator of which shall be the Fair Market Value per share of Common Stock on the record date for such dividend or other distribution, and (ii) the

8

Source: TRIBUNE CO, 8-K, April 05, 2007

denominator of which shall be the excess, if any, of (x) such Fair Market Value per share of Common Stock, over (y) the sum of the amount of any cash distribution per share of Common Stock plus the positive Fair Market Value, if any, per share of Common Stock of any such evidences of indebtedness, Options, Convertible Securities, other securities or property or rights to be so distributed.  Such adjustments shall be made whenever any such dividend or other distribution is made and shall become effective as of the date of such distribution, retroactive to the record date therefor.  For purposes of this Warrant the term "Options" means rights, options or warrants to subscribe for, purchase or otherwise acquire, directly or indirectly, shares of Common Stock, including, without limitation, Convertible Securities.  "Convertible Securities" means any evidences of indebtedness, shares of capital stock or any other securities convertible into or exchangeable for, directly or indirectly, shares of Common Stock.

(d)     Other Events.  If any other similar event occurs as to which the provisions of this Section 8 are not strictly applicable or if strictly applicable would not fairly protect the purchase rights of the Holder in accordance with such provisions, then the Board shall make an adjustment in the number of Shares available under this Warrant, the Exercise Price or the applicability of such provisions so as to protect such purchase rights.  The adjustment shall be such as will give the Holder upon exercise for the same aggregate Exercise Price the total number of shares of Common Stock as the Holder would have owned had this Warrant been exercised prior to the event and had the Holder continued to hold such Common Stock until after the event requiring the adjustment, but in no event shall any such adjustment have the effect of increasing or decreasing the Exercise Price.

(e)     Minimum Adjustment.  The adjustments required by the preceding subsections of this Section 8 shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the Exercise Price or the number of Shares purchasable upon exercise of this Warrant that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made decreases the Exercise Price immediately prior to the making of such adjustment by at least $0.01 or increases or decreases the number of Shares purchasable upon exercise of this Warrant immediately prior to the making of such adjustment by at least one Share.  Any adjustment representing a change of less than such minimum amount shall be carried forward and made as soon as such adjustment, together with other adjustments required by this Section 8 and not previously made, would result in the requisite minimum adjustment.

(f)     Accountants' Report as to Adjustments.  In the case of any adjustment in the number of Shares purchasable upon exercise of this Warrant or the Exercise Price, the Company, at its sole expense, shall promptly (i) compute such adjustment in accordance with the terms of this Warrant and, if the Holder so requests in writing from the Company within 30 days of receipt of such computations from the Company, cause independent certified public accountants of recognized national standing to verify such computation (other than any determination of the Fair Market Value), (ii) prepare a report setting forth such adjustment and showing in reasonable detail the method of calculation thereof and the facts upon which such adjustment is based, including, without limitation, (A) the event or events giving rise to such adjustment, (B) the number of shares of Common Stock outstanding or deemed to be outstanding prior and subsequent to any such transaction, (C) the method by which any such adjustment was calculated (including a description of the basis on which the Board made any

9

Source: TRIBUNE CO, 8-K, April 05, 2007

determination of Fair Market Value or fair market value required thereby) and (D) the number of Shares purchasable upon exercise of this Warrant and the Exercise Price in effect immediately prior to such event or events and as adjusted, (iii) mail a copy of each such report to the Holder and, upon the request at any time of the Holder, furnish to the Holder a like report setting forth the number of Shares purchasable upon exercise of this Warrant and the Exercise Price at the time in effect and showing in reasonable detail how they were calculated and (iv) keep copies of all such reports available at the principal office of the Company for inspection during normal business hours by the Holder or any prospective purchaser of this Warrant designated by the Holder.

(g)     No Dilution or Impairment. The Company shall not, by amendment of its certificate of incorporation or other organizational document or through any sale or other issuance of securities, capital reorganization, reclassification, recapitalization, consolidation, merger, transfer of assets, dissolution, liquidation, winding-up, any similar transaction or any other voluntary action, solely to avoid or solely to seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all terms hereunder and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against dilution or other impairment in a manner that is consistent with the Company's obligations hereunder. Without limiting the generality of the foregoing, the Company (i) will not permit the par value of any shares of Common Stock receivable upon the exercise of this Warrant to exceed the Exercise Price and (ii) will take all such action as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon the exercise of this Warrant by the Holder. Without limiting the generality of the foregoing, before taking any action that would cause a reduction of the Exercise Price pursuant to Section 8 hereof below the then par value (if any) of the Common Stock, the Company shall take any and all corporate action (including, without limitation, a reduction in par value) which shall be necessary to validly and legally issue fully paid and nonassessable shares of Common Stock, as the case may be, at the Exercise Price as so reduced.

(h)     Contest and Appraisal Rights. If the Holder shall, in good faith, disagree with any determination by the Board of the Fair Market Value made pursuant to this Warrant, and such disagreement is in respect of securities not traded on a national securities exchange or quoted on an automated quotation system or other property valued by the Board at more than $10,000,000, then the Holder may by notice to the Company (an "Appraisal Notice"), given within 30 days after notice to the Holder following such determination, elect to contest such determination; provided, however, that the Holder may not seek appraisal of any determination of Fair Market Value to the extent based upon the determination of the ESOP Trustee or if the Company has received a fairness opinion or other appraisal from an independent nationally recognized investment bank or other qualified financial institution acceptable to the Company and the Holder (the "Appraiser") in connection with the transaction giving rise to such determination. Within 20 days after an Appraisal Notice, the Company shall engage an Appraiser to make an independent determination of such Fair Market Value (the "Appraiser's Determination"), who shall deliver to the Company and the Holder a report describing its methodology and results in reasonable detail within 30 days of such engagement. In arriving at its determination, the Appraiser shall base any valuation of property on the fair market value of such property assuming that such property was sold in an arm's length transaction between an

10

informed and willing buyer and an informed and willing seller, under no compulsion to buy or sell, taking into account all the relevant facts and circumstances then prevailing. The Holder shall be afforded reasonable opportunities to discuss the appraisal with the Appraiser. The Appraiser's Determination shall be final and binding on the Company and the Holders, absent manifest error. The costs of conducting an appraisal shall be borne by the Company.

(i)  Notice of Corporate Action. In the event the Company proposes to: (i) pay, distribute, or take a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution, or any right to subscribe for, purchase or otherwise acquire any shares of capital stock or any other securities or property, or (ii) consummate any capital reorganization, reclassification, recapitalization, consolidation, merger, transfer of all or substantially all of its assets, dissolution, liquidation or winding-up, or any similar transaction then, at least 10 days prior to the earlier of any applicable record date or such event, as the case may be, the Company shall mail to the Holder a notice specifying: (A) the date or expected date on which any such payment or distribution is to be made or record is to be taken and the amount and character of any such dividend, distribution or right, (B) the date or expected date on which any such reorganization, reclassification, recapitalization, consolidation, merger, transfer, dissolution, liquidation, winding-up or similar transaction is to take effect and any record date therefor, (C) the time as of which any holders of record of shares of Common Stock and/or any other class of securities shall be entitled to exchange their shares of Common Stock and/or other securities for the securities or other property deliverable upon such reorganization, reclassification, recapitalization, consolidation, merger, transfer, dissolution, liquidation, winding-up or similar transaction and a description in reasonable detail of such transaction and (D) in each case, the expected effect on the number of Shares purchasable upon exercise of this Warrant and the Exercise Price of each such transaction or event. The Company shall update any such notice to reflect any change in the foregoing information.

9.  **No Fractional Shares**. No fractional shares of Common Stock shall be issued in connection with any exercise hereunder, but in lieu of such fractional shares the Company shall make a cash payment therefor based on the Fair Market Value thereof.

10.  **Other Antidilution Provisions**. In the event that the Company proposes to issue, sell, grant or assume any convertible or exchangeable debt (including, without limitation, debt issued by any affiliate of the Company convertible or exchangeable for shares of Common Stock) or equity securities which, in the aggregate, provide for greater or more favorable antidilution protection than the antidilution protection provided for in Section 8 hereof, then the Company shall give the Holder 30 business days' prior written notice of its intention to do so and offer the Holder the right to participate in such issuance, sale, grant or assumption on the same terms and conditions as proposed and to purchase a percentage of the aggregate amount of such convertible or exchangeable debt or aggregate number of such equity securities (or aggregate number of units, in the event that the convertible or exchangeable debt or equity securities are proposed to be issued, sold, granted or assumed together with other securities of the Company) proposed to be issued, sold, granted or assumed equal to a percentage determined by dividing (a) the total number of shares of Common Stock issuable upon exercise of this Warrant or any portion hereof then held by the Holder, its affiliates or permitted transferees by (b) the total number of outstanding shares of Common Stock on a fully diluted basis before

11

Source: TRIBUNE CO, 8-K, April 05, 2007

giving effect to any such proposed transaction. The Holder shall notify the Company of its intention to participate in such transaction within 15 business days of receipt of written notice from the Company. For the avoidance of doubt, a different exercise price or trigger price for the application of such rights (including any such price based on fair market value) shall not by itself be considered more favorable.

11.     **No Stockholder Rights**. Prior to exercise of this Warrant, the Holder shall not be entitled to any rights of a stockholder with respect to the Shares, including (without limitation) the right to vote such Shares, receive dividends or other distributions thereon, exercise preemptive rights or be notified of stockholder meetings and, except as otherwise provided in this Warrant, such Holder shall not be entitled to any stockholder notice or other communication concerning the business or affairs of the Company.

12.     **Transfer of Warrant**. Subject to compliance with applicable federal and state securities laws and any other contractual restrictions between the Company and the Holder contained herein and in the Investor Rights Agreement, this Warrant and all rights hereunder are transferable, in whole or in part, by the Holder to any Permitted Transferee upon written notice to the Company. Within a reasonable time after the Company's receipt of (x) an executed Assignment Form in the form attached hereto, (y) the written opinion of counsel to the Holder in form and substance reasonably satisfactory to the Company that the transferee of the Warrant will be an eligible S corporation holder and (z) the execution by the Permitted Transferee of a Joinder to the Investor Rights Agreement in form and substance reasonably satisfactory to the Company, the transfer shall be recorded on the books of the Company upon the surrender of this Warrant, properly endorsed, to the Company at its principal offices, and the payment to the Company of all transfer taxes and other governmental charges imposed on such transfer. In the event of a partial transfer, the Company shall issue to the new holders one or more appropriate new warrants. The Company will at no time close its transfer books against the transfer of this Warrant or of any Shares issued or issuable upon the exercise of this Warrant in any manner which interferes with the timely exercise of this Warrant. For purposes of this Section 12, "Permitted Transferee" shall mean any direct or indirect affiliate of the Holder, Equity Group Investments, L.L.C. or Samuel Zell; any direct or indirect member of the Holder and any direct or indirect affiliate thereof; any senior employee of Equity Group Investments, L.L.C. and any direct or indirect affiliate thereof; and Samuel Zell and his spouse, lineal ancestors and descendants (whether natural or adopted), any trust or retirement account primarily for the benefit of Samuel Zell and/or his spouse, lineal ancestors and descendants and any private foundation formed by Samuel Zell.

13.     **Governing Law**. This Warrant shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

14.     **Successors and Assigns**. The terms and provisions of this Warrant shall inure to the benefit of, and be binding upon, the Company and the holders hereof and their respective successors and assigns. This Warrant shall be binding upon any corporation or other entity succeeding the Company by merger, consolidation or acquisition of all or substantially all

12

of the Company's assets.  All of the obligations of the Company relating to the Shares issuable upon the exercise of this Warrant shall survive the exercise and termination of this Warrant.

15.    **Headings**.  Headings of the Sections of this Warrant are for convenience of the parties only and shall be given no substantive or interpretive effect whatsoever.

16.    **Notices**.  Any notice required to be given hereunder shall be sufficient if in writing, and sent by facsimile transmission (<u>provided</u> that any notice received by facsimile transmission or otherwise at the addressee's location on any business day after 5:00 p.m. (addressee's local time) shall be deemed to have been received at 9:00 a.m. (addressee's local time) on the next business day), by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows:

To the Company:

        Tribune Company
        435 North Michigan Avenue
        Chicago, IL 60611
        Attn: c/o Crane H. Kenney
        Senior Vice President, General Counsel & Secretary
        Tel: (312) 222-2491
        Fax: (312) 222-4206

with copies to:

        Wachtell, Lipton, Rosen & Katz
        51 West 52nd Street
        New York, NY 10019
        Attn: Steven A. Rosenblum and Peter E. Devine
        Tel: (212) 403-1221 and (212) 403-1179
        Fax: (212) 403-1179

To the Holder:

        EGI-TRB, L.L.C.
        c/o Equity Group Investments, L.L.C.
        Two North Riverside Plaza, Suite 600
        Chicago, IL 60606
        Attn: Joseph M. Paolucci and Marc D. Hauser
        Tel: (312) 466-3885 and (312) 466-3281
        Fax: (312) 454-0335

13

Source: TRIBUNE CO, 8-K, April 05, 2007

with copies to:

> Jenner & Block LLP
> 330 N. Wabash Ave.
> Chicago, IL 60611
> Attn: Joseph P. Gromacki
> Tel: (312) 923-2637
> Fax: (312) 923-2737

17.     **Entire Agreement; Amendments and Waivers**.  This Warrant and the documents delivered pursuant hereto constitute the entire agreement, and supersede all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.  Any provision of this Warrant may be amended or waived if, and only if, such amendment or waiver is in writing and signed.

18.     **Severability**.  Any term or provision of this Warrant which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Warrant in any other jurisdiction.  If any provision of this Warrant is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

19.     **Reservation of Shares**.  The Company covenants and agrees that during the period within which the rights represented by this Warrant may be exercised, the Company will at all times have authorized and reserved, for the purpose of issue or transfer upon exercise of the subscription rights evidenced by this Warrant, a sufficient number of shares of authorized but unissued Common Stock, or other securities and property, when and as required to provide for the exercise of the rights represented by this Warrant.  The Company will take all such action as may be necessary to assure that such Shares may be validly issued as provided herein without violation of any applicable law or regulation or of any requirements of any domestic securities exchange upon which the Shares may be listed.

20.     **Issue Tax**.  The issuance of certificates for Shares upon the exercise of this Warrant shall be made without charge to the Holder of this Warrant for any issue tax in respect thereof; provided, however, that the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than that of the then Holder of this Warrant being exercised.

21.     **Remedies**.  The Company stipulates that the remedies at law of the Holder in the event of any default or threatened default by the Company in the performance of or compliance with any of the terms of this Warrant are not and will not be adequate, and that such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any terms hereof or otherwise.  No failure or delay on the part of the Holder in exercising any right, power or remedy hereunder shall operate as a suspension or waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any

14

Source: TRIBUNE CO, 8-K, April 05, 2007

other right, power or remedy hereunder.  The remedies herein provided are in addition to and not exclusive of any other remedies provided at law or in equity.

22.    **Lost Warrants or Stock Certificates**.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction, or mutilation of any Warrant or stock certificate representing any Shares issued hereunder and, in the case of any such loss, theft or destruction, upon receipt of an indemnity reasonably satisfactory to the Company, or in the case of any such mutilation upon surrender and cancellation of such Warrant or stock certificate, the Company at its expense will make and deliver a new Warrant or stock certificate, of like tenor, in lieu of the lost, stolen, destroyed or mutilated Warrant or stock certificate.

[Signature Page Follows]

15

Source: TRIBUNE CO, 8-K, April 05, 2007

IN WITNESS WHEREOF, the Company has caused this Warrant to be executed in its corporate name by its duly authorized officer and to be dated as of the date first set forth above.

**TRIBUNE COMPANY**

By:    _____
Name:
Title:

**EGI-TRB, L.L.C.**

By:    _____
Name:
Title:

**Signature Page to Warrant Agreement**

## NOTICE OF EXERCISE

TRIBUNE COMPANY
Attention:  Corporate Secretary

The undersigned hereby elects to purchase, pursuant to the provisions of the Warrant, as follows:

_____ shares of Common Stock pursuant to the terms of the attached Warrant, and tenders herewith payment in cash of the Exercise Price of such Shares in full, together with all applicable transfer taxes, if any.

_____ Net Exercise the attached Warrant with respect to _____ Shares.

### HOLDER:

Date: _____                    By:_____

                                             Address:_____

                                             _____

                                             _____

Name in which shares should be registered:

_____

_____

## ASSIGNMENT FORM

(To assign the foregoing Warrant, execute this form and supply required information.  Do not use this form to purchase shares.)

**FOR VALUE RECEIVED**, the foregoing Warrant and all rights evidenced thereby are hereby assigned to

Name: _____
(Please Print)

Address: _____
(Please Print)

Dated: _____

Holder's
Signature: _____

Holder's
Address: _____

**NOTE:**  The signature to this Assignment Form must correspond with the name as it appears on the face of the Warrant.  Officers of corporations and those acting in a fiduciary or other representative capacity should provide proper evidence of authority to assign the foregoing Warrant.

Source: TRIBUNE CO, 8-K, April 05, 2007

**Exhibit 10.6**
[EXECUTION COPY]

## ESOP PURCHASE AGREEMENT

THIS ESOP PURCHASE AGREEMENT ("Agreement") is made this 1st day of April, 2007, between TRIBUNE COMPANY (the "Company") and GREATBANC TRUST COMPANY, not in its individual or corporate capacity, but solely as trustee (the "Trustee") of the TRIBUNE EMPLOYEE STOCK OWNERSHIP TRUST ("Purchaser" or the "Trust"), a separate trust created under the Tribune Employee Stock Ownership Plan (the "ESOP").

RECITALS:

WHEREAS, concurrently herewith, the Company has executed a merger agreement with the ESOP (the "Merger Agreement") pursuant to which a corporation formed by the ESOP (the "Initial ESOP Entity") will be merged with and into the Company (the "Merger"), with the Company being the surviving entity (the "Surviving Corporation");

WHEREAS, concurrently herewith, the Company, EGI-TRB, L.L.C., a Delaware limited liability company, and the Trustee, on behalf of the ESOP, have entered into that certain Investor Rights Agreement pursuant to which the parties thereto will have certain rights and obligations regarding the Surviving Corporation following the Merger;

WHEREAS, concurrently with execution of the Merger Agreement and subject to the terms and conditions of this Agreement, the Company desires to sell, and Purchaser desires to purchase, shares (the "Shares") of the Company's common stock, par value $.01 per share ("Common Stock"), having an aggregate purchase price of $250,000,000 (with the meaning of the word "Shares" including both the shares of the Company to be acquired as of the date of this Agreement and any such shares into which the Shares may be converted as a result of the Merger or other similar transaction);

WHEREAS, pursuant to the Merger Agreement, the Company will launch a tender offer at a purchase price of $34.00 per share for a maximum number of shares calculated to provide a return of capital to shareholders of $17.50 per share (the "Stock Repurchase");

WHEREAS, the ESOP wishes to acquire the Shares for its account and for the purpose of investment and not with a view of distribution or resale thereof and, accordingly, will not tender any of the Shares into the Stock Repurchase; and

WHEREAS, to induce Purchaser to purchase the Shares, the Company wishes to make (i) various representations and warranties and (ii) certain covenants for the benefit of Purchaser.

NOW, THEREFORE, in consideration of the foregoing and of the mutual agreements, covenants, and undertakings contained herein, and subject to and the terms and conditions herein set forth below, the parties to this Agreement hereby agree as follows:

SECTION 1.          PURCHASE OF SHARES

Subject to the terms and conditions of this Agreement, at the Closing (as defined in Section 3 hereof), the Company will transfer to Purchaser, and Purchaser will purchase the Shares.

SECTION 2.          PURCHASE PRICE AND PAYMENT

In full consideration of the Company's transfer and delivery to Purchaser of the Shares at the Closing, Purchaser shall pay to the Company an aggregate purchase price for the Shares of Two Hundred Fifty Million Dollars ($250,000,000.00) (the "Purchase Price"). Such payment of the Purchase Price shall be subject to the terms and conditions of this Agreement. The Purchase Price shall be payable by the Trust's delivery at the "Closing" (as defined in Section 3 below) of a promissory note dated as of the "Closing Date" (as defined in Section 3 below) and payable to the Company (the "ESOP Note" (a copy of which is attached to Schedule 1)), with (i) such note having those payment and other terms referenced in the ESOP Note and more fully described in an "ESOP Loan Agreement" of even date to which the Trust and the Company are parties (copy of which is attached to Schedule 2)), (ii) the extension of credit made under the ESOP Note and the ESOP Loan Agreement being referred to herein as the "ESOP Loan," and (iii) the extension of credit made under the ESOP Note and the ESOP Loan Agreement being secured by a pledge of the Shares pursuant to the terms of an "ESOP Pledge Agreement" of even date by and between the Company and the Trust (a copy of which is attached to Schedule 3). The number of Shares purchased hereunder shall be determined by dividing the Purchase Price by the lower of (A) the average of the last reported sales prices on each of the last twenty trading days ending on the trading date next preceding the Closing Date for a share of the Company's Common Stock on the New York Stock Exchange, (B) the last reported sales price for such a share of Common Stock on the New York Stock Exchange on the trading date next preceding the Closing Date, or (C) $28.00.

SECTION 3.          CLOSING

(a)     Time and Place.  The closing ("Closing") of the purchase of the Shares shall be held at a location mutually agreed upon by the Trustee and the Company on the date hereof.  The date of the Closing is referred to herein as the "Closing Date."

(b)     Deliveries.  On the Closing Date the Trustee and the Company shall make the deliveries described in Section 8 below.

SECTION 4.          REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to the Purchaser as follows:

(a)     Corporate Existence and Authority.  The Company (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite corporate power to execute, deliver and perform this Agreement; and (iii) has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement.

2

Source: TRIBUNE CO, 8-K, April 05, 2007

(b)     Trustee Appointment. The Company has taken all necessary corporate action to appoint GreatBanc Trust Company as trustee of the Trust.

(c)     No Conflict. The execution and delivery of this Agreement do not, and the consummation of the transactions contemplated hereby will not, violate, conflict with or constitute a default under (i) the Company's Certificate of Incorporation or By-Laws, (ii) any material agreement, indenture or other instrument to which the Company is a party or by which the Company or its assets may be bound or subject, or (iii) any law, regulation, order, arbitration award, judgment or decree applicable to the Company.

(d)     Validity. This Agreement has been duly executed and delivered by the Company and is a valid and binding agreement of the Company enforceable against the Company in accordance with its terms, except as the enforceability thereof may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other laws affecting the enforcement of creditors' rights generally, or by general equitable principles.

(e)     The Shares. The Shares have the rights, preferences and qualifications set forth in the Company's Certificate of Incorporation, have been duly authorized and, when issued and delivered against payment therefor as provided in Section 2 hereof, will be duly and validly issued and will constitute fully-paid and nonassessable shares of Common Stock of the Company. The Company will convey to the Purchaser, on the date of Closing, good and valid title to the Shares free and clear of any liens, claims, security interests and encumbrances, except for (i) beneficial interests accruing to ESOP participants and their beneficiaries and (ii) any liens, claims, security interests and encumbrances, created or imposed by the Purchaser.

(f)     ESOP Matters. The ESOP and the Trust have been duly authorized, organized and established by all necessary corporate action on the part of the Company. The ESOP is a legal and valid employee stock ownership plan within the meaning of Section 4975(e)(7) of the Internal Revenue Code of 1986, as amended (the "Code"), is qualified under Section 401(a) of the Code, and the Trust is exempt from taxation under Section 501(a) of the Code, subject to the receipt of a favorable determination letter from the Internal Revenue Service (the "IRS").

SECTION 5.           REPRESENTATIONS AND WARRANTIES OF THE TRUSTEE.

The Trustee represents and warrants to the Company as follows:

(a)     Trustee Existence and Authority. The Trustee is a trust company organized, validly existing, and in good standing under the laws of the State of Illinois. The Trustee has all requisite power and authority to act as Trustee and exercise trust powers, including without limitation, the trust powers provided in and contemplated under the Trust. Further, the Trustee, on behalf of the Trust, has full power and authority under the Trust to execute and deliver this Agreement and to consummate the transactions contemplated hereby. This Agreement has been duly authorized, executed and delivered by the Trustee on behalf of the Trust.

(b)     No Conflict. The execution and delivery of this Agreement do not, and the consummation of the transactions contemplated hereby will not, violate, conflict with or constitute a default under (i) the terms of the Trust, (ii) any agreement, indenture or other

3

instrument to which the Trust is a party or by which the Trust or its assets may be bound or subject, or (iii) any law, regulation, order, arbitration award, judgment or decree applicable to the Trust.

(c)     Validity. The Trustee has signed this Agreement as its own free act, and this Agreement constitutes the legal, valid and binding obligation of the Trustee and the Trust and is enforceable in accordance with its provisions, except to the extent limited by any applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other laws affecting creditors' rights generally, or by general equitable principles. The execution, delivery and performance of this Agreement by the Trustee, on behalf of the Trust, and the consummation of the transactions contemplated herein do not and will not require the Trustee to obtain the consent or approval of, or make any filing with, any person or public authority.

(d)     Investment. The Shares are being acquired by the Trustee for investment, and not for, with the view to, or in connection with the resale or distribution thereof in violation of Federal securities laws or any applicable state securities laws. The Trustee has no present intention to sell, hypothecate, distribute or otherwise transfer any of the Shares or any interest therein, except pursuant to the terms of the Trust.

(e)     No Commissions. The Trustee has not incurred any obligation for any finder's, broker's or agent's fees or commissions or similar compensation in connection with the transactions contemplated hereby.

(f)     Litigation and Compliance with Governmental Rules. There are no current actions, suits, proceedings, arbitrations or investigations pending or, to the knowledge of the Trustee, threatened against the Trust. The Trust is not subject to any court or administrative judgment, order, or decree which would reasonably be anticipated to have a material adverse effect on the Trust's right to enter into the transaction contemplated by this Agreement.

(g)     Opinion of Financial Advisor. The financial consulting firm of Duff & Phelps, LLC has delivered to Trustee its opinion dated as of the Closing Date to the effect that (i) the Purchase Price to be paid by the Trustee for the Shares is not in excess of fair market value for the purposes of Section 3(18) of ERISA; (ii) the interest rate payable under the ESOP Loan is not in excess of a reasonable rate of interest; (iii) the terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable extension of credit resulting from arm's length negotiations between independent parties; and (iv) the terms and conditions of the transactions which are to occur pursuant to this Agreement and the Merger Agreement are fair and reasonable to the Trustee from a financial point of view.

(h)     Satisfaction as to Prudence. The Trustee is satisfied in its sole discretion that the purchase of the Shares contemplated hereunder is prudent and in the best interest of ESOP participants and beneficiaries.

SECTION 6.            COVENANTS OF THE PARTIES.

(a)     Covenants of the Company. The Company hereby covenants and agrees with the Trustee as follows:

4

Source: TRIBUNE CO, 8-K, April 05, 2007

(1)      Maintenance of Company.  The Company will take all actions within its power to preserve its existence.

(2)      Maintenance of ESOP.  Subject to the right of the Company to amend or terminate the ESOP in accordance with the terms of the ESOP, the Company will take all actions within its power to preserve the existence of the ESOP and of the Trust and to maintain their tax-qualified status under Sections 401(a) and 501(a), respectively, of the Code. The Company shall administer, or cause to be administered, the ESOP in material compliance with (a) the Code and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), as applicable to the ESOP and this Agreement, and (b) all other laws and regulations applicable to the ESOP and the Trust.

(3)      Contributions to the ESOP.  The Company shall make contributions to the ESOP and/or declare and pay dividends/distributions on the Shares held by the ESOP in amounts which are sufficient to enable the Trustee to pay all interest and principal, when due, on the ESOP Loan; provided, however, that if (i) the Company terminates the ESOP or (ii) all or substantially all of either the Shares or the Company's assets are sold or otherwise transferred after consummation of the Merger, the Company's obligations under this Section 6(a)(3) shall cease prospectively.

(4)      ESOP Plan Qualification.  The Company will apply for a favorable determination letter with respect to the matters referenced in Section 4(f) and shall make such amendments as the IRS requests within the remedial amendment period allowed by Section 401(b) of the Code and the regulations thereunder; provided that no such amendments shall have a material adverse effect on the transactions contemplated hereby.  In addition, the Company will file with the IRS any amendments to the ESOP that are required with respect to the ESOP and any other amendments to the ESOP which should be so filed within the time prescribed by law for obtaining an effective date for the amendments that is retroactive to the earliest date allowed by the IRS.

(5)      Expenses.  The Company will pay the reasonable expenses of the Trustee and the Trust (including, without limitation, the fees of its legal and financial advisors) which are incurred (i) in connection with the authorization, preparation, execution, performance, negotiation and/or review of this Agreement and the documents ancillary thereto or (ii) in the performance of the Trustee's duties under and with respect to the Trust and the ESOP following the Closing.

(6)      Post-Merger.  After the consummation of the Merger the Company will, from time to time, contribute sufficient shares to the Trust to insure that the Trust owns at least 51% both as to value and voting of the Company's total equity on a fully-diluted basis; provided, that the provisions of this clause 6 shall no longer be applicable in the event that the Trust's ownership of the Company's total equity on a fully-diluted basis at any time drops below 51% as a result of any of the following events: (i) an equity offering subject to Article IV of the Investor Rights Agreement, dated as of the date hereof (the "Investor Rights Agreement"), by and among the Company, EGI-TRB, L.L.C. and the ESOP (A) in which the ESOP fails to purchase its pro rata share of the offered securities notwithstanding the Company having made available to the ESOP for

5

Source: TRIBUNE CO, 8-K, April 05, 2007

the purchase of such securities "Additional Financing" (as defined in Section 4.4 of the Investor Rights Agreement), (ii) a Qualified Public Offering (as defined in the Investor Rights Agreement) or (iii) a Sale of the Company (as defined in the Investor Rights Agreement). For purposes of this Agreement, the Company's total equity on a fully diluted basis shall mean all equity of the Company whether evidenced by issued and outstanding shares of capital stock, shares of capital stock issuable under options, warrants or convertible securities or equity value in the Company evidenced by stock appreciate rights, shares of phantom stock or other similar instruments.

       (7)    <u>Financial Statements, Reports and Documents</u>. The Company shall deliver to the Trustee the materials described in Article VI of the Investor Rights Agreement by and among the Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company as trustee of the Tribune Employee Stock Ownership Trust.

       (b)    <u>Covenants of the ESOP Trustee</u>. The Trustee hereby covenants and agrees with the Company, on behalf of the Trust, that it will not tender any of the Shares into the Stock Repurchase.

   SECTION 7.              TRANSFER OF SHARES.

       (a)    The Trustee acknowledges that the Shares shall not be registered under the 1933 Act, or under applicable state securities laws, and they will be transferable only pursuant to: (i) a public offering registered under the 1933 Act; (ii) Rule 144 or Rule 144A of the Securities and Exchange Commission (or any similar rule in force) if that rule is available after the applicable holding period; or (iii) any other legally available means of transfer, if the transferor provides the Company with a legal opinion from such transferor's legal counsel that is satisfactory to the Company's legal counsel.

       (b)    The certificates for the Shares will be imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER APPLICABLE STATE SECURITIES LAWS, AND ARE BEING OFFERED AND SOLD PURSUANT TO AN EXEMPTION FROM THOSE LAWS THAT LIMITS THE DISPOSITION AND THE TRANSFER OF THE SECURITIES. THEREFORE, THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THOSE TRANSFER LIMITATIONS. THE SECURITIES MAY NOT BE TRANSFERRED UNLESS, IN THE OPINION OF COUNSEL TO THE COMPANY, REGISTRATION UNDER THE ACT OR APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED OR UNLESS THE SECURITIES ARE SO REGISTERED. THIS CERTIFICATE AND THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO RESTRICTIONS ON TRANSFER IMPOSED BY AN INVESTOR RIGHTS AGREEMENT DATED AS OF April 1, 2007 BY AND AMONG TRIBUNE COMPANY, EGI-TRB, L.L.C. AND GREATBANC TRUST COMPANY, AS TRUSTEE. THE SHARES REPRESENTED BY THIS CERTIFICATE ARE TRANSFERABLE ONLY UPON COMPLIANCE WITH THE TERMS OF THE

6

TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN, WHICH RESTRICTS THE TRANSFER OF SUCH SHARES IN THE MANNER DESCRIBED THEREIN, A COPY OF SAID PLAN BEING ON FILE IN THE OFFICE OF THE COMPANY."

SECTION 8.                    CLOSING DELIVERIES

(a)    By the Trustee. At the Closing, the Trustee shall deliver to the Company the ESOP Note in payment for the Shares, as provided in and subject to the provisions of Section 2 above.

(b)    By the Company. At the Closing, the Shares shall be credited, free and clear of any encumbrances, to a securities account of the Trustee for the benefit of the Purchaser. The Company shall deliver to the Trustee a certificate, dated as of the Closing Date and signed by the Secretary of the Company, certifying (i) resolutions of the Board of Directors of the Company authorizing the Company to enter into this Agreement and the related agreement(s) contemplated herein and to consummate the transactions and perform its obligations hereunder and thereunder, and (ii) as to the incumbency and specimen signatures of each officer of the Company executing this Agreement and any other agreement or document contemplated herein. The Company shall also deliver to the Trustee a registration rights agreement of even date, signed by the Company, in favor of the Trustee (on behalf of the Trust).

(c)    By the Trustee and the Company. At the Closing, the Trustee and the Company shall sign and deliver to each other copies of the ESOP Loan Agreement and the ESOP Pledge Agreement.

SECTION 9.                    NO SURVIVAL OF REPRESENTATIONS AND WARRANTIES.

None of the representation and warranties in this Agreement or any instrument delivered pursuant to this Agreement shall survive the Closing.

SECTION 10.                   SEVERABILITY.

The invalidity or unenforceability of any provisions of this Agreement shall not affect the validity or enforceability of any other provision under this Agreement.

SECTION 11.                   ASSIGNMENT, SUCCESSORS AND ASSIGNS.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. No party shall assign any of its rights or obligations hereunder without the prior written consent of the other party, except that the Trustee may assign its rights and obligations hereunder without consent to any successor trustee or trustees of the Trust or any successor Trust of the ESOP.

SECTION 12.                   GENERAL.

(a)    Execution of Counterparts. For the convenience of the parties, this Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

7

Source: TRIBUNE CO, 8-K, April 05, 2007

(b)    Notices. All notices which are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be sufficient in all respects if delivered personally or by registered or certified mail, postage prepaid, or facsimile as follows:

If to the Company:

> Tribune Company
> 435 North Michigan Avenue
> Chicago, IL 60611
> Attn: c/o Crane H. Kenney
> Senior Vice President, General Counsel & Secretary
> Tel: (312) 222-2491
> Fax: (312) 222-4206

Copies to:

> McDermott Will & Emery LLP
> 227 West Monroe Street
> Chicago, IL 60606
> Attn: Paul Compernolle and
> William W. Merten
> Tel: (312) 984-7647
> Fax: (312) 984-7700
>
> Wachtell, Lipton, Rosen & Katz
> 51 West 52 Street
> New York, NY 10019
> Attn: Steven A. Rosenblum
> and Peter E. Devine
> Tel: (212) 403-1221 and (212) 403-1179
> Fax: (212) 403-1179

If to the Trust to:

> Tribune Employee Stock Ownership Trust
> c/o GreatBanc Trust Company, Trustee
> 1301 West 22nd Street, Suite 702
> Oak Brook, IL 60523
> Attn: Marilyn Marchetti and Danielle Montesano
> Tel: (630) 572-5121 and (630) 572-5120
> Fax: (630) 571-0599

Copies to:

> K & L Gates
> 535 Smithfield Street
> Pittsburgh, PA 15222-2312
> Attn: Charles R. Smith, Esq.
> Tel: (412) 355-6536
> Fax: (412) 355-6501

(c)    Governing Law. This Agreement shall be governed by and construed in accordance with ERISA, the Code and, to the extent not preempted by Federal law, the laws of the State of Delaware. Whenever possible, each provision of this Agreement shall be construed and interpreted in such manner as to be effective and valid under ERISA and the Code, and the

8

regulations issued thereunder, but if any provision of this Agreement shall be prohibited or invalid under such statutes or regulations, such provision shall be unenforceable and ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(d)    Amendments, Waivers, Discharges, etc.  This Agreement may not be amended or modified except by a writing signed by all parties to be bound by the amendment or modification.  The failure of a party to enforce any provision of this Agreement shall not be deemed a waiver by such party of any other provision or subsequent breach of the same or any other obligation hereunder.

(e)    Entire Agreement.  Other than the provisions of the Trustee's Engagement Agreement dated February 26, 2007 with the Company (the "Trustee's Engagement Letter"), this Agreement contains all the terms agreed upon by the parties with respect to the purchase and sale of the Shares and, except as to the Trustee's Engagement Letter, it supersedes all prior agreements, arrangements, or understandings, whether oral or written, with respect to the purchase and sale of the Shares.

(f)    Action as Trustee.  The Trustee has signed and delivered this Agreement solely as trustee of the ESOP, and not in its individual or corporate capacity.  The performance of this Agreement by the Trustee, and all duties, obligations, and liabilities of the Trustee under this Agreement, will be undertaken by the Trustee only in its capacity as the trustee of the ESOP.  The Trustee does not undertake any individual or corporate liability or obligation by virtue of the signing and delivery of this Agreement or by reason of the representations, warranties, and covenants contained in this Agreement.

[Remainder of page intentionally left blank.]

*[Signature pages to follow.]*

9

Source: TRIBUNE CO, 8-K, April 05, 2007

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first above written.

**The Trust:**

GreatBanc Trust Company, not in its
individual or corporate capacity, but
solely as Trustee of Tribune Employee
Stock Ownership Plan

By:    /s/ Marilyn H. Marchetti
      Marilyn H. Marchetti

Its:    Senior Vice President

**Tribune Company:**

By:    /s/ Dennis J. FitzSimons
      Dennis J. FitzSimons
Its:    Chairman, President and Chief
      Executive Officer

**Signature Page to ESOP Purchase Agreement**