Exhibit 10.13

[EXECUTION COPY]

### VOTING AGREEMENT

THIS VOTING AGREEMENT (this "Agreement") is made and entered into this 1st day of April, 2007 by and between Tribune Company, a Delaware corporation (the "Company"), and each of Chandler Trust No. 1 and Chandler Trust No. 2 (Chandler Trust No. 1 and Chandler Trust No. 2 collectively being the "Shareholders").

WHEREAS, concurrently herewith, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and the Company have entered into an Agreement and Plan of Merger (as amended from time to time, the "Merger Agreement") (unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed thereto in the Merger Agreement) pursuant to which the ESOP will acquire the Company by merging Merger Sub with and into the Company (the "Merger"), with the Company surviving the Merger as the surviving corporation (the "Surviving Corporation");

WHEREAS, the Company, EGI-TRB, L.L.C. ("EGI-TRB") and Samuel Zell have concurrently herewith entered into that certain Securities Purchase Agreement, dated April 1, 2007 (the "EGI-TRB Purchase Agreement"), pursuant to which EGI-TRB will purchase from the Company, (i) as soon as practicable following the execution and delivery of the EGI-TRB Purchase Agreement, (a) newly-issued shares of the Company's common stock, par value $0.01 per share (the "Company Common Stock"), and (b) an unsecured subordinated exchangeable promissory note, and (ii) immediately following the consummation of the Merger, (x) an unsecured subordinated promissory note and (y) warrants to purchase shares of Company Common Stock;

WHEREAS, concurrently herewith, the ESOP and the Company have entered into an ESOP Purchase Agreement (as amended from time to time, the "ESOP Purchase Agreement") pursuant to which the ESOP has, on the terms and subject to the conditions set forth in the ESOP Purchase Agreement, agreed to purchase shares of Company Common Stock;

WHEREAS, as of the date hereof, each Shareholder is the record and beneficial owner of, and has the sole right to vote and dispose of, that number of shares of Company Common Stock (such shares, together with any other capital stock of the Company acquired by such Shareholder after the date hereof whether acquired directly or indirectly, upon the exercise of options, conversion of convertible securities or otherwise, being collectively referred to herein as the "Shares") set forth on Attachment A hereto;

WHEREAS, concurrently herewith and as a condition to the Shareholders' execution of this Agreement, the Company and the Shareholders have entered into a Registration Rights Agreement (as amended from time to time, the "Registration Rights Agreement") pursuant to which the Company has granted the Shareholders certain registration rights with respect to the Shares; and

WHEREAS, obtaining appropriate shareholder approval is a condition to the consummation of the Merger and certain of the other transactions contemplated by the Merger Agreement.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## VOTING

Section 1.1        Agreement to Vote.  Each Shareholder irrevocably and unconditionally hereby agrees that from and after the date hereof until the earlier of (a) the Effective Time and (b) any date of termination of the Merger Agreement in accordance with its terms (the "Expiration Time"), at any meeting (whether annual or special and each adjourned or postponed meeting) of the Company's shareholders, however called, or in connection with any written consent of the Company's shareholders, each Shareholder will (i) appear at such meeting or otherwise cause its Owned Shares (as defined below) to be counted as present thereat for purposes of calculating a quorum and (ii) vote or cause to be voted (including by written consent, if applicable) all of such Shareholder's Shares beneficially owned by such Shareholder as of the relevant time (the "Owned Shares"), (A) for approval and adoption of the Merger Agreement and the transactions contemplated by the Merger Agreement, (B) against any Alternative Proposal, without regard to the terms of such Alternative Proposal, or any other proposal made in opposition to adoption of the Merger Agreement or in competition or inconsistent with the Merger and the other transactions contemplated by the Merger Agreement, (C) against any agreement, amendment of any agreement (including the Company's certificate of incorporation or by-laws), or any other action that is intended or would reasonably be expected to prevent, impede, or, in any material respect, interfere with, delay, postpone or discourage the transactions contemplated by the Merger Agreement, other than those specifically contemplated by this Agreement, the Merger Agreement or the other agreements contemplated thereby and (D) against any action, agreement, transaction or proposal that would result in a breach of any representation, warranty, covenant, agreement or other obligation of the Company in the Merger Agreement, the EGI-TRB Purchase Agreement or the ESOP Purchase Agreement.

Section 1.2        Restrictions on Transfers.  The Shareholders hereby agree that, from the date hereof until the Expiration Time, they shall not, directly or indirectly, sell, assign, give, mortgage, pledge, hypothecate, issue, bequeath or in any manner encumber or dispose of, or permit to be sold, assigned, encumbered, attached or otherwise disposed of in any manner, whether voluntarily, involuntarily or by operation of law, with or without the Company's certificate of incorporation or by-laws), Owned Shares in an aggregate of five percent (5%) of the Company's outstanding Common Stock in a single Transfer or series of related Transfers to a third party other than Goldman Sachs & Co. ("Goldman Sachs") or another financial intermediary as nominee, underwriter or otherwise for further distribution thereof, unless as a condition to any such Transfer or Transfers, the transferee or transferees shall execute an agreement that contains the same substantive covenants regarding voting and the granting of a proxy as are contained in this Agreement (except to reflect the change of the Shareholder).

Section 1.3        Irrevocable Proxy. Each Shareholder hereby revokes any and all previous proxies granted with respect to his, her or its Owned Shares.  Subject to the last two sentences of this Section 1.3, upon the request of the Company and subject to applicable law, each Shareholder shall, or shall use its reasonable efforts to cause Goldman Sachs as the nominee of the Shareholders to, irrevocably appoint the Company or its designee as such Shareholder's

2

Source: TRIBUNE CO, 8-K, April 05, 2007

proxy, to vote (or cause to be voted) his, her or its Owned Shares in favor of approval of the Merger Agreement, the Merger and the other transactions contemplated by the Merger Agreement, as applicable, and subject to and otherwise in accordance with Section 1.1 hereof. Such proxy shall be irrevocable and coupled with an interest and shall be granted in consideration of the Company entering into the Registration Rights Agreement. In the event that Goldman Sachs for any reason fails to irrevocably appoint the Company or its designee as such Shareholder's proxy in accordance with this Section 1.3, such Shareholder shall cause Goldman Sachs to vote his, her or its Owned Shares in accordance with Section 1.1 hereof. In the event that any Shareholder or Goldman Sachs fails for any reason to vote his, her or its Owned Shares in accordance with the requirements of Section 1.1 hereof, then the Company or its designee shall have the right to vote such Shareholder's Owned Shares in accordance with Section 1.1. Subject to applicable law, the vote of the Company or its designee shall control in any conflict between the vote by the Company or its designee of such Shareholder's Owned Shares and a vote by such Shareholder (or Goldman Sachs on behalf of such Shareholder) of his, her or its Owned Shares. Notwithstanding the foregoing, the proxy granted by each Shareholder and/or Goldman Sachs shall be automatically revoked upon termination of this Agreement in accordance with its terms.

Section 1.4    Inconsistent Agreements. Each Shareholder hereby agrees that he, she or it shall not enter into any agreement, contract or understanding with any person prior to the termination of the Merger Agreement directly or indirectly to vote, grant a proxy or power of attorney or give instructions with respect to the voting of such Shareholder's Owned Shares in any manner which is inconsistent with this Agreement.

Section 1.5    Waiver of Voting Restriction in Distribution Agreements. The Company and the Shareholders hereby agree to waive Section 4.6(b) of the Distribution Agreements (as hereinafter defined) with respect to, and only with respect to, voting all of the Owned Shares as contemplated by this Agreement. The "Distribution Agreements" shall mean (i) the Distribution Agreement, dated September 21, 2006, by and among TMCT, LLC, the Company, Candle Holdings Corporation, Fortify Holdings Corporation and the Shareholders and (ii) the Distribution Agreement, dated September 21, 2006, by and among TMCT II, LLC, the Company, Fortification Holdings Corporation, Wick Holdings Corporation, Eagle New Media Investments, LLC, Eagle Publishing, LLC and the Shareholders. For purposes of clarification, the provisions of Section 4.6(b) of the Distribution Agreements do not apply to the transfer of any Owned Shares by a Trust Member (as defined in the Distribution Agreements) to any person other than a beneficiary of a Trust Member following the transfer of all of such Trust Member's right, title and interest in and to the Owned Shares.

**ARTICLE II**
**NO SOLICITATION**

Section 2.1    General. Each Shareholder in his, her or its capacity as a shareholder of the Company shall not, and shall direct his, her or its Representatives not to, directly or indirectly, (a) solicit, initiate or knowingly facilitate or encourage any inquiry with respect to, or the making, submission or announcement of, any Alternative Proposal, (b) participate in any negotiations regarding, or furnish to any person any nonpublic information regarding, an Alternative Proposal, (c) engage in discussions with any person regarding an Alternative Proposal, (d) approve, endorse or recommend any Alternative Proposal, (e) enter into any letter

3

Source: TRIBUNE CO, 8-K, April 05, 2007

of intent or agreement in principle or any agreement providing for any Alternative Proposal, or (f) otherwise cooperate with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any person (other than EGI-TRB, the ESOP, Merger Sub or their respective Representatives) with respect to, or which would reasonably be expected to result in, an Alternative Proposal (the activities specified in clauses (a) through (f) being hereinafter referred to as the "Restricted Activities"); provided, that if the Company is engaging in Restricted Activities in compliance with Section 5.3 of the Merger Agreement, the Shareholders may participate with the Company in such Restricted Activities. Each Shareholder shall promptly inform his, her or its Representatives of the obligations under this Section 2.1. Without limiting the foregoing, it is understood that any action of any Representative of any Shareholder that would be a violation if taken by such Shareholder shall be deemed to be a breach of this Section 2.1 by such Shareholder.

Section 2.2    Notification. Each Shareholder promptly shall advise the Company, EGI-TRB and the ESOP orally and in writing of (a) any Alternative Proposal after the date hereof or indication or inquiry after the date hereof with respect to or that would reasonably be expected to lead to any Alternative Proposal, (b) any request after the date hereof for nonpublic information relating to the Company or its Subsidiaries, other than requests for information not reasonably expected to be related to an Alternative Proposal, or (c) any inquiry or request after the date hereof for discussion or negotiation regarding an Alternative Proposal, including in each case the identity of the person making any such Alternative Proposal or indication or inquiry and the material terms of any such Alternative Proposal or indication or inquiry (including copies of any document or correspondence evidencing such Alternative Proposal or inquiry). Each Shareholder shall keep the Company, EGI-TRB and the ESOP reasonably informed on a current basis (and in any event promptly after the occurrence of any changes or developments) of the status (including the material terms and conditions thereof and any material change thereto) of any such Alternative Proposal or indication or inquiry, including furnishing copies of any written revised proposals. No Shareholder shall enter into any confidentiality agreement with any person subsequent to the date of this Agreement which prohibits such Shareholder from providing such information to the Company, EGI-TRB or the ESOP as required by this Section 2.2.

Section 2.3    Ongoing Discussions. On the date hereof, each Shareholder shall, and shall direct his, her or its Representatives to, immediately cease any discussions or negotiations with any parties that may be ongoing with respect to any Alternative Proposal.

Section 2.4    Capacity. Each Shareholder is signing this Agreement solely in such Shareholder's capacity as a shareholder of the Company and nothing contained herein shall limit or affect any actions taken by any Shareholder in his, her or its capacity as an officer or director of the Company, and no action taken in any such capacity as an officer or director shall be deemed to constitute a breach of this Agreement.

**ARTICLE III**
**REPRESENTATIONS, WARRANTIES AND COVENANTS**
**OF SHAREHOLDERS**

Section 3.1    Representations and Warranties. Each Shareholder represents and warrants to the Company as follows: (a) such Shareholder has the requisite capacity and all

4

Source: TRIBUNE CO, 8-K, April 05, 2007

necessary power and authority to execute and deliver this Agreement and to perform his, her or its obligations hereunder, (b) this Agreement has been duly executed and delivered by such Shareholder and the execution, delivery and performance of this Agreement by such Shareholder and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of such Shareholder, (c) assuming the due authorization, execution and delivery of this Agreement by the Company, this Agreement constitutes the valid and binding agreement of such Shareholder enforceable against such Shareholder in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application which may affect the enforcement of creditors, rights generally and by general equitable principles, (d) the execution and delivery of this Agreement by such Shareholder does not conflict with or violate any law or agreement binding upon it, nor require any consent, notification, regulatory filing or approval, except for the filing with the Securities and Exchange Commission of an amendment to Schedule 13D by the Shareholders, and (e) except for (i) restrictions in favor of the Company pursuant to this Agreement or the Distribution Agreements and (ii) such transfer restrictions of general applicability as may be provided under the Securities Act of 1933, as amended, and the "blue sky" laws of the various states of the United States, such Shareholder owns, beneficially and of record, all of such Shareholder's Owned Shares free and clear of any proxy, voting restriction, adverse claim or other Lien (other than any restrictions created by this Agreement) and has sole voting power and sole power of disposition with respect to such Shareholder's Owned Shares, with no restrictions on such Shareholder's rights of voting or disposition pertaining thereto and no person other than such Shareholder has any right to direct or approve the voting or disposition of any of such Shareholder's Owned Shares.

Section 3.2      Covenants.  From the date hereof until the Expiration Time:

(a)      each Shareholder agrees not take any action that would make any representation or warranty of such Shareholder contained herein untrue or incorrect or have the effect of preventing, impeding, or, in any material respect, interfering with or adversely affecting the performance by such Shareholder of its obligations under this Agreement;

(b)      each Shareholder hereby waives any rights of appraisal or rights of dissent from the Merger that such Shareholder may have;

(c)      each Shareholder hereby agrees, while this Agreement is in effect, to promptly notify the Company of the number of any new Shares acquired by such Shareholder, if any, after the date hereof. Any such Shares shall be subject to the terms of this Agreement as though owned by the Shareholder on the date hereof;

(d)      from time to time, at the request of the Company and without further consideration, each Shareholder shall execute and deliver such additional documents and take all such further action as may be necessary to consummate and make effective the transactions contemplated by this Agreement; and

(e)      each Shareholder, severally and not jointly, hereby authorizes the Company to publish and disclose in any announcement or disclosure required by the SEC and in the Proxy Statement such Shareholder's identity and ownership of the Owned Shares and the nature of such Shareholder's obligation under this Agreement; provided that such Shareholder is provided with a reasonable opportunity to review and comment on such disclosure.

5

Source: TRIBUNE CO, 8-K, April 05, 2007

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Section 4.1        Representations and Warranties of the Company.  The Company represents and warrants to each Shareholder as follows: (a) each of this Agreement, the EGI-TRB Purchase Agreement, the ESOP Purchase Agreement and the Merger Agreement has been approved by the Company's board of directors, (b) each of this Agreement, the EGI-TRB Purchase Agreement, the ESOP Purchase Agreement and the Merger Agreement has been duly executed and delivered by a duly authorized officer or other representative of the Company and (c) assuming the due authorization, execution and delivery of this Agreement by each Shareholder, this Agreement constitutes a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application which may affect the enforcement of creditors rights generally and by general equitable principles.

## ARTICLE V
## TERMINATION

Section 5.1        Termination.  This Agreement shall automatically terminate and be of no further force or effect upon the Expiration Time (other than with respect to this Section 5.1 and Article VI, which shall survive any termination of this Agreement); provided that no such termination shall relieve any party hereto from any liability for any breach of this Agreement occurring prior to such termination.

## ARTICLE VI
## MISCELLANEOUS

Section 6.1        Expenses.  Except as otherwise agreed in writing, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring or required to incur such expenses.

Section 6.2        Notices.  Any notice required to be given hereunder shall be sufficient if in writing, and sent by facsimile transmission (provided that any notice received by facsimile transmission or otherwise at the addressee's location on any business day after 5:00 p.m. (addressee's local time) shall be deemed to have been received at 9:00 a.m. (addressee's local time) on the next business day), by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows:

To the Shareholders:

> Chandler Trust No. 1 and Chandler Trust No. 2
> 350 W. Colorado Boulevard, Suite 230
> Pasadena, CA 91105
> Attn: Warren B. Williamson
> Tel: (626) 793-2623
> Fax: (626) 793-0814

6

Source: TRIBUNE CO, 8-K, April 05, 2007

with a copy to:

        Gibson, Dunn & Crutcher LLP
        333 South Grand Avenue, 47th Floor
        Los Angeles, CA 90071
        Attn: Andrew E. Bogen and Peter W. Wardle
        Tel: (213) 229-7000
        Fax: (213) 229-7520

To the Company:

        Tribune Company
        435 North Michigan Avenue
        Chicago, IL 60611
        Attn: Crane H. Kenney
        Senior Vice President, General Counsel & Secretary
        Tel: (312) 222-2491
        Fax: (312) 222-4206

with copies to:

        Wachtell, Lipton, Rosen & Katz
        51 West 52nd Street
        New York, NY 10019
        Attn: Steven A. Rosenblum and Peter E. Devine
        Tel: (212) 403-1000
        Fax: (212) 403-2000

        and

        Sidley Austin LLP
        One South Dearborn Street
        Chicago, IL 60603
        Attn: Thomas A. Cole and Larry A. Barden
        Tel: (312) 853-7473 and (312) 853-7785
        Fax: (312) 853-7036

        and

        Skadden, Arps, Slate, Meagher & Flom LLP
        Suite 2100
        333 West Wacker Drive
        Chicago, IL 60606
        Attn: Charles W. Mulaney, Jr.
        Tel: (312) 407-0700
        Fax: (312) 407-0411

        and

7

Source: TRIBUNE CO, 8-K, April 05, 2007

Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL 60611
Attn: Joseph P. Gromacki
Tel: (312) 923-2637
Fax: (312) 923-2737

or to such other address as any party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated, personally delivered or mailed. Any party to this Agreement may notify any other party of any changes to the address or any of the other details specified in this paragraph; provided, however, that such notification shall only be effective on the date specified in such notice or five (5) business days after the notice is given, whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

Section 6.3        Amendments, Waivers, Etc. At any time prior to the Expiration Time, any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by the Company and the Shareholders, or in the case of a waiver, by the party against whom the waiver is to be effective. The failure of any party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other party hereto with his or its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such party of his or its right to exercise any such or other right, power or remedy or to demand such compliance.

Section 6.4        Successors and Assigns; Share Transfers.

(a)        Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, including any corporate successor by merger or otherwise, and any transferee of Shares that is a trust which has the same trustees as the Shareholders (each an "Affiliated Trust").

(b)        The Company agrees to use its commercially reasonably efforts to assist the Shareholders, and to cause its transfer agent to assist the Shareholder, with transfers of Shares to an Affiliated Trust or among Affiliated Trusts, in each case whether in certificated form or by electronic book entry. Notwithstanding any transfer of Shares to an Affiliated Trust, the transferor shall remain liable for the performance of all obligations of transferor under this Agreement.

Section 6.5        No Third Party Beneficiaries. Nothing expressed or referred to in this Agreement will be construed to give any person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any

8

Source: TRIBUNE CO, 8-K, April 05, 2007

provision of this Agreement except as such rights as may inure to a successor or permitted assignee under Section 6.4.

Section 6.6       No Partnership, Agency, or Joint Venture. This Agreement is intended to create, and creates, a contractual relationship and is not intended to create, and does not create, any agency, partnership, joint venture or any like relationship between the parties hereto.

Section 6.7       Entire Agreement. This Agreement (including the attachment hereto) constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, between the parties, or any of them, with respect to the subject matter hereof and thereof.

Section 6.8       Severability. Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

Section 6.9       Specific Performance; Remedies Cumulative. The parties hereto acknowledge that money damages are not an adequate remedy for violations of this Agreement and that any party, in addition to any other rights and remedies which the parties may have hereunder or at law or in equity, may, in his, her or its sole discretion, apply to a court of competent jurisdiction for specific performance or injunction or such other relief as such court may deem just and proper in order to enforce this Agreement or prevent any violation hereof and, to the extent permitted by applicable law, each party waives any objection to the imposition of such relief. All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise or beginning of the exercise of any thereof by any party shall not preclude the simultaneous or later exercise of any other such rights, powers or remedies by such party.

Section 6.10       Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

Section 6.11       Jurisdiction. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware). In addition, each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by the other party hereto or its successors or assigns, shall be brought and determined exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, if the

9

Source: TRIBUNE CO, 8-K, April 05, 2007

Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware). Each of the parties hereto hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the aforesaid courts. Each of the parties hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve in accordance with this Section 6.11, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by the applicable law, any claim that (i) the suit, action or proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject mater hereof, may not be enforced in or by such courts.

Section 6.12     Waiver of Jury Trial. Each Shareholder hereby waives, to the fullest extent permitted by applicable law, any right he, she or it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement. Each Shareholder (a) certifies that no representative of any other party has represented, expressly or otherwise, that such other party would not, in the event of any such litigation, seek to enforce the foregoing waiver and (b) acknowledges that he, she or it has been induced to enter into this Agreement by, among other things, the consideration received by such Shareholder in respect of such Shareholder's Owned Shares pursuant to the transactions contemplated by the Merger Agreement.

Section 6.13     Drafting and Representation. Each of the parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

Section 6.14     Construction. When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement or instrument defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement or instrument as from time to time amended, modified or supplemented, including by waiver or consent, and references to all attachments thereto and instruments incorporated therein.

Section 6.15     Counterparts. This Agreement may be executed in two or more consecutive counterparts (including by facsimile), each of which shall be an original, with the

10

Source: TRIBUNE CO, 8-K, April 05, 2007

same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties and delivered (by telecopy or otherwise) to the other parties.

**[Signature Page follows]**

11

Source: TRIBUNE CO, 8-K, April 05, 2007

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date and year first written above.


TRIBUNE COMPANY

By:   /s/ Dennis J. FitzSimons
Name:  Dennis J. FitzSimons
Title:        Chairman, President and
              Chief Executive Officer

CHANDLER TRUST NO. 1

By:   /s/ Susan Babcock
     Susan Babcock, as Trustee of Chandler
     Trust No. 1 under Trust Agreement dated
     June 26, 1935

By:   /s/ Jeffrey Chandler
     Jeffrey Chandler, as Trustee of Chandler
     Trust No. 1 under Trust Agreement dated
     June 26, 1935

By:   /s/ Camilla Chandler Frost
     Camilla Chandler Frost, as Trustee of
     Chandler Trust No. 1 under Trust
     Agreement dated June 26, 1935

By:   /s/ Roger Goodan
     Roger Goodan, as Trustee of Chandler Trust
     No. 1 under Trust Agreement dated June 26,
     1935

By:   /s/ William Stinehart, Jr.
     William Stinehart, Jr., as Trustee of
     Chandler Trust No. 1 under Trust
     Agreement dated June 26, 1935

By:   /s/ Judy C. Webb
     Judy C. Webb, as Trustee of Chandler Trust
     No. 1 under Trust Agreement dated June 26,
     1935

By:   /s/ Warren B. Williamson
     Warren B. Williamson, as Trustee of
     Chandler Trust No. 1 under Trust
     Agreement dated June 26, 1935

CHANDLER TRUST NO. 2

By:     /s/ Susan Babcock
        Susan Babcock, as Trustee of Chandler
        Trust No. 2 under Trust Agreement dated
        June 26, 1935

By:     /s/ Jeffrey Chandler
        Jeffrey Chandler, as Trustee of Chandler
        Trust No. 2 under Trust Agreement dated
        June 26, 1935

By:     /s/ Camilla Chandler Frost
        Camilla Chandler Frost, as Trustee of
        Chandler Trust No. 2 under Trust
        Agreement dated June 26, 1935

By:     /s/ Roger Goodan
        Roger Goodan, as Trustee of Chandler Trust
        No. 2 under Trust Agreement dated June 26,
        1935

By:     /s/ William Stinehart, Jr.
        William Stinehart, Jr., as Trustee of
        Chandler Trust No. 2 under Trust
        Agreement dated June 26, 1935

By:     /s/ Judy C. Webb
        Judy C. Webb, as Trustee of Chandler Trust
        No. 2 under Trust Agreement dated June 26,
        1935

By:     /s/ Warren B. Williamson
        Warren B. Williamson, as Trustee of
        Chandler Trust No. 2 under Trust
        Agreement dated June 26, 1935

## ATTACHMENT A

| Shareholder | Capital Stock |
|---|---|
| Chandler Trust No. 1 | 22,881,590 |
| Chandler Trust No. 2 | 25,244,751 |

Source: TRIBUNE CO, 8-K, April 05, 2007

**Exhibit 10.14**

[EXECUTION COPY]

## TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN

Source: TRIBUNE CO, 8-K, April 05, 2007

# TABLE OF CONTENTS

|  |  |  | PAGE |
|---|---|---|---|
| SECTION 1 |  |  | 1 |
|  | Background of Plan |  | 1 |
|  | 1.1 | History and Purpose | 1 |
|  | 1.2 | Effective Date; Plan Year | 1 |
|  | 1.3 | Trustee; Trust Agreement | 1 |
|  | 1.4 | Plan Administration | 2 |
|  | 1.5 | Employers | 2 |
| SECTION 2 |  |  | 3 |
|  | Eligibility and Participation |  | 3 |
|  | 2.1 | Eligibility to Participate | 3 |
|  | 2.2 | Participation Not Guarantee of Employment | 4 |
|  | 2.3 | Leased Employees | 4 |
|  | 2.4 | Military Service | 4 |
|  | 2.5 | Omission of Eligible Employee | 5 |
|  | 2.6 | Inclusion of Ineligible Person | 5 |
| SECTION 3 |  |  | 6 |
|  | Service & Compensation |  | 6 |
|  | 3.1 | Years of Service | 6 |
|  | 3.2 | Hour of Service | 7 |
|  | 3.3 | One Year Break in Service | 8 |
|  | 3.4 | Compensation | 8 |
| SECTION 4 |  |  | 10 |
|  | Employer Contributions |  | 10 |
|  | 4.1 | Employer Contributions | 10 |
|  | 4.2 | Due Date for Employer Contributions | 11 |
|  | 4.3 | Payment of Acquisition Loans | 11 |
|  | 4.4 | Individual Employer's Share of Employer Contributions; Limitations on Employers' Contributions | 12 |
| SECTION 5 |  |  | 13 |
|  | Company Stock; Acquisition Loans |  | 13 |
|  | 5.1 | Company Stock | 13 |
|  | 5.2 | Acquisition Loans | 13 |

i

Source: TRIBUNE CO, 8-K, April 05, 2007

| SECTION 6 | | | 14 |
|---|---|---|---|
| | Investment of Employer Contributions | | 14 |
| | 6.1 | ESOP Stock Account Investments in Company Stock | 14 |
| | 6.2 | Diversification of Investments in Company Stock | 14 |
| | | | |
| SECTION 7 | | | 16 |
| | Accounting | | 16 |
| | 7.1 | Participants' Accounts | 16 |
| | 7.2 | Loan Suspense Account | 16 |
| | 7.3 | Accounting Dates; Special Accounting Dates; Accounting Period | 16 |
| | 7.4 | Transfer of Shares From Loan Suspense Account to Participants' ESOP Stock Accounts | 17 |
| | 7.5 | Adjustment of Participants' Accounts | 17 |
| | 7.6 | Dividends on Company Stock | 19 |
| | 7.7 | Investment of Cash in Trust | 20 |
| | 7.8 | Fair Market Value of Company Stock | 20 |
| | 7.9 | Stock Dividends, Stock Splits and Capital Reorganizations Affecting ESOP Shares | 20 |
| | 7.10 | Allocation of Proceeds from Sale or Liquidation | 22 |
| | | | |
| SECTION 8 | | | 23 |
| | Contribution and Benefit Limitations | | 23 |
| | 8.1 | Contribution Limitations | 23 |
| | 8.2 | Combining of Plans | 24 |
| | 8.3 | Highly Compensated Employee | 24 |
| | | | |
| SECTION 9 | | | 26 |
| | Period of Participation | | 26 |
| | 9.1 | Settlement Date | 26 |
| | | | |
| SECTION 10 | | | 27 |
| | Vesting in Benefits; Forfeitures; Reinstatements | | 27 |
| | 10.1 | Fully Vested Benefits | 27 |
| | 10.2 | Partially Vested Benefits | 27 |
| | 10.3 | Forfeitures | 27 |
| | 10.4 | Reinstatement | 28 |
| | | | |
| SECTION 11 | | | 29 |
| | Distributions Following Settlement Date | | 29 |
| | 11.1 | Manner of Distribution | 29 |
| | 11.2 | Determination of Account Balances | 29 |

ii

|       | 11.3  | Reinvestment of ESOP Stock Account | 30 |
|       | 11.4  | Timing of Distributions | 30 |
|       | 11.5  | Direct Rollovers | 35 |
|       | 11.6  | Designation of Beneficiary | 37 |
|       | 11.7  | Missing Participants or Beneficiaries; Delays in Determining Benefits | 38 |
|       | 11.8  | Facility of Payment | 39 |

| SECTION 12 | | | 40 |
| Rights, Restrictions, and Options on Company Stock | | | 40 |
|       | 12.1  | Right of First Refusal | 40 |
|       | 12.2  | Put Option | 40 |
|       | 12.3  | Share Legend; Other Restrictions | 42 |
|       | 12.4  | Nonterminable Rights | 42 |

| SECTION 13 | | | 43 |
| Voting and Tendering of Company Stock | | | 43 |

| SECTION 14 | | | 45 |
| General Provisions | | | 45 |
|       | 14.1  | Interests Not Transferable | 45 |
|       | 14.2  | Absence of Guaranty | 45 |
|       | 14.3  | Employment Rights | 45 |
|       | 14.4  | Litigation by Participants or Other Persons | 45 |
|       | 14.5  | Evidence | 46 |
|       | 14.6  | Waiver of Notice | 46 |
|       | 14.7  | Controlling Law | 46 |
|       | 14.8  | Statutory References | 46 |
|       | 14.9  | Severability | 46 |
|       | 14.10 | Additional Employers | 46 |
|       | 14.11 | Action By Employers | 47 |
|       | 14.12 | Gender and Number | 47 |
|       | 14.13 | Indemnification | 47 |
|       | 14.14 | Automated Systems | 47 |

| SECTION 15 | | | 48 |
| Restrictions as to Reversion of Trust Assets to the Employers | | | 48 |

| SECTION 16 | | | 50 |
| Amendment and Termination | | | 50 |
|       | 16.1  | Amendment | 50 |
|       | 16.2  | Termination | 50 |
|       | 16.3  | Nonforfeitability and Distribution on Termination | 50 |

iii

Source: TRIBUNE CO, 8-K, April 05, 2007

| | 16.4 | Plan Merger, Consolidation, Etc. | 51 |
|---|---|---|---|
| **SECTION 17** | | | 52 |
| | Administration | | 52 |
| | 17.1 | The Administrator | 52 |
| | 17.2 | The Administrator's General Powers, Rights, and Duties | 52 |
| | 17.3 | Interested Administrator Member | 53 |
| | 17.4 | Administrator Expenses | 53 |
| | 17.5 | Uniform Rules | 54 |
| | 17.6 | Information Required by the Administrator | 54 |
| | 17.7 | Review of Benefit Determinations | 54 |
| | 17.8 | Administrator's Decision Final | 54 |
| | 17.9 | Denial Procedure and Appeal Process | 54 |
| **SECTION 18** | | | 58 |
| | Special Rules Applicable When Plan is Top-Heavy | | 58 |
| | 18.1 | Purpose and Effect | 58 |
| | 18.2 | Top-Heavy Plan | 58 |
| | 18.3 | Key Employee | 59 |
| | 18.4 | Aggregated Plans | 59 |
| | 18.5 | Minimum Employer Contribution | 60 |
| | 18.6 | Coordination of Benefits | 60 |
| **EXHIBIT 1** | | | 61 |
| | Tribune Employee Stock Ownership Plan | | 61 |

iv

Source: TRIBUNE CO, 8-K, April 05, 2007

Index of Defined Terms

| | |
|---|---|
| *Accounting Date* | 16 |
| *Accounting Period* | 16 |
| *Accounts* | 16 |
| *Acquisition Loan* | 13 |
| *Administrator* | 2, 52 |
| *Annual Addition* | 23 |
| *Beneficiary* | 38 |
| *Code* | 46 |
| *Company* | 1 |
| *Company Stock* | 13 |
| *Compensation* | 8 |
| *Controlled Group Member* | 2 |
| *Deemed-Owned Shares* | 21 |
| *Determination Date* | 58 |
| *Disqualified Person* | 20 |
| *Dividend* | 17 |
| *Effective Date* | 1 |
| *Eligible Distributee* | 36 |
| *Eligible Employee* | 3 |
| *Eligible Participant* | 10 |
| *Eligible Retirement Plan* | 36 |
| *Eligible Rollover Distribution* | 36 |
| *Employee* | 3 |
| *Employer* | 2 |
| *Employer Contribution* | 10 |
| *ERISA* | 46 |
| *ESOP Cash Account* | 16 |
| *ESOP Stock Account* | 16 |
| *Financed Shares* | 13 |
| *Forfeiture* | 27 |

| | |
|---|---|
| *Highly Compensated Employee* | 24 |
| *Hour of Service* | 7 |
| *Investment Income* | 20 |
| *Key Employee* | 59 |
| *Leased Employee* | 4 |
| *Limitation Year* | 23 |
| *Loan Suspense Account* | 16 |
| *Nonallocation Year* | 20 |
| *Normal Retirement Age* | 26 |
| *One Year Break in Service* | 8 |
| *Participant* | 3 |
| *Plan* | 1 |
| *Plan Year* | 1 |
| *Pledge Agreement* | 48 |
| *Put Option* | 40 |
| *Qualified Election Period* | 14 |
| *Qualified Participant* | 14 |
| *Ratio Percentage Test* | 10 |
| *Related Company* | 2 |
| *Related Defined Contribution Plan* | 23 |
| *Required Commencement Date* | 31 |
| *Right of First Refusal* | 40 |
| *Settlement Date* | 26 |
| *Special Accounting Date* | 16 |
| *Spouse* | 38 |
| *Synthetic Equity* | 21 |
| *Top-Heavy Plan* | 58 |
| *Trust* | 1 |
| *Trustee* | 1 |
| *Years of Service* | 6 |

i

Source: TRIBUNE CO, 8-K, April 05, 2007

## TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN

### SECTION 1

### Background of Plan

**1.1    History and Purpose**

Tribune Company, a Delaware corporation (the "*Company*") hereby establishes the Tribune Employee Stock Ownership Plan (the "*Plan*"), to enable eligible Employees to acquire stock ownership interests in the Company by investing primarily in Company Stock.  The Plan is intended to be a qualified employee benefit plan under section 401(a) of the Code and an employee stock ownership plan within the meaning of section 4975(e)(7) of the Code, and all interpretations of the Plan shall be consistent with that intent.  The Plan is intended to invest primarily in Company Stock, and is specifically permitted to invest up to 100% of its assets in Company Stock.

**1.2    Effective Date; Plan Year**

The Effective Date of the Plan is January 1, 2007 (the "*Effective Date*").  The Plan will be administered on the basis of a plan year (the "*Plan Year*") which shall be the 12-month period ending on December 31 of each year.

**1.3    Trustee; Trust Agreement**

Amounts contributed under the Plan are held and invested, until distributed, by the trustee (the "*Trustee*") appointed by the Company acting by its Board of Directors.  The Trustee acts in accordance with the terms of a trust agreement between the Company and the Trustee, which trust agreement is known as the Tribune Employee Stock Ownership Trust (the "*Trust*").  The Trust implements and forms a part of the Plan.  The provisions of and benefits under the Plan are subject to the terms and provisions of the Trust.  In the event of any conflict between the Plan and the trust agreement, the terms of the trust agreement shall control.

**1.4    Plan Administration**

The Plan is administered by a committee appointed by the Board of Directors of the Company (the "*Administrator*") as described in Section 17.1. Any notice or document

1

Source: TRIBUNE CO, 8-K, April 05, 2007

required to be given to or filed with the Administrator will be properly given or filed if delivered or mailed, by registered or certified mail, postage prepaid, to the Administrator, in care of the Company at its corporate headquarters.

**1.5      Employers**

Exhibit 1 lists the payroll codes and employee groups, and the corresponding employers, which are all Controlled Group Members, are Employers. Any other Controlled Group Member by resolution may adopt the Plan with respect to one or more employee groups with the Company's consent (acting through the Administrator). The Company and any such Controlled Group Members that adopt the Plan are referred to below collectively as the "*Employers*" and sometimes individually as an "*Employer*." A "*Controlled Group Member*" means any corporation that is a member of a controlled group of corporations with the Company (within the meaning of Section 409(l)(4) of the Code). A "*Related Company*" includes the Company and any corporation or other entity treated as being in a controlled group of corporations or under common control with the Company, within the meaning of Code Sections 414(b) and (c), or that is treated as being part of an affiliated service group that includes the Company within the meaning of Code Section 414(m), or that is otherwise aggregated with the Company pursuant to any regulations issued under Code Section 414(o).

2

Source: TRIBUNE CO, 8-K, April 05, 2007

## SECTION 2

### Eligibility and Participation

**2.1**    **Eligibility to Participate**

(a)    Subject to the terms and conditions of the Plan, each Eligible Employee will become a *"Participant"* in the Plan on the first day of the pay period following the date on which the Employee first completes a Year of Service and has attained age 21. An *"Eligible Employee"* is an Employee:

(i) who is not a member of a group or class of Employees of an Employer whose terms and conditions of employment are covered by a collective bargaining agreement, unless retirement benefits were not the subject of good faith bargaining between the Employer and a collective bargaining representative;

(ii) who is not a Leased Employee;

(iii) who is not a nonresident alien;

(iv) the terms and conditions of whose employment are not governed by an employment agreement that precludes his participation in the Plan;

(v) who does not perform services for an Employer as an employee of a personal service corporation, professional corporation or similar intervening corporate entity, regardless of whether the validity of that corporate entity is subsequently nullified by the Internal Revenue Service or any court; and

(vi) who is a member of a group of employees to which the Plan has been extended by his Employer (Exhibit 1 lists the groups of Employers to which the Plan is extended as of the Effective Date).

(b)    For all purposes of the Plan, an individual shall be an *"Employee"* of or be "employed" by a Related Company for any Plan Year only if such individual is treated as a common law employee by the Related Company for purposes of employment taxes and wage withholding for federal income taxes. If an individual is not considered to be an "Employee" of a Related Company in accordance with the preceding sentence for a Plan Year, a subsequent determination by the Related Company, any governmental agency or court that the individual is a

3

Source: TRIBUNE CO, 8-K, April 05, 2007

common law employee of the Related Company, even if such determination is applicable to prior years, will not have a retroactive effect for purposes of eligibility to participate in the Plan.

(c)    Any Participant who terminates employment but is reemployed by an Employer before incurring a One Year Break in Service shall continue to participate in the Plan in the same manner as if such termination had not occurred, effective as of the date of reemployment. Any Participant who terminates employment but is reemployed by an Employer after incurring a One Year Break in Service shall be treated as a new hire and participate in the Plan only after again satisfying the requirements of this Section.

## 2.2    Participation Not Guarantee of Employment

Participation in the Plan does not constitute a guarantee or contract of employment and will not give any Employee the right to be retained in the employ of the Employers nor any right or claim to any benefit under the terms of the Plan unless such right or claim has specifically accrued under the terms of the Plan.

## 2.3    Leased Employees

A "*Leased Employee*" means any person defined in Code Section 414(n), which includes any person who is not an Employee of an Employer, but who has provided services to an Employer, which services are performed under the primary direction or control of the Employer, on a substantially full-time basis for a period of at least one year, pursuant to an agreement between the Employer and a leasing organization. If a Leased Employee is subsequently employed by an Employer, the period during which a Leased Employee performs services for the Employer shall be taken into account for purposes of Section 3.1 of the Plan.

## 2.4    Military Service

Notwithstanding any provision of this Plan to the contrary, contributions, benefits and service credit with respect to qualified military service will be provided in accordance with Code Section 414(u). A Participant returning to employment after serving in the uniformed services is treated as not having incurred a One Year Break In Service (as defined in subsection 3.3) during the period of qualified military service. Each period of qualified military service is considered under the Plan to be service with the Employer for the purposes of:

(a)    determining the nonforfeitability of the Participant's Account balances, in accordance with the provisions of Section 10 of the Plan; and

4

Source: TRIBUNE CO, 8-K, April 05, 2007

(b)   .   determining the Participant's benefit allocations under Section 4.

## 2.5    Omission of Eligible Employee

If, in any Plan Year, any Employee who should be included as a Participant in the Plan is erroneously omitted, and discovery of such omission is not made until after a contribution by the Employer for the Plan Year has been made, the Employer shall make a subsequent contribution with respect to the omitted Employee in the amount which the Company would have contributed if he or she had not been omitted.  Such contribution shall be made regardless of whether or not it is deductible in whole or in part in any taxable year under applicable provisions of the Code.

## 2.6    Inclusion of Ineligible Person

If, in any Plan Year, any person who should not have been included as a Participant in the Plan is erroneously included, and discovery of such incorrect inclusion is not made until after a contribution by the Company for the year has been made, the Company shall not be entitled to recover the contribution made with respect to the ineligible person regardless of whether a deduction is allowable with respect to such contribution.  In such event, the amount contributed with respect to the ineligible person shall constitute a Forfeiture for the Plan Year in which the discovery is made.

5

Source: TRIBUNE CO, 8-K, April 05, 2007

**SECTION 3**

**Service & Compensation**

**3.1    Years of Service**

The term *"Years of Service"* means an Employee's or Participant's period of service with the Employer or Controlled Group Member determined in accordance with the following:

(a)    An Employee shall be credited with one "Year of Service" for eligibility purposes if he or she is employed with an Employer or Controlled Group Member for a period of 12 months following the date he or she first completes an Hour of Service and completes 1,000 Hours of Service during that period.  If the Employee fails to do so, then he or she shall be credited with one "Year of Service" for eligibility purposes if he or she is employed by an Employer during the 12 months of a Plan Year and completes 1,000 Hours of Service during that period, beginning with the Plan Year including the first anniversary of the date on which the Employee first completes an Hour of Service for an Employer or Controlled Group Member.

(b)    For purposes of vesting under Section 10, a Participant will be credited with a Year of Service upon completing 1,000 Hours of Service during a Plan Year.

(c)    Years of Service shall include service performed prior to the Effective Date of the Plan and shall include service regardless of age.

(d)    If any former Participant is reemployed after a One Year Break in Service has occurred, Years of Service shall include Years of Service prior to his One Year Break in Service, subject to the following rules:

(i)    If a former Participant has a One Year Break in Service, his pre-break and post-break service shall be used for computing Years of Service for eligibility and for vesting purposes only after he has been employed for one (1) Year of Service following the date of his reemployment with an Employer;

(ii)    Any former Participant who under the Plan does not have a nonforfeitable right to any interest in the Plan resulting from Employer Contributions shall lose credits otherwise allowable under (i) above if his consecutive One Year Breaks in Service equal or exceed the greater of (A) five (5) or (B) the aggregate number of his pre-break Years of Service;

6

Source: TRIBUNE CO, 8-K, April 05, 2007

(iii)    After five (5) consecutive One Year Breaks in Service, a former Participant's vested balance of his Accounts attributable to pre-break service shall not be increased as a result of post-break service;

(iv)    If a former Participant who has not had his Years of Service before a One Year Break in Service disregarded pursuant to (ii) above completes one (1) Year of Service for eligibility purposes following his reemployment with an Employer, he shall participate in the Plan retroactively from his date of reemployment;

(v)    If a former Participant who has not had his Years of Service before a One Year Break in Service disregarded pursuant to (ii) above completes a Year of Service (a One Year Break in Service previously occurred, but employment had not terminated), he shall participate in the Plan retroactively from the first day of the Plan Year during which he completes one (1) Year of Service.

## 3.2    Hour of Service

Subject to the following provisions of this Section, the term *"Hour of Service"* means, with respect to any Employee, (1) each hour for which the Employee is directly or indirectly paid or entitled to payment by an Employer for the performance of duties; (2) each hour for which the Employee is directly or indirectly paid or entitled to payment by an Employer for reasons other than the performance of duties (such as vacation, holiday, sickness, jury duty, disability, lay-off, military duty or leave of absence); and (3) each hour for which back pay, irrespective of mitigation of damages, has been either awarded or agreed to by an Employer. These hours will be credited to the Employee for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment is made. The same Hours of Service shall not be credit both under (1) or (2), as the case may be, and under (3). All Hours of Service shall be determined and credited in accordance with Department of Labor Reg. Sec. 2530.200b-2.

An Employee or Participant shall not be credited with more than 501 Hours of Service for any single continuous period during which he performs no duties for an Employer. Payments considered for purposes of the foregoing shall include payments unrelated to the length of the period during which no duties are performed but shall not include payments made solely as reimbursement for medically related expenses or solely for the purpose of complying with applicable workmen's compensation, unemployment compensation or disability insurance laws.

7

Source: TRIBUNE CO, 8-K, April 05, 2007

3.3    **One Year Break in Service**

The term *"One Year Break in Service"* means any Plan Year during which an Employee or a Participant does not complete more than 500 Hours of Service.

To the extent necessary to avoid a One Year Break in Service and to the extent Hours of Service are not otherwise credited as provided in Section 3.2, an Employee or Participant shall be credited with up to 501 Hours of Service during a Plan Year on account of an absence during such Plan Year due to:

(a)    the pregnancy of the Employee or Participant;

(b)    the birth of a child of the Employee or Participant;

(c)    the placement of a child with the Employee or Participant in connection with the adoption of such child by such Employee or Participant; and

(d)    caring for such child for a period beginning immediately following such birth or placement.

3.4    **Compensation**

Except as otherwise provided below, a Participant's *"Compensation"* for a Plan Year means the base salary, wages and commissions paid by his Employer for personal services, excluding the following: bonuses; overtime pay; shift differential amounts; deferred compensation; severance pay; accrued vacation pay paid in a lump sum after the Employee has terminated employment; incentive pay or incentive commissions; amounts attributable to the grant or exercise of stock options, the grant of restricted stock, the lapse of restrictions on restricted stock, or dividends paid on restricted stock; payments from or contributions to any employee benefit plan (except as specifically provided below); and special allowances (such as amounts paid to a Participant during an authorized leave of absence, moving expenses, car expenses, tuition reimbursement, meal allowances, the cost of excess group life insurance includible in taxable income, and similar items). Compensation shall be determined prior to reduction for any contributions made on behalf of the Participant to this Plan or to any plan which is qualified under Section 125, 132(f) or 401(k) of the Internal Revenue Code.

For a Participant's initial year of participation, Compensation shall be recognized only for the period he is a Participant.

In no event shall the amount of a Participant's Compensation taken into account for purposes of the Plan for any Plan Year exceed the dollar limitation in effect under Code Section 401(a)(17) (as that limita-tion is adjusted from time to time by the Secretary of the Treasury pursuant to Code Section 401(a)(17) and which is $225,000 for the Plan Year commencing in 2007). If this period consists of fewer than 12 months, the annual compensation

8

Source: TRIBUNE CO, 8-K, April 05, 2007

limit shall be an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

9

Source: TRIBUNE CO, 8-K, April 05, 2007

## SECTION 4

### Employer Contributions

**4.1    Employer Contributions**

(a) **Timing, Form and Amount.**  Subject to the conditions and limita-tions of the Plan, the Company, in its sole discretion, may direct the Employers to make a contribution (the "*Employer Contri-bution*") to the Plan for any Plan Year.  Any such Employer Contribution for a Plan Year shall be made in such amount, if any, as determined by the Company prior to the end of the Plan Year or within a reasonable period of time after the end of the Plan Year, provided, however, that the Company shall direct the Employer to make Employer Contributions at least in the amount which, when combined with Dividends which may lawfully be used to make payments on an Acquisi-tion Loan, is sufficient to meet the Plan's obligations on all outstanding Acquisition Loans. Employer Contributions shall be made in cash or in Company Stock (in the discretion of the Company) as of the last day of the Plan Year.  Employer Contribu-tions may also be made in the form of forgiveness of any indebtedness owing by the Plan to an Employer, or by an Employer's payment of indebtedness owing by the Plan to any third party.

(b) **Allocation of Employer Contributions — General Rule.**  An "*Eligible Participant*" for a Plan Year is a Participant (1) who completes 1,000 Hours of Service during the Plan Year and who is actively employed by an Employer on the last day of the Plan Year, or (2) who terminated employment with the Related Companies due to retirement, disability, or death as described in Section 9.1(a), (b), or (c) during the Plan Year.  Except as otherwise provided herein, Employer Contributions for a Plan Year shall be allocated to the ESOP Stock Account or ESOP Cash Account, as applicable, of each Eligible Participant in the proportion that such Eligible Participant's Compensation for the Plan Year bears to the total Compensation of all Eligible Participants for such Plan Year.

(c) **Allocation of Employer Contributions — Special Rules.**

(1)  If in any Plan Year, as a result of excluding from the allocation for such year Participants with less than 1,000 Hours of Service or who are not employed on the last day of the Plan Year as described in paragraph (b), the Plan would fail to qualify under section 401(a)(3) of the Code due to failure to comply with the "*Ratio Percentage Test*" described below, then for such Plan Year a number of Participants as determined in the following sentence shall be treated as Eligible Participants, to the extent necessary to satisfy such Ratio Percentage Test, and the allocation of Employer Contributions shall be recomputed accordingly.  The number of such Participants who were not otherwise Eligible Participants who shall become Eligible Participants shall be the minimum number of Participants as are necessary to permit the Plan to satisfy the Ratio Percentage Test, and the specific Participants who shall become Eligible Participants under the terms of this paragraph shall be those Participants who were employed by an Employer on the last day of the Plan Year and who

10

completed the greatest number of Hours of Service in the Plan Year. If, after including all Participants described in the preceding sentence as Eligible Participants, the Plan still fails to satisfy the Ratio Percentage Test, then Participants who were not employed by an Employer on the last day of the Plan Year shall be included, in the order of those who completed the greatest number of Hours of Service during the Plan Year. In the event more than one Employee has completed a specific number of Hours of Service, all such Employees shall be Eligible Participants if any one of them would be so eligible. The plan shall be deemed to comply with the Ratio Percentage Test if the percentage of non-Highly Compensated Employees benefiting under the Plan for a Plan Year is at least 70% of the percentage of Highly Compensated Employees benefiting under the Plan. Employees who are nonresident aliens, who are under age 21, or who do not have a Year of Service for eligibility purposes, or who were not employed by an Employer on the last day of the Plan Year and who had less than 500 Hours of Service during the Plan Year shall be excluded from this computation. For this purpose, an Employee shall be considered to benefit under the Plan for a Plan Year if he or she receives an allocation of Employer Contributions for that Plan Year.

(2) If, for any Plan Year, it is necessary to rely on the special rules of Section 415(c)(6) of the Code to permit the Plan to comply with the limitations of Section 415 of the Code for that year, and more than one third of the Employer Con-tributions for such Plan Year would be allocated in accor-dance with this section to the accounts of Highly Compensated Employees, then the following procedure shall be utilized instead of the procedure in paragraph (b): (1) exactly one third of the Employer Contributions shall be allocated to the accounts of the Highly Compensated Employees who are Eligible Participants, pro rata on the basis of such Eligible Participants' Compensation for such Plan Year; (2) the remaining Employer Contribu-tions shall be allocated to the accounts of the non-Highly Compensated Employees who are Eligible Participants, pro rata on the basis of such Eligible Participants' Compensation for such Plan Year.

(d) **No Participant Contributions**. No contributions, including rollover contributions, will be permitted by Employees or Participants.

## 4.2    Due Date for Employer Contributions

Any Employer Contributions for a Plan Year shall be due on the last day of the Plan Year and, if not paid by the end of that Plan Year, shall be payable to the Trustee as soon as practicable thereafter, without interest, but not later than the time prescribed by law for filing the Company's Federal income tax return for such Plan Year, including extensions thereof.

## 4.3    Payment of Acquisition Loans

For each Accounting Period during which an Acquisition Loan is outstanding, the Trustee shall use any Employer Contributions made for such Accounting Period pursuant to Section 4.1 to make principal and interest payments then due on the Acquisition Loan or

11

Source: TRIBUNE CO, 8-K, April 05, 2007

loans outstanding at the end of such Accounting Period. Each such payment by the Trustee will release shares of Company Stock from the Loan Suspense Account of the Trust. Except as provided in Section 7.6, Company Stock that is so released will be allocated to Participants' ESOP Stock Accounts as provided in Section 4.1. If no Acquisition Loan is outstanding at the end of an Accounting Period, the Trustee shall invest the contributions made for such Accounting Period as directed by the Administrator, in accordance with the provisions of Section 6.1.

4.4    **Individual Employer's Share of Employer Contributions; Limitations on Employers' Contributions**

The Company shall determine each Employer's share of Employer Contributions to be made pursuant to Section 4.1. The certificate of the Company as to the correctness of any amounts or calculations relating to the Employers' contributions under the Plan shall be conclusive on all persons.

12

Source: TRIBUNE CO, 8-K, April 05, 2007

## SECTION 5

### Company Stock; Acquisition Loans

**5.1    Company Stock**

For purposes of the Plan, the term *"Company Stock"* shall mean common stock issued by a Controlled Group Member that is readily tradable on an established securities market; provided, however, if no Controlled Group Member's common stock is readily tradable on an established securities market, the term *"Company Stock"* shall mean common stock issued by a Controlled Group Member having a combination of voting power and Dividend rights equal to or in excess of: (a) that class of common stock of the Controlled Group Members having the greatest voting power and (b) that class of common stock of the Controlled Group Members having the greatest Dividend rights. Non-callable preferred stock shall be treated as Company Stock for purposes of the Plan if such stock is convertible at any time into stock that is readily tradable on an established securities market (or, if applicable, that meets the requirements of (a) and (b) next above) and if such conversion is at a conversion price that, as of the date of the acquisition by the Plan, is reasonable. For purposes of the immediately preceding sentence, preferred stock shall be treated as non-callable if, after the call, there will be a reasonable opportunity for a conversion that meets the requirements of the immediately preceding sentence. Company Stock shall be held under the Trust only if such stock satisfies the requirements of Section 407(d)(5) of ERISA.

**5.2    Acquisition Loans**

An *"Acquisition Loan"* means the issuance of notes, a series of notes or other installment obligations incurred by the Trustee, in accordance with the Trust, in connection with the purchase of Company Stock. The term *"Financed Shares"* means shares of Company Stock acquired by the Trustee with the proceeds of an Acquisition Loan. The terms of each Acquisition Loan shall meet the applicable requirements of Treasury Regulations Section 54.4975-7(b), including the requirements: (a) that the loan bear a reasonable rate of interest, be for a definite period (rather than payable on demand), and be without recourse against the Plan, and (b) that the only assets of the Plan that may be given as collateral are Financed Shares purchased with the proceeds of that loan or with the proceeds of a prior Acquisition Loan.

13

Source: TRIBUNE CO, 8-K, April 05, 2007

## SECTION 6

### Investment of Employer Contributions

**6.1    ESOP Stock Account Investments in Company Stock**

Employer Contributions that are used to repay an Acquisition Loan shall be invested in Company Stock through the release of Financed Shares and the crediting of such shares to Participants' Accounts (as described in Sections 7.4, 7.5 and 7.6). If an Acquisition Loan is not outstanding, the Administrator may direct the Trustee to invest the Employer Contributions in Company Stock.

**6.2    Diversification of Investments in Company Stock**

Pursuant to rules established by the Administrator, Active Participants may elect to diversify portions of their ESOP Stock Accounts, subject to the following:

(a)    Each Active Participant who has attained age 55 years and has at least ten years of participation in the Plan (a "*Qualified Participant*") may elect during each of the Participant's Qualified Election Periods to diversify up to twenty-five percent (fifty percent in the case of the Participant's last Qualified Election Period) of the number of shares of Company Stock in the Qualified Participant's ESOP Stock Account eligible for diversification (as described in paragraph (b) next below), by receiving a cash distribution of the applicable amount.

(b)    The portion of a Qualified Participant's ESOP Stock Account balance subject to diversification shall equal twenty-five percent (fifty percent in the case of the Qualified Participant's last year of the Qualified Election Period) of the total number of shares of Company Stock allocated to the Participant's ESOP Stock Account (including shares that the Participant previously elected to diversify pursuant to this Section), less the number of such shares previously diversified pursuant to the Qualified Participant's election under this Section.

(c)    For purposes of this Section, a "*Qualified Election Period*" means:  (i) the ninety-day period immediately following the last day of the first Plan Year in which the Participant becomes a Qualified Participant, and (ii) the ninety-day period immediately following the last day of each of the five Plan Years immediately following the first Plan Year in which the Participant becomes a Qualified Participant. Any election made in accordance with the provisions of paragraph (a) next above with respect to any Qualified Election Period shall be given effect within ninety days after the end of that Qualified Election Period.

14

(d)    The provisions of this Section shall not apply to any Participant if the value of the Participant's ESOP Stock Account (determined as of the regular Accounting Date immediately preceding the first day on which the Participant would otherwise be entitled to make an election under this Section) is $500 or less.

15

Source: TRIBUNE CO, 8-K, April 05, 2007

**SECTION 7**

**Accounting**

**7.1    Participants' Accounts**

The Administrator shall maintain or cause to be maintained under the Plan the following accounts in the name of each Participant (to the extent applicable):

(a)    **ESOP Stock Account**.  An *"ESOP Stock Account"* to reflect shares of Company Stock allocated to such Participant.

(b)    **ESOP Cash Account**.  An *"ESOP Cash Account"* to reflect assets other than Company Stock allocated to such Participant.

In addition to the accounts described above, the Administrator may maintain such other accounts and subaccounts in the names of Participants or otherwise as the Administrator may consider necessary or advisable.  Collectively, all accounts and subaccounts maintained for a Participant are referred to as the Participant's *"Accounts."*

The Administrator may establish such nondiscriminatory rules and procedures relating to the maintenance, adjustment and liquidation of Participants' Accounts as the Administrator may consider necessary or advisable.

**7.2    Loan Suspense Account**

The Administrator shall maintain or cause to be maintained in the Trust a *"Loan Suspense Account"* to reflect the Financed Shares acquired by the Trustee with the proceeds of an Acquisition Loan, if any, prior to the transfer of such Financed Shares to the Participants' ESOP Stock Accounts, any Dividends attributable to such shares or transferred to the Loan Suspense Account pursuant to Section 7.5, and any Investment Income attributable to such Dividends.

**7.3    Accounting Dates; Special Accounting Dates; Accounting Period**

The last day of each Plan Year shall be the *"Accounting Date."*  Participants' Accounts shall be adjusted on the Accounting Date.  A *"Special Accounting Date"* is any date designated as such by the Administrator or a Special Accounting Date occurring under Section 16.3.  The term "Accounting Date" includes an annual Accounting Date and a Special Accounting Date.  Any references to an *"Accounting Period"* ending on an Accounting Date shall mean the period since the next preceding regular Accounting Date.

16

Source: TRIBUNE CO, 8-K, April 05, 2007

7.4    **Transfer of Shares From Loan Suspense Account to Participants' ESOP Stock Accounts**

At the direction of the Administrator, the Trustee shall use the following to repay an Acquisition Loan:

(a)    Employer Contributions under Section 4.1 and any investment income attributable to such contributions; and

(b)    Cash Dividends paid on shares of Company Stock, as provided in Sections 7.5 and 7.6, and any investment income attributable to such Dividends.

The repayment of an Acquisition Loan shall cause a release of shares of Company Stock from the Loan Suspense Account to the Participants' ESOP Stock Accounts in accordance with Sections 7.5 and 7.6 as of each applicable Accounting Date. The number of shares to be released shall be deter-mined by multiplying the number of shares in the Loan Suspense Account by a fraction, the numerator of which is the principal and interest payments during the applicable Accounting Period and the denominator of which is the sum of the numera-tor plus the total projected principal and interest payments during the remainder of the term of the Acquisition Loan.

7.5    **Adjustment of Participants' Accounts**

Participants' Accounts shall be adjusted as follows:

(a)    **Repayments of Acquisition Loans and Purchases of Company Stock**. For each Accounting Period, Financed Shares that are released from the Loan Suspense Account in accordance with Section 7.4 as a result of the use of Employer Contributions to make payments on an Acquisition Loan shall be credited to the Participants' ESOP Stock Accounts in accordance with the provisions of Section 4.1(b). For each Accounting Period, Employer Contri-butions in cash shall be credited as of the applicable Account-ing Date to the Participants' ESOP Cash Accounts as in accordance with the provisions of Section 4.1. Upon the purchase of Company Stock with such cash, an appropriate number of shares of Company Stock shall be credited to the Participant's ESOP Stock Account, as appro-priate, and the Participant's ESOP Cash Account shall be charged by the amount of the cash used to buy such Company Stock. At all times cash in Participants' ESOP Cash Account may be used to purchase Company Stock from any source.

(b)    **Dividends**. The term *"Dividend"* shall include both dividends as described in Code Section 316 and all distributions made with respect to the shares of stock of an S corporation. Subject to the provisions of

17

Source: TRIBUNE CO, 8-K, April 05, 2007

Section 7.6, cash Dividends on shares of Company Stock in the Loan Suspense Account shall be used to repay the outstanding Acquisition Loan incurred in connection with the acquisition of such shares, and the released shares shall be credited to the Participants' ESOP Stock Accounts, in accordance with the provisions of Section 7.6. Subject to the provisions of Section 7.6, the Administrator shall credit to the Participants' ESOP Cash Accounts any cash Dividends paid to the Trustee on shares of Company Stock held in the Participants' ESOP Stock Accounts as of the record date. Such cash Dividends credited to the Participants' ESOP Cash Accounts may, to the extent permitted by law, be applied to the repayment of the Acquisition Loan incurred in connection with the acquisition of such shares, or, as deter-mined in the discretion of the Administrator, be used to purchase shares of Company Stock, or be paid to the Participants as described in Section 7.6(c). The Administrator shall credit an appropriate number of shares of Company Stock to the ESOP Stock Account of such Participant, and the Participant's ESOP Cash Account shall then be charged by the amount of cash used to repay an Acquisition Loan or used to purchase such Company Stock for the Participant's ESOP Stock Account.

(c)     **Employer Contributions in Shares of Company Stock.**  For any Accounting Period in which the Employer Contributions are made in the form of shares of Company Stock, such stock shall be credited to the Participants' ESOP Stock Accounts, as of the applicable Accounting Date, in accordance with the applicable provisions of Section 4.1(b).

(d)     **Forfeitures.**  As of each Accounting Date, any amounts which have been deemed Forfeitures pursuant to subsection 10.3 since the immediately prior Accounting Date shall be allocated to the Participants' ESOP Stock Accounts and ESOP Cash Accounts, as applicable, pursuant to the allocation formula provided in subsection 4.1(b). The terminated Participants' Accounts from which such amounts are deemed Forfeitures shall be charged accordingly.

(e)     **Distributions.**  As of each Accounting Date, any amounts which have been distributed to Participants or their Beneficiaries shall be charged against the applicable Accounts of such Participants and Beneficiaries.

(f)     **Appreciation, Depreciation, Etc.**  As of each Accounting Date, before the allocation of any Employer Contributions under Section 4.1, any appreciation, depreciation, income, gains or losses in the fair market value of the Participants' ESOP Cash Accounts shall be allocated among and credited to the ESOP Cash Accounts of Participants, pro rata, according to the balance of each ESOP Cash Account as of the

18

Source: TRIBUNE CO, 8-K, April 05, 2007

immediately preceding Accounting Date, reduced in each case by the amount of any charge to such ESOP Cash Account since the next preceding Accounting Date. Any gain or loss realized by the Trustee on the sale of Company Stock credited the Participants' ESOP Stock Accounts will be allocated to the Participants' ESOP Cash Accounts, pro rata, accor-ding to the balance of Participants' ESOP Stock Accounts, as of the next preceding Accounting Date. Dividends paid on Company Stock during a Plan Year will be allocated prior to the allocation of Employer Contributions for that Plan Year.

7.6     **Dividends on Company Stock**

The following shall apply with respect to Dividends on Company Stock:

(a)     **Dividends Credited to ESOP Cash Accounts**. Any cash Divi-dends paid with respect to shares of Company Stock allocated to Participants' ESOP Stock Accounts or held in the Loan Suspense Account may, as determined by the Administrator, be allocated among and credited to Participants' ESOP Cash Accounts in accordance with Section 7.5(b).

(b)     **Dividends Used to Repay Acquisition Loan**. To the extent permitted by applicable law, any cash Dividends paid with respect to Financed Shares allocated to Participants' ESOP Stock Accounts or held in the Loan Suspense Account may (as required by applicable Acquisition Loan documentation or, if not so required, as determined in the sole discretion of the Administrator) be used to make payments on an outstanding Acquisition Loan incurred in connection with the acquisition of such shares, or to purchase additional shares of Company Stock. Financed Shares released from the Loan Suspense Account by reason of Dividends paid with respect to such Company Stock shall be allocated to Participants' ESOP Accounts as follows:

(i)     First, Financed Shares with a fair market value (determined as of the valuation coincident with or immediately preceding the Dividend declaration date) equal to the Dividends paid with respect to the Company Stock allocated to Partici-pants' ESOP Stock Accounts shall be allocated among and credited to the ESOP Stock Accounts of such Participants, pro rata, according to the number of shares of Company Stock held in such accounts on the Dividend declaration date; and

(ii)     Next, any remaining Financed Shares released from the Loan Suspense Account shall be allocated among and credited in accordance with Section 4.1 to the Participants' ESOP Stock Accounts, as applicable.

19

Source: TRIBUNE CO, 8-K, April 05, 2007

7.7    **Investment of Cash in Trust**

At the direction of the Administrator, cash held in the Loan Suspense Account or Participants' ESOP Cash Accounts under the Trust will be invested by the Trustee, to the extent practicable, in short term securities or cash equivalents having ready marketability, mutual funds or in any other investment vehicle permitted under the terms of the Trust agreement. Investment Income resulting from such investments shall be credited to the account to which it pertains. The term "*Investment Income*" means income resulting from the temporary investment of Employer Contributions in cash, cash Dividends and any other amounts.

7.8    **Fair Market Value of Company Stock**

For purposes of the Plan and Trust, the fair market value of Company Stock that is not readily tradable on an established securities market shall be determined, as of the last day of each Plan Year, by the Trustee after consultation with an independent appraiser, as defined in Section 401(a)(28)(C) of the Code, in accordance with the terms of the Trust and the provisions of Section 3(18) of ERISA.

7.9    **Stock Dividends, Stock Splits and Capital Reorganizations Affecting ESOP Shares**

Shares of Company Stock received by the Trustee that are attributable to stock dividends, stock splits or to any reorganization or recapitalization of the Company shall be credited to the Loan Suspense Account, if attributable to shares held in that account, or shall be credited to the Participants' ESOP Stock Accounts if attributable to shares held in such Accounts, so that the interests of Participants immediately after any such stock dividend, split, reorganization or recapitalization are the same as such interests immediately before such event.

For any period in which the Company is an S-corporation, no allocation of Company Stock (or other assets in lieu of such Stock) may be made to any "*Disqualified Person*" (as defined below) during any "*Nonallocation Year*" (as defined below) or if such allocation would result in a Nonallocation Year.

For purposes of this Section, the following definitions shall apply:

(1)    A "Nonallocation Year" shall mean a Plan Year during which, at any time, more than 50% of the outstanding stock of the Company is held by Disqualified Persons. Synthetic Equity held by Disqualified Persons (but not by others) and all other Deemed-Owned Shares held by a Disqualified Person shall be included in the determination of whether there is a Nonallocation Year. The ownership attribution rules of Code Section 318(a) shall apply for this purpose, except that the family members as described in Code Section 318(a)(1) shall include all of (1) the person's spouse, (2) the ancestors and lineal descendants of the person and the person's spouse, (3) siblings of the person and the person's

20

Source: TRIBUNE CO, 8-K, April 05, 2007

spouse, and lineal descendants of such siblings, and (4) the spouse of any person described in (2) or (3).

(2)        A "Disqualified Person" shall mean any person if (1) the aggregate number of Deemed-Owned Shares of such person and members of such person's family (as described in preceding paragraph) exceeds 20% of all of the Deemed-Owned Shares of the Company, or (2) the aggregate number of Deemed-Owned Shares of such person exceeds 10% of the Deemed-Owned Shares of the Company.

(3)        "Deemed-Owned Shares" shall mean (1) shares of Company Stock allocated to a person's Account; plus (2) a proportion of all of the unallocated shares of Company Stock held under the Plan equal to the proportion of Company Stock allocated to the person during the preceding Plan Year; plus (3) Synthetic Equity held by such person.

(4)        "Synthetic Equity" shall mean any stock option, warrant, restricted stock, deferred issuance stock right, or similar right to acquire stock from the Company in the future. Synthetic Equity shall also include the value at any time of any stock appreciation right, phantom stock unit, or similar right to a future cash payment based on the value (or appreciation in value) of Company Stock, divided by the most recently determined fair market value of a share of Company Stock. The amount of nonqualified deferred compensation that a person is entitled to receive shall also be treated as a number of shares of Synthetic Equity equal to the value of the deferred compensation (determined as of the last day of each Plan Year) divided by the fair market value per share of Company Stock as of such date. The number of Synthetic Equity shares owned by a person for purposes of determining whether the person is a Disqualified Person or whether a Nonallocation Year has occurred shall be multiplied by a fraction, the numerator of which is the number of shares of outstanding stock of the Company held by the Trust (and any other tax-exempt entity), and the denominator of which is all outstanding shares of stock of the Company.

To the extent necessary to avoid a Nonallocation Year and to prevent a violation of Code Section 409(p), the Administrator may take either of the following actions as it determines in a uniform and nondiscriminatory manner:

(i)        Company Stock in an amount sufficient to prevent a Nonallocation Year shall remain a part of the Plan but shall be deemed to be held by a separate profit sharing plan and not governed by the ESOP features of the Plan; provided however, that any applicable non-lapse provisions of the ESOP features shall apply to such reclassified contributions; or

(ii)        To the extent permitted by law, the Administrator may adjust the mix of assets in Participants' Accounts to prevent the occurrence of a Nonallocation Year, by removing Company Stock from the accounts of Disqualified Persons and replacing it with other assets of identical value taken from the Accounts of Active Participants who are not Disqualified Persons, subject to the requirements that: (i) no such action may diminish the overall value of any Participant's Accounts, (ii) each Participant shall continue to have the

21

right to receive distribution of his entire Account balance in the form of Company Stock to the extent otherwise permitted hereunder, and (iii) the Accounts of each Active Participant who is not a Disqualified Person shall be adjusted in the same proportionate manner as the Accounts of all other Active Participants who are not Disqualified Persons.

The Plan intends to comply with Code Section 409(p) and the terms and operation of this Section shall be interpreted in a manner consistent with Code Section 409(p) and Treas. Reg. Section 1.409(p)-1T.

**7.10    Allocation of Proceeds from Sale or Liquidation**

(a)    Proceeds with respect to Company Stock allocated to Participants' ESOP Stock Accounts as a result of sale or redemption of Company Stock or of distributions from liquidation of the Company resulting from sale or other disposition of substantially all of the Company's assets shall be allocated in the Plan Year in which such proceeds are received by the Trust.

(b)    Proceeds with respect to Company Stock held in the Loan Suspense Account as a result of sale or redemption of Company Stock or of distributions from liquidation of the Company resulting from sale or other disposition of substantially all of the Company's assets shall be first applied to repayment of any outstanding Acquisition Loan with respect to such Company Stock in the Plan Year in which such proceeds are received by the Trust, any remaining proceeds shall be allocated in the Plan Year received by the Trust to the Participants' Accounts pro rata based on the Participant's ESOP Stock Account balances.

22

Source: TRIBUNE CO, 8-K, April 05, 2007

## SECTION 8

### Contribution and Benefit Limitations

**8.1    Contribution Limitations**

The Annual Addition to a Participant's Accounts for a Limitation Year shall not exceed the lesser of the amount specified under Section 415(c)(1)(A) of the Code, as adjusted from time to time pursuant to Section 415(d)(1)(C) of the Code, which amount is $45,000 for the Plan Year ending in 2007, or one hundred percent of the Participant's Compensation for that Limitation Year.

(a)    **Definitions**

The term "*Limitation Year*" means the Plan Year.

The term "*Annual Addition*" for any Limitation Year means the total amount of Employer Contributions, voluntary Employee contributions and forfeitures allocated to the Accounts of a Participant under this Plan and any Related Defined Contribution Plan for a Plan Year, except that if no more than one-third of the Employer Contributions which are deductible under Code section 404(a)(9) are allocated to the Accounts of Highly Compensated Employees during the Plan Year, then any Employer Contributions which are applied by the Trustee to pay interest on an Acquisition Loan, and any Financed Shares which are allocated as Forfeitures, shall not be included in computing Annual Additions. In the event that Employer Contributions are applied to the repayment of an Acquisition Loan and shares of Company Stock are released from the Loan Suspense Account and allocated to the Participants' ESOP Stock Accounts, each Participant's Annual Addition for a Limitation Year based on the allocated shares of Company Stock shall be calculated as the lesser of:  (i) the amount of such Employer Contributions credited to the Participant's Accounts, as adjusted by the preceding sentence, or (ii) the fair market value of shares of Company Stock credited to the Participant's Accounts resulting from the application of such Employer Contributions to the repayment of the Acquisition Loan.

The term "*Related Defined Contribution Plan*" means any defined contribution plan (as defined in section 414(i) of the Code) maintained by the Company or a Related Company.

(b)    **Corrections.** If it is anticipated that a Participant's Annual Addition will exceed the limitations of this Section, the Administrator shall reduce such Participant's Annual Addition to the extent necessary to meet the above limitations. If any Employer Contributions cannot be allocated to any Participant's Accounts by reason of this limitation, the Administrator shall,

23

Source: TRIBUNE CO, 8-K, April 05, 2007

first, in a Related Defined Contribution Plan, return salary reduction contributions made by the Participant and reduce other employer contri-butions made for the Participant. If after the return of all salary reduction contributions and the reduction of employer contributions in a Related Defined Contribution Plan, any Employer Contributions hereunder still cannot be allocated to a Participant's Accounts, the Administrator shall credit such Employer Contributions to a "suspense account" pursuant to the authority and regulations of Treasury Regulation Section 1.415-6(b)(6), to the extent permitted thereby.

## 8.2    Combining of Plans

In applying the limitations set forth in Section 8.1, reference to this Plan shall mean this Plan and all other defined contribu-tion plans (whether or not terminated) ever maintained by the Related Companies. It is intended that in complying with the requirements of Section 8.2, a Participant's benefits under this Plan shall be limited after the Participant's benefits under any other defined contribution plan maintained by the Employers are limited.

## 8.3    Highly Compensated Employee

With respect to any Plan Year, a "*Highly Compensated Employee*" means an eligible Employee who is a highly compensated employee as defined in Section 414(q) of the Code, which includes any Employee who:

(a)    was at any time a 5 percent owner (as defined in Section 416(i) of the Code) of any Employer or any Related Company during the Plan Year or the preceding Plan Year; or

(b)    for the preceding Plan Year received compensation from an Employer or any Related Company in excess of the amount specified in Section 414(q)(1)(B)(i) of the Code, as adjusted pursuant to Section 414(q)(1) of the Code, which amount is $100,000 for the Plan Year ending in 2007, and was in the top 20 percent of Employees when ranked on the basis of Compensation paid for such preceding year.

A former Employee will be considered a Highly Compensated Employee if such former Employee was a Highly Compensated Employee either when he separated from service with the Employ-ers, or at any time after he attained age 55. The determination of whether an Employee is a Highly Compensated Employee will be made with reference to the definitions provided in Section 414(q) of the Code and any regulations issued by the Secretary of the Treasury thereunder (including any cost-of-living adjustments to the dollar figure above). For purposes of this Section, an Employee's compen-sation for a Plan Year shall be the wages paid to the Employee within the meaning of section 3401(a) of the Code and all other payments of compensation to the Employee by an Employer for which the Employer is required to furnish the Participant a written statement, as described in Treas. Reg. § 1.415-2(d)(11)(i),

24

Source: TRIBUNE CO, 8-K, April 05, 2007

but including the Employee's elective deferral contri-butions made pursuant to Sections 125, 132(f)(4) and 401(k) of the Code (including income deferral contributions, if any) made under this Plan).

25

Source: TRIBUNE CO, 8-K, April 05, 2007

## SECTION 9

### Period of Participation

**9.1    Settlement Date**

A Participant's "*Settlement Date*" will be the date on which his employment with the Related Companies is terminated because of the first to occur of the following events:

(a)    **Normal Retirement**.  The Participant retires or is retired from the employ of the Employers and the Related Companies on or after the date on which he attains age 65 ("*Normal Retirement Age*").  A Participant's right to the balances in his Accounts shall be non-forfeitable on or after the date he attains Normal Retirement Age.

(b)    **Disability Retirement**.  The Participant is retired on account of total and permanent disability when the Administrator determines a physical or mental condition of a Participant resulting from bodily injury, disease or mental disorder which renders the Participant incapable of continuing any gainful occupation.  This determination will be made in a nondiscriminatory manner to all Participants.  A Participant's right to the balances in his Accounts shall be nonforfeitable on or after the date he retires due to disability.

(c)    **Death**.  The Participant's death.

(d)    **Resignation or Dismissal**.  The Participant resigns or is dismissed from the employ of the Employers and the related companies before retire-ment in accordance with paragraph (a) or (b) next above.

If a Participant is transferred from employment with an Employer to employment with a Related Company that is not an Employer, then for purposes of determining when the Participant's Settlement Date occurs under this Section, the Participant's employment with such Related Company (or any Related Company to which the Participant is subsequently transferred) shall be considered as employment with the Employers.

26

## SECTION 10

### Vesting in Benefits; Forfeitures; Reinstatements

**10.1    Fully Vested Benefits**

If a Participant's employment with an Employer or a Related Company is terminated because the Participant retires, becomes disabled, or dies, under Sections 9.1(a), (b) or (c), respectively, the balances in all of his Accounts as at the Accounting Date coincident with or next following his Settlement Date (after all adjustments required under the Plan as of that date have been made) shall be non-forfeitable and shall be distributable to him, or in the event of his death to his Beneficiary, under Section 11.1.

**10.2    Partially Vested Benefits**

If a Participant resigns or is dismissed from the employ of an Employer or a Related Company under Section 9.1(d), the balances in his ESOP Cash Account and ESOP Stock Account as of the Accounting Date coincident with or next following his Settlement Date (after all adjustments required under the Plan as of that date have been made) will each be reduced to a vested percentage thereof computed in accordance with the following schedule:

| If the Participant's Number of Years of Service Is: | The Vested Percentage of His Account Will Be: |
|---|---|
| Less than 2 years | 0% |
| 2 years but less than 3 years | 20% |
| 3 years but less than 4 years | 40% |
| 4 years but less than 5 years | 60% |
| 5 years but less than 6 years | 80% |
| 6 years or more | 100% |

The resulting balances in his ESOP Cash Account and ESOP Stock Account will be distributable to the Participant in the time and manner provided in Sections 11.1 and 11.4.

**10.3    Forfeitures**

Except as provided in Section 10.4, the portion of a Participant's Accounts that is not distributable to him on his Settlement Date by reason of the provisions of Section 10.2 shall become a *"Forfeiture"* on the last day of the Plan Year in which such Participant has incurred five consecutive One Year Breaks in Service. The amount deemed as Forfeitures will be reallocated for such Plan Year in accordance with the provisions of Section 4.1(b). Assets in the Participant's Accounts other than Financed Shares will be forfeited before Financed Shares are forfeited.

27

Source: TRIBUNE CO, 8-K, April 05, 2007

**10.4    Reinstatement**

If a Participant who is not 100% vested terminates employment with the Employers and then returns to employment with an Employer prior to receiving any distribution of his Accounts and prior to incurring five consecutive One Year Breaks in Service, his Accounts shall cease to be subject to forfeiture arising from his earlier termination of employment.

If a Participant who is not 100% vested terminates employment with the Employers and receives a distribution of any portion of his Accounts prior to the occurrence of five consecutive One Year Breaks in Service, and is reemployed by an Employer prior to the occurrence of five consecutive One Year Breaks in Service, the portion of his Accounts which was not vested shall be maintained separately until he becomes 100% vested. His vested and nonforfeitable percentage in such separate Accounts upon his subsequent termination of Service shall be equal to:

$$\frac{X-Y}{100\%-Y}$$

For purposes of applying this formula, X is the vested percentage at the time of the subsequent termination, and Y is the vested percentage at the time of the prior termination.

28

Source: TRIBUNE CO, 8-K, April 05, 2007

## SECTION 11

### Distributions Following Settlement Date

**11.1    Manner of Distribution**

Distribution will be made in the form of whole and/or fractional shares of Company Stock, but the value of any fractional shares of Company Stock may be distributed in cash.  However, if the Company's charter or bylaws restrict ownership of substantially all of the outstanding Company Stock to Employees and the Trust, or if the Company has elected to be taxed as an "S corporation," the Participant's Accounts will be distributed in cash, or if the Administrator elects, shares of Company Stock subject to a requirement that they be sold to the Company immediately upon distribution in the manner described in Section 12.2.  If the Company is an S corporation, the Administrator may deny distribution in the form of Company Stock to any person who elects direct rollover of such a distribution as described in Section 11.5.

Subject to the conditions set forth below, distribution of the balances in a Participant's ESOP Cash Account and ESOP Stock Account will be made to, or for the benefit of, the Participant or, in the case of the Participant's death, to or for the benefit of the Participant's Beneficiary, as directed by the Administrator in its sole discretion, either in the form of a lump sum or, in the form of substantially equal annual installments over a period not to exceed five years.  In the event distribution is made in the form of installments, the balance in the Participant's ESOP Stock Account and ESOP Cash Account will continue to be subject to appreciation, depreciation, income, gains, and earnings or losses pursuant to Section 7.5(e) until the final installment is paid.

Notwithstanding the foregoing, the period over which distribution of a Participant's ESOP Stock Account may be made may be increased by one year, up to four additional years, for each $180,000 (or fraction thereof) by which the total balance of the Participant's Accounts exceeds $915,000.  The aforementioned dollar amounts shall be subject to cost-of-living adjustments after 2007 as prescribed by the Secretary of the Treasury.

**11.2    Determination of Account Balances**

After a Participant's Settlement Date has occurred and pending complete distribution of the Participant's Account balances, the Participant's Accounts will be held under the Plan and will be subject to adjustment under Section 7.

**11.3    Reinvestment of ESOP Stock Account**

As of the end of any Plan Year in which a Participant who has terminated employment with the Employers ("Inactive Participant") has shares of Company Stock in his

29

Source: TRIBUNE CO, 8-K, April 05, 2007