# EXHIBIT A

## *Sale Agreement*

PURCHASE AND SALE AGREEMENT

BY AND BETWEEN

TRIBUNE NM, INC.,
a Delaware corporation

AS SELLER

AND

STEEL TRIBUNE, LLC
a Delaware limited liability company

AS PURCHASER

FOR

250 Miller Place,
Hicksville, New York

Dated as of September _1_, 2009

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "Agreement") is made as of the __1ˢᵗ__ day of September, 2009 (the "Effective Date") by and between TRIBUNE NM, INC., a Delaware corporation ("Seller"), and STEEL TRIBUNE, LLC, a Delaware limited liability company ("Purchaser").

## ARTICLE I

## PURCHASE AND SALE

1.1    Agreement of Purchase and Sale.  Subject to the terms and conditions hereinafter set forth, Seller agrees to sell and convey and Purchaser agrees to purchase the following:

(a)    that certain tract or parcel of land situated in the City of Hicksville, County of Nassau, State of New York, more particularly described on Exhibit A attached hereto and made a part hereof, together with all and singular the rights and appurtenances pertaining to such property, including any right, title and interest of Seller in and to adjacent streets, alleys or rights-of-way (the property described in clause (a) of this Section 1.1 being herein referred to collectively as the "Land");

(b)    the buildings, structures, fixtures and other improvements on the Land, including specifically, without limitation, that certain building located thereon having a street address of 250 Miller Place, Hicksville, New York (the property described in clause (b) of this Section 1.1 being herein referred to collectively as the "Improvements"); and

1.2    Property Defined.  The Land and the Improvements are hereinafter sometimes referred to collectively as the "Property."

1.3    Purchase Price.  The purchase price for the Property is Four Million Six Hundred Fifty Thousand and No/100 Dollars ($4,650,000.00) (the "Purchase Price"), of which One Million and No/100 Dollars ($1,000,000.00) shall be due at Closing (the "Cash Payment").  The remaining Three Million Six Hundred Fifty Thousand and No/100 Dollars ($3,650,000.00) shall be financed by the Seller pursuant to the terms of Section 1.6 herein.

1.4    Payment of Cash Payment.  The Cash Payment, as increased or decreased by prorations and adjustments as herein provided, shall be payable by Purchaser in full at Closing (as hereinafter defined) in cash by wire transfer of immediately available federal funds to a bank account designated by Title Company (as such term is defined in Section 1.5 hereof) in writing to Purchaser prior to the Closing.  Said funds shall be so deposited not later than 11:00 a.m., Eastern Time, on the Closing Date (as hereinafter defined).

1.5    Earnest Money.

(a)    Not later than five (5) business days after the date hereof, Purchaser shall deposit with Commonwealth Land Title Insurance Company, having its office at 140 East 45th Street, New York, New York 10017, Attn: Brian Juodzevich (the "Title Company"), the sum of Two Hundred Thousand and No/100 Dollars ($200,000.00) (the "Earnest Money") in good

1

funds, either by certified bank or cashier's check or by federal wire transfer. Upon the expiration of the Study Period (as hereinafter defined), the Earnest Money shall be non-refundable to Purchaser except as expressly set forth in this Agreement. Time is of the essence for the delivery of Earnest Money under this Agreement. The Earnest Money shall be held in escrow by Title Company in an interest-bearing bank account selected by Title Company and Purchaser pursuant to the terms of a strict joint order escrow agreement in the form attached hereto as Exhibit B. On the Closing Date, Title Company shall deliver the Earnest Money to Seller, which Earnest Money (excluding any interest earned thereon) shall be applied against the Purchase Price. Any interest on the Earnest Money shall be paid to Purchaser, except if the Earnest Money is paid to Seller as a result of Purchaser's default under this Agreement, in which event the interest shall be paid to Seller.

1.6    Seller Financing. Seller agrees to provide financing to Purchaser at Closing (the "Seller Financing") secured by the Property in the amount of $3,650,000.00 pursuant to the terms set forth on Exhibit C attached hereto. The Seller Financing shall be credited against the Purchase Price at Closing. At Closing, Purchaser shall execute and deliver to Seller (i) a Promissory Note, (ii) a Mortgage, Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement (the "Mortgage"), (iii) a pollution liability insurance policy (the "PLI Policy"), all premiums for which shall be paid by Purchaser, with a term of ten (10) years from and after the Closing Date, with limits of coverage of $10,000,000 per occurrence, and with an insurer and on such other terms and conditions acceptable to Seller, including but not limited to provisions naming Seller as an insured and/or additional insured and/or loss payee under such policy, limited to environmental issues arising/caused from and after the Closing Date. Purchaser shall maintain in full force and effect the PLI Policy, or a pollution liability insurance policy on substantially the same terms and conditions as the PLI Policy, until such time as all of Purchaser's obligations under or with respect to the Seller Financing shall have been fully discharged, (iv) UCC Financing Statements and Fixture Filings, and (v) any other documents or instruments reasonably requested by Seller to secure and evidence the Seller Financing (the "Loan Documents"), all of which documents and/or instruments shall be in a form proscribed by Seller in its sole discretion. Any and all fees, costs and expenses incurred by Seller or Purchaser due to the Seller Financing (including, but not limited to, mortgage and intangible taxes, recording fees for the Mortgage, and fees for the Loan Policy [defined below]), but excluding Seller's legal fees, shall be paid by Purchaser at Closing. Seller agrees that the Mortgage shall contain a provision whereby upon repayment in full of the Seller Financing and the performance of all other obligations of Purchaser secured by the Mortgage, Seller will, at the sole cost and expense of Purchaser, either satisfy the Mortgage and release the lien thereof from the Property, or, at the written request of Purchaser, assign the Mortgage and the Promissory Note secured thereby to a refinancing lender, without any representation, warranty or recourse of any nature whatsoever.

## ARTICLE II

### TITLE AND SURVEY

2.1    Title Examination; Commitment for Title Insurance. Purchaser may, at its sole costs and expense, obtain from the Title Company an ALTA title insurance commitment (the "Title Commitment") covering the Property. From and after the Closing Date, Purchaser shall

2

look solely to the Title Company issuing the title insurance policy for any loss, damage or claim attributable to any Permitted Exceptions (as hereinafter defined). The provisions of this Section 2.1 shall survive the Closing and the recording of the Deed (as hereinafter defined).

2.2    Survey. Seller has delivered to Purchaser Seller's existing ALTA survey of the Property (the "Existing Survey"). Purchaser may, at its sole cost and expense, update and recertify the Existing Survey or obtain a new survey of the Property (either of which is hereinafter referred to as the "Updated Survey").

2.3    Title and Survey Objections; Cure of Title and Survey Objections. Purchaser shall have until 6:00 p.m. (Eastern Time) on the last day of the Study Period (the "Title Exam Deadline") to notify Seller, in writing, of such objections as Purchaser may have to anything contained in the Title Commitment or the Updated Survey. Any item contained in the Title Commitment or any matter shown on the Updated Survey to which Purchaser does not object prior to the Title Exam Deadline shall be deemed a Permitted Exception. In the event Purchaser shall notify Seller of objections to title or to matters shown on the Updated Survey prior to the Title Exam Deadline, Seller shall have the right, but not the obligation, to cure such objections. Within five (5) days after receipt of Purchaser's notice of objections, Seller shall notify Purchaser in writing whether Seller elects to attempt to cure such objections. Seller's failure to respond within said five (5) day period shall be deemed to be Seller's election not to cure any such objections. If Seller elects to attempt to cure, and provided that Purchaser shall not have terminated this Agreement in accordance with Section 3.2 hereof, Seller shall have until the date of Closing to attempt to remove, satisfy or cure the same to Purchaser's reasonable satisfaction and for this purpose Seller shall be entitled to a reasonable adjournment of the Closing if additional time is required, but in no event shall the adjournment exceed sixty (60) days after the date for Closing set forth in Section 4.1 hereof. If Seller elects not to cure any objections specified in Purchaser's notice, or if Seller is unable to effect a cure prior to the Closing (or any date to which the Closing has been adjourned), Purchaser shall have the following options: (i) to accept a conveyance of the Property subject to the Permitted Exceptions, specifically including any matter objected to by Purchaser which Seller is unwilling or unable to cure, and without reduction of the Purchase Price; or (ii) to terminate this Agreement by sending written notice thereof to Seller, and upon delivery of such notice of termination, this Agreement shall terminate and the Earnest Money shall be returned to Purchaser, and thereafter neither party hereto shall have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement. If Seller notifies Purchaser that Seller does not intend to attempt to cure any title objection, or if having commenced attempts to cure any objection, Seller later notifies Purchaser that Seller will be unable to effect a cure thereof, Purchaser shall, within five (5) days after such notice has been given, notify Seller in writing whether Purchaser shall elect to accept the conveyance under clause (i) or to terminate this Agreement under clause (ii). Purchaser's failure to respond within said five (5) day period shall be deemed to be Purchaser's election to accept the conveyance under clause (i) above.

2.4    Conveyance of Title. At Closing, Seller shall convey and transfer to Purchaser fee simple title to the Property by bargain and sale deed without covenants (the "Deed"). Notwithstanding anything contained herein to the contrary, the Property shall be conveyed subject to the following matters (the "Permitted Exceptions"):

LEGAL_US_E # 84182856.11

(a)        the lien of all ad valorem real estate and similar taxes and assessments not yet delinquent;

(b)        local, state and federal laws, ordinances or governmental regulations, including but not limited to, building and zoning laws, ordinances and regulations, now or hereafter in effect relating to the Property;

(c)        items appearing of record or shown on the Title Commitment or the Updated Survey and, in either case, not objected to by Purchaser or waived or deemed waived by Purchaser in accordance with Section 2.3 hereof; and

(d)        any matter created by, through, under or with the consent of Purchaser.

## ARTICLE III

## STUDY PERIOD

3.1    <u>Right of Inspection</u>.  Purchaser acknowledges that Seller has previously delivered to Purchaser the following items (the "<u>Property Materials</u>"):

(a)        Any surveys of the Property in Seller's possession.

(b)        Any existing title insurance reports with respect to the Property in Seller's possession.

(c)        Any environmental surveys and/or inspections of the Property in Seller's possession.

(d)        Any plans and specifications relating to the Property in Seller's possession.

(e)        Any certificates of occupancy relating to the Property in Seller's possession.

During the period beginning upon the Effective Date and ending at 6:00 p.m. (Eastern Time) on the date which is thirty (30) days thereafter (as the same may be extended as provided below, the "<u>Study Period</u>"), Purchaser shall have the right to make a non-invasive physical inspection of the Property and to examine the Property Materials.  Notwithstanding anything herein to the contrary, the Property Materials shall exclude materials not directly related to the leasing, current maintenance and/or management of the Property such as, without limitation, Seller's internal memoranda, financial projections, budgets, appraisals, accounting and tax records and similar proprietary, elective or confidential information.  Purchaser understands and agrees that any on-site inspections of the Property shall be conducted upon at least twenty-four (24) hours' prior written notice to Seller and in the presence of Seller or its representative.  Such physical inspection shall not unreasonably interfere with the use of the Property by Seller nor shall Purchaser's inspection damage the Property in any respect.  Such physical inspection shall not be invasive in any respect (unless Purchaser obtains Seller's prior written consent), and in any event shall be conducted in accordance with standards customarily employed in the industry and in

4

compliance with all governmental laws, rules and regulations. Following each entry by Purchaser with respect to inspections and/or tests on the Property, Purchaser shall restore the Property to a condition which is as near as possible to its original condition as existed prior to any such inspections and/or tests. Seller shall reasonably cooperate with Purchaser in its due diligence but shall not be obligated to incur any liability or expense in connection therewith. Purchaser agrees to indemnify against and hold Seller and its members, managers, officers, directors, shareholders, employees, property managers and agents harmless from any claim for liabilities, costs, expenses (including reasonable attorneys' fees actually incurred), damages or injuries arising out of or resulting from the inspection of the Property by Purchaser or its employees, agents or contractors, and notwithstanding anything to the contrary in this Agreement, such obligation to indemnify and hold harmless Seller and its members, managers, officers, directors, shareholders, employees, property managers and agents shall survive Closing or any termination of this Agreement. All inspections shall occur during normal business hours of the Property and as agreed upon by Seller and Purchaser. Prior to Purchaser entering the Property to conduct the inspections and/or tests described above, Purchaser shall obtain and maintain, at Purchaser's sole cost and expense, and shall deliver to Seller evidence of the following insurance coverage: general liability insurance, from an insurer reasonably acceptable to Seller, in the amount of Two Million and No/100 Dollars ($2,000,000.00) combined single limit for personal injury and property damage per occurrence, such policy to name Seller as an additional insured party or loss payee, as applicable.

3.2    <u>Right of Termination</u>.  Seller agrees that in the event Purchaser determines, in Purchaser's sole discretion, that the Property is not suitable for its purposes, Purchaser shall have the right to terminate this Agreement by giving written notice thereof to Seller prior to the expiration of the Study Period. If Purchaser gives such notice of termination within the Study Period, this Agreement shall terminate and the Earnest Money shall be returned to Purchaser. Time is of the essence with respect to the provisions of this Section 3.2. If Purchaser fails to give Seller a notice of termination prior to the expiration of the Study Period, Purchaser shall no longer have any right to terminate this Agreement under this Section 3.2 and shall be bound to proceed to Closing and consummate the transaction contemplated hereby pursuant to the terms of this Agreement. Upon any termination of this Agreement by Purchaser as permitted in this Section 3.2, Purchaser shall promptly deliver to Seller all Property Materials received by Purchaser and copies of any and all surveys, studies, reports, evaluations and other materials prepared by third parties in connection with Purchaser's due diligence inspections of the Property.

## ARTICLE IV

## CLOSING

4.1    <u>Time and Place</u>.  The closing (the "<u>Closing</u>") on the sale and purchase of the Property shall occur on or before the date which is thirty (30) days after the later of (i) expiration of the Study Period and (ii) receipt by Purchaser of a copy of the Order (as hereinafter defined), or such later date as the same may be extended pursuant to Section 2.3 hereof (the "<u>Closing Date</u>"); provided, however, that in no event shall the Closing occur after December 4, 2009 (the "<u>Outside Closing Date</u>"). At Closing, Seller and Purchaser shall perform the obligations set forth

in, respectively, Section 4.2 hereof and Section 4.3 hereof, the performance of which obligations shall be concurrent conditions.

4.2    <u>Seller's Obligations at Closing</u>.  Not later than 11:00 a.m., Eastern Time, on the Closing Date, Seller shall deliver to the Title Company:

(a)    a duly executed Deed, conveying the Property, subject only to the Permitted Exceptions;

(b)    two (2) originals of a certificate stating that the representations and warranties of Seller contained in this Agreement are true and correct in all material respects as of the date of Closing (with appropriate modifications of those representations and warranties made in Section 5.1 hereof to reflect any changes therein) or identifying any representation or warranty which is not, or no longer is, true and correct and explaining the state of facts giving rise to the change.  In no event shall Seller be liable to Purchaser for, or be deemed to be in default hereunder by reason of, any breach of representation or warranty which results from any change that (i) occurs through no act or omission of Seller between the Effective Date and the date of Closing and (ii) is expressly permitted under the terms of this Agreement or is beyond the reasonable control of Seller to prevent; provided, however, that the occurrence of a change which is not permitted hereunder or is beyond the reasonable control of Seller to prevent shall, if materially adverse to Purchaser, constitute the non-fulfillment of the condition set forth in Section 4.7(b) hereof; provided, further, that if despite changes or other matters described in such certificate, the Closing occurs, Seller's representations and warranties set forth in this Agreement shall be deemed to have been modified by all statements made in such certificate;

(c)    duly executed counterparts of the Loan Documents to which Seller is a party;

(d)    two (2) duly executed counterparts of an affidavit by Seller stating that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Property Tax Act of 1980 and the 1984 Tax Reform Act;

(e)    a duly executed counterpart of the settlement statement prepared by the Title Company and in form and substance acceptable to Seller and Purchaser (the "<u>Settlement Statement</u>"); and

(f)    duly executed counterparts of New York transfer tax forms RP-5217 and TP-584.

4.3    <u>Purchaser's Obligations at Closing</u>.  Not later than 11:00 a.m., Eastern Time, on the Closing Date, Purchaser shall deliver to Title Company:

(a)    the full amount of the Cash Payment, as increased or decreased by prorations and adjustments as herein provided, in immediately available wire transferred funds pursuant to Section 1.4 hereof;

(b)    duly executed counterparts of the Loan Documents;

6

(c)  duly executed counterparts of New York transfer tax forms RP-5217 and TP-584;

(d)  a legal opinion with respect to the Loan Documents in form and substance acceptable to Seller, in its sole and absolute discretion, from a law firm reasonably acceptable to Seller;

(e)  an ALTA Loan Policy of Title Insurance issued by the Title Company dated the day of Closing in the amount of $3,650,000, naming Seller as the insured and insuring the lien of the Mortgage as a first priority mortgage lien on the Property, with such exceptions to title and containing such endorsements as Seller shall approve in its sole discretion (the "Loan Policy"); and

(f)  a duly executed counterpart of the Settlement Statement.

4.4  Title Company's Obligations at Closing.  Intentionally Deleted.

4.5  Credits and Prorations.  The following shall be apportioned with respect to the Property as of 12:01 a.m., Eastern Time, on the day of Closing, as if Purchaser were vested with title to the Property during the entire day upon which Closing occurs:

(a)  Property Taxes.  Property Taxes shall be apportioned on the basis of the fiscal period for which assessed.  If the Closing Date shall occur either before an assessment is made or a tax rate is fixed for the tax period in which the Closing Date occurs, the apportionment of such Property Taxes based thereon shall be made at the Closing Date by applying the tax rate for the preceding year to the latest assessed valuation, but, promptly after the assessment and/or tax rate for the current year are fixed, the apportionment thereof shall be recalculated and Seller or Purchaser, as the case may be, shall promptly make an appropriate payment to the other based on such recalculation.  For purposes of this Agreement, "Property Taxes" shall mean real estate taxes, sewer rents and taxes, water rates and charges, vault charges and taxes, business improvement district taxes and assessments and any other governmental taxes, charges or assessments levied or assessed against the Property.

(b)  Utilities.  Prior to the Closing Date, to the extent that any utility accounts are in Seller's name, Purchaser shall open new accounts or otherwise notify the utility companies furnishing water, telephone, steam, electricity, gas and other utility service to the Property (collectively, the "Utilities") of the scheduled transfer of the title to the Property so that such utility companies may bill Seller directly for the charges for such utilities accrued prior to the Closing Date and Purchaser for such charges accrued from and after the Closing Date.  Seller shall be responsible for all charges for Utilities applicable to the period prior to the Closing Date and Purchaser shall be responsible for all charges for Utilities applicable to the period from and after the Closing Date.

(c)  Discounts.  Seller shall receive the entire advantage of any discounts for the prepayment by it of any taxes, water rates or sewer rents.

7

(d)     True-Up.  In the event that a post closing true-up is necessary, Purchaser shall work diligently with Seller to finalize the prorations within sixty (60) days after the Closing Date.

(e)     Survival.  The provisions of this Section 4.5 shall survive Closing.

4.6     Closing Costs.  Seller shall pay (a) the fees of any counsel representing it in connection with this transaction; (b) one-half (1/2) of any escrow fee which may be charged by Title Company, and (c) any transfer tax, documentary stamp tax or similar tax which becomes payable by reason of the transfer of the Property.  Purchaser shall pay (u) the fees of any counsel representing Purchaser in connection with this transaction; (v) the cost of the Title Commitment and the premium for any Owner's Policy of Title Insurance to be issued to Purchaser by the Title Company at Closing and the costs of any endorsements thereto; (w) the cost of the Updated Survey; (x) the fees for recording the deed conveying the Property to Purchaser; (y) one-half (1/2) of any escrow fees charged by Title Company; and (z) any costs and expenses in connection with Purchaser's financing including, without limitation, the Loan Policy, fees for recording the Mortgage, and mortgage or similar taxes, but excluding Seller's legal fees.  All other costs and expenses incident to this transaction and the closing thereof shall be paid by the party incurring same.

4.7     Conditions Precedent to Obligation of Purchaser.  The obligation of Purchaser to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

(a)     Seller shall have delivered to Purchaser all of the items required to be delivered to Purchaser pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.2 hereof.

(b)     All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the date of Closing (with appropriate modifications permitted under this Agreement or not adverse to Purchaser).

(c)     Seller shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Seller as of the date of Closing.

(d)     Seller shall have obtained and delivered to Purchaser a copy of the Order (as hereinafter defined).

4.8     Conditions Precedent to Obligation of Seller.  The obligation of Seller to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which may be waived by Seller in its sole discretion:

(a)     Seller shall have received the Cash Payment as adjusted pursuant to and payable in the manner provided for in this Agreement.

8

(b)    Purchaser shall have delivered to Seller all of the items required to be delivered to Seller pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.3 hereof.

(c)    All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the date of Closing.

(d)    Purchaser shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Purchaser as of the date of Closing.

(e)    Seller shall have obtained the Order.

## ARTICLE V

## REPRESENTATIONS, WARRANTIES AND COVENANTS

5.1    <u>Representations and Warranties of Seller</u>.  Seller hereby makes the following representations and warranties to Purchaser as of the Effective Date:

(a)    <u>Organization and Authority</u>.  Seller has been duly organized and is validly existing under the laws of Delaware.  Subject to receipt of the Order, Seller has the full right, power and authority to enter into this Agreement and, to transfer all of the Property to be conveyed by Seller pursuant hereto and to consummate or cause to be consummated the transactions contemplated herein to be made by Seller.  The person signing this Agreement on behalf of Seller is authorized to do so.

(b)    <u>Pending Actions</u>.  Except for the pending bankruptcy case before the Court (as hereinafter defined) (Case No. 08-13141 (KJC)), to Seller's knowledge, there is no action, suit or proceeding pending against the Property, which, if adversely determined, could individually or in the aggregate have a material adverse effect on title to the Property or any portion thereof or which could in any material way interfere with the consummation by Seller of the transaction contemplated by this Agreement.

(c)    <u>Condemnation</u>.  To Seller's knowledge, Seller has not received written notice of any pending or threatened condemnation proceedings relating to the Property.

(d)    <u>Service Contracts</u>.  To Seller's knowledge, Seller is not a party to any service contracts or equipment leases of any type or nature affecting the Property.

(e)    <u>Governmental Approvals</u>.  To Seller's knowledge, Seller has not received any written notice from any governmental agency with respect to any violation existing at the Property of any federal, state or local law, ordinance or code that has not previously been cured.

(f)    <u>Leases</u>.  There are no leases or occupancy agreements to which Seller is a party affecting the Property.  To Seller's knowledge, except as disclosed by the Title Commitment, no person, firm or entity other than Seller and its affiliates have any possessory interest in any portion of the Property or any right to use the Property (whether pursuant to lease, sublease, rental, license, concession, management or other agreement, written or oral, now or

9

hereafter in effect) or any rights to acquire or to lease the Property or any portion thereof, including, without limitation, any renewals or extension options, or otherwise obtain any interest therein, and there are no outstanding rights of first refusal, rights of reverter or rights of first offer relating to the Property or any interest therein.

(g)    Special Assessments.  To Seller's knowledge, there are no pending or threatened special assessments affecting the Property or any contemplated improvements affecting the Property that may result in special assessments affecting the Property.

(h)    Insurance Requirements.  Seller has no knowledge of any notice or request from any insurance company or Board of Fire Underwriters (or organization exercising functions similar thereto) or from any mortgagee requesting the performance of any work or alteration in respect of the Property.

5.2    Knowledge Defined.  References in this Agreement to the "knowledge" of Seller shall refer only to the actual knowledge of the Designated Person (as hereinafter defined) of Seller, and shall not be construed, by imputation or otherwise, to refer to the knowledge of Seller, or any affiliate of Seller, to any property manager, or to any other officer, agent, manager, representative or employee of Seller or any affiliate thereof or to impose upon such Designated Person any duty to investigate the matter to which such actual knowledge, or the absence thereof, pertains.  As used herein, the term "Designated Person" shall refer to the following person: Stephanie Pater.

5.3    Survival of Seller's Representations and Warranties; Limit on Liability.  The representations and warranties of Seller set forth in Section 5.1 hereof as updated by the certificate of Seller to be delivered to Purchaser at Closing in accordance with Section 4.2(d) hereof, shall survive Closing for a period of six (6) months.  No claim for a breach of any representation or warranty of Seller shall be actionable or payable (a) if the breach in question results from or is based on a condition, state of facts or other matter which was known to Purchaser prior to Closing, (b) unless the valid claims for all such breaches (including, without limitation, all attorneys' fees and court costs) collectively aggregate more than Ten Thousand and No/100 Dollars ($10,000.00), in which event the full amount of such claims shall be actionable, and (c) unless an action shall have been commenced by Purchaser against Seller prior to the expiration of said six (6) month period.  Purchaser agrees to first seek recovery under any insurance policies (including title insurance policies) prior to seeking recovery from Seller, and Seller shall not be liable to Purchaser if Purchaser's claim is satisfied from such insurance policies.  Notwithstanding anything herein to the contrary, in no event shall Seller's aggregate liability to Purchaser under this Agreement, including, without limitation, liability for breach of any representation or warranty of Seller in this Agreement, exceed the amount of the Earnest Money.

5.4    Representations and Warranties of Purchaser.  Purchaser hereby represents and warrants to Seller:

(a)    ERISA.  Purchaser is not acquiring the Property with the assets of a employee benefit plan as defined in Section 3(3) of ERISA.

10

(b)    <u>Organization and Authority</u>. Purchaser has been duly organized and is validly existing under the laws of Delaware. Purchaser has the full right, power and authority to purchase the Property as provided in this Agreement and to carry out Purchaser's obligations hereunder, and all requisite action necessary to authorize Purchaser to enter into this Agreement and to carry out its obligations hereunder have been, or by the Closing will have been, taken. The person signing this Agreement on behalf of Purchaser is authorized to do so.

(c)    <u>Pending Actions</u>. There is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Purchaser which, if adversely determined, could individually or in the aggregate materially interfere with the consummation of the transaction contemplated by this Agreement.

(d)    <u>OFAC</u>. Purchaser and, to Purchaser's actual knowledge, each person or entity owning an interest in Purchaser is (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the OFAC and/or on any other similar List, (ii) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, and (iii) not an "<u>Embargoed Person</u>", to Purchaser's actual knowledge, none of the funds or other assets of Purchaser constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as hereinafter defined), and to Purchaser's actual knowledge, no Embargoed Person has any interest of any nature whatsoever in Purchaser (whether directly or indirectly).

5.5    <u>Survival of Purchaser's Representations and Warranties</u>. The representation and warranties of Purchaser set forth in Section 5.4(a) hereof shall survive Closing and shall be a continuing representation and warranty without limitation.    All other representations and warranties of Purchaser shall survive Closing for a period of six (6) months.

5.6    <u>Covenants of Seller</u>. Seller hereby covenants with Purchaser the following:

(a)    From the Effective Date hereof until the Closing or earlier termination of this Agreement, Seller shall use reasonable efforts to operate and maintain the Property in a manner generally consistent with the manner in which Seller has operated and maintained the Property prior to the date hereof; and

(b)    On the Closing Date, there will be no outstanding contracts made by Seller for any improvements to the Property which have not been fully paid for.

(c)    Seller shall file a motion with the United States Bankruptcy Court for the District of Delaware (the "Court") seeking an Order from the Court (the "Order") to be issued at the next available hearing date approving the sale of the Property to Purchaser pursuant to the terms of this Agreement. Seller shall deliver to Purchaser a copy of the Order not later than November 4, 2009. In the event that Seller fails to deliver a copy of the Order to Purchaser on or before November 4, 2009, then Purchaser may, as its sole and exclusive remedy hereunder and in lieu of any other remedies available to Purchaser at law or in equity including, without limitation, the remedies available to Purchaser pursuant to Section 6.2 hereof, terminate this Agreement, in which event the Earnest Money shall be returned to Purchaser and Seller shall reimburse Purchaser for its actual out-of-pockets third party costs and expenses incurred in

11

connection with its due diligence investigations of the Property in an amount not to exceed the sum of Fifty Thousand and No/100 Dollars ($50,000.00).

5.7     Covenants of Purchaser.  Purchaser hereby covenants with Seller that Purchaser shall, in connection with its investigation of the Property during the Study Period, inspect the Property for the presence of hazardous substances, and shall furnish to Seller copies of any reports received by Purchaser in connection with any such inspection. Purchaser hereby assumes full responsibility for such inspections and irrevocably waives any claim against Seller arising from the presence of hazardous substances on the Property. Purchaser shall also furnish to Seller copies of any other reports received by Purchaser relating to any other inspections of the Property conducted on Purchaser's behalf, if any.

## ARTICLE VI

## DEFAULT

6.1     **Default by Purchaser.**  IF THE SALE OF THE PROPERTY IS NOT CONSUMMATED DUE TO ANY DEFAULT BY PURCHASER HEREUNDER, THEN SELLER SHALL RETAIN THE EARNEST MONEY AS LIQUIDATED DAMAGES AS ITS SOLE AND EXCLUSIVE REMEDY HEREUNDER.  THE PARTIES HAVE AGREED THAT SELLER'S ACTUAL DAMAGES, IN THE EVENT OF A FAILURE TO CONSUMMATE THIS SALE DUE TO PURCHASER'S DEFAULT HEREUNDER, WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE. AFTER NEGOTIATION, THE PARTIES HAVE AGREED THAT, CONSIDERING ALL THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT, THE AMOUNT OF THE EARNEST MONEY IS A REASONABLE ESTIMATE OF THE DAMAGES THAT SELLER WOULD INCUR IN SUCH EVENT. BY PLACING THEIR INITIALS BELOW, EACH PARTY SPECIFICALLY CONFIRMS THE ACCURACY OF THE STATEMENTS MADE ABOVE AND THE FACT THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED, AT THE TIME THIS AGREEMENT WAS MADE, THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION.  THE FOREGOING IS NOT INTENDED TO LIMIT PURCHASER'S INDEMNITY OBLIGATIONS UNDER OTHER SECTIONS HEREOF.

SELLER: _____     PURCHASER: _____

6.2     Default by Seller.  In the event that Seller fails to consummate this Agreement for any reason other than Purchaser's default hereunder or the permitted termination of this Agreement by Seller or Purchaser as herein expressly provided, Purchaser shall be entitled, as its sole remedy, either (a) to receive the return of the Earnest Money, which return shall operate to terminate this Agreement and release Seller from any and all liability hereunder, or (b) to enforce specific performance of Seller's obligation to execute the documents required to convey the Property to Purchaser; provided, however, that (i) Purchaser shall only be entitled to such remedy if (A) any such suit for specific performance is filed within six (6) months after Purchaser becomes aware of the default by Seller, (B) Purchaser is not in default of any material terms under this Agreement, and (C) Purchaser has furnished ten (10) days prior written notice to Seller of its intent and election to seek specific enforcement of this Agreement; (ii)

12

notwithstanding anything to the contrary contained herein, if Purchaser seeks specific performance under this Agreement, Purchaser agrees to accept the Property in its "WHERE IS, AS IS" condition as of the last day of the Study Period (subject to normal wear and tear since such date), and (iii) the remedy of specific performance shall not be available to enforce any other obligation of Seller hereunder. Purchaser hereby agrees that prior to its exercise of any rights or remedies as a result of any defaults by Seller, Purchaser will first deliver written notice of said default to Seller, and if Seller so elects, Seller shall have the opportunity, but not the obligation, to cure such default within ten (10) days after Seller's receipt of such notice. Purchaser expressly waives its rights to seek money damages in the event of Seller's default hereunder including, without limitation, punitive, consequential or speculative damages.

## ARTICLE VII

## RISK OF LOSS

7.1    Minor Loss or Damage or Condemnation.  In the event of casualty loss or damage prior to Closing to the Property or any portion thereof which is not "major" (as hereinafter defined), this Agreement shall remain in full force and effect.  Seller shall assign to Purchaser at Closing Seller's right, title and interest in and to any insurance proceeds relating to such casualty loss or damage; provided, however, that this assignment shall not apply if and to the extent Seller remedies, or incurs liability or loss in connection with, such casualty loss or damage.  Seller retains all right, title and interest in such insurance proceeds not so assigned.  If and to the extent any insurance proceeds assigned pursuant to this Section 7.1 are subject to any deductible, Seller shall provide Purchaser a credit against the Purchase Price at Closing in the amount of such deductible.  In the event of a condemnation prior to Closing of any portion of the Property which is not "major," Seller shall assign to Purchaser at Closing Seller's right, title and interest in and to any claims and proceeds Seller may have with respect to condemnation awards relating to the premises in question.  Except as expressly set forth above, in no event shall the Purchase Price be reduced as a result of any loss or damage to the Property or as a result of any condemnation of any portion of the Property

7.2    Major Loss or Damage or Condemnation.  In the event of a "major" casualty loss or damage or condemnation prior to Closing to the Property or any portion thereof, Purchaser may terminate this Agreement by written notice to Seller, in which event the Earnest Money shall be returned to Purchaser and neither party shall have any further obligations or liabilities hereunder except for any obligations or liabilities that are expressly intended to survive any such termination.  If Seller does not receive written notice from Purchaser of Purchaser's election to terminate this Agreement within thirty (30) days after Seller sends purchaser written notice of the occurrence of major casualty loss or damage or condemnation, then Purchaser shall be deemed to have elected to proceed with Closing.  In the event of a casualty loss or damage or condemnation prior to Closing of any portion of the Property which is "major," and provided Purchaser has not terminated this Agreement as provided above in this Section 7.2, Seller shall assign to Purchaser at Closing Seller's right, title and interest in and to any insurance proceeds applicable to such casualty loss or damage, or claims and proceeds Seller may have with respect to condemnation awards relating to the premises in question, as applicable; provided, however, that such assignment of insurance proceeds shall not apply if and to the extent Seller remedies, or incurs liability or loss in connection with, such casualty loss or damage.  If and to the extent any

13

insurance proceeds assigned pursuant to this Section 7.2 are subject to any deductible, Seller shall provide to Purchaser a credit against the Purchase Price at Closing in the amount of such deductible. Upon Closing, full risk of loss with respect to the Property shall pass to Purchaser. Except as expressly set forth above, in no event shall the Purchase Price be reduced as a result of any loss or damage to the Property or as a result of any condemnation of any portion of the Property.

7.3    Definition of "Major" Loss or Damage or Condemnation. For purposes of Sections 7.1 and 7.2 hereof, "major" loss or damage refers to the following, as applicable: (i) loss or damage to the Property or any portion thereof prior to Closing such that the cost of repairing or restoring the premises in question to a condition substantially identical to that of the premises in question prior to the event of loss damage would be, in the opinion of an architect selected by Seller and reasonably approved by Purchaser, equal to or greater than Five Hundred Thousand and No/100 Dollars ($500,000.00), and (ii) any loss due to a condemnation prior to Closing which permanently and materially impairs the current use of the Property. If Purchaser does not give notice to Seller of Purchaser's reasons for disapproving an architect within ten (10) business days after receipt of notice of the proposed architect, Purchaser shall be deemed to have approved the architect selected by Seller.

## ARTICLE VIII

## COMMISSIONS

8.1    Brokerage Commissions. In the event the transaction contemplated by this Agreement is consummated, but not otherwise, Seller agrees to pay to Cushman & Wakefield of Long Island, Inc. (the "Broker") at Closing a brokerage commission pursuant to the terms of a separate written agreement between Seller and the Broker. Each party agrees that should any claim be made for brokerage commissions or finder's fees by any broker or finder other than the Broker by, through or on account of any acts of said party or its representatives, said party will indemnify and hold the other party free and harmless from and against any and all loss, liability, cost, damage and expense in connection therewith. The provisions of this Section 8.1 shall survive Closing or earlier termination of this Agreement.

## ARTICLE IX

## DISCLAIMERS AND WAIVERS

9.1    No Reliance on Documents. Except as expressly stated herein, Seller makes no representation or warranty as to the truth, accuracy or completeness of any materials, data or information delivered by Seller to Purchaser in connection with the transaction contemplated hereby. Purchaser acknowledges and agrees that all materials, data and information delivered by Seller to Purchaser in connection with the transaction contemplated hereby are provided to Purchaser as a convenience only and that any reliance on or use of such materials, data or information by Purchaser shall be at the sole risk of Purchaser, except as otherwise expressly stated herein. Without limiting the generality of the foregoing provisions, Purchaser acknowledges and agrees that (a) any environmental or other report with respect to the Property which is delivered by Seller to Purchaser shall be for general informational purposes only,

14

(b) Purchaser shall not have any right to rely on any such report delivered by Seller to Purchaser, but rather will rely on its own inspections and investigations of the Property and any reports commissioned by Purchaser with respect thereto, and (c) neither Seller, any affiliate of Seller nor the person or entity which prepared any such report delivered by Seller to Purchaser shall have any liability to Purchaser for any inaccuracy in or omission from any such report or in verbal communication.

9.2    Disclaimers; Release.

(a)    As-Is; Acceptance of Property.    PURCHASER AND SELLER UNDERSTAND, ACKNOWLEDGE AND AGREE THAT PURCHASER'S PURCHASE OF THE PROPERTY AND ANY OTHER RIGHTS AND INTERESTS TO BE CONVEYED, SOLD, TRANSFERRED AND/OR ASSIGNED PURSUANT TO THIS AGREEMENT SHALL BE ON AN "AS IS" "WHERE IS" BASIS AND CONDITION WITH ALL FAULTS, AND PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, OR AS TO THE PHYSICAL MEASUREMENTS OR USABLE SPACE OF THE PROPERTY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY OR THE EXPENSES OR OPERATIONS OF THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, (H) THE EXISTENCE OR NONEXISTENCE OF ANY LATENT OR PATENT DEFECTS WITH RESPECT TO THE PROPERTY, (I) THE EXISTENCE OR NONEXISTENCE OR DISPOSAL OF HAZARDOUS SUBSTANCES OR POLLUTANTS AT, IN, ON, UNDER OR IN THE VICINITY OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY "HAZARDOUS SUBSTANCES" AS DEFINED BY THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATIONS AND LIABILITY ACT OF 1980, AS AMENDED, AND REGULATIONS PROMULGATED THEREUNDER (COLLECTIVELY, "CERCLA") AND ANY "SOLID WASTE" AS DEFINED BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY REGULATIONS AT 40 C.F.R., PART 261, (J) COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING WITHOUT LIMITATION CERCLA ("ENVIRONMENTAL LAWS"), (K) TITLE TO THE PROPERTY OR THE ASSIGNABILITY, ASSUMABILITY, TRANSFERABILITY OR VALIDITY OF ANY CONTRACTS, AGREEMENTS, FRANCHISES, LICENSES, PERMITS,

15

GOVERNMENT APPROVALS, WARRANTIES OR GUARANTIES RELATING TO THE PROPERTY OR THE USE AND OPERATION THEREOF; (L) COMPLIANCE OR NONCOMPLIANCE WITH LOCAL, STATE OR FEDERAL STATUTES, ORDINANCES, ORDERS, OR REGULATIONS CONCERNING THE PROPERTY OR THE USE THEREOF; (M) PRIOR OR CURRENT OPERATIONS CONDUCTED ON THE PROPERTY, OR (N) ANY OTHER MATTER OR THING WITH RESPECT TO, AFFECTING OR RELATING TO THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER OR ANY AFFILIATE OF SELLER OR ANY AGENT, EMPLOYEE, SERVANT OR REPRESENTATIVE OF SELLER OR ANY AFFILIATE OF SELLER OR ANY BROKER OR ANY OTHER PERSON. SELLER IS NOT AND SHALL NOT BE LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATIONS THEREOF, FURNISHED BY SELLER OR ANY AFFILIATE OF SELLER OR ANY AGENT, EMPLOYEE, SERVANT OR REPRESENTATIVE OF SELLER OR ANY AFFILIATE OF SELLER OR ANY BROKER OR ANY OTHER PERSON. PURCHASER ACCEPTS ALL RISK OF LOSS DUE TO FIRE OR OTHER CASUALTY OR CONDEMNATION OCCURRING WITH RESPECT TO THE PROPERTY. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY SOLD BY SELLER AND PURCHASED BY PURCHASER IS AND SHALL BE SUBJECT TO THE FOREGOING.

      (b)    <u>Release</u>.

          (i)    PURCHASER HEREBY AGREES THAT, TO THE FULLEST EXTENT PERMITTED BY LAW, AS OF THE CLOSING, SELLER AND EACH OF ITS PARTNERS, MEMBERS, TRUSTEES, DIRECTORS, OFFICERS, EMPLOYEES, ASSET MANAGERS, ATTORNEYS, AFFILIATES AND RELATED ENTITIES, HEIRS, SUCCESSORS, AND ASSIGNS (COLLECTIVELY, THE "<u>RELEASEES</u>") SHALL BE, AND ARE HEREBY, FULLY AND FOREVER RELEASED AND DISCHARGED FROM ANY AND ALL LIABILITIES, INCLUDING, WITHOUT LIMITATION, STRICT LIABILITIES, LOSSES, CLAIMS (INCLUDING THIRD PARTY CLAIMS), DEMANDS, DAMAGES (OF ANY NATURE WHATSOEVER), CAUSES OF ACTION, COSTS, PENALTIES, FINES, JUDGMENTS, REASONABLE ATTORNEYS' FEES, CONSULTANTS' FEES AND COSTS AND EXPERTS' FEES (COLLECTIVELY, THE "<u>CLAIMS</u>") WITH RESPECT TO ANY AND ALL CLAIMS, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THAT MAY ARISE ON ACCOUNT OF OR IN ANY WAY BE CONNECTED WITH THE PROPERTY OR THE PHYSICAL, ENVIRONMENTAL AND STRUCTURAL CONDITION OF THE PROPERTY OR ANY LAW OR REGULATION APPLICABLE THERETO, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS FOR COST RECOVERY UNDER CERCLA OR ANY OTHER CLAIMS UNDER ANY ENVIRONMENTAL LAWS, AND ANY CLAIM OR MATTER

(REGARDLESS OF WHEN IT FIRST APPEARED) RELATING TO OR ARISING FROM (I) ANY VIOLATION, NONCOMPLIANCE OR OBLIGATION TO COMPLY WITH ENVIRONMENTAL LAWS, THE PRESENCE OF ANY ENVIRONMENTAL PROBLEMS, OR THE USE, PRESENCE, STORAGE, RELEASE, DISCHARGE, OR MIGRATION OF HAZARDOUS MATERIALS ON, IN, UNDER OR AROUND THE PROPERTY REGARDLESS OF WHEN SUCH HAZARDOUS MATERIALS WERE FIRST INTRODUCED IN, ON OR ABOUT THE PROPERTY, (II) ANY PATENT OR LATENT DEFECTS OR DEFICIENCIES WITH RESPECT TO THE PROPERTY, (III) ANY AND ALL MATTERS RELATED TO THE PROPERTY OR ANY PORTION THEREOF, INCLUDING WITHOUT LIMITATION, THE CONDITION AND/OR OPERATION OF THE PROPERTY AND EACH PART THEREOF, AND (IV) THE PRESENCE, RELEASE AND/OR REMEDIATION OF ASBESTOS AND ASBESTOS CONTAINING MATERIALS IN, ON OR ABOUT THE PROPERTY REGARDLESS OF WHEN SUCH ASBESTOS AND ASBESTOS CONTAINING MATERIALS WERE FIRST INTRODUCED IN, ON OR ABOUT THE PROPERTY. PURCHASER HEREBY WAIVES AND AGREES NOT TO COMMENCE ANY ACTION, LEGAL PROCEEDING, CAUSE OF ACTION OR SUITS IN LAW OR EQUITY, OF WHATEVER KIND OR NATURE, DIRECTLY OR INDIRECTLY, AGAINST THE RELEASEES OR THEIR AGENTS IN CONNECTION WITH CLAIMS DESCRIBED ABOVE. THE RELEASE PROVIDED IN THIS <u>SECTION 9.2</u> SHALL SPECIFICALLY APPLY WHETHER OR NOT ANY OF THE FOREGOING IS ATTRIBUTABLE, IN WHOLE OR IN PART, TO THE NEGLIGENCE OF SELLER OR ANY OTHER RELEASEE. SUBJECT TO THE OTHER TERMS AND PROVISIONS OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, SECTIONS 5.2 AND 5.3 HEREOF, THE FOREGOING RELEASE SHALL NOT APPLY TO ANY MATTER THAT HAS A MATERIAL ADVERSE EFFECT ON THE PROPERTY AND TO WHICH SELLER HAD KNOWLEDGE PRIOR TO CLOSING AND FAILED TO DISCLOSE SUCH MATTER TO PURCHASER. NOTWITHSTANDING THE IMMEDIATELY PRECEDING SENTENCE TO THE CONTRARY, NO CLAIM SHALL BE ACTIONABLE BY PURCHASER IF SUCH CLAIM IS BASED ON A CONDITION, STATE OF FACTS OR OTHER MATTER WHICH WAS KNOWN TO, OR REASONABLY DISCOVERABLE BY, PURCHASER PRIOR TO CLOSING.

(ii)    IN CONNECTION WITH THE COVENANTS, AGREEMENTS, ACKNOWLEDGMENTS, WAIVERS, RELEASES AND PROVISIONS CONTAINED IN THIS <u>SECTION 9.2</u>, PURCHASER HEREBY AGREES, REPRESENTS AND WARRANTS THAT PURCHASER REALIZES AND ACKNOWLEDGES THAT FACTUAL MATTERS NOW KNOWN TO IT OR PRESENTLY UNKNOWN TO IT MAY HAVE GIVEN OR MAY HEREAFTER GIVE RISE TO CAUSES OF ACTION, CLAIMS, DEMANDS, DEBTS, CONTROVERSIES, DAMAGE, COSTS, LOSSES AND EXPENSES WHICH ARE PRESENTLY UNKNOWN, UNANTICIPATED AND

LEGAL_US_E # 84182856.11

UNSUSPECTED, AND PURCHASER FURTHER AGREES, REPRESENTS AND WARRANTS THAT THE WAIVERS AND RELEASES HEREIN HAVE BEEN NEGOTIATED AND AGREED UPON IN LIGHT OF THAT REALIZATION AND THAT PURCHASER NEVERTHELESS HEREBY INTENDS TO RELEASE, DISCHARGE AND ACQUIT SELLER FROM ANY SUCH UNKNOWN CLAIMS, DEBTS, AND CONTROVERSIES WHICH MIGHT IN ANY WAY BE INCLUDED AS A MATERIAL PORTION OF THE CONSIDERATION GIVEN TO SELLER BY PURCHASER IN EXCHANGE FOR SELLER'S PERFORMANCE HEREUNDER.    SELLER HAS GIVEN PURCHASER MATERIAL CONCESSIONS REGARDING THIS TRANSACTION IN EXCHANGE FOR PURCHASER AGREEING TO THE PROVISIONS OF THIS SECTION 9.2.    THE PROVISIONS OF THIS SECTION 9.2 SHALL SURVIVE THE CLOSING AND SHALL NOT BE DEEMED MERGED INTO ANY INSTRUMENT OR CONVEYANCE DELIVERED AT THE CLOSING.

(c)    Waiver of Disclosures.  TO THE FULLEST EXTENT PERMITTED BY LAW, PURCHASER HEREBY WAIVES ANY AND ALL RIGHTS AND BENEFITS WHICH IT NOW HAS BY VIRTUE OF THE PROVISIONS OF FEDERAL, STATE OR LOCAL LAW, RULES OR REGULATIONS, TO RECEIVE ANY DISCLOSURES, STATEMENTS, MATERIALS OR OTHER INFORMATION FROM SELLER IN CONNECTION WITH PURCHASER'S PURCHASE OF THE PROPERTY.  BY PLACING ITS INITIALS BELOW, PURCHASER SPECIFICALLY CONFIRMS THE FACT THAT IT IS AN EXPERIENCED AND SOPHISTICATED REAL ESTATE INVESTOR AND WAS REPRESENTED BY COUNSEL WHO EXPLAINED, AT THE TIME THIS AGREEMENT WAS MADE, THE CONSEQUENCES OF THE FOREGOING PROVISION.

PURCHASER: _____

9.3    Survival of Disclaimers.   Seller and Purchaser agree that the provisions of this Article IX shall survive Closing.

## ARTICLE X

## MISCELLANEOUS

10.1    Confidentiality.    Purchaser and its representatives shall hold in strictest confidence all data and information obtained with respect to the Property, whether obtained before or after the execution and delivery of this Agreement, and shall not disclose the same to others; provided, however, that it is understood and agreed that Purchaser may disclose such data and information to the employees, consultants, accountants and attorneys of Purchaser provided that such persons agree in writing to treat such data and information confidentially.  In the event this Agreement is terminated or Purchaser fails to perform hereunder, Purchaser shall promptly return to Seller any statements, documents, schedules, exhibits or other written information obtained from Seller in connection with this Agreement or the transaction contemplated herein. It is understood and agreed that, with respect to any provision of this Agreement which refers to the termination of this Agreement and the return of the Earnest Money to Purchaser, such

18

Earnest Money shall not be returned to Purchaser unless and until Purchaser has fulfilled its obligation to return to Seller the materials described in the preceding sentence. In the event of a breach or threatened breach by Purchaser or its agents or representatives of this Section 10.1, Seller shall be entitled to an injunction restraining Purchaser or its agents or representatives from disclosing, in whole or in part, such confidential information. Nothing herein shall be construed as prohibiting Seller from pursuing any other available remedy at law or in equity for such breach or threatened breach. The provisions of this Section 10.1 shall survive Closing.

10.2   <u>Public Disclosure</u>.  Prior to Closing, any release to the public of information with respect to the sale contemplated herein or any matters set forth in this Agreement will be made only in the form approved by Purchaser and Seller and their respective counsel.

10.3   <u>Discharge of Obligations</u>.  The acceptance of the Deed by Purchaser shall be deemed to be a full performance and discharge of every representation and warranty made by Seller herein and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement, except those which are herein specifically stated to survive Closing.

10.4   <u>Assignment</u>.  Purchaser may not assign its rights under this Agreement without first obtaining Seller's written approval, which approval may be given or withheld in Seller's sole discretion.  Any transfer, directly or indirectly, of any stock, partnership interest or other ownership interest in Purchaser without Seller's written approval, which approval may be given or withheld in Seller's sole discretion, shall constitute a default by Purchaser under this Agreement.   Notwithstanding the foregoing, Purchaser may assign its rights under this Agreement to a newly formed limited liability company that is an affiliate of Purchaser. Without limitation of the foregoing, no assignment by Purchaser shall relieve Purchaser of any of its obligations or liabilities pursuant to this Agreement.

10.5   <u>Notices</u>.  Any notice pursuant to this Agreement shall be given in writing by (a) personal delivery, or (b) reputable overnight delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, return receipt requested, or (d) legible facsimile transmission sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or, in the case of facsimile transmission, as of the date of the facsimile transmission provided that the party sending such facsimile transmission receives a confirmation of transmission on such date and an original of such facsimile is also sent to the intended addressee by means described in clauses (a), (b) or (c) above.  Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement shall be as follows:

If to Seller:                           c/o Tribune Company
                                        435 North Michigan Avenue
                                        Chicago, Illinois 60611
                                        Attention: Stephanie Pater
                                        E-mail: spater@tribune.com

19

|  | Telephone: (312) 222-5563 |
|  | Facsimile: (312) 222-3148 |

with a copy to:
MacMunnis, Inc.
1840 Oak Avenue, Suite 300
Evanston, IL 60201

and

Paul, Hastings, Janofsky & Walker, LLP
191 N. Wacker Drive, 30th Floor
Chicago, Illinois 60606
Attention: Jeffrey S. Rheeling, Esq.
E-mail: jeffreyrheeling@paulhastings.com
Telephone: (312) 499-6083
Facsimile: (312) 499-6183

If to Purchaser:
Steel Tribune, LLC
700 Hicksville Road
Bethpage, New York 11714
Attention: Joseph Lostritto
E-mail: jlostritto@steelequities.com
Telephone: (516) 576-3165
Facsimile: (516) 576-3170

with a copy to:
Malman & Goldman
120 Bloomingdale Rd.
White Plaines, New York 10605
Attention: Larry Goldman
E-mail: lgoldmand@mglawyer.net
Telephone: (914) 686-4616
Facsimile: (914- 686-4615

10.6    <u>Binding Effect</u>.  This Agreement shall not be binding in any way upon Seller unless and until Seller shall execute and deliver the same to Purchaser

10.7    <u>Modifications</u>.   This Agreement cannot be changed orally, and no executory agreement shall be effective to waive, change, modify or discharge it in whole or in part unless such executory agreement is in writing and is signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

10.8    <u>Calculation of Time Periods</u>.   Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday under the laws of the State in which the Property is located, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday or legal holiday.  The final day of any such period

LEGAL_US_E # 84182856.11

shall be deemed to end at 6:00 p.m., Eastern Time. Time is of the essence of each and every provision of this Agreement.

10.9    Successors and Assigns. The terms and provisions of this Agreement are to apply to and bind the permitted successors and assigns of the parties hereto.

10.10    Entire Agreement. This Agreement, including the Exhibits, contains the entire agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

10.11    Further Assurances. Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement (but without expanding the obligations or liability of either party hereunder in any material manner). Without limiting the generality of the foregoing, Purchaser shall, if requested by Seller, execute acknowledgments of receipt with respect to any materials delivered by Seller to Purchaser with respect to the Property. The provisions of this Section 10.11 shall survive Closing.

10.12    Counterparts. This Agreement may be executed in counterparts, and all such executed counterparts shall constitute the same agreement. It shall be necessary to account for only one such counterpart in proving this Agreement.

10.13    Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

10.14    Applicable Law. THIS AGREEMENT IS PERFORMABLE IN THE STATE IN WHICH THE REAL PROPERTY IS LOCATED AND SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE SUBSTANTIVE FEDERAL LAWS OF THE UNITED STATES AND THE LAWS OF SUCH STATE. SELLER AND PURCHASER HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN THE STATE IN WHICH THE REAL PROPERTY IS LOCATED IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN A STATE OR FEDERAL COURT SITTING IN THE STATE IN WHICH THE REAL PROPERTY IS LOCATED. PURCHASER AND SELLER AGREE THAT THE PROVISIONS OF THIS SECTION 10.14 SHALL SURVIVE THE CLOSING OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT.

10.15    No Third Party Beneficiary. The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party (including, without limitation, Title Company and Broker), and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing. The

21

provisions of this Section 10.15 shall survive the closing of the transaction contemplated by this Agreement.

10.16  <u>Exhibits and Schedules</u>.  The following schedules or exhibits attached hereto shall be deemed to be an integral part of this Agreement:

(a)  <u>Exhibit A</u> -  Legal Description of the Land

(b)  <u>Exhibit B</u> -  Strict Joint Order Escrow Agreement

(c)  <u>Exhibit C</u> -  Seller Financing Terms

10.17  <u>Captions</u>.  The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any section or any subsection hereof.

10.18  <u>Construction</u>.  The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

10.19  <u>Termination of Agreement</u>.  It is understood and agreed that if either Purchaser or Seller terminates this Agreement pursuant to a right of termination granted hereunder, such termination shall operate to relieve Seller and Purchaser from all obligations under this Agreement, except for such obligations as are specifically stated herein to survive the termination of this Agreement.

10.20  <u>1031 Exchange</u>.  Either party hereto may elect to seek to structure its purchase or sale, as applicable, of the Property as a tax-deferred exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, and the treasury regulations promulgated thereunder ("<u>1031 Exchange</u>"), subject to the limitations set forth herein.  Each party shall reasonably cooperate with the other, at no material cost to such cooperating party, in connection with the same, including, but not limited to, executing and delivering a consent to an assignment to a qualified exchange intermediary of rights (but not obligations) under this Agreement; provided that (i) the party desiring to effectuate a 1031 Exchange shall notify the other party of the same not later than ten (10) days prior to the Closing, (ii) neither party shall be required to incur any additional liabilities or financial obligations as a consequence of such cooperation, (iii) neither party shall be relieved of its obligations, representations or warranties under this Agreement, (iv) any attempt to structure an acquisition or sale of the Property as a 1031 Exchange shall not be a condition to, and shall not delay or extend, the Closing, and (v) neither party shall be required to acquire title to any property other than the Property.  Any risk that such an exchange or conveyance might not qualify as a tax-deferred transaction shall also be borne solely by the party seeking to effectuate the same, and each party acknowledges that the other has not provided, and will not provide, any tax, accounting, legal or other advice regarding the efficacy of any attempt to structure the transaction as a 1031 Exchange.  Each party hereby agrees to save, protect, defend, indemnify and hold the other harmless from any and all losses, costs, claims, liabilities, penalties, and expenses, including, without limitation, reasonable attorneys' fees, fees of accountants and other experts, and costs of any judicial or administrative

22

proceeding or alternative dispute resolution to which the other may be exposed, due to any attempt by the indemnifying party to structure the transaction as a 1031 Exchange.   The provisions of this Section 10.20 shall survive the Closing.

[Next page is signature page]

23

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

**SELLER:**

TRIBUNE NM, INC., a Delaware corporation

By: _Redde_
Name: _Jack Fedden_
Its: _VP / Treasurer_

**PURCHASER:**

STEEL TRIBUNE, LLC, a Delaware limited liability company

By: _____
Name: _Joseph J. Costrith_
Its: _____

24

## EXHIBIT A

### LEGAL DESCRIPTION OF THE LAND

All of that certain plot, piece or parcel of land situate, lying and being at Hicksville, Town of Oyster Bay, County of Nassau and State of New York, being bounded and described as follows:

BEGINNING at a point on the westerly side of the highway leading from Syosset to Hicksville, known as Miller Place, which point in marked by a monument and is at the northeast corner of land herein described adjoining the southeast corner of land formerly of Nicholas Meyer now land of the State of New York;

RUNNING THENCE south along said highway south 3 degrees 47 minutes west a distance of 607.10 feet to a point in the westerly side of Miller Place distant 1013.47 feet northerly from the intersection of the present northerly side of Miller Place and the westerly side of Miller Place;

THENCE north 86 degrees 13 minutes 00 seconds west, a distance of 420.80 feet to property along the Long Island Railroad;

THENCE north 17 degrees 57 minutes 30 seconds east along property of the Long Island Railroad, a distance of 774.79 feet;

THENCE south 54 degrees 16 minutes east along the land or Nicholas Meyer now land of the State of New York a distance of 272.32 feet to the point or place of BEGINNING.

A-1

## EXHIBIT B

## FORM OF STRICT JOINT ORDER ESCROW AGREEMENT

Refer to: _____
Phone no.: _____
Fax no: _____

### STRICT JOINT ORDER #1 ESCROW TRUST INSTRUCTIONS (EARNEST MONEY)

ESCROW TRUST NO: _____     DATE: _____

To: _____ ("Escrow Trustee")

Customer Identification:

Seller:  Tribune NM, Inc.

Purchaser:   Steel Tribune, LLC

Property Address: 250 Miller Place, Hicksville, New York

Project Reference:

Proposed Disbursement Date:

Deposits:

1.  The sum of $ 200,000 will be deposited by Purchaser as initial earnest money no later than 5 business days after the date of the Purchase and Sale Agreement.

Delivery of Deposits:

The above-referenced escrow trust deposits and any other trust deposits deposited with the escrow trustee with respect to the above-referenced property ("deposits") are deposited with the escrow trustee to be delivered by it only upon the receipt of a joint order of the undersigned or their respective legal representatives or assigns except as follows: Pursuant to Article 3 of the Purchase and Sale Contract, Purchaser may, prior to the expiration of the Study Period (as defined in the agreement), elect to terminate this Agreement by giving written notice thereof to the Seller and to the Escrow Agent, and, the Deposit shall be returned to the Buyer by the Escrow Agent, whereupon the Agreement and this escrow agreement shall be cancelled and none of the parties hereto shall have any further rights and obligations hereunder, except as provided in the Agreement.

In no case shall the above-mentioned deposits be surrendered except upon the receipt of an order signed by the Purchaser as provided above or by both of the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

Billing Instructions:
Escrow trust fee will be billed as follows:  $300.00; ½ to each party, unless otherwise specified. However, if the final Deed and Money takes place at the offices of Escrow Trustee, the Joint Order Escrow Fee will be waived.

The parties acknowledge that beginning after a period of one year from the date of this agreement, Escrow Trustee will impose an administrative maintenance fee (quarterly, semi-annually, or annually) equivalent to the fee set forth on the Company's then current rate schedule.

This fee may be deducted from the outstanding escrow balance or billed to:  ½ TO EACH PARTY

PLEASE NOTE: The escrow trust fee for these joint order escrow trust instructions is due and payable within 30 days from the projected disbursement date (which may be amended by joint written direction of the parties hereto). In the event no projected disbursement date is ascertainable, said escrow trust fee is to be billed at acceptance and is due and payable within 30 days from the billing date. Escrow Trustee, at its sole discretion, may reduce or waive the escrow trust fee for these joint order escrow instructions in the event the funds on deposit herein are transferred to or disbursed in connection with sale escrow trust instructions or an agency closing transaction established at the offices of Escrow Trustee.

Investment:

Deposits made pursuant to these instructions shall be invested in an insured interest bearing account upon receipt of Purchaser's taxpayer identification number, or may be invested in some other manner on behalf of any party or parties hereto; provided that any other such direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to this escrow, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest deposits hereunder, Escrow Trustee is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these escrow trust instructions.

Direction Not to Invest/Right to Commingle:

Except as to deposits of funds specified above or such other investments for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct the escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder. Provided, however, nothing herein shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

Compliance With Court Order:

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly or unilaterally by Purchaser to the extent provided above) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit(s) herein for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the said deposit(s).

Execution:

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

For Seller:                                    For Purchaser:


Name:                                          Name:


Address:                                       Address:

Phone:                                  Phone:

Fax:                                    Fax:

Signature:                              Signature:


Accepted: _____, as Escrow Trustee

By:                                     Date:

## EXHIBIT C

### SELLER FINANCING TERMS

[The below terms are not all-inclusive and the documents evidencing and securing the loan may include other provisions deemed appropriate by lender]

1)      Loan Amount: $3,650,000.00.

2)      Maturity Date:  The loan shall mature on the date occurring one (1) year after the Closing Date (as defined in the Purchase and Sale Agreement to which this Exhibit C is attached).  A balloon payment of the entire outstanding principal amount plus accrued and unpaid interest shall be due and payable on the Maturity Date.

3)      Interest Rate: The loan shall bear interest at a rate of to 6% with interest-only payments payable monthly in arrears.