```
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE


IN RE:                      .    Case No. 08-13141(KJC)
                            .
TRIBUNE COMPANY,            .
                            .
                            .    824 Market Street
                            .    Wilmington, Delaware 19801
          Debtor.           .
                            .    August 31, 2009
. . . . . . . . . . . . .        2:04 p.m.


                    TRANSCRIPT OF HEARING
              BEFORE HONORABLE KEVIN J. CAREY
           UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:             Sidley Austin, LLP
                            By:  BRYAN   KRAKAUER, ESQ.
                                 JAMES W. DUCAYET, ESQ.
                                 KENNETH P. KANZA, ESQ.
                            One South Dearborn
                            Chicago, IL  60603

                            Sidley Austin, LLP
                            By:  CANDICE KLINE, ESQ.
                            One South Dearborn
                            Chicago, IL  60603
                            (Telephonic Appearance)

                            Sidley Austin, LLP
                            By:  KEVIN LANTRY, ESQ.
                            555 West Fifth Street
                            Los Angeles, CA  90013
                            (Telephonic Appearance)




Audio Operator:             Sherry Johnson

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service
```

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

**APPEARANCES (Contd'):**

For the Debtor:            Cole Schotz
                           By:  KATE STICKLES, ESQ.
                           500 Delaware Avenue
                           Suite 1410
                           Wilmington, DE 19801

                           The Tribune Company
                           By:  DAVID P. ELDERSVELD, ESQ.
                           435 North Michigan Avenue
                           Suite 600
                           Chicago, IL  60611
                           (Telephonic Appearance)

                           The Tribune Company
                           By:  DONALD J. LIEBENTRITT, ESQ.
                           2 N. Riverside Plaza
                           Suite 600
                           Chicago, IL  60611
                           (Telephonic Appearance)


For the Ricketts Family: By:  ALFRED LEVITT


For the Committee:         Landis, Rath & Cobb, LLP
                           By:  MATTHEW McGUIRE, ESQ.
                           919 Market Street
                           Suite 1800
                           Wilmington, DE  19899

                           Chadbourne & Parke, LLP
                           By:  DAVID M. LeMAY, ESQ.
                                DOUGLAS E. DEUTSCH, ESQ.
                           30 Rockefeller Plaza
                           New York, NY  10112

For the U.S. Trustee:      Office of the U.S. Trustee
                           By:  JOSEPH J. McMAHON, JR., ESQ.
                           844 N King St
                           Suite 2207
                           Wilmington, DE  19801

For J.P. Morgan:           Richards, Layton & Finger
                           By:  MARK COLLINS, ESQ.
                           One Rodney Square
                           920 North King Street
                           Wilmington, DE  19801

**APPEARANCES (Contd'):**

```
For J.P. Morgan:         Davis, Polk & Wardwell
                         By:  DAMIAN SCHAIBLE, ESQ.
                         450 Lexington Avenue
                         New York, NY  10017
                         (Telephonic Appearance)

For Kramer, Levin,       Kramer, Levin, Naftalis & Frankel, LLP
Naftalis & Frankel:      By:  JENNIFER SHARRET, ESQ.
                         1177 Avenue of the Americas
                         New York, NY  10036
                         (Telephonic Appearance)
```

                              ---

1          THE COURT:  Good afternoon, everyone.  Are the

2  parties ready to proceed?

3          MR. KRAKAUER:  Your Honor, Brian Krakauer here on

4  behalf of the Tribune Entities.  Should we ask for any other

5  appearances before I start, or should I go ahead?

6          THE COURT:  Just go ahead.

7          MR. KRAKAUER:  Okay.  First I want to thank the Court

8  for allowing us to be heard on an expedited basis.  The hearing

9  today is on our motion to establish notice and procedures, and

10  also to approve certain investor protections in connection with

11  the agreement.  The transaction at issue is a business

12  combination, it's not a sale.  It's a business combination

13  involving the Chicago Cubs baseball team.  This is a very

14  important transaction for the debtors and its creditor

15  constituencies, and again, we very much appreciate the

16  opportunity to be heard on it.

17          Although there's no objections filed, Your Honor,

18  there was some discussions that occurred with the U.S.

19  Trustee's Office through the weekend.  The U.S. Trustee called

20  us -- Mr. McMahon did -- toward the end of last week expressing

21  some issues with respect to the notice, the form of notice and

22  the setting of dates, particularly with respect to parties in

23  interest and creditors of the Cubs.  And we agreed to work with

24  the U.S. Trustee to try and resolve their issues and we did so

25  over the weekend and through this morning.  And we now have a

1  modified form of order which clarifies jurisdictionally what

2  this Court is doing and is not doing, and perhaps the best

3  thing to do is to hand that to the Court and maybe walk the

4  Court through that.  That would be useful.

5          THE COURT:  All right.

6          MR. KRAKAUER:  Your Honor, I have handed up to you

7  both clean and black-lined form of orders.  The blackline is

8  against the form we filed.  And also attached is the form of

9  revised notices, both the mailed notice and the publication

10  notice, and again, there's for those, both a clean and a

11  blackline.  And it may be useful for me just to walk through on

12  the blackline of the order where most of the changes are.

13          Okay.  Your Honor, if you look on Page 2, where

14  there's a reference first to the jurisdiction of this court,

15  we've put subject to the Cubs' entities' reservation, as

16  defined below.  And then if you go back to Page 6 of the

17  blackline, you'll see on the top paragraph where we've defined

18  what the Cubs' entities' reservation is all about.

19          And the notion, before I get to the language, is, I

20  think, straightforward.  What we're asking this Court to do is

21  authorize the Tribune debtors to send out notice, and we would

22  send out notice to both the Tribune creditors and substantially

23  all the Cubs' creditors.  We have more than 9,000 Cubs'

24  creditors, including counterparties to our executory contracts,

25  including players, including basically everybody.  And we also

6

1  are going to send a separate letter, although not this form of

2  notice, to our season ticket holders.  And we would notify them

3  of this motion and also of the prospect that there will be a

4  Cubs' filing and a Cubs' hearing on approval of this

5  transaction, as well.  And we're asking anybody who has an

6  objection to get that objection on file by September 17th.

7         What this reservation makes clear is at this point,

8  this Court doesn't have -- there is no Cubs' case.  When there

9  is a Cubs' case, find that the notice that went out was

10 sufficient, was proper, gave parties the due process rights

11 they're entitled to, and that the deadlines set forth in the

12 notice were appropriate vis-a-vis the Cubs' case and the Cubs'

13 creditors.  So, we're leaving that issue to be ratified, if you

14 will, or confirmed by the Court with jurisdiction over the

15 Cubs' proceeding, and we're not asking this Court to determine

16 that issue at this time.

17        What we are asking the Court to do is authorize us to

18 send out the notice to all the creditors telling them that

19 there is an objection date and that if they don't file an

20 objection by that date, then their objection may be barred.

21 And then pursuant to this reservation, if somebody tries to

22 come in late, then there will be an issue for the Cubs' Court

23 to decide whether the notice was sufficient or not.

24        Turning back, if you want to -- I could run through

25 the language, but I think the language that we have at the top

1 of Page 6 basically does that.

2         THE COURT:  I see it.

3         MR. KRAKAUER:  Then if you want to roll through the

4 rest, this objection, on Page 3 there's smaller changes.  One

5 is that if we reschedule the date in the Cubs' hearing, we

6 will, (a) file that rescheduling with the Court here, which was

7 our intent in any event, and then we would also mail notice to

8 the 20 largest creditors of the Cubs' entity that's anticipated

9 to be filed, so that if we wind up changing the date from

10 October 1st to some other date, they will get mail notice to

11 those people.

12         Top of Page 4 where it refers to the fact that

13 parties may be barred if they don't file an objection by a date

14 certain, including Cubs' creditors, we're making clear that

15 what this Court is authorizing and ordering to be done is

16 authorizing the Tribune debtors to provide that notice.  And

17 that's all that's being requested today.

18         And then the rest of the changes in this are made

19 clear, basically, that when the Court's approving the form of

20 notice and approving what we're doing, it's all subject to the

21 Cubs' entities' reservation.  So, it leaves it for the Court in

22 the Cubs' case to determine.

23         The only other change is on Page 6.  And that was

24 requested by -- first instance, by the Pension Benefit Guaranty

25 Corporation that we make clear that by this order we're not

1  prejudicing anybody's rights and we're reserving our rights

2  with respect to what happens to the proceeds from this

3  transaction.  And that was our intent, but we've made this

4  clear.  We've made clear it also applies to all parties in

5  interest.  We are not, in this particular order, trying to

6  change anybody's rights or prejudicing anybody's rights with

7  respect to what happens to the proceeds.

8         And then on the actual mailed notices, we have --

9  we're referencing that if you don't file an objection by a date

10 certain, it formally said you shall be precluded from further

11 objecting, and we've changed "shall" to "may" for the purpose

12 of dealing with the Cubs' entity reservation.

13        And with that I think we have resolved any

14 jurisdictional issues and addressed the points of the U.S.

15 Trustee.  And there aren't any other issues or objections with

16 respect to what we have before you today.  I think that deals

17 with the notice point.

18        We are also requesting approval of the investor

19 protections.  The investor protections are specified in Section

20 4.15 and 9.3 of the formation agreement.  Those are the only

21 two provisions of the formation agreement that we are

22 requesting approval of at this time.  All the other sections to

23 the formation agreement and the other agreements will be before

24 this Court at the substantive approval hearings.  They're not

25 being sought today.

1           The investor protections, I would admit, are fairly

2  complex.  I'll describe them very briefly, but I can describe

3  in a lot more detail if this Court desires, but --

4           THE COURT:  I've read them, but for completeness of

5  the record, it probably would be helpful for you to describe

6  them, at least in summary fashion.

7           MR. KRAKAUER:  I'd be happy to, Your Honor, and I

8  understand completely.

9           There are three levels that are protection provided

10  by the Tribune to the bidder here.  There's a $20 million

11  level, a $10 million level, and a $5 million level.  And they

12  were designed, depending upon an allocation of risks, and some

13  notion of who should bear what responsibility and what level of

14  responsibility should be borne in the event that these events

15  happened.  And I will say there are bilateral provisions in

16  addition to payments that are to be made to the Tribune, there

17  was also negotiated to be payments to be made by the bidder if

18  certain things happen that preclude the bidder from going

19  forward with the transaction.

20           At the $20 million level, one of the first points

21  that was discussed when we were going through this agreement

22  once the chapter proceeding has been filed was the notion by

23  the bidder that if we were going to proceed forward, they

24  wanted to proceed on a fully consensual basis with respect to

25  our official committee and our unofficial committee of senior

1 lenders.  And we in the end agreed to that, that this

2 transaction made the most sense if we had the full support of

3 both committees.  They fully participated in the process, and

4 at the end of the day, each of those committees voted to

5 approve the transaction and support it before we signed the

6 agreement.  And we had rather lengthy discussions with them and

7 presentations to them in connection with that.  If the

8 committees were to change their mind and decide not to go

9 forward with this and that they wanted to now oppose it, this

10 does provide that the debtor gets the ability to terminate and

11 to receive a payment.

12         Just to provide some context to that.  In this

13 particular transaction, one of the things we were negotiating

14 for, at some length, was to provide as much certainty as

15 possible with respect to the consummation of this deal.

16 Portions of the deal require financing.  The bidder is going

17 out and getting, for instance, senior debt financing in order

18 to consummate the transaction.  In order to wind that up and

19 get that committed requires that some significant amounts of

20 money be spent to obtain those commitments.  So, what we

21 essentially were negotiating and bargaining for was getting

22 certainty on the financing and having the bidder go out and

23 incur all these expenses at the same time we were agreeing,

24 essentially, to go forward together with our committees in

25 support.  So, that was one provision.

1           Most of the other, or a lot of the other triggers

2   related to the $20 million are also geared to those same types

3   of things.  If we actively pursue an alternative transaction

4   there's a payment.  If we don't object to an alternative

5   transaction, there also would be a payment.  If we -- if this

6   Court were to actually approve the transfer of assets to

7   another party, other than the bidder, there would be a payment.

8           And then there are provisions relating to an escrow

9   closing.  The concept there is that after we get approval from

10  this Court, the Tribune Court, and prior to the Cubs' filing,

11  we would actually close into escrow.  So, all the documents to

12  consummate the transaction would be tendered into escrow and

13  funding would actually occur in escrow so that the money is

14  sitting there waiting to be dispersed, and then the only thing

15  left -- pretty much the only thing left at that point is to

16  file the Cubs and get approval in the Cubs' proceeding.  There

17  are conditions relating to if the escrow doesn't take place due

18  to some fault of the Tribune, and we don't make the deliveries

19  that we're required to make, that we would also have to have to

20  fund the payment.

21          And I should mention on the other side there are also

22  parallel provisions saying if the escrow closing doesn't occur

23  because of some fault of the bidder, they're required to make

24  payments to us.

25          And then there also is a provision with regard to

1  Major League Baseball approval.  And without getting into all

2  the details, basically if it's our fault, then payments get

3  made by us, if it's the bidder's fault, then basically payments

4  get made by the bidder, and the nature of the reason gives rise

5  to different levels of payments.  That's pretty much it for the

6  large $20 million payments.

7          With respect to the $10 million payments, there's a

8  provision requiring that we do the normal things in cooperating

9  with the bidder's lender in terms of providing information and

10 such so that that financing can occur.  And basically, there's

11 a provision that says if we don't provide the level of

12 cooperation that would normally be expected and their financing

13 falls apart because of that, then we would owe them a payment.

14         And there's also a provision that -- well, on that it

15 would also say there's other provisions saying if their

16 financing falls apart and it's not our fault, it's things that

17 they did, then they would owe us a payment.  So, it goes both

18 ways.

19         And then if there is an objection filed by a

20 competing bidder and that results in their transaction not

21 closing and also they would be entitled to a payment at a

22 lesser level than the 20 million, that they would still get

23 some money.

24         And then finally, at the $5 million level, there is a

25 provision saying that we are in, in this essence, committing to

1  get Court approval for this transaction by November 6th, and if

2  we can't get approval by November 6th, then a payment is owed

3  to the other side.  And that has to do with -- that was

4  negotiated in the context of the other sides of bidders'

5  financing costs and what they're having to incur to keep this

6  open, et cetera.  So, that's a summary of the provisions, Your

7  Honor.  I could go in as much more detail as you'd like.

8         THE COURT:  Not necessary for me at this point.  I'll

9  hear from others before we're done if anyone else wishes to be

10 heard.  Was it the debtor's intention to offer into evidence

11 either of the declarations that are attached to the motions?

12         MR. KRAKAUER:  Yes, it is, Your Honor.  Both Mr.

13 Crane Kenney, who is the chairman of the Chicago Cubs' baseball

14 team, he's here today and we would like to offer his

15 declaration into evidence.  And also Mr. Christopher Martell

16 who is one of the financial advisors to first the Tribune, and

17 then for the last several months, the Cubs, in connection with

18 this transaction and has been intimately familiar with the

19 whole transaction since almost day one, is also here today and

20 we would like to introduce his declaration into evidence, as

21 well.  And they were both filed with the Court.

22         THE COURT:  Let me ask, for the record, if there is

23 any objection to the admission of either the Kenney declaration

24 or the Martell declaration.

25         I hear no response.  They're admitted without

1 objection.  Debtor have anything further in support of its

2 motion?

3          MR. KRAKAUER:  I think I'll hold any further remarks

4 for a response, Your Honor, if I need to.

5          THE COURT:  All right.  There are a couple of things

6 I did want to review with you, Mr. Krakauer, so that I'm clear.

7 The relief that's been requested here is somewhat unique, at

8 least in my experience.

9          MR. KRAKAUER:  Yes.

10          THE COURT:  One of the differences is, I am being

11 asked today to approve a process that affects parties not yet

12 involved in the bankruptcy proceeding, but I'll note that with

13 the changes apparently advanced by the U.S. Trustee, much of my

14 concern about what the original form of order had requested has

15 been put to rest.

16          In preparing for the hearing today, it seems to me

17 that the process that's been suggested, especially with the

18 changes that have been made to the proposed form of order,

19 offer the necessary due process in terms of notice.  Now, while

20 the changes in the form of order appear to protect the rights

21 of parties which could be asserted after a Cubs' entity filing

22 and at a -- I guess at the second hearing, to approve the

23 remaining part of the transaction, the time to object would be

24 limited.  So, while it's theoretically open, it seems to me

25 that meaningfully what's called for is for such objections to

1 be made by the September 17th date that's called for.  But, I
2 see that again, the order doesn't, as it's been revised,
3 preclude further assertions of rights, but there will be -- and
4 I do recognize a limited time to do that and I'm willing to
5 approve that part of the process on the theory that everyone is
6 actually getting notice sufficiently in advance of the
7 anticipated filing, at least as it's been represented to the
8 Court.

9            The other part of the proposed order I wanted to
10 discuss with you, and which has not been altered in the
11 revisions that are being suggested now, and that is the
12 decretal paragraph which indicates that no other or further
13 auction or other marketing process for the Cubs' business shall
14 be required.  I'm willing to order that relief as a matter of
15 process only, understanding that when we get to the point of a
16 363 hearing, I don't consider this order as having relieved the
17 debtor of any of its burdens which it must carry in achieving
18 the relief that it wishes to have, substantively.  It's simply
19 approving now something which is different from that which
20 would ordinarily occur, which is there be competitive bidding.
21 But, under these circumstances and based upon the submissions
22 and in the absence of objection, I would be inclined to grant
23 that relief, but with the understanding that the debtor hasn't
24 been relieved in any respect of its burdens under 363.  And for
25 the moment, that addresses, or at least expresses the concerns

1  that I had had and I'd like to hear from anyone else who wishes

2  to be heard at this point.

3        MR. LeMAY:  Good afternoon, Your Honor.  David LeMay

4  from Chadbourne and Parke for the Official Committee of

5  Unsecured Creditors.

6        At the outset, I would like to relieve Mr. Krakauer

7  and his client and their respective cardiologists of any

8  concern.  I'm not going to say anything that's going to cost

9  them $20 million this afternoon.  Neither, Your Honor, am I

10  going to make a long speech on what is effectively an

11  uncontested motion in which I think the Court has indicated

12  it's inclined to rule on.  It is my experience, though, that

13  judges do derive some comfort from hearing that a Creditors'

14  Committee has paid some attention to a transaction.

15        THE COURT:  It usually doesn't hurt.

16        MR. LeMAY:  The Creditor's Committee, Your Honor, has

17  paid an awful lot of attention to this transaction.  The

18  Committee was formed in December of 2008, and it was really

19  actually at that point one of the first orders of business,

20  because as this deal unfolded, originally it looked like

21  something might happen that would require Your Honor's

22  attention pretty early on, and so the Committee got involved,

23  actually, right around the Christmas holidays.  At that time it

24  seemed like the timing was very fast.  As matters have

25  unfolded, however, there actually was, for exogenous reasons,

1  an opportunity for the Creditors' Committee and its investment

2  bankers, Mullis and Company, to do a very, very, very thorough

3  review of both the process that the debtors had done and the

4  overall question of whether this was a business that should be

5  monetized for a transaction or held for the future company.

6  And Mullis and the Committee spent countless hours on that.

7           At the end of the day, Your Honor, the Committee is

8  quite satisfied that the process that the debtors ran was a

9  very thoughtful one and that it was a process designed to

10 extract maximum value from this transaction.  The Committee

11 also convinced itself that the core business of Tribune Company

12 did not necessarily require being a Major League Baseball owner

13 and that the monetization of that asset or the buy versus --

14 I'm sorry -- the hold versus monetized decision was best

15 answered by saying monetized.  And because the process did take

16 a little bit longer than anyone originally understood it would,

17 there was the opportunity to get very, very deep into that.

18 And the conclusion that my client reached, I think, was that

19 this was not a rush transaction and that it was a transaction

20 that really did, seek to and did extract a value maximizing

21 result.

22          Your Honor knows, it's been mentioned that a

23 professional baseball team is not like a hammer company, it's

24 not even like a newspaper company.  It's got some very unique

25 attributes.  The interplay between Major League Baseball and

1  the individual teams is a unique and delicate one.  It was very

2  important that any bidder who was brought forward be one who

3  would basically not get us the -- sorry to use a baseball

4  analogy, Your Honor -- not get us to the second half of the

5  ninth inning and then leave us high and dry.  All indications

6  so far are that the bidder who the debtors have brought forward

7  is best positioned among those who did seek to buy this team to

8  achieve that goal.

9        The timing of the transaction, Your Honor, although

10 maybe everyone might have wished that it would have happened

11 sooner, at least did leave us with the ability to know that

12 every tire had been kicked, every stone had been turned over.

13 With respect to the investor protections that Mr. Krakauer

14 mentioned, no committee lightly signs off on investor

15 protections.  But, here we asked and required and the lender

16 group, the bank lender group had a very similar ask and

17 requirement, that the bidder come to us with a fully gelled

18 deal with financing in place and the ability to close.

19       In that context, when you're asking, basically,

20 somebody to come with their cookies all baked, it's not

21 surprising that they would want something in return, and this

22 is what they needed in return.  That seemed to the Committee to

23 be a fair trade.

24       Finally, Your Honor, with respect to the no shop

25 provision, again, recognizing the unique nature of this asset,

1  the fact that this is not a hammer factory where it can just be

2  auctioned off, the fact that Major League Baseball is going to

3  have an exceedingly important role in the approval of every

4  bidder, and the fact that this business has been and has been

5  known to be very publicly on the block for a long time, all of

6  those things led the Committee to think that the process, and I

7  appreciate Your Honor's remarks from the bench that all you're

8  doing is making a process ruling at this point, that that

9  process is a satisfactory one in this context.

10      The people who buy major league baseball teams really

11  are not sort of the typical buyer who just buys a business for

12  its prospective cash flow.  There's an awful lot else that goes

13  into it.  And so because of the uniqueness of the asset, the

14  uniqueness of the Major League Baseball approval process, and

15  the extent to which this entity has been marketed, the

16  Creditors' Committee very much supports both the process that

17  is before you now and the transaction that will be before you

18  in a short while.  Thank, Your Honor.

19      THE COURT:  Thank you.  Does anyone else wish to be

20  heard in connection with this motion?

21      I hear no further response.  And something you said,

22  Mr. LeMay, triggered something that I suppose I should say, and

23  that is, my comments were not to be taken as any kind of hint

24  that the Court is looking askance at the proposed transaction.

25  I simply wanted to make it clear that today we were only

1 talking about process and due process, which I think is

2 important.  Okay.

3        MR. KRAKAUER:  Your Honor, just a couple of

4 clarifying things?

5        THE COURT:  Yes.

6        MR. KRAKAUER:  One, I wanted to state on the record

7 what I had told the U.S. Trustee, which is that if we do

8 receive an alternative transaction proposal, we would certainly

9 give a copy right away to the U.S. Trustee, so they asked me to

10 confirm that and we have no problem confirming that.

11       THE COURT:  And I'm not going to say too much about

12 that situation, because under the circumstances, it seems to me

13 -- and you never say never in this court -- but unlikely that

14 that scenario will develop, and if it does it may very well

15 cause the debtor to do some deep thinking about what its

16 fiduciary duty is, notwithstanding the terms of its agreement.

17 But, we may not get there, so I think enough said for now.

18       MR. KRAKAUER:  Okay.  Just some housekeeping items.

19 We are concerned when we send out notice about some privacy

20 issues.  So, with regard to the players, we're going to send

21 notice to them at the ballpark, 10 West Addison, rather than

22 publishing publicly their home addresses for reasons you

23 probably can understand.  Similarly, with respect to season

24 ticket holders and any other individuals who we're sending

25 notice to, we would redact that from what we filed publicly so

1 that nobody has lists of home addresses for individuals, and I

2 think that's been done in other occasions.

3        THE COURT:  You don't want the White Sox stealing

4 season ticket holders?

5                     (Laughter)

6        MR. KRAKAUER:  I won't respond to that one, Your

7 Honor.

8        THE COURT:  All right.   Is the U.S. Trustee okay

9 with that?  Is that U.S. Trustee okay with that, Mr. McMahon?

10        MR. McMAHON:  Joseph McMahon for the acting U.S.

11 Trustee.  The debtors' proposals regarding sending notice here

12 are perfectly acceptable.  Excuse me.

13        THE COURT:  All right.  Thank you.  The order's been

14 signed.  Is there anything further for today?

15        Thank you all very much.  That concludes this

16 hearing.  Court is adjourned.

17                 * * * * *

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

I, RITA BERGEN, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Rita Bergen                    DATE: September 6, 2009

RITA BERGEN

J&J COURT TRANSCRIBERS, INC.

(CR)