**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
-----------------------------------------------------x
                                        :       Chapter 11
In re:                                  :
                                        :       Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,                :
                                        :       (Jointly Administered)
            Debtors.                    :
                                        :       Hearing Date: 9/24/09 at 10:00 a.m.
                                        :       Response Deadline: 9/21/09 at 5:00 p.m.[1]
                                        :
                                        :       Re: Docket No. 2031
-----------------------------------------------------x
```

**JOINDER OF WILMINGTON TRUST COMPANY,
AS SUCCESSOR INDENTURE TRUSTEE, TO THE
MOTION OF LAW DEBENTURE TRUST COMPANY OF
NEW YORK FOR LEAVE TO CONDUCT DISCOVERY
PURSUANT TO RULE 2004 OF THE FEDERAL RULES
OF BANKRUPTCY PROCEDURE OF TRIBUNE COMPANY,
ITS AFFILIATES, AND CERTAIN THIRD PARTIES, OR
<u>ALTERNATIVELY, FOR THE APPOINTMENT OF AN EXAMINER</u>**

Wilmington Trust Company ("<u>Wilmington Trust</u>"), Successor Indenture Trustee for the Exchangeable Subordinated Debentures due 2029 in the aggregate principal amount of approximately $1.2 billion (the "<u>Subordinated Debentures</u>") issued by Tribune Company ("<u>Tribune</u>" and, together with its Chapter 11 affiliates, the "<u>Debtors</u>"), by and through its undersigned counsel, respectfully submits this Joinder to the *Motion of Law Debenture Trust Company of New York For Leave to Conduct Discovery Pursuant to Rule 2004 Of the Federal Rules of Bankruptcy Procedure of Tribune Company, Its Affiliates, And Certain Third Parties, Or Alternatively, For The Appointment of An Examiner,* dated August 26, 2009 [D.I. 2031]  (the

---

[1]     By agreement of the Movant.

"Rule 2004/Examiner Motion").   In support thereof, Wilmington Trust respectfully states as follows:

       1.    Wilmington Trust was appointed to the Official Committee of Unsecured Creditors (the "Official Committee") approximately two-weeks after its original formation, nearly nine-months ago.   Since then, it has attended most (if not all) Official Committee meetings, studied information delivered and the advice rendered by Official Committee professionals, participated in Official Committee deliberations on most (if not all) matters of importance, and carefully observed how this Official Committee and its professionals function. Coming from this vantage-point, Wilmington Trust has a perspective regarding the Rule 2004/Examiner Motion that might be particularly informative to the Court and the United States Trustee.

       2.    Initially, it bears underscoring that the matters at issue in the Rule 2004/Examiner Motion are not trivial.   Rather, they go to the heart of the case.   By Sam Zell's own public admission, the leverage buyout was "a mistake" and the consummation of "a deal from hell."   The transaction extended the Debtors' debt-to-EBITDA ratio from less than 5:1 to nearly 12:1.   Wall Street analysts, then already predicting the downfall of the newspaper industry, promptly published scathing reviews.   Rating agencies immediately downgraded Tribune's pre-existing bond debt to anticipated near-term default.   The company collapsed into bankruptcy less than 12-months later.   Based on information learned and advice received as a member of the Official Committee, Wilmington Trust has been led to understand that the estates now hold very significant causes of action arising from the transaction, sounding in fraudulent conveyance, breach of fiduciary duty, aiding and abetting same, equitable subordination, and other theories.

3.      To be sure, not all parties benefit equally from prosecution of such claims. At one end of the continuum is Mr. Zell (who today is in control of the Debtors) and the members of the Board of Directors; notwithstanding the measured tone of the Debtors' "Response" to the Rule 2004/Examiner Motion, it must be presumed that these individuals will fully exploit the bankruptcy process, the Debtors' possession of estate assets, and plan exclusivity to stymie all litigation and shelter themselves from liability to the fullest extent possible.  Close on the continuum to Mr. Zell and the Board are the Bank Lenders that financed the transaction in the face of the above-mentioned warning signs.  This debt purports to be structurally senior to all unsecured debt because (1) material operating companies in the conglomerate guaranteed the bank debt (but not the bond debt) and/or (2) Tribune pledged its stock in downstream companies as security for the bank debt.  Trade and similar creditors are on the other side of the continuum, but only slightly so: they benefit merely by the avoidance of the down-stream guarantees as fraudulent conveyances (perhaps a "lay-up" under these facts). Tribune bond debt (the only debt pre-existing the transaction, totaling approximately $3.4 billion) is far more interested in zealous prosecution; bondholders benefit if the stock pledges are also avoided and the Bank Lender claims subordinated pursuant to, among other law, Bankruptcy Code Section 510(c).

4.      Placed in this context, it may not be surprising that the Rule 2004/Examiner Motion engendered aggressive responses from the Debtors, J.P. Morgan Chase Bank N.A., Merrill Lynch Capital Corporation, Robert R. McCormick Foundation, and Valuation Research Corporation.  These parties advance the kind of arguments to be expected from litigation targets hoping to obstruct and deflect.

5.      Since the Official Committee is not a litigation target and is intended to be a representative body and case fiduciary, its *Response and Partial Objection* deserves a more thoughtful review.  In that pleading, the Official Committee largely opposes the relief requested. In so doing, the Official Committee (through its general counsel, Chadbourne & Parke): (1) represents that it has undertaken an "aggressive, thoughtful and coordinated investigation" (¶ 1) of all estate causes of action; (2) rejects any argument predicated on Chadbourne & Parke's disclosed conflicts-of interest; and (3) contends that the Official Committee (and its counsel) are entitled to a near-exclusive right to investigate and prosecute all estate causes of action arising from the leveraged buyout transaction.

6.      Wilmington Trust does not agree with important aspects of this pleading, necessitating this public dissent and Joinder to the Rule 2004/Examiner Motion.   Honoring the confidentiality of professional advice and Official Committee deliberations, it is sufficient for Wilmington Trust to note its frustration and dissatisfaction with the manner in which estate causes of action have been handled to date.  Tribune's bondholder community has long voiced to Wilmington Trust its concerns over Mr. Zell's control of the process, the Official Committee's construction, and the lack of meaningful development before this Court respecting these causes of action.  Wilmington Trust has long relayed those concerns to the Official Committee and its counsel, in good faith, hoping to inform and persuade action.  But, despite its best efforts, Wilmington Trust believes that there today remains ample justification for these concerns to remain extant.

7.      Regarding the Official Committee's construction, the Court and the United States Trustee might review that this is a nine-person committee, initially comprised of (a) two Bank Lenders; (b) two trade creditors; (c) the Pension Benefit Guaranty Corporation; (d) a union;

(e) a retiree; and (f) two Successor Indenture Trustees.  One Bank Lender recently resigned, but (per the Official Committee's bylaws) that seat may be taken by another Bank Lender.  The Tribune bondholders have long feared this construction because seven of the nine members of the Official Committee are economically motivated to reach a quick and rather easy plan settlement with a Zell-control management that: (i) hands the reorganized Debtors over to the Bank Lenders; (ii) releases all estates claims against Mr. Zell, the Board, and others that might bear complicity liability; (iii) pays a satisfactory amount to the trade creditors (on-going business relationships and waiver of preference actions as potential added benefits); (iv) leaves the union member's contract unmolested; (v) shores up and assumes all pension plans as obligations of the reorganized Tribune; and (vi) reserves some millions (a small quantum in light of the size of these cases) for retirees.  Indeed, the Debtors' "Response" states that a plan will be filed shortly; presumably a plan that has been informed by at least some private discussions with members of the Official Committee.[2]

8.       To reiterate: The Debtors soon will be filing a plan (one that they may have reason to believe will be supported by a majority of the Official Committee); and, yet, the litigation remains nowhere.  If, as the Official Committee contends, the law bestows on it some

---

[2]       None of this is to suggest that Wilmington Trust believes any member of the Official Committee has acted or is acting inappropriately.  To the contrary, Wilmington Trust believes each member is acting honorably and laboring hard to acquit its fiduciary duties in good faith.  That said, it is always a difficult matter for a committee to evaluate how it should approach significant estate litigation.  That is especially true when: (i) the litigation in question is inter-creditor in nature; (ii) benefits types of unsecured creditors differently (e.g., trade creditors and unsecured bondholders rarely collaborate to protect the other group's interests); and (iii) litigation may risk a plan proposal that provides satisfactory treatment for certain creditors (such as, in this case, those holding a majority of the committee votes).  Thus, a majority of the Official Committee may theoretically act in good faith and still accept a plan that contemplates a very inappropriate resolution of estate claims arising from the buyout.  That is precisely the result that should be avoided.

form of litigation exclusivity, cause would exist to lift such exclusivity.  Indeed, for this reason alone, the Rule 2004/Examiner Motion is well taken.

9.    Wilmington Trust is informed that the parties are discussing a settlement of the Rule 2004/Examiner Motion.  Consensual resolution of this new contested matter may have momentary advantages, but it may also foreclose a prime opportunity to address a much larger, systemic problem in these cases.  In paragraph 12 of the *Joinder of Deutsche Bank Trust Company of Americas, Indenture Trustee Under the 1992 Indenture, the 1996 Indenture and the 1997 Indenture to the Motion of Law Debenture Trust Company of New York for Leave to Conduct Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure of Tribune Company, its Affiliates, and Certain Third Parties, or Alternatively, for the Appointment of an Examiner*, dated September 17, 2009 [D.I. 2147] (the "Deutsche Bank Joinder"), Deutsche Bank Trust Company of Americas (the other Successor Indenture Trustee on the Official Committee) suggests that this case would benefit greatly from the appointment of an Official Bondholders' Committee.  Wilmington Trust fully joins in that sentiment and hereby expresses its willingness to accept appointment to such Committee (resigning from the Official Committee) if the United States Trustee or the Court were to view that suggestion with favor.[3]

---

[3]    Certain unusual aspects of this case also support the appointment of an Official Bondholders' Committee.  First, the estates are exceptionally large, with several billions of dollars in enterprise value; the cases are assuredly large enough to support the appointment of an additional official committee.  Second, the Debtors did not pledge their cash (or other current asset classes) as collateral pre-petition or post-petition, and they have not required post-petition financing; thus, there are no contractual or other legal constraints on the estates' ability to fund an additional official committee.  Third, as discussed at length in the Deutsche Bank Joinder, the estates have undertaken to pay (purportedly, $10 million to date) for duplicate lawyers and financial advisors assisting the Bank Lenders; the "adversary process" would be greatly enhanced by the appointment of an Official Bondholders' Committee that can serve as an appropriate case counter-balance.  As discussed herein, the Official Committee, as presently constructed, can not or will not effectively undertake that role.

10.     Wilmington Trust otherwise supports the relief requested in the Rule 2004/Examiner Motion and joins in the request.

## **CONCLUSION**

**WHEREFORE**, for the reasons set forth herein, Wilmington Trust, as successor Indenture Trustee, requests that this Court (a) grant the Rule 2004/Examiner Motion; (b) direct the United States Trustee to appoint an Official Bondholders' Committee; and (c) grant such other and further relief to Wilmington Trust as is just and proper under the circumstances.

Dated:  September 21, 2009

Respectfully submitted,

BENESCH, FRIEDLANDER, COPLAN
 & ARONOFF LLP


By:    /s/ Jennifer R. Hoover
       Jennifer R. Hoover, Esquire (No. 5111)
       222 Delaware Avenue, Suite 801
       Wilmington, DE  19801
       (302) 442-7010 (telephone)
       (302) 442-7012 (facsimile)
       jhoover@beneschlaw.com

       -and-

       BROWN RUDNICK LLP
       Robert J. Stark, Esq.
       Daniel J. Saval, Esq.
       Seven Times Square
       New York, New York  10036
       Phone: (212) 209-4800

       *Counsel to Wilmington Trust Company,*
       *as Successor Indenture Trustee*