# **EXHIBIT C**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## DECLARATION OF CHRISTOPHER J. MARTELL IN SUPPORT OF (I) NOTICE AND PROCEDURES APPROVAL MOTION, (II) TRIBUNE TRANSACTION APPROVAL MOTION, AND (III) CUBS TRANSACTION APPROVAL MOTION

CHRISTOPHER J. MARTELL declares as follows:

1.  I am a Vice President of J.P. Morgan Securities Inc. ("JPMSI").[2] I make this Declaration (the "Declaration") in support of (a) the Motion of Debtors and Debtors in Possession Pursuant to Section 105(a) of the Bankruptcy Code and Fed. R. Bankr. P. 2002, 6004 and 9007 for an Order (I) Approving Form and Scope of Notice of Proposed Business

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motions.

Combination Involving Cubs Business to Creditors and Parties-in-Interest of Tribune Debtors and Cubs Entities, (II) Approving Transaction Process and Setting Transaction Hearing and Related Deadlines, and (III) Approving Certain Investor Protections (the "Notice and Procedures Approval Motion"), (b) the Motion for Orders Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 (I) Authorizing Tribune Debtors and CNLBC to (A) Enter Into and Perform Obligations under Formation Agreement and Ancillary Agreements, (B) Contribute Cubs-Related Assets, Interests in Wrigley Field, and Related Assets Free and Clear of All Liens, Claims, Rights, Interests and Encumbrances, (C) Assume and Assign Executory Contracts; (II) Authorizing Debtor Tribune Company to Enter Into Guarantees of Debt Financing; (III) Authorizing Debtor WGN Continental Broadcasting Company to Enter Into and Perform Obligations Under Amended and Restated Broadcast Agreements; and (IV) Granting Related Relief (the "Tribune Transaction Approval Motion"), and (c) the Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 (I) Authorizing Chicago National League Ball Club, LLC to (A) Enter Into and Perform Obligations Under Formation Agreement and Ancillary Agreements, (B) Effect Proposed Business Combination Involving Cubs-Related Assets, Interests in Wrigley Field, Comcast Sports Net and Related Assets Free and Clear of All Liens, Claims, Rights, Interests and Encumbrances, and (C) Assume and Assign Executory Contracts; (II) Pledge Membership Interest in Chicago Baseball Holdings, LLC; and (III) Granting Related Relief (the "CNLBC Transaction Approval Motion") (collectively, the "Motions").

2.  The Motions collectively seek approval for the Proposed Business Combination, pursuant to which the Cubs Business will be contributed to Chicago Baseball Holdings, LLC ("Newco"), an entity that will be 95% owned by Ricketts Acquisition LLC and 5% owned by the Tribune Debtors and the Cubs Entities. This Declaration is made on my

personal knowledge and my review of documents made available to me.

3. This Declaration provides factual background and information concerning (i) the more than two-year marketing process for the Cubs Business and the evaluation of the various expressions of interest and bids that were received by Tribune Company ("Tribune") as a result of that process, and (ii) the factors that were ultimately employed by Tribune and CNLBC, with input from JPMSI and other advisers, in selecting the Bidder as the party with whom to consummate the Proposed Business Combination.

Background Concerning JPMSI's Involvement with the Proposed Business Combination

4. JPMSI was engaged by Tribune in May 2007 and formally engaged on July 9, 2007 as a financial adviser in connection with the marketing and disposition of the Cubs Business.[3] I have been involved with JPMSI's provision of financial advisory services to Tribune and CNLBC since the outset, along with a number of my colleagues at JPMSI and its affiliates (collectively, "JP Morgan").

5. JP Morgan has provided advisory services in connection with numerous strategic transactions involving professional sports franchises in recent years, including at least six (6) transactions on behalf of Major League Baseball franchises. JP Morgan has provided other advisory services with respect to many other transactions involving professional sports franchises, such as stadium financing, and has participated in more than two dozen financing efforts by professional sports teams, including at least ten (10) such financing efforts by Major League Baseball franchises, as well as the league-wide facility. All of these particularized efforts on behalf of professional sports franchises are in addition to JP Morgan's considerable expertise and experience respecting mergers and acquisitions, commercial lending, syndicated

---

[3] Although JPMSI's engagement letter was originally with Tribune, JPMSI's engagement was later transferred to CNLBC pursuant to a revised engagement letter that also extended the term of the engagement. The transfer of the engagement from Tribune to CNLBC was approved by the Bankruptcy Court.

3

and leveraged finance and real estate financing, among many other areas.

6. JPMSI has actively advised Tribune and – following assignment of the engagement letter from Tribune to CNLBC – CNLBC with respect to the Proposed Business Combination on a continuous basis since its engagement. During that more than two-year period, I personally, and JPMSI generally, have developed an extensive understanding of the facts and circumstances relevant to the Proposed Business Combination and a detailed understanding of the issues present in the negotiations concerning the Proposed Business Combination, and a unique base of transaction-specific knowledge key to completing the negotiations and successfully concluding the Proposed Business Combination. I and/or my colleagues at JPMSI have been personally involved in all or essentially all aspects of the marketing of the Cubs Business, from its early stages in identifying potential bidders in mid-2007 through the final negotiations with the Bidder that led to the completion and execution of the Formation Agreement and the Ancillary Agreements. In addition, my colleagues and I have been involved on an ongoing basis in the negotiations with the Bidder concerning the Proposed Business Combination, as well as with other interested parties concerning the terms of their proposed transactions involving the assets of the Cubs Business.

## The Marketing Process for the Cubs Business

*I.    Process Launch and Initial Solicitations of Interest (Early-to-Mid 2007)*

7. The marketing process for the Cubs Business that led to the Proposed Business Combination took place in several stages over a period beginning more than two years ago. Tribune publicly announced its intention to dispose of a controlling interest in the Cubs Business and its attendant assets in April 2007, on the same day and as part of the same press release in which Tribune announced the completion of its strategic review process and its

decision to convert from a public company to a privately-held company. The announcement respecting the Cubs received widespread and extensive media coverage throughout the United States and beyond, giving parties interested in acquiring the Cubs Business and attendant assets notice that the Tribune was seeking to enter into a transaction involving the Cubs Business and attendant assets.

8. After the retention of JPMSI by Tribune in July 2007, Tribune and JPMSI sought initial solicitations of interest with respect to both the entirety of the Cubs Business and, apart from that, in two separate transactions, one of which would have been principally focused on real estate and would have involved Wrigley Field and certain other real estate assets (a "Cubs Real Estate Transaction"), and the second of which would have involved the remaining assets of the Cubs Business, including the Chicago Cubs Major League Baseball franchise and the 25.34% stake in CSN Chicago indirectly owned by Tribune.

9. Tribune initially asked JPMSI to advise it in connection with the identification of parties likely to be interested in any such transactions, and JPMSI provided such services accordingly. JPMSI identified potentially-interested parties through several means, focusing on (i) high net-worth individuals in the Chicago area, (ii) high net-worth individuals outside of the Chicago area with an expressed interest in sports either publicly or through prior discussions with colleagues at JP Morgan, (iii) parties involved in prior transactions relating to sports franchises, (iv) owners of other professional sports teams, and (v) parties that contacted Tribune or JPMSI independently to express their interest in being involved with a transaction relating to the Cubs Business. In the first four situations, JPMSI reached out to make contact with the parties through connections available to it, while in the fifth situation JPMSI responded to the inquiries in order to evaluate the background and financial means of the parties in

question. JPMSI also examined certain scenarios in which Tribune and CNLBC would team with a corporate strategic partner with a potential interest in the Cubs Business and certain of the assets thereof.

10. JPMSI's evaluations of all parties focused on individuals and entities that were likely to have the financial means to consummate a transaction involving the Cubs Business and/or a Cubs Real Estate Transaction and, with respect to the transactions involving the Cubs Business, who would likely be acceptable to Major League Baseball as the potential owner of a controlling interest in the Cubs Business. In situations where a party did not appear to have the financial means on their own to effect a transaction relating to the Cubs Business, or one of the related separate transactions, JPMSI attempted, if the party's financial circumstances warranted, to put that party in contact with other potential bidders for purposes of forming a bidding partnership that could fashion a transaction.

11. In the initial solicitation phase of the process, Tribune and/or JPMSI contacted or were contacted by in excess of 100 parties with respect to a possible transaction involving the Cubs Business, and contacted or were contacted by in excess of 60 parties with respect to a potential separate Cubs Real Estate Transaction. The majority of parties contacted in both respects, as is common with an initial solicitation, did not ultimately manifest an interest in either potential transaction, although discussions with many of such parties occurred during this initial phase as a means of gauging any potential interest they might have.

II.    *Prepatory Phase and Phase I (Second Half 2007 – Mid-2008)*

12. A number of the parties with which Tribune and JPMSI had contact, however, elected to pursue a potential transaction involving either the Cubs Business or a Cubs Real Estate Transaction, with many of the parties forming bidding groups as described above.

6

Those bidding groups then began the second stage of the process, which commenced in the second half of 2007. At that time, a number of the bidding groups entered into non-disclosure agreements and delivered initial Major League Baseball applications to JPMSI, which were then forwarded by JPMSI to Major League Baseball.

13. The initial applications – known as "Phase I" applications – included, among other items, background information concerning the individuals and entities that were potentially interested in submitting a bid for the Cubs Business and financial disclosure for such individuals and entities. The Phase I applications provided necessary preliminary information as to whether the bidding groups were legitimate candidates to acquire a controlling interest in the Cubs Business, both on financial grounds and in terms of their likelihood of ultimately being approved by Major League Baseball, in accordance with Major League Baseball's rules and regulations, as potential holders of a controlling interest in a Major League Baseball franchise.

14. I am informed that Major League Baseball also conducted background checks on each individual or entity associated with each bidding group, and where necessary conducted telephone interviews with such individuals and entities to clarify certain items of their disclosure. During this phase, Major League Baseball, after reviewing the Phase I applications and the results of the background checks, informed Tribune and JPMSI of certain affiliations or other considerations under the rules and regulations of Major League Baseball that would have prevented certain individuals and entities from being approved as owners of a Major League Baseball franchise or would have required their divestiture of certain ownership interests in other businesses in order to proceed further under Major League Baseball's rules and regulations. None of those individuals or entities were leading proposed financial contributors of their respective bidding groups.

15. While the Phase I applications were being prepared, Tribune, CNLBC and JPMSI were preparing certain descriptive memoranda respecting both the transaction involving the Cubs Business and the Cubs Real Estate Transaction.[4] Those memoranda were subject to comment and approval by Major League Baseball. At the conclusion of this initial evaluation and application process, in June 2008, ten (10) bidding groups, comprised of 96 individuals or entities, were cleared to receive the descriptive memorandum with respect to the Cubs Business, while another 26 bidding groups received the descriptive memorandum with respect to a Cubs Real Estate Transaction. This began "Phase I" of the bidding process. At this time, all of the bidding groups participating in the process were provided with the opportunity to speak with or meet management of Tribune and the Cubs Entities, if they so requested, as part of Phase I, and most of the bidding groups elected to do so. The bidders were also advised that it was Tribune's expectation that the Cubs would have a long-term media agreement with WGN-TV, WGN Radio and WGN America and that the terms of that agreement were included in the financial forecast provided.

16. Each of the parties receiving a descriptive memorandum was asked to submit a preliminary non-binding indication of interest by mid-July 2008. All of the bidding groups that received the descriptive memorandum with respect to the Cubs Business provided written indications of interest in further pursuing a transaction involving the Cubs Business, while six of the 26 groups that received the descriptive memorandum respecting a Cubs Real Estate Transaction elected to pursue such a transaction further.

III.   *Phase II (Mid-2008 to Late 2008)*

---

[4] During this period, Tribune, with input from JPMSI and Tribune's special advisor SportsCorp Ltd., also evaluated various structural alternatives to the proposed transaction process, such as a public/private partnership involving Wrigley Field. Those alternatives did not materialize into substantive alternatives to the potential transactions involving the Cubs Business and the Cubs Real Estate Transactions then being proposed.

8

17. Following submission of the first-round bids, Tribune, with input from JPMSI and other advisers, evaluated each of the bids based on the following principal (but not exclusive) criteria:

- the total value of the transaction (often referred to as the "headline value");

- whether the bidder was interested in all or some part of the assets;

- the amount of equity to be contributed by the bidding group to the new entity to own the Cubs franchise;

- the likelihood that Major League Baseball would grant approval for a particular bid, based on the identity of the bidding group and the economic terms of the bid;

- any bidder-specific issues relating to the conditionality of their proposed transaction; and

- the willingness of the bidding group to work with the preferred transaction structure proposed by Tribune.

In considering the bids, to my knowledge none of the factors above was considered by Tribune or CNLBC as dispositive. Instead, the merits of each bid were evaluated with respect to all of the above factors viewed in their totality relative to the other bids.

18. The evaluation made clear the bids had varying degrees of desirability from Tribune's economic perspective. Several bids, for example, offered a value that was substantially lower than other bids. Other bids proposed low levels of equity commitment on the part of the bidding group or significant conditionality related to their equity, meaning that their bids did not offer the desired certainty as compared to others under consideration. Still other bids reflected an unwillingness to work with the structure proposed by Tribune. At this phase, JPMSI was in contact with all of the various bidding groups to discuss Tribune's evaluation of their bids and ways in which each bid could be improved in light of the factors set forth above.

19. As a result of this process, the Phase I participants – ten (10) bidders respecting the entire Cubs Business and six (6) bidders pursuing a Cubs Real Estate Transaction – were narrowed to five (5) bidding groups with respect to the Cubs Business and three (3) bidding groups with respect to a Cubs Real Estate Transaction. Those bidding groups then began to participate in "Phase II" of the transaction process.[5] All five (5) bidding groups respecting the Cubs Business satisfied the primary factors described in ¶ 17 above.

20. Those bidding groups then went through an extensive diligence phase with respect to the Cubs Business or a Cubs Real Estate Transaction, as applicable, intended to permit them to formulate bids. During this diligence period, bidding groups with respect to the Cubs Business received access to over 1,500 financial, legal, insurance, real estate, and operational documents, and bidding groups with respect to a Cubs Real Estate Transaction received access to approximately 900 real estate, financial, legal and insurance documents. Bidding groups also received access to Cubs management, and several bidding groups engaged third party consultants to conduct evaluations with respect to Wrigley Field. All five bidding groups with respect to the Cubs Business participated in management presentations at Wrigley Field. In addition, if those groups requested, they met with senior officials from Major League Baseball, MLB Advanced Media and MLB Network concerning those businesses and their relationship with the Cubs.

21. During this process, one of the five potential bidders for the Cubs Business made clear that it had several concerns respecting the proposed structure of the transaction. A second potential bidder for the Cubs Business also expressed concern about the proposed transaction that ultimately resulted in them not submitting a further bid. Several of the

---

[5] During Phase II of the transaction process, JPMSI also participated in discussions with a party concerning a potential transaction in which that party would take a substantial minority position in the Cubs franchise in order to allow a partial monetization of the value of the Cubs Business by Tribune and CNLBC. Those discussions ultimately did not result in a formal transaction proposal.

groups that had been interested in a Cubs Real Estate Transaction also ceased participating further in the process.

22. As a result, at the end of Phase II, following several months of intensive diligence efforts and discussions concerning the Cubs Business and a potential Cubs Real Estate Transaction, Tribune received three (3) bids for the Cubs Business in November 2008, as well as one (1) bid respecting a Cubs Real Estate Transaction. Each of those bids contained, among other things, markups of the proposed Formation Agreement, as well as a confirmation that the overall structure of the proposed bid conformed with the structure proposed by Tribune and information regarding the status of the particular bidder's discussions with potential financing sources. In addition, the bidders had been previously provided with draft media agreements in proposed final form. In submitting their proposals, bidders provided various degrees of comments on those documents.

IV. *Phase III (Late 2008 – Early 2009)*

23. Following submission of the Phase II bids and related materials, Tribune, with input from JPMSI and other advisers, then began a detailed analysis and evaluation of each of the bids. The evaluation of those bids was done using similar criteria as the evaluation of the bids received in the prior round (discussed at ¶ 17, above), while also taking into account as principal factors (i) the net upfront after-tax cash component of the bid, (ii) the total present value of all forms of consideration for the proposed transaction, (iii) the terms and value of ongoing radio and television broadcast relationships; (iv) the certainty that the transaction could be closed based on the likelihood for each bidder securing committed financing for the transaction, (v) the likelihood of Major League Baseball approval for the transaction, (vi) the markups of the transaction documents submitted by the bidders, and (vii) the tax benefits, if any,

to be provided to Tribune and CNLBC in the event a particular bid was implemented. As with the evaluations at the preceding round, no single factor was viewed as dispositive by JPMSI (or, to my knowledge, by Tribune and CNLBC); rather, each bid was evaluated in its totality relative to the other bids.

24. Tribune concluded that each of the three bids for the Cubs Business should be pursued further. Accordingly, Tribune and CNLBC, with input from JPMSI and other advisers, engaged the three (3) bidding groups that submitted bids at the end of Phase II for the Cubs business to determine whether those bids could be improved and, if so, how the terms of the bids might be revised. This process was extended beyond the period originally envisioned as a result of Tribune's chapter 11 filing on December 8, 2008. At this time, Tribune advised JPMSI that it had also determined that a transaction involving the entire Cubs Business was preferable to separate transactions involving the Cubs Business on the one hand and a Cubs Real Estate Transaction on the other hand, and accordingly only the three potential transactions respecting the entire Cubs Business were pursued further, with JPMSI terminating discussions with other parties.

25. Following evaluation of the bids by Tribune and CNLBC, and discussions between the remaining bidders, on the one hand, and Tribune and CNLBC, on the other hand, each of the remaining three (3) bidding groups for the Cubs Business submitted improved and revised bids for the Cubs Business on or about January 13, 2009. Those revised bids were then evaluated by Tribune and CNLBC, with input from JPMSI, using the same criteria as were used in evaluating the definitive bids received in November 2008.

26. As a result of evaluation of the revised bids, and on information and belief, after consultation with the Official Committee of Unsecured Creditors and the Steering

Committee of Tribune's pre-bankruptcy lenders, Tribune determined in January 2009 – as was the subject of public reports at the time – that it should pursue negotiations toward the Proposed Business Combination with the Bidder. CNLBC at that time also entered into a fee reimbursement agreement with the Bidder.

27. Tribune and CNLBC, as advised by JPMSI and its other outside professionals, and the Bidder have been engaged in intensive negotiations since January 2009 to finalize the Proposed Business Combination. In May 2009, given that the Proposed Business Combination had not been finalized and was not likely to be imminently finalized at that time in light of open issues that then remained with respect to the Proposed Business Combination, the fee reimbursement arrangement between CNLBC and the Bidder was terminated. Tribune also restarted discussions with one of the other two parties that had submitted bids in January 2009 in an effort to determine whether a transaction involving the Cubs Business with that bidder would be possible.

28. In furtherance of that second possible transaction, a separate fee reimbursement agreement was entered into with the second bidder, and the second bidder was once again provided access to Tribune and CNLBC's electronic data room of diligence materials. From May 2009 through early August 2009, representatives of Tribune negotiated with both the Bidder and the alternative bidder in an attempt to finalize a transaction respecting the Cubs Business. Tribune and CNLBC's professionals engaged with both bidders on all aspects of the Proposed Business Combination, including exchanging numerous drafts of documentation and assisting in both parties' financing efforts respecting the transaction. Tribune and its professionals also met with Major League Baseball during this period in order to apprise them of the status of the potential bids and the Proposed Business Combination. At various points during

13

this period, numerous press reports were made regarding the status of one or both of the potential transactions. Over this period, neither JPMSI nor, it is my understanding, Tribune or CNLBC received any additional substantive inquiries from third parties who were interested in participating in the process or reengaging therein.

29. In late July 2009, the Bidder advised Tribune and CNLBC that if definitive documentation was not reached by August 7, 2009, it would withdraw from the bidding process and would not participate in further efforts to conclude the Proposed Business Combination. Tribune's and CNLBC's representatives, in my view, recognized the Bidder's position on this timeframe as credible and sought to meet that timeframe with the Bidder while also continuing to negotiate with the second bidder on the contractual and economic terms of their offer. As a result, Tribune and CNLBC, with input from JPMSI and other advisers, negotiated intensively with both the Bidder and the alternative bidder during late July and early August 2009.

30. As of August 7, 2009, Tribune and CNLBC, together with the Bidder, had negotiated and documented the Proposed Business Combination to a degree that was largely complete, but remained subject to finalization on various terms. The process with the alternative bidder was also well advanced as of that date, but was not final on all material terms and would require additional time after that date to complete. Given those facts and the expressed view of Tribune's and CNLBC's representatives that the Proposed Business Combination represented the highest and best offer for the Cubs Business, Tribune and CNLBC entered into a two-week exclusive negotiating period with the Bidder on August 7, 2009. At the conclusion of that negotiating period, Tribune and the Cubs Entities executed the Formation Agreement.

31. On August 20, 2009, near the end of the two-week exclusive negotiating

period with the Bidder, Tribune and JPMSI received an unsolicited letter from the alternative bidder. That letter clarified and detailed certain components of the alternative bidder's offer for the Cubs Business, but did not contain enhanced pricing terms or other material improvements to the alternative bidder's offer. Tribune consulted with JPMSI and its other advisers concerning the letter, advised the alternative bidder of the terms of its exclusivity arrangement with the Bidder, and advised the Bidder of the letter. Tribune, with the input of JPMSI and its other advisers, concluded that the letter did not materially change or enhance the alternative bidder's proposal.

### Considerations Relating to Major League Baseball

32. I understand from participating in certain of the negotiations and discussions with the Bidder, Tribune, Major League Baseball and others that there are no substantive issues known to me that would prevent the Bidder from receiving the necessary approvals from Major League Baseball as an owner of the Chicago Cubs Major League Baseball franchise. I further understand from participating in certain of the negotiations and discussions with the Bidder, Tribune and Major League Baseball that Major League Baseball will not, as a practical matter, submit more than one bid at a time for approval by the owners of the Major League Baseball franchises for the Cubs Business (or any other Major League Baseball franchise). I further understand that it is very difficult for financing for more than one bid for the Cubs Business (or any other Major League Baseball franchise) to be syndicated at any one time, given the relatively limited number of parties that participate in professional sports-related financing efforts and given that potential lenders into debt financing to be established by a professional sports franchise will want to be assured that the essential requirement of league approval can be obtained before committing to such financing. As a result of these

considerations, it is difficult, if not impossible, for multiple bids for a single Major League Baseball franchise to proceed to conclusion at one time.

Comparison of the Proposed Business Combination to Similar Transactions

33. In addition to advising Tribune and CNLBC as to the benefits of the Proposed Business Combination compared to other proposed transactions respecting the Cubs Business, JPMSI also compared the reasonableness of the Proposed Business Combination with other transactions involving Major League Baseball franchises. Specifically, JPMSI compared the "headline value" of the Proposed Business Combination ($844,700,000) to the preceding season's revenue for the Cubs Business, which, after application of Major League Baseball's revenue sharing requirements, was approximately $241,000,000, yielding a headline value-to-preceding season revenue multiple of 3.5 times prior season revenue.

34. JPMSI then compared that multiple to analogous publicly reported figures for the 18 other changes in ownership that occurred in Major League Baseball from 1998 to the present. Those figures showed a median figure of 2.5 times prior season revenue, with three (3) transactions having had multiples in excess of 3.0 times prior season revenue, two of which were 3.1 times prior season revenue and the third of which (the 2002 acquisition of the Montreal Expos by Major League Baseball) was at 3.5 times prior season revenue. One additional transaction was at 3.0 times prior season revenue. The remaining 14 transactions were all at 2.9 times prior season revenue or lower, with figures ranging from 1.6 times prior season revenue to 2.9 times prior season revenue. Accordingly, the proposed consideration to be received by the Tribune Debtors and the Cubs Entities will yield a headline value-to-preceding season revenue multiple that is at the high end of the multiples yielded in connection with the transfers of other Major League Baseball franchises.

35.   The Proposed Business Combination also compares favorably to recent transactions even if only the proposed net after-tax proceeds are taken into account. Those proceeds are approximately $740,000,000, subject to certain adjustments, which represents a multiple of roughly 3.1 times preceding season revenue. Such a multiple still falls within the high end of recent transactions involving Major League Baseball franchises, as described above.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of August 2009 at New York, New York.

_____
Christopher J. Martell

CH1 4842841v.3