UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF DELAWARE

```
                            )
IN RE:                      )
                            )          Bankruptcy Action
TRIBUNE COMPANY, et al.,    )
                            )
                            )          Chapter 11
            Debtors,        )          Wilmington, DE
                            )          September 25, 2009
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            JONATHAN LOTSOFF, ESQUIRE
                            BRIAN GOLD, ESQUIRE
                            Sidley, Austin, LLP
                            One South Dearborn Street
                            Chicago, Illinois 60603

                            NORMAN PERNICK, ESQUIRE
                            Cole, Schotz, Meisel, Forman &
                            Leonard, P.A.
                            500 Delaware Avenue
                            Wilmington, Delaware 19801

Audio Operator:             Sherry Stiles

Transcribed by:             DIANA DOMAN TRANSCRIBING
                            P.O. Box 129
                            Gibbsboro, New Jersey  08026-129
                            PHONE:  (856)435-7172
                            FAX:    (856) 435-7124
                            Email:  Dianadoman@comcast.ne

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

(Appearances Continued)

For Creditors Committee:    DAVID LeMAY, ESQUIRE
                            Chadbourne & Parke, LLP
                            30 Rockefeller Plaza
                            New York, New York 10112

For U.S. Trustee:          JOSEPH J. McMAHON, JR., ESQUIRE
                            Office of the U.S. Trustee
                            844 King Street
                            Wilmington, Delaware

For Guild:                 CHRISTOPHER SIMON, ESQUIRE
                           MICHAEL JOYCE, ESQUIRE
                           Cross & Simon
                           913 North Market Street
                           Wilmington, Delaware 19801

For Dow Jones:             JOEL FRIEDLANDER, ESQUIRE
                           Bouchard, Margules & Friedlander
                           222 Delaware Avenue
                           Wilmington, Delaware

<u>I N D E X</u>

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | THE COURT |
|---------|--------|-------|----------|---------|-----------|
| Chandler Bigelow | 16 | 62(Sim) | | | 101 |
| John Dempsey | 105 | 137(Sim) | 176 170(McM) | | |
| Edward Phillips | 181 | 190(Lot) | | | |

<u>CLOSING STATEMENTS</u>

| | |
|---|---|
| By Mr. Lotsoff | 209 |
| By Mr. Simon | 217 |
| By Mr. McMahon | 225 |
| By Mr. LeMay | 235 |

| <u>EXHIBIT</u> | | <u>EVID</u> |
|---------|---|------|
| D-1 | Statistics 2009 TMIP | 47 |
| D-2 | Statistics MIP | 44 |
| D-4 | Historic Cash Flow Numbers | 92 |
| D-5 | Tribune Incentive Comp Program | 20 |
| D-5D | 2002 Proxy | 92 |

Page 4

1    (Call to the Order of the Court)

2         THE COURT:  Good morning all.

3         COUNSEL:  Good morning.

4         THE COURT:  Are the parties ready to proceed?

5         MR. LOTSOFF:  We are, Your Honor.

6         THE COURT:  All right.  Is there anything

7    preliminarily?

8         MR. LOTSOFF:  If I may address the Court.  Good

9    morning, Your Honor.  Jonathan Lotsoff on behalf of the

10   debtors.  I believe preliminarily we had indicated in our joint

11   pretrial memorandum that the parties were going to workout

12   issues with respect to the treatment of confidential

13   information during the hearing.

14        We've done that, and if the Court would like to hear

15   our resolution, I could share that.

16        THE COURT:  All right.

17        MR. LOTSOFF:  I've spoken with the U.S. Trustee's

18   Office, the attorneys for the Guild, and our proposal to the

19   Court is that, as you know, the Court entered a protective

20   order with respect to confidential information at the August --

21   following the August 11th hearing.

22        THE COURT:  Yes.  I mean, everything that's been

23   submitted in connection with this hearing is under seal.

24        MR. LOTSOFF:  And that's because it all contains

25   confidential information, Your Honor.  We would propose

Colloquy                          Page 5

1    maintaining that information under seal, to the extent it's

2    reflected, for example, in exhibits, and that the information

3    also be not shared in open Court, to the extent it is

4    confidential, with one notable exception, and that is all the

5    parties have agreed that, given the issues in the case, it

6    would be acceptable to share cash flow information, cash flow

7    levels.

8         One thing we've also agreed on, though, is that

9    individualized compensation information would not be shared in

10   open Court.  We have the Mercer report, there are other

11   documents that the parties can refer to, to the extent that

12   that issue even comes up.

13        And as the Court may recall, we filed a redacted

14   version of the Mercer report that had aggregate information for

15   the top 10, the other key executives.  So that information

16   would be available, as well.  But that would be the proposal of

17   the parties.

18        THE COURT:  Well will that involve at some point, at

19   least as the parties expect presently, that I will be asked to

20   close the courtroom at any point, or is it anticipated we can

21   get through the testimony and other evidentiary part of the

22   record without having to do so?

23        MR. LOTSOFF:  The latter, Your Honor.

24        THE COURT:  All right.  Thank you.  I appreciate

25   that.  I would much prefer to conduct the hearing in that

Colloquy                                    Page 6

1   manner, and I thank the parties for their efforts in that, in

2   that respect.  Does anyone else care to be heard on that issue

3   alone?

4           MR. SIMON:  Good morning, Your Honor.  Chris Simon on

5   behalf of the Guild.  And I just wanted to rise to concur with

6   Mr. Lotsoff's representations to the Court.  And I will say

7   that, you know, to the extent if we get into a situation where

8   we feel like we're moving outside the parameters of this

9   agreement, we're certainly willing to stop and discuss with Mr.

10  Lotsoff and the Court during the hearing.

11          But we don't anticipate the need to close the

12  courtroom.

13          THE COURT:  Very well.

14          MR. SIMON:  Thank you, Your Honor.

15          THE COURT:  Anyone else on that one issue?

16          MR. FRIEDLANDER:  Your Honor, Joel Friedlander from

17  Bouchard, Margules & Friedlander, on behalf of Dow Jones,

18  Bloomberg and AP.  And I just want to advise the Court that we

19  would intend to object to any effort to close the courtroom

20  during today's proceedings.

21          THE COURT:  I understand.  Thank you.  Anyone else

22  care to be heard?

23          Okay.  Funny how this generated more interest than

24  the Cubs sale.  You never know.  All right.  I have some

25  preliminary thoughts I would like to share with the parties,

Colloquy                                    Page 7

1    before we begin.

2           Including specifically how to address the proposed

3    expert testimony.  But let me ask this, have any of the issues,

4    either with respect to the experts, or otherwise, been narrowed

5    from what the papers reflect?  Okay.  I'll take that as a no.

6           MR. SIMON:  Your Honor, Chris Simon, on behalf of the

7    Guild.  I thought our report was pretty narrow.  So -- but we

8    haven't really discussed it.

9           THE COURT:  I don't know, except for that little

10   thing that I had yesterday morning.  I spent pretty much all

11   day yesterday looking at these papers.  They didn't look so

12   narrow to me, but I appreciate your --

13          MR. SIMON:  I'm sorry, Your Honor.  I didn't mean to

14   make light of that

15          THE COURT:  -- comment.

16          MR. SIMON:  With respect to the areas of disagreement

17   regarding the motions in limine, I don't believe there's been

18   any narrowing of those areas of disagreement.

19          THE COURT:  Okay.  Thank you.  First, let me ask, is

20   there agreement that we should incorporate into this record the

21   hearing record from May 12th?

22          MR. SIMON:  We would be fine with that, Your Honor.

23          MR. LOTSOFF:  Your Honor, I have no objection.

24          THE COURT:  Okay.  Then I will do that.

25          MR. SIMON:  I would like to say, for the record, I

Colloquy                                    Page 8

1    was not present for that hearing.  But --

2              THE COURT:  Well we're glad to have you today.

3              MR. SIMON:  Thank you, Your Honor.

4              THE COURT:  All right.  Let me first address then,

5    the dueling exclusion motions.  Both parties propose what are

6    in essence hybrid witnesses, both of whom, I understand from

7    the submissions, intend to testify about both facts and to

8    express expert views.

9              I will permit the use of each witness.  With respect

10   to Mercer, subject to making the appropriate foundation when

11   Mr. Dempsey takes the stand, and making the appropriate

12   foundation, I will permit him to testify as a compensation

13   expert, subject to whatever voir dire or cross-examination

14   would otherwise be appropriate.

15             With respect to Mr. Phillips, he's not, according to

16   the Guild submission, being offered as a compensation expert,

17   but as a certified public accountant and forensic accountant.

18   And despite the colorful description of Mr. Phillips by the

19   debtor, as being just a personification of a demonstrative

20   exhibit, I have at least preliminarily concluded that, based

21   upon the written submissions, his testimony, within his area of

22   expertise, and not as a compensation expert, is likely to be

23   helpful to the Court.

24             And, frankly, my supposition is, although the parties

25   can correct me if I'm wrong, that much of what is supplied in

1   the way of argument, and asserted fact in the Guild

2   submissions, I'm guessing came in large measure from Mr.

3   Phillips' work.

4           Of course, his testimony will also be subject to

5   whatever voir dire the debtor would like to conduct, cross-

6   examination, and evidentiary objections, if he should happen to

7   stray from his area of expertise.

8           And at the end of the evidentiary hearing, if it's

9   appropriate, I will consider respective motions to strike, once

10   we're all said and done here.

11          Are there any questions about that, so far?

12          MR. SIMON:  I have none, Your Honor.

13          MR. LOTSOFF:  None, Your Honor.  Thank you.

14          THE COURT:  Okay.  And I will say, the submissions in

15   connection with those motions, were very helpful.  Not just in

16   addressing the Daubert issues per se, but also in consideration

17   of the underlying requests for relief that the debtor has made

18   here.

19          So I appreciate the parties' efforts in that respect.

20   And I apologize for the stealing away of your opportunity to

21   argue them today.  But the submissions were very complete and

22   extensive.

23          Let me ask also the U.S. Trustee whether she presses

24   all of her earlier objections?  By that I mean, is there still

25   a substantive objection to the relief requested, or is the U.S.

1    Trustee, the point where it's the debtor -- will put the debtor

2    to its proofs type of position?  Mr. McMahon.

3           MR. MCMAHON:  Your Honor, good morning.  Joseph

4    McMahon, for the acting United States Trustee.  The

5    informational issues raised in that response have been

6    addressed to our satisfaction.

7           Your Honor is correct, we do reserve the right to

8    take a position on matters at the close of the evidence.

9           THE COURT:  All right.  Thank you.

10          MR. MCMAHON:   Thank you.

11          THE COURT:  Let me ask, too, for the record, the --

12   with respect to the objections that appear on the agenda, other

13   than the U.S. Trustee, who's just explained the nature of her

14   present objection, and the Washington/Baltimore Newspaper

15   Guild, who else is present to press objections or joinder's to

16   objections, if anyone?

17          I hear no response.  Okay.  Those will be the two

18   objectors then, for today's purposes.  I'd also like to share

19   with the parties some preliminary views and just pose a

20   question or two with respect to the relief that's been

21   requested today, so that the parties can direct their arguments

22   and evidentiary presentations accordingly.

23          And, again, I express these preliminary views for

24   that purpose and have not made final legal decisions with

25   respect to these issues.

1       First, with respect to request for payment of the

2   remaining participants in the 2008 plan, which is being sought

3   today.  Let me ask, is there still objection to that -- to

4   those payments?

5       MR. SIMON:  Your Honor, I was double checking, but we

6   -- Chris Simon, on behalf of the Guild -- we do not have any

7   objection to the 2008 MIP component.

8       THE COURT:  Okay.  How about the U.S. Trustee?

9       MR. MCMAHON:  Your Honor, Joseph McMahon, again, for

10  the record.  We are not objecting to 2008 payments.  Our

11  response is focused on the 2009 payments.

12      THE COURT:  Okay.  All right.  So there's some

13  agreement.  With respect to the 2009 plan, there are three

14  components.  The issue for the first component, the MIP

15  component from a legal standards standpoint is whether it's a

16  363 type of undertaking by the debtor, or whether it should be

17  subject to 503(c) scrutiny.

18      Debtor indicates, either way it can meet the burdens

19  based upon -- well and issue with respect to whether it's

20  363(c) is, while the overall framework may be similar to what's

21  gone on in the past, have the alterations that have been made

22  to it move it out of the ordinary course?

23      With respect to the TMIP and the KOB components of

24  the plan, it's pretty clear to me that those are not 363

25  issues, but fall within 503(c) scrutiny.  And I'd like the

1    parties to direct themselves to that accordingly, or tell me

2    why they disagree.

3            I have just some overall thoughts I'd like to

4    express, before we begin with the evidentiary record.  And, by

5    the way, I think the parties knew I was going to take a break

6    around midday.  I do have an internal meeting.

7            So my intention is to break around 12:10, at least

8    until 2.  If we're not done by then, and I suppose we may not

9    be, we'll probably just go straight through until that time.

10   All right.

11           Some overall thoughts.  I haven't -- and I've said

12   this a number of times in this context in various cases.  I

13   haven't had a opportunity to write yet on what I think about

14   how these requests for relief ought to be approached.

15           There is some building body of case law on it,

16   including some here in this District.  But I have a question

17   that just -- I just haven't found an adequate answer to yet.

18   And maybe the parties will end up addressing this as part of

19   their presentation.

20           In a troubled industry, as this one is, the argument

21   could be made that no bonuses should be paid, or certainly not

22   at this magnitude, because, well, there's noplace for

23   executives or managers to go.

24           Nobody's expanding.  On the other hand, an argument

25   could be made, that especially in a troubled industry, with

1       companies not doing well, there's companies that would be

2       looking to upgrade their capabilities in the executive and

3       managerial ranks to improve their business.

4              That may weigh in favor of making sure those who are

5       in place stayed there.  Here, the debtors' submissions say that

6       the company is performing well, even under these distressed

7       circumstances, in relation to its competitors.

8              If this is true, why jeopardize the solidity of the

9       management team here?  That's a question I'd like to have

10      answered.

11             I'll say one more thing, directed largely to the

12      Guild, but to the debtor as well.  The debtor in its papers has

13      asserted that the Guild represents only 1.8 of the debtors

14      employees.  Now, make no mistake, numbers do matter.  Here, as

15      I understand it, all of the major constituencies support this

16      heavily negotiated, multi-tiered package.

17             A factor I think which the Court legitimately can and

18      should take into consideration in determining whether to grant

19      this relief.  But, on the other hand, the Guild here has made

20      what appears to be, what I considered principled objections,

21      which will be decided on their merits.  Something which I think

22      is entirely appropriate in this forum.

23             All right.  Now with that having been said, let me

24      turn to the debtor, who's the movant here, and just confirm

25      what our roadmap is for today with respect to evidentiary

Colloquy                          Page 14

1    presentations.

2         MR. LOTSOFF:  Thank you, Your Honor.  Jonathan

3    Lotsoff on behalf of the debtors.  We anticipate calling two

4    witnesses.  Chandler Bigelow, the company's chief financial

5    officer, from whom you heard at the May hearing.  Followed by

6    Mr. Dempsey, of Mercer.

7         THE COURT:  Okay.  And documentary evidence?

8         MR. LOTSOFF:  We have a binder with 5 exhibits that

9    we anticipate using in our direct case.  Obviously, we'll see

10   if the need arises to use additional exhibits.  What I thought

11   would be helpful is, if we, prior to even putting on Mr.

12   Bigelow, circulated these binders, so that we could all just

13   flip through and not have to have someone walk through the

14   courtroom 5 times, if that would be acceptable to the Court?

15        THE COURT:  Yes.  And do you have a copy for my law

16   clerk, too?

17        MR. LOTSOFF:  We do.

18        THE COURT:  All right.  And while that's happening,

19   let me as the Guild the same question.  I'm sorry, and how much

20   time do you expect on direct, each examination to take?

21        MR. LOTSOFF:  Mr. Bigelow could be 45 minutes to an

22   hour.  Mr. Dempsey 30 minutes, 40 minutes, perhaps.

23        THE COURT:  All right.  Thank you.

24        MR. SIMON:  Thank you, Your Honor.  Chris Simon, on

25   behalf of the Guild.  We have one witness to call, that is Mr.

Colloquy                              Page 15

1   Phillips.  We also have exhibits to submit to the Court, and we

2   have prepared the exhibits in three notebooks, each with tabs

3   identifying the respective documents.

4         There's an index in the front of the binders.  And I

5   think perhaps Mr. Lotsoff and I, we discussed briefly before

6   the hearing how best to handle this.  I think for ease of

7   reference for the witnesses, the binders make sense.  I think

8   there are a number of exhibits that probably could come into

9   evidence without contest, because they're referenced or relied

10  upon by the debtors in their submissions.

11        So I think, at some point, it might be more efficient

12  for the Court, if we agree to put those exhibits into evidence

13  without having a witness go through each one and identify them,

14  the particular point.

15        THE COURT:  Will we have a need to reach the use of

16  those exhibits during the cross-examinations of either Messrs.

17  Bigelow or Dempsey?

18        MR. SIMON:  There will be documents in the exhibits

19  that will be necessary for their review, that is true.

20        THE COURT:  All right.  Then let's do this.  Why

21  don't you, as the debtor did, distribute the binders now.  And

22  at the lunch break, take a opportunity to see whether some

23  agreement can be reached about what can be admitted and what

24  not.

25        And under what conditions.

1        MR. SIMON:  That's fair, Your Honor.  I appreciate

2  it.  We will do that.

3        THE COURT:  And how long would you anticipate Mr.

4  Phillips' direct would be?

5        MR. SIMON:  I would imagine Mr. Phillips' direct

6  would take 20, 30 minutes.

7        THE COURT:  Okay.  Anything else, before we begin?

8  Let's start.

9        MR. LOTSOFF:  Thank you.

10        MR. SIMON:  Your Honor, Chris Simon for the Guild,

11  one more time.  I did deliver the binders to the clerk for the

12  Court.  I just want to make sure you have access to our

13  binders, when the time comes.

14        THE COURT:  I don't know where they are --

15        MR. SIMON:  We placed three on the witness box

16  already, and --

17        THE COURT:  How many sets did you delivered to the

18  Court?

19        MR. SIMON:  Just one.  And I have loose copies, as

20  well, so I'm happy to -- I just want to make sure we

21  accommodate the Court.

22        THE COURT:  I do, too.  I'd like my law clerk to have

23  a set.

24        MR. SIMON:  I'm doing everything I can, Your Honor.

25        THE COURT:  All right.  Thank you.  All right.

Bigelow - Direct                           Page 17

1              MR. LOTSOFF:  With your permission, Your Honor, we'd

2      call our first witness.

3              THE COURT:  Very well.

4              MR. LOTSOFF:  The debtors call Chandler Bigelow.

5              THE CLERK:  Please state your name and spell your

6      last name for the Court.

7              MR. BIGELOW:  Chandler Bigelow, B-I-G-E-L-O-W.

8            CHANDLER BIGELOW, DEBTOR'S WITNESS, SWORN

9              THE CLERK:  Be seated.

10                         DIRECT EXAMINATION

11     BY MR. LOTSOFF:

12     Q    Good morning, Mr. Bigelow.

13     A    Good morning.

14     Q    Could you tell us what position you currently hold with

15     the company?

16     A    I'm Chief Financial Officer of Tribune Company.

17     Q    And how long have you been in that position?

18     A    About a year and a half.

19     Q    And could you briefly describe your duties and

20     responsibilities in that position, including your duties, if

21     any, with respect to the debtors' restructuring?

22     A    I am responsible for the corporate finance activities of

23     the company and have the treasury department, financial

24     reporting department, tax department reporting up through me.

25              And have been part of our team to focus on the

1    restructuring, interacting with creditor constituencies, their

2    advisors, as well.

3    Q   And prior to being the company's Chief Financial Officer,

4    what position did you hold?

5    A   I was treasurer of the company for a number of years.  And

6    prior to that, assistant treasurer of the company.  And worked

7    in the treasury department before that.  I started working at

8    the company in 1998.

9    Q   Can you describe the debtors' primary business segments?

10   A   Yes, we have two primary business segments.  A publishing

11   group and a broadcasting group.  The publishing group is home

12   to our 8 newspapers, as well as their website's, as well as a

13   business called Tribune Media Services.

14        On the broadcasting side of the house, we own 23

15   television stations in large markets across the country.  We

16   own a radio station in Chicago.  We own WGN America, which is a

17   Superstation cable channel that's viewed in 72 million homes

18   across the country.

19        In addition, we have support groups that are home to

20   shared services.  We have a corporate group, and then each of

21   the publishing group and the broadcasting group have their own

22   smaller corporate offices.

23        And, Mr. Bigelow, are you familiar with the motion

24   that we're here on today, the motion to approve the debtors'

25   proposed 2009 management incentive plan?

1    A    I am.

2    Q    And for purposes of terminology, as the Court indicated

3    earlier, are you familiar that that plan has three components?

4    A    Yes.

5    Q    And just so we're all consistent with our terminology,

6    when I refer to the -- what we've argued as the historical MIP

7    component of that overarching plan, I'll refer to that as the

8    MIP.  Is that fair?

9    A    That's fair.

10   Q    And when I refer to the transition MIP or TMIP, I'll use

11   that terminology?

12   A    Okay.

13   Q    And then the key operator's bonus, I would call that that

14   or the KOB.

15   A    Okay.

16   Q    Okay.  Does the company's CEO participate in any of these

17   plans?

18   A    No.  He does not.

19   Q    Or any other incentive plans of the company?

20   A    He does not.  He has a de minimis salary.

21   Q    And has the compensation committee of the company's board

22   of directors approved the proposed plan?

23   A    They have.

24   Q    And we'll talk more about this.  But as we heard at the

25   last hearing on August 11th, is it your understanding that the

1    Official Committee of Unsecured Creditors and the Steering

2    Committee of the debtors' senior lenders support the proposed

3    plan that's before the Court today?

4    A    They do.

5    Q    Can you describe the debtors' historical practices, in

6    terms of how management compensation has been structured

7    historically?

8    A    Yes.  As I talked about in May, when we were discussing

9    the 2008 MIP, the company's overall compensation philosophy has

10   been to set salaries at a relatively low level, relative to

11   market, and has placed an emphasis on cash bonuses, as well as

12   stock-based compensation historically.

13   Q    And has the annual cash compensation component of

14   management compensation typically been awarded through the

15   historical MIP program?

16   A    Yes, that's correct.  The Tribune incentive compensation

17   plan, which was put into effect in 1997, has been the framework

18   for incentive compensation at the company since that time.

19   Q    And you should have an exhibit binder in front of you, do

20   you have that?

21   A    I do not.

22   Q    You will, in about 5 seconds.  Mr. Gold is very fast.

23        If you could direct your attention to tab number 5.

24   A    Yes.  This is the Tribune Company incentive compensation

25   plan that was put in place in 1997.

Bigelow - Direct                              Page 21

1      MR. LOTSOFF:  And for the record, we've marked that

2    Tribune Exhibit Number 5.

3    BY MR. LOTSOFF:

4    Q   Does that -- is this the plan that contains the MIP?

5    A   It does.  The annual management incentive plan, that's

6    right.

7           MR. LOTSOFF:  Your Honor, we move for admission of

8    exhibit number 5.

9           THE COURT:  Is there any objection?

10          MR. SIMON:  No objection, Your Honor.

11          THE COURT:  D-5 is admitted without objection.

12   BY MR. LOTSOFF:

13   Q   And has the company paid out MIP awards historically since

14   1997 on an annual basis?

15   A   It has.

16   Q   Do management personnel currently have any meaningful

17   equity, or other long term compensation opportunities for 2009?

18   A   No.  I think it's fair to say that the equity of the

19   company has little to no value.

20   Q   Historically, Mr. Bigelow, what group of employees has

21   participated in the MIP?

22   A   The primary criteria would be non sales employees, whose

23   annual bonus target was 15 percent or higher of their salary.

24   Q   And is that the same population that would participate in

25   the current proposed MIP component?

Bigelow - Direct                    Page 22

1   A    That's correct.

2   Q    And historically, what has been the performance metric for

3   the MIP?

4   A    The historic metric has been to consolidate operating cash

5   flow of the company.  In addition, on the broadcasting side,

6   we've used market share, local advertising market share metrics

7   to determine those bonuses.

8        And in the past, we also reflected the income that

9   the company receives from our equity investments.

10  Q    And, historically, how has the operating cash flow target

11  that's been used in the MIP program, historically how has that

12  been determined?  Is it determined specifically for the MIP?

13  A    No.  The MIP utilizes the consolidated operating cash flow

14  budget that's approved by the board each year.  And that

15  process begins in the, generally in the fourth quarter of each

16  year as our business units, our newspapers, our TV stations,

17  prepare their annual bottoms up budget.

18       Those budgets are then consolidated by the publishing

19  and broadcasting group offices, as well as the corporate

20  office, and then those -- that consolidated budget is presented

21  to the board in the first quarter of each year and is approved

22  by the board.

23       And then it's that figure, or metric, if you will,

24  that's utilized for the framework of the MIP.

25  Q    So the planned operating cash flow figure that's developed

1    for the operating plan is then used as the target for the MIP

2    for that year?

3    A    That's right.

4    Q    And historically, if the company hits its planned cash

5    flow target, what would be paid out under the MIP, in terms of

6    a percentage of the target pool?

7    A    Historically, that would be a hundred percent.

8    Q    And can you tell us, Mr. Bigelow, why is the company

9    seeking approval to implement the 2009 management incentive

10   plan?

11   A    Well we are looking to incentivize our key managers to

12   battle all of the intense challenges that, unfortunately, our

13   local media businesses are facing.

14        There is a not only an economic crisis in the

15   country, but there is an acute advertising crisis in the

16   country.  And that is effecting large metropolitan newspapers

17   and television broadcast stations.

18        So we're looking to have a plan to incentivize our

19   key managers to, you know, continue battling against those

20   pressures.  In addition, we're looking to deliver a

21   compensation plan to these key managers that's market and

22   reasonable.

23   Q    And you touched upon the current environment that the

24   company is facing right now.  And I believe you testified about

25   the 2008 environment in which the company was operating, when

Bigelow - Direct                    Page 24

1    you testified on May 12th.

2         Could you tell us a bit more about the current

3    environment facing the company, and media companies generally?

4    A    It's much worse this year than last year.  The current

5    trends for our company, for example, through August, print or

6    publishing advertising revenue's down 29 percent year-to-date.

7    That is far worse than where we were trending last year.

8         Our broadcasting revenue is down approximately 23

9    percent year-to-date.  Again, much worse than last year.  There

10   is just intense pressure, from a revenue standpoint, on the

11   business, which is a function of the broader economic crisis.

12        We do have economically sensitive businesses

13   advertising, as very economically sensitive, economy sensitive.

14   So, you know, the pressure's in '09 have just gotten worse than

15   in '08.

16        And, you know, as a result of those revenue declines,

17   and the fact that we have an inherently fixed cost base

18   business, that's really put a lot of pressure on cash flow.

19   Q    And can you explain why having a fixed cost business puts

20   pressure on cash flow?

21   A    Yeah.  The -- if you take a step back, the newspaper

22   business, especially in the largest metropolitan markets, is an

23   incredibly ambitious business.  And the mere fact that every

24   evening we look to distribute hundreds of thousands of

25   newspapers across, you know, in the case of the Los Angeles

1   Times across the geography of the size of Ohio, you know, that

2   in and of itself is going to just have naturally large fixed

3   costs.  And when you have a business like that, it's incredibly

4   sensitive to changes in your revenue.  And what we've

5   endeavored to do over the last year or so with all of the

6   initiatives we're implementing, is to try and convert as much

7   of that fixed cost into variable costs.

8          So that, when you're confronted with such dramatic

9   declines in revenue, you at least can see some benefits with

10  expense declining, but just having such a fixed cost base puts

11  such tremendous pressure on your cash flow, as your revenue

12  declines.

13         For example in 2008, we had 2 billion dollars of

14  publishing advertising revenue.  So each one percent change in

15  publishing advertising revenue, across the company, translates

16  to a decline of 20 million dollars.  Historically speaking, and

17  -- and this is not just a Tribune fact, you know, across the

18  industry, you know, you would expect 75 to 80, 85 percent of

19  that decline to drop right to the bottom line, because there's

20  so much fixed cost imbedded in the business.

21         So when you have one percent decline translate into a

22  20 million dollar decline in revenue, which, you know,

23  historically speaking could result in 15, 16, 17 million

24  dollars of cash flow decline, and we're off nearly 30 percent

25  this year, you start doing the math and it produces a

Bigelow - Direct                    Page 26

1    tremendous amount of pressure on the underlying profitability

2    of the business.

3         Now we can get into this later, but the -- one of the

4    over -- under -- you know, overarching strategies is to try and

5    take as much of that fixed cost and turn it into variable

6    costs, try and become far more efficient in the way you

7    assemble the newspaper, layout the newspaper -- interact with

8    customers, so that you do have some relief in that pressure.

9         But, you know, just operating this kind of business

10   in this kind of revenue environment, is very difficult.

11   Q   But can you tell me a little bit more, tell the Court a

12   little bit more about the initiatives that the company is

13   undertaking to battle these revenue and other industry trends

14   and pressures?

15   A   Sure.  So, you know, as I look at it, we have had two

16   strategic imperatives recently.  There is the, how do we

17   survive this crisis, because at the end of the day these are

18   some very important assets that nobody wants to have to

19   shutdown, because of, you know, revenue -- you know, revenue

20   trends.

21        So you've got the survival mode which we've been in,

22   but you've also, you know, need to be thinking about the future

23   and trying to transform the business.  And so, you know, we've

24   tried to design as you know our initiatives to try and take on

25   both of those trends.

1      You know, for example, technology is so important for

2  us to leverage in a more thoughtful and disciplined manner.

3  And over the last 12 months we have a new chief technology

4  officer, who has taken all the technology resources that were

5  disparate, historically, across all of our business units,

6  brought them into one centralized group, and tried to

7  implement, you know much, more efficient technology with things

8  like how we layout the paper each day.

9      How we inventory -- you know, and add inventory

10  management system.  You know, very importantly creating you

11  know cloud computing content sharing systems, so that our 8

12  newspapers and our 23 TV stations, all of our website's, can

13  begin to share information and content in a far more efficient

14  manner.

15      Things like advertising self service.  Instead of

16  having us do some of the work with respect to creating the

17  advertisement, begin, you know, developing, you know,

18  developing systems so that advertisers can submit their own

19  ads, and then link it to the ad inventory system so that fewer

20  and fewer people need to actually do the manual work to, you

21  know, take in an ad, lay it out, and then ultimately, you know,

22  get it manufactured.

23      So we've got a huge technology, you know, focus

24  across the company.  In addition, you know, we are in real time

25  trying to change the sales organization and the sales culture.

1           This has been a business, more so on the publishing

2    side than the broadcasting side, that has had, you know, for

3    lack of a better description, an order taking mentality.  We

4    need to be selling, we need to be creating solutions for our

5    advertisers that deliver results, and we are undergoing a

6    complete re-engineering of the sales culture around the

7    company, which, hopefully, will put us in a position as the

8    economy comes back, to begin to drive revenue.

9           In addition, we're spending a lot of time and making

10   a lot of investments in the interactive space.  Obviously, it's

11   a key to media's future, and we're developing new products and

12   services to do that.  On the television side, we have increased

13   the number -- we've doubled the number of local television news

14   hours across our 23 stations in the last 12 months gone -- you

15   know, literally doubled the number of hours that we're

16   producing news in all of our markets.  News is a really good

17   business for us on the TV side.  It also goes a long way to

18   developing, you know, solidifying the strength of our TV

19   stations in the markets delivering local news.

20          So that gives you a sense of the initiatives.  But

21   they're broad based and, you know, it's not just about cutting

22   costs for cutting -- for costs sake, it's really, how do you do

23   it thoughtfully, how do you mitigate the revenue?  At the same

24   time you're trying to -- you know, we're in the transition, at

25   the same time we're trying to transform the business, so you

1   can succeed in the future.

2   Q   Are these initiatives that you've described, are they

3   being implemented on any kind of accelerated basis?

4   A   Oh, yeah.  The -- listen, the conditions that we were

5   facing in the beginning of the year in some cases, you know,

6   caused us concern that some of our businesses might not make

7   it.

8           And so we have been in real time, you know,

9   accelerated mode to do everything we can to insure, you know,

10  ensure we survive this.

11  Q   And can you describe the demands that have been placed on

12  management at the company, as a result of having to do all of

13  this work in an accelerated time frame, under these conditions.

14  A   There's a lot of pressure.  Like I said we operate really

15  important businesses, and everybody recognizes that.  Everyone

16  in this room recognizes that.  And so there is a lot of

17  pressure.  And it's a lot of hard work, it's, obviously, a lot

18  of long hours.

19          You know, unfortunately we have less resources to do

20  it with.  So there does -- it does produce a lot of demands.

21  Q   And does senior management shoulder any additional

22  burdens, as a result of the company's restructuring, in

23  addition to being responsible for these operational

24  initiatives?

25  A   Yeah, that's absolutely fair.  This process is, you know,

1    requires a lot of time, and we're trying to do it right.  We, I

2    believe, have been very transparent with both Creditor

3    Committees and worked very closely with them.

4         It's important for us to, you know, have a prompt

5    emergence.  There are costs to, you know, being in this

6    position.  It -- not only do you have the expenses that are

7    related to the bankruptcy, which were running about 7 or 8

8    million dollars a month, but you also have -- you sometimes

9    have issues when you want to do a deal with a third party.  Or

10   you think there's an interesting transaction that you might be

11   able to do with a third party.

12        Sometimes those third parties, like Dow Jones earlier

13   in the year, want to come to Court and make sure that the Court

14   blesses the transaction, so that, you know, they're insured

15   that we'll deliver on the agreement.  And so there -- I think

16   that, not only do you have the actual economic costs, but you

17   also have, I think, the less, you know, quantifiable cost that

18   it's harder for us to do things with third parties.

19        In addition, I think you just have a general, you

20   know, tension with employees in advertisers about the

21   bankruptcy.

22   Q   Mr. Bigelow, what would the consequences be for the

23   initiatives that you've described and for the debtors

24   transformative efforts, if management does not have proper

25   incentives to aggressively pursue these goals and objectives?

1    A    I would say that they're -- there would be concrete

2    damages to the initiatives.  I mean, the initiatives are very

3    wide.  We're literally trying to tackle every single business

4    process at the company.

5         They're real time.  Not only do you have to, you

6    know, be creative to think of solutions, but you then need to

7    figure out how to implement them.  And you then need to figure

8    out how to manage them, and you then need to figure out how to

9    tweak them, so that, you know, you can improve upon them.

10        And it requires a tremendous amount of effort.  So,

11   you know, I would think there would certainly be, you know,

12   damage to the implementation of all these initiatives.

13   Q    And have the debtors been realizing any benefits to date

14   from these initiatives and their efforts?

15   A    I believe we have.  I believe that our profitability year-

16   to-date is noteworthy.  And I believe that we have -- we have

17   so far survived this crisis.

18        We've done more than survive.  And I believe that we

19   do -- we are showing tangible benefits to these initiatives.

20   But our work is nowhere near done.  Let's be clear.

21   Advertising revenue on the publishing side is still down 29

22   percent year-to-date.

23        Broadcasting revenue is still down 23 percent year-

24   to-date.  we need to keep fighting to make sure that we can

25   continue to mitigate those trends.  But I do think what we've

                    Bigelow - Direct                 Page 32

1    done so far is distinguished.

2    Q    And of the debtors' 8 newspapers, how many are cash flow

3    positive?

4    A    This year, all of them.

5    Q    and can you also describe how the debtors' television

6    stations are faring?

7    A    Year-to-date all but one of our markets -- or, excuse me,

8    two of our markets is profitable.

9    Q    And you have -- that would be 21 markets, then, that are

10   profitable?

11   A    That's correct.

12   Q    How does the debtors' performance compare to that of other

13   media companies?

14   A    I believe our profitability at the newspaper -- within the

15   newspaper segment of our business, especially in the large

16   metropolitan markets that we serve, on a relative basis, is

17   noteworthy and better than other large metropolitan newspapers

18   in America.

19          And year-to-date our 23 TV stations, as a group, are

20   building off of last year's gains in market share and

21   continuing that this year.

22   Q    And do the benefits that you've described, the benefits of

23   these initiatives, do they accrue only to the debtors?

24   A    Well they accrue to anybody connected with the debtors.

25   Our employees, our advertisers, our vendors.  Obviously, our

1    creditor constituencies, and I'd go so far as saying as the

2    communities that, you know, our assets serve.

3    Q    At the beginning of this hearing, the Court posed a

4    question and two potential arguments.  One argument, and

5    forgive me if I paraphrase, Your Honor, but in a troubled

6    industry the argument could be made that no bonuses should be

7    paid under a plan, because executives and managers have noplace

8    to go.

9         But a contrary argument could be made that it's

10   precisely in a troubled environment where you need strong

11   incentives, particularly when a company like Tribune is doing

12   well, to make sure that you don't derail that.  Which of those

13   two arguments do you agree with, if either, and why?

14   A    Well I think that one of the reasons why we are

15   distinguishing ourselves, and the use of the term well is all

16   relative.  Yes, we are profitable, I think we are doing better

17   than others in our businesses.  In fact, I think we're doing

18   demonstratively better.

19        But we still have intense pressure to overcome.  But

20   I believe that, as somebody who's been at the company 11 years,

21   that one of the keys that we -- one of the keys to implementing

22   all of these initiatives so quickly in real time, and

23   creatively, is the fact that we do have new leadership within

24   the organization.

25        And I think that that is very helpful, as you start

Bigelow - Direct                          Page 34

1    considering ways to think differently about the business.  And

2    so I would point to the fact that we have been able to attract

3    very creative, experienced new talent at the most senior

4    levels, to really be the architects of many of these

5    initiatives.

6              I think it's imperative that we keep incentivizing

7    and motivating this team, because like I said, we are not out

8    of the woods yet, and we need to really transform this company

9    so that it can grow in the future.

10             Obviously, cash flow is down a lot.  It is a function

11   of the fact that revenue has declined so very much.  I believe

12   we've distinguished ourselves with respect to trying to

13   mitigate as much of those declines as possible, and I think we

14   just need to keep doing it.

15             I view these plans as almost -- as an investment in

16   the initiatives themselves, an investment in the

17   transformation.  I believe that that's why we have the full

18   support of both the official Committee and the Steering

19   Committee.  These are two Committees, that have done months of

20   diligence, and I believe they've come to the same conclusion,

21   that these are thoughtful investments in the company for the

22   future.

23   Q   And are you aware of whether the company, at the direction

24   of its board compensation committee, retained Mercer as an

25   independent compensation consulting professional to assist the

Bigelow - Direct                    Page 35

1    company in determining whether the proposed plan is, as you had

2    testified earlier, market based?

3    A    `Yes, I'm aware of that.

4    Q    And, as you may have heard, we'll call a witness from

5    Mercer, but in general, and in supporting and proposing this

6    plan that we're here on today, what is your understanding of

7    Mercer's conclusions?

8    A    That the plans before the Court are reasonable and market,

9    and common in these types of bankruptcy situations.

10   Q    What is the performance metric for the three proposed

11   components of the 2009 management incentive plan?

12   A    It's consolidated operating cash flow.

13   Q    And is that the same metric as the principal metric under

14   the historical MIP plan?

15   A    It is the same metric as the principal metric, although in

16   the past, we would have added the income we received from our

17   equity investments.

18        Such as TV Food Network, Career Builder, Classified

19   Ventures.  In 2009 it is just the consolidated operating cash

20   flow.

21   Q    So for 2009, why are you not adding in equity income from

22   investments in other companies?

23   A    We are looking to really focus the metric on the true --

24   on the operating cash flow the operating businesses, which at

25   the end of the day are the -- our managers are principally

1    responsible for.  And the incentive plan is designed to just

2    drive that operating cash flow.

3    Q   And what is the target level of cash flow, the plan level

4    of it's used as a basis for the current plan?

5    A   So for the plan level, it's 212 million dollars of

6    operating cash flow.

7    Q   And was that target developed specifically for these

8    plans?

9    A   No.  As I mentioned, that is the 2009 operating plan

10   consolidated cash flow level.

11   Q   And so that was developed as part of the operating plan

12   for the year 2009?

13   A   That's correct.

14   Q   The debtors have, in their pleadings, referred to the fact

15   that cash flow for 2009 is lower than cash flow for prior

16   years.  Do you have an explanation for that?

17   A   Well I think that, again, it would go back to my comments

18   about how much pressure has been on revenue.  This year, in

19   2009, I expect our revenue to decline 800 million dollars.  And

20   I think that we'll be able to mitigate more than half of that

21   decline through expense declines.

22        But when you're confronted by such revenue pressure,

23   and, again, in a business that's inherently fixed costs, you

24   will have a decline in your operating cash flow.

25   Q   And what is the debtors' approximate cash flow through

1    August, 2009, if you know?

2    A    It's approximately 255 million.

3    Q    And do you have a present estimate, recognizing that

4    things can change, but as to where you may end up at the end of

5    the year?

6    A    Again, it is very revenue dependent, because of how

7    sensitive operating cash flow is to changes in revenue.  But

8    should our revenue forecasts be met in the remainder of the

9    year, which, by the way, they basically have been through

10   August, our out performance, if you will, relative to our plan

11   year to date, is almost entirely on the expense side.

12          So if our revenue forecasts continue to be accurate,

13   I would expect the company to be able to generate between 350

14   to 400 million dollars of operating cash flow this year.  It

15   could be more, but, again, it will be very sensitive to revenue

16   for the remainder of the year.

17   Q    Mr. Bigelow, the Guild has argued that the debtors set

18   their 212 million dollar cash flow target too low, and that

19   that target, the essence of their argument is that it's not a

20   bona fide target, given that the debtors have now exceeded that

21   target as they have.

22          Do you agree with that contention?

23   A    I don't agree with that, and I can provide a little

24   background.  Our operating plan was developed in what I think

25   most people would consider perhaps the worst period in U.S.

1    advertising history.

2         We had a very difficult fourth quarter last year.

3    And, unfortunately, each week, as we went through January and

4    February, revenue trends got even worse.  To the point that, in

5    February, there were some weeks when publish ad revenue was off

6    more than 30 percent, and broadcasting revenue was off 30

7    percent, as well.

8         We had both sides of the house feeling acute revenue

9    pressure, and it was getting worse each and every week.  In the

10   first 60 days of the year, operating cash flow of the -- at the

11   whole company, consolidated operating cash flow was of

12   approximately 65 to 70 percent.

13        I believe that the 212 million dollar level for '09,

14   as planned, calls for approximately a 72 percent decline.  We

15   had concern at the beginning of the year that some of our

16   businesses might not survive.  The Los Angeles Times' EBITDA

17   operating cash flow margin, for example, was razor thin, it was

18   2 percent in the month of February.

19        We had large metropolitan newspapers within our

20   organization that had less than a million dollars of operating

21   cash flow in the month of February.  This was a period of time

22   that was very uncertain, we had very limited visibility.  We

23   also had just filed for bankruptcy.

24        We didn't yet know the full impact that that might

25   have.  And so I will tell you that the 200, that the operating

1  plan was developed in good faith, with integrity.  It was

2  approved by the board.  And then I also point out that both

3  Committees, both of their financial advisors spent months

4  diligencing our operating plan.

5          And they are here today in full support of our

6  incentive plan, which is based on that operating plan.

7  Q    And I believe were you present at the August 11th hearing

8  when counsel for the Creditors Committee, Mr. LeMay, described

9  the official Committee's diligence as a deep dive?

10  A    Yes, I was.  And I can verify that it was.  It included

11  multiple management presentations in Chicago.  It included

12  multiple business unit site visits with the local management

13  teams of our largest newspapers, of our largest TV stations.

14          This was a three to four month process of intense

15  diligence, which not only included Mr. LeMay's clients, the

16  Official Creditors Committee, but also included the financial

17  advisors for the senior lender Steering Committee.

18  Q    And to be clear, is it your understanding that this deep

19  dive included not only a dive into the incentive plan that

20  we're here for today, but also the underlying operating plan

21  for 2009?

22  A    Absolutely.  Yes.

23  Q    And I believe you testified earlier, but correct me if I'm

24  wrong, that company's revenue projections have actually been

25  accurate for 2009?

1    A    Yes.  Year-to-date, our projections, our forecast included

2    in the operating plan for the newspaper business have been

3    right on, within less than 1 percent variance.   On the

4    broadcasting side, we have done slightly better, but it's very

5    close.

6    Q    And so why have the debtors managed to exceed their cash

7    flow target to date?

8    A    Well, as I said, it has been just the acceleration of

9    initiatives to manage our costs.  So we've outperformed, I

10   think, the 255 million dollar number, for example, is a little

11   more than a hundred million better then our original plan for

12   the first 8 months of the year.

13          And nearly all of that difference is coming from the

14   expense side.

15   Q    Did the compensation committee of the company's board of

16   directors also have a opportunity to diligence the incentive

17   plan, prior to granting its approval to the plan?

18   A    Yes.  Yes.  We have a compensation committee of three

19   independent directors, who have approved the plan.

20   Q    And you referred, I believe, to discussions with the

21   Creditors Committee and the Steering Committee regarding the

22   proposed plan.  Generally speaking, did the proposed plans

23   change in any respect as a result of those negotiations and

24   discussions?

25   A    Yes.  Again, at a high level, we've had a very

Bigelow - Direct                    Page 41

1   constructive, I'd say cooperative, dialogue with both

2   Committees.  There's been a healthy give and take with respect

3   to these plans.  Generally speaking, the payout's proposed have

4   come down.  The targets have come up.  And -- but it's been a

5   very constructive dialogue.

6           All along the way, Mercer's been helping us, as well.

7   Q   And can you tell us, as you understand it, why through

8   these negotiations you ended up with payout's coming down and

9   targets going up?

10  A   Generally speaking, they're in the environment that we are

11  doing better, and have been doing better versus our plan, and

12  so as a result of that there has been a healthy give and take

13  about the establishment of the incentive plans.

14          But at the end of the day, this has been a

15  cooperative pursuit, not only with the company, the Creditor

16  Committees, to establish a market based compensation plan for

17  our key managers.

18  Q   I'm going to ask you some questions about the MIP program.

19  And just so the record is clear, and so you're clear, Mr.

20  Bigelow, I'm referring now tot he historical MIP component of

21  the management incentive plan.

22  A   Okay.

23  Q   How many participants are there, approximately, in the

24  2009 MIP?

25  A   Approximately 720.

Bigelow - Direct                    Page 42

1   Q    And did you participate in preparing an exhibit reflecting

2   the proposed incentive award opportunities and performance

3   target levels under the 2009 MIP?

4   A    Yes.

5   Q    And if you could look at the binder that's in front of

6   you.  Directing your attention to the first page of exhibit 1.

7   Could you identify that document, please?

8   A    This is a summary of some of the key statistics for the

9   2009 MIP program, and I can quickly go through them.  There are

10  statistics for payout's, if we reach the plan, which is 212

11  million.  If we reach what we refer to as the stretch target,

12  which is 301 million, and if we reach what we refer to as the

13  maximum target, which is 424 million, at plan, it's a payout of

14  50 percent of target, which is 17.5 million dollars.

15          At stretch, again, which is at 301 million, which is

16  142 percent above the 212, it's a payout of a hundred percent,

17  or 35 million dollars.  And at maximum, should we hit that

18  level, which is 200 percent above our plan, there would be a

19  payout of 130 percent of target, which is approximately 45.6

20  million dollars.

21          And I believe you testified earlier that,

22  historically, if the company achieved its plan, the payout

23  under the MIP would be 100 percent of target.  Why for this

24  year is it 50 percent?

25  A    It's 50 percent to reflect the fact that operating cash

1   flow is a lot lower this year than in past years.  The company

2   had originally proposed a 75 percent level to reflect that, and

3   through our negotiations and discussions with the Creditors

4   Committees we landed at the 50 percent level.

5   Q    And, again, what level of performance is required to fund

6   a target pool of a hundred percent?

7   A    That would be the stretch goal, which is 301 million of

8   consolidated operating cash flow, or approximately 142 percent

9   above plan.

10  Q    And I see from your testimony in the chart that in order

11  to achieve a maximum payout you have to achieve 200 percent of

12  plan performance.  And for that you get a payout at 130 percent

13  of the target pool.  Historically, what level of performance,

14  relative to target, did the company have to achieve in order to

15  hit the maximum payout under the MIP?

16  A    Historically, a business unit would have to have achieved

17  about 120 percent above target to achieve maximum, which

18  historically would have been a 200 percent payout of target.

19  Q    As opposed to 130 --

20  A    130 percent.

21  Q    -- percent under this plan.

22  A    That's correct.

23  Q    And did you also participate in preparing an exhibit that

24  reflects how the proposed 2009 MIP compares in various respect

25  to prior years?

1    A    Yes.

2    Q    Could you look at tab 2?

3    A    Yes.

4    Q    Of your binder.

5    A    So tab 2, we have an exhibit that, as you said, compares

6    statistics for the 2006, 2007, 2008 and 2009 MIP.  It includes

7    participant counts, which have been declining.  Includes the

8    MIP -- the target pool, which, again, has declined.

9              And the payout's of each year, and the payout as a

10   percent of target.

11   Q    And can you describe, under the 2008 column, under total

12   payout's, you see there's a reference to a metric without the

13   top 10 and then with the top 10.  Can you just explain what

14   that means?

15   A    Yes.  Well the relevant number, based on this morning,

16   would be with the top 10.  We had previously shown the amount

17   under the '08 being paid with 13.275 million, without the top

18   10, which was approved earlier in the year by the Court.

19             If we have the payment for the top 10, that would

20   increase to 16.475 million, which would be a payout of 47

21   percent.

22   Q    And am I reading this correctly, that the participant

23   level for 2009 is equal to, or less than the past several

24   years?

25   A    That's correct.

1   Q    And that's also true of the target MIP pool at plan, or

2   stretch?

3   A    That's correct.

4   Q    And it looks like the payout is a percent of target for

5   plan is less than the historical payout's for at least 2006 and

6   2007?

7   A    Yes.

8   Q    And we all were here for the 2008 MIP, so we know the

9   unique circumstances relating to that --

10  A    Um --

11  Q    And I see there's a note at the bottom referring to the

12  median MIP award?

13  A    Yes.  That's for, I believe, 2009.

14  Q    And the --

15  A    It's 13,250, at plan.

16          MR. LOTSOFF:  Your Honor, I would move for admission

17  of Exhibit 2.

18          THE COURT:  Is there any objection?  I hear none.  D-

19  2 is admitted without objection.

20  BY MR. LOTSOFF:

21  Q    And, again, we'll cover this with a Mercer witness, but

22  I'm asking for your understanding.  Do you have an

23  understanding as to how the management teams proposed

24  compensation would relate to the market, market levels, if only

25  the historical MIP component of the proposed plan were

1   approved, and not the TMIP and the KOB, as well?

2   A   It's my understanding that it would be below market.

3   Q   With respect to the transition MIP, the TMIP, what is the

4   purpose of that component of the proposed plan?

5   A   The purpose of the TMIP is to incentivize and motivate key

6   managers to drive operating cash flow.  The principal metric is

7   operating cash flow.  It is a plan for 21 employees, who not

8   only have, you know, the -- who not only have a big impact on

9   just the overall strategies of the company, but also play a

10  significant role in the restructuring.

11       And so it's designed to ensure that incentives are in

12  place for that group.  And, ultimately, it is in the context of

13  this entire plan, you know, it's designed to bring a total

14  compensation for those individuals to market.

15  Q   The Guild has argued in its submissions to the Court, in

16  essence, that the debtors should just have one plan, at most,

17  the MIP, and that the TMIP, and for that matter, the KOB are

18  just additional gives, if you will, to management.  Do you

19  agree with that contention?

20  A   No.  These plans are designed to incentivize and drive

21  cash flow.  And to, again, this entire process, our work with

22  the Committees, our work with Mercer has been, you know, our

23  pursuit of bringing compensation to market.

24  Q   And does the TMIP also provide for a discretionary pool

25  for any other employees?

1    A    It does.  There's a pool, a small pool for up to 50

2    employees who are handling the administrative aspects of the

3    bankruptcy case.  And that pool has been set aside for that

4    group.

5    Q    And how were the individual TMIP award opportunities

6    determined?

7    A    Again, as I've testified, it's -- it has been a very

8    healthy give and take with our Creditor Committees, their

9    financial advisors, we've had Mercer along our side every step

10   of the way.

11        And so, you know, the levels by individual in total

12   have been fully vetted by all the key constituents, with the

13   goal of implementing a market based compensation structure for

14   our key employees.

15   Q    And did you assist in the preparation of an exhibit that

16   reflects the proposed aggregate payout opportunities, and

17   discretionary pool amounts and performance levels under the

18   TMIP?

19   A    Yes.

20   Q    Could you look, Mr. Bigelow, at Tab 1, page 2 of Exhibit

21   1?

22   A    Yes.  This is similar to page 1 under this tab.  A summary

23   of the key statistics for the 2009 TMIP.  It's organized in

24   relatively the same way as the first page, with a planned

25   column, which is, again, 212 million of operating cash flow.  A

1    stretch column, 301 million of operating cash flow.  And a

2    maximum column, 424 million of operating cash flow.

3            Under plan, there's proposed 3.5 million dollar

4    payment to the TMIP participants, and a discretionary pool of

5    500,000, for a total cost of 4 million.  Under stretch there's

6    a payout to participants of 7.5 million, a 1 million dollar

7    discretionary pool for 8.5 million in total costs.

8            And under the maximum scenario, which is, again, a

9    424 million dollar level, twice our plan, there would be a

10   payout of 10.6 million to TMIP participants, 1.3 million dollar

11   discretionary pool, for a total of 11.9 million.

12   Q   And I see that there are caps on individual awards that

13   may be made out of the discretionary pool to any one

14   individual.  Is that your understanding?

15   A   That's correct.  In the plan situation, the cap would be

16   $25,000 and the stretch $50,000.  And in the maximum column

17   65,000.

18           MR. LOTSOFF:  Your Honor, we move for admission of

19   Exhibit 1.

20           THE COURT:  Is there any objection?

21           MR. SIMON:  No objection, Your Honor.  Exhibit 1?

22           THE COURT:  D-1 is admitted, without objection.

23           MR. LOTSOFF:  Thank you, Your Honor.

24   BY MR. LOTSOFF:

25   Q   To the extent the applicable performance target is met and

Bigelow - Direct                                    Page 49

1   a TMIP becomes earned, when would the TMIP award become

2   payable?

3   A    The earlier of emergence, or June of 2011.

4   Q    And I guess we don't need to get into all the legalese,

5   but it's my understanding that the June 2011 is sort of a

6   failsafe, outside date, unlikely to ever be of issue, but it

7   relates to some provisions of the Tax Code, is that your

8   understanding?

9   A    That's correct.

10  Q    The Guild has argued that the payout provision is

11  basically a retention provision.  And makes this plan a

12  retention plan, not an incentive plan.  Do you agree with that

13  argument?

14  A    I don't agree.  This is an incentive plan designed to

15  maximize operating cash flow and is paid on emergence.  And I

16  think, as we've discussed, prompt emergence is in, I think it's

17  in our interest.

18          It's costly to be in bankruptcy.  And I think the

19  company could be relieved of a number of steps and limitations

20  that the bankruptcy places on trying to do other transactions

21  with third parties.

22  Q    And prior to the TMIP, have the debtors proposed and

23  discussed with the various Committees any other kind of

24  incentive plan?

25  A    Yes.  The predecessor plan, if you will, the TMIP, as we

1    discussed, these proposals with the Committees was a keep.

2    That had its metric to be emergence, not operating cash flow.

3    And as we discussed with our creditor constituencies, their

4    view was that we'd be better off having a plan that

5    incentivized driving operating cash flow.

6          And we thought that was reasonable.  And, again,

7    every step of the way during that process, we had Mercer

8    helping us, and felt as though that was a thoughtful,

9    considered thing to do, and that's the genesis of the TMIP.

10   Q    And did keep -- Stamford Key Employee Incentive Plan?

11   A    That's correct.

12   Q    And when you said it -- the proposed prior proposal was

13   related to emergence, was it your understanding that it would

14   of provided for payments, if you hit certain timing metrics,

15   and the sooner you emerged, the better, if you will?

16   A    Yes.  Exactly.  The payments were tethered, or linked to

17   timing.  And the more expedited timing, the higher the

18   payments.  And through our discussions with the Committees,

19   that metric changed to operating cash flow.  And, in fact, I

20   believe the total pay out amounts did come down.

21   Q    With respect to the key operators bonus, what is the

22   purpose of that component of the proposed plan?

23   A    So the key operator plan covers 23 employees of the

24   company, who are the key executives with respect to managing

25   and operating our key businesses.

1         There are six of our top 10 executives are in this

2    plan, as well as 17, you know, managers, other publishers of

3    newspapers, general managers of TV stations.  These are the key

4    operators of our businesses, and the plan is designed to,

5    again, drive cash flow, incentivize the maximization of cash

6    flow.

7    Q    And which of the 6 members of the top 10 participate in

8    the key operator's bonus?

9    A    The chief operating officer, the chief administrative

10   officer, the president of Tribune Broadcasting Group.  An

11   executive vice president in the Tribune Publishing Group, the

12   president of Tribune Interactive.  And the publisher of the Los

13   Angeles Times.

14   Q    And why do the chief operating officer and the chief

15   administrative officer participate in the key operator bonus

16   program?

17   A    At the end of the day, all of these executives report up

18   through the chief operating officer and the chief

19   administrative officer, and they are the two key executives at

20   the company who are charged with driving cash flow.

21   Q    And other than these six participants that you've just

22   listed, do any other KOB participants also participate in the

23   TMIP?

24   A    No.

25   Q    What are the circumstances under which a participant would

Bigelow - Direct                                Page 52

1    receive a KOB payout?

2    A    KOB payout's are made, should the operations that report

3    up through the individuals exceed their stretch operating cash

4    flow goals for 2009.

5            As they exceed those goals, a certain percent of the

6    excess above the stretch is used to determine the actual award

7    that would go to the key operator.

8    Q    And does each participant have his or her own specific

9    stretch target?

10   A    That's correct.  Yes.

11   Q    And can you describe what the stretch target is for the

12   chief operating officer and the chief administrative officer?

13   A    Yes.  That is -- that stretch -- those stretch goals are

14   slightly different.  So the chief operating officer and the

15   chief administrative officer, their stretch target is 350

16   million of operating cash flow.

17           As I talked about, the stretch goal for the

18   consolidated company, for the MIP and TMIP, is 301 million.  So

19   their stretch goal is above the overall stretch goal for the

20   company.

21   Q    And if the participant hits his or her stretch goal on the

22   nose, is there any payout under the KOB?

23   A    No.  No.

24   Q    The Guild's witness, Mr. Phillips, states in his report

25   that the KOB pays out at maximum operating cash flow of 424

Bigelow - Direct                        Page 53

1    million, is that accurate?

2    A    No.  It pays out as the operations exceed stretch.

3    Q    And you indicated earlier, that once a participant

4    achieves and exceeds his or her stretch level, they're eligible

5    to receive a percentage of the incremental overage, if you

6    will.  What is that percentage?

7    A    For the majority of the people in the plan, it's 2

8    percent.  There are two people who it's 3 percent.  And then,

9    for the chief operating officer and the chief administrative

10   officer, it's 1 percent above the 350.

11   Q    And are these payments capped for any of the participants?

12   A    They are.  They are capped.  They're capped at one times

13   salary for all of the participants, except for the chief

14   operating officer and the chief administrative officer.

15        They're capped at 40 percent, and 33 percent of their

16   salary, respectively.

17   Q    And what is the aggregate maximum KOB incentive

18   opportunity, if everybody hits it out of the park and hits

19   their cap award?

20   A    It's 9.3 million dollars.

21   Q    Are the KOB awards payable, if earned at the same time as

22   any TMIP awards?

23   A    That's right.  It's the same -- the same payout mechanism.

24   Q    And how did the key operator's bonus program come into

25   being?

1   A    We had proposed a key operator plan back in March when we

2   first met with our Creditor Committees, and it only included 4

3   or 5 people.  As we had, again, extensive discussions with the

4   Committees -- actually the Committees encouraged us to increase

5   the number of participants in the plan, because these are the

6   key operators who are driving cash flow.

7            And so the number of folks in the plan increased

8   during those discussions, and that's how we ultimately ended up

9   with the plan we're proposing.

10  Q    And so were the individualized stretch targets and

11  proposed payout's also vetted and negotiated with the

12  Committees?

13  A    Yes.

14  Q    The Guild argues that the potential incentive awards, as a

15  percentage of operating cash flow may be greater under the

16  proposed plan than under prior plans, is that accurate?

17  A    That is accurate, yes.

18  Q    And why is that?

19  A    Well you can take it in parts.  So the denominator in that

20  calculation operating cash flow, as we've talked about, has

21  obviously declined significantly because of the revenue

22  pressure that the businesses faced, and because of the fixed

23  cost nature of the business inherently.

24            And so the denominator in that calculation has come

25  down.  The numerator, which, in your example, is cash

Bigelow - Direct                          Page 55

1    incentives, has gone up, because historically speaking, as I

2    have discussed, we have had cash incentives, but stock based

3    comp incentives, as well.

4          And so as a function of the denominator coming down,

5    based on the pressure on the operations, and the fact that in

6    2009, you know, these plans are designed to try and restore our

7    overall compensation to market levels, which historically had

8    included stock based comp, the cash, you know, the cash amount

9    in the numerator would increase, and, therefore, your

10   percentage would obviously increase.

11   Q   And is there anything in the incentive compensation plan,

12   exhibit 5, that prevents the company from paying out a greater

13   percentage of its cash flow than in prior years?

14   A   No.

15   Q   And as the company's chief financial officer, can you tell

16   us whether the proposed plan is structured so that the company

17   will be able to afford the proposed payout's, assuming that the

18   requisite level of performance is achieved?

19   A   Yes.  Yes, we can.  These are, as we've discussed in our

20   motion, self funding, pay for performance plans.  For example,

21   just take our plan level, 212 million of consolidated operating

22   cash flow, at that level, you have a 17.5 million dollar MIP

23   payment, and you also have approximately a 4 million dollar

24   TMIP award that's triggered.

25         So the combination of those two is twenty one and a

Bigelow - Direct                          Page 56

1   half million, the twelve -- excuse me, the 212 million

2   operating cash flow figure is net of that twenty-one and a half

3   million of MIP and TMIP expense.

4            And so, you know, the operating cash flow excluding

5   that would be 233 million.

6   Q   And --

7   A   -- and you would net the twenty-one and a half to get down

8   to 212 million.

9            And that's the self-funding mechanism.

10  Q   And I may have spoken over you, so I apologize.  But the

11  21.5 plus 212, for the record, is it your understanding that

12  that would be 233 million, roughly?

13  A   That's my understanding, yes.

14  Q   Okay.  And do the Guild's figures for historical payout's

15  as a percentage of cash flow, include the fair market value of

16  equity based awards that key management also used to receive,

17  in addition to MIP awards?

18  A   No.

19  Q   And if you add in the then fair market value of those

20  historical equity based compensation awards for the period from

21  1999 to 2007, what would the average total incentive award, as

22  a percentage of cash flow, be over that period?

23  A   If you calculated the fair market value at the time, I

24  think it's approximately seven and a half percent.

25  Q   The Guild has also argued that the proposed plan is

1    suspect, because prior awards were not all cash.  Do you

2    believe that all cash awards are appropriate for 2009?

3    A    I do.  And, again, as I've testified, this has been, you

4    know, we've been looking to develop compensation plans for our

5    key managers that are market.  And as we talked earlier,

6    historically we would design these plans with a cash bonus and

7    a stock based compensation bonus.

8         At the moment, we don't have that stock-based

9    compensation tool.  And, as a result, we have designed a plan

10   that's fully supported by our Creditor Committees, has been

11   fully vetted by Mercer, and approved by the compensation

12   committee, that it's an all cash program.

13   Q    What business units does the Guild represent employees at?

14   A    I believe the Baltimore Sun and Channel 11 WPIX in New

15   York City.

16   Q    And, if you know, approximately how many employees do they

17   represent?

18   A    As His Honor said this morning, about 2 percent.

19   Q    And the Guild claims that the proposed plan is unfair,

20   because, according to the Guild, it overcompensates management

21   at the expense of other employees, including unionized

22   employees.

23        Do you agree with that contention?

24   A    I don't.  The intention of this plan is not to

25   overcompensate.  We have worked very hard with our constituents

1   to develop a plan that is market based.

2          And that's always been our goal.

3   Q   The Guild also claims that approval of the proposed plan

4   would have a significant impact on morale across the company.

5   Do you agree with that contention?

6   A   I don't.  I don't agree.  This plan that we're discussing,

7   is the continuation of a management incentive plan that we have

8   had at the company for many, many years.

9          It's a plan that has always had a very high level of

10  transparency with the public, as we were a public company, and

11  it has always been part of the compensation philosophy of the

12  company.

13         I think, as I think about morale, I mean, let's be

14  clear, there has been pervasive pessimism about newspaper

15  business, and this year, the TV business.

16         So it's clear that everybody recognizes how tough

17  things are.  But we have a common goal, and that is to survive

18  and transform the company.  And I think it's very clear that,

19  in our large metropolitan markets, that we are succeeding and

20  that -- and that's really the best anecdote -- antidote for,

21  you know, low morale.

22         I mean, people are seeing that we are differentiating

23  ourselves, especially from a profitability standpoint.  And so,

24  in my view, that's, you know, that's the key to morale.

25  Q   The Guild states that the debtors have also attempted to

Bigelow - Direct                           Page 59

1    negotiate a wage freeze with certain labor unions.  And have

2    implemented a wage freeze for other employees.  Have non-union,

3    management employees, including executives, also been subject

4    to a wage freeze in 2009?

5    A    Yes.  They're, generally speaking, there's been a wage

6    freeze at the company in 2009.

7    Q    And have the Baltimore Sun employees, represented by the

8    Guild, had their wages frozen for 2009?

9    A    No.

10   Q    And why not?

11   A    That's part of the collective bargaining agreement that we

12   have with them.  Salaries have actually gone up.

13   Q    And have the debtors rejected, or sought to reject any

14   collective bargaining agreements with any of their unions

15   during these Chapter 11 proceedings?

16   A    No.

17   Q    Have the debtors implemented a furlough --

18   A    No.

19   Q    Have unionized employees, including those represented by

20   the Guild, ever participated historically in the company's MIP

21   program, or their equity based programs?

22   A    I don't believe so.

23   Q    So to the extent they are not participating in the current

24   proposed plan, are they being denied anything that they were

25   historically eligible for?

Bigelow - Direct                          Page 60

1    A    No.

2    Q    Do the debtors offer incentive compensation opportunities

3    to employees, other than the management participants, in the

4    MIP?

5    A    Yes.  Yes, we do.  We have sales incentives, we have bonus

6    opportunities for people who aren't in the MIP, and we've had

7    those structures for some time, and will continue to do that in

8    2009.

9    Q    The Guild also refers to layoffs of bargaining unit

10   personnel.  Have non-union employees, including management

11   employees, also been laid off in 2009?

12   A    Yes.

13   Q    And can you describe briefly the reasons for those

14   layoffs, broadly speaking?

15   A    Yes.  Obviously, no one likes implementing layoffs, but as

16   I've discussed, we have been very focused on ensuring the

17   survival of our businesses, and I think have tried to take a

18   very thoughtful approach to the layoffs.

19        We've, you know, we've had to, you know, manage

20   expenses.  But we've been trying to implement technologies to

21   become more efficient.

22        And we've tried to analyze each and every business

23   process that we have, with the goal of becoming more efficient.

24   As a result of that, we have had layoffs during 2009.

25   Q    And, to your knowledge, did these layoffs

1    disproportionately effect unionized employees, as opposed to

2    management and supervisory employees?

3    A    They don't.

4    Q    Did you participate in preparing an exhibit that reflects

5    the relative percentages of union and management supervisory

6    employees employed across the company, and the relative

7    percentages of layoffs in those groups?

8    A    Yes.

9    Q    Could you turn in your binder to exhibit 3?

10   A    Yes.

11   Q    And can you tell us --

12   A    Under exhibit 3, these are some statistics regarding 2009

13   layoffs, that breakout the layoffs related to union employees

14   and the layoffs related to supervisors and managers, and then

15   total company layoffs.

16        And show the number and the percent within each

17   category, and the percent of total.  And as we -- as you look

18   at this, the percent of layoffs within the union employee base,

19   has been 118 employees, on a base of 2,204, for 5.4 percent.

20        Supervisors and managers laid off, 127 on the base of

21   2,622, or 4.8 percent.  And then as a percentage of the total

22   company layoffs, which this year have been just over a

23   thousand, 1,013, the union percentage is 11.6 and the

24   supervisor or manager percentage is 12.5.

25   Q    So these relative percentages are within a fraction of a

Bigelow - Direct                          Page 62

1    percent of each other?

2    A    That's correct.

3            MR. LOTSOFF:  Your Honor, we move for the admission

4    of exhibit 3.

5            THE COURT:  Is there any objection?  D-3's admitted

6    without objection.  We're going to take just a 5 minute break.

7    So stay close.

8            MR. LOTSOFF:  And, Your Honor, I have no further

9    questions.  Assuming the Court didn't want us to also go into

10   the 2008 proposed payout's.

11           THE COURT:  Not necessary.

12           MR. LOTSOFF:  Okay.  Then we have no further

13   questions, Your Honor.

14           THE COURT:  All right.  We'll take a 5 minute break.

15   Mr. Bigelow, I ask that you not discuss your testimony during

16   the break with anyone.

17           All right.  We'll stand in recess.

18                              (Recess)

19           THE COURT:  Cross-examination.

20           MR. SIMON:  I think I need five minutes to get ready

21   -- no, I'm kidding.

22                         CROSS-EXAMINATION

23   BY MR. SIMON:

24   Q    Good morning, Mr. Bigelow how are you?

25   A    Fine.  How are you Mr. Simon?

1    Q    Good.   Thanks. I want to turn your attention real quickly

2    to your deposition on September 9th, 2009.

3              MR. SIMON:  And if I can approach, Your Honor, I'd

4    like to present him with a copy of his deposition transcript.

5              THE COURT:  All right.

6              MR. SIMON:  From that date.  Thank you.  And, Your

7    Honor, if I can approach the Court, I will hand up a --

8              THE COURT:  You may.  Thank you.

9    BY MR. SIMON:

10   Q    Can you turn -- Mr. Bigelow, could you turn to page 14 of

11   your deposition transcript for us, please?

12   A    Um-hum.

13   Q    And on page 14, there's a paragraph that begins with, "The

14   stretch goal is 300 million."  Do you see that?

15   A    Yep.

16   Q    Can you read that paragraph for us?

17   A    (Reading)

18              "The stretch goal is 300 million, 300 million of

19   operating cash flow.  At that level, it pays 100 percent of

20   MIP.  That was a level that we, again, developed with our

21   business units and felt that, at that level, that would be,

22   given the environment, a very good outcome.  And at that level,

23   we should make 100 percent payments under the MIP and TMIP.

24   Again, the KOB does not pay at that level."

25   Q    Again, the KOB does not pay out at that level, is that

1  your testimony?

2  A    Yeah.   That's what it says.   Yes.

3  Q    Okay.   And then can you continue reading for us, please?

4  A    (Reading)

5       "And then the highest level was the basically two

6  times the initial operating plan, 424 million, which pays 130

7  percent of MIP and TMIP, and then does, at that level, you

8  would start paying under the KOB, and the KOB is delivering

9  benefits above stretch, at the business units for key

10 managers."

11 Q    Okay.   Is that consistent with your testimony today?

12 A    The KOB is delivering benefits above stretch.   Yes.

13 Q    Okay.

14 A    I think that, you know, if your question is, is the 424

15 referencing the KOB, I think there's two different thoughts

16 there that we were talking about.   Two times the initial

17 operating plan for the TMIP and the MIP.   And then, you know,

18 changed my thought to the KOB, which delivers benefits above

19 stretch.

20 Q    Okay.   But your testimony on September 9th, I think, as I

21 read it, says the KOB does not payout at 300 million, it pays

22 out at 424.

23 A    Well to be specific, what I was referring to, the KOB does

24 not pay out at the level which is described in line 15, which

25 is 300 million.   And then on page 15, lines, well almost all of

1    line 4, 5, 6 and 7, are describing that the KOB delivers

2    benefits above stretch.

3    Q    Okay.  But prior to that, you did say at 424, at that

4    level you would start paying under the KOB, is that correct?

5    A    No.  Well no it says -- I think it -- I think line 3 says

6    MIP and TMIP.  It does actually says MIP and TMIP.

7    Q    Okay.

8    A    The fact of the matter is that, as we talked about, the

9    424 is the maximum for the TMIP and the MIP, and the KOB is

10   paying above stretch for the business units.

11   Q    So at 300 million -- the 300 million OCF, the KOB starts

12   to fund, or to pay.

13   A    Again, the KOB pays at stretch for the individual

14   operations, which are all defined in the Mercer document for

15   the -- to the participants who are responsible for those

16   operations.

17   Q    Okay.  Thank you.  I want to ask you to confirm, were the

18   debtors parties to a leveraged buyout in 2007?

19   A    Yes.

20   Q    Okay.  And prior to the leverage buyout, what were the

21   debtors' total liabilities?

22   A    Prior to the leveraged buyout, we had approximately five,

23   five and a half billion of debt.  And then, in the leveraged

24   buyout, that increased to about twelve and a half, thirteen

25   billion of debt.

1  Q   Okay.  And you signed the first day affidavit in this

2  case?

3  A   I did.  Yeah.

4  Q   Okay.  And in that affidavit, I believe you stated that,

5  for the quarter ended September 28th, 2008 the company had 7.6

6  billion in assets, and 13.9 billion in liabilities, is that

7  correct?

8  A   Yeah.  That sounds right.

9  Q   And that would include -- the liabilities would include

10  the debt that it incurred as part of the leverage buyout?

11  A   That's correct.  Yes.

12  Q   Okay.  Is one of the reasons the company filed for

13  bankruptcy, is because the debtors couldn't service its debt

14  under the LBO?

15  A   The operating environment, as I've described, that the

16  company was facing throughout '08, but intensely in the fourth

17  quarter of -- late fourth quarter of '08, was strong enough

18  that it was clear that we would not be able to have the

19  financial wherewithal to continue supporting the capital

20  structure, that's correct.

21  Q   Okay.  All right.  And I want to be careful here, in

22  accordance with our confidentiality agreement.  But if the 2009

23  plan is approved, and the debtors hit their targets in that

24  plan, what will your total compensation -- is your total

25  compensation reflected accurately in the Mercer report on page

Bigelow - Cross (Sim)                    Page 67

1    31?

2              And I can refer you to the Mercer report, if you'd

3    like to look at it.

4    A    My personal?

5    Q    Yes.

6    A    Okay.

7    Q    Sure.  If you look at exhibit -- well you have it in the

8    debtors' exhibits.  We have it at tab 1 of our binders, which

9    are behind you.

10   A    So I'm going to look at -- which page were you referring

11   to?

12   Q    Page 31.  And without stating the number -- well I'm happy

13   to state my number.  My base sal --

14             MR. LOTSOFF:  Can we stipulate to that, Your Honor,

15   that the Mercer report accurately reflects Mr. Bigelow's

16   compensation?

17             THE COURT:  Apparently, your counsel is not.  So I

18   would answer the question, please, in the framework with

19   which --

20             MR. SIMON:  Okay.  I'm not trying to elicit testimony

21   -- so --

22             MR. BIGELOW:  Can you repeat the question?

23   BY MR. SIMON:

24   Q    I want to turn your attention to page 31 of the Mercer

25   report.  And I believe you're the CFO of the company.

1   A    That's correct.

2   Q    So your compensation, your total direct compensation, and

3   I believe this page has your plan TDC, I just want to make sure

4   the numbers here, do you believe those to be correct, based on

5   your knowledge?

6   A    Yes, I believe that they're correct.  You're asking for my

7   personal numbers, correct?

8   Q    Yes, just your personal numbers.

9   A    Yeah.  That's right.

10  Q    Your bonuses would be approximately 3 times your base

11  salary, is that -- if the debtors hit the max target?

12  A    So at plan --

13  Q    Don't give me any specific numbers, I'm just looking --

14  A    Well I'm looking at page 31, which is the plan.  So I can

15  switch to the max -- maximum awards are on page 35.  And the

16  combination of the max MIP -- again, if we hit 200 percent of

17  our planned operating cash flow goal, the combination of my max

18  MIP and my max TMIP would be, it looks like about three and a

19  half times my salary.

20  Q    Is that fair?  I think page 35 is a better reference

21  point.  I'm sorry for the -- I want to establish your

22  compensation, for the record.

23  A    And I would point out that, based on the Mercer analysis

24  that that would be a level, based on their market max TDC

25  calculation of 91 percent of market median.

1   Q   Okay.  Of the top ten individuals, executives at the

2   company, listed on that, we can say page 8, there's a number of

3   pages, page 35, who arrived after the LBO?

4   A   So, again, I'm using 35.  So on this particular page we

5   have the CEO, who joined the board prior to the culmination of

6   the LBO, but became CEO after the LBO.  The COO, who became COO

7   after the LBO.  The CAO, who became CAO after the LBO.  The

8   general counsel, who became general counsel after the LBO.  The

9   EVP, again, after the LBO.

10          Myself, I've worked at the company for 11 years.  The

11  EVP of restructuring, who came to the company after the LBO.

12  The president of Tribune Broadcasting, who came to the company

13  after the LBO.  The publisher of the Los Angeles Times, who

14  became part of the company after the LBO.  The president of

15  Tribune Interactive, who came to the company after the LBO.

16  And the EVP of Tribune Publishing, who has been with the

17  company, geez, 20, 25 years.

18  Q   Okay.  Thank you.  I understand, and I will stand

19  corrected if this is incorrect, but I understand that the

20  debtors' stock is owned by an ESOP, is that correct?

21  A   Yes.

22  Q   And does that stock have any value today?

23  A   I would say that it likely has de minimis value.

24  Q   Do you have any idea how widely held that stock was among

25  the employees?

Bigelow - Cross (Sim)                    Page 70

1   A    That stock is not widely held, at this point.  There have

2   been no shares that have been allocated.

3   Q    Okay.  Fair enough.

4   A    But the plan, the intention was to allocate those shares

5   over time to the employees.

6   Q    Okay.  And just to confirm your testimony, the projected

7   revenue for 2009, it was projected the revenue would be down 29

8   percent.  And in your testimony today, you said that the

9   revenue was down approximately 30 percent, you're off by about

10  a percent.

11  A    That would be for our print advertising, that's correct.

12  There's obviously a lot of other components to the business,

13  there's circulation, which is going to be down down in the low

14  to mid single digits.  There is circulation for our newspapers,

15  there's commercial delivery deals, which we've done, which and,

16  for example, is the transaction that Dow Jones wanted approval

17  from the Court earlier in the year, where we do third party

18  distribution deals with other publishers.

19        And that business is actually growing.  So then

20  you've got, you know, television revenue, radio revenue, so

21  there's a lot of different components.  But for print

22  advertising, year-to-date we're down 29, and that's about what

23  we had planned.

24  Q    Are there any other components to gross revenue?

25  A    So gross revenue will be advertising revenue from the

1   publishing business, circulation revenue from the publishing

2   business.  Commercial print and delivery deals.  TMS in the

3   publishing business.

4          And then on broadcasting, you have television station

5   revenue, radio revenue, WGN cable revenue, we have internet on

6   line revenue.  We obviously continue to have the Cubs, and so

7   we've got Cubs revenue, as well.

8   Q   On a consolidated basis, is it down 30 percent this year?

9   A   No.  On a consolidated basis, when you add everything up

10  together, it will be down about 20, 21 percent.

11  Q   Okay.  On a but for the advertising, the print

12  advertising --

13  A   Yeah, print advertising would be down 29 to 30 percent.

14  And in certain weeks, it's been down worse, other weeks, you

15  know, slightly better.

16  Q   Okay.  The expenditures, I want to just talk to you

17  quickly about the debtors' expenditures.  Would it -- is

18  personnel your largest expense?

19  A   Compensation will be our largest expense.

20  Q   Okay.  And where does newsprint rank?

21  A   Newsprint will be top three, probably, after compensation,

22  just programming costs, newsprint in 2009 will be in the 200 to

23  250 million dollar range.  Which will be down in 2009, versus

24  last year, for a couple of reasons.  One, you know, as a result

25  of the redesigns of all of our newspapers last year, which I

1    think I talked about last May, we are able to deliver, you

2    know, a more compelling, contemporary product with less pages

3    in it.  And that has resulted in consumption declines this

4    year.  And then there were, in the second half of last year,

5    steady price per ton newsprint declines, which continued, and

6    we forecasted for a decline.  But then in the second quarter,

7    newsprint prices dropped dramatically.

8             And so, you know, unprecedented declines, and so

9    that's also contributing to the decline in newsprint.

10   Q    Okay.

11            THE COURT:  Excuse me, let me ask you to pause for

12   just a second, just as a matter of personal curiosity.  Do you

13   do any business with Abby Tibby (phonetic)?

14            MR. BIGELOW:  We do.

15            THE COURT:  Go ahead.

16            MR. SIMON:  Thank you, Your Honor.

17            MR. BIGELOW:  I hope that helps our case.

18            THE COURT:  It's a neutral factor.  It doesn't help

19   Abby Tibby, much, though.

20            MR. SIMON:  No.

21   BY MR. SIMON:

22   Q    I want to focus your attention on costs and the actual

23   cost savings.  In 2008 you had personnel cuts.  You cut

24   personnel.

25   A    We did.

Bigelow - Cross (Sim)                    Page 73

1    Q    Layoffs.  How much did you save as a result of those cuts?

2    A    I don't have that information specifically.  But I can,

3    you know, give you some background.  I think since the

4    beginning of 2008, we've cut -- we've cut staff by about 3,500

5    people.  And as one of the exhibits shows, about, you know,

6    1,000 of that has occurred this year.

7         Compensation this year, on a year over year basis,

8    will probably be down in the 150 million dollar range.  Which

9    is, you know, probably in the 10 percent-ish range of total

10   compensation.  So that is a meaningful contributor to, as I

11   testified earlier, the fact that 2009 expenses will be probably

12   down about 450 million.

13   Q    Okay.  So because of the layoffs in 2008 and 2009, the

14   company is going to end up saving about 150 million?

15   A    Yeah.  I don't have that in front of me, but, you know,

16   125-ish to 150.

17   Q    Okay.  And the newsprint costs, you talk about the tonnage

18   costs, the raw material cost dropping significantly.  What is

19   that goign to save you for 2009?

20   A    So the combination of the reduction in consumption, as

21   well as the reduction in price, is likely to save us costs in

22   that same range as compensation in the 125, 150 range.  Again,

23   those are estimates.

24   Q    So you're going to be about 300 million in total costs

25   cuts, as a result of the tonnage -- raw material costs

1    declines, -- price declines --

2    A    As well as compensation.

3    Q    -- and the compensation cuts, that's going to account for

4    about 300 million of your savings?

5    A    Yeah.  Again, I don't have the number in front of me, but

6    that sounds about right.

7    Q    Okay.  I want to turn, if you could, please, turn to tab

8    19 of our binder, and I think it's in binder 2.  And I

9    apologize, again, for the multiple binders.

10          We should have printed on the newsprint.

11   A    Yep.  I got it.

12   Q    All right.  Can you tell me what this document is?

13   A    This is a e-mail communication to all employees from our

14   chief administrative officer describing the 2009 salary freeze.

15   Q    Okay.  And what is the date of this?

16   A    February 16th, 2009.

17   Q    Okay.  I'd like you to read this into the record, if you

18   could.  If you could just start at the top, and just read this

19   communication for us, I'd appreciate it.

20   A    Okay.

21          "As you know, this year is off to a difficult start,

22   not only for us, but for our peers in the media industry.  And

23   for much of the business world, as well.  The advertising

24   environment is very difficult.  The economy is, at best,

25   challenging.  Across the country, business are cutting jobs,

1   furloughing employees, and freezing pay.  Some of our major

2   advertising clients like General Motors have laid off thousands

3   of employees, others, like Circuit City, have been forced to

4   liquidate assets and go out of business.  Obviously,

5   developments like these put significant downward pressure on

6   our revenue.  As a company, we're fighting back like never

7   before, developing new products, operating extremely

8   efficiently, and reexamining everything we do with an eye

9   towards maximizing our cash flow.  However, given current

10  trends and the likelihood that it will take some time for the

11  economy to recover, we have to do even more.  For that reason,

12  we decided to implement a salary freeze for non-union employees

13  in 2009.  For those employees represented by a union the issue

14  will be addressed in collective bargaining.  I know this is

15  difficult, and I appreciate your understanding.  Compensation

16  is our largest expense, and the salary freeze enables us to

17  share the sacrifice.  Hopefully, freezing salaries now will

18  allow us to avert more drastic action in the future.  Thank

19  you, again, for all of your efforts."

20  Q    Okay.  Now Mr. Spector, you said he's the CAO, is that

21  correct?

22  A    That's correct.

23  Q    And if we turn to page 35 of exhibit 1 in which -- our

24  exhibit 1, and it's the Mercer report so we can -- whatever's

25  easiest for you.

1  A    Yep.

2  Q    Okay.  If you look at his maximum total compensation, and

3  I don't want you to state any numbers, what I'm looking for is

4  the multiple of his bonus from his base.  If you could just

5  tell us what that is.  If the debtors hit the max.

6  A    So, again, if we hit 424 million dollars of consolidated

7  EBITDA, which I will tell you is hitting the ball out of the

8  park, and insuring the survival of our businesses, his payout

9  would be approximately a little more than --

10 Q    Don't give me the exact number.  Just as a multiple of his

11 base.

12 A    -- well a little more than 4 times.

13 Q    What if he hit the 300, the stretch?  And as a multiple,

14 not as an actual number.

15 A    About 3 -- a little more than 3 times.

16 Q    All right.  Thank you.  Can you turn to exhibit 4, which

17 is in binder number 1, please?

18 A    Yep.

19 Q    All right.  Can you tell me what this document is?

20 A    This is a document that we prepared, I believe initially

21 at the request of the United States Trustee, but also shared it

22 with you, as we bridge between our reported operating profit in

23 our SEC filings, to the operating cash flow as we define it.

24 Q    All right.  So let's start in --

25 A    Because, to be clear, operating cash flow is not a number

1    that's included in our SEC filings.

2    Q    All right.  Let's start in 1999.  If we could.

3    A    Yep.

4    Q    What was the operating cash flow for 1999?

5    A    993 million.

6    Q    Okay.  In 2000?

7    A    Would you like me to read across the --

8    Q    I want to make sure you do it for each year.  And if you

9    want to do the years and the numbers, that would be very

10   helpful.

11   A    Okay.  So in 1999 the company's operating cash flow was

12   993 million dollars.  In 2000, the operating cash flow was 1

13   billion 404 million.  In 2001, the operating cash flow was 1

14   billion 244 million.  In 2002 the operating cash flow was 1

15   billion 499 million.  In 2003 the operating cash flow was 1

16   billion 589 million.  In 2004 the operating cash flow was 1

17   billion 582 million.  In 2005, the operating cash flow was 1

18   billion 424 million.  In 2006, the operating cash flow was 1

19   billion 362 million.  In 2007 the operating cash flow was 1

20   billion 199 million.  In 2008 the operating cash flow was 789

21   million.

22        Those are full year numbers.  Year-to-date, when this

23   was prepared in 2009, through the first six months of the year,

24   it was 195 million.

25   Q    Okay.  So through June 30th, your operating cash flow was

1  195?

2  A   That's right.  And through the end of August it's

3  approximately 255 million.

4  Q   And what was it in July, at the end of July when you filed

5  the motion, do you remember?

6  A   I think it was about 211-ish.

7  Q   Okay.  And operating cash flow today, I know -- I think

8  you just said it.  What is the --

9  A   Actually, I think it was higher than that.  225-ish.

10  Q   225 million operating cash flow.

11  A   Through July.

12  Q   Through July.  All right.  And what is the projected

13  operating cash flow today through December 31st?

14  A   Again, very dependent upon revenue trends.  But should

15  revenue hit our forecast, it could be about 350 to 400 million,

16  and it could be higher.

17  Q   Okay.  Now, historically, my understanding is that the

18  revenue, the debtors' revenue fluctuates seasonally.

19  A   It does.

20  Q   Throughout the year.  Each year the revenue fluctuates.

21  A   It does.  You know, throughout the year, typically, the

22  revenue in the fourth quarter on a dollar basis is the highest.

23  Q   And as a percentage of total operating cash flow revenue,

24  what percentage does it make?  What percentage comes in, in the

25  fourth quarter?

Bigelow - Cross (Sim)                    Page 79

1    A    It will depend.  But, you know, I would say that more than

2    a quarter, probably in the third range.

3    Q    Approximately a third of their total revenue or --

4    A    Again, it's going to vary.  But, you know, generally

5    speaking the fourth quarter will have more significant revenue,

6    because of the holiday season.  And as we talked about, because

7    of the fixed cost nature of the business, you know, that

8    revenue you know will drive cash flow, just on a seasonality

9    basis.

10   Q    Now the -- what's the first quarter look like?  I mean, is

11   that your worst quarter?

12   A    The summer months, there's really the lowest period of

13   time, on a relative basis.  And so the first and second quarter

14   are about the same.

15   Q    Okay.  Now we just went through the years with -- we had

16   total operating cash flow, do you have any idea what the total

17   bonus programs cost the debtors during each of those years?

18   A    Not off the top of my head.  But I do have '06 and '07 in

19   our exhibit.

20   Q    All right.

21   A    But I can tell you, you know, that it, when you consider

22   the cash incentive awards and the stock based awards, on

23   average, we're paying about seven and a half percent of the

24   operating cash flow in incentive compensation.

25   Q    All right.  Now you said that you have a pay freeze this

1    year, is that correct?

2    A   Generally, across the company, there is a pay freeze.

3    Q   Okay.  Was that always -- is it true that the board

4    proposed to raise base salaries for the top three executives

5    for 2009?

6    A   The compensation committee did propose initially for the

7    chief operating officer, the chief administrative officer and

8    myself raises in 2009.

9         Those -- you know, that proposal was, you know,

10   essentially withdrawn and never occurred.

11   Q   Okay.  Do you know why?

12   A   Through, again, very collaborative and, you know,

13   constructive dialogue with our creditor constituencies that was

14   something that, you know, we reached agreement was not

15   something that we'd pursue.

16   Q   So it was the creditors who put the brakes on that?

17   A   They raised an issue about it, yeah.  And we, again, felt

18   that, you know, on a relative basis, that certainly wasn't

19   nearly as important a feature as getting, you know, this broad

20   based incentive plan -- getting their support for the broad

21   based incentive plan.

22   Q   Okay.  Could you turn to tab 17 of our exhibits for us,

23   please?

24   A   Yep.

25   Q   Now if you look at this document, do you know what this

1   document is?

2   A    Let me see -- I believe that this is a document that was

3   prepared by management for the -- either the compensation

4   committee, or the board, regarding the 2006 MIP.

5           But I don't know if it was just exclusively for the

6   compensation committee, or the board as -- in full.

7   Q    All right.  And if you look at the table -- on page 3,

8   there's a table -- there's four tables on that page, and the

9   top table says 2006 bonus summary by group.

10          The second table says comparison of bonus paid versus

11  earned.  Do you see that table?

12  A    Yes.

13  Q    Okay.  Now this looks like a historic -- a list of bonuses

14  paid versus earned, and a percentage of OCF for each of the

15  years from 1997 through 2006.  Can you go through each of those

16  years and tell us what the bonus earned and paid was, and why

17  it would be different for those two numbers?  And then, as a

18  percentage of OCF, tell us what those are for each of the

19  years?

20  A    Yes, I can do that.  Before I do, just to be very clear,

21  these are the cash MIP, at least -- yeah, cash MIP bonuses that

22  were paid, and obviously don't include the equity -- the stock

23  based compensation that was granted.

24          But do you want me to start with 1997 or --

25  Q    That would be great.

1    A    Okay.  So in 1997, the bonus earned was 28.1 million, the

2    bonus paid was 25 million.  And that 25 million represented 3.3

3    percent of operating cash flow.  In 1998, 22.5 million of bonus

4    was earned, and 21.9 million was paid, that was 2.6 percent of

5    operating cash flow.  In 1999, 31.2 million of bonus was

6    earned, 27.1 million was paid, 2.9 percent.

7         In 2000, 23 million of bonus was earned, 24.7 bonus

8    was paid, that represented 1.8 percent.  In 2001, 1 million in

9    bonus was earned, 1 million was paid, and that represented a de

10   minimis percentage of operating cash flow.

11        In 2002, 52.1 of bonus was earned, 45.1 was paid,

12   represented 3 percent of operating cash flow.  In 2003, 36.3

13   million was earned, 41.6 was paid, 2.6 percent of operating

14   cash flow.  In 2004, 26.8 was earned, 27.5 was paid, 1.7

15   percent of operating cash flow.  In 2005, 18.9 was earned, 22.5

16   was paid, 1.6 percent of operating cash flow.

17        In 2006, 39.9 was earned, 37 was paid, 2.7 percent of

18   operating cash flow.

19   Q    Okay.  And what's, again, the distinction between what

20   would have been earned and what would have been paid, why is,

21   in some cases, the number bigger, or higher for paid than it

22   was -- than the earned number?

23   A    Well, because the plan has always had a discretionary

24   element to it.  And so the earned calculation is based on the

25   operating cash flow metrics, and the, you know, market share

1    metrics for broadcasting.  But then, to the extent that a

2    business unit didn't hit their goals, there was the ability,

3    under the plan, to pay up to 40 percent discretionary amount.

4              So in certain years, you'll have, you know, examples

5    of how more would get paid than technically earned under the

6    operating cash flow metrics, because of the discretionary

7    element.  Other years, you might see a discretionary reduction

8    in the amount that may have been earned, and that ultimately

9    got paid.

10             I point out that, you know, under the new plan, you

11   know, one of the features, one of the changes is there's you

12   know that discretionary element is not in the plan.

13   Q    Okay.  All right.  Now let's look at 2001, it doesn't look

14   like there was -- there was a million dollars paid in 2001 in

15   bonuses.  And 2001, as I recall, you had 1.4 billion in

16   operating cash flow profit, is that correct?

17   A    Yeah.  Well I think that's what it said on the other page,

18   yes.

19   Q    Do you want to go back?  Let's look at tab -- I think it's

20   tab 4, to make sure we're right on that.  Correct, I should

21   say.

22   A    Remind me which tab it --

23   Q    It's tab 4.

24   A    Thanks.

25   Q    You know what, I misstated.  I'm glad we checked.

1    A   Okay.  So it was 1 billion 244 million.

2    Q   Okay.  And that's operating cash flow?

3    A   Yeah.  And that's a decline from the previous year of 1

4    billion 404 million.

5    Q   As a percentage basis, what's that?

6    A   More than 10 percent.

7    Q   Okay.  Now let's turn, if we could, to tab 5 of the

8    binder, which is the -- tab 5 and D, sub tab D, 5D.  Can you

9    tell me what this document is?

10   A   This is the company's proxy statement, which was filed

11   with the SEC in March of 2002.

12   Q   Okay.  Let's turn to page -- if you look at the top right

13   corner, there's page numbers, or page 2 of 28, let's turn to

14   page 16 of 28, please.

15   A   Okay.

16   Q   Okay.  Can you read, if you look down on the page it says,

17   annual incentive bonus.

18   A   Yes.

19   Q   All right.  The last paragraph of that section, can you

20   read that?

21   A   Starting with only 7?  Or due to?

22   Q   Due to.

23   A   (Reading)

24          "Due to the difficult economic conditions in 2001,

25   Tribune did not meet its corporate goals set in February of

1    2001.  As a result, Mr. Madigan (phonetic), and the other

2    executives named in the summary compensation table, did not

3    receive bonuses for 2001."

4    Q    Okay.  So in 2001, in a year when you had profit of 1.2

5    billion dollars, which was down approximately 10 percent from

6    the year prior, they paid a million dollars in cash bonus, and

7    it was in part due to the board's decision that the performance

8    was not up to measure, is that correct?

9    A    That's correct.  I think I recall in that year, though, we

10   made a hundred million dollars of stock based compensation

11   grants to our employees, and if you factor that into the

12   overall compensation philosophy of the company, which included,

13   during this period of time, cash incentive awards, as well as

14   stock based compensation awards, you know, the hundred million

15   on the base of a billion two, is probably in the, I don't know,

16   8 percent range.

17        Which, again, when you factor in the historical

18   philosophy of the company from a compensation standpoint, you

19   need to factor in both the cash incentive awards, as well as

20   the stock based awards.

21   Q    All right.  Let's look at the stock options in that year.

22   The next section says stock options.  Can you read us that

23   paragraph, please?

24   A    (Reading)

25        "Tribune for many years has used stock options as a

Bigelow - Cross (Sim)                    Page 86

1    long term incent..."

2         Do you want me to read the whole paragraph?

3    Q    Sure.  That would be great.

4    A    "...stock options as a long term incentive for executives

5    and other key employees, stock options are used, because they

6    directly relate to the amounts earned by executives and other

7    key employees, to the amount of appreciation realized by

8    Tribune's shareholders over comparable periods.  Stock options

9    also provide executives with other key employee -- and other

10   key employees with the opportunity to acquire and build

11   ownership interest in Tribune.  The incentive plan provides for

12   a 10 year exercise period for stock options, and gives the

13   committee the ability to modify vesting schedule and other --

14   for stock option grants.  Option grants under the incentive

15   plan generally vest over equal installments of a period of 4

16   years from the grant date."

17   Q    Okay.  You can stop there.  Now as I understand from your

18   testimony when we had your deposition, the benchmark numbers in

19   the 2009 plan for plan, stretch and max, and the payout

20   figures, the bonus payout figures, were reached ultimately by

21   the debtors, and then given to Mercer to prepare its report, is

22   that correct?

23   A    Yes.  Management of the company is responsible for

24   planning and budgeting the business.  And as a result, as we

25   always have, we established our budgets and submitted them to

1    the board of directors.  And on their approval, you know, had

2    an approved operating plan for 2009.  That budget was then

3    shared, not only with Mercer, but also with our two Creditor

4    Committees.  And the two Creditor Committees and their

5    financial advisor, as well as Mercer, reviewed that

6    information.

7            But, yes, we, you know, we are responsible.  The

8    management of the company is responsible for preparing those

9    plans -- that plan.

10   Q    Those numbers, the benchmarks and payout's, were generated

11   by the company.

12   A    No the -- well, the operating plan was approved and, you

13   know, that was the 212 million dollar plan level.  And so, you

14   know, that was what management, you know, came up with in their

15   normal course.

16           It was, you know, through discussion with Mercer,

17   and, you know, using them and their expertise, that we, you

18   know, ultimately landed on original proposed stretch and other

19   thresholds as part of the plan.

20   Q    All right.  Let's turn to, I think it's page 80 of your

21   deposition transcript.  I think it's line 17 -- I'm sorry, line

22   14.

23   A    (Reading)

24        "Q    Okay, you heard the testimony yesterday of Mr.

25   Dempsey, we talked about this at the beginning of your

1    deposition.  He said he testified that at numbers the benchmark

2    and the payout numbers were generated by Tribune and given to

3    Mercer for this report.

4    A    That's correct."

5    Q    Okay.  Thank you.  You can stop there.  Okay.  Let's look

6    at page 94.  The line 8.  Again, I ask you a similar question.

7    A    (Reading)

8         "Q   Mr. Dempsey's testimony yesterday was that the

9    debtors came to him with the salary payout's and the benchmarks

10   he prepared in the report?

11   A    Right."

12   Q    Okay.  Thank you.  Now you've talked a little bit in your

13   direct about how the debtors have provided information to the

14   Committee, and to the other, I guess, stakeholders.  And

15   there's been a thorough review of that information in the

16   Mercer report.  You're familiar with the Mercer report?

17   A    Yeah.

18   Q    Is that correct?

19   A    Yes.

20   Q    And there's a lot of data in that report, is that correct?

21   Is that a correct statement?

22   A    Yeah.

23   Q    Okay.  Have you -- are you aware of anybody, the debtors

24   vetting that data?

25   A    Well we absolutely reviewed the operating plan related

1  data, the, you know, compensation data.  Mercer in, you know,

2  what they do as an independent compensation consultant, does,

3  you know, provided all of the bench marking data, the database

4  analysis that they hold, the TDC work and all of the peer

5  analysis.

6        So with respect to that information, you know,

7  absolutely, we reviewed it.  But did I go through each and

8  every number?  No, on the peer analysis.  And, obviously, the

9  Mercer proprietary database information, I did not.

10       But all of the company specific information, the

11  operating cash flow, the salary stuff, we did vet, yes.

12  Q   Okay.  But let's talk about the -- in the Mercer report

13  there's a comparable analysis of other bankruptcy debtors who

14  have been -- who have adopted plans, bonus plans in bankruptcy.

15  Did you look at any of the backup data for that chart?

16  A   I did not personally.  But at the end of the day, that's

17  why we wanted to have Mercer on the team, to help us analyze

18  this information.

19       Like I said earlier, the intention for these plans

20  was to develop a reasonable market based compensation plan.

21  That's what we've worked incredibly hard to present to the

22  Court, incredibly hard to get the support of both Committees,

23  all of their financial advisors.

24       And so absolutely, you know, we wanted the

25  compensation committee, or the company wanted expert help, and

1    that's where Mercer came into play.

2         Did I check all of their the numbers that they

3    brought into the deck?  I did not.

4    Q   Okay.  You said that the financial advisors for the

5    committee looked at the information.  Who's the financial

6    advisor to the committee?

7    A   The financial advisor for the Official Committee in this

8    particular matter was Alex Partners.  And the financial advisor

9    for the senior lender Steering Committee in this particular

10   situation was Blackstone.

11        I personally don't know the involvement of the other

12   financial advisor for the Official Committee, Moelis, and the

13   other financial advisor for the Steering Committee, FTI, I

14   don't know how involved they were.

15        But each Committee has two financial advisors.

16   Q   Okay.  Are those financial advisors compensation

17   consultants?

18   A   Not that I'm aware of.  Although I think they obviously

19   advise committees in these types of situations, so I think they

20   have experience.

21   Q   But they're not compensation consultants?

22   A   No.  They are not.

23   Q   All right.  I want to get back to the -- we talked earlier

24   in your -- in my cross about the newsprint and personnel costs.

25   Do you have any idea if the newsprint, if the debtors had not

1    terminated any employees and the debtors were paying 2008

2    newsprint costs, do you have any idea what your OCF would be

3    today?

4    A    I would say -- I don't know specifically what our OCF

5    would be.  But if we had not started implementing the

6    initiatives and the strategies that we did last year, and have

7    continued to do this year, I would imagine that certain of our

8    business units would not generate operating cash flow this

9    year, and that that would pose some very difficult questions to

10   our creditor constituency, the company, the Court.

11        It is possible that on a consolidated basis that we

12   might have had some operating cash flow in 2009, but I would

13   say that, if we hadn't really driven very hard and really

14   accelerated the pace of change, that, you know, we would run

15   the risk of not having any cash flow.

16   Q    Okay.  My question, though, specifically, was related to

17   the personnel costs and the newsprint costs.  Those are the two

18   components --

19   A    Yeah.  Which I think in total, you know, this year will be

20   down in the 250 to 300 million dollar range.  And, as I've

21   said, you know, we could have EBITDA this year -- excuse me,

22   operating cash flow this year of 350 to 400 million.

23        And so, if you didn't have those year over year

24   savings, you would have significantly diminished operating cash

25   flow.  And on a consolidated basis, I don't know what the

Bigelow - Cross (Sim)                    Page 92

1    impact could be for some of our specific businesses.  And like

2    I said, we have a priority to ensure that all of these

3    businesses survive as -- you know, the bigger the business, the

4    bigger the newspaper, the more fixed costs.

5            And I would imagine that, if we had not had the

6    compensation savings, and if we had not redesigned all of our

7    newspapers last year to reduce our, you know, consumption of

8    newsprint so dramatically, that you would have had the risk

9    that some of our larger newspapers, you know, may have shut

10   down.

11   Q    All right.  Is there anybody from the compensation

12   committee here today?

13   A    No.

14   Q    All right.

15           MR. SIMON:  Could I have one minute, Your Honor?

16           THE COURT:  You may.

17                          (Pause)

18           MR. SIMON:  I think just, I have one more question.

19   And this more of a confirmation.

20   BY MR. SIMON:

21   Q    But if you look at page -- if you look at the Mercer

22   report on page 35, the Mercer report is tab 1.  Can you confirm

23   that the individuals listed on the positions listed on page 35

24   -- actually let me just check another page.

25           Well let's look at page 8, which has a list of

1    individuals and their positions.  Can you confirm that

2    everybody on this page is an officer of the company?

3    A    Yes.  Aside from the group of employees who will be part

4    of the discretionary.

5    Q    The titled positions on that page --

6    A    Yeah.

7    Q    -- not in the footnote, those are all officers?

8    A    The titled positions, that's correct.

9    Q    All right.

10             MR. SIMON:  Your Honor, I would move into evidence

11   today, or at this time, exhibits, I think tab 4, which is the

12   historic operating cash flow numbers, tab 19, which is the e-

13   mail from Mr. Spector, the historic bonus programs.  These are

14   debtors' documents at tabs 17 and 18.

15             And the 2002 proxy, Tribune proxy, which is at tab

16   5D.  And I believe that's the only thing I would move at this

17   time, without prejudice to my right to move other exhibits

18   later after talking to Mr. Lotsoff.

19             THE COURT:  Is there any objection?

20             MR. LOTSOFF:  No objection, Your Honor.

21             THE COURT:  Presented without objection.

22             MR. SIMON:  Thank you, Your Honor.  And I think we're

23   at break time.

24             THE COURT:  We are going to break here.  But let me

25   just ask the parties to consider a couple of things during the

1    break.

2         First, again, Mr. Bigelow I'll ask that you not

3    discuss your testimony with anyone during the break.

4         MR. BIGELOW:  Yes, Your Honor.

5         THE COURT:  Okay.  Counsel, we'll confer on exhibits

6    and admissibility of that which is yet to be presented.  I'd

7    like a fresh assessment of what time will be required to

8    complete the evidentiary portion of the hearing.

9         I don't presently know -- I'm going to have to take a

10   break at 3 for a short conference call, what I hope will be a

11   short conference call.  I don't know how late I can go tonight,

12   but I'd like the parties to tell me how late they'd like to go

13   tonight.

14        I'm not interested in a 9 or 10:00 deal tonight.

15        MR. LOTSOFF:  Your Honor, Jonathan Lotsoff, on behalf

16   of the debtors.  I don't foresee the need to go to 9 or 10

17   tonight.  If I could note, though, as we noted at the August

18   hearing, this hearing has been a long time coming, so it is

19   very important to the debtors to finish.

20        You know, again, we anticipate that Mr. Dempsey will

21   be a shorter witness.  I can't speak to Mr. Simon's cross.

22        Obviously, that's up to him.  I don't anticipate

23   having a huge amount of cross for Mr. Phillips.  But,

24   obviously, I haven't heard what he has to say yet.  But, you

25   know, we're prepared to go as long as it takes, but I don't

                    Bigelow - Cross (Sim)                    Page 95

1   anticipate, again, that that would be until the wee hours of
2   the evening, or anything close to it.
3           THE COURT:  I have a hot date tonight with my wife,
4   you know.
5           Well here's the point, from my standpoint, other than
6   the use of Court staff and pressing their days, as I gain
7   experience, some might say age, I find that my ability to
8   listen as keenly as I formerly am able, wanes as the hours pass
9   5 and 6 press on.
10          This is a matter, as all matters are before me, I
11  know important to the parties.  And I wish to give it all of
12  the attention that it deserves.  I'm aware of the pressing
13  considerations that the company has here, and the Guild, as
14  well.  And the expense, and time, and disruption involved in
15  bringing people back to complete a hearing.
16          So I would like to finish today.  Okay.  Anything
17  else before we break?
18          MR. LOTSOFF:  I'm sorry, Your Honor?
19          THE COURT:  Anything else before we break?
20          MR. LOTSOFF:  Nothing from me, Your Honor.
21          MR. SIMON:  Nothing from the Guild, Your Honor.
22          THE COURT:  All right.  Court will stand in recess
23  until 2:00.
24                          (Recess)
25                        (Tape Change)

1    (On the record at 2:06 p.m.)

2             THE CLERK:  All rise.

3             You may be seated.

4             THE COURT:  Good afternoon, all.

5             MR. LOTSOFF:  Good afternoon.

6             THE COURT:  All right.  Let me just first ask for a

7    revised or up-to-date projection on time required to finish

8    this hearing.

9             We have redirect and recross to go yet with Mr.

10   Bigelow.

11            MR. LOTSOFF:  Well, we --

12            THE COURT:  Or is there no redirect?

13            MR. LOTSOFF:  We have no -- subject to Mr. McMahon

14   having no cross, which I don't want to speak for Mr. McMahon,

15   but --

16            MR. McMAHON: We have no questions of Mr. Bigelow.

17            MR. LOTSOFF:  Okay.  And then we have no questions for

18   Mr. Bigelow either, and are prepared to move --

19            THE COURT:  Okay, you know, I do.

20            MR. LOTSOFF:  Okay.

21            THE COURT:  So I'm going to throw a monkey wrench in

22   that works.  See, when I -- I try not to interfere with direct

23   or cross, so I ask before redirect or recross, so counsel have

24   the opportunity to repair whatever damage I've done by my

25   questioning.  And you'll have that opportunity today.

1          MR. LOTSOFF:  Thank you, Your Honor.

2          THE COURT:  All right.  Okay.  Beyond Mr. Bigelow?

3          MR. LOTSOFF:  Beyond Mr. Bigelow?

4          THE COURT:  Yes, the --

5          MR. LOTSOFF:  Again, I would --

6          THE COURT:  -- morning's estimates still apply?

7          MR. LOTSOFF:  My estimate for Mr. Dempsey still

8    applies, yes.

9          THE COURT:  Okay.

10          MR. SIMON:  Good afternoon, Your Honor.  Chris Simon

11   for the Guild.

12          We -- I believe my estimates still apply, shouldn't

13   be too long for Mr. Dempsey's cross and Mr. Phillips's direct

14   should be relatively short.

15          I do want to report, I think debtors' counsel will

16   concur, that we've agreed that the exhibits can be moved into

17   evidence, and the notebook that was submitted by the -- both

18   parties, and that would include the expert reports for both

19   parties.  So that should save some time on both cross and

20   direct as far as moving --

21          THE COURT:  All right.  So in terms of numbers, for

22   the Guild, it's Exhibits 1 through 40 in their entirety?

23          MR. SIMON:  I believe that's correct, Your Honor.

24   Plus --

25          THE COURT:  Okay, and -- I'm sorry.

1          MR. SIMON:  Plus, I would also like to move the

2     deposition transcripts of Mr. Bigelow and Mr. Dempsey when

3     appropriate, but probably 42 in total.

4          THE COURT:  Okay.  And from the debtors' standpoint, 1

5     through 5?

6          MR. LOTSOFF:  That's correct, Your Honor.

7          THE COURT:  Okay.  Now --

8          MR. LOTSOFF:  Could I add one thing?

9          THE COURT:  Yes.

10         MR. LOTSOFF:  I believe Mr. Simon and I also

11    stipulated that we would move the exhibits into evidence with

12    the Court's permission, but we reserve the right obviously to

13    argue the weight that those exhibits should be given.

14         THE COURT:  Understood.  Now, the debtors' exhibits,

15    at least the cover indicates, they're to be kept under seal.

16    I'm assuming that request still applies?

17         MR. LOTSOFF:  That is correct, Your Honor.

18         THE COURT:  Although the witness testified pretty

19    completely about a lot of it.

20         MR. LOTSOFF:  True.

21         THE COURT:  With respect to the Guild's exhibits, what

22    is the request?

23         MR. SIMON:  Your Honor, I don't know which exhibits

24    were produced by the debtors and which weren't.  Our exhibits,

25    for the most part, are public documents, and documents that

1    should not be under seal, as far as I'm concerned.   And it

2    might help, what I'm willing to do is, maybe to save time, take

3    a position on that issue when we get through the evidence --

4          THE COURT:  Okay.

5          MR. SIMON:  -- or later, because I don't want to do

6    anything to prejudice the debtors' rights to keep things under

7    seal that they did produce.

8          THE COURT:  Understood.

9          MR. LOTSOFF:  I could give my quick view, if it would

10   be helpful to the Court.

11         THE COURT:  Go ahead.

12         MR. LOTSOFF:  With respect to the index of exhibits

13   that the Guild has submitted with their binders, our position,

14   and I'd want to double-check this, but number 1, which is the

15   Mercer report unredacted, would be subject to confidentiality.

16   Number 3, Mercer attachment, that was also produced pursuant to

17   the protective order, as was number 4, the OCF reconciliation.

18   I believe there are numbers on there that go beyond just the

19   cash flow.

20         Then I believe 17 and 18 -- and 16 for that matter,

21   Mr. Phillips's report, as Mr. Simon helpfully points out, those

22   all contain, so 16 through 18, and 19, Mr. Spector's document,

23   but that was produced pursuant to the protective order.

24         And then the deposition transcripts --

25         THE COURT:  Is there anything in the email that wasn't

Bigelow - Court                    Page 100

1    read into the record?

2              MR. LOTSOFF:  Well, actually I'd want to double-check,

3    but possibly not.

4              THE COURT:  ALL RIGHT.

5              MR. LOTSOFF:  Okay.  So subject to that.  The

6    deposition transcripts have of course a lot of confidential

7    information in them as well.

8              But beyond that, it looks like these are publicly

9    filed documents for the most part on the Guild's exhibit list.

10             THE COURT:  Okay.  Thank you.

11                             (Pause)

12             THE COURT:  All right, let me ask Mr. Bigelow to

13   return to the stand briefly.

14                      CHANDLER BIGELOW, RESUMES

15             THE COURT:  Please have a seat.  I'll remind you, sir,

16   that you are still under oath.

17   BY THE COURT:

18   Q    Here's my question.  The submissions reflect, and I don't

19   recall that any of the examination or cross dealt specifically

20   with this issue, but on the three components of the 2009 plan,

21   the MIP includes the group that's been referred to as the top

22   ten.  The TMIP includes the members of the top ten.  And the

23   KOB includes six of the top ten members.

24   A    That's correct.

25   Q    Explain to me why you felt it was appropriate to rate the

1   -- well, include the top ten in all three elements of the plan.

2   A    Sure.  The intent of the entire plan that's before you,

3   all three components, is designed to provide a market based

4   compensation package for -- for all the participants.  And the

5   MIP component is the normal ordinary course component of the

6   three, and the targets in the MIP are unchanged.  My target,

7   for example, as a percent of salary, is the same in the 2009

8   plan as it was in the 2008 plan.

9         The inclusion of the TMIP and the KOB for those members

10   of the top ten that are included in both is an attempt to again

11   deliver market based compensation.

12        As you recall, we've always had a cash incentive piece as

13   well as a stock based incentive piece. And the TMIP and the KOB

14   are new to our overall program and our design to restore the

15   market based compensation that previously had been delivered in

16   a traditional annual MIP plus stock based comp.  The MIP

17   portion of this year's incentive plan is essentially unchanged,

18   and the TMIP and the KOB are in addition to that normal

19   ordinary course MIP which strives to deliver market based

20   compensation.

21   Q    Well, assuming that none of the components, just assuming

22   for the moment that none of the components are primarily

23   retention oriented, but are meant truly to incent those covered

24   in the manner and for the reasons you've already explained,

25   speaking for yourself, how do you think your performance will

Bigelow - Court                          Page 102

1    be incented by being included in all three categories as

2    opposed to just one, or aren't you in the KOB?

3    A     I'm not in the KOB.

4    Q     Okay.

5    A     So --

6    Q     So tell me what the TMIP adds to what it is you might

7    otherwise do or not do in your role at the company?

8    A     So, again, the underlying metric for the TMIP is operating

9    cash flow.  And so, at its core, the TMIP is incentivizing to

10   drive operating cash flow.

11        Specifically with the TMIP, in addition to that, it's

12   recognizing the 21 people at the company who are most

13   responsible for the restructuring.  And it's also because of

14   the payout feature of the TMIP, is you know, motivating prompt

15   emergence from -- from bankruptcy because of the timing of the

16   payment.

17        But at the end of the day, the underlying metric is

18   incentivizing me to do whatever I can in my capacity as the

19   Chief Financial Officer to drive and maximize operating cash

20   flow.

21   Q     So in other words, if you were in the MIP but not in the

22   TMIP, you'd be less motivated?

23   A     Well, from a personal standpoint, I am very motivated to

24   ensure that we survive and transform the company.

25        The addition of the TMIP is, in the case of myself, in

Bigelow - Court                              Page 103

1    working with Mercer and working with the Creditors Committees,

2    is you know, the pursuit of trying to deliver a market based

3    compensation package for someone of my responsibilities for a

4    company that's as complicated and as large as Tribune.

5         And so, you know, just paying the MIP, in my personal

6    situation, would deliver me, according to all the Mercer data,

7    a compensation package that would be below the market median.

8    And it's the inclusion of the TMIP that restores the overall

9    compensation for the Chief Financial Officer in this case to

10   be, I believe it's actually below market, but close to market

11   median.

12        THE COURT:  Is there any redirect based upon, and

13   limited to that which I have raised with the witness?

14        MR. LOTSOFF:  Could I take one moment?

15        THE COURT:  Yes.

16                           (Pause)

17        MR. LOTSOFF:  Your Honor, assuming there's no

18   additional cross, we have no redirect.

19        THE COURT:  Well, let me ask if there's cross, further

20   cross based upon and limited to that which I've raised with the

21   witness.

22        Mr. Simon?

23        MR. SIMON:  Your Honor, I have nothing further.

24        THE COURT:  All right.  Thank you, sir.  You may step

25   down.

                    Colloquy                    Page 104

1                THE WITNESS:  Thank you, sir.

2                THE COURT:  Next witness.

3                MR. LOTSOFF:  Thank you, Your Honor.  Jonathan Lotsoff

4       on behalf of the debtors.  The debtors would call John Dempsey

5       of Mercer.

6                THE CLERK:  Please remain standing.  Please state your

7       name, spelling your name for the Court, please.

8                MR. DEMPSEY:  John Dempsey, D-E-M-P-S-E-Y.

9                          JOHN DEMPSEY, SWORN

10               THE CLERK:  You may be seated.

11                         DIRECT EXAMINATION

12      BY MR. LOTSOFF:

13      Q    Good afternoon, Mr. Dempsey.

14      A    Mr. Lotsoff.

15      Q    What is your current position with Mercer?

16      A    I'm a principal.

17      Q    And how long have you been a principal with Mercer?

18      A    Since 2000.

19      Q    And when did you commence your employment with Mercer?

20      A    I originally commenced my employment with Mercer in 1985.

21      Q    And can you describe for us what Mercer does?

22      A    Mercer is a global human resource consulting firm.  We

23      provide advice on the design of compensation and benefit

24      programs.  I -- including in addition to -- executive

25      compensation broad based employee compensation, and benefits,

1    pensions, health insurance and investment products associated

2    with those.

3    Q    And do the services offered by Mercer include the analysis

4    and design of incentive compensation programs for management

5    teams?

6    A    Yes, they do.  And in addition -- and more specifically,

7    my personal practice relates to the design of programs for

8    companies going through restructurings, including bankruptcies.

9    Q    And I'll ask you that in one moment, but to circle back.

10   Where did you get your undergraduate degree?

11   A    My undergraduate degree from Yale.

12   Q    And do you also have any graduate degree?

13   A    I do.  I have an MBA with concentration in finance from

14   the Ohio State University.

15   Q    And when did you obtain that degree?

16   A    In 2000 -- excuse me, in 1992.

17   Q    Can you describe your practice area with Mercer?

18   A    Well, as I mentioned, I advise organizations going through

19   restructurings, including bankruptcies.

20   Q    And in addition to that, do you have any experience with

21   respect to the design and analysis and benchmarking of

22   compensation programs, and specifically incentive compensation

23   programs?

24   A    Yes, I do.

25   Q    Can you describe that expertise and experience?

Dempsey - Direct (Lot)                              Page 106

1   A    Well, throughout my time with  Mercer, I have advised

2   companies on, primarily on executive compensation programs,

3   including base salaries, annual incentive plans, long term

4   incentives, both cash and stock based.

5   Q    And can you describe the area of specialization that you

6   mentioned before with respect to restructuring?

7   A    Yes.  In the last seven or eight years, much of my time

8   has been spent advising companies going through restructurings.

9   My clients have included Owens Corning, Solutia, Dana, Nortel

10  presently, a number of smaller companies including Intermet,

11  Venture Industries, Citation.

12       In addition to all of that, I've advised many companies

13  preparing for prepackaged or prearranged bankruptcies, and

14  companies just planning for potential restructurings.

15  Q    And how long have you been engaged in the field of

16  executive compensation and management compensation consulting?

17  A    Throughout my time at Mercer.

18  Q    So over 20 years?

19  A    That's correct.

20  Q    And have you testified as an expert witness on management

21  incentive compensation issues and benchmarking and the like in

22  any court proceedings?

23  A    Yes, I have.

24  Q    And can you identify some of those proceedings?

25  A    Owens Corning, Venture Industries, Citation, Intermet, LI

1    Holdings.

2    Q    Nortel?

3    A    Nortel recently, yes.

4    Q    Can you describe Mercer's retention by Tribune Company?

5    A    I was --

6    Q    The scope of your engagement, if you will.

7    A    I was engaged to assist the company with the development

8    of incentive compensation programs for the time in bankruptcy

9    shortly after they filed.  Addition to that, also to review the

10   potential payouts of the 2008 MIP bonuses.

11   Q    And did your engagement extend to review of the incentive

12   plan that's before the Court today?

13   A    Yes, it did.

14   Q    And who at Tribune retained Mercer?  What --

15   A    I was retained by the Compensation Committee of the Board

16   of Directors.  And that's who I report to for this project.

17   Q    And what are the purposes of the 2009 incentive plan as

18   you understand them?

19   A    To provide an incentive for the company to maximize 2009

20   operating cash flow, and you know, and built on that is that

21   that is a key driver of the overall success of the

22   restructuring, and the company's long term prospects to

23   continue as a successful enterprise.

24        And in addition to that, to provide for a market

25   competitive compensation program for the participants.

Dempsey - Direct (Lot)                    Page 108

1    Q    And based on your experience in this field, is it

2    important for a company, including a company undergoing

3    restructuring, to pay competitive compensation to its

4    management team?

5    A    Yes.

6    Q    Why?

7    A    Well, it is critical because we -- Tribune is asking its

8    employees to, you know, go above and beyond the meets

9    expectations daily responsibilities of their role, and to work

10   extremely hard to find new ways to do things to reduce costs,

11   and to build businesses that will thrive in the information

12   age.  And it is, if we want to ask people to go above and

13   beyond, we need to compensate them appropriately for that

14   effort.

15   Q    And did you and your team at Mercer prepare a report

16   documenting your analysis and conclusions with respect to the

17   reasonableness and the other characteristics of the proposed

18   incentive plan?

19   A    Yes, I did.

20   Q    And do you have the exhibit binder in front of you?  The

21   small one beyond you on the ledge.

22        Could you look at Exhibit 4, Tribune Exhibit 4.

23   A    Yes, I have it in front of me.

24   Q    Is that the report that you prepared?

25   A    Yes, it is.

Dempsey - Direct (Lot)                    Page 109

1   Q    And in benchmarking or assessing the competitiveness of

2   the proposed compensation opportunities under the proposed

3   plan, what standard did you benchmark against?

4   A    We were building compensation to be at the market median.

5   Q    And what is the market median?

6   A    Market median is the point in the range of all the market

7   data where you're halfway through it, and so half of the

8   observations are above and half are below.

9   Q    So half the relative companies pay more, half the relative

10  companies pay less?

11  A    That's correct.

12  Q    And is that concept, the market median, is that a common

13  measure of competitiveness in your experience?

14  A    Yes, it is.  Different employers have different targets

15  for their pay, but the market median is the most common.

16  Q    And is the market median also sometimes referred to as the

17  50th percentile?

18  A    Yes, it is.

19  Q    Can you describe the methodology that you used in

20  determining the market median for the various groups of

21  employees that participate in these plans that you benchmarked?

22  A    Yes.  For the top four executives in the plans, so that's

23  the Chief Operating Officer, the Chief Administrative Officer,

24  the General Counsel and the Chief Financial Officer, we

25  developed our market comparisons with reference to a peer

1    group, and we drew the information from proxy statements and

2    other publicly available sources for the salary, the annual

3    incentives, long term incentives and the total of those, which

4    is what we call total direct compensation.  And so we gather

5    that information and analyze it and array it, and then from

6    those samples derive the percentile that we report; most

7    importantly the median, or 50th percentile.

8         For the remaining participants, we drew our information

9    from survey sources which were -- some published by Mercer,

10   others from other vendors, including an excellent source survey

11   of media companies that's published by Towers Perrin.  And we

12   matched the roles in the survey to the roles at Tribune to find

13   the most -- the closest comparable job and then pull out of

14   there the data for organizations of the relevant size to

15   present as the market data for the positions.

16   Q    And of the employees in the various plans, for how many

17   did you do a position-by-position comparison?

18   A    We focused on the -- well, we focused in this report on

19   the participants in the TMIP and the KOB.  And so it was that

20   universe of 23 that is the primary focus.

21        In addition to that, we did a study of compensation for

22   about 86 other positions at Tribune just to ascertain their

23   market competitiveness, and we found that for those 86, of the

24   720 of the MIP, that their pay opportunities were competitive

25   on a cash compensation basis, so salary and annual incentive.

Dempsey - Direct (Lot)                    Page 111

1    Q     And with respect to the peer group that you used in order

2    to benchmark the top four, is that peer group set forth in your

3    report?

4    A     Yes, it is.

5    Q     Can you show us where?

6                                    (Pause)

7    A     It's on page 37.

8    Q     And how does your methodology for benchmarking with

9    respect to this plan compare to those used by your counterparts

10   in the management compensation consulting profession?

11   A     This is a consistent -- very typical process of looking

12   within the industry and then -- within the industry and

13   considering size and complexity and to establish a peer group.

14         So I have worked over the years with people that have

15   come and gone to Mercer's primary competitors and found very

16   consistent thinking on the size -- on the process for

17   developing a peer group of this kind.

18   Q     And directing your attention to page 37 of your report,

19   the peer group used for the top four executives -- and by the

20   way, because public filings typically disclose compensation for

21   the top five, why did you only benchmark the top four using the

22   public filings?

23   A     Because we thought that that group was the most

24   appropriate to compare to the public data, and that it was

25   better to look at functional roles for the other positions.

Dempsey - Direct (Lot)                    Page 112

1    Q    So you didn't find a good match to the fifth rank?

2    A    That's correct.

3    Q    Okay.  How did you determine the peer group used at page

4    37?

5    A    Well, we began looking at the industry.  We were looking

6    for organizations that were you know, in the media space, and

7    organizations that were you know -- we were looking for

8    organizations that had newspaper, that had broadcasting and

9    cable.  We also -- you know, much of the trend here is looking

10   for new sources of revenue.  And so some of the companies in

11   the peer group do have businesses that are newer to the media,

12   and looking for new ways to gather revenue from information and

13   some of that in the peer group as well.

14   Q    And did you consider the complexity of the organization as

15   well?

16   A    Yes, we did.

17   Q    And why did you consider complexity of the organization?

18   A    Well, it's, you know, having a variety of different

19   businesses does add to the challenge of managing a company.

20   And the strategic vision that is required and flexibility, and

21   so we consider that to be an important factor in assessing who

22   should be in the peer group.

23   Q    Why did you not include other newspaper companies that

24   filed for Chapter 11 such as the Chicago Sun Times or the Star

25   Tribune?

Dempsey - Direct (Lot)                    Page 113

1    A    Well, first of all we were -- you know, the sources of

2    talent that are not to hire people, does not come primarily

3    from organizations in bankruptcy.  We look to the broader

4    industry.  And so we didn't consider that you know, that it was

5    particularly important to consider for purposes of developing

6    pay levels, companies in bankruptcy.

7         The other factor we considered is that the other

8    organizations in bankruptcy in the media are quite a bit

9    smaller than Tribune.  And so we didn't think that you know, to

10   be managing Sun Times is just a completely different -- it's

11   much more akin to one of the business units of Tribune and not

12   to its senior leadership, which is what we were trying to

13   benchmark.  So we didn't consider it appropriate.

14   Q    And to your knowledge, is the methodology that you used in

15   developing this peer group consistent with how others in your

16   field develop peer groups for comparable purposes?

17   A    Yes.

18   Q    Did you also do anything to determine whether companies

19   other than Tribune had implemented supplemental incentive

20   programs outside the ordinary course while in Chapter 11 as

21   Tribune proposes to do with respect to the TMIP and the KOB?

22   A    I did.

23   Q    And can you describe why you did that and what you did?

24   A    Well, we were seeking to assess the cost of the TMIP and

25   KOB relative to bankruptcy compensation practices.  And we

Dempsey - Direct (Lot)                    Page 114

1    therefore looked for organizations that were in bankruptcy that

2    had implemented special compensation programs.  And we -- we

3    gathered information from them on their programs.

4    Q    And what sources did you use to gather this information?

5    A    We gathered it from Court filings primarily, from motions

6    and orders, and then we supplemented that information with

7    information available from SEC filings in cases where the

8    debtors go ahead and file with the SEC.

9    Q    And with pulling information from these public filings

10   with respect to these supplemental incentive plans that were

11   implemented in Chapter 11 by other companies, did you use

12   information only for plans that had been approved by the Court?

13   A    Yes, I did.

14   Q    And did you also, as part of this cost analysis, include a

15   benchmarking of the costs of any ordinary annual incentive

16   components that these companies may have had, to the extent

17   they had any?

18   A    No, we did not.

19   Q    And why not?

20   A    Well, we were trying to compare the cost of the

21   supplemental compensation, the special sort of non-ordinary

22   part of this.  And so, we wanted to separate out the costs and

23   compare those specialized programs.

24        The other factor is that it is quite common for short

25   term set of plans to go in as ordinary course.  And they aren't

1    always included in the motions that come before the Court.  And

2    for that reason, it's hard to do a consistent analysis, and so

3    we did not include -- we did not include them.  And where it

4    was disclosed, we did make an effort to separate out the short

5    term incentive from the special compensation.

6    Q    And so in some instances, is information regarding

7    ordinary course programs even available?

8    A    It isn't always available, that's correct.

9    Q    Having gone through this process, and I'll ask you some

10   more questions about specific aspects of your report in a

11   moment, but having gone through this process, what were your

12   overall conclusions with respect to the debtors' proposed

13   incentive plan?

14   A    My conclusion is that the program will offer a market

15   competitive compensation, and that it does provide an incentive

16   to generate strong operating cash flows in 2009.  And that it's

17   appropriate and in the circumstances for the company.

18   Q    And there are various payout levels under these proposed

19   plans.  Did you reach any conclusions with respect to whether

20   the proposed plan is or is not market at each of those various

21   payout levels --

22   A    Yes, I did.

23   Q    -- depending on performance?

24   A    Yes, I did.

25   Q    And what was that conclusion?

Dempsey - Direct (Lot)                    Page 116

1    A    That it, in each case, in the aggregate, the programs are

2    at or below the market median relative to the benchmarks.

3    Q    And did you also reach a conclusion as to whether or not

4    these plans, and in particular the TMIP and the KOB are

5    appropriate plans for a company in Chapter 11?

6    A    Yes, I did.

7    Q    And what was your conclusion?

8    A    That they are appropriate.

9    Q    All of these plans use cash flow as a core performance

10   metric.  Is that a common performance metric in incentive plans

11   in your experience?

12   A    Yes, it is. The operating cash flow is another name for

13   EBITDAR or Earnings Before Interest, Taxes, Depreciation,

14   Amortization and Restructuring costs.  And so that is the most

15   common metric for incentive plans in this environment.  And so

16   absolutely.

17   Q    Your report speaks of total direct compensation and total

18   cash compensation.  Can you briefly explain what those terms

19   mean?

20   A    So in the -- in a typical package you have a salary.  Then

21   you have the total -- then you have an annual incentive, the

22   sum of the salary and the annual incentive is the total cash

23   compensation.  Then there's this long term incentive element,

24   and then as we add the expected value of that to the cash

25   compensation, we get what we call total direct compensation.

Dempsey - Direct (Lot)                    Page 117

1    Q    Mr. Bigelow testified that the company does not currently

2    have any equity value to grant, as it historically has done.

3    What does that mean in terms of the management team's total

4    direct compensation without the proposed plan?

5    A    Well, without any sort of equity compensation, the total

6    direct compensation will be far below the market, the

7    prevailing market or at levels.

8    Q    And could you look at page 14 of your report.

9    A    Okay.

10   Q    And this page is entitled "impact on TDC at plan".  Can

11   you tell us what this page of your report shows?

12   A    This page shows that the market competitiveness of the

13   compensation for the top ten without -- with and without the

14   CEO and also with other key executives who are the participants

15   in the TMIP and KOB, compares in aggregate to the market.

16   Q    So, taking for example the line, top ten without CEO, and

17   because the CEO doesn't participate in this plan, I'll have you

18   walk through that line, but could you take us just across that

19   row and explain those figures and what they signify?

20   A    Certainly.  So you have the sum of the salaries for the

21   top ten without the CEO, and then the column market index which

22   shows 40 percent.  That is their pay relative to total direct

23   compensation if they receive only base salary.  So, if there

24   were no MIP, no TMIP, no KOB, we did nothing, people would be

25   paid 40 cents on the dollar relative to the market median.

Dempsey - Direct (Lot)                    Page 118

1   Q    And so, just if I could interject to be clear, that 40

2   percent doesn't mean they're paid at the 40th percentile.

3   You're saying that would be 40 percent of the median?

4   A    That's correct.

5   Q    So 60 percent below the 50th percentile?

6   A    That's correct.

7   Q    Okay.  Could you continue going across that row?

8   A    Certainly.  If we add in the MIP, we reach 59 percent of

9   the market median, for 59 cents on the dollar relative to

10  market.  We've improved, but we're still not competitive.

11  Q    And could you continue across that row?

12  A    Certainly.  And for these remaining numbers, I want to

13  point out that this slide is at plan performance.  So on

14  subsequent pages we see a stretch of that max performance.

15       So at planned performance, we reach a -- we increase the

16  planned compensation and we arrive at 73 percent of the market

17  median.

18       So I would --

19  Q    Why -- go ahead.

20  A    If I may continue.  If you were to look in ordinary times

21  at an ordinary company, you would typically expect that this

22  compensation program at planned performance would be at a

23  hundred percent of market median.  And so in recognition of the

24  difficult environment, the company has -- and the plan design

25  envisions paying less for at planned performance than what

Dempsey - Direct (Lot)                    Page 119

1    would normally be the case.

2    Q    And so I understand, if you look at the top ten without

3    the CEO, if the company were to implement only the MIP, the

4    historical MIP but not the TMIP and the KOB, at planned

5    performance, their compensation would be 59 percent of the

6    market median or about 40 percent below the median?

7    A    That's correct.

8    Q    And then if the plan were implemented in its entirety,

9    including the TMIP and the KOB, they would be at 73 percent of

10   the market median?

11   A    That's correct.

12   Q    And just in the interest of time, if I go to the other key

13   executives, am I correct that if they received only their base

14   salary, and this would be the other TMIP and KOB participants,

15   with only their base salary they would be at 44 percent of the

16   market median?

17   A    That's correct.

18   Q    And with only the MIP they would be at 55 percent of the

19   market median?

20   A    That's correct.

21   Q    And if the program were implemented in its entirety at

22   planned performance they would still be at 61 percent of the

23   market median?

24   A    That's correct.

25   Q    And what is the overall line?

1   A    That is the sum of the costs of the above lines.

2   Q    Of the two rows that we just went over?

3   A    Yes, and well, also to the extent appropriate, the

4   discretionary.

5   Q    And in your view, what would the consequences be if

6   management were to receive substantially below market

7   compensation?

8   A    Well, it's critical to have a market compensation

9   opportunity, so depending on how the company does, the actual

10  would vary.   But if there is a -- if the opportunity is not

11  there, then the risk you run is that people will simply adjust

12  their level of effort to the compensation that they're

13  receiving.   And we won't see the level of drive and energy on

14  rebuilding the company, and developing it further, that we have

15  today at Tribune.

16  Q    And does Mercer use a range to determine, around the

17  median, what is competitive in terms of a percentage of the

18  market median?

19  A    Yes, we do.

20  Q    What is that range?

21  A    We use a range of plus or minus 15 percent around the

22  market median.

23       So there is a -- you know, people are not all the same.

24  And there is a tremendous -- there are many, many factors that

25  go into determining an individual's compensation.   And so, we

Dempsey - Direct (Lot)                    Page 121

1   don't see -- you know, whereas a barrel of oil might have

2   pretty much the same price in all transactions at a given

3   moment, that is just not the case with compensation.

4        And so we don't try to tie to an exact number when we do

5   these kinds of analyses.  We look -- you know, we consider if

6   they're plus five percent, plus ten percent, or minus five,

7   minus ten, within that range.

8   Q    And do other firms, other compensation consulting firms

9   also use ranges?

10  A    Yes, they do.  And I've seen a number of ranges from you

11  know, plus or minus ten percent, plus or minus 20 percent, our

12  plus or minute 15 percent is in that range and is consistent

13  generally with this practice that we see.

14  Q    And on an individualized basis, are variations even from

15  that 50-percent range sometimes appropriate?

16  A    Yes, absolutely.

17  Q    And what would be some of the factors that would make

18  variations from that range appropriate?

19  A    Well, there are a couple of big ones.  One is that you

20  hire people in and negotiate, you know, what it takes to bring

21  a person into the company, and that forms a starting point in

22  their pay.  And then it's -- you know, that sort of influences

23  where they are relative to the market median.

24       That's not -- when you go out to hire someone, you look

25  at market median, but you also look at what it's gonna take to

Dempsey - Direct (Lot)                    Page 122

1    bring the person to the company.  So that's a big factor.

2          Another factor can be the -- you know, their performance,

3    their potential, all sorts of a host of factors that may come

4    into it.

5    Q    Could you direct your attention to page 15 of your report.

6    A    Yes.

7    Q    And that page is entitled "impact on TDC at stretch" and I

8    understand that this page would assume performance such that

9    payouts are made at a hundred percent of target?

10   A    At a hundred percent of the pay target, yes.

11   Q    And can you tell us what this chart shows as to the

12   competitiveness of the employee's compensation at this level of

13   performance?

14   A    Okay.  Walking across the top ten without the CEO, and I'm

15   at -- if the MIP pays out at stretch, we are now at -- they

16   would now be at 77 percent of the market median.  And if we go

17   to -- if the TMIP pays out -- of course, at stretch, the KOB

18   has no value still, so that has no impact.  We get to 108

19   percent of market median.

20         Then if we go, take a look at the other -- it's very

21   similar, so we're at 66 percent, and including the base and the

22   MIP, and we're 79 percent for the -- including the TMIP, and so

23   if we aggregate all that together, we're at 91 percent of the

24   market median.

25   Q    And so am I correct in understanding this that if you

Dempsey - Direct (Lot)                    Page 123

1    implement only the historical MIP component, but not the TMIP

2    or the KOB, and you achieve stretch performance, so I think 301

3    million of operating cash flow, under those circumstances, the

4    top ten, their compensation, their total direct compensation

5    would still be roughly 25 percent below the market median, and

6    the other key executives would be roughly 35 percent below the

7    market median?

8    A    That's correct.

9    Q    And if you were to implement the TMIP and it paid out at

10   stretch, and as you noted there's no payout under the KOB at

11   that level, the top ten would be within eight percent of the

12   market median?

13   A    Yes, that's correct.

14   Q    And that's within your 15-percent range for

15   competitiveness?

16   A    Yes.

17   Q    And the other key executives would be approximately 79

18   percent of the market median?

19   A    Yes.

20   Q    Could you direct your attention to page 16 of your report.

21   A    Okay.

22   Q    And this page is entitled "impact on TDC all awards at

23   maximum".  Can you tell us what this page indicates and how you

24   performed your benchmarking?

25   A    Here we were looking to compare the maximum awards.  And

1    so we wanted -- we compared to that the maximum awards to an

2    estimate of what the maximum awards would -- you know, are, or

3    would be at other companies.

4         And so, in order to do that, we assumed a target annual

5    incentive and long term incentive at two times the target

6    level.  And that's how this chart was developed.

7    Q    Why did you use the two times factor?

8    A    The two times is the most common maximum where they exist.

9    Not every plan, not every plan design has a maximum, but where

10   there is a maximum, two times is the most common, and so we

11   used that as our assumption for this analysis.

12   Q    And so in benchmarking against that standard, can you tell

13   us what this chart shows with respect to the top ten and then

14   the other key executives, and I would ask you to focus on the

15   competitiveness if only the MIP were implemented, and then the

16   competitiveness if you also then incorporate the TMIP and the

17   KOB.

18   A    Okay.  For the top ten without the CEO, if the -- if only

19   -- if we have only the MIP, the top ten will be at 54 percent

20   of market median.  And if the KOB and the TMIP pay out as

21   maximum as well, the top ten, without the CEO, will be 98

22   percent of the market median.

23        For the other key executives, you would have a -- you

24   would be at 47 percent of the market median with only the base

25   and the MIP.  And then you would be at 76 percent of the market

1    median if -- if all the plans paid out at maximum.

2        So in aggregate, if we combine everything together,

3    you're 84 percent of maximum.

4    Q    And so, assuming only the MIP were in place, the

5    historical MIP, and the company achieved maximum performance

6    and received a maximum payout under only the MIP, the aggregate

7    compensation of the top ten and the other key executives would

8    still be roughly 50 percent below the median for maximum

9    payouts under comparative plans?

10   A    That's correct.

11   Q    And if you incorporated all of these plans, including the

12   TMIP and the KOB which assuming they paid out at maximum, in

13   the aggregate the management team would be at 85 percent of the

14   median for maximum payouts?

15   A    Yes.

16   Q    And that's still within the 15-percent range that you

17   testified about earlier?

18   A    Yes.

19   Q    You testified earlier about a cost analysis that you did

20   of supplemental programs for companies in Chapter 11.  Could

21   you direct your attention to page 19 of your report.

22   A    Yes.

23        I'm here.

24   Q    Does this reflect the cost analysis that you performed, or

25   part of the cost analysis that you performed?

1   A    Page 19 shows the list of the companies we included in the

2   cost analysis.

3   Q    And could you describe briefly how you chose those

4   companies?

5   A    Again, they were -- we were looking for companies that had

6   implemented special incentive plans for -- in bankruptcy in

7   this recent period.  And we were -- so we looked at that

8   universe.  And of course that's not as robust a universe as you

9   include companies outside of bankruptcy, and therefore you

10  know, we found this list of companies, and it ranges down to --

11  we put the cutoff at 900 million dollars.

12  Q    And if you go to page 20 of your report, can you just walk

13  us through the cost analysis on this page?

14  A    Yes.  We -- the purpose of -- so this plan, this page

15  compares the maximum cost of the plan to the revenue for the

16  organization.  And it is -- and so we calculated a cost as a

17  percent of revenue, and then compare that to the cost of the

18  Tribune's proposals.

19       So if we include only the -- only the TMIP and ignore the

20  KOB for a moment, we find that the -- that represents 0.259

21  percent of the cost -- of revenue, and we see that that is

22  below the average and the median relative to the organizations

23  that we're comparing to.

24       And if we include the cost of the KOB, we need to again

25  remember that -- that would be, you know, to have maximum on

1   the KOB, the company has to do even better than stretch to even

2   begin to pay.  So this really is, you know, far exceeds

3   performance.

4        We do find that the compensation cost would still be

5   within the range of market, but it is above the average and the

6   median.  We do see three observations that are above it.

7   Q    And I see that your list of comparables include Delphi,

8   which as I understand it, filed just under the wire before the

9   Bankruptcy Code amendments in 2005, sometimes known as BAPCPA,

10  I believe they filed about nine days before.  Is the inclusion

11  of Delphi in your analysis appropriate in your view?

12  A    Yes, it is.

13  Q    Why?

14  A    And it is clear from reading the motions that were filed

15  in Delphi, that they were conscious of BAPCPA and their

16  intention was to develop programs that were consistent with

17  BAPCPA.

18       And so, we included it in our universe of post BAPCPA

19  cases.

20  Q    And if you nevertheless took Delphi off this list, what

21  would the median become?

22  A    The median would end up being Quebecor or 0.316.  Only a

23  very, very slight decline.  As it happens, Delphi is right in

24  the middle of the range anyway, so it really doesn't affect the

25  market competitiveness very much.

Dempsey - Direct (Lot)                    Page 128

1    Q    And so the cost of the Tribune plan without the KOB would

2    still be below that revised median?

3    A    That is correct.

4    Q    And with the KOB, it would still be somewhat above but

5    within the range of the entire set of companies?

6    A    That is correct.

7    Q    And we can do the math, but if we take Delphi out and

8    recalculate the average, my figure has the average going from

9    .348 percent to .346 percent, so two one-thousandths of a

10   percentage point.  Is that consistent with your understanding?

11   A    Yes, it is.

12   Q    And again, the plan Tribune proposes without the KOB would

13   still be below that average, is that correct?

14   A    That's correct.

15   Q    And with the KOB, it would still be a touch above?

16   A    It would still be within the market range, yes.

17        MR. LOTSOFF:  I'm just about finished, Your Honor.  I

18   know you indicated you had something --

19        THE COURT:  I'm not going to take the call.  So you

20   may continue, but thank you.

21        MR. LOTSOFF:  Thank you, Your Honor.  I appreciate

22   that.

23   BY MR. LOTSOFF:

24   Q    The Guild in its pleadings indicated that some peer

25   companies such as McClatchy and Lee Enterprises decided in 2009

Dempsey - Direct (Lot)                    Page 129

1    not to pay short term incentives.  And in some cases, I believe

2    in the case of Lee, decided not to pay long term incentives to

3    executives.

4         And as I understand the Guild's position, they appear to

5    be arguing that Mercer's report and methodology are flawed

6    because Mercer benchmarked based on those companies, target

7    opportunities for 2009 as opposed to the subsequent decisions

8    that those companies made about actual bonuses in 2009.

9         Do you agree with that contention by the Guild?

10   A    No, I do not.

11   Q    And can you tell us why?

12   A    Okay.  Let me take -- take the question in two parts.

13        There is the question of the short term incentive and the

14   long term incentive in this benchmark.

15        With the short term incentive, three companies elected to

16   not offer profit in this year.  They were -- you know, they --

17   we were trying to develop what an appropriate compensation

18   opportunity would be.  And so we sized with reference to what

19   has been historically the targets associated with the incentive

20   plan.

21        The Tribune has set goals that we all concluded they

22   could afford to pay the incentive out, and you know, if the

23   goals were achieved, and so we structured it accordingly.

24        With respect to the long term incentives, there was one

25   company that determined -- decided not to make -- announced

Dempsey - Direct (Lot)                    Page 130

1    they were not going to make long term incentive grants that

2    year.

3         We were very conscious in developing our market data that

4    the general prevailing rate of long term incentives was going

5    to be quite a bit lower in 2009 than in the previous years.

6    And this is a function of the stock market decline that is an

7    important factor in sizing long term incentives.

8         So, we did an analysis some months ago of the rate of

9    grants up to that point in 2009, and found that the declines

10   were likely to be in the 30 to 40 percent range.

11        And so we made a conservative assumption to reduce the

12   long term incentives in our market data by half, so that the

13   long term incentive value is half of what it would have been

14   had we been doing this analysis based on the most recently

15   disclosed data and proxies for 2008.

16        And it was in that way that Mercer reflected the change

17   in the market for long term incentives for 2009.  And you know,

18   that had a very substantial impact on our -- the levels of pay

19   that are included in our analysis.

20   Q    And in the -- in your view on the current economy and the

21   media industry, do you believe that paying zero percent as

22   incentives for 2009 is market and appropriate?

23   A    I do not.  Had I been working for those organizations, I

24   would have discouraged them from throwing in the towel, that

25   it's better to have a goal, that people have to work at

1   everything even harder during difficult economic times than

2   they do in better times when you know, it's easier to have the

3   earnings roll in.

4        And so, it's important to offer the carrot and keep

5   people focused on the right things and moving forward.  And so,

6   I think that it's desirable that -- and a very good thing that

7   Tribune is putting forward incentive plans for this year.

8   Q    And if you look at the ten companies on the peer group

9   that you used, are a majority of them still to your knowledge

10  offering incentive plans for 2009 --

11  A    Yes.

12  Q    -- they have not thrown in the towel?

13  A    That's correct.

14  Q    For informational purposes, did you rerun your

15  benchmarking using the actual figures that the Guild, and in

16  particular, Mr. Phillips, suggested should have been used in

17  his report for certain of the peer group companies?

18  A    Yes, I did.

19  Q    And did that rerunning of the benchmarking, using those

20  figures proposed by the Guild, did that change the

21  competitiveness of these programs at any payout level?

22  A    The program --

23       MR. SIMON:  Your Honor, I'm going to object to this.

24  We haven't seen any supplemental report or calculation or

25  anything from the debtors on this point.  We've worked with the

Dempsey - Direct (Lot)                    Page 132

1    Mercer report.  We don't have anything to review or see that

2    justifies this line of questions, so I'm going to object.

3              THE COURT:  Any response?

4              MR. LOTSOFF:  Yes, Your Honor.

5              The Guild's arguments were set forth in their -- Mr.

6    Phillips's report and in their supplemental objection to the

7    proposed incentive plan motion which they filed on September

8    11th, after they took Mr. Bigelow's deposition, and Mr.

9    Dempsey's deposition.  And so that was the first time we saw

10   those arguments.  We then had a week to take our depositions

11   and now here we are.

12             So, having read their objections filed on September

13   11th, we wanted to see if there was any merit to them.  We

14   don't believe there are, and we went through and reran the

15   figures.

16             And so, as Your Honor noted, this is a somewhat

17   accelerated proceeding on an accelerated time frame.  We

18   haven't had six months of discovery here.  And we believe that

19   it's appropriate for Mr. Dempsey to be able to respond to the

20   arguments made by the Guild, because otherwise they basically

21   get to make these claims, and how do we respond.

22             So, we think it's entirely appropriate.

23             THE COURT:  Well, it's in the nature of rebuttal, and

24   I'll allow it.  Overruled.

25             MR. LOTSOFF:  Thank you, Your Honor.

Dempsey - Direct (Lot)                    Page 133

BY MR. LOTSOFF:

Q    And with respect to the individual percentages that were
set forth in your report, for example, at pages 14, 15, and 16,
and you can pick any of those percentages, what was the range
of change, if any, in those percentages that you found if you
used the Guild's figures?

A    If we excluded the bonus targets for the three
organizations and the long term incentive value for the one
organization, and I believe there was one salary furlough that
we also took a look, the aggregate impact on the summary
statistics on pages 14, 15, and 16, changed by one to three
percent.

Q    So to clarify, if you look at page 14 for example, and you
look at the top ten without the CEO, the 73 percent of market
figure, that would change by at most three percent?

A    That's correct.

Q    And the 61 percent would change by at most three percent?

A    That's correct.

Q    And if you go to page 15, where we see that the top ten at
stretch with all incentive programs in place, they would be at
108 percent, that would change at most by three percent?

A    That's correct.  And that would still be within the plus
or minus 15-percent range that we consider normal.

Q    And is that true of all the percentages that are set forth
on these pages?

1    A    Yes.

2    Q    The Guild contends that the debtors are paying out a

3    greater percentage of their cash flow as incentive awards than

4    they have historically.  Is that uncommon with companies

5    undergoing Chapter 11 restructuring in your experience?

6    A    No, it is not.  In fact, it isn't unusual for companies

7    outside of bankruptcy in economically distressed times to have

8    to pay out a higher percentage of profits in order to offer the

9    market competitive program.

10   Q    And is it appropriate for Tribune in your judgment to pay

11   out a higher percentage of cash flow this year under the

12   proposed program?

13   A    Yes, it is.

14   Q    And is there any industry or management compensation

15   standard that dictates that it's inappropriate for a company to

16   pay out a greater percentage of cash flow as incentive awards

17   than it has in the past?

18   A    No, there is not.

19   Q    The Guild also argues that the proposed plan is

20   inappropriate because it offers all cash incentive

21   opportunities for 2009 as opposed to a combination of cash and

22   equity based compensation as in prior years.  Do you agree?

23   A    I do not.  In fact, I discourage clients in bankruptcy

24   from paying equity based compensation.  Equity holders are one

25   constituency in a bankruptcy, but there are other

Dempsey - Direct (Lot)                    Page 135

1    constituencies that -- higher up the value ladder that

2    generally are the beneficiaries of the state at this point.

3    And so our plans are designed to be in the interest of all

4    stakeholders.  And that's, you know, very different from

5    outside of bankruptcy, where usually the stakeholder at the

6    risk is the shareholder.

7            MR. LOTSOFF:  Nothing further, Your Honor.

8            THE COURT:  Cross-examination.

9            MR. SIMON:  Your Honor, if you need to take a break, I

10   can --

11           THE COURT:  Would you like a moment?

12           MR. SIMON:  No, I don't need a moment.  I just thought

13   the Court was going to take a call.

14           THE COURT:  No, I indicated --

15           MR. SIMON:  I'm sorry, I misunderstood.

16           THE COURT:  -- I'm not going to participate on that

17   call today.

18           MR. SIMON:  I'm sorry, Your Honor, I misunderstood

19   you.

20           THE COURT:  That's okay.  Thank you for asking.

21                        (Pause)

22           MR. SIMON:  Your Honor, if I could approach, I have a

23   copy of Mr. Dempsey's deposition transcript.  I'd just like to

24   approach, if I could approach the bench, I have a copy for the

25   Court and a copy for Mr. Dempsey.

1        THE COURT:  Do you have a copy for my law clerk, by

2   any chance?  We'll each need one if you have one.  All right,

3   thank you.

                        CROSS-EXAMINATION

4

5   BY MR. SIMON:

6   Q    Good afternoon, Mr. Dempsey.

7   A    Good afternoon.

8   Q    A minute ago you testified that you prepared a

9   supplemental analysis of the data that you compiled for your

10  report.  When did you prepare that?

11  A    In the last few days, in the last week.

12  Q    Do you know the date?

13  A    Do I have the date?  I don't actually.  It was last week.

14  Q    Okay.  Did you provide a copy to the debtors?

15  A    I did not.

16  Q    Okay.  When did you discuss it with the debtors?

17  A    The debtors?

18  Q    Debtors' counsel.

19  A    Last week.  And I did provide a copy to debtors' counsel.

20  I misunderstood your question.

21  Q    Yes, I'm sorry, I wasn't clear.

22       When you say last week, the week before this week?

23  A    Yes, sir.

24  Q    Okay, thank you.

25       I want to take you back to when you were initially

1   retained by the debtors.  Who approached you from the debtors

2   to ask you to do work?

3   A    I was originally contacted by Don Liebentritt, the general

4   counsel of Tribune Company.

5   Q    Okay.  And he asked you to do the consulting for the

6   debtors?

7   A    Well, he was the person who introduced me to the

8   Compensation Committee who engaged me.

9   Q    Okay.  And how much has Mercer been paid for this project?

10  A    I don't know exactly, but it was -- it's been several

11  hundred thousand dollars.

12  Q    Okay.  If you recall, we deposed you, and in that

13  deposition you talked about a number of documents or source

14  data that you have, that you relied upon to create this report.

15  Do you remember that testimony?

16  A    Yes, I do.

17  Q    Okay.  And I believe your testimony was that you maintain

18  a database, for instance, of bankrupt companies and what they

19  do in bankruptcies, is that correct?

20  A    Yes.

21  Q    Did you producer a copy of that database to the debtors or

22  to the Committee or to the Guild?

23  A    No, I did not.

24  Q    Okay.  I believe you testified that you had census lists

25  of companies that filed for bankruptcy.  Did you produce that

Dempsey - Cross (Sim)                    Page 138

1    list to the debtors, the Committee or the Guild?

2    A    Well, I was not party to the -- all these negotiations

3    about the sharing of information.  My observation was that

4    there was an agreement that was negotiated between the --

5    between the company and the Guild to provide the information

6    that was provided to the -- to the Creditors Committee.  And

7    so, you know, I believe -- my understanding is we complied with

8    that agreement, and you were given what you were -- what was

9    agreed in that.  But I was not a, you know, I don't -- did not

10   participate in those negotiations or I did not participate in

11   those negotiations or assessment of what or was not provided.

12   Q    Okay.  You testified at your deposition that you had a

13   file for this matter, you had an electronic and paper file for

14   the matter.  Did you ever produce copies of your file to the

15   debtors, the Committee or the Guild?

16        MR. LOTSOFF:  Your Honor, I'd like to interpose an

17   objection, if I may, on the basis of foundation.  And also

18   because I think this question and the implication of the

19   question is misrepresenting the facts.

20        As this Court knows, the Guild asked for a raft of

21   discovery initially.  We objected, filed a motion for a

22   protective order.  This Court agreed to permit limited

23   discovery.  We thought we reached agreement with the Guild as

24   to what we were going to produce.  Two weeks after the August

25   4th hearing, we got a number of additional requests that

Dempsey - Cross (Sim)                              Page 139

1    frankly surprised us.  We objected to those but tried to work

2    something out with the Guild so that we wouldn't have to bother

3    the Court with that matter.

4         We were successful in working out a limited

5    additional production of information.  And in the course of

6    doing so, reached a written agreement with the Guild in which

7    they agreed that what we provided to them satisfied all of

8    their outstanding written discovery requests, and that the

9    quote, "Guild will not seek further discovery".

10        So, you know, Mr. Simon can question Mr. Dempsey

11   about what he did or did not provide, but the implication is

12   that somehow there was something that should have been

13   provided, and we vehemently disagree with that, because the

14   Guild agreed on what discovery would be produced in writing.

15             THE COURT:  Mr. Simon?

16             MR. SIMON:  Mr. Lotsoff said that I could ask what the

17   witness produced.  I'm really just trying to get a handle on

18   what was produced to the parties so they can conduct their due

19   diligence in this case.

20             THE COURT:  Well, let me ask the question directly.

21   Is the foundation being laid for some additional request or

22   motion?

23             MR. SIMON:  No, Your Honor.

24             THE COURT:  All right, you may proceed.

25             MR. SIMON:  Thank you.

Dempsey - Cross (Sim)                    Page 140

1    BY MR. SIMON:

2    Q    The source documents for your report, proxies, 10K's,

3    notes, prior drafts, databases that Mercer maintains, censuses

4    -- is that a word -- the multiple source documents, they were

5    never produced to the debtors, the Committee or the Guild, is

6    that correct?

7    A    We provided what was agreed in the schedules, and that's

8    all we produced.

9    Q    Was your file produced?  Was your personal file produced?

10   A    No.

11   Q    Okay.  Now, the benchmark targets that were set for the

12   MIP, the TMIP and the KOB, they were determined by the debtors,

13   is that correct?

14   A    The compensation targets for the incentive plan award

15   sizes for the MIP were -- preexisted this project that, you

16   know, our ordinary courses had gone on for some time, and the

17   compensation award sizes under the TMIP and the KOB were

18   developed through negotiations with the creditors with

19   reference to Mercer's market data, which was available to them.

20   Q    Okay, but the debtors provided you with those benchmark

21   numbers.  For instance, the OCF targets, let's take the OCF

22   targets to start with.  The MIP, the TMIP and the KOB.  Now, we

23   heard Mr. Bigelow testify this morning that those numbers were

24   provided to Mercer by the debtors, is that correct?

25   A    The -- the performance goals are in the incentive plans.

1   There is the business plan, and then the stretch goal.  And

2   those numbers were developed in the first quarter of this year.

3   And in a really derivative of the budgeting process that the

4   company undertook at the end of last year and in the beginning

5   of this year, I was part of that -- I was a part of the process

6   throughout this year of sort of how those financial performance

7   objectives would be mapped into incentive plans.

8        But did I develop the company's budget?  The answer to

9   that question is no, I did not.

10  Q    The question wasn't the budget.  The benchmark numbers,

11  those numbers, the 212 million, you didn't come up with those

12  numbers, did you?

13  A    That is the business plan.  The 212 is the company's

14  business plan.

15  Q    That's the plan target, is that correct?

16  A    It's the company's business plan which is the plan goal in

17  the incentive plan.

18  Q    Okay, and that would generate -- I'm asking you a pretty

19  simple question.  The debtors generated those numbers, not you.

20  A    I guess I'm not following the question.

21  Q    Okay, we'll just -- we'll rely on Mr. Bigelow's testimony

22  for that.

23       Now the payouts, the incentive payouts or the bonus

24  payouts under the plan, the numbers, the gross numbers, whether

25  it be 17.5 million or 35 million under the MIP or the TMIP or

1   the KOB, those numbers, the actual payout numbers, those were

2   also developed by the debtors, is that correct?

3   A    Well, this is what I just tried to explain a couple of

4   minutes ago, that you know, Mercer provided market benchmarking

5   information, and that was presented not only to the company but

6   also to the creditors.  And there was a lengthy negotiating

7   process that went on back and forth between the company and the

8   creditors where the business people negotiated a pay-for-

9   performance relationship which Mercer then assisted in

10  translating that business discussion into an incentive plan.

11       And that is how, you know, how the performance, the pay-

12  for-performance relationship arrived into the Mercer report.

13  Q    Okay, so you take the numbers that the debtors agree to

14  and you put them in your report, the report dated July 22nd,

15  2009, and you basically justify the numbers, the payout

16  numbers, you tell the debtors you believe those reasonable; is

17  that correct?

18  A    What I take exception to in the way you asked your

19  question is that you're implying that somehow I'm just taking

20  orders, and I'm not assessing what's happening and consulting

21  to develop an incentive plan that is appropriate and going to

22  be effective.  And I was an active participant in that process,

23  and I did review these, both the pay opportunities and the

24  performance levels to be comfortable, that they are fair and

25  appropriate.

Dempsey - Cross (Sim)                    Page 143

1      And that occurred over months of effort.

2          So you know, it's sort of twisting words to say, oh, they

3      were just handed to Mercer and I just put them in the report.

4      It just didn't happen that way.

5              THE COURT:  Mr. Dempsey, let me make a suggestion.

6      Counsel of course is trying to probe every weakness he can find

7      in the positions that you've taken.  I haven't heard anything

8      casting aspersions on your integrity or the purity of the

9      process.  But if you confine yourself to trying to answer the

10     question directly that was asked, things will move along much

11     more quickly.

12             MR. SIMON:  Thank you, Your Honor.

13     BY MR. SIMON:

14     Q    Now, I want to ask you a little bit about your research.

15     Did you interview the top 25 executives at the company?  Did

16     you interview them and ask them questions about what would

17     happen if they didn't get paid their bonuses?

18     A    Not all of them.

19     Q    How many did you interview?

20     A    I had discussions with the Chief Administrative Officer,

21     with the General Counsel, with the Chief Financial Officer,

22     with the Vice President of Human Resources, Director of

23     Compensation and Benefits, and the Vice President of Strategic

24     Planning.  I may well be leaving one or two out, but that gives

25     you a sense of the number that I interviewed.

Dempsey - Cross (Sim)                    Page 144

1    Q    Okay.  And it's your opinion that if they don't get these

2    bonuses they will not work hard, is that correct?

3    A    I think that the result could be worse if we don't have an

4    incentive plan for them, yes.

5    Q    And what result would that be?

6    A    That they would be less motivated to maximize the

7    operating cash flow this year.

8    Q    Now do you have any opinion whether or not they would

9    leave the company?

10   A    I don't have a specific opinion about whether or not they

11   would leave.

12   Q    Okay.  You said in your direct testimony that it was

13   important here to get the pay-to-market median, is that

14   correct?

15   A    Yes.

16   Q    Okay.  You want to get pay so it's market rate, and that's

17   the focus of the plan, is that correct?

18   A    That is a focus of the plan.

19   Q    Okay.  Could I have you turn, there's exhibit binders

20   behind you and I want you to turn to Exhibit 40, please.

21                        (Pause)

22   Q    All right.  Can you identify what this document is to the

23   Court, please?

24   A    Transcript of hearing before the Honorable Kevin Gross,

25   U.S. Bankruptcy Court.  I see this is <u>In Re: Nortel Networks</u>.

1      THE COURT:  That's Kevin the elder, by the way.

2   Q    All right.  Now in Nortel, you were retained, as I

3   understand it, to provide compensation consulting, is that

4   correct?

5   A    That's correct.

6   Q    Okay.  And what kind of plans did you design?  Did you

7   design a KEIP for Nortel?

8   A    I designed two plans for Nortel; a incentive plan and a

9   retention plan.

10  Q    Okay.  And when I say KEIP, I mean -- we're calling that a

11  retention plan, is that acceptable?  Do you understand that

12  term?

13  A    Yes, that's as distinct from a KEIP, which is an incentive

14  plan.

15  Q    Okay.

16  A    That's how I'm understanding it.

17  Q    All right, now, I want you to turn to page 33, line 9.

18  Can you read the first sentence starting at -- well, why don't

19  you read the question starting at line 6 for me.

20  A    "Now in designing plans, can you give us some, a color of

21  the factors that you considered in designing a plan?"

22  Q    All right.  And can you read the answer from line 9 to 13?

23  A    "We took a look at the market pay levels that people are

24  for the jobs that they are in at Nortel, and we took a look at

25  what Nortel was offering.  And so what we did is we tried to

Dempsey - Cross (Sim)                    Page 146

1    bring pay closer to market pay levels in total for the employee

2    population."

3    Q    Okay, so in Nortel when you were designing a KERP, a

4    retention plan, you looked at employee compensation levels and

5    you tried to bring them closer to market, is that correct?

6    A    Yes.

7    Q    All right.  Let's turn to, turn for a minute to the Mercer

8    report which is Exhibit 1.  And you may have a copy from your

9    direct testimony from Mr. Lotsoff.

10   A    The Mercer report.

11   Q    That's correct.

12        Now, before we get to the -- into the Mercer report a

13   little bit, do you recall when I deposed you, I asked you

14   questions about historical compensation; do you remember that?

15   A    I'm sorry, can you repeat the question?

16   Q    During your deposition, I asked you questions about the

17   relevancy of historical pay.  Do you recall that?

18   A    Yes.

19   Q    All right.  Why don't we turn to page -- well, before --

20   again, before we get into the Mercer report, let's go into your

21   deposition transcript real quickly at page 52.

22                              (Pause)

23   A    Page 52.

24   Q    Yes, line 6.

25   A    2006.

Dempsey - Cross (Sim)                    Page 147

1   Q    I'm sorry.  I think I have the wrong -- okay, I'm sorry.

2   Why don't we start at line 7, your answer.

3   A    "I was focused primarily on 2009 in developing matrices

4   for 2009 in the context of an extremely distressed economic

5   environment so I didn't consider the historical earnings to be

6   particularly relevant to that, given how different 2009 is from

7   prior years in the outside world.  So I didn't go into a great

8   -- into great detail on those goals.  I did review them, but it

9   was a long time ago and I didn't consider it to be particularly

10  important."

11  Q    Okay.  And then let's turn to page 73, and line 1, if you

12  could read the question and answer.

13  A    Question, "Should it correspond at all to the -- to year

14  over year performance?"

15       Answer, "Generally we don't find a very good correlation

16  over pay year over year, and over -- year over year

17  performance."

18  Q    All right.  Now let's get into your report a little bit.

19  On page 19 of your report, you talk about comparable data for

20  the TMIP and the KOB.  Do you have that?

21  A    I have the list of companies on page 19 that I included

22  for my analysis.

23  Q    Okay, and the data that's with that list, the revenue and

24  the petition date?

25  A    Yes.

Dempsey - Cross (Sim)                    Page 148

1    Q    Okay.  Now, this chart, this is a chart that I believe you

2    said helps justify the size of this plan, the current plan, the

3    2009 TMIP and KOB, is that correct?

4    A    Yes, I used this for the cost comparisons.

5    Q    Okay.  The only factors as I understand you used, or

6    looked at, was the revenue of the company the year before it

7    filed for bankruptcy, is that correct?

8    A    That and the cost of the plan.

9    Q    Okay.  Those were the only two components?

10   A    Well, we went through on page 20 the calculation of the

11   maximum cost, and we took a look at that as a percentage of

12   revenue.

13   Q    Okay.  But the components for reaching those conclusions

14   are based on prepetition revenue before they filed for

15   bankruptcy, and the size of their bankruptcy plan, is that

16   correct?

17   A    Yes.

18   Q    Okay.  Now for Nortel, does that include the KERP?

19   A    The cost does include the KERP.

20   Q    Okay.  Did any of these other companies on this list, did

21   they put in Key Employee Retention Plans?

22   A    Not that I recall.

23   Q    Okay.  Did these -- your analysis, and I think maybe this

24   has already been answered, but it didn't take into account any

25   sort of operating cash flow, did it?

Dempsey - Cross (Sim)                        Page 149

1    A     For this, no, it did not.

2    Q     Okay.  It didn't take in -- you didn't review any monthly

3    operating reports for these companies?

4    A     No, I did not.

5    Q     Okay.  And you didn't look at compensation by position for

6    each of these companies?

7    A     No, I did not.

8    Q     And you didn't look at the percentage of cost by OCF or

9    operating cash flow, did you not?

10   A     No, I did not.

11   Q     Okay.  Now, I think the chart speaks for itself, but are

12   any of these companies media companies?

13   A     No, they're not.

14   Q     So the Sun Times isn't on here?

15   A     That's correct.

16   Q     The General Register is not on here?

17   A     That's correct.

18   Q     Philadelphia Newspapers?

19   A     That's correct.

20   Q     Are there any other media companies that you know of that

21   are in bankruptcy right now that could have been on this chart?

22   A     Not that come to mind.  I guess Freedom Communication

23   filed pursuant.

24   Q     Okay.  Now let's turn to page 35 of your report.  And

25   we've heard, I think it's fair to say, both you and Mr. Bigelow

Dempsey - Cross (Sim)                    Page 150

1    testify about the importance of market compensation as a focus

2    of these plans.  And on page -- I'm sorry, I misstated the page

3    number.  Page 31.

4         If you turn to page 31, and we look at the far right

5    column, we have a column that's entitled "market TDC", is that

6    correct?

7    A    That's correct.

8    Q    Okay.  And this market component is based on your analysis

9    of what you would call peers of the debtors, and the pay for

10   each position that's identified on the lefthand column, is that

11   correct?

12   A    Yes.

13   Q    Okay.  So this is a pretty important component of your

14   analysis, market compensation; and in this case, market TDC?

15   A    That's correct.

16   Q    Now, if we turn to page 33, we also see in the far right

17   column the market TDC term used again, is that correct?

18   A    Yeah.

19   Q    And this chart shows the payouts under the TMIP and KOB at

20   stretch levels.  So the total overall, without the CEO if you

21   look down on page 33, is 36 -- is that 36 million?

22   A    I see where you're looking.

23        The overall total without CEO is 36 million, yes.

24   Q    That would be the 50th percentile market TDC, is that

25   correct?

Dempsey - Cross (Sim)                    Page 151

1   A    Yes.

2   Q    And under these plans, the debtors would be paying 33

3   million, which would by your analysis would be 91 percent of

4   market TDC, is that correct?

5   A    Yes.

6   Q    Which is the 50th percentile of pay levels for those

7   positions, is that right?

8   A    The 36 million, yes.

9   Q    Right, the 36 million.

10       Okay, that's within your 15-percent range of

11  reasonableness, is that correct?

12  A    Yes.

13  Q    All right, let's turn to page 35.  Now this, as I

14  understand it, shows similar -- it's designed to show

15  compensation at certain levels.  In this case, if the debtors

16  hit the max benchmark, is that correct?

17  A    Yes.

18  Q    So the total compensation for the top ten at maximum is

19  48.5 million dollars, is that correct?

20  A    Yes.

21  Q    Okay.  And you look at the far right column and it says

22  "market max TDC".

23  A    Yes.

24  Q    And at market max TDC, that 48.5 million is only 85

25  percent.  So it's actually not as -- it seems like it's not as

1   generous as the last -- the payout under the -- at the stretch

2   levels where you're only hitting, or you're hitting 91 percent,

3   is that fair to say?

4   A    Well, in comparison to other maximums it is lower relative

5   to the median of the maximums.

6   Q    Okay.  So the other thing that's striking is that your

7   switched from market TDC -- the first two you measure at

8   market, but the third chart you measure at market max, so

9   you're basically increasing the total number of compensation as

10  a comparable to the max payout under the TMIP and the KOB, is

11  that correct?

12  A    That's correct.

13  Q    So you're stretching the benchmark, is that true?

14  A    Stretching it?  It's a different analysis.

15  Q    It's a bigger number.

16  A    It's a bigger -- a number associated with a higher level

17  of performance.

18  Q    Okay.  It's a higher level of performance or high level of

19  pay?

20  A    Well, generally, a maximum payout is associated with a

21  higher level of performance.

22  Q    Okay.

23  A    So you get a higher level of pay and a higher level of --

24  you know, and the higher level of pay and the higher level of

25  performance go hand in hand.

1    Q    Okay, but this is a new metric?

2    A    Yes, that's correct.

3    Q    Okay, it's a different metric?

4    A    Yes.

5    Q    Okay.  All right, now, let's go to page 39 of your report.

6    And this describes how you get your proxy analysis for the top

7    five positions, is that correct?

8    A    Yes.

9    Q    And if you look at the proxy compare group, you use

10   certain criteria.  And if I'm looking at the far column, you

11   use most recent base salary where it's disclosed.  Is that

12   correct?

13   A    Yes.

14   Q    Okay.  And then for annual incentive, you have target

15   percentage used where available, otherwise three-year average,

16   actual bonuses, a percentage of base salary applied to most

17   recent base salary; is that correct?

18   A    Mmhmm.

19   Q    And then you have total cash compensation which is base

20   salary plus target annual incentive or three-year average

21   actual when target is not available, is that true?

22   A    That's correct.

23   Q    And then Long Term Incentive, LTI, is three-year average

24   value of restricted shares, cash plans at target, and Black-

25   Scholes value of options, okay, is that true?

Dempsey - Cross (Sim)                          Page 154

1    A    Yes.

2    Q    All right.  Now let's look at the, page 42.  Now this is

3    an analysis of CFO compensation at the alleged peer group

4    companies, is that correct?

5    A    Yes, it is.

6    Q    Okay.  So reading across, we have the name of the company,

7    the name of the individual who occupies the position of CFO,

8    their base salary for 2009, we have a target short term

9    incentive as a percentage of base, we actually have a number of

10   I guess 2.5 million in total cash compensation, is that

11   correct?

12   A    I lost you.

13   Q    First row, Clear Channel Communications.  These have

14   actual numbers, is my point.  If you look --

15   A    Oh, I see what you're saying.  Yes.  I see the 2.5 million

16   cash compensation, yes.

17   Q    If you go to the far right column, you have total direct

18   compensation, you have actual numbers here?

19   A    Yes.

20   Q    Okay.  Now these are 2009 numbers, is that correct?

21   A    They are our estimate for that, yes.

22   Q    Estimates.  They're not actual numbers?

23   A    No, because 2009 isn't over.

24   Q    Okay, and you don't have access to actual numbers?

25   A    Not in all cases, no.

Dempsey - Cross (Sim)                    Page 155

1    Q    Where are you getting these numbers from?

2    A    Well, this is this whole methodology that we just went

3    through that we have gathered the information from proxy

4    statement --

5    Q    From 2008?

6    A    Yes.

7    Q    Okay, so it's old numbers.

8    A    It is, yes.

9    Q    Okay.  And you have actual numbers here.  Let's look at,

10   for each of these companies, Clear Channel, Gannett, New York

11   Times, Washington Post, Cablevision, McClatchy, E.W. Scripts,

12   Thomson's, Lee Enterprises and Meredith.  Those are the

13   companies in your expert opinion you picked as peers of the

14   debtor, is that correct?

15   A    Yes.

16   Q    Okay.  Any of these companies in bankruptcy?

17   A    No.

18   Q    Okay.  Let's look at tab 15 of my exhibits.  15.

19                           (Pause)

20   A    Okay.

21   Q    All right.  First on the point of, on peer status, let's

22   look at -- hold on, if I can just have one second to find

23   this.

24                           (Pause)

25   Q    Okay, I'm sorry, it's on page 12 of 49.

1  A    Page 12 of 49, of the Meredith Corporation proxy

2  statement.

3  Q    Okay.  And this is for 2008, is that correct?

4  A    Yes, it is.

5  Q    Okay.  The last line of the first paragraph that starts

6  with "Media General, Inc.", do you see that paragraph?

7  A    I see at the very top of the page "Media General, Inc."

8  Q    Okay.  Can you read the last line of the paragraph that

9  starts after the semicolon, "Cox Communications, Inc.",

10  semicolon, can you read that last line?

11  A    "And Tribune Company was" -- "At Tribune Company, we're

12  removed from the peer group because of acquisition or

13  privatization, no companies were added to the peer group."

14  Q    Okay.  Let's look at tab 7, which I'm sorry, is in another

15  binder.

16  A    Oh, thank you.

17  Q    I'm very sorry about that.

18                        (Pause)

19  A    Okay, this is the McClatchy Company --

20  Q    Proxy.

21  A    -- proxy.

22  Q    And McClatchy is in the peer group, is that correct?

23  A    Yes.

24  Q    So for McClatchy, if we go back to page 42 for the CFO

25  comparable, you used these numbers.  Let me just give you the

Dempsey - Cross (Sim)                    Page 157

1    numbers.  Well, I don't know if I want to get --

2              MR. LOTSOFF:  I'm sorry, Chris, what are you

3    referring to, page 42?

4              MR. SIMON:  I'm on page 42 of the Mercer report.

5              THE WITNESS:  Oh.

6              MR. SIMON:  Well, I'm going to use Exhibit 7.  I don't

7    mean to be jumping around --

8    A    But that's the McClatchy proxy --

9    Q    You should probably keep your report in front of you at

10   all times.

11         Now at your report at page 42, you use actual numbers of

12   short term incentives for McClatchy, actual numbers for 2009,

13   and long term incentives for McClatchy, okay?

14         All right, let's look at page 26 of 50 of Exhibit 7,

15   which is the McClatchy proxy.  And there's a section called

16   "base pay".

17   A    Okay.

18   Q    And the second sentence of that paragraph starts "in light

19   of".  Can you read that sentence, the remainder of that -- just

20   read the end of that -- if you can just read that one sentence

21   for us.

22   A    Under the base pay, there's a paragraph beginning "In

23   determining each", is that what you're --

24   Q    Yes.

25   A    "In determining each --

Dempsey - Cross (Sim)                    Page 158

1   Q    No, no, no.  "In light of the difficult", the next

2   sentence, please.

3   A    Oh.  "In light of the difficult operating environment for

4   the company, and newspaper companies generally, as well as the

5   economic downward turn in the markets, the company newspaper" -

6   - "Mr. Pruitt recommended that all executive officers,

7   including his own, be frozen for fiscal 2008 at fiscal 2007

8   levels."

9   Q    Okay.  Look at the last sentence.

10  A    "Based on Mr. Pruitt's recommendations, the Compensation

11  Committee agreed there would be no base salary increase for '08

12  for any of the executive officers, including himself, other

13  than Mr. Dickerson".

14  Q    Okay.  Now let's turn the page to page 27 of 50.

15  A    Okay.

16  Q    Let's look at annual cash bonus section.  Let's -- you can

17  start reading that paragraph, it begins with "Mr. Pruitt".

18  A    "Mr. Pruitt is eligible to receive annual incentive

19  compensation under our CEO bonus plan and NEO's other than Mr.

20  Pruitt are eligible to receive annual incentive compensation

21  under our management by objectives annual bonus plan, also

22  known as the MBO plan.  Awards under the CEO bonus plan and the

23  MBO plan are based on full or partial achievement of financial

24  or non-financial performance goals preestablished by the

25  Compensation Committee."

Dempsey - Cross (Sim)                    Page 159

1    Keep going?

2    Q    Keep reading, please.

3    A    "In light of the severe downturn in the company's revenues

4    resulting primarily from the economic downturn in July 2008,

5    Mr. Pruitt informed the Committee that he would not accept a

6    bonus for 2008.  In January 2009 the Compensation Committee

7    determined that the company would not pay annual cash bonuses

8    in 2009 based on the results of the fiscal year 2008 to any of

9    the other executive officers, including the other four NEO's.

10   At that time, Mr. Pruitt also informed the Compensation

11   Committee that he would not accept a bonus for 2009.  In March

12   2009, the Compensation Committee determined that the company

13   announced that no bonuses will be paid to the other executive

14   officers including the other NEO's for 2009."

15   Q    Okay, so this information was -- and when was this

16   information made public?  Do you have any idea?

17   A    The letter to shareholders is dated April 1st, 2009.

18   Q    Was that before your report -- can we just agree that

19   that's before your report --

20   A    Yes.

21   Q    -- dated July 22nd?

22   A    Yes.

23   Q    Thank you.  Now let's turn to tab 6.  And can you identify

24   this document for the record?

25   A    This is the Lee Enterprises, Incorporated proxy statement

Dempsey - Cross (Sim)                    Page 160

1     from March 10th, '09.

2     Q    Okay, and let's turn to page -- hold on one second --

3                         (Pause)

4     Q    All right, let's read, let's read the top of page -- of 28

5     of 44.  First paragraph says "for 2009".

6     A    Yes, I have page 28 of 44.

7     Q    Okay, can you read that sentence.

8     A    "For 2009 we have suspended annual cash incentives for the

9     CEO due to difficult economic conditions affecting the company,

10    the publishing industry and the overall economy."

11    Q    Okay, can you turn the page to page 29 of 44.

12    A    Okay.

13    Q    It says, the second paragraph starts "for 2009".

14    A    "For 2009 we have suspended grants under our LTIP due to

15    difficult economic conditions affecting the company, the

16    publishing industry and the overall economy.  Accordingly, no

17    grants were made in 2009 related to NEO performance for the

18    2008 fiscal year."

19    Q    Okay.  All right.  And this is also publicly available

20    information, is that correct?

21    A    Yes.

22    Q    All right.  And to save a little time, the E.W. Scripps

23    proxy is also in this binder that I believe has been admitted

24    into evidence.  Are you aware what happened to E.W. Scripps for

25    2009?

Dempsey - Cross (Sim)                         Page 161

1    A    Well, a number of things happened to E.W. Scripps so --

2    Q    With respect to annual incentive bonuses.

3    A    There was a reduction in the targets is what I recall.

4    Q    Okay.  Now, notwithstanding the fact that those -- these

5    are public documents and they're readily available, you have

6    actual numbers in your report that state that you use as a

7    basis to determine market median compensation and market

8    maximum compensation two metrics, is that correct?

9    A    Yes.

10   Q    Now, I understand that the -- there's been a lot of talk

11   about how the parties conducted due diligence in this case, and

12   -- well, let me just strike that.

13       At some point did you make any sort of report to the

14   Committee's financial advisor on actual compensation for

15   certain companies in 2009?

16   A    There was some information that we provided, yes.

17   Q    And you used actual data for that, is that correct, for

18   2009?  Do you recall?

19   A    We used what information we had available to us.

20   Q    Let's turn to page 3 -- tab 3.

21   A    Okay.

22   Q    And let's turn to page 2 of this -- well, first of all,

23   identify the report for us.  Do you know what this is?

24   A    It's a Mercer report dated May 14th, 2009, and it's

25   entitled "Tribune Company attachment material for Alex

Dempsey - Cross (Sim)                    Page 162

1    Partners."

2    Q    Right.  Okay, so this was produced for the Committee?

3    A    Yes.

4    Q    Okay, and can you turn to page 3.

5    A    Yes.

6    Q    And here you're doing an analysis for the Committee's

7    financial advisor on actual, I guess L, long term -- what's

8    LTI, just tell me?

9    A    Long term incentives.

10   Q    Okay, so you're doing analyses for the Committee's

11   professionals and you're using data that you have, or don't

12   have, is that correct?

13        Well, let me strike that question because it's a little

14   bit unclear.  I'm sorry.

15        For purposes of Gannett, you have 2006 data, 2007 data,

16   2008 data, then you come up with a three-year kind of moving

17   average -- what's that for?

18   A    It's the average of the '06, '07 and '08.

19   Q    Okay.  And then you use -- you look at the 2009 form 9 to

20   see what was actually --

21   A    Form 4.

22   Q    Form 4, I'm sorry.  To see what was actually paid or

23   distributed?

24   A    This is the expected value of the awards that were

25   granted, that were disclosed in form 4's.

Dempsey - Cross (Sim)                          Page 163

1    Q    Okay.

2    A    For those companies.

3    Q    Okay.  And so for instance --

4    A    Just for clarification, I believe you mentioned page 3,

5    but this is page 2.

6    Q    I'm sorry, page 2.  I'm very sorry.  For everybody else in

7    the courtroom who was on page 3.

8         For CC Media Holdings, you don't have any information on

9    that column, is that correct?  On that row?

10   A    Correct.

11   Q    And for McClatchy, for 2009, you don't have anything.  You

12   use the three-year average.  For Lee Enterprises you have zero

13   dollars for 2009.  Is that correct?

14   A    Yes.

15   Q    Okay.  Now this actual data that you have for the form

16   4's, that didn't make it into your final report, did it?

17   A    No, it did not.

18   Q    Why was that?

19   A    I didn't consider it to be as -- you know, I was trying to

20   manage the -- to have a complete report but I didn't consider

21   it to be sufficiently important to put in the appendix.

22   Q    You didn't think it was sufficiently important to put

23   actual data that you could obtain to justify this program?  You

24   didn't feel that was important enough to put in your final

25   report?

1   A    Well, there is information in the final report on long

2   term incentives.

3   Q    Right.

4   A    That I consider to be some really work papers that was

5   used to derive the information that's in the report.

6   Q    You put actual long term incentive value in your final

7   report where none exists for some companies, is that correct?

8   A    The -- to explain how I used page 2 of this form 4

9   analysis, I used it to establish -- and I referenced this

10  analysis earlier in my testimony.  This is the analysis that I

11  did in order to estimate the decline in long term incentive

12  values in general in 2009.

13       And from this analysis, I derived the statement I made

14  that there was a 30 to 40-percent decline which I then made --

15  took a step beyond and in my report, I used 50-percent decline.

16       And so it was, I wanted to show that the -- so I did a --

17  I used a different methodology for defining the long term

18  incentives than adjusting company by company for these

19  disclosures.  And the reason I did that is that there's very

20  incomplete information available.  I wanted to rely on the "06,

21  "07, "08 long term incentives and then apply the discount.

22       And so, that was the reason why I -- I took the approach

23  that I did in my report.

24  Q    Mr. Dempsey, I appreciate your explanation, but there's

25  actual data that was available, public actual data that was

Dempsey - Cross (Sim)                    Page 165

1    available that said there were going to be no bonuses paid for

2    certain companies in your peer group.  And yet, you put actual

3    numbers to create a market median 50-percentile number from

4    which you base your opinion that this plan is reasonable and

5    fair and justified.  Is that correct?

6    A    Well, I do acknowledge that I show on page 2 of my report

7    a zero for Lee Enterprises, and on page -- on the total comp

8    pages I do show a value for Lee Enterprises.  That is correct.

9    Q    Okay.  Well, I think the record is pretty complete on what

10   the facts are, so we'll let that -- I'll just drop that line of

11   questioning.

12        Now, in your deposition, you testified -- you talked a

13   little bit about the threshold number that the company

14   typically hits to make a cash incentive payment.  And I believe

15   in your deposition, you testified that the company should have

16   about a 80 or 90-percent chance of hitting the threshold for a

17   given year, is that correct?

18   A    Yes.

19   Q    Okay.  And I believe you also testified that when you were

20   advised, when you were discussing this plan with the company,

21   you were talking to the CAO and the CFO, and they told you that

22   the company had about a 50/50 chance of hitting the threshold,

23   the 212 million dollar target in 2009.  They told you that they

24   had about a 50-percent chance of hitting that, is that correct?

25   A    Yes.  Back in -- and that conversation occurred in the

1    first quarter.

2    Q    Okay.  When you filed the report, did you have any idea

3    what the current or the then current operating cash flow was

4    for the company?

5    A    I knew that it was -- that they were doing better than

6    they had originally expected.

7    Q    Did you know that they had already hit it?

8    A    I did not.

9    Q    All right.  When you looked at the -- let me just ask you

10   this.  For 2009 in the peer companies, do you have any idea

11   what their benchmark threshold is for a cash incentive program?

12   Do you have any idea what those numbers are?

13   A    I'm not sure I follow the question.

14   Q    Well, let's take Lee Enterprises.  Do you know what their

15   -- or not Lee Enterprise, because they suspended theirs.

16   That's a bad example.  But let's take the Clear Channel.  Do

17   you know what their benchmark target is?

18   A    I do not.

19   Q    Okay.  Do you know, did they have a stretch target?

20   A    I would expect that many of them would have a threshold, a

21   target and a maximum goal.

22   Q    Okay.  Do you have any idea what those numbers are for any

23   of the peers?

24   A    I do not.

25   Q    Do you have any idea what their operating cash flow is for

Dempsey - Cross (Sim)                    Page 167

1    2009?

2    A    I do not.

3    Q    You don't know what their actual bonus programs are for

4    2009, do you?

5    A    I don't know their goals or their metrics, no.

6    Q    Except for the companies that have already announced that

7    they're not going to pay any bonuses in 2009, you don't have

8    any idea what those other companies are doing in 2009, do you?

9    A    No.

10   Q    Now, I want to talk to you a little bit about the

11   requirements that are in place for an employee to get paid

12   under the TMIP and the KOB, okay?

13        As I understand it, there's two.  One is an operating

14   cash flow number, okay?  And the other is -- well, what's the

15   other one?  What do they have to do to be eligible to get paid?

16   A    Well, they have to emerge from bankruptcy.

17   Q    Okay.  Or they have to be around in 2011, is that correct?

18   A    That's correct.

19   Q    So they have to stay with the company?

20   A    Through to -- they have to be there when the company

21   emerges.

22   Q    They can't leave?

23   A    No.

24   Q    Otherwise they don't get paid?

25   A    That's correct.

Dempsey - Cross (Sim)                          Page 168

1    Q    Okay.  Of the -- do you know what the -- if the company

2    hits the -- if the company hits the MIP threshold level, the

3    212 million dollars, do you have any idea what the top 21 would

4    get in the amount of bonus?

5    A    I believe that figure is in my report.  The -- what the

6    top 21 would get from the MIP?

7    Q    If the company has 212 million in operating cash flow,

8    which they do, what's the top 21 going to get as a total

9    payment?

10   A    5,117,000.

11   Q    Okay.  If they hit the 300 million dollar number, what do

12   the top 21 get?

13   A    10,233,000.

14   Q    Does that include -- is that a payout under the MIP and

15   the TMIP?

16   A    I'm sorry, that was just the MIP.

17   Q    What about the TMIP?

18   A    Well, the TMIP and the MIP together, it would be

19   17,736,000.

20   Q    Okay.  And if the company hits the max level in operating

21   cash flow, how much would the top 21 get as total cash

22   compensation?

23   A    Well, you mean including the MIP or including both the

24   MIP, the TMIP and the KOB?

25   Q    They hit 424 million, what do the top 21 get paid?

Dempsey - Cross (Sim)                    Page 169

1    A    Under the -- under the MIP and the TMIP, the -- it'll be

2    about 23 million.  And then I don't -- I honestly don't -- I

3    can't tell you just right off the top of my head what the --

4    what portion of the KOB would pay out at that particular

5    consolidated level because it all depends on the mix between

6    the different business units.

7    Q    Do you have any idea?

8    A    I really wouldn't want to --

9    Q    So it's 23 million just under the MIP and the TMIP, the

10   300 -- 424 million?

11   A    Yes.  And then if you -- if the KOB were to pay out at

12   maximum, there'd be an additional nine million.

13   Q    Okay.  So 31 or 32 million dollars to the top 21?

14   A    Yes.

15   Q    Okay.  What's the total plan?  What's the total plan

16   payout, the max number?

17   A    The total cost of the plan, if the MIP, the TMIP and the

18   KOB payout at maximum to all participants would be 66 million -

19   -

20   Q    Okay.  Of that --

21   A    -- 300 thousand.

22   Q    Okay.  Of that, the top 21 would get approximately half,

23   is that correct?

24   A    Yes.

25        MR. SIMON:  Can I have a minute, Your Honor?

Dempsey - Cross (Sim)                                    Page 170

1          THE COURT:  Yes.

2          MR. SIMON:  Thank you.

3                              (Pause)

4          MR. SIMON:  I do want to just turn to one issue.  I

5     apologize.

6     BY MR. SIMON:

7     Q    Let's turn to page -- this is your report.  Turn to page

8     33.

9          Okay, this is -- page 33, as I understand it, talks about

10    the top ten compensation if the TMIP and the KOB are paid.  Is

11    that correct?

12    A    Yes.

13    Q    And let's look -- the market TDC is again the far right

14    column, and the -- at the stretch level -- so if the company

15    hots 300 million, let's look at the general counsel's

16    compensation, and I don't want you to tell me the exact

17    numbers.

18         But at the stretch level, if we go to the far right hand

19    column, the general counsel gets 166 percent of the market

20    median, is that correct?

21    A    Yes.

22    Q    And that's the highest percentage in the group at the

23    stretch level, is that correct?

24    A    Yes.

25    Q    And why is the general counsel -- is the general counsel

Dempsey - Cross (Sim)                    Page 171

1    the one that contacted you and had you retained?

2    A    It is correct that Mr. Liebentritt did contact me.

3    Q    Okay.  And what -- why is it that the general counsel has

4    the largest percentile of all the parties?

5    A    The -- he was considered to be particularly critical to

6    the restructuring process, was one factor.

7    Q    Can you give me some --

8    A    And the second factor was that he was -- you know, he was

9    brought in at a high level of compensation from the outside

10   quite recently, and so his baseline compensation was high.

11   Q    Do you know what he does on a day-to-day basis, what his

12   focus is?

13   A    He focuses quite heavily on the restructuring.

14   Q    What do you mean by that?

15   A    On -- my observation of Mr. -- of the general counsel's

16   responsibilities, have generally been related to the

17   restructuring, to the process of working a company through the

18   legal, very very legal process, we are after all here in a

19   courtroom today, of getting a company migrated through

20   bankruptcy to a healthy operation and a healthy balance sheet

21   on the other side.

22        And so, it isn't unusual to see a general counsel playing

23   a particularly critical role in providing leadership because

24   his, you know, legal activities is necessary to get almost

25   anything done.

Dempsey - Cross (McM)                    Page 172

1    Q    His focus is legal, are legal issues; pleadings, the

2    bankruptcy case, pleadings in the bankruptcy case, contested

3    matters such as this, legal issues; is that correct?

4    A    Yes.  And the business related business issues, but he's

5    the general counsel and so his primary responsibility will be

6    legal matters.

7    Q    He's not focused on whether or not the Baltimore Sun is

8    generating additional operating cash flow, is that correct?

9    A    I don't have any knowledge of his involvement with that.

10    Q    Okay.  Thank you very much.

11              MR. SIMON:  I have no further questions, Your Honor.

12              THE COURT:  Finally somebody who wants to be a lawyer.

13              Is there any -- Mr. McMahon, do you have questions?

14              MR. McMAHON:  Quite a few, Your Honor.

15              THE COURT:  All right.

16                          CROSS-EXAMINATION

17    BY MR. McMAHON:

18    Q    Good afternoon, sir.

19    A    Good afternoon.

20    Q    It's your view, sir, that the proposed plan before the

21    Court is necessary because in the absence of market based

22    compensation as you've described it, employees may not go the

23    extra mile or put in the extra effort that the company needs,

24    correct?

25    A    Yes.

1   Q    Now, in your report you refer to two peer groups, right?

2   There's a industry peer group and a bankruptcy peer group,

3   correct?

4   A    Yes.

5   Q    Let's talk about the industry peer group for a moment.

6        Can I find in your report a historical analysis of how

7   Tribune's operating performance compares to the members of the

8   industry peer group?

9   A    No.

10  Q    And in your report, can I find any analysis as to whether

11  the members of the industry peer group that got paid market

12  based compensation, had operating results that correlated with

13  that fact?

14  A    I don't have any analysis like that in the peer group.

15  Q    And --

16  A    I mean in my report.

17  Q    And with respect to -- and with respect to operating

18  results, sir, there's nowhere in your report where I can find

19  any information regarding the size of the awards in dollars to

20  the, to top management, the top ten, and improved performance,

21  correct?

22  A    There's no analysis of pay versus performance for the peer

23  group in my report.

24  Q    There's nothing in your report which indicates that if we

25  pay you know, a dollar over bonus, you know, or a thousand

Dempsey - Cross (McM)                          Page 174

1    dollars over bonus, that we get a particular result in the

2    company's bottom line,  correct?

3    A    Correct.

4    Q    Now, I could ask you the same set of questions for the

5    bankruptcy peer group.  Would your answers be the same?

6    A    Yes, they would.

7    Q    I'm not going to find that information in this report?

8    A    That's correct.

9    Q    And Mercer hasn't analyzed the efficacy of either peer

10   group's incentive targets, correct?  It hasn't analyzed whether

11   the X company, its targets are easy to achieve, more difficult

12   to achieve, in connection with preparing this report?

13   A    That's correct.

14   Q    In the absence of information responsive to the questions

15   that I just asked you, why should this Court assign any weight

16   to your view that market based compensation is necessary to

17   properly incentivize an employee?

18   A    Well, it has been -- it is a basic principle of human

19   resources management that the -- that incentives are a tool

20   that we use to both motivate people and to align the interests

21   of people with the company.

22        And so, it is a universal practice in business to pay

23   incentive plan -- to pay incentives to participants in -- to

24   management level employees.  Our studies generally show that

25   well over 90 percent of companies provide incentives.

1    And I am quite confident, having designed many plans

2    through the years, that they do affect behavior.  I have -- I

3    do go back to my clients after the end of the project, and talk

4    with them about what did and did not work.  And I have found

5    consistently that where there's a clear goal, that it is

6    motivational for the participants in the plan, and they can go

7    and work to maximize it, and if at all possible they'll do so.

8    Q    But with respect again, with respect to the industry peer

9    group and the bankruptcy peer group, we find no empirical

10   support for that suggestion in this report, correct?

11   A    Yes.

12             MR. McMAHON:  Nothing further, Your Honor.

13             THE COURT:  Redirect?

14             MR. LOTSOFF:  Could I take one minute, Your Honor?

15             THE COURT:  You may.  Tell you what, let's take a

16   five-minute break.  Court will stand in recess.

17                     (Off the record at 4:19 p.m.)

18                     (On the record at 4:34 p.m.)

19             THE CLERK:  All rise.

20             Please be seated.

21             THE COURT:  Okay.  Anything further?

22             MR. LOTSOFF:  Your Honor, very limited redirect.

23             THE COURT:  All right.

24                     REDIRECT EXAMINATION

25   BY MR. LOTSOFF:

Dempsey - Redirect (Lot)                    Page 176

1    Q    Mr. Dempsey, it's my understanding that median level of

2    compensation typically under an incentive plan assumes a target

3    level of performance.  Is that consistent with your experience?

4    A    Yes, it is.

5    Q    And when a plan pays out at maximum, in your experience,

6    does that maximum payout typically correspond just to target

7    level performance?

8    A    No, it does not.

9    Q    And so, do you believe it would be appropriate to

10   benchmark payouts for maximum performance against market median

11   levels of compensation that assume target level performance?

12   A    No.

13   Q    And so why did you benchmark the maximum payouts under

14   this plan against maximum payouts under other plans?

15   A    Well, the point is that we were trying to compare the --

16   you know, at the high performance level.  Generally there would

17   a threshold, a target and a maximum level of pay, and a

18   threshold target and maximum level of performance.  And if you

19   -- you would expect to see, you know, high performance for

20   high, and high pay.  And the -- so you tie the high -- we were

21   trying to compare the high payouts to what kind of, the benefit

22   would have been in the peer group if they had achieved a high

23   level of performance in their years.

24   Q    So an apples to apples comparison?

25   A    That's correct.

Dempsey - Redirect (Lot)                    Page 177

1    Q    And the benchmarking that you did involving the peer

2    group, so the companies that are listed on page 37 of your

3    report, again, was that benchmarking that was done just for the

4    top four positions?

5    A    That's correct.

6    Q    And that's benchmarking that's based on proxy statements

7    and publicly filed information?

8    A    That's correct.

9    Q    And is it your understanding that proxy information

10   typically discloses individualized compensation only for the

11   top five named executive officers?

12   A    That's correct.

13   Q    And in using the methodology that you used to develop the

14   peer group in this case for those top four positions, did you

15   follow the methodology that you typically follow in your

16   practice over many years?

17   A    Yes.

18   Q    And again, is that consistent with the methodology used by

19   other consulting firms?

20   A    Yes.

21   Q    You were asked a number of questions about some other

22   companies, and Mr. Simon showed you some proxy statements for

23   companies including I believe Scripps, E.W. Scripps, McClatchy,

24   Meredith, Lee Enterprises, there may have been one other, but

25   you recall on your cross-examination being taken through a

1    number of proxies?

2    A    Yes.

3    Q    Now, you had testified earlier on direct that you believed

4    that the methodology that you used in using target figures as

5    opposed to actual numbers where companies threw in the towel,

6    if you will, was appropriate.  Do you recall that testimony

7    that you gave?

8    A    I do.

9    Q    And was that testimony in relation to those companies that

10   Mr. Simon pointed out on your cross-examination?

11   A    Yes.

12   Q    And you also testified that you had rerun your analysis

13   and concluded if you used the Guild's information, that even if

14   you had done so, that would not have had any impact on the

15   competitiveness of the debtors' program, and that the

16   variations and percentages would have been at most one to three

17   percent.  Do you recall that testimony that you gave?

18   A    Yes.

19   Q    And again, did that testimony involve the companies that

20   Mr. Simon was asking you about and for which he showed you

21   proxy statements during the cross-examination?

22   A    Yes.

23   Q    And so, in running that alternate analysis which concluded

24   that there was no difference in competitiveness, you used the

25   actual information from the proxies that Mr. Simon showed you?

Phillips - Direct (Sim)                    Page 179

1    A    Yes.

2            MR. LOTSOFF:  Nothing further, Your Honor.

3            THE COURT:  Any recross?

4            MR. SIMON:  No, Your Honor.

5            THE COURT:  Mr. McMahon?

6            MR. McMAHON:  No, Your Honor.

7            THE COURT:  Thank you, sir, you may step down.

8            Debtor have anything further in support of its

9    motion?

10           MR. LOTSOFF:  We have nothing further, Your Honor, at

11   this time.

12           THE COURT:  Mr. Simon?

13                          (Pause)

14           MR. SIMON:  Your Honor, thank you.  Chris Simon for

15   the Guild.

16           I would like at this time, I think, to call Mr.

17   Phillips, Edward A. Phillips as a witness, and take him through

18   some brief direct in support of his report.  And then of course

19   he's subject to cross-examination.  But I should be brief, if

20   that's okay.

21           THE COURT:  Very well.

22           THE CLERK:  Please state your name, spell your last

23   name for the Court.

24           MR. PHILLIPS:  Edward Phillips, P-H-I-L-L-I-P-S.

25                     EDWARD PHILLIPS, SWORN

1          DIRECT EXAMINATION

2    BY MR. SIMON:

3    Q    Good afternoon, Mr. Phillips.

4    A    Good afternoon.

5    Q    Could you just tell us where you're employed right now?

6    A    Yes.  I'm at a partner at Amper, Politziner & Mattia.

7    Q    Okay, and how long have you been employed by Amper?

8    A    I've been employed by Amper for four years.

9    Q    And what's your educational background?

10   A    I have a Bachelor of Science in business administration

11   with a major in finance from the Ohio State University.  I've

12   also taken some additional accounting courses at Temple

13   University in order to sit for the CPA examination.

14   Q    And can you tell us a little bit about your professional

15   background?

16   A    Sure.  I started in accounting in 1988, doing accounting

17   work, auditing work, tax work.  In 1994, I moved to another

18   firm where I was doing -- where I did bankruptcy and

19   restructuring work, forensic accounting.

20   Q    Okay, thank you.  Do you have any professional

21   certifications?

22   A    I do.

23   Q    Can you tell us what they are?

24   A    Yes.  I'm a Certified Public Accountant, a certified

25   insolvency restructuring advisor, certified fraud examiner, and

Phillips - Direct (Sim)                    Page 181

1    I'm  certified in financial forensics by the American

2    Association of Certified -- American Institute of Certified

3    Public Accountants.

4    Q    Okay, thank you.  Let me just ask you a little bit about

5    your professional experience, if I could.

6         What kind of work have you done?

7    A    In this arena, I've -- I act quite frequently as a

8    financial advisor to Creditor Committees.  I've been, and I am

9    a financial advisor to Chapter 7 trustees and debtors.  I have

10   acted as a liquidating trustee or plan administrator in cases,

11   I'm an elected Chapter 7 trustee in two matters.  I've been a

12   federal receiver and I've been a Chancery Court receiver in

13   Delaware.

14        Additionally, I've been employed as a consultant with

15   troubled businesses.  I've been involved in forensic accounting

16   matters, cash collateral disputes, preference defense issues.

17   Q    Okay, great.  How does your background, your educational

18   background and your professional training and your professional

19   experience, how does it relate to what we -- the motion that

20   the debtors have filed and the issues that we have before the

21   Court today?

22   A    Well, my professional background, my education and my

23   training allows me to collect, analyze, understand, and make

24   sense of complex financial data.

25   Q    Okay.  Do you have experience reviewing publicly filed

Phillips - Direct (Sim)                    Page 182

1    documents, such as proxy statements, 10K's?

2    A    I do.  As an accountant, I have a great deal of experience

3    with financial statements.  Earlier in my career I was involved

4    in preparing financial statements.  I have familiarity with

5    public -- with the documents that are filed with the SEC.

6    Q    Okay.  Have you reviewed the debtors' motion that's

7    subject -- that's the basis of this hearing today?

8    A    I have, yes.

9    Q    Okay.  And did you review the first day affidavit of

10   Chandler Bigelow?

11   A    I did.

12   Q    Did you review the documents that were produced by the

13   debtors in this matter?

14   A    I did, yes.

15   Q    Okay.  Did you review the debtors' historical financial

16   information?

17   A    Yes.

18   Q    Did you look at the debtors' current financial

19   information?

20   A    Yes.

21   Q    What kind of documents did you review to do that?

22   A    I've looked at -- well, the current financial information,

23   I've looked at recent monthly operating reports that have been

24   filed with the Court, and I've looked at their historical

25   information that's been filed, that's on record with the

                    Phillips - Direct (Sim)                    Page 183

1    Securities and Exchange Commission.

2    Q    Okay, thank you.

3    A    I'm sorry.  Plus they've also provided cash flow data,

4    both current and historical that I've looked at.

5    Q    Okay, thank you.  Did you review the deposition testimony

6    of John Dempsey and Chandler Bigelow?

7    A    Yes.

8    Q    Did you review the Mercer report?

9    A    Yes.

10   Q    What else did you review in connection with those -- the

11   Mercer report?

12   A    Well, in connection with my analysis, I've reviewed news

13   articles, proxy statements.

14   Q    Okay.  Did you -- were there any proxy statements that

15   were included in the debtors' production?

16   A    No.

17   Q    Okay.  Was there any financial information about the

18   alleged peer group in the Mercer report, was that provided to

19   you?

20   A    No, there was not.

21   Q    Okay.  Can you turn to Exhibit 1, and there's a binder,

22   there's three binders behind you, Exhibit 1 should be in binder

23   1.

24                         (Pause)

25   Q    Can you turn to page 37, please.

Phillips - Direct (Sim)                    Page 184

1    A    Yes.

2    Q    On page 37 is listed, or describes what's called the peer

3    group profile.  Are you familiar with this page?

4    A    I am familiar with this page, yes.

5    Q    Okay.  And did you review any information about the

6    companies listed on this page?

7    A    I read their proxies.

8    Q    Did you read any other documents in connection with your

9    work in this case?

10   A    I also read the proxies from Tribune Company that were

11   filed when they were publicly traded.

12   Q    Okay.  Did you read the debtors' -- have you read the

13   pleadings since the motion?  Have you looked at any of the

14   pleadings, the reply and response to the supplemental

15   objections filed by the Guild?

16   A    I have, yes.

17   Q    And based on what you've read in those pleadings and

18   elsewhere and the proxies, what's your understanding of the

19   debtors' business conditions in 2009?

20   A    In early 2009, it was characterized as devastating, and

21   getting worse by the week.

22   Q    Okay.  All right.  Now let me ask you a question about

23   cash and equity.

24   A    Okay.

25   Q    In your experience, is there a difference between cash and

Phillips - Direct (Sim)                    Page 185

1   equity?

2   A    There is a difference, yes.

3   Q    Okay, what is the difference?

4   A    Well, first, equity, it doesn't cost a company anything to

5   give equity.  They're not writing a check for it.  What's

6   happening when you're giving, when you're giving equity awards,

7   first, they're normally long term in nature.  They vest over a

8   period of years.  But effectively, it's a transfer of wealth

9   from current shareholders to the recipients of the equity

10  awards.

11      Cash, you're writing a check and the money's not available

12  to the company anymore.

13  Q    Based on your review of proxies and other documents,

14  publicly filed documents, that describe what we would call

15  maybe an equity incentive compensation program, what's your

16  understanding of what an equity compensation package is

17  supposed to provide?

18  A    Well, it's intended to align long term the interests of

19  management and shareholders.

20  Q    Is there any risk with receiving equity?

21  A    There is risk, yes.

22  Q    And what's your understanding of what that risk is?

23  A    Well, there's upside risk and there's downside risk.  If

24  the company executes on its strategy and prospers and its stock

25  price goes up, the equity awards can be very lucrative.  If the

                  Phillips - Direct (Sim)                Page 186

1   company falters, if it fails, the equity awards can turn out to

2   be worthless.

3   Q    Okay.  What about cash, is there a risk with getting cash?

4   A    The only risk would be is when it's time for the cash

5   award, the company doesn't have the cash to pay for it.  But

6   no, normally once a check clears the bank, the money's yours.

7   Q    Okay.  I assume you're familiar with the report you

8   submitted in connection with this matter?

9   A    I am, but I'd love to refer to it.

10  Q    Would you like to turn to tab -- to, I think it's 16.

11                          (Pause)

12  A    It's not 16.

13                          (Pause)

14       MR. SIMON:  May I approach the witness, Your Honor?

15       THE COURT:  You may.

16       MR. SIMON:  Thank you.

17                          (Pause)

18  Q    All right.  Now as I understand your report, you did a

19  number of financial -- financial analyses of the cost of these

20  programs and the relative -- or the percentage cost as it

21  relates to operating cash flow and some other calculations

22  which are all set forth in your report.  Is that correct?

23  A    That's correct, yes.

24  Q    All right, let's start with the MIP.  Do you have any

25  sense for what the cost of the MIP is if the debtors hit the

Phillips - Direct (Sim)                    Page 187

1   plan threshold of 212 million?

2   A    Yes.  The MIP is 17 and a half million dollars.

3   Q    And do you know what that is as a percentage of OCF?

4   A    It's eight and a quarter percent of operating cash flow.

5   Q    Okay.  And if the debtors hit the 300 million mark, do you

6   know what the cost of the MIP is, as a percentage of that?

7   A    If -- sorry.  If the debtors hit the 300 million dollar

8   mark, the cost of the MIP is 35 million or 11.6 percent of

9   operating cash flow.

10  Q    Okay.  And if the debtors hit the 424 million max mark, do

11  you know what the cost of the MIP is as a percentage of

12  operating cash flow?

13  A    Yes.  If they hit the 424 million dollar mark, the cost of

14  the MIP is 45.6 million or ten and three-quarters percent of

15  operating cash flow.

16  Q    Okay.  Now let's just focus quickly on the MIP and the

17  TMIP.  If you hit the plan mark, you said it was eight and a

18  quarter percent, the cost.  If the TMIP kicks in, do you know

19  what the cost of that is, as a percentage of the operating cash

20  flow?

21  A    It's 2.1 percent at the first threshold.

22  Q    Okay.  So the combined percentage is a basis of -- I'm

23  sorry, I didn't mean to interrupt you.

24  A    I apologize.  It's 1.9 percent.

25  Q    Okay.  So the combined percentage -- the 212 million,

Phillips - Direct (Sim)                    Page 188

1    what's going to be the cost of the --

2    A    About 10.1 percent.

3    Q    Okay.  Now, as a percentage of operating cash flow, do you

4    know what the cost of the MIP and the TMIP is if the debtors

5    hit the stretch 300 million mark?

6    A    I do.  It's 14 and a half percent of operating cash flow.

7    Q    Okay.  As a percentage of operating cash flow, what is the

8    cost, do you know what the cost of the MIP, the TMIP and the

9    KOB is if the debtors hit the max level?

10   A    Well, the -- if the KOB -- if the KOB pays out at the full

11   amount, it would be -- I'm sorry -- it would be 15.7 percent of

12   operating cash flow.

13        However, the MIP and the TMIP would be 13.6.  And the KOB

14   is not linear the way the MIP and the TMIP are.

15   Q    Okay.  Now, we heard this morning, Mr. Bigelow testified

16   about the historic percentages of -- as far as cost of plans

17   versus -- or as a percentage of OCF.  Do you know what -- do

18   you remember what the range was?

19   A    It was 1.6 to 3.3 percent of operating cash flow.

20   Q    Okay.  How does that compare with -- you just gave us a

21   percentage, I believe, of about 15.7 percent.  It's a different

22   number, isn't it?

23   A    It's a different number, yes.

24   Q    Bigger?

25   A    It is bigger, yes.

Phillips - Direct (Sim)                    Page 189

1   Q    Is it a substantial change from the range of numbers that

2   were the historic numbers?

3   A    It's a multiple of the 3.3.

4   Q    So year over year, from '97 to 2007, we had numbers

5   anywhere between, each of those years the numbers were between

6   1.6 and 3.3, and this year we're looking at 15.7?

7   A    Well, if they hit the ball out of the park, potentially

8   all three factors could kick in.

9   Q    Okay.  How about if they hit the 300 million mark?  It's

10   still substantially different in your opinion?

11   A    It is, yes.

12   Q    Okay.  Now, have the debtors always hit their targets, to

13   your knowledge?

14   A    No, they haven't.  Last time they hit their targets was

15   2002.

16   Q    Okay.  Missed their targets or hit?

17   A    No, the last time they hit their --

18   Q    Hit the targets?

19   A    Yes.

20   Q    Okay, I'm sorry.

21        Now, there was -- you said that you looked at the proxies

22   for most of the companies, or all the companies listed on page

23   37 of the report.  You only listed five -- you only referenced

24   five in your report.  What is it about those five that you felt

25   were important?

Phillips - Direct (Sim)                    Page 190

1    A    Well, all --

2    Q    Or the lack of the five that weren't in your report,

3    however you wanted to handle that.

4    A    No, it wasn't exclusion by design.  All five of the

5    companies that I referenced in my report had either frozen or

6    reduced executive compensation for 2009.  Additionally, four of

7    the five companies had either suspended or curtailed their cash

8    incentive programs for 2009.

9    Q    Okay.  Did that information make it into the Mercer

10   report?

11   A    I didn't see it, no.

12   Q    Okay.  It's your understanding that the Mercer report

13   relied on assumptions for 2009, is that correct?

14   A    That's --

15   Q    Is that the testimony we heard?

16   A    That's the testimony I've heard, yes.

17   Q    Okay.  There was also a reference I think in the -- I'm

18   not sure if it was in your deposition or report, but there was

19   an issue about whether family control played any sort of role

20   in setting -- in how the compensation was -- or how management

21   made decisions about compensation.  And what were your thoughts

22   on that?

23   A    Well, my thoughts -- my thoughts on that were the issue of

24   -- and I'm not a management compensation consultant, but there

25   could be a degree of conflict involved with it.

Phillips - Direct (Sim)                    Page 191

1    Q    Let's look at, for instance, the New York Times.  The New

2    York Times, do you know anything about the ownership of that

3    company?

4    A    Yes.

5    Q    What's --

6    A    The Sulzberger family controls the voting shares in the

7    New York Times.

8    Q    Okay.  The majority of the voting shares?

9    A    Yes.

10   Q    How about the Washington Post?

11   A    That's the Graham family.

12   Q    All right.  They control the majority of the voting

13   shares, to your knowledge?

14   A    I think it's on the order of 74, 75 percent.

15   Q    Okay.  And just to move things along, you stated in your

16   report, you have a summary conclusion, and I just want you to

17   just take a look at it, and in the interest of time, just tell

18   us if you believe that that conclusion or these conclusions are

19   accurate today.  Have they changed?

20   A    Allow me to reread it just for one moment.

21                           (Pause)

22   A    No, they haven't changed.

23   Q    Okay.  Is this your -- are these your opinions or

24   conclusions to a reasonable degree of accounting certainty?

25   A    Well, to a reasonable degree of professional certainty,

Phillips - Cross (Lot)                    Page 192

1    yes.

2    Q    Okay.

3             MR. SIMON:  I have nothing further, Your Honor.

4             THE COURT:  Cross-examination.

5             MR. LOTSOFF:  Your Honor, just to expedite things, in

6    the event that I need to refer to Mr. Phillips's deposition, I

7    propose to circulate his transcript just at the outset.  And

8    then if we don't need it, we don't need it.

9             THE COURT:  Very well.  We have a recycle bin.

10                        (Pause)

11                  CROSS-EXAMINATION

12   BY MR. LOTSOFF:

13   Q    Good afternoon, Mr. Phillips.

14   A    Good afternoon, Mr. Lotsoff.

15   Q    I believe we're all in agreement here today that you are

16   not a management compensation consulting expert?

17   A    I think we've all agreed to that, yes.

18   Q    And that's not the purpose for which you're being called

19   by the Guild today?

20   A    That is not the purpose.

21   Q    And you're also not an expert in the media industry, is

22   that correct?

23   A    I am not a media industry expert.

24   Q    And you've never worked in the media industry?

25   A    No, I haven't.

Phillips - Cross (Lot)                    Page 193

1    Q    And you've never done budgeting or business planning for a

2    media industry client, is that correct?

3    A    I've done budgeting, I've done business planning, I don't

4    recall doing it for a media industry client, no.

5    Q    And you've never represented a client in the media

6    industry in or out of bankruptcy, is that also correct?

7    A    Not to my recollection, no.

8    Q    And you've never represented a Creditors Committee or

9    other constituency in a restructuring involving a media company

10   other than your engagement in the current matter, correct?

11   A    I think that's correct, yes.

12   Q    And is it true that when you work on restructuring matters

13   involving companies in bankruptcy, that over 75 percent of the

14   time you are retained by the Creditors Committee?

15   A    That's an accurate statement, yes.

16        MR. SIMON:  Your Honor, I just want to -- I thought I

17   heard Mr. Lotsoff say that he was retained as a creditor -- by

18   the Creditors Committee in this case.  I just wanted to make

19   that's not -- it's clear for the record that he's not retained

20   by the Creditors Committee.

21        MR. LOTSOFF:  And that's not the implication I meant

22   to make.

23        THE COURT:  I understand.

24   BY MR. LOTSOFF:

25   Q    Is it your experience in working with creditors and

Phillips - Cross (Lot)                    Page 194

1    Creditors Committees that they try to protect the interests of

2    those constituencies?

3    A    That is my experience, yes.

4    Q    And has it also been your experience that as a result of

5    that objective, Creditors Committees will often review and

6    sometimes negotiate with the debtor over an incentive plan that

7    the debtor wants to implement?

8    A    It's been my experience in the times I've encountered

9    incentive plans and prior to the change in the Bankruptcy Code,

10   retention plans, there was negotiation, yes.

11   Q    And sometimes that happens in conjunction with a motion

12   that's pending in Court to approve a plan?

13   A    It does, yes, that's accurate.

14   Q    And would you agree with me that the support of a

15   Creditors Committee for a proposed incentive plan is a factor,

16   perhaps not the only factor, but a factor that would weigh in

17   favor of the plan being a valid exercise of the debtors'

18   business judgment?

19   A    I think it depends on what's at stake for the constituents

20   of that Creditors Committee.

21   Q    Well, the Committee has a fiduciary duty to its members,

22   correct?

23   A    Yes, I understand that, yes.

24   Q    And that's why I said it may not be the only factor.  But

25   if a Creditors Committee, in exercising its fiduciary duty to

Phillips - Cross (Lot)                    Page 195

1    its constituencies, determines that it supports a debtor's

2    proposed plan, would you agree that that's a factor that could

3    weigh in favor of that plan being a valid exercise of the

4    debtors' business judgment?

5    A    I'm not sure how a Creditors Committee support weighs in

6    favor of the debtors' business judgment.  I haven't been asked

7    to opine on a debtor's business judgment in this matter.

8    Q    Do you recall giving a deposition in this matter a week

9    and a half ago?

10   A    I do, yes.

11   Q    And I asked you questions and you answered those

12   questions?

13   A    Yes.

14   Q    And you were under oath at that time?

15   A    I was, yes.

16   Q    Could you turn to page 59 of your deposition testimony.

17                          (Pause)

18   A    Are the pages on the side or the bottom?

19   Q    Do you have your deposition transcript?

20   A    I do, yes.

21   Q    Page 59.

22   A    There's two numbers on every page.

23        I see it.

24                          (Pause)

25   Q    It's actually page 53.

Phillips - Cross (Lot)                    Page 196

1    A    I have it, yes.

2    Q    At the bottom?

3    A    Yes.

4    Q    Okay.  Do you see the question, I'll ask the question that

5    I asked at your deposition.

6         "And a Creditors Committee as you understand it has a

7    fiduciary responsibility to its constituent creditors?"

8         What did you answer?

9    A    I answered it could be a factor but you have to look --

10   Q    No, no, I'm asking --

11        THE COURT:  No, you need to follow the deposition

12   transcript.

13   Q    What did you answer?

14   A    I'm sorry.  "As I understand it, yes."

15   Q    And then I asked the question, "So if the Creditors

16   Committee exercises its fiduciary duty and makes a judgment

17   that overall this plan is in the best interest of the Committee

18   members as a whole, is that a factor, maybe not the only

19   factor, but a factor that weighs in favor of the plan being a

20   valid exercise of the debtors' business judgment?"

21        Could you read your answer.

22   A    Yes.  I responded, "It could be a factor but I think you

23   have to look at where that particular creditor constituency

24   stands in that particular case."

25   Q    And I asked you, "But it could be a factor that weighs in

1    favor of the plan?"

2         And what was your answer?

3    A    I agreed.  "It could be a factor."

4    Q    Thank you.

5         Would you also agree with me that the business challenges

6    faced by companies in Chapter 11 can be different from those

7    not in Chapter 11?

8    A    I would agree with you, yes.

9    Q    And that merely filing for Chapter 11 can be a traumatic

10   event for a company and create uncertainty among its creditors

11   and suppliers and employees?

12   A    It can be, yes.

13   Q    And are you aware that it's common for a company out of

14   bankruptcy to offer management compensation comprised of base

15   salary cash incentive and long term incentive compensation

16   typically equity?

17   A    Yes.

18   Q    And typically in Chapter 11, the debtors' equity has no

19   value, is that correct?

20   A    That's correct.

21   Q    And in those circumstances, the company can't effectively

22   offer equity based compensation because there's really no value

23   to grant, even if it wanted to do so, is that correct?

24   A    That's accurate, yes.

25   Q    Now, I think you testified that the stock based

Phillips - Cross (Lot)                    Page 198

1   compensation has no cost.  Are you familiar with FAS-123?  FAS-

2   123?

3   A    Tangentially, I don't perform audits.  If you could give

4   me the title of it.

5   Q    Well, I don't have the title.  I thought you were an

6   accounting expert and you might be familiar with that --

7   A    But it's -- these are items used by auditors, and you can

8   ask the question.  If I can answer it, I will.

9   Q    Okay.  Well, you testified that stock based compensation

10  has no cost.  Are you aware, as an accounting expert, that

11  under a FAS-123, companies are obligated to accurately report

12  the cost of stock based compensation on their income

13  statements?

14  A    They have to value the stock based compensation, but it is

15  not a cash expenditure of the company.  In fact, when you

16  compute operating cash flow, one of the things you add back is

17  the cost of stock based compensation that you reported on your

18  income statement as an expense.

19       So, yes, it's on your income statement, but it's not a

20  cash expense.

21  Q    Thank you.  Now, are you aware that sometimes companies

22  exceed the targets that they set in their incentive plans?

23  A    I'm aware of that, yes.

24  Q    And you remember during your deposition we talked about

25  one such example that you had worked on in a prior matter, I

1   believe, <u>Foamex</u>, do you remember that --

2   A    Yes.

3   Q    -- we talked about that at your deposition?

4   A    Yes.

5   Q    And you agree, do you not, that the issue of when

6   incentive plan targets were set, and what the architects of the

7   plan knew at that time, those issues are relevant to the

8   question of whether those targets were appropriate when they

9   were set?

10  A    Yeah, as are the assumptions that they make, yes.

11  Q    And that's true in part because conditions change, markets

12  change, correct?

13  A    Nothing is a constant except change, of course.

14  Q    And no one can predict the future, correct?

15  A    Some try.  You can make assumptions.

16  Q    And all budgeting and business planning and projections

17  involve some predictions and judgments, do they not?

18  A    There are assumptions in making plans.

19  Q    And when a company develops a budget and makes projections

20  about future performance with respect to cash flow or other

21  variables, it's common for them to rely in some cases heavily

22  on what happened in the past, is it not?

23  A    You have to take the past into consideration but you also

24  have to look at the current environment you're in and what you

25  think is gonna happen in the future.  It's a projection of

Phillips - Cross (Lot)                    Page 200

1    what's going to happen in the future.

2    Q    And would you agree with me that all things being equal,

3    if you're in times that are unprecedented, so that current

4    conditions don't really match up with the past, it's inherently

5    more difficult to budget and forecast accurately?

6    A    Well, from what I've heard this morning, the revenue

7    projections have been spot on.  But in a general sense, yes, I

8    think it would be more difficult to budget and forecast

9    accurately.

10   Q    Is that also a true statement for economically sensitive

11   businesses, that derive a material part of their revenues from

12   discretionary spending?

13   A    That's accurate.

14   Q    And does that include newspapers?

15   A    Well, I'm a person who read two newspapers a day just

16   about every day.  So for me, no.  But it could be for some,

17   yes.

18   Q    And do you recall testifying at your deposition that

19   newspapers were economically sensitive businesses?

20   A    Yes, but you're attempting to make the case that I'm not a

21   media industry expert.  This is really a personal observation

22   on my part.

23   Q    But your personal observation at your deposition was that

24   newspapers are economically sensitive businesses, correct?

25   A    Yes.

Phillips - Cross (Lot)                    Page 201

1   Q    Okay.  And that's also true to an extent for broadcasting

2   and internet based media, correct?

3   A    Yes.

4   Q    If Tribune had in the past paid out a greater percentage

5   of its operating cash flow as cash awards, and that percentage

6   from the past was comparable to the percentage of cash flow

7   that it now proposes to pay out, isn't it true that you

8   wouldn't have the concerns that you now claim to have regarding

9   inconsistency with past practice?

10  A    Well, I don't know that it was concerns.  I performed an

11  analysis, and what I found was the potential payout is

12  significantly higher than what's been done in the past.

13  Q    Right.

14  A    It's not consistent with the Tribune Company's past

15  practice.

16  Q    And my point is that if it had been consistent with past

17  practice, if past percentage payouts as a percentage of cash

18  flow had been higher --

19  A    I wouldn't be here.

20  Q    And would you also agree that a company can vary from past

21  practices and is not bound by them?

22  A    I would agree with that, yes.

23  Q    So in your view it's more a question of the degree of the

24  variation?

25  A    Well, in my view, I looked at the situation in front of

Phillips - Cross (Lot)                    Page 202

1    me, and I've noted the degree of variation.

2    Q    But in terms of inconsistency with past practice, whether

3    or not you have a concern about that inconsistency depends on

4    the degree of variation, is that correct?

5    A    Well, what I observed here is that it's a multiple, it's

6    not a percentage more.  It's a multiple.

7    Q    But you agree that there's no industry accounting or

8    finance standard that specifies when a payout as a percentage

9    of operating cash flow is too great, is that correct?

10   A    I'm not aware of any specific standard that discusses when

11   a payout of operating cash flow is too great.

12   Q    And you also agree, I take it, that there's no industry

13   accounting or finance standard that specifies when an increase

14   in payouts as a percentage of cash flow, relative to past

15   practice, is too great, is that correct?

16   A    I have not seen that, no.

17   Q    And you were not able at your deposition to tell me when a

18   variance from past percentage payouts would be small enough to

19   be appropriate?

20   A    That's not what I was hired to do.

21   Q    Okay.  And you would also agree that if a company has

22   determined in its judgment that it can afford to pay out a

23   greater percentage of its cash flow as incentive awards and

24   still meet its other day-to-day cash operations, that would be

25   a relevant factor in determining whether a variation from past

Phillips - Cross (Lot)                              Page 203

1    practice is appropriate?

2    A    Did I testify to that?  If I did, I would have testified

3    to that in the context of a healthy operating company.

4    Q    Okay.  So you would agree that there are circumstances

5    under which if a company decides that it can afford to pay out

6    a greater percentage of its cash flow as incentive awards,

7    that's a relevant factor in determining whether a variation

8    from past practice is appropriate, correct?

9    A    I'm sorry, ask the question one more time, please.

10   Q    Yes, I just want to make sure I understand.

11        You agree then that there are circumstances where if a

12   company decides that it can afford to pay out a greater

13   percentage of its operating cash flow as incentive awards,

14   that's a relevant factor in determining whether a variation

15   from past practice is appropriate?

16   A    It could be, yes.

17   Q    Now, you've never developed, because you're not a

18   management compensation expert, you've never developed a peer

19   group in order to benchmark management compensation, have you?

20   A    No, I haven't.

21   Q    And the analysis of the peer group companies in your

22   report is based on your reviews of their most recent proxy

23   statements, is that correct?

24   A    That's correct.

25   Q    And so when you testified about your concerns about

Phillips - Cross (Lot)                    Page 204

1    certain companies that are family owned having a, maybe a

2    conflict because they're family owned, that's just your, sort

3    of gut sense.  That's not based on any investigation that you

4    did of these particular companies, is that correct?

5    A    Well --

6    Q    My question is --

7    A    I understand that.  There are disclosures in these proxies

8    about the control standards of the New York Stock Exchange, how

9    a number of them are not subject to it.  I think there's always

10   a degree of conflict, even for an independent board member,

11   when you have one person or one family determining who's going

12   to go on the board and you know, as you can see in the proxies,

13   sometimes the board compensation is fairly lucrative.

14   Q    Okay.  But my question is, you haven't talked to any board

15   members at these companies, have you?

16   A    I did not go out and survey board members, no.

17   Q    And you haven't talked to management?

18   A    No.

19   Q    And these are public companies, correct?

20   A    Yes.

21   Q    And public companies have fiduciary duties to

22   shareholders, correct?

23   A    Arguably, yes.

24   Q    Including these companies?

25   A    Yes.

Phillips - Cross (Lot)                    Page 205

1   Q     And to your knowledge, they have Compensation Committees

2   with independent directors, correct?

3   A     Independent with, you know, with what I discussed just a

4   few questions ago.

5   Q     Your general sense --

6   A     Yes.

7   Q     -- that there can be a conflict of interest?

8   A     Yes.

9   Q     Okay.  The -- your report at page 9, 9 to 10, see that?

10  A     Yes, I do.

11  Q     You see in the footnotes, you refer to a number of proxy

12  statements for five companies, Lee Enterprises, McClatchy,

13  Gannett, E.W. Scripps and I think that may be it.  Do you see

14  that?

15  A     Yeah, I think there were five companies, Lee, McClatchy,

16  Gannett, Scripps, and I also referenced Thomson Reuters.  It

17  wasn't a proxy, Thomson Reuters is a foreign corporation, and

18  they filed a document similar called a management information

19  circular.

20  Q     Okay.  And you were here for Mr. Simon's cross-examination

21  of Mr. Dempsey, were you not?

22  A     I was, yes.

23  Q     And you saw that he showed Mr. Dempsey some proxy

24  statements and asked him some questions about those statements

25  and those companies, right?

Phillips - Cross (Lot)                    Page 206

1    A    Yes.

2    Q    And those companies that Mr. Simon was asking Mr. Dempsey

3    about, those are the same companies that are in these footnotes

4    in your report, correct?

5    A    Yes.

6    Q    Directing your attention to page 3 of your report,

7    paragraph 7.  Do you see that?

8    A    I do, yes.

9    Q    Do you see the line in paragraph 7 that says, "the KOB has

10   only one payout level"?

11   A    I do.

12   Q    That being the max level of 424.2 million dollars of OCF?

13   A    I see that, yes.

14   Q    The same as the MIP and TMIP, do you see that sentence?

15   A    I do see that.

16   Q    Is that an accurate statement?

17   A    Well --

18   Q    Is it an accurate statement?

19   A    I'm not sure, based on what's been presented.  Mr. Bigelow

20   had testified at his deposition that the KOB didn't pay until

21   424 million.  The pleadings and the Mercer report appeared

22   unclear at times.

23        As I sit here today, I understand that that is not an

24   accurate statement.  But it doesn't -- first, it doesn't affect

25   my opinion.  And second, because the KOB apparently kicks in at

Colloquy                                    Page 207

1    earlier levels --

2    Q    My question was --

3    A    -- it would cause even more cash --

4    Q    This is --

5    A    -- would cause even more cash to be paid out at the

6    various operating --

7    Q    You answered my question --

8    A    -- cash flow levels.

9    Q    Okay.

10            MR. LOTSOFF:  Could I have one moment, Your Honor?  I

11   think I'm done.

12            THE COURT:  You may.

13                         (Pause)

14            MR. LOTSOFF:  Nothing further, Your Honor.

15            THE COURT:  U.S. Trustee?

16            MR. McMAHON:  No, Your Honor.

17            THE COURT:  Redirect.

18            MR. SIMON:  No redirect, Your Honor.

19            THE COURT:  Thank you, sir, you may step down.

20            THE WITNESS:  Thank you, Your Honor.

21            THE COURT:  All right.  Does the Guild have anything

22   further in support of its objection?

23            MR. SIMON:  No, Your Honor.

24            THE COURT:  All right.  Mr. McMahon, anything further

25   in support of the U.S. Trustee's position?

Lotsoff - Closing Statement                    Page 208

1    MR. McMAHON:  Not by way of testimony, Your Honor.

2    THE COURT:  All right.

3    I will tell you, I'm not prepared to rule from the

4    bench today on the relief requested.  But I would be interested

5    in hearing very brief comments by anyone who wishes to be heard

6    in the nature of closing.  But understand that I've read the

7    papers that were submitted.  But to the extent you want to

8    highlight some things for me that were elicited by way of

9    testimony today, I'm open to that.  But I won't require it.

10   MR. LOTSOFF:  Thank you, Your Honor.  I'll take you up

11   on your offer, and I'll try to be brief.  I won't go over the

12   legal standard.  I believe that's been fully briefed by the

13   parties.  Suffice it to say that we believe the evidence more

14   than meets that standard.

15   This is a vitally important plan for the debtors, for

16   their employees as a whole, for their estates and their

17   constituencies.  And perhaps the most obvious proof of that

18   fact is that it's not just the debtors that have expressed

19   their support for this plan.  It's also the Official Committee

20   and the Steering Committee after a long diligence process.

21   You've heard today from Mr. Bigelow about some of the

22   ways in which the company is trying to mitigate the

23   unprecedented and adverse trends that it's now facing.  And

24   those initiatives are bearing fruit.  You've heard about the

25   profitability of the papers, the success of the TV stations,

Lotsoff - Closing Statement                    Page 209

1    and the success of the company relative to its competitors.

2         And notwithstanding any potential efforts to cast

3    aspersions on current management, this is the team that's

4    making that happen.  And I would just emphasize that these

5    comparisons to past cash flow in our view are not relevant, are

6    not appropriate in benchmarking this plan.  It's undisputed on

7    this record that we are in a new media environment, and that

8    this company is distinguishing itself, and that it's doing so

9    not only by just trying to survive but by trying to transform

10   itself to become an industry leader.

11        In that context, and given the demands that are

12   placed on management, it is critically important, and you've

13   heard this from Mr. Bigelow and from Mr. Dempsey, to ensure

14   that the management team which is driving these efforts day in

15   and day out, in addition to handling this restructuring, has

16   proper incentives.

17        And you've also heard about the concrete damage that

18   could occur to the company's transformative efforts if this

19   management team didn't have those incentives.

20        And so to go to the Court's initial question in this

21   matter, we respectfully submit that this is precisely the case

22   where, in a troubled environment, it's absolutely critical to

23   maintain proper incentives, and not jeopardize what this

24   company has achieved.

25        These plans should be viewed as an investment in the

Lotsoff - Closing Statement                    Page 210

1    company, and not just the company, but in its employees, its

2    constituencies, its estates.

3         Mercer has also validated that at all performance

4    levels, these plans are appropriate and market based.  That if

5    they received only salary, or even only the MIP, the key

6    management team would be profoundly below the market median.

7         THE COURT:  Well, let me -- since you mentioned it,

8    let me ask you this.

9         MR. LOTSOFF:  Sure.

10        THE COURT:  If upon consideration, I were to determine

11   that one or more, but not all of the components, should be

12   approved, would the debtor prefer that I issue a decision in

13   that framework; or, because the components were the subject of

14   such extended and highly negotiated proceedings, would the

15   debtor prefer to go back and start over again, or as I said,

16   accept approval of one or more of the components but not all?

17        MR. LOTSOFF:  Well, I guess, Your Honor, I feel that

18   I'd have to talk to our client --

19        THE COURT:  And I'll give you the opportunity before

20   we leave today to do that, if you think you can get me an

21   answer that quick.

22        MR. LOTSOFF:  That's fine.  But if I could just make a

23   point on that.

24        Again, in addition to the market based nature of

25   these provisions, I guess I question having gone through this

1    extended negotiation process with the Official Committee and

2    the Steering Committee, and it was an extended process, based

3    on extensive due diligence, I guess I would question what the

4    negotiation would be, since the parties that --

5             THE COURT:  Well, Courts make decisions all the time

6    that send parties back to the table.

7             MR. LOTSOFF:  Understand.

8             THE COURT:  And don't misunderstand, you know, I do

9    this job, I don't do the jobs that you've described which

10   occurred among the professionals, both legal and otherwise, to

11   come up with this result.  This is one of those situations that

12   Bankruptcy Courts face a lot, and that is, you know, the

13   courtroom may be full of people that know a lot more about the

14   topic than I do.  But the process is framed in such a way that

15   because there's an objection, I must make a decision.

16            And I'm not sure exactly how I will come out yet, but

17   I ask the question for the very reason that I don't know how

18   the various constituents came to where they did as a matter of

19   bargaining.  And I typically don't know from evidentiary

20   hearings.

21            I understand what philosophically is being presented

22   as the reasons for the three parts to the plan.  But that's why

23   I asked the question.  Understand?

24            MR. LOTSOFF:  Understand, Your Honor.

25            THE COURT:  Okay.

Lotsoff - Closing Statement                    Page 212

1          MR. LOTSOFF:  You know, with respect to some of the

2     Guild's points, in considering your decision, its attacks on

3     Mercer's methodology as flawed, I think the evidence shows that

4     those attacks are off base, and that Mr. Phillips is not a

5     compensation expert.

6          We believe that the Guild's claim that this plan is a

7     retention plan is also simply wrong.  All of the components of

8     the plan are directly tied to a central performance metric

9     which is the generation of operating cash flow, and the payment

10    provision of this plan which again is intended to incentivize

11    emergence, and you heard the benefits of that from Mr. Bigelow,

12    was also --

13          THE COURT:  Well, let me just put that one to rest.

14          Every bonus plan, virtually every bonus plan has some

15    element of retention in it.  I have routinely held that unless

16    a plan is demonstrated to be primarily for the purpose of

17    retention, it doesn't fit within the 503(c)(1) rubric.  And I

18    don't see the evidence here supporting that view either.

19          I mean, largely, as I understand the debtors' goal,

20    it's to reward those who are most responsible for, to put it

21    plainly, strapping the company on its back and pulling it

22    through these times.

23          MR. LOTSOFF:  We appreciate that, Your Honor.

24          The Guild also argues that the targets in the plan

25    are lay-ups in essence because the debtors have had the good

Lotsoff - Closing Statement                Page 213

1    fortune of exceeding their initial projections.  And with

2    respect to that, I'll just say, you know, hindsight is 20/20,

3    but I think that Mr. Bigelow has testified, again without

4    dispute, as to how that projection was eminently reasonable at

5    the time that it was set, and how the debtors' success in

6    exceeding that projection is due to their very hard efforts

7    which are to be, we would respectfully submit, commended and

8    not attacked by the Guild, and the Guild's own witness just

9    conceded that what matters is what you knew at the time.

10             THE COURT:  Well, we talked a little bit about this at

11   the earlier hearing in connection with the 2008 plan.  What I

12   am finding more frequently is, because of how the cases are

13   coming here, there are other issues of more urgency, greater

14   urgency, as they should be, at the beginning of cases.

15             So that when it comes to negotiating and seeking

16   approval of bonus plans, especially for top management and

17   executives, it does often, and should, await the disposition of

18   other more pressing matters.  So I don't see the passing of

19   time here, and I've said this before, as a point against the

20   relief that's been requested.

21             MR. LOTSOFF:  Thank you, Your Honor.

22             The Guild also pointed to the debtors' historical

23   payouts as a percentage of cash flow.  We again don't believe

24   that that is a relevant consideration here that counts against

25   the merits of these plans.  We are not in the past.  I think

Lotsoff - Closing Statement                    Page 214

1    the evidence overwhelmingly shows that we are in a different

2    time period here.  We don't have equity to grant to ensure

3    proper incentives and market based compensation.

4           There are no standards, and the Guild's own witness

5    conceded that he's not aware of any standards that specify when

6    a variance from past practice is too great, and that indeed a

7    variance from past practice can be too great.  And Mr. Dempsey

8    testified that this is precisely the circumstance where it's

9    common and appropriate, in his experience, for companies to pay

10   out a greater percentage of their cash flow.  And as Mr.

11   Bigelow testified, without dispute, this plan is self funding

12   at all levels, and therefore, the debtors can't afford it at

13   all payout and performance levels.

14          Lastly, I must disagree with the Guild's contention

15   that the proposed plans will harm morale, and are not

16   consistent with the notion of shared sacrifice.  Mr. Bigelow

17   testified that, you know, the best boost to morale in an

18   industry where other companies are going out of business, they

19   are cash flow negative, is to know that in essence you're

20   working for a healthy dynamic organization that's not only

21   trying to survive, but to transform itself, so that there is a

22   company that can continue to support an employee base, and

23   continue to be a vibrant force in the marketplace.

24          And there is shared sacrifice here, as you've heard.

25   The Guild mentions a wage freeze, but did not mention that the

Lotsoff - Closing Statement                    Page 215

1   management team is subject to the very same wage freeze.

2          The debtors have honored all of their collective

3   bargaining agreements with their labor unions, including the

4   Guild, and the Guild even received in Baltimore, increase

5   pursuant to this agreement for this year.  Unionized employees

6   have never participated in these programs.  And therefore, to

7   the extent they are suggesting that they're being excluded from

8   something in these programs, that simply would not be accurate.

9          Really, the population that the Guild is asking to

10  give something up here is the management team that's driving

11  this change and this success.

12         And as for layoffs, no company, Your Honor, wants to

13  engage in head count reductions.  But layoffs are an

14  unfortunate reality for many companies in these times, not just

15  this company.  And in this case, it's management's initiatives

16  that have produced increased efficiencies that have allowed

17  them to do more with less and make these reductions possible.

18  But when layoffs have occurred, I think the evidence was

19  undisputed, Your Honor, that those layoffs have been

20  implemented equitably across both unionized and management and

21  supervisory employees.

22         And so, again, we believe that the proposed plan and

23  the various components of the plan, and I say this recognizing

24  earlier comments, but our position would be that the proposed

25  plan is a valid exercise of the considered judgment of not only

Simon - Closing Statement                Page 216

1    the debtors, but the Committees, their Compensation Committee

2    and Mercer.  They're important, vitally important for the

3    continued health and welfare of the debtors and the

4    constituencies including their employees.

5           And we would respectfully request, again subject to

6    the Court's earlier comments, that this Court grant the

7    debtors' motion.

8           THE COURT:  Thank you.  Mr. Simon.

9           MR. LeMAY:  Your Honor, I'm going to wish to be heard

10   very briefly in support.  Would you prefer --

11          THE COURT:  I think I want to hear from the direct

12   participants first, and then I'll hear from others, but thank

13   you.  I normally would do that.

14          MR. SIMON:  Thank you, Your Honor.

15          I just -- I'll try to be brief.  I think Your Honor

16   has heard a lot of testimony today, and there's a lot of facts,

17   there's an extensive factual record that's been established.

18   There were a lot of documents that were placed into evidence.

19          And really, I can tell you that the Guild's focus in

20   this case has been on facts and evidence that it's flushed out

21   of the record.

22          As far as this plan goes, it's a historic high as far

23   as dollar amounts.  The proposed cost of the plan is 66.8

24   million dollars for 2009.  And the stretch level, which the

25   company is about to hit, the cost would be about 43.5 million.

Simon - Closing Statement                    Page 217

1    And the most cash that the company's ever paid in the last

2    decade, as far as we understand from the record, is 37 million

3    in 2006.  So, it's historically high.

4            THE COURT:  But let's just go with that for a minute

5    and say that's all true.  Don't you think employees of a

6    company that's in a troubled industry during bad economic

7    times, with no immediate -- well, assurance that things will

8    change for the better, need more rather than less in the way of

9    incentive?

10           MR. SIMON:  Well, I think there's two answers to the

11   question.  One is, what's the factual record say about

12   incentive.  I think Mr. Bigelow, to his credit, said you know,

13   if I don't get paid, I'm going to continue to work.  And I

14   would like to think that the employees of the business have

15   been working hard despite the fact that they received an email

16   saying that they would have no pay increases, there would be a

17   pay freeze for 2009.

18           So, I think to some extent there's a factual record

19   that has to be developed.  We haven't heard from the members of

20   the management that they're going to stop working.  There's no

21   factual record, empirical record or otherwise, that supports

22   the conclusion that if they don't get this money, the debtors

23   are going to stop in its tracks.

24           THE COURT:  You know, and I -- obviously you recognize

25   that the import of my questions to Mr. Bigelow was to see

Simon - Closing Statement                    Page 218

1    whether I would elicit that response, and I did not.  And

2    frankly, as a practical matter, I wouldn't expect any debtor to

3    troop in any number of management employees who would say if I

4    don't get the money, I'm going to sit at my desk and play

5    solitaire on the computer.

6           So his response wasn't a surprise to me.

7           MR. SIMON:  I wasn't shocked by it either, I don't

8    think.  I think he's a stand-up guy.  And I don't know him

9    personally but I don't get the sense that -- I would hope that

10   these people are all professionals and will continue to work.

11          I mean, I think when we're talking about bonuses and

12   cash coming out of the company for certain employees, you know,

13   the total number, the top 21 get 32 million dollars of the

14   66.8.  It just seems like it's not -- I mean, I don't know what

15   the factual record, if there's a factual record saying that's a

16   justified allocation of resources.

17          So, I hope that answers Your Honor's question.

18          We also, you know, the Guild took a lot of time and a

19   lot of effort to look at operating cash flow, and I think

20   there's some element of, when you read proxies and you look at

21   bonuses or incentive plans, when you read these proxies and

22   they say we're having a tough time this year, we're going to

23   suspend pay or we're going to freeze bonuses, we're not going

24   to make cash bonuses, and I think there's a historical record

25   here where companies, including this company in 2001, said

Simon - Closing Statement                    Page 219

1    we're not going to pay cash bonuses this year.

2         So, here we have a huge -- we have the biggest cash

3    bonus ever in a year when we have the lowest OCF ever.  And I

4    think there's certain driving -- you know, there's factors

5    driving that OCF.  I mean, I don't know what the record says

6    about what is the cause of the improved OCF as opposed to

7    target.  Is it a decline in the newsprint cost, a decline in

8    compensation cost, or is it the redesign of the paper layout?

9    I don't know that the evidence says that there's a

10   justification for making these cash payments, and it will

11   actually result in increased or better performance.

12        It's also high as a per capita basis.  And this plan

13   is 720 people.  The plans before covered I think more than a

14   thousand.  The -- I think one of the things I wanted -- I mean,

15   sometimes the Guild has been belittled through this process, is

16   really poking management in the eye, this -- the Guild did not

17   object in 2008 --

18        THE COURT:  Well, it wouldn't be the first time that

19   happened.

20        MR. SIMON:  I said this case, Your Honor, in this

21   contested matter.

22        I think the Guild has been very focused on the facts.

23   And I think if you look at what the Guild did in 2008, there

24   was no objection to the MIP and there's no objection to 2008

25   MIP for the top ten management.

Simon - Closing Statement                    Page 220

1        But you're talking about numbers, I think in 2008 the

2   number was 13.3 million in bonuses.  It's apples and oranges.

3   I mean, I don't -- I don't think you need to be a compensation

4   consultant to see the differences here.

5        The other -- and I touched on this briefly.  I mean,

6   I think that there's issues or factors driving operating can

7   flow this year.  And I can't say that you know, there's a lot

8   of employees working in these business units that aren't

9   affected by this plan that are not -- they're not participants

10  in this plan.

11       I mean, one of the things -- I think if you look at

12  the <u>Nortel</u> case and Mr. Dempsey's testimony there, they wanted

13  a very, very broad plan touching a ton of people to motivate

14  everybody.  I mean, this is the narrowest plan we've ever seen.

15       I think that there's fundamental burden issues here

16  and --

17       THE COURT:  Well, in <u>Nortel</u>, you had a company -- you

18  have a company with a global reach, and employee compensation

19  issues vary over that span, I think.  And there may have been -

20  - I don't know if that was the reason, but there may have been

21  a reason why there was a broad proposal.  And I don't know, I'm

22  just speculating, and you are too, but there could have been a

23  reason for that.

24       MR. SIMON:  That's true, Your Honor.  That's fair.

25  And I don't want to speculate.  I just was -- I studied the

Simon - Closing Statement                    Page 221

1    transcript and I noted that the basis for making it broad was

2    to make it -- it was an attempt to make it as broad as

3    possible.  This one is more narrow than anything in the

4    history.

5           The Mercer report, again, and this goes to the record

6    of the case, the Mercer report, it's an interesting report, and

7    it serves -- the debtors say hey, this justifies our

8    compensation -- our compensation and our plan for this year.

9           When you look at the Mercer report and you really dig

10   into it, and you see what happens at each of the levels, and

11   it's interesting, that you know, they use the market, TDC, and

12   that's acceptable when you're looking at the MIP and the KOB --

13   the MIP and the TMIP, but when they get up to the level that

14   you're looking at maximum payouts, suddenly we've got a --

15   we're not even at market median because we've got a market

16   number that's basically a market test number that's inflated.

17          And when we looked at the documents, you know,

18   readily available public documents and really dug into it, I

19   mean there's holes in that report.  I mean there's significant

20   factual deficiencies in the report.

21          I don't want to -- I'm not a compensation consultant,

22   and I'll let the record stand as to what the purpose of this

23   plan is.  I heard Your Honor's comments about whether it's a

24   retention plan or incentive plan, and frankly, I still believe

25   that the record is devoid of evidence as to what it is.  I do

1    believe that, you know, based on Mr. Dempsey's testimony in the

2    Nortel case, you know, getting payment to market median, in

3    that case it was perfectly -- the reason for it was to make --

4    keep the employees at the company.

5           And I don't want to waive my rights with retention

6    issues, but I did hear Your Honor, and I won't belabor the

7    point.

8           The other thing about the Mercer report is there's a

9    lot of -- the bankruptcy comparison, I mean, I don't -- you

10   know, comparing this case to other cases, I don't want to make

11   a finding as to what would be reasonable or not reasonable in

12   this case versus other cases.  But I will say the Mercer

13   report, I don't think there's any bit of credibility to the

14   chart that has those companies that were in bankruptcy and the

15   size of the plans as it relates to the -- the prepetition

16   revenues.  I just think the report is deficient on that, on

17   that analysis.

18          So when you look at comparable, what comparable

19   companies are doing, if that's the purposes of the Mercer

20   report, I think we have deficiencies there.

21          And then again, I want to just back to the record.

22   As Mr. McMahon elicited on cross-examination, there's really no

23   empirical evidence of what's going to happen if this plan is

24   approved or disapproved.  And I don't think it's -- I

25   appreciate Your Honor's comments about the parties discussing

McMahon - Closing Statement                    Page 223

1    this, and I appreciate -- I want Your Honor to appreciate the

2    fact that I don't think the Guild -- and I don't want to speak

3    without my client's consent here, but I don't think the Guild

4    would be opposed to having management receive some sort of

5    bonus.

6         But I mean, the plan that's been proposed, we find it

7    objectionable.  And I think that the record on this point is --

8    there's not a record to support the numbers that have been

9    proposed.

10        And I think when you look at the record, we didn't

11   see anybody from the key stakeholders.  I know counsel for the

12   Creditors Committee wants to speak, but we didn't hear anybody

13   from the Compensation Committee, we didn't hear from the cadre

14   of management, the 21 top executives.  We don't know what's

15   going to happen if this isn't paid.

16        And I would respectfully suggest that, you know, I

17   think the Court -- it's the debtors' burden, it's the debtors'

18   motion, and I think the numbers -- there's pretty powerful

19   evidence that the plan is just not justified -- reasonable,

20   justified or warranted, given the facts of this case.

21        And I appreciate Your Honor's time today and patience

22   with our objection.

23        THE COURT:  Thank you, Mr. Simon.

24        MR. SIMON:  Thank you, Your Honor.

25        THE COURT:  Mr. McMahon.

McMahon - Closing Statement                    Page 224

1           MR. McMAHON:   Thank you, Your Honor, and good evening.

2    Joseph McMahon for the Acting United States Trustee.

3           I want to hit the points that the Court raised at the

4    beginning of the hearing because I think they're important to

5    address.

6           The 363 versus 503(c) issue, where we go with that.

7    Our view is that Section 503(c) effectively restricts the

8    Court's ability to authorize the use of estate property under

9    363.  And Your Honor may ask what do we base that view on.

10          Well, if we take a look at the statutory language,

11   the operative language in Section 503(c) indicates that there

12   "shall neither be allowed nor paid".  And while there's a prior

13   reference to Section 503(b) of the Code, looking at the Code as

14   a whole, it's our view that Congress would have set this up so

15   that we interpret matters consistently.  I think it's this

16   Court's obligation to look for a consistent construction where

17   the statutory language affords one.

18          And it's that "nor paid" language which is informing

19   our position, meaning that notwithstanding a debtor's attempt

20   to, I guess, route a plan through Section 363, it would be our

21   expectation that Congress did not intend for the Bankruptcy

22   Code to be used as a supermarket.

23          THE COURT:   Well, I think that at the 30,000 foot

24   level, what Congress intended was to curtail, some might say

25   prohibit, what Congress and others viewed as excessively

McMahon - Closing Statement                 Page 225

1   generous payments to corporate executives made during Chapter

2   11 cases.

3           I will tell you, beyond that, I'm not sure there's

4   much agreement.

5           MR. McMAHON:  I understand the Court's view, Your

6   Honor.

7           That being said, reading 503(c) against Section 363,

8   it's our view that well, we have to look to see whether or not

9   503(c) prohibits something that the debtor wants to do under

10  363.

11          And with 503(c)(1)( and (c)(2) obviously, and this is

12  again consistent with, I think, a holistic statutory

13  interpretation analysis, it wouldn't matter necessarily whether

14  the proposed retention payment was inside the ordinary course

15  or not, a la Section 363.  I mean, the Court would be obligated

16  to look at whether or not a retention or severance payment

17  under (c)(1) or (c)(2) was prohibited by its terms.

18          THE COURT:  Well, if you want to talk about statutory

19  construction for a moment, let's look at (c)(3) --

20          MR. McMAHON:  Sure.

21          THE COURT:  -- which refers to transfers or

22  obligations that are outside the ordinary course of business.

23          So, wouldn't that seem to be consistent with the view

24  that a transaction that falls within 363(c) is not precluded or

25  governed by 503(c)(3)?

McMahon - Closing Statement                    Page 226

1        MR. McMAHON:  Your Honor, by its express terms, we

2   would agree that 503(c)(3) only applies to obligations or

3   transfers that are outside of the ordinary course of business.

4        THE COURT:  Okay.  So then let's go back to (c)(1) and

5   (c)(2).  Here it's arguably only (c)(1) I think that's at

6   issue.  And is the U.S. Trustee taking issue -- well, is the

7   U.S. Trustee saying that some or -- one or more of the

8   components of the proposed plan ought to be measured under

9   503(c)(1)?

10       MR. McMAHON:  Your Honor, I'll -- if I can address

11  that point in a second.  I want to start with the (c)(3)

12  analysis first.

13       THE COURT:  All right.

14       MR. McMAHON:  Just because we were there.

15       THE COURT:  All right.

16       MR. McMAHON:  And our view of the record kind of

17  dovetails across the two sections, for what it's worth, in a

18  sense.

19       When we look at ordinary course in the Third Circuit,

20  we're dealing with the Roth American case that has been set

21  out.  The horizontal test industry-wide, whether the

22  transaction is of the sort commonly undertaken by companies in

23  that industry, and the vertical test, which is a creditor

24  expectation test, and that's whether the transaction subjects

25  the creditor to a risk.  It's different than those risks which

McMahon - Closing Statement                    Page 227

1    the creditor assumed at the time he entered into the

2    transaction.

3           And I'm going to focus on the vertical component of

4    that test, because I think it's fairly clear on this record

5    that we are dealing with a plan taken as a whole that is

6    outside the ordinary course of business.

7           And there's two points that really I think are

8    driving that, from our view.  First is, the aggregate size of

9    the cash awards as a percentage of ordinary cash flow.  We are

10   now in 2009, as proposed by the debtors, on a percentage basis

11   in a land that historically the Tribune has never been at.

12   Your Honor heard the testimony, the evidence is in the record.

13   The summary document that the Guild's counsel had Mr. Bigelow

14   review discussed these awards historically by Tribune fall

15   within, and I'm just going to be generic about it, it's like a

16   percentage and a half to a little bit north of three percent.

17   It's a typical range for the ordinary course cash award that's

18   been made.

19          Here, we're way off that number.  And I'm not going

20   to suggest to the Court that it's not an apples to oranges

21   comparison.  We're in a different time.  I appreciate the fact

22   that there were equity awards back then, there aren't now.  But

23   the mere fact that we're in this circumstance where the debtors

24   are proposing a cash award, that's inconsistent with prior

25   practice, is a point to be made.

McMahon - Closing Statement                    Page 228

1          THE COURT:  Well, let's explore that for a moment,

2     because in a sense, there's a continuum, and at some point

3     along that continuum the -- at least the MIP part of the

4     proposal, which bears some resemblance to prior plans but has

5     some adjustments which have been made because of the current

6     circumstances, may cross the line out of ordinary course.  And

7     I've yet to determine which side of the line it falls on.  It

8     may not matter.  I could always find that both standards have

9     been met in any event.

10          But, what I want to get to is the notion that yes,

11     the percentages are dramatically higher, but the cash flow is

12     dramatically lower.  So in order to make a bonus award that's

13     meaningful, adjustments must be made.

14          I mean, it would go the other way too.  If it was

15     projected for 2010 that the company was going to do fabulously

16     well in OCF, the percentages would come down, at least in terms

17     of what would be awarded as a percentage of OCF.

18          So it seems to me it only makes sense that

19     adjustments would be made in such a way that a meaningful bonus

20     would still result if benchmarks were met.

21          The question in my mind is, is that enough of a

22     change to take it out of 363(c) and put it into 503(c)(3)?  I

23     don't know yet.  It might, but it might not.

24          MR. McMAHON:  In our view, Your Honor, we draw a

25     distinction between plan construction and what from the

McMahon - Closing Statement                    Page 229

1    debtors' view makes sense, and putting one together versus

2    where we find ourselves.

3           And when OCF is less than a third of what it was, say

4    in 2008, or around that, at the time the debtors filed for

5    bankruptcy protection, I don't think it takes that much to

6    state that creditor expectations prior to the LBO, prior to

7    filing for bankruptcy at the time, are markedly different than

8    today.  And --

9           THE COURT:  Well, creditor expectations are usually

10   the same.  They want to be paid.  You know, I don't know what

11   beyond that, with respect to particularly the objector here,

12   that means.  I mean, I understand what the standard is, and I -

13   - and I'm bound by Third Circuit law --

14          MR. McMAHON:  If I could touch on the historical

15   equity awards as part of this analysis because I think it's

16   important for the Court to consider.

17          What makes equity different is that it's obviously

18   subordinate to creditor claims, for one reason.  I mean we

19   heard some reasons on the record today from an incentive based

20   standpoint why it's different than just giving the guy an

21   annual cash award versus providing a restricted equity award

22   that might, you know, I guess keep that person's interest more

23   closely aligned with shareholders over the course of a case,

24   but.

25          We're talking today about cash that's getting paid

McMahon - Closing Statement                    Page 230

1    out ahead of creditor recoveries.  And with respect to the

2    equity awards, historically the Tribune has referenced in its

3    direct case, that was not the situation.  And from a creditor

4    expectation analysis, that's certainly a factor that the Court

5    can consider in determining whether this proposal, all cash, is

6    ordinary course or not.

7              Now with respect to the analysis, Your Honor, under

8    503(c)(3), the language is justified by the facts and

9    circumstances.  First, something about the standard.  The

10   Court, I believe, if I'm correct, has characterized either

11   Court rulings or itself as the standard as being something

12   along the lines of business judgment plus.

13             THE COURT:  That's what I've said.  And as I said, I

14   think before, I haven't written, and I find it a disadvantage

15   because these issues just continue to come up.  The problem is,

16   I find that the time it would take to develop something,

17   especially these days, just would delay a decision I think

18   beyond what anything, including the Court, would like to have.

19   But yes, that's what I said.

20             MR. McMAHON:  With respect to its placement in the

21   statute, Your Honor, and modifying the allowance of claims

22   under Subsection 503(b), as well as the payment of claims

23   generally.  And again, in our view, that restricts the 363

24   action.  We take the view that it's closer, if not at, by

25   function of where it stands in the statute the administrative

McMahon - Closing Statement                    Page 231

1    expense standard along the continuum.  If you viewed that, you

2    know, you have one end business judgment and the other end

3    being that.  Or else, kind of like again taking the statute as

4    a whole 503 and then matching it up against 363, it doesn't --

5    there's no consistency there.

6           THE COURT:  Okay.  You're telling me something I think

7    I've heard you say before, and that is there should be an

8    administrative expense standard imposed.  Let's say, a la

9    O'Brien, that's what you're telling me, isn't it?

10          MR. McMAHON:  Well, that's essentially the argument,

11   yes.

12          THE COURT:  Okay.  So let's look at 503(b).  Is that

13   where -- is that where that standard originates?

14          MR. McMAHON:  503(b)(1), there's other subsections

15   that --

16          THE COURT:  That's correct.  That's where the

17   statutory administrative expense standard is fixed, correct?

18          MR. McMAHON:  Correct.

19          THE COURT:  Okay.  If you look at 503(c), which is

20   what's applicable here, and it says notwithstanding Subsection

21   (b).

22          MR. McMAHON:  Correct.

23          THE COURT:  So, doesn't that take it out of the 503(b)

24   standard and impose a new one?

25          MR. McMAHON:  I'm not exactly sure whether that is the

McMahon - Closing Statement                    Page 232

1    case, Your Honor.  I think what (c) does is -- well, it's

2    restricting the Court's ability to allow or pay certain claims

3    under (b).  Whether 503(c)(3), the "justified by the facts and

4    circumstances" test is a new or different standard, I don't

5    view, or we don't view the statute that way.  It says

6    "notwithstanding Subsection (b) the Court cannot allow" this

7    stuff.  So, notwithstanding the availability to the Court of

8    the power to allow administrative expenses under (b).  That's

9    the way we view the statute.  It's not throw it out and just

10   look at (c).

11              THE COURT:  Have you had any judge agree with you yet?

12              MR. McMAHON:  I have not had a judge -- well --

13              THE COURT:  Anywhere in the country?

14              MR. McMAHON:  I have had this colloquy with Judge

15   Sontchi.  I'd have to go back over transcripts to see whether

16   he nodded his head in agreement with me or said something.

17   But,

18   I --

19              THE COURT:  Well, he wrote an opinion.

20              MR. McMAHON:  I wish my memory were better.

21              THE COURT:  So do I.

22              Anything further, Mr. McMahon?

23              MR. McMAHON:  Your Honor, with respect to the facts

24   and circumstances test, Your Honor, we generally take the

25   position that the, I think the Guild is taking with respect to

McMahon - Closing Statement                    Page 233

1    the plan as a whole.

2          We think that the ordinary course component with the

3    TMIP and the KOB layered on it, and with the focus on those

4    last two elements, puts us on basically a bridge too far.  It's

5    -- based upon this record, it's, you know, it's several

6    factors, some of them which the Guild's counsel articulated.

7    The aggregate size of the plans, the absence of empirical data

8    supporting the efficacy of the dollars spent on performance,

9    amongst some of the other factors that the Guild cited, which

10   inform our position in that regard.

11         We think that the record speaks for itself, that

12   there's -- at the upper range of what's being proposed, there

13   are issues.

14         THE COURT:  Okay.

15         MR. McMAHON:  And that would conclude our argument.

16         THE COURT:  Thank you, Mr. McMahon.

17         MR. McMAHON:  Thank you.

18         THE COURT:  I'll hear from anyone else who wishes to

19   be heard at this point.

20         MR. LeMAY:  Thank you, Your Honor, good evening.

21   David LeMay from Chadbourne & Parke for the Official Committee

22   of Unsecured Creditors.

23         Your Honor already knows that the Committee supports

24   the relief sought.  The debtors have mentioned it at least a

25   few times, and I said it when we were here at the prior

1    hearing.

2          Mr. McMahon has spoken about creditor expectations.

3    I would submit very respectfully that I guess I am the, sort of

4    spokesperson for those expectations, the way that the

5    Bankruptcy Code sets up.

6          So I thought I'd talk a little bit.  Once again as

7    when we were before you on the 2008 plan, the question has to

8    be asked, why would creditor representatives allow substantial

9    money to go out ahead of them?  It's a pretty fair question.

10         The answer is not that we like Mr. Bigelow and his

11   colleagues, although in fact my clients very much do and they

12   appreciate what the management is doing.  That's true, but

13   irrelevant.  And the esteem and regard in which we hold these

14   folks is good but entirely irrelevant.  The reason creditors

15   want this money to go out ahead of them is precisely the reason

16   that Your Honor identified a moment ago from the bench.  They

17   want to get paid, and they believe, as business people and

18   students of human nature in the business context, that these

19   incentives are the best mechanic to maximize their own

20   recovery.

21         In that connection, with respect to the suggestion

22   that's been made, well, if the relief were not granted, would

23   the management team kind of slack off, would they play computer

24   games at their desk instead of working really hard?  Perhaps no

25   evidence is in the record on that.  Mr. Bigelow said that he

McMahon - Closing Statement                    Page 235

1    would KEIP cracking on, and I suspect he would under any

2    circumstances.

3         But actually my clients don't want to find out the

4    answer to that question.  That's really not something that

5    business people want to know.  Business people in the for-

6    profit world have an understanding about what motivates

7    management, because all business people in the for-profit world

8    are in that world themselves.  And what motivates management is

9    a number of things, including pride in a job well done, but the

10   chance to make something for one's self and one's family.

11        Our clients, my clients, don't wish to find out what

12   would happen if the management didn't get these awards, would

13   they really keep going or would they slack off a bit.

14        Your Honor, the suggestion has been made that a

15   company, because it's in Chapter 11, maybe shouldn't pay

16   bonuses just because it's in Chapter 11.  And that may be true

17   when a company is in a life or death liquidity situation where

18   there's simply, you either pay the bonuses or have to turn the

19   lights off.

20        That's really not the case here.  Liquidity is

21   obviously an issue, but it's not a life or death liquidity

22   question.  So the question as a business matter then becomes

23   what's in the best interest of the business and its owners.

24        And I'd like to submit that being in Chapter 11

25   doesn't change at all what management should be doing.  It just

1    changes who they're doing it for.  In the old days, they were

2    doing it for the ESOP and for Mr. Zell.  Now ultimately they're

3    going to be doing it for the unsecured creditors.  But they're

4    still doing the same thing, which is making as much money as

5    possible for the enterprise, under, as Your Honor noted, what

6    are now very, very, very tough circumstances.

7         So I don't think that the mere fact that a company is

8    in Chapter 11 should in any way suggest that the bonus plan

9    should be curtailed, leaving aside the liquidity crisis

10   situation that I think is inapplicable here.  It really just

11   goes to the question of who their ultimate constituents are.

12   In this case, as in so many, it is almost inevitable, indeed I

13   would go so far as to say inevitable, that the equitable owners

14   of the business are now the creditors.  The creditors have an

15   official representative.  That representative is my client.

16   And that client, which consists of a number of very canny

17   business people has concluded that these incentives will

18   ultimately put more money in their pockets than the

19   alternative.

20        I'll also mention just in closing, as I have in the

21   past, the Newspaper Guild is and remains a very valued member

22   of the Creditors Committee.  Nothing that's happening here

23   today by way of this disagreement is anything other than I

24   think a good faith disagreement between reasonable minds that

25   sometimes differ.

McMahon - Closing Statement                    Page 237

1    And that's all I've got for you this evening, Your

2    Honor.  Thank you.

3                THE COURT:  Thank you, Mr. Lemay.

4          Does anyone else care to be heard?

5          I hear no further response.  All right.  I will make

6    a decision in due course.  It will either be by bench opinion

7    at some later date, or I'll write.  I want to sleep on how I

8    approach coming to a decision.  But as we wrap up, I'll simply

9    thank the parties for what were very helpful submissions,

10   arguments and evidentiary presentations which were very helpful

11   too.  And I thank you for the quality of the presentation that

12   has been made.  It will aid me in my decision.

13         Thank you all very much.  That concludes this

14   hearing.  Court is adjourned.

15               ALL COUNSEL:  Thank you, Your Honor.

16               (Matter concluded at 6:07 p.m.)

17                        *  *  *  *

Page 238

1

2                        **C E R T I F I C A T I O N**

3

4          We, Josette M. Jones and  Sandra Carbonaro, court

5   approved transcriber,   certify that the foregoing is a correct

6   transcript from the official electronic sound recording of the

7   proceedings in the above-entitled matter.

8   _____

9   JOSETTE M. JONES

10  _____

11  SANDRA CARBONARO

12  Doman Transcribing & Recording Svcs.   _____

13  AGENCY                              DATE

14