1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case Nos. 08-13141, 09-13496

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

TRIBUNE COMPANY ET AL.,

       Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

CHICAGO NATIONAL LEAGUE BALL CLUB, LLC,

       Debtor.

- - - - - - - - - - - - - - - - - - - -x

         United States Bankruptcy Court

         824 Market Street

         Wilmington, Delaware

         October 13, 2009

         1:34 PM

B E F O R E:

HON. KEVIN J. CAREY

U.S. BANKRUPTCY JUDGE

ECR OPERATOR:  AL LUGANO

2

1

2    HEARING re Joint motion of Tribune Company et al. and Chicago

3    National League Ball Club, LLC for an order (I) jointly

4    administering Chapter 11 cases and (II) directing that certain

5    orders and other pleadings entered or filed in the Chapter 11

6    cases of Tribune Company et al., be made applicable to the

7    Chapter 11 case of Chicago National League Ball Club, LLC.

8

9    HEARING re Motion for order pursuant to 11 USC Sections 105(a)

10   and 365 (I) authorizing Chicago National League Ball Club, LLC

11   to (a) enter into and perform obligations under formation

12   agreement and ancillary agreements, (b) effect proposed

13   business combination respecting Cubs-related assets, interests

14   in Wrigley Field, Comcast Sports Net and related assets free

15   and clear of all liens, claims, rights, interests and

16   encumbrances, (c) assume and assign executory contracts, (d)

17   operate and pay obligations related to Cubs business in the

18   ordinary course, subject to formation agreement and Major

19   League Baseball rules and regulations, and (d) pledge

20   membership interest in Chicago Baseball Holdings, LLC; (II)

21   recognizing sufficiency of notice; (III) waiving certain

22   actions, and (IV) granting related relief.

23

24

25   Transcribed by:  Penina Wolicki

3

1

2    A P P E A R A N C E S :

3

4    NORMAN L. PERNICK, ESQ.

5    J. KATE STICKLES, ESQ. (TELEPHONICALLY)

6    COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

7    REPRESENTING:  THE DEBTORS

8

9    BRYAN KRAKAUER, ESQ.

10    KENNETH P. KANSA, ESQ.

11    JILLIAN MCCLELLAND, ESQ. (TELEPHONICALLY)

12    SIDLEY AUSTIN

13    REPRESENTING:  THE DEBTORS

14

15    MATTHEW MCGUIRE, ESQ.

16    LANDIS RATH & COBB

17    REPRESENTING:  THE COMMITTEE

18

19    MICHAEL SMALL, ESQ.

20    FOLEY & LARDNER

21    REPRESENTING:  CHICAGO BASEBALL HOLDINGS LLC, RICKETTS

22                   ACQUISITIONS LLC

23

24

25

4

1

2   JOHN LOAGMIRE, ESQ.

3   WILKE FARR

4   REPRESENTING:  MAJOR LEAGUE BASEBALL

5

6   JOSEPH J. MACMAHON, JR., ESQ.

7   U.S. DEPARTMENT OF JUSTICE

8   OFFICE OF THE U.S. TRUSTEE

9

10   HOWARD SIEFE, ESQ.

11   MARC ALPERT, ESQ.

12   CHADBOURNE & PARKE

13   REPRESENTING:  THE COMMITTEE

14

15   BILL BOWDEN, ESQ.

16   ASHBY & GEDDES

17   REPRESENTING: RICKETTS

18

19   GARVEN MCDANIELS, ESQ.

20   BIFFERATO GENTILOTTI

21   REPRESENTING:  LAW DEBENTURE

22

23   CHRISTINA THOMPSON, ESQ.

24   CONNOLLY BOVE LODGE & HUTZ, LLP

25   REPRESENTING:  DMD SPECIAL SITUATIONS FUNDING

5

1

2    KATHERINE GILLMAN, ESQ. (TELEPHONICALLY)

3    KRAMER LEVIN NAFTALIS & FRANKEL, LLP

4

5    GARY WEITMAN (TELEPHONICALLY)

6    TRIBUNE COMPANY

7

8    DANIEL SMIT, ESQ. (TELEPHONICALLY)

9    DAVIS POLK & WARDWELL

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                   P R O C E E D I N G S

2          THE CLERK:  All rise.  Be seated, please.

3          THE COURT:  Good afternoon, all.

4          MR. KRAKAUER:  Your Honor?

5          THE COURT:  I'm ready, counsel, if you are?

6          MR. KRAKAUER:  Your Honor, I think -- Bryan Krakauer

7   and Ken Kansa on behalf of the Cubs today.  Mr. Kansa will

8   start with the joint administration order.

9          THE COURT:  Very well.

10          MR. KENSA:  Good afternoon, Your Honor.  Ken Kansa on

11   behalf of the debtor, Chicago National League Ball Club, LLC,

12   and also on behalf of Tribune Company and its affiliated

13   debtors.

14          As Your Honor is aware, Chicago National League Ball

15   Club, LLC is an affiliate, a subsidiary of Tribune Company,

16   which already has a pending Chapter 11 case before Your Honor

17   in this district.  Yesterday morning, Chicago National League

18   Ball Club, LLC, which I'll just refer to as Cubs LLC for the

19   sake of brevity, commenced its own Chapter 11 case in this

20   district.  We have previously disclosed in our filings with the

21   Court that that Chapter 11 filing was intended and was intended

22   as a means of effecting the disposition of what we referred to

23   in our pleadings as the Cubs Business.

24          The agenda today before Your Honor really addresses

25   two motions in connection with the Cubs' filing.  The second

1    one is the motion to approve the disposition as to the Cubs

2    Business, which my partner Mr. Krakauer will handle in a

3    minute.  Prior to that on the agenda, however, Your Honor, we

4    have a supplemental joint administration motion that will

5    jointly administer the Cubs LLC bankruptcy case together with

6    that of the other Tribune debtors.

7         And what we have asked, Your Honor, in the

8    supplemental joint admin motion, is to make five orders that

9    have already been entered in the Tribune bankruptcy case,

10   applicable to Cubs LLC as well.  Those are:  the existing joint

11   administration order; Your Honor's case management order,

12   setting hearing times; the cash management orders that had

13   previously been entered by the Court; all of the various orders

14   admitting counsel pro hac vice; and the one order that has been

15   entered sealing two of the exhibits and schedules -- two

16   exhibits and one schedule, to the Tribune transaction approval

17   motion that was previously filed with the Court and is directly

18   relevant to the disposition we're talking about here today.

19        We have also asked in that motion for two other orders

20   previously -- three other orders previously entered by the

21   Court:  one concerning compliance with Bankruptcy Rule 2015.3;

22   one concerning interim compensation procedures; and one

23   appointing a fee examiner, to be applicable in the Cubs LLC

24   case, following a twenty-day negative notice period.  We will

25   provide notice to the twenty largest creditors of Cubs LLC plus

8

1   the 2,000 list in the Tribune cases, of our intention to have

2   these orders apply.  If no objections are received, we would

3   submit a proposed order under certification of counsel to Your

4   Honor; and after that, if the Court wished, those orders would

5   become applicable without need for a further hearing.

6        We have also asked in that motion for this Court's

7   order waiving compliance with 11 USC 345(b) to be made

8   applicable to Cubs LLC for a forty-five day interim period.

9   And at the conclusion of that period, if there are no

10  objections received, again, we would submit a certification of

11  counsel and proposed order to the Court.  And if the Court

12  wished, that relief would become applicable to Cubs LLC on a

13  final basis.

14       In that regard I would add, Your Honor, that we have

15  provided information concerning the Cubs LLC bank accounts,

16  particularly those that are intended to hold the proceeds of

17  the Cubs' disposition.  We have provided that information to

18  the U.S. Trustee in advance of today's hearing.  And so we're

19  hopeful that the forty-five day interim period will allow the

20  U.S. Trustee to review those materials, determine if there are

21  any open points thereon, and make a decision as to whether they

22  object to the relief becoming applicable on a final basis, or

23  whether we need to work something else out.

24       The one other piece of relief we have asked for in the

25  supplemental joint administration motion, Your Honor, is to

1    make the existing professional retention applications in the

2    Tribune cases applicable to Cubs LLC as well.  We would ask

3    that to occur on a basis after a twenty-day period in which the

4    professionals in question would update their disclosures to

5    take account of any new disclosures they must make as a result

6    of the Cubs becoming a debtor affiliated with the Tribune

7    debtors.

8         The U.S. Trustee and any other party would then have

9    twenty days to raise any objections to the expansion of the

10   retention based upon those disclosures.  After the expiration

11   of that second twenty-day period, the order would become -- we

12   would submit a certification of counsel to Your Honor, and the

13   order would become applicable -- the retention order would

14   become applicable to Cubs LLC on a permanent basis, again, if

15   the Court were willing to enter such an order.

16        THE COURT:  I would ask that with the certification,

17   any updated or supplemented affidavits be included.

18        MR. KENSA:  We would have that, Your Honor, at the end

19   of that first twenty-day period.  And the updating and

20   supplementing of the affidavit is the one open issue we have on

21   this particular motion with the U.S. Trustee's Office.  We will

22   have all of the professionals whose retentions we seek to make

23   applicable to Cubs LLC undertake new searches and determine

24   whether they have any further disclosures to make.  If -- under

25   out proposal, if there are any further disclosures to make,

10

1    those would be made by way of a supplemental affidavit.  We

2    would not however, in the case of a professional who has no new

3    declarations to make, have them actually submit a declaration

4    saying, in effect, there is nothing to declare.  And I think we

5    still have that point open with the U.S. Trustee's Office.

6              THE COURT:  All right.  Should we discuss that now?

7              MR. MACMAHON:  Your Honor, good afternoon.  Joseph

8    McMahon for the Acting United States Trustee.  Counsel

9    correctly indicated our position.  And a simple common sense

10   point is this, Your Honor.  I don't know whether a

11   professional's silence in response to the Court's order would

12   be indicative of noncompliance with the order's terms or a

13   statement that they don't have any connections.  In other

14   words, the filing of a simple one- or two-paragraph statement

15   affirmatively stating that we have no connections under Federal

16   Rule of Bankruptcy Procedures 2014, would alleviate any

17   misunderstandings or confusion with respect to that.

18             THE COURT:  All right.  Anyone else care to be heard

19   on that discrete issue?  I would much prefer to see an

20   affirmative statement that the particular professional remains

21   disinterested within the meaning of the Bankruptcy Code; and to

22   the extent the standard is not adverse to the estate, the

23   affidavit should say so accordingly.  But I think an

24   affirmative statement by every professional is appropriate.

25             MR. KENSA:  Your Honor, we will make that happen.  My

1  one question would be that in the event we seek to -- not to

2  have a particular professional's retention applicable to Cubs

3  LLC as well, because the scope of their retention simply

4  doesn't touch it, we may make a statement to that effect as

5  well, simply that that professional would not be rendering

6  services for that particular debtor.

7        THE COURT:  That's fine with me.  The U.S. Trustee

8  have any objection to that?

9        MR. MACMAHON:  No objection, Your Honor.

10       THE COURT:  All right.

11       MR. KENSA:  With that, Your Honor, I believe that's

12  the only open and outstanding issue that we had on the

13  supplemental joint administration motion, and I think we can

14  work with Mr. McMahon to prepare a revised form of order and

15  submit it to Your Honor.

16       THE COURT:  All right.  Let me ask if anyone else

17  wishes to be heard in connection with the joint administration

18  motion?  I hear no response.  All right.

19       MR. KENSA:  We will submit an appropriate order, Your

20  Honor.  With that, I'll turn the podium over to my partner, Mr.

21  Krakauer.

22       THE COURT:  All right.  Thank you.

23       MR. KRAKAUER:  Good afternoon, Your Honor.  Bryan

24  Krakauer here on behalf of the Chicago Cubs and also on behalf

25  of the Tribune entities.

1     We're here on the motion for an order to authorize the

2     Chicago National League Ball Club, LLC, which is often referred

3     to as the Cubs, to enter into the transactions that are

4     described in the motion.  And as Your Honor knows from prior

5     hearings, they consist of a formation agreement and ancillary

6     agreements.

7         The motion did go out on notice.  It went out on

8     notice to substantially all the Cubs' creditors.  More than

9     9,000 Cubs' creditors received notice of the motion.  The

10    motion also went to our notice list in the Tribune cases.  So

11    everybody who requested notice in the Tribune cases received

12    it.  And also there was publication in the Chicago Tribune as

13    well.  We filed all the affidavits respecting notice indicating

14    that service has been made on all those parties.

15        There are no pending objections to the motion.  There

16    is one issue at the end which I'll address that has been raised

17    with the U.S. Trustee regarding payments for some professionals

18    retained by the Cubs, but I'll get to that at the end.  But in

19    terms of the actual motion itself, there has been nothing filed

20    and no parties have objected.

21        We did receive approval from Major League Baseball.

22    That happened on October 5th.  As you may recall, it was

23    anticipated after we received Major League Baseball approval

24    there would be a closing in escrow.  That closing happened this

25    past Friday.  And on Friday, all the monies necessary to

1    consummate the transaction were put into escrow.  The lenders

2    funded their share of the money; equity funded their share of

3    the money; the subordinated debt funded their share of the

4    money.  And we have all the money sitting in escrow.  We also

5    have substantially all the transaction documents from

6    deliveries into escrow.  So the transaction is essentially

7    ready to close, save for the approval of this Court.

8            The Cubs filed a Chapter 11 petition yesterday

9    morning.  We put the motion on file immediately after that.

10   And we're here today seeking approval of the motion, pursuant

11   to the notice that was sent out, now more than a month ago.  We

12   also filed schedules and a statement of affairs for the Cubs,

13   so that it would be on record as to who our creditors were; and

14   provided as full information as we can with respect to the Cubs

15   entities.

16           In support of the motion today, we are offering the

17   declarations of Mr. Chandler Bigelow, who is the CFO of the

18   Tribune; Mr. Christopher Martell, who has been the financial

19   advisor with JPMorgan Securities for the Chicago Cubs over a

20   large number of months in connection with this process; and

21   also Mr. Crane Kenney, who is the Chairman of the Chicago Cubs.

22   All three of those declarations were previously entered in the

23   Tribune case, so they're in the same form, but obviously this

24   is a new proceeding, so we're seeking their entry today as

25   well.  And all of Mr. Bigelow, Mr. Martell, and Mr. Kenney are

14

1    here in the courtroom today in case anybody has any questions.

2            And I'd like to offer those into evidence.  If Your

3    Honor would like a proffer we could do that.  I'm not sure it's

4    necessary, but we're prepared --

5            THE COURT:  Well, first let me ask.  Is there any

6    objection to putting into evidence the Kenney, Martell and

7    Bigelow declarations?  I hear no response.  They're admitted

8    without objection.

9    (Kenney, Bigelow and Martell Declarations were hereby received

10   in evidence as Debtor's Exhibits, as of this date.)

11           THE COURT:  Does anyone wish to cross examine any one

12   of those individuals?  I hear no response.

13           What I would like, Mr. Krakauer is, for the record,

14   for you to summarize the contents of the respective

15   declarations, just for the record, indicating the purpose for

16   which each has been submitted.

17           MR. KRAKAUER:  Okay.  Your Honor, we anticipated you

18   might want that.  Mr. Kansa is going to do that, if I could

19   give him the podium for a minute?

20           THE COURT:  Certainly.

21           MR. KRAKAUER:  And then I'll conclude on the motion.

22           MR. KENSA:  Your Honor, I'll take the declarations in

23   whatever the Court wishes, but I propose to go with Mr.

24   Kenney's first, then Mr. Bigelow's and then Mr. Martell's.

25           THE COURT:  As you please.

1          MR. KENSA:  Mr. Kenney is the Chairman of the Chicago

2    Cubs Major League Baseball franchise.  Were he called to

3    testify today he would testify as to the harm that would come

4    to the Cubs franchise from an extended stay in Chapter 11.  He

5    would testify as to the importance of the value to the Cubs of

6    its unique brand and its unique identity as a Major League

7    Baseball franchise.

8          He would also testify as to the various business and

9    player personnel decisions that the Cubs will need to undertake

10   in the very near term and to the irreparable harm that would

11   result to the Cubs franchise if the Cubs were unable to or were

12   perceived by players to be unable to enter into and honor their

13   financial commitments to players; to the harm that would result

14   to sponsors if the -- or to the harm that would result to the

15   Cubs Business if the Cubs were perceived as unable to honor

16   their commitments or to enter into commitments with sponsors

17   for the upcoming baseball season.

18         He would also testify as to the lasting nature of the

19   damage that could result to the Cubs Business as a result of

20   being unable to undertake player/personnel decisions, even for

21   a very brief period; or being perceived unable to.  And as to

22   the effect that not having even a single player make a decision

23   to come to the Cubs on the grounds of some perceived inability

24   of the Cubs to honor that transaction, as to the harm that

25   would result to the Cubs Business from that.  That is a brief

1    summary, Your Honor, of Mr. Kenney's declaration.

2         Turning to Mr. Bigelow's.  Mr. Bigelow is the senior

3    vice president and chief financial officer of Tribune Company.

4    He's also an assistant treasurer of Cubs LLC.  Mr. Bigelow

5    would testify as to the basis for Tribune's decision to market

6    the Cubs Business.

7         He would testify that the proposed transaction here

8    permits Tribune and its affiliates to refocus their business

9    efforts on their core media business.  He would testify that

10   the Cubs Business is not historically one of those core media

11   businesses, but has been instead more of a source of

12   programming for their radio and television media businesses,

13   operated through WGN, one of Tribune's affiliates.

14        Mr. Bigelow would also testify that the transaction

15   permits the Tribune group of companies to realize a cash

16   distribution in the approximate amount of 740 million dollars,

17   subject to certain adjustments.  And he would testify that

18   Tribune management believes that it is an opportune time to

19   lock in that particular value for the Cubs Business.

20        Mr. Bigelow would also testify as to the reasons to

21   pursue the particular bid that was ultimately selected by

22   Tribune for the Cubs Business, and the various criteria,

23   including net after-tax proceeds, including the amount of

24   equity retained, and similar criteria that went into Tribune's

25   decision to select the Ricketts family as the winning bidding

1    group and to pursue that particular transaction.  That is what

2    Mr. Bigelow would testify to were here called today, Your

3    Honor.

4            The third declaration, Your Honor, is that of Mr.

5    Martell.  Mr. Martell is a vice president at JPMorgan

6    Securities Inc. who has acted as a financial advisor to

7    Tribune, and since this Court's assignment of the engagement

8    letter, to Cubs LLC.

9            Mr. Martell submitted his declaration at the same time

10    as the other two declarants.  And if he were called to testify,

11    he would testify as to three subjects.  First is JPMorgan

12    Securities' experience in working on Major League Baseball-

13    related transactions, including at least half a dozen

14    transactions that have been on behalf of Major League Baseball

15    franchises.  Second is the marketing process that was

16    undertaken for the Cubs Business, which began from the time

17    that JPMorgan was retained in mid-2007, and really continued

18    until the filing of the pleadings back in August and the

19    signing of the formation agreement with the Ricketts entity, at

20    that time.  And third, he would offer a comparison of the

21    economic terms of the proposed business combination involving

22    the Cubs to other transactions involving Major League Baseball

23    franchises.

24            On the first point, I think we've -- I think I've

25    covered that Mr. Martell would testify as to the experience of

1    JPMorgan Securities, their involvement not just in the six

2    transactions I mentioned on behalf of Major League Baseball

3    franchises, but also various financings that have been

4    undertaken with respect to various franchises as well.

5         On the second point, Mr. Martell would testify that

6    Tribune began, in mid-2007, a process aimed at identifying a

7    winning bidder for the Cubs Business.  And that broke down,

8    although not really envisioned at the time, into three phases.

9    The first phase, which lasted about a year was -- involved the

10   solicitation of initial interests in the Cubs Business, the

11   formation of bidding groups, the distribution of descriptive

12   materials to those bidding groups, and ultimately the receipt

13   of expressions -- the ultimate receipt of nonbinding

14   expressions of interest and rough financial terms from each of

15   those bidding groups.

16        He would then testify that in mid-2008, approximately

17   ten bidding groups entered into phase two of the bidding

18   process in which Tribune and the Cubs reviewed the expressions

19   of interest they had received and evaluated those based on

20   criteria specified in his declaration, including, among other

21   things, the amount of after-tax proceeds to be received by the

22   Cubs entities and Tribune in connection with the disposition.

23        He would then testify that that phase resulted in a

24   narrowing of the number of bidders, ultimately, to three final

25   bidders for the Cubs Business, plus one bidder interested in

19

1   Wrigley Field.  All three of those bidders had fairly intensive

2   negotiations undertaken throughout late 2008 and the early part

3   of 2009; and that in January 2009, the decision was made to

4   pursue a transaction with the Ricketts family, and that that

5   transaction has been pursued along with, for a time, an

6   alternative transaction, from that time until August of 2009,

7   when the formation agreement with the Ricketts entity was

8   entered into, and the appropriate filings made with this Court.

9        Mr. Martell, finally, on this third point, would

10  testify as to the comparison of the economic terms of the

11  proposed business combination, as against all of the

12  transactions that have been undertaken with Major League

13  Baseball franchises in the last twelve years.  And the

14  comparison that is outlined in his declaration, Your Honor,

15  states that the value of the proposed business combination as a

16  multiple of revenue, indicates that this is a very attractive

17  value.  It is among the highest values for a Major League

18  Baseball franchise.

19       And he has also identified both on a headline-value

20  basis and on a net after-tax proceeds basis what the values are

21  and the analysis that this is an attractive transaction from --

22  although he doesn't offer the opinion, the analysis that this

23  is a high multiple transaction, is contained in his declaration

24  as well.

25       So those are the summaries of the three declarations,

20

1    Your Honor, and we can answer any questions if you have them.

2         THE COURT:  All right.  I'll ask once more whether

3    anyone wishes to examine either Mr. Kenney, Mr. Bigelow, or Mr.

4    Martell?  I hear no response.

5         I do have a question.  Since entry of the September

6    24th order in the Tribune case, approving that side of the

7    proposed transaction, have any old or new bidders come forward?

8         MR. KRAKAUER:  No, they've not, Your Honor.

9         MR. KENSA:  Not to our knowledge, Your Honor.

10        THE COURT:  All right.  Does the debtor have anything

11   further in support of its motion?

12        MR. KRAKAUER:  Your Honor, we don't have any further

13   evidence.  But I would like to address the points that the U.S.

14   Trustee has.

15        THE COURT:  All right.

16        MR. KRAKAUER:  If that's okay?  Although the U.S.

17   Trustee's not filed anything, they have raised issues with

18   us -- an issue regarding whether or not two of the

19   professionals who were providing services to the Cubs prior to

20   the petition date and are owed some monies, should be required

21   to file a fee application and go through the whole fee

22   application process, and I want to address that.

23        The first professional is JPMorgan Securities, which

24   has been financial advisor to the Cubs in connection with this

25   transaction that's before you today.  The formation agreement

1    for which approval is sought provides that JPMorgan will be

2    paid by the NewCo entity at closing, essentially from the

3    proceeds and escrow.  So there is provision for them to get

4    paid at closing.  The engagement letter that JPMorgan

5    Securities also has, also anticipates that JPMorgan would be

6    paid at closing for its services.  And indeed, that's

7    consistent with the industry practice in deals of this sort.

8    And that anticipation has been part of the engagement by

9    JPMorgan that now goes back a couple of years, that they would

10    always provide these services with the payment due on closing.

11         You may recall that when the Tribune originally filed

12    its chapter proceedings, the JPMorgan engagement in connection

13    with the Cubs was related to -- was actually with the Tribune

14    Company.

15         THE COURT:  And then there came a time when I think

16    you sought and obtained a court order pushing that relationship

17    directly to the Cubs entity.

18         MR. KRAKAUER:  That is exactly right, Your Honor.  And

19    in that process, one of the things we did, even before filing

20    the motion with the Court is we vetted the JPMorgan engagement

21    with our unsecured creditors' committee, and also informed the

22    U.S. Trustee, because there was a concern that JPMorgan also is

23    a significant creditor in these cases.  And we wanted to make

24    sure that all the parties were comfortable that JPMorgan could

25    continue to provide services.  And we talked about the best way

22

1    to accomplish that, and it was -- and we proposed, and the

2    Court ultimately agreed, and the unsecured committee and the

3    U.S. Trustee signed off on transferring the engagement down to

4    the Cubs.

5         At the time we did that, one of the issues that was

6    discussed was how does JPMorgan still get paid from the Cubs?

7    And we provided specifically in the order approving the

8    transfer that they would get paid at closing.  And I'd like to,

9    if I could, hand that up to you.

10        THE COURT:  You may.  Thank you.

11        MR. KRAKAUER:  Your Honor, if you look at the bottom

12   of page 2 of that order you will see that indeed covers the

13   fact that no matter what mechanism, no matter what process is

14   used to effectuate a transaction regarding the Cubs, that JPM

15   is intended to be paid at closing.  And indeed, although no

16   decisions were made at the time as to how -- the transaction,

17   at that point, were hopeful of one being negotiated and

18   consummated, but we were talking about potential transactions

19   at that point -- but one of the issues that was discussed with

20   our creditors' committee, etcetera, was the fact that -- the

21   possibility, because of the guarantees, that the Cubs would

22   wind up in a proceeding.

23        And hence, some of this broad language.  We did not

24   publicly state that at the time, because there was no decision

25   made and we did not think it would be prudent to engage in

1    public speculation at that point.  But it was always

2    anticipated by the parties that JPM would be paid in closing.

3          THE COURT:  Now, I don't have the benefit of the

4    transcript of the hearing, but correct me if I'm wrong.  I seem

5    to remember that the discussion centered around really two

6    things:  that the parties had decided it was more appropriate

7    to transfer the relationship, to put it with the entity which

8    was connected to the activity that JPMorgan was involved in.

9          MR. KRAKAUER:  Correct.

10          THE COURT:  And secondly, I think I remember a

11    specific statement saying that the estate would no longer be

12    responsible for their fees.

13          MR. KRAKAUER:  That's correct, Your Honor.  The

14    Tribune estates, that's correct.  As a matter of fact, you

15    asked that question from the bench to confirm it, and we did

16    confirm it.  So it was moved entirely to the Cubs.  That's

17    correct.

18          THE COURT:  Okay.  But what did not follow from that,

19    at least in the way of discussion in open court, was that

20    ultimately the circle would be completed and that there would

21    be a bankruptcy estate from which fees would be paid.

22          MR. KRAKAUER:  That's correct.

23          THE COURT:  Okay.

24          MR. KRAKAUER:  Okay.

25          THE COURT:  I'm not saying okay, it's all right, I'm

24

1    just saying --

2              MR. KRAKAUER:  No, that you recall that conversation.

3              THE COURT:  All right.  Thank you.

4              MR. KRAKAUER:  I understand.  In terms of JPM's role

5    going forward, we are not going to seek authority to retain JPM

6    going forward.  Their service, with the consummation of this

7    transaction, is concluded.  So they are not -- we are not

8    seeking to employ them as a continuing professional in

9    connection with these cases.  And indeed, because of issues

10   related to JPM's separate role as a creditor, it's not

11   something we, frankly, ever contemplated.  It was always

12   anticipated that their role would be related to this particular

13   transaction, and on the conclusion of this transaction, it

14   would be completed.

15             So we strongly believe that JPM should be paid at

16   closing, pursuant to the agreement.  We believe it's consistent

17   with the formation agreement.  It's, in fact, required by the

18   formation agreement.  It's consistent with their engagement

19   letter.  It's consistent with what was anticipated in terms of

20   the transfer order.  And it is also consistent with the Code.

21   JPM's situation, in this case, is they are an unsecured

22   creditor with respect to the Cubs.  They have performed

23   services and they're due certain amounts.

24             This is an unusual case but -- where unsecured

25   creditors who have performed services for the Cubs, whether

1    they be vendors, whether they be service providers of whatever

2    sort, are being paid.  That's what's being sought.  And we are

3    treating all service providers equivalently.  And there's no

4    reason to make a distinction.  And there's nothing in the

5    Bankruptcy Code that requires a distinction to be made.  And it

6    is -- there's no basis to essentially go in and change and

7    modify our contractual agreements that require the payment to

8    be made.

9          This is a matter which contractually, legally, and

10   otherwise, is all in support of payment being made.  And it's

11   also reasonable.  I mean, these amounts and these agreements

12   were fully vetted with our committee some time ago.  I mean,

13   there's not a question of, for instance, our unsecured

14   creditors' committee, our official committee, being privy to

15   the amounts and not signing off on them.  That was all done

16   quite some time ago.  And we do believe very strongly that

17   payment is appropriate here, and that filing a separate fee app

18   is not only not required, but not provided by the rules and

19   doesn't make any sense, because they're not seeking to perform

20   services in the case.

21         THE COURT:  Well, let me ask this.  It seems to me

22   that -- and I'll hear from the U.S. Trustee -- but what I'm

23   sensing is the U.S. Trustee is taking the position that an

24   application to be engaged should be filed unless that's

25   obviated by the terms of the joint administration order that

26

1    I'm asked to enter.  But pushing beyond that, in its capacity

2    as an unsecured creditor of the Cubs entity that's just

3    recently filed, would it even be eligible to be employed under

4    the terms of the Bankruptcy Code?

5         MR. KRAKAUER:  Your Honor, I don't know whether it's

6    not -- whether it's eligible.  I mean, they have an issue with

7    regard to their claim.  They also have an issue with regard to

8    their affiliates situation in these cases.  I mean, these are

9    all reasons why the debtors' view was, we were not

10   contemplating continuing to get the services from JPM.  So I

11   think you look at them in the capacity they are, which is as an

12   unsecured creditor, and you deal with them as we're dealing

13   with all the other unsecured creditors who provided services of

14   whatever type.  That's our position.

15        THE COURT:  And you don't think 327 of the Code makes

16   them a different type of entity than other unsecured service

17   providers?

18        MR. KRAKAUER:  I don't, Your Honor, because they're

19   not providing services going forward in the case.  And I don't

20   think that 327 contemplates that you'd file an application for

21   somebody doing that.  And in that sense, how are they different

22   from, for instance, an attorney who provides services up to the

23   petition date, and then for whatever reason is not retained by

24   a debtor, has an outstanding claim?  And then how do you treat

25   that attorney's claim in the proceeding.

1        THE COURT:  Well, that attorney normally doesn't get

2    paid at a closing of the sale.  That might be one difference.

3        MR. KRAKAUER:  They don't.  And this is a unique case,

4    because here we're contemplating paying all our service

5    providers, all our unsecured creditors, at the closing of the

6    case.  And that's what makes it different.  I think that is a

7    big distinction.

8        THE COURT:  All right.  You indicated there was a

9    second professional?

10       MR. KRAKAUER:  Yes.  Your Honor, the second

11   professional is McDermott Will & Emery.  They are a

12   professional in connection -- are anticipated to be a

13   professional in connection with the Cubs.  They --

14       THE COURT:  I'm sorry.  Who is it, again, Mr.

15   Krakauer?

16       MR. KRAKAUER:  McDermott --

17       THE COURT:  Okay.

18       MR. KRAKAUER:  -- McDemott Will & Emery.

19       THE COURT:  All right.

20       MR. KRAKAUER:  They are anticipated to a professional

21   who will be retained by the Cubs.  They have been the

22   transaction counsel to the Cubs in connection with this

23   transaction that's before you.  There are still some services

24   to be performed going forward.  And with respect to those

25   services that are to be performed going forward, they would

1   submit fee applications for those services.  And we don't

2   dispute that 327(b) applies to their future services.  That's

3   clear.  McDermott Will & Emery is covered by the formation

4   agreement in terms of providing for their payments that are

5   owed them for their prepetition services at closing.

6         And with respect to McDermott Will, we have the same

7   issue with respect to the treatment like any other service

8   providers, any other vendors that have been dealing with the

9   Cubs.  We are in a situation where we are providing for

10  payments to all the creditors to bring everybody current and

11  keep current.  And with respect to the prepetition amounts that

12  are owed McDermott, those amounts are provided -- would be also

13  brought current.

14        In McDermott's case, they are covered -- with respect

15  to prepetition services, they are covered by a provision of the

16  Code, they're covered by 329.  And 329 does say that McDermott

17  would be required to file a report with the Court as to amounts

18  they receive and agreements they have within the year prior to

19  the filing of the petition.  And 329 also says that to the

20  extent that any compensation exceeds the reasonable value of

21  such services, it remains subject to review by parties in the

22  case and obviously this Court, if that issue is raised.  And no

23  effort is being made to avoid that scrutiny.  I mean, we

24  understand McDermott will need to file that report and will

25  need to -- if there are questions about what they did and

1   whether their services, their fees were reasonable, that

2   remains subject to the jurisdiction of the Court.

3          We think that's what the Code provides very clearly

4   for how you deal with McDermott's situation here.  And that's

5   what we're proposing be done.  It's not an attempt to evade any

6   scrutiny on any of this.  But they have performed services also

7   in anticipation of being paid at closing.  And like our other

8   creditors, we see no basis to make a distinction on their

9   behalf and not comply with our agreements with them pursuant to

10  both the formation agreement and our separate understanding

11  with McDermott.

12         And we think, again, very strongly, that that is the

13  appropriate way to deal with them.  There's not a process that

14  I'm familiar with for attorneys typically to file applications

15  seeking approval of prepetition amounts owed.  I mean, normally

16  if you're owed prepetition amounts, that's treated as an

17  unsecured claim.  And fee applications deal with postpetition

18  services.  And we think that's what the Code provides.  And for

19  327 that's what we'd do, and for prepetition 329 is what

20  governs.

21         THE COURT:  All right.  Thank you.  Let me hear from

22  the U.S. Trustee.

23         MR. MACMAHON:  Your Honor, good afternoon.  A few

24  initial points.  First, JPMorgan and McDermott Will & Emery,

25  our understanding, are the only two professionals that are

1    proposed to be paid at closing from the special distribution

2    amount.

3          THE COURT:  I didn't ask debtors' counsel, but do you

4    know what the amount of those proposed payments is, roughly?

5          MR. MACMAHON:  Your Honor, I don't know what the

6    aggregate amount --

7          THE COURT:  Okay.

8          MR. MACMAHON:  -- of the payments are.  So they're

9    expenses of the Cubs.  They're included in the defined term

10   Cubs Expenses under the formation agreement, and they reduce

11   the amount that the Cubs are scheduled to receive as a special

12   distribution, pursuant to the transaction.  And final closing

13   is expressly conditioned upon this Court's approval of the

14   transaction in the Cubs case, after which point, closing is

15   scheduled to occur.  Our understanding is that all or part of

16   the compensation of both professionals is actually contingent

17   upon closing occurring.

18         There are several arguments raised here, and I think

19   we start with the basic premise that -- put aside this

20   bankruptcy case for a moment -- in any other bankruptcy case,

21   in fact, under the express provisions of the Code, JPMorgan and

22   McDermott Will & Emery are professionals for 327 purposes.  And

23   the responsive arguments by the debtor -- I'm going to walk

24   through them one by one.  First, we're not doing any work

25   postpetition, therefore we're not a professional.

1          THE COURT:  Well, that's with respect to JPMorgan.

2          MR. MACMAHON:  Correct, Your Honor.  And McDermott

3    Will & Emery is transactional counsel.  But as a technical

4    matter, it's inaccurate.  Mr. Martell is here in support of the

5    transaction as a declarant today.  And more than that, Your

6    Honor, more importantly, as a practical matter, this situation

7    really is no different than the number of prepackaged

8    restructurings and quick-sale cases that this Court sees on a

9    routine basis where the investment banker takes matters down to

10   the goal line, prepetition, and comes to court.  And in that

11   wealth of experience that this Court has, Your Honor's well

12   aware, we're well aware that in all those cases, the investment

13   banker gets employed, notwithstanding that circumstance,

14   because the transaction fee -- the transaction being the goal

15   of the restructuring or the bankruptcy, the reason for it -- is

16   paid postpetition from estate proceeds.

17          And we fail to see, Your Honor, why the debtor is

18   trying to distinguish its situation from that body of

19   experience that this Court has.  There's no principled way of

20   doing it.  And the fact that closing may occur in fifteen days

21   as opposed to forty-five or sixty days, this really should be

22   of no import in terms of this Court's consideration of the

23   circumstances here.

24          I don't think that the debtor has taken a position

25   that we're not talking about estate funds based upon the record

1    that's been made here.  In fact, the express terms of the

2    agreement provide that we're talking about a reduction of the

3    distribution to the Cubs.  But even if the debtor wanted to

4    make that argument, Your Honor is well aware of a situation

5    where a nondebtor affiliate may advance a retainer at the

6    outset of an engagement.  And that doesn't change the

7    circumstances under which professional employment and

8    compensation occurs in a bankruptcy case.  The professional has

9    to be retained.  It has to file a fee application to draw on

10   those now-estate funds.  So I don't think that's really at

11   issue here, either.

12        The third point, the JPMorgan order that was entered

13   earlier in the cases.  That order did not obviate the need for

14   professional employment -- adherence to professional employment

15   strictures in a subsequently filed bankruptcy case.  And I

16   think the simple way of approaching that, Your Honor, is

17   looking at it this way.  The law is clear that this Court is

18   only authorized to enter orders that will be consistent with

19   provisions of the Bankruptcy Code.  And to the extent that the

20   debtor is taking a position that it got a free and clear card

21   way back when we considered the assumption and assignment

22   issue, we would take strong exception to that.

23        The language that Mr. Krakauer read into the record

24   was expressly designed upon and recognized the Cubs' status as

25   a nondebtor entity at that time.  And to the extent that the

1    Cubs are arguing today that this Court had the power to enter

2    an order to obviate the need for Section 327 compliance back

3    then, we think that's an open and shut issue.

4         Finally, Your Honor, the point about Section 329 and

5    that offer from the debtor.  We considered it, but as Your

6    Honor might imagine, it's half a loaf.  Any attorney appearing

7    in a bankruptcy case that's providing -- it's representing a

8    debtor, has to provide that statement as a matter of course.

9    That doesn't excuse the need for compliance with Section 327 or

10   330.  That's in addition to those requirements.  And the mere

11   fact that the debtor is offering that accommodation suggests

12   that they acknowledge that, at least for McDermott Will &

13   Emery, they're a professional.

14        So, Your Honor, in sum, I think the issue for today

15   is, does the timetable really matter here?  We find no

16   principled way to distinguish this circumstance from the

17   prepackaged bankruptcy case that proceeds to confirmation

18   without a creditor objection or the quick-sale Section 363 case

19   that may proceed before this Court on a more extended

20   timetable.

21        THE COURT:  Well, let me ask this question.  Does the

22   U.S. Trustee object to the payment in the case of JPMorgan of

23   its fee and in the case of McDermott the payment of its

24   prepetition fee at closing?

25        MR. MACMAHON:  Your Honor, I don't know.  I haven't

34

1    had the chance to evaluate an employment application from

2    JPMorgan.  The critical thing with respect to Section 327 and

3    330 compliance is that -- well, respect to the 330 aspect of

4    it, Court approval will be required prior to the authorization

5    or the allowance of the expense.  And --

6         THE COURT:  Well, with respect to 330, we've routinely

7    entered, and in fact as part of the joint administration order

8    proposed here, the Court is being asked to approve what's

9    routinely permitted, and that is payment of eighty percent of

10   monthly fees and a hundred percent of costs.  So it's not like

11   we don't ever -- it's not like professionals don't get paid

12   here before the court order is entered on the quarterly or

13   final basis, authorizing such payment.  I mean, money goes out

14   even before Court approval.

15        MR. MACMAHON:  I appreciate Your Honor's reference to

16   that order.  Our response is that, but there is a court order,

17   meaning the professional compensation order, which provides

18   that there is a process by which to discern whether there is an

19   objection to allowance on an interim basis.  And here the

20   debtor is not even giving that much up.  In fact, under the

21   debtor's proposal, both JPMorgan and McDermott Will & Emery

22   would be excepted from compliance with that order with respect

23   to what it is we're talking about.  So that's a basic concern

24   we have.

25        THE COURT:  All right.  Thank you.

1          MR. MACMAHON:  Thank you, Your Honor.

2          THE COURT:  Does anyone else wish to be heard on this

3     discrete issues?

4          MR. SIEFE:  Yes, Your Honor, good afternoon.  It's

5     Howard Siefe from Chadbourne & Parke, counsel for the official

6     committee of unsecured creditors.

7          We were first made aware of this issue walking in the

8     courtroom this afternoon.  But I have checked with my office,

9     and we've confirmed that we were certainly aware of the terms

10     of the JPMorgan relationship, some time ago.  We were aware of

11     the assignment of the contract to the Cubs.  And the committee

12     had the opportunity to review and vet the terms of the

13     engagement and had no objections to its terms.

14          And in hearing the discussion today, it seems to me

15     that based on the representations of counsel for the Cubs, JPM

16     is not going to be a retained professional in the case.  Their

17     services have been rendered and been completed, and the only

18     contingency to payment is the closing of the transaction.  So

19     based on that, we would have no objection to having their fees

20     and claim paid like every other unsecured creditor in the case.

21     So I don't see the basis for differentiating their position

22     from any other creditor and its treatment.  So we would have no

23     objection to that fee being paid at closing.

24          Similarly, McDermott, we've been working with very

25     closely throughout the transaction.  And they have provided

36

1    very important and valuable services to get the transaction

2    completed.  And I would think that for services rendered before

3    the filing of the case, that's a general unsecured claim.  The

4    debtor would have to evaluate the reasonableness of it.  And

5    again, I don't see a basis to differentiate it from other

6    prepetition claims that are going to be taken care of.  So to

7    that extent, we would not object as well to the McDermott

8    payment at closing.

9              THE COURT:  Thank you.

10             MR. SIEFE:  Thank you, Your Honor.

11             THE COURT:  Anyone else care to be heard on this

12   particular issue?  I hear no further response.  Mr. Krakauer,

13   how much are we talking about?

14             MR. KRAKAUER:  Your Honor, with regard to McDermott, I

15   think the payment would be in the neighborhood of 1.4 to 1.5,

16   probably, at closing.

17             THE COURT:  All right.  And that is for prepetition

18   services?

19             MR. KRAKAUER:  Correct, Your Honor.

20             THE COURT:  Only?  Okay.

21             MR. KRAKAUER:  Yes.  Any postpetition will be subject

22   to a separate -- the normal fee application process.

23             THE COURT:  All right.  Well, and 329?

24             MR. KRAKAUER:  I'm sorry?

25             THE COURT:  And whatever --

1        MR. KRAKAUER:  Your right.  Anything previous is

2   subject to 329, absolutely.

3        THE COURT:  Okay.  And JPMorgan?

4        MR. KRAKAUER:  JPMorgan, the only equivocation I

5   have -- could I ask one thing?  I'm not sure -- I think when we

6   filed the original application, it was done under seal, showed

7   to the committee, the U.S. Trustee, I believe, and the Court.

8   Can I, before I announce it, can I just talk to JPMorgan --

9        THE COURT:  You may.

10       MR. KRAKAUER:  -- to make sure I don't have to hand

11  you up a note?

12     (Pause)

13       MR. KRAKAUER:  Your Honor, the amount that JPMorgan is

14  entitled to is one percent of a transaction value.  And then

15  the agreement goes on to describe various adjustments to that

16  transaction value.  In the context of this case, it's

17  approximately 6.7 million dollars.  And we would -- as I said,

18  that amount was extensively vetted at the time.  I wasn't

19  planning on getting into it today, but that is a very customary

20  fee amount, one percent, and if anything, at the low end of

21  sometimes what you see in these deals.

22       THE COURT:  And what's the magnitude of prepetition

23  debt that's either to be paid at closing or assumed by the

24  buyer?

25       MR. KRAKAUER:  Well, there's a whole variety of

1    contractual agreements that are obviously being assumed.   In

2    terms of other postpetition -- other amounts that are

3    outstanding, I have to say, I haven't looked at the actual

4    form.  If you want to hold on for a second, I could give you

5    probably a rough estimate from --

6         THE COURT:  Well, let me ask the question another way.

7    I have not taken the opportunity to review the debtor's

8    schedules.

9         MR. KRAKAUER:  Right.

10         THE COURT:  What, after closing, other than I guess

11    secured debt, shared by the Tribune entities, will remain to be

12    paid?

13         MR. KRAKAUER:  There is very limited that remains to

14    be paid.  First the debt shared by the Tribune entities

15    guarantees claims -- unsecured.  In addition to that, the

16    excluded liabilities include things like claims of the other

17    Tribune entities against the Cubs; include, if there's

18    ultimately tax obligations owed by the Tribune family, which

19    the Cubs would be part of the consolidated tax entity.  Those

20    are still outstanding.  Similarly, with respect to other

21    Tribune-type liabilities, like the PBGC claim, that would also

22    be outstanding.

23         But in terms of the operations and people who deal

24    with the Cubs, the business, if you will, and obligations

25    coming out of that, those are all moving over.  And some of

1    them -- the reason I'm having a little trouble understanding --

2    remembering what's owed is, most of those obligations just get

3    assigned over and get paid in the ordinary course.  So there --

4    if there are amounts owed, for instance, to ball players on

5    contracts, and there's contracts, those will be paid as they

6    come due.  There's all sorts of liabilities like that that are

7    being assumed.  This is only -- these particular obligations

8    are just part of it.  But the whole Cubs Business, if you will,

9    is being transferred over to the NewCo entity, including all

10   the liabilities.  I don't know if that's responsive to your

11   question.

12            THE COURT:  It is.  Going back to McDermott for a

13   moment.  Is any portion of the approximately 1.4 to 1.5 million

14   to be paid McDermott, or proposed to be paid, fall outside of

15   the one-year reach-back of Section 329?

16            MR. KRAKAUER:  Can I confer with my client?  Because I

17   would like to respond to that in a particular way, and I just

18   want to make sure.

19            THE COURT:  Very well.

20            MR. KRAKAUER:  Your Honor, our view is the full amount

21   of the 1.5 would be covered.  And it would be covered by 329

22   and subject to review under 329.

23            THE COURT:  Okay.

24            MR. KRAKAUER:  I just wanted to confirm that for sure

25   before making that statement.

1          THE COURT:  Is that consistent with McDermott's view?

2          MR. KRAKAUER:  I will bet it would be consistent with

3      McDermott's view, yes.

4          THE COURT:  All right.  Well, with that understanding,

5      with respect to McDermott, I'm willing to approve that which

6      has been proposed as part of the transaction and under the

7      terms of the transaction documents for this reason.  The

8      payment that's to be made is subject to Court review upon

9      request of a party.  They do intend to make an application for

10     327(e) engagement in connection with this Chapter 11

11     proceeding.  They're being paid only prepetition amounts.  And

12     they're being treated like every other unsecured creditor,

13     which basically, it sounds to me, except for related entities

14     and related indebtedness, are being paid in full, with the

15     possible exception of family tax or pension obligations, which

16     I'm supposing the Tribune is going to have to address sooner or

17     later anyway.

18          Also, 327(e) does not preclude engagement of an entity

19     that's owed money by the estate, so long as it doesn't hold an

20     interest adverse to the estate or represent an interest adverse

21     to the estate.  So that seems to me to be, I guess,

22     conceptually, and trying to be principled about it, as the U.S.

23     Trustee properly suggests, should be the case, is the way to

24     handle that one.

25          The JPMorgan situation involves a little bit of a

41

1     different circumstance.  They're clearly the type of entity

2     that would be considered a professional, in fact, were engaged

3     as a professional in the Tribune Chapter 11 proceeding.  But

4     it's being represented to the Court that their engagement is

5     completely finished and that no additional services are to be

6     rendered.  So that technically, and in actuality, they're not

7     acting in any way as a professional in connection with this

8     Chapter 11 proceeding.

9            And if that's the case, I would, under these very

10    unique circumstances -- and they are unique -- permit the

11    transaction to go forward as proposed, even though technically

12    the payment reduces the yield to the estate.  And of course,

13    one of the primary purposes, if not the primary purpose of the

14    process that the U.S. Trustee is suggesting here, is for the

15    Court to fulfill its role as gatekeeper of estate funds.

16           But that having been said, it's obviously something

17    that had been contemplated by the parties all along.  Now, that

18    having been said, I agree with the U.S. Trustee that the order

19    of February 20th of this year, at least from the Court's

20    standpoint, doesn't in and of itself serve as the -- I'll put

21    it this way -- blessing by this Court to otherwise ignore what

22    might be otherwise applicable provisions of the Bankruptcy Code

23    or the Bankruptcy Rules.

24           I do remember that at the time of the hearing, there

25    was no discussion about -- specifically with the Court, the

1    ultimate filing of the Cubs entity, and how it would work.  It

2    may be that the parties contemplated that all along, but that

3    was not a basis for the Court entering that order, and it

4    should not be viewed -- and I do not view it, as the means to

5    accomplish what the debtor is proposing here, alone.  It serves

6    as, I think, a blessing, at least that the parties' intentions

7    under their, either then tentative agreements, or as they

8    eventually became embodied in the transaction documents.  But

9    the debtor has otherwise satisfied me that based upon the

10   arguments that have been made today, the payments should be

11   made.

12          And with that I'll say no more other than to emphasize

13   woe betide the party that comes in and tells me I established

14   some kind of precedent here today with respect to treatment of

15   such professionals.  I'm sure Mr. McMahon will remember that.

16          All right.  Does the debtor have anything further?

17          MR. KRAKAUER:  No, we don't, Your Honor.  Thank you.

18          THE COURT:  All right.  Let me ask if anyone else

19   wishes to be heard in connection with this motion?

20          MR. SIEFE:  Yes Your Honor.  Howard Siefe.  While I

21   did speak as to the specific matters that were being contested,

22   I do want to say that the creditors' committee has worked

23   closely with the debtors and their professionals in the Cubs

24   transaction.  And the transaction has been heavily scrutinized

25   by the committee and its professionals, every step of the way.

43

1    And it's been a difficult transaction.  It's required great, I

2    think, creativity on the part of the company, the debtors and

3    their professionals and officers.  And at the end of the day, I

4    think it's, I think, a fairly remarkable accomplishment to get

5    it to where it is today.  And the committee wholeheartedly

6    supports the transaction.

7         We think the process was fair and thorough.  And we

8    think the consideration being received at the end of the day is

9    fair and the best that could be achieved under all of the

10   circumstances.  So we would support approval of the motion.

11        THE COURT:  Thank you.  Does anyone else wish to be

12   heard in connection with this motion?  I hear no further

13   response.

14        Well, the record made today consists, in large

15   measure, of that which was made at the September 24th hearing,

16   which record I will incorporate into this one, the substantive

17   support for the relief granted in support of the September 24th

18   order, also being presented today.  And as I found then, with

19   respect to the Tribune part of the transaction, I see nothing

20   in this record which dictates a different result.

21        The debtor has, again, convinced me that the manner in

22   which it proceeded, that is, by private sale rather than by the

23   traditional auction route, really accomplished the same end.

24   Through extensive and exhaustive marketing efforts, it's now

25   obtained League approval, which it had not yet had at the

44

1    September 24th hearing, and has demonstrated not only that the

2    price is adequate under the circumstances, but there is a sound

3    business reason for proceeding in this fashion.

4           So for all of these reasons, I will approve the relief

5    that the debtor has requested.  Do you have a form of order for

6    me?

7           MR. KRAKAUER:  Yes, I do, Your Honor.

8           THE COURT:  Thank you.

9       (Pause)

10          THE COURT:  That order has been signed.  When can I

11   expect a submission of the revised joint administration order?

12          MR. KENSA:  Your Honor, we'll submit a revised order

13   to Mr. McMahon just as soon as we can, have him look at it, and

14   get that to the Court as soon as possible.

15          THE COURT:  All right.  Is there anything further for

16   today?

17          MR. KENSA:  I believe that's all we have, Your Honor.

18          THE COURT:  All right.  Thank you all very much.  And

19   I'd like to thank specifically the U.S. Trustee for her help in

20   working with counsel through this process.  It was very helpful

21   to the Court in these unique circumstances.

22          That concludes this hearing.  Court is adjourned.

23      (Proceedings concluded at 2:44 p.m.)

24

25

45

```
 1
 2                        I N D E X
 3
 4                     E X H I B I T S
 5    DEBTOR'S           DESCRIPTION          PAGE
 6                       Kenney, Bigelow    14
 7                       and Martell
 8                       Declarations
 9
10                        RULINGS
11                       Page      Line
12    Joint administration    11        18
13    motion approved
14    Prepetition fee for     40        5
15    McDermott Will & Emery
16    approved as proposed
17    JPMorgan transaction is  41       10
18    approved to go forward
19    Debtor's motion for     44        4
20    disposition
21    transaction, etc. approved
22
23
24
25
```

46

1

2                          C E R T I F I C A T I O N

3

4        I, Penina Wolicki, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        Penina Wolicki

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:  October 19, 2008

16

17

18

19

20

21

22

23

24

25