**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------x
| | | |
|---|---|---|
| **In re:** | : | Chapter 11 Cases |
| | : | Case No. 08-13141 (KJC) |
| **TRIBUNE COMPANY, et al.,** | : | (Jointly Administered) |
| | : | |
| Debtors. | : | Objection Deadline: November 9, 2009 at 4:00 p.m. (ET) |
| | : | Hearing Date: November 17, 2009 at 11:00 a.m. (ET) |

---------------------------------------------------------x

**MOTION OF LAW DEBENTURE TRUST COMPANY OF NEW
YORK TO TERMINATE DEBTOR AFFILIATES' UNDISCLOSED
PAYMENT OF LBO LENDERS' FEES AND EXPENSES, FOR AN
ACCOUNTING, AND FOR DISGORGEMENT OF PAST PAYMENTS**

Law Debenture Trust Company of New York ("Law Debenture"), successor trustee under that certain Indenture, dated March 19, 1996, between Tribune Company ("Tribune" and with its subsidiaries that are debtors in possession, the "Debtors") (successor to The Times Mirror Company) and Citibank, N.A., for the 6.61% Debentures due 2027 and the 7 1/4 % Debentures due 2096 (as amended, the "Indenture"), as fiduciary for the interests of more than 18% of the Debtors' bondholders, pursuant to sections 105(a) and 363 of Title 11 of the United States Code (the "Bankruptcy Code"), moves this Court for the entry of an order compelling and directing: (i) the Debtors to cause any non-debtor affiliate or subsidiary to terminate the undisclosed and unauthorized payments (the "Unauthorized Fee Payments") of professional fees and expenses to the Debtors' leveraged buyout lenders (the "LBO Lenders"); (ii) the LBO Lenders to provide an accounting of all Unauthorized Fee Payments; and (iii) the LBO Lenders to disgorge the Unauthorized Fee Payments. In support of its motion, Law Debenture respectfully represents as follows:

**PRELIMINARY STATEMENT**

Transparency.  Disclosure.  Notice.  Public hearings.  A debtor must comply with these obligations in exchange for the extraordinary protections that Chapter 11 provides.  A debtor, as fiduciary to creditors and beneficiary of this Bankruptcy Court's good offices, has the obligation to satisfy these requirements both in form and in substance and not to seek ways to avoid them.  These requirements maintain the integrity of the bankruptcy process, which must not only be fair, but which also must appear fair.

The Debtors are deeply insolvent.  Nonetheless, the Debtors here have entered into an undisclosed transaction to benefit their LBO Lenders at the expense of their estates and have kept this arrangement hidden from this Court and creditors (other than the Creditors Committee).  The Debtors have arranged to pay millions of dollars in fees to the LBO Lenders' restructuring professionals -- no less than four law firms and two financial advisory firms -- even though the LBO Lenders are unsecured creditors (undersecured at the parent) holding disputed claims arising from an LBO that most likely constituted a fraudulent conveyance.

The Unauthorized Fee Payments create irreconcilable conflicts of interest and discriminatory treatment of creditors.  As recently determined in the TOUSA bankruptcy cases on similar facts, the LBO Lenders' claims are subject to dispute and likely avoidance as fraudulent conveyances.  If successful, the estate's fraudulent conveyance claims would completely eliminate the LBO Lenders' claims and avoid any obligation to pay their unsecured, prepetition claims for reimbursement of professional fees, which, in any event, could *never* be paid by the grossly insolvent Debtors.  Yet the LBO Lenders have caused the Debtors to direct their subsidiaries to pay these otherwise unpayable prepetition claims without notice to this Court and all creditors.  In addition to restructuring fees, Law Debenture understands that certain of the LBO Lenders are

actually being paid -- not only for their counsels' participation on the Creditors Committee[1] which in and of itself is intolerable and discriminatory -- but also in direct contravention of the estates' interests by *defending* against the Creditors Committee's and Law Debenture's claims investigation.

The LBO Lenders could not have received these payments themselves under the Bankruptcy Code. The LBO Lenders are undersecured creditors of Tribune and unsecured creditors of the other grossly insolvent Debtors, so they could not be paid pursuant to section 506(c) of the Bankruptcy Code. The LBO Lenders have not sought -- because they could not seek -- reimbursement for a substantial contribution to these cases under section 503(b) of the Bankruptcy Code. Instead, the LBO Lenders circumvented these restrictions, notice to this Court and creditors, and application for payment with associated disclosure of the services for which they seek reimbursement. Law Debenture understands that the LBO Lenders extracted payment from Tribune by threatening to take action against the paying subsidiaries that the Debtors believed valuable. If that threat were real, the Debtors would have made an appropriate showing to this Court and protected these subsidiaries by injunction, extension of the automatic stay protections, or otherwise, not simply and surreptitiously paying their fees.

The Unauthorized Fee Payments create serious conflicts of interest. The LBO Lenders are likely litigation targets of estate claims. By facilitating the payment of legal fees to the LBO Lenders in preparation for the LBO Lenders' defense and at the same time paying the LBO Lenders for negotiating a plan (that most likely will seek to release estate claims against the LBO Lenders and other targets), the Debtors are acting in a manner inimical to the best interests of the estate and their creditors.

---

[1] Other capitalized but undefined terms in this Preliminary Statement have the meanings in the text.

For all of the reasons set forth herein, Law Debenture respectfully submits that the Court should terminate this undisclosed and unsupportable payment scheme.

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### The Chapter 11 Cases

2. On December 8, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. Neither a trustee nor an examiner has been appointed in these Chapter 11 cases. The Debtors kept certain wholly- and partially-owned entities out of their filings.

3. On December 18, 2008, the Office of the United States Trustee appointed a nine-member statutory committee of unsecured creditors (the "Creditors Committee"), which included two agent banks for the LBO Lenders.

4. As detailed in the Affidavit of Chandler Bigelow III in support of the Debtors' first-day motions [Docket No. 3], the Debtors are party to credit facilities (the "LBO Credit Facilities") in the aggregate amount of approximately $11.7 billion arising from the failed LBO. *See generally* Bigelow Aff. ¶¶ 19-20. The LBO Credit Facilities are secured only by the equity interests owned by Tribune. The LBO Credit Facilities also are guaranteed on an unsecured basis by certain of the Tribune's direct and indirect subsidiaries, some of which are non-Debtors. Bigelow Aff. ¶¶ 9-11.

4

Through these guarantees, the LBO Lenders sought to structurally subordinate the pre-LBO debt, including that for which Law Debenture serves as trustee, to bear the risk of the failed LBO.

5.    The Debtors incurred the LBO Credit Facilities in 2007 through a leveraged buyout transaction (the "LBO"):  approximately $8.3 billion of loan proceeds went to cash out shareholders for no consideration while pre-existing creditors were left unpaid.  *See generally, Motion for Leave to Conduct Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure of Tribune Company, Its Affiliates, and Certain Third Parties, or Alternatively, for the Appointment of an Examiner Filed by Law Debenture Trust Company of New York* at ¶ 13 [Docket No. 2031].  The Creditors Committee and Law Debenture are investigating claims against the LBO Lenders, and Law Debenture believes that, at a minimum, the LBO Lenders' claims are disputed if not likely subject to litigation in the near future.

### The LBO Lenders Require The Debtors' Subsidiaries To Pay The LBO Lenders

6.    Prior to the Petition Date, certain LBO Lenders formed a steering committee (the "Steering Committee") in connection with Tribune's restructuring and hired several legal and financial advisors (some for the Steering Committee and some for individual LBO Lenders).  At some point, perhaps on the eve of Tribune's filing, the LBO Lenders demanded that the Debtors cause certain non-debtor subsidiaries to pay the LBO Lenders' professional fees.

7.    The Steering Committee has retained four law firms and two financial advisory firms in connection with these Chapter 11 cases, including, Law Debenture believes, Davis Polk & Wardwell LLP, Kaye Scholer LLP, Kramer Levin Naftalis & Frankel LLP, Richards, Layton & Finger, P.A., Potter Anderson & Corroon LLP, the Blackstone Group, and FTI Consulting, Inc.  Certain of these professionals Law Debenture believes have included representation of Steering Committee members serving in their capacities as members of the Creditors Committee.

8.      The Debtors caused their non-debtor subsidiaries to pay the LBO Lenders' fees under the purported threat that the LBO Lenders would exercise remedies. But that appears to be or should have been an empty threat. Most fiduciaries, having placed the entirety of their organization into bankruptcy, would not surreptitiously pay millions to disputed unsecured creditors from valuable subsidiaries rather than protect them through recognized relief from this Court; a Bankruptcy Code section 105 injunction, extension of the automatic stay, a filing, or other equitable relief. In fact, when necessary, the Debtors did just that. To facilitate a sale of the Cubs Entities,[2] the Debtors filed them.

9.      Law Debenture believes that the agreement to make the Unauthorized Fee Payments may have been part of a plan that would assist in the burying of the estates' claims against the LBO Lenders. Indeed, since the filing of these cases, the Debtors have negotiated exclusively with the LBO Lenders, it appears, to the near exclusion of the Creditors Committee, indenture trustees, and significant creditors. In this regard, the Debtors' professional time records include extensive entries involving preparation of a plan term sheet and related meetings and calls with the LBO Lenders even thought the Debtors always knew that the LBO Lenders would or should be targets of estate litigation. *See* Sidley Austin LLP May Fee Statement [Docket No. 1631] (including billing time for third-party releases in plan, timing for confirmation of the plan, meetings with the Steering Committee about the plan and responses to the Steering Committee about the plan). Unlike this disclosure, neither the LBO Lenders nor the Debtors have disclosed the payments sought and made to the LBO Lenders and the services "rendered to the estates" for such payments.

---

[2]     The "Cubs Entities" are Chicago Cubs Dominican Baseball Operations, LLC, Chicago National League Ball Club, LLC, Diana-Quentin, LLC, Tribune Sports Network Holdings, LLC, and Wrigley Field Premium Ticket Services, LLC.

**The Debtors Made No Disclosure To This Court**
**Or To Creditors (Other Than To The Creditors Committee)**

10. The LBO Lenders required the Debtors' subsidiaries to pay millions of dollars in restructuring fees to the Steering Committee's professionals during the course of these Chapter 11 cases. The LBO Lenders and all participants in Chapter 11 processes know that Bankruptcy Courts pay keen attention to restructuring fees that Debtors pay, directly or indirectly. That is why, as here, Bankruptcy Courts put into place independent fee examiners to ensure that Debtors do not make payment of errant, unnecessary fees and expenses.

11. The Debtors informed the Creditors Committee, on which the LBO Lenders sit[3] (and which Law Debenture understands approved the arrangement), and the Office of the United States Trustee about the payment arrangement, but provided no notice to the creditor body at large. The LBO Lenders have made no application to this Court on notice for payment, thus none of the fees have been subject to public scrutiny or even a fee examiner.

**No Disclosure Under Bankruptcy Rule 2015.3**

12. Pursuant to Bankruptcy Rule 2015.3, the Debtors must file periodic financial reports for their non-debtor affiliates.

13. On January 12, 2009, the Debtors filed a motion seeking an extension of time to file the Bankruptcy Rule 2015.3 reports or modification of the reporting requirement (the "2015.3 Motion") [Docket No. 189]. The Debtors filed various supplements to the 2015.3 Motion [Docket Nos. 356, 790, 887 and 1975], and the hearing on the 2015.3 Motion was extended several times pending discussions with the Office of the United States Trustee.

---

[3] One of the LBO Lenders has since resigned but Law Debenture understands that it was on the Creditors Committee when the Debtors obtained the Creditors Committee's approval for the Unauthorized Fee Payment arrangement.

7

14. On or about July 28, 2009, the Debtors filed their first financial report pursuant to Bankruptcy Rule 2015.3 (the "Periodic Report") [Docket No. 1863]. The Periodic Report contained unaudited balance sheets, income and cash flow statements, and statements of shareholders' equity for each "Reporting Entity."[4]

15. The Periodic Report includes no reference to the LBO Lenders' Unauthorized Fee Payments. Instead, it merely references broader categories of income and expenses for each non-debtor affiliate. The Periodic Report includes no footnotes or explanations of any intercompany, related-party transactions, or payments to the Debtors' creditors, particularly disputed creditors. To the extent that the Debtors included these payments in the Periodic Report, there is no basis to determine the amounts of such payments or for what they were made.

16. The Periodic Report includes no information regarding the Cubs Entities or any subsidiaries in which they held an interest of 50% or less (the "Minority Interest Entities"). The Debtors allege that they did not include a report for the Minority Interest Entities because "the Debtors do not believe that they have a 'substantial or controlling' interest in the [Minority] Interest Entities within the meaning of [Bankruptcy] Rule 2015.3." (Periodic Report at 2 n.2.).

17. Law Debenture believes that the Debtors' omission of these entities from the Periodic Report may not have been coincidental. Law Debenture believes that the Cubs Entities and one or more Minority Interest Entities have been making the Unauthorized Fee Payments. The failure to include these entities enabled the LBO Lenders to shield the Unauthorized Fee Payments from public disclosure.

---

[4] The "Reporting Entities" are Fairfax Media, Incorporated, Multimedia Insurance Company, Tribune (FN) Cable Ventures, Inc., Tribune Interactive, Inc., Tribune National Marketing Company, Tribune ND, Inc., Tribune Receivables, LLC, TMS Entertainment Guides Canada Corp, Tribune Hong Kong Ltd., Tribune Media Services B.V., Professional Education Publishers International (Africa) Pty Ltd., Tribune Employee Lease Company LLC, and Tribune Technology LLC.

18.     The Debtors certainly are capable of making disclosure of payments. In fact, the Debtors create detailed reports of all other professional fee payments on a monthly basis. Set forth below is an excerpt from the Debtors' August 2009 Monthly Operating Report:

**MOR-1b**
**Schedule of Professional Fees and Expenses Paid**
**For the Period August 3, 2009 through August 30, 2009**

| Professional | Amount Paid This Period | | | Cumulative Amount Paid Since Petition Date | | |
|---|---|---|---|---|---|---|
| | Fees | Expenses | Total | Fees | Expenses | Total |
| AlixPartners, LLP | $ 288,393 | $ 5,258 | $ 293,650 | $ 2,403,676 | $ 53,928 | $ 2,457,604 |
| Alvarez & Marsal North America, LLC | 561,327 | 6,208 | 567,535 | 4,340,979 | 52,755 | 4,393,734 |
| Chadbourne & Parke LLP | 580,808 | 32,090 | 612,898 | 3,324,519 | 146,948 | 3,471,467 |
| Cole, Schotz, Meisel, Forman & Leonard, P.A. | 147,843 | 8,710 | 156,554 | 311,949 | 26,449 | 338,399 |
| Daniel J. Edelman, Inc. | 700 | - | 700 | 5,655 | 125 | 5,780 |
| Deloitte & Touche LLP | - | - | - | - | - | - |
| Dow Lohnes PLLC | - | - | - | - | - | - |
| Epiq Bankruptcy Solutions, LLC | - | - | - | 1,048,126 | 299,902 | 1,348,028 |
| Ernst & Young LLP | - | - | - | - | - | - |
| Jenner & Block LLP | 74,429 | 5,705 | 80,135 | 282,511 | 10,990 | 293,501 |
| Jones Day | 27,374 | 75 | 27,449 | 52,082 | 534 | 52,616 |
| Landis Rath & Cobb LLP | 53,778 | 4,101 | 57,879 | 291,020 | 24,452 | 315,471 |
| Lazard Freres & Co. LLC | 160,000 | 7,119 | 167,119 | 609,032 | 24,469 | 633,501 |
| McDermott Will & Emery LLP | - | - | - | 363,435 | - | 363,435 |
| Mercer (US) Inc. | 306,463 | 10,671 | 317,134 | 306,463 | 10,671 | 317,134 |
| Moelis & Company LLC | 160,000 | 10,380 | 170,380 | 934,194 | 50,805 | 984,998 |
| Paul, Hastings, Janofsky & Walker LLP | - | - | - | 602,244 | 1,419 | 603,663 |
| PricewaterhouseCoopers LLP | - | - | - | 882,629 | 17,970 | 900,599 |
| Reed Smith LLP | 4,568 | 284 | 4,852 | 98,565 | 3,790 | 102,355 |
| Sidley Austin LLP | 982,323 | 25,982 | 1,008,304 | 6,237,093 | 296,867 | 6,533,960 |
| Stuart Maue | 200,318 | 14 | 200,332 | 200,318 | 14 | 200,332 |
| Zuckerman Spaeder LLP | - | - | - | - | - | - |
| Unsecured Creditors Committee Members | - | 652 | 652 | - | 9,133 | 9,133 |
| Total | $ 3,548,323 | $ 117,248 | $ 3,665,571 | $ 22,294,489 | $ 1,031,220 | $ 23,325,710 |

| Professional | Role |
|---|---|
| AlixPartners, LLP | Unsecured Creditors Committee Financial Advisor |
| Alvarez & Marsal North America, LLC | Debtors' Restructuring Advisor |
| Chadbourne & Parke LLP | Unsecured Creditors Committee Legal Counsel |
| Cole, Schotz, Meisel, Forman & Leonard, P.A. | Debtors' Co-Counsel |
| Daniel J. Edelman, Inc. | Corporate Communications Advisor |
| Deloitte & Touche LLP | Debtors' Financial and Accounting Advisor |
| Dow Lohnes PLLC | Debtors Special Counsel for FCC and Broadcast Matters |
| Epiq Bankruptcy Solutions, LLC | Noticing / Claims Agent |
| Ernst & Young LLP | Debtors' Valuation and Business Modeling Consultant |
| Jenner & Block LLP | Debtors' Special Counsel for Litigation Matters |
| Jones Day | Debtors' Counsel |
| Landis Rath & Cobb LLP | Unsecured Creditors Committee Legal Counsel |
| Lazard Freres & Co. LLC | Debtors' Financial Advisor & Investment Banker |
| McDermott Will & Emery LLP | Debtors' Special Counsel for General Domestic Legal Matters |
| Mercer (US) Inc. | Debtors' Compensation Consultant |
| Moelis & Company LLC | Unsecured Creditors Committee Investment Banker |
| Paul, Hastings, Janofsky & Walker LLP | Debtors' Special Counsel for Real Estate Matters |
| PricewaterhouseCoopers LLP | Debtors' Independent Auditors and Tax Advisor |
| Reed Smith LLP | Debtors' Special Counsel for Certain Litigation Matters |
| Sidley Austin LLP | Debtors' Co-Counsel |
| Stuart Maue | Court Appointed Fee Examiner |
| Zuckerman Spaeder LLP | Unsecured Creditors Committee Special Counsel |

19. There is no valid reason why the Debtors could not disclose at least the same information for the Unauthorized Fee Payments.[5]

### Harm To The Estates

20. The Unauthorized Fee Payments harmed the estates. If these payments were not made, the amounts would have been available to pay claims of other creditors, including intercompany claims. Moreover, upon information and belief, such payments were adverse to the interests of the estates because they included services relating to the Steering Committee's and LBO Lenders' *defense of claims* that likely will be brought by the estates and restructuring services relating to a plan of reorganization that likely contravene other creditors' rights and, based upon research indicated by the Debtors' primary counsel's time records, may seek to eliminate estate claims against the LBO Lenders.

21. Tribune, the Debtors' parent company, is indebted to Law Debenture's noteholders and other non-LBO creditors for over $2.4 billion. Any funds not otherwise used to make the Unauthorized Fee Payments increase the value of the payors' parent companies and ultimately Tribune. Thus, in essence, the LBO Lenders are causing the Debtors' subsidiaries to deplete assets otherwise available to the Debtors', particularly Tribune's, creditors. The LBO Lenders, as holders of claims subject to dispute if not complete disallowance, should not be permitted to purloin estate assets.

---

[5] In the recent case of *In re Freedom Communications Holdings, Inc.* (09-13046 (BLS)), the creditors committee alleged that one of the agent lenders here struck an undisclosed agreement with the debtors on the eve of bankruptcy to pay fees relating to consent to use of cash collateral. *See* Ex. A. Accordingly, it appears that surreptitious payments to lenders may be becoming a pattern.

**RELIEF REQUESTED**

22.     Law Debenture respectfully requests entry of an order, pursuant to sections 105(a) and 363 of the Bankruptcy Code, compelling and directing: (i) termination of the Unauthorized Fee Payments; (ii) an accounting of Unauthorized Fee Payments; and (iii) disgorgement of the Unauthorized Fee Payments.

**ARGUMENT**

**A.      The Unauthorized Fee Payments Violate The Bankruptcy Code.**

  **i.      The Standards For Approval Of Insider Transactions Out Of Course Of Business Under Section 363(b).**

23.     A debtor in possession may only use property of the estate outside the ordinary course of business after "notice and a hearing." *See* 11 U.S.C. § 363(b).

24.     The phrase notice and hearing "means such notice as is appropriate in the particular circumstances." 11 U.S.C. § 102(1). In addition, procedural due process requires notice and a meaningful opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). Indeed, an "elementary" and "fundamental" requirement of due process in any proceeding is that parties be provided notice "reasonably calculated" under all of the circumstances to afford the objecting party an opportunity to present his objections. *See Walthall v. United States*, 131 F.3d 1289, 1294 (9th Cir. 1997). As the Debtors recently acknowledged, "Bankruptcy Courts in this District have observed that '*notice is of paramount importance*' and therefore 'it is fundamental that notice should be sent to all parties whose interests may be affected' by an transfer of assets." *Motion to Authorize (Motion for Orders Pursuant to 11 U.S.C. Sections 105(a), 363 and 365 (I) Authorizing Tribune Debtors and CNLBC to (A) Enter Into and Perform Obligations Under Formation Agreement and Ancillary Agreements, (B) Effect Proposed Business Combination Respecting Cubs-Related Assets, Including Interests in Wrigley Field, Comcast Sports Network and*

11

*Related Assets Free and Clear of All Liens, Claims, Rights, Interests and Encumbrances, and (C) Assume and Assign Executory Contracts; (II) Authorizing Debtor Tribune Company to Enter Into Guarantees of Debt Financing; (III) Authorizing Debtors WGN Continental Broadcast Company and Tribune Company to Enter Into and Perform Obligations Under Radio and Television Broadcast Agreements; and (IV) Granting Related Relief)* (the "Cubs Bidding Procedures Motion") ¶ 63. (citation omitted).  Nevertheless, neither the LBO Lenders nor the Debtors gave any public notice of the Unauthorized Fee Payments, which deprived stakeholders of the right to be heard on this important matter.

25. To determine whether a transaction is out of the ordinary course of the debtor's business, bankruptcy courts consider whether the transaction is common practice in the debtor's industry and whether creditors could reasonably expect the debtor to enter into such a transaction. *Teamsters Local Union No. 401 Health & Welfare Fund v. International Brotherhood of Teamsters, Local 401 (In re Roth Am.),* 975 F.2d 949, 952-53 (3d Cir. 1992).  Related-party transactions such as the Unauthorized Fee Payments require heightened scrutiny by a bankruptcy court.  *See, e.g., In re Enron Corp.*, 335 B.R. 22, 28 (S.D.N.Y. 2005); *C&J Clark Am., Inc. v. Carl Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (finding that section 363(b) transactions involving insiders are subject to abuse, which requires heightened scrutiny).

26. The Debtors' unauthorized payment scheme cannot withstand heightened scrutiny.

### ii.     The Unauthorized Fee Payments Violated Section 363(b).

27.     The Unauthorized Fee Payments required court approval under section 363(b) of the Bankruptcy Code.  The LBO Lenders demanded property of the Debtors' estates -- the control of, and equity interests in, their subsidiaries and the cash otherwise distributable to Debtor entities, ultimately to Tribune -- to make the Unauthorized Fee Payments.  *See In re Consolidated Auto Recyclers, Inc.,* 123 B.R. 130 (Bankr. D. Me. 1991) (voting shares to change of management, board and file chapter 11 petition for non-debtor subsidiary were uses of shares owned by debtor requiring approval under section 363(b) of the Bankruptcy Code).

28.     It is, of course, no answer to protest that non-debtors are making the payments, not Debtors.  The LBO Lenders are requiring that the Debtors *cause* their subsidiaries to make the payments -- an action outside of the ordinary course for the Debtors.

29.     The Unauthorized Fee Payments have a direct and significant impact on the Debtors and the administration of these cases.  The Unauthorized Fee Payments diminished the value of the Debtors estates:  every dollar used to pay the Unauthorized Fee Payments could have and should have been used to pay the principal amount of all claims ratably, including intercompany claims across several estates, not the LBO Lenders' legal fees.  Indeed, the underlying obligation for the Unauthorized Fee Payments arises under the same credit agreement to which the Debtors are a party.  Accordingly, the Unauthorized Fee Payments created contribution claims against Tribune and other Debtors under the guarantees and applicable state law.  The Unauthorized Fee Payments have been made for the direct benefit of parties serving on the Creditors Committee -- including for professional fees relating to Creditors Committee service and preparation for the defense of claims to be brought by the estates against the LBO Lenders – that directly (and negatively) impacts the administration of these bankruptcy estates.

30. Indeed, a major recent decision held that, not only can the estate avoid legal fees paid to lenders whose claims have been avoided as fraudulent transfers, but the estate also can *recover* its legal fees from such lenders. *See Official Committee of Unsecured Creditors of Tousa, Inc. v. Citibank, N.A.* (Bankr. S.D. Fla. Oct. 13, 2009) ("TOUSA"). Moreover, in TOUSA, a case against many of the LBO Lenders here, the Bankruptcy Court approved payment of the *disclosed* request initially, and, until avoidance, the TOUSA lenders were secured. *Id.*

31. Here, the undisclosed, unapproved Unauthorized Fee Payments to unsecured creditors were not in the ordinary course of the Debtors' business. Such payments are not part of the Debtors' standard industry practice and, to the best of Law Debenture's knowledge, are unprecedented in any major Chapter 11 case.

32. As stated, when necessary, the Debtors sought this Court's approval for a similar (albeit significantly larger) transaction. Just last month, the Debtors filed a motion seeking relief from this Court under section 363(b) of the Bankruptcy Code in connection with the sale of the Cubs Entities. *See* The Cubs Entities Bidding Procedures Motion [Docket No. 2000]. In the Cubs Entities Bidding Procedures Motion, the Debtors conceded:

- The Cubs Business is operated through non-Debtor subsidiaries.
- "The Cubs Business is one of the most valuable assets of Tribune and its affiliates."
- The sale of the Cubs Business was out of the ordinary course of business.
- The sale of the Cubs Business required the Debtors' consent.
- The sale of the Cubs Business required the Court's approval.

Cubs Bidding Procedures Motion ¶¶ 1-7. These are similar factual predicates for the Unauthorized Fee Payments, but, by contrast, the LBO Lenders deliberately chose not to seek approval of the

14

Unauthorized Fee Payments. There is no valid reason why the Debtors and the LBO Lenders did not follow the same procedure used for the sale of the Cubs Entities.

### iii.   The Bankruptcy Code Prohibits The Unauthorized Fee Payments.

33.   The LBO Lenders had a strong motive to conceal this arrangement. Professional fees of creditors' counsel can only be paid pursuant to sections 503(b) and 506(c) of the Bankruptcy Code after notice and a hearing. As unsecured and undersecured creditors of these estates, the LBO Lenders have no entitlement to payment under section 506(c) of the Bankruptcy Code. Nor have the LBO Lenders provided a substantial contribution to these cases; just the opposite: the LBO they financed *caused* the harm that led to the filing of the Chapter 11 cases. Law Debenture submits that the LBO Lenders obtained the Unauthorized Fee Payments for a cost-free stranglehold on these cases to the detriment of the Debtors' other creditors.

34.   The failure to obtain approval of the Unauthorized Fee Payments voids such payments as a matter of law. *In re Lavigne,* 114 F.3d 379, 385 (2d Cir. 1997) (purported cancellation of policy was void as an extraordinary disposition of property of the estate without notice or hearing); *In re NextWave Personal Communications Inc.*, 244 B.R. 253 (Bankr. S.D.N.Y. 2000) (unapproved transactions subject to section 363(b) of the Bankruptcy Code are void).

35.   Accordingly, Law Debenture respectfully submits that this Court should terminate the Unauthorized Fee Payments, and, following a full accounting, require disgorgement of all Unauthorized Fee Payments.

### NOTICE

36.   Notice of this Motion has been given to: (a) counsel to the Debtors, (b) the Office of the United States Trustee, (c) counsel to the Creditors Committee, (d) counsel to the LBO Lenders,

and (d) all parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, Law Debenture submits that no further or other notice is required.

## WAIVER OF MEMORANDUM OF LAW

37.     Inasmuch as Law Debenture has set forth the reasons and authorities on which it relies, Law Debenture requests that the Court waive compliance with Local Rule 9013-1(b) regarding the filing of a separate memorandum of law.

## NO PRIOR REQUEST

38.     No prior application for the relief requested in this motion has been made to this or any other Court.

## CONCLUSION

For the reasons set forth above, Law Debenture respectfully requests entry of an order, pursuant to sections 105(a) and 363 of the Bankruptcy Code, compelling and directing:  (i) termination of the Unauthorized Fee Payments, (ii) an accounting of Unauthorized Fee Payments, and (iii) disgorgement of the Unauthorized Fee Payments; and granting to Law Debenture such other and further relief as is just and proper.

Dated: October 23, 2009
       Wilmington, Delaware

Respectfully submitted,

By: /s/ Garvan F. McDaniel
**BIFFERATO GENTILOTTI LLC**
Garvan F. McDaniel (No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel: (302) 429-1900
Fax: (302) 429-8600

      – and –

David S. Rosner
Andrew K. Glenn
Matthew B. Stein
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700

*Co-Counsel for Law Debenture Trust Company*
 *of New York*