**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>Hearing Date: December 15, 2009 at 10:00 a.m. ET<br>Objection Deadline: December 8, 2009 at 4:00 p.m. ET |

**MOTION OF THE DEBTORS FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b) AND FED. R. BANKR. P. 9019(a) APPROVING A SETTLEMENT AGREEMENT BETWEEN CERTAIN DEBTORS AND THE ESTATE OF E. MICHAEL GUTMAN, M.D.**

Tribune Company and most of its wholly owned subsidiaries, each of which is a debtor and debtor-in-possession (each a "Debtor" and collectively, the "Debtors"), hereby submit this motion (the "Motion") seeking entry of an order pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving that certain settlement

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club, LLC n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

46429/0001-6112087v1

agreement by and between (i) on the one hand, the estate of E. Michael Gutman, M.D., Mike Gutman, M.D. (MPAC), Gutman Pain/Accident Center, Inc. a/k/a/ and/or d/b/a Back Pain Institute of Orlando, and their legal representatives (collectively, "Plaintiffs"), and (ii) on the other hand, Orlando Sentinel Communications Company, Tribune Company of Chicago a/k/a Tribune Company, Tribune Publishing Company, and Sentinel Communications News Ventures, Inc. In support of this Motion, the Debtors respectfully represent as follows:

## STATUS OF THE CASE AND JURISDICTION

1. On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, with the exception of Debtor Tribune CNLBC, LLC (formerly known as Chicago National League Ball Club, LLC), which filed a voluntary chapter 11 petition on October 12, 2009. The Debtors' chapter 11 cases have been consolidated for procedural purposes only by applicable orders of the Bankruptcy Court.

2. The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee.

3. On December 18, 2008, the Office of the United States Trustee appointed an official committee of unsecured creditors in these cases.

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief sought herein are sections 105 and 363 of the Bankruptcy Code and Rule 9019(a) of the Bankruptcy Rules.

## RELEVANT BACKGROUND

### A.   The Florida Action

5.   On May 11, 2005, the Plaintiffs commenced an action against certain Debtors and reporters employed by the Debtors alleging, among other things, that articles published in the Orlando Sentinel, a newspaper published by one of the Debtors, wrongfully identified Dr. Gutman, one of the Plaintiffs, as prescribing pain and anxiety medication that was linked to the death of eleven patients (the "Florida Action").[2] The Florida Action, which contained one count of defamation and one count for a false light invasion of privacy claim, sought damages in excess of $15,000,000.00 for certain alleged defamatory statements included in articles published by the Orlando Sentinel and written by reporters Rene Stutzman and Fred Schulte (collectively, the "Reporters").

6.   As of the Petition Date, the Plaintiffs and the Defendants had completed significant discovery with respect to the Florida Action including, but not limited to, depositions of fact witnesses such as reporters, editors, and Dr. Gutman, as well as multiple expert depositions. The Debtors had expended approximately $1,264,184.00 in connection with defense of the Florida Action prior to the Petition Date. However, substantial discovery currently remains outstanding in the Florida Action including the potential deposition of numerous fact witnesses, medical experts, damages experts, journalism experts, and individuals. In addition, there are potentially several pre-trial motions of both a substantive and non-

---

[2] The Plaintiffs' complaint, as amended, named as defendants the Orlando Sentinel Communications Company, the Tribune Company of Chicago a/k/a Tribune Company, Tribune Publishing Company, Sentinel Communications News Ventures, Inc., Rene Stutzman, individually, and Fred Schulte, individually.

3

46429/0001-6112087v1

substantive nature outstanding that would have to be resolved before trial could begin. In the Debtors' response to the Gutman's Relief from Stay Motion (as defined below), the Debtors estimated that if such discovery were to resume and the Florida Action were permitted to proceed to trial, the Debtors would be required to expend up to an additional $2 million in defense costs.[3]

7. As a result of Dr. Gutman's suicide on April 28, 2009, Donna G. Gutman, Dr. Gutman's widow ("Mrs. Gutman"), has asserted additional financial damages, as well as additional pain and suffering, which will result in a variety of new factual and legal issues requiring substantial discovery and additional briefing beyond what was originally contemplated in the litigation.

8. The Debtors maintain insurance applicable to the Florida Action. However, the Debtors' insurance policy is subject to a $1 million per occurrence self-insured retention provision, with the Debtors being obligated to pay for all defenses costs, which payments do not erode the Debtors' retention obligation.

**B.    Automatic Stay Proceedings**

9. On April 9, 2009, the Plaintiffs filed the Motion for Relief from Automatic Stay With Respect to E. Michael Gutman, M.D., Mike Gutman, M.D. (MPAC), P.A. and Gutman Pain/Accident Center, Inc. (the "Relief from Stay Motion") [Doc. No. 883], seeking relief from the automatic stay to permit the Florida Action to proceed to trial. On April 23, 2009, the Debtors filed an objection to the Relief from Stay Motion, arguing, among other things, that

---

[3] A more detailed disclosure of the Debtors' defense costs estimate, as estimated prior to Dr. Gutman's suicide, is included in the Affidavit of Jack Rodden, Vice President and Treasurer of Tribune Company, in Support of Debtors' Objection to the Motion for Relief from Automatic Stay with Respect to E. Michael Gutman, M.D., Mike Gutman, M.D. (MPAC), P.A. and Gutman Pain/Accident Center, Inc. [Doc. No. 1084].

allowing the Florida Action to proceed to trial would expend up to $2 million in estate resources. As a result of Dr. Gutman's suicide on April 28, 2009, the hearing on the Relief from Stay Motion (which was scheduled for April 30) was continued. An evidentiary hearing was ultimately held on the Relief from Stay Motion on June 30, 2009. At the hearing, the Court advised the parties that it appeared beneficial for them to proceed to mediation, and that if mediation was unsuccessful the Gutman claims would not be liquidated by the Bankruptcy Court but that a trial would "be likely finished in Florida or tried in the district court here". (Hr'g Tr. 43, June 30, 2009).

10. On July 15, 2009, this Court entered an Order Granting Relief From the Automatic Stay (the "Lift Stay Order"). [Doc. No. 1748]. The Lift Stay Order modified the automatic stay to the limited extent necessary for mediation to occur in Florida and to request a trial date in Florida in the event the mediation was unsuccessful.

C. **Mediation and Related Settlement**

11. Following entry of the Lift Stay Order, the Debtors and the Plaintiffs agreed to engage in mediation in Central Florida with Rodney Max, an experienced mediator (the "Mediation").

12. Under the supervision of the mediator, the Debtors and the Plaintiffs, along with the Debtors' insurer, were able to reach a resolution of the Florida Action. On October 27, 2009, the Debtors and the Plaintiffs agreed, subject to approval of this Court, to the terms of a settlement agreement completely resolving their dispute.

13. The Debtors believe that the following three facts played a significant role in the outcome of the Mediation: First, Mrs. Gutman appeared to be facing significant financial

5

difficulties, and as a result, immediate payment was a prerequisite to any settlement. Second, under the terms of the insurance policy, the Debtors had no ability to legally compel the insurer to make any payments until the Debtors had satisfied their $1 million self-insured retention. Third, if the mediation failed, the Debtors faced the prospect of a trial that would likely cost as much as $2 million to defend, where the plaintiff appearing before the jury would now be a destitute widow rather than a doctor who may have been responsible for the deaths of 11 patients.

## THE SETTLEMENT AGREEMENT

14. On October 27, 2009, the relevant Debtors and the Plaintiffs entered into the Settlement Agreement.[4] The Settlement Agreement provides that the Debtors will pay $1 million and the Debtors' insurer will pay $850,000 (for a total of $1,850,000 "Total Settlement Amount") to the Plaintiffs within 20 days of Bankruptcy Court approval of the Settlement Agreement.

15. A summary of certain additional salient terms of the Settlement Agreement is as follows:[5]

>  (i) Payment of the Total Settlement Amount shall be subject to any necessary approval of the Bankruptcy Court and the Probate Court and any necessary substitution of Dr. Gutman's estate as a party to the Florida Action.
>
>  (ii) Payment of the Total Settlement Amount shall be subject to execution of a release applicable to all Debtors and each of the Reporters. The release for the Reporters will be effective and the claims against the Reporters will be dismissed

---

[4] Consistent with the mutual confidentiality provisions of the Settlement Agreement, the Debtors have provided the Settlement Agreement to the Creditors Committee and the Steering Committee of the Lenders, subject to their respective confidentiality agreements, and will make it available to the United States Trustee and the Court if requested.

[5] The terms set forth herein are intended only as a summary of the terms of the Settlement Agreement. The Motion shall not in any way supersede or alter the terms of the Settlement Agreement.

with prejudice upon entry of an order by the Bankruptcy Court approving the Settlement Agreement.

(iii) The Plaintiffs will release any and all claims relating to the relevant Debtors upon payment of the Total Settlement Amount. Immediately upon that payment, the Florida Action will be dismissed with prejudice with respect to all Debtors.

(iv) The Settlement Agreement does not contain an admission of fault, and the Settlement Agreement expressly acknowledges that the Reporters contributed no part of the Total Settlement Amount.

(v) Any disputes pertaining to any interpretation of the Settlement Agreement shall be subject to mediation with Rodney Max.

## RELIEF REQUESTED

16. The Debtors seek entry of an order pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, substantially in the form attached hereto as Exhibit A, (i) approving the Debtors entry into Settlement Agreement and (ii) authorizing the Debtors' performance all of their obligations under the Settlement Agreement. As set out more fully below, the Debtors believe that entering into the Settlement Agreement constitutes a reasonable exercise of the Debtors' business judgment.

## BASIS FOR RELIEF REQUESTED

A. **The Settlement Agreement**

17. The Debtors seek authority to enter into the Settlement Agreement pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, and Bankruptcy Rule 9019. Section 105(a) grants bankruptcy courts broad authority to enforce the provisions of the Bankruptcy Code under equitable common law doctrines, providing, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

7

18. The Third Circuit has stated that section 363 of the Bankruptcy Code is the substantive provision requiring a hearing and court approval of settlements, while Bankruptcy Rule 9019 established the procedure by which such approval may be secured. See In re Martin, 91 F.3d 389, 395 n.2 (3d Cir. 1996) (distinguishing substance of section 363 from procedural effect of Bankruptcy Rule 9019). Bankruptcy Rule 9019 provides, in relevant part:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a). Approval of a settlement under Bankruptcy Rule 9019 is committed to the discretion of the court. Key3Media Group, Inc. v. Pulver.com, Inc., (In re Key3Media Group, Inc.), 336 B.R. 87, 92 (Bankr. D. Del. 2005).

19. In determining whether to approve a settlement under Bankruptcy Rule 9019, the court must decide whether "the compromise is fair, reasonable, and in the best interest of the estate." In re TSIC, Inc., 393 B.R. 71, 78 (Bankr. D. Del. 2008) (quoting In re Louise's, Inc., 211 B.R. 798 (D.Del. 1997)). In considering the best interest of the estate, the Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (citing Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)). In making this determination, a court should consider four criteria: "(1) the probability of success in the litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay…; and (4) the paramount interest of the creditors." Id. (referencing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,

46429/0001-6112087v1

390 U.S. 414, 424-25 (1968)); see also In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D.Del. 1998) (listing the Anderson factors as controlling whether a settlement should be approved). The ultimate inquiry is whether the compromise is fair, reasonable, and in the interest of the estate. See In re Louise's, Inc. 211 B.R. 798, 801 (D. Del. 1997).

20.  The Settlement Agreement is the product of arm's-length negotiations between the Debtors, the Debtors' insurer, and the Plaintiffs. The Debtors believe that the terms of the Settlement Agreement are fair and reasonable and that the Settlement Agreement meets the requirements for approval under Rule 9019(a) as described in the In re Martin criteria.

Application of the Martin Factors

21.  The probability of success in the litigation. With regard to this first aspect of the In re Martin factors, "the Court's task ... is to canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness." In re Exide Technologies, 303 B.R. 48, 68 (Bankr. D. Del. 2003) (quoting In re Neshaminy office Bldg. Assoc., 62 B.R. 798, 803 (E.D.Pa. 1986)). Absent the resolution of the Florida Action afforded by the Settlement Agreement, the Debtors and the Plaintiffs would likely be forced to litigate the merits of the Florida Action, thereby exposing the Debtors to additional defense costs incurring up to $2 million or more in administrative expenses to the Debtors' estates. Although the Debtors believe that neither the Debtors nor the Reporters are liable for defamatory material, and that a summary judgment motion is meritorious and should be successful, such dispositive motions are not easily obtained in the Florida state courts, especially when there are complex factual issues such as those inherent in this defamation claim. The Plaintiffs are represented by successful and adept counsel; there are fact issues to which a jury may give undue weight; and compounding the uncertainty is the extent to which Dr. Gutman's suicide might affect a jury. In

46429/0001-6112087v1

this instance, the uncertainty of litigation could expose the Debtors to a substantial adverse judgment, of which the Debtors would be responsible for the first $1 million of the judgment under their applicable insurance coverage. Additionally, since the Florida Action involves high stakes litigation, even if the Debtors were to win at trial, the Florida Action would likely be appealed, which could lead to additional administrative costs to the Debtors and their estates. All told, the Florida Action exposes the Debtors to potential liability of $3 million or more. In contrast to continuing the Florida Action, the Settlement Agreement resolves timely and efficiently the Florida Action, avoids the uncertainty of litigation, and represents out of pocket costs to the Debtors of only $1 million. Accordingly, the Debtors believe that the first of the In re Martin factors weighs in favor of approving the Settlement Agreement.

22. *The likely difficulties in collection.* The Settlement Agreement does not present any issues regarding collection. Therefore, the second of the In re Martin factors weighs neither in favor nor against approval of the Settlement Agreement.

23. *The complexity of the litigation involved, and the expense, inconvenience and delay.* If the Florida Action were to go to trial, the litigation would be very expensive and time consuming. To resolve the Florida Action, the Plaintiffs would need to establish whether the alleged defamatory statements published in the Orlando Sentinel were false by clear and convincing evidence. Philadelphia Newspapers Inc. v. Hepps, 475 U.S. 767 (1986). Litigation regarding the truth or falsity of the alleged defamatory statements involves complicated factual predicates and would require analysis of Dr. Gutman's treatment of eleven separate patients, which analysis would be akin to eleven separate malpractice cases.

24. Furthermore, the Plaintiffs assert that the pairing of the article concerning Dr. Gutman with an article about Medicaid abuses implied an accusation that Dr. Gutman was a Medicaid cheat. The accuracy of such an implication or the lack of a reasonable person understanding the pairing of the two articles as creating that implication will be significant litigation issues.

25. Finally, two legal issues – that Dr. Gutman is a public figure and, consequently, that the Plaintiffs cannot demonstrate "actual malice"—have not yet been presented in the Florida Action. While Debtors believe that such motions are meritorious and will be successful, the failure to prevail at the trial level will result in trying a defamation case with a negligence standard of fault. The exigencies of a jury in such a case and the additional expense for this type of defense should be noted.

26. As of the Petition Date, the Debtors had already incurred approximately $1,264,184 in costs connected with defense of the Florida Action and the discovery phase of the Florida Action was not yet completed. As noted above, in addition to the costs associated with completing the already outstanding discovery, it is possible that the death of Dr. Gutman could further complicate discovery regarding potential claims held by Dr. Gutman's estate, and related damages issues. As stated, there is substantial pre-trial discovery outstanding, including the depositions of many additional fact witnesses and experts. Although the Debtors originally estimated that trial costs defending the Florida Action could reach $2 million, subsequent to Dr. Gutman's death it is possible that those costs could increase significantly. Moreover, the Plaintiffs have asserted additional post-petition claims arising from Dr. Gutman's death, which they assert would be entitled to administrative expense priority.

27.     Because all defense costs incurred defending the Florida Action would represent administrative expenses against the Debtors' estates, the Debtors believe that the Settlement Agreement represents a resolution of the Florida Action that is half as expensive to the estates than the alternative, even if the Debtors were to be completely successful in defending the Florida Action. The Debtors therefore believe the Settlement Agreement is in the interest of their estates.

28.     <u>The paramount interest of the creditors</u>. The Debtors believe that the Settlement Agreement represents a substantial cost savings to the Debtors by limiting the Debtors' potential liability, and by containing the Debtors' out of pocket costs well below those costs that would likely be incurred in defending the Florida Action. The Settlement Agreement is effectively a defense cost settlement under which the Debtors pay $1 million to avoid up to $2 million in administrative priority expenses, plus avoid any exposure to the additional $1 million in self-insured retention. Accordingly, the Debtors believe that the Settlement Agreement is in best interest of the Debtors' estates and their creditors.

**B.    The Settlement Agreement is a Sound Exercise of Business Judgment**

29.     Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Under the applicable law in this and other Circuits, if a debtor's proposed use of the debtor's assets pursuant to section 363(b) is supported by the debtor's reasonable business judgment, such use should be approved. <u>See, e.g.</u>, <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 395 (3d Cir. 1996) (citing <u>In re Schipper (Fulton State Bank v. Schipper)</u>, 933 F.2d 513, 515 (7th Cir. 1991)); <u>Stephens Indus., Inc. v. McClung</u>, 789 F.2d 386, 390 (6th Cir. 1986); <u>In re Lionel Corp. (Comm. of Equity Security Holders v. Lionel Corp.)</u>, 722

12

46429/0001-6112087v1

F.2d 1063, 1070 (2d Cir. 1983); In re Delaware & Hudson R.R. Co., 124 B.R. 169, 176 (Bankr. D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought under section 363(b)).

30.     Under the business judgment standard, the debtor must establish that a valid business purpose exists for the use of the debtor's assets in a manner outside of the debtor's ordinary course of business. See Lionel Corp. 722 F.2d at 1071. Once the debtor establishes a valid business justification for the proposed use of the debtor's assets, it is presumed that the decision was made "on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule therefore shields a debtor's management from judicial second-guessing and mandates that a court approve a debtor's business decision unless that decision is the product of bad faith or gross abuse of discretion. See id.; see also Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("the Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"); see also Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

31.     For the reasons articulated above, the Debtors believe, in their business judgment, that the Settlement Agreement is in the best interests of the Debtors' estates and creditors. During the course of the Mediation, both the Debtors and the insurer exchanged views as to the merits of the Debtors' positions in the Florida Action and ultimately reached an agreement with the Plaintiffs through informed, good faith negotiations. After apprising

13

themselves of relevant risks and costs associated with potential litigation in the Florida Action, the Debtors and their insurer concluded that the terms of the Settlement Agreement were a good deal. By the Settlement Agreement the Debtors incur out of pocket expenses that are half the estimated defense cost expenses, and one-third the overall potential exposure.

C.  **Payment of the Total Settlement Amount Should Not be Subject to the "Necessity of Payment Rule"**

32. The Debtors' submit that approval of the terms of the Settlement Agreement, including immediate payment by the Debtors' of $1 million, should not depend upon application of the "Necessity of Payment Rule". Under normal circumstances, the payment of prepetition claims to creditors before confirmation of a plan requires a showing that payment is "essential to the continued operation of the business." In re Columbia Gas Sys., 171 B.R. 189, 192 (Bankr. D. Del. 1994) (citing In re Lehigh & N.E. R. Co., 657 F.2d 570, 581 (3d Cir. 1981)). The Debtors submit, however, that the necessity of payment test should not apply, as in this case the Debtors' $1 million payment is to avoid the administrative expense of defense costs and to obtain a release of potential post-petition damage claims. This Court has made it clear that claims such as the Gutman's will not be liquidated in this Court, and that the Court does not want to allow the automatic stay to delay the liquidation of disputed claims. The Debtors believe that if the automatic stay were to be fully lifted, the state judge in the Florida Action would set trial for some time in the next eight or ten months. As disclosed above, the Debtors believe that the costs of defending the Florida Action will range as high as $2 million, all of which will represent post-petition administrative expenses. In addition, the Settlement Agreement and accompanying

46429/0001-6112087v1

releases completely resolve any of the alleged post-petition claims associated with or arising from Dr. Gutman's suicide.[6]

33. The Debtors believe that the Settlement Agreement therefore represents settlement of two types of post-petition liabilities. Therefore, the Debtors believe that the necessity of payment rule should not apply to the Settlement Agreement.

34. For the reasons set forth above, the Debtors submit that it is in the best interests of their estates for the Court to approve the Settlement Agreement.

## NOTICE

35. Notice of this Motion has been provided to: (i) counsel for the Plaintiffs; (ii) the Office of the United States Trustee; (iii) counsel for the Committee; (iv) counsel for the Steering Committee for the Debtors' prepetition loan facilities; (v) counsel for the administrative agent for the Debtors' postpetition financing facility; (vi) Chubb Insurance Group; and (vii) all parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary

---

[6] Although the Debtors adamantly deny any liability for the death of Dr. Gutman, the Debtors acknowledge that the Settlement Agreement fully resolves and releases the Debtors from any post-petition claims the Plaintiffs may assert arising from Dr. Gutman's death.

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as <u>Exhibit A</u>, approving the Settlement Agreement, authorizing the Debtors to perform all of their obligations in connection therewith, and granting such other and further relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
      November 11, 2009

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Kerriann S. Mills
Geo. Tyler Coulson
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

46429/0001-6112087v1