# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Hearing Date: December 1, 2009 at 10:00 a.m. EST**<br>**Objection Deadline: November 20, 2009 at 4 p.m. EST**<br>**Related to Docket Nos. 2407 and 2413** |

## DEBTORS' RESPONSE TO MOTION OF LAW DEBENTURE TRUST COMPANY OF NEW YORK TO TERMINATE DEBTOR AFFILIATES' UNDISCLOSED PAYMENT OF LBO LENDERS' FEES AND EXPENSES, FOR AN ACCOUNTING, AND FOR DISGORGEMENTS OF PAST PAYMENTS

The debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and collectively, the "Debtors"), by and through their undersigned counsel, hereby file this response (the "Response"), to the Motion of Law Debenture Trust Company of New York ("Law Debenture") to Terminate Debtors Affiliates' Undisclosed Payment of LBO

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

CHI 5070261v.4

Lenders' Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments (the "Motion"). In response to the Motion, the Debtors respectfully state as follows:

**PRELIMINARY STATEMENT**

The Motion ignores certain critical facts necessary to the resolution of the Motion.

First, the Motion puts at issue payments made by a non-debtor (specifically, Tribune (FN) Cable Ventures, Inc. ("TCV")) pursuant to the terms of a contractual guarantee which has been in place since June 4, 2007. TCV is not the subject of a chapter 11 case and none of the monies used to fund these payments were obtained from or generated by any of the Debtors during their chapter 11 cases. Further, the Debtors' bankruptcy cases do not relieve TCV or any of the other the non-debtor guarantors from performing under their pre-existing contractual commitments, and nothing in the Bankruptcy Code or Bankruptcy Rules requires Court approval prior to a non-debtor continuing to perform under its pre-existing contractual commitments. Finally, while they may share certain senior management in common, the Debtors and non-debtors are separate and distinct legal entities. The guarantees of the subsidiaries, including TCV, were entered into with all requisite corporate authorization, and contrary to the allegations in the Motion, the payments were consistent with TCV's independent legal obligations.[2]

Second, the payments were not in any respect "surreptitious" or "concealed." Payments of the fees of the agent to the senior lenders ("Agent") and of the senior lender steering committee ("Steering Committee") commenced only after (i) the Debtors insisted upon full disclosure of the proposed payments to both the Official Committee of Unsecured Creditors

---

[2] Further, while not necessary to the disposition of the Motion, it is important to note that valid business reasons existed for the non-debtor guarantor payments, just as there were valid business reasons for certain subsidiaries not to participate in the Debtors' bankruptcy filings. Creditor enforcement action (including an involuntary bankruptcy) could cause substantial harm to these enterprises, certain of which are extremely valuable.

2

("Committee") and the Office of the United States Trustee ("U.S. Trustee"), and (ii) the Debtors received confirmation that neither the Committee nor the U.S. Trustee objected to the commencement of the payments. The disclosure to the Committee, in particular, must be viewed in a context where the Committee contains members representative of virtually every major constituency in these cases and also includes among its members Deutsche Bank Trust Company Americas ("Deutsche Bank"), which served as indenture trustee for almost all issuances of Tribune's public notes, including those notes currently represented by Law Debenture. At no time did Deutsche Bank indicate to the Debtors or their affiliated non-debtors any objection to the payments. Law Debenture succeeded Deutsche Bank as indenture trustee for one of the Tribune's four public note indentures commencing June 8, 2009, and thus stands in Deutsche Bank's shoes as successor indenture trustee.[3]

As the Response will demonstrate and contrary to the Motion's allegations, the actual facts are straightforward, the Debtors' and non-debtors' conduct proper and transparent and the payments in question legally appropriate.

## FACTUAL BACKGROUND

**A.    The Non-Debtor Guarantors**

1.    On December 8, 2008 (the "Petition Date"), Tribune Company ("Tribune") and 110 subsidiaries commenced these cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Due to business considerations -- in particular the potentially adverse impact that a chapter 11 filing might have on these enterprises -- not all Tribune subsidiaries participated in the chapter 11 filings. For

---

[3] Deutsche Bank was, inter alia, the indenture trustee for the 6.61% debentures due 2027 and the 7/14% debentures due 2096, which are now represented by Law Debenture as indenture trustee. Law Debenture presently represents approximately 18% of Tribune's outstanding public notes. Deutsche Bank continues to serve on the Committee in its capacity as Indenture Trustee for the remaining public notes other than the Exchangeable Subordinated Debentures due 2029 (a/k/a, the "PHONES").

example, Chicago National League Ball Club, LLC (i.e., the "Chicago Cubs") did not participate in the Debtors' bankruptcy filings based on, among other reasons, the potential impact of a bankruptcy on the day to day operations of a major league baseball franchise and the ongoing negotiations toward a transaction involving the Chicago Cubs.[4] Likewise, other Tribune subsidiaries -- such as Tribune Interactive and TCV, which holds an interest in the Food Network -- are participants with third parties in privately held joint ventures. These subsidiaries were excluded from the Debtors' bankruptcy filings in order to avoid any risk of disruption to joint venture business operations and damage to relationships with third party partners or LLC members.

        2. These non-debtor subsidiaries, together with most of the Debtors, have guaranteed Tribune's "Obligations" to its senior lenders under a May 17, 2007 credit agreement (the "Credit Agreement") pursuant to guaranty agreements entered into in June 2007 (the "Guarantees").[5] In such capacity, the non-debtor guarantors agree to be primary obligors with independent contractual liability for the payment and performance of all "Obligations" under the Credit Agreement. The Obligations include all accrued and unpaid fees and "all expenses, reimbursements, indemnities and other obligations of the Loan Parties [i.e., the Borrower and each Guarantor] to the Lenders ... (including interest and fees accruing after commencement of any bankruptcy or insolvency proceeding against any Loan Party, whether or not allowed in such

---

[4] As the Court is aware, Chicago National League Ball Club, LLC (n/k/a Tribune CNLBC, LLC) filed a chapter 11 petition on October 12, 2009 solely in order to conclude the transaction involving the Chicago Cubs major league baseball franchise.

[5] The non-Debtor subsidiaries who are guarantors are: Chicago National League Ball Club, LLC. (n/k/a Tribune CNLBC, LLC); Tribune (FN) Cable Ventures, Inc.; Tribune Interactive, Inc.; Tribune National Marketing Company; and Tribune ND, Inc.

proceeding)."[6] The non-debtors' liability under the Guarantees was not relieved or altered by the filing of the Debtors' bankruptcy cases.

**B.      Request for Payments**

3.      Shortly after the commencement of the Debtors chapter 11 cases, JP Morgan Chase, in its capacity as Agent under the Credit Agreement, requested that reimbursable fees and expenses under the Credit Agreement be paid by the non-debtor guarantors. Specifically, the Agent requested reimbursement of those fees and expenses incurred by (i) counsel and financial advisors to the Agent and (ii) counsel and financial advisors to the Steering Committee and certain other lenders (collectively, the "Lender Fees"). This request was evaluated in the context of the non-debtors' independent contractual liability, as well as the concerns, noted above, that the value of the non-debtor entities be protected and maintained.

4.      After several weeks of discussions, the Agent's request was addressed in the following manner: In return for commencement of payment by non-debtors of the Lender Fees, the Agent agreed to address the potential for enforcement action by the Bridge lenders[7] by delivering a "Payment Blockage Notice" to the Bridge facility Agent. Such a notice would preclude potential enforcement action by the Bridge lenders against the non-debtor guarantors. This approach was fully consistent with the pre-existing contractual guarantee obligations of the non-debtors, and significantly mitigated the risk of enforcement action against the non-debtors.

---

[6] Section 8.04(a) of the Credit Agreement requires the payment, following demand, of "all reasonable and documented out-of-pocket costs and expenses of the Agent ... and the Lenders, if any (including, without limitation, reasonable and documented counsel fees and expenses), in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of this Agreement, the Notes and the other documents to be delivered hereunder ...."

[7] The Bridge lenders are those lenders participating in the Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, Merrill Lynch Capital Corporation as agent and the lender signatories thereto. The loan obligations to the Bridge lenders are also guaranteed by the same subsidiaries which have guaranteed the Obligations under the Credit Agreement, but the Bridge guaranty is subordinated to the Guarantee in favor of the senior lenders.

C.  **Disclosure to the Committee and the U.S. Trustee**

5. The conclusion that non-debtors' payments to the Agent and Steering Committee were appropriate did not by itself result in the commencement of such remittances. Prior to the payment of any amounts, the Debtors insisted that both the Committee and the U.S. Trustee be apprised of the proposed payments and that the Debtors confirm that neither objected to the payments. The Debtors' counsel contacted the Committee's counsel in January, 2009 and described the proposal. Discussions between the Agent and Committee regarding the proposed payments ensued and culminated in an agreement reflected by an email exchange on February 27, 2009 between counsel for the Committee and counsel for the Agent, of which the Debtors were provided a copy. In this email exchange, the Committee confirmed that it had no objection to the payment of Lender Fees by non-debtors, including a $7.5 million retainer, subject to certain conditions to which the Agent agreed. These conditions included that (i) the Agent and Steering Committee would seek reimbursement of the reasonable fees and expenses of only the following specified professionals of the Agent and/or certain members of the senior lender Steering Committee (the "Reimbursed Professionals"):[8] Davis Polk & Wardwell ("DPW"), Richards, Layton & Finger, FTI Consulting, Blackstone Advisory Services ("Blackstone") and Kramer Levin Naftalis & Frankel; (ii) the lenders would provide to the Committee quarterly summaries of all fees; (iii) the Agent and/or the Debtors would notify the U.S. Trustee of the non-debtors' intent to reimburse such professional fees before any payment was made; and (iv) in respect of Blackstone, the retainer would not be used for the payment of a proposed "Restructuring Fee." In addition, the Committee required notification prior to payment of the

---

[8] Certain additional professionals, including Wiley Rein LLP, FCC counsel to the Agent, Huron Consulting Group and Epiq eDiscovery Solutions, Inc. were later included in this group.

6

Restructuring Fee and preserved all rights it might otherwise have to object on any basis.[9] A copy of the February 27 email exchange is attached hereto as <u>Exhibit A</u>. The Debtors understood that the full Committee was apprised of and voted on the Agent's request for payment of the Lender Fees.

6.  In late February, 2009, after receiving confirmation from the Committee that it had no objection to the proposed payments, the Debtors' counsel communicated the proposed agreement to the U.S. Trustee. This communication was followed by a March 4, 2009 email from Debtor's counsel to the U.S. Trustee which included a short analysis of the contractual and legal support for the proposed payments and by a further communication confirming, pursuant to the U.S. Trustee's request, that any proposed future payment of a Blackstone success or transaction fee would be communicated to the U.S. Trustee before payment was made. By email dated as of March 10, 2009, the U.S. Trustee acknowledged receipt of the forgoing notification and stated "to the extent that we have something to communicate to you on this point, we will do so." Copies of these email communications are attached hereto as <u>Exhibit B</u>. No further communication on this topic was thereafter received by the Debtors from the U.S. Trustee. The Debtors understood, based upon verbal communications as well as the emails, that the U.S. Trustee's March 10 email meant the U.S. Trustee did not object to the proposed fee payments. The non-debtors thereafter commenced payment of the Lender Fees on the terms disclosed to the Committee and the U.S. Trustee.

**D.    Creditor Notice and Reporting**

7.  Payments of the Lender Fees to date have been made only by TCV, a non-debtor guarantor, and have been made only to the Reimbursed Professionals. The Debtors'

---

[9] No Tribune entity, Debtor or non-debtor, was a signatory to the engagement letter between Blackstone and the Agent.

financial advisors provide regular weekly and monthly reporting to the Committee's advisors, which includes any Lender Fee payments made in the prior period.

8.      Further, the Motion mistakenly suggests that the Debtors' Rule 2015.3 reports have been manipulated to avoid reporting the payment of the Lender Fees. To the contrary, the Debtors have met their reporting requirements under the Rule, having filed and served Rule 2015.3 reports for both their wholly owned non-debtor affiliates (other than the Chicago Cubs entities, which were excused pursuant to Court order) and the "Non-Majority Interest Entities" in which the Debtors directly hold a 20% or greater interest. On July 29, 2009, the Rule 2015.3 reports for the wholly-owned non-debtors, including TCV, were filed and served on all creditors included in the Debtors' Rule 2002 notice list. Following the entry of an order on September 2, 2009 establishing a Rule 2015.3 reporting protocol, the Debtors filed and served Rule 2015.3 reports for the Non-Majority Interest Entities.[10]

9.      Notwithstanding the implications to the contrary in the Motion, the reporting requirements mandated by Rule 2015.3 are not synonymous with those for the Debtors' monthly operating reports. While Bankruptcy Rule 2015.3 contains various financial reporting requirements for non-debtors, those requirements do not include a break out of professional fee payments or other specific line item expenses. Indeed, Official Form 26 (the form required for Rule 2015.3 reporting) contains no schedule or other entry for such fee payments.[11] The Debtors

---

[10] Between February and August 2009, the Debtors filed a motion and several supplements seeking to extend and to excuse or modify, for cause, certain of Rule 2015.3's reporting requirements. During this time the Debtors both met with and conferred telephonically and by email with the U.S. Trustee to address specific confidentiality and commercial/competitive concerns arising from Rule 2015.3's financial reporting requirements as they pertained to the Chicago Cubs and the Non Majority Interest Entities. After months of dialogue with the U.S. Trustee, an order was entered without objection on September 2, 2009, [D.I. 2072] establishing the Debtors' Rule 2015.3 reporting protocol. Contrary to Law Debenture's "beliefs," the Debtors have not "omitted" compliance with their Rule 2015.3 reporting obligations. The Debtors have fully complied with such obligations.

[11] Nevertheless, information pertaining to the Lender Fee payments is included within the financial statements required by Rule 2015.3. TCV's financial statements included, within the appropriate line items, such information as (a) a net non-operating loss on the income statement of $8.1 million, reflecting Lender Fees accrued or paid

have fully complied with the reporting required under Rule 2015.3 and their reports have been filed with the Court and served on the Debtors' regular notice list.

10. To date, Lender Fees totaling $23.7 million have been remitted by TCV.[12] The remittances are not intended to include any fees or expenses incurred by the Agent in its capacity as a member of the Committee.

11. The Debtors and non-debtors have made no post-petition commitments to continue reimbursement of the Lender Fees. Further, the Debtors and non-debtors have continued to evaluate and weigh the benefits of remitting these amounts, and reserve the right to cease payments, should it be appropriate to do so.

## LEGAL ARGUMENT

### A. The Lender Fee Payments by TCV Did Not Require Court Authorization

12. Law Debenture's entire argument hinges on blurring the corporate separateness of the Debtors and non-debtors. No factual basis or legal support is to be found anywhere in the Motion for Law Debenture's conclusory allegations that the Debtors are legally responsible for the Lender Fee payments. While the allegations are clearly meant to serve as a basis for bringing the payments within the Court's purview, it nevertheless remains black letter law that the autonomy and independent corporate existence of distinct legal entities must be respected. See In re South Jersey Land Corp., 361 F.2d 610, 613-14 (3d Cir. 1966); Red Bell Brewing Co. v. GS Capital, L.P. (In re RBGSC Inv. Corp.), 242 B.R. 851, 859 (Bankr. E.D. Pa. 2000) ("[A] corporation is a legal entity which is ordinarily deemed to be separate and distinct from its officers, directors, and stockholders and must be upheld unless there are specific circumstances which call for an exception to this rule.") (citing Zubik v. Zubik, 384 F.2d 267,

---

through June 28, and (b) the $7.5 million retainer within "prepaid and other expenses" on the balance sheet.

[12] Prior to the Petition Date, Tribune paid a $2 million retainer to the Agent. Approximately 50% of this retainer was applied to pre-petition professional services and the balance was applied to post-petition services.

273 (3d Cir. 1967); V.I. Tel. Corp. v. Rural Tel. Fin. Coop., et al., 2006 U.S. Dist. Lexis 5943 at *14 (D.V.I. 2006) (same). The Debtors have not made the Lender Fee payments and estate assets were not used in TCV's satisfaction of its own contractual liabilities. Therefore, Bankruptcy Court authorization is not required for (or even implicated by) TCV's payment of Lender Fees, and the authorities cited in the Motion, all of which pertain to debtors and property of the estate, are inapposite.

**(1)    TCV Had an Independent Contractual Obligation Under the Guarantee, Which was Not Impacted By the Debtors' Bankruptcy Filing**

13.    The case law is unambiguous that non-debtor guarantors remain liable under the terms of a guarantee regardless of whether the bankruptcy proceedings of a primary obligor disallow, discharge, or release payment of fees, expenses, or postpetition interest as to a debtor. A guarantor's liabilities are unaffected by the bankruptcy proceeding. See, e.g., 11 U.S.C. § 524(e) ("[D]ischarge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."); Credit Suisse First Boston Mortg. Capital LLC v. Cohn, 2004 U.S. Dist. LEXIS 16577, at *24-26 (S.D.N.Y. Aug. 19, 2004) (holding non-debtor guarantors liable for postpetition interest, fees, and costs incurred in collecting under the Loan Agreement and Guaranty); VFB L.L.C. v. Money's Trust (In re VF Brands, Inc.), 282 B.R. 134, 138 (Bankr. D. Del. 2002) ("Non-debtors are generally not entitled to releases or discharges of direct claims against them simply because a co-obligor is in bankruptcy."); In re Southco, Inc., 168 B.R. 95 (Bankr. D.S.C. 1994) (ordering non-debtor guarantor to reimburse a lender for amounts that the lender was required to disgorge to the trustee under section 549, plus the lender's attorney's fees and costs); Nat'l Energy & Gas Transmission, Inc. v. Liberty Electric Power, LLC (In re Nat'l Energy & Gas Transmission, Inc.), 492 F.3d 297, 303, n.5 (4th Cir. 2007) (citing In re Stoller's, Inc., 93 B.R. 628, 635 (Bankr.

N.D. Ind. 1988) (non-debtor guarantors liable for postpetition interest and attorney's fees according to the terms of the guarantee)).[13]

### (2) Bankruptcy Court Authorization of the Lender Fee Payments Was Not Required

14. The Debtors are aware of no authority (and none is cited by Law Debenture) for the proposition that non-debtors must come before the Bankruptcy Court to obtain authorization to satisfy their independent contractual obligations with their own funds. The authorities relied upon in the Motion are inapposite, as they apply to debtors and estate property. Accordingly, they simply have no relevance to the facts before the Court.[14]

15. For example, Law Debenture claims that the Lender Fee payments "violated" Bankruptcy Code section 363(b). However, it is axiomatic that section 363 only applies to property of a debtor's estate. See 11 U.S.C. § 363(b)(1) (providing that a trustee "may use, sell or lease, other than in the ordinary course of business, property of the estate."); see also In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[I]n order for asserts to come within the auspices of § 363, they must be property of the estate."). It is likewise

---

[13] Law Debenture alleges, without support, that the Debtors could have obtained protection from the Bankruptcy Court through an injunction or extension of the automatic stay. (Motion, p. 3). This allegation ignores well settled law holding that the automatic stay does not apply to non-debtor guarantors. See, e.g., McCartney v. Integra Nat'l Bank North, 105 F.3d 506, 509-10 (3d Cir. 1997) (noting clear language of section 362(a) only applies to debtors); Maintainco, Inc. v. Mitsubishi Caterpillar Forklift Am., Inc. (In re Mid-Atlantic Handling Sys., LLC), 304 B.R. 111, 128 (Bankr. D.N.J. 2003) ("[A]utomatic stay is generally not available to non-bankrupt co-defendants ...."); In re Aldan Indus., Inc., 2000 WL 357719, at *3 (Bankr. E.D. Pa. Apr. 3, 2000) ("[A]s a general rule, the automatic stay does not affect proceedings against guarantors.") (unpublished decision); Spirco, Inc. v. Copelin (In re Spirco, Inc.), 221 B.R. 361, 370 (W.D. Pa. 1998) (stating that guarantor's contractual obligation is "usually unaffected by bankruptcy proceedings"). See also Lynch v. Johns-Manville Sales Corp., 710 F.2d 1194, 1196 (6th Cir. 1983) (stating that the stay is not ordinarily extended to "entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the chapter 11 debtor"). In addition, injunctive relief is granted only under a "narrow exception" and in "unusual circumstances," not present here. See McCartney, 105 F.3d at 510; Mid-Atlantic, 304 B.R. at 129; Aldan Indus., 2000 WL 357710, at *4.

[14] Additionally, Law Debenture's reliance on the creditor committee motion from In re Freedom Communications Holdings, Inc., (See Motion, n.5 and Exhibit A to the Motion) is misplaced, as that motion was denied by Judge Shannon on or about October 30, 2009. See Order Denying Motion of the Official Committee of Unsecured Creditors for Reconsideration of Interim Order (I) Authorizing Use Of Prepetition Lenders' Cash Collateral, (II) Granting Adequate Protection, and (III) Scheduling Final Hearing, Case No. 09-13046 (BLS) (Bankr. D. Del. Oct. 30, 2009) [D.I. 366].

axiomatic that assets of a non-debtor subsidiary or affiliate do not constitute property of the debtor's estate. In re Beck Indus., Inc., 479 F.2d 410 (2d Cir. 1973); V.I. Tel Corp. v. Rural Tel. Fin. Coop., 2006 U.S. Dist. LEXIS 5943 (D.V.I. 2006) ("[I]t is well settled that absent unusual circumstances, the property of the debtor's subsidiary is not considered property of the debtor by virtue of the debtor's sole ownership of the subsidiary.").[15] Since assets of a non-debtor subsidiary are not property of the estate, section 363 as a whole, and section 363(b) in particular, provide no basis for requiring this Court's approval of the Lender Fee payments.[16]

16.     Law Debenture's other arguments are equally unpersuasive. The Motion's analogy to the Chicago Cubs' transaction, for example, misapprehends that the Chicago Cubs did become Debtors when necessary to consummate a section 363 transaction in which their assets were contributed, "free and clear," to a new joint venture. The Chicago Cubs analogy does not, therefore, provide a "similar factual predicate" (Motion, ¶ 32) for the payment by non-debtors of their own contractual liabilities. Likewise, Law Debenture's argument that court authorization was required based on Bankruptcy Code sections 503 and 506 is also misplaced. Like section 363, sections 503 and 506 by their terms apply to the use of estate property. They have no application to these facts.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

---

[15] The case cited by Law Debenture in support of its argument to the contrary, In re Consolidated Auto Recyclers, Inc., 123 B.R. 130 (Bankr. D. Me. 1991), concerns the trustee's use of the debtor's stock in its subsidiary (clearly an estate asset), and not the subsidiary's assets. As with other authority relied upon by Law Debenture, this case has no relevance to the payments in issue.

[16] Furthermore, and apart from being factually unsupported, Law Debenture's speculation that funds not otherwise used to make the Lender Fee payments would somehow "increase the value of [TCV's] parent companies and ultimately Tribune" is similarly irrelevant. See Equity Broadcasting Corp. v. Shubert (In re Winstar Communications, Inc.), 284 B.R. 40, 51 (Bankr. D. Del. 2002) (court dismissed third-party complaint against non-debtor subsidiary for lack of jurisdiction, even though lawsuit could have an effect on value of debtor's estate, observing "if the court were to find that this action was under the jurisdiction of the Bankruptcy Court, the decision would have the result of bringing every wholly owned subsidiary into every bankruptcy case . . . .")

Dated: Wilmington, Delaware  
November 20, 2009

Respectfully submitted,

SIDLEY AUSTIN LLP  
James F. Conlan  
Bryan Krakauer  
Janet E. Henderson  
Jillian K. Ludwig  
Gregory V. Demo  
One South Dearborn Street  
Chicago, Illinois 60603  
Telephone: (312) 853-7000  
Facsimile: (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,  
FORMAN & LEONARD, P.A.

By: /s/ Kate Stickles  
Norman L. Pernick (No. 2290)  
J. Kate Stickles (No. 2917)  
Patrick J. Reilley (No. 4451)  
500 Delaware Avenue, Suite 1410  
Wilmington, Delaware 19801  
Telephone: (302) 652-3131  
Facsimile: (302) 652-3117

ATTORNEYS FOR DEBTORS  
AND DEBTORS IN POSSESSION