**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------x
| | | |
|---|---|---|
| In re: | : | Chapter 11 Cases |
| | : | Case No. 08-13141 (KJC) |
| **TRIBUNE COMPANY, et al.,** | : | (Jointly Administered) |
| | : | |
| Debtors. | : | Hearing Date:  December 1, 2009 |
---------------------------------------------------x  Objections Due:  November 24, 2009[1]

**LAW DEBENTURE TRUST COMPANY
OF NEW YORK'S RESPONSE TO THE DEBTORS'
MOTION TO EXTEND THEIR EXCLUSIVITY PERIODS**

Law Debenture Trust Company of New York ("Law Debenture" or the "Trustee"), as successor indenture trustee under that certain Indenture dated March 19, 1996 between Tribune Company (with its debtor subsidiaries, "Tribune" or the "Debtors") (successor to The Times Mirror Company) and Citibank, N.A., for the 6.61% Debentures due 2027 and the 7 1/4 % Debentures due 2096 (as amended, the "Indenture"), as fiduciary for the interests of certain of the Debtors' pre-LBO Senior Noteholders, respectfully responds to the Debtors' motion to extend their exclusivity periods as follows:

**PRELIMINARY STATEMENT**

The 2007 leveraged buy out of Tribune Company (the "LBO") undoubtedly greatly contributed to, if not caused, the Debtors' demise.  No reasonable person can honestly assert otherwise.  Had Tribune maintained its pre-LBO debt level (approximately $5.3 billion) rather than the LBO's obviously unsustainable resulting $14.7 billion in debt, Tribune likely would have survived the known, apparent, and predicted major decline in the newspaper business.  In

---

[1] By agreement, the Debtors extended Law Debenture's time within which to respond to the Debtors' exclusivity motion until November 24, 2009 at 4:00 p.m. EST.

1

fact, had Tribune simply paid heed to the year over year 40% drop in operating profit that it experienced while actually conducting the LBO, the company likely would have survived. It did not.

Remedying the LBO's damage to Tribune and its creditors should have been among the most compelling aspects, if not the most compelling aspect, of Tribune's bankruptcy. However, after almost one year in chapter 11, the LBO has just recently become a gating item in connection with Tribune's emergence from chapter 11, with Tribune now asserting that it wants to act in accordance with the Bankruptcy Code by brokering a resolution of the LBO-related claims among its primary creditor constituencies. Yet, it is not clear that Tribune will exercise its statutory mandate. Although Law Debenture hopes that this is not the case, a plain reading of the exclusivity motion indicates that, should the parties not reach an agreement, Tribune's intention may be to force a plan "settlement" over the LBO-harmed creditors' dissent. That would not be a proper use of exclusivity.

To be clear, Law Debenture supports Tribune's continued exclusivity in accordance with the interests of its pre-LBO senior noteholders. Accordingly, Tribune must not use this valuable, exclusive right simply to bury the LBO claims and prevent the assertion of meritorious or, at minimum, decidedly colorable LBO fraudulent transfer and related claims.

## BACKGROUND OF THE LBO

**A.    Pre-LBO Senior Notes.**

1.    Between 1992 and 1997, Tribune issued various notes and debentures, currently outstanding in the aggregate principal amount of approximately $1.26 billion (the "Senior

Notes," and the holders of such Senior Notes, the "Senior Noteholders").[2] When issued, the Senior Notes were unsecured obligations of Tribune, though their respective indentures require Tribune to grant equal and ratable liens for the benefit of the Senior Noteholders if Tribune granted liens to third parties. Law Debenture serves as indenture trustee in a fiduciary capacity for the Senior Noteholders under the Indenture.

**B.    The LBO.**

2.    In April 2007, Tribune's Board of Directors approved and Tribune commenced the LBO pursuant to which Tribune would cash out its existing shareholders and emerge with a new owner, the newly-formed Tribune Employee Stock Ownership Plan (the "ESOP"). Mr. Zell (who later called the Tribune LBO a "mistake") became a director on Tribune's Board of Directors on May 9, 2007 and Chairman of the Board and Chief Executive Officer on December 20, 2007. EGI-TRB, L.L.C., an entity formed for the benefit of Mr. Zell and his family received warrants to purchase approximately 40% of Tribune's common stock. Through this grant and his executive and Board positions, Mr. Zell continues to maintain control over Tribune today.

3.    To finance the LBO, Tribune borrowed (1) **$8.028 billion** under a senior secured credit agreement,[3] (2) **$2.105 billion** incremental facility under the credit agreement, and (3) **$1.6 billion** under an interim "bridge" facility; totaling **$11.7** billion, and with the pre-LBO debt left behind, **over $14 billion in total debt**. Mr. Zell contributed $315 million (roughly 2.6% of

---

[2] The Senior Notes include the 4.875% Notes due 2010, the 7.25% Debentures due 2013, the 5.25% Notes due 2015, the 7.5% Debentures due 2023, the 6.61% Debentures due 2027, the 7.75% Debentures due 2096, the 5.6% (average) Medium-Term Note due 2008, the 7.25% Notes due 2013 and the 6.25% Notes dues 2026.

[3] Tribune secured its obligations under the credit agreement only by the stock in two newly formed holding companies, Tribune Broadcasting Holdco LLC and Tribune Finance LLC. Tribune granted the Senior Notes equal and ratable liens on this stock. However, Tribune granted the banks subsidiary guarantees so as to render the banks structurally senior (presuming the guarantees are left unavoided) to the Senior Notes upon Tribune's eventual, predictable bankruptcy.

the "purchase price") and Tribune paid out close to $400 million in transaction "fees" and other payments to the banks and bankers who effectuated the transaction that leveraged Tribune to an unsustainable level.

4.      The Senior Notes were left behind -- literally left behind over $11 billion in crushing and clearly unsustainable debt.  Tribune used over **$8.3 billion** of its massive new debt to cash out shareholders without remote benefit to the Debtors while pre-existing creditors were left unpaid and with no prospect of being repaid.  In addition, Tribune granted the LBO banks guarantees at all material subsidiaries that, if left unavoided, ensure the banks' primacy over the Senior Notes.  These guarantees purportedly permit the banks to assert structural seniority over the Senior Notes by allowing the banks to seek to recover all of the subsidiaries' value prior to payment on the Senior Notes.  Tribune also put into place what appears to be a second layer of defense against payment of the Senior Notes through the artifice of the two intermediate holding companies, Tribune Broadcasting Holdco LLC and Tribune Finance LLC, each of which guaranteed the banks' obligations but were intended to have no other debt, so that the banks could stop an apparent fraudulent conveyance claim at these newly created guarantor/subsidiaries.  Tribune and its LBO banks (and advisors) appear to have designed the entire transaction structure to put the burden of Tribune's excess leverage and the risk of its survival on the Senior Notes.

5.      Before the LBO, Tribune's ratio of indebtedness to EBITDA was 4.8:1.  After the LBO, Tribune's ratio leapt to an extraordinary 11:1.  At that time, among other things, comparable diversified publishing companies were trading publicly at a significantly smaller average ratio of *total* enterprise value (debt *plus* equity) to EBITDA.

6.      As a result of the transaction, Tribune's bond ratings predictably plummeted, indicating the unlikelihood that Tribune could pay interest and repay principal because of its new debt burden.  For example, specifically with respect to the 5¼% notes, S&P and Moody's lowered the ratings to CCC+ and Caa2, respectively, whereas prior to the LBO the ratings were BB+ and Ba1, respectively.  According to Moody's, its Caa2 rating means the bonds are of "poor standing," "may be in default," or there "may be present elements of danger with respect to principal and interest."  Accordingly, the LBO forced both ratings agencies to doubt, correctly, the future viability of Tribune as a going concern.

## RESPONSE TO EXCLUSIVITY REQUEST

7.      To date, Tribune has failed to take full advantage of the bankruptcy process and its valuable chapter 11 rights and powers to undo the harm of the ill-advised LBO or to undertake a full operational restructuring.[4]  Rather it appears that Tribune initially viewed bankruptcy only as a program for a debt for equity exchange to give the LBO banks the entirety of the company.  Indeed, after only seven months, Tribune was poised to grant the Senior Notes only a minute amount of equity, turn itself completely over to the LBO banks, and most likely obtain releases for the parties that brought Tribune to its knees.  In some cases, perhaps those without the proximate and loss causation of a massive, virtually no money down LBO, a simple debt for equity approach may be appropriate.  But here it is not.

8.      Law Debenture acknowledges that Tribune recently has asserted that it wants to achieve an amicable resolution among the Senior Noteholders and the LBO banks with respect to

---

[4]     Tribune has used its time in chapter 11 to pay over $23.7 million in fees and expenses to its LBO banks outside of the purview of the Court. Law Debenture has raised with the Court this extraordinary matter by separate motion.

the LBO and the resulting claims. Law Debenture remains hopeful that it is Tribune's true desire to achieve this result. Assuming it is, if Tribune's efforts fail, these estates must be prepared to litigate the LBO-related claims through a properly motivated creditor like Law Debenture or other creditor constituency vested by this Court with the fiduciary status to do so.

9.  Tribune should use its requested exclusivity extension to ensure that the pre-LBO creditors recover appropriately from the harms borne on them by the LBO and to have Tribune emerge from bankruptcy with a fair capital structure based on its creditors' rights and their realizable recoveries. However, Tribune's exclusivity motion intimates the potential for a drastically different outcome. Tribune says that it would like there to be negotiation among the LBO banks and the Senior Notes, but failing a negotiated resolution, Tribune will seek to force one through a plan:

> The Debtors intend to file a Plan within the time period of the extended exclusivity period sought by this Motion. The Debtors' preferred solution in these cases is a consensual agreement among major constituencies encompassed in a Plan. Alternatively, the Debtors believe that the above described efforts will provide a framework that will position the Debtors to propose a Plan that provides for resolution of any remaining issues in a fair manner. In either event, it is the Debtors' goal to confirm a Plan that will avoid prolonged and expensive litigation that would cause significant harm to the Debtors and their estates.

Exclusivity Motion, ¶ 5. Tribune cannot be permitted to use the exclusivity it enjoys to file a plan that eliminates the meritorious LBO-related claims at the expense of the Senior Noteholders. That would be the LBO's second and final blow to the Senior Noteholders. Indeed, it is not clear to Law Debenture how a plan can resolve issues in a "fair manner" if the Senior Noteholders have not agreed to a proper resolution of the LBO-related claims or the claims have not been litigated. A settlement between the banks (the LBO defendants) and Tribune (whose equity would be owned by the LBO banks) that is

6

opposed by the Senior Noteholders cannot be a settlement and cannot be fair and equitable.

10. In chapter 11, Tribune suffers no specific operational harm (it is in fact performing better), there is no expiration of financing on which it relies, there is no passage of case milestones causing the loss of valuable rights, there is no termination of necessary exit financing commitments, nor is there any other exigency. In short, there is absolutely no rush for Tribune to publish and to prosecute an unfair plan. Under these circumstances it would be a failure of fiduciary conduct to bury the LBO claims within a forced plan settlement. Rather, absent agreement, the Court should permit properly motivated parties, vested with appropriate fiduciary authority, to bring the LBO claims.

11. To be clear, Law Debenture does not seek delay or the prosecution of unnecessary litigation. Law Debenture seeks only to ensure a fair recovery to Senior Noteholders based on proper recognition of their rights and recoveries from the meritorious LBO-related claims.

## **CONCLUSION**

12. For the foregoing reasons, Law Debenture respectfully request that this Court grant Tribune's exclusivity request upon Tribune's recognition that it should use this period to obtain consensual resolution of the LBO claims, or failing agreement, to enable the prosecution of the LBO claims.

| | |
|---|---|
| Dated: November 24, 2009<br>Wilmington, Delaware | Respectfully submitted,<br><br>By: /s/ Garvan F. McDaniel<br>**BIFFERATO GENTILOTTI LLC**<br>Garvan F. McDaniel (No. 4167)<br>800 N. King Street, Plaza Level<br>Wilmington, Delaware 19801<br>Tel:  (302) 429-1900<br>Fax:  (302) 429-8600<br><br>– and –<br><br>David S. Rosner<br>Andrew K. Glenn<br>Matthew B. Stein<br>Kasowitz, Benson, Torres & Friedman LLP<br>1633 Broadway<br>New York, New York 10019<br>Tel:  (212) 506-1700<br><br>*Co-Counsel for Law Debenture Trust Company*<br> *of New York* |