## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| TRIBUNE COMPANY, et al., | ) Case No. 08-13141 (KJC) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Re: Docket No. 2566 |
| | ) |
| | ) **Hearing date:** December 1, 2009, at 10:00 a.m. (Eastern) |
| | ) |
| | ) **Objection deadline:** November 24, 2009 |
| | )                              (as extended by the Debtors) |
| | ) |
| | ) |

### CREDIT AGREEMENT LENDERS' OBJECTION TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. § 1121(d) FURTHER EXTENDING DEBTORS' EXCLUSIVE PERIODS WITHIN WHICH TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF

The Credit Agreement Lenders,[1] as holders of approximately $4.4 billion principal amount of indebtedness arising under the Tribune Company Senior Secured Credit Agreement, dated as of May 17, 2007 (as amended, the "Credit Agreement"), hereby *object* to the "Motion For An Order Pursuant To 11 U.S.C. § 1121(d) Further Extending Debtors' Exclusive Periods Within Which To File A Chapter 11 Plan And Solicit Acceptances Thereof" (the "Motion") filed by Tribune Company ("Tribune") and its various debtor subsidiaries (the "Subsidiary Debtors" and, with Tribune, the "Debtors"), to the extent that the Motion requests an extension of exclusivity for the Subsidiary Debtors.

### PRELIMINARY STATEMENT

The Debtors state that "most of the prerequisites to the filing of a Plan have been accomplished," noting that they have stabilized their businesses, achieved "profitable operating results exceeding those of most of the Debtors' newspaper and broadcasting peers," developed a multi-year business plan and proposed post-reorganization capital structure, completed "extensive operational, financial and legal analyses related to the Plan," and made "substantial

---

[1]    The Credit Agreement Lenders are the entities identified on *Exhibit A* hereto.

progress" on "most of the 'case administration' tasks required to bring these cases to a conclusion. Motion ¶ 1.

A year into these cases, why then the need for yet another extension of plan exclusivity? The Debtors give only one reason: "at this juncture the principal remaining task to be addressed is to bring the review of the prepetition Leveraged ESOP Transactions to a prompt conclusion." *Id.* ¶ 2. Specifically, the Debtors assert that resolution of alleged issues regarding those transactions is necessary to avoid "the destabilization and enormous expense attendant to warring creditor factions and protracted litigation." *Id.* ¶12.

In one important respect, the Debtors are wrong. They have failed to inform the Court that the Credit Agreement Lenders have proposed and agreed to a reorganization of the Subsidiary Debtors – the entities that actually operate the Debtors' various businesses – in which all known claims other than those arising under the Credit Agreement would be paid in full or unimpaired, with holders of Credit Agreement claims (including the Credit Agreement Lenders) voluntarily taking a combination of debt and equity in satisfaction of their claims against the Subsidiary Debtors. This Subsidiary Debtor reorganization would produce two incontrovertible benefits. *First*, it would enable the operating businesses to exit bankruptcy rapidly, removing the ongoing harm to those businesses occasioned by these lengthening proceedings. *Second*, it would constrain disputes over the Leveraged ESOP Transactions to the case of parent-entity Tribune, whose creditors (and whose creditors alone) are the only constituents agitating for the "protracted litigation" feared by the Debtors. *See, e.g., Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80, 92-97 (S.D.N.Y. 2008) (dismissing fraudulent conveyance and avoidance actions where plan or reorganization pays creditors of the subsidiary debtors in full).

Since the Debtors have declined to pursue a Subsidiary Debtor reorganization along the lines proposed by the Credit Agreement Lenders, the Motion should be denied so that the Credit Agreement Lenders themselves have the opportunity to proceed with a plan of reorganization that should win unanimous or near unanimous acclaim and approval of the Subsidiary Debtor creditors whose claims would be treated in such a plan.

- 2 -

## BACKGROUND

Tribune has nearly 130 subsidiaries, of which approximately 110 are Subsidiary Debtors. *See* Affidavit Of Chandler Bigelow III, Senior Vice President And Chief Financial Officer Of Tribune Company In Support Of First Day Motions [docket # 3] (the "Bigelow Aff."), ¶ 16.

Substantially all of the Tribune enterprise business operations are conducted by its subsidiaries, including the Subsidiary Debtors. Tribune's subsidiaries own and operate the *Los Angeles Times*, the *Baltimore Sun*, *Newsday*, WPIX in New York, WGN in Chicago, and KTLA in Los Angeles, among many other media properties. Tribune itself does not conduct any business that actually has customers. Instead, it provides varying amounts of direction and support to the subsidiaries in exchange for reimbursement of costs and overhead.

Tribune's subsidiaries account for nearly 100% of the Tribune enterprise revenue and EBITDA. For example, in fiscal year 2007, the Tribune enterprise recorded revenues of approximately $5.1 billion, in which the publishing segment contributed approximately 72% of the Tribune enterprises' revenue and the broadcasting/entertainment segment contributed approximately 28%. Bigelow Aff. ¶ 11.

Many of the most significant Subsidiary Debtors are guarantors of debt governed by Credit Agreement. Bigelow Aff. ¶ 18. That indebtedness, which exceeds $8.5 billion (over half of which is held by the Credit Agreement Lenders), constitutes the largest claims against those entities. In contrast, allowable trade claims against the Subsidiary Debtors have been estimated at less than $150 million.

Tribune itself has more than $1.25 billion in bonds and notes, plus approximately $900 million in exchange subordinated debentures (known as the "PHONES"), all of which represent liabilities of Tribune, and only Tribune. Bigelow Aff. ¶¶ 21-23. None of the Subsidiary Debtors are liable in respect of any of that parent company indebtedness.

The Debtors commenced their cases a year ago, on December 8, 2009. As the Motion illustrates, the Debtors have resolved their business issues and, for all intents and purposes, are ready and able to file a plan. Motion ¶¶ 1, 6-10. The only obstacle identified by the Debtors to

- 3 -

the prompt filing and confirmation of a plan is that there has been no settlement or resolution of the alleged claims and issues arising from the Leveraged ESOP Transactions. *Id.* ¶ 2.

To be sure, this lack of a resolution is no fault of the Debtors. The Debtors and the Credit Agreement Lenders have worked hard to bring the alleged issues to a head, with the Debtors, the agent for the Credit Facility, and potentially thirty or more other interested parties producing hundreds of thousands of documents to the Official Committee of Unsecured Creditors (the "Committee") and Law Debenture, an indenture trustee for one of the Tribune-only unsecured note issues. Motion ¶ 11. Through September (the latest month for which fee information is available), the Committee's professionals alone have run up almost $5 million in fees purportedly "investigating" the transactions. Given the run rate for August and September, it is likely that the Committee's fees in respect of its "investigation" now exceed $7 million. (In fact, through September the Committee already had incurred a substantial amount of fees in drafting and preparing a complaint, making the Committee's ongoing discovery under the guise of its "investigation" an abuse of Rule 2004, as to which the Credit Agreement Lenders reserve all rights.)

The Debtors and the Credit Agreement Lenders have tried hard to schedule settlement discussions in an effort to move the process forward, and the Credit Agreement Lenders are and have been ready, willing, and able to attend any meeting at any reasonable time and place. The Committee, however, repeatedly has indicated that it is not interested in even discussing the matter until its alleged "investigation" is concluded, with no timetable given. Representatives of the Tribune-only noteholders initially said they would be willing to meet in September, only to postpone with an indication that meetings could be held before Thanksgiving. This, too, did not occur, and there are no meetings scheduled.

In short, there are no negotiations currently occurring or pending with the Committee or any noteholder representatives. Accordingly, there is no progress towards a consensual plan for all of the Debtors occurring now and there is no presently-existing concrete prospect for any. In contrast, the Debtors and the Credit Agreement Lenders have had substantive plan negotiations,

- 4 -

and the Credit Agreement Lenders have agreed to many pertinent and material plan terms –

including all material economic terms of plans of reorganization for all or substantially all of

Tribune's Subsidiary Debtors.

Most notably, the Credit Agreement Lenders have agreed that, in a plan otherwise

acceptable to them, allowable unsecured claims against the Subsidiary Debtors could be paid in

full, in cash, on or shortly after the plan effective date, provided that such claims are allowed in

an aggregate amount no greater than an already negotiated limit that includes a reasonable

margin over the Debtors' most recent estimates of the liabilities of the Subsidiary Debtors.  In

such a plan, holders of claims under the Credit Agreement would agree to take excess cash and

new debt securities issued or guaranteed by the guarantor Subsidiary Debtors in an amount that

can be comfortably serviced by these entities, and otherwise would receive equity in a newly-

formed holding company for the Subsidiary Debtors in satisfaction of the claims represented by

Credit Agreement guarantees executed by the Subsidiary Debtors.[2]  Any claims against Tribune

itself would be preserved and treated in accordance with a subsequent stand-alone Tribune plan.

The Credit Agreement Lenders made this concession, notwithstanding the very large

claims held by the Credit Agreement Lenders against the Subsidiary Debtors, only in part to

address the potential avoidance claims relating to the Subsidiary Debtors that are now under

"investigation".  In fact, the Credit Agreement Lenders mainly have been motivated by a

recognition that no business is completely unaffected by a bankruptcy case, particularly a long

bankruptcy case (as these cases have become).  The Credit Agreement Lenders believe that the

value of the additional consideration to be provided to trade and other unsecured creditors of the

Subsidiary Debtors will be more than made up by improved business results (and hence

increased value) made possible by an earlier exit from bankruptcy.

---

[2]    These terms already have been negotiated with the Debtors, have been disclosed by the Debtors to the
Committee, and can be described with precision if the Court and/or parties in interest are interested in reviewing
them.  They have been omitted from this pleading out of an abundance of caution to avoid any allegation that
the filing of this Objection somehow violates the Debtors' exclusivity periods.

DB02:8974255.1                                                                                    068968.1001

Trade creditors of the Subsidiary Debtors certainly will be supportive of a plan that pays their claims in full and ensures the prompt exit from bankruptcy of viable, ongoing businesses, and the Credit Agreement Lenders are aware of no material obstacles to the implementation of a plan for the Subsidiary Debtors having the terms and conditions outlined above.

Significantly, under this proposed plan structure, there could be no fraudulent transfer or avoidance claims of the sort now being "investigated" that would impact the Subsidiary Debtors or otherwise need to be resolved or addressed prior to plan confirmation.[3]  Simply put, where (as proposed by the Credit Agreement Lenders) a plan pays creditors in full and where avoidance action recoveries otherwise will not redound to the benefit of creditors, no viable avoidance action exists to be prosecuted.  This is because, as explained below, the avoiding powers exist "only for the benefit of creditors, and not for the benefit of the debtor itself" (nor, of course, for shareholders of the debtors).  *Adelphia Recovery Trust*, 390 B.R. at 94 (quoting *In re Liggett*, 118 B.R. 219, 222 (Bankr. S.D.N.Y. 1990)).

It is indisputable that, where a debtor's businesses are otherwise prepared to emerge from bankruptcy, potential litigation is preventing that emergence, the businesses actually are owned and conducted by subsidiaries, and a plan for the subsidiaries can be confirmed without need to confront or resolve that potential litigation, the clearest path to a business rehabilitation is the filing of a separate plan for the subsidiaries.  That is precisely the case here.  Yet, the Debtors have refused to file such a plan, and they have given no legitimate reasons for declining to do so. As a consequence, exclusivity should be terminated to enable the Credit Agreement Lenders to proceed to file a plan that pays creditors of the Subsidiary Debtors in full and otherwise

---

[3]  This proposal by the Credit Agreement Lenders should not be interpreted as concern about litigation over the Leveraged ESOP Transactions.  That litigation would remain in prospect in the Tribune (parent company) case, and the Credit Agreement Lenders fully expect that the Committee eventually will bring its lawsuit.  Indeed, given the exorbitant amount the Committee already has spent in its investigation, the Committee likely will have no choice but to file a complaint, regardless of the lack of merit of the claims it ultimately chooses to pursue.  The Credit Agreement Lenders are confident that, at the end of the day, none of the claims to be brought by the Committee will succeed.

- 6 -

minimizes the ongoing harm – and thus maximizes the value – of those Subsidiary Debtors, for the benefit of all of their stakeholders.

## ARGUMENT

The paramount consideration in the context of a requested extension of plan exclusivity is whether or not an extension will facilitate a successful reorganization. *See, e.g., In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 451 (Bankr. D.N.J. 1993) ("As the legislative history to § 1121(d) indicates, the legislature intended that the granting of an extension would be based 'on a showing of some promise of probable success [for reorganization].'"); *In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989) (same); *In re Perkins*, 71 B.R. 294, 298 (W.D. Tenn. 1987) (same). Further, in a case like this, where the fate of thousands of employees, suppliers and customers hangs in the balance, the welfare of business should be of critical importance. Where appropriate, in order to maximize value and facilitate a rapid and successful reorganization, it is prudent and permissible for a once-consolidated enterprise to exit chapter 11 in stages. *E.g., In re Tropicana Entertainment, LLC, et al.*, Case No. 08-10856-KJC (Bankr. D. Del. 2009) (two separate plans confirmed, with disaggregated debtor groups achieving plan effectiveness many months apart).

These cases have not been substantively consolidated, and there is no reason why one or more individual Subsidiary Debtors cannot and should not file its own plan. Indeed, because there has been no substantive consolidation, the requested extension of plan exclusivity must be judged, and must stand or fall, on a debtor-by-debtor basis where, as here, constituents assert that one or more of the Subsidiary Debtors would be better served by a termination of plan exclusivity. The inability of one of a group of debtors to promptly reorganize should not cause delay for those that can.

The Debtors tout their "substantial progress toward filing a plan." Motion ¶ 1. Yet, the absence of negotiations and the absence of concrete plans for discussion is not progress towards a consensual plan. In contrast, the plan the Credit Agreement Lenders would propose for the

Subsidiary Debtors is intended and expected to be a consensual or substantially consensual plan among the actual parties in interest in the cases of the Subsidiary Debtors. Such a plan would eliminate any adverse impact on the subsidiaries and their businesses and, perhaps more importantly, eliminate the ability of the subsidiaries' competitors to cast aspersions on subsidiary stability based upon existence or threat of the litigation the Committee continues to "investigate".

Specifically, because creditors (other than those holding claims arising under the Credit Agreement, who will agree to other plan treatment) will be paid in full under the plan contemplated by the Credit Agreement Lenders, that litigation cannot and should not impact the Subsidiary Debtors in any way. The *Adelphia* case, which also involved hundreds of affiliated debtors and fraudulent conveyance claims asserted against prepetition lenders, is instructive. There, a confirmed joint plan of reorganization paid creditors of certain subsidiary debtors in full, but distributed interests in a litigation trust to unpaid creditors of the parent debtor. The litigation trust then took over the fraudulent conveyance and preference action initially commenced by the official committee of creditors against various prepetition lenders.

The lenders moved to dismiss the avoidance actions relating to claims and liens against the subsidiary debtors (called the "Obligor Debtors"), contending that "all of the creditors of the Obligor Debtors have been paid in full, and recovery on the [avoidance actions] would therefore benefit none of the Obligor Debtor's [sic] creditors. The Lenders assert that the only parties who would benefit from recovery by the [litigation trust] . . . are the creditors and shareholders of the Parent Debtors, who are separate and distinct from the Obligor Debtors. As a result, the Lenders contend, any recovery by the [litigation trust] on the Avoidance Claims at issue here, including the Fraudulent Transfer Claims and Preference Claims, would benefit only the estate represented by the [litigation trust] and not the creditors of the Obligor Debtors." *Id.* at 91.

The District Court agreed. It observed that "none of the payouts to the Obligor Debtors' creditors included shares in the [litigation trust], according to the terms of the Joint Plans, so there is no apparent benefit that the creditors would accrue from the [litigation trust]'s recovery." *Id.* at 95. Accordingly, the Court held: "the terms of the Plans establish that all creditors of the

- 8 -

Obligor Debtors have been paid in full and would not benefit from [the litigation trust]'s recovery on the Fraudulent Transfer Claims under the facts alleged in the Amended Complaint, and that the [litigation trust] therefore lacks standing to assert those claims. Lenders' motion to dismiss the Amended Complaint is therefore granted as to the Fraudulent Transfer Claims." *Id.* at 97. For the same reasons, the Court also dismissed the preference and equitable subordination claims asserted the lenders. *Id.* at 98-99.

A number of other courts have reached the same result in similar contexts. *See, e.g., In re Harstad*, 39 F.3d 898, 903-05 (8th Cir. 1994) (affirming dismissal of avoidance action where creditors would not benefit from recovery on claims); *Wellman v. Wellman*, 933 F.2d 215, 217-19 (4th Cir. 1991) (same). To the extent there is any dispute over this fundamental point – and there should not be – it is an issue properly raised in connection with confirmation of a plan for the Subsidiary Debtors.[4] There is no reason to put the Subsidiary Debtors and their estates to the burden of dealing with (and paying for) the massive litigation now contemplated by the Committee before the Subsidiary Debtors have a full and fair opportunity to confirm a full-payment plan for the benefit of all of their creditors.

Given all of this, the Debtors need not maintain plan exclusivity in an effort to pressure the Committee and the Credit Agreement Lenders to "settle" the nascent disputes over the Leveraged ESOP Transactions, and there is good cause instead for a termination of plan exclusivity so that the Subsidiary Debtors may confirm a plan and get on with their business.

---

[4]    The Committee undoubtedly will cite Judge Walsh's decision in *In re Trans World Airlines, Inc.*, 163 B.R. 964 (Bankr. D. Del. 1994), but *TWA* is not to the contrary. There, unlike here with the Subsidiary Debtors, the debtor was insolvent and its plan distributed to unsecured creditors shares in the reorganized enterprise. Judge Walsh found that a post-confirmation avoidance action could proceed because "the unsecured creditors will benefit from the enhanced value of reorganized TWA by reason of being shareholders of the reorganized debtor." *Id.* at 973. There would be no such indirect benefit under the Subsidiary Debtor plan(s) contemplated by the Credit Agreement Lenders, which would pay unsecured creditors in cash in full on or about the effective date, making any post-confirmation litigation recovery moot from the perspective of the unsecured creditor constituents.

## CONCLUSION

For all of the foregoing reasons, there simply is no valid reason for denying the Credit Agreement Lenders the opportunity to propose and pursue a consensual plan or plans for the Subsidiary Debtors. The Credit Agreement Lenders respectfully request that the Court deny the Motion as to the Subsidiary Debtors and terminate plan exclusivity to enable them to do just that.

Dated: November 24, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telephone: (302) 571-6600
Telecopier: (302) 571-1253

*Proposed counsel to the Credit Agreement Lenders*

-and-

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
James O. Johnston
Joshua D. Morse
865 S. Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone:  (213) 694-1200
Telecopier: (213) 694-1234

*Counsel to the Credit Agreement Lenders*

**Exhibit A**

Anchorage Advisors, L.L.C.
Avenue Investments, LP
Avenue Special Situations Fund IV, L.P.
Avenue - CDP Global Opportunities Fund,
    L.P. (US)
Avenue International Master, LP (Master)
Avenue Special Situations Fund V, L.P.
Canyon Capital Advisors, LLC
Contrarian Funds LLC
CVI GVF (Lux) Master S.a.r.l.
Goldman Sachs Loan Partners
GoldenTree Credit Opportunities Financing I,
    Limited
GoldenTree 2004 Trust
GoldenTree Leverage Loan Master Fund, Ltd.
GoldenTree Credit Opportunities Second
    Financing, Limited
GoldenTree MultiStrategy Subsidiary, LLC
GoldenTree MultiStrategy Financing, Limited
GN3 SIP Limited
Greywolf Capital Partners II LP
Greywolf Capital Overseas Master Fund
Greywolf CLO I Ltd
James River Insurance
Northwoods Capital IV, Limited
Northwoods Capital V, Limited
Northwoods Capital VI, Limited
Northwoods Capital VII, Limited
Northwoods Capital VIII, Limited
Silver Oak Capital, LLC
KKR Financial CLO 2005-1, Ltd.
KKR Financial CLO 2006-1, Ltd.
KKR Financial CLO 2007-1, Ltd.
Oregon Public Employees Retirement Fund
KKR Financial Holdings III, LLC
KKR Strategic Capital Holdings I, L.P.
Knighthead Master Fund, L.P.
LMA SPC for and on behalf of MAP84
    Segregated Portfolio
Latigo Master Fund Ltd.
LP MA1, Ltd.
SEG LP MA2, L.P.
SEG Latigo Master Fund Ltd.

Newstart Factors, Inc. Oaktree Capital
    Management, L.P., and its affiliates as
    general partner or investment manager of
    certain funds and accounts
Scoggin Capital Management LP II
Scoggin International Fund LTD.
Scoggin Worldwide Distressed Fund, LTD
Taconic Market Dislocation Fund II LP
Taconic Market Dislocation Master Fund II
    LP
Taconic Capital Partners 1.5 LP
Taconic Opportunity Fund LP
Värde Investment Partners, L.P.
Viking Global Equities LP
Viking Global Equities II LP
VGE III Portfolio Ltd.
Waterstone Market Neutral Master Fund, Ltd
Waterstone Market Neutral Mac51 Fund, Ltd
York Capital Management, L.P.