**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------x
| | | |
|---|---|---|
| In re: | : | Chapter 11 Cases |
| | : | Case No. 08-13141 (KJC) |
| **TRIBUNE COMPANY, et al.,** | : | (Jointly Administered) |
| | : | |
| Debtors. | : | Hearing Date: December 1, 2009 |
---------------------------------------------------------x   Related Dkt. Nos. 2407, 2596, 2597, 2602, 2603

**REPLY OF LAW DEBENTURE TRUST COMPANY OF NEW YORK
IN SUPPORT OF ITS MOTION TO TERMINATE DEBTOR AFFILIATES'
UNDISCLOSED PAYMENT OF LBO LENDERS' FEES AND EXPENSES, FOR AN
ACCOUNTING, AND FOR DISGORGEMENT OF PAST PAYMENTS**

Law Debenture Trust Company of New York ("Law Debenture" or the "Trustee"), as successor indenture trustee under that certain Indenture dated March 19, 1996 between Tribune Company (with its debtor subsidiaries, "Tribune" or the "Debtors") (successor to The Times Mirror Company) and Citibank, N.A., for the 6.61% Debentures due 2027 and the 7 1/4 % Debentures due 2096 (as amended, the "Indenture"), respectfully submits its reply (the "Reply")[1] in support of its *Motion to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, For an Accounting, and For Disgorgement of Past Payments* (the "Motion"), as follows:

---

[1] This Reply responds to: (i) *Debtors' Response to Motion of Law Debenture Trust Company of New York To Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, For an Accounting, and For Disgorgement of Past Payments* (the "Debtors' Objection") [Dkt. No. 2603]; (ii) *J.P. Morgan Chase Bank, N.A.'s Objection to Motion of Law Debenture Trust Company of New York To Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, For an Accounting, and For Disgorgement of Past Payments* (the "JPM Objection") [Dkt. No. 2597]; (iii) *Credit Agreement Lenders' Statement and Joinder in Support of J.P. Morgan Chase Bank, N.A.'s Opposition to Motion of Law Debenture Trust Company of New York To Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, For an Accounting, and For Disgorgement of Past Payments* (the "Credit Agreement Lenders' Objection") [Dkt. No. 2602] (collectively, the "Objections"); and (iv) *Response of the Official Committee of Unsecured Creditors to Motion of Law Debenture Trust Company of New York To Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, For an Accounting, and For Disgorgement of Past Payments* (the "Committee Response") [Dkt. No. 2596].

**PRELIMINARY STATEMENT**[2]

The LBO Lenders expect this Court to treat their collection of $23.7 million in professional fees (the "Unauthorized Fee Payments") -- *an amount rivaling the $24.5 million received by all of the Debtors' professionals* through the end of September of 2009 -- like an electricity bill or other routine operating expense paid by their non-debtor affiliates (the "Paying Affiliates").  The LBO Lenders' arguments fail.  The exorbitant amounts paid to the LBO Lenders' professionals are unprecedented and result from demands by the LBO Lenders to insulate the payments from public scrutiny and this Court's review.

The LBO Lenders never agreed to a forbearance or provided the Debtors (or their affiliates) with anything else of value to justify payment of the Unauthorized Fee Payments.  The proposed fee reimbursements include a success fee payable to the Steering Committee's financial advisor *upon confirmation of a plan of reorganization for the Debtors*.  Thus, the parties always contemplated that the restructurings of the Debtors and their affiliates would be consummated through these or affiliated Chapter 11 cases.  Nor did the Credit Agreement or the guarantees require such payments, which are limited to "enforcement" activities.  Tellingly, the Objections fail to articulate what negative ramifications would have ensued had the Debtors never agreed to the Unauthorized Fee Payments.  The inescapable conclusion is that there were none.

The Unauthorized Fee Payments merely continued a pattern starting with the LBO itself: after lending over $8 billion to finance the LBO for no consideration to the Debtors, the LBO Lenders have sought yet another vehicle to siphon value from the estates without consideration.  This practice should stop now.

---

[2] Capitalized terms not defined in the Preliminary Statement have the meanings ascribed to them in the text *infra*.

Fundamental policy arguments also strongly militate in favor of disclosure and court approval of these payments. If the Court sanctions the secretive payments extracted by LBO Lenders, nothing would forestall secured creditors from demanding that debtor affiliates remain out of Chapter 11 to ensure that they will receive such payments out of public view.

Accordingly, Law Debenture respectfully submits that the Court should terminate the funding of the LBO Lenders investigation and defense of the LBO, and that all funds received to date pertaining to such investigation and defense must be disgorged.

## ARGUMENT

**The LBO Lenders Crafted The Agreement To Shield The Unauthorized Fee Payments From The Scrutiny of the Court and Unsecured Creditors.**

1. Documents produced in discovery reveal a series of negotiations between the Debtors and the Steering Committee to ensure that the Unauthorized Fee Payments would not be publicly disclosed or subject to meaningful review. The Debtors and JPM originally drafted a forbearance agreement to ensure that the LBO Lenders would not exercise remedies against the Paying Affiliates, presumably to create some pretext to justify the reimbursement. *See* Ex. 1 (Email communication from Bryan Krakauer to Thomas Mayer, dated January 20, 2009, attaching a revised draft of a forbearance agreement). However, the parties have not produced an executed forbearance agreement.

2. Indeed, there does not appear to be a signed writing of any kind formalizing the fee reimbursement agreement among the Steering Committee, the Paying Affiliates and the Debtors. However, JPM clearly worried that this Court would deny payment if the Debtors were parties to any such agreement. An Executive Director at JPM stated that:

> I think the [Steering Committee] feels that it's best if only non-debtors are parties *and it would be more likely to get approved by the court if the*

3

> *debtors were not a party. We are worried that if the debtors are parties the UCC may object to it and it would get denied. . . . . [S]ome are wondering if the company really wants the court to reject this so that the company has an excuse not to pay the fees.*

*See* Ex. 2 (E-mail from Miriam Kulnis to Nils Larsen and Chandler Bigelow, dated January 22, 2009) (emphasis added).  Notably, the e-mail seemingly reflects that there would court review of the fee reimbursement agreement even if the Debtors were not a party, but JPM and the Debtors chose instead to notify only the U.S. Trustee and the Committee.  However, the Steering Committee made clear that the arrangement was to be presented to the U.S. Trustee solely as a *fait accompli* not subject to the U.S. Trustee's consent.  Counsel to JPM wrote to the Debtors' counsel that:

> Based on your description of your conversation last week and Joe's description of the same conversation when we spoke, *you didn't ask his permission and you didn't tell him you were waiting for his consent (both correctly) but instead told him that the non-debtor intended to pay around the middle of this week*.  We sent him the engagement letters he asked for last Friday and haven't heard a word since.  Why wouldn't you just pay at this point?  Have there been further conversations that I am not aware of?

*See* Ex. 3 (Email from Damian Schaible to Brian Krakauer, Donald Bernstein, and Meyer Dworkin, dated March 5, 2009) (emphasis added).

3.    Thus, the record is clear that the Debtors and JPM purposely structured the fee reimbursement arrangement to avoid the very scrutiny of this motion.

**Court Approval Of The Unauthorized Fee Payments Was Required
Because The Payment Were Authorized By And Through The Debtors.**

4.    The Objectors assert that they were not obligated to disclose the Unauthorized Fee Payments or to obtain this Court's approval therefor.  Debtors' Objection ¶ 14; JPM Objection ¶ 2; Credit Agreement Lenders' Objection at 2.  Specifically, the Debtors assert that a "guarantor's liabilities are unaffected by the bankruptcy proceeding" of a primary obligor and

that no authority exists "for the proposition that non-debtors must come before the Bankruptcy Court to obtain authorization to satisfy their independent contractual obligations with their own funds." Debtors' Objection ¶ 13-14. The compelling facts of this case demonstrate why the objectors are wrong.

5. As a threshold matter, even though the Unauthorized Fee Payments were made by the Paying Affiliates, this Court can and should disregard the form of the transaction to determine its substance. *Noddings Inv. Group, Inc. v. Capstar Communications*, 1999 WL 182568, at *6-*7 (Del. Ch.), *aff'd*, 741 A.2d 16 (Del. Sup. Ct. 1999) (collapsing transactions to determine whether integrated transactions violated warrant agreement); *see also Big V Supermarkets Inc. v. Wakefern Food Corp.*, 267 B.R. 71, 95 (Bankr. D. Del. 2001) (collapsing series of transactions in determining withdrawal liability under stockholders agreement); *In re Sackman Mortgage Corp. (European Amer. Bank v. Sackman Mortgage Corp.)*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993) (holding that court's equity jurisdiction authorized the court to examine transaction to determine that relationship was a lending agreement, rather than participation agreement); *Boyarsky v. Froccaro*, 125 Misc.2d 352, 361, 479 N.Y.S.2d 606, 613 (Sup. Ct. N.Y. 1984) ("It is the substance rather than the form of a transaction which controls and the basic issue is intent"); *DMG, Inc. v. Aegis Corp.*, 1984 WL 8228, at *6, 9 Del. J. Corp. L. 437, 445 (Del. Ch. 1984) (holding that while merger agreement technically was still enforceable, the substance of the transaction was "dead" as a practical matter; thus, option under merger agreement could not be enforced).

6. While the Paying Affiliates nominally are making the fee reimbursement payments to the LBO Lenders, the underlying agreement to make the Unauthorized Fee Payments was entered into by employees of Tribune along with Debtors' counsel and relates

specifically to the administration of the Debtors' estates, not to a workout of the Paying Affiliates.  *See* Debtors' Objection ¶ 5.  Indeed, the Debtors were to be a party to the fee reimbursement agreements, but dropped them as parties only because it could lead to this Court's scrutiny, not because the Debtors were not proper parties to the agreement.  *See* Ex. 2.  Upon information and belief, management of the Paying Affiliates was never involved in the decision making leading to the fee reimbursements, nor was separate counsel retained by the Paying Affiliates to analyze the propriety of the agreement.  To the extent that there is overlap between the officers and professionals of the Debtors and Paying Affiliates, there is an irreconcilable conflict of interest that warranted the Court's review of this transaction under Section 363.  This is especially true because one of the primary purposes of the agreements -- and a substantial portion of the fees to be reimbursed – relates to the defense of claims asserted by the Debtors' estates against the LBO Lenders.

7. Accordingly, where, as here, the Debtors have exercised control over the Paying Affiliates to consummate a transaction that directly impacts the administration of the Debtors' estates, the Paying Affiliates were required to obtain court authorization before making the Unauthorized Fee Payments.  Motion ¶ 27.

**The Paying Affiliates Received No Consideration For The Unauthorized Fee Payments.**

8. Moreover, the economic substance of the Unauthorized Fee Payments reveals that the Paying Affiliates gained no economic benefit from entering into the agreement.

9. The Debtors do not claim that the LBO Lenders have agreed to any forbearance or any other meaningful agreement to justify payment of the fees.  There is not even a condition that prevents the LBO Lenders from attempting to collect the entire obligation of the Debtors owed under the Credit Agreement from Paying Affiliates.

10.     Whether this is because all parties recognize that the Paying Affiliates either will file Chapter 11 cases (just like the Chicago Cubs affiliates did) or will benefit from an injunction pursuant to a confirmed Chapter 11 plan, the fact remains that the Paying Affiliates received no consideration for making these payments rather than filing for bankruptcy themselves.

11.     The Debtors feebly argue that "[JPM] agreed to address the potential for enforcement action by the Bridge lenders by delivering a 'Payment Blockage Notice' to the Bridge facility Agent" in connection with the Unauthorized Fee Payments.  Debtors' Objection ¶ 4.  By issuing this notice, the Debtors assert that JPM assisted the Debtors in avoiding payments to the bridge facility creditors.

12.     However, the Payment Blockage Notice, dated February 26, 2009 was sent before the parties purportedly agreed to payment terms on the following day (the United States Trustee was not even notified of the agreement until March 10, 2009).  Debtors' Objection ¶¶ 5-6.  Further, the issuance of the Payment Blockage Notice was entirely in the interest of the LBO Lenders, who would have sought to prevent subordinated creditors from seizing assets that it had priority over independently of any agreement concerning the Unauthorized Fee Payments.

**The Credit Agreement Does Not Mandate Payment Of The Unauthorized Fee Payments.**

13.     The Debtors and the LBO Lenders assert that the Unauthorized Fee Payments are reasonable and, indeed, mandated by Section 8.04(a) of the Credit Agreement, which requires payment of "all reasonable and documented out-of-pocket costs and expenses of the Agent . . . and the Lenders, if any (including, without limitation, reasonable and documented counsel fees and expenses), *in connection with the enforcement . . . of this Agreement*, the Notes and the other documents to be delivered hereunder . . . ."  Debtors' Objection ¶ 2; JPM Objection ¶ 3.  The

7

millions of dollars in fees expended by JPM and its professionals, however, relates to a yet-to-be-filed lawsuit by the Committee, not to the enforcement of the LBO Lenders rights against the Paying Affiliates or otherwise.[3]

14.     Thus, recovery of these fees and expenses is not authorized by Section 8.04 of the Credit Agreement.  *See United States v. Broad. Music, Inc.*, 275 F.3d 168, 175 (2d Cir. 2001) (stating that, "deference is to be paid to the plain meaning of the language of a decree and the normal usage of the terms selected.") (internal quotations omitted); *Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 988 (2d Cir. 1991) (contract language is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.").

15.     None of the Objections addresses this issue; the Debtors, JPM, and the Credit Agreement Lenders[4] simply assume that all of the work performed is covered by the Credit Agreement and subject to reimbursement.  Indeed, the Debtors agreed in advance to pay all the

---

[3]     Black's Law Dictionary defines enforcement as "the act of putting something such as a law into effect; the execution of a law; the carrying out of a mandate or command."  BLACK'S LAW DICTIONARY 528 (6th ed. 1990).

[4]     Defined as those entities identified on *Exhibit A* attached to the Credit Agreement Lenders Objection.  On November 20, 2009, the Credit Agreement Lenders filed their *Joint Verified Statement of Representation of More Than One Creditor By Hennigan Bennett & Dorman, LLP and Young Conway Stargatt & Taylor, LLP* (the "2019 Statement") [Dkt. No. 2600].  While the statement lists those entities who together constitute the Credit Agreement Lenders, the 2019 Statement is insufficient and fails to comply with the standard as set forth by this Court.  *See* Transcript of Proceedings Before the Honorable Kevin J. Carey, *In re Sea Containers Ltd.*, 06-11156 (KJC) (Bankr. D. Del. May 14, 2008).  The Court held that the clients acting together toward a common goal are, in fact, a committee, and accordingly, "must provide information that's required by 2019(a)(1), (2) and (3) . . . ."  *Id.* at p. 45, ln 9-11.  Accordingly, the Credit Agreement Lenders 2019 Statement is deficient to the extent that it does not set forth "the nature and amount of the claim or interest and the time of acquisition thereof" and "a recital of the pertinent fact and circumstances in connection with the employment of the entity or indenture trustee, and . . . the name or names of the entity or entities at whose insistence, directly or indirectly, the employment was arranged or the committee was organized or agreed to act." Fed. R. Bankr. P. 2019(a)(2) and (3); *see also In re Northwest Airlines Corp.*, 363 B.R. 701 (Bankr. S.D.N.Y. 2007).

fees and expenses of the Steering Committee's professionals without any limitation that such fees be restricted to enforcement (and funded retainers in advance).

## **CONCLUSION**

For the reasons set forth above, Law Debenture respectfully requests that the Court enter an order compelling and directing (i) termination of the payments to the LBO Lenders, (ii) an accounting of unauthorized payments made to the LBO Lenders, (iii) disgorgement of all unauthorized payments to the LBO Lenders, and (iv) granting such other and further relief as is necessary and proper.

Dated:  November 24, 2009   Respectfully submitted,
       Wilmington, Delaware

By: /s/ Garvan F. McDaniel
**BIFFERATO GENTILOTTI LLC**
Garvan F. McDaniel (No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel:  (302) 429-1900
Fax:  (302) 429-8600

– and –

David S. Rosner
Andrew K. Glenn
Matthew B. Stein
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700

*Co-Counsel for Law Debenture Trust Company*
 *of New York*