# EXHIBIT A

## *Sale Agreement*

## SALE AGREEMENT

This **SALE AGREEMENT** ("Agreement") is made on November 10th, 2009 between **CHICAGO TRIBUNE COMPANY**, an Illinois corporation ("Seller"), and **MICHAEL D. GAIN and JENNIFER R. GAIN**("Purchaser").

1. **Purchase and Sale.** Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Property (as hereinafter defined) for the Purchase Price and subject to the terms and conditions set forth in this Agreement.

2. **Purchase Price.** The purchase price (the "**Purchase Price**") for the Property shall be Six Hundred Ninety Five Thousand and 00/100 Dollars ($695,000.00).

3. **Property.** "**Property**" means all of Seller's right, title and interest in the real property located at 555 E. Plainfield Road, Countryside, Illinois 60525 together with the building presently located thereon (the "Building"), along with appurtenances to the Building, (collectively, the "**Property**").

4. **Earnest Money Deposit.** Within 5 days of the full execution and delivery of this Agreement, Purchaser shall deposit with Chicago Title Insurance Company (located at 171 N. Clark Street, Chicago, Illinois 60601) ("**Escrow Agent**") in a joint direction escrow agreement among Seller, Purchaser and Escrow Agent ("**Earnest Money Escrow Agreement**") the sum of Fifty Thousand and No/100 Dollars ($50,000.00) (the "**Earnest Money**") for the benefit of Purchaser and Seller pursuant to the Earnest Money Escrow Agreement. In the event that the Earnest Money is required to be paid to Seller or Purchaser pursuant to the terms of this Agreement, Seller and Purchaser will each execute and deliver to Escrow Agent a written direction to disburse the Earnest Money to such person.

5. **Due Diligence.**

    (a) **Inspections.** For a period of 30 days after the date of acceptance of this Agreement, Purchaser and any representatives or consultants designated by Purchaser may, at Purchaser's expense, at reasonable times and upon reasonable prior notice to Seller, to the extent reasonably necessary in connection with the purchase of the Property have access to and inspect the Property and the Building, provided that such inspections shall be non-invasive. (collectively, the "**Inspections**"). All actions taken by or on behalf of Purchaser in connection with the Inspections shall be in accordance with this Agreement and all applicable laws, rules and regulations of the appropriate governmental authorities having jurisdiction over the Property.

    (b) **Indemnity.** Purchaser shall (i) not unreasonably interfere with the use of the Property by the tenants or any other occupants at the Building, (ii) in the event any damage occurs to the Property as a result of the exercise of Purchaser's rights under this **Section 5**, restore the Property to the condition which existed immediately prior to such damage, (iii) defend and indemnify Seller, its members and affiliates, and each of their officers, directors, agents and employees, from and against any and all liability, loss, cost,

1

expense and damage (including, without limitation, reasonable attorneys' fees) incurred by any of them in connection with the Inspections (iv) provide Seller, promptly after receipt, with copies of all written reports, tests and other written information regarding the Inspections that are not attorney-client or work product doctrine privileged, and (v) prior to and as a condition to any Inspections, deliver to Seller certificates of insurance evidencing commercial general liability insurance (including coverage for contractual indemnities) with a combined single limit of at least $2,000,000, in a form reasonably acceptable to Seller, and naming Seller as an additional insured. The mere discovery of any defects in the Property, including any environmental defects, shall not be deemed to be damages or any other occurrence for which Purchaser is obligated to indemnify, defend or hold harmless Seller, provided, however, that if and to the extent Purchaser or its agents, consultants or other representatives discover a defect and then exacerbate such defect or the damage caused thereby, Purchaser shall be obligated to indemnify, defend and hold harmless Seller as provided herein. The provisions of this Section 5(b) shall survive the Closing.

(c) If Purchaser terminates this Agreement pursuant to its rights under paragraph 18 only, Seller shall reimburse Purchaser for its actual out of pocket third party costs and expenses incurred in connection with its due diligence investigation of the property in an amount not to exceed the sum of Five Thousand and No/100 Dollars ($5,000.00).

6. **Termination**. Purchaser may terminate this Agreement for any reason in its sole and absolute discretion by delivering to Seller (with a copy to Escrow Agent) written notice of such termination prior to 5:00 p.m. (Chicago time) on or before the date (the "**Approval Date**") that is thirty (30) days after the date of acceptance of this Agreement. If Purchaser fails to duly and timely deliver such written notice, Purchaser shall be deemed to have waived its right to terminate this Agreement pursuant to this **Section 6** and Purchaser shall be deemed to have approved of, for all purposes, the Property and the Building.

7. **Title Policy**.

(a) **Title Commitment**. Seller has delivered to Purchaser a title commitment (the "**Title Commitment**") for an owner's title insurance policy issued by the Chicago Title Insurance Company (the "**Title Company**") in the amount of the Purchase Price, covering title to the Property on or after the date hereof, showing title in Seller subject only to the following (collectively, the "**Permitted Exceptions**"): (a) the title exceptions set forth in **Exhibit A** attached hereto; and (b) title exceptions pertaining to liens or encumbrances of a definite or ascertainable amount which may be removed by the payment of money at the Closing or by obtaining an endorsement insuring Purchaser against the same (in form and substance reasonably acceptable to Purchaser) and (c) the Bankruptcy action further described in Section 18. The Title Commitment shall be conclusive evidence of good title as therein shown as to all matters insured by the policy, subject only to the exceptions as therein stated and subject to Seller's obligation to obtain the Order described in Section 18.

2

(b) The obligation of Purchaser to purchase the Property on the Closing Date is conditioned upon the issuance by the Title Company of a title pro forma insurance policy for, or a "marked up" written commitment to issue, an owner's title insurance policy, pursuant to the terms of the Title Commitment (the **"Title Policy"**), provided that the Title Policy shall (i) be subject only to the Permitted Exceptions shown on Exhibit A hereto, (ii) be dated as of the date of the Closing, and (iii) name Purchaser as the insured. Purchaser shall be entitled to request that the Title Company provide such endorsements to the Title Policy as Purchaser may reasonably require, provided that (x) such endorsements shall be at no cost to, and shall impose no additional liability on, Seller, (y) Purchaser's obligations under this Agreement shall not be conditioned upon Purchaser's ability to obtain such endorsements and, if Purchaser is unable to obtain such endorsements, Purchaser shall nevertheless be obligated to proceed to close the transaction without any reduction of or set off against the Purchase Price, and (z) the Closing shall not be delayed as a result of Purchaser's request.

8. **Seller's Representations and Warranties**. Seller represents and warrants to Purchaser as of the date hereof and as of the Closing Date the following:

(a) **No Leases**. There are no valid Leases of any space in the Property (a "Lease" being any written lease or agreement for a lease, and any amendment thereof, for any portion of the Property).

(b) **Title**. Seller holds fee simple title to the Property.

(c) **Environmental Representation**. To Seller's knowledge, based solely upon that certain Phase I Environmental Site Assessment Report by GeoTrans, Inc. dated May 21, 2009, the Premises are free of Hazardous Materials in amounts and conditions which are in violation of applicable environmental laws. "Hazardous Materials" shall mean any material or substance that is now defined or regulated by any statute, regulation, ordinance, or governmental authority thereunder, as radioactive, toxic, hazardous, or waste.

(d) **Section 1445**. Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code and is therefore exempt from the withholding requirements of said Section. Seller will furnish Purchaser at closing the Exemption Certificate set forth in said Section.

9. **Seller's Covenant**. Seller covenants with Purchaser that, from and after the date hereof until Closing, and provided this Agreement has not been properly terminated and Purchaser is not in default of this Agreement, Seller will not (without Purchaser's prior consent), enter into any lease for the Property.

10. **Closing**. The closing of the sale of the Property (the **"Closing"**) shall take place at 9:00 a.m. at the office of Escrow Agent at 171 N. Clark Street, Chicago, Illinois, on the date (the **"Closing Date"**) that is fifteen (15) days after the Approval Date, unless another date or office of Chicago Title is mutually agreed to by the parties. This sale shall be closed through an escrow (the **"Closing Escrow"**) with Chicago Title and Trust Company

("CT&T"), in accordance with the general provisions of the usual form of Deed and Money Escrow Agreement then in use by CT&T, with such special provisions as may be required to conform with this Agreement. Upon the creation of the Closing Escrow, anything herein to the contrary notwithstanding, the Seller Closing Documents and the Purchaser Closing Documents shall be deposited in the Closing Escrow and this Agreement and the Earnest Money shall be deposited in the Closing Escrow. The cost of the Closing Escrow shall be divided equally between Seller and Purchaser, provided Purchaser shall pay all the escrow or agency costs for any lender escrow or agency required by its lender.

(a) **Seller Closing Documents**. At the Closing, Seller shall execute or deliver to Purchaser (or, if indicated, to CT&T) the following documents, each in the form hereinafter prescribed or otherwise in a form and substance reasonably acceptable to Seller and Purchaser:

(i) Deed (the "**Deed**") conveying the Property, along with an affidavit of title reasonably required by the Title Company;

(ii) State and county transfer tax declarations (collectively, the "**Transfer Declarations**");

(iii) A closing statement reflecting the matters set forth herein (the "**Closing Statement**");

(iv) An ALTA survey certified to Purchaser, or as directed by Purchaser pursuant to its rights under Section 19(f), Purchaser's Lender and Chicago Title Insurance Company;

(v) ALTA statements; and

(vi) The Order as defined in Section 18.

(b) **Purchaser Closing Documents**. At the Closing, Purchaser shall execute and deliver to Seller (or, if indicated, to CT&T) the following documents:

(i) the Transfer Declarations; and

(ii) the Closing Statement.

(c) **Purchase Price**.

(i) **Earnest Money Deposit**. At the Closing, Seller and Purchaser shall direct Escrow Agent to disburse pursuant to the Earnest Money Escrow Agreement by federally insured wire transfer (i) to Seller (or, if indicated, to CT&T) the amount of the Earnest Money Deposit, and (ii) to Purchaser all interest earned on the Earnest Money Deposit (less any investment fee).

(ii)    **Balance**.  At the Closing, Purchaser shall pay to Seller (or, if indicated, to CT&T), by federally insured wire transfer, the total amount of the Purchase Price (A) less the amount of the Earnest Money Deposit, and (B) plus or minus (as the case may be) the net amount of payments required to be made by Seller and Purchaser at the Closing.

(d)    **Further Assurances**.  Seller and Purchaser shall, at the Closing, and from time to time thereafter, upon request, execute such additional documents as are reasonably necessary in order to convey, assign and transfer the Property pursuant to this Agreement, provided that such documents are consistent with the terms of this Agreement, and do not increase Seller's or Purchaser's obligations hereunder or subject Seller or Purchaser to additional liability not otherwise contemplated by this Agreement.  The provisions of this Section 10(d) shall survive the Closing

11.    **Prorations and Adjustments**.

(a)    **Real Estate Taxes**.  Real estate taxes shall be prorated as of the Closing Date based on the amount of the most recently ascertainable taxes applicable to the Property.

(b)    **Utilities**.  With respect to utilities serving the Property, the parties will arrange for transfer of any utility services into the name of the Purchaser.  Any outstanding water, sewer, electric, gas and other utilities shall be prorated on the basis of the period for which assessed (and with respect to utilities, based upon the last reading of meters prior to Closing, which readings Seller shall make reasonable efforts to attempt to obtain prior to Closing).

(c)    **Prorations**.  All prorations under this **Section 11** for a particular period shall be on a per diem basis assuming an equal amount is payable on each day during such period.  Prorations will be made as of 12:01 a.m. on the Closing Date and will adjust the Purchase Price accordingly.  All prorations shall be final.

(d)    **Closing Date**.  If the Earnest Money Deposit and balance of the Purchase Price is not delivered to Seller before 5:00 p.m. (Chicago time) on the Closing Date, then the payments required to be made by Seller or Purchaser under this **Section 11** shall be determined assuming that the Closing Date occurred on the day after the actual Closing Date.

12.    **Closing Costs**.

(a)    **Seller**.  Seller shall be responsible for the payment of (i) one-half of the Closing Escrow charged by the CT&T and one-half of the Earnest Money Escrow, (ii) the cost of the basic premium for the Title Policy including the cost of extended coverage over standard exceptions on the Title Commitment, but excluding the cost of any endorsements to the Title Policy [other than with respect to any endorsements necessary for Seller to deliver title in the condition required by this Agreement, which shall be Seller's responsibility]), (iii) State of Illinois and Cook County transfer taxes, (iv) the cost of the ALTA survey, (v) any prepayment penalties or other costs and charges in connection with the payoff of Seller's

5

existing financing, including recording fees for any releases, (vi) fees and costs of Seller's counsel representing it in connection with this transaction, and (vii) all other costs customarily incurred by sellers in the jurisdiction where the Building is located.

(b) **Purchaser**. Purchaser shall be responsible for the payment of (i) one-half of the Closing Escrow charged by the CT&T and one-half of the Earnest Money Escrow, (ii) the cost of any endorsements to the Title Policy (other than with respect to any endorsements necessary for Seller to deliver title in the condition required by this Agreement, which shall be Seller's responsibility), (iii) all recording fees for the Deed and any Purchaser financing and any escrows relating thereto, (iv) the fees and costs of Purchaser's counsel representing it in connection with this transaction, and (vi) all other costs customarily incurred by purchasers in the jurisdiction where the Building is located.

13. **Remedies**.

   (a) **Purchaser Default**.

   (i) **Closing**. If Purchaser fails to perform any of its obligations under this Agreement which are required to be performed prior to or at the Closing (including the direction to disburse the Earnest Money Deposit, the payment of the balance of the Purchase Price and the payment of any amounts under **Section 11**) ("**Purchaser Default**"), then Seller shall have the right, as its sole and exclusive remedy for such failure, to terminate this Agreement by delivering written notice thereof to Purchaser, in which event the Earnest Money Deposit (including any interest thereon) shall be paid to Seller as liquidated damages. SELLER AND PURCHASER AGREE THAT SELLER'S ACTUAL DAMAGES IN THE EVENT OF A PURCHASER DEFAULT ARE UNCERTAIN AND DIFFICULT TO ASCERTAIN, AND THAT THE EARNEST MONEY DEPOSIT IS A REASONABLE ESTIMATE OF SELLER'S DAMAGES.

   (ii) **Other**. If, after Closing, Purchaser fails to perform any of its obligations under, or otherwise breaches the terms of, this Agreement (other than a Purchaser Default), then Seller may, as its remedies therefor, (A) specifically enforce such obligations, (B) sue for damages, and/or (C) enforce any other rights or remedies available at law or in equity.

   (b) **Seller Default**. If Seller fails to perform any of its material obligations under this Agreement which are required to be performed at or prior to the Closing (including the delivery of the Deed and the payment of any amounts under **Section 11**), which failure remains uncured for ten (10) days after written notice from Purchaser to Seller specifying such default in reasonable detail ("**Seller Default**"), then Purchaser shall have the right to, as its sole and exclusive remedy, elect one of the following: (i) to terminate this Agreement by delivering written notice thereof to Seller and, if such failure to perform is Seller's willful and intentional failure to close, seek reimbursement of actual, out-of-pocket damages in an amount not to exceed $5,000.00, (ii) to file an action for specific performance (thereupon automatically waiving any right it may have to pursue an action for monetary damages), or (iii) to waive the failure or other matter and proceed to close.

6

(c) **Collection Costs.** If any legal action, arbitration or other similar proceeding is commenced to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to an award of its attorneys' fees and expenses. The phrase "prevailing party" shall include a party who receives substantially the relief desired whether by dismissal, summary judgment, judgment or otherwise.

14. **Brokers**. Seller shall pay all brokerage commissions and expenses owed to Cushman & Wakefield ("**Seller's Broker**") in connection with the sale of the Property, and Seller's Broker shall be responsible for paying any commission due to Darwin Realty &Y Development Corporation ("**Purchaser's Broker**") pursuant to a separate agreement between Seller's Broker and Purchaser's Broker. Seller and Purchaser represents to the other that it has not engaged or dealt with any broker or finder (other than Seller's Broker and Purchaser's Broker) in connection with the sale of the Property. Seller and Purchaser shall indemnify, hold harmless and defend the other, its affiliates, and its and their officers, directors, affiliates, agents and employees, against and from all claims, demands, causes of action, judgments, and liabilities (including, without limitation, reasonable attorneys' fees and costs) which arise from a breach of such parties' respective representations set forth in this **Section 14**.

15. **Casualty and Condemnation.** The provisions of the Uniform Vendor and Purchaser Risk Act of the State of Illinois shall be applicable to this Agreement.

16. **Confidentiality.** Except as otherwise required by law, prior to the Closing, Purchaser agrees to keep confidential and not to disclose (either orally or in writing) the sale and purchase contemplated by this Agreement and any information and documents regarding the Property obtained by Purchaser, whether independently or from Seller, its agents, contractors or other third party (collectively, "**Confidential Information**") to any person or entity other than Purchaser's consultants, professionals, lenders, underwriters, ratings agencies, accountants, attorneys, partners, officers, and employees involved in evaluating, reviewing, negotiating and closing the sale and purchase of the Property contemplated by this Agreement (collectively, the "**Involved Parties**"). Anything to the contrary contained herein notwithstanding, Confidential Information shall not include information if and to the extent it (a) is or becomes a matter of public record, other than as a result of the acts by Purchaser in breach of this Agreement; (b) is in Purchaser's possession before disclosure by Seller; (c) Purchaser reasonably believes must be disclosed by law by Purchaser (but only after reasonable prior notice to and consultation with Seller); or (d) is necessary or appropriate to disclose in any litigation regarding this Agreement. Purchaser agrees to cause all Involved Parties to keep confidential and not to disclose the Confidential Information. Any of the Confidential Information provided to Purchaser or any of the Involved Parties, or obtained by Purchaser or any Involved Parties, whether independently or from Seller, shall be for their internal use only and shall not be published, quoted, copied, distributed, divulged, disseminated or discussed, without the express prior written consent of Seller. Purchaser further agrees that the Confidential Information will be used solely for the purpose of evaluating a purchase of the Property by Purchaser. Notwithstanding anything to the contrary contained in this **Section 16**, each of Seller and Purchaser and their respective employees, representatives and agents may disclose to any and all persons, without limitation of any kind,

7

the existence of this Agreement as long as no terms hereof are disclosed. Nothing contained herein shall be deemed or construed to limit Seller's right, after the Closing, to disclose the fact that the transaction contemplated hereby has closed.

17. **Disclaimers, Waivers and Release**.

(a) **Disclaimer**. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN THE DEED, PURCHASER AGREES THAT PURCHASER IS PURCHASING THE PROPERTY IN "AS IS", "WHERE IS", "WITH ALL FAULTS" CONDITION, AND WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR IMPLIED, OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM, OR ON BEHALF OF, SELLER. Without in any way limiting the generality of the immediately preceding sentence, Purchaser and Seller further acknowledge and agree that in entering into this Agreement and closing the transactions hereunder, except as otherwise expressly set forth in this Agreement or in the Deed:

(i) Each of Seller and its affiliates, and its and their officers, directors, employees and agents, expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property or any portion thereof, the physical condition or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii) Each of Seller and its affiliates, and its and their officers, directors, employees and agents, expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability, workmanship or fitness for a particular use;

(iii) Seller neither assumes nor authorizes any person to assume for Seller any other liability in connection with the sale or use of the Property (including any personal property) and there are no agreements or warranties, either verbal or written, collateral or affecting this Agreement or the Property (including any personal property);

(iv) Seller specifically excludes all warranties of merchantability and fitness for a particular purpose and neither makes nor adopts any warranty, express or implied, as to any items of personal property being sold to Purchaser pursuant to this Agreement; and

(v) The rights granted to Purchaser under this Agreement will permit Purchaser a full investigation of the Property, and the parties hereto are fully satisfied with the opportunity afforded for investigation. Neither party is relying upon any statement or representation by the other unless such statement or representation is specifically set forth in this Agreement. Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof. Such inquiries and investigations of Purchaser

shall be deemed to include, but shall not be limited to, the physical components of all portions of the Building, the condition of repair of the Property or any portion thereof, and the present and future zoning, ordinances, resolutions and regulations of the city, county and state where the Property is located.

(b) RELEASE. WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTION (A), EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN THE DEED, PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST EACH OF SELLER AND ITS AFFILIATES, AND ITS AND THEIR OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, RELATING TO, ARISING OUT OF OR WITH RESPECT TO (I) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (II) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY OR OTHER LICENSES FOR THE USE OR OPERATION OF THE BUILDING, AND/OR CERTIFICATES OF COMPLIANCE FOR THE BUILDING, (III) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (IV) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, (V) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE PROPERTY OR OTHERWISE DEVELOP THE PROPERTY, OR (VII) ANY OTHER MATTER RELATING TO THE PROPERTY.

(c) <u>WAIVER-DISCLAIMER AND EFFECT AND CONSEQUENCES OF THIS WAIVER-DISCLAIMER</u>. TO THE EXTENT THAT ANY IMPLIED WARRANTY (INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTY OF WORKMANSHIP) MIGHT OTHERWISE BE DEEMED TO BE A PART OF THIS AGREEMENT, IN CONSIDERATION OF THE MUTUAL COVENANTS, PROMISES AND AGREEMENTS CONTAINED HEREIN AND THE PURCHASE AND SALE CONTEMPLATED HEREBY, SELLER HEREBY DISCLAIMS, AND PURCHASER HEREBY KNOWINGLY, VOLUNTARILY, FULLY AND FOREVER WAIVES, THE IMPLIED WARRANTY OF HABITABILITY AND ANY OTHER WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF WORKMANSHIP, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. PURCHASER HEREBY ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT AS A RESULT OF SUCH DISCLAIMER AND WAIVER, THE IMPLIED WARRANTY OF HABITABILITY, AS WELL AS ALL OTHER EXPRESS OR IMPLIED WARRANTIES, ARE, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE DEED, NOT A PART OF THIS AGREEMENT AND THAT IF A DISPUTE ARISES WITH SELLER AND THE DISPUTE RESULTS IN A LAWSUIT, PURCHASER, AS A RESULT OF SUCH WAIVER AND DISCLAIMER, WILL NOT BE ABLE TO RELY ON THE IMPLIED

**WARRANTY OF HABITABILITY OR ANY OTHER SUCH EXPRESS OR IMPLIED WARRANTY AS A BASIS.**

(d) **WAIVER OF DISCLOSURES. TO THE FULLEXTE EXTENT PERMITTED BY LAW, PURCHASER HEREBY WAIVES ANY AND ALL RIGHTS AND BENEFITS WHICH IT NOW HAS BY VIRTUE OF THE PROVISIONS OF FEDERAL, STATE OR LOCAL LAW, RULES OR REGULATIONS, TO RECEIVE ANY DISCLOSURES, STATEMENTS, MATERIALS OR OTHER INFORMATION FROM SELLER IN CONNECTION WITH PURCHASER'S PURCHASE OF THE PROPPERTY.**

(e) **ACKNOWLEDGEMENT OF DISCLAIMERS, RELEASE AND WAIVERS AND SURVIVAL OF DISCLAIMERS, RELEASE AND WAIVERS. BY PLACING ITS INITIALS BELOW, PURCHASER SPECIFICALLY CONFIRMS THE FACT THAT IT IS AN EXPERIENCED AND SOPHISTICATED REAL ESTATE INVESTOR AND WAS PREPRESENTED BY COUNSEL WHO EXPLAINED, AT THE TIME THIS AGREEMENT WAS MADE, THE CONSEQUENCES OF THE FOREGOING PROVISIONS OF THIS SECTION 17. THE PROVISIONS OF THIS SECTION 17 SHALL SURVIVE THE CLOSING.**

PURCHASER: _/s/_       _/s/_

18. **Bankruptcy Court Approval.** Notwithstanding anything in this Agreement to the contrary, Purchaser and Seller acknowledge that Seller is a "Debtor" in Case No. 08-13141 in the United States Bankruptcy Court for the District of Delaware. Seller shall file a motion with the United States Bankruptcy Court for the District of Delaware (the "Court") seeking an Order from the Court (the "Order") to be issued at the next available hearing date approving the sale of the Property to Purchaser pursuant to the terms of this Agreement. Seller shall deliver to Purchaser or deposit it in the Closing Escrow a copy of the Order not later than the Closing Date set forth in Section 10. If Seller fails to deliver a copy of the Order to Purchaser or deposit it in the Closing Escrow on or before the Closing Date set forth in Section 10, the Closing shall be delayed until the copy of the Order is delivered to Purchaser or deposited in the Closing Escrow. Notwithstanding the foregoing, If Seller fails to deliver a copy of the Order to Purchaser or the Closing Escrow on or before 30 days after the Closing Date set forth in Section 10 (such extended date being referred to herein as the "Outside Closing Date") and Purchaser is not in default under any of its obligations under this Agreement, then Purchaser may, as its sole and exclusive remedy hereunder and in lieu of any other remedies available to Purchaser at law or in equity including, without limitation, the remedies available to Purchaser pursuant to Section 13 hereof, upon written notice to Seller which must be given after the Outside Closing Date but on or before the date the copy of the Order is delivered to Purchaser or the Closing Escrow, terminate this Agreement, in which event the Earnest Money shall be returned to Purchaser and Seller shall reimburse Purchaser for its actual out of pocket third party costs and expenses incurred in connection with its due diligence investigation of the

property in an amount not to exceed the sum of Five Thousand and No/100 Dollars ($5,000.00).

19.  **General Provisions**.

(a) **Entire Agreement**. This Agreement and exhibits hereto constitute the entire agreement of Seller and Purchaser with respect to sale of the Property and supersede all prior or contemporaneous written or oral agreements, whether express or implied.

(b) **Amendments**. This Agreement may be amended only by a written agreement executed and delivered by Seller and Purchaser.

(c) **Waivers**. No waiver of any provision or condition of, or default under, this Agreement by any party shall be valid unless in writing signed by such party. No such waiver shall be taken as a waiver of any other or similar provision or of any future event, act, or default.

(d) **Time**. Time is of the essence of this Agreement. In the computation of any period of time provided for in this Agreement or by law, the day of the act or event from which the period of time runs shall be excluded, and the last day of such period shall be included, unless it is not a Business Day, in which case it shall run to the next day which is Business Day. For the purpose of this Agreement, the term "**Business Day**" means any day other than (A) Saturday, (B) Sunday, or (C) any other day when federally insured banks in Chicago, Illinois are required or authorized to be closed. Any condition precedent to either party's obligation to perform hereunder is for the sole benefit of such party and may be waived at any time by such party.

(e) **Unenforceability**. In the event that any provision of this Agreement shall be unenforceable in whole or in part, such provision shall be limited to the extent necessary to render the same valid, or shall be excised from this Agreement, as circumstances require, and this Agreement shall be construed as if said provision had been incorporated herein as so limited, or as if said provision has not been included herein, as the case may be.

(f) **Assignment**. This Agreement may not be assigned by Purchaser without the prior express written consent of Seller (except as set forth below). This Agreement may be assigned by Seller to Seller's affiliate(s), provided (i) each such affiliate(s) is the owner of the Building for the period from such assignment until the Closing and (ii) such assignment(s) shall not release Seller from its obligations hereunder. Notwithstanding the foregoing, Purchaser may assign all of its rights, title, liability, interest and obligation pursuant to this Agreement to one or more entities affiliated with Purchaser provided that (i) no such assignment shall act to release Purchaser hereunder and (ii) Purchaser provides Seller with a copy of a written assignment agreement between Purchaser and its affiliate, which instrument shall be in form reasonably acceptable to Seller. In addition, Purchaser

may, at least 5 business days prior to Closing direct Seller to convey title to an entity as directed by Purchaser.

(g) **Notices.** Any notices or other communications permitted or required to be given hereunder shall be in writing, shall be delivered personally, by reputable overnight delivery service, or by fax (provided a hard copy is delivered on the next Business Day by personal delivery or reputable overnight delivery service), and shall be addressed to the respective party as set forth in this subsection (g). All notices and communications shall be deemed given and effective upon receipt or refusal thereof.

| | |
|---|---|
| To Seller: | **CHICAGO TRIBUNE COMPANY,** an Illinois corporation<br>435 N. Michigan Avenue<br>Chicago, Illinois<br>Attention: Stephanie Pater<br>Phone: 312-222-5563<br>Fax: 312-222-3148 |
| with a copy to: | Phyllis Volk<br>250 E. Pearson St.<br>Suite 906<br>Chicago, IL  60611<br><br>Phone: 312-440-7266<br>Fax:    312-268-7266 |
| To Purchaser: | **MICHAEL D. GAIN and JENNIFER R. GAIN**<br>12301 S. New Ave.<br>Ste. B<br>Lemont, IL  60439<br>Phone: 630-243-9900<br>Fax: 630-243-9925 |
| with a copy to: | Atty. Kevin M. Gensler<br>Dommermuth, Brestal, Cobine + West<br>123 Water St.<br>Naperville, IL  60566<br>Phone: 630-355-5800<br>Fax: 630-355-5976 |

(h) **Governing Law.** This Agreement shall be governed in all respects by the internal laws of the State of Illinois without regard to the laws regarding conflicts of laws. The provisions of this Section 19(h) shall survive the Closing

12

(i) **Counterparts**. This Agreement may be executed in any number of identical counterparts, any or all of which may contain the signatures of less than all of the parties, and all of which shall be construed together as a single instrument.

(j) **Construction**. Seller and Purchaser agree that each and its counsel have reviewed and approved this Agreement, and that any rules of construction which provide that ambiguities be resolved against the drafting party shall not be used in the interpretation of this Agreement or any amendments or exhibits hereto. The words "include", "including", "includes and any other derivation of "include" means "including, but not limited to" unless specifically set forth to the contrary. Headings of sections herein are for convenience of reference only, and shall not be construed as a part of this Agreement. Except to the extent expressly provided otherwise in this Agreement, (a) references to "Sections" or "subsections" in this Agreement shall refer to Sections and subsections of this Agreement, (b) references to "Exhibits" in this Agreement shall mean Exhibits attached to this Agreement, which by this reference are incorporated in and made a part of this Agreement, (c) the "date of this Agreement", "date hereof" and similar terms shall mean the date of the full execution and delivery of this Agreement, (d) "hereof", "herein", "hereunder" and similar terms shall refer to this Agreement as a whole and not to only a paragraph, Section or subsection of this Agreement, and (e) a "third party" shall mean, with regard to either party, any person or entity that is not directly or indirectly, controlled by, under common control of, or controlling such party, and an "affiliate" shall mean the opposite. The singular includes the plural and the plural includes the singular.

(k) **No Recording**. Purchaser shall not, and shall not cause or permit any other person to, record this Agreement or any memorandum or other evidence thereof in any public records. If Purchaser violates the terms of this subsection (k), then this Agreement shall be deemed *ipso facto* terminated, the Earnest Money Deposit (including all interest accrued thereon) shall be paid to Seller, and Purchaser shall have no further interest in the Property pursuant to this Agreement or otherwise.

(l) **OFAC**. Purchaser and, to Purchaser's actual knowledge, each person or entity owning an interest in Purchaser is (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the OFAC and/or on any other similar List (ii) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation or Executive Order of the President of the United States, and (iii) not an "Embargoed Person", and, to Purchaser's actual knowledge, none of the funds or other assets of Purchaser constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person, and to Purchaser's actual knowledge, no Embargoed Person has any interest of any nature whatsoever in Purchaser (whether directly or indirectly).

(m) **Binding Effect**. This Agreement shall not be binding in any way upon Seller unless and until Seller shall execute and deliver the same to Purchaser.

(n) **No Third Party Beneficiary.** The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party (including, without limitation, Title Company and Broker) , and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing. The provisions of this Section 19(n) shall survive the Closing.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**PURCHASER:**

_____
MICHAEL D. GAIN

_____
JENNIFER R. GAIN

**SELLER:**

CHICAGO TRIBUNE COMPANY, **an Illinois corporation**

By: _Phil Avy_____
Printed Name: PHIL DOHERTY
Its: VP/Finance & CFO

Date of Acceptance: __11/13/09__

15

## **EXHIBIT A**

## **PERMITTED EXCEPTIONS**

1. General and special real estate taxes and assessments not due and payable at the time of Closing;

2. Easements, Building and Building line restrictions of record, applicable Building and zoning laws and ordinances;

3. Acts done or suffered by or judgments against Purchaser or anyone claiming by, through or under Purchaser;

4. Purchaser's mortgage, if any, and related documents;

5. Liens and other matters of title over which the Title Company is willing to insure without cost to Seller (unless Seller has agreed to the cost) or Purchaser (in a manner reasonably acceptable to Purchaser); and

6. Any and all other matters of public record affecting the Property existing on or before the Approval Date.

7. Matters disclosed by the ALTA Survey.