UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        .    Case No. 08-13141-KJC
                              .
                              .
                              .
TRIBUNE COMPANY,              .
                              .    824 North Market Street
                              .    Wilmington, DE 19801
                              .
          Debtor.            .    December 1, 2009
. . . . . . . . . . . . . .    10:04 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


APPEARANCES:

For the Debtor:           Sidley Austin, LLP
                          By:  BRYAN KRAKAUER, ESQ.
                               JAMES F. CONLAN, ESQ.
                               JANET E. HENDERSON, ESQ.
                               JAMES DUCAYET, ESQ.
                          One South Dearborn Street
                          Chicago, IL 60603

                          Cole, Schotz, Meisel, Forman &
                           Leonard, P.A.
                          By:  NORMAN L. PERNICK, ESQ.
                          500 Delaware Avenue
                          Wilmington, DE  19801



Audio Operator:           Al Lugano




Proceedings recorded by electronic sound recording, transcript
produced by transcription service

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

For the Committee:          Landis Rath & Cobb, LLP
                            By:  ADAM G. LANDIS, ESQ.
                            919 Market Street
                            Wilmington, DE  19801

                            Chadbourne & Parke LLP
                            By:  HOWARD SEIFE, ESQ.
                                 DOUGLAS E. DEUTSCH, ESQ.
                            30 Rockefeller Plaza
                            New York, NY  10112

For the United States       Office of the U.S. Trustee
Department of Justice:      By:  JOSEPH J. McMAHON, ESQ.
                            844 King Street
                            Wilmington, DE 19801

For Law Debenture Trust     Bifferato, Gentilotti
Company of New York:        By:  GARVAN McDANIEL, ESQ.
                            800 N. King Street
                            Wilmington, DE  19801

For Credit Agreement        Hennigan, Bennett & Dorman, LLP
Lenders:                    By:  BRUCE BENNETT, ESQ.
                                 JAMES JOHNSTON, ESQ.
                            865 South Figueroa Street
                            Los Angeles, CA  90017

                            Young Conaway Stargatt & Taylor,
                             LLP
                            By:  M. BLAKE CLEARY, ESQ.
                            The Brandywine Building
                            1000 West Street
                            17th Floor
                            P.O. Box 391
                            Wilmington, DE  19899

For Perry Capital:          Perry Capital
                            By:  RICHARD PAIGE
                                 (telephonic appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For the Debtor: | Tribune Company<br>By:  CHANDLER BIGELOW, ESQ.<br>    (telephonic appearance)<br>    DAVE ELDERSVELD, ESQ.<br>    DONALD LEIBENTRITT, ESQ.<br><br>Sidley Austin, LLP<br>(telephonic appearances)<br>By:  CANDICE KLINE, ESQ.<br>    JILLIAN McCLELLAND, ESQ.<br>    KENNETH P. KANSA, ESQ.<br>    JESSICA BOELTER, ESQ.<br>One South Dearborn Street<br>Chicago, IL  60603 |
| For J.P. Morgan Chase: | Davis, Polk & Wardell<br>By:  DONALD BERNSTEIN, ESQ.<br>    DENNIS GLAZER, ESQ.<br>    SHARON KATZ, ESQ.<br>450 Lexington Avenue<br>New York, NY  10022<br><br>Richards, Layton & Finger, P.A.<br>By:  ROBERT J. STEARN, JR., ESQ.<br>One Rodney Square<br>920 N. King Street<br>P.O. Box 551<br>Wilmington, DE 19899 |
| For McCormick Tribune Foundation: | Ciardi, Ciardi & Astin, P.C.<br>By:  DANIEL K. ASTIN, ESQ.<br>919 Market Street<br>Suite 700<br>Wilmington, DE  19801 |
| For Centerbridge Credit Advisors: | Akin Gump Strauss Hauer &<br>    Feld L.L.P.<br>By:  DANIEL H. GOLDEN, ESQ.<br>590 Madison Avenue<br>New York, NY  10022-2524<br><br>Pachulski, Stang, Ziehl & Jones, LLP<br>By:  LAURA DAVIS JONES, ESQ.<br>919 North Market Street<br>17th Floor<br>P.O. Box 8705<br>Wilmington, DE  19899 |

**J&J COURT TRANSCRIBERS, INC.**

4

APPEARANCES (Cont'd.):

For Law Debenture:              Kasowitz, Benson, Torres &
                                 Friedman LLP
                                By:  DAVID ROSNER, ESQ.
                                     MATTHEW STEIN, ESQ.
                                1633 Broadway
                                New York, NY  10019

For Deutsche Bank              McCarter & English, LLP
Trust Company:                 By:  L. KATHARINE MAYER, ESQ.
                                     DAVID ADLER, ESQ.
                                Mellon Bank Center
                                919 Market Street
                                Suite 1800
                                Wilmington, DE 19899

For the Committee:             Zuckerman Spaeder LLP
                               By:  THOMAS G. MACAULEY, ESQ.
                                    GRAEME BUSH, ESQ.
                               1201 Connecticut Avenue, N.W.
                               Suite 1200
                               Washington, D.C.  20036

For Neil Plaintiffs:           Bifferato, LLC
                               By:  THOMAS F. DRISCOLL III, ESQ.
                               800 N. King Street, First Floor
                               Wilmington, DE  19801

For Merrill Lynch:             Potter, Anderson & Corroon, LLP
                               By: LAURIE SELBER SILVERSTEIN, ESQ.
                               Hercules Plaza
                               1313 North Market Street
                               Wilmington, DE 19801

                               Kaye Scholer, LLP
                               By:  MADLYN GLEICH PRIMOFF, ESQ.
                                    JOSEPH M. DRAYTON, ESQ.
                               425 Park Avenue
                               New York, NY  10022-3598

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES:

For Phillip Bentley:        Kramer, Levin, Naftalis &
                             Frankel, LLP
                            By:  PHILLIP BENTLEY, ESQ.
                            919 Third Avenue
                            New York, NY  10022

For Katherine Gilman:       Kramer, Levin, Naftalis &
                             Frankel, LLP
                            By:  KATHERINE GILMAN, ESQ.
                            919 Third Avenue
                            New York, NY  10022

For Hain Capital            Hain Capital Group, LLC
Group, LLC:                 By:  BRIAN L. BRAGER

For JPMorgan Chase:         JPMorgan Chase
                            By:  KEVIN C. KELLEY

For Sandelman Partners      Sandelman Partners Multi-Strategy
Multi-Strategy:             By:  JOSEPH LAMPORT

For Dennis A. Prieto:       Aurelius Capital Management
                            By:  DENNIS A. PRIETO

For Seneca Capital:         Seneca Capital
                            By:  USMAN TAHHIR

For Carval Investors:       Carval Investors
                            By:  TECK WONG

**J&J COURT TRANSCRIBERS, INC.**

1              THE CLERK:  All rise.  Be seated.

2              THE COURT:  Good morning, everyone.

3              ALL:  Good morning, Your Honor.

4              MR. CONLAN:  Good morning, Your Honor.  James Conlan

5    on behalf of the debtor.  Mr. Krakauer, my partner, and I will

6    be tag teaming today.

7              Your Honor, before we begin today, before we start

8    with the agenda, I'd like to provide some brief context.  The

9    motions today and, frankly, because it's an omnibus and since

10   we're at that stage of the case, I would like to again briefly

11   provide some context.

12             THE COURT:  Go ahead.

13             MR. CONLAN:  I'd like to say in order to make an

14   omelette, you have to break some eggs, so I'm going to break a

15   few eggs here.

16             We have a firm, highly developed view of what the

17   plan will look like.  A de-leveraged, reorganized Tribune will

18   emerge with modest debt under that plan.  It's equity will be

19   owned by the banks and by other in-the-money funded debt

20   creditors.  The trade will be taken care of.  That's not in

21   serious dispute.  The plan will -- that we will file will

22   provide for global resolution.

23             The big issue, and it's a very big one, is what

24   percentage of the stock of the reorganized, de-leveraged

25   Tribune will be owned by the banks under the plan and which

1  part will be owned by the in-the-money funded debt creditors.

2  We have been focused like a laser on that issue since the very

3  beginning of this case.  While we work through a variety of

4  other issues, which we'll discuss later, that issue has been

5  the core issue for a long time.  We've been positioning with

6  respect to that issue, analyzing with respect to that issue,

7  and now attempting to drive to consensus on that issue.

8          We are close to the place where -- and I say close --

9  close to the place where there is -- has been enough informal

10  discovery to allow a meaningful bid ask to develop.  We some

11  more, but we're close.  Some would say we have enough already.

12  Others would say we need a little more, but we're close.

13          If we get stuck in that negotiation, and we may very

14  well get stuck in that negotiation, we're going to unstick it

15  with litigation.  That litigation, which we will tee up, may be

16  -- may be in context of a cram down plan supported by the

17  banks, and it may not be.  It may be separate and apart from an

18  advance of confirmation of a plan, and among the things that we

19  working with the Committee will focus upon in deciding which

20  way that litigation is teed up is, in part, who's being

21  unreasonable in those negotiations.

22          If the banks are being reasonable and the public

23  debtor not being reasonable, everyone can figure out how we'll

24  approach that issue.  If the reverse is the case, everyone can

25  figure out how we'll approach that issue.  That creative

1   tension is precisely what we have meant to cause.

2          That's the background for everything you will hear

3   today, and, frankly, it's the background of everything that

4   matters at this stage of this case.  Not that everything we've

5   done to date, which we're very proud of, hasn't mattered.  It

6   has.  But it's always been in context of that, who owns the

7   equity of the reorganized, de-leveraged Tribune and in what

8   percentage.  That's it in terms of context.  And if Your Honor

9   wishes, we can provide that kind of context each month at the

10  omnibus hearing if warranted, quite frankly, and even more

11  frequently if Your Honor would like.

12         With respect to the items on the agenda today, this

13  is a matter of housekeeping.  Items 1 through 12 and Item 15

14  have been adjourned, resolved, or orders have been entered.  So

15  that all that remains are Item 13 -- Items 13, 14, and 16.

16         We think that the best way to proceed is to have the

17  exclusivity motion go first with the status conference

18  regarding discovery after that and the so-called fee motion

19  after, because we think, obviously, the last two items that we

20  proposed will make more sense in the wake of the context that

21  will be provided by the exclusivity discussion, but you're the

22  Judge.

23         THE COURT:  Does anyone have any objection to

24  proceeding in that fashion?

25                    (No verbal response)


                 **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I hear no response.  Let's do that then.

2          MR. CONLAN:  Very good.  Your Honor, I am not going

3 to read or even follow in a very tight fashion what's already

4 in our exclusivity motion.  I'll hit the high points, but,

5 obviously, everybody's read it.  Your Honor is very familiar

6 with what we say in that motion.

7          We ask for an extension of so-called front-end

8 exclusivity to March 31.  We ask for an extension of back-end

9 exclusivity to May 31.  We are quite cognizant of the outer

10 limit of our exclusivity in these cases.  This is our third

11 request.

12          Just to run the bases here, as Your Honor knows,

13 keenly aware, and it's in our motion, we have stabilized the

14 business.  Hats off to management as well as some stabilization

15 in what was a very sick economy, although it is getting better,

16 we hope.  We have sold the Cubs.  That was a point of big

17 focus.  We were somewhat concerned about the damage of these

18 proceedings to that very sensitive franchise.  That's been

19 resolved.

20          We have developed a multi-year business plan, and we

21 have shared that multi-year business plan with major

22 constituencies and have a pretty firm view on what the

23 enterprise value of this reorganized, de-leveraged company

24 would be.  We have a highly developed sense of the -- what I'll

25 broadly describe as the operational, financial, and legal

1 analyses that underpin the negotiation that I talked about,

2 which in reality has already begun.

3       In addition to issues relating to the so-called ESOP

4 transaction, the tax issues, the regulatory issues, the FCC

5 issues are all issues that we have ground down to a very fine

6 point, and all of the extensions of exclusivity that we've

7 received have aided in that regard, Your Honor, and we thank

8 you for that.

9       We now are at a place where we are actively engaging

10 with respect to the review of the so-called ESOP transaction.

11 That doesn't mean we just started.  We started at the very

12 beginning of the case, but it all comes together in a

13 framework, frankly, as the parties position and the issues

14 develop.  Did we tell everybody that was our approach?  No.

15 That's not how a negotiation works.  That's not how a debtor

16 leads a company through a process.  Your Honor knows that very,

17 very well.

18       But we are at the stage where we are on top of that

19 issue now.  We know who we think is in the money and who's not.

20 We have a pretty highly developed view of the legal issues and

21 the likelihood of success and failure on each of those issues,

22 and we think we have a pretty good idea of where a consensual

23 resolution ought to come out.  We just don't know if others

24 will agree, but we're going to make every effort we can to

25 drive them to that place in a sensible, intelligent, and fully

1 informed way.

2          Over 30 entities, as you've seen in the motion have

3 been involved in this so-called informal discovery process,

4 some more than others, and when we come to the place of the

5 status conference today, our objective will be, with your help,

6 to begin to ham in people with respect to the remaining items

7 that could be necessary to close the gap we'll call it --

8 generously call it with respect to the bid ask between the

9 banks, on the one hand, and the in-the-money funded debt

10 creditors, other funded debt creditors.

11          As I said in my contextual remarks at the beginning,

12 all of the moving parts -- I shouldn't say all.  Ninety-nine

13 percent of the moving parts, the infrastructure, the machinery

14 of a plan of reorganization are highly developed.  We know that

15 a -- in our view, a reorganized, de-leveraged Tribune will

16 emerge, just to repeat.  That it will have modest debt.  It

17 can't handle significant debt given the overall environment.

18 The equity of the reorganized, de-leveraged company will be

19 owned by the banks and by the in-the-money funded debt

20 creditors.

21          I'm going to refer to that today as the two big

22 blanks, but make no mistake the vast majority of the plan and

23 its infrastructure are well in hand in filling in those blanks.

24 By agreement or by litigation is what we mean to do, and we're

25 not leaving this courtroom until we fill those two blanks in by

1 agreement or by litigation.  We want global resolution, and we

2 want to achieve it here.

3        Some of this I'll save with respect to rebuttal, if

4 you will, in responding to the objections that have been filed,

5 but one preview that I'd like to provide the Court now is that

6 -- and I alluded to this again at the beginning.  Anybody who

7 thinks -- and I think the public debt holders may have thought

8 this initially.  Anybody who thinks that if the negotiation

9 does not result in those two numbers being filled in by

10 agreement, that is a plan where two-thirds an amount, more than

11 one half the number of the banks will accept it, and where two-

12 thirds an amount, more than one half the number of the in-the-

13 money other funded debt creditors who accept it.  Anybody who

14 thinks that if that negotiation fails, it means we're going to

15 file the bank's plan and cram it down on the public debt is

16 mistaken.  That's not what we meant to say or to indicate in

17 our motion.

18        Conversely, anybody who thinks that if those

19 negotiations fail, because the public debt is being

20 unreasonable and the banks are being reasonable, that we won't

21 file a plan that seeks to cram down the public debt is also

22 mistaken.  We reserve our rights to do that.  We want to

23 utilize this process to drive consensus, and if we can't, if we

24 are stuck -- for example, if the standing issue, which is

25 referred to in Mr. Bennett's pleading, is a gating item and the

1  parties just can't get over it, then we will quickly -- we

2  won't delay.  We will quickly come to this Court and we will

3  tee up a resolution of that issue.

4         It won't be in a  subsidiary-only plan, I can tell

5  you that, because that's not global resolution.  But it may be

6  in a global cram down plan if the banks are being reasonable,

7  or it may be in advance of and apart from a global -- or a plan

8  of reorganization as well.  That, quite frankly, Your Honor, is

9  where we are in these cases.  We are at a critical juncture.

10         We are very satisfied with the way that these cases

11  have gone to date, knowing full well that the issue I just

12  described is what ultimately drives the ownership of the

13  reorganized, de-leveraged Tribune companies, and the parties

14  have all been, frankly, sensible, reasonable.  Everybody's a

15  little litigious.  Some -- there certainly are factions that

16  have developed, including among our banks.  There are -- but

17  they also are sensible and reasonable to deal with most of the

18  time.  I like to think we are as well.

19         Same is true with the public debt.  And the Committee

20  has been very helpful in the process.  And in everything I just

21  described, I referred to the debtor, only because we represent

22  the debtor, but we regard the Committee as very much our

23  partner in this process, and that we will be working closely

24  with them in attempting to drive a consensual resolution, and

25  if we are stuck those efforts to unstick it through a

1  litigation mechanism that makes sense and that takes into

2  account how the parties have conducted themselves and what the

3  issues are that have stopped them in those negotiations.

4        I'll stop there and ask Your Honor is you have any

5  questions before I go on and --

6        THE COURT:  Well, my first question is do you intend

7  to present any evidence in support of your motion?

8        MR. CONLAN:  Your Honor, we didn't come today

9  prepared to present evidence, but we can, if Your Honor

10  believes it's necessary.

11        THE COURT:  Well, I'll hear from the objectors.  I've

12  read the objections.  You know, they range from four months is

13  too long to we want to do a subsidiary plan to any extension

14  ought to be conditioned on requiring the focus on resolving the

15  LBO issue consensually.  I didn't gather, frankly, there were

16  any factual disputes from the issues raised by the objectors,

17  but matters of I guess we'd call them largely strategy.  And if

18  that's the case, I won't necessarily require testimony in

19  support of the motion to answer your question.  Let me hear

20  from others.

21        MR. CONLAN:  Very well, Your Honor.

22        MR. SEIFE:  Good morning, Your Honor.  Howard Seife

23  from Chadbourne & Parke for the Official Committee of Unsecured

24  Creditors.  And, as you know from the Committee's submission,

25  the Committee is supportive of the debtor's request for

1 extension of exclusivity by the four months and the additional

2 two months for solicitation.

3        Debtor's counsel has set forth what has been

4 accomplished in the case, and we think there have been very

5 significant accomplishments to date including the disposition

6 of the Cubs, improvement of cash flow, and, certainly, the

7 production of a business plan.  But I think counsel for the

8 debtor was quite frank that the elephant in the room remains,

9 and now there's the resolution of any potential claims that

10 might have arisen from the LBO ESOP transaction.

11        And from the start of the case it's been the

12 Committee's mandate to its professionals to conduct an

13 investigation of that transaction and see if there are

14 potential causes of action which should be pursued by the

15 estate or by a designee on behalf of the creditors, and that's

16 been what we have been focusing on from the outset.  And we

17 have undertaken that through a review of the publicly available

18 information, obviously, researched the issues involved, and

19 also the commencement of an extensive discovery program under

20 Rule 2004, and under the local rules that is a somewhat

21 cooperative process.

22        And it's been very fruitful in this case, and in

23 almost every -- almost every party that we have contacted has

24 cooperated in terms of the production of documents, and that

25 process is ongoing.  And to date, we've received I think over

1  2.3 million pages of documents from the various parties.  Those

2  parties have consisted of the lenders, the financial advisors

3  to the transaction, shareholders, members of the boards of

4  directors, and the issuers of solvency opinions.

5          So it's really run the gamut, and as I said, that has

6  been underway since March, and our firm, in conjunction with

7  special counsel that was brought into the case.  Graeme Bush of

8  the Zuckerman Spaeder firm has been working very closely and in

9  conjunction with lead Committee counsel.

10         From the start, the Committee determined that we

11 would approach this case somewhat differently than other large

12 Chapter 11s which had LBO fraudulent conveyance issues.  I'm

13 sure Your Honor is aware in some of those other cases

14 litigation was initiated from day one.  We, the Committee,

15 determined that that was not the approach to take in this case.

16 Rather than shoot first and talk later, we decided to undertake

17 the investigation, become knowledgeable and then engage in

18 substantive discussions with the various parties to see if a

19 consensual resolution could be reached.

20         And we are now approaching the knowledge curve where

21 the Committee is in the position, and we have told other

22 parties that in January we will be in the position of being

23 sufficiently knowledgeable and up to speed and having gone far

24 enough along in the discovery process to sit down and have

25 those substantive negotiations.

1         That is not to say we have not had preliminary

2 meetings with the various parties including the debtors and the

3 lenders.  Those have been conducted on several occasions.

4 They've been very useful in terms of sharing legal theories,

5 defenses, factual issues that will have to be dealt with

6 including the gating solvency issues at the time of the

7 transactions.  The parties shared their views on solvency and

8 some of the factors that are going to be critical to that

9 determination.  So that process has already begun, and, as I

10 said, I think we're now teeing up for the real meat and

11 potatoes of negotiations in January.

12         The discovery is continuing.  There are depositions

13 which are scheduled for December.  Hopefully, those will be

14 completed in time before the negotiation session.  We will talk

15 in the status conference following this particular motion

16 regarding one or two problems that have come up in the

17 discovery process, and the possible need for Court assistance

18 in that regard.

19         Given the framework that we are in and this process

20 that has been commenced from the beginning to try to come to a

21 consensual resolution and given where we are in the discovery

22 process, we think it is appropriate to have an extension of

23 four months.  When one looks at the calendar and starts in

24 January with substantive negotiations which I'm sure will take

25 a period of weeks, and if they do come to a resolution, it will

1  take time to develop the final elements of a plan.  I think it

2  is a little more than plugging in the two gaps, the two blanks

3  alluded to by debtor's counsel, because settlements and

4  negotiations can develop complex resolutions of issues.  So I

5  think the four-month period that is being sought could be one

6  that is quite valuable and fits well into the framework of

7  where we are in the case today.

8          As to the suggestion by the credit agreement lender

9  group, that they have a magical plan for the subsidiaries which

10 will obviate the need for a resolution of the fraudulent

11 conveyance claims regarding the upstream guarantees, I would

12 suggest, Your Honor, that that is just a clever technical

13 attempt to try to avoid a real issue here, and the reliance on

14 dicta in a Southern District of New York case, the <u>Adelphia</u>

15 case, is not particularly applicable to our situation where we

16 do have live creditors at the subsidiaries that have

17 substantial claims that do -- would benefit from a potential

18 fraudulent conveyance action, number one.

19         Number two, I don't think <u>Adelphia</u> is an accurate

20 statement of the law, particularly in a situation here where we

21 would, if there is litigation, be proceeding under Section 548

22 to set aside the guaranties, and 548 does not have a benefit to

23 the estate provision in it unlike Section 550.  So I don't

24 think this is the forum to get into the substantive discussion

25 of potential defenses to a fraudulent conveyance action.  I

1 think suffice it to say that any such plan that might be filed

2 would result in a massive litigation, and I think it's fair to

3 say the public debt holders and their representatives and

4 perhaps as well the Committee would not sit aside and let such

5 a plan go through and have it provide a release for the lenders

6 in the case under the guise of a plan.

7 　　　　　So all in all, Your Honor, as I said, the Committee

8 is supportive of the motion.  We think it fits well in the

9 framework to give the parties sufficient time to see if a

10 consensual resolution can be met.  If not, you've heard from

11 debtor's counsel that they're prepared to go forward

12 potentially with a plan that one side or the other is not happy

13 with, but I think it has been the Committee's goal to avoid

14 massive litigation that we've seen in other cases to see if a

15 consensual resolution can be reached, and I think we need the

16 appropriate time and structure to allow that process to go

17 forward.

18 　　　　　THE COURT:  Thank you.

19 　　　　　MR. ROSNER:  Thank you, Your Honor.  David Rosner of

20 Kasowitz, Benson, Torres & Friedman.  We represent Law

21 Debenture, who is the Indenture Trustee for the 6.61 percent, 7

22 and a quarter percent indentures that were the pre-LBO debt

23 along with a bunch of other pre-LBO debt that were left --

24 about $2.4 billion of debt that was left behind and are left,

25 you know, in this case I guess fighting for their recovery on

1  the basis of the LBO.

2          I also would like to, if you don't mind, give some

3  context.  I have not been before Your Honor before, and I would

4  like to give a viewpoint from our perspective of the case.  I

5  have certainly appreciated Mr. Conlan's remarks, and I listened

6  to them.  I was somewhat discomforted by what could be view and

7  I hope I shouldn't view as somewhat of a predisposition of

8  certain issues that are fairly raised by the LBO that put this

9  company into bankruptcy, you know, just a year ago.

10          THE COURT:  I didn't gather any predisposition.  I

11  gathered from his comments a resoluteness about moving the

12  process through.

13          MR. ROSNER:  And the resoluteness that we share, and

14  there's -- and I think that all the parties share.  I guess

15  what my concern and I just want to point out to the Court that

16  a view that the banks -- call them the banks or call them the

17  hedge funds -- are going to end up with as the new owners of

18  the company is taking a view somewhat on the litigation,

19  because that is taking a view that the -- that they will remain

20  post-LBO remedy with claims such that those claims would be

21  able to receive equity in a reorganized Tribune Company, and

22  that would be a principal issue in the case.

23          And I take it -- and I'm just going to state it,

24  because I do think that this was Mr. Conlan's point -- that he

25  said there will be -- there may be litigation if parties can't

1    reach a reasonable agreement, and that's often the case that

2    litigation succeeds at failure of negotiation, but that the

3    litigation would be predicated upon who's being the most

4    reasonable.  And I take it from that what he means is who is

5    being -- how the various parties, and in particular, the debtor

6    is looking at reasonableness from the perspective of what the

7    parties rights, remedies, and the claims actually are not who

8    is sitting in a bid and ask negotiation and is giving up more

9    than maybe another side is that is really looking at what the

10   parties' rights and remedies are, because I think that's the

11   basis of any fair negotiation.

12           And, importantly, in that respect I think we all have

13   to take into account that these are not -- we're not just

14   simply talking about fraudulent conveyance claims.  You know,

15   traditional -- let's say, you know, in the Third Circuit very

16   well developed fraudulent conveyance claims that arise out of a

17   leverage buyout, but, in addition, the breach of fiduciary duty

18   claims that can affect, you know, current directors as well as

19   current managers, the aiding and abetting type claims, and then

20   recovery claims for discouragement of both -- of interest and

21   advisory fees that were paid out of the Tribune Company.  So

22   there's a mix here of claims that I think is necessary for

23   people to understand.

24           I think it is important in understanding both the

25   exclusivity motion and the other matters that are going to be

1  before Your Honor really the substance of the leverage buyout,

2  because that really is the heart of this case.  The selling of

3  the Cubs was good and maybe will bring more fortune to the Cubs

4  franchise and new ownership, but that was not the --

5          THE COURT:  I've read that new ownership has resolved

6  to take this franchise to the World Series.

7          MR. ROSNER:  I assume that means there will be no

8  goats, and it has been, what is it, 104 years, I believe, since

9  the last victor -- the last World Series.  But, in any event,

10  we somewhat wish them luck, and being from New York not too

11  much luck.

12          THE COURT:  Oh.

13          MR. ROSNER:  In April --

14          THE COURT:  As a Philadelphia Phillies fan, I share

15  that view.

16                      (Laughter)

17          MR. ROSNER:  In April of 2007 Tribune agreed to

18  undertake -- and the funding banks and now the hedge funds as

19  successors, they agreed -- they funded this massive amount of

20  debt to permit Mr. Zell to acquire control of Tribune.  That is

21  the LBO that drove this company into bankruptcy.

22          I think the numbers -- the staggering numbers are

23  relevant to not only the proceedings today but to the substance

24  of what this entire case is about.  Eleven and a half billion

25  dollars in debt was brought on to the company, which added to

1  the existing debt, put $14 billion of leverage on to this

2  newspaper and entertainment company -- newspaper being I

3  believe 72 percent of the business and entertainment 28 percent

4  -- knowing where the newspaper business was going and causing

5  the rapid decline of both this company as it has other

6  companies.

7         The LBO here was the sort that we all saw in 2007.

8  Some of us, myself included, would say it was the type of

9  transaction that helped to bring down our economy, because it

10 was a virtually no-money-down LBO, kind of like we're seeing in

11 the Lyondell in New York, that we saw in other instances

12 perhaps like Tusa.  But no money down in which equity sponsors

13 would put in 2 -- I think this I think slightly less than 2.5

14 percent of the total capitalization and then putting on 98 to

15 97 percent leverage and acquiring no additional assets unlike a

16 Lyondell.  No commercial purpose other than to pay out $8.3

17 billion to shareholders, absolutely no benefit to the Tribune

18 companies and to put Mr. Zell in charge of the company where he

19 remains today.  You know, I've heard that he has at times, you

20 know, stated that he's -- this is the biggest loss he's ever

21 suffered, but he has been and remains in charge of this

22 company, and I would say that that has some value in and of

23 itself.

24         This LBO was actually predicated and designed upon

25 upstream guarantees from the subsidiaries in order to achieve a

1 result where Mr. Conlan and others can say that equity goes to

2 the banks, and that there's funded public debt, but that

3 they're at a different level, and it was structured so that

4 they can utilize that and actually disenfranchise the pre-LBO

5 creditors, and in this way shift the entire risk to those

6 creditors, which is the fundamental flaw of an LBO.  Some would

7 argue -- I'm not necessarily taking this view, -- that LBOs

8 provide absolutely no benefit to companies at all, and in this

9 case we've seen it in spades.

10        THE COURT:  Well, that's an argument that's been out

11 there for a very long time.

12        MR. ROSNER:  Yes.  And then we read about them, and

13 you see the ones that come into this court, particularly in the

14 Third Circuit, and you scratch your head, and there's this

15 argument that while people can contract away from them,

16 indentures can provide that these things can't be done.  But in

17 the real world, those indentures can't be written that way.

18 Nobody can put in provisions that will actually block LBOs.

19 The debt doesn't get issued that way.

20        Here the probable intent and purpose and, certainly,

21 the effect of Tribune's LBO was to take value out of the

22 company in exchange for no value but to the detriment of the

23 pre-LBO creditors, the very creditors that were being told,

24 either through the hedge funds pleading or in general, are the

25 ones that are going to continue to suffer by not receiving any

1  distribution, or at least it's alleged that they may not

2  receive any distribution, which can't happen in a Bankruptcy

3  Court, in my opinion.  When there is a harm, there is a remedy,

4  and that -- and when there's been an injury to a particular

5  entity, that entity is able to realize upon that injury and

6  then obtain its remedy, and the Third Circuit is pretty clear

7  that those remedies exist.

8         Now, I will tell you, Your Honor, that a man who is

9  much smarter than I once said something that I thought was very

10 apropos to this case, so I wrote it down, and I -- and so I'm

11 going to say it.  He said, "You cannot solve a problem from the

12 same level of thinking that created the problem that you're

13 trying to solve."  And I think that's what is going on amongst

14 the various parties.  That it's -- when I see the hedge funds

15 presenting a paper that says we can buy off a bunch of

16 creditors, and then we don't even have to deal with these

17 things, it's that kind of thinking, and I think that maybe

18 Tribune, the banks, and certainly, the hedge funds are choosing

19 to ignore Mr. Einstein's admonition and have continued, as

20 we'll hear and as we'll see later when I address the bank fee

21 discouragement motion, as I like to call it -- and I heard it

22 called a so-called motion just a little while ago.

23        Bankruptcy cases have to not only be fair.  They have

24 to appear fair.  When there's a harm, there's a remedy, and the

25 pre-LBO creditors are entitled to that remedy.  That's the way

1  that I see the context of this case.  I, for Law Debenture, I

2  think other public debtor holders -- that's the phrase that's

3  being used -- see that and cannot look at this case as the case

4  where an LBO is swept -- the LBO harms our swept under the rug

5  through a forced negotiation.  And I'm sorry.  I shouldn't say

6  a forced negotiation.  An actual negotiation and then a forced

7  litigation that occurs afterwards, should that litigation be in

8  the nature of a pre-determined settlement of claims to which

9  the bondholders not agree.  I've always understood the word

10  settlement to mean both sides agree on what that -- what a

11  settlement is, but I'm not --

12          THE COURT:  Or in this case all 30 of them.

13          MR. ROSNER:  In this --

14          THE COURT:  Let's focus on the motion that's directly

15  before me at the moment, and I want to make sure I understand

16  the response that you filed.  You're in favor of an extension,

17  but it seems to me from your pleading what you want me to do is

18  either outside of an order granting the extension or inside of

19  the order granting the extension somehow condition it upon or

20  require the debtor to focus on debt, which it's now told me

21  it's already focusing on.  So tell me precisely what relief you

22  would like me to grant or not grant today.

23          MR. ROSNER:  Well, the relief I would like you to

24  grant is to extend the debtor's exclusivity by four months.  We

25  are in agreement with the debtors that that is what is

necessary here.  I guess for a slightly different reason as well we -- we absolutely agree that there should be full information provided to all the parties.  And not to jump ahead to something else you're going to hear today, but when people often times throw out numbers like 30 parties and the 170,000 pages of documents and this and that, that doesn't necessarily mean that real information in discovery has been flowing.  It just means there's been a lot of stuff.

THE COURT:  Well, in today's electronic age it's not hard to generate big numbers.

MR. ROSNER:  Absolutely not, and when you get 170,000 pages that are identical to the 170,000 you got before, I would say you haven't gotten 340,000 pages by any stretch.  But I do think that there's also other benefits that can be obtained in -- during the exclusivity period in addition to understanding and remedying the LBO.  I do think that is first and foremost. I think that is most important that it (a) be understood, but then (b) that it actually be remedied, and remedy can be done by an agreement, but remedying can also be done through the prosecution of claims, and there can be settlement once claims are prosecuted.  It shouldn't be forced.

So we were making the point that we were saying we are -- I don't want to use the word admonished, because that sounds harsh.  I want to say we're encouraging the debtors not to utilize this time in order to put forth a plan that forces a

1  so-called settlement of the LBO claims.  Again, noting that

2  there are a lot of LBO claims, people can't just be handed

3  releases.  Particularly in the Third Circuit they just can't be

4  handed releases on claims that are at Tribune Company for

5  aiding and abetting and claims of breach of fiduciary duty.

6           So there is -- I agree with Mr. Seife for the

7  Committee that there's a lot to what would be even a negotiated

8  settlement.  So our point was please, debtors, as you move into

9  exclusivity with which we support, make sure that when you talk

10 about a settlement, that you're actually trying to achieve it

11 with the set -- with the parties who would settle, and absent

12 that, then let's prosecute the litigation not a cram down plan,

13 because that does not bring on the actual litigation.

14          The other point that we wanted to make was that

15 exclusivity can do even more than what is the headline, which

16 is the LBO.  The bankruptcy is -- has been almost a year long.

17 And I don't mean this in a disparaging way in any respect, but

18 I would say that what's really been achieved so far has been

19 there's been a sale of the Cubs.  There's been an ongoing fight

20 with Warren Beatty that I've been reading about.  There have

21 been -- a motion to earn bonuses for certain executives, and

22 there's been a bunch of leases and contracts that have been

23 examined.

24          I think there's more that the company can do probably

25 in its four months before it gets to a plan that would actually

1  aid it while it uses its very powerful Chapter 11 tools that it

2  will no longer have once it's out of bankruptcy.  I trust that

3  the company is also studying that, and for that reason they

4  said we need four months.  We don't -- this isn't something

5  where we can -- it's just a 30-day sit down with the banks and

6  the hedge funds and sit down with the bondholders.  So we think

7  it's -- that's important.

8          I would like to say that getting back to the LBO,

9  which I guess you could say is somewhat of theme that I have,

10 and the remedies of the LBO, but it cannot just be blithely

11 ignored as has been urged by the hedge funds in the aggressive

12 pleading that they filed to say that, you know, in their first,

13 you know, entrance into the case that exclusivity should be

14 terminated, and they should be able to stuff the fraudulent

15 conveyance claims and pay off a bunch of people and be gone.

16         In addition to the other claims that I've identified

17 that are not the fraudulent conveyance claims, it is, of

18 course, inequitable for people to keep ill-gotten gains by

19 simply trying to maneuver into a position where they can say we

20 don't think that those claims exist.  So -- and I do think

21 there's an irony, and I hope Your Honor, you know, picked up on

22 the -- and I'm sure Your Honor picked up on the irony in the

23 papers where the hedge funds kind of shamelessly complain about

24 the Unsecured Creditors Committee's -- the costs associated

25 with investigating what is the most important and probably

1 largest failed LBO ever, the 5 to 7 million, while at the same

2 time participating and taking down $25 million from the debtors

3 in their defense of the very claim.  There's a bit of an irony

4 there that certainly wasn't lost on me.

5         What the hedge funds urge this Court to accept as a

6 principle, which it's not, is, is that they can simply buy off

7 the trade creditors, which we -- I assume in good faith they

8 weren't meaning that that would somehow change the trade

9 creditors views as members of the Unsecured Creditors

10 Committee.  But what they can essentially do is create a $150

11 million dollar administrative claim class or a larger one than

12 we're used to seeing, and then they can bury the claims for

13 good.

14         There's several flaws in that idea, and I think that

15 Mr. Seife has pointed out the ones that are, you know,

16 important, but there are other facts, of course, that would go

17 into that.  There's $22.3 billion of filed -- I'm sorry -- of

18 scheduled inter-company claims that fly from Tribune Company

19 down to the various subsidiaries.  They're not being paid in

20 full.  There's the bridge debt.  That's not being paid in full

21 as far as I understand.  They complain that there's been no

22 substantive consolidation.  Well, that usually happens as part

23 of a plan.  It's seldom.  It has happened outside of a plan,

24 but it's seldom.  And here you may very well have a substantive

25 consolidation of these two companies that were created just

1  under Tribune Company as part of the LBO.  I don't know.

2        And, you know, asked earlier of Mr. Conlan whether

3  there was going to be a presentation of evidence on the motion,

4  because you didn't know if that was required and you didn't

5  know what their position was.  I would say that as to the hedge

6  funds and their pleading that's been before the Court, it is

7  actually predicated upon these quasi-facts, these things that

8  they say.  And I don't know if they want to catch someone's

9  attention, but it's really this supposition and kind of

10 innuendo that there's competitors, quote, casting aspersion on

11 Tribune, and that the buy off will garner full support of a

12 hotly contested confirmation where there will be opposition by,

13 you know, not only Law Debenture and not only Deutsche Bank but

14 probably from Tribune Company as well as the Ds and Os and the

15 shareholders both current and former.  I mean there's just no

16 evidence of these things, but yet they're said in the motion

17 that Tribune Company is suffering ongoing harm.

18       I mean my I look at the numbers is that they're

19 performing very well.  In fact, they're performing better in

20 bankruptcy than they did outside of bankruptcy.  Not to say

21 that getting out of bankruptcy is not a laudable goal.

22 Everybody wants to get out of bankruptcy.  It's not the best of

23 all places to operate, but you do have an automatic stay, and

24 in this case the Tribune Company doesn't have any milestones

25 that are coming up.  It doesn't have financing that's

1  disappearing.  It doesn't have anything that is pushing it.  So

2  this urge to push through a plan on this, you know, artifice to

3  actually eliminate plans -- claims is a bad idea, but it's also

4  unprincipled.

5        They raise this issue that they can bury the claims,

6  and then they quickly, you know, run from it and say, well,

7  that's not an issue for today.  And I agree it's not an issue

8  for today, but I do think that they said it, and we should just

9  make sure that Your Honor understands that there's a lot of

10 things they didn't say about that, and I'm not going to belabor

11 the point, unless Your Honor later on or now wants me to be

12 belabor the point, which I assume you don't.

13       THE COURT:  It's belabored enough I think.

14       MR. ROSNER:  I'm sorry?

15       THE COURT:  It's been belabored enough.

16       MR. ROSNER:  Okay.  I just do want to point out that

17 there are -- that the cases to look at are that the fraudulent

18 conveyance claims subsist when there's the existence of an

19 unsecured creditor at the outset of the case.  You don't look

20 at it post-confirmation.  You look at it on the day of the

21 filing.  The case law is clear.

22       And as to what they're proposing, I would like to

23 just leave the Court with one quotation, and basically what

24 that principle is, and we all know what it is, it's the Moore

25 vs. Bay principle that's throughout the Bankruptcy Code, that

1  you avoid something in its entirety.  But the one thing that

2  the Eighth Circuit Bankruptcy Appellate Panel said specifically

3  about something that the hedge funds are pushing hard on is

4  they said, "It is inconsistent with the Bankruptcy Code to

5  allow a transferee of a fraudulent transfer to defeat the

6  Bankruptcy Trustee by paying off a couple of creditors.  The

7  potential for abuse is obvious."  I would agree that it's

8  obvious, and it would be clear here.  And that's the <u>DLC</u> case,

9  Your Honor, out of the Eighth Circuit.

10         So to summarize where we stand -- where Law Debenture

11  stands, we support exclusivity with the encouragement that

12  there be no forced plan or forced settlement, but what there is

13  is a negotiation, and should that fail, the litigation that Mr.

14  Conlan has spoken about is litigation to remedy the LBO and not

15  to seek to cram down an unfair plan.  Thank you, Your Honor.

16         THE COURT:  Well, before you leave, I hear your

17  position.  It's consistent with what your written submission

18  indicated.  What other than that which the debtor has proposed

19  in its form of order would you have me add, if anything?

20         MR. ROSNER:  In -- what I would like you to add is to

21  say that it is conditioned on the good faith negotiations and

22  short -- and failing those negotiations the prosecution of the

23  LBO claims, should there be a determination that those claims,

24  you know, are colorable, as I think anybody at this point would

25  tell you that they are colorable.

1            THE COURT:  So in addition to the very large

2   litigation issues looming out there, you'd like me to create

3   another one by inserting that language in the order.

4            MR. ROSNER:  Well, you asked me what would be perfect

5   and what I -- I think that I'm actually okay with the order as

6   it is, but I would prefer -- I mean what I would ask the Court

7   to do is to recommend to the debtor the points that we have

8   recommended.

9            THE COURT:  Thank you.

10           MR. ROSNER:  Thank you, Your Honor.

11           THE COURT:  Who else would like to be heard?

12           MR. GOLDEN:  Good morning, Your Honor.  Daniel

13  Golden, Akin, Gump, Strauss, Hauer, and Feld, counsel for

14  Centerbridge Credit Advisors as holders of in excess of $470

15  million of the Tribune senior notes.

16           Your Honor, let me say at the outset -- and I'm going

17  to say it in a way that hopefully is a lot shorter than Mr.

18  Rosner got to -- that we support the debtor's requested

19  extension of approximately four months of its exclusivity

20  period to March 31, and I regret to acknowledge that our

21  pleading that was filed was probably not a model of clarity to

22  help the Court reach that conclusion.

23           In the -- so I say at the outset we support the

24  debtor's request, but we do so based upon the debtor's

25  pleadings and Mr. Conlan's recitation this morning, and there

1  is a point we want to make.  The debtor's pleading, and as

2  amplified by Mr. Conlan's comments this morning, that at this

3  juncture in the debtor's Chapter 11 cases there is but one

4  remaining yet large looming issue, and that is the analysis of

5  the leveraged ESOP transaction.  And what that really means is

6  whether that leverage buyout transaction created actionable

7  fraudulent conveyance claims and other related claims or not.

8          The debtors say that they have studied that analysis

9  or made that analysis since the beginning of the case, and that

10  it is their intention to act as the honest broker in the

11  ensuing hope-to-be good faith negotiations primarily to be

12  conducted between the Committee, the bank lenders, and the

13  senior note holders over the next four months.  And we applaud

14  the debtor's efforts to act as an honest broker, but we do so

15  with some amount of grain of salt.  For, after all, the debtors

16  have a board of directors and have a management team, the

17  extent of which remains to be seen but may well be subject to

18  potential fraudulent conveyance and other related claims.

19          So it's not far afield to suggest that it may be

20  difficult for the debtor to be the 100 percent honest broker in

21  these negotiations.  I assume the Committee was of the same

22  view, because the debtors -- I'm sorry -- the Committee, from a

23  relatively early part in these Chapter 11 cases, undertook its

24  own analysis of the fraudulent conveyance claims or potential

25  fraudulent conveyance claims, despite the fact that those

1    claims, until there's an STN motion, belong to the debtor.   And

2    I think everybody in this case naturally understood if there

3    was going to be litigation brought to undue the fraudulent

4    conveyance, it would be brought by a party other than the

5    debtor.

6          I think that's probably typical in the type of

7    transactions that we're concerned about here where a party

8    other than the debtor in possession seeks authority and gets

9    authority to commence and prosecute that litigation.   That's

10   what happened in the <u>Tusa</u> bankruptcy case.   That's what

11   happened in the pending <u>Lyondell</u> bankruptcy case.   And I assume

12   if we could not get to a consensual good faith resolution of

13   these issues, that's what would happen in this case.

14         I commend the Creditors' Committee for taking a

15   forward stance in undertaking this analysis, and I think Your

16   Honor may remember that both Law Debenture and my client,

17   Centerbridge Capital -- Credit Advisors, entered into an

18   agreement with the Creditors' Committee where they would

19   collaboratively share information and go through the discovery

20   process in the most practical way possible, and that effort is

21   continuing.

22         So we will not prejudge the next four months and how

23   these, quote, good faith negotiations will turn out.   But one

24   thing that the debtors recite in their pleadings is of concern

25   to Centerbridge, and that's found at Paragraph 5 where the

1  debtors say they, "intend to file a plan within the time frame
2  -- within the time period to be extend --" I'm sorry "-- within
3  the time period of the extended exclusivity period sought by
4  this motion."  And you heard Mr. Conlan say, and Your Honor
5  commented on it, that they are resolute in trying to move this
6  process along.  But we are concerned that if despite everyone's
7  best efforts that have good faith negotiations, it may well not
8  be for the debtor's to be the final arbiter as to who is right
9  or who has been more amenable in the negotiation process.  And
10 so, as Mr. Rosner just pointed out, the litigation may not
11 simply or should not simply be over whether a plan proposed by
12 the debtors is confirmable or not, but, rather, whether that
13 litigation must be in ultimately determining whether this
14 leverage buyout transaction constituted a fraudulent conveyance
15 action and gave rise to other related claims.  We won't
16 prejudge the issues, but we do want to warn the Court or at
17 least acknowledge for the Court -- I don't mean to say warn the
18 Court -- acknowledge to the Court that although we along with
19 the Creditors' Committee along with Law Debenture, and I assume
20 with the other Indenture Trustees representing the senior note
21 holders will participate in good faith in those negotiations.
22 We'll leave for another day whether at the end of this extended
23 exclusivity period it should result in a plan filing come hell
24 or high water.
25            If Your Honor was to ask me the same question that

1  you posed to Mr. Rosner, is there anything else I would add to
2  the proposed form of order, there isn't.  I don't think it
3  needs to be, but I think it's certainly appropriate that the
4  debtors and the senior lenders understand the position of the
5  senior note holders.
6          And so that while we will, as I said, engage in good
7  faith negotiations, our endpoint is not necessarily a plan to
8  be filed by March 31, but, rather, either a resolution that can
9  be encompassed or contemplated by a plan  or, failing that,
10 ultimate litigation to resolve the issues as to whether the
11 leverage buyout constituted a fraudulent conveyance or not.
12         THE COURT:  All right.  Well, I note that just as a
13 rejoinder to your remarks that the debtor has expressed an
14 intention, but the order will contain no requirement.  So I'll
15 say no more than that.
16         MR. GOLDEN:  Thank you, Your Honor.
17         THE COURT:  All right.  Who else would like to be
18 heard?
19         MR. BENNETT:  Good morning, Your Honor.  I've now
20 heard about an hour of argument as to why exclusivity should be
21 extended.  I promise not to have an hour of argument on the
22 other side, but I have a fair amount of ground to cover.
23         THE COURT:  Well, you know what?  If you do, then I'm
24 going to take just a five-minute break, and we'll continue
25 after that.  Court will stand in recess.

1          MR. BENNETT:  Okay.

2                         (Recess)

3          THE CLERK:  If everyone could please take your seats.

4                         (Pause)

5          THE CLERK:  All rise.  Be seated.

6          THE COURT:  All right.

7          MR. BENNETT:  Good morning.

8          THE COURT:  The floor is yours.

9          MR. BENNETT:  Good morning again.  Bruce Bennett of

10 Hennigan, Bennett & Dorman, and I represent Credit Agreement

11 Lenders, but subject to some face clearing and some arithmetic

12 holds more than half of the loans outstanding under the senior

13 credit agreement facility that was part of the loans that Mr.

14 Kasowitz referred to during his discussion.

15         Between Mr. -- excuse me.  Between Mr. Rosner and the

16 other people who spoke, there were a number of issues that I

17 kind of put on the side as being my introductory remarks or

18 context remarks for the Court, which will be very brief.

19         Several times Mr. Rosner told Your Honor that the LBO

20 drove the company into bankruptcy.  Clearly, a debate not for

21 today.  But just so that Your Honor understands that this case

22 is a little bit different from things like Tusa and Lyondell, I

23 want to leave the Court with just three factual observations

24 about which I think in the end there's not going to be much

25 dispute.

1            In this case -- in the Tribune case the ESOP

2    acquisition transaction came at the end of a prolonged auction,

3    and the auction actually ended in a tie.  I'll say as an aside

4    that management in this case never gets a break, because

5    immediately after that auction ended in a tie and Mr. Zell's

6    proposal was selected as better, more advanced relative to the

7    other proposal, there were some shareholder attorneys who had

8    actually initiated litigation complaining about another

9    transaction and they amended their complaint to say that the

10   company didn't get enough money and that they actually should

11   have gotten more.  And Mr. Rosner, of course, suggests that the

12   company was in fact worth much less.

13           Lyondell, of course, involved a preemptive bid, that

14   was hundreds, actually billions of dollars higher than anyone

15   ever thought the company was worth and of course too said it

16   didn't involved an auction or any kind of real economic

17   transaction at all, it was a restructuring in a company that

18   was already very severely distressed.

19           Secondly, when the experts finally make their reports

20   and show up before Your Honor, they're all going to have the

21   chart.  You're always going to see these charts and it's going

22   to show the decline in the industry -- I guess from your

23   perspective it goes like this -- the decline in the media

24   industry and what you will find, and there may be arguments

25   about exactly the number, is that the equity values of the

1  comparable companies following the ESOP transaction declined by

2  85 percent.  That's afterwards that this industry had its huge

3  decline.  Things were not great when this acquisition was

4  negotiated, but when you look at the curve you'll see there was

5  a major subsequent decline.

6          So I think it's jumping the gun a little bit to say

7  that the LBO caused the bankruptcy case.  There will be lots of

8  discussion, but I just wanted to leave Your Honor with a couple

9  of facts.

10         And the last observation, which frankly leads us to

11 the core of everything, is that when you look at the credit

12 agreement debt, it is certainly true that some of the proceeds

13 were used by the borrower to make distributions to the equity.

14 But some, a lot, nearly $4 billion, maybe even more than

15 $4 billion were used to pay preexisting debt, provide working

16 capital and other things that were benefits to at least the

17 borrower, we'll put aside the subsidiaries for a second.  So

18 when push comes to shove -- although Mr. Rosner I'm sure has a

19 theory and he would like to say that in the worst case the

20 lenders could walk away with no claims -- when push comes to

21 shove, the credit agreement lenders have enormous claims in

22 this case, they're vastly larger at the end of the day than Mr.

23 Rosner's claims, or the claims Mr. Rosner represents, and they

24 are going to own, the credit agreement lenders are going to own

25 the largest share of this business.

1          So we come to another one of Mr. Rosner's quotes
2  which is he said that the heart of this case is the litigation.
3  I don't know.  Maybe the case has two hearts.  I would probably
4  say this.  In our view, the heart of this case is the debtors'
5  many and some separately enormous, but fairly together enormous
6  businesses that, according to the debtors' count, involve
7  14,000 jobs.  And I would submit that that is the heart of this
8  case and the litigation is an issue or a problem in this case
9  that most certainly has to be addressed.
10          The next thing I'm going to say is that global
11  resolution happens to be our first choice too, but this may be
12  my first appearance before Your Honor in this case, but I've
13  been here for a while, we say in our papers that there are no
14  meetings occurring and no meetings scheduled, okay?  Those
15  words have been true since September.  I was looking in my
16  Blackberry to try to find the date of the last meeting that
17  occurred in this case to discuss litigation.  I was at it, it
18  was in New York, it was in Mr. Bernstein's office, but my
19  calendar rolls off after 60 days.  So it was in early September
20  and it's no longer on my electronic calendar, at least on the
21  one I carry around, which was a long time ago.  And
22  interestingly, I heard yesterday from the debtors that there
23  was a desire by the Committee to have a meeting set in January.
24  Now I don't know if that meeting had ever been discussed before
25  our papers were filed.  I suspect not.  I don't know.    But I

1  heard about it yesterday.

2       So I come to this case when we filed our papers,

3  there being no meetings on the schedule, several meetings

4  promised that had never occurred, and this was a situation that

5  had been persisting not for weeks, but for, by the time we get

6  to the hearing, almost not quite three months.  And so one of

7  the things I have to say to myself, and what I would hope the

8  debtors have to say to themselves too is, I don't see that

9  global resolution on the horizon.  I don't see any effort

10 whatsoever to achieve that global resolution, so I've got to do

11 something.  And the something, frankly, that we decided to

12 propose, that we very much want to propose, and I want to

13 discuss the process we have in mind, it does several things at

14 the same time.

15      One, it does focus on the fact that the, it turns

16 out, in the Tribune case, that not substantially all, all the

17 business operations that actually face customers, that are out

18 there in the market doing business are conducted by

19 subsidiaries not the parent, that the claims represented by Mr.

20 Rosner are claims only against the parent.  There's other

21 things we could say about them too.  They impose -- those

22 indentures impose no restrictions on the subsidiaries

23 whatsoever, they impose no restrictions on the way the parent

24 deals with the subsidiaries, they have a negative pledge

25 provision that deals with the equity interests in the

44

1   subsidiaries that was complied with.  The Law Debenture

2   Company's, Law Debenture Trust Company's predecessor, I guess

3   they weren't there at the time, received when this transaction

4   was done, a pledge agreement that included their interests, you

5   know, exactly where they were supposed to be in the parent's

6   immediate subsidiaries.  They sat there for a year, didn't

7   complain saying I'm entitled to more.  Putting all that aside,

8   they're all at the parent level.

9           So I have this coincidence or this interesting

10  situation where the businesses where the employees are -- by

11  the way, I'm not going to agree that the debtors are doing well

12  with the businesses, they are, and we want it to continue, but

13  I've never met a business person in my entire life, and Mr.

14  Rosner essentially agreed with that, I don't think Your Honor

15  needs testimony, if you do, we'll find it, there's not a

16  business person I've ever met in a bankruptcy case that doesn't

17  wish that from a business perspective, from an operating

18  perspective, he was out yesterday.  And I suspect at the

19  operating level, that's exactly how they feel.

20          So I look at that situation and then I look at the

21  Adelphia case.  Now where does the Adelphia case fit in this?

22  It's a procedural clue and an important one.  I hope if Your

23  Honor reads any case in connection with this hearing you read

24  the Adelphia case, not for the result that clearly has to be

25  litigated later -- more about that in a few minutes -- but to

1  see what Judge Gerber did with essentially the situation

2  confronted by Your Honor.  He had subsidiaries that he thought

3  may well turn out to be solvent, but there wasn't a plan and it

4  wasn't done and so he's dealing with a fraudulent transfer

5  case, so he says, you know, I can't really deal with whether or

6  not the subsidiaries are going to be proper plaintiffs or

7  whether their claims can be asserted by the Creditors'

8  Committee at this point in time, because there's unpaid

9  creditors still there.

10       When the case advances, the litigation, you know,

11 kind of advances, but the plans get done first and the plans,

12 lo and behold, pay all subsidiary creditors in cash and then

13 the District Court reaches it, actually I think Judge Gerber

14 reached it first, but the District Court is the opinion that's

15 published and that we cite to you.  The District Court gets to

16 it, recites in the District Court opinion that Judge Gerber had

17 been there before, had looked at this case in the context

18 before the subsidiary creditors had been paid, now plans have

19 been confirmed, the subsidiary creditors are paid, and we look

20 at it from a different perspective.  And you read cases, it

21 stimulates ideas.

22       Because it's here, let me digress.  Do we think we're

23 performing magic or creating an artifice?  Of course not.  Do

24 we understand that Mr. Rosner or people essentially allied with

25 him, like Mr. Golden are going to come to Court and say that

1  for some reason they have claims against the subsidiaries or

2  for some reason the subsidiaries can't confirm plans?  Well, of

3  course they will or they might.  And if there is a way to

4  resolve those objections, we will, and if there's not a way to

5  resolve those objections, Your Honor will have to decide

6  whether or not there is any standing by parent creditors to

7  interfere with obligations created by subsidiaries,

8  particularly in circumstances where subsidiary creditors are

9  paid in full.  I don't fear that hearing.  I'll have it any

10  time, any place Your Honor wants to set it.

11          And what Your Honor's going to find is that it's not

12  just the Adelphia case, I think there are like 20 cases that

13  have considered various aspects of this in different contexts.

14  And there were differences among the holdings.  But there's one

15  thing they all share in common.  There hasn't been a case yet

16  that has said, here's a fraudulent transfer case, it's

17  delivered $101, there's $100 worth of unsecured claims and that

18  extra dollar goes to the equity.  Not on the books.  Can't find

19  it, it isn't there.  Every single case talks about the fact

20  that when fraudulent cases are allowed to even begin or go

21  forward, there has to be obvious real benefit to unsecured

22  creditors.  And there's debates about how much benefit is real

23  benefit and in what circumstances is it kind of a trumped up

24  benefit.  Not for today, I agree.  Ready for it whenever Your

25  Honor wants to.  Not seeking to evade it.

1          But look what we might have.  We might have a

2    procedural vehicle that does a number of good things at once,

3    not perfect.  It may not be the global resolution everyone

4    seeks, including me, but it might get every single subsidiary

5    out of bankruptcy, it might tee up one central issue divorced

6    from a lot of other issues that might also have to be decided,

7    but it might be simpler and cleaner to deal with it in the

8    context that might be created.  And why isn't this progress?

9          I am reminded of saying that I ran into a couple

10   years out of law school where there was actually a general

11   counsel discussing something in a case and he said once and

12   then proceeded to say it many times, the perfect is the enemy

13   of the good and the perfect could be the enemy of the very

14   good.  We can't always get perfect.  And there is another

15   experience I had early in my career involving an oil driller

16   where I was involved in a situation where one particular

17   creditor group insisted on perfection and they insisted --

18   there was all kinds of opportunities to make partial solutions

19   of important problems and actually get some things done in a

20   case, but partial solutions were never good enough.  And of

21   course, that case totally liquidated and nobody got anything,

22   because perfect solutions never appeared, and everything

23   deteriorated while it happened.

24          I'm not suggesting that that's a risk here.  I sure

25   as hell hope it's not.  But I don't think that pursuit of

1 perfection where nothing whatsoever is happening on that

2 pursuit and where the first meeting won't even happen until

3 some time in January, no date set, it's not unreasonable to

4 say, let's look around and figure out other things we can do to

5 advance the ball.

6        Another loose end.  I don't think anywhere in our

7 papers we mentioned the subject of releases.  We didn't.  I

8 think Mr. Rosner has some complaint that was not one of the

9 plan terms I described.  Also I want to be very clear.  We do

10 understand that there might be plan related litigation if a

11 plan process continues for the subsidiaries.  And I've heard

12 very clearly that Mr. Rosner said it's going to be massive.

13 Well, it might be.  I can't control what Mr. Rosner does.

14 Can't control what the Committee will do.  It doesn't have to

15 be.  It can be focused on the issues that are relevant to the

16 subsidiaries with everyone understanding.  And I'm agreeing up

17 front that none of the things that are going to happen to the

18 subsidiaries are going to prejudice the parent in any way, or

19 the litigation that Mr. Rosner or the Committee would initiate

20 on behalf of the parent in any way.

21        Okay.  So we've given a lot of thought to the terms

22 and conditions.  I am mindful and was warned by many people to

23 be careful about how much I say about the plan, because I don't

24 want to be -- I did not want this hearing to be about whether

25 or not we jumped the gun and filed the plan before exclusivity

1  had actually expired.   But I do want to say to Your Honor, this

2  is extraordinarily well thought out, a lot of the essential

3  economic parameters are not only thought out internally,

4  they've in fact been discussed because they're relevant to a

5  plan that would constitute a global solution.   We're not

6  suggesting -- we're not intending that we're going to depart

7  very much, if at all, from those kinds of numbers.   I will tell

8  Your Honor anything you want to know about the plan.   I'm

9  prepared to answer question in every conceivable level of

10  detail.   It's up to you.

11          The other thing I want to say is, how do we expect to

12  start this?   Well, we certainly would describe what we have in

13  mind to all the important constituencies and meet with them

14  beginning this week, if we are so permitted, not some undefined

15  time in January.   Yes, December is a short month.   I'm even

16  planning a holiday vacation, but there's three full weeks left.

17  We would intend to use them.   We would also intend ultimately

18  to win the endorsement of the debtors.   This is not intended.

19  We don't intend exclusivity to file plan tomorrow, ignore

20  everybody, try to get it confirmed.   We're going to have a

21  normal process that involves talking to all relevant parties in

22  interest, those we think will agree with us and those we expect

23  might not agree with us.   We will try very hard to narrow

24  differences.   We will try very hard to narrow differences at

25  every stage.   If we file a plan and a disclosure statement and

1  we have objections, we will talk to those people.  If we can

2  resolve them, at least in part, we will.  If we can't resolve

3  them completely, there will be some issues that might have to

4  be teed up for decision.  We won't try to avoid any.  We won't

5  try to perform magic.  We will try to work through the paces

6  and develop progress.

7          One final point about what we intend.  Nothing about

8  this should imply that we would not immediately adopt a global

9  solution or fold in the parent if that became possible.  Of

10 course we will.  So another way to view moving on the

11 subsidiary plans is, it's kind of practice for the parent plan.

12         One of the arguments frequently made, and I'm a

13 little bit disadvantaged because I don't think I'm going to

14 hear what the debtors' response to our opposition is until Mr.

15 Conlan stands up again, and since I think he even told you new

16 things were coming, I may have to stand up again too.  But what

17 are the arguments we usually hear in opposition through

18 termination of exclusivity?  Well, one is that somehow the

19 termination of exclusivity will be bad for a dialogue.  Well, I

20 think you've already heard.  There is no dialogue right now.

21 The debtors have a lot of really good intentions.  And I do

22 think they've tried hard.  But it's been radio silence for 90

23 days.  And there is no date set in January.  So there's plan

24 silence for 30 more and maybe as many as 60 more.

25         And I wanted to say as an aside, Mr. Rosner's client

1  has previously suggested that there would be meetings and

2  they've always been kind of held out as, you know, a few weeks

3  away, a month away, but they haven't ever managed to make a

4  definite appointment.  So it's not for a lack of people talking

5  about it, for whatever reason, it just hasn't happened yet and

6  there are no plans for it to happen now.  So for starters,

7  there isn't anything I'm going to interrupt.  And as I said

8  before, the way we view this, the subsidiary plans are the

9  launching pad of the dialogue that might initially deal with

10  subsidiary issues only, but there's certainly no law against

11  and certainly no intent to preclude a dialogue that goes

12  further than that.

13          Termination of exclusivity will lead to chaos.  Your

14  Honor's heard that before.  I think it's important to note that

15  in this case, the case has been pending for a year.  There's

16  been two previous exclusivity extensions, no one through this

17  entire period of time has ever suggested that they were going

18  to file another plan, so you're not going to unleash an

19  enormous series of plans, there's just been one suggestion,

20  ours.  And once again, the termination of exclusivity doesn't

21  prevent the debtors from filing a plan involving the

22  subsidiaries, involving all the companies, but severable as to

23  subsidiaries if all the companies prove too much.  Again, would

24  love to see it happen, what it will be met with is dialogue,

25  again in an effort to try to get something before Your Honor to

1  move businesses out of these proceedings.

2         Now, what's another effect of exclusivity?  Last

3  personal case story.  Many years ago I became counsel to the

4  trustee for Hawaiian Airlines.  It was a rare operating case

5  where a trustee was appointed for cause.  That also meant there

6  was no exclusivity from day one.  First person who filed a plan

7  was a creditor, it was actually Boeing.  The debtor -- the

8  trustee was not in a position to file a plan, it took a few

9  months.  But then he did, our economics were better.

10 Ultimately the trustee's plan prevailed.  The other plan was

11 abandoned.  Was there chaos?   No.  The result was 100 cent

12 plan.  Now, did the trustee and his professionals feel just a

13 little bit of pressure by the fact that there was another plan

14 on file that kind of looked viable and that people might

15 support?  I'm only going to speak for myself.  Of course I did.

16 And again, why is that a bad thing in this case?

17        Are there obstacles to a subsidiary plan?  Well,

18 there may be real ones.  I think the debtor has told me that

19 they're studying, don't really know.  But we heard from Mr.

20 Rosner, inter-company claims, bridge claims, substantive

21 consolidation.  Okay, inter-company claims.  When the dust

22 settles on those, we thought about it, Your Honor is going to

23 find that there's exactly one subsidiary that has net payables

24 to the parent on the books and records.  And what Your Honor

25 may know from past experience is that many inter-company claims

1 have infirmities because they're never disclosed to the public,

2 they're not arm's length, they're very often not documents,

3 they often don't bear interest, they have all kinds of problems

4 with them.   It's an issue that will clearly have to be

5 studied, and we'll work on it.  By the way, inter-company

6 claims would be a distribution issue for plans that were filed

7 for all of the entities.  So of course we'll run into things.

8 We'll have to deal with them.

9        Second, bridge claims.  Well, at the subsidiary

10 level, the bridge loan claims are completely subordinated to my

11 clients, so we don't think they'll be a factor.  They're also

12 LBO related debt, they didn't preexist, they don't have a

13 fraudulent transfer claim.

14        Subcon, well, we're in the Third Circuit, the Owens

15 Corning case being one of the most important cases out of the

16 Third Circuit in bankruptcy in a good long time, which, if we

17 had to describe it in a sentence it is that, I think that we

18 would say that corporate boundaries matter a lot and it's a

19 really tall order to try to ignore them.  And I think that

20 others will disagree with that one sentence and come up with a

21 different sentence, but it's going to sound the same or a lot

22 the same.  I suppose that Mr. Rosner or the Committee or

23 someone else can object to a plan for the subsidiaries on the

24 basis that they should be substantively consolidated with the

25 parent.  I suspect the same objection could conceivably apply

1 to plans for the parent and all of the subsidiaries, business

2 the Court might have to deal with anyway.

3      THE COURT:  Well, apparently I have some more to

4 learn about what <u>Owens Corning</u> meant, so I'd be eager to hear

5 everyone's position.

6      MR. BENNETT:  Okay.  So in any event, my important

7 point with respect to obstacles, will there be obstacles to the

8 confirmation of a subsidiary only plan?  Sure there will be.

9 There are obstacles to confirmation of all plans in large,

10 important and complicated cases.  And there's a lot of talent

11 in this room.  They know how to deal with those obstacles,

12 they've dealt with them before.

13      It is the debtors' burden to prove it's entitled to

14 additional extension of exclusivity in this case.  What I think

15 Your Honor has already heard is that we clearly believe that

16 the most important factor is whether or not termination of

17 exclusivity is going to enhance progress or whether

18 continuation of exclusivity will enhance progress.  I think the

19 current facts of this case, which aren't disputed, the absence

20 of meetings and the absence of plan meetings speaks volumes

21 about the status of the case today with an extension of

22 exclusivity.  I think it's worth pointing out also that it is

23 said by many courts that as more extensions are sought, the

24 burden to be overcome increases over time.  But at each one it

25 should be a little bit harder, and it should be.

1          We don't think that any of the debtors can meet the

2    burden in this case, but particularly, and the debtor does have

3    a duty to look at the subsidiaries as well as the parent, but

4    particularly from the perspective of the subsidiaries as being

5    the businesses to face the rest of the world and deal with the

6    rest of the world, we don't think the subsidiaries can meet

7    their burden as to why they are entitled to a continuation of

8    exclusivity where their plan issues are less impacted -- I

9    don't want to say less -- differently impacted by the potential

10   litigation than the parent is, and they may be able to come out

11   of bankruptcy with fewer and less massive litigation than the

12   entire unit.

13         As I said before, we do think that starting a process

14   at the subsidiary level or starting a plan process at the

15   subsidiary level will only stimulate dialogue, even if as to

16   some parties, it is an angry dialogue at the beginning.

17         Okay, so what do we do, how do we kind of work this

18   through with the law we deal with?  Well, Your Honor, it's very

19   clear that you're accorded enormous amounts of discretion

20   during the now maximum 18 months that congress has specified

21   for exclusivity.

22         THE COURT:  And in exercising that discretion, I

23   really have at least initially two questions for you.

24         MR. BENNETT:  Go ahead.

25         THE COURT:  Why is it so important now, and put aside

1  for the moment what might be your initial reaction that I am
2  reversing the standard, but I'm interested in your response.
3  Why is it so important that exclusivity be terminated now?
4  There comes a time in many cases when because of money running
5  out or other circumstances which exist or other impending
6  crises or deadlines or drop dead dates, call them what you
7  will, that something has to move now.  In this case, tell me
8  why now.
9          MR. BENNETT:  Okay.  I'm going to tell you two
10 reasons.  Reason Number one, take a look at the debtors'
11 papers.  I didn't bring them up with me, so I'm casting about,
12 but Paragraph 5 and Paragraph 12.  What they say in those
13 paragraphs, and I believe it absolutely to be true is that the
14 onset of litigation will have an adverse effect on the debtors
15 and their businesses. They don't say it once, they say it
16 twice, and they say it very strongly.  I wish I had it up here
17 to read to you.  And that's a real risk.  What happens is is
18 that competitors go out and start whisper campaigns about how
19 bad the litigation can be, even if everyone tries really hard
20 to isolate it and to convince everybody that it is not going to
21 impact the businesses that Tribune really conducts.  So you
22 don't have to take my word for it, Your Honor, take the
23 debtors' word for it.
24          The onset of the massive litigation, Rosner's words,
25 not ours.  Okay?  In this case, will not be good.  The press

1  articles will talk about how the cases are mired in litigation

2  of uncertain duration and the debtors and all of their

3  subsidiaries will be held hostage to it.  That's one.

4           Second reason is back at the law.  Congress now says

5  the maximum is 18 months.  This extension, with the four

6  months, takes them 30 days - excuse me -- 60 days away

7  nominally from the 18 months, but in reality because of the way

8  the bridge orders work and the fact that they can file an

9  extension just before it expires and set a hearing afterwards,

10 it basically gets them all the way there.

11          THE COURT:  Well, of course they could run the risk

12 of having the relief denied without any safe harbor to file

13 something.

14          MR. BENNETT:  They certainly could.  But it's -- I'll

15 just leave you with the proposition that it's pretty close to

16 all the way.  So do we really think that the representatives

17 and senators who shortened the maximum exclusivity to 18 months

18 envisioned that you reward the maximum or almost the maximum to

19 a case that hasn't seen a material discussion on the most

20 central plan related issues for 90 days, and that before our

21 opposition filed, had none scheduled?  I'm having a hard time

22 with that.

23          THE COURT:  I'll tell you what.  If you can define

24 the individual intent of legislatures who voted for any

25 provision of the Bankruptcy Code at any time, you have my

1  undying admiration.

2          MR. BENNETT:  I can't.  But when a maximum is set,

3  one would think that the maximum is available in cases where

4  the maximum is warranted by the facts.

5          THE COURT:  I think that's a fair statement.

6          MR. BENNETT:  And let's try to fit this case on that

7  continuum.  And I'm having trouble -- I'm having trouble

8  fitting a case where the admitted facts before you is no

9  discussions going on for 90 days, no discussions scheduled, as

10 we sit here today.  Okay, I'm trying hard to figure out why

11 that case is the model deserving of the maximum -- or

12 essentially the maximum --

13         THE COURT:  Well, first of all --

14         MR. BENNETT:  -- which is almost what is being sought

15 here.

16         THE COURT:  -- I don't know if those facts have been

17 admitted by anybody, but they've been asserted by you, that's

18 for sure.

19         MR. BENNETT:  Well, they were in our papers and I

20 would have expected, I heard that Mr. Seife tried to talk about

21 how meetings had already started and he failed to tell Your

22 Honor that the last one was in the first week of September.

23 I'm interested to know whether there was a meeting that was set

24 that somehow didn't make it on my calendar.

25         THE COURT:  All right, thank you.  I have a second

**J&J COURT TRANSCRIBERS, INC.**

1  question.  And that is, if it's true that all of the business

2  operations are conducted through the subsidiaries, and what

3  follows from that is, it means most or all of the value in this

4  collection of debtors rests in the subsidiaries.  Why would it

5  be appropriate for the Court at this point to deprive the

6  debtor of an opportunity to achieve a global resolution which

7  involved the parent as well as the subsidiaries?

8       MR. BENNETT:  I couldn't be clearer about this.  I'm

9  not depriving them of any opportunity.  Allowing us to start

10 pursuing a subsidiary plan, Number one, does not mean the

11 debtors can do anything they want to do.  And if they think

12 they can pursue a global plan and put one together at the same

13 time, that's fantastic.  And frankly as the process of working

14 through a subsidiary plan potentially becomes a platform for

15 including the parent, we're going to do that too.  I don't

16 disagree with the idea that a global settlement is the best and

17 is the optimal and that it would -- I'm not arguing that it

18 wouldn't be a wonderful thing, it would be.  I think given

19 where this case is today, where in reality, no progress is

20 being made toward that goal.  I hope it will start.

21      THE COURT:  But I -- over the course of time things

22 which I don't think can be disputed legitimately.  This is a

23 business in a troubled industry.  This is a business

24 particularly which had operational issues.  You know, Chapter

25 11 -- and of course one of the problems that can be created by

1  the newer time frames that you've referred to are that they

2  don't allow businesses with operational problems sufficient

3  time to correct them before they must exit bankruptcy,

4  especially if they want to take advantage of the exclusivity

5  provisions.  This is a business, it seems to me, which has been

6  struggling, successfully so far, with the operational issues

7  with which it was faced.  Now, I guess part of the argument

8  being made is that yes, they've had some things to deal with,

9  but really their plate shouldn't have been so full that they

10 shouldn't be farther along in the process of trying to bring

11 together all of the parties in a consensual plan.  But, you

12 know, under the circumstances, it really does not strike me

13 that this debtor has been in too long without proposing a plan.

14            MR. BENNETT:  First of all, Your Honor, a couple of

15 things.  They, themselves say that they're done with the

16 operational things, and quite frankly, I'd hope that after a

17 year they've identified the real estate leases that need to be

18 rejected, and they've rejected many.  They've done a lot of

19 things with executory contracts.  And by the way, we applaud

20 many of their initiatives.  I'm also not critical of the

21 debtors when I say no meetings have been set.  I have no

22 problem having meetings with the debtors.  I call up, I set a

23 meeting, it gets done.  And they have been wonderfully

24 cooperative in that respect.

25            I part company with them at one point.  It's their

1  strategic decision, global resolution or else, and we've had --

2  this isn't a new topic for them.   We've been talking about

3  this for a good, long time, but I don't want to go into those

4  discussions unless I have to.   We part company with them with

5  they say to us, no, no, no, we really want to have a global

6  resolution.   And by the way, I wanted to say this earlier, but

7  I forgot.   The litigation specter sounds like it's getting

8  worse before yours and my eyes.   We not only heard that it's an

9  LBO case against lenders, but it's also now a fiduciary duty

10 case against the very officers and directors who are supposed

11 to be running the ship.   I assume that Mr. Rosner was

12 extraordinarily careful before he decided to unveil that

13 particular dimension of this case.   This could be really ugly.

14          I think it's extremely important for us to start

15 looking at alternatives to narrow the problem.   The debtors,

16 for whatever reasons, have been unwilling to do this.   I see no

17 harm in allowing us to get started.   No harm.   I'm not charging

18 the debtors for it.   You know, it would have to be a great,

19 substantial contribution and enormously successful for me to

20 get the money from the other side.   Okay?   I'm willing to do

21 the work, we're willing to carry the ball, we'll figure out how

22 to resolve the problems.   What exactly is wrong with trying?

23 Would I prefer that the debtor try to in light of the situation

24 confronting them?   Sure, I would.   And we've tried that route.

25 We're here because that route didn't get very far.

1           THE COURT:  Thank you.

2           MR. BERNSTEIN:  Your Honor, Don Bernstein

3  representing J.P. Morgan Chase Bank from Davis, Polk and

4  Wardwell.  I'm going to try to be mercifully brief.  I

5  understand you've heard a lot today.  And I'm not going to give

6  you our complete perspective on the leverage ESOP transaction

7  and the potential for litigation and the like, other than to

8  say that we profoundly disagree with Mr. Rosner and Mr. Golden.

9           And also to point out, Your Honor, that a substantial

10 part of J.P. Morgan Chase's constituency is represented by Mr.

11 Bennett.  And what you're seeing in Mr. Bennett and his clients

12 is a deep frustration with the fact that for eight months, or

13 since March, as Mr. Seife has said, the lenders, and in

14 particular J.P. Morgan Chase, but also others have been

15 cooperating with voluntary discovery in order to facilitate a

16 settlement negotiation.  And it's getting to the point, Your

17 Honor, where frankly, we don't believe, after having one

18 meeting scheduled and then canceled and other meetings promised

19 and then promised again, that we are really leading in the

20 direction of a negotiated resolution, hence the frustration in

21 your hearing to try something else.  And Mr. Bennett has given

22 you an elaborate proposal to try something else.

23          It is true, as Mr. Rosner says, that there are

24 parties who have prejudged the outcome.  I have no doubt that

25 my clients have  prejudged the outcome and that Mr. Rosner has

1  and that Mr. Golden has and their clients probably have too.

2  But in that context, it's very hard to get a negotiation going.

3  And what we had proposed to the debtor was that four months was

4  just too long.  In that context where people are really

5  uncertain whether this process is going to get going at all,

6  four months was far too long.  And we had indicated to the

7  debtor that we would be willing to consent to a 60-day

8  extension, because we believe deadlines are good.  This hearing

9  is really the first time that all of these constituencies have

10 been under the same roof in this case, so that we can have a

11 conversation.  It would be good to come back here and do that

12 more often.  And the best context in which to do it, as we're

13 seeing today, is at an exclusivity hearing, because people have

14 to talk about progress, and that progress is just not being

15 made.

16         THE COURT:  Well, let me tell you something.  That is

17 a thought that occurred to me.  Here's one hesitation I have

18 about that.  Look around you and listen.  I mean, the sounds of

19 the clocks ticking is deafening.  So, you know, some things --I

20 think the Courts in cases of this magnitude, and we see many of

21 them here as you know, have to be sensitive to how much, the

22 cost benefit of requiring the exercise in two months rather

23 than in four.  Respond to that if you can.

24         MR. BERNSTEIN:  I guess I have two responses.  First

25 of all, on the issue of clocks ticking in this room, they're

1    going to tick whether they're in this room or not in this room.

2    But on the more important issue of coming back in shorter

3    periods of time, sometimes the need to justify yourself

4    actually speeds the process up, whereas the ability to delay

5    things can be used tactically.  And so bringing people back

6    actually can shorten the total duration of the case which

7    actually perhaps leads to a less expensive case.  So that's my

8    perspective on it and that's what I've seen in all the cases

9    I've been in.  It's a good thing for everybody to have to come

10   to report to the Court.

11          So I'm not going to belabor anything more, Your

12   Honor, on this issue other than to say that because our group

13   is so frustrated and nothing has happened and we believe there

14   is a prospect that nothing will happen for potentially four

15   months if the debtors' motion is granted, we oppose the

16   extension of exclusivity.  And as you've heard, Mr. Bennett has

17   proposed one alternative, to move forward here, not so much

18   necessarily to do that plan, but to motivate the exercise and

19   to try to get things moving here, because they're not moving

20   now.  Thank you, Your Honor.

21          THE COURT:  Thank you.  Does anyone else care to be

22   heard?  We'll give the debtor a very brief opportunity for

23   rebuttal.

24          MR. CONLAN:  Jim Conlan on behalf of the debtor,

25   again, Your Honor.  And I will be brief.  But taking each of

1  those in reverse order starting with Mr. Bernstein on behalf of

2  JPM.  The exclusivity extension that we have requested is

3  absolutely necessary, the entire four months is necessary.  I

4  can tell you that if we are stuck in these negotiations, in 15

5  days we will be back.  We're not going to sit there stuck

6  without resorting to teeing up litigation.  And I frankly think

7  that there are many people in the courtroom that would agree to

8  that.

9          But let me agree with something Mr. Bernstein said.

10 And that is, I love the idea of coming back here every month

11 and having a conversation on the record about who's doing what

12 and what's going on, if only to hem people in who are

13 maneuvering in negotiations or otherwise, all within the

14 context, of course, of privileged settlement communications.

15 So I welcome the offer of returning every month and telling you

16 where we are.  I don't think it's a good idea to limit

17 exclusivity in that respect, but I like the idea of coming back

18 and hemming people in.  And you'll get a taste of that when we

19 come to the discovery portion of the hearing today as well.

20         In terms of posturing, sure, there's posturing on all

21 sides.  Are the banks thrilled with us right now?  No.  They

22 would like us to file their plan.  We're not prepared to do

23 that.  They're not happy with us.  That's okay.

24         Moving on to Mr. Bennett, the other faction of the

25 banks.  Mr. Bennett was right about one thing, global

1 resolution is the preferred course.  He was also right that

2 uncontrolled litigation is a disaster.  Controlled and surgical

3 litigation, including specific issues to unstick the

4 negotiation and standing might be one of them, makes a lot of

5 sense.  That's another part of what was said today that made

6 sense.  But frankly, the standing issue, and that's what most

7 of what Mr. Bennett had to say boils down to, there's

8 absolutely no reason that has to occur in context of a cram

9 down subsidiary plan.  He knows that.  It doesn't even have to

10 occur in context of a cram down global plan, although that's a

11 possibility, and he knows that.  And it may be that we'll have

12 to litigate surgically the standing issue if we can't come too

13 quickly to a global resolution consensually, and it's possible,

14 as Your Honor knows well, you negotiate, you get stuck, you

15 litigate, and then you start negotiating again against the

16 backdrop of that litigation.

17        With respect to how much Mr. Bennett's clients have

18 studied the subsidiary plan concept, frankly, Your Honor, it

19 would be a mess trying to separate these companies.  They are

20 highly integrated.  There are billions in inter-company claims

21 that we are analyzing.  It simply doesn't make sense.  These

22 are highly integrated companies.  It certainly doesn't make

23 sense to jump to that now, it would be chaotic.

24        With respect to what Mr. Golden had to say on behalf

25 of Centerbridge, which we believe is the largest of the public

1  debt holders.  I want to be clear about this.  We have not

2  concluded, and I'll say what I said at the beginning again, but

3  perhaps with even more emphasis.  We have not concluded that if

4  negotiations fail that we are going to cram the bank's plan

5  down on the public debt.  We have not concluded that.  It may

6  well be that we will tee up apart from confirmation, in advance

7  of confirmation, surgical issues that separate the parties.

8  And I understand Mr. Golden's point that he prefers the latter,

9  and we understand the bank's view that they prefer the former.

10 We get it.  That's frankly one of the dynamics that we and the

11 Committee are using in these discussions.

12          And one point with respect to Mr. Bennett.  And I

13 hope I'm not talking too much out of school, but this is rather

14 free form at this point.  We're meeting with Mr. Bennett's

15 clients on Thursday, Thursday this week.  We've been meeting

16 constantly for months with Mr. Bernstein and his clients, with

17 Mr. Bennett over the phone, with Mr. Mayer, who also represent

18 the banks, with the Chadbourne firm, with Centerbridge.  We've

19 been meeting with everybody constantly.  The formality of the

20 meeting to which Mr. Seife referred to in January is just that.

21 It is a formal set piece meeting.  We don't wait until those

22 formal meetings.  Frankly, a lot happens outside of an advance

23 and around those meetings, as Your Honor knows.  Frankly, the

24 meetings have been continuous, as you would expect.

25          Mr. Rosner's comments on behalf of Law Debenture, and

1  as we understand it, he, like Mr. Golden, on behalf of

2  Centerbridge, supports the requested extension.  A lot of what

3  Mr. Rosner said, we agree with, and we take it to heart.  And

4  we do, when we say reasonable, mean reasonable on the law and

5  on the facts and given the posture of these cases and these

6  businesses, not reasonable as we deem it because we have a

7  particular objective in mind and we're going to force the

8  unwilling there.  So we understand his comment and we take it

9  to heart and we meant it the way that I just said.

10       With respect to referring to the fee motion as the so

11  called fee motion, that was merely short hand on my part, I

12  probably shouldn't have done it, to shorten a lengthy title.  I

13  didn't mean to refer to it as something less than a motion,

14  just to be clear about that.

15       With respect to what Mr. Seife said on behalf of the

16  Committee, I agree with everything he said.  I think the

17  Committee has done a very good job in this case.  The debtor is

18  the honest broker.  So is the Committee.  It's a complicated

19  committee in terms of its composition, but Mr. Seife and his

20  firm are doing a very good job and they are right there with us

21  in this process.  This isn't the debtor attempting to serve one

22  particular constituency or another, and quite frankly, Your

23  Honor, I think probably the single most powerful piece of

24  information or evidence if you want to identify one for

25  purposes of granting this exclusivity request is everything

1  you've seen here today.  There are good elements to much of

2  what was said today.  We think we can harmonize those.  We hope

3  we can.  Do we think we can do it without resorting to some set

4  piece litigation?  We hope we can.  That won't be easy.  We may

5  be back here.  We may be back here quickly with respect to set

6  piece litigation.  We may be back here quickly with respect to

7  a cram down plan.  We're not there yet, but believe me, we're

8  working hard at it and we've been working hard at it, and

9  frankly, at least when you look around the room and see the

10  displeasure, you can figure out that we're doing something,

11  quite frankly, and it isn't that we're just sitting on our

12  hands and worrying about the business, although we are very

13  focused on the business.

14        In conclusion, Your Honor, everything we've done in

15  these cases, including with respect to reviewing these

16  transactions, everything we've done with the Committee and the

17  other constituents in this case in our view adds up to cause

18  for the extension of exclusivity that we've requested.

19        THE COURT:  Thank you.  I've heard enough.  Well, if

20  you look at the things that Courts typically consider when

21  determining whether to grant extensions of exclusivity

22  particularly over the objection of one or more creditors or

23  creditor groups, I think all of those things taken together,

24  and I'll give you individual views in a minute, warrant the

25  granting of some extension of exclusivity.  These are large and

1  complex cases.  I'm satisfied, and I think the debtor's right

2  based upon the discussions I've heard today, it's clear that

3  there are ongoing discussions, which may or may not result in a

4  global resolution.  It also strikes me that whether there is a

5  global resolution or not, the debtor still has a reasonable

6  prospect of being able to propose a plan.  This case is not so

7  old that there's anything that tells me that exclusivity should

8  be looked at now.  And I don't think there's been any

9  demonstration that this request for exclusivity is a way to

10  pressure creditors improperly into plan negotiations.

11         I also -- I don't think it is disputed that this

12  company, from parent through subs is highly integrated and that

13  it seems to me a lot of the value lies there.  I don't see any

14  benefit to be gained in separating, breaking up the corporate

15  family at this point.  There may come a time when that may be

16  appropriate.  I will tell you, Mr. Bennett's presentation was

17  very thoughtful and it's something I will have to think about

18  perhaps more in the future.

19         But there is this elephant in the room, as some

20  person described earlier, that has to be addressed.  Now, I

21  will say Mr. Conlan seems to think that if there is no

22  agreement it's to be resolved.  The parties come to the Court

23  and it gets resolved quickly.  These are not the kinds of

24  things that are resolved in the matter of days or weeks.  So

25  from that standpoint it doesn't seem to me to be a good thing

1 to postpone too far the process of if litigation has to go

2 forward, moving that forward.

3       So for all of these reasons, I am going to grant the

4 debtor until February 28th and the following second part of

5 exclusivity in an appropriate increment, 60 days beyond that to

6 achieve confirmation.  But I think what I'd like to do is set a

7 framework in which the parties come back somewhere say mid

8 February, mid to late February to determine whether if the

9 debtor is requesting it, it should have a further extension of

10 exclusivity.  And if it's the case that the debtor at that time

11 wishes more exclusivity, then I will need an evidentiary

12 record.

13       And I'm thinking that a hearing date that's set on

14 the omnibus, February 22nd, is not going to allow enough time,

15 at least based on my experience today, to consider the issue if

16 it's still contested.  So I'm inclined to specially list you

17 for February 18th.  Let me ask if anyone has a problem with

18 that scheduling.  All right.  I see some affirmative nods and I

19 hear no wailing otherwise, so we'll fix a hearing for February

20 18th at ten o'clock to determine whether there should be a

21 further extension of exclusivity and ask the parties to confer

22 and submit a form of order that embodies the ruling I've made

23 today.  And all it need do is refer to the fact that my reasons

24 for it were stated on the record.  Are there any questions

25 about what should go in the order?

1          MR. CONLAN:  Not from the debtor, Your Honor.

2          THE COURT:  Anyone else?  Okay.  To be clear, all

3   parties are free to renew their responses or objections with

4   respect to any future request for exclusivity.  Now, let me ask

5   this.  I don't know if anything yet is scheduled for February

6   18th, which is that February omnibus hearing.  Can we move

7   everything that is or would have been on the 18th to the 22nd

8   as well to save everybody an extra trip?

9          UNIDENTIFIED ATTORNEY:  The 22nd to the 18th?

10          THE COURT:  Thank you.

11          MR. CONLAN:  How much time did you say we have on the

12   18th, Your Honor?

13          THE COURT:  An hour.  No, I'm sorry.  On the 18th?

14          MR. CONLAN:  Yes.

15          THE COURT:  I'm going to set aside the day.  The 22nd

16   there's just an hour.

17          MR. CONLAN:  That's fine, Your Honor.

18          THE COURT:  Okay.  Now, I'll just ask that you do

19   this.  If it turns out that you want to add something other

20   than exclusivity that is of moment for the 18th, let my

21   courtroom deputy know ahead of time so we don't overload it.

22   Okay.

23          MR. ROSNER:  Your Honor.

24          THE COURT:  Yes?

25          MR. ROSNER:  I have to apologize.  And I don't know

1 if it's going to matter to you after you've just done all of

2 this setting up.  It's not on my calendar, I don't know what is

3 Presidents' week in February, I'm not exactly sure, but I know

4 that I'm going to be out of the country on Presidents' week and

5 --

6           THE COURT:  Presidents' Day is February 15th.

7           MR. ROSNER:  So I'm thinking that I'm actually not --

8 I am going to be -- I just was trying to look up on my calendar

9 to see if it was there, but it's not there, because it's a good

10 thing, so that's probably why it's not on that calendar.  I

11 don't know, I mean, obviously I have other people at my firm

12 and if that's the date that it needs to be, then we will

13 certainly make it that date.  I just, I personally can't make

14 it.

15           THE COURT:  Yes, the following week, the only day I'm

16 sitting is the 22nd.

17           MR. ROSNER:  Okay.

18           THE COURT:  I apologize, but I think we're stuck with

19 that.  I had flexibility for the 16th and 17th, but that

20 doesn't help you.

21           MR. ROSNER:  I don't think so.

22           THE COURT:  I understand.

23           MR. ROSNER:  But you do allow people to phone in,

24 right?

25           THE COURT:  Yes.


                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. ROSNER:  Okay.

2          THE COURT:  The only thing I say is, to the extent

3  that there's to be extensive argument, that has to be in

4  person.

5          MR. ROSNER:  I understand, Your Honor.

6          THE COURT:  Okay.

7          MR. ROSNER:  Okay, thank you.

8          THE COURT:  Thanks.  Any other questions?  All right.

9  Let's address the next matter.

10         MR. CONLAN:  Your Honor, I think I'm next.  We should

11  take Law Debenture's motion to terminate payment of LBO

12  lenders' fees and expenses.

13         THE COURT:  Okay.

14  ***********

15         MR. ROSEN:  Thank you, Your Honor.  For the record,

16  David Rosner from Kasowitz, Benson, Torres and Friedman on

17  behalf of Law Debenture who is the indentured trustee for the

18  6.61 percent Debentures due 2027 and the 7.25 percent

19  Debentures that are due 2096.  Your Honor, I believe, hopefully

20  yesterday you received a binder of certain documents that were

21  turned over during some very informal discovery amongst the

22  parties, and everybody has reserved all their rights.  The only

23  thing that I had asked people was to waive confidentiality

24  because I think every page was marked confidential and the

25  parties have done so.

                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay, I have the binder.  I was in court

2   until about six o'clock last night, so I tell you I have not

3   had the opportunity to review it.  But let me distill if I can

4   what I think's at issue here.  From what I think the facts are,

5   but you'll tell me if I'm wrong.

6          MR. ROSNER:  Thank you, Your Honor.  For the record,

7   David Rosner from Kasowitz, Benson, Torres and Friedman, on

8   behalf of Law Debenture who is the indenture trustee for the

9   6.61 percent debentures due 2027 and the seven and a quarter

10  percent debentures that are due 2096.

11         Your Honor, I believe -- hopefully yesterday you

12  received a binder of certain documents that were turned over

13  during some very informal discovery amongst the parties and

14  everybody has reserved all the rights.  The only thing that I

15  had asked people was to waive confidentiality because I think

16  every page was marked confidential, and the parties have done

17  so.

18         THE COURT:  Okay, I have the binder.  I was in court

19  until about six o'clock last night so I tell you I have not had

20  the opportunity to review it.  But, let me distill, if I can,

21  what I think is at issue here and what I think the facts are,

22  but you'll tell me if I'm wrong.

23         The arrangement that's been made, and to which you

24  now object, involves payment by, it looks like, one of the

25  debtors -- one of the debtor's non-debtor subsidiaries of six

1  professionals, four law firms and two financial advisors, in an

2  amount of about $25 million.  This is an arrangement, at least

3  according to the submissions that I've read, which was known to

4  the Unsecured Creditors Committee and to which they did not

5  object based upon certain conditions which involved, among

6  other things, reporting requirements and not objected and

7  disclosed to but not objected to by the U.S. Trustee.

8         There has been, according to your filing anyway, no

9  public filing of this arrangement or other disclosure by the

10  debtor, or anyone else publicly, concerning this arrangement.

11  It's your position that the parent is accomplishing indirectly

12  that which it could not do directly and therefore requires --

13  and should have required bankruptcy court approval.  So you

14  want the Court, number one, to stop it, number two, to order an

15  accounting, and number three, to order disgorgement of that

16  which has been received.  Have I missed anything?

17         MR. ROSNER:  Other than saying you agree with what we

18  sought, no, I don't think you've missed it.  I mean, I have a

19  lot to add to that as to what are, I think, the undisputed

20  facts, but that is the gist of what we are seeking and that is

21  the fact as to who knew about it and who has not known about

22  it.

23         THE COURT:  Now, I'd like to stop here, if I may, and

24  ask the U.S. Trustee to come forward.

25         MR. McMAHON:  Your Honor, good afternoon.  Joseph

1  McMahon for the acting United States Trustee.

2          THE COURT:  Good afternoon, Mr. McMahon.  I consider

3  it, under these circumstances, significant, maybe not

4  dispositive but significant, that the U.S. Trustee did not

5  object to this arrangement.  And I'm assuming that the U.S.

6  Trustee did not object because it reached some principled

7  position about why it should not and I was wondering number

8  one, if that were true, and two, if you would share that view

9  with me.

10          MR. McMAHON:  Your Honor, consistent with what has

11  been referenced in some of the papers, the debtors reached out

12  to us at a certain juncture earlier on in these cases and

13  indicated to us that their intention was to allow the payments

14  that are in dispute here to be paid from the cash flows by

15  non-debtor subsidiaries.  That was provided -- that information

16  was provided to us as an informational point from our

17  perspective.  I indicated, as I believe one of the e-mails

18  referenced that was attached to the papers, that to the extent

19  that we decided to take an issue, we would get back to the

20  debtors and we did not so object.

21          Insofar as the issue has been framed, really, the way

22  I think our office saw the issue is whether the payment by the

23  non-debtor, pursuant to the guarantee, which obviously applies

24  to the entire debt of the -- callable under the bank debt as

25  opposed to the ratable portion owed by the non-debtor, whether

1  we would have a basis and principle for doing so.  We

2  understood that the Committee, at least, had been consulted and

3  was not going to be objecting on those grounds.  We asked the

4  debtors for copies of certain underlying documents, including

5  their -- I believe they shared with us a memorandum or some

6  analysis as to the reasons why they believed they were

7  obligated, meaning the non-debtor sub was obligated, to make

8  the payments.  And based upon our review of those materials, we

9  elected not to take a position at that time.

10         To the extent that the objectors have concern, we did

11 not view the debtor's position in any way prejudicing the

12 ability of any party-in-interest in connection with the review

13 of the bank's claims to revisit this issue in the sense that

14 the bank's distribution under a confirmed plan of

15 reorganization should be adjusted to account for this issue or

16 to otherwise address this matter in the context of these

17 bankruptcy cases.  Generally, that's my response to Your

18 Honor's question.  I don't know if the Court has anything

19 further to ask.

20         THE COURT:  Are you taking a position with respect to

21 the relief that's been requested today?

22         MR. McMAHON:  Well, Your Honor, we did not file

23 responsive papers.  We did not take a position, and I do not

24 intend to do so.  My understanding is that the debtors, I

25 think, prepared -- or someone, a party-in-interest has prepared

1  a listing of the payments that I presume, you know, if it

2  hasn't been shared with the objecting parties already, could

3  be.  So, I don't think that getting a list of who's being paid

4  and what's been paid out is really no of moment.

5        On the disgorgement issue, Your Honor, there are

6  three items on today's agenda.  I dare say at this point that

7  this issue is probably one piece of a larger puzzle and our

8  view generally is that perhaps it's best addressed in the

9  context of the overarching framework that Your Honor referenced

10  earlier.  Thank you.

11        THE COURT:  Thank you.

12        MR. ROSNER:  Your Honor, Law Debenture sees this

13  issue quite differently.  We don't think this is simply an

14  issue of a two-party dispute with a guarantee that happens to

15  be, you know, outside of the Court and the party, you know,

16  seeking to enforce its rights and the debtor having to do --

17  typically would do something about that.  Because if that were

18  not -- if it were correct that all they could do is just call

19  upon these guarantees, then I suspect that, and I'm not

20  recommending they do this, but they could call on it for

21  interest, they could call on it for principal, they could say

22  we want, you know, all of you guarantors to be paying, but they

23  didn't do that because they knew they couldn't do that.

24        They came up with a scheme with the Tribune debtors

25  to orchestrate a way that they could have their fees and

1  expenses paid during the course of the case.  The principal

2  beneficiary of that is the chairman of the Unsecured Creditors

3  Committee.  I understand Mr. Seife has written, and I believe,

4  you know, it's got to be correct that J.P. Morgan recused

5  itself from the determination.

6        However, at least one of the documents that are

7  sitting in here and the formulation and orchestration of the

8  scheme to keep it outside of the bankruptcy court is actually

9  written by the chairman of -- the co-chairman, I'm sorry, of

10 the Unsecured Creditors Committee in determining how this

11 should be done.  It was attached to our papers, actually.  It

12 was one of the three that was attached to our papers saying how

13 this should be done to make sure that the scheme would not be

14 brought before the Court.

15       And, in fact, another of the documents that I've

16 submitted, and I'll refer to it more directly in a moment,

17 makes clear that J.P. Morgan had directed the Tribune debtors

18 to do just what Mr. McMahon just kind of indicated that they

19 did, tell the U.S. Trustee, but under no circumstances ask the

20 U.S. Trustee.  Just inform them, informationally.  And this was

21 a plan.  This was not something that was just done.  It was a

22 plan.  It is, I think, a subterfuge.  It is a ruse to say that

23 this is outside of the court that there are non-debtors that

24 are paying fees and expenses to which they're otherwise

25 obligated.

1          There's not a Tribune Creative Ventures, FN Creative

2    Ventures individual who's negotiating this, putting up its

3    defenses to this, seeking a 105 injunction urging the debtors

4    to do something.  There's not a Tribune Creative Ventures

5    separate counsel who is being attacked by the banks in order to

6    meet certain obligations under a guarantee.  This is a

7    negotiation between Tribune and Company and the banks as to how

8    they're going to pay the banks' fees, and that's what -- and

9    most importantly, how they're going to keep it outside of this

10   court.

11          And, you know, there's a lot of things that you get

12   in bankruptcy from coming to the bankruptcy court.  It's an

13   incredibly powerful operation to come into bankruptcy.  You get

14   to take a company that owes a lot of money to a lot of people,

15   including to my client, $1.26 billion from before the LBO, that

16   they owe and say, no, I don't have to pay you right now.  And

17   even more than that, I get to be the only one who's going to

18   file a plan, and I get to use my business judgment, and I get

19   to sell assets free and clear of even (indiscernible).  I get

20   to break leases and contracts.  I get all of these powers by

21   coming in before Your Honor and exercising them.

22          Do they have any obligations that go along with that?

23   I think that they have several obligations.  And I think that

24   one thing we know about bankruptcy court, one thing we know

25   that is supposed to happen, if not in exchange for all of those

1 tremendous rights, but at least along with all those tremendous

2 rights, is transparency to the Court, transparency to the

3 creditors, not just the Unsecured Creditors Committee.

4         I understand that they're a representative body, but

5 so is Law Debenture for hundreds if not thousands of individual

6 creditors that own bonds, and there's a lot of (indiscernible),

7 but most importantly to this Court to say, hey, by the way,

8 we're going to pay out to the bank lenders $25 million over the

9 course of the next nine or ten months and we're going to do

10 that without you knowing about it, without you taking a look at

11 what that money is being utilized for, taking a look at where

12 that money came from.

13         I mean, it had to come from the cash management

14 system.  I mean, when I read their cash management motion, all

15 the money goes into the cash management system.  Those

16 accounts, as far as I recall, the J.P. Morgan concentration

17 accounts are owned by Tribune and Company and the money goes

18 out.  It's possible -- I don't know this, I didn't see it in

19 the documents I requested -- it is possible that they set up a

20 separate chain so that they wouldn't be going through the cash

21 management system.  If they did, they should have sent that

22 document over in accordance with our request.  But, if they

23 did, also, it's just furtherance of the scheme.

24         I mean, if you look at the 2015 statement, there's a

25 couple of things -- do you mind taking a look at a couple of

1  these documents?

2          THE COURT:  No, I actually often consider evidence

3  here.

4          MR. ROSNER:  I mean, there's -- it's staggering from

5  our perspective as to, you know, what has occurred here and

6  what has occurred without the Court's -- you know, without the

7  Court even being advised.

8          And, you know, and actually, before I turn to this, I

9  do want to just state that transparency in bankruptcy is so

10 utterly important because of the massive effect of the matters

11 that are addressed before this Court and how they impact

12 individual creditors.  People that sign contracts with

13 companies and expect to get paid and then find out in

14 bankruptcy that they're not getting paid, in fact, their

15 contract is rejected, they need transparency as to why that's

16 happened.

17         We've seen throughout the world in the last couple of

18 years what happens when there's a lack of transparency.  Here,

19 we're guaranteed it and here we're also guaranteed notice and

20 an opportunity to be heard.  When something -- when someone

21 wants to take $25 million out of this family of companies, as

22 Your Honor just said a moment ago, these are integrated

23 companies, this is a family of companies and I don't care if

24 the debtors choose to put TCV at the top of the payment, they

25 are taking money out of this enterprise and they're not doing

1  it with the notice that the parties are entitled to.

2        THE COURT:  But here's -- you know, here's one

3  implication your argument has.  There may be others, but let's

4  focus on one for the moment.  It's not uncommon for a large

5  organization to file with many subsidiaries but not bring in

6  other subsidiaries, for a variety of reasons.  They might be

7  subject to a separate lending regimen, they might be foreign

8  subs.  I mean, there are all kinds of reasons.

9        And depending on whose interest is being adversely

10 impacted, at least in that party's view, the Court is urged to

11 either ignore or give effect to the corporate separateness.

12 And as I look at this situation, you know, anything you take

13 out in the way of value from a subsidiary, debtor or

14 non-debtor, ultimately reduces value in the parent or somewhere

15 up the chain, maybe in more than one entity.  So, it seems to

16 me that that can't be the basis for the relief that you request

17 because if it were, then what would be the difference between a

18 sub and a parent and a debtor's sub and a non-debtor's sub?

19 Can you respond to that?

20        MR. ROSNER:  Well, Your Honor, I think the difference

21 is, is that when companies file certain debtors and they don't

22 file other debtors, it is in connection with guaranteed

23 obligations such as this so that they bring the totality of the

24 debt into the case itself so that they are not subject to

25 having bank debt that is by anybody's calculation worth

1  substantially less than the amount that it was put on at to

2  have the ability to have those yet continue to go against

3  companies that are left outside of bankruptcy.  So, it is

4  unusual to take -- to leave guarantor entities outside of

5  bankruptcy under these facts and circumstances.

6        And what I'm arguing to Your Honor, I'm urging Your

7  Honor to focus upon is, is that it's the facts and

8  circumstances of this situation, that is not the same as an

9  operating non-debtor subsidiary who is paying its obligations

10 in the ordinary course.  We have to look at who is the actual

11 payee here and what does the payee -- what is the status of

12 that payee.

13        I agree with Your Honor that the fact that the

14 reduction in the equity value of the company ultimately cannot,

15 by itself, serve as the predicate for this relief in the

16 context of paying a utility bill or a custodial bill.  However,

17 I think when there's a massive reduction of the value of an

18 integrated company and the use of those funds are to the very

19 creditors in the case who are likely holders of disputed claims

20 and are likely defendants in a potential litigation, or at

21 least in an absolute negotiation, when the money is used for

22 that purpose, then it is well within this Court's jurisdiction

23 to take a look and have it brought before -- you err on the

24 side of bringing those payments before the Court and to put

25 those in front of the fee examiner.  Because what's happening

1 here is that the debtor is paying for the defense of the claims

2 that it is trying to determine may be brought against those

3 parties.

4          They are unsecured creditors.  They are not entitled

5 to have their defense costs paid by the very company that is

6 trying to determine whether it has claims.  The Creditors

7 Committee is trying to determine with us -- we may be in

8 different positions as to how far along we are and what we've

9 determined -- but in determining whether there are assets of

10 this estate in the nature of claims to be brought against these

11 companies -- I'm sorry, these entities, these banks.  And while

12 they're doing that, they're paying the banks' defense costs and

13 actually dealing with the actual investigation.

14          THE COURT:  Well, then I think the way that the

15 request for relief should be articulated is that -- let me put

16 it this way.  Let me say it another way.  The principle of law

17 that you would like the Court to adopt under these

18 circumstances is that when a parent allows or causes a

19 subsidiary, even if it's a non-debtor subsidiary, to undertake

20 an activity or make payments which are material in nature to

21 the business of those entities that are in bankruptcy, and

22 which I would say either are for an improper purpose or

23 improperly re-allocate value away from the debtor entities, the

24 Court has jurisdiction to act, but I still have to look to a

25 specific code section, it seems to me.  And what you've said in

1  your papers is this is a transaction outside of the ordinary

2  course of business.

3        MR. ROSNER:  And it is, Your Honor.  It is a

4  transaction outside of the ordinary course of business.  There

5  are at least three transactions here that are outside of the

6  ordinary course, one of which I only learned about when I

7  actually asked for them for the banks to turn -- and the

8  company to turn over some documents in connection with this

9  motion and which we debated for quite awhile as to whether I

10 was going to be entitled to those documents, being told that

11 this is not a factual matter.  But, one is, is that Tribune

12 Company who is not a non-debtor subsidiary paid $2 million of

13 this $25 million and has paid that over to the banks of which

14 I'm not sure if it's been applied or if it's being held as a

15 retainer, but the parent company paid $2 million.

16       I also understand, at least looking through the

17 documents, and it very well may be, Your Honor, that that was

18 done on the eve of the bankruptcy filing, but that would just

19 give rise to, you know, Chapter 5 issues and also something

20 that should be brought to the Court's attention because again,

21 that was not in connection with a DIP loan or -- and even in

22 connection with a DIP financing to fully secured creditors the

23 right to receive payment on pre-petition claims comes before

24 the Court.  This is -- that's piece one that makes it outside

25 of the ordinary course.

1          Piece two is, and again, I'm not exactly sure.  I
2    have the document in here presented to Your Honor.  Blackstone
3    required, at least I have the draft, I don't have a final
4    agreement -- and the parties can correct me if the final
5    agreement was not signed -- but Blackstone on a post-petition
6    basis required that the debtors sign an agreement.  Again, I
7    have it in draft.  Blackstone may ultimately not have required
8    that, and then I would be wrong about this.
9          But, the document that I have has Blackstone -- has
10   Tribune Company, the parent, on behalf of all of its
11   affiliates, signing a contract to pay Blackstone and also to
12   indemnify, a blanket indemnity like we've all seen for
13   financial advisors on a post-petition basis that, again, signed
14   by Tribune and Company.  That is outside of the ordinary course
15   and certainly something that should be before Your Honor.
16   Those are two pieces.
17         The overall piece of what is outside of the ordinary
18   course, what would fail the vertical test, what would fail the
19   horizontal test is the Tribune Company's orchestrating this
20   transaction is the Tribune Companies, along with the banks,
21   including the chairman of the Creditors Committee, organizing a
22   way to make payments to the banks outside of Your Honor.  It's
23   not simply the fact that it was being -- the money was being
24   run through a non-debtor.  It was the fact that it was the
25   Tribune Companies that were organizing this.

1          And, in fact, for awhile they tried to get something
2    for it.  They tried to actually get a forbearance agreement.
3    And they said, well, you'll forebear and we'll pay your fees
4    and, you know what, that might have been something that you
5    would bring to the Court and say, this seems to be a decent
6    transaction, what do you think, Your Honor, that's our business
7    judgment?  But, they didn't even get the forbearance agreement.
8    What they did was, instead, they came up with an idea of how to
9    do it.  The banks wouldn't give them the forbearance agreement
10   and then the debtors came up with a way of taking it outside of
11   court.
12          Now, there was a concern from -- and I believe I'm
13   right, and if I'm not right, I assume you would have corrected
14   me, Mr. Seife -- that it's Ms. Colnus (phonetic) is co-chairman
15   of the Creditors Committee?  That is correct.  You know, in
16   Exhibit 4 is where she states that it's -- "The steering
17   committee feels that it's best if only non-debtors are parties
18   and it would be more likely to get approved by the Court if the
19   debtors were not a party.  We are worried that if the debtors
20   are parties, the committee may object to it and it would get
21   denied.  I will be frank, as I always am with you, that some
22   are wondering if the company really wants the Court to reject
23   this so the company has an excuse not to pay the fees.  So
24   that's a big heads up and you should think about that in
25   advance of tomorrow's call."

1    Their response is, is that they understand the
2    concern -- this is Tribune -- surrounding the inclusion of the
3    debtors.  They can discuss it further in the morning.  But, the
4    intent to their markup is not to proffer something the Court
5    and the UCC are likely to reject.  We're not being cute on the
6    fee question.

7    Well, there they were at least contemplating coming
8    to you and doing it with non-debtors on the tab.  But, then
9    they came up with this idea of not doing it in front of the
10   Court.  They came up with this idea of just saying, well, it's
11   non-debtors, but it's not non-debtors.  That's the point here.
12   It is the Tribune Company that has made this agreement and it's
13   the Tribune Company that is obligated to come here.

14   And by the way, if I'm not mistaken, there's -- in
15   the cash management order there's the creation of post-petition
16   administrative claims by virtue of inter-company transfers and
17   I assume that that would apply to inter-company contribution
18   claims.  So, if these debtors that are making -- these
19   non-debtors that have actually been the vehicle through which
20   the money has been funded over to the banks and to the hedge
21   funds, by the way, that that creates a post-petition
22   administrative contribution claim, again, without having been
23   brought to the Court.

24   So, I think that a fair reading of the documents that
25   are placed before Your Honor, and I would refer you to Number

1 11, excuse me, at Tab 11 which is where J.P. Morgan is speaking

2 with Mr. Krakauer and Mr. Krakauer is describing a conversation

3 and J.P. Morgan is saying, "Well, you didn't ask for his

4 permission and you didn't tell him that you were waiting for

5 his consent," both correctly, but instead told him the

6 non-debtors intended to pay around the middle of the week.

7 That is part of a scheme, Your Honor.

8          THE COURT:  All right.

9          MR. ROSNER:  And if you -- and each one of these

10 documents that are put before you, Your Honor, evidence that

11 the debtors' scheme was to enable the banks to be paid, mostly

12 J.P. Morgan, by the way, Your Honor.  And you said before I

13 think that there were six entities that were being paid?

14          THE COURT:  I thought that's what the papers said.

15          MR. ROSNER:  Yeah, there's eight entities being paid.

16 We learned about that when we received some documents.  I don't

17 think any have fallen off, but there were an additional three

18 entities that were added on, I think the Wiley and Ryan firm,

19 Epic and Huron whose sole job is to deal with the discovery.

20 I'm not sure if that information was given to the United States

21 Trustee, but I'm sure that the addition of those entities has

22 aggregated into the 25 million that has been paid to date, Your

23 Honor.  I'm sorry, maybe not to date, through October, and

24 continues to run, which it's a -- if you think about it as a

25 percentage of what the debtors have spent and what the

1  Committee has spent, it is four times what the Committee has

2  spent.  It is twice, if not more than what the debtors have

3  spent.  And this has all gone without notice by the fee

4  examiner and not in front of Your Honor.

5        You know what the risk is here, I think, Your Honor,

6  something to be concerned about, is that does the Tribune case

7  become the case in which the message is sent out to bankruptcy

8  participants that it is appropriate to game the system?  That

9  all you need do is figure out how you want to game the system,

10  how you want to pay, in this instance, pay creditors.  Maybe we

11  keep a subsidiary and make it a non-debtor and therefore we can

12  then pay a creditor.  Or maybe if you have a creditor who

13  really wouldn't work as a critical vendor because their claim

14  is too large and there's no way you'll get them paid, maybe

15  before you file what you do is you transfer that claim over to

16  a company that you're going to keep out of bankruptcy in

17  exchange for an inter-company claim, and then when you file

18  bankruptcy, you pay that creditor.  That creditor gets 100

19  cents on the dollar while the rest of the unsecured creditors

20  are getting ten cents on the dollar, I don't know.  Or maybe

21  the debtor figures out ways to hire lawyers a year before the

22  case is filed and then those lawyers get paid by the debtor

23  again without coming to the court.

24        THE COURT:  Look, if we ended the hearing right now

25  and went off the record and sat around for just a couple of

1  hours, I'm sure we could fill a couple of legal pads with

2  methods that are used to accomplish ends like that.

3          MR. ROSNER:  I hope not, but --

4          THE COURT:  But -- oh, I have no doubt of it.  But, I

5  really can only deal with the issue that's before me today.

6  Let me ask this.  Other than the documents that are in the

7  binder, and I'm assuming you want to walk me through them at

8  some point, is there any other evidence that you're going

9  present in support of your motion?

10          MR. ROSNER:  There wasn't, Your Honor.  It was a

11 matter of I believe that these facts are undisputed and if

12 there was a dispute about them, then perhaps we would need to

13 have a witness, although I don't know if one is in court today.

14 I didn't bring a witness down for that purpose, but I don't

15 know if Tribune has a witness here who would be able to answer

16 the questions.  But, no, Your Honor.

17          THE COURT:  I'd like to poll the others who wish to

18 participate and see what they intend.

19          MR. ROSNER:  Okay, thank you, Your Honor.

20          THE COURT:  You're welcome.

21          MR. BERNSTEIN:  Your Honor, may I intervene here?

22          THE COURT:  You may.

23          MR. BERNSTEIN:  Don Bernstein from Davis, Polk for

24 Morgan Chase Bank.  We did not understand this hearing to be an

25 evidentiary hearing.  We did consent to releasing the

94

1 confidentiality.  We knew that Mr. Rosner wanted to use the

2 documents he's put before you in oral argument, but we didn't

3 understand this to be an evidentiary hearing.  There's

4 obviously lots of other evidence that could be educed if we

5 were in an evidentiary context.  I just wanted to make that

6 point for the record.  And, obviously, the chamber's rules have

7 certain restrictions on, you know, what we can do to, you know,

8 have an evidentiary hearing and giving notice to people and

9 that sort of thing.  So, I just wanted to make that point, Your

10 Honor.

11         THE COURT:  Well, let me ask this.  Is it your desire

12 to present evidence --

13         MR. BERNSTEIN:  No, no, Your Honor.

14         THE COURT:  -- today or at some future point?

15         MR. BERNSTEIN:  Your Honor, we think this is an issue

16 that needs to be resolved as a matter of law and should be, so

17 we are not planning on presenting any evidence.

18         THE COURT:  Well, let me tell you something right

19 now.  While I am not yet convinced that there's a specific --

20 well, while I'm not yet convinced that 363 can be used as a way

21 of accomplishing the relief that the movant here wants and

22 putting aside for the moment the, you know, argument with merit

23 that injunctive relief requires an adversary.  I am concerned

24 that if, in fact, there was some scheme here to avoid that

25 which otherwise should have been brought before the Court as

1  undertaken by one or more of the constituents in the case, I

2  certainly don't feel as if the Court is without power or

3  authority to do something about it.

4        So, I doubt very much whether I would make a decision

5  which would put finally to bed all of the relief requested on

6  the law alone.  I might narrow the focus a little bit.  But, I

7  will tell you -- and I haven't looked at the 2015.3 statement

8  yet, again given time constraints -- but to the extent that

9  these payments were put into general categories rather than

10  specifically listed and even if the terms of the rule don't

11  require that they be specifically disclosed and even if the

12  U.S. Trustee did not object to that which was proposed, I don't

13  think that answers the question.

14        I think, frankly, it was a mistake not to make a

15  case-wide disclosure of this arrangement.  The Committee acted

16  as it thought was appropriate in its view, and the U.S. Trustee

17  acted in a way it thought was appropriate, and I make no

18  criticism of them at this point.  But, from the Court's

19  standpoint based on what I've read so far and heard so far, I

20  think it was a tactical error whether there was nefarious

21  motive or not, not to make a disclosure on the record in the

22  2015.3 filing or in some other filing so that this information

23  was available to all concerned.

24        That's where I am.  Anyone else care to be heard,

25  preliminarily?

**J&J COURT TRANSCRIBERS, INC.**

1         MR. ADLER:  Good afternoon, Your Honor.  David Adler

2  from McCarter and English on behalf of Deutsche Bank Trust

3  Company America who serves as the indentured trustee under

4  three separate indentures, one from 1992, one from 1995 and one

5  from 1997.

6         Your Honor, we join in the relief sought by Law

7  Debenture and we did file a joinder on this motion.  And we did

8  note, Your Honor, that there were two factual issues that we

9  see present here with respect to J.P. Morgan.  The first one is

10 that J.P. Morgan says that they have not sought payment for any

11 legal fees incurred in its capacity as a member of the

12 Creditors Committee.  Well, Your Honor, that's a statement that

13 we think should be supported.  How have the fees been

14 segregated between the steering committee for which J.P. Morgan

15 serves on, as well the Creditors Committee?  We would like to

16 know what processes have been employed to segregate the fees

17 and expenses with respect to counsel that's been employed by

18 J.P. Morgan.  That's issue number one.

19        Issue number two is, J.P. Morgan says that they've

20 accounted regularly to the Creditors Committee and to the

21 debtor and if they've accounted regularly on those issues, it

22 should not be too much of an issue in this case for them to

23 account to the Court and to provide exactly what the amounts

24 are and the underlying narratives for those -- for the fees and

25 expenses that they seek.

**J&J COURT TRANSCRIBERS, INC.**

1           So, Your Honor, for those reasons, I mean, we think

2    that there are two distinct factual issues raised from J.P.

3    Morgan's objection which will need to be addressed before the

4    Court can make a ruling on this issue.  But, we do join in the

5    relief, and we do believe that these payments should not have

6    been made from the non-debtors.  And as Mr. Rosner said, quite

7    frankly, you know, the debtors are basically paying for the

8    defense of J.P. Morgan and the senior lenders and we think that

9    that's improper.  Thank you.

10          MR. GOLDEN:  Your Honor, Daniel Golden, Akin, Gump,

11   Strauss, Hauer and Feld, counsel for Centerbridge.

12          Your Honor has invited preliminary comments.  I don't

13   intend to give you the full oral argument, but one point that I

14   don't think has been focused on yet is one of the dangers

15   inherent with this kind of process is that there apparently is

16   nobody, no fiduciary who is trying to understand or analyze

17   whether the proposed payments are even in compliance with the

18   credit agreement section that the lenders have relied upon as

19   giving them the right to these payments.

20          And as the J.P. Morgan's papers said -- it's Section

21   8.04(a) -- that provision provides for the reimbursement of

22   reasonable and documented counsel fees and expenses.  It makes

23   no reference to financial advisory fees, and yet we know that

24   some of the fees, presumably a large portion of the fees, are

25   being paid not only to counsel fees, but are being paid to two

1 well-healed financial advisory firms.  And there is no

2 reference in Section 8.04 for the payment for advisory fees.

3      Secondarily, but no less important, the payment

4 scheme under Section 804 talks about payments to the agent and

5 the lenders for enforcement of their rights under the credit

6 agreement.  Well, we won't know with absolute certainty until

7 we see a summary of the fees that have been paid to date, the

8 24 or $25 million amount that's been bandied about, but it is a

9 very strong belief on the part of Centerbridge and Law

10 Debenture that these fees were not incurred primarily for

11 enforcement actions, but rather to mount a defense in

12 connection with a potential fraudulent conveyance action.

13      And we suggest that for both of those reasons, even

14 if the Court could get over the fact that this hasn't been

15 publicly disclosed, they're not -- these fees are not even in

16 compliance with the credit agreement as set forth by J.P.

17 Morgan, a point I wanted to raise on a preliminary basis and

18 reserve the right to respond to other points on oral argument.

19      THE COURT:  Thank you.  Let me hear from the debtor.

20      MR. KRAKAUER:  Your Honor, first -- Bryan Krakauer on

21 behalf of the debtors and also speaking I guess today on behalf

22 of the non-debtors, as well.  First of all I'd like to clear up

23 just a couple of points raised by Mr. Rosner.

24      First, there were no payments made by the Tribune

25 Company since the filing of the petition.  One of Mr. Rosner's

1  requests in his motion was for an accounting.  We didn't wait

2  till after this Court heard this motion to give an accounting.

3  We supplied an accounting.  It listed pre-petition payments, as

4  well, that were made before the filing of the petition and the

5  payment by the Tribune Company that's listed there was a

6  pre-petition payment that was made before any decision was made

7  to file these cases.  So, I just wanted to be clear about that.

8  There have been no payments by the parent to the banks.

9        Second, all the monies that have been remitted have

10 been non-debtor monies.  None of them were generated by the

11 debtors.  They were all generated by the T.B. Foods Group --

12 T.B. Foods entity and they were all non-debtor monies.  So,

13 there has not been any debtor monies used.

14       Third, there's a reference to the Blackstone

15 engagement and a Blackstone indemnity and a reference to a

16 Tribune signature line.  Neither the debtors nor the

17 non-debtors have signed any agreement providing for any consent

18 or indemnification for Blackstone with respect to the

19 Blackstone engagement.  There was, during the course of

20 discussions and negotiations, a request by the lenders that the

21 -- either the debtors or the non-debtors do so and in the end

22 the debtors and the non-debtors both declined to do so.  So

23 there is no additional agreement that exists.  And what's been

24 provided in the way of documents was a draft that was

25 circulated by the lenders to us at one time, and that was not

1  executed or consented to.  So, I wanted to get those points

2  just out of the way.

3          The point at issue here is, obviously these payments

4  and whether or not the debtors should have come before this

5  Court and requested permission provided prior to making payment

6  and whether or not there should have been additional

7  disclosure.  These issues were given some careful thought at

8  the time and I think it might be helpful to this Court to put

9  it in a little bit of context.

10          First, with regard to the decision of which entities

11  to file and which not to file, I think as this Court is aware,

12  the Tribune Company and its affiliates consist of more than 100

13  entities.  More than 110 of them filed a petition.  There was

14  five guarantor entities that did not file a petition and the

15  reason they didn't file was based on the business circumstances

16  associated with those entities.  One of them was the Cubs, and

17  I think we have previously briefed before the Court some of the

18  reasons why we thought that filing the Cubs would have a very

19  adverse business impact on that entity and why it was kept out

20  of the proceeding.

21          The other four entities were, in one form or another,

22  involved in joint venture or affiliation agreements with

23  non-affiliated entities.  And there was a business concern that

24  subjecting those entities to a proceeding may have a

25  detrimental effect on those joint ventures, and that it may

1 impair value and that it may not be in the interest of the

2 estate to run that sort of risk, and that was given a fair

3 amount of thought before we filed these cases, if we were going

4 to file.  And the decision was made that in prudence that those

5 entities should not file because of their relationships and

6 their joint ventures with third party unrelated parties.

7          One effect of that was, it left those entities

8 without the protection of an automatic stay.  You had entities

9 that were out there that could be subject to creditor claims

10 both by our senior lenders and by bridge lenders who had

11 guaranteed claims.  A whole number of parties are bridge

12 lenders and senior lenders.  And the possibility that there

13 might be an involuntary, the possibility that there might be

14 some action against those parties was a risk that we balanced

15 and incurred in connection with the decision not to file this.

16 The decision at the end of the day that was made, was not to

17 file for the business reasons that I just discussed.

18          Shortly after the filing we were approached by the

19 senior lenders for their payment of fees in connection with

20 their guarantees.  That was an issue which we gave a lot of

21 thought to at the time.  We took a look at the guarantees

22 themselves to see what they guaranteed and made a determination

23 that there were amounts that were owed under those guarantees.

24 There's been cited 804(a) of the guarantees which deals with

25 enforcement expenses.  There is also 804(b) of the guarantees

1   which deals with broader indemnification provisions.

2          And in looking at that, we determined that there was,

3   indeed, a claim pursuant to the wording of those guarantees and

4   that there was a claim that could be made out there.

5   Obviously, people disagree with that.  That would be an issue

6   for another day as to whether or not the fees were properly

7   owed pursuant to the terms of the guarantees.  But, that is

8   something we looked at.  It's also something Mr. McMahon

9   inquired about when we had discussions with him and we also

10  provided him the provisions of those agreements, as well as our

11  analysis at the time.

12         Second, we looked at the law to see what was required

13  and how the filing of our parent entities and affiliated

14  entities might or might not affect our obligations under those

15  guarantee agreements, and whether or not if payments were made

16  pursuant to those pre-existing agreements, they would require

17  court approval.  In connection with the law, the law does seem

18  to be very clear that the filing of a proceeding for some

19  entities does not affect -- and affiliates, does not affect the

20  obligations of the non-filers and that the circumstances under

21  which one can get an injunction for the benefit of the debtors

22  against creditors of a non-debtor have to be extraordinary

23  circumstances.  It can be done in certain circumstances, but

24  it's difficult and it requires a very stringent test.  We felt

25  that it would be very difficult for us in this circumstance to

1  satisfy that test.

2          Second, we looked at whether or not this was -- if

3  these payments were made by the non-debtors, whether they would

4  come within Section 363.  And our view was, after looking at

5  it, was that these were payments not a property of the estate

6  and that so long as the monies were not generated by the

7  debtors and were exclusively assets of the non-debtors, that it

8  did not come within 363.

9          And based upon that, we reached a conclusion that the

10  request for payment was something that something that we should

11  honor at the time, both looking at the business issues of

12  maintaining stability in these entities and in terms of not

13  running the risk of creditor claims and feeling that if we did

14  make the payments, that it was much more probable that we would

15  not seek claims against these entities.  And we also negotiated

16  at the time that we would -- that the senior lenders would also

17  provide a blockage provision preventing the bridge lenders from

18  acting against these entities which we viewed as beneficial to

19  the estate to additionally provide for stability.

20          Having reached that conclusion, though, we also

21  realized that these were payments that other constituencies

22  would have an interest in and that they could be controversial.

23  So, we determined that we would not make a final decision on

24  payment without first seeking disclosure to the Creditors

25  Committee and the U.S. Trustee and confirming that neither

1  party had an objection to the payments or to the process that

2  we were proposing for the payments.

3        We then approached the Creditors Committee first,

4  disclosed to them what was being proposed in terms of the

5  payments, both what they were for, the amount, how we proposed

6  to do it, and asked them to please carefully consider that and

7  let us know whether they objected to us making the payments in

8  this matter.  And the Committee at that time consisted of

9  representatives of most all the major constituencies in this

10 case.  The U.S. Trustee when they appointed the Committee, went

11 with the route of one from Column A, one from Column B, one

12 from Column C.

13       We've had very broad representation on the Committee.

14 Included in the representation was Deutsche Bank which at the

15 time was indenture trustee for all the public bondholders.  And

16 they -- Mr. Rosner's client, Law Debenture, at that time did

17 not exist as an indenture trustee in this proceeding.  They

18 subsequently became indenture trustee for one of the four

19 indentures with Deutsche Bank, remaining trustee for the other

20 three indentures.  But, there was no Law Debenture in this case

21 at that time.  It was all one hundred percent for the public

22 noteholders Deutsche Bank which was on the committee and was

23 part of this process of disclosure.

24       We tried to make the disclosure very broad to the

25 committee, and the committee spent about a month reviewing it.

1 They had three separate meetings.  They asked a number of

2 questions.  They asked questions of us, they asked questions of

3 the secured lenders.  And at the end the Unsecured Committee

4 came back to us and said, provided these conditions are

5 satisfied, and they listed the conditions in an e-mail, they

6 did not object to the payments.

7          We then went to the U.S. Trustee and went through

8 much the same process.  We disclosed the proposal.  We

9 disclosed the reasons why we thought legally the non-debtors

10 were entitled to -- or obligated to make them.  And we asked

11 for the U.S. Trustee's reaction.  The U.S. Trustee asked us for

12 some backup information, asked us for some analysis.  We

13 provided that, and ultimately the U.S. Trustee got back to us.

14          In the end it was, of course, the decision of the

15 non-debtors and also of the debtors to allow the non-debtors to

16 make these payments.  But, we did have a great cognizance that

17 we should do this with full disclosure to the proper parties

18 and to ensure that there was not objection to what we were

19 proposing.

20          In terms of stability of the entities that for the

21 non-debtors it has accomplished so far from a business basis

22 what we had hoped.  We got through the Cubs transaction without

23 there being a problem, without any creditor actions and to date

24 there have not been any creditor actions by any of the

25 guarantor creditors against the non-debtors.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  You know, let me interrupt for a minute

2 --

3          MR. KRAKAUER:  Yes, sure.

4          THE COURT:  -- Mr. Krakauer.  It might be that if

5 this information were introduced in the way of evidence as

6 opposed to --

7          MR. KRAKAUER:  Right.

8          THE COURT:  -- statement of counsel, I might conclude

9 that the motion should be denied.  But, even if these payments

10 were to be characterized as for the sole purpose of buying

11 peace to accomplish other legitimate ends, that might be good

12 enough.  Put that aside for a moment.  I'm still of the view

13 that as it turns out and, you know, as they say, hindsight is

14 20/20, it was a mistake not to make a wider disclosure.

15          Now, let me tell you what I'm going to do.

16          MR. KRAKAUER:  Sure.

17          THE COURT:  We're up against a time constraint here.

18 I have a one o'clock hearing and I have a two o'clock

19 conference call.  I'm going to bring you back at three, and

20 we'll finish with this matter and pick up the status in the LBO

21 issues at that time.  But, with respect to this motion, I am

22 going to order that a disclosure be made and I'm open to the

23 foreman, which the debtor does that, and file it with the

24 Court.  But, I don't think I'm in a position to determine

25 whether the relief should be granted unless I actually hear

1  evidence in support of what lawyers are arguing to me.  And I

2  say that, understanding that it may be the motion here is

3  motivated by something other than that which appeared on the

4  surface.  It comes at a time when everything is now coming to a

5  head about the plan.  I'm not unmindful of these things and I

6  hate to start another -- well, I hate to create a forum for

7  another skirmish when there are other more important things to

8  be considered.  And I think Mr. McMahon put his finger on it

9  that ultimately maybe the best resolution of this issue comes

10 in the context of a plan.

11        But, I have what I have before me, and I do think it

12 has to be decided.  So, during the time between now and three

13 o'clock I'd like the parties to confer and determine the

14 framework for an evidentiary hearing, what further discovery,

15 if any, is necessary, and the time frame during which the

16 parties believe they would be ready for such a hearing and I'll

17 try to schedule it to accommodate the parties' wishes.

18        But, I don't think I can accede to both the movants'

19 and J.P. Morgan's wishes that I decide this matter on the law.

20 I don't think that would be the appropriate thing to do.

21        Any questions before we break?

22        MR. KRAKAUER:  No, Your Honor.

23        THE COURT:  All right, court will stand in recess on

24 this matter until three o'clock.  I'll take a short break to

25 allow the one o'clock parties to set up.

**J&J COURT TRANSCRIBERS, INC.**

1                        (Recess)

2              THE CLERK:  All rise.

3              THE COURT:  All right.  Good afternoon.  Let's resume

4    consideration of the Law Debenture's e-motion, disgorgement

5    motion.  Whatever anyone wants to --

6              MR. KRAKAUER:  Your Honor, Brian Krakauer again.  A

7    few points.  First, on the disclosure, obviously we're very

8    willing to do that.  We have provided an accounting, which I

9    think is one of the exhibits that was given -- handed up to the

10   Court.  We would take that information and list it item by item

11   for each professional, showing the exact amounts that were

12   paid, and do it at the same level of detail which currently is

13   in our MOR reports for all the debtor's attorneys.

14             If the Court wants a greater amount of disclosure

15   than that, we'll obviously do what the Court wants.  But that

16   was, at least, our thought.

17             THE COURT:  That's sufficient for now.

18             MR. KRAKAUER:  Okay. And we'll get that on file --

19             THE COURT:  All right.

20             MR. KRAKAUER:  Second, we have talked about

21   discovery and a hearing date, and I'll let, you know, the

22   various parties talk about what they need.  But the thought is

23   to schedule an evidentiary hearing some time around January

24   20th, or the nearest date after that.

25             THE COURT:  Is there a consensus on that?

1           MR. KRAKAUER:  I believe there is, Your Honor.  Yes.

2                          (Pause)

3           MR. KRAKAUER:  And we would anticipate it may take a

4 half day, possibly a little longer.

5           THE COURT:  How about January 21st at 11 o'clock.

6           MR. KRAKAUER:  That's fine with me.  Is that okay?

7           UNIDENTIFIED ATTORNEY:  That's fine.  Yes.

8           MR. KRAKAUER:  Okay.  It appears to be fine, Your

9 Honor.  And then, I'll let various parties come up and talk

10 about the amount of discovery they want.  But one thing, Your

11 Honor, we've -- as I've said earlier today, I think from the

12 debtor's point of view we believe we've handled this in an

13 appropriate way; however, given the fact that Your Honor wants

14 to take it up with a full evidentiary hearing and hear all the

15 evidence, we've also decided that between now and the hearing

16 date we will suspend further payments so that it could all be

17 addressed at that time.

18           THE COURT:  All right.

19           MR. KRAKAUER:  And that's -- I'd turn it over to

20 people, if you want to talk --

21           THE COURT:  All right.  I'll hear from others.

22           MR. BERNSTEIN:  Your Honor, Don Bernstein,

23 representing J.P. Morgan Chase Bank, from Davis, Polk and

24 Wardwell.  We're in concurrence on the schedule, Your Honor.

25 We expect we are going to need some depositions.  We haven't

1  even discussed yet whether we're going to need some document

2  discovery.  It will probably be a handful of depositions.  I

3  don't know the exact number.

4          One point on Mr. Krakauer's statement about

5  suspending the payments, the debtor has every right to do that

6  under the agreement that we had reached with the debtor, so we

7  are not quarreling with that.  We do have -- I just want the

8  Court to realize that of the money that we've got there's a

9  significant unused retainer, and we would expect to continue in

10  the ordinary course to apply that retainer as we continue

11  through this period.  And we think that's appropriate.  We

12  don't think there's a record yet sufficient to justify not

13  permitting us to continue to operate in the ordinary course, as

14  we have been.  So, I just wanted to put that on the record,

15  Your Honor.

16          THE COURT:  Thank you.  Does anyone else care to be

17  heard?

18          MR. ROSNER:  Yes, Your Honor.  For the record, David

19  Rosner from Kasowitz, Benson, on behalf of Law Debenture.  I

20  appreciate your accommodation on the hearing date, and I think

21  the parties will work cooperatively in making sure that the

22  discovery is accomplished in time so that we can have the

23  hearing that we should.

24          I don't necessarily agree that the disclosure that's

25  being made is totally sufficient for the case, but I recognize

1 that this is where we're going for now, and then we'll have a

2 hearing on it and see if other and further disclosure that's

3 case-wide or public-wide should be made.

4          I categorically disagree with the application of the

5 retainers by the professionals during the period where the

6 debtor has determined to suspend payments by the non-debtor.  I

7 think that that is, to use a phrase I used before, doing

8 indirectly what the debtors are not doing directly, where the

9 debtors have said it's not appropriate to be making those

10 payments and the professionals are now saying, well, that's

11 okay because we have the money anyway.  And I think that during

12 the period, it's not that long of a period between now and the

13 hearing date, that they shouldn't be applying that, and my

14 recollection is is that in the demand that they made to the

15 debtor originally of posting retainers they made clear that

16 those retainers would be used for last dollars in the case such

17 that they would be evergreen retainers, and they're now

18 changing it so they wouldn't have, you know, any absence of

19 payment now.  So, we would ask that in addition to the

20 suspension of payment that they also not apply retainers at

21 this point, and if the hearing goes their way, then there will

22 be no prejudice, of course.

23          THE COURT:  Well, except for disclosure I'm prepared

24 to, in the fixing of a hearing, order no further relief today

25 on the motion.  There isn't a record sufficient before me to

1  make any, even a preliminary determination that any of the

2  payments were inappropriate.  As I said, my main concern, at

3  least preliminarily, until I hear the facts, was the failure to

4  disclose.  Now, I guess on the other hand if it turns out that

5  I think you're right and I order all of the relief that you

6  asked for, it seems to me that you should be readily able to

7  recover that which has been paid.

8          MR. ROSNER:  Thank you, Your Honor.  Last, just a

9  procedural point, is --

10          THE COURT:  Or rather the estate should.

11          MR. ROSNER:  Sorry?

12          THE COURT:  Or rather the estate should.

13          MR. ROSNER:  Oh.  I hadn't picked that up, but okay,

14 Your Honor.  The -- just as a procedural point, will Your Honor

15 be requiring a pretrial order?  And if so, when would Your

16 Honor be requiring that?

17          THE COURT:  Well, let's see.  The answer is yes.  You

18 can submit it with the binder, which would be due by noon on

19 the 19th.

20          MR. ROSNER:  Okay.  Thank you, Your Honor.

21          THE COURT:  All right.  Are there any other

22 questions?

23          MR. GOLDEN:  Thank you, Your Honor.  Daniel Golden,

24 Akin, Gump, Strauss, Hauer & Feld, counsel for Centerbridge.

25 Two points of clarification, Your Honor.  I just wanted to make

1   sure the Court understands that the disclosure Mr. Krakauer has

2   suggested is what the debtors intend to do, will be a single

3   line item, entry by entry, for each payment that will be made.

4   It will be the day the payment will be made, the amount of the

5   payment, and the professional who was paid.  There won't be any

6   further detail.  And if that's acceptable to the Court, we'll

7   live with that.  It will involve, though, in terms of

8   discovery, getting behind those one line items to try to

9   appreciate what, in fact, the fees were incurred.  So, I just

10  wanted to make sure the Court understood what Mr. Krakauer was

11  suggesting would be filed in terms of disclosure.

12          THE COURT:  I do.

13          MR. GOLDEN:  Okay.  Second, with the Court's ruling

14  about not having enough or sufficient record before it to stop

15  any payments being drawn from the escrow account or the deposit

16  account, I just bring to the Court's attention a problem we ran

17  into in Tusa when we had to seek to recover fees.  These

18  payments are being made on behalf of an agent, and on behalf of

19  a lending group, or a steering committee, to, as I understand,

20  eight different professional firms.  To the extent that the

21  Court ultimately determines that it was inappropriate for these

22  payments to be made, the payments made already and the payments

23  that are proposed to be made between now and the hearing date,

24  I'd like to get some clarification from J.P.M, as agent,

25  whether J.P.M. will stand behind the disgorgement obligation or

1 whether the estate will need to go after eight firms that are

2 not necessarily within the jurisdiction of the Court?

3           THE COURT:  Well, if you care to respond?

4           MR. BERNSTEIN:  I'll be frank with Mr. Golden.  I

5 have no idea what the answer to that question is.

6           THE COURT:  Let me ask this.  There was a place in

7 the papers where the professionals were identified, I think.

8 Could someone direct me -- redirect me to that place?

9           MR. ROSNER:  Yes, Your Honor.  The schedule that I

10 think Mr. Krakauer and Mr. Golden were talking about is at Tab

11 9.

12           THE COURT:  Well, who is Wiley Rein, or Wiley Rain

13 (sic)?

14           MR. GOLDEN:  Your Honor, they are FCC counsel.

15           THE COURT:  And Eaton Vance?

16           MR. GOLDEN:  They are one of the hedge funds that's

17 on the steering committee.  And I don't know exactly what that

18 small amount of money was used for.

19           THE COURT:  So, they are a --

20           MR. GOLDEN:  Expenses of some sort.

21           THE COURT:  They are a creditor in the Tribune cases?

22           MR. GOLDEN:  Yes.

23           THE COURT:  Well, I will say I see all of these folks

24 on a regular basis, and if I enter an order telling them to pay

25 money back I have the feeling it's going to happen.

1          MR. GOLDEN:  Very well, Your Honor.

2          THE COURT:  All right.  Any other questions or

3  comments?  Okay.  Shall we proceed to the status hearing?

4          MR. CONLAN:  Your Honor, Jim Conlan for the debtors.

5  This is the last item today, and again, it will be sort of free

6  form.  This is a -- just a status conference with respect to

7  the informal discovery to which we referred during the argument

8  on the exclusivity motion.

9          THE COURT:  So, are the parties going to be

10  requesting an informal order?

11                          (Laughter)

12          THE COURT:  Or, just tell me what precisely is the

13  Court going to be asked to do today, if anything, other than

14  listen?

15          MR. CONLAN:  Frankly, Your Honor, other than listen

16  and other than perhaps hemming people in with respect to when

17  they will be delivering their documents, their information, it

18  doesn't have a purpose.  Frankly, we would like you to be

19  involved in the informal discovery process, not so much to

20  issue orders, but to keep people on their toes as we drive

21  towards a resolution.

22          THE COURT:  Exercise my moral and persuasive

23  authority?

24          MR. CONLAN:  Yes, sir.

25          THE COURT:  I see.  Proceed.


                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. CONLAN:  And as we proceed I'd like to invite

2    Graeme Bush, counsel to the creditors' committee, to join me at

3    the podium, as well, because as you heard earlier the discovery

4    efforts have involved many people, including the creditors'

5    committee, and in general, as we said in the agenda that we

6    filed with the Court, discovery has gone along nicely.

7          There are lots of people involved, about 30 different

8    parties.  A few issues have developed.  One of them involves

9    Merrill Lynch with respect to the timing of delivery of e-

10   mails, and we've had difficulty nailing down when those e-mails

11   will be delivered, and a party or two, who can also speak for

12   themselves in the courtroom, have identified that as making it

13   difficult for them to proceed with respect to settlement

14   discussions.

15         THE COURT:  Can you -- excuse me -- tell me what

16   general framework, if any, has been agreed to with respect to

17   this informal discovery.

18         MR. CONLAN:  Sure.  Graeme?

19         MR. BUSH:  Good afternoon, Your Honor.  I'm Graeme

20   Bush from Zuckerman Spaeder, and as Your Honor knows, Zuckerman

21   Spaeder was retained as special litigation counsel to advise

22   the committee with respect to the LBO claims, and we've been

23   working on this since we were retained at the beginning of

24   September.

25         It might be helpful if I just give a kind of a

1 flyover of what's been going on in discovery, and of course I'm

2 happy to answer any more detailed questions the Court has about

3 any aspect of discovery.  But generally speaking, since even

4 before we got into the case there was a fair amount of document

5 discovery going on pursuant to the Court's informal Rule 2004

6 procedures, and by and large parties were producing documents

7 voluntarily.

8         Pursuant to that process we have received documents

9 from several categories of producing parties, the Tribune

10 related entities, the Zell related entities, some of the major

11 shareholders, and board representatives, and advisors.  We have

12 received documents from financial advisors, from the lenders,

13 and from the firms rendering solvency opinions.  We have

14 received some documents from the rating agencies, from some of

15 the financial institutions that declined to participate in the

16 LBO loans, and from some of the members of Tribune's board of

17 directors back at the time.  Those documents have all been

18 processed, reviewed and analyzed, and that's an on-going

19 process as documents are received.  And documents are still

20 coming in; indeed, Merrill Lynch just produced another 171,000

21 pages of hard copy documents in the last week or so.

22         For the most part the document discovery has gone

23 fairly well.  The reference to Merrill Lynch really has to do

24 with electronic documents and e-mail discovery.  Merrill Lynch

25 was, I think, first served with document production requests

1  back in March and did begin producing hard copy documents, I

2  guess at the end of the summer, and continued through that

3  process.  They probably are the ones that have taken the

4  longest to reach an agreement with -- they are the ones, not

5  probably, who have taken the longest to reach an agreement with

6  the creditors' committee on a protocol for searching electronic

7  documents and producing them.  That protocol was finally agreed

8  to in the last several weeks, and the issue right now with

9  Merrill Lynch is not that we don't have an agreement about what

10 they'll look for, but we don't have any real assurance about

11 when we will start to receive documents.  And I think that is

12 an issue for some of the other parties in the room, as you

13 mentioned, but it really is an issue also for the creditors'

14 committee.

15        We have decided that we can go ahead and begin

16 substantive discussions with regard to the LBO claims, but I

17 have been -- tried to be clear that the Merrill Lynch documents

18 are -- e-mails are fairly important to any kind of final advice

19 that we can give to the committee with respect to the strength

20 of the claims, and with respect to any position that they ought

21 to be taking, or may be asked to take in settlement context.

22 And if these documents come in in the next several weeks, then

23 that's not going to be a problem.  But if they come in some

24 time in the middle of January, or come in, dribble in

25 throughout January and into February, it could very well turn

1 out to be a problem.  And since we don't really have any

2 assurance one way or the other about when the protocols would

3 run on the electronic documents and when we'll start to receive

4 them, we're a little bit up in the air about whether this is

5 going to impede our ability to engage in settlement

6 discussions.  I don't know if you want to address that any

7 further.  I can move on and continue with some of the other

8 aspects of discovery, but that's up to --

9             THE COURT:  Let me --

10             MR. CONLAN:  Just --

11             THE COURT:  Go ahead.

12             MR. CONLAN:  I was just going to say one suggestion.

13 Merrill Lynch obviously was aware of what was on the agenda,

14 and Merrill Lynch's counsel is in the courtroom.  Perhaps, in

15 fairness, if we could ask Merrill Lynch's counsel to come up

16 and tell us what they could about delivery dates on the e-mails

17 so that we know that there's an issue before we --

18             MS. PRIMOFF:  Good afternoon, Your Honor.  Madlyn

19 Primoff of Kaye Scholer for Merrill Lynch.  With me is my

20 colleague, Joseph Drayton.  Merrill received an amended

21 informal document request on May 14th.  We've produced all hard

22 copy documents and all electronic documents other than e-mails

23 and attachments.  It was agreed with the creditors' committee

24 back in the June/July time frame that once the creditors'

25 committee had reviewed the non-e-mail documents, that we would

1 table the production of e-mail documents, and that once they

2 had an opportunity to review the non-e-mail documents the

3 creditors' committee would come back to us and we would work

4 out a protocol for e-mail discovery.

5         September 18th was the first time that they

6 approached us about e-mail discovery.  They asked for 82

7 custodians and 43 search terms, which is just absurd in our

8 judgment.  And the rationale for that was that we could

9 identify groups within Merrill Lynch who worked on the

10 transaction and come to a rational number of people and search

11 terms for the e-mail production.  So, during the month of

12 October, on virtually a daily basis, we had communications with

13 the creditors' committee about the scope of the e-mail

14 production.  And this was focused on limiting the functions

15 within the institution, so -- not just the number of people,

16 but coming up with a rational basis for deciding how many --

17 for deciding which custodians' e-mails would be searched,

18 reducing the number of search terms.  And the creditors'

19 committee then made a request at that time to expand the time

20 frame for the search by seven months, and we acceded to that

21 request.

22         On October 26th we reached an agreement that provided

23 for us to search 12 particular custodians.  They essentially

24 would not budge off of the 43 search terms.  The only search

25 terms that they agreed to give up were Standard & Poors and

1 S&P.  So, we agreed to gather the data and run the search terms

2 using the 41 search terms, but reserving our rights.

3        So, promptly following that agreement on October 26th

4 we began the process of collecting the electronic data.

5 Merrill Lynch maintains -- has a system which is called the CAR

6 system, and that's their e-mail retention system.  We promptly

7 began retrieving data from the CAR system.  There's a limited

8 amount of data that can physically be pulled at any one time.

9 So, Merrill Lynch's practice is to prioritize -- obviously this

10 isn't the only discovery request that they have, their practice

11 is to prioritize their discovery requests within the

12 institution.  This request was assigned the highest priority.

13        After the data is pulled it's bar coded and it's

14 placed on a source drive.  It's then sent to the processing

15 team to be loaded onto a processing platform.  And processing

16 includes a loading phase, an indexing phase, a searching phase,

17 and an assignment phase.  What we have found thus far is that

18 the volume of data is more than we anticipated, thus it has

19 taken more time to collect and process than what we

20 anticipated.  We expect to finish the collection process in the

21 next day or two.  The raw estimate that we have as of yesterday

22 evening from the client is that there will be about 330,000

23 documents for the 12 custodians using the 41 search terms over

24 the 30 to 31-month period.  In our view this is way, way, way

25 too many documents, and all that this process has done so far

1  is support Merrill's belief from the beginning that the 41

2  search terms was way too burdensome.

3          We have estimated how long it would take to make a

4  production from start to finish, if it's based on these 330,000

5  documents, and we estimate approximately 12 weeks, which is

6  calculated as follows.  It's one week to run the processing

7  phase.  That's the indexing, the analyzing, the doc mapper.

8  And it's about seven weeks for our outside vendor, which is

9  called DiscoverReady, to review the documents for

10 responsiveness and privilege.

11         Working with DiscoverReady we've -- and based on

12 their normal and customary practices for document production of

13 this type, we would have ten people on this project full time.

14 They would be able to review 10,000 documents a day.  So,

15 that's a seven-week process.  There's an additional week for

16 quality control and technology issues, an additional week to

17 export the documents from a TEN-X (sic) to TIFF, an additional

18 week for the TIFF process, an additional week for Kaye Scholer

19 to spot check the documents and prepare and finalize the

20 production.  So, that's 12 weeks, start to finish.

21         On a rolling basis we anticipate that we could begin

22 rolling out documents in three-and-a-half weeks, so that would

23 be three-and-a-half weeks to start production for the first

24 custodian.  But as I said, our position is that 12 weeks is way

25 too long, it's too many documents, and that this is too

1 burdensome and costly for us.  So, the way we suggest
2 proceeding is as follows.
3        What we suggest is to eliminate the following 12
4 search terms that from the outset we have found to be
5 problematic because they have -- it has to be that they're
6 producing too many documents that are unrelated to this
7 transaction, and I'll go through those search terms in a
8 second.  The --
9        THE COURT:  Actually, I'd prefer you not.
10        MS. PRIMOFF:  Okay.
11        THE COURT:  I mean, this is -- we're getting into
12 what would ordinarily be a request to resolve a discovery
13 dispute, and normally I would prefer to have papers in front of
14 me for that.  But I hear what you've said so far.  Is there
15 more?
16        MS. PRIMOFF:  Well, our position, Your Honor, is that
17 we can pare down the search terms, we can re-run the searches
18 by the end of this week with the pared-down search terms, and
19 we can then report back to the committee with an estimated
20 number of documents, an estimated time to begin the production,
21 and an estimate time to complete the production, and we
22 continue to reserve our rights if the re-run search terms still
23 produce too many documents.
24        THE COURT:  Well, let me ask this.  If you eliminated
25 the 12 search terms, how, if at all, would that change the time

1 frame you've just described to me?

2      MS. PRIMOFF:  We don't know until we run the data set

3 with the reduced search terms to see how many documents it is.

4 And that's what our proposal is.  Our proposal is to eliminate

5 the search terms that we think are producing so many documents

6 in so many numbers -- particularly so many non-responsive

7 documents.  So, it's just a couple of days -- by the end of

8 this week we can re-run the data set with the pared down search

9 terms and have an estimate about production.

10      THE COURT:  Okay.

11      MR. BUSH:  Your Honor, this wasn't -- isn't a motion

12 to compel, and I don't know what the search terms are that they

13 want to eliminate, and there are other people who would have to

14 be involved in discussing whether that has -- is at all

15 reasonable, given the number of documents that came out of the

16 search they ran.  But I would make a couple of observations for

17 the purposes of what we're here today for.  First is that J.P.

18 Morgan and several other financial institutions seem to have

19 been able to do essentially the same thing that we've asked

20 Merrill Lynch to do, and get it done, and get us e-mails

21 produced already.  They're not at the beginning of the process.

22 They have either finished it or they're very close to the end

23 of the process.  So, it's not some kind of inherently

24 unreasonable thing that we asked Merrill Lynch to do.  We

25 didn't single them out.  We didn't do anything special with

1  them.

2          And the second point I would make is that whatever it

3  is, my point is that, and I think it's a point that several

4  people would make here if they come up and talk, is that if

5  we're -- you heard a lot this morning about trying to get to a

6  point where these claims can be resolved, either consensually

7  or we all understand that they're not going to be resolved

8  consensually, and some other mechanism has to be put in place

9  to resolve them.  And at least on the discussion side and the

10  consensual side, without having these documents it may very

11  well end up impeding that process.  And if that's what happens

12  and there's no other way to get around it, that's what happens.

13  But today is the first day that we've been able to get any kind

14  of information that gives us some kind of concrete notion about

15  how long it's going to take to get these documents.

16          THE COURT:  All right.  Anything further on Merrill

17  Lynch?

18          MR. ROSNER:  Your Honor, I just wanted to emphasize,

19  we are part of the process with the committee.  We're working

20  cooperatively with the committee on all of the documents.  This

21  is not -- Merrill Lynch is not -- you know, it's one of the

22  several banks that refused to do the deal who may, you know,

23  have some information that's relevant to this proceeding.

24  Merrill Lynch is this proceeding, Merrill Lynch and J.P.M.  I

25  mean, they're the arranger, the syndicator.  They -- and

1 actually in another construct they actually advise the board of
2 directors.  So, it's not just a discovery problem with them
3 having waited a very long time in getting these documents, it
4 is critical that Merrill Lynch's documents, particularly e-
5 mails, because I think we all know that a lot of people put
6 critical information into e-mails, that that has to be produced
7 and reviewed so that there can be actual negotiations.  People
8 can say that they want to sit down in meetings, and let's
9 schedule a meeting for December whatever, but when one side has
10 the information, they know what took place because they were
11 the parties that did the LBO, and the other side doesn't know,
12 it doesn't make for a very good negotiation because you've got
13 an inequality of information.
14        So, Merrill Lynch has constrained this process, we
15 think, by not having acted with more alacrity, and we would
16 just urge that they would so that we can, at their instance,
17 kind of bring a negotiation together.  They're a critical
18 player here, and the fact that we don't have their e-mails at
19 this point is very discomfiting.
20        THE COURT:  Okay.  Anyone else on this issue?  All
21 right.  Thank you.
22        MS. PRIMOFF:  Merrill Lynch has cooperated every step
23 of the way, so just because it's taken a long time -- I mean,
24 the committee has insisted on an outrageous number of search
25 terms, an outrageous number of custodians, and we can detail

1  quite carefully all the steps that have occurred since the

2  committee's request on September 18th for these documents.  So,

3  I take issue with Mr. Rosner's statement, or implication, that

4  Merrill has dragged its feet in any way.

5          THE COURT:  I took from your opening statement that

6  you did.

7          MS. PRIMOFF:  Okay.  Thank you.

8          MR. BUSH:  Your Honor, I can continue and give you a

9  little bit -- continue the overview, I guess, of the discovery

10 process.  In addition to the -- what I've told you already

11 about the documents, we are -- the other, I guess, thing that

12 remains to be done here that is of some importance, I think

13 it's underway and I think it will work out okay, is to get

14 privilege logs.  That, in some cases, involves a fair number of

15 documents and in some cases the documents -- it may be fairly

16 obvious why the documents are privileged, and in other cases

17 they're, just on the face of the information we have about

18 withheld documents, it appears, for example, with redactions,

19 that there are some questions about why documents may be

20 privileged.  And obviously for things that were withheld in

21 their entirety we don't really know.  But we are working with

22 the debtors to get a privilege log with respect to their

23 documents and with J.P. Morgan to get a privilege log with

24 respect to their documents, and with certain of the other

25 producing parties.  I think that's going okay, although there

1  are some timing issues there.  I hope we'll be able to work

2  them out.

3         A couple of the other things.  Some of the other

4  things that we have been doing, we've been working with the

5  financial advisors to conduct a financial analysis of the

6  debtor and of the solvency opinions that were given, and of the

7  solvency of the debtor at the relevant time periods.

8         We have done a fairly substantial legal analysis,

9  both Chadbourne and ourselves, of a variety of legal issues

10  both relating to the merits, and relating to certain defenses

11  that the lenders have indicated to us they would intend to

12  raise, and I think we're fairly well along in that process.

13  There is some work left to be done, but we're pretty advanced

14  in that process.

15         We have begun to take Rule 2004 oral examinations.  I

16  shouldn't say we have begun to take them.  We have noticed

17  them, and in fact they start tomorrow.  There will be

18  depositions of the VRC which gave solvency opinions in

19  connection with the transactions, and of certain other solvency

20  experts.  There also will be depositions scheduled of some of

21  the debtor's employees who were involved in projections.

22         We have sought to take depositions of people from

23  J.P. Morgan.  We will probably want to take depositions of

24  people from Merrill Lynch but have decided not to even ask

25  until we have the documents, and particularly the e-mails,

1  because we just don't think it would be productive to do that

2  until we have the documents.

3          One of the other issues that has come up is that J.P.

4  Morgan has declined to agree on a voluntary basis to tender the

5  witnesses we asked to examine, and my understanding is that

6  they are sticking to their guns on that.  They have agreed, and

7  I guess they can come up and tell us what they're going to

8  agree to do, but what I have heard second hand is that they're

9  willing to answer written questions, but that's an issue, we do

10 need to examine some of their witnesses.  And I think that's an

11 important part of the process that we're going through to be

12 able to advise the committee.

13         We have also begun drafting a complaint, and as Your

14 Honor saw in some of the papers that were filed, that has been

15 used as a basis for refusing to tender witnesses for

16 examination on the grounds, I suppose, that people contend that

17 we have already decided, or the committee has already decided

18 to institute litigation.  What we have been doing is simply

19 drafting a complaint so that it helps focus everybody's

20 thinking on what the claims really are and how good the claims

21 are.  And furthermore, I don't know if these discussions are

22 going to end up in a successful resolution or if they're going

23 to end up at a place where litigation is necessary.  And so, we

24 determined for both those reasons that that was a prudent thing

25 to do, but it certainly isn't an indication that the committee

1  is not interested in having discussions, or that Zuckerman

2  Spaeder isn't interested in having discussions, or that anybody

3  associated with the committee has determined that litigation is

4  the only way to go and consensual resolution is not possible.

5          There are some things, and I don't know if there's

6  some things you want to raise.  There are a couple of things I

7  want to respond to in some of the papers, but if there are

8  other things you want to talk about before we get to that,

9  that's fine.

10         MR. CONLAN:  Before we move on beyond the Merrill

11 Lynch point, one of the things that occurred to us as we were

12 sitting there listening to this is, in order to achieve some

13 closure, is whether it would be possible to come back in a week

14 to see if Mr. Bush is able to narrow with Ms. Primoff what

15 exactly it is that Merrill Lynch can produce, and when, whether

16 the search terms can be narrowed.  Perhaps Mr. Bush could show

17 people what J.P.M. -- what search terms J.P.M. used, because

18 J.P.M. was able to respond, and to see what the differences are

19 to try to achieve some closure.  So, if we could come back in a

20 week to update on that, as well as anything else that Mr. Bush

21 wants to update on, that's the one contribution I'd like to

22 make before we move on to other items.

23         MR. BUSH:  And the only thing I would say about that

24 is that our side -- there's actually a gentleman at Chadbourne

25 who I think has been handling the lion's share of the

1  discussions about search terms with our input.  But he's been
2  handling that direct discussions.  And my understanding is that
3  these discussions have been extensive and continuous, and the
4  protocol was finally agreed on.  I think if Merrill Lynch has
5  something it wants to tell us about what came out of the
6  application of those search terms to the body of documents they
7  were looking through, and how that maybe changes their view of
8  things, or should change our view of things, I don't think we
9  would object to having that discussion.  That's fine.  But it
10 does need to be with the people who have been having the
11 discussions with you all along.
12      MS. PRIMOFF:  Your Honor, we had six weeks of
13 discussion with the committee about the search terms, and all
14 of the discussions went something like this.  We said there's
15 too many search terms and there was way too -- they are way too
16 broad.  Step one, step two, phase one, phase two, it does not
17 make sense for those to be search terms.  And the committee's
18 response every single time was, well, J.P. Morgan agreed to
19 these search terms except for Standard & Poors, so we want you
20 to do the same.  And we said, okay, but we're reserving all of
21 our rights, and we think this is going to produce an absurd
22 number of documents.  And that's exactly what's gone on here.
23 So, our position is we will know within the next day or two,
24 but it seems that this has produced 330,000 documents, which is
25 way too broad.  So, we are willing to have discussions about a

1  further narrowing of the search terms, but that discussion has

2  nothing to do with J.P. Morgan.  Whatever J.P. Morgan --

3  whatever search terms they ran, whatever set of documents that

4  resulted in -- for them, that's their issue.  I would note that

5  it seems that the estate has been paying for their issue.  But

6  for Merrill Lynch, who has not been paid for this exercise,

7  this is way too burdensome.  So, we're willing to have

8  discussions about narrowing the search terms with a view

9  towards reducing the volume of documents.

10          MR. BUSH:  Your Honor, all I can do is say what I've

11  already said.  We're happy to have the discussion, but it

12  sounds like we've already had the discussion that you proposed,

13  which is we've shown them the J.P. Morgan search terms that

14  seemed to be doable for J.P. Morgan.  Merrill Lynch thinks

15  they're not doable for Merrill Lynch.  And in any event, we're

16  looking at a 12-week time horizon, which is, if I did my math

17  right, is pretty near the end of the exclusivity period that

18  you just extended.  So, we are where we are.  I don't know if

19  there's any way to shorten this.  As I said, I'm always willing

20  to try one more time to reach agreement.  And maybe we ought to

21  do that and come back next week if we can't reach agreement.

22          THE COURT:  Well --

23          MR. CONLAN:  That strikes me as a good idea.  We'll

24  participate in the discussions, as will others, but there is

25  something magical about having to come back to Court and say

1 how we did in front of everybody and let them comment.  That

2 goes for everybody, us as well.

3          THE COURT:  The whole magic thing just makes my spine

4 tingle.

5                         (Laughter)

6          THE COURT:  Okay.  But, see, when you come back, if

7 things aren't resolved, you're going to want me to order

8 something.  So, let's do this.  Have further discussions if you

9 think that would be helpful.  And to the extent there is no

10 agreement, file a motion, ask for a shortened time frame, and

11 I'll get you back as quick as I can.  I think that's how we

12 have to tee it up.

13          MR. CONLAN:  Okay, Your Honor.

14          MR. BUSH:  Very well.

15          THE COURT:  All right.

16          MR. BUSH:  There are really just a couple of other

17 things that I wanted to touch on, and then of course I'll

18 answer any questions the Court may have.  And these really have

19 to do with the response of the lenders' group and Mr. Bennett,

20 who you heard from earlier.  He -- there were a couple of

21 things that were said in there that I just think really need to

22 be responded to.  He has talked about a secret discovery

23 process that the committee has been involved in, and there's

24 nothing really secret about it at all.  The committee has

25 simply followed the local rule that requires the parties to go

through the Rule 2004 process and try and do it in a voluntary

matter and not burden the Court with formal motions, and that's

been largely successful, but there's nothing secret about it.

It's simply following the process that this Court has in place.

He has asked for, in his pleadings, for the first time that I'm

aware of, for a list of all the parties who have produced

documents.  We're happy to give it to him.  If he picked up the

phone and called he would have had it by now.

He has said that there is -- that he would like to

have the right to participate in the depositions.  He is

representing a significant constituency in the bankruptcy, and

I'm sure we weren't perfect, but we tried to give informal

notice of the depositions that are starting tomorrow, and all

the depositions that we're planning to take are examinations

that we're planning to conduct to those groups, and his group

through -- I don't really know the status of counsel now, but

the counsel that I understood was representing that group, Mr.

Mayer, was given notice of that by e-mail, and nobody from that

group ever picked up the phone and called and said, gee, we

want to participate, and can we participate?  So, I don't know

why this all shows up in his pleadings for the first time, but

if he had picked up the phone I don't think it would have been

necessary.

And the last -- I think the last thing that was in

his motion papers was a request that the Court indicate that

1  everybody reserves all their rights in these examinations with

2  respect to the use of the transcripts, and any litigation that

3  might ensue.  And I don't know that the Court is going to be

4  interested in doing that, or that it's necessary.  I mean, he

5  can reserve all his rights, and if he has any rights to reserve

6  they will be reserved.  But the notion of having the major

7  constituencies there is not because it -- excuse me -- it was

8  our conclusion that they had any right to be there so much as

9  that we thought it was going to be more conducive to the

10 process here, and also would give us the opportunity, perhaps,

11 to be able to use these depositions in subsequent litigation.

12 If that doesn't work for one reason or another, it doesn't

13 work, but he can reserve his rights on the record.

14            I don't think I have anything else that I need to

15 address, or that I wanted to address, but I'm happy to answer

16 any questions that you have, or any other questions that we

17 ought to address for the Court.

18            THE COURT:  I don't.  Thank you.

19            MR. BUSH:  Okay.

20            MR. CONLAN:  Nothing else, Your Honor.  We will work

21 with the committee, work with Merrill and anybody else,

22 including Centerbridge -- sorry, I didn't mean to cut you off

23 --

24            UNIDENTIFIED ATTORNEY:  That's okay.

25            MR. CONLAN:  -- and if we can't get to where we need

**J&J COURT TRANSCRIBERS, INC.**

1  to be in a few days we'll file that motion and ask you for

2  shortened time.

3          THE COURT:  All right.

4          MR. JOHNSTON:  Good afternoon, Your Honor.  Jim

5  Johnston of Hennigan, Bennett and Dorman -- not Mr. Bennett,

6  who was earlier today, but representing the same clients, which

7  are about 20 institutions that hold over $4.4 billion of the

8  credit agreement debt.  Our clients obviously have a

9  substantial interest in the leveraged ESOP transactions and the

10  efforts by the committee and others to investigate them and

11  possibly litigate them.  We did ask the Court for three

12  specific items of relief arising out of the status conference

13  today, and I'll get to those in just a minute.  Mr. Bush

14  touched upon two of them.

15          First, and I know it's late and I hate to go last,

16  and I won't take more than a minute, but let me just step back

17  and observe that what's going on in this case is at least

18  unusual, and it's maybe unprecedented.  You have the committee

19  engaged in a massive amount of discovery, which you've heard

20  about today.  It's gone on for almost a year.  It's produced

21  millions of pages of documents.  There are 2004 depositions now

22  scheduled to begin imminently regarding claims that the

23  committee hasn't filed and hasn't even requested standing to

24  bring.

25          As Mr. Seife I think implicitly acknowledged earlier

**J&J COURT TRANSCRIBERS, INC.**

1  today, the committee's pre-litigation effort is well beyond the

2  typical investigation that usually proceeds a standing motion,

3  and an initiation of litigation.  It's surpassed anything that

4  would be reasonably required, we think, to make a good faith

5  assessment as to whether or not there are causes of action to

6  bring here, or maybe more to the point, for a lot of what's

7  been discussed today, way more than what's necessary for the

8  committee to sit down and actually discuss a substantive

9  resolution of the claims.  It somewhat boggles the mind to

10 suggest that every single document needs to be reviewed, every

11 e-mail needs to be read, every deposition needs to be taken

12 before the parties can engage in settlement negotiations, and

13 that's been one of the frustrations that we've encountered

14 throughout.

15        We submit that the efforts that have gone on so far

16 stretch Rule 2004 to the limit, if not beyond, and the reason

17 why we submitted a status conference statement, and the reason

18 why I'm here today, is because this is prejudicial to us, not

19 having access to the same information that the committee has.

20 We do think there is an inequality of information here, as Mr.

21 Rosner put it, but it tilts in a way that's different than he's

22 suggested.  So, we'd like to be part of the hemming in process,

23 as Mr. Conlan has said, and we'd ask the Court to order three

24 things today, two of which it sounds like aren't controversial.

25 We would like to know the entities from whom the committee has

1  sought documents, and who has produced what.  I believe Mr.

2  Bush has said that's no problem.

3         Second, and I think much more importantly, we'd like

4  copies of the documents that have been produced to the

5  committee.  We'll agree to all the same confidentiality

6  agreements that the committee has agreed to, but we've heard

7  today that the committee has received 2.3 million pages of

8  discovery.  We'd be entitled to that information in an

9  adversary proceeding, and there's no reason why the information

10 should be withheld from us now.  The debtors themselves have

11 created an electronic data room.  They have given us access to

12 their documents.  We've gotten access to a few other parties'

13 documents.  It would be very easy to create a central

14 electronic warehouse of this information, put it up there to

15 people who have signed confidentiality agreements, and make it

16 available.  That can do nothing but facilitate the on-going

17 discussion process that hopefully will begin soon, and it will

18 begin to level the playing field.

19        The last point, again, I don't think it's

20 controversial, is we would like the right to attend and

21 participate in the Rule 2004 depositions.  We are now in the

22 information flow as to when those depositions are taking place.

23 We ask to continue to be in that information flow.  And because

24 the depositions are starting now, literally starting tomorrow,

25 on the basis of many, many documents that we haven't seen, we

1  ask the Court to make it clear that our attendance at those

2  depositions can't somehow be later used against us in an

3  adversary proceeding where we would have the independent right

4  to conduct discovery.  We just don't want someone to come back

5  and say, hey, hey, hey, you were at a deposition back in

6  December and maybe even you asked a question or two, you don't

7  have the right to examine us again.  We don't think that's an

8  appropriate response under the adversary proceeding rules, but

9  I've heard the argument made before.

10         We submit all of this will facilitate the fair and

11 efficient resolution of the cases.  They will facilitate

12 settlement negotiations if and when they begin.  And if claims

13 are ultimately pursued it will mean that we are not starting

14 from scratch on discovery, and that only will enhance a rapid

15 resolution of the cases, or at least move things along as much

16 as possible.  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         MR. BUSH:  I won't take much more of the Court's time

19 on this, Your Honor, but the -- I just think this is an

20 inappropriate place to raise these issues for the first time.

21 Most of the other parties in this case who have wanted access

22 to the documents have gotten them by calling up and finding out

23 how to get access to them, and arranging through

24 confidentiality agreements with the producing parties to be --

25 or consents, or joinders, to get those documents directly from

1  the parties who produced them to us.  This is not something

2  that is all of a sudden new on the face of the earth.  We've

3  been dealing with this with lots of other parties throughout

4  the course of these proceedings, and the right way to do this

5  is not to bring it up in a status conference for the first

6  time.  If the lender's group wants access to the documents,

7  they can talk to us about how other people who have wanted

8  access to them have been able to get them, and we can arrange

9  it that way.  It doesn't require a Court order at this point.

10       The one other thing I wanted to mention that I forgot

11  to mention before I sat down the first time was on the J.P.

12  Morgan matter.  I know we don't have a motion in front of you,

13  and maybe you'll just tell me, if we want to take their -- the

14  testimony of their witnesses we should file a Rule 2004 motion,

15  and if that's the answer, we will.  But it might be helpful if

16  we could just persuade J.P. Morgan at this point to tender the

17  witnesses.

18       THE COURT:  Well, you'll need to follow the local

19  rule process, and if that doesn't work consensually, file a

20  motion.  Frankly, it may be resisting the inevitable, but

21  parties are entitled to do that, I suppose.

22       MR. BUSH:  Fair enough, Your Honor.  Thank you.

23       THE COURT:  All right.

24       MR. JOHNSTON:  And, Your Honor, just a point of

25  clarification.  We did tender a request to all the parties that

1 we were aware of that the committee had sought information

2 from.  We had no idea that they had sought information from 30

3 parties.  And the debtors agreed to produce.  J.P. Morgan

4 produced.  VRC produced.  Duff & Phelps produced.  The others

5 haven't, and so we find ourselves in the position where -- and

6 understandably there are parties out there responding to

7 informal discovery requests tendered by an Official Committee

8 of Creditors, so the Official Committee of Creditors has

9 compiled this massive warehouse of information, and the other

10 parties are saying, who are you, why should we produce to you?

11 And I think the time has come where all the documents are on

12 the table and made available.

13          THE COURT:  Well, but why, on a matter of this

14 magnitude, would you expect me to order that at a status

15 conference?  I mean, it seems to me that if there's an

16 appropriate motion to be filed and you can't work out things

17 with the committee or others, you need to file it on notice to

18 those who would be affected by it, to give them an opportunity

19 to be heard.  Look, it's -- this has been a revealing day for

20 me.  So much of what goes on in cases I often say, happily,

21 happens outside of the courtroom.  But I can see now that

22 everyone is beginning to stake our there positions, which is a

23 natural part of the process, which either leads to agreement or

24 war, typically, or at least to the first battle, anyway.  And

25 if that's what's happening, and I sense that it is, then we

1  need to put some judicial framework to it, if what you want is

2  judicial relief.

3           MR. JOHNSTON:  Fair enough, Your Honor.  We're here

4  today because we saw a pleading saying -- asking Your Honor to

5  schedule a status conference regarding the very topics that

6  we're concerned about, but we will --

7           THE COURT:  No, and it was --

8           MR. JOHNSTON:  -- we'll go through the normal

9  channels.

10          THE COURT:  -- appropriate for you to appear and

11 express your concerns.

12          MR. JOHNSTON:  Thank you.

13          THE COURT:  Okay.  Does anyone else wish to be heard

14 in connection with the status?

15          MR. DRISCOLL:  Good afternoon, Your Honor.  Tom

16 Driscoll from Bifferato, LLC, and I will try and keep this very

17 brief.  We represented the Neil Class plaintiffs in the

18 Northern District of Illinois action, as well as defendants in

19 an adversary proceeding before Your Honor.  The subject of

20 these actions is the leveraged LBO ESOP transaction that is the

21 subject of this status conference.  I come forward with a

22 hopefully simple request, similar to the one before mine.  We

23 ask for the opportunity to attend these depositions that the

24 committee has currently scheduled.  We're not seeking to

25 participate in them.  But as the discovery that is going on

1 there is substantially similar to what we expect would take

2 place in our matters should they go forward after the motion to

3 dismiss is decided in Illinois, we would like the opportunity

4 to attend in the interest of judicial economy.  Thank you, Your

5 Honor.

6           MR. BUSH:  Your Honor, this is -- I guess today is

7 the first I've heard of this particular request.  I don't think

8 it's appropriate.  The people who are going to be attending the

9 depositions are people who represent major constituencies in

10 the bankruptcy and not people who have pending litigation and

11 want to participate in the 2004 process in order to gather

12 information and litigation, so I don't think it's appropriate

13 that they attend.

14           MR. KRAKAUER:  Your Honor, with reference to this

15 particular party we do -- absolutely do not think it's

16 appropriate that they attend.  It's separate litigation that

17 they have pending in the District Court in Chicago, and this

18 would not be appropriate for them to participate here.

19           THE COURT:  What's the posture of the District Court

20 action?

21           MR. KRAKAUER:  The District Court action, the motion

22 to dismiss has been briefed and it's pending before the Judge

23 in the District Court in Chicago.

24           THE COURT:  Any discovery being undertaken in that

25 action at this time?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. KRAKAUER:  The discovery has been stayed.  There

2  is no discovery while the motion to dismiss is proceeding is my

3  understanding.

4          THE COURT:  All right.  Well, I'm not going to order

5  anything today at the risk of losing some judicial efficiency.

6  But again, if you want me to order something, you'll have to

7  file a motion.  And I'm not saying that if you do I will, but

8  that would be the vehicle to use, I think.

9          UNIDENTIFIED ATTORNEY:  And you're addressing the

10 Neil plaintiffs?

11         THE COURT:  I am.

12         UNIDENTIFIED ATTORNEY:  Thank you.

13         THE COURT:  And I -- well -- I've extended more

14 invitations for filings today than I think I have in --

15                         (Laughter)

16         THE COURT:  -- the last couple of years.

17         MR. CONLAN:  That's it, Your Honor.  We just wanted

18 to let you know what was going on.

19         THE COURT:  All right.

20                         (Laughter)

21         THE COURT:  I'm afraid to as the next question, but I

22 always do before I conclude.  Is there anything further for

23 today?

24                         (Laughter)

25         MR. CONLAN:  No, Your Honor.  We're done for today.

1          THE COURT:  All right.  Thank you all very much.

2          MR. CONLAN:  Thank you.

3          THE COURT:  That concludes this hearing.  Court is

4  adjourned.

5                      * * * * *

### C E R T I F I C A T I O N

          We, PATRICIA REPKO, RITA BERGEN, MARY POLITO and

TAMMY DeRISI, court approved transcribers, certify that the

foregoing is a correct transcript from the official electronic

sound recording of the proceedings in the above-entitled matter

to the best of our abilities.

/s/ Patricia Repko
PATRICIA REPKO

/s/ Rita Bergen
RITA BERGEN

/s/ Mary Polito
MARY POLITO

/s/ Tammy DeRisi                    ___  Date: December 4, 2009
TAMMY DeRISI
J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**