IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13141 (KJC)<br><br>(Jointly Administered)<br><br>**Hearing Date: TBD**<br>**Objection Deadline: TBD** |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER REQUIRING THE PRODUCTION BY DATE CERTAIN OF EMAIL DOCUMENTS FROM MERRILL LYNCH CAPITAL CORPORATION PURSUANT TO BANKRUPTCY RULE 2004

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this Motion for an Order Requiring the Production by Date Certain of Email Documents from Merrill Lynch Capital Corporation ("Merrill") Pursuant to Bankruptcy Rule 2004 (the "Motion"). In support of this Motion, the Committee respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); foresalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KJAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347) Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspapers Readers Agency, Inc. (7335); North Michigan Production Company (5466), North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

698.001-W0004667

## BACKGROUND

1. On December 8, 2008 (the "Petition Date"), the Tribune Company (the "Company") and one hundred ten of its subsidiaries each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court"). An additional Debtor, Chicago National League Ball Club, LLC, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009. Pursuant to orders of this Court, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2. The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. On December 18, 2008, the Office of the United States Trustee for Region 3 appointed the Committee. As a result of subsequent resignations and additional appointments, the membership of the Committee changes from time to time.

## THE COMMITTEE'S INITIAL INVESTIGATION INTO THE MERGER

4. As part of its statutory duties pursuant to section 1103(c) of the Bankruptcy Code, the Committee has been investigating the acts, conduct, liabilities and financial condition of the Debtors, including, without limitation, the transaction (the "Leveraged ESOP Transaction") that took place beginning in April 2007 and culminated with the consummation of the merger of the Company and Tesop Corporation in December 2007 (the "Merger").

5. As the Court is aware, the Company, one of the Debtors, was founded in 1847 and incorporated in Illinois in 1861. In 1968, as a result of a corporate restructuring, the Company became a holding company incorporated in Delaware. In 1983, after 136 years of private ownership, the Company became a public company.

6. As early as February 2005, the Company and Merrill, the Company's outside financial advisor, reviewed certain factors affecting the Company's Broadcasting and Entertainment Group and discussed, on a preliminary basis, the range of financial and strategic options available with respect to that business. Merrill continued to serve as the Company's outside advisor for the next three years, during which the Company, Merrill and other discussed a number of possible alternative transactions.

7. Ultimately, on April 1, 2007, the Company's board of directors approved the Leveraged ESOP Transaction designed to return the Company to private ownership with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company wholly owed by Sam Investment Trust (a trust established for the benefit of Samuel Zell ("Zell") and his family), and Zell. The Leveraged ESOP Transaction ultimately resulted in the Merger. On December 20, 2007, the Company completed the Merger, culminating with (a) cancellation of all issued and outstanding shares of the Company's common stock as of that date, (other than shares held by the Company or the ESOP), and (b) the Company becoming wholly owned by the ESOP. Less than a year after the Merger, the Company and its subsidiary Debtors commenced these Chapter 11 cases.

8. In connection with the Merger, the Company entered into certain financing facilities in May and December 2007. In particular, the Company entered into (i) a $8.028 billion credit agreement (as amended, the "Credit Agreement") with JPMorgan Chase

Bank, N.A. ("JPMorgan"), as Administrative Agent, Merrill, as Syndication Agent, Citicorp North America, Inc., Bank of America, N.A. and Barclays Bank PLC as Co-Documentation Agents, and the Initial Lenders named therein and (ii) a 1.6 billion Senior Unsecured Interim Loan Agreement (the "Bridge Facility"), with Merrill Lynch as Administrative Agent, JPMorgan as Syndication Agent, CNAI and Bank of America as Co-Documentation Agents, and the Initial Lenders named therein. The proceeds from the Credit Agreement and Bridge Facility were used by the Company, among other ways, in connection with the consummation of the Merger, to refinance certain existing indebtedness of the Company, and for general corporate purposes.

## THE COMMITTEE'S ATTEMPTS AT INFORMAL DISCOVERY

9. In connection with its investigation, counsel to the Committee has spoken with various parties involved and sent requests for information surrounding the Leveraged ESOP Transaction and the Merger to the Debtors and Zell, among others. With respect to Merrill, the Committee sent a detailed request for information on March 26, 2009 (the "March Request"), a true and correct copy of which is attached to the Certification of Robert A. Schwinger dated December 8, 2009 (the "Schwinger Certification") as Exhibit "A." The March 26 Request was generally limited to information that Merrill would have by virtue of its role as an agent and a lender under the Credit Agreement and Bridge Facility. After discussions with counsel for Merrill, the Committee sent an amended request on May 14, 2009 (the "May Request," together with the March Request, the "Requests for Information") that additionally covered information that Merrill would have in its capacity as the Company's outside financial advisor. A true and correct copy of the May Request is attached to the Schwinger Certification as Exhibit "B." By letter dated June 26, 2009 (the "June 26 Letter"), a copy of which is attached to the Schwinger

Certification as Exhibit "C," counsel to Merrill acknowledged receipt of the May Request and enclosed various objections and responses to the Requests for Information.

10. As set forth on the record at the status conference on December 1, 2009 (the "Status Conference") and in the Schwinger Certification attached hereto, the Committee has received and reviewed substantial document discovery from many parties on a consensual basis. However, Merrill's production has been delayed far more than that of virtually any other party in this matter, notwithstanding the fact that Merrill was among the earliest recipients of document requests from the Committee. After a relatively small initial production of material in mid-July 2009, the Committee received a first production of non-email documents from Merrill just before Labor Day weekend. At that time Merrill represented that its production of non-email documents was complete. Nearly three months later, however – on the day before Thanksgiving – Merrill advised the Committee that it was about to produce additional non-email documents. According to Merrill's counsel, these documents had not been produced previously due to a "technical glitch," but the volume of this late November production exceeded the entire volume of material that Merrill had produced to the Committee to date. See Schwinger Certification at ¶ 4.

11. Merrill has been even more dilatory in its production of email to the Committee. At Merrill's urging, the Committee's counsel had agreed back in June 2009 to defer discussion of email search terms and custodians until Merrill's non-email document production was in hand and could be reviewed. The Committee never anticipated that Merrill would not make its first substantial non-email production until Labor Day. Approximately two weeks after Labor Day, after the Merrill non-email production then in hand had been reviewed, Committee's counsel began negotiating email search terms and custodians with Merrill's counsel. See Schwinger Certification at ¶ 5.

12. The Committee's counsel proposed using the same search terms and approach to identifying custodians that had been used with respect to JPMorgan. The Committee had reached agreement on that search protocol with JPMorgan after minimal debate or negotiation among counsel. However, Merrill's counsel strongly resisted following this same approach, extending negotiations throughout most of October 2009. It was not until October 26, 2009 that a "without prejudice" agreement was reached between Merrill and the Committee regarding email search methodology, which included a radically truncated list of email custodians from what the Committee originally had sought from Merrill. In the approximately six weeks since then, however, and Merrill has yet to produce a single email. See Schwinger Certification at ¶ 6.

13. In early November 2009, the Committee's counsel made several requests to Merrill's counsel for estimates of (a) when the first installment of the rolling production of Merrill's email was expected to arrive, and (b) the estimated amount of time the overall email production would take for completion. On November 10, 2009, Merrill's counsel advised in a telephone conversation that they were still in the process of "collecting, processing and filtering" email in accordance with the agreed-upon search terms and custodian list. The Committee was told that this phase of work would be completed within two weeks (i.e., by November 24, the Tuesday before Thanksgiving) but perhaps earlier, and that at that point the material would be "sent out" for review. The Committee was also told that Merrill would have a sense of the total volume, and could give the Committee an updated report about timing. See Schwinger Certification at ¶ 7.

14. Merrill never provided an update on the timing of its email production prior to the Status Conference. On Friday, November 20, 2009, and again on Monday, November 23, 2009, the Committee's counsel had telephone conversations with Merrill's

counsel concerning the mounting concern among various parties about the slow pace of Merrill's email production and the impact of the dellay on other issues in the case. The Committee's counsel explained that this was one of the issues that had prompted the Debtors to seek a discovery status conference on December 1, and that the Committee and others were hoping to get firm commitments from Merrill regarding th estart and completion of Merrill's rolling production of email. Merrill's only response was to provide a cryptic email later on the evening of November 23, 2009 (a copy of which is attached to the Schwinger Certification as Exhibit "D") which stated "Merrill has collected the email data for the 12 custodians identified in the email discovery plan agreed to by Merrill and the Creditors' Committee. The size of the collection is 215 GB which is extremely large for 12 custodians over a two year period. Merrill is currently processing the data. The project is a high priority for Merrill which is adhering to the email discovery plan." No further information was provided prior to the Status Conference. See Schwinger Certification at ¶ 8.

15.     During the December 1, 2009 Status Conference, Merrill asserted that it would take approximately twelve weeks for it to complete production of email and related electronic documents, which production would begin on a rolling basis three and a half weeks from December 1, 2009. See 12/1/09 Hearing Tr. at pg. 122. Merrill also expressed its concerns regarding the Committee's requested search terms and email custodians - both of which it had agreed to on October 26. See 12/1/09 Hearing Tr. at pg. 120-124, 131-132. Ultimately, the Committee agreed to continue discussions with Merrill regarding the timing and scope of the requested production. See 12/1/09 Hearing Tr. at pg. 135-136. This Court instructed the Committee, if it proved necessary, to return on a shortened time frame and seek the relief now requested herein. See 12/1/09 Hearing Tr. at pg. 133.

16. After the December 1, 2009 Status Conference, counsel for Merrill and the Committee had a further telephone conference on these issues on the evening of December 2, 2009. In that conversation, and again in an email dated December 4, 2009 (a copy of which is attached as Exhibit "E" to the Schwinger Certification), Merrill proposed a further limitation on the scope of its email production by which it would omit 12 of the search terms previously agreed to (and previously used with JPMorgan without incident) on a schedule consistent with Merrill's representations at the Status Conference. Thereafter, by email dated December 7, 2009, Merrill offered to expedite its constricted email production only to the limited extent of offering a "target date" for completion of February 11, 2010. See Schwinger Certification at ¶10. After careful consideration of Merrill's proposal, it is clear to the Committee that Merrill's proposed timing as outlined in the Status Conference simply does not work given that (i) substantive settlement negotiations regarding claims arising from the Merger is planned to commence sometime in the early part of January 2010, and (ii) the Debtors' exclusive period to propose a chapter 11 plan is currently set to expire on February 28, 2010. Merrill's counsel has been so advised. Accordingly, the Committee requests the Court's assistance so that this matter is not delayed further by Merrill's stonewalling tactics.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

18. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**RELIEF REQUESTED**

19.     Pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1, the Committee requests that the Court order Merrill to (a) commence its production of emails responsive to the May 14, 2009 Amended Request for Information within one week of the date of this Order; (b) complete production of 75% of the total number of email documents by the close of business on December 30, 2009; (c) complete the remainder of such production no later than the close of business on Friday, January 8, 2010.

**BASIS FOR RELIEF**

20.     Bankruptcy Rule 2004 provides that upon a motion of a party in interest, the court may order an examination of any entity relating to the "acts, conduct, or property or liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate ...." Fed. R. Bankr. P. 2004(a) – (b). Rule 2004 "permits a party invoking to undertake a broad inquiry of the examiner, in the nature of a 'fishing expedition.'" In re Valley Forge Plaza Assoc., 109 B.R. 669, 674 (Bankr. E.D. Pa. 1990); see also In re Bakalis, 199 B.R. 443, 447 (Bankr. E.D.N.Y 1996) (Rule 2004 is a broad "fishing expedition").

21.     Pursuant to section 1103 of the Bankruptcy Code, the Committee is authorized to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor," including the apparent decline in revenue and poor economic conditions suffered by the Debtors after the Merger. As set forth in the attached Schwinger Certification, Merrill's approach to its document production has obstructed and delayed the Committee's efforts. These delays threaten to disrupt the upcoming schedule for activity in these cases that was discussed

with the Court at the Status Conference. The Committee needs to have this email information in hand by early January 2010 for its investigation of the Merger and to assess whether the Debtors' estates may have causes of action related thereto.

22. Any potential causes of action relating to the Leveraged ESOP Transaction and the Merger are assets of the Debtors' estates. Merrill, as the Company's financial advisor as well as an agent and lender under the Credit Agreement and Bridge Facility, has material and relevant information concerning the Merger. This information relates to the acts, conduct, or property or to the liabilities and financial condition of the Debtors. Accordingly, the Rule 2004 exam of Merrill is appropriate under these circumstances. See e.g. 2435 Plainfield Ave., Inc. v. Township of Scotch Plains (In re: 2435 Plainfield Ave., Inc.), 223 B.R. 440, 456 (Bankr. D. N.J. 1998) ("A Rule 2004 exam has been explained as a broad investigation into the financial affairs of the debtor for the purpose of the discovery of assets of the estate and the exposure of fraudulent conduct.").

23. Pursuant to Local Rule 2004-1, counsel for the Committee has communicated with counsel for Merrill repeatedly (as set forth in the Schwinger Certification) in an attempt to arrange mutually agreeable production. Although Merrill has provided the Committee with certain information, Merrill has refused to provide the Committee with the necessary and relevant emails within a reasonable time. Indeed, under the schedule Merrill originally proposed, its email production would not be completed until nearly a full year after the Committee first issued a document request to Merrill. Given the upcoming settlement negotiations and possible termination of exclusivity, the Committee needs to receive (so it can review) the emails by early January 2010. Otherwise, there will be little of hope of having a meaningful settlement negotiation in mid-January 2010 and a confirmable chapter 11 plan in the near term.

WHEREFORE, the Committee respectfully requests that the Court (i) grant the Motion, (ii) compel Merrill to (a) commence its production of emails responsive to the May 14, 2009 Amended Request for Information within one week of the date of this Order; (b) complete production of 75% of the total number of email documents by the close of business on December 30, 2009; (c) complete the remainder of such production no later than the close of business on Friday, January 8, 2010; and (iii) grant such further relief as is just and proper.

Dated: December 8, 2009
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ Rebecca L. Butcher
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Rebecca L. Butcher (No. 3816)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

*Counsel to the Official Committee of Unsecured Creditors*

- and -

**ZUCKERMAN SPAEDER LLP**
Graeme W. Bush
James Sottile
Andrew N. Goldfarb
1800 M Street, NW, Suite 1000
Washington, DC 20036
(202) 778-1800 (phone)
(202 822 8106 (facsimile)

- and –

/s/ Thomas G. Macauley
Thomas G. Macauley (ID No. 3411)
919 Market Street, Suite 990
Wilmington, DE 19801
(302) 427-0400 (phone)
(302) 427-8242 (facsimile)

*Special Counsel to the Official Committee of Unsecured Creditors*