## IN THE UNITED BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| | ) | **Case No. 08-13141 (KJC)** |
| | ) | |
| **TRIBUNE COMPANY, et al.,** | ) | **(Jointly Administered)** |
| | ) | |
| | ) | |
| | ) | Hearing Date:  December 15, 2009 at 10:00 a.m. |
| **Debtors.** | ) | Ref. No.:  2548, 2766 |

**REPLY OF DONNA GERHART GUTMAN, PERSONAL REPRESENTATIVE
OF THE ESTATE OF DECEDENT E. MICHAEL GUTMAN, M.D., MIKE
GUTMAN, M.D. (MPAC), P.A. AND GUTMAN PAIN/ACCIDENT CENTER, INC.,
TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO
MOTION OF THE DEBTORS FOR AN ORDER PURSUANT TO 11 U.S.C. § 105(a),
363(b) AND FED.R.BANKR.P. 9019(a) APPROVING A SETTLEMENT AGREEMENT
BETWEEN CERTAIN DEBTORS AND THE ESTATE OF E. MICHAEL GUTMAN, MD**

Donna Gerhart Gutman ("Mrs. Gutman"), Personal Representative of the Estate of
Decedent E. Michael Gutman, M.D. (the "Decedent"), Mike Gutman, M.D. (MPAC), P.A. and
Gutman Pain/Accident Center, Inc (collectively, the "Plaintiffs"), by and through her
undersigned counsel, hereby files this reply (the "Reply") to the Official Committee of
Unsecured Creditors' Objection (the "Objection") [D.I. No. 2766] to the Motion of the Debtors
for an Order Pursuant to 11 U.S.C. § 105(a), 363(b) and Fed.R.Bankr.P. 9019(a) Approving a
Settlement Agreement Between Certain Debtors and the Estate of E. Michael Gutman, M.D. (the
"Motion")[D.I. No. 2548].  In further support hereof, Mrs. Gutman represents as follows:

1

# BACKGROUND

## Introduction

1.      Mrs. Gutman, as the surviving spouse of the Decedent, was appointed the personal representative of the Decedent's estate on May 18, 2009.  At the time of his death, Decedent was a licensed physician and director of Mike Gutman, M.D. (MPAC), P.A. and Gutman Pain/Accident Center, Inc., commonly referred to as the Back Pain Institute of Orlando.

2.      Almost six years ago, on November 30, 2003,  the Orlando Sentinel (the "Sentinel"), one of the Debtors in this bankruptcy proceeding, published two articles concerning the Decedent that stated the following:

- Many Die as Doctors Exploit Medicaid

- Overprescribing By Small Group Fuels Black Market

- A small group of Florida doctors is drugging the poor at taxpayer's expense.

- The doctors are exploiting the Medicaid system by prescribing hundreds of millions of dollars worth of dangerous drugs that are feeding a booming black market and adding to a torrent of fatal over-doses.

- Even as the state faces a budget crisis in which Medicaid costs figure prominently, abuse of the health-care system for the poor by doctors – and by willing pharmacists and patients – has gone largely unpunished, according to an eight month investigation by South Florida Sun-Sentinel.

- A separate investigation by the Orlando Sentinel found that at least 11 people in Central Florida died in the past three years on prescriptions linked to Orlando psychiatrist and pain specialist E. Michael Gutman.

- Ten of those who died were patients of Dr. E. Michael Gutman and all had taken drugs he prescribed for the treatment of pain or mental disorders, according to medical examiner's reports.

- 11 Die from Doctor's Prescriptions

- Central Florida's Dr. Michael Gutman is under investigation by three

2

state entities.

- Gutman, a licensed psychiatrist who also operates two Orlando area pain management clinics, is under investigation by the Florida Department of Law Enforcement, the Florida Attorney General's Office and the Florida Board of Medicine, which licenses doctors.

- State records show that a few months after Medicaid fraud investigators with the Attorney General's Office began their inquiry in 2001, Gutman surrendered his Medicaid certificate, meaning he would no longer accept payments from the government program that provides medical care to the needy.

3.      The harm suffered by the Decedent and Mrs. Gutman as a result of the Debtors' publications was immediate and severe.  According to the deposition transcript of the Decedent, the harm done by the Debtors' articles "decimated" Decedent's practice, causing his "forensic practice, which used to be quite a prominent part, [to have] dwindled and died." See Deposition of E. Michael Gutman, M.D. ("M. Gutman Dep."), p. 112, ln. 17-24, attached hereto as Exhibit "A"

4.      In response to the harm done by the Debtors, on May 11, 2005, Decedent commenced a civil action against the Debtors captioned E. Michael Gutman, M.D., Mike Gutman, M.D. (MPAC), P.A. and Gutman Pain/Accident Center, Inc. a/k/a and/or d/b/a Back Pain Institute of Orlando v. Orlando Sentinel Communications Company, Tribune Company of Chicago a/k/a Tribune Company, Tribune Publishing Company, Sentinel Communications News Ventures, Inc., C.A. No. 48-2005-CA-4071- O, in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida (the "Florida Action").

5.      On April 30, 2006, Decedent filed a Second Amended Complaint against the Debtors and various related defendants alleging that the Debtors published false, misleading and

3

defamatory statements that damaged the personal and professional reputation of the Decedent and his businesses.

**Procedural Posture in the Florida Action**

6.      Since the commencement of the Florida Action, the parties have engaged in over three years of discovery and motion practice. As reflected in the docket in the Florida Action, the parties have exchanged requests for production, interrogatories, requests for admissions and depositions.  The docket further reflects that the court in the Florida Action heard and disposed of motions to dismiss, motions to strike, motions for judgment on the pleadings and a motion for summary judgment.  Defendants have already deposed the Plaintiff's economic expert and both of Plaintiff's medical experts.

7.      The Florida Action was initially set for trial on November 17, 2008.  On August 20, 2008, the Debtors filed a motion to continue the trial date for a time certain in 2009.  The court in the Florida Action granted Debtors' motion to continue and the court rescheduled trial for June 1, 2009.  With a trial date then set for June 1, 2009, once Debtors filed their bankruptcy petitions on December 8, 2008, the parties in the Florida Action had only five (5) months remaining to complete discovery.

8.      On April 9, 2009, Decedent filed Motion for Relief from Stay With Respect to E. Michael Gutman, M.D., Mike Gutman, M.D. (MPAC), P.A. and Gutman Pain/Accident Center, Inc. (the "Relief from Stay Motion") [Doc. No. 883], seeking relief from the automatic stay to permit the Florida Action to proceed to trial.  The Motion for Relief from Stay was originally scheduled for hearing on April 30, 2009.  Dr. Gutman took his life on April 28, 2009.

9.      The Court heard argument and testimony for and against the Motion for Relief from Stay on June 30, 2009.  At the conclusion of the hearing, the Court awarded Mrs. Gutman

4

limited relief from the automatic stay so that the Plaintiffs in the Florida Action could proceed to mediation and schedule a trial date. Plaintiffs were not granted relief from stay to proceed with discovery.

**Mediation**

10.     The Debtors and Plaintiffs participated in mediation that began at 9:00 a.m. on October 27, 2009 and ended at 2:00 a.m. on October 28, 2009. At the conclusion of mediation, the parties executed a confidential settlement agreement (the "Agreement") under which Debtors agreed to pay $1 million and Debtors' insurer agreed to pay $850,000, bringing the total settlement of the Florida Action to $1,850,000 (the "Settlement").

11.      Pursuant to the Agreement, Debtors and its insurer agreed to pay Mrs. Gutman the Settlement 20 days after the Bankruptcy Court approved the Agreement. Pursuant to its Objection, the Committee asks the Court to reject the Agreement arguing the Settlement is not fair and reasonable and that the Agreement does not satisfy the "Necessity of Payment" doctrine.

## LEGAL ARGUMENT

12.     The Settlement which the Committee opposes was the product of seventeen (17) hours of contentious negotiations. Were it approved, the Settlement would end a six-year process that began with reckless reporting by the Debtors, only to be followed by severe financial hardship by the Plaintiffs and the loss of Dr. Gutman.

13.     The Committee, although it opposed the Gutman's relief from stay, chose not to participate (not even telephonically) in the October mediation. Instead of being a participant at the mediation, the Committee waited until an agreement was reached before it objected to the terms of the Settlement.

5

14.    The Plaintiffs request the Court deny the Committee's Objection as the Settlement falls squarely within the Debtors' business judgment as it is fair and reasonable and in the best interest of the creditors of Debtors' estates.   Further, to approve the settlement is within the discretion of this Court pursuant to sections 105 and 363(b) of the Bankruptcy Code.

**The Settlement is Fair and Reasonable**

15.    Federal Rule of Bankruptcy Procedure 9019 authorizes the Court to approve settlements of claims and controversies after notice and a hearing.  The Third Circuit recognizes that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy."  Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996).  Likewise, this Court recognizes that approval of proposed settlements is within the sound discretion of the bankruptcy court.  In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997). In deciding whether to approve a settlement,  courts look to whether the settlement is "fair, reasonable and in the interest of the estate."  In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (Bankr. D.Del. 1998).

16.    As described above, the Settlement allows Debtors to pay $1 million, and Debtors' insurer to pay $850,000, in exchange for full releases of all claims arising from the Florida Action.  Plaintiffs submit that the Settlement represents the best opportunity under the circumstances for the speedy resolution of the Florida Action at the lowest amount acceptable to the Plaintiffs.

17.    From the start of mediation, Plaintiffs made clear that in order to settle the Florida Action, Debtors must agree to pay the full Settlement within weeks of executing the Agreement (contingent on approval by the Court).  Debtors agreed to pay the Plaintiffs the Settlement twenty (20) days after the Agreement was approved by the Court.  Debtors' willingness to pay

6

the Settlement before confirmation of a plan of reorganization illustrate Debtors'(and its insurer's) legitimate concerns regarding both Debtors' liability exposure and the litigation costs should the Florida Action proceed to trial.

18.     As stated in Debtors' Motion, the Florida Action raises "fact issues to which a jury may give undue weight; and compounding the uncertainty is the extent to which Dr. Gutman's suicide might affect a jury."  Motion at ¶ 21.  Further, Debtors concede that going to trial in the Florida Action will require Debtors to "incur[] up to $2 million or more in administrative expenses to the Debtors' estates." <u>Id.</u>

19.     By approving the Settlement, the Court would "minimize litigation and expedite the administration" of Debtors' cases.  <u>In re Martin</u>, <u>Id.</u>  Aside from the administrative expense, however, the Settlement allows the estate to avoid protracted litigation that could result in verdict for the Plaintiffs that far exceeds the amount of the present Settlement.   Approving the Settlement brings the Florida Action to close;  sustaining the Committee's Objection takes the parties back to where they started.

## The Court Has Broad Discretion to Approve Settlement

20.     When considering whether a proposed settlement is fair, reasonable and in the interest of a debtor's estate, courts consider four factors:  (1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it, and (4) the paramount interest of the creditors.  <u>In re RFE Industries, Inc.</u>, 283 F.3d 159, 165 (3d Cir. 2002).

21.     With respect to the first factor, probability of success, it is "unnecessary to conduct a mini-trial to determine the probable outcomes of any claims waived in settlement." <u>In re Cajun Electric Power Cooperative, Inc.</u>, 119 F.3d 349, 356 (5th Cir. 1997).  All that is required

7

is for the court to be familiar with the relevant facts and law in order to make an informed decision.  LaSalle Nat'l Bank v. Holland (In re American Reserve Corp.), 841 F.2d 159, 163 (7th Cir. 1987).  Considering the scope of the alleged defamation, and the harm sustained by the Plaintiffs, this Court can very easily find that the Settlement was the result of Plaintiff's "probability of success" were the matter to proceed to trial.

22.     The two factors remaining relevant to the Settlement, complexity of litigation and interests of the creditors, both support approval of the Settlement.  As stated by the Debtors, Decedent's claims of defamation and personal injury have required Debtors to incur approximately $1.2 million in defense costs.  Were the Florida Action to proceed to trial, Debtors' anticipate incurring an additional $2 million in defense costs.  Decedent's sudden death further complicates the underlying litigation.

23.     As for the interest of the creditors, Debtors' future litigation costs alone support approval of the Settlement.  But in addition to avoiding defense costs, the Settlement allows the Debtors to avoid litigation that may result in a judgment that has the potential to be far greater than the Settlement.

24.     The Committee's reliance on the "necessity of payment" doctrine is not appropriate in this instance. As the Third Circuit has recognized,  the analysis of "necessity of payment" is appropriate when the failure to pay a creditor may result in "immediate economic sanction, failing such payment."   In re Lehigh & N.E.R. Co., 657 F.2d 570, 581 (3d Cir. 1981)(recognizing that "the *sine qua non* for the application of the 'necessity of payment' doctrine is the possibility that the creditor will employ an immediate economic sanction.").

25.     Instead of applying the "necessity of payment" analysis, the Court should consider whether the Settlement satisfies the factors provided under In re RFE Industries, Id.; see

8

also, In re Marvel Entertainment Group, Inc., 222 B.R. 243, 249 (D. Del. 1998)(finding that when determining the "fairness, reasonableness, and adequacy of a settlement," in addition to considering the probability of success, complexity of litigation, etc., courts should consider "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.")

26.    One of Plaintiff's objectives during mediation was to reach an agreement that would result in an immediate settlement. Were the Debtors unwilling to agree to a settlement that provided for an immediate payment in full, it is highly unlikely Plaintiffs would have settled the Florida Action for an amount anywhere near the Settlement amount.

27.    The Committee was present at the hearing on the Relief From Stay Motion and listened to the proffer of Mrs. Gutman as she explained why it was important that she expeditiously resolve her claims against the Debtors.  The Committee was also aware that this Court authorized the parties to proceed to mediation in Florida, yet the Committee chose not to participate in mediation.

**Approval of the Settlement Under 11 U.S.C. § 363(b)**

28.    It is well recognized that debtors can settle lawsuits under 11 U.S.C. § 363(b).  In re Cajun Electric Power Cooperative, Inc., 119 F.3d 349, 354 (5th Cir. 1997).  However, section 363(b) does not authorize a debtor to enter into a settlement if the settlement results in a *sub rosa* plan of reorganization.  Id., citing Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983).

29.    In Cajun Electric, the Fifth Circuit addressed the Committee of Unsecured Creditors' objection to a settlement which the committee argued would "remove more than $100 million from the estate."  Cajun Electric, at 354.  Despite the Committee's objection, the Fifth Circuit approved the Cajun settlement, finding it did not restrict creditors' rights to vote on the

9

plan, did not dispose of all claims against the debtors and did not "dispose of virtually all of Cajun's assets." Id.; see also, In re Public Service Company of New Hampshire, 99 B.R. 510 (Bankr. D. N.H. 1989)(approving a prepetition settlement payment as such settlements provide "a device for resolving obstacles to reorganization by the compromise … [and provide the] necessary flexibility in chapter 11 and often makes successful reorganizations possible." But see, In re Columbia Gas System, 171 B.R. 189, 192 (Bankr. D. Del. 1994)(distinguishing In re Public Service Co. of New Hampshire).

WHEREFORE, for the reasons stated above, Plaintiffs respectfully request this Court approve the Settlement as set forth in the Debtors' Motion and grant such further relief as this Court deems appropriate.

**FOX ROTHSCHILD LLP**

/s/ L. JASON CORNELL, ESQUIRE
L. Jason Cornell, Esquire (No. 3821)
919 North Market Street, Suite 810
Wilmington, DE  19899-2323
302/654-7444; 302/656-8920 (fax)
jcornell@foxrothschild.com

*Attorneys for Donna Gutman, Estate Representative of Plaintiff E. Michael Gutman, M.D., Mike Gutman, M.D. (MPAC), P.A. and Gutman Pain/Accident Center, Inc.*

Dated:  December 13, 2009

10

11