# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, et al., | (Jointly Administered) |
| Debtors. | Hearing Date: December 15, 2009 at 10:00 a.m. |
| | Objection Deadline: December 15, 2009 |

## DECLARATION OF JOSEPH M. DRAYTON

JOSEPH M. DRAYTON states as follows:

1. I am an attorney with the firm of Kaye Scholer LLP, representing Merrill Lynch Capital Corporation ("Merrill Lynch") in the above-captioned cases.

2. I am submitting this declaration in support of Merrill Lynch's objection to the motion by the Official Committee of Unsecured Creditors (the "Creditors' Committee") for an order requiring the production by a date certain of emails from Merrill Lynch (the "Rule 2004 Motion"). I make this declaration based on personal knowledge.

3. I have reviewed the Certification of Counsel by Mr. Robert A. Schwinger and, where appropriate, address below some of the issues he raised in his certification.

A. **The Creditors' Committee's Informal Rule 2004 Document Requests**

4. On May 14, 2009, the Creditors' Committee made informal requests to Merrill Lynch for the production of documents ("Document Requests"). Over about a five-week period, I participated in a series of telephonic meetings with Thomas Hall, Esq.

of Chadbourne & Parke LLP, counsel for the Creditors' Committee, regarding the scope of the Document Requests.

5. On June 15, 2009, in one of the telephonic meetings between counsel for Merrill Lynch and counsel for the Creditors' Committee regarding the Document Requests, Merrill Lynch and the Creditors' Committee agreed to defer email production from Merrill Lynch. At that time, the Creditors' Committee planned to review Merrill Lynch's initial production of non-email electronic and hard copy documents in order to become informed before engaging in a dialogue with Merrill Lynch about the selection of appropriate custodians and a narrow list of search terms for the subsequent email production. See Exhibit A, letter from R. Schwinger dated June 30, 2009. It was intended that the parties would engage in good faith dialogue at a later date about appropriate search terms but the Creditors' Committee has steadfastly refused ever to engage in such a dialogue; instead, it has sought to dictate unilaterally an overly broad set of search terms.

6. On June 26, 2009, Merrill Lynch sent an informal objection and response memorializing, among other things, its understanding of the negotiations between Merrill Lynch's counsel and counsel for the Creditors' Committee. Thereafter, Robert A. Schwinger, Esq. replaced Mr. Hall as the primary contact for the Creditors' Committee with respect to the Document Requests.

7. On July 7, 2009, Merrill Lynch and the Creditors' Committee agreed to the scope of the non-email documents to be searched for, collected and produced by Merrill Lynch. On July 10, 2009, the Creditors' Committee and Merrill Lynch entered into a confidentiality agreement that, among other things, governs the production of all

documents and other information and materials produced by Merrill Lynch in response to the Document Requests (the "Confidentiality Agreement").

**B.    Merrill Lynch's Production of Non-Email Documents**

8.    On July 14, 2009, immediately after entering into the Confidentiality Agreement with the Creditors' Committee, Merrill Lynch produced 1,086 responsive, non-privileged documents from its paper files.

9.    After the scope of the production was finalized on July 7, 2009, Merrill Lynch searched its electronic files and engaged an independent discovery vendor to assist with the preparation of its electronic non-email document production. As a result of these efforts, Merrill Lynch produced an additional 1,523 documents on August 11, 2009, 5,669 documents on September 4, 2009, and 903 documents on November 25, 2009.[1]

**C.    The Creditors' Committee's Overly Broad Demand for Email Discovery**

10.    The first time that the Creditors' Committee contacted Merrill Lynch after the June 15 agreement to defer the production of emails was on September 18, 2009. At that time, I reminded Mr. Schwinger of the Creditors' Committee's agreement to provide Merrill Lynch with a list of proposed custodians for the collection of email and a list of narrowly tailored search terms. The Creditors' Committee responded by proposing that Merrill Lynch search an extraordinary *82 custodians,* for the 24-month time period from

---

[1]    While Mr. Schwinger asserts that the volume of the November 25, 2009 production "exceeded the entire volume of material that Merrill had produced to the Committee to date," see Certification of Counsel by Robert Schwinger ("Schwinger Cert.") at ¶ 4, the fact of the matter is that the 903 documents produced by Merrill Lynch in November 2009 represent only 10% of the documents in Merrill Lynch's non-email production. These documents had been inadvertently excluded from Merrill Lynch's earlier productions and were produced immediately upon learning of the existence of the documents.

January 1, 2007 to December 8, 2008, and filter each custodian's emails using the following *42 overly broad search terms*:

>Tribune; Trib; Trb
>EGI; EGI-TRB; EGII;
>Equity Group Investments; Equity Office Properties
>Zell
>Sam Investment Trust
>Chai Trust
>ESOP; TESOP
>Step 1; Step One; First Step
>Step 2; Step Two; Second Step
>Chandler
>Grenesko
>Osborn*
>S-Corp*; S Corp*
>Tranche X; Tranche B
>VRC; Valuation Research
>Duff & Phelps; D&P
>Nils; Larsen
>FitzSim*
>Tower
>McCormick
>Cantigny
>Foundation*
>GreatBanc
>Navigant
>Standard & Poor's; S&P
>Murray Devine.

See Ex. B, email from Schwinger dated September 18, 2009.

11. During the week of September 21, 2009, Merrill Lynch and its counsel considered the enormity of the burdens imposed by the Creditors' Committee's overly broad request and the practical considerations associated with compliance with the request -- such as cost and the strain on Merrill Lynch's computer, technology and personnel resources. Based on these considerations as well as Merrill Lynch's knowledge of its email systems and the composition of its Tribune deal team, Merrill

4

Lynch determined that the Creditors' Committee's request was overly broad and unduly burdensome.

12. On September 29, 2009, I informed Mr. Schwinger by teleconference that Merrill Lynch had determined that the Creditors' Committee's request for 82 custodians and 42 search terms was over-reaching and overly broad. In response, Mr. Schwinger asserted that the Creditors' Committee assembled its list of 82 custodians from Merrill Lynch's non-email production. On September 30, 2009, in order to better understand the materiality of the list of 82 custodians, I asked Mr. Schwinger to provide me with the documents supporting the Creditors' Committee's list of 82 custodians. In response, on October 1, 2009, Mr. Schwinger provided me with various contact lists for the Tribune transaction; however, these contact sheets did not demonstrate any substantive involvement by the personnel listed thereon.

13. In an email dated October 2, 2009, Mr. Schwinger attempted to justify the Creditors' Committee request that Merrill Lynch filter its emails by applying 42 search terms by telling me about an agreement the Creditors' Committee had reached with J.P. Morgan Chase, N.A. ("JPM") in July 2009. See Ex. C, email from Mr. Schwinger dated October 2, 2009. Based on my discussions with counsel for the Creditors' Committee back in June and the general rules regarding electronic discovery, however, the Creditors' Committee had an obligation to negotiate independently with Merrill Lynch and in good faith about the search terms to be applied. To this day, such independent, good faith negotiations have never taken place. Regardless of what search terms JPM may have agreed or not agreed to, it is abundantly clear -- based on the sheer volume of 330,000 documents -- that the JPM search terms are overly broad as applied to Merrill Lynch.

D.  **Merrill Lynch's Proposal to the Creditors' Committee for Email Discovery**

14.  Given that the Creditors' Committee was resolute in adhering to its unreasonable demands for 82 custodians and 42 overly broad search terms, Merrill Lynch made its own proposal to the Creditors' Committee on October 2, 2009 regarding the production of emails the ("ML Proposal"). See Ex. D, email from Drayton dated October 2, 2009. The ML Proposal took a more systematic approach to the collection of potentially responsive emails by identifying the various groups within Merrill Lynch that participated in the Tribune transactions and identifying one or two custodians per group for email collection. In the ML Proposal, Merrill Lynch identified nine custodians from the following eight groups at Merrill Lynch that worked on the Tribune transactions: Leveraged Finance, Rating Agency Review, Loan Syndication, Capital Commitments, Chicago Investment Banking, Media Investment Banking, Mergers &Acquisitions and Corporate Credit.

15.  With respect to search terms, Merrill Lynch offered in the ML Proposal to search all of the terms that the Creditors' Committee proposed in its September 18, 2009 email except for the following 13 generic terms:

   Step 1, Step One, First Step;
   Step 2, Step Two, Second Step;
   S-Corp*, S Corp*;
   Tranche B;
   Duff & Phelps, D&P; and
   Standard & Poor's, S&P.

See Ex. D.

E.  **The Creditors' Committee Rejected the ML Proposal**

16.  On October 5, 2009, the Creditors' Committee rejected the ML Proposal. See Ex. E, email from Schwinger dated October 5, 2009. Contrary to its obligation under

6

Rule 2004 to meet and confer in good faith regarding the scope of a discovery plan, the Creditors' Committee dismissively asserted that Merrill Lynch "must bear responsibility for the choices it makes in this regard if those choices prove to be wanting." Instead of conferring in good faith, the Creditors' Committee improperly attempted to shift all responsibility for a plan for email production to Merrill Lynch.

17. On October 9, 2009, I explained to Mr. Schwinger by email that the Creditors' Committee's position is contrary to Merrill Lynch's understanding of the entities' obligations to work together to reach an agreement on an email discovery plan. See Ex. F, email from Drayton dated October 9, 2009. I reiterated Merrill Lynch's continued willingness to work in good faith with the Creditors' Committee towards reaching an agreement. I also explained that Merrill Lynch's proposal sought to achieve a middle ground that would not unduly burden Merrill Lynch with an overly broad and primarily non-responsive universe of emails to review for production.

### F. Merrill Lynch Provided the Creditors' Committee With Information Regarding Burden

18. On October 12, 2009, the Creditors' Committee requested data supporting Merrill Lynch's rejection of the Creditors' Committee's demands of September 18. See Ex. G, email from Schwinger dated October 12, 2009. Upon receipt of that request, Merrill Lynch worked diligently to refine the ML Proposal to address the concerns of the Creditors' Committee in order to attempt, yet again, to arrive at a mutually agreeable email discovery plan. On October 15, 2009, the Creditors' Committee requested that Merrill Lynch provide an additional proposal unless the entities have reached an impasse. See Ex. H, email from Schwinger dated October 15, 2009. That same day, I emailed Mr. Schwinger to inform him that Merrill Lynch was finalizing a comprehensive email

discovery plan and expected to share the details shortly. See Ex. I, email from Drayton dated October 15, 2009.

19. On October 19, 2009, Merrill Lynch provided the Creditors' Committee with information regarding the costs and burden associated with its unreasonable demand for Merrill Lynch to collect the email of 82 custodians. See Ex. J, email from Drayton dated October 19, 2009. At that time, the estimated cost to comply with the Creditors' Committee's request was in the range of **$4 million to $16 million** and likely required the collection and processing of **4.8 terabytes of data**.

### G.    Merrill Lynch's Seven Step Email Discovery Plan

20. On October 19, 2009, in a further effort to compromise, Merrill Lynch proposed a seven step email discovery plan that was not substantially different from the ML Proposal of October 2, 2009. See Exs. D and J. The seven step email plan attempted to address various concerns raised by the Creditors' Committee while protecting Merrill Lynch from the exorbitant costs and consumption of resources associated with the Creditors' Committee's demands for 82 custodians, over a 24-month period, using 42 search terms. A description of each of the seven steps in the email discovery plan is as follows.

21. <u>Step 1</u>. Merrill Lynch expanded its list of proposed custodians to include 12 custodians (rather than nine) from nine groups within Merrill Lynch (the eight referred to in paragraph 12 above plus Loan Portfolio Management). Based on the functions performed by these custodians and their groups in connection with the Tribune transactions, these custodians were likely to capture the vast majority of emails responsive to the Creditors' Committee's Document Requests.

22. <u>Step 2</u>. Given that the Creditors' Committee had had ample time to educate itself from its review of Merrill Lynch's non-email electronic and hard copy documents as well as the documents produced by the Debtors and JPM, Merrill Lynch offered the Creditors' Committee the opportunity to substitute one or more different custodians for any of the 12 custodians identified by Merrill Lynch in Step 1. The substitution of a custodian by the Creditors' Committee was contingent on the Creditors' Committee's acknowledgement that Merrill Lynch had advised the Creditors' Committee of Merrill Lynch's belief that the 12 custodians identified in Step 1 were likely to capture the vast majority of the potentially responsive emails.

23. <u>Step 3</u>. Merrill Lynch would collect and process the email data associated with the 12 custodians identified via Steps 1 and 2.

24. <u>Step 4</u>. Merrill Lynch would filter the email data collected and processed in accordance with Step 3, using 40 of the 42 overly broad search terms originally proposed by the Creditors' Committee.

25. <u>Step 5</u>. If Merrill Lynch concluded that the use of the 40 search terms required by the Creditors' Committee yielded an unduly burdensome amount of data to cull, review and produce, it would communicate its view to the Creditors' Committee and attempt to reach agreement on a less burdensome search string.

26. <u>Step 6</u>. Upon completion of Step 5, Merrill Lynch would cull, review and produce non-privileged emails responsive to the Document Requests.

27. <u>Step 7</u>. Merrill Lynch and the Creditors' Committee each reserved their rights with respect to all issues concerning Merrill Lynch's email production.

H.    **The Creditors' Committee Accepted the Seven Step Email Discovery Plan**

28.    On October 20, 2009, the Creditors' Committee sought clarification on certain aspects of Merrill Lynch's proposed email discovery plan and requested, among other things, a modification of the agreed upon time period for document production to include June 1, 2006 to December 31, 2006. See Ex. K, email from Schwinger dated October 20, 2009.

29.    In response, on October 23, 2009, **Merrill Lynch agreed to extend the time period** for email production to include June 1, 2006 to December 31, 2006 -- a period of **an additional seven months**. See Ex. L, email from Drayton dated October 23, 2009. On Monday, October 26, 2009, the Creditors' Committee accepted Merrill Lynch's email discovery plan as modified on October 23, 2009 (the "EDP").

I.    **Merrill Lynch's Work Under the Seven-Step Email Discovery Plan**

30.    On October 28, 2009, Merrill Lynch informed the Creditors' Committee that it had started the process of collecting email data consistent with the EDP. See Ex. M, email from Drayton dated October 28, 2009.

31.    On November 18, 2009, Merrill Lynch completed the collection of email data for the 12 custodians identified in the EDP. The email data collected was 215 GB. At this time, Merrill Lynch began to process the data, which included applying the 40 overly broad search terms in the EDP to filter the data collected for the 12 custodians.

32.    On November 11, 2009, I provided Mr. Schwinger with my understanding of the then current estimate for the completion of email data filtering in accordance with the EDP. In actuality, the collection, processing and filtering work took two business days longer than the estimate provided to Mr. Schwinger. By November 30, 2009,

Merrill Lynch had substantially completed its filtering of the custodians' emails and estimated that an extraordinary 330,000 email documents would be filtered in accordance with Step 4 of the EDP.

33. Mr. Schwinger incorrectly states that he was told that by "November 24 . . . material would be 'sent out' for review." See Schwinger Cert. at ¶7. Neither I nor anyone else acting on behalf of Merrill Lynch *ever* communicated that Merrill Lynch would send email data to its discovery vendor for review on November 24 after the completion of the email data filtering process. Indeed, as set forth in Step 5 of the EDP, Merrill Lynch had always contemplated that it would have the opportunity to assess the number of filtered documents (330,000, here, as it turned out) in order to determine whether the Creditors' Committee's 40 overly broad search terms had yielded an unduly burdensome amount of data to cull, review and produce. An important component of Step 5 of the EDP was that if Merrill Lynch were to determine that the 40 overly broad search terms had produced an unduly burdensome amount of documents to cull, review and produce, then Merrill Lynch would have, at that point, an opportunity to attempt to reach agreement with the Creditors' Committee on a less burdensome set of search terms. Thus, the parties and their counsel had a clear understanding that further discussion may be required prior to the start of the review process.

34. As expressed to the Court at the December 1 status conference, Merrill Lynch believes that the data set of 330,000 documents, using the 40 overly broad search terms, is excessive and burdensome. At the December 1, 2009 status conference before this Court, Merrill Lynch informed the Court that it would take three and a half weeks to start producing responsive and non-privileged emails from the data set of 330,000

documents, and 12 weeks to complete the production and furnished the Court with a detailed explanation of the 12-week estimate.

### J.     Merrill Lynch's Attempt to Compromise

35.    Immediately following the December 1, 2009 status conference, Merrill Lynch undertook steps to determine whether removing certain generic terms from the 40 search terms in the EDP would materially reduce the pool of 330,000 email documents. On December 2, 2009, Merrill Lynch started the process of filtering the emails of the 12 custodians identified in the EDP with a narrower set of **28 terms**. More specifically, Merrill Lynch filtered the emails of the 12 custodians with all of the search terms demanded by the Creditors' Committee except for the following 12 generic terms:

    Step 1, Step One, First Step;
    Step 2, Step Two, Second Step;
    S-Corp*, S Corp*;
    Tranche B;
    Duff & Phelps, D&P; and
    Navigant.

36.    The removal of the 12 generic terms from the search string reduced the potentially responsive pool of emails from approximately 330,000 documents to approximately 277,000 documents -- a difference of more than 50,000 documents.

37.    **Before it learned whether or not it could reach an agreement with the Creditors' Committee to avoid motion practice**, Merrill Lynch decided to move forward with its processing of the 277,000 emails (the "Proper Email Set") on December 4, 2009 and commence its review of the Proper Email Set for responsiveness and privilege in order to complete its production of responsive, non-privileged documents as soon as practicable. On December 4, 2009, I informed Mr. Schwinger that Merrill Lynch intended to produce responsive, non-privileged emails from the Proper Email Set and try

to meet or exceed the estimates for its rolling production that it communicated to this Court on December 1, 2009. See Ex. N, email from Drayton dated December 4, 2009.

38.  Later that day, Mr. Schwinger communicated that the Creditors' Committee "need[ed] Merrill's production completed by the end of January 2010." See Ex. O, email from Schwinger dated December 4, 2009. The Creditors' Committee requested that Merrill Lynch provide a firm commitment by December 7, 2009 that it could complete its entire email production by January 31, 2010.

39.  On December 7, 2009, I informed Mr. Schwinger that Merrill Lynch had started to process emails for review and instructed its discovery vendor to increase its document reviewers from 10 to 15. See Ex. P, email from Drayton dated December 7, 2009. I also informed Mr. Schwinger that Merrill Lynch could provide a firm commitment to produce responsive, non-privileged documents from the Proper Email Set of 277,000 emails on or before February 16, 2010. I emphasized to Mr. Schwinger that there was only a two-week difference in Merrill Lynch's target date and the Creditors' Committee's target date for the completion of Merrill Lynch's email production. The Creditors' Committee rejected Merrill Lynch's commitment and filed the Rule 2004 Motion.

40.  Merrill Lynch has considered whether there are any further measures that can be taken to accelerate the completion of its production of responsive and non-privileged emails from the Proper Email Set. By compressing Merrill Lynch's established processing and review protocols and further increasing its discovery vendor's review team to the maximum number feasible, Merrill Lynch determined that it could review the Proper Email Set of 277,000 emails for responsiveness and privilege and

produce responsive, non-privileged emails by January 31, 2010. We communicated this information to Mr. Schwinger on December 10, 2009 and requested that the Creditors' Committee accept the January 31, 2010 target date.

41.     On December 11, 2009, the Creditors' Committee rejected Merrill Lynch's compromise.

42.     The Creditors' Committee constantly compares Merrill Lynch to JPM. It is my understanding that the Creditors' Committee completed its negotiation of an email discovery plan with JPM in July 2009 and JPM completed its production of email at the end of November 2009. Thus, the time period that Merrill Lynch is seeking to complete its email production following agreement on the EDP is **actually <u>less</u> than the time JPM took to complete its email production** following agreement on JPM's email discovery plan.

43.     I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on December 14, 2009 in New York, New York.

*/s/ Joseph M. Drayton*
Joseph M. Drayton