# EXHIBIT G

"Schwinger, Robert A."
&lt;RSchwinger@chadbourne.c
om&gt;

10/12/2009 11:43 AM

Document is Retained

To    "'Joseph Drayton'" &lt;JDrayton@kayescholer.com&gt;

cc    "'mprimoff@kayescholer.com'"
&lt;mprimoff@kayescholer.com&gt;; "Seife, Howard"
&lt;HSeife@chadbourne.com&gt;; "Zink, N. Theodore"

bcc

Subject    RE: Tribune/MLCC -- E-mail search terms


Dear Joe,

Thank you for your response to our October 5, 2009 message.  I hope that this e-mail can help move matters forward.

To date, we have had several telephone conversations and exchanged a number of extraordinarily detailed written communications regarding e-mail discovery issues.  Given these circumstances, any suggestion that the parties have not been conferring on these issues seems unwarranted.  Rather, I believe the difficulties we face concern the substance of that conferral.

Specifically, we continue to feel that to date we have not received substantive responses to the legitimate issues and concerns that on behalf of the Committee we have raised.  For example, my October 5, 2009 message identified specific various reasons that gave us concern (or at least precluded us from having any comfort) regarding whether certain highly relevant e-mail would be captured (or at least reliably captured) if the limited custodian list proposed by Merrill Lynch were to be used.  The response we received contains nothing to address these concerns, nor to suggest any reason to believe that such material would not be appropriately subject to discovery by the Committee in its investigation.  We performed and reported on actual empirical testing that we were able to conduct on other e-mail populations we had, concerning the theoretical premises upon which Merrill Lynch has suggested that we base the custodian list, and the results showed that those premises were unreliable.  Again, the response we received contains nothing to address these concerns.

The suggestion that we are proceeding differently with Merrill Lynch than we did with JPMorgan is unfounded.  To the contrary, we are proceeding in the exact same way.  We have proposed the exact same list of e-mail terms that was agreed to with JPMorgan.  Regarding e-mail custodians, we did the exact same thing with Merrill Lynch as we did with JPMorgan -- find a deal team list preparing by the responding party itself and use that list as the basis for identifying e-mail custodians.  Notably, when we discovered that JPMorgan's original proposed list of e-mail custodians was missing certain names from deal team lists that had been compiled by JPMorgan, we brought that fact to JPMorgan's attention and asked that the missing names be included -- and JPMorgan agreed to do so that same afternoon.  My October 5, 2009 message raised the point that we did not see any reason why the matrix of relevance/reasonableness/cost issues would be any different for Merrill Lynch than it was for JPMorgan.  Here again, we have not received any substantive response to suggest that this is not correct.

All we really have seen to date is the rather conclusory recitation of buzzwords like "reasonableness" and "cost" devoid of any supporting specifics, as if merely saying these words somehow obligates the Committee to pare down the discovery it will obtain.  We have seen no empirical information from Merrill Lynch regarding the costs associated with including or not including particular search terms or e-mail custodians.  Nor have we been told of the results of any sampling or other empirical testing to determine the extent to which including or not including particular search terms or e-mail custodians affects whether truly responsive e-mail material is or is not being captured.  Caselaw is quite clear that parties seeking to raise such issues bear the burden of supporting their positions through such empirical information.  Since the Committee, as the requesting party, is not in possession of the relevant universe of data and cannot test it ourselves, that burden necessarily falls here on Merrill Lynch -- particularly since Merrill Lynch is the party resisting on supposed cost and reasonableness grounds an approach that its peer financial

institution found unobjectionable.

As some of the leading recent cases in this area have stated:

> "Selection of the appropriate search and information retrieval technique requires careful advance planning by persons qualified to design effective search methodology. The implementation of the methodology selected should be tested for quality assurance; and the party selecting the methodology must be prepared to explain the rationale for the method chosen to the court, demonstrate that it is appropriate for the task, and show that it was properly implemented."

Victor Stanley, Inc. v. Creative Pipe, Inc., 250 F.R.D. 251, 260, 262 (D.Md. 2008) (Grimm, M.J.).

> "Whether search terms or 'keywords' will yield the information sought is a complicated question involving the interplay, at least, of the sciences of computer technology, statistics and linguistics. Given this complexity, for lawyers and judges to dare opine that a certain search term or terms would be more likely to produce information than the terms that were used is truly to go where angels fear to tread. This topic is clearly beyond the ken of a layman and requires that any such conclusion be based on evidence that, for example, meets the criteria of Rule 702 of the *Federal Rules of Evidence.*"

United States v. O'Keefe, 537 F. Supp. 2d 14, 24 (D.D.C. 2008) (Facciola, M.J.); see also, e.g., In re Seroquel Products Liability Litig., 244 F.R.D. 650, 662 (M.D. Fla. 2007) (Baker, M.J.) ("[W]hile key word searching is a recognized method to winnow relevant documents from large repositories, use of this technique must be a cooperative and informed process.... Common sense dictates that sampling and other quality assurance techniques must be employed to meet requirements of completeness.").

> "[W]hat is required is something other than a lawyer's guesses, without client input, and without any quality control testing to see if the search terms produce reasonably all the responsive ESI and limited 'false positives.'"

William A. Gross Const. Associates, Inc. v. American Mfrs. Mut. Ins. Co., 256 F.R.D. 134, 136 n.3 (S.D.N.Y. March 19, 2009) (Peck, M.J.).

As I mentioned, the Committee obviously is not in a position to perform any such testing on our end. But we are not without an empirical benchmark to support the basic approach we propose. That same approach was followed -- with very little fuss -- at a reasonably comparable financial institution, without creating any apparent issues of an unreasonably broad or unduly expensive search. This seems to us to be a fairly persuasive indication that there are not likely to be significant cost or overbreadth considerations that should preclude following the same approach at Merrill Lynch.

Finally, I do want to say a word about LR 7026-3. We are well familiar with LR 7026-3, though we note that other parties with whom we have addressed e-mail discovery issues in this matter have made a point of questioning its applicability outside the adversary proceeding context. But more to the point, the fact is that, per LR 2004-1, the Committee and Merrill Lynch came to consensus months ago on the scope of the Committee's requests for production, and Merrill Lynch has been producing non-email materials for some time on that basis. E-mail production, which we are getting to now, is not a new or separate request. Rather, we are simply discussing which mechanical steps in gathering responsive e-mail material for review would and would not be likely to result in a full production of e-mail material responsive to the requests already agreed upon. LR 7026-3 does not furnish a license to delay e-mail production indefinitely due to lack of advance agreement on those mechanical issues, particularly when no substantive support, but rather only conclusory assertions, are being offered as the basis of disagreement. The Committee is not obliged to consent to foregoing discovery of relevant responsive e-mail material as the price of getting timely e-mail production. Every other major party that, like Merrill Lynch, received document requests early on from the Committee is currently well under way with its e-mail production. The Committee's investigation may be a large and complicated matter, but other

parties have faced up to their discovery responsibilities and the attendant costs without undue delay.  We think it is more than time for Merrill Lynch to do the same.

Best regards,

R. A. S.

**Robert A. Schwinger**
**Chadbourne & Parke LLP**
30 Rockefeller Plaza, New York, NY 10112
**tel** 212-408-5364 | **fax** 646-710-5364
rschwinger@chadbourne.com | http://www.chadbourne.com
vCard: http://www.chadbourne.com/vcard/rschwinger.vcf

Please consider the environment before printing this email.

**From:** Joseph Drayton [mailto:JDrayton@kayescholer.com]
**Sent:** Friday, October 09, 2009 6:10 PM
**To:** Schwinger, Robert A.
**Cc:** Goldfarb, Andrew; Nellos, Alexandra; Vazquez, Francisco; Seife, Howard; Ashley, Marc D.; 'mprimoff@kayescholer.com'; Zink, N. Theodore
**Subject:** RE: Tribune/MLCC -- E-mail search terms

Robert,

We have reviewed your response to Merrill's proposed e-mail production methodology and frankly find your comments to be inconsistent with the meet and confer requirements embodied in Federal Rule of Bankruptcy Procedure 2004 and particularly Delaware Bankruptcy Court Local Rule 2004-1. Local Rule 2004-1 provides that prior to filing a formal Rule 2004 motion, parties are "[r]equired" to confer to arrange for a "mutually agreeable . . . scope of an examination or production. . . . [T]he scope of the examination or production shall be filed and served in accordance with the Local Rule." The process of meeting and conferring regarding the scope of any request for production of documents is a continuing dialogue.

Merrill is willing to continue to discuss with the Creditors' Committee the parameters of an acceptable discovery plan for the collection and production of email. In your email, the Creditors' Committee disclaims any responsibility it has to arrive at an mutually agreeable email search criteria and custodian list. You incorrectly assert that Merrill "must bear responsibility for the choices it makes in this regard if those choices prove to be wanting." A good faith effort by the Creditors' Committee to work with Merrill to arrive at an discovery plan for email is not simply a "good step

and a 'best practice'" as you state, but rather is a requirement under the rules.

It is well settled law that Rule 2004 examinations must seek information that is "both *relevant* and *reasonable* ." Further, under Fed. R. Civ. P. 45(c)(1) (which is made applicable to Rule 2004 motions via Rule 2004(c)'s incorporation of Bankruptcy Rule 9016, which in turn incorporates Fed. R. Civ. P. 45), the Creditors' Committee must take "reasonable steps to avoid imposing undue burden or expense" on Merrill.

Merrill seeks to reach agreement on a discovery plan with the Creditors' Committee based on Fed. R. Civ. P. 26 and Delaware District Court Local Rule 7026-3 (related to discovery of electronic documents). The goal of these rules is to provide reasonable steps for how to avoid imposing an undue burden or expense in the electronic search process. Under Local Rule 7026-3, it is "expected that parties to a case will cooperatively reach agreement on how to conduct e-discovery." Particularly relevant is subsection (e) of the local rule, which provides, *inter alia* , that "[t]he parties shall reach agreement as to the method of searching, and the words, terms, and phrases to be searched with the assistance of the respective e-discovery liaisons, who are charged with familiarity with the parties' respective systems. . . . To minimize the expense, the parties may consider limiting the scope of the electronic search (e.g., time frames, fields, document types)."

Merrill's proposal seeks to achieve a middle ground that does not unduly burden Merrill with an overly broad universe of documents to review for production. In fact, based on our understanding of the Creditors' Committee's agreement with JP Morgan Chase for email production, its method for arriving at a reasonable list of custodians for email searching is based on a framework much like the one Merrill has proposed as opposed to an exhaustive custodian list. We ask that you consider the applicable legal principles and reconsider Merrill's proposal in light of them.

Joseph M. Drayton
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
(212) 836-7177
(212) 836-6576 (fax)

"Schwinger, Robert A." <RSchwinger@chadbourne.com>

"
Sc
h
wi
n
ge
r,
R
o
be
rt
A.
"
<
R
Sc
h
wi
n
ge
r
@
ch
a
d
b
o
ur
ne
.c
o
m
>

10
/0
5/
20
09
06
:2
6
P
M

To "'Joseph Drayton'" <JDrayton@kayescholer.com>;
    "'mprimoff@kayescholer.com'" <mprimoff@kayescholer.com>

cc "Seife, Howard" <HSeife@chadbourne.com>; "Zink, N. Theodore"
    <TZink@chadbourne.com>; "Vazquez, Francisco"
    <FVazquez@chadbourne.com>; "Ashley, Marc D."
    <MAshley@chadbourne.com>; "Nellos, Alexandra"
    <ANellos@chadbourne.com>; "Goldfarb, Andrew"
    <agoldfarb@zuckerman.com>

Subject RE: Tribune/MLCC -- E-mail search terms

Dear Joe,

This is in response to the discussion of e-mail production in your message below
from Friday afternoon.

We have considered the points in your message and from our earlier telephone conversation very carefully. However, for the reasons that we previously advised you, and for the additional reasons noted below, we believe that your client's proposed approach to performing a sweep of e-mails that it would then review for responsiveness is too limited to be likely to result in a complete production of e-mail responsive to the Committee's requests.

In terms of where we go from here, we note most obviously that while, on a without-prejudice basis, the Committee can and has provided you with our input and the benefit of our experience in dealing with other parties regarding e-mail production in this matter, we ultimately cannot control what your client chooses to do. In e-mail productions, as with any other kind of document productions, the burden of searching for, gathering and producing the full range of responsive material that a party has rests with the producing party. Thus, your client must bear responsibility for the choices it makes in this regard if those choices prove to be wanting.

In any e-mail production, proposed search methodologies for the first-pass sweep of e-mails are essentially nothing more than working hypotheses as to how to most feasibly get to the result (in terms of ultimate production) that is required under the rules, given the document request at issue. Consultation on methodology with the requesting party is viewed as a good step and a "best practice" in helping to reach a good working hypothesis to follow in this regard. To the extent that the production that results from use of a particular methodology may prove to suffer from some deficiencies, factors such as the extent to which the proposed approach was okayed in advance by the requesting party, the extent to which input and suggestions given by the requesting party were disregarded, and any empirical testing that was performed by the producing party to see what the result of including or excluding particular terms or custodians might be, may play a role in the court's analysis of what the appropriate remedy should be for such deficiencies in such circumstances, e.g., supplemental production, a sanction of some kind, etc. We can only presume that Merrill Lynch will take these principles in to account in choosing how it intends to proceed in this matter.

Search Terms

With regard to search terms, while you are certainly correct that the approach followed by JPMorgan is not "binding" on Merrill Lynch in any legal sense, it does seem to provide some highly useful and relevant information and context that the Committee is loath to disregard:

1. We are not aware of any reason to believe that JPMorgan has any greater willingness to make unnecessary expenditures of time and money in connection

with e-mail discovery than does Merrill Lynch.

2. We are not aware of any reason to believe that there is some material difference between the substantive content of the e-mails found at Merrill Lynch versus those at JPMorgan, such that search terms which did not lead to overinclusive results or excess "false positives" for JPMorgan would somehow do so for Merrill Lynch.

3. The search terms we proposed that Merrill Lynch now resists including were proposed to us unilaterally by JPMorgan as their opening proffer regarding an e-mail search methodology in this matter. That fact suggests a recognition on JPMorgan's part that it was necessary to include those terms in the search here in order to get a proper and sufficient response, even considering the level of "false positives" that might have to be waded through during the attorney review process as a result.

4. We also note that there have been some other parties in this action beside JPMorgan who have agreed to a number of the terms that Merrill Lynch has challenged.

Given this background, it is difficult for the Committee to have any confidence in Merrill Lynch's suggestion that the search terms Merrill now resists using have such limited marginal value and/or would impose such excessive burdens or costs that including them in the search methodology cannot be justified.


E-mail custodians

Merrill Lynch has suggested that instead of searching the e-mails of the Merrill personnel listed on Merrill's own deal team lists, the search be limited instead to a single individual (or, in one instance, two individuals) in various functional areas that Merrill has identified. For a number of reasons, the suggestion that this would be a feasible approach does not seem realistic:

1. Your message below suggests that the vast majority of the proposed e-mail custodians that we identified in fact "were not actively involved in the relevant transactions." However, nothing beyond the representation of counsel is provided to substantiate this assertion, e.g., something in the nature of time records or other objective documentation. Indeed, no identification is even provided as to which specific persons are deemed by Merrill to have been the ones who were "actively involved." In any event, more fundamentally, it is contrary to our experience for a company to list significant numbers of truly inconsequential persons on working group lists for a deal that the company itself prepares and circulates to outside parties. It is thus difficult for the Committee to premise an e-mail collection effort on the unsupported assurance that this atypical scenario was the case here.

2. Even if the representation that there were only limited numbers of people with active involvement were true, it would not resolve the question of whether the e-mail of the not-actively-involved persons nevertheless warrants production. Just as a hypothetical example, if a person had been moved off the project at an early stage because he or she would not "play ball" and insisted on presenting solvency projections that cast severe doubt on the transactions then under discussion, the Committee certainly would want to see that person's e-mails. The Committee would be in a difficult position in responding to potential critics of its investigation if it had to state that it decided not to bother seeking e-mail of this kind.

3. As I understand from our September 30 conversation, the premise behind Merrill Lynch's proposed approach as to e-mail custodians to be searched is that, for all practical purposes, everything of any significance was copied to the head of the functional area, and thus the e-mail files of the head of the functional area would be sufficient to yield the responsive material. A statement such as this seems to represent at best the idealized "policy manual" view of how things perhaps ought to have functioned in theory, rather than any empirical assessment about how things actually did function in practice on this particular project as between the particular individuals involved. Indeed, to the extent that members of the team raised concerns between themselves about sensitive issues or questions that for some reason they were not comfortable raising directly with the head of their functional area, Merrill's proposed approach to selecting e-mail custodians would necessarily exclude discovery of such communications. That is not the kind of basis upon which the Committee can rest its investigation if that investigation is to be credible.

4. We took the additional step of performing some analysis on e-mail productions that we have received to date from other parties in this matter, where Merrill Lynch personnel were senders or recipients of those messages. While obviously this e-mail population is not identical to Merrill Lynch's internal e-mail population, we noted numerous individuals from our proposed list of custodians who appeared on many more of these e-mails than did some of the e-mail custodians that Merrill has proposed. Among the most notable examples we identified in this regard -- but hardly an exhaustive list -- were Mariela Figueroa, Caroline Kim, Greg Margolies, Stephen Paras, Todd Scolnick and David Tulnick. Indeed, just from a very quick look in this population, we identified some notable e-mails for certain such people on which none of the e-mail custodians proposed by Merrill appear to have been copied. Examples of these included an e-mail from Chandler Bigelow of Tribune sent only to Greg Margolies and Stephen Paras following up on telephone conversations they apparently had, and a March 2007 e-mail thread from JPMorgan to Caroline Kim apparently concerning financial presentations and the bases of certain numbers found on them. Perhaps such e-mails may later have been forwarded around internally within Merrill, but perhaps not. We obviously cannot know this, nor can we know whether or how

consistently such a practice was or was not followed in such circumstances. But given this evidence, we do not see how an e-mail production that excluded the e-mails files of e-mail custodians such as these could be deemed sufficient. More to the point, the evidence from this exercise seems to cast grave doubt on the everything-went-to-the-boss premise behind Merrill's proposed approach for identifying appropriate e-mail custodians.

In sum, for these reasons and those discussed in our prior e-mails and telephone conversation, we are unable to agree that the e-mail search methodology proposed by Merrill is appropriate in this matter. We believe it is far too limited, and likely to bypass substantial amounts of significant responsive material. Without prejudice to or waiver of any of the Committee's rights in this matter, please keep us advised as to how Merrill intends to proceed. The Committee reserves all rights to seek such relief from the Court as it determines may be needed in light of the e-mail production from Merrill that it receives.

Best regards,

R. A. S.

**Robert A. Schwinger**
**Chadbourne & Parke LLP**
30 Rockefeller Plaza, New York, NY 10112
**tel** 212-408-5364 | **fax** 646-710-5364
rschwinger@chadbourne.com | http://www.chadbourne.com
vCard: http://www.chadbourne.com/vcard/rschwinger.vcf

Please consider the environment before printing this email.

---

**From:** Joseph Drayton [mailto:JDrayton@kayescholer.com]
**Sent:** Friday, October 02, 2009 4:28 PM
**To:** Schwinger, Robert A.
**Cc:** Goldfarb, Andrew; Nellos, Alexandra; Vazquez, Francisco; Seife, Howard; Ashley, Marc D.; Zink, N. Theodore; Madlyn Primoff
**Subject:** Re: Tribune/MLCC -- E-mail search terms

Robert,

As a general matter, please add Madlyn Primoff to all of your email correspondence to me.

Below, I address several issues raised during our teleconference on September 30, 2009:

(A) You raised concerns about the completeness of Merrill's production of non-email documents in response to the Creditors' Committee's request for production. Merrill conducted a thorough search of its paper and electronic records and produced non-email documents that were responsive to the negotiated scope of the Creditors' Committee's requests as memorialized in the letters exchanged between our offices dated June 26, 2009, June 30, 2009 and July 9, 2009. To our knowledge, after its search for responsive documents, Merrill has produced all non-privileged, non-email documents in its possession.

(B) With regard to the search terms, Merrill agrees to search all of the terms that you propose in your September 18, 2009 email except for the following:

Step 1; Step One; First Step
Step 2; Step Two; Second Step
S-Corp*, S Corp*
Tranche B
Duff & Phelps, D&P
Standard & Poor's; S&P

Merrill's agreement on search terms is conditioned upon the ability to filter out email that contains the word "Tribune" within the complete name of an entity unrelated to Tribune Company. In conferring with our client on the above proposed search terms that we have rejected, it is our understanding that they would yield an overly broad result as they relate to several matter unrelated to the subject matter of the Creditors' Committee's request for production. With regard to your discussions with JPMorgan on this topic, JPMorgan's position is not binding on Merrill.

(C) With regard to the custodians for an electronic search by Merrill of email responsive to the Creditors' Committee's request for production, Merrill will not search the email of the 82 custodians that the Creditors' Committee proposes. As I mentioned to you on our call, the proposed list is overly

broad, unduly burdensome and likely to capture a substantial amount of non-responsive documents especially in light of the list of broad search terms. The vast majority of the persons on your proposed list were not actively involved in the relevant transactions. As I mentioned during our call, Merrill proposes to identify the various groups who participated in the transaction and search one custodian per group. This approach should capture the vast amount of email that you seek if not all. Since the Leveraged Finance Team led the deal, we are providing two custodians for that group. Below is the list of custodians that Merrill is willing to search organized by group:

Leveraged Finance

Todd Kaplan
Henrik Dahlback

Rating Agency Review

Todd Baker

Loan Syndication

Carl Mayer

Capital Commitments

Jim Janover

Chicago Investment Banking

Mike O'Grady

Media Investment Banking

John Harrison

M&A Team

Michael Costa

Corp Credit

Don Wilson

Joseph M. Drayton
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
(212) 836-7177
(212) 836-6576 (fax)

---

**From:** Schwinger, Robert A.
**Sent:** Friday, October 02, 2009 10:05 AM
**To:** 'Joseph Drayton'
**Cc:** Seife, Howard; Zink, N. Theodore; Vazquez, Francisco; Ashley, Marc D.; Nellos, Alexandra; Goldfarb, Andrew
**Subject:** Tribune/MLCC -- E-mail search terms

Dear Joe,

I am writing as a further follow-up to our discussion on Wednesday morning about proposed search terms to use for the first-pass sweep of Merrill Lynch e-mails to be reviewed for responsiveness to the Committee's document requests.

In our conversation, you expressed some strong reservations about certain of the search terms that we had proposed to you in my September 18, 2009 e-mail, citing concern that they would be likely to yield too many false positives. You specifically cited in this regard the following (assuming my notes from the call are correct and complete):

Duff & Phelps; D&P
Standard & Poor's; S&P
Step 1; Step One; First Step
Step 2; Step Two; Second Step
Tranche B
S-Corp*; S Corp*

I thought it would be helpful to note the following observations in response:

1. All the terms you identified (and virtually all the others that were on the list we suggested to you) are search terms that are being used currently by JPMorgan in its e-mail production to the Committee in this matter. In fact, JPMorgan itself

proposed these terms to us. (The only exception to this is Standard & Poor's / S&P, and that is because S&P became part of our focus only after the JPMorgan search terms had been agreed upon.) JPMorgan is a major national financial institution that in terms of size and complexity is not materially different from Merrill Lynch for the purposes of an e-mail production such as this. That JPMorgan apparently did not find these terms to be too burdensome or overinclusive suggests to me that these terms are likely to be equally workable and appropriate for Merrill Lynch in this context.

2. JPMorgan agreed to add to the list of search terms it initially had proposed certain additional terms that we had suggested, even after expressing initial reservations that some of them (e.g., "Navigant") might yield too many nonresponsive e-mails. Since that is essentially the same kind of concern you are voicing, I will make to you the same observations that I made to JPMorgan when this issue arose, which seemed to help resolve the matter:

(a) We, as counsel to the Committee, ultimately are not in any position to meaningfully assess whether including searches for these additional terms in the first-pass sweep of e-mails, in addition to all the other terms agreed to, would or would not create an undue burden for your client in terms of identifying the full range of responsive material for production.

(b) The costs associated with including these as search terms can only be weighed in the context of some empirical and analytical testing as to the degree that searches omitting such terms may fail to capture responsive non-duplicative/non-cumulative material.

(c) Any decision to exclude such terms ultimately can only be judged by seeing in practice how well that approach succeeds in performing the key function of fully identifying responsive material for production. Thus, if the terms in question are not included in the initial stage of your client's e-mail collection, it would be incumbent upon you to employ testing procedures to assure yourselves that your approach did not impair the production of truly responsive material, and to keep us advised as to the outcome of any such procedures.

I hope that you will find the foregoing helpful in moving our discussions along, so that we can proceed promptly to get the Merrill Lynch e-mail production in motion in this matter.

Best regards,

R. A. S.

**Robert A. Schwinger**
**Chadbourne & Parke LLP**
30 Rockefeller Plaza, New York, NY 10112
**tel** 212-408-5364 | **fax** 646-710-5364

rschwinger@chadbourne.com | http://www.chadbourne.com
vCard: http://www.chadbourne.com/vcard/rschwinger.vcf

Please consider the environment before printing this email.

---

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please notify me by replying to this message and permanently delete the original and any copy of this e-mail and any printout thereof.

For additional information about Chadbourne & Parke LLP and Chadbourne & Parke, a multinational partnership, including a list of attorneys, please see our website at http://www.chadbourne.com

＊    ＊    ＊    ＊

IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please notify me by replying to this message and permanently delete the original and any copy of this e-mail and any printout thereof.

For additional information about Chadbourne & Parke LLP and Chadbourne & Parke, a multinational partnership, including a list of attorneys, please see our website at http://www.chadbourne.com