1                IN THE UNITED STATES BANKRUPTCY COURT

2                   FOR THE DISTRICT OF DELAWARE

3    IN RE:                         :
                                    : Chapter 11
4    TRIBUNE COMPANY, *et al.*,       :
                                    : Case No. 08-13141(KJC)
5         Debtors.                  :
     . . . . . . . . . . . . . . . .

6
                              Wilmington, Delaware
7                             December 15, 2009
                                 10:10 a.m.
8
                            TRANSCRIPT OF HEARING
9               BEFORE THE HONORABLE KEVIN J. CAREY
                   UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtors:          Norman Pernick, Esquire
12                             Cole Schotz

13                             Ken Kansa, Esquire
                               Janet Henderson, Esquire
14                             Sidley Austin, LLP

15                             Gary Ravert, Esquire
                               McDermott, Will & Emery
16
                               Cory Falgowski, Esquire
17                             Reed Smith, LLP

18   For the Creditors'        Adam Landis, Esquire
     Committee:                Daniel Rath, Esquire
19                             Landis, Rath & Cobb, LLP

20                             Doug Deutsch, Esquire
                               Robert Schwinger, Esquire
21                             Chadbourne & Parke, LLP

22                             Andrew Goldfarb, Esquire
                               Zuckerman Spaeder, LLP
23
     For the Estate of         Jason Cornell, Esquire
24   Michael Gutman:           Fox Rothschild, LLP

25

           Perfect Pages Transcription & Reporting, Inc.
                         (609) 654-8880

2

| | | |
|---|---|---|
| 1 | For JPMorgan Case: | Robert Stearn, Esquire |
| | | Richards, Layton & Finger |
| 2 | | |
| | For Merrill Lynch | Madlyn Gleich Primoff, Esquire |
| 3 | Capital Corporation: | Joseph M. Drayton, Esquire |
| | | Kaye Scholer, LLP |
| 4 | | |
| | | Laurie Selber Silverstein, Esquire |
| 5 | | Potter Anderson & Corroon, LLP |
| 6 | For Law Debenture: | Garvin McDaniel, Esquire |
| | | Bifferato Gentilotti |
| 7 | | |
| | For ESOP: | Matthew P. Ward, Esquire |
| 8 | | Womble Carlyle |
| 9 | For the U.S. Trustee: | Joseph J. McMahon, Jr., Esquire |
| | | U.S. Department of Justice |
| 10 | | |
| | VIA TELEPHONE: | |
| 11 | | |
| | For the Debtors: | Chandler Bigelow, Esquire |
| 12 | | David Eldersveld, Esquire |
| | | Don Liebentritt, Esquire |
| 13 | | Gary Weitman, Esquire |
| | | Thomas E. Hill |
| 14 | | Tribune Company |
| 15 | | Bryan Krakauer, Esquire |
| | | Jillian McClelland, Esquire |
| 16 | | Kerriann Mills, Esquire |
| | | Sidley Austin, LLP |
| 17 | | |
| | For Dow Jones News | Peg Brickley, Esquire |
| 18 | Wires: | Dow Jones & Co. |
| 19 | For Katherine Gilman: | Katherine Cruz, Esquire |
| | | Kramer Levin Naftalis & Frankel, LLP |
| 20 | | |
| | For Official Committee | Alan D. Holtz, Esquire |
| 21 | of Unsecured Creditors: | AlexPartners, LLC |
| 22 | For RBS: | Jeffrey Farkas, Esquire |
| | | RBS Greenwich Capital |
| 23 | | |
| | For Oaktree Capital | Bruce Bennett, Esquire |
| 24 | Management: | James O. Johnston, Esquire |
| | | Hennigan Bennett & Dorman, LLP |
| 25 | | |

3

```
1    For Anna Kalenchits:      Anna Kalenchits

2    For Perry Capital:        Richard Paige, Esquire
                               Perry Capital
3
     For Dennis A. Prieto:     Dennis A. Prieto
4                              Aurelius Capital Management

5    JPMorgan Chase:           Damian Schaible, Esquire
                               Davis Polk & Wardwell, LLP
6
     Court Recorder:           Al Lugano
7
     Transcription Service:    Perfect Pages Transcription, Inc.
8                              18 Tuckerton Road
                               Shamong, NJ 08088
9                              www.perfecttranscripts.com
                               (609) 654-8880
10
     Proceedings recorded by electronic sound recording;
11   transcript produced by transcription service.
```

4

1                                INDEX

2
                                    Re-    Re-   Further
3                          Direct Cross Direct Cross Redirect

4    Witnesses For Debtors:

5      Jennifer Shea
       (Proffered)
6      (By Ms. Primoff)        23
       (By Mr. Goldfarb)              29
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1    (Call to order of the Court.)

2        THE CLERK:  All rise.  Be seated, please.

3        THE COURT:  Good morning, all.

4        MR. PERNICK:  Good morning, Your Honor.

5        THE COURT:  Please excuse my tardiness.  Life has

6    become quite busy here lately.

7        MR. PERNICK:  No problem, Your Honor.  Norman

8    Pernick, on behalf of the Debtors, Your Honor.  If it would

9    help the Court, I'll just run through where we are.  We have

10   two matters going forward.  One is just a status conference,

11   but I'll run through the other one just so we make sure we're

12   in sync with the Court.

13       THE COURT:  All right.

14       MR. PERNICK:  I have as continued to January 27,

15   number 1, which is CenterPoint Energy's 503(b)(9).  Numbers --

16   number 2, which is the 8th omnibus objection, that's with

17   respect to the Mylander claim only.  Number 3, which is the 9th

18   omnibus objection, with respect to the Sanzeri claim only, and

19   number 4, the 10th omnibus objection, there are a number of

20   listed claimants in the Agenda, only with respect to those

21   claimants is it continued to the 27th.  We did -- Your Honor

22   actually entered Orders in item number 6, which is the LA

23   Times assumption of the real property lease.

24       THE COURT:  Yes.  Before you move on, let me just

25   say with respect to 1, 3 and 4, I just received those papers,

6

1    I think, this morning.  Have not had the opportunity to look

2    at them, but will consider them in due course.  Let me ask if

3    anyone wishes to be heard in connection with any of those

4    matters.

5          (No verbal response.)

6          THE COURT:  All right.  I hear no response.  I'll

7    act without further hearing unless I have a question.

8          MR. PERNICK:  Okay.  And those were the COCs that

9    were submitted on 1, 3 and 4 with respect to all of the ones

10   except the claims I just mentioned.

11         THE COURT:  That's correct.

12         MR. PERNICK:  And just continuing on the COCs then,

13   Your Honor, also on item number 10, which is the first interim

14   fee applications.  We did all their -- all of the fee

15   auditor's issues were resolved.  Of course, we don't know

16   whether the Court has any questions, so all of the parties, I

17   believe, are available in case the Court does have questions

18   on those.

19         THE COURT:  I appreciate everyone attending either

20   in person or by telephone, but with the understanding that all

21   have agreed to the adjustments recommended by the fee auditor,

22   we do not have any further questions, so I'm prepared to grant

23   the relief that's been requested with respect to those

24   applications.

25         MR. PERNICK:  Thank you, Your Honor.  And then item

1    number 13 --

2            THE COURT:  Do you have a form --

3            MR. PERNICK:  -- which was, sorry.

4            THE COURT:  Do you have a Form of Order?

5            MR. PERNICK:  I do have one, Your Honor.  I'm

6    actually -- I thought I had it with me and I apologize, but

7    I'm having it sent over.

8            THE COURT:  Okay.

9            MR. PERNICK:  I have the other three just in case

10   and, of course, the most important one to everybody here, I

11   don't have with me, but it's on its way.

12           THE COURT:  I'd watch my back if I were you.

13           MR. PERNICK:  I am, Your Honor.  So I hope the Court

14   won't be offended if I turn around once in a while.  The other

15   COC was item number 13, which is Debtors' Motion to Establish

16   a Document Depository.  Again, that is now uncontested and we

17   submitted a COC on that also.

18           THE COURT:  Okay.  Do you have a Form of Order with

19   you.  And can you just explain briefly, for the record, where

20   you ended up.

21           MR. PERNICK:  Yeah.  I'm going to let -- I'm not

22   sure if Mr. Kansa or Ms. Henderson is going to -- is most

23   familiar with that but I'll let them handle it.

24           THE COURT:  Okay.

25           MS. HENDERSON:  Good morning, Your Honor.  Janet

1   Henderson, Sidley Austin, on behalf of the Debtors.  Your

2   Honor, there were only two responses filed to the Depository

3   Motion.  One by the foundations, Cantigny Foundation and

4   McCormick Foundation, as an objection.  Essentially seeking to

5   have access to documents in the Document Depository, subject

6   to their adhering to the Order and signing the Acknowledgment,

7   which all of the parties will have to sign.  We have agreed to

8   add them as document -- excuse me, as Depository Designees for

9   that purpose and, thereby, resolved their objection.

10        A response was filed by the Credit Agreement Lenders,

11   represented by Mr. Bennett, who was initially seeking to have

12   additional parties within his group added as negotiating

13   parties, but he has since withdraw that objection.  So there

14   are no objections to the Proposed Form of Order that was

15   submitted after being circulated to all parties yesterday

16   afternoon, Your Honor.

17             THE COURT:  All right.  Does anyone else wish to be

18   heard in connection with this matter?

19        (No verbal response.)

20             THE COURT:  I hear no response.  Do you have a Form

21   of Order to bring me up?

22        (No verbal response.)

23             THE COURT:  Thank you.

24             MR. PERNICK:  Sorry, Your Honor.  That's the Fee

25   Order actually.  I will get -- I have the other one coming

1    also.  I apologize.

2          THE COURT:  All right.  All right.  The Fee Order

3    has been signed.  If there's anyone either present in the

4    courtroom or on the telephone who wishes to be excused,

5    understanding then that might have been your only interest,

6    you're free to drop off or drop out at this point.

7          MR. PERNICK:  Your Honor, item number 5, which was

8    the Tribune versus Beatty adversary status conference.  As

9    noted in the Agenda, we're going to be noticing a stipulated

10   order staying that adversary proceeding, so that is not going

11   forward today.  And the Court was kind enough to enter Orders

12   --

13         THE COURT:  Let me just add a little postscript.  If

14   it wasn't clear from the opinion that I wrote in connection

15   with that matter, parties might be wondering why didn't I just

16   dismiss the adversary given my decision on the relief from

17   stay and the answer is, I thought it was important to reaffirm

18   the jurisdictional principles with which the Court was faced.

19   By having done so, I recognize there, at least for now,

20   wouldn't be anything or much to do in connection with the

21   adversary.  So I think the agreement the parties have

22   described to me is an appropriate one.

23         MR. PERNICK:  Thank you, Your Honor.  The Court was

24   kind enough to enter Orders on the following matters:  Item

25   number 6, which was the LA Times assumption of the real

10

1   property lease.  Item number 7, which was the 7th omnibus

2   objection.  Item number 8, which was the 8th omnibus objection

3   and item number 9, which was the Motion to Sale the

4   Countryside, Illinois property.  And according to my records,

5   that then leaves us with item number 11, which is the status

6   conference on the Gutman Settlement Motion, and item number

7   12, which is the Committee's 2004 Motion with respect to

8   Merrill Lynch.

9          THE COURT:  All right.

10          MR. PERNICK:  And I think Mr. Kansa is going to

11   handle item number 11, Your Honor.

12          THE COURT:  Okay.

13          MR. KANSA:  Good morning, Your Honor.  Ken Kansa,

14   Sidley Austin, on behalf of the Debtors with respect to item

15   number 11 on the Agenda, which is the Debtors' Motion to

16   Approve a Settlement with respect to -- with the Estate of Dr.

17   E. Michael Gutman.  I believe this is just a status

18   conference, but with the Court's permission, I'll provide a

19   couple minutes of background on how we got here, and why we

20   are looking for a status and scheduling conference --

21          THE COURT:  Very well.

22          MR. KANSA:  -- today with the Court.  Your Honor,

23   this matter arises out of a pre-petition defamation action

24   filed by Dr. Gutman against four of the Debtors.  In that

25   defamation action, Dr. Gutman alleged that certain stories

1  that were published in the Orlando Sentinel were defamatory.

2  The action had proceeded in the Florida state courts for about

3  three years prior to the petition date last December, in which

4  -- and the Debtors had strongly disputed in that Florida

5  action, both the allegations that Dr. Gutman had made and

6  stood by the reporting that was in the Orlando Sentinel.

7      The matter first came before this Court on a Motion to

8  Lift the Automatic Stay filed by Dr. Gutman on April 9th of

9  this year, which sought leave for the trial in Florida to

10  proceed.  The Debtors objected to that Motion on several

11  grounds, most prominently two of them and that was, one, the

12  prejudice that resulted to the Debtors from the presence of a

13  $1 million self-insured retention with respect to this claim

14  on the Debtors' insurance.  And, two, the prospect that

15  litigating this matter would cost the Debtors up to an

16  additional $2 million in defense costs to get the matter to a

17  jury trial and then through what were likely to be several

18  appeals by whomever the disappointed party at the trial was.

19      The Court held the hearing on the Motion on June 30th of

20  2009, and at that time, the Court ordered a limited lifting of

21  the stay for two purposes.  One, to allow the Plaintiff's

22  claim to proceed to mediation and, two, if that mediation was

23  not successful, to allow for the setting of a trial date in

24  the Florida action with respect to the Gutman claims.  The

25  Court also indicated at the June 30th hearing, that if the

12

1  Motion did proceed to litigation, that it would likely be

2  litigated either in Florida or in the district court here in

3  Delaware.

4      The mediation, Your Honor, occurred on October 27th, 2009

5  and went in essence for an entire day, and at the end of that

6  mediation, I'm pleased to report that there was an agreement

7  reached that's reflected in the Motion between the Debtors,

8  the Gutman Plaintiffs and the Debtors' insurer on the terms of

9  a settlement of the Gutman actions.  We've summarized the

10 saving in terms of that settlement in the Motion, Your Honor,

11 but the basic points are that it calls for a payment by the

12 Debtors of $1 million within 20 days of the approval of the

13 settlement by the Bankruptcy Court, and the payment in

14 addition of $850,000 beyond that by the Debtors' insurer.  The

15 Debtors would receive a full release, including from any post-

16 petition claims that have been alleged or might be alleged in

17 the future by the Plaintiffs.  The Debtors then filed the

18 Instant Motion on November 11th to approve this settlement and

19 proceed to consummate it.

20     The Creditors' Committee has objected to the Motion, Your

21 Honor, on two basic grounds.  First, that the immediate

22 payment called for under the settlement should not be approved

23 and, second, that the Debtors have not carried their burden of

24 showing that the settlement is in the best interest of the

25 Debtors.

13

1    The Debtors and the Gutman Plaintiffs have filed

2    supplemental materials in the past couple of days.  The

3    Debtors have filed a Declaration of David Bralow, who for

4    several years was an assistant general counsel at Tribune

5    Company overseeing this action on behalf of the Debtors and

6    more recently is now a partner at a Florida law firm that has

7    continued to retain responsibility for this action on behalf

8    of the Debtors.

9    The -- Mrs. Gutman also filed a Response, a Reply to the

10   Committee's objection setting forth several arguments in favor

11   of the settlement as well.  We understand from discussions

12   since we filed the Motion, with both the Committee and with

13   counsel for Mrs. Gutman, that counsel for Mrs. Gutman would

14   like to put on live testimony in support of the settlement,

15   specifically, testimony of Mrs. Gutman.  The Committee has

16   indicated that prior to proceeding with any such live

17   testimony, they would like to depose Mrs. Gutman.  Given this

18   Court's proceedings regarding -- given this Court's procedures

19   regarding evidentiary hearings and the limited time we have

20   available to us today, when we spoke with chambers on Friday,

21   Your Honor, the -- our request was that this be moved to a

22   scheduling conference to permit the scheduling of an

23   evidentiary hearing, where Mrs. Gutman could provide testimony

24   in support of the settlement.  And before we turn to timing or

25   anything like that, with the Court's permission, I would ask

1  for counsel for Mrs. Gutman and counsel for the Committee to

2  address any issues they may have respecting this.

3          THE COURT:  All right.

4          MR. CORNELL:  Good morning, Your Honor.  Jason

5  Cornell, Fox Rothschild, on behalf of Donna Gutman

6  representative of the Estate of Dr. Michael Gutman.  Your

7  Honor, we have reviewed the Committee's objection, and

8  although we dispute the need to depose Mrs. Gutman, she was

9  deposed already by the Debtors on June 7th, 2009, we're not

10  going to stand in the way of that today, Your Honor.  We would

11  instead ask that time is important to our client and if the

12  Court's calendar would permit, that we set this up a final

13  hearing in the week of January 18th depending on the Court's

14  availability.

15          THE COURT:  All right.  Let me hear from the

16  Committee.

17          MR. DEUTSCH:  Good morning, Your Honor.  Doug

18  Deutsch, from Chadbourne and Parke, on behalf of the

19  Creditors' Committee.  Your Honor, one notation with respect

20  to Mr. Kansa's comments, that is we would also like to depose

21  David Bralow, who is the, I guess, attorney, the former

22  attorney for the Debtors, who was instrumental in reaching

23  this settlement.  I guess from a process standpoint, we would

24  like to depose the parties, and that's with regard to the

25  factual inquiry.  There's also a legal inquiry here.  We put

1  it in the pleadings.  You've seen some of the things -- some

2  of the steps may not be relevant with respect to the factual

3  end of it, if there is resolution on the legal end.  But we'll

4  proceed as set forth and provide the deposition and depose the

5  parties and come back to your court in the second week of

6  January if that's what's ordered.

7          THE COURT:  So that timing is okay with the

8  Committee?

9          MR. DEUTSCH:  It is.

10         THE COURT:  Bear with me.  How much time do you need

11 for a hearing?

12         MR. DEUTSCH:  A few hours, I would imagine, Your

13 Honor.  I mean, we'll object, I imagine on relevance and

14 probably depends how long the Judge wants to hear from the

15 witnesses.

16         MR. KANSA:  Your Honor, I can't imagine the Debtors

17 would need very much time at all.  We think this can proceed

18 fairly quickly, so I'll ask counsel for Mrs. Gutman.

19         MR. CORNELL:  I'll agree with that, Your Honor.  Two

20 hours I think would be sufficient for the issues raised in the

21 papers.

22         THE COURT:  Mr. Deutsch?

23         MR. DEUTSCH:  Two to three hours, Your Honor.

24     (Pause in proceedings.)

25         THE COURT:  Well, let me ask this:  What is the

16

1  present expectation of the parties with respect to the time

2  that has been set aside on the 21st for the (indiscernible)

3  Motion.  Is that so far as you know, at least as of today,

4  going forward?

5       MR. KANSA:  I believe that's going forward, Your

6  Honor.

7       UNIDENTIFIED SPEAKER:  Your Honor, I second that.  I

8  do believe that is going forward.

9       THE COURT:  And how much time do you think you'll

10  need for that?

11      MR. DEUTSCH:  I am not the point man on that but I

12  would imagine that it's going to be a day.

13      MR. KANSA:  Also not being the point man on the

14  Debtors' side, I would echo Mr. Deutsch's comments.  I think

15  that's from all understandings I have, likely to be a

16  considerable period of time.

17      THE COURT:  Well, not going to happen that week.

18  How about Thursday, January 28th?

19      MR. CORNELL:  Jason Cornell, Your Honor, that's

20  fine.

21      THE COURT:  Counsel available?

22      MR. KANSA:  That's agreeable with the Debtors, Your

23  Honor.

24      UNIDENTIFIED SPEAKER:  I'm sure that's fine, Your

25  Honor.

1          THE COURT:  All right.  Thursday, January 28th, at

2     10:00.

3          MR. KANSA:  Thank you, Your Honor.

4          MR. DEUTSCH:  Thank you, Your Honor.

5          MR. CORNELL:  Thank you, Your Honor.

6          THE COURT:  Normally, in a contested evidentiary

7     matter, I would ask for a Form of Pretrial Memorandum, but I'm

8     not sure that would be particularly helpful under these

9     circumstances.  Do counsel have a view about that?

10          MR. KANSA:  Your Honor, I won't speak for counsel

11    for Mrs. Gutman or for the Committee.  I don't believe the

12    Debtors think that would aid the Court here, and we certainly

13    don't think it would aid the parties either.

14          MR. CORNELL:  Likewise, Your Honor, we submitted a

15    Pretrial Memorandum prior to the Motion for Relief from Stay

16    that I think puts the factual records before the Court on many

17    of these issues, so I don't think one would be necessary as

18    well for the current Motion.

19          THE COURT:  Okay.  So I take it there are no

20    material disputed facts?

21          UNIDENTIFIED SPEAKER:  I don't believe there are,

22    Your Honor.  We've laid out our facts in a series of

23    Declarations.  Two that were submitted in connection with our

24    original objections, back in the April to June time frame, and

25    then more recently in the Declaration of Mr. Bralow, that was

1    filed with the Court, I believe, yesterday.

2         THE COURT:  Okay.  So are we going to have one or

3    two witnesses?

4         MR. KANSA:  My understanding right -- in support of

5    the Motion right now, Your Honor, the Debtors do not believe

6    we need to present a witness.  I understand that Mrs. Gutman

7    -- that the Gutman Plaintiffs intend to submit testimony from

8    Mrs. Gutman as a witness and I think what Mr. Deutsch has

9    articulated is he would like at least to depose Mr. Bralow in

10   connection with why the Debtors have entered into this

11   settlement, but beyond that, Your Honor, we would not intend

12   to offer Mr. Bralow as a witness at the hearing.

13       Your Honor, Mr. Pernick points out that if we do need,

14   however, to have Mr. Bralow available for cross, subject to

15   checking with his schedule, we can do that.

16        THE COURT:  Okay.  That's -- I would just like to

17   make sure counsel work that out ahead of time, and if they

18   can't, you'll reach out to me by telephone conference and

19   we'll address that issue.  I would also ask that any documents

20   purposed to be used as exhibits be, you know, exchanged ahead

21   of time and pre-marked.  And maybe if they can be the subject

22   of agreement for admissibility all the better.  To the extent

23   there's disputes about that, I'll resolve them at the hearing.

24        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

25        MR. DEUTSCH:  Thank you, Your Honor.  My only point

1    was going to be with respect to a pretrial order and

2    generally, that we're going to have some disputes over the

3    relevance of Mrs. Gutman to that hearing that day.  And I

4    think we can agree among ourselves about how to best deal with

5    that and come to the Court if we have any issues as opposed --

6           THE COURT:  I wouldn't expect to decide that issue

7    until the time of hearing, but if you wish to tee it up before

8    than, that's fine.

9           MR. KANSA:  Fair enough, Your Honor.

10          THE COURT:  Okay.

11          MR. KANSA:  Thank you.

12          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

13          MR. PERNICK:  Your Honor, back to item number 13, I

14   have the Certification of Counsel and a Form of Order for the

15   Court.

16          THE COURT:  Very well.  Thank you.

17       (Pause in proceedings.)

18          THE COURT:  That Order has been signed.

19          MR. PERNICK:  Thank you, Your Honor.  That leaves us

20   with item number 12, which is the Committee's Motion.

21          THE COURT:  Okay.  Now, counsel, let me just deal

22   with a couple things preliminarily if I may.  First, has there

23   been any, at least from the Committee's standpoint, narrowing

24   of the issues based upon the submissions?

25          MR. GOLDFARB:  Your Honor, not that will resolve the

1   Motion.  Just for the record, my name is Andrew Goldfarb.  I'm

2   with the Zuckerman Spaeder firm and we are special counsel to

3   the Creditors' Committee.

4           THE COURT:  Okay.  Now, let me also implore counsel.

5   We've already had preliminary discussions and the papers are

6   full of who's responsible for any delay.  What I would prefer

7   to focus on today and what I think would be more helpful to

8   the process is just understanding where are we now, what are

9   the legitimate needs of the Committee and what reasonably can

10  or should the Court impose in the way of production

11  requirements and timing of Merrill Lynch.

12          MR. GOLDFARB:  Understood, Your Honor.

13          THE COURT:  Okay.

14          MR. GOLDFARB:  I was not intending to go backward,

15  but to hopefully address the Court's questions about where we

16  are now.  And I think it was discussed somewhat at the

17  December 1st hearing, Your Honor, but where we're at basically

18  is that Merrill Lynch has yet to produce any of its e-mails

19  and the parties have begun to schedule substantive discussions

20  to try to resolve this dispute so that the -- so that a plan

21  can be developed and hopefully the matter can proceed.  In the

22  early January period, I think it's the week of January 11th,

23  that we're looking to start substantive negotiations, and our

24  concern is that our ability to advise our client is impaired

25  in those negotiations without the e-mails of Merrill Lynch,

1    which obviously was a critical party to the -- involved in the

2    (indiscernible) lending.  And so what we are asking the Court

3    for, we understand that Merrill Lynch has now proposed January

4    31st as a hard-end date for it's production.  Our concern is

5    that we receive e-mails and a substantial volume of the e-

6    mails sufficiently in advance of the substantive negotiations.

7    That we have a chance to actually review them and so that we

8    -- our views as those negotiations can be informed by what's

9    in the documents.  Our concern is based somewhat on how we've

10   gotten to this point is that the -- we look at a huge dump at

11   the very end of January, which will not serve our purposes,

12   which is why in our Motion, we've sought benchmark, you know,

13   time-period commitments that will guarantee that we'll get

14   some of the e-mails in in timely fashion.  And that's why we

15   set production start date, a request for 75 percent of the e-

16   mails to be produced by the end of the year and then a

17   completion by January 8th.

18           THE COURT:  All right.  Has the dispute over the

19   (indiscernible) of search terms to the employee been resolved?

20           MR. GOLDFARB:  I think at this point, the -- with

21   reservation of rights, we have agreed that there has been this

22   modest reduction in the number of search terms and -- so that

23   the size of the production at issue, I believe, again, at this

24   point in time, has been about 200 -- about 270,000 e-mails,

25   not the 330.  My numbers may be slightly off, but I think

1    that's approximately it.  And then, again, the -- with respect

2    to the custodian list, we have, again, with reservation of

3    rights, agreed to go forward with the custodian list as it

4    stands today with the 12 custodians.

5              THE COURT:  Okay.  Anything --

6              MR. GOLDFARB:  So it's really -- the timing of the

7    production is really of greatest concern to us, Your Honor.

8              THE COURT:  Okay.  Anything further?

9              MR. GOLDFARB:  Not unless the Court has further

10   questions.

11             THE COURT:  No.  Thank you.

12             MS. PRIMOFF:  Good morning, Your Honor.  Madlyn

13   Primoff of Kaye Scholer, LLP for Merrill Lynch.  We submitted,

14   to Your Honor's chambers and filed on the record in these

15   cases yesterday afternoon, an objection to the Rule 2004

16   Motion, together with a Declaration of Joseph Drayton, who's

17   here in court with me today.  I just want to make sure Your

18   Honor has received those papers.

19             THE COURT:  I have but have not had the opportunity

20   to review them in any depth.

21             MS. PRIMOFF:  Okay.

22             THE COURT:  I was in court most of the day yesterday

23   and otherwise occupied.

24             MS. PRIMOFF:  No, no.  That's fine, Your Honor.  The

25   Drayton Declaration summarizes the background, the history, of

Shea - Direct (proffered)

1  this matter beginning with our discussions back in June to

2  defer the e-mail production.

3          THE COURT:  Right.  And I don't --

4          MS. PRIMOFF:  Given that your Court --

5          THE COURT:  -- want to go back there.

6          MS. PRIMOFF:  Right.  And I understand that Your

7  Honor doesn't want to go into that, so I'll focus my remarks

8  on the period going forward.  And Merrill Lynch is now, only

9  in the last couple of days, well aware of the Committee's

10  desire to move on with plan negotiations.  There are

11  constraints in terms of exclusivity, but notwithstanding that,

12  we can only do what we can do.  I have with me today in court,

13  Ms. Jennifer Shea, who's the vice-president, specialist of

14  systems and data security with the Enterprise Management Group

15  for Bank of America Corporation.  As a result of the merger of

16  Bank of America and Merrill Lynch, Ms. Shea's group is

17  responsible for handling this investigation within Bank of

18  America Merrill Lynch.  And I can make a proffer, Your Honor,

19  if Ms. -- what Ms. Shea would testify to today regarding

20  Merrill Lynch's ability to produce the documents.

21          THE COURT:  Go ahead.

22          MS. PRIMOFF:  Thank you, Your Honor.

23      Ms. Shea would testify that she's responsible for

24  supervising the collection and processing of electronic data

25  in response to discovery requests and litigations and

Shea - Direct (proffered)

1  investigations of Bank of America.  She has oversight

2  responsibility for Merrill Lynch's e-mail production in these

3  Chapter 11 cases.  She has a degree in computer information

4  systems from Boston College in 2000.  After graduation, she

5  worked as a consultant at a software company named Gensim

6  *(ph)*, which is located in Massachusetts.  From November 2001

7  through October 2005, she was employed by SteelPoint

8  Technologies in Boston, performing technology support,

9  software training and consulting services.  In October 2005,

10  she joined the Corporate Information Security Group at Bank of

11  America in Charlotte and that group is now known as the

12  Enterprise Information Management Group.

13      Ms. Shea would describe the manner in which e-mail data

14  is collected and processed in response to discovery requests,

15  and the steps that her group took here in connection with the

16  e-mail discovery plan that was agreed to between Merrill Lynch

17  and the Committee back on October 26th.  Ms. Shea would testify

18  that this investigation has received the highest priority

19  within Bank of America Merrill Lynch of any non-regulatory

20  assignment.  She would testify that her group began to collect

21  e-mail data for this matter on October 30th, and that they have

22  continued on a daily basis since that time to pursue the steps

23  necessary to complete the e-mail production.  Given the

24  quantity of e-mails and attachments generated in accordance

25  with the e-mail discovery plan that was agreed to, it takes

Shea - Direct (proffered)

1  time to process the e-mail data.  Ms. Shea would testify that

2  based on her understanding of the e-mail discovery plan,

3  Merrill Lynch was required to collect e-mail data for 12

4  present and former employees of Merrill Lynch for a 31 month

5  time period beginning in June of 2006 through December 8,

6  2008.  She would testify that she understands that Merrill

7  Lynch was required to filter that e-mail data using the 40

8  search terms described in the e-mail discovery plan.

9      Ms. Shea would further testify that beginning on October

10  30th, her group started to collect the e-mail data for the 12

11  custodians.  She would further testify that the e-mails for

12  the 12 custodians are stored in an e-mail repository system

13  and can be retrieved by date range.  That repository system

14  preserves all of the e-mails at Merrill Lynch and the group

15  collected 215 gigabytes of e-mail data.  Ms. Shea would

16  testify that after the e-mail data for the 12 employees was

17  pulled from the repository system, it's copied electronically

18  to preserve a pristine set.  And after the copying, the data

19  is sent to the processing team at B of A to be loaded for

20  search term indexing, so that search terms can be applied to

21  the e-mails and the attachments.  Ms. Shea would testify that

22  in accordance with the electronic discovery plan, her group

23  filtered the e-mail data for the 12 custodians using the 40

24  search terms that had been set forth in the e-mail discovery

25  plan.

26

Shea - Direct (proffered)

1    She would testify that after application of those search

2  terms, the potential e-mail data was reduced from about 2.2

3  million documents to about 330,000 documents.  Ms. Shea would

4  testify that on December 2nd, her group further filtered the

5  330,000 documents, by excluding the 12 search terms that were

6  determined to be overly generic.  And those search -- that

7  further filtering yielded approximately 277,000 documents, so

8  the further filtering reduced the pool by 50,000 documents.

9  Ms. Shea would testify that on December 4th, her group began to

10  organize that proper e-mail set of 277,000 documents, in the

11  manner necessary for B of A Merrill Lynch's outside discovery

12  vendor, to start its review of the e-mails.  The work is being

13  completed by the outside discovery vendor on a rolling basis.

14    And on December 6th, Ms. Shea's group provided the outside

15  discovery vendor with e-mail data to start its review and it

16  will continue to do so until the outside discovery vendor has

17  received the entire proper e-mail set.  The discovery vendor,

18  Ms. Shea would testify, began its review of the e-mails on the

19  morning of December 7 and has been reviewing e-mails every day

20  since then.  The discovery vendor initially had 50 document

21  reviewers reviewing e-mails on a daily basis and has increased

22  the size of the review team to the maximum number of 30 to

23  ensure that the proper e-mail set can be produced by January

24  31.

25    Ms. Shea would testify that their discovery vendor also

Shea - Direct (proffered)

1    conducts a quality check of the work of its document reviewers

2    and resolves any technical issues that may arise along the

3    way.  That work, the quality control work and the technical

4    issues are completed on a rolling basis per custodian.  Ms.

5    Shea would testify that after the discovery vendor completes

6    its review and quality check on a per custodian basis, the e-

7    mails for each custodian are exported by her group.  The

8    purpose for of export process is to capture the native e-mail

9    file along with coding relating to the document review.  Ms.

10   Shea would testify, thereafter, the discovery vendor prepares

11   TIFF images of the responsive e-mails.  That work takes

12   approximately seven business days per custodian.  Ms. Shea

13   would testify that the TIFF images are sent to Kaye Scholar on

14   a rolling basis.  Kaye Scholar loads the TIFF images into

15   Concordance, which is a litigation review database, so that

16   Kaye Scholar can complete a second quality check of the

17   production and ultimately prepare a final production set.

18        Finally, Ms. Shea would testify that based on her group's

19   experience in collecting and processing e-mails, as well as

20   input from their discovery vendor, her group has determined

21   that they can commit to start the production of e-mails on a

22   rolling basis on December 29th and complete the production of

23   the proper e-mail set by January 31.  So that once the rolling

24   production is started on December 29th, the production will

25   occur periodically on a per custodian basis until January 31.

Shea - Direct (proffered)

1   Ms. Shea would testify that this commitment represents an

2   accelerated production schedule over and above their normal

3   and customary practices and requires significant resources and

4   effort to complete.  That's all I have in the way of a

5   proffer, Your Honor.

6           THE COURT:  All right.  Thank you.  Does anybody

7   wish to cross-examine Ms. Shea?

8           MR. GOLDFARB:  Your Honor, we would ask for the -- a

9   copy of the hard copy proffer and a brief opportunity to

10  review it to see whether cross-examination and the extent of

11  cross-examination that may be necessary.

12          THE COURT:  Ms. Primoff, is there a hard copy of the

13  proffer you can share with counsel?

14          MS. PRIMOFF:  Your Honor, we didn't file a

15  Declaration on the record.  I introduced a proffer, and I

16  don't have a Declaration that incorporates word for word the

17  proffer, so we prefer to stick with the proffer.

18          THE COURT:  Okay.

19          MR. CORNELL:  Your Honor, if I could request just a

20  brief recess, so I can confer with counsel and we can decide

21  how we want to --

22          THE COURT:  Five minutes.

23          MR. CORNELL:  -- proceed with respect to this.

24          THE COURT:  Five minutes.

25          MR. CORNELL:  Thank you, Your Honor.

Shea - Cross

1          THE COURT:  Court will stand in recess.

2      (Recessed from 10:48 a.m. to 10:58 p.m.)

3          THE CLERK:  All rise.

4          MR. GOLDFARB:  Your Honor, based on the proffer, we

5  do have some questions for the witness.

6          THE COURT:  All right.  Ms. Shea, please come

7  forward and be sworn in.

8               JENNIFER SHEA, WITNESS, SWORN

9          THE CLERK:  Please state your full name for the

10  record.

11          THE WITNESS:  Jennifer N. Shea.

12          THE CLERK:  Thank you.

13                    CROSS-EXAMINATION

14  BY MR. GOLDFARB:

15  Q.  Good morning, Ms. Shea.

16  A.  Good morning.

17  Q.  Could you state for the record again, please, where you're

18  currently employed?

19  A.  Bank of America.

20  Q.  Okay.  And when did you first get involved in the e-mail

21  production at issue in this Motion?

22  A.  I don't recall the exact date, but it was the end of

23  October of this year.

24  Q.  Okay.  And what were you given to understand was your

25  responsibility at that point?

Shea - Cross

1    A.   That we were to collect e-mails for 12 custodians and that

2    we would receive search terms to run against those custodians.

3    Q.   And who, at that point, instructed you to -- who were you

4    working with at Bank of America Merrill Lynch to undertake the

5    process?

6    A.   Members of the legal department and outside counsel.

7    Q.   And at that point in time, were you given any time frame

8    for when the production was scheduled to occur?

9    A.   I was not, no.

10   Q.   Are you the one that devised the production protocol?

11   A.   No, sir.

12   Q.   Okay.  How did -- explain a little bit about how the

13   process that was described in the proffer came to be the

14   process by which Merrill has processed its e-mail.

15   A.   Bank of America and now Merrill Lynch, our group is

16   responsible for the collection and processing of the data.  At

17   that point, once we've applied search terms or date range

18   filters to the data, we utilize a discovery review vendor to

19   do our first-tier review to cut down on time lines and to save

20   money on the overall review costs.  So that's how this case

21   ended up following that same process.

22   Q.   And at the outset of the process, how many reviewers did

23   the outside vendor engage?

24   A.   Fifteen.

25   Q.   And counsel for Merrill indicated that it was 50, but just

Shea - Cross

1    so the record is clear, there was initially 15; is that

2    correct?

3    A.   Yes.

4    Q.   Okay.  And how long did these 15 reviewers work before the

5    number was increased?

6    A.   They worked from December 7th until December 14th, at which

7    point the number had increased to 30.

8    Q.   And so the reviewers only began reviewing the first stage

9    of review on December 7th; is that right?

10   A.   Yes.

11   Q.   And at that point it was the initial 15; is that right?

12   A.   Yes.

13   Q.   And at what -- what happened -- what was occurring during

14   the period from late October, when you were first given this

15   project to -- that caused no review to occur from the outside

16   vendors who were doing the first-cut review on December 7th.

17   A.   The process that our team follows, the Bank of America

18   Group, we collect data from the Merrill e-mail repository

19   system.  We copy the data over to the bank's network to create

20   a pristine copy.  We do a QC at that point, and then we load

21   the data into processing software prior to review.  So at the

22   point that it's loaded into the processing software, the

23   data's de-duplicated by custodian and prepared for review by

24   running the search terms.  So during the course of the time in

25   between the initial data collection, that's what was

Shea - Cross

1  occurring, the collection and processing of the data as well

2  as the migration into the Bank of America servers.

3  Q.  Okay.  Just one second.  Looking at the situation as it

4  exists today, Ms. Shea, are you working full-time on this

5  matter?

6  A.  Can you clarify?

7  Q.  Well, are there other -- is Merrill Lynch involved in

8  other productions in which you and this project team are also

9  working?

10  A.  Yes.

11  Q.  Okay.  Can you give me some sense of what those other

12  projects that are ongoing are or just their size or their

13  stage relative to this one?

14         MS. PRIMOFF:  Object to the extent that requires

15  disclosure of either attorney/client privilege information or

16  trade secrets type information.  I have no objection to Ms.

17  Shea responding in a generic fashion without mentioning matter

18  names.

19         THE COURT:  All right.  Respond as you can within

20  those prescriptions.

21         MR. GOLDFARB:  That's fine.  Thank you, Your Honor.

22         THE WITNESS:  We are working on other regulatory

23  investigation and litigation matters at this time.

24  BY MR. GOLDFARB:

25  Q.  Now, it's my understanding that when the outside initial

Shea - Cross

1   review occurred there were ten reviewers assigned to the

2   outside review; is that correct?

3   A.   I believe the number was 15.

4   Q.   Okay.  And 15 is your understanding is what it started

5   with?

6   A.   Yes.

7   Q.   Okay.  So what I'm trying to understand is whether or not

8   there's a way in which you and your colleagues could

9   accelerate this production.  So, for example, if you were to

10  only work on this e-mail production full-time with you and

11  your team is that -- could the production be accelerated?

12  A.   There are a variety of factors that affect the time line.

13  Adding additional resources at different phases simply pushes

14  the bottleneck from one phase to another.  So the addition of

15  the 30 reviewers will accelerate the first-tier review, but it

16  will not significantly decrease the first date of production

17  and the final date of production.  Increasing that number

18  beyond 30, also does not slash the time in half or have what

19  would seem to be predictable results.  What will happen is the

20  data will still take the same amount of time to be TIFFed and

21  to be second-tier reviewed.  We may shave off a day or two at

22  the end.  It won't significantly decrease the January 31st

23  deadline.

24  Q.   Okay.  But when you say significantly, do you have any

25  estimate based on your experience and your involvement in this

34

Shea - Cross

1   project, if your resources were dedicated at the outside

2   vendor phase, how much more quickly would you be able to at

3   least complete that phase of the review?

4   A.   To complete that phase of review or to complete final

5   production?

6   Q.   Well, my understanding from the proffer offered by counsel

7   from your testimony is that there are various stages of the

8   production.  And what I'm trying to understand is there is a

9   -- what you just testified is a bottleneck in terms -- at the

10  outside vendor because the addition of -- the adding of

11  additional viewers, will not speed the ultimate production; is

12  that right?

13  A.   Yes.

14       MS. PRIMOFF:   Objection.  He (indiscernible) to

15  characterize the testimony.  She testified that the bottleneck

16  occurs after the review by the outside vendor.

17       THE COURT:   Well, the question's been asked and

18  answered.  Press on.

19       MR. GOLDFARB:   Okay.

20  BY MR. GOLDFARB:

21  Q.   So my question to you Ms. Shea is how -- before it gets to

22  the second-tier review and final production, my question is if

23  additional reviewers were added, how much more quickly could

24  the outside vendor complete its first-tier review?

25       MS. PRIMOFF:   Objection.  It's irrelevant if it

Shea - Cross

1  doesn't result in a faster production of the e-mails.

2       THE COURT:  Overruled.  Answer if you can.

3       THE WITNESS:  I don't know the answer to that.

4  BY MR. GOLDFARB:

5  Q.  The proffer indicated that there was a maximum of -- the

6  current number of vendors which is -- reviewers, excuse me,

7  which is 30 is the maximum, do you recall counsel's proffer on

8  your behalf saying that 30 was the maximum?

9  A.  It significantly increases our average, which is between

10 10 and 15.

11 Q.  I don't understand what that response -- what do you mean

12 by that?

13 A.  It's -- I don't recall that that was listed as a maximum.

14 Q.  Okay.  Could there be additional reviewers beyond 30 added

15 to this first-tier review?

16 A.  Yes.

17 Q.  Okay.  And if additional reviewers were added the

18 production -- that phase of the production would be completed

19 more quickly, correct?

20 A.  That phase of the process would be completed more quickly.

21 Again, it would immaterially affect the final production date.

22 Q.  Okay.  And is that because there's then a (indiscernible)

23 resources to accelerate the production at the next phase of

24 review?

25 A.  There's the processes that happen after the first-tier

36

Shea - Cross

1  review are significantly either machine intensive or people

2  intensive.

3  Q.  Okay.  So in terms -- let's take them one at a time.  In

4  terms of machine intensive, what has to be done after the

5  first-tier review to accomplish those machine based tasks?

6  A.  We receive an export request per custodian and our team

7  performs the export request and burns the data to turn over

8  back to the discovery vendor for TIFFing.

9  Q.  Okay.  And for a typical custodian that you've -- excuse

10  me, you've look at 12 custodians so far?

11  A.  Yes.

12  Q.  How long does the process, machine processing for one

13  custodian take?

14  A.  That's volume dependent.

15  Q.  Okay.  Have you completed that phase for any of the

16  custodians?

17  A.  No.

18  Q.  Have you started that process for any of the custodians?

19  A.  No.

20  Q.  When do you anticipate even -- does this machine process

21  have to occur before the second-tier human review occurs?

22  A.  Yes.

23  Q.  Okay.  When, at this point, would you anticipate beginning

24  that first machine processing for the first custodian?

25  A.  It typically takes two weeks from the start of the review

Shea - Cross

1  to receive the first export request and typically takes seven

2  days after that for the full TIFF set to be delivered.

3  Q.  But it's volume dependent, so --

4  A.  Right.

5  Q.  Okay.  Just to clarify, can you explain what a export

6  request is, please?

7  A.  Yes.  An export request comes into the Bank of America

8  Group when full first-tier review has been completed on that

9  set.  We turn over the native data as well as the coding that

10  was done during the course of a first-tier review.  And we

11  turn that data over to our TIFFing vendor.

12  Q.  And then, as you've testified, you said it typically takes

13  seven days to go through the machine processing, correct?

14  A.  Typically, yes.

15  Q.  Okay.  Can that be accelerated?

16  A.  That is something we've explored.  I don't believe it can

17  be expedited on this matter, no.

18  Q.  Why not?

19  A.  There's different phases of the TIFFing process that we

20  need to -- the way the data needs to be matched up after a

21  first-tier review, so that the second-tier review can be

22  completed expeditiously.  We need to take the time at the

23  TIFFing phase in order to not take the time at the second-tier

24  review phase.

25  Q.  What's happening during that seven-day machine phase that

Shea - Cross

1   couldn't be accelerated by either the addition of more

2   machines or more directors or some other point in the process?

3   A.   The data processing time cannot change.  More machines

4   typically does not accelerate a single custodian's individual

5   processing.  In terms of the QC and data mapping phases, that

6   could potentially be accelerated for later custodians, but not

7   for the first handful of custodians?

8   Q.   And why not for the first handful of custodians?

9   A.   It's better to take the time to develop an appropriate

10  process at the beginning rather than after having processed

11  all of the data.

12  Q.   But from your earlier testimony, you haven't begun

13  processing the data for any of the custodians, so why can't

14  you do it at this point and increase the -- or change the

15  protocol to accelerate that first phase of machine processing?

16  A.   I don't think I understand the question.

17  Q.   Well, it was your testimony earlier that you haven't begun

18  the machine processing for any of the 12 custodians, correct?

19  A.   Correct.

20  Q.   So why can't you institute an accelerated machine

21  processing protocol for custodian one?

22  A.   As I said, there's no way to accelerate the machine time.

23  The data mapping needs to be done when we have the data to

24  map, so we're not able to develop a protocol for that until we

25  have the data to map.

Shea - Cross

1   Q.  Okay.  So -- but there -- you also said that in terms of

2   this machine phase there is a human component -- a processing

3   -- a human processing component to that, correct?

4   A.  Yes.

5   Q.  Okay.  Since you haven't done that for any of the

6   custodians, why can't that human component of the processing

7   be modified to accelerate completion of this machine phase?

8   A.  The human component is dependent on the data.  What the

9   human does is dependent on what the data is.

10  Q.  But that data hasn't begun -- I don't know if there's a

11  disconnect between what you're saying and what I'm asking, but

12  if none of the data has been processed yet, why can't that

13  adjustment occur for the first custodian?

14  A.  There is a disconnect.  What needs to happen in the next

15  phase, needs to start at time zero.  TIFFing cannot start

16  until we have the export request.  The entire TIFFing process

17  occurs within its own bubble.

18  Q.  Has the TIFFing process started for any of the custodians?

19  A.  No.

20  Q.  So, again, why aren't we at time zero for custodian one if

21  none of that processing has occurred?

22  A.  Perhaps I'll take a step back.  The first-tier review has

23  to occur, then the export request, then the TIFFing.  We've

24  begun first-tier review across all of the custodians.  As soon

25  as a full custodian is first-tier reviewed, we will receive an

Shea - Cross

1  export request.  At that time, TIFFing can start.

2  Q.  Okay.  But you haven't received an export request for any

3  of the custodians; is that right?

4  A.  Correct.

5  Q.  Okay.  Well, I guess my first question's why?  Why have

6  you not received an export request for any of the custodians?

7         MS. PRIMOFF:  Objection.  Calls for speculation.

8         THE COURT:  You may answer if you know.

9         THE WITNESS:  It would be speculation.

10  BY MR. GOLDFARB:

11  Q.  Are you involved in -- as a liaison with the vendor that's

12  doing the first-tier review?

13  A.  Tangentially only.

14  Q.  Okay.  Who's -- do you supervise the person who's involved

15  with acting as a liaison to the vendor that's conducting the

16  first-tier review?

17  A.  Not in an official capacity, no.

18  Q.  Do you know where in the first-tier review stage the

19  vendor is for any of the custodians?

20  A.  I do not.

21  Q.  Do you -- have you received any reports about when you

22  would expect to have the first export request for the first

23  custodian?

24  A.  No.

25  Q.  Do you have any time frame -- do you have any sense of any

Shea - Cross

1  time frame at all as to when that export request is going to
2  occur for the first custodian?
3  A.   It will typically, and I believe the plan for this case,
4  is that it will happen two weeks after the start of review and
5  reviews starting on the 7th, could mean that we would receive
6  an export request next week, but that is speculation.
7  Q.   Okay.  But, again, from your earlier testimony -- just one
8  more question.  The export request comes from whom and goes to
9  whom?
10 A.   Comes from the discovery vendor and goes to the Bank of
11 America Group.
12 Q.   Okay.  So if you're saying it's typically a two-week time
13 period, but that's depending on the number of reviewers.  If
14 the number or reviewers were increased at the tier-one review,
15 the export request would come sooner in time, correct?
16 A.   Potentially, the -- there are administrative tasks that
17 occur during the course of a review that require time as well
18 other than the reviewer time spent reading the documents.
19 Q.   Okay.  But it's been your testimony, has it not, that
20 increasing the number of reviewers from 15 to 30 for the tier-
21 one reviewers, would increase -- excuse me, would decrease the
22 total review time, correct?
23 A.   It will decrease the review time, yes, not the QC time and
24 the technical issue clearing.
25 Q.   Okay.  And if you increase -- and if you were to increased

Shea - Cross

1  it above 30, from 30 to 50, from 50 to 60, the same -- there

2  would be a further decrease in that front end tier-one review,

3  correct?

4  A.  Yes.

5  Q.  Okay.  Has anyone made the request to the vendor to

6  increase the number of viewers beyond 30?

7  A.  No.

8  Q.  Okay.  Then you referred to a QC process, right?  That

9  also happens at the tier-one phase before the export request

10  occurs, correct?

11  A.  Yes.

12  Q.  That is a human process, correct?

13  A.  Yes.

14  Q.  How many people are involved in the QC process currently?

15  A.  I don't know the answer to that.

16  Q.  Are the -- do you know whether the QC people are a

17  bottleneck because the review is happening at a pace that the

18  QC can't occur fast enough to keep up with the review?

19  A.  I don't know the answer to that.

20  Q.  In your experience, based on the work that you've done, if

21  you were to increase the number of people doing the QC at the

22  tier-one review, would that increase the speed of the tier-one

23  process and cause an export review to -- an export request to

24  occur sooner in time?

25  A.  I don't know the answer to that.

43
Shea - Cross

1  Q.  Is there someone on your team that would know the answer
2  to that?
3  A.  I believe the discovery vendor would have the answer to
4  that.
5  Q.  Do you know whether anyone at Merrill Lynch has explored
6  the possibility of speeding all aspects of this tier-one
7  review, so that the export request can occur sooner in time
8  and, therefore, you can move on to the next phase of the
9  review?
10  A.  We have explored options.  The Bank of America team has
11  explored options and, again, have come to the conclusion that
12  adding additional resources at the beginning end of the
13  process simply creates bottlenecks at the other portion of the
14  process and will not significantly impact the January 31st,
15  2010 final production date.
16  Q.  Okay.  But -- so the phase-one process is what it is?
17  A.  Um-hmm.
18  Q.  And you don't -- your testimony's been you don't know
19  whether adding resources to the phase-one process would result
20  in an export request coming sooner, right?
21  A.  Correct.
22  Q.  Okay.  So now, the next bottleneck that you've suggested
23  might exist is at the phase of the machine processing before
24  we get to tier two, right?
25  A.  Correct.

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880

Shea - Cross

1  Q.  And you've said that the machine processing -- that the

2  machine aspect of the processing cannot be speeded up because

3  of the processes -- the electronic processes that have to

4  occur, right?

5  A.  Correct.

6  Q.  And you say that has to be seven days -- a typical seven

7  days for a custodian.  That hasn't happened -- an export

8  request for any of the custodians hasn't happened yet, but

9  whenever you get that that's a hard seven days, right?

10  A.  Yes.

11  Q.  There's no way to speed that processing beyond -- to be

12  shorter than the seven-day period; is that your testimony?

13  A.  Yes.

14  Q.  And then, there's also in this -- at this phase, before

15  you get to tier-two review, there's also a human component to

16  this processing, right?

17  A.  Yes.

18  Q.  Okay.  Is it your testimony that that's a bottleneck?

19  A.  I would be speculating.

20  Q.  Okay.

21  A.  I don't compute that work (indiscernible).

22  Q.  Okay.  Do you know how many people are waiting for the

23  export request to occur for the machine phase of the

24  processing to occur, so that when it gets to them, they're

25  ready to go?  How many -- do you know how many people are

Shea - Cross

1  assigned to that job at this point?

2  A.  I don't understand the question.

3  Q.  Well, when the machine -- I'll rephrase.  When the machine

4  aspect of this processing that you've described is done, it

5  goes to a human phase before the tier-two reviewers, correct?

6  A.  Yes.

7  Q.  My question is, how many people at that human phase are

8  just waiting for the information to come in so that they can

9  do their processing?

10  A.  That I don't know.

11  Q.  Who's responsible for setting up that team of people?

12  A.  The discovery vendor.

13  Q.  Is this the same discovery vendor that's overseeing the

14  tier-one reviewers?

15  A.  Yes.

16  Q.  And do you know whether there's been any discussion about

17  increasing the resources available at that phase, so that when

18  those people eventually get the data, they can accelerate what

19  they need to do?

20  A.  I don't know.

21  Q.  Okay.  And then, after they're done their processing, then

22  it goes to tier-two review; is that correct?

23  A.  Yes.

24  Q.  Okay.  Do you know how many people are assigned at this

25  point -- the team that's assigned to conduct that tier review,

Shea - Cross

1  how large is that team?

2  A.  I don't know.

3  Q.  Do you know if any thought has been giving about how many

4  people that -- about how many people should be assigned to do

5  that task?

6  A.  I don't know.

7  Q.  In a -- are you -- in any of your other projects, are you

8  ever involved in overseeing or -- in overseeing the tier-two

9  review?

10  A.  Overseeing how?

11  Q.  Well, who conducts the tier-two review?

12  A.  It's typically completed by outside counsel.

13  Q.  Do you confer, without obviously getting into the

14  substance of communication, do you confer with outside counsel

15  about how to structure that tier-two review process?

16  A.  No.

17  Q.  And without revealing the substance of any communications,

18  have you -- in this matter, have you been involved in any --

19  privy to any discussions or communications about how the

20  outside counsel intends to staff and structure its tier-two

21  review?

22  A.  No.

23  Q.  If you were to -- if -- well, let me step one back, you

24  said that you're not working full-time on this matter,

25  correct?

47

Shea - Cross

1    A.   Correct.

2    Q.   Do you know if -- are the people at the outside vendor who

3    are working on this matter, are they working on this matter

4    full-time?

5    A.   The reviewers, yes.

6    Q.   Okay.  Are there other staff people at the outside vendor

7    that are working on -- that are not working on this full-time?

8    A.   I don't know.

9    Q.   Do you have any sense as to the magnitude of other

10   projects that are going on at the outside vendor?

11   A.   Yes.

12   Q.   Do you have any ability to influence the resources that

13   are given to this project at the front end in that tier-one

14   review to accelerate the issuance of an export request?

15   A.   No.

16   Q.   Why not?

17   A.   Influence, yes.  I believe I misunderstood the question.

18   Influence, yes.  I don't -- I'm not personally responsible for

19   putting bodies at computers.

20   Q.   Right.  But it's your understanding that if Merrill Lynch

21   were to request that the vendor add resources, that could

22   occur?

23   A.   Yes.

24   Q.   Okay.  Stepping now to kind of maybe where we need to get

25   to, you've understood that we are trying to get to a point

Shea - Cross

1  where by mid-January, the party's going to engage in
2  substantive negotiations, correct?
3  A.  Yes.
4  Q.  From the proffer indicated by counsel and from your
5  testimony, the first production is set to occur on December
6  29th or 30th, right?
7  A.  Yes.
8  Q.  Okay.  Based on your understanding of the process, and the
9  various pieces of the -- either the -- the various components
10  is there a way to accelerate that?  If you were setting up the
11  system to get out custodian one as quickly as possible, how
12  would that be -- where in the process would you be able to
13  make the changes and how quickly could that be -- how quickly
14  could custodian one be produced?
15  A.  We've explored the various ways to get custodian one out
16  more quickly, and we've come to the soonest we can get
17  custodian one out is December 29th or 30th of this year.
18  Q.  And is there a schedule by which the -- that you are aware
19  of for the production of particular -- for the collections of
20  particular custodians?  Is that already planned out.  Sort of
21  the order of the custodians?
22  A.  Are you asking if there's a ranking of the custodians?
23  Q.  Yes.  Is there one custodian that you're focusing on
24  first?
25  A.  That I don't know.

Shea - Cross

1  Q.  Okay.  And, again, can you clarify at this point, for

2  custodian one, the first -- whoever -- whatever is far -- is

3  the furthest along in the process, where are those documents

4  currently?

5        MS. PRIMOFF:  Objection.  Asked and answered.

6        THE COURT:  Sustained.  Mr. Goldfarb, I don't know

7  how many ways you can ask the question.  I know you may feel

8  as if Ms. Shea is not as helpful as you'd like her to be, but

9  I think you've covered all that needs to be covered.

10        MR. GOLDFARB:  Let me just confer with counsel and

11  I'm in general agreement, Your Honor.

12        THE COURT:  All right.

13        MR. GOLDFARB:  Last couple of questions, Your Honor.

14  Thank you for your indulgence.

15  BY MR. GOLDFARB:

16  Q.  The -- if we were to work with Merrill Lynch counsel to

17  identify particular custodians, are you -- would you be able

18  to order the process to produce custodians in a particular

19  order, if there are priorities identified by the Committee?

20  A.  Yes.  Caveat being I don't know how that would -- given

21  that we have two weeks or 15 days before the first production,

22  I don't know that it would affect the first production, but it

23  could be sped up so that the additional, the supplementary

24  productions, would appear in the order that (indiscernible).

25  Q.  Okay.  But you -- so there is a particular custodian who's

Shea - Cross

1  furthest along in his or her collection such that you can --
2  it's your intention to produce the first set of materials on
3  December 29th or December 30th, right?
4  A.  I don't know for certain, but typically, yes.  There would
5  be a focus on a particular custodian.
6  Q.  Okay.  And --
7  A.  We do roll by custodian.
8  Q.  And thereafter -- I mean, as you've heard, what we're
9  interested in being able to get documents in as quickly as
10 possible.  So what is your expectation or your intention with
11 respect to final production for the 12 custodians if you begin
12 on December 29th.  How frequently -- my question is how
13 frequently are we going to be getting productions for these
14 various custodians?
15 A.  I don't know the answer to that; however, there would be
16 rolling production, not December 29th, January 30th.  There
17 would be full on rolling production throughout the course of
18 January.
19 Q.  But does that mean -- can you provide any more information
20 about that?  Is it for set particular days that we can expect
21 productions?  Our concern obviously is that we not -- that
22 everything not slide to January 29th, where we get a huge
23 production, so we --
24      MR. GOLDFARB:  Our concern, Your Honor, has been
25 that we get a -- that the rolling production means we're

Shea - Cross

1  getting substantial productions from the get go.

2       MS. PRIMOFF:  Well, objection.  It calls for

3  speculation.  The witness has testified, there will be rolling

4  productions and there will be, but the exact timing of the

5  rolling production is dependent on the responsiveness of the

6  documents contained in the materials being reviewed, and she

7  would be speculating.  The materials haven't been reviewed, so

8  she can't possibly know how responsive they are.

9       THE COURT:  Well, Ms. Primoff, I will say, Mr.

10  Goldfarb finally, in his own way, is getting to a question

11  which I think is very relevant.  So I'd like the witness to

12  have the opportunity to answer if she can.  Do you understand

13  the question?

14       (No verbal response.)

15       THE COURT:  The question is, when document

16  production begins on the 29th and extends over almost a five-

17  week period based on the time frames that you've mentioned,

18  are documents -- are about the same number of documents going

19  to be produced every week or with whatever frequency they're

20  produced or is the production -- will it come out unevenly for

21  whatever reason, if you know?

22       THE WITNESS:  I don't know.

23  BY MR. GOLDFARB:

24  Q.  Is there anyone else who you're working with that has any

25  better information than you about what the timing and volume

Shea - Cross

1    of expected production will be?

2    A.   No.   Until we know the responsiveness, we won't know the

3    volumes, in which case, we won't know if certain custodians

4    will have a very limited number of documents or certain

5    custodians will have a very high number of documents.

6    Q.   Okay.   But at this point, based on the earlier testimony,

7    you have a general sense of the total volume of documents

8    currently under discussion, about 277,000, correct?

9    A.   Correct.

10   Q.   Okay.   Just one second.

11        MR. GOLDFARB:   Thank you, Your Honor.   We don't have

12   further questions.

13        THE COURT:   Thank you.   Let's pass on redirect, but

14   I'll ask Ms. Shea to remain on the witness stand just for a

15   moment just in case.   Frankly, I think I've heard enough.   And

16   what I'm inclined to order and then to do is the following and

17   have counsel confer and embody in a Form of Order, the time

18   frame in granting the Motion of the Committee to provide the

19   time frame that's been suggested now by Merrill Lynch for the

20   production of documents.   And it is a time frame, I will tell

21   you, to which I intend to hold Merrill Lynch.   Assuming that

22   the parties have, as they indicate, addressed the issues of

23   numbers of custodians and search terms, I'd like those

24   embodied in the order as well.   And we're going to come back,

25   I think, about halfway through the process for a status

Shea - Cross

1    hearing, because there is uncertainty about the frequency with

2    which production will be made.  I am sensitive to the

3    Committee's concern that there would be what's been

4    characterized as a dump at the end of the period, so I'm going

5    to set a status hearing for January 14th at 3:30 in the

6    afternoon.  If it turns out that things are going swimmingly

7    and there's not much to argue about, we can do that by

8    telephone; however, to the extent there is to be either

9    testimony or extensive argument about how the process is

10   going, I would like the parties to appear in person.  I'd also

11   like and will direct as part of this process, that the parties

12   consult to the extend that the Committee wishes to rank the

13   order in which custodians are considered and put through the

14   process.  Merrill Lynch should accede to those requests.  Now,

15   understanding it may speed up or slow down the process,

16   depending upon the ranking, based on what I'm hearing, so that

17   largely will be the Committee's choice in terms of who goes

18   first and what impact that has on the timing of the process.

19   But I do want the parties to confer and will direct that the

20   Committee be given its preference, but there may be a price

21   for that, so -- but I leave that to you to work out.  And to

22   the extent others, other than Ms. Shea, need to be consulted

23   in connection with nailing down this process, I ask that

24   Merrill Lynch cooperate in making those folks available to the

25   Committee, so that those decisions can be reached quickly, so

54

1   that we can embody this in an order and move forward in

2   accordance with the schedule.  Are there any questions?

3         MS. PRIMOFF:  No questions, Your Honor.  Just a

4   statement.  We do know how many documents there are for each

5   of the 12 custodians, and we're happy to share that

6   information with the Committee.  We also know that it takes

7   based on the witness's testimony and our discussions with the

8   client, that it takes less time to process the custodians with

9   the smaller number of documents, and we're happy to make all

10  of that information available.  I believe that the process is

11  well underway for four of the custodians.  I'm not sure which

12  four, but we'll figure that out and share that information.

13        THE COURT:  Okay.  Any questions?

14        MR. GOLDFARB:  No, Your Honor.

15        THE COURT:  All right.  Ms. Shea, thank you for your

16  testimony.  You may step down.

17     (Witness excused.)

18        THE COURT:  All right.  I'll ask counsel to confer

19  and embody that result in a Form of Order to be presented. If

20  there any disputes about what should go in the Form of Order,

21  please reach out to me by conference telephone.  Okay.

22  Anything left for today?

23        UNIDENTIFIED SPEAKER:  Nothing, Your Honor.  Thank

24  you.

25        THE COURT:  All right.  Thank you all very much.

55

1   That concludes this hearing.

2        (Court adjourned at 11:44 p.m.)

3                        CERTIFICATE

4        I certify that the foregoing is a correct transcript

5   from the electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8    _/s/April J. Foga_____        December 21, 2009
    April J. Foga, CET, CCR, CRCR
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25