**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TRIBUNE COMPANY, *et al.*, | : | Case No. 08-13141 (KJC) |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | **Requested Hearing Date: January 27, 2010 at 10:00 a.m.** |
| | : | **Requested Objection Deadline: January 22, 2010 at 4:00 p.m.** |
| | : | |

**MOTION OF WILMINGTON TRUST COMPANY
FOR APPOINTMENT OF AN EXAMINER PURSUANT TO
SECTION 1104(c) OF THE BANKRUPTCY CODE**

Pursuant to Sections 1104(c)(1) and (2) of title 11 of the United States Code (the "Bankruptcy Code"), Wilmington Trust Company ("Wilmington Trust"), Successor Indenture Trustee for the Exchangeable Subordinated Debentures due 2029 in the aggregate principal amount of approximately $1.2 billion (the "PHONES") issued in April 1999 by Debtor Tribune Company ("Tribune" and, together with its Chapter 11 affiliates, the "Debtors"), by and through its undersigned counsel, hereby moves this Court for entry of an order directing the appointment of an examiner. In support of this motion (the "Motion"), Wilmington Trust relies upon the Declaration of Robert J. Stark, dated January 13, 2010, and further states as follows:

**PRELIMINARY STATEMENT**

1.      Wilmington Trust is a member of the Official Committee of Unsecured Creditors appointed in the Debtors' Chapter 11 cases (the "Official Committee"). As a result, Wilmington Trust has learned that the Debtors' estates hold very significant causes of action against multiple prospective defendants, including current and former members of the

1

Official Committee, arising from Tribune's 2007 leveraged buy-out ("LBO") transaction. Those causes of action include, but are not limited to, claims for fraudulent conveyance, breach of fiduciary duty, aiding and abetting the same, and equitable subordination.

2.      From 1847 onward, Tribune had been known as an innovator and a leader, growing from its roots as the market-leading Chicago newspaper into emerging opportunities in new media, taking significant market share in radio, television, and more recently, the Internet.  During this storied history, Tribune had a sensible capital structure. In 2007, however, that capital structure was turned upside down.

3.      On April 1, 2007, the Board of Directors (the "Board") of Tribune approved a complex LBO transaction orchestrated by Samuel Zell ("Zell"), a Chicago-based real estate investor, who was appointed Chief Executive Officer and Chairman of the Board on December 10, 2007.   The LBO proposed a strange cure for the adverse business environment for media companies:  taking on enormous debt.  As implemented, the LBO left Tribune saddled with an incremental *9 billion dollars* in additional debt (the "LBO Debt").   The funding for the LBO was provided by J.P. Morgan Chase, N.A. ("J.P. Morgan"), Merrill Lynch & Co. ("Merrill"), Citicorp North America, Inc. ("Citi"), Bank of America, N.A. ("Bank of America"), and Barclays Bank, PLC ("Barclays") (collectively, the "LBO Banks"), under advice given by investment bankers J.P. Morgan, Merrill, Citi, Morgan Stanley & Co., Incorporated ("Morgan Stanley"), Bank of America, and Barclays (collectively, the "LBO Advisors") and for the benefit of Zell (collectively, the "LBO Parties").

4.     The risk of this transaction largely fell on the shoulders of the existing bondholders (the "Pre-LBO Bondholders"), who found themselves swamped by $11.8 billion in structurally senior bank debt.  The Pre-LBO Bondholders are owed some $2.4 billion under issuances from the 1990s, including over $900 million held by the PHONES.

5.     After the LBO, Tribune ceased being a media company and became a debt service vehicle administered for the benefit of the LBO Banks.  In addition to the enormous interest rate burden, conservatively estimated at $332 million dollars annually, Tribune found itself battered by economic headwinds that ravaged its core media businesses.  As described in greater detail in the Affidavit of Chandler Bigelow III (D.I. 3), who is the Chief Financial Officer of Tribune, Tribune's financial condition promptly deteriorated following the LBO – operating cash flow fell 33% and core advertising revenues plummeted 18%.  Previously, Tribune had withstood several comparable challenges, leveraging its considerable resources and institutional knowledge to develop valuable properties as television, radio, and the Internet undermined its core newspaper business.  This time, however, relief was unavailable – buried in debt, the Debtors could only look forward to a future of looming maturities and crushing interest rate payments.

6.     Against this backdrop, the Debtors sought relief from this Court, driven into Chapter 11 by the sheer magnitude of their LBO Debt.  Absent the LBO Debt, the Debtors would not be in bankruptcy.  The Debtors continue to run a business that, albeit hobbled, promises to continue to play a meaningful role in the lives of the American media consumer.  However, the prospects for the Debtors' unsecured creditors, and particularly its Pre-LBO Bondholders, including the PHONES, are bleak.

7.      As of the petition date, the Pre-LBO Bondholders held some reason for optimism.  The LBO was the subject of considerable public scrutiny and was viewed as potentially fertile ground for the investigation, development, and assertion of litigation claims that could lead to a meaningful recovery.  Indeed, the LBO appears to be a textbook example of a fraudulent conveyance, for which any recovery would directly inure to the benefit of creditors whose claims predate the LBO.  Unsecured creditors expected vigorous advocacy of their interests by professionals funded out of the estates, taking direction from the Official Committee, and the aggressive pursuit of claims that would maximize the recovery for general unsecured creditors, including the PHONES.  Although it has been over one year since the appointment of the Official Committee, this simply has not occurred.

8.      This foot dragging caused Law Debenture Trust Company of New York ("Law Debenture"),[1] the indenture trustee for the Notes (as defined below), to file a motion, which Wilmington Trust joined, for Rule 2004 discovery on August 26, 2009.  Extensive discovery has occurred, and the data collected demonstrates that there are colorable claims arising out of the LBO.

9.      As a fiduciary for a large portion of Pre-LBO creditors, Wilmington Trust requests the appointment of an examiner to protect the interests of the PHONES holders and other parties-in-interest regarding claims arising out of the LBO.[2]  The Court should appoint

---

[1] See Motion of Law Debenture Trust Company of New York for Leave to Conduct Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure of Tribune Company, its Affiliates, and Certain Third Parties, or Alternatively, for the Appointment of an Examiner (D.I. 2031); Wilmington Trust Company's Joinder to the Law Debenture Rule 2004/Examiner Motion.  (D.I. 2172).

[2] In addition to the appointment of an examiner, Wilmington Trust expressly reserves its right to seek the appointment of an official committee to represent the disenfranchised Pre-LBO creditors or to ask the Court to grant the PHONES derivative standing to prosecute the claims.  See Official Committee ex rel. Cybergenics, v.

an examiner for the limited purpose of investigating the LBO and those claims arising therefrom that may be brought against the Debtors and others.  Such an appointment is necessary to preserve the integrity of the Chapter 11 process in this matter because certain members of the Official Committee have disabling conflicts and/or no financial incentive to pursue causes of action against the Debtors, their lenders (two of whom served on the Official Committee and one who still so serves), and advisors.  Furthermore, even if the Official Committee seeks and/or obtains authority to pursue the causes of action, because of those disabling conflicts, an examiner is still necessary to make certain that the claims are pursued vigorously and not settled cheaply, without a thorough airing.

10.    Specifically, and as described more fully below, the composition of the Official Committee and the identity of its counsel impedes the Official Committee's willingness and ability to vigorously pursue potential claims against the Debtors and others with respect to the LBO.  Almost from its inception, the Official Committee was compromised by the presence of two members (out of nine total) appointed to represent the interests of the LBO Banks:  J.P. Morgan and Merrill.[3]

11.    J.P. Morgan and Merrill were lenders in the LBO and are very likely targets of any litigation arising out of the LBO.  Obviously, these lenders, powerful institutions with able representation on the Official Committee, had little appetite for a full-scale investigation of the LBO, even though such an investigation may present the best avenue for

---

Chinery, 330 F.3d 548, 579-80 (3d Cir. 2003).

[3] Merrill Lynch Capital Corporation resigned from the Official Committee on September 4, 2009.

recovery by the general unsecured creditors.  Indeed, J.P. Morgan, an LBO Bank with a great deal to fear from an investigation of the LBO, is *co-chair* of the Official Committee.

12.    In addition, the Official Committee's counsel, Chadbourne & Parke LLP ("Chadbourne"), is compromised by its long-standing and important business relationships with many of the LBO Parties.  Chadbourne has advised the Official Committee that it is unable to initiate or pursue litigation against J.P. Morgan or Merrill due to such conflicts.  Chadbourne also represents Citi *in defense* of a very similar fraudulent transfer litigation arising out of an LBO in the Tousa bankruptcy.[4]

13.    In recognition of these insurmountable conflicts, the Official Committee hired special litigation counsel.  After months of bickering, the Official Committee decided to retain Zuckerman Spaeder LLP ("Zuckerman") to analyze the potential causes of action and, if necessary, to litigate such causes of action.[5]  Zuckerman is performing these functions in continued coordination with Chadbourne and is likely to rely on analysis performed by the Official Committee's conflicted advisors.  The fact that Zuckerman is not conflicted does not address the issues caused by the presence of LBO Banks on the Official Committee because Zuckerman reports to the Official Committee and Chadbourne.[6]

---

[4] See Answer to the Complaint and Third-Party Complaint by Citicorp North America, Inc., in its Capacity as Administrative Agent for the First Lien Term Loan, In re Tousa, Inc., Case No. 08-01435 (Bankr. S.D. Fla. Aug. 13, 2008). A copy is attached to the Stark Decl. as Exhibit A.

[5] See Zuckerman Spaeder Retention Motion (D.I. 1953).

[6] Wilmington Trust does not, by the filing of this motion, intend to suggest that members of the Official Committee or their counsel are intentionally breaching their duties.  However, these parties simply lack the economic incentive to prosecute the claims.  Furthermore, the Debtors, as the parties who consummated the LBO, are, of course, wary of pursuing a real investigation of its merits.  Compounding this reluctance are the conflicts of the Debtors' professionals, which are so debilitating that *the Debtors' conflicts counsel* is also precluded from any investigation of the LBO.  As such, it is critical that an examiner investigate potential causes of action because the Debtors' Counsel are just as, if not more, conflicted.

14.     The Official Committee also must seek leave of the Court to prosecute any such actions that Zuckerman's investigation finds meritorious.  The need for additional motion practice creates a possibility that the Debtors could seek to exit bankruptcy before the recovery of any damages from what appears to be a fraudulent $12 billion transaction.

15.     A recent decision by the United States District Court for the Northern District of Illinois in Neil v. Zell further supports the need for an examiner.  In Neil, the District Court denied a motion to dismiss brought by defendants (including Zell, the Zell Entity (defined below) and others) with respect to claims arising out of the LBO.  As set forth in more detail below, the court in Neil found the operative facts - including most notably what the District Court characterized as the "great amount of debt Tribune would take on in the deal" - sufficient to state claims arising out of the LBO.  Those same operative facts also support the causes of action that should be brought against the Debtors and the LBO Parties in these proceedings.

16.     For the reasons stated herein, the Court should appoint an examiner.  Not only is the appointment of an examiner mandated by Section 1104(c)(2) of the Bankruptcy Code because of the size of Tribune's debt in this case, it is also in the best interests of the Debtors' estates and therefore justified under Section 1104(c)(1).  The appointment of an examiner with the limited authority proposed herein is the only fully independent procedure available to ensure that appropriate legal claims are pursued against the Debtors, and their lenders and advisors, and to mitigate conflicts of interest and economic disincentives of certain members of the Official Committee, and conflicts of interest of certain of the Official Committee's counsel.

17.    The time is also ripe for an examiner.  Pursuant to this Court's order dated December 15, 2009, the fruits of the Rule 2004 discovery process are now located in a central document depository.[7]  Further, several Rule 2004 examinations have occurred. Thus, there is a body of information readily available to the examiner to expeditiously evaluate the potential claims.  As a result, such examination should not interfere with or unduly delay resolution of these proceedings.

18.    For all of these reasons, and as explained more fully below, Wilmington Trust requests the appointment of an examiner for the limited purpose of investigating and reporting to the Court and the parties-in-interest whether claims lie against the Debtors and the LBO Parties arising out of the LBO, including, but not limited to, claims for fraudulent conveyance, breach of fiduciary duty, aiding and abetting the same, and equitable subordination.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

19.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for this motion are Sections 1104(c) and 1106(a) and (b) of the Bankruptcy Code.

## FACTUAL BACKGROUND

## I.    TRIBUNE'S  PRE-LBO INDEBTEDNESS

20.    Pursuant to indentures entered into between 1992 and 1997, Tribune is obligated on various issues of outstanding bonds in the aggregate approximate amount of

---

[7] (D.I. 2858).

$1.26 billion (the "Notes" and the holders of such Notes, the "Noteholders").  In April 1999, Tribune issued the PHONES in an aggregate principal amount of approximately $1.3 billion. Wilmington Trust serves as successor Indenture Trustee in a fiduciary capacity for the holders of the PHONES.

## II.    BACKGROUND OF THE LBO

### A.    THE LBO TRANSACTION

21.    Before the LBO, Tribune was a publicly traded company worth billions, owning 10 newspapers, 25 television stations, more than 50 websites, the Chicago Cubs, and significant real estate holdings.[8]  In response to declining profits, Tribune created a special committee of the Board in September, 2006 to consider structural changes, including a sale of some or all of Tribune's assets.[9]  The Board and special committee considered several options, including an Employee Stock Ownership Plan ("ESOP") transaction proposed by Zell that would take the company private and put stock ownership into the hands of its employees.[10]  In February 2007, Tribune hired GreatBanc Trust Company ("GreatBanc") to serve as trustee of the possible ESOP proposed under Zell's plan.[11]

22.    It was no secret that Zell's plan would devalue the company.  In 2008, Zell described the ESOP to Tribune employees as follows:

> When we closed the going-private transaction in December [2007], our total debt increased to nearly $13 billion.  I put $315 million behind that debt . . . . The employees – you –

---

[8] See Neil v. Zell, No. 1:08-cv-06833, Memorandum and Order regarding Defendants' Motion to Dismiss, dated Dec. 17, 2009, pg. 2 (Dkt No. 128).  A copy of this case is attached to the Stark Decl. as Exhibit B.

[9] Id. at p. 3.

[10] Id.

[11] Id.

> then acquired 100 percent of the company.  I acquired an
> option to buy 40 percent of the company for $500 to $600
> million within the next 15 years . . . In the end, you and I
> together will own a collection of assets worth billions of
> dollars . . . .[12]

23.     After the LBO was announced, Standard & Poor ("S&P") promptly cut the

company's credit rating and promised to cut it again if Tribune's shareholders actually

approved the deal.[13]  S&P also announced that, given the amount of priority debt ahead of

the unsecured notes, there was an expectation for "negligible (0% - 25%) recovery" of the

principal in the event of a payment default.[14]  Fitch put the company on notice of a

"multiple-notch downgrade" if the transaction was consummated.[15]

24.     Several media outlets also criticized the fundamentals of the LBO

transaction.  On April 4, 2007, the Wall Street Journal questioned how Tribune would pay

its debt after the LBO transaction, stating:

> The big question hanging over Tribune's $8.2 billion
> buyout deal unveiled Monday is this:  How do they plan to
> do that, given that the newspaper industry faces uncertain
> prospects?  Financed almost entirely by debt, the buyout
> will leave the newspaper and TV concern staggering under
> more than $12 billion in debt, when existing borrowings are
> included.  **That is about 10 times Tribune's annual cash**

---

[12] See February 2008 edition of Tribune News Special ESOP Edition.  A copy is attached to the Stark Decl. as Exhibit C.

[13] See Cynthia Koons and Michael Aneiro, Buyouts Batter Debt Ratings – First Data, Tribune Are Downgraded Amid Risk Worries, Wall Street Journal, April 3, 2007, pg. A6.  A copy of the article is attached to the Stark Decl. as Exhibit D.

[14] See McGraw Hill Companies, Inc./S&P Press Release, April 20, 2007.  A copy is attached to the Stark Decl. as Exhibit E.

[15] See Koons supra.

**flow, a ratio several times higher than typically carried
by most media businesses.** [16]

(emphasis added).  The article also quoted a Barclays Capital analyst stating, "[w]e think it

is possible that Tribune is **leveraged higher than the total assets of the company after

taxes.**" (emphasis added). [17]

25.    The LBO was quite lucrative for the advisors and banks.  LBO Advisors Citi

and Merrill were paid $35.8 million and $37 million respectively in fees, and also lent Zell

the money to buy the company, for which they shared in the $47 million in fees paid to the

LBO Banks.  Morgan Stanley was paid $7.5 million for the fairness opinion, and Value

Research Corporation was reportedly paid $1 million for the solvency opinion. [18]

26.    Moreover, Zell and Tribune created a $25 million pool for a management

equity incentive plan for the purpose of providing Tribune executives compensation to

support the LBO and to retain them over a transition period. [19]  Then-CEO Dennis J. Fitz-

Simons overcame his early resistance to the plan, and was paid approximately $17.7 million

in severance payments and sold his shares for $23.8 million. [20] Not surprisingly, with these

incentives, Tribune's Board approved the LBO on April 1, 2007.

---

[16]See Sarah Ellison, How Will Tribune Pay Its Debts?  Highly Leveraged Deal Leaves Little Room for Error,
Despite Tax Breaks, The Wall Street Journal, April 4, 2007, pg. A10.  A copy of the article is attached to the
Stark Decl. as Exhibit F.

[17] Id.

[18]  See Andrew Ross Sorkin, Workers Pay for Debacle at Tribune, New York Times, Dec. 9, 2008.  A copy of
the article is attached to the Stark Decl. as Exhibit G.

[19]  See Neil v. Zell, Second Amended Complaint, No. 08-cv-06833, filed June 12, 2009, ¶¶ 3, 28 (Dkt. No.
102).

[20]  See Ellison supra.

27.     Although the LBO was one large unitary transaction, it proceeded in two phases, both of which were approved on April 1, 2007.[21]  Tribune cashed out its existing shareholders and emerged with a new owner, the newly-formed Tribune ESOP.  Zell joined Tribune's Board on May 9, 2007 and became Chairman of the Board and Chief Executive Officer on December 20, 2007.[22]  EGI-TRB, L.L.C., an entity formed for the benefit of Zell and his family (the "Zell Entity") received warrants to purchase approximately 40% of Tribune's common stock.[23]

28.     The LBO spanned eight months, beginning in April 2007 and ending in December 2007.  The LBO included two phases involving various transactions.  Although the second phase closed in December 2007, the Debtors committed to the second phase transactions at the time of the phase one transaction in April 2007.  Thus, both phases, as well as various agreements entered into by the Debtors, were part of the same LBO.[24]

---

[21] The structure of the LBO was described in detail by Law Debenture in its Rule 2004 motion, which Wilmington Trust joined.  (D.I. 2031, 2172).  For the convenience of the Court, a summary of those facts is set forth again here.

[22] Tribune Form 10-K for the fiscal year ending December 20, 2007 (the "2007 Form 10-K") at 204.  A copy of the 2007 10-K is attached to the Stark Decl. as Exhibit H.

[23] Tribune Form S-3 dated April 25, 2007 (the "2007 S-3") at 2 (identifying Zell Entity as a wholly owned subsidiary of Sam Investment Trust ("a trust established for the benefit of Samuel Zell and his family")).  A copy of the 2007 S-3 is attached to the Stark Decl. as Exhibit I; 2007 10-K at 204 (describing Zell Entity as having been "formed solely for purposes of entering into and consummating the [Leveraged Buyout];" identifying Zell as President).

[24] In fact, for purposes of determining whether a LBO transaction constitutes a fraudulent transfer, courts focus on the substance of the transaction rather than its form.  Under the fraudulent transfer analysis, courts will "collapse" the various transactions within an LBO and treat it as a single transaction in determining whether a transferor or obligator received "reasonably equivalent value" in exchange for making the transfer or incurring the obligation.  See Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.), 274 B.R. 71, 90-91 (D. Del. 2002) ("Regardless of the various complex structures of leveraged buyouts, which often involve various loans, stock purchases, mergers, and repayment obligations, courts have found that a set of transactions may be viewed as one integrated transaction if the transactions 'reasonably collapse into a single integrated plan and either defraud creditors or leave the debtor with less than equivalent value post-exchange.'") (quoting CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.), 145 B.R. 131, 137 (Bankr. S.D.N.Y. 1992); see also Orr v. Kinderhill Corp, 991 F.2d 31, 35 (2d Cir. 1993) ("an

29.    The LBO first involved the execution of new credit facilities and a cash tender offer for nearly 50% of Tribune's outstanding common stock.

30.    On April 1, 2007, the ESOP purchased approximately 8.9 million shares of Tribune's common stock at $28 per share.  The ESOP paid for these shares with a promissory note in the amount of $250 million, to be repaid by the ESOP over 30 years.

31.    On April 23, 2007, the Zell Entity made an initial investment of $250 million in Tribune in exchange for (a) approximately 1.5 million shares of common stock valued at $34 per share and (b) a $200 million unsecured subordinated exchangeable promissory note from Tribune to be repaid immediately upon consummation of the LBO (i.e., at the completion of the second phase). [25]

32.    On April 25, 2007, Tribune commenced a tender offer to purchase up to 126 million shares of the of Tribune's common stock at $34 per share.  The offer expired on May 24, 2007.

33.    To finance the tender offer, Tribune entered into a $8.028 billion senior secured credit agreement dated May 17, 2007, with J.P. Morgan, Merrill, Citi, Bank of America, and Barclays as Co-Documentation Agents (as amended on June 4, 2007, the "Credit Agreement," and the lenders thereunder, the "Credit Agreement Lenders").  The Credit Agreement initially consisted of the following facilities:

---

allegedly fraudulent conveyance must be evaluated in context; '[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all of its composite implications.'") (quoting Pereira v. Checkmate Commc'ns Co., Inc. (In re Checkmate Stereo and Elecs., Ltd.), 9 B.R. 585, 612 (Bankr. E.D.N.Y. 1981).

[25] 2007 S-3, Exhibit I at 2.

(1)    $1.5 billion Senior Tranche X Term Loan Facility (the "Term X Facility");

(2)    $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility");

(3)    $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility");

(4)    $750 million Revolving Credit Facility (the "Revolving Facility"); and

(5)    a commitment for an additional $2.105 billion (the "Incremental Facility").[26]

34.    A number of Tribune's domestic subsidiaries, many of which are Debtors, provided unsecured guarantees (the "Subsidiary Guarantees") of Tribune's indebtedness under the Credit Agreement.[27]    The subsidiaries received no value in exchange for the guarantees; rather, the proceeds went to Tribune's shareholders.    Tribune granted the

---

[26] See 2007 10-K at 111; Bigelow Aff. at 10 (¶ 19).

[27] See 2007 10-K at 113; Bigelow Aff. at 9-11 (¶¶ 18-19) ("[T]he indebtedness under the Credit Agreement and the indebtedness under the Bridge Facility constitute unsecured obligations at those Tribune subsidiaries ... which have guaranteed (i) the Credit Agreement indebtedness on a senior priority basis, and (ii) the Bridge Facility indebtedness on a subordinate basis to the Credit Agreement indebtedness ...").

The subsidiary guarantors are 5800 Sunset Productions Inc.; California Community News Corporation; Channel 39, Inc.; Channel 40, Inc.; Chicago National League Ball Club, LLC; Chicago Tribune Company; Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.; Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC; Forsalebyowner.com Corp.; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; Homeowners Realty, Inc.; Homestead Publishing Company; Hoy Publications, LLC; Internet Foreclosure Service, Inc.; KIAH Inc.; KPLR, Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications, LLC; New Mass. Media, Inc.; Orlando Sentinel Communications Company; Patuxent Publishing Company; Southern Connecticut Newspapers, Inc.; Star Community Publishing Group, LLC; Stemweb, Inc.; Sun-Sentinel Company; The Baltimore Sun Company; The Daily Press, Inc.; TMLH 2, Inc.; TMLS 1, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution Company; Tribune (FN) Cable Ventures, Inc.; Tribune Broadcast Holdings, Inc.; Tribune Broadcasting Company; Tribune Broadcasting Holdco, LLC; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune Entertainment Company; Tribune Finance LLC; Tribune Interactive, Inc.; Tribune Los Angeles, Inc.; Tribune Manhattan Newspaper Holdings, Inc.; Tribune New York Newspaper Holdings, LLC Tribune NM, Inc.; Tribune Television Company; Tribune Television Holdings, Inc.; Tribune Television of New Orleans, Inc.; Tribune Television Northwest, Inc.; Virginia Gazette Companies, LLC; WDCW Broadcasting, Inc.; WGN Continental Broadcasting Company; WPIX, Inc.; and WTXX Inc. (hereinafter, the "Subsidiary Guarantors").

Noteholders an equal and ratable lien, but did not grant any subsidiary guarantees. Consequently, the Credit Agreement Lenders obtained a structurally senior claim to the Subsidiary Guarantors' assets.

35.     To provide security for its obligations under the Credit Agreement, Tribune pledged its equity interests in newly-formed subsidiaries, Tribune Broadcasting Holdco LLC and Tribune Finance LLC (hereinafter, the "Pledged Equity Interests").   Pursuant to the indenture, Tribune also provided the Pledged Equity Interests as security for its indebtedness with respect to the Notes on an equal and ratable basis.   As a result, the interests of the Noteholders and the Credit Agreement Lenders ranked *pari passu* with respect to Tribune's assets.[28]

36.     The proceeds from the Tranche X Facility ($1.5 billion) and the Tranche B Facility ($5.515 billion): (a) financed the repurchase of the 126 million shares of common stock from Tribune's shareholders on June 4, 2007; and (b) refinanced the former five-year credit agreement and bridge credit agreement (under which Tribune (and not its subsidiaries) was a borrower).[29]

---

[28] See 2007 10-K at 113 ("The Company's other senior notes and senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as required by the indentures governing such notes and debentures"); Bigelow Aff. at 9-10 (¶ 18) ("[T]he Credit Agreement indebtedness, the Bridge Facility indebtedness, the Notes and the PHONES -- are ... pari passu in payment priority at Tribune .... The Credit Agreement indebtedness and the Notes are secured at Tribune, equally and ratably, by a stock pledge of the equity in two subsidiaries").

[29] See 2007 10-K at 99 (indicating shares were retired on June 4, 2007); Id. at 111 ("The proceeds from the Tranche X Facility and the Tranche B Facility were used ... in connection with the consummation of the Share Repurchase ... and to refinance the Company's former five-year credit agreement and former bridge credit agreement"); Id. at 114 ("On June 19, 2006, the Company entered into a five-year credit agreement [providing for a $1.5 billion unsecured term facility and a $750 million unsecured revolving facility] and a 364-day bridge credit agreement [providing for a $2.15 billion unsecured bridge facility] .... On June 4, 2007, the Company repaid its obligations under the five-year credit agreement and bridge credit agreement with proceeds from the Credit Agreement"); Tribune Form 10-Q, dated May 9, 2007 at 17 ("As of April 1, 2007, the Company had

37.    Tribune used $7.265 billion (refinancing approximately $3 billion in existing debt and taking on approximately $4 billion in new debt) to redeem shares at $34 per share. The sources included $1.5 billion from the Tranche X Facility, $5.515 billion from the Tranche B Facility, and $250 million from the Zell Investment.  The uses included $4.288 billion from the share repurchase, $2.825 billion from the refinance of the existing Tribune debt, and $152 million from estimated fees and expenses from the first phase alone.[30]

38.    In the second phase, on December 20, 2007, Tribune entered into the Interim Loan Agreement (hereinafter, the "Bridge Facility Agreement," and the lenders thereunder, the "Bridge Facility Lenders") among the same agent banks that participated in the Credit Agreement, i.e., Merrill as Administrative Agent, J.P. Morgan as Syndication Agent, and Citi, Bank of America, and Barclays as Co-Documentation Agents.  Pursuant to that agreement, the Bridge Facility Lenders extended a $1.6 billion unsecured "bridge" facility (the "Bridge Facility").[31]  The amount of the Bridge Facility was reduced by $500 million in the days immediately prior to the closing.  According to news reports, this was done to give

---

outstanding borrowings of $1.5 billion and $1.325 billion under the term facility and the bridge facility, respectively, and the Company had no borrowings under the  revolving facility").  A copy of the Tribune Form 10-Q, dated May 9, 2007, is attached to the Stark Decl. as Exhibit J.

While a portion of these former facilities appears to have been to repay then-existing debt (e.g., $250 million to refinance certain medium-term notes), the clear majority appears to have been used to repurchase stock.  See id.

[30] Tribune Form 8-K, dated April 5, 2007 Ex. 10.10. A copy of the Tribune Form 8-K dated April 5, 2007 is attached to the Stark Decl. as Exhibit K.

The estates also need to investigate potential claims against the recipients of hundreds of millions in fees.

[31] 2007 10-K at 111 ("On December 20, 2007, the Company entered into (i) a $1.6 billion unsecured Bridge Facility Agreement ... and (ii) a number of increase joinders pursuant to which the Incremental Facility became part of the Tranche B Facility"); Bigelow Aff. at 11 (¶ 20).

the Bridge Facility Lenders "a little breathing room."[32]  As a result, obligations under the

Bridge Facility Agreement are guaranteed, albeit on a subordinated basis to the Credit

Agreement obligations, by the Subsidiary Guarantors.[33]

39.     As stated above, the Credit Facility included a provision to increase Tranche

B by $2.105 billion (as defined above, the "Incremental Facility").  On December 20, 2007,

Tribune entered into a number of "increase joinders" whereby the Incremental Facility

became part of the Tranche B Facility.

40.     Also on December 20, 2007, a wholly-owned subsidiary of the ESOP, Tesop

Corporation (the "Merger Sub"), merged into Tribune, with Tribune emerging as the

surviving company post-merger.[34]  The remaining shares of Tribune common stock (with

certain exceptions) were cancelled and automatically converted into $34 in cash; an

aggregate consideration of approximately $4.0 billion was paid, funded by the Bridge and

Incremental Facilities.[35]

41.     The Zell Entity received cash for the shares of common stock it acquired (1.5

million shares) and repayment of the initial Zell investment with interest and fees ($261

---

[32] See Amy Thomas and Shannon D. Harrington, Being Like Zell in August Means 35% in Tribune Deal, Bloomberg.com, December 13, 2007, *available at* http://www.bloomberg.com/apps/news? pid=2060187&sid= aYd0rJItZnRg&dlbk.  A copy of this article is attached to the Stark Decl. as Exhibit L.

[33] 2007 10-K at 113 ("Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the company's direct and indirect U.S. subsidiaries"); Bigelow Aff. at 11 (¶ 20) ("The Bridge Facility indebtedness is unsecured but is guaranteed, on a senior subordinate basis, by the [Subsidiary Guarantors]").

[34] 2007 10-K at 98-99.

[35] Tribune Form 8-K, dated December 28, 2007, at 6 ("On December 20, 2007, pursuant to the terms of the Merger Agreement, the Merger of Merger Sub with and into the Company was consummated .... The aggregate consideration paid with respect to the cancelled shares of Company Common Stock was approximately $4.0 billion. The aggregate consideration was funded by the Second Step Credit Facilities, the purchase by EGI-TRB of the Subordinated Note and the Warrant ... and available cash on hand").  A copy of the Tribune Form 8-K, dated December 28, 2007, is attached to the Stark Decl. as Exhibit M.

million).   The Zell Entity also purchased for $315 million a $225 million subordinated promissory note and a 15-year warrant entitling it to purchase approximately 43.4 million shares of Tribune's common stock, representing approximately 40% of the economic equity interest in Tribune.[36]

42.    The following appears to constitute the salient "sources and uses" of financing from the LBO transaction:

| SOURCES | | USES | |
|---|---|---|---|
| Tranche X Facility | $1.500 billion | Share Repurchase | $4.288 billion |
| Tranche B Facility | $5.515 billion | Refinance Existing Tribune Debt | $2.825 billion |
| Initial Zell Investment | $0.250 billion | Estimated Fees and Expenses | $0.152 billion |
| Bridge Facility | $1.600 billion | Purchase Remaining Shares | $4.000 billion |
| Incremental Facility | $2.10515 billion | Initial Zell Investment/Shares | $0.261 billion |
| Second Zell Investment | $0.315 billion | Estimated Fees and Expenses[37] | $0.224 billion |
| Cash on Hand | $0.465 billion | | |
| **Total** | **$11.750 billion** | **Total** | **$11.750 billion** |

## B.    Aftermath of the LBO

43.    Although Tribune made public the solvency opinion in connection with the first phase of the LBO, notably, it did not do so with any solvency opinions from the second phase.[38]

44.    Prior to the LBO, Tribune had approximately $3.6 billion in debt.  As a result of the LBO, Tribune took on a debt burden of more than $11 billion.  Approximately $8.3

---

[36] 2007 10-K at 99. See also Bigelow Aff. ¶ 18 ("Tribune is obligated on a $225 million subordinated promissory note to ... [the Zell Entity and certain of its permitted assignees,] which note is subordinate to the indebtedness under the Credit Agreement, the Bridge Facility and the Notes").

[37] Tribune Form 8-K, April 5, 2007. Again, the estates need investigate potential claims against the recipients of $224 million in fees.

[38] See Professor Randal C. Picker, Was Zell's Tribune Ever Solvent?, The Legal Infrastructure of Business, Fall, 2009, available at http://picker.typepad.com/legal_infrastructure_of_b/2009/11/was-zells-tribune-ever-solvent.html.  A copy of this article is attached to the Stark Decl. as Exhibit N.

billion of the loan proceeds was used to cash out shareholders while pre-existing creditors, including holders of the PHONES, were left holding the bag.

45.    Prior to the LBO, the ratio of indebtedness to EBITDA was 4.8:1.  After the LBO, it skyrocketed to 11.8:1.[39]  At that time, comparable diversified publishing companies were trading publicly at a significantly smaller average ratio of total enterprise value 23 (debt plus equity) to EBITDA.[40]

46.    In fact, industry analysts widely reported that the price paid for Tribune stock during the LBO was significantly over-valued as a consequence of the debt burden imposed on the company by Zell.  On November 2, 2007, a month before the deal closed, a Lehman Brothers' Newspaper Valuation and Stock Scorecard stated the following:

> Should the Tribune privatization deal break and not occur, we believe that the fair value on the stock, if it were to remain an ongoing public entity, would be significantly less than the current stock price.  **Given the added $7 billion in debt to repurchase 126 million shares in the tender offer, we think fair value on the stock would be $7-$8 per share based on our detailed sum-of-the-parts analysis…**"

(emphasis added).[41]  Despite the existence of these opinions, all outstanding stock (except the ESOP stock) was repurchased one month later for $34 share with borrowed funds under Zell's plan.

47.    After the purchase closed, Goldman Sachs provided another indication of the imprudent nature of the deal:

---

[39] Tribune Form 10-Q, dated May 9, 2007; 2007 10-K.

[40] Tribune Form SC TO-I, April 25, 2007, Ex. C.10. A copy of the Tribune Form SC TO-1, dated April 25, 2007, is attached to the Stark Decl. as Exhibit O.

[41] See Lehman Brothers' Newspaper Valuation and Stock Scorecard.  A copy of this report is attached to the

> The company starts life as a private entity with roughly $13 billion in debt . . . **the transaction leaves little room for error, particularly given the extremely challenging industry backdrop.** The company could potentially face a liquidity crunch fairly quickly if the ad revenue trends of 2007 . . . persist into 2008 and beyond. **Mr. Zell and team clearly have their work cut out for them . . . Tribune's $34 go-private price represents . . . [a] very rich valuation in the context of the cyclical and secular challenges facing the industry."**

(emphasis added).[42]

48.     Adding insult to injury, Zell himself has called the transaction a "mistake"[43] and the "deal from hell."[44]    In addition, Randy Michaels, the Chief Operating Officer installed by Zell stated, "[a]n animal with his leg caught in a trap will chew it off . . . At the moment, we are doing some leg chewing."[45]

49.     Not surprisingly, the reaction to the LBO from the market was appropriately harsh.  The New York Times called it "one of the most absurd deals ever…" in its bizarre marriage of the slumping newspaper market and the frothy leveraged loan market.[46]  Barry L. Lucas, an analyst with Gabelli & Co. stated: "I certainly hope no one else is thinking of

---

Stark Decl. as Exhibit P.

[42] See Goldman Sachs Tribune Company Update, December 20, 2007.  A copy of this report is attached to the Stark Decl. as Exhibit Q.

[43] See Zell Calls Tribune Co. Buy A 'Mistake', Boston Globe, April 16, 2009, *available at* http://www.boston.com /ae/media/articles/2009/04/16/zell_calls_tribune_co_buy_a_mistake/.  A copy of the article is attached to the Stark Decl. as Exhibit R.

[44] See Sam Zell's Deal from Hell, Business Week, July 30, 2008, *available at* http://www.businessweek.com /magazine/content/08_32/b4095000408330.htm?chan=top+news_top+news+index_top+story.  A copy of the article is attached to the Stark Decl. as Exhibit S.

[45] Id.

[46] See Floyd Norris, The Deal is Encouraging and Absurd, New York Times, April 6, 2007, pg A1.  A copy of this article is attached to the Stark Decl. as Exhibit T.

doing what Tribune has done.  It's a mess."[47]  Tribune's own advisors were reportedly divided during the negotiations, with some advisors "uncomfortable with the level of debt in Sam Zell's proposal."[48]

50.    After the transaction, the bond ratings plummeted, indicating that it was unlikely that Tribune would have the financial capacity to pay interest and repay principal with respect to its new debt burden.  S&P and Moody's lowered Tribune's credit rating to CCC+ and Caa2, respectively, whereas prior to the LBO, the ratings were BB+ and Ba1, respectively.  Moody's Caa2 rating means the bonds are of "poor standing," "may be in default," or there "may be present elements of danger with respect to principal and interest." S&P's CCC+ rating meant that the credit had a "negative outlook."  S&P also noted the likelihood that Tribune could ultimately violate a debt covenant by stating, "[l]everage levels are high enough and expected EBITDA declines large enough, that Tribune is unlikely to continue to service its current capital structure over the intermediate term, even with significant asset sales."[49]  Ultimately, the LBO caused both ratings agencies to doubt the future viability of Tribune.

51.    Of course, if the LBO Banks were taking on "equity risks" then the Pre-LBO Bondholders, junior to the LBO Banks in priority of payment, were at extraordinary risk.

---

[47] See Sarah Ellison and Jennifer S. Forsyth, Zell Wins Tribune In Bid to Revive a Media Empire, Wall Street Journal, April 3, 2007 Pg. A1.  A copy of this article is attached to the Stark Decl. as Exhibit U.

[48] See id.

[49] See S&P Cuts Tribune's Ratings Deeper Into Junk, Reuters UK, Nov. 11, 2008, *available at* http://uk.reuters.com/articlePrint?articleId=UKN1154167820081111.  A copy of this article is attached to the Stark Decl. as Exhibit V.

The PHONES, as the most junior of that group, shouldered the greatest amount of risk should "things go wrong."

### C.    The Debtors' Financial Demise.

52.    Chandler Bigelow cited several reasons in his affidavit for Tribune's bankruptcy filing, including: (1) the decline in advertising industry-wide by 15-20% in metropolitan markets; (2) Tribune's broadcasting revenue in 2008 lagging 2007 performance; (3) revenue declines by 10% through November 2008 versus 2007 with advertising revenues down 18% and broadcasting revenues down 3%; (4) Tribune's operating cash flow was declining 33% (excluding one-time items); and (5) the Debtors facing increasing constraints on liquidity, including the ability to service the approximately $13 billion of indebtedness.[50]

53.    However, the Debtors cannot deny that the negative trends contributing to the present bankruptcy filings identified in the Bigelow Affidavit started well before the LBO. More specifically, it was widely acknowledged that the company picked the worst possible time to leverage a business with such a massive amount of debt.   During negotiations surrounding the potential LBO, Peter Appert at Goldman Sachs concluded that the LBO put Tribune "in a precarious financial position" from the start.[51]   The Annual Report on American Journalism also stated at this time that the tension "between managing decline and

---

[50] Bigelow Affidavit ¶¶12, 24.

[51] See Frank Ahrens, Zell in Talks with Geffen on Deal for L.A. Times, Wash. Post, Apr. 5, 2007, at D1, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/04/04/AR2007040402591.html.  A copy of this article is attached to the Stark Decl. as Exhibit W.

maneuvering through transition will become even greater" in 2007.[52]   The report declared bluntly that "[t]he fundamentals are all problematic" and "[t]he entire business model of journalism may be in flux in a few years."[53]   The report also stated that, with respect to the newspaper business in particular, "[t]he year 2006 was terrible in many respects, and there seems little prospect that 2007 will be much better."[54]

54.     Presumably, if Tribune had selected a more prudent restructuring option and avoided a transaction that did not require $8.3 billion of additional debt to cash out former shareholders, Tribune may well have been able to withstand this predictable downturn in the publishing market.  In fact, Bigelow himself admits that without the LBO debt, the Debtors would have positive book equity value.[55]   It is undeniable, then, that Zell's takeover of Tribune, which included buying the Board's approval of the LBO and financing the deal with crippling debt, led to the company's Chapter 11 filing.

## III.    CHAPTER 11 FILING

55.     On December 8, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

---

[52]  The State of the News Media 2007: An Annual Report on American Journalism, *available at* http://www.stateofthemedia.org/2007/narrative_overview_economics.asp?cat=4&media=1.  A copy of this article is attached to the Stark Decl. as Exhibit X.

[53]  Id.

[54]  Id.

[55]  Bigelow Affidavit ¶ 11.

A.      **Composition of Official Committee and Counsel Conflicts**

1.      **Conflicted Official Committee**

56.     Wilmington Trust has already expressed "its frustration and dissatisfaction with the manner in which estate causes of action have been handled to date."[56]   Other members of Tribune's bondholder community have also voiced their concerns over Zell's control of the LBO process, the Official Committee's construction, and the lack of meaningful progress before this Court concerning these causes of action.  These complaints, however, have largely been ignored to date by the Official Committee, which is unsurprising given the rampant conflicts.

57.     The nine-person Official Committee appointed on December 18, 2008 by the Office of the United States Trustee was originally comprised of: (1) two Bank Lenders; (2) two trade creditors; (3) the Pension Benefit Guaranty Corporation; (4) a union; (5) a retiree; and (6) two Successor Indenture Trustees.

58.     Incredibly, two of the original members of the Official Committee were LBO Banks, J.P. Morgan and Merrill.[57]   In their List Of Creditors Holding The Thirty Largest Unsecured Claims (the "Top 30 List") the Debtors identify: (a) J.P. Morgan as the largest unsecured creditor in its capacity as a Credit Agreement Lender ($1,045,833,000 claim) and a Bridge Facility Lender ($437,371,428 claim); and (b) Merrill as one of the largest

---

[56] See Joinder (D.I. 2172).

[57] As noted above, Merrill officially resigned from the Official Committee in September, 2009.  The remaining Committee members are Deutsche Bank Trust Company Americas, as Indenture Trustee, Warner Bros. Television, William Niese, Pension Benefit Guaranty Corporation, Washington-Baltimore Newspaper Guild, Local 32035, Buena Vista Television, and Wilmington Trust Company. See Second Amended Notice of Appointment of Committee of Unsecured Creditors, dated May 26, 2009 (Docket No. 1238).

unsecured creditors in its capacity as a Bridge Facility Lender ($437,371,428 claim).[58]   As described below, their presence on the Official Committee as LBO Banks and their status as clients of Chadbourne have compromised and, in the case of J.P. Morgan, continue to impair the ability of the Official Committee to properly investigate and pursue potential causes of action against the Debtors.

59.     Wilmington Trust is advised and aware that the parties to this case are involved in preliminary plan negotiations.  Wilmington Trust and other Tribune bondholders have been consistently troubled by the composition of the Official Committee because certain of the eight remaining members are economically motivated to structure a plan of reorganization that resolves the LBO litigation claims in favor of the LBO banks and does not give the Pre-LBO creditors the relief to which they are entitled.  For example, if the causes of action arising from the LBO are successfully prosecuted, the PHONES should recover 100% of their claims.

60.     Simply put, the holders of the PHONES are not adequately represented because there are only two representatives on the Official Committee whose interests represent Pre-LBO debt.  In fact, there is no estate fiduciary capable of faithfully and fully investigating, prosecuting and evaluating claims arising from the LBO – the Debtors' principals and professionals are also conflicted from bringing the LBO litigation, and the Official Committee's interest appears to be tainted.

---

[58] Consolidated List of Creditors Holding the Thirty Largest Unsecured Claims Against the Debtors, dated December 8, 2008 (D.I. 1); see also Tribune's Bank Lenders May Seek Unsecured Committee Seats Tomorrow, Debtwire, December 17, 2008 ("In an unusual twist, Tribune's bank lenders may seek a seat at the table at tomorrow's formation meeting for the official committee of unsecured creditors .... The lenders potential push for committee representation stems from the atypically loose security package backing their

**2. Conflicted Official Committee Counsel**

61. Further conflicts arise from the Official Committee's retention of counsel. As discussed above, the Official Committee retained Chadbourne, and also retained Landis, Rath & Cobb LLP ("LRC" and with Chadbourne, "Committee Counsel"). Both firms acknowledge that various affiliates of J.P. Morgan are current clients.[59] Chadbourne also acknowledges that it currently represents Merrill and its affiliates.[60]

62. Moreover, AlixPartners, LLP ("AlixPartners"), the Official Committee's financial advisor, has also stated that J.P. Morgan, Merrill, and/or their respective affiliates are current clients of the firm. In a supplemental declaration, AlixPartners stated that while it is "not prohibited by any ethical rules from reviewing, investigating and testifying" in connection with the LBO, "as a business practice and to preserve client relations AlixPartners may not be in a position to pursue such investigation or otherwise support the litigation."[61] Despite the existence of this conflict, AlixPartners has issued a preliminary analysis of Tribune's solvency to the Official Committee. It is clear, then, that Wilmington Trust and other Pre-LBO creditors are left without an untainted financial advisor to investigate and advise upon the highly technical and complicated LBO.

debt."). A copy of this article is attached to the Stark Decl. as Exhibit Y.

[59] See Affidavit of David M. Lemay in support of Chadbourne's retention application (Docket No. 243, Exhibit A) (the "Lemay Affidavit") at Exhibit 2 (listing, as "Active Unrelated Representations" for unsecured creditors, for the pre-petition lenders, and for agents under pre-petition credit agreements: JPMorgan Chase & Co., JPMorgan Securities, Inc., JPMorgan Capital Corporation and JPMorgan Bank, S.A., Institution Of Multiple BA); see also Affidavit of Adam G. Landis in support of LRC's retention application (Docket No. 242, Exhibit A) at Exhibit 2 (disclosing that LRC represents J.P. Morgan in matters unrelated to this case).

[60] Lemay Aff. at Ex. 2 (listing "Active Unrelated Representations" for unsecured creditors, for pre-petition lenders and for agents under pre-petition credit agreements Merrill Lynch & Co.).

[61] First Supplemental Declaration of Alan D. Holtz of AlixPartners, LLP as Financial Advisors to the Official Committee of Unsecured Creditors (Docket No. 425), ¶ 4.

63.     Furthermore, the Office of the United States Trustee asked Committee Counsel whether it can investigate and pursue malpractice claims against advisors in the LBO, specifically Citi, Merrill, Pierce, Fenner & Smith Incorporated (financial advisor to Tribune), Morgan Stanley (financial advisor to the Special Committee of the Board of Directors) and Valuation Research Corporation (advisor to the Board of Directors concerning solvency).  Chadbourne explicitly stated that it could not conduct a malpractice investigation with respect to J.P. Morgan, Citi and Merrill, but suggested that either LRC or special counsel handle this investigation.[62]

64.     It is also worth noting that while the Debtors retained a number of law firms, their primary bankruptcy counsel is Sidley Austin LLP ("Sidley") (assisted by Delaware co-counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A.).  The Debtors are also represented by Jenner & Block LLP ("Jenner") as "special counsel for certain litigation matters" pursuant to Section 327(e) of the Bankruptcy Code.  Sidley currently represents J.P. Morgan and Merrill.  Jenner's current clients include the Zell Entity, Equity Group Investments LLC, and Zell, who are represented "in connection with an investment made to the Debtors," as well as Merrill and Chase Insurance (which Jenner submits is "related" to J.P. Morgan).[63]  Given the Debtors' representation, it is also clear that the Debtors will not advocate for further investigation of the LBO transaction.

---

[62] See First Supplemental Affidavit of David Lemay in support of Chadbourne's retention application (D.I. 395) ¶¶ 5-9.

[63] See 2007 10-K at 204 (noting Zell Entity was formed "solely for the purposes of entering into [the Leveraged Buyout]"); Declaration of David J. Bradford in support of Jenner retention application (D.I. 142) ¶ 15 & Exhibit B ("Jenner represented Sam Zell, Equity Group Investments, LLC and EGI-TRB, LLC in connection with an investment made in the Debtors. Jenner represents or has represented entities that are directly or indirectly related to Mr. Zell or Equity Group Investments, LLC, including, but not limited to

65.     The conflicts posed by Committee Counsel clearly implicate the Rules of Professional Conduct.  Both Delaware and New York law support the view that Committee Counsel cannot appropriately investigate claims against the Debtors and negotiate against its clients.   Delaware rules provide that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."[64]

66.     Similarly, New York's rules provides that "[a] lawyer shall decline proffered employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under DR 5 - 105.[65]  The Second Circuit has held that it is "prima facie improper" for an attorney to represent simultaneously a client and another party with adverse interests.[66]  The attorney "must be prepared to show, at the very least, that there will

---

Equity Lifestyle Properties, Ltd., Equity Group Investments, and E.R.P.").

[64] Del. R. Prof. Resp. 1.7.

[65] N.Y. Code Prof. Resp. DR 5-105(A)

[66] Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d 1384, 1387 (2d Cir. 1976).

be no actual or apparent conflict in loyalties or diminution in the vigor of his representation."[67]

67.    On August 13, 2009, the Official Committee sought to retain Zuckerman as special counsel.[68]  In its request for special counsel, the Official Committee recognized the clear conflicts presented by Merrill's and J.P. Morgan's participation on the Official Committee.[69]  In seeking the appointment of special counsel, the Official Committee requested that Zuckerman's role include the following: (1) assist the Official Committee in the analysis of the potential causes of action; (2) participate in negotiations with the lenders and the Debtors; (3) if necessary, prosecute such causes of action as described above to the extent, by subsequent motion, the Official Committee may be authorized to bring such causes of action; and (4) perform such other legal services in the interests of the Official Committee.[70]  On September 3, 2009, the court granted the Official Committee's request to retain Zuckerman.[71]

68.    Notwithstanding the retention of Zuckerman as special counsel, the Official Committee remains compromised in its ability to fairly consider the merits of claims arising from the LBO, including those against certain of its current or former members such as the

---

[67] Id.

[68] Application of the Official Committee of Unsecured Creditors of Tribune Company, et al. Pursuant to 11 U.S.C. §§ 328 and 1103 and Fed. R. Bankr. P. 2014 for an Order Authorizing the Employment and Retention of Zuckerman Spaeder LLP as Special Counsel Nunc Pro Tunc to August 6, 2009, dated August 12, 2009 (D.I. 1953) ¶ 13.

[69] Id. ¶ 8.

[70] Id. ¶ 13.

[71] Order Granting Application of Official Committee of Unsecured Creditors for Order Authorizing the Employment and Retention of Zuckerman Spaeder, LLP as special counsel (D.I. 2088).

LBO Banks.    And while Zuckerman may be independent, it reports to the Official

Committee, and must of necessity rely on the preliminary investigative report created by

Chadbourne, a firm with an admittedly disabling conflict, and take direction from such firm.

69.    A summary of the various professionals and the limitations on their ability to

initiate causes of action relating to the LBO appears below:

| FIRM | RETENTION | CONFLICTS |
|---|---|---|
| Chadbourne | Committee Counsel | - Represents J.P. Morgan, Merrill and/or their respective subsidiaries<br>- Cannot initiate or purse litigation against J.P. Morgan or Merrill relating to such issues<br>- Cannot investigate, initiate, pursue possible malpractice claims against most transaction advisors, *e.g.*, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith, and Morgan Stanley & Co., Inc. |
| LRC | Committee Counsel | - Represents J.P. Morgan and Citigroup USA |
| AlixPartners | Financial Advisors to the Committee | - Represents J.P. Morgan, Merrill and/or their respective subsidiaries |
| Sidley | Debtors' 327(a) Counsel | - Represents J.P. Morgan and Merrill |
| Jenner | Debtors' 327(e) "Special Litigation" Counsel | - Represented Zell and the Zell Entity "in connection with an investment made in the Debtors"<br>- Represents Zell affiliates<br>- Represents Merrill, and Chase Insurance |

70.    The above-mentioned conflicts cause Wilmington Trust grave concern that

the Official Committee will continue to be compromised in investigating and pursuing

potential claims arising from the LBO.    For the reasons previously stated, the retention of

Zuckerman as special counsel has done little to allay the substantial concerns arising from

the composition of the Official Committee.    Accordingly, the appointment of an examiner is

critical to ensure that the interests of the Pre-LBO creditors and other parties-in-interest are

protected and that the appropriate causes of action are fully, fairly, and vigorously investigated and brought against the Debtors and others.

## IV.    NEIL v. ZELL

71.    The recent opinion in Neil v. Zell further supports the need for the appointment of an examiner.[72]  There, the District Court for the Northern District of Illinois denied (in part) the motion to dismiss filed by GreatBanc (the trustee of the ESOP), members of the committee that oversaw the ESOP, members of Tribune's Board and Zell (collectively the "Neil Defendants") against claims filed by six current and former employees of Tribune who participated in the company's ESOP (the "Neil Plaintiffs").

72.    Although the Neil Plaintiffs' claims were largely premised on ERISA violations, the Neil Plaintiffs brought claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty.  Specifically, the Neil Plaintiffs alleged that the Neil Defendants breached their fiduciary duties either by agreeing to the ESOP deal, failing to stop the deal, and failing to remedy the damage caused by the deal.[73]  Significantly, the Neil Plaintiffs also alleged that the deal was imprudent because of the significant amount of debt Tribune took on.[74]  In ruling on the motion to dismiss, the court said:

> Plaintiffs' allegations include, among others, that the deal saddled Tribune with so much debt that the company was very unlikely to succeed, that GreatBanc failed to ensure that the expert advice it sought was reasonable, and that GreatBanc failed to conduct its own thorough review of the deal.   (Compl. ¶ 110-11, 151.) Defendants impugn these allegations as "wild shots at GreatBanc's

---

[72] See Neil v. Zell at Exhibit B.

[73] Id. at 7.

[74] Id. at 2.

> work." (Defs' Reply Br. at 19.) The court finds that they are not
> so wild that the claim must be dismissed. In particular, Plaintiffs'
> allegations raise serious questions regarding whether GreatBanc
> adequately considered the risk created by the great amount of debt
> Tribune would take on in the deal. Id. at 9-10.

In addition to finding that the Neil Plaintiffs' claims survived the motion to dismiss, the court also ruled that Zell and the Zell Entity were potentially liable for "knowing participation in fiduciary breaches."[75]

73.    The court's decision in Neil clearly shows that viable claims and actions arising out of the LBO may be brought against the Debtors in this action. Thus, this Court should reject any attempt by the Debtors to sweep under the rug the significant claims in this Chapter 11 action when a court in another jurisdiction already has found actionable claims arising out of the same operative facts against some of the potential defendants arising out of the LBO.

## V.    POTENTIAL CAUSES OF ACTION

### A.    Fraudulent Transfer

74.    The facts give rise to what appear to be more than colorable claims that an examiner should investigate. Here, an examiner should investigate whether a claim of fraudulent transfer exists against the LBO Banks under Section 548 of the Bankruptcy Code and under applicable state law (either the Uniform Fraudulent Conveyance Act ("UFCA") or the Uniform Fraudulent Transfer Act ("UFTA")). Fraudulent transfer claims may be brought on the grounds of either intentional (or actual) fraud or constructive fraud. Claims of actual fraud require a showing that the transaction at issue was made "with the actual

---

[75] Id. at 12.

intent to hinder, delay or defraud" the debtor's creditors.[76]  Claims of constructive fraud, however, do not require a showing of actual intent to defraud.[77]

75.    More specifically, constructive fraud requires that a debtor receive less than "reasonably equivalent value."[78]  This also requires that one of the following elements coincide with the transfer or obligation: (i) the debtor was either insolvent or became insolvent because of the transfer or obligation; (ii) the debtor was engaged in business or a transaction for which any property remaining with the debtor was "an unreasonably small capital"; (iii) the debtor intended to incur or believed that the debtor would incur debts beyond the debtor's ability to pay the debts as they matured; or (iv) the debtor made the transfer to or for the benefit of an insider under an employment contract and not in the ordinary course of business.[79]

76.    Given the facts, it is clear that the Debtors received "less than reasonably equivalent value" from the LBO transaction, which gives rise to claims against the Debtors and the LBO Lenders.

77.    The examiner should also investigate whether there are claims against the LBO Lenders and Advisors for fees received in connection with the LBO because Tribune received less than reasonably equivalent value from the LBO.

---

[76] See 11 U.S.C. § 548(a)(1)(A).

[77] Grochocinski v. Schlossberg (In re Eckert), 388 B.R. 813, 830 (Bankr. N.D. Ill. 2008), aff'd, 402 B.R. 825 (N.D. Ill. 2009).

[78] See 11 U.S.C. § 548(a)(1)(B).

[79] Id.

78.     Finally, the examiner should investigate a potential claim against Zell and the Zell Entity because the funds advanced by the Debtors to the Zell Entity in connection with the LBO transaction were for less than reasonably equivalent value (because Tribune did not benefit from the LBO).

**B.     Equitable Subordination**

79.     The examiner should investigate whether the claims of certain creditors should be equitable subordinated under Section 510(c) of the Bankruptcy Code.   Section 510(c) of the Bankruptcy Code provides that a court may:

> (1)   under   principles   of   equitable   subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinate claim be transferred to the estate.[80]

80.     Under a claim of equitable subordination, a bankruptcy claim may be subordinated to all or part of another allowed claim, and in some instances, may be relegated to the "bottom rung of claims" or may be allowed after, rather than ahead of, the claim of a party who has been injured by the holder of the subordinated claim.[81]

81.     Courts have uniformly applied a three part test in determining whether the equitable subordination of a claim or interest is appropriate: (1) the claimant engaged in some type of "inequitable conduct"; (2) the misconduct resulted in injury to other creditors

---

[80] See 11 U.S.C. § 510(c).

[81] 5 COLLIER ON BANKRUPTCY, ¶ 510.05.

or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is consistent with the Bankruptcy Code. [82]

82.     Here, the examiner should investigate a claim of equitable subordination against the LBO Banks on the grounds that they: (i) knowingly and recklessly disregarded Tribune's insolvency or likely insolvency; (ii) knowingly or recklessly disregarded the fact that the LBO transaction would force the Debtors into bankruptcy; and (iii) knowingly or recklessly disregarded the impact of the LBO transaction on unsecured creditors.[83]

### C.     Unjust Enrichment

83.     The examiner should also investigate claims of unjust enrichment against those parties receiving payment in connection with the LBO transaction, such as payments made in the form of shares, or fees received for services rendered in connection with the LBO.  The elements of a claim for unjust enrichment include: (1) the defendant received a benefit; (2) the defendant was aware of the benefit; and (3) "that the benefit was accepted by the defendant under circumstances that would make the acceptable inequitable without payment for its value."[84]

84.     More specifically, the examiner should investigate whether payments made through the LBO transaction enriched the Debtors and/or substantially burdened Tribune with so much debt that it effectively wiped-out its assets.

---

[82] See In re Mid-American Waste Sys., Inc., 284 B.R. 53, 69 (Bankr. D. Del. 2002) (internal citations omitted).

[83] See Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC), 321 B.R. 128, 145 (Bankr. D. Del. 2005).

[84] See id.

85.     Given the facts in this matter, an examiner should also investigate whether Zell and the Zell Entity were unjustly enriched by receiving various payments in connection with the LBO transactions.

86.     In addition, an examiner should investigate claims of unjust enrichment against the LBO Banks, given that they benefitted from the LBO in terms of receiving hundreds of millions in fees while impoverishing Tribune, and did so with the knowledge that that transaction would result in the Tribune's insolvency (or that the LBO Banks should have reasonably foreseen Tribune's insolvency based on the financial information and projections available to it at the time of the LBO transaction).

87.     Finally, an examiner should investigate claims against the LBO Advisors in that they accepted payment for services they rendered in furtherance of a fraudulent transaction that conveyed no real value to Tribune.

### D.     **Breach of Fiduciary Duty**

88.     A claim for breach of fiduciary duty may be brought against several parties under Delaware law.  When a company becomes insolvent, fiduciary duties are owed to creditors by directors, officers, and controlling shareholders.[85]  Fiduciary duties consist of the duty of due care, loyalty and good faith.[86]  In the failed LBO context, only those directors, officers, and controlling shareholders who served in a fiduciary capacity when the

---

[85] See In re Hechinger Inv. Co., 274 B.R. at 89.

[86] See McMullin v. Beran, 765 A.2d 910, 917 (Del. 2000).

corporation planned and implemented the LBO can be found liable for a breach of fiduciary duty.[87]

89.    A shareholder owes a fiduciary duty "if it owns a majority interest in or exercises control over the business and affairs of the corporation."[88]    In absence of a majority stock ownership, the minority shareholder must hold a dominant position and have actually controlled the corporation's conduct.[89]

90.    The examiner should investigate a claim of breach of fiduciary duties against Tribune's Board, where the facts support that the Board knew or should have known of Tribune's insolvency or near insolvency and that despite this knowledge, Tribune's fiduciaries supported, facilitated, and effectuated the LBO.[90]    A breach of fiduciary duty claim is also viable because it was reasonably foreseeable that the LBO would cause Tribune's subsequent financial failure and skyrocketing debt.[91]

91.    An examiner should also investigate claims of breach of fiduciary duty against Zell because he acted as a fiduciary as a Board member and because Zell exercised dominion and control over the  board.

---

[87] See In re Hechinger Inv. Co., 274 B.R. at 91.

[88] See In re Western Nat'l Corp. Shareholders Litigation, 2000 WL 710192, at *6 (Del. Ch. May 22, 2000).

[89] Id.

[90] See In re Hechinger Inv. Co., 274 B.R. at 90-91 (court denied defendants' motion to dismiss where plaintiff sufficiently stated claim that defendants breached fiduciary duties to company and creditors because company was insolvent at the time of the LBO transaction or because the company became insolvent as a result of the LBO transaction).

[91] See id.

92.     As set forth above, the court's decision in <u>Neil</u> further supports that there are sufficient facts to pursue such an action against the Debtors.

### E.     Aiding and Abetting Breach of Fiduciary Duties

93.     A claim for aiding and abetting a breach of fiduciary duty may be brought under Delaware law.  Given the potential causes of action against the Board and Zell for breach of fiduciary duties, an examiner should investigate claims against third parties for aiding and abetting such a breach.  The three elements of aiding and abetting a breach of fiduciary duty under Delaware law include: "(1) a breach of fiduciary duty, (2) knowing participation in that breach by the defendant, and (3) damages."[92]

94.     A third party will have knowingly participated in such a breach, for instance, if it provided material information that the fiduciaries depended on in approving and establishing the LBO and was exposed to the same warning signs of the failed LBO, yet allowed the fiduciaries to proceed with the transaction knowing the risks.[93]  A third party may also be charged with aiding and abetting a fiduciary breach if it was aware of fraudulent misconduct and participated in that misconduct by financing the LBO.[94]

95.     Here, the examiner should investigate whether there is a claim of aiding and abetting a breach of fiduciary duty against the LBO Banks, Tribune's Board, Tribune's shareholders, the LBO Advisors, Zell and the Zell Entity.

---

[92] <u>See</u> <u>LaSala v. Bordier et Cie</u>, 519 F.3d 121, 130 (3d Cir. 2008).

[93] <u>See</u> <u>Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)</u>, 208 B.R. 288, 309 (Bankr. D. Mass. 1997).

[94] <u>See</u> <u>In re OODC, LLC</u>, 321 B.R. at 143-44; <u>see also</u> <u>Neil</u> at <u>Exhibit B</u> (finding that plaintiffs stated claim for aiding and abetting breach of fiduciary duty).

96.     More specifically, if those parties had actual knowledge that the Board was breaching its duty to Tribune in approving the LBO transaction, they could be liable for aiding and abetting.

## RELIEF REQUESTED

97.     Wilmington Trust respectfully requests the appointment of an examiner for the limited purpose of investigating and reporting to the Court and the parties-in-interest whether any claims lie against the Debtors, their lenders, and their advisors, as well as members of Tribune's Board, for claims arising out of the LBO, including but not limited to claims for fraudulent conveyance, breach of fiduciary duty, aiding and abetting the same, and equitable subordination.

## ARGUMENT

98.     The appointment of an examiner is necessary to examine the LBO, the potential claims and actions arising therefrom, and the manner in which such claims have been addressed by the estates.

99.     Simply put, the interests of Debtors' Pre-LBO bondholders, including the PHONES, are not adequately represented in these cases.  Their interests are certainly not represented by the Debtors, whose principals and professionals are conflicted from bringing the LBO litigation.  Moreover, their interests are not being adequately represented by the Official Committee.  Indeed, at this juncture, the Official Committee has been effectively disabled from carrying out its mandate to serve as a case "counterbalance" – its primary counsel is conflicted, and the appointment of special litigation counsel cannot cure the

structural problems created by the composition of the Official Committee and the conflicts

of its primary counsel.

### A.    <u>Legal Standard</u>

100.    Section 1104(c) of the Bankruptcy Code provides as follows:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of the plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor if –
>
> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

101.    Accordingly, a court is required under Section 1104(c) to appoint an

examiner: (a) at the request of a party in interest; (b) at any time prior to plan confirmation;

(c) when a trustee has not been appointed; and (d) when such appointment is in the best

interest of creditors or the debtor's fixed, liquidated, and unsecured debts other than debts

for goods, services, taxes, or insider debts exceed $5 million.  <u>See</u> 11 U.S.C. § 1104(c); <u>In re</u>

<u>Revco D.S. Inc.</u>, 898 F.2d 498, 500-501 (6th Cir. 1990); <u>see also</u> <u>In re Marvel Entm't</u>

<u>Group, Inc.</u>, 140 F.3d 463, 472, 474 (3d Cir. 1998) (appointment of trustee mandatory when

moving party satisfies statutory criteria of 11 U.S.C. § 1104(a)); <u>In re Sharon Steel Corp.</u>, 871 F.2d 1217, 1226 (3d Cir. 1989) (same).

**B.      <u>Appointment of an Examiner is in the Best Interests of the Estates.</u>**

102.    The Court should appoint an examiner as being in the best interest of creditors under Section 1104(c)(1).    In the instant matter, the facts, on their face, demonstrate irreconcilable conflicts of interest and create a "textbook" case for the appointment of an examiner.  As set forth above, the composition of the Official Committee and Committee Counsel have hampered and will continue to hinder any efforts to appropriately investigate and pursue any claims arising out of the LBO.

103.    In an analogous context, many courts have held that conflicts of interest constitute sufficient justification for the appointment of a trustee under Section 1104.  This principle should apply with even more force in the context of motions to appoint an examiner, where the remedy is much less intrusive.  <u>See</u>, <u>e.g.</u>, <u>In re Cajun Elec. Power Coop., Inc.</u>, 74 F.3d 599, 600 (5th Cir. 1995), <u>adopting on rehearing the dissent in</u> 69 F.3d 746, 751 (5th Cir. 1995), (appointing trustee because of "inherent conflict" caused by utility cooperative's board members also serving in various capacities at the cooperative's member utility companies); <u>In re Marvel Entm't Group, Inc.</u>, 140 F.3d 472-473 (affirming appointment of trustee because conflicts of interest that existed between former creditor turned debtor-in-possession and other creditors were beyond "healthy" conflicts that always exist in bankruptcy); <u>In re Sharon Steel Corp.</u>, 871 F.2d 1226-28 (affirming appointment of trustee because of debtor's internal conflicts of interest and inability to fulfill fiduciary duties as debtor-in-possession to creditors); <u>In re Fiesta Homes of Georgia</u>, 125 B.R. 321,

325-26 (Bankr. S.D. Ga. 1990) ("the presence of a conflict of interest constitutes cause for removal of the Debtor in Possession from administration of this case."); In re Nautilus of New Mexico, Inc., 83 B.R. 784, 789 (Bankr. D.N.M. 1988) (where individual who controlled debtor-in-possession had conflicts with interests of the estate, trustee was warranted).

104.    Accordingly, the appointment of an examiner is necessary and would benefit all parties-in-interest in this matter.  See In re New Century TRS Holdings, Inc., 407 B.R. 558, 566 (Bankr. D. Del. 2009) ("The Examiner performs his duties at the request of the Court, for the benefit of the debtor, its creditors and shareholders"); In re FiberMark, Inc., 339 B.R. 321, 325 (Bankr. D. Vt. 2006) ("The benefit of appointing an independent examiner is that he or she will act as an objective nonadversarial party who will review the pertinent transactions and documents, thereby allowing the parties to make an informed determination as to their substantive rights."); In re Apex Oil Co., 101 B.R. 92, 99 (Bankr. E.D. Mo. 1989) ("The Examiner is appointed to act as an independent party to review, without monetary interest, transactions and documents.  He is first and foremost disinterested and nonadversarial.  The benefits of his investigative efforts flow solely to the debtor and to its creditors and shareholders.") (internal citations omitted).

### C.    Appointment of an Examiner is Mandatory Under Section 1104(c)(2) Because the Debtors' Unsecured Debt Exceeds the Statutory Threshold.

105.    The requisite elements of § 1104(c) are plainly present in this case because the Debtors' unsecured debts are well in excess of $5 million.  See In re Big Rivers Elec. Corp., 284 B.R. 580, 584 (W.D. Ky. 2002); In re Schepps Food Stores, 148 B.R. 27, 30

(Bankr. S.D. Tex. 1992).  Section 1104(c)(2) leaves a court no discretion where, as here, the claims threshold is met.

106.    The Sixth Circuit's opinion in <u>Revco</u> is particularly instructive.  In <u>Revco</u>, the bankruptcy court initially denied the United States Trustee's motion to appoint an examiner, where the parties stipulated that each of the debtors' unsecured debts exceeded $5 million.  898 F.2d at 499.  On appeal, the Sixth Circuit ordered the appointment of an examiner, reasoning that Section 1104(c) "plainly means that the bankruptcy court 'shall' order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million."  <u>Id.</u> at 500-501; <u>see</u> <u>also</u> <u>In re GHR Cos.</u>, 43 B.R. 165, 175 (Bankr. D. Mass. 1984) ("In order to insure that adequate investigation of the debtor is conducted to determine fraud or wrongdoing on the part of present management, an examiner is required to be appointed in all cases in which the debtor's fixed, liquidated and unsecured debts, other than debts for goods, services, or taxes, or owing to an insider exceed $5 million") (<u>quoting</u> 124 Cong. Rec. H11,100 (daily ed. September 18, 1978) (statement of Rep. Edwards) and 124 Cong. Rec. S17,417 (daily ed. October 6, 1978) (statement of Sen. DeConcini)); 7 COLLIER ON BANKRUPTCY, (15th ed. rev.) § 1104.03[2][b] ("If Congress intended to subject the appointment issue to the court's discretion, it could have said so.").

107.    The majority of other courts addressing this issue have also recognized the mandatory nature of examiner appointment under § 1104(c)(2).  <u>See</u> <u>In re Loral Space & Commc'ns, Ltd.</u>, 2004 WL 2979785, at *5 (S.D.N.Y. Dec. 23, 2004) (finding that §1104(c)(2) mandates the appointment of an examiner where the debt threshold is met and reversing the bankruptcy court's finding that if the requested appointment is inappropriate,

the bankruptcy court should not stretch to fashion a more appropriate job description for the examiner); In re Vision Dev. Group of Broward County, LLC, 2008 WL 2676827, at *3 (Bankr. S.D. Fla. June 30, 2008); In re Mechem Fin. of Ohio, Inc., 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988); In re Big Rivers Elec. Corp., 213 B.R. 962, 965-66 (Bankr. W.D. Ky. 1997); In re The Bible Speaks, 74 B.R. 511, 514 (Bankr. D. Mass. 1987); In re 1243 20th St. Inc., 6 B.R. 683, 685 n.3 (Bankr. D.D.C. 1980); In re Lenihan, 4 B.R. 209, 211 (Bankr. D. R.I. 1980).

108.    Given that there is no dispute that the Debtors' debts exceed $5 million, the appointment of an examiner is warranted under 11 U.S.C. § 1104(c)(2).

**D.    The Proposed Scope of the Examiner's Investigation is Appropriate.**

109.    Under Section 1106(b) of the Bankruptcy Code, a court-appointed examiner performs the duties set forth in Sections 1106(a)(3) and 1106(a)(4), which provide that an examiner shall:

> (3) except to the extent that the court orders otherwise, ***investigate the acts, conduct***, assets, liabilities, and financial condition ***of the debtor***, the operation of the debtor's business and the desirability of the continuance of such business, and ***any other matter relevant to the case or to the formulation of a plan***;
>
> (4) as soon as practicable—
>
>> (A) file a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate; and
>>
>> (B) transmit a copy or a summary of any such statement to any creditors' committee or equity security holders' committee, to

> any indenture trustee, and to such other entity as the court
> designates

11 U.S.C. § 1106(a) (emphasis added).

110.    The broad mandate of Section 1106 plainly includes the limited powers that
Wilmington Trust requests the examiner be vested with in this case, which relate to
investigating potential claims arising out of the LBO.  Moreover, the limited scope requested
by the Official Committee is well within the purview of an examiner's role, as set forth by
the plain language of Section 1106.  See 11 U.S.C. § 1106 (an examiner shall "investigate . .
. any other matter relevant to the case or to the formulation of a plan"); see also The Official
Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 577 (3d Cir.
2003) ("An examiner's duties include investigation of the debtor, the debtor's business, and
'any other matter relevant to the case or to the formation of a plan.'"); In re Gilman Servs.,
46 B.R. 322, 327 (Bankr. D. Mass. 1985) (the primary function of an examiner is to
"investigate the debtor's actions, financial condition, as is appropriate under the particular
circumstances of the case including any allegations of fraud, dishonesty or gross
mismanagement of the debtor by current or former management"); see also In re Ionosphere
Clubs, Inc., 156 B.R. 414, 432 (S.D.N.Y. 1993) ("The purpose of an examiner's
investigation in bankruptcy is to discover whatever assets may exist for the estate of the
bankrupt, just as one purpose for the appointment of a trustee is so that a trustee may use
statutory powers conferred by the Bankruptcy Code to collect all property belonging to the
debtor for the benefit of the debtor's creditors.").

## NOTICE

111.    Notice of this Motion has been given to: (a) counsel to the Debtors; (b) the Office of the United States Trustee; (c) counsel to the Official Committee; (d) all Respondents; and (e) all parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, Wilmington Trust submits that no further or other notice is required.

## NO PRIOR REQUEST

112.    No previous request for the relief sought herein has been made by Wilmington Trust to this or any other Court.  On August 26, 2009, Law Debenture filed the Motion of Law Debenture Trust Company of New York for Leave to Conduct Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure of Tribune Company, its Affiliates, and Certain Third Parties, or Alternatively, for the Appointment of an Examiner (the "Law Debenture Rule 2004/Examiner Motion"), in which Law Debenture set forth the need for critical discovery documents.  In the alternative, Law Debenture sought the appointment of an examiner.[95]   On September 21, 2009, Wilmington Trust filed a Joinder to the Law Debenture Rule 2004/Examiner Motion (the "Joinder").[96]

113.    On September 25, 2009, the Court entered an Order approving the Stipulation as Between the Debtors, the Unsecured Creditors Committee, J.P. Morgan Chase Bank, N.A., Citigroup Global Markets, Inc., Merrill Lynch Capital Corporation, Merrill, Lynch, Pierce, Fenner & Smith, Inc., Morgan Stanley & Co. Inc., Valuation Research Corporation,

---

[95] (D.I. 2031).

[96] (D.I. 2172).

Robert R. McCormack Foundation, Cantigny Foundation (together the "Producing Parties")

and Law Debenture Trust Company of New York, settling the Law Debenture Rule

2004/Examiner Motion (the "Stipulation")[97] by providing for the discovery sought by Law

Debenture.  As a result, the Court never considered the alternative request for an examiner.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[97] (D.I. 2235).

## CONCLUSION

114.    For the reasons set forth above, Wilmington Trust respectfully requests that the Court appoint an examiner to examine the LBO, the potential claims arising therefrom, and grant Wilmington Trust further relief as this Court deems appropriate.

Dated: January 13, 2010

Respectfully submitted,

**BENESCH, FRIEDLANDER, COPLAN**
**  & ARONOFF LLP**

By:    _/s/ Jennifer R. Hoover_
        Jennifer R. Hoover, Esquire (No. 5111)
        222 Delaware Avenue, Suite 801
        Wilmington, DE 19801
        (302) 442-7010 (telephone)
        (302) 442-7012 (facsimile)
        jhoover@beneschlaw.com

        -and-

**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Martin S. Siegel, Esq.
Seven Times Square
New York, New York 10036
T:  (212) 209-4800
F:  (212) 209-4801

William M. Dolan III, Esq.
Brown Rudnick LLP
121 South Main Street
Providence, RI 02903
(401) 276-2600
(401) 276-2601 Fax

*Counsel to Wilmington Trust Company, as*
*Successor Indenture Trustee*

*1719935*

48