- subject us to market and industry speculation as to our financial condition and the effect of our debt level and debt service obligations on our operations, which speculation could be disruptive to our relationships with customers, suppliers, employees, creditors and other third parties.

**We may not be able to generate sufficient cash to service or make required repayments of our indebtedness and we may be forced to take other actions to satisfy our obligations under our indebtedness, which may not be successful.**

We have significant interest expense and principal repayment obligations. Assuming the consummation of the Leveraged ESOP Transactions occurred at the beginning of fiscal year 2007, our pro forma interest expense for the twelve months ended Dec. 30, 2007, would have been approximately $1.0 billion assuming the LIBOR rates as of March 10, 2008. Further, the $1.4 billion of borrowings under the Tranche X Facility in the Credit Agreement must be repaid in an aggregate amount of $650 million on Dec. 4, 2008, less any mandatory or other prepayments applied thereto, and the remaining outstanding amount of the Tranche X Facility must be repaid on June 4, 2009. Our ability to make scheduled payments or prepayments on our debt and other financial obligations will depend on our future financial and operating performance and our ability to dispose of assets on favorable terms. There can be no assurances that our businesses will generate sufficient cash flows from operations or that future borrowings under the revolving credit facility will be available to us in an amount sufficient to enable us to pay our indebtedness or to fund our other liquidity needs or that any such asset dispositions can be completed. Our financial and operating performance is subject to prevailing economic and industry conditions and to financial, business and other factors, some of which are beyond our control. In 2007, publishing operating revenues decreased 9% primarily due to a decrease in advertising revenue. We have experienced accelerating declines in publishing operating revenues in 2008 to date. Our increased leverage exposes us to significant risk during periods of downturns in our businesses (whether through competitive pressures or otherwise), in our industries or in the economy generally, as our cash flows would likely decrease in this scenario, but our required principal payments in respect of indebtedness do not change and our interest expense obligations could increase due to increases in interest rates.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we will likely face increased pressure to reduce or delay capital expenditures, dispose of assets or operations, further reduce the size of our workforce, seek additional capital or restructure or refinance our indebtedness. These actions could have a material adverse effect on our business, financial condition and results of operations. In addition, we cannot assure that we would be able to take any of these actions, that these actions would be successful and permit us to meet our scheduled debt service obligations or that these actions would be permitted under the terms of our existing or future debt agreements, including the Credit Agreement and the Interim Credit Agreement. For example, we may need to refinance all or a portion of our indebtedness on or before maturity. There can be no assurance that we will be able to refinance any of our indebtedness on commercially reasonable terms or at all. In the absence of improved operating results and access to capital resources, we could face substantial liquidity problems and might be required to dispose of material assets or operations to meet our debt service and other obligations. The Credit Agreement and the Interim Credit Agreement restrict our ability to dispose of assets and use the proceeds from the disposition. We may not be able to consummate those dispositions or to obtain the proceeds realized. Additionally, these proceeds may not be adequate to meet the debt service obligations then due.

If we cannot make scheduled payments or prepayments on our debt, we will be in default and, as a result, among other things, our debt holders could declare all outstanding principal and interest to be due and payable and we could be forced into bankruptcy or liquidation or required to substantially restructure or alter our business operations or debt obligations.

24

Source: TRIBUNE CO, 10-K, March 20, 2008

**Restrictive covenants under the Credit Agreement and the Interim Credit Agreement may adversely affect our operations and liquidity.**

The Credit Agreement and the Interim Credit Agreement contain, and any future indebtedness we incur may contain, various covenants that limit our ability to, among other things:

- incur or guarantee additional indebtedness, including additional secured indebtedness and/or subsidiary indebtedness;

- make certain distributions, investments and other restricted payments;

- dispose of our assets;

- grant liens on our assets;

- engage in transactions with affiliates; and

- merge or consolidate or transfer substantially all of our assets.

As a result of these covenants, we are limited in the manner in which we conduct our business and we may be unable to engage in favorable business activities or finance future operations or capital needs. In addition, the covenants in the Credit Agreement require us to comply with a specified maximum total guaranteed leverage ratio and minimum interest coverage ratio. Our ability to comply with the covenants and restrictions contained in the agreements governing our indebtedness may be affected by economic, financial and industry conditions beyond our control. A breach of any of these covenants or any of the other restrictive covenants could result in a default under the Credit Agreement and the Interim Credit Agreement. Upon the occurrence of an event of default under the Credit Agreement and the Interim Credit Agreement, the lenders:

- will not be required to lend any additional amounts to us;

- could elect to declare all borrowings outstanding thereunder, together with accrued and unpaid interest and fees, to be due and payable;

- could require us to apply all of our available cash to repay these borrowings; or

- could require us to engage in other restructuring transactions that could materially affect our stakeholders' interest in the Company or our business operations;

any of which could also result in an event of default under our indentures governing our existing senior notes or PHONES debt.

**We are a holding company and our ability to make payments on our indebtedness depends on our ability to receive dividends and other distributions from our subsidiaries.**

Tribune Company is a holding company with limited direct operations. Our principal assets are the equity interests that we hold in our operating subsidiaries. As a result, we are dependent on dividends and other distributions from our subsidiaries to generate the funds necessary to meet our financial obligations, including the payment of principal and interest on our outstanding indebtedness. Our subsidiaries may not generate sufficient cash from operations to enable us to make principal and interest payments on our indebtedness. In addition, any payment of dividends, distributions, loans or advances to us by our subsidiaries could be subject to legal or

25

regulatory restrictions on dividends. Payments to us by our subsidiaries will be contingent upon our subsidiaries' cash flows.

**Variable rate indebtedness subjects us to interest rate risk, which could cause our debt service obligations to increase significantly.**

As of Dec. 30, 2007, approximately $10.6 billion of our borrowings, primarily borrowings under the Credit Agreement and the Interim Credit Agreement, were at variable rates of interest and expose us to interest rate risk. If interest rates increase, our debt service obligations on the variable rate indebtedness would increase even though the amount borrowed remained the same. Under the terms of the Credit Agreement discussed in Item 1, Business "Significant Events", we are required to enter into hedge arrangements to offset a percentage of our interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. We are party to three interest rate swaps confirmations with Barclays Bank, which provides for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to $750 million in notional amount. The swaps confirmations effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points. We are also party to an additional interest rate swap agreement related to the $100 million 7.5% debentures due in 2023 which effectively converts the fixed 7.5% rate to a variable rate based on LIBOR. Although we may enter into additional interest rate swaps, involving the exchange of floating for fixed rate interest payments, to reduce interest rate volatility, we cannot provide assurances that we will be able to do so or that such swaps will be effective.

**If we fail to maintain our election to be treated as a subchapter S corporation under the Internal Revenue Code, we will remain subject to federal income tax and, in the future, may be required to obtain a significant investment in the Company.**

The Credit Agreement and the Interim Credit Agreement require that we make and maintain an election to be treated as a subchapter S corporation under the Internal Revenue Code. As discussed in Item 1, Business "Significant Events", on March 13, 2008, we filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code effective for fiscal year 2008 and beyond. Subject to certain limitations (such as the built-in gains tax applicable for ten years to gains accrued prior to the election), as a result of this election we are no longer subject to federal income tax. Instead, our income is required to be reported by our shareholders. The Company's Employee Stock Ownership Plan is generally not taxed on the amount of income that is passed through to it. If we fail to maintain the election, we will once again be subject to federal income tax.

Further, if we fail to maintain the S corporation election for any year beginning with 2009, then we will be required under the Credit Agreement and the Interim Credit Agreement in each such year to obtain an investment in the Company in the form of common stock or subordinated debt of the Company in an amount up to $100 million. If we are unable to keep the S corporation election effective as a result of governmental, regulatory or administrative challenge or change in law, rule or regulation, we will not be required under the Credit Agreement and the Interim Credit Agreement to obtain such an investment for so long as we are diligently contesting in good faith by appropriate proceedings our inability to keep such election effective. However, if after contesting our inability to keep such election effective we are still unable to keep the S corporation election effective, we will be required by the terms of the Credit Agreement and the Interim Credit Agreement to obtain an investment of up to $100 million per year in respect of all applicable years beginning with 2009 for which the S corporation was not effective. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and the Interim Credit Agreement and, as a result, among other things, our debt holders could declare all outstanding principal and interest to be due and payable and we could be forced into bankruptcy or liquidation or required to substantially restructure or alter our business operations or debt obligations.

26

Source: TRIBUNE CO, 10-K, March 20, 2008

**Risks Related to Our Business**

**Advertising demand will continue to be impacted by changes in economic conditions and fragmentation of the media landscape.**

Advertising revenue is the primary source of revenue for our publishing and broadcasting businesses. National and local economic conditions, particularly in major metropolitan markets, affect the levels of retail, national and classified newspaper advertising revenue, as well as television advertising revenue. Changes in Gross Domestic Product, consumer spending, auto sales, housing sales, unemployment rates, job creation and circulation levels and rates all impact demand for advertising. Consolidation across various industries, particularly large department store and telecommunications companies, may also reduce our overall advertising revenue.

Competition from other media, including other metropolitan, suburban and national newspapers, broadcasters, cable systems and networks, satellite television and radio, websites, magazines, direct marketing and solo and shared mail programs, affects our ability to retain advertising clients and raise rates. In recent years, Internet sites devoted to recruitment, automobile and real estate have become significant competitors of our newspapers and websites for classified advertising. While we have invested in successful Internet ventures such as CareerBuilder and Classified Ventures to capture some of the advertising dollars that have migrated online, retaining our historical share of classified advertising revenues remains a challenge.

Seasonal variations in consumer spending cause our quarterly advertising revenues to fluctuate. Second and fourth quarter advertising revenues are typically higher than first and third quarter advertising revenues, reflecting the slower economic activity in the winter and summer and the stronger fourth quarter holiday season.

In broadcasting, the proliferation of cable and satellite channels, advances in mobile and wireless technology, the migration of television audiences to the Internet and the viewing public's increased control over the manner and timing of their media consumption through personal video recording devices, have resulted in greater fragmentation of the television viewing audience and a more difficult sales environment.

All of these factors continue to contribute to a difficult sales environment and may further adversely impact our ability to grow or maintain our revenues.

**Circulation and audience share may continue to decline as consumers migrate to other media alternatives.**

Competition for newspaper advertising is based on reader demographics, price, service, advertiser results, and circulation and readership levels, while competition for circulation is based upon the content of the newspaper, service and price. Competition for television advertising is based on audience share and ratings information, audience demographics and price.

The National Do Not Call Registry has impacted the way newspapers sell home-delivery circulation, particularly for the larger newspapers that historically have relied on telemarketing. Similarly, Nielsen's Local People Meters, which capture viewership data in a different manner than historical Nielsen viewership data collection methods, have tended to reduce the overall share of broadcast television compared to cable television and, within the broadcast television universe, disadvantage stations like ours that target younger audiences.

Our advertising and circulation revenues have declined, reflecting general trends in the newspaper industry, including declining newspaper buying by young people and the migration to other available forms of media for news. In order to address declining circulation in certain markets, we may increase marketing designed to retain our existing subscriber base and continue to introduce niche publications targeted at commuters and young adults. We may also increase marketing efforts to drive traffic to our proprietary websites.

Source: TRIBUNE CO, 10-K, March 20, 2008

**Changes in the regulatory landscape could affect our business operations and asset mix.**

Various aspects of our operations are subject to regulation by governmental authorities in the United States. Changes in the current regulatory environment could result in increased operating costs or divestitures of several of our properties.

Our television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act of 1934, as amended. FCC rules, among other things, govern the term, renewal and transfer of radio and television broadcasting licenses and limit concentrations of broadcasting control inconsistent with the public interest. Federal law also regulates the rates charged for both political advertising and the quantity of advertising within children's programs.

From time to time, the FCC revises existing regulations and policies in ways that could affect our broadcasting operations. In addition, Congress from time to time considers and adopts substantive amendments to governing communications legislation. We cannot predict what regulations or legislation may be proposed, what regulations or legislation may be finally enacted, or what effect, if any, such regulations or legislation could have on our broadcasting operations. See "Business—Governmental Regulation" in Item 1, hereof for a discussion of the newly proposed television/newspaper cross-ownership rule and the effect the outcome could have on our business.

**The availability and cost of quality network-provided and syndicated programming may impact television ratings.**

The cost of syndicated programming represents a significant portion of television operating expenses. Programming emphasis at our stations is placed on network-provided programming, syndicated series, feature motion pictures, local and regional sports coverage, news, and children's programs. Most of our stations' programming is acquired from outside sources, including the networks with which our stations are affiliated, and some is produced locally or supplied by Tribune Entertainment Company. Network-provided programming is dependent on our ability to maintain our existing network affiliations and the continued existence of such networks. Syndicated programming costs are impacted largely by market factors, including demand from other stations or cable channels within the market. Availability of syndicated programming depends on the production of compelling programming and the willingness of studios to offer the programming to unaffiliated buyers. Our inability to continue to acquire or produce affordable programming for our stations could adversely affect operating results or our financial condition.

**Events beyond our control may result in unexpected adverse operating results.**

Our results could be affected in various ways by global or domestic events beyond our control, such as wars, political unrest, acts of terrorism, and natural disasters. Such events can quickly result in significant declines in advertising revenues and significant increases in newsgathering costs. Coverage of the war in Iraq and Hurricane Katrina are two examples where newsgathering costs increased and, in the case of Hurricane Katrina, revenues dropped off significantly at our two New Orleans television stations.

**Newsprint prices may continue to be volatile and difficult to predict and control.**

Newsprint is one of the largest expenses of our publishing units. The price of newsprint has historically been volatile and the consolidation of North American newsprint mills over the years has reduced the number of suppliers. We have historically been able to realize favorable newsprint pricing by virtue of our company-wide volume and a long-term contract with a significant supplier. However, recent supplier consolidation has led to increases in newsprint prices. Failure to maintain our current consumption levels, further supplier consolidation or the inability to maintain our existing relationships with our newsprint suppliers could adversely impact newsprint prices in the future.

28

Source: TRIBUNE CO, 10-K, March 20, 2008

**Changes in accounting standards can significantly impact reported earnings and operating results.**

Generally accepted accounting principles and accompanying pronouncements and implementation guidelines for many aspects of our business, including those related to intangible assets, pensions, employee stock ownership plans, income taxes, derivatives, equity-based compensation and broadcast rights, are complex and involve significant judgments. Changes in these rules or their interpretation could significantly change our reported earnings and operating results.

**Adverse results from litigation or governmental investigations can impact our business practices and operating results.**

From time to time, Tribune and its subsidiaries are parties to litigation and regulatory, environmental and other proceedings with governmental authorities and administrative agencies. Adverse outcomes in lawsuits or investigations could result in significant monetary damages or injunctive relief that could adversely affect our operating results or financial condition as well as our ability to conduct our businesses as they are presently being conducted. See Item 3. "Legal Proceedings" for a description of certain of our pending litigation and regulatory matters and other proceedings with governmental authorities.

**We could be faced with additional tax liabilities.**

We are subject to both federal and state income taxes and are regularly audited by federal and state taxing authorities. Significant judgment is required in evaluating our tax positions and in establishing appropriate reserves. We analyze our tax positions and reserves on an ongoing basis and make adjustments when warranted based on changes in facts and circumstances. While we believe our tax positions and reserves are reasonable, the resolution of our tax issues are unpredictable and could negatively impact our effective tax rate, net income or cash flows for the period or periods in question. See "Risk Factors—Risks Related to Our Capital Structure" above for a discussion regarding our election to be treated as a subchapter S Corporation under the Internal Revenue Code effective for fiscal year 2008 and beyond.

**Labor strikes, lock-outs and protracted negotiations can lead to business interruptions and increased operating costs.**

Union employees currently comprise about 17% of our workforce. We are required to negotiate collective bargaining agreements across our business units on an ongoing basis. Complications in labor negotiations can lead to work slowdowns or other business interruptions and greater overall employee costs.

**Acquisitions, investments and divestitures pose inherent financial and other risks and challenges.**

We intend to pursue dispositions of certain assets or businesses or other transactions to enable us to repay a portion of our indebtedness and meet our financial or operating covenants contained in our debt agreements. In addition, we continuously evaluate our businesses and make strategic acquisitions and investments, either individually or with partners, and divestitures as part of our strategic plan. These transactions involve challenges and risks in negotiation, execution, valuation and integration. There can be no assurance that any such dispositions can be completed. Moreover, competition for certain types of acquisitions is significant, particularly in the Interactive space. Even if successfully negotiated, closed and integrated, certain acquisitions or investments may prove not to advance our business strategy and may fall short of expected return on investment targets. In certain of our investments, we take a minority position in a company with limited voting rights and an inability to exert absolute control over the entity.

**ITEM 1B.    UNRESOLVED STAFF COMMENTS.**

None.

Source: TRIBUNE CO, 10-K, March 20, 2008

## ITEM 2.   PROPERTIES.

The corporate headquarters of the Company are located at 435 North Michigan Avenue, Chicago, Illinois. The general character, location and approximate size of the principal physical properties used by the Company on Dec. 30, 2007 are listed below. In total, the Company owns or leases transmitter sites, parking lots and other land aggregating approximately 1,048 acres in 87 separate locations. In addition to those properties listed below, the Company owns or leases an aggregate of approximately 3,011,451 square feet of office and production space in 291 locations. The Company also owns Wrigley Field, the 41,118-seat stadium used by the Chicago Cubs baseball team. The Company considers its various properties to be in good condition and suitable for the purposes for which they are used.

| General Character of Property | Approximate Area in Square Feet | |
|---|---|---|
| | Owned | Leased(1) |
| Publishing: | | |
| Printing plants, business and editorial offices, and warehouse space located in: | | |
| Los Angeles, CA | 656,000 | 1,334,000 |
| Chicago, IL | 1,583,000(2) | 89,000 |
| Melville, NY | | 719,000 |
| Baltimore, MD | 10,000 | 875,000 |
| Hartford, CT | 173,000 | 337,000 |
| Orlando, FL | 374,000 | 81,000 |
| Deerfield Beach, FL | 320,000 | 44,000 |
| Costa Mesa, CA | 339,000 | 47,000 |
| Irwindale, CA | | 325,000 |
| Allentown, PA | 222,000 | — |
| Chatsworth, CA | | 52,000 |
| Newport News, VA | 218,000 | 22,000 |
| Northlake, IL | | 246,000 |
| Fort Lauderdale, FL | — | 163,000 |
| Oakbrook, IL | | 99,000 |
| Stamford, CT | 85,000(3) | — |
| Miller Place, NY | 85,000 | |
| Glens Falls, NY | — | 59,000 |
| Bel Air, MD | 52,000 | |
| Columbia, MD | 29,000 | 14,000 |
| Greenwich, CT | 24,000(3) | |
| Washington, DC | | 41,000 |
| Williamsburg, VA | 25,000 | 3,000 |
| Broadcasting and entertainment: | | |
| Business offices, studios and transmitters located in: | | |
| Los Angeles, CA | 309,000(4) | 65,000 |
| Chicago, IL | 132,000 | 6,000 |
| New York, NY | | 121,000 |
| Indianapolis, IN | 79,000 | |
| Seattle, WA | 68,000 | — |
| Greenwood Village, CO | 42,000 | |
| Maryland Heights, MO | | 39,000 |
| Houston, TX | 34,000 | |
| Dallas, TX | 33,000 | — |
| San Diego, CA | | 26,000 |
| Hartford, CT | — | 22,000 |
| Philadelphia, PA | 21,000 | 4,000 |

Source: TRIBUNE CO, 10-K, March 20, 2008

| General Character of Property | Approximate Area in Square Feet | |
| --- | --- | --- |
| | Owned | Leased(1) |
| Sacramento, CA | 24,000 | |
| Grand Rapids, MI | 21,000 | — |
| Hollywood, FL | 20,000 | |
| York, PA | 20,000 | — |
| Beaverton, OR | 14,000 | |
| Washington, DC | — | 13,000 |

(1) The Company has financed eight real properties, constituting 2,989,000 square feet from TMCT. This property financing arrangement was amended by Tribune and TMCT on Sept. 22, 2006, to extend the properties' current fixed rental rate through Aug. 7, 2021. Under the terms of the amended financing agreement, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company exercised this option on Jan. 29, 2008 and expects to complete this acquisition in April 2008. See Note 8 to the Company's consolidated financial statements in Item 8 for further discussion.

(2) Includes Tribune Tower, an approximately 630,000 square foot office building in downtown Chicago, and Freedom Center, the approximately 943,000 square foot production center of the *Chicago Tribune*. Tribune Tower houses the Company's corporate headquarters, the Chicago Tribune's business and editorial offices, offices of various subsidiary companies and approximately 41,000 square feet of space leased to unaffiliated tenants. Freedom Center houses the Chicago Tribune's printing, packaging and distribution operations.

(3) The properties in Stamford, CT and Greenwich, CT are included in assets held for sale at Dec. 30, 2007. See Note 4 to the Company's consolidated financial statements in Item 8.

(4) During the third quarter of 2007, the Company commenced a process to sell the real estate and related assets of its studio production lot located in Hollywood, California. The sale of the studio production lot closed on Jan. 30, 2008. In connection with the closing of the sale, the Company entered into a five-year lease for a portion of the studio production lot currently utilized by the Company's KTLA-TV station.

31

Source: TRIBUNE CO, 10-K, March 20, 2008

#### ITEM 3.    LEGAL PROCEEDINGS.

The Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations. In addition, the Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies.

**Matthew Bender and Mosby Income Tax Liability**—During 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in the United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in Tax Court.

On Sept. 27, 2005, the Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions totaled approximately $1 billion as of Sept. 27, 2005. Over time, deductions for state taxes and interest were expected to reduce the net cash outlay to approximately $840 million.

The Company appealed the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. On June 1, 2007, the Company announced that an offer of settlement was pending in its appeal. The Company finalized the settlement during the third quarter of 2007. As a result of the settlement, the Company received refunds of federal income taxes and interest of $4 million on Sept. 26, 2007 and $340 million on Oct. 1, 2007. After consideration of income taxes on the interest received, the net cash proceeds totaled approximately $286 million. These refunds, together with related state income tax benefits of $29 million, were accounted for as a $91 million reduction in 2007 income tax expense and a $224 million reduction in goodwill recorded on the Company's consolidated balance sheet. For further information, see Note 14 to the Company's consolidated financial statements in Item 8.

*Newsday* **and** *Hoy,* **New York Charge**—In February 2004, a purported class action lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* and *Hoy,* New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications. The purported class action also alleges that entities that paid a *Newsday* subsidiary to deliver advertising flyers were overcharged. The Company is vigorously defending this suit.  In July 2004, another lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* alleging damages resulting from inflated *Newsday* circulation numbers as well as federal and state antitrust violations. On Feb. 11, 2008, this suit was settled with all defendants.

On June 17, 2004, the Company publicly disclosed that it would reduce its reported circulation for both *Newsday* and *Hoy,* New York for the 12-month period ended Sept. 30, 2003 and the six-month period ended March 31, 2004. The circulation adjustments were the result of a review of reported circulation at *Newsday* and *Hoy,* New York, conducted by the Company's internal audit staff and the Audit Bureau of Circulations. Subsequent to the June 17th disclosure, the Company continued its internal review and found additional misstatements for these time periods, as well as misstatements that impacted the 12-month period ended Sept. 30, 2002. On Sept. 10, 2004, the Company announced additional revisions to the circulation figures for *Newsday* and *Hoy,* New York, for the 12-month period ended Sept. 30, 2003 and the six-month period ended March 31, 2004.

As a result of the misstatements of reported circulation at *Newsday* and *Hoy,* New York, the Company recorded a total pretax charge of $90 million in 2004 as its estimate of the probable cost to settle with advertisers.

Source: TRIBUNE CO, 10-K, March 20, 2008

In the fourth quarter of 2007, the Company recorded an additional pretax charge of $3 million pertaining to *Newsday*. The Company will continue to evaluate the adequacy of the advertiser settlement accrual on an ongoing basis (see Note 5 to the Company's consolidated financial statements in Item 8).

In addition to the advertiser lawsuits, several class action and shareholder derivative suits were filed against the Company and certain of its current and former directors and officers as a result of the circulation misstatements at *Newsday* and *Hoy*, New York. These suits alleged breaches of fiduciary duties and other managerial and director failings under Delaware law, the federal securities laws and the Employee Retirement Income Security Act ("ERISA"). The consolidated shareholder derivative suit filed in Illinois state court in Chicago was dismissed with prejudice on March 10, 2006. The appeal of this dismissal to the Illinois State Court of Appeals was voluntarily dismissed by the plaintiff following the closing of the Company's going private transaction. The consolidated securities class action lawsuit and the consolidated ERISA class action lawsuit filed in Federal District Court in Chicago were both dismissed with prejudice on Sept. 29, 2006, and the dismissals are currently being appealed to the United States Court of Appeals for the Seventh Circuit. Oral arguments of the consolidated securities and ERISA class action appeals were heard on Jan. 23, 2008. The Company continues to believe these suits are without merit and will continue to vigorously defend them.

On May 30, 2006, the Securities and Exchange Commission ("SEC") concluded its inquiry into circulation practices at *Newsday* and *Hoy*, New York. In closing its inquiry, the SEC ordered the Company to cease and desist from violating statutory provisions related to its record keeping and reporting. No fines or other sanctions were levied against the Company. The Company consented to the order without admitting or denying any of the Commission's findings. The SEC acknowledged the prompt internal investigation and remedial acts undertaken by the Company and the cooperation the Company afforded the Commission's staff throughout its investigation.

On Dec. 17, 2007, *Newsday* and *Hoy*, New York reached a non-prosecution agreement with the United States Attorneys' Office for the Eastern District of New York that ended the federal inquiry into the circulation practices of *Newsday* and *Hoy*, New York. The agreement recognized *Newsday's* and *Hoy*, New York's full cooperation with the investigation; the implementation of new practices and procedures to prevent fraudulent circulation practices, the payment of approximately $83 million in restitution to advertisers, and a civil forfeiture payment of $15 million, which is available for additional restitution. The $15 million civil forfeiture payment is included in 2007 non-operating expense (see Note 2 of the Company's consolidated financial statements in Item 8). Nine former employees and contractors of *Newsday* and *Hoy*, New York have pleaded guilty to various criminal charges in connection with the fraudulent circulation practices uncovered by the Company. They are awaiting the imposition of sentence.

**Media Ownership Rules**—On Nov. 30, 2007, the FCC issued an order (the "Order") granting the Company temporary waivers of the newspaper/broadcast cross-ownership rule in Miami, Florida (WSFL-TV and the *South Florida Sun-Sentinel*); Hartford, Connecticut (WTXX-TV/WTIC-TV and the *Hartford Courant*); Los Angeles, California (KTLA-TV and the *Los Angeles Times*); and New York, New York (WPIX-TV and *Newsday*), for a six-month period beginning Jan. 1, 2008. The six-month waiver could be automatically extended under two conditions: (1) if the Company appeals the Order, the waivers are extended for the longer of two years or six months after the conclusion of the litigation over the Order; or (2) if the FCC adopts a revised newspaper-broadcast cross-ownership rule prior to Jan. 1, 2008, the waivers are extended for a two-year period to allow the Company to come into compliance with any revised rule, provided that in the event the revised rule is the subject of a judicial stay, the waiver is extended until six months after the expiration of any such stay.

The Order also granted the Company a permanent waiver of the newspaper-broadcast cross-ownership rule to permit continued common ownership of WGN-AM, WGN-TV and the *Chicago Tribune* in Chicago, Illinois; a permanent "failing station" waiver of the television duopoly rule to permit continued common ownership of WTIC-TV and WTXX-TV in Hartford, Connecticut; and granted satellite station status to WTTK-TV, Kokomo, Indiana to permit continued common ownership with WTTV-TV, Bloomington, Indiana.

33

The Company filed an appeal of the Order in the United States Court of Appeals for the District of Columbia Circuit on Dec. 3, 2007, thus automatically extending the waivers for two years or until six months after the conclusion of that appeal, whichever is longer. Intervenors have filed a motion to dismiss the appeal, as well as a motion to hold the appeal in abeyance; the Company and others have filed oppositions to these motions. Various parties have filed petitions for reconsideration of the Order with the FCC; the Company has filed oppositions to such filings with the FCC.

On Dec. 18, 2007, the FCC announced in an FCC news release the adoption of revisions to the newspaper/broadcast cross-ownership rule. The FCC, on Feb. 4, 2008, released the full text of the rule. The revised rule establishes a presumption that the common ownership of a daily newspaper of general circulation and either a television or a radio broadcast station in the top 20 Nielsen Designated Market Areas ("DMAs") would serve the public interest, provided that, if the transaction involves a television station, (i) at least eight independently owned and operating major media voices (defined to include major newspapers and full-power commercial television stations) would remain in the DMA following the transaction and (ii) the cross-owned television station is not among the top-four ranked television stations in the DMA. Other proposed newspaper/ broadcast transactions would be presumed not to be in the public interest, except in the case of a "failing" station or newspaper, or in the event that the proposed transaction results in a new source of news in the market. The FCC did not further relax the television-radio cross-ownership rules, the radio local ownership rules, or the television duopoly rules. Under the rule adopted, the Company would be entitled to a presumption in favor of common ownership in three of the four of the Company's cross-ownership markets (New York, New York; Los Angeles, California, and Miami, Florida) not covered by the FCC's grant of a permanent waiver (Chicago, Illinois).

Various parties, including the Company, have sought judicial review of the FCC's order adopting the new rule, seeking either to challenge the relaxation of the complete prohibition on cross-ownership or the retention of any restrictions. While the Company remains optimistic that the cross-ownership relief granted in major markets will be upheld, it cannot predict with certainty the timing or the outcome of the FCC's reconsideration proceeding concerning the Nov. 30, 2007 order, the Company's appeal of the Order, or the various challenges to the adoption of the new rule on Dec. 18, 2007.

**PHONES Indenture**—The Company received a letter dated April 9, 2007, (1) stating that it was written on behalf of two hedge funds purporting to hold approximately 37% of the Company's 8,000,000 PHONES Exchangeable Subordinated Debentures due 2029 (the "PHONES"), (2) purporting to give a "notice of default" that the Company has violated the "maintenance of properties" covenant in the indenture under which the PHONES were issued (the "PHONES Indenture") and (3) informing the Company that failure to remedy such purported violation within 60 days of notice will result in an "event of default" under the PHONES Indenture (which could, if properly declared, result in an acceleration of principal and interest payable with respect to the PHONES). On April 27, 2007, the Company received a letter from the law firm purporting to represent the two hedge funds stating that the law firm also purported to represent a third hedge fund, which, together with the first two hedge funds, purported to hold 55% of the Company's PHONES and reiterating the claims set forth in the April 9, 2007 letter.

The particular covenant in question, Section 10.05 of the PHONES Indenture, requires the Company to "cause all properties used or useful in the conduct of its business or the business of any Subsidiary to be maintained and kept in good condition, repair and working order (normal wear and tear excepted) and supplied with all necessary equipment… all as in the judgment of the Company may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times…." Section 10.05 of the PHONES Indenture expressly provides that the covenant does not "prevent the Company from discontinuing the operation and maintenance of any such properties, or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company or of the Subsidiary concerned, desirable in the conduct of its business or the business of any Subsidiary and not disadvantageous in any material respect to the Holders [of the PHONES]." The letters suggest that the Company's recent sales of three television stations, announced intention to dispose of an interest in the Chicago Cubs baseball team and recent and proposed

34

issuances of debt and return of capital to stockholders violated or will violate this maintenance of properties covenant.

On May 2, 2007, the Company sent a letter to the law firm purporting to represent the hedge funds rejecting their purported "notice of default" as defective and invalid because the Company was not in default of Section 10.05, the entities the law firm purported to represent were not "Holders" as defined in the PHONES Indenture, and because the law firm had provided no evidence that it was an agent duly appointed in writing as contemplated by Section 1.04 of the PHONES Indenture. The law firm sent a letter to the Company on May 8, 2007 responding to the Company's May 2, 2007 letter, reiterating its claim that the Company was in default of Section 10.05 and stating that it had properly noticed a default pursuant to Section 5.01(4) of the Indenture. The Company further responded by letter dated May 18, 2007 reaffirming its rejection of the purported "notice of default" and reiterating its position that the Company was not in default of Section 10.05 and that the entities the law firm purported to represent were not entitled to provide a notice of default under Section 5.01(4) of the PHONES Indenture.

On July 23, 2007, the Company received a letter from the law firm purporting to represent the hedge funds, purported to hold 70% of the Company's PHONES, stating that the Company has breached Section 10.05 of the PHONES Indenture, such breach was continuing on the date of such letter, which was more than 60 days after the purported "notice of default" had been given, and that pursuant to Section 5.01(4) of the Indenture, an "event of default" under the PHONES Indenture had occurred and was continuing. The July 23, 2007 letter further stated that the hedge funds were declaring the outstanding principal of $157 per share of all of the outstanding PHONES, together with all accrued but unpaid interest thereon to be due and payable immediately, and were demanding immediate payment of all such amounts. On July 27, 2007, the Company sent a letter to the trustee under the PHONES Indenture and the law firm purporting to represent the three hedge funds rejecting the allegations made in such law firm's July 23, 2007 letter and reiterating the Company's position that the Company is not in default of Section 10.05 and that such hedge funds are not entitled under the PHONES Indenture to provide the purported notice of default.

On Aug. 10, 2007, the law firm purporting to represent the three hedge fund holders sent a letter to the trustee under the PHONES Indenture stating that the PHONES holders intended to institute proceedings to confirm the alleged covenant default and acceleration notice. On Sept. 17, 2007, the Company received copies of default notices from Cede & Co., the record holder of the PHONES, on behalf of the three hedge fund holders. These purported notices of default indicate that they were issued at the request of each of the hedge funds by Cede & Co., the holder of record for the notes beneficially owned by each of the hedge funds. The letter stated that Tribune was required to remedy the purported default within 60 days of the date of the letter and that failure to do so would constitute an "Event of Default" under the PHONES Indenture. On Dec. 26, 2007, the Company received copies of notices of acceleration from Cede & Co., purportedly on behalf of the three hedge fund holders. These purported notices of acceleration indicate that they were issued at the request of each of the hedge funds by Cede & Co., the holder of record for the notes beneficially owned by each of the hedge funds. To date, the trustee under the PHONES Indenture has not initiated any action on behalf of the PHONES holders.

The Company continues to believe that the hedge funds' claims are without merit and that the Company remains in full compliance with Section 10.05 of the PHONES Indenture. The Company will enforce and defend vigorously its rights under the PHONES Indenture.

**PHONES Interest**—In connection with the routine examination of the Company's federal income tax returns for 2000 through 2003, the IRS proposed that the Company capitalize the interest on the PHONES as additional tax basis in the Company's 16 million shares of Time Warner common stock, rather than allowing the Company to currently deduct such interest. The National Office of the IRS has issued a Technical Advice Memorandum that supports the proposed treatment. The Company disagrees with the IRS's position and requested that the IRS administrative appeals office review the issue. The effect of the treatment proposed by the IRS would be to increase the Company's tax liability by approximately $189 million for the period 2000 through 2003 and by approximately $245 million for the period 2004 through 2007.

35

During the fourth quarter of 2006, the Company reached an agreement with the IRS appeals office regarding the deductibility of the PHONES interest expense. The agreement would apply for the tax years 2000 through the 2029 maturity date of the PHONES. In December of 2006, under the terms of the agreement reached with the IRS appeals office, the Company paid approximately $81 million of tax plus interest for tax years 2000 through 2005. The tax payments were recorded as a reduction in the Company's deferred tax liability, and the interest was recorded as a reduction in the Company's income tax reserves. The agreement reached with the appeals office is being reviewed by the Joint Committee on Taxation. A decision from the Joint Committee on Taxation is expected by the end of the second quarter of 2008.

**Shareholder Derivative Litigation**—On Sept. 19, 2006, a Company stockholder filed a complaint in the United States District Court for the Northern District of Illinois against the Company's directors, with the exception of Messrs. Chandler, Goodan and Stinehart, and the Company as a nominal defendant, alleging direct and derivative claims on behalf of a purported class of Company stockholders for breach of fiduciary duty in connection with the Company's May 2006 share repurchase program and the manner in which the Board was handling its exploration of strategic alternatives. After the judge in that case issued a memorandum questioning whether plaintiff had satisfied the requirements for diversity jurisdiction in order to maintain the case in federal court, plaintiff moved to dismiss the case voluntarily without prejudice. The district court dismissed the case on Sept. 27, 2006.

Approximately seven weeks later, on Nov. 17, 2006, the same plaintiff filed a complaint captioned Garamella v. FitzSimons, et al., No. BC362110, in the Superior Court of California, Los Angeles County, alleging substantially identical direct and derivative claims on behalf of a purported class of Company stockholders against all Company directors, including Messrs. Chandler, Goodan and Stinehart, and the Company as a nominal defendant. After the Company announced the Leveraged ESOP Transactions on April 2, 2007, and before any responsive pleading was due, plaintiff amended the California complaint to include claims alleging that the Company's directors breached their fiduciary duties to stockholders in connection with the negotiation of the Leveraged ESOP Transactions and execution of the related documents. Specifically, plaintiff claimed that the directors' desire to entrench themselves on the Company's Board caused them to breach their fiduciary duties by undertaking the May 2006 share repurchase program which caused the Company to take on additional debt and, according to plaintiff, become less attractive to potential bidders. Plaintiff further alleged that the directors' entrenchment motives caused them to breach their fiduciary duties by rejecting certain strategic alternatives for the Company, such as a sale of individual Company assets or a tax-free spin-off, and by keeping in place certain of the Company's corporate governance mechanisms such as the stockholder rights plan and the staggered structure of the Board. With respect to the Merger Agreement and the auction process that preceded it, plaintiff claimed that the directors breached their fiduciary duties by setting a bid deadline of March 31, 2007 and thereby "cutting short" the bidding process, by structuring the transaction to include an up-front tender offer which plaintiff characterizes as "coercive," and by structuring the transaction so that "insider shareholders" such as the Chandler Trusts and McCormick Tribune Foundation obtain additional unique benefits from the transaction that are not available to other stockholders. Defendants filed motions to dismiss the California complaint on April 20, 2007. On May 4, 2007, the court denied defendants' motions to dismiss. On May 18, 2007, plaintiff filed a motion for a preliminary injunction seeking to enjoin the Company from completing the Tender Offer until the Company (1) took steps to maximize shareholder value, (2) removed the allegedly coercive aspects of the Tender Offer and (3) disclosed all material information about the Tender Offer to stockholders. On May 22, 2007, the court denied plaintiff's motion for a preliminary injunction. On Feb. 26, 2008, plaintiff filed a stipulation and proposed order regarding the voluntary dismissal of this action. The court entered the order dismissing the case on Feb. 27, 2008.

The Company does not believe that any other matters or proceedings presently pending will have a material adverse effect on its consolidated financial position, results of operations or liquidity.

## ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

None.

36

PART II

ITEM 5.  MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER
PURCHASES OF EQUITY SECURITIES.

On Dec. 20, 2007, the Company consummated the Merger, as defined and discussed in Part I, Item 1, hereof.  Pursuant to the Merger Agreement, each share of the Company's common stock issued and outstanding immediately prior to the Merger, other than shares held by the Company, the ESOP, or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties), and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes.

The Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated and requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of market on Dec. 20, 2007, and that the NYSE file with the Securities and Exchange Commission an application on Form 25 to report that the shares of the Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

Prior to the Merger, total cash dividends declared on the Company's common stock were $43 million in 2007 and $195 million for 2006.  The Company ceased paying cash dividends after the first quarter of 2007.

**Common Stock Repurchases**—As defined and discussed in the description of the Leveraged ESOP Transactions contained in Part I, Item 1, hereof, the Company completed two common stock repurchases in 2007.  The following table summarizes the Company's 2007 common stock repurchases (in thousands):

|  | Shares | Cost |
|---|---|---|
| June 4, 2007 Share Repurchase | 126,007 | $ 4,289,192 |
| Dec. 20, 2007 Merger consummation | 118,586 | 4,032,081 |
| Total common stock repurchases | 244,593 | $ 8,321,273 |

ITEM 6.  SELECTED FINANCIAL DATA.

Selected financial data for the years 2003 through 2007 is contained under the heading "Five Year Financial Summary" on pages 141 and 142 and is derived from financial statements for those years. The information contained in the "Five Year Financial Summary" is not necessarily indicative of the results of operations to be expected for future years, and should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in Item 7 and the Company's consolidated financial statements and related notes thereto included in Item 8 of this Form 10-K which were audited by the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP.

37

Source: TRIBUNE CO, 10-K, March 20, 2008

**ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

The following discussion presents the significant factors that have affected the businesses of Tribune Company and its subsidiaries (the "Company") over the last three years. This commentary should be read in conjunction with the Company's consolidated financial statements and "Five Year Financial Summary," which are also presented in this Form 10-K. Certain prior year amounts have been reclassified to conform with the 2007 presentation. These reclassifications had no impact on reported prior year total revenues, operating profit or net income.

## FORWARD-LOOKING STATEMENTS

The discussion contained in this Item 7 (including, in particular, the discussion under "Overview"), the information contained in Item 7A, "Quantitative and Qualitative Disclosures About Market Risk," and the information contained in the subsequent notes to the Company's consolidated financial statements, contain certain forward-looking statements that are based largely on the Company's current expectations. Forward-looking statements are subject to certain risks, trends and uncertainties that could cause actual results and achievements to differ materially from those expressed in the forward-looking statements including, but not limited to, the items discussed in Item 1A, "Risk Factors." Such risks, trends and uncertainties, which in some instances are beyond the Company's control, include: our ability to generate sufficient cash to service the significant debt levels and other financial obligations as a result of the Leveraged ESOP Transactions (as defined below in "Significant Events"); potential impacts to operations and liquidity as a result of restrictive covenants under our senior credit facilities; our dependency on dividends and distributions from our subsidiaries to make payments on our indebtedness; increased interest rate risk due to variable rate indebtedness; the ability to maintain subchapter S corporation status; changes in advertising demand, circulation levels and audience shares; regulatory and judicial rulings; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in accounting standards; adverse results from litigation, governmental investigations or tax related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, investments and divestitures; the effect of derivative transactions; the Company's reliance on third-party vendors for various services; and other events beyond the Company's control that may result in unexpected adverse operating results.

The words "believe," "expect," "anticipate," "estimate," "could," "should," "intend" and similar expressions generally identify forward-looking statements. Readers are cautioned not to place undue reliance on such forward-looking statements, which are being made as of the date of this filing. The Company undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

## OVERVIEW

Tribune Company is a media and entertainment company, operating primarily in the United States, that conducts its operations through two business segments: publishing and broadcasting and entertainment. These segments reflect the manner in which the Company sells its products to the marketplace, manages its operations and makes business decisions. The Company's media operations are principally in major metropolitan areas of the United States and compete against similar media and other types of media on both a local and national basis.

Publishing currently consists primarily of nine daily newspapers, which include related businesses such as interactive websites. Publishing represented 72% of the Company's consolidated revenues in 2007. About 78% of publishing revenues were derived from advertising. These revenues were generated from the sale of advertising space in published issues of the newspapers and on interactive websites. Approximately 14% of publishing revenues were generated from the sales of newspapers to individual subscribers or to sales outlets, which re-sell the newspapers. The remaining 8% of revenues came from a variety of activities including the syndication of columns, features, information and comics to newspapers, commercial printing operations, sales of entertainment listings and other publishing-related activities.

38

Publishing advertising revenues are comprised of three basic categories: retail, national and classified. Changes in advertising revenues are heavily correlated with changes in the level of economic activity in the United States. Changes in Gross Domestic Product, consumer spending, auto sales, housing sales, unemployment rates, job creation, circulation levels and rates all impact demand for advertising in the Company's newspapers. The Company's advertising revenues are subject to changes in these factors both on a national level and on a local level in its markets.

Significant expense categories for publishing include compensation, newsprint and ink and other operating expenses. Compensation, which includes benefits expense and stock-based compensation expense in 2007 and 2006, represented 40% of publishing's consolidated operating expenses in 2007. Compensation expense is affected by many factors, including the level of merit increases, the number of full-time equivalent employees and changes in the design and costs of the Company's various employee benefit plans. Newsprint and ink represented 13% of the 2007 operating expenses for publishing. The Company consumed approximately 614,000 metric tons of newsprint in 2007. Newsprint is a commodity and pricing can vary significantly between years. Other expenses comprised 47% of total operating expenses. These expenses are principally for the distribution of the newspaper, promotional activities and other general and administrative expenses.

Broadcasting and entertainment currently consists of 23 television stations, one radio station, the Chicago Cubs and Tribune Entertainment, a company that distributes its own programming together with programming licensed from third parties. Broadcasting and entertainment represented 28% of the Company's consolidated revenues in 2007. About 75% of these revenues came from the sale of advertising spots in its television group. Changes in advertising revenues are heavily correlated with and influenced by changes in the level of economic activity in the United States. Changes in Gross Domestic Product, consumer spending levels, auto sales, programming content, audience share and rates all impact demand for advertising on the Company's television stations. The Company's advertising revenues are subject to changes in these factors both on a national level and on a local level in the markets in which it operates.

Significant expense categories for broadcasting and entertainment include programming expense, compensation and other expenses. Programming expense represented 33% of 2007 expenses. The level of programming expense is affected by the cost of programs available for purchase and the selection of programs aired by the Company's television stations. Compensation expense represented 42% of broadcasting and entertainment's 2007 expenses and is impacted by the same factors as noted for publishing. Other expenses represented 25% of total operating expenses and are for promotional activities and other station operating expenses.

The Company uses revenues and operating profit as ways to measure the financial performance of its business segments. The Company uses average net paid circulation for its newspapers and average audience share for its television stations as a means to measure its publishing and broadcasting and entertainment market shares and performance.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The Company's significant accounting policies are summarized in Note 1 to the Company's consolidated financial statements in Item 8. These policies conform with accounting principles generally accepted in the United States of America and reflect practices appropriate to the Company's businesses. The preparation of the Company's consolidated financial statements requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from these estimates. On an ongoing basis, the Company evaluates its policies and estimates, including those related to income taxes, pension and other postretirement benefits, broadcast rights, goodwill and other intangible assets, self-insurance liabilities, derivative instruments, accounts receivable allowances and stock-based compensation.

Management has discussed with the Audit Committee of the Board of Directors the development, selection and disclosure of the critical accounting policies and estimates and the application of these policies and estimates. In addition, there are other items within the financial statements that require estimation, but are not deemed to be critical accounting policies and estimates. Changes in the estimates used in these and other items could have a material impact on the financial statements.

39

**Income Taxes**

Provisions for federal and state income taxes are calculated on reported pretax earnings based on current tax laws and also include, in the current period, the cumulative effect of any changes in tax rates from those used previously in determining deferred tax assets and liabilities. Taxable income reported to the taxing jurisdictions in which the Company operates often differs from pretax earnings because some items of income and expense are recognized in different time periods for income tax purposes. The Company provides deferred taxes on these temporary differences in accordance with Financial Accounting Standard ("FAS") No. 109, "Accounting for Income Taxes." Taxable income also may differ from pretax earnings due to statutory provisions under which specific revenues are exempt from taxation and specific expenses are not allowable as deductions. The Company establishes reserves for income tax when it is probable that one or more of the taxing authorities will challenge and disallow a position taken by the Company in its income tax returns and the resulting liability is estimable. The consolidated tax provision and related accruals include estimates of the potential taxes and related interest as deemed appropriate. These estimates are reevaluated and adjusted, if appropriate, on a quarterly basis. Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

On Jan. 1, 2007, the Company adopted the provisions of the Financial Accounting Standards Board ("FASB") Interpretation ("FIN") No. 48, "Accounting for Uncertainty in Income Taxes." FIN 48 addresses the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. Under FIN 48, a company may recognize the tax benefit of an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. FIN 48 requires the tax benefit recognized in the financial statements to be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods and disclosure. See Note 14 to the Company's consolidated financial statements in Item 8 for additional information.

**Pension and Other Postretirement Benefits**

The Company provides defined benefit pension, postretirement health care and life insurance benefits to eligible employees under a variety of plans (see Note 15 to the Company's consolidated financial statements in Item 8). Accounting for pension and other postretirement benefits requires the use of several assumptions.

Weighted average assumptions used in 2007 and 2006 in accounting for pension benefits and other postretirement benefits were:

|  | Pension Plans | | Other Postretirement Plans | |
| --- | --- | --- | --- | --- |
|  | 2007 | 2006 | 2007 | 2006 |
| Discount rate for expense | 5.75% | 5.50% | 5.75% | 5.50% |
| Discount rate for obligations | 6.65% | 5.75% | 6.30% | 5.75% |
| Increase in future salary levels for expense | 3.50% | 3.50% | — | — |
| Increase in future salary levels for obligations | 3.50% | 3.50% | — | — |
| Long-term rate of return on plans' assets | 8.50% | 8.50% | — | — |

The Company used a building block approach to determine its current 8.5% assumption of the long-term expected rate of return on pension plan assets. Based on historical market studies, the Company's long-term expected returns for equity and fixed income securities approximate 10% and 6%, respectively. As of the date of this report, a 0.5% decrease in the Company's long-term rate of return assumption would result in a $9 million increase in the Company's net pension expense. In 2007, the pension plans' assets earned a return of approximately 6.6%. Prior to Dec. 30, 2007, the Company based the rate used for discounting future benefit

40

obligations and calculating interest cost on an index of Aa-rated corporate bonds. The duration of the bonds in this index approximated the timing of future payments for the Company's benefit obligations. Beginning on Dec. 30, 2007, the Company uses the Citigroup Above Median yield curve for discounting future benefit obligations and calculating interest costs. The Citigroup Above Median yield curve represents yields on high quality corporate bonds that more closely match the cash flows of the estimated payouts for the Company's benefit obligations.

In September 2006, the FASB issued FAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106 and 132(R)" which requires an employer to recognize the overfunded or underfunded status of a defined benefit postretirement plan (other than a multiemployer plan) as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which changes occur through comprehensive income. The Statement also requires an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions. The Company adopted the provisions of FAS No. 158 as of Dec. 31, 2006. Prior to Dec. 31, 2006, the Company accounted for its defined benefit plans under FAS No. 87, "Employers' Accounting for Pensions" and accounted for its other postretirement benefit plans under FAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions."

In accordance with FAS No. 87, unrecognized net actuarial gains and losses will be recognized in net periodic pension expense over approximately 11 years, representing the estimated average remaining service period of active employees expected to receive benefits, with corresponding adjustments made to accumulated other comprehensive income (loss) in accordance with FAS No. 158. The Company's policy is to incorporate asset-related gains and losses into the asset value used to calculate the expected return on plan assets and into the calculation of amortization of unrecognized net actuarial loss over a four-year period.

In December 2005, the pension benefits for former Times Mirror non-union and non-Newsday employees were frozen. As a result of the plan freeze, a pretax curtailment gain of $18 million ($13 million at publishing, $1 million at broadcasting and entertainment, and $4 million at corporate) was recorded. On March 31, 2006, the pension plan benefits for Newsday union and non-union employees were frozen.

The Company's pension plans' asset allocations at Dec. 30, 2007 and Dec. 31, 2006 were as follows (in millions):

| Asset Category | Plan Assets | | | |
| | Dec. 30, 2007 | | Dec. 31, 2006 | |
| --- | ---: | ---: | ---: | ---: |
| Equity securities | $ 1,316 | 72.8% | $ 1,344 | 76.2% |
| Fixed income securities | 405 | 22.4% | 334 | 18.9% |
| Other | 86 | 4.8% | 86 | 4.9% |
| Total | $ 1,807 | 100% | $ 1,764 | 100% |

The Company's current 2008 target allocation for its pension plans' assets are 70% in equity securities and 30% in fixed income securities and other.

For purposes of measuring 2007 postretirement health care costs, a 8.25% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2007. The rate was assumed to decrease gradually to 5% for 2012 and remain at that level thereafter. For purposes of measuring health care obligations at Dec. 30, 2007, a 6.7% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2008. The rate was assumed to decrease gradually to 5% for 2012 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported for health care plans. As of the date of this report, a 1% change in assumed health care cost trend rates would have the following effects (in thousands):

| | 1% Increase | 1% Decrease |
| --- | ---: | ---: |
| Service cost and interest cost | $ 357 | $ (319) |
| Projected benefit obligation | $ 5,559 | $ (4,983) |

41

Source: TRIBUNE CO, 10-K, March 20, 2008

The Company contributed $17 million to certain of its union and non-qualified pension plans, including $10 million of contributions made upon consummation of the Merger pursuant to change in control provisions contained in certain of the Company's non-qualified pensions plans (as defined in the description of the Leveraged ESOP Transactions in "Significant Events"), and $15 million to its other postretirement plans in 2007. The Company plans to contribute $6 million to certain of its union and non-qualified pension plans and $13 million to its other postretirement plans in 2008.

During 2008, the Company expects to recognize as part of its net periodic pension benefit cost approximately $25 million of net actuarial losses and $1 million of prior service credits that are included, after taxes, in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) at Dec. 30, 2007.

The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid (in thousands):

| | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| 2008 | $ 87,205 | $ 14,746 |
| 2009 | 91,420 | 14,798 |
| 2010 | 95,207 | 14,804 |
| 2011 | 98,976 | 14,832 |
| 2012 | 102,946 | 14,487 |
| 2013-2017 | 576,314 | 66,598 |

## Broadcast Rights

Broadcast rights consist principally of rights to broadcast syndicated programs, sports and feature films and are stated at the lower of cost or estimated net realizable value. The total cost of these rights is recorded as an asset and a liability when the program becomes available for broadcast. Syndicated program rights that have limited showings are generally amortized using an accelerated method as programs are aired. Sports and feature film rights are amortized using the straight-line method. The current portion of broadcast rights represents those rights available for broadcast that are expected to be amortized in the succeeding year. At Dec. 30, 2007 and Dec. 31, 2006, the Company had broadcast rights assets of $588 million and $567 million, respectively.

The Company maintains an allowance for programming that is not expected to be aired by the end of the contract period. This allowance for excess programming inventory is based on a program-by-program review of the Company's five-year broadcast plans and historical write-off trends. The total reserve balance at Dec. 30, 2007 and Dec. 31, 2006 was $3 million and $4 million, respectively. Actual write-offs in 2007 and 2006 were $.9 million and $.4 million, respectively. Future write-offs can vary based on changes in consumer viewing trends and the availability and costs of other programming.

## Goodwill and Other Intangible Assets

The Company reviews goodwill and certain intangible assets no longer being amortized for impairment annually, or more frequently if events or changes in circumstances indicate that an asset might be impaired, in accordance with FAS No. 142, "Goodwill and Other Intangible Assets." Under FAS No. 142, the impairment review of goodwill and other intangible assets not subject to amortization must be based on estimated fair values. At Dec. 30, 2007 and Dec. 31, 2006, goodwill and other intangible assets totaled $8,243 million and $8,683 million, respectively.

The Company performs its annual impairment review in the fourth quarter of each year. The estimated fair values of the reporting units to which goodwill has been allocated is determined using many critical factors, including operating cash flows, revenue and market growth, market multiples, and discount rates. The estimated fair values of other intangible assets subject to the annual impairment review, which include newspaper mastheads and FCC licenses, are generally calculated based on projected future discounted cash flow analyses.

42

Source: TRIBUNE CO, 10-K, March 20, 2008

The development of market multiples, operating cash flow projections and discount rates used in these analyses requires the use of assumptions, including assumptions regarding revenue and market growth as well as specific economic factors in the publishing and broadcasting industries. These assumptions reflect the Company's best estimates, but these items involve inherent uncertainties based on market conditions generally outside of the Company's control.

In the fourth quarter of 2007, the Company recorded a pretax impairment charge of $130 million ($79 million after taxes) related to one of its masthead intangible assets in connection with its annual impairment review under FAS No. 142 (see Note 7 to the Company's consolidated financial statements in Item 8). This impairment was primarily due to a decrease in actual and projected newspaper advertising revenues as a result of the continued difficult advertising environment.

On March 13, 2008, the Company filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. As a result, essentially all of the Company's net deferred tax liabilities will be eliminated and such adjustment will be recorded as a reduction in the Company's provision for income taxes in the first quarter of 2008. This adjustment will increase the carrying values of the Company's reporting units. The Company has experienced declines in its consolidated financial operating results during 2007 as compared to the prior year, particularly in its publishing unit. Adverse changes in expected operating results and/or unfavorable changes in other economic factors used to estimate fair values could result in additional non-cash impairment charges in the future under FAS No. 142.

**Self-Insurance Liabilities**

The Company self-insures for certain medical and disability benefits, workers' compensation costs and automobile and general liability claims. The recorded liabilities for self-insured risks are calculated using actuarial methods and are not discounted. The liabilities include amounts for actual claims, claim growth and claims incurred but not reported. Actual experience, including claim frequency and severity as well as health care inflation, could result in different liabilities than the amounts currently recorded. The recorded liabilities for self-insured risks totaled $100 million and $115 million at Dec. 30, 2007 and Dec. 31, 2006, respectively.

**Derivative Instruments**

FAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," requires all derivative instruments to be recorded on the balance sheet at fair value. Changes in the fair value of derivative instruments are recognized periodically in income or other comprehensive income (loss) as described below. The provisions of FAS No. 133 affect the Company's accounting for its 8 million Exchangeable Subordinated Debentures due 2029 ("PHONES"), its three interest rate swaps related to a $2.5 billion notional amount of its variable rate borrowings, and its interest rate swap related to its $100 million 7.5% debentures (see Note 10 for further information on the Company's PHONES and interest rate swaps).

Under the provisions of FAS No. 133, the initial value of the PHONES was split into a debt component and a derivative component. Changes in the fair value of the derivative component of the PHONES are recorded in the statement of income. Beginning in the second quarter of 1999, changes in the fair value of the related 16 million Time Warner shares are also recorded in the statement of income and should at least partially offset changes in the fair value of the derivative component of the PHONES. However, there have been, and may continue to be, periods with significant non-cash increases or decreases to the Company's net income pertaining to the PHONES and the related Time Warner shares.

The interest rate swaps related to $2.5 billion of the Company's variable rate borrowings are cash flow hedges. Under FAS No.133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. While there will be some ineffectiveness in the future, the Company's cash flow hedges are deemed to be highly effective, and therefore gains and losses resulting from changes in the fair value of these hedges, other than changes resulting from hedge ineffectiveness, are recorded in other comprehensive income (loss), net of taxes.

43

Source: TRIBUNE CO, 10-K, March 20, 2008

The Company's interest rate swap on the $100 million 7.5% debentures is a fair value hedge and is used to manage exposure to market risk associated with changes in interest rates. The changes in fair value of the swap agreement and the related debt instrument are recorded in income.

The Company has classified the fair value of its hedging instruments in long-term debt in its consolidated balance sheet.

**Accounts Receivable Allowances**

The Company's accounts receivable are primarily due from advertisers. Credit is extended based on an evaluation of a customer's financial condition and generally collateral is not required. The Company maintains an allowance for uncollectible accounts, rebates and volume discounts. This allowance is determined based on historical write-off experience and any known specific collectibility exposures. At Dec. 30, 2007 and Dec. 31, 2006, the Company's allowance for accounts receivable was $32 million and $34 million, respectively.

**Stock-Based Compensation**

In the first quarter of 2006, the Company adopted FAS No. 123R, "Share-Based Payment," which superseded Accounting Principles Board ("APB") Opinion No. 25, FAS No. 123 and related interpretations. FAS No. 123R requires the Company to expense stock-based compensation in its income statement. Under FAS No. 123R, stock-based compensation cost is measured at the grant date for equity-classified awards and at the end of each reporting period for liability-classified awards based on the estimated fair value of the award.

The Company granted stock options to employees in 2006 and prior years. The Company used the Black-Scholes option-pricing model to determine the fair value of each stock option it granted. The Black-Scholes model included assumptions regarding dividend yields, expected volatility, expected lives and risk-free interest rates. These assumptions reflected the Company's best estimates, but they involved certain risks, trends and uncertainties, which in some instances were outside of the control of the Company. As a result, if other assumptions had been used, stock-based compensation could have been materially impacted. The Company adopted FAS 123R utilizing the modified prospective application method and did not restate prior years. Additional information on the accounting for stock-based compensation in accordance with FAS No. 123R is provided in Note 17 to the Company's consolidated financial statements in Item 8.

Prior to the adoption of FAS No. 123R, the Company accounted for its stock-based compensation plans in accordance with APB No. 25 and related interpretations. Under APB No. 25, no compensation expense was recorded because the exercise price of employee stock options equaled the market price of the underlying stock on the date of grant. Under the provisions of APB No. 25, the Company was not required to recognize compensation expense for its Employee Stock Purchase Plan. Pro forma stock-based compensation expense for 2005, calculated under FAS No. 123, as amended by FAS No. 148, is disclosed in Note 1 to the Company's consolidated financial statements in Item 8.

On June 24, 2005, the Company accelerated the vesting of certain stock options granted on Feb. 11, 2003 and Feb. 10, 2004, totaling 2.4 million in each year. Unvested stock options awarded to the then current executive officers of the Company on these grant dates, which aggregated .8 million and .6 million, respectively, were not accelerated at that time. On Dec. 16, 2005, the Company accelerated the vesting of all stock options granted on Feb. 8, 2005, totaling 3.5 million, and the remaining unvested stock options granted to the then current executive officers of the Company on Feb. 11, 2003 and Feb. 10, 2004, totaling .4 million in both years. No other terms and conditions of the stock option grants were changed.

In accordance with APB No. 25 and related interpretations, the acceleration of vesting of these stock options did not require accounting recognition in the Company's income statement. The exercise prices of the 2003, 2004 and 2005 grants were $45.90, $52.05 and $40.59, respectively, and the Company's closing stock prices on the June 24, 2005 and Dec. 16, 2005 dates of acceleration were $35.64 and $30.80, respectively. The impact of the accelerated vesting was to increase pro forma stock-based compensation by $82 million, or $50 million net of taxes, in 2005. The accelerated vesting of these stock options was one of several actions taken by the Company to reduce stock-based compensation expense with the adoption of FAS No. 123R.

44

Source: TRIBUNE CO, 10-K, March 20, 2008

On Dec. 20, 2007, the Company consummated the Merger, as defined and described in the description of the Leveraged ESOP Transactions below. Pursuant to the Merger Agreement, the Company redeemed for cash all outstanding stock awards, each of which vested in full upon completion of the Merger, with positive intrinsic value relative to $34.00 per share. Accordingly, the Company recorded additional stock-based compensation expense of $53 million, or $35 million net of taxes, in the fourth quarter of 2007 in connection with the cash settlement of its outstanding stock awards. All remaining outstanding stock awards under the Tribune Company Incentive Compensation Plan (the "Incentive Plan") as of Dec. 20, 2007 that were not cash settled pursuant to the Merger Agreement were cancelled. Following the Merger, the Company does not intend to grant any new equity awards under the Incentive Plan.

## New Accounting Standards

In September 2006, the FASB issued FASB Statement No. 157, "Fair Value Measurements," ("FAS No. 157"), which defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. In February 2008, the FASB issued Staff Position No. 157-2 which defers the effective date of FAS No. 157 for all nonfinancial assets and liabilities, except those items recognized or disclosed at fair value on an annual or more frequently recurring basis, until one year after the adoption of FAS No. 157. The provisions of FAS No. 157, as amended, are effective for financial statements issued for fiscal years beginning after Nov. 15, 2007 and interim periods beginning within these fiscal years. Accordingly, the Company will be required to adopt FAS No. 157 in the first quarter of 2008. The Company is currently evaluating the impact of adopting FAS No. 157 on its consolidated financial statements.

In February 2007, the FASB issued FASB Statement No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities ("FAS No. 159"). FAS No. 159 permits entities to choose to measure many financial instruments and certain other items at fair value. Unrealized gains and losses on items for which the fair value option has been elected will be recognized in earnings at each subsequent reporting date. The provisions of FAS No. 159 are effective for financial statements issued for fiscal years beginning after Nov. 15, 2007 and interim periods beginning within these fiscal years. Accordingly, the Company will become subject to the provisions of FAS No. 159 in the first quarter of 2008. The Company is currently evaluating the impact of adopting FAS No. 159 on its consolidated financial statements.

In December 2007, the FASB issued FASB Statement No. 160, "Noncontrolling Interests in Consolidated Financial Statements, an Amendment of ARB No. 51" ("FAS No. 160"), which provides accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. It clarifies that an ownership interest in a subsidiary should be reported as a separate component of equity in the consolidated financial statements, requires consolidated net income to be reported at amounts that include the amounts attributable to both the parent and the noncontrolling interest and provides for expanded disclosures in the consolidated financial statements. FAS No. 160 is effective for financial statements issued for fiscal years beginning after Dec. 15, 2008 and interim periods beginning within these fiscal years. The Company is currently evaluating the impact of adopting FAS No. 160 on its consolidated financial statements.

## SIGNIFICANT EVENTS

### Leveraged ESOP Transactions

On April 1, 2007, the Company's board of directors (the "Board"), based on the recommendation of a special committee of the Board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company (the "Zell Entity") wholly owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions which culminated in the cancellation of all issued and outstanding shares of the Company's common stock as of that date, other than shares held by the Company or the ESOP, and the Company becoming wholly owned by the ESOP.

45

The Leveraged ESOP Transactions consisted of a series of transactions that included the following:

- On April 1, 2007, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust which forms a part of the ESOP, Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and the Zell Entity (solely for the limited purposes specified therein) providing for Merger Sub to be merged with and into the Company, and following such merger, the Company to continue as the surviving corporation wholly owned by the ESOP (the "Merger").

- On April 1, 2007, the ESOP purchased 8,928,571 shares of the Company's common stock from the Company at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger (as described below), the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represent the only outstanding shares of capital stock of the Company after the Merger. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007.

- On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of the Company's common stock at a price of $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million, which the Company repaid immediately prior to the Merger (as described below).  Pursuant to the Zell Entity Purchase Agreement, on May 9, 2007, Mr. Zell was appointed as a member of the Board.

- On April 25, 2007, the Company commenced a tender offer to repurchase up to 126 million shares of the Company's common stock that were then outstanding at a price of $34.00 per share in cash (the "Share Repurchase"). The tender offer expired on May 24, 2007 and 126 million shares of the Company's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Credit Agreement (as defined in the "New Credit Agreements" section below).

- The Company granted registration rights to Chandler Trust No. 1 and Chandler Trust No. 2 (together, the "Chandler Trusts"), which were significant shareholders of the Company prior to the Company's entry into the Leveraged ESOP Transactions. On April 25, 2007, the Company filed a shelf registration statement in connection with the registration rights granted to the Chandler Trusts.

- On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman, Sachs & Co. ("Goldman Sachs") and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of the Company's common stock, which represented the remainder of the shares of the Company's common stock owned by them following the Share Repurchase, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to the shelf registration statement filed by the Company on April 25, 2007. Following the closing of this transaction, the Chandler Trusts no longer owned any shares of the Company's common stock. On June 4, 2007, Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. resigned as members of the Board. Messrs. Chandler, Goodan and Stinehart served on the Board as representatives of the Chandler Trusts, which agreed to cause the resignations of Messrs. Chandler, Goodan and Stinehart effective upon the consummation of the Share Repurchase.

- On Dec. 20, 2007, the Company completed its merger with Merger Sub, with the Company surviving the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of the Company, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other

46

Source: TRIBUNE CO, 10-K, March 20, 2008

than shares held by the Company, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes, and the Company became wholly owned by the ESOP.

- In the Merger, the Zell Entity received cash for the shares of the Company's common stock it had acquired pursuant to the Zell Entity Purchase Agreement and the Company repaid the exchangeable promissory note held by the Zell Entity including approximately $6 million of accrued interest. In addition, the Company paid to the Zell Entity a total of $5 million in legal fee reimbursements, of which $2.5 million was previously paid following the Share Repurchase described above. Following the consummation of the Merger, the Zell Entity purchased from the Company, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. For accounting purposes, the subordinated promissory note and 15-year warrant were recorded at fair value based on the relative fair value method. The warrant entitles the Zell Entity to purchase 43,478,261 shares of the Company's common stock (subject to adjustment), which represents approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to share equivalents granted under a new management equity incentive plan which is described in Note 17 to the Company's consolidated financial statements in Item 8). The warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees. See Part III, Items 12 and 13, hereof for further information on the assignment of the minority interests in the subordinated promissory note and the warrant.

- On Dec. 20, 2007, the Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated. The Company requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of the market on Dec. 20, 2007, and that the NYSE file with the Securities and Exchange Commission an application on Form 25 to report that the shares of Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

The Company currently intends to dispose of an interest in the Chicago Cubs and the Company's 25% equity interest in Comcast SportsNet Chicago. The Company currently expects that proceeds from such dispositions will be used to pay down Company debt. The disposition of an interest in the Cubs is subject to the approval of Major League Baseball.

**Common Stock Repurchases**

As defined and discussed in the description of the Leveraged ESOP Transactions above, the Company completed two common stock repurchases in 2007. The following table summarizes the Company's common stock repurchases during 2007 (in thousands):

|  | Shares | Cost |
|---|---|---|
| June 4, 2007 Share Repurchase | 126,007 | $ 4,289,192 |
| Dec. 20, 2007 Merger consummation | 118,586 | 4,032,081 |
| Total common stock repurchases | 244,593 | $ 8,321,273 |

47

Source: TRIBUNE CO, 10-K, March 20, 2008

The following table summarizes the Company's common stock repurchases during 2006 (in thousands):

|  | Shares | Cost |
|---|---|---|
| Repurchases in the first quarter | 4,604 | $ 137,746 |
| Tender offer repurchases | 45,027 | 1,468,270 |
| Repurchases from the Robert R. McCormick Tribune Foundation and Cantigny Foundation | 10,000 | 325,300 |
| Repurchases subsequent to the tender offer | 11,053 | 330,952 |
| Total common stock repurchases | 70,684 | $ 2,262,268 |

On May 30, 2006, the Company initiated a modified "Dutch Auction" tender offer to repurchase up to 53 million shares of its common stock at a price per share not greater than $32.50 and not less than $28.00. The tender offer closed on June 26, 2006, and the Company acquired 45 million shares of its common stock on July 5, 2006 at a price of $32.50 per share before transaction costs. The Company also acquired 10 million shares of its common stock from the Robert R. McCormick Tribune Foundation and the Cantigny Foundation on July 12, 2006 at a price of $32.50 per share before transaction costs. The Robert R. McCormick Tribune Foundation and the Cantigny Foundation were affiliated non-profit organizations, which together held 13.6% of the Company's outstanding shares when the tender offer was launched. In connection with the tender offer, the Board also authorized the repurchase of an additional 12 million shares of the Company's common stock commencing on the eleventh business day following the completion of the tender offer. In the third quarter of 2006, the Company repurchased an additional 11.1 million shares under that authorization at a weighted average cost of $29.94 per share. In addition, the Company repurchased and retired 4.6 million shares of its common stock in the first quarter of 2006.

During 2005, the Company repurchased and retired 12.2 million shares of its common stock in the open market for $440 million.

**New Credit Agreements**

On May 17, 2007, the Company entered into a $8.028 billion senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consists of the following facilities: (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement equals $10.133 billion.

On June 4, 2007, proceeds from the Tranche X Facility and the Tranche B Facility were used by the Company in connection with the consummation of the Share Repurchase (as defined in "Leveraged ESOP Transactions" above) and to refinance the Company's former five-year credit agreement and former bridge credit agreement.

The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. Borrowings under the Revolving Credit Facility may be used for working capital and general corporate purposes. The Company intends to use the Delayed Draw Facility to refinance approximately $263 million of its medium-term notes as they mature during 2008. In February 2008, the Company refinanced $25 million of such medium-term notes with borrowings under the Delayed Draw Facility.

On Dec. 20, 2007, the Company entered into (i) a $1.6 billion senior unsecured interim loan agreement (the "Interim Credit Agreement") and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement (the Incremental Facility and Tranche B

48

Facility are hereinafter referred to collectively as the Tranche B Facility). The Interim Credit Agreement contains a $1.6 billion twelve-month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by the Company, among other ways, in connection with the consummation of the Merger, and for general corporate purposes.

Prior to the consummation of the Merger, the Tranche X Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. Pursuant to the terms of the Credit Agreement, following the closing of the Merger (as defined above in the description of the Leveraged ESOP Transactions), the margins applicable to the Tranche X Facility increased to 175 basis points and 275 basis points, respectively.

The Tranche B Facility, Delayed Draw Facility and Revolving Credit Facility bear interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 200 basis points or LIBOR plus a margin of 300 basis points. All undrawn amounts under the Delayed Draw Facility and the Revolving Credit Facility accrue commitment fees at a per annum rate of 75 basis points and 50 basis points, respectively. With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts are subject to decreases based on a leverage-based grid.

On June 29, 2007, the Company repaid $100 million of the $1.5 billion of borrowings under the Tranche X Facility. The remaining principal balance of the Tranche X Facility must be repaid in an aggregate amount of $650 million on Dec. 4, 2008, which amount may be adjusted to reflect additional prepayments or other mandatory prepayments (described below) applied thereto, and the remaining outstanding amount of the Tranche X Facility, if any, must be repaid on June 4, 2009.

The Tranche B Facility is a seven-year facility which matures on June 4, 2014 and also amortizes at a rate of 1.0% per annum (payable quarterly). The Delayed Draw Facility automatically becomes part of the Tranche B Facility as amounts are borrowed and amortizes based upon the Tranche B Facility amortization schedule. The Revolving Facility is a six-year facility and matures on June 4, 2013.

Prior to June 4, 2008, optional prepayments on the Tranche X Facility and the Tranche B Facility with the proceeds of a substantially concurrent issuance of loans under any senior secured credit facilities to the Credit Agreement must be accompanied by a prepayment fee equal to 1.0% of the aggregate amount of such prepayments if the interest rate spread applicable to such new loans is less than the interest rate applicable to the Tranche X Facility or the Tranche B Facility. Except as described in the immediately preceding sentence, borrowings under the Credit Agreement are prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

The Bridge Facility bears interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points; provided that such margins will increase by 50 basis points per annum each quarter beginning on March 20, 2008, subject to specified caps, a portion of which interest may be payable through an interest payable-in-kind feature. Subject to certain prepayment restrictions contained in the Credit Agreement, the Bridge Facility is prepayable at any time prior to maturity without penalty, including in connection with the issuance of up to $1.6 billion of high-yield notes.

If any loans under the Bridge Facility remain outstanding on Dec. 20, 2008, the lenders thereunder will have the option, subject to the terms of the Interim Credit Agreement, at any time and from time to time to exchange such initial loans for senior exchange notes that the Company will issue under a senior indenture, and the maturity date of any initial loans that are not exchanged for senior exchange notes will, unless a bankruptcy event of default has occurred and is continuing on such date, automatically be extended to Dec. 20, 2015

49

(the "Final Interim Credit Agreement Maturity Date"). The senior exchange notes will also mature on the Final Interim Credit Agreement Maturity Date. Holders of the senior exchange notes will have registration rights.

Loans under the Tranche X Facility, Tranche B Facility and Revolving Loan Facility are required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leverage-based grid ranging from 50% to 0% and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Credit Agreement.

Loans under the Bridge Facility are required to be repaid with the following proceeds, in each case after the obligations under the Credit Agreement have been repaid, either as required by the Credit Agreement or repaid at the election of the Company, subject to certain exceptions and exclusions set forth in the Interim Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of certain debt for borrowed money by the Company or any subsidiary, (b) 100% of the net cash proceeds of any equity issuance consummated by the Company and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Interim Credit Agreement.

Borrowings under the Credit Agreement are guaranteed on a senior basis by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the equity interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company. Audited financial statements of these two subsidiaries are included in Part II, Item 8, hereof. The Company's other senior notes and senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as required by the terms of the indentures governing such notes and debentures. Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the Company's direct and indirect U.S. subsidiaries.

The Credit Agreement and the Interim Credit Agreement contain representations and warranties, affirmative and negative covenants, including restrictions on capital expenditures, and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. If an event of default occurs, the lenders under the Credit Agreement and the Interim Credit Agreement will be entitled to take certain actions, including acceleration of all amounts due under the facilities.

Further, pursuant to the Credit Agreement, the Company is required to comply, on a quarterly basis, with a maximum total guaranteed leverage ratio and a minimum interest coverage ratio. For the twelve-month period ending Dec. 30, 2007, the maximum permitted "Total Guaranteed Leverage Ratio" and the minimum permitted "Interest Coverage Ratio" (each as defined in the Credit Agreement) were 9.00 to 1.0 and 1.10 to 1.0, respectively. Both financial covenant ratios are measured on a rolling four-quarter basis and become more restrictive on an annual basis as set forth in the Credit Agreement. At Dec. 30, 2007, the Company was in compliance with these financial covenants. The Company's ability to remain in compliance with these financial covenants will be impacted by a number of factors, including the Company's ability to continue to generate sufficient revenues and cash flows, changes in interest rates, the impact of future purchase, sale, joint venture or similar transactions involving the Company or its business units and the other risks and uncertainties set forth in Part I, Item 1A, "Risk Factors."

The Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code on March 13, 2008, which election is effective as of the beginning of the Company's 2008 fiscal year. The Credit Agreement and the Interim Credit Agreement contain affirmative covenants which required the Company to make such an election and that the election be effective for fiscal 2008. The Credit Agreement and Interim Credit Agreement further provide that if the Company fails to maintain the S corporation election for any year

50

beginning with 2009, the Company will be required in each such year to obtain an investment in the Company in the form of common stock or subordinated debt in an amount of up to $100 million. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and Interim Credit Agreement.

Under the terms of the Credit Agreement, the Company is required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. On July 2, 2007, the Company entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and, on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays Bank, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to $750 million in notional amount. The Swap Documents effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points. The Company accounts for these interest rate swaps as cash flow hedges in accordance with FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("FAS No. 133"). Under FAS No. 133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. The cash flow hedges covered by the Swap Documents are deemed to be highly effective, and therefore gains and losses resulting from changes in the fair value of these hedges, other than changes resulting from hedge ineffectiveness, are recorded in other comprehensive income (loss), net of taxes.

As of Dec. 30, 2007, the Company had outstanding borrowings of $7.6 billion under the Tranche B Facility, $1.4 billion under the Tranche X Facility, and $1.6 billion under the Bridge Facility. As of Dec. 30, 2007, the applicable interest rate was 7.91% on Tranche B Facility, 7.99% on the Tranche X Facility and 9.43% on the Bridge Facility.

**Matthew Bender and Mosby Tax Liability**

During 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in the United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in Tax Court.

On Sept. 27, 2005, the Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions totaled approximately $1 billion. Over time, deductions for state taxes and interest were expected to reduce the net cash outlay to approximately $840 million.

The Company appealed the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. On June 1, 2007, the Company announced that an offer of settlement was pending in its appeal. The Company finalized the settlement during the third quarter of 2007. As a result of the settlement, the Company received refunds of federal income taxes and interest of $4 million on Sept. 26, 2007 and $340 million on Oct. 1, 2007. After consideration of income taxes on the interest received, the net cash proceeds totaled approximately $286 million. These refunds, together with related state income tax benefits of $29 million, were accounted for as a $91 million reduction in 2007 income tax expense and a $224 million reduction in goodwill recorded on the Company's consolidated balance sheet.

51

Source: TRIBUNE CO, 10-K, March 20, 2008

**TMCT Transactions**

As a result of the Company's purchase of Times Mirror in 2000, the Company acquired investment interests in TMCT, LLC ("TMCT") and TMCT II, LLC ("TMCT II"). TMCT and TMCT II were formed in 1997 and 1999, respectively, as a result of transactions involving agreements between Times Mirror and its largest shareholders, Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "Chandler Trusts"). The Times Mirror acquisition resulted in the Chandler Trusts becoming significant shareholders of the Company. As a result of the Leveraged ESOP Transactions (see above), the Chandler Trusts are no longer shareholders of the Company. The TMCT and TMCT II LLC agreements had no specific term, and the dissolution, determination of liquidation values and distribution of assets required the mutual consent of the Company and the Chandler Trusts.

The collective assets of TMCT and TMCT II as of Dec. 25, 2005 included approximately 51.4 million shares of the Company's common stock and 1.1 million shares of the Company's preferred stock, representing all of the Company's then issued Series C, D-1 and D-2 preferred stock. The TMCT and TMCT II assets also include a variety of fixed income and equity investments. In addition, TMCT owns eight real properties that are leased to the Company. Additional information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 8 to the Company's consolidated financial statements in Item 8.

On Sept. 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on Sept. 22, 2006, a total of 38.9 million shares of the Company's common stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. As a result of the transactions, the Company's interests in each of TMCT and TMCT II were reduced to approximately 5%. The Sept. 21, 2006 agreements also provided for certain put and call options, which were exercisable at fair market value beginning in September 2007, relating to the Company's remaining ownership interests in TMCT and TMCT II. As a result of the transactions, the Company in the third quarter of 2006 recorded a non-operating gain of $48 million, net of tax; increased its common treasury stock by $161 million and its preferred treasury stock by $107 million; and reduced its combined investment in TMCT and TMCT II by $195 million.

On Sept. 22, 2006, the Company and TMCT amended the lease agreement for the eight properties the Company leased from TMCT. Under the terms of the amended lease, the properties' current fixed rental rate was extended through Aug. 7, 2021. In addition, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company exercised this option on Jan. 29, 2008 and expects to complete this acquisition in April 2008.

On Oct. 20, 2006, the remaining 12.4 million shares of the Company's common stock held by TMCT and TMCT II were distributed to the Company and the Chandler Trusts in accordance with their respective ownership interests. The Company received .6 million shares and the Chandler Trusts received 11.8 million shares.

Prior to the Sept. 22, 2006 transactions, the cash flows from the Tribune common and preferred shares held by TMCT and TMCT II were largely allocated to the Company, while the cash flows from the other assets were largely allocated to the Chandler Trusts. As a result, the Company included in treasury stock 80% of the Tribune common and preferred shares held by TMCT and TMCT II. In addition, 80% of the dividends on the preferred and common shares held by TMCT and TMCT II were effectively eliminated. Following the Sept. 22, 2006 transactions and until the Oct. 20, 2006 distribution, the Company included in treasury stock approximately 5% of the Tribune common shares held by TMCT and TMCT II. In addition, the Company no longer had any shares of its Series C, D-1 and D-2 preferred stock outstanding, and the Company's common shares outstanding increased by 1.6 million.

On Sept. 21, 2007, the Company gave notice of its intent to exercise its put rights with respect to its remaining interests in TMCT and TMCT II. The sale of the Company's remaining interests in TMCT and TMCT II to the Chandler Trusts was consummated on Sept. 28, 2007. The Company received $73.7 million in proceeds from the sale, and recorded a non-operating gain of $5 million, net of tax.

52

### Sales of *Hoy*, New York, SCNI and Recycler

On Feb. 12, 2007, the Company announced an agreement to sell the New York edition of *Hoy*, the Company's Spanish-language daily newspaper ("*Hoy*, New York"), to ImpreMedia, LLC. The Company completed the sale of *Hoy*, New York on May 15, 2007 and recorded a pretax gain on the sale of $2.5 million ($.1 million after taxes) in the second quarter of 2007. On March 6, 2007, the Company announced an agreement to sell its Southern Connecticut Newspapers—*The Advocate* (Stamford) and *Greenwich Time* (collectively "SCNI") to Gannett Co., Inc. On May 25, 2007, the Company announced the termination of this agreement following an arbitrator's ruling that the Company could not sell SCNI unless Gannett Co., Inc. assumed an existing collective bargaining contract as a condition of the sale, which Gannett Co., Inc. declined to do. The Company simultaneously announced that it would immediately begin the process of soliciting offers for SCNI with the intention of completing a sale as soon as possible. On Oct. 25, 2007, the Company announced an agreement to sell SCNI to Hearst Corporation for $62.4 million. The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which the Company plans to sell separately. In the first quarter of 2007, the Company recorded a pretax loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to sell. In the third quarter of 2007, the Company recorded a favorable $3 million after-tax adjustment to the loss on the sale of SCNI. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of one of its subsidiaries, EZ Buy & EZ Sell Recycler Corporation ("Recycler"), to Target Media Partners. Recycler publishes a collection of free classified newspapers in Southern California. The sale of Recycler closed on Oct. 17, 2007. The Company recorded a pretax loss on the sale of the stock of Recycler of $1 million in the third quarter of 2007. Due to the Company's high tax basis in the Recycler stock, the sale generated a significantly higher capital loss for income tax purposes. As a result, the Company recorded a $65 million income tax benefit in the third quarter of 2007, resulting in an after-tax gain of $64 million.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations of each of these businesses have been reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income have been reclassified to conform to the current year presentation of discontinued operations.

### Sales of WATL-TV, Atlanta, WCWN-TV, Albany and WLVI, Boston

On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. for $180 million. The sale closed on Aug. 7, 2006. On June 19, 2006, the Company announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on Dec. 6, 2006. On Sept. 14, 2006, the Company announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million. The sale closed on Dec. 19, 2006.

These businesses were considered components of the Company's broadcasting and entertainment segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations of each of these businesses have been reported as discontinued operations in the consolidated statements of income. Prior year consolidated statements of income were reclassified to conform to the presentation of these businesses as discontinued operations.

In conjunction with the sales of WATL-TV, Atlanta and WCWN-TV, Albany, the Company recorded in the second quarter of 2006 a pretax loss totaling $90 million, to write down the net assets of the stations to estimated fair value, less costs to sell. The Company subsequently reduced the pretax loss on the sales of the Atlanta and Albany stations during the third quarter of 2006 by $1 million. In addition, the Company recorded in the fourth

53