TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

Debt was classified as follows in the consolidated balance sheets (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Current Liabilities: | | |
| PHONES debt related to Time Warner stock | $    253,080 | $          — |
| Other debt due within one year | 750,239 | 1,429,007 |
| Total current debt | 1,003,319 | 1,429,007 |
| Long-Term Debt: | | |
| PHONES debt related to Time Warner stock | 343,960 | 572,960 |
| Other long-term debt | 11,496,246 | 3,003,251 |
| Total long-term debt | 11,840,206 | 3,576,211 |
| Total Debt | $  12,843,525 | $  5,005,218 |

**New Credit Agreements**—On May 17, 2007, the Company entered into a $8.028 billion senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consists of the following facilities: (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement equals $10.133 billion.

On June 4, 2007, proceeds from the Tranche X Facility and the Tranche B Facility were used by the Company in connection with the consummation of the Share Repurchase (as defined in the discussion of the Leveraged ESOP Transactions in Note 3) and to refinance the Company's former five-year credit agreement and former bridge credit agreement.

The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. As of Dec. 30, 2007, the Company had $65 million of letters of credit outstanding. Borrowings under the Revolving Credit Facility may be used for working capital and general corporate purposes. The Company intends to use the Delayed Draw Facility to refinance approximately $263 million of its medium-term notes as they mature during 2008. In February 2008, the Company refinanced $25 million of such medium-term notes with borrowings under the Delayed Draw Facility.

On Dec. 20, 2007, the Company entered into (i) a $1.6 billion senior unsecured interim loan agreement (the "Interim Credit Agreement") and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement (the Incremental Facility and Tranche B Facility are hereinafter referred to collectively as the Tranche B Facility). The Interim Credit Agreement contains a $1.6 billion twelve-month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by the Company, among other ways, in connection with the consummation of the Merger (as defined and discussed in Note 3), and for general corporate purposes.

Prior to the consummation of the Merger, the Tranche X Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. Pursuant to the terms of the Credit Agreement, following the closing of the Merger, the margins applicable to the Tranche X Facility increased to 175 basis points and 275 basis points, respectively.

The Tranche B Facility, Delayed Draw Facility and Revolving Credit Facility bear interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 200 basis points or

111

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

LIBOR plus a margin of 300 basis points. All undrawn amounts under the Delayed Draw Facility and the Revolving Credit Facility accrue commitment fees at a per annum rate of 75 basis points and 50 basis points, respectively. With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts are subject to decreases based on a leverage-based grid.

On June 29, 2007, the Company repaid $100 million of the $1.5 billion of borrowings under the Tranche X Facility. The remaining principal balance of the Tranche X Facility must be repaid in an aggregate amount of $650 million on Dec. 4, 2008, which amount may be adjusted to reflect additional prepayments or other mandatory prepayments (described below) applied thereto, and the remaining outstanding amount of the Tranche X Facility, if any, must be repaid on June 4, 2009.

The Tranche B Facility is a seven-year facility which matures on June 4, 2014 and also amortizes at a rate of 1.0% per annum (payable quarterly). The Delayed Draw Facility automatically becomes part of the Tranche B Facility as amounts are borrowed and amortizes based upon the Tranche B Facility amortization schedule. The Revolving Facility is a six-year facility and matures on June 4, 2013.

Prior to June 4, 2008, optional prepayments on the Tranche X Facility and the Tranche B Facility with the proceeds of a substantially concurrent issuance of loans under any senior secured credit facilities pursuant to the Credit Agreement must be accompanied by a prepayment fee equal to 1.0% of the aggregate amount of such prepayments if the interest rate spread applicable to such new loans is less than the interest rate applicable to the Tranche X Facility or the Tranche B Facility. Except as described in the immediately preceding sentence, borrowings under the Credit Agreement are prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

The Bridge Facility bears interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points; provided that such margins will increase by 50 basis points per annum each quarter beginning on March 20, 2008, subject to specified caps, a portion of which interest may be payable through an interest payable-in-kind feature. Subject to certain prepayment restrictions contained in the Credit Agreement, the Bridge Facility is prepayable at any time prior to maturity without penalty, including in connection with the issuance of up to $1.6 billion of high-yield notes.

If any loans under the Bridge Facility remain outstanding on Dec. 20, 2008, the lenders thereunder will have the option, subject to the terms of the Interim Credit Agreement, at any time and from time to time to exchange such initial loans for senior exchange notes that the Company will issue under a senior indenture, and the maturity date of any initial loans that are not exchanged for senior exchange notes will, unless a bankruptcy event of default has occurred and is continuing on such date, automatically be extended to Dec. 20, 2015 (the "Final Interim Credit Agreement Maturity Date"). Accordingly, the Company has classified the borrowings under the Bridge Facility as long-term at Dec. 30, 2007. The senior exchange notes will also mature on the Final Interim Credit Agreement Maturity Date. Holders of the senior exchange notes will have registration rights.

Loans under the Tranche X Facility, Tranche B Facility and Revolving Loan Facility are required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leverage-based grid ranging from 50% to 0% and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Credit Agreement.

112

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

Loans under the Bridge Facility are required to be repaid with the following proceeds, in each case after the obligations under the Credit Agreement have been repaid, either as required by the Credit Agreement or repaid at the election of the Company, subject to certain exceptions and exclusions set forth in the Interim Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of certain debt for borrowed money by the Company or any subsidiary, (b) 100% of the net cash proceeds of any equity issuance consummated by the Company and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Interim Credit Agreement.

Borrowings under the Credit Agreement are guaranteed on a senior basis by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the equity interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company. Audited financial statements of these two subsidiaries are included in this Item 8. The Company's other senior notes and senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as required by the terms of the indentures governing such notes and debentures. Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the Company's direct and indirect U.S. subsidiaries.

The Credit Agreement and the Interim Credit Agreement contain representations and warranties, affirmative and negative covenants, including restrictions on capital expenditures, and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. If an event of default occurs, the lenders under the Credit Agreement and the Interim Credit Agreement will be entitled to take certain actions, including acceleration of all amounts due under the facilities.

Further, pursuant to the Credit Agreement, the Company is required to comply, on a quarterly basis, with a maximum total guaranteed leverage ratio and a minimum interest coverage ratio. For the twelve-month period ending Dec. 30, 2007, the maximum permitted "Total Guaranteed Leverage Ratio" and the minimum permitted "Interest Coverage Ratio" (each as defined in the Credit Agreement) were 9.00 to 1.0 and 1.10 to 1.0, respectively. Both financial covenant ratios are measured on a rolling four-quarter basis and become more restrictive on an annual basis as set forth in the Credit Agreement. At Dec. 30, 2007, the Company was in compliance with these financial covenants. The Company's ability to remain in compliance with these financial covenants will be impacted by a number of factors, including the Company's ability to continue to generate sufficient revenues and cash flows, changes in interest rates, the impact of future purchase, sale, joint venture or similar transactions involving the Company or its business units and the other risks and uncertainties set forth in Part I, Item 1A, "Risk Factors."

The Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code on March 13, 2008, which election is effective as the beginning of the Company's 2008 fiscal year. The Credit Agreement and the Interim Credit Agreement contain affirmative covenants which required the Company to make such election and that the election be effective for fiscal 2008. The Credit Agreement and Interim Credit Agreement further provide that if the Company fails to maintain the S corporation election for any year beginning with 2009, the Company will be required in each such year to obtain an investment in the Company in the form of common stock or subordinated debt in an amount of up to $100 million. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and Interim Credit Agreement.

Under the terms of the Credit Agreement, the Company is required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. On July 2, 2007, the Company entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and, on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays Bank, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to

113

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

$750 million in notional amount. The Swap Documents effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points. The Company accounts for these interest rate swaps as cash flow hedges in accordance with FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("FAS No. 133"). Under FAS No. 133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. While there will be some ineffectiveness in the future, the cash flow hedges covered by the Swap Documents are deemed to be highly effective, and therefore gains and losses resulting from changes in the fair value of these hedges, other than changes resulting from hedge ineffectiveness, are recorded in other comprehensive income (loss), net of taxes.

As of Dec. 30, 2007, the Company had outstanding borrowings of $7.6 billion under the Tranche B Facility, $1.4 billion under the Tranche X Facility, and $1.6 billion under the Bridge Facility. As of Dec. 30, 2007, the applicable interest rate was 7.91% on the Tranche B Facility, 7.99% on the Tranche X Facility and 9.43% on the Bridge Facility.

**Former Credit Agreements**—On June 19, 2006, the Company entered into a five-year credit agreement and a 364-day bridge credit agreement, both of which were amended and restated on June 27, 2006. The five-year credit agreement provided for a $1.5 billion unsecured term facility, of which $250 million was used to refinance the medium-term notes that matured on Nov. 1, 2006, and a $750 million unsecured revolving facility. The 364-day bridge credit agreement provided for a $2.15 billion unsecured bridge facility.

The Company entered into these agreements to finance the Company's tender offer initiated on May 30, 2006 ; to repurchase shares of the Company's common stock from the Robert R. McCormick Tribune Foundation and Cantigny Foundation; to repurchase shares of the Company's common stock pursuant to open market or privately negotiated transactions; to refinance certain indebtedness; and to pay fees and expenses incurred in connection with the repurchases. In addition, the revolving facility was available for working capital and general corporate purposes, including acquisitions.

On June 4, 2007, the Company repaid its obligations under the five-year credit agreement and bridge credit agreement with proceeds from the Credit Agreement, the terms of which are described above.

In general, borrowings under the five-year and bridge credit agreements bore interest at a rate equal to LIBOR plus a spread ranging from 35 to 125 basis points. The applicable spread was determined on the basis of the Company's debt ratings by Standard and Poor's ("S&P") and Moody's Investor Services ("Moody's"). The Company's debt ratings were also used in determining the annual facility fee, which ranged from 0.07% to 0.25% of the aggregate unused commitments. In addition, the Company agreed to pay customary fees to the lenders under the five-year and bridge credit agreements.

**Medium-Term Notes**—Notes issued under these programs may not be redeemed by the Company prior to maturity.

**Subordinated Promissory Note**—Following the consummation of the Merger, the Zell Entity purchased from the Company a $225 million subordinated promissory note due Dec. 20, 2018 at a stated interest rate of 4.64%. Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note to certain permitted assignees. The note was recorded at an estimated fair value of $60 million, resulting in a discount of $165 million. The discount will be amortized and included in interest expense over the term of the note using an effective interest rate of 17%. At Dec. 30, 2007, the net book value of the note was $60.3 million and included $.3 million of payable in-kind interest.

**Interest Rate Swaps**—As noted above, the Company is party to three interest rate swaps covered under the Swap Documents. At Dec. 30, 2007, the fair value of these swaps had declined since their inception date of July 3, 2007 by $91 million, which is included in long-term debt. The Company determined that $1.7 million of this

114

Source: TRIBUNE CO, 10-K, March 20, 2008

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)**

change resulted from hedge ineffectiveness and therefore included the $1.7 million in interest expense. The remaining $89 million change in fair value of these swaps was included, net of taxes, in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) at Dec. 30, 2007 (see Note 18). The Company is also party to an additional interest rate swap agreement related to the $100 million 7.5% debentures due in 2023 which effectively converts the fixed 7.5% rate to a variable rate based on LIBOR.

**Debt Due Within One Year**—Debt due within one year at Dec. 30, 2007 included $650 million of borrowings under the Tranche X Facility, $76 million of borrowings under the Tranche B Facility, $253 million related to PHONES, and $24 million of property financing and other obligations. The Company expects to fund interest and principal payments due in 2008 through a combination of cash flows from operations, available borrowings under the Revolving Credit Facility, and, if necessary, dispositions of assets or operations. The Company's ability to make scheduled payments or prepayments on its debt and other financial obligations will depend on future financial and operating performance and the ability to dispose of assets on favorable terms. There can be no assurances that the Company's businesses will generate sufficient cash flows from operations or that future borrowings under the Revolving Credit Facility will be available in an amount sufficient to satisfy debt maturities or to fund other liquidity needs or that any such asset dispositions can be completed. The Company's financial and operating performance is subject to prevailing economic and industry conditions and to financial, business and other factors, some of which are beyond the control of the Company.

If the Company's cash flows and capital resources are insufficient to fund debt service obligations, the Company will likely face increased pressure to reduce or delay capital expenditures, dispose of assets or operations, further reduce the size of its workforce, seek additional capital or restructure or refinance its indebtedness. These actions could have a material adverse effect on the Company's business, financial condition and results of operations. In addition, the Company cannot assure the ability to take any of these actions, that these actions would be successful and permit the Company to meet scheduled debt service obligations or that these actions would be permitted under the terms of the Company's existing or future debt agreements, including the Credit Agreement and the Interim Credit Agreement. For example, the Company may need to refinance all or a portion of its indebtedness on or before maturity. There can be no assurance that the Company will be able to refinance any of its indebtedness on commercially reasonable terms or at all. In the absence of improved operating results and access to capital resources, the Company could face substantial liquidity problems and might be required to dispose of material assets or operations to meet its debt service and other obligations. The Credit Agreement and the Interim Credit Agreement restrict the Company's ability to dispose of assets and use the proceeds from the disposition. The Company may not be able to consummate those dispositions or to obtain the proceeds realized. Additionally, these proceeds may not be adequate to meet the debt service obligations then due.

If the Company cannot make scheduled payments or prepayments on its debt, the Company will be in default and, as a result, among other things, the Company's debt holders could declare all outstanding principal and interest to be due and payable and the Company could be forced into bankruptcy or liquidation or required to substantially restructure or alter business operations or debt obligations.

**Exchangeable Subordinated Debentures due 2029 ("PHONES")**—In 1999, the Company issued 8 million PHONES for an aggregate principal amount of approximately $1.3 billion. The principal amount was equal to the value of 16 million shares of Time Warner common stock at the closing price of $78.50 per share on April 7, 1999. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. The Company records both cash and non-cash interest expense on the discounted debt component of the PHONES. The PHONES debenture agreement requires principal payments equal to any dividends declared on the 16 million shares of Time Warner common stock. Time Warner declared total dividends of $.24 per share in 2007 and $.21 per share in 2006. The Company records the dividends it receives on its Time Warner common stock as dividend income and accounts for the related payment to the PHONES holders as principal reduction.

The Company may redeem the PHONES at any time for the higher of the principal value of the PHONES ($155.99 per PHONES at Dec. 30, 2007) or the then market value of two shares of Time Warner common stock,

115

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

subject to certain adjustments. At any time, holders of the PHONES may exchange a PHONES for an amount of cash equal to 95% (or 100% under certain circumstances) of the market value of two shares of Time Warner common stock. At Dec. 30, 2007, the market value per PHONES was $52.50, and the market value of two shares of Time Warner common stock was $33.30. The amount PHONES holders could have received if they had elected to exchange their PHONES for cash on Dec. 30, 2007 was $253 million, which is included in current liabilities at Dec. 30, 2007. Deferred income taxes related to the current portion of the PHONES is also included in current liabilities as of Dec. 30, 2007.. At Dec. 31, 2006, the PHONES were classified entirely as long-term because if the PHONES were exchanged on that date, the Company had the ability and the intent to refinance the PHONES on a long-term basis through its then existing revolving credit facility.

Under the provisions of FAS No. 133, the PHONES consist of a discounted debt component, which is presented at book value, and a derivative component, which is presented at fair value. Changes in the fair value of the derivative component of the PHONES are recorded in the statement of income. Prior to 2007, the Company calculated the fair value of the derivative component of the PHONES debt as the difference between the quoted market value of the PHONES and the estimated fair value of the discounted debt component of the PHONES. The fair value of the discounted debt component of the PHONES was calculated based on an estimate of the current interest rate available to the Company for debt of the same remaining maturity and similar terms to the PHONES. At Dec. 30, 2007, the Company performed a direct valuation of the derivative component of the PHONES utilizing the Black-Scholes option-pricing model. Had the Company utilized the Black-Scholes option pricing model to value the derivative component of the PHONES at Dec. 31, 2006, the resulting valuation would have been approximately $20 million higher than the $108 million recorded at Dec. 31, 2006. The book value of the discounted debt component is based on the prevailing interest rate (8.125%) at issuance of the PHONES. The market value of the PHONES, which are traded on the New York Stock Exchange, was $420 million and $549 million at Dec. 30, 2007 and Dec. 31, 2006, respectively.

The discounted debt component and derivative component of the PHONES were as follows (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| PHONES Debt: |  |  |
| Discounted debt component (at book value) | $ 477,360 | $ 465,280 |
| Derivative component (at estimated fair value) | 119,680 | 107,680 |
| Total | $ 597,040 | $ 572,960 |
| Time Warner stock related to PHONES (at fair value) | $ 266,400 | $ 348,480 |

Maturities—Debt at Dec. 30, 2007 matures as shown below (in thousands):

| | |
|---|---|
| 2008 | $ 1,003,319 |
| 2009 | 857,222 |
| 2010 | 563,074 |
| 2011 | 78,309 |
| 2012 | 118,324 |
| Thereafter | 10,223,277 |
| Total | $ 12,843,525 |

116

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

## NOTE 11: CONTRACTS PAYABLE FOR BROADCAST RIGHTS

Contracts payable for broadcast rights are classified as current or long-term liabilities in accordance with the payment terms of the contracts. Required payments under contractual agreements for broadcast rights recorded at Dec. 30, 2007 are shown in the table below (in thousands):

| | |
|---|---:|
| 2008 | $ 339,909 |
| 2009 | 188,748 |
| 2010 | 139,270 |
| 2011 | 66,724 |
| 2012 | 20,113 |
| Thereafter | 17,538 |
| Total | $ 772,302 |

## NOTE 12: FAIR VALUE OF FINANCIAL INSTRUMENTS

Estimated fair values and carrying amounts of the Company's financial instruments are as follows (in thousands):

| | Dec. 30, 2007 | | Dec. 31, 2006 | |
|---|---:|---:|---:|---:|
| | Fair Value | Carrying Amount | Fair Value | Carrying Amount |
| Cost method investments | $ 272,042 | $ 272,042 | $ 365,445 | $ 362,630 |
| Debt | $ 11,473,131 | $ 12,843,525 | $ 4,904,390 | $ 5,005,218 |
| Contracts payable for broadcast rights | $ 724,945 | $ 772,302 | $ 696,363 | $ 743,872 |

The following methods and assumptions were used to estimate the fair value of each category of financial instruments.

**Cost Method Investments**—Cost method investments in public companies were recorded at fair value in the consolidated balance sheets (see Notes 1 and 9). Cost method investments in private companies were recorded at cost, net of write-downs, and fair value was generally estimated based on prices recently paid for shares in those companies.

**Debt**—Fair value was estimated based on quoted market prices for the Company's debt securities or similar issues or on current rates available to the Company for debt of the same remaining maturities and similar terms. The carrying value of the Company's derivative instruments approximates fair value. The fair value of the PHONES was determined by reference to the market value resulting from trading on a national securities exchange.

**Contracts Payable for Broadcast Rights**—Fair value was estimated using the discounted cash flow method.

## NOTE 13: COMMITMENTS AND CONTINGENCIES

The Company has entered into commitments for broadcast rights that are not currently available for broadcast and are therefore not included in the financial statements. These commitments totaled $473 million at Dec. 30, 2007. Payments for broadcast rights generally commence when the programs become available for broadcast.

The Company had commitments totaling $652 million at Dec. 30, 2007 related to the purchase of property, plant and equipment and talent contracts. In addition, under its current agreement with AbitibiBowater Inc., the Company has a commitment to purchase 369,000 metric tons of newsprint each year over the next two years based on market prices at the time of purchase. The Company leases certain equipment and office and production

117

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

space under various operating leases. Net lease expense from continuing operations was $57 million in 2007, $55 million in 2006 and $55 million in 2005. The table below presents the future minimum lease payments to be made under non-cancelable operating leases at Dec. 30, 2007 (in thousands):

| | |
|---|---:|
| 2008 | $ 62,851 |
| 2009 | 57,941 |
| 2010 | 45,000 |
| 2011 | 35,627 |
| 2012 | 27,538 |
| Thereafter | 57,191 |
| Total | $ 286,148 |

The Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations. In addition, the Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies. See Note 5 for a discussion of potential liability related to *Newsday* and *Hoy*, New York, and see Note 14 for a discussion of potential income tax liabilities. The Company does not believe that any other matters or proceedings presently pending will have a material adverse effect on its consolidated financial position, results of operations or liquidity.

## NOTE 14: INCOME TAXES

The following is a reconciliation of income taxes computed at the U.S. federal statutory rate to income taxes reported for continuing operations in the consolidated statements of income (in thousands):

| | 2007 | 2006 | 2005 |
|---|---:|---:|---:|
| Income from continuing operations before income taxes | $ 37,104 | $ 1,008,746 | $ 1,084,677 |
| Federal income taxes at 35% | $ 12,986 | $ 353,061 | $ 379,637 |
| State and local income taxes, net of federal tax benefit | 6,535 | 30,097 | 37,431 |
| Interest on uncertain tax positions, net of tax | 8,605 | 17,820 | 19,288 |
| Manufacturing and production activities deduction | (4,079) | (5,710) | (2,349) |
| Merger, restructuring and disposition transactions | 18,678 | (10,237) | |
| Matthew Bender/Mosby adjustment | (90,704) | | 150,493 |
| Income tax settlements and adjustments | — | (33,563) | (11,829) |
| Deferred income tax asset write-off | 24,699 | | |
| Other | 5,046 | (3,895) | (7,378) |
| Income taxes reported | $ (18,234) | $ 347,573 | $ 565,293 |
| Effective tax rate | (49.1%) | 34.5% | 52.1% |

In 2007, the Company recorded a favorable $91 million income tax expense adjustment due to the settlement of its appeal of the Matthew Bender and Mosby Tax Court decision (see "Matthew Bender and Mosby Tax Liability" discussion below). The Company incurred non-deductible expenses and other costs in 2007 in connection with merger, restructuring and disposition transactions. In addition, the Company increased its income tax expense by $25 million in 2007 due to the write-off of tax credit carryforwards related to its low income housing investments (see Note 2). The Company reports interest on uncertain tax positions as part of its income tax expense. After-tax interest on uncertain tax positions increased 2007 income tax expense by $9 million. In 2006, the Company recorded a favorable $34 million income tax expense adjustment, most of which related to the Company's PHONES as a result of reaching an agreement with the Internal Revenue Service appeals office pertaining to the deduction of interest expense on the PHONES (see "PHONES Interest" discussion below). After-tax interest on uncertain tax positions increased income tax expense by $18 million in

118

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

2006. The Company recorded a non-taxable gain in 2006 related to certain restructuring transactions. In 2005, the Company increased its income tax expense by $150 million as a result of the Matthew Bender Tax Court decision and reduced its income tax expense by $12 million as a result of resolving certain federal income tax issues. After-tax interest on uncertain tax positions increased income tax expense by $19 million in 2005.

Components of income tax expense (benefit) charged to income from continuing operations were as follows (in thousands):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Currently payable: |  |  |  |
| U.S. federal | $ (86,764) | $ 287,600 | $ 434,502 |
| State and local | 4,022 | 43,193 | 44,043 |
| Sub-total | (82,742) | 330,793 | 478,545 |
| Deferred: |  |  |  |
| U.S. federal | 58,476 | 13,639 | 72,716 |
| State and local | 6,032 | 3,141 | 14,032 |
| Sub-total | 64,508 | 16,780 | 86,748 |
| Total | $ (18,234) | $ 347,573 | $ 565,293 |

Significant components of the Company's net deferred tax liabilities were as follows (in thousands):

|  | Dec. 30, 2007 | Dec. 31, 2006 |
|---|---|---|
| Net properties | $ 196,267 | $ 214,770 |
| Net intangible assets | 1,160,384 | 1,209,999 |
| Pensions | 179,073 | 74,891 |
| Investments | 363,541 | 406,409 |
| PHONES interest | 216,126 | 219,552 |
| Other future taxable items | 23,114 | 18,325 |
| Total deferred tax liabilities | 2,138,505 | 2,143,946 |
| Postretirement and postemployment benefits other than pensions | (50,296) | (54,990) |
| Deferred compensation | (34,245) | (84,288) |
| Other accrued liabilities | (69,780) | (55,270) |
| Federal capital loss and tax credit carryforwards | (41,355) | (24,699) |
| Accounts receivable | (12,281) | (13,211) |
| Other future deductible items | (10,768) | (6,352) |
| Tax benefits from future payments of uncertain tax positions | (42,413) | — |
| State operating loss carryforwards | (46,084) | (42,371) |
| Valuation allowances on state operating loss carryforwards | 40,886 | 37,457 |
| Total deferred tax assets | (266,336) | (243,724) |
| Net deferred tax liability | $ 1,872,169 | $ 1,900,222 |

**Federal Capital Loss and Tax Credit Carryforwards**—At Dec. 30, 2007, the Company had a capital loss of approximately $120 million that will be carried back to offset net capital gains reported in earlier tax years. The Company will file a claim for the refund of previously paid taxes after it files its 2007 federal income tax return. Capital losses can only be used to offset capital gains. As a result of the Recycler disposition (see Note 4), capital losses exceeded capital gains in 2007. At Dec. 31, 2006, the Company had approximately $25 million of tax credit carryforwards relating to its low income housing investments. As a result of restructuring certain investments during the fourth quarter of 2007 (see Note 2), the Company no longer expects to realize any tax benefits from the tax credit carryforwards and therefore wrote off the related deferred tax assets in the fourth quarter of 2007.

119

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

**Operating Loss Carryforwards**—At Dec. 30, 2007, the Company had approximately $895 million of operating loss carryforwards for state income tax purposes These carryforwards arose in certain states primarily as a result of intercompany interest expense, royalty expense and management fees allocated to the Company's various subsidiaries, and expire between 2008 and 2027. The deferred tax assets related to these carryforwards totaled approximately $46 million, net of federal taxes, at Dec. 30, 2007. However, the Company believes it is more likely than not that $41 million of the deferred tax assets will not be realized because the related carryforwards will expire before being utilized. Therefore, in accordance with FAS No. 109, "Accounting for Income Taxes," the Company has established valuation allowances of $41 million on the deferred tax assets related to the state carryforwards. The state operating loss carryforwards increased in 2007 because the Company generated additional tax losses in certain states.

**Matthew Bender and Mosby Tax Liability**—During 1998, Times Mirror, which was acquired by the Company in 2000, disposed of its Matthew Bender and Mosby subsidiaries in separate transactions, which were structured to qualify as tax-free reorganizations under the Internal Revenue Code. The Company believes these transactions were completed on a tax-free basis. However, the Internal Revenue Service ("IRS") audited the transactions and disagreed with the position taken by Times Mirror. In the fourth quarter of 2001, the Company received an IRS adjustment to increase Times Mirror's 1998 taxable income by approximately $1.6 billion. The Company filed a petition in the United States Tax Court in November 2002 to contest the IRS position, and in December 2004, the Company presented its position in Tax Court.

On Sept. 27, 2005, the Tax Court issued an opinion contrary to the Company's position and determined that the Matthew Bender transaction was a taxable sale. In January 2006, the Tax Court extended its opinion in the Matthew Bender case to the Mosby transaction given the similarity of the two transactions. Taxes and related interest for both the Matthew Bender and Mosby transactions totaled approximately $1 billion. Over time, deductions for state taxes and interest were expected to reduce the net cash outlay to approximately $840 million.

The Company appealed the Tax Court ruling to the United States Court of Appeals for the Seventh Circuit. On June 1, 2007, the Company announced that an offer of settlement was pending in its appeal. The Company finalized the settlement during the third quarter of 2007. As a result of the settlement, the Company received refunds of federal income taxes and interest of $4 million on Sept. 26, 2007 and $340 million on Oct. 1, 2007. After consideration of income taxes on the interest received, the net cash proceeds totaled approximately $286 million. These refunds, together with related state income tax benefits of $29 million, were accounted for as a $91 million reduction in 2007 income tax expense and a $224 million reduction in goodwill recorded on the Company's 2007 consolidated balance sheet.

Times Mirror established a tax reserve of $180 million in 1998 when it entered into the transactions. The reserve represented Times Mirror's best estimate of the amount the expected IRS and state income tax claims could be settled for based upon an analysis of the facts and circumstances surrounding the issue. In accordance with Emerging Issues Task Force ("EITF") Issue No. 93-7, "Uncertainties Related to Income Taxes in a Purchase Business Combination," the Company treated this item as an uncertain tax position at the time of the Times Mirror acquisition in 2000 and concluded that the estimate determined by Times Mirror was the most appropriate estimate of the exposure. The Company maintained this initial reserve, plus interest, and evaluated the adequacy of the reserve on a periodic basis. At Dec. 26, 2004, the reserve, including pretax interest of $66 million, totaled $246 million ($221 million after considering the tax benefit of the interest). In 2005, prior to the Tax Court ruling, the Company recorded additional after-tax interest of $7 million on the reserve.

As a result of the Tax Court ruling, the Company increased its tax reserve by an additional $609 million in the third quarter of 2005 by recording additional income tax expense of $150 million, representing additional after-tax interest applicable to the post-acquisition period, and goodwill of $459 million. In accordance with EITF No. 93-7, the Company adjusted goodwill because the tax contingencies existed at the time of the Times Mirror acquisition. On Sept. 30, 2005, the Company paid $880 million to the IRS, representing the federal tax and interest owed on the transactions, and financed the payment through the issuance of commercial paper. On Feb. 10, 2006, the Company made a California state tax and interest payment of approximately $86 million ($55

120

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

million after considering the federal tax benefit of the state taxes and interest). The remaining liability was $35 million at Dec. 31, 2006 and consisted of state tax and interest accruals. As a result of the Matthew Bender/Mosby settlement, the liability was adjusted to $24 million at Dec. 30, 2007.

The September and October 2007 refunds of the previously paid income taxes and interest were accounted for in accordance with EITF No. 93-7. The portion of the refunds representing after-tax interest applicable to periods following the acquisition of Times Mirror reduced income tax expense, and the remainder reduced goodwill.

A summary of the activity with respect to the Matthew Bender and Mosby tax liability is as follows (in millions):

| | |
|---|---:|
| Liability at Dec. 26, 2004: | |
| Tax | $ 180 |
| After-tax interest ($66 million pretax) | 41 |
| Liability at Dec. 26, 2004 | 221 |
| After-tax interest recorded in income tax expense in the first three quarters of 2005 ($11 million pretax) | 7 |
| Additional reserve recorded as a result of the Tax Court ruling: | |
| Charged to income tax expense | 150 |
| Additional goodwill | 459 |
| Liability at Sept. 25, 2005 | 837 |
| Federal tax and interest paid on Sept. 30, 2005: | |
| Federal tax | (542) |
| After-tax interest ($338 million pretax) | (210) |
| After-tax interest recorded in income tax expense in the fourth quarter of 2005 ($3 million pretax) | 2 |
| Liability at Dec. 25, 2005 | 87 |
| After-tax interest ($4 million pretax) | 3 |
| California tax and interest paid in February 2006: | |
| State tax ($55 million pretax) | (36) |
| After-tax interest ($31 million pretax) | (19) |
| Liability at Dec. 31, 2006 (included in "other current liabilities") | $ 35 |
| After-tax interest ($4 million pretax) | 2 |
| Adjustment recorded as a result of settling the appeal of the Tax Court decision | (9) |
| State tax and interest paid in 2007: | |
| State tax ($4 million pretax) | (3) |
| After-tax interest ($2 million pretax) | (1) |
| Liability at Dec. 30, 2007 (included in "other current liabilities") | $ 24 |

**PHONES Interest**—In connection with the routine examination of the Company's federal income tax returns for 2000 through 2003, the IRS proposed that the Company capitalize the interest on the PHONES as additional tax basis in the Company's 16 million shares of Time Warner common stock, rather than allowing the Company to currently deduct such interest. The National Office of the IRS has issued a Technical Advice Memorandum that supports the proposed treatment. The Company disagrees with the IRS's position and requested that the IRS administrative appeals office review the issue. The effect of the treatment proposed by the IRS would be to increase the Company's tax liability by approximately $189 million for the period 2000 through 2003 and by approximately $245 million for the period 2004 through 2007.

During the fourth quarter of 2006, the Company reached an agreement with the IRS appeals office regarding the deductibility of the PHONES interest expense. The agreement will apply for the tax years 2000 through the 2029 maturity date of the PHONES. In December of 2006, under the terms of the agreement reached with the IRS appeals office, the Company paid approximately $81 million of tax plus interest for tax years 2000 through

121

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

2005. The tax payments were recorded as a reduction in the Company's deferred tax liability, and the interest was recorded as a reduction in the Company's income tax reserves. The agreement reached with the appeals office is being reviewed by the Joint Committee on Taxation. A decision from the Joint Committee on Taxation is expected by the end of the second quarter of 2008.

Adoption of New Income Tax Accounting Standard—On January 1, 2007, the Company adopted the provisions of FIN 48, "Accounting for Uncertainty in Income Taxes." FIN 48 addresses the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. Under FIN 48, a company may recognize the tax benefit of an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. FIN 48 requires the tax benefit recognized in the financial statements to be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, and disclosure.

Due to the adoption of FIN 48, the Company was required to make certain reclassifications in its consolidated balance sheet as of Jan. 1, 2007. In the aggregate, these reclassifications increased the Company's liability for unrecognized tax benefits by $73 million and decreased its net deferred tax liabilities by $73 million. The adoption of FIN 48 had no impact on the Company's Jan. 1, 2007 consolidated retained earnings.

The amount of unrecognized tax benefits at Jan. 1, 2007 and Dec. 30, 2007, totaled $128 million and $138 million, respectively. If all of the unrecognized tax benefits at Jan. 1, 2007 and Dec. 30, 2007 were recognized, there would be a favorable $48 million and $52 million impact on the Company's effective tax rate respectively, after consideration of the federal effect of state income taxes.

The liability for unrecognized tax benefits at Jan. 1, 2007 and Dec. 30, 2007 included $38 million and $43 million, respectively, related to the PHONES issue discussed in the preceding "PHONES Interest" section. The Company expects to resolve this issue within the next twelve months. If the issue is definitively resolved on the terms agreed to with the appeals office, the $43 million liability at Dec. 30, 2007 would be reclassified to deferred income tax liabilities.

The Company does not expect that changes in the amount for unrecognized tax benefits during the next twelve months will have a significant impact on the Company's consolidated results of operations or financial position.

As allowed by FIN 48 and consistent with the Company's prior accounting policy, the Company recognizes accrued interest and penalties related to uncertain tax positions in income tax expense. As of Jan. 1, 2007 and Dec. 30, 2007, the Company's accrued interest and penalties related to uncertain tax positions totaled $26 million and $36 million, respectively.

The IRS is currently auditing the Company's federal income tax returns for the 2004 and 2005 fiscal years. The IRS has completed its audits of the Company's returns for all fiscal years prior to 2004. With the exception of the PHONES matter discussed above, the Company and the IRS have reached agreement on all issues raised during the prior audits. State income tax returns are generally subject to examination for a period of three to five years after they are filed, although many states often receive extensions of time from the Company. In addition, states may examine the state impact of any federal changes for a period of up to one year after the states are formally notified of the changes. The Company currently has various state income tax returns in the process of examination or administrative appeals.

122

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

The following summarizes the changes in unrecognized tax benefits during 2007 (in thousands):

| | |
|---|---:|
| Uncertain tax benefits at Jan. 1, 2007 | $  127,652 |
| Gross increase as a result of tax positions taken during a prior period | 9,625 |
| Gross increase as a result of tax positions taken during the current period | 5,428 |
| Decreases related to settlements with taxing authorities | (4,624) |
| Uncertain tax benefits at Dec. 30, 2007 | $  138,081 |

Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

On March 13, 2008, the Company filed an election to be treated as a subchapter S Corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. As a result, essentially all of the Company's net deferred tax liabilities will be eliminated and such adjustment will be recorded as a reduction in the Company's provision for income taxes in the first quarter of 2008.

## NOTE 15: PENSION AND OTHER POSTRETIREMENT BENEFITS

**Employee Pension Plans**—In connection with the establishment of the Tribune Company ESOP in 1988, Tribune amended its company-sponsored pension plan for employees not covered by a collective bargaining agreement. The Tribune Company pension plan continued to provide substantially the same pension benefits as under the pre-amended plan until December 1998. After that date, Tribune pension benefit credits were frozen in terms of pay and service.

In connection with the Times Mirror acquisition, the Company assumed defined benefit pension plans and various other contributory and non-contributory retirement plans covering substantially all of Times Mirror's former employees. In general, benefits under the Times Mirror defined benefit plans were based on years of service and the employee's compensation during the last five years of employment. In December 2005, the pension plan benefits for former Times Mirror non-union and non-Newsday employees were frozen. As a result of the plan freeze, a pretax curtailment gain of $18 million was recorded in 2005. On March 31, 2006, the pension plan benefits for Newsday union and non-union employees were frozen. Benefits provided by Times Mirror's Employee Stock Ownership Plan ("Times Mirror ESOP") are coordinated with certain pension benefits and, as a result, the defined benefit plan obligations are net of the actuarially equivalent value of the benefits earned under the Times Mirror ESOP. The maximum offset is equal to the value of the benefits earned under the defined benefit plan.

Effective Jan. 1, 2008, the Tribune Company pension plan was amended to include a cash balance plan to provide a tax-qualified, non-contributory guaranteed pension benefit for eligible employees. In addition, effective Dec. 31, 2007, the Tribune Company pension plan was amended to provide a special one-time initial cash balance benefit for eligible employees.

The Company also maintains several small plans for other employees. The Company's portion of assets and liabilities for multi-employer union pension plans is not determinable.

**Postretirement Benefits Other Than Pensions**—The Company provides postretirement health care and life insurance benefits to eligible employees under a variety of plans. The various plans have significantly different provisions for lifetime maximums, retiree cost-sharing, health care providers, prescription drug coverage and other benefits.

**Obligations and Funded Status**—As discussed in Note 1, the Company adopted FAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB

123

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATMENTS (Continued)

Statements No. 87, 88, 106 and 132(R)", as of Dec. 31, 2006. FAS No. 158 requires the Company to recognize the overfunded or underfunded status of its defined benefit pension and other postretirement plans as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which changes occur through comprehensive income. Prior to Dec. 31, 2006, the Company accounted for its defined benefit pension plans under FAS No. 87, "Employers' Accounting for Pensions" and accounted for its other postretirement benefit plans under FAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions".

Summarized information for the Company's defined benefit pension and other postretirement plans is provided below (in thousands):

| | Pension Plans | | Other Postretirement Plans | |
| --- | --- | --- | --- | --- |
| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 30, 2007 | Dec. 31, 2006 |
| Change in benefit obligations: | | | | |
| Projected benefit obligations, beginning of year | $ 1,546,911 | $ 1,599,129 | $ 139,832 | $ 140,465 |
| Service cost | 1,957 | 3,934 | 1,291 | 1,335 |
| Interest cost | 83,984 | 84,349 | 7,825 | 7,367 |
| Special termination benefits | 1,067 | 1,382 | | |
| Impact of Medicare Reform Act | | | 1,200 | 1,200 |
| Actuarial (gain) loss | (190,437) | (57,317) | (4,549) | 3,471 |
| Benefits paid | (92,108) | (84,566) | (14,768) | (14,006) |
| Projected benefit obligations, end of year | 1,351,374 | 1,546,911 | 130,831 | 139,832 |
| Change in plans' assets: | | | | |
| Fair value of plans' assets, beginning of year | 1,764,470 | 1,598,398 | — | — |
| Actual return on plans' assets | 116,854 | 243,209 | — | — |
| Employer contributions | 17,322 | 7,429 | 14,768 | 14,006 |
| Benefits paid | (92,108) | (84,566) | (14,768) | (14,006) |
| Fair value of plans' assets, end of year | 1,806,538 | 1,764,470 | — | — |
| Funded (under funded) status of the plans | $ 455,164 | $ 217,559 | $ (130,831) | $ (139,832) |

Amounts recognized in the statement of financial position consisted of (in thousands):

| | Pension Plans | | Other Postretirement Plans | |
| --- | --- | --- | --- | --- |
| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 30, 2007 | Dec. 31, 2006 |
| Prepaid pension costs | $ 514,429 | $ 293,455 | $ | $ |
| Employee compensation and benefits | (5,899) | (6,163) | — | — |
| Deferred compensation and benefits | (53,366) | (69,733) | (130,831) | (139,832) |
| Net amount recognized | $ 455,164 | $ 217,559 | $ (130,831) | $ (139,832) |

The accumulated benefit obligation, which excludes the impact of future compensation increases, for all defined benefit pension plans was $1,349 million and $1,543 million at Dec. 30, 2007 and Dec. 31, 2006, respectively. The projected benefit obligation at Dec. 30, 2007 includes $1,292 million related to the Company's qualified pension plans and $59 million related to its non-qualified plans. The Company's non-qualified plans are not funded.

124

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The components of net periodic benefit cost (credit) for Company-sponsored plans were as follows (in thousands):

| | Pension Plans | | | Other Postretirement Plans | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| Service cost | $ 1,957 | $ 3,934 | $ 25,160 | $ 1,291 | $ 1,335 | $ 1,469 |
| Interest cost | 83,984 | 84,349 | 81,436 | 7,825 | 7,367 | 7,774 |
| Expected return on plans' assets | (139,364) | (128,836) | (127,346) | — | — | — |
| Recognized actuarial loss | 47,080 | 67,018 | 59,095 | 180 | (127) | — |
| Amortization of prior service costs | 220 | 220 | (1,415) | (1,445) | (1,444) | (1,444) |
| Amortization of transition asset | — | (1) | (5) | — | — | (439) |
| Special termination benefits(1) | — | 1,382 | 1,434 | — | — | — |
| Settlement gain(2) | (1,227) | — | — | — | — | — |
| Curtailment gain | — | — | (17,825) | — | — | — |
| Net periodic benefit cost (credit) | $ (7,350) | $ 28,066 | $ 20,534 | $ 7,851 | $ 7,131 | $ 7,360 |

(1) Costs related to position eliminations.
(2) Gain related to change in control settlement payments made in connection with the consummation of the Merger (see Note 3).

The changes in minimum pension liabilities included in other comprehensive income (loss) for Company-sponsored plans were as follows (in thousands):

| | Pension Plans | | | Other Postretirement Plans | | |
|---|---|---|---|---|---|---|
| | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 25, 2005 | Dec. 30, 2007 | Dec. 31, 2006 | Dec. 25, 2005 |
| Change in minimum pension liabilities included in other comprehensive income, net of tax | $ — | $ 18,987 | $ (20,597) | $ — | $ — | $ — |

Amounts included in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) for Company-sponsored plans following the adoption of FAS No. 158 were as follows (in thousands):

| | Pension Plans | | Other Postretirement Plans | | Total | |
|---|---|---|---|---|---|---|
| | Dec. 31, 2007 | Dec. 30, 2006 | Dec. 31, 2007 | Dec. 30, 2006 | Dec. 31, 2007 | Dec. 30, 2006 |
| Unrecognized net actuarial gains (losses), net of tax | $ (253,562) | $ (384,859) | $ 8,411 | $ 5,527 | $ (245,151) | $ (379,332) |
| Unrecognized prior service costs, net of tax | (2,790) | (1,400) | 5,078 | 5,959 | 2,288 | 4,559 |
| Total | $ (256,352) | $ (386,259) | $ 13,489 | $ 11,486 | $ (242,863) | $ (374,773) |

In accordance with FAS No. 87, unrecognized net actuarial gains and losses will be recognized in net periodic pension expense over approximately 11 years, representing the estimated average remaining service period of active employees expected to receive benefits, with corresponding adjustments made to accumulated other comprehensive income (loss) in accordance with FAS No. 158. The Company's policy is to incorporate asset-related gains and losses into the asset value used to calculate the expected return on plan assets and into the calculation of amortization of unrecognized net actuarial loss over a four-year period.

During 2008, the Company expects to recognize as part of its net periodic pension benefit cost approximately $25 million of net actuarial losses and $1 million of prior service credits that are included, after

125

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

taxes, in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) at Dec. 30, 2007.

**Assumptions**—Weighted average assumptions used each year in accounting for pension benefits and other postretirement benefits were:

| | Pension Plans | | Other Postretirement Plans | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Discount rate for expense | 5.75% | 5.50% | 5.75% | 5.50% |
| Discount rate for obligations | 6.65% | 5.75% | 6.30% | 5.75% |
| Increase in future salary levels for expense | 3.50% | 3.50% | | |
| Increase in future salary levels for obligations | 3.50% | 3.50% | — | — |
| Long-term rate of return on plans' assets | 8.50% | 8.50% | — | — |

The Company used a building block approach to determine its current 8.5% assumption for the long-term expected rate of return on pension plan assets. Based on historical market studies, the Company's long-term expected returns for equity and fixed income securities approximate 10% and 6%, respectively. The Company's current 2008 target asset allocation for pension plan assets is 70% in equity securities and 30% in fixed income securities and other. Prior to Dec. 30, 2007, the Company based the rate used for discounting future benefit obligations and calculating interest cost on an index of Aa-rated corporate bonds. The duration of the bonds in this index approximated the timing of future payments for the Company's benefit obligations. Beginning on Dec. 30, 2007, the Company uses the Citigroup Above Median yield curve for discounting future benefit obligations and calculating interest cost. The Citigroup Above Median yield curve represents yields on high quality corporate bonds that more closely match the cash flows of the estimated payouts for the Company's benefit obligations.

**Plan Assets**—The Company's pension plans' asset allocations at Dec. 30, 2007 and Dec. 31, 2006 were as follows (in millions):

| | Plan Assets | | | |
|---|---|---|---|---|
| Asset Category | Dec. 30, 2007 | | Dec. 31, 2006 | |
| Equity securities | $ 1,316 | 72.8% | $ 1,344 | 76.2% |
| Fixed income securities | 405 | 22.4% | 334 | 18.9% |
| Other | 86 | 4.8% | 86 | 4.9% |
| Total | $ 1,807 | 100% | $ 1,764 | 100% |

**Health Care Cost Trend Rates**—For purposes of measuring 2007 postretirement health care costs, a 8.25% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2007. The rate was assumed to decrease gradually to 5% for 2012 and remain at that level thereafter. For purposes of measuring health care obligations at Dec. 30, 2007, a 6.7% annual rate of increase in the per capita cost of covered health care benefits was assumed for 2008. The rate was assumed to decrease gradually to 5% for 2012 and remain at that level thereafter.

Assumed health care cost trend rates have a significant effect on the amounts reported for health care plans. As of the date of this report, a 1% change in assumed health care cost trend rates would have the following effects (in thousands):

| | 1% Increase | 1% Decrease |
|---|---|---|
| Service cost and interest cost | $ 357 | $ (319) |
| Projected benefit obligation | $ 5,559 | $ (4,983) |

126

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Cash Flows**—The Company contributed $17 million to certain of its union and non-qualified pension plans, including $10 million of contributions made pursuant to change in control provisions contained in certain of the Company's non-qualified pensions plans upon consummation of the Merger, and $15 million to its other postretirement plans in 2007. The Company plans to contribute $6 million to certain of its union and non-qualified pension plans and $13 million to its other postretirement plans in 2008.

**Expected Future Benefit Payments**—The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid (in thousands):

|  | Pension Benefits | | Other Postretirement Benefits |
|---|---|---|---|
| 2008 | $ | 87,205 | $ 14,746 |
| 2009 | | 91,420 | 14,798 |
| 2010 | | 95,207 | 14,804 |
| 2011 | | 98,976 | 14,832 |
| 2012 | | 102,946 | 14,487 |
| 2013-2017 | $ | 576,314 | $ 66,598 |

## NOTE 16: CAPITAL STOCK

On Dec. 20, 2007, the Company consummated the Merger Agreement, as defined and discussed in Note 3. Pursuant to the Merger Agreement, each share of the Company's common stock issued and outstanding immediately prior to the Merger, other than shares held by the Company, the ESOP or Merger Sub immediately prior (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes.

The Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated and requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of market on Dec. 20, 2007, and that the NYSE file with the Securities and Exchange Commission an application on Form 25 to report that the shares of the Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

Following the consummation of the Merger, the Company had no shares of common stock issued other than 56,521,739 shares held by the ESOP. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007. See Note 17 for further information on the classification of the shares of the Company's common stock held by the ESOP in the Company's consolidated balance sheet at Dec. 30, 2007.

**Series C, D-1 and D-2 Convertible Preferred Stock**—In connection with the June 12, 2000 merger with Times Mirror, outstanding shares of Times Mirror cumulative, non-voting preferred stock were converted into shares of Tribune preferred stock with similar terms. A total of 213,733 shares of the Company's Series C-1, D-1 and D-2 convertible preferred stock, net of treasury stock, were issued due to the conversion. The Series C, D-1 and D-2 convertible preferred stocks related to Times Mirror recapitalization transactions whereby TMCT, LLC and TMCT II, LLC (see Note 8) were formed. In connection with a restructuring of TMCT, LLC and TMCT II, LLC, all of these preferred shares were distributed to the Company on Sept. 22, 2006. As a result, the Company had no preferred shares outstanding effective as of Sept. 22, 2006, other than 137,643 treasury shares of Series D-1 convertible preferred stock held by a subsidiary of the Company. These remaining shares of convertible preferred stock were retired prior to the completion of the Merger.

Series C convertible preferred stock was cumulative, non-voting preferred stock, which was entitled to annual dividends of 8%, based on liquidation value. Dividends for Series D-1 and D-2 preferred stock were paid

127

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

at the annual rate of 6.91% and 6.67% in 2006 and 2005, respectively. The Series C, D-1 and D-2 preferred stocks were convertible into the Company's common stock in 2025 and thereafter. The conversion factor was calculated by dividing $500 plus accrued and unpaid dividends by the average closing prices of the Company's common stock for the 20 trading days immediately preceding the conversion date.

**Common Stock Repurchases**—As defined and discussed in the description of the Leveraged ESOP Transactions in Note 3, the Company completed two common stock repurchases in 2007. The following table summarizes the Company's common stock repurchases during 2007 (in thousands):

|  | Shares | | Cost |
| --- | --- | --- | --- |
| June 4, 2007 Share Repurchase | 126,007 | $ | 4,289,192 |
| Dec. 20, 2007 Merger consummation | 118,586 | | 4,032,081 |
| Total common stock repurchases | 244,593 | $ | 8,321,273 |

The following table summarizes the Company's common stock repurchases during 2006 (in thousands):

|  | Shares | | Cost |
| --- | --- | --- | --- |
| Repurchases in the first quarter | 4,604 | $ | 137,746 |
| Tender offer repurchases | 45,027 | | 1,468,270 |
| Repurchases from the Robert R. McCormick Tribune Foundation and Cantigny Foundation | 10,000 | | 325,300 |
| Repurchases subsequent to the tender offer | 11,053 | | 330,952 |
| Total common stock repurchases | 70,684 | $ | 2,262,268 |

On May 30, 2006, the Company initiated a modified "Dutch Auction" tender offer to repurchase up to 53 million shares of its common stock at a price per share not greater than $32.50 and not less than $28.00. The tender offer closed on June 26, 2006, and the Company acquired 45 million shares of its common stock on July 5, 2006 at a price of $32.50 per share before transaction costs. The Company also acquired 10 million shares of its common stock from the Robert R. McCormick Tribune Foundation and the Cantigny Foundation on July 12, 2006 at a price of $32.50 per share before transaction costs. The Robert R. McCormick Tribune Foundation and the Cantigny Foundation were affiliated non-profit organizations, which together held 13.6% of the Company's outstanding shares when the tender offer was launched. In connection with the tender offer, the Board also authorized the repurchase of an additional 12 million shares of the Company's common stock commencing on the eleventh business day following the completion of the tender offer. In the third quarter of 2006, the Company repurchased an additional 11.1 million shares under that authorization at a weighted average cost of $29.94 per share. In addition, the Company repurchased and retired 4.6 million shares of its common stock in the first quarter of 2006.

During 2005, the Company repurchased and retired 12.2 million shares of its common stock in the open market for $440 million.

**Stock Purchase Warrants**—As defined and discussed in the description of the Leveraged ESOP Transactions contained in Note 3, following the consummation of the Merger, the Zell Entity purchased from the Company a 15-year warrant. The warrant entitles the Zell Entity to purchase 43,478,261 shares of the Company's common stock (subject to adjustment), which represents approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to the share equivalents granted under the Management Equity Incentive Plan as defined and discussed in Note 17). The warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted

128

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

assignees. See Part III, Items 12 and 13, hereof for further information on the assignment of the minority interests in the subordinated promissory note and the warrant. The Company recorded the warrants at an estimated fair value of $255 million, which is presented as a separate component of shareholders' equity (deficit) in the Company's consolidated balance sheet at Dec. 30, 2007.

## NOTE 17: INCENTIVE COMPENSATION AND STOCK PLANS

**Defined Contribution Plans**—The Company maintains various qualified 401(k) savings plans, which permit eligible employees to make voluntary contributions on a pretax basis. The plans allow participants to invest their savings in various investments. In 2004, the Company enhanced its primary 401(k) plan to include a larger Company contribution. This new plan was designed to replace the Company's Employee Stock Ownership Plan that was established in 1988 and fully allocated at the end of 2003. In 2006, the Company amended its primary 401(k) plan to make a portion of the Company's contributions discretionary. Amounts charged to expense for all of the Company's defined contribution plans totaled $35 million in 2007, $65 million in 2006, and $59 million in 2005.

**Employee Stock Purchase Plan**—This plan permitted eligible employees to purchase the Company's common stock at 85% of market price. In April 2007, the Company suspended future contributions to the plan. The Company incurred charges of $.1 million in 2007 and $.2 million in 2006 and 2005 related to the administration of this plan. During 2007, 2006, and 2005, 175,687, 598,186, and 682,624 shares, respectively, were sold to employees under this plan. The weighted average fair value of shares sold in 2007 was $30.70. The Plan was discontinued as of Dec. 20, 2007 following the consummation of the Merger (see Note 3).

**Employee Stock Ownership Plan ("ESOP")**—As defined and described in Note 3, on April 1, 2007, the Company established a new ESOP as a long-term employee benefit plan. On that date, **the ESOP purchased 8,928,571 shares of the Company's common stock. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger, the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock.**

The ESOP provides for the allocation of the Company's common shares it holds on a noncontributory basis to eligible employees of the Company. None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007. Beginning in fiscal year 2008, as the Company repays the ESOP loan, shares will be released and allocated to eligible employees in proportion to their eligible compensation. The shares that are released for allocation on an annual basis will be in the same proportion that the current year's principal and interest payments bear in relation to the total remaining principal and interest payments to be paid over the life of the $250 million ESOP loan. The Company will recognize compensation expense based on the estimated fair value of the shares of the Company's common stock that are allocated in each annual period.

129

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The Company's policy is to present unallocated shares held by the ESOP at book value, net of unearned compensation, and allocated shares at fair value in the Company's consolidated balance sheet. Pursuant to the terms of the ESOP, following the Merger, participants who receive distributions of shares of the Company's common stock can require the Company to repurchase those shares within a specified time period following such distribution. Accordingly, the shares of the Company's common stock held by the ESOP are classified outside of shareholders' equity (deficit), net of unearned compensation, in the Company's consolidated balance sheet. The amounts at Dec. 30, 2007 were as follows (in thousands):

|  | Dec. 30, 2007 |
|---|---|
| Unallocated ESOP shares (at book value) | $ 250,000 |
| Unearned compensation related to ESOP | (250,000) |
| Common shares held by ESOP, net of unearned compensation | $ — |

At Dec. 30, 2007, the fair value of the unallocated shares held by the ESOP was approximately $593 million. In accordance with the terms of the ESOP, the fair value of the Company's common stock was determined by the trustee of the ESOP.

**Tribune Company Incentive Compensation Plan**—In 1997, the 1992 Long-Term Incentive Plan was replaced with the 1997 Incentive Compensation Plan, which was amended and restated in 2004 as the Tribune Company Incentive Compensation Plan (the "Incentive Plan"). The Incentive Plan provides for the granting of awards to eligible employees in any one or combination of stock options, performance equity program awards and annual management incentive program bonuses.

On Dec. 20, 2007, the Company consummated the Merger, as defined and described in the description of the Leveraged ESOP Transactions in Note 3. Pursuant to the Merger Agreement, the Company redeemed for cash all outstanding stock awards, each of which vested in full upon completion of the Merger, with positive intrinsic value relative to $34.00 per share. Accordingly, the Company recorded additional stock-based compensation expense of $53 million, or $35 million net of taxes, in the fourth quarter of 2007 in connection with the cash settlement of its outstanding stock awards (see below for further discussion of amounts recorded for stock-based compensation following the adoption of FAS 123R). All remaining outstanding stock awards under the Incentive Plan as of Dec. 20, 2007 that were not cash settled pursuant to the Merger Agreement were cancelled. Following the Merger, the Company does not intend to grant any new equity awards under the Incentive Plan.

**Tribune Company Management Equity Incentive Plan**—On Dec. 20, 2007, the Board approved the Company's 2007 Management Equity Incentive Plan (the "Management Equity Incentive Plan"). The Management Equity Incentive Plan provides for phantom units (the "Units") that generally track the value of a share of the Company's common stock after the effective date of the Merger. Awards have been made to eligible members of the Company's management and other key employees at the discretion of the Board. Under the terms of the Management Equity Incentive Plan, awards are classified as First Tranche Units or Second Tranche Units.

The First Tranche Units represent approximately 5% of the Company's fully-diluted outstanding common stock, including after giving effect to the stock purchase warrants (see Note 16) and the First Tranche Units and Second Tranche Units authorized under the Management Equity Incentive Plan (5,434,652 First Tranche Units authorized, subject to customary anti-dilution adjustments). First Tranche Units vest ratably over a three-year period beginning on the date of grant. Unvested First Tranche Units vest upon a change in control of the Company or upon termination of employment due to death or disability. Unvested First Tranche Units will be cancelled upon a termination of a participant's employment for any reason other than death or disability.

The Second Tranche Units represent approximately 3% of the fully-diluted outstanding common stock, including after giving effect to the stock purchase warrants (see Note 16) and the First Tranche Units and Second Tranche Units authorized under the Management Equity Incentive Plan (3,261,000 Second Tranche Units authorized, subject to customary anti-dilution adjustments). Fifty percent of the Second Tranche Units vested upon grant and the remaining fifty percent will vest on the one year anniversary of the grant date. Any unvested

130

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Second Tranche Units will become fully vested upon a change in control of the Company, an involuntary termination of employment or a termination of employment due to a Plan participant's death or disability. Unvested Second Tranche Units will be cancelled upon a termination of a participant's employment for any reason other than an involuntary termination of employment or a termination of employment due to death or disability. Participants receiving Second Tranche Units will be entitled to a gross-up for the payment of excise taxes, if any, in connection with the Merger.

In general, one-third of vested Units subject to an award (whether First Tranche Units or Second Tranche Units) will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date or, if sooner, upon the occurrence of a change in control or a termination of employment based on the fair market value of the Company's common stock on the December 31 immediately following the settlement event. With respect to Second Tranche Units only, in the event of a termination of a Plan participant's employment prior to Dec. 20, 2008, such participant will receive his or her pro rata share (based upon the amount of his or her vested Second Tranche Units relative to all Second Tranche Units outstanding and reserved for issuance) of $25 million, payable within ten business days following such termination of employment.

The Company accounts for the Units issued under the Management Equity Incentive Plan as liability-classified awards in accordance with FAS No. 123R (see below for further information regarding the Company's adoption of FAS No. 123R). The Company recorded $19 million of compensation expense in 2007 in connection with the Management Equity Incentive Plan, including $3 million of early termination payments made immediately following the Merger. As required by the terms of the plan, the remaining $16 million of expense was based on the estimated fair value of the Company's common stock as of Dec. 30, 2007 as determined by the trustee of the ESOP and is included in other non-current liabilities on the Company's consolidated balance sheet at Dec. 30, 2007.

**Stock-Based Compensation**—In the first quarter of 2006, the Company adopted FAS No. 123R which requires the Company to expense stock-based compensation in its income statement. Under FAS No. 123R, stock-based compensation cost is measured at the grant date for equity-classified awards and at the end of each reporting period for liability-classified awards based on the estimated fair value of the awards. The Company adopted FAS No. 123R using the modified prospective application method and did not restate prior years. FAS No. 123R requires stock-based compensation expense to be recognized over the period from the date of grant to the date when the award is no longer contingent on the employee providing additional service (the "substantive vesting period"). The Incentive Plan provided that awards generally vested upon the death, disability or retirement of an employee. As a result, stock-based grants issued to retirement eligible employees under the Incentive Plan were required to be expensed immediately. The Units issued under the Management Equity Incentive Plan do not contain a retirement eligibility provision and are therefore expensed ratably over the contractual vesting period of each Unit.

Prior to the adoption of FAS No. 123R, the Company accounted for its stock-based compensation plans in accordance with APB No. 25 and related interpretations. Under APB No. 25, no compensation expense was recorded because the exercise price of employee stock options equaled the market price of the underlying stock on the date of grant. Under the provisions of APB No. 25, the Company was not required to recognize compensation expense for its Employee Stock Purchase Plan. See Note 1 for pro forma stock-based compensation expense calculated under FAS No. 123 for 2005.

131

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The following table summarizes the impact of the adoption of FAS 123R on the Company's consolidated statement of income for the years ended Dec. 30, 2007 and Dec. 31, 2006 (in thousands):

| | 2007 | 2006 |
|---|---|---|
| Stock-based compensation expense: | | |
| Options (1) | $ 4,935 | $ 8,747 |
| Restricted stock units(1)(2) | 86,392 | 19,975 |
| Management Equity Incentive Plan(2)(3) | 18,568 | — |
| Employee stock purchase plan | 800 | 2,681 |
| Total stock-based compensation expense | 110,695 | 31,403 |
| Income tax benefit | (40,108) | (12,247) |
| Total impact on net income from continuing operations | (70,587) | (19,156) |
| Impact on discontinued operations, net of tax | 11 | (251) |
| Total impact on net income | $ (70,576) | $ (19,407) |

(1)   Option and restricted stock unit expense for 2007 includes accelerated compensation amounts recorded in connection with the consummation of the Merger of $2.5 million and $50.3 million, respectively.

(2)   Expense for restricted stock units and the Management Equity Incentive Plan would have been recorded under APB No. 25.

(3)   Expense for the Management Equity Incentive Plan includes $2.9 million of early termination payments made immediately following the Merger.

Total stock-based compensation costs included $.2 million and $.1 million of capitalized costs and less than $.1 million and $.4 million of costs related to discontinued operations in 2007 and 2006, respectively.

As of Dec. 30, 2007, the Company had not yet recognized compensation cost on the following non-vested awards (in thousands):

| | Nonvested Compensation | Weighted Average Recognition Period |
|---|---|---|
| Management Equity Incentive Plan | $ 57,623 | 1.48 years |

In determining the fair value of compensation cost for equity-classified awards granted under the Incentive Plan, the Company valued restricted stock unit awards at the quoted closing market price on the date of grant. The fair value of stock option awards was determined using the Black-Scholes option-pricing model, which incorporated the assumptions in the following table for general and replacement awards granted during 2006 and 2005. There were no general awards or replacement awards granted in 2007. The risk-free rate was based on the U.S. Treasury yield curve in effect at the time of grant. Expected volatility was based on actual historical volatility. Expected life was based on historical experience and consideration of changes in option terms.

| | 2006 | | 2005 | |
|---|---|---|---|---|
| | General Awards | Replacement Awards | General Awards | Replacement Awards |
| Risk-free interest rate | 4.6% | * | 3.7% | 3.3% |
| Expected dividend yield | 2.5% | * | 1.8% | 1.8% |
| Expected stock price volatility | 22.0% | * | 28.1% | 22.8% |
| Expected life (in years) | 4 | * | 5 | 3 |
| Weighted average fair value | $ 5.96 | * | $ 10.49 | $ 6.96 |

*No replacement awards were granted in 2006.

Under the Incentive Plan, the exercise price of a stock option award could not be less than the market price of the Company's common stock at the time the stock option award was granted. Stock option awards were exercisable not less than six months or more than 10 years after the date the stock option award was granted. General stock option awards granted after 2003 had an 8-year term. General stock option awards granted under the Plan prior to 2006 vested in annual 25% increments beginning one year from the date of the grant. General

Source: TRIBUNE CO, 10-K, March 20, 2008

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

stock option awards granted under the Plan in 2006 vested in annual 33% increments beginning one year from the date of the grant.

Under certain circumstances, replacement options were granted when a participant paid the exercise price of a stock option and related tax withholding obligations with previously acquired shares of common stock. The number of replacement options granted was equal to the number of shares used to pay the exercise price and related tax withholding obligations. The exercise price of a replacement option was equal to the market price of the underlying stock on the date of grant, and the term was equal to the remaining term of the original option. Replacement options vested one year from the date of grant. Beginning in 2004, general stock option awards did not have a replacement stock option award feature.

A summary of activity and weighted average exercise prices and fair values related to general stock option awards follows (shares in thousands):

| | General Options(1) | | | | | | | | |
| | 2007 | | | 2006 | | | 2005 | | |
| | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| Outstanding, beginning of year | 33,442 $ | 38.30 $ | 14.38 | 34,489 $ | 38.35 $ | 15.03 | 32,991 $ | 37.92 $ | 15.59 |
| Granted | — | | | 1,938 | 31.16 | 5.96 | 3,780 | 40.30 | 10.64 |
| Exercised | (3,351) | 22.77 | 20.23 | (1,101) | 21.24 | 20.25 | (993) | 23.96 | 18.40 |
| Canceled/forfeited | (2,470) | 41.38 | 13.56 | (1,884) | 42.13 | 13.57 | (1,289) | 43.57 | 13.68 |
| Cash settled in Merger | (5,254) | 26.31 | 15.12 | | | | | | |
| Canceled in Merger | (22,367) | 43.01 | 13.48 | | | | | | |
| Outstanding, end of year | — | | | 33,442 | 38.30 | 14.38 | 34,489 | 38.35 | 15.03 |
| Exercisable, end of year | — | | | 31,469 $ | 38.75 $ | 14.93 | 32,993 $ | 38.28 $ | 15.08 |

(1) Includes options assumed in the Times Mirror acquisition.

A summary of activity and weighted average exercise prices and fair values related to replacement options follows (shares in thousands):

| | Replacement Options | | | | | | | | |
| | 2007 | | | 2006 | | | 2005 | | |
| | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value | Shares | Weighted Avg. Exercise Price | Weighted Avg. Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| Outstanding, beginning of year | 7,185 $ | 48.10 $ | 8.04 | 9,520 $ | 47.79 $ | 8.06 | 10,845 $ | 47.79 $ | 8.11 |
| Granted | — | | | | | | 13 | 41.83 | 6.96 |
| Exercised | — | | | | | | (20) | 42.20 | 8.43 |
| Canceled/forfeited | (4,501) | 47.90 | 8.11 | (2,335) | 46.83 | 8.13 | (1,318) | 47.93 | 8.46 |
| Canceled in Merger | (2,684) | 48.40 | 7.90 | | | | | | |
| Outstanding, end of year | — | | | 7,185 | 48.10 | 8.04 | 9,520 | 47.79 | 8.06 |
| Exercisable, end of year | — | | | 7,185 $ | 48.10 $ | 8.04 | 9,507 $ | 47.80 $ | 8.06 |

The total intrinsic value (the excess of the market price over the exercise price) was approximately $49 million for general and replacement stock option awards outstanding and exercisable as of Dec. 31, 2006. The total intrinsic value for stock options exercised in 2007 prior to the Merger and in 2006 was approximately $43 million and $11 million, respectively. The Company realized approximately $21 million of tax benefits from the exercise and cash settlement of stock options in 2007. In addition, the Company received approximately $77 million from the exercise of stock options in 2007. In 2006, the Company realized approximately $4 million of tax benefits and received approximately $22 million from the exercise of stock options. Pursuant to the Merger

133

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Agreement, the Company paid $135 million in connection with the cash settlement of its outstanding stock awards.

The Incentive Plan also allowed the Company to grant restricted stock units. The Company did not grant restricted stock units prior to 2006. In 2006, the Company granted restricted stock units which vested either in annual 33% increments beginning one year from the date of the grant, or 100% three years from the date of grant. Each restricted stock unit represented the Company's obligation to deliver to the holder one share of common stock upon vesting.

Holders of restricted stock also received dividend equivalent units until the restricted stock units vested. The number of dividend equivalent units granted for each restricted stock unit was calculated based on the value of the dividends per share paid on Tribune's common stock and the closing price of Tribune stock on the dividend payment date. The dividend equivalent units vested with the underlying restricted stock units.

A summary of restricted stock unit and dividend equivalent unit activity and weighted average fair values follows (shares in thousands):

| | 2007 | | 2006 | | 2005 | |
| | Shares | Weighted Avg. Fair Value | Shares | Weighted Avg. Fair Value | Shares | Weighted Avg. Fair Value |
|---|---|---|---|---|---|---|
| Outstanding and nonvested, beginning of year | 1,524 | $ 31.18 | — | — | — | — |
| Restricted stock units granted | 1,837 | 30.41 | 1,523 | $ 31.18 | — | — |
| Dividend equivalent units granted | 11 | — | 34 | — | — | — |
| Forfeited | (135) | 30.29 | (33) | $ 31.16 | — | — |
| Vested and issued | (410) | 30.65 | — | — | — | — |
| Cash settled in Merger | (2,827) | 34.00 | — | — | — | — |
| Outstanding and nonvested, end of year | — | — | 1,524 | $ 31.18 | — | — |

As described above, the Company issued Units under the Management Equity Incentive Plan following the consummation of the Merger. The fair value of the Units is based on the estimated fair value of the Company's common stock at the end of each reporting period, other than for Second Tranche Units that are cash settled due to early terminations prior to Dec. 20, 2008.

A summary of 2007 activity under the Management Equity Incentive Plan and weighted average fair values follows (Units in thousands):

| | 2007 | |
| | Units | Weighted Avg. Fair Value |
|---|---|---|
| Outstanding, beginning of year | — | $ — |
| First Tranche Units granted | 4,163 | $ 10.50 |
| Second Tranche Units granted | 3,196 | 10.50 |
| Cash settled due to early terminations | (380) | 7.67 |
| Outstanding, end of year | 6,979 | 10.50 |
| Vested, end of year | 1,408 | $ 10.50 |

134

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 18: COMPREHENSIVE INCOME

Comprehensive income reflects all changes in the net assets of the Company during the period from transactions and other events and circumstances, except those resulting from stock issuances, stock repurchases and dividends. The Company's comprehensive income includes net income and other gains and losses. Prior to 2007, the Company's other comprehensive income (loss) primarily included gains and losses on marketable securities classified as available-for-sale and the change in minimum pension liabilities. Beginning in the Company's 2007 fiscal year, and as a result of the Company's adoption of FAS No. 158 as of Dec. 31, 2006, other comprehensive income (loss) no longer includes the change in minimum pension liabilities, but does include changes in unrecognized benefit cost gains and losses. In addition, beginning in the Company's 2007 third quarter, other comprehensive income (loss) includes gains and losses on cash flow hedging instruments as a result of the interest rate swap agreements the Company entered into in July 2007 (see Note 10 for further information on the Company's interest rate swap agreements). The Company's comprehensive income was as follows (in thousands):

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| Net income | $ 86,945 | $ 593,995 | $ 534,689 |
| Change in unrecognized benefit cost loss, net of taxes of $66,850 | 104,560 | — | — |
| Adjustment for previously unrecognized benefit cost (gains) and losses included in net income, net of taxes of $17,486 | 27,350 | — | — |
| Change in minimum pension liabilities, net of taxes of $12,139 and ($13,168), respectively | — | 18,987 | (20,597) |
| Unrealized gain (loss) on marketable securities: | | | |
| Unrealized holding gain (loss) arising during the period, net of taxes of ($3,414), $1,234, and ($2,098), respectively | (5,340) | 1,929 | (3,282) |
| Adjustment for gain on investment sales included in net income, net of taxes of ($7,241) and ($116), respectively | — | (11,325) | (181) |
| Unrealized gain (loss) on marketable securities, net of taxes | (5,340) | (9,396) | (3,463) |
| Unrecognized losses on cash flow hedging instruments: | | | |
| Change in losses on cash flow hedging instruments, net of taxes of ($35,440) | (55,431) | — | — |
| Adjustment for losses on cash flow hedging instruments included in net income, net of taxes of $661 | 1,033 | — | — |
| Unrecognized losses on cash flow hedging instruments, net of taxes | (54,398) | — | — |
| Change in foreign currency translation adjustments, net of taxes of $373, $117 and ($45), respectively | 584 | 183 | (70) |
| Other comprehensive income (loss) | 72,756 | 9,774 | (24,130) |
| Comprehensive income | $ 159,701 | $ 603,769 | $ 510,559 |

135

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Accumulated other comprehensive income (loss) is a separate component of shareholders' equity (deficit) on the Company's consolidated balance sheet. A reconciliation of the components of accumulated other comprehensive income (loss) is as follows (in thousands):

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Minimum pension liabilities, net of tax:** | | | |
| Balance, beginning of year | $ — | $ (27,901) | $ (7,304) |
| Current year change prior to adoption of FAS No. 158 | | 18,987 | (20,597) |
| Change due to adoption of FAS No. 158 | — | 8,914 | |
| Balance, end of year | | — | (27,901) |
| **Unrecognized benefit cost gains and (losses), net of tax:** | | | |
| Balance, beginning of year | (374,773) | — | |
| Current year change | 131,910 | | |
| Change due to adoption of FAS No. 158 | — | (374,773) | |
| Balance, end of year | (242,863) | (374,773) | — |
| **Unrealized gain (loss), net of tax, on marketable securities:** | | | |
| Balance, beginning of year | 7,051 | 16,447 | 19,910 |
| Current year change | (5,340) | (9,396) | (3,463) |
| Balance, end of year | 1,711 | 7,051 | 16,447 |
| **Foreign currency translation adjustments, net of tax:** | | | |
| Balance, beginning of year | 337 | 154 | 224 |
| Current year change | 584 | 183 | (70) |
| Balance, end of year | 921 | 337 | 154 |
| **Unrecognized losses on cash flow hedging instruments, net of tax:** | | | |
| Balance, beginning of year | — | — | — |
| Current year change | (54,398) | | |
| Balance, end of year | (54,398) | — | — |
| Accumulated other comprehensive income (loss) | $ (294,629) | $ (367,385) | $ (11,300) |

The adoption of FAS No. 158 resulted in a net increase in accumulated other comprehensive loss, and a corresponding net decrease in shareholders' equity, of $366 million at Dec. 31, 2006 (see Note 15 for additional information on the impact of the adoption of FAS No. 158).

## NOTE 19: BUSINESS SEGMENTS

Tribune Company is a media and entertainment company that conducts its operations through two business segments: publishing and broadcasting and entertainment. In addition, certain administrative activities are reported and included under corporate. These segments reflect the manner in which the Company sells its products to the marketplace and the manner in which it manages its operations and makes business decisions.

**Publishing**—Tribune Publishing currently operates nine market-leading daily newspapers and related businesses, distributes entertainment listings and syndicated content, operates a 24-hour cable news channel, and manages the websites of Tribune's daily newspapers and television stations, along with other branded sites targeting specific communities of interest. The daily newspapers are the *Los Angeles Times*; *Chicago Tribune*; *Newsday*, serving Nassau and Suffolk counties on Long Island, New York and the borough of Queens, New York; *South Florida Sun-Sentinel*; *Orlando Sentinel*; *The Sun*, serving the metropolitan Baltimore, Maryland market; *Hartford Courant*, *The Morning Call*, serving Pennsylvania's Lehigh Valley; and *Daily Press*, serving the Virginia Peninsula.

136

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Broadcasting and Entertainment**—The Company's broadcasting operations currently consist of The CW Network affiliates in New York, Los Angeles, Chicago, Dallas, Washington D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, San Diego, Hartford, and New Orleans; FOX television affiliates in Seattle, Sacramento, Indianapolis, Hartford, Grand Rapids and Harrisburg; MyNetwork affiliates in Philadelphia and Seattle; an ABC television affiliate in New Orleans; and one radio station in Chicago. Entertainment operations include Tribune Entertainment, which distributes its own programming together with programming licensed from third parties, and the Chicago Cubs baseball team.

No single customer provides more than 10% of the Company's revenue. In determining operating profit for each segment, none of the following items have been added or deducted: interest and dividend income, interest expense, equity income and loss, non-operating items or income taxes. Assets represent those tangible and intangible assets used in the operations of each segment. Corporate assets include cash and the Company's investment portfolio.

137

Source: TRIBUNE CO, 10-K, March 20, 2008

# TRIBUNE COMPANY AND SUBSIDIARIES
## BUSINESS SEGMENTS
### (In thousands of dollars)

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Operating Revenues** | | | |
| Publishing | $ 3,664,590 | $ 4,018,418 | $ 4,012,413 |
| Broadcasting and entertainment | 1,398,394 | 1,425,146 | 1,414,433 |
| Total operating revenues | $ 5,062,984 | $ 5,443,564 | $ 5,426,846 |
| **Operating Profit(1)** | | | |
| Publishing(2) | $ 368,193 | $ 748,940 | $ 753,781 |
| Broadcasting and entertainment | 357,341 | 391,533 | 416,891 |
| Corporate expenses | (91,617) | (55,712) | (49,413) |
| Total operating profit | $ 633,917 | $ 1,084,761 | $ 1,121,259 |
| **Depreciation** | | | |
| Publishing(3) | $ 167,600 | $ 163,467 | $ 181,081 |
| Broadcasting and entertainment | 39,553 | 39,815 | 36,828 |
| Corporate | 1,084 | 1,380 | 1,630 |
| Total depreciation | $ 208,237 | $ 204,662 | $ 219,539 |
| **Amortization of Intangible Assets** | | | |
| Publishing | $ 8,315 | $ 8,208 | $ 7,181 |
| Broadcasting and entertainment | 11,518 | 11,555 | 11,657 |
| Total amortization of intangible assets | $ 19,833 | $ 19,763 | $ 18,838 |
| **Capital Expenditures** | | | |
| Publishing | $ 104,732 | $ 173,459 | $ 163,317 |
| Broadcasting and entertainment | 38,793 | 42,227 | 36,851 |
| Corporate | 2,476 | 6,221 | 5,777 |
| Total capital expenditures | $ 146,001 | $ 221,907 | $ 205,945 |
| **Assets** | | | |
| Publishing | $ 8,131,591 | $ 8,512,512 | $ 8,637,176 |
| Broadcasting and entertainment | 4,017,255 | 3,987,449 | 4,425,135 |
| Corporate | 1,000,873 | 900,811 | 1,483,931 |
| Total assets | $ 13,149,719 | $ 13,400,772 | $ 14,546,242 |

---

(1) Operating profit for each segment excludes interest and dividend income, interest expense, equity income and loss, non-operating items and income taxes.

(2) Publishing operating profit for 2007 includes an impairment charge of $130 million to write-down one of its masthead intangible assets to fair value (see Note 7).

(3) Publishing depreciation for 2005 includes $16 million of accelerated depreciation expense related to the shut down of the *Los Angeles Times'* San Fernando Valley printing facility (see Note 2).

138

Source: TRIBUNE CO, 10-K, March 20, 2008

TRIBUNE COMPANY AND SUBSIDIARIES
2007 QUARTERLY RESULTS (Unaudited)
(In thousands of dollars)

| | Quarters | | | | 2007 |
| | First | Second | Third | Fourth | Total |
|---|---|---|---|---|---|
| **Operating Revenues** | | | | | |
| Publishing | $ 926,371 | $ 915,052 | $ 870,848 | $ 952,319 | $ 3,664,590 |
| Broadcasting and entertainment | 283,008 | 392,959 | 406,051 | 316,376 | 1,398,394 |
| Total operating revenues | $ 1,209,379 | $ 1,308,011 | $ 1,276,899 | $ 1,268,695 | $ 5,062,984 |
| **Operating Profit** | | | | | |
| Publishing(1) | $ 140,176 | $ 102,455 | $ 122,543 | $ 3,019 | $ 368,193 |
| Broadcasting and entertainment | 61,382 | 107,734 | 117,787 | 70,438 | 357,341 |
| Corporate expenses | (19,641) | (13,932) | (11,329) | (46,715) | (91,617) |
| Total operating profit | 181,917 | 196,257 | 229,001 | 26,742 | 633,917 |
| Net income on equity investments | 12,684 | 28,710 | 26,559 | 32,266 | 100,219 |
| Interest and dividend income | 3,154 | 3,830 | 4,924 | 9,919 | 21,827 |
| Interest expense | (83,249) | (115,905) | (186,771) | (195,715) | (581,640) |
| Gain (loss) on change in fair values of derivatives and related investments(2) | (69,780) | (27,395) | (84,969) | 85,338 | (96,806) |
| Strategic transaction expenses(2) | (14,473) | (20,925) | (3,160) | (46,573) | (85,131) |
| Gain on TMCT transactions(2) | | | 8,329 | (326) | 8,003 |
| Gain on other investment transactions, net(2) | 73 | 443 | — | 31,062 | 31,578 |
| Other non-operating gain (loss), net(2) | 465 | 5,534 | 1,936 | (2,798) | 5,137 |
| **Income (Loss) from Continuing Operations Before Income Taxes** | 30,791 | 70,549 | (4,151) | (60,085) | 37,104 |
| Income taxes(2) | (19,441) | (34,764) | 89,966 | (17,527) | 18,234 |
| **Income (Loss) from Continuing Operations** | 11,350 | 35,785 | 85,815 | (77,612) | 55,338 |
| Income (Loss) from Discontinued Operations, net of tax(3) | (34,645) | 491 | 66,950 | (1,189) | 31,607 |
| **Net Income (Loss)** | $ (23,295) | $ 36,276 | $ 152,765 | $ (78,801) | $ 86,945 |

**Notes to Quarterly Results:**

(1) In the fourth quarter of 2007, the Company recorded a $130 million pretax impairment charge related to one of its masthead intangible assets. See Note 7 to the Company's consolidated financial statements for further information.

(2) See Note 2 to the Company's consolidated financial statements for information pertaining to non-operating items recorded in 2007 and 2006.

(3) See Note 4 to the Company's consolidated financial statements for information pertaining to discontinued operations.

Source: TRIBUNE CO, 10-K, March 20, 2008