**Payment Obligations under Transitional Compensation Plan upon Termination of Employment of NEO**

Upon a termination under the circumstances outlined above, NEOs covered by the Transitional Compensation Plan would be entitled to a lump sum payment equal to three times the sum of (1) the highest annual rate of the executive's base salary in effect within three years of the date of the participant's termination; plus (2) 200% of the participant's target bonus payable for the year in which the change in control occurs. The Transitional Compensation Plan would also provide outplacement benefits and continuation of medical, life insurance and disability benefits for up to three years. This table shows the amounts that would be paid under those circumstances to Messrs. Grenesko, Kenney and Smith and shows the amounts that were actually paid to Messrs. FitzSimons and Reardon in connection with the termination of their employment. For Messrs. Grenesko, Kenney and Smith, the amounts in the table are based on an assumption that the terminations took place on Dec. 31, 2007 and that benefits costs continue at 2007 levels.

| | Mr. FitzSimons | Mr. Grenesko | Mr. Kenney | Mr. Smith | Mr. Reardon |
|---|---|---|---|---|---|
| Severance Payment | $ 10,657,500 | $ 4,403,250 | $ 3,118,500 | $ 4,619,940 | $ 3,708,000 |
| Outplacement | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Benefits Continuation | 40,827 | 28,168 | 38,473 | 28,190 | 38,658 |

Under the Transitional Compensation Plan, the NEOs covered by the Transitional Compensation Plan would also be eligible to receive a "gross-up" payment from us to the extent that they incur excise taxes under Section 4999 of the Internal Revenue Code and to account for the income tax liability resulting from the "gross-up." Had a payment been made to the NEOs under the Transitional Compensation Plan as a result of termination as of Dec. 31, 2007, they would have been entitled to receive a "gross-up" payment in the following amounts: Mr. Grenesko: $2,747,914; Mr. Kenney: $2,632,387; and Mr. Smith: $2,565,866. Messrs. FitzSimons and Reardon received gross-up payments of $5,308,621 and $2,410,449, respectively.

In addition, upon a termination under the circumstances outlined above as of Dec. 31, 2007, Messrs. Grenesko, Kenney and Smith would each be entitled to receive $2,083,333 in respect of the Second Tranche Units held by them under the MEIP. Mr. Zell does not hold any units under the MEIP. In connection with their respective terminations, all MEIP Second Tranche Units held by Messrs. FitzSimons and Reardon were settled in cash for $2,916,667 and $1,500,000, respectively. Further, as noted above, pursuant to the terms of the Incentive Plan and individual equity awards, upon completion of the Leveraged ESOP Transactions, all outstanding equity awards immediately vested and were settled in cash.

As noted above, pursuant to their terms and as a result of the Leveraged ESOP Transactions, accrued amounts under the Supplemental Pension Plan, Supplemental Savings Plan, and Deferred Bonus Plan were paid in a lump sum to all plan participants, including the NEOs.

Execution of a release of claims is not a prerequisite to the receipt of payments under the Transitional Compensation Plan. The Transitional Compensation Plan does not include noncompete, nonsolicit, nondisparagement or confidentiality requirements.

198

Source: TRIBUNE CO, 10-K, March 20, 2008

**2007 Non-Employee Director Compensation**

Directors who are our employees receive no additional compensation for service as a director. In 2007, the non-employee directors received a combination of cash payments and equity-based compensation as shown in the table below and were also reimbursed for actual out-of-pocket expenses incurred in attending meetings. For 2008, non-employee directors will receive a $100,000 cash retainer. Further, the Audit Committee chair will be paid an additional $15,000 cash retainer and each member of the Audit Committee, including the chair, will be paid an additional $6,000 cash retainer. The current members of the Committee are currently evaluating the non-employee director compensation program for future years. The Company does not expect to pay any equity compensation to our non-employee directors.

| Name (1)(2) | Fees Earned or Paid in Cash ($) | Stock Awards (3)($) | Total ($) |
|---|---|---|---|
| Jeffrey S. Berg* | $            0 | $            0 | $            0 |
| Jeffrey Chandler | 0 | 0 | 0 |
| Roger Goodan | 0 | 0 | 0 |
| Brian L. Greenspun* | 0 | 0 | 0 |
| Enrique Hernandez, Jr. | 85,000 | 75,000 | 160,000 |
| Betsy D. Holden* | 81,000 | 75,000 | 156,000 |
| Robert S. Morrison | 85,000 | 75,000 | 160,000 |
| William A. Osborn* | 96,000 | 75,000 | 171,000 |
| William C. Pate* | 0 | 0 | 0 |
| J. Christopher Reyes | 81,000 | 75,000 | 156,000 |
| William Stinehart, Jr. | 0 | 0 | 0 |
| Dudley S. Taft | 81,000 | 75,000 | 156,000 |
| Miles D. White | 75,000 | 75,000 | 150,000 |
| Mary Agnes Wilderotter* | 0 | 0 | 0 |
| Frank E. Wood* | 0 | 0 | 0 |
| Samuel Zell* (4) | 75,000 | 75,000 | 150,000 |

(1) Current members of the Board of Directors are noted with an asterisk (*).

(2) Messrs. Chandler, Goodan and Stinehart served on the Board of Directors from Jan. 1 through June 4, 2007. Mr. Zell joined the Board on May 9, 2007 and was appointed Chairman and Chief Executive Officer of the Company on Dec. 20, 2007. Mr. Reyes served on the Board until July 18, 2007. Mr. White served on the Board until Aug. 6, 2007. On Dec. 20, 2007, Messrs. Hernandez, Morrison and Taft resigned from the Board and Ms. Wilderotter and Messrs. Berg, Greenspun, Pate and Wood were elected to serve on the Board along with Ms. Holden and Messrs. Osborn and Zell, who each continued as directors.

(3) The amounts shown in this column include the compensation expense recorded by the Company with respect to the stock awards as determined pursuant to FAS No. 123R. Such amounts also equal the grant date fair value of these awards. No director held any stock or options as of Dec. 30, 2007.

(4) Amounts shown in this table for Mr. Zell were paid to Mr. Zell solely in his capacity as a member of the Board of Directors and prior to his appointment as Chairman and Chief Executive Officer of the Company. Accordingly, these amounts are not reflected in the Summary Compensation Table.

**2007 Director Compensation**

*Cash retainer.* In 2007, each non-employee director received a $75,000 cash retainer.

*Attendance Fees.* Directors did not receive fees for attendance at Board or committee meetings in 2007.

*Committee Chairs and Membership.* In light of the significant responsibilities imposed on certain Board committee members, in 2007 the Audit Committee chair was paid an additional $15,000 cash retainer and the chairs of each of the former Compensation & Organization Committee and the former Nominating & Governance Committee were paid an

Source: TRIBUNE CO, 10-K, March 20, 2008

additional $10,000 cash retainer. In addition, in 2007, all Audit Committee members, including the chairman of the Audit Committee, received an additional $6,000 cash retainer.

*Stock Awards*.  In 2007, each non-employee director received a $75,000 stock award. The number of shares awarded was based on the closing price of Tribune stock on the date of the annual meeting, May 9, 2007.

**Compensation Committee Interlocks and Insider Participation**—Jeffrey Chandler is a trustee and a beneficiary of the Chandler Trusts. The Chandler Trusts and the Company engaged in certain transactions in connection with the Leveraged ESOP Transactions, which are described in further detail in "Item 1. Business – Significant Events" and "Item 13. Transactions with Related Persons, Promoters and Certain Control Persons." Mr. Chandler served on Tribune's Compensation & Organization Committee in 2007 through June 4, 2007.

200

ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED
              STOCKHOLDER MATTERS.

**Security Ownership of Certain Beneficial Owners and Management**

The following table shows the beneficial ownership of Tribune common stock by each director, each current and former executive officer named in the summary compensation table included in Item 11 hereof, and by all directors and executive officers as a group, in each case as of March 20, 2008. Unless otherwise indicated, the address of each person listed is c/o Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611. Except as otherwise noted, the persons named in the table below have sole voting and investment power with respect to all shares shown as beneficially owned by them.

| Name of Beneficial Owner | Shares of Common Stock (1) | Warrants Exercisable within 60 days (2) | Percentage of Shares (3) |
|---|---|---|---|
| **5% Shareholders:** | | | |
| Tribune Employee Stock Ownership Plan | | | |
| c/o GreatBanc Trust Company | | | |
| 801 Warrenville Road, Suite 500 | | | |
| Lisle, IL 60532 | 56,521,739 | 0 | 100% |
| EGI-TRB, L.L.C. (2) | | | |
| 2 North Riverside Plaza | | | |
| Chicago, IL 60606 | 0 | 30,997,777 | 35.42% |
| **Directors and Executive Officers:** | | | |
| Jeffrey S. Berg | 0 | 0 | * |
| Dennis J. FitzSimons | 0 | 0 | * |
| Brian L. Greenspun (4) | 0 | 6,901,311 | 10.88% |
| Donald C. Grenesko | 0 | 0 | * |
| Betsy D. Holden | 0 | 0 | * |
| Crane H. Kenney | 0 | 0 | * |
| William A. Osborn | 0 | 0 | * |
| William C. Pate (5) | 0 | 941,965 | 1.64% |
| John E. Reardon | 0 | 0 | * |
| Scott C. Smith | 0 | 0 | * |
| Mary Agnes Wilderotter | 0 | 0 | * |
| Frank E. Wood | 0 | 0 | * |
| Samuel Zell (6) | 0 | 0 | * |
| Directors and Executive Officers as a group (15 persons) | 0 | 7,843,276 | 12.19% |

---

\*    Less than 1% of the issued and outstanding common stock.

(1)    As of March 20, 2008, there were 56,521,739 shares of common stock issued and outstanding, all of which were held by the Tribune Employee Stock Ownership Plan (the "ESOP"). On Dec. 20, 2007, the Board approved the Company's Management Equity Incentive Plan which provides for 8,695,652 phantom units (the "Units") that may be awarded to eligible members of Company management and other key employees at the discretion of the Board. In the aggregate, the Units represent approximately 8% of the fully diluted outstanding our common stock (subject to customary anti-dilution adjustments). Although the value of the Units is based on the value of our common stock, the Units do not give the holder the right to acquire any common stock, or other securities of the Company, at any time. Accordingly, the Units are disregarded for purposes of determining the figures that appear under the column headings "Shares of Common Stock" and "Percentage of Shares."

(2)    On Dec. 20, 2007, immediately following the consummation of the Merger, the Zell Entity purchased from the Company, pursuant to the Securities Purchase Agreement dated April 1, 2007 by and among the Company, the Zell Entity and Mr. Zell, a 15-year warrant to purchase 43,478,261 shares of common stock (subject to adjustment). Immediately thereafter, the Zell Entity transferred interests in the initial warrant, totaling warrants to purchase 12,480,484 shares, to certain permitted assignees, including entities controlled by each of Mr. Greenspun, Mr. Pate and

Source: TRIBUNE CO, 10-K, March 20, 2008

certain senior employees of EGI, an affiliate of the Zell Entity. The warrants are exercisable, in whole or in part, at any time from Dec. 20, 2007 through Dec. 20, 2022 and have an initial aggregate exercise price of $500 million ($11.50 per share), increasing by $10 million per year, up to a maximum aggregate price of $600 million ($13.80 per share), in each case, subject to adjustment. The Company, the ESOP, the Zell Entity and each holder of a warrant is party to the Investor Rights Agreement, which is described in further detail in, and filed as an exhibit to, this Annual Report on Form 10-K.

(3)   These figures have been calculated in accordance with SEC rules by dividing (i) the number of shares of common stock beneficially owned by such person or entity, including shares that may be acquired by exercise of the warrant held by such person or entity, by (ii) the number of common shares held by the ESOP *plus* the number of shares of common stock that may be purchased in connection with the exercise of the warrant held by such person or entity. If all of the warrants were deemed exercised and all of the underlying shares were deemed outstanding, the percentages in this column would be as follows: ESOP: 56.52%; EGI-TRB, L.L.C.: 31%; Mr. Greenspun: 6.9%; Mr. Pate: 0.94%; and all directors and executive officers as a group: 7.84%.

(4)   As described in footnote 2, following the Merger, the Zell Entity transferred warrants representing the right to acquire 6,901,311 shares of common stock to an entity controlled by Mr. Greenspun.

(5)   As described in footnote 2, following the Merger, the Zell Entity transferred warrants representing the right to acquire 941,965 shares of common stock to an entity controlled by Mr. Pate.

(6)   Samuel Zell is the chairman and chief executive officer of the Company. As disclosed in the table above and described in footnote 2, the Zell Entity holds a warrant pursuant to which it may purchase 30,997,777 shares of our common stock. Sam Investment Trust ("SIT"), the sole member of the Zell Entity, is a trust established for the benefit of Mr. Zell and his family. Chai Trust Company, LLC, an Illinois limited liability company ("Chai Trust"), is the trustee of SIT and has investment control with respect to SIT. Mr. Zell is not a managing director or officer of Chai Trust, and does not otherwise exercise investment control with respect to SIT or the Zell Entity. As such, the amount of shares indicated as beneficially owned by Mr. Zell does not include the securities of the Company beneficially owned by the Zell Entity.

**Equity Compensation Plan Information Table**

The following table provides information as of Dec. 30, 2007 regarding the number of shares of Tribune common stock that may be issued under Tribune's equity compensation plans.

| Plan Category | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted-average exercise price of outstanding options, warrants and rights | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | — | N/A | — |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | — | N/A | — |

202

Source: TRIBUNE CO, 10-K, March 20, 2008

## ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

**Policy Regarding Related Person Transactions**

We or one of our subsidiaries may occasionally enter into transactions with certain "related persons." Related persons include our executive officers, directors, 5% or more beneficial owners of our common stock, immediate family members of these persons and entities in which one of these persons has a direct or indirect material interest. We refer to transactions with these related persons as "related person transactions." Beginning in February 2007, the Audit Committee became responsible for the review and approval of each related person transaction exceeding $120,000. The Audit Committee considers all relevant factors when determining whether to approve a related party transaction including, without limitation, whether the terms of the proposed transaction are at least as favorable to us as those that might be achieved with an unaffiliated third party. Among other relevant factors, the Audit Committee considers the following:

- The size of the transaction and the amount payable to a related person.

- The nature of the interest of the related person.

- Whether the transaction may involve a conflict of interest.

- Whether the transaction involves the provision of goods or services to us that are available from unaffiliated third parties and, if so, whether the proposed transaction is on terms and made under circumstances that are at least as favorable to us as would be available in comparable transactions with or involving unaffiliated third parties.

The policies and procedures relating to the Audit Committee approval of related person transactions are available on our website at www.tribune.com. All of the related person transactions occurring during 2007 and described below under the heading "Transaction with Related Persons, Promoters and Certain Control Persons" were approved by the Audit Committee or by the full Board of Directors.

**Transactions with Related Persons, Promoters and Certain Control Persons**

*Chandler Trusts.* Jeffrey Chandler, Roger Goodan and William Stinehart, Jr., formerly members of our Board, are trustees of Chandler Trust No. 1 and Chandler Trust No. 2 (the "Chandler Trusts"). Mr. Chandler and Mr. Goodan are also beneficiaries of these trusts. The Chandler Trusts were the principal shareholders of The Times Mirror Company ("Times Mirror") prior to the merger of Times Mirror into the Company on June 12, 2000. In connection with the merger in 2000, the Chandler Trusts exchanged their Times Mirror common stock for 36,304,135 shares of the Company's common stock and the Company amended its bylaws to grant the Chandler Trusts the right to nominate three directors, one for each of the Board's three classes. Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. were the Chandler Trusts' initial nominees and became directors of the Company following the merger. Mr. Chandler and Mr. Goodan are cousins.

Pursuant to the terms of a Registration Rights Agreement dated April 1, 2007 among the Company and the Chandler Trusts, the Chandler Trusts tendered into the Company's tender offer commenced on April 25, 2007 (the "Tender Offer") all shares of the Company's common stock held by them at the expiration of the Tender Offer, and caused Messrs. Chandler, Goodan and Stinehart, each of whom were serving on the Board as a representative of the Chandler Trusts, to resign as directors of the Company, effective June 4, 2007. On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman Sachs and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of the Company's common stock, the remainder of the shares owned by them following the Tender Offer, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to a shelf registration statement that the Company filed with the Securities and Exchange Commission that became effective on April 25, 2007. Following the closing of this transaction on June 7, 2007, the Chandler Trusts no longer owned any shares of the Company's common stock.

In 1997, the Chandler Trusts and Times Mirror entered into a transaction which, through the formation of TMCT, LLC ("TMCT"), enabled Times Mirror to retire for accounting purposes a substantial block of Times Mirror stock. Times Mirror and its affiliates contributed to TMCT real property used in Times Mirror's business operations and cash and the Chandler Trusts contributed Times Mirror stock. Times Mirror leased back the real property under long-term leases. Upon completion

203

of the merger of Times Mirror into the Company, the Company assumed these leases, and the Times Mirror stock held by the limited liability company was converted into shares of the Company's common stock.

In 1999, the Chandler Trusts and Times Mirror formed TMCT II, LLC ("TMCT II") and entered into a similar transaction that again enabled Times Mirror to retire for accounting purposes a substantial block of stock. Times Mirror's contribution to TMCT II consisted of cash and securities. The Chandler Trusts again contributed Times Mirror stock that was converted into shares of the Company's common stock upon completion of the merger of Times Mirror into the Company.

On Sept. 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on Sept. 22, 2006, a total of 38.9 million shares of the Company's common stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. Following the distributions by TMCT and TMCT II, the Company's interests in each of TMCT and TMCT II were reduced to approximately five percent. The agreements also provided for certain put and call options relating to the Company's then remaining ownership interests in TMCT and TMCT II. In September 2007, the Company exercised these put rights and sold its remaining interests in TMCT and TMCT II to the Chandler Trusts.

In addition, on Sept. 22, 2006, the Company and TMCT amended the lease agreement for the eight properties the Company leases from TMCT. Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company was also granted an option to acquire the leased properties from Feb. 8, 2008 to three months prior to the expiration of the amended lease at the higher of fair market value or $195 million. In addition, the amendment extended the properties' current fixed rental rate through Aug. 7, 2021. The Company exercised the option to acquire the eight properties for $175 million on Jan. 29, 2008 and expects to close on the acquisition in April 2008. In 2007, the Company made $23.181 million of lease payments to TMCT.

The remaining 12.4 million shares of the Company's common stock held by TMCT and TMCT II were distributed on October 20, 2006 to the Company and the Chandler Trusts in accordance with their respective ownership interests. The Company received 0.6 million shares and the Chandler Trusts received 11.8 million shares. Information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 8 to the Company's consolidated financial statements in Part II, Item 8, hereof.

*EGI-TRB, L.L.C. and Equity Group Investments, L.L.C.* EGI-TRB, L.L.C. (the "Zell Entity") was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions and is wholly owned by Sam Investment Trust ("SIT"), a trust established for the benefit of Sam Zell and his family. The trustee of SIT is Chai Trust Company, LLC, an Illinois limited liability company ("Chai Trust"). Equity Group Investments, L.L.C. ("EGI") is a private corporate and real estate investment firm co-founded by Mr. Zell in 1968, and is owned by trusts established for the benefit of Mr. Zell and his family, but not SIT. EGI provides investment advisory services to Chai Trust, however, EGI does not have investment control over Chai Trust or the assets held by the trusts controlled by Chai Trust. As such, EGI has no ownership or beneficial interest in either the Zell Entity or SIT, is not a party to any of the agreements entered into in connection with the Leveraged ESOP Transactions and has no beneficial interest therein.

In connection with the Leveraged ESOP Transactions, Sam Zell was appointed to the Company's Board of Directors on May 9, 2007 and elected to serve as Chairman of the Board and Chief Executive Officer on Dec. 20, 2007. Mr. Zell is the President of the Zell Entity and the President and Chairman of EGI. Further, William C. Pate was also appointed to the Company's Board of Directors on Dec. 20, 2007. Mr. Pate is a Vice President of the Zell Entity and the Chief Investment Officer and a Managing Director of EGI.

As more fully described in "Item 1. Business – Significant Events," the Zell Entity made certain investments in the Company. The Zell Entity is also party to certain of the agreements entered into in connection with the Leveraged ESOP Transactions and had an interest in the Leveraged ESOP Transactions. In particular, on Dec. 20, 2007, immediately following the consummation of the Merger, the Zell Entity purchased from the Company, pursuant to the Securities Purchase Agreement (the "Securities Purchase Agreement") dated April 1, 2007 by and among the Company, the Zell Entity and Mr. Zell, a $225 million subordinated promissory note and a 15-year warrant to purchase 43,478,261 shares of the Company's common stock (subject to adjustment). Immediately thereafter, the Zell Entity transferred interests in the initial subordinated promissory note and warrant, totaling approximately $64.6 million of the aggregate principal amount of the subordinated promissory note and warrants to purchase 12,480,484 shares, to certain permitted assignees, including entities controlled by each of Mr. Greenspun, a member of the Company's Board of Directors, Mr. Pate and certain senior

204

Source: TRIBUNE CO, 10-K, March 20, 2008

employees of EGI, an affiliate of the Zell Entity. The warrants are exercisable, in whole or in part, at any time from Dec. 20, 2007 through Dec. 20, 2022 and have an initial aggregate exercise price of $500 million ($11.50 per share), increasing by $10 million per year, up to a maximum aggregate price of $600 million ($13.80 per share), in each case, subject to adjustment. Pursuant to the Securities Purchase Agreement, the Company also reimbursed the Zell Entity for $5 million of expenses incurred in connection with the Leveraged ESOP Transactions.

*Investor Rights Agreement.* Each of the Zell Entity and the Trustee (on behalf of the ESOP) are a party to that certain Investor Rights Agreement (the "Investor Rights Agreement") dated as of April 1, 2007 to which each of the Zell Entity and the Trustee (on behalf of the ESOP) have agreed to vote their shares such that (i) the initial directors on the Board following the Merger shall serve until the third annual election following the consummation of the Merger, (ii) there shall be two directors designated by the Zell Entity and (iii) there shall be one director who shall be the chief executive officer of the Company. The Investor Rights Agreement also contains provisions governing the transfer of the shares of Company common stock held by the Zell Entity and the ESOP, preemptive rights granted to the Zell Entity and the ESOP by the Company, and specified actions requiring the approval of a majority of the entire Board, including a majority of the independent directors and one designee of the Zell Entity. The parties to the Investors Rights Agreement also have agreed to take all actions necessary to enable the Company to maintain its election for subchapter S status under the Internal Revenue Code.

*The ESOP and the Trustee.* Pursuant to the terms of the ESOP Purchase Agreement, on April 1, 2007, the Company sold 8,928,571 shares of Company Common Stock to the ESOP at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP executed by GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee (the "Trustee") in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through the ESOP's use of annual contributions from the Company to the ESOP or distributions paid on the shares of Company Common Stock held by the ESOP. On the same date, the Company and the Trustee, on behalf of the ESOP, entered into the ESOP Loan Agreement, which documents the extension of credit from the Company to the ESOP evidenced by the ESOP Note. The ESOP Note contemplates payment by the ESOP to the Company in 30 annual installments with an annual interest rate of approximately 5%. The Trustee, on behalf of the ESOP, also entered into the ESOP Pledge Agreement with the Company whereby the ESOP has agreed to pledge the shares of Company Common Stock acquired by the ESOP from the Company as collateral for the Company's extension of credit to the ESOP.

## Director Independence

Pursuant to the Company's Amended and Restated Bylaws, the Board of Directors must have five independent directors. The Bylaws provide that a director shall be deemed "independent" if such director would be independent under the New York Stock Exchange listing standards. Further, a director is "independent" under the New York Stock Exchange listing standards if the Board affirmatively determines that the director has no material relationship with Tribune directly or as a partner, shareholder or officer of an organization that has a relationship with Tribune.

The Board has reviewed the independence of our current non-employee directors and found that each of them, namely Jeffrey S. Berg, Brian L. Greenspun, Betsy D. Holden, William A. Osborn, William C. Pate, Mary Agnes Wilderotter and Frank E. Wood, is independent within the meaning of the rules of the New York Stock Exchange. In making these determinations, the Board considered the relationships described above under "Transactions with Related Person, Promoters and Certain Control Persons." With respect to Mr. Greenspun, the Board considered the fact that, from time to time, entities in which Mr. Greenspun has an ownership interest have purchased and may continue to purchase, in the ordinary course of business, advertising from the Company's subsidiaries and affiliates. With respect to Mr. Osborn, the Board considered the fact that he is the Chairman of Northern Trust Corporation, which in 2007, together with its subsidiaries, provided trust, custody, cash management and related services to Tribune and certain of its employee benefit plans and was one of several lenders under Tribune's former credit facilities. The Board has determined that these relationships are not material and do not cause any non-employee director to be considered not independent under the rules of the New York Stock Exchange.

In addition, the Board reviewed the independence of Jeffrey Chandler, Roger Goodan, Enrique Hernandez, Jr., Robert S. Morrison, J. Christopher Reyes, William Stinehart, Jr., Dudley S. Taft and Miles D. White, who each resigned their directorships in 2007, and found that each of them was independent within the meaning of the rules of the New York Stock Exchange through the date of his or her resignation. In making these determinations, the Board considered the relationships

205

described above under "Transactions with Related Persons, Promoters and Certain Control Persons." With respect to Mr. Stinehart, the Board considered the fact that he was a partner in the law firm of Gibson, Dunn & Crutcher LLP until his retirement in December 2004. Gibson, Dunn & Crutcher LLP was external corporate counsel to Times Mirror and has, from time to time, provided legal services to Tribune since the merger. The Board has determined that these relationships were not material and do not cause any such former non-employee director to be considered not independent under the rules of the New York Stock Exchange through the date of his or her resignation.

Other than the matters described above and the matters described under "Transactions with Related Persons, Promoters and Certain Control Persons," there were no related person transactions, relationships or arrangements involving our current or former directors that were considered by the Board in evaluating and determining the independence of the current and former non-employee directors named above.

## ITEM 14.   PRINCIPAL ACCOUNTANT FEES AND SERVICES.

### Policy on Audit Committee Pre-Approval of Audit, Audit-Related and Permissible Non-Audit Services of Independent Accountants

The Audit Committee has responsibility for appointing, setting fees, and overseeing the work of the independent accountants. In recognition of this responsibility, the Audit Committee has established a policy to pre-approve all audit, audit-related and permissible non-audit services provided by the independent accountants, subject to de minimis exceptions for non-audit services that are approved by the Audit Committee prior to the completion of the audit. The projects and categories of service that the Audit Committee pre-approves are as follows:

*Audit Services.* Audit services include work performed in connection with the audit of the consolidated financial statements, as well as work that is normally provided by the independent accountants in connection with statutory and regulatory filings or engagements. These services include work performed in connection with the audit of internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002.

*Audit-Related Services.* These services are for assurance and related services that are traditionally performed by the independent accountants and that are reasonably related to the work performed in connection with the audit, including due diligence related to mergers and acquisitions, employee benefit plan audits and audits of subsidiaries and affiliates.

*Tax Services.* These services are related to tax compliance, tax advice and tax planning.

*Other Services.* These services include all other permissible non-audit services provided by the independent accountants and are pre-approved on an engagement-by-engagement basis.

Prior to the engagement of the independent accountants, the Audit Committee pre-approves these services by category of service. The fees are budgeted and the Audit Committee requires the independent accountants and management to report actual fees versus the budget periodically throughout the year by category of service. During the year, circumstances may arise when it may become necessary to engage the independent accountants for additional services not contemplated in the original pre-approval for which advance approval is required. In those instances, the Audit Committee pre-approves the services before engaging the independent accountants.

The Audit Committee has delegated pre-approval authority to the chair of the committee. The chair must report, for informational purposes only, any pre-approval decisions to the Audit Committee at its next scheduled meeting.

Source: TRIBUNE CO, 10-K, March 20, 2008

**Fees Paid to Independent Accountants**

The fees for all services provided by the independent accountants for the fiscal years ended Dec. 30, 2007 and Dec. 31, 2006 are shown below (in thousands):

|                                              | 2007  |       | 2006  |
| -------------------------------------------- | ----- | ----- | ----- |
| Audit fees (1)                               | $     | 2,225 | $     | 2,435 |
| Audit-related fees (2)                       |       | 1,487 |       | 1,543 |
| Tax fees                                     |       | —     |       | —     |
| All other fees:                              |       |       |       |       |
| Employee benefit plan filings               |       | 172   |       | 160   |
| Accounting research software license         |       | 2     |       | 2     |
| Total all services                           | $     | 3,886 | $     | 4,140 |

---

(1) Fees for the integrated audit of Tribune's annual consolidated financial statements and internal controls over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002. Fees also include reviews of quarterly Forms 10-Q.

(2) Includes audits of Tribune's employee benefit plans, audits of certain Tribune affiliates and audits of subsidiary financial statements.

## PART IV

## ITEM 15.   EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.

(a)(1)&(2)   Financial Statements and Financial Statement Schedule filed as part of this report. Also included are the financial statements and related notes of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company whose equity interests collateralize certain registered securities of the Company, and the related reports of the independent registered public accounting firm.

See Index to Financial Statements and Financial Statement Schedule on page 78 hereof.

(a)(3)   Index to Exhibits filed as part of this report

See Exhibit Index on pages 209 to 212 hereof.

(b)   Exhibits

See Exhibit Index on pages 209 to 212 hereof.

(c)   Financial Statement Schedule

See Index to Financial Statements and Financial Statement Schedule on page 78 hereof.

Source: TRIBUNE CO, 10-K, March 20, 2008

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on March 20, 2008.

TRIBUNE COMPANY
(Registrant)

/s/ SAMUEL ZELL
Samuel Zell
Chairman and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 20, 2008.

| Signature | Title |
|---|---|
| /s/ SAMUEL ZELL<br>Samuel Zell | Chairman, Chief Executive Officer and Director |
| /s/ DONALD C. GRENESKO<br>Donald C. Grenesko | Senior Vice President/Finance and Administration (principal financial officer) |
| /s/ R. MARK MALLORY<br>R. Mark Mallory | Vice President and Controller (principal accounting officer) |
| /s/ BETSY D. HOLDEN<br>Betsy D. Holden | Director |
| /s/ WILLIAM A. OSBORN<br>William A. Osborn | Director |
| /s/ WILLIAM C. PATE<br>William C. Pate | Director |
| /s/ FRANK E. WOOD<br>Frank E. Wood | Director |

208

Source: TRIBUNE CO, 10-K, March 20, 2008

## TRIBUNE COMPANY

### EXHIBIT INDEX

Exhibits marked with an asterisk (*) are incorporated by reference to documents previously filed by Tribune Company with the Securities and Exchange Commission, as indicated. Exhibits marked with a circle (o) are management contracts or compensatory plan contracts or arrangements filed pursuant to Item 601(b)(10)(iii)(A) of Regulation S-K. All other documents listed are filed with this Report.

| Number | Description |
|---|---|
| 3.1(i) * | Amended and Restated Certificate of Incorporation of Tribune Company (Exhibit 3.1 to Current Report on Form 8-K dated Dec. 20, 2007) |
| 3.1(ii) | Amended and Restated Bylaws of Tribune Company (as amended and in effect as of Feb. 12, 2008) |
| 4.1 * | Indenture, dated as of March 1, 1992, between Tribune Company and Citibank, N.A. (successor to Bank of New York, Bank of Montreal Trust Company and Continental Bank, N.A.), as Trustee (Exhibit 4.1 to Registration Statement on Form S-3, Registration No. 333-02831) |
| 4.2 * | Indenture, dated as of Jan. 1, 1997, between Tribune Company and Citibank, N.A. (successor to Bank of New York), as Trustee (Exhibit 4 to Current Report on Form 8-K dated Jan. 14, 1997) |
| 4.3 * | Indenture, dated as of April 1, 1999, between Tribune Company and Citibank, N.A. (successor to Bank of New York and Bank of Montreal Trust Company), as Trustee for the PHONES securities (Exhibit 4 to Current Report on Form 8-K dated April 5, 1999) |
| 4.4 * | Indenture, dated Jan. 30, 1995, between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A. (successor to The Bank of New York, Wells Fargo Bank, N.A. and First Interstate Bank of California), as Trustee for the $7^{1}/4$% Debentures due 2013 and $7^{1}/2$% Debentures due 2023 (Exhibit 4.1 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.5 * | First Supplemental Indenture, dated as of June 12, 2000, among Tribune Company, The Times Mirror Company and The Bank of New York, as Trustee (Exhibit 4.13 to Current Report on Form 8-K dated June 12, 2000) |
| 4.6 * | Indenture, dated March 19, 1996, between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A., as Trustee for the 6.61% Debentures due 2027 and the $7^{1}/4$% Debentures due 2096 (Exhibit 4.1 to The Times Mirror Company's Current Report on Form 8-K dated March 13, 1996) |
| 4.7 * | First Supplemental Indenture, dated as of Oct. 19, 1999, between The Times Mirror Company and Citibank, N.A., as Trustee (Exhibit 4.3 to The Times Mirror Company's Current Report on Form 8-K dated Oct. 19, 1999) |
| 4.8 * | Second Supplemental Indenture, dated as of June 12, 2000, among Tribune Company, The Times Mirror Company and Citibank, N.A., as Trustee (Exhibit 4.12 to Current Report on Form 8-K dated June 12, 2000) |
| 4.9 * | Agreement of Resignation, Appointment and Assumption, dated as of Sept. 4, 2002, among Tribune Company, The Bank of New York and Citibank, N.A., appointing Citibank, N.A. as Trustee under the Indentures dated March 1, 1992, Jan. 30, 1995, Jan. 1, 1997 and April 1, 1999 (Exhibit 4.7 to Annual Report on Form 10-K for 2004) |

209

| Number | Description |
|---|---|
| 4.10 * | Form of Exchangeable Subordinated Debenture due 2029 relating to the PHONES securities (Exhibit 4 to Current Report on Form 8-K dated April 13, 1999) |
| 4.11 * | Specimen Note for 7 1/4% Debenture due 2013 (Exhibit 4.2 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.12 * | Specimen Note for 7 1/2% Debenture due 2023 (Exhibit 4.3 to The Times Mirror Company's Annual Report on Form 10-K for 1995) |
| 4.13 * | Officers' Certificate, dated Nov. 13, 1996, establishing the terms of the 7 1/4% Debentures due 2096 and attaching the specimen Form of Debenture (Exhibit 4.2 to The Times Mirror Company's Current Report on Form 8-K dated Nov. 7, 1996) |
| 4.14 * | Officers' Certificate, dated Sept. 9, 1997, establishing the terms of the 6.61% Debentures due 2027, and the specimen Form of Debenture (Exhibit 4.2 to The Times Mirror Company's Current Report on Form 8-K dated Sept. 4, 1997) |
| 4.15 * | Form of Note relating to Tribune Company's 4.875% Notes due 2010 (Exhibit 4.1a to Current Report on Form 8-K dated Aug. 10, 2005) |
| 4.16 * | Form of Note relating to Tribune Company's 5.25% Notes due 2015 (Exhibit 4.1b to Current Report on Form 8-K dated Aug. 10, 2005) |
| 4.17 * | Credit Agreement, dated as of May 17, 2007, by and among Tribune Company, as borrower, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, Citicorp North America, Inc., Bank of America, N.A., and Barclay's Bank plc, as co-documentation agents and J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner and Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners (Exhibit 4.1 to Current Report on Form 8-K dated May 17, 2007) |
| 4.18 * | Amendment No. 1 to Credit Agreement, dated as of June 4, 2007, by and among Tribune Company, as borrower, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, Citicorp North America, Inc., Bank of America, N.A., and Barclays Bank PLC, as co-documentation agents, and J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner and Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners (Exhibit 4.1 to Current Report on Form 8-K dated June 4, 2007) |
| 4.19 * | Form of Increase Joinder, by and among Tribune Company, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, and the various lenders party thereto (Exhibit 4.2 to Current Report on Form 8-K dated Dec. 20, 2007) |
| 4.20 * | Unsecured Interim Loan Agreement, dated as of Dec. 20, 2007, by and among Tribune Company, as borrower, the lenders party thereto, Merrill Lynch Capital Corporation, as administrative agent, JPMorgan Chase Bank, N.A., as syndication agent, Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, and J.P. Morgan Securities Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners (Exhibit 4.1 to Current Report on Form 8-K dated Dec. 20, 2007) |

Source: TRIBUNE CO, 10-K, March 20, 2008

| Number | Description |
|---|---|
| 10.1 o* | Tribune Company Directors' Deferred Compensation Plan, as amended and restated effective as of Jan. 1, 2005 (Exhibit 10.2 to Current Report on Form 8-K dated Dec. 22, 2005) |
| 10.2 o* | The Times Mirror Company Deferred Compensation Plan for Non-Employee Directors (Exhibit 10.7 to The Times Mirror Company's Annual Report on Form 10-K for 1994) |
| 10.3 o* | Tribune Company Bonus Deferral Plan, as amended and restated as of Oct. 18, 2006 (Exhibit 10.1 to Current Report on Form 8-K dated Oct. 18, 2006) |
| 10.4 o* | Tribune Company Transitional Compensation Plan for Executive Employees, amended and restated effective as of July 19, 2006 (Exhibit 10.7 to Annual Report on Form 10-K for 2006) |
| 10.5 o* | Tribune Company Supplemental Defined Contribution Plan, as amended and effective as of Oct. 18, 2006 (Exhibit 10.2 to Current Report on Form 8-K dated Oct. 18, 2006) |
| 10.6 o | Tribune Company 1996 Nonemployee Director Stock Compensation Plan, as amended and restated effective as of Dec. 20, 2007 |
| 10.7 o* | Tribune Company Incentive Compensation Plan, as amended and restated effective May 12, 2004 (Exhibit 10.1 to Quarterly Report on Form 10-Q for the quarter ended June 27, 2004) |
| 10.8 * | Amended and Restated Lease Agreement between TMCT, LLC and Tribune Company, dated Sept. 22, 2006 (Exhibit 10.5 to Current Report on Form 8-K dated Sept. 21, 2006) |
| 10.9 o | Tribune Company's 2007 Management Equity Incentive Plan, effective as of Dec. 20, 2007 |
| 10.10 * | Subordinated Promissory Note, dated as of Dec. 20, 2007, issued by Tribune Company to EGI-TRB, L.L.C. (Exhibit (d)(45) to the final amendment to Schedule 13E-3 filed by Tribune Company with the Securities and Exchange Commission on Dec. 20, 2007) |
| 10.11 * | Warrant to Purchase Shares of Common Stock, dated Dec. 20, 2007, issued by Tribune Company to EGI-TRB, L.L.C. (Exhibit (d)(46) to the final amendment to Schedule 13E-3 filed by Tribune Company with the Securities and Exchange Commission on Dec. 20, 2007) |

211

Source: TRIBUNE CO, 10-K, March 20, 2008

| Number | Description |
|--------|-------------|
| 10.12 * | ESOP Purchase Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust created under the Tribune Employee Stock Ownership Plan (Exhibit 10.6 to Current Report on Form 8-K dated April 1, 2007) |
| 10.13 * | ESOP Loan Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan (Exhibit 10.7 to Current Report on Form 8-K dated April 1, 2007) |
| 10.14 * | ESOP Note, dated as of April 1, 2007, executed by GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan in favor of Tribune Company (Exhibit 10.8 to Current Report on Form 8-K dated April 1, 2007) |
| 10.15 * | ESOP Pledge Agreement, dated as of April 1, 2007, between the Company and GreatBanc Trust Company, not in its individual or corporate capacity but solely in its capacity as trustee of the Tribune Employee Stock Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan (Exhibit 10.9 to Current Report on Form 8-K dated April 1, 2007) |
| 10.16 * | Investor Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (Exhibit 10.12 to Current Report on Form 8-K dated April 1, 2007) |
| 10.17 * | Tribune Employee Stock Ownership Plan (Exhibit 10.14 to Current Report on Form 8-K dated April 1, 2007) |
| 10.18 * | Tribune Employee Stock Ownership Trust, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust (Exhibit 10.15 to Current Report on Form 8-K dated April 1, 2007) |
| 14 * | Code of Ethics for CEO and Senior Financial Officers (Exhibit 14 to Annual Report on Form 10-K for 2003) |
| 21 | Table of Subsidiaries of Tribune Company |
| 23 | Consent of Independent Registered Public Accounting Firm |
| 31.1 | Rule 13a-14 Certification of Chief Executive Officer |
| 31.2 | Rule 13a-14 Certification of Chief Financial Officer |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer |
| 99.1 | Report of Deloitte & Touche, LLP, Independent Registered Public Accounting Firm, dated March 11, 2008, on the financial statements of Television Food Network, G.P., a subsidiary of the E.W. Scripps Company, as of and for the year ended Dec. 31, 2007. |

212

Source: TRIBUNE CO, 10-K, March 20, 2008

Exhibit 3.1(ii)

## Amended and Restated Bylaws

### of

### Tribune Company

### (a Delaware Corporation)

### (As amended and in effect as of February 12, 2008)

## ARTICLE I

### Offices

The corporation may have offices at such places both within and without the State of Delaware as the board of directors may from time to time determine or the business of the corporation may require.

## ARTICLE II

### Meetings of Stockholders

Section 1.        All meetings of the stockholders shall be held at such place, in or out of the state of Delaware, as may be fixed from time to time by the board of directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof.

Section 2.        Annual meetings of stockholders shall be held at such date and time as shall be designated by the board of directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof, at which the stockholders shall elect by a plurality vote a board of directors, and transact such other business as may properly be brought before the meeting.  Unless otherwise provided in the certificate of incorporation, voting at all elections for directors need not be by ballot and shall not be cumulative.  If the election of directors shall not be held on the day designated for any annual meeting, or at any adjournment thereof, the board of directors shall cause the election to be held at a special meeting of the stockholders as soon thereafter as convenient.  At such meeting, the stockholders may elect directors and transact other business with the same force and effect as at an annual meeting.

Section 3.        Written notice of the annual meeting stating the place, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.

Section 4.        The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a

Source: TRIBUNE CO, 10-K, March 20, 2008

complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

Section 5.        Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the certificate of incorporation, may be called by the chief executive officer, president or chairman, and shall be called by the president or secretary at the request in writing of a majority of the board of directors, or at the request in writing of stockholders owning ten percent (10%) or more of the entire capital stock of the corporation issued and outstanding and entitled to vote. Such request shall state the purpose or purposes of the proposed meeting.

Section 6.        Written notice of a special meeting stating the place, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting and the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, to each stockholder entitled to vote at such meeting.

Section 7.        Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 8.        The holders of a majority of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the certificate of incorporation; provided that if a separate class vote is required with respect to any matter, the holders of a majority of the outstanding shares of such class, present in person or by proxy, shall constitute a quorum of such class, and, except as otherwise provided by law or the certificate of incorporation, the affirmative vote of a majority of shares of such class so present shall be the act of such class. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

2

Source: TRIBUNE CO, 10-K, March 20, 2008

Section 9.        When a quorum is present at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which by express provision of statute or of the certificate of incorporation a different vote is required, in which case such express provision shall govern and control the decision of such question.

Section 10.        Each stockholder shall, at every meeting of the stockholders, be entitled to one vote in person or by proxy for each share of the capital stock having voting power held by such stockholder, but no proxy shall be voted on after three years from its date, unless the proxy provides for a longer period.

Section 11.        Any action required to be taken at any annual or special meeting of stockholders of the corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

Section 12.        Inspectors. At any meeting of the stockholders, the board of directors may, or upon the request of any one or more stockholders or proxies holding or representing not less than 10 percent of the outstanding shares shall, appoint one or more persons as inspectors for such meeting. Such inspectors shall ascertain and report the number of shares represented at the meeting, based upon their determination of the validity and effect of proxies, count all votes and report the results, and do all such other acts as are proper to conduct the election and voting with impartiality and fairness. Each report of an inspector shall be in writing and signed by the inspector or by a majority of them if there be more than one inspector acting at such meeting. If there is more than one inspector, the report of a majority shall be the report of the inspectors. The report of the inspector or inspectors on the number of shares represented at the meeting and the results of the voting shall be prima facie evidence thereof.

ARTICLE III

Directors

Section 1.        The number of directors which shall constitute the whole board shall consist of nine directors. Subject to the last sentence of this paragraph, the following qualifications for directors shall apply:  two (2) directors shall be persons designated by EGI-TRB, L.L.C. ("EGI-TRB") pursuant to that certain Investor Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, solely as trustee of the Tribune Employee Stock

3

Source: TRIBUNE CO, 10-K, March 20, 2008

Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan (such directors referred to as the "EGI-TRB Designees"); five (5) directors shall be "Independent Directors" as such term is defined below; one (1) director shall be the chief executive officer of the corporation for so long as such person serves in such capacity; and, subject to the immediately following sentence, one (1) director shall be without qualification.  Notwithstanding the foregoing, the two (2) EGI-TRB Designees shall become directors without qualification when EGI-TRB and its permitted transferees no longer hold of record and/or beneficially own an aggregate of at least ten percent (10%) of the outstanding shares of common stock, par value $0.01 per share, of the corporation (including shares underlying that certain Warrant initially issued to EGI-TRB by the corporation pursuant to that certain Securities Purchase Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB and Samuel Zell) on a fully diluted basis. Not more than two (2) of the directors other than the director serving as the chief executive officer of the corporation shall be Affiliates of EGI-TRB, and not more than two (2) directors shall be officers or employees of the corporation, it being understood that for these purposes the chairman of the board of directors shall not be deemed to be an officer or employee of the corporation.

For purposes hereof, the term "Independent Director" shall mean a director that has no material relationship with the corporation directly or as a partner, shareholder or officer of an organization that has a relationship with the corporation as determined under the director independence standards of the New York Stock Exchange, as amended from time to time.  For purposes hereof, the term "Affiliate" shall mean, with respect to a person, another person who, directly or indirectly, controls, is controlled by or is under common control with such person, including, without limitation, any general partner, officer, director, or manager of such person; provided that no entity for whom the trustee of the corporation's employee stock ownership trust which forms part of the corporation's employee stock ownership plan serves as a trustee shall be deemed to be an Affiliate of such trustee.

Section 2.        The directors shall be elected at the annual meeting of the stockholders, and each initial director shall be elected to serve until the next annual meeting of stockholders, until the director's successor is elected and qualified or until the director's earlier resignation or removal.  From and after the third annual meeting of the stockholders following the Merger (as such term is defined in that certain Agreement and Plan of Merger, dated as of April 1, 2007, by and among GreatBanc Trust Company, solely as trustee of the Tribune Employee Stock Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan, Tribune Company and EGI-TRB), the board shall be divided into three classes, with each class consisting of three directors, or as nearly equal in number as the then total number of directors constituting the entire board permits, to serve for staggered three-year terms.  The initial term of office of the first class shall expire at the fourth annual meeting of the stockholders following the Merger.  The initial term of office of the second class shall expire at the fifth annual meeting of the stockholders following the Merger.  The initial term of office of the third class shall expire at the sixth annual meeting of the stockholders following the Merger.  The directors elected at an annual meeting of stockholders to succeed those whose terms

4

then expire shall be identified as being directors of the same class as the directors whom they succeed, and each of them shall hold office until the third succeeding annual meeting of the stockholders and until such director's successor shall have been elected and qualified. Directors need not be stockholders.

Section 3.      Vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by the sole remaining director, or by the affirmative vote of a majority of stockholders then entitled to vote thereon, and each director so chosen shall hold office in accordance with Section 1 of this Article. If there are no directors in office, then an election of directors may be held in the manner provided by statute..

Section 4.      At any duly called and held special meeting of the stockholders, any director or directors may, by the affirmative vote of the holders of a majority of all the shares of stock outstanding and entitled to vote in an election of directors, be removed from office for cause; provided, however, that, if the stockholders of the corporation are entitled under the provisions of the certificate of incorporation to exercise cumulative voting rights in the election of directors, then no removal shall be effective if the holders of that proportion of the shares of stock outstanding and entitled to vote for an election of directors as could elect to the full board as then provided by these bylaws the director or directors sought to be removed shall vote against removal. The successor or successors to any director or directors so removed may be elected by the stockholders at the meeting at which removal was effectuated. The remaining directors may, to the extent vacancies are not filled by election by the stockholders, fill any vacancy or vacancies created by the removal.

Section 5.      The business of the corporation shall be managed by or under the direction of the board of directors which may exercise all such powers of the corporation and do all such lawful acts as are not by statute or by the certificate of incorporation or by these bylaws directed or required to be exercised or done by the stockholders.

Section 6.      The corporation shall have standing Audit and Compensation Committees of the board, each composed of three members, in each case, with such rights, duties and obligations as are customarily possessed by such committees at similarly situated companies. Each of the Audit and Compensation Committees will have at least two Independent Directors as members. At least one member of each of the Audit Committee and Compensation Committee shall be an EGI-TRB Designee. The board may, in its discretion, by the affirmative vote of a majority of the whole board, designate one or more additional committees, each committee to consist of one or more of the directors. The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. At all committee meetings, a majority of the total number of members shall constitute a quorum for the transaction of business and the act of a majority of the members present at any meeting at which there is a quorum shall be the act of such committee. In the absence or disqualification of any member of a committee, the

5

Source: TRIBUNE CO, 10-K, March 20, 2008

member or members thereof present at any meeting and not disqualified from voting, whether he or they constitute a quorum, may unanimously appoint another member of the board to act at the meeting in the place of the absent or disqualified member provided such member meets the qualification requirements set forth herein.  Except as otherwise provided by law or these bylaws, any committee, to the extent provided by resolution of the board, shall have and may exercise all the powers and authority of the board.  No committee shall have or exercise the powers and authority of the board with respect to filling vacancies among the directors or in any committee of the directors, amending the certificate of incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease, or exchange of all or substantially all of the corporation's property and assets, recommending to the stockholders a dissolution of the corporation or a revocation of a dissolution, amending the bylaws, or, unless the resolution of the board expressly so provides, declaring a dividend or authorizing the issuance of stock.  A majority of the members of a committee may determine its action and fix the time and place of its meetings, unless the board shall otherwise provide.  The board shall have the power at any time to fill vacancies in, to change the membership of, or to discharge any committee.

ARTICLE IV

Meetings of the Board of Directors

Section 1.          The board of directors of the corporation may hold meetings, both regular and special, either within or without the State of Delaware.

Section 2.          The first meeting of each newly elected board of directors shall be held at such time and place as shall be fixed by the vote of the stockholders at the annual meeting and no notice of such meeting shall be necessary to the newly elected directors in order legally to constitute the meeting, provided a quorum shall be present.  In the event of the failure of the stockholders to fix the time or place of such first meeting of the newly elected board of directors, or in the event such meeting is not held at the time and place so fixed by the stockholders, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the board of directors, or as shall be specified in a written waiver of notice signed by all of the directors.

Section 3.          Regular meetings of the board of directors may be held without notice at such time and at such place as shall from time to time be determined by the board, and no notice need be given as to any regular meeting.

Section 4.          Special meetings of the board may be called by the chairman, president or chief executive officer on two (2) days' notice to each director, either personally or by mail or by telegram; special meetings shall be called by the chairman, president or chief executive officer in like manner and on like notice on the written request of two or more directors.  Meetings may be held at any time without notice if all

6

---

the directors are present or if, at any time before or after the meeting, those not present waive notice of the meeting in writing.

Section 5.        At all meetings of the board a majority of the total number of directors shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the board of directors, except as may be otherwise specifically provided by statute or by the certificate of incorporation. If a quorum shall not be present at any meeting of the board of directors the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 6.        Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting, if all members of the board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the board or committee.

Section 7.        The directors may be paid their expenses, if any, of attendance at each meeting of the board of directors and may be paid a fixed sum for attendance at each meeting of the board of directors or a stated salary as director. No such payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

Section 8.        Unless otherwise restricted by the certificate of incorporation, members of the board of directors or of any committee designated by the board may participate in a meeting of the board or any such committee by means of conference telephone or similar communications equipment whereby all persons participating in the meeting can hear each other. Participation in any meeting by such means shall constitute presence in person at such meeting.

Section 9.        A director who is present at a meeting of the board at which action on any corporate matter is taken shall be conclusively presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to the action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward his written dissent by registered mail to the secretary immediately after the adjournment of the meeting. The right to dissent shall not apply to a director who voted in favor of the action.

7

Source: TRIBUNE CO, 10-K, March 20, 2008

## ARTICLE V

### Notices

Section 1.        Whenever, under the provisions of the statutes or of the certificate of incorporation or of these bylaws, notice is required to be given to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, by mail, addressed to such director or stockholder, at his address as it appears on the records of the corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail. Notice to directors may also be given by telegram, facsimile or by electronic transmission.

Section 2.        Whenever any notice is required to be given under the provisions of the statutes or of the certificate of incorporation or of these bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Attendance by a director or stockholder at a meeting shall constitute a waiver of notice of such meeting except when the director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened.

## ARTICLE VI

### Officers

Section 1.        The officers of the corporation shall be chosen by the board of directors and shall be a president, secretary and treasurer. The board of directors may elect a chairman of the board, chief executive officer, a chief operating officer, a chief financial officer, one or more vice presidents and one or more assistant secretaries and assistant treasurers. Any number of offices may be held by the same person, unless the certificate of incorporation or these bylaws otherwise provide.

Section 2.        The board of directors at its first meeting and after each annual meeting of stockholders shall choose a president, a secretary and a treasurer and shall choose a chairman of the board.

Section 3.        The board of directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the board.

Section 4.        The officers of the corporation shall hold office until their successors are chosen and qualify. Any officer elected or appointed by the board of

8

Source: TRIBUNE CO, 10-K, March 20, 2008

directors may be removed at any time by the affirmative vote of a majority of the board of directors. Any vacancy occurring in any office of the corporation may be filled by the board of directors.

Section 5.       The Chairman of the Board. The chairman of the board, if there be a chairman, shall preside at all meetings of the stockholders, of the board of directors and of the executive committee, if any, and he shall have such other powers and duties as the board of directors may from time to time prescribe. He may execute contracts in the name of the corporation. He may sign, with the secretary, assistant secretary, treasurer or assistant treasurer, certificates for shares of the corporation, and may sign any policies, deeds, mortgages, bonds, contracts, or other instruments which the board of directors have authorized to be executed except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these bylaws to some other officer or agent of the corporation, or shall be required by law to be otherwise signed or executed.

Section 6.       The Chief Executive Officer. The chief executive officer of the corporation shall have the general direction of the affairs of the corporation except as otherwise prescribed by the board of directors. In the absence of the chairman of the board, he shall preside at all meetings of the stockholders, of the board of directors and of the executive committee, if any, and shall designate the acting secretary for such meetings to take the minutes thereof for delivery to the secretary. He may sign, with the secretary, assistant secretary, treasurer or assistant treasurer, certificates for shares of the corporation, and may sign any policies, deeds, mortgages, bonds, contracts, or other instruments which the board of directors have authorized to be executed except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these bylaws to some other officer or agent of the corporation, or shall be required by law to be otherwise signed or executed, appoint and discharge agents and employees of the corporation, and in general, shall perform all duties incident to the office of chief executive officer.

Section 7.       The President. The president along with the chief executive officer of the corporation shall have the general direction of the affairs of the corporation except as otherwise prescribed by the board of directors. He may sign, with the secretary, assistant secretary, treasurer or assistant treasurer, certificates for shares of the corporation, and may sign any policies, deeds, mortgages, bonds, contracts, or other instruments which the board of directors have authorized to be executed except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these bylaws to some other officer or agent of the corporation, or shall be required by law to be otherwise signed or executed, appoint and discharge agents and employees of the corporation, and in general, shall perform all duties incident to the office of president. In the absence of the chief executive officer or in the event of his inability or refusal to act, the president, if there be any, shall perform the duties of the chief executive officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the chief executive officer.

9

Source: TRIBUNE CO, 10-K, March 20, 2008

Section 8.      The Vice-Presidents.  In the absence of the chief executive officer or president in the event of his inability or refusal to act, the vice-president, if there be any, (or in the event there be more than one vice-president, the vice-presidents in the order designated, or in the absence of any designation, then in the order of their election) shall perform the duties of the chief executive officer or president, and when so acting, shall have all the powers of and be subject to all the restrictions upon the chief executive officer or president.  The vice-presidents shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.

Section 9.      The Secretary.  The secretary shall attend all meetings of the board of directors and all meetings of the stockholders and record all the proceedings of the meetings of the corporation and of the board of directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required.  He shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the board of directors, and shall perform such other duties as may be prescribed by the board of directors or president, under whose supervision he shall be.  He shall have custody of the corporate seal of the corporation and he, or an assistant secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by his signature or by the signature of such assistant secretary.  The board of directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by his signature.

Section 10.      The Assistant Secretary.  The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the board of directors (or if there be no such determination, then in the order of their election) shall, in the absence of the secretary or in the event of his inability or refusal to act, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.

Section 11.      The Treasurer.  The treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the corporation in such depositories as may be designated in accordance with Section 1 of Article VIII hereof.

He shall disburse the funds of the corporation as may be ordered by the board of directors, taking proper vouchers for such disbursements, and shall render to the president and the board of directors, at its regular meetings, or when the board of directors so requires, an account of all his transactions as treasurer and of the financial condition of the corporation.

If required by the board of directors, he shall give the corporation a bond (which shall be renewed every six (6) years) in such sum and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of his office and for the restoration to the corporation, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other

10

Source: TRIBUNE CO, 10-K, March 20, 2008

property of whatever kind in his possession or under his control belonging to the corporation.

Section 12.        The Assistant Treasurer.  The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the board of directors (or if there be no such determination, then in the order of their election), shall, in the absence of the treasurer or in the event of his inability or refusal to act, perform the duties and exercise the powers of the treasurer and shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.

## ARTICLE VII

### Certificates of Stock

Section 1.        Every holder of stock in the corporation shall be entitled to have a certificate, signed by, or in the name of the corporation by the chief executive officer or president or a vice president and the treasurer or an assistant treasurer, or the secretary or an assistant secretary of the corporation, certifying the number of shares owned by him in the corporation.  In case any such officer who has signed, or whose facsimile signature has been placed upon, a stock certificate shall have ceased to be such before such certificate is issued, it may be issued with the same effect as if such officer had not ceased to be such at the time of its issuance.

If the corporation shall be authorized to issue more than one class of stock or more than one series of any class, the designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in Section 202 of the General Corporation Law of Delaware, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, a statement that the corporation will furnish without charge to each stockholder who so requests the designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

Section 2.        Where a certificate is countersigned (i) by a transfer agent other than the corporation or its employee, or (ii) by a registrar other than the corporation or its employee, any of or all the signatures of the officers of the corporation may be a facsimile. In case any officer who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be an officer before such certificate is issued, it may be issued by the corporation with the same effect as if he were such officer at the date of issue.

11

Source: TRIBUNE CO, 10-K, March 20, 2008

Section 3.    <u>Lost Certificates</u>.  The board of directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of the fact by the person claiming the certificate of stock to be lost, stolen or destroyed.  When authorizing such issue of a new certificate or certificates, the board of directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or to give the corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

Section 4.    <u>Transfers of Stock</u>.  Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

Section 5.    <u>Fixing Record Date</u>.  In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the board of directors may fix, in advance, a record date, which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; <u>provided</u>, <u>however</u>, that the board of directors may fix a new record date for the adjourned meeting.

Section 6.    <u>Failure to Fix Record Date</u>.  If no record date is fixed in accordance with Section 5 of this Article VII:

(a)    The record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or if the notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(b)    The record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the board is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to the place where the proceedings of the corporation are recorded and the custodian of such proceedings.  When prior action by the board is required by law, the record date shall be at the close of business on the day on which the board adopts the resolution taking such prior action.

12

Source: TRIBUNE CO, 10-K, March 20, 2008

(c)      The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the board adopts the resolution relating thereto.

Section 7.      <u>Registered Stockholders</u>.  The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

ARTICLE VIII

<u>Miscellaneous</u>

Section 1.      <u>Bank Deposits and Check Authorization</u>.  The funds of the corporation shall be deposited to its credit in such banks, trust companies or other financial institutions as may be determined from time to time by the chairman or president or any executive vice president and the secretary of the corporation, evidenced by joint written action.  By such joint written action, filed with the minutes of the board of directors, the chairman or president or any executive vice president together with the secretary may authorize (a) the opening of one or more deposit accounts at any such institution and (b) the designation of, or a change in the designation of, the officers or employees upon whose signature checks may be written or funds withdrawn on any corporation account at any such institution, provided that the signature of one person other than the chairman, president or any executive vice president and secretary shall be required therefor.  By the adoption of this Section 1 of Article VIII of these bylaws, the board of directors adopts the form of any resolution or resolutions requested by or acceptable to any financial institution in connection with the foregoing actions, provided that the secretary of the corporation (x) believes that the adoption of such resolution or resolutions is necessary or advisable and (y) files such resolution or resolutions with the minutes of the board of directors.

Section 2.      <u>Fiscal Year</u>.  The fiscal year of the corporation shall be as determined by the board of directors.  In the absence of such determination, the fiscal year shall begin on the first Monday after the last Sunday in December each year and end on the last Sunday in the following December.

Section 3.      <u>Corporate Seal</u>.  The board of directors may provide a suitable seal, including duplicates thereof, containing the name of the corporation.

13

Source: TRIBUNE CO, 10-K, March 20, 2008

ARTICLE IX

Amendments

These bylaws may be amended, altered, or repealed and new bylaws adopted by the affirmative vote of the holders of at least 67% of the voting power of the shares entitled to vote, or at any meeting of the board of directors by a majority vote if the certificate of incorporation shall confer such power to adopt, amend, alter, or repeal the bylaws upon the directors. The fact that the power to adopt, amend, alter, or repeal the bylaws has been conferred upon the board of directors shall not divest the stockholders of the same powers.

14

Source: TRIBUNE CO, 10-K, March 20, 2008

EXHIBIT 10.6

## TRIBUNE COMPANY
### 1996 NONEMPLOYEE DIRECTOR STOCK COMPENSATION PLAN
(As amended and restated effective December 20, 2007)

### ARTICLE I
### GENERAL

1.1      **Purpose.** Tribune Company, a Delaware corporation (the "Company"), hereby amends and restates the 1996 Nonemployee Director Stock Compensation Plan (the "Plan"). The purpose of the Plan has been to increase the stock ownership of nonemployee directors, to further align their interests with those of the Company's other stockholders and to foster and promote the long-term financial success of the Company by attracting and retaining outstanding nonemployee directors by enabling them to participate in the Company's growth through stock ownership. Effective December 20, 2007 the Plan is hereby amended to reflect the leveraged acquisition of Tribune Company by the Tribune Employee Stock Ownership Plan and the resulting cessation of trading of Tribune common shares on the New York Stock Exchange (collectively, the "going-private transaction").

1.2      **Participation.** Only directors of the Company who at the time an award is made meet the following criteria ("Directors") shall receive awards under the Plan: (a) the director is not an employee of the Company or any subsidiary of the Company and (b) the director is a "disinterested person" as such term is defined in Rule 16b-3 promulgated under the Securities Exchange Act of 1934 (the "Exchange Act") or any similar rule which may subsequently be in effect ("Rule 16b-3").

1.3      **Shares Subject to the Plan.** Shares of stock covered by awards under the Plan may be in whole or in part authorized and unissued or treasury shares of the Company's common stock or such other shares as may be substituted pursuant to Section 4.2 ("Common Stock"). The maximum number of shares of Common Stock, which may be issued for all purposes under the Plan, shall be 300,000 (subject to adjustment pursuant to Section 4.2).

### ARTICLE II
### STOCK AWARDS

2.1      **Stock Awards.** Effective on the day after the date of each annual meeting of the stockholders of the Company at which Directors are elected ("Annual Meeting"), commencing with the Annual Meeting in 2005, each Director in office on adjournment of said meeting will automatically be awarded shares of Common Stock which on the date of the Annual Meeting have a Fair Market Value of $75,000 (the "Stock Award"). A Director who is not initially elected at the Annual Meeting shall receive an award for a pro rata portion of the Stock Award on the day following his or her becoming a Director based on the number of months remaining from such date until the anniversary date for the most recent Annual Meeting of the Company divided by twelve.

Source: TRIBUNE CO, 10-K, March 20, 2008