2.2      **Definition of Fair Market Value.**  The term "Fair Market Value" unless otherwise required by any applicable provision of the Internal Revenue Code of 1986, as amended, (the "Code")or any regulations issued hereunder shall mean, as of any date, the closing price of the Common Stock as reported on the New York Stock Exchange Composite Transactions List (or such other consolidated transaction reporting system on which the Common Stock is primarily traded) for such day, or if the Common Stock was not traded on such day, then the next preceding day on which the stock was traded, as reported by such source as the Board of Directors may select.  If the Common Stock is not readily tradeable on a national securities exchange or other market system, its Fair Market Value shall be set under procedures established by the Board of Directors on the advice of an investment advisor.

## ARTICLE III
## DEFERRAL OF STOCK AWARDS

3.1    **Deferral.**  Each Director may elect to defer receipt of part or all of any stock awards hereunder.  Any such election must be made in writing prior to the beginning of the calendar year in which an award is earned.  The deferred award will be credited to an account established in the Director's name and held subject to the following terms and conditions:

(a)      If the Company pays a cash dividend with respect to its Common Stock at any time while there is a balance in the Director's account, the Company will determine the cash dividend which the Director would have received had the Director been the actual owner of the number of shares shown in the account at the time of the dividend payment.  The Company will then determine the additional shares of Common Stock that could have been purchased with the dividend at the fair market value of the stock on the date of dividend payment and add this number to the Director's account.

(b)      The number of whole shares in a Director's account at the time the Director terminates service on the Board shall be delivered in a lump sum on the February 15 following the year in which the Director terminates Board service or in no more than ten equal annual installments commencing on the February 15 following the year in which the Director terminates Board service in accordance with the Director's original or amended deferral election.  The value of any fractional shares shall be paid in cash upon termination.  An election made under this paragraph 3.1(b) with respect to deferrals credited to a Director's account after December 31, 2004 (and any investment gains or losses attributable thereto) shall be irrevocable, provided that a Director may amend an election no later than December 31, 2005. A Director may amend an election with respect to the manner of the delivery of shares deferred to a Director's account prior to January 1, 2005 (and any investment gains or losses attributable thereto) at any time up to six months prior to the date of termination of service.

(c)      If a Director dies or becomes legally incapacitated, the Company will deliver the shares to the persons designated by the Director by a writing filed with the Company.

2

Source: TRIBUNE CO, 10-K, March 20, 2008

(d)  The Company's obligations with respect to the deferred stock awards shall not be funded or secured in any manner nor shall the Director's right to receive shares be assignable or transferable voluntarily or involuntarily except as expressly provided herein. However, nothing shall prevent the Company from establishing a rabbi trust to provide a Director additional assurance that the shares subject to a deferred award will be delivered in a timely fashion in accordance with the Director's election.

3.2    **Going-Private Transaction.**  As a result of the going-private transaction, Directors' deferred share awards under this Plan or under the Tribune Incentive Compensation Plan which are denominated in Tribune stock shall be converted to a cash equivalent based on the price provided to shareholders pursuant to the transaction. Converted account balances shall bear interest, at an annual rate equal to 120% of the long-term Applicable Federal Rate (compounded quarterly), which rate shall be updated on an annual basis.

3.3    **Change in Election.**  In connection with the application of Section 409A of the Code to the Plan, the Tribune Company Employee Benefits Committee or its delegate may offer Directors the opportunity to elect a revision to their existing payment election under the Plan so as to accelerate the payment of their account balance following termination of Board service. Such revised payment election shall be determined in the sole discretion of the Committee or its delegate. Such revisions shall be provided and operate in compliance with the transition rules under Section 409A and shall be offered and elected prior to December 31, 2007.

**ARTICLE IV**
**MISCELLANEOUS PROVISIONS**

4.1    **Nontransferability.**  No shares awarded under the Plan shall be sold for a period of six months and one day after the date of the award.

4.2    **Adjustments Upon Certain Changes.**  If any of the events described in Sections 14.1 or 14.2 of the Company's 1997 Incentive Compensation Plan (As Amended and Restated Effective May 12, 2004) shall occur, the number of shares authorized by the Plan, shall be automatically adjusted on the same basis to give the proper effect to such change so as to prevent the dilution or enlargement of the shares available under Section 1.3 hereof.

4.3    **Amendment or Discontinuation of Plan.**  Subject to Code Section 409A, the Board of Directors may amend the Plan at any time or suspend or discontinue the Plan at any time, but no such action shall adversely affect any prior award; provided that this Plan may not be amended more frequently than once every six months and no amendment shall be adopted which would result in any Director losing his or her status as a "disinterested" administrator under Rule 16b-3 with respect to any employee benefit plan of the Company or result in the Plan losing its status as a protected plan under Rule 16b-3.

3

Source: TRIBUNE CO, 10-K, March 20, 2008

4.4     **Plan Not Exclusive.**  The adoption of the Plan does not supersede the 1995 Nonemployee Director Stock Option Plan and shall not preclude the adoption by appropriate means of any other stock or other compensation plan for Directors.

4.5     **Other Provisions; Securities Registration.**  The grant of any award under the Plan may also be subject to other provisions as counsel to the Company deems appropriate, including, without limitation, such provisions as may be appropriate to comply with federal or state securities laws and stock listing requirements.

4.6     **Rights of Directors.**  Nothing in the Plan shall confer upon any Director any right to serve as a Director for a period of time or to continue his or her present or any other rate of compensation.

4.7     **Requirements of Law; Governing Law.**  The awarding and the issuance of shares of Common Stock shall be subject to all applicable laws, rules and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required. The Plan, and all agreements hereunder, shall be construed in accordance with and governed by the laws of the State of Delaware.

4.8     **Effective Date.**  The Plan was approved by the holders of a majority of the votes of all shares present, or represented, and entitled to be cast on the matter at the 1996 Annual Meeting and became effective as of such Annual Meeting.  No grants shall be made hereunder after May 31, 2006.

IN WITNESS WHEREOF, the Tribune Company Employee Benefits Committee has caused the foregoing to be executed on behalf of Tribune Company by the undersigned duly authorized Chairman of the Committee this 20th day of December, 2007.

TRIBUNE COMPANY

By:     /s/ Donald C. Grenesko

Chairman of Tribune Company
Employee Benefits Committee

4

Source: TRIBUNE CO, 10-K, March 20, 2008

EXHIBIT 10.9

TRIBUNE COMPANY

## 2007 MANAGEMENT EQUITY INCENTIVE PLAN

**SECTION 1.**    **Purpose**

The purpose of the Plan is to enable Tribune Company (the *"Company"*) to attract, retain and motivate employees and to provide the Company and its Subsidiaries with a unit plan providing incentives directly linked to increases in Company shareholder value.

**SECTION 2.**    **Definitions**

For purposes of the Plan, the following terms are defined as set forth below:

a.    *"1934 Act"* means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

b.    *"Administrator"* means the Board or any committee of the Board authorized by the Board to perform the duties of the Administrator hereunder.

c.    *"Applicable Participant Ratio"* means (1) the number of Participant's vested Second Tranche Units (including any such Second Tranche Units that vest by virtue of a Termination of Service) divided by (2) 3,261,000, as each of clauses (1) and (2) may be adjusted pursuant to Section 4(c).

d.    *"Award"* means a grant of Units pursuant to the Plan.

e.    *"Board"* means the Board of Directors of the Company.

f.    *"Cause"* means conduct involving dishonesty or willful misconduct which, in either case, is detrimental in a significant way to the business of the Company or any of its Subsidiaries.

g.    *"Change of Control"* means (i) the acquisition, other than from the Company, by any person, entity or "group" (within the meaning of Section 13(d)(3) or 14(d)(2) of the 1934 Act), excluding for this purpose the Company, any employee benefit plan (or related trust) sponsored or maintained by the Company or its Subsidiaries, the ESOP, EGI, Samuel Zell and their respective affiliates, of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the 1934 Act) of 40% or more of either the then outstanding shares of Common Stock or the combined voting power of the Company's then outstanding voting securities entitled to vote generally in the election of directors; (ii) a liquidation or dissolution of the Company, or (iii) the sale of all or substantially all of the assets of the Company.

Source: TRIBUNE CO, 10-K, March 20, 2008

h.    *"Closing"* means the completion of the merger of Tesop Corporation with and into the Company.

i.    *"Code"* means the U.S. Internal Revenue Code of 1986, as amended from time to time, and any successor thereto.

j.    *"Common Stock"* means the common stock of the Company, par value $0.01.

k.    *"Credit Agreement"* means that certain Credit Agreement, entered into as of May 17, 2007, among Tribune Company, each lender from time to time party hereto, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp.North America, Inc. and Bank of America, N.A., as co-documentation agents, J.P. Morgan Securities Inc, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC., together with any amendments thereto, as in effect as of the effective date of this Plan.

l.    *"Disability"* means (i) the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months; provided that such Participant has been unable to work for at least one hundred eighty (180) days in any twelve (12) month period, or (ii) receipt of income replacement benefits for a period of not less than three months under an accident and health plan covering employees of the Company, by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months. Whether a Participant has incurred a "Disability" shall be determined by a physician selected by the Administrator or the Company's insurers, which physician shall be reasonably acceptable to a Participant (or Participant's legal representative).

m.    *"EGI"* means EGI-TRB, L.L.C.

n.    *"EGI-TRB Director"* shall have the meaning given to such term in that certain Investor Rights Agreement, dated April 1, 2007, by and among the Company, EGI and the ESOP.

o.    *"Eligible Individuals"* means employees and non-employee directors of the Company or a Subsidiary; provided, that no individual may be an Eligible Individual to the extent that his or her participation in the Plan would prevent the Plan from being a Top Hat Plan.

p.    *"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended.

q.    *"ESOP"* means the Tribune Employee Stock Ownership Plan, effective as of January 1, 2007, as amended.

2

Source: TRIBUNE CO, 10-K, March 20, 2008

r.      *"Fair Market Value"* as of any date means (i) if such date precedes the occurrence of a Change of Control, the fair market value of Common Stock as determined by the Trustee (as defined in the ESOP) after consultation with an independent appraiser, as defined in Section 401(a)(28)(C) of the Code, in accordance with the terms of the Trust (as defined in the ESOP), the ESOP and the provisions of Section 3(18) of ERISA, or (ii) if such date is the date of, or subsequent to, a Change of Control, the fair market value of the consideration received in respect of a share of Common Stock in the Change of Control transaction, as determined by the Administrator in its good faith discretion.

s.      *"Fair Market Value Reference Date"* means the date as of which the Fair Market Value of a share of Common Stock is determined.

t.      *"Good Reason"* means (i) a material reduction in the nature or scope of the Participant's employment duties (but excluding any change in the Participant's service as a member of any board of directors of any Subsidiary or any committee thereof), (ii) a reduction in the Participant's base salary or target annual bonus, (iii) an adverse and disproportionate change (relative to similarly situated employees of the Company) in the aggregate benefits available to the Participant , or (iv) a change in the city in which Participant is required to perform his or her duties.  For the avoidance of doubt, a change in the Participant's line of reporting resulting from organizational changes, including the interposition of additional employees in the Participant's line of reporting, will not by itself constitute "Good Reason."

u.      *"Involuntary Termination"* means a termination of a Participant's employment by the Company without Cause or a termination of a Participant's employment by the Participant for Good Reason.

v.      *"Participant"* means any Eligible Individual who receives a Unit Award.

w.      *"Person"* means an individual, entity or group (within the meaning of Sections 13(d)(3) or 14(d)(2) of the 1934 Act).

x.      *"Plan"* means this Tribune Company 2007 Unit Plan, as set forth herein and as hereinafter amended from time to time.

y.      *"Section 409A Change of Control"* means a Change of Control that constitutes (i) a change in the ownership of the Company, (ii) a change in effective control of the Company or (iii) a change in the ownership of a substantial portion of the assets of the Company (each as defined in Section 409A of the Code and the final regulations promulgated thereunder (*"Section 409A"*).

z.      *"Subsidiary"* means any corporation, partnership, joint venture or other entity during any period in which at least a 20% voting or profits interest is owned, directly or indirectly, by the Company or any successor to the Company.

3

Source: TRIBUNE CO, 10-K, March 20, 2008

aa.    "*Subsidiary Change of Control*" means, with respect to a Participant, a "change in the ownership" of (i) the Subsidiary that employs Participant or (ii) any corporation (other than the Company) in a chain of corporations in which each corporation is a "majority shareholder" of another corporation in the chain, ending in the Subsidiary that employs Participant. For purposes of this definition, "change in the ownership" and "majority shareholder" shall have the meanings ascribed to them in Section 409A.

bb.    "*Termination of Service*" means the termination of a Participant's employment by or service to the Company or any Subsidiary. A Participant employed by or providing service to a Subsidiary shall also be deemed to incur a Termination of Service if the Subsidiary experiences a Subsidiary Change of Control and the Participant does not immediately thereafter become an employee of the Company or another Subsidiary.

cc.    "*Top Hat Plan*" means a plan described in Sections 201(2), 301(a)(3) and 401(a)(1) of ERISA.

dd.    "*Tranche One Participants*" means Participants who receive First Tranche Unit Awards.

ee.    "*Tranche Two Participants*" means Participants who receive Second Tranche Unit Awards.

ff.    "*Unit*" means a contingent right to receive U.S. dollars equal to the Fair Market Value of one share of Common Stock upon satisfaction of the conditions for vesting as provided in Section 5 of this Agreement and subject further to the terms of the Plan and the additional terms and conditions of any Unit Agreement.

**SECTION 3.**    **Administration**

(a)    The Plan shall be administered by the Administrator in accordance with the terms of the Plan. The Administrator shall have full power to construe and interpret the Plan and to make all other determinations which may be necessary or advisable for the administration of the Plan, in each case, to the extent not inconsistent with the terms of the Plan.

(b)    The Administrator shall have the full power to (i) select Tranche One Participants and Tranche Two Participants and to determine the size of Awards and their terms and conditions and (ii) vary the terms and treatment of the First Tranche Units and the Second Tranche Units in individual cases as warranted by circumstances, in each case, subject to the terms of this Plan; <u>provided, however,</u> that in addition to approval by the Administrator, with respect to (A) all Tranche One Participants and First Tranche Units and (B) Tranche Two Participants and Second Tranche Units (other than the Tranche Two Participants and Second Tranche Units set forth on Exhibit B to the Plan), each of the items contemplated by clause (i) and clause (ii) shall require the approval or written consent of at least one EGI-TRB Director, to the extent one or more EGI-TRB Director then serves as a member of the Board.

4

(c)     All determinations of the Administrator shall be final and conclusive on all persons, including the Company, its stockholders and Participants, and their estates and beneficiaries.

## SECTION 4.        Units Subject to Plan

(a)     No more than 8,695,652 Units may be granted under the Plan, subject to adjustment in accordance with Section 4(c).  If any Unit is forfeited, or if any Unit terminates, expires, or lapses without being settled or if any Unit is settled pursuant to Section 5(c)(i), it shall again be available for grant under the Plan; provided, however, that any Second Tranche Units (defined below) which so become available again for grant under the Plan shall automatically convert into the same number of First Tranche Units (defined below) upon so becoming again available for grant under the Plan.

(b)     5,434,652 Units shall be designated as First Tranche Units (the "*First Tranche Units*") and 3,261,000 Units shall be designated as Second Tranche Units (the "*Second Tranche Units*"), subject in each case to adjustment in accordance with Section 4(c) and conversion of Second Tranche Units into First Tranche Units as described in Section 4(a) above.  4,174,080 of the First Tranche Units shall initially be allocated at Closing among the individuals set forth on *Exhibit A* to the Plan.  The remaining 1,260,572 First Tranche Units, any awarded but forfeited First Tranche Units and any First Tranche Units converted from Second Tranche Units as described in Section 4(a) above may be granted by the Administrator from time to time under the Plan.  The Second Tranche Units shall be allocated at Closing among the individuals set forth on *Exhibit B* to the Plan.

(c)     In the event of any change in corporate capitalization (including, but not limited to, a change in the number of shares outstanding), such as a stock split or a corporate transaction, such as any merger, consolidation, separation, including a spin-off, or other distribution of shares or property of the Company (including cash), any reorganization (whether or not such reorganization comes within the definition of such term in Section 368 of the Code) or any partial or complete liquidation of the Company, the Administrator shall make such substitution or adjustments in the aggregate number and kind of Units reserved for issuance under the Plan, the numbers and kind of Units designated as First Tranche Units and Second Tranche Units and the number of Units subject to outstanding Awards, and/or such other equitable substitutions or adjustments as it may determine to be appropriate in its sole discretion.

## SECTION 5.        Units

Each Award shall be confirmed by, and be subject to, the terms of a written Unit agreement (the "*Unit Agreement*") duly executed by the Company and the Participant.  The terms and provisions of Unit Agreements need not be the same for each Participant, but, subject to Section 3(b), shall be consistent with the terms of the Plan.  The grant of a Unit shall occur on the date (the "*Grant Date*") the Administrator selects an Eligible Individual to receive a grant of Units.  Unless otherwise determined by the Administrator in accordance with Section 3(b) and as

5

Source: TRIBUNE CO, 10-K, March 20, 2008

provided in the applicable Unit Agreement, Units granted under the Plan shall be subject to the following terms and conditions:

(a)    *Vesting/Forfeiture of First Tranche Unit Awards.*

(i)    Subject to Section 5(a)(ii) and subject to Participant's continuous employment with the Company or any of its Subsidiaries through the applicable vesting date, each First Tranche Unit Award shall become vested as follows:

| Number of Units Vesting | Vesting Date |
| --- | --- |
| 1/3 (rounded to the nearest whole number) | First Anniversary of Grant Date |
| 1/3 (rounded to the nearest whole number) | Second Anniversary of Grant Date |
| Remainder | Third Anniversary of Grant Date |

(ii)    All unvested First Tranche Units will immediately vest upon a Change of Control or a Termination of Service due to a Participant's death or Disability.

(iii)    Upon a Termination of Service for any reason other than death or Disability, any then unvested First Tranche Units shall be forfeited.

(b)    *Vesting/Forfeiture of Second Tranche Unit Awards.*

(i)    Each Second Tranche Unit Award shall be vested with respect to 1/2 of the Units covered thereby (rounded to the nearest whole number) on the Grant Date and, subject to a Participant's continuous employment with the Company or any of its Subsidiaries through the vesting date, the remainder of such Units shall become vested on the first anniversary of the Grant Date.

(ii)    All unvested Second Tranche Units will immediately vest upon a Change of Control or a Termination of Service due to a Participant's death, Disability or Involuntary Termination.

(iii)    Upon a Termination of Service for any reason, other than death, Disability or an Involuntary Termination, any then unvested Second Tranche Units shall be forfeited.

(c)    *Settlement of Unit Awards.*

(i)    With respect to vested Second Tranche Units (including those Second Tranche Units that vest as a result of a Termination of Service) held by any Participant who experiences a Termination of Service prior to the one-year anniversary of the Closing (such Units, "*Early Termination Second Tranche Units*"), subject to Section 5(e), the Company shall pay to such Participant in respect of such Participant's Early Termination Second Tranche Units an amount

6

Source: TRIBUNE CO, 10-K, March 20, 2008

in U.S. dollars equal to the product of (A) $25,000,000 and (B) the Applicable Participant Ratio, such amount to be paid to the Participant or Participant's estate within ten business days following the Participant's Termination of Service for any reason, whether voluntary or involuntary, with our without Cause or Good Reason, including without limitation by reason of Death or Disability; provided that such Termination of Service must constitute a "separation from service" (as defined in Section 409A) or must involve a Subsidiary Change of Control. Any amounts payable pursuant to this Section 5(c)(i) shall bear interest, from and including the eleventh business day following the Participant's Termination of Service through and including the date of payment at the prime rate in effect on such sixth business day following the Participant's Termination of Service (as reported in the Wall Street Journal, national edition).

(ii)    Subject to Section 5(e), except as otherwise provided in any Unit Agreement, and other than with respect to the Early Termination Second Tranche Units, which shall be settled in accordance with the immediately preceding clause (i) above, each vested First Tranche Unit and each vested Second Tranche Unit will be settled and paid in U.S. dollars as follows: (A) (1) 1/3 of the vested First Tranche Units and vested Second Tranche Units (rounded to the nearest whole number) will be settled and paid in U.S. dollars as soon as practicable (but in no event later than March 31) in the first calendar year that begins after the fourth anniversary of the Grant Date (or such later anniversary of the Grant Date designated pursuant to a valid subsequent deferral election as contemplated by Section 5(d)) based on the Fair Market Value of a share of Common Stock on December 31 of the year in which the fourth anniversary of the Grant Date occurs (or such later anniversary of the Grant Date designated pursuant to a valid subsequent deferral election as contemplated by Section 5(d) occurs), (2) 1/3 of the vested First Tranche Units and vested Second Tranche Units (rounded to the nearest whole number) will be settled and paid in U.S. dollars as soon as practicable (but in no event later than March 31) in the first calendar year that begins after the sixth anniversary of the Grant Date (or such later anniversary of the Grant Date designated pursuant to a valid subsequent deferral election as contemplated by Section 5(d)) based on the Fair Market Value of a share of Common Stock on December 31 of the year in which the sixth anniversary of the Grant Date occurs (or such later anniversary of the Grant Date designated pursuant to a valid subsequent deferral election as contemplated by Section 5(d) occurs), and (3) the remainder of the vested First Tranche Units and vested Second Tranche Units will be settled and paid in U.S. dollars as soon as practicable (but in no event later than March 31) in the first calendar year that begins after the eighth anniversary of the Grant Date (or such later anniversary of the Grant Date designated pursuant to a valid subsequent deferral election as contemplated by Section 5(d)) based on the Fair Market Value of a share of Common Stock on December 31 of the year in which the eighth anniversary of the Grant Date occurs (or such later anniversary of the Grant Date designated pursuant to a valid subsequent deferral election as contemplated by Section 5(d) occurs) or (B) if earlier, as soon as practicable (but in no event later than March 31) and without giving effect to any subsequent deferral election pursuant to Section 5(d) below, in the first calendar year that begins after a Section 409A Change of Control or a Participant's Termination of Service for any reason, whether voluntary or involuntary, with or without Cause or Good Reason, including without limitation by reason of Death or Disability (provided that such Termination of Service must constitute a "separation from service" (as defined in Section

7

Source: TRIBUNE CO, 10-K, March 20, 2008

409A) or must involve a Subsidiary Change of Control based on the Fair Market Value of a share of Common Stock on December 31 of the year in which the Section 409A Change of Control or a Participant's Termination of Service, as applicable, occurs; provided, however, that if the Section 409A Change of Control involves the acquisition of Common Stock solely for U.S. dollars, any vested portion of the First Tranche Units Award or Second Tranche Units Award will be settled and paid as soon as practicable after the Section 409A Change of Control, but in no event later than thirty (30) days after such Section 409A Change of Control. Any amounts payable pursuant to this Section 5(c)(ii) shall bear interest, from and including April 1 of the year in which such Units are designated to be settled (taking into account any subsequent deferral election) through and including the date of payment at the prime rate in effect on such April 1 (as reported in the Wall Street Journal, national edition); provided, however, that if the settlement is triggered by virtue of a Section 409A Change of Control, amounts payable pursuant to this Section 5(c)(ii) shall bear interest, from and including the thirty-first day following the occurrence of the Section 409A Change of Control through and including the date of payment at the prime rate in effect on such thirty-first day following the occurrence of the Section 409A Change of Control.

(d)      *Subsequent Deferral Election.*  A Participant who is an employee of the Company may elect, by providing written notice to the Company, to defer payment of some or all of such Participant's First Tranche Unit Award or Second Tranche Unit Award in accordance with the following requirements; provided, however, that any such deferral shall be expressed in whole Units:

(i)      Any such election shall not take effect until at least twelve months after the date on which the election is made.

(ii)      Any such election must be made at least twelve months prior to the first day of the calendar year in which settlement was scheduled to occur, absent the election.

(iii)      Any such election must defer payment of the First Tranche Unit Award or Second Tranche Unit Award until at least five years beyond the first day of the calendar year in which settlement was scheduled to occur, absent the election.

(e)      *Limitations on Payment.*

(i)      Any settlement payment in respect of any Units may be delayed where the Company reasonably anticipates that the making of the payment will violate federal securities laws or other applicable law; provided that the payment is made at the earliest date at which the Company reasonably anticipates that the making of the payment will not cause such violation.

(ii)      Any settlement payment in respect of any Units shall be delayed to the extent such payment would have, or on a Pro Forma Basis (as defined in the Credit Agreement) taking into account the payment would have, caused the Company to exceed the objective and nondiscretionary limitations set forth in Section 5.02(i)(A) and (B) of the Credit Agreement, such that the Company would have been in breach, or in breach on a Pro Forma Basis, of the

8

terms thereof (the "*Limitations*"); provided, however, that any such payment shall be made during the first taxable year of the Participant in which the making of such payment would not cause the Company to exceed the foregoing objective and nondiscretionary limitations. In any given year, the maximum aggregate amount payable in respect of the settlement of Units without running afoul of the Limitations shall be referred to as the "*Annual Limit.*" In the event the Company's obligations pursuant to Section 5(c) exceed the Annual Limit in any given year, the Company will settle Units of each Participant entitled to a cash payment during such year (any such amount, the "*Settlement Amount*") based on the proportion that each Participant's Settlement Amount bears to the aggregate Settlement Amount for such year for all Participants and any unsettled obligation during such year shall be settled during the following year, subject to the Annual Limit applicable to such following year; provided, however, that this Section 5(e)(ii) shall not apply following a Section 409A Change of Control.

(iii)    The Company may delay any payment the making of which would jeopardize the ability of the Company to continue as a going concern; provided that any such payment is made during the first taxable year of the Participant in which the making of the payment would not have such effect.

(iv)    In order to comply with Section 409(p) of the Code and the final regulations promulgated thereunder, the Administrator may at any time permit the Plan to provide one or more distribution(s) to any Participants in an amount sufficient to avoid a "nonallocation year" as defined in Section 409(p) of the Code.

(v)    Any amounts payable pursuant to Section 5(c) or Section 5(d)(ii) shall bear interest from and including the February 1 immediately following the Fair Market Value Reference Date through and including the date of payment at the prime rate in effect on such February 1 (as reported in the Wall Street Journal, national edition); provided, however, that amounts payable due to the occurrence of a Section 409A Change of Control shall bear interest from and including the thirty-first day after the Section 409 Change of Control through and including the date of payment at the prime rate in effect on such thirty-first day after the Change of Control.

(f)    *Nontransferability of Units.*  No Unit shall be transferable (by means of sale, assignment, exchange, encumbrance, hypothecation, pledge or otherwise) by a Participant other than by will or by the laws of descent and distribution or as otherwise expressly permitted by the Administrator, nor may a Participant sell, assign, transfer, pledge, or encumber such Participant's interest in a Unit. In the event a Participant transfers a Unit in violation of this Section 5(h), the Administrator may, in its discretion, cause such Unit to be forfeited.

(g)    *Gross-Up Payments.*  Unit Agreements with respect to Second Tranche Unit Awards shall provide that if any amounts payable to a Participant in respect of the Second Tranche Unit Awards together with any other payment or distribution in the nature of compensation (within the meaning of Section 280G(b)(2) of the Code) to or for the benefit of the Participant, whether paid or payable in respect of the Second Tranche Unit Awards or otherwise

9

are deemed to be "excess parachute payments" within the meaning of Section 280G(b)(1) of the Code, the Company shall pay to such Participant in addition to any amounts payable in respect of the Second Tranche Unit Awards or otherwise an amount which, after all federal, state and local taxes imposed on the Participant with respect to such amount are subtracted therefrom, is equal to the excise taxes imposed on such excess parachute payment pursuant to Section 4999 of the Code. Any gross-up payment shall be paid no later than the end of the Participant's taxable year next following the Participant's taxable year in which the excise tax (and any income or other related taxes or interest or penalties thereon) on a payment are remitted to the Internal Revenue Service or any other applicable taxing authority.

(h)      *Dividends*. As of each date on which the Company pays a cash dividend to record owners of shares of Common Stock (a "*Dividend Date*") (excluding for this purpose any amounts distributed to the ESOP for purposes of repaying the ESOP Note, dated April 1, 2007, in principal amount of $250,000,000, as amended), an amount equal to the per share dividend amount shall be credited (each such amount, a "*Dividend Credit*") to an account on behalf of each Participant in respect of each Unit subject to an Award. Dividend Credits shall bear interest at the prime rate in effect on the first business day following the applicable Dividend Date (as reported in the Wall Street Journal, national edition) from and including the Dividend Date through and including the date of payment. Dividend Credits and any related interest shall vest at such time as the Units to which the Dividend Credits pertain vest and Dividend Credits and any related interest shall be settled and paid in U.S. dollars at such time as the Units to which the Dividend Credits pertain are settled and paid.

## SECTION 6.    Amendment and Termination

(a)      The Plan will terminate on the tenth anniversary of the Effective Date, and no Units shall be granted after such date. Awards outstanding on the tenth anniversary of the Effective Date shall not be affected or impaired by the termination of the Plan.

(b)      The Administrator may amend or terminate the Plan, but no amendment or termination shall be made which would adversely impair the rights of a Participant under any Award theretofore granted without the Participant's consent, except such an amendment made to comply with applicable law, stock exchange rules or accounting rules. In addition, no amendment shall be made without the approval of the Company's shareholders to the extent such approval is required by applicable law or stock exchange rules. Subject to Section 3(b), the Administrator may amend the terms of any Award theretofore granted, but no amendment shall be made that would adversely impair the rights of any Participant without the Participant's consent except such an amendment made to cause the Plan or Award to comply with applicable law, stock exchange rules or accounting rules.

## SECTION 7.    General Provisions

(a)      This Plan is intended to constitute a Top Hat Plan and it shall at all times be interpreted and administered accordingly. Notwithstanding any other provision of this Plan,

10

subject to Section 3(b), the Administrator may make such amendments to this Plan, and to any procedures established under this Plan, as it may determine to be necessary to comply with any applicable law, regulation or requirement, including without limitation the rules governing Top Hat Plans, and such amendments need not apply uniformly to all Participants.

(b)      Nothing contained in the Plan shall prevent the Company or any Subsidiary from adopting other or additional compensation arrangements for its employees and consultants.

(c)      The Plan shall not constitute a contract for employment or services, and adoption of the Plan shall not confer upon any individual any right to continued employment, nor shall it interfere in any way with the right of the Company or any Subsidiary to terminate the employment or services of any individual at any time.

(d)      The Participant shall pay to the Company, or make arrangements satisfactory to the Company regarding the payment of, any U.S. (federal, state, or local) or non-U.S. taxes of any kind required by law to be withheld with respect to any payment hereunder. The obligations of the Company under the Plan shall be conditional on such payment or arrangements, and the Company and its Subsidiaries shall, to the extent permitted by law, have the right to deduct any such taxes from any payment otherwise due to the Participant.

(e)      The Administrator shall establish such procedures as it deems appropriate for a Participant to designate a beneficiary to whom any amounts payable in the event of the Participant's death are to be paid or by whom any rights of the Participant, after the Participant's death, may be exercised.

(f)      The Plan, Unit Agreements, and all actions taken thereunder shall be governed by and construed in accordance with the laws of the State of Delaware without reference to principles of conflict of laws.

(g)      Subject to Section 3(b), within the time period permitted by the applicable Treasury Regulations, the Administrator may modify the Plan in the least restrictive manner necessary in order to cause the provisions of the Plan to comply with the requirements of Section 409A, so as to avoid the imposition of taxes and penalties pursuant to Section 409A.

(h)      Subject to Section 3(b), in the event an Award is granted to a Participant who is employed or providing services outside the United States and who is not compensated from a payroll maintained in the United States, the Administrator may, in its sole discretion, modify the provisions of the Plan as they pertain to such individual to comply with applicable non-U.S. law.

(i)      Each Unit Agreement shall provide that if a Participant engages in any act of fraud, insider trading or other securities law violation then: (i) Participant shall immediately forfeit, effective as of the date Participant engages in such conduct, all vested and unvested Units; and (ii) with respect to Units, if any, that were cash settled prior to the date Participant engaged in such conduct, Participant shall return to the Company the cash proceeds received with respect to such Units.

11

Source: TRIBUNE CO, 10-K, March 20, 2008

**SECTION 8.    Effective Date of Plan**

The Plan was adopted by the Board on December 20, 2007, to be effective December 20, 2007 (the "*Effective Date*"). Termination of this Plan shall not affect the terms or conditions of any Award granted on, or prior to, the termination date.

12

Source: TRIBUNE CO, 10-K, March 20, 2008

Exhibit 21

## TRIBUNE COMPANY—LIST OF SUBSIDIARIES

### PUBLISHING

| Subsidiary | Jurisdiction of Incorporation | Other names under which subsidiary does business |
|---|---|---|
| Tribune Finance, LLC | Delaware | |
| Tribune Publishing Company | Delaware | |
| The Baltimore Sun Company | Maryland | The Sun; baltimoresun.com |
| Homestead Publishing Company | Maryland | The Aegis; The Record; APG News; The Weekenders; Harford Magazine; Harford Business Ledger; TheAegis.com; harfordledger.com |
| Patuxent Publishing Company | Maryland | Eldersburg Eagle; Westminster Eagle; Howard County Times; Columbia Flier; Laurel Leader; SoundOff; Catonsville Times; Arbutus Times; Owings Mills Times; Baltimore Messenger; Towson Times; Northeast Booster; Northwest Reporter; North County News; Jeffersonian; The View — Ellicott City; The View — West Howard County; The View — Catonsville; The View — Elkridge; Maryland Family; ChesapeakeHome Magazine; Howard/Columbia Magazine; Baby Steps Magazine; Pet Tracks (copyright application pending). Patuxent Directories — 8 community directories: Howard County, Olney, Bowie, Crofton, Carroll County, Harford County, Catonsville, and Laurel. The Weekenders; arbutustimes.com; baltimoremessenger.com; catonsvilletimes.com; columbiaflier.com; ftmeadesoundoff.com; howardcountytimes.com; laurelleader.com; lifetimesmd.com; northconews.com; northeastbooster.com; northeastreporter.com; owingsmillstimes.com; theeldersburgeagle.com; thejeffersonian.com; theviewnewspapers.com; thewestminstereagle.com; towsontimes.com; classifido.net; patuxentpublicnotices.com; connect2mdhomes.com |
| Baltimore Newspaper Network, Inc. | Maryland | |
| Chicago Tribune Company | Illinois | Chicago Tribune; chicagotribune.com; RedEye chicagosports.com |
| Chicagoland Publishing Company | Delaware | Apartments.com Magazine; Cars Magazine; Chicago Fashion Magazine; Chicago Home and Garden Magazine; Chicago Magazine; JobFinder; New Homes Guide; TribLocal; |

Source: TRIBUNE CO, 10-K, March 20, 2008

| | | |
|---|---|---|
| Chicago Tribune Newspapers, Inc. | Illinois | Chicago Tribune |
| Chicago Tribune Press Service, Inc. | Illinois | Tribune Newspaper Network |
| Newspaper Readers Agency, Inc. | Illinois | |
| Tribune Direct Marketing, Inc. | Delaware | Tribune Direct Marketing |
| | | |
| The Daily Press, Inc. | Delaware | Daily Press; dailypress.com |
| Virginia Gazette Companies, LLC | Delaware | Virginia Gazette; vagazette.com |
| Virginia Community Shoppers, LLC | Delaware | |
| Forum Publishing Group, Inc. | Delaware | Jewish Journal, Shalom, The Coupon Book, EastSider, Hi-Riser, Deerfield Beach Forum, Delray Beach Forum, Pompano Beach Forum, West Boca Forum, Boca Forum, Davie and Cooper City Gazette, Plantation Forum, Sunrise Forum, Weston Gazette, Margate/Coconut Creek Forum, Coral Springs Forum, Parkland Gazette, Tamarac Forum, Boynton Beach Forum, Lake Worth Forum, Wellington Forum, Oakland Park Gazette |
| | | |
| The Hartford Courant Company | Connecticut | Hartford Courant; courant.com; |
| Courant Specialty Products, Inc. | Connecticut | |
| New Mass Media, Inc. | Massachusetts | Fairfield Weekly; Hartford Advocate; New Haven Advocate; |
| Heart & Crown Advertising, Inc. | Connecticut | |
| TMLH 2, Inc. | California | |
| Hoy Publications, LLC | Delaware | Hoy; Hola Hoy; hoyinternet.com |
| Orlando Sentinel Communications Company | Delaware | Orlando Sentinel; orlandosentinel.com; Orlando City Book; El Sentinel; Sentinel Express; elsentinel.com |
| Neocomm, Inc. | Delaware | Neocomm of Delaware, Inc. |
| Sentinel Communications News Ventures, Inc. | Delaware | |
| The Morning Call, Inc. | Pennsylvania | Morning Call; mcall.com |
| Direct Mail Associates, Inc. | Pennsylvania | |
| Southern Connecticut Newspapers, Inc. | Connecticut | |
| TMLS I, Inc. | California | |
| Sun-Sentinel Company | Delaware | Sun-Sentinel; sun-sentinel.com |
| Gold Coast Publications, Inc. | Delaware | City Link; City & Shore; Teen Link; Sun-Sentinel Direct; El Sentinel; South Florida Parenting; Florida New Homes Guide |
| Newsday, Inc. | New York | Newsday; newsday.com; amny; amny.com; |
| Distribution Systems of America, Inc. | New York | Island Publications. Newsday Media Group |
| Star Community Publishing Group, LLC | Delaware | Huntington Pennysaver; Results Media; Shopper's Guide; This Week; Yankee Trader |

| | | |
|---|---|---|
| Hoy, LLC | New York | |
| Tribune Interactive, Inc. | Delaware | metromix.com; FSBO.com |
| Tribune Los Angeles, Inc. | Delaware | |
| Los Angeles Times Communications LLC | Delaware | The Burbank Leader; latimes.com; Glendale-News Press; La Canada Valley Sun; La Crescenta Valley Sun; Laguna Beach Coastline; Newport Beach/ Costa Mesa Daily Pilot; Times Community News |
| Los Angeles Times Newspapers, Inc. | Delaware | |
| Tribune Manhattan Newspaper Holdings, Inc. | Delaware | |
| Tribune New York Newspaper Holdings, LLC | Delaware | amNewYork |
| Tribune Media Services, Inc. | Delaware | Tribune Media Services International; tms.tribune.com; Zap2It; Zap2it.com; Tribune Media Services Entertainment Products; Tribune Media Services Publishing; Tribune Media Services Specialty Products, Tribune Media Services International-Hong Kong |
| TMS Entertainment Guides, Inc. | Delaware | |
| TMS Entertainment Guides Canada Corp. | Canada | |
| Tribune Media Services, BV | Netherlands | |
| Tribune Media Net, Inc. | Delaware | |
| Tribune National Marketing Company | Delaware | |

Source: TRIBUNE CO, 10-K, March 20, 2008

**BROADCASTING AND ENTERTAINMENT**

| | | |
|---|---|---|
| Tribune Broadcasting Holdco, LLC | Delaware | |
| Tribune Broadcasting Company | Delaware | Tribune Cable; Tribune Creative Services Group; Tribune Plus; Tribune Plus Corporate Sales; Tribune Television |
| ChicagoLand Microwave Licensee, Inc. | Delaware | |
| ChicagoLand Television News, Inc. | Delaware | ChicagoLand Television/CLTV News; cltv.com |
| KHCW Inc. | Delaware | KHCW-TV; khcw.com HOUSTONCW.COM THECWHOUSTON.COM |
| KSWB Inc. | Delaware | KSWB-TV; sandiegocw.com SANDIAGOSCW.COM SANDIEGOSCW.COM YOVIO.COM SANDIEGOCW.COM |
| KPLR, Inc. | Missouri | KPLR-TV; cw11tv.com CW11STLOUIS.COM CWSTLOUIS.COM KPLR11CW.COM KPLRCW.COM STLOUISCW.COM |
| KTLA Inc. | California | KTLA-TV; ktla.com CWLOSANGELES.COM LOSANGELESCW.COM |
| KWGN Inc. | Delaware | KWGN-TV; cw2.com COLORADOSCW.COM COLORADOSCW2.COM DENVERSCW.COM DENVERSCW2.COM KWGNCW.COM 2NEWSCOLORADO.COM CW2COLORADO.COM DENVERS2NEWS.COM |
| Oak Brook Productions, Inc. | Delaware | |
| Tower Distribution Company | Delaware | WGN Cable; Superstation WGN; wgncable.com |
| Tribune Broadcasting News Network, Inc. | Delaware | TribNet |
| Tribune Broadcast Holdings, Inc. | Delaware | KRCW-TV; WTTV-TV; thecw4.com; WTTK-TV CWPORTLAND.COM PORTLANDSCW.COM CWINDIANA.COM CWINDIANAPOLIS.COM INDIANAPOLISCW.COM INDIANASCW.COM WTTVCW.COM WB4.COM |
| Tribune Entertainment Company | Delaware | |
| Magic T Music Publishing Company | Delaware | |
| Tribune Entertainment Production Company | Delaware | |
| 435 Production Company | Delaware | |
| 5800 Sunset Productions Inc. | Delaware | |
| Chicago River Production Company | Delaware | |
| North Michigan Production Company | Delaware | |
| The Other Company, LLC | Delaware | |
| Towering T Music Publishing Company | Delaware | |
| Tribune (FN) Cable Ventures, Inc. | Delaware | |
| Tribune Network Holdings Company | Delaware | |

| | | |
|---|---|---|
| Tribune Television Company | Delaware | WPMT-TV; wpmt.com; WXIN-TV; fox59.com; WTIC-TV; fox61.com; KDAF-TV; cw33.com WPHL-TV; myphl17.com; KDAFCW.COM TEXASCW.COM WB33.COM CW33TV.COM KDAFTV.COM TEXASWB.COM WB17.COM CW4TV.COM THECW4.COM MYPHL17.COM MYPHL17.NET MYPHL17.TV MYPHLTV.COM MYPHLTV.NET MYPHLTV.TV MYWPHL17.COM MYWPHL17.NET MYWPHL17.TV MYWPHLTV.COM MYWPHLTV.NET MYWPHLTV.TV WXIN.COM |
| Channel 20, Inc. | Delaware | |
| Channel 40, Inc. | Delaware | KTXL-TV; fox40.com KTXL.COM |
| Channel 39, Inc. | Delaware | WSFL-TV; cwsfl.com MIAMICW.COM SOUTHFLORIDASCW.COM WB39.COM |
| WDCW Broadcasting, Inc. | Delaware | WDCW-TV; thecwdc.com CW50.COM WASHINGTONSCW.COM WBDCCW.COM WBDC.COM |
| WTXX Inc. | Delaware | WTXX-TV; wtxx.com CONNECTICUTSCW.COM CW20.COM CWCONNECTICUT.COM CWHARTFORD.COM HARTFORDSCW.COM WTXXWB.COM CONNECTICUTSCW20.COM CTCW20.COM CW20WTXX.COM WTXXCW.COM |
| Tribune Television Holdings, Inc. | Delaware | WXMI-TV; wxmi.com; KMYQ-TV; myq2.com MYQ2.TV MYQ2TV.COM |
| Tribune Television New Orleans, Inc. | Delaware | WGNO-TV; wgno.com; WNOL-TV; wnol.com WB38.COM CWNEWORLEANS.COM NEWORLEANSCW.COM WNOLCW.COM |

| | | |
|---|---|---|
| Tribune Television Northwest, Inc. | Delaware | KCPQ-TV; q13.com Q13FOX.COM<br>KCPQ.COM<br>KCPQ13.COM<br>Q13REPORTS.COM |
| WGN Continental Broadcasting Company | Delaware | WGN-TV; wgntv.com; WGN Radio; wgnradio.com;<br>Tribune Radio Network CHICAGOSCW.COM<br>WGNCW.COM<br>WGNTVCW.COM<br>WGNCABLE.COM |
| Tribune Sports Network Holdings, LLC | Delaware | |
| WPIX, Inc. | Delaware | WPIX-TV; cw11.com THEWB11.COM<br>NEWYORKSCW.COM<br>WPIXCW.COM |
| Chicago National League Ball Club, LLC | Delaware | Chicago Cubs; cubs.com |
| Chicago Cubs Dominican Baseball Operations, LLC | Delaware | |
| Diana-Quentin, LLC | Delaware | |
| Tribune California Properties, Inc. | Delaware | |

## MISCELLANEOUS

| | |
|---|---|
| California Community News Corporation | Delaware |
| Chicago Avenue Construction Company | Illinois |
| Eagle New Media Investments, LLC | Delaware |
| Stemweb, Inc. | New York |
| ForSaleByOwner.com | New York |
| Homeowners Realty, Inc. | Utah |
| Internet Foreclosure Service, Inc. | New York |
| Newport Media, Inc. | Delaware |
| ValuMail, Inc. | Connecticut |
| Eagle Publishing Investments, LLC | Delaware |
| GreenCo, Inc. | Delaware |
| Los Angeles Times International, Ltd. | California |
| JuliusAir Company LLC | Delaware |
| JuliusAir Company II, LLC | Delaware |
| Multimedia Insurance Company | Vermont |
| Riverwalk Center I Joint Venture | Florida (Partnership) |
| Tribune License, Inc. | Delaware |
| Tribune Finance Service Center, Inc. | Delaware |
| Wrigley Field Premium Ticket Services, LLC | Delaware |

Source: TRIBUNE CO, 10-K, March 20, 2008

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statement on Form S-3 (File No. 333-135905) of Tribune Company of our report dated March 14, 2008, relating to the consolidated financial statements, financial statement schedule, and the effectiveness of internal control over financial reporting, which appears in this Form 10-K. We also consent to the reference to us under the heading "Selected Financial Data" in this Form 10-K.

We also hereby consent to the incorporation by reference in the above registration statement of our reports dated March 14, 2008 relating to the financial statements of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC which also appear in this Form 10-K.

/s/ PRICEWATERHOUSECOOPERS LLP
PricewaterhouseCoopers LLP

Chicago, Illinois
March 14, 2008

1

EXHIBIT 31.1

**Form 10-K Certification**

I, Samuel Zell, certify that:

1.  I have reviewed this annual report on Form 10-K of Tribune Company;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this annual report;

4.  Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

    d)  Disclosed in this annual report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.  Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

/s/ SAMUEL ZELL

Samuel Zell
Chairman and
Date: March 20, 2008                          Chief Executive Officer

1

Source: TRIBUNE CO, 10-K, March 20, 2008

EXHIBIT 31.2

**Form 10-K Certification**

I, Donald C. Grenesko, certify that:

1.  I have reviewed this annual report on Form 10-K of Tribune Company;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this annual report;

4.  Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

    d)  Disclosed in this annual report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.  Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

/s/ DONALD C. GRENESKO
_____
Donald C. Grenesko
Senior Vice President/
Date: March 20, 2008                    Finance and Administration

1

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO**
**18 UNITED STATES CODE SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Samuel Zell, the Chairman and Chief Executive Officer of Tribune Company, certify that (i) Tribune Company's Form 10-K for the year ended Dec. 30, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-K for the year ended Dec. 30, 2007 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

/s/ SAMUEL ZELL
Samuel Zell
Chairman and Chief Executive Officer

March 20, 2008

1

Source: TRIBUNE CO, 10-K, March 20, 2008

EXHIBIT 32.2    Case 08-13141-BLS    Doc 3065-16    Filed 01/13/10    Page 27 of 28

**CERTIFICATION PURSUANT TO
18 UNITED STATES CODE SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Donald C. Grenesko, the Senior Vice President/Finance and Administration of Tribune Company, certify that (i) Tribune Company's Form 10-K for the year ended Dec. 30, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-K for the year ended Dec. 30, 2007 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

/s/ DONALD C. GRENESKO

Donald C. Grenesko
Senior Vice President/
Finance and Administration

March 20, 2008

1

Exhibit 99.1

# Deloitte.

**Deloitte & Touche LLP**
250 East 5th Street
Suite 1900
Cincinnati, OH 45202-5109
USA

Tel: +1 513 784 7100
Fax: +1 513 784 7204
www.deloitte.com

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Partners of Television Food Network, G.P.:

We have audited the accompanying balance sheet of Television Food Network, G.P. ("Food Network" – a subsidiary of The E.W. Scripps Company) as of December 31, 2007, and the related statements of income and comprehensive income, cash flows, and partners' equity for the year then ended. These financial statements are the responsibility of the Food Network's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Food Network is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Food Network's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, such financial statements present fairly, in all material respects, the financial position of the Food Network at December 31, 2007, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

*Deloitte & Touche LLP*

March 11, 2008

Member of
**Deloitte Touche Tohmatsu**

---

Created by 10KWizard    www.10KWizard.com