with copies to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attn: Steven A. Rosenblum and Peter E. Devine
Tel: (212) 403-1000
Fax: (212) 403-2000

and

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Attention: Thomas A. Cole and Larry A. Barden
Tel: (312) 853-7473 and (312) 853-7785
Fax: (312) 853-7036

and

Skadden, Arps, Slate, Meagher & Flom LLP
Suite 2100
333 West Wacker Drive
Chicago, Illinois 60606
Attn: Charles W. Mulaney, Jr.
Tel: (312) 407-0700
Fax: (312) 407-0411

or to such other address as any party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated, personally delivered or mailed. Any party to this Agreement may notify any other party of any changes to the address or any of the other details specified in this paragraph; provided, however, that such notification shall only be effective on the date specified in such notice or five (5) business days after the notice is given, whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

Section 8.11    Assignment; Binding Effect. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other party. Subject to the preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, beneficiaries, executors, successors and assigns.

Section 8.12    Severability. Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the

22

Source: TRIBUNE CO, 8-K, April 05, 2007

extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

Section 8.13    Entire Agreement; No Third-Party Beneficiaries. This Agreement (including the exhibits and schedules hereto), the Merger Agreement, the Investor Rights Agreement, the Registration Rights Agreement and the Confidentiality Agreement, dated as of November 8, 2006, between the Company and Equity Group Investments, L.L.C., constitute the entire agreement, and supersede all other prior agreements and understandings, both written and oral, between the parties, or any of them, with respect to the subject matter hereof and thereof and is not intended to and shall not confer upon any person other than the parties hereto any rights or remedies hereunder.

Section 8.14    Amendments; Waivers. Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by the Company and EGI-TRB, or in the case of a waiver, by the party against whom the waiver is to be effective. Notwithstanding the foregoing, no failure or delay by the Company or EGI-TRB in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

Section 8.15    Headings. Headings of the Articles and Sections of this Agreement are for convenience of the parties only and shall be given no substantive or interpretive effect whatsoever.

Section 8.16    Interpretation. When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Each of the parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

23

Source: TRIBUNE CO, 8-K, April 05, 2007

Section 8.17    <u>No Recourse</u>.  This Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against, the entities that are expressly identified as parties hereto and no past, present or future affiliate, director, officer, employee, incorporator, member, manager, partner, stockholder, agent, attorney or Representative of any party hereto shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

Section 8.18    <u>Guarantee</u>.

(a)    Guarantor absolutely, unconditionally and irrevocably guarantees (the "<u>Guarantee</u>") to the Company each and every representation, warranty, covenant and agreement of EGI-TRB and the full and timely observance, payment, performance and discharge of its obligations under the provisions of the EGI-TRB Transaction Documents (the "<u>Obligations</u>") and not of their collectibility only.  This Guarantee shall remain in force and effect until performance in full of all the Obligations, and is in no way conditioned upon any requirement that the Company first attempt to collect any of the Obligations from EGI-TRB or resort to any collateral security or other means of obtaining payment.

(b)    If any of the Obligations have become irrecoverable from or unenforceable against EGI-TRB in whole or in part by reason of EGI-TRB's insolvency, bankruptcy or reorganization, or if the collection or enforcement of any of the Obligations shall be stayed, or the Obligations shall be discharged, in each case in any insolvency, bankruptcy or reorganization of EGI-TRB, this Guarantee shall notwithstanding any of the preceding nevertheless be binding on Guarantor and the enforceability of this Guarantee in accordance with its terms shall not be affected thereby.

(c)    Guarantor waives promptness, diligence, presentment, demand, protest, notice of acceptance, any right to require the marshalling of assets of EGI-TRB, and all suretyship defenses generally. Without limiting the generality of the foregoing, Guarantor agrees that its obligations hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure of the Company to assert any claim or demand or to enforce any right or remedy against EGI-TRB; (ii) the addition, substitution or release of any entity or other person primarily or secondarily liable for any Obligation; (iii) the adequacy of any other means the Company may have of obtaining repayment of any of the Obligations; or (iv) other acts or omissions which might in any manner or to any extent vary the risk of Guarantor or otherwise operate as a release or discharge of Guarantor.  The agreements and waivers of Guarantor set forth above in this Section 8.18(c) shall not operate to waive, affect or impair (x) any of the rights of EGI-TRB under the Merger Agreement, this Agreement or any of the other EGI-TRB Transaction Documents, including but not limited to any right to receive notice, or prejudice any right of the Obligor to assert any defense, counterclaim or setoff otherwise applicable to any of the Obligations, or (y) any right of Guarantor to receive notice under the Merger Agreement, this Agreement or any of the other Transaction Documents.  The Obligations shall be determined in accordance with the provisions of the Merger Agreement, this Agreement or any of the other EGI-TRB Transaction Documents.  Without limiting the generality of the foregoing, (A) if an Obligation is compromised in accordance with the provisions of the Merger

24

Source: TRIBUNE CO, 8-K, April 05, 2007

Agreement, this Agreement or any of the other EGI-TRB Transaction Documents, such Obligation shall be compromised for purposes of this Guarantee, and (B) if EGI-TRB is entitled to assert a defense, counterclaim or right of setoff to an Obligation in accordance with the provisions of the Merger Agreement, this Agreement or any of the other EGI-TRB Transaction Documents, Guarantor shall be entitled to assert the same defense, counterclaim or right of offset under this Guarantee.

(d)      Until the final payment and performance in full of all of the Obligations, Guarantor shall not exercise and hereby waives any rights against EGI-TRB arising as a result of payment by Guarantor hereunder, by way of subrogation, reimbursement, restitution, contribution or otherwise, and will not file or assert any claim in competition with the Company in respect of any payment hereunder in any bankruptcy, insolvency or reorganization case or proceedings of any nature involving EGI-TRB, nor will Guarantor assert any setoff, recoupment or counterclaim to any of its obligations hereunder in respect of any liability of EGI-TRB to Guarantor.

Section 8.19      Termination.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated and abandoned at any time prior to the First Closing or the Second Closing as follows:

(a)      by the mutual written consent of the Company and EGI-TRB;

(b)      by either the Company or EGI-TRB if an injunction, order, decree or ruling shall have been entered permanently restraining, enjoining or otherwise prohibiting the consummation of the Merger or the transactions contemplated hereby and such injunction, order, decree or ruling shall have become final and non-appealable;

(c)      by either the Company or EGI-TRB upon termination of the Merger Agreement in accordance with its terms;

(d)      by the Company, if EGI-TRB or Guarantor shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i)(A) would result in a failure of a condition set forth in Section 6.1 or 6.2 and (B) cannot be cured by the First Closing End Date (as hereinafter defined), or (ii)(A) would result in a failure of a condition set forth in Section 7.1 and (B) cannot be cured by the End Date, provided that the Company shall have given EGI-TRB written notice, delivered at least thirty (30) days prior to such termination, stating the Company's intention to terminate this Agreement pursuant to this Section 8.19(d) and the basis for such termination;

(e)      by the EGI-TRB, if the Company shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i)(A) would result in a failure of a condition set forth in Section 6.1 or 6.3 and (B) cannot be cured by the First Closing End Date, or (ii)(A) would result in a failure of a condition set forth in Section 7.1 and (B) cannot be cured by the End Date, provided that EGI-TRB shall have given the Company written notice,

25

delivered at least thirty (30) days prior to such termination, stating EGI-TRB's intention to terminate this Agreement pursuant to this Section 8.19(e) and the basis for such termination;

(f)       by either the Company or EGI-TRB if (i) the First Closing shall not have occurred on or before August 17, 2007 (the "First Closing End Date") and (ii) the party seeking to terminate this Agreement pursuant to this Section 8.19(f) shall not have breached in any material respect its obligations under this Agreement in any manner that shall have proximately caused the failure to consummate the purchase and sale of the Purchased Shares and the Exchangeable Note on or before such date;

(g)       by EGI-TRB if (i) the Merger shall not have occurred by the End Date and (ii) EGI-TRB shall not have breached in any material respect its obligations under this Agreement in any manner that shall have proximately caused the failure to consummate the Merger on or before such date;

(h)       by EGI-TRB, prior to the Company Shareholder Approval, if the Board of Directors of the Company has failed to make the Recommendation in the Proxy Statement or has effected a Change of Recommendation in a manner adverse to EGI-TRB;

(i)       by EGI-TRB if the Company Meeting (including any adjournments or postponements thereof) shall have concluded and the Company Shareholder Approval shall not have been obtained; and

(j)       by EGI-TRB if the Board of Directors of the Company or the Special Committee determines to accept a Superior Proposal.

        In the event of termination of this Agreement pursuant to this Section 8.19, this Agreement shall terminate (except for the provisions of Section 5.2 (excluding references to Section 5.12 contained therein) and this Article VIII, each of which shall survive such termination in accordance with its terms), and there shall be no other liability on the part of the Company, EGI-TRB or Guarantor.

Section 8.20       Termination Fees.

(a)       In the event that (i) any of the representations or warranties of the Company contained in this Agreement or the Merger Agreement, as applicable, was materially false when made or the Company shall have failed to perform in any material respect any of its covenants or other agreements contained in this Agreement or the Merger Agreement, as applicable, and, as a result thereof, (A) EGI-TRB terminates this Agreement pursuant to Section 8.19(e), (B) EGI-TRB terminates this Agreement pursuant to Section 8.19(c) where the Merger Agreement has been terminated pursuant to Section 7.1(f) thereof, or (C) EGI-TRB terminates this Agreement pursuant to Section 8.19(g) and such materially false representation or warranty of the Company or such failure by the Company to perform in any material respect any of such covenants was the proximate cause of the failure of the Merger to close by the End Date, (ii) the Company or EGI-TRB terminates this Agreement pursuant to Section 8.19(c) where the Merger Agreement has been terminated pursuant to Section 7.1(g) or Section 7.1(h) thereof or EGI-TRB terminates this Agreement pursuant to Section 8.19(h) or 8.19(j), or (iii) after the date of this

26

Source: TRIBUNE CO, 8-K, April 05, 2007

Agreement, any bona fide Alternative Proposal (substituting for purposes of this Section 8.20(a) 50% for the 20% thresholds set forth in the definition of "Alternative Proposal" in the Merger Agreement) (a "Qualifying Transaction") is publicly proposed or publicly disclosed prior to the time of the Company Meeting and not permanently abandoned prior to the time of the Company Meeting, and the Company or EGI-TRB terminates this Agreement pursuant to Section 8.19(c) where the Merger Agreement has been terminated pursuant to Section 7.1(d) thereof or EGI-TRB terminates this Agreement pursuant to Section 8.19(i), and, within twelve (12) months after any such termination, the Company enters into any Qualifying Transaction, then in any such event set forth in clauses (i), (ii) or (iii) above, the Company shall pay to EGI-TRB a fee of $25 million in cash (the "Company Termination Fee").  Payment of the Company Termination Fee shall be made five (5) business days after termination of this Agreement under the circumstances described in clauses (i) or (ii) of the preceding sentence or within five (5) business days after the entering into of the Qualifying Transaction under the circumstances described in clause (iii) of the preceding sentence.  In no event shall the Company be required to pay the Company Termination Fee on more than one occasion.

(b)        In the event that any of EGI-TRB's or Guarantor's representations or warranties contained in this Agreement was materially false when made or EGI-TRB or Guarantor shall have failed to perform in any material respect any of its covenants or other agreements contained in this Agreement and, as a result thereof, (A) the Company terminates this Agreement pursuant to Section 8.19(d), or (B) the Company terminates this Agreement pursuant to Section 8.19(c) where the Merger Agreement has been terminated pursuant to Section 7.1(b) thereof and such materially false representation or warranty of EGI-TRB or Guarantor or such failure by EGI-TRB or Guarantor to perform in any material respect any of such covenants was the proximate cause of the failure of the Merger to close by the End Date, then in any such event EGI-TRB shall pay to the Company a fee of $25 million in cash (the "EGI-TRB Termination Fee").  EGI-TRB shall also pay to the Company the EGI-TRB Termination Fee if (i) this Agreement is terminated by the Company or EGI-TRB pursuant to Section 8.19(c), (ii) the primary factor leading to the underlying termination of the Merger Agreement was the failure to satisfy the financing condition set forth in Section 6.1(g) of Merger Agreement and (iii) the failure to satisfy the financing condition set forth in Section 6.1(g) of the Merger Agreement was not the result of the breach or failure by the Company or the ESOP to perform in any material respect any of their respective covenants or other agreements contained in this Agreement, the Merger Agreement or the Debt Commitment Letters, as applicable, or any of the other documents delivered by either the Company or the ESOP in connection therewith, or the result of the Company's or the ESOP's representations or warranties contained in any such agreements or documents having been materially false when made.  Payment of the EGI-TRB Termination Fee shall be made five (5) business days after termination of this Agreement under the circumstances described in either of the two preceding sentences.  In no event shall EGI-TRB be required to pay the EGI-TRB Termination Fee on more than one occasion.

(c)        Each of the parties hereto acknowledges that the agreements contained in this Section 8.20 are an integral part of the transactions contemplated by this Agreement and that none of the fees contemplated under this Section 8.20 is a penalty, but rather is liquidated damages in a reasonable amount that will compensate EGI-TRB or the Company, as the case may be, for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the

27

transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision. Notwithstanding anything to the contrary in this Agreement, and except as otherwise provided in the next succeeding sentence, (i) the Company's right to receive payment of the EGI-TRB Termination Fee pursuant to this Section 8.20 shall be the exclusive remedy of the Company against EGI-TRB for (A) the loss suffered as a result of the failure of the transactions contemplated hereby or by Merger Agreement to be consummated and (B) any other losses, damages, obligations or liabilities suffered as a result of or under this Agreement and the transactions contemplated hereby, and upon payment of the EGI-TRB Termination Fee in accordance with this Section 8.20, neither EGI-TRB nor any of its equityholders, partners, members, directors, officers or agents, as the case may be, shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby (except as provided for in the Confidentiality Agreement); and (ii) EGI-TRB's right to receive payment of the Company Termination Fee pursuant to this Section 8.20 shall be the exclusive remedy of EGI-TRB for (A) the loss suffered as a result of the failure of the transactions contemplated hereby or by the Merger Agreement to be consummated and (B) any other losses, damages, obligations or liabilities suffered as a result of or under this Agreement and the transactions contemplated hereby, and upon payment of the Company Termination Fee in accordance with this Section 8.20, neither the Company nor any of its stockholders, directors, officers or agents, as the case may be, shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby (except as provided for in the Confidentiality Agreement). If the Company fails to pay EGI-TRB any amounts due to EGI-TRB pursuant to this Section 8.20 within the time periods specified in this Section 8.20 or EGI-TRB fails to pay the Company any amounts due to the Company pursuant to this Section 8.20 within the time periods specified in this Section 8.20, the Company or EGI-TRB, as applicable, shall pay the costs and expenses (including reasonable legal fees and expenses) incurred by EGI-TRB or the Company, as applicable, in connection with any action, including any lawsuit, taken to collect payment of such amounts, together with interest on such unpaid amounts at the prime lending rate prevailing during such period as published in *The Wall Street Journal*, calculated on a daily basis from the date such amounts were required to be paid until the date of actual payment.

*        *        *        *

28

Source: TRIBUNE CO, 8-K, April 05, 2007

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

**EGI-TRB, L.L.C.**

By:  /s/ Philip G. Tinkler
      Name: Philip G. Tinkler
      Title:  Vice President

**SAMUEL ZELL**

      /s/ Samuel Zell

**TRIBUNE COMPANY**

By:  /s/ Dennis J. FitzSimons
      Name: Dennis J. FitzSimons
      Title:  Chairman, President and
             Chief Executive Officer

**Signature Page to the Securities Purchase Agreement**

Source: TRIBUNE CO, 8-K, April 05, 2007

Exhibit 10.3

EXHIBIT A
[FINAL FORM]

## SUBORDINATED EXCHANGEABLE PROMISSORY NOTE

[                    ], 2007                                                                  $200,000,000.00

Tribune Company, a Delaware corporation located at 435 North Michigan Avenue, Chicago, Illinois 60611 ("**Maker**"), for value received, hereby promises to pay to the order of EGI-TRB, L.L.C., a Delaware limited liability company located at Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606 (the "**Holder**") or its successors or permitted assigns, the principal amount of TWO HUNDRED MILLION DOLLARS ($200,000,000.00) (the "**Original Principal Amount**") together with interest thereon calculated from the date hereof in accordance with the provisions of this Subordinated Exchangeable Promissory Note (this "**Note**"). This Note is being issued pursuant to that certain Securities Purchase Agreement by and among Maker, Holder and Sam Zell, as guarantor, entered into in connection with that certain Agreement and Plan of Merger by and among GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "**ESOP**"), Tesop Corporation and Maker and, for the limited purposes set forth therein, the Holder (the "**Merger Agreement**"). Capitalized terms used and not otherwise defined herein shall have the meaning given to such terms in the Merger Agreement.

1.     <u>Payments</u>.

       (a)       Interest on the unpaid principal amount of this Note outstanding from time to time shall accrue at the rate of 4.81% *per annum* calculated on the basis of a 365-day year and the actual number of days elapsed in any year (the "**Interest Rate**"), or (if less) at the highest rate then permitted under applicable law. Interest on the unpaid principal amount hereunder shall be payable in-kind on the last day of each calendar quarter beginning            , 2007 (each, a "**Payment Date**") and, subject to earlier acceleration or exchange under Section 4, ending on, and including, the Maturity Date (as defined below), through the issuance of additional Notes ("**PIK Notes**"). Such PIK Notes shall be in an aggregate principal amount equal to the amount of interest that has accrued with respect to this Note (less any cash interest payments), and such PIK Notes shall be identical to this Note, except that such PIK Notes shall not include the provisions of Section 4 hereof but shall provide that the provisions of Section 4 of this Note will operate to reduce the principal amount of such PIK Notes and otherwise have the effect on such PIK Notes as is set forth in Section 4 hereof. Except as expressly provided herein, the term "**Note**" shall include all PIK Notes that may be issued pursuant to this Section 1(a) and all references to the principal amount or principal outstanding under this Note shall include the principal amount of the PIK Notes.

       (b)       Payments of principal outstanding under this Note shall be made as follows:

              (i)       immediately prior to consummation of the Merger (the date of consummation of the Merger is referred to herein as the "**Maturity Date**"), Maker shall pay the outstanding principal amount of this Note, together with all accrued and unpaid interest hereon, and any costs and expenses incurred by Holder in connection herewith; and

(ii)     to the extent not prohibited by the terms of Section 2 hereof, at any time and from time to time, Maker may prepay, without premium or penalty, all or any portion of the outstanding principal amount of this Note, any such prepayment to be applied first, to all accrued but unpaid interest on this Note and second, to outstanding principal.

(c)     If any payment is due, or any time period for giving notice or taking action expires, on a day which is a Saturday, Sunday or legal holiday in the State of New York, the payment shall be due and payable on, and the time period shall automatically be extended to, the next business day immediately following such Saturday, Sunday or legal holiday, and interest shall continue to accrue at the required rate hereunder until any such payment is made.  Except as provided in Section 1(a) above, all payments to be made to the Holder shall be made in the lawful money of the United States of America in immediately available funds, free and clear of all taxes and charges whatsoever.  Payments shall be delivered to the Holder at the address set forth above or to such other address or to the attention of such other person as specified by prior written notice to Maker or by wire transfer pursuant to wire instructions as specified by prior written notice to Maker.

2.     Subordination.

(a)     The Subordinated Obligations (as defined below) are subordinate and junior in right of payment to all Senior Obligations (as defined below).  No part of the Subordinated Obligations (or any other obligations hereunder) shall have any claim to the assets of Maker on a parity with or prior to the claim of the Senior Obligations.  Unless and until the obligations to extend credit to Maker under the Senior Documents shall have been irrevocably terminated and the Senior Obligations have been paid in full in cash, the Holder will not take, demand or receive from Maker, and Maker will not make, give or permit, directly or indirectly, by set-off, redemption, purchase or in any other manner, any payment of (of whatever kind or nature, whether in cash, property, securities or otherwise), whether in respect of principal, interest or otherwise, or security for the whole or any part of the Subordinated Obligations.  The Holder agrees that the Subordinated Obligations (and all other obligations of Maker hereunder) are unsecured and that Holder shall not take any liens or security interests in any assets or property of Maker, any of its subsidiaries or otherwise to secure the Subordinated Obligations or any other obligations of Maker hereunder.  All payments or distributions upon or with respect to any Subordinated Obligation which are made by or on behalf of Maker or received by or on behalf of the Holder in violation of or contrary to the provisions of this Section 2 shall be received in trust for the benefit of the holders of Senior Obligations and shall be paid over upon demand to such holders for application to the Senior Obligations until the Senior Obligations shall have been paid in full in cash.  The provisions of this Section 2 shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Senior Obligations is rescinded or must otherwise be returned by the any holder of Senior Obligations for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of Maker or any of its subsidiaries) all as though such payments had not been made.

(b)     At no time shall the Holder take or continue any action, or exercise any rights, remedies or powers under the terms of this Note, or exercise or continue to exercise any other right or remedy at law or in equity that the Holder might otherwise possess, to collect any Subordinated Obligation, including, without limitation, the acceleration of the Subordinated

2

Source: TRIBUNE CO, 8-K, April 05, 2007

Obligations, the commencement of any action to enforce payment or foreclosure on any lien or security interest, the filing of any petition in bankruptcy or the taking advantage of any other insolvency law of any jurisdiction. Notwithstanding the foregoing, the Holder may file a proof of claim in any bankruptcy or similar proceeding instituted by another entity and may vote such claim in a manner not inconsistent with the terms hereof. If the Holder shall attempt to enforce, collect or realize upon any of the Subordinated Obligations in violation of the terms hereof, any holder of Senior Obligations may, by virtue of the terms hereof, restrain any such enforcement, collection or realization, either in its own name or in the name of Maker.

(c)      The holders of Senior Obligations shall be entitled to rely upon, and shall be intended beneficiaries of the subordination provisions contained in this Section 2, and such holders shall be entitled to enforce the same. The holders of all or any portion of the Senior Obligations may, at any time, in their discretion, renew, amend, refinance, extend or otherwise modify the terms and provisions of Senior Obligations so held (including, without limitation, the terms and provisions relating to the principal amount outstanding thereunder, the rate of interest thereof, the payment terms thereof and the provisions thereof regarding default or any other matter) or exercise (or refrain from exercising) any of their rights under the Senior Obligations, all without notice to or consent from the Holder. The Holder covenants and agrees that it will not, at any time, contest the validity, perfection, priority or enforceability of the subordination provisions of this Section 2, the Senior Obligations, the Senior Documents or the security interests or liens granted pursuant thereto.

(d)      Notwithstanding any other provision of this Note to the contrary, this Section 2 and the subordination provisions hereof (i) shall not apply to the principal and interest payments contemplated by Section 1(b)(i) or to the issuance of PIK Notes, (ii) shall not apply to or otherwise restrict, limit or modify the provisions of Section 4 or Section 5 hereof or the enforcement thereof, and (iii) shall not prevent or restrict Maker or Holder from taking any action or refraining from taking any action as required by or pursuant to, or otherwise complying with or exercising or enforcing any right under, Section 4 or Section 5 hereof. Nothing herein shall prohibit Maker from making payments under Section 1(b)(ii) to the extent not prohibited by any Senior Documents.

(e)      For purposes hereof, the following terms shall have the following meanings:

"**Senior Documents**" means, collectively, those documents, instruments and agreements evidencing, securing or otherwise relating to any of the Senior Obligations.

"**Senior Obligations**" means all obligations, indebtedness and other liabilities of the Maker other any such obligations, indebtedness or liabilities that by its express terms ranks pari passu or junior to the Maker's obligations under this Note, in each case, whether incurred on or prior to the date hereof or hereafter incurred.

"**Subordinated Obligations**" means the collective reference to the unpaid principal of and interest on this Note and all other obligations and liabilities of Maker to the Holder, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, in each case, arising under this Note; provided that the term "Subordinated Obligations" shall not include (a) the principal and interest payments contemplated by

3

Source: TRIBUNE CO, 8-K, April 05, 2007

Section 1(b)(i) hereof, (b) payments of interest through the issuance of PIK Notes, and (c) the rights, obligations and liabilities of Maker and Holder under Section 4 or Section 5 hereof.

3.     Events of Default.

      (a)     For purposes of this Note, an "**Event of Default**" shall be deemed to have occurred if:

          (i)     Maker fails to make any payment of principal of, or interest on, this Note when due and payable and such default remains uncured for a period of more than five (5) business days after written notice to Maker; provided that the failure by Maker to make a principal or interest payment hereunder when due shall not constitute an Event of Default if Maker is prohibited from making such payment under the terms of Section 2 hereof; or

          (ii)     Maker makes an assignment for the benefit of creditors or admits in writing its inability to pay its debts generally as they become due; or an order, judgment or decree is entered adjudicating Maker bankrupt or insolvent; or any order for relief with respect to Maker is entered under Title 11 of the United States Code, 11 U.S.C. §§101 *et. seq.*; or Maker petitions or applies to any tribunal for the appointment of a custodian, trustee, receiver or liquidator of Maker, or of any substantial part of the assets of Maker, or commences any proceeding (other than a proceeding for the voluntary liquidation and dissolution of any subsidiary of Maker) relating to Maker under any bankruptcy reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction; or any such petition or application is filed, or any such proceeding is commenced, against and, in any such case, either (A) Maker consents thereto or acquiesces therein or (B) such petition, application or proceeding is not dismissed within sixty (60) days.

The foregoing shall constitute Events of Default whatever the reason or cause for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

      (b)     Upon the occurrence of an Event of Default:

      (i)     if an Event of Default of the type described in Section 3(a)(i) of this Note has occurred, the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto) shall become immediately due and payable upon written notice from the Holder to Maker, and, to the extent not prohibited by the provisions of Section 2 hereof, Maker shall immediately pay to the Holder all amounts due and payable with respect to this Note;

      (ii)     if an Event of Default of the type described in Section 3(a)(ii) of this Note has occurred, the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto) shall become immediately due and payable without any action on the part of the Holder, and, to the

4

Source: TRIBUNE CO, 8-K, April 05, 2007

extent not prohibited by the provisions of Section 2 hereof, Maker shall immediately pay to the Holder all amounts due and payable with respect to this Note; and

(iii)      subject to the terms of Section 2 hereof, the Holder shall have all rights and remedies set forth herein and under any applicable law or in equity. No such remedy is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or thereunder or now or hereafter existing at law or in equity or by statute or otherwise. Subject to the terms of Section 2 hereof, the Holder shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Note and to exercise all other rights granted by law.

4.      Exchange.

(a)      At the option of Maker, any portion or all of the outstanding Original Principal Amount of this Note shall be exchangeable at any time and from time to time prior to the Maturity Date, for such number of fully paid and non-assessable shares of common stock of Maker, par value $0.01 per share ("**Common Stock**"), as shall be determined by dividing (i) the portion of the Original Principal Amount of this Note being exchanged under this Section 4 by Maker by (ii) $34.00 (the "**Exchange Price**"), subject to adjustment in accordance with Section 4(d) below. On the date of any exchange of any or all of the outstanding Original Principal Amount of this Note pursuant to this Section 4(a), Maker shall make a cash payment to the Holder in an amount equal to 40% of the sum of (i) all accrued and unpaid interest on the portion of the Original Principal Amount of this Note being exchanged that has accrued from the Payment Date immediately preceding such exchange date to such exchange date and (ii) the amount of interest on the portion of the Original Principal Amount being exchanged that has been paid-in-kind through the issuance of PIK Notes including PIK Notes paid in respect of any previously issued PIK Notes relating to such portion of the Original Principal Amount and accrued but unpaid interest on such PIK Notes (such outstanding principal balance of PIK Notes, the "**PIK Interest Amount**" and, together with the accrued and unpaid interest amounts referenced in clauses (i) and (ii) above, the "**Interest Amount**"). Upon such cash payment, the outstanding principal balance of the PIK Notes shall be decreased by an amount equal to the PIK Interest Amount, the accrued and unpaid interest referred to in clauses (i) and (ii) above shall be deemed fully discharged and 60% of the Interest Amount shall be allocated as additional consideration for the applicable exchange of the outstanding Original Principal Amount of this Note.

(b)      Immediately upon termination of the Merger Agreement pursuant to Article VII thereof, and without any further action of Maker or the Holder, any outstanding portion of the Original Principal Amount of this Note shall be exchanged for such number of fully paid and non-assessable shares of Common Stock as shall be determined by dividing (i) the then outstanding portion of the Original Principal Amount of this Note by (ii) the Exchange Price, subject to adjustment in accordance with Section 4(d) below. On the date of any exchange of any outstanding Original Principal Amount of this Note pursuant to this Section 4(b), Maker shall make a cash payment to the Holder in an amount equal to 40% of the sum of (i) all accrued and unpaid interest on the then outstanding portion of the Original Principal Amount of this Note that has accrued from the Payment Date immediately preceding such exchange date to such

5

Source: TRIBUNE CO, 8-K, April 05, 2007

exchange date and (ii) the outstanding principal balance of all PIK Notes including PIK Notes paid in respect of any previously issued PIK Notes and accrued but unpaid interest on such PIK Notes (such outstanding principal balance of all PIK Notes and accrued but unpaid interest thereon, together with the amount referenced in clause (i) above, the "**Total Interest Amount**"). Upon such cash payment, the outstanding principal balance of all PIK Notes shall be deemed paid, the accrued and unpaid interest referred to in clauses (i) and (ii) above shall be deemed fully discharged, and 60% of the Total Interest Amount shall be allocated as additional consideration for the exchange of the outstanding Original Principal Amount of this Note. For the avoidance of doubt, the term Original Principal Amount of this Note shall be deemed to refer only to the original $200,000,000 principal amount of this Note originally issued and shall not include the principal amount of any PIK Notes whenever issued.

(c)     As soon as reasonably practicable after an exchange under this Section 4 in whole or in part, Maker at its expense will cause to be issued in the name of, and delivered to, the Holder, or as the Holder may direct: (i) a certificate or certificates (with appropriate restrictive legends) for the number of shares of Common Stock to which the Holder shall be entitled in such denominations as may be requested by the Holder; and (ii) in case such exchange is in part only, in accordance with Section 4(a), a new subordinated exchange promissory note (dated the date hereof) of like tenor, calling in the aggregate on the face thereof for a principal amount equal to the principal amount plus accrued and unpaid interest thereon described in this Note minus the amount exchanged by Maker or deemed paid or discharged in accordance with Section 4(a) above. Maker shall at all times reserve for issuance a sufficient number of shares of Common Stock to be issued upon exchange of this Note, and upon issuance thereof, such shares shall be fully paid and non-assessable, and free from all taxes, liens and charges with respect to the issue thereof.

(d)     The number and kind of shares of Common Stock issuable upon exchange of this Note under this Section 4 and the Exchange Price shall be subject to adjustment from time to time as follows; provided that no action taken by Maker in compliance with the terms of the Merger Agreement and the Tower Purchase Agreement prior to consummation of the Merger or termination of the Merger Agreement shall give rise to any adjustment:

(i)     If Maker shall at any time subdivide its Common Stock, by split-up or otherwise, or combine its Common Stock, or issue additional shares of its Common Stock as a dividend or distribution with respect to any shares of its Common Stock, the number of shares issuable upon exchange under this Section 4 shall forthwith be proportionately increased in the case of a subdivision or stock dividend or distribution, or proportionately decreased in the case of a combination. Any adjustment under this Section 4(d)(i) shall become effective at the close of business on the date the subdivision or combination becomes effective, or as of the record date of such dividend, or in the event that no record date is fixed, upon the making of such dividend.

(ii)     In the event of any corporate reclassification, capital reorganization, consolidation, spin-off, merger, transfer of all or a substantial portion of Maker's properties or assets or any dissolution, liquidation or winding up of Maker (other than as a result of a subdivision, combination, dividend or distribution provided for in Section 4(d)(i) above) (a "**Corporate Transaction**"), then, as a condition of such event,

6

Source: TRIBUNE CO, 8-K, April 05, 2007

provision shall be made, and duly executed documents evidencing the same from Maker and any surviving or acquiring person (the "**Successor Company**") shall be delivered to the Holder, so that the Holder shall have the right to receive upon exchange under this Section 4 the same number of shares of Common Stock and amount of cash and other property that the Holder would have been entitled to receive upon such Corporate Transaction had an exchange of this Note been effected immediately prior to the effective time of such Corporate Transaction. Maker shall provide that any Successor Company in such Corporate Transaction shall enter into an agreement with Maker confirming the Holder's rights pursuant to this Note, assuming Maker's obligations under this Note, jointly and severally with Maker if Maker shall survive such Corporate Transaction, and providing after the date of such Corporate Transaction for adjustments, which shall be as equivalent as possible to the adjustments provided for in this Section 4. Maker shall ensure that the Holder is a beneficiary of such agreement and shall deliver a copy thereof to the Holder. The provisions of this Section 4(d)(ii) shall apply similarly to successive Corporate Transactions involving any Successor Company. In case of any Corporate Transaction in which all or a portion of the consideration payable to holders of Common Stock is cash, Maker or any Successor Company, as the case may be, shall make available any funds necessary to pay to the Holder the amount to which the Holder is entitled as described above in the same manner and at the same time as holders of Common Stock would be entitled to such funds.

(iii)    In the event that Maker at any time or from time to time declares, orders, pays or makes any dividend or other distribution on the Common Stock, including, without limitation, distributions of cash, evidence of its indebtedness, Options, Convertible Securities, other securities or property or rights to subscribe for or purchase any of the forgoing, and whether by way of dividend, spin-off, reclassification, recapitalization, similar corporate reorganization or otherwise, other than a dividend or distribution payable in additional shares of Common Stock that gives rise to an adjustment pursuant to Section 4(d)(i) hereof, then, and in each such case, the Exchange Price shall be reduced to a number determined by dividing the previously applicable Exchange Price by a fraction (which must be greater than one (1), otherwise no adjustment is to be made pursuant to this Section 4(d)(x)) (i) the numerator of which shall be the fair market value per share of Common Stock on the record date for such dividend or other distribution, and (ii) the denominator of which shall be the excess, if any, of (x) such fair market value per share of Common Stock, over (y) the sum of the amount of any cash distributed per share of Common Stock plus the positive fair market value, if any, per share of Common Stock of any such evidences of indebtedness, Options, Convertible Securities, other securities or property or rights to be so distributed. Such adjustments shall become effective as of the close of business on the record date therefor. "**Options**" means rights, options or warrants to subscribe for, purchase or otherwise acquire, directly or indirectly, shares of Common Stock, including, without limitation, Convertible Securities. "**Convertible Securities**" means any evidences of indebtedness, shares of capital stock or any other securities convertible into or exchangeable for, directly or indirectly, shares of Common Stock.

(iv)    If any event occurs as to which the provisions of this Section 4(d) are not strictly applicable or if strictly applicable would not fairly protect the rights of the Holder in

7

Source: TRIBUNE CO, 8-K, April 05, 2007

accordance with such provisions, then the board of directors of Maker shall make an adjustment in the number of shares of Common Stock exchangeable under this Section 4, the Exchange Price or the applicability of such provisions so as to protect such rights. The adjustment shall be such as will give the Holder upon exchange under this Section 4 the total number of shares of Common Stock as the Holder would have owned had this Note been exchanged prior to the event and had the Holder continued to hold such Common Stock until after the event requiring the adjustment, but in no event shall any such adjustment have the effect of increasing the Exchange Price.

(v)    The adjustments required by the preceding subsections of this Section 4(d) shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the Exchange Price or the number of shares of Common Stock issuable upon exchange under this Section 4 that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made decreases the Exchange Price immediately prior to the making of such adjustment by at least $0.01 or increases or decreases the number of shares issuable upon exchange immediately prior to the making of such adjustment by at least one share. Any adjustment representing a change of less than such minimum amount shall be carried forward and made as soon as such adjustment, together with other adjustments required by this Section 4(d) and not previously made, would result in the requisite minimum adjustment.

(e)    In the case of any adjustment in the number of shares issuable upon exchange under this Section 4 or the Exchange Price, Maker, at its sole expense, shall promptly (i) compute such adjustment in accordance with the terms of this Note and, if the Holder so requests in writing from Maker within 30 days of receipt of such computations from Maker, cause independent certified public accountants of recognized national standing to verify such computation (other than any determination of the fair market value), (ii) prepare a report setting forth such adjustment and showing in reasonable detail the method of calculation thereof and the facts upon which such adjustment is based, including, without limitation, (A) the event or events giving rise to such adjustment, (B) the consideration received by Maker for any Additional Shares of Common Stock issued or sold or deemed to have been issued or sold, (C) the number of shares of Common Stock outstanding or deemed to be outstanding prior and subsequent to any such transaction, (D) the method by which any such adjustment was calculated (including a description of the basis on which the board of directors of Maker made any determination of fair market value required thereby) and (E) the number of shares of Common Stock issuable upon exchange under this Section 4 and the Exchange Price in effect immediately prior to such event or events and as adjusted, (iii) mail a copy of each such report to the Holder and, upon the request at any time of the Holder, furnish to the Holder a like report setting forth the number of shares of Common Stock issuable upon exchange under this Section 4 and the Exchange Price at the time in effect and showing in reasonable detail how they were calculated and (iv) keep copies of all such reports available at the principal office of Maker for inspection during normal business hours by the Holder.

(f)    Maker shall not, by amendment of its certificate of incorporation or other organizational document or through any sale or other issuance of securities, capital reorganization, reclassification, recapitalization, consolidation, merger, transfer of assets,

8

Source: TRIBUNE CO, 8-K, April 05, 2007

dissolution, liquidation, winding-up, any similar transaction or any other voluntary action, solely to avoid or solely to seek to avoid the observance or performance of any of the terms of this Note, but will at all times in good faith assist in the carrying out of all terms hereunder and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against dilution or other impairment in a manner that is consistent with Maker's obligations hereunder.  Without limiting the generality of the foregoing, Maker (i) will not permit the par value of any shares of Common Stock receivable upon exchange to exceed the Exchange Price and (ii) will take all such action as may be necessary or appropriate in order that Maker may validly and legally issue fully paid and nonassessable shares of Common Stock upon exchange under this Section 4.  Without limiting the generality of the foregoing, before taking any action that would cause a reduction of the Exchange Price pursuant to Section 4(d) hereof below the then par value (if any) of the Common Stock, Maker shall take any and all corporate action (including, without limitation, a reduction in par value) which shall be necessary to validly and legally issue fully paid and nonassessable shares of Common Stock, as the case may be, at the Exchange Price as so reduced.

(g)      If the Holder shall, in good faith, disagree with any determination by the board of directors of Maker of the fair market value made pursuant to this Note, and such disagreement is in respect of securities not traded on a national securities exchange or quoted on an automated quotation system or other property valued by the board of directors of Maker at more than $1,000,000, then the Holder may by notice to Maker (an "**Appraisal Notice**"), given within 30 days after written notice to the Holder of such determination, elect to contest such determination; provided, however, that the Holder may not seek appraisal of any determination of fair market value to the extent that Maker has received a fairness opinion or other appraisal from an independent nationally recognized investment bank or other qualified financial institution acceptable to Maker and the Holder (the "**Appraiser**") in connection with the transaction giving rise to such determination.  Within 20 days after an Appraisal Notice, Maker shall engage an Appraiser to make an independent determination of such fair market value (the "**Appraiser's Determination**"), who shall deliver to Maker and the Holder a report describing its methodology and results in reasonable detail within 30 days of such engagement.  In arriving at its determination, the Appraiser shall base any valuation upon:  (i) in the case of the fair market value of shares of Common Stock, the fair market value of Maker and its subsidiaries on the basis of an arm's length sale of a going concern between an informed and willing buyer and an informed and willing seller, under no compulsion to buy or sell, taking into account all the relevant facts and circumstances then prevailing, and without consideration of (A) the lack of an actively trading public market for the Common Stock, (B) any restrictions on the transfer of shares of Common Stock or (C) any control premium or minority discount, and (ii) in the case of the fair market value of any other property, the fair market value of such other property assuming that such other property was sold in an arm's length transaction between an informed and willing buyer and an informed and willing seller, under no compulsion to buy or sell, taking into account all the relevant facts and circumstances then prevailing.  The Holder shall be afforded reasonable opportunities to discuss the appraisal with the Appraiser.  The Appraiser's Determination shall be final and binding on Maker and the Holder, absent manifest error.  The costs of conducting an appraisal shall be borne by Maker.

(h)      In the event Maker proposes, other than pursuant to the transactions contemplated by the Merger Agreement, to:  (i) pay, distribute, or take a record of the holders of any class of

9

securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution, or any right to subscribe for, purchase or otherwise acquire any shares of capital stock or any other securities or property, or (ii) consummate any capital reorganization, reclassification, recapitalization, consolidation, merger, transfer of all or substantially all of its assets, dissolution, liquidation or winding-up, or any similar transaction then, at least 20 days prior to the earlier of any applicable record date or such event, as the case may be, Maker shall mail to the Holder a notice specifying: (A) the date or expected date on which any such payment or distribution is to be made or record is to be taken and the amount and character of any such dividend, distribution or right, (B) the date or expected date on which any such reorganization, reclassification, recapitalization, consolidation, merger, transfer, dissolution, liquidation, winding-up or similar transaction is to take effect and any record date therefor, (C) the time as of which any holders of record of shares of Common Stock and/or any other class of securities shall be entitled to exchange their shares of Common Stock and/or other securities for the securities or other property deliverable upon such reorganization, reclassification, recapitalization, consolidation, merger, transfer, dissolution, liquidation, winding-up or similar transaction and a description in reasonable detail of such transaction and (D) in each case, the expected effect on the number of shares issuable upon exchange under this Section 4 of this Note and the Exchange Price of each such transaction or event.  Maker shall update any such notice to reflect any change in the foregoing information.

(i)    No fractional shares of Common Stock shall be issued in connection with any exchange under this Section 4, but in lieu of such fractional shares Maker shall make a cash payment therefor based on the fair market value thereof.

(j)    For the avoidance of doubt and notwithstanding any other provision of this Note to the contrary, Section 2 hereof (including, without limitation, any subordination provisions thereof) shall not apply to or otherwise restrict or modify the provisions of this Section 4.

(k)    Prior to exchange of this Note for Common Stock under this Section 4, the Holder shall not be entitled to any rights of a stockholder with respect to the shares of Common Stock, including (without limitation) the right to vote such shares, receive dividends or other distributions thereon, exercise preemptive rights or be notified of stockholder meetings, and, except as otherwise provided in this Note or any other arrangement with, or undertaking by, Maker, the Holder shall not be entitled to any stockholder notice or other communication concerning the business or affairs of Maker.

(l)    Shares of Common Stock issuable upon exchange of this Note under this Section 4 shall be subject to that certain Registration Rights Agreement dated as of April 1, 2007 by and between Maker, the Holder and the ESOP.

5.    <u>Regulatory Requirements</u>.

10

Source: TRIBUNE CO, 8-K, April 05, 2007

(a)    If any filing or notification becomes necessary pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), in connection with the exchange of this Note or any portion hereof under Section 4 above, Maker shall notify the Holder prior to such exchange, and the Holder and Maker shall file with the proper authorities all forms and other documents necessary to be filed pursuant to the HSR Act, as promptly as possible and shall cooperate with each other in promptly producing such additional information as those authorities may reasonably require to allow early termination of the notice period provided by the HSR Act or as otherwise necessary to comply with requirements of the Federal Trade Commission or the Department of Justice. Maker and the Holder agree to cooperate with each other in connection with such filings and notifications, and to keep each other informed of the status of the proceedings and communications with the relevant authorities. Maker and Holder shall each pay its own filing fees in connection with any filings required under the HSR Act as a result of the exchange of this Note under Section 4 above.

(b)    If the Holder or, upon the advice of counsel, Maker determines that the exchange of this Note or any portion hereof under Section 4 above would require notice to, or the consent or approval by, the Federal Communications Commission or any other regulatory agency that is vested with jurisdiction over Maker, Maker and the Holder shall make all necessary filings and notifications required, and shall have received all required consents, approvals, orders or otherwise, prior to effecting the exchange of this Note or any portion thereof. Maker and Holder shall each pay its own filing fees in connection with such filings and notifications.

6.    General.

(a)    The terms of this Note may be waived, altered or amended, and Maker may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only by an instrument in writing duly executed by Maker and the Holder. Any such amendment or waiver shall be binding upon the Holder, Maker and their respective successors and permitted assigns.

(b)    Maker hereby waives diligence, presentment, protest and demand and notice of protest and demand, dishonor and nonpayment of this Note, and expressly agrees that this Note, or any payment hereunder, may be extended from time to time, all without in any way affecting the liability of Maker hereunder.

(c)    All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Note shall be in writing and shall be deemed to have been given when delivered personally to the recipient, sent to the recipient by reputable overnight courier service (charges prepaid), transmitted by facsimile (receipt confirmed) or three days after mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid. Such notices, demands and other communications shall be sent to Maker and the Holder at the address set forth above or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

11

Source: TRIBUNE CO, 8-K, April 05, 2007

(d)     If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Holder in order to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

(d)     This Note shall be binding upon and inure to the benefit of the respective successors and permitted assigns of each of the parties hereto. Subject to compliance with applicable federal and state securities laws, this Note and all rights hereunder are transferable, in whole or in part, by the Holder to any Permitted Transferee upon written notice to Maker. For purposes hereof, "**Permitted Transferee**" shall have the meaning set forth in the Investor Rights Agreement. Except as provided in the immediately preceding sentence, neither the Holder nor Maker shall assign or transfer its rights or duties hereunder without the prior written consent of the other party hereto.

(e)     It is the intention of Maker and the Holder to conform strictly to all applicable usury laws now or hereafter in force, and any interest payable under this Note shall be subject to reduction to the highest amount not in excess of the maximum legal amount allowed under the applicable usury laws as now or hereafter construed by the courts having jurisdiction over such matters. If the maturity of this Note is accelerated by reason of an election by the Holder resulting from an Event of Default or otherwise, then earned interest may never include more than the maximum amount permitted by law, computed from the date hereof until payment, and any interest in excess of the maximum amount permitted by law shall be canceled automatically and, if theretofore paid, shall at the option of the Holder either be rebated to Maker or credited on the principal amount of this Note, or if this Note has been paid, then the excess shall be rebated to Maker. The aggregate of all interest (whether designated as interest, service charges, points or otherwise) contracted for, chargeable, or receivable under this Note shall under no circumstances exceed the maximum legal rate upon the unpaid principal balance of this Note remaining unpaid from time to time. If such interest does exceed the maximum legal rate, it shall be deemed a mistake and such excess shall be canceled automatically and, if theretofore paid, rebated to Maker or credited on the principal amount of this Note, or if this Note has been repaid, then such excess shall be rebated to Maker.

(f)     This Note shall be governed by and interpreted in accordance with the laws of the State of Delaware, without giving effect to any laws or principles of conflicts of laws that would cause the laws of any other jurisdiction to apply.

(G)     **MAKER HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR DELAWARE STATE COURT IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE AND MAKER HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT**

12

Source: TRIBUNE CO, 8-K, April 05, 2007

THE RIGHT OF THE HOLDER TO BRING PROCEEDINGS AGAINST MAKER IN THE COURTS OF ANY OTHER JURISDICTION.  ANY JUDICIAL PROCEEDING BY MAKER AGAINST THE HOLDER OR ANY AFFILIATE THEREOF INVOLVING DIRECTLY OR INDIRECTLY ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTION WITH THIS NOTE SHALL BE BROUGHT ONLY IN A COURT IN DELAWARE.

(H)     MAKER AND THE HOLDER EACH WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.  MAKER AND THE HOLDER EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS NOTE OR ANY PROVISION HEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE.

{*Signature Page Follows*}

13

Source: TRIBUNE CO, 8-K, April 05, 2007

IN WITNESS WHEREOF, Maker has executed and delivered this Note on this   day of        , 2007.

TRIBUNE COMPANY

By: _____
Name: _____
Its: _____

Acknowledged and agreed to as of
this   day of         , 2007

EGI-TRB, L.L.C.

By: _____
Name: _____
Its: _____

**Signature Page to Subordinated Exchangeable Promissory Note**

Source: TRIBUNE CO, 8-K, April 05, 2007

Exhibit 10.4

EXHIBIT B
[FINAL FORM]

## SUBORDINATED PROMISSORY NOTE

, 2007                                                                                     $225,000,000.00

Tribune Company, a Delaware corporation located at 435 North Michigan Avenue, Chicago, Illinois 60611 ("**Maker**"), hereby promises to pay to the order of EGI-TRB, L.L.C., a Delaware limited liability company located at Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606 (the "**Holder**") or its successors or permitted assigns, the principal amount of TWO HUNDRED TWENTY-FIVE MILLION AND NO/100 DOLLARS ($225,000,000.00) together with interest thereon calculated from the date hereof in accordance with the provisions of this Subordinated Promissory Note (this "**Note**").

1.    Payments.

(a)    Interest on the unpaid principal amount of this Note outstanding from time to time shall accrue at the rate of    (1) percent (  %) *per annum* calculated on the basis of a 365-day year and the actual number of days elapsed in any year, or (if less) at the highest rate then permitted under applicable law (the "**Interest Rate**"). At all times during the occurrence of an Event of Default, and at all times after          , 2018 (the "**Maturity Date**"), all of the obligations and liabilities of Maker to the Holder hereunder shall accrue interest at a rate equal to the Interest Rate plus two percent (2%) (the "**Default Rate**") to the extent permitted under applicable law.  Interest on the unpaid principal amount hereunder shall be payable on the last day of each calendar quarter (each, a "**Payment Date**") as follows:

(i)    to the extent the payment of such interest payment is not prohibited by the terms of any applicable subordination agreement or intercreditor agreement (if any) made by and among the Holder and the financial institutions, agents and other persons party thereto from time to time (any such agreement or agreements, as amended, restated or otherwise modified from time to time, collectively, the "**Intercreditor Agreement**") as of such Payment Date, Maker shall pay to the Holder all accrued and unpaid interest as of such Payment Date in cash in accordance with the terms of Section 1(c) below (each, a "**Cash Interest Payment**"); and

(ii)    to the extent the payment of such interest payment is prohibited pursuant to the terms of the Intercreditor Agreement as of such Payment Date, all accrued and unpaid interest as of such Payment Date shall be capitalized as principal outstanding on this Note by adding the amount of such interest payment to the outstanding principal amount of this Note.

(b)    Payments of principal outstanding from time to time under this Note shall be made as follows, each to the extent not prohibited by the terms of the Intercreditor Agreement:

Source: TRIBUNE CO, 8-K, April 05, 2007

(i)       on each Payment Date, Maker shall make principal payments to the Holder in the amount of two hundred fifty thousand and no/100 Dollars ($250,000.00), commencing on _____ 2007 and through and including the Maturity Date;

(ii)       on the Maturity Date hereof, Maker shall pay the outstanding principal amount of this Note, together with all accrued and unpaid interest hereon, and any costs and expenses incurred by Lender in connection herewith; and

(iii)       at any time and from time to time, Maker may, prepay, without premium or penalty, all or any portion of the outstanding principal amount of this Note, any such prepayment to be applied first, to all accrued but unpaid interest on this Note; second, to scheduled installments of principal in the direct order of maturity; and third, to outstanding principal (including, without limitation, capitalized interest).

(c)       If any payment is due, or any time period for giving notice or taking action expires, on a day which is a Saturday, Sunday or legal holiday in the State of New York, the payment shall be due and payable on, and the time period shall automatically be extended to, the next business day immediately following such Saturday, Sunday or legal holiday, and interest shall continue to accrue at the required rate hereunder until any such payment is made. All payments to be made to the Holder shall be made in the lawful money of the United States of America in immediately available funds, free and clear of all taxes and charges whatsoever. Payments shall be delivered to the Holder at the address set forth above or to such other address or to the attention of such other person as specified by prior written notice to Maker or by wire transfer pursuant to wire instructions as specified by prior written notice to Maker.

2.       Subordination.

All of the obligations and liabilities of Maker to the Holder evidenced by this Note (including, without limitation, principal, interest and costs and expenses) are qualified by, limited and expressly subordinated in accordance with the terms and conditions set forth in the Intercreditor Agreement.

3.       Events of Default.

(a)       For purposes of this Note, an "**Event of Default**" shall be deemed to have occurred if:

(i)       Maker fails to make any payment of principal of, or interest on, any Note when due and payable and such default remains uncured for a period of more than five (5) business days; provided, that, the failure by Maker to make a principal or interest payment hereunder when due shall not constitute an Event of Default if Maker is prohibited from making such payment under the terms of the Intercreditor Agreement; or

(ii)       Maker or any its subsidiaries or any guarantor of Maker's obligations hereunder makes an assignment for the benefit of creditors or admits in writing its inability to pay its debts generally as they become due; or an order, judgment or decree is entered adjudicating Maker or any such subsidiary or guarantor bankrupt or insolvent; or any order for relief with respect to Maker or any such subsidiary or guarantor is entered

2

Source: TRIBUNE CO, 8-K, April 05, 2007

under Title 11 of the United States Code, 11 U.S.C. §§101 *et. seq.*; or Maker or any such subsidiary or guarantor petitions or applies to any tribunal for the appointment of a custodian, trustee, receiver or liquidator of Maker or any such subsidiary or guarantor, or of any substantial part of the assets of Maker or any such subsidiary or guarantor, or commences any proceeding (other than a proceeding for the voluntary liquidation and dissolution of any subsidiary of Maker) relating to Maker or any such subsidiary or guarantor under any bankruptcy reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction; or any such petition or application is filed, or any such proceeding is commenced, against Maker or any such subsidiary or guarantor and either (A) Maker or any such subsidiary or guarantor by any act indicates its approval thereof, consent thereto or acquiescence therein or (B) such petition, application or proceeding is not dismissed within sixty (60) days.

The foregoing shall constitute Events of Default whatever the reason or cause for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

(b)     Upon the occurrence of an Event of Default:

(i)     if an Event of Default of the type described in Section 3(a)(i) of this Note has occurred, the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto, including, without limitation, any costs and expenses incurred by Lender in connection herewith) shall become immediately due and payable upon written notice from the Holder to the Maker, and, to the extent not prohibited by the provisions of the Intercreditor Agreement, Maker shall immediately pay to the Holder all amounts due and payable with respect to this Note;

(ii)     if an Event of Default of the type described in Section 3(a)(ii) of this Note has occurred, the aggregate principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto, including, without limitation, any costs and expenses incurred by Lender in connection herewith) shall become immediately due and payable without any action on the part of the Holder, and, to the extent not prohibited by the provisions of the Intercreditor Agreement, Maker shall immediately pay to the Holder all amounts due and payable with respect to this Note; and

(iii)     subject to the terms of the Intercreditor Agreement, the Holder shall have all rights and remedies set forth herein and under any applicable law or in equity.  No such remedy is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or thereunder or now or hereafter existing at law or in equity or by statute or otherwise.  Subject to the terms of the Intercreditor Agreement, any Holder having any rights under any provision of this Note shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Note and to exercise all other rights granted by law.

3

Source: TRIBUNE CO, 8-K, April 05, 2007

4.    General.

(a)    The terms of this Note may be waived, altered or amended, and Maker may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only by an instrument in writing duly executed by Maker and the Holder. Any such amendment or waiver shall be binding upon the Holder, Maker and their respective successors and permitted assigns.

(b)    Maker hereby waives diligence, presentment, protest and demand and notice of protest and demand, dishonor and nonpayment of this Note, and expressly agrees that this Note, or any payment hereunder, may be extended from time to time, all without in any way affecting the liability of Maker hereunder.

(c)    All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Note shall be in writing and shall be deemed to have been given when delivered personally to the recipient, sent to the recipient by reputable overnight courier service (charges prepaid), transmitted by facsimile (receipt confirmed) or three days after mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid. Such notices, demands and other communications shall be sent to Maker and the Holder at the address set forth above or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

(d)    If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (a) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Holder in order to carry out the intentions of the parties hereto as nearly as may be possible and (b) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

(d)    This Note shall be binding upon and inure to the benefit of the respective successors and permitted assigns of each of the parties hereto, provided, that neither Holder nor Maker shall assign or transfer its rights or duties hereunder without the prior written consent of the other party hereto.

(e)    It is the intention of Maker and the Holder to conform strictly to all applicable usury laws now or hereafter in force, and any interest payable under this Note shall be subject to reduction to the amount not in excess of the maximum legal amount allowed under the applicable usury laws as now or hereafter construed by the courts having jurisdiction over such matters. If the maturity of this Note is accelerated by reason of an election by the Holder resulting from an Event of Default, voluntary prepayment by Maker or otherwise, then earned interest may never include more than the maximum amount permitted by law, computed from the date hereof until payment, and any interest in excess of the maximum amount permitted by law shall be canceled automatically and, if theretofore paid, shall at the option of the Holder either be rebated to Maker or credited on the principal amount of this Note, or if this Note has been paid, then the excess shall be rebated to Maker. The aggregate of all interest (whether designated as interest, service charges, points or otherwise) contracted for, chargeable, or receivable under this Note shall under no circumstances exceed the maximum legal rate upon the

4

Source: TRIBUNE CO, 8-K, April 05, 2007

unpaid principal balance of this Note remaining unpaid from time to time. If such interest does exceed the maximum legal rate, it shall be deemed a mistake and such excess shall be canceled automatically and, if theretofore paid, rebated to Maker or credited on the principal amount of this Note, or if this Note has been repaid, then such excess shall be rebated to Maker.

(f)     This Note shall be governed by and interpreted in accordance with the laws of the State of Delaware, without giving effect to any laws or principles of conflicts of laws that would cause the laws of any other jurisdiction to apply.

(G)     MAKER HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR DELAWARE STATE COURT IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE AND MAKER HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF HOLDER TO BRING PROCEEDINGS AGAINST MAKER IN THE COURTS OF ANY OTHER JURISDICTION. ANY JUDICIAL PROCEEDING BY MAKER AGAINST HOLDER OR ANY AFFILIATE THEREOF INVOLVING DIRECTLY OR INDIRECTLY ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR IN CONNECTION WITH THIS NOTE SHALL BE BROUGHT ONLY IN A COURT IN DELAWARE.

(H)     MAKER AND HOLDER EACH WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. MAKER AND HOLDER EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS NOTE OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE.

*{Signature Page Follows}*

5

IN WITNESS WHEREOF, Maker has executed and delivered this Note on this     day of          , 2007.

TRIBUNE COMPANY

By:     _____
Name:   _____
Its:    _____

Acknowledged and agreed to as of
this     day of          , 2007

EGI-TRB, L.L.C.

By:     _____
Name:   _____
Its:    _____

Signature Page to Subordinated Promissory Note

Source: TRIBUNE CO, 8-K, April 05, 2007

Exhibit 10.5

EXHIBIT C
[FINAL FORM]

THIS WARRANT AND THE SECURITIES ISSUABLE UPON THE EXERCISE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT. THIS WARRANT IS SUBJECT TO THE TERMS OF AN INVESTOR RIGHTS AGREEMENT AMONG THE COMPANY, EGI-TRB, L.L.C., AND GREATBANC TRUST COMPANY, SOLELY AS TRUSTEE OF THE TRIBUNE EMPLOYEE STOCK OWNERSHIP TRUST WHICH FORMS PART OF THE TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN.

Date of Issuance ("Issue Date"):

[      ], 200[7]

Void after:

[      ], 202[  ]

Certificate No. W-_____

## WARRANT TO PURCHASE SHARES OF COMMON STOCK

For value received, the receipt and sufficiency of which is hereby acknowledged, this Warrant is issued to EGI-TRB, L.L.C., a Delaware limited liability company (the "Holder"), by Tribune Company, a Delaware corporation (the "Company").

1.    **Purchase of Shares**.

(a)    Number of Shares.  Subject to the terms and conditions set forth herein, the Holder shall be entitled, at any time, from time to time, upon surrender of this Warrant, to purchase from the Company an aggregate of 43,478,261 duly authorized, validly issued, fully paid and nonassessable shares (the "Shares") of the Company's common stock, par value $0.01 per share (the "Common Stock"). The term "Warrant" as used herein shall be deemed to include any warrants issued upon transfer or partial exercise of this Warrant unless the context clearly requires otherwise.

(b)    Exercise Price.  In respect of any exercise, in whole or in part, of the Warrant pursuant to Section 1(a) above, the exercise price per Share issuable upon such exercise shall be $11.50 (the "Exercise Price"). Notwithstanding the immediately preceding sentence, the Shares and the Exercise Price shall be subject to adjustment pursuant to Section 8 hereof. In addition, on each of the first ten anniversary dates of the Issue Date, the Exercise Price in effect immediately prior to such anniversary date (the "Prior Exercise Price") shall be increased by an amount equal to the Prior Exercise Price multiplied by the percentage set forth opposite the applicable anniversary date as hereinafter set forth. For the avoidance of doubt, the applicable Exercise Price for each period, assuming no other adjustments in accordance with Section 8, is set forth below under the heading "Exercise Price Without Section 8 Adjustment" with respect to the year that commences on the anniversary date indicated.

| Anniversary Date | Percentage Increase to Exercise Price | Exercise Price Without Section 8 Adjustment |
|---|---|---|
| First anniversary of Issue Date | 2.000000% | $ 11.73 |
| Second anniversary of Issue Date | 1.960784% | $ 11.96 |
| Third anniversary of Issue Date | 1.923077% | $ 12.19 |
| Fourth anniversary of Issue Date | 1.886792% | $ 12.42 |
| Fifth anniversary of Issue Date | 1.851852% | $ 12.65 |
| Sixth anniversary of Issue Date | 1.818182% | $ 12.88 |
| Seventh anniversary of Issue Date | 1.785714% | $ 13.11 |
| Eighth anniversary of Issue Date | 1.754386% | $ 13.34 |
| Ninth anniversary of Issue Date | 1.724138% | $ 13.57 |
| Tenth anniversary of Issue Date | 1.694915% | $ 13.80 |

Following the tenth anniversary of the Issue Date, there shall be no further changes to the Exercise Price, except as provided in Section 8 hereof.

(c)     Vesting and Exercisability of Shares. This Warrant shall be fully vested and exercisable as of the date of issuance set forth above.

2.     Exercise Period. This Warrant shall be exercisable, in whole or in part, during the term commencing on the date hereof and ending on [        ], 202[    ].(1)

3.     Method of Exercise.

(a)     While this Warrant remains outstanding and exercisable in accordance with Section 2 above, the Holder may exercise, in whole or in part, the purchase rights evidenced hereby.  Such exercise shall be effected by:

(i)     the surrender of the Warrant, together with a duly executed copy of the Notice of Exercise attached hereto, to the Secretary of the Company at its principal office (or at such other place as the Company shall notify the Holder in writing);

(ii)     the delivery to the Company of a written opinion of counsel to the Holder in form and substance reasonably satisfactory to the Company that the transferee of the Warrant will be an eligible S corporation holder; and

(iii)     except in connection with a Net Exercise (as defined below) pursuant to Section 4 below, the payment to the Company by wire transfer to an account designated by the Company of an amount equal to the aggregate Exercise Price for the number of Shares being purchased.

(b)     Each exercise of this Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which this Warrant is surrendered to the Company as provided in Section 3(a) above.  At such time, the person or persons in whose name or names any certificate for the Shares shall be issuable upon such

---

(1)     Such date to be the fifteenth (15th) anniversary of the issuance date of the Warrant.

2

Source: TRIBUNE CO, 8-K, April 05, 2007