exercise as provided in Section 3(c) below shall be deemed to have become the holder or holders of record of the Shares represented by such certificate. As used in this Warrant, "person" means any individual, partnership, limited liability company, corporation, association, joint stock company, trust, joint venture, unincorporated organization or any federal, state, county or municipal governmental or quasi-governmental agency, department, commission, board, bureau or instrumentality or any other entity.

(c)    As soon as reasonably practicable after the exercise of this Warrant in whole or in part, the Company at its expense will cause to be issued in the name of, and delivered to, the Holder, or as the Holder may direct:

(i)    a certificate or certificates (with appropriate restrictive legends) for the number of Shares to which the Holder shall be entitled in such denominations as may be requested by the Holder; and

(ii)    in case such exercise is in part only, a new warrant or warrants (dated the date hereof) of like tenor, calling in the aggregate on the face or faces thereof for the number of Shares equal to the number of such Shares described in this Warrant minus the number of such Shares purchased by the Holder upon all exercises made in accordance with Section 3(a) above or Section 4 below.

(d)    Notwithstanding any other provisions hereof, if an exercise of any portion of this Warrant is to be made in connection with the consummation of a sale of the Company's Common Stock or other securities pursuant to a registration statement under the Securities Act of 1933, as amended (the "Act") (other than a registration statement relating either to a sale of securities to employees of the Company pursuant to its stock option, stock purchase or other similar plan or to a Securities and Exchange Commission ("SEC") Rule 145 transaction) (the "Public Offering"), or a Sale of the Company (as defined below), the exercise of any portion of this Warrant may, at the election of the Holder hereof, be conditioned upon the consummation of the Public Offering or Sale of the Company, in which case such exercise shall not be deemed to be effective until the consummation of such transaction. A "Sale of the Company" shall mean (i) the closing of the sale, lease, transfer or other disposition of all or substantially all of the Company's assets, (ii) the consummation of a merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of capital stock of the Company immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the capital stock of the Company or the surviving or acquiring entity), (iii) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons not affiliated with the Company (other than an underwriter of the Company's securities), of the Company's securities if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting stock of the Company (or the surviving or acquiring entity) or (iv) a liquidation, dissolution or winding up of the Company, whether voluntary or involuntary; provided, however, that a transaction described in (i), (ii) or (iii) above shall not constitute a Sale of the Company if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately prior to such transaction. For purposes of this Warrant, "affiliate" shall mean, with respect to any specified person, any other person that

3

Source: TRIBUNE CO, 8-K, April 05, 2007

directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified person.

                (e)      Notwithstanding anything else to the contrary herein, in connection with a proposed Sale of the Company, the Holder shall, upon ten days prior written notice to the Company, have the right (but not the obligation) to require the Company to redeem (and the Company shall redeem) in connection with consummation of such Sale of the Company all or any portion of the Warrant, without exercising it, for consideration equal to the same number of shares of Common Stock and amount of cash and other property that the Holder would have been entitled to receive upon such Sale of the Company had this Warrant (or any portion thereof) been exercised immediately prior to consummation of such Sale of the Company using the Net Exercise procedures specified in Section 4.

4.        Net Exercise. In lieu of exercising this Warrant for cash, the Holder may elect to receive Common Stock (or other cash or property the Holder may be entitled to pursuant to Section 8(b)) equal to the value of this Warrant (or the portion thereof being exercised) (a "Net Exercise"). Upon a Net Exercise, the Holder shall have the rights described in Sections 3(b) and 3(c) hereof, and the Company shall issue to the Holder a number of Shares computed using the following formula:

$$X = Y \frac{(A - B)}{A}$$

Where

        X =      The number of Shares to be issued to the Holder.

        Y =      The number of Shares purchasable under this Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being exercised (at the date of such calculation).

        A =      The Fair Market Value of one (1) Share (at the date of such calculation).

        B =      The Exercise Price (as adjusted to the date of such calculation).

      For purposes of this Warrant, the "Fair Market Value" of a Share shall mean the average of the closing prices of the Shares quoted in the over-the-counter market in which the Shares are traded or the closing price quoted on any exchange or electronic securities market on which the Shares are listed, whichever is applicable, as published in *The Wall Street Journal* for the thirty (30) trading days prior to the date of determination of fair market value (or such shorter period of time during which such Shares were traded over-the-counter or on such exchange). In the event that this Warrant is exercised pursuant to this Section 4 in connection with the consummation of the Company's sale of its Common Stock or other securities pursuant to a Public Offering, the Fair Market Value per Share shall be the per share offering price to the public of the Public Offering. In the event this Warrant is redeemed pursuant to Section 3(e) above or exercised pursuant this Section 4, in each case, in connection with consummation of a Sale of the Company, the Fair Market Value per Share shall be equal to the Fair Market Value of the consideration per Share that the Holder would have been entitled to receive upon such Sale of

4

the Company had this Warrant been redeemed or exercised immediately prior to the effective time of the Sale of the Company. If the Shares are not traded on the over-the-counter market, an exchange or an electronic securities market, the Fair Market Value shall be the price per Share that the Company could obtain from a willing buyer for Shares sold by the Company from authorized but unissued Shares, as such prices shall be reasonably determined in good faith by the trustee (the "ESOP Trustee") of the Company's employee stock ownership trust which forms part of the Company's employee stock ownership plan (the "ESOP") based upon a written valuation of the Company's shares of Common Stock prepared by an independent appraiser retained by the Company to determine the Fair Market Value of the Shares for purposes of the ESOP and delivered to the Holder.

For purposes of this Warrant, the "Fair Market Value" of property (including, without limitation, securities) other than Shares shall mean the fair market value thereof, as shall be reasonably determined in good faith by the Board of Directors of the Company (the "Board") and set forth in a written resolution delivered to the Holder. Any determination of Fair Market Value of property other Shares shall be subject to the Holder's contest and appraisal rights set forth in Section 8(h) hereof. Furthermore, at any time prior to the consummation of a Net Exercise other than in connection with a Sale of the Company, the Holder shall have the right in its sole and absolute discretion to (a) rescind its election to exercise the Warrant pursuant to Section 3(a) above or (b) rescind its election to effect a Net Exercise and instead pay to the Company the aggregate Exercise Price in accordance with Section 3(a) for the number of Shares being purchased.

5.    **Regulatory Requirements**.

(a)    Hart-Scott-Rodino. If any filing or notification becomes necessary pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), based upon the planned exercise of this Warrant or any portion hereof, the Holder shall notify the Company of such requirement, and the Holder and the Company shall file with the proper authorities all forms and other documents necessary to be filed pursuant to the HSR Act, as promptly as possible and shall cooperate with each other in promptly producing such additional information as those authorities may reasonably require to allow early termination of the notice period provided by the HSR Act or as otherwise necessary to comply with requirements of the Federal Trade Commission or the Department of Justice. The Holder and the Company agree to cooperate with each other in connection with such filings and notifications, and to keep each other informed of the status of the proceedings and communications with the relevant authorities. Each of the Holder and the Company shall pay its own filing fee in connection with any filings required under the HSR Act as a result of the exercise of Warrants and shall each bear its own expenses incurred in connection with any filing required pursuant to the HSR Act. Each Holder by acceptance of this Warrant or any portion hereof agrees to comply with the provisions of this Section 5(a).

(b)    Other Regulatory Requirements. If the Holder or, upon the advice of counsel, the Company, determines that the exercise of this Warrant would require prior notice to, or the consent or approval by, the Federal Communications Commission or any other regulatory agency that is vested with jurisdiction over the Company, the Holder and the Company shall make all necessary filings and notifications required, and shall have received all

5

Source: TRIBUNE CO, 8-K, April 05, 2007

required consents, approvals, orders or otherwise, prior to effecting the exercise of this Warrant. The Company shall be required to pay all filing fees in connection with such filings and notifications.

6.    <u>Representations and Warranties of the Company</u>. In connection with the transactions provided for herein, the Company hereby represents and warrants to the Holder that:

(a)    <u>Organization, Good Standing, and Qualification</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified and is authorized to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

(b)    <u>Authorization</u>. All corporate action on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Warrant by the Company, the performance of all obligations of the Company hereunder, and the authorization, issuance (or reservation for issuance), sale and delivery of the Shares issuable hereunder has been taken, and this Warrant constitutes a valid and legally binding obligation of the Company, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c)    <u>Compliance with Other Instruments</u>. The authorization, execution and delivery of the Warrant will not constitute or result in a material default or violation of any law or regulation applicable to the Company or any material term or provision of the Company's current certificate of incorporation or bylaws, or any material agreement or instrument by which it is bound or to which its properties or assets are subject.

(d)    <u>Valid Issuance of Common Stock</u>. The Shares, when issued, sold, and delivered in accordance with the terms of this Warrant for the consideration expressed herein, will be duly authorized, validly issued, fully paid and nonassessable and free from all preemptive rights, taxes, liens and charges with respect to the issuance thereof. Based in part upon the representations and warranties of the Holder in this Warrant, the offer, sale and issuance of this Warrant and the issuance of Shares upon exercise of this Warrant, are and will be exempt from the registration requirements of any applicable state and federal securities laws, and neither the Company nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemption.

7.    <u>Representations and Warranties of the Holder</u>. In connection with the transactions provided for herein, the Holder hereby represents and warrants to the Company that:

(a)    <u>Authorization</u>. The Holder has full power and authority to enter into this Warrant, and this Warrant constitutes its valid and legally binding obligation, enforceable in accordance with its terms except (i) as limited by applicable bankruptcy,

6

Source: TRIBUNE CO, 8-K, April 05, 2007

insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(b)  Accredited Investor.  The Holder is an "accredited investor" within the meaning of Rule 501 of Regulation D, as presently in effect, as promulgated by the SEC.

(c)  Restricted Securities.  The Holder understands that the securities are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration only in certain limited circumstances.  In this connection, the Holder represents that it is familiar with Rule 144, as presently in effect, as promulgated by the SEC ("Rule 144"), and understands the resale limitations imposed thereby and by the Act.

(d)  Legends.  It is understood that the Shares may bear the following legend:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT   UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT.  THESE SECURITIES ARE SUBJECT TO THE TERMS OF AN INVESTOR RIGHTS AGREEMENT AMONG THE COMPANY, EGI-TRB, L.L.C. AND GREATBANC TRUST COMPANY, SOLELY AS TRUSTEE OF THE TRIBUNE EMPLOYEE STOCK OWNERSHIP TRUST WHICH FORMS PART OF THE TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN."

8.  **Adjustment of Exercise Price and Number of Shares**.  The number and kind of Shares purchasable upon exercise of this Warrant and the Exercise Price shall be subject to adjustment from time to time as follows:

(a)  Subdivisions, Combinations and Other Issuances.  If the Company shall at any time after the issuance but prior to the expiration of this Warrant subdivide its Common Stock, by split-up or otherwise, or combine its Common Stock, or issue additional shares of its Common Stock as a dividend or distribution with respect to any shares of its Common Stock, the number of Shares issuable on the exercise of this Warrant shall forthwith be proportionately increased in the case of a subdivision or stock dividend or distribution, or proportionately decreased in the case of a combination.  The Exercise Price in effect prior to such subdivision, combination or issuance shall forthwith be proportionately decreased in the case of a subdivision or stock dividend or distribution, or proportionately increased in the case of a combination, but the aggregate Exercise Price payable for the total number of Shares purchasable under this Warrant (as adjusted) shall remain the same.  Any adjustment under this

7

Section 8(a) shall become effective at the close of business on the date the subdivision or combination becomes effective, or as of the record date of such dividend, or in the event that no record date is fixed, upon the making of such dividend.

(b)      Reclassification, Reorganization and Consolidation. In the event of any corporate reclassification, capital reorganization, consolidation, spin-off, merger, transfer of all or a substantial portion of the Company's properties or assets or any dissolution, liquidation or winding up of the Company (other than as a result of a subdivision, combination, dividend or distribution provided for in Section 8(a) above) (a "Corporate Transaction"), then, as a condition of such event, provision shall be made, and duly executed documents evidencing the same from the Company and any surviving or acquiring person (the "Successor Company") shall be delivered to the Holder, so that the Holder shall have the right to receive upon exercise of this Warrant the same number of shares of Common Stock and amount of cash and other property that the Holder would have been entitled to receive upon such Corporate Transaction had this Warrant been exercised immediately prior to the effective time of such Corporate Transaction. The Company shall provide that any Successor Company in such Corporate Transaction shall enter into an agreement with the Company confirming the Holder's rights pursuant to this Warrant, assuming the Company's obligations under this Warrant, jointly and severally with the Company if the Company shall survive such Corporate Transaction, and providing after the date of such Corporate Transaction for adjustments, which shall be as nearly equivalent as possible to the adjustments provided for in this Section 8. The Company shall ensure that the Holder is a beneficiary of such agreement and shall deliver a copy thereof to the Holder. The provisions of this Section 8(b) shall apply similarly to successive Corporate Transactions involving any Successor Company. In the event of a Corporate Transaction in which consideration payable to holders of Common Stock is payable solely in cash, then the Holder shall be entitled to receive in exchange for this Warrant cash in an amount equal to the amount the Holder would have received had the Holder exercised this Warrant immediately prior to such Corporate Transaction, less the aggregate Exercise Price for this Warrant then in effect. In case of any Corporate Transaction described in the immediately preceding sentence of this Section 8(b), the Company or any Successor Company, as the case may be, shall make available any funds necessary to pay to the Holder the amount to which the Holder is entitled as described above in the same manner and at the same time as holders of Common Stock would be entitled to such funds.

(c)      Dividends and Distributions. In the event that the Company at any time or from time to time declares, orders, pays or makes any dividend or other distribution on the Common Stock, including, without limitation, distributions of cash, evidence of its indebtedness, Options, Convertible Securities, other securities or property or rights to subscribe for or purchase any of the forgoing, and whether by way of dividend, spin-off, reclassification, recapitalization, similar corporate reorganization or otherwise, other than (x) a dividend or distribution payable in additional shares of Common Stock that gives rise to an adjustment pursuant to Section 8(a) hereof, or (y) any dividend or distribution paid in cash out of retained earnings of the Company to the ESOP only to the extent subsequently paid to the Company to fund repayment of then-outstanding ESOP debt, then, and in each such case, the Exercise Price of this Warrant shall be reduced to a number determined by dividing the previously applicable Exercise Price by a fraction (which must be greater than 1, otherwise no adjustment is to be made pursuant to this Section 8(c)) (i) the numerator of which shall be the Fair Market Value per share of Common Stock on the record date for such dividend or other distribution, and (ii) the

8

denominator of which shall be the excess, if any, of (x) such Fair Market Value per share of Common Stock, over (y) the sum of the amount of any cash distribution per share of Common Stock plus the positive Fair Market Value, if any, per share of Common Stock of any such evidences of indebtedness, Options, Convertible Securities, other securities or property or rights to be so distributed.  Such adjustments shall be made whenever any such dividend or other distribution is made and shall become effective as of the date of such distribution, retroactive to the record date therefor.  For purposes of this Warrant the term "Options" means rights, options or warrants to subscribe for, purchase or otherwise acquire, directly or indirectly, shares of Common Stock, including, without limitation, Convertible Securities.  "Convertible Securities" means any evidences of indebtedness, shares of capital stock or any other securities convertible into or exchangeable for, directly or indirectly, shares of Common Stock.

(d)     Other Events.  If any other similar event occurs as to which the provisions of this Section 8 are not strictly applicable or if strictly applicable would not fairly protect the purchase rights of the Holder in accordance with such provisions, then the Board shall make an adjustment in the number of Shares available under this Warrant, the Exercise Price or the applicability of such provisions so as to protect such purchase rights.  The adjustment shall be such as will give the Holder upon exercise for the same aggregate Exercise Price the total number of shares of Common Stock as the Holder would have owned had this Warrant been exercised prior to the event and had the Holder continued to hold such Common Stock until after the event requiring the adjustment, but in no event shall any such adjustment have the effect of increasing or decreasing the Exercise Price.

(e)     Minimum Adjustment.  The adjustments required by the preceding subsections of this Section 8 shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the Exercise Price or the number of Shares purchasable upon exercise of this Warrant that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made decreases the Exercise Price immediately prior to the making of such adjustment by at least $0.01 or increases or decreases the number of Shares purchasable upon exercise of this Warrant immediately prior to the making of such adjustment by at least one Share.  Any adjustment representing a change of less than such minimum amount shall be carried forward and made as soon as such adjustment, together with other adjustments required by this Section 8 and not previously made, would result in the requisite minimum adjustment.

(f)     Accountants' Report as to Adjustments.  In the case of any adjustment in the number of Shares purchasable upon exercise of this Warrant or the Exercise Price, the Company, at its sole expense, shall promptly (i) compute such adjustment in accordance with the terms of this Warrant and, if the Holder so requests in writing from the Company within 30 days of receipt of such computations from the Company, cause independent certified public accountants of recognized national standing to verify such computation (other than any determination of the Fair Market Value), (ii) prepare a report setting forth such adjustment and showing in reasonable detail the method of calculation thereof and the facts upon which such adjustment is based, including, without limitation, (A) the event or events giving rise to such adjustment, (B) the number of shares of Common Stock outstanding or deemed to be outstanding prior and subsequent to any such transaction, (C) the method by which any such adjustment was calculated (including a description of the basis on which the Board made any

9

Source: TRIBUNE CO, 8-K, April 05, 2007

determination of Fair Market Value or fair market value required thereby) and (D) the number of Shares purchasable upon exercise of this Warrant and the Exercise Price in effect immediately prior to such event or events and as adjusted, (iii) mail a copy of each such report to the Holder and, upon the request at any time of the Holder, furnish to the Holder a like report setting forth the number of Shares purchasable upon exercise of this Warrant and the Exercise Price at the time in effect and showing in reasonable detail how they were calculated and (iv) keep copies of all such reports available at the principal office of the Company for inspection during normal business hours by the Holder or any prospective purchaser of this Warrant designated by the Holder.

(g)     No Dilution or Impairment.  The Company shall not, by amendment of its certificate of incorporation or other organizational document or through any sale or other issuance of securities, capital reorganization, reclassification, recapitalization, consolidation, merger, transfer of assets, dissolution, liquidation, winding-up, any similar transaction or any other voluntary action, solely to avoid or solely to seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all terms hereunder and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against dilution or other impairment in a manner that is consistent with the Company's obligations hereunder. Without limiting the generality of the foregoing, the Company (i) will not permit the par value of any shares of Common Stock receivable upon the exercise of this Warrant to exceed the Exercise Price and (ii) will take all such action as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon the exercise of this Warrant by the Holder.  Without limiting the generality of the foregoing, before taking any action that would cause a reduction of the Exercise Price pursuant to Section 8 hereof below the then par value (if any) of the Common Stock, the Company shall take any and all corporate action (including, without limitation, a reduction in par value) which shall be necessary to validly and legally issue fully paid and nonassessable shares of Common Stock, as the case may be, at the Exercise Price as so reduced.

(h)     Contest and Appraisal Rights.  If the Holder shall, in good faith, disagree with any determination by the Board of the Fair Market Value made pursuant to this Warrant, and such disagreement is in respect of securities not traded on a national securities exchange or quoted on an automated quotation system or other property valued by the Board at more than $10,000,000, then the Holder may by notice to the Company (an "Appraisal Notice"), given within 30 days after notice to the Holder following such determination, elect to contest such determination; provided, however, that the Holder may not seek appraisal of any determination of Fair Market Value to the extent based upon the determination of the ESOP Trustee or if the Company has received a fairness opinion or other appraisal from an independent nationally recognized investment bank or other qualified financial institution acceptable to the Company and the Holder (the "Appraiser") in connection with the transaction giving rise to such determination.  Within 20 days after an Appraisal Notice, the Company shall engage an Appraiser to make an independent determination of such Fair Market Value (the "Appraiser's Determination"), who shall deliver to the Company and the Holder a report describing its methodology and results in reasonable detail within 30 days of such engagement.  In arriving at its determination, the Appraiser shall base any valuation of property on the fair market value of such property assuming that such property was sold in an arm's length transaction between an

10

Source: TRIBUNE CO, 8-K, April 05, 2007

informed and willing buyer and an informed and willing seller, under no compulsion to buy or sell, taking into account all the relevant facts and circumstances then prevailing. The Holder shall be afforded reasonable opportunities to discuss the appraisal with the Appraiser. The Appraiser's Determination shall be final and binding on the Company and the Holders, absent manifest error. The costs of conducting an appraisal shall be borne by the Company.

(i)      Notice of Corporate Action. In the event the Company proposes to: (i) pay, distribute, or take a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution, or any right to subscribe for, purchase or otherwise acquire any shares of capital stock or any other securities or property, or (ii) consummate any capital reorganization, reclassification, recapitalization, consolidation, merger, transfer of all or substantially all of its assets, dissolution, liquidation or winding-up, or any similar transaction then, at least 10 days prior to the earlier of any applicable record date or such event, as the case may be, the Company shall mail to the Holder a notice specifying: (A) the date or expected date on which any such payment or distribution is to be made or record is to be taken and the amount and character of any such dividend, distribution or right, (B) the date or expected date on which any such reorganization, reclassification, recapitalization, consolidation, merger, transfer, dissolution, liquidation, winding-up or similar transaction is to take effect and any record date therefor, (C) the time as of which any holders of record of shares of Common Stock and/or any other class of securities shall be entitled to exchange their shares of Common Stock and/or other securities for the securities or other property deliverable upon such reorganization, reclassification, recapitalization, consolidation, merger, transfer, dissolution, liquidation, winding-up or similar transaction and a description in reasonable detail of such transaction and (D) in each case, the expected effect on the number of Shares purchasable upon exercise of this Warrant and the Exercise Price of each such transaction or event. The Company shall update any such notice to reflect any change in the foregoing information.

9.      **No Fractional Shares**. No fractional shares of Common Stock shall be issued in connection with any exercise hereunder, but in lieu of such fractional shares the Company shall make a cash payment therefor based on the Fair Market Value thereof.

10.     **Other Antidilution Provisions**. In the event that the Company proposes to issue, sell, grant or assume any convertible or exchangeable debt (including, without limitation, debt issued by any affiliate of the Company convertible or exchangeable for shares of Common Stock) or equity securities which, in the aggregate, provide for greater or more favorable antidilution protection than the antidilution protection provided for in Section 8 hereof, then the Company shall give the Holder 30 business days' prior written notice of its intention to do so and offer the Holder the right to participate in such issuance, sale, grant or assumption on the same terms and conditions as proposed and to purchase a percentage of the aggregate amount of such convertible or exchangeable debt or aggregate number of such equity securities (or aggregate number of units, in the event that the convertible or exchangeable debt or equity securities are proposed to be issued, sold, granted or assumed together with other securities of the Company) proposed to be issued, sold, granted or assumed equal to a percentage determined by dividing (a) the total number of shares of Common Stock issuable upon exercise of this Warrant or any portion hereof then held by the Holder, its affiliates or permitted transferees by (b) the total number of outstanding shares of Common Stock on a fully diluted basis before

11

Source: TRIBUNE CO, 8-K, April 05, 2007

giving effect to any such proposed transaction. The Holder shall notify the Company of its intention to participate in such transaction within 15 business days of receipt of written notice from the Company. For the avoidance of doubt, a different exercise price or trigger price for the application of such rights (including any such price based on fair market value) shall not by itself be considered more favorable.

11.    **No Stockholder Rights**.  Prior to exercise of this Warrant, the Holder shall not be entitled to any rights of a stockholder with respect to the Shares, including (without limitation) the right to vote such Shares, receive dividends or other distributions thereon, exercise preemptive rights or be notified of stockholder meetings, and, except as otherwise provided in this Warrant, such Holder shall not be entitled to any stockholder notice or other communication concerning the business or affairs of the Company.

12.    **Transfer of Warrant**.  Subject to compliance with applicable federal and state securities laws and any other contractual restrictions between the Company and the Holder contained herein and in the Investor Rights Agreement, this Warrant and all rights hereunder are transferable, in whole or in part, by the Holder to any Permitted Transferee upon written notice to the Company. Within a reasonable time after the Company's receipt of (x) an executed Assignment Form in the form attached hereto, (y) the written opinion of counsel to the Holder in form and substance reasonably satisfactory to the Company that the transferee of the Warrant will be an eligible S corporation holder and (z) the execution by the Permitted Transferee of a Joinder to the Investor Rights Agreement in form and substance reasonably satisfactory to the Company, the transfer shall be recorded on the books of the Company upon the surrender of this Warrant, properly endorsed, to the Company at its principal offices, and the payment to the Company of all transfer taxes and other governmental charges imposed on such transfer. In the event of a partial transfer, the Company shall issue to the new holders one or more appropriate new warrants. The Company will at no time close its transfer books against the transfer of this Warrant or of any Shares issued or issuable upon the exercise of this Warrant in any manner which interferes with the timely exercise of this Warrant.  For purposes of this Section 12, "Permitted Transferee" shall mean any direct or indirect affiliate of the Holder, Equity Group Investments, L.L.C. or Samuel Zell; any direct or indirect member of the Holder and any direct or indirect affiliate thereof; any senior employee of Equity Group Investments, L.L.C. and any direct or indirect affiliate thereof; and Samuel Zell and his spouse, lineal ancestors and descendants (whether natural or adopted), any trust or retirement account primarily for the benefit of Samuel Zell and/or his spouse, lineal ancestors and descendants and any private foundation formed by Samuel Zell.

13.    **Governing Law**.  This Warrant shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

14.    **Successors and Assigns**.  The terms and provisions of this Warrant shall inure to the benefit of, and be binding upon, the Company and the holders hereof and their respective successors and assigns. This Warrant shall be binding upon any corporation or other entity succeeding the Company by merger, consolidation or acquisition of all or substantially all

12

Source: TRIBUNE CO, 8-K, April 05, 2007

of the Company's assets. All of the obligations of the Company relating to the Shares issuable upon the exercise of this Warrant shall survive the exercise and termination of this Warrant.

15.    **Headings**. Headings of the Sections of this Warrant are for convenience of the parties only and shall be given no substantive or interpretive effect whatsoever.

16.    **Notices**. Any notice required to be given hereunder shall be sufficient if in writing, and sent by facsimile transmission (provided that any notice received by facsimile transmission or otherwise at the addressee's location on any business day after 5:00 p.m. (addressee's local time) shall be deemed to have been received at 9:00 a.m. (addressee's local time) on the next business day), by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows:

To the Company:

> Tribune Company
> 435 North Michigan Avenue
> Chicago, IL 60611
> Attn: c/o Crane H. Kenney
> Senior Vice President, General Counsel & Secretary
> Tel: (312) 222-2491
> Fax: (312) 222-4206

with copies to:

> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, NY 10019
> Attn: Steven A. Rosenblum and Peter E. Devine
> Tel: (212) 403-1221 and (212) 403-1179
> Fax: (212) 403-1179

To the Holder:

> EGI-TRB, L.L.C.
> c/o Equity Group Investments, L.L.C.
> Two North Riverside Plaza, Suite 600
> Chicago, IL 60606
> Attn: Joseph M. Paolucci and Marc D. Hauser
> Tel: (312) 466-3885 and (312) 466-3281
> Fax: (312) 454-0335

13

Source: TRIBUNE CO, 8-K, April 05, 2007

with copies to:

> Jenner & Block LLP
> 330 N. Wabash Ave.
> Chicago, IL 60611
> Attn: Joseph P. Gromacki
> Tel: (312) 923-2637
> Fax: (312) 923-2737

17.     **Entire Agreement; Amendments and Waivers**.  This Warrant and the documents delivered pursuant hereto constitute the entire agreement, and supersede all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.  Any provision of this Warrant may be amended or waived if, and only if, such amendment or waiver is in writing and signed.

18.     **Severability**.  Any term or provision of this Warrant which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Warrant in any other jurisdiction.  If any provision of this Warrant is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

19.     **Reservation of Shares**.  The Company covenants and agrees that during the period within which the rights represented by this Warrant may be exercised, the Company will at all times have authorized and reserved, for the purpose of issue or transfer upon exercise of the subscription rights evidenced by this Warrant, a sufficient number of shares of authorized but unissued Common Stock, or other securities and property, when and as required to provide for the exercise of the rights represented by this Warrant.  The Company will take all such action as may be necessary to assure that such Shares may be validly issued as provided herein without violation of any applicable law or regulation or of any requirements of any domestic securities exchange upon which the Shares may be listed.

20.     **Issue Tax**.  The issuance of certificates for Shares upon the exercise of this Warrant shall be made without charge to the Holder of this Warrant for any issue tax in respect thereof; provided, however, that the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than that of the then Holder of this Warrant being exercised.

21.     **Remedies**.  The Company stipulates that the remedies at law of the Holder in the event of any default or threatened default by the Company in the performance of or compliance with any of the terms of this Warrant are not and will not be adequate, and that such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any terms hereof or otherwise.  No failure or delay on the part of the Holder in exercising any right, power or remedy hereunder shall operate as a suspension or waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any

14

Source: TRIBUNE CO, 8-K, April 05, 2007

other right, power or remedy hereunder. The remedies herein provided are in addition to and not exclusive of any other remedies provided at law or in equity.

22.     **Lost Warrants or Stock Certificates**.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction, or mutilation of any Warrant or stock certificate representing any Shares issued hereunder and, in the case of any such loss, theft or destruction, upon receipt of an indemnity reasonably satisfactory to the Company, or in the case of any such mutilation upon surrender and cancellation of such Warrant or stock certificate, the Company at its expense will make and deliver a new Warrant or stock certificate, of like tenor, in lieu of the lost, stolen, destroyed or mutilated Warrant or stock certificate.

[Signature Page Follows]

15

Source: TRIBUNE CO, 8-K, April 05, 2007

IN WITNESS WHEREOF, the Company has caused this Warrant to be executed in its corporate name by its duly authorized officer and to be dated as of the date first set forth above.

**TRIBUNE COMPANY**

By: _____
Name:
Title:

**EGI-TRB, L.L.C.**

By: _____
Name:
Title:

**Signature Page to Warrant Agreement**

Source: TRIBUNE CO, 8-K, April 05, 2007

## NOTICE OF EXERCISE

TRIBUNE COMPANY
Attention:  Corporate Secretary

The undersigned hereby elects to purchase, pursuant to the provisions of the Warrant, as follows:

shares of Common Stock pursuant to the terms of the attached Warrant, and tenders herewith payment in cash of the Exercise Price of such Shares in full, together with all applicable transfer taxes, if any.

Net Exercise the attached Warrant with respect to            Shares.

### HOLDER:

Date: _____        By:_____

Address:_____

_____

_____

Name in which shares should be registered:

_____

## ASSIGNMENT FORM

(To assign the foregoing Warrant, execute this form and supply required information.  Do not use this form to purchase shares.)

**FOR VALUE RECEIVED,** the foregoing Warrant and all rights evidenced thereby are hereby assigned to

Name: _____
                                        (Please Print)

Address: _____
                                        (Please Print)

Dated: _____

Holder's
Signature: _____

Holder's
Address: _____

NOTE:  The signature to this Assignment Form must correspond with the name as it appears on the face of the Warrant.  Officers of corporations and those acting in a fiduciary or other representative capacity should provide proper evidence of authority to assign the foregoing Warrant.

Source: TRIBUNE CO, 8-K, April 05, 2007

**Exhibit 10.6**
[EXECUTION COPY]

## ESOP PURCHASE AGREEMENT

THIS ESOP PURCHASE AGREEMENT ("Agreement") is made this 1st day of April, 2007, between TRIBUNE COMPANY (the "Company") and GREATBANC TRUST COMPANY, not in its individual or corporate capacity, but solely as trustee (the "Trustee") of the TRIBUNE EMPLOYEE STOCK OWNERSHIP TRUST ("Purchaser" or the "Trust"), a separate trust created under the Tribune Employee Stock Ownership Plan (the "ESOP").

RECITALS:

WHEREAS, concurrently herewith, the Company has executed a merger agreement with the ESOP (the "Merger Agreement") pursuant to which a corporation formed by the ESOP (the "Initial ESOP Entity") will be merged with and into the Company (the "Merger"), with the Company being the surviving entity (the "Surviving Corporation");

WHEREAS, concurrently herewith, the Company, EGI-TRB, L.L.C., a Delaware limited liability company, and the Trustee, on behalf of the ESOP, have entered into that certain Investor Rights Agreement pursuant to which the parties thereto will have certain rights and obligations regarding the Surviving Corporation following the Merger;

WHEREAS, concurrently with execution of the Merger Agreement and subject to the terms and conditions of this Agreement, the Company desires to sell, and Purchaser desires to purchase, shares (the "Shares") of the Company's common stock, par value $.01 per share ("Common Stock"), having an aggregate purchase price of $250,000,000 (with the meaning of the word "Shares" including both the shares of the Company to be acquired as of the date of this Agreement and any such shares into which the Shares may be converted as a result of the Merger or other similar transaction);

WHEREAS, pursuant to the Merger Agreement, the Company will launch a tender offer at a purchase price of $34.00 per share for a maximum number of shares calculated to provide a return of capital to shareholders of $17.50 per share (the "Stock Repurchase");

WHEREAS, the ESOP wishes to acquire the Shares for its account and for the purpose of investment and not with a view of distribution or resale thereof and, accordingly, will not tender any of the Shares into the Stock Repurchase; and

WHEREAS, to induce Purchaser to purchase the Shares, the Company wishes to make (i) various representations and warranties and (ii) certain covenants for the benefit of Purchaser.

NOW, THEREFORE, in consideration of the foregoing and of the mutual agreements, covenants, and undertakings contained herein, and subject to and the terms and conditions herein set forth below, the parties to this Agreement hereby agree as follows:

SECTION 1.                        PURCHASE OF SHARES

        Subject to the terms and conditions of this Agreement, at the Closing (as defined in Section 3 hereof), the Company will transfer to Purchaser, and Purchaser will purchase the Shares.

SECTION 2.                        PURCHASE PRICE AND PAYMENT

        In full consideration of the Company's transfer and delivery to Purchaser of the Shares at the Closing, Purchaser shall pay to the Company an aggregate purchase price for the Shares of Two Hundred Fifty Million Dollars ($250,000,000.00) (the "Purchase Price"). Such payment of the Purchase Price shall be subject to the terms and conditions of this Agreement. The Purchase Price shall be payable by the Trust's delivery at the "Closing" (as defined in Section 3 below) of a promissory note dated as of the "Closing Date" (as defined in Section 3 below) and payable to the Company (the "ESOP Note" (a copy of which is attached to Schedule 1)), with (i) such note having those payment and other terms referenced in the ESOP Note and more fully described in an "ESOP Loan Agreement" of even date to which the Trust and the Company are parties (copy of which is attached to Schedule 2)), (ii) the extension of credit made under the ESOP Note and the ESOP Loan Agreement being referred to herein as the "ESOP Loan," and (iii) the extension of credit made under the ESOP Note and the ESOP Loan Agreement being secured by a pledge of the Shares pursuant to the terms of an "ESOP Pledge Agreement" of even date by and between the Company and the Trust (a copy of which is attached to Schedule 3). The number of Shares purchased hereunder shall be determined by dividing the Purchase Price by the lower of (A) the average of the last reported sales prices on each of the last twenty trading days ending on the trading date next preceding the Closing Date for a share of the Company's Common Stock on the New York Stock Exchange, (B) the last reported sales price for such a share of Common Stock on the New York Stock Exchange on the trading date next preceding the Closing Date, or (C) $28.00.

SECTION 3.                        CLOSING

        (a)        Time and Place.  The closing ("Closing") of the purchase of the Shares shall be held at a location mutually agreed upon by the Trustee and the Company on the date hereof.  The date of the Closing is referred to herein as the "Closing Date."

        (b)        Deliveries.  On the Closing Date the Trustee and the Company shall make the deliveries described in Section 8 below.

SECTION 4.                        REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

        The Company represents and warrants to the Purchaser as follows:

        (a)        Corporate Existence and Authority.  The Company (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite corporate power to execute, deliver and perform this Agreement; and (iii) has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement.

2

Source: TRIBUNE CO, 8-K, April 05, 2007

(b)    <u>Trustee Appointment.</u>  The Company has taken all necessary corporate action to appoint GreatBanc Trust Company as trustee of the Trust.

(c)    <u>No Conflict</u>.  The execution and delivery of this Agreement do not, and the consummation of the transactions contemplated hereby will not, violate, conflict with or constitute a default under (i) the Company's Certificate of Incorporation or By-Laws, (ii) any material agreement, indenture or other instrument to which the Company is a party or by which the Company or its assets may be bound or subject, or (iii) any law, regulation, order, arbitration award, judgment or decree applicable to the Company.

(d)    <u>Validity</u>.  This Agreement has been duly executed and delivered by the Company and is a valid and binding agreement of the Company enforceable against the Company in accordance with its terms, except as the enforceability thereof may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other laws affecting the enforcement of creditors' rights generally, or by general equitable principles.

(e)    <u>The Shares</u>.  The Shares have the rights, preferences and qualifications set forth in the Company's Certificate of Incorporation, have been duly authorized and, when issued and delivered against payment therefor as provided in Section 2 hereof, will be duly and validly issued and will constitute fully-paid and nonassessable shares of Common Stock of the Company.  The Company will convey to the Purchaser, on the date of Closing, good and valid title to the Shares free and clear of any liens, claims, security interests and encumbrances, except for (i) beneficial interests accruing to ESOP participants and their beneficiaries and (ii) any liens, claims, security interests and encumbrances, created or imposed by the Purchaser.

(f)    <u>ESOP Matters</u>.  The ESOP and the Trust have been duly authorized, organized and established by all necessary corporate action on the part of the Company.  The ESOP is a legal and valid employee stock ownership plan within the meaning of Section 4975(e)(7) of the Internal Revenue Code of 1986, as amended (the "Code"), is qualified under Section 401(a) of the Code, and the Trust is exempt from taxation under Section 501(a) of the Code, subject to the receipt of a favorable determination letter from the Internal Revenue Service (the "IRS").

<u>SECTION 5.</u>                    <u>REPRESENTATIONS AND WARRANTIES OF THE TRUSTEE</u>.

The Trustee represents and warrants to the Company as follows:

(a)    <u>Trustee Existence and Authority</u>.  The Trustee is a trust company organized, validly existing, and in good standing under the laws of the State of Illinois.  The Trustee has all requisite power and authority to act as Trustee and exercise trust powers, including without limitation, the trust powers provided in and contemplated under the Trust.  Further, the Trustee, on behalf of the Trust, has full power and authority under the Trust to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  This Agreement has been duly authorized, executed and delivered by the Trustee on behalf of the Trust.

(b)    <u>No Conflict</u>.  The execution and delivery of this Agreement do not, and the consummation of the transactions contemplated hereby will not, violate, conflict with or constitute a default under (i) the terms of the Trust, (ii) any agreement, indenture or other

3

instrument to which the Trust is a party or by which the Trust or its assets may be bound or subject, or (iii) any law, regulation, order, arbitration award, judgment or decree applicable to the Trust.

(c)     Validity. The Trustee has signed this Agreement as its own free act, and this Agreement constitutes the legal, valid and binding obligation of the Trustee and the Trust and is enforceable in accordance with its provisions, except to the extent limited by any applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other laws affecting creditors' rights generally, or by general equitable principles. The execution, delivery and performance of this Agreement by the Trustee, on behalf of the Trust, and the consummation of the transactions contemplated herein do not and will not require the Trustee to obtain the consent or approval of, or make any filing with, any person or public authority.

(d)     Investment. The Shares are being acquired by the Trustee for investment, and not for, with the view to, or in connection with the resale or distribution thereof in violation of Federal securities laws or any applicable state securities laws. The Trustee has no present intention to sell, hypothecate, distribute or otherwise transfer any of the Shares or any interest therein, except pursuant to the terms of the Trust.

(e)     No Commissions. The Trustee has not incurred any obligation for any finder's, broker's or agent's fees or commissions or similar compensation in connection with the transactions contemplated hereby.

(f)     Litigation and Compliance with Governmental Rules. There are no current actions, suits, proceedings, arbitrations or investigations pending or, to the knowledge of the Trustee, threatened against the Trust. The Trust is not subject to any court or administrative judgment, order, or decree which would reasonably be anticipated to have a material adverse effect on the Trust's right to enter into the transaction contemplated by this Agreement.

(g)     Opinion of Financial Advisor. The financial consulting firm of Duff & Phelps, LLC has delivered to Trustee its opinion dated as of the Closing Date to the effect that (i) the Purchase Price to be paid by the Trustee for the Shares is not in excess of fair market value for the purposes of Section 3(18) of ERISA; (ii) the interest rate payable under the ESOP Loan is not in excess of a reasonable rate of interest; (iii) the terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable extension of credit resulting from arm's length negotiations between independent parties; and (iv) the terms and conditions of the transactions which are to occur pursuant to this Agreement and the Merger Agreement are fair and reasonable to the Trustee from a financial point of view.

(h)     Satisfaction as to Prudence. The Trustee is satisfied in its sole discretion that the purchase of the Shares contemplated hereunder is prudent and in the best interest of ESOP participants and beneficiaries.

SECTION 6.                    COVENANTS OF THE PARTIES.

(a)     Covenants of the Company. The Company hereby covenants and agrees with the Trustee as follows:

4

Source: TRIBUNE CO, 8-K, April 05, 2007

(1)    <u>Maintenance of Company</u>.  The Company will take all actions within its power to preserve its existence.

(2)    <u>Maintenance of ESOP</u>.  Subject to the right of the Company to amend or terminate the ESOP in accordance with the terms of the ESOP, the Company will take all actions within its power to preserve the existence of the ESOP and of the Trust and to maintain their tax-qualified status under Sections 401(a) and 501(a), respectively, of the Code. The Company shall administer, or cause to be administered, the ESOP in material compliance with (a) the Code and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), as applicable to the ESOP and this Agreement, and (b) all other laws and regulations applicable to the ESOP and the Trust.

(3)    <u>Contributions to the ESOP</u>.  The Company shall make contributions to the ESOP and/or declare and pay dividends/distributions on the Shares held by the ESOP in amounts which are sufficient to enable the Trustee to pay all interest and principal, when due, on the ESOP Loan; provided, however, that if (i) the Company terminates the ESOP or (ii) all or substantially all of either the Shares or the Company's assets are sold or otherwise transferred after consummation of the Merger, the Company's obligations under this Section 6(a)(3) shall cease prospectively.

(4)    <u>ESOP Plan Qualification</u>.  The Company will apply for a favorable determination letter with respect to the matters referenced in Section 4(f) and shall make such amendments as the IRS requests within the remedial amendment period allowed by Section 401(b) of the Code and the regulations thereunder; provided that no such amendments shall have a material adverse effect on the transactions contemplated hereby.  In addition, the Company will file with the IRS any amendments to the ESOP that are required with respect to the ESOP and any other amendments to the ESOP which should be so filed within the time prescribed by law for obtaining an effective date for the amendments that is retroactive to the earliest date allowed by the IRS.

(5)    <u>Expenses</u>.  The Company will pay the reasonable expenses of the Trustee and the Trust (including, without limitation, the fees of its legal and financial advisors) which are incurred (i) in connection with the authorization, preparation, execution, performance, negotiation and/or review of this Agreement and the documents ancillary thereto or (ii) in the performance of the Trustee's duties under and with respect to the Trust and the ESOP following the Closing.

(6)    <u>Post-Merger</u>.  After the consummation of the Merger the Company will, from time to time, contribute sufficient shares to the Trust to insure that the Trust owns at least 51% both as to value and voting of the Company's total equity on a fully-diluted basis; provided, that the provisions of this clause 6 shall no longer be applicable in the event that the Trust's ownership of the Company's total equity on a fully-diluted basis at any time drops below 51% as a result of any of the following events: (i) an equity offering subject to Article IV of the Investor Rights Agreement, dated as of <u>the date hereof</u> (the "Investor Rights Agreement"), by and among the Company, EGI-TRB, L.L.C. and the ESOP (A) in which the ESOP fails to purchase its pro rata share of the offered securities notwithstanding the Company having made available to the ESOP for

5

Source: TRIBUNE CO, 8-K, April 05, 2007

the purchase of such securities "Additional Financing" (as defined in Section 4.4 of the Investor Rights Agreement), (ii) a Qualified Public Offering (as defined in the Investor Rights Agreement) or (iii) a Sale of the Company (as defined in the Investor Rights Agreement). For purposes of this Agreement, the Company's total equity on a fully diluted basis shall mean all equity of the Company whether evidenced by issued and outstanding shares of capital stock, shares of capital stock issuable under options, warrants or convertible securities or equity value in the Company evidenced by stock appreciate rights, shares of phantom stock or other similar instruments.

(7)    Financial Statements, Reports and Documents.  The Company shall deliver to the Trustee the materials described in Article VI of the Investor Rights Agreement by and among the Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company as trustee of the Tribune Employee Stock Ownership Trust.

(b)    Covenants of the ESOP Trustee.  The Trustee hereby covenants and agrees with the Company, on behalf of the Trust, that it will not tender any of the Shares into the Stock Repurchase.

SECTION 7.        TRANSFER OF SHARES.

(a)    The Trustee acknowledges that the Shares shall not be registered under the 1933 Act, or under applicable state securities laws, and they will be transferable only pursuant to: (i) a public offering registered under the 1933 Act; (ii) Rule 144 or Rule 144A of the Securities and Exchange Commission (or any similar rule in force) if that rule is available after the applicable holding period; or (iii) any other legally available means of transfer, if the transferor provides the Company with a legal opinion from such transferor's legal counsel that is satisfactory to the Company's legal counsel.

(b)    The certificates for the Shares will be imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER APPLICABLE STATE SECURITIES LAWS, AND ARE BEING OFFERED AND SOLD PURSUANT TO AN EXEMPTION FROM THOSE LAWS THAT LIMITS THE DISPOSITION AND THE TRANSFER OF THE SECURITIES. THEREFORE, THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THOSE TRANSFER LIMITATIONS. THE SECURITIES MAY NOT BE TRANSFERRED UNLESS, IN THE OPINION OF COUNSEL TO THE COMPANY, REGISTRATION UNDER THE ACT OR APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED OR UNLESS THE SECURITIES ARE SO REGISTERED. THIS CERTIFICATE AND THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO RESTRICTIONS ON TRANSFER IMPOSED BY AN INVESTOR RIGHTS AGREEMENT DATED AS OF April 1, 2007 BY AND AMONG TRIBUNE COMPANY, EGI-TRB, L.L.C. AND GREATBANC TRUST COMPANY, AS TRUSTEE. THE SHARES REPRESENTED BY THIS CERTIFICATE ARE TRANSFERABLE ONLY UPON COMPLIANCE WITH THE TERMS OF THE

Source: TRIBUNE CO, 8-K, April 05, 2007

TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN, WHICH RESTRICTS THE TRANSFER OF SUCH SHARES IN THE MANNER DESCRIBED THEREIN, A COPY OF SAID PLAN BEING ON FILE IN THE OFFICE OF THE COMPANY."

SECTION 8.            CLOSING DELIVERIES

(a)        By the Trustee. At the Closing, the Trustee shall deliver to the Company the ESOP Note in payment for the Shares, as provided in and subject to the provisions of Section 2 above.

(b)        By the Company. At the Closing, the Shares shall be credited, free and clear of any encumbrances, to a securities account of the Trustee for the benefit of the Purchaser. The Company shall deliver to the Trustee a certificate, dated as of the Closing Date and signed by the Secretary of the Company, certifying (i) resolutions of the Board of Directors of the Company authorizing the Company to enter into this Agreement and the related agreement(s) contemplated herein and to consummate the transactions and perform its obligations hereunder and thereunder, and (ii) as to the incumbency and specimen signatures of each officer of the Company executing this Agreement and any other agreement or document contemplated herein. The Company shall also deliver to the Trustee a registration rights agreement of even date, signed by the Company, in favor of the Trustee (on behalf of the Trust).

(c)        By the Trustee and the Company. At the Closing, the Trustee and the Company shall sign and deliver to each other copies of the ESOP Loan Agreement and the ESOP Pledge Agreement.

SECTION 9.            NO SURVIVAL OF REPRESENTATIONS AND WARRANTIES.

None of the representation and warranties in this Agreement or any instrument delivered pursuant to this Agreement shall survive the Closing.

SECTION 10.            SEVERABILITY.

The invalidity or unenforceability of any provisions of this Agreement shall not affect the validity or enforceability of any other provision under this Agreement.

SECTION 11.            ASSIGNMENT, SUCCESSORS AND ASSIGNS.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. No party shall assign any of its rights or obligations hereunder without the prior written consent of the other party, except that the Trustee may assign its rights and obligations hereunder without consent to any successor trustee or trustees of the Trust or any successor Trust of the ESOP.

SECTION 12.            GENERAL

(a)        Execution of Counterparts. For the convenience of the parties, this Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

7

(b)    <u>Notices</u>.  All notices which are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be sufficient in all respects if delivered personally or by registered or certified mail, postage prepaid, or facsimile as follows:

If to the Company:        Tribune Company
                          435 North Michigan Avenue
                          Chicago, IL  60611
                          Attn:  c/o Crane H. Kenney
                          Senior Vice President, General Counsel & Secretary
                          Tel:  (312) 222-2491
                          Fax:  (312) 222-4206

Copies to:                McDermott Will & Emery LLP
                          227 West Monroe Street
                          Chicago, IL  60606
                          Attn: Paul Compernolle and
                          William W. Merten
                          Tel:  (312) 984-7647
                          Fax:  (312) 984-7700

                          Wachtell, Lipton, Rosen & Katz
                          51 West 52 Street
                          New York, NY  10019
                          Attn:  Steven A. Rosenblum
                          and Peter E. Devine
                          Tel: (212) 403-1221 and (212) 403-1179
                          Fax: (212) 403-1179

If to the Trust to:       Tribune Employee Stock Ownership Trust
                          c/o GreatBanc Trust Company, Trustee
                          1301 West 22nd Street, Suite 702
                          Oak Brook, IL  60523
                          Attn:  Marilyn Marchetti and Danielle Montesano
                          Tel:  (630) 572-5121 and (630) 572-5120
                          Fax:  (630) 571-0599

Copies to:                K & L Gates
                          535 Smithfield Street
                          Pittsburgh, PA  15222-2312
                          Attn:  Charles R. Smith, Esq.
                          Tel:  (412) 355-6536
                          Fax:  (412) 355-6501

(c)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with ERISA, the Code and, to the extent not preempted by Federal law, the laws of the State of Delaware.  Whenever possible, each provision of this Agreement shall be construed and interpreted in such manner as to be effective and valid under ERISA and the Code, and the

8

Source: TRIBUNE CO, 8-K, April 05, 2007

regulations issued thereunder, but if any provision of this Agreement shall be prohibited or invalid under such statutes or regulations, such provision shall be unenforceable and ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

       (d)      Amendments, Waivers, Discharges, etc. This Agreement may not be amended or modified except by a writing signed by all parties to be bound by the amendment or modification. The failure of a party to enforce any provision of this Agreement shall not be deemed a waiver by such party of any other provision or subsequent breach of the same or any other obligation hereunder.

       (e)      Entire Agreement. Other than the provisions of the Trustee's Engagement Agreement dated February 26, 2007 with the Company (the "Trustee's Engagement Letter"), this Agreement contains all the terms agreed upon by the parties with respect to the purchase and sale of the Shares and, except as to the Trustee's Engagement Letter, it supersedes all prior agreements, arrangements, or understandings, whether oral or written, with respect to the purchase and sale of the Shares.

       (f)      Action as Trustee. The Trustee has signed and delivered this Agreement solely as trustee of the ESOP, and not in its individual or corporate capacity. The performance of this Agreement by the Trustee, and all duties, obligations, and liabilities of the Trustee under this Agreement, will be undertaken by the Trustee only in its capacity as the trustee of the ESOP. The Trustee does not undertake any individual or corporate liability or obligation by virtue of the signing and delivery of this Agreement or by reason of the representations, warranties, and covenants contained in this Agreement.

[Remainder of page intentionally left blank.]

*[Signature pages to follow.]*

9

Source: TRIBUNE CO, 8-K, April 05, 2007

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first above written.

**The Trust:**

GreatBanc Trust Company, not in its
individual or corporate capacity, but
solely as Trustee of Tribune Employee
Stock Ownership Plan


By:    /s/ Marilyn H. Marchetti
        Marilyn H. Marchetti

Its:    Senior Vice President


**Tribune Company:**

By:    /s/ Dennis J. FitzSimons
        Dennis J. FitzSimons
Its:    Chairman, President and Chief
        Executive Officer

**Signature Page to ESOP Purchase Agreement**

Exhibit 10.7

[EXECUTION COPY]

## ESOP LOAN AGREEMENT

THIS **ESOP LOAN AGREEMENT** is dated as of April 1, 2007 by and between **TRIBUNE COMPANY**, a Delaware corporation (the "Company"), and **GREATBANC TRUST COMPANY** ("GreatBanc"), not in its individual or corporate capacity, but solely as trustee (the "Trustee") of the Tribune Employee Stock Ownership Trust (the "Trust") which implements and forms a part of the Tribune Employee Stock Ownership Plan (the "Plan").

### W I T N E S S E T H :

WHEREAS, the Company sponsors the Plan and Trust, GreatBanc serves as Trustee of the Trust and the Trust is acquiring from the Company shares of its common stock, $.01 par value per share (the "Shares" as more fully described in an "ESOP Purchase Agreement" of even date by and between the Trustee (on behalf of the Trust) and the Company); and

WHEREAS, to implement the terms of the ESOP Purchase Agreement and to enable the Trust to purchase the Shares, the Company has agreed to extend credit to the Trust on the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the premises and the covenants hereinafter contained, the Company and the Trust hereby agree as follows:

### ARTICLE 1
### DEFINITIONS

The following words and phrases shall have the following meanings:

1.1      "Agreement" means this ESOP Loan Agreement and any amendments and supplements hereto.

1.2      "Closing" or "Closing Date" shall mean the date of the closing of the purchase of the Shares under the ESOP Purchase Agreement.

1.3      "Code" means the Internal Revenue Code of 1986, as amended, and any successor provisions thereto.

1.4      "ERISA" means the Employee Retirement Income Security Act of 1974, as supplemented and amended.

1.5      "ESOP" means the Plan and Trust collectively.

1.6      "ESOP Loan Documents" means this Agreement, the ESOP Note, the ESOP Pledge Agreement and the other documents and certificates delivered pursuant to the terms thereof.

1.7      "ESOP Note" means the promissory note of even date herewith, executed on behalf of the Trust and payable to the Company in the amount of $250,000,000.00.

1.8    "IRS" means the Internal Revenue Service.

1.9    "Loan Proceeds" means the $250,000,000.00 extension of credit made by the Company pursuant to this Agreement and the ESOP Note.

1.10    "Merger" means the merger of a corporation formed by the ESOP (the "Initial ESOP Entity") with and into the Company, with the Company being the surviving entity and the merger occurring pursuant to a merger agreement executed by the ESOP, the Initial ESOP Entity, the Company and EGI-TRB, L.L.C.

1.11    "Pledge Agreement" means the agreement of even date herewith between the Company and the Trust pursuant to which the Shares have been pledged to the Company as security for the ESOP Note.

1.12    "Shares" mean the shares of Tribune Company common stock, par value $.01 per share, acquired by the Trust under the ESOP Purchase Agreement and any shares of stock into which such share are converted by merger or similar action.

1.13    "Trust Agreement" means the agreement dated as of even date between the Company and GreatBanc pursuant to which the Trust was established.

**ARTICLE 2**
**LOAN**

2.1    Amount of Loan. The Company agrees, upon the terms and conditions contained in this Agreement, to provide an extension of credit to the Trust in the principal amount of $250,000,000.00.

2.2    Use of Loan Proceeds. The Loan Proceeds shall be used by the Trust to acquire the Shares and for no other purpose.

2.3    ESOP Note. To evidence its obligation in connection with the Loan Proceeds, the Trustee will duly execute and deliver the ESOP Note.

2.4    Payment of ESOP Note. The principal amount of the ESOP Note and accrued interest thereon shall be paid by the Trust to the Company as set forth in the ESOP Note.

2.5    Prepayments. The Trust may prepay the principal amount of the ESOP Note, in whole or in part, at any time or from time to time, without penalty or premium. Concurrently with any prepayment, the Trust shall pay all interest accrued to the date of prepayment. Any prepayment of the ESOP Note should be applied to installments of principal in order of their due date so that the first installment scheduled to be paid shall be the first installment satisfied by the prepayment.

2

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES
### OF THE TRUSTEE

The Trustee, on behalf of the Trust, hereby represents and warrants to, and agrees with the Company as follows:

3.1 <u>Necessary Authority</u>. Assuming the accuracy of the representations of the Company set forth in <u>Article 4.3</u>, the Trustee has full power and authority under the Trust Agreement to execute and deliver the ESOP Loan Documents and to consummate the transactions contemplated thereby. The ESOP Loan Documents have been duly authorized, executed and delivered by the Trustee on behalf of the Trust and, assuming the due authorization, execution and delivery by the other parties thereto, constitute the legal, valid and binding obligations of the Trust, enforceable against the Trust in accordance with their respective terms, except as the same may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization or other laws affecting the enforcement of creditors' rights generally now or hereafter in effect, and subject to the availability of equitable remedies.

3.2 <u>No Conflicts</u>. The execution, delivery and performance of the ESOP Loan Documents by the Trustee on behalf of the Trust and the consummation of the transactions contemplated therein do not and will not constitute or result in the breach of any provision of, or constitute a default under, the ESOP or any agreement, indenture or other instrument known to the Trustee or to which the Trust is a party or by which it or its assets may be bound.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES
### OF THE COMPANY

The Company hereby represents and warrants to, and agrees with the Trustee and the Trust as follows:

4.1 <u>Necessary Authority</u>. The Company has all requisite power and authority to enter into, deliver and perform this Agreement and the Pledge Agreement and to consummate the transactions contemplated therein. The execution, delivery and performance of this Agreement and the Pledge Agreement and the consummation of the transactions contemplated therein have been duly authorized by all necessary action on the part of the Company. Assuming the due authorization, execution and delivery by the other parties thereto, this Agreement and the Pledge Agreement have been duly executed and delivered by the Company and constitute its valid and legally binding obligations, enforceable against the Company in accordance with their respective terms, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditors' rights generally now or hereafter in effect, and subject to the availability of equitable remedies.

3

Source: TRIBUNE CO, 8-K, April 05, 2007

4.2      No Conflicts. The execution, delivery and performance of this Agreement and the Pledge Agreement by the Company, and its consummation of the transactions contemplated therein, do not and will not (i) require the consent, approval, authorization, order, filing, registration or qualification of or with any court, governmental authority or third person, (ii) conflict with or result in any violation of or default under any provision of the Certificate of Incorporation or By-laws of the Company or of any mortgage, indenture, lease, agreement or other instrument, permit, concession, grant, franchise or license to which the Company is a party or by which it or its properties are bound, (iii) violate any law, ordinance, rule, regulation, judgment, order or decree applicable to the Company, or (iv) result in the creation of any security interest, claim, lien, charge or encumbrance upon the Shares other than the lien of the Pledge Agreement.

4.3      ESOP Matters. The Company has duly adopted the ESOP and has validly appointed the Trustee pursuant to the terms of the ESOP.

## ARTICLE 5
## POST CLOSING COVENANTS OF THE COMPANY

The Company hereby covenants with the Trustee and the Trust that after the Closing:

5.1      Maintenance of Company. The Company will take all actions within its power to preserve its existence.

5.2      Maintenance of ESOP. Subject to the right of the Company to amend or terminate the ESOP in accordance with the terms of the ESOP, the Company will take all actions within its power to preserve the existence of the ESOP and of the Trust and to maintain their tax-qualified status under Sections 401(a) and 501(a), respectively, of the Code. The Company shall administer, or cause to be administered, the ESOP in material compliance with (a) the Code and ERISA, as applicable to the ESOP and this Agreement, and (b) all other laws and regulations applicable to the ESOP and the Trust.

5.3      Contributions to the ESOP. Unless the ESOP is terminated or, following the Merger, all or substantially all the Company's assets or the Shares are sold or otherwise transferred, the Company shall make contributions to the ESOP and/or declare and pay dividends/distributions on the Shares held by the ESOP in amounts which are sufficient to enable the Trustee to pay all interest and principal, when due, on the ESOP Loan.

## ARTICLE 6
## EVENTS OF DEFAULT AND THEIR EFFECT

6.1      Events of Default; Effect. The occurrence of either of the following events shall constitute an Event of Default hereunder:

(a)      The Trustee shall fail to make any payment or prepayment of the principal of the ESOP Note within ten (10) days after the same becomes due and payable; or

4

Source: TRIBUNE CO, 8-K, April 05, 2007