or as soon as practicable following the execution of the Acquisition Agreement, the ESOP will purchase $250.0 million of Tribune common equity (at a price not in excess of fair market value for purposes of Section 3(18) of ERISA) in exchange for a $250.0 million aggregate principal amount 30 year note (at a reasonable rate of interest and otherwise on arms' length terms that are generally fair and reasonable to the ESOP from a financial point of view) (such note, the "ESOP Note" and such investment, the "ESOP Investment"), (v) immediately upon consummation of the Acquisition, the ESOP will own 100% of the equity of Tribune, (vi) immediately following the consummation of the Acquisition, Holdco will use the cash proceeds it receives from the Acquisition plus an additional $65.0 million (the "Incremental Zell Investment") to purchase: (a) an 11 year $225.0 million initial principal amount pay-in-kind subordinated note (the "Zell Sub Note") and (b) a 15 year warrant (the "Warrant") to purchase the number of shares of the common stock of Tribune (on a fully diluted basis) set forth in the Warrant at the exercise price provided for in the Warrant (such purchase, the "Holdco Purchase"), (vii) Tribune intends to enter into that certain "Project Tower — Amended and Restated First Step Commitment Letter" dated the date hereof among Tribune, the Initial Lenders and the Lead Arrangers (the "First Step Commitment Letter" and the Transactions contemplated thereby the "First Step Transactions") and consummate the First Step Transactions prior to the consummation of the Acquisition, and (viii) the sources and uses of the funds necessary to consummate the Acquisition and the other transactions contemplated hereby are set forth on Annex I to this Amended and Restated Commitment Letter.  For purposes of this Amended and Restated Commitment Letter, "Citigroup" means CGMI, Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as may be appropriate to consummate the transactions contemplated herein.  This letter amends, restates and supersedes in its entirety the Project Tower — Second Step Commitment Letter among JPMorgan, JPMCB, Merrill Lynch, and Citigroup dated April 1, 2007 and such Commitment Letter shall be of no further force or effect.

In addition, you have advised JPMCB, Merrill Lynch, Citigroup, Bank of America and Banc of America Bridge (collectively, the "Initial Lenders") that in connection with the Acquisition, Tribune will (i) borrow up to $2,105 million of new term loans described in Exhibit A hereto (the "Incremental Facility") as incremental term loans provided for under the senior secured credit facilities to be entered into by Tribune as part of the First Step Transactions (the "Senior Secured Credit Facilities" and together with the Incremental Facility, the "Bank Facilities") and (ii) either (a) borrow up to $2,100 million in senior unsecured loans from one or more lenders under the senior unsecured bridge facility described in Exhibit B hereto (the "Senior Bridge Facility" and together with the Incremental Facility, the "Second Step Facilities") or (b) issue $2,100 million in aggregate principal amount of senior unsecured notes (the "Senior Notes") in a public offering or in a Rule 144A or other private placement.

The Acquisition, the incurrence of the incremental term loans under the Incremental Facility, the execution and delivery of the Senior Bridge Facility or the issuance of the Senior Notes, the Holdco Purchase (including the issuance of the Warrant and the Zell Sub Note) and the other transactions contemplated hereby and thereby (other than the First Step Transactions) are referred to as the "Second Step Transactions".

You have requested that the Initial Lenders commit to provide the Second Step Facilities to finance the Acquisition and to pay certain related fees and expenses.

2

Source: TRIBUNE CO, 8-K, April 05, 2007

Accordingly, subject to the terms and conditions set forth below, the Initial Lenders hereby agree with you as follows:

1.    Commitment; Engagement.  (a) Each of JPMCB and Merrill Lynch hereby commits, severally and not jointly, to provide to Tribune 30% of each of the Second Step Facilities, (b) Citigroup hereby commits, severally and not jointly, to provide to Tribune 25% of each of the Second Step Facilities, (c) Bank of America hereby commits, severally and not jointly, to provide to Tribune 15% of the Incremental Facility and (d) Banc of America Bridge hereby commits, severally and not jointly, to provide to Tribune 15% of the Senior Bridge Facility, in each case, upon the terms and subject to the conditions set forth or referred to herein, in the confidential Amended and Restated Second Step Fee Letter (the "Second Step Fee Letter") dated the date hereof and delivered to you, in the Incremental Facility Summary of Terms and Conditions attached hereto (and incorporated by reference herein) as Exhibit A (the "Incremental Term Sheet") and in the Bridge Facility Summary of Terms and Conditions attached hereto (and incorporated by reference herein) as Exhibit B (the "Bridge Term Sheet" and together with the Incremental Term Sheet, the "Term Sheets").  The commitments of the Initial Lenders hereunder with respect to the Incremental Facility are subject to the negotiation, execution and delivery of an incremental term loan amendments to the Credit Documents (as defined in the First Step Commitment Letter) and appropriate ancillary documentation necessary to include the Incremental Facility in the Senior Secured Credit Facilities (the "Incremental Amendments") reflecting substantially the terms and conditions set forth herein and in the Term Sheets and the Second Step Fee Letter and otherwise mutually agreed upon.  The commitments of the Initial Lenders hereunder with respect to the Bridge Facility are subject to the negotiation, execution and delivery of definitive documents governing the Senior Bridge Facility (the "Bridge Documents" and together with the Incremental Amendments, the "Operative Documents") reflecting substantially the terms and conditions set forth herein and in the Term Sheets and the Second Step Fee Letter and otherwise in a customary form.  Notwithstanding anything in this Amended and Restated Commitment Letter, the Term Sheets, the Second Step Fee Letter, the Operative Documents or any other letter agreement or other undertaking concerning the financing of the Second Step Transactions to the contrary, (i) the only representations relating to Tribune, its subsidiaries and their businesses the making of which shall be a condition to availability of the Second Step Facilities on the Second Step Closing Date shall be (A) such of the representations made by Tribune in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that Merger Sub has the right to terminate its obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement and (B) the representations and warranties of Tribune set forth in the Credit Agreement and the Operative Documents relating to corporate status, power and authority, due authorization, execution and delivery and enforceability of the Operative Documents, Federal Reserve margin regulations and the Investment Company Act (the representations in clauses (A) and (B) together the "Specified Representations") and (ii) the terms of the Operative Documentation shall be in a form such that they do not impair availability of the Second Step Facilities on the Second Step Closing Date if the conditions set forth herein and in the Term Sheets are satisfied.

2.    Syndication.  The Initial Lenders reserve the right and intend, prior to or after the execution of the Operative Documents and in consultation with you, to syndicate all or a portion of their respective commitments with respect to the Second Step Facilities to one or more financial institutions (together with the Initial Lenders, the "Lenders").  Upon the issuance by

3

Source: TRIBUNE CO, 8-K, April 05, 2007

any additional Lender of its commitment with respect to any of the Second Step Facilities, the Initial Lenders' commitments with respect to such Second Step Facilities shall be reduced in the aggregate by an equal amount (and on a pro rata basis as among the Initial Lenders). Notwithstanding any such reduction in commitments, the Initial Lenders shall remain committed to fund amounts assigned in the event additional Lenders fail to fund. The commitments of the Initial Lenders hereunder are several and not joint, and are subject to (a) JPMorgan, Merrill Lynch, Citigroup and BAS (or one or more of their respective affiliates) and acting as joint lead arrangers and bookrunners (the "Lead Arrangers") of, (b) Merrill Lynch acting as sole and exclusive administrative agent (the "Administrative Agent") for, (c) JPMCB acting as sole and exclusive syndication agent for, and (d) Citigroup and Banc of America Bridge acting as co-documentation agents for the Senior Bridge Facility. It is further agreed that in connection with any offering or marketing materials relating to the Incremental Facility, JPMorgan will appear "on the left", in connection with any offering or marketing materials relating to the Senior Bridge Facility, Merrill Lynch will appear "on the left", and in each case the names of the other Lead Arrangers will appear in such order as they appear in the caption of this letter. The Lead Arrangers (or one or more of their respective affiliates) will manage all aspects of the syndication in consultation with you, including decisions as to the selection of potential Lenders to be approached and when they will be approached, when their commitments will be accepted, which Lenders will participate and the final allocations of the commitments among the Lenders (which are likely not to be pro rata across facilities among Lenders). The Lead Arrangers will exclusively perform, in consultation with you, all functions and exercise all authority as customarily performed and exercised in such capacities, including selecting one law firm as counsel for the Lead Arrangers and the Initial Lenders and negotiating the Operative Documents. Any agent or arranger titles (including co-agents) awarded to other Lenders with respect to the Facilities are subject to the prior approval of Tribune and the Lead Arrangers (such approval not to be unreasonably withheld or delayed) and shall not entail any role with respect to the matters referred to in this paragraph without the prior consent of the Lead Arrangers (such consent not to be unreasonably withheld or delayed). You agree that, without the consent of the Initial Lenders, Tribune shall not pay to any Lender any compensation outside the terms contained herein and in the Second Step Fee Letter in order to obtain its commitment to participate in any of the Second Step Facilities.

You understand that the Lead Arrangers intend to commence the syndication of the Second Step Facilities promptly, and you agree actively to assist them, and to use commercially reasonable efforts to cause Tribune to assist them, in achieving a timely syndication that is mutually satisfactory to the Lead Arrangers and Tribune. The syndication efforts will be accomplished by a variety of means, including direct contact during the syndication between senior management, advisors and affiliates of Tribune on the one hand and the proposed Lenders and affiliates of Tribune on the other hand, and Tribune hosting, with the Lead Arrangers, at least one meeting with prospective Lenders at such times and places as the Lead Arrangers may reasonably request. You agree, upon the reasonable request of the Lead Arrangers, to use commercially reasonable efforts to (a) provide, and cause your subsidiaries and advisors to provide to the Lead Arrangers all information relating to you and your subsidiaries reasonably deemed necessary by them as and when such information becomes available, including without limitation, upon request from the Lead Arrangers copies of Tribune's internal management reports prepared in the ordinary course of business consistent with past practices for each fiscal month after the most recent fiscal quarter (including year end) for which financial statements were received by the Lenders as described in Paragraph 1 of Annex II hereto and ended 30 days before the Second Step Closing Date, to suc-

4

Source: TRIBUNE CO, 8-K, April 05, 2007

cessfully complete the primary syndication of the Second Step Facilities, including the Information and Projections (including updated projections) contemplated hereby, (b) assist, and cause your subsidiaries and advisors to assist, the Lead Arrangers in the preparation of a Confidential Information Memorandum to be completed not later than 20 business days prior to the Second Step Closing Date (as defined in Exhibit A) and other reasonably necessary marketing materials (the contents of which, except to the extent relating to either Lead Arranger or its affiliates, you shall be solely responsible for) to be used in connection with the primary syndication of the Second Step Facilities and (c) obtain, at your expense, corporate family ratings and a monitored public rating of each of the Second Step Facilities from each of Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's, a division of the McGraw Hill Companies ("S&P") (which in the case of the Bank Facilities, may be a re-assignment of an existing rating). You also agree to use your commercially reasonable efforts to ensure that the syndication efforts of the Lead Arrangers benefit materially from your (and your subsidiaries') existing lending relationships. You further agree to afford the Lead Arrangers and their affiliates a period of not less than 20 business days prior to the Second Step Closing Date to syndicate the Second Step Facilities.

Without limiting your obligation to assist with the syndication efforts as set forth above, it is understood and agreed that completion of such syndication is not a condition to the Initial Lenders' commitments hereunder.

3.      Fees. As consideration for the commitments of the Initial Lenders hereunder and the agreement of the Lead Arrangers to arrange, manage, structure and syndicate the Second Step Facilities, you agree to pay to them when due the fees as set forth in the Second Step Fee Letter.

4.      Conditions. The Initial Lenders' commitments hereunder are subject to the conditions set forth in Annex II to this Amended and Restated Commitment Letter and are also subject to:

(a)      the preparation, execution and delivery of mutually satisfactory definitive documentation with respect to the Second Step Facilities (including Incremental Amendments and a bridge credit agreement and related guarantees) incorporating the terms outlined in this Amended and Restated Commitment Letter and in the Term Sheets and otherwise in a customary form;

(b)      the Initial Lenders and their respective affiliates shall be satisfied that, after the date hereof and until the successful syndication of the Second Step Facilities, or, if earlier, the Second Step Closing Date, none of Tribune, Holdco, any of their respective subsidiaries or the ESOP shall have offered, placed, arranged or issued, or engaged in discussions concerning the offering, placement, arrangement or issuance of, any debt facility or debt security (including any renewal or refinancing of and increase of commitments under existing facilities or securities) prior to or during the primary syndication of the Second Step Facilities, without the prior written consent of the Lead Arrangers, other than the Second Step Facilities, the Zell Note, the Zell Sub Note and any Senior Notes offered, issued or sold in connection with or as a part of the First Step Transactions or the Second Step Transactions; and

5

Source: TRIBUNE CO, 8-K, April 05, 2007

(c)       (i) from December 31, 2006 through the date hereof, except as otherwise contemplated, required or permitted by the Acquisition Agreement, the Tower Purchase Agreement (as defined in the Acquisition Agreement) or the ESOP Purchase Agreement (as defined in the Acquisition Agreement) there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect (as defined (and all component definitions thereof are defined) in the Acquisition Agreement as in effect on the date hereof) and (ii) since the date hereof, there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

5.       Information and Investigations.  You hereby represent and warrant that (a) all information and data (excluding the Projections and information of a general economic or industry-specific nature) that have been or will be made available by you or any of your representatives or advisors to the Initial Lenders, the Lead Arrangers or any Lender (whether prior to or on or after the date hereof) in connection with the Second Step Transactions, taken as a whole (the "Information"), is and will be complete and correct in all material respects and does not and will not, taken as a whole, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made, and (b) all financial projections concerning Tribune and its subsidiaries and the transactions contemplated hereby (the "Projections") that have been made or will be prepared by or on behalf of you or any of your representatives or advisors and that have been or will be made available to the Initial Lenders, the Lead Arrangers or any Lender in connection with the transactions contemplated hereby have been or in the case of projections made after the date hereof, will be, prepared in good faith based upon assumptions that you reasonably believe to have been reasonable at the time made (it being understood that any such projections are subject to significant uncertainties and contingencies, many of which are beyond your control, and that no assurance can be given that such projections will be realized and that actual results may differ from such projections and such differences may be material).  You agree to use commercially reasonable efforts to supplement the Information and the Projections from time to time until the Second Step Closing Date and, if requested by the Lead Arrangers, for a reasonable period thereafter (not to exceed 45 days) necessary to complete the successful syndication of the Second Step Facilities so that the representation and warranty in the preceding sentence remains correct in all material respects.  In syndicating the Second Step Facilities the Lead Arrangers will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent check or verification thereof.

You hereby acknowledge that (a) the Lead Arrangers will make available Information and Projections to the proposed syndicate of Lenders on a confidential basis through posting on IntraLinks or another similar electronic system and (b) certain of the proposed Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Tribune and its affiliates or any securities thereof ("Material Non-Public Information")) (each, a "Public Lender").  You hereby agree that (a) you will use commercially reasonable efforts to identify that portion of the Information and Projections that may be distributed to the Public Lenders and include a reasonably detailed term sheet in such Information and that all of the foregoing that is to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC"; (b) by marking materials "PUBLIC," you shall be

6

Source: TRIBUNE CO, 8-K, April 05, 2007

deemed to have authorized the Lead Arrangers and the proposed Lenders to treat such materials as not containing any Material Non-Public Information, it being understood that certain of such materials may be subject to the confidentiality requirements of the definitive credit documentation; (c) all materials marked "PUBLIC" are permitted to be made available by electronic means designated for "Public Lenders;" and (d) the Lead Arrangers shall be entitled to treat any materials that are not marked "PUBLIC" as being suitable only for posting by confidential electronic means not designated for "Public Lenders." You also acknowledge that Public Lenders employed by one or more of the Lead Arrangers or their respective affiliates, consisting of publishing debt analysts, may participate in any meetings or telephone conference calls held pursuant to Section 2 hereof; *provided* that such analysts shall not publish any information obtained from such meetings or calls until the syndication of the Second Step Facilities has been completed upon the making of allocations by the Lead Arrangers and the Lead Arrangers freeing the Second Step Facilities to trade.

6.      <u>Indemnification</u>.  You agree to indemnify and hold harmless each Initial Lender, each Lead Arranger, each other Lender and their respective affiliates, and each such person's respective officers, directors, employees, agents and controlling persons (each Initial Lender, each Lead Arranger and each such other person being an "<u>Indemnified Party</u>") from and against any and all losses, claims, damages, costs, expenses and liabilities, joint or several, to which any Indemnified Party may become subject under any applicable law, or otherwise related to or arising out of or in connection with this Amended and Restated Commitment Letter, the Second Step Fee Letter, the Term Sheets, the Second Step Facilities, the loans thereunder and the use of proceeds therefrom, any of the Second Step Transactions or any related transaction and the performance by any Indemnified Party of the services contemplated hereby, and will reimburse each Indemnified Party for any and all reasonable and documented expenses (including reasonable and documented counsel fees and expenses) as they are incurred in connection with the investigation of or preparation for or defense of any pending or threatened claim or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party and whether or not such claim, action or proceeding is initiated or brought by or on behalf of you or any of your subsidiaries and whether or not any of the Second Step Transactions are consummated or this Amended and Restated Commitment Letter is terminated, except to the extent (i) determined by a final judgment of a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct or (ii) arising from a material breach of the obligations of such Indemnified Party under this Amended and Restated Commitment Letter.  No party hereto nor any of its affiliates or subsidiaries shall be liable to any other party hereto or any of its subsidiaries or affiliates on any theory of liability for any special, indirect, consequential, punitive or exemplary damages in connection in any way with this Amended and Restated Commitment Letter, the Second Step Fee Letter, the Term Sheets, the Second Step Facilities, the loans thereunder and the use of proceeds therefrom, any of the Second Step Transactions or any related transaction or the performance by any party hereto or any of its subsidiaries, or affiliates, its obligations hereunder or under the Second Step Facilities.  Notwithstanding any other provision of this Amended and Restated Commitment Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, except to the extent determined by a final judgment of a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct.

7

Source: TRIBUNE CO, 8-K, April 05, 2007

You agree that, without the prior written consent of the Lead Arrangers (not to be unreasonably withheld), neither you nor any of your affiliates or subsidiaries will settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification has been or could be sought under the indemnification provisions hereof (whether or not any other Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent (i) includes an unconditional written release in form and substance reasonably satisfactory to the Lead Arrangers of each Indemnified Party from all liability arising out of such claim, action or proceeding and (ii) does not include any statement as to or an admission of fault, culpability or failure to act by or on behalf of any Indemnified Party.

7.      Expenses.  You agree to reimburse the Initial Lenders and their affiliates for their reasonable, documented, out-of-pocket expenses promptly following their request made from time to time (including, without limitation, all reasonable due diligence investigation expenses, fees of consultants engaged with your consent (not to be unreasonably withheld), syndication expenses (including printing, distribution, and bank meetings), travel expenses, duplication fees and expenses, search fees, filing and recording fees and the reasonable, documented fees, disbursements and other charges of Cahill Gordon & Reindel LLP as counsel to the Initial Lenders, and any sales, use or similar taxes (and any additions to such taxes) related to any of the foregoing) incurred in connection with the negotiation, preparation, execution and delivery, waiver or modification, collection and enforcement of this Amended and Restated Commitment Letter, the Term Sheets, the Second Step Fee Letter and the Operative Documents and whether or not such fees and expenses are incurred before or after the date hereof or any loan documentation is entered into or the Second Step Transactions are consummated or any extensions of credit are made under the Facilities or this Amended and Restated Commitment Letter is terminated or expires; provided that such payment or reimbursement obligation with respect to legal counsel shall include only the reasonable fees and expenses of Cahill Gordon & Reindel LLP.

8.      Confidentiality.  This Amended and Restated Commitment Letter, the Term Sheets, the contents of any of the foregoing and the Initial Lenders' and/or their affiliates' activities pursuant hereto or thereto are confidential and shall not be disclosed by or on behalf of you or any of your subsidiaries to any person without the prior written consent of the Initial Lenders, except that you may (i) disclose this Amended and Restated Commitment Letter, the Second Step Fee Letter and the Term Sheets to your officers, directors, employees and advisors, and then only in connection with the Second Step Transactions and on a confidential need-to-know basis, (ii) file a copy of any portion of this Amended and Restated Commitment Letter (but not the Second Step Fee Letter) and the Term Sheets in any public record in which it is required by law to be filed and (iii) make any other disclosure as you are required to make by applicable law or compulsory legal process (based on the advice of legal counsel); provided, however, that in the event of any such compulsory legal process you agree, to the extent permitted by applicable law, to give the Lead Arrangers prompt notice thereof and to cooperate, at the Lead Arrangers' expense, with the Initial Lenders in securing a protective order in the event of compulsory disclosure.  The foregoing restrictions shall cease to apply with respect to this Amended and Restated Commitment Letter, the Term Sheets and the contents thereof once this Amended and Restated Commitment Letter has been accepted by you.  You agree that you will use commercially reasonable efforts to permit the Initial Lenders to review and approve any reference to any of the Initial Lenders or any of their affiliates in connection with the Second Step Facilities or the

8

Source: TRIBUNE CO, 8-K, April 05, 2007

transactions contemplated hereby contained in any press release or similar public disclosure prior to public release. Subject to the terms of the next succeeding paragraph, you agree that the Initial Lenders and their affiliates may share information concerning you and your subsidiaries and affiliates among themselves solely in connection with the performance of their services hereunder and the evaluation and consummation of financings and Transactions contemplated hereby. You also acknowledge that the Initial Lenders or their affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to parties whose interests may conflict with yours. The Initial Lenders agree that they will not furnish confidential information obtained from you to any of their other customers and that they will treat confidential information relating to you and your affiliates with the same degree of care as they treat their own confidential information. The Initial Lenders further advise you that they and their affiliates will not make available to you confidential information that they have obtained or may obtain from any other customer.

Each Lead Arranger agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Confidential Information may be disclosed (a) to its and its affiliates' partners, directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and agree to keep such Confidential Information confidential), (b) to the extent requested or required by any state, Federal or foreign authority or examiner regulating such Lead Arranger, (c) to the extent required by applicable law, rule or regulation or by any subpoena or similar legal process, (d) in connection with any litigation or legal proceeding relating to this Amended and Restated Commitment Letter or the Second Step Fee Letter or any other documentation in connection therewith or the enforcement of rights hereunder or thereunder or to which such Lead Arranger or any of its affiliates may be a party, (e) to any prospective Lender (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and agree to keep such Confidential Information confidential), (f) with the consent of Tribune, (g) to any rating agency when required by such rating agency, (h) for purposes of establishing a "due diligence defense" or (i) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this paragraph or (ii) becomes available to such Lead Arranger on a nonconfidential basis from a source other than you or any of your subsidiaries, officers, directors, employees or advisors. For the purposes of this paragraph, "Confidential Information" means all information received from you or any of your subsidiaries, officers, directors, employees or advisors relating to you, or your businesses, other than any such information that is available to the Lead Arrangers on a nonconfidential basis prior to disclosure by you. Any person required to maintain the confidentiality of Confidential Information as provided in this paragraph shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Confidential Information as such person would accord to its own confidential information.

9.      Termination. The Initial Lenders' commitments hereunder shall terminate in their entirety on the earliest to occur of (A) May 31, 2008 if the Operative Documents are not executed and delivered by Tribune and the Lenders on or prior to such date, (B) the date of execution and delivery of the Operative Documents by Tribune and the Lenders, (C) if earlier than (B), the date of termination of the Acquisition Agreement and (D) August 17, 2007 if the Credit Agreement has not been executed and delivered by Tribune and the lenders thereunder on or

9

Source: TRIBUNE CO, 8-K, April 05, 2007

prior to such date.  Notwithstanding the foregoing, the provisions of Sections 6, 7, 8, 10 and 11 hereof shall survive any termination pursuant to this Section 9 (it being understood that the reimbursement and indemnification provisions contained herein shall be superseded by the reimbursement and indemnifications provisions contained in the Credit Agreement or the Bridge Documentation when the applicable Operative Documents become effective).

10.    Assignment; No Fiduciary; Etc.  This Amended and Restated Commitment Letter and the commitments of the Initial Lenders hereunder shall not be assignable by any party hereto (other than by the Initial Lenders to their respective affiliates) without the prior written consent of the other parties hereto, and any attempted assignment shall be void and of no effect; provided, however, that nothing contained in this Section 10 shall prohibit the Initial Lenders (in their sole discretion) from (i) performing any of their duties hereunder through any of their affiliates, and you will owe any related duties (including those set forth in Section 2 above) to any such affiliate, and (ii) granting (in consultation with you) participations in, or selling (in consultation with you) assignments of all or a portion of, the commitments or the loans under the Second Step Facilities pursuant to arrangements satisfactory to the Initial Lenders (provided that, in the case of clause (i) or (ii) above, the Initial Lenders shall be and remain primarily liable for the full and prompt performance of their duties and obligations hereunder).  This Amended and Restated Commitment Letter is solely for the benefit of the parties hereto and does not confer any benefits upon, or create any rights in favor of, any other person.

In connection with all aspects of each transaction contemplated by this Amended and Restated Commitment Letter, you acknowledge and agree, and acknowledge your subsidiaries' understanding, that (i) each transaction contemplated by this Amended and Restated Commitment Letter is an arm's-length commercial transaction, between Tribune, on the one hand, and each of the Initial Lenders and the Lead Arrangers, on the other hand, (ii) in connection with each such transaction and the process leading thereto each of the Initial Lenders and Lead Arrangers will act solely as a principal and not as agent (except as otherwise provided herein) nor as fiduciary of Tribune, or its stockholders, affiliates, creditors, employees or any other party, (iii) none of the Initial Lenders and the Lead Arrangers will assume an advisory or fiduciary responsibility in favor of Tribune or any of its affiliates with respect to any of the transactions contemplated hereby or the process leading thereto (irrespective of whether any Initial Lender or Lead Arranger has advised or is currently advising Tribune on other matters) and none of the Initial Lenders and Lead Arrangers will have any obligation to Tribune or any of its affiliates with respect to the transactions contemplated in this Amended and Restated Commitment Letter except the obligations expressly set forth herein or as otherwise expressly agreed to in writing, (iv) the Initial Lenders and Lead Arrangers may be engaged in a broad range of transactions that involve interests that differ from those of Tribune and its affiliates, and (v) none of the Initial Lenders and Lead Arrangers has provided nor will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby and Tribune has consulted and will consult its own legal, accounting, regulatory, and tax advisors to the extent it deems appropriate.  You hereby waive and release, to the fullest extent permitted by law, any claims that you may have against the Initial Lenders and Lead Arrangers with respect to any breach or alleged breach of fiduciary duty in respect of any of the transactions contemplated by this Amended and Restated Commitment Letter.

10

Source: TRIBUNE CO, 8-K, April 05, 2007

11.     <u>Governing Law; Waiver of Jury Trial</u>. This Amended and Restated Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York. Each of the parties hereto waives all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of any of the Transactions or the other transactions contemplated hereby, or the performance by the Initial lenders, the Lead Arrangers or any of their respective affiliates of the services contemplated hereby.

12.     <u>Amendments; Counterparts; etc</u>. No amendment or waiver of any provision hereof or of the Term Sheets shall be effective unless in writing and signed by the parties hereto and then only in the specific instance and for the specific purpose for which given. This Amended and Restated Commitment Letter, the Term Sheets and the Second Step Fee Letter are the only agreements between the parties hereto with respect to the matters contemplated hereby and thereby and set forth the entire understanding of the parties with respect thereto. This Amended and Restated Commitment Letter may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart by telecopier shall be effective as delivery of a manually executed counterpart.

13.     <u>Patriot Act</u>. The Initial Lenders hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "<u>Patriot Act</u>"), the Lenders may be required to obtain, verify and record information that identifies Tribune, which information includes the name, address and tax identification number and other information regarding it that will allow such Lender to identify it in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to the Lenders.

14.     <u>Public Announcements; Notices</u>. The Initial Lenders and Lead Arrangers may, subject to your prior consent (not to be unreasonably withheld, delayed or conditioned) at their expense, publicly announce as they may choose the capacities in which they or their affiliates have acted hereunder. Any notice given pursuant hereto shall be mailed or hand delivered in writing, if to (i) you, at your address set forth on page one hereof; (ii) JPMorgan and JPMCB, at 270 Park Avenue, New York, NY 10017, Attention: Rajesh Kapadia; (iii) Merrill Lynch, at 4 World Financial Center, New York, New York 10080, Attention: David Tuvlin; (iv) CGMI, at 390 Greenwich Street, New York, NY 10013, Attention: Robert Chen; (v) Bank of America, Banc of America Bridge and BAS, at 9 West 57th Street, New York, New York 10019, Attention: William Pegler; (vi) in the case of the foregoing clause (i), with a copy to Sidley Austin LLP, 1 South Dearborn Street, Chicago, Illinois 60603, Attention: Robert Lewis; and (vii) in the case of the foregoing clauses (ii), (iii), (iv) or (v), with a copy to Cahill Gordon & Reindel LLP, 80 Pine Street, New York, NY 10005, Attention: Jonathan A. Schaffzin.

(Signature Page Follows)

11

Source: TRIBUNE CO, 8-K, April 05, 2007

Please confirm that the foregoing correctly sets forth our agreement of the terms hereof and the Second Step Fee Letter by signing and returning to the Initial Lenders the duplicate copy of this letter and the Second Step Fee Letter enclosed herewith.  Unless the Initial Lenders receive your executed duplicate copies hereof and thereof by 5:00 p.m., New York City time, on April 5, 2007, the commitments of the Initial Lenders hereunder will expire at such time.

We are pleased to have this opportunity and we look forward to working with you on this transaction.

Very truly yours,

MERRILL LYNCH CAPITAL CORPORATION

By:   /s/ Stephen B. Paras
     Name:  Stephen B. Paras
     Title:   Vice President

CITIGROUP GLOBAL MARKETS INC.

By:   /s/ Robert H. Chen
     Name:  Robert H. Chen
     Title:   Director

J.P. MORGAN SECURITIES INC.

By:   /s/ Robert Anastasio
     Name:  Robert Anastasio
     Title:   Vice President

JPMORGAN CHASE BANK, N.A.

By:   /s/ Robert Anastasio
     Name:  Robert Anastasio
     Title:   Vice President

S-1

BANK OF AMERICA, N.A.

By:  /s/ Daniel R. Petrik
     Name:  Daniel R. Petrik
     Title:   Senior Vice President


BANC OF AMERICA BRIDGE LLC

By:  /s/ James G. Rose
     Name:  James G. Rose
     Title:   Managing Director


BANC OF AMERICA SECURITIES LLC

By:  /s/ James G. Rose
     Name:  James G. Rose
     Title:   Managing Director


S-2

Source: TRIBUNE CO, 8-K, April 05, 2007

Accepted and agreed to as of
the date first written above:

TRIBUNE COMPANY


By:     /s/ Donald C. Grenesko
Name:   Donald C. Grenesko
Title:   Senior Vice President, Finance and Administration


Acknowledged:

EGI-TRB, L.L.C.


By:     /s/ Philip G. Tinkler
Name:   Philip G. Tinkler
Title:   Vice President


S-3

**Estimated Sources and Uses of Funds**
**(in $ millions)**

| Sources | | | Uses | | |
|---|---|---:|---|---|---:|
| Options proceeds(1) | $ | 215.0 | | | |
| Incremental Zell Investment | | 65.0 | | | |
| Revolving Facility(2) | | 0 | | | |
| Incremental Term Loan | | 2,105.0 | Acquisition consideration(3) | $ | 4,261.0 |
| Senior Notes/Senior Bridge Facility | | 2,100.0 | Estimated fees and expenses(4) | | 224.0 |
| Rollover Debt and PHONES(5) | | 9,106.0 | Rollover Debt and PHONES(5) | | 9,106.0 |
| Total Sources | $ | 13,591.0 | Total Uses | $ | 13,591.0 |

(1)    Includes $15.0 million of tax benefits in 2007.

(2)    $750,000,000 of commitments on the Second Step Closing Date; $0 drawn on the Second Step Closing Date.

(3)    Includes repayment of the Zell Note to the extent Tribune has not elected to convert it into common equity in accordance with its terms.

(4)    Includes approximately $104.0 million of cash distributions resulting from the change of control.

(5)    Includes approximately $1,521.0 million of outstanding notes, the $7,015 million Tranche B Facility and $900.0 million of PHONES.

Annex II

Project Tower
**Summary of Additional Conditions Precedent**

Except as otherwise set forth below, the initial borrowing under each of the Second Step Facilities shall be subject to the contemporaneous or prior satisfaction of the following additional conditions:

1.      The Lenders shall have received audited consolidated balance sheets of Tribune for the most recent fiscal year ended on or before 75 days before the Second Step Closing Date and related statements of income, stockholders' equity and cash flows of Tribune and unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Tribune for each fiscal quarter ended after the date of the audited financial statements provided above and ended on or before 30 days before the Second Step Closing Date.

2.      The Lenders shall have received a pro forma consolidated balance sheet of Tribune as of the fiscal quarter (including the fourth quarter) most recently ended prior to the Second Step Closing Date, after giving effect to the Second Step Transactions. The Lead Arrangers shall have received reasonably detailed pro forma consolidated financial projections prepared by or on behalf of Tribune for Tribune and its consolidated entities for the five-fiscal year period after the Second Step Closing Date.

3.      All accrued fees and expenses (including the reasonable fees and expenses of counsel to the Lead Arrangers) of the Lead Arrangers in connection with the Operative Documents shall have been paid; provided that such fees and expenses shall have been invoiced at least two business days prior to the Second Step Closing Date.

4.      As a condition to the Incremental Facility, the Lenders thereunder shall have a valid lien on and security interest in the collateral referred to in Exhibit A under "Collateral" that is equivalent to the lien in favor of the other Lenders under the Tranche B Facility.

5.      As a condition to the Senior Bridge Facility, the Lead Arrangers shall have received, not later than 20 business days prior to the Second Step Closing Date and at the Second Step Closing Date, a complete printed preliminary prospectus or preliminary offering memorandum or preliminary private placement memorandum suitable for use in a customary "high-yield road show" relating to the Senior Notes, which will include (unless and to the extent that you and the Lead Arrangers otherwise agree) all financial statements and other data to be included therein (including all audited financial statements, all unaudited financial statements (which shall have been reviewed by the independent accountants for Tribune as provided in Statement on Auditing Standards No. 100) and all appropriate pro forma financial statements prepared in accordance with, or reconciled to, U.S. GAAP and prepared in accordance with Regulation S-X under the Securities Act), and all other data (including selected financial data) that the Securities and Exchange Commission would require in a registered offering of the Senior Notes or that would be necessary for the Lead Arrangers to receive customary "comfort" (including "negative assur-

ance" comfort) from independent accountants in connection with the offering of the Senior Notes. Upon delivery of such prospectus, offering memorandum or private placement memorandum you will, and will use commercially reasonable efforts to cause Tribune's senior management personnel to participate in, a customary road show for the sale of the Senior Notes.

6.      Delivery of reasonably satisfactory legal opinions, including customary opinions of counsel to the ESOP (to the extent requested by the Lead Arrangers) and of Tribune's counsel; absence of prepayment events under other material debt instruments; no creation of liens on Collateral (as defined in Exhibit A) under other debt instruments or other agreements and no creation of material liens on assets not constituting Collateral, in each case as a result of the transactions contemplated hereby; customary closing certificates, including evidence of authority, charter documents and officers' incumbency certificates; to the extent requested by the Lead Arrangers, delivery of the opinion of the ESOP trustee's financial advisor; and to the extent requested by the Lead Arrangers, delivery of a customary certificate of the ESOP trustee.

7.      The Acquisition shall have been consummated in accordance with the terms and conditions of the Acquisition Agreement and no provision thereof shall have been waived, amended, supplemented or otherwise modified and no action by Tribune prohibited by the Acquisition Agreement shall have been consented to, in each case in a manner material and adverse to the Lenders without the consent of the Lead Arrangers.

8.      Each of the First Step Transactions shall have been consummated and the Credit Agreement (as defined in the First Step Commitment Letter) shall have been executed and delivered shall be in full force and effect and there shall not have been any amendments, modifications or waivers thereto subsequent to the execution and delivery thereof that are adverse to the Lenders under the Incremental Facility in any material respect.

9.      As a condition to the Incremental Facility, no default or event of default shall result from the making of term loans thereunder.

10.     Zell and Holdco shall have entered an equity commitment agreement or subscription agreement whereby Zell (either directly or through Holdco) will agree to invest up to $100.0 million (less the Investment Reduction Amount (as defined in the First Step Commitment Letter)) on the later to occur of March 25, 2008 and the Second Step Closing Date, in Junior Capital (as defined in the First Step Commitment Letter) of Tribune if Tribune has not made the election to be treated as an S Corporation under the Code (the "S. Corp Election") on or prior to March 15, 2008, such agreement to be in form and substance reasonably satisfactory to the Lead Arrangers and granting third-party enforcement rights in favor of the Administrative Agent on behalf of the Lenders (the "Zell Investment Agreement").

11.     The ratio of total outstanding indebtedness of Tribune that is guaranteed by any of its subsidiaries and outstanding indebtedness of any of the Guarantors (on a consolidated basis) to trailing four quarter EBITDA (as defined in Annex II to this Exhibit A) shall not exceed 9.00:1:00 when measured on a pro forma basis as of the last day of the fiscal quarter ending immediately prior to the date of the Acquisition (giving effect to the Second Step Transactions and other customary and appropriate pro forma adjustment events, including any acquisi-

2

Source: TRIBUNE CO, 8-K, April 05, 2007

tions or dispositions after the beginning of the relevant determination period but prior to or simultaneous with the consummation of the Acquisition).

12.     The Lead Arrangers shall be reasonably satisfied that subsequent to the consummation of the First Step Transactions, there shall not have been any changes to the terms and conditions of the documentation regarding the establishment of the ESOP (including the provisions of the ESOP relating to redemptions and distributions) that are material and adverse to Lenders.  The Lead Arrangers shall be reasonably satisfied that subsequent to the consummation of the First Step Transactions, the ESOP shall not have entered into any transactions (a) constituting a "prohibited transaction" as defined in the Code, (b) that violate fiduciary standards imposed by Section 404(a) of ERISA or (c) adversely affect the qualified status of the ESOP under Sections 401(a) or 4975(e)(7) of the Code.

13.     The Holdco Purchase shall be consummated substantially concurrent with the consummation of the Acquisition.

3

Source: TRIBUNE CO, 8-K, April 05, 2007

**Exhibit 10.12**

[EXECUTION COPY]

INVESTOR RIGHTS AGREEMENT

by and among

TRIBUNE COMPANY,

EGI-TRB, L.L.C.

and

GREATBANC TRUST COMPANY,
solely as trustee of the
TRIBUNE EMPLOYEE STOCK OWNERSHIP TRUST
which forms a part of the
TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN

Dated as of April 1, 2007

Source: TRIBUNE CO, 8-K, April 05, 2007

INVESTOR RIGHTS AGREEMENT

      This INVESTOR RIGHTS AGREEMENT (this "Agreement") is entered this 1st day of April, 2007, by and among Tribune Company, a Delaware corporation (the "Company"), EGI-TRB, L.L.C., a Delaware limited liability company ("EGI-TRB"), and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee (the "ESOP Fiduciary") of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP" and together with EGI-TRB, the "Initial Shareholders").

## WITNESSETH:

      WHEREAS, concurrently herewith, EGI-TRB, the ESOP, Tesop Corporation, a Delaware corporation ("Merger Sub"), and the Company have entered into that certain Agreement and Plan of Merger, dated as of April 1, 2007 (the "Merger Agreement"), pursuant to which Merger Sub, a wholly owned subsidiary of the ESOP, will be merged with and into the Company, with the Company surviving the Merger (the "Merger"), on the terms and subject to the conditions set forth therein.

      WHEREAS, concurrently herewith, the Company and EGI-TRB have entered into a Securities Purchase Agreement (the "EGI Purchase Agreement") pursuant to which EGI-TRB has, on the terms and subject to the conditions set forth in the EGI Purchase Agreement, agreed to purchase (i) (a) 1,470,588 shares of Common Stock prior to consummation of the Merger and (b) a $200 million unsecured subordinated exchangeable promissory note in the form attached as an exhibit thereto, and (ii) (y) a $225 million unsecured subordinated promissory note in the form attached as an exhibit thereto and (z) a warrant to purchase 43,478,261 shares of Common Stock of the Company immediately following consummation of the Merger (the "Warrant") pursuant to a warrant agreement in the form attached as an exhibit thereto (the "Warrant Agreement").

      WHEREAS, concurrently herewith, the ESOP Fiduciary, on behalf of the ESOP, and the Company have entered into an Equity Purchase Agreement (the "ESOP Purchase Agreement") pursuant to which the ESOP has, on the terms and subject to the conditions set forth in the ESOP Purchase Agreement, agreed to purchase 8,928,571 shares of Common Stock prior to consummation of the Merger (the "ESOP Purchase").

      WHEREAS, the Company and each of the Initial Shareholders have entered into this Agreement for purposes, among others, of (a) establishing the composition of the Company's board of directors (the "Board"), (b) granting to the Shareholders (as defined herein) certain rights in connection with the sale or transfer of Shares (as defined herein) and (c) granting to the Shareholders certain other rights, including information rights, with respect to the Company, in each case, upon consummation of the Merger.

      NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties (as defined herein) hereby agree as follows:

---

# ARTICLE I
## DEFINITIONS

Section 1.1      _Definitions_.  When used in this Agreement, the following terms shall have the meanings set forth below:

      (a)      "_Additional Financing_" shall have the meaning set forth in _Section 4.4_.

      (b)      "_Affiliate_" shall mean, with respect to a Person, another Person who, directly or indirectly, controls, is controlled by or is under common control with such Person, including, without limitation, any general partner, officer, director, or manager of such Person; provided, however, that no Person for whom the ESOP Fiduciary serves as trustee shall be deemed to be an Affiliate of the ESOP Fiduciary.

      (c)      "_Agreement_" shall have the meaning set forth in the Preamble.

      (d)      "_Annual Budget_" shall have the meaning set forth in _Section 7.1_.

(e)      "_Board_" shall have the meaning set forth in the Recitals.

(f)      "_Code_" shall mean the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

      (g)      "_Common Stock_" shall mean the common stock, par value $.01 per share, of the Company.

      (h)      "_Company_" shall have the meaning set forth in Preamble.

      (i)      "_Convertible Securities_" shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Common Stock, but excluding Options.

      (j)      "_Effective Date_" shall mean the date of consummation of the Merger.

(k)      "_EGI Purchase Agreement_" shall have the meaning set forth in the Recitals.

      (l)      "_EGI Transferee_" shall mean any direct or indirect Affiliate of EGI-TRB, Equity Group Investments, L.L.C. or Samuel Zell, and any senior employee of Equity Group Investments, L.L.C. and any direct or indirect Affiliate thereof.

      (m)      "_EGI-TRB_" shall have the meaning set forth in the Preamble.

      (n)      "_EGI-TRB Director_" shall have the meaning set forth in _Section 2.1_.

      (o)      "_ESOP_" shall have the meaning set forth in the Preamble.

      (p)      "_ESOP Fiduciary_" shall have the meaning set forth in the Preamble.

2

Source: TRIBUNE CO, 8-K, April 05, 2007

(q) "ESOP Loan Agreement" shall mean the Loan Agreement, dated as of the date of the ESOP Purchase, by and between the Company and the ESOP Fiduciary.

(r) "ESOP Pledge Agreement" shall mean the Stock Pledge Agreement, dated as of the date of the ESOP Purchase, by and between the Company and the ESOP Fiduciary.

(s) "ESOP Purchase" shall have the meaning set forth in the Recitals.

(t) "ESOP Purchase Agreement" shall have the meaning set forth in the Recitals.

(u) "Excluded Transactions" shall mean (a) the issuance of shares of Common Stock, Options or Convertible Securities as a dividend or distribution on Shares, (b) the issuance of shares of Common Stock, Options or Convertible Securities by reason of a stock split, split-up or other distribution on shares of Common Stock, (c) the issuance of shares of Common Stock or Options to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to a compensatory plan, agreement or arrangement approved by the Board or (d) the issuance of shares of Common Stock or Convertible Securities upon the exercise of Options or upon the conversion or exchange of Convertible Securities, in each case, provided such issuance is pursuant to the terms of such Option or Convertible Security.

(v) "Fully-Exercising Shareholder" shall have the meaning set forth in Section 4.2.

(w) "General Notice" shall have the meaning set forth in Section 4.2.

(x) "Independent Director" shall have the meaning set forth in the Company's By-laws in effect from time to time.

(y) "Initial Directors" shall mean the persons initially designated as directors on the Effective Date, including the directors designated in accordance with the provisions of Section 2.1 hereof.

(z) "Initial Shareholders" shall have the meaning set forth in the Preamble.

(aa) "Joinder" shall have the meaning set forth in Section 3.6.

(bb) "Merger" shall have the meaning set forth in the Recitals.

(cc) "Merger Agreement" shall have the meaning set forth in the Recitals.

(dd) "Merger Sub" shall have the meaning set forth in the Recitals.

(ee) "Option" shall mean any right, option or warrant to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

(ff) "Other Shareholder" shall have the meaning set forth in Section 3.2.

(gg) "Parties" shall mean the parties to this Agreement.

3

Source: TRIBUNE CO, 8-K, April 05, 2007

(hh)    "Permitted Transferees" shall have the meaning set forth in Section 3.3.

(ii)    "Person" shall mean an individual, corporation, partnership, limited liability company, association, trust, unincorporated organization, entity or group.

(jj)    "Qualified Public Offering" shall mean a firm commitment underwritten public offering of the Common Stock to the public with gross proceeds to the Company of not less than $250 million, pursuant to an effective registration statement filed under the Securities Act of 1933, as amended.

(kk)    "Sale of the Company" shall mean either (a) a merger or consolidation in which (i) the Company is a constituent party or (ii) a subsidiary of the Company is a constituent party and the Company issues shares of its capital stock pursuant to such merger or consolidation, except any such merger or consolidation involving the Company or a subsidiary pursuant to which the shares of capital stock of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (A) the surviving or resulting corporation or (B) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation (provided that, for purposes of this definition, all Shares issuable upon exercise of rights, options or warrants to subscribe for, purchase or otherwise acquire Shares or securities convertible into Shares, which are outstanding immediately prior to such merger or consolidation or upon conversion of convertible securities outstanding immediately prior to such merger or consolidation shall be deemed to be outstanding immediately prior to such merger or consolidation and, if applicable, converted or exchanged in such merger or consolidation on the same terms as the actual outstanding Shares are converted or exchanged), (b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company of all or substantially all the assets of the Company and its subsidiaries taken as a whole, or the sale or disposition (whether by merger or otherwise) of one or more subsidiaries of the Company if substantially all of the assets of the Company and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company or (c) a Stock Sale. Notwithstanding the foregoing, a "Sale of the Company" shall not include the Merger or any other transaction contemplated by the Merger Agreement.

(ll)    "Sale Notice" shall have the meaning set forth in Section 3.2.

(mm)    "Shareholder" or "Shareholders" shall mean (and this Agreement shall bind and create rights in) the Initial Shareholders and any other transferee to which (a) any Shares are permitted by this Agreement to be issued or Transferred or (b) any Warrants are assigned, in each case, in accordance with the terms of this Agreement. Each of the foregoing Persons shall remain a Shareholder as long as he, she or it continues to own Shares or Warrants in the Company.

4

(nn)    "Shares" shall mean (a) the shares of Common Stock acquired by the Initial Shareholders as a result of the Merger and the ESOP Purchase or otherwise, (b) the shares of Common Stock issued upon conversion of the Warrant and (c) any Common Stock issued with respect to the securities referred to in clauses (a) and (b) by way of stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization. "Shares" shall also include shares or other interests in any successor to the Company, whether by merger, consolidation or otherwise.

(oo)    "Stock Sale" shall mean a transac-tion or series of related transactions in which a Person, or a group of related Persons, acquires from Shareholders of the Company capital stock and other voting securities representing more than fifty percent (50%) of the out-standing voting power of the Company.

(pp)    "Transfer" or "Transferred" shall mean to directly or indirectly sell, assign, give, mortgage, pledge, hypothecate, issue, bequeath or in any manner encumber or dispose of, or permit to be sold, assigned, encumbered, attached or otherwise disposed of in any manner, whether voluntarily, involuntarily or by operation of law, with or without consideration other than as part of a distribution of Shares by the ESOP to a participant of the ESOP as may be required by the terms thereof.

(qq)    "Transferring Shareholder" shall have the meaning set forth in Section 3.2.

(rr)    "Warrant" shall have the meaning set forth in the Recitals.

(ss)    "Warrant Agreement" shall have the meaning set forth in the Recitals.

(tt)    "Zell Family Group" shall mean Samuel Zell and his spouse, lineal ancestors and descendants (whether natural or adopted), and any trust or retirement account primarily for the benefit of Samuel Zell and/or his spouse, lineal ancestors and descendants.

## ARTICLE II
## CORPORATE GOVERNANCE

Section 2.1    Size and Composition of the Board.  Upon and following the Effective Date, each Shareholder agrees that in any election of directors of the Company, such Shareholder shall vote, or cause to be voted, all shares of Common Stock and any other voting securities of the Company owned by such Shareholder, or over which such Shareholder has voting control, and shall take all other necessary or desirable actions within such Shareholder's control (whether in the capacity of a Shareholder, director, member of a Board committee or officer of the Company or otherwise, and including, without limitation, attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company shall take all necessary or desirable actions within its control (including, without limitation, calling special Board and shareholder meetings), so that:

(a)    the Initial Directors shall serve as directors until the third (3rd) annual election following consummation of the Merger;

5

Source: TRIBUNE CO, 8-K, April 05, 2007

(b)      there shall be two (2) directors designated by EGI-TRB (each an "EGI-TRB Director");

(c)      there shall be one (1) director who shall be the Company's chief executive officer; provided that if for any reason the chief executive officer of the Company shall cease to serve in such capacity, each Shareholder shall take all other necessary or desirable actions within such Shareholder's control (whether in the capacity of a Shareholder, director, member of a Board committee or officer of the Company or otherwise, and including, without limitation, attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company shall take all necessary or desirable actions within its control, to (i) remove the former chief executive officer of the Company from the Board if such person has not resigned as a member of the Board and (ii) elect or appoint such person's replacement as chief executive officer of the Company as a director;

Section 2.2     Removal of EGI-TRB Directors.  Subject to any limitation in the Company's By-laws, each Shareholder agrees that it shall take all other necessary or desirable actions within such Shareholder's control (whether in the capacity of a Shareholder, director, member of a Board committee or officer of the Company or otherwise), and the Company shall take all necessary or desirable actions within its control, to ensure that no EGI-TRB Director elected or appointed as a member of the Board pursuant to Section 2.1 may be removed from office unless such removal is directed or approved by EGI-TRB (in its sole and absolute discretion).

Section 2.3     Written Consent.  All Shareholders agree to execute any written consents required to perform the obligations under Sections 2.1 and 2.2 of this Agreement, and the Company agrees at the request of any Party entitled to designate directors to call a special meeting of shareholders for the purpose of electing directors.

Section 2.4     No Liability for Election or Appointment of Recommended Directors.  No Party, nor any Affiliate of any such Party, shall have any liability as a result of designating a person for election or appointment as a Board member or committee member for any act or omission by such designated person in his or her capacity as a Board member or committee member, as applicable, nor shall any Party have any liability as a result of voting for any such designee in accordance with the provisions of this Agreement.

Section 2.5     Compensation of Board.  Upon and following the Effective Date, the Company agrees to reimburse all members of the Board for their actual and reasonable out-of-pocket expenses incurred in attending meetings of the Board and all committees thereof, and otherwise incurred in fulfilling their duties as Board members or committee members, as applicable, and pay such reasonable compensation to members of the Board as the Board shall from time to time determine.

Section 2.6     No Other ESOP Obligations.  For the avoidance of doubt, nothing in this Article II shall require the ESOP or its participants to vote in any manner on matters other than the election of directors.

6

Source: TRIBUNE CO, 8-K, April 05, 2007

Section 2.7      Termination.  Subject to Article IX, the rights of EGI-TRB under Sections 2.1 and 2.2 shall continue for so long as EGI-TRB and its Permitted Transferees hold in the aggregate at least ten percent (10%) of the outstanding Shares (including for purposes of this Section 2.7, Shares subject to the Warrant) on a fully diluted basis.

**ARTICLE III**
**TRANSFERS**

Section 3.1      Transfer of Shares.  Subject to Article VI, upon and following the Effective Date, no Shareholder shall Transfer its Shares, except (a) pursuant to the provisions of Section 3.2, (b) pursuant to a Transfer of not more than two percent (2%) of the outstanding Common Stock (on a fully diluted basis) to any transferee or (c) to a Permitted Transferee; provided that in no event shall any Transfer of Shares pursuant to Section 3.2 be made for any consideration other than cash payable upon consummation of such Transfer or in installments over time and no Shares may be pledged (except for a pledge of Shares by a transferee to secure indebtedness to the transferor thereof hereunder).  In connection with any transfer pursuant to Section 3.2, no Shareholder shall consummate any Transfer until thirty (30) calendar days after delivery to the Company and the other Shareholders of such Shareholder's Sale Notice, unless the parties to the Transfer have been finally determined pursuant to this Article III prior to the expiration of such thirty (30) calendar day period.

Section 3.2      Co-Sale Rights.  Subject to Section 3.1, upon and following the Effective Date, at least thirty (30) calendar days prior to any Transfer of Shares, the transferring Shareholder (the "Transferring Shareholder") shall deliver a written notice (the "Sale Notice") to the Company and the other Shareholders (the "Other Shareholders") specifying in reasonable detail the identity of the prospective transferee(s), the number of Shares to be Transferred and the terms and conditions of the Transfer.  The Other Shareholders may elect to participate in such Transfer as sellers at the same price per share and on the same terms by delivering written notice to the Transferring Shareholder within thirty (30) calendar days after delivery of the Sale Notice.  If any Other Shareholders have elected to participate in such Transfer, the Transferring Shareholder and such Other Shareholders shall be entitled to sell in the contemplated Transfer, at the same price and on the same terms, a number of Shares equal to the result of (a) an amount equal to (i) the percentage of Shares owned by such Person (including for these purposes, in the case of the holder of the Warrant, the Shares underlying the Warrant) divided by (ii) the aggregate percentage of Shares owned by the Transferring Shareholder and the Other Shareholders participating in such sale (including for these purposes, in the case of the holder of the Warrant, the Shares underlying the Warrant) multiplied by (b) the number of Shares to be sold in the contemplated Transfer.

Each Transferring Shareholder shall use reasonable best efforts to obtain the agreement of the prospective transferee(s) to the participation of the Other Shareholders in any contemplated Transfer, and no Transferring Shareholder shall Transfer any of its Shares to any prospective transferee if such prospective transferee(s) declines to allow the participation of the Other Shareholders.  Each Shareholder transferring Shares pursuant to this Section 3.2 shall pay its pro rata share (based on the number of Shares to be Transferred) of the expenses incurred by the Company and the Transferring Shareholder in connection with such Transfer and shall be obligated to join on a pro rata basis (based on the number of Shares to be Transferred) in any

7

Source: TRIBUNE CO, 8-K, April 05, 2007

indemnification or other obligations that the Transferring Shareholder agrees to provide in connection with such transfer (other than any such obligations that relate specifically to a particular Shareholder, such as indemnification with respect to representations and warranties given by a Shareholder regarding such Shareholder's title to and ownership of Shares; provided that no holder shall be obligated in connection with such Transfer to agree to indemnify or hold harmless the prospective transferee(s) with respect to an amount in excess of the net cash proceeds paid to such holder in connection with such Transfer).

Section 3.3    Permitted Transfers. Subject to Article VI, the restrictions set forth in this Article III shall not apply with respect to any Transfer of Shares (a) by any Shareholder to or among its Affiliates, (b) by EGI-TRB to or among any EGI Transferee or (c) by EGI-TRB to or among any member of the Zell Family Group (collectively referred to herein as "Permitted Transferees"); provided that the restrictions contained in this Article III and Article VI shall continue to be applicable to such Shares after any such Transfer. Notwithstanding the foregoing, no Party hereto shall avoid the provisions of this Agreement by making one or more transfers to one or more Permitted Transferees and then disposing of all or any portion of such party's interest in any such Permitted Transferee.

Section 3.4    ESOP Provisions. Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall be construed as a restriction upon the ESOP's ability to Transfer its Shares if such Transfer is required by the exercise of the Trustee's fiduciary duty to the ESOP and its participants.

Section 3.5    Transfers in Violation of Agreement. Any Transfer or attempted Transfer of any Shares in violation of any provision of this Agreement shall be void, and the Company shall not record such Transfer on its books or treat any purported transferee of such Shares as the owner of such shares for any purpose.

Section 3.6    Joinder. Upon and following the Effective Date, prior to Transferring any Shares (other than pursuant to a Qualified Public Offering or Sale of the Company) to any Person, the Transferring Shareholder shall cause the prospective transferee to be bound by this Agreement and to execute and deliver to the Company and the other Shareholders a joinder in the form of Exhibit A hereto (a "Joinder").

Section 3.7    Legend. Upon and following the Effective Date, each certificate evidencing Shares and each certificate issued in exchange for or upon the transfer of any Shares (if such shares remain Shares after such transfer) shall be stamped or otherwise imprinted with a legend in substantially the following form:

> "The securities represented by this certificate are subject to an Investor Rights Agreement dated as of April 1, 2007, among the issuer of such securities (the "Company") and certain of the Company's shareholders, as amended and modified from time to time. A copy of such Investor Rights Agreement shall be furnished without charge by the Company to the holder hereof upon written request."

8

Source: TRIBUNE CO, 8-K, April 05, 2007

The Company shall imprint such legend on certificates evidencing Shares outstanding as of the date hereof. The legend set forth above shall be removed from the certificates evidencing any shares which cease to be Shares hereunder.

Section 3.8    Further Assurances. The parties hereto agree that, to the extent the exercise of any rights or the enforcement of any obligations of any party hereto requires the prior consent of the Federal Communications Commission to a transfer of control of the Company pursuant to law then in effect, the parties hereto shall cooperate fully in obtaining all necessary prior approval prior to the taking of any action that would constitute or be deemed to effect a transfer of control of the Company requiring such prior approval.

Section 3.9    Termination. Subject to Articles VI and IX, the restrictions on the Transfer of Shares set forth in this Article III shall terminate upon the earlier to occur and shall not be applicable to Transfers occurring as part of (a) a Qualified Public Offering and (b) a Sale of the Company.

ARTICLE IV
PRE-EMPTIVE RIGHTS

Section 4.1    General. Subject to the terms and conditions specified in this Article IV, and applicable securities laws, the Company hereby grants to the Shareholders a right of first offer with respect to sales by the Company of its Shares following the Effective Date, as follows:

Section 4.2    Procedures. Following the Effective Date, each time the Company proposes to offer any Shares, the Company shall first make an offering of such Shares to each Shareholder in accordance with the following provisions:

(a)    The Company shall deliver a written notice ("General Notice") to the Shareholders stating (i) its bona fide intention to offer such Shares, (ii) the number of such Shares to be offered and (iii) the price and terms upon which it proposes to offer such Shares.

(b)    By written notification received by the Company within ten (10) calendar days after the giving of the General Notice, each Shareholder may elect to purchase, at the price and on the terms specified in the General Notice, up to that portion of such Shares that equals the proportion that the number of Shares then held by such Shareholder (including for these purposes, in the case of the holder of the Warrant, the Shares underlying the Warrant) bears to the total number of Shares then outstanding (including the Shares underlying the Warrant). The Company shall promptly, in writing, inform each Shareholder that elects to purchase all the Shares available to it (a "Fully-Exercising Shareholder") of any other Shareholder's failure to do likewise. During the ten (10) calendar day period commencing after such information is given, each Fully-Exercising Shareholder may elect to purchase up to that portion of the Shares for which Shareholders were entitled to subscribe, but which were not subscribed for by the Shareholders, that is equal to the proportion that the number of Shares then held by such Fully-Exercising Shareholder (including for these purposes, in the case of the holder of the Warrant, the Shares underlying the Warrant) bears to the total number of Shares then held by all Fully-Exercising Shareholders who wish to purchase some of the unsubscribed Shares (including for these purposes, in the case of the holder of the Warrant, the Shares underlying the Warrant).

9

Source: TRIBUNE CO, 8-K, April 05, 2007

(c)     If all Shares that the Shareholders are entitled to obtain pursuant to Sections 4.2(a) and (b) are not elected to be obtained as provided in Sections 4.2(a) and (b) hereof, the Company may, subject to Article VI, during the ninety (90) calendar day period following the expiration of the period provided in Sections 4.2(a) and (b) hereof, offer the remaining unsubscribed portion of such Shares to any Person or Persons at a price not less than that, and upon terms no more favorable to the offeree than those, specified in the General Notice. If the Company does not enter into an agreement for the sale of the Shares within such period, or if such agreement is not consummated within ninety (90) calendar days of the execution thereof, the right provided hereunder shall be deemed to be revived and such Shares shall not be offered unless first reoffered to the Shareholders in accordance with this Section 4.2.

Section 4.3      Limitations. The rights provided in this Article IV shall not be applicable to Shares issued in any Excluded Transaction. In addition to the foregoing, the right of first offer in this Article IV shall not be applicable with respect to any Shareholder in any subsequent offering of Shares if (a) at the time of such offering, the Shareholder is not an "accredited investor," as that term is then defined in Rule 501(a) of the Securities Act of 1933, as amended, and (b) such offering of Shares is otherwise being offered only to accredited investors.

Section 4.4      Additional Financing. The Company shall use reasonable best efforts to lend to the ESOP under a note sufficient funds to permit the ESOP to exercise its preemptive rights in full pursuant to this Article IV (an "Additional Financing"); provided, however, that the Company shall have no obligation to provide the Additional Financing (a) if providing such Additional Financing would violate any covenant or other obligation in respect of then-outstanding indebtedness or (b) the Board reasonably determines that providing such Additional Financing would adversely affect in a material manner the Company's business plans and objectives, financial position or results of operations. The Company shall be deemed to have satisfied its obligations under this Section 4.4 if it shall have offered such Additional Financing on terms substantially similar to or more favorable than existing loan obligations between the Company and the ESOP.

Section 4.5      Termination. Subject to Article IX, the covenants set forth in this Article IV shall terminate upon the earlier to occur and shall not be applicable to Transfers occurring as part of (a) a Qualified Public Offering or (b) a Sale of the Company.

## ARTICLE V
## RESTRICTIVE COVENANTS

The Company hereby covenants and agrees that, from and after the Effective Date, it shall not, without the prior approval or prior written consent of a majority of the Board, which majority shall include a majority of the Independent Directors and one EGI-TRB Director, enter into any transaction, contract, agreement or arrangement to:

(a)     amend, alter or repeal any provision of the Certificate of Incorporation or By-laws of the Company;

(b)     create, or authorize the creation of, or issue or obligate itself to issue shares of, any additional class or series of capital stock other than shares issued and sold to the

10

Source: TRIBUNE CO, 8-K, April 05, 2007

ESOP at fair market value solely for purposes of maintaining its 51% equity ownership of the Company, on a fully diluted basis;

(c)      liquidate, dissolve or wind-up the business and affairs of the Company, or consent to any of the foregoing;

(d)      purchase or redeem (or permit any subsidiary to purchase or redeem) or pay or declare any dividend or make any distribution on, any shares of capital stock of the Company other than (i) repurchases of stock from former employees, officers, directors, consultants or other Persons who performed services for the Company or any subsidiary in connection with the cessation of such employment or service, (ii) dividends or distributions necessary to enable the ESOP to make all payments due under the terms of the ESOP Loan Agreement as they come due and (iii) repurchases of stock from the ESOP as required by the terms of the ESOP plan document;

(e)      engage in transactions with Affiliates other than in their capacity as a stockholder, director, officer or employee of the Company, including any transaction, contract, agreement or arrangement between the ESOP and the Company, or any amendment or waiver thereof, other than this Agreement, the Merger Agreement, the ESOP Purchase Agreement, the ESOP Loan Agreement and the ESOP Pledge Agreement, and the transactions contemplated thereby;

(f)      make, or permit any subsidiary to make, any loan or advance to, any subsidiary or other corporation, partnership or other entity unless it is wholly owned by the Company;

(g)      make, or permit any subsidiary to make, any loan or advance to any Person, including, without limitation, any employee or director of the Company or any subsidiary, except (i) advances and similar expenditures in the ordinary course of business or under the terms of an employee stock or option plan approved by the Board, (ii) notes that may be issued by the Company to participants of the ESOP under the terms of the ESOP and (iii) financing provided to the ESOP pursuant to <u>Section 4.4</u>;

(h)      guarantee, directly or indirectly, or permit any subsidiary to guarantee, directly or indirectly, any indebtedness except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

(i)      incur any aggregate indebtedness in excess of $250 million that is not already included in the Annual Budget approved by the Board, other than trade credit incurred in the ordinary course of business;

(j)      acquire any assets or securities of any Person in a transaction resulting in payments by the Company in an aggregate amount in excess of $250 million;

(k)      sell, assign, license, pledge or encumber any assets of the Company for an amount in excess of $250 million;

11

Source: TRIBUNE CO, 8-K, April 05, 2007

(l)      enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $250 million;

(m)     change the fiscal year of the Company; or

(n)     elect not to qualify, or continue to qualify as an S corporation.

## ARTICLE VI
## S CORPORATION COVENANTS

Section 6.1     Election of S Corporation Status. The Company and the Shareholders agree to take all actions necessary to enable and allow the Company to elect, and maintain an election, to be treated as an S corporation under the Code as soon as reasonably practicable following the Effective Date (but, in any event, not later than the first day of the Company's fiscal year immediately following the fiscal year in which the Effective Date occurs). The Company shall elect the calendar year as its fiscal year in connection with its election of S corporation status.

Section 6.2     Change of Shareholder Status. Neither the Company nor any Shareholder may cause or effect a change in the status of a Shareholder or related party that would cause (i) the Shareholder to become an ineligible S corporation holder, (ii) the Company to become ineligible for S corporation status or (iii) the S corporation status of the Company to terminate.

Section 6.3     Exercise of a Warrant. For so long as the Company maintains its status as an S corporation, no Shareholder may exercise a Warrant if, as a result of such exercise, the Company becomes ineligible for S corporation status.

Section 6.4     Shareholder Acknowledgment of S Corporation Status. Each Shareholder acknowledges that a termination of the Company's status as an S corporation by reason of a Transfer of Shares or the exercise of a Warrant in violation of this Article VI or a change of status pursuant to Section 6.2 may cause material adverse tax effects to the other Shareholders. For this reason, any Shareholder who contemplates a Transfer of Shares, an exercise of a Warrant or a change of status pursuant to Section 6.2 agrees to advise the Company at least thirty (30) days (or such shorter period as the Company may agree) in advance of any such Transfer, exercise or change of status, so that the Company may take action to preserve its status as an S corporation. Each Shareholder agrees that any such Transfer, exercise or change of status that causes the Company to become ineligible for S corporation status may and should be enjoined.

Section 6.5     Inadvertent Termination. If the Company's status as an S corporation is terminated inadvertently and the Company wishes to obtain a ruling under Section 1362(f), or a successor provision, of the Code, each Shareholder agrees to make any adjustments required pursuant to Section 1362(f)(4), or a successor provision, of the Code and approved by the Board. A Shareholder's obligation to make such adjustments shall continue after the Shareholder has ceased to own Shares in the Company and after this Agreement has terminated.

Section 6.6     Further Assurances. Each Shareholder agrees to take all actions necessary to enable and allow the Company to elect, and maintain an election, to be treated as an

12

Source: TRIBUNE CO, 8-K, April 05, 2007