# EXHIBIT N

**November 02, 2009**

## Was Zell's Tribune Ever Solvent?

The junior bondholders are claiming that Sam Zell and other senior leaders completed a leveraged buyout that made the company insolvent from the onset of the 2007 deal. The junior bondholders allege that the $8.2 billion transaction is a case of "fraudulent conveyance" and that the bankruptcy was inevitable and not the result of the deteriorating economic and industry conditions. Fraudulent conveyance for a leveraged buyout is defined as overloading the debt and leaving a company undercapitalized and unable to meet debt obligations. If the junior bondholders are able to prove fraudulent conveyance, the bankruptcy court could invalidate the $10 billion in claims held by the senior bondholders.

While the article written by the Tribune dismisses the claims as "audacious" (surprise! surprise!), it does actually try to provide a valid defense as well. As part of the LBO, the Tribune was required to obtain two solvency opinions. The first one was obtained in May 2007 and indicated that the company was still solvent. The second solvency opinion is not required to be disclosed, but the Tribune claims that it also indicated the company was solvent. The Tribune claims that the company was solvent and that the actual financial results were just significantly lower than the projected results. However, the junior bondholders respond that in the months between the solvency opinions, the Tribune's business was declining and the company should have been aware of the state of the industry.

The junior bondholders filed a request in bankruptcy court for permission to investigate the buyout and pursue a case against the Tribune for fraudulent conveyance. Contrary to the ruling we saw in Twombley ruling last week, the bankruptcy judge agreed to provide the junior bondholders access to emerging evidence. The junior bondholders are currently reviewing reams of documents and emails relating to the Zell deal to see if they can support their fraudulent conveyance claim. This case differs from Twombley in a few different ways. First, the case is in bankruptcy court and adheres to bankruptcy law. Part of the defense in the Twombley case was that fishing for evidence in company documents is expensive and time-consuming. In the Tribune's case, since the company already has the expensive task of producing documents to the bankruptcy court, there is little additional cost of providing that information to the junior bondholders. Additionally, since the junior bondholders have a claim on the Tribune's assets, it is reasonable to give them access to internal company documents during bankruptcy.

Fraudulent conveyance claims have become more prevalent of late as a result of the current economic conditions. During the recent economic downturn, many poorly structured deals are landing the company in bankruptcy, which bring any high-risk deals by the banks and company management to the forefront. With an increasing number of companies in bankruptcy, fraudulent conveyance claims by junior bondholders are likely on the rise. Additionally, recent rulings have given them greater credibility as a legal tactic. A US Bankruptcy Court in the Southern District of Florida recently ruled that TOUSA, Inc. fraudulently conveyed value away from its operating subsidiary. It is hard to imagine who other than the prior shareholders benefited from the Zell deal. Bondholders and shareholders both generally lose when a company enters bankruptcy, and it doesn't appear any of the current stakeholders are getting a good return on their investment in the Tribune.

Unlike the Trans Union case for today, a valuation of the Tribune was done prior to the leveraged buyout. At the time of the buyout, the company was valued at $8.2 billion, and the deal placed more than $12 billion in debt on the company. The Tribune's reorganization plan gives the senior bondholders a majority stake in the company when it emerges from bankruptcy and provides only a small sliver of equity for the junior bondholders. Given the small crumbs given to the junior bondholders, it's understandable that they are using every means possible to increase their stake in the company when it emerges from bankruptcy. What I don't quite understand is why the junior bondholders went along with the buyout if they believed the company would be insolvent. Or why didn't they write clauses limiting the additional debt the company could take on? It seems to me that the junior debtholders had ways to protect themselves from this situation but decided against it in order to obtain a higher interest rate.

http://online.wsj.com/article/SB125134056143662707.html
http://www.chicagotribune.com/business/chi-sun-fraudulentnov01,0,4944206.story
Posted by Stephanie Uhl on November 02, 2009 at 07:44 AM | Permalink

# EXHIBIT O

United States
Securities and Exchange Commission
Washington, D.C. 20549

# SCHEDULE TO
### (Amendment No. 10)

Tender Offer Statement Under Section 14(d)(1) or 13(e)(1)
of the Securities Exchange Act of 1934

# TRIBUNE COMPANY
*(Name of Subject Company (Issuer))*

# TRIBUNE COMPANY
*(Name of Filing Person (Offeror and Issuer))*

**Common Stock, Par Value $0.01 Per Share
(including the associated Preferred Share Purchase Rights)**
*(Title of Class of Securities)*

**896047 10 7**
*(CUSIP Number of Class of Securities)*

# SCHEDULE 13E-3

**Rule 13e-3 Transaction Statement
Under Section 13(e) of the Securities Exchange Act of 1934**

**Tribune Company
Samuel Zell
EGI-TRB, L.L.C.
Sam Investment Trust
Tribune Employee Stock Ownership Plan
Tesop Corporation**
*(Name of Person(s) Filing Statement)*

**Common Stock, Par Value $0.01 Per Share
(including the associated Preferred Share Purchase Rights)**
*(Title of Class of Securities)*

**896047 10 7**
*(CUSIP Number of Class of Securities)*

| | | | | | |
|---|---|---|---|---|---|
| **Tribune Company** 435 North Michigan Avenue Chicago, Illinois 60611 Attn: Crane Kenney (312) 222-9100 | **Samuel Zell** Two North Riverside Plaza, Suite 600 Chicago, Illinois 60606 (312) 454-0100 | **EGI-TRB, L.L.C.** Two North Riverside Plaza, Suite 600 Chicago, Illinois 60606 Attn: Joseph M. Paolucci (312) 454-0100 | **Sam Investment Trust** c/o Chai Trust Company, LLC Two North Riverside Plaza, Suite 600 Chicago, Illinois 60606 Attn: Joseph M. Paolucci (312) 454-0100 | **Tribune Employee Stock Ownership Plan** c/o GreatBanc Trust Company 1301 West 22nd Street, Suite 800 Oak Brook, Illinois 60523 Attn: Marilyn H. Marchetti (630) 572-5130 | **Tesop Corporation** c/o GreatBanc Trust Company 1301 West 22nd Street, Suite 800 Oak Brook, Illinois 60523 Attn: Marilyn H. Marchetti (630) 572-5130 |

*(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications on Behalf of Person(s) Filing Statement)*

*Copies to:*

| | | | | |
|---|---|---|---|---|
| **Steven A. Rosenblum** Wachtell, Lipton, Rosen & Katz 51 West 52nd Street New York, New York 10019 (212) 403-1000 | **Thomas A. Cole Larry A. Barden** Sidley Austin LLP One South Dearborn Street Chicago, Illinois 60603 (312) 853-7000 | **Charles W. Mulaney, Jr. Richard C. Witzel, Jr.** Skadden, Arps, Slate, Meagher & Flom, LLP 333 West Wacker Dr. Chicago, Illinois 60606 (312) 407-0700 | **Joseph P. Gromacki** Jenner & Block LLP 330 N. Wabash Avenue Chicago, Illinois 60611 (312) 222-9350 | **Charles R. Smith** K&L Gates Henry W. Oliver Building 535 Smithfield Street Pittsburgh, PA 15222 (412) 355-6500 |

## CALCULATION OF FILING FEE

| Transaction Valuation* $4,284,000,000 | Amount of Filing Fee** $131,519 |
|---|---|

---

\*       Estimated for purposes of calculating the amount of the filing fee only, this amount is based on the purchase of 126,000,000 shares of common stock at a price of $34.00 per share.

\*\*       The amount of the filing fee, calculated in accordance with Rule 0-11 of the Securities Exchange Act of 1934, as amended, equals $30.70 per million of the value of the transaction.

☒       Check the box if any part of the filing fee is offset as provided by Rule 0-11(a)(2) and identify the filing with which the offsetting fee was previously paid. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

Amount Previously Paid: $131,519.00          Filing Party: Tribune Company
Form or Registration No.: Schedule TO          Date Filed: April 25, 2007

☐       Check the box if the filing relates solely to preliminary communications made before the commencement of a tender offer.

Check the appropriate boxes below to designate any transaction to which the statement relates:

☐       third party tender offer subject to Rule 14d-1.

☒       issuer tender offer subject to Rule 13e-4.

☒    going private transaction subject to Rule 13e-3.

☐    amendment to Schedule 13D under Rule 13d-2.

Check the following box if the filing is a final amendment reporting the results of the tender offer: ☐

## INTRODUCTION

This Amendment No. 10 (this "Amendment No. 10") filed under cover of Schedule TO and Schedule 13E-3 amends and supplements Amendment No. 9 filed with the Securities and Exchange Commission (the "SEC") on May 23, 2007, Amendment No. 8 filed with the SEC on May 22, 2007, Amendment No. 7 filed with the SEC on May 17, 2007 and Amendment No. 6 filed with the SEC on May 17, 2007 under cover of Schedule TO and Schedule 13E-3, and Amendment No. 5 filed with the SEC on May 11, 2007, Amendment No. 4 filed with the SEC on May 4, 2007, Amendment No. 3 filed with the SEC on May 1, 2007, Amendment No. 2 filed with the SEC on April 27, 2007, Amendment No. 1 filed with the SEC on April 26, 2007 and the Tender Offer Statement and Rule 13e-3 Transaction Statement under cover of a Schedule TO filed by Tribune Company, a Delaware corporation (the "Company"), on April 25, 2007 (as amended, the "Filing"), in connection with the Agreement and Plan of Merger, dated as of April 1, 2007 (the "Merger Agreement"), by and among the Company, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP and, for limited purposes, EGI-TRB, L.L.C., a Delaware limited liability company wholly owned by a trust established for the benefit of Samuel Zell and his family. In connection with the Merger Agreement, the Company is offering to purchase up to 126,000,000 shares of its common stock, par value $0.01 per share, including the associated preferred share purchase rights issued under the Rights Agreement, dated as of December 12, 1997, as amended, between the Company and Computershare Trust Company, N.A. (as successor to First Chicago Trust Company of New York), as Rights Agent, at a price of $34.00 per share, net to the seller in cash, less any applicable withholding taxes and without interest, upon the terms and subject to the conditions set forth in the Offer to Purchase, dated April 25, 2007 (the "Offer to Purchase"), and in the related Letter of Transmittal (the "Letter of Transmittal," which, together with the Offer to Purchase, as amended or supplemented from time to time, constitute the "Tender Offer"), copies of which are attached to the Filing as Exhibits (a)(1)(A) and (a)(1)(B), respectively.

The information in the Tender Offer, including all schedules and annexes thereto, which were previously filed with the Filing, is hereby expressly incorporated by reference into this Amendment No. 10, except that such information is hereby amended and supplemented to the extent specifically provided herein.

**Item 12.** *Exhibits.*

Item 12 of the Filing is hereby amended and supplemented by adding the following exhibit:

(c)(13) Opinion of Valuation Research Corporation, dated May 24, 2007.

## SIGNATURES

Tribune Company is filing this statement as a combined Schedule TO and Schedule 13E-3, and each of the Tribune Employee Stock Ownership Plan, Tesop Corporation, Samuel Zell, EGI-TRB, L.L.C. and Sam Investment Trust is filing this statement as a Schedule 13E-3.

After due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: May 24, 2007

**TRIBUNE COMPANY**

By:   /s/ Crane H. Kenney
Name: Crane H. Kenney
Title:  Senior Vice President, General Counsel and Secretary

Date: May 24, 2007

**TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN**

By:   GreatBanc Trust Company, as Trustee

By:   /s/ Marilyn H. Marchetti
Name: Marilyn H. Marchetti
Title:  Senior Vice President

Date: May 24, 2007

**TESOP CORPORATION**

By:   /s/ Marilyn H. Marchetti
Name: Marilyn H. Marchetti
Title:  President

Date: May 24, 2007

**SAMUEL ZELL**

/s/ Samuel Zell
Samuel Zell

Date: May 24, 2007

**EGI-TRB, L.L.C.**

By:   /s/ Philip G. Tinkler
Name: Philip G. Tinkler
Title:  Vice President

Date: May 24, 2007

**SAM INVESTMENT TRUST**

By: Chai Trust Company, LLC, as Trustee

By:   /s/ James G. Bunegar
Name: James G. Bunegar
Title:  Vice President

## Exhibit Index

| | |
|---|---|
| (a)(1)(A)* | Offer to Purchase, dated April 25, 2007. |
| (a)(1)(B)* | Letter of Transmittal including Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9. |
| (a)(1)(C)* | Notice of Guaranteed Delivery. |
| (a)(1)(D)* | Letter to Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees, dated April 25, 2007. |
| (a)(1)(E)* | Letter to Clients for use by Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees, dated April 25, 2007. |
| (a)(1)(F)* | Form of Summary Advertisement, dated April 25, 2007. |
| (a)(1)(G)* | Form of Letter From Tribune Company to Participants in the Tribune Company Employee Stock Purchase Plan, dated April 25, 2007. |
| (a)(1)(H)* | Form of Letter From the Northern Trust Company to Participants in the Tribune Company Retirement Plans, dated April 25, 2007. |
| (a)(2) | Not Applicable. |
| (a)(3) | Not Applicable. |
| (a)(4) | Not Applicable. |
| (a)(5)(A)* | First Amended Complaint filed in the Superior Court of California, Los Angeles County, captioned Garamella v. FitzSimons, et al., Case No. BC362110, filed on April 4, 2007. |
| (a)(5)(B)* | Complaint filed in the Chancery Division of the Circuit Court of Cook County, Illinois, captioned Simpson v. Tribune Co., et al., Case No. 07CH9519, filed on April 5, 2007. |
| (a)(5)(C)** | Tender Offer Employee Questions and Answers, made available April 25, 2007. |
| (a)(5)(D)** | Press Release, dated April 25, 2007. |
| (a)(5)(E)** | Tender Offer Employee Questions and Answers, made available April 26, 2007. |
| (a)(5)(F)*** | Transcript of a video message addressed to Tribune employees on April 27, 2007. |
| (a)(5)(G)*** | Tender Offer Employee Questions and Answers, made available April 27, 2007. |
| (a)(5)(H)**** | Tender Offer Employee Question and Answer, made available May 1, 2007. |
| (a)(5)(I)***** | Tender Offer Employee Questions and Answers, made available May 4, 2007. |
| (a)(5)(J) | Press Release of Tribune Company, dated May 9, 2007 (incorporated by reference to Exhibit 99.1 of the Company's Current Report on Form 8-K, filed with the Securities and Exchange Commission on May 10, 2007). |
| (a)(5)(K)******* | Tender Offer Employee Questions and Answers, made available May 16, 2007. |
| (a)(5)(L)******** | Tender Offer Employee Question and Answer, made available May 22, 2007. |
| (b)(1)(A) | Amended and Restated First Step Commitment Letter, dated as of April 5, 2007, by and among Tribune Company, J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Banc of America Securities LLC and Bank of America, N.A., incorporated by reference to Exhibit 10.10 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (b)(1)(B) | Amended and Restated Second Step Commitment Letter, dated as of April 5, 2007, by and among Tribune Company, J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Banc of America Securities LLC, Banc of America Bridge LLC and Bank of America, N.A., incorporated by reference to Exhibit 10.11 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (b)(2)(A)* | Exhibit A to Amended and Restated First Step Commitment Letter, dated as of April 5, 2007, by and among Tribune Company, J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Banc of America Securities LLC and Bank of America, N.A. |
| (b)(2)(B)* | Exhibit A to Amended and Restated Second Step Commitment Letter, dated as of April 5, 2007, by and among Tribune Company, J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Banc of America Securities LLC, Banc of America Bridge LLC and Bank of America, N.A. |

| | |
|---|---|
| (b)(3) | Credit Agreement, dated as of May 17, 2007, by and among Tribune Company, as borrower, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, Citicorp North America, Inc., Bank of America, N.A. and Barclay's Bank plc, as co-documentation agents, and J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners, incorporated by reference to Exhibit 4.1 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on May 17, 2007. |
| (c)(1)* | Opinion of Morgan Stanley & Co. Incorporated, dated April 1, 2007 (included as Annex I to this Statement). |
| (c)(2)* | Opinion of Merrill Lynch & Co., dated April 1, 2007 (included as Annex II to this Statement). |
| (c)(3)* | Excerpt from financial analysis presentation materials, dated February 12, 2007, prepared by Merrill Lynch & Co. and Citigroup Global Markets Inc., for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(4)* | Excerpt from financial analysis presentation materials, dated February 24, 2007, prepared by Merrill Lynch & Co. and Citigroup Global Markets Inc., for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(5)* | Financial analysis presentation materials, dated March 21, 2007, prepared by Merrill Lynch & Co. and Citigroup Global Markets Inc., for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(6)* | Financial analysis presentation materials, dated March 30, 2007, prepared by Merrill Lynch & Co. and Citigroup Global Markets Inc., for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(7)* | Financial analysis presentation materials, dated March 21, 2007, prepared by Morgan Stanley & Co. Incorporated, for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(8)* | Financial analysis presentation materials, dated March 30, 2007, prepared by Morgan Stanley & Co. Incorporated, for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(9)* | Financial analysis presentation materials, dated March 30, 2007, prepared by Morgan Stanley & Co. Incorporated, for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(10)* | Financial analysis presentation materials, dated April 1, 2007, prepared by Morgan Stanley & Co. Incorporated, for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(11)****** | Opinion of Valuation Research Corporation, dated May 9, 2007. |
| (c)(12)****** | Tribune Company Solvency Opinion Analysis, dated May 9, 2007, prepared by Valuation Research Corporation for the Board of Directors of Tribune. |
| (c)(13)********* | Opinion of Valuation Research Corporation, dated May 24, 2007. |
| (d)(1) | Agreement and Plan of Merger, dated as of April 1, 2007, by and among Tribune Company, Tesop Corporation, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan and EGI-TRB, L.L.C. (solely for the limited purposes of Section 8.12 thereof), incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(2) | Registration Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan, incorporated by reference to Exhibit 4.1 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |

| | |
|---|---|
| (d)(3) | Registration Rights Agreement, dated as of April 1, 2007, by and between Tribune Company and each of Chandler Trust No. 1 and Chandler Trust No. 2, incorporated by reference to Exhibit 4.2 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(4) | Securities Purchase Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and Samuel Zell, incorporated by reference to Exhibit 10.2 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(5) | Form of Subordinated Exchangeable Promissory Note of Tribune Company, incorporated by reference to Exhibit 10.3 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(6) | Form of Subordinated Promissory Note of Tribune Company, incorporated by reference to Exhibit 10.4 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(7) | Form of Warrant Agreement, incorporated by reference to Exhibit 10.5 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |

| | |
|---|---|
| (d)(8) | ESOP Purchase Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust created under the Tribune Employee Stock Ownership Plan, incorporated by reference to Exhibit 10.6 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(9) | ESOP Loan Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan, incorporated by reference to Exhibit 10.7 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(10) | ESOP Note, dated as of April 1, 2007, executed by GreatBanc Trust Company, not in its individual or corporate capacity, but solely in its capacity as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan in favor of Tribune Company, incorporated by reference to Exhibit 10.8 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(11) | ESOP Pledge Agreement, dated as of April 1, 2007, between the Company and GreatBanc Trust Company, not in its individual or corporate capacity but solely in its capacity as trustee of the Tribune Employee Stock Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan, incorporated by reference to Exhibit 10.9 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(12) | Investor Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan, incorporated by reference to Exhibit 10.12 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(13) | Voting Agreement, dated as of April 1, 2007, by and among Tribune Company, and each of Chandler Trust No. 1 and Chandler Trust No. 2, incorporated by reference to Exhibit 10.13 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(14) | Tribune Employee Stock Ownership Plan, incorporated by reference to Exhibit 10.14 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(15) | Tribune Employee Stock Ownership Trust, dated April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, incorporated by reference to Exhibit 10.15 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(16) | Rights Agreement between Tribune Company and First Chicago Trust Company of New York, as Rights Agent, dated as of December 12, 1997, incorporated by reference from Exhibit 4.1 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 1 to Current Report on Form 8-K, dated December 12, 1997. |
| (d)(17) | Amendment No. 1, dated as of June 12, 2000, to the Rights Agreement between Tribune Company and First Chicago Trust Company of New York, as Rights Agent, incorporated by reference from Exhibit 4.1 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 4.1 to Current Report on Form 8-K, dated June 12, 2000. |

| (d)(18) | Amendment No. 2, dated as of September 21, 2006, to the Rights Agreement between Tribune Company and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent, incorporated by reference from Exhibit 4.1 to Current Report on Form 8-K, dated September 21, 2006. |
|---|---|
| (d)(19) | Amendment No. 3, dated as of April 1, 2007, to the Rights Agreement between Tribune Company and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent, as amended by Amendment No. 1, dated as of June 12, 2000, and Amendment No. 2, dated as of September 21, 2006, incorporated by reference to Exhibit 4.3 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |

| | |
|---|---|
| (d)(20) | Tribune Company Supplemental Retirement Plan, as amended and restated October 18, 2006, incorporated by reference from Exhibit 10.1 of the Company's Form 10-K for the fiscal year ended December 31, 2006, as filed with the Securities and Exchange Commission on February 26, 2007, incorporating by reference from Exhibit 10.3 to Current Report on Form 8-K, dated October 18, 2006. |
| (d)(21) | Tribune Company Directors' Deferred Compensation Plan, as amended and restated effective as of January 1, 2005, incorporated by reference from Exhibit 10.2 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.2 to Current Report on Form 8-K, dated December 22, 2005. |
| (d)(22) | The Times Mirror Company Deferred Compensation Plan for Non-Employee Directors, incorporated by reference from Exhibit 10.3 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.7 to The Times Mirror Company's Annual Report on Form 10-K as filed March 29, 1995. |
| (d)(23) | Tribune Company Bonus Deferral Plan, as amended and restated as of October 18, 2006, incorporated by reference from Exhibit 10.4 of the Company's Form 10-K for the fiscal year ended December 31, 2006, as filed with the Securities and Exchange Commission on February 26, 2007, incorporating by reference from Exhibit 10.1 to Current Report on Form 8-K, dated October 18, 2006. |
| (d)(24) | Tribune Company 1992 Long-Term Incentive Plan, effective as of April 29, 1992, as amended April 19, 1994, incorporated by reference from Exhibit 10.5 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.11 to Annual Report on Form 10-K as filed March 22, 1995. |
| (d)(25) | First Amendment to Tribune Company 1992 Long-Term Incentive Plan, effective October 24, 2000, incorporated by reference from Exhibit 10.5a of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.6a to Annual Report on Form 10-K as filed March 27, 2001. |
| (d)(26) | Tribune Company Executive Financial Counseling Plan, effective October 19, 1988, as amended January 1, 1994, incorporated by reference from Exhibit 10.6 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.13 to Annual Report on Form 10-K as filed March 23, 1994. |
| (d)(27) | Tribune Company Transitional Compensation Plan for Executive Employees, amended and restated effective as of July 19, 2006, incorporated by reference from Exhibit 10.7 of the Company's Form 10-K for the fiscal year ended December 31, 2006, as filed with the Securities and Exchange Commission on February 26, 2007. |
| (d)(28) | Tribune Company Supplemental Defined Contribution Plan, as amended and effective as of October 18, 2006, incorporated by reference from Exhibit 10.8 of the Company's Form 10-K for the fiscal year ended December 31, 2006, as filed with the Securities and Exchange Commission on February 26, 2007, incorporating by reference from Exhibit 10.2 to Current Report on Form 8-K, dated October 18, 2006. |
| (d)(29) | Tribune Company Employee Stock Purchase Plan, as amended and restated July 27, 1999, incorporated by reference from Exhibit 10.9 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.10 to Annual Report on Form 10-K as filed March 16, 2000. |
| (d)(30) | First Amendment to Tribune Company Employee Stock Purchase Plan, as amended and restated July 27, 1999, incorporated by reference from Exhibit 10.9a of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.10a to Quarterly Report on Form 10-Q for the quarter ended September 24, 2000. |

(d)(31)        Second Amendment to Tribune Company Employee Stock Purchase Plan, effective as of May 7, 2002, incorporated by reference from Exhibit 10.9b of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.8b to Annual Report on Form 10-K as filed March 12, 2003.

| | |
|---|---|
| (d)(32) | Tribune Company 1995 Non-employee Director Stock Option Plan, as amended and restated effective December 9, 2003, incorporated by reference from Exhibit 10.10 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.9 to Annual Report on Form 10-K as filed February 27, 2004. |
| (d)(33) | Tribune Company 1996 Non-employee Director Stock Compensation Plan, as amended and restated effective January 1, 2005, incorporated by reference from Exhibit 10.11 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.4 to Current Report of Form 8-K dated December 22, 2005. |
| (d)(34) | Tribune Company Incentive Compensation Plan, as amended and restated effective May 12, 2004, incorporated by reference from Exhibit 10.12 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.1 to Quarterly Report on Form 10-Q for the quarter ended June 27, 2004. |
| (d)(35) | Form of Notice of Grant and Stock Option Term Sheet, incorporated by reference from Exhibit 10.12a of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.1 to Current Report on Form 8-K dated February 11, 2005. |
| (d)(36) | Form of Restricted Stock Unit Award Notice, incorporated by reference from Exhibit 10.12b of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.1 to Current Report on Form 8-K dated February 21, 2006. |
| (d)(37) | The Times Mirror Company 1997 Directors Stock Option Plan, incorporated by reference from Exhibit 10.13 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.15 to The Times Mirror Company's Annual Report on Form 10-K as filed March 18, 1997. |
| (d)(38) | Limited Liability Company Agreement of TMCT, LLC, dated August 8, 1997, incorporated by reference from Exhibit 10.14 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.1 to The Times Mirror Company's Current Report on Form 8-K, dated August 8, 1997. |
| (d)(39) | Lease Agreement between TMCT, LLC and Times Mirror, dated August 8, 1997, incorporated by reference from Exhibit 10.15 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.4 to The Times Mirror Company's Current Report on Form 8-K, dated August 8, 1997. |
| (d)(40) | Amended and Restated Limited Liability Company Agreement of TMCT II, LLC, dated September 3, 1999, incorporated by reference from Exhibit 10.16 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.1 to The Times Mirror Company's Current Report on Form 8-K, dated September 3, 1999. |
| (d)(41) | First Amendment to Amended and Restated Limited Liability Agreement of TMCT II, LLC, dated as of August 14, 2000, incorporated by reference from Exhibit 10.16a of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.17a to Annual Report on Form 10-K as filed March 27, 2001. |
| (d)(42) | Second Amendment to Amended and Restated Limited Liability Agreement of TMCT II, LLC, dated as of August 1, 2002, incorporated by reference from Exhibit 10.16a of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.14b to Annual Report on Form 10-K, as filed March 12, 2003. |

| | |
|---|---|
| (d)(43) | Subordinated Exchangeable Promissory Note of Tribune Company, dated April 23, 2007, incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 24, 2007. |
| (d)(44) | Letter Agreement, dated April 23, 2007, among Tribune Company, EGI-TRB, L.L.C. and Samuel Zell, incorporated by reference to Exhibit 10.2 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 24, 2007. |

(f)             Not Applicable.
(g)             Not Applicable.
(h)             Not Applicable.

---

*               Previously filed on Filing on April 25, 2007.

**              Previously filed on Amendment No. 1 to the Filing on April 26, 2007.

***             Previously filed on Amendment No. 2 to the Filing on April 27, 2007.

****            Previously filed on Amendment No. 3 to the Filing on May 1, 2007.

*****           Previously filed on Amendment No. 4 to the Filing on May 4, 2007.

******          Previously filed on Amendment No. 5 to the Filing on May 11, 2007.

*******         Previously filed on Amendment No. 6 to the Filing on May 17, 2007.

********        Previously filed on Amendment No. 8 to the Filing on May 22, 2007.

*********       Filed herewith.

# EXHIBIT P

# LEHMAN BROTHERS

EQUITY RESEARCH

November 02, 2007

# Publishing

Industry Overview

**Newspaper Valuation and Stock Scorecard**

North America
Internet & Media
Publishing

Craig A. Huber
1.212.526.5546
chuber@lehman.com
LBI, New York

**Sector View:**

New: 3-Negative
Old: 3-Negative

## Investment Conclusion

☐ Maintain 3-Negative newspaper sector view and would continue to underweight the newspaper stocks due to expensive valuations, our belief that Street estimates remain too high, declining readership and circulation, declining advertising market share, a weak newspaper advertising revenue outlook (estimated down 8.0% in 2007 and down 5.0% in 2008), a total decoupling of newspaper advertising growth from nominal GDP growth, very tight cost containment already over the past seven years, and margins that are currently at pre-1990's levels on average due to secular issues. Given increasing secular pressures, we think the newspaper group will trade down to 5-5.5x EBITDA over time (or 15% or so FCF yields) vs. the 12-year valuation range of 7-10.5x forward EBITDA for the large cap more pure-play newspaper stocks and down to 6x EBITDA for the small caps.

## Summary

☐ Newspaper stocks are down 18.5% on average YTD (or down 31.3% excluding Dow Jones and Tribune) vs. up 6.4% for the S&P 500. This compares with the YTD performance of television stocks up 21.8%; cable/satellite stocks up 8.7%; entertainment stocks down 1.9%; printing stocks down 2.9%; publishing/financial information stocks down 9.3%; advertising agency stocks down 10.9%; Spanish-language broadcasting stocks down 14.6%; magazine stocks down 17.2%; yellow pages stocks down 17.5%; and radio stocks down 31.5%.

☐ Newspapers are trading on average at an unattractive 7.9x 2008E EBITDA (excluding Dow Jones and Tribune) vs. 10-year historical range of 6.0-10.5x forward EBITDA for the more pure-play newspaper companies.

☐ For comparison, radio trading at 8.5x 2008E EBITDA (vs. 10-year historical range of 9-25x), entertainment trading at 8.5x (vs. historical range of 7-18x), ad agencies trading at 8.1x (vs. historical range of 8-20x), and cable trading at 6.6x (vs. historical range of 7-13x).

☐ On a free cash flow basis, newspapers are trading at 13.3x 2008E (excluding Dow Jones and Tribune) on average with the large/mid cap. newspapers trading in a current range of 7-26x. Comparatively, radio stocks trading at 9.2x 2008E FCF on average (6-16x range), entertainment trading at 14.9x (10-20x range), ad agencies trading at 17.9x (15-21x range), and cable trading at 22.3x (16-28x range).

☐ See attached Cross Media Comparative Valuation table for details.

---

**Lehman Brothers Newspaper Stock Scorecard:** In order to put a quantitative framework around how we look at nine newspaper stocks from most attractive to least, we have developed the Lehman Brothers Newspaper Stock Scorecard. We have chosen 11 metrics that we view as important when attempting to determine which stocks are most attractive at any given time. Each metric is given a score of 1 to 9, with 1 assigned to the best performer and 9 for the worst performer. Each of the 11 metrics is equally weighted for each company and summed up into an overall score. The 11 metrics we assign scores to are: 1) Blended 2007-08E price-to earnings multiple, 2) blended 2007-08E enterprise-value-to-EBITDA multiple, 3) blended 2007-08E free cash flow multiple, 4) potential upside/downside to our 12-month price target, 5) 2006-08E compound annual growth rate (CAGR) for EPS, 6) 2006-08E CAGR for EBITDA, 7) 2006-08E CAGR for FCF, 8) percentage difference between our 2008 EPS estimate and First Call consensus, 9) 2007-08E return on invested capital, 10) 2007-08E return on equity, and 11) lastly, our own subjective measure of potential catalysts.

**Gannett** (3-Underweight) is in the first position followed by **Washington Post** (1-Overweight), **Journal Communications** (2-Equal weight), **New York Times** (3-Underweight), **Dow Jones** (2-Equal weight), **Scripps** (3-Underweight), **McClatchy** (3-Underweight), **Tribune** (3-Underweight), and **Journal Register** (3-Underweight).

Lehman Brothers does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report.

Customers of Lehman Brothers in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.lehmanlive.com or can call 1-800-2LEHMAN to request a copy of this research.

Investors should consider this report as only a single factor in making their investment decision.

PLEASE SEE ANALYST(S) CERTIFICATION(S) ON PAGE 7 AND IMPORTANT DISCLOSURES BEGINNING ON PAGE 8

EXHIBIT C – 73

LEHMAN BROTHERS

EQUITY RESEARCH

Lehman Brothers
November 1, 2007

Craig A. Huber (212) 526-5546

## Comparative Valuation - Newspaper Companies

### Sector Rating - Negative

| | Dow Jones | Gannett | McClatchy | New York Times | Scripps, E.W. | Tribune | Washington Post | Small-Cap Newspapers: Journal Comm. | Small-Cap Newspapers: Journal Register |
|---|---|---|---|---|---|---|---|---|---|
| Stock Symbol | DJ | GCI | MNI | NYT | SSP | TRB | WPO | JRN | JRC |
| Rating | 2-Equal weight | 3-Underweight | 3-Underweight | 3-Underweight | 3-Underweight | 3-Underweight | 1-Overweight | 2-Equal weight | 3-Underweight |
| Recent Stock Price | 59.51 | 41.45 | 16.58 | 18.97 | 44.13 | 29.45 | 817.89 | 8.49 | 2.28 |
| 52-week High | 61.75 | 63.50 | 44.04 | 28.80 | 53.39 | 33.85 | 885.23 | 14.00 | 8.60 |
| 52-week Low | 33.67 | 40.70 | 16.28 | 18.05 | 37.89 | 22.78 | 712.73 | 8.47 | 2.17 |
| Stock Price Return - YTD | 56.9% | -31.4% | -61.7% | -22.1% | -11.8% | -4.3% | 8.7% | -32.7% | -69.8% |
| % Off 52-Week High | -3.6% | -34.7% | -62.4% | -29.5% | -17.3% | -13.0% | -7.8% | -39.4% | -73.7% |
| [redacted] | | | | | | | | | |
| Dividend per Share | 1.00 | 1.60 | 0.72 | 0.92 | 0.56 | 0.72 | 8.20 | 0.30 | 0.08 |
| Dividend Yield (%) | 1.7% | 3.9% | 4.3% | 4.8% | 1.3% | 2.4% | 1.0% | 3.5% | 3.5% |
| Dividend Payout Ratio (vs. 2007E FCF) | 67.1% | 33.3% | 29.0% | 53.3% | 26.1% | 40.6% | 37.6% | 63.1% | 17.3% |
| Earnings per Share (excl. extra week in 4Q06) | | | | | | | | | |
| 2005 | 0.85 | 4.78 | 2.51 | 1.49 | 2.05 | 2.07 | 31.49 | 0.57 | 1.00 |
| 2006(A) | 0.97 | 4.69 | 2.67 | 1.31 | 2.34 | 1.96 | 34.67 | 0.70 | 0.73 |
| 2007(E) | 1.40 | 4.31 | 1.48 | 1.02 | 2.03 | 1.45 | 29.25 | 0.58 | 0.45 |
| 2008(E) | 1.47 | 4.40 | 1.30 | 1.05 | 2.10 | 1.05 | 33.75 | 0.68 | 0.35 |
| % Change 2005 vs. 2004 | -14.1% | -0.4% | 2.9% | -17.2% | 17.1% | -5.9% | -8.0% | -18.2% | -9.8% |
| % Change 2006(A) vs. 2005 | 14.1% | -1.9% | 6.3% | -11.8% | 14.1% | -5.2% | 10.7% | 22.2% | -27.4% |
| % Change 2007(E) vs. 2006(E) | 44.3% | -8.1% | -44.5% | -22.4% | -13.2% | -26.1% | -16.1% | -16.7% | -38.0% |
| % Change 2008(E) vs. 2007(E) | 5.0% | 2.1% | -12.2% | 2.9% | 3.4% | -27.8% | 15.4% | 17.2% | -22.2% |
| [redacted] | | | | | | | | | |
| P/E Relative - 2006(A) | 3.32 | 0.48 | 0.34 | 0.79 | 1.02 | 0.81 | 1.27 | 0.66 | 0.17 |
| P/E Relative - 2007(E) | 2.51 | 0.57 | 0.86 | 1.10 | 1.28 | 1.20 | 1.85 | 0.86 | 0.30 |
| P/E Relative - 2008(E) | 2.87 | 0.82 | 0.84 | 1.19 | 1.38 | 1.85 | 1.59 | 0.82 | 0.42 |
| [redacted] | | | | | | | | | |
| Free Cash Flow per Share (excl. extra week in 4Q06) | | | | | | | | | |
| 2006(A) | 1.19 | 4.99 | 3.18 | 1.97 | 2.42 | 1.96 | 27.41 | 0.78 | 0.68 |
| 2007(E) | 1.49 | 4.80 | 2.48 | 1.72 | 2.14 | 1.77 | 21.81 | 0.48 | 0.46 |
| 2008(E) | 1.62 | 4.81 | 2.24 | 1.84 | 2.24 | 1.48 | 31.95 | 0.57 | 0.43 |
| [redacted] | | | | | | | | | |
| Financial Data ($ mil; excl. extra week in 4Q06) | | | | | | | | | |
| Revenue - 2006(A) | 2,062 P | 7,806 P | 2,462 P | 3,228 | 2,508 P | 5,388 P | 3,905 | 620 P | 498 P |
| EBITDA - 2006(A) | 268 P | 2,208 P | 624 P | 484 | 857 P | 1,299 P | 744 | 128 P | 109 P |
| EBITDA Margin (%) | 13.0% | 28.3% | 25.3% | 15.0% | 34.2% | 24.2% | 19.1% | 20.6% | 22.0% |
| Revenue - 2007(E) | 2,080 P | 7,517 P | 2,263 | 3,192 | 2,485 | 5,029 | 4,150 | 578 | 464 |
| EBITDA - 2007(E) | 315 P | 2,028 P | 575 | 473 | 773 | 1,090 | 688 | 104 | 92 |
| EBITDA Margin (%) | 15.1% | 27.0% | 25.4% | 14.8% | 31.1% | 21.7% | 16.5% | 17.9% | 19.7% |
| Market Capitalization ($ mil) | | | | | | | | | |
| Shares Outstanding (mil) | 85.9 | 234.2 | 82.1 | 143.8 | 163.4 | 118.4 | 9.5 | 67.1 | 39.1 |
| Equity Market Capitalization | 5,118 | 9,710 | 1,361 | 2,730 | 7,213 | 3,487 | 7,771 | 569 | 88 |
| Total Debt | 392 | 4,558 | 2,291 P | 959 | 624 | 9,824 | 417 | 98 P | 651 |
| Cash | 28 | 177 | 25 | 58 | 21 | 606 | 279 | 5 | 4 |
| Minority Interests | 0 | 22 | 0 | 0 | 851 | 0 | 0 | 0 | 0 |
| Investments | 75 | 800 | 474 P | 250 | 221 | 2,000 | 420 | 0 | 0 |
| Enterprise Value | 5,407 | 13,312 | 3,153 | 3,381 | 8,446 | 10,883 | 7,489 | 661 | 735 |
| Debt-to-Capital | 39.8% | 34.1% | 45.8% | 52.2% | 18.8% | 87.7% | 11.1% | 18.4% | 73.5% |
| [redacted] | | | | | | | | | |
| EPS CAGR (2006-08E) | 23.1% | -3.1% | -30.2% | -10.6% | -5.3% | -26.8% | -1.6% | -1.2% | -30.8% |
| EBITDA CAGR (2006-08E) | 9.3% | -5.6% | -10.8% | -2.4% | -3.8% | -12.9% | 0.9% | -6.9% | -11.9% |
| FCF/share CAGR (2006-08E) | 16.9% | -1.8% | -16.1% | -8.9% | -3.7% | -13.5% | 8.0% | -14.8% | -19.5% |
| [redacted] | | | | | | | | | |

*E = Lehman Brothers estimates A= Actual P = Pro forma*

*Note: Revenue and EBITDA multiples are pro forma, as needed, for full year for acquisitions/divestitures. EPS and free cash flow estimates are from transaction closing date forward.*

*Free cash flow = Net Income + D&A - Capital Expenditures; capital expenditures, though, for New York Times, Journal Communications, and Journal Register exclude large one-time projects.*

*Figures for Gannett, McClatchy, New York Times, Tribune, Journal Communications, and Journal Register exclude extra week in 4Q06.*

*Includes stock option expensing beginning 1Q06. New York Times includes stock option expensing beginning 2005 (full-year).*

*Source: Lehman Brothers*

EXHIBIT C – 74

# LEI᠎ ᠎ᠮ AN BROTHERS
EQUITY RESEARCH

Cross Media Comparative Valuation                              Craig A. Huber (212) 526-5546
November 1, 2007

| | | EBITDA Multiple | | Free Cash Flow Multiple | |
|---|---|---|---|---|---|
| | 10-Year Range* | 2007(E) | 2008(E) | 2007(E) | 2008(E) |
| **Newspapers** | | | | | |
| Dow Jones | | 17.2 | 16.9 | 40.0 | 36.8 |
| Gannett | | 6.6 | 6.8 | 8.8 | 8.6 |
| McClatchy | | 5.5 | 6.4 | 6.7 | 7.4 |
| New York Times | | 7.1 | 7.3 | 11.0 | 11.6 |
| Scripps, E.W. | | 10.9 | 10.6 | 20.6 | 19.7 |
| Tribune | | 9.9 | 11.0 | 16.6 | 19.9 |
| Washington Post | | 10.9 | 9.9 | 37.5 | 25.6 |
| Journal Comm. | | 6.4 | 5.9 | 17.9 | 15.0 |
| Journal Register | | 8.0 | 8.7 | 4.9 | 5.3 |
| Average (excl. outliers) | | | | | |
| | | | | | |
| **Advertising Agencies** | | | | | |
| Interpublic | | 10.5 | 7.0 | 51.0 | 20.6 |
| Omnicom | | 10.2 | 9.3 | 16.9 | 15.2 |
| | | | | | |
| **Publishing / Financial Info.** | | | | | |
| McGraw-Hill | | 8.6 | 8.6 | 15.6 | 14.4 |
| Moody's | | 9.0 | 8.1 | 16.0 | 14.0 |
| | | | | | |
| **Radio** | | | | | |
| CBS | | 6.3 | 5.7 | 8.3 | 7.2 |
| Citadel | | 8.6 | 8.2 | 9.2 | 6.6 |
| Clear Channel | | 11.2 | 10.9 | 15.9 | 15.6 |
| Cox Radio | | 8.8 | 8.4 | 11.1 | 11.3 |
| Cumulus | | 11.0 | 11.0 | 9.0 | 9.8 |
| Emmis | | 11.9 | 12.6 | 5.4 | 10.5 |
| Entercom | | 8.3 | 7.5 | 6.9 | 6.5 |
| Radio One | | 8.3 | 8.1 | -- | -- |
| Westwood One | | 7.0 | 6.8 | 6.8 | 6.1 |
| Average | | | | | |
| | | | | | |
| **Spanish Language Broadcasting** | | | | | |
| Entravision | | 13.0 | 11.5 | 22.5 | 18.8 |
| Spanish Broadcasting | | 10.9 | 10.0 | -- | -- |
| Average | | | | | |
| | | | | | |
| **Outdoor** | | | | | |
| Clear Channel Outdoor | | 11.9 | 10.7 | 29.0 | 25.9 |
| Lamar | | 13.6 | 12.2 | 21.6 | 18.5 |
| JC Decaux | | 6.3 | 6.1 | 25.7 | 15.4 |
| Average | | | | | |
| | | | | | |
| **Entertainment** | | | | | |
| Disney | | 9.6 | 8.7 | 21.5 | 19.5 |
| News Corp. | | 9.8 | 8.0 | 11.5 | 10.3 |
| Time Warner | | 8.4 | 7.5 | 24.2 | 13.7 |
| Viacom | | 10.6 | 9.7 | 17.8 | 15.9 |
| Average | | | | | |
| | | | | | |
| **Cable** | | | | | |
| Comcast | | 6.5 | 5.7 | 42.0 | 16.1 |
| Liberty Global | | 9.7 | 7.7 | 27.8 | 28.2 |
| Time Warner Cable | | 7.1 | 6.3 | 34.0 | 22.7 |
| Average | | | | | |

E = Lehman Brothers Estimates      * = 10-year historical range using the current year EBITDA
** = Range is for the more pure-play newspaper companies
Note:  EBITDA Multiple = Enterprise Value / EBITDA; Free Cash Flow Multiple = Price / Free Cash Flow
EBITDA multiples are pro forma, as needed, for full year for acquisitions/divestitures.
Source:  Lehman Brothers (Newspapers / Advertising Agencies / McGraw-Hill - Craig Huber;
Radio / Spanish Language / Outdoor / Entertainment - Anthony DiClemente; Entertainment / Cable - Vijay Jayant)

EXHIBIT C – 75

Lehman Brothers

**LEH IAN BROTHERS**
EQUITY RESEARCH

Craig A. Huber (212) 526-5546

**Stock Price Performance**
**Publishing and Various Media Stocks**

EXHIBIT C – 76

# LEHMAN BROTHERS

EQUITY RESEARCH

Lehman Brothers Newspaper Stock Scorecard  (1 = Best Performer; 9 = Worst Performer)

Lehman Brothers
Craig A. Huber  (212) 526-5546

| Overall Score | | | Blended 2007-08(E) Multiple | | | Potential Upside to 12-mn Price Target | 2008-08(E) CAGR | | | 2008(E) % Diff LB EPS vs. First Call | Average 2007-08(E) | | Catalyst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | P/E | EB/TDA | FCF | | EPS | EB/TDA | FCF | | ROIC | ROE | |
| 1 | Gannett | 3-Underweight | 2 | 3 | 3 | 5 | 4 | 5 | 3 | 2 | 3 | 4 | 3 |
| 2 | Washington Post | 1-Overweight | 8 | 6 | 6 | 4 | 3 | 2 | 2 | 1 | 2 | 5 | 1 |
| 3 | Journal Comm. | 2-Equal weight | 4 | 2 | 5 | 2 | 2 | 6 | 7 | 4 | 5 | 8 | 2 |
| 4 | New York Times | 3-Underweight | 5 | 4 | 4 | 9 | 6 | 3 | 5 | 3 | 7 | 2 | 6 |
| 5 | Dow Jones | 2-Equal weight | 9 | 9 | 9 | 3 | 1 | 1 | 1 | 7 | 4 | 7 | 5 |
| 6 | Scripps, E.W. | 3-Underweight | 6 | 8 | 7 | 6 | 5 | 4 | 4 | 6 | 1 | 3 | 7 |
| 7 | McClatchy | 3-Underweight | 3 | 1 | 2 | 7 | 8 | 7 | 8 | 5 | 8 | 9 | 4 |
| 8 | Tribune | 3-Underweight | 7 | 7 | 6 | 1 | 7 | 9 | 6 | 9 | 6 | 1 | 9 |
| 9 | Journal Register | 3-Underweight | 1 | 5 | 1 | 8 | 9 | 8 | 9 | 8 | 9 | 8 | 8 |

**Company Statistics**

| | | P/E | EB/TDA | FCF | Target | EPS | EB/TDA | FCF | | ROIC | ROE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Large/Mid-Cap Newspapers** | | | | | | | | | | | | |
| | Dow Jones | 41.8 | 17.0 | 38.4 | 0.7% | 23.1% | 9.3% | 16.9% | -17.1% | 6.3% | 8.1% | |
| | Gannett | 9.5 | 5.7 | 8.8 | -5.9% | -3.1% | -5.6% | -1.8% | -4.8% | 8.1% | 10.0% | |
| | McClatchy | 12.0 | 5.9 | 7.0 | -9.5% | -30.2% | -10.6% | -18.1% | -11.6% | 4.3% | 3.4% | |
| | New York Times | 18.3 | 7.2 | 11.3 | -15.7% | -10.6% | -2.4% | -8.9% | -10.1% | 4.5% | 12.7% | |
| | Scripps, E.W. | 21.4 | 10.8 | 20.1 | -9.4% | -5.3% | -3.8% | -3.7% | -14.0% | 13.6% | 11.6% | |
| | Tribune | 24.2 | 10.4 | 18.3 | 15.4% | -28.8% | -12.9% | -13.5% | -27.9% | 4.7% | 13.2% | |
| | Washington Post | 26.1 | 10.4 | 31.5 | -5.3% | -1.8% | 0.9% | 8.0% | 0.0% | 8.9% | 9.0% | |
| **Small-Cap Newspapers** | | | | | | | | | | | | |
| | Journal Comm. | 13.5 | 6.2 | 18.4 | 8.0% | -1.2% | -6.8% | -14.8% | -10.5% | 5.0% | 8.9% | |
| | Journal Register | 5.7 | 8.3 | 5.1 | -11.5% | -30.8% | -11.9% | -19.5% | -25.8% | 3.4% | 5.6% | |

*E = Lehman Brothers estimates*
*Note:  Criteria are equal weighted in the total score.*
*Source:  Lehman Brothers*

5

EXHIBIT C – 77

# LEHMAN BROTHERS

EQUITY RESEARCH

## Price Target Methodologies

Our price target for shares of **Dow Jones** is $60, which is equal to the announced takeout price from News Corp.

Our **12-month price target** on shares of **Gannett** is $39, which is derived as the average of the following three methodologies. 1) Our 10-year DCF analysis places fair value at $32 (using a WACC of 10.1%, a long-term FCF growth rate of negative 2.5%, and a terminal FCF multiple of 7.9, or an implied terminal EBITDA multiple of 4.7). 2) A target multiple of 7.0x estimated 2008 EBITDA, or $43 per share (which works out to 9.8x estimated 2008 EPS and 8.9x FCF). 3) Our sum-of-the-parts analysis places fair value at $42 based on applying an estimated 2008 EBITDA multiple of 6.5x for the newspaper division and a multiple of 9.0x for the TV station group (using blended 2007/08 EBITDA to take into account political/Olympics advertising), adjusting down the overall valuation by $441 million for corporate expenses, and taking into account net debt of $4.38 billion, an estimated $800 million in investments, and shares outstanding of 234.2 million.

Our **12-month price target** on shares of **McClatchy** is $15, which is derived as the average of the following two methodologies: 1) Our 10-year DCF analysis places fair value at $12.50 (using a WACC of 10.0%, a long-term FCF growth rate of negative 2.5%, and a terminal FCF multiple of 8.0x, or an implied terminal EBITDA multiple of 4.5x); and 2) a multiple target of 6.5x estimated 2008 EBITDA equates to $17 per share (which is 13.1x estimated 2008 EPS and 7.6x FCF).

Our **12-month price target** on shares of **New York Times** is $16, which is derived as the average of the following three methodologies: 1) Our 10-year DCF analysis places fair value at $12 (using a WACC of 10.5%, a long-term FCF growth rate of negative 2.5%, and a terminal FCF multiple of 7.7 or an implied terminal EBITDA multiple of 4.1). 2) A target multiple of 7.0x estimated 2008 EBITDA equates to $18 per share (which works out to 17.1x estimated 2008 EPS and 11.0x FCF). 3) Our sum-of-the-parts analysis places fair value at $19, based on applying an estimated 2008 EBITDA multiple of 7.0x for the newspapers, a multiple of 10.0x for About.com, adjusting down the overall valuation by $352 million for corporate expenses, and taking into account pro forma net debt of $901 million, an estimated $250 million in investments, and 143.9 million shares outstanding.

Our **12-month price target** on shares of **Scripps** is $40, which is based on a sum of the parts analysis using 2008 EBITDA multiples (7.0x for the newspapers, 8.5x for the TV stations using blended 2007/08 EBITDA to take into account political/Olympics advertising, 10.0x for Home & Garden TV, 10.5x for Food Network, 7.5x for the interactive division, and 6.0x for licensing and other); a value of $75 million for Do It Yourself, $157.5 million for Fine Living, $75 million for Great American Country Network; docking $595.7 million in value for corporate expenses at a multiple of 8.8x; and taking into account net debt of $603.0 million and shares outstanding of 163.4 million.

Our **12-month price target** on shares of **Tribune** is $34 based on the price per share shareholders will receive in a transaction taking Tribune private announced on April 2, 2007. The transaction is taking place in two parts with 126 million shares tendered on May 24, 2007, at $34 per share and the remaining shareholders receiving $34 per share in 4Q07 (target time frame). Should the Tribune privatization deal break and not occur, we believe that fair value on the stock, if it were to remain an ongoing public entity, would be significantly less than the current stock price. Given the added $7 billion in debt to repurchase 126 million shares in the tender offer, we think fair value on the stock would be $7-$8 per share based on our detailed sum-of-the-parts analysis: Using estimated 2008 EBITDA multiples of 7.0x for newspapers, 9.0x for the TV stations using blended 2007/08 EBITDA to take into account political advertising, 9.0x for radio/entertainment excluding the Chicago Cubs, docking $394 million in value for corporate expenses at a multiple of 7.8x, taking into account debt of $8.6 billion, PHONES debt of $1.3 billion, cash of $262 million, $286 million from Matthew Bender tax settlement case, $640 million in estimated after-tax proceeds for the Chicago Cubs which is being divested, $60 million in estimated after-tax proceeds for sale of three small newspapers, valuing the investment portfolio at $2.0 billion, and 118.4 million shares outstanding. Another way of looking at what Tribune's stock would be worth if the privatization deal were to break and not occur would be to value the shares at an assumed 15% 2008E free cash flow yield which equates to $10 per share.

Our **12-month price target** on shares of **Washington Post** is $775, which is derived as the average of the following three methodologies. 1) Our 10-year DCF analysis places fair value at $787 per share (using a WACC of 10.0%, a long-term FCF growth rate of 3.5%, and a terminal FCF multiple of 15.6x, or an implied terminal EBITDA multiple of 7.4x). 2) A target multiple of 9.25x estimated 2008 EBITDA equates to $765 per share (which works out to 22.7x estimated 2008 EPS and 23.9x FCF). 3) Our sum-of-the-parts valuation places fair value at $784 per share based on 2008 EBITDA multiples—7.0x for the newspaper division, 9.0x for broadcasting (using blended 2007/08 EBITDA to take into account political/Olympics advertising), 7.5x for magazines, 8.0x for cable, and 12.5x for the education division. Docking the overall valuation by $375.9 million for corporate expenses, and taking into account net debt of $138.1 million, $420.0 million for the equity investment portfolio, and 9.50 million shares outstanding, gives us fair value.

Our **12-month price target** on shares of **Journal Communications** is $9, which is derived as the average of the following three methodologies. 1) Our 10-year DCF analysis places fair value at $7 (using a WACC of 10.1%, a long-term FCF growth rate of 2.0%, and a terminal FCF multiple of 12.3x, or an implied terminal EBITDA multiple of 5.1x); 2) A target multiple of 7.25x estimated 2008 EBITDA equates to $11 per share (which results in 16.2x estimated 2008 EPS and 19.4x FCF); and 3) Our sum-of-the-parts analysis places fair value at $11 based on the following 2008 EBITDA multiples by segment—7.0x for the newspapers, 8.5x for the TV stations, 8.5x for the radio stations, (for both TV and radio stations, we use blended 2007/08 EBITDA to take into account political/Olympics advertising) and 4.5x for the printing services operation. We also assign a value of $10 million to the company's "other" segment. Also taking into account net debt outstanding of $91.9 million and shares outstanding of 67.1 million, this works out to a blended 2008 estimated EBITDA multiple of 7.9x.

Our **12-month price target** on shares of **Journal Register** is $2, which is derived as the average of the following two methodologies: 1) Given the very high amount of debt at the company already, our 10-year discounted cash flow analysis puts fair value at $0 (using a WACC of 10.0%, a long-term free cash flow growth rate of 1.5%, and a terminal free cash flow multiple of 11.8x, or an implied terminal EBITDA

EXHIBIT C – 78

# LEHMAN BROTHERS
### EQUITY RESEARCH

multiple of 5.1x); and 2) a target multiple of 9.5x estimated 2008 EBITDA equates to $4 per share (which results in 11.4x 2008 estimated EPS and 9.3x FCF).

## Investment Risks

**Risks that may impede the achievement of our price targets for the nine newspapers we cover**, in our view, include the following possibilities. 1) The U.S. economy slows in the next 12–18 months. 2) National and/or local advertisers make a secular shift out of newspapers and move their advertising budgets to the TV networks/stations, cable networks, Internet, the trade press, business/weekly magazines, and/or cut them altogether. 3) Secular deterioration occurs at a faster rate in newspaper classified advertising (help wanted, in particular) and through a continued migration to third-party online sites. 4) Newsprint prices rise faster than we expect. 5) A company begins to expand its cost base in anticipation of better economic times that do not occur in the coming years. 6) A company undertakes a large, expensive acquisition and/or the integration of an acquisition does not proceed smoothly. 7) The proposed loosening of media ownership rules and regulations fail or are tightened. 8) Circulation figures decrease more quickly than we anticipate. 9) Recent larger-than-normal newspaper circulation volume drops, leading to lack of advertising pricing power and/or ad volume decreases.

Risks specific to each company that may impede the achievement of our price targets, in our view, which are not aforementioned, include the following:

**Dow Jones:** 1) Wall Street employment levels deteriorate, pressuring Dow Jones Newswires; 2) tombstone advertising suffers from a lack of public offerings and/or investment banks choose not to place tombstone advertising in *The Wall Street Journal*; 3) a stock market downturn leads to fewer advertisements; 4) other advertisers look for alternative publications in which to place their ads; and 5) News Corp.'s takeout deal with Dow Jones does not end up happening.

**Gannett:** 1) TV stations suffer from a slowdown in advertising; and 2) the large U.K. newspaper operation continues to be negatively affected by the advertising slowdown in that market and/or currency hurts the overall performance in U.S. dollars.

**New York Times:** 1) Local economic trends in New York and/or Boston deteriorate more than the national average.

**Scripps:** 1) TV stations suffer from a slowdown in advertising; and 2) investors' revenue and ratings expectations for Scripps Networks do not materialize.

**Tribune:** 1) TV stations suffer from a slowdown in advertising, 2) ratings of the new CW network (launched in fall 2006) do not increase as much as expected; and 3) risk the deal to take Tribune private does not materialize.

**Washington Post:** 1) TV stations and/or magazines suffer from an advertising slowdown; 2) the number of cable subscribers declines sharply; and 3) revenue growth at the education division slows significantly and/or regulation changes affect the business.

**Journal Communications:** 1) TV stations suffer from a slowdown in advertising; 2) continued margin expansion in all segments, particularly newspapers and broadcasting, does not materialize as expected; 3) the company loses some or all of its business from a major client; and 4) there is continued pricing pressure in the commercial printing businesses.

**Journal Register:** 1) Interest expense on the high amounts of debt eventually overwhelm the company's cash flow.

*Stocks in this report are priced as of the close of business, November 1, 2007.*

**Analyst Certification:**

I, Craig A. Huber, hereby certify (1) that the views expressed in this research Industry Note accurately reflect my personal views about any or all of the subject securities or issuers referred to in this Industry Note and (2) no part of my compensation was, is or will be directly or indirectly related to the specific recommendations or views expressed in this Industry Note.

EXHIBIT C – 79

# LEHMAN BROTHERS

EQUITY RESEARCH

**FOR CURRENT IMPORTANT DISCLOSURES REGARDING COMPANIES THAT ARE
THE SUBJECT OF THIS RESEARCH REPORT, PLEASE SEND A WRITTEN REQUEST TO:
LEHMAN BROTHERS CONTROL ROOM
745 SEVENTH AVENUE, 19TH FLOOR, NEW YORK, NY 10019
OR
REFER TO THE FIRM'S DISCLOSURE WEBSITE AT www.lehman.com/disclosures**

**Important Disclosures Continued:**
The analysts responsible for preparing this report have received compensation based upon various factors including the firm's total revenues, a portion of which is generated by investment banking activities

| Company Name | Ticker | Price (31-Oct-2007) | Stock / Sector Rating |
|---|---|---|---|
| Dow Jones | DJ | US$ 59.61 | 2-Equal weight / 3-Negative |
| Gannett Inc. | GCI | US$ 41.45 | 3-Underweight / 3-Negative |
| Journal Communications | JRN | US$ 8.49 | 2-Equal weight / 3-Negative |
| Journal Register | JRC | US$ 2.26 | 3-Underweight / 3-Negative |
| McClatchy Company | MNI | US$ 16.58 | 3-Underweight / 3-Negative |
| New York Times | NYT | US$ 18.97 | 3-Underweight / 3-Negative |
| Scripps, E.W. | SSP | US$ 44.13 | 3-Underweight / 3-Negative |
| Tribune Co. | TRB | US$ 29.45 | 3-Underweight / 3-Negative |
| Washington Post | WPO | US$ 817.99 | 1-Overweight / 3-Negative |

**Guide to Lehman Brothers Equity Research Rating System:**
Our coverage analysts use a relative rating system in which they rate stocks as 1-Overweight, 2-Equal weight or 3-Underweight (see definitions below) relative to other companies covered by the analyst or a team of analysts that are deemed to be in the same industry sector (the "sector coverage universe"). Below is the list of companies that constitute the sector coverage universe:

Dow Jones (DJ)                          Gannett Inc. (GCI)
Journal Communications (JRN)            Journal Register (JRC)
McClatchy Company (MNI)                 McGraw-Hill (MHP)
Moody's Corp. (MCO)                     New York Times (NYT)
RR Donnelley & Sons (RRD)               Scripps, E.W. (SSP)
Tribune Co. (TRB)                       Washington Post (WPO)

In addition to the stock rating, we provide sector views which rate the outlook for the sector coverage universe as 1-Positive, 2-Neutral or 3-Negative (see definitions below). A rating system using terms such as buy, hold and sell is not the equivalent of our rating system. Investors should carefully read the entire research report including the definitions of all ratings and not infer its contents from ratings alone.

**Stock Rating**
**1-Overweight** - The stock is expected to outperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon.
**2-Equal weight** - The stock is expected to perform in line with the unweighted expected total return of the sector coverage universe over a 12- month investment horizon.
**3-Underweight** - The stock is expected to underperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon.
**RS-Rating Suspended** - The rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Lehman Brothers is acting in an advisory capacity in a merger or strategic transaction involving the company.

**Sector View**
**1-Positive** - sector coverage universe fundamentals/valuations are improving.
**2-Neutral** - sector coverage universe fundamentals/valuations are steady, neither improving nor deteriorating.
**3-Negative** - sector coverage universe fundamentals/valuations are deteriorating.

**Distribution of Ratings:**
Lehman Brothers Equity Research has 2106 companies under coverage.
39% have been assigned a 1-Overweight rating which, for purposes of mandatory regulatory disclosures, is classified as Buy rating, 30% of companies with this rating are investment banking clients of the Firm.

## LEHMAN BROTHERS
**EQUITY RESEARCH**

45% have been assigned a 2-Equal weight rating which, for purposes of mandatory regulatory disclosures, is classified as Hold rating, 37% of companies with this rating are investment banking clients of the Firm.

12% have been assigned a 3-Underweight rating which, for purposes of mandatory regulatory disclosures, is classified as Sell rating, 24% of companies with this rating are investment banking clients of the Firm.

**Lehman Brothers Inc. and its Foreign Affiliates involved in the Production of Equity Research**

| New York | London | Tokyo |
|---|---|---|
| Lehman Brothers Inc. (LBI, New York) | Lehman Brothers International (Europe) Ltd. | Lehman Brothers Japan Inc. (LBJ, Tokyo) |
| 745 Seventh Avenue | (LBIE, London) | Roppongi Hills Mori Tower, 31st Floor |
| New York , New York 10019 | 25 Bank Street | 6-10-1 Roppongi, Minato-ku, Tokyo 106-6131, |
| Member, NYSE and NASD | London, E14 5LE, United Kingdom | Japan |
| | Regulated by FSA | Regulated by FSA |
| **Taipei** | **Seoul** | **Hong Kong** |
| Lehman Brothers Inc., Taiwan Branch | Lehman Brothers International (Europe) Seoul | Lehman Brothers Asia Limited - Hong Kong |
| (LBI, Taiwan) | Branch (LBIE, Seoul) | (LBAL, Hong Kong) |
| Cathay Financial Center 12F | Hanwha Building, 12th Floor | Two International Finance Centre |
| 7 Sungren Road - Shin-Yi District | 110, Sokong-dong Chung-Ku | 8 Finance Street, 26th Floor |
| Taipei, Taiwan | Seoul 100-755, Korea | Central, Hong Kong |
| | Regulated by FSC | Regulated by SFC |
| **Mumbai** | **Mumbai** | **Sydney** |
| Lehman Brothers Inc., India Branch | Lehman Brothers Securities Private Limited | Lehman Brothers Australia Securities Pty Ltd. |
| (LBI, India) | (LBSPL, India) | LBASPL, Sydney |
| Winchester, Off High Street, 9th Floor | Ceejay House, 11th Level, Plot F, | Level 33, 264 George Street |
| Hiranandani Business Park, | Shivsagar Estate, Dr. Annie Besant Road, | Sydney NSW 2000, Australia |
| Powai, Mumbai 400 076, India | Worli, Mumbai 400018 | Regulated by ASIC |
| | Regulated by SEBI | |

This material has been prepared and/or issued by Lehman Brothers Inc., member SIPC, and/or one of its affiliates ("Lehman Brothers") and has been approved by Lehman Brothers International (Europe), authorized and regulated by the Financial Services Authority, in connection with its distribution in the European Economic Area. This material is distributed in Japan by Lehman Brothers Japan Inc., and in Hong Kong by Lehman Brothers Asia Limited. This material is distributed in Australia by Lehman Brothers Australia Pty Limited, and in Singapore by Lehman Brothers Singapore Pte Ltd. Where this material is distributed by Lehman Brothers Singapore Pte Ltd, please note that it is intended for general circulation only and the recommendations contained herein does not take into account the specific investment objectives, financial situation or particular needs of any particular person. An investor should consult his Lehman Brothers' representative regarding the suitability of the product and take into account his specific investment objectives, financial situation or particular needs before he makes a commitment to purchase the investment product. This material is distributed in Korea by Lehman Brothers International (Europe) Seoul Branch. This document is for information purposes only and it should not be regarded as an offer to sell or as a solicitation of an offer to buy the securities or other instruments mentioned in it. No part of this document may be reproduced in any manner without the written permission of Lehman Brothers. With the exception of disclosures relating to Lehman Brothers, this research report is based on current public information that Lehman Brothers considers reliable, but we make no representation that it is accurate or complete, and it should not be relied on as such. In the case of any disclosure to the effect that Lehman Brothers Inc. or its affiliates beneficially own 1% or more of any class of common equity securities of the subject company, the computation of beneficial ownership of securities is based upon the methodology used to compute ownership under Section 13(d) of the United States' Securities Exchange Act of 1934. In the case of any disclosure to the effect that Lehman Brothers Inc. and/or its affiliates hold a short position of at least 1% of the outstanding share capital of a particular company, such disclosure relates solely to the ordinary share capital of the company. Accordingly, while such calculation represents Lehman Brothers' holdings net of any long position in the ordinary share capital of the company, such calculation excludes any rights or obligations that Lehman Brothers may otherwise have, or which may accrue in the future, with respect to such ordinary share capital. Similarly such calculation does not include any shares held or owned by Lehman Brothers where such shares are held under a wider agreement or arrangement (be it with a client or a counterparty) concerning the shares of such company (e.g. prime broking and/or stock lending activity). Any such disclosure represents the position of Lehman Brothers as of the last business day of the calendar month preceding the date of this report. This material is provided with the understanding that Lehman Brothers is not acting in a fiduciary capacity. Opinions expressed herein reflect the opinion of Lehman Brothers and are subject to change without notice. The products mentioned in this document may not be eligible for sale in some states or countries, and they may not be suitable for all types of investors. If an investor has any doubts about product suitability, he should consult his Lehman Brothers representative. The value of and the income produced by products may fluctuate, so that an investor may get back less than he invested. Value and income may be adversely affected by exchange rates, interest rates, or other factors. Past performance is not necessarily indicative of future results. If a product is income producing, part of the capital invested may be used to pay that income. © 2007 Lehman Brothers. All rights reserved. Additional information is available on request. Please contact a Lehman Brothers entity in your home jurisdiction.

Lehman Brothers policy for managing conflicts of interest in connection with investment research is available at www.lehman.com/researchconflictspolicy. Ratings, earnings per share forecasts and price targets contained in the Firm's equity research reports covering U.S. companies are available at www.lehman.com/disclosures.

Complete disclosure information on companies covered by Lehman Brothers Equity Research is available at www.lehman.com/disclosures.

EXHIBIT C – 81

# LE_ _AAN BROTHERS

EQUITY RESEARCH

October 25, 2007

North America
Investment Strategy & Macro
Accounting & Tax Policy

## Accounting & Tax Policy

Market Commentary/Strategy

Rangel's Tax Proposal

Robert Willens, CPA
1.212.526.4095
rwillens@lehman.com
LBI, New York

**Sector View:**

New:  0-Not Rated

Old:   0-Not Rated

**Investment Conclusion**

❏ Representative Rangel's Tax Proposal Contains Some "Interesting" Provisions.

Representative Charles Rangel (D—NY), the Chairman of the House Ways & Means Committee, has introduced a tax bill, called "The Tax Reduction and Reform Act of 2007", the centerpiece of which is the repeal, for taxable years beginning after 2007, of the alternative minimum tax on individuals. However, this repeal is estimated to cost $795.66 billion over ten years and in order to "pay" for this tax reduction, the bill proposes numerous tax increases including treating at least a portion of the "carried interest" earned by investment fund managers as ordinary income rather than capital gain. In addition, the bill would require brokers to report to their customers the cost basis of any "publicly-traded securities" acquired by such customers in accounts maintained with the broker. Covered securities would be stock, debt, commodities, derivatives and other items specified by the Secretary of the Treasury. The provision would apply to stock acquired after January 1, 2009 and to other instruments (that fall within the definition of the term publicly-traded securities) acquired after January 1, 2011.

The bill would reduce the top corporate marginal tax rate from its present level of 35% to 30.5%. In addition, however, it would reduce the inter-corporate dividends received deduction from its present level of 70% to only 60%. Thus, even taking into account the reduction in the marginal corporate tax rate, the "effective tax rate" on inter-corporate dividends would increase some 16%, from 10.5 % to 12.2 %. (In addition, the 80% dividends received deduction, for dividends received from "20 % owned corporations", would be reduced to 70 %—Thus, the effective rate on these dividends would increase from 7 % to 9.15 %). The bill would also repeal the Sec. 199 domestic production activities deduction—a deduction which, when fully phased in, would provide qualifying taxpayers with a 3.15 % tax rate reduction with respect to domestic manufacturing income.

In addition, the bill would repeal the LIFO method of accounting under which corporations, in computing their gross profit, are permitted to "sequence" the most recent costs through the cost of goods sold account. In addition, corporations presently using LIFO would have to "recapture" (i.e., report as income) their "LIFO reserves" (the amount by which the LIFO basis of the inventory is less than the FIFO basis). The income recognized as a result of this recapture would be taken into account over 8 years. The bill would clarify (but not, as feared, "codify") the "economic substance" doctrine. Under this clarification, the doctrine would be satisfied only if (i) the transaction changes, in a "meaningful way", apart from tax consequences, the taxpayer's "economic position" and (ii) the taxpayer has a substantial non-federal income tax purpose for entering into the transaction.

Transactions that are structured as actual asset acquisitions or as deemed asset acquisitions (because the transaction constitutes a "qualified stock purchase" and the purchaser, in connection with such qualified stock purchase, makes an election under Sec. 338, including an election under Sec. 338(h)(10)) are eligible for the benefits of Sec. 197. That section requires that the cost of most acquired intangible assets, including goodwill, be amortized, ratably, over a 15 year period beginning with the month in which the intangible asset is acquired. The Rangel bill would extend the amortization period from 15 years to 20 years. Nearly $21 billion in tax revenues, over the 10 year period, would be raised by this seemingly innocuous provision. In addition, the bill contains provisions that will make it much more difficult for U.S. taxpayers to defer the reporting, for U.S. tax purposes, of the income earned by their foreign subsidiaries. In addition, the bill would amend Sec. 361(a) to re-classify "securities" received in a reorganization as "other property or money". Accordingly, the debt for debt exchanges that have become a staple of many spin-off transactions would no longer be as popular. To avoid tax on the receipt of the securities, the distributing corporation would have to distribute the securities to its shareholders (as opposed to its creditors) and, thus, debt could not be shifted, in a tax-efficient manner, from the distributing corporation to the controlled corporation.

Lehman Brothers does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report.

Customers of Lehman Brothers in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.lehmanlive.com or can call 1-800-2LEHMAN to request a copy of this research.

Investors should consider this report as only a single factor in making their investment decision.

**PLEASE SEE ANALYST(S) CERTIFICATION(S) ON PAGE 2 AND IMPORTANT DISCLOSURES BEGINNING ON PAGE 3**

EXHIBIT C – 82

LE: /AN BROTHERS

The "Zell Amendment"

Finally, the bill might actually have an adverse effect on the Tribune buyout. The Tribune buyout envisions the conversion of Tribune, once it satisfies the requirements to be characterized as a "small business corporation", from C corporation to S corporation status. S corporations are not taxed on their taxable income. Instead, the income earned by an S corporation is "passed through" to its shareholders and is taxed directly to such shareholders. Where the shareholder of an S corporation is a "qualified retirement plan" ("an organization described in Sec. 401(a)"), the income earned by the S corporation, and passed through to the plan, is taxed to such plan because Sec. 512(e)(1)(B) provides that such income is taken into account in computing the organization's "unrelated business taxable income". However, there is an exception to this rule, found in Sec. 512(e)(3), for cases where the qualified plan (owning the S corporation's stock) is an ESOP. In that case, the income passed through from the S corporation is not taken into account in calculating the ESOP's unrelated business taxable income. In the Tribune case, Mr. Zell will hold a warrant (to acquire 43 % of Tribune's outstanding stock) and the ESOP will hold 100 % of the S corporation's outstanding stock. Thus, during the period this arrangement exists, no taxes at all will be assessed on the income earned by Tribune. The bill, however, would alter this outcome: It would require "option holders" (like Mr. Zell) to recognize income when the option is exercised or sold in an amount equal to the income "that was shifted to the ESOP" during the period of time that the option was held by the taxpayer. Thus, apparently, when Mr. Zell sold (or exercised) his option (to purchase stock of Tribune) he would be required to report (and pay tax and interest on) 43 % of the taxable income earned by Tribune during the period in which Mr. Zell held the option. Will the specter of this tax hinder the Tribune deal? It certainly cannot be ruled out.

**Analyst Certification:**

I, Robert Willens, CPA, hereby certify (1) that the views expressed in this research Industry Note accurately reflect my personal views about any or all of the subject securities or issuers referred to in this Industry Note and (2) no part of my compensation was, is or will be directly or indirectly related to the specific recommendations or views expressed in this Industry Note.

# LEHMAN BROTHERS
EQUITY RESEARCH

**Important Disclosures Continued:**
The analysts responsible for preparing this report have received compensation based upon various factors including the firm's total revenues, a portion of which is generated by investment banking activities

**Guide to Lehman Brothers Equity Research Rating System:**
Our coverage analysts use a relative rating system in which they rate stocks as 1-Overweight, 2-Equal weight or 3-Underweight (see definitions below) relative to other companies covered by the analyst or a team of analysts that are deemed to be in the same industry sector (the "sector coverage universe"). Not applicable.

In addition to the stock rating, we provide sector views which rate the outlook for the sector coverage universe as 1-Positive, 2-Neutral or 3-Negative (see definitions below). A rating system using terms such as buy, hold and sell is not the equivalent of our rating system. Investors should carefully read the entire research report including the definitions of all ratings and not infer its contents from ratings alone.

**Stock Rating**
**1-Overweight** - The stock is expected to outperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon.
**2-Equal weight** - The stock is expected to perform in line with the unweighted expected total return of the sector coverage universe over a 12- month investment horizon.
**3-Underweight** - The stock is expected to underperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon.
**RS-Rating Suspended** - The rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Lehman Brothers is acting in an advisory capacity in a merger or strategic transaction involving the company.

**Sector View**
**1-Positive** - sector coverage universe fundamentals/valuations are improving.
**2-Neutral** - sector coverage universe fundamentals/valuations are steady, neither improving nor deteriorating.
**3-Negative** - sector coverage universe fundamentals/valuations are deteriorating.

**Distribution of Ratings:**
Lehman Brothers Equity Research has 2101 companies under coverage.
39% have been assigned a 1-Overweight rating which, for purposes of mandatory regulatory disclosures, is classified as Buy rating, 30% of companies with this rating are investment banking clients of the Firm.
45% have been assigned a 2-Equal weight rating which, for purposes of mandatory regulatory disclosures, is classified as Hold rating, 38% of companies with this rating are investment banking clients of the Firm.
12% have been assigned a 3-Underweight rating which, for purposes of mandatory regulatory disclosures, is classified as Sell rating, 21% of companies with this rating are investment banking clients of the Firm.

**Lehman Brothers Inc. and its Foreign Affiliates Involved in the Production of Equity Research**

| New York | London | Tokyo |
|---|---|---|
| Lehman Brothers Inc. (LBI, New York)<br>745 Seventh Avenue<br>New York , New York 10019<br>Member, NYSE and NASD | Lehman Brothers International (Europe) Ltd.<br>(LBIE, London)<br>25 Bank Street<br>London, E14 5LE, United Kingdom<br>Regulated by FSA | Lehman Brothers Japan Inc. (LBJ, Tokyo)<br>Roppongi Hills Mori Tower, 31st Floor<br>6-10-1 Roppongi, Minato-ku, Tokyo 106-6131, Japan<br>Regulated by FSA |
| **Taipei**<br>Lehman Brothers Inc., Taiwan Branch<br>(LBI, Taiwan)<br>Cathay Financial Center 12F<br>7 Sungren Road - Shin-Yi District<br>Taipei, Taiwan | **Seoul**<br>Lehman Brothers International (Europe) Seoul Branch (LBIE, Seoul)<br>Hanwha Building, 12th Floor<br>110, Sokong-dong Chung-Ku<br>Seoul 100-755, Korea<br>Regulated by FSC | **Hong Kong**<br>Lehman Brothers Asia Limited - Hong Kong<br>(LBAL, Hong Kong)<br>Two International Finance Centre<br>8 Finance Street, 26th Floor<br>Central, Hong Kong<br>Regulated by SFC |
| **Mumbai**<br>Lehman Brothers Inc., India Branch<br>(LBI, India)<br>Winchester, Off High Street, 9th Floor<br>Hiranandani Business Park,<br>Powai, Mumbai 400 076, India | **Mumbai**<br>Lehman Brothers Securities Private Limited<br>(LBSPL, India)<br>Ceejay House, 11th Level, Plot F,<br>Shivsagar Estate, Dr. Annie Besant Road,<br>Worli, Mumbai 400018<br>Regulated by SEBI | **Sydney**<br>Lehman Brothers Australia Securities Pty Ltd.<br>LBASPL, Sydney<br>Level 33, 264 George Street<br>Sydney NSW 2000, Australia<br>Regulated by ASIC |

EXHIBIT C – 84

# LEHMAN BROTHERS

This material has been prepared and/or issued by Lehman Brothers Inc., member SIPC, and/or one of its affiliates ("Lehman Brothers") and has been approved by Lehman Brothers International (Europe), authorized and regulated by the Financial Services Authority, in connection with its distribution in the European Economic Area. This material is distributed in Japan by Lehman Brothers Japan Inc., and in Hong Kong by Lehman Brothers Asia Limited. This material is distributed in Australia by Lehman Brothers Australia Pty Limited, and in Singapore by Lehman Brothers Singapore Pte Ltd. Where this material is distributed by Lehman Brothers Singapore Pte Ltd, please note that it is intended for general circulation only and the recommendations contained herein does not take into account the specific investment objectives, financial situation or particular needs of any particular person. An investor should consult his Lehman Brothers' representative regarding the suitability of the product and take into account his specific investment objectives, financial situation or particular needs before he makes a commitment to purchase the investment product. This material is distributed in Korea by Lehman Brothers International (Europe) Seoul Branch. This document is for information purposes only and it should not be regarded as an offer to sell or as a solicitation of an offer to buy the securities or other instruments mentioned in it. No part of this document may be reproduced in any manner without the written permission of Lehman Brothers. With the exception of disclosures relating to Lehman Brothers, this research report is based on current public information that Lehman Brothers considers reliable, but we make no representation that it is accurate or complete, and it should not be relied on as such. In the case of any disclosure to the effect that Lehman Brothers Inc. or its affiliates beneficially own 1% or more of any class of common equity securities of the subject company, the computation of beneficial ownership of securities is based upon the methodology used to compute ownership under Section 13(d) of the United States' Securities Exchange Act of 1934. In the case of any disclosure to the effect that Lehman Brothers Inc. and/or its affiliates hold a short position of at least 1% of the outstanding share capital of a particular company, such disclosure relates solely to the ordinary share capital of the company. Accordingly, while such calculation represents Lehman Brothers' holdings net of any long position in the ordinary share capital of the company, such calculation excludes any rights or obligations that Lehman Brothers may otherwise have, or which may accrue in the future, with respect to such ordinary share capital. Similarly such calculation does not include any shares held or owned by Lehman Brothers where such shares are held under a wider agreement or arrangement (be it with a client or a counterparty) concerning the shares of such company (e.g. prime broking and/or stock lending activity). Any such disclosure represents the position of Lehman Brothers as of the last business day of the calendar month preceding the date of this report. This material is provided with the understanding that Lehman Brothers is not acting in a fiduciary capacity. Opinions expressed herein reflect the opinion of Lehman Brothers and are subject to change without notice. The products mentioned in this document may not be eligible for sale in some states or countries, and they may not be suitable for all types of investors. If an investor has any doubts about product suitability, he should consult his Lehman Brothers representative. The value of and the income produced by products may fluctuate, so that an investor may get back less than he invested. Value and income may be adversely affected by exchange rates, interest rates, or other factors. Past performance is not necessarily indicative of future results. If a product is income producing, part of the capital invested may be used to pay that income. © 2007 Lehman Brothers. All rights reserved. Additional information is available on request. Please contact a Lehman Brothers entity in your home jurisdiction.

Lehman Brothers policy for managing conflicts of interest in connection with investment research is available at www.lehman.com/researchconflictspolicy. Ratings, earnings per share forecasts and price targets contained in the Firm's equity research reports covering U.S. companies are available at www.lehman.com/disclosures.

Complete disclosure information on companies covered by Lehman Brothers Equity Research is available at www.lehman.com/disclosures.

EXHIBIT C – 85

# EXHIBIT Q

December 20, 2007



## COMPANY UPDATE
## Tribune Company (TRB)

Neutral

# Good-bye and good luck

## What's changed

Tribune completed its go-private transaction today with the purchase of the company's remaining outstanding shares for $34 per share. The company starts life as a private entity with roughly $13 billion in debt (before proceeds from planned asset sales), or roughly 11x 2008E EBITDA.

## Implications

With estimated annual interest expense (before adjustments for asset sales) of $1 billion and 2008E EBITDA of $1.147 billion, the transaction leaves very little room for error, particularly given the extremely challenging industry backdrop. The company could potentially face a liquidity crunch fairly quickly if the ad revenue trends of 2007 (YTD newspaper ad revenues down 8.5% thru November, TV revenues down 2.4%) persist into 2008 and beyond. Mr. Zell and team clearly have their work cut out for them. We wouldn't be surprised to see additional asset sales beyond the announcements to date (Cubs, Southern CT papers).

## Valuation

Based on our 2008 estimate of EBITDA, and assuming the company's other assets (Chicago Cubs, Food Network interest, CareerBuilder stake, etc.) are worth approximately $2.2 billion, Tribune's $34 go-private price represents a multiple of about 9.0x EBITDA. We view this as a very rich valuation in the context of the cyclical and secular challenges facing the industry.

## Key risks

(1) Highly levered, (2) cyclical pressures, (3) secular shifts in ad market.

## Impact on related securities

We do not believe the Tribune go-private transaction portends further industry consolidation given (1) tight credit market conditions and (2) weak industry fundamentals. Financial pressure on Tribune leading to asset sales could create opportunities for other media firms, including Scripps if liquidity pressures motivate Tribune to sell its Food Network stake.

**INVESTMENT LIST MEMBERSHIP**
Neutral

**Coverage View: Cautious**
United States:
Media

Peter P. Appert, CFA
(415) 249-7480 | peter.appert@gs.com Goldman, Sachs & Co.

Peter M. Salkowski
(415) 249-7482 | peter.salkowski@gs.com Goldman, Sachs & Co.

Stephanie Withers, CFA
(415) 249-7470 | stephanie.withers@gs.com Goldman, Sachs & Co.

The Goldman Sachs Group, Inc.

**Investment Profile: Tribune Company**

| | Low | | | | | | High | |
|---|---|---|---|---|---|---|---|---|
| Growth | | | | ○ | | | Growth | |
| Returns * | | | | | | | Returns * | |
| Multiple | | | | ○ | | | Multiple | |
| Volatility | | | | | | | Volatility | |
| | Percentile | 20th | 40th | 60th | 80th | 100th | | |

■ TRB
○ Amedeo Publishing Peer Group Average

* Returns = Return on Capital   For a complete description of the investment profile measures please refer to the disclosure section of this document.

| Key data | Current |
|---|---|
| Price ($) | 33.99 |
| 8 month price target ($) | 34.00 |
| Market cap ($ mn) | 8,224.9 |
| Dividend yield (%) | 1.5 |
| Net margin (%) | 8.2 |
| Debt/total capital (%) | 87.6 |

| | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Revenue ($ mn) | 5,546.8 | 5,093.1 | 5,052.8 | 5,026.8 |
| EPS ($) | 2.02 | 1.89 | 1.45 | 1.53 |
| P/E (X) | 16.8 | 28.1 | 23.4 | 22.2 |
| EV/EBITDA (X) | 10.0 | 12.0 | 10.7 | 10.8 |
| ROE (%) | 10.1 | 10.5 | 12.1 | 10.8 |

| | 9/07 | 12/07E | 3/08E | 6/08E |
|---|---|---|---|---|
| EPS ($) | 0.80 | 0.67 | 0.02 | 0.44 |

**Price performance chart**



— Tribune Company (L)  — — S&P 500 (R)

| Share price performance (%) | 3 month | 6 month | 12 month |
|---|---|---|---|
| Absolute | 24.2 | 13.4 | 8.4 |
| Rel. to S&P 500 | 29.1 | 17.5 | 5.8 |

Source: Company data, Goldman Sachs Research estimates, FactSet. Price as of 12/20/2007 close.

The Goldman Sachs Group, Inc. does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Customers in the US can receive independent, third-party research on companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.independentresearch.gs.com or call 1-866-727-7000. For Reg AC certification, see the text preceding the disclosures. For other important disclosures go to www.gs.com/research/hedge.html. Analysts employed by non-US affiliates are not required to take the NASD/NYSE analyst exam.

EXHIBIT D-

December 20, 2007

Tribune Company (TRB)

# Tribune Company: Summary financials

| Profit model ($ mn) | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Total revenue | 5,548.8 | 5,093.1 | 5,052.6 | 5,028.8 |
| Cost of goods sold | (2,745.8) | (2,555.8) | (2,544.9) | (2,531.3) |
| SG&A | (1,467.7) | (1,366.1) | (1,380.4) | (1,353.1) |
| R&D | 0.0 | 0.0 | 0.0 | 0.0 |
| Other operating profit/(expense) | 0.0 | 0.0 | 0.0 | 0.0 |
| ESO expense | (33.8) | (33.4) | (33.4) | (33.4) |
| EBITDA | 1,333.3 | 1,171.4 | 1,147.2 | 1,142.4 |
| Depreciation & amortization | (229.3) | (225.0) | (225.0) | (225.0) |
| EBIT | 1,104.0 | 946.4 | 922.2 | 917.4 |
| Net interest income/(expense) | (259.8) | (556.0) | (710.0) | (692.0) |
| Others | 74.9 | 103.0 | 80.0 | 83.2 |
| Income/(loss) from associates | 0.0 | 0.0 | 0.0 | 0.0 |
| Pretax profits | 919.1 | 493.3 | 292.2 | 308.6 |
| Provision for taxes | (357.5) | (200.2) | (115.4) | (121.9) |
| Minority interest | 0.0 | 0.0 | 0.0 | 0.0 |
| Net income pre-preferred dividends | 561.6 | 292.1 | 176.8 | 186.7 |
| Preferred dividends | (6.3) | 3.0 | 6.0 | 6.0 |
| Net income (pre-exceptionals) | 555.2 | 295.1 | 182.8 | 192.7 |
| Post tax exceptionals | 97.6 | 19.1 | 0.0 | 0.0 |
| Net income (post-exceptionals) | 652.9 | 315.2 | 182.8 | 192.7 |
| | | | | |
| EPS (basic, pre-except) ($) | 2.02 | 1.70 | 1.46 | 1.54 |
| EPS (diluted, pre-except) ($) | 2.02 | 1.68 | 1.45 | 1.53 |
| EPS (basic, post-except) ($) | 2.37 | 1.81 | 1.46 | 1.54 |
| EPS (diluted, post-except) ($) | 2.38 | 1.80 | 1.45 | 1.53 |
| Common dividends paid | (194.6) | (88.7) | (90.7) | (90.7) |
| DPS ($) | 0.73 | 0.49 | 0.68 | 0.68 |
| Dividend payout ratio (%) | 36.2 | 28.9 | 46.3 | 44.0 |

| Balance sheet ($ mn) | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Cash & equivalents | 174.7 | 844.7 | 742.9 | 713.5 |
| Accounts receivable | 785.9 | 577.5 | 559.3 | 547.8 |
| Inventory | 41.0 | 38.0 | 35.6 | 35.4 |
| Other current assets | 395.9 | 264.8 | 264.8 | 264.8 |
| Total current assets | 1,377.4 | 1,723.9 | 1,602.5 | 1,561.5 |
| Net PP&E | 1,685.1 | 1,936.1 | 2,351.1 | 2,586.1 |
| Net intangibles | 18,574.9 | 18,268.7 | 18,248.7 | 18,228.7 |
| Total investments | -- | -- | -- | -- |
| Other long-term assets | 445.5 | 721.2 | 721.2 | 721.2 |
| Total assets | 13,400.3 | 14,068.1 | 14,353.7 | 14,517.7 |
| | | | | |
| Accounts payable | 151.6 | 542.5 | 559.4 | 557.9 |
| Short-term debt | 1,429.0 | 78.5 | 78.5 | 78.5 |
| Other current liabilities | 966.1 | 734.6 | 734.6 | 734.6 |
| Total current liabilities | 2,546.7 | 1,355.6 | 1,372.5 | 1,371.0 |
| Long-term debt | 3,576.2 | 8,863.8 | 8,663.8 | 8,463.8 |
| Other long-term liabilities | 2,958.2 | 2,578.5 | 2,578.5 | 2,578.5 |
| Total long-term liabilities | 6,534.4 | 11,442.1 | 11,242.1 | 11,042.1 |
| Total liabilities | 9,081.2 | 12,797.6 | 12,614.6 | 12,413.1 |
| | | | | |
| Preferred shares | 0.0 | 0.0 | 0.0 | 0.0 |
| Common stock | 1,181.3 | (2,030.3) | (1,654.7) | (1,299.2) |
| Retained earnings | 3,138.3 | 3,301.8 | 3,393.9 | 3,403.8 |
| Other common equity | 0.0 | 0.0 | 0.0 | 0.0 |
| Total common equity | 4,319.6 | 1,271.5 | 1,739.2 | 2,104.6 |
| Minority interest | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | |
| Total liabilities & equity | 13,400.3 | 14,068.1 | 14,353.7 | 14,517.7 |

| Growth & margins (%) | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Sales growth | (0.9) | (8.2) | (0.8) | (0.5) |
| EBITDA growth | (7.4) | (12.1) | (2.1) | (0.4) |
| EBIT growth | (7.7) | (14.3) | (2.6) | (0.5) |
| Net income (pre-except) growth | (15.0) | (46.7) | (38.3) | 5.4 |
| EPS growth | (2.8) | (15.5) | (14.2) | 5.4 |
| Gross margin | 50.5 | 49.8 | 49.6 | 49.6 |
| EBITDA margin | 24.0 | 23.0 | 22.7 | 22.7 |
| EBIT margin | 19.9 | 18.6 | 18.3 | 18.3 |

| Additional financials | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Net debt/equity (%) | 111.8 | 636.8 | 459.9 | 372.0 |
| Interest cover (X) | 4.3 | 1.7 | 1.3 | 1.3 |
| Inventory days | 5.7 | 5.5 | 5.1 | 5.1 |
| Receivable days | 51.5 | 48.1 | 41.1 | 40.2 |
| BVPS ($) | 14.29 | 4.21 | 5.75 | 6.96 |
| | | | | |
| ROA (%) | 4.0 | 2.2 | 1.3 | 1.3 |
| CROCI (%) | 4.0 | 3.8 | 4.0 | 3.9 |

| Cash flow statement ($ mn) | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Net income | 561.6 | 258.9 | 176.8 | 186.7 |
| D&A add-back (incl. ESO) | 229.3 | 225.0 | 225.0 | 225.0 |
| Minority interest add-back | 0.0 | 0.0 | 0.0 | 0.0 |
| Net inc/dec working capital | 39.9 | 483.8 | 35.5 | 10.2 |
| Other operating cash flow | 22.2 | 33.4 | 33.4 | 33.4 |
| Cash flow from operations | 787.8 | 999.1 | 470.8 | 455.3 |
| | | | | |
| Capital expenditures | (221.9) | (200.0) | (200.0) | (200.0) |
| Acquisitions | (48.1) | 0.0 | 0.0 | 0.0 |
| Divestitures | (174.1) | 0.0 | 0.0 | 0.0 |
| Others | 470.8 | 0.0 | 0.0 | 0.0 |
| Cash flow from investing | 26.5 | (200.0) | (200.0) | (200.0) |
| | | | | |
| Dividends paid (common & pref) | (200.9) | (85.7) | (84.7) | (84.7) |
| Inc/(dec) in debt | 1,635.4 | 4,035.7 | (200.0) | (200.0) |
| Other financing cash flows | (2,225.1) | (4,167.0) | 0.0 | 0.0 |
| Cash flow from financing | (790.7) | (217.6) | (284.7) | (284.7) |
| Total cash flow | 23.6 | 582.1 | (13.9) | (29.4) |

| Dupont ROE (%) | 12/06 | 12/07E | 12/08E | 12/09E |
|---|---|---|---|---|
| Dupont ROE (%) | 12.9 | 23.3 | 10.5 | 9.2 |
| Margin (%) | 10.0 | 5.8 | 3.6 | 3.8 |
| Turnover (X) | 0.4 | 0.4 | 0.4 | 0.3 |
| Leverage (X) | 3.1 | 11.1 | 8.3 | 6.9 |
| | | | | |
| Free cash flow per share ($) | 1.25 | 4.80 | 2.17 | 2.04 |
| Free cash flow yield (%) | 4.1 | 15.5 | 6.4 | 6.0 |

Note: Last actual year may include reported and estimated data.
Source: Company data, Goldman Sachs Research estimates.

**Analyst Contributors**

Peter P. Appert, CFA
peter.appert@gs.com

Peter M. Salkowski
peter.salkowski@gs.com

Stephanie Withers, CFA
stephanie.withers@gs.com

EXHIBIT D – 87

2

Tribune Company (TRB)

# Trading history

### Exhibit 1: TRB trading history



Source: Factset.

EXHIBIT D – 88    3

December 20, 2007                                                                                        Tribune Company (TRB)

# Financial Model

**Exhibit 2:  Tribune earnings model - pre buyout**
Data in $ millions, except per share amounts

| | 2005A | FY 2006 | | | | 2006A | FY 2007E | | | | 2007E | 2008E | 2009E | 06-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | YEAR | 1QA | 2QA | 3QA | 4QA | YEAR | 1QA | 2QA | 3QA | 4QE | (YEAR | YEAR) | YEAR | CAGR |
| | | | | (14 weeks) | | | | | | (53 weeks) | | | | |
| **REVENUE** | | | | | | | | | | | | | | |
| Publishing | $4,098.9 | $984.5 | $1,029.3 | $968.5 | $1,111.3 | $4,092.6 | $931.5 | $920.4 | $870.6 | $848.9 | $3,699.5 | $3,576.2 | $3,617.2 | -4.9% |
| Advertising | 3,244.6 | 737.7 | 622.9 | 756.2 | 883.3 | 3,290.1 | 730.3 | 721.1 | 674.5 | 749.6 | 2,872.3 | 2,786.9 | 2,731.6 | -5.7% |
| Circulation | 598.2 | 146.3 | 142.0 | 137.7 | 149.5 | 578.0 | 134.3 | 131.6 | 129.3 | 131.9 | 527.9 | 522.6 | 517.4 | -3.5% |
| Other | 256.1 | 63.0 | 63.4 | 62.6 | 68.5 | 257.5 | 85.8 | 87.5 | 97.0 | 88.5 | 359.8 | 369.8 | 388.8 | 1.4% |
| Broadcasting/Entertainment | 1,498.9 | 302.5 | 403.5 | 382.6 | 355.8 | 1,454.3 | 283.0 | 383.0 | 408.1 | 341.4 | 1,423.5 | 1,474.4 | 1,508.6 | 1.3% |
| Television | 1,250.2 | 284.2 | 320.3 | 277.5 | 325.2 | 1,207.2 | 264.4 | 298.9 | 298.3 | 311.0 | 1,180.7 | 1,190.7 | 1,214.6 | 0.2% |
| Entertainment/Chicago Cubs | 248.5 | 18.3 | 83.3 | 115.0 | 30.4 | 247.0 | 18.6 | 106.0 | 117.8 | 30.4 | 272.8 | 283.7 | 295.0 | 6.1% |
| **Total Revenues** | **5,595.6** | **1,289.1** | **1,431.9** | **1,348.8** | **1,466.9** | **5,546.9** | **1,214.5** | **1,313.4** | **1,278.9** | **1,293.3** | **5,093.1** | **5,062.9** | **5,626.0** | **-3.2%** |
| Growth | -2.3% | -1.3% | -2.1% | -3.8% | 3.7% | -0.9% | -5.8% | -8.3% | -5.7% | -12.7% | -8.2% | -0.9% | -0.5% | |
| **Operating Expenses (excl. nonrecurring)** | | | | | 3.8% | | | | | | | | | |
| Publishing | 3,285.1 | 810.3 | 819.8 | 815.2 | 875.2 | 3,320.4 | 791.8 | 789.4 | 744.8 | 752.8 | 3,058.8 | 3,023.9 | 2,967.2 | -3.8% |
| Y/Y Change | 0.4% | 0.4% | -0.2% | 0.5% | 3.4% | 1.1% | -2.3% | -6.1% | -8.6% | -14.0% | -7.9% | -1.8% | -1.6% | |
| Broadcasting | 1,062.2 | 233.8 | 291.7 | 284.8 | 249.7 | 1,069.8 | 221.8 | 285.2 | 289.3 | 227.2 | 1,052.3 | 1,070.0 | 1,063.1 | 1.0% |
| Y/Y Change | 1.0% | -4.0% | 0.8% | -2.4% | 5.0% | -6.7% | -2.2% | 1.2% | -5.0% | -2.6% | 2.8% | -2.7% | |
| **Total Operating Expenses** | **4,347.4** | **1,043.9** | **1,111.4** | **1,100.0** | **1,124.9** | **4,380.1** | **1,013.4** | **1,054.8** | **1,033.1** | **980.9** | **4,091.1** | **4,073.8** | **4,050.5** | **-2.6%** |
| Y/Y Change | 0.5% | -0.5% | 0.1% | -0.2% | 3.7% | 0.8% | -2.9% | -5.1% | -6.1% | -12.0% | -6.5% | -0.4% | -0.6% | |
| **OPERATING MARGIN** | | | | | | | | | | | | | | |
| Publishing | 19.8% | 18.7% | 20.3% | 14.8% | 21.2% | 18.9% | 15.0% | 18.4% | 14.5% | 20.5% | 16.8% | 15.3% | 15.9% | |
| Broadcasting | 28.1% | 22.8% | 27.7% | 27.3% | 28.9% | 27.1% | 21.7% | 27.4% | 29.0% | 30.3% | 27.6% | 27.4% | 27.6% | |
| Television | 32.2% | 28.1% | 32.8% | 36.7% | 33.0% | 29.9% | 26.3% | 31.1% | 30.2% | 34.0% | 30.3% | 30.2% | 30.3% | |
| Entertainment/Chicago Cubs | 13.4% | -28.4% | 8.0% | 29.3% | -6.0% | 13.6% | -28.7% | 17.3% | 28.1% | -5.0% | 15.8% | 18.0% | 16.4% | |
| **TOTAL MARGIN** | **22.3%** | **18.8%** | **22.4%** | **18.5%** | **23.3%** | **21.0%** | **16.6%** | **19.7%** | **18.1%** | **23.2%** | **19.7%** | **19.4%** | **19.4%** | |
| **OPERATING INCOME** | | | | | | | | | | | | | | |
| Publishing | 811.7 | 188.2 | 208.7 | 141.2 | 236.1 | 772.2 | 139.7 | 151.0 | 126.0 | 194.1 | 610.9 | 574.3 | 580.0 | -10.2% |
| Broadcasting | 436.5 | 69.0 | 111.3 | 107.8 | 105.9 | 394.0 | 61.4 | 107.7 | 117.8 | 104.2 | 391.1 | 404.4 | 418.2 | 1.6% |
| Television | 403.1 | 74.2 | 105.2 | 74.1 | 107.4 | 360.9 | 69.9 | 91.1 | 95.7 | 105.7 | 348.3 | 358.0 | 367.7 | 0.8% |
| Entertainment/Chicago Cubs | 33.4 | (5.2) | 6.3 | 33.7 | (1.6) | 33.6 | (5.5) | 18.8 | 30.7 | (1.5) | 42.3 | 45.4 | 48.5 | |
| **OPERATING INCOME (pre-corp exp.)** | **1,248.2** | **258.2** | **320.5** | **249.8** | **342.0** | **1,166.7** | **201.1** | **289.7** | **243.5** | **298.3** | **1,002.0** | **978.7** | **976.2** | **-5.8%** |
| Corporate Expense | 52.4 | 20.4 | 14.0 | 13.7 | 14.6 | 62.7 | 19.6 | 10.9 | 11.6 | 13.4 | 53.9 | 56.5 | 58.8 | -2.1% |
| **OPERATING INCOME** | **1,195.8** | **234.9** | **306.4** | **236.3** | **327.4** | **1,104.0** | **181.5** | **247.8** | **232.2** | **284.9** | **948.4** | **922.2** | **917.4** | **-6.9%** |
| Net gain (loss) on equity investments | 41.2 | 6.5 | 20.1 | 16.7 | 29.5 | 74.9 | 12.7 | 28.7 | 29.5 | 35.0 | 103.0 | 80.0 | 83.2 | 3.6% |
| Net Interest | (147.7) | (46.5) | (44.8) | (78.6) | (80.7) | (250.8) | (80.1) | (112.1) | (181.8) | (192.0) | (556.0) | (710.0) | (692.0) | 38.8% |
| Other | 0.2 | | | | | | | | | | | | | |
| **PRETAX INCOME** | **1,088.6** | **194.3** | **281.8** | **174.4** | **258.1** | **919.1** | **114.1** | **184.4** | **76.3** | **127.9** | **493.3** | **292.2** | **308.5** | **-30.9%** |
| Rate | 39.3% | 38.2% | 40.1% | 38.4% | 39.4% | 38.9% | 40.2% | 41.8% | 40.5% | 39.5% | 40.6% | 39.5% | 39.5% | |
| Taxes | 427.3 | 74.5 | 113.1 | 66.9 | 103.0 | 357.5 | 45.8 | 88.9 | 31.2 | 54.5 | 200.2 | -115.4 | 121.9 | -30.1% |
| **CONTINUED OPERATIONS** | **661.3** | **120.3** | **168.7** | **107.5** | **158.1** | **561.6** | **68.3** | **95.5** | **45.5** | **83.4** | **293.1** | **176.9** | **186.7** | **-30.7%** |
| **NON OPERATING & EXTRAORDINARY ITEMS** | | | | | | | | | | | | | | |
| Total (after tax amount) | (127.1) | (17.5) | (80.8) | 55.8 | 73.9 | 32.4 | (83.9) | (58.4) | 107.0 | | (36.2) | | | |
| **NET INCOME** | **534.7** | **102.8** | **87.8** | **164.3** | **236.1** | **594.0** | **(15.6)** | **36.3** | **152.8** | **83.4** | **256.9** | **176.9** | **186.7** | **-32.9%** |
| PREFERRED DIVDS. | 8.4 | 2.1 | 2.1 | 2.1 | | 8.3 | | | | | | | | -100.0% |
| AVAIL FOR COMMON (basic) | 526.3 | 100.7 | 85.7 | 162.2 | 236.1 | 587.7 | (15.8) | 36.3 | 152.8 | 83.4 | 256.9 | 176.9 | 186.7 | -31.8% |
| EPS Adjustments - ESOP, etc. | 8.4 | 2.1 | 2.1 | 2.1 | | 8.3 | | | | | | | | -100.0% |
| Adjusted Net (for diluted EPS Calc.) | 526.3 | $100.7 | 285.7 | $162.2 | $239.1 | 587.7 | (15.6) | 536.3 | $152.6 | 583.4 | 256.9 | 176.9 | 186.7 | -31.8% |
| Avg. Shares-Diluted | 315.4 | 308.0 | 304.5 | 252.8 | 241.4 | 274.4 | 242.1 | 204.4 | 126.3 | 129.0 | 174.7 | 126.0 | 126.0 | -22.6% |
| **EARNINGS PER SHARE** | | | | | | | | | | | | | | |
| Diluted | | | | | | | | | | | | | | |
| Continuing Operations | $2.97 | 0.79 | 0.55 | 0.43 | 0.68 | $2.82 | 0.28 | 0.47 | 0.37 | 0.67 | $1.48 | $1.53 | -4.9% | |
| Y/Y growth | -7.8% | -5.7% | -6.7% | -14.4% | 20.7% | -2.3% | -27.0% | -14.5% | -12.1% | -1.6% | -16.2% | -14.4% | 3.4% | |
| Reported | $1.57 | $0.33 | $0.28 | $0.65 | $0.99 | $2.14 | ($0.06) | $0.18 | $0.74 | $0.67 | $1.40 | $1.45 | $1.53 | -10.6% |

Notes:
2Q07: Results adjusted to exclude a $3.5m pre-tax ($0.02bln) severance charge, a favorable $91m ($0.72bln) tax adjustment, a $7.8m pre-tax ($0.38bln) loss mostly attributable to the marking-to-market of the Phones,
a gain of $58m pre-tax ($0.55bln) on the sale of assets, and an after-tax gain of $3m ($0.66bln) from the TMCT transaction
2Q07: Results adjusted to exclude a $28m pre-tax ($0.06bln) severance charge as well as a $2.9m pre-tax ($0.37bln) charge for write-off of LA Times plant
Non-core advertising revenues for 2007 and 2008 are included in the appropriate publishing categories
3Q06: Discontinued operations are related to the sale of two TV stations in Atlanta and Albany. Since we include assets incurred to write-down the TV stations, loss the cost to sell them.
Equity investments adjusted to exclude a favorable tax gain at Comerladbér of $2.9 million pre-tax (approximately $3m post-tax)
1Q06: Operating Income adjusted to exclude a $19 m pre-tax severance charge related to a new union contract at NewsDay and a $7m on the sale of certain publishing assets

| **REVENUE GROWTH** | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Publishing | -0.8% | -0.9% | -1.0% | -2.4% | 2.4% | -0.1% | -6.8% | -10.5% | -9.0% | -14.8% | -10.3% | -2.5% | -1.7% | |
| Advertising | 0.5% | 0.0% | 0.0% | -2.2% | 3.1% | 0.5% | -1.2% | -12.9% | -12.4% | -10.8% | -11.9% | -3.0% | -2.0% | |
| Circulation | -7.4% | -2.9% | -5.3% | -6.0% | 1.9% | -3.5% | -7.5% | -7.2% | -6.1% | -11.8% | -8.2% | -1.0% | -1.0% | |
| Other | 0.1% | -4.3% | -3.8% | 3.4% | 7.1% | 0.6% | 4.3% | 6.4% | 7.1% | 6.0% | 4.4% | 0.0% | 0.0% | |
| Broadcasting/Entertainment | -8.1% | -2.5% | -4.7% | -7.1% | 3.9% | -3.0% | -6.5% | -2.8% | 3.4% | -4.0% | -2.9% | 3.6% | 2.4% | |
| Television | -7.8% | -2.0% | -4.3% | -9.5% | 2.0% | -3.4% | -7.0% | -10.4% | 3.9% | -4.4% | -4.7% | 3.5% | 2.0% | |
| Entertainment/Chicago Cubs | 2.4% | -9.1% | -8.3% | -0.7% | 26.2% | -0.6% | 1.4% | 37.3% | 2.4% | 0.0% | 10.4% | 4.0% | 4.0% | |
| **Total Revenues** | **-2.3%** | **-1.3%** | **-2.1%** | **-3.9%** | **3.1%** | **-0.9%** | **-6.5%** | **-8.3%** | **-5.3%** | **-12.2%** | **-8.2%** | **-0.6%** | **-0.6%** | |

Source: Company data, Goldman Sachs Research estimates.

EXHIBIT D – 89

4

# Reg AC

I, Peter P. Appert, CFA, hereby certify that all of the views expressed in this report accurately reflect my personal views about the subject company or companies and its or their securities. I also certify that no part of my compensation was, is or will be, directly or indirectly, related to the specific recommendations or views expressed in this report.

# Investment profile

The Goldman Sachs Investment Profile provides investment context for a security by comparing key attributes of that security to its peer group and market. The four key attributes depicted are: growth, returns, multiple and volatility. Growth, returns and multiple are indexed based on composites of several methodologies to determine the stocks percentile ranking within the region's coverage universe.

The precise calculation of each metric may vary depending on the fiscal year, industry and region but the standard approach is as follows:

Growth is a composite of next year's estimate over current year's estimate, e.g. EPS, EBITDA, Revenue. Return is a year one prospective aggregate of various return on capital measures, e.g. CROCI, ROACE, and ROE. Multiple is a composite of one-year forward valuation ratios, e.g. P/E, dividend yield, EV/FCF, EV/EBITDA, EV/DACF, Price/Book. Volatility is measured as trailing twelve-month volatility adjusted for dividends.

# Quantum

Quantum is Goldman Sachs' proprietary database providing access to detailed financial statement histories, forecasts and ratios. It can be used for in-depth analysis of a single company, or to make comparisons between companies in different sectors and markets.

# Disclosures

## Coverage group(s) of stocks by primary analyst(s)

Peter P. Appert, CFA: America: Media: Newspapers and Directories, America: Media: Publishing and Information Services. Peter M. Salkowski: America: Media: Newspapers and Directories.

America: Media: Newspapers and Directories: Belo Corp., E.W. Scripps Co., Gannett Company, Inc., GateHouse Media, Inc., Idearc Inc., Journal Communications Inc., The McClatchy Co., Monster Worldwide, Inc., The New York Times Co., R.H. Donnelley Corp., Tribune Company.

America: Media: Publishing and Information Services: Dolan Media Company, FactSet Research Systems Inc., Gartner, Inc., Getty Images, Inc., IHS Inc., The McGraw-Hill Companies, Inc., Moody's Corp., Scholastic Corporation, Solera Holdings, Inc., Thomson Corp..

## Company-specific regulatory disclosures

The following disclosures relate to relationships between The Goldman Sachs Group, Inc. (with its affiliates, "Goldman Sachs") and companies covered by the Global Investment Research Division of Goldman Sachs and referred to in this research.

Goldman Sachs beneficially owned 1% or more of common equity (excluding positions managed by affiliates and business units not required to be aggregated under US securities law) as of the month end preceding this report: Tribune Company ($33.98)

Goldman Sachs has received compensation for investment banking services in the past 12 months: Tribune Company ($33.98)

Goldman Sachs expects to receive or intends to seek compensation for investment banking services in the next 3 months: Tribune Company ($33.98)

Goldman Sachs has received compensation for non-investment banking services during the past 12 months: Tribune Company ($33.98)

Goldman Sachs had an investment banking services client relationship during the past 12 months with: Tribune Company ($33.98)

Goldman Sachs had a non-investment banking securities-related services client relationship during the past 12 months with: Tribune Company ($33.98)

Goldman Sachs had a non-securities services client relationship during the past 12 months with: Tribune Company ($33.98)

Goldman Sachs has managed or co-managed a public or Rule 144A offering in the past 12 months: Tribune Company ($33.98)

Goldman Sachs is a specialist in the relevant securities and will at any given time have an inventory position, "long" or "short," and may be on the opposite side of orders executed on the relevant exchange: Tribune Company ($33.98)

## Distribution of ratings/investment banking relationships

Goldman Sachs Investment Research global coverage universe

|  | Rating Distribution | | | Investment Banking Relationships | | |
|---|---|---|---|---|---|---|
|  | Buy | Hold | Sell | Buy | Hold | Sell |
| Global | 29% | 59% | 12% | 39% | 32% | 29% |

**EXHIBIT D – 90**    5

As of Oct 1, 2007, Goldman Sachs Global Investment Research had investment ratings on 2,770 equity securities. Goldman Sachs assigns stocks as Buys and Sells on various regional Investment Lists; stocks not so assigned are deemed Neutral. Such assignments equate to Buy, Hold and Sell for the purposes of the above disclosure required by NASD/NYSE rules. See 'Ratings, Coverage groups and views and related definitions' below.

## Price target and rating history chart(s)



## Regulatory disclosures

## Disclosures required by United States laws and regulations

See company-specific regulatory disclosures above for any of the following disclosures required as to companies referred to in this report: manager or co-manager in a pending transaction; 1% or other ownership; compensation for certain services; types of client relationships; managed/co-managed public offerings in prior periods; directorships; market making and/or specialist role.

The following are additional required disclosures: **Ownership and material conflicts of interest**: Goldman Sachs policy prohibits its analysts, professionals reporting to analysts and members of their households from owning securities of any company in the analyst's area of coverage. **Analyst compensation**: Analysts are paid in part based on the profitability of Goldman Sachs, which includes investment banking revenues. **Analyst as officer or director**: Goldman Sachs policy prohibits its analysts, persons reporting to analysts or members of their households from serving as an officer, director, advisory board member or employee of any company in the analyst's area of coverage. **Distribution of ratings**: See the distribution of ratings disclosure above. **Price chart**: See the price chart, with changes of ratings and price targets in prior periods, above, or, if electronic format or if with respect to multiple companies which are the subject of this report, on the Goldman Sachs website at http://www.gs.com/research/hedge.html. Goldman, Sachs & Co. is a member of SIPC.

## Additional disclosures required under the laws and regulations of jurisdictions other than the United States

The following disclosures are those required by the jurisdiction indicated, except to the extent already made above pursuant to United States laws and regulations. **Australia**: This research, and any access to it, is intended only for "wholesale clients" within the meaning of the Australian Corporations Act. **Canada**: Goldman Sachs Canada Inc. has approved of, and agreed to take responsibility for, this research in Canada if and to the extent it relates to equity securities of Canadian issuers. Analysts may conduct site visits but are prohibited from accepting payment or reimbursement by the company of travel expenses for such visits. **Hong Kong**: Further information on the securities of covered companies referred to in this research may be obtained on request from Goldman Sachs (Asia) L.L.C. **India**: Further information on the subject company or companies referred to in this research may be obtained from Goldman Sachs (India) Securities Private Limited; **Japan**: See below. **Korea**: Further information on the subject company or companies referred to in this research may be obtained from Goldman Sachs (Asia) L.L.C., Seoul Branch. **Russia**: Research reports distributed in the Russian Federation are not advertising as defined in Russian law, but are information and analysis not having product promotion as their main purpose and do not provide appraisal within the meaning of the Russian Law on Appraisal. **Singapore**: Further information on the covered companies referred to in this research may be obtained from Goldman Sachs (Singapore) Pte. (Company Number: 198602165W). **United Kingdom**: Persons who would be categorized as retail clients in the United Kingdom, as such term is defined in the rules of the Financial Services Authority, should read this research in conjunction with prior Goldman Sachs research on the covered companies referred to herein and should refer to the risk warnings that have been sent to them by Goldman Sachs International. A copy of these risk warnings, and a glossary of certain financial terms used in this report, are available from Goldman Sachs International on request.

**European Union**: Disclosure information in relation to Article 4 (1) (d) and Article 6 (2) of the European Commission Directive 2003/126/EC is available at http://www.gs.com/client_services/global_investment_research/europeanpolicy.html

**Japan**: **Goldman Sachs Japan Co., Ltd. is a Financial Instrument Dealer under the Financial Instrument and Exchange Law, registered with the Kanto Financial Bureau (Registration No. 69), and is a member of Japan Securities Dealers Association (JSDA) and Financial Futures Association of Japan (FFJAJ). Sales and purchase of equities are subject to commission pre-determined with clients plus consumption tax.** See company-specific disclosures as to any applicable disclosures required by Japanese stock exchanges, the Japanese Securities Dealers Association or the Japanese Securities Finance Company.

## Ratings, coverage groups and views and related definitions

**Buy (B), Neutral (N), Sell (S)** -Analysts recommend stocks as Buys or Sells for inclusion on various regional Investment Lists. Being assigned a Buy or Sell on an Investment List is determined by a stock's return potential relative to its coverage group as described below. Any stock not assigned as a Buy or a Sell on an Investment List is deemed Neutral. Each regional Investment Review Committee manages various regional Investment Lists to a global guideline of 25%-35% of stocks as Buy and 10%-15% of stocks as Sell; however, the distribution of Buys and Sells in any particular coverage group may vary as determined by the regional Investment Review Committee. Regional Conviction Buy and Sell lists represent investment recommendations focused on either the size of the potential return or the likelihood of the realization of the return.

Return potential represents the price differential between the current share price and the price target expected during the time horizon associated with the price target. Price targets are required for all covered stocks. The return potential, price target and associated time horizon are stated in each report adding or reiterating an Investment List membership.

Coverage groups and views: A list of all stocks in each coverage group is available by primary analyst, stock and coverage group at http://www.gs.com/research/hedge.html. The analyst assigns one of the following coverage views which represents the analyst's investment outlook on the coverage group relative to the group's historical fundamentals and/or valuation. Attractive (A). The investment outlook over the following 12 months is favorable relative to the coverage group's historical fundamentals and/or valuation. Neutral (N). The investment outlook over the following 12 months is neutral relative to the coverage group's historical fundamentals and/or valuation. Cautious (C). The investment outlook over the following 12 months is unfavorable relative to the coverage group's historical fundamentals and/or valuation.

Not Rated (NR). The investment rating and target price, if any, have been removed pursuant to Goldman Sachs policy when Goldman Sachs is acting in an advisory capacity in a merger or strategic transaction involving this company and in certain other circumstances. Rating Suspended (RS). Goldman Sachs Research has suspended the investment rating and price target, if any, for this stock, because there is not a sufficient fundamental basis for determining an investment rating or target. The previous investment rating and price target, if any, are no longer in effect for this stock and should not be relied upon. Coverage Suspended (CS). Goldman Sachs has suspended coverage of this company. Not Covered (NC). Goldman Sachs does not cover this company. Not Available or Not Applicable (NA). The information is not available for display or is not applicable. Not Meaningful (NM). The information is not meaningful and is therefore excluded.

## Ratings, coverage views and related definitions prior to June 26, 2006

Our rating system requires that analysts rank order the stocks in their coverage groups and assign one of three investment ratings (see definitions below) within a ratings distribution guideline of no more than 25% of the stocks should be rated Outperform and no fewer than 10% rated Underperform. The analyst assigns one of three coverage views (see definitions below), which represents the analyst's investment outlook on the coverage group relative to the group's historical fundamentals and valuation. Each coverage group, listing all stocks covered in that group, is available by primary analyst, stock and coverage group at http://www.gs.com/research/hedge.html.

Definitions

Outperform (OP). We expect this stock to outperform the median total return for the analyst's coverage universe over the next 12 months. In-Line (IL). We expect this stock to perform in line with the median total return for the analyst's coverage universe over the next 12 months. Underperform (U). We expect this stock to underperform the median total return for the analyst's coverage universe over the next 12 months.

Coverage views: Attractive (A). The investment outlook over the following 12 months is favorable relative to the coverage group's historical fundamentals and/or valuation. Neutral (N). The investment outlook over the following 12 months is neutral relative to the coverage group's historical fundamentals and/or valuation. Cautious (C). The investment outlook over the following 12 months is unfavorable relative to the coverage group's historical fundamentals and/or valuation.

Current Investment List (CIL). We expect stocks on this list to provide an absolute total return of approximately 15%-20% over the next 12 months. We only assign this designation to stocks rated Outperform. We require a 12-month price target for stocks with this designation. Each stock on the CIL will automatically come off the list after 90 days unless renewed by the covering analyst and the relevant Regional Investment Review Committee.

## Global product; distributing entities

The Global Investment Research Division of Goldman Sachs produces and distributes research products for clients of Goldman Sachs, and pursuant to certain contractual arrangements, on a global basis. Analysts based in Goldman Sachs offices around the world produce equity research on industries and companies, and research on macroeconomics, currencies, commodities and portfolio strategy.

This research is disseminated in Australia by Goldman Sachs JBWere Pty Ltd (ABN 21 006 797 897) on behalf of Goldman Sachs; in Canada by Goldman Sachs Canada Inc. regarding Canadian equities and by Goldman Sachs & Co. (all other research); in Germany by Goldman Sachs & Co. oHG; in Hong Kong by Goldman Sachs (Asia) L.L.C.; in India by Goldman Sachs (India) Securities Private Ltd.; in Japan by Goldman Sachs Japan Co., Ltd.; in the Republic of Korea by Goldman Sachs (Asia) L.L.C., Seoul Branch; in New Zealand by Goldman Sachs JBWere (NZ) Limited on behalf of Goldman Sachs; in Singapore by Goldman Sachs (Singapore) Pte. (Company Number: 198602165W); and in the United States of America by Goldman, Sachs & Co. Goldman Sachs International has approved this research in connection with its distribution in the United Kingdom and European Union.

European Union: Goldman Sachs International, authorised and regulated by the Financial Services Authority, has approved this research in connection with its distribution in the European Union and United Kingdom; Goldman, Sachs & Co. oHG, regulated by the Bundesanstalt für Finanzdienstleistungsaufsicht, may also be distributing research in Germany.

## General disclosures in addition to specific disclosures required by certain jurisdictions

This research is for our clients only. Other than disclosures relating to Goldman Sachs, this research is based on current public information that we consider reliable, but we do not represent it is accurate or complete, and it should not be relied on as such. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment.

Goldman Sachs conducts a global full-service, integrated investment banking, investment management, and brokerage business. We have investment banking and other business relationships with a substantial percentage of the companies covered by our Global Investment Research Division.

Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and our proprietary trading desks that reflect opinions that are contrary to the opinions expressed in this research. Our asset management area, our proprietary trading desks and investing businesses may make investment decisions that are inconsistent with the recommendations or views expressed in this research.

We and our affiliates, officers, directors, and employees, excluding equity analysts, will from time to time have long or short positions in, act as principal in, and buy or sell, the securities or derivatives (including options and warrants) thereof of covered companies referred to in this research.

EXHIBIT D – 92     7

This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of the investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors.

Current options disclosure documents are available from Goldman Sachs sales representatives or at http://www.theocc.com/publications/risks/riskchap1.jsp. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments.

Our research is disseminated primarily electronically, and, in some cases, in printed form. Electronic research is simultaneously available to all clients.

Disclosure information is also available at http://www.gs.com/research/hedge.html or from Research Compliance, One New York Plaza, New York, NY 10004.

Copyright 2007 The Goldman Sachs Group, Inc.

No part of this material may be (i) copied, photocopied or duplicated in any form by any means or (ii) redistributed without the prior written consent of The Goldman Sachs Group, Inc.

EXHIBIT D – 93

# EXHIBIT R

  THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# Zell calls Tribune Co. buy a 'mistake'

**By Bloomberg News  |  April 16, 2009**

NEW YORK - Billionaire investor Sam Zell made what is acknowledged to be one of the best-timed investment decisions ever by selling his real estate empire at the peak of the market in February 2007. Now he says he made one of the worst 10 months later by purchasing Tribune Co.

"The definition if you bought something and it's now worth a great deal less, you made a mistake," Zell said. "And I'm more than willing to say that I made a mistake. I was too optimistic in terms of the newspaper's ability to preserve its position."

Zell, 67, exited the US office market by selling Equity Office Properties Trust to Blackstone Group LP for $39 billion including debt in the biggest leveraged buyout at the time. The sale earned Zell about $900 million. In December 2007, Zell and investors took Tribune private in a deal that left it with $13 billion in debt. The company filed for bankruptcy in December 2008.

"I think you're going to recognize the fact that by filing for bankruptcy in December and being the first one, we also were able to stop the bleeding and preserve a great company," Zell said. Tribune owns eight major daily newspapers, including the Chicago Tribune and Los Angeles Times, and the Chicago Cubs.

"I think we're looking at every option at the Tribune Co.," he said. "It's very obvious that the newspaper model in its current form is not working. And the sooner we all acknowledge that the better. Whether it be home delivery, whether it be giving away content for free, I mean these are critical issues."

Zell said a merger of Tribune is unlikely. "That's like asking someone . . . if they want to get vaccinated with a live virus," Zell said. "There's not a long list of people who want to buy newspaper companies today." ■

© Copyright 2009 The New York Times Company

# EXHIBIT S



**IN DEPTH**  July 30, 2008, 3:47PM EST

# Sam Zell's Deal from Hell

The turnaround maven should have seen the problems ahead in the newspaper industry. His blind side may cost Tribune Co. its very life

by Emily Thornton, Michael Arndt and Ronald Grover

"It's the deal from hell," says Sam Zell, never one to mince words. "And it will continue to be the deal from hell until we turn it around." Zell is talking, of course, about his $8.5 billion purchase of Tribune Co. in December 2007, a transaction that's shaping up to be one of the most disastrous the media world has ever seen. Zell is a real estate tycoon, and his plush office reflects his decades of success: Giant even by CEO standards, it brims with paintings and statues and looks out on a private garden above the Chicago River. One item that stands out among the clutter is an upside-down map of the world, a prop presumably intended to convince visitors that they're in the presence of an iconoclast. Zell, 66 and fiercely devoted to blue jeans, has burnished that image carefully over the years.

Were it not for the Tribune debacle, there would be no reason to question Zell's brilliance as a businessman. He describes himself, immodestly, as a "grave dancer" who buys properties at fire-sale prices and resells them for a profit. His biggest coup came in late 2006, when he orchestrated a bidding war for his real estate trust, Equity Office Properties. EOP eventually went to Blackstone Group (BX) for $39 billion, in what was then the biggest leveraged buyout in history. Weeks later he thumbed his nose at the dealmaking world with a satirical song, posted on the Web, that predicted the credit crunch soon to sweep the globe. It seemed he could do no wrong.

Then Zell bought Tribune and stumbled into a calamity of plunging sales and rising costs. He had expected only single-digit declines in newspaper ad revenue. Turns out he was off by a factor of two or three. "If current trends in advertising are permanent," he says, "we have a really serious problem."

He should have seen it coming. Tribune comprises eight newspapers, including the *Chicago Tribune*, *Los Angeles Times*, and *Baltimore Sun*, which together generate 76% of the company's revenues; more than 50 Web sites; 25 television stations, including superstation WGN America; a 31% share of the Food Network; the Chicago Cubs baseball team; and real estate and other holdings. Tribune had been slumping for years, courting buyers for more than 18 months before Zell ambled onto the scene in early 2007. Against that bleak backdrop, he loaded the already strapped company with more than $8 billion in fresh debt to pay for the deal, leveraging Tribune to within an inch of its life.

The payments, $1.4 billion by June 2009 alone, have proven crippling. Tribune's junk-level credit rating has fallen since Zell took over, and some of its bonds are fetching 35¢ on the dollar. Zell has been forced to cut costs far more than he anticipated. It may not be enough to avoid a default. "The colossal debt Zell piled on is forcing Tribune to take more and more desperate actions," says media consultant Alan D. Mutter.

On paper, Zell's plan looked great. He would quickly sell the Chicago Cubs, Wrigley Field, and a 25% stake in Comcast SportsNet Chicago to pay off debt, and focus on making Tribune's newspapers zippier and more ad-friendly. The strategy was based on an innovative financing scheme that used Tribune's tax-exempt employee

stock ownership plan as the vehicle through which to fund the transaction. That would allow Tribune to save big on taxes: It paid $245 million annually on average over the past three years. Zell's financing arrangement required the billionaire to pony up just $315 million of his own cash to wrest control of the company, with a warrant to buy 40% more for as little as $500 million. What's more, Zell turned Tribune into a so-called S corporation, a designation usually reserved for small businesses. That could allow Tribune to sell assets in 10 years without having to pay capital-gains taxes.

Zell doesn't need Tribune to thrive; merely keeping it alive could earn him an astronomical return when it comes time to sell. That has always been the goal. "When we first undertook this project, we viewed Tribune as 60 ways to get lucky," Zell says. But amid the credit crunch, the quick asset sales haven't panned out. With the newspaper business deteriorating, his seemingly clever strategy has thrown the whole Tribune enterprise into jeopardy.

The question for the company's 18,500 employees is whether Sam Zell is the guy to save it. Although he owned a radio company called Jacor Communications that was acquired by Clear Channel Communications (CCU) in 1999 and spends his weekends in Malibu, Zell is no media mogul and hasn't mixed well in that world thus far. Early on, he told Tribune executives he would "cut off their ties" if he caught them looking so formal at future meetings. Prone to off-color jokes and profanity, he's more like "that guy you see on the Mexican beer commercial," says Jeff Peterson, owner of Geoffrey's Malibu, a restaurant frequented by Zell and his wife, Helen. "He just seems like a down-to-earth guy's guy."

Many staffers are alarmed by Zell's open disdain for the newspaper business. "The industry has lost its credibility" because of biased, boring, and self-indulgent articles, says Zell. For that matter, he doesn't much care for baseball, either, says Chicago White Sox majority owner and longtime friend Jerry Reinsdorf: "He actually dislikes it." Most dealmakers, by contrast, lionize the companies they own to pump up sale prices. "If you have a lemonade stand, you don't try to sell the lemonade by saying it's terrible," says Myron Levin, a reporter for 23 years at the *Los Angeles Times* who took a buyout in March.

Adding to the uncertainty, Zell has tapped some quirky characters with no newspaper experience to run key elements of the Tribune empire. Randy Michaels, the chief operating officer, is a former Clear Channel executive and onetime "shock jock" who worked for Zell at Jacor. Michaels has installed jukeboxes, pinball machines, and a sculpture of a six-legged man running in circles called "The Bureaucratic Shuffle" in the Tribune Tower in Chicago. Marc Chase, president of Tribune Interactive, is another Clear Channel alum and former DJ. Robert J. Gremillion, Tribune's executive vice-president and interim publisher of the *Chicago Tribune*, hails from the broadcasting division. Gerald Spector, the chief administrative officer who's overseeing the *Los Angeles Times*, is a Zell acolyte from the real estate business with a penchant for sweaters emblazoned with cartoon characters.

Tribune's new chief innovation officer, Lee Abrams, a former XM Satellite Radio Holdings (XMSR) programmer, has raised eyebrows, too. In March he began firing off 5,000-word e-mails suggesting employees peruse his 108 blog posts on what's wrong with the media. "While my background is steeped in rock 'n' roll," he wrote in his first e-mail, "I strongly believe that News and Information is the NEW rock 'n' roll…The NEW rock 'n' roll isn't about Elvis or James Dean, but it IS about re-inventing media with the exact same moxie that the fathers of rock 'n' roll had. The Tribune has the choice of doing to News/Information/Entertainment what rock 'n' roll did to music."

## EMPTY PROMISES

With the newspaper industry in free fall, Zell's new survival plan is to build out Tribune's broadcasting and Internet groups, which represent 24% of revenues, and slash costs in the newspaper group. "It's a smart move,"

says Hale Holden, a debt analyst at Barclays Capital (BCS) who follows Tribune. Broadcast companies are commanding valuations double what newspaper companies enjoy. "We think it's one of the few options he has available," Holden says.

That grim assessment stands in stark contrast to the jubilation that greeted Zell last Dec. 20, his first day as CEO, as he strode triumphantly into the *Chicago Tribune* offices, smiled broadly at his new comrades, and announced: "You own this company now!" He promised no cuts.

Even then, most observers knew the industry was being buffeted by falling revenues. "We started out saying, 'big Christmas, slow January,'" Zell says of the typically booming fourth quarter and anemic first quarter for ad sales. "Then we started seeing trends we didn't expect." Companies were abandoning newspaper ads at an accelerating pace because of a souring economy and cheaper alternatives online. "It's going to get worse, and it's going to go on a lot longer," says New York Daily News owner Mortimer Zuckerman, who has known Zell for 15 years and considers him a "business genius."

As ad sales nosedived, Zell rushed to enact a turnaround plan originally scheduled for 2010. It called for cost cuts and an immediate redesign of Tribune's six smallest dailies to make them leaner and more attractive to advertisers. Zell told employees, whom he addressed as "fellow investors," that they had to start acting like owners. The new mantra was "AFDI," an abbreviation for a crude slogan that was later sanitized to mean "Actually Frigging Doing It."

The first round of cuts came in the form of buyouts intended to slice 2% of Tribune's workforce. Zell suggested in a Feb. 13 memo that the moves reflected "the reality of our significant debt levels" and other problems. Tribune publishers sent memos hinting that future packages wouldn't be as lucrative. Profits were falling so fast that Tribune looked likely to violate loan agreements requiring it to keep new debt no higher than nine times operating earnings. (The ratio now stands at 8.1.) In March, Standard & Poor's (which, like *BusinessWeek*, is a unit of The McGraw-Hill Companies (MHP)) cut Tribune's credit rating to B-, from B. Says analyst Emile Courtney, who wrote the report: "That reflects the concern that Tribune might violate [loan agreements] in the near term...as early as December."

Operating chief Michaels conferred with publishers to find out how many pages Tribune could afford to print without breaking its debt provisions. In June he ordered that the ratio of ads to news shift to 50-50 instead of the usual 60% reserved for articles—meaning the so-called news hole had to shrink by 17%. The *Baltimore Sun* killed its stand-alone daily business section. The *Orlando Sentinel* ditched its stock tables. The *Los Angeles Times* announced it was merging sections devoted to books, opinion, real estate, autos, and a weekend calendar.

To Michaels, the moves are a matter of survival. "An animal with his leg caught in a trap will chew it off," he explains. "At the moment, we're doing some leg-chewing." Zell, meanwhile, has no patience for what he views as the pomposity of journalists casting their profession as some kind of sacred trust. "If you want to tell people what they should want, become a professor," he says. "But if you're in the newspaper business—and I emphasize the word business—then you have to respond to what your customer wants."

Zell and Michaels also shook up the sales side. They started placing calls to big advertisers, paying sales reps on commission only, and arming them with new types of ads, including ones in the middle of stories. "We want to incent them like hell to be greedy," says EVP Gremillion. Even if advertisers didn't want to be in the paper, Zell suggested, they could buy space on delivery trucks and printing plants.

As newspaper bosses were cutting jobs and pages, Zell's lieutenants sought to crank up broadcast profits, which had fallen 10% in 2007 because 13 Tribune stations were affiliated with the struggling CW Network. Michaels pressured CW to lower the estimated $72 million a year Tribune pays for its programs. He also complained about its core audience of young women, saying they tend not to watch local news. Local newscasts are the most lucrative programs because 100% of the ad revenue flows to the station, without network or syndicator middlemen.

## THE MORE URGENT PROBLEM

Internally, Michaels unleashed radical changes designed to double the number of hours of local news on Tribune's stations. In Fort Lauderdale, Tribune is building a local TV news station inside the newsroom of the *South Florida Sun-Sentinel* to feed hours of content to Miami's WSFL-TV station. It also plans to launch a four-hour local morning show in January. In Chicago the company is planning a 24-hour breaking news center in the Tribune's newsroom to provide content for television, radio, cell phones, and newspapers. "What we're doing could really change the business not only for television but also for print," says Ed Wilson, Tribune's head of broadcasting. One top executive at a major network has doubts: "Michaels doesn't know this business and hasn't taken the time to learn it. He's still a radio guy playing a TV executive."

None of the moves address the more urgent problem: Tribune's need for cash. It raised $630 million on July 29 by selling New York's *Newsday*, one of its most profitable newspapers, to Cablevision Systems (CVC) (Zell smartly kept a 3% stake to avoid taxes.) The price was less than what analysts estimate Zell paid for it last year, but it covered a big chunk of debt. In June, Zell put Tribune's headquarters and the *Los Angeles Times'* property on the market. On July 3, Tribune signed a $300 million asset-backed commercial paper deal with Barclays, in essence borrowing against money it expects to collect in the future.

And so the layoffs will keep coming. Tribune has axed 1,100 people thus far, with newspapers bearing the brunt. On July 2 the *Los Angeles Times* scrambled to cut 150 people, or 17% of its staff. It happened so fast that one editor said he didn't know whether to nod sadly or smile to his own staff members in the hallway because he couldn't recall who was on the list.

One wonders what might have happened had someone else bought Tribune. Zell and his team have limited flexibility, but a different buyer might not have taken on so much debt. Zell says the casualties will be "significantly greater" by yearend, and he's unapologetic about that. "I knew that I needed to act as both the grenade thrower and the bomb deflector if we were going to get from here to there," he says. Getting "there," of course, would mean a big payday for Sam Zell.

## LINKS

### Speak, Lazarus

In 1976, *Real Estate Review* published "The Grave Dancer: A Guide to the Risky Art of Resurrecting Dead Properties," by Sam Zell. The author wrote: "Grave dancing is an art that has many potential benefits. But one must be careful while prancing around not to fall into the open pit and join the cadaver."

*With Susan Zegel in New York*

The McGraw·Hill Companies

# EXHIBIT T

**The New York Times**
Case 08-13141-BLS    Doc 3068-1    Filed 01/13/10    Page 53 of 81
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY

GOLD
GLO
NOMINA

April 6, 2007

HIGH & LOW FINANCE

# This Deal Is Encouraging and Absurd

By FLOYD NORRIS

THIS is a tale of two markets. One has unbridled optimism and believes that risk is a thing of the past. The other has experienced severe losses and can think of no reason those losses will not become worse.

Put those markets together, throw in some generous tax breaks, and you have Sam Zell taking over the Tribune Company for almost nothing, with shareholders happy to get out at a price that is well below the company's average share price over the last decade.

The first market is the leveraged loan market, which is growing rapidly and is willing to take risks that would have been deemed foolhardy a few years ago.

The rates on loans rated in the nether regions of junk are higher than the rates on high-quality loans, but not by much. The bond rating agencies moan that such rates in no way cover the risk of default, but in recent years there have been few defaults. Almost any corporate loan can be financed these days.

The second market is the one for newspaper stocks. Over the last three years, the average such stock has lost more than a third of its value, while the overall American stock market has gained 25 percent. Owners are depressed and fearful, and so are employees.

The combination has produced one of the most absurd deals ever, albeit one that seems likely to be completed if no higher bid emerges and the loan market does not suddenly grow conservative.

The deal is absurd not because Mr. Zell is likely to lose his money. He may, but the potential rewards more than offset the risk. It is absurd because those who will lend the money to the company are taking on equity risks if things go wrong, but will not get equity benefits if they go right.

The employees could prosper — eventually — from the employee stock ownership plan, or ESOP, that will own the company until Mr. Zell exercises his right to buy 40 percent of it. But it will be a decade before employees will be allowed to cash in even a part of their ESOP shares.

In the meantime, the company will be cutting the cash it sets aside for their retirement. If the company falters, the workers could find that they have no jobs, and a lot of company stock that has little value. Most of Mr. Zell's investment will be classified as a loan to the company, giving him a chance of recovering money even if the stock becomes worthless.

The workers will also be working for a company saddled with $13 billion of debt. Will there be more and more rounds of staff reductions? No one is saying.

To make this deal work, Tribune is relying on a combination of tax benefits that assure the company will not pay a dime of income tax for years to come. Its annual profits, if there are any, will be attributed to the ESOP — and the ESOP is exempt from paying taxes on them.

"Taxpayers are silent partners in this deal," said Robert Willens, a tax analyst with Lehman Brothers. "But we don't get any of the upside."

To those of us who care deeply about the future of newspapers, this deal is encouraging. At long last, someone without an existing tie to the industry has stepped up to say he sees value in it. No such person turned up when Knight Ridder was auctioned.

Mr. Zell's record as an investor is not flawless, but it is very good. He has just cashed in on commercial real estate at a time when prices are high, and is buying something that Wall Street hates. He appears to be in it for the money, not for the psychic value of owning a paper that makes him a big man in town.

It would be more encouraging if someone had stepped up without relying so much on tax breaks that will increase the government's budget deficit without bringing much net benefit to the employees, since the elimination of company contributions to existing 401(k) plans will offset the benefits of the ESOP.

Those tax breaks have been around for decades, and were used by Tribune nearly two decades ago when it set up an earlier ESOP and froze benefits in its traditional defined-benefit pension plan.

They are largely the legacy of Senator Russell Long, a Louisiana Democrat who led the Senate Finance Committee and was passionate about encouraging employee ownership.

Senator Long once remarked that the attitude of those who came before his committee could be summarized as: "Don't tax you. Don't tax me. Tax that fellow behind the tree."

These days, that attitude seems almost quaint, since it assumes someone should pay taxes. Tribune will no longer do so. But at least one smart investor is betting that newspapers have a future.

Copyright 2007 The New York Times Company

# EXHIBIT U



---

Databases selected: Multiple databases...

## THE WALL STREET JOURNAL.
## Final Edition: Zell Wins Tribune In Bid to Revive A Media Empire; Budget Cuts Are Likely As Developer Takes Helm; Debt, ESOP Sew Up Deal

*Sarah Ellison and Jennifer S. Forsyth*. **Wall Street Journal**. (Eastern edition). New York, N.Y.: Apr 3, 2007. pg. A.1

### Abstract (Summary)

Mr. [Dennis FitzSimons] told Tribune employees yesterday in a town hall meeting at the company's headquarters that Mr. [Sam Zell] "has identified . . . assets that he views as undervalued, and that's his track record as a contrarian investor. He sees things, he's been successful in identifying assets that others think are out of favor . . ."

On Feb. 7, the day shareholders approved that deal, he discussed his interest in the Tribune. He provided no details, saying only that he felt the business was undervalued and had prospects for recovery. Civic pride may have played a part. Mr. Zell is a longtime Chicagoan whose office features a bronze cast of Michael Jordan's hands. He is a part owner of the Chicago White Sox, one reason why Tribune is selling the crosstown Cubs. (Mr. Zell wouldn't be permitted to have stakes in both).

At that time, the Tribune's board was working on a restructuring it could do on its own: It would borrow money and pay shareholders a big dividend. Then a company-related charity, the McCormick Tribune Foundation, which owns roughly 14% of Tribune, would buy out roughly half of the Chandler family's stake, and the three Chandler board members -- Mr. [William Stinehart], Jeffrey Chandler and Roger Goodan -- would step down, according to a person familiar with the matter. "The idea was to have peace in the valley," says one person familiar with the negotiations.

### Full Text (2187 words)

*(c) 2007 Dow Jones & Company, Inc. Reproduced with permission of copyright owner. Further reproduction or distribution is prohibited without permission.*

Nearly a year ago, William Stinehart, a Tribune Co. director and the lawyer for its largest shareholder, stormed out of the company's boardroom and slammed the door, according to two people who were there.

The company's share price was sluggish, the newspaper industry's prospects were dim, and the Chandler family, his client, wanted action. But the company's management and its board rebuffed the family's recommendations. Mr. Stinehart began to agitate for change, writing a public letter demanding something more than the stock buyback that had been proposed.

What he got was one of the most wrenching auctions in the history of newspapers -- a seemingly endless process that featured tepid buyers, unhappy employees and angry investors. As the process dragged on, the landscape shifted constantly, and the entire industry lurched into decline as fears of Internet pressure on advertising and circulation mounted. In the end, the Chandlers had to settle for less than they had hoped to receive.

Yesterday, the Chicago Tribune, Los Angeles Times, several other newspapers and 23 television stations fell into the hands of an unlikely newspaper baron, iconoclastic real-estate magnate Sam Zell, whose bid had come at the eleventh hour. Mr. Zell's plan suggests that he has some degree of confidence in the beleaguered newspaper business. He has told people he sees promise in the company's Internet assets. But the deal leaves many unanswered questions about the future of Tribune.

"It's generally not wise to sell your house when the market is going to hell in a handbasket," says Barry L. Lucas, an analyst with Gabelli & Co., whose parent company, Gamco Investors Inc., owns shares in Tribune Co. "I certainly hope no one else is thinking of doing what Tribune has done. It's a mess."

Early yesterday, following a weekend of negotiations, the company's board accepted a revised $34-dollar-a-share proposal from Mr. Zell to take the company private. The complex deal is structured around an employee stock-ownership plan, or ESOP. When it is completed, most of the company's shares will be held by Tribune employees. Although he has no background in journalism, Mr. Zell will become chairman of a media company that will be carrying a heavy debt load, which will force its new owners to face tough questions.

The company said yesterday morning that Mr. Zell will invest $315 million in the deal in a two-step process. In the first step, Tribune will stage a tender offer, at $34 a share, for a bit more than half of the company's shares. To fund the offer, the company will use $250 million of the $315 million pledged by Mr. Zell, plus additional borrowed money. It will return $4.2 billion to shareholders.

If the deal is approved by regulators, a second step will follow: the ESOP will buy the rest of the shares at $34 a share and Zell will put in $65 million, the rest of his pledge. The ESOP then will hold all of Tribune's remaining stock outstanding, and Mr. Zell will hold a subordinated note and a warrant entitling him to acquire 40% of the common stock for a price initially set at $500 million. The deal values the company at roughly $8.2 billion.

Mr. Zell will get a seat on the company's board and will be able to appoint one other member. If the deal is approved, he will become chairman. The board will have five independent directors, a majority. Dennis FitzSimons, the company's current chairman and chief executive, will remain on the board and continue as CEO. Although Mr. Zell will not control a majority of the stock, he is expected to exert considerable influence over decision-making.

The deal will spell the end to the Chandler family's involvement in Tribune, ending a period of open warfare between the family and the company. Yesterday, Mr. FitzSimons referred to the letter in which the Chandlers originally attacked the company's board, which was filed with the Securities and Exchange Commission, as "the most bogus filing of all time."

A spokesman for the Chandler family trust said: "We are pleased with the outcome" of the auction process.

Tribune kept open the possibility that a rival bidder might jump in with a higher bid. The company set a relatively low "breakup fee" of $25 million, which it would have to pay Mr. Zell if it abandoned yesterday's deal. Among those who could try to extend the auction are Los Angeles billionaires Ron Burkle and Eli Broad, who tried to outbid Mr. Zell late in the auction.

How Mr. Zell will be received remains to be seen. He has said he doesn't intend to break up the company, but Tribune said yesterday it will sell off the Chicago Cubs after the completion of the current baseball season. One person who has spoken to Mr. Zell about his plans says he is likely to seek further budget cuts, a move that will likely be unpopular with staff, particularly at the Los Angeles Times, where the editor and publisher both stepped down last year to protest budget cuts ordered by Tribune's headquarters. (See related articles on pages B1 and B9.)

Billionaire entertainment executive David Geffen, who had earlier made an offer for the L.A. Times, said yesterday he was still interested in the paper. "I hope to meet with Sam Zell sometime in the future," he said.

Mr. FitzSimons told Tribune employees yesterday in a town hall meeting at the company's headquarters that Mr. Zell "has identified . . . assets that he views as undervalued, and that's his track record as a contrarian investor. He sees things, he's been successful in identifying assets that others think are out of favor . . ."

The newspaper industry certainly fits into that category. Last summer, a dramatic decline in newspaper advertising revenue forced many newspaper executives to re-evaluate their businesses. A drop-off in print ad revenue has plagued Tribune's biggest markets -- Chicago, Los Angeles and New York -- undermining the rationale for its 2000 merger with Times Mirror Co. That merger was designed to bring newspapers and TV stations together in large markets to amplify ad revenue. The strategy has proved disastrous for Tribune, and the merger has turned into a huge disappointment for the company and its investors.

Mr. Zell, 65 years old, made a quiet offer for Tribune last October, when the company was having trouble scaring up bids. Private-equity firms had been looking and walking away. Potential buyers, including Los Angeles billionaires intrigued by the L.A. Times, only expressed interest in parts of the company, or were making lowball offers. The company was cobbling together a "self-help" deal to recapitalize the company and to spin off its TV stations, which would have paid a dividend to the Chandlers and other shareholders.

Mr. Zell got sidetracked on another deal. In November, he announced he would sell Equity Office Properties Trust, a public real-estate investment trust he headed. A bidding war broke out, and Blackstone Group eventually agreed to pay about $23 billion, excluding debt. By some measures, it was the largest leveraged buyout in U.S. history. Mr. Zell, chairman of Equity Office Properties and its largest individual shareholder, walked away with $900 million.

On Feb. 7, the day shareholders approved that deal, he discussed his interest in the Tribune. He provided no details, saying only that he felt the business was undervalued and had prospects for recovery. Civic pride may have played a part. Mr. Zell is a longtime Chicagoan whose office features a bronze cast of Michael Jordan's hands. He is a part owner of the Chicago White Sox, one reason why Tribune is selling the crosstown Cubs. (Mr. Zell wouldn't be permitted to have stakes in both).

In some ways, Mr. Zell is cut from different cloth than the buttoned-down culture of Tribune, which is closely aligned with the Chicago establishment. He prefers blue jeans to suits and is a longtime motorcycle rider. The son of a Jewish grain trader who escaped Poland as the Nazis were preparing to invade, Mr. Zell broke into the real-estate business investing in apartments with his fraternity brother from the University of Michigan. He has called himself the Grave Dancer, in reference to his affinity for buying distressed properties on the cheap. Over the years, he has also invested in a railroad-car company, a cruise line, a bicycle manufacturer and a fertilizer company, among others.

Many of his deals have been successful, but he has had his share of missteps. He was unable to turn around the Schwinn Bicycle Co. in the mid-1990s, and in 2001, American Classic Voyages Co. sought Chapter 11 bankruptcy protection in the wake of a deep dip in tourism after the Sept. 11 terrorist attacks.

Equity Office Properties, the enormous real-estate company he assembled and ran, suffered from some operational problems.

Although it dwarfed other publicly traded office companies in scale, it often lagged behind them in performance, with one analyst calling it a "perennial disappointment."

After the Equity Office sale was complete, Mr. Zell turned back to Tribune. Conditions in the newspaper industry were deteriorating fast, and the auction wasn't going well. The company's revenue numbers came in lower than anticipated, forcing management to downgrade its internal estimates for the full year.

Messrs. Broad and Burkle already had submitted a bid valued at $34 a share. After the company's internal revenue estimates were lowered, an adviser to the two investors informed a representative of the Tribune's board that they were dropping the value of their proposal to $27 a share. If the company was interested in that new offer, the adviser said, the Broad-Burkle team would put it in writing. That never happened, this person said.

Mr. Zell came in with his own offer.

At that time, the Tribune's board was working on a restructuring it could do on its own: It would borrow money and pay shareholders a big dividend. Then a company-related charity, the McCormick Tribune Foundation, which owns roughly 14% of Tribune, would buy out roughly half of the Chandler family's stake, and the three Chandler board members -- Mr. Stinehart, Jeffrey Chandler and Roger Goodan -- would step down, according to a person familiar with the matter. "The idea was to have peace in the valley," says one person familiar with the negotiations.

But the economics of that idea were problematic. In early March, the company began re-evaluating that plan. The declining performance of some of Tribune's properties made the special committee overseeing the auction uncomfortable with the proposed debt load, according to people familiar with the matter. The plan's proposed dividend had been shaved from more than $20 a share to roughly $18, these people say.

The company's management and the special committee's advisers were uncomfortable with the level of debt in Mr. Zell's proposal as well. By March 9, negotiations with Mr. Zell were at a standstill, according to one person familiar with the talks.

Mr. Zell met Mr. FitzSimons for breakfast on March 13 to discuss his proposal, according to people familiar with the matter. Days earlier, Mr. FitzSimons had met with publishers from some of Tribune's newspapers, who expressed concerns about the trajectory of the business.

After the breakfast, Mr. FitzSimons and the special committee's advisers continued pushing hard for a self-help deal. But later that week, on March 15, William Osborne, Tribune's lead independent director, called Mr. Zell to tell him that he wanted to get a deal with him back on track, according to a person familiar with the call.

Mr. Zell called him back the following day and said: "We aren't going to do anything until you tell us it is worth our time," according to a person familiar with his thinking. Mr. Osborne assured him the company was seriously considering his offer.

The two sides continued talking. The team of advisers included Merrill Lynch & Co. and Citigroup Inc. for Tribune; Morgan Stanley for the special committee; Duff & Phelps for the ESOP trustee, and J.P. Morgan Chase & Co. for Mr. Zell.

By March 21, Tribune presented the outlines of Mr. Zell's proposal to ratings agencies, which eventually said they would grant a double- B-minus rating to the company. That gave the company the push it needed to move forward with Mr. Zell, who had by this point raised the value of his offer to above $33 a share.

At the last minute, Messrs. Burkle and Broad resurfaced, complaining that they hadn't been given adequate information to make a sufficient bid. They said they would be happy to make an offer for Tribune at $34 a share, but needed more information.

A weekend of fevered negotiations followed. Mr. Zell, working from his weekend home in Malibu, agreed to raise the equity in his offer to $315 million, from $225 million, which allowed him to match the Broad- Burkle offer.

The full board of directors, including three representatives from the Chandler family and Mr. FitzSimons, convened via conference call on Sunday night, at 10:30 Chicago time, to discuss the deal. The board approved it shortly before 11 p.m.

---

Matthew Karnitschnig and Brian Steinberg contributed to this article.



*Samuel Zell*

**Indexing (document details)**

| | |
|---|---|
| **Subjects:** | Acquisitions & mergers,  Bids |
| **Classification Codes** | 8690,  2330,  8330,  9190 |
| **People:** | Zell, Samuel |
| **Companies:** | Tribune Co(**Ticker:**TRB, **NAICS:** 322121, 511110, 511120, 511140, 515112, 515120, 517410, **Duns:**00-516-1542 ) |
| **Author(s):** | Sarah Ellison and Jennifer S. Forsyth |
| **Document types:** | News |
| **Publication title:** | Wall Street Journal. (Eastern edition). New York, N.Y.: Apr 3, 2007.  pg. A.1 |
| **Source type:** | Newspaper |
| **ISSN:** | 00999660 |
| **ProQuest document ID:** | 1248829941 |
| **Text Word Count** | 2187 |
| **Document URL:** | http://0-proquest.umi.com.www.consuls.org/pqdweb?did=1248829941&sid=3&Fmt=4&clientId=23650&RQT=309&VName=PQD |

Copyright © 2010 ProQuest LLC. All rights reserved.



# EXHIBIT V

Case 08-13141-BLS    Doc 3068-1    Filed 01/13/10    Page 61 of 81

 **REUTERS** UK

Print | Close this window

# S&P cuts Tribune's ratings deeper into junk

Tue Nov 11, 2008 10:16pm GMT

NEW YORK, Nov 11 (Reuters) - Standard & Poor's on Tuesday cut its ratings on Tribune Co TXA.N deeper into junk territory, citing concerns that financing difficulties could limit the proceeds the publisher makes from asset sales, as well as delay the receipt of any funds.

Tribune is selling assets to help pay down debt. People involved with the sale of the Chicago Cubs baseball team said last month that a sale may be delayed by the global financial crisis unless Tribune is willing to accept a lower price for the baseball team. For details, see [ID:nN10343568]

"We had previously expected proceeds of $1 billion or more by the end of 2008 to repay significant additional debt balances," S&P said in a statement. "We now believe that proceeds could be significantly below this amount and that the company will not likely receive them this year."

S&P cut Tribune's corporate credit ratings two notches to "CCC," eight steps below investment grade, from "B-minus." It also cut the company's senior and subordinated bonds two notches to "CC," 10 steps below investment grade and a deeply speculative level, from "CCC."

The outlook is negative, indicating additional downgrades may be likely over the coming one-to-two years.

Tribune is also suffering from a worsening operating environment, with its revenue declining 11 percent in the third quarter of 2008, S&P said.

"As a result, Tribune may not generate additional asset sale proceeds for debt repayment over the near term at levels sufficient to avoid a near-term covenant violation, given the rapidly weakening economy's significant negative impact on newspaper and broadcasting ad revenue," the rating agency said.

The company's long-term viability relies on its reducing its leverage, which in September stood at more than 11 times debt to earnings before interest, taxes, depreciation and amortization, or EBITDA.

"Leverage levels are high enough, and expected EBITDA declines large enough, that Tribune is unlikely to continue to service its current capital structure over the intermediate term, even with significant asset sales," S&P said. (Reporting by Karen Brettell; Editing by Dan Grebler)

© Thomson Reuters 2008. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

1/12/2010 8:00 PM

# EXHIBIT W

# The Washington Post

## Zell in Talks With Geffen On Deal for L.A. Times

By Frank Ahrens
Washington Post Staff Writer
Thursday, April 5, 2007

Advertisement » Your Ad Here



Chicago real estate mogul Samuel Zell, whose $13.2 billion bid for the Tribune Co. media empire was accepted Monday, has already talked to entertainment mogul David Geffen about a possible deal for the Los Angeles Times and dismissed a pair of rival bidders as backstabbers.

Zell said Eli Broad and Ronald Burkle, Southern California billionaires who also bid on Tribune, approached him late in the process about forming a partnership to buy the company. Zell said in yesterday's Chicago Tribune that he put.them off until his bid was accepted.

Broad and Burkle then complained in a letter to the Tribune board that Zell's bid got preferential treatment over their original offer.

"If somebody calls me and says 'I want to be a partner' and the next day tries to stick a knife in my back, tell me again why I would want to do business with him?" Zell told the Tribune. Representatives for Broad and Burkle declined to comment.

Meanwhile, a source familiar with Geffen's thinking who spoke on condition of anonymity because negotiations are ongoing said Geffen has spoken with Zell since Monday's announcement and is optimistic that he may gain control of the Times, either in a spinoff deal or a joint-venture partnership. Geffen's original $2 billion offer for the Times was turned down in November.

"Yes, I continue to want to buy the Los Angeles Times," Geffen said in an interview yesterday.

Broad and Burkle, whose 11th-hour push for Tribune fell short, are meeting with their advisers and remain interested in the company, said a source close to the situation who spoke on condition of anonymity because plans are still fluid.

A clause in Tribune's deal with Zell allows the company to solicit higher bids until shareholders vote on Zell's offer this summer. If Tribune ends up dumping Zell's bid, it will have to pay him a relatively small $25 million breakup fee, giving the company greater flexibility to go another direction.

With several variables still in play, the eventual shape, size and ownership of the company's many pieces remain uncertain. Tribune owns 26 radio and television stations, 16 newspapers and several other properties.

Financially, the most controversial part of Zell's bid is that it loads the company with an extraordinary amount of debt. He has offered $34 per share for the company, for a total of $8.2 billion, but only $315 million of that is his money. The remainder of the investment would be debt, and Zell would also have to take on $5 billion in existing Tribune debt, pushing the total debt to about $13 billion, or 10 times the company's anticipated 2007 cash flow. The most highly leveraged newspaper companies operate at about five times cash flow.

That puts Tribune in a "precarious financial position," Peter P. Appert, a <u>Goldman Sachs</u> analyst, wrote in a research note Tuesday.

Tribune has already said it will sell the Chicago Cubs baseball club to pay down debt, but analysts said the sale would raise $700 million at most, which could force Tribune to sell other assets or take partners in joint ventures.

Zell's deal would create an employee stock-ownership plan at Tribune. Tribune rejected Geffen's bid for the Times because the company did not want to sell off individual media properties, owing to the high taxes associated with a piecemeal sale.

An employee-owned company is afforded tax benefits that ordinary companies are not, which would enable Zell to sell individual properties, such as the Times and the Baltimore Sun, with fewer tax penalties, said Lisa Van Fleet, leader of the employee benefits practice group at Bryan Cave, a law firm specializing in labor law. At the same time, because an employee-owned company's first obligation is the protection of its employees' retirement accounts, potential buyers have more hoops to jump through when dealing with such companies, she said.

Geffen, who founded <u>DreamWorks</u> SKG studios with Steven Spielberg and Jeffrey Katzenberg, has said he thinks the Times should feature more local coverage, as well as improved national and foreign reports, and would like to see more robust and inclusive opinion pages.

Meanwhile, a group of Baltimore businessmen remains interested in buying the Sun, which is valued by analysts at about $500 million. "Our intention is to approach Mr. Zell at some point after he's digested all of this," said businessman and former politician Ted Venetoulis, who is leading the group. Venetoulis has spoken to Broad about spinning off the Sun should the Broad-Burkle bid ultimately prevail.

The mood in the Times newsroom after Monday's announcement is "understandably anxious," said editor James O'Shea, because it is not clear that months of newsroom turmoil -- including the ouster of a publisher and an editor -- are over.

"Obviously, there's the thought that we could be spun off or sold again," O'Shea said.

**View all comments** that have been posted about this article.

© 2007 The Washington Post Company

| Ads by Google |
| --- |

**Find Contractor Work**
Looking For Contractor Jobs? Start Receiving Leads Today!
www.1800Contractor.com

**Procurement Roundtables**
Sept. 2009 Leanlogistics Events Transportation Procurement Luncheon
www.Leanlogistics.com/RegisterToday

**Bidders**

Search 1000's of active commercial projects up for bid in your area
www.reedconstructiondata.com

# EXHIBIT X

 Send to Printer



Journalism.org
**The State of the News Media** 2007
An Annual Report on American Journalism

# Overview

## Economics

*By the Project for Excellence in Journalism*

If the audience trends are down, the financial picture for journalism is more nuanced. The industry has learned to manage decline, to a point. But it has also shown it can over-manage, cutting costs without innovating.

Heading into 2007, that tension, between managing decline and maneuvering through transition, will become even greater. The signs of more structural change are strong.

There is more evidence that advertisers are reluctant to spend money without a clearer sense of its effect. The technology for measuring audience is about to leap forward, including methods for showing whether TV viewers are skipping the ads. The hope that Internet advertising will someday match what print and television now bring in appears to be vanishing. Former enemies, newspapers and classified job Web sites are now creating partnerships in part to fend off the effects of free listings from Craigslist. The entire business model of journalism may be in flux in a few years.

For the moment, however, the current phase of transition for many sectors is proving difficult.

In 2006, newspaper revenues were flat and earnings fell — for the first time in memory in a non-recessionary year. The decline in earnings before taxes was sizeable, about 8% from 2005, and 2005 was not an especially good year either.

The fundamentals are all problematic: Employment classified is disappearing. Automotive is suffering too. And the gains in online ad revenue are no longer enough to make up for the combined declines in print ads and circulation.

The response by Wall Street was grumpy. The price of newspaper stocks fell about 11%, and that after 20% declines the year before.

The other major print sector, magazines, fared better, but it was still not a good year. After a bad 2005, the industry anticipated a recovery in 2006 that didn't materialize. The number of ad pages in magazines in 2006 was flat industry-wide, and news magazines fared about the same.

That has led several publications, particularly Time and to a lesser degree U.S. News and World Report, to announce that they want to be considered for the purposes of setting ad rates combined online and print publications.

The one sector in print that seemed to break the trend continued to be the ethnic press, especially Hispanic. For the latest year available, 2005, ad dollars spent in Hispanic publications grew 4.6%. The percentage ad revenue at

Hispanic newspapers from national advertisers doubled, according to the Latino Print Network.

Online, meanwhile, the advertising market appeared headed for yet another record-setting year, up more than a third again, past $16 billion, in 2006.

But now there are growing doubts about how much of that will accrue to news, and the projections are that the growth rate in online advertising will begin to slow next year and could drop to single digits before the decade ends. That adds to the sense of urgency that journalism must find a new economic model online or suffer serious erosion.

If the problems in print seem intractable, and the growth of online still not enough to clarify the future, television continued to manage the balance sheet more successfully.

In local TV news, projections for 2006 have advertising revenues increasing 10%. TV is still able to increase revenues by adding more news programming during the day, and indeed the number of hours of local news programming has reached record highs. But at some point local TV news will likely hit a ceiling when it comes to adding programs.

In network news, according to the latest full-year figures (2005), all three networks saw revenues grow for both morning and evening news, in some cases by double digits. The projections for 2006 also look positive.

And in cable, where fees come both from advertising and from 10-year contracts signed with cable carriers who pay licensing fees to the channels, business for the news channels is robust. Fox is projected to see profits grow by a third, overtaking CNN. CNN is expected to increase profits 13%, MSNBC is expected to see meaningful profits for the first time.

Radio, by contrast, was flat in 2006, with total ad revenue rising just 1%. More radio news directors, according to survey data, have also been reporting losses from their news operations in recent years.

But some of that may be deceiving. Revenues from new audio technology are growing rapidly; online radio advertising rose 77% in 2005 to $60 million. Those numbers are still small, but a good portion of such revenues (half in the case of online radio advertising) are going to traditional radio companies.

Send to Printer



Journalism.org
**The State of the News Media 2007**
An Annual Report on American Journalism

---

# Newspapers

## Economics

*By the Project for Excellence in Journalism and Rick Edmonds of The Poynter Institute*

Newspapers have a tough time making the case that their business is headed in the right direction. The year 2006 was terrible in many respects, and there seems little prospect that 2007 will be much better.

The best that the industry can hope for is that some easing of costs — both paper and people — will improve earnings and that they can demonstrate continued strong growth in the range of their online and niche offerings and in ad revenues in the new media.

Even that last seems in doubt. Online revenue growth came in just below 30% in 2006 after years of 30%-plus growth.[1] The rate is expected to fall to 22% in 2007, and for the first time newspaper sites are not maintaining share in total Internet advertising growth.

The grim 2006 picture contained these elements:

*Pre-tax earnings at print newspapers were off about 8.4% compared with 2005, and that was not an especially good year either.[2] At companies with television holdings, that was softened by the predictable windfall of Winter Olympic and election advertising.

*Ad revenues were flat , despite contributions from online and niche publications that continue to grow at an average rate of 20% to 30% rate. Optimistic industry sources are predicting a slightly more positive 2007 for advertising.[3] Most analysts, however, forecast that ad revenues will be down by 1 to 2%.

*After seeing their share prices drop an average of 20% in 2005, publicly traded newspaper companies lost another 14% of value in 2006.[4] One of the gainers for the year was Tribune — but that came on speculation that it would be sold at a premium early in 2007.

There will be some good news on costs in 2007, though it comes with a caveat. Newspapers have been downsizing everything from their staff counts to the dimensions of the paper to the breadth of their coverage and the range of their circulation area. All of that flirts with the danger of chasing away readers from an inferior product. Executives argue that they must live within their means, but some are also cutting way back on business-side staffing and circulation promotion, which will likely further depress circulation.

One unambiguous bit of good news is that newsprint prices, after three consecutive years of 10% increases, had softened by the end of 2006 and were expected to be flat or down in 2007. With smaller papers, a typical company can

save 7% on newsprint spending.[5]

Looking for more fundamental reasons for hope, we find two. A year ago we noted that the impending sale of Knight Ridder was a likely "lose-lose" proposition — dooming the 32 papers to more deep cuts under new ownership or the industry to a sort of no-confidence vote if no buyer materialized.

In fact, the McClatchy Co., with a strong record of commitment to editorial quality, came away with 20 of the papers. All 12 of the papers McClatchy chose not to keep, in turn, found buyers among private companies and investor groups. But the fact that only one public company came forward did signal some lack of interest in newspapers generally. And some of those local and private owners have indeed made deeper cuts at the papers they purchased (See Ownership and News Investment).

The drama over newspapers' appeal continued with turns at another company, Tribune, in 2006 and early 2007. With Tribune on the block, a trend may be emerging in which private investors see better possibilities for newspapers than Wall Street does.

Then there are indications that the industry is making progress toward a whole-hearted commitment to transformative online growth. Paul Ginocchio, one of our analyst sources, said after listening to company presentations during the December 2006 Media Week investors' meetings he could now see at least the potential outline of a successful turnaround.

But the biggest question remains whether the economic model of the Internet can change as the audience moves more heavily to that platform. Until it does, it seems reasonable to foresee the economics of the newspaper business — even with an ever-larger online component — as one of erosion and shrinking horizons.

**What Ails Advertising?**

In the golden era of the newspaper business financially, from the 1960s well into the 1990s, newspapers had three big things going for them. The first was a lock on the highly profitable classified advertising business. The second was page after page of department store advertising — John Wanamaker in Philadelphia, Woodies in Washington, D.C., Dayton's in Minneapolis, and dozens more. The third was the leverage to raise rates aggressively even as circulation was beginning to slide because of the numbers, the attractive demographics of newspapers' readership and their near-monopoly pricing power.

You will find vestiges of all three in newspapers circa 2006-2007. But all three of those pillars are now badly eroded.

Classifieds are subject to massive competition from electronic companies like Google, Yahoo, Monster and Craigslist, plus an assortment of sites for autos and real estate.

The traditional department store has been progressively weakened by the growth of Wal-Mart, a very light newspaper advertiser, and other discount retailers. Remaining department stores have been consolidating over the last quarter-century notably in the merger of Federated and May stores, carried out over 2005 and 2006.

Stronger competition and faster circulation losses eat at newspapers' ability to raise rates at will.

## Daily Newspaper Advertising Revenue
1984-2005



Design Your Own Chart

Source: Newspaper Association of America Business Analysis and Research Department

Here is a breakout of how those advertising troubles played out in 2006.

**Retail** The department store herd has been thinned dramatically. Some of the big-box stores — Best Buy and Home Depot — are at least reliable sources of insert income. In 2006, the Federated and May consolidation led to double-digit-percentage losses in local retail advertising in some markets.

Despite that, the overall picture for local retail advertising in newspapers is not so bad. The Newspaper Association of America found that spending on such advertising was up just under 1% from 2004 to 2005.[6] In the first three quarters of 2006, spending on retail looks flat.

**Classifieds** Classified advertising has a more complicated set of troubles. From competition from online listing entities to companies connecting directly to the consumer through their own sites, skipping the middle man altogether, to the free pricing of Craigslist, classified advertising has entered a new era.

The online giant Monster Inc. built a huge business in employment listings through the late 1990s and early 2000s while newspapers were sitting on their heels. The industry finally countered with its own national service — CareerBuilder — which now edges Monster in volume but not profits. At the end of 2006 Yahoo, with its Hot Jobs (No. 3 in online job classifieds) signed an agreement with 200 papers. Monster, too, has begun to make newspaper affiliations.

After massive declines in ad revenue from employment classifieds in the 2000-2002 recession, the sector bounced back some in 2004 and 2005. But employment classified again declined in the second and third quarters of 2006, down 6.5% and 10% year-to-year, respectively.[7] That leaves the marketplace unsettled headed into 2007, but this much is clear: the industry has lost its pre-eminent position.

Automotive classifieds had an especially bumpy 2006. One of Detroit's responses to the deep losses of the domestic manufacturers has been to eliminate some local dealerships and reduce the advertising budgets of those that remain. Direct online-to-consumer communications, where car buyers can sample everything from interior color schemes to

prices, have become a big factor in the business. (A current Toyota TV ad touts the Web site rather than the cars themselves.) New marketing dollars are sure to flow that way in years to come. Automotive classifieds have declined since 2004, and those declines accelerated through the first three quarters of 2006, hovering near 15%.[8]

Real estate classifieds were a bright spot in 2006, up about 20% year-to-year through the first three quarters, as a big inventory of properties stayed on the market for months at a time.[9] But as real estate heads from slowdown into downturn in 2007, the industry will be pressed to stay even in that category.

For those three big categories of classified advertising and the smaller "other" (general merchandise and services), the industry faces killer competition from the communitarian-minded Craigslist. From a modest local start in San Francisco in 1995, it has expanded to 450 cities worldwide and posts 14 million new classifieds a month.[10] Most listings are free. The service is now among the top 10 in monthly page visits and clearly has achieved the mass to do the job for a great many buyers and sellers.

**National advertising** was also weak in 2006, contributing particularly to the poor performance of large regional newspapers and of the New York Times, where the important movie advertising category has fallen considerably from its 2000 peak. Year-end spending in 2005 was down 18.5% from that 2000 high, representing a loss in revenue to newspapers of over $230 million.[11]

Another major source of national ad revenue is transportation advertising, which accounts for about 15% of the category (down from about 19% in 2000). As in the case of movie ads, newspaper revenue from transportation ads also fell, by 18.5%, from 2000 to 2005, representing a revenue loss to newspapers of over $265 million.[12]

There is a bright element in this dismal picture, however. Coupon spending, which currently accounts for approximately 17% of national advertising, has increased by just over 17% from 2000 to 2005.[13]

**Ad Rates** On pricing, the industry has a pair of problems. Online is competitive and priced accordingly. Google search produces results (and premium bid pricing for top placements) that the industry cannot currently match.

Even in the face of falling circulation, newspapers raised their stated rates in 2006 and have said they plan to do so again in 2007. But the higher rates may paint a misleading picture — some advertisers are simply choosing to take less space, something that is evidenced by the decline in total print ad revenue for 2006.

Discussions of newspaper economics are often thin on new trends in the advertising industry. At the moment, advertisers are moving their budgets not only online but also to non-traditional direct-to-the-consumer marketing. One example is Procter and Gamble, a bell-cow in consumer product marketing. It now has its own word-of-mouth agency, Tremor, with 800,000 registered panelists who agree to sample products and then talk them up to friends and acquaintances. The Web makes such "viral marketing" far more powerful.

In the face of all this, newspapers need to protect their share of flat traditional-media budgets, continue to grow online and invent some new lines of e-commerce — all three at once.

**Making the Best of It**

While advertising has not declined at the same pace as circulation, there are parallels to the two stories. Repeated reports hammering newspapers for circulation losses tend to overlook the 50 million-plus buyers and 120 million-plus print readers on an average day.

On the advertising front, all the challenges and losses may obscure something about the enduring financial muscle of newspapers: Taking into account the loss of some advertising and the simultaneous arrival of new business, newspapers annually are holding on to the vast majority of their advertising base.[14]

Loyalty and inertia play a role; local advertising practices don't turn on a dime. So does the perceived effectiveness of newspapers, especially when advertising a store's sale prices. The Newspaper Association attempted to highlight those elements with a campaign hailing newspaper advertising as "a destination not a distraction." The study, by MORI research, includes a barrage of survey statistics on how many readers consider advertising a welcome information resource. The "distraction" is a thinly veiled dig at television, where blocks of commercials are a repetitive irritant increasingly vulnerable to being zapped by TiVos and other DVRs. In short, newspaper ads, executives believe, still have distinct advantages, especially as the landscape of options becomes more cluttered.

Newspapers also continue to field the largest advertising sales force in most communities. We are told anecdotally that there has been a steady effort to upgrade sales people and particularly managers, recognizing that simple order-taking will not suffice. With the boom of online and niche publications, those sales people now have a portfolio of products to sell.

Newspaper pricing practices also help. Advertisers earn big discounts if they commit to a fixed-amount annual contract. That can help lock up budgets against other alternatives.

Costs

On the cost side, mark 2006 down as a transitional year. Throughout the industry (not just at public companies under Wall Street pressure) newspaper executives were judging that their cost structure was out of whack with revenues and future prospects.

Many reduced the page width, paper weight and space allocated to news. The Wall Street Journal shrunk to five columns, instead of its former six, and a 12-inch page width with its first 2007 edition, a 20% trim in the physical size of the page. The Journal expects to net $18 million annually in newsprint-related savings from the downsizing.[15] The New York Times will follow later in the year, the last of the big-circulation broadsheets to take a trim.

Another cut was of distant, so-called "vanity" circulation, basically to readers who live too far away to be of interest to advertisers. The Dallas Morning News for instance, eliminated all distribution beyond a 100-mile radius in 2006 and will cut back, with a few exceptions, to a 50-mile radius in 2007.

One negative in 2006 was the rising price of paper. Newsprint costs were up for the fourth consecutive year in 2006 to the tune of 7% to 8%.[16] But with the ad slump and the shrinking dimensions discussed above, demand was off dramatically by the fourth quarter. Prices are expected to flatten or even fall during 2007. Another positive factor, we were told by William Dean Singleton, CEO of MediaNews Group, is that imported Chinese newsprint, less expensive and high-quality, is now an option, especially for West Coast publishers.

The most conspicuous attempt to rein in costs was another round of staff reductions, both in the newsroom (discussed in the News Investment section of this chapter) and elsewhere in the operation. Many of those were in the form of buyouts of more experienced and better-paid staff members. There will be savings in 2007 and years to come, but in the short run, the reductions are an expense. At the Washington Post print edition, for instance, the pre-tax profit margin would have been about 10% had the paper not bought out employees.[17] With the plan, it fell to about 5%.

In previous editions of the Annual Report, we have not treated labor issues. But 2006 ushered in a trend of hardball negotiations that seemed likely to continue. Block Communications used non-union help in the production departments of the Toledo Blade and threatened to sell both that paper and the Pittsburgh Post-Gazette unless unions agreed to new contracts with deep concessions on benefits and work rules. The National Labor Relations Board ruled the lockout at the Blade illegal in December 2006, but in early 2007 the situation remained unresolved. Blade management said the paper lost $5 million in 2006.

Dean Singleton's MediaNews Group got the Newspaper Guild at the San Jose Mercury News to agree to discontinuation of a pension plan, a new employee contribution to health benefits and a two-tier wage scale with lower

pay for new employees. In exchange management agreed to a 2% wage increase and fewer layoffs than previously planned.[18]

In Philadelphia, the Guild made loud noises about striking but reluctantly voted in early December to accept a disappointing contract rather than further endanger the financially precarious position of the Inquirer and Daily News. At the Boston Globe, the Guild agreed to tie future raises to revenue increases at the paper and its online operation.

**Can Online Editions Rescue Newspapers?**

Since newspapers typically have the best-trafficked Web sites in their markets and the sites' ad revenues have grown at a 30% rate for five years now, it would be appealing to think that readership and advertising will simply transfer gradually to the Web.[19] Thus could the expensive news-gathering function and newspapers' public service mission be preserved, and without the cumbersome costs of printing and delivering the paper.

Unfortunately, after all that growth, online typically still contributes only 6% or 7% of ad revenues.[20] So while developing the new platform, papers can ill afford to take their eye off the ball of a print operation that constitutes 94% of the business.

As we noted last year, Rick Edmonds of the Poynter Institute, a co-author of this chapter on newspapers, in January 2005 ran a rough projection estimating that it would take online a dozen years to pass print as a revenue source, assuming continuation of the trends of 2003 and 2004. Built into that model, in other words, online would have to continue to grow by a third each year. Print revenue would grow modestly, by 3%.

Two years later, it probably makes sense to adjust downward the assumption that print will grow at 3% a year for a dozen more years.

But it also seems overly optimistic, absent some surge from new and unanticipated lines of business, to think that online can keep up that percentage growth.

Partly that is just the law of large numbers. As the base gets bigger, even substantial gains are not so large a percentage (a phenomenon that soured Yahoo's earnings reports in 2006).

More mature newspaper Web operations, particularly those of the national papers, are now growing annually in the 20% to low 30% range. Gannett executives told analysts in December that USA Today.com would end 2006 with 25% revenue growth and was estimated to grow 18% to 20% in 2007.[21]

Industry online growth fell just below 30% in 2006, and the Newspaper Association forecasts that it will grow just 22% in 2007.[22] That is still robust growth, but not a third a year. So it still seems reasonable to expect that the industry is a decade or more away from seeing online business contributing half of revenue What can newspapers do to maximize sustained online growth? The consensus strategy heading into 2007 is to get more people to visit and more often (especially with breaking-news updates) and to stay longer (especially with new multimedia and interactive features). More page views can equate to more advertising opportunities.

A second strategy is to redesign, reduce clutter and create better display space for advertising. The industry's current mix depends lopsidedly on classified (roughly 75%).[23] But some speculate that the mix could shift as national and regional advertisers gradually develop the capability for integrated campaigns that include more online display advertising, some of it now in video or even interactive video.

A shift of readership from print to online cuts several ways for newspapers. The commitment of time and attention is so much less that online readers do not command the premium rates print can charge. Paul Ginocchio, a Deutsche Bank analyst, estimates that a print reader is worth $350 a year to a newspaper, an online reader 10% to 15% of that.

Since only the Wall Street Journal and the New York Times charge for all or part of their daily content, newspapers are losing circulation revenue every day, month or year that a potential reader opts instead for the free Web version.

On the other hand, in theory, there should be a critical mass of Web audience that will allow newspaper companies to save at least on paper costs and perhaps on printing and delivery capacity.

So the potential profitability of news Web sites theoretically is high but also conjectural. One can envision a scenario in which lucrative Web operations carry costs for a newsroom that serves both the site and a slimmed-down and more targeted print edition. But it is just too early to predict that. Nor is there evidence that papers are using the savings from online production and distribution to reinvest in news staff.

Donald Graham, CEO of the Washington Post Company, has a reputation for plain-speaking on the topic. He noted in a December 2006 presentation to investors that the Post already gets 11% of revenue from online (nearly double the norm) and reaches a huge national and international audience who are not served by the print edition.[24] But even with those "strong cards to play," he concluded, "I simply have no way to tell you" what combined newspaper print and online revenues will be like in five or ten years. Extrapolating from the last several years doesn't work because trends could easily change, he said.

**Niche Publications, Acquisitions and Collaborations with Google and Yahoo**

Companies have several additional strategies to keep overall revenue growing as the print newspaper falters.

As discussed in earlier editions of this report, most have added a family of niche publications as a way to target audiences that the main paper is starting to miss. Some of the more ambitious go after a Spanish-language audience with separate daily editions where concentrations of immigrant Hispanic population are highest — cities like Miami or Dallas. Others target young adults, with free dailies in the big cities, weeklies elsewhere.

Another layer of niche products, many of them monthly and in magazine format, focus on health, home design, travel and fashion, often with an advertising-driven agenda of reaching the well-to-do. Gannett now has 1,000 such publications in its 90 newspaper markets, 100 in Phoenix alone and 40 in St. George, Utah, where print circulation is just 24,000.[25]

The companies now routinely lump those niche efforts together in reports to investors with online as a part of a growth story in counterpoint to the negative trends for the traditional paper. Our read is that niche publications remain significant but less of a novelty. They aren't expanding as quickly as a few years ago, hence a lesser part of the growth story. The St. Petersburg Times and the Virginian Pilot in Norfolk, Va., launched free youth dailies in 2006, but the pace of such launches is slowing. In several markets, Spanish-language launches have met strong competition from established family-owned publications or community-based start-ups.

A second approach has been to acquire online companies, often information-driven but not strictly news. Examples include E.W. Scripps's Shopzilla, a comparison-price shopping site, and the New York Times Company's About.com, which offers information on more than 500 topics, produced by freelance "guides."

The acquisitions bulk up and diversify online operations, adding further counterpoint to profitable, slow-growing print operations. Most of the acquisitions took place in 2005, and it is not clear whether the best properties had been picked over by 2006 or whether the companies were marshalling cash for other priorities. Gannett did add Planet Discover, a small company that provides technology for local search. Scripps acquired U-Switch, a British company that lets consumers switch utility providers online (legal there but not in the U.S.).

What was new at the end of 2006 was joint ventures with both Yahoo and Google — a sign that the industry had gotten past wringing their hands about the huge upstart competitors and started figuring out ways to make money together.

In the Yahoo deal, put together by Dean Singleton, 200 newspapers will partner with the online giant. Initially that will mean placing online classifieds through Yahoo's Hot Jobs (third in listings behind Craigslist and Monster). But the partners envision later sharing content and mounting an initiative to build local search advertising (essentially the equivalent of Yellow Page listings for specific goods or services). That would combine using Yahoo's technology and the newspapers' advertiser contacts within their markets to ramp up an emerging base of new business.

The venture is open on the same terms to any other newspapers that wish to join. Media General, owner of 25 newspapers (with a circulation of over 850,000), did so weeks after the initial announcement. The deal is being celebrated as "transformational" by several of the participants, and could be so if it opens a new front on local search, which Google dominates. The market analyst Gordon Borrell estimates that local paid search and e-mail advertising will be the hot growth areas online in the next four years, and that newspaper sites are in danger of losing share unless they strengthen their effort.

The Google deal is entirely different: a 90-day trial in which Google is placing ads from its base of search clients into 50 newspapers with digitized "bid" pricing. Initially it was for so-called "remaindered" space in which newspapers typically place house ads but it has been expanded to guaranteed placements. The buzz at the December investment meetings where major media companies talk to Wall Street analysts was that Google had met its three-month revenue projection in the first three weeks.

Each of those experiments is new enough that the results cannot be predicted (nor were the revenue splits disclosed). But they add one more piece of evidence that the industry is no longer committed in wishful fashion to doing all the traditional things the traditional way.

If all goes well, the deals might help increase ad revenues as well as pave the way for licensing content to Google and Yahoo, a far more realistic prospect for newspapers than charging local customers directly for content.

**Newspaper Next and the New Business Model**

If one thing seems inevitable, it is that the newspaper industry is moving toward a new business model, though no one seems certain what that will be. The turmoil of 2006 prompted many proposals (see sidebar).

The one attracting the most attention was a year-long, $2 million project of the American Press Institute entitled "Newspaper Next" and based on work by Clayton Christensen and others at the Harvard Business School.

In essence, the Harvard team concluded in a report released in September, all of the above — the print edition, existing online sites, niche publications and acquisitions — may not be enough.

Newspapers were urged instead:

*To be much more committed to a systematic approach to innovation, scoping out unmet "jobs to be done" for consumers and advertisers in their communities.

*To settle for projects that can be started quickly on a modest scale and be readjusted if the initial plan is flawed, as it likely will be.

*To consider a broad cooperative industry-wide effort to sell and place national online advertising.

One of six pilot projects, at the Dallas Morning News, involved setting up a Web site for mothers, with lots of informative listings on camps, after-school programs and the like. The appeal to a set of advertisers is obvious if the targeted audience is assembled. The idea is catching on fast. By the December investor meetings, Gannett and Journal Communications announced that they had similar sites up, running and off to a fast start at the Indianapolis Star and Milwaukee Journal-Sentinel, respectively.

Another pilot paper, The Oregonian, sought to tap into the "non-consuming" youth population of Portland and learned that its potential audience primarily demands local and entertainment information. The newspaper is developing a product to meet those needs.

The Boston Globe, like the Richmond Times-Dispatch, is focusing on marketing, using search engine marketing (SEM) programs for its Web site that guarantee advertisers with small budgets a certain number of clicks from high-potential customers.

Yet another of the pilot papers, the Desert Sun in Palm Springs, Calif., asked employees to take a close look at the pages of their own paper to identify what they read regularly. Executive Editor Steve Silberman found his reporters consumed little of their own product, and when he asked them to write in a way that they would be more inclined to read, the result was that stories shrunk in length.

Ultimately, the "Newspaper Next" project's strategy is to encourage newspapers to experiment outside of their core news product to compete with cheaper alternatives, or what Christenson refers to as "disruptive" products that are proliferating online and as niche publications. Such changes may seem radical to some or a sign of desperation in a beleaguered industry to others. But as one of the organizers remarked, the motivation for change shouldn't be fear, but enthusiasm. For now, it may be both.

**Profits, Stock Performance and the Dividend Question**

Newspaper stocks staged a "mini-rally" late in 2006, but it was another year of falling valuations. Having lost 20% on average in 2005, shares declined another 14% in 2006.[26]

There was substantial variation company by company. The biggest losers were Journal Register, which experienced some of the sharpest advertising revenue declines, and McClatchy, a former market favorite, which in Wall Street's view doubled down at the wrong time by purchasing Knight Ridder.

## Newspaper Company Stock Values
2004 vs. 2005

| Company | 12/31/2005 | 12/29/2006 | % change | 2-year peak | Decline from peak |
|---------|-----------|-----------|----------|-------------|-------------------|
| Gannett | $61/share | $61/share | 0% | 82 (2/05) | -26% |
| Tribune | 30 | 31 | 3% | 42 (2/05) | -26% |
| New York Times | 26 | 24 | -8% | 41 (1/05) | -41% |
| Dow Jones | 35 | 38 | 9% | 43 (1/05) | -12% |
| E.W. Scripps | 48 | 50 | 4% | 52 (4/05) | -4% |
| McClatchy | 59 | 43 | -27% | 75 (04/05) | -43% |
| Washington Post | 765 | 746 | -2.5% | 928 (2/05) | -20% |
| Lee | 37 | 31 | -16% | 46 (2/05) | -33% |
| Journal | 14 | 13 | -7% | 17 (4/05) | -24% |
| Journal Register | 15 | 7 | -53% | 19 (9/05) | -63% |
| Media General | 51 | 37 | -27% | 69 (7/05) | -46% |
| Belo | 21 | 18 | -14% | 25 (1/05) | -28% |

Source: Yahoo Finance, PEJ Research

Dow Jones, improving on several years of poor performance, saw a nearly 10% rise in the value of its shares.[27] Scripps, Washington Post and Gannett were all roughly even for 2006. Tribune stock was declining for the first part of the year but rallied on the announcement that it was being put up for sale.

Pre-tax earnings margins for the public company group fell to roughly 17%.[28] Individual papers, including the San Francisco Chronicle, Seattle Times and Boston Globe, now report losing money.

Various analysts suggest that newspaper companies could boost their appeal to shareholders by paying out a big dividend (a reasonable course for a business with strong cash flow but slow growth). The companies have resisted, saying they need to keep those earnings to cover the cost of new ventures, acquisitions, debt repayment, and the transition to online.

GateHouse Media Inc., a New England-based chain of weeklies and dailies, had a successful initial public offering in part by saying it planned to pay a 7.5% dividend, more than three times the industry norm.[29]

**Conclusion**

What are the chances of the industry's making a successful transition to a new business model? Newspapers are embracing transformation as a concept and a slogan. The Newspaper Next project even provides models of what new lines of business could look like.

Still, a pessimist might note the number of competitors that have emerged from nowhere so far this decade — Google and Craigslist siphoning off ad dollars; Wikipedia, My Space and YouTube capturing audience and attention. Isn't it reasonable to expect more of the same new ventures at regular intervals in coming years?

There is a case too, however, for a more positive long-term picture. Newspapers remain the pre-eminent source of news, recycled by aggregators and blog commentators. The aggregators, at least, are now signaling that they may prefer cooperation to a duel that continues to diminish newspapers' capacity.

# Footnotes

1. James Conaghan, Vice President, Business Analyst & Research of Newspaper Association of America, presentation at UBS Media Week Conference, December 4, 2006

2. Paul Ginocchio, " '07 Outlook More Positive Than Expected," Deutsche Bank Securities, December 1, 2007

3. James Conaghan, presentation at UBS Media Week Conference, December 4, 2006

4. Paul Ginocchio, Deutsche Bank Securities to co-author Edmonds, February 13, 2007; also Miles Groves, Morton-Groves Newspaper Newsletter, January 22, 2007

5. Lauren Rich Fine, "Headwinds Despite Newsprint Relief," Merrill Lynch, January 18, 2007

6. Newspaper Association of America, "Annual Newspaper Ad Expenditures" Year-end 2005 over 2004 total retail ad spending increased by .8%. The first three quarters of 2006 were as follows: 1st quarter showed (-1%) growth, 2Q (1%), and 3Q (-.3%)].

7. Newspaper Association of America, "Newspaper Classified Advertising Expenditures"

8. Ibid.

9. Ibid.

10. Craigslist Fact Sheet, http://www.craigslist.org/about/factsheet.html

11. Newspaper Association of America, "Quarterly Newspaper National Ad Expenditures"

12. Ibid.

13. Ibid.

14. Lauren Rich Fine, "Headwinds Despite Newsprint Relief," Merrill Lynch, January 18, 2007

15. Katharine Q. Seelye "In Tough Times, a Redesigned Journal," The New York Times, December 4, 2006

16. Lauren Rich Fine, "Headwinds Despite Newsprint Relief," Merrill Lynch, January 18, 2007

17. Donald Graham, UBS Media Week presentation, December 6, 2006

18. Pete Carey, "Mercury News Reaches Tentative Pact With Union," San Jose Mercury News, December 5, 2006

19. Rick Edmonds, "An Online Rescue for Newspapers," Poynter Online, January 27, 2005, and Rick Edmonds, "The New Bottom Line: 25 Percent Online Revenue by 2011," June 23, 2006

20. Ibid.

21. Craig Moon, UBS Media Week presentation, December 6, 2006

22. James Conaghan, presentation at UBS Media Week Conference, December 4, 2006

23. Gordon Borrell, UBS Media Week Presentation, December 4, 2006

24. Donald Graham, UBS Media Week Presentation, December 6, 2006

25. Lisa Snedeker, "In St. George, Utah, There's Lots to Read," Medialife, January 11, 2005

26. Paul Ginocchio, Deutsche Bank Securities, to co-author Edmonds, February 13, 2007; also Miles Groves, Morton-Groves Newspaper Newsletter, January 22, 2007

27. Yahoo Finance

28. Janet H. Cho, "Web Reshaping Newspapers, Analyst Says," Cleveland Plain Dealer, February 16, 2007

29. Steven Syke, "An Unlikely IPO," Boston Globe, October 24, 2006

# EXHIBIT Y

Intelligence ID: 846978

**17-Dec-08**
**19:47**
**Story:**

### Tribune's bank lenders may seek unsecured committee seats tomorrow

In an unusual twist, Tribune's bank lenders may seek a seat at the table at tomorrow's formation meeting for the official committee of unsecured creditors, said multiple sources familiar with the situation.

The formation meeting is scheduled for tomorrow at 10AM EST at the Hotel DuPont in Wilmington, Delaware. The sheer variety of creditors who could show up tomorrow ensures that a scrum of law firms and financial advisors will pitch for mandates from the committee, said those same sources

The lenders potential push for committee representation stems from the atypically loose security package backing their debt. Tribune's loans are secured by guarantees operating subsidiaries, not liens on hard assets such as inventory and/or property plant and equipments. Tribune had USD 8.249bn in bank debt outstanding at the time of its 8 December bankruptcy filing spread between its USD 7.5bn term loan B, USD 512m term loan X and USD 237m outstanding under a revolver. Structurally subordinate to the bank debt is a USD 1.6bn bridge loan facility followed by USD 1.26bn in pre-existing notes.

The term loan B has since dropped to 24-26 today from 32-34 at the time of its bankruptcy filing and 42-44 on 17 November. The term loan X trades today at 24-26, down from 42-48 on 5 December, according to Markit.

The debt is secured by a pledge of equity interests in Tribune Finance llc and Tribune Broadcasting Holdco llc and guaranteed, on a senior priority basis, by its guarantor subsidiaries. Since lenders have a security interest in stock of the operating subsidiary, they could be considered pari passu with trade claims at those subsidiaries, said one of the sources familiar with the situation.

There is precedent for loan holders seeking seats on unsecured creditor committees to pursue deficiency claims, said a fifth source familiar with the matter. Another option for lenders would be to form an ad hoc committee. As reported, the lender's agent JPMorgan engaged Davis Polk and FTI as advisors in anticipation of an amendment or waiver request for the 4Q08. There are rumors that JP Morgan might still try and form an ad hoc committee in the case.

The top holders of Tribune's term loan B and term loan X include JPMorgan, Deutsche Bank, Angelo Gordon, KKR Financial, Viking Global, Highland Capital Management, Davidson Kempner, Avenue Advisors, Goldman Sachs and Taconic. The top holders of the bridge include JPMorgan, Merrill Lynch, Citigroup, and Bank of America, according to court documents.

As reported, Tribune is using Lazard as a financial advisor and Sidley Austin as legal counsel.

by Jon Berke

**Source:**    Debtwire

### Dealscope potential activity analysis

| | |
|---|---|
| Issuer | Tribune Company |
| Financial advisor | Lazard |
| Lawyer | Sidley Austin LLP |
| Other Equity Provider | Sam Zell |
| Book-runner | JPMorgan |
| Other | Davis Polk & Wardwell |
| Other | FTI Consulting Inc |

### Tribune Company is in Lev. Loan/High Yield

| | |
|---|---|
| Balance Sheet & Docs | Tear Sheet |

### Tribune Company is in CH11-Restructuring

| | | |
|---|---|---|
| Balance Sheet & Docs | Restructuring Details | Tear Sheet |

Request Tear Sheet

*Debtwire only provides Tear Sheet on companies that have public financial statements*