## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TRIBUNE COMPANY *et al.,* | : | Case No. 08-13141 (KJC) |
| | : | Jointly Administered |
| Debtors. | : | |
| _____ | : | **Hearing Date: 2/18/10 @ 10:00 a.m.** |
| | | **Objections Due: 2/11/10 @ 4:00 p.m.** |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING AND AUTHORITY TO COMMENCE, PROSECUTE AND SETTLE CLAIMS AND COUNTERCLAIMS OF THE DEBTORS' ESTATES

The Official Committee of Unsecured Creditors (the "Committee") of the Tribune Company (the "Company") and its various debtor-subsidiaries (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this motion (the "Motion") for entry of an order pursuant to 11 U.S.C. §§ 105, 1103 and 1109, granting the Committee leave, standing and authority on behalf of the Debtors' estates to commence, prosecute and settle claims and counterclaims arising out of or in connection with the Debtors' 2007 LBO transaction. In support of this Motion, the Committee respectfully submits as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This Motion raises a core matter under 28 U.S.C. § 157(b)(2)(A). Venue of these cases and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief sought herein is found in 11 U.S.C. §§ 105, 1103 and 1109.

### PROCEDURAL BACKGROUND

2. On December 8, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      On December 18, 2008, the United States Trustee for the District of Delaware, pursuant to section 1102 of the Bankruptcy Code, appointed the Committee to represent the interests of all unsecured creditors in these chapter 11 cases.  The eight current members of the Committee are: (i) JP Morgan Chase, (ii) Warner Bros., (iii) Buena Vista Television, (iv) Deutsche Bank, (v) Pension Benefit Guaranty Corporation, (vi) Washington-Baltimore Newspaper Guild, (vii) William Niese, and (viii) Wilmington Trust.

4.      The Court set a bar date of June 12, 2009 (the "Bar Date"), for the filing of proofs of claim in these cases.  Prior to the Bar Date, JPMorgan Chase Bank, N.A. ("JPMCB"), as Administrative Agent for the Senior Credit Facility, filed proofs of claim against the Company and each of the other Debtors that guaranteed the Company's obligations on the Senior Credit Facility.  Merrill Lynch Capital Corporation ("MLCC"), as Administrative Agent for the Bridge Facility, filed a proof of claim against the Company only (collectively, the "Claims").

## FACTUAL BACKGROUND

5.      The Company is America's largest employee-owned media and entertainment company, operating businesses in interactive and broadcasting publishing, including daily newspapers and television stations.  The Company is the ultimate parent company of each of the Debtors and has a history that spans over century and a half, beginning with the company's origin in 1847.  In 1983, after 136 years of private ownership, the Company became a public company and subsequently grew rapidly through a series of acquisitions.

6.      In 2006, the Company's board of directors began to focus on a potential recapitalization or transaction with respect to the Debtors' businesses in response to urging from the Debtors' largest shareholders.  Despite a failed auction process and a declining publishing

2495038.5

business, the Company nevertheless approved a LBO transaction in which the Debtors became obligated on a massive amount of debt and paid billions of dollars to shareholders to take the Company private.[1]

7.      In order to finance the LBO, the Debtors became obligated on over $10 billion in debt (the "LBO Debt") under a Senior Credit Facility and a Bridge Facility (the "Facilities"). The LBO Debt was not secured other than through stock pledges, but was made structurally superior to the Company's preexisting debt – consisting of almost $1.3 billion of publicly held non-subordinated debt as well as trade and contractually subordinated debt – by obtaining guarantees of the LBO Debt from many of the Company's subsidiaries.

8.      As the Court knows, the Committee began a comprehensive investigation of the LBO transaction in March 2009.  Over the course of its investigation, the Committee reviewed publicly available information and, on a consensual basis under Rule 2004, the Committee has requested, received and reviewed information from the Debtors and many other parties who were involved in the LBO transaction and its financing.[2]

9.      The Committee retained undersigned special counsel in August 2009 to examine potential claims with respect to the LBO Debt.  Special counsel has continued the Committee's investigation and taken several oral examinations on consent pursuant to Rule 2004.  The

---

[1]      The history and structure of the LBO transaction is set forth more fully in the draft Complaint and Objection to Claims, attached as Exhibit A (filed under seal), the allegations of which are incorporated herein by reference and will not be repeated here.

[2]      JPMorgan Chase has not participated in the Committee's investigation or deliberations concerning the LBO transaction.

2495038.5

Committee's professionals have reviewed massive amounts of information, and that review continues.

10.    At this point, the Committee has decided to seek authority to assert objections to the Claims and to pursue other relief in connection with the LBO and the Facilities.    The Committee believes there is substantial evidence that (i) the LBO Debt was fraudulently incurred and should be avoided, (ii) the Claims should be equitably subordinated and disallowed and (iii) related transfers should be avoided and recovered, including:  (a) fees paid relating to the LBO and the Facilities, (b) principal and interest repaid on the LBO Debt prior to the Petition Date, and (c) payment at closing to satisfy preexisting debt.  Moreover, the Lead Banks (as defined below) are liable to the Debtors for damages relating to breaches of fiduciary duty in connection with the LBO Debt.   The above-referenced objections and causes of action are referred to collectively as the "Derivative Causes of Action."[3]

## RELIEF REQUESTED

11.    By this Motion, pursuant to §§ 105, 1103 and 1109 of the Bankruptcy Code, the Committee requests that the Court enter an order authorizing the Committee to commence, prosecute and settle the Derivative Causes of Action.

## BASIS FOR RELIEF

The Bankruptcy Code authorizes the trustee or the debtor-in-possession to pursue avoidance actions on behalf of the estate and obligates such estate representatives to maximize their value for the benefit of creditors.  *Commodity Futures Trading Comm'n v. Weintraub,* 471

---

[3]    The Committee does not need derivative standing to assert objections to the Claims. *See* 11 U.S.C. § 502(a).  Nevertheless, for judicial economy, it makes more sense to grant derivative standing to the Committee so that the Derivative Causes of Action can be addressed by the Court in one proceeding.

2495038.5

U.S. 343, 352 (1985) ("The trustee is accountable for all property received, and has the duty to maximize the value of the estate.") (internal citations and quotations omitted).

Nevertheless, "[fraudulent conveyances] present a particularly vexing problem in reorganizations conducted under Chapter 11." *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (en banc).  In chapter 11, a debtor's management often operates under the influence of conflicts of interest and may have little appetite to seek to avoid a transfer or obligation that management itself made or incurred. *Id.*  Management may want to protect its reputation or its own individual economic interest, or may not want to disturb the debtor's ongoing and future relationships.  *Id.*  When management is lax about or ignores fraudulent conveyances, it is the unsecured creditors who suffer the loss as the parties that avoidance actions are designed to protect.  *Id.*

To address this problem in chapter 11 cases, the Third Circuit recognizes that derivative standing to a creditors committee "provides a critical safeguard to prevent against lax pursuit of avoidance actions."  *Id.*; *see In re Valley Media, Inc.*, Case No. 01-11353 (PJW), 2003 WL 21956410, at *2 (Bankr. D. Del. Aug. 14, 2003).[4]

The prerequisites for granting derivative standing are:  (i) whether a colorable claim exists that would affect distributions to unsecured creditors; (ii) whether the debtor has unjustifiably refused to bring the claim itself, or circumstances excuse the committee from making demand; and (iii) whether the committee has sought permission from the bankruptcy

---

[4]    Other Circuits have also recognized that "creditors' committees have an implied, but qualified, right ... to initiate adversary proceedings in the name of the debtor in possession under 11 U.S.C. §§ 1103(c)(5) and 1109(b)."  *In re STN Enters.*, 779 F.2d 901, 904 (2d Cir. 1985); *see Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000); *In re Gibson Group, Inc.*, 66 F.3d 1436, 1438 (6th Cir. 1995); *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988).

2495038.5

court to initiate the action. *See In re Yes! Entm't Corp.*, 316 B.R. 141, 145 (D. Del. 2004); *Valley Media*, 2003 WL 21956410, at *2.

A.      **The Derivative Causes of Action Are Plainly Colorable.**

To establish that the claims to be asserted are colorable, the Committee must demonstrate that pursuit of such claims is reasonably expected to produce an actual benefit for the estate. *See, e.g., Yes! Entm't*, 316 B.R. at 145 (allowing committee to pursue claims after finding that they might "yield substantial recovery to the estate"). Thus, there are two aspects of the colorability analysis: First, the Court considers the colorability of the proposed claims on the merits. Second, the Court undertakes a cost-benefit analysis in deciding whether the litigation should proceed. As discussed below, the Committee easily satisfies both aspects of colorability.

1.      **The Derivative Causes of Action Are Substantial.**

The requirement to establish that "colorable" claims exist "is a relatively easy one to make." *See, e.g., In re Adelphia Communications Corp.*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005; *see also In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985) (requiring merely a claim that on appropriate proof would support a recovery).

Recently, in this District, Judge Shannon expounded on the colorability standard in granting a creditors committee's motion for derivative standing in *In re Fedders North America, Inc.*, Case No. 07-11176 (BLS) (Bankr. D. Del. Mar. 28, 2008). The court eschewed a line-by-line or claim-by-claim analysis of the proposed complaint under a Rule 12(b)(6) legal standard:

> I cannot believe that that is the appropriate analysis. Rather, I think when we consider colorability, [the] threshold consideration the Court has is that this is at a stage prior to the commencement of litigation …. So the allegations, the sufficiency of the allegations simply cannot be to a Rule 12(b)(6) standard, because we haven't even filed the complaint yet.

*Id.*, Tr. at 97 (relevant pages annexed as Ex. B hereto). Rather, in determining colorability, the court looked to the import of what had been alleged. *Id.* at 98.

6

The Debtors were insolvent at the time of the LBO closings so that the obligations incurred under the Facilities, as well as payments of fees and repayments of principal and interest, should be avoided under constructive fraudulent transfer and other theories. Moreover, JPMCB, MLCC and others (the "Lead Banks") obtained the elevation in priority of the Company's existing debt to them (the "2006 Bank Debt") – which had not been guaranteed by the Company's subsidiaries – by obtaining guarantees from many of the Company's subsidiaries on over $10 billion of LBO Debt. The guarantees gave the LBO Debt a structural priority over the Company's public and other debt and circumvented the negative covenants in the Company's indentures that required the Company to accord the public debt equal payment priority with all other non-subordinated debt of the Company. The Lead Banks, which in conflicting roles had arranged the 2006 Bank Debt, then advised the Company with respect to the LBO transaction and arranged the Facilities, improving their position impermissibly to the detriment of the Debtors and the general creditors. The Derivative Causes of Action seek to address and remedy this misconduct.

The Derivative Causes of Action are legally and factually substantial and easily satisfy the low colorability threshold. If successful, recoveries on the Derivative Causes of Action will significantly augment the estates. Even if a Rule 12(b)(6) analysis were appropriate – and it is not as Judge Shannon concludes persuasively – the Derivative Causes of Action are not susceptible to legal defenses that could be addressed by the Court on a motion to dismiss. Demonstrating insolvency, for instance, requires the determination of complex facts and the use of expert testimony at trial. For these reasons, the Court should conclude that the Derivative Causes of Action are colorable.

2495038.5

## 2.    A Cost-Benefit Analysis Supports Derivative Standing.

The Court should "weigh the 'probability of success and financial recovery, as well as the anticipated costs of litigation, as part of a cost/benefit analysis" to determine whether the prosecution of claims is likely to benefit the estate. *In re Matter of iPCS, Inc.,* 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003) (citations omitted); *see also Adelphia,* 330 B.R. at 386 (considering whether the "prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost"); *In re National Forge Co.,* 326 B.R. 532, 548 (W.D. Pa. 1985) (performing a cost-benefit analysis to determine whether the estate would likely benefit if the claims were pursued); *Fedders,* Tr. at 98-99 (same).

The Committee's prosecution of the Derivative Causes of Action may have a profound effect on the Debtors' estates by substantially increasing their size and reordering the existing priorities among creditors.  Aside from the proposed objections to the Claims, which exceed $10 billion and constitute a substantial majority of the total claims asserted in these cases, the Derivative Causes of Action seek to avoid and recover very large transfers made by the Debtors in connection with the LBO, including (a) almost $2 billion in principal and interest repaid on the LBO Debt, (b) over $200 million in fees paid to the Lead Banks, (c) over $30 million paid to the Debtors' financial advisors, and (d) over $2.5 billion paid to the administrative agent for the 2006 Bank Debt that was satisfied in connection with the LBO.  These potential monetary recoveries do not even include any recoveries on damages claims.

Moreover, the Committee does not require derivative standing to assert objections to the Claims.  If the Committee were to receive derivative standing to assert all the Derivative Causes of Action, the combined proceeding would promote judicial economy and make eminent sense under a cost-benefit analysis.

2495038.5

Finally, any projected costs of the proposed litigation are dwarfed by the potential recoveries to be obtained through the Derivative Causes of Action. As Judge Gerber noted in a case also involving potentially huge dollar recoveries, the cost-benefit analysis "is, to be blunt about it, an easy one." *Adelphia*, 330 B.R. at 384 (noting that the potential recoveries would be enormous and that the cost of prosecution would be relatively modest, as compared to the amount at stake). The decision should be no more difficult here.

**B.    Demand Is Excused Under the Circumstances.**

In considering whether the Debtors have unjustifiably refused to bring the claims on behalf of the estate, the Court may excuse the Committee from making formal demand on the Debtors when it is apparent that such demand would be futile. *See, e.g., National Forge*, 326 B.R. at 544-45 (affirming finding that formal demand request would have been futile); *In re G-I Holdings, Inc.*, 313 B.R. 612, 630 (Bankr. D.N.J. 2004) ("It cannot be said that a formal request, in order to obtain a formal refusal, a request which would surely be refused, should be required."); *In re First Capital Holdings Corp.*, 146 B.R. 7, 13 (Bankr. C.D. Cal. 1992) ("The Court concludes that the creditors' committee is excused from making a demand on a debtor to pursue action against its officers, directors or controlling shareholders where such a demand would be futile.").

When the cost-benefit analysis supports the grant of derivative standing, this creates a rebuttable presumption on the demand question:

> If the bankruptcy court finds that the claim will likely benefit the estate based on a cost-benefit analysis, then the creditor has raised a rebuttable presumption that the debtor-in-possession's failure to bring that claim is unjustified.

*In re Gibson Group, Inc.*, 66 F.3d 1436, 1442 (6th Cir. 1995). Thus, the Court should presume that demand is satisfied in this case.

9

2495038.5

The Committee has not formally demanded that the Debtors themselves prosecute the Derivative Causes of Action because such a demand would be futile given at least three inherent conflicts of interest facing the Debtors.  First, the Debtors themselves approved the LBO and will not want to pursue an action that attacks the LBO Debt.  Second, the Debtors have no interest in litigating against the interests of future owners of the Debtors; after all, after plan confirmation and resolution or adjudication of the Derivative Causes of Action, the holders of the LBO Debt will own a substantial part of and most likely a majority of the Debtors' new equity.  Third, neither the Debtors' general bankruptcy counsel or conflicts counsel in these chapter 11 cases are able to litigate the Derivative Causes of Action.

Nothing that has thus far transpired during these chapter 11 cases, moreover, suggests that the Debtors would undertake to prosecute these claims were a demand to be made.  It has been more than a year since the Petition Date, and the Debtors have neither asserted the Derivative Causes of Action nor taken any steps to do so.  Instead, the Debtors have deferred to the Committee.  Recently, the Debtors have taken a more active role, but this role is self-described as acting as a "honest broker" rather than an adversarial litigant.  Given the very large potential recoveries that could augment the estates as a result of successful prosecution of the Derivative Causes of Action and the Debtors' unwillingness to prosecute claims in order to obtain such recoveries, the Court can easily infer that the Debtors' conduct since the Petition Date demonstrates their unwillingness to take adversary action in this matter.

Likewise, policy considerations support excusing the Committee from making a formal demand on the Debtors.  "The policy concerns underlying the general requirement of a formal demand are to ensure that the debtor is (i) informed of the committee's intent to assert the subject claims and (ii) afforded an opportunity to explain its reasons, if any, for declining to pursue the

claims itself." *National Forge*, 326 B.R. at 544.  In this case, the Debtors are well aware that the Committee has undertaken a thorough investigation of the LBO transaction and yet never sought to stop the Committee's efforts or otherwise to assume responsibility for the investigation.

The Committee should be excused from the requirement to demand formally that the Debtors take action when the record is plain that "a formal request upon the Debtor to file an avoidance action would have been futile."  *See id.* at 545 (affirming the bankruptcy court's excusal of the committee's failure to petition the debtor on the ground that any request to file suit would have been futile).

C.    **The Committee Is Seeking Prior Court Approval.**

Lastly, the Committee is seeking permission from this Court for derivative standing. Given that the Derivative Causes of Action are colorable, their prosecution makes sense under a cost-benefit analysis and the demand requirement is excusable, the Court should grant derivative standing to the Committee to commence and prosecute the Derivative Causes of Action.

<u>**RESERVATION OF RIGHTS**</u>

The Committee reserves its rights to seek derivative standing to commence and prosecute any other claims and/or causes of action on behalf of the Debtors' estates.

**WHEREFORE**, the Committee respectfully requests that the Court enter an order granting leave, standing and authority to the Committee to commence, prosecute and settle the Derivative Causes of Action and granting to the Committee such other and further relief as is just.

Dated: Wilmington, Delaware
       February 1, 2010

ZUCKERMAN SPAEDER LLP

_____
Thomas G. Macauley (ID No. 3411)
919 Market Street, Suite 990
Wilmington, DE 19801
Telephone:  (302) 427-0400
Facsimile:  (302) 427-8242

- and -

Graeme W. Bush, Esquire
Andrew N. Goldfarb, Esquire
1800 M Street, N.W., Suite 1000
Washington, DC  20036
Telephone:  (202) 778-1800
Facsimile:  (202) 822-8106

Special Counsel to the Official Committee
of Unsecured Creditors

2495038.5