# EXHIBIT A

## SECOND AMENDMENT TO THE
## 2008 AUDIT ENGAGEMENT LETTER DATED MAY 1, 2008



PricewaterhouseCoopers LLP
One North Wacker
Chicago IL 60606
Telephone (312) 298 2000
Facsimile (312) 298 2001

**Amendment #2 to Existing Engagement Letters Dated May 1, 2008**

November 30, 2009

Mr. William A. Osborn
Director, Audit Committee Chair of Tribune Company
435 North Michigan Avenue
Chicago, IL 60611

Dear Mr. Osborn:

This letter reflects our agreement to amend our engagement letters of May 1, 2008, with Tribune Company, Tribune Broadcasting Holdco, LLC; and Tribune Finance, LLC (the "Companies") in the following respects.

Tribune Company
We incurred additional time due to incremental audit procedures performed associated with the fourth quarter impairment assessment, additional procedures for income taxes related to the Newsday disposition and PHONES transaction, subsequent events and fieldwork delays resulting from the bankruptcy filing and the extended financial reporting process.

As a result of these items, we estimate that an additional $375,000 in fees will be incurred in the aggregate. All other provisions of our engagement letters dated May 1, 2008 as amended by Amendment #1 with the Companies remain unchanged.

If you have any questions, please call William T. England at (312) 298-2808. Please have one copy of this letter signed in the space provided below acknowledging your agreement and return it to us.

Very truly yours,

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP

The services and terms as set forth in this letter are agreed to.

Tribune Company by and through its Audit Committee

By: _____
William A. Osborn
Audit Committee Chair

(Date) 11/30/09

## EXHIBIT B

## EMPLOYEE BENEFIT PLAN
## ENGAGEMENT LETTER



PricewaterhouseCoopers LLP
One North Wacker
Chicago, IL 60606
Telephone (312) 298 2000

May 28, 2009

Mr. Jack Rodden
Vice President and Treasurer
Tribune Company
435 North Michigan Avenue
Chicago, IL 60611

Re: **Tribune Company Employee Benefit Plan Filings**

Dear Mr. Rodden:

We appreciate the opportunity to provide services to Tribune Company and subsidiaries ("Tribune Company" or "you") related to the employee benefit plans of Tribune Company.

This letter confirms that we will provide certain services in connection with the annual employee benefit plan filing requirements for Tribune Company. This engagement letter sets forth an understanding of the nature and scope of the services to be performed and the fees we will charge for the services, and outline the responsibilities of PricewaterhouseCoopers LLP, a Delaware limited liability partnership ("PwC" "we" or "us") and Tribune Company necessary to ensure that PwC's professional services are performed to achieve mutually agreed upon objectives.

**Summary of Services**

Our services will include the preparation of the 2008 Forms 5500 (Annual Return/Report of Employee Benefit Plan), other required government filings, and certain other consultations for the Tribune Company employee benefit plans and trusts ("Services"). The attached chart lists the plans and filings that we understand to be covered by our Services, as of the date of this letter.

Our Services will include:

- Overall coordination assistance related to the completion of the filings;

- Preparation of a data request for all required filings, and monitoring of the progress of the data accumulation;

- On-site review of the accumulated data, including discussions and resolution of certain issues regarding the data;

- Preparation of all required requests for extension of time to file the returns;

- Preparation of the Forms 5500 and other filings for the plans;

- Coordination of the necessary steps with the PricewaterhouseCoopers audit team;



May 28, 2009
Mr. Jack Rodden
Page 2

- Certain coordination and review related to filings prepared by other service providers or Tribune Company entities;

- Preparation of a Summary Annual Report for distribution to participants and beneficiaries for each plan (where applicable);

- Review and discussion of technical and other issues that arise during our project; and

In preparing the Forms 5500, PricewaterhouseCoopers will be relying upon data, representations and other information provided by Tribune Company, the plan administrator, recordkeeper and/or other plan agents and vendors. The Form 5500 requires signature, under penalty of perjury, by the plan administrator, affirming that the return/report and accompanying schedules, statements and attachments are true, correct and complete to the best of his or her knowledge and belief. The plan administrator is responsible for understanding and agreeing with the various amounts, computations and statements presented in the Form 5500 before filing with the regulatory authorities.

If the scope of the engagement changes, or you request additional services that are not within the scope of this agreement, we will notify you that those services are out-of-scope and additional fees will be incurred at our hourly rates. If we anticipate that the additional fees will exceed $5,000, we will also provide you with a fee estimate and request your approval before proceeding. Finally, if the scope of the work is unrelated to this engagement, or there is a significant departure from the existing engagement, we will provide you with a scope of services description which will incorporate the terms of this agreement for your approval and signature.

**Ownership and Use**

We are providing these Services solely for your use and benefit and pursuant to a client relationship exclusively with you. We disclaim any contractual or other responsibility to others based upon these Services or upon any deliverables or advice we provide.

You will own all tangible written material delivered to you under this engagement letter, except as follows: PwC will own its working papers and preexisting materials and any general skills, know-how, processes, or other intellectual property (including a non-client specific version of any deliverables) which may have been discovered or created by PwC as a result of its provision of the Services. You will have a nonexclusive, non-transferable license to use such materials included in the deliverables for your own use as part of such deliverables.

**Our Responsibilities**

We will perform the Services in accordance with, as applicable, the Statements on Standards for Consulting Services, or the Statements on Standards for Tax Services established by the American Institute of Certified Public Accountants. Accordingly, we will not provide an audit or attest opinion or other form of assurance, and we will not verify or audit any information provided to us. Any spreadsheets or software tools that PwC provides to Client are for Client's convenience and are provided as is. PwC will not be responsible for results obtained by anyone other than PwC from the use of those items.

**Your Responsibilities**

You have agreed to provide us with any assistance necessary to perform the services discussed above. As in past years, Tribune Company and its service providers will need to provide the requested data in a timely manner to facilitate our work.



May 28, 2009
Mr. Jack Rodden
Page 3

You are responsible for all management functions and decisions relating to this engagement, including evaluating and accepting the adequacy of the scope of the Services in addressing your needs. You are also responsible for the results achieved from using any Services or deliverables, and it is your responsibility to establish and maintain internal controls. You will designate a competent member of your management to oversee the Services.

**Fees and Expenses**

Our fees are based on the time required by our professionals to complete the engagement. Individual hourly rates vary according to the experience and skill required. We estimate our fees for this engagement will be between $130,000 and $140,000.

In past years, most of the fees have been paid by the plan trusts. Based upon our prior experience, we would expect that $10,000 to $15,000 of the total fees listed above will be paid by the Company. We will ensure that the fees expected to be paid by the Company are submitted for the appropriate approvals related to the bankruptcy (including any updates to the amounts to be paid by the Company).

We also will bill Tribune Company for our reasonable out-of-pocket expenses and our internal per ticket charges for booking travel. Our internal per ticket travel charge is an allocation of estimated costs of running our travel department in a manner to maximize cost savings.

The amount of our fee is based on the assumption that we will receive the information and assistance as detailed throughout this agreement. In the event we believe an additional fee is required as the result of the failure of Tribune Company to meet any of these requests or for any other reason, we will inform you promptly.

**Payment Schedule**

We will progress bill our fees during the term of this engagement. Payment of our invoices is due on presentation and expected to be received within 60 days of the invoice date. We reserve the right to charge interest on any past due balances at a rate of 1% per month or part thereof.

**Termination and Dispute Resolution**

Either party may terminate the Services by giving notice to that effect. Any dispute relating in any way to the Services or this letter shall be resolved by arbitration, except that either party shall be free to seek equitable relief in court. The arbitration will be conducted in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution then in effect. The arbitration will be conducted before a panel of three arbitrators. The arbitration panel shall have no power to award non-monetary or equitable relief of any sort. It shall also have no power to award damages inconsistent with the Limitations on Liability provisions below. You accept and acknowledge that any demand for arbitration arising from or in connection with the Services must be issued within one year from the date you became aware or should reasonably have become aware of the facts that give rise to our alleged liability and in any event no later than two years after any such cause of action accrued.

This engagement letter and any dispute relating to the Services will be governed by and construed, interpreted and enforced in accordance with the laws of the State of New York, without giving effect to any provisions relating to conflict of laws that would require the laws of another jurisdiction to apply.



**Limitations on Liability**

Except to the extent finally determined to have resulted from our gross negligence or intentional misconduct, our liability to pay damages for any losses incurred by you as a result of breach of contract, negligence or other tort committed by us, regardless of the theory of liability asserted, is limited to no more than the total amount of annual fees paid to us for the particular service provided under this engagement letter. In addition, we will not be liable in any event for lost profits or any consequential, indirect, punitive, exemplary or special damages. Also, we shall have no liability to you arising from or relating to any third party hardware, software, information or materials selected or supplied by you.

**Indemnification**

You agree to indemnify and hold us and our partners, principals and employees harmless from and against any and all third party claims resulting from any of the Services or Deliverables under this Agreement, except to the extent determined to have resulted from our gross negligence or other intentional misconduct relating to such Services and/or Deliverables.

**Regulatory Matters**

Notwithstanding anything to the contrary in this Agreement, you have no obligation of confidentiality with respect to any materials, advice or portions of Deliverables to the extent they concern the tax structure or tax treatment of any transaction.

**Other Written Advice.** It is anticipated that the written advice PricewaterhouseCoopers provides during the course of this engagement will be Other Written Advice as defined by Circular 230. Accordingly, unless otherwise prohibited or we agree to issue a Covered Opinion as defined by Circular 230, our written advice may include a disclosure stating that the advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties that may be imposed. Our advice will contain any other disclosures required by Circular 230.

**Tax Return Disclosure and Tax Advisor Listing Requirements.** Treasury Regulations Section 1.6011-4 requires that taxpayers disclose to the IRS their participation in certain reportable transactions. Additionally, certain states have adopted rules with purposes similar to Treasury Regulations under Internal Revenue Code Section 6011. You agree to advise us if you determine that any matter covered by this Agreement is a reportable transaction that is required to be disclosed under Section 1.6011-4, or is a transaction requiring disclosure to a particular state under such state's particular statutes or regulations.

Similar rules under Internal Revenue Code Sections 6111 and 6112 require that we submit information returns and maintain lists of certain client engagements if we are material advisors to clients that have participated in a reportable transaction. Additionally, certain states have adopted rules similar in scope to Internal Revenue Code Sections 6111 and 6112, thereby creating similar registration and list maintenance requirements in those states. Therefore, if we determine, after consultation with you, that you have participated in a transaction causing us to have a registration and/or list maintenance obligation, we will place your name and other required information on a list. We will contact you if we are required to provide your name to the IRS or any state in connection with any matter under this Agreement.

**PCAOB Rule 3522.** Tribune Company represents to us, and by signing this Agreement, confirms that no other advisor providing advice or assistance with respect to the subject matter of this Agreement has imposed any conditions of confidentiality, as defined by Public Company Accounting Oversight



Board ("PCAOB") Rule 3522. In addition, you agree that if, after we begin providing services covered by this Agreement any other advisor imposes conditions of confidentiality with respect to the matter that is subject to this Agreement, you will notify us immediately so that we can cease all work in order to avoid any impairment to independence under PCAOB Rule 3522.

**Internal Revenue Code Section 6694 Preparer Standards.**

In order for PricewaterhouseCoopers to review or provide advice with respect to a federal tax return or claim for refund due after December 31, 2007 (including extensions) without disclosure, positions of which we are aware must have a more likely than not likelihood of prevailing on the merits. If a position does not meet the "more likely than not" standard, but has a reasonable basis, we will advise you about required disclosures and your penalty exposure, if any. If it is concluded that disclosure is required, we will advise you about the form of disclosure necessary.

With respect to positions that do not clearly meet the more likely than not standard, our work will include discussions with you regarding the particular position and may require consultation with a PricewaterhouseCoopers subject matter specialist to reach and document the level of technical support for the position. We will discuss with you any additional fees that may be incurred as a result of complying with these requirements.

Several states also have standards regarding positions taken on returns and claims for refund. For instance, California has a standard similar to the federal standard that applies to certain California tax returns. We will discuss these issues with you as appropriate.

**Other Matters**

By entering into this engagement letter, you are binding to its terms your subsidiaries and affiliates to the extent you have the authority to do so; we disclaim any contractual or other responsibility to any other subsidiaries and affiliates. You agree we may use your name in experience citations and recruiting materials. This engagement letter supersedes any prior understandings, proposals or agreements with respect to the Services, and any changes must be agreed to in writing.

*   *   *   *   *

If you have any questions or comments regarding the terms of this engagement letter, please contact Chris King at (312) 298-2231.

Yours very truly,

PricewaterhouseCoopers LLP

By: _____
Paul C. Perry, Partner

Enclosure:    Chart of Tribune Company Plans and Filings

cc:  Dan Drobac, PricewaterhouseCoopers



May 28, 2009
Mr. Jack Rodden
Page 6

If the Services and terms outlined in this letter are acceptable, please sign one copy of this letter in the space provided and return it to:

        Christopher J. King
        PricewaterhouseCoopers LLP
        One North Wacker Drive
        Chicago, IL 60606.

**ACKNOWLEDGED AND AGREED:**

**Tribune Company**

**Signature of client official:** _____

**Please print name:** _____

**Title:** _____

**Date:** _____

# TRIBUNE COMPANY
## 2008 FORMS 5500 AND RELATED FILINGS
As of 5/28/2009

| Plan Name | EIN | PN | 2008 Filing |
|---|---|---|---|
| Tribune Company Hourly Pension Plan | 36-1880355 | 002 | 5500 |
| Tribune Company 401(k) Savings Plan | 36-1880355 | 003 | 5500 |
| Tribune Company Defined Contribution Retirement Plan | 36-1880355 | 006 | 5500 |
| Tribune Company Cash Balance Pension Plan | 36-1880355 | 007 | 5500 |
| Times Mirror Savings Plus Plan | 36-1880355 | 009 | 5500 |
| Tribune Company ESOP | 36-1880355 | 015 | 5500 |
| Tribune Company Master Trust for Pensions | 36-1880355 | 201 | 5500 (DFE) |
| Stable Value Fund Master Trust | 36-1880355 | 205 | 5500 (DFE) |
| Tribune Company Master Retirement Savings Trust | 36-1880355 | 207 | 5500 (DFE) |
| Tribune Company Benefit Program | 36-1880355 | 502 | 5500 |
| Tribune Company LTD Plan | 36-1880355 | 503 | 5500 |
| Tribune Company Business AD&D Plan | 36-1880355 | 506 | 5500 |
| Tribune Company Employee Assistance Program | 36-1880355 | 560 | 5500 |
| Baltimore Sun Employees' Retirement Plan | 95-4066880 | 001 | 5500 |
| Master Trust for Pension Plans | 36-2944700 | N/A | 990-T |
| Master Trust for Pension Plans | 36-2944700 | N/A | IL-990-T |
| Trust for Welfare Plans - VEBA | 36-3002676 | N/A | 990 |
| Forum Publishing Group PS Plan (Delinquent Filing) | 65-0612940 | 001 | 5500 |
| Various 2008 Tribune Company Severance Plans | Various | Various | 5500 |

# EXHIBIT C

**EMPLOYEE STOCK OWNERSHIP PLAN
ENGAGEMENT LETTER**



PricewaterhouseCoopers LLP
One North Wacker
Chicago IL 60606
Telephone (312) 298 3000
Facsimile (312) 298 2001

September 1, 2009

Mr. Jack Rodden
Treasurer
Tribune Company
435 North Michigan Avenue
Chicago, IL 60604

Dear Mr. Rodden:

The purpose of this letter is to confirm our understanding of the terms of our engagement as independent accountants of the Tribune Employee Stock Ownership Plan ("the Plan").

Service and related report

We will audit the Plan's statement of net assets available for benefits at December 31, 2008 and the statement of changes in net assets available for benefits for the year then ending. Upon completion of our audit, we will provide you with our audit report on the financial statements referred to above. Our audit and the related report also will address the supplemental information required by the Employee Retirement Income Security Act of 1974 ("ERISA"). If, for any reasons caused by or relating to the affairs or management of the Plan, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

Our responsibilities and limitations

The objective of a financial statement audit is the expression of an opinion on the financial statements. We will be responsible for performing the audits in accordance with auditing standards generally accepted in the United States of America. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements and supplemental information, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

We will consider the Plan's internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements and supplementary information. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, all significant deficiencies and material weaknesses relating to internal control over financial reporting identified during our audits will be communicated in writing to the Plan's oversight entity and management of the Plan. All deficiencies in internal control over financial reporting (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude than significant



Mr. Jack Rodden
Tribune Company
Page 2

deficiencies) relating to internal control over financial reporting identified while performing our work will be communicated to management of the Plan.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audit will not include a detailed audit of transactions, such as would be necessary to identify errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, an audit designed and executed in accordance with auditing standards generally accepted in the United States of America may not detect a material fraud. Characteristics of fraud include (i) concealment through collusion among management, employees, or third parties; (ii) withheld, misrepresented, or falsified documentation; and (iii) the ability of management to override or instruct others to override what otherwise appears to be effective controls. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts; including prohibited transactions with parties in interest and other violations of ERISA rules and regulations, if present, will be detected. However, we will communicate to the Plan's oversight entity, Plan Administrator, and management of the Plan, as appropriate, any such matters identified during our audit.

We will perform certain procedures directed at considering the Plan's compliance with Internal Revenue Code requirements for tax-exempt status, including inspecting the Plan's latest tax determination letter from the Internal Revenue Service (IRS). As we perform our audit, we will be aware of the possibility that events affecting the Plan's tax status may have occurred. Similarly, we will be aware of the possibility that events affecting the Plan's compliance with the requirements of ERISA may have occurred. These procedures do not constitute an examination or review for the purpose of determining compliance with the Internal Revenue Code or ERISA. However, any instances of tax or ERISA non-compliance identified during our audits will be communicated to the Plan's oversight committee and Plan sponsor.

We also are responsible for determining that the Plan's oversight entity and Plan sponsor is informed about certain other matters related to the conduct of the audits, including (i) any disagreements with management about matters that could be significant to the Plan's financial statements or our report thereon; (ii) any serious difficulties encountered in performing the audits; (iii) information relating to our independence with respect to the Plan; and (iv) other matters related to the Plan's financial statements including its accounting policies and practices; and (v) all significant deficiencies and material weaknesses identified during the audits, as previously mentioned.

The audit will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction. Therefore, items of a possible interest to a third party will not be specifically addressed or matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.



Mr. Jack Rodden
Tribune Company
Page 3

Management's responsibilities

The Plan's management is responsible for the financial statements and supplemental information referred to above. In this regard, management is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records, and for reporting financial information in conformity with accounting principles generally accepted in the United States of America. Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the plan involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the plan received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for (i) adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year under audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole; and (ii) notifying us of all material weaknesses, including other significant deficiencies, in the design or operation of the Plan's internal control over financial reporting that are reasonably likely to adversely affect the Plan's ability to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles. Management also is responsible for identifying and ensuring that the Plan complies with the laws and regulations applicable to its activities.

As part of management's responsibility for the financial statements and the effectiveness of its internal control over financial reporting, management is responsible for making available to us, on a timely basis, all of the Plan's original accounting records and related information and plan personnel to whom we may direct inquiries. As required by auditing standards generally accepted in the United States of America, we will make specific inquiries of management and others about the representations embodied in the financial statements and supplemental information and the effectiveness of internal control over financial reporting. Auditing standards generally accepted in the United States of America also require that we obtain written representations covering the audited financial statements and supplemental information from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements and the supplemental information.

Other documents

Auditing standards generally accepted in the United States of America require that we read any annual report that contains our audit report. Our engagement does not include preparation of the Plan's 2008 Form 5500 for filing with the IRS and Department of Labor ("DoL"). We will, however, read the Form 5500 prior to filing and consider whether the information in the Form 5500, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. Management agrees for this purpose to provide us with the final draft Form 5500 before it is filed with the IRS and DoL. These procedures are not sufficient, nor are they intended, to ensure that the Plan's Form 5500 is completely and accurately prepared. We assume no obligation to perform procedures to corroborate such other information as part of our audit.


Mr. Jack Rodden
Tribune Company
Page 4

### Release and indemnification

Because of the importance of oral and written management representations to an effective audit, the Plan releases and indemnifies PricewaterhouseCoopers LLP and its personnel from any and all claims, liabilities, costs and expenses attributable to any knowing misrepresentation by management.

In no event shall PricewaterhouseCoopers LLP be liable to the Plan, whether a claim be in tort, contract or otherwise, for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers LLP's services provided under this engagement letter, except to the extent finally determined to have resulted from the willful misconduct or fraudulent behavior of PricewaterhouseCoopers LLP relating to such services.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Plan and PricewaterhouseCoopers LLP agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

### Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Plan's personnel including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the Plan is unable to provide such schedules, information and assistance, PricewaterhouseCoopers LLP and you will mutually revise the fee to reflect additional services, if any, required of us to complete the audit.

Our fee estimates are based on the time required by the individuals assigned to the engagement. We estimate our fees for this audit engagement will be $20,000 subject to the terms and conditions above. We will advise you should any other circumstances arise which may cause actual time to exceed that estimate.

We also will bill the Company for our reasonable out-of-pocket expenses.

Invoices rendered are due and payable upon receipt.

### Other matters

PricewaterhouseCoopers LLP is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

Any additional services that may be requested and we agree to provide will be the subject of separate written agreements.



Mr. Jack Rodden
Tribune Company
Page 5

We may be requested to make certain working papers available to the DoL pursuant to authority given to it by law or regulation. If requested, access to such working papers will be provided under the supervision of PricewaterhouseCoopers LLP personnel. Furthermore, upon request, we may provide photocopies of selected working papers to the DoL. We will mark all information as confidential and maintain control over the duplication of all such information. However, the DoL may intend, or decide, to distribute the photocopies or information contained therein to others, including other governmental agencies. You will be billed for our time and costs incurred as a result of the aforementioned activities, should they be necessary.

In the event we are requested or authorized by you or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Plan, the Plan will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Company agrees that it will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers LLP arising out of this engagement to anyone, except to an entity with which the Company merges or an entity which acquires all or substantially all of the assets of the Company and where, in either case, the assignee entity agrees to be bound by this provision.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

\* \* \* \* \*



Mr. Jack Rodden
Tribune Company
Page 6

If there are any questions, please call Matt Booth at (312) 298-2856 or Heather Vasilenko at (312) 298-3430. If the services outlined herein are in accordance with your requirements and if the above terms are acceptable, please have one copy of this letter signed in the space provided below and return it to us.

Very truly yours,

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP

cc: *Tribune Company Employee Benefits Committee*

The services and terms as set forth in this letter are agreed to.

Tribune Employee Stock Ownership Plan

By: _____
    Mr. Jack Rodden
    Treasurer

    10-5-09
    Date