UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                                   .
IN RE:                             .        Chapter 11
                                   .
Tribune Company, et al.,           .
                                   .
             Debtor(s).            .    Bankruptcy #08-13141 (KJC)
.....................................................
```

Wilmington, DE
January 28, 2010
10:00 a.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For The Debtor(s): | Guy S. Neal, Esq.<br>Sidley Austin, LLP<br>One South Dearborn St.<br>Chicago, IL 60603 |
| | Kevin T. Lantry, Esq.<br>Sidley Austin, LLP<br>One South Dearborn St.<br>Chicago, IL 60603 |
| | Norman L. Pernick, Esq.<br>Cole Schotz Meisel Forman<br>& Leonard, P.A.<br>500 Delaware Ave.-Ste. 1410<br>Wilmington, DE 19801 |
| For The Official Committee:<br>Of Unsecured Creditors | Rebecca Butcher, Esq.<br>Landis Rath & Cobb, LLP<br>919 Market St.-Ste. 1800<br>Wilmington, DE 19801 |

2

```
                              Doug Deutsch, Esq.
                              Landis Rath & Cobb, LLP
                              919 Market St.-Ste. 1800
                              Wilmington, DE 19801

                              Marc D. Ashley, Esq.
                              Chadbourne & Parke, LLP
                              30 Rockefeller Plaza
                              New York, NY 10112

  For Donna Gutman:          L. Jason Cornell, Esq.
                              Fox Rothschild, LLP
                              Citizens Bank Center
                              919 N. Market St.-ste. 1300
                              Wilmington, DE 19899

  For J.P. Morgan Chase:      Drew G. Sloan, Esq.
                              Richards Layton & Finger, PA
                              One Rodney Square
                              Wilmington, DE 19801

  Audio Operator:             Al Lugano

  Transcribing Firm:          Writer's Cramp, Inc.
                              6 Norton Rd.
                              Monmouth Jct., NJ 08852
                              732-329-0191
```

**Proceedings recorded by electronic sound recording, transcript produced by transcription service.**

3

## Index

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **Witnesses For The Plaintiff:** | | | | | |
| Ms. Gutman | 31 | 49 | | | |
| | | | | | |
| **Witnesses For The Debtor:** | | | | | |
| Mr. Bralow | | | | | |
| (by Mr. Ashley) | | 12 | | 29 | |
| (by Mr. Cornell) | | 23 | | | |
| (by Mr. Neal) | | | 26 | | |

MOTIONS:

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| G-1 | Document Re: Back Taxes | 35 | 48 |
| G-2 | Document Re: Default Judgment | 35 | 48 |
| G-3 | Document Re: Answer | 35 | 49 |
| G-4 | Document Re: Answer | 36 | 49 |
| G-5 | Document RE: Pacific Financial | 36 | 49 |
| G-6 | Document RE: WKCF Television | 36 | 49 |
| G-7 | Debt Owed - Gutman Pain Center | 36 | 49 |
| G-8 | Debt Owed - Gutman Pain Center | 36 | 49 |
| G-9 | Document Re: GE Capital | 36 | 49 |

SUMMATION BY:

THE COURT: Finding

1              THE CLERK:  All rise.

2              THE COURT:  Good morning everyone.

3              ALL:  Good morning.

4              MR. NEAL:  Good morning, Your Honor, Guy Neal, Sidley

5    Austin here on behalf of the Debtors.  Also joining me is Kevin

6    Lantry, Sidley Austin and Norm Pernick.  Your Honor, there's

7    one matter on the agenda for today, and that is our 9019

8    settlement motion, as it relates to the Gutman action.  Your

9    Honor, I have spoken with counsel for the Committee, and

10   counsel for Mrs. Gutman, and have a proposal in terms of how to

11   proceed today.  I believe each party would like to make some

12   very preliminary opening remarks, in terms of an opening

13   statement.  The Debtors have one witness, David Bralow, who had

14   submitted a declaration in support of the settlement motion,

15   and I believe Mr. Cornell has his client, Mrs. Gutman, in the

16   courtroom today, who he proposes to call to the stand.  And

17   then there may be some cross-examination by Committee counsel,

18   and then we would revert, I think, to argument, after all the

19   testimony has been submitted.  Is that acceptable to Your

20   Honor?

21             THE COURT:  Yes, it is.  Let me ask, any estimate of

22   how much time the respective witnesses will take, at least on

23   direct?

24             MR. NEAL:  Your Honor, I have the agreement of

25   Committee counsel and Mrs. Gutman's counsel that Mr. Bralow's

1    testimony can come in by way of his declaration, if that's

2    acceptable to Your Honor.  And then in terms of the cross of

3    Mr. Bralow, is there a time estimate?

4            UNIDENTIFIED MALE:  Your Honor, I would estimate 10

5    to 15 minutes.

6            MR. CORNELL:  Good morning, Your Honor, Jason

7    Cornell, Fox Rothchild on behalf of Donna Gutman.  Your Honor,

8    that's correct, we are going to offer the live testimony of

9    Mrs. Gutman, and we expect it to last no more than 30 minutes

10   on direct.  There are a few documents we will seek to admit

11   into evidence, but that should not take very long.

12           THE COURT:  All right.  That gives me a good enough

13   idea.

14           MR. NEAL:  Okay.  Very good.

15           THE COURT:  Please proceed.

16           MR. NEAL:  Your Honor, I was last before you in this

17   matter on June 30th, 2009, about seven months ago, and that's

18   when Your Honor lifted the automatic stay, in part to permit

19   the Gutman action to go to mediation in Florida, and for

20   Mrs. Gutman to obtain, should she elect, a trial date in that

21   defamation action.  I am pleased to report that we did go to

22   mediation, and we achieved a, what we believe to be, a very

23   favorable result for the estates, the mediation was successful.

24   So we're here today to seek approval of the settlement of the

25   Gutman defamation action.  It will save the Debtors and their

1   estates a significant amount of money, that would otherwise be

2   likely incurred in litigating this matter through trial and

3   through an appeal in the Florida state courts.  In short, the

4   settlement agreement provides that the Debtors will pay one

5   million, and the Debtor's insurer will pay 850,000, for a total

6   of 1.85 million to Mrs. Gutman within 20 days of Bankruptcy

7   Court approval of the settlement agreement.  We seek entry of

8   this order, pursuant to Sections 105(a), 363(b) of the

9   Bankruptcy Code and Bankruptcy Rule 9019.  As set forth in our

10  papers, and as we are prepared to demonstrate today, the

11  Debtors believe that entering into the settlement agreement

12  constitutes a reasonable exercise of the Debtor's business

13  judgment.  The settlement agreement is effectively a defense

14  cost settlement, under which the Debtors pay one million to

15  avoid up to two million in administrative priority expenses,

16  plus avoid any exposure to the additional one million in self-

17  insured retention.  Stated differently, by the settlement

18  agreement, the Debtors incur out-of-pocket expenses that are

19  half the estimated defense cost expenses and one-third of the

20  overall potential exposure.  Accordingly, the Debtors believe

21  that the settlement agreement is in the best interest of the

22  Debtor's estates and their creditors.  Your Honor, that

23  concludes my opening remarks, and I'll let other counsel speak.

24          THE COURT:  All right.

25          MS. BUTCHER:  Good morning, Your Honor, Rebecca

1    Butcher from Landis Rath & Cobb on behalf of the official

2    Committee of Unsecured Creditors.  I have just a preliminary

3    procedural issue before we get to the opening remarks on behalf

4    of the Committee.  Mark Ashley, who's with us today, has not

5    yet been admitted pro hoc vice.  I just realized this, we'll be

6    submitting his papers after the hearing, but we would request

7    that he be allowed to cross examine Mr. Bralow today.

8              THE COURT:  Very well.

9              MR. DEUTSCH:  Good morning, Your Honor.  Doug Deutsch

10   from Chadbourne & Park on behalf of the Creditors Committee.

11   Your Honor, with respect to our arguments, I would bifurcate

12   them into two distinct issues.  One is the legal argument that

13   the proposal set forth by the Debtors in the 9019 motion is

14   inconsistent with the Bankruptcy Code.  Without an exception,

15   such as the necessity of payment doctrine, which the Debtors

16   acknowledged does not apply, the Court is generally not

17   permitted to pay a pre-petition claim with post-petition,

18   pre-plan dollars.  Secondly, Your Honor, as a factual argument,

19   we're going to test today the 9019 standards.  We believe

20   consistent with our first argument, that it is not fair and

21   reasonable to pay a pre-petition claim with post-petition

22   dollars.  We will show, moreover, that the analysis that the

23   Debtors have put forth with respect to the estimates of value

24   in this case are incorrect.  We believe they've overstated

25   costs, and otherwise not complied with the requirements of --

1  set forth by -- in the Third Circuit, with respect to fair and

2  reasonable criteria.  For those reasons, Your Honor, we're

3  going to ask the Court to deny the settlement.

4            THE COURT:  And yet the Committee consented to the

5  payment in post-petition dollars of incentive bonus payments

6  that were due pre-petition.  Isn't that a little bit

7  inconsistent?  I could probably think of other examples, but

8  that's the one because of yesterday's proceeding that

9  immediately comes to mind.

10            MR. DEUTSCH:  Well, Your Honor, I think Your Honor

11  mentioned yesterday that the Creditors Committee in all cases

12  has done a careful analysis of the facts and situation of those

13  individual cases.  While not recalling, I mean, yesterday we

14  dealt with the 2009 MIP, I know at the beginning of the case,

15  we did have payments that were made with respect to

16  pre-petition payments.  I would note, Your Honor, that with

17  respect to claims, we have 38,000 scheduled and filed claims in

18  this case, 200 tort claimants -- excuse me, 200 litigation

19  claimants, and approximately 45 media cases.  If Your Honor

20  wants to make an exception, I mean, we think you're going to

21  have to make a more global exception.  One of our concerns, of

22  course, is to act consistently with all claimants.  We think

23  that's consistent with, you know, the Bankruptcy Code,

24  bankruptcy policy.

25            THE COURT:  Now, see that position I understand

1  better.

2           MR. DEUTSCH:  Yeah.

3           THE COURT:  Than the two you initially articulated.

4  Okay.

5           MR. DEUTSCH:  Thank you, Your Honor.

6           THE COURT:  Thank you.

7           MR. CORNELL:  Good morning again, Your Honor, Jason

8  Cornell.  And, Your Honor, I don't know if he needs

9  introduction, but with me in the courtroom today is Donna

10  Gutman and her son, Robert Gutman.

11           THE COURT:  Good morning.

12           MR. CORNELL:  Your Honor, the evidence we're going to

13  present today -- well, let me back up and say this is Debtor's

14  motion and we support it.  And so we are not going to try to

15  duplicate what the Debtors are going to put on.  Instead, we're

16  going to look at what the points are in the Committee's

17  objection.  We see those as three points that the Committee has

18  raised that we're going to address today.  One, their argument

19  that they learned of the settlement after the fact, and whose

20  fault is that?  Second, they bring an argument that Mrs. Gutman

21  receives special treatment that other creditors don't.  And,

22  Your Honor, today we ask the Court when hearing evidence, or

23  maybe the lack of evidence that the Committee's going to put

24  on, as far as what damage will the creditor constituency

25  experience if the settlement is approved, because we think

1  Judge Kelvey's decision is going to be helpful in that point in

2  Marvel.

3          THE COURT:  Well, the committee has previously taken

4  a position, and again, it came up in the bonus motion yesterday

5  in my ruling, and that is, the committee views the company as

6  essentially now being owned by the -- or run for the benefit of

7  the unsecured creditors.  Now there may be others who disagree

8  with that proposition.  But what would follow from that is a

9  view that any post-petition dollars spent comes out of their

10 pocket, so that position I understand.

11         MR. CORNELL:  Certainly, Your Honor.  And then the

12 final factor that we're going to address with the Court is,

13 given Mrs. Gutman's testimony, how that plays into the Martin

14 factors of the reasonableness of the settlement.  So with that,

15 Your Honor, we're ready to proceed.

16         THE COURT:  Thank you.

17         MR. NEAL:  Your Honor, Guy Neal for the Debtors.  We

18 have only one witness in the courtroom today, and as I said at

19 the outset, we have the agreement of the committee and

20 Mrs. Gutman's counsel to present his direct testimony by way of

21 his declaration, which was submitted with the motion.  But just

22 by a very brief way of background, David Bralow is the

23 declarant.  Mr. Bralow has more than 20 years of experience

24 advising clients about media issues, including defamation

25 issues.  He's a graduate of the Temple University Law School.

1   He joined his current law firm, Thomas and LoCicero, after
2   serving as assistant general counsel for Tribune Company from
3   2000 to 2009, where he provided legal advice to such newspapers
4   as Newsday, Orlando Sentinel, South Florida Sun Sentinel, The
5   Baltimore Sun, the Morning Call, and the Hartford Current.
6   He's admitted to the Bars of Florida, New York, and
7   Pennsylvania.  He's also a member of the Bar -- excuse me, a
8   member of the Florida Bar Media Law Committee and the American
9   Bar Association Forum on Communications Law.  He's an adjunct
10  faculty member at New York University School of Continuing and
11  Professional Studies where he teaches media law and media
12  ethics, and Mr. Bralow is also the co-author or author of
13  several published articles on media law.  Mr. Bralow supervised
14  the handling of the Gutman litigation, both in his capacity as
15  in-house counsel and outside counsel.  So we have proffered his
16  declaration on the issue of whether the Debtor's entering into
17  the settlement is a prudent exercise of the Debtor's business
18  judgment.  I will highlight only one part of Mr. Bralow's
19  declaration as the entirety is coming in, and that's simply
20  paragraph ten of the declaration.  Paragraph ten is, "I believe
21  the Florida action exposes the Debtors to potential liability
22  of three million or more.  By the settlement agreement, the
23  Debtors incur out-of-pocket expenses that are half the
24  estimated total defense cost expenses, and one-third of the
25  overall potential exposure.  Accordingly, based on my

1  involvement throughout the duration of the Florida action, and

2  my experience handling defamation lawsuits, I believe that

3  entering into the settlement agreement is a prudent exercise of

4  the Debtor's business judgment."  And I will turn the witness

5  over to Committee counsel.

6              THE COURT:  All right.  Let me first formally for the

7  record, indicate that we are taking into evidence the Bralow

8  declaration, which is at Docket No. 2840.  And let me ask now

9  whether anyone wishes to cross examine Mr. Bralow.

10             MR. ASHLEY:  We do, Your Honor.

11             THE COURT:  All right.  Mr. Bralow, if you'd come

12  forward sir, please, and be sworn in.  Over here, other side.

13  There you go.

14             THE CLERK:  Please remain standing.

15              DAVID S. BRALOW, DEBTOR'S WITNESS, SWORN

16             THE CLERK:  Please state your full name for the

17  record and spell it.

18             MR. BRALOW:  David Steven Bralow, Steven with a V.

19             THE CLERK:  Thank you.

20             THE COURT:  You may be seated.

21             MR. ASHLEY:  Good morning, Your Honor.  Mark Ashley

22  from Chadbourne & Park for the Creditors Committee.

23                     CROSS EXAMINATION

24  BY MR. ASHLEY:

25  Q.  Good morning, Mr. Bralow.  During what period of time were

1   you employed by the Tribune Company?

2   A.   I've been employed by the Tribune Company from 2000 to

3   2009.

4   Q.   Okay.  At what point in 2009 did you leave the employment

5   of the Tribune Company?

6   A.   I believe it was March '09.

7   Q.   Okay.  Your declaration estimates that if litigation in the

8   Gutman action were to continue, the defendant's future legal

9   costs through a jury verdict, would be 1.5 to $2 million, is

10  that correct?

11  A.   Yes, sir.

12  Q.   And the $2 million figure is the upper end of that range;

13  is that right?

14  A.   Yes, sir.

15  Q.   Is it true that more than 60 percent of those estimated

16  future costs are attributable to the cost of the trial itself?

17  A.   Yes, I believe that's right.

18  Q.   So that would mean that less than 40 percent of the

19  estimated future costs would be attributable to pre-trial work,

20  is that right?

21  A.   Yes, sir.

22  Q.   By the time of the settlement of the Gutman action,

23  significant discovery had already been conducted, is that

24  right?

25  A.   Correct, yes.

1  Q.  Dr. Gutman had already been deposed?

2  A.  Yes, sir.

3  Q.  And his deposition had lasted for eight days?

4  A.  I believe that's right.

5  Q.  And the reporters of the allegedly defamatory articles had

6  been deposed?

7  A.  Yes.

8  Q.  And had the editors of those articles also been deposed?

9  A.  Yes.

10  Q.  And had several of the parties' experts already been

11  deposed?

12  A.  There had been one or two experts that had been deposed and

13  concluded, and the other experts had not been concluded by the

14  time the petition was filed.

15  Q.  And had one of plaintiff's two claims in their complaint

16  already been dismissed by the trial court?

17  A.  Yes.

18  Q.  The 1.5 million to $2 million range of future legal costs

19  reflected in your declaration assumes that a jury verdict would

20  be reached, is that correct?

21  A.  The 1.5 to 2 assumes that -- a cost that would take -- that

22  would require to take this case through trial, yes.

23  Q.  Okay.  So those estimated future defense costs did not take

24  account of potential motions that the defendants could've

25  filed, that would've disposed of the case before trial, is that

1  correct?

2  A.   Those defense costs included the costs of summary judgment

3  motions that would or could be filed.

4  Q.   Okay.  It's possible, though, isn't it, that had litigation

5  continued, a trial would never have been reached?

6  A.   Yes, that is possible that would be true.

7  Q.   And if that had happened, defendant's legal costs would've

8  been significantly lower than the range reflected in your

9  declaration, correct?

10  A.   I think everyone hopes that they will have -- first, yes,

11  correct.  I think everyone hopes that they will have a

12  successful summary judgment motion, but I don't think that it

13  would be wise to prepare for a defamation case without

14  including the entire gamut taking the case through trial.

15  Q.   But if the defendants had filed a successful summary

16  judgment motion, then the costs of the action would've been

17  substantially lower than the $1.5 million low end of the range,

18  correct?

19  A.   You know, I can't answer that to be correct.  For instance,

20  if you had filed a successful summary judgment motion on having

21  Dr. Gutman declared a public figure, that doesn't necessarily

22  mean that you wouldn't have a trial on whether there was

23  malice, or it is quite possible that you would never get a

24  decision on your summary judgment motion until all those -- or

25  a good portion of those trial costs had or preparation costs

1   had been done.

2   Q.  The defendants had several viable summary judgment motions

3   available to them, is that correct?

4   A.  Correct.

5   Q.  And, in fact, the defendants believed that those summary

6   judgment motions were meritorious and should be granted, is

7   that correct?

8   A.  I absolutely would never file a non-meritorious summary

9   judgment motion.

10  Q.  Didn't the defendants have approximately five or six viable

11  summary judgment arguments that they could've made to the

12  Court?

13  A.  Yes.

14  Q.  The defendants, for example, could've filed a summary

15  judgment motion based on the substantial truth of the articles

16  at issue, is that correct?

17  A.  That is correct.  We could have filed that.

18  Q.  And the defendant's litigation position was that the

19  articles at issue were substantially true, correct?

20  A.  That's correct.

21  Q.  And the defendants could have filed a summary judgment

22  motion based on the lack of actual malice on the part of the

23  authors of the article, correct?

24  A.  If the defendant -- if the plaintiff, Dr. Gutman, was

25  considered to be a public figure, then a motion relating to the

1   actual malice would be available to the defendant.

2   Q.  The defendants would've argued that Dr. Gutman was a public

3   figure, correct?

4   A.  Absolutely.

5   Q.  And further, the defendants could've filed the summary

6   judgment motion based on the fair and accurate reporting

7   privilege, is that correct?

8   A.  There is a fair and accurate reports privilege summary

9   judgment motion that would be available to the defendants.

10  Q.  Could you tell us what that privilege is?

11  A.  That privilege applies when a defendant or a publisher uses

12  public records or judicial records, that even if the content of

13  those records is erroneous, if the recitation was a fair and

14  accurate report of those particular records, it would be

15  considered privileged, and subject a -- would be an affirmative

16  defense to a claim if the defendants also demonstrated that it

17  was published without either constitutional malice or ill will

18  malice; ill will malice being the common law type of malice;

19  constitutional malice being the Sullivan type of malice.

20  Q.  But, in fact, Mr. Bralow, it was defendant's position that

21  the articles at issue were both true and privileged, correct?

22  A.  Yes.

23  Q.  Did the defendants have any other viable summary judgment

24  motions at their disposal?

25  A.  I think that we've discussed that there are any number of

1   practical or probable summary judgment motions.  Whether the

2   defendants would choose to use one or six of them at one time

3   would be a matter of trial strategy.

4   Q.  But you had six or so motions available to you, correct?

5   A.  As a matter of trial practice in a defamation case, yes.

6   Whether we would've filed all six of those motions is a matter

7   of strategy.

8   Q.  Isn't it true that any one or more of those meritorious

9   dispositive summary judgment motions, had they prevailed, would

10  have lowered the defendant's future legal costs substantially,

11  because a trial would've been avoided?

12  A.  Depending on when that motion was available to the

13  defendant, and depending on when the Court ruled on that

14  motion, it is possible.  As I said before, it's also quite

15  possible that you would get an incomplete motion, for instance,

16  in the public figure malice circumstance, the Court may rule

17  that the individual was a public figure.  At the same time, the

18  Court may require the malice issue be tried before the jury.

19  Q.  Okay.  But let's say the Court wanted to clean up the

20  pending motions before the trial started, and fully addressed

21  defendant's summary judgment motion on substantial truth.

22  Would that have dispensed with a trial?

23  A.  If we won a substantial truth motion, the trial would not

24  be necessary, that's correct.

25  Q.  And if the case had gone to trial, Mr. Bralow, the

1   plaintiffs would have borne the burden to prove that the

2   allegedly defamatory statements were false, correct?

3   A.   Yes.   Under constitutional law, <u>Philadelphia Newspaper</u>

4   <u>versus Hepps</u>, the plaintiff has the burden of proof on proving

5   falsity.

6   Q.   And assuming that the defendants were able to prove that

7   Dr. Gutman was a public figure, the plaintiffs would've also

8   bourne the burden to prove that the statements were written

9   with actual malice, is that correct?

10  A.   That's correct.

11  Q.   And the plaintiffs would've had to carry those burdens by

12  clear and convincing evidence?

13  A.   That's correct.

14  Q.   And isn't it true that you as a defamation practitioner

15  consider the plaintiff's burden in such a case to be a

16  substantial constitutional burden?

17  A.   Yes.

18  Q.   The defendants in the <u>Gutman</u> action also believed they had

19  a viable dispositive appellate argument, is that correct?

20  A.   That's correct.

21  Q.   And that argument was based on a Florida statutory pre-suit

22  notice requirement?

23  A.   Correct.

24  Q.   And if that particular argument were successful, would it

25  have been dispositive of the case?

1  A.  I think as I explained the other day, while we thought we

2  had -- while we still think we have a viable 770 pre-suit

3  notice defense, we tried that as a motion to dismiss, and we

4  tried it as a summary judgment motion, and both times we

5  failed.  So certainly two courts, because there were two

6  separate judges have disagreed with us on that pre-suit notice,

7  although as I sit here today, I still believe that we're

8  correct on the law and we will prevail on an appeal.

9  Q.  You believe, in fact, that that argument should've

10 succeeded at the trial court level, right?

11 A.  Absolutely.

12 Q.  Mr. Bralow, you were directly involved in the Gutman

13 mediation and settlement?

14 A.  Yes.

15 Q.  And you were one of the Debtor's three representatives at

16 the mediation?

17 A.  Yes.

18 Q.  Were you the Debtor's outside litigation counsel at that

19 time?

20 A.  No, sir.

21 Q.  What was your role at that time?

22 A.  I guess I should clarify that.  I mean, I was in an outside

23 law firm, but I still had a role pretty much as the inside, you

24 know, as the inside counsel.  We had another counsel that acted

25 more traditionally like the outside counsel.

1  Q.  Okay.  But you were not actually employed by the Tribune

2  Company anymore, correct?

3  A.  That's correct.

4  Q.  At the mediation, isn't it true that the Debtors had the

5  option not to agree to settlement of the action with

6  plaintiffs?

7  A.  Yes.

8  Q.  Indeed, isn't it true that in objecting to the Gutman

9  plaintiff's lift stay motion, the Debtors were concerned that

10  moving forward with the Gutman plaintiffs along the lines that

11  they were requesting, could open the floodgates for similar

12  requests?

13  A.  That argument was asserted in the motion papers.

14  Q.  And the Debtors were concerned that moving forward with the

15  Gutman plaintiffs could have a domino effect with respect to

16  similar cases?

17  A.  That argument was also asserted in the motion papers.

18  Q.  Would it be a good thing for the Debtor's estates if the

19  floodgates were opened for other similar requests?

20  A.  No.

21  Q.  Did all the defamation cases that the Debtors were facing

22  at the time of the Gutman settlement implicate the same

23  $1 million per occurrence deductible obligation?

24  A.  If you're asking if that's how the insurance was

25  structured, yes.

1   Q.   And were there approximately 45 or so such pre-petition

2   media related cases?

3   A.   I don't have knowledge of the specific numbers, but there

4   were media related defamation cases, yes.

5   Q.   And there were more than just a few?

6   A.   Yes, sir.

7   Q.   Mr. Bralow, you're not a bankruptcy attorney; is that

8   correct?

9   A.   Correct.

10  Q.   Other than the Gutman action and the Fagio (ph) action,

11  have you ever settled any litigation claim in the context of

12  bankruptcy proceedings?

13  A.   No.

14  Q.   In fact, isn't it true that you had never heard of

15  Bankruptcy Rule 9019 before the Creditors' Committee filed its

16  objection to this proposed settlement?

17  A.   Yes.

18  Q.   And you had never heard of the Necessity of Payment

19  Doctrine before reading the Creditors' Committee's papers?

20  A.   Yes.

21  Q.   Mr. Bralow, did you consult with bankruptcy counsel prior

22  to entering into the settlement with the Gutman plaintiffs?

23  A.   Yes.

24  Q.   And with whom did you consult?

25  A.   Attorneys at Sidley.

1   Q.   Okay.  Could you tell me who?

2   A.   I recall consulting with Mr. Lantry.

3   Q.   And do you recall at what point you consulted with

4   Mr. Lantry?

5   A.   I think we talked before the mediation, and I think at one

6   point, we talked during the mediation.

7   Q.   Okay.  Did you ever recall discussing Rule 9019 with

8   Mr. Lantry?

9   A.   No.

10           MR. ASHLEY:   Thank you, Your Honor.

11           THE COURT:   Mr. Cornell.

12                        CROSS EXAMINATION

13   BY MR. CORNELL:

14   Q.   Mr. Bralow, Jason Cornell on behalf of Mrs. Gutman.  As you

15   sit here today, sir, do you have an understanding of what the

16   lowest range of defense costs would be, were this matter to

17   proceed to trial in Florida?

18   A.   Were it to proceed to trial, I think we estimate that range

19   at 1.5.

20   Q.   And in the motion in support of the settlement today, sir,

21   have you had an opportunity to read that motion?

22   A.   Yes, sir.

23   Q.   In paragraph 21, there's comment regarding concern that

24   dispositive motions are not easily obtained in Florida state

25   courts.  Would you agree with that statement?

1  A.   I agree that summary judgment motions are often denied when

2  we think they're meritorious, yes.  And I think in Orange

3  County Court in Florida, it is sometimes difficult, it is said,

4  to get a summary judgment motion granted.

5  Q.   In the same paragraph, the statement is made, there are

6  fact issues in the Florida litigation to which a jury may give

7  undue weight.  Would you agree to that statement as well?

8  A.   Yes, sir.

9  Q.   Why would you agree with that?

10  A.   Well, I pause because I don't want to disclose sort of

11  internal strategic thinking with respect to how we plan to try

12  the case, but I will say that Dr. Gutman's suicide is an issue

13  that will create a factual -- a significant factual problem for

14  trial.

15  Q.   And finally, in the same paragraph, the comment is made

16  that this litigation in the Florida action involves high stakes

17  litigation.  Would you agree with that statement as well?

18  A.   Yes, sir.

19  Q.   The motion to approve the settlement compares the Gutman

20  defamation action to the equivalent of 11 different malpractice

21  actions, do you agree with that statement?

22  A.   Yes.

23  Q.   And what is meant by that 11 malpractice actions?

24  A.   The published article discusses the fact that 11 patients

25  died under Dr. Gutman's care.  And the claim of the plaintiff

1   is that Dr. Gutman was a physician that practiced medicine with

2   a duly appropriate or higher than appropriate reputation for

3   his standard of care.  So the issue with respect to the

4   standard of care that Dr. Gutman engaged in with respect to

5   each of those 11 patients will be a significant factor in the

6   trial.

7   Q.  During mediation, did you understand it was the position of

8   Mrs. Gutman that in order to reach a settlement at mediation,

9   payment would need to be made in the short term?

10  A.  Yes.

11  Q.  What was your --

12  A.  Well -- yeah, before --

13  Q.  If -- please.

14  A.  Let me amend that.  Before mediation and after mediation as

15  well, that statement or that condition was preeminent with the

16  attorneys that were representing Mrs. Gutman at the time.

17  Q.  And during negotiations then, was it your understanding if

18  you were going to reach a settlement with Mrs. Gutman at

19  mediation, the terms of that settlement would have to require

20  payment in the short term?  And by short term, I'm talking

21  about less than 30 days?

22  A.  It was my understanding that we had a significant -- we had

23  an obligation to seek approval of the settlement within

24  20 days, I believe, of approval of settlement in the bankruptcy

25  court within 20 days, and that the expectation was that that

1   approval would occur and Mrs. Gutman would be paid.

2   Q.  And that language was actually in the handwritten

3   settlement agreement, was it not, that the settlement was

4   conditioned on approval by the bankruptcy court; is that

5   correct?

6   A.  Yes.

7   Q.  Who wrote the settlement agreement?

8   A.  I believe the mediator, Roger Macks (ph), actually

9   handwrote the settlement agreement.  I think it was his

10  handwriting.

11  Q.  Okay.  And finally, Mr. Bralow, what time did mediation

12  begin and what time did it end?

13  A.  Mediation began I think around 9:30 and ended close to 2:00

14  in the morning, I believe that's right.

15          MR. CORNELL:  Thank you.  Nothing further, Your

16  Honor.

17          THE COURT:  Redirect.

18                      REDIRECT EXAMINATION

19  BY MR. NEAL:

20  Q.  Mr. Bralow, when you were in-house at Tribune, did you

21  supervise the handling of defamation cases?

22  A.  Yes, sir.

23  Q.  Did you supervise the handling of defamation cases in

24  Florida?

25  A.  Yes, sir.

1  Q.  Did you supervise the handling of defamation cases in

2  Orange County, Florida?

3  A.  Yes.

4  Q.  About how many defamation cases did you supervise during

5  your period at the Tribune?

6  A.  It would be hard to put a number to it, but over a dozen,

7  dozens.

8  Q.  Did you review the monthly bills of your outside counsel?

9  A.  Yes.

10  Q.  Did you work with outside counsel in preparing budgets for

11  the estimated costs of handling these defamation cases?

12  A.  Yes.

13  Q.  Based on your experience, is that an exact science?

14  A.  No, it is always some sort of prognostication.

15  Q.  Is every defamation case handled more or less the same?

16  A.  Oh, no.  Defamation cases are very different, depending on

17  what's being asserted.

18  Q.  What makes the Gutman defamation case different from the

19  others that you supervised the handling of?

20  A.  The Gutman case is unique, in that it is rare to have a

21  six -- Gutman is scheduled for trial, or was scheduled for

22  trial, to be a six-week trial involving a significant number of

23  fact witnesses, involving a significant number of experts; and

24  I think in that respect, it was unique.

25  Q.  In preparing the estimated costs of litigating the Gutman

1   case through trial, the number that's in your declaration, 1.5

2   to 2 million, did you factor in the likelihood of prevailing on

3   summary judgment?

4   A.   Yes.

5   Q.   Did you expect that a court to rule in favor or rule on, I

6   should say, Tribune's motion prior to the close of discovery?

7   A.   I would -- it would be difficult to say when a court would

8   rule on a particular motion for summary judgment.  And some of

9   our summary judgment motions may, in fact, not even be filed

10  until after the close of discovery.

11  Q.   What discovery remained outstanding as of the time the stay

12  was imposed on the Florida action?

13  A.   There were most particularly, discovery with respect to the

14  medical experts, and there was also discovery with respect to

15  damage experts, our damage expert, and the finishing of the

16  Gutman damage expert.  There were factual witnesses still that

17  remained to be deposed as well.

18  Q.   Mr. Ashley discussed with you the substantial truth motion

19  as being potentially dispositive of the entire action.  Do you

20  recall that testimony?

21  A.   Uh-huh.

22  Q.   Were you in a position at the time the stay was imposed to

23  have filed a substantial truth summary judgment motion?

24  A.   I think not.  I think we had more discovery that we

25  would've wanted to have, before we had filed that motion.

1  Q.  Do you believe that an appeal would be likely in the Gutman

2  action regardless of which party prevailed at trial?

3  A.  Yes.

4  Q.  Did your estimate of 1.5 to 2 million include costs and

5  expenses of an appeal?

6  A.  No.

7  Q.  Regarding the timing of the settlement payment, did anyone

8  from the Gutman side of the table, so to speak, ever express to

9  you that they were prepared to accept less in return for a

10  prompt payment?

11  A.  I think it was made pretty clear to us before the

12  mediation, and then subsequent to the mediation that the amount

13  that they were prepared to accept was dependent upon an

14  immediate payment.

15  Q.  And would that amount be less than prior settlement

16  demands?

17  A.  Oh, absolutely, yes.

18          MR. NEAL:  I have no further questions.

19          MR. ASHLEY:  Your Honor, I just have a quick

20  follow-up question.

21          THE COURT:  Very well.

22                  RECROSS EXAMINATION

23  BY MR. ASHLEY:

24  Q.  Ms. Bralow, in your experience as a practitioner of media

25  related cases in Orange County, Florida where the Gutman action

1   was being litigated, had you ever filed a summary judgment

2   motion?

3   A.   I have filed summary judgment motions.

4   Q.   Did you win on any of those motions?

5   A.   Yes, I have.

6            MR. ASHLEY:   Thank you.

7   A.   May --

8            THE COURT:   You may finish your response.

9   A.   I will say that I've rarely filed a summary judgment motion

10  that was successful that had this many disparate factual

11  elements to it, not to say that I can't, or we wouldn't, I have

12  also had that, but the ones in Orange County, Florida that I

13  won was one, a summary judgment on whether a statement was a

14  matter of opinion, which was a matter of law for the Court to

15  decide, and a second one was whether a particular idea was

16  novel enough for the purposes of a theft of idea case, which

17  again would've been one for the Court to decide.  And I've also

18  won on 770 grounds, that the demand for retraction wasn't

19  specific enough, and therefore, didn't provide sufficient pre-

20  suit notice in previous times.  I think those are the ones I

21  can remember in Orange County.

22           THE COURT:   Mr. Cornell?

23           MR. CORNELL:   No further questions.

24           THE COURT:   Thank you, sir.  You may step down.

25  A.   Thank you.

1        MR. NEAL:  Your Honor, I believe Mr. Cornell will be

2   calling his witness at this point, and then we'll turn to oral

3   argument.

4        THE COURT:  All right.  I'd like to take just a

5   two-minute break before we hear Mrs. Gutman.  Court will stand

6   in recess, just two minutes.

7        (Recessed at 10:42 a.m.; reconvened at 10:49 a.m.)

8        THE COURT:  All right.  Let's proceed.

9        MR. CORNELL:  For the record again, Your Honor, Jason

10  Cornell on behalf of Donna Gutman.  Your Honor, we have one

11  witness we'd like to call today and that's Mrs. Gutman.

12       THE COURT:  Very well.

13       DONNA G. GUTMAN, PLAINTIFF'S WITNESS, SWORN

14       THE CLERK:  Please state your full name for the

15  record.

16       MS. GUTMAN:  My name is Donna Gerhart Gutman.

17       THE COURT:  Please be seated.

18                    DIRECT EXAMINATION

19  BY MR. CORNELL:

20  Q.  Mrs. Gutman, will you state for the record, how old are

21  you, ma'am?

22  A.  I'm 75.

23  Q.  And how long have you worked for the Gutman Pain and

24  Accident Center?

25  A.  Fourteen years.

1  Q.  Now, Mrs. Gutman, you lost your husband in April of 2009.

2  Before Dr. Gutman's passing, what were your responsibilities

3  with the center?

4  A.  I basically took care of the employees, their health

5  insurance, you know, employee benefits.  I made sure that the

6  office had supplies, that everything was running smoothly, that

7  maintenance was maintained, and I planned the parties for the

8  employee's birthdays, and they nicknamed me Office Mom.

9  Q.  Okay.  After Dr. Gutman passed away, your responsibilities

10  changed a little bit, is that correct?

11  A.  Yes.

12  Q.  Would you describe for the Court how they changed?

13  A.  Well, after my husband died, the Court appointed me as

14  personal representative of his estate.  And also in his Will,

15  he made me the owner of the Gutman Pain Accident Center.

16  Q.  And as owner, would you tell us what type of

17  responsibilities did you take on that were different from

18  before Dr. Gutman passing away?

19  A.  One of the first responsibilities that I took on was to

20  meet with the Internal Revenue Service, and to arrange a

21  payment for back taxes.

22  Q.  Besides the payment of taxes, did your responsibilities

23  increase as to dealing with employees, hiring and firing and

24  the like?

25  A.  Yes.  I terminated three employees.  We froze their

1    salaries.  We cut back the hours in which they could work, and

2    there were no longer any employee benefits.

3    Q.  And why did you make those cutbacks?

4    A.  Well, we were in -- we had substantial loss of income after

5    my husband's death.

6    Q.  Did that include a loss of patients?

7    A.  Yes.

8    Q.  Now, was Dr. Gutman the only doctor at the pain center?

9    A.  No, we had two other doctors.

10   Q.  Are they currently there?

11   A.  Yes.

12   Q.  And are they currently seeing patients?

13   A.  Yes, but they're not psychiatrists.

14   Q.  So as to Dr. Gutman's psychiatric patients, what did the

15   center do with those patients?

16   A.  Those patients, about -- we referred on to other

17   psychiatrists, because we could no longer treat them at the

18   center.  So that was a loss of income for the medical office.

19   Q.  How would you describe the current economic situation for

20   the center?

21   A.  Currently, we are being -- we are under a heavy debt load,

22   which we are not able to make payments on the leases.

23   Q.  Has this situation worsened since Dr. Gutman passed away?

24   A.  Yes, because of the loss of our key man, and the loss of

25   the psychiatric patients.  Now, we're not -- we're treating

1    general medicine, and chiropractic medicine.

2    Q.  That raises a good point.  Would you describe with a little

3    more detail for the Court the type of services that you are

4    providing in general medicine and chiropractic medicine?

5    A.  The type of services that the Gutman Pain Accident Center

6    provides have to do with primarily people who have been in

7    automobile accidents, people who have failed backs.  We provide

8    for them chiropractic treatment, and we have a VAX-D treatment

9    which is very successful.

10   Q.  What is the VAX-D treatment?

11   A.  The VAX-D treatment is a decompression table, which heals

12   failed backs, bulging disks, herniated discs, and sciatica.

13   Without the patient having to undergo surgery, they can heal

14   naturally with the VAX-D treatment.

15   Q.  Does that require equipment besides the use of the doctors

16   and the assistants?

17   A.  Yes.  It definitely requires equipment, yes.

18   Q.  Okay.  You've had to hire recently defense counsel for

19   various debt collection matters; is that correct?

20   A.  Yes.

21   Q.  Okay.  Could you explain to the Court the nature of the

22   debt collection actions that are against the pain center?

23   A.  We are about to be foreclosed on with our office equipment.

24   We have judgments against us.  We have ongoing collection calls

25   and we have -- we're going to lose our office equipment and our

1   medical equipment, and we will no longer be able to stay in

2   business.

3   Q.  Now, previously after Dr. Gutman's death but before this

4   hearing, you received a life insurance settlement; is that

5   right?

6   A.  Yes.

7   Q.  Have you had to use the proceeds from that life insurance

8   to help the business move forward?

9   A.  Yes.

10  Q.  To what extent have you loaned the business money?

11  A.  I would estimate approximately at the present time

12  $100,000.

13  Q.  And what did that money go towards?

14  A.  Payment of back taxes, to assist with payroll, and that --

15  none of that includes any of the attorney's fees.  It's just

16  the day-to-day operations of the business.

17          MR. CORNELL:  Your Honor, earlier this morning, I

18  handed documents previously marked 1 -- Exhibit 1 through 9 to

19  Counsel for the Committee, Counsel for the Debtors.  May I

20  approach the witness and the Court?

21      (Gutman's Exhibit-1 previously marked for identification)

22      (Gutman's Exhibit-2 previously marked for identification)

23      (Gutman's Exhibit-3 previously marked for identification)

24      (Gutman's Exhibit-4 previously marked for identification)

25      (Gutman's Exhibit-5 previously marked for identification)

1        (Gutman's Exhibit-6 previously marked for identification)

2        (Gutman's Exhibit-7 previously marked for identification)

3        (Gutman's Exhibit-8 previously marked for identification)

4        (Gutman's Exhibit-9 previously marked for identification)

5            THE COURT:  You may.  Thank you.

6   BY MR. CORNELL:

7   Q.  Mrs. Gutman, I just handed you documents that have

8   previously been marked Exhibits 1 through 9.  If you will take

9   a look at the first document marked as Exhibit 1.  Do you

10  recognize that document?

11  A.  Yes.

12  Q.  Would you describe briefly to the Court what that document

13  is?

14  A.  That was a document where we had to resolve a case with

15  payment of back taxes.

16  Q.  And on --

17  A.  There was a lien against the practice.

18  Q.  On page three of what has been marked as Exhibit 1, if

19  you'll look at the bottom of that page, it says balance due.

20  And there's a number $88,284.31.  Will you let me know when you

21  see that number?

22  A.  Yes, I see it.

23  Q.  Did you pay that balance to the IRS?

24  A.  Yes, I did.

25  Q.  And was that money paid out of part of your life insurance

1   proceeds?

2   A.  Yes, it was.

3   Q.  Okay.  If you will turn next to what's been previously

4   marked as Exhibit 2.  Do you recognize this document?

5   A.  Yes, I do.

6   Q.  At the top, it says Lyon Financial Services (ph), and it's

7   a -- in the middle of the page it says final judgment by

8   default, and towards the bottom, I believe it says the total

9   amount is $102,017.

10  A.  I see that.

11  Q.  Could you explain to the Court what this default judgment

12  is pertaining to?

13  A.  This is pertaining to office equipment, copiers and fax

14  machines.

15  Q.  I'm going to ask you to look at documents that have been

16  previously marked 3, 4.  Exhibit 3 is an answer filed by Gutman

17  Pain Accident Center against a suit for Tigress Vendor Finance

18  and 4 is an answer filed to an action brought by CIT Technology

19  Financing.

20  A.  Yes.

21  Q.  Are these answers that have been filed for debt collection

22  matters that have been brought against Gutman?

23  A.  Yes.

24  Q.  Mrs. Gutman, I'm going to ask that you now turn to what's

25  been marked as Exhibit 5, correspondence dated September 14th,

1    2009.

2            MS. BUTCHER:  Your Honor, I'm going to raise an

3    objection to the admission of these exhibits.

4            THE COURT:  Well, they haven't been offered yet.

5            MS. BUTCHER:  Okay.  I'll wait.

6    BY MR. CORNELL:

7    Q.  Mrs. Gutman, if you'll look at what's been marked as

8    Exhibits 5 --

9    A.  Yes.

10   Q.  Been marked for identification, not been moved into

11   evidence, 5, 6, 7, 8.  Do you see those documents?

12   A.  Yes, I do.

13   Q.  Starting with Exhibit 5, this is correspondence from a

14   Financial Pacific Leasing Company.  It says amount due is

15   $7,320.

16   A.  Yes.

17   Q.  Are you familiar with this document?

18   A.  Yes, I am.

19   Q.  What does this document represent?

20   A.  These are various -- this is various medical equipment.

21   Q.  What has been marked as Exhibit 6 is regarding the WKCF

22   Television, Gutman Pain Center $14,277.  Do you recognize that?

23   A.  Yes, I do.

24   Q.  What amount -- what's the nature of the debt owed to WKCF

25   Television?

1  A.   This was for running an infomercial that we had to

2  advertise the treatment center.

3  Q.   Is this amount still due and owing?

4  A.   Yes, it is.

5  Q.   And for 7 and 8, do these also represent amounts that are

6  still owing by the Gutman Pain and Accident Center?

7  A.   Yes.

8  Q.   And finally, what's been marked as Exhibit 9, GE Electric

9  Capital Corporation.

10 A.   Yes.

11 Q.   What's your understanding as far as what this complaint

12 represents?

13 A.   This is various medical and office leased equipment.

14 Q.   And one last thing regarding these documents, Mrs. Gutman,

15 if you will flip back to what was marked as Exhibit 2, final

16 judgment by default.

17 A.   Yes.

18 Q.   On the second page, there's a writ of replevin.

19 A.   Yes.

20 Q.   Has the sheriff, Orange County Sheriff come out to Gutman

21 Pain and Accident Center regarding these, in an attempt to

22 replevin or collect certain equipment?

23 A.   Yes.

24 Q.   Would you explain to the Court basically what has gone on

25 in that respect, regarding attempts to collect equipment from

1   the Gutman Center?

2   A.  Well, they came in with -- the sheriffs came in with an

3   order, and they didn't leave with any equipment, but they

4   came -- they looked around the office, and there was someone

5   with them who was prepared at that moment to take the

6   equipment.  But I believe because they had the numbers

7   incorrectly listed on their order, on their writ, that they did

8   not take the equipment.

9   Q.  Has there been talk about an auction by the sheriff?

10  A.  Yes.

11  Q.  Has there been an auction to date?

12  A.  No.

13          MR. CORNELL:  Your Honor, at this time, I would like

14  to move what's been marked as Gutman 1 through 9 into evidence.

15          THE COURT:  Is there any objection?

16          MS. BUTCHER:  There is an objection.  I would --

17  before these are admitted into evidence, I would wish for an

18  explanation as to the relevance, as for the underlying merits

19  of the settlement agreement that we're here to discuss.

20          MR. CORNELL:  And, Your Honor, in response to that,

21  instead of ruling on the admission of these exhibits right now,

22  if the Court would like to wait till we're done presenting

23  evidence, these do, we believe, go to the reasonableness of the

24  settlement agreement.

25          THE COURT:  I'll reserve ruling.

1          MR. CORNELL:   Thank you, Your Honor.

2    BY MR. CORNELL:

3    Q.   Mrs. Gutman, has the Gutman Center consulted with the

4    bankruptcy attorney?

5    A.   Yes.

6    Q.   Is there a concern that if -- that you may have to shut

7    down your business?

8    A.   Yes.

9    Q.   You're 75 years old, Mrs. Gutman, and candidly you've lost

10   your husband, and now you are trying to keep a business going.

11   Why not close the business and retire?

12   A.   I believe that my husband would want his business to

13   keep -- to continue.  We have two children and a granddaughter,

14   who have worked for the company for a number of years, and they

15   would be thrown out of work, and those children -- and all

16   those children that I just mentioned have their own children,

17   and so it would affect the grandchildren as well. Also, we have

18   two doctors that would be unemployed, four other office

19   members, staff members, they would be unemployed.  It would

20   work a terrible hardship on our family to close this business.

21   Also, our patients that would have to -- that would be without

22   a doctor who would have to locate another -- other physicians

23   for themselves, and that is not always an easy thing to do.

24   And I don't want that to happen, because I know my husband

25   worked many years to establish a beautiful practice, and he

1   wanted it to be a family business.  And so we want to carry

2   that on, carry on Michael's legacy, and at the same time, have

3   employment for our family.

4   Q.  And the grandchild you mentioned, she's actually a licensed

5   physician's assistant, correct?

6   A.  She works in the chiropractic department and, yes, she has

7   a certification, yes.

8   Q.  And one of the children is actually Robert Gutman, who

9   handles the accounting and bookkeeping for the business; is

10  that right?

11  A.  Yes.  Robert's here today, and yes, he does.  He handles

12  all of the finances for the company.

13  Q.  Do you believe it's possible to turn this business around

14  if you are able to take care of some of these debts?

15  A.  We are having new patients every week.  We have a wonderful

16  program.  There's no doubt that it could go forward and be

17  successful, but with the heavy weight of the leases that we

18  have not been able to pay after my husband died, we can't go

19  forward.  So what we want to do is get an opportunity to

20  negotiate those leases away, and then yes, our business is

21  growing.

22  Q.  Mrs. Gutman, I want to talk about mediation.  You were

23  present at mediation in Florida; is that correct?

24  A.  Yes.

25  Q.  And you were there from when it started at 9:00 till when

1   it ended at 2:00 a.m.; is that correct?

2   A.   That's correct.

3   Q.   You heard Mr. Bralow talk today about it was understanding

4   that prior to mediation, that in order to settle, that

5   settlement -- payment needed to be made in the short term.   Do

6   you agree with that statement?

7   A.   Yes.

8   Q.   Why did payment need to be in the short term?

9   A.   Because I am in financial difficulty.   I can't move

10  forward, I can't settle.   If we could -- you see, these

11  companies don't want to take our equipment.   They don't want to

12  close us down, they just are asking us to renegotiate the

13  loans.   So if we have the settlement, we can then do that, and

14  then go forward from there.

15  Q.   Could the business go on another six months to a year and

16  wait to see if payment was received after a plan of

17  confirmation was entered?

18  A.   No.

19  Q.   Why not?

20  A.   We are in imminent danger of being -- of judgments being

21  brought against us, and going into bankruptcy.

22  Q.   With what you have to deal with so far, did you want this

23  case to settle, or was it your preference to go to trial?

24  A.   I want this case to settle.

25  Q.   Why is that?

1  A.  Because of the financial difficulties that I -- that my

2  husband's business is experiencing, and because my husband

3  would've wanted this.  Because it went on -- the litigation --

4  the trial had gone on for five and a half years, and it just

5  seemed like the right thing to do to bring it to a close.

6  Q.  Mrs. Gutman, you may have heard today there was a

7  discussion about an order in a case in this bankruptcy called

8  Fagio, where I believe, and they will correct if I'm mistaken,

9  there was a waiver of the first one million of the unsecured

10 claim in order to proceed against the insurance proceeds.

11 Would you have agreed to settlement, if you would have had to

12 have waived the first one million dollars against the Debtor's

13 estate?

14 A.  No.

15 Q.  There's one last area I want to discuss with you,

16 Mrs. Gutman, and we're almost done, and that is the actual

17 articles that gave rise to this litigation.  What effect are

18 you aware of that these articles had on Dr. Gutman when they

19 were first published?

20 A.  On November 30th, 2003, the articles appeared in the

21 Orlando Sentinel, and he read them, we read them, and he said

22 to me, "I'm finished.  I'm washed up.  I'm ruined.  I'm damaged

23 goods."

24 Q.  Why did he think one article could do that to him?

25          MS. BUTCHER:  Objection.  He's asking her to testify

1   to the thoughts of another person.

2            THE COURT:  Sustained.

3   BY MR. CORNELL:

4   Q.  Do you have any understanding as far as what would cause

5   Dr. Gutman to believe that he was damaged goods?

6   A.  Because when you link a doctor's name with death and fraud

7   in a newspaper article, he can no longer continue his forensic

8   practice.  He was a double boarded forensic psychiatrist, and

9   that was a prominent part of his practice, and he would no

10  longer be -- he could no longer continue that.

11  Q.  Why could he no longer continue that business?

12  A.  Because of his damaged reputation, and because it would

13  always be brought into question, because he was an expert

14  witness.  So as an expert witness, that would always be brought

15  into question whenever he testified.

16  Q.  Why did Dr. Gutman file suit against the Tribune?

17  A.  May of 2005, he commenced the Florida action.

18  Q.  Why did he do that?

19  A.  Because of defamation of character, and because it badly

20  damaged his reputation and his business.

21  Q.  Do you have any knowledge, Mrs. Gutman, if Dr. Gutman ever

22  made an initial demand for settlement against the Tribune or

23  the Orlando Sentinel?

24  A.  No.

25  Q.  Do you know if his attorney ever made a dollar amount

1  demand for settlement when this case was initially started?

2  A.  No.  Oh, well, yes.  Now, can I change my answer?

3  Q.  You can change your answer, ma'am.

4  A.  Yes.  In May of 2005, Willie Gary (ph) held a press

5  conference, and at that time, he announced that it would be a

6  600 million lawsuit would be filed against the Tribune.

7  Q.  What effect, if any, did the publications of the articles

8  have on the pain center?

9  A.  Well, the effects were immediate, because patients canceled

10  their appointments.  Then what happened was, gradually and

11  slowly, the income lessened because there were no more

12  referrals from attorneys for forensic work.  So slowly, we

13  could feel the financial pinch.

14  Q.  Was there an effect on your social life?

15  A.  Well, yes, because whenever we went out socially, because

16  my husband was well known in Winter Park and Orlando, people

17  would come over and say to him, Mike, what did you do, that you

18  got into the paper.  It was -- then he was always having to

19  defend himself, and then people shunned us.  They didn't

20  invite -- we didn't get invitations over for dinner anymore.

21  It was a -- gradually we just stopped going out.

22  Q.  How did the litigation affect Dr. Gutman?

23  A.  He was -- okay.  The way the litigation affected my husband

24  was that he suffered.  He anguished.  He cried.  He became

25  despondent.  He couldn't pay his bills anymore.  He was

1  devastated.

2  Q.  As far as the payment of bills, did Dr. Gutman ever have to

3  borrow from individuals or from organizations to cover

4  expenses?

5  A.  Yes.

6  Q.  Would you elaborate on who he borrowed from?

7        THE COURT:  Before you do, let me see counsel at

8  sidebar, please?  Off the record.

9    (Recess)

10 BY MR. CORNELL:

11 Q.  Mrs. Gutman, regarding the bills that we've discussed, was

12 it your intention in settling at mediation, so that you could

13 pay the expenses that are coming due for the business?

14 A.  Yes.

15 Q.  And were it not for the fact that you sought to settle and

16 receive payment within 20 days after the Court approved the

17 settlement, were it not for that fact, would you not enter into

18 the settlement agreement at mediation?

19 A.  Would you ask me that again?

20 Q.  Certainly.  In the settlement agreement, payment to you is

21 20 days after approval by the bankruptcy court.  If you had to

22 wait a time much longer than that, would you still have entered

23 into a settlement agreement had you not been able to receive

24 payment, as what I say is in the short term?

25 A.  No.

1          MR. CORNELL:  Your Honor, at this time I would like

2   to move into evidence what's been previously marked as

3   Exhibits 1 through 9.

4          THE COURT:  Is there any objection?

5          MS. BUTCHER:  I'm still going to object to the

6   relevance of these exhibits, to the extent that counsel, and

7   I'm assuming, I'm not positive, is seeking to tie these

8   documents to the reason for the settlement.  Most of them are

9   dated after the mediation, and therefore, are unlikely to

10  bear -- that bourne any connection to her decision to settle

11  it.

12         THE COURT:  Any response?

13         MR. CORNELL:  My response to that, Your Honor, is

14  these debts had been looming prior -- far before these

15  documents came through.  Many of these documents, default

16  judgments and the like, are after the fact.  What this shows is

17  the motivation to enter into the settlement, the urgency for

18  Mrs. Gutman.  I think they are relevant to why she entered into

19  it and to the reasonableness.

20         THE COURT:  All right.  The objection is overruled.

21  1 through 9 are admitted.

22     (Gutman's Exhibit-1 admitted into evidence)

23     (Gutman's Exhibit-2 admitted into evidence)

24     (Gutman's Exhibit-3 admitted into evidence)

25     (Gutman's Exhibit-4 admitted into evidence)

1        (Gutman's Exhibit-5 admitted into evidence)

2        (Gutman's Exhibit-6 admitted into evidence)

3        (Gutman's Exhibit-7 admitted into evidence)

4        (Gutman's Exhibit-8 admitted into evidence)

5        (Gutman's Exhibit-9 admitted into evidence)

6            MR. CORNELL:  Thank you, Your Honor.  I have nothing

7    further for Mrs. Gutman.

8            THE COURT:  Cross examination.

9                      CROSS EXAMINATION

10   BY MS. BUTCHER:

11   Q.  I just have a couple of questions, Mrs. Gutman.  Do you

12   have any personal knowledge of any of the other libel suits

13   currently pending against the Debtors?

14   A.  No.

15   Q.  Do you have any personal knowledge of any facts that make

16   your suit different than those?

17   A.  No.

18            MS. BUTCHER:  Thank you.

19            MR. DEUTSCH:  I have no questions, Your Honor.

20            THE COURT:  All right.  Thank you, ma'am.  You may

21   step down.

22   A.  Thank you.

23            MR. NEAL:  Shall we turn to argument?

24            THE COURT:  I'm sorry, let me ask if there's any

25   further evidence in support of the motion?

1            MR. NEAL:  No, there is not, Your Honor.

2            THE COURT:  Okay.  Does the Committee have any

3    evidence in support of its opposition?

4            MR. DEUTSCH:  No, Your Honor.

5            THE COURT:  All right.  Thank you.  Then, yes, let's

6    proceed with brief argument.

7            MR. NEAL:  Very good.  I will keep it brief, Your

8    Honor.  Your Honor, as Your Honor's well familiar, cases settle

9    for a myriad of reasons, and of course, mediation requires

10   compromise by both sides.  It is often said that a good

11   settlement is one where the parties are equally unhappy, Your

12   Honor.  But here, I would submit that the evidence shows, by

13   virtue of simple math, Your Honor, that the settlement is a

14   good deal for the Debtors and their estates.

15           Let's review the numbers very quickly.  They're set

16   forth in full detail in the Bralow declaration.  As of the

17   petition date, the Debtors had already incurred approximately

18   1.2 million in costs, connected with the defense of the Florida

19   action.  And it is clear from Mr. Bralow's testimony, that the

20   discovery phrase of the Florida action is not yet complete.

21   Because all the defense costs incurred by the Debtor's estates

22   would represent administrative expenses against the Debtor's

23   estates, the Debtors believe that the settlement represents a

24   resolution of the Florida action that is half as expensive to

25   the estates than the alternative, even if the Debtors were to

1   completely be successful in defending the Florida action

2   through trial and through appeal.  Therefore, the Debtors

3   believe the settlement agreement is in their best interests.

4   There are several unique characteristics regarding the case

5   itself, but certainly this settlement.  We have underscored in

6   our motion that we believe that there are at least three facts

7   that played a significant role in the outcome of the mediation.

8   First, as the testimony was elicited today, Mrs. Gutman

9   appeared -- appears to be facing significant financial

10  difficulties, and as a result, immediate payment was a

11  prerequisite to any settlement.  And as Mr. Bralow testified,

12  Mrs. Gutman made it clear that she would accept less, in return

13  for an immediate payment.  Second, Your Honor, under the terms

14  of the insurance policy, the Debtors had no ability to legally

15  compel the insurer to make any payments, until the Debtors had

16  satisfied their one million self-insured retention, to which

17  you do not apply defense costs.  Third, if the mediation

18  failed, the Debtors faced the prospect of a trial that would

19  likely cost as much as two million to defend, were the

20  plaintiff appearing before the jury would now be a widow now

21  proclaiming financial hardship, rather than a doctor, who we

22  contend had responsibility, in whole or in part, for the deaths

23  of 11 patients. We believe that we can easily satisfy the three

24  of the four applicable <u>Martin</u> factors that are in play here.

25  The probability of success of the litigation.  Most of the

1    cross examination of the Committee was devoted to this factor.

2    Mr. Ashley wanted to underscore that we had stated repeatedly

3    that we believe we have very strong, and ultimately successful

4    arguments to raise, both in the summary judgment phase of the

5    case, as well as on appeal.  But again, as Your Honor is very

6    familiar with, dispositive motions are not easily obtained.

7    They're not a guarantee that you would even obtain them in your

8    favor or against you prior to the trial date, and that there

9    are complex factual issues inherent in any defamation case,

10   certainly here where there are 11 deaths at issue, and the

11   complicating factor of Mr. -- excuse me, Dr. Gutman's suicide,

12   and how that might affect a jury. So in terms of the

13   probability of success in the litigation, Your Honor, that is

14   crystal ball gazing on all parties, but we do have an

15   experienced lawyer, 20 years of experience, member of the

16   Florida Bar, who has practiced in this county, Orange County,

17   Florida, that has experience with trying defamation cases, and

18   has come up with an estimate.  Is it perfect, can it be exact?

19   No, it isn't, Your Honor, but the range is 1.5 to 2 million.

20   Even assuming it's a little on the high end, and it should be

21   1.1 to 1.5 million, nonetheless, the Debtors would have to

22   incur, or more likely than not, have to incur those expenses

23   before you could even get to summary judgment.  The second

24   factor in play, Your Honor, is the complexity of the litigation

25   involved and the expense and inconvenience of delay.  I think

1   much has been said on that issue, 1.2 million already expended,

2   substantial discovery still needed even to get to the summary

3   judgment motion that may be a home run.  The substantial truth

4   summary judgment motion, which was certainly not in draft form

5   and ready to file at the time the stay was imposed.

6          The last issue, the last Martin factor, the paramount

7   interest of the creditors, again, this may be repeating, but I

8   will be brief.  The Debtors believe the settlement agreement

9   represents a substantial cost savings to the Debtors.  It

10  limits their potential liability and contains the Debtors'

11  out-of-pocket expenses well below the costs that would be

12  incurred in defending.

13          THE COURT:  Mr. Neal, often in these cases, that

14  factor -- I look most usually, most heavily to the

15  representatives of the creditor body themselves to tell me what

16  they think is the right way to go.  Here, they've said this is

17  not in our best interests.  How do you respond to that?

18          MR. NEAL:  I think, Your Honor, they're focused --

19  their focus, excuse me, is misplaced.  They're not looking at

20  the math, which really cannot be subject to any legitimate

21  dispute.  They're looking at the policy reason of advancing

22  monies on what they contend to be a pre-petition claim -- and

23  there is a pre-petition claim component no doubt to this

24  matter -- having immediate payment of that before a plan is

25  confirmed.  My understanding in representing creditors'

1  committees, they have a constituency of creditors with

2  fiduciary obligations, holding perhaps similar unsecured

3  claims, that don't want to see one get paid ahead of them.

4         So I understand the politics that are involved here.

5  Nonetheless, Your Honor, we see a situation where there are

6  savings associated with this settlement, that really cannot and

7  should not be ignored.  The second argument they have raised is

8  the floodgate argument, that we're going to be seeing 30 to 40,

9  if not more, similar cases come down the track.  Two responses

10  to that, one, we haven't seen those cases to date come in here

11  in a flurry of lift stay motions, and second, I tried to raise

12  this argument with Your Honor on June 30th, when I said, keep

13  the stay in place in full, in its entirety, no mediation, no

14  litigation.

15         THE COURT:  You both did actually on the June 30th

16  hearing.

17         MR. NEAL:  Yes.  So the floodgate argument didn't

18  really get much traction on June 30th, and you said, and you

19  quote, I will say that I know how to stop the floodgate from,

20  you know, remaining open if that were to happen.

21         THE COURT:  And I do sense that there was a bit of

22  skepticism about that at the time.  But I'd like to pursue what

23  we also discussed at the June 30th hearing, and that is the

24  creation for the Court's consideration of an ADR process.

25  The Committee at the time told me that they were working with

1   the Debtor to put something together.  Now, we're six, seven

2   months away from that time, and yet I've seen nothing.  And I

3   know exclusivity is presently set to expire at the end of next

4   month.  I don't know whether the Debtor intends to ask for an

5   enlargement of that period, a further enlargement of that

6   period, or whether a plan is to be filed at that point.  But

7   we're now over a year into the case, and you know, my -- even

8   more now than in June of last year, my strong sentiment is

9   really the ability to keep the floodgates opening rests with

10  the parties here, to propose either separately or in the

11  context of a plan, an ADR process that manages the litigation

12  that's pending.  And I'm -- you know, I just remind the parties

13  that they've had a lot of time to think about it.  Now, I'm

14  aware there have been other issues in this case, which may have

15  been more urgent at the time, but we are really now getting to

16  the time where if you want to keep floodgates from opening,

17  that may be really largely in your hands.

18          MR. NEAL:  So noted, Your Honor, so noted.  Returning

19  to this particular matter with Dr. Gutman, of course Your Honor

20  allowed a partial lifting of the stay to allow for the

21  mediation.  And there was some skepticism at the time of

22  whether this could achieve a mutually consensual result of

23  mediation, but perhaps we surprised everybody, Your Honor, in

24  reaching that deal.  For the economics as we've stated, it is a

25  good deal.  My last point, Your Honor, this decision that the

1  Debtors arrived at, was not arrived at in a vacuum.  The

2  Debtor's insurer was intimately involved, and by virtue of the

3  settlement itself, is testimony to the fact that it made an

4  independent judgment that it would come out of pocket $850,000

5  of this settlement, over and above the Debtor's one million

6  self-insured retention component.  That's an objective party

7  making a determination that there was risk that would exceed

8  the one million the Debtors were on the hook for.  So is it not

9  simply the Debtors that arrived at this independently; it was

10  arrived in consultation with its insurer and through the

11  exchange of views regarding the merits of the positions in the

12  Florida action and good faith negotiations.  So in conclusion,

13  Your Honor, after apprising themselves of the relevant risks,

14  the relevant costs associated with potential litigation, the

15  Debtors, as well as their insurer, concluded that the terms of

16  the settlement were a good deal, and were in their best

17  interests.  Thank you.

18           THE COURT:  Thank you.  Mr. Cornell, do you wish to

19  be heard?

20           MR. CORNELL:  Briefly, Your Honor.  Your Honor, I'd

21  like to start off by going back to the point the Court raised,

22  and that is usually in the Martin factor of the interest of the

23  creditors, the Court likes to know what the creditor committee

24  has to say on this point.  What's helpful, Your Honor, we

25  started this in our response to the motion in limine yesterday,

1    is the opinion by Judge McKelvey in <u>Marvel</u> as far as the

2    evidentiary issues that come up when a committee does object to

3    a settlement like this.  And I think what's important and

4    what's lacking here, and was also lacking in <u>Marvel</u> is evidence

5    to show that this is not in the best interests of the creditor

6    committee, or the creditor constituency.  I think the evidence

7    that's been put on, shows that indeed it is in the best

8    interests, and so, like <u>Marvel</u>, I think here the objection of

9    the Creditor Committee that this is going to hurt the creditors

10   is speculative.  I want to go back, Your Honor, to where I was

11   going to start, and that is the issue of the Committee learned

12   about this settlement after the fact.  That should not be a

13   basis to deny Mrs. Gutman approval of the settlement.  The

14   Gutmans filed their motion for relief from stay in April of

15   2009.  The committee filed a joinder, a separate joinder into

16   the objection of the Debtor, and then the Committee presented

17   argument in opposition to the relief from stay on June 30th.

18   At that time, there was a discussion about mediation and the

19   parties went forward with mediation.  The Committee, for

20   whatever reason, and I will acknowledge, sometimes committees

21   do not participate in mediation.  This was a $600 million

22   demand, a highly litigious piece of litigation, did not

23   participate in mediation, whether it be by phone, or whether

24   flying down to Florida to be there in person.  Instead, the

25   Committee flew down to Florida after the mediation to take Mrs.

1    Gutman's deposition, her second deposition in this bankruptcy

2    case, to find out what are you going to testify to at the

3    hearing in support of the settlement.  So that -- this -- and

4    the reason I raise this issue, you might say what's the

5    relevance under <u>Martin</u>?  The relevance is if the Court is

6    thinking of this case in the terms of ADR, Mrs. Gutman should

7    be carved out, because she's going through her ADR process, and

8    she's mediated, and to the surprise of all, there was a

9    settlement.  I want to go now to the issue of Mrs. Gutman is

10   receiving special treatment to the detriment of other

11   creditors.  It hasn't been discussed, but it's been on the

12   record, so I think that the point needs to be made.  This is

13   not the necessity of payment issue.  The cases cited by the

14   Committee for a necessity of payment, it's a Third Circuit 1972

15   and a Third Circuit 1981 case, both those cases are railroad

16   reorganization cases, neither of which apply a <u>Martin</u> type

17   analysis, neither of which are in the context of a Rule 9019

18   settlement motion.  No one here is saying that this case cannot

19   move forward unless the Gutman settlement is approved.  And so

20   the idea that necessity of payment bars this settlement, we

21   believe is incorrect.  In our response to the settlement, we

22   cited two cases we thought were important, <u>Public Service of</u>

23   <u>New Hampshire</u>, 1989 District of New Hampshire Bankruptcy Court

24   decision, and I believe the Fifth Circuit's decision in <u>Cajun</u>

25   <u>Electric</u>.  The reason I bring those up now, Your Honor, is in

1   <u>Public Service</u> the Court said look, settlements like this are

2   what help a debtor get to reorganization, even if includes a

3   payment of cash prior to other creditors.  This is the

4   flexibility of Chapter.  Your Honor shared at the beginning a

5   comment about other creditors have been paid post-petition in

6   this case, which I believe were bonuses.  And that shows you

7   the flexibility this Court has, that necessity of payment is

8   not the.  <u>Cajun Electric</u>, when they're -- they are the Circuit

9   Court looking at the reasonableness of the settlement, they

10  said, we're also going to look at the arm's length negotiation;

11  and I raise that here, only because I think a 15-hour mediation

12  shows that this is contentious, and then in June, Mr. Neal and

13  I were not on the same side of the fence, and now we're trying

14  to work to get this deal done, for our own various reasons, of

15  course.  I will not go through all the <u>Martin</u> factors, except I

16  think two are important.  Actually, I'll only stick to one, and

17  that is success on the merits.  I want to thank the Court for

18  allowing Mrs. Gutman to testify.  She testified -- the purpose

19  behind it was two respects.  One, what's the likelihood of

20  success in the underlying action?  You have an articulate

21  composed witness who can make a very compelling case against

22  these Debtors, were it to go to trial.  I think the Debtor's

23  acknowledged that in their settlement.  Two, why now?  So why

24  did she settle now, and we've got a family business here.  And,

25  Your Honor, candidly, that's an equitable argument, that's not

1  relevant, but it needs to be heard.  She cut a $600 million

2  demand down to $1.8 million, because she wants to keep the

3  family business going.  That's her interest, the Debtor's

4  recognized their interest.  And finally, Your Honor, I think we

5  wanted to bring up the point we want this to be over with, so I

6  thank the Court for hearing us this morning.

7          THE COURT:  Thank you.  I'll hear from the Committee.

8          MR. DEUTSCH:  Your Honor, Doug Deutsch on behalf of

9  the Creditors' Committee again.  I guess to start, I would note

10  that the Debtors have relied on business judgment, and frankly

11  not an issue that we focused on a lot until very recently, but

12  the business judgment is apparently Mr. Bralow's business

13  judgment.  Mr. Bralow, of course, is no longer employed by the

14  Debtor, so they have essentially out-sourced their business

15  judgment to a third party.  Your Honor, as a start, we don't

16  think it's appropriate, and we don't think that the Debtors

17  have put on their evidence, haven't met their burden to prove

18  that the settlement is appropriate on that basis.  Secondly,

19  Your Honor, with respect to the --

20          THE COURT:  So what are you suggesting should have

21  occurred but did not, at least on this record?

22          MR. DEUTSCH:  With respect to this record, the

23  Debtors would have to put forward a witness who was actually

24  employed by the Debtors.  I certainly could not come forward as

25  a lawyer of one of my clients and talk about my client's

1    business judgment.

2              THE COURT:  Are you suggesting that the witness was

3    not authorized to speak on behalf of the Debtor?

4              MR. DEUTSCH:  I fully believe he was authorized to

5    speak, and I believe he may be an agent of the employee -- of

6    the employer, of Tribune, excuse me.

7              THE COURT:  Well, in light of that, why wouldn't he

8    have been competent to speak on behalf of the Debtor here?

9    What you're suggesting really is that by your statement, is

10   that the Debtor didn't properly go through the process, which

11   is required to illustrate that there was some appropriate

12   exercise of decision-making in the process, and I agree there

13   was no specific evidence presented about that.  But it seems to

14   me, unless you have some reason to suspect that it did not

15   occur, I would tend to rely on what the witness here, at least

16   in terms of his authority, had to say.  Tell me why I

17   shouldn't?

18             MR. DEUTSCH:  Your Honor, as a -- I guess as a

19   fundamental principal, again, I've never seen before a lawyer

20   come forward and put on testimony on behalf of a client with

21   respect to the business judgment of the client.  I don't want

22   to reiterate what I already said, I mean, it's bothersome.

23             THE COURT:  I've seen it.

24             MR. DEUTSCH:  Okay.

25             THE COURT:  I've seen it.

1              MR. DEUTSCH:  Well, Your Honor, you're certainly the

2    boss.

3              THE COURT:  Well, maybe not at home, but here anyway.

4              MR. DEUTSCH:  Fair enough.  Your Honor, secondly, and

5    I touched on this before, and wanted to go into a little bit of

6    detail with respect to the law.  I think we'll talk about where

7    all our sympathies lie with respect to fair and reasonableness,

8    and what I would consider the factual arguments.  With respect

9    to the law, Your Honor, I think we have a situation here that

10   is not typical.  You may see it, and you may approve it where

11   everybody's aboard, that is where the Creditors' Committee and

12   the other major constituencies say it's okay to pay this pre-

13   petition claimant.  But I don't believe -- and we'll talk about

14   the cases and the law -- I don't believe it's appropriate, or

15   you're authorized to grant it where all the parties are not

16   aboard.

17             THE COURT: Well, let's explore that, because on one

18   level, I think the Debtor here, as Mr. Neal stated, is

19   absolutely right.  And that is, as a matter of simple math, if

20   I believe the testimony of Mr. Bralow, if I don't grant this

21   relief, and the litigation continues, and as I indicated at the

22   June hearing, I thought that process with respect to this claim

23   should move forward.  The Debtor will end up spending more

24   money than it will by saving -- then by making the settlement.

25   And just as a matter of simple logic, it makes no sense to me

1   that I should deny the settlement because arguably, because it

2   settles a pre-petition claim; and as a matter of bankruptcy

3   principles, we don't pay pre-petition claims except in certain

4   limited circumstances, except through a plan.  But if the

5   evidence demonstrates that by settling, the Debtor actually

6   will spend less in the way of out-of-pocket dollars, why

7   wouldn't I approve it?  I mean, all other things being equal.

8              MR. DEUTSCH:  Yeah.  I -- Your Honor, at least the

9   way I think about it, I actually think you may be on the fair

10  and reasonableness analysis, but I'll address this because

11  certainly I wrote it down as a point as Mr. Neal said it, and I

12  think it's important and you're asking.  I can do math.  I also

13  know that $3 million is more than $1 million.  That's not the

14  point, and I think we've said this repeatedly.  We're not

15  talking about one case here, and I think that's where the

16  Debtors have made a mistake.  We are talking about 38,000

17  scheduled and filed claims in this case, and hundreds of

18  litigation claims.

19             THE COURT:  Well, by my ruling, I pretty much didn't

20  give the Debtors a choice but to proceed, at least through

21  mediation in this matter, so.  But in a way, I limited what was

22  available to the Debtor in the way of alternatives.  And I know

23  the Committee was also resisting this.  And I hear the 38,000

24  claims, but what we're really talking about is claims like

25  this, and as I understand from what counsel have discussed, the

1    universe of that is more like 45 media cases.

2            MR. DEUTSCH:  Your Honor, there's 45 media cases,

3    there are 200 litigations, that includes PI cases.  I mean,

4    we're going to have a lot of sympathetic claimants who are

5    paraplegics and the like and --

6            THE COURT:  Hold on, hold on.

7            MR. DEUTSCH:  Yeah.

8            THE COURT:  I made it clear, I thought, in fact the

9    transcript of June 30th reflects it, that's why I took the

10   break to have this pulled up.  The -- while on a human and

11   personal level, Mrs. Gutman's situation is very compelling,

12   that's not why I made the decision.  As I said then, justice

13   has to be administered dispassionately.  And I will tell you

14   that played no factor whatsoever in terms of the decision I

15   made in June or the one that I will make today, one way or the

16   other.  I'm sticking strictly to the Martin factors, and what's

17   relevant is the impact on the estate, as opposed to the benefit

18   to the non-debtor party.  Let me be clear about that.

19           MR. DEUTSCH:  Okay.  Your Honor, the impact on the

20   estate, I believe, is more than the million dollars at stake

21   here, for the reasons I've already said.  I don't believe that

22   you should take this claim in a vacuum and say, that's

23   $3 million is more than $1 million and therefore it should be

24   settled.  We disagree with the Debtors on this, and I'd like to

25   go through, among other things, why we think it's inappropriate

1    to pay it from a legal perspective.  Now, I understand your

2    questions, I guess.  I would suggest to you that absent the

3    major parties in this case aboard the payment, aboard,

4    approving, joining with, of this payment, that it is

5    inconsistent with the Bankruptcy Code, and I think it's

6    inconsistent with case law, and we can talk a little bit about

7    the case law.

8            THE COURT:  So that taken to its logical conclusion,

9    your argument is that if something isn't permitted by the

10   Bankruptcy Code, and I don't object, the Court can order it.

11   But if I do object, the Court can't?

12           MR. DEUTSCH:  Your Honor, I'm not sure about the

13   former, but I know that it happens.  So with respect to the

14   latter, yes.

15           THE COURT:  Well, give me your best argument.

16           MR. DEUTSCH:  Okay.  Fair enough, Your Honor, thank

17   you.  Your Honor, as a matter of black letter law, we believe

18   that the Bankruptcy Code does not permit the payment of pre-

19   petition claims prior to a plan confirmation, absent agreement

20   of all the parties.  I cite, Your Honor, to among other cases,

21   In Re: Columbia Gas, 136 BR 930 at 935, a bankruptcy case from

22   Judge Balick in 1992, where she said "The quality of

23   distributions among claimants is a central policy of the

24   Bankruptcy Code.  Similarly situated claimants should receive

25   pro rata shares of the Debtor's property, and only in the

1  context of a confirmed plan."  And she cites a Third Circuit

2  case which actually provides a bunch of cites, and full

3  disclosure, a bunch of cites that don't say -- that say she had

4  gathered together the cites to come to that proposition.

5          THE COURT:  My guess is that one could find hundreds,

6  if not thousands, of cases articulating the same principal.

7          MR. DEUTSCH:  I agree, Your Honor, and with respect

8  to that, I mean, we talked about kind of the corollary to that,

9  which is all of the discussions on the necessity of payment.

10 The reason we discussed the necessity of payment, is because

11 it's the exception to the general rule, and I cite to one case

12 Sharon Steel Corporation, which is a Western District of

13 Pennsylvania bankruptcy case, 159 BR 730, where it talks about

14 it a little bit.  And it says, there's a split of authority

15 with the respect to the issue of whether we are empowered to

16 authorize a Chapter 11 Debtor's payment of pre-petition claims.

17 The line of cases suggested by the PBGC holds that the

18 bankruptcy case does not permit selective pre-confirmation

19 payments to unsecured creditors.  Other courts hold that the

20 necessity of payment doctrine is a narrow exception to the

21 rule.  Your Honor, if you go read through the necessity of

22 payment cases, again along with the cases we've cited in our

23 brief and this one, you'll see the general rule is, there's no

24 payment.  That's consistent with the Code.  It's consistent

25 with the principles upon which the Code is meant, is created.

1  We don't want to rush to the courthouse, and we want to treat

2  all creditors the same way.  Your Honor, just to touch upon

3  Cajun, which is one of the cases cited by Mrs. Gutman's

4  attorney.  If you read Cajun Electric, which is a Fifth Circuit

5  case from a few years ago, what you'll note about Cajun is that

6  the facts are incredibly dissimilar from those we face.  The

7  case involved a nuclear facility, a $5 billion facility, where

8  the two main parties had been warring for years over various

9  litigations, a nuclear facility included safety, the contract

10  to build this facility, and seemingly everything else in the

11  world, these two parties agreed to settle the litigation.  Then

12  the unsecured creditors' committee came in and objected to it.

13  And they objected not on the basis that it was inconsistent

14  with a priority scheme set forth in the Code, but they objected

15  because they said it was a -- it violated Braniff and was a de

16  facto -- a sub rosa plan, excuse me, Your Honor.  The Court

17  addressed that in that case, and said it wasn't a sub rosa

18  plan, and never addressed the issue as to whether you could pay

19  a creditor inconsistent with the Code.  I note in that case,

20  also, that these two major parties, again, who held billions of

21  claims, were compared to a creditors' committee that had $7

22  million in total claims.  I mean, that's certainly not the

23  situation we're talking about here.  We represent approximately

24  $13 billion of claims in this case.  Your Honor, we talked

25  about the 38 other thousand claims, we believe moving this case

1   forward, and we're trying to do it with the plan, as you know.

2   Mr. Conlan from the Debtors came forward about two months ago,

3   and talked about how we were all trying to bring everybody

4   together and move this case forward.  I'll tell you, Your

5   Honor, I'm not sure I've heard you express it in this term, but

6   I know I've heard you express it before, getting to a plan

7   confirmation where everybody's moving in the same direction is

8   like herding cats.  That's what we're facing here.  We don't

9   want disparate treatment for similar creditors.  Turning to the

10  facts, Your Honor.  Is this proposed settlement fair and

11  reasonable?  At its core and I guess I'd say because I've heard

12  what you've already commented on this, one way to look at this

13  is that we're paying a million dollars to satisfy a million-

14  dollar claim.  The maximum amount that the Debtors can be

15  liable under this case for as a claim is a million dollars.

16  All the rest, although I was told by Mrs. Gutman's attorney,

17  that it's all speculation.  All the rest, the 1.5 to $2

18  million, that's all speculation.  All I know about is the

19  million dollars.  Now, we think it would be fair, of course, to

20  pay the million as part of a -- pay whatever amount comes out

21  of this, at the conclusion of the bankruptcy case.  With

22  respect to the one point --

23          THE COURT:  So your objection is only as to timing?

24          MR. DEUTSCH:  No, my objection goes further, Your

25  Honor, and I knew -- however, timing is certainly a primary

1   concern of ours.  What we heard today is we heard that the
2   Debtors seek to pay -- put forth facts where they would seek to
3   pay two-thirds of the low end of the -- about two-thirds of the
4   low end costs of the legal costs, without taking into account
5   any discount.  I mean, you heard from Mr. Bralow with respect
6   to the estimate, 1.5 to 2 million, there was no real discount
7   taken into account for any summary judgment motions or the
8   like.  That's just not generally how it's done.  We believe, as
9   I noted, that the Debtors have failed to provide analysis of
10  the other cases, and it really drilled down on that.  I think
11  that's something that Mr. Neal said to me, you know, look at
12  the math.  We're not -- we look past the math.  We don't look
13  at one claim, we look at all the claims in this case.
14  What happens when, you know, Mrs. Smith in Connecticut brings
15  forward a PI claim or Mr. Jones in the LA Times, and we have
16  these cases.
17          THE COURT:  It depends on whether there's an ADR
18  process in place or not.
19          MR. DEUTSCH:  Well, let's talk about that for a
20  minute.  From my perspective, an ADR should be in place, and we
21  need not go into like all the back and forth on that, but
22  that's something that I think the Committee would wish and
23  desire.  And unfortunately, we can't control everything that
24  the Debtor does or doesn't do.  And I invite you to -- if you'd
25  like more information on the ADR process, to chat with the

1  Debtors about that.

2         THE COURT:  I thought I did.  In June and today.

3         MR. DEUTSCH:  Fair enough, Your Honor.  I can assure

4  you I've talked to them a lot more than that.

5         With respect to the factors, we talked about the

6  factors, you know, the first factor, the probability of success

7  in the litigation, the --

8         THE COURT:  Maybe the Committee's going to have to

9  file the motion.

10        MR. DEUTSCH:  Maybe.  The Debtors believe they will

11  win.  With respect to the second, it's not the likely

12  difficulty in collection.  The third, complexity of litigation

13  and the inconvenience and delay necessarily attending it.

14  We don't believe the Debtors have put forth the appropriate

15  cost analysis, with respect to three, to allow us to actually

16  seriously gauge whether this element is satisfied.  With

17  respect to the paramount view of the interest of the creditors,

18  the creditors reviewed all these facts, did a detailed

19  examination of it, had numerous calls and meetings to try and

20  work this out, and concluded this wasn't a good deal.  Your

21  Honor, you said yesterday during your ruling how the creditors

22  are the owners of this company.

23        THE COURT:  No, what I said was, Mr. LaMay (ph) took

24  the position that the company was operating for the benefit of

25  creditors.  I also noted that there may be other constituents

1   who might disagree with that proposition.

2           MR. DEUTSCH:  Well, I will not say it nearly as well,

3   so I'll just note that I agree with Mr. LaMay.  In any event,

4   the creditor's views here should be taken into account, and we

5   don't believe they have been.  Just to kind of hit the few

6   items that were raised during discussion, we were criticized

7   with respect to taking an affirmative role in the Florida

8   litigation.

9           THE COURT:  Or the failure to take an affirmative

10  role.

11          MR. DEUTSCH:  Thank you, Your Honor.

12          THE COURT:  By the way, which I considered to be of

13  no consequence under these circumstances.

14          MR. DEUTSCH:  Okay.  You know, had we been invited,

15  we would've been there.  Had I known about it, we would've been

16  there.  We have regular conferences with the Debtors on a

17  weekly basis about what's going on and frankly, this just never

18  came up.  There are hundreds of things going on, surprisingly

19  with 38,000 claims, the Debtors weren't focused on it or we

20  weren't -- the Debtors didn't share some information with us.

21  Secondly, it was suggested that we need to put on evidence with

22  respect to the 9019 motion.

23          THE COURT:  I know upon whom the burden rests.

24          MR. DEUTSCH:  Fair enough, Your Honor.  That's all I

25  have, Your Honor.

1           THE COURT:  Thank you.

2           MR. DEUTSCH:  Thank you.

3           THE COURT:  All right.  I'm prepared to make my

4    ruling.  I'm going to approve the motion, and I will tell you

5    why.  When I look at the <u>Martin</u> factors, and really I -- the

6    evidence went largely here to the probability of success and

7    the complexity of litigation and expense factors, which really

8    under these circumstances blend, not only the direct testimony

9    of Mr. Bralow, but frankly, the information that was elicited

10   by the Committee on cross, I think provides more than

11   sufficient evidence of the fact that the continuing expense,

12   uncertainty, and complexity of this case, is one which calls

13   for a settlement.  And in fact, despite the fact today that

14   counsel have expressed surprise that the mediation was

15   actually successful, this does not necessarily come as a

16   surprise to the Court, and frankly, it's one of the reasons I

17   ordered the relief that I ordered in June.  The likely

18   difficulty of collection as the Debtor has pointed out, is not

19   applicable here.  And let's talk about the paramount interest

20   of creditors.  I do think -- first of all, I don't know that

21   there's any case that's been cited and certainly none's been

22   argued here today, that prohibits a Court in the context of a

23   9019 settlement to -- prohibits the Court from approving a

24   settlement, which involves payment of pre-petition debt, and

25   on the level as we've been discussing of pre math, it just

1  defies logic to say that the Bankruptcy Code prohibits a Court

2  from approving a settlement that would actually save the

3  expenditure of post-petition dollars, even though it involves

4  a payment, a settlement of a pre-petition debt.  I don't know,

5  until I'm directed by controlling law to the contrary, I'm not

6  buying into the principle that says a Court can't do that.  I

7  am sensitive to the floodgates issue.  We talked about it in

8  June, by now the parties all know my views about that, so I

9  won't repeat them here.  All I'll say is that I anxiously

10  await the proposal of an ADR process or the filing of a plan

11  which contains one, so we can find a way to manage the

12  potential problems that the Committee, with some legitimacy,

13  points out.  ButI will say until something like that happens,

14  when people file motions, the Court is required to dispose of

15  them.  I'm not saying that if there's another motion filed

16  I'll dispose of it in like manner.  Each situation poses its

17  own circumstances, so I'm not going to prejudge anything.  And

18  despite the objection of the Committee, I do think that this

19  settlement is in the best interest of creditors, because if it

20  is true, and Mr. LaMay was right that the company is being

21  operated for the benefit of the unsecured creditors at this

22  point, this settlement saves you some money; and the math does

23  make that clear.  So for these reasons, I am going to approve

24  the relief that's been requested, and I'll ask Counsel to

25  confer and submit a form of order which provides that,

1    referring to the reasoning for the decision as what I've

2    stated on the record today.  Are there any questions?

3          MR. LANTRY:  Your Honor, Kevin Lantry, no questions

4    on your ruling.  If you would like, I would like to respond

5    briefly about the ADR process.

6          THE COURT:  I would love that.

7          MR. LANTRY:  Your Honor, we have spent a lot of time

8    talking about how this could be structured, designing it; and

9    we ran into a problem with the insurers.  I'm a little

10   uncomfortable going into detail in open court about that.  We

11   have certainly explained it to Creditors' Committee counsel,

12   as well as the lenders, in terms of some of the issues that

13   the insurers have raised, and its results, and that has not

14   yet been solved.

15         THE COURT:  Well, let me just ask this again, with

16   no need on your part to be specific, is there something unique

17   about the types of litigations that are involved here, that

18   poses a different kind of a problem as it has in other cases?

19         MR. LANTRY:  It's really differences in the

20   underlying coverage that cause inequitable or disparate

21   results for the claimant, given the positions the insurers

22   have taken in interpreting their policies  What we have been

23   doing, as you have seen, and you granted one of the

24   stipulations again yesterday, is we have, on an individual

25   basis, as claimants' impending litigation come forward, we

1    have said, we'll do exactly what we would do in an ADR, which

2    is grant relief on a limited basis to go to mediation, and

3    we've been doing a number of those.  And a number of

4    successful results have come from that.  That seems to be

5    where we sit right now, the best way to go.  And part of it is

6    for one other reason.  As you certainly heard on the December

7    1 hearing, when there was a lot of talk about the plan, there

8    are vast swings between how the various constituencies view

9    the treatment of the general unsecured creditors, particularly

10   at the operating subsidiaries, in terms of how they'll be

11   treated under the plan.  And so what the government's came to

12   us, and almost everybody else comes to us and says, what are

13   we going to get paid under the plan, and what are we going to

14   get paid under the plan.  And that's at this stage, still a

15   very difficult thing to give them any certainty on. And so

16   what we've bumped into in the mediation and in our settlement

17   negotiations is they don't want to talk to us about reaching

18   an allowed claim unless they have some view of what it's going

19   to ultimately pay them.  I think we could roll out an ADR

20   procedure or simply grant, you know, more relief from stays,

21   as soon as we get a little further down the road, in getting a

22   little more visibility on that.

23          So I just didn't want to leave that unanswered, Your

24   Honor –

25          THE COURT:  All right.

1          MR. LANTRY:  -- because we've certainly been

2    thinking about it.

3          THE COURT:  Thank you.  Anyone else wish to be heard

4    on that topic?  All right.  Anything further for today?

5          MR. NEAL:  No, Your Honor.

6          THE COURT:  Thank you all very much.  That concludes

7    this hearing.  Court will stand in recess.

8       (Court adjourned)

9

10                      CERTIFICATION
11   I certify that the foregoing is a correct transcript from the
12   electronic sound recording of the proceedings in the above-
13   entitled matter.
14

15   *Lewis Parham*                          2/4/10

16   _____        _____
17   Signature of Transcriber              Date