**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al., | Case No. 08-13141 (KJC) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: February 18, 2010 at 10:00 a.m.**<br>**Ref. No. 3062** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS TO MOTION OF WILMINGTON TRUST COMPANY**
**FOR APPOINTMENT OF AN EXAMINER PURSUANT TO**
**SECTION 1104(C) OF THE BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") submits this objection ("Objection") to the Motion of Wilmington Trust Company ("Wilmington Trust") for Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code (the "Motion") and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      Despite the Motion's overwrought tone, the issue presented for judicial determination is straightforward: should the Court appoint an examiner to conduct a disruptive, expensive and wholly-duplicative investigation of potential causes of action already being investigated and pursued by the Committee. This issue should be examined against the backdrop of the Committee's work to date in investigating and now actively pursuing these claims, including most notably the recent filing of the Committee's Motion for Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute and Settle Claims and

Counterclaims of the Debtors' Estates (Docket No. 3281) (the "Motion for Standing").

2.　　　In considering the Motion and its underlying motivations, the Court must also take note of the deeply subordinated nature of the debt instruments that Wilmington Trust represents -- those obligations (known as the "PHONES") are expressly contractually subordinate in right of payment to all other funded debt of Tribune Company, as specified in the indenture under which the PHONES were issued.[1]  Wilmington Trust has offered no analysis or explanation for why the very deep subordination imposed by the indenture should not be applied in accordance with its terms.

3.　　　In addition to addressing the legal arguments set forth in the Motion, the Committee also files this Objection to correct significant material misstatements of fact contained in the Motion.[2]  Because Wilmington Trust's misstatements question the Committee's discharge of its fiduciary duties, the Committee addresses them in this Objection.

## I.　　RELEVANT PROCEDURAL HISTORY

4.　　　On August 26, 2009, Law Debenture Trust Company ("Law Debenture") filed its Motion for Leave to Conduct Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure of Tribune Company, its Affiliates, and Certain Third Parties or Alternatively, for the Appointment of an Examiner (the "First Examiner Motion") (Docket No. 2031).  That motion contained allegations and, in part, a request for relief that were virtually identical to the allegations made and the relief now requested by Wilmington Trust.

5.　　　On September 21, 2009, Wilmington Trust joined the First Examiner Motion

---

[1]  *Indenture*, dated as of April 1, 1999, between Tribune Company as Issuer, and Wilmington Trust Company as successor Indenture Trustee, Section 14.01 at 61-62.

[2]  The Committee notes that most of the accusations and factual misstatements contained in the Motion have already appeared in the First Examiner Motion (as hereafter defined).  While the Committee has already addressed these accusations and misstatements in its Response to Law Debenture (as hereafter defined), it will do so here again to be sure the factual record on these issues is accurate.

(the "Joinder").  *See* Docket No. 2172.  By doing so, Wilmington Trust put its request for an examiner squarely before the Court over four months ago.

6.     On September 25, 2009, the Court entered an order approving a stipulation in which Law Debenture agreed to, without prejudice and *inter alia,* withdraw its First Examiner Motion.  *See* Docket No. 2235.  Wilmington Trust did not object to that stipulation or otherwise seek to have its request for an examiner heard by the Court.

7.     On January 13, 2010, four months after it filed the Joinder, Wilmington Trust filed its Motion.  Despite its representation to the contrary in the first sentence of ¶ 112 of the Motion, the procedural history and the rest of that very same paragraph of the Motion demonstrate plainly that a previous request for the precise relief sought in the Motion has been made by Wilmington Trust.  That Wilmington Trust failed to seek a hearing on its previous request for over four months does not erase its existence.

8.     On February 1, 2010, after an extensive investigation, and with no consensual resolution in sight, the Committee, through its independent special counsel, filed the Motion for Standing, which seeks authority to pursue causes of action on behalf of the Debtors' estates arising from Tribune Company's ("Tribune") 2007 ESOP/LBO transaction (the "LBO"). The Committee's Motion for Standing represents the culmination to date of the Committee's thorough and diligent investigation into the LBO transaction and its determination that the time is now ripe for these issues to be litigated if they cannot be appropriately settled.

## II.    COMMITTEE'S RESPONSE TO WILMINGTON TRUST'S FACTUAL MISSTATEMENTS

9.     As the Committee has already pointed out in response to Law Debenture's First Examiner Motion, it is a long-held tenet of chapter 11 bankruptcy law that the Committee

owes a fiduciary duty to all unsecured creditors and is charged with the investigation and pursuit of claims where the Debtors are unable to proceed.[3]  While the Motion criticizes the Committee for not advancing the specific and narrow goals of Wilmington Trust's subordinated constituency, it ignores the Committee's mandate to represent -- and necessarily to weigh and balance -- the interests of all unsecured creditors.  It is precisely because official creditors' committees are broadly representative and transcend narrow parochial agendas that courts grant them the authority to pursue estate claims where, as here, the debtor cannot.[4]  This authority is exactly what the Committee seeks to invoke through its Motion for Standing.

　　　　10.　　Wilmington Trust may be an ideal voice for the specific, deeply subordinated interests it represents, but only the Committee, and not any narrow individual constituency, can legitimately speak as the consensus voice for the diverse interests of all unsecured creditors.  That is why the Office of the United States Trustee is so careful to form chapter 11 committees in this and other cases that are broadly representative and not narrowly parochial.

　　　　11.　　Because the Motion relies on a series of unsupported and untrue allegations about the Committee and its professionals that challenge the Committee's proper discharge of its duties, this objection also sets the record straight with respect to three significant issues

---

[3]  *See Maryland Nat'l Bank* v. *Busy Beaver Bldg. Ctrs., Inc.* (*In re Busy Beaver Bldg. Ctrs., Inc.*), 127 B.R. 343, 345 (Bankr. W.D. Pa. 1991) ("The Committee has a statutory duty to investigate, *inter alia*, the acts, conduct, assets, liabilities, and financial condition of the Debtor."); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp.* v. *Chinery*, 330 F.3d 548, 553 (3d Cir. 2003) ("'[N]early all courts considering the issue have permitted creditors' committees to bring actions in the name of the debtor in possession if the committee is able to establish' that a debtor is neglecting its fiduciary duty.").

[4]  *See Unsecured Creditors' Comm.* v. *Stern* (*In re SPM Mfg. Corp.*), 984 F.2d 1305, 1316 (1st Cir. 1993) ("[The committee] is purposely intended to represent the necessarily different interests and concerns of the creditors it represents. . . .  There is simply no other entity established by the Code to guard those interests.") (citation omitted); *Official Comm. of Unsecured Creditors of Apex Global Info. Servs., Inc.* v. *Qwest Commc'ns. Corp.*, 405 B.R. 234, 251-52 (E.D. Mich. 2009) ("A creditors' committee is the representative body for the entire unsecured creditor constituency . . . [and] is responsible for representing and protecting the interest of the unsecured creditors in the plan negotiation process and throughout the entire bankruptcy case.") (citations omitted).

identified in the Motion: (1) the Committee's membership and its conflict of interest procedures; (2) the Committee's consideration of the issues raised by the LBO; and (3) the actions taken by the Committee's professionals.

### A.    *Tribune's Unsecured Creditors' Committee*

12.    The Committee was initially selected by the U.S. Trustee on December 18, 2008[5] and its composition was later amended to fill a vacancy.  Although over $10 billion of the estimated $14 billion of Tribune's total unsecured debt was held by the "LBO Banks"[6] at the time of the bankruptcy filings, the Committee is not composed solely, or even mostly, of such lenders.  Instead the U.S. Trustee achieved a balanced representation through the careful appointment of a diverse group of creditors holding different types of claims situated in different positions in the Debtors' capital structure.  These members as of the filing of the Motion[7] were:

- JPMorgan Chase Bank, N.A., in its capacity as lender ("JPM");
- Deutsche Bank Trust Company Americas, as successor Indenture Trustee ("Deutsche");
- Wilmington Trust, as successor Indenture Trustee;
- Warner Brothers Television;
- Buena Vista Television;[8]
- William Niese;
- Pension Benefit Guaranty Corporation; and
- Washington-Baltimore Newspaper Guild, Local 32035.

---

[5]  The Committee believes that no bondholder or bondholder representative (other than the two indenture trustees named below) sought a seat on the Creditors' Committee at the December 18, 2008 formation meeting.  Both of the indenture trustees, including Wilmington Trust, who sought Committee seats were appointed.

[6]  *See* Motion ¶ 3 for definition.

[7]  Merrill Lynch Capital Corporation ("Merrill") was a member of the Committee but resigned from the Committee on September 9, 2009.  The vacancy created by Merrill's resignation was not filled.

[8]  Buena Vista Television replaced Vertis, Inc. when the latter entity resigned in April of 2009.  Both are trade creditors of the Debtors.

*See* Second Amended Notice of Appointment of Committee of Unsecured Creditors (May 26, 2009) (Docket No. 1238).

13.     Despite contrary assertions by Wilmington Trust, its constituency is fully represented on the Committee.  In fact, though Wilmington Trust's constituency represents at most 8.6%[9] of Tribune's unsecured claims, its seat represents 12.5%[10] of the total Committee membership.  In contrast, the LBO Banks also have one seat, despite the fact that the LBO Banks represent approximately 83.4%[11] of Tribune's unsecured claims.  None of the other members of the Committee have the alleged "disabling" conflicts of which Wilmington Trust complains.  Thus the composition of the Committee itself has been designed to prevent exactly the abuse that Wilmington Trust asserts, namely that the presence of members with "disabling conflicts and/or no financial incentive to pursue causes of action" arising out of the LBO would undermine the LBO investigation.

14.     Not only has the composition of the Committee itself prevented such abuse; the Committee Bylaws provide additional safeguards.  As required by those bylaws, JPM and, prior to its resignation, Merrill, have at all times been completely recused from any participation of any kind in the Committee's review or deliberations concerning any aspect of the LBO, and they have been carefully screened from access to any Committee professional analysis or other non-public information that relates to the LBO investigation.  Accordingly, the Committee's review of the LBO is entirely free of any taint of participation by interested

---

[9]   Wilmington Trust states that it is the successor indenture trustee for the Exchangeable Subordinated Debentures due 2029 (the "PHONES") in aggregate amount of approximate $1.2 billion.  *See* Motion at p. 1.

[10]   Prior to Merrill's resignation Wilmington Trust represented approximately 11% of the Committee's membership.

[11]   JPM is the only current representative on the Committee of the LBO Banks, who collectively hold over $10 billion of Tribune's total unsecured debt.  Prior to Merrill's resignation, the LBO Banks had Committee representation of approximately 22.2%.

members.[12]

15.     The remaining seven Committee members -- two trade creditors, one labor union, one retired executive, the Pension Benefit Guaranty Corporation, and two indenture trustees (including Wilmington Trust) -- consider and decide all LBO-related issues.  The Committee is a representative cross-section of unsecured creditors and exercises its fiduciary duties to all unsecured creditors.

### B.     The Committee's Review and Prosecution of Claims Arising from the LBO

16.     Since the date of its appointment the Committee has been unwaveringly focused on the issues arising from the LBO and has pursued a detailed and exhaustive investigation into the potential claims arising from the LBO.  The Committee's Motion for Standing represents the latest and most public step to date in the Committee's pursuit of those claims.  While discussing specific and non-public details of the Committee's investigation would not be appropriate, the general scope and extent of the Committee's efforts can be documented.

17.     As noted in its Response and Partial Objection to the Law Debenture Motion (Docket No. 2136) (the "Response to Law Debenture"), the Committee timely initiated and conducted a comprehensive and extensive program of third-party discovery.  *See* Response to Law Debenture ¶ 16.  Beginning in March, 2009, that discovery has resulted to date in the production and review of approximately 2,500,000 pages of documents from over 20 parties and the taking of seven oral examinations.  No discovery target has been spared, as compulsory

---

[12]  Both JPM and Merrill acknowledged their inability under the Committee's Bylaws to participate in Committee deliberations (or to see Committee work product) related to the LBO and cooperated in the screening and recusal process described above.

discovery has been taken from all of the following: the Debtors, certain of the Debtors' advisors and professionals, the LBO Banks, Sam Zell and certain related entities, the Tribune Employee Stock Ownership Plan, and other parties. *Id.*

18.     When the Committee's discovery efforts met with resistance or delay there has been no hesitation to remove all obstacles in the path of its investigation. The Committee's tenacity is exemplified by its aggressive efforts to obtain broad and timely discovery from Merrill, a former Committee member. *See* Committee's Motion for Order Requiring the Production by Date Certain of Email Documents from Merrill Lynch Capital Corporation (Docket No. 2767).

19.     The Motion acknowledges the success of the Committee's investigation, stating that, as a result of the Committee's efforts, "extensive discovery has occurred and the data collected demonstrates that there are colorable claims arising out of the LBO." *See* Motion ¶ 8. Such an admission makes the request for an examiner to investigate the exact same data even more suspect.

20.     Wilmington Trust, as a member of the Committee, is well aware of the Committee's diligent efforts to investigate and prosecute any potential claims arising from the LBO. The most recent step in that process was the filing of the Committee's Motion for Standing. Any suggestion that the Committee has been sluggish in pursuing those claims is belied by the Committee's clear and decisive step towards putting its months of preparation and planning into action. The real problem here is not that the Committee's makeup has compromised or impaired its ability to investigate and pursue potential claims arising from the LBO, but rather that Wilmington Trust, as the indenture trustee for a deeply subordinated constituency at the very bottom of the Debtors' debt structure, has been unable to direct the

Committee's course of action to its own parochial satisfaction.

## C.    *The Committee's Professionals*

21.    On the day of its appointment the Committee selected Chadbourne & Parke LLP ("Chadbourne") and Landis Rath & Cobb LLP ("Landis", together with Chadbourne, "Committee Counsel") as its counsel.  Both law firms, in full accordance with all required bankruptcy and ethical disclosures, subsequently submitted applications for employment, *see* Docket Nos. 242 and 243, and, at the request of the U.S. Trustee, submitted supplemental affidavits.  *See* Docket Nos. 395 and 404.  Following the opportunity for parties, including Wilmington Trust, to object to the retention of Committee Counsel, this Court entered orders officially retaining Committee Counsel on February 20, 2009.  *See* Order Granting Application to Employ and Retain Chadbourne & Parke LLP as Co-Counsel to the Official Committee of Unsecured Creditors (Docket No. 429); Order Granting Application to Employ and Retain Landis Rath & Cobb LLP as Co-Counsel to the Official Committee of Unsecured Creditors (Docket No. 428).  Wilmington Trust, an active participant in these cases from their inception and itself a member of the Committee, raised no formal or informal objection or reservation to those retentions.

22.    As set forth in the Committee's Response to Law Debenture, all of the foregoing retention-related documents demonstrate that Committee Counsel made all required bankruptcy and ethical disclosures and confined their efforts -- through the use of co-counsel -- to those tasks where there could be no legitimate question about its motivations or loyalties.[13]

---

[13]  Chadbourne's representation of a bank group agented by Citigroup in an unrelated LBO fraudulent transfer action in the TOUSA bankruptcy case, hardly a secret in any event, was disclosed to the Committee during its first interview with Chadbourne, and the fact that Citigroup is a substantial client which Chadbourne represents in various matters was disclosed in Chadbourne's retention papers.  Law firms are generally allowed to serve on opposite sides of legal issues and Wilmington Trust has not suggested why this case would be different.  *See* ABA

These facts have not changed since the applications and related documents were filed and approved by the Court (with no objection by Wilmington Trust), nor should any of the related conclusions. In addition, to ensure that its process was beyond reproach the Committee took an important additional step, hiring Zuckerman Spaeder LLP ("Zuckerman") as special counsel.

23. Following an exhaustive search and selection process with full and active participation by Wilmington Trust and the other unconflicted Committee members, Zuckerman was chosen from among a highly skilled group of law firms. Again, the Committee followed the proper retention process by submitting its application to employ Zuckerman, *see* Docket No. 1953, and again a supplemental declaration was filed. *See* Docket No. 2081. No objections by Wilmington Trust or any other party were received to Zuckerman's retention, and the Court approved Zuckerman's Retention by an order dated September 3, 2009 (the "Zuckerman Retention Order"). *See* Docket No. 2088.

24. Pursuant to that order, Zuckerman's role is to:

> (a) assist the Creditors' Committee in its analysis of the potential causes of action [against the lenders related to the LBO];

> (b) participate in negotiations with the lenders and the Debtors;

> (c) if necessary prosecute such causes of action as described above to the extent, by subsequent motion, the Committee may be authorized to bring such causes of actions; and

> (d) perform such other legal services in connection with the above services as may be required or are otherwise are deemed to be in the interests of the Creditors' Committee in accordance with the Creditors' Committee's powers and duties as set forth in the Bankruptcy Code, Bankruptcy Rules and applicable law.

Zuckerman Retention Order at p. 2.

25. Under the Zuckerman Retention Order, Zuckerman's mandate -- claims to

---

MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. 24 (2002) ("Ordinarily a lawyer may take inconsistent legal positions in different tribunals at different times on behalf of different clients.").

the contrary notwithstanding -- is the broadest possible grant of authority necessary to do its job, mirroring the typical broad language used by courts in these instances. To that end, Zuckerman has independent authority, unfettered access to all the discovery materials produced, a mandate to review all issues it believes necessary to fulfill its tasks, and has been directed by the Committee to prepare for (and press forward with) the litigation of the LBO claims if a fair and equitable settlement cannot be achieved. The filing of the Committee's Motion for Standing demonstrates beyond any doubt the independent mandate of Zuckerman to investigate and prosecute the LBO claims to the fullest extent possible.

26. Zuckerman has confirmed its independent mandate from the Committee, as set forth in the Declaration of Graeme W. Bush annexed as Exhibit A to the Committee's Response to Law Debenture, and a copy of the relevant pages are attached hereto as *Exhibit A*. Zuckerman, Chadbourne and Landis coordinate efforts with respect to the investigation but, simply put, Zuckerman does not "report" to Chadbourne and is in no way subordinate to Chadbourne on the matters it is handling for the Committee.[14]

27. Wilmington Trust also asserts that the Committee's financial advisor, AlixPartners, LLP ("AlixPartners"), is conflicted and as a result Wilmington Trust "is left without an untainted financial advisor to investigate and advise upon the highly technical and complicated LBO." *See* Motion ¶ 62. Like the retention of Committee Counsel and Zuckerman, AlixPartners' retention was accomplished through the public filing of an application to employ, s*ee* Docket No. 245, and the public filing of a supplemental declaration. *See* Docket No. 425. Neither Wilmington Trust nor any other party filed an objection to

---

[14] As disclosed in its retention papers, Chadbourne sought and received the necessary written waivers from JPM and Merrill to conduct an investigation of the LBO claims. Landis also obtained a written waiver from JPM to conduct the investigation of the LBO claims and, at the Committee's request, has pursued discovery against several parties throughout the course of the investigation.

AlixPartners' retention, which was approved by the Court on February 20, 2009. *See* Docket No. 433. As a member of the Committee, Wilmington Trust was aware of AlixPartners' prior work with certain of the LBO Banks and had every opportunity to object to that retention but did nothing, waiting nearly a year after AlixPartners' retention to raise any complaint.

28. Wilmington Trust, as a member of the Committee, has thus been fully aware of every step in the retention of Committee Counsel, Zuckerman and AlixPartners, including each and every one of the supposed "disabling" conflicts it now belatedly complains about in its Motion. Wilmington Trust has waited until thirteen months after the retention of Chadbourne and Landis, eleven months after the retention of AlixPartners and five months after the retention of Zuckerman, to suggest that the professionals hired by the Committee on which it sits are conflicted or are somehow prevented from fully investigating and prosecuting potential causes of action. Such allegations must fail in the face of the plain facts of the case. That Wilmington Trust has waited until now to raise these pseudo-issues is clear evidence of litigation gamesmanship, all to the detriment of the estates and the other creditors.[15]

### III. THERE IS NO REQUIREMENT THAT AN EXAMINER BE APPOINTED, AND SUCH AN APPOINTMENT WOULD BE DETRIMENTAL TO CREDITORS' INTERESTS

29. Having addressed the numerous factual accuracies and unfounded accusations contained in the Motion, the Committee will now demonstrate why the Motion can and should be denied on the law. Simply put, the Motion should be denied because Section 1104(c) of the Bankruptcy Code does not require the appointment of an examiner, and no cause whatsoever for the appointment of an examiner exists here. In the alternative, if the Court

---

[15] When faced with similar gamesmanship, the court in *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 677 (Bankr. S.D.N.Y. 2006) noted that the bringing of untimely and tactically motivated "motions like these is not unethical, or sanctionable, but neither should it be encouraged, or rewarded."

determines that an examiner is required, the Court has ample authority to narrowly circumscribe the scope, duration and expense of any examiner's investigation so that a massive waste of time and money and duplication of efforts do not result.

### A. 11 U.S.C. § 1104(c)(2) is Permissive, Not Mandatory

30. Wilmington Trust argues that the appointment of an examiner is mandatory in this case pursuant to Section 1104(c) of the Bankruptcy Code because the Debtors' unsecured debts are well in excess of $5 million. *See* Motion ¶ 105-108. Section 1104(c) provides in pertinent part that:

> (c) . . . [A]t any time before the confirmation of a plan, on request of a party in interest . . . and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if –
>
>> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>>
>> (2) the debtor's fixed, liquidated, unsecured debts, other then debts for goods, services or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c)

31. While some courts have interpreted the language in Section 1104(c) to require the appointment of an examiner where the $5 million debt test is met, *see e.g.*, *Morgenstern* v. *Revco D.S., Inc.* (*In re Revco D.S., Inc.*), 898 F.2d 498 (6th Cir. 1990), not all courts have held that the language in Section 1104(c)(2) is mandatory. To the contrary, several courts in this jurisdiction have held that Section 1104(c)(2) is permissive, not mandatory. *See* Transcript of Record at 23, *In re SA Telecomms., Inc.*, Nos. 97-2395-2401 (PJW) (Bankr. D. Del. Mar. 27, 1998) (denying the U.S. Trustee's motion for the appointment of an examiner, where the request was ostensibly motivated in part by concerns that the unsecured committee

was not representative of all creditors and had potential conflicts, and stating that "this Court has for years consistently viewed § 1104(c)(2) as not being a mandatory provision."), a copy of the relevant pages is attached hereto as *Exhibit B*; Transcript of Proceedings at 75-76, *In re Am. Home Mortgage Holdings, Inc.*, No. 07-11047 (CSS) (Bankr. D. Del. Oct 31, 2007) (holding that Section 1104(c)(2) does not mandate appointment of an examiner simply because the debt test of Section 1104(c)(2) is met), a copy of the relevant pages is attached hereto as *Exhibit C*.

32.     This discretionary view of Section 1104(c) has been shared by several other courts in various jurisdictions.  *See e.g.*, *In re Rutenberg*, 158 B.R. 230, 233 (Bankr. M.D. Fla. 1993) (denying the appointment of an examiner in a case where the debtor's unsecured debts exceeded $5 million when such appointment "will cause further delay in the administration" of the case); *In re Shelter Res. Corp*., 35 B.R. 304, 305 (Bankr. N.D. Ohio 1983) (holding that the appointment of an examiner "would serve no useful or beneficial purpose and is not in the best interests of the estate" and noting that "to slavishly and blindly follow the so-called mandatory dictates of [Section 1104] is needless, costly and non-productive . . . .").

33.     Courts that view Section 1104(c) as discretionary interpret the statutory language as a consistent and coherent whole, defining "shall" in conjunction with "as is appropriate".  *See* Transcript of Proceedings at 75, *In re Am. Home Mortgage Holdings, Inc.*, No. 07-11047 (CSS) (Bankr. D. Del. Oct 31, 2007) (noting that it is important to look at the statutory language "not on its own, but as it relates to the rest of the sentence.").  The statutory language in its entirety indicates that the court "shall" appoint an examiner only where there is an appropriate investigation to perform.  *See id.* at 76 (denying the request to appoint an examiner where the debt test was met but where there was  no appropriate investigation to perform, noting that "the financial criteria are important, and obviously, they're met in this case,

but that's only one piece of the puzzle, and the other piece of the puzzle is that there has to be an investigation to perform that's appropriate.")   This reading of the language of Section 1104(c) as a whole demonstrates that there is no statutory requirement that the Court grant the Motion and courts in Delaware have not slavishly followed the "mandatory" reading suggested by Wilmington Trust, but have instead applied the statute in accordance with common sense and principles of sound bankruptcy administration.

34.     Even courts that have held that Section 1104(c)(2) requires the appointment of an examiner where the debt test is met will deny a request to appoint an examiner on other grounds if appropriate to prevent gamesmanship and abuse.  For example, in *In re Bradlees Stores, Inc*., 209 B.R. 36 (Bankr. S.D.N.Y. 1997), the bankruptcy court dealt with the request of an isolated constituency of unsecured creditors to appoint an examiner over the objections of the creditors' committee, among others.  The bankruptcy court held that "regardless of whether section 1104(c)(2) is mandatory or discretionary, a party in interest may waive its right to seek the appointment of an examiner."  *Id*. at 39.  Pointing, in part, to the fact that the small constituency had allowed a thirteen-month investigation to be conducted without seeking the appointment of an examiner, the court denied the request, noting that "the appointment of an examiner to conduct a new investigation at this time would be duplicative, needless and wasteful."  *Id*.  This is exactly the situation present here.  Wilmington Trust has watched the Committee's professionals perform the investigation over the past year but has only just now filed the Motion.  The Court has clear discretion to fashion a remedy under 11 U.S.C. § 1104(c) considering all of these facts.  *See also In re Schepps Food Stores, Inc*., 148 B.R. 27, 31 (S.D. Tex. 1992) (denying a request to appoint an examiner because, among other reasons, the request was motivated by the creditor's own interest and was used as a leverage tactic, not a

legitimate request).

**B.** *Appointment of an Examiner is Not in the Best Interests of the Estates*

35.     The Motion fails under 11 U.S.C. § 1104(c)(1) because the appointment of an examiner in this case is manifestly contrary to the best interests of the estates and their creditors.  As an initial matter, setting aside the factual inaccuracies that permeate the Motion, Wilmington Trust has offered no explanation for why the appointment of an examiner here would be in the best interests of the creditors or estates.  Instead, Wilmington Trust relies again and again on false and stale accusations of disabling conflicts and assertions that its constituency is not adequately represented in these cases.  *See* Motion ¶ 99.  But Section 1104(c)(1) is not designed to permit a single creditor class to hijack the chapter 11 process for its own narrow goals.   Otherwise, any unhappy party could abuse the examiner process to pursue its own private ends at the expense of all other creditors.  *See In re Gliatech, Inc.*, 305 B.R. 832, 836 (Bankr. N.D. Ohio 2004) ("A single creditor group 'cannot justify the appointment of a[n] . . . examiner simply by alleging that it would be in its interests.'" (*quoting In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001)).  Wilmington Trust must be able to show that the appointment of an examiner will be beneficial to the various constituencies; mere allegations are insufficient to justify appointment of an examiner.  *See In re Bel Air Assocs., Ltd.*, 4 B.R. 168, 173 (Bankr. W.D. Okla. 1980) ("[M]ere naked allegations are not enough to warrant the necessary expense and delay involved with such an appointment and investigation. . . .  [T]here should at least be some evidence presented that such allegations have some factual basis.  To construe the statute otherwise would mean that an examiner must be appointed to conduct a complete investigation in every case where a party in interest makes a naked accusation, whether it be in good faith or bad.").  Wilmington Trust has failed to provide

-- and cannot provide -- any genuine factual support and for that reason alone the Motion should be denied.

36. 11 U.S.C. § 1104(c)(1) asks the Court to use its discretion to consider whether grounds exist that would justify the appointment of an examiner. In its determination, the Court should consider the additional expense and potential delay that the appointment of an examiner entails. *See In re Gliatech, Inc*., 305 B.R. at 836 (noting that the costs of the appointment of an examiner should be considered). When evaluating the appointment of an examiner, the court in *In re Shelter Res. Corp.* noted that where a committee already existed that was capable of investigating potential claims, the duplication of effort that would result from the appointment of an examiner was "not in the spirit of economy of administration in the handling of bankruptcy estates." *In re Shelter Res. Corp*., 35 B.R. at 305. Here, where the Committee has already initiated and substantially advanced an investigation into the very claims the Motion requests an examiner to investigate, and has taken the additional step of seeking the ability to prosecute those claims by filing the Committee's Motion for Standing, the appointment of an examiner would clearly be a waste of the estates' resources. Appointment of an examiner here would seriously harm the interests of the unsecured creditors by draining assets from the estates, imposing delays with absolutely no resultant benefits, and potentially undermining the Committee's current investigation and proposed pursuit of the LBO claims. Furthermore, the examiner's investigation could potentially impact current discussions regarding the Debtors' reorganization, including ongoing plan negotiations. Adding an examiner could potentially disrupt and would almost certainly delay these delicate negotiations. *See In re Schepps Food Stores, Inc*., 148 B.R. at 30 (noting that Section 1104(c) should not be used by a creditor as a tool to disrupt the administration of the bankruptcy case.) This Motion

was filed solely in the interest of Wilmington Trust's own subordinated constituency and not those of the entire creditor group. The potential cost, in delay, money and perhaps results, the appointment of an examiner would impose in these chapter 11 cases strongly militate against the Motion.

## C. *Alternatively, Any Examiner's Mandate Should be Limited*

37. Alternatively, if the Court does determine that Section 1104(c)(2) of the Bankruptcy Code requires that an examiner be appointed, the Court still has ample discretion to limit the examiner's mandate and can readily use that discretion to thwart the tactical gamesmanship that is at the heart of the Motion. *See In re Revco D.S., Inc*., 898 F.2d at 501 ("[T]he bankruptcy court retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration."). The language of the statute itself dictates that the examination be "appropriate". 11 U.S.C. § 1104(c). By limiting the scope of an examiner's investigation and the resources devoted to it, the best interests of the estate will be served. *See In re UAL Corp*., 307 B.R. 80, 86 (Bankr. N.D. Ill. 2004) ("There would be substantial potential for abuse and waste of estate assets if . . . any party in interest in a case exceeding the debt threshold could obtain appointment of an examiner to investigate whatever matters that party specified.")

38. In the case of *In re Parmalat USA Corp*., the Bankruptcy Court for the Southern District of New York was faced with a very similar motion for the appointment of an examiner, which was filed by an isolated dissident creditor and which proposed an examination in some respects nearly identical to one already being conducted by the unsecured creditor's committee and in other respects far broader than what the committee considered appropriate under the circumstances. Transcript of Proceedings, *In re Parmalat USA Corp*., No. 04-11139

(RDD) (Bankr. S.D.N.Y. May 19, 2004), a copy of the relevant pages is attached hereto as *Exhibit D.* After noting that it believed itself compelled by Section 1104(c)(2) to appoint an examiner, the court held that it had "the ability, basically the unfettered discretion, to determine what is the appropriate scope of an examiner's appointment." *Id.* at 184. The court determined that, where, as here, the unsecured creditors' committee was "doing its job" that it was "particularly appropriate to have the examiner's role and tasks be as limited as possible." *Id.* at 185. Ultimately, the court severely restricted the scope of the examiner's investigation, provided a time frame of two weeks within which to conduct the examination and a strict budget of $5,000. *Id.* at 185-187; *see also* Order Directing the Appointment of an Examiner and Setting the Duties of the Examiner, No. 04-11139 (RDD) (Bankr. S.D.N.Y. June 4, 2004) (Docket No. 383). Should the Court determine that it is statutorily required to appoint an examiner here, the Committee urges similar limitations be placed on the duration, budget and scope of any investigation.

39. In this situation, should the Court be required to appoint an examiner, narrowly circumscribing the duration, budget and scope of any required examiner's investigation would be in the best interests of the creditors and the estates. The Motion requests that, if an examiner is appointed, the examiner be granted broad authority to investigate potential "claims arising out of the LBO." *See* Motion ¶ 97. Of course, that very investigation has already been undertaken by the Committee, which is now poised to pursue the claims, subject only to the Court's consideration of the pending Motion for Standing. This Court is well aware of the time and expense that has gone into the Committee's investigation, request for standing and draft complaint. Wilmington Trust asks the Court to authorize the exact same inquiry, with no explanation as to how this would not duplicate efforts or would

provide any additional benefit to the unsecured creditors generally. Given the "substantial potential for abuse and waste of estate assets", should the Court determine the appointment of an examiner is statutorily necessary, the Committee urges that the examiner's mandate be limited, in duration, scope and budget, to the fullest extent possible so as to not interfere with or duplicate the Committee's ongoing and vigorous prosecution of the LBO claims.

WHEREFORE, the Committee respectfully requests that the Court (a) deny the Motion in its entirety, or (b) in the alternative, if the Court determines that the appointment of an examiner is statutorily required, limit the scope, duration and budget of the examiner's investigation to prevent waste and a duplication of the work already completed and being done by the Committee, and (c) grant such other or further relief as the Court deems appropriate.

Dated: February 11, 2010                    Respectfully submitted,

**LANDIS RATH & COBB LLP**
Wilmington, Delaware

*/s/ Matthew B. McGuire*
Matthew B. McGuire (No. 4366)
Adam G. Landis (No. 3407)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

- and -

Howard Seife
David LeMay
Douglas Deutsch
**CHADBOURNE & PARKE LLP**
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369

*Counsel to the Official Committee of Unsecured Creditors*

- and -

Graeme W. Bush, Esquire
**ZUCKERMAN SPAEDER LLP**
1800 M. Street, N.W., Suite 1000
Washington, DC 20036
Telephone: (202) 778-1800
Facsimile: (202) 822-8106

Thomas G. Macauley
**ZUCKERMAN SPAEDER LLP**
919 Market Street, Suite 990
Wilmington, Delaware 19801
Telephone: (302) 427-0400
Facsimile: (302) 427-8242

*Special Counsel to the Official Committee of Unsecured Creditors*