IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------ x

In re:  :  Chapter 11
        :  Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,  :  (Jointly Administered)
        :
    Debtors.  :  Re: Docket No. 3063
        :  **Hearing Date: Feb. 18, 2010 at 10:00 a.m.**
        :  **Objection Deadline: Feb. 11, 2010 at 4:00 p.m.**

------------------------------ x

## J.P. MORGAN CHASE BANK, N.A.'S RESPONSE TO MOTION OF WILMINGTON TRUST COMPANY FOR APPOINTMENT OF AN EXAMINER PURSUANT TO SECTION 1104(C) OF THE BANKRUPTCY CODE [DKT. NO. 3063]

JPMorgan Chase Bank, N.A. ("JPMorgan") hereby responds and objects to the motion of Wilmington Trust Company ("Wilmington Trust") for the appointment of an examiner (the "Motion") pursuant to 11 U.S.C. §§ 1104(c)(1) - (2) (the "Response").[1]

The Motion includes many misleading and incorrect statements. JPMorgan files this Response to correct the record as to the most significant inaccuracies asserted by Wilmington Trust regarding JPMorgan.

1. Despite baseless allegations summarily stating that JPMorgan's mere presence on the UCC has tainted the UCC's ongoing investigation, the simple fact is that neither JPMorgan nor any other Credit Agreement Lender or Bridge Facility Lender (collectively, the "Bank Lenders") is or has been involved in any way in the UCC's review or deliberations concerning any aspect of the June 2007 tender offer or December

---

[1] JPMorgan also joins in and incorporates herein the arguments set forth in the Credit Agreement Lenders' Objection to Motion of Wilmington Trust for Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code.

2007 merger transactions (collectively, the "Transactions"). As the largest unsecured creditor at the time Debtors filed the petition, JPMorgan's appointment to the UCC by the Office of the United States Trustee was entirely justified and appropriate. However, recognizing the importance of an independent investigation, JPMorgan has from the outset recused itself from participation in the UCC's investigation of the Transactions. Merrill Lynch, though no longer a member of the UCC, did the same prior to its resignation.[2] The Bank Lenders are not privy to any of the UCC's professional analyses or other non-public information in the UCC's possession concerning the investigation. The remaining members of the UCC who collectively retain complete and exclusive responsibility for the UCC's investigation are a diverse group consisting of two indenture trustees (including Wilmington Trust), two trade creditors, one labor union, one retired executive, and the Pension Benefit Guaranty Corporation. Wilmington Trust's failure to credit these facts results in a gross misrepresentation of the ongoing investigation and JPMorgan's role as a potential target of that investigation.

2. The motion is also replete with baseless and conclusory accusations regarding the conduct of the Bank Lenders and the purported effects of that conduct. Wilmington Trust, for example, states that "[a]fter the LBO, Tribune ceased being a media company and became a debt service vehicle administered for the benefit of the LBO Banks," concludes that "[a]bsent the LBO Debt, the Debtors would not be in bankruptcy," and opines that "J.P. Morgan . . . [has] a great deal to fear from an investigation of the LBO." These gratuitous statements share a common thread: they are

---

[2] Merrill Lynch resigned from the UCC on September 9, 2009.

2

divorced from both reality and the factual record (with which Wilmington Trust, as a UCC member, should be familiar). JPMorgan is confident in the propriety and reasonableness of its actions and will be prepared to defend itself against any and all allegations to the contrary when and if such allegations are properly asserted. JPMorgan's extensive voluntary cooperation with the Rule 2004 investigation belies the claim that is has a "great deal to fear" from an investigation, just as the fact of Tribune's ongoing business operations wholly undermines the senseless accusation that Tribune was reduced to "a debt service vehicle."

3. The examination Wilmington Trust requests is also unnecessarily duplicative of the ongoing investigation and wasteful of the estate's resources. The UCC and its professionals began investigating the Transactions in the Spring of 2009, in the process incurring millions of dollars in expenses on behalf of the estate and requiring many more millions of dollars to be spent by the Bank Lenders and other parties. JPMorgan has fully cooperated with the investigation, producing more than 500,000 pages of documents in response to the UCC's requests and allowing the UCC to depose JPMorgan witnesses. Pursuant to the document depository program, Wilmington Trust has access to more than 2.4 million pages of documents that have been produced to the UCC by certain Bank Lenders, the Debtors, Equity Group Investments, Valuation Research Corporation, and Duff & Phelps, among other key parties.[3]

4. Wilmington Trust also largely ignores the fact that the special litigation counsel retained by the UCC, Zuckerman Spaeder LLP ("Zuckerman") has no conflicts

---

[3] The document depository was established pursuant to the Court's December 15, 2009 Order.

3

with JPMorgan. In August 2009, the UCC moved for authority to retain Zuckerman as special counsel to assist in the development of potential claims arising out of the Transactions and potentially to prosecute litigation against the Bank Lenders. The Bank Lenders did not participate in the decision to retain a special litigation counsel or in the selection of the Zuckerman firm, but Wilmington Trust presumably did. The Court authorized the Zuckerman appointment in a September 3, 2009 Order, conferring broad authority on Zuckerman and imposing no limitations on its role.[4] Wilmington Trust did not object to the Zuckerman appointment in September and has no basis to do so now. Instead, months later and without any legal or factual basis whatsoever, Wilmington now suggests that Zuckerman is under the control of Chadbourne and is therefore compromised from discharging its responsibilities. Such accusations are insufficient justification for appointment of an examiner.

5. Wilmington Trust's motion also is untimely, for two reasons: first, an investigation has already taken place; and second, Wilmington Trust previously abandoned a similar motion for the appointment of examiner (the "Initial Examiner Motion"). Wilmington Trust seeks a second bite at the apple, having joined in the Initial Examiner Motion, which was filed by Law Debenture Trust Company of New York ("Law Debenture") on August 26, 2009. Law Debenture withdrew the Initial Examiner Motion upon entry of the Court's September 25, 2009 order approving a stipulation that allowed Law Debenture access to discovery materials. Wilmington Trust did not object

---

[4] Order Granting Application of the Official Committee of Unsecured Creditors for Order Authorizing the Employment and Retention of Zuckerman Spaeder LLP as Special Counsel, dated September 3, 2009 (Docket No. 2088).

4

to that stipulation or otherwise seek to have its request for an examiner heard by the Court. Nor has it explained any way in which circumstances have since changed so as to support the appointment of an examiner now.

6. The quantity and quality of the misrepresentations and omissions described above suggest that Wilmington Trust's true motive is not to investigate the Transactions – a function already being performed by un-conflicted and court-approved litigation counsel – but rather to gain negotiating leverage that it does not otherwise have as an indenture trustee for a deeply subordinated debt issuance. However, its desire to improve its negotiating leverage is not a basis on which the Motion should be granted.

7. For these reasons, the appointment of an examiner is not "appropriate," as is required under 11 U.S.C. § 1104(c). *In re American Home Mortgage Holdings, Inc.*, Case No. 07-11047 (Bankr. D. Del. Oct. 31, 2007) (J. Sontchi), Tr. of Oct. 31, 2007 Hr'g at 76-77. The statutory language of § 1104(c)(2) does not deprive courts of discretion to deny a request for an examiner where, as here, there would be nothing to gain from duplicating existing investigatory efforts. *Id.* at 77 (declining to appoint examiner even though debt requirement was met); *In re SA Telecommunications, Inc.*, Case No. 97-02395 (Bankr. D. Del. Mar. 27, 1998) (J. Walsh), Tr. of Mar. 27, 1998 Hr'g at 82 ("My view is that [1104](c)(2) is not mandatory"); *In re Adelphia Communications*, Case No. 02-41729 (Bankr. S.D.N.Y. 2006) (J. Gerber), Tr. of Feb. 6, 2006 Hr'g at 7.61 – 7.65 (declining to appoint an examiner, even though § 1104(c)(2) debt requirement was satisfied, where the same result could be achieved in a more efficient and economic manner); *cf. In re Bradlees Stores, Inc.*, 209 B.R. 36, 39 (Bankr. S.D.N.Y. 1997) (denying motion under § 1104(c)(1) and § 1104(c)(2) as untimely where appointment of

examiner would be "duplicative, needless and wasteful"). Given the vast amount of work that has been undertaken at significant cost to the estate, an examination here is unnecessary and, at minimum, should be limited in scope so as to avoid duplicating what the UCC has already done.[5] *See In re Revco D.S., Inc.*, 898 F.2d 498, 501 (6th Cir. 1990) (noting courts' discretion to direct the "nature, extent, and duration" of an examination, as is appropriate).

WHEREFORE, for all the foregoing reasons, JPMorgan requests that the Court deny the Motion.

Dated: February 11, 2010
       Wilmington, Delaware

Respectfully submitted,

_____
Dennis E. Glazer
Karen E. Wagner
Sharon Katz
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10022
(212) 450-4500

*Attorneys for JPMorgan Chase Bank, N.A.*

---

[5] It remains JPMorgan's view that the UCC has not discovered any evidence that would suggest a fraudulent conveyance.