IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------- x
:
In re:                          : Chapter 11
                                : Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,        : (Jointly Administered)
                                :
       Debtors.                 : Re: Docket No. 3281
                                . Hearing Date: Feb. 18, 2010 at 10:00 a.m.
                                  Objection Deadline: Feb. 11, 2010 at 4:00 p.m.
                                :
------------------------------- x

## J.P. MORGAN CHASE BANK, N.A.'S RESPONSE TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING AND AUTHORITY TO COMMENCE, PROSECUTE AND SETTLE CLAIMS AND COUNTERCLAIMS OF THE DEBTORS' ESTATES [DKT. NO. 3281]

JPMorgan Chase Bank, N.A. ("JPMorgan") hereby submits this objection to the motion of the Official Committee of Unsecured Creditors ("UCC") for entry of an order granting leave, standing and authority to commence, prosecute and settle claims and counterclaims of the Debtors' estates (the "Standing Motion") pursuant to Sections 105, 1103 and 1109 of title 11 of the United States Code.[1]

1.     When before this Court on December 1, 2009, the Debtors proposed a process by which the parties would engage in negotiation, essentially brokered by the Debtors, in order to try to resolve through a plan process the divergent claims of various constituencies. The UCC, though at the time fully engaged with numerous parties in voluntary Rule 2004 discovery, supported the Debtors' approach. While that negotiation

---

[1] JPMorgan also joins in and incorporates herein the arguments set forth in the Credit Agreement Lender' Objection to Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing, and Authority to Commence, Prosecute, and Settle Claims and Counterclaims of the Debtors' Estates.

process continues even as this response is being filed, the UCC, for reasons that can only been viewed as trying to give it a tactical advantage, has undertaken to file, quite prematurely, the Standing Motion. That motion should be denied as premature, or at a minimum should be deferred, in order to give the negotiation/Plan process a fair opportunity for resolution – and potentially successful resolution -- rather than allowing the process to be overtaken by a rash of competing motions by various parties jockeying for position. *See Exide Techs., Inc. v. Credit Suisse First Boston*, 299 B.R. 732, 739 n.4 (Bankr. D. Del. 2003) (denying standing to creditor where it is not "in the best interest of the estate."); *In re Sunbeam Corp.*, 284 B.R. 355, 375 (Bankr. S.D.N.Y. 2002) (denying standing to pursue claims that would delay resolution of reorganization proceeding).

2.  If the Court is nevertheless inclined to consider the UCC's motion on its merits, JPMorgan submits that the motion should be denied. The UCC has spent one year and millions of dollars conducting an investigation of the June 2007 tender offer ("Tender Offer") and December 2007 merger ("Merger") transactions (collectively, the "Transactions"), deposing witnesses and collecting more than 2.4 million pages of documents from numerous parties, including the Tribune Company ("Tribune"), certain Senior Credit Agreement and Bridge Facility Lenders (collectively, the "Bank Lenders"), and Tribune's former shareholders and directors. Yet, after all this effort and expense, the UCC's motion posits nothing more than conclusory arguments.

### The UCC's Motion Is Conclusory and Speculative

3.  Stripped of its rhetoric, the UCC's motion consists of naked assertions that the Transactions were fraudulent conveyances because the "Debtors were insolvent" and because the Bank Lenders "improved their position impermissibly to the detriment of the

2

Debtors and the general creditors." *See* Standing Motion at 7. As set forth below, the UCC's arguments are without merit and insufficient to support the UCC's request for standing.

4. The UCC fails to offer any support for its summary conclusion that the Debtors were insolvent at the time of the Transactions. *See* Standing Motion at 6. Solvency was a requirement for both the Tender Offer and the Merger. To that end, Tribune engaged Valuation Research Corporation ("VRC") to issue an opinion as to Tribune's solvency prior to each transaction. VRC concluded that neither the Tender Offer nor the Merger would render Tribune insolvent or leave it with insufficient capital. Due diligence by the Bank Lenders revealed no reason to doubt VRC's opinions, belying the UCC's unsupported conclusory contention that the Bank Lenders "recognized the . . . loans would render [Tribune] insolvent." *See* Standing Motion ¶ 3.

5. Furthermore, VRC's conclusions were consistent with contemporaneous valuation analyses performed by JPMorgan, Duff & Phelps, and Morgan Stanley,[2] as well as with credit ratings issued by Moody's and Standard & Poor's. The price of Tribune's common stock following the Tender Offer, and Tribune's ability to pay creditors for more than eighteen months after the Tender Offer and nearly twelve months following the Merger, further belie the UCC's conclusory arguments. *See, e.g., VFB v. Campbell Soup*, 482 F.3d 624 (3d Cir. 2007) ("[M]arket price is a more reliable measure of [a] stock's value than the subjective estimates of . . . expert witnesses."); *In re Iridium*

---

[2] Such analyses were performed by (i) JPMorgan in connection with its diligence of the Transactions, (ii) Duff & Phelps in connection with its issuance of a financial fairness opinion for Tribune's ESOP at the time of the Tender Offer and (iii) Morgan Stanley in connection with its advisory role for the Special Committee of the Company's Board of Directors, prior to the Board's acceptance of the Zell proposal.

3

*Operating LLC*, 373 B.R. 283, 346 (Bankr. S.D.N.Y. 2007) ("A company's stock price is an ideal datapoint for determining value."); *In re Ohio Corrugating Co.*, 91 B.R. 430, 440 (Bankr. N.D. Ohio 1988) ( "The most important factor which tends to support the Debtor's solvency after the buyout was its ability and practice of paying . . . trade creditors . . . over the ten-month period of operation after the buyout."); *see also In re Fid. Bond & Mortgage Co.*, 340 B.R. 266, 299 (Bankr. E.D. Pa. 2006); *Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1074 (3d Cir. 1992).

6.  The UCC's motion conveniently ignores the actual and obvious reason for the Debtors' downfall—the historic financial crisis of 2008. At the time of the Transactions in 2007, no one could have reasonably foreseen the scope of the impending economic collapse or its extraordinary impact on the media industry. Since 2008, 629 major companies have filed for bankruptcy protection, with 136 public company casualties and forty-nine leveraged buyout-related bankruptcies in 2008 alone.[3] Remarkably, eleven of the nation's top 100 media companies have plunged into bankruptcy,[4] leaving behind an industry "gasping for survival."[5] Undoubtedly, if armed with the benefit of 20/20 foresight, numerous businesses would have made different decisions in 2007—including the Bank Lenders, who have already lost billions of dollars on their loans (a fact entirely and conveniently ignored by the UCC). It is wholly insufficient to assert that the Tender Offer and Merger were fraudulent conveyances,

---

[3] Mark G. Douglas, "The Year in Bankruptcy: 2008," Pratt's Journal of Bankruptcy Law, February/March 2009.

[4] "U.S. Media revenue set for historic 2009 decline," Advertising Age, 10/05/09.

[5] "Bankruptcies show newspapers are teetering," Associated Press, 2/23/09.

simply because Tribune ultimately failed. Rather, each transaction must be independently evaluated at the time it occurred and, when viewed from that vantage point, it becomes clear that the unprecedented and unforeseen severity of the economic downturn, not the Transactions, ultimately caused the Debtors' insolvency. *See Moody*, 971 F.2d 1056 (no fraudulent conveyance where debtor's demise was due to extrinsic economic factors rather than LBO transaction).

### The Tender Offer and Merger Were Independent Transactions

7.      The UCC misrepresents the Transactions as a single "LBO transaction" in a mistaken belief that, when viewed together, they rendered Tribune insolvent. *See* Standing Motion ¶ 6. The reality is that the June 2007 Tender Offer and the December 2007 Merger were two independent transactions. The Tender Offer was designed to survive as a standalone transaction even if the Merger never occurred, because all parties understood that the numerous non-trivial conditions to the Merger were not assured and rendered consummation of the Merger far from a certainty. Among the most significant conditions were: (1) shareholder approval of the Merger (not obtained until August 21, 2007); (2) FCC approval of the Merger (not obtained until November 30, 2007); (3) Major League Baseball's approval (not obtained until December 17, 2007); (4) receipt of a satisfactory solvency opinion; and (5) Hart-Scott-Rodino regulatory compliance.

8.      Indeed, all of the relevant facts contradict the UCC's misperception that the Tender Offer and the Merger were one transaction: The contemporaneous transaction documents treat them as independent; the trading prices of Tribune debt after the Tender Offer reflected the market's understanding that the Transactions were distinct; the ratings agencies treated the Transactions separately; the internal deal documents from the

parties-in-interest treated the Transactions separately; Tribune retained the option after the closing of the Tender Offer to consider alternative offers and to abandon the Merger in favor of a superior proposal for a modest fee; and numerous press and industry analysts openly speculated that Tribune might not proceed with the Merger after the Tender Offer.[6] The UCC simply ignores all of these facts.

9. Legal precedent similarly refutes the UCC's attempt to treat the two transactions as one for purposes of determining solvency. Solvency must be determined at the time the loan obligations were incurred. *See Mellon Bank v. Metro Commc'ns.*, 945 F.2d 635, 648 (3d Cir. 1991). The Company incurred an obligation to repay the Tender Offer financing in May 2007 pursuant to the Senior Credit Agreement, while it incurred an obligation to repay the Merger financing in December 2007 pursuant to the Interim Credit Agreement and a series of Increase Joinders.

**The UCC's Implicit Assertions of Bad Faith Are Speculative and False**

10. Lacking evidence of insolvency, the UCC resorts to irrelevant and inaccurate accusations designed to cast aspersions on the Transactions. For example, the UCC characterizes the Company's auction process as "failed" when, in reality, the Company approved the Zell proposal after a "down-to-the-wire bidding war."[7] *See* Standing Motion ¶ 6. The fact that competing bids each sought to acquire Tribune for $34 per share testifies to the reliability of that share price and, accordingly, to Tribune's

---

[6] "Tribune accepts $8.2B offer from Zell," AFX News Limited, 4/2/07 (noting that Merger Agreement "leav[es] open the possibility of another counter bid"); Deutsche Bank Analyst Report, 6/20/07 (discussing "the probability of . . . the deal not closing"); "Markets Fret Over Tribune Deal," Chicago Tribune, 6/22/07 ("[T]he market is betting that there's only a 60% chance the deal will close . . . .").

[7] *See* "Tribune accepts $8.2B offer from Zell," AFX News Limited, 4/2/07.

6

solvency. *See generally Campbell Soup*, 482 F.3d 624; *In re Iridium Operating LLC*, 373 B.R. 283. The UCC also attempts to imply bad faith on the part of transaction participants, *see* Standing Motion ¶ 10, Standing Motion at 7, in complete disregard of the well-established principle that transactions may be simultaneously leveraged and "above board." *See Lippi v. City Bank*, 955 F. 2d 599, 613 (9th Cir. 1992); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 502 (Bankr. N.D. Ill. 1988). *See also In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) ("[R]educing the test . . . to a showing [that an LBO increased risk to creditors] would likely mean that any LBO would be a fraudulent conveyance.").

11.   It is self-evident that no bank, including JPMorgan, is in the business of lending billions of dollars to an entity that the bank believes is unable to repay its debts. The Tribune Transactions present no exception. *See In re M. Fabrikant & Sons*, 394 B.R. 721, 739 (Bankr. S.D.N.Y. 2008) (finding lending activity "inconsistent" with bank's knowledge of debtor's insolvency); *Official Comm. of Unsecured Creditors of Grand Eagle Co. v. Asea Brown Boveri, Inc.*, 313 B.R. 219, 230 (N.D. Ohio 2004). To overcome this common-sense axiom, the UCC intimates that the Bank Lenders somehow acted in bad-faith. *See* Standing Motion at 7. These arguments fall flat. The UCC's argument that the Bank Lenders had "conflicting roles" is demonstrably false with respect to JPMorgan—which was not retained as financial advisor to the Company or Sam Zell. *See* Standing Motion at 7. The UCC's accusations of "breaches of fiduciary duty" are nonsensical, as JPMorgan did not have a fiduciary relationship with the Debtors or their creditors. *See* Standing Motion ¶ 10.

12. Again undeterred by the absence of evidence, the UCC imputes nefarious motives to Tribune's repayment of antecedent debt ("2006 Bank Debt") in June 2007. *See* Standing Motion at 7. In fact, Tribune made a legitimate business decision to refinance the 2006 Bank Debt, the majority of which ($1.3 billion) was about to come due. The UCC's conjecture about the motives of other parties does not, in any event, refute the legal truism that a "conveyance which satisfies an antecedent debt . . . is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another." *In re Sharp*, 403 F.3d 43, 54 (2d Cir. 2005); *see also In re Hechinger Investment Co.*, 327 B.R. 537, 552 (D. Del. 2005).

### Settlement Authority Rests with the Debtors

13. The UCC's motion also overreaches by requesting that the Court grant it settlement authority with respect to claims that belong to the Debtors' estates. Authority to settle must remain with the Debtors, even where leave to bring a complaint has been granted. *See* F.R.B.P. 91019(a) ("On motion by the trustee . . . the court may approve a compromise or settlement."); 11 U.S.C. § 1107 (conferring on a debtor-in-possession "all the rights . . . of a trustee serving in a case under this chapter"). "[T]he Debtor's authority to wisely manage the estate's legal claims is implicit in its role as the estate's only fiduciary." *Smart World Techs., LLC, v. Juno Online Servs., Inc.*, 423 F.3d 166, 175 n.12 (2d Cir. 2005). Unlike the Debtors, the UCC represents only one group of interested parties. *See id.* at 175 n.12. Thus, it is only after a showing of misconduct that a derivative plaintiff may prevent a debtor-in-possession from settling its claims. *Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns. Corp.*, 371 B.R. 660, 671

(S.D.N.Y. 2007) (citing *Smart World*, 423 F.3d at 177). No such showing or even allegation has been made here.

WHEREFORE, for all the foregoing reasons, JPMorgan requests that the Court deny the Motion.

Dated: February 11, 2010
       Wilmington, Delaware

Respectfully submitted,

/s/ Robert J. Stearn
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Dennis E. Glazer
Karen E. Wagner
Sharon Katz
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10022
(212) 450-4500

*Attorneys for JPMorgan Chase Bank, N.A.*