IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13141 (KJC)<br><br>Jointly Administered<br><br>Related to Docket No. 3281 |

## DEBTORS' RESPONSE AND OBJECTION TO THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING, AND AUTHORITY TO PROSECUTE CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES

Tribune Company ("Tribune") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby submit their response and objection to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing, and Authority to Commence, Prosecute and Settle Claims and Counterclaims of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a/ Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

the Debtors' Estates (the "Motion"). In support of this response and objection, Tribune and its affiliated Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

The Committee's request for standing to prosecute certain fraudulent conveyance and other claims on behalf of the Debtors' estates should be denied. The Debtors have made the reasoned judgment to pursue resolution of these claims outside of full-fledged litigation. The Debtors' decision in that regard is entitled to deference. This is not a case where the Debtors are refusing to confront the claims in question. To the contrary, having long recognized the significance of the Leveraged ESOP Transactions (as defined below) to the resolution of these cases, the Debtors facilitated the Committee's (and other parties') review of such transactions and the Debtors are actively addressing these claims through a process of negotiation and, soon, a plan of reorganization. Granting the Committee standing to pursue these claims now—in the middle of the Debtors' diligent efforts to broker a global settlement and propose a plan of reorganization—would seriously undermine the progress that has been made toward resolution of these key matters and would undoubtedly prolong the pendency of these bankruptcy proceedings—at significant and unnecessary expense to the estates. Litigation is a means, not an end. Stated simply, the Debtors believe that it is the plan process, and not protracted litigation, that should drive the resolution of these claims.

A creditor's right to derivative standing is not established simply by asserting that the claims at issue are colorable and that the debtor has, as of the date of the motion, failed to bring them. Rather, the Committee must show, among other things, that the Debtors' failure to bring suit is *unjustifiable*. That showing plainly cannot be made here. Although the Committee largely ignores or attempts to downplay these efforts, the Debtors have been working hard to

2

develop a consensual resolution of these claims while leaving open the possibility, if negotiations fail, of providing a resolution of such claims in a plan of reorganization, based on the Debtors' reasoned assessment of the merits of the claims. Filing suit at this juncture, while negotiations are underway and with a plan filing to occur in the near term, would not only be premature, but would undermine the substantial progress the Debtors have made thus far.

The fact that the Debtors are not acting unjustifiably in pursuing settlement at this time instead of filing litigation alone calls for the denial of the Committee's motion. But the Committee is also wrong in conclusorily asserting that the Debtors are laboring under a conflict of interest. This is not a case in which the debtors waived the right to bring claims against their pre-petition lenders in order to obtain debtor in possession financing. Nor is it a case in which Tribune's board of directors lacks sufficient independence to determine whether pursuing the claims is in the best interest of the estate. To the contrary, there is no legitimate basis for contending that the board is unable to act by reason of any conflict whatsoever. The Committee has made no particularized showing demonstrating otherwise.

## BACKGROUND

On April 1, 2007, Tribune's then board of directors, based on the recommendation of a special committee of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune employee stock ownership plan (the "ESOP") and EGI-TRB, L.L.C., a Delaware limited liability company wholly owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell, with the intent to return Tribune to private ownership, see Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company in Support of First Day Motions, paragraph 14. (D.I. 3) In Step 1, Tribune made a cash tender offer for nearly 50% of the Company's outstanding common stock. In order to finance the tender offer,

3

Tribune entered into a $8.028 billion senior secured credit agreement dated May 17, 2007, with JPMorgan Chase Bank, N.A., as Administrative Agent, Merrill Lynch Capital Corporation as Syndication Agent, and Citicorp North America, Inc., Bank of America, N.A. and Barclays Bank PLC as Co-Documentation Agents (the "Credit Agreement"). A number of Tribune's domestic subsidiaries (the "Guarantor Subsidiaries") provided unsecured guarantees of Tribune's indebtedness under the Credit Agreement.

In Step 2, which was completed on December 20, 2007, the Company merged with Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), with Tribune surviving the merger. At the time of the merger, all issued and outstanding shares of Tribune's common stock, other than shares held by Tribune or the ESOP, were cancelled, and Tribune became wholly owned by the ESOP. Also on December 20, 2007, Tribune entered into an Interim Loan Agreement with certain of the same agent banks that participated in the Credit Agreement, albeit in different roles. Pursuant to the Interim Loan Agreement, Tribune borrowed $1.6 billion under a bridge facility, the proceeds of which were used for, among other things, the consummation of the merger and general corporate purposes. The bridge facility indebtedness is unsecured but is guaranteed, on a subordinated basis to the Credit Agreement indebtedness, by the Guarantor Subsidiaries.

On December 8, 2008, due to, among other things, an unprecedented decline in both the newspaper publishing and broadcasting industries, uncertainty in the capital markets and the overall economic downturn, which left the Debtors with weak operating results and significant liquidity challenges, each of the Debtors (other than the Chicago Cubs entity[2]) filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code.

---

[2] Chicago National League Ball Club, LLC n/k/a Tribune CNLBC, LLC filed its petition under chapter 11 on October 12, 2009 and is jointly administered with the other Debtors' chapter 11 cases by order entered on October 14, 2009.

46429/0001-6325365v1

The Committee seeks derivative standing to assert fraudulent conveyance, equitable subordination, and related claims against certain of the Debtors' pre-petition lenders and financial advisors arising from the Leveraged ESOP Transactions.

## ARGUMENT

### A. The Committee Has Not—And Cannot—Establish That The Debtors Are Acting Unjustifiably.

In *The Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 580 (3d Cir. 2003), the Third Circuit recognized that a bankruptcy court, as a court of equity, has the power to authorize a creditors' committee to sue derivatively to recover property for the benefit of the estate. A creditors' committee does not, however, have an absolute right to derivative standing to pursue any claim that the debtor has failed to bring. Courts repeatedly have emphasized "the debtor's central role in handling the estate's legal affairs." *In re Adelphia Communications Corp.*, 544 F.3d 420, 424 (2d Cir. 2008) (citing cases). A debtor in possession thus has the primary responsibility for initiating suit if, in its determination, doing so would be in the best interests of the estate, *see In re STN Enters.*, 779 F.2d 901, 903-04 (2d Cir. 1985) (citing 11 U.S.C. §§ 1106, 1107), and for moving the court to approve a compromise or settlement of an estate claim, *see In re Smart World Technologies, LLC*, 423 F.3d 166, 174 (2d Cir. 2005); Fed. R. Bankr. P. 9019(a). Accordingly, to override a debtor's decision to refrain from prosecuting a particular cause of action, a creditors' committee must establish that the claim to be pursued is colorable *and* that the debtor *unjustifiably* failed to bring suit—that is, its decision not to commence litigation is so unwarranted that it rises to the level of a breach of its statutory duty to wisely manage the estate's legal claims. *See In re STN*, 779 F.2d at 904-05; *see also In re Yes!*

*Entertainment Corp.*, 316 B.R. 141, 145 (D. Del. 2004) (noting that the creditor's committee has the burden of demonstrating that each of the prerequisites to derivative standing has been met).[3]

In this case, the Committee has not—and cannot—establish that the Debtors' decision to pursue a negotiated approach at this time constitutes a breach of their fiduciary and statutory duties to the estate. Indeed, all the Committee says on this score is that the Debtors have taken a "conciliatory" rather than an "adversarial" stance in attempting to broker a settlement, and this somehow evidences the Debtors' unwillingness ever to embrace any form of adversarial action. Not only does that conclusion not follow, but it is patently insufficient to show that the Debtors' have acted unjustifiably. As noted, the Debtors are addressing these claims, albeit pursuant to a different strategy and within a different framework than the "litigate now" strategy espoused by the Committee. Courts routinely recognize the superiority of settlements over full scale litigation, particularly in the bankruptcy context. *See, e.g.*, *In re Kaiser Aluminum Corp.*, 339 B.R. 91, 94 (D. Del. 2006) (noting "the important policy of promoting settlements in bankruptcy proceedings"); *Florida Trailer and Equip. Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960) (noting that "the Congressional infusion of the power to compromise" in the Bankruptcy laws "is a recognition of the policy in the law generally to encourage settlements"); *see also Rodgers v. U.S. Steel Corp.*, 541 F.2d 365, 372 (3d Cir. 1976) ("settlements have been a long favored course for the resolution of litigation"). Moreover, it is well recognized that settlement may be more

---

[3] The Committee cites *In re Gibson Group, Inc.*, 66 F.3d 1436, 1442 (6th Cir. 1995) for the proposition that if the proposed claims are likely to benefit the estate, that raises a "rebuttable presumption" that the debtor in possession's failure to bring the claim is unjustified. (Mot. p. 9.) In fact, the Court in *Gibson* held that the burden shifts to the debtor to establish that the refusal to bring suit was justified only if, in response to the committee's demand, the debtor refused to take action "without stating a reason." 66 F.3d at 1446. Here, although the Committee knows full well the Debtors' reasons for pursuing a global resolution outside of litigation, the Committee never provided the Debtors with an opportunity to provide a reason. In any event, the Sixth Circuit's holding in *Gibson* has not been adopted by the courts in this district, which, as noted above, have held that it is the movant's duty to bring forth facts establishing that all of the requirements for derivative standing have been met—including that the debtor has acted unjustifiably. *See, e.g.*, *In re Yes! Entertainment*, 316 B.R. at 145 (D. Del. 2004); *see also In re Racing Servs., Inc.*, 540 F.3d 892, 900, n.9 (8th Cir. 2008) (disagreeing with *Gibson* and holding that "the burden of persuasion always remains with the creditor.") Whether the Committee or the Debtors bear the burden of persuasion ultimately makes little difference here, as the Debtors clearly can show that they have not acted unjustifiably.

feasible before suit is filed, costs are expended, and the parties become entrenched in adversary positions. *See Federal Exp. Corp. v. Holowecki*, 128 S.Ct. 1147, 1160-61 (2008) ("Once the adversary process has begun a dispute may be in a more rigid cast than if conciliation had been attempted at the outset.").

Notably, up until now, the Committee has agreed with the Debtors' strategy to attempt a consensual resolution of the claims at issue and has actively participated in the negotiations. In its Motion, the Committee does not explain the abrupt turn-around. Indeed, the Committee's Motion is utterly silent as to why, suddenly, full scale litigation of the fraudulent conveyance and related claims is the answer. Further, the Committee ignores entirely the obvious fact that the Debtors' strategy is designed to lead to the expedient resolution of such claims, while the strategy the Committee proposes indisputably would mire the Debtors in lengthy and costly litigation.

Under these circumstances, the Committee does not even come close to establishing that the Debtors are acting unjustifiably, and its motion for standing should be denied. *See In re Interco Inc.*, 135 B.R. 631, 633 (E.D. Mo. 1992) (denying creditor committees' motion to appoint special representative to prosecute litigation on behalf of estate where debtors' board of directors had decided to delay prosecution of claim because pursuing matter could disrupt reorganization process); 7-1109 Collier on Bankruptcy ¶ 1109.05[2][b] (noting that debtor's refusal to prosecute claim at particular time may be justified).

**B.     The Committee's Assertion That The Debtors Suffer From Conflicts Of Interest Is Wrong.**

In an apparent attempt to sidestep the fact that the strategy currently being pursued by the Debtors not only is entitled to deference but is entirely reasonable, the Committee contends that its failure to make a formal demand on the Debtors should be excused, and it should be granted derivative standing, because the Debtors' decision whether to pursue the claims is colored by three supposed conflicts of interest. (Mot. p. 10.) The Committee's conclusory arguments in this regard fall wide of the mark. The relevant inquiry is whether a disinterested majority of a legally constituted board of directors has exercised its independent and disinterested business judgment in pursuing the current strategy. *See Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993).[4] Under Delaware law, a director is considered "interested" "where he or she will receive a personal benefit from a transaction," or "where a corporate decision will have a materially detrimental impact on the director, but not on the corporation and the stockholders." *Rales*, 634 A.2d at 936; *see also Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). In such a case, "a director cannot be expected to exercise his or her independent judgment without being influenced by the personal consequences resulting from the decision." *Rales*, 634 A.2d at 936. Here, however, the Committee has not even attempted to argue (and cannot argue) that Tribune's board of directors is unable to act independently and to exercise its business judgment in addressing the Leveraged ESOP Transactions.

---

[4] As several courts have recognized, a creditor's motion for derivative standing to bring a claim on behalf of the estate in the bankruptcy context is analogous to a shareholder derivative action. *See, e.g., In re Smart World Technologies, LLC*, 423 F.3d 166, 176 (2nd Cir. 2005) ("derivative standing in the bankruptcy context is analogous to derivative standing in shareholder suits; it arises when the debtor unjustifiably refuses to pursue a cause of action"). Therefore, in assessing whether a debtor's failure to bring an estate claim is entitled to deference, it makes sense to look to the law governing whether a demand in a shareholder derivative case would be futile, given that both inquiries look to whether the debtor/corporation suffers from a conflict of interest. Because Tribune is incorporated in the state of Delaware, we look to Delaware law.

The Committee first asserts that "the Debtors approved the LBO and will not want to pursue an action that attacks the LBO Debt." (Mot. p. 10.) This assertion proves far too much, since in essentially every case, the pre-petition debtor will have been involved in the transaction alleged to have been a fraudulent conveyance. This nearly universal fact alone clearly cannot be a sufficient basis on which to forfeit a debtor in possession's statutory authority over estate causes of action and cede derivative standing to a creditor's committee. Furthermore, the Committee's assertion simply ignores the fact that Tribune's current board is fully capable of discharging its fiduciary duties in respect of the Leveraged ESOP Transactions, unhampered by any disabling conflicts of interest.

Next, the Committee makes the curious assertion that the Debtors have a conflict because "the holders of the LBO Debt will own a substantial part of and most likely a majority of the Debtors' new equity" and the Debtors allegedly "have no interest in litigating against the interests of future owners of the Debtors." (Mot. p. 10.) In making this assertion, however, the Committee cites no cases—and Debtors are aware of none—in which a Debtor was found to have a disabling conflict because of the possibility that a potential defendant in a putative suit might at some future date own a controlling interest in the company. In fact, under Delaware law, it is black letter law that directors will not be held to lack independence for demand futility purposes simply because they are elected by a *current* controlling person, much less a potential future controlling person. "[I]n the demand context even proof of majority ownership of a company does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984). Instead, to establish a lack of independence in such a context, "[t]here must be coupled with the allegation of control such facts as would demonstrate that

9

through personal or other relationships the directors are beholden to the controlling person." *Id.; see also Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993). Conclusory and unsubstantiated assertions in this regard are insufficient. "Under Delaware law, to claim that the directors lack independence based upon an allegiance to a dominating [entity], [the movant] must plead *specific* facts sufficient to support a sense to 'owingness,' namely, a sense of feeling beholden, on the part of the other directors to undermine their independence." *In re Fed. Nat'l Mort. Ass'n Sec., Deriv. and "ERISA" Litig.*, 503 F. Supp. 2d 9, 22 (D.D.C. 2007) (emphasis in original); s*ee also Aronson*, 473 A.2d at 816 ("The shorthand shibboleth of 'dominated and controlled directors' is insufficient to establish that a majority of directors lacked independence."); *Litt v. Wycoff*, 2003 Del. Ch. LEXIS 23 (Del. Ch. Mar. 28, 2003) ("A director is considered 'independent' unless the complaint alleges particularized facts to show that the director is unable to base his or her decisions on the corporate merits of the issue before the board."). Once again, the Committee has failed to come forward with a single fact to support the conclusory allegation that the existing board is unable to act independently because it is purportedly beholden to the "future owners of the Debtors."

Finally, the Committee asserts that demand should be excused because the Debtors' *counsel* has conflicts that would prevent them from prosecuting the fraudulent conveyance claims. The Committee does not, however, cite any cases granting a Committee derivative standing on that basis, and for good reason. Whether or not the Debtors' counsel has conflicts has nothing to do with whether the Debtors are capable of exercising independent business judgment in respect of claims related to the Leveraged ESOP Transactions. If Tribune's board of directors determines at some point that targeted litigation is a necessary or appropriate tool to

10

achieve resolution of these cases, the board can determine the best method for employing that tool.[5]

One additional contention made by the Committee merits comment. The Committee suggests that the Debtors have somehow been lax in examining the potential claims arising out of the Leveraged ESOP Transactions and have allowed the Committee to take the lead in that regard. (Mot. p. 11.) That contention simply cannot be squared with the facts. The Debtors have been aggressively working these issues, including by producing numerous documents, pressing other parties to complete their productions, participating in interviews and depositions, and investigating and analyzing potential claims and defenses. The mere fact that the Debtors have worked to provide the Committee with access to the information the Debtors have gathered in no way signals an intent by the Debtors to allow the Committee to "assume responsibility for the investigation" or to assign the decision to the Committee whether to pursue litigation.

### C. If The Committee Is Granted Derivative Standing, The Debtors Should Retain The Authority To Settle The Claims.

The Committee seeks standing not only to commence and prosecute estate claims, but also standing to settle such claims. To the extent the Committee is seeking to divest the Debtors of their power to settle these causes of action, that request must be denied. Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion *by the trustee* and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a) (emphasis added). Under this Rule, the trustee (or debtor in possession by virtue of section 1107(a) of the Bankruptcy Code) has the express, if not exclusive, right to settle claims in a chapter 11 case. *See Hartford Underwriters Ins. Co. v. Union Planters Bank N.A.*, 530 U.S. 1, 6

---

[5] For example, the Committee's counsel, Chadbourne & Parke, itself suffered from such a conflict and the Committee selected Zuckerman Spaeder as special litigation counsel. (Mot. p. 3.)

11

(2000) (construing the phrase "the trustee may recover" to confer a right exclusively on the trustee). In addition, Section 1123 of the Bankruptcy Code provides that a plan of reorganization may settle "any claim or interest belonging to the debtor or the estate...." 11 U.S.C. § 1123(b)(3)(A). Notwithstanding a grant of derivative standing, estate claims remain property of the estate. *In re Adelphia Communications Corp.*, 371 B.R. 660, 664 (S.D.N.Y. 2007).

Accordingly, courts consistently have held that a debtor has the power to propose a settlement of a claim brought derivatively on behalf of the estate. *See, e.g., In re Exide Techs.*, 303 B.R. 48, 67 (Bankr. D. Del. 2003) (holding that § 1123(b)(3)(A) authorized a debtor to propose in its plan of reorganization a settlement of an adversary proceeding brought by a creditors committee); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 326 (Bankr. W.D. Pa. 1990) (approving settlement proposed by debtor of equitable subordination claim brought derivatively by equity committee although equity committee did not join in settlement proposal); *In re Fugazy*, 150 B.R. 103, 105-06 (Bankr. S.D.N.Y. 1993) (allowing debtor to seek approval to settle fraudulent transfer claims before considering creditor's motion for derivative standing to bring claims); *In re Matco Elecs. Group, Inc.*, 287 B.R. 68 (Bankr. N.D.N.Y. 2002) (considering debtor's proposed settlement of claims brought by creditor's committee on behalf of estate); *see also In re Smart World Techs. LLC*, 423 F.3d 166, 176 (2d Cir. 2005) (holding that bankruptcy court improperly granted derivative standing to creditors' committee to settle a lawsuit over the debtor's objection).

Although for the reasons set forth in Parts A and B above, the Debtors do not believe that the Committee should be granted derivative standing at all, if any such step is ultimately authorized, the Debtors request that such an order make clear that the Debtors retain the right to

settle the claims, whether pursuant to a plan of reorganization or otherwise, so long as the Court concludes that the settlement is fair and reasonable pursuant to Bankruptcy Rule 9019.

## CONCLUSION

For the foregoing reasons, the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing, and Authority to Commence, Prosecute and Settle Claims and Counterclaims of the Debtors' Estates should be denied.

Dated:   Wilmington, Delaware
          February 11, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Melanie E. Walker
Candice L. Kline
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

46429/0001-6325365v1