# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Related to Docket No. 3062** |

## DEBTORS' RESPONSE AND OBJECTION TO THE MOTION OF WILMINGTON TRUST COMPANY FOR APPOINTMENT OF AN EXAMINER PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE

Tribune Company ("Tribune") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby submit their response and objection to the motion (the "Motion") of Wilmington Trust Company for Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code. In support of this response and objection,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a/ Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Tribune and its affiliated Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      From the outset of these Chapter 11 proceedings, the Debtors have recognized the importance of having the major creditor constituencies understand fully the facts and circumstances relating to Tribune's pre-petition transactions, specifically including the Leveraged ESOP Transactions (as defined below).  Accordingly, the Debtors have undertaken substantial efforts to provide the Official Committee of Unsecured Creditors (the "Committee")—of which Wilmington Trust is a charter member—with full access to the discovery necessary to understand the Leveraged ESOP Transactions and analyze any potential causes of action arising from them.  And when Law Debenture Trust Co. of New York ("Law Debenture"), as successor indenture trustee for certain Tribune bonds, filed a motion last summer seeking discovery in order to perform its own independent review and analysis of the Leveraged ESOP Transactions, the Debtors resolved the motion by agreeing to provide Law Debenture with access to the same discovery provided to the Committee.

2.      Notably, the Law Debenture motion, in which Wilmington Trust joined, also sought the appointment of an examiner.  Yet Wilmington Trust did not object to the settlement of the Law Debenture motion, including the examiner request.  Indeed, during all the months that these parallel investigations have been being conducted, Wilmington Trust has sat passively watching on the sidelines, never once pressing any challenge to the make-up of the Committee or the ability of the Committee's special counsel and the disinterested majority of the Committee to conduct an appropriate investigation in accordance with their fiduciary duties.  Nor, until just weeks ago, did Wilmington Trust even begin seeking access to any of the discovery provided to the Committee and Law Debenture.

2

3.        Only now when the Debtors are poised to file a plan of reorganization, and against the backdrop of intensive settlement negotiations among the various creditor constituencies, does Wilmington Trust suddenly see the need for an examiner to investigate the very issues that have been the subject of exhaustive review for the better part of a year—*i.e.*, whether and what claims exist as a result of Tribune's Leveraged ESOP Transactions.  As the history of events leading up to this Motion makes clear, Wilmington Trust's eleventh hour request is a thinly-disguised ploy to leverage these proceedings to the potential benefit of not a single creditor other than itself.  Having determined not to pursue the appointment of an examiner earlier, despite knowing all of the supposed facts that support its current motion, and having failed until recently even to bother to seek access to discovery or to participate in the investigation, Wilmington Trust can provide no credible rationale for the appointment of an examiner.

4.        In this regard, it is critical to understand the position of Wilmington Trust in these proceedings.  The notes represented by Wilmington Trust, commonly referred to as the "PHONES," are deeply subordinated and sit at the bottom of the priority pecking order, beneath billions in funded debt claims.  Thus, Wilmington Trust is not representative of the interests of creditors generally in these cases.  And, given its isolated position at the bottom of the priority ladder, Wilmington Trust has everything to gain and nothing to lose from "swinging for the fences" in the hopes of forcing some recovery—particularly if the bill gets footed by the estate through the use of an examiner.  However, the pursuit of parochial interests by a single creditor constituency is not synonymous with the best interests of the estates and does not justify the appointment of an examiner.  The appointment of an examiner must benefit *all* creditors—not the interests of just one.

3

5.    Were this not enough, the examiner-conducted investigation Wilmington Trust seeks would be entirely duplicative of what has already been done over the course of nearly a year.  No benefit would be conferred by such a redundant and costly exercise, and no reasonable argument can be, or has been, made that the massive review and analysis undertaken to date by the Debtors, the Committee, and other creditors has been deficient such that an entirely new review by an examiner is warranted.

## BACKGROUND

6.    Although the Motion is replete with misrepresentations and mischaracterizations of fact, the Debtors will not attempt to correct each of those errors.  Certain background facts are, however, necessary to understand why Wilmington Trust's request for an examiner should be denied.

7.    Wilmington Trust is Successor Indenture Trustee for certain Exchangeable Subordinated Debentures due 2029 in the aggregate principal amount of approximately $1.2 billion (the "PHONES") issued in April 1999 by Tribune.  In 2007, Tribune's board of directors, based on the recommendation of a special committee of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune employee stock ownership plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company wholly owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell, see Affidavit of Chandler Bigelow III, Senior Vice President and Chief Financial Officer of Tribune Company in Support of First Day Motions ("Bigelow Aff."), paragraph 14.  (D.I. 3)  These transactions ultimately resulted in the transfer of ownership of Tribune and its subsidiaries to the ESOP.  (Id.)  In connection with the merger and in order to fund ongoing general corporate and working capital needs, Tribune entered into

4

financing facilities in May 2007 (the "Credit Agreement") and December 2007 (the "Bridge Facility"). (*Id.* ¶¶ 19-20.)

8.      Importantly, contrary to the representation in Wilmington Trust's Motion (¶ 35 & n.28), the PHONES are ***not*** *pari passu* with the Credit Agreement Indebtedness, the Bridge Facility Indebtedness and the approximately $1.26 billion in bonds issued by Tribune ("Notes"). Rather, the PHONES are contractually subordinated to all such indebtedness. (*Id.* ¶ 18.) Wilmington Trust seriously misquotes the First-Day Affidavit of Chandler Bigelow III in footnote 28 of its Motion, misleadingly substituting ellipses for the critical phrase "except for the PHONES which are contractually subordinated to all other funded indebtedness at Tribune." (*Compare* Motion n.28 *with* Bigelow Aff. ¶ 18.)

9.      Shortly after the Debtors filed their petition for bankruptcy protection, Wilmington Trust was appointed by the United States Trustee as a member of the Committee. As Wilmington Trust notes in its Motion, the nine-member Committee was originally comprised of (1) two Bank Lenders; (2) two trade creditors;[2] (3) the Pension Benefit Guaranty Corporation; (4) a union; (5) a retiree; and (6) two Successor Indenture Trustees (including Wilmington Trust). (Motion ¶ 57.) Merrill, one of the Bank Lenders, resigned from the Committee in September 2009. (*Id.* p. 24, n.57.) At no time did Wilmington Trust challenge the make-up of the Committee or the selection of Chadbourne & Parke LLP as the Committee's counsel.

10.     It was apparent from the outset that a central issue in these bankruptcy proceedings would be the Debtors' pre-petition Leveraged ESOP Transactions. Accordingly, following the Committee's request in the Spring of 2009, the Debtors have cooperated with the

---

[2]  The two original trade creditors on the Committee were Warner Bros. Television and Vertis, Inc., which subsequently resigned from the Committee on April 22, 2009 and was replaced by Buena Vista Television on May 26, 2009.

Committee's professionals in providing them informal discovery respecting the Leveraged ESOP

Transactions in order that the Committee could conduct its own investigation. Substantial work

also has been done by the Debtors to review and analyze the Leveraged ESOP Transactions, to

facilitate the Committee's review, and, as discussed further below, to provide the same discovery

and access to information to Law Debenture and Centerbridge Credit Advisors LLC

("Centerbridge"), substantial holders of certain series of notes. To date, over 30 entities and

persons involved with the Leveraged ESOP Transactions have responded to document requests,

producing voluminous pages of documents, six witnesses have been deposed, and others have

been interviewed. Further, all documents have been made available to the Committee, Law

Debenture, Centerbridge, and the Debtors, and counsel for each of these parties has attended

each of the depositions. Additionally, in December 2009, the Debtors streamlined and further

facilitated the review process by creating a centralized document depository to provide the

relevant parties access to all of the documents and deposition transcripts that have been collected

to date (the "Document Depository").

      11.    In August 2009, the Committee voted to retain special counsel,

Zuckerman Spaeder LLP ("Zuckerman") to analyze potential causes of action arising out of the

Leveraged ESOP Transactions and, if necessary, to litigate such causes of action. (D.I. 1953.)

The retention of Zuckerman was intended to address one of the main issues now raised by

Wilmington Trust—*i.e.,* Chadbourne's alleged conflict of interest in investigating or bringing

claims against the Senior Lenders because of its ongoing representation of JP Morgan and

Merrill in other matters. Wilmington Trust did not object to the Zuckerman retention motion,

and certainly never suggested to this Court that, even with the advice and counsel of Zuckerman,

the Committee would nevertheless be unable or unwilling to investigate and pursue potential LBO claims.

12.     Also in August 2009, Law Debenture filed a Motion for Leave to Conduct Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure of Tribune Company, Its Affiliates, and Certain Third Parties, or Alternatively, for the Appointment of an Examiner.  (D.I. 2031.)  That motion subsequently was withdrawn when the Debtors agreed to provide Law Debenture and Centerbridge with full access to the discovery related to the Leveraged ESOP Transactions that had been and was being collected and to permit them to participate in discovery, including attending depositions, on a going-forward basis.  Law Debenture and Centerbridge also have requested, and have been granted, access to the Document Depository created in December 2009.  As noted, although Wilmington Trust initially joined Law Debenture's motion to conduct discovery and for an examiner (D.I. 2172), it did not pursue the motion after Law Debenture reached its agreement with the Debtors, and its posture since that point has been one of inaction.  Remarkably, given its current complaints, Wilmington Trust never sought access to the discovery for itself so it could perform its own review and analysis of the Leveraged ESOP Transactions independent of the Committee.  Wilmington Trust also has not sought to attend any of the depositions that have been taken and, although it was provided with notice in December that the Document Depository was being created, never even bothered to obtain access to the depository until just a few weeks ago.

## ARGUMENT

### A.    Appointment Of An Examiner Is Not In The Best Interests Of Creditors Or Otherwise Appropriate Under Section 1104(c)(1).

13.    Wilmington Trust has not—and cannot—establish that appointment of an examiner is warranted under section 1104(c)(1) of the Bankruptcy Code.  That provision allows the Court to order the appointment of an examiner in the exercise of its discretion only where the party requesting appointment has carried its burden of showing that appointment is "in the interests of creditors, any equity security holders, and other interests of the estate."  11 U.S.C. § 1104(c)(1).  To carry its burden, the requesting party must meet certain threshold requirements.

14.    First, a requesting party must show a *factual basis* supporting the need for an independent investigation.  *See In re Gilman Servs., Inc.*, 46 B.R. 322, 327 (Bankr. D. Mass. 1985) (mere allegations of misconduct will not suffice to justify appointing an examiner).

15.    Second, a requesting party must establish that the appointment is in the interests of all parties, not just those of a single creditor group.  *In re Gliatech, Inc.*, 305 B.R. 832, 836 (Bankr. N.D. Ohio 2004) ("An appointment under § 1104(c)(1) must ... be in the interests of everyone with a stake in the case...  One creditor simply does not have the right to use estate resources for an investigation that will serve its purpose, only."); *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (denying motion for an examiner because it was only in interest of creditor group making the request); *see generally* 7 Collier on Bankruptcy ¶ 1104.03[3] (15th ed. rev'd 2009) ("A party seeking the appointment of an examiner under the

46429/0001-6325940v1

discretionary standard must be able to show that such an appointment will be beneficial to the various constituencies.") (citation omitted).[3]

16.    Finally, the requesting party must also establish that the benefits to the estate from the proposed investigation are not outweighed by the attendant burden and expense. *See Gliatech*, 305 B.R. at 836; *Sletteland*, 260 B.R. at 671-72.  In connection with this inquiry, the moving party must establish that no party in interest could conduct the investigation itself, thereby obviating the need for an examiner.  *See Gliatech*, 305 B.R. at 836 (denying motion to appoint an examiner where the creditor "can investigate the facts that would support ... an objection on its own nickel"); *see also Sletteland*, 260 B.R. at 672 (denying motion to appoint examiner where proposed investigation would be duplicative of one already being conducted by creditors' committee); *In re Bradlees Stores, Inc.*, 209 B.R. 36, 39 (Bankr. S.D.N.Y. 1997) (denying motion to appoint examiner where another party in interest had been investigating same allegations).

17.    Wilmington Trust has failed to establish any of these threshold requirements.  In its attempt to show that an additional investigation into the Leveraged ESOP Transactions is warranted, Wilmington Trust argues that one of the members of the Committee, JP Morgan, and the Committee's counsel, Chadbourne, have "disabling conflicts."  (*E.g.*, Motion ¶ 9.)  It is the Debtors' understanding, however, that JP Morgan has recused itself from the Committee's review of and discussions regarding the Leveraged ESOP Transactions.  Moreover, Wilmington Trust makes no showing that the remaining seven members of the Committee— including itself—are failing to fulfill their fiduciary duties in investigating potential claims.  On

---

[3] The Bankruptcy Reform Act of 1994 created a new Section 1104(b) and, as a result, cases before October 22, 1994, refer to the examiner-appointment provision as Section 1104(b), while subsequent decisions refer to Section 1104(c).

this score, Wilmington Trust instead states that the other members of the Committee "simply lack the economic incentive to prosecute the claims," presumably implying that other Committee members will receive an acceptable recovery regardless of the resolution of the issues related to the Leveraged ESOP Transactions and therefore will be indifferent to such issues. (Motion p. 6, n.6.) Wilmington Trust's argument thus seems to be that the composition of the Committee disables it from carrying out its fiduciary duties to all creditors. This argument, however, misapprehends the facts and, if taken to its logical conclusion, renders the Committee meaningless. As is common in cases involving a parent/subsidiary structure, the Committee represents creditors at both the parent and the subsidiaries. That fact does not mean that the Committee is thereby unable to fulfill its fiduciary duties to all of the creditors it represents, and no support is offered by Wilmington Trust for this startling proposition. Indeed, the Committee members are obliged to take actions for the benefit of creditors as a whole.

18.    As for the Committee's counsel, Wilmington Trust concedes that the Committee has hired special litigation counsel, Zuckerman, to analyze potential causes of action and, if necessary, litigate such causes of action. (Motion ¶ 13.) Nevertheless, Wilmington Trust asserts—without any supporting facts—that Zuckerman is somehow unable to perform those functions. (Motion ¶¶ 68-69.) Simply put, although Wilmington Trust raises the specter that the investigation *may* be inadequate because of alleged bias, it has not come forward with any evidence of a specific problem. And, as a member of the Committee, were there any such evidence, it would certainly be within Wilmington Trust's possession. Wilmington Trust's

10

failure to identify such evidence, as well as its lackadaisical attitude prior to filing the Motion, speaks volumes as to the *bona fides* of its current position.[4]

19.    More importantly, other assertions in Wilmington Trust's own brief completely undermine its claim that there have been substantial failings in the Committee's investigation.  Wilmington Trust states at the outset of its Motion that as a member of the Committee, it "has learned that the Debtors' estates hold very significant causes of action against multiple prospective defendants, including current and former members of the Official Committee."  (Motion ¶ 1.)  Later in its Motion, over the course of more than seven pages, Wilmington Trust details what it characterizes as "more than colorable claims" arising out of the Leveraged ESOP Transactions.  (Motion ¶¶ 74-96.)  And again at another point, Wilmington Trust asserts that "[e]xtensive discovery has occurred, and the data collected demonstrates that there are colorable claims arising out of the LBO."  (Motion ¶ 8.)  In short, Wilmington Trust admits that the necessary discovery has been conducted, and that this has enabled Wilmington Trust, if not others, to evaluate what claims exist and assess whether, in its view, the claims are "colorable."  Under these circumstances, Wilmington Trust cannot establish a factual basis supporting the appointment of an examiner.[5]

---

[4] Notably, none of the cases cited by Wilmington Trust in support of its contention that an examiner is warranted because of the supposed conflicts of interest at the Committee level (Motion ¶ 130) is at all on point.  *See In re Cajun Elec. Power Co-op., Inc.*, 74 F.3d 599 (5th Cir. 1996) (appointing trustee where members of board of directors of co-op that would be harmed by rate-decrease were also managers of member-companies that would benefit from rate-decrease); *In re Marvel Ent. Group*, 140 F.3d 463 (3d Cir. 1998) (appointing trustee where entities controlling debtor were also creditors); *In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989) (appointing trustee where there was evidence debtor was siphoning assets to subsidiary both pre- and post-petition and court did not have confidence management would run company); *In re Fiesta Homes of Georgia, Inc.*, 125 B.R. 321 (S.D. Ga. 1990) (appointing trustee where case converted to Chapter 7 and only remaining task was to pursue preference actions against insiders or their family members); *In re Nautilus of New Mexico, Inc.*, 83 B.R. 784 (Bankr. D.N.M. 1988) (appointing trustee where owner of debtor was also largest creditor).

[5] In its Motion, Wilmington Trust also makes passing remarks regarding supposed conflicts of interest held by the Debtors and their counsel. (*E.g.*, Motion p. 6, n.6 and ¶ 64.)  Although the Debtors strongly dispute that they are subject to any conflicts preventing them from performing a full and unbiased review and analysis of potential claims arising from the Leveraged ESOP Transactions, it is unnecessary to address that issue here.  For purposes of the

46429/0001-6325940v1

20.     Wilmington Trust also has not established that an examiner is in the best interests of the creditors as a whole, and not just the PHONES it represents. Although Wilmington Trust suggests that an examiner is in the interests of all pre-LBO bondholders, that is simply not the case. For several months now, Law Debenture and Centerbridge, on behalf of certain Notes, have been reviewing discovery and assessing the merits of potential claims, at their own expense. Law Debenture and Centerbridge thus have nothing to gain from having an examiner duplicate the work they have already done.

21.     More to the point, the timing of Wilmington Trust's motion is highly suspect, and further underscores that an examiner would only serve the unique interests of the PHONES. As noted, for the past year, Wilmington Trust has sat passively, content to let the Committee, the Debtors, and later Law Debenture and Centerbridge, wade through the discovery and analyze potential claims. Now that negotiations have intensified and the filing of a plan of reorganization is imminent, Wilmington Trust has apparently become concerned over the PHONES' prospects and it therefore seeks to frustrate the progress of these cases for its own perceived tactical advantage. At this juncture, the appointment of an examiner would merely result in unnecessary delay, disrupt the parties' negotiations, and serve the interests of the PHONES by having the estate pay *again* for an investigation into claims that they believe are their best shot at some recovery. Courts routinely deny motions for the appointment of an examiner in situations such as this, where the motion is a thinly-disguised ploy to benefit one creditor groups' negotiating or litigating position. *See, e.g., In re Gliatech, Inc.*, 305 B.R. at 836;

present Motion, it suffices to say that the Committee (not to mention Law Debenture and Centerbridge), has already conducted the very investigation that Wilmington Trust now seeks to have duplicated by an examiner, and Wilmington Trust has come forward with no *facts*—as opposed to rhetoric and speculation—to call that investigation into question. In addition, as discussed more below, Wilmington Trust does not address why, if it is dissatisfied with the investigation performed by the Committee or the Debtors, Wilmington Trust itself—as opposed to an examiner paid for by the estate—could not conduct the investigation it seeks on its own at its own expense.

*In re Sletteland*, 260 B.R. at 672; *see also In re Bradlees,* 209 B.R. at 39 (denying motion for examiner where "request is nothing more than a litigation/negotiation tactic"); *In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y.), Tr. of Oct. 24, 2007 Hr'g at 73 (refusing to appoint examiner in part because the requesting party's "ill-timed motion smacks ... of litigation leverage ...") (attached as Ex. A).[6]

       22.    As the foregoing amply demonstrates, Wilmington Trust also cannot show that the benefit of an examiner would outweigh the burden and expense imposed upon the estate by having that examiner cover the same ground already being covered by the Committee at great cost to the estate. *See, e.g., In re Adelphia Communications*, Case No. 02-41729 (Bankr. S.D.N.Y.), Tr. of Feb. 6, 2006 Hr'g at 7.61-7.65 (declining to appoint an examiner because, among other reasons, the same result could be achieved in a more efficient and economic manner through an investigation conducted by the committees) (attached as Ex. B); *In re Bradlees Store*, 209 B.R. at 39 (declining to appoint an examiner where such would be "duplicative, needless and wasteful"); *Sletteland*, 260 B.R. at 672 (declining to appoint an examiner and noting that it would be inappropriate to impose the costs of an examiner on the estate where the committee could perform any necessary investigation). In this regard, the Committee, Law Debenture and Centerbridge (at their own expense) have conducted their own investigation into the Leveraged ESOP Transactions. There is no reason why Wilmington Trust could not have done the same over the last several months. However, it has declined to do so, instead waiting until the last minute to request a duplicative investigation, the expense of which it seeks to foist on the estate.

---

[6] Wilmington Trust asserts in conclusory fashion that the appointment of an examiner would not cause any delay because all of the relevant documents have been placed in a central document depository. (Motion ¶ 17.) This assertion ignores entirely the substantial time it would take any competent examiner and his advisors to review and analyze in any depth the millions of pages of documents that reside in the depository and to issue a report identifying and evaluating the legal and factual merits of any potential claims.

This is wholly inappropriate. *See Gliatech*, 305 B.R. at 836 (denying motion to appoint an examiner where the creditor "can investigate the facts that would support … an objection on its own nickel").

23.    Finally, it bears noting that the District Court's decision in *Neil v. Zell*, a putative class action on behalf of the participants in the ESOP under the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* that Wilmington Trust discusses at some length in its Motion, says nothing whatsoever about the merits of the potential causes of action outlined in Wilmington Trust's brief and, more importantly, does not bear at all on the question of whether the appointment of an examiner is appropriate here. In *Neil*, the Court held that the complaint stated a cause of action under ERISA against GreatBanc, the named fiduciary in the ESOP plan documents, for alleged breach of its fiduciary duty *to the ESOP* in agreeing to the deal, and against Zell and EGI-TRB for alleged knowing participation in GreatBanc's breach of fiduciary duty to the ESOP. (*See* Exhibit B to Wilmington Trust's Motion at pp. 10-13.) The Court also found that the complaint adequately stated a claim that certain of the transactions approved by GreatBanc were prohibited under ERISA. (*See id.* at 17-24.) GreatBanc did not owe any fiduciary duties to Tribune's *creditors*, and the decision in *Neil* does not remotely touch on whether the LBO transactions were fraudulent conveyances or whether any members of Tribune's Board of Directors breached any fiduciary duties to Tribune's *creditors* in connection with those transactions. In fact, the Court in *Neil* dismissed all of the claims for breach of fiduciary duty asserted against current and former members of Tribune's Board of Directors—a fact Wilmington Trust conveniently ignores.

24.    Wilmington Trust's motion for the appointment of an examiner pursuant to Section 1104(c)(1) should be denied.

14

**B.**     **Appointment Of An Examiner Is Not Mandatory Under
Section 1104(c)(2) And Is Not Otherwise Appropriate.**

25.     Wilmington Trust also contends that the appointment of an examiner is
mandated in this case under Section 1104(c)(2) because the Debtors' unsecured assets are well in
excess of $5 million. (Motion ¶ 105.)[7] This assertion is demonstrably wrong for at least three
independent reasons.

26.     **First**, although some courts have read Section 1104(c)(2) as mandating
the appointment of an examiner whenever the debtor's specified debts exceed the $5 million
threshold, Wilmington Trust ignores entirely that courts in this District are among those that
have rejected this reading and interpret Section 1104(c)(2) as providing for appointment only
where the moving party has shown that an examiner-conducted investigation would be
"appropriate." *See, e.g., In re SA Telecommunications, Inc.*, Case Nos. 97-2395 through 97-2401
(Bankr. D. Del.) (Walsh, J.), tr. of March 27, 1998 proceedings at p. 82 (attached as Ex. C)
(denying motion to appoint an examiner and noting "this Court has for years consistently viewed
1104(c)(2) as not being a mandatory provision"); *In re Am. Home Mort. Holdings, Inc.*, Case No.
07-11047 (Bankr. D. Del.) (Sontchi, J.), tr. of Oct. 31, 2007 proceedings at pp. 76-77 (denying
motion to appoint an examiner under section 1104(c)(2) where there was not an "appropriate"
investigation to be undertaken); *see also In re The GHR Cos., Inc.*, 43 B.R. 165 (D. Mass. 1984)
(appointment of examiner not mandatory under section 1104(c)(2)); *In re Rutenberg*, 158 B.R.
230, 233 (M.D. Fla. 1993) (same); *In re Shelter Resources Corp.*, 35 B.R. 304, 305 (N.D. Ohio
1983) (same).

---

[7] Section 1104(c)(2) of the Bankruptcy Code provides for appointment of an examiner where (i) a trustee has not
been appointed, (ii) a request is made by a party in interest before the confirmation of a plan, and (iii) "the debtor's
fixed, liquidated, unsecured debts, other than debts for goods, services or taxes, or owing to an insider, exceed
$5,000,000." 11 U.S.C. § 1104(c)(2).

46429/0001-6325940v1

27.     The courts rejecting a reading of Section 1104(c)(2) as mandating appointment of an examiner reason that the statute should not be read to require an appointment where—as here—there is no "appropriate" investigation to undertake. As Judge Sontchi observed, it should not be the case under Section 1104(c)(2) that "if you cry 'examiner' in a crowded case, you get one." *Am. Home Mort.*, tr. at 76. Because in that case Judge Sontchi saw nothing to be gained from a potentially very broad and expensive investigation into whether the debtors violated state or federal law in connection with their loan origination and servicing policies, particularly given the Committee's active involvement in the case, the Court denied the motion. *Id.* at 77; *see also Shelter Resources Corp.*, 35 B.R. at 305 (denying motion under Section 1104(c)(2) where, among other things, proposed investigation might duplicate work being done by Committee and would cause estate to incur unnecessary expenses). Indeed, "[r]equiring appointment of an examiner in the absence of any need to investigate will encourage courts to appoint examiners to examine the debtor's broom closet." James F. Queenan, Jr., Philip J. Hendel and Ingrid M. Hillinger, Eds., *Chapter 11 Theory and Practice: A Guide To Reorganization* (Horsham, PA:  LRP Publications, 1994), 14:39 (attached as Ex. D).  That is not conducive to an efficient and orderly process that seeks to preserve the value of an estate and provide maximum benefit to creditors.

28.     Judge Walsh's decision in *SA Telecommunications* is also instructive. After noting that he did not view Section 1104(c)(2) as being mandatory, Judge Walsh found that appointing an examiner to investigate certain intercompany claims would not be in the best interests of creditors.  In that regard, Judge Walsh noted that 90% of the creditors did not want the requested relief, the quick and cheap investigation proposed by the U.S. Trustee was unlikely

16

to provide any value, and, most importantly, any examiner's report would not bring the creditors any closer to agreement. *SA Telecommunications*, tr. at 81-82.

29.      Precisely the same is true here.  Wilmington Trust has not established that the examiner-conducted investigation it seeks is appropriate, and the fact that the Debtors' specified debts exceed the $5 million threshold does nothing to change that analysis.  Indeed, as in *SA Telecommunications*, the process currently underway, with the key players having performed their own analyses and staked their positions, is undoubtedly the most expedient path to resolution of the outstanding issues holding up the reorganization.  Adding another layer of review at the expense of the Debtors—for the sole potential benefit of one creditor so far unwilling to expend its own resources on an investigation—is not in the best interests of the creditors or the estate.  Accordingly, an examiner should not be deemed "mandatory" in this case under Section 1104(c)(2).

30.      **Second**, even those courts that have read Section 1104(c)(2) to mandate the appointment of an examiner when the monetary threshold is met have held that a party can waive the right to an examiner by its delay in bringing a request.  *See, e.g., In re Schepps Food Stores, Inc.*, 148 B.R. 27, 30 (S.D. Tex. 1992) (denying motion to appoint an examiner under Section 1104(c)(2) where all the statutory conditions were satisfied but movant waited approximately two-and-a-half months after his concerns arose to request appointment: "While the statute states that the court may appoint an examiner any time before the plan is confirmed, a creditor cannot use the provision to disrupt the proceedings."); *Walton v. Cornerstone Ministries Invs., Inc.*, 398 B.R. 77, 82 (N.D. Ga. 2008) (noting "dilatory use of examiner motion" by the movant may lead courts "into the realm of equity"); *In re Bradlees Stores, Inc.*, 209 B.R. 36, 39 (S.D.N.Y. 1997) (holding that claims traders waived right to seek appointment of an examiner

17

where they had "allowed the entire thirteen-month investigation surrounding the Acquisition to be conducted by the Debtors' professionals, at significant cost to the estates, without seeking the appointment of an independent third party"); *In re Calpine Corp.*, Case No. 05-60200, tr. of Oct. 24, 2007 proceedings at p. 72 (attached as Ex. A) (holding that creditor waived right to request an examiner by waiting two years after petition date, seven months after issue it proposed to be investigated was first raised, and less than two months before the confirmation hearings). As noted by one commentator, "the mandatory nature of [Section 1104(c)(2)] was not intended and should not be relied upon to permit blatant interference with the Chapter 11 case or the plan confirmation process. Failure to make a timely request for the appointment of an examiner may provide the court with a basis for denying the request on the ground of laches." 7 Collier on Bankruptcy ¶ 1104.03[2][b] (15th ed. rev'd 2009) (citation omitted). "Nor should the mandatory nature of the provision be used to allow one group of creditors or interest holders to obtain a protagonist supporting its litigation position under the guise of investigation." *Id.*

31.     Wilmington Trust has waived its right to request an examiner here. Although it was apparent from the outset of these chapter 11 proceedings that the Leveraged ESOP Transactions would be a central issue, Wilmington Trust waited over a year after the petition date and more than nine months after discovery into these Transactions commenced to file its motion for an examiner. Wilmington Trust concedes that, as a member of the Committee, it has been privy to the progress of the Committee's investigation, and certainly has known the make-up of the Committee and its counsel all along. None of the supposed issues Wilmington Trust raises in its Motion reasonably can be characterized as "new." What is more, Wilmington Trust's motion comes over four months after Law Debenture first raised the issue of whether an examiner should be appointed to perform the very investigation Wilmington Trust now seeks,

18

based on many of the same allegations that Wilmington Trust now makes.  After Law Debenture

withdrew its motion for an examiner and commenced its own review of the discovery related to

the Leveraged ESOP Transactions, Wilmington Trust simply did nothing.  It neither sought

access to the discovery for itself so it could perform its own independent review nor pressed the

issue of an examiner.  Indeed, not until the eve of the Debtors' filing a proposed plan did

Wilmington Trust act.  Under these circumstances, Wilmington Trust's "ill-timed motion smacks

more of litigation leverage than the protection of the unrepresented public as the statute

intended" and its motion should be denied.  *Calpine*, tr. at 73.

32.     **Third**, it is well-settled that "the bankruptcy court retains broad discretion

to direct the examiner's investigation, including its nature, extent, and duration." *In re Revco*

*D.S., Inc.*, 898 F.2d 498, 501 (6th Cir. 1990); *see also In re Loral Space & Communications,*

*Ltd.*, 2004 WL 2979785, at *5 (S.D.N.Y. Dec. 23, 2004); *Schepps*, 148 B.R. at 30.  Thus, even

where courts find appointment of an examiner to be mandatory under Section 1104(c)(2), it does

not follow that a movant can abuse that provision by demanding an investigation that would not

be in the interests of the estate or its creditors.  "There would be substantial potential for abuse

and waste of estate assets if … any party in interest in a case exceeding the debt threshold could

obtain appointment of an examiner to investigate whatever matters that party specified." *In re*

*UAL Corp.*, 307 B.R. 80, 86 (Bankr. N.D. Ill. 2004).  Thus, as the statute itself makes clear, any

examiner-conducted investigation must be "appropriate." 11 U.S.C. § 1104(c).

33.     An investigation by an examiner into the Leveraged ESOP Transactions is

not in the interests of the estate or the creditor body as a whole and, therefore, should not be

ordered.  Such an investigation would be entirely duplicative of other investigations not only

currently underway, but, at this late date, substantially completed.  Thus, even if the appointment

of an examiner were mandatory (which it is not), it does not follow that the Court should order an examiner to undertake the entirely duplicative and unnecessary investigation Wilmington Trust seeks. *See, e.g., In re Acands, Inc.*, Case No. 02-12687 (Bankr. D. Del.) (Newsome, J.), 12/19/02 Order (attached as Ex. E) (appointing examiner pursuant to Section 1104(c)(2) but ordering that "examiner is not to perform any task or take up any duty or in any way perform any work or incur cost to the estate without further order of the Court); *In re Asarco LLC*, Case No. 05-21207 (Bankr. S.D. Tex.), 3/4/08 Order (attached as Ex. F) (appointing examiner under Section 1104(b)(2) but ordering that Examiner would not have any current duties because "no current matter in this case warrants the attention of an examiner"). The examiner-conducted investigation Wilmington Trust seeks is not appropriate under Section 1104(c)(2).[8]

[Remainder of page intentionally left blank.]

---

[8] In the event that the Court believes itself required to appoint an examiner notwithstanding the cited authorities, the Debtors submit that the Court should adopt the approach taken by the courts in *Acands* and *Asarco*, and refrain from establishing any duties or scope for such examiner pending further order of this Court.

## CONCLUSION

For the foregoing reasons, Wilmington Trust's motion for the appointment of an

examiner should be denied.


Dated:    Wilmington, Delaware                     Respectfully submitted,
          February 11, 2010

                                                   SIDLEY AUSTIN LLP
                                                   James F. Conlan
                                                   Bryan Krakauer
                                                   Janet E. Henderson
                                                   Melanie E. Walker
                                                   Candice L. Kline
                                                   One South Dearborn Street
                                                   Chicago, IL  60603
                                                   Telephone:  (312) 853-7000
                                                   Facsimile:  (312) 853-7036

                                                           -and-

                                                   COLE, SCHOTZ, MEISEL,
                                                   FORMAN & LEONARD, P.A.

                                                   By: _____
                                                   Norman L. Pernick (No. 2290)
                                                   J. Kate Stickles (No. 2917)
                                                   Patrick J. Reilley (No. 4451)
                                                   500 Delaware Avenue, Suite 1410
                                                   Wilmington, DE  19801
                                                   Telephone:  (302) 652-3131
                                                   Facsimile:  (302) 652-3117

                                                   ATTORNEYS FOR DEBTORS AND DEBTORS IN
                                                   POSSESSION

21

46429/0001-6325940v1