## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, et al., | ) Jointly Administered |
| | ) |
| Debtors. | ) Re: Docket No. 3063 |
| | ) **Hearing date**: February 18, 2010, at 10:00 a.m. (Eastern) |
| | ) **Objection deadline**: February 11, 2010 |
| | ) |

## CREDIT AGREEMENT LENDERS' OBJECTION TO MOTION OF WILMINGTON TRUST FOR APPOINTMENT OF AN EXAMINER PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE

The Credit Agreement Lenders,[1] as holders of approximately $4.6 billion principal amount of indebtedness arising under the Tribune Company Senior Secured Credit Agreement, dated as of May 17, 2007 (as amended, the "Credit Agreement"), hereby *object* to the "Motion For Appointment Of An Examiner Pursuant To Section 1104(c) Of The Bankruptcy Code" (the "Motion") filed by Wilmington Trust Company ("Wilmington Trust") in its capacity as indenture trustee for the Exchangeable Subordinated Debentures dues 2029 (the "PHONES") issued by debtor Tribune Company ("Tribune" and, with its affiliated debtors, the "Debtors").

## PRELIMINARY STATEMENT

Wilmington Trust is the indenture trustee for Tribune's contractually-subordinated PHONES debt. The PHONES are so deeply subordinated that, except in the most wildly-optimistic (and unrealistic) litigation and valuation scenarios, PHONES claims will receive no distribution from the Tribune estate even in the unlikely event that some or all of the Credit Agreement debt were to be avoided in the fraudulent conveyance case touted by Wilmington Trust.

---

[1]    The Credit Agreement Lenders are the entities identified in the "Second Amended Joint Verified Statement Of Representation Of More Than One Creditor By Hennigan Bennett & Dorman LLP And Young, Conaway, Stargatt & Taylor, LLP" filed concurrently herewith.

Wilmington Trust thus is an out-of-the-money party in interest, with nothing at stake and no qualms about spending other people's money in pursuit of the quixotic and duplicative investigation sought by the Motion. Indeed, the Motion reads like a page from the out-of-the-money stakeholder handbook: it casts unsubstantiated aspersions at the estate fiduciaries and their professionals; it comes at the eleventh hour, without regard for cost, delay, or impact on the proceedings; and it misstates facts and applicable law in an effort to catch the attention of the Court.

Ultimately, though, the Motion raises nothing new. Indeed, it would not be surprising if the Court was struck by a sense of *déjà vu* when reading the Motion, as Wilmington Trust sought and joined in a request for exactly the same relief, based on exactly the same grounds and accusations, four months ago. That prior request for an examiner was resolved through the sensible agreement to give interested parties access to the vast store of documents and discovery materials compiled by the Official Committee of Unsecured Creditors (the "Committee") in its own investigation of the claims that are the subject of Wilmington Trust's motion.

Wilmington Trust now wants to have the Court ignore the history of these cases (including resolution of the prior examiner motion) so that an examiner can toss out the work of the Committee (and other estate fiduciaries) and start from scratch. The Court should deny this senseless, tactically-motivated request for at least the following reasons:

1.   ***Prior Resolution***: The Court already ruled upon and resolved Wilmington Trust's prior request for an examiner. The Motion raises no new arguments and Wilmington Trust is not entitled to a second bite at the apple.

2.   ***Delay***: Wilmington Trust has been a member of the Committee since its formation and, by its own admission, has been aware for a year or more of the Committee's own investigation of the alleged claims that it now wants an examiner to pursue. During that time, the Committee's professionals have spent nearly 20,000 hours and incurred well over $10 million in fees investigating the matter. Wilmington Trust's inexcusable delay in requesting an examiner forecloses the relief it now seeks.

3.    *Duplication*:  An examiner would completely duplicate the efforts of the Committee and the Debtors, estate fiduciaries who have investigated – at a likely cost to the bankruptcy estates of $20 million or more – the causes of action for which Wilmington Trust wants an examiner.  There is no justification for burdening the estates with the substantial costs of an examiner and its attendant crew of professionals.

At a minimum, if the Court nevertheless determines to appoint an examiner, it can and should limit the scope and duration of the investigation so as to minimize the expense, delay, and disruption that inexorably will follow from the insertion of an examiner into these proceedings at this late date.  Specifically, any investigation should be limited to (1) whether the Debtors and the Committee have adequately investigated the alleged claims and whether either estate fiduciary has done anything inappropriate in connection with its investigation of the claims and the potential assertion of them; and (2) whether Wilmington Trust, as an estate fiduciary itself, has acted properly and, if not, whether it should be removed from the Committee.

## BACKGROUND

### *Regardless Of Litigation Outcome, Wilmington Trust Represents A Subordinated, Out-Of-The-Money Constituency*

Wilmington Trust is the indenture trustee for the PHONES.  According to the Debtors, "[t]he PHONES are contractually subordinated in right of payment to all of the funded indebtedness at Tribune."[2]

As of the petition date, there was approximately $8.25 billion in senior debt outstanding under the Credit Agreement.[3]  By the plain terms of the subordination agreement that governs the PHONES, the PHONES are subordinated to the entire amount of this Credit Agreement debt, even if this Court ultimately were to disallow or avoid some or all of the debt as to Tribune itself.

---

[2]    "Affidavit Of Chandler Bigelow III, Senior Vice President And Chief Financial Officer Of Tribune Company In Support Of First Day Motions" [docket # 3] ("Bigelow Aff.") ¶ 23

[3]    *Id.* ¶ 19.

Moreover, because Tribune used at least $3 billion of proceeds from the Credit Agreement to repay existing funded indebtedness and fund corporate expenses,[4] the lenders under the Credit Agreement unquestionably gave reasonably equivalent value for at least that portion of their loan. Those lenders therefore have a minimum of a $3 billion claim for "funded indebtedness" against Tribune that is contractually senior to the PHONES, even if the balance of the Credit Agreement debt is avoided (something the Credit Agreement Lenders vigorously contest) *and* the contractual subordination is determined not to apply as an intercreditor matter to the avoided debt.

Thus, because Tribune has approximately $1.26 billion in additional funded indebtedness that is contractually senior to the PHONES,[5] there is an absolute minimum of $4.26 billion in claims against Tribune itself that are senior to any and all claims in respect of the PHONES. Accordingly, before Wilmington Trust's constituents are entitled to receive a single dollar of distribution under a plan, the value of Tribune's assets must exceed $4.26 billion. This will occur if, but only if, all of the guarantees of the Credit Agreement indebtedness executed by Tribune's various subsidiaries also are avoided such that all value of the subsidiaries flows first to Tribune itself before being distributed to creditors – a highly-unlikely litigation outcome given the clear solvency of the Tribune subsidiaries (which had $2.1 billion *less* total indebtedness than Tribune itself) at the time of the Credit Agreement transactions.[6]

The Committee itself agrees that, "after plan confirmation and resolution and adjudication of the Derivative Causes of Action [*i.e.*, those that Wilmington Trust wants an examiner to investigate], the holders of the LBO Debt [*i.e.*, Credit Agreement debt] will own a

---

[4]    Motion ¶¶ 36, 42 and n.29.

[5]    Bigelow Aff. ¶ 21.

[6]    Cribbing from the Law Debenture Discovery/Examiner Motion (described below), Wilmington Trust spills pages of ink arguing that the Credit Agreement loans are subject to avoidance. Motion ¶¶ 21-95. In so doing, Wilmington Trust misstates numerous aspects of the transaction and applicable facts. Now is not the time for a refutation of Wilmington Trust's error-ridden diatribe, and the Credit Agreement Lenders reserve all rights in this regard.

substantial part of and most likely a majority of the Debtors' new equity."[7]  This

acknowledgement is an implicit recognition that Wilmington Trust is wrong in its assertions that

all of the Credit Agreement debt can be avoided and that, even under the rosiest of assumptions

about the alleged fraudulent conveyances claims, holders of the Credit Agreement debt will

retain the largest claims against the estate (which claims are entitled to be paid in full pursuant to

the contractual subordination of the PHONES).

Thus, for all intents and purposes, Wilmington Trust represents a constituency of

noteholders that have no realistic chance of achieving any recovery in these cases, even if a duly-

authorized plaintiff ultimately achieves the realistic best-case litigation scenario of avoiding all

but $3 billion in Credit Agreement debt owed by Tribune.  Wilmington Trust's Motion should be

viewed in this context.

### *Wilmington Trust Did Nothing To Address Its Alleged Concerns For The First Nine Months Of These Cases*

Notwithstanding its out-of-the-money position, Wilmington Trust has been a member of

the Committee since the very first weeks of these cases.  According to the Committee's prior

pleadings, "the issues arising from the LBO have been at the forefront of the Committee's

agenda" since the very day of its formation.[8]  Specifically, the Committee states that "[p]robing

questions regarding the LBO and possible approaches to resolution or related claims were asked

of Committee counsel candidates that day.  The Committee's efforts to examine the LBO have

not wavered since.  From the earliest months of the case, the Committee has directed and

---

[7]  "Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Granting Leave, Standing And Authority To Commence, Prosecute And Settle Claims And Counterclaims Of The Debtors' Estates" [docket # 3281] ("Committee Standing Motion") at 10.

[8]  "Response And Partial Objection Of The Official Committee Of Unsecured Creditors To Motion Of Law Debenture Trust Company Of New York For Leave To Conduct Discovery Pursuant To Rule 2004 Of The Federal Rules Of Bankruptcy Procedure Of Tribune Company, Its Affiliates, And Certain Third Parties, Or Alternatively, For The Appointment Of An Examiner" [docket # 2136] ("Committee Reply") ¶ 15.

776750.3

pursued a detailed and exhaustive investigation and review of the LBO and the issues and possible claims arising from the LBO."[9]

The fee statements of the Committee's counsel confirm this assertion. As the following table shows, the Committee's primary counsel and conflicts counsel have billed over 19,000 hours and $9.75 million in fees through December in connection with this investigation:

### Committee Fees And Hours For LBO Investigation

| Period | Chadbourne & Parke ("Review of Prepetition Financing") | Chadbourne Hours | Zuckerman Spaeder ("Bank Claims") | Zuckerman Hours |
|---|---|---|---|---|
| 12/18/08-1/31/09 | $25,266 | 59.20 | | |
| Feb. '09 | $167,960 | 334.10 | | |
| Mar. '09 | $182,099 | 306.90 | | |
| Apr. '09 | $142,949 | 236.40 | | |
| May '09 | $315,982 | 549.80 | | |
| June '09 | $443,056 | 949.10 | | |
| July '09 | $989,967 | 1,932.30 | | |
| Aug. '09 | $880,942 | 1,791.30 | $212,206 | 374.80 |
| Sept. '09 | $1,149,214 | 2,378.30 | $368,083 | 623.00 |
| Oct. '09 | $1,523,989 | 3,163.30 | $308,389 | 641.30 |
| Nov. '09 | $1,215,900 | 2,277.30 | $315,570 | 620.10 |
| Dec. '09 | $1,211,986 | 2,253.70 | $303,175 | 589.00 |
| Totals: | $8,249,310 | 16,231.70 | $1,507,423 | 2,848.20 |

Considering unbilled attorney fees for January and February of this year, plus fees of the Committee's financial advisors, *the Committee's investigation of the so-called LBO claims already has cost the estates well over $13 million.* This is in addition to the millions of dollars of fees incurred by the Debtors in their own independent and ongoing investigation of the same claims and causes of actions.

As a member of the Committee, Wilmington Trust surely is aware of the Committee's efforts in this regard. Indeed, Wilmington Trust previously observed that "it has attended most

---

[9]    *Id.*

(if not all) Official Committee meetings, studied information delivered and the advice rendered by Official Committee professionals, participated in Official Committee deliberations on most (if not all) matters of importance, and carefully observed how this Official Committee and its professionals function."[10]

Yet, despite that first-hand knowledge of the Committee's composition and inner workings, and despite the ever-mounting legal fees associated with the Committee's investigation, Wilmington Trust never raised any concern about the Committee's and the Debtors' actions in respect of the "LBO claims" for more than the first nine months of these cases.

### Wilmington Trust Joins Law Debenture's Discovery/Examiner Motion And Does Not Object To Its Resolution

In September 2009, Law Debenture Trust Company of New York filed a motion for leave to conduct discovery with respect to the so-called LBO claims or, alternatively, for the appointment of an examiner to investigate the claims.[11]  Law Debenture's Discovery/Examiner Motion raised all of the same issues now raised by Wilmington Trust in the pending Motion. Among other things, Law Debenture asserted that the Committee and its counsel were conflicted and unable to pursue a fulsome investigation of the claims, and Law Debenture sought the appointment of an examiner in the event that the Court denied it the discovery it sought.  Much as Wilmington Trust now argues, Law Debenture claimed that "the appointment of an examiner may be critical because, if the Court denies Law Debenture its Bankruptcy Rule 2004 request, there will not be any opportunity for a separate investigation by non-LBO participant advisors

---

[10] "Joinder Of Wilmington Trust, As Successor Indenture Trustee, To The Motion Of Law Debenture Trust Company Of New York For Leave To Conduct Discovery Pursuant To Rule 2004 Of The Federal Rules Of Bankruptcy Procedure Of Tribune Company, Its Affiliates, And Certain Third Parties, Or Alternatively, For The Appointment Of An Examiner" [docket # 2172] ("Wilmington Joinder") ¶ 1.

[11] "Motion Of Law Debenture Trust Company Of New York For Leave To Conduct Discovery Pursuant To Rule 2004 Of The Federal Rules Of Bankruptcy Procedure Of Tribune Company, Its Affiliates, And Certain Third Parties, Or Alternatively, For The Appointment Of An Examiner" [docket # 2031] ("Law Debenture Discovery/Examiner Motion").

into the LBO [and] allowing the Debtors to negotiate with the LBO participants with an

ineffective or unwilling Committee permits the LBO potentially to be largely ignored."[12]

      Wilmington Trust joined Law Debenture's Discovery/Examiner Motion, noting its

alleged "frustration and dissatisfaction with the manner in which estate causes of action have

been handled to date."[13]  Subsequently, however, Law Debenture settled the motion through a

stipulation allowing it access to the Committee's discovery material,[14] a resolution that

ultimately resulted in the creation of a document depository available to all major participants in

the cases.[15]  Notably, notwithstanding its newly-expressed venom, Wilmington Trust did not

object to the resolution of the Discovery/Examiner Motion or do anything further to press its

request for the appointment of an examiner.

      Since that time, the Committee's professionals have incurred well over $5 million in fees

in their investigation of the LBO claims (from October 2009 to date), hundreds of thousands of

pages of discovery documents have been placed into the depository, seven depositions have

taken place, and several settlement conferences have occurred – all without a word of discontent

from Wilmington Trust.

### *Wilmington Trust's Motion Adds Nothing To Its Prior Allegations*

      Now, well over a year into these cases, Wilmington Trust has filed its own motion

seeking exactly the same relief sought in the Law Debenture Discovery/Examiner Motion to

which it previously joined – the appointment of an examiner to investigate the very claims that

both the Committee and the Debtors are exhaustively investigating themselves.  Indeed, huge

portions of the Motion are copied wholecloth from the Law Debenture motion.  There is not a

---

[12]  *Id.* ¶ 64.

[13]  Wilmington Joinder ¶ 6.

[14]  *See* "Stipulated Order" resolving Law Debenture's Discovery/Examiner Motion [docket # 2235].

[15]  *See* "Order (I) Authorizing The Debtors To Establish A Document Depository And Directing The Committee To Deliver Certain Documents To The Depository Pursuant To Federal Rule Of Bankruptcy Procedure 2004 And (II) Establishing Settlement Negotiation Protections Pursuant To 11 U.S.C. § 105(a)" [docket # 2858].

single new allegation in the Motion that was not contained in the now-resolved Law Debenture Discovery/Examiner Motion.

The gist of the Motion is that an examiner is needed because the Committee is "tainted" by the participation of Committee member JPMorgan Chase and other members "who are economically motivated to structure a plan of reorganization that resolves the LBO litigation claims in favor of the LBO banks and does not give the pre-LBO creditors the relief to which they are entitled."[16] In other words, Wilmington Trust fears that, in the exercise of its fiduciary duty to all creditors, the Committee may choose not to pursue the "swing for the fences" litigation strategy that is the only way to generate any recovery for the deeply subordinated PHONES. *Cf. In re Adelphia Communications Corporation*, 371 B.R. 660, 673 (S.D.N.Y. 2007) (withdrawing standing where committee "would always have the incentive to do nothing but swing for the fences").

To bolster its accusation of a "tainted" Committee, Wilmington Trust claims that JPMorgan's Committee membership "impair[s] the ability of the Official Committee to properly investigate and pursue potential causes of action against the Debtors."[17] As a fellow member of the Committee, Wilmington Trust clearly knows better. The Committee has emphasized that JPMorgan (and Merrill Lynch, when it was a member of the Committee) "have at all times been entirely recused from any participation of any kind in the Committee's review or deliberations concerning any aspect of the LBO, and they have been carefully screened from access to any Committee professional analysis or other non-public information that relates to the LBO investigation."[18] In other words, per the Committee itself, "the Committee's review of the LBO is entirely free of any taint of participation by interested members."[19]

---

[16] Motion ¶¶ 59-60.

[17] *Id.* ¶ 58.

[18] Committee Reply ¶ 13.

[19] *Id.*

- 9 -

Wilmington Trust has tendered no evidence whatsoever to the contrary. Its frankly scurrilous allegations should be disregarded.[20]

## ARGUMENT

Wilmington Trust requests the appointment of an examiner under both sections 1104(c)(1) and 1104(c)(2) of the Bankruptcy Code. An examiner is not warranted under either section.

### *Appointment Of An Examiner Is Not In The Best Interests Of The Estates*

An examiner may be appointed pursuant to section 1104(c)(1) only where the Court concludes that "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(c)(1).

Wilmington Trust claims that an examiner would be in the best interests of the estate because "the composition of the Official Committee and Committee Counsel have hampered and will continue to hinder any efforts to appropriately investigate and pursue any claims arising out of the LBO."[21] Notably, Wilmington Trust offers no evidence to support that bare allegation. *See* 7 COLLIER ON BANKRUPTCY ¶ 1104.03[3] (16th ed. 2010) ("If a request for the appointment of an examiner is contested, the party requesting the appointment must demonstrate by probative evidence that the facts of the case justify the appointment of an examiner.") (collecting cases).

In fact, the record in the case is directly to the contrary to Wilmington Trust's allegations: the Committee has stated that the so-called "tainted" members of the Committee have been excluded from all participation in its investigation of the alleged causes of action and the Committee's professionals have spent nearly 20,000 hours, and run up $13 million in fees, in

---

[20]  Wilmington Trust also raises the specter of conflicts of the Committee's counsel and financial advisor, but ultimately concedes that the Zuckerman firm is "independent". Motion ¶ 68. In any event, to the extent that the Committee's professionals are conflicted, the appropriate remedy is not the appointment of an examiner; it is the disqualification of the applicable professionals and disgorgement of fees charged for the work at issue.

[21]  Motion ¶ 102.

776750.3

examining the claims. This is hardly a lack of effort in respect of the so-called LBO claims.
Further, undoubtedly prompted by Wilmington Trust's request for an examiner, the Committee
now has filed a premature motion for leave to pursue the claims it has been investigating.[22]

On these facts, the appointment of an examiner most assuredly would not be in the
interests of the estates. For one thing, it will add to the already-substantial, and continually-
mounting, fees associated with the Committee's and the Debtors' review of the estates' causes of
action. Given the complexity of the transactions at issue and the enormous amount of discovery
already produced and other information available, and given the data point provided by the fees
of the Committee's own professionals, the cost of any credible, thorough examination is likely to
exceed $10 million. *Cf. In re New Century TRS Holdings, Inc.*, 407 B.R. 558, 564 (Bankr. D.
Del. 2009) ("the Examiner and his professionals had incurred nearly $20 million of fees and
expenses from the beginning of his appointment through the filing of the Final Report").

Further, the appointment of an examiner threatens to disrupt these cases at this very
critical stage, where the Debtors are on the verge of filing one or more plans of reorganization
and the Debtors, the Committee, the Credit Agreement Lenders, and other parties are engaged in
intensive negotiations regarding the restructuring, the LBO claims, and the future direction of
these cases.

Most tellingly, Wilmington Trust lacks the courage of its convictions. If it really
believed that the Committee (of which it is a member) is hopelessly conflicted, it could and
should file a motion to reconstitute its membership. If it really believed that the Debtors are
unable to act as fiduciaries for the entire estate, it could and should file a motion for the
appointment of a trustee. In each case, Wilmington Trust would then be required to actually
prove the allegations it so easily throws around in the Motion.

Instead, by the Motion Wilmington Trust does nothing other than lob a grenade and ask
the Court and other parties to bear the cost of cleaning up the inevitable fallout. As this is the

---

[22]   The Credit Agreement Lenders have responded separately to the Committee's motion in this
regard.

antithesis of the "interests of the estate" standard of section 1104(c)(1), no grounds exist for the appointment of an examiner under that provision of the Bankruptcy Code.

### *Appointment Of An Examiner Is Not Mandatory Under The Circumstances*

Notwithstanding the foregoing, Wilmington Trust claims that the Court actually has no say in the matter and must appoint an examiner because "[s]ection 1104(c)(2) leaves a court no discretion where, as here, the [$5 million] claims threshold is met."[23]

Here again, Wilmington Trust is wrong. First, Wilmington Trust fails to inform the Court that there is a distinct split of authority on the question, with at least three published opinions concluding that section 1104(c)(2) does *not* automatically require the appointment of an examiner in cases where debts exceed $5 million. *See In re Rutenberg*, 158 B.R. 230, 232-33 (Bankr. M.D. Fla. 1993); *In re GHR Cos.*, 43 BR. 165, 170-76 (Bankr. D. Mass. 1984); *In re Shelter Resources Corp.*, 35 B.R. 304, 305 (Bankr. N.D. Ohio 1983).

*Shelter Resources* is particularly analogous. In that case, an indenture trustee moved for the appointment of an examiner to investigate causes of action that the debtor subsequently settled. The court held that, despite the fact that the debtor's debts exceeded $5 million, an examiner was not mandatory or warranted under the circumstances:

> The appointment of an examiner would entail undue delay in the administration of this estate and most likely cause the debtor to incur substantial and unnecessary costs and expenses detrimental to the interests of creditors and parties in interest. There is currently in place a Debenture Holders' Committee with powers under Section 1103(c) of the Bankruptcy Code to carry on, if necessary, an investigation as may be appropriate. The appointment of an examiner under these circumstances, with the possibility of duplicated effort, is not in the spirit of economy of administration in the handling of bankruptcy estates.

*Shelter Resources*, 35 B.R. at 305.

---

[23]    Motion ¶ 105.

776750.3

Wilmington Trust also fails to inform the Court that this split of authority extends to this District, where at least four Bankruptcy Judges have concluded that section 1104(c)(2) does not mandate the appointment of an examiner upon demand in cases involving debts of more than $5 million. *See In re IdleAire Technologies Corp.*, Case No. 08-10960 (KG) (Bankr. D. Del. June 16, 2008); *In re American Home Mortgage Holdings, Inc.*, Case No. 07-11047 (CSS) (Bankr. D. Del. Nov. 5, 2007); *In re SA Telecommunications, Inc.*, Case No. 97-2395 (PJW) (Bankr. D. Del. Mar. 27, 1998); *In re Webcraft Techs., Inc.*, Case No. 93-1210 (HSB) (Bankr. D. Del. Nov. 4, 1993).[24]

Further, even courts that conclude that section 1104(c)(2) generally requires the appointment of an examiner in cases with more than $5 million in claims have held that, in factual circumstances similar to those in this case, a movant may be deemed to have waived its right to demand an examiner. *In re Bradlees Stores, Inc.*, 209 B.R. 36 (Bankr. S.D.N.Y. 1997), is directly on point. There, a group of trade creditors filed a motion seeking an examiner to review claims and causes of action allegedly arising from a prior leveraged buyout of the debtors. The debtors had conducted a thirteen-month investigation of such claims and concluded that no viable causes of action existed. The movants asserted that an examiner was needed in part because "the attorneys for both the Creditors' Committee and the Debtors have conflicting fiduciary obligations." *Id.* at 38.

The court held that, even if section 1104(c)(2) otherwise would require the appointment of an examiner, the movants had waived the right to invoke the statute because they "allowed the entire thirteen-month investigation surrounding the Acquisition to be conducted by the Debtors' professionals, at significant cost to the estates, without seeking the appointment of an independent third party. The appointment of an examiner to conduct a new investigation at this time would be *duplicative, needless* and *wasteful.*" *Id.* at 39 (emphasis added). Thus, the court concluded that the movants were "barred by their own inaction from seeking [an examiner] at

---

[24]  Copies of the applicable orders and/or transcript excerpts from *IdleAire, American Home,* and *SA Telecommunications* are attached hereto as *Exhibit A.*

this late date." *Id.*; *see also In re Schepps Food Stores, Inc.*, 148 B.R. 27, 28 (S.D. Tex. 1992) ("Smith has waived its right to an examiner by its delay in bringing a request").

So, too, here.  If Wilmington Trust truly believed that an examiner was warranted, it should have asked for one well before the Committee's professionals had spent 20,000 hours and $13 million in fees investigating the claims that Wilmington Trust just now wants an examiner to look into.  This is particularly true given that Wilmington Trust previously joined in a request for an examiner and then stood by while the movant and other parties negotiated a resolution of the requested relief that did not include an examiner's appointment.

### *If The Court Appoints An Examiner, It Can And Should Limit The Nature, Extent, And Duration Of The Investigation*

Section 1104(c) provides for the appointment of an examiner "to conduct such investigation of the debtor *as is appropriate*." 11 U.S.C. § 1104(c) (emphasis added).  Thus, "the bankruptcy court retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration." *In re Revco D.S., Inc.*, 898 F.2d 498, 501 (6th Cir. 1990).  Indeed, it is the "court's duty to fashion the role of an examiner to avoid substantial interference with the ongoing bankruptcy proceedings.  To that end, the Bankruptcy Court may exercise its discretion to limit the scope of the examiner's investigation and the compensation and expenses available to the examiner." *In re Loral Space & Communications Ltd.*, Case No. 04 CIV. 8645 (RPP), 2004 U.S. Dist. Lexis 25681, *16 (S.D.N.Y. Dec. 23, 2004); *see In re UAL Corp.*, 307 B.R. 80, 86 (Bankr. N.D. Ill. 2004) ("There would be substantial potential for abuse and waste of estate assets if . . . any party in interest in a case exceeding the debt threshold could obtain appointment of an examiner to investigate whatever matters that party specified.").

Here, if the Court determines to appoint an examiner, it should limit the investigation to whether the Debtors and the Committee have adequately investigated the alleged claims and whether either estate fiduciary has done anything inappropriate in connection with its investigation of the claims and the potential assertion of them.  Also, given the false and misleading premise of the Motion and Wilmington Trust's own position as a fiduciary in these

- 14 -

cases (as a member of the Committee), any examiner should investigate whether Wilmington

Trust has acted properly and, if not, whether it should be removed from the Committee.

## CONCLUSION

For all of the foregoing reasons, the Credit Agreement Lenders respectfully request that

the Court deny the Motion.

Dated: February 11, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telephone: (302) 571-6600
Telecopier: (302) 571-1253

- and -

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
James O. Johnston
Joshua D. Morse
865 S. Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone:  (213) 694-1200
Telecopier:  (213) 694-1234

*Counsel to the Credit Agreement Lenders*

776750.3

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IDLEAIRE TECHNOLOGIES | ) | Case No. 08-10960(KG) |
| CORPORATION, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | **Related Docket No. 101** |

## ORDER DENYING MOTION
## FOR APPOINTMENT OF EXAMINER

On May 23, 2008, the Office of the United States Trustee filed its Motion for Entry of an Order Directing the Appointment of a Chapter 11 Examiner Pursuant to 11 U.S.C. § 1104 ("the Motion") (D.I. 101). The Court held a hearing on the Motion on June 13, 2008, and found that 11 U.S.C. § 1104(2)(c) does not mandate appointment of an examiner, the appointment would not be appropriate or in the best interests of Debtor's estate and, in fact, would be detrimental. The Court stated the bases for its findings on the record.

For those reasons, IT IS ORDERED this 16th day of June, 2008, that the Motion is DENIED.

Dated: June 16, 2008

KEVIN GROSS, U.S.B.J.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------ x
In re:                                                                :      Chapter 11
                                                                         :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,    :      Case No. 07-11047 (CSS)
a Delaware corporation, ct al.,                             :
                                                                         :      Jointly Administered
        Debtors.                                                  :
                                                                         :      **Ref. Docket Nos. 1489 and** 1760
------------------------------------------------------ x

**ORDER DENYING MOTION FOR DISCLOSURE UNDER U.S.C. § 363, § 1106, AND
BANKRUPTCY RULE 2004, DIRECTING EXAMINATION OF, AND PRODUCTION OF
DOCUMENTS BY DEBTORS AND LIMITED OBJECTION TO ASSET PURCHASE
AGREEMENT COMPLAINT FOR INJUNCTION AGAINST SALE OF MORTGAGE NOTES
FREE AND CLEAR OF LIENS OR LIABILITIES AND REQUEST FOR APPOINTMENT OF
CONSUMER PRIVACY OMBUDSMAN PURSUANT TO U.S.C. § 332 AND TRUSTEE OR
EXAMINER PURSUANT TO U.S.C. § 1104 FILED BY PAULA RUSH**

The Court having considered the *Motion For Disclosure Under U.S.C. § 363, § 1106,*

*and Bankruptcy Rule 2004, Directing Examination of, and Production of Documents By Debtors and*

*Limited Objection to Asset Purchase Agreement Complaint for Injunction Against Sale of Mortgage*

*Notes Free and Clear of Liens or Liabilities and Request for Appointment of Consumer Privacy*

*Ombudsman Pursuant to U.S.C. § 332 and Trustee or Examiner Pursuant to U.S.C. § 1104* [Docket

No. 1489] (the "Motion") filed by Paula Rush, and the opposition thereto; and this Court having

jurisdiction over the matters set forth in the Motion; and upon the record made at the hearing on

October 31, 2007; and after due deliberation and sufficient cause appearing therefor; it is hereby

ORDERED, that the Motion is denied in all respects.

Dated: November 5, 2007
        Wilmington, Delaware

                                        Christopher S. Sontchi
                                        United States Bankruptcy Judge

03/01/04  12:35 FAX                    PARCELS INC                              ☒022

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In the matter of                    )
                                    )
SA TELECOMMUNICATIONS, INC.,        )
et al..                             ) Case Nos. 97-2395
                                    ) through 97-2401(PJW)
            Debtors.                )



                        U.S. Bankruptcy Court
                        Sixth Floor
                        824 Market Street
                        Wilmington, Delaware



                        Friday, March 27, 1998
                        1:00 p.m.



BEFORE: HONORABLE PETER J. WALSH
        United States Bankruptcy Judge



                    WILCOX & FETZER
        1330 King Street - Wilmington Delaware  19801
                    (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

23

1   these debtors, then how do you know if you need more

2   than one.  The answer is you don't.  You put an

3   examiner in there, you get the information you need,

4   you get an independent report, versus three different

5   stacks of discovery, that you can work off of.

6            And even if Your Honor concludes that

7   you can only appoint an examiner in the case of SA

8   Tel, if you for some reason, take their representation

9   that this debt only relates to SA Tel, well, then,

10  wouldn't it be efficient to, since the same issues

11  relate to all the other estates, since the same issues

12  are going to relate to the proposal of the plan, to

13  let the examiner examine all of the books and records,

14  finances of those related entities?

15           THE COURT:  Well, first of all, I'm

16  going to point out that this Court has for years

17  consistently viewed 1104(c)(2) as not being a

18  mandatory provision.  So we're only talking about

19  whether it's in the interests of the creditors and any

20  equity holders and the interests of the estate to

21  appoint an examiner.  I assume that nobody challenges

22  the proposition that there's no value for equity here,

23  so that interest is --

24           MR. ASTIN:  I would ask Your Honor to



WILCOX & FETZER LTD.
Registered Professional Reporters

03/01/04  12:36 FAX                    PARCELS INC                        ⊠024

24

1   consider the Revco case.  But if Your Honor knows the

2   court's position, I will acknowledge that there are

3   other cases out there that think "shall" doesn't mean

4   shall.  The U.S. Trustee believes it does and I think

5   Revco and the Morganstern case is right on point.

6           THE COURT:  My view doesn't turn on the

7   word "shall" and I've ruled a number of times to this

8   effect, Judge Balick has, and I think I'm not going to

9   change this Court's view of that section.

10          MR. ASTIN:  So if you look at the best

11  interests of the creditors I will acknowledge that

12  everyone here today is going to argue that their

13  interests are best served by the stipulation.  But, of

14  course -- the answer is of course.  Not everybody in

15  this room represents all of the interests in this

16  case.

17          The Committee I think will acknowledge

18  that you can't -- the Court shouldn't consider the

19  vote of the Committee to be representative of the

20  large body of creditors out there because it's

21  lopsided.  If it wasn't, then committee counsel long

22  ago and far away between November, when this case was

23  filed, and this hearing would have looked at the issue

24  of substantive consolidation.  The bottom line is,

79

1    period and hopefully we will never have to address it

2    because the parties will have been able to work it

3    out.  Thank you.

4                THE COURT:  Anyone else?

5                MR. DeNATALE:  Your Honor, I do have a

6    copy of the stipulation that was actually executed by

7    each of the parties and that I would hand up for the

8    Court to so order if the Court is so inclined.

9                THE COURT:  Let me look at it.  I

10   haven't ruled yet.

11               Interesting debate and I'm going to

12   approve the stipulation and deny the U.S. Trustee's

13   motion for the appointment of an examiner for the

14   following reasons:

15               First of all, Section 1104(c)(1)

16   authorizes the appointment of an examiner where it is

17   in the interest of the creditors, the equity holders,

18   or other interests of the estate.  We're all agreed

19   that there's no equity interests here.  And I don't

20   think there's really an interest of the estate in the

21   sense that this is a liquidation case.  This company

22   is going nowhere, it's over.  The only interests are

23   those of the creditors and in amount we have 90

24   percent of those people opposing the relief that the

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

03/01/04  12:36 FAX                    PARCELS INC                              @026

38

1    trustee says they need.  That doesn't make any sense

2    to me to appoint an examiner when the U.S. Trustee

3    says it's needed to protect the creditors when 90

4    percent in amount of those creditors say we don't want

5    this relief.

6            Secondly, particularly in light of the

7    comment that Mr. DeNatale just made regarding Jay

8    Alix's assessment of what it would cost to find out

9    what the intercompany claims are and whether the eggs

10   can be unscrambled so as to have to avoid substantive

11   consolidation, we have the U.S. Trustee in order to

12   achieve his result putting a 30 day and $40,000 cap on

13   the examiner's effort.  I think if you buy it that

14   cheaply and permit that short a time, I think you're

15   going to get what you pay for and that is nothing that

16   would be of any value to the proceedings that we're

17   engaged in.  I think it will be a waste of $40,000 and

18   an unnecessary delay in the proceedings.

19           Thirdly, based upon my experience with

20   examiners what you're going to do with an examiner is

21   produce a document which is only going to continue the

22   combat that the creditors have been engaged in for

23   some time, because as sure as we're all sitting here

24   whatever the examiner says one or more of these three



WILCOX & FETZER LTD.
Registered Professional Reporters

8 ½

1  major creditors are going to disagree with it.  And so

2  the examiner's report would simply serve as perhaps a

3  convenient and concise statement of what the parties

4  will be litigating over and it's not going to solve

5  anything.  I think an examiner's report is an

6  invitation to litigation and we already have that.

7          Fourth, I take a different approach from

8  the U.S. Trustee's position.  He claims we need

9  someone independent who will look at the facts without

10  any bias and report accordingly.  My view is the best

11  way to develop facts is in an adversary proceeding and

12  that's what we do all the time in this Court.  And so

13  I think it's probably equally effective, if not more

14  effective, to have the fighting parties look at the

15  facts and take their positions, and if we're lucky it

16  will result in a settlement.  If not, we will be back

17  here and pick up where we would leave off today.

18          So for those reasons I don't think that

19  appointing an examiner would be in the best interests

20  of these proceedings, certainly not in the best

21  interests of the creditors.  And parties have observed

22  and it went without saying that this has been an

23  acrimonious four months since the case was filed.  And

24  to pile on an examiner shackled by a limited budget



WILCOX & FETZER LTD.
Registered Professional Reporters

82

1    and time frame I just think would be a waste.

2                        Finally, this is not the beginning of

3    this case, it's the end of the case.  And we're

4    looking at $44 million chasing a million and a half.

5    And I think it's time the parties realistically looked

6    at this nominal dividend that they are going to get

7    and reach an agreement that is going to settle it

8    without further debate about consolidation or

9    intercompany claims, because if we get to those issues

10   and we have hearings on the merits, the million and a

11   half is going to be spent in a matter of weeks.

12                       In addition to the reasons I've already

13   given, in my view this is the wrong time and the wrong

14   case for the appointment of an examiner.  So I'll deny

15   that motion.

16                       MR. ASTIN:  Your Honor, to clarify Your

17   Honor's ruling, is Your Honor ruling as to

18   1104(c)(2)?  You mentioned best interests of the

19   creditors under (c)(1).  Our request for relief was

20   pursuant to (c)(2), (c)(1) in the alternative.

21                       THE COURT:  My view is that (c)(2) is

22   not mandatory and for the same reasons I've already

23   given I'll deny the relief to the extent it is

24   premised on (c)(2).



WILCOX & FETZER LTD.
Registered Professional Reporters