UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------- x
In re:                                            :   Chapter 11 Cases
                                                  :   Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,                          :   (Jointly Administered)
                                                  :
        Debtors.                                  :   Hearing Date:  February 18, 2010
                                                  :
                                                  :
                                                  :
------------------------------------------------- x
```

## RESPONSE OF WILMINGTON TRUST COMPANY, AS INDENTURE TRUSTEE, TO THE OFFICIAL CREDITORS' COMMITTEE'S STANDING MOTION AND CROSS-MOTION FOR ORDER AUTHORIZING INTERVENTION IN ANY RESULTING ESTATE LITIGATION

Wilmington Trust Company ("Wilmington Trust"), Successor Indenture Trustee for $1.2 billion principal Exchangeable Subordinated Debentures due 2029 (generally referred to by parties-in-interest and in the market-place as the "PHONES") issued in April 1999 by Tribune Company ("Tribune" or the "Company" and, together with its Chapter 11 affiliates, the "Debtors"), by and through its undersigned counsel, respectfully submits this: (1) Response to the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute and Settle Claims and Counterclaims of the Debtors' Estates*, dated February 1, 2010 [Docket Number 3281] (the "Standing Motion"); and (2) Cross-Motion for and Order authorizing Wilmington Trust to intervene as co-plaintiff, pursuant to Bankruptcy Rule 7024 and Bankruptcy Code Section 1109(b), with all commensurate rights as the Official Committee of Unsecured Creditors (the "Official Creditors' Committee" or the "Committee") should the Court grant any of the relief requested in the Standing Motion. In support thereof, Wilmington Trust states as follows:

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

## PRELIMINARY STATEMENT

1.      The Official Creditors' Committee's Standing Motion is a curious pleading. It triumphantly declares: "[t]he Committee's prosecution of the Derivative Causes of Action may have a profound effect on the Debtors' estates by substantially increasing their size and reordering the existing priorities among creditors." (Standing Motion at 8.)    But, the Standing Motion – all 10 pages of it – and attendant draft Complaint then go on to present only a tepid, sanitized, and woefully incomplete story of what actually transpired pre-petition.    As a result, the Official Creditors' Committee unfortunately evidences, yet again, its apparent inability or unwillingness to zealously prosecute valuable estate causes of action arising from one of the most blatantly fraudulent leveraged buyouts in history.

2.      Noticeably absent from the Standing Motion and attendant Complaint are the details of knowing and willful wrongdoing, with mens rea evidenced by, for example, salacious emails readily found in the Rule 2004 document depository established by this Court's December 15, 2009 Order [Docket Number 2858].    Noticeably absent from the Standing Motion and attendant Complaint are claims sounding in intentional fraudulent conveyance, notwithstanding clear evidence in the document depository establishing Tribune's, the LBO Banks' actual intent to at least hinder and delay holders of the PHONES.    Noticeably absent from the Standing Motion and attendant Complaint are certain obvious estate claims against Sam Zell (a "deep pocket" himself), the Board of Directors, and Tribune's management for breaches of fiduciary duty, as well as "aiding and abetting" claims against the lenders who helped design, orchestrate, and/or fund the leveraged buyout (the "LBO") and malpractice claims against other Tribune advisors.    And, noticeably absent from the Standing Motion is any representation whatsoever that, if the Court were to grant the relief requested, the Official Creditors' Committee will in fact appropriately prosecute the estate claims the Court entrusts to its care.

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

3.      The circumstances surrounding the Standing Motion give further reason to question whether the Official Creditors' Committee can be trusted to zealously prosecute valuable estate causes of action. These cases have been pending for more than one year and, during that time, Wilmington Trust (as a member of the Official Creditors' Committee) has argued incessantly for the Official Creditors' Committee to take action. Historically, these arguments were met with staunch internal resistance, presumably because (i) the Official Creditors' Committee is chiefly comprised of creditors that either have absolutely no economic interest in the claims (except that they want them resolved as soon as possible) or are targets for estate litigation and/or (ii) the Committee is being led by professionals with an admitted predilection towards bank clients (including LBO Banks and LBO advisors).[1] Regardless of the reason, one thing is certain: this Official Creditors' Committee has failed to act.

4.      Two recent developments appear to have prompted the Standing Motion. First, in January 2010, certain holders of the Debtors' unsecured senior notes invited the LBO Banks to settlement negotiations. Although Wilmington Trust was denied access to most of these settlement discussions, it understands that counsel to the Official Creditors' Committee attempted to serve as "mediator" at the meetings and that the "mediation" utterly failed. Second, after it was denied access to the settlement meetings, when the cases really started taking on the character of "smoky, back-room" deal-making and, as a result, Wilmington Trust finally gave up expecting the Official Creditors' Committee would ever advocate for holders of the PHONES (representing as much as $1.2 billion in unsecured debt), Wilmington Trust filed its own Motion seeking the appointment of an examiner [Docket Number 3062] (the "Examiner Motion").

---

[1] Capitalized terms not defined herein have the meaning given to them in the Examiner Motion.

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

5.      These surrounding circumstances leave Wilmington Trust firmly believing that: (a) the Official Creditors' Committee has not had and does not now have any real desire to zealously prosecute the estate claims; (b) if the Court were to entrust the Official Creditors' Committee with standing to assert estate causes of action, it likely will promptly settle them for a fraction of their true value; and (c) notwithstanding the allegations, counts, and prayers for relief contained in the draft Complaint (which advocate for a significant value allocation to holders of the PHONES), the Official Creditors' Committee has not had and does not now have any real interest in advancing the interests of the holders of the PHONES, one of its major constituencies.

6.      Wilmington Trust does not object to the Official Creditors' Committee *eventually* being vested with standing to prosecute estate causes of action but, in light of its lukewarm (at best) interest in prosecuting such claims, appointment of an examiner continues to be imperative.   For the same reasons, Wilmington Trust requests that the Court adjourn consideration of the Standing Motion (or deny the relief requested without prejudice) until after consideration of the Examiner Motion and, if the relief requested therein is granted, publication of the examiner's report.   Indeed, as Justice Lewis Brandeis famously put it: "Sunshine is the best disinfectant."

7.      Alternatively, if the Court is inclined to grant the relief requested in the Standing Motion, Wilmington Trust requests that it be authorized to intervene as a co-plaintiff, with commensurate rights as the Official Creditors' Committee.   Indeed, under applicable Third Circuit precedent, Wilmington Trust is entitled to intervene as a matter of right, pursuant to Bankruptcy Rule 7024(a) and Bankruptcy Code Section 1109(b).   Assuredly, intervention is not a perfect remedy for the problems permeating these cases, but at least it may aid Wilmington Trust ward off a travesty of justice and/or a squandering of valuable estate causes of action.

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

## CERTAIN ADDITIONAL BACKGROUND FACTS

8.      For judicial convenience, Wilmington Trust respectfully refers the Court to its Examiner Motion for a description of the Tribune leveraged buyout, and other attendant and relevant facts.   The factual recitation contained in the Examiner Motion, as well as evidence attached thereto, are incorporated herein by reference.

9.      By this date, Wilmington Trust has not yet had an opportunity to review all of the documents and information contained in the Rule 2004 document depository.   Unlike the Official Creditors' Committee, Wilmington Trust was granted access to the depository only in the last few weeks.   But, already Wilmington Trust has become aware of evidence that should have been included in the Standing Motion and attendant draft Complaint.   This evidence establishes the breadth, strength and value of estate causes of action against the LBO Banks, the LBO Advisors, Mr. Zell, the Tribune Board, and management.   A representative sample of such evidence is provided below.

## A.      The LBO and its Impact on the PHONES.

10.      In April 1999, Tribune issued the PHONES in an aggregate principal amount of approximately $1.2 billion.   Citibank, N.A. acted as the Indenture Trustee for the PHONES and owed fiduciary duties to the PHONES holders.   At the time, its sister company and affiliate, Citigroup Global Markets ("Citigroup") was acting as an LBO Bank and a principal LBO advisor to the Company.   Pursuant to Indentures entered into between 1992 and 1997, Tribune become obligated on various issues of outstanding bonds in the aggregate approximate amount of $1.26 billion (the "Senior Notes").   The PHONES and the Senior Notes are collectively referred to herein as the "Pre-LBO Debt."

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

11.     Prior to the LBO, Tribune had approximately $3.6 billion in debt.  As a result of the LBO, Tribune took on a debt burden of more than $13 billion.

12.     A number of Tribune's domestic subsidiaries, many of which are Debtors, provided unsecured guarantees (the "Subsidiary Guarantees") of Tribune's indebtedness under the Credit Agreement (as defined in the Examiner Motion).  Approximately $8.3 billion of the loan proceeds was used to cash out Tribune shareholders while pre-LBO creditors, including holders of the PHONES, were left "holding the bag."

13.     Another $2.5 billion was used to refinance the Company's then existing bank debt, which had been arranged in 2006 and, at the time of the refinancing, was held primarily by the same lenders who orchestrated and structured the leveraged buyout (i.e., the LBO Banks).  The refinancing gave these lenders, among other things, better terms than the pre-existing debt.  For example, the refinanced debt bore a higher interest rate than the pre-existing debt and benefited from added subsidiary guarantees (guarantees requested for the express purpose of improving the lenders' position in a bankruptcy, an event that the LBO Banks foresaw could likely follow closely on the heels of the LBO).  The guarantor subsidiaries did not receive any value for their guarantees of billions of dollars in Tribune's new and refinanced debt.

14.     As a result of the guarantees, the LBO Banks obtained structurally senior claims to the Subsidiary Guarantors' assets.

**B.      The Defendants' Actual Intent to Hinder,**
**Delay, and Defraud Holders of the PHONES.**

15.     In the months and weeks leading up to the LBO, Tribune knew that actual results were falling short of its projections and that the proposed LBO was incredibly risky for the Company. ████████████████████████████████████████████

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER



prior to even signing the LBO documents, the Company saw the handwriting on the wall. Nonetheless, knowing that bankruptcy could result, the Company, guided and encouraged by the LBO Banks, proceeded on its inevitable course to insolvency and, ultimately, bankruptcy.

16.    Indeed, numerous analysts were predicting that the proposed LBO would not occur because of the high leverage involved.

17.

---

[2] A true and accurate copy of this e-mail is attached hereto as Exhibit A.

[3] A true and accurate copy of this document is attached hereto as Exhibit B.

[4] Id.

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

18. 

19.     Barclays Capital issued an April 2, 2007 equity research report that stated:

"We think it is possible that TRB is leveraged higher than the total asset value of the company (after taxes), which makes recovery valuations difficult if the economy and/or advertising market slows."[6]

20.     The market predictions of disaster were not unfamiliar to the Company.



---

[5] A true and accurate copy of this document is attached hereto as Exhibit C.

[6] See Sarah Ellison, How Will Tribune Pay Its Debts?  Highly Leveraged Deal Leaves Little Room for Error, Despite Tax Breaks, The Wall Street Journal, April 4, 2007, pg. A10.

[7] A true and accurate copy of this document is attached hereto as Exhibit D.

[8] A true and accurate copy of this document is attached hereto as Exhibit E.

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

21.    Like Tribune, the LBO Banks also consciously disregarded the market's predictions and their own internal analysis, in large part because the PHONES and the Senior Notes provided a cushion and would bear the brunt of insolvency. ███████████████ ████████████████████████████████ ████████████████████████████ [9]

The LBO Banks actively sought to protect themselves from the consequences of an inevitable bankruptcy filing at the expense of the PHONES. ████████████████ ████████████████████████████████ ████████████████████████████████ ███████████

22.    ████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████ [10]

23.    ████████████████████████████ ████████████████████████████████ ███████████ [11]

---

[9] A true and accurate copy of this document is attached hereto as Exhibit F.

[10] A true and accurate copy of this document is attached hereto as Exhibit G.

[11] A true and accurate copy of this document is attached hereto as Exhibit H.

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

24.



25.

26.    Notwithstanding its knowledge that the LBO debt likely would drive the

Company into bankruptcy, JP Morgan aggressively promoted the highly leveraged transaction in

order to collect millions of dollars in fees and cement future relationships with Mr. Zell, all

without any real assumption of risk on its part, as it planned on syndicating the resulting debt

---

[12] A true and accurate copy of this document is attached hereto as Exhibit I.

[13] A true and accurate copy of this document is attached hereto as Exhibit J.

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

and, in concert with the other LBO Banks, structured the financing so as to offload the clear and obvious risk of bankruptcy to the Pre-LBO debt, particularly the PHONES.

C.    **The Solvency Opinions: Garbage-In, Garbage-Out.**

27.    Tribune understood that, to do a transaction like the LBO, it needed to buy a solvency opinion. Tribune first approached Houlihan Lokey ("Houlihan"). ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████.[14]

28.    Tribune also discussed a solvency opinion engagement with Duff & Phelps ("D&P"). ██████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████.[15]

29.    On or about March 29, 2007, one day before a March 30, 2007 meeting of the Tribune Board, Tribune continued shopping around for a favorable solvency opinion and spoke with Valuation Research Corp. ("VRC"). ██████████████████████████████

██████████████████████████████████████████████████

---

[14] See Exhibit K, pp. 71-72.

[15] See Exhibit L.

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER



30. ████████████████████████████████████

31. ████████████████████████████████████

32. ████████████████████████████████████

33.    VRC issued two solvency opinions in connection with Step One, one on May 9, 2007, and another on May 24, 2007.[22] ██████████████████

---

[16] A true and accurate copy of the email is attached hereto as Exhibit M.

[17] See Exhibit N.

[18] See Exhibit O.

[19] See Exhibit N, p. 65; Exhibit P, p. 29.

[20] See Exhibit N, p. 59.

[21] A true and accurate copy of this document is attached hereto as Exhibit Q.

[22] See Exhibit P, pp. 102-05.

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER



---

[23] <u>See</u> Exhibit N, pp. 50-51.

[24] <u>See</u> Exhibit N, pp. 163-67; Exhibit P, pp. 102-11.

[25] <u>See</u> Exhibit R.

[26] <u>See</u> Exhibit S.

[27] <u>See</u> Exhibit P, p. 35.

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER



37.    Prior to consummation of Step Two, the LBO Banks became concerned about Tribune's solvency.

## CLAIMS NOTICEABLY ABSENT FROM THE DRAFT COMPLAINT.

38.    As discussed above, the draft Complaint attendant to the Standing Motion curiously fails to allege obvious estate causes of action arising from the same nucleus of operative fact.   Since the Official Creditors' Committee has informed the Court that is has labored 14 months to investigate such claims,   there must an explanation other than a

---

[28] See Exhibit N, p. 205.

[29] See Exhibit S, pp. 213-14.

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

misunderstanding of fact or law, but none is contained in the Standing Motion.  Obvious missing

counts include, by way of examples, the following:

- **Breaches of Fiduciary Duty.**  Most assuredly, as Mr. Zell, the Board, and management knew or should have known that the leveraged buyout was overly risky or otherwise wrongful, they bear liability to the estates for breaches of fiduciary duty.  See, e.g., Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.), 344 B.R. 340, 382 (Bankr. W.D. Pa. 2006); In re Hechinger inv. Co., 274 B.R. 71, 75 (Bankr. D. Del. 2001) at 75; In re Buckhead Am. Corp., 178 B.R. 956, 968 (Bankr. D. Del. 1994).

- **Aiding and Abetting Breaches of Fiduciary Duty.**  The facts as alleged also establish that the LBO Banks knew or should have know that Mr. Zell, the Board, and management were breaching their fiduciary duties, and that the LBO Banks gave substantial assistance and encouragement.  Thus, they too bear substantial liability to the estates for the insiders' fiduciary duty breaches.  See, e.g., In re American Business Fin. Services, Inc., 362 B.R. 135, 146-47 (Bankr. D. Del. 2007); In re OODC, LLC, 321 B.R. 128, 144 (Bankr. D. Del. 2005).

- **Intentional Fraudulent Conveyance.**  The facts as alleged (as augmented by the pieces of evidence discussed in the Examiner Motion and herein) evidence Tribune's actual intent to at least hinder and delay pre-existing creditors: the holders of the PHONES.  This gives rise to additional claims under Bankruptcy Code Sections 548 and 544, and applicable state law.

- **Aiding and Abetting Fraudulent Conveyance.**  Much of the precedent surrounding failed leverage buyouts focuses on the "collapsing" doctrine and, thus, whether claims held by LBO funders are themselves avoidable as fraudulent conveyances.  Separately, the law also acknowledges that LBO funders can be held accountable for "aiding and abetting" a fraudulent conveyance to former shareholders, even though moneys paid may be beyond the estate's reach due to Bankruptcy Code Section 546(e).  See, e.g., Hefferman v. Bass, 467 F.3d 596, 601 (7th Cir. 2006); Coleman v. Greefield, 2005 WL 2592538, at *1-3 (N.D. Ill. Oct. 11, 2005); American Business Fin. Services, Inc., 362 B.R. at 146-47.  Thus, the LBO Banks may have significant liability to the Tribune estate, irrespective of whether the "collapsing" doctrine applies.

39.     Viewing these omissions from a Machievellian vantage-point, Wilmington

Trust wonders whether there was purposeful strategy in not including these causes of action.  For

example, the PHONES admittedly do not enjoy guarantees at the operating company Debtors,

meaning that guarantees benefitting the LBO Banks at the operating company level may need to

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

be avoided for enterprise value to "flow-up" to the level where the PHONES claim resides. The draft Complaint seeks to avoid the operating company guarantees (which may be a "lay-up" under these facts) but, regardless, there is certainly other significant "value" available at the parent-company level: all of the parent-company causes of action, including the above-mentioned breach of fiduciary duty and complicity claims. The LBO Banks do not have a lien on such estate causes of action and, if their claims at Tribune are equitably subordinated (which may also be a "lay-up" under these facts), then all that value is deliverable to holders of the Senior Notes and the PHONES. But, remarkably, the Official Creditors' Committee has not even taken the first step along that path -- requesting derivative standing to assert such parent-level claims.

40.    These omissions give cause for further concern and, should the Official Creditors' Committee receive the relief requested in the Standing Motion, the Court should next consider what happens to these "other" estate claims not discussed in the Standing Motion or attendant draft Complaint.

## THE STANDING MOTION SHOULD BE ADJOURNED
## PENDING RECEIPT OF THE EXAMINER'S REPORT.

41.    For the reasons discussed above, the Standing Motion does not obviate the concerns prompting Wilmington Trust to file its Examiner Motion. The Standing Motion and attendant Complaint are obviously the work of an all-too-restrained hand, not that of a zealous advocate actually intending to litigate towards a trial or appropriate settlement. Indeed, these wisps of pleading do little to inspire a 180-degree shift from the skepticism born from 14 months of inactivity, Committee members that are either targets for suit or economically disinterested in the litigation outcome, and Committee professionals with an admitted predilection towards the

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

LBO Banks. Rather, the Standing Motion furthers Wilmington Trust's belief that an examiner's report should come first.

42.    Wilmington Trust anticipates that the Debtors, the LBO Banks and perhaps the Official Creditors' Committee will all rise in unison against the Examiner Motion, arguing that resulting delay will be harmful. The Court should consider any such contention carefully. The Debtors did not file for Chapter 11 burdened by significant secured indebtedness. The Debtors, therefore, have unrestrained access to their cash (i.e., there are no "cash collateral" issues here) and no meaningful "adequate protection" obligations. The Company is cash-flow positive and there is no other need for debtor-in-possession financing. As a result, there are no ticking deadlines or other "case control" obligations compelling immediate conclusion of the cases.

43.    In fact, ████████████████████████████████████████ The Debtors ████████████████████████████████████████████ are not going to run out of cash any time soon.

44.    Wilmington Trust fully appreciates that Chapter 11 is an expensive and inconvenient process. But, absent obvious business necessity, time should be made available to resolve issues as complex as those discussed herein and in the Standing Motion. Stated differently, a fair adjudication of these Chapter 11 cases is more important than the added expense and inconvenience of a few additional months. And, if the examiner does his/her job well, the report might actually (a) narrow the litigation that the Official Creditors' Committee requests leave to prosecute and/or (b) help the parties achieve a fully consensual plan.

45.    Moreover, much of an examiner's work has already been done. Documents produced in discovery have now been collected and are readily available for review

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

in the Rule 2004 document depository. Many depositions have also already been taken. If the Court were inclined to adjourn the Standing Motion pending publication of an examiner's report, it is now reasonable to conclude that the delay may be a matter of only a few months.

## CROSS-MOTION FOR LEAVE TO INTERVENE

46.    Bankruptcy Rule 7024(a) provides that, "on timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impeded the movant's ability to protect its interest, unless existing parties adequately represent that interest." Wilmington Trust's Cross-Motion for intervention should be granted under either the first or second prong of Bankruptcy Rule 7024(a)

47.    As a preliminary matter, there can be no serious dispute that this Cross-Motion is timely. Wilmington Trust seeks to intervene, in all practical respects, contemporaneously with the filing of the estate lawsuit. Clearly, contemporaneous intervention is timely. See In re Stone & Webster, Inc. v. ACE USA, Inc., 380 B.R. 366, 370 (Bankr. D. Del. 2008) (motion to intervene filed shortly after defendants filed their answer and where no substantive proceedings had occurred undisputedly timely); see also Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc., 72 F.3d 361, 369-70 (3d Cir. 1995) (the timeliness of a motion to intervene is determined from all the circumstances and, in the first instance, by the court in its sound discretion).

48.    Regarding the first prong of Bankruptcy Rule 7024(a), the Third Circuit Court of Appeals has held that Bankruptcy Code Section 1109(b) is a federal statute that confers on any "party-in-interest" an unconditional right to intervene. Phar-Mor, Inc. v. Coopers &

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

Lybrand, 22 F.3d 1228, 1230-31 (3d Cir. 1994); Marin Motor Oil, Inc. v. Michaels, 689 F.2d 445, 457 (3d Cir. 1982).  There can be no serious dispute that Wilmington Trust, as Successor Indenture for the PHONES, is a "party-in-interest" for purposes of Bankruptcy Code Section 1109(b) and Bankruptcy Rule 7024(a).  See 11 U.S.C. § 1109(b)("[a] party in interest, including … any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.").

49.    Regarding the second prong of Bankruptcy Rule 7024(a), the Third Circuit Court of Appeals has stated that, in addition to be timely, the movant must show: (1) a sufficient interest in the underlying litigation; (2) a threat that the interest will be impaired or affected by the disposition of the underlying action; and (3) that the existing parties to the action do not adequately represent the prospective intervener's interests.  Mountain Top Condo. Ass'n, 72 F.3d 361 at 366; In re Stone & Webster, Inc., 380 B.R. at 370.  As indicated above, holders of the PHONES have a paramount interest in the litigation (since recovery from the Debtors' estates appears hinged on zealous prosecution of estate causes of action), and that holders of the PHONES have very good reason to be highly skeptical that the Committee will zealously prosecute the estate claims towards an appropriate recovery for the PHONES.

50.    Accordingly, should the Court grant the relief requested in the Standing Motion, the Court should also authorize Wilmington Trust's intervention as a matter of right, with commensurate plaintiff rights as the Official Creditors' Committee.

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

## CONCLUSION

**WHEREFORE,** for all of the foregoing reasons, Wilmington Trust respectfully requests that this Court: (1) adjourn consideration of the Standing Motion (or deny the relief requested without prejudice) until after consideration of the Examiner Motion and, if the relief requested therein is granted, publication of the examiner's report; (2) alternatively, should the Court grant the relief requested in the Standing Motion, authorize Wilmington Trust to intervene in the resulting adversary proceeding as a co-plaintiff, with commensurate rights as the Official Creditors' Committee; and (3) grant Wilmington Trust such other and further relief as is just and equitable.

Wilmington, Delaware
February 11, 2010

Respectfully submitted,

**BENESCH, FRIEDLANDER, COPLAN
& ARONOFF LLP**

By: _____/s/_____
Jennifer R. Hoover, Esquire (No. 5111)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
(302) 442-7010 (telephone)
(302) 442-7012 (facsimile)
jhoover@beneschlaw.com

-and-

**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Martin S. Siegel, Esq.
Seven Times Square
New York, New York 10036
T: (212) 209-4800
F: (212) 209-4801

UNREDACTED COPY SUBMITTED UNDER SEAL
CONTAINS MATERIAL SUBJECT TO CONFIDENTIALITY ORDER

William M. Dolan III, Esq.
Brown Rudnick LLP
121 South Main Street
Providence, RI 02903
(401) 276-2600
(401) 276-2601 Fax

*Counsel to Wilmington Trust Company, as
Successor Indenture Trustee*