**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TRIBUNE COMPANY *et al.,* | : | Case No. 08-13141 (KJC) |
| | : | Jointly Administered |
| Debtors. | : | |
| _____ | : | **Hearing Date: 2/18/10 @ 10:00 a.m.** |

**REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
IN SUPPORT OF ITS MOTION FOR ENTRY OF AN ORDER GRANTING LEAVE,
STANDING AND AUTHORITY TO COMMENCE, PROSECUTE AND SETTLE
CLAIMS AND COUNTERCLAIMS OF THE DEBTORS' ESTATES**

The Official Committee of Unsecured Creditors (the "Committee") of the Tribune Company (the "Company") and its various debtor-subsidiaries (collectively, the "Debtors"), by and through its undersigned counsel, submits this reply memorandum in support of its motion for entry of an order pursuant to 11 U.S.C. §§ 105, 1103 and 1109, granting the Committee leave, standing and authority on behalf of the Debtors' estates to commence, prosecute and settle claims and counterclaims arising out of or in connection with the Debtors' 2007 leveraged buyout ("LBO") transaction (the "Motion for Standing").

The Motion for Standing was filed on February 1, 2010. On February 11, 2010, several parties filed objections and responses to the Motion for Standing, including the Debtors, J.P. Morgan Chase Bank ("JPM"), the "Credit Agreement Lenders"[1] and Wilmington Trust

---

[1] Merrill Lynch, Citicorp North America, Inc. and Citigroup Global Markets, Inc. joined the objections of JPM and the Credit Agreement Lenders. This reply refers to JPM, the Credit Agreement Lenders, Merrill Lynch, Citicorp, and Citigroup collectively as the "Lenders."

Company.² In support of the Motion for Standing, the Committee respectfully submits as follows.

### **PRELIMINARY STATEMENT**

Debtors and Lenders join in saying that the Committee's Motion for Standing should be denied. Their unified position is unsurprising, as they share a common interest in avoiding litigation of the fraudulent conveyance claims.

The Debtors and Lenders start by attacking the Committee's motivations in seeking standing at this time and decry what they claim is a "shoot first, ask questions later" approach. The Committee's approach has in fact been to ask questions and support settlement negotiations first – and it has spent months and thousands of hours of professional time doing so since this case was filed fourteen months ago.³ It seeks authority to "shoot" now because months of negotiations among the parties have failed to produce a deal. Indeed, no serious settlement negotiations involving the Committee are even ongoing, and the end of exclusivity is in sight. The Committee believes the best chance of breaking the logjam and reaching a fair settlement and fully consensual plan is to confront the Lenders with a plaintiff who, unlike the Debtors, is

---

² Wilmington Trust, indenture trustee for certain unsecured creditors, has cross-moved to intervene in any action the Committee brings should the Motion for Standing be granted. The Court has already denied Wilmington Trust's request for accelerated consideration of the cross-motion. The Committee will therefore address Wilmington Trust's cross-motion to intervene in accordance with the applicable rules.

³ Notably, the Committee proceeded with far more deliberation than the creditors' committees in the *TOUSA*, Case No. 08-10928 (Bankr. S.D. Fla.), and *Lyondell*, Case No. 09-10023 (Bankr. S.D.N.Y.), bankruptcies. In *TOUSA*, the creditors' committee moved for standing to file litigation three months after the petition was filed, while the *Lyondell* committee moved for standing five months after the petition was filed. Although the timing of those motions may have been driven in part by certain deadlines contained in cash collateral orders, the Debtors' and Lenders' suggestion that it is premature to file a motion for standing fourteen months after commencement of these bankruptcy cases and almost four months before the expiration of the Debtors' maximum exclusivity period, following a massive investigation and months of negotiations, is utterly unfounded.

unconflicted and will vigorously pursue litigation. If no deal can be reached, it is important for the Committee to have standing to file litigation now, because resolution of that litigation will be an integral part of the Debtors' exit from Chapter 11. Delay in starting the litigation when negotiations are at an impasse only ensures delay in the Debtors leaving bankruptcy.

The Debtors' current management cannot investigate and pursue these claims in good faith because they would be investigating and litigating their own conduct in connection with the LBO of the Company. The conduct of at least four of the ten current directors of the Company and three of its current top officers is at the center of the fraudulent conveyance litigation the Committee seeks standing to pursue. For example, the Committee's proposed complaint alleges that the LBO was intended to give control of the Company to Samuel Zell, current Chairman of the Board of the Company, at the expense of the unsecured creditors. The Company's current Chief Operating Officer and General Counsel are longtime associates of Zell who were involved in the LBO, and its current Chief Financial Officer was instrumental in closing the LBO for the Company.[4]

Moreover, the Committee is completing its investigation of breach of fiduciary duty and other claims against many of the Debtors' current and former officers and directors based on the same core of facts alleged in the fraudulent conveyance complaint. The Committee anticipates seeking standing to pursue such claims in the near future. Debtors' assertions that they will have

---

[4] The conflicts do not stop there. Many of current senior management played instrumental roles in negotiating, documenting and closing the LBO transaction. These include members of the current general counsel's office who are also involved in the bankruptcy cases. These also include members of management who directed the formulation of projections, provided by the Company as the basis for a solvency opinion, that were overly optimistic to begin with and ignored completely the failure of the Company to meet the projections in the months prior to the closing of Step One of the transaction.

2522172.1

no disabling conflict and will vigorously pursue a fair resolution of claims focused on conduct of their current management are absurd.

Moreover, even if one were to credit Debtors' claims that they are prepared to zealously pursue claims based on their own officers' and directors' conduct, the Debtors' current management knows that Debtors will be controlled by the Lenders following confirmation of a plan of reorganization. Debtors' management, whose jobs will be beholden to Lenders, cannot possibly be relied upon to pursue full and fair value for claims against their future controlling shareholders.

Simply put, the Debtors are hopelessly conflicted. As a result, the only option they are willing to consider is settlement, and any settlement they reach will inevitably favor the Lenders over other creditors. Debtors' objection makes this clear, treating "targeted litigation" (read: litigation that spares key parties, including its officers and directors, from meaningful scrutiny) as an option it might consider "at some point." Debtors' Obj. at 10-11. Debtors nowhere suggest when "some point" may come although their answer is obvious – never. Even if Debtors were prepared to consider litigating claims based on the conduct of their own management, they cannot pursue that option now because Debtors' counsel, who has been investigating the claims and representing the Debtors in efforts to settle them, is *itself* conflicted from bringing litigation against the Lenders because it represents certain of the Lenders.

The Lenders, who will be defendants in the litigation, know that the Debtors cannot and will not aggressively pursue claims against the Lenders and their own current and former management. Their objection to granting the Committee standing to pursue the claims is hardly surprising – what defendant would, if given the choice, select the plaintiff who will aggressively

litigate over the plaintiff who will only settle? The Committee is the only unconflicted party ready, willing, and able to aggressively prosecute claims (the "Derivative Causes of Action") that will substantially benefit the estate.

The Committee agrees with the Debtors and Lenders, as it has from the outset of these cases, that a settlement that is fair to all parties is preferable to litigation. The Committee has encouraged the parties to reach a fair settlement rather than force it to pursue litigation that likely will be protracted and costly to all involved. It is now apparent, however, that the parties cannot achieve such a settlement under the current circumstances. The process requires a plaintiff that is prepared and willing to pursue litigation. The Lenders know full well that the Debtors cannot be that plaintiff.

Only the Committee, which has thoroughly investigated the claims and represents precisely the creditors who would benefit from the litigation, can pursue vigorous litigation against the Lenders and other potential parties. Accordingly, the best chance for a fair resolution is to give the Committee standing, forcing the Lenders to confront a plaintiff committed to litigating the Derivative Causes of Action if a reasonable settlement cannot be reached. The Motion for Standing should be granted.

## ARGUMENT

**I.    The Test for Granting Derivative Standing to the Committee Is Met Here.**

When a debtor-in-possession is delinquent in pursuing colorable claims to maximize the value of the estate, a bankruptcy court in its equitable power should grant derivative standing to the creditors' committee to pursue an avoidance action that will benefit the estate. *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568-69 (3d

Cir. 2003) (en banc); *see also Official Committee of Unsecured Creditors on behalf of Valley Media, Inc. v. Cablevision Sys. Corp. (In re Valley Media, Inc.*), No. 01-11353, 2003 WL 21956410, at *2 (Bankr. D. Del. Aug. 14, 2003). The Committee demonstrated in its opening brief that the circumstances for the Court to confer derivative standing on the Committee exist here, and the Debtors' and Lenders' efforts to show otherwise are unavailing.

In their objections, the Debtors and Lenders labor to raise the bar that the Third Circuit has set for a creditors' committee to obtain derivative standing. To do so, they cobble together language from decisions from other Circuits and cases that concern applications for derivative standing by individual creditors, not, as in this case, a creditors' committee that has the ability and fiduciary duty to zealously represent the interests of the body of unsecured creditors.[5] The Debtors and Lenders do not cite a single case in which a court rejected a creditors' committee's request for derivative standing in anything like the circumstances here.[6] The Debtors' and Lenders' efforts to distinguish the circumstances here from those in the many cases cited by the Committee (and by the Debtors and Lenders) where conflicting interests of the debtors and/or their counsel prompted courts to uphold derivative standing for creditors' committees (or overturn lower court decisions denying derivative standing) to bring colorable claims are not persuasive.

---

[5] Ironically, the Committee is attacked simultaneously by Debtors and Lenders for being too aggressive and by Wilmington Trust for being insufficiently aggressive. This alone suggests that the Committee has struck an appropriate balance in the timing and scope of its Motion for Standing.

[6] The lone case the Debtors cite as affirmative support, *In re Interco Inc.*, 135 B.R. 631 (Bankr. E.D. Mo. 1992), is an out-of-Circuit, pre-*Cybergenics* case in which the creditors' committee did not seek derivative standing, but rather appointment of a special representative, and the court expressly found that the potential claims were not aimed at conduct of the debtor's board of directors. In *In re Baltimore Emergency Services II, Corp.*, 432 F.3d 557 (4th Cir. 2005), the court reversed a bankruptcy court's implicit grant of derivative standing in the context of a preliminary injunction, finding the creditors did not have the debtor's consent to sue and the committee failed to meet the Second Circuit's test for derivative standing. Neither case bears any resemblance to the situation here.

2522172.1

A.     The Derivative Causes of Action Are More Than Colorable.

In its opening memorandum and draft complaint attached thereto, the Committee demonstrated that its claims are more than colorable – they are substantial, and pursuit of such claims is reasonably expected to produce an actual benefit for the estate. UCC Mem. at 6-9.

JPM's objection previews the Lenders' predictable disagreement with the Derivative Causes of Action. JPM Obj. at 2-8. Point-by-point rebuttal of JPM's conclusory denials is both unnecessary and unwarranted at this stage. *See, e.g.*, *In re Fedders North America, Inc.*, Case No. 07-11176 (BLS) (Bankr. D. Del. Mar. 28, 2008) (transcript of hearing on creditors' committee's motion for derivative standing) (previously submitted as Ex. B to UCC Mem.); *In re G-I Holdings, Inc.*, 313 B.R. 612, 631 (Bankr. D.N.J. 2004). It is understandable that JPM would like to prevent, or at least delay, filing of a complaint alleging facts that show the high level of personal involvement of JPM top management in ensuring that JPM bent over backwards to push through the LBO for Zell, a potential source of lucrative business for JPM; JPM's considerable focus on the extraordinary size of its fees; and JPM's awareness, before the LBO closed, of the risks that the Company could not support the LBO debt levels.

In its zeal to avoid the filing of a lawsuit laying bare these facts, JPM ignores the numerous, substantial, and specific allegations in the draft complaint, which were expressly incorporated into the Motion for Standing (UCC Mem. at 3 n.1). Two examples suffice to make the point.

First, JPM's argument that the LBO was really two independent transactions simply ignores the specific allegations of the draft complaint that, from the time the Merger Agreement and LBO financing commitment letters were signed on April 1, 2007, Zell, the Company, JPM, and other lenders all considered the LBO to be a single, integrated transaction. *See* Ex. A to


UCC Mem. ¶¶ 44-49 (filed under seal). For example, the Company's press release about the deal referred to a single "two-stage transaction," and JPM's internal announcement similarly noted Zell's intention to take the Company private in a single "two step transaction." *Id*.

Second, JPM argues that the complaint ignores "the actual and obvious reason for the Debtors' downfall – the historic financial crisis of 2008." JPM Obj. at 4. To the contrary, it is JPM that ignores the draft complaint's allegations that: 1) the LBO quintupled the Debtors' prior debt load; 2) the Debtors became insolvent in 2007 as a result of that massive LBO debt; 3) JPM knew there was a serious risk of bankruptcy before the first step of the LBO closed; and 4) the Company's financial performance throughout 2007, before the 2008 financial crisis, was far short of the projections on which the LBO was based. *See* Ex. A to UCC Mem. ¶¶ 1, 54-56, 59-60, 70, 91 (filed under seal).

Should litigation ensue, a trial will be necessary to resolve these and other disputed factual issues, and the Committee is confident that it would prevail in such litigation.[7] Of course, JPM's sweeping disagreement with the Committee's allegations underlying the Derivative Causes of Action does not defeat the Committee's demonstration, through the Motion for Standing and the draft complaint, that the Derivative Causes of Action are colorable.

B.  Debtors' Conflicts and Objection Confirm It Will Not Pursue and Aggressively Litigate Claims That Will Benefit the Estate.

"[D]ebtor's management . . . bears a fiduciary duty to avoid fraudulent transfers that it itself made. One suspects that if managers can devise any opportunity to avoid bringing a claim

---

[7] The Credit Agreement Lenders devote only a paragraph of rhetoric to colorability and argue in conclusory fashion that a motion to dismiss will be of consequence. Credit Agreement Lenders Obj. at 8-9. As the JPM examples discussed above illustrate, the Derivative Causes of Action are not subject to summary disposition and will require a trial.

that would amount to reputational self-immolation, they will seize it." *Cybergenics*, 330 F.3d at 573.[8] Moreover, "where . . . a debtor's counsel has a conflict of interest in pursuing an estate claim so that it is effectively disqualified from pursuing an action which is otherwise a colorable claim, the debtor . . . can be viewed as delinquent and the creditors' committee should be authorized to pursue the cause of action." *Valley Media*, 2003 WL 21956410 at *2.[9]

Here, the Debtors and Lenders ask that the Court allow control over the fraudulent conveyance and related claims to remain exclusively with the very group of people who structured and engineered the Zell LBO which, as alleged in the draft complaint, rendered the Debtors insolvent. Among those the Debtors and Lenders ask the Court to entrust with the decision about whether and against whom to pursue litigation are current Company Board members Sam Zell and William Pate, who engineered the LBO for Zell through Zell's firm Equity Group Investments ("EGI"); current Board members Betsy Holden and William Osborn, both of whom served on the special committee of the Board that recommended that the Company

---

[8] *See also Official Committee of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 548 (W.D. Pa. 2005) (affirming grant of derivative standing to creditors' committee where Bankruptcy Court excused on futility grounds committee's failure to make formal demand on debtor, in part because parties opposing derivative standing were potential defendants in the contemplated suit and the debtor's management, including four directors, had a conflict of interest in pursuing a fraudulent conveyance action); *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 246, 251 (5th Cir.1988) (granting derivative standing to creditors after management committee of board of directors declined to vote on committee's suit demand where the suit named as defendants certain directors and officers, creating a conflict of interest; recognizing that "[i]nherent conflicts in the debtor-in-possession's relationship with its management and creditors" can constitute a basis for granting a creditors' committee derivative authority to bring a suit on behalf of the estate).

[9] *See also In re Hydrogen L.L.C.*, No. 08-14139, 2009 WL 2913448, at *2 (Bankr. S.D.N.Y. May 7, 2009) (granting derivative standing to creditors committee where debtor was conflicted from bringing suit against its former officer and directors; debtor had thus assigned the estate's causes of action to the committee). The Credit Agreement Lenders claim that *Valley Media* is distinguishable because the debtor in that case consented to the committee controlling the cause of action. Credit Agreement Lenders Obj. at 7. But the same circumstances that induced the debtor in *Valley Media* to reasonably consent – "Debtor's counsel's relationship with Defendants," 2003 WL 21956410 at *1 – exist here. Debtors' claim that, at some unspecified future time, they would address and resolve such conflict – especially in light of their professed desire to exit bankruptcy as soon as possible – is simply not credible and further supports why the Committee's Motion is ripe and should be granted.

proceed with the calamitous LBO; and current officers Randy Michaels (CEO), Gerald Spector (COO), and Chandler Bigelow (CFO), who were executives at either the Tribune or EGI when the Zell LBO was conceived, approved, and implemented.[10] Debtors' contention that the Debtors are capable of fairly weighing and pursuing claims against their banks (JPM, Merrill Lynch, Citi, and other lenders), and perhaps against themselves – let alone better positioned than the Committee to do so – is ludicrous, and Debtors offer no evidence to support it.

Attempting to blunt the Committee's explication of the Debtors' disabling conflicts, Debtors seek to graft onto the derivative standing test Delaware corporate law standards on director independence drawn from shareholder derivative suits. Debtors Obj. at 8-11. But Debtors cite no decisions, let alone decisions of this Court or Circuit, that have applied these cases when analyzing whether to grant derivative standing to a creditors' committee. Rather, in deciding whether to excuse a committee's failure to make a formal demand on futility grounds (or whether a debtor's refusal to bring suit was justified), courts have undertaken the cost-benefit analysis described in the Committee's opening memorandum. *See National Forge*, 326 B.R. at 548. None of the objecting parties seriously contests the Committee's showing (UCC Mem. at 8-9) that the Derivative Causes of Action, if proven, would have a profound impact on the estate. As part of that inquiry, courts have weighed whether the interests of decision makers at the debtor, whose conduct would be at issue in any litigation, are likely to impair the zealous prosecution of a suit. *See, e.g.*, *Cybergenics*, *National Forge*, *Valley Media, Louisiana World Exposition*. Here, the high degree of impairment of the board and top management – at least four

---

[10] *See* 2007 Tribune Co. Form 10-K at 21, 175 (available at http://corporate.tribune.com/tribune_sec/investors/ sectext.php?ipage=5548662&repo=tenk) (listing officers and directors); *see also* http://www.tribune.com/about/ index.html (Tribune web pages with brief bios for current directors and officers).

2522172.1

of the ten directors, including Chairman Zell, and the top echelon of management – implicates exactly the concerns that courts have repeatedly cited in granting creditors' committees standing to sue on behalf of the estate.

In its objection, the Debtors fail to offer any view of the colorability of the Derivative Causes of Action, even though Debtors contend they have been "aggressively" investigating and analyzing potential claims for months.[11] That the Debtors do not even hazard to express a view – one way or the other – underscores their inability to vigorously prosecute claims against the Lenders or the Company's officers and directors.[12] To acknowledge that the claims are colorable would be a concession that there is sufficient basis to bring suit to avoid as fraudulent conveyances the multibillion dollar obligations that many of the current officers and directors caused the Company to incur. Indeed, these individuals, along with the Lenders, are themselves potential defendants in an action to recover fraudulent transfers and other improper distributions that will benefit unsecured creditors. At the same time, the Debtors cannot deny that the claims

---

[11] That investigation has been conducted by Debtors' current counsel, Sidley Austin LLP. Sidley cannot litigate such claims for the Debtors because of its representations of JPM and Merrill Lynch, two of the principal Lenders, both of whom are named as defendants in the Committee's proposed complaint. Conlan Affidavit in support of Sidley Retention Application, Ex. B. The Debtors' objection acknowledges as much. Debtors Obj. at 11, n.5 (recognizing that Board would need to retain conflict-free counsel to litigate on the Company's behalf). Debtors' special litigation counsel, Jenner & Block, LLP, likewise cannot litigate such claims because, among other matters, it represented Samuel Zell and entities he controls in connection with the LBO. Declaration of David J. Bradford in support of Jenner Retention Application (D.I. 142) ¶ 15 & Ex. B.
      Given the size and complexity of this matter, and how long it would take new counsel to learn the case, prepare a complaint, and commence litigation, the fact that the Debtors offer no indication that they have taken any steps to prepare for this contingency further confirms that Debtors have no intention of ever litigating claims that have real value for the estate.

[12] Wilmington Trust criticizes the Committee for not including claims against Tribune directors and officers and other third parties for malfeasance. Wilmington Trust Obj. at 2, 14-15. The Committee has investigated and continues to investigate breach of fiduciary duty and other potential claims against such parties. The Committee opted not to include such allegations in its draft complaint at this time. Should the Court grant the Committee standing and continuing discussions among the parties fail to produce a fair outcome for the unsecured creditors, the Committee anticipates that it will seek standing to commence litigation against current and former officers and directors of the Company, as well as other third parties.

2522172.1

asserted in the Committee's draft complaint are colorable, because such denial would fatally undermine their argument that they remain capable of vigorously litigating claims that will benefit the estate.

In short, the Debtors' silence further shows that they are ill-positioned and disinclined to fulfill the fiduciary obligations they have to maximize the value of the estate for the Company's creditors.

In marked contrast, the Committee, through its unconflicted counsel, has undertaken an extensive and intensive investigation into potential claims against the Lenders, Debtors' management, and other parties, satisfying itself that the Derivative Causes of Action reflected in the draft complaint, and other claims the Committee continues to prepare, are well supported and have the potential to yield substantial benefits for the estate. As but a few measures of the scope of its investigation, counsel for the Committee have pursued discovery under Rule 2004 of the Federal Rules of Bankruptcy Procedure from more than forty parties, obtaining over three million pages of documents and conducted Rule 2004 examinations of seven individuals, including employees of the Company and JPM. Affidavit of Graeme W. Bush at ¶¶ 2-7 (attached hereto as Ex. 1). The Committee has, through its legal and financial professionals, also conducted an extensive evaluation and analysis of the legal basis of claims and defenses to claims relating to the LBO transaction and of the impact of the LBO transaction on the solvency of the Debtors. Affidavit of Graeme W. Bush at ¶¶ 8-9.

## II. Granting the Committee Standing To Sue Now Will Facilitate, Not Hinder, Settlement Negotiations.

The Debtors and Lenders suggest that if the Committee obtains standing, the ongoing settlement negotiations will be fatally disrupted. That is wrong for several reasons. First, while the Committee and its counsel have met with representatives of the Debtors and Lenders a

number of times to discuss settlement, there are no ongoing settlement negotiations involving the Committee. It is clear from those discussions that the parties are so far apart, and value the claims so differently, that they are at an impasse – and have been for some time. There may be ongoing discussions between the Debtors and the Lenders aimed at "settling" the fraudulent conveyance claims through a proposed plan at a bargain basement price without any involvement by the real party in interest, the Committee that represents the unsecured creditors who will benefit from a recovery on these valuable claims. Given the Debtors' conflicts, any such settlement reached without the Committee would be highly suspect. It is difficult to imagine how any such settlement could be found to be in good faith, at arms' length, for fair value and, ultimately, binding on the unsecured creditors.

Second, grant of the Motion for Standing will not end efforts at a negotiated resolution. Notwithstanding the Debtors' and Lenders' fanciful assertions that the threat – or fact – of litigation dooms all settlement negotiations, the reality is that settlements are reached when litigation is imminent or already underway. The Committee, Debtors and Lenders are sophisticated parties capable of negotiating a fair settlement in an environment in which meaningful litigation is threatened or ongoing. The Committee believes that obtaining derivative standing will facilitate, not impair, efforts to reach a fair settlement and the consensual conclusion of these cases. In the Committee's view, it is the Lenders' conviction that the Debtors will never sue them that is the most significant impediment at this stage to a fair settlement and consensual plan.

Moreover, denial of the Motion for Standing now will not (absent a settlement fair to creditors) prevent litigation by the Committee, it will merely defer it. The Court should allow

13

2522172.1

these meritorious claims to be litigated directly and decided on their merits, rather than forcing them to be addressed indirectly in the context of a settlement or plan confirmation challenge.

**III.    The Committee Should Receive Authority to Settle the Derivative Causes of Action.**

The Debtors argue that, even if the Court grants derivative standing to the Committee, the Debtors should retain the exclusive right to settle the Derivative Causes of Action. In other words, the Debtors may be too conflicted to be trusted to pursue litigation vigorously but they should be trusted with exclusive control of settlement. That approach would defeat the entire purpose of granting a creditors' committee derivative standing – ensuring that an unconflicted representative of creditors will vigorously pursue claims that the Debtors will not. If the Debtors retain exclusive power to settle, they can, and their conflicts indicate they will, use it to prevent the Committee from achieving a fair resolution of the claims. If derivative standing is granted, the Committee must have the ability to litigate, or settle, the Derivative Causes of Action in order to ensure that the Committee is able to maximize the value of these causes of action for the estate. *See, e.g.*, *In re Adelphia Communications Corp.*, 361 B.R. 337, 355 n. 82 (S.D.N.Y. 2007) ("There can be little doubt that the right to litigate a cause of action must include the right to withdraw it, settle it or try it – every case must be 'dropped, settled or tried.'") (quoting *United States v. Glens Falls Newspapers, Inc.*, 160 F.3d 853, 856 (2d Cir. 1998)).

Contrary to the Debtors' and Lenders' claims, nothing in Rule 9019 requires a court to leave a conflicted debtor in control of settlement after a creditors' committee has been appointed. Indeed, courts have recognized that after a committee is granted derivative standing to pursue claims on behalf of the debtors' estates, it should be permitted to settle such claims and propose related settlements. *See, e.g.*, *Motorola, Inc. v. Official Committee of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 458-59 (2d Cir. 2007) (allowing a creditors' committee

to seek to settle derivative claims against prepetition lenders pursuant to a Rule 9019 settlement motion). If the Committee is granted derivative standing to commence and prosecute the estate claims, the Committee must also be a necessary party to settlement of any such claims. *See In re Adelphia*, 361 B.R. at 355 (S.D.N.Y. 2007) (granting stay pending appeal on finding that creditors' committee had substantial possibility of prevailing on its appeal of settlement of claims the committee had been authorized to litigate; "[i]t is beyond cavil" that the creditors' committee's authority to litigate certain claims in bankruptcy includes the authority to settle such claims, and that the committee's consent to settle "may not have been sufficient, but certainly was necessary").

**WHEREFORE**, for the reasons presented herein and in the Committee's opening memorandum, the Committee respectfully requests that the Court grant the Motion for Standing.

Dated: Wilmington, Delaware
February 15, 2010

ZUCKERMAN SPAEDER LLP

    /s/ Virginia Whitehill Guldi
Thomas G. Macauley (ID No. 3411)
Virginia Whitehill Guldi (ID No. 2792)
919 Market Street, Suite 990
Wilmington, DE 19801
Telephone: (302) 427-0400
Facsimile: (302) 427-8242

- and -

Graeme W. Bush, Esquire
James Sottile, Esquire
Andrew N. Goldfarb, Esquire
1800 M Street, N.W., Suite 1000
Washington, DC 20036
Telephone: (202) 778-1800
Facsimile: (202) 822-8106

2522172.1

Special Counsel to the Official Committee
of Unsecured Creditors

2522172.1