IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ------------------------------------------------------ x | | |
| In re: | : | Chapter 11 Cases |
| | : | Case No. 08-13141 (KJC) |
| **TRIBUNE COMPANY, <u>et</u> <u>al</u>.,** | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |
| | : | |
| | : | Re: Docket No. 3062 |
| ------------------------------------------------------ x | | |

## WILMINGTON TRUST COMPANY'S OMNIBUS REPLY TO OBJECTIONS TO EXAMINER MOTION

Wilmington Trust Company ("<u>Wilmington Trust</u>"), Successor Indenture Trustee for the Exchangeable Subordinated Debentures due 2029 in the aggregate principal amount of approximately $1.2 billion (the "<u>PHONES</u>") issued in April 1999 by Debtor Tribune Company ("<u>Tribune</u>" or the "<u>Company</u>," and, together with its Chapter 11 affiliates, the "<u>Debtors</u>"), by and through its undersigned counsel, hereby submits this omnibus reply to the objections filed to its motion for entry of an order directing the appointment of an examiner (the "<u>Examiner Motion</u>.")

**PRELIMINARY STATEMENT**

1.      The objectors to the Examiner Motion make strange bedfellows.  While the Official Committee of Unsecured Creditors (the "Creditors' Committee") simultaneously seeks standing to commence a fraudulent conveyance lawsuit against the LBO Banks, it joins with those same proposed defendants and the Debtors, whose senior management should be defendants in that proposed fraudulent conveyance lawsuit, to argue against the appointment of an examiner.[1]  The LBO Banks and the Debtors, however, simultaneously seek to block <u>both</u> the Creditors' Committee's request for standing <u>and</u> Wilmington Trust's request for an examiner.  In

---

[1] Capitalized terms not defined herein have the same meaning as in the Examiner Motion, (D.I. 3062), or its Response to the Official Creditors' Committee's Standing Motion (D.I. 3377).

short, the Goldilocks like response of the LBO Banks and the Debtors is: the Creditors' Committee's Standing Motion is too early; Wilmington Trust's Examiner motion is too late; and the status quo (i.e. doing nothing) is just right.

2.  Doing nothing, however, is not a viable option, nor is it in the best interest of the estate or its creditors. Although certain judges on this Court have previously indicated their belief that they have discretion to determine whether an examiner should be appointed under §1104(c)(2) of the Bankruptcy Code, the only appellate court to consider the direct question, every district court, and most bankruptcy courts have held that the provisions of that section mandate appointment of the examiner.

3.  Even assuming that discretion over the appointment of an examiner resides in the Court, the appointment of an examiner in this case clearly is in the best interests of the estate and its creditors. The status quo suggested by the LBO Banks and the Debtors would do nothing to materially advance this case and instead would leave the Debtors' management, who structured and implemented the failed LBO, to negotiate in secret with the LBO Banks, who financed the LBO, a resolution of the valuable causes of action that reside in the estate that will leave creditors out to dry. As it has to date, that status quo will not result in a thorough and independent evaluation and assertion of the claims that are at the heart of this case.

4.  Similarly, appointment of an examiner is preferable to granting standing to the Creditors' Committee at this time. The conflicts of this Creditors' Committee and its counsel are well-documented, and clearly have caused the Creditors' Committee, even with special conflicts counsel, to act slowly, incompletely and with little or no resolve to pursue the causes of action with vigor. Indeed, the Creditors' Committee's very response to the Examiner Motion – suggesting that the holders of the PHONES should not be heard at all because of their

subordinated status, while at the same seeking standing to assert equitable subordination of the LBO Banks' claims that would, if successful, elevate the PHONES claims above those of the LBO Banks – underscores the perhaps unintentional, but nevertheless hopelessly compromised thinking and mentality of the Creditors' Committee. Even when it tries to do so, it cannot remove the interests of the LBO Banks from its frame of reference. In such an environment, the only effective remedy is the appointment of an independent examiner to advise the Court on the merits of the potential claims.

5. Nor is it too late for the appointment of an examiner; if anything, the time is exceedingly ripe for an independent party to shine some light on the efficacy of these claims. Further, given the work done to date, there is every reason to believe that an examiner could conduct an efficient, relatively quick examination, at a reasonable cost to the estate.

**ARGUMENT**

    **A.    Appointment of an Examiner is Mandatory**

6. As Wilmington Trust demonstrated in its moving papers, under § 1104(c)(2), appointment of an examiner is mandatory here. Although the objecting parties have cited certain unpublished opinions that hold that provision not to be mandatory, as one court recently noted, "the only appellate court to consider the question . . . . [and] every district court and nearly every bankruptcy court that has confronted the question has also read the provision to be mandatory on its face." Walton v. Cornerstone Ministries Invs., Inc., 398 B.R. 77, 81-82 (N.D. Ga. 2008) (citing Morgenstern v. Revco D.S., Inc. (In re Revco, D.S., Inc.), 898 F.2d 498, 500-01 (6th Cir. 1990); In re Loral Space & Commc'ns, Ltd., No. 04-CV-8645-RPP, 2004 U.S. Dist. LEXIS 25681, 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004); In re Schepps Food Stores, Inc., 148 B.R. 27 (S.D. Tex. 1992); In re Vision Dev. Group of Broward County, LLC, No. 07-17778-BKC-

RBR, 2008 Bankr. LEXIS 2178, 2008 WL 2676827 (Bankr. S.D. Fla. June 30, 2008); <u>In re Collins & Aikman Corp.</u>, 368 B.R. 623 (Bankr. E.D. Mich. 2007); <u>In re UAL Corp.</u>, 307 B.R. 80 (Bankr. N.D. Ill. 2004); <u>In re Mechem Fin. of Ohio, Inc.</u>, 92 B.R. 760 (Bankr. N.D. Ohio 1988); <u>In re The Bible Speaks</u>, 74 B.R. 511 (Bankr. D. Mass. 1987); <u>In re 1243 20th St., Inc.</u>, 6 B.R. 683 (Bankr. D.D.C. 1980); <u>In re Lenihan</u>, 4 B.R. 209 (Bankr. D.R.I. 1980)).

7. As Colliers on Bankruptcy states:

> Section 1104(c)(2) does not leave any room for the court to exercise discretion about whether an examiner should be appointed, as long as the $5,000,000 threshold is met and a party in interest moves to appoint an examiner. If Congress intended to subject the appointment issue to the court's discretion, it could have said so. Section 1104(c)(2) states that the court shall order the appointment of an examiner if the prescribed debts exist. It would be inappropriate to read shall to mean may because in certain circumstances a court disagrees with the result that would be reached.

3-1104 Collier Bankruptcy Manual, 3d Edition Revised P 1104.03.

8. In <u>In re Revco</u>, 898 F.2d 498 (6th Cir. 1990), the Sixth Circuit stated:

> The requirement that an examiner be appointed is a question of statutory interpretation, the resolution of which begins with the words of the statute. We give those words their "ordinary, contemporary, common meaning." <u>Perrin v. United States</u>, 444 U.S. 37, 42, 62 L. Ed. 2d 199, 100 S. Ct. 311 (1979). Section 1104(b) . . . plainly means that the bankruptcy court "shall" order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $ 5 million. . . .

898 F.2d at 501. The Sixth Circuit also responded to concerns similar to the ones raised by the objecting parties here:

> The debtors claim that such a construction of the statute invites abuse, and that the trustee or any other party in interest could needlessly prolong a case with last-minute demands for an examiner. That is not the case before us, of course, and we do not decide it except to note that the bankruptcy court retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration. Section 1104(b) plainly states that the court shall appoint an examiner "to conduct such an investigation of the debtor as is appropriate."

- 4 -

<u>Id.</u>   Thus, Wilmington Trust submits that the appointment of an examiner is mandatory, and the Court should exercise its discretion to order a limited examination into the merits of the fraudulent conveyance, equitable subordination and other unasserted estate claims.

### B.    **Appointment of an Examiner is in the Best Interest of the Estates**

9.    Even if appointment of the examiner were not mandatory under § 1104(c)(2), such appointment is in the best interests of the estates and creditors under the discretionary provision of § 1104(c)(1).

10.   The Examiner Motion, and the opposition thereto, posit three possible ways to evaluate the assertion and resolution of the potential fraudulent conveyance, and other unasserted estate claims, arising from the LBO. The Creditors' Committee advocates granting the Standing Motion; and the proposed defendant LBO Banks and the Debtors advocate doing nothing so that they can negotiate a secret settlement between them. Wilmington Trust submits that its proposal - appointing an examiner to assess the merits of the fraudulent conveyance and other estate claims - is the most independent, efficient and thorough way to proceed, and therefore is in the best interest of the estate and its creditors.

#### 1.    **An Examiner Is Preferable To The Do Nothing Approach Advocated By The Debtors And The LBO Banks**

11.   The Debtors and the LBO Banks should not be left to their own devices to control the evaluation, prosecution and resolution of the fraudulent conveyance and other estate claims. The banks and the Debtors refer to the so-called progress in self-proclaimed "intensive negotiations" as a justification for doing nothing. In fact, negotiations between the banks and the unsecured Senior Notes (with the Creditors' Committee acting as a "mediator") have gone nowhere. Thus, the only progress is in secret negotiations between the Debtors, whose senior

management should be defendants of the lawsuit, and the LBO Banks, who are already properly named as defendants in the Creditors' Committee's proposed fraudulent conveyance lawsuit. Those negotiations could result in one fox negotiating a settlement with another fox over the hen house, consisting of the valuable fraudulent conveyance and other estate claims before they are even brought or prosecuted. The fraudulent LBO was the brainchild of Zell, and the Debtors cannot be entrusted to negotiate the resolution of estate claims in which Zell, his management team, and many of the directors should be targets. See Official Committee ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003) ("One suspects that if [a debtor's] managers can devise an opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it.").

12. There simply is no reason why plan negotiations cannot continue while an examiner analyzes the proper application of the relevant law to the facts, and the objecting parties offer no factual support for their in terrorem contention that an examiner would interfere with those negotiations. The negotiating parties are sophisticated parties, and are not likely to walk away from an appropriate consensual resolution merely because an examiner is investigating, or because the Creditors' Committee receives standing to bring its fraudulent conveyance suit.

### 2. An Examiner Is Preferable To The Creditors' Committee Receiving Standing Now

13. Various objecting parties argue that Wilmington Trust has produced no evidence of conflicts in the Creditors' Committee process. Yet none can dispute that it was not until two weeks after the Examiner Motion was filed that the Creditors' Committee, finally spurred to action, filed its Standing Motion and proposed complaint. As discussed in the Examiner Motion and in Wilmington Trust's Response to the Creditors' Committee Standing Motion (D.I. 3377),

the very makeup of the Creditors' Committee causes it to serve too many masters and inhibits it from vigorously pursuing the meritorious fraudulent conveyance litigation.[2]  A majority of the Creditors' Committee members are trade creditors or pension holders who will likely recover regardless of the outcome of the disputes between the LBO Banks and the PHONES and other parent company creditors.  In large part, those members of the Creditors' Committee are neutral observers as to whether the liens and other obligations to the LBO Banks that arise from the LBO would be disallowed or equitably subordinated to the claims of the pre-LBO creditors, including the PHONES, or whether the guarantees of Tribune's subsidiaries should be avoided.

14.    As a result, a majority of the Creditors' Committee simply want any litigation to be over with as soon as possible.  See, e.g., Joinder of TM Retirees in Creditors' Committee Objection for Examiner Motion (D.I. 3375) at 2-3.  Unfortunately, that dynamic, along with the conflict issues previously discussed and the Creditors' Committee's obvious reluctance to file a complaint, plays into the hands of a Zell-controlled Company and the LBO Banks, the potential defendants in such litigation.  And, when the Creditors' Committee, through its special counsel, finally sought standing to file a complaint, that draft complaint still showed an apparent disinclination to ruffle any feathers.  As set forth in Wilmington Trust's Response to the

---

[2] As shown in Wilmington Trust's moving papers, in analogous contexts, courts have held that conflicts of interest constitute sufficient justification for the appointment of a trustee under Section 1104.  This same principle should apply, with even more force, in the context of a motion to appoint an examiner, where the remedy is much less intrusive.  See, e.g., In re Cajun Elec. Power Coop., Inc. 74 F.3d 599, 600 (5th Cir. 1995) (adopting on rehearing the dissent in 69 F.3d 746, 751 (5th Cir. 1995) (appointing trustee because of "inherent conflict" caused by utility cooperative's board members also serving in various capacities at the cooperative's member utility companies); In re Marvel Entm't Group, Inc., 140 F.3d 472-473 (affirming appointment of trustee because conflicts of interest that existed between former creditor turned debtor-in-possession and other creditors were beyond "healthy" conflicts that always exist in bankruptcy); In re Sharon Steel Corp., 871 F.2d 1226-28 (affirming appointment of trustee because of debtor's internal conflicts of interest and inability to fulfill fiduciary duties as debtor-in-possession to creditors); In re Fiesta Homes of Georgia, 125 B.R. 321, 325-26 (Bankr. S.D. Ga. 1990) ("the presence of a conflict of interest constitutes cause for removal of the Debtor in Possession from administration of this case."); In re Nautilus of New Mexico, Inc., 83 B.R. 784, 789 (Bankr. D.N.M. 1988) (where individual who controlled debtor-in-possession had conflicts with interests of the estate, trustee was warranted).

Standing Motion, the proposed complaint presents only a tepid, sanitized and wholly incomplete story of the LBO.

15.     The arguments of the objectors that the process has not been tainted because JP Morgan has recused itself when the Creditors' Committee discusses the investigation of the LBO actually proves the point. JP Morgan is the 800 pound gorilla that never leaves the room. Its presence looms large, as reflected by the Creditors' Committee's opposition, which dismisses the PHONES as a mere 8.6% of the outstanding debt. To make that calculation, the Creditors' Committee counted as valid, the $10 billion in unsecured debt held by the LBO banks. See Creditors' Committee Objection to Examiner Motion (D.I. 3360) at ¶13, and n. 11. Yet, the Creditors' Committee has filed a draft complaint that seeks to disallow or equitable subordinate the entire $10 billion in claims arising from the LBO. The fact that the Creditors' Committee took inconsistent positions, by counting the LBO Banks' claims as valid for purposes of opposing the Examiner Motion, while at the very same time seeking standing to file a Complaint that would disallow or subordinate the very same claims, demonstrates how wanly the Creditors' Committee will pursue those claims if it is granted standing.[3] It is inconsistent positions such as these by the Creditors' Committee that demonstrate that it does not have its heart in the zealous pursuit of the fraudulent conveyance litigation, which is why an independent examiner is needed to report to the Court on the strengths, or weaknesses, of the fraudulent conveyance claims and other unasserted estate claims.

---

[3] Indeed, because of the Creditor' Committee's inconsistency on this issue, the Credit Agreement Lenders (D.I. 3373 Credit Agreement Lenders' Objection to Motion of Wilmington Trust for Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code ("Credit Agreement Lenders' Objection", at 4-5), proclaims that the "Committee itself agrees . . . . that not all of the Credit Agreement Debt can be avoided," when that is precisely the relief sought by the draft complaint.

16. As one court has noted, "[t]he benefit of appointing an independent examiner is that he or she will act as an objective nonadversarial party who will review the pertinent transactions and documents, thereby allowing the parties to make an informed determination as to their substantive rights." In re FiberMark, Inc., 339 B.R. 321, 325 (Bankr. D. Vt. 2006).

17. As noted in Wilmington Trust's Response to the Standing Motion, the Creditors' Committee eventually should be vested with standing to prosecute estate causes of action, but only after the independent examiner issues his report.

### 3. The Phones Are Acting In The Interests of the Estate and Its Creditors

18. Contrary to the allegations of the objectors, the appointment of an examiner is not merely in the best interests of the PHONES, but will benefit all creditors. The focus by the objectors on the subordination of the PHONES is a red herring and obscures the very real nature of this inter-creditor dispute. Contractual subordination of the PHONES' claims is only relevant if the fraudulent transfer claims set forth in the Creditors' Committee draft complaint are unsuccessful. Indeed, if the fraudulent conveyance and other estate claims are vigorously and successfully prosecuted, the claims of the senior debt will be equitably subordinated to those of the PHONES, notwithstanding contractual subordination. See In re Best Prods. Co., Inc., 168 B.R.35, 69-70 (Bankr. S.D.NY 1994) (inequitable conduct which harms a subordinated creditor, such as a fraudulent transfer, can cause contractual subordination to be ignored). In such event, the PHONES would recover 100 percent of their claims. Thus, the suggestion that the PHONES are so deeply subordinated that they should be ignored is disingenuous.

19. That result does not change just because the PHONES are contractually subordinated to the Senior Notes (with whom failed negotiations occurred) or other parent company creditors. The Senior Notes, like the PHONES, must succeed under equitable

subordination and/or other theories at the parent company level before they receive any substantial recovery. If equitable subordination of the LBO Banks' claims as a result of their participation in the fraudulent conveyance is the appropriate remedy for the Senior Notes, those claims will be equitably subordinated to the claims of the PHONES and other parent company creditors to the same extent as the Senior Notes.

20. One need look no further than the recent decision, on similar facts, of the leveraged buyout in the by now well known *Tousa* case,[4] to see that disallowance or equitable subordination LBO of the LBO Banks' claims under these circumstances is a very real prospect. The facts uncovered so far in discovery in this case are far more egregious than those in *Tousa*, as they show that the LBO Banks knowingly proceeded with the LBO despite foreseeing Tribune's insolvency, secure in their belief that the PHONES and other pre-LBO debt provided them with an adequate cushion.

21. Therefore, the suggestion that the PHONES are out of the money and are seeking an examiner merely to obtain leverage just does not ring true. There are viable claims arising out of the LBO that should be vigorously prosecuted on behalf of all creditors (except the LBO Banks who are the defendants), and the contractual subordination of the PHONES should not distract from the need to appoint an unbiased and independent examiner to assess the LBO claims.

---

[4] In re Tousa, Inc., Case No. 08-01435 (Bankr. S.D. Fla. Aug. 13, 2008).

22. Indeed, given the fact that the Debtors and the LBO Banks insist that there are no colorable claims arising from the LBO, one would think they would join in Wilmington Trust's Examiner Motion and give an examiner the opportunity to review the discovery to date.[5] If the examiner were to agree with the banks that the claims are not colorable, the specter of fraudulent conveyance litigation will not hang over plan negotiations. But, the fact that the Debtors and the LBO Banks want to continue to secretly negotiate resolution of these claims, and present them as a *fait accompli*, makes an independent examination all the more necessary.[6] See In re Apex Oil Co., 101 B.R. 92, 99 (Bankr. E.D. Mo. 1989) ("The Examiner is appointed to act as an independent party to review, without monetary interest, transactions and documents. He is first and foremost disinterested and nonadversarial. The benefits of his investigative efforts flow solely to the debtor and to its creditors and shareholders.") (internal citations omitted).

### 4. An Examiner Would Benefit the Estate and its Creditors

23. The objecting parties bring forth a parade of horrible consequences that would befall the estate if an examiner is appointed. However, none of those are valid, particularly the assertions of inevitable delay and duplication.

24. An examiner would presumably get the cooperation that Wilmington Trust has not received. The fact that the Debtor proclaims that it is "cooperating" is a non-issue. The Debtors are supposed to be cooperating, as are the LBO Banks.

---

[5] The Credit Agreement Lenders argue (Credit Agreement Lenders' Objection at 3-4) that $3 billion used to repay existing funded indebtedness and fund expenses "unquestionably gave reasonable equivalent value." On the contrary, that allegation is most definitely questioned and disputed, as is their argument that the guarantees of Tribune's subsidiaries cannot be avoided given the clear solvency of the subsidiaries. (Id.). These and other factual assertions as to potential defenses contained in the objections are disputed, but if the LBO Banks were so sure that these defenses were "clear" or "unquestioned," they would want an examiner to confirm those assertions.

[6] If the Court grants the Standing Motion, it should also give the Creditors' Committee the power to settle those claims. Otherwise, the ability to bring the lawsuit could be meaningless, since the Debtor could just settle the claims without the Creditors' Committee's participation or over the Creditors' Committee's objection.

25. There is simply no reason why an examiner would need to reinvent the wheel. The parties have already reviewed the bulk of the documents produced to date that are contained in the document depository and undoubtedly selected the ones most relevant to their position. That work does not have to be duplicated. The Court could set a deadline for interested parties to submit to the examiner those documents, deposition transcripts and other materials that support their respective positions – thus, there would be no long delay in getting the appropriate information to the examiner. However, even if there would be some delay and some additional expense, an examination still is in the best interest of the estate as it would focus the litigation that the Creditors' Committee seeks to bring and, by advising the parties of the strengths of the claims, or lack thereof, may help the parties achieve a <u>fully</u> consensual plan that is not possible under the present circumstances.

### C. The Examiner Motion Is Timely

26. Lastly, complaints by the Creditors' Committee, the banks and the Debtors that Wilmington Trust delayed bringing its Examiner Motion should be given short shrift considering the lack of real progress so far in resolving the fraudulent conveyance, equitable subordination and other estate claims implicated by the LBO.

27. When the Debtors filed their petitions, Wilmington Trust expected that the LBO, which had been the subject of considerable public scrutiny, would be the subject of an immediate and thorough investigation and assertion of claims that could lead to meaningful recovery for unsecured creditors. When that did not occur despite the overwhelming evidence supporting the conclusion that the LBO was a fraudulent conveyance, Wilmington Trust joined in the August

26, 2009 motion of Law Debenture,[7] the indenture trustee for the Notes, for Rule 2004 discovery, or in the alternative, for an examiner.

28.     And, when the Creditors' Committee appeared to make some progress in its investigation, at least in part as a result of the Law Debenture Motion, rather than objecting to the stipulation regarding the resolution of Law Debenture's motion, Wilmington Trust adopted what it then believed was a reasoned wait-and-see approach and expected that the process would continue the way it should.  Unfortunately, even after discovery revealed more damning evidence supporting strong fraudulent conveyance claims, it became clear that the Debtors would not act on that evidence, and that the Creditors' Committee had no appetite for litigation (however necessary and appropriate it is).  And, negotiations to date have gone nowhere, except perhaps those between the Debtors and the LBO Banks in which neither the Creditors' Committee nor other interested creditors are actively involved.  In these circumstances, Wilmington Trust concluded that the most appropriate way for the facts surrounding the LBO, and the strengths of the fraudulent conveyance and other estate claims arising therefrom, to be brought to light was to file its Examiner Motion, and it did so.

29.     Other objections concerning Wilmington Trust's alleged delay in bringing the Examiner Motion are untrue, or gross exaggerations.  For example, contrary to the Debtor's assertions, Wilmington Trust promptly sought access to the Document Depository, to which the Debtors responded with glacial speed.  Incredibly, the Debtors state that "although it was provided with notice in December that the Document Depository was being created, [Wilmington Trust] never even bothered to obtain access to the depository until just a few weeks

---

[7] See Motion of Law Debenture Trust Company of New York for Leave to Conduct Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure of Tribune Company, its Affiliates, and Certain Third Parties, or Alternatively, for the Appointment of an Examiner (D.I. 2031); Wilmington Trust Company's Joinder to the Law Debenture Rule 2004/Examiner Motion. (D.I. 2172).

ago." (Debtor's Response and Objection to the Motion of Wilmington Trust Company for the Appointment of an Examiner Pursuant to 1104(c) of the Bankruptcy Code (D.I. 3372), at 7). This is just wrong. The Court issued the document depository order on December 15, 2009. Wilmington Trust requested access to the depository on December 23, 2009, but despite repeated requests, it took **23 days** after Wilmington Trust's first request for Debtor's counsel to provide Wilmington Trust with the index for the Document Depository, and another five days for Wilmington Trust to receive the first set of disks containing documents. Given that nearly one month elapsed between Wilmington Trust's first request and its receipt of any documents, the Debtors' assertion that Wilmington Trust delayed reviewing the documents in the document depository is specious.[8]

    30.    In any event, Section 1104(c) of the Bankruptcy Code provides:

> If the court does not order the appointment of a trustee under this section, then **at any time before the confirmation of the plan**, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court **shall** order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor if –
>
> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

---

[8] As another example of the Debtors' delaying tactics, the Debtors circulated an updated depository index on February 5 reflecting additional productions from Merrill Lynch, Citigroup Global Markets, Inc., and Tribune on January 27, 28, 29, and 30, and February 2. That same day, Wilmington Trust requested the disks, which it did not receive until 6 days later; thus, documents produced as early as January 27 were not received by Wilmington Trust until February 11. As a result of these stall tactics, Wilmington Trust received almost 900,000 pages of new documents roughly a week before the hearings on the Examiner Motion and the Standing Motion.

11 U.S.C. 1104(c) (emphases added).  The only limitation of the time for appointment of an examiner under the clearly mandatory language of the statute is before the confirmation of a plan.

31.    Here, although these cases have been pending for more than a year, a plan has not been filed, much less confirmed.  And the only real negotiations of such a plan are being conducted secretly between the Debtors and the LBO Banks, without the active participation of the Creditors' Committee or the Debtors' pre-LBO creditors.  In sum, Wilmington Trust proceeded in a timely fashion once it became apparent that nothing was going to happen without an examiner, and the objections' characterization of Wilmington Trust's reasoned approach as delay are misguided.

32.    The "delay" argument is particularly disingenuous as the banks and debtors who make that assertion also argue that the Creditors' Committee is acting too hastily in bringing its Standing Motion.  In other words, they urge the Court to continue the status quo.  In light of the facts discussed above, in the Examiner Motion, and in Wilmington Trust Response to the Standing Motion, this Court should not permit that to happen.

**CONCLUSION**

33. For the reasons set forth above, Wilmington Trust respectfully requests that the Court enter an order appointing an examiner.

Dated: February 16, 2010

    Respectfully submitted,

    **BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

By:   */s/ Jennifer R. Hoover*
    Jennifer R. Hoover, Esquire (No. 5111)
    222 Delaware Avenue, Suite 801
    Wilmington, DE 19801
    (302) 442-7010 (telephone)
    (302) 442-7012 (facsimile)
    jhoover@beneschlaw.com

    -and-

    **BROWN RUDNICK LLP**
    Robert J. Stark, Esq.
    Martin S. Siegel, Esq.
    Seven Times Square
    New York, New York 10036
    T: (212) 209-4800
    F: (212) 209-4801

    William M. Dolan III, Esq.
    Brown Rudnick LLP
    121 South Main Street
    Providence, RI 02903
    (401) 276-2600
    (401) 276-2601 Fax

    *Counsel to Wilmington Trust Company, as Successor Indenture Trustee*