IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 Cases |
| TRIBUNE COMPANY, et al., | Case No. 08-13141 (KJC) |
| Debtors. | (Jointly Administered) |

**REPLY OF LAW DEBENTURE TRUST COMPANY OF NEW YORK IN SUPPORT OF THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING AND AUTHORITY TO COMMENCE, PROSECUTE AND SETTLE CLAIMS AND COUNTERCLAIMS OF THE DEBTORS' ESTATES**

Law Debenture Trust Company of New York ("Law Debenture"), successor trustee under that certain Indenture, dated March 19, 1996, between Tribune Company ("Tribune" and with its subsidiaries the "Debtors") (successor to The Times Mirror Company) and Citibank, N.A., for the 6.61% Debentures due 2027 and the 7.25% Debentures due 2096 (as amended, the "Indenture"), as fiduciary for the interests of more than 18% of the Debtors' bondholders, by and through its undersigned counsel, hereby this reply (the "Reply") in support of the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute and Settle Claims and Counterclaims of the Debtors' Estates (the "Motion") and respectfully represents as follows:

## PRELIMINARY STATEMENT

The Court should grant the Committee standing to prosecute claims on behalf of the estates because the claim asserted are colorable, will decidedly benefit these estates, and the Debtors and their professionals have irreconcilable and disabling conflicts of interest that preclude them from zealously prosecuting them. That is all that the Third Circuit requires under the standard articulated in *Official Comm. of Unsecured Creditors of Cybergenics Corp. v.*

*Chinery (In re Cybergenics Corp.)*, 330 F.3d 58, 575 (3d Cir. 2003).

The leveraged buyout of Tribune in 2007 (the "LBO") through an ESOP controlled by Samuel Zell – consummated when the Debtors' businesses already was in secular decline – created an unsustainable debt burden that plainly caused the Debtors' demise. The LBO deal more than tripled Tribune's debt and, [redacted] Within a year of the LBO, Tribune commenced these Chapter 11 cases, leaving billions of dollars of pre-LBO debt unpaid. The LBO did not provide the Debtors with reasonably equivalent value in exchange for the $11 billion in partially secured and guaranteed debt the Debtors incurred, of which $8.3 billion was used to cash out former shareholders and the majority of the remaining amount to refinance existing debt held by the same lenders on terms that were more favorable for the lenders. Accordingly, the LBO and the obligations incurred in connection therewith constitute classic fraudulent transfers under Sections 544 and 548 of the Bankruptcy Code, applicable state law, and Third Circuit precedent.

The Debtors, JP Morgan Chase Bank, N.A. ("JPM"), the Credit Agreement Lenders, and Merrill Lynch all argue -- without supporting precedent -- that the Court should defer the Motion. They barely dispute that the claims are colorable. Instead, they assert that the Debtors somehow are still capable of commencing LBO-related claims and that, in any event, intense negotiations are still ongoing between the parties. These assertions are false. The claims are colorable, the Debtors are neither capable nor willing to commence LBO-related litigation, and negotiations, while ongoing, hardly qualify as arduous.

The Debtors and their counsel are both conflicted. Tribune's Board of Directors and officers consummated the LBO or are otherwise affiliated with Zell, the Chairman of Tribune and the architect of the LBO. This case has been pending for a year, and the Debtors have taken no steps to prosecute these claims. To the contrary, the Debtors have carefully avoided acting as a potential plaintiff that will prosecute the claims zealously consistent with fiduciary duties; instead, they have limited their role to that of an "honest broker" for a potential settlement between unsecured creditors and the LBO lenders (the "Bank Defendants"). Finally, the Debtors have retained conflicted counsel (including conflicts counsel) that cannot sue the Bank Defendants. Tellingly, the Debtors knew that the Committee would be hiring conflict counsel to handle litigation against the Bank Defendants, and allowed the retention without any showing that they would act as plaintiff in the litigation. Indeed, throughout the Committee's investigation, the Debtors played the role of potential defendants – failing to ask any questions of deponents, and even objecting to questions asked by the Committee and Law Debenture. The Debtors actions are completely inconsistent with that of a plaintiff.

The Debtors may hope to settle LBO-related litigation, and they remain free to continue working as an "honest broker" after the Court grants the Committee's Motion. But the Motion was filed because the Debtors' efforts have failed to result in any meaningful progress despite their (intentionally) mistaken belief that there have been "arduous" negotiations. To the extent settlement is possible, the existence of pending litigation rather than a vague threat of litigation, will make the parties more willing to engage in real negotiations and enter into a settlement. While the Bank Defendants' wish to delay their day of reckoning as long as possible is understandable, that is not a proper basis to deny Committee standing.

Accordingly, Law Debenture supports the Committee's Motion. Granting the Motion

will maximize the value of the estates' litigation claims against the Bank Defendants and other parties for the benefit of all of the Debtors' creditors.

## I. <u>The Debtors' Conflicts Make Demand Futile</u>.

2. The Debtors' existing conflicts of interest render them unable and unwilling to prosecute any claims relating to the LBO. Accordingly, formal demand by the Committee for standing would be futile.

3. The case law makes clear that a committee or a creditor is not required to demand formally that a debtor take action where, as here, it is "plain from the record that no action on the part of the debtor would have been forthcoming." *See In re Nat'l Forge Co.*, 326 B.R. at 544 (affirming the bankruptcy court's excusal of the committee's failure to petition the Debtor on the ground that any request to file suit, under the facts of the case, would have been futile).

4. The Third Circuit specifically recognized that standing should be granted to a Committee because of a debtor's conflicts:

> This situation immediately gives rise to the proverbial problem of the fox guarding the henhouse. If no trustee is appointed, the debtor -- really, the debtor's management -- bears a fiduciary duty to avoid fraudulent transfers that it itself made. One suspects that if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it. *See, e.g., Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir. 1988). For that reason, courts and commentators have acknowledged that the debtor-in-possession "often acts under the influence of conflicts of interest." *Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1441 (6th Cir. 1995). These conflicts of interest can arise even in situations where there is no concern that a debtor's management is trying to save its own skin. For example, a debtor may be unwilling to pursue claims against individuals or businesses, such as critical suppliers, with whom it has an ongoing relationship that it fears damaging. *Id.* at 1439. . . . In any of these situations, the real losers are the unsecured creditors whose interests avoidance actions are designed to protect.
>
> The possibility of a derivative suit by a creditors' committee

> provides a critical safeguard against lax pursuit of avoidance actions. . . . [T]he mere threat of a creditors' committee suit is often a potent deterrent to overreaching by creditors and insiders. *See In re W. Pac. Airlines, Inc.*, 219 B.R. 575, 577-78 (Bankr. D. Colo. 1998) (discussing a creditors' committee's "watchdog" role). This deterrent effect remains important even after commencement of the bankruptcy case itself.

*Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 58, 573-74 (3d Cir. 2003).

5. Other courts are in accord. In *In re Louisiana World Exposition, Inc.*, 858 F.2d 233 (5th Cir. 1988), the court stated "we must look to whether the interests of creditors were left unprotected as a result [of the debtor's inaction.] As the interests of creditors are imperiled where valid and profitable state law causes of action are neglected by the debtor-in-possession, the unjustified refusal calculus will generally amount to little more than a cost-benefit analysis." *Id.* at. 253 n.20; *see also In re The V Cos.*, 292 B.R. 290 (BAP 6th Cir. 2003) (recognizing that "the situation may be such that the trustee's decision not to pursue a particular action (or more likely, the debtor in possession's decision in a chapter 11 case), may be colored by self interest or a conflict of some kind. For example, in certain cases it may be unrealistic to assume that a corporate debtor in possession will be willing to commence a cause of action if the defendants include the sitting officers of the debtor or members of the debtor's board of directors. Ultimately, at the behest of other parties in interest, the court may intervene and authorize someone other than the trustee to commence litigation on behalf of the estate."); *In re First Capital Holdings Corp.*, 146 B.R. 7, 13 (Bankr. C.D. Cal. 1992) (committee would be excused from making a demand on a debtor to pursue action against its officers, directors and controlling shareholders where such a demand would be futile because of conflicts).

6. In *G-I Holdings, Inc. v. Those Parties Listed On Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612 (D.N.J. 2004), the creditors committee argued that it should be granted

standing because "a fundamental conflict of interest precludes [the debtor] from bringing the contemplated avoidance actions." *Id.* at 627. Specifically, the committee alleged that two transactions, which the committee sought to avoid, "were consummated under the direction of executives who had, and continue to have, interests" in the debtor. *Id.* The committee argued that the continued involvement of these individuals precluded the debtors from commencing the adversary proceedings contemplated. *Id.* Citing *Cybergenics* and its "fox guarding the henhouse" analogy, the court stated that "a debtor's refusal to pursue an avoidance action can be implied even where no formal demand has been made by a creditors committee" and that in this case "ample evidence suggests that any formal demand made by the Committee upon [the debtor] to investigate and prosecute the proposed avoidance action would have been refused." *Id.* at 630. Consequently, the *G-I* court granted derivative standing.

7.     Finally, the Debtors' retention of conflicted professionals proves that it has no interest in actually pursuing the claims. "[W]here . . . a debtor's counsel has a conflict of interest in pursuing an estate claim so that it is effectively disqualified from pursuing an action which is otherwise a colorable claim, the debtor (or a trustee) can be viewed as delinquent and the creditors committee should be authorized to pursue the cause of action." *The Official Committee of Unsecured Creditors, on Behalf of Valley Media, Inc. v. Cablevisions Sys. Corp. (In re Valley Media, Inc.)*, 2003 Bankr. LEXIS 940 (Bankr. D. Del. 2003).

### A.     Tribune's Directors and Officers' Conflicts of Interest Warrant the Court Grant Derivative Standing.

8.     Tribune's current directors and officers suffer from conflicts of interest that preclude the Debtors from prosecuting LBO-related claims. These conflicts relate to either their personal involvement with the formation and execution of the LBO or their close connections to

Zell, the architect of the LBO, Chairman of Tribune's Board, and until recently, Tribune's Chief Executive Officer.

9. Tribune's current directors are Samuel Zell, Betsy Holden, William A. Osborn, William Pate, Randy Michaels, Jeffrey S. Berg, Brian L. Greenspun, Maggie Wilderooter, Frank Wood, and Mark Shapiro. *See* Glenn Decl. at Ex. 2 (http://www.tribune.com/about/bios/board_index.html). All of these directors are conflicted by their connection with the LBO or with Zell.

10. Samuel Zell orchestrated the LBO through his company Equity Group Investments, Inc. ("EGI"). [redacted] Director Pate is Managing Director and Chief Investment Officer of EGI and worked closely with Zell to orchestrate the LBO. *See* Glenn Decl. at Ex. 4 (http://www.tribune.com/about/bios/pate.html). Zell appointed him to Tribune's board of directors in December 2007. *See* Glenn Decl. at Ex. 5 (http://www.azdailysun.com/news/national/article_3e73c9c2-81ed-5aba-b2fc-0768e1893fc5.html). He reportedly is a co-investor with Zell in Tribune. *See* Glenn Decl. at Ex. 6 (http://archives.chicagotribune.com/2007/dec/29/business/chi-sat_4brief_1229dec29).

11. Director and Chief Executive Officer Michaels joined Tribune in 2007 at the request of Zell and became Tribune's Executive Vice President of Tribune's broadcasting and interactive businesses. *See* Glenn Decl. at Ex. 7 (http://www.tribune.com/about/bios/michaels.html). He was elected to Tribune's board of directors in December 2009. *Id.* Before joining Tribune, Michaels previously worked at Jacor Communications, Inc. with Zell. *Id.* Finally, Zell appointed him to Tribune's board. *See* Glenn Decl. at Ex. 5.

12. Director Brian L. Greenspun, a friend of Zell's, was appointed to Tribune's Board by Zell in December 2007. *See* Glenn Decl. at Ex. 5. Greenspun reportedly is a co-investor with Zell in Tribune. *See* Glenn Decl. at Ex. 6.

13. Zell appointed Director Wilderotter in December 2007. *See* Glenn Decl. at Ex. 5. She has also sat on the boards of three other Zell firms. *See* Glenn Decl. at Ex. 8 (http://www.beachwoodreporter.com/people_places_things/the_sam_zell_papers.php). Director Wood was appointed to Tribune's board by Zell in December 2007. *See* Glenn Decl. at Ex. 5. He previously was the President of Jacor Communications, Inc. *See* Glenn Decl. at Ex. 9 (http://www.tribune.com/about/bios/wood.html). Director Berg was appointed to Tribune's board by Zell in December 2007. *See* Glenn Decl. at Ex. 5. Director Shapiro was appointed to Tribune's board by Zell in 2008. *See* Glenn Decl. at Ex. 5. He is also a trustee of Equity Residential, another company controlled by Zell. *See* Glenn Decl. at Ex. 10 (http://www.earthtimes.org/articles/show/equity-residential-appoints-mark-shapiro-to-board-of-trustees,1137916.shtml).

14. Chief Operating Officer Gerald Spector joined Tribune in 2007 from Equity Residential, a Zell-controlled company, where he was Vice Chairman. *See* Glenn Decl. at Ex. 11 (http://www.tribune.com/about/bios/spector.html). He is a longtime Zell associate.

15. Chief Financial Officer Chandler Bigelow was a key player at Tribune during the LBO. *See* Glenn Decl. at Ex. 12 (http://www.tribune.com/about/bios/bigelow.html).

16. Chief Investment Officer Nils Larsen is a Managing Director at EGI and worked extensively with Zell to orchestrate the LBO. *See* Glenn Decl. at Ex. 13 (http://people.forbes.com/profile/nils-e-larsen/4485 and http://www.tribune.com/pressroom/releases/2009/12102009.html).

17. Executive Vice President and General Counsel Donald J. Liebentritt is a longtime Zell associate and is currently also a senior advisor with EGI. *See* Glenn Decl. at Ex. 14 (http://www.tribune.com/about/bios/liebentritt.html).

18. Accordingly, all ten current directors of Tribune and Tribune's top five officers are all so closely related to Zell that it is highly unlikely that any of them would authorize the commencement of an adversary proceeding that would attack the LBO orchestrated by Zell.

**B. The Debtors' Retention of Conflicted Counsel Proves That They Have Abdicated Authority To Commence LBO-Related Litigation.**

19. The Committee's investigation of the LBO is no secret. Given the conflicts impairing the Debtors and their professionals, the Debtors have acted solely as a mediator -- the Debtors have referred to themselves as an "honest broker" -- for a possible settlement between the LBO Lenders and creditors that has been unsuccessful.[1] As the "honest broker," the Debtors clearly have no ability and have stated no desire to commence and prosecute the Derivative Claims themselves. The Debtors cannot assume the role of both mediator and plaintiff.

20. Throughout the Committee's investigation, the Debtors have played the role of a co-defendant rather than a potential plaintiff. Debtors produced documents and witnesses. At depositions of bank witnesses and other third parties, the Debtors did not ask any questions at all, leaving all the investigation to the Committee and Law Debenture. Notably, Debtors objected to questions asked by the Committee to witnesses, including bank witnesses. These are hardly the actions of a future plaintiff.

---

[1] *See* Glenn Decl. at Ex. 15 (Transcript of Hearing Before Honorable Kevin J. Carey United States Bankruptcy Court Chief Judge, *In re Tribune Co.*, 08-13141-KJC, dated December 1, 2009), at 68.

21. Moreover, the Debtors' counsel has represented to the Court that the Bank Defendants will control a reorganized Tribune.[2] The fact remains, however, that if the claims proposed by the Committee are successful, the Bank Defendants will not control a reorganized Tribune. So, not only are the presumed plaintiffs acting solely as mediators, they are also acting as mediators that have assumed the ultimate outcome of their mediation.

22. The Debtors' retention of conflicted counsel proves that the Debtors cannot and will not commence any action related to the LBO. Although the Debtors retained a number of law firms, their primary bankruptcy counsel is Sidley Austin LLP ("Sidley") (assisted by Delaware co-counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A.). The Debtors also retained Jenner & Block LLP ("Jenner") as "special counsel for certain litigation matters" pursuant to Section 327(e) of the Bankruptcy Code. Sidley currently represents JPM, Merrill, Citigroup, Morgan Stanley and Bank of America. (Dkt. No. 139) Jenner's current clients include Zell and two Zell-related entities -- whom they represent "in connection with an investment made to the Debtors" -- as well as Merrill and Chase Insurance (which Jenner submits is "related" to JPM). (Dkt. No. 142)

23. The Debtors have failed to pursue litigation against the Bank Defendants for over a year since these cases were filed, they have hired conflicted counsel and they have limited their role to mediating the dispute. Accordingly, because the Debtors have completely abdicated the responsibility to act as zealous advocates for the LBO claims, the Committee had no obligation to issue any demand to the Debtors as a predicate for standing. *The Official Committee of*

---

2 *See* Glenn Decl. at Ex. 15, at 6-7 ("We have a firm, highly developed view of what the plan will look like. A de-leveraged, reorganized Tribune will emerge with modest debt under that plan. It's equity will be owned by the banks and by other in-the-money funded debt creditors").

*Unsecured Creditors, on Behalf of Valley Media, Inc. v. Cablevisions Sys. Corp. (In re Valley Media, Inc.)*, 2003 Bankr. LEXIS 940 (Bankr. D. Del. 2003).

**C. A Cost-Benefit Analysis Supports Granting Standing to the Committee.**

24. Courts also consider the potential benefits and costs to the estate of derivative litigation, including the likelihood of recovery in the proposed litigation and whether the costs of pursuing the litigation are likely to outweigh the recovery:

> [I]f the bankruptcy court finds that the claim will likely benefit the estate based on a cost-benefit analysis, then the creditor has raised a rebuttable presumption that the debtor-in-possession's failure to bring that claim is unjustified.

*Canadian Pac. Forest Prods., Ltd., v. J.D. Irving, Ltd, (In re Gibson Group, Inc),* 66 F.3d at 1442; *see also In re National Forge Co.*, 326 B.R. at 548 ("In determining whether a debtor's refusal is unjustified, courts generally perform a cost-benefit analysis of the claims to determine . . . whether, in light of the probable costs of litigation, the claims would likely benefit the estate if pursued."); *In re Adelphia,* 330 B.R. at 386 (noting a Court need only assure itself that the proposed litigation is not a "hopeless fling" and that the "prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost").

25. The claims to be asserted by the Committee will likely yield substantial value for the benefit of unsecured creditors. The costs are dwarfed by the billions of dollars of potential recoveries through the avoidance of claims, liens and cash payments of interest and principal. *In re Adelphia,* 330 B.R. at 384 ("the cost of prosecution will be relatively modest (by the standards of the amount at stake)"). Accordingly, as the *Adelphia* court noted in similar circumstances, the determination of the benefit of the Committee's proposed litigation is, "to be blunt about it, an easy one." *Id.* at 384.

## II. The Claims Alleged By The Committee Are Colorable.

26. To establish a colorable claim, a committee need only provide minimal evidentiary basis for its allegations; the court need not conduct a mini-trial to determine whether such a claim exists. *See e.g., Adelphia Commc'ns Corp.,* 330 B.R. at 369 (noting that the Court need only be satisfied that there is "some factual support" for the claims); *Official Comm. of Unsecured Creditors ex rel. Corell Steel v. Fishbein & Co., RC. (In re Coral Steel),* No. Civ. A. 91-4919, 1992 WL 196768 at *10 n.3 (E.D. Pa. Aug. 10, 1992) (a committee seeking to prosecute estate claims need only demonstrate that the claims are colorable — that is, "potentially meritorious"); *In re America's Hobby Ctr,* 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (standing to sue should be denied only if claims are "facially defective"). The Motion and the attached Complaint and Objection to Claim describes in detail that there exists overwhelming evidentiary support to demonstrate that the Bank Defendants orchestrated Tribune's LBO despite knowing that it would render the Company insolvent, all while impartial Wall Street observers not involved in the transaction stated that the LBO would render Tribune insolvent.

### A. The Bank Defendants Orchestrated The LBO Despite Knowing That It Would Render the Company Insolvent.

27. 



[redacted]

**B. The Projections Were Unreasonable.**

28. [redacted]

29. It is indisputable that the industry had been (and continues to be) in secular decline. For example for the period three years prior to the LBO transaction, the industry experienced significant declines in newspaper circulation volume, readership, advertising market share and public market valuations (while the S&P 500 increased approximately 20%). [redacted]

30. [redacted]

31. The belief that Tribune's financials were unreasonable and that the LBO would render Tribune insolvent was shared by numerous market participants prior to the consummation of the LBO. [redacted]

[redacted]

## C. The LBO Constituted A Single Integrated Transaction.

32. In its opposition to the Motion, JPM argues that "the June 2007 Tender Offer and the December 2007 Merger were two independent transactions." *See* J.P. Morgan Chase Bank, N.A.'s Response to Motion of the Official Committee of Unsecured Creditors For Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute and Settle Claims and Counterclaims of the Debtors' Estates (Dkt. No. 3363), at p. 5. While the Zell LBO was structured to occur in two phases over the course of 7 to 8 months, it was a single integrated transaction. [redacted]

33. [redacted]

34. The key transactional documents that were drafted, approved and executed by the Bank Defendants, Zell and Tribune during Phase I contain provisions showing the parties' intent to treat the two Phases of the transaction as a single transaction. [redacted]

35. Moreover, the First Step and Second Step Commitment Letters (collectively, "Commitment Letters") – both executed as part of Phase I – formally bound the signatories to provide the requisite financing for Phase I and Phase II of the LBO. [redacted]

36. [redacted]



37. The end goal of the Zell LBO was to take Tribune private as an S-Corp entity owned entirely by an ESOP. The creation and funding of the ESOP in Phase I was a critical component to achieving the Zell LBO envisioned by the parties whereby Tribune and Zell would receive certain tax benefits associated with the ESOP structure.

These ESOP-related tax savings would only be realized upon completion of Phase II and again demonstrate that Phases I and II as two critical components of a single integrated transaction.

**CONCLUSION**

WHEREFORE, Law Debenture respectfully submits that the Court should grant the Standing Motion and grant such other and further relief as the Court deems just and proper.

DATED: Wilmington, Delaware
February 16, 2010

Respectfully submitted,

Garvan F. McDaniel
Bifferato Gentilotti
800 N. King St., Plaza Level
Wilmington, DE 19801
(302) 429-1900

– and –

David S. Rosner
Andrew K. Glenn
Sheron Korpus

Christine A. Montenegro
Matthew B. Stein
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Co-Counsel for Law Debenture Trust
Company of New York*