# EXHIBIT 15

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        .    Case No. 08-13141-KJC
                              .
                              .
TRIBUNE COMPANY,              .
                              .    824 North Market Street
                              .    Wilmington, DE 19801
                              .
          Debtor.             .    December 1, 2009
. . . . . . . . . . . . .     .    10:04 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

APPEARANCES:

For the Debtor:            Sidley Austin, LLP
                           By:  BRYAN KRAKAUER, ESQ.
                                JAMES F. CONLAN, ESQ.
                                JANET E. HENDERSON, ESQ.
                                JAMES DUCAYET, ESQ.
                           One South Dearborn Street
                           Chicago, IL 60603

                           Cole, Schotz, Meisel, Forman &
                            Leonard, P.A.
                           By:  NORMAN L. PERNICK, ESQ.
                           500 Delaware Avenue
                           Wilmington, DE  19801


Audio Operator:            Al Lugano


Proceedings recorded by electronic sound recording, transcript
produced by transcription service

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For the Committee: | Landis Rath & Cobb, LLP<br>By:  ADAM G. LANDIS, ESQ.<br>919 Market Street<br>Wilmington, DE  19801 |
| | Chadbourne & Parke LLP<br>By:  HOWARD SEIFE, ESQ.<br>     DOUGLAS E. DEUTSCH, ESQ.<br>30 Rockefeller Plaza<br>New York, NY  10112 |
| For the United States<br>Department of Justice: | Office of the U.S. Trustee<br>By:  JOSEPH J. McMAHON, ESQ.<br>844 King Street<br>Wilmington, DE 19801 |
| For Law Debenture Trust<br>Company of New York: | Bifferato, Gentilotti<br>By:  GARVAN McDANIEL, ESQ.<br>800 N. King Street<br>Wilmington, DE  19801 |
| For Credit Agreement<br>Lenders: | Hennigan, Bennett & Dorman, LLP<br>By:  BRUCE BENNETT, ESQ.<br>     JAMES JOHNSTON, ESQ.<br>865 South Figueroa Street<br>Los Angeles, CA  90017 |
| | Young Conaway Stargatt & Taylor,<br> LLP<br>By:  M. BLAKE CLEARY, ESQ.<br>The Brandywine Building<br>1000 West Street<br>17th Floor<br>P.O. Box 391<br>Wilmington, DE  19899 |
| For Perry Capital: | Perry Capital<br>By:  RICHARD PAIGE<br>     (telephonic appearance) |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For the Debtor:            Tribune Company
                           By:  CHANDLER BIGELOW, ESQ.
                                (telephonic appearance)
                                DAVE ELDERSVELD, ESQ.
                                DONALD LEIBENTRITT, ESQ.

                           Sidley Austin, LLP
                           (telephonic appearances)
                           By:  CANDICE KLINE, ESQ.
                                JILLIAN McCLELLAND, ESQ.
                                KENNETH P. KANSA, ESQ.
                                JESSICA BOELTER, ESQ.
                           One South Dearborn Street
                           Chicago, IL  60603

For J.P. Morgan Chase:     Davis, Polk & Wardell
                           By:  DONALD BERNSTEIN, ESQ.
                                DENNIS GLAZER, ESQ.
                                SHARON KATZ, ESQ.
                           450 Lexington Avenue
                           New York, NY  10022

                           Richards, Layton & Finger, P.A.
                           By:  ROBERT J. STEARN, JR., ESQ.
                           One Rodney Square
                           920 N. King Street
                           P.O. Box 551
                           Wilmington, DE 19899

For McCormick Tribune      Ciardi, Ciardi & Astin, P.C.
Foundation:                By:  DANIEL K. ASTIN, ESQ.
                           919 Market Street
                           Suite 700
                           Wilmington, DE  19801

For Centerbridge Credit    Akin Gump Strauss Hauer &
Advisors:                      Feld L.L.P.
                           By:  DANIEL H. GOLDEN, ESQ.
                           590 Madison Avenue
                           New York, NY  10022-2524

                           Pachulski, Stang, Ziehl & Jones, LLP
                           By:  LAURA DAVIS JONES, ESQ.
                           919 North Market Street
                           17th Floor
                           P.O. Box 8705
                           Wilmington, DE  19899

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Law Debenture: | Kasowitz, Benson, Torres & Friedman LLP<br>By:  DAVID ROSNER, ESQ.<br>        MATTHEW STEIN, ESQ.<br>1633 Broadway<br>New York, NY  10019 |
| For Deutsche Bank Trust Company: | McCarter & English, LLP<br>By:  L. KATHARINE MAYER, ESQ.<br>        DAVID ADLER, ESQ.<br>Mellon Bank Center<br>919 Market Street<br>Suite 1800<br>Wilmington, DE 19899 |
| For the Committee: | Zuckerman Spaeder LLP<br>By:  THOMAS G. MACAULEY, ESQ.<br>        GRAEME BUSH, ESQ.<br>1201 Connecticut Avenue, N.W.<br>Suite 1200<br>Washington, D.C.  20036 |
| For Neil Plaintiffs: | Bifferato, LLC<br>By:  THOMAS F. DRISCOLL III, ESQ.<br>800 N. King Street, First Floor<br>Wilmington, DE  19801 |
| For Merrill Lynch: | Potter, Anderson & Corroon, LLP<br>By: LAURIE SELBER SILVERSTEIN, ESQ.<br>Hercules Plaza<br>1313 North Market Street<br>Wilmington, DE 19801<br><br>Kaye Scholer, LLP<br>By:  MADLYN GLEICH PRIMOFF, ESQ.<br>        JOSEPH M. DRAYTON, ESQ.<br>425 Park Avenue<br>New York, NY  10022-3598 |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES:

For Phillip Bentley:        Kramer, Levin, Naftalis &
                             Frankel, LLP
                            By:  PHILLIP BENTLEY, ESQ.
                            919 Third Avenue
                            New York, NY  10022

For Katherine Gilman:       Kramer, Levin, Naftalis &
                             Frankel, LLP
                            By:  KATHERINE GILMAN, ESQ.
                            919 Third Avenue
                            New York, NY  10022

For Hain Capital           Hain Capital Group, LLC
Group, LLC:                By:  BRIAN L. BRAGER

For JPMorgan Chase:        JPMorgan Chase
                           By:  KEVIN C. KELLEY

For Sandelman Partners     Sandelman Partners Multi-Strategy
Multi-Strategy:            By:  JOSEPH LAMPORT

For Dennis A. Prieto:      Aurelius Capital Management
                           By:  DENNIS A. PRIETO

For Seneca Capital:        Seneca Capital
                           By:  USMAN TAHHIR

For Carval Investors:      Carval Investors
                           By:  TECK WONG

**J&J COURT TRANSCRIBERS, INC.**

1          THE CLERK:  All rise.  Be seated.

2          THE COURT:  Good morning, everyone.

3          ALL:  Good morning, Your Honor.

4          MR. CONLAN:  Good morning, Your Honor.  James Conlan

5   on behalf of the debtor.  Mr. Krakauer, my partner, and I will

6   be tag teaming today.

7          Your Honor, before we begin today, before we start

8   with the agenda, I'd like to provide some brief context.  The

9   motions today and, frankly, because it's an omnibus and since

10  we're at that stage of the case, I would like to again briefly

11  provide some context.

12         THE COURT:  Go ahead.

13         MR. CONLAN:  I'd like to say in order to make an

14  omelette, you have to break some eggs, so I'm going to break a

15  few eggs here.

16         We have a firm, highly developed view of what the

17  plan will look like.  A de-leveraged, reorganized Tribune will

18  emerge with modest debt under that plan.  It's equity will be

19  owned by the banks and by other in-the-money funded debt

20  creditors.  The trade will be taken care of.  That's not in

21  serious dispute.  The plan will -- that we will file will

22  provide for global resolution.

23         The big issue, and it's a very big one, is what

24  percentage of the stock of the reorganized, de-leveraged

25  Tribune will be owned by the banks under the plan and which

**J&J COURT TRANSCRIBERS, INC.**

1  part will be owned by the in-the-money funded debt creditors.

2  We have been focused like a laser on that issue since the very

3  beginning of this case.  While we work through a variety of

4  other issues, which we'll discuss later, that issue has been

5  the core issue for a long time.  We've been positioning with

6  respect to that issue, analyzing with respect to that issue,

7  and now attempting to drive to consensus on that issue.

8         We are close to the place where -- and I say close --

9  close to the place where there is -- has been enough informal

10  discovery to allow a meaningful bid ask to develop.  We some

11  more, but we're close.  Some would say we have enough already.

12  Others would say we need a little more, but we're close.

13         If we get stuck in that negotiation, and we may very

14  well get stuck in that negotiation, we're going to unstick it

15  with litigation.  That litigation, which we will tee up, may be

16  -- may be in context of a cram down plan supported by the

17  banks, and it may not be.  It may be separate and apart from an

18  advance of confirmation of a plan, and among the things that we

19  working with the Committee will focus upon in deciding which

20  way that litigation is teed up is, in part, who's being

21  unreasonable in those negotiations.

22         If the banks are being reasonable and the public

23  debtor not being reasonable, everyone can figure out how we'll

24  approach that issue.  If the reverse is the case, everyone can

25  figure out how we'll approach that issue.  That creative

**J&J COURT TRANSCRIBERS, INC.**

1    tension is precisely what we have meant to cause.

2            That's the background for everything you will hear

3    today, and, frankly, it's the background of everything that

4    matters at this stage of this case.  Not that everything we've

5    done to date, which we're very proud of, hasn't mattered.  It

6    has.  But it's always been in context of that, who owns the

7    equity of the reorganized, de-leveraged Tribune and in what

8    percentage.  That's it in terms of context.  And if Your Honor

9    wishes, we can provide that kind of context each month at the

10   omnibus hearing if warranted, quite frankly, and even more

11   frequently if Your Honor would like.

12           With respect to the items on the agenda today, this

13   is a matter of housekeeping.  Items 1 through 12 and Item 15

14   have been adjourned, resolved, or orders have been entered.  So

15   that all that remains are Item 13 -- Items 13, 14, and 16.

16           We think that the best way to proceed is to have the

17   exclusivity motion go first with the status conference

18   regarding discovery after that and the so-called fee motion

19   after, because we think, obviously, the last two items that we

20   proposed will make more sense in the wake of the context that

21   will be provided by the exclusivity discussion, but you're the

22   Judge.

23           THE COURT:  Does anyone have any objection to

24   proceeding in that fashion?

25                    (No verbal response)


**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  I hear no response.  Let's do that then.

2        MR. CONLAN:  Very good.  Your Honor, I am not going

3   to read or even follow in a very tight fashion what's already

4   in our exclusivity motion.  I'll hit the high points, but,

5   obviously, everybody's read it.  Your Honor is very familiar

6   with what we say in that motion.

7        We ask for an extension of so-called front-end

8   exclusivity to March 31.  We ask for an extension of back-end

9   exclusivity to May 31.  We are quite cognizant of the outer

10  limit of our exclusivity in these cases.  This is our third

11  request.

12       Just to run the bases here, as Your Honor knows,

13  keenly aware, and it's in our motion, we have stabilized the

14  business.  Hats off to management as well as some stabilization

15  in what was a very sick economy, although it is getting better,

16  we hope.  We have sold the Cubs.  That was a point of big

17  focus.  We were somewhat concerned about the damage of these

18  proceedings to that very sensitive franchise.  That's been

19  resolved.

20       We have developed a multi-year business plan, and we

21  have shared that multi-year business plan with major

22  constituencies and have a pretty firm view on what the

23  enterprise value of this reorganized, de-leveraged company

24  would be.  We have a highly developed sense of the -- what I'll

25  broadly describe as the operational, financial, and legal

**J&J COURT TRANSCRIBERS, INC.**

analyses that underpin the negotiation that I talked about,

which in reality has already begun.

In addition to issues relating to the so-called ESOP

transaction, the tax issues, the regulatory issues, the FCC

issues are all issues that we have ground down to a very fine

point, and all of the extensions of exclusivity that we've

received have aided in that regard, Your Honor, and we thank

you for that.

We now are at a place where we are actively engaging

with respect to the review of the so-called ESOP transaction.

That doesn't mean we just started.  We started at the very

beginning of the case, but it all comes together in a

framework, frankly, as the parties position and the issues

develop.  Did we tell everybody that was our approach?  No.

That's not how a negotiation works.  That's not how a debtor

leads a company through a process.  Your Honor knows that very,

very well.

But we are at the stage where we are on top of that

issue now.  We know who we think is in the money and who's not.

We have a pretty highly developed view of the legal issues and

the likelihood of success and failure on each of those issues,

and we think we have a pretty good idea of where a consensual

resolution ought to come out.  We just don't know if others

will agree, but we're going to make every effort we can to

drive them to that place in a sensible, intelligent, and fully

1  informed way.

2        Over 30 entities, as you've seen in the motion have

3  been involved in this so-called informal discovery process,

4  some more than others, and when we come to the place of the

5  status conference today, our objective will be, with your help,

6  to begin to ham in people with respect to the remaining items

7  that could be necessary to close the gap we'll call it --

8  generously call it with respect to the bid ask between the

9  banks, on the one hand, and the in-the-money funded debt

10 creditors, other funded debt creditors.

11        As I said in my contextual remarks at the beginning,

12 all of the moving parts -- I shouldn't say all.  Ninety-nine

13 percent of the moving parts, the infrastructure, the machinery

14 of a plan of reorganization are highly developed.  We know that

15 a -- in our view, a reorganized, de-leveraged Tribune will

16 emerge, just to repeat.  That it will have modest debt.  It

17 can't handle significant debt given the overall environment.

18 The equity of the reorganized, de-leveraged company will be

19 owned by the banks and by the in-the-money funded debt

20 creditors.

21        I'm going to refer to that today as the two big

22 blanks, but make no mistake the vast majority of the plan and

23 its infrastructure are well in hand in filling in those blanks.

24 By agreement or by litigation is what we mean to do, and we're

25 not leaving this courtroom until we fill those two blanks in by

**J&J COURT TRANSCRIBERS, INC.**

1  agreement or by litigation.  We want global resolution, and we

2  want to achieve it here.

3         Some of this I'll save with respect to rebuttal, if

4  you will, in responding to the objections that have been filed,

5  but one preview that I'd like to provide the Court now is that

6  -- and I alluded to this again at the beginning.  Anybody who

7  thinks -- and I think the public debt holders may have thought

8  this initially.  Anybody who thinks that if the negotiation

9  does not result in those two numbers being filled in by

10 agreement, that is a plan where two-thirds an amount, more than

11 one half the number of the banks will accept it, and where two-

12 thirds an amount, more than one half the number of the in-the-

13 money other funded debt creditors who accept it.  Anybody who

14 thinks that if that negotiation fails, it means we're going to

15 file the bank's plan and cram it down on the public debt is

16 mistaken.  That's not what we meant to say or to indicate in

17 our motion.

18        Conversely, anybody who thinks that if those

19 negotiations fail, because the public debt is being

20 unreasonable and the banks are being reasonable, that we won't

21 file a plan that seeks to cram down the public debt is also

22 mistaken.  We reserve our rights to do that.  We want to

23 utilize this process to drive consensus, and if we can't, if we

24 are stuck -- for example, if the standing issue, which is

25 referred to in Mr. Bennett's pleading, is a gating item and the

1    parties just can't get over it, then we will quickly -- we

2    won't delay.  We will quickly come to this Court and we will

3    tee up a resolution of that issue.

4         It won't be in a  subsidiary-only plan, I can tell

5    you that, because that's not global resolution.  But it may be

6    in a global cram down plan if the banks are being reasonable,

7    or it may be in advance of and apart from a global -- or a plan

8    of reorganization as well.  That, quite frankly, Your Honor, is

9    where we are in these cases.  We are at a critical juncture.

10        We are very satisfied with the way that these cases

11   have gone to date, knowing full well that the issue I just

12   described is what ultimately drives the ownership of the

13   reorganized, de-leveraged Tribune companies, and the parties

14   have all been, frankly, sensible, reasonable.  Everybody's a

15   little litigious.  Some -- there certainly are factions that

16   have developed, including among our banks.  There are -- but

17   they also are sensible and reasonable to deal with most of the

18   time.  I like to think we are as well.

19        Same is true with the public debt.  And the Committee

20   has been very helpful in the process.  And in everything I just

21   described, I referred to the debtor, only because we represent

22   the debtor, but we regard the Committee as very much our

23   partner in this process, and that we will be working closely

24   with them in attempting to drive a consensual resolution, and

25   if we are stuck those efforts to unstick it through a

**J&J COURT TRANSCRIBERS, INC.**

1  litigation mechanism that makes sense and that takes into

2  account how the parties have conducted themselves and what the

3  issues are that have stopped them in those negotiations.

4        I'll stop there and ask Your Honor is you have any

5  questions before I go on and --

6        THE COURT:  Well, my first question is do you intend

7  to present any evidence in support of your motion?

8        MR. CONLAN:  Your Honor, we didn't come today

9  prepared to present evidence, but we can, if Your Honor

10 believes it's necessary.

11       THE COURT:  Well, I'll hear from the objectors.  I've

12 read the objections.  You know, they range from four months is

13 too long to we want to do a subsidiary plan to any extension

14 ought to be conditioned on requiring the focus on resolving the

15 LBO issue consensually.  I didn't gather, frankly, there were

16 any factual disputes from the issues raised by the objectors,

17 but matters of I guess we'd call them largely strategy.  And if

18 that's the case, I won't necessarily require testimony in

19 support of the motion to answer your question.  Let me hear

20 from others.

21       MR. CONLAN:  Very well, Your Honor.

22       MR. SEIFE:  Good morning, Your Honor.  Howard Seife

23 from Chadbourne & Parke for the Official Committee of Unsecured

24 Creditors.  And, as you know from the Committee's submission,

25 the Committee is supportive of the debtor's request for

**J&J COURT TRANSCRIBERS, INC.**

1  extension of exclusivity by the four months and the additional

2  two months for solicitation.

3       Debtor's counsel has set forth what has been

4  accomplished in the case, and we think there have been very

5  significant accomplishments to date including the disposition

6  of the Cubs, improvement of cash flow, and, certainly, the

7  production of a business plan.  But I think counsel for the

8  debtor was quite frank that the elephant in the room remains,

9  and now there's the resolution of any potential claims that

10 might have arisen from the LBO ESOP transaction.

11       And from the start of the case it's been the

12 Committee's mandate to its professionals to conduct an

13 investigation of that transaction and see if there are

14 potential causes of action which should be pursued by the

15 estate or by a designee on behalf of the creditors, and that's

16 been what we have been focusing on from the outset.  And we

17 have undertaken that through a review of the publicly available

18 information, obviously, researched the issues involved, and

19 also the commencement of an extensive discovery program under

20 Rule 2004, and under the local rules that is a somewhat

21 cooperative process.

22       And it's been very fruitful in this case, and in

23 almost every -- almost every party that we have contacted has

24 cooperated in terms of the production of documents, and that

25 process is ongoing.  And to date, we've received I think over

**J&J COURT TRANSCRIBERS, INC.**

1    2.3 million pages of documents from the various parties.  Those

2    parties have consisted of the lenders, the financial advisors

3    to the transaction, shareholders, members of the boards of

4    directors, and the issuers of solvency opinions.

5         So it's really run the gamut, and as I said, that has

6    been underway since March, and our firm, in conjunction with

7    special counsel that was brought into the case.  Graeme Bush of

8    the Zuckerman Spaeder firm has been working very closely and in

9    conjunction with lead Committee counsel.

10        From the start, the Committee determined that we

11   would approach this case somewhat differently than other large

12   Chapter 11s which had LBO fraudulent conveyance issues.  I'm

13   sure Your Honor is aware in some of those other cases

14   litigation was initiated from day one.  We, the Committee,

15   determined that that was not the approach to take in this case.

16   Rather than shoot first and talk later, we decided to undertake

17   the investigation, become knowledgeable and then engage in

18   substantive discussions with the various parties to see if a

19   consensual resolution could be reached.

20        And we are now approaching the knowledge curve where

21   the Committee is in the position, and we have told other

22   parties that in January we will be in the position of being

23   sufficiently knowledgeable and up to speed and having gone far

24   enough along in the discovery process to sit down and have

25   those substantive negotiations.

**J&J COURT TRANSCRIBERS, INC.**

1          That is not to say we have not had preliminary

2   meetings with the various parties including the debtors and the

3   lenders.   Those have been conducted on several occasions.

4   They've been very useful in terms of sharing legal theories,

5   defenses, factual issues that will have to be dealt with

6   including the gating solvency issues at the time of the

7   transactions.   The parties shared their views on solvency and

8   some of the factors that are going to be critical to that

9   determination.   So that process has already begun, and, as I

10  said, I think we're now teeing up for the real meat and

11  potatoes of negotiations in January.

12          The discovery is continuing.   There are depositions

13  which are scheduled for December.   Hopefully, those will be

14  completed in time before the negotiation session.   We will talk

15  in the status conference following this particular motion

16  regarding one or two problems that have come up in the

17  discovery process, and the possible need for Court assistance

18  in that regard.

19          Given the framework that we are in and this process

20  that has been commenced from the beginning to try to come to a

21  consensual resolution and given where we are in the discovery

22  process, we think it is appropriate to have an extension of

23  four months.   When one looks at the calendar and starts in

24  January with substantive negotiations which I'm sure will take

25  a period of weeks, and if they do come to a resolution, it will

1  take time to develop the final elements of a plan.  I think it

2  is a little more than plugging in the two gaps, the two blanks

3  alluded to by debtor's counsel, because settlements and

4  negotiations can develop complex resolutions of issues.  So I

5  think the four-month period that is being sought could be one

6  that is quite valuable and fits well into the framework of

7  where we are in the case today.

8         As to the suggestion by the credit agreement lender

9  group, that they have a magical plan for the subsidiaries which

10 will obviate the need for a resolution of the fraudulent

11 conveyance claims regarding the upstream guarantees, I would

12 suggest, Your Honor, that that is just a clever technical

13 attempt to try to avoid a real issue here, and the reliance on

14 dicta in a Southern District of New York case, the _Adelphia_

15 case, is not particularly applicable to our situation where we

16 do have live creditors at the subsidiaries that have

17 substantial claims that do -- would benefit from a potential

18 fraudulent conveyance action, number one.

19        Number two, I don't think _Adelphia_ is an accurate

20 statement of the law, particularly in a situation here where we

21 would, if there is litigation, be proceeding under Section 548

22 to set aside the guaranties, and 548 does not have a benefit to

23 the estate provision in it unlike Section 550.  So I don't

24 think this is the forum to get into the substantive discussion

25 of potential defenses to a fraudulent conveyance action.   I

1  think suffice it to say that any such plan that might be filed

2  would result in a massive litigation, and I think it's fair to

3  say the public debt holders and their representatives and

4  perhaps as well the Committee would not sit aside and let such

5  a plan go through and have it provide a release for the lenders

6  in the case under the guise of a plan.

7       So all in all, Your Honor, as I said, the Committee

8  is supportive of the motion.  We think it fits well in the

9  framework to give the parties sufficient time to see if a

10 consensual resolution can be met.  If not, you've heard from

11 debtor's counsel that they're prepared to go forward

12 potentially with a plan that one side or the other is not happy

13 with, but I think it has been the Committee's goal to avoid

14 massive litigation that we've seen in other cases to see if a

15 consensual resolution can be reached, and I think we need the

16 appropriate time and structure to allow that process to go

17 forward.

18       THE COURT:  Thank you.

19       MR. ROSNER:  Thank you, Your Honor.  David Rosner of

20 Kasowitz, Benson, Torres & Friedman.  We represent Law

21 Debenture, who is the Indenture Trustee for the 6.61 percent, 7

22 and a quarter percent indentures that were the pre-LBO debt

23 along with a bunch of other pre-LBO debt that were left --

24 about $2.4 billion of debt that was left behind and are left,

25 you know, in this case I guess fighting for their recovery on

**J&J COURT TRANSCRIBERS, INC.**

1 the basis of the LBO.

2          I also would like to, if you don't mind, give some

3 context.  I have not been before Your Honor before, and I would

4 like to give a viewpoint from our perspective of the case.  I

5 have certainly appreciated Mr. Conlan's remarks, and I listened

6 to them.  I was somewhat discomforted by what could be view and

7 I hope I shouldn't view as somewhat of a predisposition of

8 certain issues that are fairly raised by the LBO that put this

9 company into bankruptcy, you know, just a year ago.

10          THE COURT:  I didn't gather any predisposition.  I

11 gathered from his comments a resoluteness about moving the

12 process through.

13          MR. ROSNER:  And the resoluteness that we share, and

14 there's -- and I think that all the parties share.  I guess

15 what my concern and I just want to point out to the Court that

16 a view that the banks -- call them the banks or call them the

17 hedge funds -- are going to end up with as the new owners of

18 the company is taking a view somewhat on the litigation,

19 because that is taking a view that the -- that they will remain

20 post-LBO remedy with claims such that those claims would be

21 able to receive equity in a reorganized Tribune Company, and

22 that would be a principal issue in the case.

23          And I take it -- and I'm just going to state it,

24 because I do think that this was Mr. Conlan's point -- that he

25 said there will be -- there may be litigation if parties can't

1 reach a reasonable agreement, and that's often the case that

2 litigation succeeds at failure of negotiation, but that the

3 litigation would be predicated upon who's being the most

4 reasonable.  And I take it from that what he means is who is

5 being -- how the various parties, and in particular, the debtor

6 is looking at reasonableness from the perspective of what the

7 parties rights, remedies, and the claims actually are not who

8 is sitting in a bid and ask negotiation and is giving up more

9 than maybe another side is that is really looking at what the

10 parties' rights and remedies are, because I think that's the

11 basis of any fair negotiation.

12        And, importantly, in that respect I think we all have

13 to take into account that these are not -- we're not just

14 simply talking about fraudulent conveyance claims.  You know,

15 traditional -- let's say, you know, in the Third Circuit very

16 well developed fraudulent conveyance claims that arise out of a

17 leverage buyout, but, in addition, the breach of fiduciary duty

18 claims that can affect, you know, current directors as well as

19 current managers, the aiding and abetting type claims, and then

20 recovery claims for discouragement of both -- of interest and

21 advisory fees that were paid out of the Tribune Company.  So

22 there's a mix here of claims that I think is necessary for

23 people to understand.

24        I think it is important in understanding both the

25 exclusivity motion and the other matters that are going to be

1  before Your Honor really the substance of the leverage buyout,

2  because that really is the heart of this case.  The selling of

3  the Cubs was good and maybe will bring more fortune to the Cubs

4  franchise and new ownership, but that was not the --

5        THE COURT:  I've read that new ownership has resolved

6  to take this franchise to the World Series.

7        MR. ROSNER:  I assume that means there will be no

8  goats, and it has been, what is it, 104 years, I believe, since

9  the last victor -- the last World Series.  But, in any event,

10  we somewhat wish them luck, and being from New York not too

11  much luck.

12        THE COURT:  Oh.

13        MR. ROSNER:  In April --

14        THE COURT:  As a Philadelphia Phillies fan, I share

15  that view.

16                    (Laughter)

17        MR. ROSNER:  In April of 2007 Tribune agreed to

18  undertake -- and the funding banks and now the hedge funds as

19  successors, they agreed -- they funded this massive amount of

20  debt to permit Mr. Zell to acquire control of Tribune.  That is

21  the LBO that drove this company into bankruptcy.

22        I think the numbers -- the staggering numbers are

23  relevant to not only the proceedings today but to the substance

24  of what this entire case is about.  Eleven and a half billion

25  dollars in debt was brought on to the company, which added to

the existing debt, put $14 billion of leverage on to this

newspaper and entertainment company -- newspaper being I

believe 72 percent of the business and entertainment 28 percent

-- knowing where the newspaper business was going and causing

the rapid decline of both this company as it has other

companies.

The LBO here was the sort that we all saw in 2007.

Some of us, myself included, would say it was the type of

transaction that helped to bring down our economy, because it

was a virtually no-money-down LBO, kind of like we're seeing in

the Lyondell in New York, that we saw in other instances

perhaps like Tusa.  But no money down in which equity sponsors

would put in 2 -- I think this I think slightly less than 2.5

percent of the total capitalization and then putting on 98 to

97 percent leverage and acquiring no additional assets unlike a

Lyondell.  No commercial purpose other than to pay out $8.3

billion to shareholders, absolutely no benefit to the Tribune

companies and to put Mr. Zell in charge of the company where he

remains today.  You know, I've heard that he has at times, you

know, stated that he's -- this is the biggest loss he's ever

suffered, but he has been and remains in charge of this

company, and I would say that that has some value in and of

itself.

This LBO was actually predicated and designed upon

upstream guarantees from the subsidiaries in order to achieve a

1  result where Mr. Conlan and others can say that equity goes to

2  the banks, and that there's funded public debt, but that

3  they're at a different level, and it was structured so that

4  they can utilize that and actually disenfranchise the pre-LBO

5  creditors, and in this way shift the entire risk to those

6  creditors, which is the fundamental flaw of an LBO.  Some would

7  argue -- I'm not necessarily taking this view, -- that LBOs

8  provide absolutely no benefit to companies at all, and in this

9  case we've seen it in spades.

10       THE COURT:  Well, that's an argument that's been out

11 there for a very long time.

12       MR. ROSNER:  Yes.  And then we read about them, and

13 you see the ones that come into this court, particularly in the

14 Third Circuit, and you scratch your head, and there's this

15 argument that while people can contract away from them,

16 indentures can provide that these things can't be done.  But in

17 the real world, those indentures can't be written that way.

18 Nobody can put in provisions that will actually block LBOs.

19 The debt doesn't get issued that way.

20       Here the probable intent and purpose and, certainly,

21 the effect of Tribune's LBO was to take value out of the

22 company in exchange for no value but to the detriment of the

23 pre-LBO creditors, the very creditors that were being told,

24 either through the hedge funds pleading or in general, are the

25 ones that are going to continue to suffer by not receiving any

1  distribution, or at least it's alleged that they may not

2  receive any distribution, which can't happen in a Bankruptcy

3  Court, in my opinion.  When there is a harm, there is a remedy,

4  and that -- and when there's been an injury to a particular

5  entity, that entity is able to realize upon that injury and

6  then obtain its remedy, and the Third Circuit is pretty clear

7  that those remedies exist.

8          Now, I will tell you, Your Honor, that a man who is

9  much smarter than I once said something that I thought was very

10  apropos to this case, so I wrote it down, and I -- and so I'm

11  going to say it.  He said, "You cannot solve a problem from the

12  same level of thinking that created the problem that you're

13  trying to solve."  And I think that's what is going on amongst

14  the various parties.  That it's -- when I see the hedge funds

15  presenting a paper that says we can buy off a bunch of

16  creditors, and then we don't even have to deal with these

17  things, it's that kind of thinking, and I think that maybe

18  Tribune, the banks, and certainly, the hedge funds are choosing

19  to ignore Mr. Einstein's admonition and have continued, as

20  we'll hear and as we'll see later when I address the bank fee

21  discouragement motion, as I like to call it -- and I heard it

22  called a so-called motion just a little while ago.

23          Bankruptcy cases have to not only be fair.  They have

24  to appear fair.  When there's a harm, there's a remedy, and the

25  pre-LBO creditors are entitled to that remedy.  That's the way

**J&J COURT TRANSCRIBERS, INC.**

1  that I see the context of this case.  I, for Law Debenture, I

2  think other public debtor holders -- that's the phrase that's

3  being used -- see that and cannot look at this case as the case

4  where an LBO is swept -- the LBO harms our swept under the rug

5  through a forced negotiation.  And I'm sorry.  I shouldn't say

6  a forced negotiation.  An actual negotiation and then a forced

7  litigation that occurs afterwards, should that litigation be in

8  the nature of a pre-determined settlement of claims to which

9  the bondholders not agree.  I've always understood the word

10  settlement to mean both sides agree on what that -- what a

11  settlement is, but I'm not --

12          THE COURT:  Or in this case all 30 of them.

13          MR. ROSNER:  In this --

14          THE COURT:  Let's focus on the motion that's directly

15  before me at the moment, and I want to make sure I understand

16  the response that you filed.  You're in favor of an extension,

17  but it seems to me from your pleading what you want me to do is

18  either outside of an order granting the extension or inside of

19  the order granting the extension somehow condition it upon or

20  require the debtor to focus on debt, which it's now told me

21  it's already focusing on.  So tell me precisely what relief you

22  would like me to grant or not grant today.

23          MR. ROSNER:  Well, the relief I would like you to

24  grant is to extend the debtor's exclusivity by four months.  We

25  are in agreement with the debtors that that is what is

**J&J COURT TRANSCRIBERS, INC.**

1  necessary here.  I guess for a slightly different reason as

2  well we -- we absolutely agree that there should be full

3  information provided to all the parties.  And not to jump ahead

4  to something else you're going to hear today, but when people

5  often times throw out numbers like 30 parties and the 170,000

6  pages of documents and this and that, that doesn't necessarily

7  mean that real information in discovery has been flowing.  It

8  just means there's been a lot of stuff.

9          THE COURT:  Well, in today's electronic age it's not

10  hard to generate big numbers.

11          MR. ROSNER:  Absolutely not, and when you get 170,000

12  pages that are identical to the 170,000 you got before, I would

13  say you haven't gotten 340,000 pages by any stretch.  But I do

14  think that there's also other benefits that can be obtained in

15  -- during the exclusivity period in addition to understanding

16  and remedying the LBO.  I do think that is first and foremost.

17  I think that is most important that it (a) be understood, but

18  then (b) that it actually be remedied, and remedy can be done

19  by an agreement, but remedying can also be done through the

20  prosecution of claims, and there can be settlement once claims

21  are prosecuted.  It shouldn't be forced.

22          So we were making the point that we were saying we

23  are -- I don't want to use the word admonished, because that

24  sounds harsh.  I want to say we're encouraging the debtors not

25  to utilize this time in order to put forth a plan that forces a

1  so-called settlement of the LBO claims.  Again, noting that

2  there are a lot of LBO claims, people can't just be handed

3  releases.  Particularly in the Third Circuit they just can't be

4  handed releases on claims that are at Tribune Company for

5  aiding and abetting and claims of breach of fiduciary duty.

6       So there is -- I agree with Mr. Seife for the

7  Committee that there's a lot to what would be even a negotiated

8  settlement.  So our point was please, debtors, as you move into

9  exclusivity with which we support, make sure that when you talk

10  about a settlement, that you're actually trying to achieve it

11  with the set -- with the parties who would settle, and absent

12  that, then let's prosecute the litigation not a cram down plan,

13  because that does not bring on the actual litigation.

14       The other point that we wanted to make was that

15  exclusivity can do even more than what is the headline, which

16  is the LBO.  The bankruptcy is -- has been almost a year long.

17  And I don't mean this in a disparaging way in any respect, but

18  I would say that what's really been achieved so far has been

19  there's been a sale of the Cubs.  There's been an ongoing fight

20  with Warren Beatty that I've been reading about.  There have

21  been -- a motion to earn bonuses for certain executives, and

22  there's been a bunch of leases and contracts that have been

23  examined.

24       I think there's more that the company can do probably

25  in its four months before it gets to a plan that would actually

**J&J COURT TRANSCRIBERS, INC.**

1    aid it while it uses its very powerful Chapter 11 tools that it

2    will no longer have once it's out of bankruptcy.  I trust that

3    the company is also studying that, and for that reason they

4    said we need four months.  We don't -- this isn't something

5    where we can -- it's just a 30-day sit down with the banks and

6    the hedge funds and sit down with the bondholders.  So we think

7    it's -- that's important.

8         I would like to say that getting back to the LBO,

9    which I guess you could say is somewhat of theme that I have,

10   and the remedies of the LBO, but it cannot just be blithely

11   ignored as has been urged by the hedge funds in the aggressive

12   pleading that they filed to say that, you know, in their first,

13   you know, entrance into the case that exclusivity should be

14   terminated, and they should be able to stuff the fraudulent

15   conveyance claims and pay off a bunch of people and be gone.

16        In addition to the other claims that I've identified

17   that are not the fraudulent conveyance claims, it is, of

18   course, inequitable for people to keep ill-gotten gains by

19   simply trying to maneuver into a position where they can say we

20   don't think that those claims exist.  So -- and I do think

21   there's an irony, and I hope Your Honor, you know, picked up on

22   the -- and I'm sure Your Honor picked up on the irony in the

23   papers where the hedge funds kind of shamelessly complain about

24   the Unsecured Creditors Committee's -- the costs associated

25   with investigating what is the most important and probably

1    largest failed LBO ever, the 5 to 7 million, while at the same

2    time participating and taking down $25 million from the debtors

3    in their defense of the very claim.  There's a bit of an irony

4    there that certainly wasn't lost on me.

5         What the hedge funds urge this Court to accept as a

6    principle, which it's not, is, is that they can simply buy off

7    the trade creditors, which we -- I assume in good faith they

8    weren't meaning that that would somehow change the trade

9    creditors views as members of the Unsecured Creditors

10   Committee.  But what they can essentially do is create a $150

11   million dollar administrative claim class or a larger one than

12   we're used to seeing, and then they can bury the claims for

13   good.

14        There's several flaws in that idea, and I think that

15   Mr. Seife has pointed out the ones that are, you know,

16   important, but there are other facts, of course, that would go

17   into that.  There's $22.3 billion of filed -- I'm sorry -- of

18   scheduled inter-company claims that fly from Tribune Company

19   down to the various subsidiaries.  They're not being paid in

20   full.  There's the bridge debt.  That's not being paid in full

21   as far as I understand.  They complain that there's been no

22   substantive consolidation.  Well, that usually happens as part

23   of a plan.  It's seldom.  It has happened outside of a plan,

24   but it's seldom.  And here you may very well have a substantive

25   consolidation of these two companies that were created just

**J&J COURT TRANSCRIBERS, INC.**

1  under Tribune Company as part of the LBO.  I don't know.

2        And, you know, asked earlier of Mr. Conlan whether

3  there was going to be a presentation of evidence on the motion,

4  because you didn't know if that was required and you didn't

5  know what their position was.  I would say that as to the hedge

6  funds and their pleading that's been before the Court, it is

7  actually predicated upon these quasi-facts, these things that

8  they say.  And I don't know if they want to catch someone's

9  attention, but it's really this supposition and kind of

10  innuendo that there's competitors, quote, casting aspersion on

11  Tribune, and that the buy off will garner full support of a

12  hotly contested confirmation where there will be opposition by,

13  you know, not only Law Debenture and not only Deutsche Bank but

14  probably from Tribune Company as well as the Ds and Os and the

15  shareholders both current and former.  I mean there's just no

16  evidence of these things, but yet they're said in the motion

17  that Tribune Company is suffering ongoing harm.

18        I mean my I look at the numbers is that they're

19  performing very well.  In fact, they're performing better in

20  bankruptcy than they did outside of bankruptcy.  Not to say

21  that getting out of bankruptcy is not a laudable goal.

22  Everybody wants to get out of bankruptcy.  It's not the best of

23  all places to operate, but you do have an automatic stay, and

24  in this case the Tribune Company doesn't have any milestones

25  that are coming up.  It doesn't have financing that's

1  disappearing.  It doesn't have anything that is pushing it.  So

2  this urge to push through a plan on this, you know, artifice to

3  actually eliminate plans -- claims is a bad idea, but it's also

4  unprincipled.

5          They raise this issue that they can bury the claims,

6  and then they quickly, you know, run from it and say, well,

7  that's not an issue for today.  And I agree it's not an issue

8  for today, but I do think that they said it, and we should just

9  make sure that Your Honor understands that there's a lot of

10  things they didn't say about that, and I'm not going to belabor

11  the point, unless Your Honor later on or now wants me to be

12  belabor the point, which I assume you don't.

13          THE COURT:  It's belabored enough I think.

14          MR. ROSNER:  I'm sorry?

15          THE COURT:  It's been belabored enough.

16          MR. ROSNER:  Okay.  I just do want to point out that

17  there are -- that the cases to look at are that the fraudulent

18  conveyance claims subsist when there's the existence of an

19  unsecured creditor at the outset of the case.  You don't look

20  at it post-confirmation.  You look at it on the day of the

21  filing.  The case law is clear.

22          And as to what they're proposing, I would like to

23  just leave the Court with one quotation, and basically what

24  that principle is, and we all know what it is, it's the Moore

25  vs. Bay principle that's throughout the Bankruptcy Code, that

1  you avoid something in its entirety.  But the one thing that

2  the Eighth Circuit Bankruptcy Appellate Panel said specifically

3  about something that the hedge funds are pushing hard on is

4  they said, "It is inconsistent with the Bankruptcy Code to

5  allow a transferee of a fraudulent transfer to defeat the

6  Bankruptcy Trustee by paying off a couple of creditors.  The

7  potential for abuse is obvious."  I would agree that it's

8  obvious, and it would be clear here.  And that's the DLC case,

9  Your Honor, out of the Eighth Circuit.

10         So to summarize where we stand -- where Law Debenture

11  stands, we support exclusivity with the encouragement that

12  there be no forced plan or forced settlement, but what there is

13  is a negotiation, and should that fail, the litigation that Mr.

14  Conlan has spoken about is litigation to remedy the LBO and not

15  to seek to cram down an unfair plan.  Thank you, Your Honor.

16         THE COURT:  Well, before you leave, I hear your

17  position.  It's consistent with what your written submission

18  indicated.  What other than that which the debtor has proposed

19  in its form of order would you have me add, if anything?

20         MR. ROSNER:  In -- what I would like you to add is to

21  say that it is conditioned on the good faith negotiations and

22  short -- and failing those negotiations the prosecution of the

23  LBO claims, should there be a determination that those claims,

24  you know, are colorable, as I think anybody at this point would

25  tell you that they are colorable.

1          THE COURT:  So in addition to the very large

2   litigation issues looming out there, you'd like me to create

3   another one by inserting that language in the order.

4          MR. ROSNER:  Well, you asked me what would be perfect

5   and what I -- I think that I'm actually okay with the order as

6   it is, but I would prefer -- I mean what I would ask the Court

7   to do is to recommend to the debtor the points that we have

8   recommended.

9          THE COURT:  Thank you.

10          MR. ROSNER:  Thank you, Your Honor.

11          THE COURT:  Who else would like to be heard?

12          MR. GOLDEN:  Good morning, Your Honor.  Daniel

13   Golden, Akin, Gump, Strauss, Hauer, and Feld, counsel for

14   Centerbridge Credit Advisors as holders of in excess of $470

15   million of the Tribune senior notes.

16          Your Honor, let me say at the outset -- and I'm going

17   to say it in a way that hopefully is a lot shorter than Mr.

18   Rosner got to -- that we support the debtor's requested

19   extension of approximately four months of its exclusivity

20   period to March 31, and I regret to acknowledge that our

21   pleading that was filed was probably not a model of clarity to

22   help the Court reach that conclusion.

23          In the -- so I say at the outset we support the

24   debtor's request, but we do so based upon the debtor's

25   pleadings and Mr. Conlan's recitation this morning, and there

**J&J COURT TRANSCRIBERS, INC.**

1    is a point we want to make.  The debtor's pleading, and as

2    amplified by Mr. Conlan's comments this morning, that at this

3    juncture in the debtor's Chapter 11 cases there is but one

4    remaining yet large looming issue, and that is the analysis of

5    the leveraged ESOP transaction.  And what that really means is

6    whether that leverage buyout transaction created actionable

7    fraudulent conveyance claims and other related claims or not.

8            The debtors say that they have studied that analysis

9    or made that analysis since the beginning of the case, and that

10   it is their intention to act as the honest broker in the

11   ensuing hope-to-be good faith negotiations primarily to be

12   conducted between the Committee, the bank lenders, and the

13   senior note holders over the next four months.  And we applaud

14   the debtor's efforts to act as an honest broker, but we do so

15   with some amount of grain of salt.  For, after all, the debtors

16   have a board of directors and have a management team, the

17   extent of which remains to be seen but may well be subject to

18   potential fraudulent conveyance and other related claims.

19           So it's not far afield to suggest that it may be

20   difficult for the debtor to be the 100 percent honest broker in

21   these negotiations.  I assume the Committee was of the same

22   view, because the debtors -- I'm sorry -- the Committee, from a

23   relatively early part in these Chapter 11 cases, undertook its

24   own analysis of the fraudulent conveyance claims or potential

25   fraudulent conveyance claims, despite the fact that those

**J&J COURT TRANSCRIBERS, INC.**

1 claims, until there's an STN motion, belong to the debtor.  And
2 I think everybody in this case naturally understood if there
3 was going to be litigation brought to undue the fraudulent
4 conveyance, it would be brought by a party other than the
5 debtor.

6      I think that's probably typical in the type of
7 transactions that we're concerned about here where a party
8 other than the debtor in possession seeks authority and gets
9 authority to commence and prosecute that litigation.  That's
10 what happened in the <u>Tusa</u> bankruptcy case.  That's what
11 happened in the pending <u>Lyondell</u> bankruptcy case.  And I assume
12 if we could not get to a consensual good faith resolution of
13 these issues, that's what would happen in this case.

14      I commend the Creditors' Committee for taking a
15 forward stance in undertaking this analysis, and I think Your
16 Honor may remember that both Law Debenture and my client,
17 Centerbridge Capital -- Credit Advisors, entered into an
18 agreement with the Creditors' Committee where they would
19 collaboratively share information and go through the discovery
20 process in the most practical way possible, and that effort is
21 continuing.

22      So we will not prejudge the next four months and how
23 these, quote, good faith negotiations will turn out.  But one
24 thing that the debtors recite in their pleadings is of concern
25 to Centerbridge, and that's found at Paragraph 5 where the

**J&J COURT TRANSCRIBERS, INC.**

1    debtors say they, "intend to file a plan within the time frame

2    -- within the time period to be extend --" I'm sorry "-- within

3    the time period of the extended exclusivity period sought by

4    this motion."  And you heard Mr. Conlan say, and Your Honor

5    commented on it, that they are resolute in trying to move this

6    process along.  But we are concerned that if despite everyone's

7    best efforts that have good faith negotiations, it may well not

8    be for the debtor's to be the final arbiter as to who is right

9    or who has been more amenable in the negotiation process.  And

10   so, as Mr. Rosner just pointed out, the litigation may not

11   simply or should not simply be over whether a plan proposed by

12   the debtors is confirmable or not, but, rather, whether that

13   litigation must be in ultimately determining whether this

14   leverage buyout transaction constituted a fraudulent conveyance

15   action and gave rise to other related claims.  We won't

16   prejudge the issues, but we do want to warn the Court or at

17   least acknowledge for the Court -- I don't mean to say warn the

18   Court -- acknowledge to the Court that although we along with

19   the Creditors' Committee along with Law Debenture, and I assume

20   with the other Indenture Trustees representing the senior note

21   holders will participate in good faith in those negotiations.

22   We'll leave for another day whether at the end of this extended

23   exclusivity period it should result in a plan filing come hell

24   or high water.

25              If Your Honor was to ask me the same question that

**J&J COURT TRANSCRIBERS, INC.**

1  you posed to Mr. Rosner, is there anything else I would add to

2  the proposed form of order, there isn't.  I don't think it

3  needs to be, but I think it's certainly appropriate that the

4  debtors and the senior lenders understand the position of the

5  senior note holders.

6         And so that while we will, as I said, engage in good

7  faith negotiations, our endpoint is not necessarily a plan to

8  be filed by March 31, but, rather, either a resolution that can

9  be encompassed or contemplated by a plan  or, failing that,

10 ultimate litigation to resolve the issues as to whether the

11 leverage buyout constituted a fraudulent conveyance or not.

12        THE COURT:  All right.  Well, I note that just as a

13 rejoinder to your remarks that the debtor has expressed an

14 intention, but the order will contain no requirement.  So I'll

15 say no more than that.

16        MR. GOLDEN:  Thank you, Your Honor.

17        THE COURT:  All right.  Who else would like to be

18 heard?

19        MR. BENNETT:  Good morning, Your Honor.  I've now

20 heard about an hour of argument as to why exclusivity should be

21 extended.  I promise not to have an hour of argument on the

22 other side, but I have a fair amount of ground to cover.

23        THE COURT:  Well, you know what?  If you do, then I'm

24 going to take just a five-minute break, and we'll continue

25 after that.  Court will stand in recess.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BENNETT:  Okay.

2                    (Recess)

3          THE CLERK:  If everyone could please take your seats.

4                    (Pause)

5          THE CLERK:  All rise.  Be seated.

6          THE COURT:  All right.

7          MR. BENNETT:  Good morning.

8          THE COURT:  The floor is yours.

9          MR. BENNETT:  Good morning again.  Bruce Bennett of

10 Hennigan, Bennett & Dorman, and I represent Credit Agreement

11 Lenders, but subject to some face clearing and some arithmetic

12 holds more than half of the loans outstanding under the senior

13 credit agreement facility that was part of the loans that Mr.

14 Kasowitz referred to during his discussion.

15          Between Mr. -- excuse me.  Between Mr. Rosner and the

16 other people who spoke, there were a number of issues that I

17 kind of put on the side as being my introductory remarks or

18 context remarks for the Court, which will be very brief.

19          Several times Mr. Rosner told Your Honor that the LBO

20 drove the company into bankruptcy.  Clearly, a debate not for

21 today.  But just so that Your Honor understands that this case

22 is a little bit different from things like Tusa and Lyondell, I

23 want to leave the Court with just three factual observations

24 about which I think in the end there's not going to be much

25 dispute.

**J&J COURT TRANSCRIBERS, INC.**

1      In this case -- in the Tribune case the ESOP

2 acquisition transaction came at the end of a prolonged auction,

3 and the auction actually ended in a tie.  I'll say as an aside

4 that management in this case never gets a break, because

5 immediately after that auction ended in a tie and Mr. Zell's

6 proposal was selected as better, more advanced relative to the

7 other proposal, there were some shareholder attorneys who had

8 actually initiated litigation complaining about another

9 transaction and they amended their complaint to say that the

10 company didn't get enough money and that they actually should

11 have gotten more.  And Mr. Rosner, of course, suggests that the

12 company was in fact worth much less.

13      Lyondell, of course, involved a preemptive bid, that

14 was hundreds, actually billions of dollars higher than anyone

15 ever thought the company was worth and of course too said it

16 didn't involved an auction or any kind of real economic

17 transaction at all, it was a restructuring in a company that

18 was already very severely distressed.

19      Secondly, when the experts finally make their reports

20 and show up before Your Honor, they're all going to have the

21 chart.  You're always going to see these charts and it's going

22 to show the decline in the industry -- I guess from your

23 perspective it goes like this -- the decline in the media

24 industry and what you will find, and there may be arguments

25 about exactly the number, is that the equity values of the

**J&J COURT TRANSCRIBERS, INC.**

comparable companies following the ESOP transaction declined by
85 percent.   That's afterwards that this industry had its huge
decline.   Things were not great when this acquisition was
negotiated, but when you look at the curve you'll see there was
a major subsequent decline.

So I think it's jumping the gun a little bit to say
that the LBO caused the bankruptcy case.   There will be lots of
discussion, but I just wanted to leave Your Honor with a couple
of facts.

And the last observation, which frankly leads us to
the core of everything, is that when you look at the credit
agreement debt, it is certainly true that some of the proceeds
were used by the borrower to make distributions to the equity.
But some, a lot, nearly $4 billion, maybe even more than
$4 billion were used to pay preexisting debt, provide working
capital and other things that were benefits to at least the
borrower, we'll put aside the subsidiaries for a second.   So
when push comes to shove -- although Mr. Rosner I'm sure has a
theory and he would like to say that in the worst case the
lenders could walk away with no claims -- when push comes to
shove, the credit agreement lenders have enormous claims in
this case, they're vastly larger at the end of the day than Mr.
Rosner's claims, or the claims Mr. Rosner represents, and they
are going to own, the credit agreement lenders are going to own
the largest share of this business.

**J&J COURT TRANSCRIBERS, INC.**

1          So we come to another one of Mr. Rosner's quotes
2    which is he said that the heart of this case is the litigation.
3    I don't know.  Maybe the case has two hearts.  I would probably
4    say this.  In our view, the heart of this case is the debtors'
5    many and some separately enormous, but fairly together enormous
6    businesses that, according to the debtors' count, involve
7    14,000 jobs.  And I would submit that that is the heart of this
8    case and the litigation is an issue or a problem in this case
9    that most certainly has to be addressed.

10          The next thing I'm going to say is that global
11   resolution happens to be our first choice too, but this may be
12   my first appearance before Your Honor in this case, but I've
13   been here for a while, we say in our papers that there are no
14   meetings occurring and no meetings scheduled, okay?  Those
15   words have been true since September.  I was looking in my
16   Blackberry to try to find the date of the last meeting that
17   occurred in this case to discuss litigation.  I was at it, it
18   was in New York, it was in Mr. Bernstein's office, but my
19   calendar rolls off after 60 days.  So it was in early September
20   and it's no longer on my electronic calendar, at least on the
21   one I carry around, which was a long time ago.  And
22   interestingly, I heard yesterday from the debtors that there
23   was a desire by the Committee to have a meeting set in January.
24   Now I don't know if that meeting had ever been discussed before
25   our papers were filed.  I suspect not.  I don't know.  But I

**J&J COURT TRANSCRIBERS, INC.**

1  heard about it yesterday.

2          So I come to this case when we filed our papers,

3  there being no meetings on the schedule, several meetings

4  promised that had never occurred, and this was a situation that

5  had been persisting not for weeks, but for, by the time we get

6  to the hearing, almost not quite three months.  And so one of

7  the things I have to say to myself, and what I would hope the

8  debtors have to say to themselves too is, I don't see that

9  global resolution on the horizon.  I don't see any effort

10  whatsoever to achieve that global resolution, so I've got to do

11  something.  And the something, frankly, that we decided to

12  propose, that we very much want to propose, and I want to

13  discuss the process we have in mind, it does several things at

14  the same time.

15          One, it does focus on the fact that the, it turns

16  out, in the Tribune case, that not substantially all, all the

17  business operations that actually face customers, that are out

18  there in the market doing business are conducted by

19  subsidiaries not the parent, that the claims represented by Mr.

20  Rosner are claims only against the parent.  There's other

21  things we could say about them too.  They impose -- those

22  indentures impose no restrictions on the subsidiaries

23  whatsoever, they impose no restrictions on the way the parent

24  deals with the subsidiaries, they have a negative pledge

25  provision that deals with the equity interests in the

1  subsidiaries that was complied with.  The Law Debenture

2  Company's, Law Debenture Trust Company's predecessor, I guess

3  they weren't there at the time, received when this transaction

4  was done, a pledge agreement that included their interests, you

5  know, exactly where they were supposed to be in the parent's

6  immediate subsidiaries.  They sat there for a year, didn't

7  complain saying I'm entitled to more.  Putting all that aside,

8  they're all at the parent level.

9       So I have this coincidence or this interesting

10  situation where the businesses where the employees are -- by

11  the way, I'm not going to agree that the debtors are doing well

12  with the businesses, they are, and we want it to continue, but

13  I've never met a business person in my entire life, and Mr.

14  Rosner essentially agreed with that, I don't think Your Honor

15  needs testimony, if you do, we'll find it, there's not a

16  business person I've ever met in a bankruptcy case that doesn't

17  wish that from a business perspective, from an operating

18  perspective, he was out yesterday.  And I suspect at the

19  operating level, that's exactly how they feel.

20       So I look at that situation and then I look at the

21  Adelphia case.  Now where does the Adelphia case fit in this?

22  It's a procedural clue and an important one.  I hope if Your

23  Honor reads any case in connection with this hearing you read

24  the Adelphia case, not for the result that clearly has to be

25  litigated later -- more about that in a few minutes -- but to

**J&J COURT TRANSCRIBERS, INC.**

1  see what Judge Gerber did with essentially the situation

2  confronted by Your Honor.  He had subsidiaries that he thought

3  may well turn out to be solvent, but there wasn't a plan and it

4  wasn't done and so he's dealing with a fraudulent transfer

5  case, so he says, you know, I can't really deal with whether or

6  not the subsidiaries are going to be proper plaintiffs or

7  whether their claims can be asserted by the Creditors'

8  Committee at this point in time, because there's unpaid

9  creditors still there.

10        When the case advances, the litigation, you know,

11 kind of advances, but the plans get done first and the plans,

12 lo and behold, pay all subsidiary creditors in cash and then

13 the District Court reaches it, actually I think Judge Gerber

14 reached it first, but the District Court is the opinion that's

15 published and that we cite to you.  The District Court gets to

16 it, recites in the District Court opinion that Judge Gerber had

17 been there before, had looked at this case in the context

18 before the subsidiary creditors had been paid, now plans have

19 been confirmed, the subsidiary creditors are paid, and we look

20 at it from a different perspective.  And you read cases, it

21 stimulates ideas.

22        Because it's here, let me digress.  Do we think we're

23 performing magic or creating an artifice?  Of course not.  Do

24 we understand that Mr. Rosner or people essentially allied with

25 him, like Mr. Golden are going to come to Court and say that

**J&J COURT TRANSCRIBERS, INC.**

1  for some reason they have claims against the subsidiaries or

2  for some reason the subsidiaries can't confirm plans?  Well, of

3  course they will or they might.  And if there is a way to

4  resolve those objections, we will, and if there's not a way to

5  resolve those objections, Your Honor will have to decide

6  whether or not there is any standing by parent creditors to

7  interfere with obligations created by subsidiaries,

8  particularly in circumstances where subsidiary creditors are

9  paid in full.  I don't fear that hearing.  I'll have it any

10  time, any place Your Honor wants to set it.

11        And what Your Honor's going to find is that it's not

12  just the <u>Adelphia</u> case, I think there are like 20 cases that

13  have considered various aspects of this in different contexts.

14  And there were differences among the holdings.  But there's one

15  thing they all share in common.  There hasn't been a case yet

16  that has said, here's a fraudulent transfer case, it's

17  delivered $101, there's $100 worth of unsecured claims and that

18  extra dollar goes to the equity.  Not on the books.  Can't find

19  it, it isn't there.  Every single case talks about the fact

20  that when fraudulent cases are allowed to even begin or go

21  forward, there has to be obvious real benefit to unsecured

22  creditors.  And there's debates about how much benefit is real

23  benefit and in what circumstances is it kind of a trumped up

24  benefit.  Not for today, I agree.  Ready for it whenever Your

25  Honor wants to.  Not seeking to evade it.

**J&J COURT TRANSCRIBERS, INC.**

1        But look what we might have.  We might have a

2  procedural vehicle that does a number of good things at once,

3  not perfect.  It may not be the global resolution everyone

4  seeks, including me, but it might get every single subsidiary

5  out of bankruptcy, it might tee up one central issue divorced

6  from a lot of other issues that might also have to be decided,

7  but it might be simpler and cleaner to deal with it in the

8  context that might be created.  And why isn't this progress?

9        I am reminded of saying that I ran into a couple

10  years out of law school where there was actually a general

11  counsel discussing something in a case and he said once and

12  then proceeded to say it many times, the perfect is the enemy

13  of the good and the perfect could be the enemy of the very

14  good.  We can't always get perfect.  And there is another

15  experience I had early in my career involving an oil driller

16  where I was involved in a situation where one particular

17  creditor group insisted on perfection and they insisted --

18  there was all kinds of opportunities to make partial solutions

19  of important problems and actually get some things done in a

20  case, but partial solutions were never good enough.  And of

21  course, that case totally liquidated and nobody got anything,

22  because perfect solutions never appeared, and everything

23  deteriorated while it happened.

24        I'm not suggesting that that's a risk here.  I sure

25  as hell hope it's not.  But I don't think that pursuit of

**J&J COURT TRANSCRIBERS, INC.**

1 perfection where nothing whatsoever is happening on that

2 pursuit and where the first meeting won't even happen until

3 some time in January, no date set, it's not unreasonable to

4 say, let's look around and figure out other things we can do to

5 advance the ball.

6        Another loose end.  I don't think anywhere in our

7 papers we mentioned the subject of releases.  We didn't.  I

8 think Mr. Rosner has some complaint that was not one of the

9 plan terms I described.  Also I want to be very clear.  We do

10 understand that there might be plan related litigation if a

11 plan process continues for the subsidiaries.  And I've heard

12 very clearly that Mr. Rosner said it's going to be massive.

13 Well, it might be.  I can't control what Mr. Rosner does.

14 Can't control what the Committee will do.  It doesn't have to

15 be.  It can be focused on the issues that are relevant to the

16 subsidiaries with everyone understanding.  And I'm agreeing up

17 front that none of the things that are going to happen to the

18 subsidiaries are going to prejudice the parent in any way, or

19 the litigation that Mr. Rosner or the Committee would initiate

20 on behalf of the parent in any way.

21        Okay.  So we've given a lot of thought to the terms

22 and conditions.  I am mindful and was warned by many people to

23 be careful about how much I say about the plan, because I don't

24 want to be -- I did not want this hearing to be about whether

25 or not we jumped the gun and filed the plan before exclusivity

**J&J COURT TRANSCRIBERS, INC.**

1  had actually expired.  But I do want to say to Your Honor, this
2  is extraordinarily well thought out, a lot of the essential
3  economic parameters are not only thought out internally,
4  they've in fact been discussed because they're relevant to a
5  plan that would constitute a global solution.  We're not
6  suggesting -- we're not intending that we're going to depart
7  very much, if at all, from those kinds of numbers.  I will tell
8  Your Honor anything you want to know about the plan.  I'm
9  prepared to answer question in every conceivable level of
10 detail.  It's up to you.
11        The other thing I want to say is, how do we expect to
12 start this?  Well, we certainly would describe what we have in
13 mind to all the important constituencies and meet with them
14 beginning this week, if we are so permitted, not some undefined
15 time in January.  Yes, December is a short month.  I'm even
16 planning a holiday vacation, but there's three full weeks left.
17 We would intend to use them.  We would also intend ultimately
18 to win the endorsement of the debtors.  This is not intended.
19 We don't intend exclusivity to file plan tomorrow, ignore
20 everybody, try to get it confirmed.  We're going to have a
21 normal process that involves talking to all relevant parties in
22 interest, those we think will agree with us and those we expect
23 might not agree with us.  We will try very hard to narrow
24 differences.  We will try very hard to narrow differences at
25 every stage.  If we file a plan and a disclosure statement and