1  we have objections, we will talk to those people.  If we can

2  resolve them, at least in part, we will.  If we can't resolve

3  them completely, there will be some issues that might have to

4  be teed up for decision.  We won't try to avoid any.  We won't

5  try to perform magic.  We will try to work through the paces

6  and develop progress.

7          One final point about what we intend.  Nothing about

8  this should imply that we would not immediately adopt a global

9  solution or fold in the parent if that became possible.  Of

10  course we will.  So another way to view moving on the

11  subsidiary plans is, it's kind of practice for the parent plan.

12          One of the arguments frequently made, and I'm a

13  little bit disadvantaged because I don't think I'm going to

14  hear what the debtors' response to our opposition is until Mr.

15  Conlan stands up again, and since I think he even told you new

16  things were coming, I may have to stand up again too.  But what

17  are the arguments we usually hear in opposition through

18  termination of exclusivity?  Well, one is that somehow the

19  termination of exclusivity will be bad for a dialogue.  Well, I

20  think you've already heard.  There is no dialogue right now.

21  The debtors have a lot of really good intentions.  And I do

22  think they've tried hard.  But it's been radio silence for 90

23  days.  And there is no date set in January.  So there's plan

24  silence for 30 more and maybe as many as 60 more.

25          And I wanted to say as an aside, Mr. Rosner's client

**J&J COURT TRANSCRIBERS, INC.**

1 | has previously suggested that there would be meetings and
2 | they've always been kind of held out as, you know, a few weeks
3 | away, a month away, but they haven't ever managed to make a
4 | definite appointment.  So it's not for a lack of people talking
5 | about it, for whatever reason, it just hasn't happened yet and
6 | there are no plans for it to happen now.  So for starters,
7 | there isn't anything I'm going to interrupt.  And as I said
8 | before, the way we view this, the subsidiary plans are the
9 | launching pad of the dialogue that might initially deal with
10 | subsidiary issues only, but there's certainly no law against
11 | and certainly no intent to preclude a dialogue that goes
12 | further than that.

13 |         Termination of exclusivity will lead to chaos.  Your
14 | Honor's heard that before.  I think it's important to note that
15 | in this case, the case has been pending for a year.  There's
16 | been two previous exclusivity extensions, no one through this
17 | entire period of time has ever suggested that they were going
18 | to file another plan, so you're not going to unleash an
19 | enormous series of plans, there's just been one suggestion,
20 | ours.  And once again, the termination of exclusivity doesn't
21 | prevent the debtors from filing a plan involving the
22 | subsidiaries, involving all the companies, but severable as to
23 | subsidiaries if all the companies prove too much.  Again, would
24 | love to see it happen, what it will be met with is dialogue,
25 | again in an effort to try to get something before Your Honor to

**J&J COURT TRANSCRIBERS, INC.**

1  move businesses out of these proceedings.

2         Now, what's another effect of exclusivity?  Last

3  personal case story.  Many years ago I became counsel to the

4  trustee for Hawaiian Airlines.  It was a rare operating case

5  where a trustee was appointed for cause.  That also meant there

6  was no exclusivity from day one.  First person who filed a plan

7  was a creditor, it was actually Boeing.  The debtor -- the

8  trustee was not in a position to file a plan, it took a few

9  months.  But then he did, our economics were better.

10  Ultimately the trustee's plan prevailed.  The other plan was

11  abandoned.  Was there chaos?   No.  The result was 100 cent

12  plan.  Now, did the trustee and his professionals feel just a

13  little bit of pressure by the fact that there was another plan

14  on file that kind of looked viable and that people might

15  support?  I'm only going to speak for myself.  Of course I did.

16  And again, why is that a bad thing in this case?

17         Are there obstacles to a subsidiary plan?  Well,

18  there may be real ones.  I think the debtor has told me that

19  they're studying, don't really know.  But we heard from Mr.

20  Rosner, inter-company claims, bridge claims, substantive

21  consolidation.  Okay, inter-company claims.  When the dust

22  settles on those, we thought about it, Your Honor is going to

23  find that there's exactly one subsidiary that has net payables

24  to the parent on the books and records.  And what Your Honor

25  may know from past experience is that many inter-company claims

**J&J COURT TRANSCRIBERS, INC.**

1  have infirmities because they're never disclosed to the public,

2  they're not arm's length, they're very often not documents,

3  they often don't bear interest, they have all kinds of problems

4  with them.    It's an issue that will clearly have to be

5  studied, and we'll work on it.  By the way, inter-company

6  claims would be a distribution issue for plans that were filed

7  for all of the entities.  So of course we'll run into things.

8  We'll have to deal with them.

9         Second, bridge claims.  Well, at the subsidiary

10 level, the bridge loan claims are completely subordinated to my

11 clients, so we don't think they'll be a factor.  They're also

12 LBO related debt, they didn't preexist, they don't have a

13 fraudulent transfer claim.

14         Subcon, well, we're in the Third Circuit, the <u>Owens</u>

15 <u>Corning</u> case being one of the most important cases out of the

16 Third Circuit in bankruptcy in a good long time, which, if we

17 had to describe it in a sentence it is that, I think that we

18 would say that corporate boundaries matter a lot and it's a

19 really tall order to try to ignore them.  And I think that

20 others will disagree with that one sentence and come up with a

21 different sentence, but it's going to sound the same or a lot

22 the same.  I suppose that Mr. Rosner or the Committee or

23 someone else can object to a plan for the subsidiaries on the

24 basis that they should be substantively consolidated with the

25 parent.  I suspect the same objection could conceivably apply

1 to plans for the parent and all of the subsidiaries, business

2 the Court might have to deal with anyway.

3         THE COURT:  Well, apparently I have some more to

4 learn about what <u>Owens Corning</u> meant, so I'd be eager to hear

5 everyone's position.

6         MR. BENNETT:  Okay.  So in any event, my important

7 point with respect to obstacles, will there be obstacles to the

8 confirmation of a subsidiary only plan?  Sure there will be.

9 There are obstacles to confirmation of all plans in large,

10 important and complicated cases.  And there's a lot of talent

11 in this room.  They know how to deal with those obstacles,

12 they've dealt with them before.

13         It is the debtors' burden to prove it's entitled to

14 additional extension of exclusivity in this case.  What I think

15 Your Honor has already heard is that we clearly believe that

16 the most important factor is whether or not termination of

17 exclusivity is going to enhance progress or whether

18 continuation of exclusivity will enhance progress.  I think the

19 current facts of this case, which aren't disputed, the absence

20 of meetings and the absence of plan meetings speaks volumes

21 about the status of the case today with an extension of

22 exclusivity.  I think it's worth pointing out also that it is

23 said by many courts that as more extensions are sought, the

24 burden to be overcome increases over time.  But at each one it

25 should be a little bit harder, and it should be.

**J&J COURT TRANSCRIBERS, INC.**

1          We don't think that any of the debtors can meet the

2  burden in this case, but particularly, and the debtor does have

3  a duty to look at the subsidiaries as well as the parent, but

4  particularly from the perspective of the subsidiaries as being

5  the businesses to face the rest of the world and deal with the

6  rest of the world, we don't think the subsidiaries can meet

7  their burden as to why they are entitled to a continuation of

8  exclusivity where their plan issues are less impacted -- I

9  don't want to say less -- differently impacted by the potential

10  litigation than the parent is, and they may be able to come out

11  of bankruptcy with fewer and less massive litigation than the

12  entire unit.

13          As I said before, we do think that starting a process

14  at the subsidiary level or starting a plan process at the

15  subsidiary level will only stimulate dialogue, even if as to

16  some parties, it is an angry dialogue at the beginning.

17          Okay, so what do we do, how do we kind of work this

18  through with the law we deal with?  Well, Your Honor, it's very

19  clear that you're accorded enormous amounts of discretion

20  during the now maximum 18 months that congress has specified

21  for exclusivity.

22          THE COURT:  And in exercising that discretion, I

23  really have at least initially two questions for you.

24          MR. BENNETT:  Go ahead.

25          THE COURT:  Why is it so important now, and put aside

1  for the moment what might be your initial reaction that I am
2  reversing the standard, but I'm interested in your response.
3  Why is it so important that exclusivity be terminated now?
4  There comes a time in many cases when because of money running
5  out or other circumstances which exist or other impending
6  crises or deadlines or drop dead dates, call them what you
7  will, that something has to move now.  In this case, tell me
8  why now.
9           MR. BENNETT:  Okay.  I'm going to tell you two
10  reasons.  Reason Number one, take a look at the debtors'
11  papers.  I didn't bring them up with me, so I'm casting about,
12  but Paragraph 5 and Paragraph 12.  What they say in those
13  paragraphs, and I believe it absolutely to be true is that the
14  onset of litigation will have an adverse effect on the debtors
15  and their businesses. They don't say it once, they say it
16  twice, and they say it very strongly.  I wish I had it up here
17  to read to you.  And that's a real risk.  What happens is is
18  that competitors go out and start whisper campaigns about how
19  bad the litigation can be, even if everyone tries really hard
20  to isolate it and to convince everybody that it is not going to
21  impact the businesses that Tribune really conducts.  So you
22  don't have to take my word for it, Your Honor, take the
23  debtors' word for it.
24           The onset of the massive litigation, Rosner's words,
25  not ours.  Okay?  In this case, will not be good.  The press

1 articles will talk about how the cases are mired in litigation

2 of uncertain duration and the debtors and all of their

3 subsidiaries will be held hostage to it.  That's one.

4        Second reason is back at the law.  Congress now says

5 the maximum is 18 months.  This extension, with the four

6 months, takes them 30 days - excuse me -- 60 days away

7 nominally from the 18 months, but in reality because of the way

8 the bridge orders work and the fact that they can file an

9 extension just before it expires and set a hearing afterwards,

10 it basically gets them all the way there.

11        THE COURT:  Well, of course they could run the risk

12 of having the relief denied without any safe harbor to file

13 something.

14        MR. BENNETT:  They certainly could.  But it's -- I'll

15 just leave you with the proposition that it's pretty close to

16 all the way.  So do we really think that the representatives

17 and senators who shortened the maximum exclusivity to 18 months

18 envisioned that you reward the maximum or almost the maximum to

19 a case that hasn't seen a material discussion on the most

20 central plan related issues for 90 days, and that before our

21 opposition filed, had none scheduled?  I'm having a hard time

22 with that.

23        THE COURT:  I'll tell you what.  If you can define

24 the individual intent of legislatures who voted for any

25 provision of the Bankruptcy Code at any time, you have my

**J&J COURT TRANSCRIBERS, INC.**

1 undying admiration.

2         MR. BENNETT:  I can't.  But when a maximum is set,

3 one would think that the maximum is available in cases where

4 the maximum is warranted by the facts.

5         THE COURT:  I think that's a fair statement.

6         MR. BENNETT:  And let's try to fit this case on that

7 continuum.  And I'm having trouble -- I'm having trouble

8 fitting a case where the admitted facts before you is no

9 discussions going on for 90 days, no discussions scheduled, as

10 we sit here today.  Okay, I'm trying hard to figure out why

11 that case is the model deserving of the maximum -- or

12 essentially the maximum --

13         THE COURT:  Well, first of all --

14         MR. BENNETT:  -- which is almost what is being sought

15 here.

16         THE COURT:  -- I don't know if those facts have been

17 admitted by anybody, but they've been asserted by you, that's

18 for sure.

19         MR. BENNETT:  Well, they were in our papers and I

20 would have expected, I heard that Mr. Seife tried to talk about

21 how meetings had already started and he failed to tell Your

22 Honor that the last one was in the first week of September.

23 I'm interested to know whether there was a meeting that was set

24 that somehow didn't make it on my calendar.

25         THE COURT:  All right, thank you.  I have a second

**J&J COURT TRANSCRIBERS, INC.**

1  question.  And that is, if it's true that all of the business

2  operations are conducted through the subsidiaries, and what

3  follows from that is, it means most or all of the value in this

4  collection of debtors rests in the subsidiaries.  Why would it

5  be appropriate for the Court at this point to deprive the

6  debtor of an opportunity to achieve a global resolution which

7  involved the parent as well as the subsidiaries?

8        MR. BENNETT:  I couldn't be clearer about this.  I'm

9  not depriving them of any opportunity.  Allowing us to start

10  pursuing a subsidiary plan, Number one, does not mean the

11  debtors can do anything they want to do.  And if they think

12  they can pursue a global plan and put one together at the same

13  time, that's fantastic.  And frankly as the process of working

14  through a subsidiary plan potentially becomes a platform for

15  including the parent, we're going to do that too.  I don't

16  disagree with the idea that a global settlement is the best and

17  is the optimal and that it would -- I'm not arguing that it

18  wouldn't be a wonderful thing, it would be.  I think given

19  where this case is today, where in reality, no progress is

20  being made toward that goal.  I hope it will start.

21        THE COURT:  But I -- over the course of time things

22  which I don't think can be disputed legitimately.  This is a

23  business in a troubled industry.  This is a business

24  particularly which had operational issues.  You know, Chapter

25  11 -- and of course one of the problems that can be created by

1  the newer time frames that you've referred to are that they

2  don't allow businesses with operational problems sufficient

3  time to correct them before they must exit bankruptcy,

4  especially if they want to take advantage of the exclusivity

5  provisions.  This is a business, it seems to me, which has been

6  struggling, successfully so far, with the operational issues

7  with which it was faced.  Now, I guess part of the argument

8  being made is that yes, they've had some things to deal with,

9  but really their plate shouldn't have been so full that they

10  shouldn't be farther along in the process of trying to bring

11  together all of the parties in a consensual plan.  But, you

12  know, under the circumstances, it really does not strike me

13  that this debtor has been in too long without proposing a plan.

14        MR. BENNETT:  First of all, Your Honor, a couple of

15  things.  They, themselves say that they're done with the

16  operational things, and quite frankly, I'd hope that after a

17  year they've identified the real estate leases that need to be

18  rejected, and they've rejected many.  They've done a lot of

19  things with executory contracts.  And by the way, we applaud

20  many of their initiatives.  I'm also not critical of the

21  debtors when I say no meetings have been set.  I have no

22  problem having meetings with the debtors.  I call up, I set a

23  meeting, it gets done.  And they have been wonderfully

24  cooperative in that respect.

25        I part company with them at one point.  It's their

**J&J COURT TRANSCRIBERS, INC.**

1  strategic decision, global resolution or else, and we've had --

2  this isn't a new topic for them.   We've been talking about

3  this for a good, long time, but I don't want to go into those

4  discussions unless I have to.  We part company with them with

5  they say to us, no, no, no, we really want to have a global

6  resolution.  And by the way, I wanted to say this earlier, but

7  I forgot.  The litigation specter sounds like it's getting

8  worse before yours and my eyes.  We not only heard that it's an

9  LBO case against lenders, but it's also now a fiduciary duty

10 case against the very officers and directors who are supposed

11 to be running the ship.  I assume that Mr. Rosner was

12 extraordinarily careful before he decided to unveil that

13 particular dimension of this case.  This could be really ugly.

14         I think it's extremely important for us to start

15 looking at alternatives to narrow the problem.  The debtors,

16 for whatever reasons, have been unwilling to do this.  I see no

17 harm in allowing us to get started.  No harm.  I'm not charging

18 the debtors for it.  You know, it would have to be a great,

19 substantial contribution and enormously successful for me to

20 get the money from the other side.  Okay?  I'm willing to do

21 the work, we're willing to carry the ball, we'll figure out how

22 to resolve the problems.  What exactly is wrong with trying?

23 Would I prefer that the debtor try to in light of the situation

24 confronting them?  Sure, I would.  And we've tried that route.

25 We're here because that route didn't get very far.

1          THE COURT:  Thank you.

2          MR. BERNSTEIN:  Your Honor, Don Bernstein

3  representing J.P. Morgan Chase Bank from Davis, Polk and

4  Wardwell.  I'm going to try to be mercifully brief.  I

5  understand you've heard a lot today.  And I'm not going to give

6  you our complete perspective on the leverage ESOP transaction

7  and the potential for litigation and the like, other than to

8  say that we profoundly disagree with Mr. Rosner and Mr. Golden.

9          And also to point out, Your Honor, that a substantial

10  part of J.P. Morgan Chase's constituency is represented by Mr.

11  Bennett.  And what you're seeing in Mr. Bennett and his clients

12  is a deep frustration with the fact that for eight months, or

13  since March, as Mr. Seife has said, the lenders, and in

14  particular J.P. Morgan Chase, but also others have been

15  cooperating with voluntary discovery in order to facilitate a

16  settlement negotiation.  And it's getting to the point, Your

17  Honor, where frankly, we don't believe, after having one

18  meeting scheduled and then canceled and other meetings promised

19  and then promised again, that we are really leading in the

20  direction of a negotiated resolution, hence the frustration in

21  your hearing to try something else.  And Mr. Bennett has given

22  you an elaborate proposal to try something else.

23          It is true, as Mr. Rosner says, that there are

24  parties who have prejudged the outcome.  I have no doubt that

25  my clients have  prejudged the outcome and that Mr. Rosner has

**J&J COURT TRANSCRIBERS, INC.**

1  and that Mr. Golden has and their clients probably have too.

2  But in that context, it's very hard to get a negotiation going.

3  And what we had proposed to the debtor was that four months was

4  just too long.  In that context where people are really

5  uncertain whether this process is going to get going at all,

6  four months was far too long.  And we had indicated to the

7  debtor that we would be willing to consent to a 60-day

8  extension, because we believe deadlines are good.  This hearing

9  is really the first time that all of these constituencies have

10 been under the same roof in this case, so that we can have a

11 conversation.  It would be good to come back here and do that

12 more often.  And the best context in which to do it, as we're

13 seeing today, is at an exclusivity hearing, because people have

14 to talk about progress, and that progress is just not being

15 made.

16         THE COURT:  Well, let me tell you something.  That is

17 a thought that occurred to me.  Here's one hesitation I have

18 about that.  Look around you and listen.  I mean, the sounds of

19 the clocks ticking is deafening.  So, you know, some things --I

20 think the Courts in cases of this magnitude, and we see many of

21 them here as you know, have to be sensitive to how much, the

22 cost benefit of requiring the exercise in two months rather

23 than in four.  Respond to that if you can.

24         MR. BERNSTEIN:  I guess I have two responses.  First

25 of all, on the issue of clocks ticking in this room, they're

1  going to tick whether they're in this room or not in this room.

2  But on the more important issue of coming back in shorter

3  periods of time, sometimes the need to justify yourself

4  actually speeds the process up, whereas the ability to delay

5  things can be used tactically.  And so bringing people back

6  actually can shorten the total duration of the case which

7  actually perhaps leads to a less expensive case.  So that's my

8  perspective on it and that's what I've seen in all the cases

9  I've been in.  It's a good thing for everybody to have to come

10  to report to the Court.

11        So I'm not going to belabor anything more, Your

12  Honor, on this issue other than to say that because our group

13  is so frustrated and nothing has happened and we believe there

14  is a prospect that nothing will happen for potentially four

15  months if the debtors' motion is granted, we oppose the

16  extension of exclusivity.  And as you've heard, Mr. Bennett has

17  proposed one alternative, to move forward here, not so much

18  necessarily to do that plan, but to motivate the exercise and

19  to try to get things moving here, because they're not moving

20  now.  Thank you, Your Honor.

21        THE COURT:  Thank you.  Does anyone else care to be

22  heard?  We'll give the debtor a very brief opportunity for

23  rebuttal.

24        MR. CONLAN:  Jim Conlan on behalf of the debtor,

25  again, Your Honor.  And I will be brief.  But taking each of

**J&J COURT TRANSCRIBERS, INC.**

1  those in reverse order starting with Mr. Bernstein on behalf of

2  JPM.   The exclusivity extension that we have requested is

3  absolutely necessary, the entire four months is necessary.   I

4  can tell you that if we are stuck in these negotiations, in 15

5  days we will be back.   We're not going to sit there stuck

6  without resorting to teeing up litigation.   And I frankly think

7  that there are many people in the courtroom that would agree to

8  that.

9          But let me agree with something Mr. Bernstein said.

10 And that is, I love the idea of coming back here every month

11 and having a conversation on the record about who's doing what

12 and what's going on, if only to hem people in who are

13 maneuvering in negotiations or otherwise, all within the

14 context, of course, of privileged settlement communications.

15 So I welcome the offer of returning every month and telling you

16 where we are.   I don't think it's a good idea to limit

17 exclusivity in that respect, but I like the idea of coming back

18 and hemming people in.   And you'll get a taste of that when we

19 come to the discovery portion of the hearing today as well.

20          In terms of posturing, sure, there's posturing on all

21 sides.   Are the banks thrilled with us right now?   No.   They

22 would like us to file their plan.   We're not prepared to do

23 that.   They're not happy with us.   That's okay.

24          Moving on to Mr. Bennett, the other faction of the

25 banks.   Mr. Bennett was right about one thing, global

**J&J COURT TRANSCRIBERS, INC.**

1  resolution is the preferred course.  He was also right that

2  uncontrolled litigation is a disaster.  Controlled and surgical

3  litigation, including specific issues to unstick the

4  negotiation and standing might be one of them, makes a lot of

5  sense.  That's another part of what was said today that made

6  sense.  But frankly, the standing issue, and that's what most

7  of what Mr. Bennett had to say boils down to, there's

8  absolutely no reason that has to occur in context of a cram

9  down subsidiary plan.  He knows that.  It doesn't even have to

10  occur in context of a cram down global plan, although that's a

11  possibility, and he knows that.  And it may be that we'll have

12  to litigate surgically the standing issue if we can't come too

13  quickly to a global resolution consensually, and it's possible,

14  as Your Honor knows well, you negotiate, you get stuck, you

15  litigate, and then you start negotiating again against the

16  backdrop of that litigation.

17        With respect to how much Mr. Bennett's clients have

18  studied the subsidiary plan concept, frankly, Your Honor, it

19  would be a mess trying to separate these companies.  They are

20  highly integrated.  There are billions in inter-company claims

21  that we are analyzing.  It simply doesn't make sense.  These

22  are highly integrated companies.  It certainly doesn't make

23  sense to jump to that now, it would be chaotic.

24        With respect to what Mr. Golden had to say on behalf

25  of Centerbridge, which we believe is the largest of the public

**J&J COURT TRANSCRIBERS, INC.**

1  debt holders.  I want to be clear about this.  We have not

2  concluded, and I'll say what I said at the beginning again, but

3  perhaps with even more emphasis.  We have not concluded that if

4  negotiations fail that we are going to cram the bank's plan

5  down on the public debt.  We have not concluded that.  It may

6  well be that we will tee up apart from confirmation, in advance

7  of confirmation, surgical issues that separate the parties.

8  And I understand Mr. Golden's point that he prefers the latter,

9  and we understand the bank's view that they prefer the former.

10  We get it.  That's frankly one of the dynamics that we and the

11  Committee are using in these discussions.

12          And one point with respect to Mr. Bennett.  And I

13  hope I'm not talking too much out of school, but this is rather

14  free form at this point.  We're meeting with Mr. Bennett's

15  clients on Thursday, Thursday this week.  We've been meeting

16  constantly for months with Mr. Bernstein and his clients, with

17  Mr. Bennett over the phone, with Mr. Mayer, who also represent

18  the banks, with the Chadbourne firm, with Centerbridge.  We've

19  been meeting with everybody constantly.  The formality of the

20  meeting to which Mr. Seife referred to in January is just that.

21  It is a formal set piece meeting.  We don't wait until those

22  formal meetings.  Frankly, a lot happens outside of an advance

23  and around those meetings, as Your Honor knows.  Frankly, the

24  meetings have been continuous, as you would expect.

25          Mr. Rosner's comments on behalf of Law Debenture, and

**J&J COURT TRANSCRIBERS, INC.**

1  as we understand it, he, like Mr. Golden, on behalf of

2  Centerbridge, supports the requested extension.  A lot of what

3  Mr. Rosner said, we agree with, and we take it to heart.  And

4  we do, when we say reasonable, mean reasonable on the law and

5  on the facts and given the posture of these cases and these

6  businesses, not reasonable as we deem it because we have a

7  particular objective in mind and we're going to force the

8  unwilling there.  So we understand his comment and we take it

9  to heart and we meant it the way that I just said.

10         With respect to referring to the fee motion as the so

11  called fee motion, that was merely short hand on my part, I

12  probably shouldn't have done it, to shorten a lengthy title.  I

13  didn't mean to refer to it as something less than a motion,

14  just to be clear about that.

15         With respect to what Mr. Seife said on behalf of the

16  Committee, I agree with everything he said.  I think the

17  Committee has done a very good job in this case.  The debtor is

18  the honest broker.  So is the Committee.  It's a complicated

19  committee in terms of its composition, but Mr. Seife and his

20  firm are doing a very good job and they are right there with us

21  in this process.  This isn't the debtor attempting to serve one

22  particular constituency or another, and quite frankly, Your

23  Honor, I think probably the single most powerful piece of

24  information or evidence if you want to identify one for

25  purposes of granting this exclusivity request is everything

**J&J COURT TRANSCRIBERS, INC.**

1  you've seen here today.  There are good elements to much of
2  what was said today.  We think we can harmonize those.  We hope
3  we can.  Do we think we can do it without resorting to some set
4  piece litigation?  We hope we can.  That won't be easy.  We may
5  be back here.  We may be back here quickly with respect to set
6  piece litigation.  We may be back here quickly with respect to
7  a cram down plan.  We're not there yet, but believe me, we're
8  working hard at it and we've been working hard at it, and
9  frankly, at least when you look around the room and see the
10 displeasure, you can figure out that we're doing something,
11 quite frankly, and it isn't that we're just sitting on our
12 hands and worrying about the business, although we are very
13 focused on the business.
14        In conclusion, Your Honor, everything we've done in
15 these cases, including with respect to reviewing these
16 transactions, everything we've done with the Committee and the
17 other constituents in this case in our view adds up to cause
18 for the extension of exclusivity that we've requested.
19        THE COURT:  Thank you.  I've heard enough.  Well, if
20 you look at the things that Courts typically consider when
21 determining whether to grant extensions of exclusivity
22 particularly over the objection of one or more creditors or
23 creditor groups, I think all of those things taken together,
24 and I'll give you individual views in a minute, warrant the
25 granting of some extension of exclusivity.  These are large and

**J&J COURT TRANSCRIBERS, INC.**

1    complex cases.  I'm satisfied, and I think the debtor's right

2    based upon the discussions I've heard today, it's clear that

3    there are ongoing discussions, which may or may not result in a

4    global resolution.  It also strikes me that whether there is a

5    global resolution or not, the debtor still has a reasonable

6    prospect of being able to propose a plan.  This case is not so

7    old that there's anything that tells me that exclusivity should

8    be looked at now.  And I don't think there's been any

9    demonstration that this request for exclusivity is a way to

10   pressure creditors improperly into plan negotiations.

11        I also -- I don't think it is disputed that this

12   company, from parent through subs is highly integrated and that

13   it seems to me a lot of the value lies there.  I don't see any

14   benefit to be gained in separating, breaking up the corporate

15   family at this point.  There may come a time when that may be

16   appropriate.  I will tell you, Mr. Bennett's presentation was

17   very thoughtful and it's something I will have to think about

18   perhaps more in the future.

19        But there is this elephant in the room, as some

20   person described earlier, that has to be addressed.  Now, I

21   will say Mr. Conlan seems to think that if there is no

22   agreement it's to be resolved.  The parties come to the Court

23   and it gets resolved quickly.  These are not the kinds of

24   things that are resolved in the matter of days or weeks.  So

25   from that standpoint it doesn't seem to me to be a good thing

**J&J COURT TRANSCRIBERS, INC.**

1  to postpone too far the process of if litigation has to go

2  forward, moving that forward.

3          So for all of these reasons, I am going to grant the

4  debtor until February 28th and the following second part of

5  exclusivity in an appropriate increment, 60 days beyond that to

6  achieve confirmation.  But I think what I'd like to do is set a

7  framework in which the parties come back somewhere say mid

8  February, mid to late February to determine whether if the

9  debtor is requesting it, it should have a further extension of

10 exclusivity.  And if it's the case that the debtor at that time

11 wishes more exclusivity, then I will need an evidentiary

12 record.

13         And I'm thinking that a hearing date that's set on

14 the omnibus, February 22nd, is not going to allow enough time,

15 at least based on my experience today, to consider the issue if

16 it's still contested.  So I'm inclined to specially list you

17 for February 18th.  Let me ask if anyone has a problem with

18 that scheduling.  All right.  I see some affirmative nods and I

19 hear no wailing otherwise, so we'll fix a hearing for February

20 18th at ten o'clock to determine whether there should be a

21 further extension of exclusivity and ask the parties to confer

22 and submit a form of order that embodies the ruling I've made

23 today.  And all it need do is refer to the fact that my reasons

24 for it were stated on the record.  Are there any questions

25 about what should go in the order?

**J&J COURT TRANSCRIBERS, INC.**

1            MR. CONLAN:  Not from the debtor, Your Honor.

2            THE COURT:  Anyone else?  Okay.  To be clear, all

3    parties are free to renew their responses or objections with

4    respect to any future request for exclusivity.  Now, let me ask

5    this.  I don't know if anything yet is scheduled for February

6    18th, which is that February omnibus hearing.  Can we move

7    everything that is or would have been on the 18th to the 22nd

8    as well to save everybody an extra trip?

9            UNIDENTIFIED ATTORNEY:  The 22nd to the 18th?

10           THE COURT:  Thank you.

11           MR. CONLAN:  How much time did you say we have on the

12    18th, Your Honor?

13           THE COURT:  An hour.  No, I'm sorry.  On the 18th?

14           MR. CONLAN:  Yes.

15           THE COURT:  I'm going to set aside the day.  The 22nd

16    there's just an hour.

17           MR. CONLAN:  That's fine, Your Honor.

18           THE COURT:  Okay.  Now, I'll just ask that you do

19    this.  If it turns out that you want to add something other

20    than exclusivity that is of moment for the 18th, let my

21    courtroom deputy know ahead of time so we don't overload it.

22    Okay.

23           MR. ROSNER:  Your Honor.

24           THE COURT:  Yes?

25           MR. ROSNER:  I have to apologize.  And I don't know

**J&J COURT TRANSCRIBERS, INC.**

1  if it's going to matter to you after you've just done all of

2  this setting up.  It's not on my calendar, I don't know what is

3  Presidents' week in February, I'm not exactly sure, but I know

4  that I'm going to be out of the country on Presidents' week and

5  --

6          THE COURT:  Presidents' Day is February 15th.

7          MR. ROSNER:  So I'm thinking that I'm actually not --

8  I am going to be -- I just was trying to look up on my calendar

9  to see if it was there, but it's not there, because it's a good

10  thing, so that's probably why it's not on that calendar.  I

11  don't know, I mean, obviously I have other people at my firm

12  and if that's the date that it needs to be, then we will

13  certainly make it that date.  I just, I personally can't make

14  it.

15          THE COURT:  Yes, the following week, the only day I'm

16  sitting is the 22nd.

17          MR. ROSNER:  Okay.

18          THE COURT:  I apologize, but I think we're stuck with

19  that.  I had flexibility for the 16th and 17th, but that

20  doesn't help you.

21          MR. ROSNER:  I don't think so.

22          THE COURT:  I understand.

23          MR. ROSNER:  But you do allow people to phone in,

24  right?

25          THE COURT:  Yes.


                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. ROSNER:  Okay.

2          THE COURT:  The only thing I say is, to the extent

3  that there's to be extensive argument, that has to be in

4  person.

5          MR. ROSNER:  I understand, Your Honor.

6          THE COURT:  Okay.

7          MR. ROSNER:  Okay, thank you.

8          THE COURT:  Thanks.  Any other questions?  All right.

9  Let's address the next matter.

10         MR. CONLAN:  Your Honor, I think I'm next.  We should

11 take Law Debenture's motion to terminate payment of LBO

12 lenders' fees and expenses.

13         THE COURT:  Okay.

14 ***********

15         MR. ROSEN:  Thank you, Your Honor.  For the record,

16 David Rosner from Kasowitz, Benson, Torres and Friedman on

17 behalf of Law Debenture who is the indentured trustee for the

18 6.61 percent Debentures due 2027 and the 7.25 percent

19 Debentures that are due 2096.  Your Honor, I believe, hopefully

20 yesterday you received a binder of certain documents that were

21 turned over during some very informal discovery amongst the

22 parties, and everybody has reserved all their rights.  The only

23 thing that I had asked people was to waive confidentiality

24 because I think every page was marked confidential and the

25 parties have done so.

**J&J COURT TRANSCRIBERS, INC.**

1      THE COURT:  Okay, I have the binder.  I was in court

2  until about six o'clock last night, so I tell you I have not

3  had the opportunity to review it.  But let me distill if I can

4  what I think's at issue here.  From what I think the facts are,

5  but you'll tell me if I'm wrong.

6      MR. ROSNER:  Thank you, Your Honor.  For the record,

7  David Rosner from Kasowitz, Benson, Torres and Friedman, on

8  behalf of Law Debenture who is the indenture trustee for the

9  6.61 percent debentures due 2027 and the seven and a quarter

10  percent debentures that are due 2096.

11      Your Honor, I believe -- hopefully yesterday you

12  received a binder of certain documents that were turned over

13  during some very informal discovery amongst the parties and

14  everybody has reserved all the rights.  The only thing that I

15  had asked people was to waive confidentiality because I think

16  every page was marked confidential, and the parties have done

17  so.

18      THE COURT:  Okay, I have the binder.  I was in court

19  until about six o'clock last night so I tell you I have not had

20  the opportunity to review it.  But, let me distill, if I can,

21  what I think is at issue here and what I think the facts are,

22  but you'll tell me if I'm wrong.

23      The arrangement that's been made, and to which you

24  now object, involves payment by, it looks like, one of the

25  debtors -- one of the debtor's non-debtor subsidiaries of six

1 professionals, four law firms and two financial advisors, in an

2 amount of about $25 million.  This is an arrangement, at least

3 according to the submissions that I've read, which was known to

4 the Unsecured Creditors Committee and to which they did not

5 object based upon certain conditions which involved, among

6 other things, reporting requirements and not objected and

7 disclosed to but not objected to by the U.S. Trustee.

8          There has been, according to your filing anyway, no

9 public filing of this arrangement or other disclosure by the

10 debtor, or anyone else publicly, concerning this arrangement.

11 It's your position that the parent is accomplishing indirectly

12 that which it could not do directly and therefore requires --

13 and should have required bankruptcy court approval.  So you

14 want the Court, number one, to stop it, number two, to order an

15 accounting, and number three, to order disgorgement of that

16 which has been received.  Have I missed anything?

17          MR. ROSNER:  Other than saying you agree with what we

18 sought, no, I don't think you've missed it.  I mean, I have a

19 lot to add to that as to what are, I think, the undisputed

20 facts, but that is the gist of what we are seeking and that is

21 the fact as to who knew about it and who has not known about

22 it.

23          THE COURT:  Now, I'd like to stop here, if I may, and

24 ask the U.S. Trustee to come forward.

25          MR. McMAHON:  Your Honor, good afternoon.  Joseph

1  McMahon for the acting United States Trustee.

2         THE COURT:  Good afternoon, Mr. McMahon.  I consider

3  it, under these circumstances, significant, maybe not

4  dispositive but significant, that the U.S. Trustee did not

5  object to this arrangement.  And I'm assuming that the U.S.

6  Trustee did not object because it reached some principled

7  position about why it should not and I was wondering number

8  one, if that were true, and two, if you would share that view

9  with me.

10         MR. McMAHON:  Your Honor, consistent with what has

11  been referenced in some of the papers, the debtors reached out

12  to us at a certain juncture earlier on in these cases and

13  indicated to us that their intention was to allow the payments

14  that are in dispute here to be paid from the cash flows by

15  non-debtor subsidiaries.  That was provided -- that information

16  was provided to us as an informational point from our

17  perspective.  I indicated, as I believe one of the e-mails

18  referenced that was attached to the papers, that to the extent

19  that we decided to take an issue, we would get back to the

20  debtors and we did not so object.

21         Insofar as the issue has been framed, really, the way

22  I think our office saw the issue is whether the payment by the

23  non-debtor, pursuant to the guarantee, which obviously applies

24  to the entire debt of the -- callable under the bank debt as

25  opposed to the ratable portion owed by the non-debtor, whether

1 we would have a basis and principle for doing so.  We

2 understood that the Committee, at least, had been consulted and

3 was not going to be objecting on those grounds.  We asked the

4 debtors for copies of certain underlying documents, including

5 their -- I believe they shared with us a memorandum or some

6 analysis as to the reasons why they believed they were

7 obligated, meaning the non-debtor sub was obligated, to make

8 the payments.  And based upon our review of those materials, we

9 elected not to take a position at that time.

10          To the extent that the objectors have concern, we did

11 not view the debtor's position in any way prejudicing the

12 ability of any party-in-interest in connection with the review

13 of the bank's claims to revisit this issue in the sense that

14 the bank's distribution under a confirmed plan of

15 reorganization should be adjusted to account for this issue or

16 to otherwise address this matter in the context of these

17 bankruptcy cases.  Generally, that's my response to Your

18 Honor's question.  I don't know if the Court has anything

19 further to ask.

20          THE COURT:  Are you taking a position with respect to

21 the relief that's been requested today?

22          MR. McMAHON:  Well, Your Honor, we did not file

23 responsive papers.  We did not take a position, and I do not

24 intend to do so.  My understanding is that the debtors, I

25 think, prepared -- or someone, a party-in-interest has prepared

**J&J COURT TRANSCRIBERS, INC.**

1 a listing of the payments that I presume, you know, if it

2 hasn't been shared with the objecting parties already, could

3 be.  So, I don't think that getting a list of who's being paid

4 and what's been paid out is really no of moment.

5      On the disgorgement issue, Your Honor, there are

6 three items on today's agenda.  I dare say at this point that

7 this issue is probably one piece of a larger puzzle and our

8 view generally is that perhaps it's best addressed in the

9 context of the overarching framework that Your Honor referenced

10 earlier.  Thank you.

11      THE COURT:  Thank you.

12      MR. ROSNER:  Your Honor, Law Debenture sees this

13 issue quite differently.  We don't think this is simply an

14 issue of a two-party dispute with a guarantee that happens to

15 be, you know, outside of the Court and the party, you know,

16 seeking to enforce its rights and the debtor having to do --

17 typically would do something about that.  Because if that were

18 not -- if it were correct that all they could do is just call

19 upon these guarantees, then I suspect that, and I'm not

20 recommending they do this, but they could call on it for

21 interest, they could call on it for principal, they could say

22 we want, you know, all of you guarantors to be paying, but they

23 didn't do that because they knew they couldn't do that.

24      They came up with a scheme with the Tribune debtors

25 to orchestrate a way that they could have their fees and

**J&J COURT TRANSCRIBERS, INC.**

1  expenses paid during the course of the case.  The principal

2  beneficiary of that is the chairman of the Unsecured Creditors

3  Committee.  I understand Mr. Seife has written, and I believe,

4  you know, it's got to be correct that J.P. Morgan recused

5  itself from the determination.

6           However, at least one of the documents that are

7  sitting in here and the formulation and orchestration of the

8  scheme to keep it outside of the bankruptcy court is actually

9  written by the chairman of -- the co-chairman, I'm sorry, of

10 the Unsecured Creditors Committee in determining how this

11 should be done.  It was attached to our papers, actually.  It

12 was one of the three that was attached to our papers saying how

13 this should be done to make sure that the scheme would not be

14 brought before the Court.

15          And, in fact, another of the documents that I've

16 submitted, and I'll refer to it more directly in a moment,

17 makes clear that J.P. Morgan had directed the Tribune debtors

18 to do just what Mr. McMahon just kind of indicated that they

19 did, tell the U.S. Trustee, but under no circumstances ask the

20 U.S. Trustee.  Just inform them, informationally.  And this was

21 a plan.  This was not something that was just done.  It was a

22 plan.  It is, I think, a subterfuge.  It is a ruse to say that

23 this is outside of the court that there are non-debtors that

24 are paying fees and expenses to which they're otherwise

25 obligated.

**J&J COURT TRANSCRIBERS, INC.**

1    There's not a Tribune Creative Ventures, FN Creative

2  Ventures individual who's negotiating this, putting up its

3  defenses to this, seeking a 105 injunction urging the debtors

4  to do something.  There's not a Tribune Creative Ventures

5  separate counsel who is being attacked by the banks in order to

6  meet certain obligations under a guarantee.  This is a

7  negotiation between Tribune and Company and the banks as to how

8  they're going to pay the banks' fees, and that's what -- and

9  most importantly, how they're going to keep it outside of this

10  court.

11    And, you know, there's a lot of things that you get

12  in bankruptcy from coming to the bankruptcy court.  It's an

13  incredibly powerful operation to come into bankruptcy.  You get

14  to take a company that owes a lot of money to a lot of people,

15  including to my client, $1.26 billion from before the LBO, that

16  they owe and say, no, I don't have to pay you right now.  And

17  even more than that, I get to be the only one who's going to

18  file a plan, and I get to use my business judgment, and I get

19  to sell assets free and clear of even (indiscernible).  I get

20  to break leases and contracts.  I get all of these powers by

21  coming in before Your Honor and exercising them.

22    Do they have any obligations that go along with that?

23  I think that they have several obligations.  And I think that

24  one thing we know about bankruptcy court, one thing we know

25  that is supposed to happen, if not in exchange for all of those

**J&J COURT TRANSCRIBERS, INC.**

1  tremendous rights, but at least along with all those tremendous
2  rights, is transparency to the Court, transparency to the
3  creditors, not just the Unsecured Creditors Committee.

4         I understand that they're a representative body, but
5  so is Law Debenture for hundreds if not thousands of individual
6  creditors that own bonds, and there's a lot of (indiscernible),
7  but most importantly to this Court to say, hey, by the way,
8  we're going to pay out to the bank lenders $25 million over the
9  course of the next nine or ten months and we're going to do
10 that without you knowing about it, without you taking a look at
11 what that money is being utilized for, taking a look at where
12 that money came from.

13        I mean, it had to come from the cash management
14 system.  I mean, when I read their cash management motion, all
15 the money goes into the cash management system.  Those
16 accounts, as far as I recall, the J.P. Morgan concentration
17 accounts are owned by Tribune and Company and the money goes
18 out.  It's possible -- I don't know this, I didn't see it in
19 the documents I requested -- it is possible that they set up a
20 separate chain so that they wouldn't be going through the cash
21 management system.  If they did, they should have sent that
22 document over in accordance with our request.  But, if they
23 did, also, it's just furtherance of the scheme.

24        I mean, if you look at the 2015 statement, there's a
25 couple of things -- do you mind taking a look at a couple of

**J&J COURT TRANSCRIBERS, INC.**

1 these documents?

2       THE COURT:  No, I actually often consider evidence
3 here.

4       MR. ROSNER:  I mean, there's -- it's staggering from
5 our perspective as to, you know, what has occurred here and
6 what has occurred without the Court's -- you know, without the
7 Court even being advised.

8       And, you know, and actually, before I turn to this, I
9 do want to just state that transparency in bankruptcy is so
10 utterly important because of the massive effect of the matters
11 that are addressed before this Court and how they impact
12 individual creditors.  People that sign contracts with
13 companies and expect to get paid and then find out in
14 bankruptcy that they're not getting paid, in fact, their
15 contract is rejected, they need transparency as to why that's
16 happened.

17       We've seen throughout the world in the last couple of
18 years what happens when there's a lack of transparency.  Here,
19 we're guaranteed it and here we're also guaranteed notice and
20 an opportunity to be heard.  When something -- when someone
21 wants to take $25 million out of this family of companies, as
22 Your Honor just said a moment ago, these are integrated
23 companies, this is a family of companies and I don't care if
24 the debtors choose to put TCV at the top of the payment, they
25 are taking money out of this enterprise and they're not doing

**J&J COURT TRANSCRIBERS, INC.**

1  it with the notice that the parties are entitled to.

2          THE COURT:  But here's -- you know, here's one

3  implication your argument has.  There may be others, but let's

4  focus on one for the moment.  It's not uncommon for a large

5  organization to file with many subsidiaries but not bring in

6  other subsidiaries, for a variety of reasons.  They might be

7  subject to a separate lending regimen, they might be foreign

8  subs.  I mean, there are all kinds of reasons.

9          And depending on whose interest is being adversely

10  impacted, at least in that party's view, the Court is urged to

11  either ignore or give effect to the corporate separateness.

12  And as I look at this situation, you know, anything you take

13  out in the way of value from a subsidiary, debtor or

14  non-debtor, ultimately reduces value in the parent or somewhere

15  up the chain, maybe in more than one entity.  So, it seems to

16  me that that can't be the basis for the relief that you request

17  because if it were, then what would be the difference between a

18  sub and a parent and a debtor's sub and a non-debtor's sub?

19  Can you respond to that?

20          MR. ROSNER:  Well, Your Honor, I think the difference

21  is, is that when companies file certain debtors and they don't

22  file other debtors, it is in connection with guaranteed

23  obligations such as this so that they bring the totality of the

24  debt into the case itself so that they are not subject to

25  having bank debt that is by anybody's calculation worth

**J&J COURT TRANSCRIBERS, INC.**

1  substantially less than the amount that it was put on at to

2  have the ability to have those yet continue to go against

3  companies that are left outside of bankruptcy.  So, it is

4  unusual to take -- to leave guarantor entities outside of

5  bankruptcy under these facts and circumstances.

6         And what I'm arguing to Your Honor, I'm urging Your

7  Honor to focus upon is, is that it's the facts and

8  circumstances of this situation, that is not the same as an

9  operating non-debtor subsidiary who is paying its obligations

10 in the ordinary course.  We have to look at who is the actual

11 payee here and what does the payee -- what is the status of

12 that payee.

13        I agree with Your Honor that the fact that the

14 reduction in the equity value of the company ultimately cannot,

15 by itself, serve as the predicate for this relief in the

16 context of paying a utility bill or a custodial bill.  However,

17 I think when there's a massive reduction of the value of an

18 integrated company and the use of those funds are to the very

19 creditors in the case who are likely holders of disputed claims

20 and are likely defendants in a potential litigation, or at

21 least in an absolute negotiation, when the money is used for

22 that purpose, then it is well within this Court's jurisdiction

23 to take a look and have it brought before -- you err on the

24 side of bringing those payments before the Court and to put

25 those in front of the fee examiner.  Because what's happening

1  here is that the debtor is paying for the defense of the claims

2  that it is trying to determine may be brought against those

3  parties.

4        They are unsecured creditors.  They are not entitled

5  to have their defense costs paid by the very company that is

6  trying to determine whether it has claims.  The Creditors

7  Committee is trying to determine with us -- we may be in

8  different positions as to how far along we are and what we've

9  determined -- but in determining whether there are assets of

10  this estate in the nature of claims to be brought against these

11  companies -- I'm sorry, these entities, these banks.  And while

12  they're doing that, they're paying the banks' defense costs and

13  actually dealing with the actual investigation.

14        THE COURT:  Well, then I think the way that the

15  request for relief should be articulated is that -- let me put

16  it this way.  Let me say it another way.  The principle of law

17  that you would like the Court to adopt under these

18  circumstances is that when a parent allows or causes a

19  subsidiary, even if it's a non-debtor subsidiary, to undertake

20  an activity or make payments which are material in nature to

21  the business of those entities that are in bankruptcy, and

22  which I would say either are for an improper purpose or

23  improperly re-allocate value away from the debtor entities, the

24  Court has jurisdiction to act, but I still have to look to a

25  specific code section, it seems to me.  And what you've said in

**J&J COURT TRANSCRIBERS, INC.**

1  your papers is this is a transaction outside of the ordinary
2  course of business.
3          MR. ROSNER:  And it is, Your Honor.  It is a
4  transaction outside of the ordinary course of business.  There
5  are at least three transactions here that are outside of the
6  ordinary course, one of which I only learned about when I
7  actually asked for them for the banks to turn -- and the
8  company to turn over some documents in connection with this
9  motion and which we debated for quite awhile as to whether I
10 was going to be entitled to those documents, being told that
11 this is not a factual matter.  But, one is, is that Tribune
12 Company who is not a non-debtor subsidiary paid $2 million of
13 this $25 million and has paid that over to the banks of which
14 I'm not sure if it's been applied or if it's being held as a
15 retainer, but the parent company paid $2 million.
16          I also understand, at least looking through the
17 documents, and it very well may be, Your Honor, that that was
18 done on the eve of the bankruptcy filing, but that would just
19 give rise to, you know, Chapter 5 issues and also something
20 that should be brought to the Court's attention because again,
21 that was not in connection with a DIP loan or -- and even in
22 connection with a DIP financing to fully secured creditors the
23 right to receive payment on pre-petition claims comes before
24 the Court.  This is -- that's piece one that makes it outside
25 of the ordinary course.

**J&J COURT TRANSCRIBERS, INC.**

1            Piece two is, and again, I'm not exactly sure.  I
2   have the document in here presented to Your Honor.  Blackstone
3   required, at least I have the draft, I don't have a final
4   agreement -- and the parties can correct me if the final
5   agreement was not signed -- but Blackstone on a post-petition
6   basis required that the debtors sign an agreement.  Again, I
7   have it in draft.  Blackstone may ultimately not have required
8   that, and then I would be wrong about this.

9            But, the document that I have has Blackstone -- has
10  Tribune Company, the parent, on behalf of all of its
11  affiliates, signing a contract to pay Blackstone and also to
12  indemnify, a blanket indemnity like we've all seen for
13  financial advisors on a post-petition basis that, again, signed
14  by Tribune and Company.  That is outside of the ordinary course
15  and certainly something that should be before Your Honor.
16  Those are two pieces.

17           The overall piece of what is outside of the ordinary
18  course, what would fail the vertical test, what would fail the
19  horizontal test is the Tribune Company's orchestrating this
20  transaction is the Tribune Companies, along with the banks,
21  including the chairman of the Creditors Committee, organizing a
22  way to make payments to the banks outside of Your Honor.  It's
23  not simply the fact that it was being -- the money was being
24  run through a non-debtor.  It was the fact that it was the
25  Tribune Companies that were organizing this.

**J&J COURT TRANSCRIBERS, INC.**

1           And, in fact, for awhile they tried to get something

2    for it.  They tried to actually get a forbearance agreement.

3    And they said, well, you'll forebear and we'll pay your fees

4    and, you know what, that might have been something that you

5    would bring to the Court and say, this seems to be a decent

6    transaction, what do you think, Your Honor, that's our business

7    judgment?  But, they didn't even get the forbearance agreement.

8    What they did was, instead, they came up with an idea of how to

9    do it.  The banks wouldn't give them the forbearance agreement

10   and then the debtors came up with a way of taking it outside of

11   court.

12          Now, there was a concern from -- and I believe I'm

13   right, and if I'm not right, I assume you would have corrected

14   me, Mr. Seife -- that it's Ms. Colnus (phonetic) is co-chairman

15   of the Creditors Committee?  That is correct.  You know, in

16   Exhibit 4 is where she states that it's -- "The steering

17   committee feels that it's best if only non-debtors are parties

18   and it would be more likely to get approved by the Court if the

19   debtors were not a party.  We are worried that if the debtors

20   are parties, the committee may object to it and it would get

21   denied.  I will be frank, as I always am with you, that some

22   are wondering if the company really wants the Court to reject

23   this so the company has an excuse not to pay the fees.  So

24   that's a big heads up and you should think about that in

25   advance of tomorrow's call."

**J&J COURT TRANSCRIBERS, INC.**

1          Their response is, is that they understand the

2  concern -- this is Tribune -- surrounding the inclusion of the

3  debtors.  They can discuss it further in the morning.  But, the

4  intent to their markup is not to proffer something the Court

5  and the UCC are likely to reject.  We're not being cute on the

6  fee question.

7          Well, there they were at least contemplating coming

8  to you and doing it with non-debtors on the tab.  But, then

9  they came up with this idea of not doing it in front of the

10 Court.  They came up with this idea of just saying, well, it's

11 non-debtors, but it's not non-debtors.  That's the point here.

12 It is the Tribune Company that has made this agreement and it's

13 the Tribune Company that is obligated to come here.

14         And by the way, if I'm not mistaken, there's -- in

15 the cash management order there's the creation of post-petition

16 administrative claims by virtue of inter-company transfers and

17 I assume that that would apply to inter-company contribution

18 claims.  So, if these debtors that are making -- these

19 non-debtors that have actually been the vehicle through which

20 the money has been funded over to the banks and to the hedge

21 funds, by the way, that that creates a post-petition

22 administrative contribution claim, again, without having been

23 brought to the Court.

24         So, I think that a fair reading of the documents that

25 are placed before Your Honor, and I would refer you to Number

**J&J COURT TRANSCRIBERS, INC.**

1  11, excuse me, at Tab 11 which is where J.P. Morgan is speaking

2  with Mr. Krakauer and Mr. Krakauer is describing a conversation

3  and J.P. Morgan is saying, "Well, you didn't ask for his

4  permission and you didn't tell him that you were waiting for

5  his consent," both correctly, but instead told him the

6  non-debtors intended to pay around the middle of the week.

7  That is part of a scheme, Your Honor.

8           THE COURT:  All right.

9           MR. ROSNER:  And if you -- and each one of these

10 documents that are put before you, Your Honor, evidence that

11 the debtors' scheme was to enable the banks to be paid, mostly

12 J.P. Morgan, by the way, Your Honor.  And you said before I

13 think that there were six entities that were being paid?

14          THE COURT:  I thought that's what the papers said.

15          MR. ROSNER:  Yeah, there's eight entities being paid.

16 We learned about that when we received some documents.  I don't

17 think any have fallen off, but there were an additional three

18 entities that were added on, I think the Wiley and Ryan firm,

19 Epic and Huron whose sole job is to deal with the discovery.

20 I'm not sure if that information was given to the United States

21 Trustee, but I'm sure that the addition of those entities has

22 aggregated into the 25 million that has been paid to date, Your

23 Honor.  I'm sorry, maybe not to date, through October, and

24 continues to run, which it's a -- if you think about it as a

25 percentage of what the debtors have spent and what the

**J&J COURT TRANSCRIBERS, INC.**

1  Committee has spent, it is four times what the Committee has

2  spent.  It is twice, if not more than what the debtors have

3  spent.  And this has all gone without notice by the fee

4  examiner and not in front of Your Honor.

5        You know what the risk is here, I think, Your Honor,

6  something to be concerned about, is that does the Tribune case

7  become the case in which the message is sent out to bankruptcy

8  participants that it is appropriate to game the system?  That

9  all you need do is figure out how you want to game the system,

10  how you want to pay, in this instance, pay creditors.  Maybe we

11  keep a subsidiary and make it a non-debtor and therefore we can

12  then pay a creditor.  Or maybe if you have a creditor who

13  really wouldn't work as a critical vendor because their claim

14  is too large and there's no way you'll get them paid, maybe

15  before you file what you do is you transfer that claim over to

16  a company that you're going to keep out of bankruptcy in

17  exchange for an inter-company claim, and then when you file

18  bankruptcy, you pay that creditor.  That creditor gets 100

19  cents on the dollar while the rest of the unsecured creditors

20  are getting ten cents on the dollar, I don't know.  Or maybe

21  the debtor figures out ways to hire lawyers a year before the

22  case is filed and then those lawyers get paid by the debtor

23  again without coming to the court.

24        THE COURT:  Look, if we ended the hearing right now

25  and went off the record and sat around for just a couple of

1 hours, I'm sure we could fill a couple of legal pads with

2 methods that are used to accomplish ends like that.

3          MR. ROSNER:  I hope not, but --

4          THE COURT:  But -- oh, I have no doubt of it.  But, I

5 really can only deal with the issue that's before me today.

6 Let me ask this.  Other than the documents that are in the

7 binder, and I'm assuming you want to walk me through them at

8 some point, is there any other evidence that you're going

9 present in support of your motion?

10          MR. ROSNER:  There wasn't, Your Honor.  It was a

11 matter of I believe that these facts are undisputed and if

12 there was a dispute about them, then perhaps we would need to

13 have a witness, although I don't know if one is in court today.

14 I didn't bring a witness down for that purpose, but I don't

15 know if Tribune has a witness here who would be able to answer

16 the questions.  But, no, Your Honor.

17          THE COURT:  I'd like to poll the others who wish to

18 participate and see what they intend.

19          MR. ROSNER:  Okay, thank you, Your Honor.

20          THE COURT:  You're welcome.

21          MR. BERNSTEIN:  Your Honor, may I intervene here?

22          THE COURT:  You may.

23          MR. BERNSTEIN:  Don Bernstein from Davis, Polk for

24 Morgan Chase Bank.  We did not understand this hearing to be an

25 evidentiary hearing.  We did consent to releasing the

**J&J COURT TRANSCRIBERS, INC.**

1 confidentiality.  We knew that Mr. Rosner wanted to use the

2 documents he's put before you in oral argument, but we didn't

3 understand this to be an evidentiary hearing.  There's

4 obviously lots of other evidence that could be educed if we

5 were in an evidentiary context.  I just wanted to make that

6 point for the record.  And, obviously, the chamber's rules have

7 certain restrictions on, you know, what we can do to, you know,

8 have an evidentiary hearing and giving notice to people and

9 that sort of thing.  So, I just wanted to make that point, Your

10 Honor.

11 　　　　　THE COURT:  Well, let me ask this.  Is it your desire

12 to present evidence --

13 　　　　　MR. BERNSTEIN:  No, no, Your Honor.

14 　　　　　THE COURT:  -- today or at some future point?

15 　　　　　MR. BERNSTEIN:  Your Honor, we think this is an issue

16 that needs to be resolved as a matter of law and should be, so

17 we are not planning on presenting any evidence.

18 　　　　　THE COURT:  Well, let me tell you something right

19 now.  While I am not yet convinced that there's a specific --

20 well, while I'm not yet convinced that 363 can be used as a way

21 of accomplishing the relief that the movant here wants and

22 putting aside for the moment the, you know, argument with merit

23 that injunctive relief requires an adversary.  I am concerned

24 that if, in fact, there was some scheme here to avoid that

25 which otherwise should have been brought before the Court as

**J&J COURT TRANSCRIBERS, INC.**

1 undertaken by one or more of the constituents in the case, I

2 certainly don't feel as if the Court is without power or

3 authority to do something about it.

4      So, I doubt very much whether I would make a decision

5 which would put finally to bed all of the relief requested on

6 the law alone.  I might narrow the focus a little bit.  But, I

7 will tell you -- and I haven't looked at the 2015.3 statement

8 yet, again given time constraints -- but to the extent that

9 these payments were put into general categories rather than

10 specifically listed and even if the terms of the rule don't

11 require that they be specifically disclosed and even if the

12 U.S. Trustee did not object to that which was proposed, I don't

13 think that answers the question.

14      I think, frankly, it was a mistake not to make a

15 case-wide disclosure of this arrangement.  The Committee acted

16 as it thought was appropriate in its view, and the U.S. Trustee

17 acted in a way it thought was appropriate, and I make no

18 criticism of them at this point.  But, from the Court's

19 standpoint based on what I've read so far and heard so far, I

20 think it was a tactical error whether there was nefarious

21 motive or not, not to make a disclosure on the record in the

22 2015.3 filing or in some other filing so that this information

23 was available to all concerned.

24      That's where I am.  Anyone else care to be heard,

25 preliminarily?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ADLER:  Good afternoon, Your Honor.  David Adler

2    from McCarter and English on behalf of Deutsche Bank Trust

3    Company America who serves as the indentured trustee under

4    three separate indentures, one from 1992, one from 1995 and one

5    from 1997.

6          Your Honor, we join in the relief sought by Law

7    Debenture and we did file a joinder on this motion.  And we did

8    note, Your Honor, that there were two factual issues that we

9    see present here with respect to J.P. Morgan.  The first one is

10   that J.P. Morgan says that they have not sought payment for any

11   legal fees incurred in its capacity as a member of the

12   Creditors Committee.  Well, Your Honor, that's a statement that

13   we think should be supported.  How have the fees been

14   segregated between the steering committee for which J.P. Morgan

15   serves on, as well the Creditors Committee?  We would like to

16   know what processes have been employed to segregate the fees

17   and expenses with respect to counsel that's been employed by

18   J.P. Morgan.  That's issue number one.

19          Issue number two is, J.P. Morgan says that they've

20   accounted regularly to the Creditors Committee and to the

21   debtor and if they've accounted regularly on those issues, it

22   should not be too much of an issue in this case for them to

23   account to the Court and to provide exactly what the amounts

24   are and the underlying narratives for those -- for the fees and

25   expenses that they seek.

**J&J COURT TRANSCRIBERS, INC.**

1        So, Your Honor, for those reasons, I mean, we think

2    that there are two distinct factual issues raised from J.P.

3    Morgan's objection which will need to be addressed before the

4    Court can make a ruling on this issue.  But, we do join in the

5    relief, and we do believe that these payments should not have

6    been made from the non-debtors.  And as Mr. Rosner said, quite

7    frankly, you know, the debtors are basically paying for the

8    defense of J.P. Morgan and the senior lenders and we think that

9    that's improper.  Thank you.

10        MR. GOLDEN:  Your Honor, Daniel Golden, Akin, Gump,

11   Strauss, Hauer and Feld, counsel for Centerbridge.

12        Your Honor has invited preliminary comments.  I don't

13   intend to give you the full oral argument, but one point that I

14   don't think has been focused on yet is one of the dangers

15   inherent with this kind of process is that there apparently is

16   nobody, no fiduciary who is trying to understand or analyze

17   whether the proposed payments are even in compliance with the

18   credit agreement section that the lenders have relied upon as

19   giving them the right to these payments.

20        And as the J.P. Morgan's papers said -- it's Section

21   8.04(a) -- that provision provides for the reimbursement of

22   reasonable and documented counsel fees and expenses.  It makes

23   no reference to financial advisory fees, and yet we know that

24   some of the fees, presumably a large portion of the fees, are

25   being paid not only to counsel fees, but are being paid to two

**J&J COURT TRANSCRIBERS, INC.**

1  well-healed financial advisory firms.  And there is no

2  reference in Section 8.04 for the payment for advisory fees.

3          Secondarily, but no less important, the payment

4  scheme under Section 804 talks about payments to the agent and

5  the lenders for enforcement of their rights under the credit

6  agreement.  Well, we won't know with absolute certainty until

7  we see a summary of the fees that have been paid to date, the

8  24 or $25 million amount that's been bandied about, but it is a

9  very strong belief on the part of Centerbridge and Law

10 Debenture that these fees were not incurred primarily for

11 enforcement actions, but rather to mount a defense in

12 connection with a potential fraudulent conveyance action.

13         And we suggest that for both of those reasons, even

14 if the Court could get over the fact that this hasn't been

15 publicly disclosed, they're not -- these fees are not even in

16 compliance with the credit agreement as set forth by J.P.

17 Morgan, a point I wanted to raise on a preliminary basis and

18 reserve the right to respond to other points on oral argument.

19         THE COURT:  Thank you.  Let me hear from the debtor.

20         MR. KRAKAUER:  Your Honor, first -- Bryan Krakauer on

21 behalf of the debtors and also speaking I guess today on behalf

22 of the non-debtors, as well.  First of all I'd like to clear up

23 just a couple of points raised by Mr. Rosner.

24         First, there were no payments made by the Tribune

25 Company since the filing of the petition.  One of Mr. Rosner's

**J&J COURT TRANSCRIBERS, INC.**

1  requests in his motion was for an accounting.  We didn't wait

2  till after this Court heard this motion to give an accounting.

3  We supplied an accounting.  It listed pre-petition payments, as

4  well, that were made before the filing of the petition and the

5  payment by the Tribune Company that's listed there was a

6  pre-petition payment that was made before any decision was made

7  to file these cases.  So, I just wanted to be clear about that.

8  There have been no payments by the parent to the banks.

9         Second, all the monies that have been remitted have

10  been non-debtor monies.  None of them were generated by the

11  debtors.  They were all generated by the T.B. Foods Group --

12  T.B. Foods entity and they were all non-debtor monies.  So,

13  there has not been any debtor monies used.

14         Third, there's a reference to the Blackstone

15  engagement and a Blackstone indemnity and a reference to a

16  Tribune signature line.  Neither the debtors nor the

17  non-debtors have signed any agreement providing for any consent

18  or indemnification for Blackstone with respect to the

19  Blackstone engagement.  There was, during the course of

20  discussions and negotiations, a request by the lenders that the

21  -- either the debtors or the non-debtors do so and in the end

22  the debtors and the non-debtors both declined to do so.  So

23  there is no additional agreement that exists.  And what's been

24  provided in the way of documents was a draft that was

25  circulated by the lenders to us at one time, and that was not

**J&J COURT TRANSCRIBERS, INC.**