1  executed or consented to.  So, I wanted to get those points

2  just out of the way.

3          The point at issue here is, obviously these payments

4  and whether or not the debtors should have come before this

5  Court and requested permission provided prior to making payment

6  and whether or not there should have been additional

7  disclosure.  These issues were given some careful thought at

8  the time and I think it might be helpful to this Court to put

9  it in a little bit of context.

10         First, with regard to the decision of which entities

11  to file and which not to file, I think as this Court is aware,

12  the Tribune Company and its affiliates consist of more than 100

13  entities.  More than 110 of them filed a petition.  There was

14  five guarantor entities that did not file a petition and the

15  reason they didn't file was based on the business circumstances

16  associated with those entities.  One of them was the Cubs, and

17  I think we have previously briefed before the Court some of the

18  reasons why we thought that filing the Cubs would have a very

19  adverse business impact on that entity and why it was kept out

20  of the proceeding.

21         The other four entities were, in one form or another,

22  involved in joint venture or affiliation agreements with

23  non-affiliated entities.  And there was a business concern that

24  subjecting those entities to a proceeding may have a

25  detrimental effect on those joint ventures, and that it may

**J&J COURT TRANSCRIBERS, INC.**

1  impair value and that it may not be in the interest of the

2  estate to run that sort of risk, and that was given a fair

3  amount of thought before we filed these cases, if we were going

4  to file.  And the decision was made that in prudence that those

5  entities should not file because of their relationships and

6  their joint ventures with third party unrelated parties.

7         One effect of that was, it left those entities

8  without the protection of an automatic stay.  You had entities

9  that were out there that could be subject to creditor claims

10 both by our senior lenders and by bridge lenders who had

11 guaranteed claims.  A whole number of parties are bridge

12 lenders and senior lenders.  And the possibility that there

13 might be an involuntary, the possibility that there might be

14 some action against those parties was a risk that we balanced

15 and incurred in connection with the decision not to file this.

16 The decision at the end of the day that was made, was not to

17 file for the business reasons that I just discussed.

18        Shortly after the filing we were approached by the

19 senior lenders for their payment of fees in connection with

20 their guarantees.  That was an issue which we gave a lot of

21 thought to at the time.  We took a look at the guarantees

22 themselves to see what they guaranteed and made a determination

23 that there were amounts that were owed under those guarantees.

24 There's been cited 804(a) of the guarantees which deals with

25 enforcement expenses.  There is also 804(b) of the guarantees

**J&J COURT TRANSCRIBERS, INC.**

1   which deals with broader indemnification provisions.

2           And in looking at that, we determined that there was,

3   indeed, a claim pursuant to the wording of those guarantees and

4   that there was a claim that could be made out there.

5   Obviously, people disagree with that.  That would be an issue

6   for another day as to whether or not the fees were properly

7   owed pursuant to the terms of the guarantees.  But, that is

8   something we looked at.  It's also something Mr. McMahon

9   inquired about when we had discussions with him and we also

10  provided him the provisions of those agreements, as well as our

11  analysis at the time.

12          Second, we looked at the law to see what was required

13  and how the filing of our parent entities and affiliated

14  entities might or might not affect our obligations under those

15  guarantee agreements, and whether or not if payments were made

16  pursuant to those pre-existing agreements, they would require

17  court approval.  In connection with the law, the law does seem

18  to be very clear that the filing of a proceeding for some

19  entities does not affect -- and affiliates, does not affect the

20  obligations of the non-filers and that the circumstances under

21  which one can get an injunction for the benefit of the debtors

22  against creditors of a non-debtor have to be extraordinary

23  circumstances.  It can be done in certain circumstances, but

24  it's difficult and it requires a very stringent test.  We felt

25  that it would be very difficult for us in this circumstance to

**J&J COURT TRANSCRIBERS, INC.**

1 satisfy that test.

2       Second, we looked at whether or not this was -- if

3 these payments were made by the non-debtors, whether they would

4 come within Section 363.  And our view was, after looking at

5 it, was that these were payments not a property of the estate

6 and that so long as the monies were not generated by the

7 debtors and were exclusively assets of the non-debtors, that it

8 did not come within 363.

9       And based upon that, we reached a conclusion that the

10 request for payment was something that something that we should

11 honor at the time, both looking at the business issues of

12 maintaining stability in these entities and in terms of not

13 running the risk of creditor claims and feeling that if we did

14 make the payments, that it was much more probable that we would

15 not seek claims against these entities.  And we also negotiated

16 at the time that we would -- that the senior lenders would also

17 provide a blockage provision preventing the bridge lenders from

18 acting against these entities which we viewed as beneficial to

19 the estate to additionally provide for stability.

20       Having reached that conclusion, though, we also

21 realized that these were payments that other constituencies

22 would have an interest in and that they could be controversial.

23 So, we determined that we would not make a final decision on

24 payment without first seeking disclosure to the Creditors

25 Committee and the U.S. Trustee and confirming that neither

**J&J COURT TRANSCRIBERS, INC.**

1  party had an objection to the payments or to the process that

2  we were proposing for the payments.

3          We then approached the Creditors Committee first,

4  disclosed to them what was being proposed in terms of the

5  payments, both what they were for, the amount, how we proposed

6  to do it, and asked them to please carefully consider that and

7  let us know whether they objected to us making the payments in

8  this matter.  And the Committee at that time consisted of

9  representatives of most all the major constituencies in this

10 case.  The U.S. Trustee when they appointed the Committee, went

11 with the route of one from Column A, one from Column B, one

12 from Column C.

13         We've had very broad representation on the Committee.

14 Included in the representation was Deutsche Bank which at the

15 time was indenture trustee for all the public bondholders.  And

16 they -- Mr. Rosner's client, Law Debenture, at that time did

17 not exist as an indenture trustee in this proceeding.  They

18 subsequently became indenture trustee for one of the four

19 indentures with Deutsche Bank, remaining trustee for the other

20 three indentures.  But, there was no Law Debenture in this case

21 at that time.  It was all one hundred percent for the public

22 noteholders Deutsche Bank which was on the committee and was

23 part of this process of disclosure.

24         We tried to make the disclosure very broad to the

25 committee, and the committee spent about a month reviewing it.

**J&J COURT TRANSCRIBERS, INC.**

1  They had three separate meetings.  They asked a number of

2  questions.  They asked questions of us, they asked questions of

3  the secured lenders.  And at the end the Unsecured Committee

4  came back to us and said, provided these conditions are

5  satisfied, and they listed the conditions in an e-mail, they

6  did not object to the payments.

7          We then went to the U.S. Trustee and went through

8  much the same process.  We disclosed the proposal.  We

9  disclosed the reasons why we thought legally the non-debtors

10  were entitled to -- or obligated to make them.  And we asked

11  for the U.S. Trustee's reaction.  The U.S. Trustee asked us for

12  some backup information, asked us for some analysis.  We

13  provided that, and ultimately the U.S. Trustee got back to us.

14          In the end it was, of course, the decision of the

15  non-debtors and also of the debtors to allow the non-debtors to

16  make these payments.  But, we did have a great cognizance that

17  we should do this with full disclosure to the proper parties

18  and to ensure that there was not objection to what we were

19  proposing.

20          In terms of stability of the entities that for the

21  non-debtors it has accomplished so far from a business basis

22  what we had hoped.  We got through the Cubs transaction without

23  there being a problem, without any creditor actions and to date

24  there have not been any creditor actions by any of the

25  guarantor creditors against the non-debtors.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  You know, let me interrupt for a minute

2  --

3        MR. KRAKAUER:  Yes, sure.

4        THE COURT:  -- Mr. Krakauer.  It might be that if

5  this information were introduced in the way of evidence as

6  opposed to --

7        MR. KRAKAUER:  Right.

8        THE COURT:  -- statement of counsel, I might conclude

9  that the motion should be denied.  But, even if these payments

10  were to be characterized as for the sole purpose of buying

11  peace to accomplish other legitimate ends, that might be good

12  enough.  Put that aside for a moment.  I'm still of the view

13  that as it turns out and, you know, as they say, hindsight is

14  20/20, it was a mistake not to make a wider disclosure.

15        Now, let me tell you what I'm going to do.

16        MR. KRAKAUER:  Sure.

17        THE COURT:  We're up against a time constraint here.

18  I have a one o'clock hearing and I have a two o'clock

19  conference call.  I'm going to bring you back at three, and

20  we'll finish with this matter and pick up the status in the LBO

21  issues at that time.  But, with respect to this motion, I am

22  going to order that a disclosure be made and I'm open to the

23  foreman, which the debtor does that, and file it with the

24  Court.  But, I don't think I'm in a position to determine

25  whether the relief should be granted unless I actually hear

**J&J COURT TRANSCRIBERS, INC.**

1 evidence in support of what lawyers are arguing to me.  And I

2 say that, understanding that it may be the motion here is

3 motivated by something other than that which appears on the

4 surface.  It comes at a time when everything is now coming to a

5 head about the plan.  I'm not unmindful of these things and I

6 hate to start another -- well, I hate to create a forum for

7 another skirmish when there are other more important things to

8 be considered.  And I think Mr. McMahon put his finger on it

9 that ultimately maybe the best resolution of this issue comes

10 in the context of a plan.

11      But, I have what I have before me, and I do think it

12 has to be decided.  So, during the time between now and three

13 o'clock I'd like the parties to confer and determine the

14 framework for an evidentiary hearing, what further discovery,

15 if any, is necessary, and the time frame during which the

16 parties believe they would be ready for such a hearing and I'll

17 try to schedule it to accommodate the parties' wishes.

18      But, I don't think I can accede to both the movants'

19 and J.P. Morgan's wishes that I decide this matter on the law.

20 I don't think that would be the appropriate thing to do.

21      Any questions before we break?

22      MR. KRAKAUER:  No, Your Honor.

23      THE COURT:  All right, court will stand in recess on

24 this matter until three o'clock.  I'll take a short break to

25 allow the one o'clock parties to set up.

**J&J COURT TRANSCRIBERS, INC.**

1             (Recess)

2             THE CLERK:  All rise.

3             THE COURT:  All right.  Good afternoon.  Let's resume

4  consideration of the Law Debenture's e-motion, disgorgement

5  motion.  Whatever anyone wants to --

6             MR. KRAKAUER:  Your Honor, Brian Krakauer again.  A

7  few points.  First, on the disclosure, obviously we're very

8  willing to do that.  We have provided an accounting, which I

9  think is one of the exhibits that was given -- handed up to the

10  Court.  We would take that information and list it item by item

11  for each professional, showing the exact amounts that were

12  paid, and do it at the same level of detail which currently is

13  in our MOR reports for all the debtor's attorneys.

14             If the Court wants a greater amount of disclosure

15  than that, we'll obviously do what the Court wants.  But that

16  was, at least, our thought.

17             THE COURT:  That's sufficient for now.

18             MR. KRAKAUER:  Okay. And we'll get that on file --

19             THE COURT:  All right.

20             MR. KRAKAUER:  Second, we have talked about

21  discovery and a hearing date, and I'll let, you know, the

22  various parties talk about what they need.  But the thought is

23  to schedule an evidentiary hearing some time around January

24  20th, or the nearest date after that.

25             THE COURT:  Is there a consensus on that?

**J&J COURT TRANSCRIBERS, INC.**

1        MR. KRAKAUER:  I believe there is, Your Honor.  Yes.

2                    (Pause)

3        MR. KRAKAUER:  And we would anticipate it may take a

4   half day, possibly a little longer.

5        THE COURT:  How about January 21st at 11 o'clock.

6        MR. KRAKAUER:  That's fine with me.  Is that okay?

7        UNIDENTIFIED ATTORNEY:  That's fine.  Yes.

8        MR. KRAKAUER:  Okay.  It appears to be fine, Your

9   Honor.  And then, I'll let various parties come up and talk

10  about the amount of discovery they want.  But one thing, Your

11  Honor, we've -- as I've said earlier today, I think from the

12  debtor's point of view we believe we've handled this in an

13  appropriate way; however, given the fact that Your Honor wants

14  to take it up with a full evidentiary hearing and hear all the

15  evidence, we've also decided that between now and the hearing

16  date we will suspend further payments so that it could all be

17  addressed at that time.

18       THE COURT:  All right.

19       MR. KRAKAUER:  And that's -- I'd turn it over to

20  people, if you want to talk --

21       THE COURT:  All right.  I'll hear from others.

22       MR. BERNSTEIN:  Your Honor, Don Bernstein,

23  representing J.P. Morgan Chase Bank, from Davis, Polk and

24  Wardwell.  We're in concurrence on the schedule, Your Honor.

25  We expect we are going to need some depositions.  We haven't

**J&J COURT TRANSCRIBERS, INC.**

1  even discussed yet whether we're going to need some document

2  discovery.  It will probably be a handful of depositions.  I

3  don't know the exact number.

4           One point on Mr. Krakauer's statement about

5  suspending the payments, the debtor has every right to do that

6  under the agreement that we had reached with the debtor, so we

7  are not quarreling with that.  We do have -- I just want the

8  Court to realize that of the money that we've got there's a

9  significant unused retainer, and we would expect to continue in

10 the ordinary course to apply that retainer as we continue

11 through this period.  And we think that's appropriate.  We

12 don't think there's a record yet sufficient to justify not

13 permitting us to continue to operate in the ordinary course, as

14 we have been.  So, I just wanted to put that on the record,

15 Your Honor.

16          THE COURT:  Thank you.  Does anyone else care to be

17 heard?

18          MR. ROSNER:  Yes, Your Honor.  For the record, David

19 Rosner from Kasowitz, Benson, on behalf of Law Debenture.  I

20 appreciate your accommodation on the hearing date, and I think

21 the parties will work cooperatively in making sure that the

22 discovery is accomplished in time so that we can have the

23 hearing that we should.

24          I don't necessarily agree that the disclosure that's

25 being made is totally sufficient for the case, but I recognize

**J&J COURT TRANSCRIBERS, INC.**

1 that this is where we're going for now, and then we'll have a

2 hearing on it and see if other and further disclosure that's

3 case-wide or public-wide should be made.

4        I categorically disagree with the application of the

5 retainers by the professionals during the period where the

6 debtor has determined to suspend payments by the non-debtor. I

7 think that that is, to use a phrase I used before, doing

8 indirectly what the debtors are not doing directly, where the

9 debtors have said it's not appropriate to be making those

10 payments and the professionals are now saying, well, that's

11 okay because we have the money anyway. And I think that during

12 the period, it's not that long of a period between now and the

13 hearing date, that they shouldn't be applying that, and my

14 recollection is is that in the demand that they made to the

15 debtor originally of posting retainers they made clear that

16 those retainers would be used for last dollars in the case such

17 that they would be evergreen retainers, and they're now

18 changing it so they wouldn't have, you know, any absence of

19 payment now. So, we would ask that in addition to the

20 suspension of payment that they also not apply retainers at

21 this point, and if the hearing goes their way, then there will

22 be no prejudice, of course.

23        THE COURT: Well, except for disclosure I'm prepared

24 to, in the fixing of a hearing, order no further relief today

25 on the motion. There isn't a record sufficient before me to

**J&J COURT TRANSCRIBERS, INC.**

1  make any, even a preliminary determination that any of the

2  payments were inappropriate.  As I said, my main concern, at

3  least preliminarily, until I hear the facts, was the failure to

4  disclose.  Now, I guess on the other hand if it turns out that

5  I think you're right and I order all of the relief that you

6  asked for, it seems to me that you should be readily able to

7  recover that which has been paid.

8           MR. ROSNER:  Thank you, Your Honor.  Last, just a

9  procedural point, is --

10          THE COURT:  Or rather the estate should.

11          MR. ROSNER:  Sorry?

12          THE COURT:  Or rather the estate should.

13          MR. ROSNER:  Oh.  I hadn't picked that up, but okay,

14 Your Honor.  The -- just as a procedural point, will Your Honor

15 be requiring a pretrial order?  And if so, when would Your

16 Honor be requiring that?

17          THE COURT:  Well, let's see.  The answer is yes.  You

18 can submit it with the binder, which would be due by noon on

19 the 19th.

20          MR. ROSNER:  Okay.  Thank you, Your Honor.

21          THE COURT:  All right.  Are there any other

22 questions?

23          MR. GOLDEN:  Thank you, Your Honor.  Daniel Golden,

24 Akin, Gump, Strauss, Hauer & Feld, counsel for Centerbridge.

25 Two points of clarification, Your Honor.  I just wanted to make

**J&J COURT TRANSCRIBERS, INC.**

1  sure the Court understands that the disclosure Mr. Krakauer has

2  suggested is what the debtors intend to do, will be a single

3  line item, entry by entry, for each payment that will be made.

4  It will be the day the payment will be made, the amount of the

5  payment, and the professional who was paid.  There won't be any

6  further detail.  And if that's acceptable to the Court, we'll

7  live with that.  It will involve, though, in terms of

8  discovery, getting behind those one line items to try to

9  appreciate what, in fact, the fees were incurred.  So, I just

10  wanted to make sure the Court understood what Mr. Krakauer was

11  suggesting would be filed in terms of disclosure.

12          THE COURT:  I do.

13          MR. GOLDEN:  Okay.  Second, with the Court's ruling

14  about not having enough or sufficient record before it to stop

15  any payments being drawn from the escrow account or the deposit

16  account, I just bring to the Court's attention a problem we ran

17  into in Tusa when we had to seek to recover fees.  These

18  payments are being made on behalf of an agent, and on behalf of

19  a lending group, or a steering committee, to, as I understand,

20  eight different professional firms.  To the extent that the

21  Court ultimately determines that it was inappropriate for these

22  payments to be made, the payments made already and the payments

23  that are proposed to be made between now and the hearing date,

24  I'd like to get some clarification from J.P.M, as agent,

25  whether J.P.M. will stand behind the disgorgement obligation or

**J&J COURT TRANSCRIBERS, INC.**

1  whether the estate will need to go after eight firms that are

2  not necessarily within the jurisdiction of the Court?

3           THE COURT:  Well, if you care to respond?

4           MR. BERNSTEIN:  I'll be frank with Mr. Golden.  I

5  have no idea what the answer to that question is.

6           THE COURT:  Let me ask this.  There was a place in

7  the papers where the professionals were identified, I think.

8  Could someone direct me -- redirect me to that place?

9           MR. ROSNER:  Yes, Your Honor.  The schedule that I

10 think Mr. Krakauer and Mr. Golden were talking about is at Tab

11 9.

12          THE COURT:  Well, who is Wiley Rein, or Wiley Rain

13 (sic)?

14          MR. GOLDEN:  Your Honor, they are FCC counsel.

15          THE COURT:  And Eaton Vance?

16          MR. GOLDEN:  They are one of the hedge funds that's

17 on the steering committee.  And I don't know exactly what that

18 small amount of money was used for.

19          THE COURT:  So, they are a --

20          MR. GOLDEN:  Expenses of some sort.

21          THE COURT:  They are a creditor in the Tribune cases?

22          MR. GOLDEN:  Yes.

23          THE COURT:  Well, I will say I see all of these folks

24 on a regular basis, and if I enter an order telling them to pay

25 money back I have the feeling it's going to happen.

1    MR. GOLDEN:  Very well, Your Honor.

2    THE COURT:  All right.  Any other questions or

3 comments?  Okay.  Shall we proceed to the status hearing?

4    MR. CONLAN:  Your Honor, Jim Conlan for the debtors.

5 This is the last item today, and again, it will be sort of free

6 form.  This is a -- just a status conference with respect to

7 the informal discovery to which we referred during the argument

8 on the exclusivity motion.

9    THE COURT:  So, are the parties going to be

10 requesting an informal order?

11                        (Laughter)

12    THE COURT:  Or, just tell me what precisely is the

13 Court going to be asked to do today, if anything, other than

14 listen?

15    MR. CONLAN:  Frankly, Your Honor, other than listen

16 and other than perhaps hemming people in with respect to when

17 they will be delivering their documents, their information, it

18 doesn't have a purpose.  Frankly, we would like you to be

19 involved in the informal discovery process, not so much to

20 issue orders, but to keep people on their toes as we drive

21 towards a resolution.

22    THE COURT:  Exercise my moral and persuasive

23 authority?

24    MR. CONLAN:  Yes, sir.

25    THE COURT:  I see.  Proceed.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. CONLAN:  And as we proceed I'd like to invite

2   Graeme Bush, counsel to the creditors' committee, to join me at

3   the podium, as well, because as you heard earlier the discovery

4   efforts have involved many people, including the creditors'

5   committee, and in general, as we said in the agenda that we

6   filed with the Court, discovery has gone along nicely.

7          There are lots of people involved, about 30 different

8   parties.  A few issues have developed.  One of them involves

9   Merrill Lynch with respect to the timing of delivery of e-

10  mails, and we've had difficulty nailing down when those e-mails

11  will be delivered, and a party or two, who can also speak for

12  themselves in the courtroom, have identified that as making it

13  difficult for them to proceed with respect to settlement

14  discussions.

15         THE COURT:  Can you -- excuse me -- tell me what

16  general framework, if any, has been agreed to with respect to

17  this informal discovery.

18         MR. CONLAN:  Sure.  Graeme?

19         MR. BUSH:  Good afternoon, Your Honor.  I'm Graeme

20  Bush from Zuckerman Spaeder, and as Your Honor knows, Zuckerman

21  Spaeder was retained as special litigation counsel to advise

22  the committee with respect to the LBO claims, and we've been

23  working on this since we were retained at the beginning of

24  September.

25         It might be helpful if I just give a kind of a

**J&J COURT TRANSCRIBERS, INC.**

1   flyover of what's been going on in discovery, and of course I'm

2   happy to answer any more detailed questions the Court has about

3   any aspect of discovery.  But generally speaking, since even

4   before we got into the case there was a fair amount of document

5   discovery going on pursuant to the Court's informal Rule 2004

6   procedures, and by and large parties were producing documents

7   voluntarily.

8         Pursuant to that process we have received documents

9   from several categories of producing parties, the Tribune

10  related entities, the Zell related entities, some of the major

11  shareholders, and board representatives, and advisors.  We have

12  received documents from financial advisors, from the lenders,

13  and from the firms rendering solvency opinions.  We have

14  received some documents from the rating agencies, from some of

15  the financial institutions that declined to participate in the

16  LBO loans, and from some of the members of Tribune's board of

17  directors back at the time.  Those documents have all been

18  processed, reviewed and analyzed, and that's an on-going

19  process as documents are received.  And documents are still

20  coming in; indeed, Merrill Lynch just produced another 171,000

21  pages of hard copy documents in the last week or so.

22         For the most part the document discovery has gone

23  fairly well.  The reference to Merrill Lynch really has to do

24  with electronic documents and e-mail discovery.  Merrill Lynch

25  was, I think, first served with document production requests

**J&J COURT TRANSCRIBERS, INC.**

1  back in March and did begin producing hard copy documents, I

2  guess at the end of the summer, and continued through that

3  process.  They probably are the ones that have taken the

4  longest to reach an agreement with -- they are the ones, not

5  probably, who have taken the longest to reach an agreement with

6  the creditors' committee on a protocol for searching electronic

7  documents and producing them.  That protocol was finally agreed

8  to in the last several weeks, and the issue right now with

9  Merrill Lynch is not that we don't have an agreement about what

10 they'll look for, but we don't have any real assurance about

11 when we will start to receive documents.  And I think that is

12 an issue for some of the other parties in the room, as you

13 mentioned, but it really is an issue also for the creditors'

14 committee.

15         We have decided that we can go ahead and begin

16 substantive discussions with regard to the LBO claims, but I

17 have been -- tried to be clear that the Merrill Lynch documents

18 are -- e-mails are fairly important to any kind of final advice

19 that we can give to the committee with respect to the strength

20 of the claims, and with respect to any position that they ought

21 to be taking, or may be asked to take in settlement context.

22 And if these documents come in in the next several weeks, then

23 that's not going to be a problem.  But if they come in some

24 time in the middle of January, or come in, dribble in

25 throughout January and into February, it could very well turn

**J&J COURT TRANSCRIBERS, INC.**

1  out to be a problem.  And since we don't really have any

2  assurance one way or the other about when the protocols would

3  run on the electronic documents and when we'll start to receive

4  them, we're a little bit up in the air about whether this is

5  going to impede our ability to engage in settlement

6  discussions.  I don't know if you want to address that any

7  further.  I can move on and continue with some of the other

8  aspects of discovery, but that's up to --

9          THE COURT:  Let me --

10          MR. CONLAN:  Just --

11          THE COURT:  Go ahead.

12          MR. CONLAN:  I was just going to say one suggestion.

13  Merrill Lynch obviously was aware of what was on the agenda,

14  and Merrill Lynch's counsel is in the courtroom.  Perhaps, in

15  fairness, if we could ask Merrill Lynch's counsel to come up

16  and tell us what they could about delivery dates on the e-mails

17  so that we know that there's an issue before we --

18          MS. PRIMOFF:  Good afternoon, Your Honor.  Madlyn

19  Primoff of Kaye Scholer for Merrill Lynch.  With me is my

20  colleague, Joseph Drayton.  Merrill received an amended

21  informal document request on May 14th.  We've produced all hard

22  copy documents and all electronic documents other than e-mails

23  and attachments.  It was agreed with the creditors' committee

24  back in the June/July time frame that once the creditors'

25  committee had reviewed the non-e-mail documents, that we would

table the production of e-mail documents, and that once they
had an opportunity to review the non-e-mail documents the
creditors' committee would come back to us and we would work
out a protocol for e-mail discovery.

September 18th was the first time that they
approached us about e-mail discovery.  They asked for 82
custodians and 43 search terms, which is just absurd in our
judgment.  And the rationale for that was that we could
identify groups within Merrill Lynch who worked on the
transaction and come to a rational number of people and search
terms for the e-mail production.  So, during the month of
October, on virtually a daily basis, we had communications with
the creditors' committee about the scope of the e-mail
production.  And this was focused on limiting the functions
within the institution, so -- not just the number of people,
but coming up with a rational basis for deciding how many --
for deciding which custodians' e-mails would be searched,
reducing the number of search terms.  And the creditors'
committee then made a request at that time to expand the time
frame for the search by seven months, and we acceded to that
request.

On October 26th we reached an agreement that provided
for us to search 12 particular custodians.  They essentially
would not budge off of the 43 search terms.  The only search
terms that they agreed to give up were Standard & Poors and

1  S&P.  So, we agreed to gather the data and run the search terms

2  using the 41 search terms, but reserving our rights.

3         So, promptly following that agreement on October 26th

4  we began the process of collecting the electronic data.

5  Merrill Lynch maintains -- has a system which is called the CAR

6  system, and that's their e-mail retention system.  We promptly

7  began retrieving data from the CAR system.  There's a limited

8  amount of data that can physically be pulled at any one time.

9  So, Merrill Lynch's practice is to prioritize -- obviously this

10 isn't the only discovery request that they have, their practice

11 is to prioritize their discovery requests within the

12 institution.  This request was assigned the highest priority.

13        After the data is pulled it's bar coded and it's

14 placed on a source drive.  It's then sent to the processing

15 team to be loaded onto a processing platform.  And processing

16 includes a loading phase, an indexing phase, a searching phase,

17 and an assignment phase.  What we have found thus far is that

18 the volume of data is more than we anticipated, thus it has

19 taken more time to collect and process than what we

20 anticipated.  We expect to finish the collection process in the

21 next day or two.  The raw estimate that we have as of yesterday

22 evening from the client is that there will be about 330,000

23 documents for the 12 custodians using the 41 search terms over

24 the 30 to 31-month period.  In our view this is way, way, way

25 too many documents, and all that this process has done so far

**J&J COURT TRANSCRIBERS, INC.**

1  is support Merrill's belief from the beginning that the 41

2  search terms was way too burdensome.

3        We have estimated how long it would take to make a

4  production from start to finish, if it's based on these 330,000

5  documents, and we estimate approximately 12 weeks, which is

6  calculated as follows.  It's one week to run the processing

7  phase.  That's the indexing, the analyzing, the doc mapper.

8  And it's about seven weeks for our outside vendor, which is

9  called DiscoverReady, to review the documents for

10  responsiveness and privilege.

11        Working with DiscoverReady we've -- and based on

12  their normal and customary practices for document production of

13  this type, we would have ten people on this project full time.

14  They would be able to review 10,000 documents a day.  So,

15  that's a seven-week process.  There's an additional week for

16  quality control and technology issues, an additional week to

17  export the documents from a TEN-X (sic) to TIFF, an additional

18  week for the TIFF process, an additional week for Kaye Scholer

19  to spot check the documents and prepare and finalize the

20  production.  So, that's 12 weeks, start to finish.

21        On a rolling basis we anticipate that we could begin

22  rolling out documents in three-and-a-half weeks, so that would

23  be three-and-a-half weeks to start production for the first

24  custodian.  But as I said, our position is that 12 weeks is way

25  too long, it's too many documents, and that this is too

**J&J COURT TRANSCRIBERS, INC.**

1 burdensome and costly for us.  So, the way we suggest

2 proceeding is as follows.

3      What we suggest is to eliminate the following 12

4 search terms that from the outset we have found to be

5 problematic because they have -- it has to be that they're

6 producing too many documents that are unrelated to this

7 transaction, and I'll go through those search terms in a

8 second.  The --

9      THE COURT:  Actually, I'd prefer you not.

10      MS. PRIMOFF:  Okay.

11      THE COURT:  I mean, this is -- we're getting into

12 what would ordinarily be a request to resolve a discovery

13 dispute, and normally I would prefer to have papers in front of

14 me for that.  But I hear what you've said so far.  Is there

15 more?

16      MS. PRIMOFF:  Well, our position, Your Honor, is that

17 we can pare down the search terms, we can re-run the searches

18 by the end of this week with the pared-down search terms, and

19 we can then report back to the committee with an estimated

20 number of documents, an estimated time to begin the production,

21 and an estimate time to complete the production, and we

22 continue to reserve our rights if the re-run search terms still

23 produce too many documents.

24      THE COURT:  Well, let me ask this.  If you eliminated

25 the 12 search terms, how, if at all, would that change the time

**J&J COURT TRANSCRIBERS, INC.**

1    frame you've just described to me?

2          MS. PRIMOFF:  We don't know until we run the data set

3    with the reduced search terms to see how many documents it is.

4    And that's what our proposal is.  Our proposal is to eliminate

5    the search terms that we think are producing so many documents

6    in so many numbers -- particularly so many non-responsive

7    documents.  So, it's just a couple of days -- by the end of

8    this week we can re-run the data set with the pared down search

9    terms and have an estimate about production.

10         THE COURT:  Okay.

11         MR. BUSH:  Your Honor, this wasn't -- isn't a motion

12   to compel, and I don't know what the search terms are that they

13   want to eliminate, and there are other people who would have to

14   be involved in discussing whether that has -- is at all

15   reasonable, given the number of documents that came out of the

16   search they ran.  But I would make a couple of observations for

17   the purposes of what we're here today for.  First is that J.P.

18   Morgan and several other financial institutions seem to have

19   been able to do essentially the same thing that we've asked

20   Merrill Lynch to do, and get it done, and get us e-mails

21   produced already.  They're not at the beginning of the process.

22   They have either finished it or they're very close to the end

23   of the process.  So, it's not some kind of inherently

24   unreasonable thing that we asked Merrill Lynch to do.  We

25   didn't single them out.  We didn't do anything special with

1  them.

2         And the second point I would make is that whatever it

3  is, my point is that, and I think it's a point that several

4  people would make here if they come up and talk, is that if

5  we're -- you heard a lot this morning about trying to get to a

6  point where these claims can be resolved, either consensually

7  or we all understand that they're not going to be resolved

8  consensually, and some other mechanism has to be put in place

9  to resolve them.  And at least on the discussion side and the

10  consensual side, without having these documents it may very

11  well end up impeding that process.  And if that's what happens

12  and there's no other way to get around it, that's what happens.

13  But today is the first day that we've been able to get any kind

14  of information that gives us some kind of concrete notion about

15  how long it's going to take to get these documents.

16         THE COURT:  All right.  Anything further on Merrill

17  Lynch?

18         MR. ROSNER:  Your Honor, I just wanted to emphasize,

19  we are part of the process with the committee.  We're working

20  cooperatively with the committee on all of the documents.  This

21  is not -- Merrill Lynch is not -- you know, it's one of the

22  several banks that refused to do the deal who may, you know,

23  have some information that's relevant to this proceeding.

24  Merrill Lynch is this proceeding, Merrill Lynch and J.P.M.  I

25  mean, they're the arranger, the syndicator.  They -- and

**J&J COURT TRANSCRIBERS, INC.**

1 actually in another construct they actually advise the board of

2 directors.  So, it's not just a discovery problem with them

3 having waited a very long time in getting these documents, it

4 is critical that Merrill Lynch's documents, particularly e-

5 mails, because I think we all know that a lot of people put

6 critical information into e-mails, that that has to be produced

7 and reviewed so that there can be actual negotiations.  People

8 can say that they want to sit down in meetings, and let's

9 schedule a meeting for December whatever, but when one side has

10 the information, they know what took place because they were

11 the parties that did the LBO, and the other side doesn't know,

12 it doesn't make for a very good negotiation because you've got

13 an inequality of information.

14        So, Merrill Lynch has constrained this process, we

15 think, by not having acted with more alacrity, and we would

16 just urge that they would so that we can, at their instance,

17 kind of bring a negotiation together.  They're a critical

18 player here, and the fact that we don't have their e-mails at

19 this point is very discomfiting.

20        THE COURT:  Okay.  Anyone else on this issue?  All

21 right.  Thank you.

22        MS. PRIMOFF:  Merrill Lynch has cooperated every step

23 of the way, so just because it's taken a long time -- I mean,

24 the committee has insisted on an outrageous number of search

25 terms, an outrageous number of custodians, and we can detail

**J&J COURT TRANSCRIBERS, INC.**

1  quite carefully all the steps that have occurred since the

2  committee's request on September 18th for these documents.  So,

3  I take issue with Mr. Rosner's statement, or implication, that

4  Merrill has dragged its feet in any way.

5          THE COURT:  I took from your opening statement that

6  you did.

7          MS. PRIMOFF:  Okay.  Thank you.

8          MR. BUSH:  Your Honor, I can continue and give you a

9  little bit -- continue the overview, I guess, of the discovery

10 process.  In addition to the -- what I've told you already

11 about the documents, we are -- the other, I guess, thing that

12 remains to be done here that is of some importance, I think

13 it's underway and I think it will work out okay, is to get

14 privilege logs.  That, in some cases, involves a fair number of

15 documents and in some cases the documents -- it may be fairly

16 obvious why the documents are privileged, and in other cases

17 they're, just on the face of the information we have about

18 withheld documents, it appears, for example, with redactions,

19 that there are some questions about why documents may be

20 privileged.  And obviously for things that were withheld in

21 their entirety we don't really know.  But we are working with

22 the debtors to get a privilege log with respect to their

23 documents and with J.P. Morgan to get a privilege log with

24 respect to their documents, and with certain of the other

25 producing parties.  I think that's going okay, although there

**J&J COURT TRANSCRIBERS, INC.**

1  are some timing issues there.  I hope we'll be able to work

2  them out.

3         A couple of the other things.  Some of the other

4  things that we have been doing, we've been working with the

5  financial advisors to conduct a financial analysis of the

6  debtor and of the solvency opinions that were given, and of the

7  solvency of the debtor at the relevant time periods.

8         We have done a fairly substantial legal analysis,

9  both Chadbourne and ourselves, of a variety of legal issues

10  both relating to the merits, and relating to certain defenses

11  that the lenders have indicated to us they would intend to

12  raise, and I think we're fairly well along in that process.

13  There is some work left to be done, but we're pretty advanced

14  in that process.

15         We have begun to take Rule 2004 oral examinations.  I

16  shouldn't say we have begun to take them.  We have noticed

17  them, and in fact they start tomorrow.  There will be

18  depositions of the VRC which gave solvency opinions in

19  connection with the transactions, and of certain other solvency

20  experts.  There also will be depositions scheduled of some of

21  the debtor's employees who were involved in projections.

22         We have sought to take depositions of people from

23  J.P. Morgan.  We will probably want to take depositions of

24  people from Merrill Lynch but have decided not to even ask

25  until we have the documents, and particularly the e-mails,

**J&J COURT TRANSCRIBERS, INC.**

1 because we just don't think it would be productive to do that

2 until we have the documents.

3         One of the other issues that has come up is that J.P.

4 Morgan has declined to agree on a voluntary basis to tender the

5 witnesses we asked to examine, and my understanding is that

6 they are sticking to their guns on that.  They have agreed, and

7 I guess they can come up and tell us what they're going to

8 agree to do, but what I have heard second hand is that they're

9 willing to answer written questions, but that's an issue, we do

10 need to examine some of their witnesses.  And I think that's an

11 important part of the process that we're going through to be

12 able to advise the committee.

13         We have also begun drafting a complaint, and as Your

14 Honor saw in some of the papers that were filed, that has been

15 used as a basis for refusing to tender witnesses for

16 examination on the grounds, I suppose, that people contend that

17 we have already decided, or the committee has already decided

18 to institute litigation.  What we have been doing is simply

19 drafting a complaint so that it helps focus everybody's

20 thinking on what the claims really are and how good the claims

21 are.  And furthermore, I don't know if these discussions are

22 going to end up in a successful resolution or if they're going

23 to end up at a place where litigation is necessary.  And so, we

24 determined for both those reasons that that was a prudent thing

25 to do, but it certainly isn't an indication that the committee

**J&J COURT TRANSCRIBERS, INC.**

1   is not interested in having discussions, or that Zuckerman

2   Spaeder isn't interested in having discussions, or that anybody

3   associated with the committee has determined that litigation is

4   the only way to go and consensual resolution is not possible.

5          There are some things, and I don't know if there's

6   some things you want to raise.  There are a couple of things I

7   want to respond to in some of the papers, but if there are

8   other things you want to talk about before we get to that,

9   that's fine.

10          MR. CONLAN:  Before we move on beyond the Merrill

11  Lynch point, one of the things that occurred to us as we were

12  sitting there listening to this is, in order to achieve some

13  closure, is whether it would be possible to come back in a week

14  to see if Mr. Bush is able to narrow with Ms. Primoff what

15  exactly it is that Merrill Lynch can produce, and when, whether

16  the search terms can be narrowed.  Perhaps Mr. Bush could show

17  people what J.P.M. -- what search terms J.P.M. used, because

18  J.P.M. was able to respond, and to see what the differences are

19  to try to achieve some closure.  So, if we could come back in a

20  week to update on that, as well as anything else that Mr. Bush

21  wants to update on, that's the one contribution I'd like to

22  make before we move on to other items.

23          MR. BUSH:  And the only thing I would say about that

24  is that our side -- there's actually a gentleman at Chadbourne

25  who I think has been handling the lion's share of the

1  discussions about search terms with our input.  But he's been

2  handling that direct discussions.  And my understanding is that

3  these discussions have been extensive and continuous, and the

4  protocol was finally agreed on.  I think if Merrill Lynch has

5  something it wants to tell us about what came out of the

6  application of those search terms to the body of documents they

7  were looking through, and how that maybe changes their view of

8  things, or should change our view of things, I don't think we

9  would object to having that discussion.  That's fine.  But it

10  does need to be with the people who have been having the

11  discussions with you all along.

12          MS. PRIMOFF:  Your Honor, we had six weeks of

13  discussion with the committee about the search terms, and all

14  of the discussions went something like this.  We said there's

15  too many search terms and there was way too -- they are way too

16  broad.  Step one, step two, phase one, phase two, it does not

17  make sense for those to be search terms.  And the committee's

18  response every single time was, well, J.P. Morgan agreed to

19  these search terms except for Standard & Poors, so we want you

20  to do the same.  And we said, okay, but we're reserving all of

21  our rights, and we think this is going to produce an absurd

22  number of documents.  And that's exactly what's gone on here.

23  So, our position is we will know within the next day or two,

24  but it seems that this has produced 330,000 documents, which is

25  way too broad.  So, we are willing to have discussions about a

**J&J COURT TRANSCRIBERS, INC.**

1  further narrowing of the search terms, but that discussion has

2  nothing to do with J.P. Morgan.   Whatever J.P. Morgan --

3  whatever search terms they ran, whatever set of documents that

4  resulted in -- for them, that's their issue.   I would note that

5  it seems that the estate has been paying for their issue.   But

6  for Merrill Lynch, who has not been paid for this exercise,

7  this is way too burdensome.   So, we're willing to have

8  discussions about narrowing the search terms with a view

9  towards reducing the volume of documents.

10         MR. BUSH:   Your Honor, all I can do is say what I've

11 already said.   We're happy to have the discussion, but it

12 sounds like we've already had the discussion that you proposed,

13 which is we've shown them the J.P. Morgan search terms that

14 seemed to be doable for J.P. Morgan.   Merrill Lynch thinks

15 they're not doable for Merrill Lynch.   And in any event, we're

16 looking at a 12-week time horizon, which is, if I did my math

17 right, is pretty near the end of the exclusivity period that

18 you just extended.   So, we are where we are.   I don't know if

19 there's any way to shorten this.   As I said, I'm always willing

20 to try one more time to reach agreement.   And maybe we ought to

21 do that and come back next week if we can't reach agreement.

22         THE COURT:   Well --

23         MR. CONLAN:   That strikes me as a good idea.   We'll

24 participate in the discussions, as will others, but there is

25 something magical about having to come back to Court and say

**J&J COURT TRANSCRIBERS, INC.**

1 how we did in front of everybody and let them comment.  That

2 goes for everybody, us as well.

3          THE COURT:  The whole magic thing just makes my spine

4 tingle.

5                    (Laughter)

6          THE COURT:  Okay.  But, see, when you come back, if

7 things aren't resolved, you're going to want me to order

8 something.  So, let's do this.  Have further discussions if you

9 think that would be helpful.  And to the extent there is no

10 agreement, file a motion, ask for a shortened time frame, and

11 I'll get you back as quick as I can.  I think that's how we

12 have to tee it up.

13          MR. CONLAN:  Okay, Your Honor.

14          MR. BUSH:  Very well.

15          THE COURT:  All right.

16          MR. BUSH:  There are really just a couple of other

17 things that I wanted to touch on, and then of course I'll

18 answer any questions the Court may have.  And these really have

19 to do with the response of the lenders' group and Mr. Bennett,

20 who you heard from earlier.  He -- there were a couple of

21 things that were said in there that I just think really need to

22 be responded to.  He has talked about a secret discovery

23 process that the committee has been involved in, and there's

24 nothing really secret about it at all.  The committee has

25 simply followed the local rule that requires the parties to go

**J&J COURT TRANSCRIBERS, INC.**

1 through the Rule 2004 process and try and do it in a voluntary

2 matter and not burden the Court with formal motions, and that's

3 been largely successful, but there's nothing secret about it.

4 It's simply following the process that this Court has in place.

5 He has asked for, in his pleadings, for the first time that I'm

6 aware of, for a list of all the parties who have produced

7 documents.  We're happy to give it to him.  If he picked up the

8 phone and called he would have had it by now.

9         He has said that there is -- that he would like to

10 have the right to participate in the depositions.  He is

11 representing a significant constituency in the bankruptcy, and

12 I'm sure we weren't perfect, but we tried to give informal

13 notice of the depositions that are starting tomorrow, and all

14 the depositions that we're planning to take are examinations

15 that we're planning to conduct to those groups, and his group

16 through -- I don't really know the status of counsel now, but

17 the counsel that I understood was representing that group, Mr.

18 Mayer, was given notice of that by e-mail, and nobody from that

19 group ever picked up the phone and called and said, gee, we

20 want to participate, and can we participate?  So, I don't know

21 why this all shows up in his pleadings for the first time, but

22 if he had picked up the phone I don't think it would have been

23 necessary.

24         And the last -- I think the last thing that was in

25 his motion papers was a request that the Court indicate that

1  everybody reserves all their rights in these examinations with

2  respect to the use of the transcripts, and any litigation that

3  might ensue.  And I don't know that the Court is going to be

4  interested in doing that, or that it's necessary.  I mean, he

5  can reserve all his rights, and if he has any rights to reserve

6  they will be reserved.  But the notion of having the major

7  constituencies there is not because it -- excuse me -- it was

8  our conclusion that they had any right to be there so much as

9  that we thought it was going to be more conducive to the

10  process here, and also would give us the opportunity, perhaps,

11  to be able to use these depositions in subsequent litigation.

12  If that doesn't work for one reason or another, it doesn't

13  work, but he can reserve his rights on the record.

14        I don't think I have anything else that I need to

15  address, or that I wanted to address, but I'm happy to answer

16  any questions that you have, or any other questions that we

17  ought to address for the Court.

18        THE COURT:  I don't.  Thank you.

19        MR. BUSH:  Okay.

20        MR. CONLAN:  Nothing else, Your Honor.  We will work

21  with the committee, work with Merrill and anybody else,

22  including Centerbridge -- sorry, I didn't mean to cut you off

23  --

24        UNIDENTIFIED ATTORNEY:  That's okay.

25        MR. CONLAN:  -- and if we can't get to where we need

**J&J COURT TRANSCRIBERS, INC.**

1  to be in a few days we'll file that motion and ask you for

2  shortened time.

3          THE COURT:  All right.

4          MR. JOHNSTON:  Good afternoon, Your Honor.  Jim

5  Johnston of Hennigan, Bennett and Dorman -- not Mr. Bennett,

6  who was earlier today, but representing the same clients, which

7  are about 20 institutions that hold over $4.4 billion of the

8  credit agreement debt.  Our clients obviously have a

9  substantial interest in the leveraged ESOP transactions and the

10  efforts by the committee and others to investigate them and

11  possibly litigate them.  We did ask the Court for three

12  specific items of relief arising out of the status conference

13  today, and I'll get to those in just a minute.  Mr. Bush

14  touched upon two of them.

15          First, and I know it's late and I hate to go last,

16  and I won't take more than a minute, but let me just step back

17  and observe that what's going on in this case is at least

18  unusual, and it's maybe unprecedented.  You have the committee

19  engaged in a massive amount of discovery, which you've heard

20  about today.  It's gone on for almost a year.  It's produced

21  millions of pages of documents.  There are 2004 depositions now

22  scheduled to begin imminently regarding claims that the

23  committee hasn't filed and hasn't even requested standing to

24  bring.

25          As Mr. Seife I think implicitly acknowledged earlier

**J&J COURT TRANSCRIBERS, INC.**

1  today, the committee's pre-litigation effort is well beyond the

2  typical investigation that usually proceeds a standing motion,

3  and an initiation of litigation.   It's surpassed anything that

4  would be reasonably required, we think, to make a good faith

5  assessment as to whether or not there are causes of action to

6  bring here, or maybe more to the point, for a lot of what's

7  been discussed today, way more than what's necessary for the

8  committee to sit down and actually discuss a substantive

9  resolution of the claims.   It somewhat boggles the mind to

10  suggest that every single document needs to be reviewed, every

11  e-mail needs to be read, every deposition needs to be taken

12  before the parties can engage in settlement negotiations, and

13  that's been one of the frustrations that we've encountered

14  throughout.

15        We submit that the efforts that have gone on so far

16  stretch Rule 2004 to the limit, if not beyond, and the reason

17  why we submitted a status conference statement, and the reason

18  why I'm here today, is because this is prejudicial to us, not

19  having access to the same information that the committee has.

20  We do think there is an inequality of information here, as Mr.

21  Rosner put it, but it tilts in a way that's different than he's

22  suggested.   So, we'd like to be part of the hemming in process,

23  as Mr. Conlan has said, and we'd ask the Court to order three

24  things today, two of which it sounds like aren't controversial.

25  We would like to know the entities from whom the committee has

1  sought documents, and who has produced what.  I believe Mr.

2  Bush has said that's no problem.

3        Second, and I think much more importantly, we'd like

4  copies of the documents that have been produced to the

5  committee.  We'll agree to all the same confidentiality

6  agreements that the committee has agreed to, but we've heard

7  today that the committee has received 2.3 million pages of

8  discovery.  We'd be entitled to that information in an

9  adversary proceeding, and there's no reason why the information

10 should be withheld from us now.  The debtors themselves have

11 created an electronic data room.  They have given us access to

12 their documents.  We've gotten access to a few other parties'

13 documents.  It would be very easy to create a central

14 electronic warehouse of this information, put it up there to

15 people who have signed confidentiality agreements, and make it

16 available.  That can do nothing but facilitate the on-going

17 discussion process that hopefully will begin soon, and it will

18 begin to level the playing field.

19       The last point, again, I don't think it's

20 controversial, is we would like the right to attend and

21 participate in the Rule 2004 depositions.  We are now in the

22 information flow as to when those depositions are taking place.

23 We ask to continue to be in that information flow.  And because

24 the depositions are starting now, literally starting tomorrow,

25 on the basis of many, many documents that we haven't seen, we

1 ask the Court to make it clear that our attendance at those

2 depositions can't somehow be later used against us in an

3 adversary proceeding where we would have the independent right

4 to conduct discovery.  We just don't want someone to come back

5 and say, hey, hey, hey, you were at a deposition back in

6 December and maybe even you asked a question or two, you don't

7 have the right to examine us again.  We don't think that's an

8 appropriate response under the adversary proceeding rules, but

9 I've heard the argument made before.

10         We submit all of this will facilitate the fair and

11 efficient resolution of the cases.  They will facilitate

12 settlement negotiations if and when they begin.  And if claims

13 are ultimately pursued it will mean that we are not starting

14 from scratch on discovery, and that only will enhance a rapid

15 resolution of the cases, or at least move things along as much

16 as possible.  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         MR. BUSH:  I won't take much more of the Court's time

19 on this, Your Honor, but the -- I just think this is an

20 inappropriate place to raise these issues for the first time.

21 Most of the other parties in this case who have wanted access

22 to the documents have gotten them by calling up and finding out

23 how to get access to them, and arranging through

24 confidentiality agreements with the producing parties to be --

25 or consents, or joinders, to get those documents directly from

**J&J COURT TRANSCRIBERS, INC.**

1  the parties who produced them to us.  This is not something

2  that is all of a sudden new on the face of the earth.  We've

3  been dealing with this with lots of other parties throughout

4  the course of these proceedings, and the right way to do this

5  is not to bring it up in a status conference for the first

6  time.  If the lender's group wants access to the documents,

7  they can talk to us about how other people who have wanted

8  access to them have been able to get them, and we can arrange

9  it that way.  It doesn't require a Court order at this point.

10         The one other thing I wanted to mention that I forgot

11  to mention before I sat down the first time was on the J.P.

12  Morgan matter.  I know we don't have a motion in front of you,

13  and maybe you'll just tell me, if we want to take their -- the

14  testimony of their witnesses we should file a Rule 2004 motion,

15  and if that's the answer, we will.  But it might be helpful if

16  we could just persuade J.P. Morgan at this point to tender the

17  witnesses.

18         THE COURT:  Well, you'll need to follow the local

19  rule process, and if that doesn't work consensually, file a

20  motion.  Frankly, it may be resisting the inevitable, but

21  parties are entitled to do that, I suppose.

22         MR. BUSH:  Fair enough, Your Honor.  Thank you.

23         THE COURT:  All right.

24         MR. JOHNSTON:  And, Your Honor, just a point of

25  clarification.  We did tender a request to all the parties that

**J&J COURT TRANSCRIBERS, INC.**

1    we were aware of that the committee had sought information

2    from.  We had no idea that they had sought information from 30

3    parties.  And the debtors agreed to produce.  J.P. Morgan

4    produced.  VRC produced.  Duff & Phelps produced.  The others

5    haven't, and so we find ourselves in the position where -- and

6    understandably there are parties out there responding to

7    informal discovery requests tendered by an Official Committee

8    of Creditors, so the Official Committee of Creditors has

9    compiled this massive warehouse of information, and the other

10    parties are saying, who are you, why should we produce to you?

11    And I think the time has come where all the documents are on

12    the table and made available.

13          THE COURT:  Well, but why, on a matter of this

14    magnitude, would you expect me to order that at a status

15    conference?  I mean, it seems to me that if there's an

16    appropriate motion to be filed and you can't work out things

17    with the committee or others, you need to file it on notice to

18    those who would be affected by it, to give them an opportunity

19    to be heard.  Look, it's -- this has been a revealing day for

20    me.  So much of what goes on in cases I often say, happily,

21    happens outside of the courtroom.  But I can see now that

22    everyone is beginning to stake our there positions, which is a

23    natural part of the process, which either leads to agreement or

24    war, typically, or at least to the first battle, anyway.  And

25    if that's what's happening, and I sense that it is, then we

1   need to put some judicial framework to it, if what you want is

2   judicial relief.

3            MR. JOHNSTON:  Fair enough, Your Honor.  We're here

4   today because we saw a pleading saying -- asking Your Honor to

5   schedule a status conference regarding the very topics that

6   we're concerned about, but we will --

7            THE COURT:  No, and it was --

8            MR. JOHNSTON:  -- we'll go through the normal

9   channels.

10           THE COURT:  -- appropriate for you to appear and

11   express your concerns.

12           MR. JOHNSTON:  Thank you.

13           THE COURT:  Okay.  Does anyone else wish to be heard

14   in connection with the status?

15           MR. DRISCOLL:  Good afternoon, Your Honor.  Tom

16   Driscoll from Bifferato, LLC, and I will try and keep this very

17   brief.  We represented the Neil Class plaintiffs in the

18   Northern District of Illinois action, as well as defendants in

19   an adversary proceeding before Your Honor.  The subject of

20   these actions is the leveraged LBO ESOP transaction that is the

21   subject of this status conference.  I come forward with a

22   hopefully simple request, similar to the one before mine.  We

23   ask for the opportunity to attend these depositions that the

24   committee has currently scheduled.  We're not seeking to

25   participate in them.  But as the discovery that is going on

1  there is substantially similar to what we expect would take

2  place in our matters should they go forward after the motion to

3  dismiss is decided in Illinois, we would like the opportunity

4  to attend in the interest of judicial economy.  Thank you, Your

5  Honor.

6          MR. BUSH:  Your Honor, this is -- I guess today is

7  the first I've heard of this particular request.  I don't think

8  it's appropriate.  The people who are going to be attending the

9  depositions are people who represent major constituencies in

10  the bankruptcy and not people who have pending litigation and

11  want to participate in the 2004 process in order to gather

12  information and litigation, so I don't think it's appropriate

13  that they attend.

14          MR. KRAKAUER:  Your Honor, with reference to this

15  particular party we do -- absolutely do not think it's

16  appropriate that they attend.  It's separate litigation that

17  they have pending in the District Court in Chicago, and this

18  would not be appropriate for them to participate here.

19          THE COURT:  What's the posture of the District Court

20  action?

21          MR. KRAKAUER:  The District Court action, the motion

22  to dismiss has been briefed and it's pending before the Judge

23  in the District Court in Chicago.

24          THE COURT:  Any discovery being undertaken in that

25  action at this time?

**J&J COURT TRANSCRIBERS, INC.**

1        MR. KRAKAUER:  The discovery has been stayed.  There

2  is no discovery while the motion to dismiss is proceeding is my

3  understanding.

4        THE COURT:  All right.  Well, I'm not going to order

5  anything today at the risk of losing some judicial efficiency.

6  But again, if you want me to order something, you'll have to

7  file a motion.  And I'm not saying that if you do I will, but

8  that would be the vehicle to use, I think.

9        UNIDENTIFIED ATTORNEY:  And you're addressing the

10  Neil plaintiffs?

11        THE COURT:  I am.

12        UNIDENTIFIED ATTORNEY:  Thank you.

13        THE COURT:  And I -- well -- I've extended more

14  invitations for filings today than I think I have in --

15                    (Laughter)

16        THE COURT:  -- the last couple of years.

17        MR. CONLAN:  That's it, Your Honor.  We just wanted

18  to let you know what was going on.

19        THE COURT:  All right.

20                    (Laughter)

21        THE COURT:  I'm afraid to as the next question, but I

22  always do before I conclude.  Is there anything further for

23  today?

24                    (Laughter)

25        MR. CONLAN:  No, Your Honor.  We're done for today.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  Thank you all very much.

2          MR. CONLAN:  Thank you.

3          THE COURT:  That concludes this hearing.  Court is

4  adjourned.

5                          *  *  *  *  *

## C E R T I F I C A T I O N

          We, PATRICIA REPKO, RITA BERGEN, MARY POLITO and

TAMMY DeRISI, court approved transcribers, certify that the

foregoing is a correct transcript from the official electronic

sound recording of the proceedings in the above-entitled matter

to the best of our abilities.


/s/ Patricia Repko
PATRICIA REPKO


/s/ Rita Bergen
RITA BERGEN


/s/ Mary Polito
MARY POLITO


/s/ Tammy DeRisi                    ____ Date: December 4, 2009
TAMMY DeRISI
J&J COURT TRANSCRIBERS, INC.




**J&J COURT TRANSCRIBERS, INC.**