```
 1              IN THE UNITED STATES BANKRUPTCY COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3   IN RE:                        :
                                   : Chapter 11
 4   TRIBUNE COMPANY, et al.,      :
                                   : Case No. 08-13141 (KJC)
 5        Debtors.                 :
     . . . . . . . . . . . . . . . .

 6
                          Wilmington, Delaware
 7                        February 18, 2010
                             10:06 a.m.
 8
                          TRANSCRIPT OF HEARING
 9              BEFORE THE HONORABLE KEVIN J. CAREY
                  UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtors:           Norman L. Pernick, Esquire
12                              Cole, Schotz, Meisel, Forman &
                                Leonard, P.A.
13
                                Bryan Krakauer, Esquire
14                              James F. Conlan, Esquire
                                James Bendernagel, Esquire
15                              James Ducayet, Esquire
                                Sidley, Austin, LLP
16
     For JP Morgan Chase        Robert Stearn, Esquire
17   Bank:                      Richards, Layton & Finger

18   For Citi Group:            Stephen J. Shimshak, Esquire
                                Jeffrey M. Gorris, Esquire
19                              Paul, Weiss, Rifkind, Wharton &
                                Garrison, LLP
20
     For TM Retirees and        Jay Teitelbaum, Esquire
21   William Niese:             Teitelbaum & Baskin, LLP

22                              Donna Harris, Esquire
                                Pinckney, Harris & Weidinger, LLC
23
     For Aurelius Capital       Nancy Mitchell, Esquire
24   Management:                Scott Cousins, Esquire
                                Greenberg, Traurig, LLP
25
```

2

| | | |
|---|---|---|
| 1 | For the Creditors' Committee: | Thomas Macauley, Esquire Graeme Bush, Esquire |
| 2 | | James Sottile, Esquire Zuckerman & Spaeder, LLP |
| 3 | | |
| 4 | | Blake Cleary, Esquire Young, Conaway, Stargatt & Taylor, LLP |
| 5 | | |
| 6 | | Adam Landis, Esquire Landis, Rath & Cobb, LLP |
| 7 | For the Official Committee of Unsecured | Howard Seife, Esquire David LeMay, Esquire |
| 8 | Creditors: | Chadbourne & Parke, LLP |
| 9 | For Law Debenture: Trust Company: | Garvan McDaniel, Esquire Bifferato, Gentilotti |
| 10 | | |
| 11 | | Matthew Stein, Esquire Andrew Glenn, Esquire Kasowitz, Benson, Torres & Friedman, |
| 12 | | LLP |
| 13 | For JP Morgan Chase Bank: | Damien Schaible, Esquire Dennis Glazer, Esquire |
| 14 | | Sharon Katz, Esquire Michael Russano, Esquire |
| 15 | | Davis, Polk & Wardwell, LLP |
| 16 | For Deutsche Bank Trust Company: | David Adler, Esquire McCarter & English, LLP |
| 17 | | |
| 18 | For Centerbridge Credit Advisors: | Daniel Golden, Esquire Alexis Freeman, Esquire Akin, Gump, Strauss, Hauer & Feld, |
| 19 | | LLP |
| 20 | | Laura Davis Jones, Esquire Pachulski, Stang, Ziehl & Jones |
| 21 | | |
| 22 | For Credit Agreement Lenders: | Bruce Bennett, Esquire James O. Johnston, Esquire Hennigan, Bennett & Dorman, LLP |
| 23 | | |
| 24 | For the U.S. Trustee: | Joseph J. McMahon, Jr., Esquire U.S. Department of Justice |
| 25 | | |

| | | |
|---|---|---|
| 1 | For Wilmington Trust Company: | Robert Stark, Esquire |
| | | William Dolan, Esquire |
| 2 | | Martin Siegel, Esquire |
| | | Brown, Rudnick |
| 3 | | |
| | | Jennifer Hoover, Esquire |
| 4 | | Raymond Lemisch, Esquire |
| | | Benesch, Friedlander |
| 5 | | |
| | For Merrill Lynch: | Laurie Selber Silverstein, Esquire |
| 6 | | Potter, Anderson & Corroon, LLP |
| 7 | VIA TELEPHONE: | |
| 8 | For the Debtors: | Chandler Bigelow, Esquire |
| | | Dave Eldersveld, Esquire |
| 9 | | Don Liebentritt, Esquire |
| | | Gary Weitman, Esquire |
| 10 | | Tribune Company |
| 11 | | Janet Henderson, Esquire |
| | | Jillian McClelland, Esquire |
| 12 | | Kevin Lantry, Esquire |
| | | Bryan Krakauer, Esquire |
| 13 | | Ken Kansa, Esquire |
| | | Sidley & Austin |
| 14 | | |
| | | Rushabh Vora |
| 15 | | MacQuarie Capital |
| 16 | For Grey Wolf Capital: | Jeff Armstrong |
| | | Grey Wolf Capital |
| 17 | | |
| | For Morgan, Lewis & | James Bayles, Esquire |
| 18 | Bockius, LLP: | Morgan, Lewis & Bockius, LLP |
| 19 | For Mina Faltas: | Mina Faltas, Esquire |
| | | Viking Global Investors |
| 20 | | |
| | For Rita Farrell: | Rita Farrell, Reporter |
| 21 | | Rita Farrell |
| 22 | For Perry Capital: | James Freeman |
| | | Perry Capital |
| 23 | | |
| | For DW Investment | Raman Gambhir |
| 24 | Managements: | DW Investment Managements |
| 25 | | |

| | | |
|---|---|---|
| 1 | For KKR Asset Management: | Evan Geller<br>KKR Asset Management |
| 2 | | |
| 3 | For Citi Group: | Andrew Gordon, Esquire<br>Stuart C. McPhail, Esquire<br>Lauren Shumejda, Esquire |
| 4 | | Paul, Weiss, Rifkin, Wharton &<br>Garrison, LLP |
| 5 | | |
| 6 | | Rebecca Song, Esquire<br>Citi Group |
| 7 | For DE Shaw: | Sarah Johnson, Esquire<br>DE Shaw |
| 8 | | |
| 9 | For Bank of America: | Evan Jones, Esquire<br>O'Melveny & Myers, LLP |
| 10 | For Anna Kalenchits: | Anna Kalenchits<br>Anna Kalenchits |
| 11 | | |
| 12 | For JP Morgan Chase: | Kevin C. Kelley, Esquire<br>JP Morgan Bank, N.A. |
| 13 | For Oaktree Capital Management: | Edgar Lee<br>Oaktree Capital Management |
| 14 | | |
| 15 | For SuttonBrook Capital Management, LP: | John London, Esquire<br>SuttonBrook Capital Management, LP |
| 16 | For Neil S. Losquadro: | Neil S. Losquadro<br>Neil S. Losquadro, In Pro Per |
| 17 | | |
| 18 | For Latigo Partners: | Scott McCabe<br>Latigo Partners |
| 19 | For Carlson Capital: | Michael McMahon<br>Carlson Capital |
| 20 | | |
| 21 | For Merrill Lynch Capital Company: | Jane Parver, Esquire<br>Madlyn G. Primoff, Esquire<br>Kaye, Scholer, LLP |
| 22 | | |
| 23 | For Aaron Rosen: | Aaron Rosen<br>Aaron Rosen, In Pro Per |
| 24 | For Aurelius Capital Management: | Dennis A. Prieto<br>Aurelius Capital Management |
| 25 | | |

5

| | | |
|---|---|---|
| 1 | For Mitchell Sockett: | Mitchell Sockett, Esquire<br>King Street Capital Management, LLC |
| 2 | | |
| 3 | For Seneca Capital: | Usman Tahir<br>Seneca Capital |
| 4 | For Contrarian Capital<br>Management: | Joshua Trump<br>Contrarian Capital Management |
| 5 | | |
| 6 | For Alvarez & Marsal,<br>Inc.: | Brian Whittman, Esquire<br>Alvarez & Marsal, Inc. |
| 7 | For James J. Williams: | James J. Williams<br>Labanche Inc. Company |
| 8 | | |
| 9 | For Carval Investor: | Teck Wong, Esquire<br>Carval Investors |
| 10 | | |
| 11 | Court Recorder: | Al Lugano |
| 12 | Transcription Service: | Perfect Pages Transcription, Inc.<br>18 Tuckerton Road<br>Shamong, NJ 08088<br>www.perfecttranscripts.com<br>(609) 654-8880 |
| 13 | | |
| 14 | | |
| 15 | Proceedings recorded by electronic sound recording;<br>transcript produced by transcription service. | |

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880

6

INDEX

|  | Direct | Cross | Re-Direct | Re-Cross | Further Redirect |
|---|---|---|---|---|---|

Witnesses For Debtors:

David Kurtz

| | Direct | Cross | Re-Direct |
|---|---|---|---|
| (By Mr. Bendernagel) | 31 | | 83 |
| (By Mr. Sottile) | | 49 | |
| (By Mr. Stark) | | 70 | |
| (By Mr. Teitelbaum) | | 80 | |

EXHIBITS:

| | | Marked | Received |
|---|---|---|---|

Debtors:

| 1 | Chart of specific meeting dates | 41 | 86 |
|---|---|---|---|

1      (Call to order of the Court.)

2           THE COURT:  Good morning, everyone.

3           UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

4           MR. PERNICK:  Good morning, Your Honor.  Your Honor,

5    Norman Pernick on behalf of the Debtor, Tribune Company.

6       I thought I'd just make a quick run through the Agenda

7    just to make sure that we're in sync with the Court on what's

8    been continued and Orders entered, and then I have just one

9    Pro Hac Motion that we'll be filing, but I thought I'd

10   introduce him to the Court.

11          THE COURT:  Very well.

12          MR. PERNICK:  I have as continued to the March 23

13   hearing item number 1, which is the ninth omnibus objection,

14   with respect to the Claudia Sanzeri objection only.  Item

15   number 2, the tenth omnibus objection, with respect to GE

16   Capital Fleet Services, Karolyn Walker and Robby Wells only.

17   The Court has entered Orders on the rest of the objections

18   before this.  And item number 3, the Conigliaro Motion for

19   Relief.  As we noted in the Agenda, settlement discussions are

20   under way and the parties are jointly requesting a continuance

21   to March 23 of that.

22      Your Honor was kind enough to enter Orders in item number

23   4, the fourteenth omnibus objection, item number 5, the

24   fifteenth omnibus objection, item number 6, the Horwood,

25   Marcus & Berk Fee Application and item number 7, the

8

1  Settlement Agreements with Jennifer Faggio and the City of New

2  Haven.

3      Your Honor, that leaves us with the contested matters and

4  with respect to those, Mr. Conlan is just going to update the

5  Court on them.

6          THE COURT:  All right.

7          MR. PERNICK:  Thank you.  Just to mention, we did

8  file this morning -- but I'll just do that very quick.  We had

9  the Pro Hac Motion of Mr. James Bendernagel.  He is a member

10  in good standing of the bar of the State of New York and the

11  bar of the District of Columbia.  He's in Court today and will

12  probably be involved in some of the presentations.

13          THE COURT:  Very well.  Welcome, sir.

14          MR. BENDERNAGEL:  Thank you.

15          MR. CONLAN:  Jim Conlan on behalf of the Debtor.

16  Good morning, Your Honor.

17      A lot has been happening.  The negotiations have been hot

18  and heavy.  At the start, we would like to put David Kurtz on

19  the stand to tell you about that process and the delicate

20  stage at which the negotiations now are.  Your Honor, an

21  announcement, we have decided, the Debtor has decided, to

22  limit our front-end and back-end exclusivity extension request

23  to approximately 30 days to kick front-end exclusivity from

24  February 28 to March 31 and back end from April 29 to May 31st,

25  I believe that's a Monday.

1        THE COURT:  Well --

2        MR. CONLAN:  Mr. Kurtz.  I'm sorry, Your Honor.

3        THE COURT:  Let's pause for a moment there, if you

4    will.

5        (Pause in proceedings.)

6        THE COURT:  Now -- well, I'm sorry, continue.

7        MR. CONLAN:  Your Honor, as a corollary, just fair

8    warning, we are also going to ask after you hear Mr. Kurtz's

9    testimony, we're going to ask that the hearing on the Standing

10   Motion and the Examiner Motion be adjourned to March 31 as

11   well.  We do think that after you hear Mr. Kurtz's testimony

12   that that will follow, but we would like to take items in that

13   order.

14       THE COURT:  All right.  Before others stand to

15   complain, let me tell you what I have determined even before

16   the Debtor made the suggestion that it did.

17       After having gone through the preliminary matters with

18   Mr. Pernick, what remains on the Agenda are three main

19   substantive Motions:  Wilmington Trust Examiner Motion and the

20   related I'll call it a Seal Motion, at number 13 in connection

21   with that, the Committee's what I'll call Standing Motion and

22   three Motions related to that, a Seal Motion with respect to

23   the Draft Complaint, Wilmington Trust Motion to file an

24   un-redacted response and a Cross Motion to intervene on which

25   I've set a status hearing today, and Law Debenture Motion to

1   file an un-redacted reply in support of the Standing Motion

2   and finally the Exclusivity Motion.

3       I have determined that it would be best to proceed first

4   with the Exclusivity Motion for a couple of reasons.  But in

5   connection with that, I'll note it is not my intention to

6   close any portion of this proceeding and part of that has to

7   do with the Seal Motions and the objection to the Seal

8   Motions, one in particular with respect to the Draft

9   Complaint.  I think maybe either avoid it or at least

10  postponed until we get through the Exclusivity Motion.  Now,

11  while I am setting aside for now, and I just mean for now as

12  in the moment, the Examiner and Standing Motions and the

13  related matters until I conclude the hearing on the

14  Exclusivity Motion, I will permit any party who even though

15  the party might not have filed a pleading in connection with

16  the Exclusivity Motion, but who did so in connection with

17  either of the other two Motions, the Examiner or the Standing

18  Motion, to participate in the examination of any witnesses the

19  Debtor presents in connection with the Exclusivity Motion.  I

20  will also allow some leeway in connection with the topic of

21  such cross-examinations or examinations so that it's

22  understood clearly that the record to be made in the manner

23  that I'm proposing to go forward and intend to go forward,

24  unless the Court later orders otherwise, is for the sole

25  purpose of the disposition of the Exclusivity Motion, so that

1    with respect to those Motions who either for now or until

2    another day I'm putting aside, no parties rights to offer

3    additional evidence in connection with those Motions is to be

4    foreclosed by anything that occurs today.  So to put it

5    plainly, nobody has to attempt to cram into the exclusivity

6    record that which they think they might be foreclosed from

7    doing later in connection with the other Motions.

8         Okay.  So in light of that, since the Debtors have the

9    podium, I'll hear first from the Debtor and then now, if

10   others wish to have comments, I will hear from them.

11        MR. CONLAN:  My only response is very well, Your

12   Honor.  That makes sense to us.

13        THE COURT:  Yes.  And I'll repeat again, we had no

14   communications with Debtors' counsel prior to today's

15   proceeding.  Okay.  I'll hear from anyone else who wishes to

16   be heard, you know, strictly with respect to procedure.

17        MR. SEIFE:  Your Honor, Howard Seife on behalf of

18   the Committee.  I understand Your Honor has ruled and we're

19   prepared to proceed on that basis, so thank you.

20        MR. GLENN:  Good morning, Your Honor.  Andrew Glenn,

21   Kasowitz, Benson, Torres & Friedman.  Nice to see you again.

22        THE COURT:  Did you just bunk in the courtroom pews

23   somewhere last night or --

24        MR. GLENN:  Yes.  Your Honor, we got wind that the

25   company was considering putting on a witness in Court today

1   late last night and we were --

2          THE COURT:  Actually, you would have gotten wind of

3   that at the last hearing because I said I would not approve

4   further exclusivity without an evidentiary hearing.

5          MR. GLENN:  Well, specifically with respect to one

6   matter that is of concern to various parties on this side of

7   the table which is, testimony about the settlement

8   negotiations that have occurred to date.  Our concern is that

9   Mr. Kurtz is going to testify about the vim, vigor,

10  arduousness of the settlement negotiations and that is going

11  to dip into Rule 408 issues and issues with respect to an

12  agreement among the parties that the settlement agreements --

13  the settlement negotiations would not be used in Court, which

14  from what I understand is the company's intent today.  If this

15  testimony comes in, we would have no alternative, I believe,

16  but to put on other witnesses to testify that the settlement

17  negotiations were of a different nature, and then you delve

18  into who's right, who's wrong, what is the underlying

19  substance of those negotiations.  I don't think anyone would

20  dispute -- we would all stipulate, A, that settlement

21  negotiations have occurred, B, regardless of Your Honor's

22  rulings today, that settlement negotiations will occur in the

23  future.  So I don't think apart from Rule 408 and issues about

24  the agreement among the parties not to use discussions,

25  settlement discussions, that it's relevant to anything.  And

1  further, if we get into issues of, well, the company's using

2  settlement negotiations in Court, in the future if someone

3  calls someone else and says I want to talk to you about

4  settlement, then there is a threat that just picking up the

5  phone to talk to someone, answering an e-mail, can somehow be

6  used against you in Court someday, and I don't think that's

7  fair and I don't think that's appropriate.  So to the extent

8  the testimony is going to delve into dates, times, attendees

9  and meetings, anything about the substance of those meetings,

10  we would ask that Your Honor not allow that testimony going

11  forward.

12          THE COURT:  Well, let me just respond briefly to

13  that.  First of all, Rule 408 is not nearly as restrictive as

14  most people normally like to advance it.  I would be more

15  concerned about whether there is an agreement which precludes

16  the introduction of certain information in the courtroom.  Has

17  such an agreement been reduced to writing?

18          MR. GLENN:  When we gave presentations to the

19  company, we put a legend on all of our presentations, Rule 408

20  for settlement purposes only, not to be used in litigation.

21  There was no agreement other than -- that was reduced to

22  writing --

23          THE COURT:  All right.

24          MR. GLENN:  -- other than that.

25          THE COURT:  And then finally, I'll just say it

1    doesn't seem to me that, except under the most unusual of

2    circumstances, testimony about dates and times of meetings and

3    who attended and general topics of discussion would ordinarily

4    be inappropriate in connection with this type of Motion.  I

5    think the only practical way, I think, to address your

6    concern, and I don't mean to minimize it, is on a

7    question-by-question basis.

8          MR. GLENN:  Okay.  And with that, Your Honor, we

9    have a potential witness in Court to counter Mr. Kurtz's

10   testimony if we might be allowed to do so afterwards.

11         THE COURT:  I will consider that request.

12         MR. GLENN:  Thank you.

13         MR. BUSH:  Good morning, Your Honor.  Graeme Bush,

14   from Zuckerman, Spaeder, as special litigation counsel for the

15   Creditors' Committee.

16      Your Honor mentioned on the subject of Rule 408, and I

17   wanted to just note for the record, perhaps, we'll have to do

18   this on a question-by-question basis, but I agree with Your

19   Honor's characterization of Rule 408.  And I think that the

20   Debtor should understand that if Mr. Kurtz talks about the

21   settlement discussions, that he's opening the door, and we

22   should be allowed to ask whatever we want about the settlement

23   discussions, including the details that this is not being used

24   to prove liability or damages, which is all that 408

25   precludes.

1          THE COURT:  I'll just say I acknowledge your

2     comment.  Anyone else wish to be heard?

3          MR. GOLDEN:  Good morning, Your Honor.  Daniel

4     Golden, Akin, Gump, Strauss, Hauer & Feld.  I'm counsel for

5     Centerbridge Capital Advisors.

6        Your Honor, I understood the Court's pronouncements that

7     the evidence adduced in connection with the exclusivity

8     meeting -- exclusivity hearing could be likewise used in

9     connection with the other pending Motions this morning.

10          THE COURT:  I don't think --

11          MR. GOLDEN:  The question I --

12          THE COURT:  I don't think that's what I said.  What

13     I said was --

14          MR. GOLDEN:  Well --

15          THE COURT:  -- whatever record we take in connection

16     with that Motion won't foreclose Movants in other matters from

17     at some later time, whether today or on another day, advancing

18     evidentiarily whatever they wish to do in support of their

19     respective motions.

20          MR. GLENN:  I'm sorry.  I appreciate the

21     clarification, Your Honor.  The reason I rise, I'm -- the

22     Debtors stood up a moment ago and indicated that they had just

23     determined to amend their exclusivity request to 30 days.

24          THE COURT:  Well, I don't think there was anyone in

25     this courtroom or on the phone who thought I was going to give

1    them until June.

2         MR. GLENN:  I don't know what the Debtors were

3    thinking.  But, you know, a review of the pleadings that were

4    filed in connection with the Exclusivity Motion indicated on

5    the part of JPM, they wanted only 30 days, the Credit

6    Agreement Lenders wanted no further exclusivity and the

7    parties on this side had no objection to the Debtors' request.

8      I wonder if it might streamline the hearings if we can

9    find out is there any pending continuing objection to the

10   Debtors' Exclusivity Motion in light of the Debtors'

11   pronouncement that they're only seeking 30 days at this point.

12         THE COURT:  Well, you know, that's a very good

13   question.  Would anyone like to respond to that?  And, I

14   guess, first I'll start with those who filed pleadings in

15   connection with the Exclusivity Motion.  Is there any

16   objection at this point to granting the now shortened request

17   of the Debtor?

18         MR. BENNETT:  Because the other items are still on

19   calendar, unfortunately the answer is, yes.  From -- excuse

20   me, for the record, Bruce Bennett on behalf of the Credit

21   Agreement Lenders and, of course, we did file an opposition to

22   continuation of exclusivity, et al.

23      I think that if we were confronted with a situation where

24   all the parties to all the motions were prepared to put

25   everything off for 30 days or if that was the package that the

1    Court was considering, 30 days is not the end of the world, it

2    might facilitate additional constructive dialogue and it would

3    probably be senseless to get in the way of that.

4           THE COURT:  Well, maybe this would be helpful

5    because it was -- I will tell you, if the parties don't

6    already have a sense for this, if I concluded that the Debtor

7    was entitled to an extension of exclusivity, it was my

8    intention to put off the other two Motions and those related

9    to them, but I wasn't prepared to make that decision until I

10   heard the record on exclusivity.

11          MR. BENNETT:  Well, if that's what we're discussing,

12   the opposition of the Credit Agreement Lenders to the

13   continuation of exclusivity for the 30 days would be

14   withdrawn.

15          THE COURT:  Okay.

16          MR. BENNETT:  But our points are important, I mean,

17   the -- and I think that -- I don't know how this fits into

18   what Your Honor was thinking and you certainly gave no

19   suggestion in your preliminary rulings.

20      We see moving forward on the Subsidiary Only Plan, which

21   progress, by the way, has not stood still between the past

22   hearing and this hearing, and the Debtors and we have had

23   extensive constructive sometimes tense, sometimes other

24   dialogue on that specific issue as well as many others.  It

25   offers constructive solutions to major problems in the case,

18

1  problems in the case that management talks about all the time,

2  which we think is even more important to be -- it's even more

3  important to be pursing that aggressively in an environment

4  where litigation is ramping up than it is in an environment

5  where there is no immediate threat of the case turning into a

6  litigation moras, so --

7        THE COURT:  I already have a couple of those going

8  on, so I'm not eager to foster another.

9        MR. BENNETT:  And, again, we're not either.  We --

10  but I think that one way for the Court to look at it, and I

11  would have much more extensive comments in a closing argument

12  on an exclusivity extension if I had to do that is that, we

13  really do see a Subsidiary Only Plan as a vehicle for

14  minimizing harm to the estates from what would otherwise be a

15  very prolonged or potentially be a very prolonged and very

16  contentious Chapter 11 case.  And I'd want to elaborate on

17  that more if Your Honor was considering continuing

18  exclusivity, but also allowing the standing to be shifted and

19  litigation to commence immediately.

20        THE COURT:  Well, as I said, to the extent, however

21  it comes about, I determine the Debtor is entitled to whatever

22  extension of exclusivity, I would put off the other two

23  Motions.

24        MR. BENNETT:  Well, in that circumstance, we'd

25  withdraw our opposition.

1        THE COURT:  Okay.  Without prejudice to --

2        MR. BENNETT:  Right.

3        THE COURT:  -- future developments.

4        MR. BENNETT:  Exactly.

5        THE COURT:  All right.  Anyone else wish to be

6   heard?

7     (No verbal response.)

8        THE COURT:  Okay.  Is there -- okay, let me ask so

9   we're clear for the record, is there any remaining opposition

10  to what now is a reduced request for extension of exclusivity?

11        MR. BUSH:  Your Honor, Graeme Bush again.  The

12  Committee wouldn't have an objection to the modified

13  Exclusivity Motion, but the other parts of that package, I

14  think, the Committee would have an objection to.  We'd be

15  prepared to argue that at the appropriate time, so right now

16  I'll just flag the issue for you, that there's no reason to

17  delay the Standing Motion.  The Debtors had and all the

18  parties have had a significant period of time, over 14 months,

19  since the case was filed to discuss settlement of what

20  everybody understood from day one was the principle issue in

21  the case that needed to be resolved in order to have a plan of

22  reorganization.  And if Mr. Kurtz -- or the basis, I guess, of

23  the exclusivity extension is that things are going well and

24  we're likely to be able to reach a consensual resolution that

25  is something that we would not agree with and, therefore, we

1   don't think there's any reason to tie the two together in the

2   way Your Honor has suggested it might make sense to do, so we

3   would like to be heard on that subject.

4           THE COURT:  I thought we just were.

5           MR. BUSH:  Well, anymore if it --

6           THE COURT:  Well, and I've said this before about

7   exclusivity issues whether it should be extended or if someone

8   has moved to terminate it and that is, on one level apart from

9   applying the standards to which the Court must attend is the

10  question in the Judge's mind of if I do things whether it has

11  to do with exclusivity or permit the Standing Motion, does it

12  make the administration of the case better or does it make it

13  harder?  Does it open up the door for the litigation nightmare

14  that others in their submissions have discussed or does it

15  push parties faster to a resolution?  That for me is usually

16  the most difficult facet of coming to a determination on these

17  issues.  But I will tell you for now, again, subject to an

18  extension of exclusivity, it's my determination that pushing

19  those matters off would be better for the administration of

20  the Chapter 11, and it's not because I see the Debtor in a

21  position of purity necessarily or that I agree or that I don't

22  agree with the Committee that ultimately someone other than

23  the Debtor may have to pursue these claims, but I'm not there

24  yet.

25          MR. BUSH:  Well, I said I would like to be heard,

1  and I guess that's because I figured there were maybe a few

2  other things to say.  I won't belabor the point, but we would

3  agree that those are all perfectly good considerations.

4      But what we think is happening in the settlement dynamic

5  is actually not going to be furthered by more of the same for

6  30 days or 60 days or any period of time.  That the dynamic

7  has gotten to a point where in our judgment, and we've said

8  this in the papers so this isn't news to anybody, we believe

9  that the Lenders don't really think that any claim will be

10  filed, that the Committee would pursue a claim or, perhaps,

11  that Your Honor will grant the Motion to pursue the claim and

12  their settlement posture is affected by that view.

13          THE COURT:  Well, let me ask --

14          MR. BUSH:  We don't --

15          THE COURT:  -- you this question.  Is it your

16  anticipation that others who may be involved in that process

17  and who may be subject on either side of the caption, would

18  make a deal but exclude the Committee from the deal, wrap a

19  proposed settlement into a plan and push for a Court approval

20  of that in connection with a plan?

21          MR. BUSH:  Do we think that's a possibility, yes.

22  And I'd make one further point, Your Honor.  To the extent

23  that filing a Complaint, as many of the folks on this side of

24  the courtroom have argued will disrupt the settlement

25  discussions entirely, you know, we've heard from the beginning

22

1  that even filing the Motion would disrupt settlement

2  discussions, and people continue to discuss things after the

3  Motion was filed.  And there is a difference between getting

4  standing and actually filing the Complaint.  And we've

5  actually been fairly judicious, I think, in trying to hold

6  back and not fire all the guns before it was too early and to

7  give the settlement process a chance to work, and we could

8  continue to do that after we have authority to file the

9  Complaint.

10        THE COURT:  You know, it's not -- and I would tend

11  generally to agree with that proposition.  The parties here

12  are all sophisticated, they're all well represented and

13  they're able for the most part to shed the collateral chatter

14  which occurs as the result of, you know, permission to pursue

15  the filing of the filing, but I still think there's great

16  advantage, at least, at this point in connection with the

17  administration of the 11 to avoid the initiation of, well,

18  I'll say more collateral chatter with respect to this issue.

19  Do you understand what I'm saying?

20        MR. BUSH:  I think so.

21        THE COURT:  Okay.

22        MR. BUSH:  All right, Your Honor.  Thank you.

23        MR. STARK:  Good morning, Your Honor.  Robert Stark

24  from Brown, Rudnick, appearing on behalf of Wilmington Trust.

25  Wilmington Trust is the Indenture Trustee for the PHONES'

1  debts, a billion two subordinated debentures at the parent

2  company level.

3      Your Honor, I listened intently and I think I understand

4  the --

5          THE COURT:  Deeply subordinated as others have

6  described it.

7          MR. STARK:  Well, in fact, we've been called a lot

8  of things.  Your Honor, we did not interpose an objection to

9  exclusivity.  Frankly, our view on life is maintain status

10 quo, which is get answers to the litigation and that's the

11 basis of our Examiner Motion.

12     As I think I understood Your Honor's thinking and

13 intention at this point, the natural implication of us not

14 interposing an objection orally now is that our Examiner

15 Motion is put off 30 days with the Standing Motion.  The

16 problem with that, it does create a issue for us.  The

17 objections say we've been too late, we've waived our rights,

18 and --

19         THE COURT:  I wouldn't worry about that argument.

20         MR. STARK:  Okay.  Well, then how about this issue,

21 Your Honor?  No one is talking to us, no one.  We asked to be

22 part of settlement discussions, we were ejected from the room.

23 We asked if at subsequent meetings can we actually attend,

24 they said, no thanks, we're not interested in talking with

25 you.  So the notion that this is all just moving the chessmen

1   on the board for people to ultimately to figure out how

2   they're going to cut the deal is not entirely accurate because

3   there is a billion two amount of debt that will not get access

4   to that settlement conference.  Your Honor, I think, knows me

5   well enough to know I'm not a shrinking violet and I'm not

6   going away, so --

7          THE COURT:  I would tend to agree with that.

8          MR. STARK:  Thank you.  So if the notion is -- and I

9   agree with the notion.  We're trying to figure out the proper

10  reasoned and reasonable mechanism to get parties to agree to

11  the right resolution.  From our perspective, you've got to

12  start to talking to us first, then we'll talk about what the

13  allocation is.  I think -- and maybe it was the last question

14  Your Honor asked Mr. Bush about if the Committee -- is it

15  possible that the Committee can ultimately work through and

16  get on board.  And it does go to a fair amount of what we've

17  asserted in our Examiner Motion, the construct of the

18  Committee as being a value allocation issue between bonds and

19  banks, and if half of the bonds can even get into the room,

20  they may be on board, but it's not going to avoid the

21  litigation.  We'll fight that litigation whether it be in an

22  1123 context of a plan or 9019 settlement or an attempted

23  settlement of our own equitable subordination Complaints.  You

24  can only capture the tiger in a paper bag for so long.  And so

25  if the notion is we're going to put this off 30 days and then

1   I'll say at that point in time when they file their plan, gee,

2   you know, I'll see you at confirmation time, we're going to

3   have trial at confirmation time and it's going to be long and

4   difficult.  I'm happy to attend any settlement conference

5   anybody will allow me to attend.  I'll make my arguments and

6   present my case, but they're not listening.

7        So if -- let me conclude, if the natural implication of

8   me standing up and saying I'm okay with the a 30-day extension

9   of exclusivity means that my Examiner Motion doesn't get heard

10  for 30 days then, yes, I do interpose that objection because I

11  think we need to be heard because we need to be part of this

12  process.  Does Your Honor have any questions for me?

13            THE COURT:  Well, you posed the objection in a

14  unique way.  I understand your position.

15            MR. STARK:  Thank you.

16            THE COURT:  Anyone else care to be heard?

17            MR. COUSINS:  Good morning, Your Honor.  Scott

18  Cousins from Greenberg, Traurig, on behalf of Aurelius

19  Capital.  My partner, Nancy Mitchell, we filed a pro hac vice

20  last night and wanted to be heard.

21            THE COURT:  Very well.

22            MR. COUSINS:  Thank you.

23            MS. MITCHELL:  Well, after what Your Honor's said,

24  I'm not sure they want to be heard, but -- Nancy Mitchell for

25  the record, Greenberg, Traurig, on behalf of Aurelius Capital

1  Management.

2      We're relatively new to these proceedings.  Aurelius owns

3  about $100 million of bonds in the Tribune Company case.  And,

4  Your Honor, we did not object to exclusivity.  We did file an

5  objection to the Seal Motion.  But given the suggestion that

6  Your Honor made that if exclusivity was granted, you would be

7  pushing the Examiner Motion and the Standing Motion, that is

8  of concern to our client.  We are interested in being part of

9  the process.  We have discussed with the Debtors the

10  possibility of becoming a negotiating party.  I won't say that

11  they were terribly anxious to talk to me about it, but they

12  did say that they would consult with the other parties.

13      We believe that moving forward with the Examiner and the

14  Standing Motion actually is most likely to move forward the

15  settlement process here because only joining those issues

16  actually, Your Honor, is likely to bring the issues to

17  resolution.  And the continuing process that people are

18  engaged in right now, which is negotiation with somebody,

19  although I'm not sure whom given the statements that have been

20  made today, and continuing not to put things out in the light

21  of day is not going to actually facilitate a settlement.  And

22  so we'd be very concerned about an extension of exclusivity if

23  it also comes with an extension of the Examiner Motion and the

24  Standing Motion, which we believe are extremely important.

25          THE COURT:  Thank you.  Does anyone else wish to be

1    heard?

2         MS. HARRIS:  Good morning, Your Honor.  For the

3    record, Donna Harris, of Pinckney, Harris & Weidinger, here on

4    behalf of 200 individuals known as the TM Retirees.  I'm also

5    here with my co-counsel, Jay Teitelbaum, he would like to be

6    heard.  His Pro Hac Motion has already been filed and granted.

7         THE COURT:  All right.  Thank you.

8         MR. TEITELBAUM:  Good morning, Your Honor.  Jay

9    Teitelbaum, Teitelbaum & Baskin.

10        We represent Bill Niese, who is a member of the

11   Creditors' Committee.  We also represent about 199 other

12   retirees that have benefits with about 112 million unfunded

13   pension benefits.

14        THE COURT:  I know you're tired, according to your

15   filing, of having everyone else play with your money.

16        MR. TEITELBAUM:  Sort of.  And I get up here, I'm

17   not sure what hat I'm wearing at the moment, but I think the

18   reason that I'm addressing the Court this morning is to put a

19   personal face on the implications of everything that's going

20   on in this Court.  And I think it's crucial because on both

21   sides of the aisle, if you will -- and we've got big financial

22   institutions that have a lot of money at stake.

23        I've got probably out of the 200, 190 or so that are

24   worried about how to pay their medical bills, how to pay their

25   college tuition, their kids college tuition, and how to pay

1   their electric bills, and do they go get a job at Walmart at

2   60 years of age to do those things.

3       I appreciate and agree actually with Your Honor's desire

4   to keep the costs of this down because, frankly, they are

5   playing with my clients' lives put aside their money, and

6   maintaining the status quo for 30 days is not going to be the

7   end of the world.  But what I would like to tell the Court is

8   our concern is -- and Mr. Bush answered the question directly

9   and I said from the back, I said just say, yes, and he did.

10  We are concerned about being locked out, the Committee, about

11  being locked out of the process.  And I'm not suggesting that

12  the Court can order people to talk to one another, but the

13  suggestion should be right, that if we're going to try to play

14  nicely in the sandbox, we should be in the sandbox together.

15  And that doesn't necessarily mean that every person in the

16  case has to be in the sandbox, but an Official Committee has

17  been appointed.  It's got a role.  It should not be minimized.

18  I will tell you that my clients are at the parent level, and

19  contrary to what Mr. Stark's pleadings imply, we have a real

20  interest in this litigation because they're looking at three,

21  five cents maybe on a Subsidiary Only Plan, and litigation may

22  unfortunately materially affect that.  I'm not standing here

23  saying, you know, damn the torpedoes.  I'm saying let's work

24  at this for the next 30 days, but let's really work at it.

25  Let us have some meaningful and constructive discussion and

1  let everybody know that if it doesn't work, you know, the

2  gloves may have to come off and I think Your Honor has

3  signaled that.  So on behalf of these people who don't want to

4  see all this terrific talent spending probably a million bucks

5  or more just to be here this morning, well, we don't want to

6  see that anymore.  We don't want to see this case run up $160

7  million in legal fees by the end of the year and have bubkes

8  at the end.  We don't want that.  My people really simply need

9  to get their money so they can move on with their lives.

10 Thank you.

11        THE COURT:  Thank you.  Does anyone else wish to be

12 heard?

13     (No verbal response.)

14        THE COURT:  Okay.  Well, in light of the way in

15 which I've framed the process for today, I will require that

16 the Debtor offer a witness in support of now even its

17 shortened request for exclusivity.

18     Now, in light of some of the statements that have been

19 made, I understand there is some -- there may be some

20 propensity to pull the testimony in directions in which it

21 need not go today for purposes of this hearing, but the only

22 way I know how to deal with that is on a question-by-question

23 basis.  But in light of how I've come to propose things, if

24 the Debtor or others would like a short break to consult

25 before we actually proceed with the evidentiary hearing, I

1  would be willing to take a five or ten minute recess to allow

2  the parties to collect themselves.  Any thoughts on that?

3          MR. CONLAN:  Your Honor, on behalf of the Debtor,

4  can we have a five minute break?

5          THE COURT:  You may.  We stand in recess.

6      (Recess from 10:40 a.m. to 10:52 a.m.)

7          THE COURT:  All right.  Is the Debtor ready to

8  proceed?

9          MR. CONLAN:  Your Honor, Jim Conlan on behalf of the

10  Debtor.  Your Honor, we did make an effort to have everyone

11  agree to a stipulation of exclusivity extension with the other

12  matters being kicked and with no need for testimony.  We were

13  not successful in that regard, and so I'm going to turn the

14  podium over to my partner, Mr. Bendernagel, who will call Mr.

15  Kurtz to the stand.

16          THE COURT:  Very well.

17          MR. BENDERNAGEL:  Good morning, Your Honor.  Jim

18  Bendernagel from Sidley & Austin.  I'd ask Mr. Kurtz to go up

19  to the stand to be sworn at this time, that would be helpful.

20          DAVID KURTZ, DEBTORS' WITNESS, SWORN

21          THE CLERK:  Please state your full name for the

22  record and spell it.

23          MR. KURTZ:  David Stephen Kurtz.

24          THE CLERK:  Thank you.

25          MR. BENDERNAGEL:  Your Honor, in the hope of not

1  making things worse, but making them better, I'll proceed

2  slowly with Mr. Kurtz.

3          THE COURT:  All right.

4                      DIRECT EXAMINATION

5  BY MR. BENDERNAGEL:

6  Q.  Mr. Kurtz, can you state your name for the record, please?

7  A.  David Kurtz.

8  Q.  And by whom are you currently employed?

9  A.  Lazard.

10  Q.  And what's your position with Lazard?

11  A.  Managing director and co-head in the restructuring group.

12  Q.  And could you briefly describe what your responsibilities

13  are in that position and what that group at Lazard does?

14  A.  My responsibility is to co-manage our global restructuring

15  group, which consists of 60 plus professionals throughout the

16  world.  The mission of our restructuring group is to quite

17  simply advise companies through restructurings, mostly on the

18  company side sometimes on the creditors side, with about equal

19  division between restructurings that take place in bankruptcy

20  and those which occur out of court.

21  Q.  And how long have you held your current position?

22  A.  I've been co-head of the group for approximately two and

23  half years.  I've been a managing director at Lazard for

24  approximately eight years.

25  Q.  And during that period of eight years, has it all been in

32

1   the restructuring area?

2   A.   Yes.

3   Q.   What did you do before you arrived at Lazard eight years

4   ago?

5   A.   I was an attorney for 23 years specializing in bankruptcy

6   and restructuring matters.

7   Q.   In the recent past couple of years, could you describe for

8   the Court the nature of some of the representations you've

9   undertaken?

10   A.   Yes.  Within the last handful of years by way of example,

11   I served as principal financial advisor in the following

12   Debtor engagements:   Charter Communications, which involved 20

13   plus billion dollars of debt, RH Donnelley, that one involved

14   10 plus billion dollars of debt, Smurfit Stone Container

15   Corporation, approximately $5 billion of debt, also on the

16   Creditors side, I advised the Creditors Committee in the

17   Calpine bankruptcy.   Calpine owed almost $20 billion, and I

18   also advised the Creditors in the Northwest Airlines

19   bankruptcy when Northwest Airlines went into Chapter 11 with

20   approximately $15 billion of debt.

21   Q.   Now, in connection with that work, have you been involved

22   in plan negotiations and the like?

23   A.   Yes, in all of those matters.

24   Q.   And in your experience, have you been involved with large

25   fraudulent conveyance claims being part of the bankruptcy

1  proceeding?

2  A.   I have.

3  Q.   When was Lazard retained to work on this matter?

4  A.   It was right around Thanksgiving, 2008.

5  Q.   Now, prior to that date, had Lazard or you worked for the

6  Tribune Company?

7  A.   Not that I'm aware of.

8  Q.   Did your firm work on the 2007 LBO that's the subject of a

9  lot of these claims involving fraudulent conveyance?

10 A.   No.

11 Q.   Could you describe what Lazard's role has been in

12 connection with the restructuring undertaking that it's been

13 asked to do in the case?

14 A.   Yes.  Our work for the Tribune has run the gamut of, you

15 know, what I would think would be a normal role for a

16 financial advisor to a large company in Chapter 11, so we work

17 with the company on the strategic aspects of their stewardship

18 of the bankruptcy and their management of the case.  We advise

19 them on issues relating to the restructuring of the company's

20 balance sheet, debt capacity, opportunities to raise new

21 capital.  We've been involved in discussions with the company

22 with respect to analyzing and understanding their forecasts on

23 which the new capital structure, financial forecasts, on which

24 the new capital structure will be based.  We've been involved

25 in performing valuation analyses for the company, which I

1    expect at some point will be incorporated into the plan or

2    reorganization that the company expects to file at some point

3    in the future.  And then we have also been involved, deeply

4    involved, in matters relating to claims that might exist

5    arising from the LBO transaction that we're all very familiar

6    with.

7    Q.  And it's that last area that I'd like to focus my

8    examination on now.  When the company was before the Court

9    back in December with respect to the last exclusivity

10   extension, they'd indicated that there was a process going on

11   in an attempt to find resolution with respect to those claims;

12   are you aware of that?

13   A.  I am.

14   Q.  Have you been involved in that process?

15   A.  Very.

16   Q.  When did the -- what's your role been in that process?

17   A.  We have been -- Lazard has been involved with the other

18   professionals engaged by the Tribune Corporation, Alvarez &

19   Marsal, Sidley & Austin, in analyzing and studying the facts

20   and circumstances and legal issues arising from the LBO, and I

21   have participated in that endeavor as a member of that team.

22   I have also been on the front line of the Debtors' efforts to

23   orchestrate a global and hopefully consensual resolution of

24   all of the issues, the legal issues and claims arising from

25   the LBO short of litigation, and in that capacity, I've more

1   or less played a lead role.

2   Q.  And when did the -- focusing on that last component, this

3   work to try to achieve a global and consensual resolution,

4   when did that work in your estimation begin?

5   A.  I would say the foundation for that work began in the fall

6   of 2009, during which time the company worked to facilitate

7   the dissemination of information, documents, discovery to the

8   principal parties-in-interest in the case and those that would

9   be most significant in determining the resolution of those

10  claims if they could be resolved consensually.  The reason

11  that was important and why it was a necessary foundation was

12  that, you know, without a baseline of knowledge, it was not

13  going to be possible for the parties who we would need to

14  participate in this settlement undertaking to have an informed

15  view of the merits of their case and their claims and their

16  respective position.

17      So I would say phase one of this undertaking involved

18  getting people smart, getting documents into people's hands,

19  facilitating that occurring, and I would say that by the time

20  we got to approximately Thanksgiving, that effort was largely

21  completed.  Now, that isn't to say that there aren't documents

22  and discovery still ongoing because there are, there is and

23  there is likely to continue to be, but I think it was our

24  view, hopefully, and I believe one that was shared by others,

25  that by Thanksgiving we were able to get enough information

1    into people's hands so that they would be comfortable

2    developing, at least, preliminary points of view with respect

3    to these claims.

4    Q.   Before we get to what happened after Thanksgiving, can you

5    explain to me why the company -- what's your understanding as

6    to why the company believes it's important to try to make this

7    effort to come up with a general consensual resolution if you

8    could, if you can?

9    A.   I can.  The company believes strongly that it is in the

10   best interest of these Debtors, our Creditors,

11   parties-in-interest, if we are able to achieve a consensual

12   resolution of the claims arising from the LBO short of

13   litigation.  There are at least two important reasons that we

14   feel that way.

15        First and foremost and, you know, the easiest to prove is

16   just the ongoing, out-of-pocket expense run rate of continuing

17   these cases into the future.  As we look back upon the

18   professional fees incurred since the Tribune Company went into

19   Chapter 11, the run rate associated with those fees is in the

20   8 to $10 million per month range.  We would expect that those

21   dollar amounts would increase if litigation were to commence

22   and then you just run that 10 plus million dollars per month

23   out into, you know, how many months until the litigation

24   actually gets resolved.  And it seems to us that it doesn't

25   take much of a leap to conclude that there are, just based

1   upon this consideration alone, hundreds of millions of dollars

2   of value to be preserved by bringing these issues to a prompt

3   and consensual resolution short of litigation, so that's

4   consideration number one.

5       Consideration number two relates to the value of the

6   business as a going concern.  This manifests itself in a

7   couple of different ways.  First, as the Tribune continues to

8   operate in Chapter 11, the company with more and more

9   frequency if you will finds itself in the position where it is

10  precluded from taking advantage of strategic opportunities

11  that exist in the marketplace to create enterprise value.  And

12  so there are joint venture opportunities that we're just not

13  able to take advantage of because third parties are unwilling

14  to enter into joint ventures with a company in Chapter 11 and

15  with no certainty as to when the company might emerge.  And so

16  we just think there's real value lost in our inability to take

17  advantage of strategic opportunities that exist in the

18  marketplace that are ongoing currently.

19      Number two, this is becoming an increasing problem and

20  one that we're growing progressively more worried about and

21  one that really concerns us as we look into the future is our

22  ability to retain our top people.  The company has found over

23  the last several months that some of the -- that many of the

24  top people in the organization are leaving to pursue other

25  opportunities in the industry.  We think the reason why this

38

1    is accelerating is a year ago there were no jobs, but now

2    things are starting to get better, the job market is opening

3    up a little bit and we're losing our key people.  What

4    exacerbates this problem is that we are virtually unable to

5    recruit high-level talent into the organization while we

6    continue to operate under the cloud of Chapter 11.

7    Q.  Now, I'd like to ask you about the period after

8    Thanksgiving and what's happened, but I'd like you to restrict

9    your comments, at least initially, to the process as opposed

10   to the substance of what's happened since then.  Can you

11   simply describe how -- you'd indicated you were trying to get

12   people into a position to talk, how that's played out from

13   December 1 to today without getting into the specifics of who

14   said what to whom.

15   A.  Fine.  I'll try to be careful on it and I'll also try to

16   speak slowly so you can stop me in mid-sentence if you think

17   I --

18   Q.  I'm not sure that I'll be the one stopping you, but --

19   A.  I'd say we spent the month of December engaged in

20   discussions with the parties with a view toward accomplishing

21   two things.

22        First, we felt we needed to establish in people's minds

23   convincingly that we took very seriously the role of the

24   honest broker.  And we were only going to be successful in the

25   role of honest broker if we played things right down the

1   middle to the extent of our ability to do so, and that's what

2   we attempted to do.  I think there might have been some

3   skepticism at the outset, hopefully that skepticism has

4   subsided over the past several months as we have very actively

5   engaged with parties who are in Court today and who have

6   participated in this process.  We also used the time in

7   December to give all of the participants in the process, and

8   I'm talking about Senior Lenders, as well as Committee, as

9   well as at least one very large bondholder, a preliminary view

10  without reaching conclusions in anyway of how we saw some of

11  the factual and legal arguments laying out, and that was more

12  or less what transpired in December.  So I would describe that

13  as after accomplishing the foundational work, getting

14  information in people's hands, this was phase one of the

15  process.

16  Q.  And what happened starting in January?

17  A.  Starting in January, we moved into what I would call phase

18  two.  And we -- in phase two, starting right after the

19  holidays, we were able to orchestrate a series of meetings

20  with people during which they were willing to explain their

21  case to us both factually and legally and why they felt the

22  way they did about their positions.  You know, this was very

23  helpful to us, it's always useful to hear an advocates point

24  of view as to how they view the facts and, frankly, it enabled

25  us to gain, I think, a much better understanding of the

40

1   various claims and the arguments supporting those claims.

2   Q.   Was the Committee involved in that process?

3   A.   Yes.

4   Q.   And what was their role as you saw it at that juncture?

5   A.   You know, the Committee was a participant in this process

6   and so we have had the benefit of the Committee's

7   professionals view of, you know, these issues, and it's been

8   extremely helpful and informational for us to hear that.

9   Q.   Now, what's happened -- I take it that all transpired in

10  January.

11  A.   Right.

12  Q.   What's happened since then in what, I guess, you'd

13  characterize as phase three.

14  A.   Well, a couple of different things.  On the negotiating

15  front we, and I in particular, have been very involved in

16  conversations with all of the principal participants in this

17  process, sometimes principals, sometimes professionals and

18  principals, sometimes professionals only.  This has consumed a

19  significant amount of my time, sometimes these discussions

20  take place late at night, sometimes they happen over the

21  weekend.  In many instances parties have shared things with me

22  in these conversations that they wouldn't want known to other

23  parties, and we have encouraged that dynamic because we think

24  the only way to try to bring folks together is to respect

25  those confidential discussions, but to use the knowledge

41

1  gained to try to steer people into the right direction.  And

2  so I would say that there has always been an ongoing line of

3  communication with the various parties, but it has been very

4  active and that activity probably accelerated around

5  mid-January through today.  I would describe the

6  conversations, frankly, with all of the parties as open,

7  professional, cordial, sometimes even friendly and it's

8  something that we very much wish to continue.

9        MR. BENDERNAGEL:  Your Honor, at this juncture I'd

10  like to mark as an exhibit a one-page document that sets forth

11  the dates of specific meetings in the December, January and

12  February time frame; if that would be appropriate?

13        THE COURT:  Has it been shared with others?

14        MR. BENDERNAGEL:  I believe it has, Your Honor.  We

15  sent it out last night.

16        MR. STARK:  Your Honor, I don't think we received a

17  copy and the (indiscernible) now, I'm not interposing an

18  objection, but as far --

19        THE COURT:  All right.

20        MR. STARK:  -- as (indiscernible) --

21        THE COURT:  Make sure the others who've stood up get

22  a copy before you present it and then you may do so.

23     (Pause in proceedings.)

24        MR. BENDERNAGEL:  May I proceed, Your Honor?

25        THE COURT:  You may.

42

1          MR. BENDERNAGEL:  Thank you.  Can I approach?

2          THE COURT:  You may.

3      (Counsel approaches.)

4          MR. BENDERNAGEL:  How many copies of this do you

5  want, Your Honor?  What's your convention?

6          THE COURT:  Just one.

7          MR. BENDERNAGEL:  Do you want me to give one to the

8  clerk as well?

9          THE COURT:  Not necessary.  Thank you.

10          MR. BENDERNAGEL:  (Indiscernible.)

11          THE COURT:  You may.

12          MR. BENDERNAGEL:  Thank you.

13  BY MR. BENDERNAGEL:

14  Q.  Do you have what's been marked as Debtors 1 in front of

15  you, Mr. Kurtz?

16  A.  I do.

17  Q.  Could you describe simply what this document depicts?

18  A.  This document is a list of face-to-face meetings the

19  company has had with the various parties-in-interest since

20  December of 2009 through early February.  And if you add those

21  meetings up, which I tried to do before Court this morning, I

22  think what this will tell you is that we've had -- and,

23  frankly, my guess is that there might be a couple that we've

24  had that are missing here, but on this sheet, I think, we have

25  23 different in-person, face-to-face meetings that have

43

1    occurred since December 3rd, 2009.

2        Now, as I indicated, you know, that no one should draw

3    the inference that the only time we talk to people is when we

4    see them in person, in fact, these discussions have been

5    augmented by telephone conversations that happened literally

6    on a daily basis.  Rarely does a day go by where I don't talk

7    to somebody and, you know, usually more than one somebody,

8    but this chart is designed to layout for the benefit of the

9    parties in the courtroom who we met with and when we met with

10   them.

11   Q.  Okay.  And I take it there have been -- you've had

12   conversations that are not reflected on this; is that correct?

13   A.  Very many.

14   Q.  I'm not asking you to comment on where the negotiations

15   are.  What I'd like you to try to give the Court without

16   stepping on too many toes the sense based on your experience

17   as to where you think you are in the negotiating dynamic.  In

18   other words, do you think you're making progress?  Do you

19   think that you've, sort of, run the deck?  Where do you think

20   you are?

21   A.  I think we're making progress.  I don't think we've run

22   the deck.  I can see a number of different pathways to

23   success.  It's also quite possible that we may not achieve

24   success.  I think we're at a delicate stage in the discussions

25   and in my view, this is something that -- we're at the point

44

1  now where it's either going to come together or not come

2  together within the next -- well, I think the 30-day

3  exclusivity extension that we asked -- requested taking us

4  through the month of March, sort of coincides with my view as

5  to the time by which we're either going to have it done or

6  not.

7  Q.  Well, do you believe that extending the exclusivity time

8  period will be of assistance in making the determination as to

9  whether you're going to get there or not?

10  A.  Yes, very much.

11  Q.  And if, in fact, exclusivity were not to be extended, if

12  it was just to terminate on February 28th, what's your sense of

13  what would happen?

14  A.  My sense is that the company would file a plan before

15  exclusivity expired.  We would -- in my view, it would be

16  premature to file a plan at that point, but we would be left

17  with no choice but to do so.

18     One of the things that we have tried to do scrupulously

19  in these discussions is to remain neutral and not to take a

20  position and not to take a side.  Once we do, we become a

21  partisan and our ability to act as the honest broker, the

22  intermediator for -- the intermediary for these conversations

23  is seriously damaged.  If we have to file a plan by the end of

24  the month, we'll have to take a position and I believe that in

25  so doing, it will have a very negative effect on the

45

1  negotiating process.

2  Q.  Based on your involvement in these negotiations and your

3  experience, what's your sense of what the impact of commencing

4  litigation would be on the dynamic you've just described?

5  A.  I think it would create a very negative dynamic.

6  Q.  There's been talk about this Committee's Standing Motion;

7  you're familiar with that Motion?

8  A.  I am.

9  Q.  What do you -- how do you see the Standing Motion

10  effecting this issue?

11          MR. SOTTILE:  Objection, Your Honor.  This seems to

12  go beyond the scope of the Exclusivity Motion and that's where

13  I understood the Court to restrict the examination.

14          THE COURT:  Actually -- and thank you for saying

15  that because I apparently wasn't clear enough.  I said I'd

16  give a little leeway because I was not, at least, initially

17  giving the opportunity to others in other motions to give me

18  their cases with respect to examination of witnesses.  I'm

19  assuming that on some of the cross, this issue might be

20  explored in any event.  I'll allow it.

21          MR. BENDERNAGEL:  Thank you, Your Honor.

22          THE COURT:  Now, it's not license for others to run

23  wild.  I just want you to know that, but you may continue for

24  now on that issue.

25          THE WITNESS:  I'm sorry, could you repeat the

1  question?

2        UNIDENTIFIED SPEAKER:   That will be, we'll see.

3  BY MR. BENDERNAGEL:

4  Q.   The question was, you're familiar with the Standing Motion

5  that's been filed by the Committee; is that correct?

6  A.   It is.

7  Q.   And the question is what you think -- how you think the

8  Standing Motion and when it gets resolved interplays with the

9  dynamic, the settlement dynamic?

10        MR. STARK:   Your Honor, I'd like to depose another

11  objection.   I think it does call for wild speculation.   The

12  filing of a motion and the order that's resulting from it can

13  have a myriad of different implications to settlement

14  discussions.   Mr. Kurtz, as much respect as we have for him,

15  simply has no idea how the negotiations will attend following

16  that order.

17        THE COURT:   I'll allow it.   Overruled.

18  BY MR. BENDERNAGEL:

19  Q.   I hope I don't have to repeat the question again.

20  A.   No, you don't.   In my opinion, it would have a negative

21  effect for the following reason.   You know, my experience

22  doing this for a long time is that when litigation begins,

23  people retreat into litigation mode, and I think that would be

24  very unhelpful to the process and something to be avoided as

25  we enter into, you know, what I would describe as the last and

1   hopefully final and successful stage of this process.

2   Q.  Now, last question.  You're familiar with the fact that

3   Wilmington Trust has filed a Motion for the Appointment of an

4   Examiner.  Do you think that moving forward with that process

5   at this juncture would have a positive or negative effect on

6   the --

7           MR. STARK:  (Indiscernible.)

8           MR. BENDERNAGEL:  -- let me finish.

9           MR. STARK:  Sorry.

10  BY MR. BENDERNAGEL:

11  Q.  -- or have a positive or negative effect on the settlement

12  dynamic you just described?

13          MR. STARK:  Your Honor, I may be doing this purely

14  for the record, but I'm interposing the same objection.

15          THE COURT:  Overruled.  You may answer.

16          THE WITNESS:  I think that would be very damaging

17  for this reason.  You know, my experience with examiners and

18  the appointment of an examiner is once one is appointed the

19  show stops and everybody waits to see what the examiner is

20  going to do and what conclusions the examiner will reach

21  because everybody is hoping that the examiner will reach a

22  conclusion that's favorable to them.  So in my view, the

23  appointment of an examiner at this critical sensitive stage of

24  the process could be very damaging.

25  BY MR. BENDERNAGEL:

48

1  Q.  What would you recommend that the Court do at this

2  juncture?

3          MR. STARK:  Objection, Your Honor.  A whole host of

4  things.

5          THE COURT:  Sustained.

6          MR. BENDERNAGEL:  I don't have anything further,

7  Your Honor.

8          THE COURT:  All right.  Now, what I've done is gone

9  down the Agenda and made a list of all the parties who filed

10  pleadings in connection with either the Exclusivity Motion,

11  the Examiner Motion or the Standing Motion, and I'll call them

12  in an order which I've listed to see whether they wish to

13  cross-examine this witness.  I'll start with the Committee.

14          MR. SOTTILE:  Yes, we would, Your Honor.

15          THE COURT:  Go ahead.

16          MR. SOTTILE:  Your Honor, James Sottile of

17  Zuckerman, Spaeder, litigation counsel for the Committee.  The

18  Committee does intend to cross-examine the witness as do a

19  number of other parties.  I would suggest, however, that if

20  the Court were to indulge us in a very brief recess, we might

21  be able to organize the cross to be somewhat more expeditious

22  and avoid duplication.

23          THE COURT:  How brief?

24          MR. SOTTILE:  Five minutes, Your Honor.

25          THE COURT:  Very well.

49

1      MR. SOTTILE:  Thank you, Your Honor.

2         (Recess from 11:20 a.m. to 11:35 a.m.)

3      MR. SOTTILE:  May I proceed, Your Honor?

4      THE COURT:  You may.

5                    CROSS-EXAMINATION

6  BY MR. SOTTILE:

7  Q.  Mr. Kurtz, my name is James Sottile.  I'm a lawyer with

8  Zuckerman, Spaeder, a special litigation counsel for the

9  Committee, and I have a few questions and follow up on your

10 direct testimony.

11 A.  All right.

12 Q.  I'd like to start with one statement you made.  I think

13 you testified, and correct me if I've got this wrong, that you

14 as a representative of the Debtors have sought to act as an

15 honest broker in efforts to reach a global resolution of

16 claims relating to the LBO; is that correct, sir?

17 A.  Yes.

18 Q.  And it's both you as their representative and the Debtors

19 themselves that have sought to act as honest brokers, correct?

20 A.  Yes.

21 Q.  And the parties between whom you and the Debtors have

22 sought to broker a deal are the Senior Lenders, the Credit

23 Agreement Lenders on the one side and the Committee acting for

24 Unsecured Creditors and other representatives of different

25 Creditors on the other side; is that fair?

50

1   A.   Generally, yes.

2   Q.   Okay.  Is it correct that the Debtors, and you as their

3   representative in these discussions, don't see themselves as

4   potential adversaries to the Lenders that would be the

5   Defendants in the fraudulent conveyance claims relating to the

6   leverage buyout.

7   A.   We could very well be adversaries with them at some point

8   in the future with respect to a plan.

9   Q.   So you envision a situation where the Debtors may end up

10  being adversary to the Senior Lenders with respect to a

11  proposed plan of reorganization?

12  A.   That could happen.

13  Q.   And just a follow up with respect to a proposed plan.  I

14  think I heard you say that if the end of the exclusivity

15  period is reached or comes close and a settlement is not

16  reached, that you believe the Debtors will file a plan of

17  reorganization; is that right?

18  A.   Yes.

19  Q.   And that's the moment at which, in your judgment, the

20  Debtors would become at least a potential adversary to the

21  Senior Lenders?

22  A.   It could happen that way.

23  Q.   And in that circumstance where the Debtors are proposing

24  their own plan, they would also, at least, potentially be

25  adverse to the interest of the Committee and of other

1  Creditors?

2  A.  It could happen that way, too.

3  Q.  But you believe that notwithstanding this potential

4  adversity to all sides, that you can make progress as an

5  honest broker in the next 30 days or so; is that right?

6  A.  Yeah, absolutely given my experience in working with this

7  group over the past several months, I'm sure that I can be

8  effective in playing that role.

9  Q.  Is litigation against the Senior Lenders on fraudulent

10  conveyance claims a path that the Debtors have considered

11  pursuing to resolve those claims?

12  A.  It is a path that we have considered pursuing.  It is a

13  path that we are unlikely to pursue.

14  Q.  Is it correct that unless and until the Motion for

15  Standing presented by the Committee is granted, the Debtors

16  are the only parties that could bring such litigation against

17  the Senior Lenders?

18  A.  Yes, that's my understanding of the law.  Our intention

19  would be if global resolution can't be reached, to file a plan

20  that incorporates a settlement of the claims and pursue

21  confirmation of that plan.

22  Q.  And nowhere in the Debtors intentions is the possibility

23  that you would actually file litigation to seek to resolve the

24  claims, correct?

25  A.  That is not our current intention.

52

1   Q.  Can you think of any circumstances in which the Debtors

2   would change their view and decide to pursue litigation as the

3   best way to resolve fraudulent conveyance claims arising from

4   the leverage buyout?

5   A.  Not as I sit here today.

6   Q.  You've spoken about a global resolution of claims relating

7   to the leverage buyout, Mr. Kurtz.  I want to make sure that I

8   understand the scope of what you're describing.  Would the

9   global resolution that you've testified about include a

10  resolution of potential claims against third parties such as

11  current and former officers and directors of the company for

12  breach of fiduciary duty and other wrongs connected with the

13  leverage buyout?

14  A.  Yeah.  Global would mean global.  All claims against all

15  parties would be resolved.

16  Q.  Oh.  And if a resolution were reached that did not include

17  resolution of the third-party claims, do I understand you

18  correctly that in that situation the Debtors would go ahead

19  and file a plan because there would be no global resolution?

20  A.  I think what I testified to is that in the absence of a

21  global resolution, we will likely file a plan, a Settlement

22  Plan, that proposes our view of what a fair settlement should

23  be.

24  Q.  And the global resolution that you're speaking about, just

25  to be absolutely clear, includes a settlement of claims

53

1  against current officers and directors for breach of fiduciary

2  duty relating to the LBO.

3  A.   Yeah, it does.  And, you know, the interesting thing about

4  that is everybody has understood that from the first

5  conversation, that that was the goal, global means everyone.

6  And I've been pleased that people, all of the participants,

7  were willing to engage with us on that basis.  So that's been

8  our intention and that's been the basis upon which these

9  discussions have occurred.

10 Q.   Have there been -- and I don't want to inquire into the

11 substance of discussions, but I just want you to tell me

12 whether or not, in fact, there have been any.  Have there been

13 any substantive settlement discussions between the Debtors and

14 the Committee with respect to potential third-party claims

15 against individuals including current and former officers and

16 directors of the company?

17 A.   Well, the subject has come up.

18        MR. BENDERNAGEL:  Objection, Your Honor.  I don't --

19 we're getting pretty close to the line of talking about

20 substance.

21        THE COURT:  Well, I don't disagree that we're

22 getting close, but I guess I would say to myself, I'd be

23 surprised if such discussions hadn't taken place.

24        MR. BENDERNAGEL:  Okay.  Well, got a guess when we

25 get to the lines that -- thank you, Your Honor.

1      THE COURT:  We're all in the business of drawing

2  lines.  You may proceed.

3      THE WITNESS:  I think I answered.

4  BY MR. SOTTILE:

5  Q.  I didn't hear the answer, Mr. Kurtz.

6  A.  The answer was those -- what was your question again?  I

7  -- it was some form of yes.  My answer was some form of yes,

8  but --

9  Q.  Well, why don't I try a different question and see if I

10  can keep the yes.

11  A.  Okay.

12  Q.  Just to be clear on the record, Mr. Kurtz, the question

13  is, have there been substantive settlement discussions

14  involving on the one hand the Debtors and on the other hand

15  the Committee that relate to settlement of potential

16  third-party claims against persons, including current and

17  former officers and directors of the company, without

18  revealing the substance of any such negotiations?

19  A.  Thank you.  Now I've got it.  The answer is, yes.  That

20  issue has come up in the context of settlement discussions

21  that we have had with the Creditors' Committee.

22  Q.  Now, when did it first come up in substantive --

23  A.  I can't tell you when it first came up.  That's my answer.

24  I don't remember when it first came up.

25  Q.  Did it come up at any time prior to February of this year?

1   A.  I don't recall.

2   Q.  You're not able to testify that such discussions took

3   place prior to February of this year?

4   A.  Well, you know what, it all kind of blends together in my

5   mind, so I couldn't draw a line and say it happened, you know,

6   on this side of the line and not that side.  I just -- I don't

7   remember it that way.  I don't know.

8   Q.  It's the 18th of February now.  You're not able to tell us

9   whether or not those discussions first took place between the

10  Committee and the Debtors in the last 17 days?

11  A.  Whether they first took place?

12  Q.  That's the question, sir.

13  A.  It -- my answer is I don't recall.  If I had to guess, I'd

14  say probably not, but I don't crisply recall and I'd rather

15  not guess.

16  Q.  Thank you.  Mr. Kurtz, you've been closely working with

17  representatives of the Debtors since Lazard was retained in

18  late 2008; is that correct?

19  A.  It is.

20  Q.  Do the persons that you have worked with include, Mr.

21  Liebentritt, their general counsel of the company?

22  A.  Yes.

23  Q.  Is it fair to say that he is the principal person you

24  report to in the course of your work?

25  A.  I would say that that's not true.

56

1    Q.   Who is the principal person that you report to?

2    A.   I would say there is not a principal person.  There are

3    different persons depending upon the issue.

4    Q.   Could you identify those persons and the issues to the

5    extent they relate to claims concerning the LBO?  I'm not

6    interested in reports on other matters.

7    A.   (Indiscernible.)

8    Q.   You're quite right.

9    A.   Then I would say it is Mr. Liebentritt.

10   Q.   Thank you.

11   A.   But ultimately the board makes these determinations of

12   course.

13   Q.   But day to day in the course of these discussions about a

14   resolution of LBO claims, the person you talk to and report to

15   is Mr. Liebentritt.

16   A.   Yes.

17   Q.   And he's currently the general counsel of the Tribune; is

18   that right?

19   A.   Correct.

20   Q.   Is it fair to say that Mr. Liebentritt is a long-time

21   business associate of Mr. Samuel Zell?

22   A.   It is correct.

23   Q.   And Mr. Zell was the moving force behind the leverage

24   buyout of the Tribune?

25   A.   No, he was a force.

1  Q.  I think we can stipulate to that.

2  A.  Yes.

3  Q.  Are you aware that -- of a company called Equity Group

4  Investments associated with Mr. Zell?

5  A.  I am.

6  Q.  What's the relationship of that company, if any, to the

7  leverage buyout transactions?

8  A.  Well, Equity Group Investments is a company controlled by

9  Mr. Zell.  I can't tell you whether it was through Equity

10  Group Investments or some other vehicle that Mr. Zell invested

11  in the Tribune.

12  Q.  Are you aware that Mr. Liebentritt was president of Equity

13  Group Investments from 2000 to 2005?

14  A.  Actually, I don't think I ever knew that.

15  Q.  But you were aware that he's had a long-time business

16  association with Mr. Zell?

17  A.  I am, and I'm aware that he's an employee of Equity Group

18  Investments.

19  Q.  Are you aware that he is currently acting as a senior

20  advisor to Equity Group Investments?

21  A.  I know he has a role in Equity Group Investments.  I don't

22  know exactly what that role is.

23  Q.  Are you aware of what role, if any, Mr. Liebentritt played

24  in connection with the leverage buyout transaction?

25  A.  My understanding is none.

1  Q.  I think you've testified that in the phase one process

2  that you described for settlement negotiations, there was a

3  major effort to gather the facts and present them to all

4  parties; is that a fair description?

5  A.  I think what I said was facilitate the dissemination of

6  information, so that's pretty close to what you said.

7  Q.  Close enough.  And is it correct that before disseminating

8  all the facts to other parties, the company had to do a

9  factual investigation itself?

10  A.  Yeah, I think that's fair to say.

11  Q.  Is it correct that that factual investigation was led by

12  the law firm of Sidley & Austin?

13  A.  Yes.

14  Q.  I think you also testified that one thing that you did was

15  inform yourself about the merits of the legal issues relating

16  to claims concerning the LBO; is that correct?

17  A.  To familiarize myself with those issues, yes.

18  Q.  And is it correct that the lawyers you turned to for that

19  familiarization would be the law firm of Sidley & Austin?

20  A.  Sidley & Austin was the law firm involved in that exercise

21  working with me.

22  Q.  Are you aware that Sidley & Austin either currently or

23  formally represents some of the Lenders, Senior Lenders,

24  including JP Morgan and Merrill Lynch?

25  A.  Yes.

1  Q.  Is it correct that to your understanding Sidley & Austin

2  either can't because of ethical rules or is not prepared to

3  act as litigation counsel for the Tribune with respect to

4  claims arising from the LBO against Senior Lenders?

5  A.  My understanding is that they would not be able to pursue

6  a litigation against JP Morgan and Merrill Lynch.

7  Q.  Has the company retained other counsel that could pursue

8  such litigation without disabling conflicts?

9  A.  Not that I'm aware of.

10  Q.  To your knowledge, has anyone acting on behalf of the

11  company prepared a Complaint for an action against the Senior

12  Lenders asserting fraudulent conveyance claims arising from

13  the LBO?

14  A.  Not to my knowledge.  As I indicated earlier, our plan if

15  global settlement can't be achieved would be to file a

16  Settlement Plan and so we're not working on a Complaint.

17  Q.  I think you indicated, Mr. Kurtz, that you have acted in

18  several different bankruptcy restructurings in which

19  fraudulent conveyance claims have been at issue; is that

20  correct?

21  A.  It is.

22  Q.  In any of those cases, have you recommended litigation as

23  a means of resolving the fraudulent conveyance claims?

24  A.  I've recommended litigation if satisfactory settlement

25  couldn't be achieved.

60

1  Q.  Have you ever actually been involved in a case where such

2  litigation was pursued?

3  A.  Ever hear of Tusa *(ph)*?

4  Q.  I have, sir.

5  A.  Bingo.

6  Q.  Was that litigation in your judgment a successful one for

7  the Creditors?

8  A.  No.

9  Q.  And why is that?

10  A.  They lost.

11  Q.  Which group of Creditors is it that lost, Mr. Kurtz?

12  A.  The banks.

13  Q.  What were the other parties at interest in the litigation?

14  A.  The nonbanks.

15  Q.  They won?

16  A.  They won.

17  Q.  At least from their perspective, litigation was a

18  successful process?

19  A.  There it was.

20  Q.  Okay.  Would you agree with me that there are occasions

21  when litigation is either necessary or appropriate to achieve

22  a fair value for fraudulent conveyance claims?

23  A.  If reasonable settlement can't be achieved, the answer is,

24  yes.

25  Q.  Would you agree with me also that the perception of

61

1  Defendants that a Plaintiff is ready, willing and able to file

2  fraudulent conveyance claims can be helpful in achieving full

3  and fair value for such claims?

4  A.  Well, I think it's helpful if potential Defendants know

5  that litigation can and will be brought if settlement isn't

6  achieved, yes.

7  Q.  And would you agree with me that the Tribune is not

8  prepared to pursue litigation against the banks if settlement

9  can't be reached?

10  A.  Well, that's not the plan, but I will tell you that there

11  is no illusion on the part of the banks that this claim is

12  just going to fade into the sunset.  I mean, this -- if

13  settlement isn't achieved or if a settlement isn't approved in

14  connection with a plan of reorganization, then there will be

15  litigation, somebody will bring it.  I'm not sure who, that's

16  up to the Court, but there will be a lawsuit, everybody knows

17  that.  So I don't think the fact that we are not planning to

18  file a lawsuit in any way influences the behavior of the banks

19  in this situation.

20  Q.  Although in this situation that we find ourselves in right

21  now, the only party that can file litigation is the Tribune,

22  which you've told us has no intention of doing so, correct?

23  A.  That's right.  And I think people understand, as I've said

24  before, that if settlement isn't achieved there will be

25  litigation.

62

1    Q.   Yeah.  Are you aware that the company is opposing the

2    Motion for Standing of the Committee seeking authority for the

3    Committee to have the power to initiate litigation against the

4    Senior Lenders?

5    A.   That's right because that's inconsistent with the goal of

6    trying to achieve a global settlement.

7    Q.   I want to make sure I understood your testimony just now.

8    Is it your testimony that giving authority to sue to a party

9    who will sue as opposed to one who has no intention to do so

10   is an impediment to settlement?

11   A.   In this case, yes, at this time, that's my testimony.   I

12   believe it would be detrimental to the process that is

13   actively underway to try to achieve a global comprehensive

14   settlement.

15   Q.   You've spoken a couple of times, Mr. Kurtz, about a

16   Settlement Plan that you envision the company filing if a

17   global resolution can't be reached; do you recall the

18   testimony?

19   A.   Yes.

20   Q.   Is it correct that the kind of Settlement Plan you

21   envision would be one that was not joined in by all the

22   parties at interest?

23   A.   Well, I think by definition if we haven't achieved global

24   resolution then somebody won't be happy.

25   Q.   And in that event, can we assume there will be litigation

63

1    over that Settlement Plan?

2    A.  I assume that the party that isn't happy will object to

3    the Plan.

4    Q.  So there will be litigation however you proceed unless a

5    global resolution is reached, correct?

6    A.  Yes, but a very different litigation.  Plan litigation is

7    something that is usually resolved within a period of months.

8    Fraudulent conveyance litigation of the kind that we're

9    talking about here potentially usually extends for a period of

10    years.

11    Q.  That's true if it goes all the way to a final conclusion,

12    but you're not suggesting that's what happens with all

13    fraudulent conveyance litigation, are you?

14    A.  No, I'm not, but you seem eager to file your lawsuit, so

15    I'm just making the observation.

16    Q.  But fair to say that fraudulent conveyance litigation,

17    even once filed is, in your experience, generally settled?

18    A.  There's certainly examples where it's been settled, yeah,

19    probably more times than not.

20    Q.  So filing litigation in and of itself, doesn't mean the

21    case isn't going to settle.

22    A.  No, it certainly doesn't preclude settlement.  What it is

23    likely to preclude is the successful culmination of the

24    process that is currently underway.

25        (Pause in proceedings.)

64

BY MR. SOTTILE:

Q.   Just so I'm clear, it's your judgment, as I hear your testimony, that giving the Committee standing in and of itself would upset this settlement balance you've testified about or is it the filing of a lawsuit that would upset that balance?

A.   At this time, I think, the grant of standing would be detrimental and here's why, I mean, one of the -- at this point, in my opinion, we kind of have a delicate settlement equilibrium, and one of the unknowns is how will the Court rule on that Motion.  And I think that's actually a helpful dynamic to the process.  Once that issue is resolved one way or the other, it changes the landscape, it changes the settlement dynamic and I believe it could be harmful.

Q.   So in your judgment, it's a helpful dynamic to settlement at present that the only party that could sue the Senior Lenders is the Tribune, which has no intention of doing so.

A.   That's not the way I'd put it.  What I -- my belief is that in order to maximize the prospect of settlement, we need to preserve the status quo for the next 45 days through the expiration of the exclusivity extension that we've requested so that we can give full effect to our efforts that all of us have invested a lot of time in to see if we can achieve a global resolution.

Q.   And you believe the parties will all pick up their marbles and go home if the Motion for Standing is granted and

65

1   settlement negotiations will stop.

2   A.   I believe that settlement negotiations in the context of

3   what we are currently working toward will terminate, whether

4   there is a new form of negotiation that erupts at some point

5   in the future, I mean, I'm not clairvoyant that could happen,

6   maybe it will happen.  What I'm focused on is trying to

7   achieve success in the context of what I've been attempting to

8   orchestrate over the last several months.   And my fervent

9   belief is that if you change the dynamic, it will be

10  detrimental to that effort.

11  Q.   Would you agree with me that sometimes changing the

12  dynamic is the only way to reach a settlement?

13  A.   I don't believe that's the case here.

14  Q.   You agree with me that it happens in some settlement

15  negotiations?

16  A.   All -- I mean, look, every situation stands on its own

17  facts.

18  Q.   So we're better off leaving the situation as it is with

19  the Tribune not intending to file suit and acting as the

20  honest broker?

21  A.   Absolutely.

22          MR. SOTTILE:  May I have the Court's indulgence for

23  just a moment?  I think I may be finished.

24      (Pause in proceedings.)

25          MR. SOTTILE:  Just a couple of questions, Your

1    Honor, and then I'll conclude.

2          THE COURT:  Go ahead.

3    BY MR. SOTTILE:

4    Q.  Mr. Kurtz, I want to return to the global resolution of

5    LBO claims that you've testified about.  If there are

6    third-party claims that may be brought against former

7    shareholders or Mr. Samuel Zell, are those claims that you

8    envision being resolved as part of a global resolution of LBO

9    claims?

10   A.  That would be part of the global resolution, correct.

11   Q.  Have you or anyone else acting for the Debtors, to your

12   knowledge, had communications about settlement with former

13   shareholders who were bought out in the LBO or Mr. Zell?

14   A.  I have not.

15   Q.  Do you know whether others have?

16   A.  I'm not sure.  I can only speak to my own involvement and

17   I have not and I'm not aware of any such discussions.

18   Q.  Do you have in front of you, sir, the chart of meetings

19   that was presented to you on direct testimony?

20   A.  Yes, I do.

21   Q.  Let me direct your attention to an entry dated January

22   12th, 2010, which describes a meeting attended by the Senior

23   Lenders, Centerbridge and UCC advisors at Chadbourne & Parke.

24   A.  Right.

25   Q.  Do you see that reference, sir?

67

1    A.   I do.

2    Q.   The topics discussed are identified as, quote, "Senior

3    Lenders and Centerbridge present settlement amounts," close

4    quote.  Do you see that, sir?

5    A.   I do.

6    Q.   Is it correct that that's the only occasion to your

7    knowledge when the Senior Lenders and Centerbridge have

8    presented settlement amounts or have there been other

9    occasions?

10   A.   My understanding is that there have been direct

11   conversations between Centerbridge and certain of the Senior

12   Lenders that I did not participate in.  So I don't know if the

13   answer to your question is yes or no.  That may have happened

14   outside within the framework of those conversations.

15   Q.   Setting aside discussions you haven't been a party to --

16   A.   Right.

17   Q.   -- is it correct the only discussions you've been a party

18   to where settlement offers have actually been made occurred on

19   January 12th, 2010?

20   A.   No.

21   Q.   What other occasions have there been when settlement

22   offers were made to you or in your presence?  I'm not asking

23   for the substance, I'm asking when it happened.

24   A.   I don't remember the exact date, but it was subsequent to

25   that meeting.  And I would say that almost every conversation

1   I had with everyone involves some discussion around

2   settlement.  And let me just make a comment on the process

3   because you're touching on it here.

4        You know, there are two ways to make a settlement.

5   There's the two parties kind of get there incrementally making

6   offers to each other and I call that settling from the outside

7   in.  And it's great if it happens that way here, we would

8   applaud.  But what we're trying to do is something quite

9   different and I would describe that as settlement from the

10  inside out.  And so it's not terribly important to me whether

11  formal offers of settlement are made.  What is much more

12  important to me and, frankly, is the subject of many if not

13  most of the conversations I've had is that people give me

14  unofficial, informal indications that, gee, if you can get

15  that guy to here, maybe I'm willing to go there.  And so I

16  don't call that a formal settlement offer because it isn't

17  and, in fact, it's explicitly not.  But I think the benefit of

18  this process is that it gives me on a confidential basis a

19  fair amount of understanding as to how we might be able to

20  steer things toward a middle ground that people can accept.

21       So there hasn't been a lot of formal settlement offering

22  and, frankly, I think it would be counterproductive, not

23  something that we've encouraged.  Instead what we've tried to

24  do is work both sides and gain an understanding as to how we

25  can move them toward the middle without putting people in the

69

1   position where they have to make a settlement offer that they

2   may view as strategically or tactically to their disadvantage.

3   Q.  Has anyone made a formal settlement offer of the type

4   you've described to you or in your presence since --

5   A.  These informal --

6   Q.  -- January 12th?

7   A.  These informal conversations, many times.

8   Q.  The question was a formal settlement offer of the type

9   you've described at any --

10  A.  I haven't --

11  Q.  -- occasion other than on January 12th, 2010?

12  A.  I think I told you, yes.  There was one subsequent to

13  that.

14  Q.  When was that?

15  A.  I told you I don't recall exactly which meeting, but it

16  was subsequent to the session that you orchestrated in your

17  office on the 12th.

18  Q.  What party or parties made offers?

19          MR. BENDERNAGEL:  Your Honor, we're getting pretty

20  close to --

21          THE COURT:  Sustained.

22          MR. BENDERNAGEL:  Thank you.

23          MR. SOTTILE:  Thank you, Your Honor.  Thank you, Mr.

24  Kurtz.

25          THE COURT:  All right.  Do the Credit Agreement

1   Lenders wish to cross-examine Mr. Kurtz?

2           UNIDENTIFIED SPEAKER:  No, Your Honor.

3           THE COURT:  Does JP Morgan Chase wish to

4   cross-examine Mr. Kurtz?

5           MR. STEARN:  No, Your Honor.

6           THE COURT:  Does Wilmington Trust wish to

7   cross-examine Mr. Kurtz?

8           MR. STARK:  Yes, Your Honor.

9   BY MR. STARK:

10  Q.  Good morning, Mr. Kurtz.

11  A.  Good morning.

12  Q.  You talked a bit about your efforts to achieve -- and I'll

13  quote, "A global comprehensive settlement."  Did I quote that

14  accurately?

15  A.  It sounds like you did, yes.

16  Q.  Okay.  And you said you were personally involved in

17  negotiations with -- and I believe I quoted you as "Principal

18  parties in this case."  Did I appropriately --

19  A.  You did.

20  Q.  -- quote you?

21  A.  Yes.

22  Q.  Can you define for me who are principal parties in this

23  case?

24  A.  The principal party participants in this process have been

25  JP Morgan, as agent for the Senior Lenders.

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880

1  Q.  I'm going to write these down, excuse me.  JP Morgan.

2  A.  Sure.

3  Q.  Go on, I'm sorry.

4  A.  The -- a group of holders of bank debt that is represented

5  by Mr. Bennett.  I think that group is in the four plus

6  billion dollar range.  The Creditors --

7  Q.  At least as of now?

8  A.  Sorry?

9  Q.  At least as of now, excuse me.

10  A.  At least as of now, Creditors' Committee has been an

11  active participant, and a large holder of bond debt by the

12  name of Centerbridge has --

13  Q.  (Indiscernible.)

14  A.  -- also been an active participant.

15  Q.  Forgive me.  I didn't mean to interrupt you.  Do you know

16  what kind of debt Centerbridge holds?

17  A.  I am -- I've been led to believe that they own

18  approximately one-third of the pre-LBO bonds, the non-funds,

19  not yours, but the pre-LBO Senior --

20  Q.  Explain that for me just a minute or for the Court the

21  differences between the bond structure pre-LBO.

22  A.  Yeah.  The funds are subordinate to the bonds that

23  Centerbridge owns.

24  Q.  Okay.  How much of the Senior Notes are there?

25  A.  I think it's 1 billion, $260 million.

72

1    Q.   And how much are the PHONES are there?

2    A.   About the same.

3    Q.   Okay.  And so your list included JP Morgan, Mr. Bennett's

4    banks, the Creditors' Committee, Centerbridge owns a third of

5    the Senior Notes.

6    A.   Right.

7    Q.   Any PHONES' Holder?

8    A.   No.

9    Q.   Wilmington Trust?

10   A.   Well, you did participate in, at least, one of the

11   meetings that I'm aware of.

12   Q.   I did?

13   A.   Well, maybe not you, but --

14   Q.   What did I say?

15   A.   -- somebody -- Wilmington Trust was present.  Maybe you

16   weren't there, but --

17   Q.   How many people were in that meeting?

18   A.   It was a big meeting.

19   Q.   What did I say in that meeting?

20   A.   If you were there, you didn't stand out.

21   Q.   Was I given a seat --

22            THE COURT:  Now, that's --

23            MR. STEARN:  -- at the table?

24            THE COURT:  -- a shocking statement.

25        (Laughter in the courtroom.)

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880

1          MR. STARK:  Your Honor, I'll take that as a

2    compliment.

3    BY MR. STARK:

4    Q.  Was I given a seat at the table?

5    A.  Everybody was seated.

6    Q.  Which meeting was that?

7    A.  My understanding is that it was the meeting that took

8    place at Chadbourne & Parke on the 5th of January.

9    Q.  On the 5th of January?

10   A.  Right.

11   Q.  Do you recall on the 5th of January if there was -- if it

12   was one big meeting, were there multiple meetings?

13   A.  My recollection of that meeting was that it was one big

14   meeting.  Now, it may have broken into separate subgroups, but

15   the main meeting was everybody sitting around a very large

16   conference room table at Chadbourne & Parke.

17   Q.  Isn't it true that that meeting initially started with

18   presentations that lasted about an hour with about 100 people

19   in the room.  I didn't have a seat at the table, and then it

20   broke for lunch, in which case there were subsequent executive

21   sessions and we were not allowed to participate in those

22   meetings; is that not true?

23   A.  Well, there were subsequent sessions.  I'm not sure who

24   allowed you to do what.  The Creditors' Committee may have

25   decided not to invite you into certain discussions.  I don't

74

1   remember telling you you couldn't participate in anything.

2   Q.   But it wouldn't surprise you if the Creditors' Committee

3   said that?

4   A.   I wouldn't be surprised one way or the other on that.

5   Q.   How about the banks?

6   A.   Don't know.

7   Q.   In fact -- well, let's take a step back.  You talked about

8   these negotiations towards a global comprehensive settlement

9   again with all the principal parties --

10  A.   That's right.

11  Q.   -- of which I'm not one, that you call them, quote,

12  "Open," close quote, another quote, "Cordial and friendly," at

13  certain points.

14  A.   Sometimes friendly, I think I said.  Sometimes not so

15  friendly, but --

16  Q.   Right.

17  A.   -- sometimes friendly.

18  Q.   Are you aware that we've asked to participate in

19  subsequent meetings besides the one you've mentioned and we

20  were not allowed to participate?

21  A.   I am aware that you have had discussions with others about

22  your participation.  It is also my understanding that

23  unfortunately because your bonds are subordinated to the

24  non-subordinated LBO bonds, the prospect of your recovering

25  economic value here is remote.

1   Q.  Good.  Let's unpack that.  Let's talk about that for a

2   minute.  There have been internal company discussions about

3   the PHONES, haven't there, about how they ought to be treated

4   under a plan?

5   A.  Yes.

6   Q.  And you've participated in those discussions, haven't you?

7   A.  I probably have.

8   Q.  And, in fact, the company's view, our honest broker, is

9   that the PHONES should not recover anything under a plan.

10          MR. BENDERNAGEL:  Your Honor, objection.  We're now

11  really getting into the substance of the plan as opposed to

12  what the process has been at a (indiscernible).  I'm not sure

13  where this is going.

14          MR. STARK:  Your Honor, at the very least it's

15  credibility.  He's called himself an honest broker to talk

16  about how he's going to resolve the issues.  We're talking

17  about what the process is and what the company's view as

18  honest broker about who can participate and why and when.

19          THE COURT:  We've actually, I think, already covered

20  that pretty well and made the point, I think, you want to

21  make.  Sustained.

22          MR. STARK:  Then I'll continue.

23  BY MR. STARK:

24  Q.  In this process that you envision going forward in the

25  next 30, 45 days, do you expect that your view or the

1  company's view about the PHONES' entitlement to be a principal

2  party will change?

3  A.  You know, I don't know the answer to that question.  And

4  as far as I'm concerned, we're talking to a lot of people,

5  talking to one more doesn't bother me, but, you know, it's not

6  my decision unilaterally.

7  Q.  Besides just talking about football, intending to have a

8  conversation with the PHONES about a rightful distribution

9  under the Plan, do you anticipate that the -- having a

10 conversation substantively the company will change its view

11 that the PHONES should not receive anything under the Plan?

12 A.  I don't -- I didn't testify that the company had formed a

13 view that the PHONES shouldn't receive anything.  The Plan

14 hasn't been filed yet.  Conclusions with respect to the Plan

15 hasn't been reached and, you know, with all due respect, I

16 would certainly assume that if we engage in conversations with

17 you and your group, it's not going to be about football.

18 Q.  Good.  The LBO claims, you've studied them.

19         THE COURT:  You need to answer orally.

20         THE WITNESS:  Yes, I have.

21 BY MR. STARK:

22 Q.  They sound in avoidance in part?

23 A.  In part.

24 Q.  Business torts in part?  Breach of fiduciary duty?

25 A.  Yes.

1  Q.  Aiding and abetting complicity type claims?

2  A.  Yes.

3  Q.  Equitable subordination?

4  A.  Yes, but --

5  Q.  Similar claims that were at issue in Tusa?

6  A.  Yeah, I think all of those issues existed there.

7  Q.  Okay.  How about Lyondell?  Have you familiarity with what

8  happened at Lyondell?

9  A.  I'm -- only vaguely.

10  Q.  Okay.  But you have lots of familiarity with busted

11  LBO-type litigation from your Tusa experience and others,

12  right?

13  A.  I don't remember testifying that I have lots of experience

14  in busted LBO litigation.  I think what I --

15  Q.  So you --

16  A.  -- testified to was that I have had a significant amount

17  of fraudulent conveyance experience.  As you know, fraudulent

18  conveyance issues can arise other than in the context of

19  busted LBO.

20  Q.  Okay.  Fair point.  I stand corrected.  If you're

21  successful in this litigation, the PHONES' Holders may

22  actually receive significant recoveries from these potential

23  claims that have been asserted by the Creditors' Committee,

24  right?

25        MR. BENDERNAGEL:  Your Honor, I'm going to object to

78

1   the form of the question because it started out if you're

2   successful in this litigation.  I'm not sure what he's talking

3   about and I'm sure --

4           THE COURT:  Well --

5           MR. BENDERNAGEL:  -- the witness can protect himself

6   but the question, I think --

7           THE COURT:  Sustained as to form.

8   BY MR. STARK:

9   Q.  You've read the Complaint attached to the Standing Motion?

10  A.  Yes.

11  Q.  You've studied the fraudulent conveyance claims and other

12  claims involved in this case?

13  A.  Yes.

14  Q.  You feel like you have a pretty good understanding of what

15  the issues are?

16  A.  I do.

17  Q.  Both factually and legally?

18  A.  I do.

19  Q.  You were a lawyer at one point in time?

20  A.  I'm sorry.

21  Q.  You were a partner at Skadden, Arps at one point in time?

22  A.  Correct.

23  Q.  If the lawsuit as asserted achieves the (indiscernible)

24  for relief that are contained in the Complaint, okay?  If the

25  factual allegations and the legal arguments are successful and

1    the (indiscernible) for relief is granted, are the PHONES

2    receiving 100 percent recovery?

3    A.   I want to make sure I understand your hypothetical

4    question.   Are you assuming that all of the bank debt is

5    eliminated?

6    Q.   That's count 1, sure.

7    A.   I just want to understand your question.

8    Q.   Well, you read the Complaint, right?

9    A.   If all -- I'm trying to understand your question.

10   Q.   Forgive me.

11   A.   Okay.   Rather than debating with you, I'd like to try to

12   give you the best answer I'm capable of.   If your assumption

13   is that could the PHONES realize a recovery if all of the bank

14   debt is eliminated, the answer is, yes.

15   Q.   What if the bank debt is equitably subordinated at the

16   parent company, is there recovery for the PHONES?

17   A.   Probably not.

18   Q.   Why do you say that?

19   A.   If they're equitably subordinated at the parent company --

20   Q.   Banks are --

21   A.   -- because there wouldn't be sufficient value at the

22   parent company to pay the bonds whose claims -- who your

23   claims are subordinated to.

24   Q.   How do you conclude that?

25   A.   Based upon our assessment of value that exists at the

80

1  parent.

2  Q.  What's your assessment of the value of the parent in terms

3  of causes of action?

4          MR. BENDERNAGEL:  Your Honor --

5          THE COURT:  Sustained.

6          MR. STARK:  Your Honor, I have nothing further at

7  this point.

8          THE COURT:  All right.  Thank you.  I didn't mean to

9  skip over Law Debenture initially.  Does Law Debenture wish to

10  cross-examine this witness?

11          MR. GLENN:  No questions at this time.

12          THE COURT:  All right.  Does Merrill Lynch Capital

13  wish to cross-examine this witness?

14      (No verbal response.)

15          THE COURT:  Do the Retirees wish to cross-examine

16  this witness?

17          MR. TEITELBAUM:  One or two quick questions, if I

18  may, Your Honor?

19          THE COURT:  All right.

20  BY MR. TEITELBAUM:

21  Q.  Good afternoon, Mr. Kurtz.

22  A.  Good afternoon.

23  Q.  Jay Teitelbaum from Teitelbaum & Baskin for the Retirees.

24  Just to quickly follow up.  Are you familiar with the

25  pleadings that were filed by the Debtors in opposition to the

1   Motion for the Appointment of an Examiner and to the Standing

2   Motion?  They were filed on the 11th.

3   A.  No, you know, I can't say for sure whether I read all of

4   them.

5   Q.  Okay.  Well, to -- I don't want to characterize it, so

6   would you agree with the characterization, though, in these

7   pleadings that the filing of a plan is imminent?

8   A.  We hope it's not.

9   Q.  But would you -- do you know -- are you aware that that's

10  a statement that's made in the pleading?

11  A.  As I said, I'm not familiar with the pleadings.  I think

12  I've testified today as to my understanding of the company's

13  thinking with respect to a plan, at least with regard to the

14  timing of the filing.

15          MR. TEITELBAUM:  Well, I'll just note for the

16  record, Your Honor, on page 12, paragraph 21 of the Debtors'

17  response to the appointment of an examiner, now that -- and

18  I'll read this.  "Now that negotiations have intensified and

19  the filing of a plan of reorganization is imminent" and it

20  goes on.

21  BY MR. TEITELBAUM:

22  Q.  Do you agree with that characterization?

23  A.  I wouldn't necessarily agree with that.

24  Q.  You would not.

25  A.  I --

1  Q.  Okay.

2  A.  We -- no.  You've heard my testimony.

3  Q.  That's fine.

4  A.  I'd just be repeating myself.

5  Q.  That's fine.  Let me ask you just one or two quick follow

6  ups then.  You've referred to this global settlement.  At this

7  point, has the Plan that embodies that global settlement been

8  shared with the Committee?

9  A.  Well, there is no global settlement, so there's no plan

10  that embodies it.

11  Q.  So this has not been reduced to writing; is that your

12  testimony?

13  A.  No.  Unfortunately, we don't have a deal to reduce to

14  writing at this stage, so it is not.

15         MR. TEITELBAUM:  No further questions.

16         THE COURT:  Thank you.  Do Citi Corp North America,

17  Citi Corp Global Markets wish to cross-examine this witness?

18      (No verbal response.)

19         THE COURT:  I hear no response.  Bank of America

20  wish to cross-examine this witness?

21         UNIDENTIFIED SPEAKER:  Your Honor, not at this time.

22         THE COURT:  Thank you.  U.S. Trustee wish to

23  cross-examine this witness?

24         MR. MCMAHON:  Your Honor, Joseph McMahon for the

25  acting United States Trustee, no.

1          THE COURT:  All right.  Now, does Centerbridge wish

2    to cross-examine this witness?

3          UNIDENTIFIED SPEAKER:  No, Your Honor.

4          THE COURT:  All right.  Now, that concludes the list

5    of all of those who according to the Agenda filed papers in

6    connection with either the Exclusivity Motion, the Standing

7    Motion or the Examiner Motion; did I miss anybody?

8        (No verbal response.)

9          THE COURT:  I hear no response.  Is there any

10   redirect?

11         MR. BENDERNAGEL:  Just a couple of questions, Your

12   Honor, if I may.

13         THE COURT:  All right.

14                    REDIRECT EXAMINATION

15   BY MR. BENDERNAGEL:

16   Q.  Mr. Kurtz, I'll keep this brief.  Mr. Sottile asked you a

17   question about Mr. Liebentritt; do you recall that?

18   A.  Yes.

19   Q.  And he also pointed out that Mr. Liebentritt had worked

20   for EGI and the like; do you recall that?

21   A.  I do.

22   Q.  In terms of your honest broker role that you've described,

23   has Mr. Liebentritt or anybody else at the company tried to

24   steer you in any particular direction?

25   A.  No, not at all.  The company and all of its officers,

1  directors, employees, have been completely hands off in terms

2  of allowing us to do our work and reach our own conclusions.

3  Q.  Now, there's some discussion of this concept of global

4  resolution and I think you used the phrase global means

5  global.  Why does the company believe a global resolution is

6  important in this context, if it can be achieved?

7  A.  Yeah.  We would strongly prefer to achieve a global

8  resolution that resolves all issues so that the company can

9  put the litigation behind it completely without the ongoing

10  cloud and potential expense.  Piecemeal litigation will

11  undoubtably expose the company to ongoing involvement in that

12  litigation.  And our view is that it's in the parties

13  collective best interest if we can figure out a way to make it

14  happen, for all of this litigation to be consensually resolved

15  or resolved by Court Order, and then it's definitively

16  concluded and the company is free of any cloud or taint, you

17  know, both from perception point of view, as well as a

18  practical matter in terms of being involved on an ongoing

19  basis in this lawsuit or these lawsuits.

20  Q.  Mr. Stark on behalf of Wilmington Trust asked you a few

21  questions; do you recall that?

22  A.  I do.

23  Q.  And he directed your attention to Debtors' Exhibit 1; do

24  you have that in front of you?

25  A.  Yes.

1  Q.  And I think he specifically -- you specifically directed

2  him to the meeting on January 5th.

3  A.  I did.

4  Q.  And he then followed up and asked you a question, were you

5  aware that Wilmington Trust had asked to be involved in

6  subsequent meetings; do you recall that?

7  A.  I think so, yeah.

8  Q.  Prior to January 5th, had Wilmington Trust asked to be

9  involved in any of these discussions as best you know?

10 A.  Not that I'm aware.

11 Q.  One last question, Mr. Stark seemed to suggest that --

12 asked you if you had engaged in conversations with him; do you

13 recall that?

14 A.  Uh-huh.

15 Q.  And you indicated that you would be willing to talk to

16 him, but that you didn't think you'd be talking about

17 football; do you recall that?

18 A.  I do.

19 Q.  If he wanted to talked about football would you be willing

20 to talk to him about that?

21 A.  Sure.

22          MR. BENDERNAGEL:  No further questions, Your Honor.

23          THE COURT:  You know, spring training just started.

24 I mean, maybe we should shift the focus.

25          UNIDENTIFIED SPEAKER:  I've always liked Mr. Stark.

1    BY MR. BENDERNAGEL:

2    Q.  Let me ask a follow up to the Judge's question.  Would you

3    talk to him about baseball?

4          MR. BENDERNAGEL:  No further questions, Your Honor.

5          THE COURT:  Is there any recross?

6          UNIDENTIFIED SPEAKER:  No, Your Honor.

7          THE COURT:  All right.  Thank you, sir.  You may

8    step down.

9          THE WITNESS:  Thank you.

10       (Witness excused.)

11         THE COURT:  Does the Debtor have any further

12   evidence in support of its Motion?

13         MR. BENDERNAGEL:  No, Your Honor.

14         THE COURT:  Debtor wish to move the admission of

15   Debtor 1?

16         MR. BENDERNAGEL:  Yes, Your Honor.

17         THE COURT:  Is there any objection?

18       (No verbal response.)

19         THE COURT:  D-1 is admitted without objection.

20   Okay.  Now, I'm going to ask this with some trepidation, but

21   I'll consider requests, does any other party wish to offer any

22   evidence in connection with the Debtors' Exclusivity Motion?

23       (No verbal response.)

24         THE COURT:  I hear no response.  Does anyone wish

25   brief argument, either in support of or in opposition to the

1   Motion?

2           UNIDENTIFIED SPEAKER:  Does the Debtor want to go

3   first?

4           MR. CONLAN:  Yes, thank you.  Your Honor, Jim Conlan

5   on behalf of the Debtor in support of the Motion.

6       As you heard Mr. Kurtz testify, the plan negotiations are

7   at a delicate stage.  Filing a plan before -- being forced to

8   file a plan before the end of March before the current

9   negotiating string has run out would be negative, it would be

10  suboptimal.  You also heard Mr. Kurtz testify that a

11  determination on the Standing Motion or the Examiner Motion at

12  this time would also have a negative impact.  The Debtor has,

13  in our judgment, clearly met its burden in terms of showing

14  progress, effort and prospect for plan confirmation to justify

15  a 30-day extension.

16          THE COURT:  So that we're all clear, where does that

17  take you to in the way of a date?

18          MR. CONLAN:  It takes us to March 31 for front-end

19  exclusivity and May 31 for back end.

20          THE COURT:  All right.

21          MR. CONLAN:  And we would expect to file a plan

22  before March, on or before March 31.  We would also expect

23  that people would like a few days to digest it after it has

24  been filed so that a hearing on the Standing Motion, if one

25  were to go forward, and the Examiner Motion would occur

1    shortly thereafter.  That's all from the Debtor, Your Honor,

2    subject to what I hear from my colleague.

3         THE COURT:  All right.  Anyone else wish to be heard

4    in support of the Motion?

5         MR. SEIFE:  Your Honor, Howard Seife, Chadbourne &

6    Parke, for the Official Committee of Unsecured Creditors.

7         We do not object to this revised request for extension of

8    exclusivity; however, we do -- we are troubled by the fact

9    that the Motion for Standing has been adjourned by your

10   Court's ruling.  We did not hear, in our view, the testimony

11   that there has been sufficient progress in the settlement

12   negotiations and as you heard through argument and

13   cross-examination, it was our view that hearing the Motion on

14   Standing today would help further and add some heat to the

15   fire to get those negotiations on track.

16        We were also very troubled to hear that the Debtor is

17   considering a plan if there is not a global resolution, which

18   would envision a unilateral settlement with the Lenders or

19   some other parties, which would freeze out the Committee.  And

20   we are of the firm view that would not be a productive tract

21   to go down.  The Committee wants to very much be a part of the

22   settlement discussions, and would be very concerned if there

23   was a unilateral deal struck which settles but leave you very

24   valuable potential claims settled by, perhaps, someone who's

25   not quite in the position to pursue those claims and, in fact,

1  admittedly cannot pursue those claims.  And I think issues

2  have been raised as to whether, in fact, this is an honest

3  broker situation.  So --

4       THE COURT:  So all this you say in support of the

5  extension of exclusivity.  Did I miss something?

6       MR. SEIFE:  It is, I think, a -- just a word to the

7  wise, the Debtors, that while we are supporting them today,

8  they should not assume that this support will continue 30 days

9  hence.  And that is what I wanted to bring to the Court's

10  attention.

11       THE COURT:  All right.  You have not convinced me

12  that I should act on the Standing Motion today, but I will

13  tell you I do share your concern about what would happen in

14  the absence of a global resolution and the filing of the Plan

15  in the absence of that.

16       MR. SEIFE:  Thank you, Your Honor.

17       THE COURT:  All right.  Anyone else wish to be

18  heard?

19       UNIDENTIFIED SPEAKER:  In support?  Go ahead.

20       THE COURT:  Might as well.  I can't seem to control

21  that process, so --

22       MR. STARK:  Well, you know --

23       THE COURT:  I'm happy to hear from you, Mr. Stark.

24       MR. STARK:  Thank you.  I'll do the best I can to

25  control myself within the confines that the Court gives me.

1     Your Honor, again, I echo Mr. Seife's comments.  We,

2  again, don't have a problem maintaining status quo but, again,

3  object to the notion that the implication of that putting off

4  means necessarily that the Examiner and the Standing Motion,

5  which probably should be heard at the same time, rides with

6  it.  The Senior Notes papers, Law Debenture's papers indicate

7  there's no deal anywhere close.  The Creditors' Committee's

8  Standing Motion evidences that fact.

9     Mr. Kurtz as knowledgeable and capable professional as he

10  is, is an honest broker who reports to the primary target for

11  state litigation.  And he's going to be negotiating, his chart

12  indicates, primarily with the banks, so we all know what this

13  Plan is going to look like.  Everyone gets a release, Mr.

14  Zell, all of his colleagues, the banks get a release and the

15  value goes to them.  So there will be -- we will get zero,

16  he's told us that already.  We're not a party-in-interest,

17  we're not part of his global settlement construct.  So it

18  doesn't give us a whole lot of comfort that this 30 days,

19  45-day period is going to change matters very much from today

20  and a month from now.  And I think it's really important, and

21  this is the reason why I went off a little while, I guess,

22  under objection for just a little bit to notice the fact this

23  is not a value sizing case.  This is not a litigation over

24  whether or not the value of Tribune stretches deep into the

25  capital structure to the PHONES.  This case is a value

1    allocation issue between the banks on the one hand, the bonds

2    on the other, okay.  It's avoidance, it's business torts, it's

3    equitable subordination.  It is not looking at the widget

4    manufacture and seeing if our comps are appropriately scaled

5    or whether or not this is a DCF.  It is strange that our

6    honest broker is about as much interested in seeing a quick

7    and easy and cheap resolution of that litigation as anybody

8    else besides the banks.  That makes us feel very

9    uncomfortable.

10        I've been -- again, I know that Your Honor said don't

11   worry about the question of standing or delay or any of those

12   types of arguments when they raise it again, and they will,

13   but what's important, Your Honor, is what we were trying to

14   achieve with an Examiner Motion, which is very risky for a

15   litigant to propose.  The examiner may say something that I

16   don't like, too.  But the notion was is if an examiner issues

17   a report in the background, okay, and then they go back to

18   their smokey backroom and try to cut their deal and say I get

19   nothing, perhaps Mr. Seife will be a part of it, maybe he

20   won't, and we're all coming back to the litigation.  At least

21   with the prospect of an examiner in the background, they would

22   have to talk to us.  They would have to listen to us because

23   if they didn't, the likelihood of the Plan being confirmed

24   prior to the report being issued seems very remote.  So we

25   thought it would actually help move matters forward, again, at

1   risk to us.

2       This is my way of my pitch of saying, again, I don't mind

3   the exclusivity status quo being maintained, but I would like

4   to press my Motion today.

5       THE COURT:  Thank you.  And I'll say to you the

6   same.  You have not convinced me to move forward on the

7   Examiner Motion today.  I understand your concern.  I

8   understand the interesting distinction that you draw between a

9   typical valuation case and what I'll call a litigation case.

10  I'll just tell you that if you haven't already, I'll direct

11  your attention to my decision in <u>Exide</u> denying confirmation of

12  a plan in which a settlement, which has a lot of the feeling

13  of what I'm hearing here, was not approved for the reasons

14  that I expressed in that opinion.  So nothing is a foregone

15  conclusion here, maybe that would be the best way to put it.

16      MR. STARK:  I understand, and I know <u>Exide</u> quite

17  well and I'm comforted by your reference to it.  Thank you.

18      THE COURT:  All right.  Does anyone else care to be

19  heard?

20      MR. MCMAHON:  Your Honor, good afternoon.  Joseph

21  McMahon for the acting United States Trustee.  We filed a

22  statement in support of the request for an examiner, and I

23  rise simply to note that in response to Mr. Kurtz's testimony

24  where he indicated that the appointment of an examiner would

25  be a, I guess, a negative result with respect to the

1    settlement process that is ongoing.  I believe the way it was

2    described is that it would not be positive right now because

3    the appointment of an examiner would bring a period of cooling

4    down or silence.

5        Your Honor, we're closely monitoring these cases and, you

6    know, we accept the Court's ruling with respect to defer in

7    consideration of that issue.  At the same time we, you know,

8    very well may be back before Your Honor in a month to 45 days

9    arguing that a little bit of silence may be a good thing for

10   these cases.

11        THE COURT:  All right.  Thank you.  Does anyone else

12   wish to be heard?

13        MR. TEITELBAUM:  Again, Your Honor, Jay Teitelbaum,

14   of Teitelbaum & Baskin.  We support the extension with the

15   caveat that the status quo not be maintained because let's

16   remember what the status quo is, $8 million a month in

17   professional fees getting spent.  So we would implore the

18   Court to use its offices to tell the parties let's get

19   something done in the next 30 to 45 days, so there's something

20   to be shown for this last 8 to $10 million in legal fees that

21   we expect to be spent.  Thank you, Your Honor.

22        THE COURT:  I suspect it won't be the last in any

23   event, but thank you.

24        MS. MITCHELL:  Your Honor, again, for the record,

25   Nancy Mitchell from Greenberg, Traurig, on behalf of the

94

1   Aurelius Capital.

2       I (indiscernible) to say just not quite sure what we're

3   addressing.  I don't have a position on exclusivity.  I think

4   we've already heard what you're going to do with standing and

5   with the Examiner Motion.

6       Your Honor, we were concerned about our objection to the

7   Motion to Seal because I think the issues under 107 and the

8   fact that there has been no showing under 107, that the

9   Complaint should have been sealed are still things that are

10  important to us in the hearing today.

11          THE COURT:  Well, they're yet to be decided.  The --

12  as I said at the beginning, there are a number of motions

13  which are related both to the Examiner Motion and the Standing

14  Motion.  They will be carried along with them.  I intend not

15  to rule in advance on the issues concerning the Motion to

16  Seal.

17          MS. MITCHELL:  And, Your Honor, I hear you.  I would

18  just say for the record that we don't think that kicking the

19  Standing Motion for 30 days really addresses the issues in the

20  Motion to Seal because under 107, I think we should have the

21  opportunity to review the Complaint in advance of the hearing

22  on standing.

23          THE COURT:  All right.  Well, I have some thoughts

24  about that and I have no desire to reopen --

25          MS. MITCHELL:  Sorry.

1   THE COURT:  -- another line of discussion on this or

2   another string in internet talk, but I've read the Complaint.

3   And, you know, the Committee's asked to file it under seal

4   because they feel they're obligated to under, I guess, their

5   various confidentiality arrangements that have been approved.

6   I'm sure they would be just as happy if I denied the Motion.

7   I -- you don't have to answer that.

8   But I will tell you without prejudging anything -- and

9   I'll address it as I said at the next round, it's much ado

10  about nothing.  Everybody knows what it's about.  You know,

11  there's no smoking gun that's been revealed in the Complaint

12  itself.  It's like so many Complaints that I've seen, and I

13  don't mean to minimize the merits of any claim that may yet be

14  made, I'm just saying on the surface, there's no magic to it.

15  And, again, I don't mean to minimize either your position, I

16  understand your concern.  I'll address it if need be at the

17  next hearing.

18  MS. MITCHELL:  I'd appreciate that, Your Honor.

19  THE COURT:  All right.  Thank you.  Anyone else wish

20  to be heard?

21  (No verbal response.)

22  THE COURT:  Okay.  I'm prepared to make my ruling

23  and in doing so, I'll look to just a few cases which I think

24  all contain a pretty fair summary of what courts ought to do.

25  In the R.G. Pharmacy case, which is reported at 374

1    Bankruptcy Reporter 484, the Court said, "A decision to extend

2    or terminate exclusivity for cause is within the discretion of

3    the Bankruptcy Court and is fact specific.  The elements that

4    constitute cause aren't outlined in the Code, but the case law

5    has identified factors that normally are considered when

6    determining whether cause exists to reduce or increase the

7    Debtors exclusivity period."  And the case, I think, it's fair

8    to say, most frequently referred to is the decision in

9    Adelphia, which the R.G. Pharmacy court looks to.  That's a

10   decision that's reported at 352 Bankruptcy Reporter 578.  It

11   lists nine factors.  I have a general rule that I think any

12   test ought to be confined to five factors or less, but I'll

13   run through them nonetheless since it's an easy gauge of I

14   think what relevant elements ought to be considered.

15       They include, among other things, the size and complexity

16   of the case, necessity for sufficient time to permit the

17   Debtor to negotiate a plan of reorganization, the existence of

18   good-faith progress towards reorganization, the fact that the

19   Debtor is paying its bills as they become due, which does not

20   seem to be an issue here, whether the Debtor has demonstrated

21   reasonable prospects for filing a viable plan, whether the

22   Debtor has made progress in negotiations with its Creditors,

23   the amount of time which has elapsed in the case, whether the

24   Debtor is seeking an extension of exclusivity in order to

25   pressure Creditors to submit to reorganization demands and

97

1  whether an unresolved contingency exists.  But I think the

2  most important factor, frankly, to be considered is that which

3  was articulated in the <u>Dow Corning</u> case, which is reported at

4  2, 8 Bankruptcy Reporter 661.

5      There the court said, "When the court is determining

6  whether to terminate a Debtor's exclusivity, the primary

7  consideration should be whether or not doing so would

8  facilitate moving the case forward, and that is a practical

9  call that can override a mere toting up of the factors."

10      Based on this record, and I find Mr. Kurtz to be both a

11  credible and a convincing witness, I conclude that the Debtor

12  is entitled to its requested extension of exclusivity.  I also

13  think that overall that under the present circumstances gives

14  the Debtor the last best opportunity to put together a global

15  resolution.  Now, it may be that given the issues that are

16  floating around this case that's impossible, but I'm not

17  prepared to decide that today.  So I will grant the Debtors'

18  request to extend the respective exclusivity periods to March

19  31st and to May 31st.

20      Now, let's talk about the Debtors' request that we fix a

21  hearing date shortly after the 31st of March before the parties

22  come back on the Standing and the Examiner Motions.  Does

23  anyone have any comment about that proposal?

24      MR. CONLAN:  Jim Conlan on behalf of the Debtor.

25  Your Honor, I believe we have a global on April 21st, but

1   certainly something earlier than that in April would be fine

2   with us.

3           THE COURT:  Not going to wait.  I'm not going to

4   make the parties wait that long.

5           MR. CONLAN:  Yes.  Perhaps the first week of April?

6   Mr. Seife or Mr. Bush?

7           MR. SEIFE:  That will be acceptable, Your Honor.

8           THE COURT:  All right.  Mr. Stark, any comment on

9   that?

10          MR. STARK:  Your Honor, I apologize.  I followed the

11  rule that I turned my BlackBerry off, so I'm trying to find my

12  calendar.  I am on vacation the last week in March, so I'm

13  trying to make sure that --

14          THE COURT:  Well, the last week in March --

15          MR. STARK:  I'm just hoping that calender wise it

16  doesn't -- I apologize.  I'll try to pull up my calendar as

17  quickly as I can.

18          THE COURT:  The last week in March we have Passover

19  to deal with anyway, so my inclination would be to stay away

20  from that.  If we're looking then to the week of April 5th, I

21  will tell you --

22          UNIDENTIFIED SPEAKER:  Your Honor, in my part of the

23  woods, the week of April 5th is spring break, so I would

24  actually prefer if Your Honor looked at it the week of April

25  12th.

1          THE COURT:  So you going to Cancun or --

2          UNIDENTIFIED SPEAKER:  I just --

3          THE COURT:  What are you thinking?

4      (Laughter in the courtroom.)

5          UNIDENTIFIED SPEAKER:  It's --

6          THE COURT:  Fort Lauderdale maybe, I don't know.

7          UNIDENTIFIED SPEAKER:  It's actually not settled

8  yet, but --

9          THE COURT:  Okay.

10         UNIDENTIFIED SPEAKER:  -- it might Asia.

11         THE COURT:  Well, I have April 12th and 13th open.  As

12  between those two dates, anyone have a preference?

13     (No verbal response.)

14         THE COURT:  Let's do the 13th then.  April 13th at 10

15  o'clock for a hearing on the matters on today's Agenda which

16  are listed as numbers 8, 9, 10, 13 and 14.  Have I missed

17  anything?

18     Let's talk a little bit about number 10, the Wilmington

19  Trust Motion to do two things.  One to file an un-redacted

20  response and, two, the Cross Motion to intervene.  I just set

21  that for status today, but I guess we should tee that up for a

22  hearing on the merits at the same time at the April hearing.

23         MR. STARK:  That works for us, Your Honor.  And

24  there's no need to talk about an intervention prior to a

25  Complaint being filed.  We wanted to be timely.

100

1      THE COURT:  Understood.

2      MR. STARK:  As far as the seal, we're happy to carry

3  again.  We're following the same rules of the road that Mr.

4  Seife is, so --

5      THE COURT:  Okay.

6      MR. STARK: -- we're doing as best we can with

7  whatever procedure makes sense.

8      THE COURT:  All right.  Any other questions or

9  comments?

10      (No verbal response.)

11      THE COURT:  All right.  I'd like the parties to

12  confer and submit a Form of Order that embodies the ruling on

13  the Exclusivity Motion, simply referring to the reasons that

14  were stated on the record as the basis for the relief.  Is

15  there anything further for today?

16      MR. CONLAN:  No, Your Honor.

17      THE COURT:  Thank you all very much.  That concludes

18  this hearing.  Court is adjourned.

19      (Court adjourned at 12:43 p.m.)

20

21

22

23

24

25

1                        <u>CERTIFICATE</u>

2          I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter.

5

6     */s/April J. Foga*                    February 23, 2010

     April J. Foga, CET, CCR, CRCR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880