IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x
:
In re:                          :   **Chapter 11 Cases**
:   **Case No. 08-13141 (KJC)**
**TRIBUNE COMPANY, et al.,**    :   **(Jointly Administered)**
:
Debtors.                :
---------------------------------------------------------x

### STIPULATED FACTS IN CONNECTION WITH MARCH 26, 2010 HEARING ON LAW DEBENTURE TRUST COMPANY OF NEW YORK'S MOTION TO TERMINATE DEBTOR AFFILIATES' UNDISCLOSED PAYMENT OF LBO LENDERS' FEES AND EXPENSES, FOR AN ACCOUNTING, AND FOR DISGORGEMENT OF PAST PAYMENTS

Law Debenture Trust Company of New York; the above-captioned debtors and

debtors-in-possession; Tribune (FN) Cable Ventures, Inc.; JPMorgan Chase Bank, N.A.;

certain Credit Lenders represented by Hennigan, Bennett & Dorman LLP; Centerbridge

Credit Advisors LLC; and the Official Committee of Unsecured Creditors (collectively,

the "Parties"), hereby stipulate to the following facts in connection with the March 26,

2010 hearing on Law Debenture Trust Company of New York's *Motion to Terminate

Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, For an

Accounting, and For Disgorgement of Past Payments*:

1.      On May 17, 2007, Tribune Company ("Tribune") entered into a credit

agreement (the "Credit Agreement") among certain lenders ("Senior Lenders");

JPMorgan Chase Bank, N.A., as administrative agent (the "Agent"); Merrill Lynch

Capital Corporation ("Merrill Lynch"), as syndication agent; Citicorp North America,

Inc., Bank of America, N.A. and Barclays Bank plc, as co-documentation agents;

JPMorgan Securities Inc., Merrill Lynch Pierce Fenner & Smith Incorporated, Citigroup

Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners; and Tribune, as borrower ("Borrower").

2.      On June 4, 2007, Tribune and the Agent entered into a Pledge Agreement (the "Pledge Agreement").   Pursuant to the Credit Agreement and the Pledge Agreement, the Borrower granted the Agent for the benefit of the Senior Lenders a security interest in its right, title and interest in, to and under (a) the membership interests owned by it in Tribune Broadcasting HoldCo, LLC and Tribune Finance, LLC; (b) all other property that may be delivered to and held by the Agent pursuant to the terms of the Pledge Agreement; (c) payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed, in respect of, in exchange for or upon the conversion of the securities referred to in clauses (a) and (b) above; (d) all rights and privileges of the Borrower with respect to the securities and other property referred to in clauses (a), (b) and (c) above; and (e) all proceeds of any of the foregoing.  Other than the security interests discussed above, the Senior Lenders are unsecured.

3.      Section 8.04(a) of the Credit Agreement provides, in part:

"Borrower further agrees to pay promptly following demand all reasonable and documented out-of-pocket costs and expenses of the Agent, the Lead Arrangers and the Lenders, if any (including, without limitation, reasonable and documented counsel fees and expenses), in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of this Agreement, the Notes and the other documents to be delivered hereunder, including, without limitation, reasonable and documented fees and expenses of counsel for the Agent and each Lender in connection with the enforcement of rights under this Section 8.04(a)."

4.      Section 8.04(b) of the Credit Agreement provides, in part:

"Borrower agrees to indemnify and hold harmless the Agent, each Lead
Arranger and each Lender and each of their Affiliates and their officers,
directors, employees, agents, trustees and advisors (each, an "Indemnified
Party") from and against any and all claims, damages, losses, liabilities
and expenses (including, without limitation, reasonable fees and expenses
of counsel) incurred by or asserted or awarded against any Indemnified
Party, in each case arising out of or in connection with or by reason of
(including, without limitation, in connection with any investigation,
litigation or proceeding or preparation of a defense in connection
therewith) the Advances, the Notes, this Agreement, any Letter of Credit,
any of the transactions contemplated herein or the actual or proposed use
of the proceeds of the Advances or Letters of Credit, except to the extent
such claim, damage, loss, liability or expense is found in a final, non-
appealable judgment by a court of competent jurisdiction to have resulted
from such Indemnified Party's gross negligence or willful misconduct."

5.      On June 4, 2007, certain of Tribune's subsidiaries (the "Guarantor

Subsidiaries") entered into a Guarantee Agreement (the "Guarantee").  Pursuant to the

Guarantee, "[e]ach Guarantor unconditionally guarantees, jointly with the other

Guarantors and severally, as a primary obligor and not merely as a surety, all of . . . the

due and punctual performance of all covenants, agreements, obligations and liabilities of

the Borrower and each Loan Party under or pursuant to the Credit Agreement and the

other Loan Documents. . . ."

6.      On December 20, 2007, Tribune entered into a Senior Unsecured Interim

Loan Agreement (the "Bridge Credit Agreement").  Merrill Lynch serves as

administrative agent (the "Bridge Agent") under the Bridge Credit Agreement.

7.      Section 8.04 of the Bridge Credit Agreement is in all relevant parts

substantively identical to Section 8.04 of the Credit Agreement.

8.      On December 20, 2007, the Guarantor Subsidiaries entered into a

Guarantee Agreement regarding the Bridge Credit Agreement (the "Bridge Guarantee").

3

9.     The Bridge Guarantee is subordinated to the Guarantee.

10.     On December 8, 2008 (the "Petition Date"), the following publicly-traded debt securities issued by Tribune and/or its predecessors were outstanding:  (1) the 6.25% Medium Term Notes, Series D due 2026 outstanding under an Indenture, dated March 1, 1992, between Tribune and Bank of New York as Trustee (the "1992 Indenture"); (2) the 7-1/4 Debentures due 2013 and the 7-1/2% Debentures due 2023 outstanding under an Indenture, dated January 30, 1995, between New TMC Inc. and First Interstate Bank of California as Trustee, as supplemented by the First Supplemental Indenture, dated as of June 12, 2000 (collectively, the "1995 Indenture"); (3) the 6.61% Debentures due 2027 and the 7-1/4% Debentures due 2096 outstanding under an Indenture, dated March 19, 1996, between the Times Mirror Company and Citibank, N.A., as Trustee, as supplemented by the First Supplemental Indenture, dated as of October 19, 1999 and the Second Supplemental Indenture, dated as of June 12, 2000 (collectively, the "1996 Indenture"); (4) the 4.875% Notes due 2010, the 5.25% Notes due 2015 and the 5.67% Medium Term Notes, Series E due 2008 outstanding under an Indenture, dated January 1, 1997, between Tribune and Bank of Montreal Trust Company as Trustee, as supplemented by the First Supplemental Indenture, dated as of August 5, 1998 (collectively, the "1997 Indenture") and (5) the Exchangeable Subordinated Debentures (PHONES) due 2029 outstanding under an Indenture, dated as of April 1, 1999 between Tribune and Citibank (the "1999 Indenture").

11.     From August 1, 2008 until June 8, 2009, Deutsche Bank Trust Company Americas ("Deutsche Bank") served as Indenture Trustee for the debentures issued pursuant to the 1996 Indenture.

4

12.    From August 1, 2008 until December 26, 2008, Deutsche Bank served as Indenture Trustee for the exchangeable subordinated debentures issued pursuant to the 1999 Indenture.

13.    From August 1, 2008 until the present, Deutsche Bank has served as Indenture Trustee for the notes and debentures issued pursuant to the 1992 Indenture, the 1995 Indenture and the 1997 Indenture.

14.    From December 26, 2008 until the present, Wilmington Trust Company has served as Indenture Trustee for the PHONES debentures issued pursuant to the 1999 Indenture.

15.    Section 610 of the 1996 Indenture provides that "[t]he Trustee may be removed at any time with respect to the Securities of any series by Act of the Holders of a majority in principal amount of the Outstanding Securities of such series, delivered to the Trustee and to the Company."

16.    On June 8, 2009, Law Debenture Trust Company of New York ("Law Debenture"), Deutsche Bank and Tribune executed the Tripartite Agreement, under which Law Debenture replaced Deutsche Bank as Indenture Trustee for the 1996 Indenture.  The Tripartite Agreement provides, in part:

> "[H]olders of a majority in principal amount of the outstanding 7-1/4% Debentures and more than 42% in principal amount of the outstanding [7-1/4% and 6.61% Debentures combined] have submitted a request to [Tribune] and [Law Debenture] that [Tribune] appoint [Law Debenture] as successor Trustee, and [Tribune] and [Law Debenture] have not received any request from any holder of [either the 7-1/4% or 6.61% Debentures] requesting that [Tribune] appoint any person other than [Law Debenture] as successor Trustee."

17.    On November 20, 2008, the Agent notified Tribune that it had retained and would retain certain professionals in connection with the Credit Agreement,

including Davis Polk & Wardwell LLP ("Davis Polk") as counsel and FTI Consulting

("FTI") as financial advisor and that it wanted to discuss obtaining a retainer from

Tribune for the fees and expenses of the professionals.

18.     In a letter dated November 26, 2008 to Tribune, the Agent confirmed that

"[p]ursuant to and as required by the terms of the Senior Secured Credit Agreement, you

have agreed to pay the reasonable and documented fees, non-professional charges and

expenses of such professionals, which amounts shall be invoiced on a monthly basis."

Prior to that time, and excluding any fees and expenses paid in connection with the

closings of the transactions on June 4, 2007, and December 20, 2007, the Agent had not

requested nor had Tribune paid any fees or expenses pursuant to Section 8.04 of the

Credit Agreement.

19.     On December 1, 2008, Tribune paid a $2,000,000 retainer to the Agent for

retainers and future fees and expenses of the Agent's professionals pursuant to the Credit

Agreement.

20.     The Agent paid Davis Polk a $750,000 retainer on December 2, 2008, and

a $500,000 retainer on December 5, 2008.

21.     The Agent paid FTI a $500,000 retainer on December 2, 2008, and a

$250,000 retainer on December 4, 2008.

22.     On December 8, 2008 (the "Petition Date"), Tribune and 110 of its

subsidiaries (the "Debtors") filed voluntary petitions for relief under Chapter 11 of the

Bankruptcy Code.

23.     The filing constituted an Event of Default under the Credit Agreement.

24.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

25.     Certain subsidiaries of Tribune did not file bankruptcy petitions on the Petition Date, including the following Guarantor Subsidiaries:  Chicago National League Ball Club, LLC (n/k/a Tribune CNLBC, LLC); Tribune (FN) Cable Ventures, Inc. ("TCV"); Tribune Interactive, Inc.; Tribune National Marketing Company; and Tribune ND, Inc. (collectively, the "Non-Debtor Guarantors").

26.     On December 18, 2008, the Office of the United States Trustee (the "U.S. Trustee") appointed an eight-member statutory committee of unsecured creditors (the "Creditors' Committee").  On December 30, 2009, the U.S. Trustee added Wilmington Trust Company as the ninth member of the Creditors' Committee.

27.     Deutsche Bank and Wilmington Trust Company were appointed to the Creditors' Committee in their capacities as Indenture Trustees.

28.     JPMorgan Chase Bank, N.A. ("JPMorgan") was appointed to the Creditors' Committee in its capacity as a lender under the Credit Agreement.

29.     After the Petition Date, JPMorgan and certain Senior Lenders (the "Steering Lenders") sought payment of fees and expenses under Section 8.04 of the Credit Agreement by Non-Debtor Guarantors pursuant to the Guarantee.

30.     The Agent, Davis Polk (as counsel for the Agent), Tribune, and Sidley Austin LLP ("Sidley") (as counsel for Tribune), had discussions regarding a potential Forbearance Agreement.

31.     On December 24, 2008, Tribune (via its financial advisor, Lazard Asset Management LLC) distributed a forbearance term sheet.  The term sheet provided, in part:

    a.    that the parties would be the Non-Debtor Guarantors, the Agent, and certain other Senior Lenders;

    b.    that the Agent, with the consent and at the direction of the Senior Lenders, would agree during a specified forbearance period to (i) "forbear from exercising any rights and remedies against the Non-Debtor Guarantors in connection with the Guarantees," and to (ii) deliver a Payment Blockage Notice to the Bridge Agent;

    c.    that the Non-Debtor Guarantors would agree, during the Forbearance Period, to pay certain costs and expenses incurred by the Agent and certain Senior Lenders; and

    d.    that the forbearance period would commence upon execution of an agreement and continue until June 30, 2009, and thereafter until terminated by any party upon 30 days notice, upon the bankruptcy filing by any Non-Debtor Guarantor, or upon a Non-Debtor Guarantors' failure to pay the amounts due under the agreement.

32.     On January 4, 2009, Geoffrey Jones of Kohlberg, Kravis, Roberts & Company ("KKR"), an affiliate of one of the Senior Lenders under the Credit Agreement, sent to other employees of KKR an email entitled "Weekly distressed credit update" which contained information with respect to Tribune, including the following:

"Early last week, Lazard (FA to the company) provided a draft forbearance term sheet. The ad hoc steering committee reviewed and provided comments to the agent and its counsel. The current draft of the forbearance term sheet provides for the following:

- The agent and the lenders will forbear from exercising remedies in connection with the enforcement of the payment obligations under the guarantees.

- The non-debtor guarantors shall pay certain costs and expenses of the agent and the lenders that formed the ad hoc group (including NY/IL counsel, DE counsel and FAs)."

33.     On January 10, 2009, Davis Polk sent Sidley a draft Forbearance

Agreement. The draft contemplated that both the Non-Debtor Guarantors and certain

other debtor Guarantors would be signatories. The draft Forbearance Agreement

provided, in part:

a.     "WHEREAS, certain of the Tribune Parties are not debtors in the

Chapter 11 Proceeding . . . and accordingly do not have the benefit

of the automatic stay applicable therein and would be subject to the

exercise of remedies under the Guarantee Agreement absent

forbearance in respect of such remedies by the Lenders and the

Agent";

b.     "WHEREAS, to permit certain of the Non-Debtor Tribune Parties

to explore possible strategic transactions and to facilitate the

overall restructuring of the Tribune Parties, the Tribune Parties

have requested that the Participant Lenders forbear from exercising

certain rights and remedies under the Guarantee Agreement against

the Non-Debtor Tribune Parties on the terms and conditions

(including the limited duration) set forth herein, and the Participant

9

Lenders are willing, upon such terms and conditions (including such limited duration) to forbear from their exercise of such rights and remedies to enable the Non-Debtor Tribune Parties to continue to explore such transactions and, in the interim, to enable the Non-Debtor Tribune Parties to continue to operate, all during the Forbearance Period (as defined herein)";

c.  provided that a "Forbearance Default" included, among other things, the entry of any "Non-Debtor Tribune Party" into any agreement relating to a "Material Disposition" that had not been consented to in writing by the Required Lenders;

d.  that the end of the "Forbearance Period" would take place upon occurrence of certain events, some of which required written notice by the Agent, but none of which required notice by the Borrower, and none of which permitted Borrower to cause the end of the Forbearance Period to occur without the consent of the Agent;

e.  that the Tribune Parties (including Debtors) would provide the Agent with access to (i) information regarding Material Dispositions or other material transactions, including a summary of the material terms of such a transaction and a copy of the most current draft of any agreement relating thereto, (ii) financial information, and (iii) management personnel, counsel, and any financial advisors or restructuring consultants;

f.     that the Non-Debtor Tribune Parties would pay, among other things, all reasonable fees, costs and expenses of the Agent and Kramer Levin Naftelis & Frankel LLP ("Kramer Levin"), as counsel to the Lenders including certain of the Steering Lenders, and that, on the "Forbearance Effective Date" the Non-Debtor Tribune Parties would pay to the Agent, $7,500,000 and to Kramer Levin, $1,000,000 to be used as an advance that could be applied in satisfaction of the reasonable fees, costs and expenses of the Agent and Kramer Levin to the extent that, notwithstanding the provisions of Section 3(a), any such fees, costs and expenses are not paid when required in accordance therewith;

g.     that as one of various conditions to the Forbearance Effective Date, the Agent would deliver a Payment Blockage Notice in connection with the Guarantee to the Bridge Agent;

h.     that "[t]he cash management system of [Tribune] and its subsidiaries and affiliates shall be maintained in a manner reasonably satisfactory to the Agent and the Required Lenders";

i.     that all consideration received in connection with a Material Disposition would be retained by the entity making such Material Disposition, and that none of such consideration would be transferred to any other Person (including, without limitation, Tribune or any of its subsidiaries or affiliates) without prior written consent of the Agent and the Required Lenders; and

11

j.      that neither Tribune nor any Guarantor "shall directly or indirectly

pay any Dividend."

34.     On January 12, 2009, Mr. Jones of KKR sent to other employees of KKR

an email entitled "Weekly distressed credit update" which stated in part that "[w]e

continue to negotiate [the] forbearance agreement to secure payment of our professional

fees and ensure that cash from sale proceeds and operations remains in our guarantor

entities."

35.     On January 14, 2009, the Bridge Agent made a demand on "the Borrower"

(Tribune) under section 8.04 of the Bridge Credit Agreement for all reasonable fees and

expenses of the Bridge Agent in connection with the administration and enforcement of

the Bridge Credit Agreement including, without limitation, the reasonable and

documented fees and expenses of counsel for the Bridge Agent and financial advisor for

the Bridge Agent, Kaye Scholer LLP and Capstone Financial Advisors, Inc., respectively.

On January 23, 2009, Sidley responded: "The Borrower is the subject of a chapter 11

bankruptcy case and not in a position to presently pay the Bridge Agent any fees or

expenses (or any other amounts)."

36.     On January 20, 2009, Sidley provided comments and revisions to the draft

Forbearance Agreement.  The suggested deletions, additions, and revisions included:

a.      the addition of a clause stating that Tribune, upon 10 days written

notice to the Agent, could terminate the agreement;

b.      the deletion of various conditions precedent, including payment in

full of the Agent's fees and expenses to date and the receipt by the

12

Agent of "all reports, forecasts, analyses or other due diligence" required under the agreement;

c.      the addition of a condition precedent that "the Bankruptcy Court has entered an order authorizing the Debtors to enter into and perform in accordance with this Forbearance Agreement";

d.      modification of the definition of "Forbearance Default" to provide that any Non-Debtor Tribune Party's consummation of a Material Disposition that was approved by the Bankruptcy Court would not constitute a Forbearance Default;

e.      the addition of a clause permitting transfer of consideration received in connection with a Material Disposition to any Person (including, without limitation, Tribune or any of its subsidiaries or affiliates) so long as such a transfer is approved by the Bankruptcy Court and prior written notice of not less than 10 days is provided to the Agent;

f.      the deletion of the clause requiring the cash management system of Tribune and its subsidiaries and affiliates be maintained in a manner reasonably satisfactory to the Agent and instead modifying the clause to only require Tribune and its subsidiaries to maintain their cash management system in a manner "consistent with the order of the Bankruptcy Court."; and

g.      the modification of the clause prohibiting Tribune or any Guarantor from directly or indirectly paying any dividend to only

13

precluding these entities from directly or indirectly paying any

"cash dividend on account of an equity interest in the entity paying

such cash dividend" without prior consent of the Required

Lenders, approval of the Bankruptcy Court, or upon not less than

10 days prior written notice to the Agent.

37.     On January 22, 2009, Miriam Kulnis, JPMorgan's representative on the

Creditors' Committee, sent an email to Nils Larsen and Chandler Bigelow at Tribune that

included the following statements:

> "well I can tell you that one of the big issues is the desire to
> make the Debtors parties to the agmt. I think the [Steering
> Committee] feels that it's best if only non-debtors are
> parties and it would be more likely to get approved by the
> court if the debtors were not a party. We are worried that if
> the debtors are parties the UCC may object to it and it
> would get denied. I will be frank (as I always am with you)
> that some are wondering if the company really wants the
> court to reject this so that the company has an excuse not to
> pay the fees. So that's a big heads up and you should think
> about that in advance of tomorrow's call."

38.     Nils Larsen of Tribune responded to Miriam Kulnis of JPMorgan that

same day in an email that included the following statements: "I understand the concern

surrounding the inclusion of the Debtors. We can discuss further in the morning. The

intent of our mark-up is not to proffer something the court and the UCC are likely to

reject. We are not being cute on the fee question."

39.     On January 25, 2009, Gavin Baiera of Angelo Gordon Co LP sent an

email to Nils Larsen at Tribune stating: "I tried to call your cell. I heard the counter

proposal, which has the company simply make payments under the guarantee demands.

14

There are clear benefits to this approach (no court approval/notice), but the downside is it leaves the senior lenders exposed if the payments stop or the non-debtors file. I am willing to push the group on this, but I don't want to negotiate the evergreen amount under this type of arrangement as it is our only protection. At the end of the day the 8.5mm gives us some downside protection, and is really our money eventually anyway. Also, the evergreen is not relevent [sic] if you don't ever expect to stop making payments. Which we have been assured is not a likely scenario since it would mean the company was at odds with the lenders. Please advise so I can go bacl [sic] to the group, and try to support this."

40.    On January 25, 2009, Mr. Jones of KKR sent to other employees of KKR an email entitled "Weekly distressed credit update (ex-KKR PE portfolio names)" which stated in part:

> "Forbearance with non-debtor guarantors has not yet been finalized.  Until today, important differences relate to the forbearance period (Tribune wants right to terminate for any non-debtor guarantor with 10 days notice) and payment of lenders professional fees (Tribune has requested that payment obligation exist only as long as the forbearance is in place, which, coupled with the right to terminate with 10 days notice, the obligation to pay professional fees would exist only until terminated by Tribune upon 10 days notice).
>
> Today a new proposal for forbearance was floated, which includes proceeding without forbearance, as follows:
>
> - Agent and the steering committee members retaining Kramer Levin would make demands of the non-debtor guarantors under their guarantees for a retainer totaling $8.5 million for professionals.
>
> - Company would advise the UCC of the demands under the guarantees and of the rights of the lenders to payment under the existing guarantees.
>
> - Company would then make the payments without seeking court approval (as it is current on the non-debtors' other obligations).

- The non-debtor guarantors would also agree to co-sign the engagement
letter with the investment bank hired by the agent.

- There would be a side-letter confidentiality agreement between the SC
and the debtors, which would also provide for continued information flow
to the agent, the steering committee and their professionals."

41.     The draft Forbearance Agreement was never finalized or executed.

42.     On January 30, 2009, the Agent sent Tribune (i) a draft Payment Blockage Notice to be delivered to the Bridge Agent, (ii) a draft payment letter from the Agent to the Non-Debtor Guarantors, and (iii) a draft payment letter from the Steering Lenders to the Non-Debtor Guarantors.

43.     On February 1, 2009, Mr. Jones of KKR sent to other employees of KKR an email entitled "Weekly distressed credit update (ex-KKR PE portfolio names)" which stated in part that "[p]rofessional fees of the steering committee will be paid by non-debtor subsidiaries under the conditions of our guarantees versus a forbearance agreement as previously contemplated.  Should the company file its non-debtor subsidiaries, we will need to secure payment through the bankruptcy court."

44.     On February 6, 2009, Davis Polk sent Sidley a draft engagement letter for the retention of Blackstone Advisory Services L.P. ("Blackstone") by Davis Polk in connection with Davis Polk's representation of the Agent.  The draft engagement letter specified that the "fees and expenses payable to Blackstone pursuant to this Agreement shall be payable by the Company in accordance with the provisions of Section 8.04 of the Credit Facilities."  The draft engagement letter called for a monthly fee of $200,000 and a restructuring fee of $5,500,000 payable upon either an out of court restructuring or a plan confirmation order.  Blackstone, Davis Polk, the Agent, and Tribune were listed as signatories.

16

45.      On February 8, 2009, Davis Polk informed Sidley that the Agent was invited to discuss the proposed fee payment agreement with the Creditors' Committee at their next meeting on Thursday February 12, 2009, and that the Agent would not be delivering the Payment Blockage Letter to the Bridge Agent prior to the meeting.

46.      The following day, on February 9, 2009, Sidley responded that Tribune wanted "to make sure that [the Creditors' Committee members] are appraised as to the amount and nature of the retainers and the amount presently due on fees, and also the proposed terms of the Blackstone engagement before their Thursday meeting" and invited Davis Polk to join Sidley on a phone-call to Chadbourne & Parke LLP ("Chadbourne"), counsel to the Creditors' Committee.  Davis Polk agreed to join the call, but expressed concern "about to (sic) many calls on this, lest it seem like a much more involved issue for the UCC than non-debtor entities paying debts under certain of their obligations should be.  We have gone down with Chadbourne the financial aspects of Blackstone's engagement as well as the planned amount and nature of the retainers.  And JPM will be speaking with the UCC about the intended payments on Thursday."

47.      On February 11, 2009, Davis Polk provided information to Chadbourne regarding the proposed agreement:

        a.      that the Agent would submit invoices for Davis Polk, Richards Layton & Finger ("RLF"), FTI, Blackstone and Kramer Levin;

        b.      that each of the professionals, with the exception of Blackstone, bills on an hourly basis;

    c.     that Blackstone would bill $200,000 per month plus a restructuring fee of $5,500,000 upon consummation of a reorganization plan; and

    d.     that a retainer of $8.5 million in the aggregate would be paid for all professionals to cover any fees/expenses that might later be unpaid;

    e.     An estimate of January fees for the hourly professionals;

    f.     A proposal to provide the Creditors' Committee with quarterly updates regarding the amount of fees and expenses paid by the Non-Debtor Guarantors.

48.    On February 17, 2009, Sidley informed Davis Polk that "as previously discussed, back-up detail will be required for each of the invoices submitted to the non-debtors for payment by the professionals retained by the Agent and the Steering Committee, so that the non-debtors will be able to confirm time and expense charges are reasonable and appropriate." Davis Polk responded:

> "I have had each of the professionals redo their invoices at least once to try to get you sufficient detail to see and be able to judge the reasonableness of what was done while still preserving privilege and confidentiality in a more sensible and efficient manner than line editing individual time entries. I am hopeful that what you see will be responsive to the company's very understandable desire."

49.    On February 17, 2009, Davis Polk informed Tribune that the Creditors' Committee was planning to have a call on the proposed fee agreement the following afternoon, after which the Agent "will be prepared to send the fee letters (revised in the ways you requested) together with the invoices and the blocking notice."

50.    On February 23, 2009, Davis Polk sent Sidley a proposed final execution copy of the Blackstone engagement letter.  The proposed final execution copy of the engagement letter provided that "[a]ll fees and expenses payable to Blackstone pursuant to this Agreement are obligations of the Tribune Company in accordance with the provision of Section 8.04 of the Credit Facilities and presently payable by the Guarantors (as defined in the Credit Agreement) whom are not the subject of a case under Chapter 11 of Title 11 of the Bankruptcy Code."  The signatories listed were Blackstone, Davis Polk, the Agent, and the Non-Debtor Guarantors.  The Blackstone engagement letter was signed and executed on February 27, 2009.  Blackstone, Davis Polk, and the Agent were listed as signatories to and signed the engagement letter.

51.    On February 24, 2009, Davis Polk outlined to Chadbourne a proposed agreement regarding the payment of Blackstone's fees and expenses by the Non-Debtor Guarantors "subject . . . to and dependent on the Committee having no objection to the reimbursement by the non-debtors."  The proposal was as follows:

a.    the retainer would not be used to pay Blackstone's restructuring fee;

b.    the Agent would notify the Creditors' Committee before making a demand for payment of Blackstone's restructuring fee;

c.    the Agent would report to the Creditors' Committee about Blackstone's activities in approximately five months; and

d.    the Agent would agree to reduce the retainer amount to be paid by $1 million to effectively cover the initial five-month period.

52.     On February 26, 2009, the Agent delivered a letter to Sidley requesting payment by the Non-Debtor Guarantors pursuant to the Guarantee of (i) the Agent's out-of-pocket costs and expenses (including, without limitation, the fees and expenses of Davis Polk, RLF, FTI and Blackstone) within 10 days after receipt of any invoice; and (ii) $6,650,000 for the purpose of advances by the Agent to cover such costs and expenses.   The letter attached unpaid invoices for these professionals in the total amount of $1,123,505.74.

53.     On February 26, 2009, the Steering Lenders delivered a letter to Sidley requesting payment by the Non-Debtor Guarantors pursuant to the Guarantee of (i) fees and expenses of Kramer Levin and the out-of-pocket expenses of each of the Steering Lenders incurred in connection with their participation as a Steering Lender within 10 days after receipt of any invoice; and (ii) $850,000 for the purpose of advances to cover such fees and expenses.  The letter attached unpaid invoices for these professionals in the total amount of $208,934.94.

54.     On February 26, 2009, the Agent delivered a Payment Blockage Notice to the Bridge Agent.

55.     On February 26, 2009, Sidley notified Tribune that "[t]he UCC's counsel confirmed to me today the UCC has no objection to the payment of the SC professional fees" and that Sidley has "a call scheduled with [the U.S. Trustee] tomorrow morning at 9:30 am est to advise him of the proposed SC professional fee payments by the non-debtors."

56.     On February 27, 2009, the Creditors' Committee confirmed in writing that it would not object to the payment of fees and expenses by the Non-Debtor Guarantors

subject to agreed-upon conditions, including (1) the Agent and Steering Lenders would

only seek reimbursement of reasonable fees and expenses of Davis Polk, RLF, FTI,

Blackstone, and Kramer Levin; (2) that the agreement by the Creditors' Committee not to

object to the payment of fees and expenses of Kramer Levin be subject to the continuing

condition that Kramer Levin is the only Senior Lender professional being reimbursed; (3)

the Senior Lenders provide quarterly summaries of all fees; (4) the Agent and/or Tribune

notify the U.S. Trustee of the Non-Debtor Guarantor's intent to reimburse the

professional fees before any payment is made; and (5) with respect to Blackstone that (i)

the retainer not be used to pay Blackstone's restructuring fee, (ii) the Agent will notify

the Committee before requesting payment of any restructuring fee and the Committee

reserves the right to object to such fee on any basis, including reasonableness, and (iii)

the Agent will report and discuss with the Committee the scope of and continuing need

for Blackstone's work in five months.  The Creditors' Committee also reserved any and

all of its rights to object to the reasonableness of any fees and/or expenses to be

reimbursed by the Non-Debtor Guarantors.

     57.     On February 27, 2009, Sidley advised the U.S. Trustee of the agreement of

the Non-Debtor Guarantors to reimburse fees and expenses pursuant to the Guarantee.

     58.     On February 27, 2009, the U.S. Trustee requested and received additional

information regarding the agreement from Davis Polk.  Specifically, Davis Polk provided

the U.S. Trustee with a final, executed version of the FTI engagement letter and a near-

final draft of the Blackstone engagement letter.  Neither engagement letter provided to

the U.S. Trustee listed Tribune as a signatory.  Davis Polk further informed the U.S.

Trustee that after numerous discussions with the Creditors' Committee, the Agent agreed

not to seek payment of any success fee for Blackstone without first advising the

Creditors' Committee.  Davis Polk further informed the U.S. Trustee that Davis Polk has

not and would not include its fees incurred in connection with representing JPMorgan on

the Creditors' Committee in any request for payment made to the Non-Debtor

Guarantors.

     59.    On March 4, 2009, Sidley provided the U.S. Trustee with a memorandum

setting forth its analysis (a) that the Non-Debtor Guarantors were obligated, pursuant to

the Guarantee, to reimburse the Agent's and Senior Lenders' reasonable fees and

expenses under Section 8.04 of the Credit Agreement and (b) that the Non-Debtor

Guarantors' obligations were not subject to the automatic stay.  At the same time, Sidley

provided the U.S. Trustee with copies of the Credit Agreement and the Guarantee.

     60.    On March 5, 2009, Davis Polk sent an email to Sidley stating: "Bryan,

Based on your description of your conversation last week and [the U.S. Trustee's]

description of the same conversation when we spoke, you didn't ask for his permission

and you didn't tell him you were waiting for his consent (both correctly) but instead told

him the non-debtors intended to pay around the middle of this week.  We sent him the

engagement letters he asked for last friday and haven't heard a word.  Why wouldn't you

just pay at this point?  Have there been further conversations I am not aware of?"  This

stipulated fact is subject to the responses and objections from Tribune and JPMorgan

dated February 1, 2010, to the Requests for Admission served by Law Debenture on

January 25, 2010.

61.     On March 10, 2009, Sidley communicated to the U.S. Trustee that the Non-Debtor Guarantors intended to commence payment of the Steering Lenders' fees and expenses on March 12, 2009.

62.     The same day, the U.S. Trustee acknowledged receipt of Sidley's email and stated that "[t]o the extent that we have something to communicate to you on this point, we will do so."

63.     TCV is a corporation incorporated in Delaware whose stock is wholly owned by Debtor Tribune Broadcasting Company.  TCV is a 31.3% general partner of Television Food Network, G.P., which operates the Food Network.  Other than its partnership interest in Television Food Network, G.P. (and proceeds thereof), TCV has no other assets and conducts no other business.  TCV's Board of Directors and officers are comprised of employees of Debtors.  TCV has no employees.  TCV has no offices separate from Tribune's offices.  TCV is included in Tribune's consolidated financial statements.  Debtors' employees controlled treasury functions at TCV.  TCV maintains separate books and records from Tribune.

64.     Before the Petition Date, cash distributions received by TCV under the Television Food Network, G.P. partnership agreement were swept into the Tribune cash management system and placed into an account held in Tribune's name.  After the Petition Date, all such distributions received by TCV have been held by TCV in an account in TCV's name and not placed in the Tribune cash management system.

65.     On June 4, 2007, TCV's Board of Directors authorized each of the President, any Vice President, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Secretary of TCV (collectively, the "Authorized Officers") to execute the

Guarantee and related documents of behalf of TCV, and also authorized the Authorized Officers to cause TCV to "perform all of its obligations" pursuant to the Guarantee.

66.     All post-petition payment of professional fees and expenses pursuant to the Guarantee have been made by TCV, from funds generated by TCV by virtue of its partnership with Television Food Network, G.P., which operates the Food Network. TCV commenced payment of professional fees and expenses pursuant to the Guarantee on March 12, 2009. Prior to March 12, 2009, TCV had not paid any professional fees and expenses pursuant to the Guarantee.

67.     All of the fees and expenses paid pursuant to the Guarantee since March 12, 2009 were paid by TCV. No other Tribune entity has made any such payment since that date.

68.     No written agreement exists for the Agent and/or the Lenders to not exercise remedies against the Non-Debtor Guarantors in exchange for payment of fees and expenses.

69.     To date, TCV has made payment of professional fees and expenses pursuant to the Guarantee totaling $16,194,803.53. In addition, on March 12, 2009, TCV paid the Agent a $7,500,000 retainer. Subject to paragraph 65 above, TCV's board of directors and officers were not specifically approached for authorization to pay these fees. The decision to pay the fees was made by management of Tribune, including Don Liebentritt, David Eldersveld, Chandler Bigelow, and Nils Larsen. Liebentritt and Eldersveld were directors of TCV at the time of the decision, and Bigelow was an officer.

70.     On June 11, 2009, Davis Polk informed Chadbourne that Tribune had "recommended that it was important for the Senior Lender Steering Committee . . . to obtain advice from counsel with experience in Federal Communications Commission . . . matters, in order to discuss, among other things, certain issues regarding cross-ownership of media assets by 5%+ shareholders." Davis Polk explained that while "the Steering Committee has decided to retain Wiley Rein LLP ("Wiley") as special counsel with respect to FCC matters", "[a]s a formal matter, Wiley is retained by JPMorgan as Agent under the Senior Credit Agreement on behalf of the Senior Lenders." Davis Polk further informed Chadbourne:  "Sidley Austin has informed us that the Non-Debtor Guarantors which are subsidiaries of Tribune are willing to reimburse these fees and expenses, as required pursuant to the Senior Credit Agreement and as is currently the position with respect to the other fees and expenses of the Agent's other professionals." Davis Polk concluded the e-mail with the following: "If we do not hear from you otherwise, we will assume that there is no objection against this arrangement."

71.     On June 19, 2009, in response to a question from Tribune regarding the submission for reimbursement of out-of-pocket Agent expenses, Davis Polk sent an email to Tribune stating that Huron Consulting Services LLC ("Huron") is "a document collection and delivery service provider needed to help store and deliver electronic versions of documents requests by the UCC in their document requests.  Standard for a service provider like this to be used in litigation document requests."  In a separate email on the same day, Davis Polk further stated that "[the Agent] engaged [Epiq eDiscovery Solutions, Inc. ("Epiq")] to provide certain ediscovery technology products and services

to [the Agent]. Epiq processed and extracted data from electronic documents delivered to them, and organized the data in a format desired for review."

72.    The following entities (collectively, the "Reimbursed Professionals") have received payment and/or reimbursement of fees and/or expenses from TCV in the following amounts:

a.    Davis Polk, in its capacity as counsel for the Agent, of $8,651,033.06;

b.    RLF, in its capacity as local Delaware counsel for the Agent, of $59,606.97;

c.    Wiley Rein and Fielding LLP, in its capacity as FCC counsel for the Agent, of $1,460,719.32;

d.    FTI, in its capacity as financial advisor for the Agent, of $2,264,561.74;

e.    Blackstone, in its capacity as investment banking advisor for the Agent, of $1,861,882.42;

f.    JPMorgan, in its capacity as Agent, of $793,871.57 for reimbursement of fees paid to Epiq and Huron as vendors for the Agent employed in connection with the production of documents requested by the Creditors' Committee;

g.    Eaton Vance Investment Managers, for out-of-pocket costs in its capacity as Steering Lender, of $3,105.86; and

h.    Kramer Levin, in its capacity as counsel for the Steering Lenders, of $1,100,022.59.

73.     Prior to payment and/or reimbursement by TCV, Tribune requested and received from Davis Polk monthly invoices of the fees and expenses for all of the Reimbursed Professionals.

74.     On May 21, 2009, Davis Polk provided the Creditors' Committee with a quarterly summary of all fees and expenses paid and/or reimbursed by TCV from February to April 2009.

75.     On September 2, 2009, Davis Polk provided the Creditors' Committee with a quarterly summary of all fees and expenses paid and/or reimbursed by TCV from May to July 2009.

76.     On December 4, 2009, Davis Polk provided the Creditors' Committee with a quarterly summary of all fees and expenses paid and/or reimbursed by TCV from August to October 2009.

77.     On February 17, 2009 and July 15, 2009, Davis Polk sent invoices to JPMorgan for work performed in connection with JPMorgan's service on the Creditors' Committee.  JPMorgan has not sought reimbursement from the Non-Debtor Guarantors for such work.

78.     On July 29, 2009, Tribune filed and served a Rule 2015.3 report on all creditors included in the Debtors' Rule 2002 notice list.  The report included unaudited balance sheets for various non-debtor entities for the six month period ending June 28, 2009.  Included in the category of "Current Assets" was a sub-category entitled "pre-paid expenses and other."  The balance sheet for TCV identified $7,500,000 in this category but did not identify to whom the expenses were paid.

79.    As of December 23, 2009, TCV's bank account at JPM had a balance of $40,517,337.57.

80.    To date, other than seeking reimbursement for fees and expenses as described above, the Senior Lenders have not exercised any rights pursuant to the Guarantee and Credit Agreement against the Non-Debtor Guarantors.

DATED:  March 2, 2010        .

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

SIGNATURE PAGES FOR STIPULATED FACTS IN CONNECTION WITH MARCH 26, 2010 HEARING ON LAW DEBENTURE
TRUST COMPANY OF NEW YORK'S MOTION TO TERMINATE DEBTOR AFFILIATES' UNDISCLOSED PAYMENT OF LBO
LENDERS' FEES AND EXPENSES, FOR AN ACCOUNTING, AND FOR DISGORGEMENT OF PAST PAYMENTS

_____
Garvan F. McDaniel (No. 4167)
**BIFFERATO GENTILOTTI LLC**
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel: (302) 429-1900
Fax: (302) 429-8600

– and –

David S. Rosner
Andrew K. Glenn
Sheron Korpus
Daniel A. Fliman
**KASOWITZ, BENSON, TORRES &**
**FRIEDMAN LLP**
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700

*Counsel for Law Debenture Trust Company*
*of New York*

_____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, PA**
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Tel: (302) 652-3131
Fax: (302) 652-3117

-- and --

James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-7000

*Counsel to the Debtors and Debtors-in-Possession and*
*Tribune (FN) Cable Ventures, Inc.*

_____
Mark D. Collins
Robert J. Stearn, Jr.
**RICHARDS, LAYTON & FINGER, P.A**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

– and –

Dennis E. Glazer
Karen E. Wagner
Sharon Katz
Michael Russano
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4019

*Counsel for JP Morgan Chase Bank, N.A.*

_____
Robert S. Brady
M. Blake Leary
**YOUNG, CONAWAY,**
**STARGATT & TAYLOR, LLP**
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899
Tel: (302) 571-6600
Fax: (302) 571-1253

– and –

Bruce Bennett
James O. Johnston
**HENNIGAN, BENNETT & DORMAN LLP**
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Tel: (213) 694-1200

*Counsel for the Credit Agreement Lenders*

SIGNATURE PAGES FOR STIPULATED FACTS IN CONNECTION WITH MARCH 26, 2010 HEARING ON LAW DEBENTURE
TRUST COMPANY OF NEW YORK'S MOTION TO TERMINATE DEBTOR AFFILIATES' UNDISCLOSED PAYMENT OF LBO
LENDERS' FEES AND EXPENSES, FOR AN ACCOUNTING, AND FOR DISGORGEMENT OF PAST PAYMENTS

Garvan F. McDaniel (No. 4167)
**BIFFERATO GENTILOTTI LLC**
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel: (302) 429-1900
Fax: (302) 429-8600

– and –

David S. Rosner
Andrew K. Glenn
Sheron Korpus
Daniel A. Fliman
**KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP**
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700

*Counsel for Law Debenture Trust Company
of New York*

Mark D. Collins
Robert J. Stearn, Jr.
**RICHARDS, LAYTON & FINGER, P.A**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

–  and –

Dennis E. Glazer
Karen E. Wagner
Sharon Katz
Michael Russano
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4019

*Counsel for JP Morgan Chase Bank, N.A.*

Norman L. Pernick
J. Kate Stickles
**COLE, SCHOTZ, MEISEL, FORMAN &
LEONARD, PA**
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Tel: (302) 652-3131
Fax: (302) 652-3117

– and –

James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-7000

*Counsel to the Debtors and Debtors-in-Possession and
Tribune (FN) Cable Ventures, Inc.*

Robert S. Brady
M. Blake Leary
**YOUNG, CONAWAY,
STARGATT & TAYLOR, LLP**
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899
Tel: (302) 571-6600
Fax: (302) 571-1253

–  and –

Bruce Bennett
James O. Johnston
**HENNIGAN, BENNETT & DORMAN LLP**
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Tel: (213) 694-1200

*Counsel for the Credit Agreement Lenders*

SIGNATURE PAGES FOR STIPULATED FACTS IN CONNECTION WITH MARCH 26, 2010 HEARING ON LAW DEBENTURE
TRUST COMPANY OF NEW YORK'S MOTION TO TERMINATE DEBTOR AFFILIATES' UNDISCLOSED PAYMENT OF LBO
LENDERS' FEES AND EXPENSES, FOR AN ACCOUNTING, AND FOR DISGORGEMENT OF PAST PAYMENTS

Garvan F. McDaniel (No. 4167)
**BIFFERATO GENTILOTTI LLC**
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel: (302) 429-1900
Fax: (302) 429-8600

– and –

David S. Rosner
Andrew K. Glenn
Sheron Korpus
Daniel A. Fliman
**KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP**
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700

*Counsel for Law Debenture Trust Company
of New York*

Mark D. Collins
Robert J. Stearn, Jr (*No. 2915*)
**RICHARDS, LAYTON & FINGER, P.A**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

– and –

Dennis E. Glazer
Karen E. Wagner
Sharon Katz
Michael Russano
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4019

*Counsel for JP Morgan Chase Bank, N.A.*

Norman L. Pernick
J. Kate Stickles
**COLE, SCHOTZ, MEISEL, FORMAN &
LEONARD, PA**
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Tel: (302) 652-3131
Fax: (302) 652-3117

– and –

James F. Conlan
Bryan Krakauer
Kenneth P. Kansa
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-7000

*Counsel to the Debtors and Debtors-in-Possession and
Tribune (FN) Cable Ventures, Inc*

Robert S. Brady
M. Blake Leary
**YOUNG, CONAWAY,
STARGATT & TAYLOR, LLP**
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899
Tel: (302) 571-6600
Fax: (302) 571-1253

– and –

Bruce Bennett
James O. Johnston
**HENNIGAN, BENNETT & DORMAN LLP**
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Tel: (213) 694-1200

*Counsel for the Credit Agreement Lenders*

SIGNATURE PAGES FOR STIPULATED FACTS IN CONNECTION WITH MARCH 26, 2010 HEARING ON LAW DEBENTURE
TRUST COMPANY OF NEW YORK'S MOTION TO TERMINATE DEBTOR AFFILIATES' UNDISCLOSED PAYMENT OF LBO
LENDERS' FEES AND EXPENSES, FOR AN ACCOUNTING,  AND FOR DISGORGEMENT OF PAST PAYMENTS

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
**LANDIS RATH & COBB LLP**
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Tel:  (302) 467-4400
Fax:  (302) 467-4450

     –   and –

Howard Seife
David M. LeMay
Douglas E. Deutsch
**CHADBOURNE & PARKE LLP**
30 Rockefeller Plaza
New York, New York 10112
Tel:  (212) 408-5100

*Counsel to the Official Committee of Unsecured
Creditors*

Laura Davis Jones
Timothy P. Cairns
Mark M. Billion
**PACHULSKI STANG ZIEHL & JONES LLP**
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Tel:  (302) 652-4100
Fax:  (302) 652-4400

     – and –

Deborah J. Newman
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, New York 10036
Tel:  (212) 872-7481

*Counsel for Centerbridge Credit Advisors LLC*