# EXHIBIT 4

CONFIDENTIAL

```
                                                        Page 1
 1

 2    IN THE BANKRUPTCY COURT
      FOR THE DISTRICT OF DELAWARE
 3
      ------------------------x
 4
      In Re:                      Chapter 11
 5
      TRIBUNE COMPANY, et al.,    Case No. 08-13141(KJC)
 6
                  Debtors.      (Jointly Administered)
 7
      ------------------------x
 8

 9

10

11                    CONFIDENTIAL

12

13

14          DEPOSITION OF MIRIAM KULNIS

15            Friday, February 5, 2010

16              New York, New York

17

18

19

20

21

22

23    REPORTED BY:

24    Christina Diaz, RPR, CSR

25    JOB NO. 28242
```

CONFIDENTIAL

Page 2

1

2

3

4

5

6                           February 5, 2010

7                              9:00 a.m.

8

9           Deposition of MIRIAM KULNIS, pursuant to

10   notice, at the offices of Davis Polk & Wardwell,

11   LLP, 450 Lexington Avenue, New York, New York

12   10017, before Christina Diaz, a Certified and

13   Registered Professional Reporter and Notary Public

14   within and for the State of New York.

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 3

```
 1
 2              A P P E A R A N C E S
 3
 4       KASOWITZ BENSON TORRES & FRIEDMAN
 5       Attorneys for Law Debenture Trust
 6         Company of New York
 7            1633 Broadway
 8            New York, NY 10019
 9       BY:  DANIEL FLIMAN, ESQ.
10
11       DAVIS POLK & WARDWELL
12       Attorneys for JPMorgan Chase Bank
13         and Miriam Kulnis
14            450 Lexington Avenue
15            New York, NY 10017
16       BY:  DENNIS GLAZER, ESQ.
17            SHARON KATZ, ESQ.
18            MICHAEL RUSSANO, ESQ.
19
20       HENNIGAN BENNETT & DORMAN
21       Attorneys for Credit Agreement Lenders
22            865 S. Figueroa Street, Suite 2900
23            Los Angeles, CA 90017
24       BY:  JAMES JOHNSTON, ESQ.
25
```

CONFIDENTIAL

Page 4

```
 1
 2          A P P E A R A N C E S  (Continued)
 3
 4      SIDLEY AUSTIN
 5      Attorneys for Debtors
 6            One South Dearborn
 7            Chicago, IL 60603
 8      BY:  JAMES DUCAYET, ESQ.
 9
10      CHADBOURNE & PARKE
11      Attorneys for Unsecured Creditors' Committee
12            30 Rockefeller Plaza
13            New York, NY 10112
14      BY:  ALEXANDRA NELLOS, ESQ.
15
16      ALSO PRESENT:
17            LAWRENCE N. CHANEN, JPMorgan Chase & Co.
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 5

1

2                S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED,

5   by and between counsel for the respective parties

6   hereto, that the filing, sealing and certification

7   of the within deposition shall be and the same are

8   hereby waived;

9

10          IT IS FURTHER STIPULATED AND AGREED that

11   all objections, except as to the form of the

12   question, shall be reserved to the time of the

13   trial;

14

15          IT IS FURTHER STIPULATED AND AGREED that

16   the within deposition may be signed before any

17   Notary Public with the same force and effect as if

18   signed and sworn to before this court.

19

20

21

22

23

24

25

CONFIDENTIAL

1                    M. Kulnis

2    M I R I A M   K U L N I S,

3              having been duly sworn by a Notary

4         Public, was examined and testified as

5         follows:

6    EXAMINATION

7    BY MR. FLIMAN:

8         Q.    Good morning, Ms. Kulnis.  If you could

9    just identify your name and address for the record,

10   please.

11        A.    Miriam Kulnis, 671 Summit Avenue,

12   Westfield, New Jersey.

13              MR. FLIMAN:  Let's just identify

14        everybody here for the record.

15              My name is Daniel Fliman.  I'm with

16        Kasowitz Benson Torres & Friedman on behalf

17        of Law Debenture.

18              MR. JOHNSTON:  Jim Johnston, Hennigan

19        Bennet & Dorman, on behalf of Credit

20        Agreement Lenders.

21              MR. DUCAYET:  Jim Ducayet from Sidley

22        Austin, LLP on behalf of the Tribune

23        entities.

24              MS. NELLOS:  Alexandra Nellos from

25        Chadbourne & Parke on behalf of the unsecured

1                    M. Kulnis

2       creditors' committee.

3              MR. CHANEN:  Lawrence Chanen from the

4       JPMorgan legal department on behalf of

5       JPMorgan and the witness.

6              MR. RUSSANO:  Michael Russano, Davis

7       Polk & Wardwell, on behalf of JPMorgan and

8       the witness.

9              MS. KATZ:  Sharon Katz, Davis Polk &

10      Wardwell.

11             MR. GLAZER:  Dennis Glazer, Davis Polk &

12      Wardwell, on behalf of JPMorgan and the

13      witness.

14  BY MR. FLIMAN:

15      Q.    Ms. Kulnis, have you been deposed

16  before?

17      A.    Yes.

18      Q.    So I will just quickly go over some of

19  the ground rules, although I suspect you are

20  probably familiar with them.

21             I'm just going to ask that you please

22  give verbal answers to all of my questions rather

23  than nodding your head because the court reporter

24  won't be able to take that down.

25             I ask that you let me finish my question

CONFIDENTIAL

1                    M. Kulnis

2    before giving me your answer and I will do my best

3    to let you finish your answer before I ask any of

4    my questions.

5              It may happen sometimes that you will

6    remember a piece of information after you have

7    given me your answer.  I will ask that you let me

8    know if that happens and we can go back and clarify

9    or add to the record at that point.

10             MR. FLIMAN:  I would like to mark these

11         as Kulnis 1 and Kulnis 2.

12             (Kulnis Exhibits 1 and 2 were marked for

13         identification)

14    Q.    Ms. Kulnis, I'm going to ask that you

15    please take a look at both of these exhibits, and

16    for the record, Exhibit Number 1 is Law Debenture

17    Trust Company of New York's Notice of Deposition of

18    JPMorgan Chase Bank.  Exhibit 2 is Law Debenture

19    Trust Company of New York's Notice of Deposition of

20    Miriam T. Kulnis.

21             Have you seen these documents before?

22             MR. GLAZER:  Dan, just so the record is

23         clear, as we have done with the other

24         depositions of JPMorgan folks, I have

25         instructed the witness if she has seen the

CONFIDENTIAL

Page 9

1                         M. Kulnis

2        document only in preparation sessions, she is

3        to answer no, and that if the question that

4        you have asked is going to be amended to say

5        have you ever seen it before other than in

6        your preparation, so we (A) don't get a

7        messed-up record, and (B) so that she doesn't

8        disclose privileged information about what we

9        selected to show her.

10            So I just want you to understand that

11       instruction as well as your colleagues have

12       heard it before.

13            MR. FLIMAN:  If she has seen it in

14       connection with preparation --

15            MR. GLAZER:  Only.

16            MR. FLIMAN:  -- it would have been

17       selected by counsel?

18            MR. GLAZER:  Correct.

19            MR. FLIMAN:  That's fine.

20       Q.   So have you seen these documents before

21    preparation for this deposition?

22       A.   No.

23            MR. JOHNSTON:  Also, Dan, I guess while

24       we are getting into preliminaries, we have

25       been using the standard set of stipulations

CONFIDENTIAL

1                    M. Kulnis

2         for objections such as an objection for one

3         person is good for all.

4              All objections other than form have been

5         reserved and need not be made at the

6         deposition.

7              So long as that's acceptable to you, I

8         would like to put that on the record again

9         here so we don't have everybody jumping all

10        over each other.

11             MR. FLIMAN:  I'm all right with those

12        two stipulations.

13    BY MR. FLIMAN:

14        Q.    Ms. Kulnis, you are here to testify on

15    behalf of JPMorgan as well as yourself, correct?

16        A.    Yes.

17        Q.    Do you understand the distinction

18    between those two capacities?

19        A.    I'm not sure.

20        Q.    Are you aware of certain topics that you

21    have been asked to appear today about?

22        A.    Yes.

23        Q.    Could you describe those topics for me,

24    please?

25        A.    Matters regarding the payment of fees by

CONFIDENTIAL

Page 11

1                          M. Kulnis

2     the nondebtor subsidiaries of Tribune related to

3     professional fees of the agent and some of the

4     lenders on the steering committee.

5         Q.    Anything else?

6         A.    Not to my knowledge.

7         Q.    If throughout this deposition I refer to

8     JPMorgan, can we just agree that's JPMorgan Chase

9     Bank so I don't have to say it over and over again?

10        A.    Sure.

11        Q.    If we could just briefly discuss your

12    background.

13              How long have you been at JPMorgan?

14        A.    This year will be twenty-five years.

15    JPMorgan and its predecessor institutions.

16        Q.    Thank you for the clarification.  What's

17    your current position?

18        A.    Executive director.

19        Q.    Is that for a specific part of JPMorgan?

20        A.    That's just the official title.

21        Q.    Where were you employed before JPMorgan

22    or its predecessor entities?

23        A.    By the Board of Education in Bayonne,

24    New Jersey.

25        Q.    If you could just describe your

CONFIDENTIAL

1                        M. Kulnis

2     post-secondary education.

3          A.    I have a master's degree.

4          Q.    In?

5          A.    Educational administration and

6     supervision.

7          Q.    Does your role at JPMorgan focus on any

8     specific type of investment alone?

9                MR. GLAZER:  Objection to form.  You can

10          answer.

11         A.    I'm sorry.  Could you repeat that?

12         Q.    Sure.  Whether your responsibilities at

13    JPMorgan focus on one type of investment alone?

14         A.    I'm not sure what you mean by type of

15    loan or investment.

16         Q.    Well, do you focus on one specific set

17    of investments or --

18         A.    I have a portfolio that I am responsible

19    for, yes, if that's the question.

20         Q.    Is that portfolio to a specific kind of

21    field?

22         A.    Not to a specific industry, no.

23         Q.    So is it specific for distressed

24    instruments or securities?

25                MR. GLAZER:  Objection to form.

CONFIDENTIAL

Page 13

1                          M. Kulnis

2          A.    The portfolio was of loans that are in

3    distress or fear of falling into distress.

4          Q.    So is it correct to say that there could

5    be certain loans that are held in other portfolios

6    and when they become distressed or might be

7    distressed, they are moved over to your portfolio?

8          A.    Correct.

9          Q.    Who makes that determination?

10         A.    The bank has a credit policy that

11   relates to when loans need to be supervised or

12   managed by people in the special credits group.

13         Q.    What do you mean by a "credit policy"?

14         A.    There is a written policy at the firm

15   that lays out when the special credits group needs

16   to get involved in advising or managing credits.

17         Q.    So there is specific criteria?

18         A.    Yes.

19         Q.    When did the Tribune loans come under

20   your portfolio?

21         A.    I became involved just prior to the step

22   2 closing.

23         Q.    So that would be in 2007?

24         A.    Correct.

25         Q.    Have you been involved in the Tribune

CONFIDENTIAL

Page 14

                        M. Kulnis

1

2    since?

3         A.    Yes.

4         Q.    My question had actually been when it

5    came under your portfolio.  You said when you

6    became involved.  Is there a distinction?

7         A.    Yes.  Sometimes we consult with other

8    areas of the bank, but the loans aren't necessarily

9    managed by us.  We provide advice, consulting

10   services to other areas of the bank.

11        Q.    Did there come a time that the Tribune

12   loans became in your portfolio?

13        A.    Yes.

14        Q.    When was that?

15        A.    When the company filed for bankruptcy.

16        Q.    So on the day that they actually filed?

17        A.    On or about that day.

18        Q.    Do you recall whether it was before that

19   date?

20        A.    I think it was probably shortly after

21   the date.

22        Q.    When somebody moves into your portfolio,

23   it's an actual -- there is an actual -- some

24   reflection of that in some bookkeeping somewhere at

25   JPMorgan, right?

CONFIDENTIAL

1                              M. Kulnis

2        A.      There is what's called a transfer memo

3    that's done.

4        Q.      Are you the person primarily responsible

5    for the portfolio you described?

6              MR. GLAZER:   At what point in time?

7        Q.      Are you currently?

8        A.      Am I the person primarily responsible

9    for the portfolio?

10             MR. GLAZER:   She will repeat it if you

11        want.

12       A.      I'm trying to understand what you mean

13   by the portfolio I described.  I have my own

14   portfolio.

15       Q.      Okay.

16       A.      Yes.

17       Q.      And how long have you had your own

18   portfolio?

19       A.      Since I joined the special credits

20   group.

21       Q.      Which was when?

22       A.      To the best of my recollection, around

23   1996.

24       Q.      So you have had prior experience with

25   loans in your portfolio ending up in bankruptcy

CONFIDENTIAL

1                      M. Kulnis

2    where the companies that issued those loans ended

3    up in bankruptcy, right?

4         A.    Correct.

5         Q.    Other than with respect to the Tribune,

6    have you served on any other creditors' committees?

7         A.    No.

8         Q.    By that I mean bankruptcy creditors'

9    committees?

10        A.    Correct.

11        Q.    What was your involvement in the 2007

12   LBI?

13             MR. GLAZER:  Objection.  We are here to

14        talk about the fee issues and not a general

15        wide-ranging look at her work or otherwise.

16             Let's get to the fee and cover the

17        subject matter of this deposition.  She is

18        not here as a general witness for JPMorgan.

19        She is here about the fee issues.

20             MR. FLIMAN:  Okay.  Are you instructing

21        her not to answer?

22             MR. GLAZER:  Yes.

23             MR. FLIMAN:  We are trying to build up

24        to the Tribune.  I'm trying to figure out --

25             MR. GLAZER:  No, you are not.  If you

CONFIDENTIAL

1                          M. Kulnis

2          are trying to figure that out and you are

3          looking for background, get background.  This

4          is not background information.

5                MR. FLIMAN:  Are you going to let me do

6          this deposition?  I want to ask her the

7          question.  Are you telling her not to answer

8          the question?  This is not a privileged

9          matter.

10               MR. GLAZER:  Correct.  Move on.  Ask

11         about the fee issues.  Let's go.

12               MR. FLIMAN:  I'm going to get to the fee

13         issue.  This will be a lot quicker if you let

14         her answer the questions.

15               MR. GLAZER:  No.  It's going to be

16         quicker if you get to the fee issues.  Do it.

17         I'm instructing her not to answer.  Move on.

18    BY MR. FLIMAN:

19         Q.    Now, you are currently JPMorgan's

20    designee on the creditors' committee for Tribune,

21    correct?

22         A.    Correct.

23         Q.    And how did it come to pass that you

24    were selected as JPM's designee?

25         A.    I'm not sure I understand what you mean.

CONFIDENTIAL

1                    M. Kulnis

2    Do you mean how did JPMorgan select me or how was I

3    selected to go serve on the committee?

4         Q.    How did JPMorgan select you?

5         A.    I'm the person at JPMorgan responsible

6    for this credit.  I have the knowledge about the

7    day-to-day handling of this credit.  So that's why

8    I would be the person from JPMorgan who would serve

9    on the committee.

10        Q.    When is the first time that you remember

11   the issue of the Tribune paying JPMorgan other

12   lenders' fees arising?

13        A.    Well, in the ordinary course, the

14   company is obligated under the credit agreement to

15   pay fees.  So regularly I would guess we submitted

16   fees to the company prior to their filing for

17   bankruptcy and they paid them as they were required

18   to do under the credit agreement.

19        Q.    So just so I understand your testimony,

20   you are saying that you previously submitted bills

21   for professional fees to Tribune in connection with

22   the same credit agreement and they paid them?

23        A.    Yes.  It's normal for companies to pay a

24   bank's legal fees and other fees related to normal

25   transactions under the credit agreement.  So, yes,

CONFIDENTIAL

Page 19

1                    M. Kulnis

2    they did.

3        Q.    So, yes, they did.  Do you recall what

4    other payments they made?

5        A.    They made some payments in connection

6    with the closing of the loan as they were required

7    to do and they made some payments in maybe October

8    or November.

9        Q.    Of what year?

10       A.    2008.

11       Q.    So between the closing and November or

12   October, November of 2008, were any other fees paid

13   by Tribune?

14       A.    I don't know.  I don't know.  Sorry.

15       Q.    Would there be some written record if

16   there were such payments?

17       A.    I suspect there would, yes.

18       Q.    If you don't know, who would know at

19   JPMorgan?

20       A.    I'm not sure.

21       Q.    Well, who would you go to ask internally

22   whether this payment was made?

23       A.    I guess I would have to check with the

24   folks who handle -- our back-office people who

25   handle payments coming in and out, I guess, or I

CONFIDENTIAL

1                    M. Kulnis

2    would ask the person who worked on the case prior

3    to me to see if they knew if any payments were

4    submitted to the company.

5         Q.    Now, do you recall that JPMorgan

6    requested that certain fees be paid before the

7    company filed for bankruptcy?

8         A.    Yes.

9         Q.    Do you remember when that was?

10        A.    I thought it was October or November

11   2008.  Around that time frame.

12        Q.    Why were you involved with that?

13        A.    Because I was advising on the credit at

14   the time.

15        Q.    Were you advising on the credit going

16   back to 2007?

17        A.    Yes.  But it hadn't moved into my

18   portfolio yet.  So I was advising on the credit,

19   but I hadn't taken over responsibility for it yet.

20        Q.    And you took responsibility for it when?

21        A.    Around the time that the company filed

22   for bankruptcy.

23        Q.    Around the time --

24        A.    The company filed for bankruptcy.

25        Q.    Right.  But you just said that you were

CONFIDENTIAL

1                    M. Kulnis

2   involved sometime around September or October --

3        A.    Right.

4        Q.    -- in the request for fees to be paid?

5              MR. GLAZER:   She said October, November.

6              THE WITNESS:   October, November, right.

7        Q.    October, November?

8        A.    Right.

9        Q.    For the fees to be paid, but at that

10   point it hadn't moved onto your portfolio?

11        A.    Correct.

12        Q.    Is there a reason why you were involved

13   in that?

14        A.    Because I was advising the group that

15   was handling the credit at the time.

16        Q.    What I don't understand and I'm trying

17   to understand is if you are saying it is possible,

18   you just don't know, whether other payments for

19   fees were made previously, then why would you be

20   aware all of a sudden that these would have been

21   made?  What changed that would give you knowledge

22   about fees getting paid?

23              MR. GLAZER:   Objection to form.

24        A.    I don't know that anything changed.   I

25   just happen to have knowledge of these fees and I

CONFIDENTIAL

Page 22

1                        M. Kulnis

2    don't happen to have knowledge of any others.

3    Nothing really changed.

4              MR. FLIMAN:  Let's mark this as Kulnis

5        3, please.

6              (Kulnis Exhibit 3 was marked for

7        identification)

8        Q.    For the record, Exhibit 3 is an e-mail

9    with an attachment that's been Bates stamped

10   JMP2_00002780 through 2783.

11             All set?

12       A.    Yes.

13       Q.    Do you remember this e-mail exchange?

14       A.    No, I don't.

15       Q.    If you could please take a look at the

16   second e-mail here, which is the one dated November

17   26, 2008 at 4:21 p.m.

18             Do you see that?

19       A.    I see it.

20       Q.    It says, "As discussed with Miriam

21   Kulnis, please find attached the letter executing

22   the agreement for payment of retainer for the

23   professional services expenses that will be

24   incurred by JPMorgan and the other lenders."

25             Do you see that?

CONFIDENTIAL

1                    M. Kulnis

2        A.    I see it.

3        Q.    Had you had a discussion prior to this

4    e-mail being sent with Chandler Bigelow about the

5    payment of fees?

6        A.    Yes.  I believe I did.

7        Q.    What was discussed?

8        A.    That the agent was going to retain Davis

9    Polk and FTI and that the company was obligated to

10   pay those fees under the credit agreement.

11       Q.    Did Mr. Bigelow agree that the company

12   was obligated to make these payments?

13       A.    I don't recall.

14       Q.    Well, did he question whether he was

15   obligated to pay them?

16       A.    I don't recall.

17       Q.    Was there any discussion about whether

18   Tribune was, in fact, obligated to make these

19   payments?

20       A.    Not to my recollection.

21       Q.    So the conversation basically said you

22   said JPM is entitled to these, the company has to

23   pay it, and there was no further discussion than

24   that?

25            MR. GLAZER:  Objection to form.

CONFIDENTIAL

1                    M. Kulnis

2        A.    To my recollection, I advised him of the

3    fees and that's all I recall.

4        Q.    So did the issue of Tribune's obligation

5    to pay those fees not even came up?

6        A.    Sure, it came up.

7        Q.    So you did more than just advise him of

8    the fees.  You also discussed the fact that Tribune

9    had to pay those fees, right?

10       A.    That comes under the umbrella of advised

11   him of the fees.  I didn't just call him and give

12   him a dollar amount.  I called him and told him

13   that we were retaining professionals and the fees

14   were required to be reimbursed under the credit

15   agreement.

16       Q.    And his reaction was what?

17       A.    I don't recall.

18       Q.    Presumably if you are sending this

19   letter, he didn't say flat out, No, we are not

20   paying the fees, right?

21            MR. GLAZER:  Objection to form.

22       A.    I didn't -- to my recollection, I didn't

23   send this letter.  It's not signed by me.

24       Q.    I'm sorry?

25       A.    I didn't send this letter, to my

CONFIDENTIAL

Page 25

1                      M. Kulnis

2    recollection.  It's not signed by me.

3        Q.    You don't remember this letter?

4             MR. GLAZER:  Objection to form.  That's

5        not her testimony.  You are going to have to

6        listen to what she says.  It's really

7        important.

8             MR. FLIMAN:  Are you going to sit here

9        and lecture me?

10            MR. GLAZER:  If you need it, I'm going

11       to.  You should ask better questions.  Come

12       on.

13       A.    You asked me if --

14       Q.    Let's go back.

15       A.    Yes.

16       Q.    Do you remember seeing this letter

17   before preparation for your deposition?

18       A.    I do not.

19       Q.    Were you aware that the company had

20   agreed to pay a retainer to JPMorgan?

21       A.    I believe I was, yes.

22       Q.    How did you become aware of that?

23       A.    I believe Chandler Bigelow, in some

24   later discussion, told me that they would send me a

25   retainer.

CONFIDENTIAL

1                        M. Kulnis

2        Q.    Do you remember when that conversation

3    occurred?

4        A.    I don't remember the date.

5        Q.    Was it before the company had filed for

6    bankruptcy?

7        A.    Yes, it was.

8        Q.    Did there come a time that the company

9    sent a retainer to JPMorgan?

10       A.    Yes.

11       Q.    Was that before the company filed for

12   bankruptcy?

13       A.    To the best of my recollection, yes.

14       Q.    When you had the conversation with

15   Mr. Bigelow that we discussed, the one that's

16   reflected in this e-mail, did you know at the time

17   that the company may file for bankruptcy?

18       A.    I don't recall.

19       Q.    Did you know at any point before the

20   company filed for bankruptcy that it may file for

21   bankruptcy?

22       A.    I knew that there was a risk that the

23   company may file for bankruptcy.  There are

24   oftentimes risks, but I didn't know that the

25   company had any plans on filing for bankruptcy.

CONFIDENTIAL

1                    M. Kulnis

2      Q.    When you say there was a risk, is there

3  any particular risk about Tribune?

4      A.    The company's performance had begun to

5  decline and there were questions about whether they

6  would have a covenant default at the end of the

7  year.

8      Q.    Which covenant was that?

9      A.    To the best of my recollection, it was

10  the maximum leverage covenant.

11      Q.    Did the issue of Tribune possibly

12  tripping this covenant come up in your conversation

13  with Mr. Bigelow that's referenced in this e-mail?

14      A.    Not to my recollection, no.

15      Q.    Did anybody at JPMorgan have a

16  conversation with anybody at Tribune, to your

17  knowledge, about the fact that Tribune may trip

18  this covenant before it filed for bankruptcy?

19           MR. DUCAYET:  Objection to the form of

20      the question.

21      A.    I had conversations with the company

22  before they filed for bankruptcy about whether or

23  not they may trip a covenant.  There may have been

24  others as well.

25      Q.    With whom did you have those

CONFIDENTIAL

Page 28

1                       M. Kulnis

2     discussions?

3          A.    Chandler Bigelow.

4          Q.    So would this be after this

5     conversation?

6          A.    I don't recall.

7          Q.    I had asked before specifically about

8     your knowledge about the bankruptcy filing, but now

9     let me ask it generally.

10               Did anybody at JPMorgan know that

11    Tribune may file for bankruptcy before they filed

12    for bankruptcy?

13               MR. DUCAYET:  Objection to the form of

14          the question.

15         A.    I don't know what other people at

16    JPMorgan knew and when they knew it.

17         Q.    You are here to testify on behalf of

18    JPMorgan, not just your personal knowledge, right?

19         A.    Yes.

20         Q.    Did you discuss with anybody internally

21    at JPMorgan before your deposition today when they

22    learned about the bankruptcy filing?

23         A.    No, I did not.

24         Q.    So is it possible that somebody at

25    JPMorgan knew that the company could file before

CONFIDENTIAL

1                          M. Kulnis

2    they filed for bankruptcy?

3              MR. GLAZER:  Objection to form.

4         A.    It is possible that they knew that.

5         Q.    Are you aware of any discussions between

6    JPMorgan and Tribune before they filed for

7    bankruptcy about which entities of the Tribune

8    family would file for bankruptcy?

9         A.    No.  I do not -- I don't recall any.

10        Q.    You didn't have any such discussions?

11        A.    I did not.

12        Q.    Are you aware that certain entities of

13   the Tribune family did not file for bankruptcy?

14        A.    I'm aware of that now, yes.

15        Q.    How did you become aware of that?

16        A.    Shortly after the company filed, it was

17   probably two or three days afterwards, my financial

18   advisers, FTI told us.  We looked at the filings

19   and they told us that some of the subsidiaries had

20   not filed for bankruptcy.

21        Q.    Sitting here today, do you have an

22   understanding of how Tribune selected which

23   companies would file and which wouldn't?

24        A.    I do not.

25        Q.    One of the entities that did not file

CONFIDENTIAL

Page 30

1                         M. Kulnis

2     was Tribune (FN) Cable Ventures, Inc., is that

3     correct?

4          A.    I believe so.

5          Q.    If I refer to that entity as TCV, can we

6     agree we know what we mean?

7          A.    Sure.

8          Q.    Now, there came a time that JPMorgan had

9     discussions with a company about a forbearance

10    agreement, correct?

11         A.    Correct.

12         Q.    Do you recall those discussions

13    generally?

14         A.    Yes.

15         Q.    Do you recall how the concept of a

16    forbearance agreement first came up?

17         A.    I don't recall the date.

18         Q.    Do you recall how it came up?

19         A.    Yes.

20         Q.    How did it first come up?

21         A.    Lenders -- after the company filed for

22    bankruptcy, many lenders were very concerned and

23    were asking JPMorgan whether or not we should

24    exercise rights against the nondebtor subsidiaries.

25         Q.    Just to be precise, when you say

CONFIDENTIAL

1                       M. Kulnis

2    "lenders," these would be lenders for which

3    JPMorgan is an agent?

4         A.    Correct.

5         Q.    So you were involved in discussions of

6    whether JPMorgan should exercise remedies?

7         A.    Correct.  I was in discussions with

8    lenders, other lenders, about whether JPMorgan

9    should exercise remedies against those subsidiaries

10   that had not filed.

11        Q.    Had there been any basis to exercise

12   remedies at that point?

13        A.    Yes.

14        Q.    What gave rise to that?

15        A.    The company's filing.

16        Q.    So the company's filing gave rise to

17   some event that would have permitted JPM -- or its

18   view was that JPM would be able to exercise

19   remedies against the nondebtors?

20        A.    The filing of bankruptcy is a default

21   under the credit agreement, which would have

22   entitled the lenders to exercise rights against

23   those entities that had not filed.

24        Q.    So my question was:  How did the idea of

25   a forbearance agreement first come up and I believe

CONFIDENTIAL

1                         M. Kulnis

2    your answer was there was discussion by the lenders

3    about whether they should exercise remedies.

4               I'm not sure that answers the question.

5         A.    And I informed the company, to the best

6    of my recollection, about concerns that we had

7    about exercising rights against those entities.

8               And then a discussion of the forbearance

9    agreement and payment of fees in return for not

10   exercising rights came about.

11        Q.    When did you inform the company of this?

12        A.    I don't remember the date.

13        Q.    This is all after the bankruptcy filing

14   obviously, right?

15        A.    Correct.

16        Q.    So this would be in December or January?

17        A.    That's probably right.

18        Q.    When you had discussions about a

19   potential forbearance agreement, JPMorgan had not

20   exercised any rights against the nondebtors'

21   collateral yet, right?

22        A.    Correct.

23        Q.    Had JPMorgan demanded payment of

24   professional fees at that point?

25        A.    I don't recall.

CONFIDENTIAL

Page 33

1                         M. Kulnis

2         Q.     Had you made a demand for payment of

3     professional fees?

4         A.     I don't recall.

5         Q.     Well, if you had made that demand, would

6     it have been in writing?

7                MR. GLAZER:  Objection to form.

8         A.     I don't know.  Normally demand letters

9     are in writing.  I don't remember if I made a

10    formal demand, if I sent a demand letter.  I just

11    don't recall.

12        Q.     Were there any internal JPMorgan

13    discussions -- now this is not including your

14    lawyer, so any internal JPMorgan discussions about

15    whether to request payment of those fees?

16        A.     I believe there were.

17        Q.     Do you remember any specific

18    conversations?

19        A.     No.

20        Q.     So what leads you to believe that those

21    conversations occurred?

22        A.     I remember speaking to my supervisor

23    about the fact that there were fees due and what we

24    -- discussing how we might be able to get those

25    paid, but I don't remember specific discussions.

CONFIDENTIAL

1                     M. Kulnis

2        Q.    What were some of the ways that you came

3   up with to get those fees?

4        A.    Well, we informed the lenders that we

5   would have to start making demand on the lenders

6   for the payment of the fees.  And the lenders were

7   obviously not very happy about that.  And that's

8   when they started to discuss exercising rights

9   against the nondebtor subsidiaries.

10       Q.    When did you inform the lenders that you

11  may have to ask them to pay the fees?

12       A.    Shortly after the company filed for

13  bankruptcy.

14       Q.    Did JPMorgan actually demand that they

15  pay it?

16       A.    Demand that who pay it?

17       Q.    Did JPMorgan at that point actually

18  demand that the lenders pay these fees?

19       A.    No.  Not to the best of my recollection.

20            MR. FLIMAN:  Let's mark this as Kulnis

21       4, please.

22            (Kulnis Exhibit 4 was marked for

23       identification)

24       Q.    I'm going to ask you to please read

25  through that.  You are more than welcome to.  You

1                    M. Kulnis

2    don't need to read every single word of it.  I'm

3    going to draw your attention to specific parts.

4            For the record, we have marked as

5    Exhibit 4 an e-mail with an attachment that's been

6    Bates stamped TRB_LD000021 through 33.

7            Let me just back up and ask a couple

8    more questions before we move on to that.

9            Before you had mentioned that there was

10   discussion about the lenders having to pay

11   JPMorgan's fees sometime after the bankruptcy

12   filing?

13       A.    Correct.

14       Q.    And their reaction, the lenders'

15   reaction, was maybe we should exercise remedies,

16   maybe JPMorgan should exercise remedies.  Right?

17            So my question is:  What was JPMorgan's

18   reaction to the suggestion that JPMorgan should

19   exercise remedies against the nondebtors?

20       A.    I can tell you what my reaction was.

21   When you say "JPMorgan," I'm not sure what others'

22   reaction at the firm was.  I can tell you what my

23   reaction was.  Is that what you would like to know?

24       Q.    I would like to know both.  Let's start

25   with your reaction first.

CONFIDENTIAL

Page 36

                        M. Kulnis

1

2      A.    My reaction was I called the company.  I

3  discussed it with them and I discussed it with my

4  counsel.

5      Q.    Who did you call at the company?

6      A.    Chandler Bigelow.

7      Q.    What was his reaction?

8      A.    He was very concerned about exercising

9  remedies against -- he expressed his concern about

10 exercising remedies against the nondebtors.  He

11 didn't want us to do it.

12     Q.    Not very surprising, I gather, but what

13 did you say in return?

14     A.    I told him that I was very concerned;

15 that the lenders were very upset; and that pursuant

16 to the credit agreement, a number of lenders can

17 require JPMorgan to take action.

18     Q.    What happened next?

19     A.    I don't recall.

20     Q.    So now other than -- your reaction was

21 to call Chandler Bigelow.

22           What other reactions were there at

23 JPMorgan to the request to exercise remedies?

24     A.    I don't recall.

25     Q.    Well, did you have any discussions

CONFIDENTIAL

Page 37

```
 1                      M. Kulnis
 2   internally at JPMorgan about that?
 3              MR. GLAZER:  You should exclude any
 4         discussions with counsel, even internal
 5         counsel at JPMorgan.
 6         A.    I don't recall specific discussions that
 7   I had with anyone internally.
 8         Q.    In preparing for your deposition today,
 9   did you discuss -- other than with lawyers, did you
10   discuss the concept -- let me back up.
11              Did you discuss events that transpired
12   in January of 2009 relating to Tribune with anybody
13   at JPMorgan?
14         A.    No.
15         Q.    So if we could turn to Exhibit 4.  To
16   your recollection, was this the first draft of a
17   forbearance agreement?
18         A.    I have no idea.
19         Q.    You don't know whether this was the
20   first draft?
21         A.    I don't know whether this was the first
22   draft or the second draft or the third draft.  I
23   don't know.
24         Q.    Do you recall who prepared the first
25   draft?
```

CONFIDENTIAL

Page 38

1                           M. Kulnis

2          A.     No, I don't.  Sorry.

3          Q.     Well, did you have discussions about the

4    preparation of a forbearance agreement, other than

5    with your counsel?

6          A.     Other than with counsel, no.

7          Q.     When was the first time that you saw a

8    draft of the forbearance agreement?

9          A.     I don't recall.

10         Q.     Well, have you seen a draft of the

11   forbearance agreement?

12         A.     I have seen drafts of a forbearance

13   agreement, yes.

14         Q.     Was that in preparation for this

15   deposition or before?

16         A.     Before.

17         Q.     If I could turn your attention to page 4

18   of the forbearance agreement, which is the page

19   Bates stamped TRB_LD 000025 and the provision about

20   forbearance covenants.  It's section (a) there.

21                Would you agree that this provision

22   would provide for the payment of professional fees

23   to JPMorgan?

24                MR. GLAZER:  Objection to form.

25         A.     Sorry.  Can you ask the question again.

CONFIDENTIAL

Page 39

1                    M. Kulnis

2          MR. FLIMAN:  Would you mind repeating

3     the question?

4          (Question read)

5     A.    Yes.

6     Q.    Were you involved in discussions about

7     the forbearance agreement?

8     A.    Yes.

9     Q.    And broadly speaking, one of the

10     conditions of the forbearance was these fees would

11     be paid by the company or by the nondebtors,

12     correct?

13     A.    Correct.

14     Q.    There were other conditions as well,

15     correct?

16     A.    There were other conditions to the

17     forbearance agreement?

18     Q.    Correct.  To the forbearance.

19     A.    Correct.

20     Q.    Do you remember what they were?

21     A.    The delivery of a blocking notice to

22     Merrill Lynch, I believe, was a condition to the

23     forbearance agreement.

24          At one point in time it was a condition

25     that the -- well, okay.  Let me make sure I

CONFIDENTIAL

Page 40

1                         M. Kulnis

2    understand.  You are asking what were the

3    conditions to the -- what were all the requirements

4    under the forbearance agreement or what were the

5    conditions for them to make payment to us?

6        Q.    The conditions for JPMorgan to continue

7    to forbear.

8        A.    Payment of fees and, I believe, a

9    delivery of a blocking notice to Merrill Lynch.

10       Q.    What was that blocking notice, can you

11   describe that?

12       A.    It was a notice to Merrill Lynch which

13   prevented them from getting payments from the

14   company until JPMorgan was paid in full is how I

15   recall it.

16       Q.    When you say "the company," who are you

17   referring to?

18       A.    To any -- to the parent or any

19   subsidiary.  Any party under the credit agreement.

20       Q.    So the debtors and nondebtors, correct?

21       A.    Correct.

22       Q.    And that was based upon an event of

23   default occurring under the credit agreement with

24   JPM?

25            MR. GLAZER:  What was based?  Objection.

CONFIDENTIAL

1                          M. Kulnis

2       A.    Yes.  I'm not sure I understand.

3       Q.    Sure.  I will clarify.

4             The blocking notice said to Merrill

5    Lynch that they couldn't take certain actions,

6    correct?

7       A.    Correct.

8       Q.    And that letter came from JPMorgan?

9       A.    Correct.

10      Q.    What gave JPMorgan the right to tell

11   Merrill Lynch not to do certain things?

12      A.    I believe -- my recollection is the

13   documents, the credit agreement and intercredit

14   agreement provide that if there is a default, we

15   can deliver -- if there is a default under the

16   credit agreement, we can deliver such -- we have

17   the right to deliver such blocking notice to

18   Merrill Lynch.

19      Q.    Did you deliver a blocking notice?

20      A.    I believe we did, yes.

21      Q.    What was the event of default that had

22   occurred?

23      A.    The filing of bankruptcy.

24            MR. FLIMAN:  If we could mark this as

25      Kulnis 5, please.

CONFIDENTIAL

Page 42

```
 1                    M. Kulnis

 2            (Kulnis Exhibit 5 was marked for

 3       identification)

 4       Q.    For the record, we have marked as

 5  Exhibit 5 an e-mail with two attachments that have

 6  been Bates stamped TRB_LD 000042 through 69.

 7            If you would please read through that,

 8  Ms. Kulnis, and, again, I'm going to call your

 9  attention to specific provisions, but you are more

10  than welcome to read the whole thing.

11            MR. DUCAYET:  Dan, let me just point

12       out, in the original there are two

13       attachments, a copy of the clean, revised

14       forbearance agreement and a redlined as well.

15            MR. FLIMAN:  I did not give you that?

16       You should have both, and if you don't, I

17       apologize.

18            MR. DUCAYET:  I don't.

19            MS. KATZ:  Here is one that has it.

20            MR. DUCAYET:  Thanks.

21  BY MR. FLIMAN:

22       Q.    Now, the exhibit that we had just looked

23  at before, which was Exhibit 4, was a draft of the

24  forbearance agreement that was prepared by Davis

25  Polk, correct?
```

CONFIDENTIAL

Page 43

                              M. Kulnis

1

2       A.    I don't know who prepared it.

3       Q.    Well, it was transmitted by Davis Polk,

4   can we agree to that?

5       A.    That seems to be the case, yes.

6       Q.    Do you have a reason to think that they

7   transmitted it without preparing it?

8             MR. GLAZER:  Objection to form.

9       A.    I have no idea.

10      Q.    On Exhibit 5, we see what appears to be

11  comments to the forbearance agreement, correct?

12            MR. GLAZER:  Objection.

13      A.    That appears to be a black line of the

14  forbearance agreement, correct.

15      Q.    As well as a clean draft, correct?

16      A.    Yes.

17      Q.    And this was transmitted, if you look at

18  the e-mail chain, by Sidley Austin, correct?

19      A.    It looks like it's from her, yes.

20      Q.    And Sidley represents who?  Who does

21  Sidley represent?

22      A.    Tribune and the nondebtor subsidiaries.

23      Q.    So these would be revisions that were

24  made by Sidley on behalf of the debtors and the

25  nondebtor subsidiaries, is that correct?

CONFIDENTIAL

Page 44

1                    M. Kulnis

2              MR. GLAZER:  Objection to form.

3      A.    I don't know who made the revisions.  It

4   seems that Sidley transmitted it.  I don't know who

5   made the revision.

6      Q.    Do you have a reason to think that

7   Sidley is transmitting revisions that somebody else

8   made?

9              MR. GLAZER:  Objection to form.

10     A.    I don't really know.

11     Q.    Have you seen these revisions before?

12     A.    I have seen revised drafts before.  I

13   don't recall if I have seen this exact one.

14     Q.    If I can turn your attention to the page

15   that's been Bates stamped TRB_LD 000064.

16              Did you locate that page?

17     A.    Yes.

18     Q.    If you look at section 4 which is in the

19   middle of that page, do you see that?

20     A.    I do.

21     Q.    Can you please describe to me if you

22   know what this provision addresses?

23     A.    It's conditions to the effectiveness of

24   the forbearance agreement.

25     Q.    What do you understand that to mean?

CONFIDENTIAL

Page 45

1                    M. Kulnis

2       A.    I understand that to mean that these

3  things have to occur for the forbearance agreement

4  to be in full force and effect.

5       Q.    So if those conditions don't occur,

6  JPMorgan doesn't have to forbear, correct?

7            MR. GLAZER:   Objection to form.

8       A.    That's how I understand it, yes.

9       Q.    If you look at the revisions that have

10 been made, there has been a subset 2 that's been

11 added there.

12           Do you see that?

13      A.    I do.

14      Q.    And it reads, "The bankruptcy court has

15 entered an order authorizing the debtors to enter

16 into and perform in accordance with this

17 forbearance agreement," correct?

18      A.    That's how it reads, correct.

19      Q.    Did you have any discussions about the

20 addition of this language to the forbearance

21 agreement?

22      A.    I believe that may be a privileged

23 discussion.

24      Q.    So other than with counsel, did you have

25 any discussions?

CONFIDENTIAL

1                    M. Kulnis

2      A.    I don't recall.

3      Q.    Did you see this markup of the

4  forbearance agreement before it was transmitted, or

5  before it was received rather?

6           Strike that.

7           You have seen this markup of the

8  forbearance agreement before, correct?

9           MR. GLAZER:  That's not her testimony.

10     She said she saw --

11     A.    I said I have seen a draft before.  I

12  don't know if I have seen this draft before.

13     Q.    Have you seen a draft or have you seen a

14  markup of the forbearance agreement that includes

15  this change before?

16     A.    I don't recall.

17     Q.    So what do you understand this

18  modification, if you have an understanding, to

19  mean?

20          MR. GLAZER:  Objection to form.

21     A.    When you say "this modification," which

22  one in particular do you mean?

23     Q.    The specific one we just identified

24  which is subset 2 of paragraph 4.

25     A.    I understand this to mean that the

CONFIDENTIAL

1                        M. Kulnis

2    bankruptcy court has to enter an order authorizing

3    the debtors to execute the forbearance agreement

4    and perform in accordance with it as a condition to

5    the effectiveness of the forbearance agreement.

6         Q.    Did you have any discussions, not with

7    counsel, about the requirement of bankruptcy court

8    approval of the forbearance agreement?

9         A.    Can you please reread that question?

10             (Question read)

11        A.    Not that I recall.

12        Q.    And I guess more broadly speaking, did

13   you have any discussions, not with counsel,

14   generally, about not necessarily the requirement,

15   but about whether the bankruptcy court would

16   approve the forbearance agreement?

17             MR. DUCAYET:  Object to the form of the

18        question.

19        A.    I don't recall.

20        Q.    Was a forbearance agreement ever signed?

21        A.    Not to my knowledge.

22        Q.    Do you know why not?

23        A.    I do not.

24        Q.    You just know that there were some

25   discussions about it, but it just never happened?

Page 48

1                    M. Kulnis

2        A.    Correct.

3        Q.    Didn't you inquire why there was no

4    forbearance agreement signed?

5        A.    There were many discussions about

6    various issues in the forbearance agreement and

7    whether or not one would be signed.  I don't

8    remember the specific reasons for the failure to

9    execute it.

10              I remember the company decided not to

11   execute it.  I don't know why.  I don't recall why

12   they decided not to execute it.

13       Q.    Did you ask why?

14       A.    I don't recall.

15       Q.    You just answered with "the company."

16   You mean, again, the debtor and the nondebtor

17   subsidiaries?

18       A.    I believe this draft of the forbearance

19   agreement was -- I don't believe any -- the debtor

20   or any of the subsidiaries executed it, correct.

21       Q.    Were there specific issues that may have

22   caused the company not to sign the forbearance

23   agreement?

24              MR. GLAZER:  Objection to form.

25       A.    I have no idea.

Page 49

1                        M. Kulnis

2        Q.    Well, did you have discussions about

3   whether the company would sign the forbearance

4   agreement?

5              MR. GLAZER:  Other than with counsel.

6        A.    While there were discussions around the

7   terms of the forbearance agreement, we were

8   attempting to get to an agreement that would be

9   acceptable to the nondebtor subsidiaries and to the

10  lenders.  So normal negotiations around those terms

11  were geared toward getting an agreement that the

12  nondebtor subsidiaries would sign.

13       Q.    Which terms were being negotiated?

14       A.    What sort of reporting had to get done,

15  the term of the forbearance period.  I know that

16  was one thing that we discussed.  What sort of

17  other requirements there were around monthly

18  reporting and ministerial things like that, how

19  quickly they had to pay the fees and expenses,

20  whether or not Kramer Levin would be included in

21  those fees and expenses.  Those sorts of

22  discussions.

23       Q.    Was one of the terms that was being

24  negotiated whether the bankruptcy court would need

25  to approve the forbearance agreement?

CONFIDENTIAL

1                       M. Kulnis

2       A.    I'm not sure what you mean by

3    "negotiated."

4       Q.    I believe it was your term, but

5    discussed, otherwise addressed?

6             MR. GLAZER:   Let's ask it in a clean

7       question.

8       Q.    Was one of the terms that was being

9    discussed, addressed, or negotiated whether the

10   bankruptcy court would need to approve the

11   forbearance agreement?

12      A.    I don't recall having discussions with

13   the company, the nondebtor subsidiaries, or anyone

14   other than counsel about whether or not the

15   bankruptcy court would have to approve the

16   forbearance agreement.

17      Q.    Do you know whether anybody else at

18   JPMorgan had those discussions?

19      A.    I don't know.

20      Q.    I'm sorry?

21      A.    I don't know.  I think I was the person

22   at JPMorgan primarily having those discussions.

23      Q.    Did you have any discussions with other

24   members of the unsecured creditors' committee about

25   whether the company would need to seek bankruptcy

CONFIDENTIAL

Page 51

1                    M. Kulnis

2    court approval of the forbearance agreement?

3        A.    No.  I don't recall having discussions

4    with the unsecured creditors' committee about the

5    forbearance agreement.

6             MR. GLAZER:  If we have reached an

7         appropriate breaking point, let's take a few

8         minutes.

9             MR. FLIMAN:  Yes.  Please.

10            (Time noted:  10:10 a.m.)

11            (Recess)

12            (Time noted:  10:20 a.m.)

13            MR. FLIMAN:  We are back on the record.

14            I would like to mark this as the next

15       exhibit which, I believe, is 6.  Kulnis 6,

16       please.

17            (Kulnis Exhibit 6 was marked for

18       identification)

19   BY MR. FLIMAN:

20       Q.    For the record, this is an e-mail chain

21   that's been Bates stamped TRB_LD 000073 through 74.

22   If you could please read that, Ms. Kulnis.

23            Starting with the earliest e-mail, which

24   is on the second page --

25            MR. GLAZER:  January 22, 11:49?

CONFIDENTIAL

Page 52

1                    M. Kulnis

2            MR. FLIMAN:  Correct.

3       Q.    Your e-mail is, "Sorry with regard to my

4   prior e-mail.  We are requesting a call at 10:00

5   a.m. eastern."

6       A.    "10:30 a.m."

7       Q.    "10:30 a.m. eastern."

8            Do you recall sending this e-mail?

9       A.    I don't.

10      Q.    Reading this now, do you remember what

11  this is about?

12      A.    Reading the entire chain?

13      Q.    Specifically about the call.

14      A.    No.

15      Q.    Do you remember what the call was to be

16  about?

17      A.    I do not.

18      Q.    Looking at chronologically the next

19  e-mail, which is an e-mail from Nils Larsen to

20  yourself and others, and looking at the second

21  paragraph of that e-mail, so now we are at the top

22  of TRB_LD 000074, and that paragraph reads, "I

23  believe that Bryan will be reaching out to DPW to

24  ascertain a sense for the open items to help make

25  the call more productive tomorrow, if possible."

CONFIDENTIAL

Page 53

1                    M. Kulnis

2            Do you see that language?

3      A.    I do.

4      Q.    Do you know what Bryan refers to, who

5  that refers to?

6      A.    I believe it's Bryan Krakauer.

7      Q.    Who is?

8      A.    An attorney at Sidley Austin.

9      Q.    Do you know what Mr. Larsen means by

10  "open items"?

11      A.    I do not.

12      Q.    Did you at the time understand what

13  "open items" meant?

14      A.    Well, I don't recall this e-mail, so I

15  don't know what I knew at the time.  Sorry.

16      Q.    If you would have received an e-mail and

17  didn't understand it, presumably you would have

18  asked, correct?

19            MR. GLAZER:  Objection to form.

20      A.    If I don't understand something,

21  generally I ask about it.

22      Q.    Having reviewed the rest of the e-mail

23  chain --

24      A.    I have.

25      Q.    Have you?

CONFIDENTIAL

 1                    M. Kulnis

 2      A.    I have reviewed it, yes.

 3      Q.    Is it possible that open items referred

 4   to the forbearance agreement?

 5            MR. GLAZER:  Objection to form.

 6      A.    It's possible that it did.  It's

 7   possible that it referred to other things as well,

 8   I guess.

 9      Q.    Well, if we continue going up, the next

10   e-mail chronologically is from yourself to

11   Mr. Larsen?

12      A.    Correct.

13      Q.    And the re line, the subject line on

14   that e-mail is, "Forbearance issues."

15            Do you see that?

16      A.    Yes.

17      Q.    So the e-mail, the text of your e-mail

18   does involve forbearance issues, correct?

19            MR. GLAZER:  Objection to form.

20      A.    I'm sorry.  Are you asking me if this

21   e-mail refers to forbearance issues, this one right

22   here?

23            MR. GLAZER:  She is pointing to January

24      22nd, 4:42.

25      Q.    Yes.

CONFIDENTIAL

Page 55

1                    M. Kulnis

2      A.    Yes.   That does refer to forbearance

3  issues.

4      Q.    The first sentence of your e-mail -- and

5  we are referring to the 4:42 e-mail in the middle

6  of the page -- is, "Well, I can tell you that one

7  of the big issues is the desire to make the debtors

8  parties to the agreement."

9            Do you see that?

10      A.    I do.

11      Q.    "The agreement" being the forbearance

12  agreement, is that your understanding?

13      A.    Yes.

14      Q.    Whose desire was it to make the debtors

15  a party to the forbearance agreement?

16      A.    I believe it was the company's desire.

17      Q.    Did JPM agree with making the debtor a

18  party to the forbearance agreement?

19      A.    We did not.

20      Q.    Why not?

21      A.    The benefit was going to the nondebtor

22  subsidiaries.   So in my mind, the nondebtor

23  subsidiaries should have been parties to the

24  forbearance agreement.   There was no need for the

25  debtor to be a party to the agreement.

CONFIDENTIAL

Page 56

1                          M. Kulnis

2        Q.    Was there a downside to JPM of having

3    the debtor be a party to the agreement?

4        A.    I'm not sure what you mean by a

5    "downside."

6        Q.    A detriment?

7        A.    I don't know.  I felt -- I remember

8    feeling that it wasn't appropriate, thinking that

9    it wasn't appropriate.  The appropriate thing was

10   to have the nondebtors be parties to the agreement.

11   The nondebtors were getting a benefit of the

12   forbearance.  It would be appropriate to have the

13   nondebtors be parties to the agreement.

14       Q.    So if we keep reading your e-mail and if

15   we actually look at the third sentence -- actually,

16   let's just go to the second sentence.  You say, "I

17   think the SC," and would you agree that the SC

18   would be the steering committee of lenders?

19       A.    Yes.

20       Q.    So, "I think the SC feels that it's best

21   if only nondebtors are parties and it would be more

22   likely to get approved by the court if the debtors

23   were not a party."

24             Do you see that?

25       A.    Yes.

CONFIDENTIAL

1                    M. Kulnis

2        Q.    Did you have discussions with the

3    steering committee about this?

4        A.    I believe that's privileged.

5        Q.    Discussions with the steering committee?

6        A.    Because counsel was on the phone at the

7    time.

8        Q.    Is JPM one of the steering committee

9    members?

10       A.    Yes.

11       Q.    Which counsel was on the phone?

12       A.    Davis Polk.

13       Q.    Who specifically, do you recall?

14       A.    I don't recall.

15       Q.    Well, did the steering committee feel

16   that it's best if only nondebtors are parties?

17       A.    I guess you would have to ask the

18   steering committee.  I mean, they expressed -- I

19   don't recall if they -- if you are asking me to

20   interpret what they felt, I think it was the belief

21   of the steering committee that nondebtors should be

22   parties to the agreement similarly to JPMorgan.

23       Q.    The next sentence reads, "We are worried

24   that if the debtors are parties, the UCC" -- and

25   that's the unsecured creditors' committee?

Page 58

1                     M. Kulnis

2      A.    Yes.

3      Q.    -- "may object to it and it would get

4  denied."

5            Do you see that language?

6      A.    I do.

7      Q.    Who are you referring to when you say

8  "we" in that sentence?

9      A.    I believe I'm referring to the steering

10 committee.

11     Q.    What led you to believe that the UCC

12 could object?

13           MR. GLAZER:  Objection to form.

14     A.    Once again, I believed -- what led me to

15 that conclusion was that the appropriate parties

16 were the nondebtor subsidiaries.  Not the debtor.

17 So if the debtor was a party to the agreement, the

18 UCC might object to that.

19     Q.    What was the debtor being asked to do in

20 the agreement?

21           MR. GLAZER:  Objection to form.

22     A.    I would have to go back and look at the

23 agreement.  I'm sorry.  I don't remember.  It was a

24 while ago.

25     Q.    So your testimony is you thought the UCC

CONFIDENTIAL

Page 59

1                           M. Kulnis

2      may object purely because the debtor was signing an

3      agreement that they are not receiving the benefit

4      to, is that correct?

5                  MR. DUCAYET:  Objection to form of the

6            question.

7                  MR. GLAZER:  Objection.

8            A.    Could you restate that or --

9            Q.    Sure.  I will put it differently.

10     Better.

11           A.    Yes.  More better.

12           Q.    One of the reasons that you identified

13     that you were worried that the UCC may object is

14     because the debtor was a party.  Let me start

15     again.

16                  You were concerned the UCC may object to

17     the forbearance agreement if the debtor was a

18     party, correct?

19           A.    Correct.

20           Q.    And you identified that one of the

21     reasons you thought that was because you believed

22     the UCC would think that the debtor should not be a

23     party because they are not receiving a benefit, is

24     that correct?

25           A.    I didn't say that.  I said I thought

CONFIDENTIAL

Page 60

1                          M. Kulnis

2    that -- the way I looked at this was it was -- the

3    appropriate parties to the forbearance agreement

4    were the nondebtors.  I thought that other people

5    would have -- including the UCC would have that

6    view as well.  So it was not appropriate for the

7    debtor to be a party to this agreement.

8        Q.    What did you base that belief on?

9        A.    That the benefit of forbearance was to

10   the nondebtor subsidiaries.  Not to the debtor.

11       Q.    I'm sorry.  Let me clarify.

12             What did you base the belief on as to

13   how the UCC would react?

14       A.    Just based on what I thought was

15   appropriate.  I always think that other people

16   think the same thing I do.

17       Q.    Did you have any discussions with the

18   UCC about this?

19       A.    About which in particular, please?

20       Q.    About whether the debtors should be a

21   party to the forbearance agreement.

22       A.    Not that I recall.  I don't recall

23   having discussions with the UCC about a forbearance

24   agreement at all.

25       Q.    Are you aware of any discussions anybody

CONFIDENTIAL

Page 61

                              M. Kulnis

1

2    else had with the UCC about whether the debtor

3    should be a party?

4         A.    A party to the forbearance agreement?

5         Q.    Yes.

6         A.    No.  I'm not aware of any other

7    discussions anyone had.

8         Q.    The end of your sentence says, "It would

9    get denied."

10              Do you see that language?

11        A.    Yes.

12        Q.    Would you agree that that refers to the

13   forbearance agreement getting -- that approval of

14   the forbearance agreement getting denied by the

15   court?

16              MR. GLAZER:  Objection to form.

17        A.    I believe that's what I mean there, yes.

18        Q.    And what led you to believe that if the

19   UCC objected, the court might not approve the

20   forbearance agreement?

21              MR. GLAZER:  Objection to form.

22        A.    I think at the time -- I don't know what

23   led me to believe that if the UCC objected, it

24   would get denied.  I guess I -- to my recollection,

25   I believed that the judge would listen to the UCC's

CONFIDENTIAL

Page 62

1                          M. Kulnis

2    objections and, therefore, deny it.

3        Q.    And you base that on your experience

4    generally with bankruptcy courts?

5              MR. GLAZER:   Objection to form.

6        A.    I'm not sure what I base it on.

7        Q.    If we go on to the next sentence, you

8    say, "I will be frank (as I always am with you)

9    that some are wondering if the company really wants

10   the court to reject this so that the company has an

11   excuse not to pay the fees."

12             Do you see that language?

13       A.    I do.

14       Q.    When you say "some are wondering," who

15   are you referring to?

16       A.    Some members of the steering committee.

17       Q.    Do you remember who in particular?

18       A.    No, I don't.

19       Q.    Was JPM one of the people wondering?

20       A.    I think we were.

21       Q.    Do you recall specific discussions?

22       A.    Discussions among who?  Among JPMorgan

23   internally or JPMorgan with others?

24       Q.    Do you recall any discussions among

25   JPMorgan internally wondering whether the company

CONFIDENTIAL

Page 63

1                          M. Kulnis

2    really wants the court to reject this?

3        A.    I don't recall any discussions that I

4    participated in or have knowledge of any

5    discussions among others at JPMorgan about this

6    issue.

7        Q.    What about outside JPMorgan, other than

8    with counsel?

9        A.    Other than with counsel, no.

10       Q.    Mr. Larsen responds to your e-mail at

11   the top, and now this is the e-mail at 4:50 p.m.,

12   and he says in the second -- I guess the last

13   paragraph, it begins with "Thanks."  "Thanks for

14   the head-ups and we will be prepared to address

15   tomorrow morning."

16            Do you see that?

17       A.    Yes.

18       Q.    Did you have a conversation with him the

19   next morning on these topics?

20       A.    Oh, I don't remember.

21       Q.    Do you recall any conversations with

22   Mr. Larsen about whether the debtor should be

23   included as a party to the forbearance agreement?

24       A.    No, I don't.  I don't recall.

25       Q.    Do you have a reason to believe that you

CONFIDENTIAL

1                          M. Kulnis

2    didn't have the conversation that's referenced in

3    this e-mail?

4              MR. GLAZER:  Objection to form.

5    A.    I'm sorry.  Could you read that again?

6          (Question read)

7    A.    That I didn't have it?

8    Q.    Yes.

9    A.    Sorry.  I don't know if I did or I

10   didn't.

11             MR. FLIMAN:  Let's mark this as Exhibit

12        7, please.

13             (Kulnis Exhibit 7 was marked for

14        identification)

15   Q.    For the record, this is an e-mail with

16   three attachments that's been Bates stamped

17   JPM2_00000250 through 260.

18             Now, there did come a time when the

19   parties were no longer working toward a forbearance

20   agreement, right?

21   A.    Yes.

22   Q.    Do you recall when that process stopped?

23   A.    I don't recall the dates.  Sorry.  I

24   don't recall.

25   Q.    Was there --

CONFIDENTIAL

1                    M. Kulnis

2        A.    It was the January, February time frame.

3    I don't really recall anything more specific than

4    that.

5        Q.    Was there a specific conversation where

6    it was made clear that the parties were not

7    pursuing a forbearance agreement?

8        A.    I remember a conversation I had with

9    counsel about no longer pursuing a forbearance

10   agreement.

11       Q.    So presumably counsel had a conversation

12   with somebody on the other side with regard to

13   that?

14            MR. GLAZER:   Objection to form.

15       A.    I was told that counsel had a -- my

16   counsel told me that they had a conversation with

17   someone on the other side.

18       Q.    What did counsel tell you that lawyers

19   for the other side had told them?

20       A.    Counsel told me that Sidley Austin told

21   them that the company no longer wished to go down

22   the road of a forbearance agreement.

23       Q.    Were you told why?

24       A.    Yes.

25       Q.    What were you told?

CONFIDENTIAL

Page 66

1                       M. Kulnis

2       A.    I was told that the company didn't want

3   to be bound for as long a period as the forbearance

4   agreement was.

5       Q.    Were you given --

6       A.    They objected -- sorry.  I didn't mean

7   to cut you off.

8       Q.    Please finish your answer.

9       A.    I was told that they objected to the

10  term of the forbearance agreement and preferred

11  instead to have an informal agreement with us.

12      Q.    Other than the term, were you told any

13  other reasons?

14      A.    No.

15      Q.    What do you mean by an "informal

16  agreement"?

17      A.    An agreement that was not documented in

18  writing.

19      Q.    Were you told why the company wanted to

20  have an agreement not documented in writing?

21      A.    So that -- I was, yes.

22      Q.    What were you told?

23      A.    I was told that the company wanted to

24  have the ability at any time to decide to stop

25  paying the fees if they thought it was appropriate.

CONFIDENTIAL

1                          M. Kulnis

2        Q.    Okay.  If we could turn to Exhibit 7

3    that I know you have now reviewed.  If you read the

4    text of the e-mail -- let's just establish this is

5    an e-mail from counsel for JPM to counsel for the

6    company and the nondebtor subsidiaries, correct?

7        A.    Correct.

8        Q.    And you are copied on this e-mail,

9    right?

10       A.    Correct.

11       Q.    And the e-mail includes a statement, and

12   this is in the bottom sentence that says, "Further,

13   obviously the entire process remains subject to

14   discussions about this approach with the UCC."

15             Do you see that?

16       A.    I do.

17       Q.    Would you agree that the UCC is the

18   unsecured creditors' committee in this context?

19       A.    Correct.

20       Q.    Do you know why it was that the UCC was

21   to be contacted about this or consulted about this?

22       A.    Yes.

23       Q.    Why is that?

24       A.    JPMorgan and the company agreed that the

25   creditors' committee should be informed about the

Page 68

1                           M. Kulnis

2     payment of fees to the senior lenders by the

3     nondebtor subsidiaries.

4          Q.     Why is that?

5          A.     I can tell you why I thought it should

6     be.  I'm not sure why the company thought it should

7     be.

8                 I thought it should be discussed with

9     the unsecured creditors' committee because JPMorgan

10    is co-chair of the unsecured creditors' committee,

11    and to the extent that we were going to be getting

12    payments from nondebtors, I thought it was

13    appropriate to disclose it to the unsecured

14    creditors' committee.

15         Q.     Well, this is an uninsured creditors'

16    committee appointed in the debtors' bankruptcy

17    case, right?

18         A.     Right.

19         Q.     And the nondebtors are not debtors in

20    the bankruptcy case, right?

21         A.     That's correct.

22         Q.     So why did you feel that the UCC should

23    be brought in and consulted on this?

24                MR. GLAZER:  Objection.  Other than as

25         you have already testified.

CONFIDENTIAL

Page 69

1                    M. Kulnis

2            THE WITNESS:  I'm not sure what that

3       means.

4            MR. GLAZER:  You have already testified

5       about that subject somewhat and if you have

6       anything to add to it, that's fine but you

7       have already made statements about that.

8       Q.   Well, let me help out here.

9            Your testimony was that you thought it

10   was appropriate to disclose it to the unsecured

11   creditors' committee, and my question --

12           MR. GLAZER:  Because JPMorgan was the

13       co-chair is what she said.

14           MR. FLIMAN:  Let me ask my question.

15       Q.   Your statement was that you thought it

16   was appropriate to disclose it to the unsecured

17   creditors' committee, and my question to you is why

18   did you think it was appropriate to disclose it?

19       A.   I thought it was appropriate because I

20   didn't want the creditors' committee to think that

21   we were hiding anything.

22           There were discussions on the creditors'

23   committee about nondebtor issues all the time like

24   the Cubs sale.  The Cubs were nondebtors but yet

25   that was discussed with the creditors' committee,

CONFIDENTIAL

Page 70

1                          M. Kulnis

2    so I felt it was appropriate to discuss this with

3    the creditors' committee and ensure that they had

4    knowledge that these payments, though they were

5    coming from nondebtors, were being made to JPMorgan

6    as agent.

7          Q.    You said an agreement had been reached

8    between JPMorgan and the company to inform the UCC,

9    correct?

10         A.    I believe what I said was that JPMorgan

11   and the company agreed, yes, that they should be

12   informed.

13         Q.    Do you know why the company wanted to

14   inform the UCC?

15              MR. GLAZER:   Objection to form.

16         A.    The company didn't tell me why they

17   wanted to inform them.

18         Q.    So the answer is you don't know?

19         A.    I don't know.

20         Q.    If you turn to the first attachment,

21   please, do you have an understanding of what this

22   document is?  And I'm specifically referring to the

23   one Bates stamped JPM2_000251.

24         A.    Yes.

25         Q.    What is this document?

CONFIDENTIAL

1                    M. Kulnis

2        A.    It appears to be a letter -- a draft of

3    a letter from JPMorgan to the nondebtor guarantors,

4    which are listed on the attached, informing them

5    that we have retained professionals and asking for

6    payment of those professional fees.

7        Q.    To your knowledge, had JPMorgan ever

8    before asked the nondebtor guarantors to pay

9    professional fees?

10       A.    Had we asked only nondebtor guarantors

11   to pay professional fees previous to this?  Not to

12   my knowledge.

13            Just if I could clarify that, as I

14   discussed before, prior to the company's bankruptcy

15   filing, we requested the company and its

16   subsidiaries to make payments and they would have

17   been included in that request.

18       Q.    Now, the demand for payment of fees

19   here, would you agree that that covers the same

20   fees that would have been included in the

21   forbearance documents that we looked at before?

22            MR. GLAZER:  Objection to form.

23       A.    I guess my first comment would be I'm

24   not sure that I read it as a demand letter, but it

25   says that we request that the subsidiaries make

CONFIDENTIAL

1                      M. Kulnis

2      payment.  But as to are these the same fees, it

3      appears so, yes.

4          Q.    If we could turn to the next attachment

5      which is JPM2_000254, we had discussed earlier a

6      payment blockage letter being sent from JPMorgan to

7      Merrill Lynch.

8                You would agree that that is a draft of

9      the letter we discussed earlier today, right?

10         A.    Yes.

11         Q.    If we could turn to the last attachment

12     and specifically to the page Bates stamped

13     JPM2_000256, do you have an understanding of what

14     this document is?

15         A.    This looks like a draft letter from the

16     steering -- from certain of the steering committee

17     members, the bank's steering committee members to

18     the nondebtor subsidiaries, nondebtor guarantors,

19     requesting payment of fees and expenses of their

20     counsel.

21         Q.    If you look at the second sentence of

22     this document, it states, "Due to the commencement

23     of cases under Chapter 11 of the Bankruptcy Code in

24     the Bankruptcy Court for the District of Delaware

25     by the borrower and certain subsidiaries, the

CONFIDENTIAL

1                          M. Kulnis

2    borrower and the agent concluded it was appropriate

3    to designate certain lenders," with a definition

4    after it, "representative of the composition of the

5    lender group as a whole to form a steering

6    committee."

7              Do you see that language?

8    A.    Yes.

9              MR. GLAZER:  It's the second paragraph

10        actually, not the second sentence.

11             MR. FLIMAN:  Thank you.  The second

12        paragraph.

13             MR. GLAZER:  You read it correctly.

14   Q.    Is it your recollection that the

15   borrower and the agent had concluded it appropriate

16   to designate a steering committee?

17   A.    Yes.

18   Q.    Were you involved in those discussions?

19   A.    I was.

20   Q.    And that sentence makes reference to

21   lenders representative of the composition of the

22   lender group as a whole.

23             Do you see that?

24   A.    I do.

25   Q.    Was that part of the consideration in

CONFIDENTIAL

Page 74

1                    M. Kulnis

2    selecting who would be on the steering committee?

3        A.    Yes.

4        Q.    How many members were there of the

5    steering committee at the time that this e-mail was

6    sent, if you remember?

7              Since I see you counting, if you

8    wouldn't mind just identifying them, please.

9        A.    JPMorgan, Eaton Vance, Angelo Gordon,

10   Davidson Kempner, and Bank of America.  Five.

11             Later we added KKR and Oaktree.  I don't

12   know if -- I guess, as they are potential signators

13   to this, they would probably -- I don't remember at

14   what time I added KKR and Oaktree.

15       Q.    When you say I added KKR and Oaktree,

16   are you the chair of the steering committee?

17       A.    Yes.  As agent.  I'm the head of the

18   steering committee.

19       Q.    Now, we had discussed a little bit ago

20   that the company had decided that it didn't want to

21   pursue a forbearance agreement path and you said

22   that the company didn't want to document an

23   agreement in writing.

24             Was this the alternative that was

25   pursued instead of the forbearance agreement?

CONFIDENTIAL

1                    M. Kulnis

2              MR. GLAZER:  Objection to form.

3         Q.    And by "this," I'm identifying

4    Exhibit 7.

5         A.    I guess I'm not sure what you are trying

6    to say.  Are you trying to say that this letter --

7              MR. GLAZER:  Why don't you let him ask a

8         question if you are not clear.

9              THE WITNESS:  I'm not clear.

10        Q.    That this letter was the path taken

11   instead of the forbearance agreement?

12             MS. KATZ:  Object to the form.

13        A.    Yes.

14        Q.    Let me simplify this.  When you were

15   working on the forbearance agreement, were you ever

16   contemplating issuing demand letters for payment of

17   fees?

18        A.    When we were working on the forbearance

19   agreement, we were contemplating an agreement with

20   the company that would provide for the payment of

21   fees and whether that request for payment would

22   come as a demand letter or as a simple request

23   letter, I don't recall.

24        Q.    So if you could just generally describe

25   for me what path was taken for the company to pay

CONFIDENTIAL

Page 76

```
1                      M. Kulnis
2   -- for the nondebtor subsidiaries to pay JPMorgan's
3   fees after the forbearance agreement was abandoned,
4   how that went forward?
5              MR. GLAZER:   Objection to form.
6       A.    After the company determined that they
7   preferred not to go down the path of a forbearance
8   agreement, we had discussions around the terms of
9   an informal agreement amongst the nondebtor
10  subsidiaries and the agent and certain steering
11  committee lenders about getting their fees paid in
12  full in return for forbearance under the guarantees
13  and we had generally discussions about how that
14  would work.
15             I then spoke to the creditors' committee
16  about the proposal and there were certain
17  negotiations with the creditors' committee around
18  that, and I believe the company raised the issue
19  with the US Trustee and when all those discussions
20  were completed, the company, the nondebtor
21  subsidiaries agreed to make the payment.
22      Q.    And so you said getting the fees paid in
23  exchange for forbearance under the guarantee.  Did
24  JPMorgan agree to forbear?
25      A.    To forbear from exercising rights
```

1                         M. Kulnis

2     under the guarantees as long as our fees were being

3     paid?

4          Q.    Yes.

5          A.    I believe we had an informal agreement

6     with the company that that's what we would do.

7          Q.    So nothing was written?

8          A.    There is no document in writing that is

9     executed by the parties that effects that, that's

10    correct.

11         Q.    Do you know why that is?

12         A.    I do not.  Well, as I previously stated,

13    the company preferred to -- it is my understanding

14    the company preferred not to have a written

15    document.  Instead to have an informal agreement.

16         Q.    The informal agreement for the company

17    to pay the fees and for JPMorgan to forbear from

18    exercising rights under the guarantees, was that

19    approved by the bankruptcy court?

20         A.    I would just like to clarify.  It's the

21    nondebtor subsidiaries that pay, not the company

22    that pay the fees.

23         Q.    I appreciate that.  Yes.

24         A.    Was that approved by the bankruptcy

25    court?  Not to my knowledge.

CONFIDENTIAL

Page 78

1                          M. Kulnis

2         Q.    Do you know whether it was presented to

3    the bankruptcy court for approval?

4         A.    I believe it was not.  I believe it was

5    presented to the US Trustee.

6         Q.    Do you know why it wasn't presented to

7    the bankruptcy court?

8         A.    I do not.

9         Q.    Did you have any discussions about

10   whether this informal agreement would be presented

11   to the bankruptcy court?

12        A.    Other than with counsel, not to my

13   recollection.

14        Q.    You never discussed that with the

15   company?

16        A.    Not to my recollection.

17        Q.    Do you know whether anybody else at

18   JPMorgan discussed that with the company?

19        A.    I don't believe they did.  The person

20   who has the majority of the discussions at this

21   point in time with the company would have been me.

22   It would have been unusual for other people at

23   JPMorgan to have discussions with the company.  So

24   not to my knowledge, they did not.

25        Q.    Do you know whether your counsel

CONFIDENTIAL

1                          M. Kulnis

2    discussed it with the debtors' counsel?

3         A.    I don't know.

4              MR. FLIMAN:  Let's mark this as Exhibit

5         8, please.

6              (Kulnis Exhibit 8 was marked for

7         identification)

8         Q.    For the record, this is an e-mail chain

9    that's been Bates stamped JPM2_0000057 through 59.

10        A.    Okay.

11        Q.    The e-mail -- and I say "the e-mail,"

12   there is only one because only one e-mail has been

13   produced.  The others have been redacted.  The one

14   e-mail here references a conversation between

15   yourself and Jay Teitelbaum, correct?

16        A.    Correct.

17        Q.    Do you recall that conversation?

18        A.    I don't really, no.

19        Q.    You don't recall the substance, or you

20   don't recall whether it took place?

21        A.    I don't recall whether it took place.  I

22   have no reason to believe he is not being truthful,

23   but I don't recall the conversation.

24        Q.    Jay Teitelbaum is counsel for William

25   Niese, correct?

CONFIDENTIAL

Page 80

1                      M. Kulnis

2        A.    Correct.

3        Q.    Who is Mr. Niese?

4        A.    Mr. Niese is a member of the unsecured

5    creditors' committee.  He is a retiree.

6        Q.    The bottom of that top paragraph

7    contains two sentences, so I'm looking at the

8    second-to-the-last sentence and the last sentence

9    which read, "JPM has explained that the payment of

10   these fees is important to its group and JPM's

11   continued efforts to manage its group of over 120

12   members.  I also agree that if the legal right

13   exists, we do not need the sideshow of litigation

14   over the issue."

15            Do you see that language?

16       A.    I do.

17       Q.    Did JPM explain that to Mr. Teitelbaum?

18       A.    I don't recall having that discussion

19   with Jay Teitelbaum.

20       Q.    Would anybody else at JPM have spoken to

21   Mr. Teitelbaum?

22       A.    No.  It would have been me in all

23   likelihood.

24       Q.    Did you feel at the time that the

25   payment of these fees was important to JPM's group?

CONFIDENTIAL

Page 81

1                          M. Kulnis

2          A.     Yes, I did.

3          Q.     Why is that?

4          A.     Because at the time the group was very,

5     as I mentioned previously, concerned about having

6     to pay the fees themselves and threatening to

7     exercise remedies against the nondebtor

8     subsidiaries.

9                 So, yes, it was important for the

10    lenders to get their fees reimbursed by the

11    nondebtor subsidiaries as required by the credit

12    agreement.

13         Q.     Was JPM having a problem managing its

14    group?

15         A.     You bet.

16         Q.     How so?

17         A.     It's a very large group and a diverse

18    group of lenders and they were very concerned about

19    having to come out of pocket for legal fees and

20    concerned about getting repaid on their debt while

21    there were nondebtor subsidiaries that potentially

22    had the ability to make payments to them.

23         Q.     You had worked with lender groups

24    before, right?

25         A.     Yes.

CONFIDENTIAL

Page 82

1                       M. Kulnis

2        Q.    Was the situation unique in any way?

3        A.    It was magnified by multitudes.  This is

4   a very large lender group and lender groups over

5   the years have gotten much more aggressive,

6   particularly by the addition of hedge funds to

7   those lender groups.  So this is -- so this was

8   much more intense and much more complicated than I

9   had experienced in the past.

10       Q.    Are your lender groups generally secured

11  lenders?

12       A.    Oftentimes, yes.

13       Q.    Was this a secured lender group?

14       A.    We are secured only by a pledge of the

15  equity in a couple of the holding companies, but we

16  are not secured by hard assets.

17       Q.    Did that pose unique issues?

18       A.    I believe it did.

19       Q.    How so?

20       A.    It's my business understanding that as

21  unsecured creditors, we wouldn't be entitled to

22  payments of interest and fees in the bankruptcy.

23       Q.    The last sentence of this paragraph

24  which I read to you refers to the "sideshow of

25  litigation" over the issue.

CONFIDENTIAL

Page 83

1                      M. Kulnis

2            Do you have an understanding of what

3    that means?

4       A.    I'm not sure what Mr. Teitelbaum meant

5    by that.

6            MR. FLIMAN:  If we can mark this as

7       Exhibit 9, please.

8            (Kulnis Exhibit 9 was marked for

9       identification)

10           THE WITNESS:  Could I ask for a brief

11      bathroom break?

12           MR. FLIMAN:  Of course.  Let's take a

13      five-minute break.

14           (Time noted:  11:10 a.m.)

15           (Recess)

16           (Time noted:  11:17 a.m.)

17   BY MR. FLIMAN:

18      Q.    Back on the record.

19      A.    I haven't finished reviewing this if

20   that's --

21      Q.    Let me ask you one question before you

22   do so.

23           You had testified you thought it was

24   appropriate to inform the UCC of the informal

25   arrangement between the nondebtor guarantors and

CONFIDENTIAL

Page 84

1                         M. Kulnis

2    JPM.

3              Did you not think it would be

4    appropriate to inform the bankruptcy court as well?

5              MR. GLAZER:   Objection to form.

6         A.    I thought it was fine to inform the

7    bankruptcy court.  I had no problem with that.  But

8    it wasn't my decision.

9         Q.    Whose decision was it?

10        A.    I guess the lawyers would have decided

11   if it was necessary or not.

12        Q.    The lawyers for?

13        A.    For the company.

14        Q.    For the company.

15              To your knowledge, did they decide it

16   was not appropriate?

17        A.    I don't know what they decided.

18        Q.    If you wouldn't mind just reviewing

19   Exhibit 9, please.

20        A.    Okay.

21        Q.    Do you recall discussions about

22   retaining Blackstone?

23        A.    I do.

24        Q.    Can you just generally describe how the

25   discussions began and how they ultimately

1                        M. Kulnis

2    concluded?

3         A.    The steering committee of which JPMorgan

4    is a member had discussions around the hiring of an

5    investment banking firm to help us and advise us on

6    various aspects of the Tribune cases, including the

7    potential sale of the Cubs.

8              So I solicited some investment banking

9    candidates' names from members of the steering

10   committee and we had several of them, several firms

11   come and make presentations to the steering

12   committee and we selected -- the steering committee

13   selected Blackstone to represent or to help to

14   advise them -- to help to advise us, I should say,

15   on various issues, and then Davis Polk retained

16   Blackstone.

17        Q.    Who was to pay Blackstone's fees?

18        A.    The non -- the fees were going to be

19   reimbursed by the nondebtor subsidiaries.

20        Q.    So they would be paid in the first

21   instance by whom?

22        A.    I guess they would be paid directly by

23   the nondebtor subsidiaries.  I don't recall what

24   the arrangement is quite frankly.

25        Q.    But with regards to whether it was

CONFIDENTIAL

1                              M. Kulnis

2    direct payment or reimbursement, the nondebtor

3    subsidiaries would be paying the fees?

4         A.    Yes.

5         Q.    Was that always the contemplation?

6               MR. JOHNSTON:  Object to the form.

7         A.    I believe it was, yes.

8         Q.    Did you or did anybody at JPM discuss

9    the idea of hiring an investment banker and having

10   the nondebtor guarantors pay for it with the

11   company or with anybody at Sidley before they were

12   hired?

13              MR. GLAZER:  Objection to form.

14        A.    I believe we -- to my recollection, I

15   discussed with the company the fact that we were

16   going to be interviewing investment banking firms

17   prior to the time that we did that.  I don't

18   remember if I told them that we selected Blackstone

19   prior to the time that an engagement letter was

20   executed.  I just don't remember.

21        Q.    I guess my question is more when you

22   started interviewing investment bankers, did you

23   already know that the nondebtor guarantors would

24   pay for their fees?

25        A.    It was my understanding that those fees

CONFIDENTIAL

1                          M. Kulnis

2    would be paid by the nondebtor subsidiaries as

3    required.  I don't know that I "knew,"

4    quote/unquote, that they would be paid.  It was my

5    expectation that they would be paid.

6        Q.    Turning to Exhibit 9 -- maybe I will

7    just ask this generally.  There are discussions in

8    this exhibit, and we can go through them, about

9    whether -- who is going to be a signatory to

10   Blackstone's engagement letter.

11             Do you remember discussions about that

12   generally?

13       A.    No.  I really don't.

14       Q.    Do you know ultimately whether the

15   debtors or any of the nondebtor subsidiaries were

16   co-signatories to Blackstone's engagement letter?

17       A.    You mean to the final engagement letter

18   that was --

19       Q.    Yes.

20       A.    I don't think they are, but I'm not

21   sure.  I think the only signatory is Blackstone and

22   Davis Polk.

23             I don't recall that there are any debtor

24   or nondebtor parties that are signators to it.

25   They may have acknowledged it, I don't know, but I

CONFIDENTIAL

Page 88

```
 1                    M. Kulnis
 2   don't recall.
 3        Q.    We can look at that exhibit in a second.
 4   But rather than go through it, I figured maybe we
 5   could just discuss the process and whether you had
 6   any memory about, generally, discussions about
 7   whether they should or shouldn't, whether the
 8   nondebtor subsidiaries or the debtor should be
 9   parties or signatories to the engagement letter?
10             MR. GLAZER:   Objection to form.
11        A.    I don't recall any discussions around
12   that at all.  Sorry.
13        Q.    So if we turn to -- well, this e-mail,
14   the top e-mail, is a transmission of a draft of the
15   Blackstone engagement letter.
16             Would you agree with that?
17        A.    Yes.
18        Q.    And it is sent from Davis Polk to
19   Sidley.  Would you agree with that?
20        A.    Yes.
21        Q.    And if you turn your attention to what
22   is page 8 of the draft agreement which is
23   JPM2_00001285, you see an acknowledgment to be
24   filled out by Tribune Company, correct?
25        A.    Correct.
```

CONFIDENTIAL

Page 89

1                        M. Kulnis

2      Q.    And if you keep turning back to the last

3   page of this exhibit -- actually, let's go to the

4   third-to-the-last page which is JPM2_00001286,

5   which is attachment A.

6            Do you see that?

7      A.    I do.

8      Q.    This is a draft indemnification

9   agreement.  Would you agree with that?

10     A.    Would I agree with that?

11     Q.    Would you agree with that?

12     A.    Yes.

13     Q.    And then turning to the last page of the

14  indemnification agreement which is JPM2_00001288,

15  there is a signature line for the company to sign

16  this, correct?

17     A.    Yes.

18     Q.    Now, when the UCC was being informed of

19  the arrangement between the nondebtor subsidiaries

20  and JPM -- do you know what I mean by "the

21  arrangement"?

22     A.    The informal agreement?

23     Q.    The informal agreement.

24            Was JPM involved in those discussions in

25  its capacity as a member of the UCC?

Page 90

```
 1                    M. Kulnis
 2           MR. DUCAYET:  Object to the form of the
 3      question.
 4      A.    I'm sorry.  Can you -- I'm getting a
 5  little confused.  Could you repeat that?
 6      Q.    Well, we had discussed the fact that the
 7  UCC was informed --
 8      A.    Right.
 9      Q.    -- of the informal agreement?
10      A.    Yes.
11      Q.    And when the UCC was informed, was JPM
12  on the UCC side of that discussion, meaning was it
13  involved in the discussions at the UCC level about
14  this?
15      A.    I was not involved in the discussions
16  related to the committee's approval or whether they
17  were going to approve it or not.  I was involved in
18  -- in other words, I was excluded from the vote
19  about whether they would consent to it or not
20  object to it.  But I did make a presentation to the
21  creditors' committee or discuss it with the
22  creditors' committee.
23      Q.    When was that?
24      A.    I don't remember the date.  It was in
25  the January, February time range, to the best of my
```

CONFIDENTIAL

1                    M. Kulnis

2    recollection.

3         Q.    Was that on one occasion or more?

4         A.    To the best of my recollection, there

5    was one creditors' committee meeting where I

6    discussed it and then there were subsequent

7    discussions with counsel for the committee and

8    perhaps my co-chair, I don't remember,

9    telephonically.

10        Q.    Who is your co-chair?

11        A.    Warner Brothers.

12        Q.    Okay.  So at the one creditors'

13   committee meeting when this was discussed, did you

14   give some kind of presentation to the committee?

15             MR. GLAZER:  Objection to form.

16        A.    I don't know that I would call it a

17   presentation, but I discussed -- to the best of my

18   recollection, I discussed the informal agreement by

19   the -- between the company and the lenders and why

20   it was necessary and how -- which firms were going

21   to be paid from -- which fees were going to be

22   reimbursed and what firms they were related to.

23        Q.    Why did you say it was necessary?

24        A.    Because the nondebtor subsidiaries were

25   bound by the terms of the credit agreement to pay

CONFIDENTIAL

Page 92

1                          M. Kulnis

2     these fees and because the lenders had a right to

3     exercise rights against these subsidiaries if those

4     fees weren't paid.

5          Q.    Were you asked any questions by the

6     members of the UCC?

7          A.    I believe I was.

8          Q.    Do you recall any of the questions

9     particularly?

10         A.    I recall questions around the success

11    fee to Blackstone and whether or not this was going

12    to be paid by the nondebtor subsidiaries as part of

13    this agreement and whether or not Blackstone was a

14    necessary professional at this point in the case.

15         Q.    I guess I had asked specifically about

16    questions.

17               Were there concerns raised not in the

18    form of questions?

19         A.    To the best of my recollection, the

20    concerns, whether they were questions or not, were

21    basically around whether or not Blackstone's

22    success fee was going to get paid.  That's what I

23    recall being one of the major concerns of the

24    creditors' committee.

25         Q.    Do you know why it was a concern?

CONFIDENTIAL

Page 93

1                    M. Kulnis

2          MR. GLAZER:  Objection to form.

3      A.    They didn't -- I believe -- to the best

4  of my recollection, what they discussed was the

5  size of the fee was large and they were concerned

6  that the nondebtor subsidiaries would be paying

7  this large fee.

8      Q.    Were there any discussions about whether

9  bankruptcy court approval would be sought for this

10  arrangement, this agreement?

11      A.    Not to my recollection.

12      Q.    Was this an in-person meeting?

13      A.    It was.

14      Q.    Where was it?

15      A.    At Chadbourne & Parke's offices.

16      Q.    Who else was present?

17      A.    To the best of my recollection, in

18  person were representatives of Chadbourne & Parke,

19  the Guild and their counsel, Merrill Lynch and its

20  counsel, Deutsche Bank and its counsel, Bloomington

21  Trust and its counsel, the PBGC, and there may have

22  been other members on the phone.

23          Those are the members -- and JPMorgan

24  and its counsel were present.  There may have been

25  members present on the phone.  I don't recall.

1                         M. Kulnis

2          Q.     When you say JPM's counsel, you mean

3    Davis Polk?

4          A.     Correct.  I don't recall if Warner

5    Brothers was in person or on the phone.  I don't

6    recall if Vertis was in person or on the phone.

7          Q.     So other than Blackstone's success fee

8    and just the necessity for Blackstone, there were

9    no other issues raised?

10         A.     I recall the counsel for Deutsche Bank

11   expressing his views that the fees shouldn't be

12   paid by the nondebtor subsidiaries.

13         Q.     Did he say why not?

14         A.     I don't recall.

15         Q.     Do you remember your response?

16         A.     I don't.

17         Q.     Do you remember anybody else's response

18   to that statement?

19         A.     I don't.  Sorry.

20         Q.     Do you remember who it was from -- it

21   was Deutsche Bank's counsel.  Do you remember who

22   it was?

23         A.     I believe it was David Adler from

24   McCarter & English.

25         Q.     So other than this meeting with the UCC,

CONFIDENTIAL

1                          M. Kulnis

2      did you have any other discussions with the entire

3      UCC about the agreement?

4           A.     Not to my recollection.

5           Q.     You had testified you had spoken to

6      counsel at Chadbourne & Parke, correct?

7           A.     Correct.

8           Q.     On how many occasions?

9           A.     After -- I spoke to Chadbourne & Parke

10     after that in-person meeting.  I don't remember if

11     it was once or twice.

12          Q.     Were there specific issues discussed?

13          A.     Yes.

14          Q.     Which were?

15          A.     Which were the concern -- Chadbourne --

16     well, my counsel was on the phone for this call.

17     Does that mean it's privileged?

18               MR. FLIMAN:  No.

19               MR. GLAZER:  I would appreciate it just

20          the same if you not let her know that.

21               MR. FLIMAN:  Fair enough.

22          A.     Chadbourne expressed the concerns that

23     were voiced by the committee on the size of the

24     Blackstone engagement and whether or not it was

25     necessary for the banks to employ Blackstone at

CONFIDENTIAL

Page 96

1                              M. Kulnis

2     this point in time.  And we negotiated certain

3     things with the committee and one of those was that

4     we would reduce the retainer that was going to be

5     paid on behalf of professional fees by a million

6     dollars.  And we would agree -- "we" being JPMorgan

7     and the senior lenders, would agree that we

8     wouldn't pay the Blackstone success fee from the

9     retainer amount or request payment of that success

10    fee without first informing the committee.  And the

11    committee reserved their right to object to the

12    payment of that success fee.

13             Then we were going to provide the

14    committee with either monthly or quarterly updates

15    on the size of the fees that were paid, and we

16    would agree to get back to the company in four or

17    five months so they could revisit the issue of

18    Blackstone's fee.

19             They agreed that -- well, we negotiated

20    that Blackstone's fees could be paid for the next

21    four or five months and then we would check back in

22    with the committee after four or five months and

23    see if they still held that view.

24    Q.    When you say that they had the right to

25    object to payment of the success fee, what do you

CONFIDENTIAL

1                    M. Kulnis

2   mean by objecting?  How would they have done that?

3       A.    I can tell you how I think they would

4   have done it.  I'm not sure how they really would

5   have done it.

6       Q.    Okay.

7       A.    I think that when it came time to pay

8   the fee, whether it was at the end of the

9   bankruptcy or whenever, that they would have gone

10  to court and objected to the payment of the fee by

11  the nondebtor subsidiaries.

12      Q.    Did you discuss that with Chadbourne,

13  the procedure for objecting?

14      A.    No, I did not.

15      Q.    And the committee retained the right to

16  object to reasonableness of certain of the fees, is

17  that right?

18          MR. GLAZER:  Objection to form.

19      A.    I think it's my understanding that they

20  reserved their rights to object to anything about

21  the success fee:  Reasonableness, whether they

22  wanted to reduce it in size, whether it should be

23  paid at all, when it was paid.  I think they

24  reserved all rights around the payment of that

25  success fee.

CONFIDENTIAL

1                         M. Kulnis

2        Q.     Beyond the success fee though, on the

3    other fees that were being paid, did they retain

4    any rights?

5        A.     I don't know.

6        Q.     After the UCC meeting that we discussed,

7    did you have any subsequent conversations with

8    Mr. Adler about --

9        A.     No.

10       Q.     -- this arrangement?

11              Do you know whether your counsel did?

12       A.     I don't know.

13              MR. FLIMAN:  Let's mark this as Exhibit

14       10, please.

15              (Kulnis Exhibit 10 was marked for

16       identification)

17              MR. FLIMAN:  I apologize for the

18       formatting but that's how we got it, so...

19       Q.     For the record, this is an e-mail Bates

20    stamped JPM2_0001916.

21       A.     Okay.

22       Q.     Is this the conversation that you were

23    referring to with the counsel at Chadbourne?

24              MR. GLAZER:  Objection to form.

25       A.     I don't know.  I assume so, but I don't

CONFIDENTIAL

1                        M. Kulnis

2    know.

3         Q.    Do you recall more than one conversation

4    about the fee reimbursement with them?

5         A.    I think I said I thought it would be one

6    or two possibly.  So I don't recall if it was one

7    conversation or two specifically.

8         Q.    It may have been one or two, you don't

9    remember which one it was?

10        A.    Right.  I don't remember if it was one

11   conversation or two.

12        Q.    But the substance would have been

13   what you testified to which would have been

14   Blackstone's --

15        A.    Correct.

16             MR. FLIMAN:  If we could mark this as

17        Exhibit 11, please.

18             (Kulnis Exhibit 11 was marked for

19        identification)

20        Q.    For the record, this is an e-mail that's

21   been Bates stamped JPM2_00000107.

22        A.    Okay.

23        Q.    This e-mail references a "compromise."

24             Do you see that word?

25        A.    I do.

CONFIDENTIAL

1                      M. Kulnis

2       Q.    Do you know what this is referring to?

3       A.    Yes.

4       Q.    What is the compromise?

5       A.    The compromise is that the retainer

6  would be reduced by a million dollars and we would

7  pay -- the million dollars was roughly equal to

8  five months of Blackstone's $200,000-a-month fee.

9            So we would reduce the retainer by a

10 million dollars, but the company would be -- the

11 nondebtor subsidiaries would be allowed to

12 reimburse the fees for Blackstone.

13           In other words, the total fees weren't

14 going to be increased.  We were reducing the

15 retainer by a million dollars and then Blackstone

16 would be paid.

17      Q.    Was anything else part of this

18 compromise?

19      A.    I think it was -- to the best of my

20 recollection, the other part of the compromise was

21 that we wouldn't pay the $5 1/2 million success fee

22 without talking to the committee first.

23           MR. FLIMAN:  Let's mark this as Exhibit

24      12, please.

25           (Kulnis Exhibit 12 was marked for

CONFIDENTIAL

1                      M. Kulnis

2         identification)

3         Q.    For the record, this is an e-mail that's

4    been Bates stamped JPM2_00000113.

5         A.    Okay.

6         Q.    This is an e-mail from -- why don't you

7    tell me what's happening in this e-mail?

8         A.    This appears to be an e-mail from my

9    counsel at Davis Polk to David LeMay who is counsel

10   for the creditors' committee, and it lays out the

11   terms of a discussion between Damian and David

12   related to a proposal to the committee on the terms

13   of payment by the nondebtor subsidiaries of the

14   professional fees of the lenders.

15        Q.    The way this was structured is that the

16   committee would have no objection, not that the

17   committee would agree, correct?

18              MR. GLAZER:  Objection to form.

19        A.    I believe that's the position the

20   committee took.  I don't recall there being an

21   agreement that they would not object as opposed to

22   consent to it.  I think the committee took the

23   position that they would not object.

24        Q.    If you look at the section that's been

25   numbered 3, and it states, "Come back to report to

CONFIDENTIAL

1                         M. Kulnis

2      the committee about Blackstone's work/involvement

3      in about five months to see if thinking has

4      changed."

5                Do you see that?

6          A.    I do.

7          Q.    What do you understand the language "to

8      see if thinking has changed" to mean?

9          A.    As I previously mentioned, there was

10     concern among the committee members that Blackstone

11     might not be needed at this point in time.  So we

12     were going to check back with the committee in five

13     months to see if they felt it was appropriate for

14     Blackstone's fees to continue to be reimbursed by

15     the nondebtor subsidiaries due to the level of work

16     that they were doing or the type of work that they

17     were doing for the lenders.

18         Q.    Why did the UCC feel that it wasn't

19     appropriate for Blackstone's fees to be reimbursed?

20               MR. GLAZER:  Objection to form.

21         A.    I'm not sure.  I could tell you what I

22     think they thought.

23         Q.    Which is?

24         A.    That it was early in the process for an

25     investment banking firm to be retained.

CONFIDENTIAL

Page 103

1                    M. Kulnis

2              MR. FLIMAN:   Let's mark this as Exhibit

3        13.

4              (Kulnis Exhibit 13 was marked for

5        identification)

6        Q.    For the record, this is an e-mail chain

7    that's been Bates stamped JPM2_00000148 through

8    150.

9        A.    Okay.

10        Q.    Each of the questions I'm going to ask

11    you is regarding the e-mail that begins on the

12    bottom of the top page which is the one at 4:35

13    p.m.

14        A.    Okay.

15        Q.    And the second paragraph here begins

16    with a sentence that says, "The committee was not

17    asked to support the foregoing proposal but only to

18    confirm that it does not object to the payment of

19    these fees."

20              Do you see that language?

21        A.    I do.

22        Q.    Is that your recollection that this is

23    correct?

24        A.    I have no recollection of whether it's

25    correct or not.

CONFIDENTIAL

1                          M. Kulnis

2        Q.    Meaning you don't know what the

3    committee was asked to do?

4        A.    Correct.

5        Q.    If you look at the following page,

6    please, and I'm looking now -- we have got a

7    section called "General" which begins on the top

8    page?

9        A.    Yes.

10       Q.    And it continues on to the second page

11   and the last bullet point of the General section

12   states that, "The agent and/or the debtors will

13   notify the US Trustee of the nondebtors' intent to

14   reimburse senior lenders' professional fees before

15   any payment is made."

16             Do you see that?

17       A.    Yes.

18       Q.    Were you aware of this condition?

19       A.    Yes.

20       Q.    Do you know how it came about?

21       A.    No.

22       Q.    When did you become aware of this

23   condition?

24       A.    I think it was during my discussions

25   with my counsel.

CONFIDENTIAL

1                    M. Kulnis

2        Q.    Your counsel being Davis Polk?

3        A.    Davis Polk.

4        Q.    But you received this e-mail shortly

5   after it was sent by Chadbourne, correct?

6        A.    I don't know when I received it.

7   Presumably I received it right after they sent it.

8        Q.    When it was transmitted?

9        A.    When it was transmitted.  But I have no

10  recollection of -- well, it's not sent to me so I

11  guess it was sent to me by Davis Polk.  It wasn't

12  sent to me by Chadbourne.

13       Q.    So just so I can understand what you are

14  saying, you learned about the fact that the US

15  Trustee was to be notified in connection with

16  preparation for this deposition?

17       A.    No.

18       Q.    So you learned back in February of '09,

19  correct?

20       A.    Yes.  But prior to receiving this

21  e-mail.

22       Q.    Okay.  Okay.  I appreciate that.  Okay.

23             Do you know why this condition was

24  added?

25       A.    No, I don't.

CONFIDENTIAL

1                       M. Kulnis

2       Q.    Did you ask?

3       A.    Not that I recall.  I recall thinking it

4  was appropriate that the trustee be informed of it.

5       Q.    Why?

6       A.    In general, I don't think it's a good

7  idea to surprise trustees.  So I thought it was

8  appropriate that they be -- just as I thought it

9  was appropriate for the creditors' committee to be

10  informed, I thought it was appropriate for the

11  trustee to be informed.

12       Q.    If you look at the last section here,

13  Reservation of Rights, the bullet point says, "The

14  committee reserves any and all rights it may have

15  to object to the reasonableness of any fees and

16  expenses to be reimbursed by the nondebtors and

17  generally reserves all its rights with respect to

18  the foregoing except as specifically noted above."

19            Typical lawyer jargon, but did you have

20  an understanding or do you know now how the UCC

21  would have objected to reasonableness?

22       A.    I don't know.  I think that's a legal

23  issue, how they would have done it.

24       Q.    Was the US Trustee notified about the

25  payment of fees?

CONFIDENTIAL

1                     M. Kulnis

2       A.    It's my understanding he was.

3       Q.    Do you know his response?

4       A.    I believe his response was that he did

5    -- let me think about it.

6            I don't know what he said in response to

7    learning about it.  It's my understanding that he

8    didn't object to it, but I don't know if he said,

9    "I do not object," if you know what I'm getting at.

10      Q.    Other than the UCC and the US Trustee,

11   was anybody else informed about this fee

12   arrangement that's a party to the bankruptcy case?

13           MR. JOHNSTON:  Object to the form of the

14      question.

15      A.    All the lenders were informed.  I don't

16   know if anybody else was informed.  Members of the

17   creditors' committee were informed.  I don't know

18   if anybody else was informed.

19      Q.    When the members of the UCC were

20   informed, were they asked to keep this

21   confidential?

22      A.    All discussions in creditors' committee

23   meetings are confidential is my understanding.

24      Q.    So aside from this standing policy, was

25   there any other confidentiality imposed?

CONFIDENTIAL

1                         M. Kulnis

2        A.    Not to my knowledge.

3        Q.    To your knowledge, had the UCC kept this

4   confidential?

5        A.    I don't know.

6        Q.    Was the US Trustee asked to keep this

7   confidential?

8        A.    I don't know.

9              MR. FLIMAN:  Could we take five minutes?

10        Let me just review my notes and see if I have

11        got anything else.

12              MR. GLAZER:  Sure.

13              Before we go off, let me designate this

14        transcript confidential under the

15        confidentiality agreement and order that's in

16        place.

17              MR. FLIMAN:  Yes.

18              (Time noted:  12:00 p.m.)

19              (Recess)

20              (Time noted:  12:05 p.m.)

21   BY MR. FLIMAN:

22        Q.    When we discussed the informal agreement

23   for the nondebtor subsidiaries to pay the fees to

24   JPM, we didn't identify who specifically would pay

25   those fees.

CONFIDENTIAL

Page 109

1                    M. Kulnis

2            Was any specific nondebtor subsidiary

3    identified?

4        A.    No.  Not to my recollection.

5        Q.    So under this agreement, JPMorgan would

6    expect that any of those nondebtor subsidiaries

7    would be able to pay?

8        A.    Correct.

9        Q.    And is there any obligation for the

10   debtor to make payment under those, for any of the

11   debtors to make payments?

12       A.    No.  Not to my knowledge.

13            MR. FLIMAN:  That's all I have.

14            MR. GLAZER:  Thank you very much.  We

15       are done.

16            MR. JOHNSTON:  I have nothing.  Thank

17       you.

18            (Time noted:  12:10 p.m.)

19

20

21

22

23

24

25

CONFIDENTIAL

Page 110

```
 1
 2                    I N D E X
 3   WITNESS              EXAMINATION BY              PAGE
 4   Miriam Kulnis        Mr. Fliman                  6
 5
 6
 7
 8                 E X H I B I T S
 9          (Exhibits attached to transcript)
10     KULNIS              DESCRIPTION               PAGE
11     Exhibit 1     Law Debenture Trust              8
               Company of New York's
12             Notice of Deposition of
               JPMorgan Chase Bank
13     Exhibit 2     Law Debenture Trust              8
               Company of New York's
14             Notice of Deposition
               of Miriam T. Kulnis
15
       Exhibit 3     Document Bates stamped          22
16             JMP2_00002780-83
17     Exhibit 4     Document Bates stamped          34
               TRB_LD000021-33
18
       Exhibit 5     Document Bates stamped          42
19             TRB_LD 000042-69
20     Exhibit 6     Document Bates stamped          51
               TRB_LD 000073-74
21
       Exhibit 7     Document Bates stamped          64
22             JPM2_00000250-260
23     Exhibit 8     Document Bates stamped          79
               JPM2_0000057-59
24
25
```

CONFIDENTIAL

Page 111

1

2                    E X H I B I T S (Continued)

3    KULNIS              DESCRIPTION                   PAGE

4    Exhibit 9     E-mail transmission of         83
                   draft of Blackstone
5                  engagement letter

6    Exhibit 10    Document Bates stamped         98
                   JPM2_0001916
7
     Exhibit 11    Document Bates stamped         99
8                  JPM2_00000107

9    Exhibit 12    Document Bates stamped         100
                   JPM2_00000113
10
     Exhibit 13    Document Bates stamped         103
11                 JPM2_00000148-150

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 112

```
1
2    A C K N O W L E D G M E N T   O F   D E P O N E N T
3    STATE OF NEW YORK      )
                            )   ss.:
4    COUNTY OF NEW YORK     )
5
6              I, MIRIAM KULNIS, hereby certify, that I
7         have read the transcript of my testimony
8         taken under oath in my deposition of February
9         5, 2009; that the transcript is a true,
10        complete and correct record of what was
11        asked, answered and said during this
12        deposition, and that the answers on the
13        record as given by me are true and correct.
14
15
16                              _____
17                              MIRIAM KULNIS
18
     SUBSCRIBED AND SWORN BEFORE ME
19   THIS _____ DAY OF _____ 2010.
20
     _____
21   Notary Public
22   My Commission Expires: _____
23
24
25
```

CONFIDENTIAL

Page 113

1

2                C E R T I F I C A T E

3

4    STATE OF NEW YORK      )

5                           ) ss.

6    COUNTY OF NEW YORK     )

7

8            I, Christina Diaz, a Certified and

9    Registered Professional Reporter and Notary Public

10   within and for the State of New York, do hereby

11   certify:

12           That MIRIAM KULNIS, the witness whose

13   deposition is hereinbefore set forth, was duly

14   sworn by me and that such deposition is a true

15   record of the testimony given by such witness.

16           I further certify that I am not related

17   to any of the parties to this action by blood or

18   marriage and that I am in no way interested in the

19   outcome of this matter.

20

21

22           _____

23                CHRISTINA DIAZ, CSR, RPR

24

25

CONFIDENTIAL

Page 114

1

2                 E R R A T A    S H E E T

3   Case Name:         In Re: Tribune Company, et al.

4   Deposition Date:  Friday, February 5, 2010
    Deponent:         Miriam Kulnis
5

    Page/Line    Now Reads    Should Read    Reason
6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____    _____

25  Date                        Signature

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
In re:                                    :        Chapter 11 Cases
                                          :        Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,                  :        (Jointly Administered)
                                          :
                        Debtors.          :
-------------------------------------------------------x
```

### LAW DEBENTURE TRUST COMPANY OF NEW YORK'S
### NOTICE OF DEPOSITION OF JPMORGAN CHASE BANK

PLEASE TAKE NOTICE THAT, pursuant to Rules 26 and 30 of the Federal Rules of

Civil Procedure (the **"Federal Rules"**), made applicable to these cases pursuant to Rules 7026,

7030 and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), Law

Debenture Trust Company of New York, by its undersigned attorneys, will take the deposition of

JPMorgan Case Bank (**"JPM"**) at the offices of Kasowitz, Benson, Torres & Friedman LLP,

1633 Broadway, New York, New York 10019 on December 22, 2009 at 10:00 a.m., or on such

other time and place as the parties shall agree or the Court may direct.

Pursuant to Bankruptcy Rules 9014 and 7030 and Rule 30(b)(6) of the Federal Rules of

Civil Procedure, JPM is required to designate one or more members, officers, directors,

managing agents or other persons to testify, who have knowledge about the matters set forth in

Exhibit A hereto.

Dated: December 7, 2009
       Wilmington, Delaware

      /s/ Garvan F. McDaniel
Garvan F. McDaniel (No. 4167)
**BIFFERATO GENTILOTTI LLC**
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel: (302) 429-1900
Fax: (302) 429-8600



EXHIBIT

Kulnis 1
(1) 2/5/10

PENGAD 800-631-6989

– and –

David S. Rosner
Andrew K. Glenn
Sheron Korpus
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700

*Co-Counsel for Law Debenture Trust Company*
  *of New York*

<u>DEFINITIONS</u>

The terms used herein shall have the meanings ascribed to them in the definitions set forth below.

1.    "<u>Bankruptcy Cases</u>" means the jointly-administered Chapter 11 bankruptcy cases styled *In re Tribune Company, et al.*, Case No. 08-13141, pending in the Bankruptcy Court.

2.    "<u>The Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

3.    "<u>Concerning</u>" means relating to, referring to, describing, evidencing or constituting.

4.    "<u>Credit Agreement</u>" means the senior secured credit agreement dated May 17, 2007, with JPMorgan Chase Bank, N.A., as Administrative Agent, Merrill Lynch Capital Corporation, as Syndication Agent, and Citicorp North America, Inc., Bank of America, N.A. and Barclays Bank PLC as Co-Documentation Agents, as the same has been amended, modified or supplemented.

5.    The "<u>Debtors</u>" means the debtors and debtor-in-possession in the Bankruptcy Cases and each of its directors, officers, employees, affiliates (as defined in the Bankruptcy Code), representatives, advisors, agents, attorneys, associates, associations or any other person acting on their behalf.

6.    "<u>Lenders Advisors</u>" means any or all advisors, including but not limited to, attorneys, financial advisors, or others, to any or all of the Lender Parties, including but not limited to, any "Steering Committee" of such lenders or assignees.

7.    "<u>Lender Parties</u>" means all lenders and/or agents under the Credit Agreement or

their assignees.

8.      "Subsidiary Guarantees" means the guarantee agreements entered into in June 2007 whereby certain of Tribune's subsidiaries guaranteed obligations arising under the Credit Agreement.

9.      "TCV" means Tribune (FN) Cable Ventures, Inc. and directors, officers, employees, affiliates (as defined in the Bankruptcy Code), representatives, advisors, agents, attorneys, associates, associations or any other person acting on their behalf.

10.      "Tribune" means Tribune Company, its directors, officers, employees, affiliates (as defined in the Bankruptcy Code), representatives, advisors, agents, attorneys, associates, associations or any other person acting on their behalf.

11.      "Tribune Entities" means, collectively, Tribune and all of its direct and indirect subsidiaries (including both debtors and non-debtors), and each of their directors, officers, employees, affiliates (as defined in the Bankruptcy Code), representatives, advisors, agents, attorneys, associates, associations or any other person acting on their behalf.

## EXHIBIT A – TOPICS OF DEPOSITION

1.      Any agreement by any Tribune Entities to pay and/or reimbursement the fees and/or expenses of Lenders Advisors.

2.      Consideration provided by the Lender Parties to any Tribune Entities in exchange for payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

3.      The reasons, if any, that any Tribune Entities paid and/or reimbursed or intends to pay and/or reimburse the Lenders Advisors' fees and/or expenses.

4.      The amount, date and recipient of all payments and/or reimbursements by the Tribune Entities of fees and/or expenses of Lenders Advisors.

5.      The nature of the Lenders Advisors' fees and/or expenses paid and/or reimbursed or to be paid and/or reimbursed by any Tribune Entities.

6.      Corporate authorization for any Tribune Entities to pay and/or reimburse Lenders Advisors' fees and/or expenses.

7.      Identity of all Tribune Entities' officers and/or directors who review or have reviewed and/or approve or have approved payment and/or reimbursement of Lenders Advisors' fees and/or expenses.

8.      The decision to seek or not seek authority from the Bankruptcy Court for Tribune Entities to pay and/or reimburse the Lenders Advisors' fees and/or expenses.

9.      Communications between any Lender Party and any Tribune Entity concerning enforcement of Lender Party rights against any Tribune Entity arising under the Credit Agreement and/or the Subsidiary Guarantees.

10.     Communications between any Lender Party and TCV regarding payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

11.     Communications between any Lender Party and the Food Network or any parties holding interests therein regarding payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

12.     Communications between any Tribune Entity and the Food Network or any parties holding interests therein regarding payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

13.     The decision to include or not to include TCV in the Bankruptcy Cases or other bankruptcy proceeding.

14.     The decision to disclose or not to disclose Tribune Entities' payment and/or reimbursement of the Lenders Advisors' fees and expenses to the Bankruptcy Court and/or Law Debenture.

15.     The Memorandum dated March 4, 2009 from Bryan Krakauer and Candice L. Kline of Sidley Austin LLP to Joe McMahon of the Office of the United States Trustee, or and the subject matters discussed therein.

16.     Disclosure of TCV's payment and/or reimbursement of the Lenders Advisors' fees and expenses to the Official Committee of Unsecured Creditors and/or the Office of United States Trustee.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
In re:                                      :    Chapter 11 Cases
                                            :    Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,                    :    (Jointly Administered)
                                            :
                        Debtors.            :
-----------------------------------------------------x
```

## LAW DEBENTURE TRUST COMPANY OF NEW YORK'S
## NOTICE OF DEPOSITION OF MIRIAM T. KULNIS

PLEASE TAKE NOTICE THAT, pursuant to Rules 26 and 30 of the Federal Rules of

Civil Procedure (the **"Federal Rules"**), made applicable to these cases pursuant to Rules 7026,

7030 and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), Law

Debenture Trust Company of New York, by its undersigned attorneys, will take the deposition of

Miriam T. Kulis of JP Morgan Case Bank at the offices of Kasowitz, Benson, Torres &

Friedman LLP, 1633 Broadway, New York, New York 10019 on December 17, 2009 at 10:00

a.m., or on such other time and place as the parties shall agree or the Court may direct.

Dated: December 7, 2009
       Wilmington, Delaware

       /s/ Garvan F. McDaniel
       Garvan F. McDaniel (No. 4167)
       **BIFFERATO GENTILOTTI LLC**
       800 N. King Street, Plaza Level
       Wilmington, Delaware 19801
       Tel:  (302) 429-1900
       Fax:  (302) 429-8600

       – and –

       David S. Rosner
       Andrew K. Glenn
       Sheron Korpus
       Kasowitz, Benson, Torres & Friedman LLP
       1633 Broadway
       New York, New York 10019
       Tel:  (212) 506-1700

       *Co-Counsel for Law Debenture Trust Company*
       *of New York*


EXHIBIT
Kulnis 2
2/5/10

**From:** "Bigelow, Chandler" <CBigelow@tribune.com>
**Date:** 12/01/2008 04:16:30 PM
**To:** <kevin.j.foley@JPMORGAN.COM>
**CC:** <MIRIAM.KULNIS@chase.com>; <brian.a.zivicky@JPMORGAN.COM>;
<damian.schaible@dpw.com>; "Liebentritt,  Don" <dliebentritt@tribune.com>; "Eldersveld,  David"
<DEldersveld@tribune.com>
**Subject:** RE: Retainer Letter
**Number of attachments:** 1

_____

Hi Kevin - attached is the executed letter.  I  confirmed from our Treasury guys that wire was sent.  Please let me
know if  you did not get it.  Many thanks, Chandler

**From:** kevin.j.foley@jpmorgan.com   [mailto:kevin.j.foley@jpmorgan.com]
**Sent:** Wednesday, November 26,  2008 4:21 PM
**To:** Bigelow, Chandler
**Cc:**  MIRIAM.KULNIS@chase.com;  brian.a.zivicky@jpmorgan.com;  damian.schaible@dpw.com
**Subject:** Retainer Letter
Chandler,
As discussed with Miriam Kulnis, please find attached the  letter executing the agreement for payment of a retainer
for the professional  service's expenses that will be incurred by J.P. Morgan and the other lenders.  In a separate
email, Miriam will forward you wiring instructions for the  payment.  Please sign and fax a copy to me at
917-463-0144.  If you  should have any questions, please let us know.
Thank you.
Regards,
Kevin
Kevin J. Foley
J.P. Morgan
270 Park Avenue, 5th Floor
New York, NY 10017
(O) 212-270-1232
(F)  917-463-0144
kevin.j.foley@jpmorgan.com

Generally, this communication is for informational purposes only and it is   not intended as an
offer or solicitation for the purchase or sale of any   financial instrument or as an official
confirmation of any transaction. In the  event you are receiving the offering materials attached
below related to your   interest in hedge funds or private equity, this communication may be
intended as  an offer or solicitation for the purchase or sale of such fund(s). All market   prices,
data and other information are not warranted as to completeness or   accuracy and are subject to
change without notice. Any comments or statements   made herein do not necessarily reflect
those of JPMorgan Chase & Co., its   subsidiaries and affiliates. This transmission may contain
information that is   privileged, confidential, legally privileged, and/or exempt from disclosure
under applicable law. If you are not the intended recipient, you are hereby   notified that any
disclosure, copying, distribution, or use of the information   contained herein (including any
reliance thereon) is STRICTLY PROHIBITED.   Although this transmission and any
attachments are believed to be free of any   virus or other defect that might affect any computer
system into which it is   received and opened, it is the responsibility of the recipient to ensure
that it  is virus free and no responsibility is accepted by JPMorgan Chase & Co., its
subsidiaries and affiliates, as applicable, for any loss or damage arising in   any way from its use.



EXHIBIT
Kulnis 3
2/5/10

JPM2_00002780

If you received this transmission in error, please   immediately contact the sender and destroy the material in its entirety, whether   in electronic or hard copy format. Thank you. Please refer to http://www.jpmorgan.com/pages/disclosures for disclosures relating to UK legal   entities.

CONFIDENTIAL

JPM2_00002781

# J.P.Morgan

November 26, 2008

**Re:     Engagement Acknowledgement**

Tribune Company
435 North Michigan Avenue
Chicago, Ill. 60611

Dear Ladies and Gentleman:

As you know, JPMorgan Chase Bank, N.A. (the **"Agent"**) is the administrative agent under the Credit Agreement dated May 17, 2007 (the **"Senior Secured Credit Agreement"**) among the lenders party thereto, the Agent, Merrill Lynch Capital Corporation, as syndication agent, Citicorp North America, Inc., Bank of America, N.A. and Barclays Bank plc, as co-documentation agents, and JPMorgan Securities Inc., Merrill Lynch Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners and Tribune Company (the **"Company"** or **"you"**) as borrower.

As you know, the Agent has retained and will retain certain professionals in connection with the Senior Secured Credit Agreement, including Davis Polk & Wardwell (**"Davis Polk"**) as counsel and FTI Consulting (**"FTI"**) as financial advisor. Pursuant to and as required by the terms of the Senior Secured Credit Agreement, you have agreed to pay the reasonable and documented fees, non-professional charges and expenses of such professionals, which amounts shall be invoiced on a monthly basis.

You understand that Davis Polk, FTI and any other such professionals represent the Agent, and that their services will be provided to and for the Agent and not for the benefit of the Company, any of its principals, any holder of debt or equity of the Company or any other party.

Promptly upon execution of this Letter, you agree to provide the Agent with an advance in the amount of $2,000,000, which the Agent will use to pay retainers and future fees and expenses of its professionals in connection with the Senior Secured Credit Agreement. You agree to replenish this amount by paying to the Agent, within five (5) days of receipt of a copy of an invoice from any of the Agent's professionals, the full amount of such invoice. Any part of this

CONFIDENTIAL

# J.P.Morgan

advance remaining unused after payment in full of all amounts due to the Agent's professionals at the end of their engagement will be promptly returned to you.

If you are in agreement with the foregoing, please so indicate by signing in the space provided below and returning this letter to us.

Very truly yours,

*Kevin J. Foley*

Kevin J. Foley

Agreed to:

Tribune Company

By: *[signature]*

Date: 12-1-

270 Park Avenue, 5th Floor, New York, New York 10017
Telephone 212 270 4300    Facsimile 212 270 1063

J.P. Morgan Securities Inc.

CONFIDENTIAL                                                                 JPM2_00002783

| From: | Smit, Daniel [daniel.smit@dpw.com] |
|---|---|
| Sent: | Saturday, January 10, 2009 10:00 AM |
| To: | Krakauer, Bryan; Lantry, Kevin T.; Henderson, Janet E.; Conlan, James F.; Boelter, Jessica C.K.; Kansa, Ken |
| Cc: | tribuneco.jpm; tribuneco.fti; tribuneco.dpw; tribuneco.sc |
| Subject: | Tribune Draft Forbearance Agreement |
| Attachments: | forbearance.agt.doc |

Sidley Team:

As discussed on Wednesday, I attach a draft Forbearance Agreement.

Please note that we are simultaneously sending the draft Agreement to the steering committee and Kramer Levin and, accordingly, it remains subject to comments received from them.

Regards

Danie Smit
Davis Polk & Wardwell
450 Lexington Ave New York, NY 10017
Tel. (212) 450-4947 / Fax (212) 450-3947
e-mail: daniel.smit@dpw.com

10/29/2009

EXHIBIT

Kudnis 4
CD   2/5/10

DRAFT

## FORBEARANCE AGREEMENT

**FORBEARANCE AGREEMENT** (this "Forbearance Agreement") dated as of January [ ], 2009, and effective as of the Forbearance Effective Date (as defined below), among the entities listed on Schedule I hereto (each such entity individually, a "Tribune Party" and, collectively, the "Tribune Parties"), the Participant Lenders and JPMorgan Chase Bank, N.A., as administrative agent under the Credit Agreement (in such capacity, the "Agent").

### W I T N E S S E T H:

WHEREAS, Tribune Company (the "Borrower"), a Delaware corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Proceeding"), certain lenders (including the Participant Lenders), the Agent and certain other parties are parties to a Credit Agreement dated as of May 17, 2007 (as the same has been and may be further amended, modified or supplemented from time to time, the "Credit Agreement");

WHEREAS, at the time of commencement of the Chapter 11 Proceeding, there were approximately 100 Lenders, and the Borrower and the Agent concluded it was necessary to designate certain lenders (the "Steering Lenders") to become focal points for regular communications and negotiations among the Borrower, its related debtors and the Lenders;

WHEREAS, the commencement of the Chapter 11 Proceeding is an Event of Default under the Credit Agreement;

WHEREAS, in connection with the Credit Agreement, the Tribune Parties and the Agent are party to a Guarantee Agreement dated as of June 4, 2007 (as the same has been and may be further amended, modified or supplemented from time to time, the "Guarantee Agreement" and together with the Credit Agreement, the "Existing Agreements") under which, among other things, certain of the Tribune Parties have guaranteed all Guaranteed Obligations (as defined therein) including, without limitation, all Obligations of and performance by the Borrower of its covenants under the Credit Agreement;

WHEREAS, certain of the Tribune Parties are not debtors in the Chapter 11 Proceeding (the "Non-Debtor Tribune Parties"), and accordingly do not have the benefit of the automatic stay applicable therein and would be subject to the exercise of remedies under the Guarantee Agreement absent forbearance in respect of such remedies by the Lenders and the Agent; and

WHEREAS, to permit certain of the Non-Debtor Tribune Parties to explore possible strategic transactions and to facilitate the overall restructuring of the Tribune Parties, the Tribune Parties have requested that the Participant Lenders forbear from exercising certain rights and remedies under the Guarantee Agreement against the Non-Debtor Tribune Parties on the terms and conditions (including the limited duration) set forth herein, and the Participant Lenders are willing, upon such terms and conditions (including such limited duration), to forbear from their exercise of such rights and remedies to enable the non-debtor Tribune Parties to continue to explore such transactions and, in the interim, to enable the non-debtor Tribune Parties to continue to operate, all during the Forbearance Period (as defined herein);

TRB_LD000022
CONFIDENTIAL

**NOW, THEREFORE,** the parties hereto hereby agree as follows:

1. **Defined Terms; References**. (a) Unless otherwise specifically defined herein, each term used herein which is defined in any Existing Agreement has the meaning assigned to such term in such Existing Agreement.

(b) As used in this Forbearance Agreement, the following terms have the meanings specified below:

"Forbearance Default" means any of the following: (i) any Tribune Party shall breach or fail to comply with any covenant, condition or agreement contained in this Forbearance Agreement, or take any action or make any statement that evidences the intent of any such Tribune Party to breach or fail to comply with any such covenant, condition or agreement; (ii) any Non-Debtor Tribune Party shall enter into any agreement relating to a Material Disposition that has not been consented to in writing by the Required Lenders, (iii) the Borrower or any of its subsidiaries shall repay all or any portion of any material obligation incurred prior to commencement of the Chapter 11 Proceeding, other than operating expenses incurred in the ordinary course of business and other payments authorized by the Bankruptcy Court in the Chapter 11 Proceeding after notice and hearing without objection by the Agent or the Participant Lenders, and (iv) the making of a demand for payment against or the exercise of any remedy against any Non-Debtor Tribune Party or a Non-Debtor Tribune Party's assets by or on behalf of any holder of any debt for borrowed money.

"Forbearance Period" means, with respect to any Non-Debtor Tribune Party, the period from and including the Forbearance Effective Date to but excluding the earliest of:

(i) the date on which the Agent delivers to such Non-Debtor Tribune Party a written notice terminating the Forbearance Period with respect to such Tribune Party pursuant to Section 2(b) hereof;

(ii) the date that is ten (10) days following the delivery by the Agent to such Non-Debtor Tribune Party of a written notice terminating the Forbearance Period with respect to such Non-Debtor Tribune Party pursuant to Section 2(c) hereof;

(iii) the date on which any petition for relief under the Bankruptcy Code is filed by or against such Non-Debtor Tribune Party, whether or not there has been an order for relief; and

(iv) the first anniversary of the Forbearance Effective Date (the "Initial Scheduled Termination Date"), as such date may be extended from time to time by Participant Lenders constituting the Required Lenders (the Initial Scheduled Termination and any subsequent date to which the date referred to in this clause (iv) may be extended being called a "Scheduled Termination Date").

"Material Disposition" means (a) any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any Sale and Lease-Back Transaction and any Disposition) of any property (excluding sales of inventory and dispositions of cash and Cash Equivalents in each case, in the ordinary course of business),

2

(NY) 27011/161/MISC08/forbearance.agt.doc

TRB_LD000023
CONFIDENTIAL

by any Non-Debtor Tribune Party or (b) any issuance or sale of any Equity Interests of any Non-Debtor Tribune Party (including any redemption of partnership, membership or other Equity Interests having the effect of reducing the interest of such Tribune Party in any other Person), in each case to any Person.

"Participant Lender" means (i) any Lender that executes this Forbearance Agreement and any of such Lender's successors and assigns that executes a Joinder to this Forbearance Agreement pursuant to Section 5 hereof and (ii) any Lender that executes a Joinder to this Forbearance Agreement in the form attached hereto as Exhibit A (whether before or after the Forbearance Effective Date), *provided that* if a Lender notifies the Borrower and the Agent in writing prior to any Scheduled Termination Date that it intends to cease to be a Participant Lender as of such Scheduled Termination Date, such Lender shall cease to be a Participant Lender effective as of such Scheduled Termination Date.

2.    **Forbearance**. (a) Each Participant Lender agrees that, with respect to each Non-Debtor Tribune Party, until the expiration or termination of the Forbearance Period with respect to such Non-Debtor Tribune Party, the Participant Lenders will forbear, and each Participant Lender hereby instructs the Agent to forbear (in each case subject to the terms and conditions hereof) from (i) demanding payment of any amount due under the Guarantee Agreement from such Non-Debtor Tribune Party or (ii) taking, exercising, instructing, voting to instruct or requesting that the Agent take or exercise, and hereby instructs the Agent not to take or exercise, any remedies under the Existing Agreements (including, without limitation, pursuant to Section 7 of the Guarantee Agreement) or otherwise for collection against such Non-Debtor Tribune Party (including, without limitation, enforcement or collection actions, the exercise of rights of setoff or other remedies available for the collection of amounts due pursuant to applicable law).

(b)    Upon the occurrence and during the continuance of a Forbearance Default, the Agent (i) may or (ii) if requested in writing by the Required Lenders, shall deliver to any Non-Debtor Tribune Party a notice terminating the Forbearance Period with respect to such Non-Debtor Tribune Party.

(c)    At any time after June 30, 2009, the Agent (i) may or (ii) if requested in writing by the Required Lenders, shall deliver to any Non-Debtor Tribune Party a notice terminating the Forbearance Period with respect to such Non-Debtor Tribune Party.

(d)    Forthwith upon the expiration or termination of the Forbearance Period with respect to any Non-Debtor Tribune Party, the agreement of the Participant Lenders pursuant to Section 2(a) hereof to forbear from *inter alia* taking or exercising certain actions and remedies and instructing the Agent not to take or exercise certain actions and remedies, in each case with respect to such Non-Debtor Tribune Party, shall terminate without the requirement of any demand, presentment, protest or notice of any kind, all of which such Non-Debtor Tribune Party hereby waives. The Tribune Parties agrees that the Agent and each Participant Lender may at any time thereafter proceed to exercise against such Non-Debtor Tribune Party any and all of their respective rights and remedies under the Guarantee Agreement and/or applicable law, including, without limitation, their respective rights and remedies in connection with any or all defaults and Events of Default.

3

TRB_LD000024
CONFIDENTIAL