# EXHIBIT 5

1

2    IN THE UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE

4

5    _____

                                   ) Chapter 11
6    In re:                        )
                                   ) Case No.
7    Tribune Company, et al.,      )
                                   ) 08-13141 (KJC)
8        Debtors.                  )
     _____) (Jointly Administered)

9

10

11

12                    REDACTED

13                   CONFIDENTIAL

14

15           DEPOSITION OF NILS LARSEN

16               Chicago, Illinois

17           Monday, February 1, 2010

18

19

20

21

22

23   Reported by:

24   PAULA CAMPBELL, CSR, RDR, CRR, CCP

25   JOB NO. 27542

1

2

3

4

5

6

7

8          February 1, 2010

9          8:32 a.m.

10

11

12          Confidential discovery deposition of

13   NILS LARSEN, held at SIDLEY AUSTIN, One South

14   Dearborn, Chicago, Illinois, pursuant to notice

15   before Paula Campbell, CSR, RDR, CRR, CCP.

16

17

18

19

20

21

22

23

24

25

1

2   A P P E A R A N C E S:

3        SIDLEY AUSTIN, LLP

4        Attorneys for Tribune Company and the witness

5             One South Dearborn

6             Chicago, Illinois 60603

7        BY:    JAMES  W. DUCAYET, ESQ.

8             SCOTT P. KRAMER, ESQ.

9

10       KASOWITZ BENSON TORRES & FRIEDMAN, LLP

11       Attorneys for Law Debenture of New York

12            1633 Broadway

13            New York, New York 10009

14       BY:   SHERON KORPUS, ESQ.

15

16       CHADBOURNE & PARKE, LLP

17       Attorneys for Committee of Unsecured Creditors

18            30 Rockefeller Plaza

19            New York, New York 10112

20       BY:   ALEXANDRA K. NELLOS, ESQ.

21

22

23

24

25

1

2    A P P E A R A N C E S:  (Continued)

3        HENNIGAN BENNETT & DORMAN, LLP

4        Attorneys for Various Credit Agreement Lenders

5            865 S. Figueroa Street, Suite 2900

6            Los Angeles, California 90017

7        BY:    JAMES O. JOHNSTON, ESQ.

8

9        DAVIS POLK & WARDWELL, LLP

10       Attorneys for JPMorgan Chase

11           450 Lexington Avenue

12           New York, New York 10017

13       BY:    SHARON KATZ, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

1

2          REPORTER:  Would you please raise your

3    right hand.

4          (Witness sworn.)

5          MR. KORPUS:  Let's just identify everybody

6    for the record.  My name is Sheron Korpus,

7    Kasowitz Benson Torres & Friedman, representing

8    Law Debenture.

9          MR. DUCAYET:  Jim Ducayet, from Sidley

10   Austin, also with me is Scott Kramer, also of

11   Sidley Austin, representing the debtors and the

12   witness.

13         MS. KATZ:  Sharon Katz, Davis Polk &

14   Wardwell on behalf of JPMorgan Chase.

15         MS. NELLOS:  Alexandra Nellos from

16   Chadbourne & Parke on behalf on the Unsecured

17   Creditors Committee.

18         MR. KORPUS:  One clarification,

19   Mr. Ducayet, you said you represent the

20   debtors.  I take it you represent the

21   non-debtor guarantor as well.

22         MR. DUCAYET:  Yes, that's correct.

23

24

25

1              CONFIDENTIAL - N. LARSEN

2    N I L S    L A R S E N,

3         called as a witness, having been duly sworn,

4         was examined and testified as follows:

5    EXAMINATION

6    BY MR. KORPUS:

7         Q.  Good morning, Mr. Larsen.

8         A.  Good morning.

9         Q.  Can you please state your full name for the

10   record?

11        A.  Nils Eric Larsen.

12        Q.  And I know we are a little pressed for

13   time, so I'm going to let you quickly run through

14   your curriculum vitae from your college, and then I

15   will ask any follow-up questions I may have.

16        A.  Sure.  I graduated from Bowdoin College in

17   1992 with a bachelor's in economics and history.  I

18   went to work for Credit Suisse First Boston in New

19   York City in '92 through '94.  I left there in

20   summer of '94 and took some months to travel, and

21   began working for Equity Group Investments in

22   February of 1995, and worked there through the

23   current, and also began as an employee of Tribune

24   Company in December 2008.

25        Q.  Thank you.  What was your -- what did you

CONFIDENTIAL - N. LARSEN

1

2    do for Credit Suisse?

3        A.  I was an analyst on the taxable fixed

4    income derivatives desk.

5        Q.  And did your -- in 1995 you started working

6    for Equity Group Investments.  That's the entity

7    that's controlled by Sam Zell; right?

8        A.  That is correct.

9        Q.  And you've been there through the present;

10   right?

11       A.  Correct.

12       Q.  And today you are employed by both Equity

13   Group Investments and by Tribune Company?

14       A.  That is correct.

15       Q.  Can you tell me what positions you have

16   held with Equity Group Investments from '95 onwards?

17       A.  Sure.  I started as an associate,

18   essentially, involved in analyzing new capital

19   investments and overseeing existing capital

20   investments.  Over time I was promoted to managing

21   director, in 2001, and held that position through

22   the current.

23           I am currently an executive vice president

24   and chief investment officer at Tribune.  In

25   December of 2008 I was named executive vice

1          CONFIDENTIAL - N. LARSEN

2    president; December 2009 I added the chief

3    investment officer title.

4         Q.  For Tribune?

5         A.  For Tribune, correct.

6         Q.  And at the same time you are also an MD,

7    managing director, at Equity Group Investments too?

8         A.  That's correct.

9         Q.  Were you involved in the LBO process for

10   Tribune?

11        A.  Yes, I was.

12        Q.  Were you the leading person at Equity Group

13   Investments on the deal?

14        A.  A leading person.

15        Q.  Okay.  One of how many?

16        A.  Three or four.  Three or four.

17        Q.  And have you been involved in various

18   matters related to the bankruptcy of Tribune since

19   it's filed?

20        A.  Yes, I have.

21        Q.  What are your responsibilities as executive

22   vice president and chief investment officer for

23   Tribune?

24        A.  It varies, but the chief investment officer

25   position is assessing new capital opportunities,

1              CONFIDENTIAL - N. LARSEN

2    current portfolio composition, and ways to manage

3    and maximize the value of the assets of the company.

4         The executive vice president position is

5    very similar to that, and also involved in various

6    aspects of the reorganization conversation with a

7    primary focus on the appropriate leverage, liquidity

8    and asset composition.

9         Q.  Now there is an entity involved in this

10   motion called Tribune (FN) Cable Ventures, Inc.  Are

11   you familiar with that entity?

12        A.  Yes.

13        Q.  Okay.  I'm going to refer to it as TCV, if

14   everybody is okay with that.  Is that okay with you?

15        A.  That's fine by me.

16        Q.  Okay.  Are you an employee of TCV?

17        A.  No.

18        Q.  Are you an officer of TCV?

19        A.  No.

20        Q.  Are you a director of TCV?

21        A.  No.

22        MR. KORPUS:  We will mark this one Larsen 1

23        and Larsen 2.

24        (Larsen Exhibit 1, Law Debenture Trust

25        Company of New York Notice of Deposition of the

                    CONFIDENTIAL - N. LARSEN

1        Debtors, marked for identification.)

2            (Larsen Exhibit 2, Subpoena to Tribune (FN)

3        Cable Ventures, Inc., marked for

4        identification.)

5    BY MR. KORPUS:

6        Q.  You understand that you are testifying here

7    today on behalf of the debtor and on behalf of TCV?

8        A.  Yes.

9        Q.  That's been explained to you?

10        A.  Yes.

11            MR. DUCAYET:  Just answer that question.

12        A.  I do.

13        Q.  And I marked as Exhibit Larsen 1 a notice

14    of deposition to the debtors that contains a list of

15    topics commencing on page 5.  You've had a chance to

16    review those, and you are ready to testify as the

17    debtor's designee on these topics?

18        A.  Yeah.

19        Q.  And, similarly, I've marked as Larsen

20    Exhibit 2 a subpoena to TCV, which has a list of

21    deposition topics in Exhibit A, and have you

22    reviewed those topics and are ready to testify on

23    those topics as the debtor's designee?

24        A.  Yes.

1      CONFIDENTIAL - N. LARSEN

2      Q.  I'm sorry, as TCV's designee rather.

3      A.  Yes.

4      Q.  And Mr. Ducayet, it's your understanding,

5  is here representing both the debtors and TCV;

6  right?

7      A.  That is correct.

8      Q.  Now, what is TCV?

9      A.  It is the subsidiary of Tribune that owns

10  Tribune's interest in television food general

11  partnership.

12      Q.  It's wholly owned by Tribune Broadcasting

13  Company?

14      A.  It's wholly owned by an entity of Tribune.

15  I'm not certain which is the actual legal entity, it

16  is directly owned by which.

17      Q.  But it's wholly owned by debtor company?

18      A.  Correct.

19      Q.  And it's 31 percent general partner of

20  Television Food Network GP?

21      A.  31.3 percent.

22      Q.  Okay.  And other than owning the

23  partnership interest in Television Food Network,

24  does it have any interest?

25          MR. DUCAYET:  I object to the form of the

CONFIDENTIAL - N. LARSEN

1    question.

2    Q.  Does it own any assets?

3    A.  Not to my knowledge.

4    Q.  So TCV is a holding entity for the

5    partnership interest in Television Food Network;

6    right?

7    A.  It owns the stake in Television Food

8    Network.

9    Q.  Does it have any operations independent of

10   its ownership of the stake in the partnership?

11   A.  No.  No.

12   Q.  I'm sorry, I'm going to ask you to keep

13   your voice up a little.

14        Does it have any -- does it have a separate

15   office other than the offices of Tribune Company?

16   A.  Not to my knowledge.

17   Q.  Does it have any employees?

18   A.  Not to my knowledge.

19   Q.  TCV and the debtors have consolidated

20   financial statements; right?

21   A.  That's correct.

22   Q.  And the treasury functions of TCV are

23   controlled by the debtors; right?

24        MR. DUCAYET:  I object to the form of the

CONFIDENTIAL - N. LARSEN

1

2    question.  Go ahead and answer, if you know.

3        A.  Could you repeat the question, please?

4        Q.  Yeah.  The treasury functions of TCV are

5    controlled by the debtors?

6        A.  They have been managed by the debtors in

7    the past.

8        Q.  Right.  And they continue to be managed by

9    the debtors?

10        A.  I believe that's correct.

11        MR. KORPUS:  I'm going to mark this as

12        Larsen Exhibit 3.

13        (Larsen Exhibit 3, Tribune Company

14        Organization Chart as of 12/5/08, marked for

15        identification.)

16        Q.  Larsen Exhibit 3 is an organization chart

17    for Tribune Company.  It is substantially similar to

18    the one, counsel, that's in the first affidavit of

19    Mr. Bigelow, but all of the copies of that one were

20    completely illegible.  This one is just slightly

21    more legible than that one.  If there is any -- if

22    for some reason it appears to be inaccurate, please

23    tell me.

24        MR. DUCAYET:  Can I just ask, there is a

25        reference at the top to Milbank Draft.  Do you

CONFIDENTIAL - N. LARSEN

1    know what that refers to?

2        MR. KORPUS:  I don't.  I just asked for a

3        legible copy of the chart.

4    BY MR. KORPUS:

5        Q.  Does this schematic look familiar to you?

6        A.  Yes.

7        Q.  And this is an organization chart for the

8    Tribune Company group of companies?

9        A.  Yes.

10       Q.  And I see TCV -- do you see it there on the

11   left-hand side?

12       A.  I do.

13       Q.  Okay.  And it's got -- it's in a shaded

14   box, which means that it's a guarantor entity under

15   the senior credit facility and the bridge facility,

16   according to the legends; right?

17       A.  That is correct.

18       Q.  And that's --

19       A.  To the left.

20       Q.  And that's consistent with your

21   understanding?

22       A.  That is correct.

23       Q.  And it's also -- it's also in a dashed line

24   box as opposed to a full box.  And that, according

CONFIDENTIAL - N. LARSEN

1    to the legend, means that it's a non-debtor; right?

2    A.   That's correct, according to the legend.

3    Q.   And that's consistent with your

4    understanding that TCV did not file for bankruptcy

5    protection; right?

6    A.   That is correct.

7    Q.   When I look -- and you see, by the way,

8    that it is owned by Tribune Broadcasting Company,

9    that through a holding company then is owned by

10   Tribune Company?

11   A.   Yes, I do see that.

12   Q.   That's consistent with your understanding

13   of the structure?

14       MR. DUCAYET:   I object to the form of the

15       question.

16   A.   That's what the schematic says, so yes, I

17   follow what you say.

18   Q.   And you don't have any information to

19   believe that's inaccurate in some form?

20   A.   No, I do not.

21   Q.   When I look at this, I see -- well, I'll

22   ask you the question.  How many guarantor

23   non-debtors are there on this chart?

24       MR. DUCAYET:   Do you want him to count them

CONFIDENTIAL - N. LARSEN

1
2    up?

3        Q.  We can do it together, and you tell me if

4    that's consistent with your understanding that's all

5    of them or if you can think of some others.  I see

6    TCV.  I see a company called Tribune Interactive,

7    Inc. on the next column.  Do you see that one?

8        A.  I see two, I believe.

9        Q.  Oh, and Tribune National Marketing Company

10   at the top?

11           MR. DUCAYET:  This is hard to read.

12       A.  I see one sort of near the top, under Hoy

13   Publications, Tribune Interactive, Inc., and then I

14   see one that same line down across -- underneath

15   Tribune Company, Tribune Interactive, Inc.

16       Q.  I see that one.  I missed that one.  Okay.

17   Were you involved in the discussion as to which

18   companies to file for bankruptcy from Tribune

19   Company?

20       A.  Excuse me, I'm sorry?

21       Q.  Were you involved in discussions as to

22   which of the Tribune group of companies would file

23   for bankruptcy and which wouldn't?

24       A.  Not for every -- not for every entity, for

25   certain entities.

1          CONFIDENTIAL - N. LARSEN

2        Q.   For certain entities.  For example, I see

3   that the Cubs did not file for bankruptcy; right?

4        A.   That is correct.

5        Q.   And why was that?

6        A.   Because there was an active marketing

7   process for the asset, which had -- which would have

8   been ongoing at the time we filed.  And there was

9   substantial concern that filing that entity would

10  disrupt that process and cause some significant

11  concerns, both with Major League Baseball as well as

12  the parties at interest.

13       Q.   I see another company, Tribune ND, Inc.,

14  are you familiar with that company?

15       A.   Yes, I am.

16       Q.   What is the company?

17       A.   It's the entity that holds Tribune's

18  interest in the Newsday partnership.

19       Q.   And why was -- why did that company not

20  file for bankruptcy protection?

21            MR. DUCAYET:  If you know.

22       A.   It was -- there was a concern that the tax

23  structuring around the transaction was such that

24  filing the entity may -- may present some

25  complications.

1          CONFIDENTIAL - N. LARSEN

2     Q.   What about Tribune National Marketing

3  Company, do you see that one there, right under

4  Tribune Company?

5     A.   I do.

6     Q.   What does that company do?

7     A.   I am not certain what that company does.

8     Q.   Do you know why it didn't file for

9  bankruptcy protection?

10    A.   No.  No.

11    Q.   Tribune Interactive, Inc., the first one, I

12 guess, the highest one on the chart, do you know

13 what that company is?

14    A.   I do not.

15    Q.   Do you know what the lower one down is?  I

16 see it has the same name, so.

17    A.   I do not.

18    Q.   Okay.  Do you know why either of those

19 companies did not file for bankruptcy protection?

20    A.   I do not.

21    Q.   Okay.  Going to TCV, why did the debtors

22 decide not to seek bankruptcy protection for TCV?

23    A.   There was concerns that under the

24 partnership agreement of the general -- of the TV

25 Food partnership that certain rights and protections

CONFIDENTIAL - N. LARSEN

1   that TCV enjoyed under that agreement may be

2   compromised by filing it.  And there was a

3   concern -- it was a significant valuable asset for

4   the company, and there was a concern that filing it

5   may deteriorate the rights and, therefore,

6   compromise the value.

7        Q.  What rights?

8        A.  Certain rights afforded to it under its

9   partnership agreement.

10           MR. KORPUS:  Okay.  Counsel, I will ask for

11       a copy of that partnership agreement as part of

12       the production in this case.  I don't

13       believe -- on this motion I don't believe we

14       got it, and it seems to be in play here, so.

15           MR. DUCAYET:  I will take that request

16       under advisement.

17           MR. KORPUS:  Thanks.

18           MR. DUCAYET:  Sheron, can we take one

19       second?

20           MR. KORPUS:  Uh-huh.

21           (A short pause in the proceedings was had.)

22   BY MR. KORPUS:

23        Q.  Was that -- was any other reason discussed

24   for not filing TCV into bankruptcy?

CONFIDENTIAL - N. LARSEN

1

2     A.  As -- as has been said publicly by Scripts,

3  there were some ongoing conversations between

4  Tribune and Scripts with regard to a potential

5  transaction associated with Tribune's interest in

6  the partnership.  Those were active conversations in

7  the third and fourth quarter of 2008, and there was

8  some concern that filing would potentially

9  jeopardize those.

10         Ultimately Tribune made a different

11  decision not to pursue those conversations, but that

12  also factored into the decision.

13     Q.  Are there any documents that record the

14  discussions with Scripts concerning the interest of

15  the debtors in TCV, in Food Network?

16     A.  Sure, yes.

17     Q.  Are there any documents that you are aware

18  of that record the concern of the debtors in filing

19  for bankruptcy for TCV and the affect that that

20  filing may have on the discussions with Scripts?

21     A.  We did not -- the discussions with Scripts

22  had ended prior to the filing, and we did not

23  discuss our financial situation with Scripts.

24     Q.  Was the question of professional fees paid

25  by non-debtors under Tribune Company's credit

1                    CONFIDENTIAL - N. LARSEN

2    agreements discussed in the context of decisions

3    made on which companies to file for bankruptcy

4    protection?

5             MR. DUCAYET:  I'm sorry, discussed with

6        whom, discussed internally or discussed with

7        Scripts?

8             MR. KORPUS:  Discussed internally.

9        A.  No.

10       Q.  Not to your knowledge; right?

11       A.  No, not to my knowledge.

12       Q.  How is TCV capitalized?

13            MR. DUCAYET:  I object to the form of the

14       question.

15       Q.  Where does the capital come from?

16       A.  I'm not sure I'm qualified to answer that,

17   because the formation of that investment was -- well

18   predated my involvement in the Tribune.

19       Q.  Okay.  TCV -- does TCV receive certain

20   funds as a result of its interest in the Food

21   Network?

22       A.  Yes.

23

24                 REDACTED

25

CONFIDENTIAL - N. LARSEN

# REDACTED

Q.  And what happens to those funds, do they stay in TCV or are they then dividend (sic) up to the holding company of Tribune?

MR. DUCAYET:  I object to the form of the question.

Q.  To your knowledge?

A.  Currently they stay inside, in TCV.

Q.  Currently they stay in TCV.  What about prior to the bankruptcy?

A.  They were part of an integrated cash management system at Tribune Company.

Q.  So they would be -- I mean, I read the cash management motion and I have a rudimentary

CONFIDENTIAL - N. LARSEN

1  understanding of it.  I'm sure it's not as detailed

2  as yours.  But previously they would be swept up

3  into the concentration accounts at JPMorgan that are

4  in -- that are in the name of Tribune Company?

5      A.  They were swept.  I don't know which

6  financial institution they were swept to, but there

7  was a zero balancing function.

8      Q.  There was a zero balancing function, and

9  the money would go to an account -- you don't know

10  the financial institution, but you do know the

11  account it was swept into was in the name of Tribune

12  Company; right?

13      A.  Yes.

14      Q.  And since the bankruptcy, it's your

15  understanding that there is no longer this sweeping

16  function?

17      A.  That is correct.

18      Q.  And what is the reason for that?

19      A.  The reason -- well, given the debtor --

20  given the entity was a non-debtor, there was

21  conversations about the best way to keep debtor

22  assets separate from non-debtor assets, the cash

23  being an asset of TCV.

24      Q.  Well, I thought under the cash management

¹          CONFIDENTIAL - N. LARSEN

² order, even after the bankruptcy, the company

³ received approval for non-debtor cash to be swept up

⁴ as well in some instances and an intercompany --

⁵ intercompany claim to be recorded; is that not your

⁶ understanding?

⁷      A.  I couldn't speak to what the cash

⁸ management order provides for.  The cash was kept at

⁹ the TCV entity, which is, I think, also consistent

¹⁰ with the order.

¹¹      Q.  Is it your understanding that for all

¹² non-debtors since the bankruptcy filing any cash

¹³ accumulated is kept in the non-debtors and is not

¹⁴ swept for -- to the parent company account or is it

¹⁵ your understanding that for some non-debtors, other

¹⁶ than TCV, the cash is indeed swept up, as it did

¹⁷ before the bankruptcy filing?

¹⁸           MR. DUCAYET:  I object form of the

¹⁹      question, it lacks foundation.

²⁰           MR. KORPUS:  I'm sorry, what did you say?

²¹           MR. DUCAYET:  Lacks foundation.

²²      Q.  Do you understand my question?

²³      A.  I believe I do.

²⁴      Q.  And the answer is?

²⁵      A.  I believe that most of the non-debtor

1          CONFIDENTIAL - N. LARSEN

2     entities are not recipients of cash.  And I believe

3     that the non-debtor entities, to the extent that

4     they receive cash, hold that cash.

5          Q.  Prior to the bankruptcy, were any payments

6     made out of TCV for any disbursements?

7          A.  Directly?

8          Q.  Yeah.

9          A.  Prior to the bankruptcy it's my

10    understanding, as I stated earlier, that the money

11    was put into a consolidated account as money is

12    fungible.  I mean, the money was certainly used for

13    routine expenses and other items, but there was the

14    intermediary step.

15         Q.  So the routine expenses and other items

16    that were mentioned were not paid out of TCV prior

17    to the bankruptcy, they were paid out of other

18    Tribune companies, because TCV no longer had any

19    cash, because it had been swept up to the parent

20    account; right?

21         A.  It was paid out of the parent account where

22    the money went.

23         MR. KORPUS:  Let's mark this Larsen 4 and

24    Larsen 5.

25         (Larsen Exhibit 4, Unanimous Written

1       CONFIDENTIAL - N. LARSEN

2       Consent of the Board of Directors of Tribune

3       (FN) Cable Ventures, Inc. Bates stamped

4       TRB_LD003215 through 217, marked for

5       identification.)

6           (Larsen Exhibit 5, Unanimous Written

7       Consent of the Board of Directors of Tribune

8       (FN) Cable Ventures, Inc. Bates stamped

9       TRB_LD003218 through 220, marked for

10      identification.)

11  BY MR. KORPUS:

12      Q.  Before we get to Larsen 4 and Larsen 5, so

13  as I understand your testimony, since the bankruptcy

14  TCV must have accumulated a substantial positive

15  balance in its account; right?

16      A.  Yes.

17      Q.  Do you know what that balance is?

18      A.  Not specifically, no.

19      MS. KATZ:  I'm sorry, you said 4 and 5 and

20  I just seem to have one --

21      MR. DUCAYET:  They are clipped together.

22      MS. KATZ:  Oh, thanks.

23  BY MR. KORPUS:

24      Q.  Okay.  Let's go to Larsen 4 and Larsen 5.

25  Larsen 4 is Unanimous Written Consent of the Board

1             CONFIDENTIAL - N. LARSEN

2    of Directors of TCV; do you see that?

3         A.  Yes.

4         Q.  And there are three signatories, and it's

5    unanimous written consent, so do I take it that the

6    three gentlemen who signed this are all the

7    directors of TCV?

8         A.  Based on the notation written below, I

9    believe that to be the case.

10        Q.  Right.  Who is Crane Kenney?

11        A.  Currently?

12        Q.  Well, okay, let's ask who he was as of

13   June 2007 for the question?

14        A.  He was the company's general counsel.

15        Q.  When you say "the company", it was Tribune

16   Company?

17        A.  Tribune Company, yes.

18        Q.  And he was also a director of TCV, by the

19   looks of things; right?

20        A.  By the looks of things.

21        Q.  And is he still in Tribune Company?

22        A.  He is no longer -- he is the president of

23   the Chicago Cubs Baseball Club.

24        Q.  Who is John Reardon or who was John Reardon

25   as the 4th of June of 2007?

CONFIDENTIAL - N. LARSEN

1

2      A.   I believe John was the president of Tribune

3  Broadcasting.

4      Q.   And Tribune Broadcasting is a debtor

5  company?

6      A.   Per Exhibit 3, yes.

7      Q.   And he was also a director of TCV, by the

8  looks of things, at the time?

9      A.   He was.

10     Q.   And where is he today?

11     A.   He is no longer employed at the company.

12     Q.   And who was John Vitanovec as of June

13  4th 2007?

14     A.   A senior executive in the broadcasting

15  business in Tribune.

16     Q.   He was also a director of TCV, by the looks

17  of things?

18     A.   By the looks of it.

19     Q.   And the same three gentlemen are all the

20  signatories of Larsen 5; right?

21     A.   Yes.

22     Q.   I should just identify the documents for

23  the record.  I didn't do that.  Larsen 4 is

24  Unanimous Written Consent of the Board of Directors

25  of TCV, heading "Guarantee", dated 4, June 2007.

CONFIDENTIAL - N. LARSEN

1  Larsen 5 is Unanimous Written Consent of the Board

2  of Directors of TCV dated December 20, 2007, and

3  heading is "Subordinated Guarantee".

4          You understand that the question we are

5  talking about here today is TCV's payment of

6  professional fees for -- pursuant to the Credit

7  Agreement that Tribune Company entered into; right?

8      A.   That is correct.

9      Q.   Okay.  Other than these two documents

10  before you, Larsen 4 and Larsen 5, is there any

11  other board document that the debtors or TCV rely on

12  as authorizing TCV to make the payments to

13  professionals?

14      A.   Not to my knowledge.

15      Q.   So there isn't a resolution or a consent

16  that specifically says that TCV should make all of

17  the payments to professionals pursuant to Section

18  8.04 of the Credit Agreement, or something like

19  that?

20      A.   Not to my knowledge, nor was one required,

21  to my knowledge.

22      Q.   You were never asked to provide one?

23      A.   Personally?

24      Q.   Yeah.  Well, no, you are testifying on

1                   CONFIDENTIAL - N. LARSEN

2    behalf of the debtors and TCV.  To your knowledge,

3    were the debtors of TCV ever asked to provide such

4    an authorization?

5         A.  Not to my knowledge.

6         Q.  To your -- strike that.

7             Was TCV -- strike that.

8             Was the board of directors -- strike this

9    again.

10            Is there a board of directors for TCV

11   today?

12        A.  Yes.

13        Q.  Who is on the board today?

14        A.  I do not know exactly who is on the board.

15        Q.  Was there a board for TCV as of the date of

16   the bankruptcy petition?

17        A.  Yes.

18        Q.  Do you know who was on the board at that

19   time?

20        A.  I do not.

21        Q.  You know that I think it's about March of

22   '09 that the professional fees commenced being paid

23   by TCV; is that right?

24        A.  Sounds accurate.

25        Q.  Do you know if prior to TCV paying those

1                    CONFIDENTIAL - N. LARSEN

2    fees the board of TCV was approached for specific

3    authorization for those payments to be made?

4        A.  I don't believe they were, nor do I believe

5    that they were required to do so.

6        Q.  But you do not believe that they were

7    approached for the payments to be made; right?

8        A.  The board of TCV?

9        Q.  Yes.

10       A.  No, I do not.

11       Q.  That was a bad question.  You do not

12   believe they were approached for authorization for

13   the payments to be made?

14       A.  No, I do not.

15       Q.  Was -- is there any -- you said there were

16   no employees, so I assume there is no management of

17   TCV, right, non-board management?

18       A.  I believe there are officers of TCV, but I

19   don't believe there are management employees, per

20   se.

21       Q.  Were any officers of TCV approached for

22   authorization for the payments to professionals to

23   be made prior to those payments -- to the

24   commencement of those payments in March of 2009?

25       A.  Not to my knowledge.

1    CONFIDENTIAL - N. LARSEN

2        Q.   Who made the decision that TCV should

3    commence paying payment of professionals in March of

4    2009?

5        A.   Tribune Company.

6        Q.   And when you say Tribune Company, is it the

7    management of Tribune Company, the board of Tribune

8    Company, who -- who made that decision?

9        A.   Management of the company pursuant to the

10    terms of its agreement under the Credit Agreement.

11        Q.   Who specifically at the management of the

12    company made -- strike that.

13            Who specifically at the management of

14    Tribune Company made that decision?

15            MR. DUCAYET:   I object to the form of the

16        question.

17        A.   Individually?

18        Q.   Yeah.

19        A.   I'm not sure if any one individual was

20    discussed.   The company felt it had a legal

21    obligation to make those payments.

22        Q.   Who were the individuals involved in that

23    decision?

24        A.   The general counsel, deputy general

25    counsel, chief financial officer, myself, perhaps

1      CONFIDENTIAL - N. LARSEN

2  others.

3      Q.  Can we just name those people for the

4  record, the general counsel is?

5      A.  Don Liebentritt.

6      Q.  The deputy general counsel?

7      A.  David Eldersveld.

8      Q.  The chief financial officer?

9      A.  Chandler Bigelow.

10     Q.  Yourself we know.  And you are all

11  employees of Tribune Company; right?

12     A.  Correct.

13     Q.  When do you recall the issue of payment of

14  professional fees pursuant to the Credit Agreement

15  first coming up?

16     A.  January of 2009.

17     Q.  And what do you remember about that, how

18  did it come up?

19     A.  There was conversation that -- that the

20  company had a legal obligation under its current

21  Credit Agreement for the non-debtors who were not

22  subject to the Bankruptcy Code to make certain

23  payments of fees and other amounts.  There was a

24  conversation that was brought up and consistent with

25  the business discussion we began earlier in order to

1          CONFIDENTIAL - N. LARSEN

2    make certain that we did everything we could to

3    preserve and enhance the value of the assets that

4    hadn't filed for bankruptcy.

5          Q.  When you say that there was a conversation,

6    conversation between whom and whom?

7          A.  I'm not certain I can say specifically who

8    initiated and between which two people.

9          Q.  Right.  But you mean a conversation, an

10   internal conversation at Tribune, or do you mean a

11   conversation with the agent?

12         A.  It was a conversation between the company

13   and the agent.

14         Q.  Okay.  Do you recall whether it was the

15   agent that approached the company about this

16   obligation or was it the company that approached the

17   agent?

18         A.  I don't recall.

19         Q.  But to your recollection sometime in

20   January 2009 there was a conversation between the

21   agent and the company about the payment of legal

22   fees, of professional fees, pursuant to the Credit

23   Agreement and the company's obligations?

24            MS. KATZ:  I object to the form, sorry.

25         A.  I would say that the conversation

CONFIDENTIAL - N. LARSEN

1  surrounded what could be done by the company to

2  preserve the value of its assets.  That conversation

3  also had a component with regard to these payments

4  of reasonable fees and expenses, but it wasn't a

5  conversation that was as narrowly defined as the

6  question.

7          (A short interruption in the proceedings

8      was had as James Johnston entered the room.)

9          MR. KORPUS:  These are going to be 6 and 7.

10      We are doing them in pairs today.

11          (Larsen Exhibit 6, 12/1/08 E-mail from

12      Chandler Bigelow to Kevin Foley Bates stamped

13      JPM2_00002780 and 2781, marked for

14      identification.)

15          (Larsen Exhibit 7, 4/16/09 E-mail chain

16      from Daniel Smit to Vince Garlati Bates stamped

17      JPM2_00002103 through 2108, marked for

18      identification.)

19  BY MR. KORPUS:

20      Q.  Do you recall -- do you recall when the

21  company filed for bankruptcy?

22      A.  I do.

23      Q.  December 8, 2008; is that correct, the

24  right date?

CONFIDENTIAL - N. LARSEN

1

2      A.  Yes, that is correct.

3      Q.  Exhibit 6 is an E-mail from Chandler

4  Bigelow to Kevin Foley at JPMorgan.  It's dated

5  December 1, 2008, and it attached to it another

6  E-mail from JPMorgan -- a response to an E-mail from

7  JPMorgan.  And attached to it is an engagement

8  acknowledge.  Do you see that?

9      A.  I do.

10     Q.  Have you seen this document before?

11     A.  I have not.

12     Q.  The document attached to the E-mail

13  contains an agreement by Tribune Company to provide

14  the agent with a retainer of $2 million?

15         MR. DUCAYET:  You know what, I'll just stop

16     you there, you don't have the attachment to the

17     E-mail.  We just the E-mail.

18         MS. KATZ:  Right.

19         MR. KORPUS:  That's nice.  Can I see the

20     set?

21         MR. DUCAYET:  That's true on the other one

22     too.

23         MR. KORPUS:  Why don't we have the witness

24     have a quick look at my copy, and then at some

25     point we will make copies.

1          CONFIDENTIAL - N. LARSEN

2          MR. DUCAYET:   That's fine.

3   BY MR. KORPUS:

4          Q.   Do you see there is attached an engagement

5   letter which provides for a retainer of $2 million

6   to be paid by Tribune Company to the agent?

7          A.   I do.

8          Q.   And the date of the engagement letter is?

9          A.   November --

10         MR. DUCAYET:   26.

11         Q.   November 26, thank you.  What were the

12   circumstances by which it came about that Tribune

13   agreed to pay $2 million to the agent at that time?

14         A.   Well, at that time, November of 2008, the

15   company was, you know, assessing the significant

16   deterioration of its operating results, its

17   liquidity position, its covenants with regard to its

18   credit agreements and deciding what actions would be

19   in the best interest of its constituents.

20         In that context it was discussing both

21   internally as well as with retained advisors and its

22   agent lender as to what sort of the whole host of

23   options were.  And there were conversations with

24   JPMorgan in its capacity as the agent around those

25   topics.  That was the context in which this

1            CONFIDENTIAL - N. LARSEN
2    conversation took place.
3         Q.   Okay.   If you turn to the cover E-mail --
4    maybe I can have my copy back?
5              MR. DUCAYET:   Sure.
6         Q.   The executed letter was sent back on
7    December 1, 2008; right?
8         A.   It appears that way.
9         Q.   And that's a week before the company filed
10   for bankruptcy protection; right?
11        A.   That's correct.
12        Q.   At the time that the agreement to pay the
13   agent $2 million was sent back to the agent, was it
14   apparent that the company was going to file for
15   bankruptcy?
16             MR. DUCAYET:   I object to the form of the
17             question.   If you know, but don't disclose the
18             contents of any conversations you had with
19             lawyers.
20        A.   I do not believe any decision -- final
21   determination had been made at that early date.
22        Q.   But it's fair to say that the company and
23   its advisors were working on a bankruptcy filing at
24   that time; right?
25        A.   We were preparing as a potential decision

Page 39

1                  CONFIDENTIAL - N. LARSEN

2    to be made, but no decision had been made to file

3    the bankruptcy.

4         Q.  Right.  But you were working on bankruptcy

5    papers in case a final decision would be made to

6    file for bankruptcy; right?

7         A.  I believe we were being prepared for all

8    the potential decisions.

9         Q.  And the agent -- there were discussions

10   with the agent where the agent knew that one of the

11   possible decisions was bankruptcy filing for the

12   company; right?

13             MS. KATZ:  I object to the form.

14        A.  I would not be in a position to say what

15   the agent knew.  You know, the conversations they

16   certainly would have been aware of it as a

17   possibility.

18        Q.  You were having discussions with the agent

19   around this time; right?

20        A.  Correct.

21        Q.  And in those discussions, I assume, part of

22   the discussions were the possibility of a bankruptcy

23   filing; right?

24        A.  Sure.

25        Q.  Did the debtor determine that it had an

1              CONFIDENTIAL - N. LARSEN

2    obligation to pay a $2 million retainer to the agent

3    at that time?

4        A.  I don't believe it was -- at the time it

5    was not a debtor.

6        Q.  Okay.  The Tribune Company determined at

7    the time that it made the $2 million payment to the

8    agent that it had a legal obligation to make that

9    payment?

10          MR. DUCAYET:  I object to the form of the

11      question.

12      A.  Yeah, I can't testify as to legal

13   obligation.

14      Q.  Well, I guess I'm --

15      A.  I'm not sure I'm following.

16      Q.  I'm trying to understand why it was that

17   you -- that Tribune Company made the decision to pay

18   a $2 million retainer to the agent a week prior to

19   bankruptcy?

20          MS. KATZ:  I object to the form.

21   BY MR. KORPUS:

22      Q.  Can you help me there?

23      A.  I could say that, you know, the company

24   felt that in its process of making certain that it

25   did everything it could to, you know, preserve, you

1          CONFIDENTIAL - N. LARSEN
2   know, it's flexibility in its assets, that it
3   decided that that was a reasonable business decision
4   to make.
5          Q.  Did the agent demand a $2 million retainer
6   at that time?
7          A.  A demand with a consequence to the
8   contrary?
9          Q.  Yes.
10         A.  Not to my knowledge.
11         Q.  Are there any specific discussions that you
12  recall concerning the decision to pay a $2 million
13  retainer to the agent a week prior to the
14  bankruptcy?
15         MS. KATZ:  I object to the form.
16         A.  Not to my recollection.
17         Q.  Who at the company made the decision to pay
18  the $2 million retainer to the agent?
19         A.  Again, I'm not certain if one individual
20  made the decision in a capacity as an individual.
21  Obviously there is a person who signed the letter.
22  But I suspect that it was a decision made by the
23  company's management, more broadly defined.
24         Q.  Were you involved in that decision?
25         A.  Not to my recollection, but at that time I

1                 CONFIDENTIAL - N. LARSEN
2    was not an employee of the company.
3        Q.  When did you become an employee of the
4    company?
5        A.  December 5th, 2008.
6        Q.  Do you recall how the $2 million paid to
7    the agent were used?
8        A.  Specific --
9            MR. DUCAYET:  I object to the form of the
10           question.
11       A.  Specific to the actual amounts, no.
12       Q.  If you look --
13       A.  I suspect they were used for various
14   professional fees.
15       Q.  Right.  If you look at Larsen 7, which is
16   an E-mail chain, the top E-mail is dated April 16,
17   2009.  Do you see it contains some information on
18   the application of retainer amounts; do you see
19   that?
20       A.  Yes.
21       Q.  And it says that for FTI invoices, retainer
22   invoices were issued on December 1 and December 4
23   for the total amount of $750,000; do you see that?
24       A.  I do.
25       Q.  And then underneath that, DPW, you

1                 CONFIDENTIAL - N. LARSEN

2    understand that to be Davis Polk, obviously?

3         A.  I do.

4         Q.  DPW issued retainer invoices for $1,250,000

5    on 12/4/08; do you see that?

6         A.  I do.

7         Q.  And adding those numbers up seems to make

8    up the $2 million that was paid to the agent; right?

9         A.  Mathematically it does, yes.

10        Q.  And does it refresh your recollection on

11   the application of the $2 million that was paid to

12   the agent?

13        MR. DUCAYET:  I object to the form of the

14        question.

15        A.  I mean, I understand where the proceeds

16   ultimately went, yes.

17        Q.  This is consistent with your recollection

18   as to what happened to the proceeds?

19        A.  In terms of the institutions who received

20   them, the actual amounts, what the actual retainers

21   were specifically in terms of how they split out,

22   this seems consistent with my recollection.

23        Q.  Is it -- I may have asked this, and I

24   apologize if I did, but do you have an understanding

25   that the company was obligated under the terms of

1       CONFIDENTIAL - N. LARSEN

2  its Credit Agreement to pay the $2 million retainer

3  to the agent?

4       MR. DUCAYET:  I object to the form of the

5       question, and I just caution you not to reveal

6       the contents of any privileged communications

7       you may have had on that topic.  If you

8       otherwise have an understanding, you may go

9       ahead and answer.

10      A.  Absent conversations with attorneys, I'm

11  not.

12      Q.  Do you recall receiving legal advice on the

13  issue of whether the company is obligated to pay a

14  retainer of $2 million to the agent under the terms

15  of its Credit Agreement?

16      MR. DUCAYET:  You can just answer that

17      "yes" or "no".

18      A.  Yes.

19      Q.  And who do you recall giving you that legal

20  advice?

21      MR. DUCAYET:  Just give a name or a firm.

22      A.  Sidley & Austin.

23      Q.  When do you recall that legal advice being

24  given?

25      A.  With regards to the $2 million retainer?

Page 45

CONFIDENTIAL - N. LARSEN

1

2       Q.   Yes.   I'm asking specifically about the

3  $2 million retainer paid prior to the bankruptcy.

4       A.   Early part of December/end of November.

5       Q.   So you have a specific recollection in your

6  mind of obtaining legal advice from Sidley in

7  December or November of '08 on the question of the

8  retainer that you paid to the agent?

9       A.   It was part of the overall conversations as

10 to what was -- where the company was going to

11 proceed.  We, you know, consume legal advice on a

12 whole host of topics, of which how to proceed with

13 our agent letter is one of them.

14      Q.   Yeah, but I'm asking you specifically do

15 you recall receiving legal advice on this subject,

16 on the subject of paying the retainer prior to

17 making a decision to pay the retainer?

18      A.   The specific legal advice, I don't -- I

19 don't recall that conversation.  But, again, as I

20 said earlier, at that point in time I was not an

21 employee of the company.  So there may have been

22 specific legal advice provided to company management

23 other than myself on that topic.

24      Q.   Okay.  But I understand what may have been.

25 I'm asking for your recollection.  I don't want to

CONFIDENTIAL - N. LARSEN

1

2  get the substance of the legal advice.  I'm not

3  asking for it.

4     A.  I understand.

5     Q.  I'm just trying to find out whether you

6  recall specifically legal advice being given by

7  Sidley prior to the bankruptcy on the question of

8  whether the Credit Agreement obligated the Tribune

9  Company to make this $2 million retainer payment to

10 the agent?

11    A.  I don't have a recollection one way or the

12 other.

13    Q.  Do you recall a discussion -- strike that.

14        Did you understand that if Tribune Company

15 wanted to make the payment after the bankruptcy

16 filing, it would need to obtain the consent of the

17 bankruptcy court to do so?

18        MS. KATZ:  I object to the form.

19        MR. DUCAYET:  And I'll object and, again,

20     caution you.  If you have such an understanding

21     because it was given to you by counsel for the

22     company, I would instruct you not to reveal the

23     contents of that conversation.

24    A.  Could you repeat the question?

25    Q.  Sure.  At the time that Tribune Company

1    CONFIDENTIAL - N. LARSEN

2    made the payment to the agent of the $2 million

3    retainer, did you have the understanding that if

4    Tribune Company wanted to make that payment after

5    the filing of the bankruptcy petition, it would need

6    obtain the consent of the bankruptcy court to do so?

7        MS. KATZ:   Same objection.

8        A.   Again, as I stated earlier, at the time no

9    final decision had been made as to the right way for

10   the company to proceed, nor which entities would

11   file, which entities weren't.  I think the question

12   seems to presume a series of items, which I'm not

13   sure I can answer simply that question.

14       Q.   I don't think there is a lot of

15   presumptions in my question.  My question is simply

16   this:  The Tribune Company made a payment to the

17   company of -- Tribune Company made a payment to the

18   agent of $2 million some days prior to the

19   bankruptcy?

20       A.   That's correct.

21       Q.   My question is:  At the time you did that,

22   did you have the understanding that if you did not

23   make that payment before the bankruptcy petition was

24   filed, if you wanted to make that payment after the

25   petition was filed by Tribune Company, you would

1          CONFIDENTIAL - N. LARSEN

2   need the consent of the bankruptcy court?  And I

3   guess the answer is either, yes, you had that

4   understanding, or, no, you didn't, or you had that

5   understanding and it's based on legal advice and you

6   are not going to tell me what it is.

7       A.  We had an understanding that was based on

8   legal advice.

9       Q.  We talked earlier about discussions as to

10  which entities to include in the bankruptcy filing

11  and which not to include.  Were there discussions

12  with the lenders or the agent on that topic?

13      MR. DUCAYET:  I object to the form of the

14      question.  Go ahead and answer.

15      A.  Not to my knowledge.

16      Q.  So you were not personally involved in any

17  discussions with the agent or its representatives

18  prior to the bankruptcy filing where the subject was

19  discussed of which specific Tribune entities would

20  be filing for bankruptcy?

21      A.  That is correct.

22      Q.  I asked you earlier, I believe, when you

23  remember the subject first coming up of

24  conversations concerning the payment of professional

25  fees, and you said you recalled in January or

CONFIDENTIAL - N. LARSEN

1  February, I believe, there were conversations with

2  the agent on the subject.  So I take it at that time

3  that the Tribune Company made the decision to pay

4  the $2 million retainer to the agent, the agent had

5  not yet demanded payment of professional fees?

6       MR. DUCAYET:  I object to the form of the

7       question.

8       Q.  To your recollection?

9       A.  To my knowledge, no.

10       MR. KORPUS:  Jim, I want to note for the

11       record that the pages that are missing from

12       Larsen Exhibit 6 are JPM2_0002782 and 2783.

13       And at some convenient point we will add them

14       to the record.

15       MR. DUCAYET:  That's fine.

16  BY MR. KORPUS:

17       Q.  Is it your understanding that the Credit

18  Agreement obligates -- strike that.

19       MR. KORPUS:  Larsen 8.

20       (Larsen Exhibit 8, 5/17/07 Credit Agreement

21       Bates stamped TRB_LD000253 through 369, marked

22       for identification.)

23       Q.  Okay.  I put before you the Credit

24  Agreement for Tribune Company dated May 17, 2007.  I

1          CONFIDENTIAL - N. LARSEN

2    assume you are familiar with this document?

3          A.  I am.

4          Q.  And if you turn to Section 8.04 on page 94,

5    is it the debtor's and TCV's position that this

6    provision obligates TCV to reimburse the debtor for

7    professional fees incurred -- reimburse the agent

8    for professional fees incurred?

9          MR. DUCAYET:  Objection to the form of the

10         question.

11         A.  Could you repeat the question, please, I'm

12    sorry?

13         Q.  Yeah.  Is it the debtor's and TCV's

14    position that Section 8.04 of the Credit Agreement

15    obligates TCV to pay the professional fees for the

16    agent?

17         MR. DUCAYET:  Again, object to the form,

18         vague.

19         A.  It's the understanding that it obligates

20    the company and its guarantor entities.  I don't

21    think it specifically obligates TCV, other than in

22    its capacity as a guarantor.

23         Q.  Okay.  Fair enough.  And is it the debtor's

24    and TCV's position that Section 8.04 obligates the

25    debtor and its guarantor entities to reimburse the

1          CONFIDENTIAL - N. LARSEN

2    agent for professional fees incurred in connection

3    with the bankruptcy of Tribune Company?

4          MS. KATZ:  Object.

5          MR. DUCAYET:  I object to the form of the

6          question, vague.  The document speaks for

7          itself.

8          A.  I'm not sure of the difference between the

9    previous question.

10         Q.  Well, I'm asking now specifically about a

11   connection with the professional fees incurred by

12   the agent in connection with the bankruptcy.  What

13   is it in Section 8.04 that the company and TCV

14   believes obligates it to pay those professional

15   fees, what's the language?

16         MS. KATZ:  I object to the form.

17         MR. DUCAYET:  And in answering that

18         question I would caution you not to reveal the

19         substance of legal communications provided to

20         the company on that issue.

21         A.  I mean there are, I would say, things that

22   are on its face appear to that, but obviously there

23   were legal conversations and considerations that

24   went into that, and it's probably not appropriate to

25   get into it.

CONFIDENTIAL - N. LARSEN

1          MR. KORPUS:  Okay.  On that topic, counsel,

2      you did produce to the trustee and produce to

3      us in this litigation an opinion that you wrote

4      on the subject, so I don't know how you can

5      continue to claim privilege in connection with

6      that topic.

7          MR. DUCAYET:  Okay.  You and I have had a

8      conversation about this.  I don't think it's

9      fair to call it an opinion, and we do maintain

10     the privilege.

11         MR. KORPUS:  So you are going to instruct

12     him not to answer that question?

13         MR. DUCAYET:  As its currently framed, yes.

14 BY MR. KORPUS:

15     Q.  Do you have any understanding independent

16 of legal advice as to how Section 8.4 (sic)

17 obligates the company to pay for costs incurred by

18 the agent in connection with the bankruptcy of

19 Tribune Company?

20         MR. DUCAYET:  Do you understand the

21     question?

22     A.  If you could clarify, it would be helpful.

23 I think I understand what you are trying to ask,

24 but...

1              CONFIDENTIAL - N. LARSEN

2       Q.   Yeah, I'm asking who decides section -- who

3  decides on the legal advice -- what is your

4  understanding of what is it -- as I read Section

5  8.04, what is it that you are relying on in saying

6  that Tribune Company and its guarantors have to

7  reimburse the company, have to reimburse the agent

8  for professional fees incurred in connection with

9  the bankruptcy?

10      A.   Well, absent a legal interpretation, I read

11 the second part of Section 8.04(a) to be borrower

12 agrees to pay promptly following demand, all

13 reasonable and documented out-of-pocket costs and

14 expenses of the agent, lead arrangers and lenders, I

15 won't read the whole thing, to be directly to that

16 point.

17      Q.   It goes on to say -- sorry.

18      A.   So it's a business person's interpretation,

19 not a legal interpretation.

20      Q.   Okay.

21      A.   But that would seem to be those were

22 entities that were not filed for -- filed for

23 bankruptcy and had some concerns different with the

24 Cubs and TCV, but consistent concerns that, you

25 know, movement against those entities would be --

1                CONFIDENTIAL - N. LARSEN

2    would diminish value.

3         Q.  Is it your -- okay.

4         Did there come a point when the agent --

5    the agent threatened to take steps against TCV if

6    its professional fees would not be paid?

7              MS. KATZ:  I object to the form.

8         A.  Not to my knowledge.

9         Q.  And is that because it never came to that,

10   because the -- because Tribune Company agreed to

11   have those payments made through TCV before it ever

12   came to that point?

13             MS. KATZ:  I object to the form.

14             MR. DUCAYET:  I object to the form, calls

15        for speculation.

16        A.  I wouldn't be able to tell you what would

17   have happened.  From the Tribune Company's

18   perspective, there was a business rationale for

19   doing that.  Where it would have ultimately come, I

20   think, is subjective.

21        Q.  And the business rationale was that Tribune

22   Company was concerned that the agent would take

23   steps against TCV that would affect the value of

24   that business, of its investment in Food Network?

25        A.  I wouldn't narrowly define it as the agent.

1           CONFIDENTIAL - N. LARSEN

2   There were other authorities.  There was a widely

3   syndicated deal.  I certainly can't speak to what

4   people would do other than we were concerned that if

5   something would transpire, that could impact the

6   value of the asset.

7       Q.  And the value of the asset, again, would be

8   that any action -- in your assessment, any action

9   against TCV would trigger some kind of a reaction

10  under the partnership agreement that you had for

11  Food Network; was that the concern in a nutshell?

12      A.  The general concern is an action would lead

13  the company to feel the need to make TCV a debtor

14  entity.  And by making TCV a debtor entity, there

15  were certain rights, privileges under its current

16  partnership agreement that would be circumscribed.

17      Q.  And sitting here today you cannot tell me

18  where those rights and privileges are?

19      MR. DUCAYET:  If you know that apart from

20      what the lawyers may have provided to you.

21      A.  These were conversations.

22      MR. KORPUS:  Are you really going to claim

23      the legal --

24      MR. DUCAYET:  I am.

25      A.  These were conversations.  It was not -- I

Page 56

CONFIDENTIAL - N. LARSEN

1    mean, I'm not an expert on Delaware general

2    partnership law.  We rely on outside help for things

3    along those lines.

4         But it was a conversation that was

5    reasonably fully vetted in that context, that

6    things -- you know, if you proceeded down that

7    continuum that we just discussed, you may have a

8    negative outcome.

9         Q.  Do you remember getting advice on this

10   subject from an expert on Delaware general

11   partnership law?

12        A.  The company has tax counsel, yes.

13        Q.  And do you remember discussions with that

14   tax counsel on this subject?

15        A.  Yes.

16        Q.  And who was that tax counsel?

17        A.  McDermott Will & Emery.

18        Q.  Who at McDermott?

19        A.  Several individuals led by Blake Rubin.

20        Q.  And when do you recall those discussions

21   taking place?

22        A.  Discussions that took place in the fourth

23   quarter of 2008 and primarily were conversations

24   that continued through 2009.

CONFIDENTIAL - N. LARSEN

1

2  Q.  And just to make it clear, you recall

3  specific discussions about the affect that the

4  bankruptcy filing would have on the interest of TCV

5  and the Food Network via the partnership agreement?

6  A.  There were -- I mean, the company has a

7  series of partner -- investments in partnerships.

8  And as we were speaking to earlier, the company was

9  preparing to figure out what its best options were.

10  Understanding the impact of a bankruptcy filing on

11  those investments was something that was discussed.

12  Q.  And is there some kind of a memo or an

13  opinion from McDermott that contains the advice that

14  you received on the subject?

15  MR. DUCAYET:  Just answer that a "yes" or

16  "no".

17  A.  Not certain that it was actually a memo or

18  opinion.

19  MR. KORPUS:  Can I go off the record for

20  one second?

21  (Whereupon a discussion was had off the

22  record.)

23  MR. KORPUS:  Let's mark this as the next

24  document, Larsen 9.

25  (Larsen Exhibit 9, 1/10/09 E-mail from

CONFIDENTIAL - N. LARSEN

1    Daniel Smit to Bryan Krakauer and others Bates

2    stamped TRB_LD000021 through 33, marked for

3    identification.)

4    Q.  I've marked as Exhibit Larsen 9 an E-mail

5    from Daniel Smit, S-m-i-t, of Davis Polk, dated

6    January 10, 2009, bearing production numbers

7    TRB_LD00021 through 33.  It has attached to it a

8    draft Forbearance Agreement.  Have you had a chance

9    to review the document?

10   A.  Yes.

11   Q.  Have you seen this document before?

12   A.  Yes.

13   Q.  And what is this document?

14   A.  I believe it's the initial draft of the

15   Forbearance Agreement from the senior lenders to the

16   company.

17   Q.  And what is a Forbearance Agreement?

18   A.  It's an agreement for certain consideration

19   for them to not take certain steps they are entitled

20   to otherwise take against the company or entities

21   and owned by the company.

22   Q.  How did it come about that Davis Polk

23   circulated a draft of this Forbearance Agreement;

24   what's the background to it?

CONFIDENTIAL - N. LARSEN

1

2   A.  I believe it was in response to

3   conversations consistent with what we've talked

4   about as the potential risk to the non-debtor

5   entity, you know, non-debtor entities as a way to

6   try to get a higher degree of certainty that someone

7   wouldn't move against those assets and, therefore,

8   precipitate the adverse impact.

9   Q.  Did the company -- I'm sorry.  Did you

10  finish?

11  A.  I'm done.

12  Q.  Did the company ask for a Forbearance

13  Agreement to be drafted by the agent's counsel?

14  A.  I believe the initial request was for some

15  form of forbearance.  Whether they requested this

16  agreement or an agreement, but the concept, I

17  believe, was raised by the company.

18  Q.  And this was the first draft that was

19  produced by the agent's counsel?

20  A.  I believe it was an initial draft.  I can't

21  speak definitively to be the first.

22  Q.  To the best of your recollection, this was

23  the initial draft that was provided to the company

24  by the agent's counsel?

25  A.  An early draft, yes.

1      CONFIDENTIAL - N. LARSEN

2      Q.  And the -- this agreement, the Forbearance

3  Agreement, was to be signed by the Tribune parties,

4  including debtor entities; right?

5          MR. JOHNSTON:  I object to the form of the

6      question.

7      Q.  Let me help you.  I can help you with that,

8  if you like.  If you look at TRB_LD00031, there is a

9  signature line for each of the entities

10  scheduling -- listed in Schedule I hereto; do you

11  see that?

12     A.  31?

13         MR. DUCAYET:  31.

14     A.  Yes.

15     Q.  And Schedule I hereto has a heading for

16  Tribune parties?

17     A.  Yes.

18     Q.  And if you look back at the first page of

19  the agreement, in the fifth "whereas" clause it

20  says, "Certain of the Tribune parties are not

21  debtors in the Chapter 11 proceeding (the non-debtor

22  Tribune parties)", and that to me suggests the

23  Tribune parties included both debtors and

24  non-debtors, and that the agreement was to be signed

25  as drafted on behalf of both debtors and

1                 CONFIDENTIAL - N. LARSEN

2    non-debtors; is that your understanding of this --

3    how this agreement works?

4          MR. DUCAYET:   I object to the form of the

5          question.

6          A.  Let me just take a closer look.

7          Q.  Yeah.

8          A.  I understand how you get to that

9    conclusion, yeah.

10         Q.  You don't have any different recollection

11   that this Forbearance Agreement was to be signed

12   only by non-debtors; right?

13         A.  I don't have a recollection of conversation

14   as to which parties would sign from either

15   perspective.

16         MR. DUCAYET:   Sheron, would this be a good

17         time to take a two-minute break?

18         MR. KORPUS:   Yeah.

19         (Recess taken from 9:50 a.m. to

20         10:00 a.m.)

21         (Larsen Exhibit 10, 1/20/09 E-mail from

22         David Eldersveld to Nils Larsen Bates stamped

23         TRB_LD000042 through 57, marked for

24         identification.)

25

1      CONFIDENTIAL - N. LARSEN

2   BY MR. KORPUS:

3      Q.  I marked as Exhibit Larsen 10 an E-mail

4   from David Eldersveld at Tribune to yourself and

5   Mr. Bigelow, dated January 20, 2009, which has other

6   documents.  It's forwarding another E-mail and has a

7   draft of the Forbearance Agreement attached to it.

8   Have you had a chance to review this document?

9      A.  I'm reviewing it right now.  Yes.

10      Q.  And do you see that you are being forwarded

11   the company's proposed modifications to the draft

12   Forbearance Agreement that we just looked at?

13      A.  Yes.

14      Q.  And do you see that this agreement also

15   included the Tribune parties as signatories?  You

16   can look at -- it's the same mechanism that I showed

17   you before, you can look at TRB_LD000054.

18      A.  Uh-huh.

19      Q.  Which has all of the entities listed in

20   Schedule I.  And Schedule I contains the Tribune

21   parties and does the same paragraph that I showed

22   you before about Tribune parties including debtors

23   and all that.  Do you see that?

24      A.  I do.

25      Q.  And in addition do you see that a term was

1          CONFIDENTIAL - N. LARSEN

2    added here under 4(ii) on page 6 as a condition to

3    effectiveness that, "The Bankruptcy Court has

4    entered an order authorizing the debtors to enter

5    into and perform in accordance with this Forbearance

6    Agreement."  Do you see that provision?

7         A.  I do.

8         Q.  And you can compare it to the last exhibit,

9    or you can just take my word for it, that this was

10   an addition that did not appear in the previous

11   draft.  You can look at page 6 of the previous draft

12   that has other conditions to effectiveness, but not

13   court approved.

14          MR. DUCAYET:  And, Sheron, just for the

15       record, there was also a red lined attached to

16       the E-mail showing the changes.  I don't know

17       if you have that.

18          MR. KORPUS:  That would have been a lot

19       easier for the presentation for the deposition,

20       but whoever prepared this for me, did not give

21       me the red line.

22          MR. DUCAYET:  Just so you know.

23          MR. KORPUS:  Thanks.

24   BY MR. KORPUS:

25       Q.  Can you --

<sup>1</sup>                    CONFIDENTIAL - N. LARSEN

<sup>2</sup>       A.   Repeat the question.

<sup>3</sup>       Q.   Yeah.  I'm just asking you to confirm that

<sup>4</sup>  the condition that was added by the companies about

<sup>5</sup>  bankruptcy court approval did not appear in the

<sup>6</sup>  previous draft that was generated by Davis Polk?

<sup>7</sup>       A.   That is correct.

<sup>8</sup>       Q.   Do you recall discussions with Davis Polk

<sup>9</sup>  or the agent or any of the lenders concerning the

<sup>10</sup> subject of bankruptcy court approval for the

<sup>11</sup> Forbearance Agreement?

<sup>12</sup>      A.   I don't recall conversations to that

<sup>13</sup> effect, but obviously it's in this version not

<sup>14</sup> accidentally.

<sup>15</sup>      Q.   Okay.  What do you remember about -- other

<sup>16</sup> than discussions with counsel, what -- what

<sup>17</sup> conversations or other information do you recall

<sup>18</sup> about the subject of bankruptcy court approval in

<sup>19</sup> connection with the Forbearance Agreement?

<sup>20</sup>           MR. DUCAYET:  I object to the form of the

<sup>21</sup>      question.

<sup>22</sup>      A.   I don't have a recollection of

<sup>23</sup> conversations about which entity and the form of who

<sup>24</sup> would execute this.  You can tell from the page this

<sup>25</sup> is forwarded to me after the changes were made.  I

1          CONFIDENTIAL - N. LARSEN

2    was focused more on some of the business areas

3    mainly, as in this case pertained to Cubs

4    transaction.

5          Q.  Okay.  Do you recall any discussions within

6    the company about the subject of court approval for

7    the Forbearance Agreement other than discussions

8    with legal counsel?

9          A.  I remember the conversation -- the topic

10   being discussed, yes.

11         Q.  Can you tell me why it was that the debtor

12   believed it should contain a condition to

13   effectiveness of the bankruptcy court approval for

14   the Forbearance Agreement?

15         MR. DUCAYET:  Again, subject to the

16         limitation that you shouldn't reveal what your

17         counsel told you.

18         A.  Generally, as you know, based on the dates

19   here, this is early in the bankruptcy process.  It's

20   a big company, a big case.  I think it was important

21   for our -- you know, from our perspective to do

22   everything in a way that was, you know, beyond sort

23   of condemnation.

24         So the theme is not, you know, specifically

25   a legal theme but just a general how you do business

1        CONFIDENTIAL - N. LARSEN

2    to make certain that there is a level of

3    transparency.

4        Q.  Do you recall any resistance by the agent

5    or the lenders to include in a condition for

6    bankruptcy court approval to the Forbearance

7    Agreement?

8            MR. JOHNSTON:  I object to the form.

9        A.  I don't have a memory of what various

10   iterations are as this document progresses.  So to

11   the extent that there are subsequent versions of

12   this, I do know that ultimately the Forbearance

13   Agreement was not executed.

14       Q.  Okay.  Well, let's -- I have not found any

15   subsequent versions to this one, so counsel will

16   tell me if any exist in the production, but that's

17   the last one that I've seen.  Are you aware of any

18   others?

19       A.  I'm not aware of any specific documents,

20   but I don't suspect that January 20th the

21   conversations ceased entirely.  There was probably

22   subsequent conversations.

23       Q.  What do you remember about the subsequent

24   conversations about the subject -- on the subject of

25   forbearance?

CONFIDENTIAL - N. LARSEN

1

2    A.   On the subject of forbearance or the

3  subject narrowly?

4    Q.   Of executing a Forbearance Agreement.

5    A.   The conversations generally were there was

6  some differences of opinion between the company and

7  the agent as to what the appropriate form of the

8  agreement was, but not necessarily narrowly with

9  regard to clause 4(ii).

10    Q.   What do you recall being the differences of

11  opinion between the company and the agent as to the

12  appropriate form of the agreement?

13    A.   One of the issues that was of concern to

14  the company was how involved in a Cubs disposition

15  process that the senior lenders would become.  Major

16  League Baseball has very -- they are very protective

17  of their information, especially league-wide

18  information, and there was concern that getting a

19  series -- opening that information up more broadly,

20  as the agreement would appear to, you know, require,

21  was one that was going to be very problematic.  And

22  that was a gap that was hard to close.

23        And that's -- you know, in this context it

24  was one of my primary concerns, was if you recall in

25  January of 2009 is when we made the decision to

1       CONFIDENTIAL - N. LARSEN

2   narrow a group of three interested parties to one

3   and try to negotiate with that one in hopes of

4   getting a deal done.  And I think there was some

5   concern with the league to the extent -- and the

6   party, that if the process became even more

7   laborious than it was, that that would have a

8   negative impact.

9       Q.  And the concern was because the Forbearance

10  Agreement called for certain information to be made

11  available to the banks?

12      A.  Correct, lending parties.

13      Q.  Okay.  What other issues do you remember

14  being differences of opinion between the agent and

15  the company or the lenders and the company in

16  connection with the Forbearance Agreement?

17      A.  There was discussion over the appropriate

18  termination rights of either party.

19      MS. KATZ:  I'm sorry, I didn't hear also.

20      A.  I will repeat it.  There was a discussion

21  over the appropriate termination rights.

22      Q.  And what do you recall about that

23  discussion?

24      A.  That the initial position of the agents was

25  that the company would not have the ability to

<sup>1</sup>                   CONFIDENTIAL - N. LARSEN

<sup>2</sup>  terminate, whereas they would after a period of

<sup>3</sup>  time.  And I believe that the company's position on

<sup>4</sup>  that was that there would be a mutual termination

<sup>5</sup>  ability.

<sup>6</sup>       Q.  And how was that resolved ultimately?

<sup>7</sup>       A.  Oh, I believe the -- there was no agreement

<sup>8</sup>  ever signed, so.

<sup>9</sup>       Q.  What other issues do you remember there

<sup>10</sup>  being discussed -- strike that.

<sup>11</sup>            What other differences of opinion do you

<sup>12</sup>  remember between the agent or the other lenders and

<sup>13</sup>  the company in connection with the Forbearance

<sup>14</sup>  Agreement?

<sup>15</sup>       A.  Those were the two principals that I

<sup>16</sup>  recall.

<sup>17</sup>       Q.  And do you recall any disagreement about

<sup>18</sup>  the question of bankruptcy court approval?

<sup>19</sup>       A.  Not directly.

<sup>20</sup>       Q.  Do you recall any indirectly?

<sup>21</sup>       A.  No.

<sup>22</sup>       Q.  Do you recall discussing with

<sup>23</sup>  representatives of JPMorgan the question of a

<sup>24</sup>  bankruptcy court approval for any Forbearance

<sup>25</sup>  Agreement?

CONFIDENTIAL - N. LARSEN

1
2    A.  Well certainly, as our document shows, it's

3    certainly something that we contemplated would take

4    place prior to executing this agreement.

5        Q.  Right, I'm asking --

6        A.  It's not negotiated is this agreement with

7    JPMorgan or its representatives.

8        Q.  Who are you negotiating this agreement

9    with?

10       A.  Well --

11           MR. DUCAYET:  I object to the form.

12       A.  Personally I was not -- the company was

13   negotiating.  I apologize for using the specific

14   "me".

15       Q.  So you don't recall sitting here today

16   having discussions with JPMorgan or its

17   representatives specifically about a concern of

18   bankruptcy court approval being needed for the

19   Forbearance Agreement?

20           MR. DUCAYET:  I'm sorry, can I get that

21           question again?

22       Q.  You don't recall, sitting here today,

23   having discussions with JPMorgan or its

24   representatives specifically about a concern

25   regarding bankruptcy court approval being needed for

1          CONFIDENTIAL - N. LARSEN

2     the Forbearance Agreement?

3          A.  I have a recollection that it was an open

4     item, that the parties, you know, may not have had

5     an agreement on it.  I'm not sure it was a concern

6     that was insurmountable.  It was -- I have a

7     recollection that it was one of a series of open

8     items.

9          Q.  Do you recall why it was that the agent or

10    any other lender expressed to you that they did not

11    want to have bankruptcy court approval as part of

12    this document?

13          MS. KATZ:  I object to the form.

14          A.  I'm not sure I'm qualified to say what was

15    the agent's view on that.

16          Q.  I didn't ask you -- I asked you what they

17    expressed to you.  Do you recall the agent and -- or

18    the lenders ever giving you any reasons as to why

19    they did not want bankruptcy court approval being

20    included in this document?

21          MS. KATZ:  I object to the form.

22          A.  No, I do not.

23          Q.  Why was it that a Forbearance Agreement was

24    never finally executed?

25          A.  The -- as I stated earlier, obviously the

CONFIDENTIAL - N. LARSEN

¹ concern was the value of the entities.  And the

² conversations that were going on looked like they

³ had the potential to take longer and expose the

⁴ non-debtor entities to incremental risk.

⁵

⁶         So there was other alternatives to the

⁷ Forbearance Agreement.  Whether you could ultimately

⁸ negotiate an acceptable Forbearance Agreement is not

⁹ something I can speculate to.  But the primary

¹⁰ concern was to keep the Cubs process going and

¹¹ preserve the value of the entities that held the

¹² various partnership entities -- interests.

¹³     Q.  What other alternatives to the Forbearance

¹⁴ Agreement are you referring to?

¹⁵     A.  The arrangement that was ultimately

¹⁶ determined.

¹⁷     Q.  And what is that arrangement?

¹⁸     A.  Where the non-debtor entities would make

¹⁹ payments under the Credit Agreement.

²⁰     Q.  And what did the non-debtors receive in

²¹ consideration for making payments under the Credit

²² Agreement?

²³     A.  The provision of a payment blockage notice

²⁴ and other protections that, you know, those entities

²⁵ wouldn't be moved against in a bankruptcy context.

1          CONFIDENTIAL - N. LARSEN

2     Q.  Did -- what is a payment blockage notice?

3     A.  It limited certain rights that were held

4  under the Subordinated Guarantee.

5     Q.  Did the non-debtors received a written

6  agreement from the senior lenders not to move

7  against the non-debtors in consideration of paying

8  the professional fees?

9     A.  I'm not certain.  I know there were certain

10  documents that were exchanged.  I can't speak

11  without them in front of me as to what exactly they

12  say.

13     Q.  What documents are you referring to?

14     A.  Letters with regard to the payment blockage

15  and for the provision of a retainer, ultimately, for

16  the benefit of various professionals.

17     Q.  Are you talking about the Blackstone

18  retainer?

19     A.  Not specifically, but there was an

20  engagement letter with Blackstone.

21     Q.  Sitting here today, are you aware of any

22  agreement containing a specific provision that the

23  lender -- the senior lenders would not move against

24  TCV and the other non-debtor guarantors in

25  consideration for TCV making payment of the

1          CONFIDENTIAL - N. LARSEN

2   professional fees?

3          A.  No, I'm not.

4          Q.  And you are here as both the company's

5   designee and TCV's designee; correct?

6          A.  Yes.

7          Q.  At what point did you decide to abandon the

8   Forbearance Agreement structure?

9          A.  Late January/early February.  I don't know

10  the specific date.

11         Q.  Without giving me the specific date, can

12  you kind of remember the chain of events that led to

13  the Forbearance Agreement concept being abandoned?

14         A.  I think just touched on that.

15         Q.  Yeah, I'm just looking for you to expand on

16  that.

17         A.  I'm not sure there is much to expand upon,

18  but the original idea was to have a Forbearance

19  Agreement.  The two parties seemed to have a fairly

20  significant difference on certain items.  And

21  ultimately it remained important for the company to

22  try to get the protection, or as much protection as

23  it could against someone moving precipitously

24  against the non-debtor entities.  And that

25  conversation then migrated into what ultimately was

1          CONFIDENTIAL - N. LARSEN

2    put into place.

3         Q.  Except that the company did not get any

4    protection against the senior lenders moving against

5    the non-debtor entities, to the best of your

6    knowledge; right?

7              MR. DUCAYET:  I object to the form of the

8         question.

9              MS. KATZ:  I object to form.

10        A.  I'm not sure I would characterize the

11   debtor received nothing.  It received something

12   different than what was provided for in the

13   Forbearance Agreement.

14        Q.  It did not receive a written agreement that

15   the senior lenders would not move against the

16   non-debtor entities, to the best of your knowledge;

17   right?

18        A.  That's correct.

19        Q.  Is there an oral agreement that you are

20   aware of that so long as the professional fees would

21   be paid, the senior lenders would not move against

22   the non-debtor entities?

23        A.  Not to my knowledge.

24             MR. KORPUS:  Larsen 11.

25             (Larsen Exhibit 11, 1/25/09 E-mail from Don

1          CONFIDENTIAL - N. LARSEN

2      Liebentritt to Nils Larsen Bates stamped

3      TRB_LD002356, marked for identification.)

4      Q.  I marked Larsen 11 a one-page document

5  bearing production numbers TRB_LD002356.  Let's

6  read -- I'm really focusing on the bottom E-mail,

7  which is an E-mail from Gavin Baiera to yourself.  I

8  assume that's you, NLarsen@egii.com?

9      A.  It is.

10     Q.  Dated January 25, 2009.  Who is Gavin

11  Baiera?

12     A.  Gavin is a principal at Angelo Gordon.

13     Q.  And Angelo Gordon was one of the senior

14  lenders at this time?

15     A.  That is correct.

16     Q.  Did you have a chance to review the E-mail?

17     A.  Yes.

18     Q.  Mr. Baiera says, "I tried to call your

19  cell.  I heard the counterproposal which has the

20  company simply make payments under the guarantee

21  demands."  Do you read -- strike that.

22          Do you recall that there was a

23  counterproposal to the Forbearance Agreement, which

24  was the company simply making payments on the

25  guarantee demands?

CONFIDENTIAL - N. LARSEN

1

2    A.  I believe, as I said earlier, conversations

3    around the Forbearance Agreement migrated to

4    something that was simpler.  Whether that was a,

5    quote, official counter proposal or not, that's

6    certain how Gavin characterized it.  But, yes, I

7    recall the form of the agreement migrated over time.

8    Q.  Right.  I'm just trying -- when he says --

9    when Mr. Baiera says "counterproposal", I'm just

10   trying to connect that it's in the context of

11   Forbearance Agreement discussions.  It's a

12   counterproposal to whatever discussions were being

13   had over the terms of the Forbearance Agreement;

14   right?

15   A.  Yes.

16   Q.  It goes on to say, "There are clear

17   benefits to this approach (no court

18   approval/notice)"; do you see that?

19   A.  I do.

20   Q.  And do you recall the view being expressed

21   by the senior lenders that one of the benefits of

22   this new revised approach was that there would be no

23   court approval or notice to the arrangement?

24       MS. KATZ:  I object to the form.

25   A.  And I don't feel that I'm in a place to say

1            CONFIDENTIAL - N. LARSEN

2    the benefits from the senior lenders' perspective as

3    to -- Gavin may perceive the clear benefits, but

4    those are his words, not mine, from that

5    perspective.

6        Q.  Yeah.  I wasn't asking for your view.  I'm

7    asking whether the view being expressed by the

8    senior lenders, or at least the view being expressed

9    by Mr. Baiera on behalf of one of the senior lenders

10   here, was that it was a clear benefit to this

11   approach that there would be no court

12   approval/notice?

13           MR. DUCAYET:  I object to the form.

14       Q.  Is that how you read this E-mail?

15           MR. DUCAYET:  I object to the form of the

16       question.

17       A.  I mean, I would read that, but then I would

18   read on to the "but" of the sentence, which seems to

19   expound on a clear downside to the extent that

20   behaviors were different.  So if -- again, if he

21   perceived that there was a benefit, I think he also,

22   you know, indicates a risk.

23       Q.  Okay.  I understand that.  But Mr. Baiera

24   did perceive as one of the clear benefits to this

25   approach the fact that there would be no court

1              CONFIDENTIAL - N. LARSEN

2    approval or notice.  That's what he said to you in

3    this E-mail; right?

4         A.  That's what it says.

5              MR. JOHNSTON:  I object to form.

6         A.  That's what it reads.

7         Q.  And that's what you understood him to say

8    at this time; right?

9              MR. JOHNSTON:  I object to the form.

10        A.  Yeah, I read it.  I mean, the words on the

11   paper I understand.

12        Q.  There is -- a few lines down it says, "At

13   the end of the day the 8.5 million gives us some

14   downside protection, and is really our money

15   eventually anyway."  Can you help me here understand

16   what Mr. Baiera is referring to?

17             MR. DUCAYET:  I object to the form of the

18             question.  It lacks foundation.

19        A.  I believe the 8.5 million refers to the

20   initial proposal with regard to the retainer that

21   was ultimately provided for.  And I think the latter

22   half of that sentence is a viewpoint as to

23   ultimately where the conversation, more broad

24   conversation may come out, which is outside of what

25   we are talking about here, but...

CONFIDENTIAL - N. LARSEN

1

2    Q.  Okay.  So the $8.5 million you understand

3  to be an -- an early discussion on the retainer that

4  eventually, I think, was $7.5 million that was paid

5  to -- for to cover professional fees; right?

6    A.  That is correct.

7    MR. JOHNSTON:  I object to the form.

8    Q.  That's your understanding?

9    A.  That was my understanding.

10    Q.  Okay.  And when he says "it's really our

11  money eventually anyway", you take that as him

12  referring to the eventual outcome of any plan of

13  reorganization and any recovery in the bankruptcy?

14    MR. JOHNSTON:  I object to the form.

15    A.  That's how I would read the words on the

16  paper.

17    Q.  Okay.  I'm not here to ask about that, so I

18  just wanted to get your understanding.

19    It goes on to say, "Also, the evergreen is

20  not relevant if you don't ever expect to stop making

21  payments, which we have been assured is not a likely

22  scenario since it would mean that the company was at

23  odds with the lenders."  Do you understand what

24  Mr. Baiera is referring to in terms of the company

25  being at odds with the lenders?

CONFIDENTIAL - N. LARSEN

1

2        MR. JOHNSTON:  I object to the form.

3    A.  No, I don't.

4    Q.  Do you recall that there was a general

5  attempt within Tribune to not be at odds with the

6  lenders in these discussions?

7    A.  It was a general attempt not to be at odds

8  with any party.

9    Q.  Right.  Did you have a discussion that you

10  recall with Mr. Baiera following receipt of this

11  E-mail?

12    A.  Not to my knowledge.

13    Q.  Sitting here today, do you recall any

14  such -- any discussion with Mr. Baiera concerning

15  the benefits of there being no court approval or

16  notice for the arrangement whereby the non-debtor

17  guarantors would pay the professional fees upon

18  demand?

19    A.  No.

20    Q.  Do you recall any discussions with any

21  other senior lender on this subject?

22    A.  No.

23        (Larsen Exhibit 12, 1/22/09 E-mail from

24    Nils Larsen to Miriam Kulnis Bates stamped

25    TRB_LD000073 and 74, marked for

Page 82

CONFIDENTIAL - N. LARSEN

1

2    identification.)

3        Q.   I have marked as Larsen 12 a series of

4    E-mails with the production numbers TRB_LD000073 and

5    74.  And I want to focus on just the top two.

6    Looking at the second E-mail on the page, it's an

7    E-mail from Miriam Kulnis to you cc'ing Chandler

8    Bigelow, dated January 22, 2009.  Who is Miriam

9    Kulnis?

10       A.   Miriam is the principal at JPMorgan who is

11   sort of the day-to-day lead person.

12       Q.   When you say "principal", that's her title

13   or that's --

14       A.   She is the point person.

15       Q.   Okay.  And you had various dealings with

16   her throughout this period?

17       A.   Yes.

18       Q.   Is she the main person at JPMorgan that you

19   had contact with in terms of negotiating in the

20   period leading up to the bankruptcy and then after

21   the bankruptcy?

22           MS. KATZ:   I object to the form.

23       A.   The company had many relationships, you

24   know, with JPMorgan/Miriam post the filing.  It was

25   my understanding Miriam's responsibilities were to

CONFIDENTIAL - N. LARSEN

1   be the leading -- the point person on behalf of

2   JPMorgan in the bankruptcy.

3   Q.  Was she involved prior to the filing as

4   there were work-up discussions with JPMorgan and the

5   debtor?

6   A.  Yes, she was one of the people involved

7   that we met through that process.

8   Q.  And you had discussions with her about the

9   subject of the professional fees to be paid; right?

10  A.  Yes.

11  Q.  Do you recall having any discussions with

12  Miss Kulnis -- am I pronouncing that right?

13  MS. KATZ:  Close enough.

14  Q.  Did you have discussions with Miss Kulnis

15  over the issue of the $2 million pre-bankruptcy

16  retainer that was paid to the agent?

17  A.  I did not.

18  Q.  Do you know whether anybody else in Tribune

19  Company had discussions with Miss Kulnis on that

20  subject?

21  A.  I don't know whether Miss Kulnis was the

22  one involved.  There were obviously discussions

23  between the company and the agent and its

24  representatives about the 2 million.  I don't know

Page 84

CONFIDENTIAL - N. LARSEN

1
2   who was leading the conversation from either side.

3       Q.  Do you know who at all was involved on the

4   debtor side or on the Tribune Company side on those

5   discussions?

6       A.  I would be speculating, but, I mean, the

7   earlier E-mail that he sent Chandler Bigelow was

8   on -- was an author of one of those E-mails, I

9   believe.  But I don't know who signed the document.

10  I assume it would have been a series of senior

11  executives at Tribune.

12      Q.  Miss Kulnis writes to you and says, "Well,

13  I can tell you that one of the big issues is the

14  desire to make the debtors parties to the agreement.

15  I think the SC feels that it's best if only

16  non-debtors are parties and it would be more likely

17  to get approved by the court if the debtors were not

18  a party."  Do you see that language?

19      A.  I do.

20      Q.  Who is the SC that she refers to there, do

21  you understand?

22      A.  The Steering Committee.

23      Q.  And what do you understand the Steering

24  Committee to be at that time?

25      A.  What -- what was its function?

1          CONFIDENTIAL - N. LARSEN

2     Q.  Who were they?

3     A.  The Steering Committee members at that time

4  I believe were JPMorgan, Oak Tree, Angelo Gordon,

5  Eaton Vance, Bank of America, KKR, and Davis.

6     Q.  My question was a lot more basic than that.

7  By SC, you understand that to be a Steering

8  Committee of the senior lenders; right?

9     A.  That's right, yes.

10     Q.  Thank you for that.  Do you recall the

11  Steering Committee -- strike that.

12          Do you recall it being expressed to you

13  that the Steering Committee felt that it was better

14  than only non -- if only non-debtors were parties to

15  the arrangement, because it would be more likely to

16  get approved by the court if the debtors were not a

17  party?

18          MR. JOHNSTON:  I object to the form.

19     Q.  Do you recall discussions over that

20  subject?

21     A.  I see the E-mail in front of me, so from

22  that perspective, I recall that.

23     Q.  Do you recall receiving this E-mail?

24     A.  In a simple -- do I recall January 22nd,

25  2009?  No.  Did I receive the E-mail?  It sits in

1                CONFIDENTIAL - N. LARSEN

2     front of me, yes.

3          Q.  Do you recall -- do you recall any

4     discussions with the senior lenders independent of

5     this E-mail where it was expressed to you that the

6     senior lenders' view was that it would be better if

7     the debtors were not party to any arrangement,

8     because it would be more likely to get approved by

9     the court?

10          MR. JOHNSTON:  I object to the form.

11          A.  As we've touched on earlier with the

12     Forbearance Agreement, there was obviously an

13     addition with regard to court approval.  This E-mail

14     itself would lead me to believe that the lenders

15     thought that there would be court approval involved

16     in this as well.  But I don't have specific

17     recollections of conversations as to who was to be

18     the appropriate signatory.

19          Q.  Well, you had discussions with the senior

20     lenders throughout this period; right?

21          A.  I did.

22          Q.  Do you remember discussions where the

23     senior lenders said to you or expressed to you a

24     concern that if the debtors were included as a party

25     to this arrangement, there was a risk that the

1          CONFIDENTIAL - N. LARSEN

2    bankruptcy court would not approve the arrangement?

3          MR. KRAMER:  I object to the form.

4          A.  I think, as I indicated earlier, I was not

5    the direct negotiating party with regard to the

6    issues of the appropriate channels, bankruptcy court

7    or known.  Those were more legal conversations.  I

8    was involved in these conversations from the

9    business perspective that we've talked about.

10         Q.  But sitting here today as TCV's and the

11   debtor's representative, do you recall -- TCV's and

12   debtor's representative, do you recall that the

13   steering lenders expressed to the debtor or the

14   debtor's representatives concerns that if the debtor

15   was to become a party to this arrangement concerning

16   fees, there was a risk that the bankruptcy court

17   would not approve the arrangement?

18         A.  Sitting here today, as I read what's in

19   front of me, there was at least a contemplation

20   there was a different risk profile.

21         Q.  The next sentence says, "We are worried

22   that if the debtors are parties, the UCC may object

23   to it and it would get denied."  Do you see that

24   sentence?

25         A.  I do.

CONFIDENTIAL - N. LARSEN

1

2    Q.  UCC is the Committee of Unsecured

3    Creditors?

4    A.  That's correct.

5    Q.  Do you recall the senior lenders expressing

6    the concern that the Committee of Unsecured

7    Creditors may object to any arrangement that

8    included a debtor as a party for the payment of

9    professional fees incurred by the senior lenders?

10    A.  Sitting here today, as I read this, yes.  I

11    mean, it was -- you know, I can read the language

12    that there may have been some concern from that

13    perspective.

14    Q.  Other than this E-mail, do you recall any

15    discussions about that concern with the senior

16    lenders or any of their representatives?

17    A.  Well, from the company's perspective,

18    whatever, the decision was ultimately made.  As I

19    mentioned earlier, our goal was to be transparent.

20    We felt that under the guarantees, as we discussed

21    earlier, that this was something that could be

22    rightfully asked for.  But we always felt that the

23    idea was to be open and communicative to all

24    parties.

25    Q.  I'm not sure that really answers my

Page 89

CONFIDENTIAL - N. LARSEN

1   question.  My question was:  Sitting here today, do

2   you recall -- other than this E-mail, do you recall

3   any discussions with the senior lenders or any of

4   their representatives about their concern that the

5   UCC may object to any -- to any agreement that had

6   the debtor as a party, that provided for payment of

7   professional fees to the agent?

8       A.  Sitting here today, it certainly was

9   something that the company intended to approach the

10  constituents.  Whether, you know, there were

11  concerns or not, I'm sure various parties had

12  concerns.

13          From the company's perspective, those were

14  concerns that, you know, you would see how -- what

15  happened after you had those conversations, what

16  materialized.

17      Q.  I'm going to ask my question again, because

18  I don't think you are answering it, and maybe it's

19  my fault, I'm not making myself clear, so don't take

20  it --

21      A.  No.

22      Q.  This E-mail, we can all agree, shows a

23  concern by the Steering Committee that if the

24  debtors were parties to any arrangement, the UCC may

CONFIDENTIAL - N. LARSEN

1  object to it and it would get denied.  That's what

2  it says.  My question is:  Putting this E-mail

3  aside, do you recall any discussions with the

4  Steering Committee or representatives of the

5  Steering Committee other than this E-mail expressing

6  the same sentiment to the company?

7       A.  I'm certain there were conversations with

8  the company's representatives and the

9  representatives of the Steering Committee about a

10  whole host of concerns.  It would not surprise me if

11  this was a potential concern.

12       Q.  Now the company eventually approached the

13  Committee Of Unsecured creditors and disclosed to it

14  the arrangement that it had entered into with the

15  senior lenders; right?

16       A.  We disclosed an arrangement that we were

17  proposing to enter into.

18       Q.  Fair enough.  Why did you decide to -- why

19  did the debtor decide to do that given -- strike

20  that.

21       Did the debtor consider that the consent of

22  the Committee of Unsecured Creditors was necessary

23  in order for it to enter into the arrangement?

24       MR. DUCAYET:  I object to the form of the

CONFIDENTIAL - N. LARSEN

1    question.  Go ahead and answer.  I mean --

2    A.  Could you repeat the question again?

3    Q.  Yeah.  Did the debtor consider the consent

4    of the Committee of Unsecured Creditors was

5    necessary in order for it to enter into the

6    arrangement?

7         MR. DUCAYET:  You can go ahead and answer

8         that, although you should exclude from your

9         answer any legal advice you got about whether

10        it was legally necessary to do that.

11        Otherwise, you can answer.

12   A.  Yeah, I would say we felt it was

13   appropriate to be disclosed.  I'm not sure I can --

14   as counsel indicated, I'm not sure that I can speak

15   to the actual legal requirement as such.

16   Q.  Okay.  Did you obtain legal advice on

17   whether it was legally required to obtain the

18   consent of the creditors committee, the Unsecured

19   Creditors Committee for the arrangement for the

20   non-debtors to pay the professional fees?

21   A.  I'm sure there was advice provided.

22   Q.  Do you recall receiving that advice?

23   A.  From a company perspective, sure, yes.

24   Q.  And the advice came from Sidley?

CONFIDENTIAL - N. LARSEN

1

2    A.  I believe that would be the case, yes.

3    Q.  Are you just kind of speculating that there

4  was such advice or do you recall a piece of paper

5  providing that advice or specific conversation

6  providing that advice?

7    A.  These were conversations, as I think you

8  have touched on.  I don't recall every specific

9  piece of paper that might have gone from Sidley to

10 Tribune Company.  It was a topic of conversation

11 along with a host of other issues that were

12 discussed between various professionals and

13 representatives of the company.

14   Q.  The company also decided that it did not

15 need to file for court approval and notice for the

16 arrangement for TCV to pay the professional fees;

17 right?

18   A.  Correct.

19   Q.  And why did the company decide that?

20     MR. DUCAYET:  And, again, you should

21     exclude from your answer the substance of any

22     legal advice that you were provided on that

23     topic.  You can otherwise answer.

24   A.  Again, that was an area where we were

25 advised and took what we thought to be appropriate

1          CONFIDENTIAL - N. LARSEN

2     steps.

3          Q.   Okay.   In connection with the Unsecured

4     Creditors Committee, I think you testified that

5     apart from any concern of the legality or not, you

6     decided in the interest of transparency to go and

7     obtain the consent of the committee to the

8     arrangement that you were proposing.   My question to

9     you is:   Why did the management of the debtors not

10    think that in the interest of transparency also

11    required it to file for court approval and obtain --

12    and give notice to all creditors?

13              MS. KATZ:   I object to the form.

14              MR. DUCAYET:   I object to the form the of

15         the question.   Again, you should exclude any

16         legal advice that you were provided on that

17         topic.

18         A.   As I stated earlier, transparency is

19    important to get parties to work together and try to

20    help preserve and maximize the value of the entity.

21              I'm not sure the decision was to get

22    consent as to provide information.   And from the

23    perspective -- there were -- to preserve the value

24    of the various entities, there is also a benefit of

25    not broadcasting publicly for people who may not

CONFIDENTIAL - N. LARSEN

1  have an interest or could view this as a way to gain

2  opportunity disproportionate to their claim.

3         So to take the continuum of talking to the

4  various parties in interest and lead that to say

5  that, you know, it should continue to go, I think is

6  a step that, you know, the company was concerned

7  about.

8      Q.  I didn't understand the last part of his

9  answer.  To take the continuum of talking to various

10  parties in interest and lead that to say that it

11  should continue to go -- what's the "it"?

12      A.  I would say it differently.  The company's

13  view of the Unsecured Committee, it was

14  representative of all the primary constituents in

15  interest.  Having a conversation with them seemed

16  appropriately broad to ascertain their views of the

17  issue.

18      Q.  What was the benefit of not broadcasting

19  publicly for people, as you put it, the fact that

20  the debtor agreed for its non-debtor guarantor to

21  make the payment of the professional fees?

22         MR. JOHNSTON:  I object to form.

23         MS. KATZ:  I object to form.

24      A.  One potential benefit if this became

1          CONFIDENTIAL - N. LARSEN

2    publicly filed is it may give a constituency a

3    roadmap on how to exert a disproportionate amount of

4    leverage by moving quickly against ATC (sic), for

5    example.  I mean, there are periods of -- there are

6    waiting time.

7         Q.  ATC being?  You said "amount of leverage to

8    move against ATC, for example".

9         A.  I said TCV.

10        Q.  I heard ATC, and so did the court reporter.

11   That's fine.

12        A.  My apologies.

13        Q.  You meant TCV.  Any other benefits of not

14   broadcasting it publicly that you can think of?

15          MR. JOHNSTON:  I object to the form.

16        A.  Well, you would have a whole host of

17   benefits associated with how you interact with -- in

18   a negotiation on the Cubs process, and how you want

19   to interact with Major League Baseball.

20        Q.  What would those be?

21        A.  Putting reasons into the public domain when

22   you are in a bilateral negotiation is not

23   particularly productive.

24        Q.  What do you mean by putting reasons into

25   the public domain?

1        CONFIDENTIAL - N. LARSEN

2        A.   Essentially signally that people have the

3    ability to insert themselves into a negotiated

4    process that has broad support.  Not much different

5    than an average commercial negotiation.  You

6    generally negotiate with the parties in interest.

7        Q.   So your concern was that if you were to

8    seek court approval for this arrangement and give

9    notice to everybody, other creditors who had claims

10   at the guarantor level, at a non-debtor level, may

11   seek to exert some kind of leverage for themselves

12   and disrupt the reorganization process; is that

13   putting it accurately?

14        MR. DUCAYET:  I object to the form of the

15        question.

16        A.   Generally speaking, the idea was to, you

17   know, not provide -- you know, put the company in a

18   situation as you described.

19        Q.   Was there also a concern that the -- if you

20   moved for court approval that the court may deny the

21   arrangement?

22        MR. DUCAYET:  I object to the form.  And,

23        again, you should exclude any legal advice that

24        you were given on this topic.

25        A.   You know, absent the legal advice, you

1        CONFIDENTIAL - N. LARSEN

2    know, there is always a concern.  I can't predict

3    how the judge would, you know, react, but not -- it

4    was not something that was --

5            MR. DUCAYET:  Hold it.  I'll stop you

6        there.  If you are just telling, you know, what

7        you were advised by counsel, then I'm going to

8        instruct you not to answer that question.

9        Q.  Did you receive legal advice on the risk

10   that the judge may not -- that the bankruptcy court

11   judge may not approve the arrangement by which TCV

12   would pay the professional fees?

13       A.  The company received legal advice on this

14   issue.

15       Q.  And by structuring it the way you

16   structured it, you were able to avoid that risk;

17   right?

18            MS. KATZ:  I object to the form.

19            MR. DUCAYET:  I object to the form as well.

20       It calls for speculation.

21       A.  Could you repeat the question?

22       Q.  Yeah.  By structuring your arrangement as a

23   payment by the non-debtor guarantors, you were able

24   to avoid any risk that the bankruptcy court judge

25   may not approve the arrangement by which TCV would

1           CONFIDENTIAL - N. LARSEN

2     pay the professional fees?

3          A.  I mean --

4          MR. DUCAYET:  I object to the form.

5          A.  Yeah, again, I mean it was -- the issue

6     was, as we go through starting with the Forbearance

7     Agreement, was to try to put in place the most

8     protection for the company that we could.  And

9     that -- the goal of avoiding something was not --

10    you know, wasn't the goal.  The goal was to protect

11    the assets of the company.

12         Q.  I understand that.  But even making the

13    decision to structure it this way and in not making

14    the decision not to move for court approval, you in

15    fact eliminated any risk that the court might not

16    approve the arrangement; right?

17         MR. DUCAYET:  I object to the form of the

18         question.

19         A.  I don't have anything further to add to

20    this.

21         Q.  If you don't move for court approval, you

22    don't have the risk that the court will deny the

23    approval; isn't that just common sense?

24         MR. DUCAYET:  I object to the form.

25         A.  We are here today, so that would lead you

CONFIDENTIAL - N. LARSEN

1    to believe that that statement is not tautologically

2    accurate.

3         Q.  Now, the top E-mail is a response from you

4    to Miss Kulnis, and you say in the second paragraph,

5    "I understand the concern surrounding the inclusion

6    of the debtors.  We can discuss further in the

7    morning.  The intent of our mark-up is not to

8    proffer something the court and the UCC are likely

9    to reject.  We are not being cute on the fee

10   question."  Do you see that?

11        A.  I do.

12        Q.  Do you see here that -- strike that.

13        What do you understand by the sentence

14   beginning with "the intent of our mark-up"; what

15   were you conveying to Miss Kulnis?

16        A.  Conveying to her that it's an agreement

17   that was appropriate, with the appropriate amount of

18   transparency and business judgment.

19        Q.  Was she concerned -- is what you read here

20   concern by Miss Kulnis that you are deliberately --

21   or the debtor is deliberately trying to propose an

22   arrangement that will then be rejected, and you are

23   addressing that concern; is that a fair reading of

24   these E-mails?

1       CONFIDENTIAL - N. LARSEN

2           MS. KATZ:  I'm sorry, could you read the

3       question back?  I didn't hear the beginning.

4           (Record was read as requested.)

5           MS. KATZ:  I object to the form.

6       A.  Could you repeat the question now?

7       Q.  Yeah, sure.  Is it a fair reading of these

8   E-mails that Miss Kulnis is suggesting that some

9   people are wondering whether the company really is

10  trying to propose something that the court will

11  reject so it has an excuse not to pay the fees; do

12  you see that?

13      A.  I do.

14      Q.  And you are trying to allay her fears by

15  saying, no, that's not what we are trying to do, we

16  are not trying to proffer something to the court

17  that the court and the UCC is likely to reject; is

18  that what you are saying in your response?

19      A.  She explicitly articulates a worry below,

20  and I'm signaling the fact that I understand her

21  worry, and I don't think any of us are in it to do

22  things with the intent of failure.  So I certainly

23  understand her concern that she has articulated in

24  the text of her E-mail.

25          MR. KORPUS:  I have another one of these

1                CONFIDENTIAL - N. LARSEN

2        documents where my good people did not attach

3        the attachment, so we are going to have to use

4        my copy.  We can mark it as Larsen 13.

5            (Larsen Exhibit 13, 1/30/09 E-mail with

6        attachment from Daniel Smit to Bryan Krakauer

7        Bates stamped JPM2_00000250 through 260, marked

8        for identification.)

9            MR. DUCAYET:  If you want, we can take two

10       minutes and at least make a copy for him to

11       look at.

12           MR. KORPUS:  Yeah, sure.

13           (Recess taken from 10:52 a.m. to

14       10:57 a.m.)

15   BY MR. KORPUS:

16       Q.  So Larsen 13 is JPM2_000250 through 260.

17   Have you had a chance to look at this document?

18       A.  Yes.

19       Q.  And you see that this is an E-mail from

20   Davis Polk, by the look of things, to Mr. Krakauer

21   at Sidley, cc'ing certain other people.  It has

22   attached to it several documents.  And focusing on

23   the first one on page 251, is that a demand letter

24   for -- or a draft demand letter for the payment of

25   professional fees to the non-debtor guarantors; is

1          CONFIDENTIAL - N. LARSEN

2    that what you take this document to be?

3          MR. DUCAYET:  I object to the form.

4          A.  I take it to be a letter with respect to

5    certain costs and expenses incurred and request for

6    payment of those under the Credit Agreement.

7          Q.  And do you recall whether a final version

8    of this letter was sent out, a signed letter was

9    sent out at some point?

10         A.  I believe there was letters consistent with

11   this that were executed.  Some of the numbers

12   changed, I believe, but there were probably other

13   changes as well.

14         Q.  And the second draft document is a draft

15   payment blockage notice.  Is that the payment -- or

16   draft of the payment blockage notice you referred to

17   earlier when we were talking about that subject?

18         A.  Yes.

19         MR. KORPUS:  Mark this as the next

20   document, please.

21         (Larsen Exhibit 14, 2/11/09 E-mail from

22   Bryan Krakauer to Nils Larsen and other Bates

23   stamped TRB_LD002148  and 2149, marked for

24   identification.)

25         Q.  I have marked as Larsen 14 a document

1          CONFIDENTIAL - N. LARSEN

2    bearing production numbers TRB_LD002148 to 2149.

3    It's an E-mail to you and others from Mr. Krakauer

4    forwarding an E-mail from Mr. Schaible,

5    S-c-h-a-i-b-l-e, of Davis Polk to Howard Seife and

6    others.  Have you had a chance to review this

7    document?

8         A.  Yes.

9         Q.  And does this document contain the

10   disclosure to the Unsecured Creditors Committee of

11   the proposal concerning payment of professional

12   fees?

13        MR. JOHNSTON:  I object to the form.

14        A.  I mean, it includes conversation with

15   regard to the payment of certain fees and expenses

16   of the agent, other lenders, by the non-debtor

17   guarantors, yes.

18        Q.  And following that did you understand that

19   there were additional discussions between the senior

20   lenders and the Unsecured Creditors Committee

21   concerning the proposed arrangement?

22        A.  Following the date hereof?

23        Q.  Yes.

24        A.  It was my understanding there was a series

25   of conversations between various parties with regard

1          CONFIDENTIAL - N. LARSEN

2    to this.

3          Q.  Was it also your understanding that the

4    Unsecured Creditors Committee had certain concerns

5    and questions about the arrangement that they voiced

6    to the lenders?

7          MR. DUCAYET:  I object to the form.

8          A.  My understanding it was a two-way dialogue,

9    yes.

10         Q.  And what was your understanding about the

11   concerns that were raised by the Unsecured Creditors

12   Committee, the specific issues that they raised?

13         MR. DUCAYET:  I object to the form.

14         A.  The one issue that springs to my mind was

15   the handling of the success fee associated with the

16   Blackstone engagement letter.

17         Q.  What do you recall about that?

18         A.  There was concern that it not be -- that

19   the Unsecured Committee reserve its rights with

20   regard to that payment.

21         Q.  And what rights would the Unsecured

22   Creditors Committee have in respect to a payment

23   that's being made by a non-debtor, to your

24   understanding?

25         MR. JOHNSTON:  I object to the form.

CONFIDENTIAL - N. LARSEN

1

2     A.   My understanding is they wanted to make

3   sure that it was appropriate and reasonable.

4     Q.   And is it your understanding that the

5   Unsecured Creditors Committee had the rights to

6   object to a payment of a success fee being made by a

7   non-debtor guarantor?

8       MR. DUCAYET:   Objection.   I think you

9       shouldn't disclose the substance of any

10      communications with the lawyers.

11    A.   We had a legal conversation with regard to

12  that.

13    Q.   Do you remember obtaining legal advice on

14  that topic?

15    A.   Yes.

16    Q.   And who gave you that legal advice?

17    A.   Bankruptcy counsel, Sidley & Austin.

18    Q.   Mr. Krakauer?

19    A.   Mr. Krakauer specifically, but his firm.

20    Q.   How was that issue resolved ultimately?

21    A.   The ultimate resolution, per my

22  recollection, was that with regard to the success

23  component of the Blackstone fee, that it would be

24  handled -- the payment of that would be addressed

25  later on during the pendency during the bankruptcy.

1        CONFIDENTIAL - N. LARSEN

2        Q.   What other issues spring to your mind as

3   being raised by the Unsecured Creditors Committee on

4   the arrangement proposed by the agent?

5        A.   The amount of the retainer.

6        Q.   The $7.5 million?

7        A.   Well, as the letter here refers to a

8   retainer of 8.5 million for professionals.  I think

9   that was a topic of further discussion.

10       Q.   And that's what -- that's what eventually

11  led to it being reduced to $7.5 million, that's how

12  the issue was resolved?

13       A.   I believe so.

14       Q.   Any other issue you recall being raised by

15  the Unsecured Creditors Committee?

16       A.   No.

17       Q.   Do you recall the Unsecured Creditors

18  Committee ever voicing a concern that this

19  arrangement was not being put forward for bankruptcy

20  court approval?

21       A.   Not to my recollection.

22       Q.   Do you recall that subject being discussed

23  with -- between -- to your knowledge, do you know of

24  this subject being discussed between the Unsecured

25  Creditors Committee and the agent or the debtors or

1          CONFIDENTIAL - N. LARSEN

2    the representatives?

3          A.  As I indicated earlier, I'm sure there is a

4    host of items that were discussed.  I don't know

5    whether this one was specifically discussed and at

6    what length.

7          Q.  But you don't know if anybody on the

8    Unsecured Creditors Committee said, hey, shouldn't

9    we get bankruptcy court approval for this; you don't

10   recall whether that came up?

11         A.  I do not.

12         Q.  Were you involved in the discussions with

13   the Unsecured Creditors Committee on this subject?

14         A.  Personally?

15         Q.  Yes.

16         A.  No.

17         Q.  Was it all handled by attorneys at Sidley

18   Austin?

19         A.  To my knowledge, yes.

20         Q.  You don't recall whether any company

21   representative was involved in that discussion?

22         A.  I don't believe directly, no.

23         Q.  Was Mr. Krakauer leading the discussions

24   for Sidley?

25         A.  I believe that to be the case.

1        CONFIDENTIAL - N. LARSEN

2        (Larsen Exhibit 15, 2/14/09 E-mail from

3     Nils Larsen to Mary Ellen Egbert Bates stamped

4     TRB_LD000723, marked for identification.)

5        Q.  I marked as Larsen 15 a document carrying

6   production numbers TRB_LD0000723.  Just a quick

7   question on this.  Who is Mary Ellen Egbert that you

8   are writing to here?

9        A.  Mary Ellen, and I don't know her exact

10  title or department, but she, to my understanding,

11  is the person who leads JPMorgan's effort to provide

12  capital to -- emergence capital to various companies

13  that they are either involved with or they are not

14  involved with in a capacity as either a DIP lender

15  or emergence lender.

16       Q.  And why were you -- so she is -- she

17  doesn't work for Miss Kulnis, she is in a separate

18  division of the bank?

19       A.  To my knowledge, yes.

20       Q.  And why were you writing to her and

21  updating her on discussions with the Unsecured

22  Creditors Committee?

23       A.  Well, I think the reason I was writing to

24  her was apparent.  First is we had active

25  discussions with her and her group with regard to

1          CONFIDENTIAL - N. LARSEN

2   the potential provision of the DIP facility to the

3   company.  And through that capacity she was

4   knowledgeable and involved with the issues that were

5   being discussed between the debtor and JPMorgan

6   broadly.  It's my understanding that she is a senior

7   executive at the bank.

8       Q.  In the second paragraph you are updating

9   her on the subjects we have been discussing, which

10  is discussions with the Unsecured Committee

11  Concerning payment of the fees.  Why did you think

12  she would be interested in that information?

13      A.  Because she -- the feeling is because

14  JPMorgan -- institutionally she was involved in the

15  early stages of the conversations around the DIP and

16  where the company was, and under the assumption the

17  principals we were dealing with spoke to each other,

18  and these were conversations that were ongoing.

19      Q.  Was Miss Egbert involved in the discussions

20  concerning the professional fees, to your knowledge?

21      A.  Not to my knowledge directly.

22      Q.  Did she express a concern -- did she

23  express an interest in that topic to you?

24      A.  To me specifically?

25      Q.  Yeah.  When you talked to her about the

¹          CONFIDENTIAL - N. LARSEN

² DIP, did she also bring up the issue of professional

³ fees that prompted you to give her an update?

⁴      A.  Not -- I have no recollection of a specific

⁵ question to that effect.

⁶      Q.  Reading this E-mail today, are you

⁷ surprised that you mentioned the professional fees

⁸ issue to Miss Egbert in this E-mail; does it strike

⁹ you as odd at all?

¹⁰     A.  Given the time under which -- the time this

¹¹ E-mail was written, not odd.  I mean, we are now

¹² well into the case, but these were the early stages

¹³ of the case that had a lot of moving parts.  And I

¹⁴ don't think it was entirely apparent to the debtor

¹⁵ who and what role people were going to.  I believe

¹⁶ Miss Egbert's background is similar to that of

¹⁷ Miss Kulnis'.

¹⁸     Q.  What do you mean by that?

¹⁹     A.  She has experience in restructuring as well

²⁰ as providing DIP capital.

²¹     Q.  Do you have experience in restructuring

²² prior to Tribune or was this your first

²³ restructuring go-around?

²⁴     A.  One of the areas where Equity Group

²⁵ Investments invests capital is in companies, you

1          CONFIDENTIAL - N. LARSEN

2    know, either providing capital to companies who were

3    in financial difficulty or purchasing securities, so

4    I do have some experience in that area, yes.

5         Q.  Have you ever been involved as working for

6    a debtor company before?

7         A.  I have not.

8         Q.  Have you ever had experience with the

9    subject of when a debtor company needs to obtain

10   bankruptcy approval for operations and when it does

11   not, is that issue something that's come up in the

12   past for you before Tribune?

13        A.  Generally not my area of expertise.

14        MR. KORPUS:  I'm going to see if I can

15        shortcut this without marking a whole bunch of

16        documents, but if we can't, we can't.

17        (A short pause in the proceedings was had.)

18   BY MR. KORPUS:

19        Q.  I have several exchanges concerning the

20   Blackstone engagement letter and several iterations

21   of it.  Just in broad terms, do you recall that

22   there came a point where -- when Davis Polk sent to

23   the debtors a draft engagement letter with

24   Blackstone and the agent?

25        A.  Yes.

1          CONFIDENTIAL - N. LARSEN

2      Q.  And was your understanding of what

3  Blackstone was proposed to be retained to do?

4      A.  What was my --

5      Q.  What is your understanding of why the agent

6  was retaining Blackstone, to do what?

7      A.  To provide investment banking advisory

8  services.

9      Q.  In connection with the bankruptcy of

10  Tribune?

11      A.  Yes, broadly.

12      Q.  Including advice on restructuring

13  activities?

14      A.  Yes.

15      Q.  And on including advice on preparing

16  possibly a plan of reorganization to be filed by the

17  banks, by the lenders?

18          MR. DUCAYET:  I object to the form of the

19      question.

20      A.  I mean, without the agreement sitting in

21  front of me, but the company understood Blackstone's

22  scope to be broad.

23      Q.  Okay.  And it included assisting the

24  lenders in proposing restructuring options?

25      A.  For instance.

1          CONFIDENTIAL - N. LARSEN

2          MS. KATZ:  You said "proposing"?

3          MR. KORPUS:  Uh-huh.

4          A.  I'm sure that Blackstone has a lot of

5     experience in advising people about appropriate

6     capital structure and appropriate liquidity profile.

7     That was something, to my understanding, that they

8     were going to be involved in.  Obviously that

9     factors into any plan of reorganization.

10          Q.  And you have mentioned before the concerns

11    raised by the Unsecured Creditors Committee about

12    the success fee that would be paid to Blackstone; do

13    you remember that?

14          A.  Yes.

15          Q.  The $5 million success fee; right?

16          A.  In that -- I thought it was 5.5.

17          Q.  It might have been 5.5.  You are right

18    $5.5 million.

19          Do you recall that the initial document,

20    initial drafts that were prepared by Davis Polk,

21    included the signature line for the debtor on the

22    Blackstone engagement letter; do you remember that

23    issue?

24          MS. KATZ:  I object to the form.

25          A.  I don't remember whether it was -- if

1          CONFIDENTIAL - N. LARSEN

2  the -- if there was, I'm sure the document would

3  show it.

4          MR. KORPUS:  Okay.  We should go through

5          it.  I tried to get you out of here.  I'm

6          trying to be a nice guy.

7      A.  I appreciate the effort.

8          (Larsen Exhibit 16, 2/5/09 E-mail from

9      Bryan Krakauer to Don Liebentritt Bates stamped

10     TRB_LD002110 through 2116, marked for

11     identification.)

12     Q.  I marked as Larsen 16 a document dated -- a

13  series of E-mails.  The top E-mail, the latest

14  E-mail, is dated February 5, 2009, from Bryan

15  Krakauer to several recipients, including yourself,

16  production numbers TRB_LD002110 through 2116.  And

17  if you look at the E-mail on the second page, there

18  is an E-mail from Damian Schaible to Bryan Krakauer

19  dated February 5, 2009.  Damian Schaible, again, is

20  with Davis Polk.  And he says, "I understand from

21  your exchanges with Don that the non-guarantors

22  would countersign the Blackstone engagement letter.

23  We expect to have a proposed letter to you in the

24  next couple of days."  Do you see that?

25     A.  I do.

CONFIDENTIAL - N. LARSEN

1

2      Q.  Do you have an understanding as to who the

3  "Don" might be, and I assume it's not Don Corleone?

4      A.  Well, there are several Dons involved in

5  this case.  So by reading it could be either.

6      Q.  Who are the candidates?

7      A.  Don Liebentritt, the company's general

8  counsel, and Don Bernstein, who is copied on this

9  E-mail.

10     Q.  Who is?

11     A.  Senior partner at Davis Polk, I believe.

12     Q.  Okay.  I can see why it could be either one

13 of them.  Do you recall discussions about the

14 question of whether the non-guarantors would

15 countersign the Blackstone engagement letter?

16     A.  I do not have a recollection of specific

17 discussions surrounding the signatories of that

18 letter.

19     Q.  You don't have any recollection concerning

20 any signatories who should sign and who should not

21 sign that letter?

22     A.  Not -- I mean other than -- no, I do not.

23     Q.  Here in your capacity as a 30(b)(6)

24 designee for the debtor and TCV, do you have any

25 information that you have learned concerning any

1          CONFIDENTIAL - N. LARSEN

2   discussions about the signatories for the Blackstone

3   letter?

4        A.  Yes.  I mean, I know it was one of a series

5   of items that were -- that was discussed over this

6   period of time.

7        Q.  And you know that -- sorry.  You know that

8   from reviewing the documents you have reviewed?

9        A.  Correct.

10        Q.  So one of the matters you learned from

11   reviewing the documents is that apparently there was

12   a request here from Davis Polk that the

13   non-guarantors would sign the Blackstone engagement

14   letter; right?

15          MS. KATZ:  I object to the form.

16        A.  If I'm reading this, I certainly know it

17   was a topic of discussion.

18        Q.  And it says the letter would be

19   forthcoming, and then I will mark what I believe is

20   the first draft of the Blackstone engagement letter.

21          (Larsen Exhibit 17, 2/6/09 E-mail with

22          attachment from Daniel Smit to Bryan Krakauer

23          Bates stamped JPM2_00001272 through 1288,

24          marked for identification.)

25        Q.  This is an E-mail from Davis Polk to

1              CONFIDENTIAL - N. LARSEN

2     Mr. Krakauer and some other E-mails.  It's dated

3     JPM2_00001272 through 1288.  And you see it

4     provides, "I attach a copy of a drafty", "T" with a

5     "Y", obviously spelling error, "engagement letter

6     for Blackstone.  Please let me know if you have any

7     comments on that."  Do you see that?

8          A.  Yes.

9          Q.  And then I see you smiling.  It brings back

10    good memories?

11         A.  Only smiling at the typographical error on

12    the page in front of me.

13         Q.  We all seek enjoyment wherever we can in

14    this laborious job.  If we turn to the engagement

15    letter, the draft engagement letter -- first of all,

16    do you see that it has a list of the financial

17    advisory services to be provided by Blackstone, and

18    indeed includes review and analyze any proposed

19    restructuring and/or recapitalization, including

20    consideration offered to the lenders; do you see

21    that?

22         A.  Where exactly?

23         Q.  I'm sorry, I'm on the second page.  Well,

24    it starts on the first page --

25         A.  You are speaking of the list between (a)

1        CONFIDENTIAL - N. LARSEN

2   and (i)?

3        Q.  I'm sorry?

4        A.  Just the list of services between (a)

5   and --

6        Q.  The list of services to (d).  Do you see

7   that?

8        A.  Okay.  Yes.

9        Q.  And generally looking at the services that

10  Blackstone was intended to offer, that was the

11  company's understanding of what Blackstone was

12  retained to do?

13       A.  Correct.

14       Q.  Okay.  And there was going to be a monthly

15  advisory fee in the amount of $200,000 to be paid;

16  right?

17       A.  Correct.

18       Q.  And then there is the restructuring fee of

19  $5.5 million on (ii); do you see that?

20       A.  I do.

21       Q.  And that's consistent with the debtor's

22  understanding of what was being proposed in terms of

23  the fees that TCV would pay to Blackstone?

24       A.  Correct.

25       Q.  And then if you look at page 8, there is a

1          CONFIDENTIAL - N. LARSEN

2     signature line for Tribune Company through Chandler

3     Bigelow; do you see that?

4          A.  I do.

5          Q.  And there is also an indemnification

6     attached that also contains a signature line for

7     Tribune Company through Chandler Bigelow; right?

8          A.  That is correct.

9          Q.  So confirm that the initial draft that was

10    sent to the debtors included signature lines for

11    the -- for Tribune Company as a party; right?

12         A.  That's correct.

13              MS. KATZ:  Just note my belated objection

14         to the form of that last question.

15         Q.  Have you ever heard that -- strike that.

16              Do you have recollection that certain

17    members of the Steering Committee were unsure of the

18    company's intent regarding getting the fees paid at

19    that period of time?

20              MR. JOHNSTON:  I object to the form.

21         A.  Could you --

22         Q.  It's so hard to do this without documents.

23         A.  Yeah, I apologize.

24              MR. KORPUS:  No, that's fine.  Let's mark

25         this as Larsen 18.

1          CONFIDENTIAL - N. LARSEN

2          (Larsen Exhibit 18, 2/9/09 E-mail from

3      Daniel Smit to Meyer Dworkin Bates stamped

4      JPM2_00001293 through 1296, marked for

5      identification.)

6      Q.   I marked as Larsen 19 documents bearing

7  production numbers JPM2_00001293 through 1296.

8  Again, it's a chain of E-mails.  I'm looking at the

9  second E-mail on the front page from Mr. Schaible to

10  Mr. Krakauer, and it has the sentence containing,

11  "As you know, certain members of the SC are unsure

12  of the company's intent regarding (getting) these

13  fees paid, so I am hopeful that we are not creating

14  additional wind that might whip up in our faces as

15  we go down the path to fee payment that you yourself

16  recommended and that we sold to the SC on that

17  basis."  Putting aside the metaphors for one second,

18  do you recall the views being expressed that certain

19  members of the SC were unsure as the company's

20  intent regarding the fees paid; do you recall people

21  at the senior lenders expressing that view to you?

22      A.   Show me the E-mail from Mr. Baiera who

23  references same.  I did not have any specific direct

24  conversations with anybody that we were in fact

25  acting counter to what our true intent was.

1          CONFIDENTIAL - N. LARSEN

2      Q.   Okay.  Well, you did have that E-mail from

3  Miss Kulnis as well that had similar concerns

4  expressed; right?

5      A.   Correct.

6      Q.   Okay.  So you just viewed this as another

7  sentiment expressed in the same -- along the same

8  lines as the ones expressed by Miss Baiera --

9  Mr. Baiera and Miss Kulnis?

10     A.   Well, as I read it here.  I'm not sure at

11  the time I saw it as --

12     Q.   Okay.

13     A.   -- as a sort of rhetorical -- but, yes,

14  consistent with your...

15     Q.   So is it your recollection -- because those

16  E-mails were a little earlier in time, is it your

17  recollection that as of February 9 there was still a

18  concern by the senior lenders expressed to the

19  debtors that they were unsure whether the company

20  was really intending to have these fees paid through

21  its non-debtor guarantors?

22     A.   I wouldn't say that I have a recollection

23  that we -- that there was indicated our intent was

24  not to move forward in good faith along the

25  conversations that were transpiring at the time.

1          CONFIDENTIAL - N. LARSEN

2     Q.   There is a reference in this E-mail from

3   Mr. Schaible to Mr. Krakauer, who he is one of the

4   lead bankruptcy attorneys for Tribune; right?

5     A.   That is correct.

6     Q.   And there is a reference here to the fee

7   payment that you yourself recommended.  Is it your

8   recollection that it was Mr. Krakauer who came up

9   with this alternative proposal whereby there would

10  simply be a demand on the non-debtor guarantors and

11  a payment by the non-debtor guarantors of

12  professional fees?

13    A.   I don't recall whether he actually was the

14  author of it solely or whether it was -- it was a

15  topic of conversation between counsel and the

16  company.

17    Q.   But is it your recollection that the source

18  of that arrangement was the debtor, not the agent,

19  that this was a recommendation that came from the

20  debtor to the agent?

21         MR. DUCAYET:  Objection to form.

22    A.   I understand.  Yeah, that is my

23  recollection.

24         MR. KORPUS:  Mark that as the next exhibit,

25     please.

Page 123

CONFIDENTIAL - N. LARSEN

1

2          (Larsen Exhibit 19, 2/27/09 letter from

3      Paul Huffard to Don Bernstein Bates stamped

4      JPM2_00002797 through 2806, marked for

5      identification.)

6      Q.  As Exhibit 19 I marked the executed

7  Blackstone agreement, and I didn't bother E-mailing

8  an intermediate -- marking an intermediate E-mail

9  that had the final draft which was the same but not

10  executed.  But do you see that in this executed

11  agreement -- first of all, do you see this is the

12  executed Blackstone agreement?

13      A.  I do.

14      Q.  Okay.  And do you see that there is, unlike

15  the draft that I marked earlier, in this version

16  there is no signature line for the debtors; right?

17      A.  Yes.

18      Q.  And contrary to the E-mail that I marked

19  earlier, which suggested there would be a signature

20  line for the non-debtors, there is no signature line

21  for the non-debtors either in this executed

22  Blackstone agreement; right?

23      A.  Correct.

24      Q.  The only parties are Blackstone, Davis Polk

25  and the agent; right?

Page 124

                    CONFIDENTIAL - N. LARSEN

1

2        A.  Yes.

3        Q.  And do you recall how it was that -- or why

4   it was that the signature lines for the debtors were

5   deleted?

6        A.  I do not.

7        Q.  You have no further information on that

8   subject, other than what you testified to?

9        A.  That's correct.

10       Q.  Do you recall any discussions about how the

11  debtor could be -- strike that.

12           Do you recall any discussions about how the

13  non-debtor guarantors could be bound to pay the fees

14  to Blackstone, including the success fee, without

15  being a party to the agreement?

16           MR. JOHNSTON:  I object to the form.

17           MR. DUCAYET:  I object to the form.

18       Q.  Do you recall any discussion on that

19  subject?

20       A.  I do not.

21           (Larsen Exhibit 20, 2/26/09 E-mail from

22       Bryan Krakauer to Nils Larsen Bates stamped

23       TRB_LD001087, marked for identification.)

24       Q.  I marked as Larsen 20 a document bearing

25  production numbers TRB_LD001087.  You see that the

1                    CONFIDENTIAL - N. LARSEN

2     top E-mail is an E-mail from Bryan Krakauer to

3     several recipients, including yourself, dated

4     February 26th, 2009?

5          A.  Yes.

6          Q.  And underneath there is an -- it's

7     forwarding an E-mail from Mr. Schaible to

8     Mr. Krakauer.  Do you recall receiving this E-mail?

9     You see it, you don't recall it at the time?

10         A.  Yes, thank you.

11         Q.  That's all right.  I prepare people to

12    answer depositions too.

13             The E-mail from Mr. Schaible states, "You

14    should be getting a call, but UCC has no objections

15    to the revised proposal."  Do you recall what the

16    revised proposal was?  We talked about earlier the

17    revisions in terms of the Blackstone fee and the

18    terms of the retainer.

19         MR. DUCAYET:  Objection to the form of the

20         question.

21         A.  My recollection would be that those were

22    the issues.  I don't know if there were others but

23    the monetary ones.

24         Q.  And then Mr. Schaible asks, "Can we speak

25    re: planning/process and calling UST?"  Do you take

1          CONFIDENTIAL - N. LARSEN

2    that to be a reference to the United States Trustee?

3         A.  I do.

4         Q.  And I assume just to -- it states, "I

5    assume just to apprise him that non-debtor subs

6    intend to pay certain fees that they are obligated

7    to pay under live guaranties and you just wanted to

8    make sure he was apprised and the UCC has been

9    apprised and had no objection?"  Do you see that?

10        A.  I do.

11        Q.  Do you recall that the plan was to contact

12   the United States Trustee just to apprise him of

13   what the company's plan was in terms of having the

14   non-debtors making this payment?

15        MR. DUCAYET:  I object to the form of the

16        question.

17        A.  My recollection was that it was important

18   to inform the U.S. Trustee, and I don't think

19   anybody was trying to predict what he would say or

20   how people would respond to that.

21        Q.  You went -- the plan was not to ask for the

22   consent of the U.S. Trustee, it was just to inform

23   him of this is what the company proposes and see

24   what happens; right?

25        MR. DUCAYET:  I object to the form of the

CONFIDENTIAL - N. LARSEN

1

2    question.

3        A.   That's what I just said.

4        Q.   I'm sorry?

5        A.   That's how I answered the earlier question.

6        Q.   So you agree with what I just said?

7        A.   We were informing him of an agreement that

8    had been reached among a series of parties after a

9    negotiation.

10           MR. KORPUS:   So if I mark Larsen 21.

11           (Larsen Exhibit 21, 3/5/09 E-mail from

12       Damian Schaible to Bryan Krakauer Bates stamped

13       JPM2_00000439 and 440, marked for

14       identification.)

15           MR. KORPUS:   Jim's favorite document.

16       Q.   Larsen 21 is a document bearing production

17    numbers JPM2_00000439 to 440.   It's an E-mail from

18    Mr. Schaible to Mr. Krakauer and Mr. Bernstein dated

19    March 5, 2009.   Now, do you recall that Mr. Krakauer

20    was the one who contacted the United States Trustee

21    and apprised him of this agreement?

22       A.   I believe that Mr. Krakauer made the call.

23    Someone from the debtors professional did.

24       Q.   And the E-mail from Mr. Schaible says,

25    "Bryan, based on your description of your

Page 128

1    conversation last week and Joe's description of the

2    same conversation when we spoke...", you understand

3    Joe to be Joseph McMahon, the U.S. Trustee?

4        A.  That would be my supposition based on

5    reading this, yes.

6        Q.  And based on the preparation that you did

7    to be here as the designated witness for the company

8    and TCV; right?

9        A.  Yes.

10       Q.  Okay.  And Mr. Schaible says that based on

11   those descriptions by Mr. Krakauer and Mr. McMahon,

12   you didn't ask for his permission and you didn't

13   tell him you were waiting for his consent, both

14   correctly, but instead told him that the non-debtors

15   intended to pay around the middle of this week.  And

16   that's what Mr. Schaible is describing as his

17   understanding of what was told by Mr. Krakauer to

18   Mr. McMahon; right?

19       A.  Excuse me, could you repeat?

20       Q.  That's what Mr. Schaible says was his

21   understanding of what Mr. Krakauer said to

22   Mr. McMahon; right?

23       A.  As it reads here, yes.

24       Q.  Yes.  And is it your understanding that

1          CONFIDENTIAL - N. LARSEN

2    indeed that is what the debtors told the U.S.

3    Trustee?

4          MR. DUCAYET:  Objection, lacks foundation.

5    A.  I wouldn't be able to say if the words that

6    Mr. Schaible uses here were consistent with the

7    words used by the debtor.

8    Q.  Well, you are here as the designee of the

9    debtor, and this is one of the topics that we

10   specifically asked for a witness on.  So if you

11   can't answer that question, if you have not been

12   prepared to answer that question, then I'm going to

13   have to reserve my rights to get a different witness

14   in response to this question.

15         So you don't know what Mr. Krakauer -- you

16   are not prepared to testify today about specifically

17   what Mr. Krakauer told the U.S. Trustee?

18         MR. DUCAYET:  Objection to the form of the

19         question.

20   A.  Specifically in word-for-word format?

21   Q.  Obviously not in word-for-word, but in

22   terms of substance.

23   A.  The substance of Mr. Krakauer's

24   conversations were to inform the U.S. Trustee that

25   after a series of negotiations that an accommodation

1          CONFIDENTIAL - N. LARSEN

2   on this particular topic had been reached with all

3   parties.  Whether Mr. Krakauer used these specific

4   words as represented here --

5          Q.  Okay.  I'm not asking for the specific

6   words.

7          A.  Yeah.

8          Q.  Do you have an understanding if

9   Mr. Krakauer asked for permission of the U.S.

10  Trustee?

11         A.  I don't -- my understanding is that it was

12  a feeling that permission was not required.  But as

13  a courtesy and as part of transparency, this was

14  provided in advance of actually taking any action.

15         Q.  I understand that.  So it is not your

16  understanding that Mr. Krakauer asked for permission

17  of the U.S. Trustee; right?

18         A.  That is correct.

19         Q.  Okay.  And it is not your -- is it your

20  understanding that Mr. Krakauer told the U.S.

21  Trustee that the debtors were waiting for his

22  consent before making the payment?

23         MR. DUCAYET:  I object to the form of the

24         question.

25         A.  I don't believe that Mr. Krakauer indicated

1          CONFIDENTIAL - N. LARSEN

2   he was waiting for a specific affirmative action on

3   behalf of the U.S. Trustee, but that doesn't

4   necessarily mean, you know, we wouldn't have reacted

5   based on the response.

6       Q.  I'm not suggesting otherwise.  I'm just

7   trying get the basis -- the substance of what was

8   said.

9       A.  Sure.

10      Q.  So your understanding was that Mr. Krakauer

11  did not tell the U.S. Trustee that he was waiting

12  for his consent or some other affirmative step, as

13  you put it, before they put -- before the non-debtor

14  guarantors start making these payments; right?

15          MR. DUCAYET:  I object to the form of the

16      question, mischaracterizes the testimony.

17      A.  My understanding is it was not needed.

18      Q.  And Mr. Krakauer did not ask for one?

19      A.  If it wasn't needed, I suspect he wouldn't

20  have asked.

21      Q.  And is it your understanding that

22  Mr. Krakauer told the non-debtors -- strike that.

23          Is it your understanding that Mr. Krakauer

24  told the U.S. Trustee that the non-debtors intended

25  to pay around the middle of this week?

1          CONFIDENTIAL - N. LARSEN

2          MR. DUCAYET:  I object to the form,

3      foundation.

4          A.  I mean, based on the date of the E-mail,

5      the middle of the week might have already passed.

6      So I'm not certain I can say as to what the actual

7      timing would have been, but an approximate period.

8          Q.  Okay.  Now, the fact -- once -- strike

9      that.

10          Once TCV started making payments to

11      professionals, that fact was not disclosed to the

12      bankruptcy court; right?

13          MR. DUCAYET:  I object to the form of the

14      question.

15          A.  Explicitly?

16          Q.  Explicitly.

17          A.  No.

18          Q.  And it wasn't disclosed to my client, Law

19      Debenture; right?

20          MR. DUCAYET:  I object to the form of the

21      question.

22          A.  Well, at the time I'm not sure Law

23      Debenture was the trustee, so.

24          Q.  Did there ever come a time when it was

25      disclosed to Law Debenture?

1                  CONFIDENTIAL - N. LARSEN

2        A.  I'm not certain.

3        Q.  In fact, the first that the court

4   explicitly heard about this issue is when we filed

5   our motion; right?

6            MR. JOHNSTON:  I object to the form.

7            MS. KATZ:  I object to the form.

8        A.  Again, I presume that to be the case.

9        Q.  The debtor filed periodic statements under

10  Bankruptcy Rule 2015.3; right?  Are you familiar

11  with those statements?

12       A.  If you can add a little bit more detail as

13  to the specific statement, it would be helpful.

14            MR. KORPUS:  Let's mark this as the next

15       exhibit.

16            (Larsen Exhibit 22, Periodic Report of

17       Debtors Pursuant to Bankruptcy Rule 2015.3,

18       marked for identification.)

19       Q.  Are you familiar with the document that

20  I've put in front of you?

21       A.  The specific document, no, but I know the

22  intent.

23       Q.  Right.  And neither this document nor none

24  of the other documents that were filed in this

25  format before the bankruptcy court was there

1          CONFIDENTIAL - N. LARSEN

2    explicit description of the fact that the non-debtor

3    guarantors were paying these fees of the

4    professionals; right?

5          A.  I'm sorry, could you repeat that question,

6    please?

7          Q.  Yeah.  Neither this document nor any of the

8    documents like it that was filed in this form in the

9    bankruptcy court was there any explicit description

10   of the fact that the non-debtor guarantors or that

11   TCV was paying the professional fees; right?

12         A.  Having not read through them word-for-word,

13   I don't believe there was an explicit statement to

14   that effect.  But on page 6, the prepaid expenses,

15   the 7.5 million I suspect is the amount that was

16   paid in the retainer.  And I suspect if you look

17   back over the monthly statements, which I'm sure you

18   have, that that's a prepaid asset that materializes.

19         Q.  But there is nothing in this document that

20   suggests that the $7.5 million is in fact prepaid

21   expenses to professionals of the agent; right?

22         A.  Again, without reading every -- every word

23   in it.

24         Q.  Take your time and tell me if you see it.

25   We've made good time.  We have time to burn.

1          CONFIDENTIAL - N. LARSEN

2          MS. KATZ:  Could I trouble you to read the

3     question, while he is looking?

4          (Record was read as requested.)

5     A.  I heard your question to be nothing

6     explicit in this document.  After quick review, I

7     don't see any explicit footnote that refers to the

8     $7.5 million of prepaid expenses of Tribune (FN)

9     Cable Ventures.

10    Q.  Right.  So if you were -- I'm sorry, did

11    you finish your answer?

12    A.  Yeah.

13    Q.  Okay.  So a creditor of Tribune reading

14    this would not know from reading this document that

15    that's what the prepaid expenses of $75 million

16    (sic) represents; right?

17          MR. JOHNSTON:  I object to the form.

18          MR. DUCAYET:  7.5.

19          MR. KORPUS:  7.5.

20          MR. DUCAYET:  Objection.

21    A.  There is nothing explicit as to what that

22    $7.5 million pertains to.

23          (Larsen Exhibit 23, 1/23/09 E-mail from

24     Bryan Krakauer to Madlyn Primoff Bates stamped

25     TRB_LD000110, marked for identification.)

CONFIDENTIAL - N. LARSEN

1

2    Q.   Larsen 23 is an E-mail from Madlyn Primoff

3  at Kaye Scholer to Mr. Krakauer, and a response from

4  Mr. Krakauer.  To your understanding, do you have an

5  understanding of who Miss Primoff's client is?

6    A.   I do.

7    Q.   Who is that?

8    A.   Merrill Lynch in its capacity as agent to

9  the bridge.

10    Q.   And the bridge is the subordinated lender

11  here?

12    A.   That is correct.

13    Q.   And in her E-mail, Miss Primoff is making a

14  demand pursuant to 8.04 of the bridge credit

15  agreement for payment of its professional fees;

16  right?

17    A.   That is correct.

18    Q.   And the response from the company is that

19  because the borrower is in bankruptcy, it is not in

20  a position to pay the fees; right?

21    A.   That is correct.

22    Q.   And why is it that the borrower made the

23  decision -- strike that.

24        Why is it that the borrower made the

25  decision not to pay the fees to Merrill Lynch?

CONFIDENTIAL - N. LARSEN

1

2      A.   The desire was to minimize the amount of

3  expenses that would need to be paid.  And given the

4  timing of this E-mail and the possibility -- and the

5  discussions that were ongoing, feeling that the

6  company with either the forbearance or at a later --

7  some other form, that they would not be necessary to

8  pay.

9           It's also in the form of some of the

10  concerns that the debtor had that someone could ask

11  for these to be paid outside of our desire, perhaps,

12  not to pay them.

13      Q.   Was there a concern that the -- Merrill

14  Lynch may move against TCV or one of the other

15  non-debtor guarantors?

16      A.   Merrill, or the possibility that it could

17  happen consistent with our overall concern.

18      Q.   And did the payment blockage notice

19  prevent, to your understanding, prevent Merrill

20  Lynch from taking action against TCV?

21      A.   Once it was in place, my understanding,

22  yes.

23      Q.   And is that why the company felt

24  comfortable in rebuffing Merrill Lynch's request for

25  payment of professional fees?

1          CONFIDENTIAL - N. LARSEN

2          MS. KATZ:  Object to the form.

3          MR. DUCAYET:  Object to the form.

4      A.  Could you ask that again?

5      Q.  Yeah.

6      A.  I didn't follow your question.

7      Q.  Is it because you had the payment blockage

8  letter in place, is that why the company felt secure

9  in rejecting the request for professional fees,

10  knowing that Merrill Lynch would not be able to move

11  against TCV?

12      A.  I don't believe at the time that we

13  provided this response there was a payment blockage

14  in effect.

15      Q.  Okay.

16      A.  There were discussions about how to avoid

17  the eventuality that's indicated here, but nothing,

18  I don't believe, on the 23rd of January was in

19  place.

20      Q.  I understand.  But at that time you knew

21  that at least one option open to you down the road

22  was to reach this deal with the senior lenders and

23  then have a payment blockage notice issued that

24  would take care of the requests for Merrill Lynch?

25      A.  I mean, those were some of the concerns

1          CONFIDENTIAL - N. LARSEN

2    that were active in the discussion around

3    forbearance as well as the payment blockage.

4          (Whereupon a discussion was had off the

5          record.)

6          (Larsen Exhibit 24, Tribune Company Bank

7          Transaction Detail Report with Ref Text 3/12/09

8          to 12/22/09 Bates stamped TRB_LD003221 through

9          3227, marked for identification.)

10         Q.  Tribune (sic) 24 is a Bank Transaction

11   Detail Report containing the Bates numbers

12   TRB_LD003221 through 3227.  We talked earlier about

13   what's happened since the bankruptcy and all these

14   monies accumulating at TCV, and then TCV's paying

15   out the professional fees.  Do you remember that

16   discussion?

17         A.  Yes, I do.

18         Q.  And is this reflected in the document that

19   I just marked?

20         A.  It appears to be, yes.

21         Q.  So the credits are, for the most part, the

22   distributions that are being received from TCV

23   from -- by TCV from the partnership?

24         A.  Yes, that appears to be the case.

25         Q.  And the debits are, for the most part,

1          CONFIDENTIAL - N. LARSEN

2    other than some smaller amounts, the payment of the

3    professional fees?

4         A.  As well as the retainer.

5         Q.  As well as the retainer, thank you.  And

6    does this document here contain all of the payments

7    for professional fees made by TCV to date?

8         A.  To my knowledge, through the date of the

9    16th of December, which is the last date here.

10         Q.  The last date I have here is --

11         A.  Oh, I'm just looking at the last -- oh, you

12    are right, my mistake.  The last debit amount

13    appears to be on the 10th of December.

14         Q.  Right.

15         A.  Last credit amount was on the 16th, per

16    this statement.

17         Q.  Right.  Are you aware of any payments that

18    were made after December 10th for professional

19    fees?

20         A.  Not to my knowledge, no.

21         Q.  And the bankruptcy court said that there

22    shouldn't be any in the interim; right?

23              MS. KATZ:  Objection to form.

24              MR. JOHNSTON:  Objection to form.

25              MR. DUCAYET:  Objection to form,

1           CONFIDENTIAL - N. LARSEN

2      mischaracterizes the Court.

3           MR. KORPUS:  I wasn't there.  Maybe I got

4      it wrong.  I don't know.

5           MR. DUCAYET:  You did.

6  BY MR. KORPUS:

7      Q.  But in any event, the company -- TCV has

8  not made any payments since December -- since

9  December 10th?

10      A.  That's correct.

11      Q.  And what's the current amount sitting in

12  the account -- or strike that.

13

14  REDACTED

15

16

17

18

19

20

21

22

23

24

25

1    CONFIDENTIAL – N. LARSEN
2
3
4    # REDACTED
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL - N. LARSEN

# REDACTED

    MR. KORPUS:  I just want to take a look at
my notes.  I think I'm pretty much done, unless
you have a new document for me to look at.
    MR. DUCAYET:  Why don't we go off the
record and we can talk about that.
    (Recess taken from 12:02 p.m. to
12:07 p.m.)
BY MR. KORPUS:
    Q.  Mr. Larsen, your counsel has produced to me
the -- in response to discussions, the agreement of
general partnership for Television Food Network
between Cable Program Management Co. and other
general partners, and I assume TCV is one of the

Page 144

CONFIDENTIAL - N. LARSEN

1

2  partners to this document; right?

3       A.  Yes.

4       Q.  And we discussed earlier about one of the

5  concerns that the company had about filing for

6  TCV -- filing bankruptcy protection for TCV was the

7  affect that would have on the partnership; do you

8  remember that discussion?

9       A.  Yes.

10      Q.  And you mentioned that there were certain

11 rights and consequences to filing -- to a bankruptcy

12 filing of a partner.  And my question to you is:  To

13 your understanding, are those rights and

14 consequences that arise under the agreement between

15 the partners or are these rights and consequences

16 that arise under general Delaware law when a partner

17 to a general partnership files for bankruptcy

18 protection?

19      A.  My understanding, those consequences arise

20 under the Delaware general law.

21      Q.  So independent of the agreement?

22      A.  Correct.

23          (Continued on next page to include jurat.)

24

25

1          CONFIDENTIAL - N. LARSEN

2          MR. KORPUS:  I have no further questions.

3      Thank you for your time.

4          (Time noted:  12:09 p.m.)

5

6

7

8

9                    _____

10                   NILS LARSEN

11

12   Subscribed and sworn to before me

13   this _____ day of _____ 2010.

14   _____

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3          I, Paula Campbell, CSR, RDR, CRR, CCP, do

4    hereby certify that on Monday, February 1, 2010

5    appeared before me, NILS LARSEN.

6          I further certify that the said witness was

7    first duly sworn to testify to the truth in the

8    cause aforesaid.

9          I further certify that the signature of the

10   witness to the foregoing deposition was not waived

11   by agreement of counsel.

12         I further certify that I am not counsel for

13   nor in any way related to any of the parties to

14   this suit, nor financially interested in the

15   action.

16         IN TESTIMONY WHEREOF, I have hereunto set my

17   hand on this 8th day of February, 2010.

18

19   _____

20                    Paula Campbell, CSR, RDR,CRR, CCP

                      Certified Shorthand Reporter

21                    Registered Diplomate Reporter

                      Certified Realtime Reporter

22                    Certified CART Provider

23                    Illinois C.S.R. No. 084-003481

24

25

1

2    ---------------------- I N D E X ------------------

3

4    WITNESS                        EXAMINATION BY        PAGE

5    NILS LARSEN                    MR. KORPUS              6

6

7

8    ----------------------EXHIBITS----------------------

9    LARSEN                                    PAGE   LINE

10   Exhibit 1   Law Debenture Trust            9     24
                 Company of New York Notice
11               of Deposition of the
                 Debtors
12

     Exhibit 2   Subpoena to Tribune (FN)      10      3
13               Cable Ventures, Inc.

14   Exhibit 3   Tribune Company               13     13
                 Organization Chart as of
15               12/5/08

16   Exhibit 4   Unanimous Written Consent     25     25
                 of the Board of Directors
17               of Tribune (FN) Cable
                 Ventures, Inc. Bates
18               stamped TRB_LD003215
                 through 217
19

     Exhibit 5   Unanimous Written Consent     26      6
20               of the Board of Directors
                 of Tribune (FN) Cable
21               Ventures, Inc. Bates
                 stamped TRB_LD003218
22               through 220

23   Exhibit 6   12/1/08 E-mail from           35     12
                 Chandler Bigelow to Kevin
24               Foley Bates stamped
                 JPM2_00002780 and 2781

25

```
 1
 2    -----------------------EXHIBITS----------------------
 3    LARSEN                                      PAGE   LINE
 4    Exhibit 7    4/16/09 E-mail chain           35     16
              from Daniel Smit to Vince
 5            Garlati Bates stamped
              JPM2_00002103 through 2108
 6
      Exhibit 8    5/17/07 Credit Agreement       49     21
 7            Bates stamped TRB_LD000253
              through 369
 8
      Exhibit 9    1/10/09 E-mail from            57     25
 9            Daniel Smit to Bryan
              Krakauer and others Bates
10            stamped TRB_LD000021
              through 33
11
      Exhibit 10   1/20/09 E-mail from            61     21
12            David Eldersveld to Nils
              Larsen Bates stamped
13            TRB_LD000042 through 57
14    Exhibit 11   1/25/09 E-mail from            75     25
              Don Liebentritt to Nils
15            Larsen Bates stamped
              TRB_LD002356
16
      Exhibit 12   1/22/09 E-mail from            81     23
17            Nils Larsen to Miriam
              Kulnis Bates stamped
18            TRB_LD000073 and 74
19    Exhibit 13   1/30/09 E-mail with           101      5
              attachment from Daniel
20            Smit to Bryan Krakauer
              Bates stamped
21            JPM2_00000250 through 260
22    Exhibit 14   2/11/09 E-mail from          102     21
              Bryan Krakauer to Nils
23            Larsen and other Bates
              stamped TRB_LD002148  and
24            2149
25
```

1
2      ----------------------EXHIBITS----------------------
3   LARSEN                                        PAGE   LINE
4   Exhibit 15  2/14/09 E-mail from               108     2
               Nils Larsen to Mary Ellen
5              Egbert Bates stamped
               TRB_LD000723
6
    Exhibit 16  2/5/09 E-mail from                114     8
7              Bryan Krakauer to Don
               Liebentritt Bates stamped
8              TRB_LD002110 through 2116
9   Exhibit 17  2/6/09 E-mail with                116    21
               attachment from Daniel
10             Smit to Bryan Krakauer
               Bates stamped
11             JPM2_00001272 through 1288
12  Exhibit 18  2/9/09 E-mail from                120     2
               Daniel Smit to Meyer
13             Dworkin Bates stamped
               JPM2_00001293 through 1296
14
    Exhibit 19  2/27/09 letter from               123     2
15             Paul Huffard to Don
               Bernstein Bates stamped
16             JPM2_00002797 through 2806
17  Exhibit 20  2/26/09 E-mail from               124    21
               Bryan Krakauer to Nils
18             Larsen Bates stamped
               TRB_LD001087
19
    Exhibit 21  3/5/09 E-mail from                127    11
20             Damian Schaible to Bryan
               Krakauer Bates stamped
21             JPM2_00000439 and 440
22  Exhibit 22  Periodic Report of               133    16
               Debtors Pursuant to
23             Bankruptcy Rule 2015.3
24  Exhibit 23  1/23/09 E-mail from               135    23
               Bryan Krakauer to Madlyn
25             Primoff Bates stamped

```
1
2      ----------------------EXHIBITS----------------------
3      LARSEN                                    PAGE   LINE
4      Exhibit 24  Tribune Company Bank          139      6
                   Transaction Detail Report
5                  with Ref Text 3/12/09 to
                   12/22/09 Bates stamped
6                  TRB_LD003221 through 3227
7      Exhibit 25  JPMorgan Chase account        142     16
                   statement from 2/28/09
8                  through 3/27/09 Bates
                   stamped TRB_LD003228
9                  through 3231
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2           ERRATA SHEET FOR THE TRANSCRIPT OF:

3    CASE NAME:          In Re Tribune Company

4    DEPOSITION DATE:    February 1, 2010

5    WITNESS NAME:       NILS LARSEN

6    Reason codes:

7           1.  To clarify the record.
            2.  To conform to the facts.
8           3.  To correct transcription errors.

9    Page _____ Line _____ Reason _____
     From _____ to _____
10

     Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
     From _____ to _____
13

     Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
     From _____ to _____
16

     Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
     From _____ to _____
19

     Page _____ Line _____ Reason _____
20   From _____ to _____
21

                         _____
22                       NILS LARSEN
23   SUBSCRIBED TO AND SWORN BEFORE ME
     THIS _____ DAY OF _____, 2010.
24

     _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____