### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
In re:                          :      Chapter 11 Cases
                                :      Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,        :      (Jointly Administered)
                                :
                 Debtors.       :
-------------------------------------------------x
```

## LAW DEBENTURE TRUST COMPANY OF NEW YORK'S
## NOTICE OF DEPOSITION OF THE DEBTORS

PLEASE TAKE NOTICE THAT, pursuant to Rules 26 and 30 of the Federal Rules of

Civil Procedure (the **"Federal Rules"**), made applicable to these cases pursuant to Rules 7026,

7030 and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), Law

Debenture Trust Company of New York, by its undersigned attorneys, will take the deposition of

the debtors and debtors-in-possession in the above-captioned jointly-administered Chapter 11

bankruptcy cases (the **"Debtors"**) at the offices of Kasowitz, Benson, Torres & Friedman LLP,

1633 Broadway, New York, New York 10019 on December 16, 2009 at 10:00 a.m., or on such

other time and place as the parties shall agree or the Court may direct.

Pursuant to Bankruptcy Rules 9014 and 7030 and Rule 30(b)(6) of the Federal Rules of

Civil Procedure, the Debtors are required to designate one or more members, officers, directors,

managing agents or other persons to testify, who have knowledge about the matters set forth in

Exhibit A hereto.

Dated: December 7, 2009
      Wilmington, Delaware

                      _/s/ Garvan F. McDaniel_
                      Garvan F. McDaniel (No. 4167)
                      **BIFFERATO GENTILOTTI LLC**
                      800 N. King Street, Plaza Level
                      Wilmington, Delaware 19801



Larsen
EXHIBIT NO. 1
2/1/10
P. CAMPBELL

Tel:  (302) 429-1900
Fax:  (302) 429-8600

– and –

David S. Rosner
Andrew K. Glenn
Sheron Korpus
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700

*Co-Counsel for Law Debenture Trust Company
of New York*

<u>DEFINITIONS</u>

The terms used herein shall have the meanings ascribed to them in the definitions set forth

below.

1.      "<u>Bankruptcy Cases</u>" means the jointly-administered Chapter 11 bankruptcy cases

styled *In re Tribune Company, et al.*, Case No. 08-13141, pending in the Bankruptcy Court.

2.      "<u>The Bankruptcy Court</u>" means the United States Bankruptcy Court for the

District of Delaware.

3.      "<u>Concerning</u>" means relating to, referring to, describing, evidencing or

constituting.

4.      "<u>Credit Agreement</u>" means the senior secured credit agreement dated May 17,

2007, with JPMorgan Chase Bank, N.A., as Administrative Agent, Merrill Lynch Capital

Corporation, as Syndication Agent, and Citicorp North America, Inc., Bank of America, N.A.

and Barclays Bank PLC as Co-Documentation Agents, as the same has been amended, modified

or supplemented.

5.      The "<u>Debtors</u>" means the debtors and debtor-in-possession in the Bankruptcy

Cases and each of its directors, officers, employees, affiliates (as defined in the Bankruptcy

Code), representatives, advisors, agents, attorneys, associates, associations or any other person

acting on their behalf.

6.      "<u>Lenders Advisors</u>" means any or all advisors, including but not limited to,

attorneys, financial advisors, or others, to any or all of the Lender Parties, including but not

limited to, any "Steering Committee" of such lenders or assignees.

7.      "<u>Lender Parties</u>" means all lenders and/or agents under the Credit Agreement or

their assignees.

8.      "Subsidiary Guarantees" means the guarantee agreements entered into in June 2007 whereby certain of Tribune's subsidiaries guaranteed obligations arising under the Credit Agreement.

9.      "TCV" means Tribune (FN) Cable Ventures, Inc. and directors, officers, employees, affiliates (as defined in the Bankruptcy Code), representatives, advisors, agents, attorneys, associates, associations or any other person acting on their behalf.

10.      "Tribune" means Tribune Company, its directors, officers, employees, affiliates (as defined in the Bankruptcy Code), representatives, advisors, agents, attorneys, associates, associations or any other person acting on their behalf.

11.      "Tribune Entities" means, collectively, Tribune and all of its direct and indirect subsidiaries (including both debtors and non-debtors), and each of their directors, officers, employees, affiliates (as defined in the Bankruptcy Code), representatives, advisors, agents, attorneys, associates, associations or any other person acting on their behalf.

**EXHIBIT A – TOPICS OF DEPOSITION**

1.    Any agreement by any Tribune Entities to pay and/or reimbursement the fees and/or expenses of Lenders Advisors.

2.    Consideration provided by the Lender Parties to any Tribune Entities in exchange for payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

3.    The reasons, if any, that any Tribune Entities paid and/or reimbursed or intends to pay and/or reimburse the Lenders Advisors' fees and/or expenses.

4.    The amount, date and recipient of all payments and/or reimbursements by the Tribune Entities of fees and/or expenses of Lenders Advisors.

5.    The nature of the Lenders Advisors' fees and/or expenses paid and/or reimbursed or to be paid and/or reimbursed by any Tribune Entities.

6.    Corporate authorization for any Tribune Entities to pay and/or reimburse Lenders Advisors' fees and/or expenses.

7.    Identity of all Tribune Entities' officers and/or directors who review or have reviewed and/or approve or have approved payment and/or reimbursement of Lenders Advisors' fees and/or expenses.

8.    The decision to seek or not seek authority from the Bankruptcy Court for Tribune Entities to pay and/or reimburse the Lenders Advisors' fees and/or expenses.

9.    Communications between any Lender Party and any Tribune Entity concerning enforcement of Lender Party rights against any Tribune Entity arising under the Credit Agreement and/or the Subsidiary Guarantees.

10.     Communications between any Lender Party and TCV regarding payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

11.     Communications between any Lender Party and the Food Network or any parties holding interests therein regarding payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

12.     Communications between any Tribune Entity and the Food Network or any parties holding interests therein regarding payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

13.     The decision to include or not to include TCV in the Bankruptcy Cases or other bankruptcy proceeding.

14.     The decision to disclose or not to disclose Tribune Entities' payment and/or reimbursement of the Lenders Advisors' fees and expenses to the Bankruptcy Court and/or Law Debenture.

15.     The Memorandum dated March 4, 2009 from Bryan Krakauer and Candice L. Kline of Sidley Austin LLP to Joe McMahon of the Office of the United States Trustee, or and the subject matters discussed therein.

16.     Disclosure of TCV's payment and/or reimbursement of the Lenders Advisors' fees and expenses to the Official Committee of Unsecured Creditors and/or the Office of United States Trustee.

B256 (Form 256- Subpoena in a Case under the Bankruptcy Code) (12/07)

# UNITED STATES BANKRUPTCY COURT
## Southern District of New York

In re TRIBUNE COMPANY, *et al.*,

      Debtors.

**SUBPOENA IN
A BANKRUPTCY PROCEEDING**

Case No.*  08-13141 (KJC)
(Bankruptcy Court – District of Delaware)

Chapter 11

TO:    Tribune (FN) Cable Ventures, Inc.
        435 North Michigan Avenue Suite 600
        Chicago, IL, 60611

☐ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the place, date and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| NOT APPLICABLE | DATE AND TIME |

☒ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above proceeding.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, made applicable hereto by Rules 7026, 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Deponent is directed to designate one or more officers, directors, agents, or other persons who will testify on its behalf regarding the subject matters listed in Exhibit A.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| The offices of **Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York, NY 10019**, T: (212) 506-1700, F: (212) 506-1800 | December 18, 2009 at 9:00 a.m. (EST) |

☒ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

      See Exhibit B.

| PLACE: | DATE AND TIME |
|---|---|
| The offices of **Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York, NY 10019**, T: (212) 506-1700, F: (212) 506-1800 | December 14, 2009 at 4:00 p.m. (EST) |

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| *(signature)*, Associate Attorney    Attorneys for Law Debenture Trust Company of New York | 12/7/09 |

ISSUING OFFICER'S NAME, ADDRESS, AND PHONE NUMBER
Daniel A. Fliman, Esq., Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York, NY 10019, 212-506-1700

    * If the bankruptcy case is pending in a district other than the district in which the subpoena is issued, state the district under the case number.



Larsen

EXHIBIT NO. 2

P. CAMPBELL

B256 (Form 256- Subpoena in a Case under the Bankruptcy Code) (12/07)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |
| SERVED BY (PRINT NAME) | TITLE |
| | |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____          _____
DATE                                        SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2007, made applicable in cases under the Bankruptcy Code by Rule 9016, Federal Rules of Bankruptcy Procedure:

(c) Protecting a Person Subject to a Subpoena.
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) Duties in Responding to a Subpoena.
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding

need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) Contempt.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## DEFINITIONS

The terms used herein shall have the meanings ascribed to them in the definitions set forth

below.

1.    "Bankruptcy Cases" means the jointly-administered Chapter 11 bankruptcy cases

styled *In re Tribune Company, et al.*, Case No. 08-13141, pending in the Bankruptcy Court.

2.    "The Bankruptcy Court" means the United States Bankruptcy Court for the District

of Delaware.

3.    "Concerning" means relating to, referring to, describing, evidencing or constituting.

4.    "Credit Agreement" means the senior secured credit agreement dated May 17, 2007,

with JPMorgan Chase Bank, N.A., as Administrative Agent, Merrill Lynch Capital Corporation, as

Syndication Agent, and Citicorp North America, Inc., Bank of America, N.A. and Barclays Bank

PLC as Co-Documentation Agents, as the same has been amended, modified or supplemented.

5.    The "Debtors" means the debtors and debtor-in-possession in the Bankruptcy Cases

and each of its directors, officers, employees, affiliates (as defined in the Bankruptcy Code),

representatives, advisors, agents, attorneys, associates, associations or any other person acting on

their behalf.

6.    The term "Document" is intended to have the broadest possible meaning under Rule

34 of the Federal Rules of Civil Procedure and includes, without limitation, any writings, drawings,

graphs, charts, photographs, phone records, electronic, recorded, digitally encoded, graphic, and/or

other data compilations from which information can be obtained, translated if necessary, by the

respondent through detection devices into reasonably usable form, or other information, including

originals, translations and drafts thereof and all copies bearing notations and marks not found on

the original.  The term "document" includes, without limitation, affidavits, analyses, appointment

books, appraisals, articles from publications, (whether in paper, database, electronic or other format(s)), calculations (whether in paper, database, electronic or other format(s)), books, books of account, statements, cables, calendars, charts, checks (cancelled or un-cancelled), check stubs, confirmations, contracts, correspondence, credit card receipts, desk calendars, desk pads, diaries, diskettes, drafts, estimates, evaluations, filings, financial statements, forms, invoices, journals, ledgers, letters, lists, memoranda, minutes, notations, notes, opinions, orders, pamphlets, papers, partners' and employees' personnel files, partners' and employees' review check lists, permanent files, pictures, press releases, projections, prospectuses, publications, receipts, recordings of conferences, conversations or meetings, reports, statements, statistical records, studies, summaries, tabulations, telegrams, telephone records, telex messages, transcripts, understandings, videotapes, vouchers, work papers, copies of records and documents, and sheets or things similar to any of the foregoing however denominated.  The term "document" further includes email and electronic communication whether stored on a personal computer, network computer system, backup computer tape and/or disk, or by some other storage mechanism.  The term "document" further means any document now or at any time in the possession, custody, or control of the entity to whom this document request is directed (together with any predecessors, successors, affiliates, subsidiaries or divisions thereof, and their officers, directors, employees, agents and attorneys).  Without limiting the term "control" as used in the preceding sentence, a person is deemed to be in control of a document if the person has the right to secure the document or a copy thereof from another person having actual possession thereof, including, but not limited to, work product contracted by you from professional firms.

7.     "Lenders Advisors" means any or all advisors, including but not limited to, attorneys, financial advisors, or others, to any or all of the Lender Parties, including but not

limited to, any "Steering Committee" of such lenders or assignees.

8.    "Lender Parties" means all lenders and/or agents under the Credit Agreement or their assignees.

9.    "Subsidiary Guarantees" means the guarantee agreements entered into in June 2007 whereby certain of Tribune's subsidiaries guaranteed obligations arising under the Credit Agreement.

10.    "TCV" or "you" means Tribune (FN) Cable Ventures, Inc. and directors, officers, employees, affiliates (as defined in the Bankruptcy Code), representatives, advisors, agents, attorneys, associates, associations or any other person acting on their behalf.

11.    "Tribune" means Tribune Company, its directors, officers, employees, affiliates (as defined in the Bankruptcy Code), representatives, advisors, agents, attorneys, associates, associations or any other person acting on their behalf.

12.    "Tribune Entities" means, collectively, Tribune and all of its direct and indirect subsidiaries (including both debtors and non-debtors), and each of their directors, officers, employees, affiliates (as defined in the Bankruptcy Code), representatives, advisors, agents, attorneys, associates, associations or any other person acting on their behalf.

## EXHIBIT A – TOPICS OF DEPOSITION

1.      Any agreement by TCV to pay and/or reimbursement the fees and/or expenses of Lenders Advisors.

2.      Consideration provided by the Lender Parties to TCV in exchange for payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

3.      The reasons, if any, that TCV paid and/or reimbursed or intends to pay and/or reimburse the Lenders Advisors' fees and/or expenses.

4.      The amount, date and recipient of all payments and/or reimbursements by TCV of fees and/or expenses of Lenders Advisors.

5.      The nature of the Lenders Advisors' fees and/or expenses paid and/or reimbursed or to be paid and/or reimbursed by TCV.

6.      Corporate authorization for TCV to pay and/or reimburse Lenders Advisors' fees and/or expenses.

7.      Identity of TCV's officers and/or directors who review or have reviewed and/or approve or have approved payment and/or reimbursement of Lenders Advisors' fees and/or expenses.

8.      The decision to seek or not seek authority from the Bankruptcy Court for Tribune Entities to pay and/or reimburse the Lenders Advisors' fees and/or expenses.

9.      Communications between any Lender Party and any Tribune Entity concerning enforcement of Lender Party rights against any Tribune Entity arising under the Credit Agreement and/or the Subsidiary Guarantees.

10.      Communications between any Lender Party and TCV regarding payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

11.     Communications between any Lender Party and the Food Network or any parties holding interests therein regarding payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

12.     Communications between any Tribune Entity and the Food Network or any parties holding interests therein regarding payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

13.     The decision to include or not to include TCV in the Bankruptcy Cases or other bankruptcy proceeding.

14.     The decision to disclose or not to disclose TCV's payment and/or reimbursement of the Lenders Advisors' fees and expenses to the Bankruptcy Court and/or Law Debenture.

15.     The Memorandum dated March 4, 2009 from Bryan Krakauer and Candice L. Kline of Sidley Austin LLP to Joe McMahon of the Office of the United States Trustee, or and the subject matters discussed therein.

16.     Disclosure of TCV's payment and/or reimbursement of the Lenders Advisors' fees and expenses to the Official Committee of Unsecured Creditors and/or the Office of United States Trustee.

## EXHIBIT B – DOCUMENTS TO BE PRODUCED

### INSTRUCTIONS

1.      You need not produce documents that have previously been provided to us.

2.      In the event that you object to the production of any document(s) responsive to a particular Request by asserting that a portion of the Request is overbroad, irrelevant or burdensome, you are requested to produce those documents that are responsive to the portion(s) of the Request to which you do not object.

3.      In the event that any document requested herein was formerly in your possession, custody or control and has been lost, destroyed or otherwise disposed of, you are requested to furnish a list identifying each such document and stating the following information with respect to each document: the title of the document and the nature and subject matter of its contents; the identity(ies) of the person(s) who prepared or authored the document, and, if applicable, the persons to whom the document was sent or was intended to be sent; the date on which the document was prepared or transmitted; and the date on which the document was lost, destroyed or otherwise disposed of, the manner and conditions of and reasons for such destruction or other disposition and the persons requesting and performing the destruction or other disposition.

4.      Documents are to be produced in full and unexpurgated form without abbreviation or redaction.

5.      Each of these Requests seeks all documents, wherever located, which are in your actual or constructive possession, custody or control or in the actual or constructive possession, custody or control of your present or former attorneys, financial advisors, accountants, bookkeepers, agents, representatives, directors, officers, partners, shareholders or employees, as well as all documents which are known to exist and can be obtained by you from any other source.

6.      Each request for the production of documents shall be deemed to be continuing in nature.  If at any time additional documents come into your possession, custody or control or are brought to your attention, prompt supplementation of your response to these requests is required.

7.      You need not produce publicly available documents.

8.      You shall produce all documents in the manner in which they are maintained in the usual course of your business and/or you shall organize and label the documents to correspond with the categories in this request.  A request for a document shall be deemed to include a request for any and all file folders within which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself.

9.      If and to the extent documents are maintained in a database or other electronic format, you shall produce along with the document(s) software that will enable access to the electronic document(s) or database as you would access such electronic document(s) or database in the ordinary course of your business.

10.      Documents shall be produced in such fashion as to identify the department, branch or office in which they were located and, where applicable, the natural person in whose possession it was found and the business address of each document's custodian(s).

11.      Any document withheld from production based on a claim of privilege or any similar claim shall be identified by (1) the type of document, (2) the general subject matter of the document, (3) the date of the document, and (4) such other information as is sufficient to identify the document including the author of the document, the addressee of the document, and, where not apparent, the relationship of the author and the addressee to each other.  The nature of each claim of privilege shall be set forth.

12.      Documents attached to each other should not be separated.

13.    Documents not otherwise responsive to this discovery request shall be produced if such documents mention, discuss, refer to, or explain the documents which are called for by this discovery request.

14.    Each document request shall be construed independently and not with reference to any other document request for the purpose of limitation.

15.    The use of the singular form of any word includes the plural and vice versa.  The past tense shall include the present tense and vice versa.

REQUESTS FOR PRODUCTION

Request No. 1

All documents concerning any agreement by the Tribune Entities to pay and/or reimbursement the fees and/or expenses of the Lender Advisors.

Request No. 2

All documents sufficient to identify Lenders Advisors whose fees and/or expenses any Tribune Entity has paid and/or reimbursed or intends to pay and/or reimburse.

Request No. 3

All documents sufficient to identify any Tribune Entity that has or intends to pay and/or reimburse Lenders Advisors' fees and/or expenses.

Request No. 4

All documents concerning any consideration provided by the Lender Parties in exchange for payment and/or reimbursement of the Lenders Advisors' fees and/or expenses by any Tribune Entity.

Request No. 5

All documents concerning the reasons, if any, that any Tribune Entity paid and/or reimbursed or intends to pay and/or reimburse the Lenders Advisors' fees and/or expenses.

Request No. 6

All documents concerning the Lenders Advisors' fees and/or expenses paid and/or reimbursed or to be paid and/or reimbursed by any Tribune Entity, specifically including invoices, bills, fee statements, time entries, and/or any summaries of the forgoing.

Request No. 7

All documents concerning each Tribune Entity's corporate authorization to pay and/or reimburse Lenders Advisors' fees and/or expenses, including without limitation, those identifying all officers and directors who review or have reviewed and/or approve or have approved such payments and/or reimbursement.

Request No. 8

All documents concerning the decision to seek or not seek authority from the Bankruptcy Court for Tribune Entities to pay and/or reimburse the Lenders Advisors' fees and/or expenses.

Request No. 9

All documents concerning the payment and/or reimbursement by any Tribune Entity of the Lenders Advisors' fees and expenses not otherwise captured in Requests No. 1 through 8.

Request No. 10

All documents concerning communications between any Lender Party and any Tribune Entity concerning enforcement of Lender Party rights against any Tribune Entity arising under the Credit Agreement and/or the Subsidiary Guarantees.

Request No. 11

All documents concerning communications between any Lender Party and TCV regarding payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

Request No. 12

All documents concerning communications between any Lender Party and the Food Network or any parties holding interests therein regarding payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

Request No. 13

All documents concerning communications between any Tribune Entity and the Food Network or any parties holding interests therein regarding payment and/or reimbursement of the Lenders Advisors' fees and/or expenses.

Request No. 14

All documents concerning the decision to include or not to include TCV in the Bankruptcy Cases or other bankruptcy proceeding.

Request No. 15

All documents concerning the decision to disclose or not to disclose TCV's payment and/or reimbursement of the Lenders Advisors' fees and expenses to the Bankruptcy Court and/or Law Debenture.

Request No. 16

All documents concerning the Memorandum dated March 4, 2009 from Bryan Krakauer and Candice L. Kline of Sidley Austin LLP to Joe McMahon of the Office of the United States Trustee, or and the subject matters discussed therein.

Request No. 17

All documents concerning any disclosure of TCV's payment and/or reimbursement of the Lenders Advisors' fees and expenses to the Official Committee of Unsecured Creditors and/or the Office of United States Trustee.

Request No. 18

All documents that you intend to use during the evidentiary hearing currently scheduled for January 21, 2010.



TRIBUNE COMPANY ORGANIZATION CHART
AS OF DECEMBER 5, 2008

PRIVILEGED & CONFIDENTIAL; ATTORNEY WORK PRODUCT
MILBANK DRAFT 12/11/2008

EXHIBIT NO. 3
P. CAMPBELL

# UNANIMOUS WRITTEN CONSENT OF
# THE BOARD OF DIRECTORS
# OF
# TRIBUNE (FN) CABLE VENTURES, INC.

The undersigned, being all of the members of the Board of Directors of Tribune (FN) Cable Ventures, Inc., a Delaware (the "*Company*"), hereby consent to the adoption of the following resolutions pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, as amended:

## GUARANTEE

**WHEREAS**, Tribune Company, the Company's ultimate parent, entered into a Credit Agreement (the "*Credit Agreement*"), dated as of May 17, 2007, by and among Tribune Company, as borrower (the "*Borrower*"), the lenders from time to time party thereto (the "*Lenders*"), JPMorgan Chase Bank, N.A., as administrative agent (the "*Administrative Agent*"), Merrill Lynch Capital Corporation, as Syndication Agent, Citicorp North America, Inc., Bank of America, N.A., and Barclays Bank PLC, as Co-Documentation Agents, and J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc., and Banc of America Securities LLC, as Joint Lead Arrangers and Joint Bookrunners;

**WHEREAS**, it is a condition precedent to the Lenders making advances under the Credit Agreement that the Company enter into a Guarantee Agreement (the "*Guarantee*") among Tribune Company, the Company, the other Guarantors (as therein defined) party thereto, and JPMorgan Chase Bank N.A., as Administrative Agent; and

**WHEREAS** the proposed terms of the Guarantee are substantially as set forth in the form included as an exhibit to the Credit Agreement;

### Authorization of Guarantee

**RESOLVED**, that each of the President, any Vice President, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Secretary of the Company (such officer or officers, which are authorized to act singly or together pursuant thereto, being hereinafter designated as "*Authorized Officers*") be, and each of them hereby is, authorized for and on behalf of the Company, to (i) execute for, in the name of and on behalf of the Company, and deliver to the Administrative Agent, as agent for the Lenders, the Guarantee, substantially on the terms and conditions contained in the form of Guarantee included as an exhibit to the Credit Agreement, and all other documents, instruments and agreements deemed necessary or desirable by the Administrative Agent in order to guarantee the obligations of the Borrower under the Credit Agreement, including extensions or amendments thereof (collectively, the "*Guarantee Documents*"), (ii) that upon such execution and delivery, such Guarantee Documents shall be the legal, valid and binding obligations of the Company, enforceable in accordance with their respective terms, (iii) take from time to time any actions deemed necessary or desirable by the

1



Larsen
EXHIBIT NO. 4
2/1/10
P. CAMPBELL

TRB_LD003215
CONFIDENTIAL

TRB_LD003215

Authorized Officers of the Company to establish the Guarantee and to evidence the Guarantee properly in accordance with the requirements of the Credit Agreement, (iv) cause the Company to enter into and perform all of its obligations pursuant to the Guarantee Documents, and (v) execute from time to time renewals, modifications, supplements, restatements, extensions and/or amendments of the Guarantee Documents;

<u>Further Authorization</u>

**FURTHER RESOLVED**, that the performance by the Company of its obligations under the Guarantee Documents and any agreements or documents referred to herein or therein be, and it hereby is, ratified, confirmed, approved and adopted in all respects;

**FURTHER RESOLVED**, that the Authorized Officers be, and each hereby is, authorized to file, execute, verify, acknowledge and deliver, for and on behalf of the Company, any and all notices, certificates, agreements, amendments, instruments and other documents and to perform or do or cause to be performed or done any and all such acts or things and to pay or cause to be paid all necessary fees and expenses, in each case in the name and on behalf of the Company, as they or any of them may deem necessary or advisable to enable, effectuate or carry out the provisions of each of the Guarantee Documents or the intentions and purposes of the foregoing resolutions in connection with the Guarantee Documents, the taking of any such action to be deemed conclusive evidence that the Board and the Company have authorized such action;

**FURTHER RESOLVED**, that the Authorized Officers be, and each of them hereby is, authorized for and on behalf of the Company to designate such individual employee(s) of the Company as they deem appropriate to execute and deliver on behalf of the Company certificates, reports and other documents as may be required from time to time in conjunction with the Guarantee Documents, and the actions of such individual(s) shall be binding and enforceable against the Company; and

**FURTHER RESOLVED**, that this Consent may be executed in counterpart in which case all such counterparts, taken together, shall constitute these resolutions.

\* \* \* \* \*

2

TRB_LD003216
CONFIDENTIAL

TRB_LD003216

**IN WITNESS WHEREOF,** the undersigned have caused this unanimous written consent to be executed as of the ___4th___ day of June 2007.

_____
Crane H. Kenney

_____
John E. Reardon

_____
John J. Vitanovec

Being all of the Directors of Tribune (FN) Cable Ventures, Inc.

SIGNATURE PAGE TO<br>
UNANIMOUS WRITTEN CONSENT OF<br>
THE BOARD OF DIRECTORS<br>
OF TRIBUNE (FN) CABLE VENTURES, INC.

TRB_LD003217
CONFIDENTIAL
TRB LD003217

## UNANIMOUS WRITTEN CONSENT OF
## THE BOARD OF DIRECTORS
## OF
## TRIBUNE (FN) CABLE VENTURES, INC.

The undersigned, being all of the members of the Board of Directors of **TRIBUNE (FN) CABLE VENTURES, INC.**, a Delaware corporation (the "*Company*"), hereby consent to the adoption of the following resolutions pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, as amended:

### SUBORDINATED GUARANTEE

**WHEREAS**, Tribune Company, the Company's ultimate parent, entered into that certain Senior Unsecured Interim Loan Agreement (the "*Credit Agreement*"), dated as of December 20 , 2007, among Tribune Company, as borrower (the "*Borrower*"), the lenders from time to time party thereto (the "*Lenders*"), Merrill Lynch Capital Corporation, as administrative agent (the "*Administrative Agent*"), JPMorgan Chase Bank, N.A., as Syndication Agent, Citicorp North America, Inc. and Bank of America, N.A. as Co-Documentation Agents, and J.P. Morgan Securities Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc., and Banc of America Securities LLC, as Joint Lead Arrangers and Joint Bookrunners;

**WHEREAS**, it is a condition precedent to the Lenders making advances under the Credit Agreement that the Company enter into a subordinated Guarantee Agreement (the "*Subordinated Guarantee*") among the Borrower, the Company, the other Guarantors (as therein defined) party thereto, and the Administrative Agent; and

**WHEREAS**, the proposed terms of the Subordinated Guarantee are substantially as set forth in the form included as an exhibit to the Credit Agreement;

<u>Authorization of Subordinated Guarantee</u>

**RESOLVED**, that each of the President, any Vice President, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Secretary of the Company (such officer or officers, which are authorized to act singly or together pursuant thereto, being hereinafter designated as "*Authorized Officers*") be, and each of them hereby is, authorized for and on behalf of the Company, to (i) execute for, in the name of and on behalf of the Company, and deliver to the Administrative Agent, as agent for the Lenders, the Subordinated Guarantee, substantially on the terms and conditions contained in the form of Subordinated Guarantee included as an exhibit to the Credit Agreement, and all other documents, instruments and agreements deemed necessary or desirable by the Administrative Agent in order to guarantee the obligations of the Borrower under the Credit Agreement, including extensions or amendments thereof (collectively, the "*Subordinated Guarantee Documents*"), (ii) that upon such execution and delivery, such Subordinated Guarantee Documents shall be the legal, valid and binding obligations of the Company, enforceable in accordance with their respective terms, (iii) take from time to time any actions deemed necessary or desirable by the Authorized Officers of the Company to establish the Subordinated Guarantee and to evidence the Subordinated Guarantee properly in accordance



Larsen

EXHIBIT NO. 5

2/1/10

P. CAMPBELL

TRB_LD003218
CONFIDENTIAL
TRB_LD003218

**IN WITNESS WHEREOF,** the undersigned have caused this unanimous written consent to be executed as of the 20th day of December, 2007.

_____
Crane H. Kenney

_____
John E. Reardon

_____
John J. Vitanovec

Being all of the Directors of Tribune (FN) Cable Ventures, Inc.

SIGNATURE PAGE TO
UNANIMOUS WRITTEN CONSENT OF
THE BOARD OF DIRECTORS OF TRIBUNE (FN) CABLE VENTURES, INC.

TRB_LD003220
CONFIDENTIAL
TRB_LD003220

**From:** "Bigelow, Chandler" <CBigelow@tribune.com>
**Date:** 12/01/2008 04:16:30 PM
**To:** <kevin.j.foley@JPMORGAN.COM>
**CC:** <MIRIAM.KULNIS@chase.com>; <brian.a.zivicky@JPMORGAN.COM>;
<damian.schaible@dpw.com>; "Liebentritt,  Don" <dliebentritt@tribune.com>; "Eldersveld,  David"
<DEldersveld@tribune.com>
**Subject:** RE: Retainer Letter
**Number of attachments:** 1

---

Hi Kevin - attached is the executed letter.  I  confirmed from our Treasury guys that wire was sent.  Please let me
know if  you did not get it.  Many thanks, Chandler

**From:** kevin.j.foley@jpmorgan.com  [mailto:kevin.j.foley@jpmorgan.com]
**Sent:** Wednesday, November 26,  2008 4:21 PM
**To:** Bigelow, Chandler
**Cc:**  MIRIAM.KULNIS@chase.com; brian.a.zivicky@jpmorgan.com;  damian.schaible@dpw.com
**Subject:** Retainer Letter
Chandler,
As discussed with Miriam Kulnis, please find attached the  letter executing the agreement for payment of a retainer
for the professional  service's expenses that will be incurred by J.P. Morgan and the other lenders.  In a separate
email, Miriam will forward you wiring instructions for the  payment.  Please sign and fax a copy to me at
917-463-0144.  If you  should have any questions, please let us know.
Thank you.
Regards,
Kevin

Kevin J. Foley
J.P. Morgan
270 Park Avenue, 5th Floor
New York, NY 10017
(O) 212-270-1232
(F)  917-463-0144
kevin.j.foley@jpmorgan.com

Generally, this communication is for informational purposes only and it is   not intended as an
offer or solicitation for the purchase or sale of any   financial instrument or as an official
confirmation of any transaction. In the  event you are receiving the offering materials attached
below related to your   interest in hedge funds or private equity, this communication may be
intended as  an offer or solicitation for the purchase or sale of such fund(s). All market   prices,
data and other information are not warranted as to completeness or   accuracy and are subject to
change without notice. Any comments or statements   made herein do not necessarily reflect
those of JPMorgan Chase & Co., its   subsidiaries and affiliates. This transmission may contain
information that is  privileged, confidential, legally privileged, and/or exempt from disclosure
under applicable law. If you are not the intended recipient, you are hereby   notified that any
disclosure, copying, distribution, or use of the information   contained herein (including any
reliance thereon) is STRICTLY PROHIBITED.   Although this transmission and any
attachments are believed to be free of any   virus or other defect that might affect any computer
system into which it is   received and opened, it is the responsibility of the recipient to ensure
that it   is virus free and no responsibility is accepted by JPMorgan Chase & Co., its
subsidiaries and affiliates, as applicable, for any loss or damage arising in   any way from its use.



CONFIDENTIAL

JPM2_00002780

If you received this transmission in error, please   immediately contact the sender and destroy the material in its entirety, whether   in electronic or hard copy format. Thank you. Please refer to http://www.jpmorgan.com/pages/disclosures for disclosures relating to UK legal   entities.

CONFIDENTIAL

JPM2_00002781

**From:** Smit, Daniel
**Sent:** Thursday, April 16, 2009 2:31 PM
**To:** 'Garlati, Vince'
**Cc:** Schaible, Damian S.; Deng, Wei
**Subject:** RE: Tribune Bills

**Attachments:** FTI Retainer Invoice 12-04-2008.pdf; FTI Retainer Invoice 12-01-2008.pdf; FTI Invoice 12-04-2008.pdf; FTI Invoice 01-14-2008.pdf; FTI Invoice 02-06-2009.pdf; DPW Retainer Invoice 12-04-2008.pdf; DPW Invoice 12-05-2008.pdf; DPW Invoice 12-08-2008.pdf; DPW Invoice 01-23-2009.pdf; DPW Invoice 02-17-2009.pdf

Vince,

Attached and below are details on the application of the retainer amounts paid to DPW and FTI.

FTI

FTI issued retainer invoices for $500k and $250k on 12-01-2008 and 12-04-2008 respectively.  These were paid to FTI on 12-02-2008 and 12-04-2008 respectively.

FTI applied the aggregate retainer amount of $750k as follows:
- $135,475.19 towards FTI invoice dated 12-04-2008
- $447,791.71 towards FTI invoice dated 01-14-2009
- $166,733.10 towards FTI invoice dated 02-06-2009, leaving a debit balance on that invoice of $145,676.14, which we understand was paid by Tribune to FTI in March 2009.

DPW

DPW issued a retainer invoice for $1,250,000 on 12-04-2008.  This retainer was paid to DPW in an amount of $750k on 12-02-2008 and an amount of $500k on 12-05-2008.

DPW applied the aggregate retainer amount of $1,250,000 as follows:

- $419,481.26 towards DPW invoice dated 12-05-2008
- $381,257.11 towards DPW invoice dated 12-08-2008
- $597,248.51 towards DPW invoice dated 01-23-2009, leaving a debit balance of $147,986.88, for which DPW issued a separate invoice to Tribune on 02-17-2009, and which was subsequently paid by Tribune in March 2009.

Please let us know if you have any further questions.

Danie Smit
Davis Polk & Wardwell
450 Lexington Ave New York, NY 10017
Tel. (212) 450-4947 / Fax (212) 450-3947
e-mail: daniel.smit@dpw.com

> **From:** Smit, Daniel
> **Sent:** Wednesday, April 15, 2009 5:44 PM
> **To:** 'Garlati, Vince'
> **Cc:** Schaible, Damian S.; Deng, Wei
> **Subject:** RE: Tribune Bills
>
> Vince,
>
> Thanks for your call.  I attach the February 2009 invoice for Kramer Levin as requested. Apologies that this feel through the cracks!
>
> We are looking forwarding to the remittances for February (without expenses) tomorrow as discussed.  We will send you the expense details for February and March on a rolling basis.

Larsen

EXHIBIT NO. 7

P. CAMPBELL

JPM2_00002103

I will also get back to you as soon as possible on details with regard to the application of the initial retainer.

Regards

Danie Smit
Davis Polk & Wardwell
450 Lexington Ave New York, NY 10017
Tel. (212) 450-4947 / Fax (212) 450-3947
e-mail: daniel.smit@dpw.com

**From:** Garlati, Vince [mailto:vgarlati@tribune.com]
**Sent:** Friday, April 10, 2009 6:06 PM
**To:** Smit, Daniel
**Subject:** RE: Tribune Bills

Daniel,

We are in the process of reviewing them and will pay them in the normal course.

Thanks,

Vince

---

**From:** Smit, Daniel [mailto:daniel.smit@dpw.com]
**Sent:** Friday, April 10, 2009 2:18 PM
**To:** 'Krakauer, Bryan'; Garlati, Vince
**Cc:** Boelter, Jessica C.K.; Schaible, Damian S.; Deng, Wei; Bigelow, Chandler; Eldersveld, David
**Subject:** RE: Tribune Bills

Thanks Bryan, will do.  Vince, do you have a sense of when the invoices referred to below would be paid?

Thanks

Danie Smit
Davis Polk & Wardwell
450 Lexington Ave New York, NY 10017
Tel. (212) 450-4947 / Fax (212) 450-3947
e-mail: daniel.smit@dpw.com

**From:** Krakauer, Bryan [mailto:bkrakauer@sidley.com]
**Sent:** Friday, April 10, 2009 2:37 PM
**To:** Smit, Daniel
**Cc:** Boelter, Jessica C.K.; Schaible, Damian S.; Deng, Wei; Bigelow, Chandler; Garlati, Vince; Eldersveld, David
**Subject:** RE: Tribune Bills

Daniel:

Please follow up with Vince Gelarti at the Tribune with respect to these and any other future invoice questions, and also direct the SC's future invoices directly to Vince.  You should copy Chandler Bigelow, David Eldersveld, and myself on your communications with Vince, including sending us copies of future invoices. Vince, as well as Chandler and David, are cc'd on this email.

Regards.

Bryan

**From:** Smit, Daniel [mailto:daniel.smit@dpw.com]
**Sent:** Friday, April 10, 2009 9:31 AM
**To:** Krakauer, Bryan
**Cc:** Boelter, Jessica C.K.; Schaible, Damian S.; Deng, Wei
**Subject:** Tribune Bills

CONFIDENTIAL

Bryan,

I am checking in with you on a number of invoices rendered by DPW to Tribune and which remain unpaid. These are:

1. General bill dated March 23, 2009 for work reimbursable under the Credit Agreement: $612,647.86

2. Bill dated February 17, 2009 for work done with respect to JPM's retention with respect to Cubs disposition, reimbursable under retention letter: $14,508.80

3. Bill dated March 23, 2009 for work done with respect to JPM's retention with respect to Cubs disposition, reimbursable under retention letter: $5,480.10.

Could you please let me know if I should rather check with someone at the Company or A & M with regard to these payments?

Thanks

Danie Smit
Davis Polk & Wardwell
450 Lexington Ave New York, NY 10017
Tel. (212) 450-4947 / Fax (212) 450-3947
e-mail: daniel.smit@dpw.com

----------------------------------------------------------------------------------------------

IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication, including attachments, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or referred to by other parties in promoting, marketing or recommending any partnership or other entity, investment plan or arrangement, then (i) the advice should be construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CONFIDENTIAL

This e-mail is sent by a law firm and may contain information that is privileged o

CONFIDENTIAL

If you are not the intended recipient, please delete the e-mail and any attachment

CONFIDENTIAL

JPM2_00002107

immediately.
************************************************************************

DPW Invoice 01-23-2009.pdf

DPW Invoice 02-17-2009.pdf

DPW Invoice 12-05-2008.pdf

DPW Invoice 12-08-2008.pdf

DPW Retainer Invoice 12-04-2008.pdf

FTI Invoice 01-14-2008.pdf

FTI Invoice 02-06-2009.pdf

FTI Invoice 12-04-2008.pdf

FTI Retainer Invoice 12-01-2008.pdf

FTI Retainer Invoice 12-04-2008.pdf

CONFIDENTIAL

EXECUTION COPY

$8,028,000,000

CREDIT AGREEMENT

Dated as of May 17, 2007

Among

TRIBUNE COMPANY

as Borrower

THE INITIAL LENDERS NAMED HEREIN

as Initial Lenders

JPMORGAN CHASE BANK, N.A.

as Administrative Agent

MERRILL LYNCH CAPITAL CORPORATION

as Syndication Agent

CITICORP NORTH AMERICA, INC.,

BANK OF AMERICA, N.A.

and

BARCLAYS BANK PLC

as Co-Documentation Agents

and

J.P. MORGAN SECURITIES INC.,
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,
CITIGROUP GLOBAL MARKETS INC.
and
BANC OF AMERICA SECURITIES LLC

as Joint Lead Arrangers and Joint Bookrunners

Larsen
EXHIBIT NO. 8
1|1|10
P. CAMPBELL

TRB_LD000253
CONFIDENTIAL

## TABLE OF CONTENTS

Page

### ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Certain Defined Terms ............................................................................ 1
SECTION 1.02. Terms Generally ................................................................................... 37
SECTION 1.03. Accounting Terms ................................................................................ 38

### ARTICLE II

### AMOUNTS AND TERMS OF THE
### ADVANCES AND LETTERS OF CREDIT

SECTION 2.01. The Advances and Letters of Credit .................................................... 38
SECTION 2.02. Making the Advances .......................................................................... 39
SECTION 2.03. Issuance of and Drawings and Reimbursement Under Letters of Credit .... 41
SECTION 2.04. Fees ..................................................................................................... 44
SECTION 2.05. Termination or Reduction of the Commitments ..................................... 45
SECTION 2.06. Repayment of Advances and Letter of Credit Drawings ......................... 45
SECTION 2.07. Interest on Advances ............................................................................ 47
SECTION 2.08. Interest Rate Determination .................................................................. 47
SECTION 2.09. Optional Conversion of Advances ......................................................... 48
SECTION 2.10. Prepayments of Advances ..................................................................... 49
SECTION 2.11. Increased Costs .................................................................................... 51
SECTION 2.12. Illegality .............................................................................................. 52
SECTION 2.13. Payments and Computations; Pro Rata Treatment ................................. 52
SECTION 2.14. Taxes ................................................................................................... 54
SECTION 2.15. Sharing of Payments, Etc ..................................................................... 55
SECTION 2.16. Evidence of Debt .................................................................................. 56
SECTION 2.17. Incremental Facilities ........................................................................... 56
SECTION 2.18. Mitigation Obligations ......................................................................... 58

### ARTICLE III

### CONDITIONS TO EFFECTIVENESS AND LENDING

SECTION 3.01. Conditions Precedent to Initial Borrowing ............................................ 58
SECTION 3.02. Conditions Precedent to Each Borrowing and Issuance .......................... 61

### ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

SECTION 4.01. Representations and Warranties of Borrower ......................................... 61

-i-

TRB_LD000254
CONFIDENTIAL

Page

## ARTICLE V

### COVENANTS OF THE BORROWER

SECTION 5.01.   Affirmative Covenants .................................................................. 66
SECTION 5.02.   Negative Covenants ...................................................................... 72

## ARTICLE VI

### EVENTS OF DEFAULT

SECTION 6.01.   Events of Default ......................................................................... 85
SECTION 6.02.   Actions in Respect of the Letters of Credit upon Default ............... 87

## ARTICLE VII

### THE AGENT

SECTION 7.01.   Authorization and Action ............................................................. 88
SECTION 7.02.   Agent's Reliance, Etc. .................................................................. 88
SECTION 7.03.   The Agent and Affiliates ............................................................... 89
SECTION 7.04.   Lender Credit Decision ................................................................. 89
SECTION 7.05.   Indemnification ............................................................................ 89
SECTION 7.06.   Successor Agent ........................................................................... 90
SECTION 7.07.   Other Agents ................................................................................ 91

## ARTICLE VIII

### MISCELLANEOUS

SECTION 8.01.   Amendments, Etc. ........................................................................ 91
SECTION 8.02.   Notices, Etc. ................................................................................ 92
SECTION 8.03.   No Waiver; Remedies ................................................................... 94
SECTION 8.04.   Costs and Expenses; Indemnity; Survival ..................................... 94
SECTION 8.05.   Right of Set-off ............................................................................ 95
SECTION 8.06.   Binding Effect .............................................................................. 96
SECTION 8.07.   Assignments and Participations ..................................................... 96
SECTION 8.08.   Confidentiality ............................................................................. 99
SECTION 8.09.   Governing Law ............................................................................. 100
SECTION 8.10.   Execution in Counterparts ............................................................ 100
SECTION 8.11.   Jurisdiction, Etc. .......................................................................... 100
SECTION 8.12    No Liability of the Issuing Banks .................................................. 100
SECTION 8.13.   Patriot Act Notice ........................................................................ 101
SECTION 8.14.   Waiver of Jury Trial ..................................................................... 101
SECTION 8.15.   Replacement of Lenders ............................................................... 101
SECTION 8.16    Acknowledgments ........................................................................ 102
SECTION 8.17.   Headings ...................................................................................... 102
SECTION 8.18.   Severability .................................................................................. 102
SECTION 8.19.   Reliance ....................................................................................... 102
SECTION 8.20.   Releases of Guarantees and Liens ................................................. 103

-ii-

TRB_LD000255
CONFIDENTIAL

## Schedules

| Schedule I | — | Commitments; List of Applicable Lending Offices |
| Schedule 1.01(a) | — | Refinancing Debt |
| Schedule 1.01(b) | — | TMCT Property |
| Schedule 1.01(c) | — | Pro Forma Basis |
| Schedule 1.01(d) | — | Certain Intercompany Indebtedness |
| Schedule 1.01(e) | — | Closing Date Guarantors |
| Schedule 2.04(a) | — | Fiscal Quarters |
| Schedule 4.01(f) | — | Litigation |
| Schedule 4.01(p) | — | Subsidiaries |
| Schedule 5.02(a) | — | Existing Liens |
| Schedule 5.02(c)(ii) | — | Existing Debt |
| Schedule 5.02(e) | — | Asset Sales |

## Exhibits

| Exhibit A-1 | — | Form of Revolving Credit Note |
| Exhibit A-2 | — | Form of Tranche X Note |
| Exhibit A-3 | — | Form of Tranche B Note |
| Exhibit A-4 | — | Form of Swing Line Note |
| Exhibit B | — | Form of Notice of Borrowing |
| Exhibit C | — | Form of Assignment and Acceptance |
| Exhibit D-1 | — | Form of Opinion of Counsel for the Company |
| Exhibit D-2 | — | Form of Opinion of Counsel to the Trustee of the ESOP Trust |
| Exhibit E | — | Form of Solvency Certificate |
| Exhibit F | — | Form of Guarantee |
| Exhibit G | — | Form of Pledge Agreement |
| Exhibit H | — | Form of Compliance Certificate |
| Exhibit I | — | Form of Administrative Questionnaire |

TRB_LD000256
CONFIDENTIAL

# CREDIT AGREEMENT

This CREDIT AGREEMENT ("Agreement") is entered into as of May 17, 2007 among TRIBUNE COMPANY, a Delaware corporation ("Tribune" or "Borrower"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), JPMORGAN CHASE BANK, N.A., as administrative agent (the "Agent"), MERRILL LYNCH CAPITAL CORPORATION, as syndication agent (in such capacity, the "Syndication Agent"), and CITICORP NORTH AMERICA, INC., BANK OF AMERICA, N.A. and BARCLAYS BANK PLC, as co-documentation agents (in such capacity, the "Documentation Agents"), J.P. MORGAN SECURITIES INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CITIGROUP GLOBAL MARKETS INC. and BANC OF AMERICA SECURITIES LLC (collectively, the "Lead Arrangers") will act as Joint Lead Arrangers and Joint Bookrunners

Borrower has requested that the Lenders provide a revolving credit facility, a tranche X facility, an initial tranche B facility and a delayed draw tranche B facility, and the Lenders are willing to do so on the terms and conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Acquisition" shall mean the merger providing for Merger Sub to be merged with and into Borrower, and following such merger, Borrower to continue as the surviving corporation wholly owned by the ESOP.

"Acquisition Agreement" shall mean the Agreement and Plan of Merger, dated as of April 1, 2007, by and among Tribune, Merger Sub, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan, and, for the limited purposes set forth therein, EGI-TRB, L.L.C., as the same may be waived, amended, supplemented or otherwise modified from time to time; provided that any such waiver, amendment, supplement or other modification, in each case that is material and adverse to Lenders shall have been approved by the Agent.

"Acquisition Conditions" has the meaning specified in Section 5.02(b)(v)

"Administrative Questionnaire" means an Administrative Questionnaire in substantially the form of Exhibit I.

"Advance" means a Revolving Credit Advance, a Term Advance or a Swing Line Advance.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person.

TRB_LD000257
CONFIDENTIAL

For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to vote 10% or more of the Voting Stock of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise.

"Agent" has the meaning specified in the preamble.

"Agent's Account" means the account of the Agent maintained by the Agent at JPMorgan Chase Bank, N.A. at its office at 270 Park Avenue, New York, New York 10017.

"Agreement" has the meaning specified in the preamble and includes any subsequent amendments, supplements, amendments and restatements or other modifications from time to time thereto.

"Applicable ECF Percentage" means, for any fiscal year, (a) 50% if the Total Guaranteed Leverage Ratio as of the last day of such fiscal year is greater than or equal to 6.25 to 1.00, (b) 25% if the Total Guaranteed Leverage Ratio as of the last day of such fiscal year is less than 6.25 to 1.00 but greater than or equal to 5.75 to 1.00 and (c) 0% if the Total Guaranteed Leverage Ratio as of the last day of such fiscal year is less than 5.75 to 1.00.

"Applicable Fee" means, for any day with respect to (i) Unused Revolving Credit Commitments, the percentage per annum specified as the "Revolver Commitment Fee" in the table under "Applicable Margin" based on the then applicable price level and (ii) any Unused Delayed Draw Tranche B Commitment, 0.75% per annum.

"Applicable Lending Office" means, with respect to each Lender, such Lender's Domestic Lending Office in the case of a Base Rate Advance and such Lender's Eurodollar Lending Office in the case of a Eurodollar Rate Advance.

"Applicable Margin" means (a) with respect to the Tranche X Advances (i) prior to the Second Step Closing Date, (A) 2.50% per annum, in the case of Eurodollar Rate Advances, and (B) 1.50% per annum, in the case of Base Rate Advances and (ii) on and after the Second Step Closing Date, (A) 2.75% per annum, in the case of Eurodollar Rate Advances and (B) 1.75% per annum, in the case of Base Rate Advances; (b) with respect to the Tranche B Advances (i) in the case of Base Rate Advances; and (c) with respect to the Revolving Credit Advances (i) until delivery of financial statements for the first full fiscal quarter commencing on or after the Closing Date pursuant to Section 5.01(i), (A) 3.00% per annum, in the case of Eurodollar Rate Advances, and (B) 2.00% per annum, in the case of Base Rate Advances and (ii) thereafter, the following percentages per annum, based upon the Total Guaranteed Leverage Ratio:

Applicable Margin

| Pricing Level | Total Guaranteed Leverage Ratio | Revolver Commitment Fee | Eurodollar Rate Advances | Base Rate Advances |
|---|---|---|---|---|
| 1 | ≥6.25:1 | 0.500% | 3.00% | 2.00% |
| 2 | <6.25:1 and ≥5.75:1 | 0.500% | 2.50% | 1.50% |
| 3 | <5.75:1 | 0.375% | 2.00% | 1.00% |

provided that if (x) the Acquisition Agreement is terminated prior to the consummation of the Acquisition and (y) the corporate credit ratings for Borrower are B1 or better by Moody's and B+ or better by S&P (in

-2-

TRB_LD000258
CONFIDENTIAL

each case with a stable outlook), then the Applicable Margin for each of the Revolving Credit Facility, the Tranche X Advances and the Tranche B Advances shall be reduced by 25 basis points. Any increase or decrease in the Applicable Margin shall be effective as of the first Business Day immediately following the receipt by the Agent of annual or quarterly financial statements pursuant to Section 5.01(i).

"Appropriate Lender" means, at any time, with respect to any of the Tranche X Facility, the Tranche B Facility or the Revolving Credit Facility, a Lender that has a Commitment with respect to such Facility at such time.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Asset Sale" means (a) any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any Sale and Lease-Back Transaction and any Disposition) of any property excluding sales of inventory and dispositions of cash and Cash Equivalents in each case, in the ordinary course of business, by Borrower or any of its Subsidiaries and (b) any issuance or sale of any Equity Interests of any Subsidiary of Borrower, in each case to any Person other than (i) Borrower, (ii) any Guarantor or (iii) except for purposes of Section 5.02(e), any other Subsidiary. Notwithstanding anything herein to the contrary, Asset Sales shall not include (x) any conveyance, sale, lease, sublease, assignment, transfer or other disposition of property or any issuance or sale of any Equity Interests of any Subsidiary of Borrower (in a single or series of related transactions) with an aggregate fair market value of less than $10.0 million and (y) any issuance or sale of Junior Capital.

"Asset Sale Prepayment Event" means (x) the receipt of any Net Cash Proceeds from any Asset Sale or series of related Asset Sales; provided that the receipt of Net Cash Proceeds from any transactions expressly permitted by Section 5.02(e), other than transactions consummated in reliance on Section 5.02(e)(ii) and (vii), shall be excluded for purposes of this clause (x), and (y) pursuant to clause (v) of the definition of "Permitted Disposition Transactions," the receipt of the prepayment amount associated with a Disposition. Notwithstanding the foregoing, any sale of the asset listed in the Side Letter shall not constitute an Asset Sale Prepayment Event if used for the purposes stipulated in the Side Letter.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 8.07 or by the definition of "Eligible Assignee"), and accepted by the Agent and, if applicable, Borrower, in substantially the form of Exhibit C hereto or any other form approved by the Agent.

"Attributable Debt" shall mean, when used with respect to any Sale and Lease-Back Transaction, as at the time of determination, the present value (discounted at a rate equivalent to Borrower's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Lease-Back Transaction.

"Available Amount" of any Letter of Credit means, at any time, the maximum amount available to be drawn under such Letter of Credit at such time (assuming compliance at such time with all conditions to drawing), which maximum amount shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all automatic increases, if any, under the terms of such Letter of Credit, whether or not such maximum stated amount is in effect at such time.

-3-

TRB_LD000259
CONFIDENTIAL

"Base Rate" means a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the higher of:

(a)    the rate of interest announced publicly by JPMorgan Chase Bank, N.A. in New York, New York, from time to time, as JPMorgan Chase Bank, N.A.'s corporate base rate; and

(b)    1/2 of one percent per annum above the Federal Funds Rate.

"Base Rate Advance" means an Advance that bears interest as provided in Section 2.07(a)(i).

"Board of Directors" means (a) with respect to a corporation, the board of directors of the corporation, (b) with respect to a partnership, the board of directors of the general partner of the partnership and (c) with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower" has the meaning specified in the preamble.

"Borrower Acquisition Bridge Loans" means senior unsecured bridge loans of Borrower (together with senior subordinated guarantees thereof by the Guarantors) in each case incurred under agreements with representations, warranties, affirmative covenants, negative covenants and events of default substantially similar to those set forth herein, the net proceeds of which are used exclusively to finance the consummation of the Acquisition and to pay related fees and expenses. Borrower Acquisition Bridge Loans also includes any extended senior term loans and senior exchange securities issued upon initial maturity of the Borrower Acquisition Bridge Loans in accordance with the Borrower Acquisition Bridge Loan Documents

"Borrower Acquisition Bridge Loan Documents" means any bridge loan credit agreement, loan agreement or indenture, related guarantee agreement and all other documents executed and delivered, in each case in connection with the making of Borrower Acquisition Bridge Loans (including, without limitation, any applicable extended senior term loans and senior exchange securities issued in exchange therefore and not in addition thereto), in each case as amended, restated, replaced or otherwise modified from time to time in accordance therewith.

"Borrower Information" has the meaning specified in Section 8.08.

"Borrower's Account" means the account of Borrower specified by Borrower to the Agent from time to time in writing.

"Borrower High Yield Notes" means senior or senior subordinated notes issued by Borrower (in either case, with related senior subordinated guarantees thereof by the Guarantors) in each case incurred on terms and conditions reasonably satisfactory to the Agent, the net proceeds of which are used exclusively to (i) finance the consummation of the Acquisition and to pay related fees and expenses or (ii) refinance any Borrower Acquisition Bridge Loans. Borrower High Yield Notes also includes exchange notes and related guarantees to be issued in exchange for the initial Borrower High Yield Notes pursuant to a customary registration rights agreement.

"Borrower High Yield Notes Documents" means any Borrower High Yield Notes, the indenture under which Borrower High Yield Notes are issued and all other documents executed and delivered in connection with the issuance of Borrower High Yield Notes, in each case as amended, restated, replaced or otherwise modified from time to time in accordance therewith.

-4-

TRB_LD000260
CONFIDENTIAL

"Borrowing" means a Revolving Credit Borrowing, a Tranche X Borrowing, a Tranche B Borrowing or a Swing Line Borrowing.

"Broadcasting Holdco Transaction" means the contribution by Borrower of 100% of its equity interests in Tribune Broadcasting Company to its newly-formed, direct wholly owned Subsidiary, Tribune Broadcasting Holdco, LLC.

"Business Day" means a day of the year on which banks are not required or authorized by law to close in New York City or Chicago, Illinois and, if the applicable Business Day relates to any Eurodollar Rate Advances, on which dealings are carried on in the London interbank market.

"Capital Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Lease Obligations) by the Borrower and the Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on a consolidated statement of cash flows of Borrower and its Subsidiaries; provided that the term "Capital Expenditures" shall not include (i) with respect to any purchase or acquisition of all of the Equity Interests of a Person or all or substantially all of the property or assets of a Person or business line of a Person, (x) the purchase price thereof and (y) any Capital Expenditures expended by the seller or entity to be acquired in connection with such purchase or acquisition prior to the date thereof or (ii) expenditures constituting part of a Permitted Disposition Transaction.

"Capital Lease Obligation" means, of any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation).

"Cash Equivalents" means, as to any Person, (a) securities issued, or directly, uncondi- tionally and fully guaranteed or insured, by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person; (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500.0 million and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organiza- tion (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such Person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above; (d) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's, and in each case maturing not more than one year after the date of acquisition by such Person; (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a), (b) and (d) above; (f) demand deposit accounts maintained in the ordinary course of business; (g) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended from time to time, (ii) are rated AAA by S&P or Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; (h) market-

-5-

TRB_LD000261
CONFIDENTIAL

able direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof, maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's; and (i) investments in auction rate securities or similar securities with a rating of AA and a maximum holding period of 90 days, for which the reset date will be used to determine the potential maturity date.

"Cash Interest Expense" means, for any period, Consolidated Interest Expense for such period, less the sum of (a) interest on any debt paid by the increase in the principal amount of such debt including by issuance of additional debt of such kind, (b) items described in clause (c) of the definition of "Consolidated Interest Expense" and (c) non-cash interest expense related to PHONES.

"Cash Management Agreement" means any agreement or arrangement to provide cash management services, including treasury, depository overdraft, credit or debit card, electronic funds transfer and other cash management arrangements.

"Casualty Event" means, with respect to any equipment, fixed assets or real property (including any improvements thereon) of Borrower or any Subsidiary, any loss of or damage to, or any condemnation or other taking by a Governmental Authority of, such property, the date on which Borrower or any of the Subsidiaries receives insurance proceeds, or proceeds of a condemnation award or other compensation to replace or repair such property, in each case, in excess of $10.0 million with respect to any such event.

"Change in Control" means (i) any Person or group of Persons (within the meaning of Sections 13(d) and 14(d) under the Exchange Act), other than, in the aggregate, Zell, EGI-TRB, L.L.C., the ESOP, the ESOP Trust or any Permitted Transferee, shall become the ultimate "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of Voting Stock representing 40% or more of the Voting Stock of Borrower (or other securities convertible or exercisable into such Voting Stock) on a fully diluted basis (including common stock equivalents issued pursuant to the Tribune Management Equity Incentive Plan) or shall obtain the power (whether or not exercised) to elect a majority of Borrower's directors or (ii) during any period of 24 consecutive months, individuals who at the beginning of such period constituted the Board of Directors of Borrower (together with any new directors whose election to such board or whose nomination for election by the stockholders of Borrower was approved by a vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of Borrower then in office; provided that the consummation of the Transactions (including the change in Board of Directors pursuant thereto) shall not constitute a "Change of Control".

"Closing Date" means the date of the initial Advances hereunder.

"Code" means the Internal Revenue Code of 1986, and the regulations thereunder, in each case as amended, reformed or otherwise modified from time to time.

"Collateral" means any and all property owned, leased or operated by a Person from time to time subject to a Lien under the Pledge Agreement.

"Commitment" means a Revolving Credit Commitment, a Letter of Credit Commitment, a Tranche X Commitment, a Tranche B Commitment, a Delayed Draw Tranche B Commitment or a Swing Line Commitment.

-6-

TRB_LD000262
CONFIDENTIAL

"Communications" has the meaning specified in Section 8.02(d).

"Companies" means Borrower and its Subsidiaries collectively, and any one of them, a "Company".

"Company Material Adverse Effect" means the definition ascribed thereto in the Acquisition Agreement.

"Compliance Certificate" means a certificate of Borrower in the form of Exhibit H hereto.

"Consolidated" refers to the consolidation of accounts in accordance with GAAP.

"Consolidated Current Assets" means, as at any date of determination, the total assets of Borrower and its Subsidiaries which may properly be classified as current assets on a consolidated balance sheet of Borrower and its Subsidiaries in accordance with GAAP, excluding cash and Cash Equivalents.

"Consolidated Current Liabilities" means, as at any date of determination, the total liabilities of Borrower and its Subsidiaries which may properly be classified as current liabilities (other than the current portion of any Debt) on a consolidated balance sheet of Borrower and its Subsidiaries in accordance with GAAP.

"Consolidated Interest Expense" means, for any period, the total Consolidated interest expense of Borrower and its Subsidiaries for such period, including without duplication:

(a)     imputed interest on Capital Lease Obligations and Attributable Debt of Borrower and its Subsidiaries for such period;

(b)     commissions, discounts and other fees and charges owed by Borrower or any of its Subsidiaries with respect to letters of credit securing financial obligations, bankers' acceptance financing and receivables financings for such period;

(c)     amortization of debt issuance costs, original issue discount and other financing, legal and accounting fees, costs and expenses (whether or not deferred) and any interest expense on deferred compensation arrangements, in each case incurred by Borrower or any of its Subsidiaries for such period;

(d)     cash contributions to any employee stock ownership plan or similar trust made by Borrower or any of its Subsidiaries to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than Borrower or a wholly owned Subsidiary) in connection with Debt incurred by such plan or trust for such period;

(e)     all interest paid or payable with respect to discontinued operations of Borrower or any of its Subsidiaries for such period;

(f)     the interest portion of any deferred payment obligations of Borrower or any of its Subsidiaries for such period; and

-7-

TRB_LD000263
CONFIDENTIAL

(g)    all interest on any Debt of Borrower or any of its Subsidiaries of the type described in clause (h) or (i) of the definition of "Debt" for such period to the extent paid by Borrower and its Subsidiaries;

provided that (a) to the extent directly related to the Transactions, debt issuance costs, debt discount or premium and other financing fees, costs and expenses shall be excluded from the calculation of Consolidated Interest Expense and (b) Consolidated Interest Expense shall be calculated after giving effect to Hedge Agreements related to interest rates (including associated costs), but excluding unrealized gains and losses with respect to Hedge Agreements related to interest rates.

Other than for purposes of calculating Excess Cash Flow, Consolidated Interest Expense shall be calculated on a Pro Forma Basis to give effect to any Debt (other than Debt incurred for ordinary course working capital needs under ordinary course revolving credit facilities) incurred, assumed or permanently repaid or extinguished at any time on or after the first day of a Test Period and prior to the date of determination in connection with any Permitted Acquisitions and Asset Sales (other than any dispositions in the ordinary course of business) as if such incurrence, assumption, repayment or extinguishing had been effected on the first day of such period.

"Consolidated Total Assets" means the total of all assets of Borrower and the Subsidiaries determined on a consolidated basis in accordance with GAAP.

"Convert", "Conversion" and "Converted" each refers to a conversion of Advances of one Type into Advances of the other Type pursuant to Section 2.08 or 2.09.

"Debt" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all payment obligations of such Person for the deferred purchase price of property or services (other than trade payables not overdue by more than 120 days incurred in the ordinary course of such Person's business), (c) all payment obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Purchase Money Obligations, Capital Lease Obligations, Attributable Debt and under synthetic, off-balance sheet or tax retention leases (excluding, however, operating leases), (e) all payment obligations, contingent or otherwise, of such Person in respect of acceptances, standby letters of credit or similar extensions of credit, (f) all net payment obligations of such Person in respect of Hedge Agreements, (g) all payment obligations outstanding to Persons that are not Affiliates of Borrower in connection with a Receivables Facility, (h) all Debt of others referred to in clauses (a) through (g) above or clause (i) below (collectively, "Guaranteed Debt") guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person, through an agreement (1) to pay or purchase such Guaranteed Debt or to advance or supply funds for the payment or purchase of such Guaranteed Debt, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Guaranteed Debt or to assure the holder of such Guaranteed Debt against loss in respect of such Guaranteed Debt, (3) to supply funds to or in any other manner invest funds in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss in respect of such Guaranteed Debt and (i) all Debt referred to in clauses (a) through (h) above (including Guaranteed Debt) secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt; provided that, if such Person has not assumed or otherwise become liable in respect of such Debt, such obligations shall be deemed to be in an amount equal to the lesser of (i) the amount of such Debt and (ii) fair market value of such property at the time of determination (in the Borrower's good faith estimate). The amount of any Guaranteed Debt shall be deemed to be an amount equal to the lesser of (a) the stated or determinable amount of the

-8-

TRB_LD000264
CONFIDENTIAL

primary obligation in respect of which such Guaranteed Debt is made and (b) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Debt, unless such primary obligation and the maximum amount for which such guaranteeing Person may be liable are not stated or determinable, in which case the amount of the Guaranteed Debt shall be such guaranteeing Person's reasonably anticipated liability in respect thereof as determined by the Borrower in good faith. Notwithstanding anything to the contrary, Borrower's obligation to pay Dividends to the ESOP pursuant to Section 6.3(a)(3) of the ESOP Purchase Agreement shall not constitute Debt.

"Debt for Borrowed Money" means, as of any date of determination and without duplication, all items that, in accordance with GAAP, would be classified as debt on Borrower's Consolidated balance sheet; provided that Debt for Borrowed Money shall exclude, to the extent otherwise included the preceding clause, (i) accounts payable and accrued liabilities in the ordinary course of business of Borrower and its Subsidiaries, (ii) to the extent constituting an "effective" hedge in accordance with GAAP, prepaid variable forward derivative instruments and prepaid variable forward contract obligations. (iii) notes, bills and checks presented in the ordinary course of business by Borrower or any of its Subsidiaries to banks for collection or deposit, (iv) all obligations of Borrower or any of its Subsidiaries of the character referred to in this definition to the extent owing to Borrower or any of its Subsidiaries; provided, further, that, with respect to Hedge Agreements, Debt for Borrowed Money shall include only net payment obligations of such Person in respect of Hedge Agreements and (v) Debt of the type otherwise permitted under clauses (viii) or (xi) of Section 5.02(e); and provided, further, that Debt for Borrowed Money shall include, without duplication, whether or not reflected as debt on Borrower's Consolidated balance sheet. all payment obligations outstanding to Persons that are not Affiliates of Borrower in connection with a Receivables Facility.

"Debt Service" means for any period, Cash Interest Expense for such period plus scheduled principal amortization in respect of Debt for Borrowed Money that is payable in cash for such period.

"Default" means any Event of Default or any event that, unless cured or waived, would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"Default Interest" has the meaning specified in Section 2.07(b)

"Defaulted Advance" means, with respect to any Lender at any time. the portion of any Advance required to be made by such Lender to Borrower pursuant to Section 2.01 or 2.02 at or prior to such time that has not been made by such Lender or by the Agent for the account of such Lender pursuant to Section 2.02(d) as of such time.

"Defaulting Lender" means, at any time, any Lender that. at such time. owes a Defaulted Advance.

"Deferred Net Cash Proceeds" has the meaning assigned to such term in clauses (a) and (c) of the definition of "Net Cash Proceeds."

"Delayed Draw Tranche B Advance" has the meaning assigned to such term in Section 2.01(c).

"Delayed Draw Tranche B Commitment" means as to any Lender (a) the amount set forth opposite such Lender's name on Schedule I hereto as such Lender's "Delayed Draw Tranche B Commitment" or (b) if such Lender has entered into any Assignment and Acceptance, the amount set forth for

TRB_LD000265
CONFIDENTIAL

such Lender in the Register maintained by the Agent pursuant to <u>Section 8.07(d)</u> as such Lender's "Delayed Draw Tranche B Commitment", as such amount may be reduced pursuant to <u>Section 2.05</u>. The aggregate Delayed Draw Tranche B Commitment on the Closing Date is $263,000,000.

"<u>Designated Assets</u>" means those assets listed as items 1 and 2 on <u>Schedule 5.02(e)</u> and those assets listed in the Side Letter.

"<u>Disposition</u>" has the meaning provided in the definition of "Permitted Disposition Transaction."

"<u>Dividend</u>" means with respect to any Person that such Person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property (other than common stock of such Person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such Person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the Equity Interests of such Person outstanding (or any options or warrants issued by such Person with respect to its Equity Interests). Without limiting the foregoing, "Dividends" with respect to any Person shall also include (i) all payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes and (ii) contributions to the ESOP.

"<u>Documentation Agents</u>" has the meaning assigned to such term in the preamble hereto.

"<u>Dollars</u>" and the "$" sign each means lawful currency of the United States of America.

"<u>Domestic Lending Office</u>" means, with respect to any Lender, the office of such Lender specified as its "Domestic Lending Office" opposite its name on <u>Schedule I</u> hereto or in the Assignment and Acceptance pursuant to which it became a Lender, or such other office of such Lender as such Lender may from time to time specify to Borrower and the Agent.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is organized or existing under the laws of the United States, any state thereof or the District of Columbia; <u>provided</u>, that the definition of "Domestic Subsidiary" shall exclude any such Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary.

"<u>EBITDA</u>" means, for any period, and with respect to Borrower and its Subsidiaries, Consolidated net income (or net loss) of Borrower and its Subsidiaries, exclusive of, without duplication, (w) the income or loss resulting from extraordinary items for such period, and all losses or gains resulting from non-cash, non-operating items and one-time charges, (x) the income of any PDT Entity and any Person accounted for by Borrower or any of its Subsidiaries on the equity method for such period, but any such income so excluded may be included in such period or any later period to the extent of any cash dividends or distributions actually paid in the relevant period or any later period to Borrower or any Subsidiary of Borrower, (y) whether or not recurring, non-cash charges and, non-cash stock-based compensation charges determined in accordance with GAAP during such period, and whether or not recurring, non-cash retirement expense, including such expense from ESOP, pension and cash balance plans and (z) expected or actual gains resulting from the disposition of discontinued operations, (excluding in the case of clauses (w) and (y) (i) any non-cash charge representing an accrual or a reserve for potential cash charges in any future period and (ii) the accrual of revenue or recording of receivables in the ordinary course of business), <u>plus</u> the sum of (a) Consolidated Interest Expense of Borrower and its Subsidiaries for such

-10-

TRB_LD000266
CONFIDENTIAL

period, (b) Consolidated income tax expense of Borrower and its Subsidiaries for such period, (c) depreciation expense of Borrower and its Subsidiaries for such period, (d) amortization expense of Borrower and its Subsidiaries for such period, in each case determined in accordance with GAAP for such period, (e) transaction fees and costs associated or incurred by Borrower or any of its Subsidiaries in connection with the First Step Transactions, the Second Step Transactions and Borrower's existing credit facilities, (f) for the four quarter periods ending December 30, 2007, March 30, 2008, June 29, 2008 and September 28, 2008, $60.0 million in each such four quarter period consisting of pro forma cash savings resulting from termination of contributions into the Tribune Company 401(k) Savings and Profit Sharing Plan, (g) expected or actual losses resulting from the disposition of discontinued operations and (h) to the extent deducted in calculating Consolidated net income (or net loss) of Borrower and its Subsidiaries, Dividends by Borrower to the ESOP to the extent the amount so Dividended to the ESOP is used to fund the ESOP Note Repayment Amounts (and to the extent such ESOP Note Repayment Amounts are themselves not included in Consolidated net income (or net loss) of Borrower and its Subsidiaries).

Other than for purposes of calculating Excess Cash Flow, EBITDA shall be calculated on a Pro Forma Basis.

"Eligible Assignee" means (i) a Lender, (ii) an Affiliate of a Lender, (iii) an Approved Fund, and (iv) any other bank or financial institution approved by the Agent, each Issuing Bank (in the case of any assignment of Revolving Credit Commitments) and Borrower (such approval not to be unreasonably withheld or delayed); provided, however, that neither Borrower nor an Affiliate of Borrower shall qualify as an Eligible Assignee.

"Employee Benefit Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) that is maintained or contributed to by a Company or with respect to which a Company could incur liability.

"Environmental Action" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, Environmental Permit or Hazardous Materials or arising from alleged injury or threat to health, safety or the environment relating to Hazardous Materials, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any governmental or regulatory authority or any third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Law" means any federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, judgment, decree or judicial interpretation or any binding agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means (i) shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person or (ii) any warrants, options or other rights to acquire such shares or interests.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

-11-

TRB_LD000267
CONFIDENTIAL

"ERISA Affiliate" means any Person that is a member of Borrower's controlled group, or under common control with Borrower, within the meaning of Section 414 of the Code.

"ERISA Event" means (a) (i) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, with respect to any Plan unless the 30-day notice requirement with respect to such event has been waived by the PBGC, or (ii) the requirements of subclause (1) of Section 4043(b) of ERISA (without regard to subclause (2) of such Section) are met with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of Borrower or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by Borrower or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for the imposition of a lien under Section 302 or Section 303 of ERISA shall have been met with respect to any Plan; (g) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 307 of ERISA; (h) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan or (i) the receipt by a Loan Party, a Subsidiary or a PDI Entity of any notice concerning the imposition of liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part 1 of Subtitle E of Title IV of ERISA, or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"ESOP" means the Tribune Employee Stock Ownership Plan.

"ESOP Documentation" means, collectively (a) the Tribune Employee Stock Ownership Plan, effective as of January 1, 2007, (b) the Tribune Employee Stock Ownership Trust, dated April 1, 2007, (c) the ESOP Loan Agreement, ESOP Loan and ESOP Pledge Agreement, (d) the ESOP Purchase Agreement, (e) Acquisition Agreement, (f) Investor Rights Agreement and (g) all amendments, supplements or other modifications to the foregoing, all schedules, exhibits and annexes thereto and all agreements affecting the terms thereof or entered into in connection therewith.

"ESOP Investment" means the purchase by the ESOP of $250.0 million of Tribune common equity made by the ESOP on April 1, 2007.

"ESOP Loan" means the extension of credit made under the ESOP Note and the ESOP Loan Agreement.

"ESOP Loan Agreement" means the ESOP Loan Agreement, dated as of April 1, 2007, by and between Borrower and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the ESOP Trust, which implements and forms a part of the ESOP, as the same may be supplemented, amended, restated or otherwise modified from time to time.

"ESOP Note" means the ESOP's 30-year amortizing 5.01% note as in effect on the Closing Date.

"ESOP Note Repayment Amounts" means, for any period, the aggregate amount of principal and interest payments due to Borrower in respect of the ESOP Note.

-12-

TRB_LD000268
CONFIDENTIAL

"ESOP Pledge Agreement" means the ESOP Pledge Agreement made April 1, 2007, between GreatBanc Trust Company, not in its individual or corporate capacity but solely in its capacity as trustee of the ESOP Trust which forms a part of the ESOP and Borrower, as the same may be supplemented, amended, restated or otherwise modified from time to time.

"ESOP Purchase Agreement" means the ESOP Purchase Agreement made April 1, 2007, between Borrower and GreatBanc Trust Company, as trustee of the ESOP Trust, a separate trust created under the ESOP, as the same may be amended, restated or otherwise modified from time to time.

"ESOP Related Distributions" means payments, loans, advances, distributions or dividends made by Borrower to satisfy its obligations to repurchase Borrower's common stock pursuant to the ESOP Documentation or ERISA (including contributions to the ESOP to enable the ESOP to purchase common stock that Borrower would otherwise be required to purchase under the ESOP Documentation or ERISA).

"ESOP Trust" means the Tribune Employee Stock Ownership Trust, dated April 1, 2007.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Eurodollar Lending Office" means, with respect to any Lender, the office of such Lender specified as its "Eurodollar Lending Office" opposite its name on Schedule I hereto or in the Assignment and Acceptance pursuant to which it became a Lender (or, if no such office is specified, its Domestic Lending Office), or such other office of such Lender as such Lender may from time to time specify to Borrower and the Agent.

"Eurodollar Rate" means, for any Interest Period for each Eurodollar Rate Advance comprising part of the same Borrowing, an interest rate per annum equal to the rate per annum obtained by dividing (a) the rate per annum (rounded upward to the nearest whole multiple of 1/16 of 1% per annum) appearing on Reuters LIBOR 01 (or any successor page) as the London interbank offered rate for deposits in U.S. dollars at approximately 11:00 A.M. (London time) two Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period or, if for any reason such rate is not available, the average (rounded upward to the nearest whole multiple of 1/16 of 1% per annum, if such average is not such a multiple) of the rate per annum at which deposits in U.S. dollars are offered by the principal office of each of the Reference Banks in London, England to prime banks in the London interbank market at 11:00 A.M. (London time) two Business Days before the first day of such Interest Period in an amount substantially equal to such Reference Bank's Eurodollar Rate Advance comprising part of such Borrowing to be outstanding during such Interest Period and for a period equal to such Interest Period by (b) a percentage equal to 100% minus the Eurodollar Rate Reserve Percentage for such Interest Period. If the Reuters LIBOR 01 (or any successor page) is unavailable, the Eurodollar Rate for any Interest Period for each Eurodollar Rate Advance comprising part of the same Borrowing shall be determined by the Agent on the basis of applicable rates furnished to and received by the Agent from the Reference Banks two Business Days before the first day of such Interest Period, subject, however, to the provisions of Section 2.08.

"Eurodollar Rate Advance" means an Advance that bears interest as provided in Section 2.07(a)(ii).

"Eurodollar Rate Reserve Percentage" for any Interest Period for all Eurodollar Rate Advances comprising part of the same Borrowing means the reserve percentage applicable two Business Days before the first day of such Interest Period under regulations issued from time to time by the Board

-13-

TRB_LD000269
CONFIDENTIAL

of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Eurodollar Rate Advances is determined) having a term equal to such Interest Period.

"Events of Default" has the meaning specified in Section 6.01.

"Excess Cash Flow" shall mean, for any fiscal year, EBITDA for such fiscal year, minus, without duplication:

(a)    Debt Service for such fiscal year;

(b)    any prepayments of Term Advances or Borrower Acquisition Bridge Loans, any prepayments of Revolving Credit Advances and Swingline Advances to the extent accompanied by corresponding permanent reductions in the Revolving Credit Commitments, and any prepayments of other Debt for Borrowed Money, during such fiscal year, in each case other than amounts already reflected in Debt Service;

(c)    Capital Expenditures during such fiscal year (excluding Capital Expenditures made in such fiscal year where a certificate in the form contemplated by the following clause (d) was previously delivered) that are paid in cash;

(d)    Capital Expenditures that Borrower or any of its Subsidiaries shall, during such fiscal year, become obligated to make but that are not made during such fiscal year; provided that Borrower shall deliver a certificate to the Agent not later than 90 days after the end of such fiscal year, signed by a financial officer of Borrower and certifying that such Capital Expenditures will be made in the following fiscal year;

(e)    the aggregate amount of expenditures made in cash during such period pursuant to Sections 5.02(h)(y) and (x) and 5.02(f)(vi);

(f)    Taxes of Borrower and its Subsidiaries that were paid in cash during such fiscal year or will be paid within six months after the end of such fiscal year and for which reserves have been established in accordance with GAAP;

(g)    the absolute value of the difference, if negative, of the amount of Net Working Capital at the end of the prior fiscal year (or the beginning of the fiscal year in the case of 2008) over the amount of Net Working Capital at the end of such fiscal year;

(h)    losses resulting from (i) non-ordinary course Asset Sales and related tax impact and (ii) extraordinary losses together with any tax effect, in each case, paid in cash during such fiscal year excluded from Consolidated net income;

(i)    to the extent (x) deducted in determining Consolidated net income and added back to determine EBITDA or (y) not deducted in determining EBITDA, in each case, the aggregate amount of expenditures made in cash during such period pursuant to Sections 5.02(g)(ii), (iii), (vii) and (ix);

-14-

TRB_LD000270
CONFIDENTIAL

(j)     the aggregate amount of all net cash payments received (i) under any Hedge Agreements and (ii) in respect of reserves relating to a prior fiscal year;

(k)     without duplication of any of clauses (a) – (j) and (l) through (n) of this definition, any amounts paid in connection with an Asset Sale for indemnification obligations, which obligations are not deducted from the definition of "Net Cash Proceeds";

(l)     to the extent included in EBITDA, proceeds from any sale of certain Equity Interests held by Borrower or its Subsidiaries listed in the Side Letter;

(m)     to the extent included in EBITDA, the aggregate amount of cash proceeds received by Borrower after April 1, 2007 and prior to any date of determination from the litigation and proceedings listed in the Side Letter; and

(n)     to the extent added to determine EBITDA, all items that did not result from a cash payment to Borrower or any of its Subsidiaries on a consolidated basis during such fiscal year;

provided that any amount deducted pursuant of any of the foregoing clauses that will be paid after the close of such fiscal year shall not be deducted again in a subsequent fiscal year; plus, without duplication:

(i)     the difference, if positive, of the amount of Net Working Capital at the end of the prior fiscal year (or the beginning of the fiscal year in the case of 2008) over the amount of Net Working Capital at the end of such fiscal year;

(ii)     all proceeds received during such fiscal year of any Debt (other than Debt under this Agreement) to the extent used to finance any Capital Expenditure or prepayments of Debt for Borrowed Money, in each case to the extent there is a corresponding deduction to Excess Cash Flow above in respect of the use of such borrowings;

(iii)     to the extent any permitted Capital Expenditures referred to in clause (d) above do not occur in the fiscal year specified in the certificate of Borrower provided pursuant to clause (d) above, such amounts of Capital Expenditures that were not so made in the fiscal year specified in such certificates;

(iv)     any return on investments received in cash (other than from a Subsidiary) during such period, which investments were made pursuant to Section 5.02(h)(v), (x) or (xvi);

(v)     income or gain excluded from consolidated net income resulting from (a) non-ordinary course Asset Sales and any related provision for taxes on such gain or (b) extraordinary gains and any related provision for taxes, in each case realized in cash during such fiscal year (except to the extent such gain is subject to Section 2.10(b)(iii));

(vi)     if deducted in the computation of EBITDA, cash interest income; and

(vii)     to the extent subtracted in determining EBITDA, all items that did not result from a cash payment by Borrower or any of its Subsidiaries on a consolidated basis during such fiscal year.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time.

-15-

TRB_LD000271
CONFIDENTIAL

"Exemption Certificate" has the meaning specified in Section 2.14(e)(ii).

"Existing Notes" means the Medium Term Notes and Borrower's 4.875% senior notes due 2010, 7.25% senior debentures due 2013, 5.25% senior notes due 2015, 7.5% senior debentures due 2023, 6.25% series D medium-term notes due 2026, 6.61% senior debentures due 2027 and 7.25% senior debentures due 2096.

"Facility" means the Revolving Credit Facility, the Letter of Credit Facility, the Tranche X Facility or the Tranche B Facility.

"FCC" means the Federal Communications Commission, as established by the Communications Act of 1934.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it.

"First Step Transactions" means (i) the Stock Repurchase, (ii) the Refinancing, (iii) the Initial Zell Investment and issuance of the Zell Note, (iv) the formation of the ESOP, (v) the execution and delivery of the Acquisition Agreement, (vi) the ESOP Investment, (vii) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the making of the credit extensions hereunder to be made on the Closing Date, (viii) the ESOP Loan and the pledge of shares by ESOP to secure the ESOP Loan, (ix) the Tribune Finance LLC Transaction and the Broadcasting Holdco Transaction, (x) all other transactions necessary to effect or incidental to the foregoing and (xi) the payment of fees, costs and expenses related to the foregoing.

"Foreign Subsidiary" shall mean a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" has the meaning specified in Section 1.03.

"Governmental Authority" means the government of the United States, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" means that certain guarantee agreement dated the Closing Date among Borrower, the Guarantors and the Agent substantially in the form of Exhibit F hereto.

"Guaranteed Debt" has the meaning specified in the definition of "Debt".

"Guarantor" means each Domestic Subsidiary of Borrower listed on Schedule 1.01(e) and each other Subsidiary of Borrower that is required to become a Guarantor after the Closing Date pursuant

-16-

TRB_LD000272
CONFIDENTIAL

to Section 5.01(l) and any other Subsidiary designated as a Guarantor by Borrower.  Borrower will provide to the Agent a supplement to Schedule 1.01(e) such that on the Closing Date, Schedule 1.01(e) lists each Domestic Subsidiary of Borrower existing on the Closing Date other than Tribune License Inc., Multimedia Insurance Company, a captive insurance Subsidiary, and each Immaterial Subsidiary of Borrower.

"Hazardous Materials" means (a) petroleum and petroleum products, byproducts or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls and radon gas and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"Hedge Agreements" means interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other similar agreements.

"Hedging Obligations" means obligations under or with respect to Hedge Agreements.

"Immaterial Subsidiary" means, at any time of determination, any Subsidiary of the Borrower that (i) has total annual revenues and total assets of less than $10,000,000 for the immediately preceding period of 12 consecutive fiscal months and (ii) does not have any Debt in respect of which the Borrower or any Subsidiary of the Borrower shall have any Guaranteed Debt or has not granted or permitted to exist any Lien on any of the Borrower's or any of its wholly owned Subsidiaries' assets.

"Increase Effective Date" has the meaning specified in Section 2.17(a).

"Increase Joinder" means a joinder agreement executed by Borrower, the Agent and each Lender making increased or new Commitments pursuant to Section 2.17, in form and substance reasonably satisfactory to each of them.

"Incremental Term Advance" has the meaning specified in Section 2.17(c).

"Incremental Term Borrowing" means a borrowing (other than a Conversion) consisting of simultaneous Incremental Term Advances of the same Type made by the applicable Lenders.

"Incremental Term Commitment" has the meaning specified in Section 2.17(a).

"Indemnified Party" has the meaning specified in Section 8.04(b).

"Information Memorandum" means the information memorandum dated April 2007 used by the Agent in connection with the syndication of the Commitments.

"Initial GAAP" has the meaning specified in Section 1.03.

"Initial Issuing Bank" means with respect to standby Letters of Credit, JPMorgan Chase Bank, N.A., in its capacity as an issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.03(g), and any other Revolving Credit Lender approved by the Agent and the Borrower (such approvals not to be unreasonably withheld) which has agreed to act as an Issuing Bank hereunder.  Each Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate and, except as otherwise agreed to by such Issuing Bank, all payments required to be made to such Issuing Bank hereunder with respect to Let-

-17-

TRB_LD000273
CONFIDENTIAL

ters of Credit issued by such Issuing Bank shall instead be made to the Affiliate that issued such Letter of Credit.

"Initial Lenders" means those Lenders listed under the heading "Initial Lenders" in the signature pages hereto.

"Initial Tranche B Advance" has the meaning assigned to such term in Section 2.01(c).

"Initial Tranche B Commitment" means as to any Lender (a) the amount set forth opposite such Lender's name on Schedule I hereto as such Lender's "Initial Tranche B Commitment" or (b) if such Lender has entered into any Assignment and Acceptance, the amount set forth for such Lender in the Register maintained by the Agent pursuant to Section 8.07(d) as such Lender's "Initial Tranche B Commitment", as such amount may be reduced pursuant to Section 2.05. The aggregate Initial Tranche B Commitment on the Closing Date is $5,515,000,000.

"Initial Zell Investment" means the investment by EGI-TRB, L.L.C. in Borrower of $250.0 million with respect to the purchase of $50.0 million of Borrower common equity and the Zell Note.

"Intellectual Property" has the meaning specified in Section 4.01(i).

"Intercompany Junior Subordinated Notes" means the junior subordinated notes of certain Guarantors issued to Tribune Finance, LLC on the Closing Date in an aggregate principal amount of not less than $3.0 billion.

"Interest Coverage Ratio" means, for any Test Period, a ratio of Consolidated EBITDA of Borrower and its Subsidiaries for such period to Cash Interest Expense of Borrower and its Subsidiaries during such period.

"Interest Period" means, for each Eurodollar Rate Advance comprising part of the same Borrowing, the period commencing on the date of such Eurodollar Rate Advance or the date of the Conversion of any Base Rate Advance into such Eurodollar Rate Advance and ending on the last day of the period selected by Borrower pursuant to the provisions below and, thereafter, with respect to Eurodollar Rate Advances, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by Borrower pursuant to the provisions below. The duration of each such Interest Period shall be one, two, three or six months or subject to clause (c) of this definition, nine or twelve months, as Borrower may, upon notice received by the Agent not later than 12:00 noon (New York City time) on the third Business Day prior to the first day of such Interest Period, select; provided, however, that:

    (a)    Borrower may not select any Interest Period for (i) any Revolving Credit Borrowing that ends after the Revolving Credit Commitment Termination Date, (iii) any Tranche X Borrowing that ends after the Tranche X Maturity Date or (ii) any Tranche B Borrowing or Incremental Term Borrowing that ends after the Tranche B Maturity Date;

    (b)    Interest Periods commencing on the same date for Eurodollar Rate Advances comprising part of the same Borrowing shall be of the same duration;

    (c)    Borrower shall not be entitled to select an Interest Period having duration of nine or twelve months unless, by 2:00 P.M. (New York City time) on the third Business Day prior to the first day of such Interest Period, each Lender notifies the Agent that such Lender will be pro-

-18-

TRB_LD000274
CONFIDENTIAL

viding funding for such Borrowing with such Interest Period (the failure of any Lender to so respond by such time being deemed for all purposes of this Agreement as an objection by such Lender to the requested duration of such Interest Period); provided that, if any or all of the Lenders object to the requested duration of such Interest Period, the duration of the Interest Period for such Borrowing shall be one, two, three or six months, as specified by Borrower requesting such Borrowing in the applicable Notice of Borrowing as the desired alternative to an Interest Period of nine or twelve months;

    (d)    whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided, however, that, if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day; and

    (e)    whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month.

    "Investment" has the meaning specified in Section 5.02(h).

    "Investment Reduction Amount" means, on any date of determination, the sum of (a) the aggregate amount of Junior Capital (other than the Zell Note, the Initial Zell Investment, the Zell Sub Note as contemplated on the Closing Date or any additional Investments made to finance the Stock Repurchase, the Refinancing, the Acquisition and the payment of related fees and expenses) issued prior to or on such date of determination plus (b) 50% of Special Proceeds received before such date of determination plus (c) the aggregate amount of cash proceeds received by Borrower after April 1, 2007 and prior to such date of determination from the litigation and proceedings listed in the Side Letter and designated (at the time such proceeds are received) by Borrower to be included in the Junior Capital Reduction Amount and Investment Reduction Amount.

    "Investor Rights Agreement" means the Investor Rights Agreement dated April 1, 2007 by and among Borrower, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the ESOP Trust, which implements and forms a part of the ESOP, as the same may be supplemented, amended, restated or otherwise modified from time to time.

    "Issuance" with respect to any Letter of Credit means the issuance, amendment, renewal or extension of such Letter of Credit pursuant to Section 2.03.

    "Issuing Bank" means an Initial Issuing Bank or any Eligible Assignee approved by Borrower (such approval not to be unreasonably withheld) to which a portion of the Letter of Credit Commitment hereunder has been assigned pursuant to Section 8.07 or any other Revolving Credit Lender (or any of its Affiliates) so long as such Eligible Assignee or other Revolving Credit Lender (or such Affiliate) expressly agrees to perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as an Issuing Bank and notifies the Agent of its Applicable Lending Office (which information shall be recorded by the Agent in the Register), for so long as such Initial Issuing Bank, Eligible Assignee or other Revolving Credit Lender (or such Affiliate), as the case may be, shall have a Letter of Credit Commitment.

TRB_LD000275
CONFIDENTIAL

"Junior Capital" means (i) common equity of Borrower that does not (a) provide for scheduled payments of dividends in cash prior to the date that is one year after the Tranche B Maturity Date or (b) become mandatorily redeemable pursuant to a sinking fund obligation or otherwise prior to the date that is one year after the Tranche B Maturity Date and (ii) Debt of Borrower that (a) is unsecured and not Guaranteed by any Subsidiary, (b) is expressly subordinated to the prior payment in full in cash of the Secured Obligations on terms reasonably satisfactory to the Agent (it being agreed that the subordination provisions of the Zell Note (taken together with Section 5.02(j)(i)(w)) are satisfactory to the Agent), (c) has a final maturity date that is not earlier than, and provides for no scheduled payments of principal or mandatory redemption obligations prior to, the date that is one year after the Tranche B Maturity Date and (d) provides for payments of interest solely in-kind until the date that is one year after the Tranche B Maturity Date.

"Junior Capital Reduction Amount" means, on any date of determination, the result of (a) 50% of Special Proceeds received before such date of determination plus (b) the aggregate amount of cash proceeds received by Borrower after April 1, 2007 from the litigations and proceedings listed in the Side Letter and designated (at the time such proceeds are received) by Borrower to be included in the Junior Capital Reduction Amount and Investment Reduction Amount minus (c) the Investment Reduction Amount (calculated without giving effect to clause (a) thereof) to the extent such amount was actually applied to reduce the Zell Investment Amount minus (d) the amount of dividends previously made of the type described in Section 5.02(g)(viii) minus (e) the principal amount of Junior Capital repurchased pursuant to Section 5.02(j)(i)(w) before such date of determination.

"L/C Cash Deposit Account" means an interest bearing cash deposit account to be established and maintained by the Agent, over which the Agent shall have sole dominion and control, upon terms as may be reasonably satisfactory to the Agent.

"L/C Disbursement" has the meaning specified in Section 2.03(c).

"L/C Related Documents" has the meaning specified in Section 2.03(f)(i).

"Lead Arrangers" has the meaning specified in the preamble.

"Lenders" means, at any time, each Revolving Credit Lender, each Tranche X Lender, each Tranche B Lender, each Issuing Bank, the Swing Line Lender and, without duplication, each Eligible Assignee that shall become a party hereto pursuant to Section 2.17 and each other Person that shall become a party hereto pursuant to Section 8.07.

"Letter of Credit" means, at any time, a letter of credit issued by an Issuing Bank pursuant to Section 2.01(b).

"Letter of Credit Agreement" has the meaning specified in Section 2.03(a).

"Letter of Credit Commitment" means, with respect to each Issuing Bank, the obligation of such Issuing Bank to issue Letters of Credit for the account of Borrower and its Subsidiaries in (a) the Dollar amount set forth opposite each Issuing Bank's name on Schedule I hereto under the caption "Letter of Credit Commitment" or (b) if such Issuing Bank has entered into one or more Assignment and Acceptances, the Dollar amount set forth for such Issuing Bank in the Register maintained by the Agent pursuant to Section 8.07(d) as such Issuing Bank's "Letter of Credit Commitment", in each case as such amount may be reduced prior to such time pursuant to Section 2.05.

-20-

TRB_LD000276
CONFIDENTIAL

"Letter of Credit Facility" means, at any time, an amount equal to the least of (a) the aggregate amount of the Issuing Banks' Letter of Credit Commitments at such time, (b) $250,000,000 and (c) the aggregate amount of the Unused Revolving Credit Commitments at such time, as such amount may be reduced at or prior to such time pursuant to Section 2.05.

"Lien" means any lien, security interest or other charge of any kind, or any other type of preferential arrangement intending to have the effect of a lien or security interest, including, without limitation, (x) any lien or retained security title of a conditional vendor, (y) any easement, right of way or other encumbrance on title to real property and (z) any assignment of income or proceeds intended to secure Debt for Borrowed Money.

"Loan Documents" means this Agreement, the Pledge Agreement and the Notes, in each case as the same may be amended, restated or otherwise modified from time to time.

"Loan Parties" means, collectively, Borrower and each Guarantor that is a party to a Loan Document.

"Material Adverse Effect" means (a) prior to the earlier to occur of the consummation of the Acquisition and the termination of the Acquisition Agreement in accordance with its terms (including, without limitation, for purposes of any representation and warranty made, or any condition required to be satisfied, on the Second Step Closing Date), except as disclosed in the SEC Reports filed prior to April 1, 2007 (other than risk factors and similar cautionary disclosure contained therein under the headings "Risk Factors" or "Forward-Looking Statements" or under any similar heading), or as disclosed in the "company disclosure schedule" to the Acquisition Agreement, a Company Material Adverse Effect and (b) thereafter, a material adverse effect on (i) the business, operations or financial condition of Borrower and its Subsidiaries taken as a whole (after giving effect to the Transactions), (ii) the rights and remedies of the Agent or any Lender under the Loan Documents or (iii) the ability of Borrower and the other Loan Parties (taken as a whole) to perform its obligations under the Loan Documents.

"Material Debt" means Debt with an outstanding principal amount of $75.0 million or more.

"Medium Term Notes" means the following medium-term notes of Borrower: (i) the 6.35% Series E Medium-Term Notes issued on February 3, 1998 and maturing on February 1, 2008 with an initial face amount of $25,000,000, (ii) the 5.50% Series E Medium-Term Notes issued on October 6, 1998 and maturing on October 6, 2008 with an initial face amount of $167,915,000 and (iii) the 5.67% Series E Medium-Term Notes issued on December 8, 1998 and maturing on December 8, 2008 with an initial face amount of $69,550,000.

"Medium Term Notes Final Maturity Date" means December 8, 2008.

"Merger Sub" shall mean Tesop Corporation, a Delaware corporation wholly owned by the ESOP.

"Moody's" means Moody's Investors Service, Inc. or any successor thereto.

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which Borrower or any ERISA Affiliate is making or had an obligation to make contributions, has within any of the preceding five plan years made or has an obligation to make contributions or with respect to which Borrower or any ERISA Affiliate could have liability.

-21-

TRB_LD000277
CONFIDENTIAL

"Multiple Employer Plan" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of Borrower or any ERISA Affiliate and at least one Person other than Borrower and the ERISA Affiliates or (b) was so maintained and in respect of which Borrower or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"Net Cash Proceeds" means

(a)    with respect to any Asset Sale (other than any issuance or sale of Equity Interests), the cash proceeds received by Borrower or any of its Subsidiaries (including cash proceeds subsequently received (as and when received by Borrower or any of its Subsidiaries) in respect of non-cash consideration initially received) net of (i) selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and Borrower's good faith estimate of income taxes paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by Borrower or any of its Subsidiaries associated with the properties sold in such Asset Sale (provided that, to the extent and at the time any such amounts are released from such reserve (other than in satisfaction of any such liabilities), such amounts shall constitute Net Cash Proceeds); (iii) Borrower's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 90 days of such Asset Sale (provided that, to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Asset Sale, such cash proceeds shall constitute Net Cash Proceeds); (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Debt for Borrowed Money which is secured by a Lien on the properties sold in such Asset Sale and which is repaid with such proceeds (other than any such Debt assumed by the purchaser of such properties); and (v) the amount of any proceeds of such Asset Sale that Borrower or any Subsidiary has reinvested (or intends to reinvest within the Reinvestment Period) in the business of Borrower or any of the Subsidiaries; provided that any portion of such proceeds that has not been so reinvested within such Reinvestment Period (with respect to such Prepayment Event, the "Deferred Net Cash Proceeds") shall (x) be deemed to be Net Cash Proceeds of an Asset Sale occurring on the last day of such Reinvestment Period, and (y) be applied to the repayment of Advances in accordance with Section 2.10(b);

(b)    with respect to any incurrence of Debt for Borrowed Money or any issuance or sale of Equity Interests by Borrower or any of its Subsidiaries, the cash proceeds thereof, net of customary fees, commissions, costs and other expenses incurred in connection therewith; and

(c)    with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, net of all reasonable costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event net of any proceeds, awards or other compensation in respect of such Casualty Event that Borrower or any Subsidiary has reinvested (or intends to reinvest within the Reinvestment Period) (with respect to such Prepayment Event, the "Deferred Net Cash Proceeds") in the business of Borrower or any of the Subsidiaries; provided that any portion of such proceeds, awards or other compensation that has not been so reinvested within such Reinvestment Period shall (x) be deemed to be Net Cash Proceeds of a Casualty Event occurring on the last day of such Reinvestment Period, and (y) be applied to the repayment of Advances in accordance with Section 2.10(b).

-22-

TRB_LD000278
CONFIDENTIAL

"Net Working Capital" means, at any time, without regard to changes due to reclassifications in accordance with GAAP or purchase accounting, Consolidated Current Assets at such time minus Consolidated Current Liabilities.

"Non-Consenting Lender" has the meaning provided in Section 8.01.

"Non-Excluded Taxes" means any Taxes other than (i) net income and franchise taxes imposed with respect to the Agent or any Lender by the Governmental Authority under the laws of which the Agent or such Lender, as applicable, is organized or in which it maintains its applicable lending office and (ii) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which Borrower is located.

"Non-U.S. Lender" means any Lender that is not a "United States Person", as defined under Section 7701(a)(30) of the Code.

"Note" means a Revolving Credit Note, a Tranche X Note, a Tranche B Note or a Swing Line Note.

"Notice of Borrowing" has the meaning specified in Section 2.02(a).

"Notice of Issuance" has the meaning specified in Section 2.03(a).

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Advances made to Borrower or L/C Disbursements made pursuant to Letters of Credit issued for the account of Borrower, including on behalf of any of its Subsidiaries, all accrued and unpaid fees (including pursuant to Section 2.04 of this Agreement) and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to the Lenders or to any Lender, the Agent, an Issuing Bank or any indemnified party, in each case arising under the Loan Documents (including interest and fees accruing after commencement of any bankruptcy or insolvency proceeding against any Loan Party, whether or not allowed in such proceeding).

"Organizational Documents" means, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (v) in any other case, the functional equivalent of the foregoing.

"Other Taxes" means any and all stamp, documentary or similar taxes, or any other excise or property taxes or similar levies that arise on account of any payment being or being required to be made hereunder or under any Note or from the execution, delivery, registration, recording or enforcement of this Agreement or any Note.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001, as amended from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation (or any successor).

-23-

TRB_LD000279
CONFIDENTIAL

"PDT Debt" has the meaning provided in the definition of "Permitted Disposition Trans-action."

"PDT Entity" has the meaning provided in the definition of "Permitted Disposition Transaction."

"Permitted Acquisition" means any transaction for the (a) acquisition by a Guarantor of all or substantially all of the property of any Person, or of any business or division of any Person; or (b) acquisition (including by merger or consolidation) of the Equity Interests of any Person that becomes a wholly owned Domestic Subsidiary after giving effect such transaction; provided, that, for any acquisition over $10,000,000, in the case of each of (a) and (b) each of the following conditions shall be met:

(i)    no Event of Default then exists or would result therefrom;

(ii)    after giving effect to such transaction on a Pro Forma Basis, Borrower shall be in compliance with all covenants set forth in Sections 5.02(i)(A) and (B) as of the most recent Test Period (assuming if such transaction is to be consummated prior to the last day of the first Test Period for which the covenants in Sections 5.02(i)(A) and (B) are required to be satisfied, the levels required for such first Test Period shall be deemed to apply in determining compliance with such covenants for purposes of this clause (ii));

(iii)    no Company (as defined prior to giving effect to such transaction) shall, in connection with any such transaction, assume or remain liable with respect to any Debt of the related seller or the business, Person or properties acquired, except to the extent permitted under Section 5.02(c);

(iv)    the Person, property or business to be acquired shall be, or shall be engaged in, a business of the type that Borrower and the Subsidiaries are permitted to be engaged in under Section 5.02(l);

(v)    all transactions in connection therewith shall be consummated in accordance with all applicable law;

(vi)    with respect to any transaction involving acquisition consideration of more than $100,000,000, unless the Agent shall otherwise agree, Borrower shall have provided the Agent and the Lenders with (A) historical financial statements for the last three fiscal years (or, if less, the number of years since formation) of the person or business to be acquired (audited if available) and unaudited financial statements thereof for the most recent interim period which are available and (B) reasonably detailed projections for the succeeding five years pertaining to the person or business to be acquired and updated projections for Borrower after giving effect to such transaction to the extent such projections have been provided to Borrower; provided that at Borrower's request, such information may instead be provided to the Agent only (who will in turn make such information to any Lender upon its reasonable request); provided further that the information will be deemed to be Borrower Information and will be subject to Section 8.08;

(vii)    at least 10 Business Days prior to the proposed date of consummation of the transaction, Borrower shall have delivered to the Agent and the Lenders an officers' certificate certifying that (A) such transaction complies with this definition (which shall have attached thereto reasonably detailed backup data and calculations showing such compliance), and (B) such transaction could not reasonably be expected to result in a Material Adverse Effect; and

-24-

TRB_LD000280
CONFIDENTIAL

(viii)      in the case of (b) above, Borrower will cause such new Subsidiary to comply with Section 5.01(l) (if applicable).

"Permitted Disposition Transactions" means (i) any disposition of property by Borrower or any of its Subsidiaries (including, without limitation, any Asset Sale) (a "Disposition") and (ii) any related incurrence of Debt (including any Debt secured by a Lien on such property), merger or consolidation of any Subsidiary of Borrower with or into any other Person (including, without limitation, with or into Borrower), Dividends to Borrower or any of its Subsidiaries, Investments in any other Person, prepayment, acquisition, exchange or other redemption of Debt, in each case in connection with or for the purpose of effecting such Disposition (any such related transaction, a "Related Transaction"); provided that, for any such Disposition (or series of related Dispositions) involving property with a fair market value of $10,000,000 or more, each of the following conditions shall be met with respect to the Disposition and all Related Transactions:

(i)      after giving effect to any such Disposition and all of its Related Transactions on a Pro Forma Basis (including after giving effect to any prepayment made or required to be made within six months thereafter pursuant to clause (v) of this definition), Borrower shall be in compliance with all covenants set forth in Sections 5.02(i)(A) and (B) as of the most recent Test Period (assuming if such transaction is to be consummated prior to the last day of the first Test Period for which the covenants in Sections 5.02(i)(A) and (B) are required to be satisfied, the levels required for such first Test Period shall be deemed to apply in determining compliance with such covenants for purposes of this clause (i)); provided that, solely for purposes of the foregoing calculations in determining whether a Disposition and its Related Transactions are permitted, all Debt incurred as a Related Transaction of such Disposition (whether in the form of Guaranteed Debt or otherwise) by Borrower or any of its Subsidiaries regardless of whether it would be included in determining compliance with Sections 5.02(i)(A) and (B) shall be included in the calculation required by this clause (i), except that Debt incurred by Borrower and not by any Guarantor that is in the form of either Guaranteed Debt of a third party to which property is being transferred pursuant to the subject Disposition (the "Subject Transferee") or an obligation owed solely to the Subject Transferee shall not be required to be included in the calculation required by this clause (i) if Borrower delivers to the Agent and the Lenders an officers' certificate to the effect that the Subject Transferee is Solvent (determined as of the date of such incurrence, treating the Subject Transferee as if it were Borrower for purposes of the definition of Solvent and disregarding the benefit of Borrower's guarantee or loan) which certificate shall be in form and substance satisfactory to the Agent;

(ii)      the aggregate fair market value of property subject to Dispositions contemplated by this definition occurring in any fiscal year shall not exceed an amount equal to (a) (1) 25% of Consolidated Total Assets prior to the date all Tranche X Advances have been paid in full and (2) thereafter, 15% of Consolidated Total Assets, in each case, as disclosed on the face of Borrower's audited financial statements for the immediately preceding fiscal year minus (b) the aggregate fair market value of all Asset Sales (other than Dispositions) permitted under Section 5.02(e)(ii) in the applicable fiscal year; provided that a Disposition of any property referenced in Section 5.02(e)(vii) shall not be subject to the foregoing limitations;

(iii)      such Disposition, all Related Transactions and transactions in connection therewith shall be consummated in accordance with all applicable law and all terms and conditions thereof shall be fair and reasonable and no less favorable (on an after-tax basis), taken as a whole, to Borrower and its Subsidiaries and the holders of the Secured Obligations than terms and conditions Borrower and its Subsidiaries otherwise would have obtained in an arm's-length Asset Sale transaction involving the property subject to the Disposition that is effected without any such

-25-

TRB_LD000281
CONFIDENTIAL

Related Transactions (other than any Related Transactions that would otherwise be permitted under this Agreement in the absence of this definition and the related concepts);

(iv)    at least 10 Business Days prior to the proposed date of consummation of the Disposition, Borrower shall have delivered to the Agent and the Lenders an officers' certificate certifying that (A) such transaction complies with this definition (which shall have attached thereto reasonably detailed backup data and calculations showing such compliance) and (B) such transaction could not reasonably be expected to result in a Material Adverse Effect;

(v)    with respect to any such Disposition:

(A) to the extent not involving a Sale and Lease-Back Transaction, Borrower shall be required to apply an amount equal to not less than the greater of (x) 70% of the fair market value of the property subject to such Disposition and (y) the Net Cash Proceeds therefrom, in each case to the prepayment of Advances in accordance with Section 2.10(b)(iii); and

(B) to the extent involving a Sale and Lease-Back Transaction, Borrower may elect to either (i) prepay the Tranche X Advances and the Tranche B Advances in accordance with Section 2.10(a) prior to the six-month anniversary of the consummation of such Sale and Lease-Back Transaction from the Net Cash Proceeds received by Borrower or any of its Subsidiaries therefrom or (ii) on or before the thirtieth (30th) day following the consummation of such Sale and Lease-Back Transaction deposit all such Net Cash Proceeds, when received, into an interest bearing cash deposit account to be established and maintained by the Agent, over which the Agent shall have sole dominion and control, upon terms as may be reasonably satisfactory to the Agent, and then on the six-month anniversary of the consummation of such Sale and Lease-Back Transaction, to the extent not otherwise voluntarily prepaid in accordance with clause (v)(B)(i) above, shall apply an amount equal to the Net Cash Proceeds received on or prior to such date and, when received, such additional Net Cash Proceeds in respect of such transaction as and when received to the prepayment of Advances in accordance with Section 2.10(b)(iii); and

(vi)    any Related Transaction shall be required to comply with the following additional requirements: (a) any Related Transaction involving an incurrence of Debt that is Debt of Borrower or any Subsidiary shall either be (1) if incurred by Borrower or a Guarantor, unsecured and, if incurred by a Guarantor, subordinated in right of payment to the Obligations of such Guarantor in a manner reasonably satisfactory to the Agent, and shall require no cash payments of principal prior to the sixth month following the Tranche B Maturity Date ("PDT Debt") or (2) in an aggregate principal amount, when taken together with all other Debt incurred pursuant to this sub-clause (2) and Section 5.02(c)(xxiii), not exceeding $50.0 million (with amounts incurred pursuant to this sub-clause (2) reducing dollar-for-dollar the amount of Debt permitted to be incurred pursuant to Section 5.02(c)(xxiii)) and, to the extent involving the incurrence of a Lien on any property other than property that is subject to the Disposition or received as consideration in connection with such Disposition, any Lien securing Debt permitted by this sub-clause (2) shall be incurred in compliance with Section 5.02(a)(xi); (b) any Related Transaction involving a merger with, or transfer or other disposition of property to, Borrower shall only be permitted to the extent permitted under Section 5.02(b) (except that this shall not prohibit transfers of Net Cash Proceeds and other transfers as part of cash management or in the ordinary course of business); (c) any Related Transaction involving a transfer or other disposition of property to a Subsidiary that is not a Guarantor (a "PDT Entity") shall only be permitted if all financial attributes

-26-

TRB_LD000282
CONFIDENTIAL

of such Subsidiary (including Consolidated EBITDA) are excluded from the Pro Forma calcula-tions required by paragraph (i) of this definition and are excluded from all calculations under Sec-tion 5.02(i)(A) and (B) for that and all subsequent Test Periods and shall thereafter be excluded from the calculation of Excess Cash Flow; (d) any Related Transaction involving an Investment shall be permitted only to the extent either (1) the Investment is being received as consideration for the Disposition or (2) the Investment shall be pursuant to Section 5.02(h)(vi), (x) or (xvi); (e) any restrictions of the type subject to Section 5.02(d) shall only be permitted to the extent that they impact only a Guarantor or a PDT Entity and do not have a material adverse impact on any Collateral for the Obligations and, in the good faith judgment of Borrower, will not materially and adversely affect the ability of such Guarantor to satisfy its Obligations when due; (f) any pre-payment or redemption of Debt shall be in compliance with and pursuant to Section 5.02(i) or shall be of Intercompany Junior Subordinated Notes of the Company effecting, or that is the sub-ject of, the Disposition in connection with the Disposition and reasonably related thereto; and (g) restrictions of the type subject to Section 5.02(m) shall be permitted only to the extent they relate to property that is the subject of the relevant Disposition and any Investments received as consid-eration for the Disposition; provided that, notwithstanding anything to the contrary, this clause (vi) will not prohibit a Related Transaction if it otherwise complies with the requirements of this Agreement other than the definition of "Permitted Disposition Transaction".

"Permitted Liens" means each of the following: (a) Liens for unpaid utilities and for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 5.01(b) hereof; (b) Liens imposed by law (other than any Lien imposed by ERISA that could reasonably be expected to result in a Material Adverse Effect), such as warehousemen's, landlord's, materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that are not overdue for a period of more than 60 days or which are being contested in good faith by appropriate proceedings and as to which appropriate reserves are be-ing maintained; (c) pledges or deposits to secure obligations under workers' compensation, unemploy-ment insurance and other social security or employment laws or similar legislation or to secure public, statutory or regulatory obligations; (d) deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory or regulatory obligations, surety and appeal bonds, perform-ance bonds and other obligations of a like nature incurred in the ordinary course of business; (e) easements, rights of way covenants, zoning, use restrictions and other encumbrances on title to real property that do not materially adversely affect the use of such property for its present purposes; (f) Liens securing judgments for the payment of money not constituting a Default under Section 6.01(f) or securing appeal or other surety bonds related to such judgments; (g) any interest or title of a lessor, sublessor, li-censee or licensor under any operating lease or license agreement entered into in the ordinary course of business and not interfering in any material respect with the rights, benefits or privileges of such lease or licensing agreement, as the case may be; (h) Liens in favor of payor financial institutions having a right of setoff, revocation, refund or chargeback with respect to money or instruments of Borrower or any Sub-sidiary of Borrower on deposit with or in possession of such financial institution; (i) leases or licenses of Intellectual Property or other assets granted by Borrower or any Subsidiary in the ordinary course of busi-ness and not interfering in any material respect with the ordinary conduct of business of Borrower or any Subsidiary and (j) the filing of UCC financing statements solely as a precautionary measure in connection with any transaction not prohibited hereunder.

"Permitted Transferee" means (i) any direct or indirect Affiliate of EGI-TRB, L.L.C., Equity Group Investments, L.L.C. or Zell, (ii) any direct or indirect member of EGI-TRB, L.L.C. and any direct or indirect Affiliate thereof, (iii) Zell or his spouse, lineal ancestors and descendants (whether natu-ral or adopted), or (iv) any trust or retirement account primarily for the benefit of Zell and/or his spouse, lineal ancestors and descendants, any entity formed and wholly owned by any such trust or retirement account and any private foundation formed by Zell and/or any one or more of his descendants.

-27-

TRB_LD000283
CONFIDENTIAL

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"PHONES" means the Exchangeable Subordinated Debentures of Borrower due 2029 and outstanding as of the Closing Date.

"Plan" means a Single Employer Plan or a Multiple Employer Plan.

"Platform" has the meaning specified in Section 8.02(d).

"Pledge Agreement" means the Pledge Agreement in substantially the form of Exhibit G hereto and any other documents granting a Lien upon the Collateral as security for the payment of the Secured Obligations.

"Prepayment Event" means any Asset Sale Prepayment Event or Casualty Event.

"Pro Forma Basis" means, with respect to compliance with any test or covenant hereunder, to the extent consummated on or after the first day of a Test Period, the First Step Transactions, the Second Step Transactions, any Permitted Acquisition, an Asset Sale (including any anticipated disposition, transfer or assignment of specific assets listed on Schedule 1.01(c) in connection with which a definitive acquisition or other agreement has been entered into, including where such sale remains subject to certain customary approvals, the incurrence, permanent repayment or extinguishment of Debt (other than Debt incurred for working capital needs under ordinary course revolving credit facilities) or any cost savings realized or to be realized as a result of any of the foregoing (each a "Specified Transaction") and the following transactions in connection therewith shall be deemed to have occurred as of the first day of the applicable Test Period in such test or covenant: income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, (i) in the case of a sale, transfer or other disposition of all or substantially all Capital Stock in any Subsidiary or any division, product line, or facility used for operations of Borrower or any of its Subsidiaries, shall be excluded, and (ii) in the case of Debt described in the definition of "Specified Transaction", if such Debt has a floating or formula rate, such Debt shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Debt as of the relevant date of determination); provided that the foregoing pro forma adjustments may be applied to any such test or covenant solely to the extent that such adjustments are consistent with the definition of EBITDA and Regulation S-X.

"Purchase Money Obligation" shall mean, for any Person, the obligations of such Person in respect of Debt (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any property (including Equity Interests of any Person) or the cost of installation, construction or improvement of any property and any refinancing thereof; provided, however, that (i) such Debt is incurred within one year after such acquisition, installation, construction or improvement of such property by such Person and (ii) the amount of such Debt does not exceed 100% of the unamortized cost of such acquisition, installation, construction or improvement, as the case may be.

"Ratable Share" of any amount means (x) with respect to any Revolving Credit Lender at any time, the product of such amount multiplied by a fraction the numerator of which is the amount of such Lender's Revolving Credit Commitment at such time (or, if the Revolving Credit Commitments shall have been terminated pursuant to Section 2.05 or 6.01, such Lender's Revolving Credit Commitment as in effect immediately prior to such termination) and the denominator of which is the aggregate amount of all Revolving Credit Commitments at such time (or, if the Revolving Credit Commitments

-28-

TRB_LD000284
CONFIDENTIAL

shall have been terminated pursuant to Section 2.05 or 6.01, the aggregate amount of all Revolving Credit Commitments as in effect immediately prior to such termination), (y) with respect to any Tranche B Lender at any time, the product of such amount multiplied by a fraction the numerator of which is the amount of such Lender's Tranche B Advances plus the amount of such Lender's Delayed Draw Tranche B Commitment which has not been drawn upon at such time and the denominator of which is the aggregate amount of all Tranche B Advances plus the amount of all Delayed Draw Tranche B Commitments which have not been drawn upon at such time and (z) with respect to any Tranche X Lender at any time, the product of such amount multiplied by a fraction the numerator of which is the amount of such Lender's Tranche X Advances and the denominator of which is the aggregate amount of all Tranche X Advances.

"Ratably" has the meaning specified in Section 7.05(a).

"Receivables Facility" one or more receivables financing facilities, in each case, as amended, supplemented, modified, extended, renewed, restated, refunded, replaced or refinanced from time to time, the Debt of which is non-recourse (except for Standard Receivables Facility Undertakings) to Borrower and its Subsidiaries, other than any Receivables Subsidiary, pursuant to which Borrower or any of its Subsidiaries sells its accounts, payment intangibles and related assets to either (a) a Person that is not a Guarantor or (b) a Receivables Subsidiary.

"Receivables Facility Repurchase Obligation" means any obligation of Borrower or a Subsidiary that is a seller of assets in a Receivables Facility to repurchase the assets it sold thereunder as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"Receivables Subsidiary" means any Subsidiary formed solely for the purpose of engaging, and that engages only, in one or more Receivables Facilities.

"Reference Banks" means JPMorgan Chase Bank, N.A. and Citibank, N.A.

"Refinancing" means the refinancing of Borrower's existing indebtedness listed on Schedule 1.01(a).

"Refunded Swing Line Advances" has the meaning specified in Section 2.02(b).

"Regulation S-X" means Regulation S-X promulgated under the Securities Act.

"Register" has the meaning specified in Section 8.07(d).

"Reinvestment Period" means 15 months following the date of an Asset Sale Prepayment Event or Casualty Event (or, if later, 180 days after the date Borrower or a Subsidiary has entered into a binding commitment to reinvest the proceeds of any such Asset Sale Prepayment Event or Casualty Event prior to the expiration of such 15 months).

"Related Funds" shall mean with respect to any Lender that is an Approved Fund, any other Approved Fund that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

-29-

TRB_LD000285
CONFIDENTIAL

"Related Transaction" has the meaning provided in the definition of "Permitted Disposition Transaction."

"Required Lenders" means at any time Lenders owed or holding at least a majority of the sum of (a) the aggregate principal amount of the Advances outstanding at such time, (b) the aggregate amount of participations in undrawn Letters of Credit, (c) the aggregate Unused Revolving Credit Commitments at such time, (d) the aggregate amount of any outstanding Initial Tranche B Commitment and outstanding Tranche X Commitment and (e) the aggregate Unused Delayed Draw Tranche B Commitments at such time.

"Required Revolving Credit Lenders" means at any time Revolving Credit Lenders owed or holding at least a majority of the aggregate principal amount of the Revolving Credit Advances outstanding at such time or, if no Revolving Credit Advances are then outstanding, Revolving Credit Lenders holding at least a majority in interest of the Revolving Credit Commitments at such time.

"Retained Amount" means (a) the sum of (i) the cumulative amount of Excess Cash Flow for the period beginning July 1, 2007 to the date of determination, (ii) the aggregate amount of cash proceeds received by Borrower after April 1, 2007 and prior to any date of determination from the litigation and proceedings listed in the Side Letter and not designated by Borrower to be included in the Junior Capital Reduction Amount and Investment Reduction Amount and (iii) solely for purposes of Section 5.02(j)(i)(cc), Net Cash Proceeds from the sale of the asset listed in the Side Letter minus (b) the sum of (i) 50% of Excess Cash Flow from the period from July 1, 2007 through December 28, 2007, (ii) the amount of any Excess Cash Flow required to be applied to a prepayment pursuant to Section 2.10(b)(ii), (iii) the aggregate amount of Dividends paid pursuant to Section 5.02(g)(x), (iv) the aggregate actual amount of Investments made with the Retained Amount in reliance on Section 5.02(h)(x) (net of any return on capital in respect of such Investment or deemed reduction in the amount of such Investment including, without limitation, the sale of any such Investment for cash), (v) the aggregate actual amount of debt repayments made pursuant to Section 5.02(j)(i)(cc) and (vi) the aggregate amount of Capital Expenditures made pursuant to Section 5.02(j)(C) in reliance on the Retained Amount; provided that if the Retained Amount shall be reduced below zero, it shall be deemed to be zero for purposes of calculating availability under Sections 5.02(g)(x), 5.02(h)(x), 5.02(j)(i)(cc) and 5.02(j)(C).

"Revolving Credit Advance" has the meaning specified in Section 2.01(a).

"Revolving Credit Borrowing" means a borrowing (other than a Conversion) consisting of simultaneous Revolving Credit Advances of the same Type made by each of the Revolving Credit Lenders.

"Revolving Credit Commitment" means as to any Lender (a) the amount set forth opposite such Lender's name on Schedule I as such Lender's "Revolving Credit Commitment", (b) if such Lender has become a Lender hereunder pursuant to an Assignment and Acceptance, the amount set forth in such Assignment and Acceptance or (c) if such Lender has entered into an Assignment and Acceptance, the amount set forth for such Lender in the Register maintained by the Agent pursuant to Section 8.07(d) as such Lender's "Revolving Credit Commitment", as such amount may be reduced pursuant to Section 2.05. The aggregate Revolving Credit Commitment on the Closing Date is $750,000,000

"Revolving Credit Commitment Termination Date" means the earlier of (a) the Revolving Credit Facility Maturity Date and (b) the date of termination in whole of the Revolving Credit Commitments pursuant to Section 2.05 or 6.01.

-30-

TRB_LD000286
CONFIDENTIAL