| | |
|---|---|
| **From:** | Krakauer, Bryan <bkrakauer@sidley.com> |
| **Sent:** | Thursday, February 5, 2009 8:45 PM (GMT) |
| **To:** | Liebentritt, Don <dliebentritt@Tribune.com>; Eldersveld, David <DEldersveld@Tribune.com>; Larsen, Nils <nlarsen@tribune.com>; Bigelow, Chandler <CBigelow@tribune.com> |
| **Subject:** | FW: |



-----Original Message-----
From: Schaible, Damian S [mailto:damian.schaible@dpw.com]
Sent: Thursday, February 05, 2009 2:38 PM
To: Krakauer, Bryan
Cc: Bernstein, Donald S ; Smit, Daniel; Eldersveld, David
Subject: RE:

Thanks

I am told that Chadbourne sent out an email to the UCC the other day explaining the situation and the company's intent and that, as of earlier today at least, they'd heard questions, etc from a few members but no loud noises or issues

I told them I'd give them a call tomorrow to see what they'd heard and where they were, thinking that if all goes well we could send the letters very early next week.

- Damian

_____

Damian S Schaible
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
Phone: 212 450-4580
Fax: 212 450-3580
email: damian.schaible@dpw.com

> -----Original Message-----
> From: Krakauer, Bryan [mailto:bkrakauer@sidley.com]
> Sent: Thursday, February 05, 2009 3:22 PM
> To: Schaible, Damian S
> Cc: Bernstein, Donald S ; Smit, Daniel; Eldersveld, David
> Subject: RE:
>
> Damian:
>
> I will confirm with the Debtors on Blackstone
>
> Have you heard any further word from the UCC on the fee arrangement with the
> Steering Committee?

Larsen
EXHIBIT NO. 16
2/1/10
P. CAMPBELL

TRB_LD002110
CONFIDENTIAL

TRB_LD002110

>
> Bryan
>
>
> -----Original Message-----
> From: Schaible, Damian S  [mailto:damian.schaible@dpw.com]
> Sent: Thursday, February 05, 2009 2:18 PM
> To: Krakauer, Bryan
> Cc: Bernstein, Donald S ; Smit, Daniel; Eldersveld, David
> Subject: RE:
>
> Bryan, Just to confirm, we are hoping to have Blackstone officially engaged by the
> time of next week's meeting, but in any event as we work toward it, Blackstone can
> have access to the conversations taking place among Moelis and FTI and the
> company on the Cubs transactions and receive from FTI the materials in connection
> therewith, right?  Also, can we get Blackstone access to the Cubs sale data room?
> (We will ask FTI to effectuate, but first wanted to confirm that it is okay)
>
> I understand from your exchanges with Don that the non-guarantors would
> countersign the Blackstone engagement letter.  We expect to have a proposed letter
> to you in the next couple of days
>
> Best.
> Damian
>
> _____
>
> Damian S  Schaible
> Davis Polk & Wardwell
> 450 Lexington Avenue
> New York, New York 10017
> Phone: 212 450-4580
> Fax: 212 450-3580
> email: damian schaible@dpw com
> > -----Original Message-----
> > From: Krakauer, Bryan [mailto:bkrakauer@sidley.com]
> > Sent: Thursday, February 05, 2009 10:30 AM
> > To: Schaible, Damian S
> > Cc: Bernstein, Donald S ; Smit, Daniel; Eldersveld, David
> > Subject: RE:
> >
> > Damian:
> >
> > A meeting with the Steering Committee next Thursday in NY at 9 am works  We
> > would have the Tribune, Sidley, David Kurtz from Lazard and also Blake Ruben
> from
> > MWE present
> >
> > Bryan
> >
> >
> > -----Original Message-----

TRB_LD002111
CONFIDENTIAL

TRB_LD002111

> > From: Schaible, Damian S. [mailto:damian.schaible@dpw.com]
> > Sent: Wednesday, February 04, 2009 2:45 PM
> > To: Krakauer, Bryan; Lantry, Kevin T.
> > Cc: Bernstein, Donald S ; Smit, Daniel; Eldersveld, David
> > Subject: RE:
> >
> > Great, I will get an email from them and effectuate
> >
> > Where are we on setting up a company/advisors meeting with the Steering
> > Committee Sub-committee for sometime next week?
> >
> > Thanks,
> >
> > - Damian
> >
> > _____
> >
> > Damian S Schaible
> > Davis Polk & Wardwell
> > 450 Lexington Avenue
> > New York, New York 10017
> > Phone: 212 450-4580
> > Fax: 212 450-3580
> > email: damian.schaible@dpw com
> >
> > -----Original Message-----
> > > From: Krakauer, Bryan [mailto:bkrakauer@sidley com]
> > > Sent: Wednesday, February 04, 2009 3:38 PM
> > > To: Schaible, Damian S ; Lantry, Kevin T
> > > Cc: Bernstein, Donald S ; Smit, Daniel; Eldersveld, David
> > > Subject: RE:
> > >
> > > I thought your initial email suggested Blackstone would sign a CA with
> > substantially
> > > the provisions of the CA we have been negotiating, and my email below was
> > meant
> > to
> > > cover additional pts Blackstone would agree to because of their special
> > circumstance
> > > If you want to keep this simple, you can just have Blackstone agree "they will
> > keep
> > > the information confidential" and then also agree to the points below
> > >
> > >
> > > -----Original Message-----
> > > From: Schaible, Damian S  [mailto:damian.schaible@dpw.com]
> > > Sent: Wednesday, February 04, 2009 2:32 PM
> > > To: Krakauer, Bryan; Lantry, Kevin T
> > > Cc: Bernstein, Donald S ; Smit, Daniel; Eldersveld, David
> > > Subject: RE:
> > >

TRB_LD002112
CONFIDENTIAL

TRB_LD002112

> > > Bryan, I just tried you to discuss/understand. What do you mean a "supplement to
> > the
> > > signed CA"? They have not yet signed anything, although we are close to
> > finalization
> > > of an engagement letter with them that of course contains the usual confidentiality
> > > provisions that you'd expect, and they -- like Davis Polk and Kramer Levin and
> > > Chadbourne and the other FAs on the UCC side -- are professionals and so are
> > > understood to maintain confidentiality as a professional matter.
> > >
> > > Is it ok, then, for me to get the email from them referenced below and then invite
> > > them to the meeting that is first thing tomorrow morning?
> > >
> > > Please advise. Thanks,
> > > Damian
> > >
> > > _____
> > >
> > > Damian S. Schaible
> > > Davis Polk & Wardwell
> > > 450 Lexington Avenue
> > > New York, New York 10017
> > > Phone: 212 450-4580
> > > Fax: 212 450-3580
> > > email: damian.schaible@dpw.com
> > >
> > > > -----Original Message-----
> > > > From: Krakauer, Bryan [mailto:bkrakauer@sidley.com]
> > > > Sent: Wednesday, February 04, 2009 3:28 PM
> > > > To: Schaible, Damian S ; Lantry, Kevin T
> > > > Cc: Bernstein, Donald S ; Smit, Daniel; Eldersveld, David
> > > > Subject: RE:
> > > >
> > > > An email should be ok to address the points below as a supplement to the
> signed
> > > CA
> > > >
> > > >
> > > > -----Original Message-----
> > > > From: Schaible, Damian S [mailto:damian.schaible@dpw.com]
> > > > Sent: Wednesday, February 04, 2009 2:26 PM
> > > > To: Krakauer, Bryan; Lantry, Kevin T
> > > > Cc: Bernstein, Donald S ; Smit, Daniel; Eldersveld, David
> > > > Subject: RE:
> > > >
> > > > Got it. OK, I assume, for them to just send me and you an email to the effect of
> > the
> > > > below for purposes of tomorrow morning's meeting?
> > > >
> > > > Please confirm and we'll coordinate. We'll also add point (ii) into the
> engagement
> > > > letter we are working with them (the other two points are either already there or

TRB_LD002113
CONFIDENTIAL

TRB_LD002113

> > > moot
> > > > for that purpose)
> > > >
> > > > Best,
> > > > Damian
> > > >
> > > > _____
> > > >
> > > > Damian S. Schaible
> > > > Davis Polk & Wardwell
> > > > 450 Lexington Avenue
> > > > New York, New York 10017
> > > > Phone: 212 450-4580
> > > > Fax: 212 450-3580
> > > > email: damian.schaible@dpw.com
> > > >
> > > > > -----Original Message-----
> > > > > From: Krakauer, Bryan [mailto:bkrakauer@sidley.com]
> > > > > Sent: Wednesday, February 04, 2009 3:23 PM
> > > > > To: Schaible, Damian S ; Lantry, Kevin T
> > > > > Cc: Bernstein, Donald S ; Smit, Daniel; Eldersveld, David
> > > > > Subject: RE:
> > > > >
> > > > > Damian:
> > > > > The Debtors are ok with Blackstone signing a confidentiality agreement and
> > > > > reviewing
> > > > > the material provided: (i) Blackstone agrees it will use the material only in
> > > > > connection
> > > > > with assistance to the Agent / Steering Committee related to the Tribune
> > chapter
> > > 11
> > > > > cases, (ii) Blackstone will wall off Blackstone individuals whom are involved in
> > > > > Blackstone's own investments in newspapers and media; and (iii) Blackstone
> > > > > agrees
> > > > > to promptly return the material, and not retain copies or notes, in the event it is
> > not
> > > > > retained by the Agent / Steering Committee
> > > > > Bryan
> > > > >
> > > > > -----Original Message-----
> > > > > From: Schaible, Damian S [mailto:damian.schaible@dpw.com]
> > > > > Sent: Wednesday, February 04, 2009 2:17 PM
> > > > > To: Krakauer, Bryan; Lantry, Kevin T
> > > > > Cc: Bernstein, Donald S ; Smit, Daniel
> > > > > Subject:
> > > > >
> > > > > Bryan and Kevin - Wanted to check in on permitting blackstone to join our tax
> > > > > meeting
> > > > > tomorrow morning. Please confirm it's ok so we can invite them  If you want
> > us
> > > to

TRB_LD002114
CONFIDENTIAL

TRB_LD002114

&gt; &gt; &gt; &gt; get
&gt; &gt; &gt; &gt; &gt; an email from them agreeing to keep the info confi, we can do it  Please
&gt; &gt; confirm
&gt; &gt; &gt; as
&gt; &gt; &gt; &gt; &gt; soon as possible. Thanks
&gt; &gt; &gt; &gt; &gt; - Damian
&gt; &gt; &gt; &gt; &gt;
&gt; &gt; &gt; &gt; &gt;
&gt; &gt; &gt; &gt; &gt; --------------------------------------------------------------------------------------------------
&gt; -
&gt; &gt; &gt; &gt; &gt; IRS Circular 230 Disclosure: To comply with certain U S  Treasury
&gt; regulations,
&gt; &gt; &gt; we
&gt; &gt; &gt; &gt; &gt; inform you
&gt; &gt; &gt; &gt; &gt; that, unless expressly stated otherwise, any U S  federal tax advice contained
&gt; in
&gt; &gt; &gt; this
&gt; &gt; &gt; &gt; &gt; communication, including attachments, was not intended or written to be used,
&gt; &gt; &gt; and
&gt; &gt; &gt; &gt; &gt; cannot be
&gt; &gt; &gt; &gt; &gt; used, by any taxpayer for the purpose of avoiding any penalties that may be
&gt; &gt; &gt; &gt; imposed
&gt; &gt; &gt; &gt; &gt; on such
&gt; &gt; &gt; &gt; &gt; taxpayer by the Internal Revenue Service  In addition, if any such tax advice
&gt; is
&gt; &gt; &gt; &gt; used
&gt; &gt; &gt; &gt; &gt; or referred
&gt; &gt; &gt; &gt; &gt; to by other parties in promoting, marketing or recommending any partnership
&gt; or
&gt; &gt; &gt; &gt; other
&gt; &gt; &gt; &gt; &gt; entity,
&gt; &gt; &gt; &gt; &gt; investment plan or arrangement, then (i) the advice should be construed as
&gt; &gt; &gt; written
&gt; &gt; &gt; &gt; in
&gt; &gt; &gt; &gt; &gt; connection
&gt; &gt; &gt; &gt; &gt; with the promotion or marketing by others of the transaction(s) or matter(s)
&gt; &gt; &gt; &gt; addressed
&gt; &gt; &gt; &gt; &gt; in this
&gt; &gt; &gt; &gt; &gt; communication and (ii) the taxpayer should seek advice based on the
&gt; &gt; taxpayer's
&gt; &gt; &gt; &gt; &gt; particular
&gt; &gt; &gt; &gt; &gt; circumstances from an independent tax advisor
&gt; &gt; &gt; &gt; &gt;
&gt; &gt; &gt; &gt;
&gt; &gt; &gt;
&gt; &gt;
&gt; ************************************************************************************************
&gt; &gt; &gt; &gt; &gt; ********
&gt; &gt; &gt; &gt; &gt; This e-mail is sent by a law firm and may contain information that is privileged
&gt; &gt; or
&gt; &gt; &gt; &gt; &gt; confidential

TRB_LD002115
CONFIDENTIAL

TRB_LD002115

> > > > > If you are not the intended recipient, please delete the e-mail and any
> > attachments
> > > > > and notify us
> > > > > immediately
> > > > >
> > > >
> > >
> >
> *****************************************************************************
> > > > > ********

TRB_LD002116
CONFIDENTIAL

TRB_LD002116

| | |
|---|---|
| From: | Smil, Daniel |
| Sent: | Friday. February 06. 2009 12:26 PM |
| To: | 'Krakauer, Bryan' |
| Cc: | Bernstein, Donald S.; Eldersveld, David; Schaible, Damian S.; Lantry. Kevin T |
| Subject: | RE: |
| Attachments: | Blackstone Engagement Letter.doc |



Blackstone
ngagement Letter d        Bryan,

I attach a copy of a drafty engagement letter for Blackstone.  Please let us know of any comments on it

Please note that this remains subject to comments from the other parties to it and the rest of the Steering Committee, but that we wanted you to have it to look at in the mean time.

Regards

Danie Smit
Davis Polk & Wardwell
450 Lexington Ave New York, NY 10017
Tel. (212) 450-4947 / Fax (212) 450-3947
e-mail: daniel.smit@dpw.com
> -----Original Message-----
> From: Krakauer, Bryan [mailto:bkrakauer@sidley.com]
> Sent: Thursday, February 05, 2009 4:16 PM
> To: Schaible, Damian S.
> Cc: Bernstein, Donald S.; Smit, Daniel; Eldersveld, David
> Subject: RE:
>
> Damian:
>
> The Tribune is ok with Blackstone having access to the data and attending
> meetings.
>
> We would want the UCC apprised of the Blackstone engagement terms prior to
> the engagement letter being executed.
>
> - Bryan
>
>
>
>
>
> -----Original Message-----
> From: Schaible, Damian S. [mailto:damian.schaible@dpw.com]
> Sent: Thursday, February 05, 2009 2:18 PM
> To: Krakauer, Bryan
> Cc: Bernstein, Donald S.; Smit, Daniel; Eldersveld, David
> Subject: RE:
>
> Bryan, Just to confirm, we are hoping to have Blackstone officially engaged by the
> time of next week's meeting, but in any event as we work toward it, Blackstone
> can have access to the conversations taking place among Moelis and FTI and the
> company on the Cubs transactions and receive from FTI the materials in

1

Larsen
EXHIBIT NO. 17
2|1|10
P. CAMPBELL

JPM2_00001272

JPM2_00001272

> connection therewith, right?  Also, can we get Blackstone access to the Cubs sale
> data room?  (We will ask FTI to effectuate, but first wanted to confirm that it is
> okay).
>
> I understand from your exchanges with Don that the non-guarantors would
> countersign the Blackstone engagement letter.  We expect to have a proposed
> letter to you in the next couple of days.
>
> Best,
> Damian
>
> _____
>
> Damian S. Schaible
> Davis Polk & Wardwell
> 450 Lexington Avenue
> New York, New York 10017
> Phone: 212 450-4580
> Fax: 212 450-3580
> email: damian.schaible@dpw.com
> > -----Original Message-----
> > From: Krakauer, Bryan [mailto:bkrakauer@sidley.com]
> > Sent: Thursday, February 05, 2009 10:30 AM
> > To: Schaible, Damian S.
> > Cc: Bernstein, Donald S.; Smit, Daniel; Eldersveld, David
> > Subject: RE:
> >
> > Damian:
> >
> > A meeting with the Steering Committee next Thursday in NY at 9 am works. We
> > would have the Tribune, Sidley, David Kurtz from Lazard and also Blake Ruben
> from
> > MWE present.
> >
> > Bryan
> >
> >
> > > -----Original Message-----
> > > From: Schaible, Damian S. [mailto:damian.schaible@dpw.com]
> > > Sent: Wednesday, February 04, 2009 2:45 PM
> > > To: Krakauer, Bryan; Lantry, Kevin T.
> > > Cc: Bernstein, Donald S.; Smit, Daniel; Eldersveld, David
> > > Subject: RE:
> > >
> > > Great, I will get an email from them and effectuate.
> > >
> > > Where are we on setting up a company/advisors meeting with the Steering
> > > Committee Sub-committee for sometime next week?
> > >
> > > Thanks,
> > >
> > > - Damian
> > >
> > > _____
> > >
> > > Damian S. Schaible
> > > Davis Polk & Wardwell
> > > 450 Lexington Avenue
> > > New York, New York 10017
> > > Phone: 212 450-4580
> > > Fax: 212 450-3580
> > > email: damian.schaible@dpw.com
> > >
> > > > -----Original Message-----
> > > > From: Krakauer, Bryan [mailto:bkrakauer@sidley.com]

2

JPM2_00001273

JPM2_00001273

> > > Sent: Wednesday, February 04, 2009 3:38 PM
> > > To: Schaible, Damian S ; Lantry, Kevin T.
> > > Cc: Bernstein, Donald S.; Smit, Daniel; Eldersveld, David
> > > Subject: RE:
> > >
> > > I thought your initial email suggested Blackstone would sign a CA with
> substantially
> > > the provisions of the CA we have been negotiating, and my email below was
> meant
> > > to
> > > cover additional pts Blackstone would agree to because of their special
> > > circumstance.
> > > If you want to keep this simple, you can just have Blackstone agree "they will
> keep
> > > the information confidential" and then also agree to the points below.
> > >
> > >
> > > -----Original Message-----
> > > From: Schaible, Damian S. [mailto:damian.schaible@dpw.com]
> > > Sent: Wednesday, February 04, 2009 2:32 PM
> > > To: Krakauer, Bryan; Lantry, Kevin T.
> > > Cc: Bernstein, Donald S ; Smit, Daniel; Eldersveld, David
> > > Subject: RE:
> > >
> > > Bryan, I just tried you to discuss/understand.  What do you mean a
> "supplement to
> > the
> > > signed CA"?  They have not yet signed anything, although we are close to
> > finalization
> > > of an engagement letter with them that of course contains the usual
> confidentiality
> > > provisions that you'd expect, and they -- like Davis Polk and Kramer Levin and
> > > Chadbourne and the other FAs on the UCC side -- are professionals and so
> are
> > > understood to maintain confidentiality as a professional matter.
> > >
> > > Is it ok, then, for me to get the email from them referenced below and then
> invite
> > > them to the meeting that is first thing tomorrow morning?
> > >
> > > Please advise.  Thanks,
> > > Damian
> > >
> > > _____
> > >
> > > Damian S. Schaible
> > > Davis Polk & Wardwell
> > > 450 Lexington Avenue
> > > New York, New York 10017
> > > Phone: 212 450-4580
> > > Fax: 212 450-3580
> > > email: damian.schaible@dpw.com
> > >
> > > > -----Original Message-----
> > > > From: Krakauer, Bryan [mailto:bkrakauer@sidley.com]
> > > > Sent: Wednesday, February 04, 2009 3:28 PM
> > > > To: Schaible, Damian S.; Lantry, Kevin T.
> > > > Cc: Bernstein, Donald S.; Smit, Daniel; Eldersveld, David
> > > > Subject: RE:
> > > >
> > > > An email should be ok to address the points below as a supplement to the
> signed
> > > CA.
> > > >
> > > >

3

Confidential

```
> > > > -----Original Message-----
> > > > From: Schaible, Damian S. [mailto:damian.schaible@dpw.com]
> > > > Sent: Wednesday, February 04, 2009 2:26 PM
> > > > To: Krakauer, Bryan; Lantry, Kevin T.
> > > > Cc: Bernstein, Donald S.; Smit, Daniel; Eldersveld, David
> > > > Subject: RE:
> > > >
> > > > Got it.  OK, I assume, for them to just send me and you an email to the
> > effect of
> > the
> > > > below for purposes of tomorrow morning's meeting?
> > > >
> > > > Please confirm and we'll coordinate.  We'll also add point (ii) into the
> > engagement
> > > > letter we are working with them (the other two points are either already there
> > or
> > > > moot
> > > > for that purpose).
> > > >
> > > > Best,
> > > > Damian
> > > >
> > > > _____
> > > >
> > > > Damian S. Schaible
> > > > Davis Polk & Wardwell
> > > > 450 Lexington Avenue
> > > > New York, New York 10017
> > > > Phone: 212 450-4580
> > > > Fax: 212 450-3580
> > > > email: damian.schaible@dpw.com
> > > >
> > > > > -----Original Message-----
> > > > > From: Krakauer, Bryan [mailto:bkrakauer@sidley.com]
> > > > > Sent: Wednesday, February 04, 2009 3:23 PM
> > > > > To: Schaible, Damian S.; Lantry, Kevin T.
> > > > > Cc: Bernstein, Donald S.; Smit, Daniel; Eldersveld, David
> > > > > Subject: RE:
> > > > >
> > > > > Damian:
> > > > > The Debtors are ok with Blackstone signing a confidentiality agreement
> > and
> > > > > reviewing
> > > > > the material provided: (i) Blackstone agrees it will use the material only in
> > > > > connection
> > > > > with assistance to the Agent / Steering Committee related to the Tribune
> > chapter
> > > > 11
> > > > > cases, (ii) Blackstone will wall off Blackstone individuals whom are
> > involved in
> > > > > Blackstone's own investments in newspapers and media; and (iii)
> > Blackstone
> > > > > agrees
> > > > > to promptly return the material, and not retain copies or notes, in the event
> > it is
> > > > not
> > > > > retained by the Agent / Steering Committee.
> > > > > Bryan
> > > > >
> > > > > -----Original Message-----
> > > > > From: Schaible, Damian S. [mailto:damian.schaible@dpw.com]
> > > > > Sent: Wednesday, February 04, 2009 2:17 PM
> > > > > To: Krakauer, Bryan; Lantry, Kevin T.
> > > > > Cc: Bernstein, Donald S.; Smit, Daniel
> > > > > Subject:
```

4

Confidential

```
> > > > >
> > > > > Bryan and Kevin - Wanted to check in on permitting blackstone to join our
> tax
> > > > meeting
> > > > > tomorrow morning. Please confirm it's ok so we can invite them. If you
> want us
> > to
> > > > get
> > > > > an email from them agreeing to keep the info confi, we can do it. Please
> > confirm
> > > as
> > > > > soon as possible. Thanks.
> > > > > - Damian
> > > > >
> > > > >
> > > > >
-----------------------------------------------------------------------------------
--
> ---------
> > > > > IRS Circular 230 Disclosure: To comply with certain U.S. Treasury
> regulations,
> > > we
> > > > > inform you
> > > > > that, unless expressly stated otherwise, any U.S. federal tax advice
> contained in
> > > this
> > > > > communication, including attachments, was not intended or written to be
> used,
> > > and
> > > > > cannot be
> > > > > used, by any taxpayer for the purpose of avoiding any penalties that may
> be
> > > > > imposed
> > > > > on such
> > > > > taxpayer by the Internal Revenue Service. In addition, if any such tax
> advice is
> > > > > used
> > > > > or referred
> > > > > to by other parties in promoting, marketing or recommending any
> partnership or
> > > > > other
> > > > > entity,
> > > > > investment plan or arrangement, then (i) the advice should be construed
> as
> > > > written
> > > > in
> > > > > connection
> > > > > with the promotion or marketing by others of the transaction(s) or matter(s)
> > > > > addressed
> > > > > in this
> > > > > communication and (ii) the taxpayer should seek advice based on the
> > taxpayer's
> > > > > particular
> > > > > circumstances from an independent tax advisor.
> > > > >
> > > > >
> > >
> > *****************************************************************************
> ****
> > > > > *********
> > > > > This e-mail is sent by a law firm and may contain information that is
> privileged
> > or
> > > > > confidential.
```
                                                    5

JPM2_00001276

Confidential

```
> > > > > If you are not the intended recipient, please delete the e-mail and any
> > attachments
> > > > > and notify us
> > > > > immediately.
> > > > >
> > > > >
> > >
> >
> ***************************************************************************
> ****
> > > > > ********
```

6

JPM2_00001277

Confidential

JPM2_00001277

February [ ], 2009

Donald S Bernstein, Esq
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Dear Don:

This letter confirms the understanding and agreement (the "Agreement") between Blackstone Advisory Services L P ("Blackstone") and Davis Polk & Wardwell ("DPW") regarding the retention of Blackstone by DPW effective as of February [ ], 2009 (the "Effective Date") to provide financial advisory services in relation to DPW's representation of JPMorgan Chase Bank, N A , as administrative agent (the "Agent"), under the Credit Agreement (the "Credit Facilities"), dated May 17, 2007, among Tribune Company (together with any affiliates and subsidiaries, the "Company"), the lenders party thereto from time to time (the "Lenders"), and the Agent

Under this Agreement, Blackstone will provide financial advisory services in connection with the restructuring of the Company and will assist in analyzing, structuring, negotiating and effecting Restructuring Activities pursuant to the terms and conditions of this Agreement   As used in this Agreement, the term Restructuring Activities shall mean, collectively, (i) any restructuring, reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code) and/or recapitalization of the Company affecting existing or potential debt obligations or other claims, including, without limitation, senior debt, junior debt, lease obligations, trade claims and general unsecured claims (collectively, the "Obligations"), capital stock or other equity securities or interests, (ii) any dispositions of entities or assets, and/or (iii) any consensual or adversarial foreclosure or other enforcement action, including, without limitation, any transfer or surrender of stock, assets or other collateral by the Company

The financial advisory services to be rendered by Blackstone will include the following:

(a)     Assist in the evaluation of the Company's businesses and prospects;

(b)     Assist in the evaluation of the Company's long-term business plan and related financial projections,

Confidential

JPM2_00001278

JPM2_00001278

(c)     Analyze the Company's financial liquidity and evaluate alternatives to improve such liquidity;

(d)     Review and analyze any proposed restructuring and / or recapitalization, including consideration offered to the Lenders;

(e)     Provide strategic advice with regard to restructuring or refinancing the Company's Obligations;

(f)     Evaluate the Company's debt capacity and alternative capital structures;

(g)     Participate in negotiations among the Agent, Lenders, the Company and its advisors, other creditors, suppliers, lessors and other interested parties,

(h)     Value the Company, entities and assets and securities offered by the Company in connection with Restructuring Activities; and

(i)     Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of any Restructuring Activities, as requested and mutually agreed

Notwithstanding anything contained in this Agreement to the contrary, Blackstone shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity   Blackstone makes no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete its Restructuring Activities   Blackstone is retained under this Agreement solely to provide advice regarding Restructuring Activities, and is not being retained to provide "crisis management "

Blackstone shall commit the personnel and resources necessary and appropriate to perform the services set forth herein and to work with the Agent, the Lenders and their advisors   Blackstone agrees that Timothy Coleman and Flip Huffard will be actively involved in and devote significant time towards the engagement described herein

All fees and expenses payable to Blackstone pursuant to this Agreement shall be payable by the Company in accordance with the provisions of Section 8 04 of the Credit Facilities; it being understood that neither DPW nor the Agent shall in any event be liable or responsible to Blackstone or any other party for any fees, expenses, obligations, liabilities or damages incurred or any other amounts that may from time to time become payable to us in connection with the Restructuring Activities, this Agreement or Attachment A   It is agreed that the Company will pay the following fees to Blackstone for its financial advisory services:

(i)     a monthly advisory fee (the "Monthly Fee") in the amount of $200,000 in cash, with the first Monthly Fee payable upon the execution of this Agreement by both parties and additional installments of such Monthly Fee payable monthly in

Confidential

advance on the [ ]th day of each month.  Any Monthly Fee paid subsequent to the twelfth (12) Monthly Fee will be credited towards the Restructuring Fee;

(ii)    an additional fee (the "Restructuring Fee") equal to $5,500,000.  Except as otherwise provided herein, Restructuring Activities shall be deemed to have been completed upon (a) the binding execution and effectiveness of all necessary waivers, consents, amendments or restructuring agreements between the Company and its creditors involving the compromise of the face amount of the Company's existing Obligations or the conversion of all or part of such Obligations into alternative securities, including equity, in the case of an out-of-court restructuring, or (b) the execution, confirmation, consummation and effectiveness of a Plan of Reorganization pursuant to an order of the Bankruptcy Court, in the case of an in-court restructuring.  The Restructuring Fee will be earned and payable in immediately available funds upon the completion of the Restructuring Activities; and

(iii)    reimbursement of all reasonable documented out-of-pocket expenses incurred during this engagement, including, but not limited to, travel and lodging, direct identifiable data processing, document production, publishing services and communication charges. courier services, working meals, reasonable fees and expenses of Blackstone's counsel (in the case of counsel and other third party advisors, except as provided in the attached Indemnification Agreement, not to exceed $50,000 without the Agent's prior written consent, which shall not be unreasonably withheld) and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.

The advisory services and compensation arrangement set forth in this Agreement do not encompass other investment banking services or transactions that may be undertaken by Blackstone at the request of DPW or the Agent, including the arranging of debt or equity capital (except as provided above), issuing fairness opinions or any other specific services not set forth in this Agreement.  The terms and conditions of any such investment banking services, including compensation arrangements, would be set forth in a separate written agreement between Blackstone and the appropriate party.  DPW and the Agent are permitted, in their sole discretion, to engage other financial advisors with respect to the Restructuring Activities.

Blackstone recognizes and agrees to be bound by the provisions of that certain Confidentiality Agreement dated as of February [ ], 2009 among the Company, its subsidiaries, the Agent and certain Lenders.

The Agent will furnish or cause to be furnished to Blackstone such information as Blackstone believes appropriate to its assignment (all such information so furnished being the "Information").  The Agent recognizes and confirms that Blackstone (a) will use and rely

primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, (c) is entitled to rely upon the Information without independent verification, and (d) will not make an appraisal of any assets in connection with its assignment  Subject to Blackstone's compliance with all applicable laws and its internal document retention policies, within 30 days after written request by the Agent following the termination of this Agreement, Blackstone shall return or destroy, at the direction of the Agent, all Information received from the Agent during the course of its engagement and, in the case of destruction, Blackstone shall certify that all Information has been so destroyed

In the event that the Information belonging to the Company, the Agent, or the Lenders is stored electronically on Blackstone's computer systems, Blackstone shall not be liable for any damages resulting from unauthorized access, misuse or alteration of such information by persons not acting on its behalf, provided that Blackstone exercises the same degree of care in protecting the confidentiality of, and in preventing unauthorized access to, the Company's, the Agent's, or the Lenders' information that it exercises with regard to its own most sensitive proprietary information

Except as required by applicable law, regulation or legal process, any advice to be provided by Blackstone under this Agreement shall not be disclosed publicly or made available to third parties (other than the Agent's other professional advisors, or, if appropriate in the Agent's judgment, to the Lenders or in any filings in a Chapter 11 proceeding) without the prior written consent of Blackstone  All services, advice and information and reports provided by Blackstone to the Agent and Lenders in connection with this assignment shall be for the sole benefit of the Agent and such Lenders and shall not be relied upon by any other person

DPW agrees that Blackstone will provide its financial advice exclusively to DPW for the benefit of the Agent and, to the extent compatible with issues of legal privilege, Lenders  The Agent and Lenders will also obtain the advice of their legal, tax and other business advisors and consider such other factors which they consider appropriate before exercising their independent business judgment in respect of Restructuring Activities  DPW further acknowledges and agrees that Blackstone has been retained to act solely as financial advisor to DPW for the benefit of the Agent and, to the extent compatible with issues of legal privilege, Lenders, and does not in such capacity act as a fiduciary for DPW, the Agent, Lenders or any other person  Blackstone shall act as an independent contractor and any duties of Blackstone arising out of its engagement pursuant to this Agreement shall be owed solely to DPW, the Agent and, to the extent compatible with issues of legal privilege, Lenders

In consideration of Blackstone's agreement to provide financial advisory services in connection with this Agreement and pursuant to the Credit Facilities, it is agreed that the Company will indemnify Blackstone and its agents, representatives, members and employees  A

copy of Blackstone's standard form of indemnification agreement is attached to this Agreement as Attachment A.

In the event that, as a result of or in connection with Blackstone's engagement hereunder, Blackstone becomes involved in any legal proceeding or investigation or is required by government regulation, subpoena or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, the Company will reimburse Blackstone for the reasonable fees and expenses of its counsel incurred in responding to such a request   Nothing in this paragraph shall affect in any way the obligations of the Company pursuant to the separate indemnification agreement attached hereto.

Blackstone's engagement hereunder may be terminated upon 30 days' written notice without cause by DPW, the Agent or Blackstone: termination for cause by any party will occur forthwith  Notwithstanding the foregoing, (a) the provisions relating to the payment of fees and expenses accrued through the date of termination, the status of Blackstone as an independent contractor and the limitation as to whom Blackstone shall owe any duties will survive any such termination, (b) any such termination shall not affect the obligations of the Company under the indemnification agreement attached as Attachment A or Blackstone's confidentiality obligations hereunder and (c) Blackstone shall be entitled to the Restructuring Fee in the event that Restructuring Activities are completed at any time prior to the expiration of 18 months following the termination of this Agreement, provided, however, in the event that Blackstone is terminated for cause, Blackstone shall not be entitled to any Restructuring Fee  For the purpose of this paragraph, "cause" shall include gross negligence, willful misconduct, or bad faith by Blackstone

DPW or the Agent do not appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury, nor are they prohibited parties according to other U.S  government regulatory or enforcement agencies

Notwithstanding anything to the contrary provided elsewhere herein, none of the provisions of this Agreement shall in any way limit the activities of The Blackstone Group L P and its affiliates in their businesses distinct from the restructuring advisory business of The Blackstone Group L P , provided that the Information is not made available to representatives of The Blackstone Group L P  and its affiliates who are not directly involved in providing advisory services in connection with this Agreement   Should the Information be made available to a representative of The Blackstone Group L P  and its affiliates who is not involved in providing advisory services in connection with the Agreement, such representative shall be bound by the obligations set forth in this Agreement  Blackstone agrees, for the term of this engagement, not to knowingly undertake any other engagement that might cause a conflict of interest with this engagement without the consent of the Agent

Confidential

JPM2_00001282

JPM2_00001282

This Agreement (including the attached indemnification agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect the Agreement in any other respect, and it will remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state

The Agent also agrees that none of Blackstone or any of its partners (both general and limited), employees, affiliates, officers, directors and agents shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Agent or its owners, parents, affiliates, security holders or creditors for or in connection with his Agreement except for any such liability for losses, claims, damages or liabilities incurred by the Agent that is finally judicially determined by a court of competent jurisdiction to have primarily resulted from such party's gross negligence or willful misconduct

Blackstone, DPW and the Agent hereby agree that any action or proceeding brought by Blackstone, DPW or the Agent based hereon or arising out of Blackstone's engagement hereunder, shall be brought and maintained exclusively in the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York  Blackstone, DPW and the Agent irrevocably submit to the jurisdiction of the courts of the State of New York located in the City and County of New York and the United States District Court for the Southern District of New York and appellate courts from any thereof for the purpose of any action or proceeding based hereon or arising out of Blackstone's engagement hereunder and irrevocably agree to be bound by any judgment rendered thereby in connection with such action or proceedings  Blackstone, DPW and the Agent hereby irrevocably waive, to the fullest extent permitted by law, any objection they may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agree not to plead or claim the same

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Blackstone the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A

Very truly yours,

BLACKSTONE ADVISORY SERVICES L P

By:_____

Name:    Paul P  Huffard
Title:     Senior Managing Director

Confidential

Accepted and Agreed to as
of the date first written above:

DAVIS POLK & WARDWELL, AS COUNSEL TO THE AGENT

By:_____
    Name:    Donald S Bernstein, Esq.
    Title:     Partner

JPMORGAN CHASE BANK, N.A., AS AGENT

By._____
    Name:    Miriam T Kulnis
    Title.     Executive Director

Acknowledged by:

TRIBUNE COMPANY

By:_____
    Name.    Chandler Bigelow III
    Title:     Chief Financial Officer

Confidential

ATTACHMENT A

February [  ], 2009

Blackstone Advisory Services L.P.
345 Park Avenue
New York, NY 10154

INDEMNIFICATION AGREEMENT

Ladies and Gentlemen:

This letter ("this Agreement") will confirm that Davis Polk & Wardwell ("DPW"), as counsel to J.P. Morgan Chase Bank, N.A. in its capacity as agent ("JPM"), has engaged Blackstone Advisory Services L.P. ("you" or "Blackstone") to advise and assist in connection with the matters referred to in Blackstone's letter of agreement dated as of February [  ], 2009 (the "Engagement Letter")  In consideration of your agreement to act on DPW's behalf in connection with such matters, Tribune Company ("we" or "us") agree to indemnify and hold harmless you and your affiliates and your and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling you or any of your affiliates (you and each such other person being an "Indemnified Party") from and against any losses, claims, damages, expenses and liabilities whatsoever, whether they be joint or several, related to, arising out of or in connection with the engagement (the "Engagement") under the Engagement Letter and will reimburse each Indemnified Party for all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement or this Agreement, whether or not pending or threatened, whether or not any Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by us We will not, however, be liable under the foregoing indemnification provision for any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the gross negligence or willful misconduct of Blackstone  We also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to us or our owners, parents, affiliates, security holders or creditors for or in connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by us that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the gross negligence or willful misconduct of Blackstone

01/30/09 1:39 PM

JPM2_00001286

Confidential

JPM2_00001286

If the indemnification provided for in the preceding paragraph is for any reason unavailable to an Indemnified Party in respect of any losses, claims, damages or liabilities referred to herein, then, in lieu of indemnifying such Indemnified Party hereunder, we shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities (and expenses relating thereto) (i) in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by you, on the one hand, and JPM and us, on the other hand, from the Engagement or (ii) if and only if the allocation provided by clause (i) above is for any reason not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i) but also the relative fault of each of you, JPM and us, as well as any other relevant equitable considerations; provided, however, to the extent permitted by applicable law, in no event shall your aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by you under the Engagement Letter. For the purposes of this Agreement, the relative benefits to JPM and us, on the one hand, and you, on the other hand, of the Engagement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by JPM and the Lenders in the transaction or transactions that are subject to the Engagement, whether or not any such transaction is consummated, bears to (b) the fees paid or to be paid to Blackstone under the Engagement Letter (excluding any amounts paid as reimbursement of expenses)

No party to this Agreement will, without the prior written consent of the other parties (which consent will not be unreasonably withheld), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (a "Judgment"), whether or not we or any Indemnified Party are an actual or potential party to such claim, action, suit or proceeding  In the event that we seek to settle or compromise or consent to the entry of any Judgment, we agree that such settlement, compromise or consent (i) shall include an unconditional release of Blackstone and each other Indemnified Party hereunder from all liability arising out of such claim, action, suit or proceeding, (ii) shall not include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of Blackstone or each other Indemnified Party, and (iii) shall not impose any continuing obligations or restrictions on Blackstone or each other Indemnified Party

Promptly after receipt by an Indemnified Party of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify us in writing of such complaint or of the commencement of such action or proceeding, but failure to so notify us will not relieve us from any liability which we may have hereunder or otherwise, except to the extent that such failure materially prejudices our rights  If we so elect or are requested by such Indemnified Party, we will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to Blackstone and the payment of the fees and disbursements of such counsel

Confidential                                                                                         JPM2_00001287

JPM2_00001287

In the event, however, such Indemnified Party reasonably determines in its judgment that having common counsel would present such counsel with a conflict of interest or if we fail to assume the defense of the action or proceeding in a timely manner, then such Indemnified Party may employ separate counsel reasonably satisfactory to us to represent or defend it in any such action or proceeding and we will pay the reasonable fees and disbursements of such counsel; provided, however, that we will not be required to pay the fees and disbursements of more than one separate counsel for all Indemnified Parties in any jurisdiction in any single action or proceeding  In any action or proceeding the defense of which we assume, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense

Our foregoing reimbursement, indemnity and contribution obligations under this Agreement shall be in addition to any rights that an Indemnified Party may have at common law or otherwise, and shall be binding upon and inure to the benefit of any of our successors, assigns, heirs and personal representatives and such Indemnified Party

The provisions of this Agreement shall apply to the Engagement and any written modification of the Engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter

This Agreement and the Engagement Letter shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,
TRIBUNE COMPANY

By:_____

Name. Chandler Bigelow III
Title:   Chief Financial Officer

Accepted and Agreed to as of the date first written above:
BLACKSTONE ADVISORY SERVICES L.P

By:  _____
    Name:   Paul P Huffard
    Title:   Senior Managing Director

**From:** Smit, Daniel
**Sent:** Monday, February 09, 2009 6:01 PM
**To:** Dworkin, Meyer C
**Subject:** FW: Tribune Payment Letters

Redacted

**From:** Krakauer, Bryan [mailto:bkrakauer@sidley.com]
**Sent:** Monday, February 09, 2009 6:00 PM
**To:** Schaible, Damian S.
**Cc:** Bernstein, Donald S.; Smit, Daniel
**Subject:** RE: Tribune Payment Letters

Damian, please refrain from the lectures  Bryan

> **From:** Schaible, Damian S [mailto:damian.schaible@dpw.com]
> **Sent:** Monday, February 09, 2009 4:50 PM
> **To:** Krakauer, Bryan
> **Cc:** Bernstein, Donald S ; Smit, Daniel
> **Subject:** RE: Tribune Payment Letters
>
> I will call you at 10 am Eastern tomorrow and we can run down everything and also discuss the plan for another call with Chadbourne  As you know, certain members of the SC are unsure of the company's intent regarding getting these fees paid. so I am hopeful that we are not creating additional wind that might whip up in our faces as we go down the path to fee payment that you yourself recommended and that we sold to the SC on that basis
>
> - Damian
>
>
> Damian S  Schaible
> Davis Polk & Wardwell
> 450 Lexington Avenue
> New York, New York 10017
> Phone: 212 450-4580
> Fax: 212 450-3580
> email  damian.schaible@dpw.com
>
> > **From:** Krakauer, Bryan [mailto:bkrakauer@sidley.com]
> > **Sent:** Monday, February 09, 2009 5:47 PM
> > **To:** Schaible, Damian S
> > **Cc:** Bernstein, Donald S ; Smit, Daniel
> > **Subject:** RE: Tribune Payment Letters
> >
> > Either later tonight or tomorrow morning (say 10 eastern) is ok
> >
> > You are welcome to join me on a call with Chadbourne tomorrow or Wednesday

Larsen
EXHIBIT NO. 18
2/1/10
P. CAMPBELL

Confidential

**From:** Schaible, Damian S. [mailto:damian.schaible@dpw.com]
**Sent:** Monday, February 09, 2009 4:41 PM
**To:** Krakauer, Bryan
**Cc:** Bernstein, Donald S ; Smit, Daniel
**Subject:** RE: Tribune Payment Letters

Bryan, I just tried you  I will be around for another 15 minutes tonight but then need to slip out to something for a couple of hours  If you don't get me in the next few minutes tonight, I am available anytime tomorrow morning -- if you want to set a time I can call then

As for calling the UCC counsel again, I would like to join to the extent that you want to have a follow-up call with them  I am a little concerned about to many calls on this, lest it seem like a much more involved issue for the UCC than non-debtor entities paying debts under certain of their obligations should be  We have gone down with Chadbourne the financial aspects of Blackstone's engagement as well as the planned amount and nature of the retainers   And JPM will be speaking with the UCC about the intended payments on Thursday

Best,
Damian

Damian S  Schaible
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
Phone: 212 450-4580
Fax: 212 450-3580
email: damian.schaible@dpw.com

**From:** Krakauer, Bryan [mailto:bkrakauer@sidley.com]
**Sent:** Monday, February 09, 2009 5:09 PM
**To:** Schaible, Damian S.
**Cc:** Bernstein, Donald S ; Smit, Daniel
**Subject:** RE: Tribune Payment Letters

Damian:

We do have some issues to talk through re: the Blackstone letter  Is there a good time to speak today?

As to the UCC, I do want to make sure they are appraised as to the amount and nature of the retainers and the amount presently due on fees  and also the proposed terms of the Blackstone engagement before their Thursday meeting  Do you want to join me on a call to Chadbourne?

Finally, I have some minor comments on the payment letters, which I can cover with you when we speak

Regards

Bryan

**From:** Schaible, Damian S  [mailto:damian.schaible@dpw.com]
**Sent:** Sunday, February 08, 2009 9:51 PM

Confidential

**To:** Krakauer, Bryan
**Cc:** Bernstein, Donald S ; Smit, Daniel
**Subject:** FW: Tribune Payment Letters

Bryan, We wanted to let you know that Chadbourne has asked JPM to briefly discuss the fee payment issues and plan with the UCC during the regularly scheduled weekly call/meeting this Thursday   Accordingly. we won't be delivering the letters before Thursday but, assuming there are no hang-ups at or after the UCC meeting, we would plan to send them soon after the meeting takes place

Let us know if you hear anything further from any front on these issues, and we will do the same  and we'll report back after the meeting   If you or the company have any comments on the letters, please be sure to send them to us this week and in advance of the meeting  Otherwise, we will presume they are fine

Thanks,
Damian

_____

Damian S  Schaible
Davis Polk & Wardwell
450 Lexington Avenue
New York. New York 10017
Phone  212 450-4580
Fax: 212 450-3580
email  damian schaible@dpw.com

**From:** tribuneco dpw-bounces@dpw com [mailto:tribuneco dpw-bounces@dpw com] **On Behalf Of** Smit, Daniel
**Sent:** Friday, January 30, 2009 12:08 PM
**To:** 'Krakauer, Bryan'
**Cc:** Grant, Jacqueline M ; Lantry, Kevin T.; 'Sharret, Jennifer'; Kolevzon, Peter S ; 'kevin c.kelley@jpmorgan com'; Mannal, Douglas; MIRIAM.KULNIS@chase.com; tribuneco.dpw; Mayer, Thomas Moers; Kansa, Ken
**Subject:** Tribune Payment Letters

Bryan.

As discussed  we attach draft payment letters and a draft payment blockage notice for your review and comments   Please note that these remain subject to comments from JPM and other Steering Committee members

Further  obviously the entire process remains subject to discussions about this approach with the UCC

Regards

Danio Smit
Davis Polk & Wardwell
450 Lexington Ave New York, NY 10017
Tel  (212) 450-4947 / Fax (212) 450-3947
e-mail  daniel smit@dpw.com

_____
IRS Circular 230 Disclosure: To comply with certain U S  Treasury regulations, we inform you

Confidential

that, unless expressly stated otherwise, any U S federal tax advice contained in this
communication, including attachments, was not intended or written to be used, and cannot be
used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such
taxpayer by the Internal Revenue Service  In addition, if any such tax advice is used or referred
to by other parties in promoting, marketing or recommending any partnership or other entity,
investment plan or arrangement, then (i) the advice should be construed as written in connection
with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this
communication and (ii) the taxpayer should seek advice based on the taxpayer's particular
circumstances from an independent tax advisor

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

This e-mail is sent by a law firm and may contain information that is pri

If you are not the intended recipient, please delete the e-mail and any a

immediately.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Confidential



The Blackstone Group®

February 27, 2009

Donald S. Bernstein, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Dear Don:

This letter confirms the understanding and agreement (the "Agreement") between Blackstone Advisory Services L.P. ("Blackstone") and Davis Polk & Wardwell ("DPW") regarding the retention of Blackstone by DPW effective as of February 1, 2009 (the "Effective Date") to provide financial advisory services in relation to DPW's representation of JPMorgan Chase Bank, N.A., as administrative agent (the "Agent"), under the Credit Agreement (the "Credit Facilities"), dated May 17, 2007, among Tribune Company (together with any affiliates and subsidiaries, the "Company"), the lenders party thereto from time to time (the "Lenders"), and the Agent.

Under this Agreement, Blackstone will provide financial advisory services in connection with the restructuring of the Company and will assist in analyzing, structuring, negotiating and effecting Restructuring Activities pursuant to the terms and conditions of this Agreement. As used in this Agreement, the term Restructuring Activities shall mean, collectively, (i) any restructuring, reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code) and/or recapitalization of the Company affecting existing or potential debt obligations or other claims, including, without limitation, senior debt, junior debt, lease obligations, trade claims and general unsecured claims (collectively, the "Obligations"), capital stock or other equity securities or interests, (ii) any dispositions of entities or assets, and/or (iii) any consensual or adversarial foreclosure or other enforcement action, including, without limitation, any transfer or surrender of stock, assets or other collateral by the Company.

The financial advisory services to be rendered by Blackstone will include the following:

(a)     Assist in the evaluation of the Company's businesses and prospects;

(b)     Assist in the evaluation of the Company's long-term business plan and related financial projections;

Redacted



Larsen
EXHIBIT NO. 19
2|1|10
P. CAMPBELL

CONFIDENTIAL

(c)     Analyze the Company's financial liquidity and evaluate alternatives to improve such liquidity;

(d)     Review and analyze any proposed restructuring and / or recapitalization, including consideration offered to the Lenders;

(e)     Provide strategic advice with regard to restructuring or refinancing the Company's Obligations;

(f)     Evaluate the Company's debt capacity and alternative capital structures;

(g)     Participate in negotiations among the Agent, Lenders, the Company and its advisors, other creditors, suppliers, lessors and other interested parties;

(h)     Value the Company, entities and assets and securities offered by the Company in connection with Restructuring Activities; and

(i)     Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of any Restructuring Activities, as requested and mutually agreed.

Notwithstanding anything contained in this Agreement to the contrary, Blackstone shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity. Blackstone makes no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete its Restructuring Activities. Blackstone is retained under this Agreement solely to provide advice regarding Restructuring Activities, and is not being retained to provide "crisis management."

Blackstone shall commit the personnel and resources necessary and appropriate to perform the services set forth herein and to work with the Agent, the Lenders and their advisors. Blackstone agrees that Timothy Coleman and Flip Huffard will be actively involved in and devote significant time towards the engagement described herein.

All fees and expenses payable to Blackstone pursuant to this Agreement shall be payable solely by the Tribune Company in accordance with the provisions of Section 8.04 of the Credit Facilities and/or by the Guarantors (as defined in the Credit Agreement) whom are not the subject of a case under Chapter 11 of Title 11 of the Bankruptcy Code (to the extent listed on Schedule I hereto, the "Non-Debtor Guarantors"); it being understood, notwithstanding anything to the contrary herein, that neither DPW nor the Agent shall in any event be liable or responsible to Blackstone or any other party for any fees, expenses, obligations, liabilities, indemnities or damages incurred or any other amounts that may from time to time become payable to or by us in connection with the Restructuring Activities or this Agreement. It is agreed that the following fees shall be payable to Blackstone for its financial advisory services pursuant to Section 8.04 of the Credit Facilities:

| Redacted |
| --- |

(i)     a monthly advisory fee (the "Monthly Fee") in the amount of $200,000 in cash, with the first Monthly Fee payable upon the execution of this Agreement by both parties and additional installments of such Monthly Fee payable monthly in advance on the 1st day of each month. Any Monthly Fee paid subsequent to the twelfth (12th) Monthly Fee will be credited towards the Restructuring Fee;

(ii)    an additional fee (the "Restructuring Fee") equal to $5,500,000. Except as otherwise provided herein, Restructuring Activities shall be deemed to have been completed upon (a) the binding execution and effectiveness of all necessary waivers, consents, amendments or restructuring agreements between the Company and its creditors involving the compromise of the face amount of the Company's existing Obligations or the conversion of all or part of such Obligations into alternative securities, including equity, in the case of an out-of-court restructuring; or (b) the execution, confirmation, consummation and effectiveness of a Plan of Reorganization pursuant to an order of the Bankruptcy Court, in the case of an in-court restructuring. The Restructuring Fee will be earned and payable in immediately available funds upon the completion of the Restructuring Activities; and

(iii)   reimbursement of all reasonable documented out-of-pocket expenses incurred during this engagement, including, but not limited to, travel and lodging, direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals, reasonable fees and expenses of Blackstone's counsel (in the case of counsel and other third party advisors not to exceed $50,000 without the Agent's prior written consent, which shall not be unreasonably withheld) and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.

The advisory services and compensation arrangement set forth in this Agreement do not encompass other investment banking services or transactions that may be undertaken by Blackstone at the request of DPW or the Agent, including the arranging of debt or equity capital (except as provided above), issuing fairness opinions or any other specific services not set forth in this Agreement. The terms and conditions of any such investment banking services, including compensation arrangements, would be set forth in a separate written agreement between Blackstone and the appropriate party. DPW and the Agent are permitted, in their sole discretion, to engage other financial advisors with respect to the Restructuring Activities.

Blackstone recognizes and agrees to be bound by the provisions of that certain Confidentiality Agreement dated as of February 9, 2009 among the Company, its subsidiaries, the Agent and certain Lenders.

Redacted

CONFIDENTIAL

Blackstone agrees to be responsible for any breach of the terms hereof by any person to whom it discloses Information (as defined hereunder) and to take all reasonable measures to restrain any such persons from prohibited or unauthorized disclosure or use of the Information. As used in this Agreement, the term "person" shall be broadly interpreted to include, without limitation, any company, partnership, group, limited liability company, trust, other entity or individual.

Blackstone shall use the Information only for the purpose of providing financial advisory services pursuant to this Agreement. No other rights or licenses to trademarks, inventions, copyrights, patents, or any other intellectual property are implied or granted under this Agreement or by the conveying or disclosure of the Information. All Information, unless otherwise specified in writing, shall be and remain the property of the disclosing party. The Information supplied to Blackstone shall not be reproduced in any form except as required to accomplish the intent of this Agreement.

The Agent will furnish or cause to be furnished to Blackstone such information as Blackstone reasonably believes to be necessary to its assignment (all such information so furnished being the "Information"). The Agent recognizes and confirms that Blackstone (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, (c) is entitled to rely upon the Information without independent verification, and (d) will not make an appraisal of any assets in connection with its assignment. Subject to Blackstone's compliance with all applicable laws and its internal document retention policies (all retained copies to be held by Blackstone and kept confidential subject to the terms of this Agreement), within 30 days after written request by the Agent following the termination of this Agreement, Blackstone shall return or destroy, at the direction of the Agent, all Information received from the Agent during the course of its engagement and, in the case of destruction, Blackstone shall certify that all Information has been so destroyed. Blackstone's return, destruction or retention of any Information will not affect any of its other obligations under this Agreement.

In the event that the Information belonging to the Company, the Agent, or the Lenders is stored electronically on Blackstone's computer systems, Blackstone shall not be liable for any damages resulting from unauthorized access, misuse or alteration of such information by persons not acting on its behalf, provided that Blackstone shall exercise the same degree of care in protecting the confidentiality of, and in preventing unauthorized access to, the Company's, the Agent's, or the Lenders' Information that it exercises with regard to its own most sensitive proprietary information.

Except as required by applicable law, regulation or legal process, any advice to be provided by Blackstone under this Agreement shall not be disclosed publicly or made available

Redacted

to third parties (other than the Agent's other professional advisors, or, if appropriate in the Agent's judgment, to the Lenders and their professional advisors or in any filings in a Chapter 11 proceeding) without the prior written consent of Blackstone. All services, advice and information and reports provided by Blackstone to the Agent and Lenders in connection with this assignment shall be for the sole benefit of the Agent and such Lenders and shall not be relied upon by any other person.

DPW agrees that Blackstone will provide its financial advice exclusively to DPW for the benefit of the Agent and, to the extent compatible with issues of legal privilege, Lenders. The Agent and Lenders will also obtain the advice of their legal, tax and other business advisors and consider such other factors which they consider appropriate before exercising their independent business judgment in respect of Restructuring Activities. DPW further acknowledges and agrees that Blackstone has been retained to act solely as financial advisor to DPW for the benefit of the Agent and, to the extent compatible with issues of legal privilege, Lenders, and does not in such capacity act as a fiduciary for DPW, the Agent, Lenders or any other person. Blackstone shall act as an independent contractor and any duties of Blackstone arising out of its engagement pursuant to this Agreement shall be owed solely to DPW, the Agent and, to the extent compatible with issues of legal privilege, Lenders.

In consideration of Blackstone's agreement to provide financial advisory services in connection with this Agreement, the Agent hereby designates Blackstone and its agents, representatives, members and employees as agents and advisors of the Agent for purposes of entitling Blackstone and its agents, representatives, members and employees to any and all rights of indemnification and exculpation provided to agents and advisors of the Agent under the Credit Facilities. Blackstone shall have no liability (whether direct or indirect, in contract or tort or otherwise) to DPW, the Agent or the Lenders or their owners, parents, affiliates, security holders or creditors for or in connection with this Agreement except for any such liability for losses, claims, damages or liabilities incurred by DPW or the Agent that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the gross negligence and willful misconduct of Blackstone.

In the event that, as a result of or in connection with Blackstone's engagement hereunder, Blackstone becomes involved in any legal proceeding or investigation or is required by government regulation, subpoena or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, Blackstone will be entitled to seek reimbursement from the Company hereunder for the reasonable fees and expenses of its counsel incurred in responding to such a request.

Blackstone's engagement hereunder may be terminated upon 30 days' written notice without cause by DPW, the Agent or Blackstone; termination for cause by any party will occur forthwith. Notwithstanding the foregoing, (a) the provisions relating to the payment of fees and expenses accrued through the date of notice of termination, the status of Blackstone as an independent contractor and the limitation as to whom Blackstone shall owe any duties will

Redacted

CONFIDENTIAL

survive any such termination, (b) any such termination shall not affect any obligations of the Company under the indemnification provisions of the Credit Agreement or Blackstone's confidentiality obligations hereunder and (c) Blackstone shall be entitled to the Restructuring Fee in the event that Restructuring Activities are completed at any time prior to the expiration of 18 months following the termination of this Agreement, provided, however, in the event that Blackstone is terminated for cause, Blackstone shall not be entitled to any Restructuring Fee. For the purpose of this paragraph, "cause" shall include gross negligence, fraud, willful misconduct, or bad faith by Blackstone.

Neither DPW nor the Agent appears on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury, nor are they prohibited parties according to other U S government regulatory or enforcement agencies.

Notwithstanding anything to the contrary provided elsewhere herein, none of the provisions of this Agreement shall in any way limit the activities of The Blackstone Group L.P. and its affiliates in their businesses distinct from the restructuring advisory business of The Blackstone Group L P, provided that the Information is not made available to representatives of The Blackstone Group L.P. and its affiliates who are not directly involved in providing advisory services in connection with this Agreement. Should the Information be made available to a representative of The Blackstone Group L P. and its affiliates who is not involved in providing advisory services in connection with the Agreement, such representative shall be bound by the obligations set forth in this Agreement. Blackstone represents that its provision of the advisory services hereunder does not conflict with any service it has performed or is performing for any past or present client and that Blackstone will not undertake to perform services for any other client in a manner that conflicts with the services it is providing in connection with this Agreement while this Agreement is in effect or for a one year period following its termination.

This Agreement embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect the Agreement in any other respect, and it will remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state.

The Agent also agrees that none of Blackstone or any of its partners (both general and limited), employees, affiliates, officers, directors and agents shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Agent or its owners, parents, affiliates, security holders or creditors for or in connection with his Agreement except for any such liability for losses, claims, damages or liabilities incurred by the Agent that is finally judicially

Redacted

CONFIDENTIAL

determined by a court of competent jurisdiction to have primarily resulted from such party's gross negligence, fraud, willful misconduct or bad faith.

Blackstone and the Agent hereby agree that any action or proceeding brought by Blackstone or the Agent based hereon or arising out of Blackstone's engagement hereunder, shall be brought and maintained exclusively in the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York. Blackstone and the Agent irrevocably submit to the jurisdiction of the courts of the State of New York located in the City and County of New York and the United States District Court for the Southern District of New York and appellate courts from any thereof for the purpose of any action or proceeding based hereon or arising out of Blackstone's engagement hereunder and irrevocably agree to be bound by any judgment rendered thereby in connection with such action or proceedings. Blackstone and the Agent hereby irrevocably waive, to the fullest extent permitted by law, any objection they may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agree not to plead or claim the same

Redacted

JPM2_00002803

CONFIDENTIAL

Page   8

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Blackstone the duplicate copy of this Agreement.

Very truly yours,

BLACKSTONE ADVISORY SERVICES L.P.

By: _____

Name:    Paul P. Huffard
Title:    Senior Managing Director

Redacted

JPM2_00002804

CONFIDENTIAL

Accepted and Agreed to as
of the date first written above:

DAVIS POLK & WARDWELL, AS COUNSEL TO THE AGENT

By:

Name:      Donald S. Bernstein, Esq.
Title:      Partner

JPMORGAN CHASE BANK, N.A., AS AGENT

By:

Name:      Miriam T. Kulnis
Title:      Executive Director

Redacted

CONFIDENTIAL

Schedule I

Non-Debtor Guarantors

Chicago National League Ball Club, Inc.
Tribune (FN) Cable Ventures, Inc.
Tribune Interactive, Inc.
Tribune National Marketing Company
Tribune ND, Inc.

Redacted

JPM2_0002806

CONFIDENTIAL

| | |
|---|---|
| **From:** | Krakauer, Bryan <bkrakauer@sidley com> |
| **Sent:** | Thursday, February 26, 2009 7:21 PM (GMT) |
| **To:** | Larsen, Nils <nlarsen@tribune.com>; Eldersveld, David <DEldersveld@Tribune com>; Liebentritt, Don <dliebentritt@Tribune.com>; Bigelow, Chandler <CBigelow@tribune.com> |
| **Cc:** | Lantry, Kevin T <klantry@Sidley com> |
| **Subject:** | FW: Fees |

**From:** Schaible, Damian S [mailto:damian schaible@dpw com]
**Sent:** Thursday, February 26, 2009 12:58 PM
**To:** Krakauer, Bryan
**Cc:** Bernstein, Donald S ; Dworkin, Meyer C
**Subject:** Fees

You should be getting a call, but UCC has no objection to our revised proposal  We are working on language for an exchange of emails between me and Chadbourne laying out what we discussed, and I'll send when done  But we plan to send the fee letters and blocking notice today  Can we speak re: planning/process on calling UST?  (Will you call?  I assume just to apprise him that non-debtor subs intend to pay certain fees that they are obligated to pay under live guaranties and you just wanted to make sure he was apprised and the UCC has been apprised and had no objection?  Could you also be sure to tell him that JPM's fees/expenses in connection with its service on the UCC are NOT included in the reimbursable amounts and are being paid by JPM separately. because that was important to Joe?)

Thanks  I am around all afternoon if helpful to discuss

Best.
Damian

---

Damian S  Schaible
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
Phone: 212 450-4580
Fax  212 450-3580
email: damian schaible@dpw com

---

IRS Circular 230 Disclosure: To comply with certain U S  Treasury regulations, we inform you that, unless expressly stated otherwise, any U S  federal tax advice contained in this communication, including attachments, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service  In addition, if any such tax advice is used or referred to by other parties in promoting, marketing or recommending any partnership or other entity, investment plan or arrangement, then (i) the advice should be construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor

This e-mail is sent by a law firm and may contain information that is privileged or confidential  If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately



Larsen
EXHIBIT NO. 20
2\1\10
P. CAMPBELL

TRB_LD001087
CONFIDENTIAL

TRB_LD001087

**From:**    Schaible, Damian S

**Sent:**    Thursday, March 05, 2009 7:41 PM

**To:**    'bkrakauer@sidley com'; Bernstein, Donald S.

**Cc:**    Dworkin, Meyer C

**Subject:** Re: Tribune – Agent's Professional Fees

Bryan, Based on your description of your conversation last week and Joe's description of the same conversation when we spoke, you didn't ask for his permission and you didn't tell him you were waiting for his consent (both correctly) but instead told him the non-debtors intended to pay around the middle of this week  We sent him the engagement letters he asked for last friday and haven't heard a word since  Why wouldn't you just pay at this point? Have there been any further conversations I am not aware of?

Best. Damian

**From:** Krakauer, Bryan
**To:** Bernstein, Donald S.
**Cc:** Schaible, Damian S.; Dworkin, Meyer C.
**Sent:** Thu Mar 05 18:59:25 2009
**Subject:** Re: Tribune -- Agent's Professional Fees

I was not able to connect with McMahon today, but will try again first thing tomorrow  I agree we should get this behind us

..........................
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
From: Bernstein, Donald S <donald bernstein@dpw com>
To: Krakauer, Bryan
Cc: Schaible, Damian S <damian schaible@dpw com>, Dworkin, Meyer C <meyer dworkin@dpw com>
Sent: Thu Mar 05 16:43:51 2009
Subject: Tribune -- Agent's Professional Fees

Bryan --

I am on the road, but I just wanted to follow up on the status of the professional fee issue  Have you had a chance yet to pursue it with the UST?

Best regards,

Don

--------------------------------------------------------------------------------
IRS Circular 230 Disclosure. To comply with certain U S  Treasury regulations, we inform you that, unless expressly stated otherwise, any U S  federal tax advice contained in this communication  including attachments. was not intended or written to be used. and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service  In addition. if any such tax advice is used or referred to by other parties in promoting, marketing or recommending any partnership or other entity,


EXHIBIT NO. 21
A1110
P. CAMPBELL

JPM2_00000439

Confidential

investment plan or arrangement, then (i) the advice should be construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor

*********************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or If you are not the intended recipient, please delete the e-mail and any attachments immediately

*********************************************************************************

Confidential

B26 (Official Form 26) (06/09)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## PERIODIC REPORT OF DEBTORS PURSUANT TO

## BANKRUPTCY RULE 2015.3

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc (5510); Baltimore Newspaper Networks, Inc (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc (7399); Channel 39, Inc (5256); Channel 40, Inc (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc (0439); Chicago Tribune Press Service, Inc (3167); ChicagoLand Microwave Licensee, Inc (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc (1352); Courant Specialty Products, Inc (9221); Direct Mail Associates, Inc (6121); Distribution Systems of America, Inc (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner com corp (0219); ForSaleByOwner com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc (2940); Gold Coast Publications, Inc (5505); GreenCo, Inc (7416); Heart & Crown Advertising, Inc (9808); Homeowners Realty, Inc (1507); Homestead Publishing Co (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc (2663); Internet Foreclosure Service, Inc (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc (4014); KPLR, Inc (7943); KSWB Inc (7035); KTLA Inc (3404); KWGN Inc (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd (6079); Los Angeles Times Newspapers, Inc (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc (7208); New Mass Media, Inc (9553); New River Center Maintenance Association, Inc (5621); Newscom Services, Inc (4817); Newspaper Readers Agency, Inc (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc (4056); Oak Brook Productions, Inc (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co, of Washington (4750); Sentinel Communications News Ventures, Inc (2027); Shepard's Inc (7931); Signs of Distinction, Inc (3603); Southern Connecticut Newspapers, Inc (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc (9368); The Hartford Courant Company (3490); The Morning Call, Inc (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc (4227); Times Mirror Services Company, Inc (1326); TMLH 2, Inc (0720); TMLS I, Inc (0719); TMS Entertainment Guides, Inc (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Washington Bureau Inc (f/k/a Tribune Broadcasting News Network, Inc) (1088); Tribune California Properties, Inc (1629); Tribune Direct Marketing, Inc (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc (7844); Tribune License, Inc (1035); Tribune Los Angeles, Inc (4522); Tribune Manhattan Newspaper Holdings, Inc (7279); Tribune Media Net, Inc (7847); Tribune Media Services, Inc (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc (1630); Tribune Television New Orleans, Inc (4055); Tribune Television Northwest, Inc (2975); ValuMail, Inc (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc (8300); WGN Continental Broadcasting Company (9530); WLVI Inc (8074); WPIX, Inc (0191); and WTXX Inc (1268)  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611



Larsen

EXHIBIT NO. 20

2/1/10

P. CAMPBELL

Page 1

B26 (Official Form 26) (06/09) - Cont

This is the Bankruptcy Rule 2015.3 report as of June 28, 2009 (the "Periodic Report") on the value, operations and profitability of certain non-debtor entities in which one or more Debtors hold a substantial or controlling interest, as required by Bankruptcy Rule 2015.3  The estates of Tribune Company, Tribune Broadcasting Company, TMS Entertainment Guides, Inc., and Tribune Media Services, Inc., directly holds all or substantially all of the equity interest in the following entities:

| Name of Entity | Interest of the Estate | Valuation, Income Statement, Balance Sheet, Cash Flow, and Equity Roll Forward Attached |
|---|---|---|
| Fairfax Media, Incorporated | 72.4% | See Note 1 |
| Multimedia Insurance Company | 100% | ✓ |
| Tribune (FN) Cable Ventures, Inc | 100% | ✓ |
| Tribune Interactive, Inc | 100% | ✓ |
| Tribune National Marketing Company | 100% | ✓ |
| Tribune ND, Inc. | 100% | ✓ |
| Tribune Receivables, LLC | 100% | ✓ |
| TMS Entertainment Guides Canada Corp | 100% | ✓ |
| Tribune Hong Kong Ltd | 100% | ✓ |
| Tribune Media Services B V | 100% | ✓ |
| Professional Education Publishers International (Africa) Pty Ltd. | 100% | See Note 1 |
| Tribune Employee Lease Company LLC | 100% | See Note 1 |
| Tribune Technology LLC | 100% | See Note 1. |

1   Inactive company  with no operations and no financial results

This Periodic Report contains separate reports (the "Entity Reports") on the operations and profitability of each entity listed above  This report does not include Chicago Cubs Dominican Baseball Operations. LLC, Chicago National League Ball Club, LLC, Diana-Quentin, LLC, Tribune Sports Network Holdings, LLC, and Wrigley Field Premium Ticket Services. LLC, (collectively. the "Cubs Entities"), nor does it include entities in which the Debtors directly hold a 50% or less interest (the "Non Majority Interest Entities").[2]

The undersigned, having reviewed the above listing of entities in which the estates of Tribune Company. Tribune Broadcasting Company, TMS Entertainment Guides. Inc., and Tribune Media Services, Inc., directly hold a substantial or controlling interest, and being familiar with the Debtors' financial affairs, verifies under the penalty of perjury that the listing is complete, accurate and truthful to the best of his/her knowledge

---

[2] The Debtors do not believe that they have a "substantial or controlling" interest in the Non Majority Interest Entities within the meaning of Rule 2015.3 and further believe that cause exists to excuse compliance if such entities are  deemed to be within the requirements of Rule 2015.3.

B26 (Official Form 26) (06/09) - Cont

Date: _7/.2 8_____, 2009

_Chandler Bigelow III_ (signature)

Chandler Bigelow III

_____

Senior Vice President & Chief Financial Officer

B26 (Official Form 26) (06/09) - Cont

### General Notes

*Condensed Statements* – The condensed financial statements and supplemental information contained herein are unaudited, preliminary, and may not comply with generally accepted accounting principles in the United States of America ("U.S. GAAP") in all material respects. Information is presented on the same basis as it is aggregated into the consolidated results of Tribune Company; however, such presentation may not be appropriate for each entity on a stand-alone basis.

The Debtors are providing balance sheets, income and cash flow statements, and statements of shareholders equity for each of the Non-Debtors that are directly wholly owned by the Debtors. The reporting excludes the Cubs Entities and the Non Majority Interest Entities.

The unaudited condensed financial statements presented in this report have been derived from the books and records of the Non-Debtors. This information, however, has not been subject to procedures that would typically be applied to financial information presented in accordance with U.S. GAAP, and upon the application of such procedures, the Debtors and the Non-Debtors believe that the financial information could be subject to changes, and these changes could be material. The information furnished in this report includes primarily normal recurring adjustments, but does not include all of the adjustments that would typically be made in accordance with U.S. GAAP.

The results of operations contained herein are not necessarily indicative of results which may be expected from any other period or for the full year and may not necessarily reflect the results of operations, financial position, and cash flows of the Non-Debtors in the future.

*Intercompany Transactions* – Receivables and payables <u>between</u> the Non-Debtors and Debtors and/or <u>among</u> the Non-Debtors have not been eliminated. No conclusion as to the legal obligation related to these intercompany transactions is made by the presentation herein.

*Valuation* – The valuation information provided herein is based on the book value of the Non-Debtors (book value of assets less book value of liabilities). The Debtors do not maintain fair market value or other basis of valuation for these entities.

B26 (Official Form 26) (06/09) - Cont

## Exhibit A

### Valuation Estimate for Non-Debtor Entities

($000s)

| Legal Entity | Interest of the Estate | Net Book Value [1] |
|---|---|---|
| Multimedia Insurance Company | 100% | ($476) |
| Tribune (FN) Cable Ventures, Inc. | 100% | $299,668 |
| Tribune Interactive, Inc. | 100% | $6,060 |
| Tribune National Marketing Company | 100% | ($22,850) |
| Tribune ND, Inc. | 100% | $543,132 |
| Tribune Receivables, LLC | 100% | $64,210 |
| TMS Entertainment Guides Canada Corp | 100% | $4,604 |
| Tribune Hong Kong Ltd | 100% | $75 |
| Tribune Media Services B.V. | 100% | ($5,385) |

Notes:

1    The basis for the valuation of each Non-Debtor Entity is the net book value calculated as total assets less total liabilities as of June 28, 2009.

B26 (Official Form 26) (06/09) - Cont

## Exhibit B-1
## Balance Sheets for Non-Debtor Entities
### As of December 28, 2008 and June 28, 2009 [1]
### Unaudited
### (Dollars in Thousands)

|  | Multimedia Insurance Company | | Tribune (FN) Cable Ventures, Inc. | | Tribune Interactive, Inc. | |
|---|---|---|---|---|---|---|
|  | Dec. 28, 2008 | Jun. 28, 2009 | Dec. 28, 2008 | Jun. 28, 2009 | Dec. 28, 2008 | Jun. 28, 2009 |
| **Assets** | | | | | | |
| **Current Assets** | | | | | | |
| Cash and cash equivalents | $ 2.591 | $ 2.638 | $ - | $ 56.848 | $ 9.994 | $ 9.900 |
| Accounts receivable. net | 3 | 1 | - | - | 6.107 | 6.121 |
| Inventories | - | - | - | - | - | - |
| Prepaid expenses and other | - | - | - | 7,500 | 1,077 | 921 |
| Total current assets | 2.594 | 2.639 | - | 64.348 | 17.178 | 16.942 |
| Property, plant and equipment, net | - | - | - | - | 13.762 | 11.515 |
| **Other Assets** | | | | | | |
| Goodwill and other intangible assets. net | - | - | - | - | 864 | 864 |
| Investments in subsidiaries | - | - | - | - | - | - |
| Other investments | - | - | 158.136 | 132.241 | (5.445) | (6.307) |
| Intercompany receivables / (payables). net | 1.592 | 1.592 | 106.201 | 106.237 | (18.446) | (12,005) |
| Other | - | - | - | - | 46 | - |
| Total Assets | $ 4,186 | $ 4,231 | $ 264,337 | $ 302,826 | $ 7,959 | $ 11,009 |
| **Liabilities and Shareholders' Equity (Deficit)** | | | | | | |
| **Current Liabilities** | | | | | | |
| Accounts payable, accrued expenses. and other | $ 4.598 | $ 4.694 | $ 425 | $ 425 | $ 13.785 | $ 2.448 |
| Short term debt | - | - | - | - | (51) | - |
| Total current liabilities | 4.598 | 4.694 | 425 | 425 | 13.734 | 2.448 |
| Other obligations | 21 | 13 | - | 2,733 | - | 2,501 |
| Total Liabilities | 4,619 | 4,707 | 425 | 3,158 | 13,734 | 4,949 |
| Shareholders' Equity (Deficit) | (433) | (476) | 263.912 | 299.668 | (5.775) | 6.060 |
| Total Liabilities and Shareholders' Equity (Deficit) | $ 4,186 | $ 4,231 | $ 264,337 | $ 302,826 | $ 7,959 | $ 11,009 |

**Notes:**

1    The information contained herein is provided to fulfill the requirements of Bankruptcy Rule 2015.3
     All information contained herein is unaudited and subject to future adjustment

B26 (Official Form 26) (06/09) - Cont

## Exhibit B-1 (Cont)
## Balance Sheets for Non-Debtor Entities
### As of December 28, 2008 and June 28, 2009 [1]
### Unaudited
### (Dollars in Thousands)

| | Tribune National Marketing Company | | Tribune ND, Inc. | | Tribune Receivables, LLC | |
|---|---|---|---|---|---|---|
| | Dec. 28, 2008 | Jun. 28, 2009 | Dec. 28, 2008 | Jun. 28, 2009 | Dec. 28, 2008 | Jun. 28, 2009 |
| **Assets** | | | | | | |
| **Current Assets** | | | | | | |
| Cash and cash equivalents | $ - | $ - | $ - | $ - | $ - | $ - |
| Accounts receivable, net | 3 | 3 | (324) | 233 | 504,458 | 390,332 |
| Inventories | - | - | - | - | | |
| Prepaid expenses and other | - | - | 342 | 342 | - | - |
| Total current assets | 3 | 3 | 18 | 575 | 504,458 | 390,332 |
| Property, plant and equipment, net | - | - | 76,285 | 74,991 | - | - |
| **Other Assets** | | | | | | |
| Goodwill and other intangible assets, net | - | - | - | - | - | - |
| Investments in subsidiaries | - | - | 589,664 | 589,664 | - | - |
| Other investments | 210,513 | 212,416 | 11,650 | 11,650 | - | - |
| Intercompany receivables / (payables), net | (239,442) | (234,961) | (114,558) | (113,462) | (216,912) | (155,315) |
| Other | - | - | - | - | - | - |
| Total Assets | $ (28,926) $ | (22,542) | $ 563,059 $ | 563,418 | $ 287,546 $ | 235,017 |
| **Liabilities and Shareholders' Equity (Deficit)** | | | | | | |
| **Current Liabilities** | | | | | | |
| Accounts payable, accrued expenses, and other | $ 308 $ | 308 | $ 5,917 $ | 13,929 | $ 1,927 $ | 713 |
| Short term debt | - | - | - | - | 225,000 | 170,000 |
| Total current liabilities | 308 | 308 | 5,917 | 13,929 | 226,927 | 170,713 |
| Other obligations | - | - | 15,767 | 6,357 | 134 | 94 |
| Total Liabilities | 308 | 308 | 21,684 | 20,286 | 227,061 | 170,807 |
| Shareholders' Equity (Deficit) | (29,234) | (22,850) | 541,375 | 543,132 | 60,485 | 64,210 |
| Total Liabilities and Shareholders' Equity (Deficit) | $ (28,926) $ | (22,542) | $ 563,059 $ | 563,418 | $ 287,546 $ | 235,017 |

**Notes:**

1. The information contained herein is provided to fulfill the requirements of Bankruptcy Rule 2015.3. All information contained herein is unaudited and subject to future adjustment.

B26 (Official Form 26) (06/09) - Cont

**Exhibit B-1 (Cont)**
**Balance Sheets for Non-Debtor Entities**
**As of December 28, 2008 and June 28, 2009 [1]**
**Unaudited**
**(Dollars in Thousands)**

| | TMS Entertainment Guides Canada Corp | | Tribune Hong Kong Ltd. | | Tribune Media Services B.V. | |
|---|---|---|---|---|---|---|
| | Dec. 28, 2008 | Jun. 28, 2009 | Dec. 28, 2008 | Jun. 28, 2009 | Dec. 28, 2008 | Jun. 28, 2009 |
| **Assets** | | | | | | |
| **Current Assets** | | | | | | |
| Cash and cash equivalents | $ 89 | $ 215 | $ 34 | $ 33 | $ 189 | $ 248 |
| Accounts receivable, net | 125 | 187 | - | - | 161 | 156 |
| Inventories | - | - | | | - | - |
| Prepaid expenses and other | 12 | 11 | 6 | 4 | 90 | 114 |
| Total current assets | 226 | 413 | 40 | 37 | 440 | 518 |
| Property, plant and equipment, net | 1 | 8 | - | - | 92 | 76 |
| **Other Assets** | | | | | | |
| Goodwill and other intangible assets, net | 816 | 817 | - | - | - | - |
| Investments in subsidiaries | - | - | - | - | - | - |
| Other investments | - | - | - | - | - | - |
| Intercompany receivables / (payables), net | 191 | 213 | 54 | 66 | (5,645) | (7,622) |
| Other | - | - | - | - | - | - |
| Total Assets | $ 1,234 | $ 1,451 | $ 94 | $ 103 | $ (5,113) | $ (7,028) |
| **Liabilities and Shareholders' Equity (Deficit)** | | | | | | |
| **Current Liabilities** | | | | | | |
| Accounts payable, accrued expenses, and other | $ (2,063) | $ (3,154) | $ 23 | $ 28 | $ (163) | $ (1,643) |
| Short term debt | - | - | - | - | - | - |
| Total current liabilities | (2,063) | (3,154) | 23 | 28 | (163) | (1,643) |
| Other obligations | - | 1 | - | - | - | - |
| Total Liabilities | (2,063) | (3,153) | 23 | 28 | (163) | (1,643) |
| Shareholders' Equity (Deficit) | 3,297 | 4,604 | 71 | 75 | (4,950) | (5,385) |
| Total Liabilities and Shareholders' Equity (Deficit) | $ 1,234 | $ 1,451 | $ 94 | $ 103 | $ (5,113) | $ (7,028) |

Notes:

1    The information contained herein is provided to fulfill the requirements of Bankruptcy Rule 2015.3.
     All information contained herein is unaudited and subject to future adjustment

B26 (Official Form 26) (06/09) - Cont

## Exhibit B-2
### Statements of Operations for Non-Debtor Entities
### Year Ended December 28, 2008 and Six Month Period Ending June 28, 2009 [1]
### Unaudited
### (Dollars in Thousands)

| | Multimedia Insurance Company | | Tribune (FN) Cable Ventures, Inc. | | Tribune Interactive, Inc. | |
|---|---|---|---|---|---|---|
| | Dec. 31, 2007 through Dec 28, 2008 | Dec. 29, 2008 through Jun 28, 2009 | Dec. 31, 2007 through Dec. 28, 2008 | Dec. 29, 2008 through Jun 28, 2009 | Dec. 31, 2007 through Dec. 28, 2008 | Dec. 29, 2008 through Jun 28, 2009 |
| Total Revenue | $ - | $ - | $ - | $ - | $ 95,966 | $ 36,962 |
| Operating Expenses | | | | | | |
| Cost of sales | - | - | - | - | 30,991 | 15,055 |
| Selling, general and administrative | 141 | 50 | - | - | 45,371 | 15,492 |
| Depreciation | - | - | - | - | 5,301 | 2,946 |
| Amortization of intangible assets | - | - | - | - | - | - |
| Total operating expenses | 141 | 50 | - | - | 81,663 | 33,493 |
| Operating Income (Loss) | (141) | (50) | - | - | 14,303 | 3,469 |
| Net income / (loss) on equity investments | - | - | 92,625 | 43,916 | (3,814) | (862) |
| Interest income (expense), net | 2,114 | 9 | - | (12) | (19,645) | 150 |
| Management fee income / expense | - | - | - | - | 18,221 | 9,062 |
| Non-operating income (loss), net | - | - | - | (8,148) | - | 14 |
| Income (Loss) Before Income Taxes | 1,973 | (41) | 92,625 | 35,756 | 9,065 | 11,833 |
| Income Taxes | 2,553 | - | 7,112 | - | (1,348) | - |
| Net Income (Loss) | $ 4,526 | $ (41) | $ 99,737 | $ 35,756 | $ 7,717 | $ 11,833 |

Notes:

[1]  The information contained herein is provided to fulfill the requirements of Bankruptcy Rule 2015.3.
All information contained herein is unaudited and subject to future adjustment

B26 (Official Form 26) (06/09) - Cont

## Exhibit B-2 (Cont)
## Statements of Operations for Non-Debtor Entities
## Year Ended December 28, 2008 and Six Month Period Ending June 28, 2009 [1]
## Unaudited
## (Dollars in Thousands)

| | Tribune National Marketing Company | | Tribune ND, Inc. | | Tribune Receivables, LLC | |
|---|---|---|---|---|---|---|
| | Dec. 31, 2007 through Dec. 28, 2008 | Dec. 29, 2008 through Jun. 28, 2009 | Dec. 31, 2007 through Dec. 28, 2008 | Dec. 29, 2008 through Jun. 28, 2009 | Dec. 31, 2007 through Dec. 28, 2008 | Dec. 29, 2008 through Jun. 28, 2009 |
| Total Revenue | $ - | $ - | $ 2,317 | $ 2,770 | $ - | $ - |
| **Operating Expenses** | | | | | | |
| Cost of sales | - | - | (79) | 3 | - | - |
| Selling, general and administrative | 22 | - | 1,013 | (376) | 42 | 159 |
| Depreciation | - | - | 1,124 | 1,294 | - | - |
| Amortization of intangible assets | - | - | - | - | - | - |
| Total operating expenses | 22 | - | 2,058 | 921 | 42 | 159 |
| Operating Income (Loss) | (22) | - | 259 | 1,849 | (42) | (159) |
| Net income / (loss) on equity investments | (9,679) | 6,303 | - | - | - | - |
| Interest income (expense), net | 2 | 83 | 26,672 | (11) | (15,564) | (16,056) |
| Management fee income / expense | - | - | (2,593) | (78) | - | - |
| Non-operating income (loss), net | (4,677) | - | 1,000 | - | 16,090 | 19,942 |
| Income (Loss) Before Income Taxes | (14,376) | 6,386 | 25,338 | 1,760 | 484 | 3,727 |
| Income Taxes | 2,460 | - | 48,260 | - | - | - |
| Net Income (Loss) | $ (11,916) $ | 6,386 | $ 73,598 $ | 1,760 | $ 484 $ | 3,727 |

## Notes:

1.  The information contained herein is provided to fulfill the requirements of Bankruptcy Rule 2015.3
    All information contained herein is unaudited and subject to future adjustment

B26 (Official Form 26) (06/09) - Cont

Exhibit B-2 (Cont)
Statements of Operations for Non-Debtor Entities
Year Ended December 28, 2008 and Six Month Period Ending June 28, 2009 [1]
Unaudited
(Dollars in Thousands)

| | TMS Entertainment Guides Canada Corp | | Tribune Hong Kong Ltd. | | Tribune Media Services B.V. | |
|---|---|---|---|---|---|---|
| | Dec. 31, 2007 through Dec. 28, 2008 | Dec. 29, 2008 through Jun 28, 2009 | Dec. 31, 2007 through Dec. 28, 2008 | Dec. 29, 2008 through Jun 28, 2009 | Dec. 31, 2007 through Dec. 28, 2008 | Dec. 29, 2008 through Jun. 28, 2009 |
| Total Revenue | $      974 | $      418 | $      181 | $      90 | $      1,062 | $      590 |
| Operating Expenses | | | | | | |
| Cost of sales | 234 | 112 | 171 | 85 | 863 | 363 |
| Selling, general and administrative | 7 | - | - | - | 1,049 | 459 |
| Depreciation | 39 | (5) | - | - | 56 | 18 |
| Amortization of intangible assets | 95 | 42 | - | - | 0 | - |
| Total operating expenses | 375 | 149 | 171 | 85 | 1,968 | 840 |
| Operating Income (Loss) | 599 | 269 | 10 | 5 | (906) | (250) |
| Net income / (loss) on equity investments | - | - | - | - | - | - |
| Interest income (expense), net | 36 | - | - | - | (41) | (35) |
| Management fee income / expense | (12) | (6) | - | - | - | - |
| Non-operating income (loss), net | - | - | - | - | 8 | - |
| Income (Loss) Before Income Taxes | 623 | 263 | 10 | 5 | (939) | (285) |
| Income Taxes | 634 | (91) | 1 | - | 731 | (156) |
| Net Income (Loss) | $      1,257 | $      172 | $      11 | $      5 | $      (208) | $      (441) |

Notes:

1    The information contained herein is provided to fulfill the requirements of Bankruptcy Rule 2015.3
    All information contained herein is unaudited and subject to future adjustment

B26 (Official Form 26) (06/09) - Cont

## Exhibit B-3
## Statements of Cash Flows for Non-Debtor Entities
### Six Month Period Ending June 28, 2009 [1]
### Unaudited
### (Dollars in Thousands)

| | Multimedia Insurance Company Dec. 29, 2008 through Jun 28, 2009 | Tribune (FN) Cable Ventures, Inc. Dec 29, 2008 through Jun 28, 2009 | Tribune Interactive, Inc. Dec 29, 2008 through Jun 28, 2009 | Tribune National Marketing Company Dec. 29, 2008 through Jun. 28, 2009 |
|---|---|---|---|---|
| Beginning Cash | $ 2,591 | $ - | $ 9,994 | $ - |
| Net Income | (41) | 35,756 | 11,833 | 6,386 |
| **Operating Activities** | | | | |
| Depreciation and amortization | - | - | 2,946 | - |
| Decrease / (increase) in accounts receivables | 2 | - | (14) | - |
| Increase / (decrease) in current liabilities | 94 | - | (11,336) | - |
| Increase / (decrease) in other obligations | (8) | 2,733 | 2,502 | - |
| Gain / (loss) on foreign exchange | - | - | - | - |
| Decrease / (increase) in other current assets | - | (7,500) | 156 | - |
| | 88 | (4,767) | (5,746) | - |
| Net Cash Flow from Operating Activities | 47 | 30,989 | 6,087 | 6,386 |
| **Investing Activities** | | | | |
| Capital expenditures | - | - | (699) | - |
| Decrease / (increase) in intangible assets | - | - | - | - |
| Decrease / (increase) in other assets | - | - | 46 | - |
| Decrease / (increase) in other investments | - | 25,895 | 862 | (1,904) |
| Net Cash Flow from Investing Activities | - | 25,895 | 209 | (1,904) |
| **Financing Activities** | | | | |
| Decrease / (increase) in intercompany receivables | - | (36) | (6,441) | (4,482) |
| Increase / (decrease) in short term debt | - | - | 51 | - |
| Net Cash Flow from Financing Activities | - | (36) | (6,390) | (4,482) |
| Net Cash Flow | 47 | 56,848 | (94) | - |
| Ending Cash | $ 2,638 | $ 56,848 | $ 9,900 | $ - |

## Notes:

[1]  The information contained herein is provided to fulfill the requirements of Bankruptcy Rule 2015.3 All information contained herein is unaudited and subject to future adjustment.

B26 (Official Form 26) (06/09) - Cont

Exhibit B-3 (Cont)
**Statements of Cash Flows for Non-Debtor Entities**
**Six Month Period Ending June 28, 2009** [1]
Unaudited
(Dollars in Thousands)

| | Tribune ND, Inc. | Tribune Receivables. LLC | TMS Entertainment Guides Canada Corp | Tribune Hong Kong Ltd. | Tribune Media Services B.V. |
|---|---|---|---|---|---|
| | Dec. 29, 2008 through Jun. 28, 2009 | Dec. 29, 2008 through Jun. 28, 2009 | Dec. 29, 2008 through Jun. 28, 2009 | Dec. 29, 2008 through Jun. 28, 2009 | Dec. 29, 2008 through Jun. 28, 2009 |
| Beginning Cash | $ - | $ - | $ 89 | $ 34 | $ 189 |
| Net Income | 1,760 | 3,727 | 172 | 5 | (441) |
| **Operating Activities** | | | | | |
| Depreciation and amortization | 1,293 | - | 38 | - | 18 |
| Decrease / (increase) in accounts receivables | (557) | 114,125 | (61) | - | 5 |
| Increase / (decrease) in current liabilities | 8,011 | (1,214) | (1,090) | 5 | (1,480) |
| Increase / (decrease) in other obligations | (9,410) | (40) | 1 | - | - |
| Gain / (loss) on foreign exchange | - | - | 1,131 | - | 4 |
| Decrease / (increase) in other current assets | - | - | 1 | 2 | (24) |
| | (663) | 112,871 | 20 | 7 | (1,477) |
| Net Cash Flow from Operating Activities | 1,097 | 116,598 | 192 | 12 | (1,918) |
| **Investing Activities** | | | | | |
| Capital expenditures | - | - | (2) | - | - |
| Decrease / (increase) in intangible assets | - | - | (47) | - | - |
| Decrease / (increase) in other assets | - | - | (1) | - | - |
| Decrease / (increase) in other investments | - | - | - | - | - |
| Net Cash Flow from Investing Activities | - | - | (45) | - | - |
| **Financing Activities** | | | | | |
| Decrease / (increase) in intercompany receivables | (1,097) | (61,598) | (71) | (13) | 1,977 |
| Increase / (decrease) in short term debt | - | (55,000) | - | - | - |
| Net Cash Flow from Financing Activities | (1,097) | (116,598) | (71) | (13) | 1,977 |
| Net Cash Flow | - | - | 176 | (1) | 59 |
| Ending Cash | $ - | $ - | $ 215 | $ 33 | $ 248 |

### Notes:

1    The information contained herein is provided to fulfill the requirements of Bankruptcy Rule 2015 3 All information contained herein is unaudited and subject to future adjustment.

B26 (Official Form 26) (06/09) - Cont

## Exhibit B-4
### Statements of Changes in Shareholders' Equity (Deficit) for Non-Debtor Entities
### Six Month Period Ending June 28, 2009 [1]
### Unaudited
### (Dollars in Thousands)

|  | Multimedia Insurance Company | Tribune (FN) Cable Ventures, Inc. | Tribune Interactive, Inc. | Tribune National Marketing Company |
|---|---|---|---|---|
| Shareholders Equity at Dec. 28, 2008 | $ (433) | $ 263,912 | $ (5,775) | $ (29,234) |
| Net Income | (41) | 35,756 | 11,833 | 6,386 |
| Foreign Currency Translation Adjustment | - | - | - | - |
| Shareholders Equity at Jun 28, 2009 | $ (476) | $ 299,668 | $ 6,060 | $ (22,850) |

Notes:

1    The information contained herein is provided to fulfill the requirements of Bankruptcy Rule 2015 3
    All information contained herein is unaudited and subject to future adjustment

B26 (Official Form 26) (06/09) - Cont

## Exhibit B-4 (Cont)
### Statements of Changes in Shareholders' Equity (Deficit) for Non-Debtor Entities
### Six Month Period Ending June 28, 2009 [1]
### Unaudited
### (Dollars in Thousands)

| | Tribune ND, Inc. | Tribune Receivables, LLC | TMS Entertainment Guides Canada Corp | Tribune Hong Kong Ltd. | Tribune Media Services B.V. |
|---|---|---|---|---|---|
| Shareholders Equity at Dec  28, 2008 | $      541.375 | $     60.485 | $     3.297 | $       71 | $      (4,950) |
| Net Income | 1,760 | 3,727 | 172 | 5 | (441) |
| Foreign Currency Translation Adjustment | - | - | 1,131 | - | 4 |
| Shareholders Equity at Jun. 28, 2009 | $      543,132 | $     64,210 | $     4,604 | $       75 | $      (5,385) |

## Notes:

1   The information contained herein is provided to fulfill the requirements of Bankruptcy Rule 2015.3.
    All information contained herein is unaudited and subject to future adjustment.

B26 (Official Form 26) (06/09) - Cont

## Exhibit C
## Description of Operations for Non-Debtor Entities

| Legal Entity | Operating Description | Parent Company |
|---|---|---|
| Multimedia Insurance Company | Captive insurance company which is being wound down. | Tribune Company |
| Tribune (FN) Cable Ventures, Inc | Holds minority investment in Television Food Network, G.P. | Tribune Broadcasting Company |
| Tribune Interactive. Inc | Centralized entity that manages the website operations for Tribune's publishing and broadcasting subsidiaries, and helps manage Tribune's various online classified businesses. | Tribune Company |
| Tribune National Marketing Company | Owns interests in several of Tribune's joint ventures. | Tribune Company |
| Tribune ND. Inc. | Formerly published Newsday; Holds 3% interest in Newsday Holdings. LLC pursuant to the Newsday/Cablevision transaction that closed in July 2008. | Tribune Company |
| Tribune Receivables, LLC | Facilitates transactions related to a trade receivables securitization facility. | Tribune Company |
| TMS Entertainment Guides Canada Corp | Canadian sales of a program guide for the Entertainment Information Products Group. | TMS Entertainment Guides. Inc. |
| Tribune Hong Kong Ltd | Operates a local sales office for Tribune Media Service's News & Features international syndication business to support sales efforts for Asian and multinational customers. | Tribune Company |
| Tribune Media Services B V | Operates a local sales office and data center for Tribune Media Service's Entertainment Information Products Group in the Netherlands | Tribune Media Services, Inc. |



From:     Krakauer, Bryan
Sent:     Friday, January 23, 2009 11:20 AM
To:       Madlyn Primoff
Cc:       Margot Schonholtz; Eldersveld, David
Subject:  RE: Tribune / Merrill Lynch fees and expenses

Madelyn:

The Borrower is the subject of a chapter 11 bankruptcy case and not in a position to presently pay the Bridge Agent any fees or expenses (or any other amounts)

Bryan Krakauer

> From: Madlyn Primoff [mailto:MPrimoff@kayescholer.com]
> Sent: Wednesday, January 14, 2009 3:05 PM
> To: Krakauer, Bryan
> Cc: Madlyn Primoff; Margot Schonholtz
> Subject: Tribune / Merrill Lynch fees and expenses
>
> Dear Bryan,
> This follows up on our discussion of earlier today. As you are aware, Merrill Lynch Capital Corporation, as Agent (the "Bridge Agent") under the Senior Unsecured Interim Loan Agreement dated as of December 20, 2007 (the "Bridge Credit Agreement"), has retained Kaye Scholer LLP and Capstone to act as its legal counsel and financial advisors, respectively, in connection with the Tribune chapter 11 cases. Pursuant to Section 8.04 of the Bridge Credit Agreement, the Borrower is required to pay promptly following demand all reasonable and documented out-of-pocket costs and expenses of the Bridge Agent in connection with (among other things) the administration and enforcement of the Bridge Credit Agreement and the other documents delivered under the Bridge Credit Agreement, including, without limitation, reasonable and documented fees and expenses of counsel for the Bridge Agent. Kindly advise us as to whether the Borrower will pay, promptly following demand from time to time, such reasonable and documented out-of-pocket costs and expenses (including but not limited to the reasonable fees, costs and expenses of Kaye Scholer LLP and Capstone) Many thanks in advance for your prompt response
> Madlyn
>
> Madlyn Gleich Primoff, Esq
> Kaye Scholer LLP
> 425 Park Avenue
> New York, New York 10022
> Phone: 212-836-7042
> Fax: 212-836-6525
> mprimoff@kayescholer.com
>
>           *     *     *     *
>
> IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with Treasury Department regulations, we

10/28/2009



TRB_LD000110
CONFIDENTIAL

TRB_LD000110

# EXHIBIT 24

# FILED UNDER SEAL

# EXHIBIT 25

# FILED UNDER SEAL