# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, <u>et al.</u>,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Related to Docket Nos. 2407, 3657 and 3660** |

## DEBTORS' MEMORANDUM IN OPPOSITION TO THE MOTION BY LAW DEBENTURE TO TERMINATE DEBTOR AFFILIATES' UNDISCLOSED PAYMENT OF LBO LENDERS' FEES AND EXPENSES, FOR AN ACCOUNTING, AND FOR DISGORGEMENT OF PAST PAYMENTS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a/ Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF FACTS ..........................................................................................................3

ARGUMENT.............................................................................................................................14

    I.     THE NON-DEBTOR GUARANTORS HAD AN ENFORCEABLE
           CONTRACTUAL OBLIGATION TO PAY THE FEES AND EXPENSES
           INCURRED BY THE SENIOR LENDERS IN CONNECTION WITH THE
           CREDIT AGREEMENT. ..................................................................................14

    II.    BANKRUPTCY COURT AUTHORIZATION OF THE SENIOR
           LENDER FEE PAYMENTS WAS NOT REQUIRED........................................17

CONCLUSION.........................................................................................................................21

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Aldan Indus., Inc.*, 2000 WL 357719 (Bankr. E.D. Pa. Apr. 3, 2000) ............................... 16

*In re Beck Indus.*, 479 F.2d 410 (2d Cir. 1973) ......................................................... 17

*In re Bernard Tech., Inc.*, 398 B.R. 526 (Bankr. D. Del. 2008) ............................. 15, 17

*Credit Suisse First Boston Mortg. Capital LLC v. Cohn,*
    2004 WL 1871525 (S.D.N.Y. Aug. 19, 2004)................................................... 14

*Holywell Corp. v. Smith*, 118 B.R. 876 (S.D. Fla. 1990)............................................... 18

*Kreisler v. Goldberg*, 478 F.3d 209 (4th Cir. 2007) ...................................................... 18

*McCartney v. Integra Nat'l Bank North*, 106 F.3d 506 (3d Cir. 1997) ....................... 16

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005)............................................... 15, 19

*In re RBGSC Inv. Corp.*, 242 B.R. 851 (Bankr. E.D. Pa. 2000) .................................. 15

*In re S & S 31 Flavors, Inc.*, 118 B.R. 202 (Bankr. E.D.N.Y. 1990) ......................... 17

*Spirco, Inc. v. Copelin (In re Spirco, Inc.)*, 221 B.R. 361 (W.D. Penn. 1998)............ 15

*In re Stein & Day, Inc.*, 113 B.R. 157 (Bankr. S.D.N.Y. 1990) ............................ 16, 17

*Stoller's, Inc. v. Peoples Trust Bank (In re Stoller's, Inc.),*
    93 B.R. 628 (Bankr. N.D. Ind. 1988)..................................................... 14

*V.I. Tel. Corp. v. Rural Tel. Fin. Coop.*, 2006 WL 319002 (D.V.I. Feb. 10, 2006) ..................... 18

*VFB LLC v. Money's Trust (In re VF Brands, Inc.)*, 282 B.R. 134 (Bankr. D. Del. 2002).......... 14

*In re Weirton Steel Corp.*, 2007 WL 2021896 (Bankr. N.D. W. Va. July 6, 2007) ..................... 17

*In re Winer*, 158 B.R. 736 (N.D. Ill. 1993)................................................................ 16

*In re Winstar Comm., Inc.*, 284 B.R. 40 (Bankr. D. Del. 2002) .................................. 18

**Statutes**

11 U.S.C. § 363..................................................................................... 16, 19

-6363999v

The debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and collectively, the "Debtors") respectfully submit this supplemental memorandum in opposition to Law Debenture's Motion to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, For an Accounting, and For Disgorgement of Past Payments (the "Motion to Terminate") filed by Law Debenture Trust Company of New York ("Law Debenture") on October 23, 2009.

## PRELIMINARY STATEMENT

At the hearing on December, 1, 2009, Law Debenture told the Court that Tribune Company ("Tribune") and JPMorgan Chase Bank, N.A. ("JP Morgan" or "Agent") had engaged in a coordinated "ruse" or "subterfuge" to avoid Court scrutiny of the payment of professional fees by a Non-Debtor, Tribune (FN) Cable Ventures, Inc. ("TCV"), pursuant to a contractual guarantee ("Credit Agreement Guarantee") (defined below).  (12/01/2009 Tr. of Proc. at 80) Now that discovery has been completed, the undisputed evidence entirely belies such rhetoric. In fact, in contrast to Law Debenture's assertions, the undisputed facts are that:

- Tribune's filing did not relieve TCV of its contractual obligations, and the record establishes a basis for legitimate concern over the possibility of harmful action, including creditor enforcement action, that could have caused substantial damage to the value of TCV or another of the Non-Debtor Guarantors (defined below), including the Chicago National League Ball Club, LLC, the entity that owned the Chicago Cubs at the time of the filing.

- TCV and Tribune received benefits in return, including a "Payment Blockage Notice" from JPMorgan, as agent to the Senior Lenders, that served to prevent the Bridge Lenders from enforcing their rights against the Non-Debtor Guarantors.

- Far from keeping the payments "secret," Tribune insisted that no payments be made without disclosure to and consultation with key constituencies, including the Unsecured Creditors Committee ("UCC"), which included broad representation of

virtually every major creditor constituency in these cases (including Law Debenture's predecessor trustee), as well as the United States Trustee, to ensure that they understood the nature and basis of the payments and had an opportunity to voice any concerns or objections. None were forthcoming.

- TCV entered into the Credit Agreement Guarantee with appropriate corporate authorization by its Board of Directors, including delegated authority to various TCV officers to both approve entry into, and performance under, the Credit Agreement Guarantee.

- None of the post-Petition professional fee payments were made with funds obtained from or earned by any Debtor; rather, the payments were made from funds generated from TCV's partnership interest in a general partnership that operates the TV Food Network.

- The determination to refrain from filing TCV was based on independent business reasons unrelated to its contractual obligations under the Credit Agreement Guarantee, and J.P. Morgan was not consulted and had no role in connection with which Tribune entities were filed.

In short, the facts demonstrate that these payments were entirely consistent with TCV's legal obligations and applicable bankruptcy law, and Law Debenture has failed to point to any valid legal basis that required the parties to do more than they did.

At the hearing in December, the Court expressed its view that, in hindsight, the better course of action would have been for the parties to have raised this issue with the Court before proceeding with the payments and also required Tribune to make certain additional disclosures, which Tribune has done. (12/01/2009 Tr. of Proc. at 106.) While Tribune does not take issue with that assessment in hindsight, and certainly respects and appreciates the Court's guidance, Tribune respectfully submits that the full and uncontroverted record shows that, based on the facts available at the time, Tribune acted with the utmost good faith in this matter and went out of its way to ensure that the payments were disclosed to an appropriately broad range of parties

2

with an interest in these proceedings. Because neither the facts nor the law support the extraordinary relief sought by Law Debenture, their Motion to Terminate should be denied.

## STATEMENT OF FACTS

### A.    Tribune Company and Tribune (FN) Cable Ventures, Inc.

1.    Tribune is a media and entertainment company based in Chicago, Illinois. (Affidavit of Chandler Bigelow ("Bigelow Aff."), D.I. 3, ¶ 8.) Tribune and its subsidiaries own and manage several daily newspapers, television and radio stations, internet sites, and other media or entertainment ventures. (*Id.*) On December 8, 2008 (the "Petition Date"), Tribune and 110 of its subsidiaries filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code. (Stipulated Facts ¶ 22.)[2] Seventeen of Tribune's subsidiaries did not file bankruptcy petitions on the Petition Date. (Bigelow Aff. ¶ 11 n.4.) Among those that did not file were Chicago National League Ball Club, LLC (n/k/a Tribune CNLBC, LLC) (the "Cubs")[3]; TCV; Tribune Interactive, Inc.; Tribune National Marketing Co.; and Tribune ND, Inc., each of which is a guarantor under the Credit Agreement Guarantee and the Bridge Agreement Guarantee, as described below (collectively, the "Non-Debtor Guarantors"). (Stipulated Facts ¶ 25.) TCV is a Delaware corporation whose stock is wholly-owned by Debtor Tribune Broadcasting Corporation. (*Id.* ¶ 63.) TCV is a general partner with certain subsidiaries of Scripps Networks Interactive ("Scripps") in the Television Food Network, G.P. partnership, which operates the TV Food Network. (*Id.*)

---

[2] Citations to "Stipulated Facts" refers to the "Stipulated Facts in Connection with March 26, 2010 Hearing on Law Debenture Trust Company of New York's Motion to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments," filed concurrently with this Memorandum. (D.I. 3657.)

[3] As this Court is aware, as a step towards completing the Cubs' transaction, CNLBC was placed into bankruptcy on October 12, 2009.

3

**B.    The Leveraged ESOP Transactions and Guarantees**

2.        Beginning in 2006 and continuing into early 2007, Tribune was exploring strategic business initiatives, including transactions with various strategic and financial buyers. As a result of this process, Tribune's board of directors, based on the recommendation of a special committee of the board comprised entirely of independent directors, approved a series of transactions pursuant to which Tribune first repurchased via tender offer slightly more than a majority of its outstanding shares, and then, upon satisfaction of various conditions, including shareholder approval, required regulatory approvals, and the receipt of a solvency opinion by a nationally-recognized valuation firm, consummated a merger, the end result of which was that Tribune became a private company, wholly-owned by an employee stock ownership plan (the "ESOP Transaction").  (Bigelow Aff. ¶ 14.)

3.        On May 17, 2007, in connection with the tender offer, Tribune entered into a $8.028 billion credit agreement (the "Credit Agreement," Joint Exhibit 5 (exhibit 8 of the Larsen deposition))[4] with certain lenders ("Senior Lenders"), including JPMorgan, which acted as administrative agent under the Credit Agreement.  (Stipulated Facts ¶ 1.)  Section 8.04(a) of the Credit Agreement requires Tribune, as the borrower, to

> pay promptly following demand all reasonable and documented
> out-of-pocket costs and expenses of the Agent, the Lead Arrangers
> and the Lenders, if any (including, without limitation, reasonable
> and documented counsel fees and expenses), in connection with
> the enforcement (whether through negotiations, legal proceedings
> or otherwise) of this Agreement, the Notes and the other
> documents to be delivered hereunder, including, without limitation,
> reasonable and documented fees and expenses of counsel for the

---

[4] Citations to "Joint Exhibits" in this Memorandum refer to the "Joint Exhibit List in Connection with March 26, 2010 Hearing on Law Debenture Trust Company of New York's Motion to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments," filed concurrently with this Memorandum.  (D.I. 3660.)  When an exhibit is included in the Joint Exhibits as an exhibit to a deposition, the deposition exhibit number is also noted in the citation.

Agent and each Lender in connection with the enforcement of rights under this Section 8.04(a).

4.    Likewise, Section 8.04(b) requires Tribune to

indemnify and hold harmless the Agent, each Lead Arranger and each Lender and each of their Affiliates and their officers, directors, employees, agents, trustees and advisors (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) the Advances, the Notes, this Agreement, any Letter of Credit, any of the transactions contemplated herein or the actual or proposed use of the proceeds of the Advances or Letters of Credit, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

5.    Section 6.01 of the Credit Agreement provides that Tribune would be in default of its Credit Agreement obligations if, among other things, it "shall fail to pay any principal of any Advance when the same becomes due and payable; or Borrower shall fail to pay any interest on any Advance or make any other payment of fees or other amounts payable under any Loan Document within five Business Days after the same becomes due and payable." In addition, Tribune would also be in default if "any proceeding shall be instituted by or against Borrower or any of its Subsidiaries … seeking to adjudicate it a bankrupt or insolvent."

6.    In connection with the Credit Agreement, various subsidiaries of Tribune entered into guarantees (the "Credit Agreement Guarantee"). In the case of TCV, on June 4, 2007, TCV's Board of Directors authorized certain TCV officers to enter into the Credit Agreement Guarantee (Joint Exhibit 8). These officers were authorized to "execute for, in the name of and on behalf of the Company, … the [Credit Agreement Guarantee]." In addition, the same officers

were authorized to "cause the Company to … perform all of its obligations pursuant to the [Credit Agreement] Guarantee." (Unanimous Written Consent of the Board of Directors of Tribune (FN) Cable Ventures, Inc., 6/4/2007, Joint Exhibit 5 (exhibit 8 of the Larsen deposition); Stipulated Facts ¶ 65.) Under the Credit Agreement Guarantee, TCV "unconditionally guarantees, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, all of the Obligations, the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrower and each Loan Party under or pursuant to the Credit Agreement and the other Loan Documents." (Stipulated Facts ¶ 5.)

       7.      In connection with the merger, Tribune also entered into a Senior Unsecured Interim Loan Agreement (the "Bridge Agreement") on December 20, 2007 with certain lenders (the "Bridge Lenders"). (Stipulated Facts ¶ 6.) Merrill Lynch served as administrative agent (the "Bridge Agent") under the Bridge Agreement. (*Id*.) Section 8.04 of the Bridge Agreement contains language that is, in all relevant parts, substantively identical to Section 8.04 of the Credit Agreement described above. (*Id*. ¶ 7.) Also on December 20, 2007, TCV, along with other subsidiaries, entered into a guarantee agreement (the "Bridge Agreement Guarantee," Joint Exhibit 9) that guaranteed Tribune's obligations under the Bridge Agreement. (Stipulated Facts ¶ 8.) The Bridge Agreement Guarantee provides that

> No Guarantor may make any payment or distribution of any kind or character with respect to any Guaranteed Obligations [under the Bridge Agreement] … if (a) a payment default under the [Credit Agreement] occurs and is continuing; or (b) any other default occurs and is continuing under the [Credit Agreement] that permits lenders under the [Credit Agreement] to accelerate its maturity and the Agent receives a written notice of such default (a "Payment Blockage Notice") from the agent under the [Credit Agreement].

Tribune completed the ESOP Transaction on December 20, 2007. (Bigelow Aff. ¶ 14.)

**C.    Background to Tribune's Petition and Agent's Requests for Fees**

8.      During 2008, the general deterioration in the publishing and broadcasting industries, as well as the severe decline in advertising revenue during the economic downturn, caused significant operational and financial problems for Tribune and most of its subsidiaries. (*Id.* ¶ 24.)  Towards the end of 2008, Tribune began exploring its options to address its deteriorating position and discussed these options with JPMorgan in its role as Agent for the Credit Agreement.  (02/01/2010 Deposition of Nils Larsen ("Larsen Dep."), Joint Exhibit 5, at 37-39.)  On November 20, 2008, JPMorgan informed Tribune that it had retained counsel and financial advisors, "to advise the agent on restructuring options/issues going forward."  (Email from Miriam Kulnis to Chandler Bigelow dated November 20, 2008 (TRB_LD002338), Joint Exhibit 10; Stipulated Facts ¶ 17.)

9.      On November 26, 2008, JPMorgan issued a letter to Tribune, stating that JPMorgan had retained "professionals in connection with the [Credit Agreement]" and that "[p]ursuant to and as required by the terms of the [Credit Agreement], you have agreed to pay the reasonable and documented fees, non-professional charges and expenses of such professionals."  (Email from Kevin Foley to Chandler Bigelow dated November 26, 2008 and attachments (TRB_LD002339-41), Joint Exhibit 11.)  JPMorgan requested $2,000,000 to pay retainer fees and other expenses connected with the professionals it had hired.  (*Id.*; Stipulated Facts ¶ 18.)  On December 1, 2008, Tribune paid the requested $2,000,000 to JPMorgan. (Stipulated Facts ¶ 19.)  At that point in time, Tribune was still examining its options, including the possibility of a chapter 11 filing, but had not yet decided what course to take.  (Larsen Dep. at 37-39.)  After its chapter 11 filing on the Petition Date, Tribune ceased making any further payments to JPMorgan.  (Stipulated Facts ¶ 66.)

-6363999v

**D.      Decision to File Particular Subsidiaries**

10.      Based on the individual legal and business circumstances surrounding each of the

Non-Debtor Guarantors, these entities did not commence chapter 11 cases.  For example, as

noted above, the Cubs did not initially file for bankruptcy based on various considerations.

Among other reasons as to why the Cubs did not file, at the time, Tribune was actively seeking a

disposition transaction involving the Cubs.  (Larsen Dep. at 17.)  Tribune was concerned that if

the Cubs filed for bankruptcy, that process would be disrupted.  (*Id*.)  Tribune was particularly

concerned about the negative effect that a chapter 11 filing by the Cubs would have on the

parties involved in those discussions, as well as Major League Baseball's involvement in the

process.  (*Id*.)  In addition, Tribune was concerned with the effect that a chapter 11 filing would

have on the operations of a Major League Baseball club, including tendering contracts to existing

players, acquisition of new players, and prosecution of potential player salary arbitration cases.

(Declaration of Crane H. Kenney, Chairman of Chicago National League Ball Club, LLC, in

Support of (I) Notice and Procedures Approval Motion, (II) Tribune Transaction Approval

Motion, and (III) CNLBC Transaction Approval Motion, D.I. 2000, at ¶ 7.)

11.      As to TCV, it did not file for bankruptcy protection because of, among other

reasons, its role as a general partner in the Television Food Network, G.P. partnership with

Scripps.  (Larsen Dep. at 19-20.)  A TCV bankruptcy filing could have resulted in disruptions to

the joint-venture operations and damaged its relationship with Scripps.  In addition, prior to the

Petition Date, there had been negotiations between Scripps and Tribune concerning Scripps

acquiring TCV's interests in the partnership.  While, in the end, those negotiations did not lead to

a transaction, there was some concern that a chapter 11 filing would limit TCV's options.  (*Id*.)

Tribune did not discuss with Scripps whether it would or would not file a chapter 11 petition for

TCV along with the other Tribune subsidiaries.  (*Id*.)  Tribune also did not discuss with

8

JPMorgan which entities it would or would not file.  (02/05/2010 Deposition of Miriam Kulnis ("Kulnis Dep.), Joint Exhibit 4, at 29.)

**E.    Post-Petition Discussions Regarding Enforcement of the Credit Agreement and a Forbearance Agreement**

12.    After the Petition Date, JPMorgan and its retained professionals continued to incur fees and expenses in connection with their efforts to protect and enforce the Senior Lenders' rights under the Credit Agreement.  Because Tribune was no longer permitted to reimburse those fees, JPMorgan and the Senior Lenders discussed enforcing their rights under the Credit Agreement and the Credit Agreement Guarantee against the Non-Debtor Guarantors. (Kulnis Dep. at 30-31; Stipulated Facts ¶ 29.)  JPMorgan discussed this possibility with Tribune. (Kulnis Dep. at 31-32.)  Understandably, Tribune was concerned about this possibility.  (*Id.*; Larsen Dep. at 58-59.)  As a result, Tribune and the Senior Lenders began discussing potential alternatives.  (Larsen Dep. at 58-59.)

13.    Subsequent to the Petition Date, JPMorgan, the law firm of Davis Polk & Wardwell LLP ("Davis Polk") (as counsel for JPMorgan), Tribune, and the law firm of Sidley Austin LLP ("Sidley") (as counsel for Tribune and its subsidiaries) began discussing the possibility of a forbearance agreement.  (Stipulated Facts ¶ 30.)  A term sheet for the forbearance agreement, which was distributed on December 24, 2008, provided that, for a certain time period, the Senior Lenders would forbear from exercising any rights or remedies under the Credit Agreement Guarantees, in return for the Non-Debtor Guarantors reimbursing the Senior Lenders for certain costs and expenses incurred by the Senior Lenders in protecting their interests under the Credit Agreement.  (Stipulated Facts ¶ 31.)

14.    Although negotiations continued for several weeks, including several draft agreements being distributed back and forth, in the end, the parties were unable to reach

9

agreement.  (Stipulated Facts ¶¶ 33, 36, 41.)  There were several sticking points.  For example, the Senior Lenders were demanding access to information regarding, *inter alia*, "all Material Dispositions and other material transactions … directly or indirectly involving any interests in or assets of Chicago National League Ball Club, Inc. or Tribune (FN) Cable Ventures, Inc." (Draft Forbearance Agreement (TRB_LD000022-33), Joint Exhibit 5 (exhibit 9 to the Larsen deposition), at 3(c).)  Tribune would not agree to this provision, as it feared that granting the Senior Lenders this access would pose a substantial obstacle in getting Major League Baseball's approval for a Cubs' transaction.  (Larsen Dep. at 66-68.)  In addition, there were disagreements concerning appropriate termination rights.  (*Id*. at 68-69.)  In the end, these and other differences were insurmountable and the forbearance agreement was never executed.  (*Id*.; Stipulated Facts ¶ 41.)  Tribune's decision to decline to pursue a forbearance agreement was not motivated by concerns as to whether court approval was necessary for such an agreement, and if so, whether the court would approve such an agreement.  (Kulnis Dep. at 65-66; Larsen Dep. at 70-71.)

F.     **Demand by Bridge Agent**

15.     On January 14, 2009, Merrill Lynch, in its role as the Bridge Agent, made a demand on Tribune, as the borrower under the Bridge Agreement, for reimbursements of fees and expenses under section 8.04 of that agreement.  (Stipulated Facts ¶ 35.)  On January 23, 2009, Bryan Krakauer of Sidley responded that Tribune "is the subject of a chapter 11 bankruptcy case and not in a position to presently pay the Bridge Agent any fees or expenses (or any other amounts)."  (*Id*.)

G.     **Discussions Regarding Alternatives to Forbearance Agreement**

16.     When it became clear that the parties would be unable to agree on terms for a forbearance agreement, Tribune, Sidley, JPMorgan, and Davis Polk began discussing possible alternatives.  (Larsen Dep. at 71-72; Kulnis Dep. at 65-66.)  Under one such arrangement, the

10

Senior Lenders would issue payment letters (the "Payment Letters") to the Non-Debtor

Guarantors requesting payment under Section 8.04 of the Credit Agreement for the fees and

expenses generated in connection with enforcing the Senior Lenders' rights under the Credit

Agreement. (Kulnis Dep. at 75-76; Email chain ending with email from Damian Schaible to

Bryan Krakauer and others dated February 26, 2009 and attachments (TRB_LD000185-89, 206-

20), Joint Exhibit 17.) In return for the payment of those fees, the Senior Lenders would forbear

from exercising any additional rights under the Credit Agreement and the Credit Agreement

Guarantee. (Kulnis Dep. at 75-76.) In addition, the Agent would deliver a Payment Blockage

Notice to the Bridge Lenders to stave off any attempt by those lenders to bring an enforcement

action against the Non-Debtor Subsidiaries. (Larsen Dep. at 72-73.)

**H.      Consultation with Unsecured Creditors Committee**

17.    Tribune was willing to proceed on this basis, but insisted on full disclosure to the

UCC and the U.S. Trustee to ensure that they were both informed of, and did not object to, this

arrangement. To that end, the Senior Lenders had "numerous discussions with the UCC and its

advisors on the fee request and the non-debtor guarantors' decision to make these payments."

(Email chain ending with email from Bryan Krakauer to Don Liebentritt and others dated

February 27, 2009 and attachments (TRB_LD000227-46), Joint Exhibit 18; *see also* Kulnis Dep.

at 67-68; 75-76.) At the time, the UCC was comprised of virtually every major creditor

constituency in the Debtors' bankruptcy cases. In particular, among the UCC's members were

Deutsche Bank Trust Company Americas ("Deutsche Bank"), which served as Indenture Trustee

for all of Tribune's public notes, including those now held by Centerbridge, and those for which

Law Debenture has now become Indenture Trustee. (Stipulated Facts ¶¶ 11-14, 27.) The Agent

explained the arrangement to the UCC and asked if there were any objections. (Kulnis Dep. at

76.) On February 26, 2009, the UCC's counsel confirmed to Sidley that "the UCC has no

11

objection to the payment of the SC professional fees." (Stipulated Facts ¶ 55.) On February 27, 2009, counsel for the UCC confirmed in writing that, pursuant to certain conditions to which Tribune did not object, "[t]he Committee will not object" to the arrangement. (Email chain ending with email from Donald Bernstein to Damian Schaible dated February 27, 2009 (JPM2_00000148-50), Joint Exhibit 4 (exhibit 13 to the Kulnis deposition); Stipulated Facts ¶ 56.)

## I.    Consultation with the U.S. Trustee

18.    As noted, Tribune also insisted that, prior to the Non-Debtor Guarantors making any payments pursuant to the Payment Letters, the U.S. Trustee be consulted and afforded an opportunity to object. On February 27, 2009, Joseph McMahon of the U.S. Trustee's office, wrote Davis Polk, noting that "[w]e were briefed by counsel to the Debtors this morning regarding the request(s) submitted by JPMorgan, as agent … for payment of professional fees." (Email chain ending with email from Bryan Krakauer to Don Liebentritt and others dated February 27, 2009 and attachments (TRB_LD000227-46), Joint Exhibit 18.) Mr. McMahon requested copies of engagement letters for certain of the professionals for whose fees JPMorgan was requesting reimbursement. (*Id.*) Davis Polk sent Mr. McMahon copies of the engagement letters that same day. (*Id.*; Stipulated Facts ¶¶ 57-58.)

19.    Sidley reached out again to Mr. McMahon on March 4, 2009 and sent him a legal memorandum setting forth its analysis (a) that the Non-Debtor Guarantors were obligated, pursuant to the Guarantee Agreement, to reimburse the Senior Lenders' fees and expenses relating to enforcement of the Credit Agreement; and (b) that the Non-Debtor Guarantors' obligations were not subject to the automatic stay. (Stipulated Facts ¶ 59.) Having not received any further response, Sidley again reached out to Mr. McMahon on March 10, 2009. (Email chain ending with email from Bryan Krakauer to David Eldersveld and others dated March 10,

2009 (TRB_LD000386-88), Joint Exhibit 20.) Sidley informed Mr. McMahon that "[t]he non-debtor subsidiaries of the Tribune plan to commence the payment of the Steering Committee professional fees this Thursday [March 12, 2009]." (*Id.*) Mr. McMahon responded, "Receipt acknowledged – thanks. To the extent that we have something to communicate to you on this point, we will do so." (*Id.*; Stipulated Facts ¶¶ 61-62.)

20.    As of March 12, 2009 – the date on which Sidley informed Mr. McMahon the Non-Debtor Guarantors would begin payment – the parties had not heard anything from Mr. McMahon. Accordingly, on March 12, 2009, Non-Debtor Guarantor TCV commenced payment of the professional fees and expenses pursuant to the Credit Agreement Guarantee (the "Senior Lender Fee Payments"). (Stipulated Fact ¶ 66.)

**J.    Senior Lender Fee Payments**

21.    As noted above, TCV has an interest in a general partnership with Scripps, from which it receives distributions. (Larsen Dep. at 21-22.) Prior to the Petition Date these cash distributions were part of the integrated cash management system at Tribune. After Tribune's chapter 11 filing, however, TCV has maintained these distributions in a separate account. (*Id.* at 22-23; Stipulated Facts ¶ 64.) All post-Petition Senior Lender Fee Payments have been made entirely from funds earned by TCV after the Petition Date. (Stipulated Facts ¶ 66.)

22.    As part of the agreement with the UCC, JPMorgan supplied the UCC with a quarterly summary of all fees and expenses paid and/or reimbursed by TCV on May 21, 2009, September 2, 2009, and December 4, 2009. (Stipulated Facts ¶¶ 74-76.)

-6363999v

## ARGUMENT

I.    **THE NON-DEBTOR GUARANTORS HAD AN ENFORCEABLE CONTRACTUAL OBLIGATION TO PAY THE FEES AND EXPENSES INCURRED BY THE SENIOR LENDERS IN CONNECTION WITH THE CREDIT AGREEMENT.**

23.    Tribune's bankruptcy filing on December 8, 2008, was an "Event of Default" under section 6.01 of the Credit Agreement.  (Stipulated Facts ¶ 23.)  As such, the Non-Debtor Guarantors became contractually obliged under the Credit Agreement Guarantee for "the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrower and each Loan Party under or pursuant to the Credit Agreement," including the professional fee obligations set forth above.[5]

24.    The Non-Debtor Guarantors were not released from these obligations by Tribune's bankruptcy filing.  A borrower's bankruptcy does not release a non-debtor guarantor or co-obligor from their contractual obligations on a debt.  *See, e.g., Credit Suisse First Boston Mortg. Capital LLC v. Cohn*, 2004 WL 1871525, at *8 (S.D.N.Y. Aug. 19, 2004) ("A discharge of liability pursuant to the bankruptcy laws generally does not affect a guarantor's liability and leaves a creditor free to pursue collection from a guarantor."); *VFB LLC v. Money's Trust (In re VF Brands, Inc.)*, 282 B.R. 134, 138 (Bankr. D. Del. 2002) ("Non-debtors are generally not entitled to releases or discharges of direct claims against them simply because a co-obligor is in bankruptcy."); *Stoller's, Inc. v. Peoples Trust Bank (In re Stoller's, Inc.)*, 93 B.R. 628, 635-36 (Bankr. N.D. Ind. 1988) (noting that "bankruptcy proceedings do not affect the liabilities of co-

---

[5] Law Debenture has argued that because no lawsuit has been filed by the UCC or the Senior Lenders, the Non-Debtor Guarantors were not required to reimburse the Senior Lenders under section 8.04(a).  (D.I. 2407 at 7-9.)  This reading ignores, however, that section 8.04(a) does not require a legal proceeding to be invoked.  Rather, Section 8.04(a) expressly anticipates that "enforcement" of the Credit Agreement may be through "negotiations, legal proceedings or otherwise."  Further, Section 8.04(b) of the Credit Agreement contains a broader obligation to reimburse the Senior Lenders for any losses in connection with "any investigation, litigation or proceeding or preparation of a defense" under the Credit Agreement.

14

debtors and guarantors" so co-guarantors' "independent obligation to Summit Bank is not affected by the debtor's bankruptcy").

25.     This proposition of law does not change simply because, as is the case here, the guarantors are related entities to the debtor.  Generally, bankruptcy courts respect the separate legal identities of related corporations.  *See, e.g., In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) ("[T]he general expectation of ... the Bankruptcy Code ... is that courts respect entity separateness absent compelling circumstances calling equity ... into play."); *In re RBGSC Inv. Corp.*, 242 B.R. 851, 858 (Bankr. E.D. Pa. 2000) (noting that "[e]lementary principles of corporate law" provide that "a corporation is a legal entity which is ordinarily deemed to be separate and distinct from its officers, directors, and stockholders").  While this protects non-debtors from being dragged unnecessarily into bankruptcy proceedings of related entities, it also means that non-debtor entities must continue to fulfill their contractual and other obligations.

26.     In *Spirco, Inc. v. Copelin (In re Spirco, Inc.)*, for example, a parent and its subsidiary entered into an employment agreement with the subsidiary's CEO.  221 B.R. 361, 363 (W.D. Penn. 1998).  The subsidiary breached the employment agreement by firing the CEO without cause and without severance.  *Id*.  The CEO brought a breach of contract claim against both the subsidiary and the parent.  *Id*.  The subsidiary subsequently filed for bankruptcy and was dismissed from the action.  *Id*.  However, the action was allowed to continue against the parent, which did not file for bankruptcy, and the court found that the parent company was a co-obligor under the agreement and was thus liable for the breach.  *Id*. at 371; *see also In re Bernard Tech., Inc.*, 398 B.R. 526, 529 (Bankr. D. Del. 2008) (finding payments made by non-debtor subsidiary to third-party were not avoidable because the third-party had "performed services for" the subsidiary).

-6363999v

27.    The Non-Debtor Guarantors were in a similar situation. Because of Tribune's bankruptcy, they faced contractual obligations under the Credit Agreement. Failure to perform these obligations ran the risk of enforcement action, which, as the undisputed evidence demonstrates, was a legitimate concern. (Kulnis Dep. at 30-31; Stipulated Facts ¶ 29.) By making the payments to the Senior Lenders, the Non-Debtor Guarantors were fulfilling a legitimate contractual obligation that was not affected either by the Debtors' bankruptcy filing or by any subsequent litigation involving the ESOP Transaction. Further, the Senior Lender Fee Payments allowed all of the Non-Debtor Guarantors, and particularly TCV and the Cubs, to continue to pursue their legitimate business objectives without becoming entangled in an enforcement action.[6]

## II.    BANKRUPTCY COURT AUTHORIZATION OF THE SENIOR LENDER FEE PAYMENTS WAS NOT REQUIRED.

28.    At the heart of Law Debenture's Motion to Terminate is their contention that the Non-Debtor Guarantors and the Senior Lenders somehow violated the Bankruptcy Code by failing to receive this Court's authorization for payments made between non-debtors using non-debtor assets. In its initial motion, Law Debenture argued that the Senior Lender Fee Payments violated section 363(b) of the Bankruptcy Code. (D.I. 2407, ¶ 27.) However, "in order for assets to come within the auspices of § 363 they must be property of the estate." *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990). Post-Petition Date, no asset of any Debtor has

---

[6] Law Debenture alleges, without support, that the Debtors could have obtained protection from the Bankruptcy Court through an injunction or extension of the automatic stay. Absent "unusual circumstances," however, the automatic stay does not apply to non-debtors in actions not involving property of the estate. *See, e.g., McCartney v. Integra Nat'l Bank North*, 106 F.3d 506, 509-10 (3d Cir. 1997) (noting that section 362(a) applied only to debtors); *In re Aldan Indus., Inc.*, 2000 WL 357719, at *3 (Bankr. E.D. Pa. Apr. 3, 2000) ("[A]s a general rule, the automatic stay does not affect proceedings against guarantors.") This is true even though the non-debtors may be wholly-owned subsidiaries of a debtor. *See, e.g., Kreisler v. Goldberg*, 478 F.3d 209, 215 (4th Cir. 2007) (refusing to extend automatic stay to non-debtor subsidiary even though subsidiary was wholly-owned by debtor); *In re Winer*, 158 B.R. 736, 743 (N.D. Ill. 1993) (rejecting argument that automatic stay should be extended to non-debtor subsidiary "based on the degree of control exercised by a majority-shareholder or sole shareholder debtor over the non-debtor subsidiary" because "[a]ny such exception would swallow up the rule itself").

16

been used to make any of the Senior Lender Fee Payments.  As noted above, the Senior Lender

Fee Payments came entirely from TCV, a non-debtor subsidiary, using solely assets TCV

received from its interest in a general partnership with Scripps.  Since the Debtors' bankruptcy

filing, these assets have been kept separate and apart from the Debtors' assets.[7]  Under these

circumstances, section 363 does not apply.  *See In re Bernard Tech., Inc.*, 398 B.R. at 529

(dismissing for lack of jurisdiction attempt by trustee to avoid transfers made by non-debtor

subsidiary to third-party because "the transferred assets were not property of the Debtor"); *see

also In re Stein & Day Inc.*, 113 B.R. at 162 ("A bankruptcy court's jurisdiction does not extend

to a wholly-owned subsidiary of the debtor, unless the subsidiary is 'a mere sham or conduit

rather than a viable entity.'") (quoting *In re Beck Indus.*, 479 F.2d 410, 416 (2d Cir. 1973)); *In re

Weirton Steel Corp.*, 2007 WL 2021896, at *7 (Bankr. N.D. W. Va. July 6, 2007) ("Where a

dispute concerns non-debtor parties, does not involve property of the estate, does not affect

administration of the estate, or where the dispute will not affect payments to creditors under a

confirmed plan, the bankruptcy court will generally not have jurisdiction under § 1334."); *In re S

& S 31 Flavors, Inc.*, 118 B.R. 202, 204 (Bankr. E.D.N.Y. 1990) ("Generally, Bankruptcy Courts

lack jurisdiction to adjudicate controversies between third-parties which do not involve the

debtor or property of the debtor, unless the Court cannot perform its administrative duties

without resolving the controversy.").

29.     Law Debenture attempts to argue that the Senior Lender Fee Payments involved

property of the estate because the Senior Lenders demanded from Tribune "the control of, and

equity interests in," its subsidiaries.  (D.I. 2407, ¶ 27.)  This is both factually and legally

---

[7] After the Petition Date, cash distributions received by TCV pursuant to the Television Food Network, G.P. partnership agreement have been held by TCV in an account in TCV's name and not placed in the Tribune cash management system.  (Stipulated Facts ¶ 64.)  As of December 23, 2009, TCV's bank account had a balance of $40,517,337.57.  (*Id.* ¶ 79.)

incorrect.  As to the facts, the Senior Lenders requested the Non-Debtor Guarantors fulfill their

contractual obligations – they did not demand "control" of Tribune's equity interests.  Indeed,

the arrangement that was ultimately struck creates no ongoing obligations on the part of Tribune

or TCV in any way, a fact that was acknowledged by JPMorgan at the December 1, 2009

hearing.  (12/01/2009 Tr. of Proc. at 109-10.)

30.    On the law, courts have rejected similar attempts to conflate a debtor's controlling

interest in a wholly-owned non-debtor subsidiary with assets of the subsidiary.  In *Kreisler v.*

*Goldberg*, for example, the debtor-parent argued that the automatic stay applied to an

enforcement action against its wholly-owned non-debtor subsidiary because the parent's interest

in the subsidiary constituted property of the estate.  478 F.3d 209, 214 (4th Cir. 2007).  The

Fourth Circuit rejected this argument, stating, "[t]he fact that a parent corporation has an

ownership interest in a subsidiary, however, does not give the parent any direct interest in the

*assets* of the subsidiary."  *Id.*; *see also V.I. Tel. Corp. v. Rural Tel. Fin. Coop.*, 2006 WL 319002,

at \*4 (D.V.I. Feb. 10, 2006) ("Indeed, it is well settled that 'absent unusual circumstances, the

property of the debtor's subsidiary is not considered property of the debtor by virtue of the

debtor's sole ownership of the subsidiary.'") (quoting *Holywell Corp. v. Smith*, 118 B.R. 876,

879 (S.D. Fla. 1990)).  Law Debenture's argument would essentially destroy this distinction.  *See*

*In re Winstar Comm., Inc.*, 284 B.R. 40, 51 (Bankr. D. Del. 2002) ("If the court were to find that

this action was under the jurisdiction of the Bankruptcy Court, the decision would have the result

of bringing every wholly owned subsidiary into every bankruptcy case regardless of the

circumstances and without the safeguards afforded by schedules, statements of financial affairs,

notices to creditors, or meetings of creditors.").

31.    Law Debenture also suggests that this Court should "disregard the form of the transaction" in order to bring the Senior Lender Fee Payments within the ambit of section 363. (D.I. 2631 ¶ 5.)  Yet doing so would require this Court to ignore the separate legal identities of the Non-Debtor Guarantors and the Debtors.  As the Third Circuit has stated, "[T]he general expectation of … the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play."  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005). The undisputed facts provide no support for such an extraordinary remedy.  To the contrary, the facts demonstrate that the corporate separateness of TCV has consistently been respected, and appropriate corporate formalities observed.  The TCV Guarantee was entered into with appropriate corporate authorization by its Board of Directors, including delegated authority to various TCV officers to both approve entry into, and performance under, the Guarantee. (Stipulated Facts ¶ 65.)  Moreover, there has been no comingling of TCV funds used to pay post-petition professional fees with any assets of the debtors.  (*Id.* ¶¶ 64, 66.)  To the contrary, the professional fees were not made from funds obtained from or earned by any Debtor; instead, the payments were made from funds generated from TCV's general partnership interest in a general partnership that operates the TV Food Network.  (*Id.* ¶ 66.)

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request this Court deny Law Debenture's Motion to Terminate.

Dated:  March 2, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
James W. Ducayet
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

-6363999v