# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :
In re:                            : Chapter 11
                                  : Case No. 08-13141 (KJC)
TRIBUNE COMPANY et al.,           : (Jointly Administered)
                                  :
            Debtors.              :
                                  :
                                  :
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## JPMORGAN CHASE BANK, N.A.'S BRIEF ON
## REIMBURSEMENT OF THE SENIOR LENDERS' FEES AND EXPENSES

Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Dennis E. Glazer
Karen E. Wagner
Sharon Katz
Michael Russano
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for JPMorgan Chase Bank, N.A.*

Dated: March 2, 2010

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT .......................................................................... 1

BACKGROUND ................................................................................................. 3

    A.    Pre-Bankruptcy Agreements. ...................................................... 3

    B.    Tribune's Bankruptcy Filing ...................................................... 6

    C.    Negotiations Regarding Reimbursement of Fees and Expenses and Full Disclosure to the Committee ............................................... 7

    D.    Agreement Regarding Reimbursement of Professional Fees and Expenses and Disclosure to the U.S. Trustee ............................. 10

    E.    Payments ................................................................................. 12

ARGUMENT ..................................................................................................... 13

    A.    The Monies Used to Reimburse Were Not Estate Property ......... 13

    B.    Section 105 Cannot Be Used to Enjoin the Reimbursements ...... 16

    C.    The Payments Were and Are Proper ......................................... 17

        1.    The Non-Debtor Guarantors Have Binding Contractual Obligations ................................................ 18

        2.    The Non-Debtor Guarantors Received Value ..................... 19

        3.    Law Debenture's "Failure-To-Disclose" Argument Is Without Merit ............................................................ 20

CONCLUSION ................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

PAGE

*Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.)*,
    351 B.R. 313 (Bankr. D. Del. 2006) .......................................................... 14

*Amresco Fin. I., L.P. v. Stone-Tec, Inc.*,
    No. 98 Civ. 2872, 1998 U.S. Dist. LEXIS 19751 (S.D.N.Y. Dec. 18, 1998)............. 19

*Big V Supermarkets Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.)*,
    267 B.R. 71 (Bankr. D. Del. 2001) ..................................................................15

*Bird v. Wilmington Soc. of Fine Arts*, 43 A.2d 476 (Del. 1945)....................................... 14

*Boyarsky v. Froccaro*, 125 Misc. 2d 352 (Sup. Ct. N.Y. 1984) ........................................15

*Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684 (Del. 1959) ......... 14

*Butner v. United States*, 440 U.S. 48 (1979)....................................................................... 14

*Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983 (2d Cir. 1991)...............19

*Chase Manhattan Bank v. Third Eighty-Ninth Assocs. (In re Third Eighty-Ninth
    Assocs.)*, 138 B.R. 144 (S.D.N.Y. 1992). ................................................................. 17

*DMG, Inc. v. Aegis Corp.*,
    Civ. No. 7619, 1984 Del. Ch. LEXIS 597 (Del. Ch. June 29, 1984)...........................15

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003)............................................................ 14

*du Pont v. du Pont*, 208 A.2d 509 (Del. 1965) .................................................................. 14

*European Amer. Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage
    Corp.)*, 158 B.R. 926 (Bankr. S.D.N.Y. 1993) ............................................................ 15

*GAF Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    26 B.R. 405 (Bankr. S.D.N.Y 1983)........................................................................... 17

*Gilman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir.
    2000) ............................................................................................................................. 16

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004)............................................. 16

*In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130 (Bankr. D. Me. 1991) ..........................15

ii

*In re NextWave Personal Commc'ns, Inc.,*
   244 B.R. 253 (Bankr. S.D.N.Y 2000) ............................................................15

*In re Patchell*, 344 B.R. 8 (Bankr. D. Mass. 2006) ........................................ 18

*IRS v. Kaplan (In re Kaplan)*, 104 F.3d 589 (3d Cir. 1997) ........................... 16

*Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*,
   114 F.3d 379 (2d Cir. 1997) ......................................................................15

*Nobelman v. Am. Sav. Bank*, 508 U.S. 324 (1993) ........................................ 14

*Noddings Inv. Group, Inc. v. Capstar Commc'ns*,
   Civ. No. 16538, 1999 Del. Ch. LEXIS 56 (Del. Ch. March 24, 1999)........................15

*Norte & Co. v. Manor Healthcare Corp.*,
   Nos. 6827, 6831, 1985 Del. Ch. LEXIS 526 (Del. Ch. Nov. 21, 1985) .............. 14, 15

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988)............................. 16

*Pitt News v. Fisher*, 215 F.3d 354 (3d Cir. 2000)............................................ 17

*Solow v. Kioi Real Estate Co.*,
   No. 92 Civ. 7562, 1994 U.S. Dist. LEXIS 1264 (S.D.N.Y. Feb. 4, 1994) ................ 19

*United States v. Broad. Music, Inc.*, 275 F.3d 168 (2d Cir. 2001) .....................19

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
   386 B.R. 17 (Bankr. D. Del. 2006) ............................................................ 17

*Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365 (2008) .................... 17

## STATUTES AND RULES

11 U.S.C. § 105............................................................................13, 16, 17

11 U.S.C. § 363.......................................................................... 13, 16, 17

11 U.S.C. § 541(a) ............................................................................. 13

## OTHER AUTHORITIES

2 <u>Collier on Bankruptcy</u> ¶ 105.03
   (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).............................. 17

<u>Ginsberg & Martin on Bankruptcy</u> § 5.101(B) (2009) ....................................15

Restatement (Third) of Agency § 5.03 (2006)................................................22

iii

## PRELIMINARY STATEMENT[1]

Law Debenture Trust Company of New York ("Law Debenture") has moved this Court to order disgorgement of reimbursements made by a non-Debtor pursuant to a valid and enforceable contractual obligation.[2] As the evidentiary record demonstrates, Law Debenture cannot prove any of its allegations, and the record and the law demonstrate that the requested relief should be denied.

In May 2007, Tribune Company ("Tribune") entered into a senior secured credit agreement (the "Credit Agreement" or "Agreement") with JPMorgan, as administrative agent ("Agent") and lender, and certain other lenders (collectively, the "Senior Lenders"). Pursuant to the express terms of the Credit Agreement, Tribune must pay and reimburse all fees and expenses incurred by the Agent in connection with the Agreement including, *inter alia*, attorneys' fees and expenses (collectively, the "Credit Agreement Expenses"). This obligation was independently guaranteed by more than fifty of Tribune's subsidiaries (the "Guarantor Subsidiaries") pursuant to a Guarantee Agreement (the "Guarantee").

In December 2008, Tribune and the majority, but not all, of its subsidiaries petitioned for reorganization under Chapter 11 of the Bankruptcy Code. Certain Guarantor Subsidiaries, including Tribune (FN) Cable Ventures, Inc. ("TCV"), did not

---

[1] JPMorgan Chase Bank, N.A. ("JPMorgan") hereby incorporates by reference the points it previously advanced in *JPMorgan Chase Bank, N.A.'s Objection to "Motion of Law Debenture Trust Company of New York to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments"*, dated November 20, 2009, and the arguments previously advanced by the Credit Agreement Lenders in *Credit Agreement Lenders' Statement and Joinder in JPMorgan Chase Bank N.A.'s Opposition to Motion of Law Debenture Trust Company of New York to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments*, dated November 20, 2009.

[2] Centerbridge Partners, L.P. ("Centerbridge") and Deutsche Bank AG ("Deutsche Bank") have joined in Law Debenture's motion.

file (collectively, the "Non-Debtor Guarantors"). Following Tribune's bankruptcy, the Agent, pursuant to the Guarantee, demanded reimbursement of the Credit Agreement Expenses from the Non-Debtor Guarantors. After a lengthy period of negotiation and disclosure to the Official Committee of Unsecured Creditors appointed in the Debtors' cases (the "Committee") and to the Office of the United States Trustee (the "U.S. Trustee"), in March 2009, TCV commenced reimbursing the Credit Agreement Expenses pursuant to the Guarantee.

Ignoring both the facts and black-letter corporate and bankruptcy law, Law Debenture asserts that the above-described reimbursements are somehow improper, and hinges this assertion upon an argument that Tribune's decision not to notify the Court of the reimbursements proves a bad-faith scheme. This theory is legally wrong and the facts it purports to rely upon are demonstrably false.

First, the unambiguous contractual obligations contained in the Credit Agreement and the Guarantee, which are ignored by Law Debenture, obligate TCV to make the reimbursements at issue.

Second, TCV, a non-debtor, is a separate and independent corporate entity that is paying its debts, including the payments for Credit Agreement Expenses, as they come due in the ordinary course of business. None of the reimbursements were made with debtor assets.

Third, the undisputed facts demonstrate that there was no secret "scheme" to defraud. Both the Committee and the U.S. Trustee were fully informed and updated regarding the Credit Agreement Expense reimbursements – indeed the Committee sought and received certain changes to the agreement to reimburse before it was finalized.

2

Moreover, the creditor interests now represented by Law Debenture were, at all times prior to Law Debenture's appointment, represented on the Committee by Deutsche Bank.[3]  It is only now, in the midst of plan negotiations and nearly a year after Deutsche Bank received notice of the reimbursements, that these non-debtor reimbursements are being challenged.  Law Debenture's motives for doing so (and Centerbridge's motives for joining it) are obvious – they hope to somehow embarrass or pressure its plan negotiation counterparties, including the Debtors and the Agent, by leading the Court to believe, without foundation, that the Debtors and the Agent did something nefarious as part of an alleged "scheme."  Because the law and the facts do not support Law Debenture's cynical attempts to gain such an unwarranted advantage, the relief requested must be denied.

## BACKGROUND

**A.    Pre-Bankruptcy Agreements**

In 2007, Tribune executed a leveraged buyout comprised of two distinct transactions.  The first, a recapitalization transaction consisting of a public tender of Tribune shares in April and May 2007, was financed by funds borrowed pursuant to the May 17, 2007, Credit Agreement.  The second, a merger transaction consisting of a merger of a newly formed ESOP subsidiary with and into Tribune, which closed on December 20, 2007, was financed, in part, through increased lending under the Credit

---

[3] Law Debenture was appointed indenture trustee at Centerbridge's request after Centerbridge acquired a majority of one series of Tribune notes.  Melwani 40:18-40:22; Melwani Ex. 3 (Jt. Ex. 7). Centerbridge is, by its own description, a private investment firm whose "primary purpose [is] obtaining influence or control over the restructuring of financially troubled companies."  Melwani Ex. 4 (Jt. Ex. 7); Melwani 52:8-52:18.

Agreement and an additional December 2007 interim loan agreement (the "Bridge

Agreement"). All of the borrowings were guaranteed by the Guarantor Subsidiaries.

1.    The Credit Agreement

Tribune and the Senior Lenders executed the Credit Agreement on May 17, 2007.

Larsen Ex. 8 (Jt. Ex. 5); Stip. ¶ 1.[4] Among other things, the Agreement provided for

$7.015 billion in financing for the first transaction and, if certain conditions were met,

$2.105 billion in financing for the second transaction. Larsen Ex. 8 (Jt. Ex. 5).

The Credit Agreement contains two provisions related to expenses, which require

the payment and reimbursement of the reasonable fees and expenses incurred by the

Agent and Senior Lenders in connection with the Credit Agreement. *Id.*; Stip. ¶¶ 3-4.

The first of those provisions states, in pertinent part:

> Borrower further agrees to pay promptly following demand all
> reasonable and documented out-of-pocket costs and expenses of the Agent,
> the Lead Arrangers and the Lenders, if any (including without limitation,
> reasonable and documented counsel fees and expenses), in connection
> with the enforcement (whether through negotiations, legal proceedings or
> otherwise) of this Agreement, the Notes and the other documents to be
> delivered hereunder, including, without limitation, reasonable and
> documented fees and expenses of counsel for the Agent and each Lender
> in connection with the enforcement of rights under this Section 8.04(a).

Larsen Ex. 8 (Jt. Ex. 5); Stip. ¶ 3.

The second provision provides:

> Borrower agrees to indemnify and hold harmless the Agent . . . and
> each Lender . . . from and against any and all claims, damages, losses,
> liabilities and expenses (including, without limitation, reasonable fees and
> expenses of counsel) incurred by or asserted or awarded against [the
> Agent and Lenders] in each case arising out of or in connection with or by

---

[4] "Jt. Ex. ___" citations are to the Joint Exhibit List. "Stip. ___" citations are to the Stipulated Facts. Both the Joint Exhibit List and the Stipulated Facts have been filed by Law Debenture on behalf of all party signatories.

reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) the Advances, the Notes, this Agreement, any Letter of Advances or Letters of Credit.

Larsen Ex. 8 (Jt. Ex. 5); Stip. ¶ 4.

2.    The Guarantee Agreement

On June 4, 2007, at the closing of the tender offer financing, a majority of the Guarantor Subsidiaries entered into the Guarantee. Jt. Ex. 8; Stip. ¶ 5. Under the terms of the Guarantee, the Guarantor Subsidiaries agreed to serve as primary obligors, with independent liability for the payment and performance of the borrower's obligations under the Credit Agreement. Stip. ¶ 5. Specifically, the Guarantor Subsidiaries guaranteed both "the Obligations" and "the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrower and each Loan Party under or pursuant to the Credit Agreement." *Id.*

3.    The Bridge Agreement and Guarantee

On December 20, 2007, the day the merger closed, Tribune entered into the $1.6 billion Bridge Agreement, for which Merrill Lynch Capital Corporation ("Merrill Lynch") served as administrative agent (the "Bridge Agent"). Stip. ¶ 6. The Bridge Agreement contains the same reimbursement and payment language that appears in the Credit Agreement. Stip. ¶ 7. The Bridge Agreement also is guaranteed by the Guarantor Subsidiaries pursuant to a separate guarantee agreement (the "Bridge Guarantee"). Jt. Ex. 9; Stip. ¶ 8. The Bridge Guarantee is subordinated to the Guarantee. Jt. Ex. 9; Stip. ¶ 9.

B.    **Tribune's Bankruptcy Filing**

1.    Pre-Petition Payment of Professional Fees and Expenses

In November 2008, JPMorgan, in its capacity as Agent and aware that Tribune

was in danger of violating its loan covenants, notified Tribune that it had retained Davis

Polk & Wardwell LLP ("Davis Polk") as counsel and FTI Consulting, Inc. ("FTI") as

financial advisor, and requested payment of fees and expenses under Section 8.04 of the

Credit Agreement.  Stip. ¶¶ 17-18; Kulnis 20:5-20:11, 23:3-23:10.  Tribune agreed to

make payment and, on December 1, 2008, wired a $2 million retainer to JPMorgan.[5]

Kulnis Ex. 3 (Jt. Ex. 4); Stip. ¶ 19.

2.    Tribune's Chapter 11 Filing

On December 8, 2008, Tribune and 110 of its subsidiaries filed voluntary

petitions for relief under Chapter 11 of the Bankruptcy Code.  Stip. ¶ 22.  Certain

subsidiaries – including the Chicago Cubs Major League Baseball franchise (the "Cubs")

and TCV – did not file because of concerns about the impact a filing could have on their

businesses.  Stip. ¶ 25; Larsen 17:2-20:23, 54:21-55:16.  The Cubs were seeking a buyer

and worried that a filing would disrupt that process, while TCV was concerned that a

filing would compromise a valuable partnership agreement.  Larsen 17:6-17:12, 18:21-

20:23, 21:19-22:6, 54:21-55:16, 143:21-144:22.  The Agent had no involvement, input,

or authority with respect to any decisions as to whether or not any entity should file.

Kulnis 29:5-29:24; Larsen 48:9-48:21.

---

[5] Of the $2 million wired, Davis Polk and FTI received $750,000 and $500,000, respectively, on December 2, 2008; FTI received an additional $250,000 on December 4, 2008, and Davis Polk received an additional $500,000 on December 5, 2008.  Stip. ¶¶ 20-21.

Shortly thereafter, the U.S. Trustee appointed nine members to the Committee, including Deutsche Bank and Wilmington Trust Corp. ("Wilmington Trust"), indenture trustees for Tribune's pre-petition senior and junior bonds, respectively.[6] Stip. ¶¶ 11-14, 26-27. As one of Tribune's largest creditors, JPMorgan was appointed to serve on the Committee in its capacity as a lender under the Credit Agreement. Stip. ¶ 28. JPMorgan's counsel, Davis Polk, records and bills JPMorgan for time and expenses incurred in connection with its Committee work separately from work that Davis Polk performs for JPMorgan in its capacity as Agent. Stip. ¶¶ 58, 77. JPMorgan has not sought reimbursement from the Non-Debtor Guarantors for such work. *Id.*

**C.    Negotiations Regarding Reimbursement of Fees
and Expenses and Full Disclosure to the Committee**

After the bankruptcy filing, the Agent fielded numerous requests from Senior Lenders regarding reimbursement of fees and expenses. Kulnis 80:24-82:9. Pursuant to the Guarantee, the Senior Lenders have the right to enforce the Credit Agreement obligations in whole or in part against the Non-Debtor Guarantors, including, *inter alia*, the right to seek reimbursement of fees and expenses. Jt. Ex. 8, § 1. Absent reimbursement from Tribune or the Non-Debtor Guarantors, pursuant to the Credit Agreement the Senior Lenders were responsible for the professional fees and expenses incurred by the Agent in enforcing these obligations. Larsen Ex. 8, § 7.05 (Jt. Ex. 5).

Consequently, the Agent and a group of Senior Lenders (the "Steering Lenders") initiated discussions with Tribune and the Non-Debtor Guarantors regarding reimbursement by the Non-Debtor Guarantors of their professional fees and expenses

---

[6] Centerbridge did not seek appointment to the Committee when it was initially formed. Melwani 30:19-30:22.

pursuant to the Guarantee. Stip. ¶ 29; Kulnis 30:21-31:23; *see also* Kulnis 81:17-81:22.

One option considered was for the Non-Debtor Guarantors to make payment in

connection with the execution of a formal forbearance agreement. Stip. ¶ 30; Kulnis

30:8-30:11; Larsen 58:19-59:17. Several draft forbearance agreements were exchanged,

all of which contemplated that Tribune would be a signatory and that Tribune would seek

Court approval to enter into the agreement. Stip. ¶¶ 31, 33, 36; Larsen Exs. 9-10

(Jt. Ex. 5); Jt. Ex. 6.

Ultimately, the parties were unable to reach agreement on the terms of a formal

forbearance agreement due to disagreement about, among other issues, the duration of a

forbearance period and whether Tribune should have the right to unilaterally terminate

the agreement upon written notice. Stip. ¶ 41; Kulnis 49:14-49:22, 66:2-66:25; Larsen

68:13-69:8. The parties also disagreed about the extent to which a formal forbearance

agreement would require Tribune to disclose sensitive information about a potential Cubs

transaction. Larsen 66:23-68:12. The need for Court approval was not among the

reasons a formal forbearance agreement was abandoned; indeed, until Tribune broached

the idea of proceeding without the participation of the Debtors in late January 2008, the

Senior Lenders believed that any forbearance agreement would be submitted to the Court

for approval. Stip. ¶ 37; Kulnis Ex. 6 (Jt. Ex. 4); Kulnis 46:7-47:5, 65:18-65:66:11;

Larsen 69:17-69:21, 86:11-86:18.

On or around January 30, 2009, the parties reached an informal agreement in

principle to reimburse the Credit Agreement Expenses. Stip. ¶¶ 42, 43; Larsen 72:15-

72:19. Under that proposed agreement, the Non-Debtor Guarantors would reimburse the

Agent's and certain Senior Lenders' Credit Agreement Expenses directly pursuant to the

Guarantee.  Larsen 72:17-72:19.  In exchange, the Agent agreed to deliver a payment

blockage notice to Merrill Lynch as Bridge Agent, since the Bridge Agent, on January 14,

2009, had demanded reimbursement of its fees and expenses.  Stip. ¶¶ 35, 42; Kulnis

71:23-73:4; Larsen 72:20-73:15.  Absent the payment blockage notice – which asserted

the Guarantee's superiority over the Bridge Guarantee – the Non-Debtor Guarantors were

contractually obligated to make payment to the Bridge Agent.  Stip. ¶ 7-8; Jt. Ex. 9.  The

Agent and the Steering Lenders also informally agreed that, provided the fees and

expenses were reimbursed, they would not take any further action to enforce the

obligations under the Credit Agreement against the Non-Debtor Guarantors.  Kulnis

72:21-73:4; Larsen 72:9-21.  To date, neither the Agent nor any Senior Lender has

initiated any enforcement action against the Non-Debtor Guarantors.  Stip. ¶ 80.

As part of the proposed agreement, the parties also agreed that full disclosure

would be made to the Committee prior to any payments being made.  Stip. ¶¶ 40, 46.  In

late January and early February 2009, the Agent's counsel and the Debtors' counsel,

Sidley Austin LLP ("Sidley"), contacted the Committee's counsel, Chadbourne & Parke

LLP, regarding the proposed agreement.  Over several weeks, the Debtors, the

Committee, the Agent, and their respective counsel had numerous discussions regarding

the proposed agreement, including retainer amounts, information that would be provided

to the Committee, and rights to be reserved by the Committee.  Stip. ¶¶ 45-47, 51, 55-56;

Kulnis Exs. 10-12 (Jt. Ex. 4); Kulnis 76:6-76:21, 95:5-97:5.  A presentation was also

made by the Agent to the Committee on February 12.  Stip. ¶ 45; Kulnis 90:20-94:24.

Considerable discussion focused on the scope and terms of the Agent's

engagement of Blackstone Group L.P. ("Blackstone") as investment banking advisor.

Stip. ¶¶ 50, 51.  After exchanging drafts of Blackstone's engagement letter,[7] on February 24, 2009, Davis Polk outlined a proposed agreement regarding the reimbursement of Blackstone's fees whereby, *inter alia*, any retainer would not be used to pay a "success" fee and the Agent agreed to reduce its requested retainer by $1 million to effectively cover a five-month "trial" period.  Stip. ¶ 51; Kulnis Ex. 12 (Jt. Ex. 4).

**D.     Agreement Regarding Reimbursement of Professional Fees and Expenses and Disclosure to the U.S. Trustee**

Following additional deliberations and discussions, on February 26, 2009, the Committee agreed not to object to the Agent's request for fees and expenses, subject to an email exchange outlining the agreement.  Stip. ¶¶ 55-56.  That same day, the Agent and Steering Lenders delivered letters to the Non-Debtor Guarantors requesting reimbursement pursuant to the Guarantee, and the Agent delivered a payment blockage notice to the Bridge Agent.  Stip. ¶¶ 52-54; Jt. Ex. 17.

On February 27, 2009, the Committee confirmed in writing that it would not object to the reimbursement of fees and expenses by the Non-Debtor Guarantors subject to certain agreed-upon conditions including, *inter alia*,

---

[7] At the December 1, 2009, hearing, counsel for Law Debenture stated that "Blackstone required, at least I have a draft, I don't have a final agreement – and the parties can correct me if the final agreement was not signed – but Blackstone on a post-petition basis required that debtors sign an agreement." December 1, 2009, Hearing, 88:2-6 (Dkt. No. 2749).  Counsel for Law Debenture should now consider himself corrected.  As the nine drafts (representing four distinct versions) of the Blackstone engagement letters produced to Law Debenture prior to the December 1, 2009, hearing indicate, Tribune was listed as a signatory in only the first, and earliest, draft.  Stip. ¶ 44.  Regarding fees, that draft, distributed on February 6, 2009, stated that the "fees and expenses payable to Blackstone pursuant to this Agreement shall be payable by the Company in accordance with the provisions of Section 8.04 of the Credit Agreement." *Id.* Debtors were not listed as signatories in any of the subsequent drafts produced to Law Debenture; only the Non-Debtor Guarantors were listed as signatories.  Stip. ¶¶ 50, 58.  The final draft produced to Law Debenture prior to the hearing, as well as the final execution copy of the Agreement subsequently produced to Law Debenture, list only the Non-Debtor Guarantors and state, with regard to fees, that "[a]ll fees and expenses payable to Blackstone pursuant to this Agreement are obligations of the Tribune Company in accordance with the provision of Section 8.04 of the Credit Facilities and presently payable by the Guarantors (as defined in the Credit Agreement) whom are not the subject of a case under Chapter 11 of Title 11 of the Bankruptcy Code." *Id.*

- that the Agent and Steering Lenders would only seek reimbursement of reasonable fees and expenses of Davis Polk; FTI; Richards, Layton & Finger PA, Delaware counsel for the Agent ("Richards Layton"); and Kramer Levin Naftalis & Frankel LLP, counsel for the Steering Lenders ("Kramer Levin");[8]

- that the agreement by the Committee not to object to the reimbursement of Kramer Levin's fees and expenses would be subject to the continuing condition that Kramer Levin be the only Senior Lender professional whose fees were reimbursed;

- that the Senior Lenders provide quarterly summaries of all fees; and

- that, before reimbursements commence, the Agent or Tribune notify the U.S. Trustee of the Non-Debtor Guarantors' intent to reimburse professional fees.

Stip. ¶ 56; Kulnis Ex. 13 (Jt. Ex. 4).

Debtors' counsel, Sidley, briefed the U.S. Trustee that same day.  Stip. ¶ 57;

Jt. Ex. 18.  The U.S. Trustee requested and received additional information from Davis

Polk, including copies of an executed version of the FTI engagement letter and a near-

final draft of the Blackstone engagement letter.   Stip. ¶ 58; Jt. Ex. 18.  Davis Polk also

confirmed (1) that it would not seek reimbursement for fees generated from its

representation of JPMorgan as a member of the Committee and (2) that JPMorgan would

not seek reimbursement of a Blackstone success fee without first advising the Committee.

Stip. ¶ 58; Jt. Ex. 18.  On March 4, 2009, Sidley presented to the U.S. Trustee a legal

memorandum concluding that the Non-Debtor Guarantors were contractually obligated,

pursuant to the Guarantee, to reimburse the Credit Agreement Expenses.  Stip. ¶ 59;

Jt. Ex. 19.

---

[8] On June 11, 2009, the Agent informed the Committee that, upon the advice of Tribune that the Agent retain FCC Counsel, it had retained Wiley Rein LLP ("Wiley Rein").  Stip. ¶ 70.  The Committee did not object.

11

On March 10, 2009, Sidley communicated to the U.S. Trustee that the Non-Debtor Guarantors intended to commence reimbursement of the Credit Agreement Expenses on March 12, 2009.  Stip. ¶ 61; Jt. Ex. 20.  The U.S. Trustee acknowledged receipt and responded that "[t]o the extent that we have something to communicate to you on this point, we will do so."  Stip. ¶ 62; Jt. Ex. 20.  The U.S. Trustee never raised any subsequent objection to the reimbursements.

**E.**    **Payments**

TCV commenced reimbursement of the Agent's and Steering Lenders' Credit Agreement Expenses on March 12, 2009.  Stip. ¶ 66.  Pursuant to the agreement, TCV paid a $7,500,000 retainer.  Stip. ¶ 69.  To date, TCV has made payments to reimburse fees and expenses totaling $16,194,803.53.  *Id.*

As agreed, the Agent provided the Debtors monthly invoices of fees and expenses, and provided the Committee with quarterly summaries.  Stip. ¶¶ 73-76.  In addition, Tribune has indicated that it has fully complied with all of its reporting obligations.  On July 29, 2009, the Debtors filed and served a Bankruptcy Rule 2015.3 report for all wholly owned non-Debtor subsidiaries, including TCV, on all creditors included on the Debtors' Rule 2002 notice list.  Dkt. No. 1863; Stip. ¶ 78.  The financial statements contained therein reflected both a net non-operating loss of $8.1 million (for fees and expenses accrued or paid through June 28, 2009) and payment of $7.5 million (for the retainer) within the balance sheet's section on "prepaid and other expenses."  Dkt. No. 1863.

# ARGUMENT[9]

Law Debenture's request for an order for disgorgement of past reimbursements and termination of future reimbursements should be denied.  First, Law Debenture has not identified any legal basis for relief.  It is undisputed that the obligation to reimburse fees is an obligation of the Non-Debtor Guarantors, who are separate and distinct corporate entities paying their debts as they come due in the ordinary course.  The monies paid were not property of the estate under Bankruptcy Code section 363, but were non-Debtor assets.  Second, Law Debenture has not made the required showing for an injunction under section 105.  Finally, Law Debenture's efforts to show a bad-faith scheme to deplete Debtor assets fails, as the evidence demonstrates that the parties acted in good faith, in a transparent manner, and pursuant to contractual rights and obligations.

## A.    The Monies Used to Reimburse Were Not Estate Property

It is an undisputed fact that all post-petition payments of fees were made by TCV, a non-Debtor.  No property of any debtor's estate is at issue.  Law Debenture's argument that Section 363 applies here evinces a fundamental misstatement of the principles of the Code and feigned ignorance of basic corporate law principles.

Section 363(b) plainly states that, in order for assets to come within the scope of that section's "notice and hearing" requirement, the assets *must* constitute "property of the estate."  11 U.S.C. § 363(b).  "Property of the estate," in turn, is defined by 11 U.S.C. § 541(a), which provides that estate property includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  To

---

[9] In its Motion, Law Debenture moves for three types of relief:  termination of the reimbursement payments, disgorgement of prior payments, and an accounting of fees paid.  Because an accounting has already been provided, only the first two issues remain for this Court.

determine whether particular property falls within this definition, courts look to the

applicable state's non-bankruptcy law. *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329

(1993) ("In the absence of a controlling federal rule, we generally assume that Congress

has 'left the determination of property rights in the assets of a bankrupt's estate to state

law,' since such 'property interests are created and defined by state law.'") (quoting

*Butner v. United States*, 440 U.S. 48, 54 (1979)).

The law of Delaware, where TCV is incorporated, applies here. In Delaware, as

elsewhere, a subsidiary "is an entity, distinct from its stockholders even if the

subsidiary's stock is wholly owned by one . . . corporation." *Buechner v. Farbenfabriken*

*Bayer Aktiengesellschaft*, 154 A.2d 684, 686-87 (Del. 1959). *See also Dole Food Co. v.*

*Patrickson*, 538 U.S. 468, 474 (2003) ("A basic tenet of American corporate law is that

the corporation and its shareholders are distinct entities."). While a corporate parent may

own a subsidiary's shares, it does not own the subsidiary's assets. *du Pont v. du Pont*,

208 A.2d 509, 512 (Del. 1965) ("The shareholder has essential rights to share in the

profits and in the distribution of assets on liquidation, *but no specific interest in the*

*corporate assets*.") (emphasis added); *Bird v. Wilmington Soc. of Fine Arts*, 43 A.2d 476,

483 (Del. 1945) ("The owner of the shares of stock in a company is not the owner of the

corporation's property."); *see also Dole Food*, 538 U.S. at 475 ("A corporate parent

which owns the shares of a subsidiary does not, for that reason alone, own or have legal

title to the assets of the subsidiary."); *Amphenol Corp. v. Shandler (In re Insilco Techs.,*

*Inc.)*, 351 B.R. 313, 321 (Bankr. D. Del. 2006) (a parent corporation's sole ownership of

a subsidiary's shares did not create an interest in the assets or liabilities of the subsidiary,

which was a "distinct, separate legal entity"); *Norte & Co. v. Manor Healthcare Corp.*,

Nos. 6827, 6831, 1985 Del. Ch. LEXIS 526, at *9 (Del. Ch. Nov. 21, 1985) ("[T]he corporation is the legal owner of its property and the stockholders do not have any specific interest in the assets of the corporation."); Ginsberg & Martin on Bankruptcy § 5.101(B) (2009) ("[I]f the debtor owns shares in a corporation, the shares become property of the estate; the assets of the corporation do not."). Thus, the mere fact that a corporate parent (Tribune) has an equity interest in its subsidiary (TCV) is an insufficient basis on which to disregard the corporate form.[10] As the Court stated at the December 1, 2009 hearing:

> [A]s I look at this situation, . . . anything you take out in the way of value from a subsidiary, debtor or non-debtor, ultimately reduces value in the parent or somewhere up in the chain, maybe in more than one entity. So it seems to me that that can't be the basis for the relief that you request because if it were, then what would be the difference between a sub and a parent and a debtor's sub and a non-debtors sub?

December 1, 2009 Hearing, 84:12-19 (Dkt. No. 2749).

---

[10] In seeking to avoid this unremarkable conclusion, Law Debenture simply disregards the corporate form and these basic tenets of corporate law – not because there is any legal basis to do so, but because doing so leads to the result Law Debenture prefers. None of the cases Law Debenture cites for support, however, are apposite. In its initial moving brief, for example, Law Debenture cites three cases that indisputably involve property of a debtor's estate for the proposition that notice and a hearing were required, despite the fact that estate property is not at issue here. *See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne),* 114 F.3d 379, 384-85 (2d Cir. 1997) (involving undisputed estate property); *In re NextWave Personal Commc'ns, Inc.,* 244 B.R. 253, 267 & n.7 (Bankr. S.D.N.Y 2000) (involving licenses that were undisputed estate property); *In re Consol. Auto Recyclers, Inc.,* 123 B.R. 130, 140 & n.50 (Bankr. D. Me. 1991) (involving shares of stock that were acknowledged estate property).

Likewise, Law Debenture has not argued or cited any legal authority in support of an argument that TCV – a distinct corporate non-Debtor subsidiary established pre-petition for valid business reasons – should now have its corporate form disregarded entirely and consolidated into its debtor parent for the purposes of this motion. The cases cited in Law Debenture's initial reply papers involve either the collapsing of transactions or transactional form, not the elimination of corporate formalities, and are similarly inapplicable. *See Big V Supermarkets Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.),* 267 B.R. 71, 95 (Bankr. D. Del. 2001) (involving the question of whether a series of transactions should be collapsed into one); *European Amer. Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.),* 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993) (analyzing the form of a transaction); *Noddings Inv. Group, Inc. v. Capstar Commc'ns,* Civ. No. 16538, 1999 Del. Ch. LEXIS 56, at *2-4 (Del. Ch. March 24, 1999) (analyzing whether multiple transactions should be collapsed); *DMG, Inc. v. Aegis Corp.,* Civ. No. 7619, 1984 Del. Ch. LEXIS 597, at *2-6 (Del. Ch. June 29, 1984) (involving the viability of a merger transaction); *Boyarsky v. Froccaro,* 125 Misc. 2d 352, 361 (Sup. Ct. N.Y. 1984) (examining the form of a transaction).

Because the fee reimbursements did not involve property of the bankruptcy estate, Law Debenture has failed to state any basis for relief under Section 363. Any decision to the contrary would require this Court to simply disregard the fact that TCV is not a debtor and that, as a separate and distinct legal entity, TCV is obligated to honor its contractual obligations. Such an unprecedented and sweeping result is wholly unjustified.

**B.     Section 105 Cannot Be Used To Enjoin the Reimbursements**

Law Debenture's other stated basis for relief – the Court's All Writs power under 11 U.S.C. § 105(a) – is similarly misplaced.

Section 105(a) does not give courts the power to create rights otherwise unavailable under the Code. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004); *Gilman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 211 (3d Cir. 2000) ("[S]ection 105(a) has a limited scope."). Rather, a bankruptcy court's equitable powers "must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988); *In re Combustion Eng'g*, 391 F.3d at 236 ("The general grant of equitable power contained in § 105(a) . . . must be exercised within the parameters of the Code itself."); *see also IRS v. Kaplan (In re Kaplan)*, 104 F.3d 589, 597-98 (3d Cir. 1997) ("[T]he fact that a [bankruptcy] proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his [or her] personal views of justice and fairness, however enlightened those views may be.") (citations and quotation marks omitted). As Law Debenture has not, and cannot, identify any substantive right under the Code that has been violated, section 105 cannot form the basis for the relief requested.

16

Moreover, even had Law Debenture properly invoked a right under the Code, in order for an injunction to issue under section 105(a) the traditional standard for injunctive relief must be met. *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 386 B.R. 17, 42-43 (Bankr. D. Del. 2006); *see also* 2 Collier on Bankruptcy ¶ 105.03 & n.1, n.3 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (collecting cases applying the traditional test to requests for section 105(a) relief, and noting that the drafters of the 1978 Code envisioned that injunctions would be "issued under the usual rules for the issuance of injunctions"); *see also GAF Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 26 B.R. 405, 415 (Bankr. S.D.N.Y 1983). Under that standard, Law Debenture must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in its favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008); *Pitt News v. Fisher*, 215 F.3d 354, 366 (3d Cir. 2000). As with traditional injunctive relief, the burden rests with the party seeking the injunction. *See* 2 Collier on Bankruptcy ¶ 105.03 ("A plaintiff . . . must carry all burdens of production and persuasion."); *see also Chase Manhattan Bank v. Third Eighty-Ninth Assocs. (In re Third Eighty-Ninth Assocs.)*, 138 B.R. 144, 146 (S.D.N.Y. 1992). Law Debenture did not even attempt to meet this standard when it filed its motion and cannot do so now.

## C.    The Payments Were and Are Proper

Aside from sections 105(a) and 363(b) – neither of which apply – Law Debenture identifies no basis for relief. Instead, it argues that the reimbursements are somehow indicative of a bad-faith "scheme." But as shown below, there is no basis for this

17

argument.  Indeed, the record demonstrates a good faith, robust negotiation process with full disclosure to potential parties in interest.

        1.     The Non-Debtor Guarantors Have Binding Contractual Obligations

        The Non-Debtor Guarantors have a valid and enforceable contractual obligation under the Guarantee to reimburse fees and expenses incurred by the Agent under the Credit Agreement.  Both the Credit Agreement and Guarantee are unambiguous.  The former defines reimbursable fees and expenses as including all those incurred in connection with the Credit Agreement, Stip. ¶¶ 3, 4, and the latter mandates that the Non-Debtor Guarantors are independently responsible for payment of such fees and expenses, Stip. ¶ 5.  For more than a year, no one disputed the validity of these provisions or their applicability to the circumstances presented here.  Until December 1, 2009, TCV met its obligations under the Credit Agreement and Guarantee in the ordinary course of business.

        Law Debenture argues that the Credit Agreement does not authorize the payments because Section 8.04(a)'s "enforcement" clause does not allow reimbursement under these circumstances.  However, Section 8.04(a)'s "enforcement" provision is broad and calls for the reimbursement of fees in connection with enforcement "*whether through negotiations, legal proceedings, or otherwise.*"  Larsen Ex. 8 (Jt. Ex. 5); Stip. ¶ 3 (emphasis added).  The reimbursements at issue here handily fall within the scope of this language.  *Cf. In re Patchell*, 344 B.R. 8, 13 (Bankr. D. Mass. 2006) (authorizing attorneys' fees under an agreement allowing for reimbursement in connection with enforcement "whether or not a lawsuit is filed").

Courts applying New York Law[11] to contractual "enforcement" language similar to that found in Section 8.04(a) regularly find professional fees reimbursable. *See Amresco Fin. I, L.P. v. Stone-Tec, Inc.*, No. 98 Civ. 2872, 1998 U.S. Dist. LEXIS 19751, at *10 (S.D.N.Y. Dec. 18, 1998) (attorneys' fees awarded based on contractual language calling for the payment of fees incurred "in connection with the collection of amounts due hereunder or enforcing any of its rights hereunder"); *Solow v. Kioi Real Estate Co.*, No. 92 Civ. 7562, 1994 U.S. Dist. LEXIS 1264, at *3-5 (S.D.N.Y. Feb. 4, 1994) (upholding an obligation to pay attorneys' fees based on contractual language providing for payment of fees incurred "in connection with the enforcement of [the agreement]"). Law Debenture offers no contrary authority.[12]

Moreover, Section 8.04(b) forms an independent basis for payment and does not include the "enforcement" language about which Law Debenture bickers. As Section 8.04(b) states, all fees and expenses incurred by the Agent or Senior Lenders in connection with the Credit Agreement, including attorneys' fees incurred in defending against any and all claims and losses, must be paid. Larsen Ex. 8(Jt. Ex. 5); Stip. ¶ 4. For this reason alone, Law Debenture's argument fails.

2.      The Non-Debtor Guarantors Received Value

Law Debenture incorrectly argues that the Non-Debtor Guarantors received nothing in exchange for the payments, and that this is probative of an alleged scheme.

---

[11] A choice of law provision provides that New York law applies. *See* Larsen Ex. 8 (Jt. Ex. 5), at § 8.09; *see also* Jt. Ex. 8, at § 13.

[12] Instead, Law Debenture cites two cases standing for broad, generally applicable contract-interpretation principles, neither of which supports its argument. *See United States v. Broad. Music, Inc.*, 275 F.3d 168, 175 (2d Cir. 2001) (holding that deference must be paid to language's plain meaning); *Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 988 (2d Cir. 1991) (holding that contract language is unambiguous when it has "a definite and precise meaning").

This argument is a red herring: it is axiomatic that the Agent and the Senior Lenders should not have to "pay" to enforce their contractual rights and TCV's contractual obligations. Moreover, the Non-Debtor Guarantors did, in fact, negotiate for and receive considerable benefits in exchange for making payment. First, payment was expressly conditioned upon delivery of a Payment Blockage Notice from the Agent to the Bridge Agent. Stip. ¶¶ 42, 54; Kulnis 71:23-73:4; Larsen 72:20-73:15. That notice precludes the Bridge Agent from seeking fees or taking any further enforcement action against the Non-Debtor Guarantors, something that the Bridge Agent had already begun to do. Stip. ¶ 35; Larsen Ex. 23 (Jt. Ex. 5). Second, the Agent and Senior Lenders have voluntarily refrained from taking any additional action to enforce their rights under the Credit Agreement against the Non-Debtor Guarantors pursuant to the Guarantee, including the right to seek payment in full of the outstanding debt. Larsen Ex. 8 (Jt. Ex. 5), at § 6.01; Kulnis 72:21-73:4; Larsen 72:16-21. There can be no dispute that this has been of considerable benefit to the Non-Debtor Guarantors.

       3.      Law Debenture's "Failure-To-Disclose" Argument Is Without Merit

Law Debenture contends that an alleged "scheme" is evidenced by the fact that the reimbursements were not disclosed to the Court. However, the evidence is clear that Tribune believed at the time, in good faith, that disclosure to the Court was not required by law and the applicable rules. Moreover, there was full and timely disclosure and transparency between and among numerous parties-in-interest and every opportunity to object and/or bring the fact of the reimbursements to the Court's attention if it were believed that such disclosure was warranted or required.

The evidence is clear and indisputable that extensive disclosure regarding the reimbursements was made to the Committee both before and after the reimbursements commenced. The Committee was actively involved in the negotiations and provided considerable input as to what fees should be reimbursed, in what manner, and in what amount. All creditor interests, *including those now represented by Law Debenture*, were represented on the Committee throughout this time by Deutsche Bank. Furthermore, the Committee was provided with the opportunity to object – and the Committee or any of its members, including Law Debenture's predecessor indenture trustee, could have brought reimbursement of the Credit Agreement Expenses to the Court's attention or, at a minimum, requested that the Debtors do so. Instead these parties made the affirmative decision not to object to the reimbursements, provided certain conditions were met. Stip. ¶¶ 55-56. And *no one* thought that disclosure to the Court was required or necessary.[13]

In addition, Tribune and the Agent communicated with the U.S. Trustee on this issue. Stip. ¶¶ 57-62. The U.S. Trustee requested and received from Tribune and/or the Agent, among other things, a legal memorandum from Tribune describing the Non-Debtor Guarantors' binding contractual obligations to make payment, a copy of the Credit Agreement, a copy of the Guarantee, copies of certain professionals' engagement letters, and assurances from the Agent that expenses for work performed by JPMorgan in its capacity as a Committee member would not be reimbursed. Jt. Exs. 18, 19;

---

[13] It is telling that when Law Debenture contends it first obtained actual knowledge of the payments on September 17, 2009, its reaction was to do nothing. Law Debenture did not contact Tribune, did not seek information from its predecessor trustee, and did not even raise the propriety of the payments with its counsel. Heaney 45:11-47:22. Indeed, the first time Law Debenture had any discussions with its counsel regarding the issue was after counsel presented Law Debenture with an unsolicited draft of a motion to disgorge the payments. *Id.* at 49:2-5, 49:16-19. Against this backdrop, the true motivation behind this motion – to seek additional negotiating leverage – becomes clear.

Stip. ¶¶ 58, 59.  After providing the information requested, Tribune informed the U.S.

Trustee that reimbursement would commence.  Stip. ¶ 61; Jt. Ex. 20.  The U.S. Trustee

informed Tribune that "to the extent that we have something to communicate to you on

this point, we will do so."  Stip. ¶ 62; Jt. Ex. 20.  Tribune received no additional

communications.  Certainly, had the U.S. Trustee believed it appropriate or necessary to

raise with the Court the issue of the arrangements or any of the reimbursements, the U.S.

Trustee could have said so or done so.  Indeed, at the time the decision was made, *no one*

expressed the view that disclosure was required.  In the face of these facts, Law

Debenture's accusations of a "scheme" fall flat, for any such "scheme" would have had

to necessarily include the members of the Committee (including Deutsche Bank) and the

creditor interests they represented,[14] and the U.S. Trustee.

---

[14] Under broadly applicable agency principles, the knowledge of an agent acting within the scope of its authority is imputed to the principal. *See, e.g.*, Restatement (Third) of Agency § 5.03 (2006) ("[N]otice of a fact an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal.").

22

## CONCLUSION

For the foregoing reasons, JPMorgan requests that the Court deny Law

Debenture's Motion.

Dated: March 2, 2010
       Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Dennis E. Glazer
Karen E. Wagner
Sharon Katz
Michael Russano
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for JPMorgan Chase Bank, N.A.*

23